# Exhibit 11, Part 1 of 3

U.2023.3198

U.2023.3198

***Assessment of interest on intra-group loans to foreign companies (beneficial-owner) according to the Danish Corporation Tax Act, EU directives and double taxation treaties.***

*EU Law 2 - International Law 5 - Taxes 311.2, 311.9 and 72.1.*

The two cases concerned in particular whether there was an obligation to withhold tax on interest on intra-group loans granted by foreign group companies. The cases were to be assessed under Danish tax legislation, the EU Interest/Royalty Directive and double taxation treaties with the Nordic countries and Luxembourg. With regard to a number of general questions about the term "beneficial owner" and when there is an abuse of rights under EU law, the Supreme Court referred to the Supreme Court's judgment in U 2023.1575, which concerned cases concerning dividends distributed to foreign parent companies. In both cases, the Supreme Court stated that a restructuring had been carried out in the group, which included the contribution of companies in Sweden and Luxembourg respectively, and that this restructuring had to be seen as an overall and pre-arranged tax arrangement. The Supreme Court also ruled that the contributed companies had to be considered flow-through companies that did not enjoy protection under the Interest/Royalty Directive or under the double taxation treaties. According to the information provided by the parties, it could not be determined what had happened to the interest after it had flowed through the contributed companies, and it could therefore not be determined who was the beneficial owner of the interest. The Supreme Court then ruled that the tax arrangements constituted abuse and that interest tax of approximately DKK 369 million and approximately DKK 817 million respectively should have been withheld.[1]

**3199**

**H.D. May 4, 2023** *in cases 116/2021 and 117/2021 (1st instance)*

(Jens Peter Christensen, Vibeke Rønne, Michael Rekling, Lars Hjort-Næs, Jan Schans Christensen, Ole Hasselgaard and Rikke Foersom).

*Takeda A/S under voluntary liquidation (attorneys Lasse Esbjerg Christensen and Søren Lehmann Nielsen, both Copenhagen) NTC Parent S.à.r.l. (adv. Arne Møllin Ottosen, Copenhagen) against Ministry of Taxation (attorney Søren Horsbøl Jensen, Copenhagen)*

# Eastern High Court's judgment of November 25, 2021, B-2942-12 and B-171-13

## I. The claims made and the background of the cases

*B-2942-12 Takeda A/S under voluntary liquidation v Skatteministeriet*

On 13 December 2010, SKAT ruled that Nycomed A/S pursuant to section 65 D of the Danish Withholding Tax Act, cf. section 2(1)(d) of the Danish Corporation Tax Act, was obliged to withhold tax at source on the interest write-ups made in the period 2007-2009 on a loan granted to the company by its parent company, Nycomed Sweden Holding 2 AB, totaling DKK 392,161,097. SKAT has subsequently reduced the amount to DKK 369,057,895.

In 2011, Takeda Pharmaceutical Company Limited acquired the shares in Nycomed A/S, which subsequently changed its name to Takeda A/S.

SKAT's decision was appealed to the National Tax Tribunal, but before the National Tax Tribunal made a decision in the case, the case was brought before the Court in Roskilde on July 9, 2012 in accordance with the Tax Administration Act.

§ Section 48(2). By order of August 24, 2012, the Court in Roskilde referred the case to the Eastern High Court pursuant to section 226(1) of the Administration of Justice Act.

*The applicant, Takeda A/S in voluntary liquidation,* claims that the Court should

Principle: The Ministry of Taxation must recognize that Takeda A/S in voluntary liquidation is not liable to withhold tax at source on interest of DKK 115,516,013, DKK 138,380,325 and DKK 115,161,557, in total DKK 369,057,895, corresponding to 25% of the interest accrued in 2007, 2008 and 2009 on the loan from Nycomed Sweden Holding 2 AB, and that Takeda A/S in voluntary liquidation is not liable to pay the amounts not withheld.

In the alternative (ancillary claims):

(A) The Ministry of Taxation must acknowledge that the withholding tax claims against Takeda A/S under voluntary liquidation for the years 2007, 2008 and 2009 are reduced by DKK 1,615,932, DKK 1,935,776 and
1,610,973 kr.

(B) The case is also referred back to the Danish Tax Agency for reconsideration with a view to reducing the withholding tax claim to DKK 0 to the extent it is documented that the direct or indirect investors in Nycomed S.C.A., SICAR at the time of the interest accruals on December 27, 2007, December 27, 2008 and December 27, 2009 were 1) the "beneficial owners" of the interest in question pursuant to a double taxation treaty between the state of domicile and Denmark, or 2) natural persons.

With respect to the Ministry of Taxation's motion to dismiss the subjective claim B), Takeda A/S under voluntary liquidation has claimed acquittal.

*The defendant, the Danish Ministry of Taxation,* has against Takeda A/S under voluntary liquidation main claim and alternative claim A) claimed acquittal.

With regard to the company's alternative claim B), the Ministry of Taxation's main claim is rejection, alternatively acquittal.

*B-171-13 NTC Parent S.a.r.l. v. Ministry of Taxation*

On March 18, 2011, SKAT ruled that Nordic Telephone Company Investment ApS, pursuant to section 65 D of the Withholding Tax Act, cf. section 2(1)(d) of the Corporation Tax Act, was obliged to withhold tax on the paid/attributed interest on the shareholder loan between Nordic Telephone Company Investment ApS and the company Angel Lux Common S.a.r.l. for the period 1 May 2006 to 10 July 2008 totaling DKK 925,764,961. By decision of October 5, 2015, SKAT reduced the amount to DKK 817,238,912.

Nordic Telephone Company Investment ApS merged in 2009 with Nordic Telephone Company Administration ApS as the continuing company. In 2010, Nordic Telephone Company Administration ApS was dissolved through a tax-free cross-border merger with Angel Lux Common S.a.r.l., which subsequently changed its name to NTC S.A. and was subsequently liquidated with the transfer of i.a. the claim in this case to NTC Parent S.a.r.l. NTC Parent S.a.r.l. has paid the interest tax in question to SKAT. The case was brought by NTC Parent S.a.r.l.

---

**1**    See the legislative history etc. in the section on legal basis in the High Court's judgment. See also U 2023.1575H and the European Court of Justice's judgment of February 26, 2019 in the joined cases C-115/16, C-118/16, C-119/16 and C-299/16 and Niels Winther-Sørensen in RR.SM.2022.0001 "Comments on selected d e c i s i o n s  - Withholding tax on interest" and in SR.2023.0075 "Supreme Court judgment on dividend tax and beneficial ownership".

Copyright © 2023 Karnov Group Denmark A/S

SKAT's decision was appealed to the National Tax Tribunal, but before the National Tax Tribunal made a decision in the case, the case was brought before the Copenhagen City Court on September 17, 2012, cf. section 48(2) of the Tax Administration Act. By order of January 9, 2013, the Copenhagen City Court referred the case to the Eastern High Court pursuant to section 226(1) of the Danish Administration of Justice Act.

*The applicant, NTC Parent S.a.r.l., makes the* following final claims:

Principle: The Ministry of Taxation must recognize that there is no Danish limited tax liability on interest on loans between Nordic Telephone Company Investment ApS as debtor and Angel Lux Common

S.a.r.l. as a creditor in the income years 2006-2008.

In the alternative: The Ministry of Taxation shall recognize that the withholding tax claim shall be reduced by DKK 574,865,866 or such amount as otherwise determined by the court.

In the further alternative: The case is remanded to the Tax Agency for calculation of the reduction amounts.

In the main, in the alternative: The Ministry of Taxation must recognize that Nordic Te- lephone Company Investment ApS is not liable for withholding tax on interest on the PEC loans, cf. section 69 of the Withholding Tax Act.

*The Ministry of Taxation* has claimed acquittal.

**3200**

## II. Case presentation

*B-2942-12 Takeda A/S under voluntary liquidation (Takeda A/S) v Skatteministeriet*

*SKAT's decision of December 13, 2010*

On 13 December 2010, SKAT ruled that Nycomed A/S should have withheld withholding tax in connection with the interest imputations made in the years 2007-2009 in favor of the company's parent company, Nycomed Sweden Holding 2 AB, and Nycomed A/S was held liable for the tax. The interest write-offs in the period 2007-2009 amounted to DKK 462,064,052, DKK 553,521,299 and DKK 460,646,228 respectively. SKAT therefore levied interest tax pursuant to section 65 D of the Withholding Tax Act, cf. the Corporation Tax Act.

| Date of attribution | Amount EUR | Course |
|---|---|---|
| 27-12-2007 | 61.965.461 | 745,68 |
| 27-12-2008 | 74.258.291 | 745,40 |
| 27-12-2009 | 61.887.366 | 744,33 |
| In total | 198.111.118 | |

*Withholding tax on interest expenses*

*1. Facts of the case*

*1.1. Group and ownership structure*

Nycomed A/S is wholly owned by Nycomed Sweden Holding 2 AB. 96.85% of Nycomed Sweden Holding 2 AB is owned by Nycomed Sweden Holding 1 AB. The rest is owned by the group management. Sweden Holding 1 AB is wholly owned by Nycomed S.C.A., SICAR, which is ultimately owned by the investors behind the private equity funds. Nycomed Sweden Holding 2 AB and Nycomed Sweden Holding 1 AB are domiciled in Sweden, while Nycomed S.C.A., SICAR is domiciled in Luxembourg.

The group overview as of 31.12.2007 is attached as Appendix 1. The exact structure of the underlying part of the group, which consequently changes continuously, is not so crucial to this case,

§ Section 2(1)(d) with DKK 138,619,216 (30%) respectively, DKK 138,380,325 (25%) and DKK 115,161,557 (25%), totaling DKK 392,161,097

kr. The Ministry of Taxation has subsequently acknowledged that the withholding tax claim for 2007 must be reduced to DKK 115,516,013 (25%), so that the total withholding tax claim was DKK 369,057,895.

SKAT's decision of December 13, 2010 states, among other things:

"*Description of the company [Nycomed A/S]*

The company was founded for the purpose of acquiring the Nycomed Group in connection with a capital fund takeover thereof. The Company's activities consist solely of owning the shares in Nyco Holdings ApS, CVR no. 26812275, which at the time was the ultimate Danish holding company for the Group.

The Group is a European marketing-driven pharmaceutical company. The company sources, develops, manufactures and sells a wide range of prescription ('Rx') and other 'OCT' pharmaceutical and consumer health products.

In 1999, the group was acquired by a private equity fund established by Nordic Capital V Limited (Nordic Capital). In 2002, a new group of private equity funds and an investment company acquired the Group from Nordic Capital. These were the investment company Carillion and private equity funds established by CSFB Private Equity, The Blackstone Group International Limited (Blackstone) and NIB Capital Private Equity. Such advisors to the private equity funds are also called sponsors. In 2005, Nordic Capital bought back 46.8% of the group from the previous ownership group.

This was done by founding Nycomed A/S, which then acquired the then top Danish parent company in the group - Nyco Holding A/S, CVR no. 26812275.

At the end of 2006, the Group acquired the German pharmaceutical group Altana Pharma. This was done by Nycomed Danmark ApS founding the German holding company Nycomed Germany Holding GmbH, which then acquired the then top German parent company in the Group - Altana Pharma AG.

*Numerical inventory*

The following interest tax must be withheld:

| Amount in DKK | Interest tax in percent. | Interest tax in DKK |
|---|---|---|
| 462.064.052 | 30 | 138.619.216 |
| 553.521.299 | 25 | 138.380.325 |
| 460.646.228 | 25 | 115.161.557 |
| 1.476.231.579 | | 392.161.097 |

which is why only the overview as of 31.12.2007 is attached.

SKAT has asked the company about the ownership of Nycomed S.C.A., SICAR. In a letter dated November 19, 2010, A and B from KPMG replied on behalf of the company that the company is currently not in possession of detailed information about the group of owners, which is why this information cannot be submitted.

*1.2. Loan between Nycomed A/S and Nycomed Sweden Holding 2 AB* On December 27, 2006, Nycomed A/S borrowed EUR 501 million from Nycomed Sweden Holding 2 AB. According to clause 3.1 of the loan agreement, the debt bears interest at EURIBOR + 8.0 percentage points once a year. The loan is primarily used to refinance the existing PIK note loan raised in 2005 when Nycomed A/S acquired the Nycomed Group.

Unless otherwise agreed between the borrower and the lender, the interest is added to the principal, cf. clause 3.2 of the agreement.

The loan plus the interest accrued in accordance with clause 3.2 shall be repaid in full 10 years after the conclusion of the agreement, i.e. on December 27, 2016.

However, the borrower may at any time repay the loan in full or in part before then, cf. clause 4.2 of the agreement.

If interest tax is to be withheld, the borrower must increase their payment so that the lender receives the same payment as if no interest tax had been withheld.

**3201**

Interest expenses are booked as follows:

*Fiscal year 2006*

| Text | Amount |
|---|---|
| Calculated interest 27.12.2006 | EUR 837,087.50 |

*Fiscal year 2007*

| Text | Amount EUR |
|---|---|
| Rentetilskrivning 27.12.2006-26.12.2007 | 61.965.461,34 |
| Of which calculated interest 27.12.2006-31.12.2006 | -837.087,50 |
| Calculated interest 27.12.2007-31.12.2007 | 799.285,85 |
| Booked interest 2007 | 61.927.659,69 |

*Fiscal year 2008*

| Text | Amount EUR |
|---|---|
| Rentetilskrivning 27.12.2007-26.12.2008 | 74.258.290,72 |

| Text | Amount |
|---|---|
| Of which calculated interest 27.12.2007-31.12.2007 | -799.285,85 |
| Calculated interest 27.12.2008-31.12.2008 | 389.071,12 |
| Booked interest 2008 | 73.848.075,99 |

*Fiscal year 2009*

| Text | Amount EUR |
|---|---|
| Rentetilskrivning 27.12.2008-26.12.2009 | 61.887.365,55 |
| Of which calculated interest 27.12.2008-31.12.2008 | -389.071,12 |
| Calculated interest 27.12.2009-31.12.2009 | 338.136,74 |
| Booked interest 2009 | 61.836.431,17 |

Based on this, the attribution of interest and the development of the debt can be calculated as follows:

| Date and time | Text | Amount EUR |
|---|---|---|
| 27.12.2006 | Borrowing a loan | 501.000.000,00 |
| 27.12.2007 | Accrued interest | 61.965.461,34 |
| 27.12.2008 | Accrued interest | 74.258.290,72 |
| 27.12.2009 | Accrued interest | 61.887.365,56 |
| 31.12.2009 | Calculated interest 27.12.09-31.12.09 | 338.136,74 |
| | Booked outstanding debt per 31.12.2009 | |

According to point 1 of the loan agreement, this is a convertible loan.

*1.3. Group contribution between Nycomed Sweden Holding 2 AB and Nycomed Sweden Holding 1 AB*

Nycomed Sweden Holding 2 AB has paid the following group contributions to Nycomed Sweden Holding 1 AB:

| Year | Amount EUR |
|---|---|
| 2006 | 839.611 |
| 2007 | 60.468.000 |
| 2008 | 75.621.000 |
| 2009 | 60.353.294 |
| In total | 197.281.905 |

The group contributions are not paid in cash but are credited over the interim invoice between the 2 companies.

In a letter dated November 19, 2010, A and B from KPMG stated the following regarding this matter:

*There is no agreement on the size of the group contribution, the calculation or the payment of the group contributions. Instead, it is decided year by year and depends on many things, including whether the Swedish requirements for payment of group contributions are met. In particular, the requirement for ownership of more than 90*

*% throughout the year, cf. that management has a varying ownership interest in SWE2. It is thus the management/board of SWE2 that decides whether group contributions etc. are to be paid. In this connection, the management must of course assess whether it is financially responsible to pay group contributions.*

The group contributions are deducted from (the Swedish) taxable income for Nycomed Sweden Holding 2 AB, while it is recognized as income in Nycomed Sweden Holding 1 AB.

*1.4. Loan between Nycomed Sweden Holding 1 AB and Nycomed S.C.A., SICAR*

Nycomed Sweden Holding 1 AB borrowed EUR 498.5 million from Nycomed S.C.A., SICAR on December 27, 2006.

Copyright © 2023 Karnov Group Denmark A/S

699.449.254,36

Section 5 states that the debt is subject to annual interest at EURIBOR + 7.9 percentage points. It also states that the interest is only due for payment together with the principal.

The conditions for the conversion are stated in TERMS AND CONDITIONS FOR CONVERTIBLE DEBENTURE SERIES 2006:1.

According to item 8, Nycomed Sweden Holding 1 AB may repay the debt by issuing shares to Nycomed S.C.A., SICAR. However, this can be done no earlier than 5 years after the creation of the debt (i.e. 27.12.2011) and no later than 27.12.2060.

Nycomed Sweden Holding 1 AB has recognized the following interest expenses:

| Year | Amount EUR |
| --- | --- |
| 2006 | 837.087,50 |
| 2007 | 61.427.405,12 |
| 2008 | 75.403.757,25 |
| 2009 | 61.836.431,85 |
| In total | 199.504.681,72 |

*1.5. Description of Nycomed Sweden Holding 2 AB*

In addition to owning Nycomed A/S, the company has from 2007, according to the annual report, 10 employees engaged in research and development. The company's income statement, excluding interest and tax, consists of payroll expenses for the 10 employees and an operating income not stated in the notes. No development costs have been capitalized.

There is also a Swedish subsidiary called Nycomed AB. According to the annual report for 2007, 10 employees were transferred to Nycomed Sweden Holding 2 AB on April 1, 2007. According to the annual report, Nycomed AB is solely a sales company and has therefore not previously had any research and development activities.

In a letter dated October 1, 2010, SKAT requested the following information regarding Nycomed Sweden Holding 2 AB:

**3202**

- *Please state the reason why the 10 employees were transferred to Nyco- med Sweden Holding 2 AB.*
- *Please state whether the employees in question were given new tasks in connection with the transfer, including their professional qualifications to perform these tasks. The reason for this is that, according to the annual report, Nycomed Sweden Holding 2 AB has activities in research and development, while Nycomed AB has only operated as a sales company.*
- *Please state whether the activity was acquired or started from scratch.*
- *If it has been acquired, please submit a copy of the contractual basis for this. In this connection, please explain why no intangible assets of any kind have been transferred.*
- *If it was started from scratch, i.e. without the acquisition of development costs, patents, know-how or similar, please explain in detail what type of activity was started.*
- *Please explain why development costs have not been capitalized.*
- *Please state whether the 10 employees in question have physically moved to a new address and if so, please state where they have moved from and to.*

In a letter dated November 19, 2010, A and B from KPMG stated the following regarding this matter:

*Nycomed Sweden Holding 2 AB*

*In connection with the acquisition of Altana at the end of 2006, the Nycomed Group is undergoing a major restructuring in order to optimally integrate the 50 acquired units.*

*One of the elements of this restructuring is to position various corporate functions more appropriately in relation to the operation, which has more than doubled in size compared to before.*

*One of the Group's most important tasks, namely registration of medical products with authorities and work in relation to clinical trials, has so far been partly handled by Nycomed AB, which has also acted as a sales company in the Swedish market.*

*It is considered inappropriate to have this group function located down in the structure and for this reason, among others, the group establishes Nycomed Sweden Holding 2 AB (SWE2) and transfers*

*- by a transfer of activities - registration of medical products and monitoring of clinical trials from Nycomed AB to SWE2. As requested, we have enclosed a copy of the transfer agreement including appendix as Appendix 5.*

*SWE2 will also take over part of the lease occupied by Nycomed AB and thus remain at the same address.*

*This is not a new activity being started up in SWE2. It is the same activity that was previously handled by Nycomed AB - now just more appropriately placed. Nycomed AB no longer performs any group functions, but is the sole sales company in the Swedish market. In addition, Nycomed AB assists SWE2 with bookkeeping assistance and payroll administration for the 10 employees.*

*SWE2 is solely financed with equity and will become the parent company of Nycomed in connection with the restructuring*

*A/S. This is primarily because it is significantly easier to establish an incentive program for the management with full equity financing than if the joint company also took on debt.*

*SWE2 is partly owned by Nycomed Sweden Holding 1 AB (>90%) and partly by the group management (<10%).*

*It is thus also in SWE2 that the management incentive program is established. SWE2 is thus the top joint company in the group, as SWE1 is solely owned by the funds via the company in Luxembourg. This is further supported by the fact that the current Board of Directors includes representatives of the owners and thus has a full quorum to adopt any disposition of the shareholding in the Nycomed Group.*

*Finally, it should be emphasized that the loan from SWE2 to Nycomed A/S is an ordinary loan entered into on normal market terms, and that the Group has complied with all rules on thin capitalization, interest rate cap and EBIT regarding deductibility of interest expenses. The loan is also a refinancing of a previously separate loan - PIK notes.*

*Thus, there is no abusive situation in relation to Danish double taxation treaties or in relation to the Interest/Royalty Directive.*

The transfer between Nycomed AB and Nycomed Sweden Holding 2 AB is agreed to take place on April 2, 2007, cf. clause 4.1 of the transfer agreement.

Sections 1.2 and 1.3 of the agreement state the following:

*1.2 The Seller is active, inter alia, in the provision of services re- lating to clinical trials, medical in-formation and regulatory ap- provals (the part of Seller's operations relating to such services is hereinafter referred to as the "Business").*

*1.3 The Seller now wish to transfer and the Buyer now wish to acquire the business assets and know-how relating to the Business on the terms set forth in this Agreement.*

Section 2.1 of the agreement states the following:

*2.1 The Business transferred under this Agreement shall comprise the following assets and contractual rights and obligations:*

(a)   *Assets and inventories, as set forth in Appendix 1;*

(b)   *Employees, with salaries, benefits and accrued vacation sa- laries as set forth in Appendix 2; and*

(c)   *Agreement and contractual rights and obligations, as set forth in Appendix 3.*

**3203**

Clause 3.1 of the agreement states that the net transfer price amounts to SEK -927,075, which amount Nycomed Sweden Holding 2 AB shall pay to Nycomed AB. The transfer price consists of SEK 225,641 for assets and inventories and SEK - 1,152,716 for accrued vacation pay liabilities. Operating assets consist primarily of desks and PCs. Item c above includes an administration agreement whereby Nycomed AB will provide accounting and payroll services to Nycomed Sweden Holding 2 AB and a rental agreement for accounts.

Nycomed Sweden Holding 2 AB has had the following financial operating results for 2006-2009:

| Text | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Other income | 0 | 1.193.131 | 1.726.601 | 1.238.442 |
| Staff costs | 0 | -1.851.855 | -4.912.421 | -6.275.092 |
| Other external costs | | | | |
| | 0 | -302.705 | -334.598 | -519.292 |
| Depreciation and amortization | 0 | -9.462 | -9.462 | -1.811 |

U.2023.3198H

| | | | | |
|---|---|---|---|---|
| Interest income | 839.662 | 61.437.884 | 75.498.014 | 62.074.499 |

Copyright © 2023 Karnov Group Denmark A/S

| | | | | |
|---|---|---|---|---|
| Interest expenses | -50 | -7.263 | -118.861 | -1.322.232 |
| Profit before tax | 839.612 | 60.459.730 | 71.849.273 | 55.194.514 |
| Skat | -235.091 | -16.931.000 | -21.173.880 | -16.089.639 |
| Profit after tax | 604.521 | 43.528.730 | 50.675.393 | 39.104.875 |

The taxes can be specified as follows:

| Text | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Skat | -235.091 | -16.931.000 | -21.173.880 | -16.089.639 |
| Tax value of group contributions | 235.091 | 16.931.000 | 21.173.880 | 15.872.916 |
| Current tax | 0 | 0 | 0 | -216.723 |

The negative tax for 2009 here means that it is an expense and therefore a tax to be paid.

Amounts are in euros.

*1.6. Description of Nycomed Sweden Holding 1 AB*

This company acts solely as a holding company for Nycomed Sweden Holding 2 AB.

Nycomed Sweden Holding 1 AB has had the following financial operating results for 2006-2009:

| Text | | | | |
|---|---|---|---|---|
| Other external costs ninger | 0 | 0 | -32.130 | -33.932 |
| Interest income etc. | 285 | 4.191 | 5.368 | 25.564 |
| Interest expenses etc. | -825.987 | -61.284.470 | -72.866.092 | -60.825.103 |
| Profit before tax | -825.702 | -61.280.279 | -72.892.854 | -60.833.471 |
| Skat | 231.196 | 16.927.154 | 20.604.514 | 15.872.916 |
| Profit after tax | -594.506 | -44.353.125 | -52.288.340 | -44.960.555 |

The taxes can be specified as follows:

| Text | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Tax on operating profit | 231.196 | 16.927.154 | 20.604.514 | 15.872.916 |
| Tax on group contributions | -235.091 | -16.931.000 | -21.173.880 | -15.872.916 |
| Current tax | -3.895 | -3.846 | -569.366 | 0 |

The negative tax for 2006-2008 here means that it is an expense and therefore a tax to be paid.

Amounts are in euros.

*1.7. Description of Nycomed S.C.A., SICAR*

"The General Partner (associé commandité) owns one General Partner Share. The other investors (actionnaires commanditaires) own the remaining Ordinary Shares.

According to the Articles of Association, the General Partner makes virtually all decisions. The other shareholders only have subscription rights at the general meeting.

"The General Partner has unlimited liability, while the other shareholders have limited liability.

"The General Partner is not entitled to dividends but instead receives an annual remuneration for the Management Fee.

The Company's activity consists solely of owning the shares in and receivables from Nycomed Sweden Holding 1 AB and payment of management fees to the General Partner.

The company also pays a small amount for "Provision for domiciliation, corporate and accounting fees". This is typically a payment to a law firm for having a mailbox and having accounting and registration in the local company register.

The company does not pay tax on the interest income. According to a note to the annual report, SICAR companies are generally required to pay 29.63% in

**3204**

interest but is exempt from tax on the income attributable to securities.

Nycomed S.C.A, SICAR has had the following accounting operating results for 2006-2008:

| Text | 2006 | 2007 | 2008 |
|---|---|---|---|
| Other external costs | -2.310,00 | -1.325.729,83 | -1.204.292,33 |
| Interest expenses etc. | -323,76 | -225,00 | -250,02 |
| Interest income from group companies | 825.986,81 | 61.732.642,83 | 72.416.763,39 |
| Other interest income etc. | 303.003,18 | 66.796,59 | 24.520,43 |
| Unrealized value adjustments | 0 | 49.200.000,00 | -16.300.000,00 |
| Results | 1.126.356,23 | 109.673.484,59 | 54.936.741,47 |

Copyright © 2023 Karnov Group Denmark A/S

No income tax is paid. Amounts are in euros. 2009 accounts are not yet available.

*2. Justification for the proposed change*

*2.1. Reference to laws and regulations*

...

*2.2. Preliminary determination of the grounds for the decision*

*2.2.1. Formal issues in the case*

A decision to withhold interest tax is not an assessment in the same way as a change of assessment of income or property value tax. This means that the decision/administrative act is not covered by a number of special rules that otherwise apply in tax matters.

In SKM2005.9.HR (SKM2002.45.ØLR), it was established that the imposition of withholding of A-tax under section 69 of the Withholding Tax Act is not an assessment covered by the current Tax Administration Act (now the Tax Administration Act).

In ordinary tax cases, SKAT would have until 1 May 2011 at the latest to send a proposal to change the tax assessment for 2007, cf. section 26(1)(1) of the Tax Administration Act. The tax claim as a result of this would not become time-barred until one year after the date of assessment, cf. section 34a(2) of the Tax Administration Act.

However, as mentioned above, these rules do not apply in this case, which is why it is the general provisions of the Public Administration Act that must be applied. Therefore, SKAT is not limited by an employment deadline. On the other hand, the 1-year rule in section 34a(2) does not apply either, which is why the general limitation rules apply. According to section 29(1) of the new Limitation Act, this came into force on January 1, 2008. As a starting point, it also applies to claims established before the entry into force, cf. section 30(1), first sentence of the Limitation Act. However, the claim becomes time-barred on January 1, 2011 at the earliest, cf. section 30(1), 2nd sentence. This means that the interest tax for 2007 as starting point parent on January 1, 2011.

Therefore, SKAT needs to complete the case very quickly. Thus, the interest tax claim must be due for payment and if it is not paid, steps must be taken to interrupt the statute of limitations, e.g. a request for deferral of payment of the tax by the company. All this must be achieved before the end of 2010.

Another effect of the decision not being covered by the usual rules for tax assessments is that the rules for sending out a letter of intent in section 20 of the Tax Administration Act do not apply. According to this, SKAT generally has an extended duty to consult. This means that SKAT has a duty to consult the taxpayer on both the factual and legal content of the case. According to the Public Administration Act § Section 19(1), which applies to this case, SKAT is only obliged to consult regarding factual information of importance to the case that the taxpayer is not already aware of.

In this case, however, SKAT chooses to send out a letter of intent and case presentation in the usual way.

*2.2.2. Substantive issues in the case - introduction*

The authority to withhold interest tax on intra-group interest expenses is in section 2(1)(d) of the Danish Corporation Tax Act and in the Danish Withholding Tax Act § Section 65D(1).

SKAT's presentation is structured so that domestic law is described first. Then the concept of beneficial owner in relation to the double taxation treaty is considered. Finally, it is considered whether there is exemption from interest tax under the Interest-Royalty Directive.

*2.2.3. Internal law*

As mentioned immediately above, the authority to withhold interest tax on intra-group interest expenses is set out in section 2(1)(d) of the Danish Corporation Tax Act and section 65 D(1) of the Danish Withholding Tax Act.

The authority to withhold interest tax was first introduced by Act 221 of 31.03.2004 amending various tax laws. The provision is inserted in section 10, no. 2 of the amendment act.

According to the first sentence of point d, the right to interest tax includes Danish companies' debt to foreign legal entities covered by section 3 B of the Tax Control Act.

The provisions of section 3 B of the Tax Control Act describe whether taxpayers are subject to a controlling influence in the form of ownership or disposal of voting rights, such that they directly or indirectly own more than 50% of the share capital or control more than 50% of the votes. By Act no. 308 of 19 April 2006, with effect from 1 May 2006, a provision was added to section 3 B, subsection 2, third sentence, stating that when assessing whether the taxpayer is considered to have a controlling influence on a legal person or whether a controlling influence is exercised over the legal person, the taxpayer is considered to have a controlling influence on the legal person.

**3205**

taxable by a legal or natural person, ownership shares and voting rights held by other shareholders with whom the shareholder has an agreement on the exercise of joint control are included.

In this case, it is clear that joint management has been agreed for Nycomed S.C.A., SICAR. Thus, it appears from the articles of association that the General Partner makes virtually all decisions, while the other shareholders only have subscription rights at the general meeting. Thus, the condition that there must be controlled debt is fulfilled.

Section 2(1)(d)(3) of the Danish Corporation Tax Act states that *the tax liability does not include interest if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies in different Member States, or under a double taxation agreement with the Faroe Islands, Greenland or the state where the receiving company etc. is resident.*

Subparagraph d has been amended several times since then, but not regarding this matter. Today, the provision thus appears unchanged in point d, 3rd sentence (most recently in Consolidated Act no. 1001 of 26.10.2009 on income taxation of limited liability companies etc.) It is thus, among other things, the authors of Act no. 221 of 31.03.2004 that are relevant in the interpretation of the provision. The Act's comments appear from LLF 2003-12-17 no. 119 on amendment of various tax laws.

Section 10, no. 5 of the Amendment Act (Act 221 of 31.03.2004) also added the following:

*In section 2(2), the following is inserted after the second sentence:*

*"The tax liability pursuant to subsection (1)(d) and (h) is finally fulfilled by the withholding of interest tax pursuant to section 65 D of the Withholding Tax Act."*

Section 65 D of the Withholding Tax Act was inserted by the same amendment act. Thus, it appears from section 4, no. 4 of the amendment act that

*After § 65 C is inserted:*

*"Section 65 D. In connection with any payment or crediting of interest to a company etc. that is liable to pay tax under section 2(1)(d) of the Corporation Tax Act, the party for whose account the payment or crediting is made shall withhold 30 percent of the total interest. The amount withheld is referred to as "interest tax". The obligation to withhold interest tax is incumbent on companies, foundations and associations that have their registered office in Denmark. If the person on whose behalf*

*payment or crediting is made is not domiciled in Denmark and the payment or crediting is made by an authorized agent who is domiciled in Denmark, the authorized agent shall be responsible for withholding. The provision in section 46(3) shall apply correspondingly.*

Section 2(2) of the Danish Corporation Tax Act was decisively amended on this point by Act no. 335 of 07.05.2008 amending various tax laws.

Section 12(1) of the Amendment Act states, among other things, that

*§ Section 2(2), second paragraph, second to fifth sentences, is repealed and replaced by the following:*

*...*

*The income tax pursuant to subsection (1)(d) and (h) shall be 25 percent of the interest and transfer sums. The tax liability is finally fulfilled by the withholding of interest tax pursuant to section 65 D of the Withholding Tax Act. ...........................*

Section 7(8) of the same amending act further states that

*In section 65 D, subsection (1), first sentence, "30 pct." is replaced by to: "25 pct."*

Both provisions were adopted with effect for interest paid or accrued on or after April 1, 2008, see section 15(8) of the Amendment Act.

*2.2.3.1. Partial conclusion*

This is interest on debt to legal entities covered by section 3 B of the Tax Control Act, which is why it is generally legal to withhold interest tax.

However, this does not apply if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalties (hereinafter the Interest and Royalties Directive) paid between associated companies in different Member States, or under a double taxation agreement (hereinafter the DTA) with the Faroe Islands, Greenland or the state where the receiving company etc. is resident. This is discussed in sections 1.2.2.4 and 1.2.2.5 below.

The rate of interest tax is 30% for the interest accrued on 27.12.2007 and 25% for the interest accrued on 27.12.2008 and 27.12.2009.

*2.2.4. Whether the taxation of the interest would have to be waived or reduced under a double tax treaty*

*2.2.4.1. The* interest income accrues to Nycomed Sweden Holding 2 AB, which is resident in Sweden. It must therefore be considered whether Denmark - if interest tax is withheld - would be obliged to waive or reduce the taxation in accordance with the joint Nordic double taxation agreement (BKI no. 92 of 25/6 1997 of the agreement of 23/9 1996 between the Nordic countries for the avoidance of double taxation with regard to income and wealth tax).

Article 11(1) of the DBO states that

*Interest arising in a Contracting State and paid to a resident of another Contracting State may be taxed in that other State only if that person is the beneficial owner of the interest.*

**3206**

In this case, the interest originates from Denmark and is paid to Nycomed Sweden Holding 2 AB, which is resident in Sweden. According to the provision, the starting point is therefore that Sweden has the right of taxation.

This means that, in principle, there is no access to interest tax. However, as stated, it is a prerequisite that Nycomed Sweden Holding 2 AB is the *beneficial owner of the* interest.

It must then be decided what is meant by the concept of legal owner and whether Nycomed Sweden Holding 2 AB on this basis can be considered as such.

*2.2.4.2. SKAT's legal assessment of the concept of beneficial owner The* term "beneficial owner" has been used in the OECD Model Tax Convention and its comments since the revision of the Model Convention in 1977. The comments contained in the commentaries on the term "beneficial owner" have gradually been clarified, but there is no basis for claiming that there have been any material changes in relation to what is meant by the term.

In the Commentary to the Model Convention, the question of the meaning of the term "beneficial owner" is now addressed in particular in points 12, 12.1 and 12.2, to Article 10, which states the following (with the emphasis added here):

*"12. The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid... to a resident" as used in paragraph 2 of the Article.*

*1. This makes it clear that the source State is not obliged to waive its right to tax dividend income merely because the income was paid directly to a resident of a State with which the source State has concluded a treaty. The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including the avoidance of double taxation and the prevention of tax avoidance and evasion.*

*12.1 Where income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption solely on the basis of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation is a resident of the other State, but no double taxation arises as a result since the recipient is not considered the owner of the income for tax purposes in the State of which he is a resident. Similarly, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State, other than as agent or broker, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a conduit company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.*

*12.2 Subject to the other conditions of the Article, the limitation on the source State's right of taxation shall continue to exist where an agent or an intermediary, resident in a Contracting State or in a third State, is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is consistent with the understanding of all member States). States wishing to express this more clearly are free to do so during bilateral negotiations."*

In relation to the interpretation of the concepts of beneficial owner and flow-through companies, SKAT also refers to the then Minister of Taxation Kristian Jensen's answer to the Danish Parliament's tax committee on question 2 regarding L-30 - Proposal for an Act on the conclusion of a protocol amending the double taxation agreement between Denmark and the United States of America. The question asked why Denmark has not, like the US, made a reservation against the use of flow-through entities. The answer states that a country should not insert a reservation that it will apply rules or interpretations mentioned in the OECD model's comments.

In particular, there are three cases from international case law that deal with the qualification of the "beneficial owner".

...

The precedent value of the judgments is limited by the fact that these are foreign courts. Consequently, the Danish courts are, as out-

In principle, the Danish courts are not bound by the case law created by foreign courts. However, the cases concern the "beneficial owner" concept in the Model Agreement, which also has source of law value in Denmark, which is why the judgments still have a certain value.

The courts in Denmark have not yet ruled on the concept. However, SKAT has lost two cases at the National Tax Tribunal. SKM2010.268.LSR deals with withholding tax under the Corporation Tax Act

§ Section 2(1)(c) on dividends and SKM2010.729.LSR deals with interest tax as in

**3207**

this case. The cases concern the same company and, as in this case, the money has been in Luxembourg and not diverted to the shareholders of the Luxembourg parent company. In both cases, the National Tax Tribunal placed decisive emphasis on the fact that there was no physical flow of funds through the Luxembourg parent company, whereby it was considered the rightful owner of the dividends (and interest).

However, SKAT does not agree with the decisions and has brought SKM2010.268.LSR before the courts. SKM2010.729.LSR is so new that it has not yet been appealed.

Therefore, the two rulings from the National Tax Tribunal cannot be used as a basis.

*SKAT's assessment of the specific situation*

The Nycomed Group has two intercompany loans of approximately EUR 500 million between the four top holding companies. As these are intercompany loans, the net interest expense for the entire group is DKK 0. Nevertheless, it is constructed in such a way that the interest expense is deducted in Nycomed A/S, while it is either tax neutral or tax-free in the other companies.

Thus, the interest income in Nycomed Sweden Holding 2 AB is offset by a deductible group contribution. In Nycomed Sweden Holding 1 AB, the taxable group contribution is offset by a deductible interest expense to Nycomed S.C.A., SICAR, where the interest income is completely tax-free under internal Luxembourg tax law. This is precisely the core situation where interest tax is intended to be applied. The DBO exception has been introduced to avoid double taxation. The idea is that if another country with which Denmark has a DBO has the right to tax the interest income, the interest income will also be taxed in that country. The whole idea is that the interest is taxed once and only once. If the exemption clause for DBOs were not there, situations would often arise where double taxation would occur and where the DBO would not necessarily solve this. However, it is not the intention that the corresponding interest income, as in this case, should not be taxed at all.

However, it is not sufficient that the situation in question is merely contrary to the purpose of the law. Consequently, taxation also requires legal authority. However, the relationship is undoubtedly important when the delimitation is to be made in the specific situation.

As stated above in section 2.2.4.2, paragraph 12 of the Commentary to the Model Convention states that

*The term beneficial owner is not used in a narrow technical sense, but must be seen in the context and in light of the intent and purpose of the agreement, including avoiding double taxation and preventing tax evasion and tax avoidance.*

Based on this background, SKAT does not find that it can be required that the recipient of the interest, e.g. by agreement, is legally obliged to forward the amount. SKAT's interpretation is also more consistent with a natural linguistic interpretation of the

English term for the concept. "Beneficial owner" is thus the one who benefits from the interest as opposed to "Legal owner", who is the formal owner of the interest. Furthermore, the limited tax liability will always arise in groups, as it is a prerequisite that the companies are covered by

Section 3 B of the Tax Control Act. By virtue of the parties' community of interest, they do not need to formalize a legal obligation to forward the amount. If it were a requirement that the immediate creditor (here Nycomed Sweden Holding 2 AB) is formally/legally prevented from disposing of the interest, there would hardly be any situations where interest tax could even be considered, which can hardly be the intention.

In SKAT's opinion, it is sufficient that Nycomed Sweden Holding 2 AB and Nycomed Sweden Holding 1 AB do not *actually* dispose of the interest.

The question is then whether this is the case in this instance.

In SKAT's opinion, it has been decided in advance that Nycomed Sweden Holding 2 AB will forward the interest to Nycomed Sweden Holding 1 AB in the form of group contributions. In the letter of November 19, 2010, A has stated that the payment of group contributions is decided year by year by the management of Nycomed Sweden Holding 2 AB. SKAT finds it doubtful that it is only the management of Nycomed Sweden Holding 2 AB that makes the decision and that it has not been decided in advance that the group contributions must correspond to the interest income. The management only owns shares in Nycomed Sweden Holding 2 AB and thus neither in Nycomed Sweden Holding 1 AB nor in Nycomed S.C.A., SICAR. Therefore, all other things being equal, management would not be interested in sending subsidies to a company they do not own shares in. Yet they do it anyway. Nor will there be a tax advantage for the group as a whole if no deductible group contributions are made to Nycomed Sweden Holding 1 AB. Furthermore, in the letter dated November 19, 2010, A has stated that the representatives of the owners of the group are also represented o n   t h e   board of Nycomed Sweden Holding 2 AB.

In the letter of November 19, 2010, it appears that there were business considerations behind the transfer of the sub-activity from Nycomed AB to Nycomed Sweden Holding 2 AB. SKAT cannot categorically reject this. However, the scope of the transferred activity is extremely limited compared to the size of the group contributions to Nycomed Sweden Holding 1 AB. Therefore, the transferred activity cannot be given decisive importance in the assessment of whether Nycomed Sweden Holding 2 AB actually holds the interest.

**3208**

Nor does SKAT find it decisive that the interest and group contributions are not paid, but only attributed. This follows partly from the general tax rules, where legal acquisition/obligation is decisive regardless of cash flows. It also follows directly from section 65 D(1)(1) of the Withholding Tax Act that interest tax includes both paid and credited interest.

SKAT finds that the determination of (another) beneficial owner requires that there is a certain connection between the various loans and payments

etc. This is also the case in this matter. In this respect, it is noted that both loans were taken out on December 27, 2006 and have almost the same principal, interest rate and payment (no payment until repayment after a number of years). It is not significant that the payments to Nycomed S.C.A., SICAR change character, as instead of a back to back loan between the two Swedish companies there are group contributions. The decisive factor is that the amounts are conditional on each other and equalize the tax.

*2.2.4.3. Partial conclusion*

Neither Nycomed Sweden Holding 2 AB nor Nycomed Sweden Holding 1 AB is considered the legal owner of the interest in question. Therefore, SKAT is not precluded from withholding tax on interest as a result of the Nordic double taxation treaty.

*2.2.5. Whether the taxation of interest should be waived under the Interest-Royalty Directive*

*2.2.5.1. Beneficial owner according to the Royalties Directive*

The introductory remarks in the Interest-Royalty Directive 2003/49/EC state the following (with SKAT's emphasis):

*(1) In an internal market having the character of a domestic market, transactions between companies from different Member States should not be subject to less favorable tax conditions than those applicable to the same transactions between companies from the same Member State.*

*(2) This requirement is currently not met for the payment of interest and royalties; national tax laws - possibly combined with bilateral or multilateral agreements - may not always ensure the elimination of double taxation and the application of tax rules often leads to burdensome administrative formalities and liquidity problems for the companies concerned.*

*(3) It must be ensured that interest and royalties are taxed once in a Member State.*

*(4) The most appropriate way to eliminate the aforementioned formalities and problems, while ensuring that national and cross-border transactions receive the same tax treatment, is to abolish the taxation of interest and royalties in the Member State in which they arise, whether by withholding at source or by assessment; it is particularly necessary to abolish such taxes in the case of payments between associated companies of different Member States and between permanent establishments of such companies.*

*(5) The scheme should only apply to any interest or royalties that would have been agreed between the payer and the beneficial owner had there been no special relationship*

*(6) Member States must not be prevented from taking appropriate measures to combat fraud and abuse.*

...

*(10) Since the objective of this Directive, namely the establishment of a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States, cannot be sufficiently achieved by the Member States and can therefore be better achieved at Community level, the Community may adopt measures, in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty.*

The purpose of the directive is thus to ensure that interest paid across borders between Member States is treated on the same terms as within the borders of each Member State, but that this arrangement only applies to any interest that would have been agreed if there had not been a special relationship. In addition, the aim is to ensure that the interest is taxed in one Member State and that abuse and fraud can be combated.

The concept of beneficial owner thus already appears from the introductory remarks. In addition, the concept appears from Article 1, which reads as follows (with SKAT's emphasis):

*"Article 1*

*..."*

For this reason alone, it is unquestionable that EU law does not prevent the implementation of withholding tax on interest in Denmark in cases where the beneficial owner is not resident in the EU.

The fact that interest is subject to withholding tax when paid to a non-resident company does not constitute a restriction on free movement, if only because there is no tax discrimination.

This is also explicitly stated by the European Court of Justice in the judgment of 22 December 2008 in case C-282/07, Truck Center,

...

Furthermore, SKAT is of the opinion that the case law of the European Court of Justice shows that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from, among other things, the Parent-Subsidiary Directive - when it must be assumed that the establishment of a holding company in another Member State "aims to

**3209**

avoid withholding tax on payments to non-European entities if such a structure serves no commercial purpose", see the Commission's interpretation of "Purely artificial arrangements" published in OJ 2008, C 116/13.

Section 2(1)(d) of the Danish Corporation Tax Act clearly states that Denmark shall not waive withholding tax unless there is an actual obligation to do so under the Interest-Royalty Directive.

In summary, it is SKAT's opinion that the concept of beneficial owner in relation to the Directive corresponds to the concept in relation to the DBOs. As stated above, the concept has existed for a number of years in the OECD Model Tax Convention before it was introduced in the Parent-Subsidiary Directive and the Interest-Royalty Directive. In this context, there appears to be no indication that the concept has a wider or narrower scope than in the OECD Model Agreement. However, the EU Court of Justice has not yet ruled on the concept. The fact that Article 1(4) of the Interest-Royalty Directive only refers to and not as an intermediary, including as agent, mandatary or authorized signatory for another person. cannot lead to a different result, as the list is not exhaustive.

For the same reason as stated in section 2.2.4.2 above, neither Nycomed Sweden Holding 2 AB nor Nycomed Sweden Holding 1 AB is considered the legal owner of the interest in question in relation to the Interest-Royalty Directive.

It must then be decided whether Nycomed S.C.A., SICAR is the rightful owner. In relation to the Swedish companies, the difference is that there is no flow-through in the sense that the interest is immediately channeled to the owners.

As mentioned above in section 2.2.4.2, SKAT has lost two cases in the National Tax Tribunal, because the National Tax Tribunal has placed decisive emphasis on the fact that there was no flow-through out of the Luxembourg parent company. However, the rulings have been/will be appealed to the courts, which is why SKAT is still of the opinion that physical flow-through is not necessarily decisive.

As also mentioned above in section 2.2.4.2, section 12.1 of the comments to the Model Agreement states that a company is not a beneficial owner if it merely acts as a pure flow-through entity. However, this is not an exhaustive definition of the concept. Thus, there is no basis for claiming that it is the actual flow-through that is decisive. A natural linguistic understanding of the Model Agreement and the comments thereto thus implies that emphasis must be placed on the formal recipient's actual powers in relation to making decisions on how to dispose of the amount received.

In this case, Nycomed S.C.A., SICAR can generally dispose of the asset in the usual manner. As a legal entity, the company is admittedly signed by the owners and especially by the general partner. This is also the case for the vast majority of companies, without this giving rise to dispute that the company is the rightful owner of a given claim.

However, as previously mentioned, emphasis should be placed on the comments to clause 12 of the Model Agreement:

*The term beneficial owner is not used in a narrow technical sense, but must be seen in the context and in light of the intent and purpose of the agreement, including avoiding double*

U.2023.3198H

*taxation and preventing tax evasion and tax avoidance.*

In this case, it has not been necessary to make back to back loans to the owners of Nycomed S.C.A., SICAR, as the company does not have to pay tax on the interest income. Instead of interest, the owners will later receive the total amount (principal and accrued interest) as dividend. Therefore, SKAT does not find that Nycomed S.C.A., SICAR is the rightful owner of the interest income. Instead, it is the owners of this company who are the beneficial owners.

*2.2.5.2. Anti-abuse provision under EU law and the Interest-Royalty Directive*

As a preliminary remark, it should be noted that in the case of transactions aimed at tax evasion, tax avoidance or abuse, situations may arise where the EU citizen cannot invoke protection under EU law. This applies both to specific regulations and directives - including the Interest-Royalty Directive - as well as the EU treaties in general, e.g. Articles 63-66 TFEU on the protection of the free movement of capital.

*The practice of the European Court of Justice*

From the case law of the European Court of Justice on the concept of abuse, reference can be made to the Cadbury Schweppes judgment (Case C-196/04, Cadbury Schweppes, [2006] ECR I-7995), the Halifax judgment (Case C-255/02, Halifax, [2006] ECR I-1609) and the Part Service judgment (Case C-425/06, Part Service Srl.).

In the Cadbury-Schweppes judgment, the European Court of Justice states in relation to the English CFC rules, among other things:

*... for a restriction on the freedom of establishment to be justified on the ground of combating abuse, the specific aim of such a restriction must be to prevent conduct consisting in the creation of purely artificial arrangements which are not based on any economic reality in order to avoid the tax normally due on profits earned from activities carried out on national territory.*

The Halifax judgment under VAT law concerns flow-through companies, as the case concerned a VAT-exempt bank with 5 percent

VAT deduction, which passed its relevant transactions through a fully taxable subsidiary in order to obtain full VAT deduction.

### 3210

Regarding the judgment and its significance in the subsequent case Part Service Srl. is stated in the VAT Guide 2010-2, section C.4:

*Advantages resulting from the provisions of the VAT Act, including the rules on deductions, cannot be claimed when the transactions*

etc. that justify this right constitute an abuse.

*It follows from the case law of the ECJ, see Case C-255/02 Halifax plc, paragraphs 74 and 75, that the finding of abuse requires the following conditions to be met:*

- *The transactions in question - even if the conditions laid down in the relevant provisions are formally complied with - would result in a tax advantage being obtained which it would be contrary to the purpose of those provisions to grant.*
- *It must also be evident from a set of objective circumstances that the main purpose of the transactions in question is to obtain a tax advantage.*

*That it is sufficient to establish abuse that the main purpose - and not the only purpose - of the transaction is to obtain a tax advantage has been established by the ECJ in the subsequent judgment in case C-425/06 (Part Service Srl.)*

*When assessing the main purpose, the purely artificial nature of the transactions as well as the legal, economic and/or personal*

links between the operators taking part in the tax relief plan may be taken into account, see Halifax, paragraph 81.

When assessing the main purpose of the establishment, the CJEU has paid particular attention to whether there is substance in the company's country of domicile or whether it is a purely artificial arrangement, which implies not only formal establishment, but also the actual exercise of economic activity.

*Article 5 of the Interest Directive*

In relation to the Interest Directive, Article 5 states the following:

...

Thus, there is a court-created case law on the general EU law concept of abuse and a specific abuse provision in Article 5 of the Interest and Royalties Directive. As will be seen below, it is SKAT's view to deny the benefits of the Directive on the basis of both.

*Implementation in Danish law*

The starting point is that directives do not have direct effect on the Member States. They are therefore obliged to implement it in their legislation. If this is not done, the citizen can invoke the directive. However, based on the so-called principle of legal certainty, the Member State cannot invoke a directive against the citizen. This is evident, inter alia, from paragraph 42 of the Kofoed judgment (Case C-321-05 Kofoed [2007] ECR I-5795):

...

The Interest Royalties Directive as such has been implemented in Danish law. This is stated in section 2(1)(d)(3) of the Danish Corporation Tax Act: *The tax liability does not include interest if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC on a common system of taxation of interest and royalties... The abuse provision in Article 5 is optional for Member States (This Directive does not exclude the application of national... ...........................................................).*

The question is then whether it is sufficient, as in this case, to decide that the Directive (as a whole) is applicable or whether Article 5 must be implemented separately.

It is SKAT's opinion that the abuse provision in Article 5 is implemented in section 2(1)(d) of the Danish Corporation Tax Act. According to its clear wording, the provision thus implies that Denmark must not waive interest tax unless there is an actual obligation to do so under the Interest-Royalty Directive.

This follows from the wording: *... the interest must be waived or reduced ....*

There does not appear to be anything in the comments to the bill that suggests a different interpretation.

On the contrary, SKAT's interpretation is supported by the comments to the bill for the adoption of withholding tax on dividends in section 2(1)(c) of the Danish Corporation Tax Act.

The 3rd sentence of this provision stipulates:

*It is a condition that the taxation of the dividends must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the company is resident.*

This sentence was inserted by Act no. 282 of April 25, 2001 (section 1, no. 1 of the Amendment Act), as the amendment was intended to introduce withholding tax on dividends. In the original bill (L 99 2000/0l), the provision was proposed to be worded as follows:

*It is a condition that the parent company is resident in a state that is a member of the EU, in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2 of Directive 90/435/EEC.*

However, during the consideration of this proposal, the Minister of Taxation submitted an amendment (LFB 2001-03-21 no. 99) (corresponding to

to the final wording of the provision), justifying this as follows:

*It is proposed to clarify that it is a condition for the proposed tax exemption that Denmark must waive the taxation of the applicable dividends after*

**3211**

*the provisions of the Parent-Subsidiary Directive or that Denmark shall waive or reduce the taxation of the dividend in question in accordance with the provisions of the double taxation treaty with the Faroe Islands, Greenland or the other state concerned.*

Both the wording and the legislative history thus unambiguously show that withholding tax must be implemented unless such taxation is contrary to EU law and/or DBOs.

In the subsequent adoption of the interest tax in point d, no such clarification was necessary, as the correct wording was already included in the proposed legislation.

*SKAT's specific assessment*

SKAT finds it clear that the abuse provision in Article 5 can be invoked in this case.

With reference to what is stated in section 2.2.4.2 above, it must be considered proven that these are transactions with tax avoidance or abuse as the main motive or one of the main motives. Consequently, it is not the borrowing of the loan itself that is not considered commercially motivated. On the contrary, it is the actual placement of the arrangement through three overlying holding companies that makes it possible for the interest expense to be deducted with tax effect in Nycomed A/S, while the interest income is not taxable in Nycomed S.C.A., SICAR.

It is then debatable whether the distinction should be made solely on the basis of the wording of Article 5(2) or whether the concept of abuse is also delimited by the general EU court practice in the area. In that case, it will not be sufficient that the main motive is tax avoidance. In addition, it must be a purely artificial arrangement where, in addition to the tax motives for the transaction, there must be no actual economic activity involved.

However, SKAT finds in any case that it is such a purely artificial arrangement.

Firstly, there does not appear to be an immediate business motive for having both Nycomed Sweden Holding 1 AB and Nycomed S.C.A., SICAR as overlying holding companies. The management of the group is as stated in Nycomed Sweden Holding 2 AB. Furthermore, there appears to be no business motive for placing the ultimate holding company in Luxembourg. Operations are conducted partly from Nycomed Sweden Holding 2 AB and partly from the General Manager of Nycomed S.C.A., SICAR. For Nycomed S.C.A., SICAR, however, this consists solely of remunerating the General Manager, which is done through an addition to an interim account. In addition, the activity consists solely of holding the shareholding and the receivable. The practicalities of bookkeeping, registration in the Luxembourg company register, etc. are handled by paying a third party for "Provision for domiciliation, corporate and accounting fees". *Partial conclusion*

Neither Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB nor Nycomed S.C.A., SICAR is considered a beneficial owner under the Interest-Royalty Directive.

The abuse provision in Article 5 of the Interest-Royalty Directive is considered implemented in Danish law.

The abuse provision is considered to be applicable in the specific case.

*2.2.6. Liability for interest tax not withheld*

Section 69(1) of the Withholding Tax Act states that

*Any person who fails to fulfill his obligation to withhold tax or who withholds it in an insufficient amount shall be directly liable to the public authorities for payment of the deficiency, unless he proves that he has not been negligent in complying with the provisions of this Act.*

It is therefore Nycomed A/S that has the burden of proof that the company should not have been aware that it should have withheld tax at source. The situation where the withholding agent can be exempted from liability is, for example, where an employee cheats his employer and thus receives excessive tax-free compensation without the employer being responsible for not being aware of this.

However, the exemption does not apply in this situation. In this connection, it is emphasized that section 2(1)(d) of the Danish Corporation Tax Act is a protective rule, that the Nycomed Group in the specific situation has sought to circumvent this protective rule and that there are related parties.

Thus, Nycomed A/S is liable for the interest tax.

*2.2.7. Reduction in interest tax based on the ownership of Nycomed S.C.A., SICAR etc.*

As the owners of Nycomed S.C.A., SICAR are considered to be the beneficial owners of the interest income, it is possible that a proportional reduction in the interest tax may be granted if the owners are to be exempted or relieved under a DBO or under the Interest-Royalty Directive.

If this can be documented, SKAT will consequently grant such a deduction.

SKAT is currently conducting a transfer pricing control of the interest rate. If the interest rate changes, the interest tax will consequently be changed accordingly.

*2.2.8. Overall conclusion*

Joint management is deemed to have been agreed in Nycomed S.C.A., SI-CAR.

Neither Nycomed Sweden Holding 2 AB nor Nycomed Sweden Holding 1 AB is considered the beneficial owner of the interest in question in relation to the Joint Nordic Double Taxation Treaty. Neither Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB nor Nycomed S.C.A., SICAR is considered the beneficial owner of the interest in question in relation to the Interest Royalty Directive.

**3212**

Instead, the owners of Nycomed S.C.A., SICAR are considered the beneficial owners.

Secondly, it is argued that even if Nycomed S.C.A., SICAR is considered the beneficial owner, the company is not protected by the Directive, as the abuse provision in Article 5 can be invoked in the specific case.

Therefore, there is a legal basis for withholding interest tax, which can be calculated as follows:

| Date of attribution | Amount EUR | Course | Amount in DKK | Interest tax in percent. | Interest tax in DKK |
|---|---|---|---|---|---|
| 27-12-2007 | 61.965.461 | 745,68 | 462.064.052 | 30 | 138.619.216 |
| 27-12-2008 | 74.258.291 | 745,40 | 553.521.299 | 25 | 138.380.325 |

U.2023.3198H

| 27-12-2009 | 61.887.366 | 744,33 | 460.646.228 | 25 | 115.161.557 |

| | In total | 198.111.118 | 1.476.231.579 | 392.161.097 |
|---|---|---|---|---|

*2.3. The company's opinion and reasoning*

In a letter dated December 9, 2010, A stated the following:

*Nycomed A/S - Interest tax - j.nr. 28313519*

*We have received SKAT's proposal for a decision, dated November 29, 2010, on the withholding of interest tax for the period 2006-09. On behalf of our client, we hereby make the following comments.*

*Factual comments on the case presentation*

*First, we have a few factual comments on the case. On page 1, it appears that The Blackstone Group is the owner of Nycomed S.C.A., SICAR. This is no longer the case, as the Group sold its stake in 2006. On page 4 in section 1.2, it should be added that the purpose of raising the loan was to refinance the existing PIK note loan raised in 2005 when Nycomed A/S acquired the Nycomed Group. This is also mentioned on page 3, top half.*

*Rating*

*We do not agree with SKAT's assessment of the case. In our assessment, SKAT has no basis for claiming withholding of interest tax.*

- *Nycomed Sweden Holding 2 AB (SEW2) is the rightful owner of the interest income and uses the interest income to cover operating expenses and salaries in the company. The company thus has full disposal of the income and is in no way obliged to pay the interest income further.*

- *Nycomed A/S has incurred interest expenses on an ordinary loan raised (intra-group) to repay an external loan. Thus, there is no form of misuse in relation to Danish legislation etc.*

- *In SKM 2010.729 LSR, the taxpayer agreed that there was no basis for claiming withholding of interest tax, as the interest amount had not been paid through the structure to the ultimate owners (flow-through company). There is no flow-through in this case either. There is not even [...] a loan relationship established between the Swedish holding companies. For this reason alone, it can in no way be argued that the interest income has flowed through SWE2 and further up through the structure and that SWE2 is therefore not the rightful owner of the income.*

*According to the National Tax Tribunal's own decision, the fact that there is a flow-through is a crucial prerequisite for it to be possible to assume that the recipient, here SWE2, is not the rightful owner of the income.*

*Due to the advanced date, we have chosen not to argue our views further for the time being. However, we must request SKAT to reconsider the decision in light of the above and then submit a final decision as soon as possible.*

*Finally, for the sake of good order, we must state that we accept that the limitation period under the Limitation Act is postponed from December 31, 2010 to January 15, 2011.*

*2.4. Final decision*

Regarding the facts, the statement of facts has now been corrected in accordance with what was stated in A's letter of December 9, 2010. Hereafter, we will briefly consider the three points that have been made.

...

Thus, a decision has been made in accordance with the proposal submitted."

*Additional information about the group and the loans*

According to the information provided, the Nycomed Group was a worldwide pharmaceutical company with a total of 12,500

employees during the case period,

including 600 in Denmark, and had subsidiaries in over 70 countries. In 2005, the group was acquired by a consortium of private equity funds with the Nordic private equity fund Nordic Capital as the largest owner. The Nycomed Group's ultimate Danish parent company was Nyco Holding ApS. The acquisition of Nyco Holding ApS was made through the newly established holding company Nycomed A/S (now Takeda A/S), which was directly owned by the participants in the private equity consortium. For the acquisition of Nyco Holding ApS, Nycomed A/S had raised an external loan of approximately EUR 400 million.

**3213**

refinancing of this debt and in this connection the following ownership structure was established:



connection. *Nycomed S.C.A., SICAR*

More than 95% of the shareholders in Nycomed S.C.A, SICAR were various private equity funds organized in fiscally transparent entities, typically limited partnerships. Nycomed A/S has stated that there were several hundred investors in the private equity funds, including pension funds, banks, investment funds and companies, ordinary companies and private individuals. Nycomed A/S has further stated that these investors were resident in a wide range of jurisdictions, including within and outside the EU and in and outside states with which Denmark has concluded a double taxation agreement, and that approximately ⅔ of the direct investors in the private equity funds were independent taxpayers resident within the EU or in a state with which Denmark has concluded a double taxation agreement. Of the remaining investors, a significant proportion were so-called "fund-of-funds", i.e. tax-transparent entities where it has not been possible to obtain information about the domicile of the investors.

The parties agree that the identity and domicile of the investors in the private equity funds in question have not been documented during the proceedings.

A number of ownership lists for Nycomed S.C.A., SICAR for the period 2007-2011 have been submitted, from which it appears that shareholder no. 39 was a private individual - reportedly residing in the USA - and shareholder no. 41 was a Swedish bank. According to the information provided, during the period in question, the two shareholders each had an ownership interest of 0.25% and 1.15% respectively.

In 2011, Takeda Pharmaceutical Company acquired the shares in Nycomed A/S and thereby acquired the Nycomed Group (except for the Group's activities in the USA), see further below. Nycomed A/S changed its name to Takeda A/S in this

Nycomed S.C.A., SICAR, was the Group's parent company. The company, which was domiciled in Luxembourg, was fully equity-financed. The company was operated as a *Société en commandite par actions* ("S.C.A."). The general partner of the Company, which was responsible for the day-to-day management of the Company, was Nycomed Luxco S.A. It appears from the submitted annual reports that four and five of the seven members of the Board of Directors of Nycomed Luxco S.A. were also members of the Boards of Directors of Nycomed Sweden Holding 1 AB and Nycomed Sweden Holding 2 AB during the relevant period.

It has been stated that an S.C.A. is an independent legal entity and an independent taxable person under Luxembourg law. The parties agree that an S.C.A. on this basis can be qualified as a "resident person" under the double tax treaty between Denmark and Luxembourg and that it is subject to income tax in Luxembourg and is therefore liable to pay

**3214**

Corporate income tax and local business tax in Luxembourg on the company's income.

Nycomed S.C.A., SICAR, was registered as a so-called "Société d'investissement en capital à risque" ("SICAR") under a Luxembourg law of June 22, 2004. This means that the company was exempt from income tax on earnings derived from the company's investments, i.e. interest, profits and dividends, just as the company was exempt from the rules on withholding tax on the distribution of dividends.

It is stated that in connection with the refinancing of Nycomed A/S' external loans, the private equity consortium injected approximately EUR 500 million in equity into Nycomed, S.C.A., SICAR. This capital injection was the basis for Nycomed, S.C.A., SICAR's loan of EUR 498,500,000 to Nycomed Sweden Holding 1 AB. The company's investment portfolio consisted of a 100% equity stake in Nycomed Sweden Holding 1 AB. Apart from the ownership of and the loan to Nycomed Sweden Holding 1 AB, Nycomed S.C.A., SICAR did not carry out any activities.

The loan to Nycomed Sweden Holding 1 AB was granted on December 27, 2006. According to the loan agreement, the loan bears an interest rate of EURIBOR + 7.9%, which is added to the principal each year on December 27. The interest on the loan was added to the principal and was reported in the company's annual reports for the income years 2007, 2008 and 2009 as accrued interest (interest in the period from December 28 to December 27) of 61,765,962, 72,826,401 and 60,825,103 euros respectively.

Nycomed, S.C.A., SICAR, did not make any distributions or other payments to the private equity funds in 2007-2009.

*Nycomed Sweden Holding 1 AB*

Nycomed Sweden Holding 1 AB's only activity was to be the holding company for Nycomed Sweden Holding 2 AB. As mentioned, the company took out a loan on December 27, 2006 from its parent company, Nycomed S.C.A., SICAR, for 498,500,000 euros. According to the company's annual reports (the period from 1/1-31/12), the company's booked interest expenses regarding the loan in question for the income years 2007, 2008 and 2009 amounted to 61,284,470, 72,866,092 and

In accordance with the terms of the loan, the interest was added to the principal of the loan on an ongoing basis and the company has deducted the interest when calculating its taxable income. Nycomed Sweden Holding 1 AB contributed the money from the above loan as equity in Nycomed Sweden Holding 2 AB.

*Nycomed Sweden Holding 2 AB*

Nycomed Sweden Holding 2 AB, which was fully equity

financed, was owned by Nycomed Sweden Holding 1 AB with approximately 97.5
% and of the group management with approximately 2.5 %. In the income years under review, the company had the same Board of Directors as Nycomed Sweden

Holding 1 AB. In 2007-2009 the company did not own shares in other companies than Nycomed A/S.

The capital contribution from Nycomed Sweden Holding 1 AB was lent by Nycomed Sweden Holding 2 AB to Nycomed A/S under a loan agreement dated December 27, 2006.

The annual reports for 2007, 2008 and 2009 show that Nycomed Sweden Holding 2 AB had two income items, namely "Other income" and "Interest income and similar income items". The company had no interest income other than the interest on the loan to Nycomed A/S. In 2007, 2008 and 2009, interest income accounted for 98.1%, 97.8% and 98% of the company's total income respectively. The interest accrued on the loan to Nycomed A/S has been included in the calculation of Nycomed Sweden Holding 2 AB's taxable income in the relevant income years. The interest income amounted to EUR 61,444,992, EUR 75,498,014 and EUR 61,836,446 respectively.

Nycomed Sweden Holding 2 AB has in the income years 2007-2009
- in accordance with the special Swedish rules on tax equalization within a group in Chapter 35 of the Swedish Income Tax Act - made group contributions to its parent company, Nycomed Sweden Holding 1 AB, of 60,468,000,
75,621,000 and 60,353,294 euros.

The group contributions were deductible for the contributing company, Nycomed Sweden Holding 2 AB, and taxable for the receiving company, Nycomed Sweden Holding 1 AB.

On April 2, 2007, Nycomed Sweden Holding 2 AB took over the activities of the Swedish company Nycomed AB with product registration with authorities and various administrative work in connection with clinical trials. The company then employed approximately 10 employees.

The day before the acquisition, on April 1, 2007, Nycomed Sweden Holding 2 AB and the company Nycomed AB entered into a service agreement. According to this agreement, Nycomed AB was obliged to provide "any administrative services that [Nycomed Sweden Holding 2 AB] may require from time to time". The assistance included, but was not limited to, "accounting and financial services, HR and payroll services, IT and techni- cal support services, services relating to invoicing and debt col- lection". On the same day, Nycomed Sweden Holding 2 AB and Nycomed AB also entered into a lease agreement whereby the former leased a part of Nycomed AB's domicile, where employees covered by the transfer remained located.

*Nycomed A/S*

Nycomed A/S, the top Danish group company, was founded in 2005 by the consortium that acquired the Nycomed Group the same year. In connection with the acquisition, Nycomed A/S had taken out a so-called PIK loan

**3215**

("Payment-in-Kind") from external lenders. The interest rate on the PIK loan, which was raised at rate 99 and matured in 2013, was fixed at 11.75 %.

As mentioned, this loan was replaced by an intra-group loan as Nycomed A/S borrowed EUR 501 million from the parent company, Nycomed Sweden Holding 2 AB, by loan agreement dated 27 December 2006, which was used to repay the PIK loan. According to the agreement, the interest rate is EURIBOR + 8 percentage points, which is added to the principal each year on December 27. The interest rate on January 1, 2007 was 12.03%, while at the end of 2009 it was 9.24%. The annual interest write-ups for 2007, 2008 and 2009 amounted to

61,444,992, 75,498,014 and 61,836,446 euro corresponding to respectively
462,064,052, 553,521,299 and 460,646,228 DKK. According to the loan agreement, the loan would not be repaid until Nycomed A/S was sold.

Nycomed A/S has made deductions for the imputed, unpaid interest when calculating its taxable income. Nycomed A/S did not withhold tax at source on the imputed interest.

"*Management Shareholders Agreement*"

In connection with the proceedings before the High Court, Takeda A/S has submitted a "Management Shareholders Agreement" from July 2007 between Nycomed Luxco S.A., Nycomed S.C.A., SICAR, Nycomed Sweden Holding 1 AB, Nycomed Sweden Holding 2 AB, Nycomed A/S, The Investor Shareholders and The Management Shareholders. The agreement regulates in particular the rights and obligations of The Management Shareholders in relation to the owners of Nycomed. S.C.A., SICAR. According to the agreement, The Management Shareholders only own shares in Nycomed Sweden Holding 2 AB. The agreement contains, among other things, a regulation of the possibilities to dispose of their shares, provisions on breach of the agreement and a regulation of

"Exit.

The agreement states that an "Investor Shareholders Agreement" has also been entered into between the same parties with the exception of "The Management Shareholders" and that this agreement prevails in the event of any inconsistency between the two agreements in relation to

"the Management Shareholders". The agreement has not been presented during the proceedings.

*Sale of the Nycomed Group in 2011 and 2012 - "Exit"*

On May 19, 2011, an agreement was signed to sell the Nycomed Group (excluding the Group's US operations) to Takeda Pharmaceutical Company. The transfer was completed by Nycomed Sweden Holding 2 AB selling its shares in Nycomed A/S (Takeda) to Takeda Pharmaceutical Company on September 30, 2011. The sales price for the shares in Nycomed A/S amounted to approximately EUR 9.6 billion.

At the time of completion of the transfer of the shares in Nycomed A/S to Takeda Pharmaceutical Company, Nycomed A/S' debt to Nycomed Sweden Holding 2 AB on the loan in question (including accrued interest) amounted to EUR 812,900,414. On September 21, 2011, immediately prior to the completion of the share transfer, Nycomed Sweden Holding 2 AB converted its entire receivable (including accrued interest) into new share capital in Nycomed A/S. The newly subscribed shares were included in the transfer to Takeda Pharmaceutical Company.

Immediately after the sale, Nycomed Sweden Holding 2 AB distributed a significant portion of the sale proceeds (approximately EUR 3.8 billion) to its parent company, Nycomed Sweden Holding 1 AB.

Nycomed Sweden Holding 1 AB redistributed most of the dividends received to its parent company, Nycomed S.C.A., SICAR, and in October 2011 the company repaid its loan (including accrued interest) totaling approximately EUR 790 million to Nycomed S.C.A., SICAR.

Nycomed Sweden Holding 1 AB had a receivable from Nycomed Sweden at the time of the sale at the end of September 2011

Holding 2 AB of approximately EUR 248 million relating to unpaid group contributions. This debt was subsequently forgiven by Nycomed Sweden Holding 1 AB deciding to make a grant (aktieägartilskott) to its subsidiary, thereby offsetting the debt.

Following the sale of Nycomed A/S to Takeda Pharmaceutical Company, Nycomed Sweden Holding 2 AB acted as the holding company for the US operating company through an intermediate US holding company. On July 30, 2012, Nycomed Sweden Holding 2 AB (which at that time had changed its name to Fougera Sweden Holding 2 AB) sold its shares in the US holding company to the independent company Sandoz Inc. The purchase price amounted to approximately EUR 1 billion. The main part of the sales price was distributed in 2012 to Nycomed Sweden Holding 1 AB, which in turn distributed the main part to its parent company, Nycomed S.C.A., SICAR.

Nycomed S.C.A., SICAR, made repayments of contributed capital and paid out proceeds to its investors in connection with capital reductions in 2011 and 2012 totaling approximately EUR 6.1 billion. *B-171-13 NTC Parent S.a.r.l. v. Skatteministeriet*

*SKAT's decision of March 18, 2011*

On March 18, 2011, SKAT ruled that Nordic Telephone Company Investment ApS was obliged to withhold tax at source on the interest payments/additions made in the period from May 1, 2006 to July 10, 2008 in favor of the company's parent company, Angel Lux Common S.a.r.l.

In this connection, SKAT stated that the two Luxembourg companies, Angel Lux Common S.a.r.l. and Angel Lux Parent S.a.r.l. could not, in SKAT's opinion, be considered

**3216**

for beneficial owners in relation to the consolidated interest payments/accruals, but instead had to be considered to act as flow-through entities for a number of private equity funds and banks, which are mainly domiciled in countries without a double tax treaty with Denmark, and thus not entitled to obtain the benefits that follow.

SKAT's decision of March 18, 2011 states, among other things:

"*Flow-through in the form of interest accrual*

*1. Description of the company*

Nordic Telephone Company Investment ApS is the ultimate Danish parent company for a number of Danish companies, including TDC A/S. The Group also owns a number of foreign subsidiaries. Nordic Telephone Company Investment ApS was founded on November 10, 2005. As of November 14, 2005, the company has been included as a subsidiary in a group. In the period from November 14, 2005, the company has been owned by companies in Luxembourg, which in turn are owned by five large private equity funds, and from April 28, 2006 also by foreign banks with a smaller share.

*2. Numerical statement in DKK*

Includes.

| | | | | | | |
|---|---|---|---|---|---|---|
| Includes. | | | | | | |
| | 2 | 8 | | t | 1.410.657. | liability for interest for the |
| | 0 | | | a | 397 | period 1.5.- |
| Ind- | 0 | | I | Interest | 824.768. | 31.12.2006 |
| coming | 7 | | n | rates for | 741 | 922.794.206 |
| year | 2 | | | the whole | | |
| | 0 | | t | year | | |
| 2006 | 0 | | o | 1.329.208.093 | | |

U.2023.3198H

| Of which withholding obligation for interest for the period 1.1.-31.3.2008 | liability for interest for the period 1.4.-10.7.2008 | Pure tax percent | Interest tax |
|---|---|---|---|
| | | 30 % | |
| | | 30 % | |
| | | 30 % | |
| 390.745.904 | | 25 % | 276,8 |
| | 434.022.837 | | 38,26 |
| | | | 2 |
| | | | 423.197.219 |
| | | | 117.223.771 |
| | | | 108.505.709 |
| | | | 925.764.961 |

*3. Background information*

Copyright © 2023 Karnov Group Denmark A/S

The case concerns whether Nordic Telephone Company Investment ApS must withhold interest withholding tax on interest on shareholder loans to Angel Lux Common S.à.r.l. for the period from May 1, 2006 to
July 10, 2008.

In general, five private equity funds established a group consisting of a number of companies domiciled in Luxembourg and Denmark for the purpose of acquiring TDC A/S in the last half of 2005 (section 3.1).

The financing of the acquisition of TDC A/S has, among other things, been done by the five private equity funds and others lending funds to Nordic Telephone Company Investment ApS.

The loans consist of a special type of corporate bonds, *Preferred Equity Certificates* (PECs) issued by Nordic Telephone Company Investment ApS in December 2005 and January 2006 (section 3.2).

The PECs were subsequently transferred in April 2006 by the 5 private equity funds and others to a newly established subsidiary in Luxembourg (Angel Lux Parent S.à.r.l.). This subsidiary immediately transferred the loan to another newly established subsidiary (Angel Lux Common S.à.r.l.) (sections 3.3 and 3.4). The latter subsidiary is thus formally a creditor in relation to Nordic Telephone Company Investment ApS. Payments on the transfer of PECs have been made by establishing debt relationships of a similar size.

The interest according to PECs is paid/attributed in a chain from Nordic Telephone Company Investment ApS through the companies in Luxembourg to the 5 private equity funds and others (flow-through) (section 4).

Interest on PECs is paid/accrued in the period from issuance on December 21, 2005 to July 10, 2008, when PECs issued by Nordic Telephone Company Invest- ment ApS, including accumulated interest, are written off.

*3.1. Establishment of the Group*

...

*3.1.1. The 5 private equity funds found 5 companies in Luxembourg Kabler S.à.r.l.*, domiciled in Luxembourg, is founded on July 4, 2005 by:

- Permira Europe III L.P,1
- Permira Europe III L.P.2
- Permira Europe III, Gmbh & Co. Kg
- Permira Europe III Co-Investment Scheme
- Permira Investments Limited

*Angel Lux I S.à.r.l.*, domiciled in Luxembourg, is incorporated on November 8, 2005 by Apax WW Nominees Ltd.

*Angel Lux II S.à.r.l.*, domiciled in Luxembourg, is incorporated on November 8, 2005 by:

- Blackstone Family Communications Partnership (Cayman) L.P.
- Blackstone Family Investment Partnership (Cayman) IV-A L.P.
- Blackstone Capital Partners (Cayman) IV-A Lp.
- Blackstone Participation Partnership (Cayman) IV

L.P. Each company subscribes ¼ of the capital.

*Angel Lux III S.à.r.l.*, domiciled in Luxembourg, becomes founded on November 8, 2005 by Providence Equity Offshore Partners V LP.

*Angel Lux IV S.à.r.l.*, domiciled in Luxembourg, is incorporated on November 8, 2005 by KKR Millennium Fund (Overseas) Limited Partnership.

**3217**

*3.1.2. Foundation of the NTC companies in Denmark*
Nordic Telephone Company Investment ApS is founded on

November 10, 2005. The shares are transferred on November 14, 2005

to the 5 newly founded companies in Luxembourg - Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. and Kabler S.à.r.l.

Nordic Telephone Company Administration ApS and Nordic Telephone Company Finance ApS are founded by Nordic Telephone Company Investment ApS on November 15 and 10, 2005 respectively. Nordic Telephone Company Holding ApS is founded by Nordic Telephone Company Finance ApS on November 11, 2005.

Nordic Telephone Company ApS is founded on October 21, 2005 by an external lawyer and is taken over by Nordic Telephone Company Holding ApS on November 30, 2005.

*3.2. Purchase of shares in TDC A/S*

On November 30, 2005, Nordic Telephone Company ApS acquires 10.08% of the share capital of TDC A/S for a purchase price of DKK 7,554,600,000 (approximately EUR 1 billion). At the same time, Nordic Telephone Company ApS makes a public offer for the remaining share capital of TDC A/S.

In a stock exchange announcement on January 25, 2006, it is announced that Nordic Telephone Company ApS has received sale acceptances for 78.1% of the share capital in TDC A/S and thus owns 88.2% of the share capital in TDC A/S.

This ownership share was subsequently reduced to 87.9% as a result of the reversal of employee shares in December 2006.

The acquisition is financed, as described in more detail below, partly by borrowing from third parties and partly by capital increases made from the ultimate Danish parent company, Nordic Telephone Company Investment ApS, down through the Danish part of the Group.

The funds for these capital increases come mainly from the 5 capital funds. The capital is injected into Nordic Telephone Company Invest- ment ApS in two ways:

1.   Firstly, the 5 companies in Luxembourg make a capital increase in the company.
2.   Secondly, the company raises loans from the 5 private equity funds etc. In connection with the acquisition of TDC A/S, Nordic Telephone Company Investment ApS issues PECs in two tranches.

In general, PECs are a financial instrument similar to an interest-bearing corporate bond. The buyer of PECs thus effectively becomes a lender to the issuer of the PECs. The interest paid is considered by the tax authorities in certain countries as a dividend for the owner of the PECs (the lender). The difference between shares and PECs is, among other things, that the shareholder has security in the company and owns a share of the company (equity), while the PECs owner has security as a creditor (in a receivable) in the company. Furthermore, PECs do not grant voting rights.

*3.2.1. December 21, 2005 - issuance of PECs (section a) and capital increases (section b)*

*3.2.1.a. Issuance of PECs*

PECs will be issued for the first time on December 21, 2005 with a total value of EUR 822,532,075 (approximately DKK 6.1 billion).

PECs are purchased on December 21, 2005 by the 5 private equity funds involved as lenders:

•    Apax Partners Worldwide LLP (Guernsey, Channel Island)
•    The Blackstone Group International Limited (Cayman Island)
•    Providence Equity Partners Limited (Cayman Island)
•    Kohlberg Kravis Roberts & Co. L.P. (Canada)
•    Permira Advisers KB (Guernsey and Germany)

The Subscription and Shareholders Agreement of December 7, 2005 states that PEC owners cannot purchase more PECs than

their ownership share of the company. However, it is the indirect owners of Nordic Telephone that

Company Investement ApS, which thus purchases the PECs issued on December 21, 2005.

The terms of the PECs can be found in part of the loan document for PECs ("Exhibit A, PEC Terms").

The loan document states that each PEC has a nominal value of EUR 25 and that the interest rate, "yield", on the PECs is nominally 10% p.a., calculated on a day-to-day basis (hence the interest rate to be calculated).

However, from the bank statements received from Nordic Telephone Company Investment ApS, it can be seen that the interest is calculated on the principal of the loan - without the accumulated interest additions, which is why compound interest has not been calculated.

The PEC issuer decides when they will pay interest and installments. Any payment of interest will be made by paying the interest that has accrued first (a form of FIFO principle). However, interest and loans are due for payment no later than 2054.

*3.2.1.b. Capital increases*

...

*Capital increases of the companies in Luxembourg:*

- Apax WW Nominees Ltd. carries out a capital increase in Angel Lux I S.à.r.l. with EUR 372,400 (approx. DKK 2.8 million).
- The Blackstone companies carry out a capital increase in Angel Lux II S.à.r.l. with EUR 451,125 (approximately DKK 3.4 million).
- Providence Equity Offshore Partners V LP makes a capital increase in Angel Lux III S.à.r.l. with EUR 392,075 (approximately DKK 2.9 million).

**3218**
- KKR Millennium Fund (Overseas) Limited Partnership proposes a capital increase in Angel Lux IV S.à.r.l. with EUR 420,600 (approx. DKK 3.1 million).
- The Permira companies and Schroder Ventures Investments Limited carry out a capital increase in Kabler S.à.r.l. with EUR 408,100 (December 20, 2005) (approximately DKK 3 million).

*Capital increases of companies in Denmark:*

The five companies in Luxembourg will carry out a capital increase on December 21, 2005 in Nordic Telephone Company Investment ApS with DKK 1,533,509,400 (approx. EUR 205.6m).

Subsequently, capital increases are made down through the Danish part of the group:

- Nordic Telephone Company Investment ApS carries out a capital increase in Nordic Telephone Company Administra- tion ApS on December 21, 2005 with DKK 7,667,542,352 (approx. EUR 1 billion).
- Nordic Telephone Company Administration ApS makes a capital increase in Nordic Telephone Company Finance ApS on December 21, 2005 with DKK 7,667,542,352.
- Nordic Telephone Company Finance ApS makes a capital increase in Nordic Telephone Company Holding ApS on December 21, 2005 with DKK 7,667,542,352.
- Nordic Telephone Company Holding ApS will carry out a capital increase in Nordic Telephone Company ApS on December 30, 2005 with DKK 7,667,542,352 (which however already takes place on November 30, 2005).

*3.2.2. January 25, 2006 - issuance of PECs (section a) and capital increases (section b)*
*3.2.2.a. Issuance of PECs*

Nordic Telephone Company Investment ApS will issue PECs for the second time on January 25, 2006. This is done with a total value of EUR 1,011,370,475 (approx. DKK 7.5 billion).

A total of EUR 1,833,902,550 (approx. DKK 13.7 billion) worth of PECs have subsequently been issued.

The second pool of PECs will be purchased on January 25, 2006 by the following capital funds and banks..:

- Apax Partners Worldwide LLP (Guernsey, Channel Island)
- The Blackstone Group International Limited (Cayman Island)
- Providence Equity Partners Limited (Cayman Island)
- Kohlberg Kravis Roberts & Co. L.P. (Canada)
- Permira Advisers KB (Guernsey and Germany)
- Deutsche Bank
- Credit Suisse
- Barclays
- JP Morgan
- RBS

*3.2.2.b. Capital increases*

...

*Capital increases of the companies in Luxembourg:*

- Apax WW Nominees Ltd. and Apax Angel Syndication Partners (Cayman) carry out a capital increase in Angel Lux I S.à.r.l. with EUR 264,400 and EUR 85,225 respectively. Total EUR 349,625 (approx. DKK 2.6 million).
- The Blackstone companies carry out a capital increase in Angel Lux II S.à.r.l. with EUR 626,350 (approximately DKK 4.7 million).
- Providence Equity Offshore Partners V LP and 3 other Providence companies carry out a capital increase in Angel Lux III S.à.r.l. with EUR 418,800 (approximately DKK 3.1 million).
- KKR Millennium Fund (Overseas) Limited Partnership and 2 other KKR companies carry out a capital increase in Angel Lux IV S.à.r.l. with EUR 479,150 (approximately DKK 3.6 million).
- The Permira companies and Schroder Ventures Investments Limited carry out a capital increase in Kabler S.à.r.l. with EUR 470,675 (approximately DKK 3.5 million) (January 24, 2006).

*Capital increases of companies in Denmark:*

The five companies in Luxembourg will carry out a capital increase on
January 25, 2006 in Nordic Telephone Company Investment ApS with DKK 1,748,584,013 (approx. EUR 234m).

The following banks will increase the capital of Nordic Telephone Company Investment ApS on January 25, 2006 by DKK 137,645,044 (approx. EUR 18.4 million) and thereby also become shareholders:

- Deutsche Bank AG, London
- Credit Suisse International, London
- Barcleys Capital PLC, London
- J. P. Morgan Securities LTD, London
- J. P. Morgan Whitefriars Inc, London
- The Royal Bank and Scotland plc, London

In total, there will be a capital increase in Nordic Telephone Company Investment ApS of DKK 1,886,229,057 (approx. EUR 252.8m).

Subsequently, capital increases are made down through the Danish part of the group:

- Nordic Telephone Company Investment ApS makes a capital increase in Nordic Telephone Company Administra- tion ApS with DKK 9,433,706,258 (approx. EUR 1.3 billion).
- Nordic Telephone Company Administration ApS makes a capital increase in Nordic Telephone Company Finance ApS with DKK 9,433,831,258 (approx. EUR 1.3 billion).

- Nordic Telephone Company Finance ApS makes a capital increase in Nordic Telephone Company

 **3219**

Holding ApS with DKK 10,990,784,249 (approx. EUR 1.5 billion) on January 30, 2006.

- Nordic Telephone Company Holding ApS makes a capital increase in Nordic Telephone Company ApS with DKK

189,957,143 (approximately EUR 25.5 million) on January 13, 2006 and

DKK 59,025,461,110 (approx. EUR 7.9 billion) on January 30 2006.

### 3.3. Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l.
### 3.3.1. Foundation

Angel Lux Common S.à.r.l., domiciled in Luxembourg, is founded on April 25, 2006 by the previously founded 5 companies in Luxembourg:

- Angel Lux I S.à.r.l.
- Angel Lux II S.à.r.l.
- Angel Lux III S.à.r.l.
- Angel Lux IV S.à.r.l.

- Kabler S.à.r.l.

Angel Lux Parent S.à.r.l., also domiciled in Luxembourg, is incorporated on April 26, 2006. Incorporation is made by a number of companies etc. that are primarily related to the five private equity funds.

The 5 companies - Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. and Kabler S.à.r.l. - owned Angel Lux Common S.à.r.l. from its incorporation on April 25, 2006 until December 20, 2007. As of the latter date, the 5 companies are liquidated so that Angel Lux Parent S.à.r.l. now owns Angel Lux Common S.à.r.l.

On April 27 and 28, 2006, the following share exchanges will take place:

- All shares in Nordic Telephone Company Investment ApS are transferred to Angel Lux Common S.à.r.l.
- The five companies in Luxembourg will all receive shares in Angel Lux Common S.à.r.l.
- The shares in the five companies in Luxembourg are transferred to Angel Lux Parent S.à.r.l.
- The private equity funds and banks get all ownership shares in Angel Lux Parent S.à.r.l.

...[Reference is made to the overview inserted under the section on Supplementary information about the group and the loans].

### 3.3.2. Handover of PECs

On April 27, 2006, all PECs are transferred from the 5 private equity funds

etc. to Angel Lux Parent S.à.r.l., which transfers them to Angel Lux Common S.à.r.l. on the same day.

Angel Lux Common S.à.r.l. is the sole owner of all PECs as of April 27, 2006. The acquisition cost is equal to the principal amount without accrued interest on April 27, 2006.

Neither the 5 private equity funds nor Angel Lux Parent S.à.r.l. receive effective payment upon transfer of the PECs. The payment is made by establishing a debt relationship between the 5 private equity funds etc. and Angel Lux Parent S.à.r.l. and between Angel Lux Parent S.à.r.l. and Angel Lux Common S.à.r.l.

Angel Lux Common S.à.r.l. owes Angel Lux Parent S.à.r.l. the same amount as Nordic Telephone Company Investment ApS owes Angel Lux Common S.à.r.l. as of April 27, 2006.

Angel Lux Parent S.à.r.l. also has a debt to the private equity funds

etc. in the same amount as Angel Lux Common S.à.r.l. has to Angel Lux Parent S.à.r.l.

From bank statements received by Nordic Telephone Company In- vestment ApS, the payment of interest and installments [note omitted] shows the following amounts:

| Date | Description | EUR | DKK |
|---|---|---|---|
| 06.02.2006 | Payments | 75,513,322 | approx. 563 million. |
| 09.02.2006 | Payments | 18.407.300 | approx. 137 million. |
| 10.11.2006 | Payments | 1.129.746 | approx. 137 million. |
| | Payments | | |
| | Payments | 250.371 | approx. 8 million. |
| | Receivable from a PEC owner | 95.299.739 | Approx. 2 million. |
| | | | Approx. 710 million. |

The principal amount on April 27, 2006 is: EUR 1,833,902,550 (approx. DKK 13.7 billion).

### 3.4. Debt repayment and payment of interest

SKAT has received an overview ("PEC status 31-12-2006") from Nordic Telephone Company Investment ApS. This shows that on October 6, 2006 the company pays an interest amount of EUR

55,872,414 (approx. DKK 416 million) and reduces the principal by EUR 39,427,325 (approx. DKK 294 million), corresponding to a total of EUR 95,299,739 (approx. DKK 710 million).

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

Payment is made according to the following payment steps:

*First step - TDC A/S distributes dividend*

On April 11, 2006, TDC A/S distributes a dividend of DKK 43,481m (approx. EUR 5.8bn)

Furthermore, on June 29, 2006, TDC A/S will distribute an extraordinary dividend of

DKK 862 million (approx. EUR 115 million) Of these two dividends, a total of approx.

DKK 5 billion (EUR 670 million) to minority shareholders.

On April 11, 2006, Nordic Telephone Company ApS will forward their dividend from TDC A/S to Nordic Telephone Company Holding ApS, DKK 39,533,903,000 (approximately EUR 5.3 billion).

Nordic Telephone Company Holding ApS has raised an external loan - senior facility - in connection with the acquisition of TDC A/S. Nordic Telephone Company Holding ApS uses the dividends received to repay the senior facility loan. But in order for TDC A/S to be acquired in the first place

**3220**

can distribute dividends, they need to take out a loan. They therefore take over the senior facility loan. The distribution, debt repayment and debt assumption happen together.

*Second step - Nordic Telephone Company Holding ApS distributes dividend*

On April 18, 2006, Nordic Telephone Company Holding ApS distributes a dividend of DKK 2,363,867,000 (approx. EUR 316m) to Nordic Telephone Company Finance ApS.

Nordic Telephone Company Finance ApS has also taken out an external loan - PIK loan [note omitted] - in connection with the acquisition of TDC A/S. Nordic Telephone Company Finance ApS uses the dividend received to repay the PIK loan.

*Third step - Nordic Telephone Company Finance ApS provides loan* On October 4, 2006, Nordic Telephone Company Finance ApS raises a new loan of EUR 95,800,000 (approx. DKK 718.5 million).

Nordic Telephone Company Finance ApS then grants a loan to Nordic Telephone Company Administration ApS of DKK 731,089,000 (approx. EUR 98 million).

*Fourth step - Nordic Telephone Company Administration ApS distributes dividend*

On October 6, 2006, Nordic Telephone Company Administration ApS uses their loan from Nordic Telephone Company Finance ApS to distribute dividends of DKK 712,851,000 (EUR 95.6 million) to Nordic Telephone Company Investment ApS.

*Fifth step - Nordic Telephone Company Investment ApS pays interest and installments*

Nordic Telephone Company Investment ApS uses their received dividends to pay interest and installments on the PECs on October 6 and 9, 2006 and November 10, 2006, respectively.

As mentioned, the bank statement shows that Nordic Telephone Company Investment ApS pays a total of EUR 95,299,739 (approx. DKK 710 million). This is stated in "PEC status 31-12-2006" from the company,

Copyright © 2023 Karnov Group Denmark A/S

that EUR 55,872,414 (approx. DKK 416 million) is paid in interest and EUR 39,427,325 (approx. DKK 294 million) in installments to the various companies and banks in the Group.

Of which they pay interest/repayments of EUR 606,857 (approximately DKK 4.5 million) to Angel Lux Common S.à.r.l. and EUR 398,510 (approximately DKK 2.9 million) to Angel Lux Parent S.à.r.l.

All other payments are made directly to private equity funds and banks and include both interest and installments.

After the payment, there will be a reduction of the debt ratio between all companies by EUR 39,427,325 (approx. DKK 294 million). The reduction is between Nordic Telephone Company Investment ApS and Angel Lux Common S.à.r.l., between Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l., and finally between Angel Lux Parent S.à.r.l. in relation to the capital funds and banks.

...

In a letter dated April 20, 2010, Nordic Telephone Company Investment ApS explained the cash flows around PEC, including that the company paid EUR 502,439 to PEC owners on June 19, 2007, but the annual accounts for 2007 for Angel Lux Common S.à.r.l. show that Angel Lux Common S.à.r.l. only received EUR 501,129 in 2007. The difference has not been disclosed to SKAT. The accounts of Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. do not show whether the amount of EUR 501,129 was paid to Angel Lux Parent S.à.r.l.

### 3.5. Issuance of PECs in December 2006

On December 7, 2006, Angel Lux Parent S.à.r.l. will carry out a minor capital increase of EUR 800. The increase is made by HD Invest, Virum ApS ...

On December 22, 2006, Nordic Telephone Company Investment ApS also issues PECs to Angel Lux Common S.à.r.l.

Angel Lux Common S.à.r.l. will have a corresponding increase in their debt to Angel Lux Parent S.à.r.l.

Angel Lux Parent S.à.r.l. also receives an increase in their debt, where HD Invest, Virum ApS enters as a shareholder and PEC's owner with DKK 318,625 on December 22, 2006. The actual payment for PEC's expansion takes place in March 2007.

### 3.6. Status on December 31, 2006

At December 31, 2006, Nordic Telephone Company Investment ApS has an outstanding debt on PECs to Angel Lux Common S.à.r.l. of EUR 1,917,212,261 (approximately DKK 14.3 billion).

Angel Lux Common S.à.r.l. has on December 31, 2006 a remaining debt on PECs to Angel Lux Parent S.à.r.l. of EUR 1,917,445,886 (approximately DKK 14.3 billion).

Angel Lux Parent S.à.r.l. has on December 31, 2006 an outstanding debt on PECs to the private equity funds and banks of EUR 1,917,853,096 (approximately DKK 14.3 billion).

Nordic Telephone Management Holding ApS is founded on December 20, 2006 and becomes a shareholder in Nordic Telephone Company Investment ApS on December 22, 2006.

Nordic Telephone Management Holding ApS is primarily owned by Angel Lux Common S.à.r.l. with 81.3% and the rest by senior employees.

...

### 4. Interest accrued on PECs from December 21, 2005 to July 10, 2008

#### 4.1. Income year 2006:

Nordic Telephone Company Investment ApS has for the income year 2006, due to the staggered financial year, deducted the following interest expenses of PECs:

**3221**

| | EUR | DKK |
|---|---|---|
| December 21, 2005 - December 31, 2005 ber 2005 | 2.478.864 | 18.516.053 |
| January 1, 2006 - December 31 2006 | 175.811.961 | 1.329.208.093 |
| Total deducted for tax purposes | 178.290.825 | 1.347.724.146 |

Nordic Telephone Company Investment ApS paid interest on PECs on October 6, 2006, cf. section 3.4 above. The principal was thus increased by the following interest as of December 31, 2006:

| | EUR | DKK |
|---|---|---|
| Total interest expenses December 21, 2005 - December 31, 2006 | 178.290.825 | 1.347.724.146 |
| Interest paid on October 6, 2006 | -55.872.414 | -416.462.940 |
| Accumulated interest expense December 31, 2006 | 122.418.411 | 931.261.206 |

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. recognized the following interest income in 2006: Amounts in EUR

| | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| Accumulated interest income December 31, 2006 | 122.418.411 | 122.076.311 |
| Interest income received October 6, 2006 | 1.760.727 | 1.729.595 |
| Total recognized | 124.180.447 | 123.805.906 |

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. have expensed the following interest expenses in 2006: Amounts in EUR

mulated interest expense December 31, 2006

Interest expenses paid October 6,

2006

| | *Angel Lux Com-<br>mon S.à.r.l.* | *Angel Lux Parent<br>S.à.r.l.* |
|---|---|---|
| | 122.076.311 | 122.101.996 |
| | 1.729.595 | 1.712.610 |

| | | | | |
|---|---|---|---|---|
| Total expensed in total | | | 123.805.906 | 123.814.606 |

Angel Lux Parent S.à.r.l. has recognized the interest expenses deducted by Angel Lux Common S.à.r.l. for PECs in 2006.

| DEBT | Investment | ADVANTAGE | Common |
|---|---|---|---|
| Principal amount | 1.833.902.550 | Principal amount | 1.833.902.550 |
| Redemption | (39.427.325) | Redemption | (39.427.325) |
| Increase | 318.625 | Increase | 318.625 |
| Sum | 1.794.793.850 | Sum | 1.794.793.850 |
| Interest 10% of | 122.418.411 | Interest 10% of | 122.419.720 |
| Last day | 1.917.212.261 | Last day | 1.917.213.570 |

There are three different loan conditions illustrated below for 2006: (Amounts in EUR):

| DEBT | | ADVANTAGE | Parent |
|---|---|---|---|
| Principal amount | 1.833.902.550 | Principal amount | 1.833.902.550 |
| Redemption | (38.851.600) | Redemption | (38.851.600) |
| Increase | 318.625 | Increase | 318.625 |
| Sum | 1.795.369.575 | Sum | 1.795.369.575 |
| Interest rates | 122.076.311 | Interest rates | 122.076.311 |
| | 9,96875% | | 9,96875% |
| Last day | 1.917.445.886 | Last day | 1.917.445.886 |

| DEBT | |
|---|---|
| Principal amount | 1.833.902.550 |
| Redemption | (38.470.075) |
| Increase | 318.625 |
| Sum | 1.795.751.100 |
| Interest rates | 122.101.996 |
| | 9,96875% |
| Last day | 1.917.853.096 |

The table above shows that the principal at the beginning of 2006 is of the same size and that the debt at the end of 2006 is of almost the same size for the three companies.

It also appears that the debt reduction of EUR 39,427,325 (approx. DKK 294 million), cf. section 3.4 above, can be followed from Nordic Telephone Company Investment

**3222**

ApS to Angel Lux Common S.à.r.l., but the debt from Angel Lux Common S.à.r.l. to Angel Lux Parent S.à.r.l. has only been reduced by EUR 38,851,600.

The debt from Angel Lux Parent S.à.r.l. to the PEC owners with the capital funds and banks has only been reduced by EUR 38,470,075.

SKAT is not aware of the reason for the differences in the debt reductions.

Furthermore, it appears that the interest rate is 10% p.a. in Nordic Telephone Company Investment ApS, while it is 9.96875% p.a. in both Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l.

Angel Lux Parent S.à.r.l.'s debt at December 31, 2006 to the PECs owners is composed as follows:

Amount in EUR

| | Principal amount | Accrued interest ter | Total debt 31.12.2006 |
|---|---|---|---|
| Apax | 282.989.375 | 19.241.847 | 302.231.222 |
| Blackstone | 421.854.900 | 28.684.000 | 450.538.900 |
| KKR | 352.262.200 | 23.952.049 | 376.214.249 |
| Permira | 348.946.375 | 23.726.589 | 372.672.964 |
| Providence | 317.467.075 | 21.586.156 | 339.053.231 |
| Deutsche Bank, London Branch | 23.475.125 | 1.596.190 | 25.071.315 |
| Credit Suisse Securities Europe Limited | 16.252.000 | 1.105.054 | 17.357.054 |
| JP Morgan Whitefriars Inc | 3.524.500 | 239.648 | 3.764.148 |
| JP Morgan Securities Limited | 7.310.200 | 497.057 | 7.807.257 |

U.2023.3198H

| | | | |
|---|---|---|---|
| Barclays Capital Princ. Invest. Limited | 10.834.675 | 736.703 | 11.571.378 |
| RBSM Invest. Limited | 10.834.675 | 736.703 | 11.571.378 |
| *TOTAL* | *1.795.751.100* | *122.101.996* | *1.917.853.096* |

Copyright © 2023 Karnov Group Denmark A/S

### 4.2. Income year 2007:

For the income year 2007, Nordic Telephone Company Investment has

ApS deducted the following interest expenses of PECs for tax purposes:

|  | EUR | DKK |
|---|---|---|
| Accumulated interest expense 31. December 2007 | 191.218.786 | |
| Interest paid on June 19, 2007 | 502.439 | |
| Total expensed | 191.721.225 | 1.410.657.397 |

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. have entered

The following interest income was recognized in 2007: Amount in EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| Accumulated interest income December 31st, 2007 | 191.218.788 | 191.145.387 |
| Interest paid in 2007 | 501.129 | |

| | DEBT | In vest ment | ADVANTAGE | Common |
|---|---|---|---|---|
| Principal amount | 1.917.212.261 | Principal amount | 1.917,213.570[i] | |
| Payment options | -502.439[2] | Payment options | -501.129 | |
| Interest 10% of | 191.721.225 | Interest 10% of | 191.719.917 | |
| Last day | 2.108.432.O47 | Last day | 2.108.432.358 | |

| | DEBT | | ADVANTAGE | Parent |
|---|---|---|---|---|
| Principal amount | 1.917.445.886 | Principal amount | L.917.445.886 | |
| Interest 9.96875% | 191.145.387 | Interest 9.96875% | 191.145.387 **3223** | |
| Last day | 2.108.591.273 | Last day | 2.108,591.273 | |

| | DEBT | |
|---|---|---|
| Principal amount | 1.917.853.096 | |
| Interest 9.96875% | 191.164.588 | |
| Last day | 2.109.017.684 | |

|  |  |
|---|---|
| Total recognized as revenue | 191.719.917    191.145.387 |

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. have recognized the following interest expenses in 2007:

Amount in EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| Fishing rod | | |
| Accumulated interest expense 31. December 2007 | 191.145.387 | 191.164.588 |

Angel Lux Parent S.à.r.l. has recognized the interest expenses deducted by Angel Lux Common S.à.r.l. for PECs for 2007.

Appendix 9 contains a table with the interest imputations regarding PECs for the income year 2007 in the three companies mentioned. The table is based on approximate figures in EUR for Nordic Telephone Company Investment ApS, as SKAT is only in possession of the exact interest imputations from this company in Danish kroner.

*ANNEX 9 Interest credited for the income year 2007 (amount in EUR)*

### 4.3. Income year 2008:

For the income year 2008 Nordic Telephone Company Investment ApS has deducted the following interest expenses on PECs for tax purposes:

|  | EUR | DKK |
|---|---|---|
| Accumulated interest expenses January 1, 2008 - July 10, 2008 | 107.725.849 | |
| Interest paid on June 27, 2008 | 2.880.370 | |
| Total expensed | 110.606.219 | 824.768.741 |

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. recognized the following interest income in 2008:

anuary 1, 2008 - July 10, 2008

January 1, 2008 -

J

December 31, 2008

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. have recognized the following interest expenses in 2008:

| Amount in EUR | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| January 1, 2008 - December 31, 2008 | 107.149.774 | 210.515.257 |

| Amount in EUR | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| | 210.515.257 | 210.221.308 |

Copyright © 2023 Karnov Group Denmark A/S

Angel Lux Parent S.à.r.l. has recognized the interest expenses deducted by Angel Lux Common S.à.r.l. for PECs in 2008.

Appendix 10 contains a table with the interest accrued on PECs for the income year 2007 in the three companies mentioned.

*ANNEX 10 Interest credited for the income year 2008 (amount in EUR)*

| DEBT | Investment | ADVANTAGE | Common |
|---|---|---|---|
| Principal | 2.108.431,047 | Principal | 2.108.432,358 |
| Interest | 110.606.219 | Interest 10% | 107.149,774 |
| 10% End of year | NONE³ | Last day | NONE |

| DEBT | | ADVANTAGE | Parent |
|---|---|---|---|
| Principal amount | 2.108.591.273 | Principal amount | 2.108.591.273 |
| Interest 9.96875% | 210.515.257 | Interest 9.96875% | 210.515.257 |
| Last day | 2.319,106.530 | Last day | 2,319.106.530 |

| DEBT | |
|---|---|
| Principal amount | 2.109.017.684 |
| Interest 9.96875% | 210.221.30 |
| Last day | 2.319.258.992 |

The table shows that the interest expenses deducted by Nordic Telephone Company Investment ApS in the 2008 income year are significantly reduced compared to the two previous income years. This is because the remaining debt and the unpaid accrued interest will be converted into additional share capital in Nordic Telephone Company Investment ApS on July 10, 2008.

The interest rate remains 10% p.a. from Nordic Telephone Company Invest- ment ApS to Angel Lux Common S.à.r.l. until the debt conversion on July 10, 2008.

The interest rate between Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. is 9.96875% p.a. until July 9, 2008 and the same percentage is applicable from Angel Lux Parent S.à.r.l. onwards. The financial statements of Angel Lux Common S.à.r.l. for the 2009 financial year show that the interest rate on PECs between Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. will be changed on July 9, 2008 from 9.96875% p.a. to 10% p.a. The interest rate on PECs from Angel Lux Parent S.à.r.l. to the private equity funds and banks remains unchanged at 9.96875% p.a.

The 2009 accounts for Angel Lux Parent S.à.r.l. are not yet available, which is why SKAT has not been able to conclude whether there is also a debt conversion here.

**5. Activity in Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l.**

Angel Lux Parent S.à.r.l. and Angel Lux Common S.à.r.l. in Luxembourg have, on the basis of

**3224**

the annual accounts for the income year 2006-2008, a minimal physical presence in Luxembourg.

The financial statements of Angel Lux Common S.à.r.l. for 2006 show on page 4 that there are expenses of EUR 8,701 referred to as Other external charges and expenses of EUR 209,349 referred to as Other operating charges. These are specified in Appendix 4 (Annex 4) (see table below).

The financial statements of Angel Lux Parent S.à.r.l. for 2006 also show on page 4 that there are expenses of EUR 3,337 referred to as Other external charges and expenses of EUR 127,031 referred to as Other operating charges. These are specified in Appendix 4 (Annex 4) (see table below).

*Angel Lux Common S.à.r.l.*

| | |
|---|---|
| *Other external expenses (Andre eksterne udgifter)* | *8.701* |
| Personal compensation (salary) | 7.810 |
| Social security contribution (Sociale sikkerheds bi- drag) | 891 |
| *Other operating expenses (Andre driftsomkost- ninger)* | *209.349* |
| Loyers et charges locatives (Leje og lokaleudgifter) | 3.253 |
| Telephone expenses (Telefonudgifter) | 300 |
| Notary fees (Notary) | 7.030 |
| Legal fees (Attorney fees) | 174.579 |
| Accounting costs (regnskabsomkostninger) | 5.000 |

U.2023.3198H

| | |
|---|---|
| Audit costs *(Revisionsomkostninger)* | 10.000 |
| Tax costs *(tax costs)* | 6.000 |
| Other personnel costs *(Andre personaleomkost-ninger)* | 1.324 |
| Social Secretariat *(salary)* | 424 |
| Voyage et subsistance *(*Travel *and subsistence)* | 644 |

Copyright © 2023 Karnov Group Denmark A/S

| | |
|---|---|
| Dépenses fournitures (Forsyningsudgifter) | 511 |
| Other personnel costs (Andre personaleomkost- ninger) | 284 |
| SKAT's translation | |

*Angel Lux Parent S.à.r.l.*

| | |
|---|---|
| Other external expenses (Andre eksterne udgifter) | *3.337* |
| Compensation (salary) | 2.996 |
| Charges sociales (Sociale sikkerheds bidrag) | 341 |
| Other operating expenses (Andre driftsomkostninger) | *127.031* |
| Loyers et charges locatives (Leje og lo- kaleudgifter) | 3.253 |
| Notary fees (Notary) | 58.250 |
| Legal fees (Attorney fees) | 43.170 |
| Accounting costs (regnskabsomkostnin- ger) | 5.000 |
| Audit costs (Revisionsomkostninger) | 10.000 |
| Tax costs (tax costs) | 6.000 |
| Social Secretariat (salary) | 324 |
| Voyage (Travel) | 820 |
| Other personnel costs (Other personnel costs) | 214 |
| SKAT's translation | |

The accounts of Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. show that modest expenses are paid for any employees and for furnishing/renting premises.

The 2006 income year is the first income year for companies in Luxembourg, which may help explain the large expenses for lawyers and notaries.

SKAT has requested documentation for the expense items from both Nordic Telephone Company Investment ApS and the Luxembourg authorities in the form of lease contracts, employment contracts and registration in Luxembourg as an employer. In addition, SKAT has requested the authorities in Luxembourg for a specification of the costs for lawyer and notary. The material has not been received.

The companies Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. do not receive any additional liquidity other than the one-off amounts they receive from Nordic Telephone Company Investment ApS on October 6, 2006 of EUR 606,857 and EUR 398,510 respectively in connection with the payment of interest and installments, cf. section 3.4 above. Section 4 above describes that Nordic Telephone Company Investment ApS on June 19 and June 27, 2008 pays interest expenses to the PEC owners of EUR 502,439 and EUR 2.880.370. In addition, the companies have remaining cash and cash equivalents from their incorporation that can cover the deficits in the companies.

Based on the accounts, it can be assumed that Angel Lux Common S.à.r.l.'s only asset, apart from the subsidiary shares, is the claim on PECs at Nordic Telephone Company Investment ApS. The Luxembourg authorities have informed SKAT that Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. are fully taxable to Luxembourg.

A Google search shows that this is the address of several different companies (large and small).

The address is also used by companies with direct ties to one of the Big 5 private equity funds (Apax).

*6. Other structural changes*

*6.1. The five intermediary companies in Luxembourg*

Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. and Kabler S.à.r.l. are all liquidated on December 20, 2007.

**3225**

...

*6.2. The debt conversion of Nordic Telephone Company Invest- ment ApS and Angel Lux Common S.à.r.l.*

On July 10, 2008, a debt conversion is made at Nordic Te- lephone Company Investment ApS by PECs of the remaining principal and accumulated interest.

The ownership structure as of December 31, 2008 is unchanged from the ownership structure December 31, 2007 ...

The financial statements of Angel Lux Common S.à.r.l. show that there is a debt conversion in Angel Lux Common S.à.r.l. on December 18, 2009.

As mentioned, the 2009 accounts for Angel Lux Parent S.à.r.l. are not yet available, which is why SKAT has not been able to see from the accounts whether there is also a debt conversion here.

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. have their registered office at 41 Boulevard de Prince Henri. SKAT has investigated the address more closely. Apparently, the address is used as an office hotel. There is indeed a building with offices, but the

*6.3. Mergers in Danish companies in 2009*

In December 2009, the following mergers are approved with retroactive effect to January 1, 2009:

- TDC A/S and Nordic Telephone Company ApS (with TDC A/S as the continuing company).
- Nordic Telephone Company Investment ApS, Nordic Telephone Company Administration ApS, Nordic Telephone Company Finance ApS and Nordic Telephone Company Holding ApS (with Nordic Telephone Company Administration ApS as the continuing company).

On December 18, 2009, a share swap is adopted whereby Angel Lux Parent S.à.r.l. acquires the shareholding in Nordic Te- lephone Management Holding ApS from Angel Lux Common S.à.r.l.

...

*6.4. Dividends in 2009 to private equity funds etc.*

On April 22, 2010, the CFO of TDC A/S informed the press (Computer-world) that the Swiss competition authorities would not approve TDC A/S' sale of part of its Swiss subsidiary, Sunrise. A sale that would immediately bring TDC A/S DKK 11 billion. In this connection, the CFO states that the Group does not regret the payment of DKK 6 billion to the shareholders.

In a press release dated December 17, 2009, the Group announced that the sale of Sunrice will generate just over DKK 11 billion for TDC A/S, and it has therefore been decided to make an early dividend payment of DKK 6 billion to the company's shareholders in 2009.

As 87.9% of the share capital of TDC A/S is owned by Angel Lux Common S.à.r.l., most of the extraordinary dividend of DKK 6 billion will be channeled through Angel Lux Common S.à.r.l. The financial statements of Angel Lux Common S.à.r.l. for the income year 2009 show that the company's debt to Angel Lux Parent S.à.r.l. was converted into additional "share capital" on December 18, 2009,

but the dividend from TDC A/S is not included in the financial statements of Angel Lux Common S.à.r.l.

The dividend share that Angel Lux Common S.à.r.l. is seen to have passed on to the private equity funds. However, it should be noted that SKAT is not currently in possession of the financial statements of Angel Lux Parent S.à.r.l. for the 2009 income year, but the article in which the CFO of TDC A/S makes a statement does not refute that the dividend has ended up with the private equity funds.

At a later date, SKAT will investigate whether dividend tax should have been withheld in connection with the payment of dividends at the end of 2009 to the private equity funds.

*6.5. Merger in 2010 of Angel Lux Common S.à.r.l. and Nordic Telep- hone Administration ApS*

On page 12 of Angel Lux Common S.a.r.l.'s financial statements for 2009, there is information that on January 15, 2010, the company's Board of Directors decided to merge with Nordic Telephone Company Administration ApS with effect from January 1, 2010.

In a major shareholder announcement dated April 16, 2010, the Danish part of the Group announced that the top Danish company (from January 1, 2009), Nordic Telephone Company Administration ApS will be merged with Angel Lux Common S.a.r.l. with effect from

January 1, 2010.

Angel Lux Common S.a.r.l. becomes the continuing company and Nordic Telephone Company Administration ApS is dissolved by the merger.

As a result, Angel Lux Common S.a.r.l. will become the owner of 87.9% of the shares in TDC A/S.

...

*7. Withholding of interest tax*

*7.1. Internal law*

It is established in section 2(1)(d), first sentence, of the Danish Corporation Tax Act that companies and associations, etc. as mentioned in section 1(1), which are domiciled abroad, are liable to tax in Denmark if they receive interest from sources in Denmark concerning debt that a company or an association, etc. covered by section 1 or point a has to legal persons as mentioned in section 3B of the Danish Tax Control Act (controlled debt). According to section 2(1)(d) of the Danish Corporation Tax Act, there is generally limited tax liability on intra-group interest.

The provisions of section 3 B of the Tax Control Act describe whether taxpayers are subject to a controlling influence in the form of ownership or disposal of voting rights, such that they directly or indirectly own more than 50% of the share capital or control more than 50% of the votes. By Act no. 308 of 19 April 2006, with effect from 1 May 2006, a provision was added to section 3 B, subsection 2, third sentence, stating that when assessing whether the taxpayer is considered to have a controlling influence over a legal person or whether a controlling influence over the taxpayer is exercised by a

**3226**

legal or natural person, ownership interests and voting rights held by other shareholders with whom the shareholder has an agreement on the exercise of joint control are included.

Section 2(2)(3) of the Danish Tax Assessment Act states that a controlling influence is defined as ownership or disposal of voting rights such that the company directly or indirectly owns more than 50% of the share capital or controls more than 50% of the votes.

As an exception to the general rule, it follows from section 2(1)(d) of the Danish Corporation Tax Act that the withholding

tax on interest shall be waived when, pursuant to a double taxation treaty or an interest rate agreement, the

/The Royalties Directive 2003/49/EC consists of an obligation to either

waive or reduce the withholding tax. When the exception applies thus depends directly on an interpretation of the double taxation treaty and/or the Interest/Royalty Directive. According to section 65 D of the Withholding Tax Act, 30% of the total interest must be withheld in connection with any payment or crediting of interest to a company liable to tax under section 2(1)(d) of the Corporation Tax Act. As of April 1, 2008, the rate has been changed to 25 %. The withholding is made by the party for whose account the payment or credit is made.

The tax liability pursuant to section 2(1)(d) is finally fulfilled by the withholding of interest tax pursuant to section 65 D of the Withholding Tax Act, cf. section 2(2)(3) of the Corporation Tax Act.

According to the provision in section 69 of the Withholding Tax Act, liability for unpaid withholding tax arises unless the company proves that there has been no negligence on its part.

*7.1.1. SKAT's assessment in this case*

It is SKAT's opinion that the conditions for a limited tax liability to Denmark of the interest in question pursuant to section 2(1)(d) of the Danish Corporation Tax Act are met. Furthermore, SKAT is of the opinion that this taxation must neither be waived pursuant to the double taxation agreement between Denmark and Luxembourg, cf. Executive Order no. 95 of 23 September 1982 of the double taxation agreement of 17 November 1980, nor pursuant to the Interest/Royalty Directive, cf. Directive 2003/48/EC. In relation to the latter, reference is made to the two following sections below for the detailed reasons for this.

As mentioned, the provisions on "controlling authority" appear in section 3B of the Tax Control Act.

It was not until April 27, 2006 that the shares in Nordic Telephone Company Investment ApS were owned by Angel Lux Common S.à.r.l., and thus by a shareholder who owned more than 50

%, and thus the controlling influence. The controlling influence will therefore not take effect until April 27, 2006.

As mentioned, section 2(2)(3) of the Danish Taxation Act was adopted and entered into force on April 21, 2006, and is effective as of May 1, 2006, whereby the circle of parties that can have the controlling influence is expanded so that ownership interests and voting rights held by other company participants with whom the company participant has an agreement on the exercise of joint controlling influence must also be included.

In relation to Nordic Telephone Company Investment ApS, all foundations and foundation-owned companies and banks that are shareholders in Angel Lux Parent S.à.r.l., and thus indirect owners of Nordic Telephone Company Investment ApS, will be covered by the extended provision on "controlling influence".

However, it is a condition, as described in section 2(2)(3) of the Tax Assessment Act, that the shareholder has an agreement on the exercise of joint control.

The "Second Amended and Restated Subscription and Shareholders Agreement" (the shareholders' agreement) of April 27, 2006 describes the exercise of joint control regarding, among other things, the ownership of PECs, cf. among other things "Article VII, Transfers, 7.7 Certain Transferees to Become Parties", why SKAT considers all shareholders in Angel Lux Parent S.à.r.l. to be covered by the provisions of section 2(2)(3) of the Tax Assessment Act.

Thus, pursuant to section 2(1)(d) of the Danish Corporation Tax Act, there is a legal basis for taxing interest (limited tax liability) in foreign companies, foundations and associations etc. from sources in Denmark in the case of controlled debt, see section 3B of the Danish Tax Control Act. SKAT assumes that

the conditions for the application of the special exceptions in section 2(1)(d), 3rd to 7th sentences of the Danish Corporation Tax Act are not present.

SKAT thus considers the interest to be subject to limited tax liability pursuant to section 2(1)(d), first sentence, of the Danish Corporation Tax Act.

The company has not withheld the interest tax.

SKAT is of the opinion that the company is liable for the interest tax not withheld pursuant to section 69 of the Withholding Tax Act, as the company has acted negligently by not withholding tax.

In this connection, it is noted that the use of the concept of beneficial owner in the Double Taxation Convention and the Interest/Royalty Directive is a safeguard against abuse of the Double Taxation Convention and the Interest/Royalty Directive, respectively, and that it is SKAT's opinion that in relation to the assessment of whether there has been negligence, see section 69 of the Withholding Tax Act, greater demands must be made on due diligence when it comes to compliance with a safeguard rule and payment of interest to a related party.

It appears from the Second Amended and Restated Subscription and Shareholders Agreement

**3227**

(the Shareholders Agreement) dated April 27, 2006, that Angel Lux Pa- rent S.à.r.l., Angel Lux Common S.à.r.l., Nordic Telephone Company Investment ApS, Nordic Telephone Company ApS and the five intermediate companies in Luxembourg must all register as limited liability companies under US law [note deleted] and that all shareholders and PEC owners must also follow US law on this point, cf. "Article XI, Additional covenants and agree- ments, 11.1 Certain Tax Matters".

The same section also states that PECs will not be considered debt, but equity under US law.

The section "Article XII Miscellaneous, 12.3 Notices" in the "Second Amended and Restated Subscription and Shareholders Agreement" (the Shareholders Agreement) dated April 27, 2006, states that the agreement and matters relating thereto shall be governed by U.S. law - unless it is necessary to govern individual items under Luxembourg or Danish law.

From the "Second Amended and Restated Subscription and Shareholders Agreement" (the Shareholders Agreement) dated April 27, 2006, it appears that by attempting to secure advantages to which neither the Interest/Royalty Directive nor the Danish-Luxembourg Double Taxation Treaty provide access, and by knowingly participating in an arrangement without any commercial justification, the company has taken a risk.

SKAT considers it irrelevant whether in the period from May 1, 2006 to July 10, 2008, an actual money transfer of the interest paid was made or whether the interest was added to the debt on a daily basis. Section 65 D of the Withholding Tax Act states that in connection with any payment or crediting of interest, interest tax must be withheld.

The issue of payment versus attribution is dealt with in the tax guide S.A.2.7 and it makes no difference for tax purposes whether there is a physical transfer of money or not.

The company is thus liable for the interest tax not withheld for the period after May 1, 2006.

*7.1.2. For the period until May 1, 2006*

SKAT considers the companies in Luxembourg, Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l. to be affiliated, but not the private equity funds and their companies and the banks under the current rules, which is why no withholding tax can be withheld.

*7.2. OECD Model Tax Convention and the Danish-Luxembourg Double Taxation Convention*

According to the wording of section 2(1)(d)(2) of the Danish

Corporation Tax Act, the principle of limited tax liability of interest is deviated from in cases where taxation must be waived or reduced pursuant to a double taxation treaty or the Interest/Royalty Directive.

The Double Taxation Convention of November 17, 1980 between Denmark and Luxembourg, cf. Executive Order no. 95 of September 23, 1982, provides that interest originating in one Contracting State and paid to a company resident in another Contracting State can only - if that company is the "beneficial owner" of the interest - be taxed in that other State, cf. Article 11(1). The starting point in the double taxation agreement is therefore that it is not possible to consider interest paid to a parent company in Luxembourg to be covered by the limited tax liability under section 2(1)(d) of the Danish Corporation Tax Act, as the withholding tax is cut off.

However, as stated above, according to the wording of the double taxation treaty, it is a condition for the exclusion of Denmark's right to tax interest as a source state that the recipient of the interest is the "beneficial owner".

The term "beneficial owner" has been used in the OECD Model Convention and its commentaries since the revision of the Model Convention in 1977. The comments contained in the commentaries on the term "beneficial owner" have gradually been clarified, but there is no basis for claiming that there has been any material change in relation to what is meant by the term.

In the Commentary to the Model Convention, the question of the meaning of the term "beneficial owner" is now addressed in particular in points 12, 12.1 and 12.2, to Article 10, which states the following (with the emphasis added here):

*"12. The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid... to a resident" as used in paragraph 2 of the Article.*

*1. This makes it clear that the source state is not obliged to waive its right to tax dividend income merely because the income was paid directly to a resident of a state with which the source state has concluded a treaty. The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including the avoidance of double taxation and the prevention of tax avoidance and evasion.*

*12.1 Where income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption solely on the basis of the immediate recipient's status as a resident of the other Contracting State. The immediate recipient of income in this situation is a resident of the other State, but no*

**3228**

*double taxation arises as a result, since the recipient of the income is not considered to be the owner of the income for tax purposes in his State of residence. It would also be inconsistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State acts, other than as agent or intermediary, merely as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a conduit company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.*

Copyright © 2023 Karnov Group Denmark A/S

*12.2 Subject to the other conditions of the Article, the limitation on the source State's right of taxation shall continue to exist where an agent or an intermediary, resident in a Contracting State or in a third State, is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is consistent with the understanding of all member States). States wishing to express this more clearly are free to do so during bilateral negotiations."*

In relation to the interpretation of the concepts of beneficial owner and flow-through companies, SKAT also refers to the then Minister of Taxation Kristian Jensen's answer to the Danish Parliament's tax committee on question 2 regarding L-30 - Proposal for an Act on the conclusion of a protocol amending the double taxation agreement between Denmark and the United States of America. The question asked why Denmark has not, like the US, made a reservation against the use of flow-through entities. The answer states that a country should not insert a reservation that it will apply rules or interpretations mentioned in the OECD model's comments.

...

*7.2.1. SKAT's assessment in this case*

It appears from the Model Convention, the commentaries thereto and international case law that the decisive factor in determining whether the formal recipient is the "beneficial owner" is the extent to which the formal recipient has been authorized to dispose of and benefit from the amount attributed/received.

When the formal recipient's actual powers to decide how to dispose of the amounts credited/received are very narrow or non-existent, the right to invoke the double taxation treaty can thus be limited.

This means that an amount of interest that the underlying owner(s) have decided in advance to direct to where it is desired, without giving the intermediate companies any real opportunity to dispose of it other than as determined by the owners, does not have the intermediate companies as "beneficial owner".

It is SKAT's opinion that the two Luxembourg companies, Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l., have no independent right to dispose of the interest amounts and are therefore not beneficial owners.

It is thus SKAT's opinion that neither of the two intermediate companies in Luxembourg, Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l., in relation to the intra-group interest payments can be considered the beneficial owner, cf. Article 11(1) of the double taxation agreement.

The two companies in Luxembourg, on the other hand, are considered to act as flow-through entities for the private equity funds and banks, which are mainly domiciled in countries without a double tax treaty with Denmark, and thus not entitled to the benefits that follow from this.

The interest flows from the Danish part of the group through the companies in Luxembourg and on to the private equity funds and banks.

In SKAT's opinion, it cannot be considered decisive that 0.03125% (the difference between 10% interest in Denmark and 9.96875% interest in Luxembourg) has been deposited in the interest margin in the lower of the two group companies in Luxembourg, Angel Lux Common S.à.r.l. The fact that a decision has been made to "leave" a small amount in Luxembourg - which is not used for commercial activities or similar - by virtue of the pre-determined interest rates, does not mean that there has been any

Angel Lux Common S.à.r.l. had a real right of determination in relation to how to deal with accrued/received interest. It is also noted that there does not appear to be any commercial purpose for the contribution of the two Luxembourg holding companies, which do not appear to have any other purpose than to seek to avoid Danish source state taxation (or obtain other tax advantages).

It is SKAT's opinion that this case is an abuse of the double taxation agreement between Denmark and Luxembourg.

Refusal to allow the group to benefit from the advantages of the double taxation treaty thus does not, in SKAT's opinion, conflict with the overall purpose of the treaty to avoid double taxation.

If SKAT agreed to let the Luxembourg companies be covered by the double taxation agreement

**3229**

with Luxembourg and thus be covered by the exemption in section 2(1)(d) of the Danish Corporation Tax Act, it would, however, constitute the granting of an improper advantage.

SKAT thus considers the interest payment/attribution to be subject to tax liability pursuant to section 2(1)(d) of the Danish Corporation Tax Act.

*7.3. Relationship to EU law*

The introductory remarks in the Interest/Royalty Directive 2003/49/EC state the following (with SKAT's emphasis):

(1) *In an internal market having the character of a domestic market, transactions between companies from different Member States should not be subject to less favorable tax conditions than those applicable to the same transactions between companies from the same Member State.*

(2) *This requirement is currently not fulfilled for the payment of interest and royalties; national tax laws*
    *-The application of tax rules - possibly combined with bilateral or multilateral agreements - may not always ensure the elimination of double taxation, and the application of tax rules often leads to burdensome administrative formalities and cash flow problems for the companies concerned.*

(3) *It must be ensured that interest and royalties are taxed once in a Member State.*

(4) *The most appropriate way to eliminate the aforementioned formalities and problems, while ensuring that national and cross-border transactions are treated equally for tax purposes, is to eliminate the taxation of interest and royalties in the Member State in which they arise, whether by withholding at source or by assessment; it is particularly necessary to eliminate such taxes in the case of payments between associated companies of different Member States and between permanent establishments of such companies.*

(5) *The regime should only apply to any interest or royalties that would have been agreed between the payer and the beneficial owner had there not been a special relationship*

(6) *Member States must not be prevented from taking appropriate measures to combat fraud and abuse.*

...

(10) *Since the objective of this Directive, namely the establishment of a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States, cannot be sufficiently achieved by the Member States and can therefore be better achieved at Community level, the Community may adopt measures, in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty.*

The purpose of the directive is thus to ensure that interest paid across borders between Member States is treated on the same terms as within the borders of each Member State, but that this scheme only applies to any interest that would have been agreed if there had not been a special relationship. In addition, the aim is to ensure that the interest is taxed in one Member State and that abuse and fraud can be combated.

Thus, the concept of beneficial owner already appears from the introductory remarks. In addition, the concept appears from Article 1, which reads as follows ...

For this reason alone, it is unquestionable that EU law does not prevent the implementation of withholding tax on interest in Denmark in cases where the beneficial owner is not resident in the EU.

Furthermore, Article 5 of the Directive allows Member States to deny the benefits of the Directive to taxpayers in situations of fraud and abuse. Article 5 reads as follows ... The use of the concept of "beneficial owner" in double taxation conventions is intended precisely to combat fraud or abuse. Thus, according to Article 5, the Directive does not prevent withholding tax from being imposed when the beneficial owner is not covered by a double taxation agreement with Denmark.

The fact that interest is subject to withholding tax when paid to a non-resident company does not constitute a restriction on free movement, if only because there is no tax discrimination.

...

Furthermore, SKAT is of the opinion that the case law of the European Court of Justice shows that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from i.a. the Parent-Subsidiary Directive - when it must be assumed that the establishment of a holding company in another Member State *"aims to avoid withholding tax on payments to non-European entities if such a structure serves no commercial purpose"*, cf. the Commission's interpretation of "Purely artificial arrangements" published in EUR-Lex-52007DC0785.

Section 2(1)(d) of the Danish Corporation Tax Act clearly implies that Denmark shall not waive withholding tax unless there is an actual obligation to do so under the Interest/Royalty Directive.

From the case law of the European Court of Justice on the concept of abuse, reference can be made to the Cadbury Schweppes judgment (Case C-196/04, Cadbury Schweppes, [2006] ECR I-7995), the Halifax judgment (Case C-255/02, Halifax, [2006] ECR I-7995), the Halifax judgment (Case C-255/02, Halifax.

**3230**

I-1609) and the Part Service judgment (case C-425/06, Part Service Srl.). In the Cadbury-Schweppes judgment, the European Court of Justice states in relation to the English CFC rules, among other things:

"... for *a restriction on the freedom of establishment to be justified on anti-abuse grounds, the specific aim of such a restriction must be to prevent conduct consisting in the creation of purely artificial arrangements, not based on any economic reality, in order to avoid the tax normally due on profits earned from activities carried out on national territory.*"

The Halifax VAT ruling concerns flow-through companies, as the case concerned a VAT-exempt bank with 5

VAT deduction, which passed its relevant transactions through a fully taxable subsidiary in order to obtain full VAT deduction.

Regarding the judgment and its significance in the subsequent case Part Service Srl. is stated in the VAT Guide 2010, section

C.4:

"*Advantages resulting from the provisions of the VAT Act, including the rules on deductions, cannot be claimed when the transactions*
*etc. that justify this right constitute an abuse.*

- *It follows from the case law of the European Court of Justice, see Case C-255/02, Hali- fax plc, paragraphs 74 and 75, that the finding of abuse requires that the following conditions are met:*
- *The transactions in question - even if the conditions laid down in the relevant provisions are formally complied with - would result in a tax advantage being obtained which it would be contrary to the purpose of those provisions to grant.*

*It must also be evident from a set of objective circumstances that the main purpose of the transactions in question is to obtain a tax advantage.*

*That it is sufficient to establish abuse that the main purpose - and not the only purpose - of the transaction is to obtain a tax advantage has been established by the ECJ in the subsequent judgment in case C-425/06 (Part Service Srl.)*

*When assessing the main purpose, the purely artificial nature of the transactions as well as the legal, economic and/or personal links between the operators taking part in the tax relief plan may be taken into account, see paragraph 81 of the Halifax judgment.*"

When assessing the main purpose of the establishment, the CJEU has paid particular attention to whether there is substance in the company's country of domicile or whether it is a purely artificial arrangement, which implies not only formal establishment, but also the actual exercise of economic activity.

SKAT is therefore of the opinion that EU law cannot, to a greater extent than the double taxation agreements based on the Model Convention, be considered to preclude Denmark from implementing a source state taxation of interest based on the consideration that the beneficial owners of the amounts in question are resident outside the EU.

*7.3.1. SKAT's assessment in this case*

In order to apply the benefits of the Directive, it is a condition that the companies in Luxembourg can be considered to be the rightful owner of the interest arising from the Danish group companies. It is SKAT's assessment that this condition is not met. Reference is made to what is stated in the preceding paragraphs.

Furthermore, SKAT refers in this case to the abuse provision in Article 5 of the Directive, which may also lead to the denial of the benefits of the Directive.

SKAT is aware of the Danish National Tax Tribunal's ruling of March 3, 2010, published as SKM2010.268 LSR, in which the National Tax Tribunal has stated that there is no authority in Danish law to deny a company the benefits of the Parent-Subsidiary Directive when the company is the correct income recipient of the dividend and when the transactions made cannot be set aside based on considerations of reality.

The Parent-Subsidiary Directive does not - in the same way as the Interest/Royalty Directive - contain an explicit condition that only the beneficial owner can invoke the Directive's provision that no withholding tax can be deducted, but the Directive contains in Article 1(2) a provision corresponding to Article 5 of the Interest/Royalty Directive.

To the extent that Article 5 of the Interest/Royalty Directive is to be considered relevant, SKAT does not agree - as stated above - that there can only be a legal basis for denying the benefits of the Directive on the basis of the court-created case law on the

right income recipient or based on considerations of reality. However, as stated, SKAT is of the opinion that there is a legal basis for denying the benefits of the Directive both on the basis of the abuse provision in Article 5 of the Directive and on the basis of

the court-created practice on the general EU law concept of abuse.

In this connection, it should be noted that in its decision of March 3, 2010, the National Tax Tribunal also specifically assessed that SKAT had not demonstrated that the Luxembourg company at issue in the case was not the rightful owner of the dividend amount in question. In SKAT's opinion, the facts that led the National Tax Tribunal to this assessment are not comparable to the facts in this case.

It should also be noted that a final decision regarding the appeal of the National Tax Tribunal's decision of March 3, 2010 to the courts has not yet been made.

SKAT considers the Luxembourg companies to be intermediaries that do not themselves benefit financially from the interest payment.

**3231**

SKAT thus finds that it would be contrary to the purpose of the Interest/Royalty Directive to allow the group to obtain the benefits of the Directive.

*7.4. The company's comments*

SKAT received a letter dated April 20, 2010 from Nordic Telephone Company Investment ApS stating the following:

*As also stated in our previous discussions, it is our opinion that there is no evidence that NTC Investment ApS has been negligent in not withholding interest tax, cf. section 69 of the Withholding Tax Act: "Anyone who fails to fulfill his obligation to withhold tax or who withholds too little tax shall be directly liable to the public authorities for payment of the missing amount unless he proves that he has not been negligent in complying with the provisions of this Act".*

*According to practice, it is SKAT that must prove that NTC Investment ApS has been negligent. So far, SKAT has not stated anything in support of this, while we - as also stated at the meeting on January 21, 2010 - have conducted a number of investigations which confirm that there was no basis for assuming that interest tax should have been withheld in connection with the interest imputations/payments and thus that there has been any negligence:*

- *Site visit: We visited the parent company Angel Lux Common in Luxembourg, met the employees, saw the premises, the inventory and facilities, and saw where the board holds their board meetings.*
- *Meetings: In addition to meeting the employees, we met two of Angel Lux Commons' three independent board members at this year's meeting in Luxembourg, who talked about the board's work.*

- *Company law investigation: Angel Lux Common is a company located in the EU, and is domiciled in Luxembourg for company law and tax purposes.*
- *Compared to Danish companies: Angel Lux Common is an "S.A.R.L." company which corresponds to a Danish limited liability company, which from a Danish perspective qualifies as an independent tax entity.*
- *Relating to the nature of the claim: PECs qualify as claims. Angel Lux Common. is the owner of the PECs and the creditor of the receivable. A claim owner is the proper income recipient for the interest paid under the claim.*
- *Examination of EU law and DBO: The Interest/Royalty Directive and the double tax treaty with Luxembourg apply and each of them leads to no withholding tax.*
- *Examined Danish literature and guidelines: SKAT's own withholding tax guide does not mention a withholding tax issue between a Danish company and an EU company, nor does other literature indicate that there should be a withholding tax issue, see for example the guide to form no. 06.26 and the tax assessment guide S.A.2.7.*

*NTC Investment has conducted a number of investigations which prove that there was no basis for assuming that interest tax should have been withheld in connection with the interest additions/payments and thus cannot be said to have been negligent.*

*In addition, the National Tax Court's decision SKM2010.268.LSR has recently been published, which rejects SKAT's claim of withholding obligation. This is supported by the Tax Council in SKM2010.240.SR.*

*7.5. SKAT's comments on the company's comments*

SKAT has reviewed the company's comments regarding the issue of negligence. It is SKAT's opinion that the company, cf. the above, has shown negligence, as it appears from the shareholder agreements, which are part of the entire complex of agreements, that it must be proven that the set-up structure does not generate withholding tax. This fact has been known to all parts of the group, which is why the negligence aspect is rejected.

*8. SKAT's preliminary decision*

Against this background, SKAT is of the opinion that interest withholding tax must be withheld on the interest accrued/paid in Nordic Te- lephone Company In-vestment ApS to Angel Lux Common S.à.r.l. in the period from May 1, 2006 to July 10, 2008.

However, this does not apply to the share of interest that ends up with the ultimate PECs owners who are resident in a DBO country.

The tax consequences for Nordic Telephone Company Investment ApS for the income years 2006 - 2008 are as follows:

| Income year | Interest rates for the entire year | Of which inside attitudinal obligation for clean-ter for the period May 1. 31.12.2006 | Of which inside attitudinal obligation for clean-ter for the period January 1. 31.3.2008 | Includes. duty of care for interest for The period April 1. 10.7.2008 | Ren-tax percent | Ren-tea tax |
|---|---|---|---|---|---|---|
| 2006 | 1.329.208.093 | 922.794.206 | | | 30 % | 276.838.262 |
| 2007 | 1.410.657.397 | | | | 30 % | 423.197.219 |
| 2008 | 824.768.741 | | 390.745.904 | | 30 % | 117.223.771 |
| | | | | 434.022.837 | 25 % | 108.505.709 |
| | | | | | | 925.764.961 |

In total                                                            **3232**

Copyright © 2023 Karnov Group Denmark A/S

If the company subsequently presents documentation showing that some of the private equity funds and banks are domiciled in countries with a double taxation treaty with Denmark, SKAT will make corrections to the basis for the calculation of the above.

Similarly, the basis will be corrected if SKAT makes changes to the interest rate for PECs."

It further appears from SKAT's decision of March 18, 2011 that in November 2010 the company complained about SKAT's preliminary decision of April 28, 2010 and explained the case in more detail, but that this did not give SKAT reason to change the preliminary decision. Finally, the following appears from the decision of March 18, 2011:

"11. *SKAT's requirements for documentation for underlying investors to waive or reduce the tax claim*

On March 17, 2011, SKAT wrote the following in an email to the company's representatives:

*Since the submission of the letter of intent regarding withholding tax, a large number of meetings have been held between the company (for the sake of convenience referred to as TDC in the following) and SKAT regarding both this letter of intent and the other letters of intent that had been submitted simultaneously.*

*During these meetings, it was discussed, among other things, whether it was possible to achieve a reduction and/or a settlement in relation to the tax claims in question.*

*Regarding the interest withholding tax, TDC raised at a meeting on*

On August 18, 2010, SKAT was briefly asked what requirements SKAT would set with regard to documentation for underlying investors in order to waive or reduce the tax claim.

*The issue was raised again at the following meeting on November 18, 2010, where TDC stated that it did not have its investigation of the underlying owners ready, and the meeting ended (in relation to the issue of interest withholding tax) with a question from the company as to whether it was possible to settle the case. In order to assess this possibility, the company wanted to postpone the limitation period so that information about the underlying owners could be obtained and SKAT could review the material about the underlying owners.*

*At the following meeting on January 6, 2011, only the interest source tax was discussed, and TDC presented a folder allegedly containing a list of the underlying owners - a list that SKAT was not allowed to see. SKAT stated that it was up to the company to present documentation regarding the underlying owners, and that SKAT's ability to accurately address the issue on a theoretical level was limited when they had no knowledge of the underlying ownership structures. However, they did provide information about the additional requirements that are generally imposed on any waiver or reduction of withholding tax.*

*Regarding the withholding tax issue, TDC subsequently stated at a meeting on February 4, 2011 that they did not consider it likely that a satisfactory result could be achieved from the capital funds' point of view, and that they were therefore not in favor of giving SKAT access to information about the underlying owners.*

*The issue was last discussed at a meeting on Monday, the March 14, 2011, where TDC requested a written statement of the requirements that SKAT will make in order to waive or reduce the withholding tax.*

*In principle, SKAT is of the opinion that TDC has received all the information about SKAT's position on the issue that SKAT is able to provide, as long as TDC will not provide any information*

*about the underlying ownership structures. Such information is simply necessary for SKAT to be able to provide more concrete*

*can assess which requirements SKAT can make for the withholding tax to be waived or reduced.*

*Due to the risk of limitation, SKAT will make a decision in the case no later than tomorrow, March 18, 2011, as TDC has stated that it will not suspend the limitation period further. When TDC, v. Christer Bell, has expressed by telephone yesterday that - despite the fact that they do not wish to try to live up to SKAT's requirements - they would like a written statement of the requirements that SKAT will make in order to waive or reduce the withholding tax, SKAT must however state the following: It is SKAT's opinion that the interest has flowed through the holding companies in Luxembourg and that these companies cannot invoke either the DBO or EU law (the Interest/Royalty Directive) because they are not the beneficial owners of the interest.*

*SKAT has no knowledge of the underlying ownership structures, but it is SKAT's opinion that to the extent that the flow-through has occurred to companies domiciled in a DBO or EU country, a reduction (possibly a waiver) of the withholding tax may be required.*

*SKAT bases this assessment on the fact that the purpose of the requirement that the formal recipient of the interest is the beneficial owner of the interest is to prevent tax evasion and abuse. However, an abuse o f  t h e  DBOs/EU law will not occur if the interest flows directly to a company in a DBO or EU country where it is considered taxable for the underlying owner. Such a flow-through will - at least as a starting point - require that the underlying (beneficial) owner has received an amount that is*

*1) identical in amount to the amount that w a s  passed on in the first stage,*

**3233**

*2) has the same character as the amount paid from Denmark, i.e. the amount must not have changed character so that it is not subject to taxation in the country of residence under the same set of rules as it would have been if the amount had been paid directly from Denmark to the relevant (beneficial) owner,*

*3) The amount must be received and taxed in the same income period as if it had been paid directly from Denmark to the underlying (beneficial) owner.*

*If interest flows through to a transparent entity, it raises special issues:*

*If the entity is considered transparent under both Danish law and the law of the country of domicile, this could, in isolation, indicate that the next link in the chain of ownership should be considered the beneficial owner of the interest. If the country of residence of the next owner also considers the entity to be transparent, it may be possible to obtain a reduction of the withholding tax by invoking a DBO (or possibly EU law) concluded between the country of residence of the next owner and Denmark (provided, of course, that the next owner can be considered the beneficial owner, which may require an investigation of whether the flow-through has actually stopped in the relevant link).*

*However, if the next owner's country of residence does not consider the entity to be transparent, the next owner will not be able to invoke any DBO/EU law. This is due to the fact that the next level of ownership in that case has not been considered a recipient of the interest for tax purposes (in its home country) and will therefore not be a person who can invoke the DBO, cf. section 6.5 of the comments to Article 1 of the Model Convention, cf. also sections 54, 65 and 69-70 of "The Application of the OECD Model Tax Convention to*

*Partnerships".*

*Finally, it can be mentioned that even if the country of domicile of the next owner in principle considers the entity as transparent, there may be cases where the next owner cannot invoke a DBO, namely if it is possible under the rules of the country of domicile to choose to consider the entity as non-transparent, cf. as an example of this the case referred to above.*

*in TfS2003.167.LSR where the DBO between Denmark and the US did not apply, as the US did not consider an (otherwise transparent) entity to be transparent due to an application of the check-the-box rules.*

*It must be emphasized that in the absence of any kind of information about the underlying ownership structures, etc. SKAT has no way of knowing to what extent these conditions are met, and SKAT cannot exclude that in the event of a closer examination of the issue, additional circumstances may arise that must be included in the assessment.*

*On the present basis - where TDC has refused to provide any kind of information on how the underlying ownership structures are organized - it is also not possible for SKAT to precisely assess how TDC should document that the conditions for waiver/reduction of the withholding tax are met. However, if TDC wishes to attempt to prove that the conditions are met, SKAT will naturally be willing to discuss these documentation requirements.*

*However, SKAT has understood that it is TDC's own opinion that the requirements set by SKAT are not met, and the question of the scope of the documentation requirements is therefore only of theoretical interest.*

*As mentioned, SKAT will make a decision in the case no later than March 18, 2011, as TDC has stated that it will not suspend the limitation period further. If comments to this email are received by March 18 at 12 noon at the latest, SKAT will to the greatest extent possible try to take this into account in the decision.*

*SKAT must emphasize that the short deadline for submitting any comments should be seen in light of the risk of obsolescence and the fact that this is an issue that has been discussed on several occasions, so that TDC is aware of SKAT's views and only at the meeting on Monday indicated that it wanted a written statement from SKAT.*

*11.1 SKAT's comments on the company's comments of March 18, 2011 on requirements for documentation for underlying investors*

On March 18, 2001, the company submitted comments to the above e-mail from SKAT. The company's comments are stated under item "9.8. Comments on SKAT's requirements for documentation for underlying investors in order to waive or reduce the tax claim".

SKAT has the following comments to the email received from the company's representative:

- SKAT has not promised a reduction of interest tax if the underlying companies were domiciled in a DBO country.
  However, SKAT has stated orally and in writing that if the company subsequently presents documentation showing that some of the private equity funds and banks are domiciled in countries with a double tax treaty with Denmark, SKAT may make corrections in the basis for the calculation of the above.
  SKAT cannot waive withholding tax in advance on an abstract basis, which is why additional documentation about the underlying owners has always been necessary.
- SKAT does not find it correct, as stated by the company's representative, that NTC S.A. has offered SKAT these overviews for review, and so that SKAT by random checks can verify the investors' residence status.
  On the contrary, at several meetings, the representative has refused to disclose any material that the representative is in possession of.

**3234**

- Furthermore, SKAT does not find it correct, as stated by the company's representative, that in the email of March 17, 2011, additional requirements were expressed in relation to the oral requirements expressed in the meetings that have taken place since January 6, 2011.
- Finally, SKAT does not agree, as stated by the company, that additional requirements cannot be imposed in accordance with the commentary to the OECD Model Tax Convention and EU law.

If an underlying company in a DBO country (or an EU member state) is not considered a recipient of the interest for tax purposes in the home country, it is SKAT's opinion that the company cannot be considered a beneficial owner of the interest that can invoke protection against withholding tax under the DBO and/or EU law. The fact that the company cannot invoke the DBO follows, among other things, from section 6.5 of the comments to Article 1 of the Model Convention, cf. also sections 54, 65 and 69-70 of "The Application of the OECD Model Tax Convention to Partnerships".

SKAT's view is not considered to be in conflict with the OECD Model Tax Convention and EU law.

The overall conclusion is therefore that the assessment is upheld." On October 5, 2015, SKAT decided that a total of DKK 108,526,049 in interest tax should be paid for the tax years in question. The adjustment was due to the fact that the decision of March 18, 2011 had imposed 30% interest tax, but that the interest rate should have been lower, corresponding to the interest rate applicable to the taxation of Danish companies' interest income. The total claim for withholding tax amounted to DKK 817,238,912.

*Additional information about the group and the loans*

As of April 29, 2006, the group structure was as follows (Appendix 5 to SKAT's decision):



The company Nordic Telephone Management Holding ApS was subsequently founded on December 20, 2006 and became a shareholder in Nordic Telephone Company Investment ApS on December 22, 2006. Nordic Telephone Management Holding ApS was primarily owned by Angel Lux Common S.a.r.l. with 81.3% and the rest by senior employees in the Danish companies.

The five companies, Angel Lux I S.a.r.l., Angel Lux II S.a.r.l., Angel Lux III S.a.r.l., Angel Lux IV S.a.r.l. and Kabler S.a.r.l., were liquidated on December 20, 2007,

**3235**

so that Angel Lux Parent S.a.r.l. then owned Angel Lux Common S.a.r.l.

As of December 31, 2007 and December 31, 2008, the group structure was as follows (Appendix 11 to SKAT's decision):

*ANNEX 11 Group overview as of December 31, 2007 and*
*December 31, 2008*
*ber 2008*

status.



| De 5 kapitalfonde | | 5 Banker | | Øvrige | |
|---|---|---|---|---|---|
| Apax | 15,74% | Deutche Bank | 1,31 % | HD Invest, | |
| Blackstone | 23,49% | Credit Suisse | 0,91% | Virum ApS | 0,02% |
| Providence | 17,68% | Barclays | 0,60% | | |
| KKR | 19,62% | JP Morgan | 0,60% | | |
| Permira | 19,43% | RBS | 0,60% | | |
| | **95,97%** | | **4,01%** | | **0,02%** |

Angel Lux Parent S.a.r.l

Angel Lux Common S.a.r.l

Ledende medarbejdere i danske selskaber

81,30%    18,70%

Nordic Telephone Management Holding ApS

98,14%

Nordic Telephone Company Investment ApS    1,48%

Nordic Telephone Company Administration ApS

Nordic Telephone Company Finance ApS

Nordic Telephone Company Holding ApS

Nordic Telephone Company ApS    87,9%

TDC A/S

*The companies Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l.*

Angel Lux Common S.à.r.l. and Angel Lux Parent S.à.r.l., which were incorporated on April 25 and 26, 2006, respectively, are both fully liable for tax in Luxembourg. A letter dated July 10, 2008 from the tax authorities in Luxembourg to the Danish tax authorities states, among other things:

"...In response to your information requested dated February 27th 2008, your reference 08-034555, W14612, regarding the Luxembourg companies Angel Lux Parent S.à.r.l., Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. Angel Lux Common S.à.r.l. and Kabler S.à.r.l., I am honored to inform you:

"...The above mentioned companies are not covered by the law of 15 June 2004 or by any other law granting a special fiscal

Copyright © 2023 Karnov Group Denmark A/S

The companies are fully liable to the corporation tax, the capital tax, the communal trade tax...""

In the period from 2006-2008, Angel Lux Common S.à.r.l. had operating expenses (excluding interest expenses) of approximately 220,000,

140,000 and 700,000 euros, while Angel Lux Parent S.à.r.l. had operating expenses (excluding interest expenses) of approximately 130,000,

290,000 and EUR 2,140,000. The expenses in question concerned salary, rent, office expenses, expenses for external advisors, etc. as stated in SKAT's decision point 5.

Angel Lux Common S.à.r.l.'s financial statements for 2007 and 2008 show that the company employed an average of two people part-time during the years. The

**3236**

Angel Lux Parent S.à.r.l.'s annual accounts for 2007 and 2008 show that the company employed an average of one person part-time during the years. There are no specifications of the companies' costs for 2007-2009.

Angel Lux Common S.á.r.l.'s only asset, apart from the shares in Nordic Telephone Company Investment ApS, was the claim under PECs issued by the same company.

*The consortium agreements presented*

An agreement dated August 24, 2005 entitled "Project Angel - Consortium Heads of Terms" lists the five private equity funds, Apax Partners Worldwide LLP ("Apax"), The Blackstone Group International Limited ("Blackstone"), Permira Advisers KB ("Permira"), Providence Equity Partners Limited ("Providence") and Kohlberg Kravis Roberts & Co. Limited ("KKR"), as consortium members. On "Governance", the agreement states, inter alia:

"All significant decisions relating to the conduct of the transaction and, if the proposed transaction is consummated, relating to the business of the acquisition vehicles (collectively, "InvestCo") and the acquired group ("Angel") (i.e., decisions of a type customarily made by a board of directors or the shareholders/equity owners) will require the affirmative approval of at least 3 out of 5 of the Parties..."

The supplementary agreement of November 16, 2005 between the same five capital funds called "Subscription and Shareholders Agreement" states about "Investment Structure", among other things:

"In the event of any transaction that would trigger withholding taxes on any distribution to an Investor, each Investor will use its best efforts to structure any such transaction and/or amend the investment structure as may be reasona-bly advisable to avoid any such withholding taxes..."

The same agreement states about "Governance", among other things:

"Each Investor will appoint one Danish Topco director and one Angel director (and, in each case, have one observer) and will ap- point one representative to the Investors Committee.

Investors Committee operates on principle of approval of 3 of 5 Investors required. Matters listed on Annex A of this Term Sheet require the approval of the Investors Committee.

Certain "supermajority" matters as listed on Annex B of this Term Sheet require approval of 4 of 5 members of the Investors Committee.

An Investor loses rights to board and Investors Committee repre- sentatives when it ceases to hold over 50% of its original aggregate investment in Danish Topco shares and PECs."

The follow-up and more detailed agreement, also referred to as the "Subscription and Shareholders Agreement", dated December

7, 2005, concluded between the same five capital funds, the five companies in Luxembourg (Angel Lux I-IV and Kabler S.a.r.l.) and the Danish NTC companies states that the five named members of "the Holdco Board" [NTC Investment ApS] are appointed by each of the

five private equity funds. It also states: "The same persons will also be members of the boards of directors of each Acquisition Subsidiary."

The agreement also states:

"ARTICLE IV

*CLOSING DATE SHARES*

4.1. *Board Actions.* On or prior to the Closing Date, the Holdco Board shall hold a meeting to consider the approval of all documents to be executed by each member of the Group at Closing and all matters contemplated or required by such documents and this Agreement.

4.2. *Subscription.* Subject to the terms and conditions hereof and the Equity Commitment Letters, on or prior to the Closing Date, the following actions will be taken:

(i)     Each Investor will irrevocably subscribe and pay for Shares and PECs as set forth in Exhibit B in an aggregate amount equal to its Equity Commitment in each case in accordance with Article III.

(ii)    ...

(iii)   Holdco and each Acquisition Subsidiary, as applicable, will transfer the amounts received pursuant to this Section 4.2. to Bidco [Nordic Telephone Company ApS] in accordance with instructions received from the Holdco Board.

Exhibit B has not been submitted to the High Court.

Both the agreement of December 7, 2005 and the subsequent agreement entered into on January 25, 2006 entitled "Amended and Restated Subscription and Shareholders Agreement" contains detailed provisions on, among other things, "Governance" and "Transfers".

Finally, an agreement dated April 27, 2006 entitled "Second Amended and Restated Subscription and Shareholders Agreement" provides, among other things, that the board of directors of the newly founded companies Angel Lux Common S.a.r.l. and Angel Lux Parent S.a.r.l. should consist of the same five named directors as mentioned in the agreement dated December 7, 2005. It further states: "The same persons will also be members of the board of directors of each Acquisition Subsidiary."

The agreement also states:

"5.8 *Investors Committee.* The Investors agree that the principal governing body of their investment in the Group will be a commit- tee of representatives of the Investors (the *"Investors Committee"),* to the fullest extent permitted by law, recognizing that the Investors Committee is a creation of contract and not of corporate law. The executive officers of the various members of the Group shall, in addition to their other duties, report to the Investors Committee if so requested. Each Investor shall take, and shall instruct its repre- sentative(s),

**3237**

nominee(s) or designee(s), as the case may be, on the Investors Committee, on each Board and any committee thereof and on the board or any similar governing body of each Subsidiary of Holdco (each, a *"Subsidiary Board")* to take, any and all action within its power to effectuate any decision taken by the Investors Committee in respect of any matter contemplated by this Agreement to be subject to the approval of the Investors Committee or reasonably related to the investment of the Investors in the Shares and PECs, and an Investor shall not take, and shall instruct its representative(s), nominee(s) or designee(s), as the case may be, on the Investors Committee, on each Board and on any committee thereof and on each Subsidiary Board not

this Agreement has been considered and either approved or rejected by the Investors Committee or if any other matter otherwise is considered and either approved or rejected by the Investors Com- mittee, it shall take any and all actions to the extent such actions are within its power and control in its capacity as an investor in Holdco [Angel Lux Parent S.a.r.l.], and shall instruct its represen- tative(s), nominee(s) or designee(s), as the case may be, on the In- vestors Committee, on each Board and on any committee thereof and on each Subsidiary Board to take any and all action within the power of such Person (i) to procure that such matter shall not be placed on the agenda of any meeting of a Board or any committee thereof or any Subsidiary Board or by any shareholders and that consideration of such matter at any meeting of a Board or committee thereof or any Subsidiary Board or by any shareholders otherwise shall be delayed and (ii) in any event, to refrain from voting on such matter (whether for or against) at any such meeting.

5.9 *Composition of Investors Committee.*

(a) The Investors Committee shall initially consist of five mem- bers. Each of the Investors shall designate one member of the Inve- stors Committee (each such member, an *"Investor Representative").* Each Investor's Investor Repre- sentative must also be such Investor's Shareholder Director. The chairman of the Investors Commit- tee shall be elected by the Investors Committee. Each initial Investor Representative is identified below opposite the name of the desig- nating Investor.

| Designating Investor | Investor Representative |
|---|---|
| Apax | C |
| Blackstone | D |
| KKR | E |
|  | G |
| Permira | F F |
| Providence | G" |

to take, any action that would contravene any decision taken by the Investors Committee. Each Investor agrees that, unless and until any matter that requires the prior ap- proval of the Investors as set forth in Section 5.11 or elsewhere in

U.2023.3198H

It is undisputed that the five private equity funds are resident in countries outside the EU without a double taxation treaty with Denmark. NTC Parent S.a.r.l. has during the proceedings in the High Court presented lists of investors prepared by the private equity funds and a list of the ultimate investors' resident status. The Danish Ministry of Taxation has disputed that these lists constitute documentation for the underlying investors.

## III. The CJEU's answers to questions referred for a preliminary ruling

In the judgment of the European Court of Justice (Grand Chamber) of February 26, 2019 in the joined cases C-115/16, C-118/16, C-119/16 and C-299/16, the Court answered a number of questions referred for a preliminary ruling by the Eastern High Court by order of February 19, 2016 in four cases, including the two cases referred to in this judgment (the Takeda case B-2942-12 is referred to in C-118/16, and the NTC case B-171-13 is referred to in C-115/16). The judgment states, inter alia:

'*On the first question, points (a) to (c), the second question, points*

*a) and (b), and the third question in Cases C-115/16, C-118/16, C-119/16 and C-299/16*

83 First, by their first question, referred to in points (a) to (c) in Cases C-115/16, C-118/16, C-119/16 and C-299/16, the referring courts seek clarification as to the interpretation to be given to the concept of 'beneficial owner' within the meaning of Article 1(1) and (4) of Directive 2003/49. Second, by the second questions (a) and (b) and by the question in Cases C-115/16, C-118/16, C-119/16 and C-299/16, the referring courts seek, in particular

Copyright © 2023 Karnov Group Denmark A/S

whether the fight against fraud or abuse permitted by Article 5 of Directive 2003/49 requires the existence of a national or contractual anti-abuse provision within the meaning of Article 5(1) of that directive. The referring courts ask, in particular, whether a national or contractual provision containing the concept of 'rightful owner' can be regarded as constituting a legal basis for combating fraud or abuse of rights.

*The concept of "rightful owner"*

84 As a preliminary point, it should be noted that the concept of 'beneficial owner of [...] interest' contained in Article 1(1) of Directive 2003/49 cannot refer to concepts of different scope under national law.

85 In that regard, it has been held that the second to fourth recitals in the preamble to Directive 2003/49 state that the purpose of the directive is to eliminate double taxation of interest and royalty payments made between associated companies of different Member States.

**3238**

Member States and to ensure that those payments are taxed once in a Member State, the most appropriate way to ensure that national and cross-border transactions are treated in the same way for tax purposes is to abolish the taxation of interest and royalties in the Member State where they arise (judgment of 21.7.2011, Scheuten Solar Technology, C-397/09, EU:C:2011:499, paragraph 24).

86 The scope of Directive 2003/49, as defined in Article 1(1) of that directive, therefore includes the exemption from tax of payments of interest or royalties arising in the source State, provided that the beneficial owner thereof is a company established in another Member State or a permanent establishment situated in another Member State and belonging to a company of a Member State (judgment of 21 July 2011, Scheuten Solar Technology, C-397/09, EU:C:2011:499, paragraph 25).

87 The Court has also pointed out that, since Article 2(a) of that directive defines interest as 'income from debt-claims of every kind', only the beneficial owner may receive interest which constitutes income from such debt-claims (see, to that effect, judgment of 21 July 2011, Scheuten Solar Technology, C-397/09, EU:C:2011:499, paragraph 27).

88 The concept of 'beneficial owner' within the meaning of that directive must therefore be interpreted as referring to an entity which actually receives the interest paid to it. Article 1(4) of the Directive confirms that reference to economic reality by specifying that a company of a Member State is to be regarded as the beneficial owner of interest or royalties only if it receives those payments for its own use and not as an intermediary, including as agent, mandatary or authorized signatory for another person. 89 Where certain language versions of Article 1(1) of Directive 2003/49, such as the Bulgarian, French, Latvian and Romanian versions, use the term 'recipient' [o.a.: equivalent in French 'bénéficiaire'], the other language versions, as is apparent from paragraph 10 of the present judgment, use terms such as 'den faktiske modtager' [o.a.: equivalent in French to 'bénéficiaire ef-fectif'] (Spanish, Czech, Estonian, English, Italian, Lithuanian, Maltese, Portuguese and Finnish versions), 'den retmæssige ejer'/'den, som har brugs- retten' [o.a.: equivalent in French to 'propriétaire'/'celui qui a le droit d'utilisera.: equivalent in French to 'propriétaire'/'celui qui a le droit d'utiliser'] (German, Danish, Greek, Croatian, Hungarian, Polish, Slovakian, Slovenian and Swedish language versions), or 'celui qui a droit en dernier lieu' [o.a.: equivalent in French to 'celui qui a droit en dernier lieu'

(Dutch language version). The use of these different terms shows that the term "beneficiary" does not refer to a formally identified beneficiary, but rather to the entity which

receives the interest earned in economic terms and is therefore able to dispose freely of its use. In accordance with paragraph 86 of the present judgment, only an entity established in the European Union can be the beneficial owner of interest which may benefit from the exemption provided for in Article 1(1) of Directive 2003/49.

90 Furthermore, as can be seen from the proposal for a Council Directive on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States, presented on 6 March 1998 (COM(1998) 67 final), on which Directive 2003/49 is based, the Directive is inspired by Article 11 of the 1996 OECD Model Tax Convention and pursues the same objective as the latter, namely to avoid international double taxation. The concept of 'beneficial owner' contained in bilateral conventions based on that Model Tax Convention, as well as the subsequent amendments to that convention and the commentaries thereto, are therefore relevant for the interpretation of that directive.

91 The applicants in the main proceedings submit that an interpretation of the concept of 'beneficial owner of [...] interest or royalties' within the meaning of Article 1(1) of Directive 2003/49 in the light of the OECD Model Tax Convention and the commentaries thereto cannot be accepted, since such an interpretation would lack democratic legitimacy. However, that argument cannot be accepted, since such an interpretation, even if inspired by the OECD texts, is based on the directive - as is apparent from paragraphs 85 to 90 of the present judgment - which, both in itself and in its legislative history, reflects the democratic process of the European Union.

92 Thus, it appears from the OECD Model Tax Convention and the comments thereto, as reproduced in paragraphs 4-6 of this judgment, that the concept of "beneficial owner" neither includes flow-through entities nor is used in a narrow technical sense, but is used in order to avoid double taxation and prevent tax avoidance and tax evasion.

93 The bilateral conventions concluded between Member States on the basis of the OECD Model Tax Convention, such as the double taxation convention between the Nordic countries, also bear witness to that development. It must therefore be held that those conventions, reproduced in paragraphs 16 to 18 of the present judgment, all contain the expression 'beneficial owner' within the meaning of that model convention.

94 It should also be clarified that the mere fact that the company receiving interest in a Member State is not the recipient of the interest

'beneficial owner' does not necessarily mean that the person referred to in Article 1(1) of Directive

**3239**

2003/49 does not apply. Accordingly, it is conceivable that such interest is exempt in the source state if the company receiving the interest transfers the amount to a beneficial owner who is resident in the EU and also meets all the conditions laid down in Directive 2003/49 in order to benefit from such an exemption.

*Whether it is necessary to have a specific national or collective agreement provision transposing Article 5 of Directive 2003/49*

95 The referring courts ask whether, in order to combat abuse of rights in the context of the application of Directive 2003/49, a Member State must have adopted a specific national provision transposing the directive or whether it may refer to national or contractual anti-abuse principles or provisions.

96 In this regard, it follows from settled case-law that there is a general principle of EU law that citizens must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse (judgment of 9.3.1999, Centros, C-212/97, EU:C:1999:126, paragraph 24 and the case-law cited therein, of 21.2.2006, Halifax and Others, C-255/02, EU:C:2006:121, paragraph 68,

of 12.9.2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 35, of 22.11.2017, Cussens and others, C-251/16, EU:C:2017:881, paragraph 27, and of 11.7.2018,

Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

97 It is incumbent on citizens to comply with this general principle of law. The application of EU law cannot therefore be extended to cover acts carried out with the aim of fraud or abuse in order to benefit from the advantages conferred by EU law (see, to that effect, judgments of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraph 38; of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 27, and of 11.7.2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

98 It follows from that principle that a Member State must refuse to grant the benefits of provisions of EU law where those provisions have not been invoked in order to achieve the objectives of those provisions but in order to benefit from an advantage under EU law, even if the conditions for granting that advantage are only formally met.

99 This is the case, for example, where the implementation of customs formalities was not carried out in the ordinary course of trade but was purely formal and had the sole purpose of unlawfully profiting from monetary compensation (see, to that effect, judgments of 27 October 1981, Schumacher and Others, 250/80, EU:C:1981:246, paragraph 16, and of 3 March 1993, General Milk Products, C-8/92, EU:C:1993:82, paragraph 21) or export refunds (see, to that effect, judgment of 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, paragraph 59).

100 The principle of prohibition of abuse of rights also applies in areas as diverse as the free movement of goods (judgment of 10 January 1985, Association des Centres distributeurs Leclerc and Thouars Distribution, 229/83, EU:C:1985:1, paragraph 27), the freedom to provide services (judgment of 3.2.1993, Veronica Omroep Organisatie, C-148/91, EU:C:1993:45, paragraph 13), public service contracts (judgment of 11.12.2014, Azienda sanitaria locale n. 5 "Spezzino" and Others, C-113/13, EU:C:2014:2440, paragraph 62), freedom of establishment (judgment of 9.3.1999, Centros, C-212/97, EU:C:1999:126, paragraph 24), company law (judgment of 23.3.2000, Diamantis, C-373/97, EU:C:2000:150, paragraph 33), social security (judgment of 2.5.1996, Paletta, C-206/94, EU:C:1996:182, paragraph 24, of 6.2.2018, Altun and others, C-359/16, EU:C:2018:63, paragraph 48, and of 11.7.2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99), transport (judgment of 6.4.2006, Agip Petroli, C-456/04, EU:C:2006:241, paragraphs 19-25), social policy (judgment of 28.7.2016, Kratzer, C-423/15, EU:C:2016:604, paragraphs 37-41), restrictive measures (judgment of 21.12.2011, Afrasiabi and Others, C-72/11, EU:C:2011:874, paragraph 62) and value added tax (VAT) (judgment of 21.2.2006, Halifax and others, C-255/02, EU:C:2006:121, paragraph 74).

101 In the latter area, the Court has repeatedly held that, although combating fraud, tax evasion and possible abuse is an objective recognized and supported by the Sixth Council Directive 77/388/EEC of 17 May 1977 on the harmonization of

the laws of the Member States relating to turnover taxes - Common system of value added tax: uniform basis of assessment (OJ 1977 L 145, p. 1), the principle of prohibition of abuse is a general principle of EU law which applies regardless of whether the rights and advantages which have been abused have

U.2023.3198H

legal basis in the Treaties, in a regulation or in a directive (see, to that effect, judgment of 22.11.2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraphs 30 and 31).

102 It follows that the general principle of prohibition of abuse must be invoked against a person where that person relies on certain rules of European Union law which confer an advantage in a manner which is not consistent with the objectives of those rules. The Court has thus held that that principle may be relied on against a taxable person in order, in particular, to deny him the right to exemption from VAT, even in the absence of provisions of national law providing for such a denial (see, to that effect, judgment of 18 December 2014, Schoenimport "Ital-moda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 62, and of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 33).

**3240**

103 In the main proceedings, the rules which, according to SKAT, have been misused are the provisions of Directive 2003/49, which was adopted in order to promote an internal market having the characteristics of a domestic market and which provides for a tax exemption in the source State for interest paid to an associated company established in another Member State. As is apparent from the proposal for a directive referred to in paragraph 90 of the present judgment, certain definitions in that directive are inspired by the definitions in Article 11 of the 1996 OECD Model Tax Convention.

104 Although Article 5(1) of Directive 2003/49 provides that the directive does not preclude the application of national provisions or provisions laid down by collective agreements to combat fraud or abuse, that provision cannot be interpreted as precluding the application of the general principle of EU law prohibiting abuse referred to in paragraphs 96-98 of the present judgment. The transactions alleged by SKAT to be abusive fall within the scope of EU law (see, to that effect, judgment of 22 December 2010, Weald Leasing, C-103/09, EU:C:2010:804, paragraph 42) and may prove to be incompatible with the objective pursued by that directive.

105 Although Article 5(2) of Directive 2003/49 provides that Member States may withdraw benefits under that directive or refuse to apply it in cases of tax evasion, avoidance or abuse, that provision cannot be interpreted as precluding the application of the EU law principle prohibiting abuse, in so far as the application of that principle is not subject to a transposition requirement, as is the case for the provisions of that directive (see, to that effect, judgment of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraphs 28 and 31).

106 As stated in paragraph 85 of the present judgment, it is apparent from the second to fourth recitals in the preamble to Directive 2003/49 that the purpose of that directive is to eliminate double taxation of interest and royalties paid between associated companies of different Member States and between permanent establishments of such companies, in order to avoid burdensome administrative formalities and liquidity problems for those companies and to ensure that national and cross-border transactions are treated equally for tax purposes. 107 However, if the creation of financial arrangements were permitted for the sole purpose of benefiting from the tax advantages resulting from the application of Directive 2003/49, that would not be consistent with such objectives but would, on the contrary, be detrimental to both economic cohesion and the functioning of the internal market, since it would distort competition. As the

Advocate General essentially stated in point 63 of his Opinion in Case C-115/16, the same applies even if the transactions at issue do not pursue exclusively

such an objective, the Court having held that the principle of the prohibition of abuse applies in the field of taxation where obtaining a tax advantage is the main purpose of the transaction at issue (see, to that effect, judgments of 21 February 2008, Part Service, C-425/06, EU:C:2008:108, paragraph 45, and of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 53).

108 Moreover, the right of taxable persons to benefit from tax competition between Member States as a result of the lack of harmonization of income taxes does not preclude the application of the general principle prohibiting abuse. In that regard, it should be noted that the purpose of Directive 2003/49 is to harmonize direct taxation in order to enable traders to benefit from the internal market by eliminating double taxation and that the sixth recital in the preamble to that directive states in particular that Member States must not be prevented from taking appropriate measures to combat fraud and abuse.

109 Although the fact that the taxable person seeks the tax regime that is most advantageous to him cannot in itself give rise to a general presumption of fraud or abuse (cf. judgments of 12 September 2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 50, of 29 November 2011, National Grid Indus, C-371/10, EU:C:2011:785, paragraph 84, and of 24 November 2016, SECIL, C-464/14, EU:C:2016:896, paragraph 60), it is nevertheless the case that such a taxable person cannot be granted a right or advantage under EU law if the transaction in question is, in economic terms, a purely artificial arrangement intended to circumvent the legislation of the Member State concerned (see, to that effect judgment of 12 September 2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 51, of 7 November 2013, K, C-322/11, EU:C:2013:716, paragraph 61, and of 25.10.2017, Polbud - Wykonawstwo, C-106/16, EU:C:2017:804, paragraphs 61-63).

110 It follows that it is for the national authorities and courts to refuse to grant the advantages provided for in Directive 2003/49 where they are relied on in order to facilitate fraud or abuse.

111 In relation to the general EU law principle of prohibition of abuse and the need to respect this principle in the context of the implementation of EU law, it is irrelevant for the obligation of national authorities to refuse to grant the

**3241**

Directive 2003/49, which are invoked to enable fraud or abuse, that there are no national or contractual anti-abuse provisions.

112 The applicants in the main proceedings rely on the judgment of 5 July 2007 in Case C-321/05 Kofoed [2007] EU:C:2007:408, concerning the grant of a tax exemption provided for in Council Directive 90/434/EEC of 23 July 1990 on the common system of taxation applicable to mergers, divisions, transfers of assets and exchanges of shares concerning companies of different Member States (OJ 1990 L 225, p. 1), in order to claim that it follows from Article 5(1) of Directive 2003/49 that the Member State concerned may refuse to grant the advantages provided for by that directive only if it is in breach of that directive. 1), claiming that it follows from Article 5(1) of Directive 2003/49 that the Member State concerned may refuse to grant the advantages provided for in that directive only if its national legislation contains a separate and specific legal basis i n that regard.

113 However, this argument cannot be accepted.

114 In paragraph 42 of the judgment of 5 July 2007, Kofoed (C-

321/05, EU:C:2007:408), the Court noted that the principle of legal certainty precludes directives per se from creating an obligation to

for citizens and therefore cannot be invoked as such by the Member State against the citizen.

115 The Court further noted that such a finding is without prejudice to the obligation on all the authorities of a Member State, when applying national law, to interpret it as far as possible in the light of the wording and purpose of directives in order to achieve the result intended by those directives, since those authorities are thus able to rely on a consistent interpretation of national law against individuals (see, to that effect, judgment of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraph 45 and the case-law cited therein).

116 It was on the basis of those considerations that the Court called on the referring court to examine whether Danish law contained a general rule or principle prohibiting the abuse of rights or other provisions on tax fraud or tax evasion which could be interpreted in conformity with the provision of Directive 90/434, under which a Member State may essentially refuse to grant the right of deduction provided for by that directive in the case of a transaction which has as its principal purpose such fraud or evasion, and then, if appropriate, to examine whether the conditions for applying those national provisions were essentially satisfied (see judgment of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraphs 46 and 47).

117 Even if it were to transpire in the main proceedings that national law does not contain rules that can be interpreted in accordance with Article 5 of Directive 2003/49, it cannot - notwithstanding what the Court stated in its judgment of 5. July 2007, Kofoed (C-321/05, EU:C:2007:408) - it cannot, however, be inferred that national authorities and courts are precluded from refusing to grant the benefit of the right to exemption provided for in Article 1(1) of that directive in cases of fraud or abuse of rights (see, by analogy, judgment of 18 December 2014, Schoenimport 'Italmoda' Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 54).

118 A refusal applied in such circumstances to a taxable person cannot fall within the situation referred to in paragraph 114 of the present judgment, since such a refusal is consistent with the general principle of EU law that no one may rely on EU law for the purpose of enabling fraud or abuse (see, by analogy, judgment of 18 December 2014, Schoenimport 'Italmoda' Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraphs 55 and 56 and the case law cited therein).

119 In so far as matters of fraud or abuse cannot give rise to a right under the EU legal order, as stated in paragraph 96 of the present judgment, the refusal of a benefit under a directive does not entail the imposition of an obligation on the citizen concerned under that directive, but is merely the consequence of the finding that the objective conditions for obtaining the benefit sought, laid down by that directive in relation to that right, are satisfied only formally (see, by analogy judgment of 18.12.2014, Schoenimport "Italmoda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 57 and the case law cited therein).

120 In such circumstances, the Member States must therefore refuse to grant the advantage resulting, in the present case, from Directive 2003/49, in accordance with the general principle of non-abuse, according to which EU law cannot cover unlawful transactions by traders (see, to that effect, judgment of 11 July 2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

121 In the light of the findings in paragraph 111 of the present

judgment, it is unnecessary to answer the third question referred by the referring courts,

more specifically, whether a provision in a double taxation convention referring to the concept of 'beneficial owner' can constitute a legal basis for combating fraud and abuse in the context of Directive 2003/49.

122 In the light of all those factors, the answer to the first question (a) to (c) and the second questions (a) and (b) in Cases C-115/16, C-118/16, C-119/16 and C-299/16 must be as follows:

**3242**

- Article 1(1) of Directive 2003/49, read in conjunction with Article 1(4) thereof, must be interpreted as meaning that the exemption from any form of tax on interest payments provided for therein is reserved solely to the beneficial owners of such interest, that is to say, the entities which actually receive that interest in economic terms and which therefore have the power to determine its use freely.

- The general principle of European Union law that individuals must not be able to rely on provisions of European Union law for the purpose of enabling fraud or abuse must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxable person the exemption from all forms of tax on interest payments provided for in Article 1(1) of Directive 2003/49, even in the absence of national or contractual provisions providing for such a refusal.

*On the first questions (d) to (f) in Cases C-115/16, C-118/16 and C-119/16, the first questions (d) and (e) in Case C-299/16, the fourth questions in Cases C-115/16 and C-118/16, the fifth question in Case C-115/16, the sixth question in Case C-118/16 and the fourth questions in Cases C-119/16 and C-299/16*

123 By the first questions (d) to (f) in Cases C-115/16, C-118/16 and C-119/16, the first questions (d) and (e) in Case C-299/16 and the fourth questions in Cases C-115/16 and C-118/16, the referring courts ask, in particular, which elements constitute an abuse of rights and how the existence of those elements can be established. In that regard, they ask, in particular, whether there can be an abuse of rights if the beneficial owner of the interest transferred by flow-through companies is ultimately a company established in a third State with which that Member State has concluded a double taxation convention. By the fifth question in Case C-115/16, the sixth question in Case C-118/16 and the fourth questions in Cases C-119/16 and C-299/16, the referring courts ask, in particular, whether a Member State which refuses to recognize a company of another Member State as the beneficial owner of interest is required to determine which company, if any, it regards as the beneficial owner.

*The question of which elements constitute an abuse of rights and the related evidence*

124 As is apparent from the case-law of the Court of Justice, proof of abuse requires, on the one hand, a coincidence of objective circumstances showing that the objective pursued by the EU legislation has not been achieved even though the conditions laid down in that legislation have been formally complied with and, on the other, a subjective element consisting in an intention to take advantage of the EU legislation by artificially creating the conditions necessary to obtain that advantage (judgment of 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, paragraphs 52 and 53, and of 12.3.2014, O. and B., C-456/12, EU:C:2014:135, paragraph 58).

125 It is thus the examination of these coinciding circumstances which makes it possible to verify the existence of the elements constituting abuse and, in particular, whether the traders concerned have carried out purely formal or artificial transactions, lacking any economic and commercial justification, with the principal aim of obtaining an undue advantage (see in

Judgment of 20.6.2013, Newey, C-653/11, EU:C:2013:409, paragraphs 47-49, of 13.3.2014, SICES a n d others, C-155/13, EU:C:2014:145, paragraph 33, and of 14.4.2016, Cervati and Malvi, C-131/14, EU:C:2016:255, paragraph 47).

126 It is not for the Court to assess the facts of the main proceedings. However, the Court may, in a reference for a preliminary ruling, provide the national courts, where appropriate, with detailed information in order to guide them in their assessment of the specific cases before them. Although, in the main proceedings, there are a number of elements from which it could be concluded that there has been an abuse of rights, it is nevertheless for the national courts to ascertain whether those elements are objective and consistent and whether the applicants in the main proceedings have had an opportunity to present evidence to the contrary.

127 A group which is not organized for reasons reflecting economic reality, which has a purely formal structure and which has as its main purpose or as one of its main purposes the obtaining of a tax advantage which is contrary to the object and purpose of the applicable tax legislation may be considered an artificial arrangement. This is particularly the case when the payment of interest tax is avoided by including in the group structure a flow-through entity between the company transferring the interest and the company which is the beneficial owner of the interest.

128 It therefore constitutes evidence of the existence of an arrangement intended to take undue advantage of the exemption provided for in Article 1(1) of Directive 2003/49 that all, or almost all, of that interest is passed on by the company which received it, very shortly after its receipt, to entities which do not comply with the conditions for the application of Directive 2003/49. The fact that all or almost all of that interest is passed on by the company which received it, very shortly after its receipt, to entities which do not satisfy the conditions for the application of Directive 2003/49, either because those entities are not resident in a Member State, because they are not constituted in one of the forms listed in the annex to that directive, because they are not subject to one of the taxes listed in Article 3(a)(iii) of that directive, or because they are not subject to one of the taxes listed in Article 3(a)(iii) of Directive 2003/49, without being subject to one of the taxes listed in Article 3(a)(iii) of that directive, constitutes evidence of the existence of an arrangement intended to take undue advantage of the exemption provided for in Article 1(1) thereof. (iii) of that directive, without being exempt, or because they are not associated companies within the meaning of Article 3(b) of that directive.

**3243**

129 Thus, entities whose tax residence is outside the European Union, such as the companies referred to in Cases C-119/16 and C-299/16 or the capital funds referred to in Cases C-115/16 and C-299/16, do not satisfy the conditions for the application of Directive 2003/49. If the interest in those cases had been paid directly by the Danish company which owed it to the recipient entities which, according to the Ministry of Taxation, were the beneficial owners of the interest, the Kingdom of Denmark would have been able to levy withholding tax. 130 The artificial nature of an arrangement may also be supported by the fact that the group in question is organized in such a way that the company receiving the interest paid by the debtor company must itself pay that interest to a third company which does not satisfy the conditions for the application of Directive 2003/49, with the result that that company receives negligible taxable income only when it acts as a conduit company to facilitate the flow of funds from

U.2023.3198H

the debtor company to the entity which is the beneficial owner of the amounts transferred.

131 The fact that a company operates as a conduit company can be established if its only activity is to receive the interest and pass it on to the beneficial owner or to other conduit companies. In this regard, the lack of actual economic activity must, in the light of the specific characteristics of the economic activity in question, be deduced from an examination of all relevant elements relating, inter alia, to the operation of the company, its accounts, the structure of the company's cost structure, the

Copyright © 2023 Karnov Group Denmark A/S

and expenses actually incurred, the personnel employed by the company and the premises and equipment at its disposal.

132 The existence of various contracts between the companies involved in the financial transactions at issue which give rise to intra-group cash flows which, as stated in Article 4 of Directive 2003/49, may have the purpose, as referred to in Article 4 of that directive, of transferring dividends from a recipient company to shareholder entities in order to avoid paying tax or to minimize the tax burden, may also constitute evidence of an artificial arrangement. In addition, evidence of the existence of such an arrangement can be found in the method of financing the transactions, in the assessment of the equity capital of the intermediate companies and in the lack of power of the flow-through companies to dispose financially of the interest received. In that regard, it is not only the contractual or legal obligation of the company receiving the interest to pass it on to third parties which may constitute such a factor, but also the fact that, without being bound by such a contractual or legal obligation, that company does not 'substantially' - as stated by the referring court in Cases C-115/16, C-118/16 and C-119/16 - have the rights to use and enjoy those funds.

133 Such evidence may, moreover, be corroborated in cases of coincidence or proximity in time between, on the one hand, the entry into force of important new tax legislation, such as the Danish legislation at issue in the main proceedings, which certain groups seek to circumvent, and, on the other hand, the implementation of complex financial transactions and the granting of loans within the same group. 134 The referring courts also ask, in particular, whether there may be an abuse of rights where the beneficial owner of interest transferred by flow-through companies is ultimately a company established in a third State with which the source State has concluded a double taxation convention under which no withholding tax would have been levied on the interest if it had been paid directly to the company established in that third State.

135 In that regard, the fact that some of the beneficial owners of the interest transferred by flow-through entities are resident for tax purposes in a third State with which the source State has concluded a double taxation convention is irrelevant when examining the group structure. It must therefore be held that the mere existence of such a convention does not preclude the existence of an abuse of rights. Thus, the existence of such a convention cannot call into question the existence of an abuse of rights if it is duly established on the basis of all the facts which show that the economic operators carried out purely formal or artificial transactions, devoid of any economic and commercial justification, with the principal aim of taking undue advantage of the exemption from all forms of tax provided for in Article 1(1) of Directive 2003/49.

136 It should be added that, while taxation must correspond to an economic reality, the existence of a double taxation treaty cannot as such establish the reality of a payment made to beneficiaries resident in the third State with which that treaty has been concluded. If the debtor company of the interest wishes to benefit from such a treaty, it is possible for it to pay such interest directly to entities which are resident for tax purposes in a State with which the source State has concluded a double tax treaty.

137 Having said that, it cannot be ruled out that there may be a situation where the interest would have been exempt if

they had been transferred directly to the company which has its registered office in a third State, that

**3244**

the objective of the group structure is not an abuse of law. In such a case, the group's choice of such a structure instead of paying the interest directly to that company cannot be challenged. 138 Moreover, where the beneficial owner of an interest payment is resident for tax purposes in a third State, the refusal of the exemption provided for in Article 1(1) of Directive 2003/49 is in no way subject to a finding of fraud or abuse of rights. As stated, in essence, in paragraph 86 of the present judgment, the sole purpose of that provision is to exempt from tax payments of interest arising in the source State where the beneficial owner of the interest is a company established in another Member State or a permanent establishment situated in another Member State and belonging to a company of a Member State

139 In the light of all those factors, the answer to the first questions (d) to (f) in Cases C-115/16, C-118/16 and C-119/16, the first questions (d) and (e) in Case C-299/16 and the fourth questions in Cases C-115/16 and C-118/16 must be that, in order to prove an abuse of rights, there must be a combination of objective circumstances, from which it is apparent that the objective pursued by the EU legislation has not been achieved even though the conditions laid down in that legislation have been formally complied with, and a subjective element consisting of an intention to benefit from the EU legislation by artificially creating the conditions necessary to obtain that benefit. The existence of a number of elements may establish an abuse of rights, provided that those elements are objective and consistent. Such evidence may include, inter alia, the existence of flow-through companies which have no economic rationale and the purely formal nature of a group's structure, financial arrangements and loans. The fact that the Member State from which the interest originates has concluded a double taxation agreement with the third country in which the company which is the beneficial owner of the interest is resident is irrelevant to any finding of abuse of rights.

*The burden of proof for abuse of rights*

140 As is apparent from Article 1(11) and (12) and Article 1(13)(b) of Directive 2003/49, the source State may require a company which has received interest to prove that it is the beneficial owner of that interest within the meaning of the first indent of paragraph 122 of the present judgment. 141 More generally, the Court has also held that there is nothing to prevent the tax authorities concerned from requiring the taxpayer to provide the evidence which they consider necessary in order to make a specific assessment of the taxes concerned and, where appropriate, from refusing a requested exemption if such evidence is not provided (see, to that effect, judgment of 28 February 2013, Petersen and Petersen, C-544/11, EU:C:2013:124, paragraph 51 and the case-law cited).

142 On the other hand, where a tax authority of the source State intends to deny a company which has paid interest to a company established in another Member State the exemption provided for in Article 1(1) of Directive 2003/49 on the ground of abuse of rights, it is for that authority to establish the existence of the elements constituting such abuse by taking account of all relevant factors, including the fact that the company to which the interest was paid is not the beneficial owner of the interest.

143 In that regard, it is not for such an authority to determine the beneficial owner of those interests but to establish that the alleged beneficial owner is merely a conduit company through

U.2023.3198H

which an abuse of rights has taken place. It may turn out that

Copyright © 2023 Karnov Group Denmark A/S

It is impossible to make such a determination, especially since the potential beneficial owners are unknown. National tax authorities do not necessarily have the necessary information to determine those beneficial owners, given the complexity of certain financial arrangements and the possibility that the intermediate companies involved in the arrangement are resident outside the EU. Thus, those authorities cannot be required to provide evidence which it would be impossible for them to obtain.

144 Moreover, even if the potential beneficial owners are known, it is not necessarily determined which of them are or will be the beneficial owners. Thus, if a company receiving interest has a parent company that also has a parent company, it will most likely be impossible for the tax authorities and courts of the source state to determine which of these two parent companies is or will be the beneficial owner of the interest. In addition, a decision on the use of this interest could be made following the findings of the tax authorities regarding the flow-through company.

145 The answer to the fifth question in Case C-115/16, the sixth question in Case C-118/16 and the fourth questions in Cases C-119/16 and C-299/16 must therefore be that, in order to refuse to recognize a company as the beneficial owner of interest or to establish an abuse of rights, a national authority is not required to determine the entity or entities which it considers to be the beneficial owner of that interest.

*On the fifth question (a) to (c) in Case C-118/16*

146 By its fifth question in Case C-118/16 (a) to (c), the referring court asks in particular

**3245**

whether an SCA approved as a SICAR under Luxembourg law can be subject to the provisions of Directive 2003/49. That question is relevant only if X SCA, SICAR is to be regarded as the beneficial owner of the interest received by that company from X Denmark, which is for the referring court alone to ascertain.

147 Having clarified that point, it must be pointed out, as the Commission and several of the governments which submitted observations have done, that Article 3(a) of Directive 2003/49 makes the status of 'company of a Member State' which may benefit from the advantages provided for in that directive subject to three conditions. First, that company must take one of the forms listed in the Annex to the Directive. Secondly, in accordance with the tax law of the Member State, the company must be considered to be resident in that State and cannot be considered to be resident outside the EU for tax purposes under a double taxation convention. Third, the company must finally be subject to one of the taxes listed in Article 3(a)(iii) of Directive 2003/49 without exemption or to an identical or almost identical tax imposed after the entry into force of that directive in addition to or instead of the existing taxes.

148 As regards the first condition, subject to review by the referring court, it must be held to be satisfied in respect of X SCA, SICAR, since an SCA approved as a SICAR corresponds to one of the types of company listed in the annex to Directive 2003/49, as the Luxembourg Government pointed out at the hearing.

149 As regards the second condition, subject to the same reservations, it also appears to be fulfilled since X SCA, SICAR is resident in Luxembourg for tax purposes.

150 As regards the third condition, it is undisputed that X SCA, SICAR is subject to the impôt sur le revenu des collectivités (corporation tax).

tax) in Luxembourg, which is one of the taxes listed in Article 3(a)(iii) of Directive 2003/49.

151 In the event, however, that it is established, as SKAT contends in the main proceedings in Case C-118/16, that the interest received by X SCA, SICAR is in fact exempt from impôt sur le revenu des collectivités in Luxembourg, it must be held that that company does not satisfy the third condition referred to in paragraph 147 of the present judgment and that it cannot therefore be considered to be a 'company of a Member State' within the meaning of Directive 2003/49. However, it is for the referring court alone to carry out, where appropriate, the necessary verification in that regard.

152 That interpretation of the scope of the third condition referred to in paragraph 147 of the present judgment is supported, first, by Article 1(5)(b) of Directive 2003/49, which provides that a permanent establishment may be regarded as the beneficial owner of interest within the meaning of that directive only 'if the interest payments [which it receives] constitute income subject to one of the taxes referred to in Article 3(a)(iii) [. (iii) [...]', on the one hand, and the purpose of the directive, which is to ensure that those interest payments are taxed once in a single Member State, as stated, in essence, in paragraph 85 of the present judgment.

153 The answer to the fifth question in Case C-118/16 must therefore be that Article 3(a) of Directive 2003/49 must be interpreted as meaning that an SCA approved as a SICAR under Luxembourg law cannot be classified as a company of a Member State within the meaning of that directive which may benefit from the tax exemption provided for in Article 1(1) of that directive where the interest received by that SICAR is exempt from the impôt sur le revenu des collectivités in Luxembourg, a situation such as that in the main proceedings. The tax exemption provided for in Article 1(1) of that directive is possible if the interest received by that SICAR in a situation such as that at issue in the main proceedings is exempt from the impôt sur le revenu des collectivités in Luxembourg, which it is for the referring court to ascertain."

## IV. Legal basis

*Corporate Tax Act*

  Consolidated Act no. 1125 of November 21, 2005 of the Act on Income Taxation of Public Limited Companies etc. (the Corporation Tax Act) Section 2(1)(d) of the Consolidated Act was worded as follows:

"*§ 2.* Tax liability under this Act shall also apply to companies and associations, etc. as mentioned in section 1(1), which are domiciled abroad, insofar as they

  ...

  d) receives interest from sources in this country concerning debt which a company or an association etc. covered by section 1 or point a has to foreign legal persons as mentioned in section 3 B of the Tax Control Act (controlled debt). However, this does not apply to interest on receivables linked to a permanent establishment covered by point a. The tax liability does not include interest if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalties paid between associated companies in different Member States, or under a double taxation agreement with the Faroe Islands, Greenland or the state where the receiving company etc. is resident. However, this only applies if the paying company and the receiving company are associated as referred to in this Directive for a continuous period of at least 1 year, within which the time of payment must fall. ..."

**3246**

By Act no. 308 of April 19, 2006, the word "foreign" was removed from
§ Section 2(1)(d), first sentence, which then included both Danish and foreign recipients.

The provision, as worded in Consolidated Act no. 1125 of November 21, 2005, was inserted in the Corporation Tax Act by Act no. 221

of March 31, 2004. The legislative history, bill no. L 119 of December 17, 2003, states, among other things:

"GENERAL REMARKS.

1. Purpose of the bill The purpose of the bill is

...

to implement the provisions of the EU Interest/Royalty Directive,

...

to limit the possibilities for tax planning by deduction of intra-group interest when the receiving group company pays no or very little tax on the interest deducted when calculating Danish taxable income,

...

Content of the bill

...

4.3.3 Limited tax liability of certain intra-group loans

It is proposed that the right of deduction for expenses incurred by a Danish company etc. or a permanent establishment in Denmark lapses if the payment regarding the expenses is considered as intra-group tax-free payments under foreign rules. In addition, it is proposed that interest payments regarding intra-group loans to companies in countries with which Denmark does not have double taxation agreements are taxed by withholding a tax of 30 percent. In terms of revenue, these rules have the character of safeguards that will prevent an unintentional erosion of the basis for corporation tax and hydrocarbon tax in Denmark.

...

Notes on the individual provisions

...

To § 10

To no. 1

The proposal concerns changes regarding intra-group loans and the proposal to implement the Interest/Royalty Directive in Danish tax legislation.

It is *proposed* to insert a new provision as point d in section 2(1) of the Danish Corporation Tax Act on limited tax liability of intra-group interest. The purpose of the provision is to prevent a Danish company etc. from reducing Danish taxation by reducing the taxable income through interest payments to certain financial companies in low-tax countries if the foreign company etc. controls the Danish company etc.

...

The starting point in the proposed section 2(1)(d), first sentence, is that the limited tax liability of interest shall only include interest on controlled debt, i.e. where the paying and receiving companies etc. are affiliated, as defined in the Tax Control Act § 3 B.

...

b. The limited tax liability shall not include interest covered by the Interest/Royalty Directive or by a double taxation agreement between Denmark and the Faroe Islands, Greenland or the country where the receiving company is resident, with the effect that the taxation of the interest must be waived or reduced, cf. clause 3.

Firstly, it means that the limited tax liability does not apply to a company resident in another EU country if the conditions of the Interest/Royalty Directive are met.

...

Secondly, it means that the limited tax liability shall not include interest payments to a foreign company resident in the Faroe Islands, Greenland or another country that has a double tax treaty with Denmark if the treaty means that Denmark must waive or reduce the taxation of the interest.

It is Danish policy not to enter into double taxation treaties with tax haven jurisdictions or other low-tax countries. The purpose of double taxation treaties is primarily to avoid international double taxation, so there is no particular need to enter into treaties with such countries."

On February 17, 2004, the Minister of Taxation responded to an inquiry from the Danish Association of State Authorized Public Accountants to the Danish Parliament's Tax Committee regarding the above bill as follows (L119 - Appendix 16):

"1. Section 2(1)(d) of the Danish Corporation Tax Act

FSR criticizes the proposed withholding tax on interest payments to certain foreign financial companies.

...

FSR is doubtful whether the interest tax will have the desired effect when not all EU countries have similar legislation. Comment:

...

There is no reason not to tax intra-group interest payments from this country to pure tax haven companies whose purpose is tax-free collection of interest deducted by other group companies.

It is true that some EU countries do not have withholding tax on interest payments to foreign recipients. It is also not Danish tax policy to tax interest paid from Denmark to foreign interest recipients. It would only make it more expensive for Danish businesses to take out commercial debt. However, it is necessary to limit the possibilities for tax planning by reducing Danish taxation on intra-group interest payments to a foreign interest recipient.

**3247**

group company that pays no or very low tax on the interest received.

The proposed withholding tax on interest is therefore targeted so that it does not cover all interest payments abroad. The withholding tax only applies to interest payments to certain financial companies in countries that are not covered by the EU Interest/Royalty Directive or do not have a double taxation agreement that requires Denmark to reduce Danish tax on interest payments to the country in question.

...

The proposed withholding tax will therefore not include interest payments to lenders in the countries with which Danish companies usually have business relations. Admittedly, there is a risk that, for example, a Danish company may seek to avoid the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation treaty, which does not have withholding tax on interest payments to foreign interest recipients, after which this company pays the interest to the company in the low-tax country. In such cases, however, the Danish tax authorities may, after a specific assessment of the facts, assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest payment is not covered by the EU Interest/Royalty Directive or the double taxation treaty.

According to Article 5(2) of the Interest/Royalty Directive, an EU country may refuse to apply the Directive in the case of transactions that have tax evasion, avoidance or abuse as a significant motive.

The notes to the OECD Model Double Taxation Conventions also allow a state not to apply a treaty in special cases, see the section on treaty abuse in the notes to Article 1 of the Model.

...

Copyright © 2023 Karnov Group Denmark A/S

If, for example, a Danish company pays interest to a financial company in a low-tax country via a company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation agreement, the tax authorities may, after a concrete assessment of the facts, assume that the interest is not covered by the directive or the agreement."

On March 22, 2004, the Minister of Taxation answered a number of questions to the Danish Parliament's Tax Committee regarding the above bill as follows (L119 - Appendix 71):

"*Question 54.* Can the Minister confirm that even after the latest changes to the rules for holding companies, and after the adoption of this bill, it will be the case that distributions and interest payments to holding companies in Cyprus will be tax-free (i.e. without Danish dividend tax), even though interest and dividends will not be taxed in Cyprus?

*Answer:* As far as *dividends* are concerned, the Corporation Tax Act

§ Section 2(1)(c) states that, as a general rule, Denmark taxes a foreign company on dividends from a Danish company at 28% of the gross amount of the dividend. However, according to the same rule, Denmark does not tax a foreign parent company on dividends if the taxation is to be waived or reduced under the EU Parent-Subsidiary Directive or a double taxation treaty.

According to Article 10 of the Danish-Cypriot double tax treaty, Denmark may tax dividends distributed by a Danish company to a company in Cyprus. However, if the Cypriot company owns at least 25 percent of the Danish company, the Danish tax may not exceed 10 percent of the gross amount of the dividend. In other cases, the tax may not exceed 15%.

The double taxation treaty thus entails that Denmark must reduce the taxation of dividends from a Danish company to a parent company in Cyprus. Section 2(1)(c) of the Danish Corporation Tax Act then means that Denmark does not tax the dividend.

This bill does not affect section 2(1)(c) of the Danish Corporation Tax Act. As regards interest, Denmark has so far not had rules on taxation of interest that a foreign company receives from a person or company in Denmark.

According to the present bill, a new rule is inserted in section 2(1)(d) of the Danish Corporation Tax Act, according to which Denmark will in future tax a foreign company on interest received from a Danish company at 30 percent of the gross amount of the interest if certain conditions in this rule are met. However, under the same rule, Denmark will not tax a foreign parent company on interest if the tax is to be waived or reduced under the EU Interest/Royalty Directive or a double taxation treaty.

According to Article 11 of the Danish-Cypriot double taxation treaty, Denmark may tax interest received by a company in Cyprus from sources in Denmark. However, the Danish tax may not exceed 10% of the gross amount of the interest.

The double taxation treaty thus entails that Denmark must reduce the taxation of interest received by a company in Cyprus from sources in Denmark. The proposed rules in section 2(1)(d) of the Danish Companies Tax Act then means that Denmark does not tax the interest.

Cyprus will become a member of the EU in the near future. This will mean that Denmark will have to waive the taxation of dividends and interest according to the Parent/Subsidiary Directive and the Interest Directive.

/In accordance with the Royalties Directive, Denmark will not collect withholding tax, even if Denmark wishes to do so. Finally, it should be noted that, as far as I can see, the Danish treasury does not suffer any loss of revenue from the fact that flow-through

companies are located in Denmark."

**3248**

By Act no. 540 of June 6, 2007, with effect from July 1, 2007, the following was added to section 2(1)(d):

"The tax liability also lapses if the receiving company etc. proves that the foreign corporate taxation of the interest is at least ¾ of the Danish corporate taxation, and that it does not pay the interest to another foreign company etc. which is subject to a corporate taxation of the interest that is less than ¾ of the Danish corporate tax,".

*Corporate Tax Act § 3*

Section 3 of the Danish Corporation Tax Act, cf. Consolidated Act no. 1745 of December 14, 2006, states, inter alia:

"Exempt from tax liability are:

[...]

19) Investment companies, cf. section 19 of the Danish Capital Gains Tax Act, except for account-holding investment associations, cf. section 2 of the Act on Taxation of Members of Account-holding Investment Associations, and except for distributing investment associations, cf. section 16 C(1) of the Danish Tax Assessment Act. [...]"

*Section 3 B of the Tax Control Act*

The provision was worded as follows in Consolidated Act no. 1126 of November 24, 2005:

"§ 3 B. Taxpayers,

1)     over which natural or legal persons exercise a controlling influence,
2)     exercising a controlling influence over legal persons,
3)     that is affiliated with a legal entity,
4)     who has a permanent establishment located abroad, or
5)     who is a foreign natural or legal person with a permanent establishment in Denmark must provide information in the tax return on the nature and extent of commercial or financial transactions with the above-mentioned natural and legal persons and permanent establishments (controlled transactions). Section 1(2) applies correspondingly.

*(*2) Controlling influence means ownership or disposal of voting rights such that the taxpayer directly or indirectly owns more than 50 percent of the share capital or controls more than 50 percent of the votes. When assessing whether the taxpayer is considered to have a controlling influence over a legal entity or whether a legal or natural person exercises a controlling influence over the taxpayer, shares and voting rights held by group companies are included, cf. Section 4(2) of the Danish Capital Gains Act, by personal shareholders and their related parties, cf. Section 16H(2) of the Danish Tax Assessment Act, or by a foundation or trust established by the parent company itself or by the aforementioned group companies, related parties etc. or by foundations or trusts established by these. Similarly, ownership interests and voting rights held by a person covered by section 1 of the Withholding Tax Act or an estate covered by section 1(2) of the Estate Tax Act, jointly with related parties or jointly with a foundation or trust established by the taxpayer or its related parties or foundations or trusts established by these are included. The taxpayer's spouse, parents and grandparents as well as children and grandchildren and their spouses or estates of deceased persons are considered related parties. Stepchildren and adoptive relationships are considered equivalent to original kinship relationships.

Stk. 3. Affiliated legal entities are legal entities where the same group of shareholders has a controlling influence.

...".

By Act No. 308 of April 19, 2006, which entered into force on May 1, 2006, the following was inserted after the first sentence

of Section 3 B(1):

"Legal entities in no. 1 are equivalent to companies and associations etc. which under Danish tax rules do not constitute an independent taxable entity."

subject but whose relationship is governed by company law rules, a company agreement or an association statute."

By the same Act, section 3 B(3) was worded as follows:

"Affiliated legal persons" means legal persons in which the same group of shareholders has a controlling influence or where there is joint management.

Bill no. 116 of December 14, 2005, which formed the basis for Act no. 308 of April 19, 2006, states, among other things:

"*A. Adjustment of the group definition in various safeguard rules*
1. Background to the proposal

In recent years, several Danish and foreign private equity funds have acquired Danish groups. The acquisition is made through a Danish holding company established for the purpose - possibly with a high degree of loan financing and thus significant interest expenses in the Danish holding company/target company. This immediately reduces the taxable income in Denmark in the group in question.

Private equity funds are typically organized as limited partnerships. According to Danish tax law, limited partnerships are not considered independent tax subjects, but as tax-transparent entities. Thus, it is the individual participants who are liable for tax. This means that the Danish safeguards regarding thin capitalization, the arm's length principle and withholding tax on interest to tax havens, which aim to limit tax planning regarding debt to affiliated companies (controlled debt), cannot be applied.

The reason is that the private equity fund is not an independent tax entity and that none of the investors own more than 50% of the capital/votes in the holding company. The

**3249**

The current safeguard rules require that one taxpayer (or equivalent foreign entity) owns more than 50% of the capital/votes (directly or indirectly).

The current rules on controlled debt, which aim to limit the possibilities for tax minimization in international groups, are therefore not applicable to private equity funds.

It is proposed that the tax-transparent entities in relation to the protective rules on transfer pricing and thin capitalization etc. are treated as independent tax subjects. This means that transactions between a private equity fund and its subsidiary are covered by the transfer pricing rules, and that debt from the private equity fund is considered to be intra-group debt in the rules on thin capitalization and withholding tax on interest, even though the private equity fund is not an independent tax subject. The private equity funds are thus equated with, among others, limited liability companies.

The consequence of the fact that private equity funds in the current rules are not covered by the protective rules is, among other things, that no withholding tax is withheld on interest and capital gains paid to the private equity fund. The interest payment is considered to be paid directly to the investors. These are not individually covered by the protective rule, as they own less than 50 percent of the capital/votes in the interest-paying company.

This means that the following scenario is possible:

A holding company is established in Denmark. The holding company, which is financed by the private equity fund, is responsible for the acquisition of the shares in the Danish company (the target company).

The holding company and the Danish target company are jointly taxed, whereby the holding company's interest expenses are offset against the target company's taxable income.

The private equity fund is located in a tax haven country with which Denmark does not have and cannot be expected to have a double taxation agreement. The private equity fund is not taxed or is taxed very lightly in the tax haven. Furthermore, this tax haven country does not exchange

information about who the investors in the private equity fund are to the countries where the investors are domiciled.

If the private equity fund had instead been an independent tax sub- ject, withholding tax would have to be withheld on all interest payments to private equity funds located in countries that do not have a double tax treaty with Denmark. This withholding tax is to prevent the foreign company receiving the interest from avoiding taxation or being taxed very lightly, while Denmark grants the interest-paying company a deduction for the interest expenses.

The proposed change ensures that withholding tax is withheld on the interest payment to the private equity fund to the extent that the investors are companies etc. and are resident in a country that does not have a double taxation treaty with Denmark.

Another consequence of the fact that private equity funds in the current rules are not covered by the protective rules is that the rules on thin capitalization do not apply. The holding company of the private equity fund is thus entitled to deduct interest expenses regardless of the size of the debt to the private equity fund. If the lender was instead a single parent company of the holding company, no deduction would be available for the interest on the debt to the extent that the holding company's debt exceeded the equity by more than a 4:1 ratio.

The current rules are not appropriate. There is no doubt that the private equity fund exercises a controlling influence on the holding company when the investors in the private equity fund act collectively. Loans from the private equity fund to the holding company should therefore be covered by the rules on thin capitalization. In reality, there is thus no difference between this situation and the situation where the private equity fund is established as a company for tax purposes.

A change is proposed to the group definition in the protective rules on transfer pricing, thin capitalization, withholding tax on intra-group interest and withholding tax on intra-group capital gains so that debt to transparent entities, such as limited partnerships, is considered controlled debt in the same way as if the foreign lender was a company. Specifically, a criterion is introduced whereby companies and associations that are not considered to be independent tax subjects are covered by the protective provisions when they exercise control over a taxpayer and when their relationship is governed by company law rules, a partnership agreement or an association's articles of association.

...

To § 7

To no. 1

The change to the group definition in section 3 B of the Tax Control Act introduces withholding tax on interest and capital gains when the creditor is a limited partnership and the partners are resident abroad. The change in section 2(1)(d) of the Danish Corporation Tax Act means that interest payments are subject to withholding tax regardless of whether the limited partnership is Danish or foreign.

It is still the limited partners who are the limited taxpayers. With the change, the limited partners will have limited tax liability on interest when the limited partnership is affiliated with the debtor company.

The limited partners in the limited partnership are generally considered to have limited tax liability on the interest and capital gains. However, the limited tax liability only applies to companies and associations etc. as mentioned in section 1 of the Danish Corporation Tax Act that are domiciled abroad, cf.

**3250**
the introduction in section 2 of the Corporation Tax Act. The

limited tax liability thus does not include limited partners who are natural persons. Nor does it include natural and legal persons who are resident in Denmark.

Furthermore, the limited tax liability will not include interest and capital gains if the taxation is to be waived or reduced under the Interest/Royalty Directive. However, the exemption requires that the paying company and the receiving company are associated (25 percent ownership, cf. the Interest/Royalty Directive) for a continuous period of at least 1 year.

Finally, the limited tax liability lapses if the taxation is to be waived or reduced under a double taxation treaty with the Faroe Islands, Greenland or the state where the receiving company (limited partner) is resident.

Thus, the interest payer must withhold tax at source on interest paid to a limited partnership when the group of owners includes limited taxpayers, i.e. companies and associations etc. resident in a country that does not have a double taxation treaty with Denmark. Withholding tax must only be withheld on the part of the interest payment that corresponds to the limited taxpayers' ownership share.

It must be assumed that in the vast majority of cases the interest payer will be able to avoid withholding tax when paying to group-related tax transparent entities, as it will be the fewest partnerships and limited partnerships etc. with owners who are legal entities resident in countries with which Denmark does not have a double taxation treaty . Most interest payers will therefore be able to pay interest to transparent entities - without considering withholding tax."

The Minister of Taxation's reply of March 3, 2006 to the Danish Parliament's Tax Committee regarding the above-mentioned bill no. 116 of December 14, 2005 states, among other things (L116 - Appendix 7):

"FSR: FSR [Foreningen af Statsautoriserede Revisorer] is aware that a few other countries have withholding tax on interest. In these cases, the equity and loan investments of private equity funds are made via holding companies in other EU countries, e.g. Luxembourg. This will probably also be the situation if Denmark introduces withholding tax on interest. The consequence will then be that interest payments will be subject to thin capitalization. Another consequence can be that dividends will be distributed on an ongoing basis, which does not happen today because Denmark has a withholding tax on dividends.

*Comment:* The limited tax liability for interest under section 2(1)(d) of the Danish Corporation Tax Act covers foreign companies that receive intra-group interest from Denmark. This limited tax liability lapses if the taxation of the interest is to be waived or reduced under the Interest/Royalty Directive or under a double taxation treaty.

In this connection, it should be noted that in relation to section 2(1)(d) of the Danish Corporation Tax Act, it must be determined based on the principle of the rightful income recipient who receives the interest. The withholding tax on the interest will only be waived under the treaties if the beneficial owner of the interest is a resident of the other state. The same applies in the Interest/Royalty Directive, cf. Article 1(1) of the Directive. The benefits of the Directive may also be denied in the case of transactions that have tax avoidance, tax evasion or abuse as the principal motive or one of the principal motives.

If the private equity funds make equity and loan investments via holding companies, it will have to be assessed whether the holding company is the right income recipient/rightful owner of the interest income. In my opinion, a pure flow-through holding company in, for example, Luxembourg can hardly be the rightful income recipient/rightful owner of the interest income. The Swiss Supreme Court has concluded that a pure flow-through holding company in Denmark was not the beneficial owner of dividend

payments under the Danish-Swiss treaty."

The report submitted by the Danish Parliament's Tax Committee on March 22, 2006 after the first reading of the above bill states, among other things:

"*Section 3 B(3) is* replaced by the following:

"*Paragraph 3.* "Affiliated legal persons" means legal persons where the same group of shareholders has a controlling influence or where there is joint management."

[Extension of the definition of control in the transfer pricing rules etc. to include joint control agreements and extension of the definition of affiliated legal entities in the transfer pricing rules etc. to include legal entities with common management].

...

### Remarks

...

To number 6. ...

If several acquiring private equity funds agree in detail how the acquired company will be managed in the future, they act as a single entity. There appears to be no difference between this situation and the situation where the acquiring private equity funds establish a joint venture company for the purpose of the acquisition. The latter situation is covered by the proposal, the former situation should therefore also be covered by the proposal.

It is therefore proposed that when assessing whether a private equity fund has a controlling interest in a company, ownership interests and voting rights that

**3251**

held by other shareholders with whom the private equity fund has an agreement on the exercise of a controlling influence. At the same time, it is proposed that the provision should also apply to independent corporate tax entities such as limited liability companies. The transfer pricing rules etc. will thus take effect if two companies have agreed on joint control in a company that they own (50/50). The provision will only apply when there is an agreement on the exercise of joint control. The provision does not mean that the shareholders are affiliated with each other. The provision only means that the shareholders are considered to have a controlling influence in the jointly owned company. Both direct and indirect shareholders will be considered to have a controlling influence in the jointly owned company. Thus, it is not possible to avoid being covered by the provision by contributing an intermediate holding company.

The provision will thus apply to both private equity funds and intermediate holding companies when two private equity funds and each intermediate holding company have agreed to exercise joint control. This will apply regardless of whether the agreement is concluded between the private equity funds or between the intermediate holding companies.

It will depend on a specific assessment of the agreement in question whether there is an agreement on the exercise of joint control. This assessment may include whether the agreement entails

- joint control of the majority of voting rights,

- joint appointment or removal of a majority of the members of the company's supreme governing body; or

- joint control over the operational and financial management of the company.

Private equity funds making a joint investment will often agree on joint controlling influence. In connection with the joint investment, the participating private equity funds will thus typically agree on common guidelines in a number of areas, for example in the form of a shareholders' agreement. These can be, for example, the following:

- Minimum investment/shareholding requirements and possible participation in future capital increases to finance further acquisitions.

Copyright © 2023 Karnov Group Denmark A/S

- The right to demand to sell on the same terms as a selling shareholder and the obligation to sell on the same terms as a selling shareholder (so-called tag along & drag along).

- Agreement on the common strategy of the investment (investment horizon, possible preferred exit mode).

- Agreement on joint appointment of board members and the functioning of the board (provisions typically found in the board's rules of procedure on meetings, quorum, majority rules, requirements for qualified majorities in certain decisions, etc.)

- Guidelines for the strategy of the acquired company.

A shareholders' agreement is not in itself sufficient to establish the existence of a joint control agreement. Some shareholders' agreements contain, for example, provisions on pre-emption rights in case of sale and provisions on restrictions on the right to pledge. Such provisions do not in themselves result in the exercise of joint control.

In situations of joint control, the companies or private equity funds will be independent in a number of ways. They will have different investor circles, management teams, investment profiles, business strategies and tax positions, and they may well each have investments in competing companies. Before a concrete investment is made, there will often be no contractual obligations between the companies and funds.

...

To #12

Reference can be made to the corresponding amendments concerning section 2 of the Tax Assessment Act (amendment no. 6).

*Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States (Interest/Royalty Directive) The* Directive provides:

"*Article 1*
*Scope and procedure*

1. Payments of interest or royalties arising in a Member State shall be exempt from any form of tax in that State, whether collected by deduction at source or by assessment, provided that the beneficial owner of such interest or royalties is a company of another Member State or a permanent establishment situated in another Member State of a company of a Member State.

...

4. A company of a Member State shall be considered the beneficial owner of interest or royalties only if it receives such payments for its own use and not as an intermediary, including as agent, mandatary or authorized signatory for another person.

...

7. This Article shall apply only if the company which is the payer or the company whose permanent establishment is deemed to be the payer of interest or royalties is a company which is associated with the company which is the beneficial owner or whose permanent establishment is deemed to be the beneficial owner of that interest or royalties.

...

**3252**

*Article     5*
*Fraud     and*
*abuse*

1.    This Directive shall not preclude the application of national or collectively agreed anti-fraud or anti-abuse provisions.

2.    Member States may withdraw benefits under this Directive or refuse to apply this Directive in the case of transactions for which tax evasion, avoidance or abuse is the principal motive or one of the principal motives.

*Double taxation treaties*
*The Nordic double taxation treaty*

The agreement of September 23, 1996 between the Nordic countries for the avoidance of double taxation with respect to taxes on income and wealth provides, among other things:

"*Article 3*
*Common definitions*

...

2. As regards the application of this Agreement by a Contracting State, any term not defined therein shall, unless the context otherwise requires, at any time have the meaning which it has at that time under the law of that State concerning the taxes to which this Agreement applies and the meaning which it has under the tax laws of that State shall prevail over the meaning which it has under any other law of that State.

...

Article 11
*Interest rates*

1. Interest arising in a Contracting State and paid to a resident of another Contracting State may be taxed in that other State only if that person is the beneficial owner of the interest."

*Agreement with Luxembourg*

The Convention of 17 November 1988 with Luxembourg for the avoidance of double taxation and the establishment of provisions for mutual administrative assistance in respect of taxes on income and capital provides, inter alia:

"*Article 3*
*Common definitions*

...

2. As regards the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

...

Article 11
*Interest rates*

1. Interest arising in a Contracting State and paid to a resident of the other Contracting State may, if such person is the beneficial owner of the interest, be taxed only in that other State.

...

*FINAL PROTOCOL*

By signing the Convention between the Kingdom of Denmark and the Grand Duchy of Luxembourg for the avoidance of double taxation and the establishment of provisions for mutual administrative assistance in respect of taxes on income and on capital, the undersigned Plenipotentiaries have agreed on the following provisions which shall form an integral part of the Convention:

§ 1. Holding companies

Re Articles 1, 3 and 4:

This Convention shall not apply to holding companies as covered by the special Luxembourg legislation, currently the Law of July 31, 1929 and the Grand-Ducal Regulation of December 17, 1938 (brought into force by Article 1, 7o, paragraphs 1 and 2, of the Law of December 27, 1937). The Agreement also does not apply to income,

received by a resident of Denmark from such companies, nor on shares or other securities of such companies of which such a person is the owner."

The bill that formed the basis for Luxembourg's conclusion of the double taxation treaty and the associated final protocol with Denmark states, among other things (unauthorized translation):

"Paragraph 1 of the Final Protocol provides that holding companies are excluded from the scope of the Convention under Luxembourg law.

As these holding companies are not subject to income or wealth tax, they are normally not subject to double taxation laws.

The express mention of Luxembourg holding companies by the High Contracting Parties is undoubtedly at the request of the Danish co-signatory, who wished to avoid confusion between the taxes mentioned in the Convention and the subscription taxes ["impots d'abonnement"] payable by the holding companies.

It is true that the exclusion of holding companies can also be seen as a sign that our contractual partners distrust one of our most original fiscal and financial institutions.

While we can hardly object to the exclusion of holding companies from the scope of the Convention, we must remain vigilant to ensure that our specific legislation is not attacked head-on by those who, rightly or wrongly, consider themselves to be its victims."

*Correspondence between Denmark and Luxembourg on the double taxation agreement*

On June 10, 1992, the Luxembourg authorities asked the Ministry of Taxation whether "Investment Funds

**3253**

under the Luxembourg law of March 30, 1988", was covered by the double taxation agreement or covered by the final protocol and thus subject to Danish taxation. In this connection, it was stated, inter alia:

"I think one cannot assimilate the Investment Funds to holding companies to the extent that would fall under paragraph 1 of the Final Protocol. The first reason is that this provision refers a particular legislation, namely the Act of 31 July 1929 and the Decree of 17 December 1938. As to the Investment Funds, they benefit by a fiscal regime totally independant from the one applying to holding companies. The second reason is that the two kinds of companies totally differ as to their structure and their activities."

On October 14, 1993, the Ministry of Taxation replied that it was of the opinion that the investment funds were not covered by the agreement, as they were covered by the final protocol on holding companies. In this connection it was stated, among other things:

"However, I disagree with you that the two types of companies differ considerably as regards structure and types of activity. On the contrary, there seems to be a great similarity between them in every respect.

In the first place, both types have a high rate of option as regards form of or-ganization.

Secondly, both types of firms make investments in other firms only and do not carry out active business of trade or industry themselves. Also it is important to note that a holding company can be the administrator of an investment

Further, they are treated almost identically for fiscal purposes. Holding companies as well as investment funds are exempt from the greater part of the Luxembourg tax (including the taxes covered by the the convention between Denmark and Luxembourg) as only a very small subscriptiontax is to be paid in both cases. Moreover,

they are subjected to the same fiscal treatment on distributions to or from a holding company or an investment fund respectively.

As a consequence of the above-mentioned and because to all appearances the laws concerning investment funds was not carried through until after the conclusion of the convention between Den- mark and Luxembourg, Denmark is of the opinion that investment funds are covered by paragraph 1 of the final protocol and they can, therefore, not come under the provisions of the convention." On April 14, 2005, a "tax consultant" in the legal department, the personal taxation office, responded to a request from an alleged bank in Luxembourg, stating that they could confirm that in a decision from 1995, the Danish Council of Equalization had determined that a unit in an investment fund in Luxembourg, a Sicav, can be compared to a Danish investment fund. Customs and Tax then stated that a Sicav can be

"in such a case" is entitled to the benefits of the double taxation agreement between Denmark and Luxembourg. It has been stated that the relevant decision from the Danish Tax Council is referred to in TfS 1995.195.

On February 15, 2006, the Danish Ministry of Taxation replied to an official request from the Luxembourg tax authorities on whether the Danish tax authorities, with reference to the above-mentioned correspondence of April 14, 2005, still considered Luxembourg "investment funds" not to be covered by the benefits of the double tax treaty:

"... I can inform you that I agree on the point view taken by the Central Customs and Tax Administration in mail of April 14, 2005. This means that Luxembourg investment funds qualify for benefits according to the Double Taxation between and Luxembourg.

Likewise it we consider the new Danish undertakings for collective invest-ments to be covered by the Double Taxation Treaty. As in the note from Ernst & Young, these undertaking are in practise tax exempt but the Danish residents, which own shares in the undertaking, are subject to taxation at an accrual basis of the increase in value of shares in the undertaking."

On 21 February 2006, a newsletter was published on the website of the Luxembourg tax authorities on the direct tax internet, stating, among other things (unauthorized translation):

"Extension of the scope of the Double Taxation Convention con- cluded be- tween Denmark and Luxembourg to SICAVs / SICAFs By exchanges of letters of December 30, 2005 and February 15, 2006, the Danish and Luxembourg tax authorities agreed that Luxembourg investment funds constituted in the form of SICAV

/ SICAF fall within the scope of the Tax Convention concluded between Denmark and Luxembourg on November 17, 1980.

The tax offices concerned will henceforth issue a certificate of tax residence serving as a supporting document.

Conversely, Danish collective investment undertakings also benefit from the provisions of the aforementioned Convention."

*OECD Model Double Taxation Conventions with comments*

The OECD Model Double Taxation Convention on Income and Capital (1977) states, among other things:

"Article 3
*Common definitions*

...

2. In the application of this Agreement in a Contracting State, unless the context otherwise requires, any term not defined therein,

**3254**

shall have the meaning which it has in the law of that State concerning the taxes to which the Agreement applies.

...

Article 10
*Yields*

Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

Paragraph 2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the dividends, exceed:

a) 5 percent of the gross amount of the dividend if the beneficial owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b) 15% of the gross amount of the proceeds in all other cases.

...

Article 11
*Interest rates*

1. Interest arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State.

2. However, such interest may also be taxed in the Contracting State in which it arises and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the interest, exceed 10 percent of the gross amount of the interest. The competent authorities of the Contracting States shall by mutual agreement lay down the detailed rules for the application of this limitation.

..."

The English wording of Articles 10 and 11 was as follows:

"Dividends

1. Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the low of that State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed

a) . . .

b) . . .

... Interests

1. Interest arising in a Contracting State and paid to a resident of the other Contracting State may be taxed in that other State.

2. However, such interest may also be taxed in the Contracting State in which it arises and according to the laws of that State, but if the recipient is the beneficial owner of the interest the tax so ch- arged shall not exceed 10 per cent of the gross amount of the inter- est. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation." From the OECD's comments on this, it appears, among other things:

"*ABUSE OF THE COLLECTIVE AGREEMENT*

7. The purpose of double taxation conventions is to facilitate, through the elimination of international double taxation, the exchange of goods and services and the movement of capital and natural and legal persons. However, they should not assist tax avoidance or evasion. While it is true that, apart from double tax treaties, taxpayers have the option of taking advantage of differences in tax levels between States and the tax benefits arising from different countries' tax laws, it is for the States concerned to adopt provisions in their domestic

legislation to counteract possible artifices. Consequently, in their bilateral double tax treaties, such States will want to maintain the application of such provisions in their domestic laws.

8. In addition, the expansion of the network of double taxation treaties reinforces the effect of such artifices by making it possible, through the creation of usually elaborate legal constructions, to benefit both from the advantages resulting from certain national laws and from the tax reductions resulting from double taxation treaties.

9. This would be the case, for example, where a person (whether a resident of a Contracting State or not) disposes through a legal association formed in a State primarily to obtain benefits under the agreement that could not be obtained by the person directly. Another case would be where an individual in a Contracting State has both a permanent home and all his economic interests, including a substantial interest in a company in that State and, essentially to sell the interest and avoid taxation of capital gains in that State on the sale (as a result of Article 13(4)), transferred his permanent home to the other Contracting State where such gains were subject to low or no taxation.

10. Some of these situations are addressed in the Agreement, e.g. by introducing the concept of "beneficial owner" (in Articles 10, 11 and 12) and special provisions for the so-called artist companies (Article 17(2)). Such problems are also mentioned in the comments on Articles 10 (points 17 and 22), 11 (point 12) and 12 (point 7). It may be appropriate for Contracting States to agree in bilateral negotiations that tax relief

**3255**

not apply in certain cases, or to agree that the application of national anti-avoidance laws is not affected by the agreement.

...

*COMMENTARY ON ARTICLE 11 ON TAXATION OF INTEREST*

8. According to paragraph 2, the limitation of taxation in the source State shall not apply in cases where an intermediary, such as an agent or a specially appointed person, is interposed between the recipient and the payer, unless the beneficial owner is a resident of the other Contracting State. States wishing to clarify this are free to do so during bilateral negotiations.

...

10. The paragraph does not determine whether the relief in the source State should depend on whether the interest is taxed in the State of residence. This question can be settled by bilateral negotiations."

Articles 10 and 11 of the OECD Model Agreement of 2003 contained largely identical provisions. The comments on these articles state, among other things:

"Abuse of the collective agreement

...

9.6 The possibility to use general anti-abuse provisions does not mean that there is no need for tax treaties to include specific provisions aimed at preventing particular forms of tax avoidance. Where particular techniques of tax avoidance have been identified or where the use of such techniques is particularly problematic, it will often be useful to include provisions in the agreement that focus directly on the relevant avoidance strategy. This will also be necessary in cases where a State advocating the view described in paragraph 9.2 above considers that its domestic law lacks the anti-abuse rules or principles necessary to properly address such a strategy.

10. For example, some forms of tax avoidance are already explicitly addressed in the agreement, such as the introduction of the concept of

"beneficial owner" (in Articles 10, 11 and 12) and in specific provisions such as Article 17(2), which deals with the so-called artist companies. Such problems are also mentioned in the comments to Art. 10 (points 17 and 22), Art. 11 (point 12) and Art. 12 (point 7).

...

*Provisions designed for entities benefiting from particularly advantageous tax regimes*

21. Special types of companies enjoying tax privileges in their home state facilitate conduit arrangements and raise the issue of harmful tax competition.

In cases where tax-exempt (or nearly tax-exempt) companies can be identified by specific legislative characteristics, abuse of tax treaties can be avoided by denying these companies treaty benefits, the exclusion approach. Since such privileges are mainly granted to specific types of companies, as defined in the business law or tax law of the country, the most radial solution would be to exclude such companies from the scope of the treaty. Another solution is the insertion of a special

"safeguarding clause" which will apply to income received or paid by such companies and which may be formulated as follows:

"No provision of this Agreement granting exemption from, or reduction of, tax shall apply to income received by, or paid by, a company falling within the definition in section ... of Law No. ...., or falling within any similar provision enacted by ... after the signature of this Agreement."

...

*OECD commentary on Article 11 on the taxation of interest*

...

8. The beneficial ownership requirement was inserted in Article 11(2) to clarify the meaning of the words "paid to a resident" as used in paragraph 1 of the Article. This makes it clear that the source State is not obliged to waive its right to tax interest income simply because the income was paid directly to a resident of a State with which the source State has concluded a treaty. The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including to avoid double taxation and to prevent avoidance or evasion of tax.

8.1 Relief or exemption from taxation on a type of income is granted by the source State to a resident of the other Contracting State in order to avoid in whole or in part the double taxation which would otherwise result from the simultaneous taxation of the income by the resident State. Where income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption solely on the basis of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of income in this situation is a resident of the other Contracting

**3256**

the other State, but no double taxation arises as a result, since the recipient of the income is not regarded as the owner of the income for tax purposes in the State in which he is resident. It would also not be in accordance with the intent and purpose of the treaty if the source state were to grant

relief or exemption from tax in cases where a resident of a Contracting State acts, otherwise than as agent or intermediary, merely as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a conduit company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

8.2 Subject to the other conditions of the Article, the limitation on the right of taxation of the source State continues to exist where an agent or an intermediary, resident in a Contracting State or in a third State, is interposed between the beneficiary and the payer, but the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is in line with the understanding of all Member States). States wishing to express this more clearly are free to do so during bilateral negotiations.

...

10. The Article does not determine whether the relief in the source State should depend on whether the interest is taxed in the State of residence. This question can be settled by bilateral negotiations."

The OECD Model Agreement of 2014 contained largely similar provisions. The comments to this agreement state, among other things:

"9. The beneficial owner requirement was inserted in Article 11(2) to clarify the meaning of the words "paid to a resident" as used in paragraph 1 of this Article. This makes it clear that the source State is not obliged to relinquish its taxing rights on interest income merely because the interest was paid directly to a resident of a State with which the source State has concluded a treaty.

9.1 As the term 'beneficial owner' was added to address the potential difficulties in using the words 'paid to

... a resident' in paragraph 1, it was intended to be interpreted in that context, but not to refer to any technical meaning that it might have under the domestic law of a given state (indeed, when the term was added to the paragraph, in many states it did not have a precise statutory meaning). The term "beneficial owner" is therefore not used in a narrow, technical sense (such as the meaning it has in the trust law of many common law states), but must instead be understood in context, particularly in relation to the words "paid

... to a resident", and in light of the intent and purpose of the treaty, including avoiding double taxation and preventing tax evasion and avoidance.

10. Relief or exemption from taxation on a type of income is granted by the source State to a resident of the other Contracting State in order to avoid in whole or in part the double taxation which would otherwise result from the simultaneous taxation of the income by the resident State. Where income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption solely on the basis of the status of the direct recipient of the income as a resident of the other Contracting State. The direct recipient of income in this situation is a resident of the other state, but no double taxation arises as a result since the income recipient is not considered the owner of the income.

Copyright © 2023 Karnov Group Denmark A/S

for tax purposes in the State in which he is resident.

10.1 It would also be inconsistent with the object and purpose of the Convention if the source State were to grant relief or exemption from tax in cases where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies"2 prepared by the Committee on Fiscal Affairs concludes that a

The "flow-through" company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

10.2 In these various examples (agent, intermediary, conduit company in its capacity as nominee or trustee), the direct recipient of the interest is not the "beneficial owner" because the recipient's right to use and enjoy the interest is limited by contractual or legal obligations to pass on the payments received to another person.

**3257**

Such an obligation will usually be evidenced by relevant legal documents, but may also be present by virtue of the facts which clearly show that the recipient does not have the substantive rights to use and enjoy the interest without being bound by a contractual or legal obligation to pass on the payments received to another person. This type of obligation does not include contractual or legal obligations that are not conditional on the onward payment by the direct recipient, such as an obligation that is not dependent on the receipt of such payment and that the direct recipient has as a debtor or as a party to financial transactions or customary distribution obligations under a pension agreement or to collective investment entities that will be entitled to collective bargaining benefits according to the principles set out in paragraphs 6.8 to 6.34 of the commentary to Article 1. Where the recipient of an interest has the right to use and enjoy the proceeds, without being bound by contractual or legal obligations to pass on the payments he has received to another person, the recipient is the "beneficial owner" of that interest. It should also be noted that Art. 11 refers to the beneficial owner of the interest as opposed to the owner of the advances from which the interest comes, and they may be different in certain situations.

10.3 However, the fact that a recipient of interest income is considered to be the beneficial owner of that interest does not mean that the reduction of tax provided for in paragraph 2 shall automatically be granted. This reduction of tax is not to be granted in the event of abuse of the provision (see also point 8 above). As explained in the section "Abuse of the treaty" in the commentary to Art. 1, there are many ways to deal with a conduit company and, on a more general level, treaty shopping situations. These include specific anti-abuse provisions in treaties, general anti-abuse provisions, and substance-over-form or economic-substance approaches. While the "beneficial owner" concept includes some forms of tax avoidance (i.e. the type involving the insertion of a recipient who is obliged to pass on the royalties to another person), there are other types that it does not include: it does not include other forms of treaty shopping, and therefore it should not be seen as a concept that in any way limits the application of other principles regarding such matters.

10.4 The above explanations of the term "beneficial owner" make it clear that the meaning of this term, as it appears from the context of the article, must be distinguished from other interpretations of the same term, but in other contexts, which relate to the identification of the person (typically a natural person) who has ultimate control over the entities or assets. Such a different understanding of the term "beneficial owner" cannot be applied in the interpretation of the Agreement. In fact, however, the understanding of the provision that refers to a natural person cannot be reconciled with the explicit wording of Article 10(2)(a), which refers to cases where a company is the beneficial owner of a dividend. The concept of "beneficial owner", as used in Articles 10 and 11, is intended to solve the problems arising from the use of the words "paid to" in relation to dividends and interest, rather than those relating to the ownership of shares or debentures from which dividends and interest arise. For this reason, it would not be appropriate, when applying these articles, to consider the application of an interpretation that has been developed to refer to natural persons who exercise: "ultimate effective control over legal persons or arrangements".

11. It follows from the provisions of the Article that the limitation of the right of taxation of the source State also applies when an intermediary, such as an agent or representative resident in the Contracting State or in a third State, is interposed between the recipient and the payer, but the beneficial owner is resident in the other Contracting State (the text was amended in 1995 and in 2014 to clarify this, which is in line with the position of all Member States).

...

13. The Article does not determine whether the relief in the source State shall depend on whether the interest is taxed in the State of residence. This question may be settled by bilateral negotiations."

On November 27, 2006, the Minister of Taxation answered a number of questions to the Danish Parliament's Tax Committee in connection with a bill to amend Denmark's double taxation agreement with the USA. Among other things, it appears from this:

"*Question 5:* Does the treaty mean that 5% withholding tax must be withheld in Denmark if dividends from a Danish company are paid to a flow-through holding company in Luxembourg owned by US private equity funds where none of the owners has 80% or more of the voting rights?

*Answer:* The starting point is that a foreign company that receives dividends from Danish companies has limited tax liability on the dividends. The tax liability is fulfilled by withholding 28% dividend tax. Section 2(1)(c) of the Danish Corporation Tax Act means that there is no limited tax liability if the dividends are received by a company that owns at least 20 percent of the share capital in the dividend-paying company. Among other things, it is a condition that the taxation must be waived or reduced in accordance with the EU's

**3258**

Parent-Subsidiary Directive or under a double taxation treaty with the country where the foreign company is resident. The lapse of limited tax liability is conditional on the foreign company being the beneficial owner of the dividends. A pure flow-through company that is resident in a foreign country, e.g. Luxembourg, will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

However, the limited tax liability still lapses if the beneficial owner behind the flow-through company is domiciled in another

country and Denmark, according to the parent/subsidiary directive

Copyright © 2023 Karnov Group Denmark A/S

treaty or a double tax treaty with that country shall reduce or waive the taxation of the dividends."

*Directive 85/611/EEC on UCITS*

Council Directive 85/611/EEC of 20 December 1985 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) provided inter alia:

"SECTION I

General provisions and scope of application

*Article 1*

1. Member States shall apply the provisions of this Directive to undertakings for collective investment in transferable securities (UCITS) situated within their territories.

2. For the purposes of this Directive and without prejudice to Article 2, UCITS shall mean undertakings the sole object of which is the collective investment in transferable securities of capital raised from the public, the business of which is based on the principle of risk-spreading and the units of which are, at the holders' request, repurchased or redeemed directly or indirectly out of the assets of such undertakings. The fact that a UCITS takes measures to ensure that the market value of its units does not deviate significantly from their net value shall be treated as equivalent to such repurchase or redemption.

3. According to the law, these institutions can be established by agreement (investment funds managed by management companies) or as trusts ("unit trusts") or by statute (investment company).

For the purposes of this Directive, the term 'investment fund' also includes the concept of 'unit trust'.

4. However, this Directive does not cover investment firms the assets of which are invested, through subsidiaries, mainly in assets other than transferable securities.

...

*Article 2*

1. The following UCITS shall not be considered UCITS for the purposes of this Directive: -closed-end UCITS,

-investment firms which raise capital without intending to offer their units to the public in the Community or any part thereof,

-UCITS whose units may, according to the fund rules or instruments of incorporation of investment companies, only be sold to the public in third countries,

-the categories of UCITS defined by the rules of the Member State in which the UCITS is situated for which the rules laid down in Section V and Article 36 are inappropriate because of the UCITS' investment and borrowing policies.

...

SECTION V

Obligations with regard to UCITS investment policy

...

*Article 22*

1. A UCITS may not invest more than 5% of its assets in securities issued by the same issuer.

2. Member States may raise the limit referred to in paragraph 1 to a maximum of 10 %. However, where a UCITS invests more than 5 % of its assets in transferable securities of the same issuer, the total value of such acquired transferable securities held by the UCITS may not exceed 40 % of its assets.

3. Member States may raise the limit referred to in paragraph 1 to a maximum of 35 % where the securities are issued or guaranteed by a Member State, by its local public authorities, by a third country or by public international bodies to which one or more Member States belong.

...

*Article 57*

1. Member States shall bring into force the measures necessary to comply with this Directive not later than 1 October 1989. They shall forthwith inform the Commission thereof.

*Directive 2009/65/EC on UCITS*

Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) provides, inter alia:

"*Article 1*

1. This Directive shall apply to undertakings for collective investment in transferable securities (UCITS) established within the territory of the Member States.

2. For the purposes of this Directive, and without prejudice to Article 3, UCITS shall mean an undertaking:

**3259**

a) the sole object of which is the collective investment in transferable securities or in other liquid financial assets referred to in Article 50(1) of capital raised from the public and whose business is based on the principle of risk-spreading; and

b) whose units are repurchased or redeemed directly or indirectly, at the request of the holders, out of the assets of those institutions. The fact that an investment institution takes measures to ensure that the market value of its units does not deviate from the net value shall be treated as equivalent to such repurchase or redemption.

Member States may allow investment firms to consist of several investment compartments.

3. The undertakings referred to in paragraph 2 may be established by agreement (unit trusts managed by the management company), as trusts (unit trusts) or by statute (investment companies).

For the purposes of this Directive, includes:

a) the term "investment fund" also includes the term "unit trust"

b) the term "units" in UCITS also includes shares in UCITS.

4. This Directive shall not apply to investment firms whose assets are mainly invested, through subsidiaries, in assets other than transferable securities.

...

*Article 3*

The following institutions shall be deemed not to be covered by this Directive:

a) closed collective investment schemes

b) collective investment undertakings which raise capital without seeking to offer their units to the public in the Community or any part thereof

c) collective investment undertakings the units of which, according to the fund rules or instruments of incorporation of investment companies, may only be sold to the public in third countries

d) the categories of collective investment undertakings

U.2023.3198H

defined in the rules of the Member State in which such collective investment undertakings are established and for which

the rules in Chapter VII and Article 83 are inappropriate due to institutions' investment and borrowing policies.

...

CHAPTER VII

OBLIGATIONS WITH REGARD TO THE INVESTMENT POLICY OF INVESTMENT INSTITUTIONS

...

*Article 50*

1. A UCITS portfolio consists of one or more of the following:

...

2. However, a UCITS does not have to:

a)    invest more than a maximum of 10% of its assets in transferable securities or money market instruments other than those referred to in paragraph 1; or

b)    acquire precious metals or certificates for them.

UCITS may hold liquid assets on an ancillary basis.

3. An investment company may acquire movable or immovable property which is strictly necessary for the direct pursuit of its business.

*Article 51*

1. A management company or investment company shall employ a risk management process that allows it to monitor and measure at any time the risk of the positions and their contribution to the overall risk profile of the portfolio.

it uses a process that allows for an accurate and independent assessment of the value of the OTC derivatives It regularly informs the competent authorities of its home Member State of the nature of the derivative instruments, the underlying risks, the quantitative limits and the methods chosen to assess the risk of transactions in derivative instruments for each of the UCITS it manages.

...

*Article 52*

1. An investment institution invests at most:

a)    5% of its assets in securities or money market instruments issued by the same issuer; or

b)    20% of its assets in deposits with the same entity. The risk to the UCITS counterparty in OTC derivative transactions shall not exceed:

a)    10 % of its assets if the counterparty is a credit institution referred to in Article 50(1)(f); or

b)    5% of its assets in other cases.

The Directive also provides that Member States may, under specified conditions, increase the specified investment limits to a certain extent.

The Directive also contains detailed rules on, inter alia, the authorization of UCITS by the authorities to carry out activities, on obligations regarding information to investors, including detailed information on the risks associated with the investment, and on limited borrowing possibilities. *Relevant Luxembourg legislation on the taxation of investments Law of July 31, 1929*

The law stipulated, among other things (unauthorized translation):

**3260**

"Art. 1st. Will be considered as a Holding company, any luxembourgeois company whose purpose is exclusive of the acquisition of participations, under some form whatsoever, in other Luxembourg companies bourgeois or foreign and management as well as the development of these participations, in a way that it does not have its own industrial activity and that it is not a commercial establishment open to the public. The portfolio of companies Hol- ding pent understand Luxembourg public funds bourgeois or foreigners.

The Holding company will be exempt from tax on income, surch- arge, additional pot rim and coupon tax, without having right to the refund of the tax on the coupon collected by the native obliga- tions that it holds in wallet; she is also exempt additional centimes from the municipalities.

The Holding company will be subject to taxes following:

1.    The acts of formation and improvement of the society as well as deeds increasing share capital will be subject to the right proportional, established by art. 40 and 41 of the law of December 23, 1913, ...

2.    The annual and compulsory subscription fee in charge of company titles, provided for by art. 34 and ss. of the law of December 23, 1913 ...

3.    The stamp duty on securities issued by holding companies is due, under penalty of a fine an additional ten, within two months of registration de Parte creating these securities, ...

Regulation of 17 December 1938 on the tax regime for holding companies receiving contributions consisting of assets of a foreign company of at least one billion francs determined, inter alia (unauthorized translation):

"*Article 2.*

(1) When the total share and bond capital of a holding company referred to in Article 1 reaches one billion francs or its equivalent in gold, in a currency of account related to gold or in a foreign currency, the following taxes shall be levied

(a) the mandatory annual subscription fee charged for securities from holding companies;

(b) income tax, additional tax and supplementary tax which may be levied on directors, commissioners and liquidators who are resident in the Grand Duchy of Luxembourg for less than six months a year and on creditors other than holders of bonds or other negotiable securities of a similar nature who are resident in the Grand Duchy of Luxembourg for less than six months a year;

c) additional cents in favor of municipalities;

is replaced by an income tax which, to the exclusion of all other taxes, is levied only on:

(a) interest paid to holders of bonds and other negotiable instruments of similar nature;

b) dividends paid to shareholders;

c) salaries and emoluments of directors, commissioners and liquidators residing less than six months a year in the Grand Duchy of Luxembourg.

(2) This income tax is levied according to the following scales:

A. - If the total interest paid each year to holders of bonds and other negotiable securities of similar nature reaches or exceeds one hundred million (100 000 000) francs;

(a) three percent (3%) on interest paid to such bondholders and other securities;

b) 18% (18 p.m.) on dividends, bonuses and salaries up to a maximum distribution of CHF 50 million (CHF 50 million);

c) one per thousand (1 p.m.) of the surplus of said dividends, fees and remuneration.

B. - If the total interest paid each year to holders of bonds and other negotiable instruments of similar nature is less than one hundred million (100 million) francs:

(a) three percent (3%) on interest paid to such bondholders and other securities;

(b) three percent (3%) on dividends, fees and remuneration, but not exceeding an amount equal to the difference between one hundred million (100

million) and the total amount of interest paid to holders of bonds and other similar negotiable instruments;

c) 18% (18 p.m.) on the surplus of dividends, fees and expenses up to a maximum distribution of 50 million francs;

d) one per thousand (1 p.m.) of the surplus of said dividends, fees and remuneration."

By Commission Decision of 19 July 2006, it was decided that the tax regime then applicable in Luxembourg to holding companies under the Law of 31 July 1929 was a State aid scheme incompatible with the common market. Luxembourg was ordered to abolish the scheme by December 31, 2006. It is stated that the 1929 tax scheme was repealed on December 22, 2006.

*Law of March 30, 1988 and Law of December 20, 2002 (SICAF and SICAV)*

The law of 30 March 1988 on collective investment undertakings [Société d'Investissement à capital fixe and Société d'Investissement à capital variable] provides inter alia (unauthorized translation):

"*PART I: Undertakings for collective investment in transferable securities Chapter 1.*

*General provisions and scope of application*

Art. 1. (1) This Part shall apply to all undertakings for collective investment in transferable securities (UCITS) situated in the Grand Duchy of Luxembourg.

**3261**

(2) For the purposes of this Act, an institution shall be deemed to be a UCITS institution, subject to Article 2

- the sole object of which is the collective investment in transferable securities of capital raised from the public and which operate on the principle of risk-spreading, and

- whose units are redeemed directly or indirectly out of the assets of the body at the request of the unit-holders. Such redemptions include action by a UCITS to ensure that the market value of its units does not deviate significantly from their net asset value.

(3) These organizations can be contractual (mutual funds managed by a management company) or the statutory form (investment company).

(4) However, this Part shall not apply to investment firms whose assets are invested through subsidiaries mainly in real estate other than securities.

...

Art. 2. This part does not concern:

Closed funds,

UCIs which raise capital without promoting the sale of their units to the public in the European Economic Community or any part of it, UCIs whose instruments of incorporation provide that their units may only be sold to the public in countries which are not members of the European Economic Community, categories of UCIs determined by the supervisory authority for which the rules in Chapter 5 are inappropriate because of their investment and lending policies.

...

*Chapter 3. Investment companies with variable capital in transferable securities (SICAV)*

Art. 24. Investment companies with variable capital (SICAVs) within t h e meaning of this Part are companies which have taken the form of a société anonyme under Luxembourg law,

- the sole purpose of which is to invest their funds in securities in order to diversify investment risks and allow their shareholders to benefit from the results of the management of their assets; and

- whose shares are to be placed with the public by means of a public or private offering and whose articles of association stipulate that the capital must at all times correspond to the value of the company's net assets.

...

*Chapter 5 Investment policy of a UCITS*

...

Art. 42. (1) A UCITS may not invest more than 10 % of its assets in securities of a single issuer. In addition, the total value of the securities held by the UCITS in issuers in which it invests more than 5% of its assets may not exceed 40% of the value of the UCITS' assets.

(2) The 10 % limit referred to in paragraph 1 may be up to 35 % if the securities are issued or guaranteed by a Member State of the European Economic Community, by its local public authorities, by a State which is not part of the European Economic Community or by public international bodies of which one or more Member States of the European Economic Community are members.

(3) The 10 % limit referred to in paragraph 1 may be up to 25 % for certain bonds if they are issued by a credit institution which has its head office in a Member State of the European Economic Community and which is subject by law to special public supervision designed to protect the holders of such bonds. In particular, the proceeds of the issue of such debt securities must be invested, in accordance with the law, in assets which, during the whole period of validity of the debt securities, adequately cover the liabilities arising therefrom and which have priority for the repayment of the principal and the payment of accrued interest in the event of default of the issuer. Where a UCITS invests more than 5 % of its assets in the bonds referred to in this paragraph issued by the same issuer, the total value of those investments shall not exceed 80 % of the value of the UCITS' assets.

(4) The securities referred to in paragraphs 2 and 3 shall not be taken into account in calculating the 40 % limit laid down in paragraph 1.

The limits laid down in paragraphs 1, 2 and 3 shall not be aggregated and therefore investments in securities of the same issuer made in accordance with paragraphs 1, 2 and 3 shall in no case exceed in total 35 % of the UCITS' assets. Art. 43. (1) By way of derogation from Article 42, the supervisory authority may allow a UCITS to invest up to 100 % of its assets in different securities issued or guaranteed by a Member State of the European Economic Community, by its local authorities, by a State which is not a member of the European Economic Community or by public international bodies of which one or more Member States of the European Economic Community are members. The supervisory authority shall grant such authorization only if it is satisfied that the unit-holders of the UCITS enjoy protection equivalent to that of unit-holders of UCITS complying with the restrictions laid down in Article 42.

These UCITS must hold securities from at least six different issues, with no single issue exceeding 30% of the total amount.

(2) The UCITS referred to in paragraph 1 shall expressly mention in their statutes the States, local authorities or

**3262**

international public bodies issuing or guaranteeing the securities in which they intend to invest more than 35 % of their assets in their statutes.

(3) In addition, the UCITS referred to in paragraph 1 shall include in their prospectuses or in any promotional literature a prominent statement drawing attention to this authorization and

U.2023.3198H

indicating the States, local authorities and international public bodies in whose securities

Copyright © 2023 Karnov Group Denmark A/S

They intend to invest or have invested more than 35% of their assets.

...

*PART II:*
*Other collective investment undertakings*
*Chapter 8.*
*Scope of application*

Art. 58. This Part shall apply to all UCITS excluded pursuant to Article 2 of this law and to all other undertakings for collective investment situated in the Grand Duchy of Luxembourg.

...

*Chapter 9. Investment funds (Fonds communs de placement)* Art. 60. For the purposes of this Part, an investment fund shall be an undivided pool of securities constituted and managed according to the principle of risk-spreading for the benefit of undivided owners who are committed only to their investment and whose rights are represented by units intended for public placement by public or private offering.

...

Art. 62. (1) A Grand-Ducal Regulation adopted on a proposal or recommendation from the supervisory authority may in particular provide

...

d) the maximum percentage of securities of the same type issued by the same body that the mutual fund may hold;

e) the maximum percentage of the mutual fund's assets that can be invested in securities of the same community;

f) the conditions and, where applicable, the maximum percentages by which the common fund may invest in the securities of other collective investment undertakings

*Chapter 10. Investment companies with variable capital (SICAV)* Art. 64. For the purposes of this Part, investment companies with variable capital shall mean investment companies which have taken the form of a société anonyme under Luxembourg law,

- whose sole purpose is to invest their funds in securities in order to diversify investment risk and allow investors to benefit from the results of the management of their assets; and

- whose shares are to be placed with the public in a public or private offering; and

- whose articles of association stipulate that the capital must at all times be equal to the company's net assets.

...

Art. 66. (1) A Grand-Ducal Regulation adopted on a proposal or recommendation from the supervisory authority may in particular provide

...

d) the maximum percentage of securities of the same type issued by the same entity that the fund may hold;

e) the maximum percentage of the fund's assets that the fund may invest in securities of a single entity;

f) the conditions and, where applicable, the maximum percentages that the company may invest in securities of other UCITS;

...

*Chapter 17. Tax provisions 1*

Art. 105. (1) Except for the capital contribution tax on capital contributions in civil and commercial companies and the subscription tax referred to in Article 108 below, no other tax shall be payable by the collective investment undertakings referred to in this Law.

(2) Payments from these organizations are exempt from withholding tax and are not taxable to non-resident taxpayers."

The Act of March 30, 1988 was replaced with certain transitional provisions by the Act of December 20, 2002 on undertakings for collective investment etc. The Act contains essentially the same provisions as the Act of March 30, 1988 for the purposes of this case. By

The Act states that it applies to "UCITS" which is defined as an undertaking for collective investment in transferable securities covered by Council Directive 85/611/EEC of 20 December 1985 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) as amended.

*Law of 22 June 2004 on Risk Capital Investment Company (SICAR)* This law on SICAR companies [Société d'investissement en capital à risque] - states inter alia (unauthorized translation):

"Art. 1st. (1) For the purposes of this law, a capital investment company shall be considered risk, in short SICAR, any company:

 - which has adopted the form of a limited partnership, a limited partnership with shares, a cooperative company organized as a public limited company, a limited liability company or a public li- mited company incorporated under Luxembourg law, and

 - whose object is the investment of its funds in securities represen- tative of risk capital in order to benefit

**3263**

investors from the results of the management of their assets in return for the risk they support, and

 - which reserves its securities for informed investors as defined in article 2 of this law, and

 - whose articles of association provide that it is subject to the provisions of this law.

 (2) Investment in risk capital is understood to mean the direct or indirect contribution of funds to entities with a view to their launch, development or IPO.

 (3) The registered office and central administration of a Luxembourg SICAR must be located at Luxembourg.

 Art. 2. A well-informed investor within the meaning of this law is the institutional investor, the professional investor as well as any other investor who meets the following conditions:

 1) he has declared in writing his adherence to the status of infor- med investor and

 2) he invests a minimum of 125,000 euros in the company, or

 3) it benefits from an assessment, on the part of a credit institution, from another professional in the sector financial institution subject to rules of conduct within the meaning of Article II of Directive 93/22 / EEC, or of a management within the meaning of Directive 2001 / 107 / EC certifying its expertise, experience and knowledge to Appreciate an investment in risk capital adequately. The condi- tions of this article do not apply to general partners of limited partnerships.

 ...

Chapter IX: Tax provisions

 Art. 34. (1) The amended law of 4 December 1967 on income tax is amended as follows: ...

 (2) Do not constitute taxable income in the hands of a capital company referred to in this law, income from securities as well as as income generated by the sale, or liquidation of these assets. Capital losses realized on the disposal of transferable securities as well as as capital losses not realized but recognized as a result of the write- down of these assets cannot be deducted from taxable income of the company."

*Law of May 11, 2005 (SPF)*

 In particular, the law on the "establishment of a family wealth management company" [Société de gestion de patrimoine familial] states (unauthorized translation):

"Art. 1. (1) For the purposes of this Act, any company shall be considered a family wealth management company, abbreviated SPF:

 - which has taken the form of a limited liability company, a public limited company, a private limited company or a cooperative organized as a public limited company, and - whose sole purpose is acquisition,

holding, managing and realizing financial assets as defined in Article 2 of this Law, to the exclusion of any commercial activity; and

- which reserves its shares or units for investors as defined in Article 3 of this Law, and

- whose articles of association expressly provide that it is subject to the provisions of this Act. ...

Art. 2 (1) Financial assets within the meaning of this Act shall mean (i) financial instruments within the meaning of the Financial Collateral Act of August 5, 2005 and (ii) cash and assets of any kind held on account.

(2) The SPF may only hold a participation in a company on condition that it does not intervene in the management of the company.

Art. 3 (1) A qualified investor within the meaning of this Act is one of the following persons

a) a natural person acting in the course of the management of his private wealth; or

b) a property entity acting exclusively in the private property interests of one or more natural persons; or

c) an intermediary acting on behalf of investors as referred to in point (a) or (b) of this paragraph.

Each investor must declare this status in writing to a representative of the SPF company or, if this is not possible, to the board of directors of the SPF.

(2) Securities issued by an SPF may not be publicly placed or listed on a stock exchange.

*Chapter II: Tax provisions*

Art. 4 (1) SPF is exempt from income tax, municipal business tax and wealth tax.

(2) Any SPF that has received in the current financial year at least 5% of the total dividends from shares in non-resident and non-listed companies that are not subject to a tax comparable to the corporate income tax under the Income Tax Act of December 4, 1967, as amended, shall be excluded from the tax regime referred to in paragraph 1.

(3) A company resident in an EU Member State and covered by Article 2 of Council Directive 90/435/EEC of 23 July 1990, as amended, on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States meets the condition of comparable taxation.

Art. 5 (1) The SPF is subject to an annual subscription tax of 0.25%, but the tax thereon may not be less than an annual amount of 100 euros. The subscription tax may not exceed an amount of one hundred and twenty-five thousand euros per year." *Section 19 of the Capital Gains Tax Act*

The Danish Capital Gains Tax Act, cf. Consolidated Act no. 172 of

January 29, 2021, § 19, paragraphs 1 and 2, are worded as follows:

"Investment company" means:

1. a UCITS within the meaning of Directive 2009/65/EC of the European Parliament and of the Council, see Annex 1.

A company etc. whose business consists of investment in securities etc. and where shares in the company on

**3264**

be repurchased at the request of the holders for funds from the company's assets at a market value that is not significantly less than the net asset value. Repurchase means that a third party indicates to the company that either he or she or another natural or legal person will, upon request, purchase any share at a market value that is not significantly less than the net asset value. The requirement to repurchase on demand is fulfilled even if the

demand is only met within a certain time limit. Notwithstanding that there is no obligation to repurchase, the company is considered an investment company if its business consists of collective investment in securities.

Collective investment means that the company has at least 8 participants. Affiliated and closely related participants, cf. section 4(2) of the Danish Capital Gains Act and section 4(2) of this Act, are counted as one participant in this context.

*Stk. 2.* An investment company as mentioned in subsection (1), no. 2, first sentence, does not include a company etc. whose assets through subsidiaries are mainly invested in assets other than securities etc. A subsidiary means a company in which the parent company has a controlling influence, cf. section 2(2) of the Assessment Act. An investment company as mentioned in subsection 1, no. 2, fourth sentence, does not include a company etc. if more than 15 percent of the company's accounting assets during the financial year are on average invested in other than securities

Securities etc. do not include shares in another company in which the first company owns at least 10% of the share capital, unless the other company is itself an investment company, cf. subsection (2) above.

1. If a company has a controlling influence on a company, cf. section 2(2) of the Danish Tax Assessment Act, these shares are disregarded in the calculation according to sentence 3, and instead the share of the other company's assets corresponding to the former company's direct or indirect ownership in the other company is included.

*Subsection 3.* An investment company as mentioned in subsection (1) does not include a UCITS with minimum taxation, cf. the Danish Tax Assessment Act

§ 16 C. An investment company as mentioned in subsection (1) also does not include an account-keeping association that meets the conditions in section 2, second and third sentence, of the Act on Taxation of Members of Account-keeping Investment Associations."

The provision in section 19(2) was originally inserted in the Profit Tax Act by Act no. 98 of February 10, 2009 with the following wording:

"*Stk. 3.* An investment company as mentioned in subsection (2), no. 2, fifth sentence, does not include a company etc. if more than 15 percent of the company's accounting assets are on average invested in other than securities etc. during the financial year. Securities etc. do not include shares in another company in which the former company owns at least 10 percent of the share capital, unless the other company is itself an investment company, see subsection (2). If a company directly or indirectly controls or owns shares in a group company, cf. section 2(2) and (3) of the Danish Tax Assessment Act, these shares shall be disregarded in the calculation pursuant to subsection 1, and instead the share of the other company's assets corresponding to the first company's direct or indirect ownership in the other company shall be included."

The preparatory work for this, Supplementary Report on Proposal for an Act to amend the Danish Corporation Tax Act, the Danish Merger Tax Act and various other acts (Adjustment of the interest deduction limitation rules etc.), submitted by the Tax Committee on January 28, 2009, states, among other things:

"COMMENTS.

To no. 2

Section 19(3) of the Danish Capital Gains Tax Act entails that companies shall not be considered investment companies even if they meet the conditions in subsection 2. In order to avoid the concept of investment companies becoming too comprehensive, it is proposed to expand the exemption rule in subsection 3 and insert a new exemption in a new subsection 5. The current provision in section 19(3) states that a company is not an

investment company if its assets are mainly invested in assets other than securities through a subsidiary. A subsidiary means that the holding company (parent company) directly or indirectly controls more than half of the share capital or half of the votes.

The new wording of section 19(3) is intended to avoid companies based on production activities and holding companies in ordinary groups based on production activities being regarded as investment companies covered by section 19.

Firstly, it is proposed that the term investment company shall not include a company if more than 15% of its accounting assets on average during the financial year in question are invested in assets other than securities, as covered by the Danish Share Capital Gains Tax Act or the Danish Capital Gains Tax Act.

Secondly, it is proposed that when a company owns more than 10% of the share capital of another company, the shares are not counted as securities when determining whether the first company should be considered an investment company. However, this does not apply if the other company is an investment company."

*Shedding light on administrative practices*

Reference is made to the review of administrative practice in the High Court's judgment of May 3, 2021 in cases B-1980-12 and B-2173-12.

*Relevant legislation implemented after SKAT's decisions Section 3 of the Tax Assessment Act*

By Act no. 540 of April 29, 2015, the following provision was added to the Tax Assessment Act :

"§ 3. Taxpayers do not enjoy the benefits of Directive 2011/96/EU on a common system of taxation

**3265**

for parent and subsidiary companies of different Member States, Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States and Directive 2009/133/EC on a common system of taxation applicable to mergers, divisions, partial divisions, transfer of assets and exchange of shares concerning companies of different Member States and on the transfer of the registered office of an SE or SCE between Member States as implemented in Danish law, to arrangements or series of arrangements which are organized for the main purpose or which have as one of their main purposes the obtaining of a tax advantage which is contrary to the content or purpose of the Directives and which are not genuine taking into account all relevant facts and circumstances. An arrangement may include several steps or parts.

*Paragraph 2.* For the purposes of paragraph 1, events or series of events shall be considered not genuine to the extent that they are not organized for well-founded commercial reasons that reflect economic reality.

*Subsection 3.* A taxpayer shall not benefit from a double taxation convention if it is reasonable to conclude, taking into account all relevant facts and circumstances, that the obtaining of the benefit is one of the essential purposes of any arrangement or transaction which directly or indirectly gives rise to the benefit, unless it is established that the granting of the benefit in those circumstances would be consistent with the substance and purpose of the relevant provision of the convention.

*Paragraph 4.* Notwithstanding paragraph 3, paragraphs 1 and 2 shall apply when assessing whether a taxpayer is excluded from the benefit of a provision of a double taxation agreement with an EU Member State if the taxpayer could alternatively claim a benefit under one of the Directives on direct taxation."

By Act no. 1726 of December 27, 2018, section 3 of the Tax Assessment Act was worded as follows:

"§ 3

Taxable companies and associations etc. must disregard events or series of events that are organized with the main purpose, or that have as one of the main purposes, to obtain a tax advantage that works against the purpose and intent of the tax law and that is not real taking into account all relevant facts and circumstances, when reporting income and calculating taxes. An arrangement

may include several steps or parts.

*Subsection 2.* For the purposes of subsection (1), events or series of events are considered to be non-real to the extent that they

are not organized for well-founded commercial reasons that reflect economic reality.

*Subsection 3.* The income statement and tax calculation must be made on the basis of the actual event or series of events if events or series of events under subsection 1 are disregarded.

*Subsection 4.* Subsections 1-3 apply correspondingly to other participants in the events or series of events when the participants are taxpayers covered by sections 1 or 2 of the Withholding Tax Act or section 1(2) of the Estate Tax Act.

*Subsection 5.* A taxpayer shall not benefit from a double taxation convention if it is reasonable to conclude, taking into account all relevant facts and circumstances, that the obtaining of the benefit is one of the essential purposes of any arrangement or transaction which directly or indirectly gives rise to the benefit, unless it is established that the granting of the benefit in those circumstances would be consistent with the substance and purpose of the relevant provision of the convention.

*Paragraph 6.* Paragraphs 1-4 take precedence over paragraph 5 when assessing whether a taxpayer is excluded from the benefit of a double taxation agreement with a country that is a member of the EU.

..."

*Council Directive 2016/1164/EU of 12 July 2016 laying down rules for combating tax avoidance practices that directly affect the functioning of the internal market*

The directive states, among other things:

"Article 1

*Scope of application*

This Directive shall apply to all taxable persons liable to corporate tax in one or more Member States, including permanent establishments in one or more Member States of entities resident for tax purposes in a third country.

...

Article 3

*Minimum level of protection*

This Directive shall not preclude the application of national or treaty-based provisions aimed at ensuring a higher level of protection for national corporate tax bases.

...

Article 6

*General anti-abuse rule*

1. When calculating the corporate tax liability, a Member State shall disregard arrangements or series of arrangements which are designed with the main purpose, or which have as one of their main purposes, the obtaining of a tax advantage which defeats the object and purpose of the applicable tax law and which are not genuine taking into account all relevant facts and circumstances. An arrangement may include several steps or parts.

2. For the purposes of paragraph 1, events or series of events shall be considered not to be real if

**3266**

to the extent that they are not organized for well-founded commercial reasons that reflect economic reality.

3. If events or series of events referred to in paragraph 1 are disregarded, the tax liability shall be calculated in accordance with national law.

*Act no. 327 of March 30, 2019 on the application of the multilateral convention for the implementation of measures in double taxation laws to prevent tax erosion and profit shifting*
By this Act, the provisions of the multilateral convention of 24 November 2016 to implement measures in double taxation agreements to prevent tax erosion and profit shifting, cf.

Appendix 1 of the Act, with effect from 1 July 2019.

This is based on, among other things, the double taxation conventions mentioned in Appendix 3 of the Act, including the Convention of 17 November 1980 between Denmark and Luxembourg for the avoidance of double taxation and the establishment of provisions on mutual administrative assistance in respect of taxes on income and capital. The Convention has been acceded to and applies to Luxembourg.

Article 7 of the Convention states:

"*Preventing abuse of agreements*

1. Notwithstanding any other provision of a covered tax treaty, no benefit shall be given under the covered tax treaty with respect to income or capital if, having regard to all relevant facts and circumstances, it is reasonable to assume that the obtaining of that benefit was one of the main purposes of any arrangement or transaction which directly or indirectly gave rise to that benefit, unless it is shown that the obtaining of that benefit in those circumstances would be consistent with the object and purpose of the relevant provisions of the covered tax treaty."

## V. Requester

*B-2942-13 Takeda A/S under frivillig likvidation v Skatteministeriet Takeda A/S* under frivillig likvidation has in its summary pleading of August 2, 2021 stated inter alia:

"*In support of the main claim,* it is claimed in principle that Nycomed Sweden Holding 2 AB is not subject to limited tax liability to Denmark on the interest in question, cf. section 2(1)(d) of the SEL in conjunction with Article 11 of the Nordic DBO and the Interest Royalty Directive (2003/49/EC). Similarly, it is claimed that no other company in the group or the underlying owners have limited tax liability to Denmark on the interest in question. Nycomed A/S (Takeda) has therefore not been liable to withhold interest tax, cf. section 65 D of the Danish Withholding Tax Act.

In relation to the DBO, it is claimed that Nycomed Sweden Holding 2 AB is the *"rightful income recipient"* and *"beneficial owner"* of the interest, cf. Article 11, and is therefore entitled to a reduction under the agreement (see section 7 below).

In relation to *the Interest/Royalty Directive (2003/49/EC)*, it is also claimed that Nycomed Sweden Holding 2 AB is the *"beneficial owner"* and "rightful *owner"* of the interest.

It is further argued that the granting of the benefits of the Directive can neither be denied on the basis of the *abuse clause in Article 5 of the Directive* nor on the basis of the so-called *"general EU law principle of prohibition of abuse"* (see sections 8.6 and 8.7 below).

There is *no abuse of rights* in the case, neither under Danish law, under the Nordic DBO nor under EU law, and even if there were, Denmark has *no* specific *national legal basis* to counteract this. This plea is addressed above in particular in the introductory section 1.3, but is also addressed below in section 7.6 (regarding the DBO) and in section 8.4 (regarding the Directive).

The fact that the flow-through of interest claimed by the Danish Ministry of Taxation in any event, as mentioned, ended up in another DBO country, Luxembourg, namely in the ultimate parent company, Nycomed S.C.A., SICAR, precludes any abuse of the Interest/Royalty Directive or under the Nordic DBO. A direct payment of interest from Nycomed A/S (Takeda) to Nycomed S.C.A., SICAR would thus, as mentioned, have been exempt from Danish withholding tax under the Danish-Luxembourg DBO. In the event that the High Court finds that Nycomed Sweden Holding 2 AB is not the "beneficial owner" of the interest, it is submitted in the alternative that the Luxembourg grandparent company, Nycomed S.C.A., SICAR, which is the only other company in the group structure that has received

interest income relating to the loans at issue in the

In that case, the intercompany loan in question must be considered the "beneficial owner" instead (with the consequence that a reduction under the DBO between Denmark and Luxembourg is required, after which there is no abuse in the case). This issue is discussed below in section 7.7.

In support of the main claim, it is further argued that the condition for lapse of limited tax liability in section 2(1)(d) last sentence of SEL is met. This is dealt with in section 9 below.

Alternatively, it is claimed that SKAT's decision of September 17, 2010 is an aggravation of an established administrative practice with retroactive effect, and that it is therefore not legal. This is discussed in section 10.

In the further alternative, it is claimed that Nycomed A/S (Takeda) is not liable for any withholding tax under section 69 of the Danish Withholding Tax Act, as Nycomed A/S (Takeda) has not acted "negligently" by not withholding

**3267**

withholding tax in connection with the interest imputations. Please refer to section 11 below.

In the event that Nycomed S.C.A., SICAR is also not considered as

'rightful owner' of the interest at issue in the present case, it is submitted, in *support of the alternative (subsidiary) claims, that*

(A)   that the withholding tax requirement must be reduced to SEK 0 in respect of the Swedish listed company, Shareholder No. 41, and the natural person resident in the United States, Shareholder No. 39, who are both direct shareholders in Nycomed S.C.A., SICAR, and their (indirect) share of the interest in question (approximately 1.40%), since these two persons must in that case be regarded as the "beneficial owners" of that share; and

(B)   that there is also a legal claim for reduction of the withholding tax claim to DKK 0, to the extent it is documented - under a referral to the Danish Tax Agency - that the other investors in Nycomed S.C.A., SICAR, are either (i) legal persons who are "beneficial owners" of the interest under a DBO between Denmark and their home country, or (ii) natural persons (as there is no legal basis in Danish law to levy withholding tax on interest concerning such persons).

In support of the claim for acquittal against *the defendant's motion to dismiss,* it is argued that the plaintiff has a clear legal interest in having its alternative claim reviewed.

The pleas in law put forward in support of the alternative claims are dealt with below in section 12.

*6 SEL § 2(1)(D) DOES NOT LEAD TO LIMITED TAX LIABILITY OF THE INTEREST*

The rule on *foreign companies'* limited tax liability to Denmark of interest credited or paid by Danish companies appears from SEL section 2(1)(d), which for the interest allocations in question had the following wording [...]:

...

Denmark has not introduced rules on limited tax liability on interest paid to *natural persons*.

It appears from SEL section 2(1)(d) that the limited tax liability only includes interest relating to so-called controlled debt. This condition is met in the present case.

In addition, it is a condition that the taxation of interest must not be waived or reduced under the provisions of a *double taxation treaty or the Interest/Royalty Directive* (2003/49/EC). Thus, if only the taxation of interest is to be reduced under one of these legal provisions, there is *no* limited tax liability to Denmark for the foreign interest recipient.

The present case is therefore primarily concerned with whether this condition is met.

Takeda claims that the taxation of interest must be waived or reduced under the Nordic DBO (alternatively the DBO between Denmark and Luxembourg) as well as under the Interest/Royalty Directive, which is why Nycomed Sweden Holding 2 AB is not subject to limited tax liability to Denmark on the interest in question. For this reason, there is no basis for levying withholding tax.

...

### 7 CLAIM FOR REDUCTION UNDER THE NORDIC DBO - NYCOMED SWEDEN HOLDING 2 AB IS THE "BENEFICIAL OWNER" OF THE INTEREST

#### 7.1 General about the DBO

It follows from Article 11 of the current *Nordic Double Taxation Convention of September 23, 1996* [...] that the source state - in this case Denmark - cannot tax interest paid to a recipient in another Nordic country if the recipient of the interest is "beneficial owner" in the English text. It is thus the state of domicile, in this case Sweden, that has the sovereign right of taxation (which Sweden has exercised, as the interest has been taxed in Sweden).

It is claimed that Nycomed Sweden Holding 2 AB is the "beneficial owner" of the interest in question and that Nycomed Sweden Holding 2 AB is therefore entitled to a reduction under Article 11 of the Nordic DBO. Since a reduction must be made, there is no limited tax liability to Denmark, cf. SEL § 2(1)(d).

Article 11 of the Nordic DBO corresponds in principle to Article 11 of the 1977 OECD Model Convention [...]. "Beneficial owner" is a translation of *"beneficial owner" from the* 1977 OECD Model Convention.

The term "beneficial owner" is neither defined in the Nordic DBO nor in the Model Agreement, and the main issue in this complex of cases concerns the interpretation of this term. In the OECD's comments to the 1977 Model Agreement, point 11 - which were the comments in force at the time of the conclusion of the DBO between the Nordic countries in 1996 - it is stated about the concept [...]:

"Paragraph 2 provides that the limitation of taxation in the source State shall not apply in cases where an intermediary, such as an agent or nominee, is interposed between the recipient and the payer, unless the beneficial owner is a resident of the other Contracting State. States wishing to clarify this are free to do so during bilateral negotiations." (Our emphasis).

As Nycomed Sweden Holding 2 AB is neither an "agent" nor a "nominee" [...] of the parent company, Nycomed Sweden Holding 1 AB, of the ultimate parent company, Nycomed S.C.A., SICAR, or of any other person, is

**3268**

it is clear from the 1977 comments that Nycomed Sweden Holding 2 AB is the "beneficial owner" under the DBO.

In 2003, the OECD expanded the comments to include so-called *flow-through units.*

In a new section 8.1, the comments were supplemented with the following third sentence [...] (the comment is found in later versions in section 10):

"It would also not be in accordance with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a *conduit* for another person who actually receives the

income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "conduit company" cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a *'nullity'* or *trustee* acting on behalf of other parties." (Our emphasis).

The tax authorities' interpretation of "beneficial owner" in the present case is based on these extended comments, which has generally been accepted by the National Tax Tribunal in the cases in the case complex where the National Tax Tribunal has made a decision (which does not apply to the present case).

In the present case, the Ministry also bases its interpretation on later comments on Article 11, namely those issued in 2014, i.e. 7 years after the first interest in this case.

In its judgment of 3 May 2021 in the first cases in the case complex, the Eastern High Court also agreed to apply the comments from 2003 [...].

However, Takeda disagrees with the judgment of May 3, 2021 on this point.

#### 7.2 *"Rightful owner" shall be interpreted in accordance with Danish domestic law*

It is argued that the term "beneficial owner" must be interpreted in accordance with *Danish domestic tax law.*

In Danish law, it will be the court-created principle of "rightful income recipient" that applies, as the Minister of Taxation has repeatedly confirmed [...].

It can easily be established that Nycomed Sweden Holding 2 AB is the "rightful income recipient" of the interest in question under Danish law, which the Ministry of Taxation also recognizes, see paragraphs 50 [...] and 78 [...] of order for reference. For that reason alone, Nycomed Sweden Holding 2 AB is also the "beneficial owner" of the interest in question.

When the Minister of Taxation has explained to the Danish Parliament prior to the adoption of the SEL that the tax exemption is dependent on Nycomed Sweden Holding 2 AB being the "rightful income recipient", this is binding for the interpretation of the SEL, regardless of what the correct interpretation of the DBO is. However, it also follows from the DBO that the term "beneficial owner" must be interpreted as defined by Danish law

"rightful owner" - and here, as mentioned, "rightful owner" has undoubtedly been equated with "rightful income recipient". Article 3(2) of the Nordic DBO [...] - and the corresponding provision in the 1977 Model Convention [...] - contains the following rule of interpretation:

"2. In the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies."

"Beneficial owner" is not defined in the agreement. The term must therefore be interpreted in accordance with Danish domestic law,

"unless the context requires otherwise".

It is argued that nothing else follows from the context and that the concept must therefore be interpreted in accordance with domestic Danish law, i.e. in accordance with the principle and case law on "rightful income recipient".

This result is in accordance with the interpretation adopted by the Danish tax authorities - prior to the start of the beneficial owner cases - [...].

Takeda has of course noted that the Eastern High Court in its

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

judgment of 3 May 2021 has noted that *"the fact that the terms 'rightful owner' and 'rightful income recipient' are not used linguistically stringently".*

*in the preparatory works ... is likewise not [found] to lead to a different result'*. Takeda does not agree with this.

In Festskrift til Ole Bjørn [...], Aage Michelsen expresses the following general opinion:

"Domestic law must be applied in all cases where an international tax issue is not resolved in a double taxation agreement that Denmark has concluded with another country."

It is undeniable that the precise understanding of "beneficial owner" is not resolved in the agreement.

The interpretation also makes sense in view of the introductory remark in paragraph 8 of the 2003 comments [...]:

"The beneficial ownership requirement was inserted in Article 11 to clarify the meaning of the words "paid to a resident" as used in paragraph 1 of that Article."

The purpose of the provision has thus been to determine who is the beneficial owner of the interest, and it is

**3269**

precisely what the principle of "right income recipient" in Danish tax law is all about [...].

Jakob Bundgaard and Niels Winther-Sørensen in SR-SKAT 2007.395 are in line with this [...]:

"Based on the aforementioned Danish case law on domestic interpretation of concepts from double taxation treaties, it must probably be assumed that the Danish courts will be inclined, at least to a certain extent, to interpret the beneficial owner concept in accordance with *domestic Danish tax law*. In other words, the Danish courts will be inclined to consider the company that, according to a Danish tax law assessment, is considered the *right income recipient*, to also be the beneficial owner." (Our emphasis).

The case law referred to is U 1994.284 H [...] and TfS 2003.222 H

The view is repeated by Jakob Bundgaard in SU 2011.31 [...]. Jens Wittendorff in SR-SKAT 2010.212, is also of the opinion that a domestic law interpretation based on the principle of "right income recipient" must be made [...]. At the same time, it appears that the authorities in several other states, including the US, the UK, the Netherlands and Italy, apply a domestic law interpretation.

Furthermore, it should be mentioned that in U.2012.2337 H [...] the Supreme Court also applies internal Danish law when interpreting a DBO.

The plaintiff is aware that in the first court decision in the "beneficial owner" case complex (SKM 2012.121 (ISS case) - [...]) - supported by the Indofood judgment [...] - the Eastern High Court found that an *autonomous* interpretation must be applied. The Eastern High Court seems to have done the same in the TDC and NetApp cases (judgment of May 3, 2021, [...]).

Takeda does not agree with this.

*Firstly,* it is particularly surprising that the Eastern High Court (in the ISS case) has placed more emphasis on the Indofood judgment, which is an English civil law decision assessing the meaning of the term in a case concerning the interpretation of a loan agreement in Indonesian law, than on the later Prévost case [...], which is a tax case decided by the competent court in the source state (Canada).

*Secondly,* it is a fact that there is no consensus in the *international literature on* what an *autonomous* interpretation - if any - should be.

A review of the available literature thus shows that there is total uncertainty as to what is meant by "beneficial owner" in an autonomous interpretation. There is simply no consensus on an "international fiscal meaning".

*Thirdly, there is* also no consensus in the international literature as to whether a domestic law interpretation or an autonomous (international) interpretation should be applied.

...

Fourthly, the (modest) international case law is not unambiguous either. The Indofood judgment [...] seems, as mentioned, to emphasize an international, autonomous interpretation, while the Prévost case [...] seems to be in favor of a domestic interpretation.

In *its public discussion draft* of April 29, 2011 [...], the OECD has suggested that the commentary to Article 10 (on dividends) should include an international interpretation of "beneficial owner", but the consultation responses from The City of London Law Society [...] and IBFD [...] dispute that this position is supported by Article 3(2).

Based on the responses received, on October 19, 2012 [...], the OECD issued a new proposal for revised comments on "beneficial owner" in which the OECD - taking into account that a majority of the responses supported this view - maintained its proposal that the concept be subject to an autonomous interpretation. This in itself shows that the OECD is on "thin ice" and that - regardless of the OECD's political wishes - there was and still is considerable disagreement on the issue.

The fact that point 10 [...] of the 2014 comments and point 10 [...] of the 2017 comments, as a result of political considerations on the part of the officials drafting the comments, point in the direction of an autonomous interpretation of the concept, does not change the fact that, at least in 2007-09, there was not (and has not been since then) the necessary international consensus on the understanding of the concept for an autonomous interpretation to make sense at that time.

Furthermore, interpreting the concept of "beneficial owner" in accordance with the Danish law concept of "rightful income recipient" is a necessity when, as here, it is not actually a question of interpreting the treaty, but of interpreting Danish law (SEL § 2(1)(d)), which refers to the treaty, since it is not actually a question of sharing a taxing right with Sweden, but of defining a tax exemption that exclusively concerns Denmark's internal taxation relations. This is particularly obvious when the preparatory works to section 2(1)(c) and (d) of SEL clearly confirm that the Danish concept of "rightful income recipient" is synonymous with the concept of "beneficial owner".

Even if it were evident that the wording of the preparatory works to SEL section 2(1)(c) in 2001 was mistaken about the meaning of the concept in the model agreement, the Danish preparatory works would still take precedence over the agreement, as it was this understanding that the Danish Parliament based on when adopting SEL § Section 2(1)(c) - and subsequently with the adoption of SEL section 2(1)(d).

Convention-compliant interpretation is also not relevant, as Denmark has not promised Sweden to do its

**3270**

internal tax exemption of interest depends on the interpretation of the DBO. This is a choice that Denmark has made on its own, and it does not owe Sweden under treaty law to adjust the interpretation of its domestic legislation in accordance with the agreement. The only decisive factor is what the Danish Parliament has assumed when adopting section 2(1)(c) and (d) of SEL.

It is thus argued that domestic law must be applied at least when - as in this case - no other international understanding of the concept can be pointed to. And this is particularly true at the time of the interest accrual at issue in the case, 2007-09, and even more so when taking into account that the Nordic DBO was concluded in 1996 (even replacing an earlier DBO which

contained a similar provision).

As it is agreed that Nycomed Sweden Holding 2 AB is "proper income recipient" under Danish law, the company is thus also "rightful owner".

### 7.3 The OECD's extended comments from 2003 cannot be included in the interpretation

It is a fact that the Ministry of Taxation's changed interpretation of "beneficial owner" is directly caused by

- and originally based solely on - the extended comments to the 2003 model agreement (on "flow-through companies"). Since then, the Ministry has also relied on even later comments, including from 2014, cf. section 7.5 below.

Denmark's DBO with the other Nordic countries [...] is from 1996, and Article 11 of the agreement corresponds to the OECD's model agreement. When Denmark and the other Nordic countries entered into the agreement, only the OECD's comments from 1977 to the model agreement [...] were available.

It is generally assumed - nationally and internationally - that the OECD's comments to the model agreement can be included in the interpretation of specific DBOs.

As far as the *legal source value* of the OECD's comments is concerned, reference is made to Aage Michelsen's article in Festskrift til Ole Bjørn [...], and Michael Lang [...], both with references to a number of international authors. It follows that if later comments represent a *change in* relation to earlier versions - and not just a *clarification* - these comments cannot be given weight, see also Vogel, 3rd edition [...]. It is clear that what is being discussed by these authors is the problem of interpretation of treaty law in a dispute between two states. The authors do not address the legal certainty issues that arise when an OECD commentary clarifies or amends a DBO, which - as is the case in Denmark - through domestic legislation has given taxpayers the opportunity to invoke a DBO provision. The taxpayer's protection against retroactive legislation and statutory interpretation depends on domestic (constitutional) law and is a fundamentally different issue than the interpretation of a treaty between two states.

Danish case law has only accepted that clarifying comments may be relevant to the interpretation of a DBO, see e.g. U. 1993.143H (Texaco) [...], U.1994.284H (professor rule) (MS 789) and U.2003.988H (Halliburton) [...]. Reference is also made to the *legal settlement* of February 3, 2000 concluded before the Eastern High Court between the Ministry of Taxation and Casino Copenhagen. The settlement is reproduced in SU 2000.241 [...].

It is argued that the extended comments from 2003 invoked by the Ministry of Taxation - at least as they are claimed by the Ministry of Taxation to be understood - represent a significant *change* compared to the comments from 1977, as they lead to the exact opposite result of what the Ministry assumed in the preparatory works to SEL § 2(1)(c) in 2001. Therefore, they *cannot* be included in the interpretation of the Nordic DBO of 1996.

The reason why *subsequent comments* cannot be given weight is that they have not been approved by the Member States' parliaments and therefore lack democratic legitimacy.

In a legal system such as the Danish one, where a double taxation agreement only becomes part of Danish law when the Danish Parliament has passed a law on it, this is particularly clear. It would quite simply be contrary to the prohibition on delegation in section 43 of the Danish Constitution to leave legislative competence to the officials, including officials from the tax administrations of the individual countries, who formulate the comments.

The fact that the interpretation of a DBO has the wider significance that it is decisive for whether there is a limited tax liability under section 2(1)(c) and (d) of SEL, further emphasizes that the clear preparatory works to this provision cannot be overridden by an amendment of the OECD comments. Since

SEL § 2(1)(c) and (d) are *internal*

*provisions* that define their *internal* scope of application by reference to an international treaty, even duly agreed amendments to the treaty could not be given effect to domestic law *unless* the treaty amendment and its impact on domestic law were ratified by the Danish Parliament, since a change in Danish domestic law solely through the Government's accession to a treaty amendment would constitute a flagrant violation of the prohibition on delegation in section

43. It is all the more clear that domestic Danish law is *not* changed by some officials through the OECD acceding to an amendment of the comments to the OECD Model Tax Convention. The significance of OECD commentaries that have emerged after the date on which the relevant

**3271**

agreement has been concluded cannot be determined separately from the effect the comment has on the case under adjudication. To the extent that a subsequent comment causes the outcome of a case to be reversed, there will clearly be a change and no weight can be given to the comment.

In the ISS case (SKM2012.121.ØLR), the Eastern High Court assessed in the premises [...] that the OECD's comments from 2003 only constituted a clarification, but also stated that the comments did not affect the outcome of the case in question (cf. the words "*In this case it is unnecessary to decide on...*", [...]).

When *Jakob Bundgaard and Niels Winther-Sørensen* in SR-SKAT 2007.395 similarly assume [...] that the comments from 2003 are

"clarifications" is because they also assume that the comments *"cannot be considered particularly far-reaching"*, as the authors assume [...] that "beneficial owner" - in accordance with the tax authorities' previous interpretation - must be interpreted in accordance with the principle of "proper income recipient" under Danish law. Under this assumption, the new comments obviously do not represent a change.

In its judgment of May 3, 2021, the Eastern High Court does not directly address the question, but it follows from the premises of the High Court that the High Court has not found that the subsequent comments are amendments to the comments. Takeda, as indicated, does not agree with this (when it leads to the dividend/interest recipient not being considered the "rightful owner" after the more recent comments).

It is contrary to *Articles 31 and 32 of the Vienna Convention* [...] to give weight to subsequent comments.

In particular, these cannot serve as a "subsequent agreement" within the meaning of Article 31(3)(a), see *Michael Lang* [...]: ...

Subsequent commentaries are not *"supplementary means of interpretation" within the* meaning of Article 32, see *Michael Lang* [...]: ... The fact that the OECD officials in paragraph 35 of the Introduction to the *2003 OECD Model Agreement [...]* themselves have stated that changes in the commentaries are to be *used* in the interpretation of previous agreements does not change the above conclusion, see *Michael Lang* [...]: ...

See also *Aage Michelsen* with references [...]: ...

In line with this, subsequent comments in Danish case law have only been used as an interpretative contribution when it has been a matter of *clarification*, cf. the already mentioned Supreme Court judgments in UfR 1993.143 H (Texaco) [...] and TfS 2003.222 H (Halliburton) [...].

The conclusion is therefore that the extended comments from 2003 are not a relevant contribution to the interpretation of the Nordic DBO. Nycomed Sweden Holding 2 AB is therefore - already for this reason

- "beneficial owner" and therefore there is no limited tax

liability.

*7.4 Nycomed Sweden Holding 2 AB is also the "beneficial owner" of the interest after the 2003 comments*

However, in the event that the extended comments from 2003 are considered to be only a *clarification* of the concept of "beneficial owner", it is further submitted that Nycomed Sweden Holding 2 AB - also according to these - must be considered the "beneficial owner" of the interest in question.

Takeda thus also in this case argues that the "beneficial owner" concept must be interpreted in accordance with the principle of "rightful income recipient" in Danish law, see e.g. *Jakob Bundgaard* and *Niels Winther-Sørensen* in SR-SKAT 2007.395 [...]. However, even if an autonomous interpretation of the concept is made, it is argued that Nycomed Sweden Holding 2 AB must be considered the "rightful owner" of the interest in question under the 2003 Commentaries.

In the 2003 revision, point 8 of the comments (on Article 11 on interest) was expanded by, inter alia, the remark that the term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in light of the intent and purpose of the treaty, including avoiding double taxation and preventing tax evasion and avoidance.

This is elaborated in section 8.1 by stating that firstly, it would not be in accordance with the intent and purpose of the treaty if the source country were to grant relief on payment to an "agent or nominee", as the agent or nominee is not the owner of the income and thus not taxed in his country of residence, which is why no double taxation occurs. This corresponds to the commentary to the 1977 Model Tax Convention.

Secondly, something new is stated about "flow-through companies" in section 8.1, 3rd sentence, cf. also above in section 7.1:

"It would *also* be inconsistent with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a *conduit for another person who actually receives the income in question*. For these reasons, the report "Double Taxation Con- ventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a *conduit company* cannot normally be regarded as the beneficial owner if, although it is the formal owner, it *actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.*" (Emphasis added).

In this set of cases, the Ministry of Taxation generally argues that point 8.1 of the extended comments from

**3272**

2003 must be understood to mean that when determining whether the formal recipient is a "beneficial owner", emphasis must only be placed on the extent of the formal recipient's actual powers in relation to deciding how to dispose of the amounts received. According to this view, the formal beneficiary will thus not be considered a "beneficial owner" if, in relation to the income in question, it cannot actually make dispositions that deviate from the will of the ultimate owners (that an amount received must be "directed to where it is desired").

In this regard, it should be noted that the wording of point 8.1 clearly states that there are 3 situations where an interest recipient is not a 'beneficial owner', namely if he/she is (1) "agent", (2) "intermediary" or (3) "conduit for another person who actually receives the income in question". In the latter situation, it is further required that the conduit has *"very narrow powers which, in relation to the income in question, make it a 'nullity' or administrator acting on behalf of other parties".*

In this case, however, there has been *no flow-through of* interest from the interest recipient, Nycomed Sweden Holding 2 AB, to Nycomed Sweden Holding

1 AB or to any other person.

The fact that Nycomed Sweden Holding 2 AB has made *group contributions* to Nycomed Sweden Holding 1 AB *does not change* this. Firstly, the interest receivable has existed regardless of the group contributions, and the group contributions have thus not prevented Nycomed Sweden Holding 2 AB from disposing of the interest by converting it into equity in connection with the Exit in 2011. In addition, the group contributions in question were never actually paid to Nycomed Sweden Holding 1 AB, as this company forgave the group contribution debt at the Exit.

Nycomed Sweden Holding 2 AB, which is fully equity financed, has thus granted the loan to Nycomed A/S (Takeda) out of *its own funds* and the interest has only benefited Nycomed Sweden Holding 2 AB. Nycomed Sweden Holding 2 AB has always been the owner of the interest, which has been continuously added to the principal (whereby Nycomed Sweden Holding 2 AB has been able to receive larger interest payments). And the interest receivable has existed until September 21, 2011, when Nycomed Sweden Holding 2 AB chose to convert the receivable into new shares included in the transfer to Takeda Pharmaceutical Company. At that time, Nycomed Sweden Holding 2 AB realized a higher share gain than if the debt and interest had not been converted beforehand.

The above shows that the company has had the full benefit of the interest.

Takeda further submits that the fact that the proceeds from the sale of Nycomed A/S (Takeda) were distributed from Nycomed Sweden Holding 2 AB to Nycomed Sweden Holding 1 AB at the end of 2011 and in 2012 in connection with the "Exit" of the consortium of owners (and further up to Nycomed S.C.A., SICAR and the owners of that company) cannot be regarded as a flow-through of the interest in question. Thus, those funds do not originate from the interest debitor, the defendant company Nycomed A/S (Takeda), but from the independent buyer of the Nycomed group, Takeda Pharmaceutical Company.

There seems to be agreement between the parties, cf. the Tax Ministry's pleading A (p. 3), which states [...]:

"Takeda's statement that Nycomed S.C.A., SICAR has made repayments of paid-in capital and paid out proceeds to its investors in connection with capital reductions in 2011 and 2012 (see paragraph 48 of the order for reference) is disputed as undocumented, *just as it is disputed that such possible payments would have resulted in a "flow-through" of the interest in question.*" (Our emphasis).

Nycomed Sweden Holding 2 AB is already for these reasons *not* a *"flow-through" company*.

Even if it is assumed that there has been a "flow-through" of the interest in question through Nycomed Sweden Holding 2 AB to Nycomed Sweden Holding 1 AB and beyond, it is noted that it is further stated in the comments to the Model Law, the extent of the *right of disposal* is an essential element in assessing whether a flow-through company is the "rightful owner" of the income.

The point of the comments is thus that if the interest-receiving company - in this case Nycomed Sweden Holding 2 AB - has channelled the interest received to the underlying owners, when assessing whether the company is a "beneficial owner", emphasis must be placed on whether this is a result of the underlying owners having restricted the company's disposal of the interest.

In this connection, it is claimed that Nycomed Sweden Holding 2 AB has been able to dispose of the interest receivables throughout the period until 2011, and any creditors of Nycomed Sweden Holding 2 AB have correspondingly been able to seek satisfaction therein. And upon conversion, the interest amount became part of the equity of Nycomed A/S (Takeda).

Takeda thus submits that Nycomed Sweden Holding 2 AB *does not* have *"very narrow powers which, in relation to the income in question, make it a 'nullity' or 'administrator acting on behalf of other parties'*. On the contrary, Nycomed Sweden Holding 2 AB has, on the whole, had the same powers that any other holding company in any other group normally has.

**3273**

Thus, in particular, there was no *legal obligation* for Nycomed Sweden Holding 2 AB to pass on the interest received to Nycomed Sweden Holding 1 AB, see further below in the next section. As stated, inter alia, in that section, it is a condition for not considering an interest recipient to be a "beneficial owner" that the recipient has assumed a *legal obligation* to pass on the interest received.

In that connection, it is disputed that the mere fact that the underlying owners or their representatives may have made the overall decision in advance on the cash flows, including the attribution of interest to Nycomed Sweden Holding 2 AB and that company's payment of group contributions to Nycomed Sweden Holding 1 AB should mean that Nycomed Sweden Holding 2 AB cannot be considered the 'rightful owner' of the interest.

All major decisions in any group - such as the acquisition of companies, major distributions, the establishment of a financing structure, etc. - are usually initially made by the top management of the group.

The decisions are then implemented by the relevant corporate bodies in the respective companies. Neither the individual companies as such nor the individual board members are generally obliged to implement the planned decisions, but refusal to do so may of course lead to the replacement of the members in question in accordance with the rules of the Companies Act.

There is no evidence that point 8.1 of the comments should be interpreted to mean that what is a customary decision-making procedure in any group automatically disqualifies group subsidiaries from being "beneficial owners" of interest received from intercompany loans.

The reality is that the Ministry of Taxation's interpretation of section 8.1 of the comments is so restrictive that it is difficult - if not impossible - to identify an intermediate holding company that the Ministry would accept as the "beneficial owner" of interest.

Accordingly, the only (real) condition that, in the opinion of the Tax Ministry, must be met in order to deny an intermediate holding company the status of "beneficial owner" is that it must be demonstrated or probable that the transaction has tax avoidance or evasion (or "abuse") as its purpose or consequence.

In reality, the Ministry of Taxation's view is that if an *abuse* can be demonstrated, an intermediate holding company will *never be a "beneficial owner"*, and thus - according to the Ministry of Taxation's own interpretation - there is no real content in the requirement of "narrow powers". The Ministry of Taxation's interpretation of the concept of "beneficial owner" must therefore be rejected as *meaningless*.

The Ministry of Taxation's interpretation is also clearly contrary to the Minister of Taxation's answer to question 86 regarding L 213 of May 22, 2007 [...]: ...

In summary, it is thus submitted that Nycomed Sweden Holding

2 AB cannot be considered a "nullity or administrator".

The plaintiff's understanding is supported by the Eastern High Court's judgment of December 20, 2011 in the ISS case, where the High Court stated [...]:

"In order for such an intermediate holding company not to be considered a legal owner, it must be required that the owner exercises control over the company that goes beyond the planning and management at group level that usually occurs in international groups".

The Ministry of Taxation has not demonstrated the existence of such special qualified control by the owners in this case.

The plaintiff's understanding is further supported by recent international case law, including the Canadian Federal Court of Appeal's judgment of February 26, 2009 in the leading case, Prévost [...], although it is recognized that the international case law on the understanding of the "beneficial owner" concept is not unambiguous.

...

*7.5 2014 comments - there must be a legal obligation for onward payment*

While this case has been pending, new comments have been received from the OECD, namely in 2014 [...], which are also invoked by the Ministry of Taxation in support of Nycomed Sweden Holding 2 AB not being the "beneficial owner" of the interest in question.

Takeda submits that it is now explicitly stated in section 10.2 of the 2014 Commentary that, as a general rule, it is a condition for denying "beneficial owner" status under the Model Agreement that there is an obligation to pass on the interest to another person. In Takeda's view, it has always been clear that it is a necessary - but not sufficient - condition for depriving an interest recipient of the status of "beneficial owner" under the Model Tax Convention that there is a legal obligation to pass on the interest. The 2014 comments thus do not add anything on *this point that* was not already applicable. This is also confirmed in the current Prévost judgment from 2009 [...], discussed above in section 7.4.

An "agent or intermediary", as mentioned in the 1977 comments, is thus clearly obliged to pass on the interest received. It is already inherent in the very fact that he is an "agent or intermediary". The same applies to a "flow-through company" in the 2003 comments.

In the opinion of the Ministry of Taxation, it is irrelevant on what basis the obligation exists, but the term "obligation" (to pass on) cannot be graded. Either the obligation exists, or the obligation exists

**3274**

It is not. The relevant test is whether the obligation is enforceable before the national courts. Thus, if someone other than the interest recipient has a legally enforceable claim to receive the interest, there is an obligation on the interest recipient to pass on the interest.

In the present case, there was *no* legal obligation for Nycomed Sweden Holding 2 AB to pass on the interest. The Ministry of Taxation refers to the 2014 comments that the recipient - without having been bound by a contractual or legal obligation to pass on the interest received to another person - "substantially" did not have the rights to "use and enjoy" the interest.

Takeda argues that the 2014 comments on this point - if they are to be understood as claimed by the Ministry of Taxation
- *completely changes* the previous comments on the provision
- 7 years after the first interest accrual in the present case - and is thus undoubtedly an extension - and not a clarification
- of the "beneficial owner" concept in the 1977 Commentaries. Therefore, they cannot be applied in the interpretation of DBOs

that are

concluded before 2014. The relevant DBO between Denmark and the other Nordic countries was concluded in 1996.

Finally, it is argued that it is completely uncertain what is meant by this statement in the comments and that it would therefore in any event be contrary to general principles of legal certainty to attach importance to the statement in question.

The Ministry of Taxation attaches great importance to the fact that Takeda has not submitted any written agreements or the like documenting that Nycomed Sweden Holding 2 AB - or Nycomed S.C.A., SICAR as regards the loan between that company and Nycomed Sweden Holding 1 AB - was not limited in its right to dispose fully of the interest in question.

The fact is that there are no agreements limiting Nycomed Sweden Holding 2 AB's (or Nycomed S.C.A., SI-CAR's) disposal of the interest earned, let alone any agreements or similar that relate to the intercompany loans at all - apart from the loan documents themselves (which, by their nature, do not contain any restrictions). The Ministry of Taxation is apparently of the opinion that there must be agreements between the underlying shareholders regarding the issue of disposal of the interest, e.g. an obligation to pay it forward. But there is not.

The issue of - and decisions regarding - transactions has thus been an integral part of the private equity manager's (the general partner of Nycomed S.C.A., SICAR's) area of responsibility and work (naturally with final decision-making authority in the individual companies), and this is because the owners have not granted loans to the underlying companies, including Nycomed S.C.A., SICAR. On the other hand, there have of course been contractual obligations for repayment of contributed capital and payment of sales proceeds in connection with an Exit.

Takeda submitted the shareholders' agreement between the shareholders of Nycomed S.C.A., SICAR [...], which shows that no provision was made for the intra-group loans. Takeda also submitted minutes of the board meetings at which the decision to grant the loans in question was taken (E 267-293). They do not mention any kind of restrictions either.

7.6 *There is no abuse of the Nordic DBO*

...

However, Takeda disputes that there is an abuse of the Nordic DBO in this case.

Countering abuse requires a legal basis in *Danish law.*

The parties to the present case agree that in 2007-09 there were two court-created anti-abuse rules, namely the *realities principle* and the *"rightful income recipient" principle*, see paragraphs 75-78 of the order for reference [...].

The parties agree that *the substantive principle* does not provide a basis for setting aside the transactions made in this case, see paragraph 76. Similarly, the parties agree that the interest recipient, Nycomed Sweden Holding 2 AB, is a *"proper income recipient"* under Danish law, see paragraph 78.

During the preparation of the case, the Ministry of Taxation has put forward a new plea that Danish case law should have developed *general principles to counter abuse that go beyond the principle of reality* (and - it must be understood - the principle of

"proper recipient of income"). Takeda has below in section 8.4.1.3 refuted this plea.

It is thus a fact *that* Danish law had rules to counteract abuse, and *that* these rules mean that there is *no* abuse under Danish law in this case. Moreover, it is settled Supreme Court practice that there can be no abuse if it appears from the legislative history that the legislator has been fully aware of the disputed issue (which is the case in this

case), cf. U.2004.174H (Over-Hold ApS) [...] and U.2007.736H (Finwill ApS - the "elevator case") [...].

There were no relevant anti-abuse rules in the current Nordic DBO.

On the other hand, Article 11 of the DBO contains the provision that the interest recipient must be the "beneficial owner", see sections 7.1 - 7.5 above.

That there is no abuse of the collective agreement is confirmed, among other things, by the fact that the chosen structure - with a

**3275**

"contributed" intermediate holding company/flow-through company - is directly indicated by the Minister of Taxation in connection with the answer to question 16 to L 99 of November 10, 2000 as a legitimate structure for the distribution of dividends [...] - and thus also for interest payments, as it is the same condition (if

"rightful owner") that applies in both situations.

This is in accordance with Mogens Rasmussen and Dennis Bernhardt, both Customs and Tax Agency, in SR-SKAT 2000.315 [...]: ...

There was general agreement among Danish authors on these points of view.

In addition, the purpose of the interest payments in question was *not to* pass them on to persons resident in non-DBO countries, see, inter alia, the ISS judgment [...], as the "flow-through", if any, in any event stopped in a company in another DBO country, namely Nycomed S.C.A., SICAR, Luxembourg. Thus, the purpose was in no way to engage in "treaty shopping".

The ISS judgment has also been fully followed up on this point in the Eastern High Court's judgment of 3 May 2021 in the NetApp case [...], where the High Court ruled that there was no basis for a finding of abuse when it was clear that the funds were destined to end up in a company located in another DBO country (in the US case). And in the NetApp case, the "flow-through" funds had even "passed through" a company in a non-DBO country. The judgment is discussed in more detail below.

...

It is a fact that the chosen financing structure implies that Nycomed A/S (Takeda) receives an interest deduction in Denmark and that Nycomed S.C.A., SICAR receives interest of approximately the same amount (although relating to a completely different loan) which is not taxable in Luxembourg. This "hybrid" situation was thus one of the purposes of the specifically chosen loan structure and thus a tax advantage was obtained. However, it should be noted that the loan was not granted with this as the main purpose. The main purpose was to repay the existing external loan (the bonds), and the loan was thus not only established to "obtain" an interest deduction right in Denmark. The interest deduction already existed - even with an interest rate that, seen over the period, would have been higher than was the case for the internal loan. It should also be noted that the tax advantage in question would also have existed if a loan agreement had instead been concluded directly between Nycomed S.C.A., SICAR and Nycomed A/S (Takeda). It is thus not made possible by the intermediate Swedish companies.

It is unclear to Takeda whether the Ministry of Taxation argues that the fact that the interest is tax-free in Luxembourg should have any bearing on whether Nycomed Sweden Holding 2 AB is the "beneficial owner" of the interest. Takeda argues that the question of whether Nycomed S.C.A., SICAR is taxed on the interest is completely irrelevant to whether Nycomed Sweden Holding 2 AB is the "beneficial owner" of the interest.

However, even if the financing structure in question - with interest deduction without offsetting interest taxation - is deemed to constitute an abuse of law (which in any case will not be possible until Denmark implements the EU Anti-Abuse Directive in 2018, cf. further below), the appropriate sanction is *not* to levy withholding tax on the interest, but rather to deny the right to deduct the interest in Denmark, cf. the principle in section 3 of the Danish Tax Assessment Act [...].

If there had been any reason to believe that Denmark would levy withholding tax on the interest in question under the chosen construction, the group could have chosen to let Nycomed S.C.A., SICAR, grant the loan directly to Nycomed A/S (Takeda) as a satisfactory alternative solution, as this would have been protected under the DBO between Denmark and Luxembourg.

This fact that the alleged "flow of interest" stops in Nycomed S.C.A., SICAR, Luxembourg also means that there is no basis for assuming that Nycomed A/S (Takeda) has abused the Nordic DBO. This follows directly from the Eastern High Court's judgment of 3 May 2021 regarding NetApp, as regards the dividends that were actually redistributed from NetApp Denmark to NetApp Cyprus and on to NetApp USA (through NetApp Bermuda). ...

It should also be noted that it was not until the BEP S project *("Base Erosion and Profit Shifting Project")*, launched in 2013, and the publication in 2015 of Action 6, *"Preventing the Granting of Treaty Benefits in In-appropriate Circumstances"* [...], that the OECD proposed the introduction of a general abuse rule in states' DBOs to actually counteract treaty shopping. ...

This initiative was followed by a large number of member states, including Denmark, entering into the Multilateral Convention ("MLI") in 2016, whereby the participating states were given the opportunity to amend their existing DBOs in several areas, including by inserting these anti-treaty shopping rules. In Denmark, the MLI was adopted by the Danish Parliament in 2019 [...].

Thus, it is only in 2019 that general anti-abuse rules have been added to the existing Danish DBOs, including the Nordic DBO.

...

*7.7 Alternatively, Nycomed S C.A., SICAR is the "rightful owner" of the interest and is entitled to a reduction under the Danish-Luxembourg DBO - therefore no abuse in the case*

**3276**

...

According to Article 11(1) of the DBO, the following applies [...]: ... If Nycomed S.C.A., SICAR is considered the "beneficial owner" of the interest, it follows directly from the DBO that Denmark cannot tax the interest, and it thus expressly follows from section 2(1)(d) of SEL that the interest withholding tax is waived (since the taxation of the interest must be waived under a DBO).

...

*7.7.1 The legal consequences of considering Nycomed S.C.A., SICAR as the "beneficial owner" of the interest*

...

In any event, in order to consider Nycomed Sweden Holding 2 AB as a "flow-through" company and thus as having limited tax liability on the interest in question, it is a condition that the "flow-through" has occurred to investors who are not protected by a DBO.

In its judgment of 20 December 2011 (the ISS judgment, MS 931), the Eastern High Court ruled that it is a prerequisite for *not* recognizing the immediate recipient as "rightful owner" that the funds have actually flowed on to non-DBO protected persons or

companies.

Copyright © 2023 Karnov Group Denmark A/S

...

If the funds are considered to have flowed through the two Swedish companies, they have been transferred to Nycomed S.C.A., SICAR in Luxembourg. The funds have thus not been transferred to *"persons in third countries without a double taxation treaty"*.

Furthermore, Østre Landsret has similarly in its judgment of 3. May 2021 [...] in one of the first two pilot cases in this case complex - the NetApp case - found that there was no basis for an assumption of an abuse of the DBO between Denmark (where the dividend distributing company was domiciled) and Cyprus (where the dividend receiving company was domiciled), as it was established in the case that the dividends were actually paid from Cyprus to Bermuda and from there to the ultimate parent company in the US where the funds ended up (and where this parent company was protected by the Danish-US DBO).

...

Applied to the present case, the fact that the alleged "flow of interest" stops in Nycomed S.C.A., SICAR Luxembourg - i.e. in another DBO country - means that the establishment of the Swedish companies did not constitute an abuse of the Nordic DBO, as the interest could have been paid directly to Nycomed S.C.A., SICAR without Danish withholding tax. According to this legal position, it is thus the Nordic DBO that causes the interest withholding tax to lapse, as there is no abuse of the Nordic DBO if Nycomed S.C.A., SICAR Luxembourg is considered the "beneficial owner" of the interest.Whether the lapse of the Danish withholding tax is based on the grounds that in the specific case it is the Danish-Luxembourg DBO that is directly applicable, as Takeda sees it, or on the grounds (which the Eastern High Court assumed in the NetApp case, and which is in accordance with the view of the Ministry of Taxation) that the existence of (and the protection under) the DBO between Luxembourg and Denmark means that there is no abuse of the Nordic DBO, seems to be "a dispute about words" which should not be pursued further.

...

In order to recognize a person as the "beneficial owner" of an interest (or dividend) received, the Ministry of Taxation normally requires that it is documented *that* the income was intended to flow to the person in question, *that* the income actually flowed there, *that* the person in question has actually been able to dispose of the income and *that* the person in question has not acted as a "flow-through entity" in relation to the funds in question.

Against this background, these points will be reviewed below and the review will show that Nycomed S.C.A., SICAR fulfills all conditions to be considered as the (alternative) "rightful owner" of the interest.

7.7.2 *Interest was predetermined to flow to Nycomed S.C.A., SICAR*

...

If the High Court thus emphasizes that in connection with the interest imputation a chain of receivables was created through the Swedish companies, it is obvious that it was also decided in advance that Nycomed S.C.A., SICAR would be the ultimate owner of the chain of receivables. As mentioned [...] the whole purpose of the loan structure was to create an intra-group loan based on equity contributed to Nycomed S.C.A., SICAR with (continued) interest deductibility in Nycomed A/S (Takeda) and no taxation elsewhere in the group. The "interest flow" from Nycomed A/S (Takeda) has thus ended up in Nycomed S.C.A., SICAR as planned (if Nycomed Sweden Holding 2 AB is

disregarded as the "beneficial owner", even though there has

writing of interest between the Swedish companies and even if no effective payment of interest has been made as a result of conversion, etc. cf. sections 7.1 - 7.5 above).

*7.7.3 The interest actually flowed to Nycomed S.C.A., SICAR*

...

If the High Court were to find that Nycomed Sweden Holding 2 AB is not the "rightful owner" of the interest accrued on Nycomed A/S (Takeda)'s debt to Nycomed Sweden Holding 2 AB, it must - as mentioned in

**3277**

preceding paragraph - is necessarily due to the fact that the High Court considers this interest to have been transferred from Nycomed Sweden Holding 2 AB to Nycomed Sweden Holding 1 AB through the group contribution (which admittedly was never actually paid) and that Nycomed Sweden Holding 1 AB subsequently passed on the interest for tax purposes to Nycomed S.C.A., SICAR due to the interest accrued on Nycomed Sweden Holding 1 AB's debt to Nycomed S.C.A., SICAR.

Against this background, it can be established without further ado that the interest, if Nycomed Sweden Holding 2 AB is not considered the "beneficial owner", was transferred to Nycomed S.C.A., SICAR for tax purposes.

*7.7.4 Nycomed S.C.A., SICAR has actually been able to dispose of the interest* On this point too, it is obvious that the right to dispose of the interest lay with Nycomed S.C.A., SICAR, if it did not lie with the two Swedish companies.

Thus, there was no prior agreement or understanding as to what Nycomed S.C.A., SICAR was to use the interest or the interest receivable for. The case was that the underlying owners of Nycomed S.C.A., SICAR (who by nature must be the "more alternative" "rightful owners" of the interest, if not Nycomed S.C.A., SICAR, see below in section

12) had not granted loans to the company, but instead contributed equity capital, which is why they had no interest return.

In addition, the actual establishment - and administration - of the intercompany loan was an integral part of the capital fund manager's (the general partner of Nycomed S.C.A, SICAR's) area of responsibility and work (naturally with final decision-making authority in the individual companies). It was thus the general partner (and thus the company itself) that made the actual decisions in this regard.

In this connection, it should be noted that an interest income on an intra-group loan creates no operational value whatsoever in a group. Admittedly, there is an interest income in the creditor company (here Nycomed S.C.A, SICAR), but this is offset by a corresponding interest expense in the debtor company (here Nycomed A/S (Takeda)). On a consolidated basis, it thus breaks down to 0. The only advantage of an intercompany loan (in terms of value creation) is if a tax advantage can be obtained because the deductibility of the interest expense exceeds the taxation of the interest income. This creates a tax saving in the group, which ultimately benefits the owners (as the profit after tax improves). Thus, the owners have no desire to have any control over the interest on such an intra-group loan further down the structure. What actually happened was that Nycomed S.C.A., SICAR, as of December 31, 2017, became a member of the group.

On December 27, 2006, Nycomed S.C.A., SICAR lent EUR 498.5 million to the ultimate Swedish parent company [...]. As interest accrued on the loan, Nycomed S.C.A., SICAR chose to leave the interest receivable as an additional loan at market interest rates to the debtor, Nycomed Sweden Holding 1 AB, so that the interest from 2007, 2008 and 2009 respectively was

added to the receivable at Nycomed

Sweden Holding 1 AB, [...]. There is no substantial evidence to support that Nycomed S.C.A., SICAR did not during this long period

could freely dispose of the interest receivable and any installments on it. The company also enjoyed the full benefit of the interest, since the attribution meant that the loan was increased - which meant that the interest rate in the following year was higher (compound interest).

In addition, the asset constituted by the interest receivable actually belonged to Nycomed S.C.A., SICAR, and any creditors of Nycomed S.C.A., SICAR could have satisfied the interest receivable if necessary.

Only in connection with the sale of the Nycomed Group in 2011 and 2012 - the Exit - was the loan repaid [...].

Nycomed S.C.A., SICAR then carried out a series of capital reductions with repayment of contributed capital and transfer of the proceeds from the repayment of the loan and the proceeds from the sale of the Nycomed Group. Only then - and as a result of the divestment of the Nycomed Group in 2011 and 2012 - were the funds transferred to Nycomed S.C.A., SICAR's shareholders. Moreover, long after SKAT's decision - which is under review in this case - was made. The fact that Nycomed S.C.A., SICAR sold its investments several years after becoming the owner of the interest receivable and transferred the proceeds from the redemption of the receivable together with the other proceeds from the sale of the Nycomed Group to its shareholders cannot be cited as grounds for Nycomed S.C.A., SICAR not being the beneficial owner - "rightful owner" - of the interest (if the Swedish companies were not).

As explained in more detail in the following section, the Tax Ministry itself has also noted that the fact that Nycomed S.C.A., SICAR, in connection with the sale of the Nycomed group in 2011 and 2012, carried out a capital reduction with repayment of contributed capital and transfer of the proceeds from the sale of Nycomed A/S (Takeda) to the shareholders cannot be equated with a further payment of the disputed interest.

Nycomed S.C.A., SICAR was obviously not in control of whether and when it would succeed in selling the Nycomed Group. Until the sale was completed, it was therefore uncertain when Nycomed S.C.A., SICAR could distribute any proceeds to its shareholders - and whether there would be any proceeds to distribute at all.

**3278**

If the Ministry of Taxation claims that there were in fact agreements, arrangements or similar which prevented Nycomed S.C.A., SICAR from disposing of the interest or the interest receivable, it must be for the Ministry of Taxation to prove this or at least explain what the restriction on Nycomed S.C.A., SICAR's freedom of action was. In that regard, it is noted that Nycomed S.C.A., SICAR had a well-founded business purpose, which consisted in being a joint investment company for a large number of shareholders who had decided to invest jointly, and that there is no reason whatsoever to assume that Nycomed S.C.A., SICAR would have undertaken in advance to pass on the interest.

On the contrary, the purpose of the established intra-group financing structure from Nycomed S.C.A., SICAR and further down to Nycomed A/S (Takeda) was - as just mentioned - among other things to obtain the tax advantage of being able to deduct interest in Denmark without (effective) taxation of the interest at Nycomed S.C.A., SICAR. In this itself shows that there was no onward flow of interest from Nycomed S.C.A., SICAR - and that this was never planned to happen. Thus, no business or tax purpose can be demonstrated for channeling the interest to the shareholders.

Therefore, no companies other than Nycomed S.C.A., SICAR

could dispose of the interest/claim on the ultimate Swedish parent company.

*7.7.5 Interest has not been passed on to Nycomed S.C.A., SI-CAR's shareholders*

There has been no onward transfer or crediting of interest from Nycomed S.C.A., SICAR to others. If the Ministry of Taxation claims that the interest has also flowed through Nycomed S.C.A., SICAR, it is incumbent on the Ministry of Taxation to bear the burden of proof or at least explain how the onward flow has allegedly taken place, which has not occurred.

The owners of Nycomed S.C.A., SICAR had fully equity-financed Nycomed S.C.A., SICAR. Thus, no loans were - and have never been - granted by the consortium of owners to Nycomed S.C.A., SICAR, and therefore no interest has ever been paid by Nycomed S.C.A., SICAR to its shareholders. ...

It is also agreed that the fact that Nycomed S.C.A., SICAR, in connection with the sale of the Nycomed group in 2011 and 2012, carried out capital reductions with repayment of contributed capital and transfer of the proceeds from the sale of Nycomed A/S (Takeda) cannot be equated with a repayment of the disputed interest (the first of which originated from 2007), see the Ministry of Taxation's pleading A (p. 3) - [...], where it states:

*"Takeda's statement that Nycomed S.C.A., SICAR has made repayments of paid-in capital and payments of proceeds to its investors in connection with capital reductions in 2011 and 2012 (see the order for reference, paragraph 48) is disputed as undocumented, just as it is disputed that with such possible payments there should have been a "flow-through" of the interest in question."* (Our signature).

The above demonstrates that Nycomed S.C.A., SICAR was the "beneficial owner" of the interest if the Swedish companies were not.

*7.7.6 Nycomed S.C.A., SICAR is covered by the DBO with Luxembourg*

It is undisputed that Nycomed S.C.A., SICAR is domiciled in Luxembourg. The fact that Nycomed S.C.A., SICAR only realized income that was tax-exempt under Luxembourg tax law is - also undisputed - not a factor that precludes the company (and Luxembourg) from invoking Article 11 of the DBO, according to which Denmark has excluded itself from taxing interest accruing to companies resident in Luxembourg. This will be elaborated later.

However, the Ministry of Taxation claims that the company is not covered by the DBO since, according to the Ministry of Taxation, the company is covered by a final protocol to the DBO, which was drawn up in connection with the drawing up of the original DBO with Luxembourg in 1980 and which exempts so-called *1929 holding companies* from the DBO.

Section 1 of the Final Protocol reads as follows in the Danish version [...]: ...

In all simplicity, the fact is that this exemption clearly by its wording concerns only the special 1929 holding companies and there is no basis whatsoever to conclude that companies other than the expressly mentioned special 1929 holding companies should also be exempted from the DBO.

...

As Nycomed S.C.A., SICAR enjoys protection under the Danish-Luxembourg DBO, there is no abuse in the case, and the company (or Nycomed Sweden Holding 2 AB) is thus not subject to limited tax liability to Denmark, cf. section 2(1)(d) of the SEL, and there is therefore no basis for withholding tax.

...

*7.7.7 The Ministry of Taxation's (changing) argumentation in the case*

...

Takeda has never claimed that the interest was passed on to the investors in Nycomed S.C.A., SICAR. Takeda has merely taken the position that if the High Court considers the interest to have flowed through to the investors, then the investors as - the more "alternative" - "beneficial owners" would also be entitled to forfeiture of the interest.

**3279**

interest withholding tax, see section 12 below for more information on this alternative view.

... When audited accounts in an EU country show that Nycomed S.C.A., SICAR was the owner of the claim against the ultimate Swedish company and the interest thereon, and the accounts also show that Nycomed S.C.A., SICAR was fully equity-financed, there is no basis for assuming that the interest has flowed on through Nycomed S.C.A., SICAR.

...

*7.7.7.2 It is agreed that it is irrelevant that Nycomed S.C.A., SICAR is transparent under Danish tax law*

...

Subsequently, in the duplicate of January 10, 2020, the Ministry dropped the appeal - i.e. after more than 7 years of process [...]:

"The Ministry of Taxation *waives the* plea that Nycomed S.C.A., SICAR cannot be the beneficial owner of the interest under the double taxation treaty, already because the company is transparent under Danish law...".

On the other hand, the Ministry of Taxation instead took *a completely new position*; namely that the company is not covered by the Danish-Luxembourg DBO at all with reference to section 1 of the final protocol (which exempts Luxembourg's so-called 1929 holding companies), cf. the review of this in the following section.

*7.7.8 The Ministry of Taxation's new plea that Nycomed S.C.A., SICAR is not covered by the DBO with Luxembourg*

...

Takeda argues that Nycomed S.C.A., SICAR is not covered by Article 1 of the Final Protocol and is therefore protected by the Danish-Luxembourg DBO. Takeda will explain this in the following subsections.

...

*7.7.8.2 The burden of proof that the DBO between Denmark and Luxembourg must be understood as claimed by the Ministry of Taxation lies with the Ministry, and the burden of proof has not been lifted*

The wording and purpose of the Final Protocol is obviously clear. It is an exemption that specifically concerns the 1929 holding companies and only them.

Ex tuto, it is submitted that the Ministry of Taxation has the burden of proving the factual and legal elements that it may rely on to support the view that Article 1 of the Protocol also covers a company such as Nycomed S.C.A., SICAR.

...

This follows from the general rules on the burden of proof, but it applies all the more so here because the Ministry is a party to the agreement and thus the only party with access to the documents relating to the negotiations on the provision and thus has the opportunity to shed light on the understanding and intent of the provision. Takeda, on the other hand, does not have access to this material. The Ministry should at least have presented documents showing that the parties (Denmark and Luxembourg) had the claimed common understanding, which goes far beyond the wording of the provision. This has not happened.

...

*7.7.8.3 DBOs generally also include tax-exempt entities*

...
  Firstly, it should be noted that in an international and also Danish context it is quite common for legal associations to be exempt from tax, either on their entire income or on certain

income. When a state has agreed under a DBO to the exclusive right to tax a certain income, it also implies the right for that state to exempt that income from taxation - without the intervention of the other state.

At the time of entering into the DBO with Luxembourg in 1980, Denmark had (and still has) many tax-exempt legal entities. Reference is made to the current Danish Corporation Tax Act, section 3 [...] and the Tax Guide 1979 Companies, section S.A.3 [...]. In particular, associations, cf. SEL § 1(1)(6) (including commercial associations that only have turnover with members, cf. SEL § 1(5)) must be emphasized. This exemption provision thus includes, for example, all cooperative housing associations, large sports organizations and large non-profit associations. Furthermore, a large number of entities of a public law nature are exempt from tax, even if they cannot be considered part of the state, cf. SEL § 3. This applies to certain religious communities, ports, airports, water supply companies, schools, hospitals and theaters.

Furthermore, it appears that non-profit foundations could be completely exempt from tax liability, cf. Executive Order no. 67 of February 28, 1978 [...] and Tax Department Circular no. 119 of June 14, 1963 [...].

As regards companies with financial activities, it is worth noting that the current Danish rules (in 1980, when the DBO with Luxembourg was concluded) exempted pension funds that were subject to the law on supervision of pension funds completely from tax. Furthermore, mortgage credit institutions were exempt from income from their statutory activities, which obviously included interest income from borrowers domiciled in Luxembourg.

Furthermore, it appears that the still applicable provision in section 1(1)(6) of the Danish State Tax Act had (and has) the consequence that the legal entities taxed under this provision are only liable to tax on business income. It was and is established practice that the tax liability in this situation does not include

**3280**

returns on liquid assets, including interest income not attributable to the operation of the business.

In 1980, one of the consequences was that all foundations other than the separately exempt non-profit foundations were only taxable on any commercial activities, and it appears from section S.A.3.2 of the Tax Guide [...] that the tax liability *"does not include interest on public bonds, mortgages, etc. and bank deposits in excess of amounts used in the operation of the commercial activity."* The consequence of this was, among other things, that some of our very largest commercial foundations under the current rules were tax-free on the return of assets that were not part of the business activity.

Furthermore, it was a consequence of the provision that trade unions and employers' associations were tax-exempt, which also applied to the return on assets set aside for strikes and lockouts.

Of particular interest for this case, it is relevant to take a closer look at the taxation of investment funds at the time. Until Act no. 536 of December 28, 1979, which entered into force on January 1, 1980, special rules were only given on account-holding associations, cf. Consolidation Act no. 130 of April 6, 1967. It appears from the legislative history of the 1979 Act (Folketingstidende 1979-1980, tillæg A, 2. saml., sp. 662) that there were only very few account-holding investment associations. In addition, the same place states the legal situation that applied until January 1, 1980:

"The certificate-issuing investment associations are covered by the current rules in section 1(1)(6) of the Danish Corporation Tax

Act, according to which the associations in question are only liable for tax on income from business activities.

**3281**

*To the extent that the sole purpose of the association is to receive deposits from members and invest these deposits in securities, the association does not engage in commercial activities, and investment associations as a whole are therefore exempt from tax liability. ....*" [our emphasis].

In addition, the following is stated in question 663:

"In recent years, a number of certificate-issuing investment associations have been established which, according to their articles of association, distribute nothing to their members, the so-called accumulating investment associations. Interest and dividends as well as capital gains are added to the fund's assets and reinvested with the effect that the certificates increase in value. According to the rules of the Act on Special Income Tax etc. the calculated profit on the sale of shares is reduced by 5%, but not more than

DKK 4,000, and the first DKK 6,000 of special income is exempt from taxation. These deductions in connection with a rounding rule in the tax calculation make it possible for members to realize a tax-free profit of up to DKK 6,421 annually on the continued sale and reacquisition of certificates, a profit that in reality derives from the untaxed interest and dividends added to the association's assets.

It is therefore proposed that from January 1, 1980, certificate-issuing investment associations will be taxed on an equal footing with public limited companies and commercial associations, unless the association is obliged under its articles of association to distribute all interest and dividends earned before the deadline for filing a tax return for the income year in question. Thereafter, interest and dividends will be taxable income for the association, and gains and losses on the sale and redemption of securities must be included in the association's income statement...

*According to the proposal, investment associations that are required by the articles of association to distribute interest and dividends before the deadline for filing a tax return will continue to be exempt from tax liability*, whereas members will be taxed on distributed amounts." (Our emphasis).

The law was adopted in the form in which it was proposed.

At the time of the conclusion of the DBO with Luxembourg in November 1980, a very significant part of Danish companies etc. were tax-exempt, and the taxation of Danish investment associations was based on the principle that the associations were tax-exempt even after the legislative amendment in 1979.

If Denmark had taken the approach to negotiations on double taxation treaties that it would not allow tax-exempt entities to be covered by the DBOs, it would therefore affect the aforementioned Danish tax-exempt entities, as it cannot be expected that Denmark can maintain withholding tax in relation to tax-exempt entities resident in the counterparty country without the counterparty country also demanding to be able to withhold tax on tax-exempt entities resident in Denmark.

At the time of Luxembourg's accession to the DBO with Denmark, Luxembourg also had a number of legal entities other than the 1929 holding company which did not pay tax. In particular, the *"association sans but lucratif (ASBL)"* and *"fondation d'utilité publique"*, which are exempt from tax on condition that they exclusively pursue religious, cultural or charitable purposes, see Article 161 of the Luxembourg Income Tax Law (LITL) [...] and Article 3 of the Trade Tax Law of 1 December 1936 (as amended) [...].

However, it is now also clear that Denmark does not interpret its DBOs in such a way that it is a condition for collective agreement protection of a company

with income from sources in this country that the foreign entity in question is actually subject to taxation in the country where the entity is resident, see below.

...

The Eastern High Court can therefore conclude that the fact that Luxembourg does not tax Nycomed S.C.A., SICAR on the disputed interest does not constitute grounds for denying Nycomed S.C.A., SICAR protection under the DBO.

...

It should also be noted that the fact that the interest is not taxed at Nycomed S.C.A., SICAR does not constitute any kind of abuse of the DBO or Luxembourg national legislation. It is precisely the *intention* of the Luxembourg legislation that Nycomed S.C.A., SICAR should not be taxed on the disputed interest as long as the company meets the conditions set by Luxembourg for non-taxation. Just as it is intended that there should be tax exemption for the Danish companies, which are tax exempt under internal Danish legislation.

The background for the interpretation of section 1 of the Final Protocol is that the issue of DBO protection for tax-exempt entities is a well-known issue that both Denmark and Luxembourg have undoubtedly been aware of when entering into the DBO, and that it is the clear starting point for Denmark, Luxembourg and the OECD committees that a company has treaty protection even if it is tax exempt in its country of residence.

Furthermore, it should be emphasized that Denmark and Luxembourg could have agreed on a so-called "subject to tax" clause (i.e. a provision on effective taxation) in connection with Article

11. With such a clause, the source state could thus have made the tax exemption of interest paid to an entity in the state of domicile conditional upon the interest income being subject to effective taxation in the source state. Such a clause is, f o r example, contained in Article 10 of Luxembourg's DBO of April 1, 1958 with France (as amended by the Protocol of September 8, 1970), [...]. When a DBO does not specifically include as a condition for the source country's relinquishment of its right to tax that the source country effectively taxes the income (a "subject to tax" clause), Luxembourg case law has established that such a condition cannot be included in the DBOs. Reference can be made to the decision of March 16, 2011 of the Luxembourg Administrative Court [...] and A. Steichen and L. Noguera: Double Non-taxation in Luxembourg reproduced in M. Lang: Avoidance of Double Taxation, 2003, p. 217 ff. [...].

In the case of interest and other payments that are deductible in the source country, the fact that the recipient country does not tax the income in question is not a problem either. A source country that finds it inappropriate that, for example, interest that is deductible in the source country is not taxed in the recipient country can solve this situation, even though the DBOs do not prevent such a situation. There is nothing to prevent the source country from introducing a purely internal rule to deny the debtor interest deduction in the source country in these cases. This does not change the fact that the recipient is tax-free on the interest income, but it provides an opportunity for the source state, which has a political desire to prevent the asymmetry inherent in the interest being deducted in the source state but not taxed in the recipient state. As long as the denial of the right of deduction does not violate any discriminatory provisions in the DBO, the DBO will not prevent such a unilateral solution based on the source country's domestic legislation on tax deduction of interest.

Denmark *has* introduced safeguards of this type, but only for some specific situations where the situation of deductibility for the debtor and non-taxation for the creditor arises as a result of

different legal qualification of the return in the source country and the country of residence, respectively. However, the Danish Parliament has never found reason to introduce a general rule according to which a Danish debtor's right to deduct interest should depend on the creditor actually being taxed on the interest income (whether the creditor is resident in Denmark or abroad).

Thus, with effect from December 13, 2006, the Danish Parliament adopted the following provision in SEL § 2 B (Act no. 344 of April 18, 2007, § 1, no. 1) [...]:

"Stk. 1. If a company or an association etc. as mentioned in section 1 has a debt etc. to a person or company domiciled abroad, and the debt etc. is considered to be contributed capital under foreign tax rules, the debt etc. is also considered to be equity in the Danish income statement. The first sentence only applies if the foreign person or company has a controlling influence over the company, or if the companies are affiliated, see section 2 of the Danish Tax Assessment Act. Subsection 2. Qualification under subsection (1) entails that the company's interest payments and capital losses are considered to be dividend distributions.

Stk. 3. Subsections (1) and (2) apply correspondingly to companies covered by section 2(1)(a) and (b)."

The provision meant that a Danish debtor was denied the right to deduct interest in the special situation where there was a loan under Danish law, while the creditor country considers the loan to be equity and thus the interest as (possibly tax-free) dividends. Furthermore, the provision only applied to loans between affiliated parties.

**3282**

By Act no. 1726 of December 27, 2018, the provision was replaced with effect from January 1, 2020 by SEL § 8 D [...], which is still limited to the situations where the non-taxation of the interest income with the creditor is due to a different qualification of the payment in the debtor country and the creditor country (so-called "hybrid mismatch"). The legislative change in 2018 was due to adaptation to EU Directive no. 2017/952 ("Anti Tax Avoidance Directive II - ATAD II") [...], and it is clearly stated in the preamble of the directive, point 16, that the intention of the directive is only to target the special situations of hybrid mismatch [...]: ...

ATAD II - and thus the current Danish rules are based on a report published by OECD in October 2015 entitled *"Neutralizing the Effects of Hybrid Mismatch Arrangements"*. On p. 192 [...] an example 1.5 is given where a deductible payment is made in one country to a tax-free entity in another country. Both states involved agree that this is a debt instrument. The example shows that this is *not* a hybrid mismatch of the type that the report calls on Member States to address.

It is thus clear that Denmark - regardless of the DBOs - has the option to prevent interest from being deducted "at home" without being taxed "abroad", but Denmark has only chosen to make use of this option in a way that is not relevant to this case, and Denmark is otherwise in line with the EU and OECD on this point. This case does not concern Nycomed A/S (Takeda)'s right to deduct the interest.

The background for the interpretation of the Final Protocol is that it is undoubtedly not the intention of the parties to the Final Protocol to generally exclude tax-exempt companies from the DBO.

...

It is also clear that it is completely unacceptable that the Final Protocol should reflect a wish on the part of Denmark to

generally exempt a company from the scope of the DBO because the company was fully or partially tax exempt in Luxembourg. In 1980, both Luxembourg and Denmark had a number of different tax-exempt entities.

and it would have serious consequences for many Danish tax-exempt entities if Denmark had the approach to DBO actions that tax-exempt entities were not DBO-protected. However, as mentioned in the Legal Guide, it also appears that Denmark, along with the majority of OECD countries, has the approach to the interpretation of DBOs that tax exemption does not exclude a company from treaty protection.

...

Moreover, it is not at all documented that the exemption for 1929 holding companies was justified by the lack of taxation of the company.

7.7.8.4 *A literal interpretation of the Final Protocol clearly leads to the conclusion that only 1929 holding companies are exempt from protection under the DBO.* It is undisputed that an S.C.A. company - a limited partnership - is covered by the DBO.

As we explain below in section 7.7.8.6, under certain conditions, an S.C.A. company in Luxembourg could be subject to a regulatory and tax regime reserved for a SICAR (*société d'-investissement en capital à risque*).

The question is whether such an S.C.A. company that meets the conditions for the special regulatory and fiscal SICAR status introduced by Luxembourg in 2004 is covered by Article 1 of the Final Protocol to the DBO (concluded in 1980, i.e. before the SICAR legislation was adopted) on the so-called 1929 holding companies, with the effect that a SICAR investment company is exempt from DBO protection.

Takeda argues that an investment company such as an S.C.A., SICAR company is *not* covered by Article 1 of the Final Protocol, which is why Nycomed S.C.A., SICAR enjoys protection under the DBO. [...]

The immediate and straightforward (and correct) understanding of the provision is that it is a very narrow exemption that only concerns 1929 holding companies - and only them. The 1st sentence identifies the 1929 holding companies in a very straightforward and concise manner that does not allow for an expansive interpretation, and

The 2nd sentence deals with the exclusion of income and capital gains derived from exactly the same companies. According to Article 31(1) [...] of the Vienna Convention

"A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

...

Guide No 74 of 28 April 1982 [...], issued by the Ministry of Taxation itself in connection with the publication of the DBO, contains no support for the view that the Final Protocol should have a wider scope of application than the 1929 holding companies. The guidance merely reproduces the text of the Final Protocol on this point.

...

Apart from the fact that an S.C.A., SICAR company is not at all comparable to a 1929 holding company - which will be documented under the next point - there is no evidence for such an expansive interpretation of the wording of the provision.

As can be seen from the text, the two sentences of the provision address a 1929 holding company with reference to the legislation applicable to these companies at the time of the conclusion of the DBO in 1980.

**3283**

The *first* sentence addresses the question of whether the 1929 holding company itself enjoys protection under the DBO. The *second* sentence concerns the investors in a 1929 holding company and is two-part, first stating that income received by a

Danish company from a 1929 holding company (e.g. a royalty) is not covered by the DBO, just as it applies to income received by a Danish company from a 1929 holding company.

Danish person receives on shares in a 1929 holding company (i.e. dividends). The words "companies of this kind" do not refer to companies "corresponding" to a 1929 holding company, but refer directly to the 1929 holding company (i.e. to "such companies" as mentioned in the first indent of the provision).

...

It is important to note how easy it would have been to amend the text of the Protocol to make it clear that the 1929 holding companies were only an example and that similar companies were also exempt from the Protocol - or to write outright that Luxembourg tax-exempt companies were generally exempt from the scope of the DBO. But the parties to the agreement did *not* do that. And that's because that wasn't the intention of the Final Protocol.

The French version ...

Furthermore, you can search for the English translation...

In this regard, reference should also be made to the explanatory notes to the bill implementing the DBO into Luxembourg domestic law (bill no. 2533 of 6 October 1981), which states with regard to paragraph 1 of the Final Protocol ([...] (French original and unauthorized translation into Danish)):

"To the 1st paragraph of the Final Protocol

This paragraph provides that holding companies are excluded from the scope of the Convention under Luxembourg's special legislation. *The same applies to income derived by a resident of Denmark from such companies and from shares in them*. The wording corresponds to that used in most of the conventions concluded by Luxembourg." It is clear from this that the reference cited by the Ministry of Taxation concerns the same companies.

The Ministry of Taxation has further emphasized that the provision refers to the legislation for 1929 holding companies with the use of the words *"currently ....." /"pris en exécution..."*.

However, this merely states the obvious: the fact that the 1929 holding companies concerned may be subject to a new, amended legislation does not change their status under the DBO. The intention was, of course, to ensure that Luxembourg could not simply replace the then existing legislation on 1929 holding companies with a new one and thus circumvent the provision. But this does not mean that other legislation relating to other companies is thereby covered by the derogation in question. ...

... There is no evidence that the two contracting states wanted anything other than to exempt the 1929 holding companies in question and only them. This is also supported by the fact that the Danish Ministry of Taxation has subsequently approved other (later added) tax-exempt Luxembourg investment companies as covered by the DBO, see further below in section 7.7.8.7.

The result is supported by a number of general principles of interpretation. First of all, it should be noted that the Final Protocol takes the approach of defining the exempted holding companies by reference to a very specific company formation under Luxembourg law. In other words, no attempt has been made to define the exempt area on the basis of objective criteria. This in itself speaks against a broad interpretation of the purpose of the Final Protocol. ... As mentioned, the Final Protocol contains a specific exception to the DBO. The Final Protocol thus does not express an agreement on an interpretation of the general provisions of the DBO, but rather a deviation from the result that would generally follow from the provision. It is a generally recognized principle of interpretation that exceptions are interpreted restrictively, i.e. only as far as the wording of the exception undoubtedly extends, cf. [...].

...

Furthermore, the reservation is unilateral - it only benefits Denmark, which retains a right of taxation in relation to income, including interest, accruing to 1929 holding companies. Although Luxembourg did not tax 1929 holding companies, it has an obvious interest in ensuring that its resident companies are not taxed by other countries. Therefore, it is presumed that Luxembourg intended the Final Protocol to have a scope that went beyond what clearly follows from the wording. As will appear from section 7.7.8.7 below, with regard to investment funds and investment companies, Luxembourg has also actively pushed for Denmark to comply with the treaty's main rule that tax-exempt entities also enjoy treaty protection - and with success.

*7.7.8.5 A purposive interpretation also means that only 1929 holding companies are exempt from collective agreement protection.*

To the extent that the Danish Ministry of Taxation bases its position on a purposive interpretation of the DBO and the Protocol with reference to the fact that the objective has been to avoid tax deductions in Denmark without including the interest in the tax base in Luxembourg, it must firstly

**3284**

It is reiterated that it is *not* a general purpose of a DBO to avoid this situation (see above in section 7.7.8.3).

Firstly, the issue of deductibility in one country and no taxation in the other *(deduction without inclusion)* is simply not a question of double taxation or double non-taxation. Double taxation occurs when the same income is taxed twice. Double non-taxation occurs when no state taxes an income. The relationship with right of deduction in one country and no taxation in another country is of a different nature, which is particularly evident in that the source country, which for political reasons does not like to grant a right of deduction to a resident debtor for interest that is not taxed by a foreign creditor, has the opportunity to legislate against this by purely national legislation, namely by denying the resident debtor the right of deduction in such a situation, as Denmark had also partly done with SEL § 2B (now SEL § 8D), cf. section 7.7.8.3 above.

Secondly, the fact that Nycomed S.C.A., SICAR was able to recognize the interest as income tax-free while Nycomed A/S (Takeda) in Denmark deducted the interest is not an abuse of the agreement either on the part of Nycomed S.C.A., SICAR or on the part of Luxembourg. The tax exemption is a consequence of the full taxing power that Denmark has transferred to Luxembourg, as the power to tax also includes the power not to tax and as Nycomed S.C.A., SICAR acts in full compliance with Luxembourg law. Danish courts have no right to censure the way in which Luxembourg uses - or fails to use, as here - its taxing power. Denmark could have demanded effective taxation as a condition for giving up its right to tax in the form of a "subject to tax" clause similar to the one France had with Luxembourg in these states' DBO.

In this connection, reference can be made to TfS 1997.506 H ....
The decision shows that as long as an intra-group loan is raised on market terms and as part of a normal business transaction, there can be no restriction on the debtor's right of deduction without express legal authority and solely based on considerations of abuse, even if the creditor is not taxed on the interest. The very fact that a creditor is not taxed on an intra-group interest income is simply not odious, as long as the lack of taxation - as here - is a result of the legislator's deliberate failure to tax in the present situation. Therefore, there is also no basis for an interpretation of the purpose that relies solely on a

implicit and unsubstantiated assumption that the parties to the agreement have sought to avoid this situation, also when it came to companies other than the 1929 holding companies.

Moreover, Denmark does not grant tax exemption for interest income simply because the debtor does not have a tax deduction for the interest, whether the debtor is resident in Denmark or abroad, cf. e.g. the European Court of Justice's judgment in C-593/14 Masco Denmark ApS (paragraph 43) [...] and SKM 2019.6.SKTST [...].

...

It appears [...] from the ratification of the DBO in Luxembourg that the purpose of Article 1 of the Final Protocol was to clarify that the subscription tax paid by 1929 holding companies was not covered by the agreement.

The following is stated in the Council of State's recommendation of December 8, 1981 for the bill implementing the DBO in Luxembourg law ([...] - French and here in its own translation):

"Paragraph 1 of the Final Protocol provides that under Luxembourg law holding companies are excluded from the scope of the Convention.

As these holding companies are not subject to income or wealth tax, they are normally not subject to double taxation laws.

*The express mention of Luxembourg holding companies by the High Contracting Parties is undoubtedly at the request of the Danish co-signatory, which wanted to avoid confusion between the taxes mentioned in the Convention and the subscription taxes ["impots d'abonnement"] payable by the holding companies.*

It is true that the exclusion of holding companies can also be seen as a sign that our contractual partners distrust one of our most original fiscal and financial institutions.

*While we can hardly object to the exclusion of holding companies from the scope of the Convention, we must remain vigilant to ensure that our specific legislation is not attacked head-on by those who, rightly or wrongly, consider themselves to be its victims.*" (Our emphasis).

It appears from this that it was Denmark that wanted § 1 of the final protocol to be introduced and that the purpose was to avoid confusion about whether the "*subscription tax*"
- paid annually by 1929 holding companies was a tax covered by the DBO. If, in these circumstances, the Ministry of Taxation claims that the purpose of the Final Protocol was in fact to avoid Luxembourg companies that paid no tax or only a marginal tax being subject to the DBO, the burden of proof lies with the Ministry of Taxation.

As will be shown below, Nycomed S.C.A., SICAR
*not "subscription tax".*

It is also clear from the above that Luxembourg could accept the exclusion of the 1929 holding companies but that the exclusion of

**3285**

At the same time, the 1929 holding companies created an awareness from Luxembourg not to be exposed to "frontal attacks" on the country's other fiscal and financial instruments. It would therefore not be consistent with the parties' common intention of the Final Protocol to use it as a basis for an interpretation of its purpose that denies treaty protection to companies other than the 1929 holding companies.

Overall, there is no basis for interpreting the Final Protocol either expansively or purposively.

*7.7.8.6 An S.C.A., SICAR company is not comparable to a 1929 holding company*

In any case, a Luxembourg S.C.A., SICAR company is *not* identical - or in any way comparable - to a 1929 holding company.

[...]

The 1929 holding company was subject to relatively simple requirements:

- It had to be a holding activity in the form of (passive) ownership of shares or possession of intangible assets (Article 1). 1929 holding companies were thus ordinary holding companies where there was no requirement as to the immediate purpose of the investment or the ownership structure. That is to say, they were companies established for the purpose of owning whatever investment assets the shareholders wished and for as long a period as the shareholders found appropriate.
- The 1929 holding company was not aimed at professional investment activity. Thus, there were no requirements for the asset composition, neither in terms of risk diversification nor in terms of requiring the 1929 holding company to invest in a specific type of assets.
- The 1929 Act did not contain rules on investor protection, just as the legislation did not otherwise set requirements for investors; neither in terms of the capital contributed nor the investors' expertise.
- The 1929 holding company was not subject to supervision by the Luxembourg Financial Supervisory Authority, nor was the 1929 holding company subject to any reporting obligations. There was no obligation to audit the accounts of a 1929 holding company.
- The 1929 regime was thus available to anyone who wanted to establish a holding company, regardless of what they wanted to invest in, as long as it was a pure holding company that did not carry out any other business activity. Anyone could transfer their shares etc. to a -possible 100 owned - holding company, and due to the lack of reporting and auditing obligations avoid that others - including the tax authorities - had insight into the holding company's activities.
- As regards the taxation of 1929 holding companies, it should be noted that these companies were completely exempt from corporation tax and paid only a (symbolic) *subscription tax* within the meaning of Article 1 of the 1929 Act [...] (of 0,2 % of their capital). The company was thus subjectively tax-exempt and had no obligation to file a tax return. On that basis, the company was generally not able to obtain a certificate of residence from the Luxembourg tax authorities (as a company covered by the Luxembourg DBOs).

A variant of the 1929 holding company was introduced by decree of

December 17, 1938 [...], which is also mentioned in the final minutes. In contrast, companies covered by the SICAR Act [...].

A SICAR can take different forms under company law. Nycomed S.C.A., SICAR was as the name indicates an S.C.A. (société en com- mandite par actions). The designation SICAR indicates that the company has chosen to be subject to - and is registered under - the SICAR Act.

The SICAR law is part of Luxembourg's legislation on regulated collective investment undertakings, which is described in detail below. Typical for collective investment undertakings is that their purpose is to enable and support several, typically many investors' joint investments in securities etc. As in Denmark,

these entities are often tax-exempt, because the aim is to avoid collective investments resulting in additional taxation compared to the situation where each individual investor invests directly.

If the SICAR regime is chosen, (passive) holding activity is opted out at the same time; a SICAR may only invest in high-risk assets,

i.e. assets where the SICAR participates in the development of the underlying company through its investment. When the underlying company is sufficiently advanced in its development that an investment in the company is no longer an investment in a high-risk asset, the SICAR must divest its investment. The purpose of a SICAR company is thus not to hold shares as a long-term investment, but rather to develop the company so that the company grows, in order to sell the shares with the greatest possible gain for the investors.

This is evident, for example, from the Luxembourg financial supervisory authority CSSF's communication of April 5, 2006 [...], which states:

"In order to maximise profits from investments for the SICAR's shareholders, the SICAR will often intervene in management of the portfolio companies via an advisory activity or a representation in the managing bodies of the portfolio company, thereby aiming to create value in the latter through restructuring, modernization, and by promoting any measures likely to improve the allocation of resources."

**3286**

SICARs can thus be used for the activity that is also carried out by Danish private equity/capital funds, which have *active ownership* in order to develop and liquidate their investment with the highest possible return. As to whether the SICAR is an ordinary holding company, the CSSF states [...]:

"Finally, it should be noted that as an investment company in risk capital, *the SICAR's declared intention shall be in general to acquire financial assets in order to sell them with a profit*, as oppo- sed to a holding company which acquires to hold." (Our emphasis).

As stated in the SICAR Act [...] and in the Danish Financial Supervisory Authority's (CSSF's) communication of April 5, 2006 [...], SICAR is subject to a wide range of regulatory requirements, including;

- The CSSF must approve the creation of a SICAR in accordance with Article 11 of the SICAR Law
- The SICAR has ongoing reporting obligations to the CSSF, which supervises the SICAR's compliance with its obligations in accordance with Articles 11 and 28 of the SICAR Law
- The SICAR must appoint an independent depositary in the form of a financial institution subject to public supervision to safeguard investors' rights in accordance with Article 9 of the SICAR Law
- The SICAR's management is subject to a fit and proper requirement, cf. article 12, paragraph 3 of the SICAR Act
- Only certain qualified investors may invest in the SICAR, cf. article 2 of the SICAR Law

For tax purposes, an S.C.A. (société en commandite par actions) is an independent tax entity under Luxembourg law. This follows from article 159(1) (1A) of the Luxembourg Income Tax Code [...]. The starting point here is that an S.C.A. is taxable on its global income.

However, the SICAR Act also contains special tax rules for SICARs. Thus, it follows from Article 34(2) of the SICAR Act that a SICAR's income *from investments in venture capital is* not included in the SICAR's taxable income [...]:

...

Thus, a SICAR is subjectively liable to tax in Luxembourg pursuant to Article 159(1) (1A) of the Luxembourg Income Tax Law [...] - and thus has to file a tax return and may obtain a domicile certificate for double taxation relief purposes) - but is objectively exempt from tax on income derived from

investments in high-risk assets (and only such income). If a SICAR company realizes losses or has to write off its investments in risk capital, the losses cannot be deducted from the company's ordinary taxable income either.

A SICAR does not pay wealth tax (beyond the minimum wealth tax) and does not pay a *subscription* tax of 0.01% or 0.05% like 1929 holding companies.

It is correct, as emphasized by the Ministry of Taxation, that Nycomed S.C.A., SICAR has not specifically paid income tax in Luxembourg in the three income years in question. This is evident from the company's annual reports and is therefore due to the fact that the company only received income from its investments (i.e. the interest income at issue in the case). However, it is disputed that it can thus be concluded - as the Ministry of Taxation seems to do - that *"the company has thus been completely exempt from direct taxation in Luxembourg"*, see the Ministry's pleading 3, p. 6.

The company has not been "exempt from direct taxation in Luxembourg", but has been tax exempt on certain income from its investments. In the years in question, the company's income consisted solely of such income.

For example, if Nycomed S.C.A., SICAR had received interest income, perhaps from an investment in bonds following an Exit for an extended period of time, this interest income would have been taxable to the company at the generally applicable corporate tax rate in Luxembourg, which in 2007 amounted to 29.63%.

At the investor level - i.e. for investors in the SICAR who are resident in Luxembourg - the returns of a SICAR are taxed in the same way as returns from other Luxembourg companies subject to corporate tax, i.e. an individual is taxed on dividend distributions (upon distribution) and share gains upon realization according to specific rules. The taxation depends, among other things, on whether the shares are traded for speculative purposes and how many shares the shareholder owns in the underlying company. Corporate investors domiciled in Luxembourg are also taxed on dividend distributions and capital gains, although Luxembourg - like Denmark - exempts certain dividends and capital gains from tax (parent company exemption).

While the 1929 holding companies could thus be used for private investments without public scrutiny, audit and without time limit and with a subjective, total tax exemption, the SICAR regime is part of the Luxembourg system of regulated collective investment undertakings with a narrowly defined scope, subject to public supervision and audit. The tax exemption is only objective - i.e. for certain income - and reserved for the generally recognized purpose of allowing a majority of investors to pool their investments through investment associations without increased taxation.

In addition to the above-mentioned significant differences, it should be noted that the legislation on 1929 holding companies was repealed in 2006 (with final effect in 2011), cf. the Act of 22 December 2006 [...] as a result of the European Commission's decision of 19 July 2006 [...] that the tax regime applicable to 1929 holding companies constituted *illegal State aid*.

**3287**

In this context, it is important to note that the Commission has also investigated whether a SICAR company constituted illegal state aid. In connection with the adoption of the Act, the Commission opened an investigation case, but closed the case administratively in 2011, cf. case no. 54 in the annex to Competition Commissioner Margrethe Vestager's letter of April 29, 2015 [...]. The Commission must therefore have reached the opposite conclusion with regard to the SICAR company. This also documents that there is a relevant difference between the two companies.

It is re-emphasized that it is the Ministry of Taxation that has the burden of proof to disclose and document the aspects of the

Luxembourg regulation/taxation that are invoked in support of SICARs being assimilated to 1929 holding companies for the purposes of the final protocol.

(if the Protocol even allows for such an expansive interpretation, which is disputed).

...

7.7.8.7 *The Danish Ministry of Taxation has informed Luxembourg that Denmark considers Luxembourg investment companies to be covered by the DBO*
*- despite being completely exempt from corporate taxation*
... In 2006, the Ministry of Taxation [has] itself [...] confirmed to Luxembourg that Denmark considers other Luxembourg investment companies that are fully exempt from corporation tax in Luxembourg to be covered by the DBO.

On *July 10, 1992,* the Luxembourg tax authorities asked the Danish tax authorities whether they agreed that Luxembourg investment companies covered by the law of March 30, 1988 on collective investment companies were *not covered by* Article 1 of the Final Protocol and that they therefore had DBO protection [...].

...

The Ministry of Taxation replied in *October 1993* [...] that the investment companies in question were not covered by the DBO because they were covered by Article 1 of the Final Protocol on Holding Companies, the purpose of which, according to the Ministry, was to avoid double tax exemption.

...

However, 12 years later - in *July and December 2005* - the Luxembourg tax authorities again contacted the Ministry of Taxation [...], asking whether the Ministry of Taxation still considered that Luxembourg investment companies fell outside the scope of the DBO pursuant to Article 1 of the Final Protocol.

...

Subsequently, the Ministry of Taxation turned the tables when the Ministry's leading international expert, Ivar Nordland, answered the Luxembourg authorities' renewed inquiry on *February 15, 2006* (i.e. before the establishment of the loan structure in this case) as follows [...]:

"I can inform you that I agree on the point of view taken by the Central Cus-toms and Tax Administration in a mail of 14 April 2005. *This means that Luxembourg investment funds qualify for benefits ac-cording to the Double Taxation Treaty between Den-mark and Luxembourg.*

Likewise it we consider the new Danish undertakings for collective investments to be covered by the Double Taxation Treaty. As mentioned in the note from Ernst & Young, these undertakings are in practice tax exempt but the Danish residents, which own the shares in the undertaking, are subject to taxation at an accrual basis of the increase in value of the shares in the undertaking." (Our emphasis).

Luxembourg (and Danish) investment companies were now, in the opinion of the Ministry of Taxation, covered by the DBO.

The response from the Ministry of Taxation refers to *"Luxembourg investment funds"* without specifying what exactly is meant. It appears from the context that reference is at least made to SICAVs and SICAFs, as Luxembourg's letter of December 30, 2005 [...] was attached to a letter of November 22, 2005 from Nordea Bank S.A. [...], which expressly refers to SICAVs. Nordea's letter was also enclosed with extracts from a guide from the auditing firm Ernst & Young *("Investment Funds in Luxembourg - A Technical Guide" from September 2005* [...], which refers to both SICAVs and SICAFs. This must be the *"note from Ernst & Young"* that Ivar Nordland refers to in his letter of February 15, 2006.

Luxembourg's first communication of July 10, 1992 [...]

concerned specifically *"In-vestment Funds under the Luxembourg law of March 30 1988"*, which includes SICAVs and SICAFs, see below. In his letter of February 15, 2006, Ivar Nordland further refers to the above-mentioned e-mail of April 14, 2005 from the Danish Personal Tax Agency.

the office, referring to the Tax Council's binding answer regarding SICAVs.

Although the newly introduced SICAR company is not specifically mentioned at this time, there is no reason whatsoever to believe that the Ministry of Taxation's general answer did not also include SICARs. In any case, the Ministry of Taxation did not make any reservation for SICAR companies or find reason to specify which *"Luxembourg investment funds"* the Ministry of Taxation accepted as being covered by the DBO in its letter of February 15, 2006. At the same time, the Ministry also pointed out that the Ministry's position meant that the newly introduced (and almost completely tax-exempt) investment companies in Denmark under section 19 of the Danish Capital Gains Tax Act (a "section 19 company") - *"the new Danish undertakings for collective investments"* - must also be considered to be covered by the DBO.

**3288**

In any event, the correspondence demonstrates that the Ministry of Taxation has not itself interpreted the Final Protocol broadly in the sense that any tax-exempt company that arose after the Protocol was drafted had to be equated with a 1929 holding company already because of the tax exemption. Not even any tax-exempt holding company, i.e. a company that mainly invested in securities - e.g. a section 19 company - could be equated with a 1929 holding company. One must assume that the Ministry of Taxation has reached this result after careful consideration, as the Ministry had previously taken the opposite position, and there are strong indications that it is the Tax Council's decision of 1995 (which came after the Ministry's initial response to Luxembourg in 1993) that has brought about the change of heart.

There is a need to put the Ministry of Taxation's answer into a larger context.

Firstly, there is widespread international (including Danish) recognition that collective investment schemes are, as a starting point, eligible for treaty protection, although many countries have exempted such companies from tax liability.

...

As mentioned, when the treaty was signed in 1980, it was already clear that Denmark also had many legal entities that did not pay tax, including investment funds.

As the Ministry of Taxation itself refers to *"Danish undertakings for collective investments"*, there may be reason to briefly review how Denmark taxed collective investment entities at this time (when the Ministry of Taxation sends the reply to Luxembourg, i.e. in February 2006).

In February 2006, there were mainly four types of collective investment vehicles:

- Account-holding investment funds
- Distributing investment associations issuing certificates, cf. also section 16 C of the Danish Tax Assessment Act
- Evidence-issuing accumulating investment funds
- Investment companies, cf. section 19 of the Danish Capital Gains Tax Act (a section 19 company)

The basic characteristics and tax treatment of the above-mentioned investment funds are described in Bill No. 98 of February 24, 2005 on p. 3864 [...].

It appears from this that *account-holding investment funds and certificate-issuing distributing investment funds* are both *tax-exempt*, cf. also section 1(1)(6), cf. (4), of the current Corporation Tax Act (Consolidated Act no. 1125 of 21 November 2005 - [...]), while certificate-issuing accumulating investment funds are subject to corporate taxation on an equal footing with a share or an equity investment fund.

company, cf. also section 1(1)(5a) of the current Corporation Tax Act [...].

*Investment companies covered by the current section 19 of the Danish Corporation Tax Act* (Act no. 1413 of December 21, 2005 - SMS 443) were in February 2006 (and still are today) tax exempt according to section 3, subsection 1, no. 19 of the current Corporation Tax Act [...], but were taxed at 15% on dividends received from Danish companies, but are thus tax exempt on interest (regardless of where the debtor is domiciled) and dividends received from foreign companies.

Denmark thus had an interest in ensuring that these *Danish tax-exempt collective investment undertakings* were protected by the DBO with regard to interest and dividends from sources in Luxembourg, which is also clearly stated in the Ministry of Taxation's response to Luxembourg in 2006 [...].

As mentioned, the correspondence between the Tax Ministry and the Luxembourg tax authorities refers to the Luxembourg law of March 30, 1988 [...].

The Law of March 30, 1988 [...] was amended by the Law of December 20, 2002 [...], which was thus at least the legal basis referred to by the Ministry of Taxation and the Luxembourg tax authorities in February 2006. The law is hereinafter referred to as the UCITS Law. An account of the regulation of Luxembourg investment undertakings/companies can therefore appropriately be based on this law. It is a law intended to regulate collective investment undertakings and thus provides rules on, among other things, the organization of investment activities (issue and repurchase of shares, rules on borrowing, hedging etc), marketing, supervision and audit. This is not legislation that is primarily concerned with tax treatment.

The form of company law is not decisive for how a collective investment entity is regulated, but not all company forms are permitted for every type of regulated activity. The company designations S.A., S.C.A., Sàrl, etc. do not in themselves say anything about whether a specific company may be regarded as an investment company.

The terms SICAV *(société d'investissement à capital variable)* and SICAF *(société d'investissement à capital fixe)* are two different ways of organizing an investment entity in Luxembourg and the only difference is that SICAV refers to an entity that has variable capital, while SICAFs have fixed capital that can only be changed through actual capital increases or decreases. Again, this designation is not decisive for the treatment of the entity under Luxembourg law on collective investment undertakings.

The UCITS Act is divided into two parts, where investment entities covered by the first part are so-called

**3289**

*Undertakings for Collective Investment of Transferrable Securities (UCITS)*, i.e. *investment companies* that intend to invest in listed securities.

Other investment companies covered by the Act are called "Part II Investment Funds".

In 2006, a Luxembourg company could thus be subject to supervision and regulation as an investment firm as

- a *UCITS under Part I of the UCITS Act*,
- a *Part II Investment Fund* or
- a *SICAR under the SICAR Act*.

In 2007, further regulation of *"fonds d'Investis- sement spécialisés - FIS"* or in English *"specialized investment fund - SIF"* was introduced, cf. the Act of 13 February 2007 [...]. An investment company could then also be regulated as a SIF. As the law was only adopted in 2007, this type of investment entity did not exist in 2006, when the Ministry of Taxation confirmed

that *"Luxembourg*

*investment funds"* were covered by the DBO between Denmark and Luxembourg. However, in a binding answer published as SKM2012.214.SR [...], the Danish Tax Council confirmed with reference to the aforementioned correspondence between Denmark and Luxembourg in the period 1992-2006 that an investment entity expected to be established as a SICAF-SIF SA was covered by the DBO.

There were also other regulated forms of collective investment vehicles, which there is no need to go into detail here.

UCITS, Part II Investment Funds as well as SIFs are regulated entities whose purpose is, in various ways, to make collective investments and which, like SICARs, are subject to supervision by the Luxembourg Financial Supervisory Authority CSSF, see Law of December 20, 2002, chapter 15, article 93 [...]. All entities must have a depositary which is a financial institution within the meaning of Articles 17 [...], 34 [...], 66 [...] and 71 [...] of the law of December 20, 2002 and Article 81 [...] of the SIF Law.

UCITS are exempt from Luxembourg tax in accordance with article 127-129 of the law of December 20, 2002 [...], but pay subscription *tax*.

Part II Investment Funds are exempt from Luxembourg tax pursuant to Article 105 of the Law of March 30, 1988 (as continued in Chapter 19 of the Law of December 20, 2002). The tax exemption provision reads as follows [...]: ...

Article 108, referred to in the above quote, sets out the obligation to pay 0.01% or 0.05% subscription tax [...]. Entities that opt for the status of a SIF are subject to a tax exemption provision similar to Part II Investment Funds. ... Subscription tax for SIFs amounted to 0.01%, according to Article 68 of the Law o f  13 February 2007.

First and foremost, it is submitted that the Ministry of Taxation's correspondence with the Luxembourg tax authorities must be understood to mean that the undertaking to recognize unspecified

*"Luxembourg investment funds"* must also have referred to SICARs, as they formed an integral part of the Luxembourg investment company regime.

In any event, it is clear that the Ministry of Taxation - after careful consideration and fully aware of the tax exemption of Luxembourg investment companies - recognized that the entities regulated by the UCITS law were protected by the DBO, and the Tax Council has since recognized the SIF as well. There are no regulatory or tax differences that would justify a SICAR being exempt from the DBO under the Final Protocol, while Part I Investment Funds (UCITS), Part II Investment Funds and SIFs are recognized by the Ministry of Taxation and the Danish Tax Council as protected by the DBO.

There is nothing strange about collective investment schemes being tax-free. Denmark had - and has as mentioned - several similar tax-free entities.

Moreover, the management of investment funds is a VAT-exempt service under Article 135(1) of the VAT Directive [...], which is implemented by section 13(1)(11) of the Danish VAT Act [...]. This exemption is also due to the need to avoid additional taxation of associations with collective investment purposes.

Also at this point, it should be mentioned that it is the Ministry of Taxation that has the burden of proof if the Ministry claims that there is such a crucial difference between a SICAR and the other collective investment undertakings in the Luxembourg legislation that a SICAR, but not all the other investment undertakings, can be denied treaty protection after an

interpretation of the Final Protocol, as it is of course still disputed that the Final Protocol even allows for an expanded interpretation of purpose in this direction.

Thus, it is the Ministry of Taxation that, if applicable, must provide the High Court with such complete documentation of the regulatory and tax treatment of 1929 holding companies (and 1938 companies), SICARs, UCITS, Part II Investment Funds and SIFs that the High Court has a complete and satisfactory basis for determining that SICARs, as opposed to UCITS, if applicable,

Part II In-vestment Funds and SIFs must be treated as 1929 holding companies for the purposes of the DBO.

*7.7.8.8 Luxembourg considers a SICAR company to be covered by the DBO and other countries with similar DBO provisions have (also) recognized a SICAR as being DBO-protected*

As mentioned above, it appears from the correspondence between the Luxembourg and Danish tax authorities that Luxembourg considers its investment companies to be covered by the DBO and thus not covered by Article 1 of the Final Protocol.

**3290**

The fact that Luxembourg considers a SICAR company to be covered by its DBOs - which the Ministry of Taxation disputes - also appears from various literature.

...

Furthermore, it is important that it can be documented that other countries have made broader reservations to 1929 holding companies. Thus, the corresponding provision in Luxembourg's DBO with Belgium (from 1971) is worded as follows ([...] - English IBFD translation):

"Notwithstanding these provisions, the Convention shall not apply to the in-come or capital of holding companies resident in Luxembourg which benefit from special tax advantages under the terms of the Luxembourg law of 31 July 1929 and the decree law of 27 December 1937 *or any other similar law which would enter into force in Luxembourg after the signature of the Convention.*" (Our emphasis).

This provision probably has the same actual content as the Danish provision, but the wording, however, provides far better opportunities for an interpretation - similar to that of the Ministry of Taxation - according to which "comparable" (completely tax-exempt) tax regimes are also covered. But even though this wording was available when Denmark's final protocol was negotiated in 1980, Denmark and Luxembourg have chosen an interpretation that was clearly narrower than the Belgian one.

It is reasonable to assume that the reason is that the parties' intention was that the reservation in the Danish/Luxembourg final protocol should only apply to 1929 holding companies - and not *"any other similar law which would enter into force in Luxembourg after the signature of the Convention"*, which is precisely the position of the Ministry of Taxation in this case.

Despite the broader exemption provision, Belgium has accepted that a SICAR company is covered by the Belgian-Luxembourg DBO.

This follows from the Belgian *Ruling Commission's* decision of July 12, 2016 [...]. ...

...

The Ministry of Taxation refers to an opinion of the Canadian tax authorities dated October 24, 2007 [...] in which the tax authorities conclude that Article 28(3) of the DBO between Luxembourg and Canada *"should apply to deny SICARs and their Canadian investors the benefits of the Convention"* [...].

It is clear that the fact that another country's tax authorities may take the same position as the Ministry of Taxation is not a strong argument that this is also correct. It is only the tax authority, not an appeal body or court decision.

In this case, however, the opinion of the Canadian tax authorities has no probative value at all, since the relevant Article 28(3) of the DBO between Luxembourg and Canada differs in crucial respects from paragraph 1 of the Final Protocol to the DBO between Luxembourg and Denmark.

Article 28(3) of the DBO in question reads (according to the opinion) as follows [...]:

"The Convention shall not apply to holding companies as defined in Luxembourg special legislation, currently the Law of July 31, 1929 and the Grand Ducal Decree of December 17, 1938, *or other similar legislation which enters into force in Luxembourg after the signature of the Agreement, nor to companies which are subject in Luxembourg to similar tax legislation.* Nor shall it apply to income derived by a resident of Canada from such companies, or shares or other interests in such companies held by such person." (Emphasis added).

As can be seen, the DBO between Luxembourg and Canada contains precisely the opening for "similar companies" under "similar tax legislation" that may come at a later date.

The Canadian tax authorities therefore made their assessment on a completely different basis than in the present case.

[It is further noted that Canada also does not recognize "ordinary" Luxembourg tax-exempt investment funds/companies as being covered by the DBO - i.e. contrary to what Denmark does, see above in section 7.7.8.7. Reference can be made to [...], which is a statement from the Canadian tax authorities stating that Canada does not consider an investment company in the form of a SICAV to be covered by the DBO. It is therefore not surprising that the Canadian tax authorities take the same position regarding a SICAR.

*7.7.8.9 To summarize the question of whether a SICAR company is covered by the DBO with Luxembourg*

The above review in sections 7.7.8.1 - 7.7.8.8 has shown that the Ministry of Taxation's new plea that a SICAR company is not covered by the Danish-Luxembourg DBO (as covered by paragraph 1 of the final protocol) has no merit whatsoever.

...

*8 TAX MUST BE WAIVED UNDER THE INTEREST/ROYALTY DIRECTIVE*

8.1 *The objective conditions for exemption in the Directive are fulfilled* The second sub-claim to Takeda's main claim that the company has not been obliged to withhold interest tax is, as mentioned, that Nycomed Sweden Holding 2 AB has an unconditional claim for the interest tax to be waived under the Interest/Royalty Directive.

*The Interest/Royalty Directive (2003/49/EC) [...]* introduced a common system of taxation of interest and royalties.

**3291**

royalties paid between associated companies in different Member States. The purpose of the Directive is to exempt interest paid between associated companies from withholding tax, i.e. taxation in the state where the companies are resident.

The provision that no withholding tax may be levied on interest is contained in Article 1(1) [...]: ...

The Directive establishes both a capital requirement and a holding period requirement. *The capital requirement* is set out in Article 1(7), cf. Article 3(b) [...], and amounted to 25% (i.e. "*association*" requirement).

According to Article 1(10), cf. Article 3(b), [...], each Member State may introduce a maximum *period of ownership of* 2 years. The ownership requirement in SEL § 2(1)(d) is 1 year, and the only requirement is that the time of payment must be within this period [...].

Under the Interest/Royalty Directive (as under the DBO, cf. section 7 above), it is also a condition that the interest recipient is the "beneficial owner" of the interest received. This is in contrast to the parent

/Directive (on dividends) (90/435/EEC). This will be addressed immediately below in section 8.2.

Takeda claims that Nycomed Sweden Holding 2 AB, which undisputedly meets both the association requirement and the ownership period requirement in the Interest/Royalty Directive, cf. section 2(1)(d) of the Income Tax Act, just as the company is the "beneficial owner" of the interest, has an unconditional claim to be exempt from withholding tax on the interest from Nycomed A/S (Takeda).

8.2 *Nycomed Sweden Holding 2 AB is also a "beneficial owner" under the Directive*

Like the DBO, the Interest/Royalty Directive contains a requirement that the interest recipient must be the "beneficial owner" of the interest in question.

Article 1(4) of the Interest/Royalty Directive reads as follows [...]: ...

In its judgment of 26 February 2019 in the present case [...], the Court of Justice of the European Union ruled that the concept of "beneficial owner" as defined in Article 1(4) of the Interest/Royalty Directive is an autonomous concept of EU law.

On its interpretation, paragraph 88 states [...]: ...

In this connection, the Court of Justice of the European Union has stated (paragraph 90) [...] that the Directive was inspired by Article 11 of the OECD Model Tax Convention of 1996 and pursues the same objective as the latter, namely to avoid international double taxation. Against this background, it is concluded in paragraph 90:

"The concept of 'beneficial owner' contained in bilateral conventions based on that Model Tax Convention, *as well as the subsequent amendments* to that Model Convention and the commentaries thereto, are therefore relevant for the interpretation of that directive." (Our emphasis).

However, in paragraph 91, the CJEU has emphasized that *"such an interpretation, even if inspired by OECD texts, is based on the directive"* and that the interpretation therefore has democratic legitimacy.

It must therefore be assumed that the OECD's extended comments from 2003 on "flow-through companies" can thus be included in the interpretation of the Directive.

However, this does not change the fact that the 2003 Commentaries cannot be included in the interpretation of the Nordic DBO, see above in section 7.3.

Takeda submits that Nycomed Sweden Holding 2 AB is also the "beneficial owner" of the interest in question under the Directive. It is thus maintained that Nycomed Sweden Holding 2 AB is a "beneficial owner", even if the 2003 comments were to be applied. Nycomed Sweden Holding 2 AB is thus not a "flow-through company", cf. the discussion above in sections 7.4 and 7.5.

8.3 *Countering abuse requires national legal basis under Article 5 - Kofoed judgment (C-321/05)*

The EU legislator has left it up to the individual Member States to determine any provisions on abuse of the Interest/Royalty Directive. Article 5 states that [...]: ...

As can be seen, this is an *enabling provision.* Thus, each Member State may introduce or maintain whatever *national* anti-abuse rules it deems appropriate. However, national anti-abuse rules must in themselves be compatible with EU law, including the freedoms guaranteed by the Treaty as established in the case law of the European Court of Justice and not least the *principle*

U.2023.3198H

*of proportionality.* The CJEU thus ensures that the anti-abuse rules do not go too far.

*8.4 There is no abuse according to the Danish anti-abuse rules applicable in 2007 - 2009*

As stated in section 1.3.2, a Member State's invocation of Article 5 of the Directive on *"national provisions"* presupposes that the Member State in question has either adopted a specific national provision to implement this provision in its legal system *or* that there are general provisions or principles in national law on fraud, abuse etc. that can be interpreted in accordance with Article 5. It is therefore entirely up to each Member State to decide whether and - if so - to what extent it wishes to have anti-abuse rules.

The question is therefore what anti-abuse rules were available to the tax authorities in 2007 - 2009 when the interest imputations took place.

The parties agree that the legal position regarding the anti-abuse rules in Danish law during the case period was as set out in paragraphs 74-78 of the order for reference [...].

**3292**

This shows that in 2007-2009 there was no *general statutory anti-abuse rule*. Denmark only introduced such an anti-abuse provision with effect from May 1, 2015 - as a result of the obligation for Member States to introduce such a measure in respect of dividends adopted by Directive 2015/121/EU, cf. also below in section 8.5.

On the other hand, the so-called *reality principle* (paragraph 75) *and the principle of "rightful income recipients"* (paragraph 77) have been developed in case law.

...

The Danish tax authorities thus have two court-created instruments at their disposal to deal with cases of abuse, namely the *principle of "rightful income recipient"* and the substantive *principle* ("sub- stance-over-form"). Both of these instruments are central to this case. Partly because they both address the problem at hand, and partly because the Danish Ministry of Taxation (and the Danish legislator), right up to the start of this complex of cases in 2008, has been of the opinion that precisely these instruments provided the necessary (desired) protection against cases of abuse, cf. section 2 above. As stated in paragraph 78 of the order for reference [...], the Ministry of Taxation acknowledges that the interest recipient, Nycomed Sweden Holding 2 AB, is the *"rightful income recipient"* of the interest in question.

Similarly, the Ministry of Taxation recognizes in paragraph 76 of the referral ruling [...] that *the principle of reality* does not provide a basis for setting aside the transactions made in the case. SKAT originally tried to deny exemption from taxation in the "beneficial owner cases" on the basis of substantive considerations, but had to recognize that there was no basis for this, cf. the judgments in *TfS 2003.889 H (Over- Hold ApS)* [...] and *TfS 2006.1062 H (Finwill ApS - "Elevatorsa- gen")* [...].

Thus, the parties agree that neither the *principle of "rightful income recipient"* nor *the principle of reality* can be invoked in support of the Ministry of Taxation's claim.

Thus, there is no abuse according to the Danish anti-abuse rules applicable in the case period 2007-09.

This has been accepted by *the National Tax Tribunal* in the dividend cases (regarding the corresponding provisions in the Parent/Subsidiary Directive), whereas the question was not considered decisive in the interest cases, as the Interest/Royalty Directive contained a - for the National Tax Tribunal - decisive provision on "beneficial owner".

*8.4.1 The Danish Ministry of Taxation's three arguments that there was a specific legal basis in Danish law during the case period to*

deny the benefits of the directive due to abuse are not sustainable

In this complex of cases, the Ministry of Taxation has put forward three pleas in support of a legal basis in Danish law to specifically deny the benefits of the Directive due to abuse. The three pleas are discussed below in sections 8.4.1.1 - 8.4.1.3.

As will be shown, none of these arguments are sustainable.

8.4.1.1 *SEL § 2(1)(d) is not a specific national provision within the meaning of Article 5 of the Directive (Question 2 to the CJEU)*

The Ministry of Taxation argues that *section 2(1)(d) of the SEL in itself* contains the necessary internal legal basis to deny the benefits of the Directive in case of abuse. The view is based on the following sentence in the provision [...]: ...

...

The general reference to the Directive thus implies an implementation of the Directive as it stands, including the authorization provision in Article 5, but it *does not* imply a position on whether the authorization should be used, and thus *not* an implementation of an anti-abuse rule in Danish law. The mere reference to the Directive suggests nothing whatsoever about Denmark's intention to introduce an (optional) national anti-abuse rule when introducing the statutory rule in 2004, let alone what such a rule - if any - would consist of.

On the contrary, it is a fact that the Ministry of Taxation and the Danish legislator already at the introduction of the Corporation Tax Act

§ The interpretation of section 2(1)(c) of the Corporation Tax Act in 2001 - on limited tax liability on dividends - specifically *did not* find a need for and therefore *did not* want to introduce an anti-abuse rule, see section 2 above. The understanding of section 2(1)(c) - and (d) - as the Ministry of Taxation now claims, and which is invented for this complex of cases, is thus in *direct conflict with the legislative history of this provision from 2001* (and thus also the basis for SEL section 2(1)(d) on interest).

*The Eastern High Court's question 2.1 to the European Court of Justice [...]* concerns this plea from the Ministry.

The Commission's pleading states in paragraph 36 [...] of the Ministry's plea *"In the Commission's view, this line of reasoning cannot be accepted"*, which is substantiated in the following paragraphs. And in the Commission's proposed answer to question 2.1, it states [...] that *SEL § 2(1)(d) "cannot be considered to be a specific national provision within the meaning of Article 5 of the Directive"*.

Similarly, point 120 of the Advocate General's proposal states [...]:

"For this reason, questions 2.1 and 3 must be answered that neither

§ Section 2(2) [now (1)](d) of the Danish Corporation Tax Act or a provision in a double taxation treaty which, as regards the taxation of interest, is based on the

**3293**

*beneficial owner*, are sufficient to be regarded as transposing Article 5 of Directive 2003/49." (Emphasis added).

*The CJEU* has not answered question 2.1 as the Court instead chose to introduce the "general EU law principle of prohibition of abuse", discussed below in section 8.6, as a mandatory principle.

As can be seen, the Ministry of Taxation's plea has no merit whatsoever.

...

8.4.1.2 *The "beneficial owner" condition in a DBO is not such a contractual anti-abuse provision covered by Article 5 of the Directive (Question 3 to the CJEU)*

Takeda submits that the Model Agreement's condition of "beneficial owner" *cannot* be regarded as a provision "necessary to prevent fraud and abuse" within the meaning of Article 5. Thus, the provision is *not* an anti-abuse measure, but rather a rule that only the person who is the taxpayer of the interest (the "beneficial owner") can claim relief under the Convention. This is explicitly stated in paragraph 8 of the 1977 Commentary to the OECD Model Convention [...], which was in force at the time of the conclusion of the Nordic DBO. This consideration is taken care of in the Directive instead of the capital and ownership period requirement.

It is widely recognized in the international tax literature that the Model Tax Convention's "beneficial owner" condition is not an anti-abuse provision. ...

It is further submitted that the expression *"provisions laid down by treaty"* in Article 5 must be interpreted as meaning that it presupposes that the Member State can rely on the DBO to the detriment of the taxpayer under its domestic law, which is not possible under Danish law, see paragraph 79 of the order for reference [...].

The view of the Ministry of Taxation also leads, among other things, to the self-contradictory result that an interest recipient will have less protection under the directive in the case where there is a DBO (whose purpose is to reduce taxes) between the countries involved than in the case where there is no such DBO. For example, Denmark has not had DBOs with France and Spain since 2009. If the view were correct, Nycomed Sweden Holding 2 AB (and thus Nycomed A/S (Takeda) as withholding agent) for the period after 2009 would thus have been better off if Nycomed Sweden Holding 2 AB had been domiciled in France or Spain instead.

In addition, there is no basis for assuming that the Ministry of Taxation and the Danish legislator when introducing SEL § Section 2(1)(c) in 2001 had no intention whatsoever of extending the OECD Model Tax Convention's "beneficial owner" provision to apply to the Parent-Subsidiary Directive (and thus also to the subsequent Interest/Royalty Directive) as an independent anti-abuse rule. On the contrary, it is clear that the legislator assumed that an intermediate holding company, which was the "beneficial owner" of dividends (and thus of interest), could be inserted above the Danish company [...].

Also, the Ministry of Taxation's argument that the condition of "beneficial owner" is an anti-abuse provision within the meaning of Article 5, with the effect that Nycomed Sweden Hol- ding 2 AB can be denied exemption under the Directive, is thus *in direct conflict with the preparatory works to SEL § 2(1)(c) (and thus to the provision in SEL § 2(1)(d)).*

*Question 3 of the Eastern High Court* to the European Court of Justice [...] concerns this plea from the Ministry.

In paragraphs 48 to 55 of its observations, *the Commission* rejects the plea raised by the Ministry in its entirety and concludes in paragraph 55 [...]:

"In the Commission's view, a provision in a double taxation convention under which the taxation of interest depends on whether or not the recipient of the interest is regarded as the beneficial owner of the interest cannot therefore constitute a 'treaty anti-abuse provision' within the meaning of Article 5(1) of the Directive."

As can be seen from the *Advocate General's* Opinion, point 120 [...], quoted above in section 8.4.1.1.1, the Advocate General came to the same conclusion.

*The CJEU* has not answered question 3 either, as the Court instead chose to introduce a mandatory "general EU law principle of

prohibition of abuse".

Thus, this plea is not sustainable either.

8.4.1.3 *There are no general principles in Danish law to counter abuse other than the principle of reality (and the principle of "rightful income recipient")*

In the complex of cases - after the CJEU's judgment - the Ministry of Taxation has put forward a new plea that Danish case law should have developed *general principles for countering abuse that go beyond the principle of reality* (and - it must be understood - the principle of "rightful income recipient").

Three Supreme Court rulings (U.1998.245H [...], U.2005.649H [...] and U.2015.2277H [...]) are mentioned as examples,

where transactions that "had been *formally* arranged in such a way that a certain favorable tax rule applied, have been set aside for tax purposes on the grounds that the transactions had no *"business purpose"* or similar. There is also an example of a Supreme Court judgment (U.1999.1714.H, [...]) that has overruled a tax arrangement without using a corresponding reversal.

...

**3294**

First of all, it should be noted that all four judgments were available when the parties' lawyers advised the Eastern High Court. Nevertheless, the Ministry of Taxation did not find reason to inform the High Court that the representation of the legal position in the referral order was incorrect, which the Ministry certainly did not believe it was.

In this regard, reference is made to the preparatory works to Act no. 540 of 29 April 2015 regarding the introduction of an anti-abuse clause concerning both the Parent/Subsidiary Directive and the Interest/Royalty Directive in section 3 of the Tax Assessment Act. In the bill (L 167 2014/15), the Ministry of Taxation has reproduced applicable law prior to the adoption of the new abuse clause, and thus also in 2007 - 2009. It states herein [...]:

"There is no general statutory anti-abuse rule in Danish tax legislation. According to Danish (legal) practice, taxation takes place after an assessment has been made of what has actually happened. This means that empty and artificial tax-related transactions can be set aside, so that taxation is instead based on the opposite *reality*. Danish tax law is thus fundamentally in line with internationally applicable principles of *"sub-stance over form"*." (Our underlining). As can be seen, the Ministry's presentation of applicable law in the bill corresponds to the presentation in the preliminary ruling [...], whereby it is recalled that the principle of "rightful income recipient" stems from the principle of reality. Thus, there is no mention of other *general principles to counter abuse,* as the Ministry of Taxation now claims on the basis of a number of older judgments.

It is therefore unthinkable to assume that the Ministry of Taxation's new plea is a view invented for the occasion. The reality is that the Ministry has regretted its recognition in paragraph 76 of the order for reference [...] that *"the principle of reality does not provide a basis for setting aside the transactions made in this case"* and is now instead trying to qualify the existing case law in a different way.

The new viewpoint has no support - neither in case law nor in literature.

The three first-mentioned judgments are perfect examples of the principle of reality being used to set aside the arrangements in question, while the last-mentioned judgment, U.1999.1714.H on Hadsten Bank, is an example of an interpretation of section 3 of the Danish Capital Gains Tax Act (on business shares).

In all three cases, the taxpayers tried to "set the stage" so that the events appear as "viable tax arrangements", but were seen through by the courts.

[...] the judgments are an expression of an application of the reality principle. It is thus the general rule that the Ministry of Taxation in cases concerning the principle of realism claims that the transactions lack *"business purpose"*. This is also confirmed by Jon Stok-holm's article [...]:

"In the discussion of the reality viewpoint, considerations of whether a disposition was *"commercially justified"* or a *"reality"* are often used interchangeably (our emphasis).

The Ministry of Taxation also fails to explain how it can consider that Nycomed Sweden Holding 2 AB is the *"correct recipient of income"*, see paragraph 78 of the order for reference (E 1097), and that the transactions *cannot* be set aside according to *the principle of reality*, cf. Paragraph 76 of the order for reference, which means that there are *no* "empty and artificial tax-related transactions" and that the substance corresponds to the form, cf. paragraph 75 of the order for reference, while the Ministry claims that the transactions must be set aside because they lack "commercial purpose".

...

The Ministry of Taxation also fundamentally fails to explain how there could be an abuse at all, when the legislator in the preparatory works to SEL § 2(1)(c) has clearly stated that the incorporation of a Cypriot intermediate holding company between a Danish company and its parent company in a non-DBO country and a subsequent dividend distribution via the intermediate holding company to the company in the non-DBO country does not constitute an abuse.

As can be seen, there are no *general principles* in Danish law *to counteract abuses that go beyond the principle of reality* (and "rightful income recipient") and which may lead to Nycomed Sweden Holding 2 AB being denied exemption from taxation under the Interest/Royalty Directive.

8.4.1.4 *Summary of the Ministry of Taxation's three claimed legal bases in Danish law to counter abuse of the Interest/Royalty Directive; the legal bases do not exist*

...

The conclusion is therefore - as also stated in the Eastern High Court's referral order - that abuse can only be countered with *the principle of reality* and the *principle of "right income recipient"*, and the parties agree that these anti-abuse rules cannot be applied in this case.

Thus, there is no abuse of the directive under Danish law.

8.5 *The amendment of the Parent-Subsidiary Directive in 2015 (and its preparatory work) confirmed that countering abuse of the tax directives still requires a national legal basis*

...

On December 6, 2012, the Commission published *"An Action Plan to strengthen the fight against tax fraud and tax evasion"*, COM (2012) 722, [...].

**3295**

...

The action plan contains a number of proposals, recommendations and initiatives. Under *the heading "Recommendation on aggressive tax planning"* it states, among other things, [...]:

"The Commission also recommends the application of a *general anti-abuse rule*. This would help to ensure consistency and effectiveness in an area where Member States' practices vary considerably.

EU tax directives (interest and royalties, mergers and parent/subsidiary directives) already allow *Member States to apply anti-abuse safeguards*. Without going against EU law,

Member States can use these possibilities to avoid harmful tax planning." (Our emphasis).

...

Finally, the conclusion states [...]:

"Tax fraud and tax evasion is a multifaceted problem that requires a coordinated and multidimensional response. Aggressive tax planning is also a problem that requires urgent attention. *These are global challenges that no single Member State can tackle alone.*

This action plan identifies a number of specific measures that can be developed now and in the coming years. It also represents a general contribution to further international debate on taxation and aims to support G20 countries in their ongoing work in this area. The Commission believes that the combination of these actions can provide a *comprehensive and effective response to the various challenges posed by tax fraud and evasion,* thus helping to increase the fairness of Member States' tax systems, to secure much-needed tax revenues and ultimately to encourage the smooth functioning of the internal market." (Our underlining).

In line with the Action Plan, on 23 November 2013, the Commission presented a *proposal to amend the Parent-Subsidiary Directive*, COM (2013) 814 [...], which included a proposal for *a general anti-abuse rule that* was *mandatory* for Member States to implement in their national law. The explanatory memorandum to the proposal states [...]:

"Anti-abuse provision:

The impact assessment concluded that the most effective option would be to update the current anti-abuse provisions of the Parent-Subsidiary Directive in line with the general anti-abuse rules proposed in the Aggressive Tax Planning Recommendation of December 2012 and make it mandatory for Member States to adopt the common anti-abuse provision.

...

Furthermore, there will be a uniform application of the EU Directive without the possibility of "directive shopping" (i.e. avoiding companies investing through intermediaries in Member States with less stringent anti-abuse provisions or no rules)." (Emphasis added).

The proposal further states [...]:

"Anti-abuse provision

The current Parent-Subsidiary Directive allows Member States to apply internal provisions or agreements necessary to prevent fraud and abuse.

...

When all these factors are taken into account, it is clear that action by Member States individually will not be as effective as action by the EU."

At the same time as the proposed amendment to the Directive, the Commission issued a Memo entitled *"Questions and Answers on the Parent Subsidiary Directive" (MS 407). Under the heading*
*"Which companies would be affected by the new proposal?"* it states [...]:

"Example 1: anti-abuse rule

Member State A has withholding taxes on dividend payments to parent companies resident in a non-EU-country X. Member State B has no withholding taxes on dividend payments to parent compa- nies in country X.

If a subsidiary in Member State A is owned directly from country X, there will be withholding taxes on profit distributions.

If the parent company in country X sets up an intermediate subsidiary in MS B, the withholding tax in Member State A can be avoided. *Member State A cannot have withholding taxes on profit distributions to a parent company in another Member State under the PSD.*

The anti-abuse rule could be applicable in Member State A if the set-up is a wholly artificial arrangement where the essential purpose for the insertion of the intermediate company in Member State B is to avoid the withholding taxes in MS A, e.g. a letterbox company with no substance. *As a consequence of the application of the anti- abuse rule, the benefits of the Directive (including the nonapplication of the withholding) would be denied.*" (Our underlining).

...

It is clear from the example that under the Parent-Subsidiary Directive as it stood before the addition of the mandatory anti-abuse rule in 2015 ("Current situation"), it was *not* possible to deny exemption from withholding tax on the distribution from MS A to MS B - even if MS B may be a

"Artificial Intermediate subsidiary".

With the adoption of *Directive 2015/121/EU* by the Council on January 27, 2015, Article 1(2) of the Parent-Subsidiary Directive - which corresponds to Article 5 of

**3296**

The Interest/Royalty Directive - then amended to *require* Member States to implement the general anti-abuse clause.

The preamble of the amending directive states, among other things, [...]:

'(2) It is necessary to ensure that Directive 2011/96/EU is not misused by taxpayers falling within its scope.

(3) Some Member States apply *domestic provisions or conventions* aimed at tackling tax evasion, tax fraud and abuse in a general or more specific way.

(4) However, these provisions may have *different degrees of severity* and are in any case designed to reflect the specificities of each Member State's tax system. Finally, there are *Member States that do not have internal rules or conventions* to prevent abuse.

(5) Therefore, the introduction of a *common minimum* anti-abuse rule in Directive 2011/96/EU would be very useful in order to prevent abuse of this Directive and ensure greater consistency in its application in the different Member States.

...

(9) This Directive should in no way affect the possibility for Member States to apply their *domestic provisions or conventions* aimed at preventing tax evasion, tax fraud or abuse." (Emphasis added). Article 1 of the amending Directive reads as follows [...]:

'In Directive 2011/96/EU, Article 1(2) is replaced by the following paragraphs:

"2. Member States shall not grant the advantages provided for in this Directive to arrangements or series of arrangements which are designed to obtain, or have as one of their main purposes, a *tax advantage contrary to the content or purpose of this Directive and which are not genuine in the light of all the relevant facts and circumstances*.

An event can include multiple steps or parts.

3. For the purposes of paragraph 2, events or series of events shall be considered *not to be genuine to the extent that they are not organized for well-founded commercial reasons reflecting economic reality.*

4. This Directive shall not preclude the application of *domestic provisions or agreements* necessary to prevent tax evasion, tax fraud and abuse." (Emphasis added).

By Act no. 540 of April 29, 2015, the Danish Parliament implemented this amended Parent-Subsidiary Directive, but not only did the Danish Parliament kill several birds with one stone, as the legislator introduced a completely new general anti-abuse rule as *section 3 of the Tax Assessment Act* [...].

The Danish legislator thus took the opportunity to apply the provision not only to the Parent-Subsidiary Directive, but also to the Interest/Royalty Directive and the Merger Tax Directive. Section 3(2) of the Danish Tax Assessment Act also contains a general anti-abuse rule regarding double taxation treaties.

The law came into force with effect for transactions as of May 1, 2015.

As can be seen, the Commission, the Council and the European Parliament have always assumed that *countering abuse of the Parent-Subsidiary Directive and the Interest/Royalty Directive requires a national legal basis* in the Member State invoking the abuse. This is (as far as the Parent-Subsidiary Directive is concerned) directly apparent from the *wording* of the provision applicable until 2015 in Article 1(2) of the Directive - and Article 5 of the Interest/Royalty Directive - which both contain an *authorization for* Member States to introduce anti-abuse rules, as confirmed by the European Court of Justice in *the Kofoed case* (C-321/05). For the period after May 1, 2015, it now appears from Article 1(2)-(4) of the Parent-Subsidiary Directive and Section 3 of the Danish Equalization Act.

For Denmark, this means that until 2015, the tax authorities had two instruments available to counter abuse: the *principle of fairness* and the *"right income recipient" principle*. From May 1, 2015, Denmark can *also* apply the mandatory abuse rule in section 3 of the Danish Tax Assessment Act.

From an EU perspective, this means that from 2015 all Member States have implemented what the EU legislator considers to be the ideal anti-abuse rule for the Interest/Royalty Directive.

Just for the sake of completeness, it should be noted that on July 12, 2016, the Council adopted *Directive (EU) 2016/1164* (the so-called *Tax Avoidance Directive),* which among other things contains a general *anti-abuse rule* (Article 6), similar to the new anti-abuse rule in the Parent-Subsidiary Directive, but which applies in all areas. The rule has been implemented in Denmark by amending section 3 of the Danish Tax Assessment Act. The Tax Avoidance Directive contains, among other things, an obligation for Member States to prevent so-called hybrid mismatches regarding loan relationships, i.e. the situation where there is interest deduction in the debtor country while there is no taxation in the creditor country, due to different qualifications of the loan in question.

The final reports on the 15 OECD anti-BEPS measures were published on October 5, 2015, and a large number of initiatives have subsequently been implemented both at the OECD and EU level. The G20/OECD and EU driven process against international tax abuse over the last decade has not only led to the adoption of a large number of new anti-abuse rules, but has also changed the political view on what constitutes an abuse in the first place.

**3297**

It is therefore important to realize that the question of whether abuse has occurred at a given time must be assessed in relation to the understanding of the anti-abuse rules applicable at that time.

**8.6** *The general EU law principle of prohibition of abuse proposed by the CJEU has not - as claimed by the CJEU - Direct impact for Danish citizens*

**8.6.1** *Background information*

In this case, the *Eastern High Court* asked more than 15 questions to the European Court of Justice.

...

Question 2 concerned whether countering abuse of the Interest/Royalty Directive requires a *national legal basis* pursuant

U.2023.3198H

to Article 5 of the Directive.

Advocate General Kokott suggested in his opinion of March 1, 2018
- in accordance with the CJEU's answer to the corresponding question in the Kofoed judgment - that the question should be answered by stating that a *national legal basis is required* [...]: ...

In its judgment of February 26, 2019, the European Court of Justice - most surprisingly - came to the exact opposite conclusion, namely that *no national legal basis is required*, cf. paragraph 2 of the judgment [...]: ...

As can be seen, the Court bases its finding on the existence of a *"general principle of EU law prohibiting abuse"* that can be *applied directly to citizens.*

In his opinion, point 120 [...], the Advocate General had rejected that the general EU law principle of prohibition of abuse could be invoked directly against citizens, but the European Court of Justice *did not agree.*

The Advocate General had made exactly the same point about rejecting the general EU law principle of prohibition of abuse in his opinion in Kofoed, points 66 and 67 [...], but at that time the CJEU *followed the* Advocate General.

It is thus a fact that the European Court of Justice in its decision of February 26, 2019 in this case has *overturned the Kofoed judgment* and thus *changed practice retroactively* - at least to 2005.

Takeda submits that the said principle is not directly applicable to citizens, as the CJEU has no jurisdiction to make this decision as Denmark has not ceded sovereignty.

8.6.2 *More about the CJEU's judgment of February 26, 2019*

The CJEU's conclusion is the result of a longer line of argumentation in the grounds.

...

This "general principle of EU law" is thus floating in the air, has a higher legal source value than even the treaties and does not require anchoring in national law. A concrete application of the principle does not depend on an interpretation of the relevant legal act, but solely on the existence and higher rank of the principle, which, so to speak, precedes the content of the legal act. The principle is created by the CJEU and can only be interpreted by the CJEU, see the conclusion of the judgment above.

...

However, according to the CJEU, the principle also applies to the (few) directives that exist in the area of direct taxes (which are not harmonized), and this applies even though these directives expressly presuppose that abuse can only be countered if there is a legal basis for this in national law. Thus, it is stated in paragraph 104:

"104. Although Article 5(1) of Directive 2003/49 provides that the directive does not preclude the application of national or collective provisions to combat fraud or abuse, that provision cannot be interpreted as precluding the application of *the general EU law principle prohibiting abuse* referred to in paragraphs 96 to 98 of the present judgment. The transactions alleged by SKAT to be abusive fall within the scope of EU law ... and may prove to be incompatible with the objective pursued by that directive." (Our emphasis) (Our emphasis). Or to put it another way. The general principle of EU law trumps the content of the specific legal act.

Against that background, the Court concludes in paragraph 111 [...]:

"111. In relation to the *general EU law principle of prohibition of abuse* and the need to respect that principle in the context of the implementation of EU law, the obligation on national authorities to refuse to grant the rights provided for in Directive 2003/49

which are relied on in order to

enable fraud or abuse, *that there are no national or contractual anti-abuse provisions.*" (Emphasis added).

The following paragraphs, 112-120, contain the Court's attempt to explain away that *the Kofoed case (C-321/05)*, where the Court came to the opposite conclusion, namely that a national legal basis is required, should have significance for the outcome of this case.

...

The Court attempts to circumvent this earlier reasoning by making a semantic rewriting of the problem. Thus, in paragraph 119, it states that the refusal of a benefit under a directive does not (any longer) entail the imposition of an obligation on the citizen concerned under that directive *"but is merely the consequence of the finding that the objective conditions for obtaining the benefit sought, which are*

**3298**

*provided for in that Directive in respect of that right are only formally fulfilled ...'.*

Hocus pocus. In this way, an *obligation* for the citizen has become a *failure to* fulfill a condition. But the problem remains exactly the same for the citizen. The citizen does not know the conditions (i.e. the content of the anti-abuse rules). They are still not stated in national law, but (now) float in a general principle of EU law that cannot even be read in the directive. The *legal certainty concerns* are therefore the same - or actually even greater with a general principle of EU law.

...

Thus, no other credible reason can be given for why the CJEU has changed its practice than that the Court of Justice - under the impression of the moral armoring by the OECD and the EU since 2012 - has *regretted the Kofoed judgment. On the* other hand, the CJEU has simultaneously *disregarded any consideration for legal certainty* for EU citizens.

...

8.6.3 *Reactions to the verdict - surprise and criticism*

The CJEU judgment of February 26, 2019 has obviously come as a *huge surprise* to everyone. Nobody knew that there was a *general principle of EU law prohibiting abuse that was directly applicable to citizens in the area of direct taxes* (and there wasn't until the ruling).

*The Commission* was thus unaware of this principle. ...

The EU legislator - the *Council and Parliament* - who adopted these directives were similarly unaware of the general unwritten principle.

*Advocate General Kokott,* who was also the Advocate General in the Kofoed case, was also unaware of the existence of this principle with the above content. She therefore suggested that the Court follow the Kofoed case and advised the Court not to extend the principle to the field of direct taxation [...].

*The National Tax Tribunal was* not aware of the new principle either and therefore relied on the *Kofoed judgment* in its decision in the NetApp case [...] (and in dividend tax in general).

Both Danish and international literature has been surprised and critical of the verdict.

...

It is difficult to understand what motivated the Court to make the change in practice.

At the time of the judgment in 2019, *the EU legislator* had long since introduced the general anti-abuse rules desired by the EU, both in the Parent/Subsidiary Directive (2015) and in the Tax Avoidance Directive (which also applies to interest) (2016).

Thus, the Court did not add anything to the legal position that did not already apply under these rules - apart from the

*retroactive effect*. It is therefore probably also a realistic assumption that the Court

made the change in practice because it appeared from paragraphs 76 and 78 of the order for reference that the parties agreed that the national abuse rules available in 2007 - 2009 - the substantive principle and the principle of "rightful income recipient" - meant that there was *no* abuse under Danish law. Only by giving the judgment retroactive effect could the Court come to the rescue of the Ministry of Taxation.

There is hardly any national legal system in the civilized world that would accept that a change in practice can have up to 12 years retroactive effect.

The European Court of Justice usually prides itself on the *principle of legal certainty*. It has simply not been applied in these cases. On the contrary.

This is *law-making (political) activity on* the part of the EU Court of Justice. The Court of Justice has itself invented the 'general EU law principle of prohibition of abuse', determines its scope, is the only court that can interpret the principle and - as it now turns out - can give it retroactive effect as it sees fit. The democratic process is short-circuited. Both the EU legislator and the Danish legislator are disconnected from the process, and the Danish courts are obliged to execute the CJEU's judgment, the content of which is miles away from *the principle of legality* and *Section 43 of the Danish Constitution*. If it is up to the European Court of Justice.

In addition, the Court of Justice of the European Union has not at all been interested in the Danish legislation on limited tax liability for dividends and interest (SEL § 2(1)(c) and (d)) and the preparatory works to especially (c). It is - in the opinion of the CJEU - completely irrelevant how the legal position was in Denmark in 2007 - 2009. The Danish courts must simply adjust to how the CJEU today (after its change of practice in 2019) believes that the legal position should have been in Denmark in 2007, 2008 and 2009.

Apart from the Danish tax authorities' initiation of the "beneficial owner" cases in 2008 based on a change in practice that took place with the first decision in this case complex at the end of 2008 (and at the earliest with publication in 2010), and which is contrary to the preparatory works to section 2(1)(c) - and thus (d) - the CJEU's decision in these cases is the *greatest assault* on the affected companies that has taken place in this entire case complex.

Neither the Danish state nor the companies have had any opportunity to adapt to what the European Court of Justice today claims to be applicable EU law back in 2007, 2008 and 2009.

8.6.4 *Danish courts are not obliged to follow the orders of the European Court of Justice*

The question is then whether the Danish courts are obliged to follow the CJEU's order to

**3299**

apply the unwritten "general EU law principle of prohibition of abuse" in question.

The answer to this question *does not* fall within the jurisdiction of the CJEU, as otherwise assumed by the Court in paragraphs 110 and 111.

Instead, it is a question of Danish constitutional law as to whether Denmark has ceded sovereignty to the CJEU to establish such a "general principle of EU law" that overrides and takes precedence over all adopted EU law norms and which must have direct effect on citizens, and this question can *only be* decided by the *Danish courts*.

The question is whether it is okay for the European Court of Justice - contrary to the wording of the directive - to try to throw a 'lifeline' to those Member States that may not have adopted (in

the Court's view) 'sufficient' national anti-abuse rules. Of course, it is not.

The reality is that the Court of Justice thereby assumes a competence that belongs to the Danish Parliament and completely upsets the balance between the CJEU and the national courts, and this is done solely at the expense of the citizens, who are left lawless because they have no way of predicting their legal position. At the same time, by introducing such a 'general principle of EU law', the CJEU short-circuits the democratic legislative process in the EU.

It follows from *the Supreme Court's judgment in U.2017.824H (Ajos judgment)* [...] that an unwritten general principle of EU law - in that case the general EU law principle of equal treatment - is not directly applicable to a citizen unless there is express legal basis for this in the Danish Act of Accession, which there was not. Takeda argues that the unwritten general EU law principle of prohibition of abuse referred to in this case does not have direct effect against a citizen either, as there is no express legal basis for this in the Danish Act of Accession.

8.6.4.1 *General about directives*

Article 288 TFEU states that a *directive is addressed* to the Member States [...]: ...

It follows that a directive can only apply to a Danish citizen in the form in which it is implemented in Danish law. In other words, the citizen must be able to read their legal position in Danish law. It also follows that a directive *cannot* create *obligations* for citizens. In a report of July 1972 on certain issues of constitutional law, the Ministry of Justice expressed it thus [...]:

"Directives and decisions addressed to the Member States can therefore at most give citizens direct *rights*. They can never create direct *obligations* for citizens." (Emphasis added).

In several judgments, the European Court of Justice has stated that *"the principle of legal certainty precludes directives per se from creating obligations for citizens and that they cannot therefore as such be relied on by the Member State against the citizen"*, cf. e.g. *the Ko- foed judgment,* paragraph 42 [...].

The same must all the more apply to an unwritten *"general principle of EU law"* that hovers over the directives. When the European Court of Justice has semantically rewritten this problem to mean that the denial of a benefit in this situation is merely *"a consequence of the finding that the objective conditions for obtaining the intended benefit ... are only formally fulfilled"*, this is a specious argument. The decisive factor for the legal certainty assessment is whether the citizen has had the opportunity to know his legal position, and here the citizen is even worse off in relation to an unwritten

"general principle of EU law".

Article 289(1) TFEU provides that a directive shall be *adopted* jointly by the European Parliament and the Council on a proposal from the Commission [...].

On the other hand, it falls within the competence of the CJEU to *interpret*

a directive within the meaning of Article 267 TFEU [...].

8.6.4.2 *This is not an interpretation of the Interest/Royalty Directive*

The Ministry of Taxation argues that the Court has merely exercised its competence to *interpret* the Interest/Royalty Directive pursuant to Article 267 TFEU.

Takeda does not agree with this. On the contrary, the Court has developed an independent, unwritten *"general principle of EU law which applies irrespective of whether the rights and advantages which have been abused are based on the Treaties, a regulation or a directive ..."*, see paragraph 101 [...].

A concrete application of the principle thus *does not* depend on

*a pre-interpretation* of the relevant legal act, but solely on the *existence* and *higher rank of the principle*, which, so to speak, precedes the content of the legal act.

The specific content of the Interest/Royalty Directive has therefore had no bearing whatsoever on the application of the principle. This is also confirmed by the operative part of the judgment (paragraph 2), which states that it is "*the general principle of EU law*" - and not the Directive - that is "*interpreted*" [...].

The reason why the Court of Justice has introduced the general principle of EU law is certainly because the Court has recognized that an interpretation of the directive could not lead to the desired result. Or to put it another way: the interpretation of the directive in the Kofoed case was correct. Therefore, in order to achieve the desired result, the Court has had to resort to a "general principle of EU law", which ranks higher than the Directive.

In this way, the Court of Justice has moved into the jurisdiction of the EU legislator . This is particularly evident in this case, where in 2015 the EU legislator inserted a

**3300**

general anti-abuse rule in the Parent-Subsidiary Directive and in 2016 inserted a similar general anti-abuse rule (for all other areas of EU law) in the Tax Avoidance Directive. Thus, with its judgment, the Court has only added the *retroactive effect* of these rules to 2005, which the Court has obviously not found to be contrary to the principle of legal certainty.

8.6.4.3 *Denmark has not ceded sovereignty to the CJEU to establish an abuse principle with direct effect on citizens - Supreme Court ruling in the Ajos case*

The Supreme Court's premises in *the Ajos case* on the issue of *direct effect on citizens* state, among other things [...]: ...

As it appears, a general principle of EU law can only have direct effect on Danish citizens if Denmark has ceded sovereignty under section 20 of the Danish Constitution for this to happen in the Accession Act. It is argued that "the general EU law principle of prohibition of abuse" is not foreseen in the Act of Accession, and that this principle therefore does not have direct effect on citizens. For the same reason, the Eastern High Court can disregard this.

It should also be noted in this context that Denmark has not ceded sovereignty to the EU since joining the Amsterdam Treaty in 1998.

Furthermore, it is submitted that *the burden of proof that* Denmark has ceded sovereignty to the EU to adopt this principle with direct effect on citizens lies with the Danish State.

8.6.4.4 *There is a "contra legem" situation* The Ministry of Taxation submits in this set of cases that related cases differ from the Ajos case because there is no "contra legem" situation in the present case. ...

Takeda *does not* agree with this. There is also a "contra legem" situation in this case, and moreover, it is not only a question of how section 2(1)(d) of SEL is to be interpreted. Instead, the issue is whether a direct application of the said principle will impose *obligations* on citizens that they do not already have under Danish law - i.e. whether citizens will be *placed at a disadvantage* compared to Danish law if the principle is applied. This depends not only on an interpretation of SEL § 2(1)(d) (taking into account its preparatory works), but also on the scope of the Danish anti-abuse rules back in 2007.

It is necessary to look at *the directive* and the *EU law principle* separately.

There is no dispute that Denmark's implementation of the *Directive* was (and continues to be) correct, as confirmed by *the Kofoed judgment* in 2007. Thus, the parties agree *that* Danish law contains the anti-abuse rules referred to in Article 5 of the

Directive (namely the *principle of reality and the principle of "rightful income recipient"*)*, and *that* these rules specifically lead to *no* abuse under Danish law,

See paragraphs 74-78 of the order for reference. It is also a fact that the preparatory works to section 2(1)(c) of SEL in 2001 - and thus also regarding point (d) in 2004 - expressly state that the legislator considered these anti-abuse rules to be sufficient and that the establishment of flow-through companies did not constitute an abuse.

The situation is different with regard to the *principle of EU law* that the Court of Justice has induced. If a direct application of this principle of abuse against citizens retroactively to 2007 were to lead to the result that - still back in 2007
- If there was abuse, it would be a "contra legem" situation, because the Danish rules and Danish practice at that time clearly led to the absence of abuse and could not be interpreted differently on the basis of the EU law principle of abuse developed 12 years later. In that case, an obligation would be introduced for citizens that did not follow from Danish law - a change in the legal situation.

There is thus a "contra-legem" situation in relation to the EU law principle of abuse if its application would lead to the existence of an abuse. The Danish courts must therefore simply refrain from applying this principle.

It constitutes an independent constitutional problem that this principle did not apply at all in 2007. Also for this reason, the Danish courts must refrain from applying the principle.

8.6.4.5 *Conclusion*

As mentioned above, Denmark has not ceded sovereignty to the CJEU to establish a general principle of abuse with direct effect on citizens.

For this reason alone, the Danish courts must refrain from applying this principle.

The same result follows from *the principle of legal certainty*. According to this principle, a Danish citizen must be able to expect that the rules that apply to the citizen under a given directive are stated in Danish law, and not in an unwritten general principle of EU law, which is not part of Danish law and which the citizen has not had the opportunity to adapt to.

This is all the more so when the general principle of EU law *contradicts the wording of the directive* and when neither the general counsel, the Commission nor the EU legislator knew of the existence of this principle.

An application of the abuse principle would also be contrary to *the principle of legality* in Danish law and Section 43 of the Danish Constitution.

...

Against this background, it is claimed that the Danish courts must disregard the European Court of Justice's order

**3301**

to refuse exemption under the Directive, even if there are no national or collective agreement provisions providing for such a refusal.

8.6.5 *Østre Landsret's judgment of May 3, 2021*

The present question of whether the Danish courts are obliged to follow the CJEU's order to apply the unwritten "general EU law principle of prohibition of abuse" - as just explained in detail - was inherently subject to the same intensive treatment in the first two beneficial owner cases in this case complex, the TDC and NetApp cases, regarding dividends (the Parent-Subsidiary Directive), and where the Eastern High Court ruled on May 3, 2021.

...

The Eastern High Court's reasoning is not entirely easy to understand, but something could indicate that the High Court has found that the necessary implementation of the directive's

optional anti-abuse rule has already been created in SEL section 2(1)(d) - through the reference to the wording

refers to the directive - and that it is therefore unnecessary to consider the question of whether Denmark is constitutionally obliged to apply the unwritten EU law principle without an internal legal basis.

With the NetApp judgment, the Eastern High Court has thus not directly addressed the constitutional issue of sovereignty, which would, however, have been desirable - also with regard to the Supreme Court's position on the issue when the case complex is to be assessed by the Supreme Court.

It goes without saying that Takeda does not agree with the High Court's decision on this point. Reference is made to the reasoning set out above in section 8.4.1.1.1 regarding the question of whether SEL

§ Section 2(1)(d) already by its wording contains an implementation of the Directive's anti-abuse rule.

8.7 *There is also no abuse according to the concept of abuse outlined by the European Court of Justice*

In the event that the Eastern High Court were to find that the general EU law principle of prohibition of abuse has direct effect on citizens and therefore applies in this case, it is submitted that there is no abuse under this principle in the circumstances of this case.

As the other conditions of the Interest/Royalty Directive are met, Nycomed Sweden Holding 2 AB is therefore entitled to exemption under the Directive and - also for this reason - there is no limited tax liability to Denmark of the interest in question.

It should be noted that it is the defendant, the Ministry of Taxation, which has the burden of proof that in this case there is an abuse of the directive in accordance with the general EU law anti-abuse principle established by the European Court of Justice.

Takeda argues that the Ministry of Taxation has not - and cannot - meet this burden of proof.

The general EU law anti-abuse principle established by the CJEU is further defined in paragraphs 124 and 125 of the judgment [...]: ...

The general concept of abuse means that EU law cannot be invoked in cases where there is a *purely artificial arrangement that is not based on an economic reality and whose purpose is to obtain unintended tax advantages*.

This general concept of abuse corresponds to the *Danish principle of reality*, according to which *empty and artificial, tax-related provisions* can be set aside and replaced with *reality*, cf. paragraph 77 of the referral order [...].

It is therefore not credible when the Ministry of Taxation, which recognizes that there is *no* abuse under the Danish substantive principle, cf. paragraph 78 of the order for reference [...], invokes that there is an abuse under the general abuse provisions of EU law.

As stated above in section 8.4.1.3, the Danish Ministry of Taxation has - after the CJEU's judgment - made a new plea that Danish law contains general principles to counteract *abuse outside the substance principle*. Takeda has in the same section added this new plea.

As the CJEU also states in paragraph 126 [...], it is not for the Court of Justice to assess the facts of the main cases - it is for the national court, here Østre Landsret

- However, the Court has chosen to provide some guidance in the form of a number of factors that may point to the existence of an abuse under the principle, see paragraphs 127 -138 [...].

...

Takeda thus submits that, taking into account the very specific circumstances of the present case, there can be no abuse. The condition that the main purpose of the transactions

is to obtain an undue advantage is thus not fulfilled in this case.

Firstly - and as stated above, including in section 7.6 - the overall purpose of Nycomed A/S (Takeda) taking out the intra-group loan in question was to replace - refinance - an already existing intra-group loan (which had a higher interest rate over the case period). Thus, there is no artificial or artificial "non-commercially justified" in the loan in question, and thus the interest write-ups in question.

Secondly, and just as importantly, the entire history of the Danish implementation and interpretation of the tax directives, including in the first instance the Parent-Subsidiary Directive - as described above in sections 1 and 2, and

**3302**

the unconditional position on tax exemption on dividends distributed to a Cypriot intermediate holding company (which acts as a pure flow-through company). When the Danish legislator and the tax authorities interpret a directive in such a way that - if the other conditions are met - there is an unconditional right to exemption from withholding tax if the recipient of the dividend or interest is the "rightful income recipient" of the dividend or interest, then there can of course be no abuse of the directive when the tax authorities subsequently change their opinion.

"Intermediary companies" - *treaty shopping* - were thus directly instructed by the Minister of Taxation shortly before the transactions that have triggered the enormous withholding tax claims found in this complex of cases. Under these circumstances, it obviously does not make sense to say that the main purpose of the transactions was to obtain an undue advantage.

The coincidence of these two very special circumstances makes it obvious that there is no abuse in this case.

However, perhaps the most important reason why there is no abuse of the Directive in this case is the fact that there is no "flow-through" of funds to a company located in a non-DBO state (or not protected by a DBO).

Reference is made to the explanation above in section 7.6, which states that the entire purpose of the loan structure was that there should only be loans up to Nycomed S.C.A., SICAR in Luxembourg. The purpose was thus in no way to engage in "treaty shopping". A payment of interest directly to Nycomed S.C.A., SICAR from Nycomed A/S (Takeda) would thus also have been exempt from taxation, see sections 7.6 and 7.7 above.

Nycomed S.C.A., SICAR must thus alternatively be regarded as the "beneficial owner" of the interest, if Nycomed Sweden Holding 2 AB is not considered as such.

And thus there is no basis whatsoever for a finding of abuse, cf. both the ISS judgment [...] and the Eastern High Court's judgment of 3 May 2021 in the NetApp case [...] (which is further commented on above in section 7.6).

In SR.2019.174 [...], Niels Winther-Sørensen [...] in his commentary on the European Court of Justice's judgment in the present case has also noted the following [...]:

"Read in conjunction with the following sentence in paragraph 110 of the Rentedom- mens judgment ... one must, however, probably understand the Court's reasoning to mean that it will normally not be possible to establish abuse of rights and thereby deny the benefit under the Parent-Subsidiary Directive or the Interest/Royalty Directive if a direct payment from the Danish company to the company in question (which is assumed to be the beneficial owner of the payment) would have been tax-free." As will be seen below in sections 10 and 11, the circumstances just

described are also included as weighty arguments in support of

Takeda's arguments that there is an (illegal) retroactive change of practice and that Nycomed A/S (Takeda) cannot have acted negligently by not withholding tax. *9 THE CONDITION FOR LAPSE OF LIMITED TAX LIABILITY IN SECTION 2(1)(D) LAST SENTENCE OF THE DANISH CORPORATION TAX ACT IS MET*

...

The provision reads as follows: ...

It follows that Nycomed Sweden Holding 2 AB is not subject to limited tax liability to Denmark on interest if it is proved that the foreign corporate taxation of the interest amounts to at least ¾ of the Danish corporate tax rate and that Nycomed Sweden Hol- ding 2 AB does not pay the interest to another foreign company which is subject to a corporate tax rate on the interest that is less than ¾ of the Danish corporate tax rate.

The foreign corporate taxation refers to the corporate tax rate in the relevant country, i.e. Sweden, cf. SKM 2010.20 SR [...]. The first condition - regarding taxation of the interest in Sweden - is fulfilled, as the interest is taxed at a corporate tax rate of 28% for the income years 2007 and 2008 and at 26.3% for the income year 2009 (the Danish corporate tax rate in the income years in question was 25%).

The second condition - that Nycomed Sweden Holding 2 AB has not passed on the interest to another foreign company that is subject to a corporate tax on the interest that is less than ¾ of the Danish corporate tax - is also met, as the company has not passed on the interest at all.

The company was thus fully equity-financed and had not taken out any loans - e.g. a back-to-back loan - on which the interest could be said to have been paid on.

The fact that Nycomed Sweden Holding 2 AB has made a group contribution to Nycomed Sweden Holding 1 AB cannot be said to mean that interest has been paid on. Furthermore, it should be noted that the group contributions were never actually paid as the debt arising in connection with their payment was forgiven by Nycomed Sweden Holding 1 AB in connection with the Exit in 2011, [...]. However, even if the group contributions were deemed to have been "paid on" to Nycomed Sweden Holding 1 AB, it can in all circumstances be stated that also the group contributions are subject to a corporate taxation in Sweden that is not less than ¾ of the Danish corporate taxation.

In this regard, it is argued that the provision by its clear wording - It's crucial what the "receiving end" is

**3303**

company" (here Nycomed Sweden Holding 2 AB) has done - *does not* contain the necessary legal basis to take into account transactions higher up in the group.

Thus, according to the wording of the provision, transactions - "onward payments" - cannot be taken into account other than between the immediate recipient and its contracting party, cf. the word "it" which refers to "the receiving company". Furthermore, there is no support for this in the preparatory works of the provision (which the Ministry of Taxation has not claimed either). Finally, the provision does not stipulate any requirement of "beneficial owner" or the like, which makes it possible to disregard the actual cash flow.

It follows from general principles of interpretation that a protective rule (as SEL § 2(1)(d) is in the opinion of the Ministry of Taxation) cannot be interpreted beyond its clear wording, unless this may have clear support in the preparatory works of the provision, which must be demonstrated by the Ministry of Taxation in this case. Here, however, there is no support whatsoever in the legislative history.

It further follows from general principles of interpretation of tax legislation that tax provisions should not be interpreted broadly

or by analogy, as the levying of taxes requires a clear legal basis, cf. section 43 of the Constitution.

And if the legislator had wanted the lapse of tax liability not to apply beyond the second stage of a loan structure, it would also have been very easy to formulate the provision with such - non-exhaustive - content. In any case, the clear wording of the provision could have been omitted. Even if the courts were to find that Nycomed Sweden Holding 2 AB is not protected by the Nordic Double Taxation Convention or the Interest/Royalty Directive, it follows directly from the last sentence of section 2(1)(d) of the SEL that there can be *no* limited tax liability and thus *no* obligation to withhold tax at source in relation to the interest imputation in this case. *10 SKATS DECISIONS ARE EXPRESSIONS OF A STRENGTHENING (ILLEGAL) CHANGE IN PRACTICE WITH RETROACTIVE EFFECT*

In the event that the Danish Ministry of Taxation is successful in its claim that there is limited tax liability under section 2(1)(d) of SEL on the interest in question, Takeda argues *in* support of its main claim that SKAT's decision (and the views that have subsequently been asserted by the tax authorities) is a *retroactive tightening of practice,* and that such tightening of practice cannot lawfully be implemented. Thus, a tightening of practice can only be made with prospective effect and with an appropriate notice as regards the new views that SKAT will consider decisive for this new practice, cf. for example U.1983.8 H [...].

The legal guidance 2010-2 is in line with this [...]:

"*Notification of change with future effect*

It is a fundamental principle of administrative law that it is only possible to implement an aggravating change in practice with effect for the future and after giving adequate notice to allow citizens to adapt to the changed legal situation.

...

A practice clarification must be published in a relevant manner, e.g. in the form of a SKM notification (control signal) or by special news marking in the legal guidelines."

A notice of stricter practice must - both in form and content - explicitly state that the practice is being tightened and what the new practice is about.

As SKAT has not notified the tightening of practice, SKAT has not been entitled to collect interest tax.

Takeda submits that there is a change in practice in relation to both *the Double Taxation Convention* and the *Interest/Royalty Directive*. These issues are addressed separately below.

If Takeda succeeds on even one of these issues, Takeda must succeed on its main claim in full.

10.1 *Practice clarification in relation to the DBO*

[...][It is] unambiguously stated in *the preparatory works to SEL section 2(1)(c)* from 2001 - regarding limited tax liability on dividends - that a *(Cypriot) intermediate holding company* can be *inserted* above a Danish subsidiary, through which the dividend *is channeled*, with the effect that the withholding tax that would otherwise be triggered is avoided. The intermediate holding company is therefore the *"beneficial owner".* It is clear that these are *pure flow-through companies and the* response of the Minister of Taxation does not contain reservations of any kind. In connection with the introduction of the limited tax liability on interest in 2004 in point (d) of the same provision, there was no departure from this, so it must still be assumed that the same interpretation regarding the "beneficial owner" concept applied in this case.

Copyright © 2023 Karnov Group Denmark A/S

(which was also supported by other statements from the ministry at the time).

Tax law preparatory works, including ministerial responses, play a significant role in the interpretation of the laws. There are numerous examples from the Supreme Court that the Ministry of Taxation invokes ministerial responses when they speak in the Ministry's favor. And when, in the ministerial responses in question in 2001, the Minister of Taxation provides clear and unreserved guidance on how the holding structures invited to Denmark from 1999 can "restructure their way" out of the tax liability introduced in 2001 (for dividends),

**3304**

then it is argued that it must necessarily follow that companies that act accordingly are not abusing any law - there is no abuse from the standard of the time (back in the case period).

At that time, there was free access to *"treaty shop ping"*.

As long as the intermediate holding company was the *civil law* owner of the shares in the subsidiary or creditor for the loan in question - and thus was *not an agent* or *straw man*, or there was a *pro forma* - the intermediate holding company was the "beneficial owner". This was not a Danish special position. This was the global view.

In 2006, Takeda - like the other companies against which SKAT has brought cases - acted in reliance on these preparatory works by establishing Nycomed Sweden Holding 2 AB and the loan structure in question. The preparatory works were based on an *internal law interpretation* of the concept of

"rightful owner", i.e. an interpretation where *"rightful owner" is interpreted in accordance with the principle of "rightful income recipient" in Danish law.* It has been concluded above in section 2.4 that the legislator and the tax authorities have continuously maintained the internal law interpretation in the period 1977-2008, as evidenced by a large number of statements especially from the Ministry of Taxation.

As stated in section 2.5, the Ministry of Taxation - after The "beneficial owner" cases had started with the first decision in November 2008 - recognized that a dividend- or interest-receiving intermediate holding company was clearly a "beneficial owner" under Danish tax law and that the previously invoked interpretation of "beneficial owner" could therefore not lead to the desired result (i.e. taxation of dividends or interest).

As a result, the Ministry of Taxation changed its practice and adopted an *autonomous (international law) interpretation* of "rightful owner", where *"rightful owner" and "rightful income recipient" are no longer equated*. On the contrary, they are *two completely different concepts that have nothing to* do with each other.

With the new autonomous interpretation of "beneficial owner", the Ministry of Taxation has - with reference to the comments to the Model Law Agreement of 2003 regarding "flow-through companies" - introduced a *very broad interpretation* of the term "flow-through company", which affects any ordinary holding company, which is in stark contrast to the previous practice.

It is thus a fact that the new practice of the tax authorities is *in direct contradiction with the express legislative history* of the 2001 dividend provision, which explicitly states that a Cypriot intermediate holding company established for the sole purpose of channeling dividends to its parent company is the "beneficial owner" of the dividends and therefore enjoys protection under the Convention (and thus the corresponding 2004 interest provision).

The new practice is thus also *contrary to SKAT's own previous interpretation of "beneficial owner",* which was only abandoned

in 2008 when the first "beneficial owner" cases were raised.

This is a *significant tightening of the practice* regarding the interpretation of "rightful owner", which leads to the exact opposite

result of what is assumed in the legislative history from 2001, even if the legal basis is unchanged.

The Ministry of Taxation disputes that there has been a tightening of practice and argues that there has been no *established administrative practice* because there are no court decisions documenting the previous practice.

However, when - as in the preparatory works to SEL section 2(1)(c) from 2001 (and thus also regarding (d)) - there is an explicit statement from the Minister of Taxation on how the legal position is, and when the tax authorities subsequently administer in accordance with this, it is full documentation of a fixed practice that taxpayers can trust.

When the Minister of Taxation states that intermediate holding companies are to be regarded as "beneficial owners" (and "rightful income recipients"), it is obvious that there are no court decisions documenting this practice. SKAT agrees with taxpayers that *no* dividend (or interest) tax should be withheld, and SKAT has therefore had no reason to raise cases about this. This has been the case for 30 years.

The Ministry of Taxation further argues that a possible (erroneous) lack of tax assessment intervention and correction cannot constitute practice and cannot create any administrative practice binding on SKAT not to impose withholding tax on interest.

Takeda naturally agrees with this general statement. However, the point is that the fact that no cases have previously been raised in this regard is not due to incomplete control by SKAT, but rather to a perception that there was no basis for conducting these cases.

The Minister of Taxation's position in the preparatory works on the specific issue is thus just as good a documentation of the legal position as a court decision would have been, and it goes without saying that SKAT has followed the Minister of Taxation's statement.

The change in practice was also confirmed in Jyllandsposten on September 14, 2010 by the official who at the time was spokesperson for SKAT in the "beneficial owner" cases [...]:

"We don't know if we will be successful. *Our view is fairly new in tax practice*, so we'll have to see what the Supreme Court says when it comes to make a decision." (Our emphasis).

**3305**

The change in practice is also confirmed by the fact that during the period 1977-2008, when SKAT used the *internal law interpretation of "beneficial owner"*, SKAT did not raise a single case of denial of relief under the agreement on the grounds that the recipient was not the "beneficial owner", while SKAT - after switching to the *autonomous interpretation* in 2008 - has raised a very large number of cases all at once. In this complex of cases, decisions have been made in 150 cases with claims for payment of withholding tax of just over DKK 6.8 billion.

Against the above background, it is thus claimed that there is a tightening of *an established administrative practice* which should have been notified and that this changed practice cannot therefore be applied in the present case.

...

10.2 *Practice clarification in relation to the Interest/Royalty Directive*

10.2.1 *Practice clarification regarding the Interest/Royalty Directive's anti-abuse clause*

As stated in section 8.6 above, in its judgment of 26 February 2019 in this case [...], the CJEU - most surprisingly - to the conclusion that countering abuse of the Parent-

Subsidiary Directive *does not require a national legal basis.*
...

It is therefore a fact that the European Court of Justice, with its decision of February 26, 2019, has *overturned the Kofoed judgment* and thus *changed practice retroactively*.

In the dividend cases, where the *National Tax Tribunal ruled* in favor of the companies, *the National Tax Tribunal* has of course applied the Kofoed ruling (while the issue was not decisive for the National Tax Tribunal in the interest cases).

...

There is hardly any national legal system in the civilized world that would accept that a change in practice can have a 14-year retroactive effect.

Takeda argues in the case, as mentioned above, that the aforementioned principle *does not have direct effect on citizens*, as the CJEU has no jurisdiction to make this decision as *Denmark has not ceded* sovereignty. Reference is made to section 8.6.4, where this view is explained in detail.

...

In the *event* that Takeda *is not successful in its claim that the general EU law principle does not have direct effect on citizens*, so that the principle can in principle be applied in *Danish law*, it is submitted that under *Danish administrative law the* principle can only be applied with *future effect*.

The principle cannot therefore be applied in this case, which relates to 2007, 2008 and 2009, because it would represent a significant *tightening of practice with retroactive effect*.

It has thus been documented in section 2 above that the Danish administrative practice during the case period was not based on a *general EU law principle prohibiting abuse that had a direct effect on citizens*. On the contrary, it was the general view both in Denmark and in the EU at the time that treaty and directive shopping could be carried out freely. The fact that the principle did not even apply in the EU is documented by the fact that *the Kofoed judgment* in 2007 came to the conclusion that counteracting abuse required a *national legal basis*.

Just for the sake of good order, it should be noted that the application of a directive in a Member State is always an expression of the application of *national law*. This applies whether it is a question of applying the Member State's own legislation or general principles of law developed by the courts of the Member State, or whether - as in the present case - it is a question of the European Court of Justice having established a principle with direct effect for citizens, if this is otherwise approved by the courts of the Member State. Therefore, it is also the *procedural and administrative law rules of the Member State* that must be applied when applying the law.

Since an application of the general EU law prohibition against abuse under the above-mentioned conditions would constitute a retroactive change in practice, this principle cannot be used as a basis for the decision of the case.

10.2.2 *Clarification of practice regarding the taxation provisions of the Interest/Royalty Directive*

In addition to the significant change in practice made by the European Court of Justice in its judgment in the present case, the judgment of the European Court of Justice contains an - even more surprising - change in practice regarding the Court's interpretation of the Interest/Royalty Directive, namely regarding the question of whether an S.C.A., SICAR company is covered by the protection of the Directive when in its home country - here Luxembourg - it is specifically exempt from taxation of the interest allegedly covered by the Directive.

In paragraph 151 of the judgment [...], the Court of Justice of the European Union held that Nycomed S.C.A., SICAR cannot enjoy protection under the interest

/royalty directive if the company is "effectively exempt" from Luxembourg corporation tax on the interest in question.

The CJEU has thus effectively introduced a "subject-to-tax" condition (requirement of effective taxation in order to obtain protection) in the Directive, which came as a bolt from the blue, especially in light of the fact that the Commission has repeatedly stated that such a condition does not apply and that the Commission has several times previously proposed to introduce such a condition in the Directive (which certain Member States blocked, see the commentary article on the judgment cited below). Reference can also be made to the fact that

**3306**

The Commission's recommendation in the case was in line with this, see points 85 and 86 [...], just as Advocate General Kokott also agreed in his recommendation that Nycomed S.C.A., SICAR was covered by the Directive, regardless of whether the company was exempt from tax on the specific interest, see point 97 [...].

In this respect, the European Court of Justice has also exercised extensive law-making activity and has short-circuited the democratic process in the process.

...

Takeda *does not argue* that this change in the case law of the European Court of Justice cannot be lawfully implemented in the present case, as the case law in question has been established by the European Court of Justice in the specific case and as the body that interprets EU law. Nycomed S.C.A., SICAR thus does not enjoy directive protection (but continues to enjoy collective agreement protection), but it is argued that this change in practice "counts" with considerable weight when determining whether Nycomed A/S (Takeda) has *acted negligently* by not withholding interest tax in connection with the interest imputations in question, see further below in section 11.

10.3 *More about the case law*

As mentioned, since 1983, there has been no doubt about the existence of the principle of administrative law according to which the tax authorities are prevented from changing their practice in an aggravating direction with retroactive effect, cf. U. 1983.8 H [...] and Den juridiske vejledning [...], cited above.

The High Court's judgment in U.2012.2337 H [...] is a *textbook example of* the minimum requirements that must be imposed on the tax authorities in order for an aggravating change in practice to take effect for citizens. ... The High Court found that the change in practice could only be deemed to have been published in such a way that it could be given legal effect against companies that, like the applicant, had used hired labor. ... Before the Supreme Court, the Ministry of Taxation did not dispute that the change in practice could only take effect from 1 November 1997.

Most of the case law following the Supreme Court's judgment in U.1983.8 H [...] is mainly about *the evidence of* what the tax authorities' practice actually amounted to. This specific assessment of evidence is, of course, decided on a case-by-case basis according to the facts. In the present case, the evidence in the form of the Minister of Taxation's own statements to the Danish Parliament is overwhelming.

... In the present case, it is evident that the tax authorities only adjusted the description of the administrative practice in accordance with the view that is now claimed after the tax authorities in 2008 initiated the control action that has led to, inter alia, this case against Takeda.

...

In U.2015.915 H [...], U.2017.2960 H [...] and U.2017.2979 H [...]

the taxpayers tried to prove the practice by referring to a long period of non-intervention by the tax authorities, which the Supreme Court did not accept. It is *not* Takeda's view that the evidence of the tax authorities' practice is constituted by a long period of non-intervention. Another thing is that when the Minister of Taxation explains a practice to the Danish Parliament and how a statutory provision is to be applied, the

Copyright © 2023 Karnov Group Denmark A/S

understood, the tax authorities naturally follow the Minister's statement. It would be strange if there were decisions from the past that showed that the tax authorities actually had a different practice than the one stated in the Minister of Taxation's statements. In Takeda's case, however, it is the Ministry of Taxation that claims that the tax authorities' practice in the period up to 2008 was different from what the Minister of Taxation had told the Danish Parliament in 2001.

...

The legal situation claimed by the Ministry of Taxation, which is contrary to the express preparatory works to SEL § 2, can thus only be achieved through legislation.

Takeda is of course aware that the Eastern High Court in its judgment of May 3, 2021 in the first case in this case complex, the NetApp case [...], found that under similar circumstances there was *no* change in practice in the case (as far as the interpretation of the "rightful owner" concept is concerned).

...

It appears from Takeda's comments above in sections 10.1 and 10.2 that Takeda does not agree with the decision of the Eastern High Court on this point. NetApp has appealed the judgment to the Supreme Court on this point.

...

*11 NYCOMED A/S (TAKEDA) IS NOT LIABLE FOR ANY INTEREST TAX - SECTION 69 OF THE WITHHOLDING TAX ACT*

*11.1 The regulatory framework and introductory remarks*

In the event that the Danish Ministry of Taxation were to agree that the interest in question is subject to limited tax liability to Denmark, it is claimed - most alternatively - that Nycomed A/S (Takeda) is not liable for the withholding tax not withheld.

The question of whether the withholding tax can be collected from Nyco-Med A/S (Takeda) is based on the provision in section 69 of the Withholding Tax Act, which reads [...]:

...

It is also stated in SKAT's Guidelines on withholding A-tax and AM contributions 2007-4, section K.2.2 [...]:

"Notwithstanding the fact that the provisions reverse the burden of proof, case law has shown that it is the customs and tax administration that must prove that the withholding agent has acted negligently." Already because Nycomed A/S (Takeda)'s understanding of the relevant rules is in accordance with the

**3307**

administrative practice that the tax authorities have continuously followed over the years regarding the concept of "beneficial owner", according to which the concept was equated with the rightful income recipient, it is evident that Nycomed A/S (Takeda) has not shown *"negligence"*.

As mentioned in the previous section, in the NetApp judgment of May 3, 2021, the Eastern High Court found that there was no established administrative practice. Takeda disagrees with this, but even if the tax authorities' many statements on the concept of "rightful owner" as being equal to the Danish concept of "rightful income recipient" are not found to constitute an administrative practice on which Nycomed A/S (Takeda) can rely, the statements have in any case given rise to sufficient qualified doubt about the interpretation that Nycomed A/S (Takeda) cannot be accused that the company - ultimately - was wrong, see further below.

...

*11.2 More details about the conditions for withholding obligation under section 69 of the Withholding Tax Act*

Section 69 of the Withholding Tax Act applies not only to liability

for interest withholding tax, but also liability for non-withheld A-tax, work rental tax

etc. Therefore, reference can be made to the case law on failure to withhold taxes other than interest withholding tax when assessing what is meant by liability-inducing negligence.

Copyright © 2023 Karnov Group Denmark A/S

It appears from e.g.  UfR 1977.844 H (non-liability [...]), SKM2002.470.ØLR Ø (non-liability [...]) and UfR 2018.3119 H (liability [...]) that misunderstanding of the correct legal interpretation and subsumption can also exempt from liability. Nor is there anything in the wording of the provision that suggests that it is only ignorance of the relevant facts that is of importance. In UfR 1977.844 H, the Supreme Court found that the potential withholding agent had had "such a sense" to be able to assume that there was no withholding obligation that there was no negligence. In SKM2002.470.ØLR, the High Court used the expression that the relevant circular in the situation in question did not lead to "an unambiguous result" and acquitted the taxpayer of liability. Therefore, if the position of the potential withholding agent has been an expression of a reasonably justified understanding of the legal basis and a reasonably justified subsumption, there will be no negligence - even if it ultimately turns out that the position of the potential withholding agent was not tenable.

In UfR 2018.3119 H, the question of tax liability depended on whether the rightful income recipient of the dividend was a Dutch foundation or the founder of the foundation, who was resident in the UK. In the premises [...], the Supreme Court found that there was liability and referred, among other things, to the fact that it appeared from the Taxation Guidelines *prior to the adoption of the dividend* that foreign foundations were not proper income recipients if the foundation did not meet the Danish conditions for considering a foundation to be an independent legal entity in relation to the founder.

Nycomed A/S (Takeda)'s understanding of the legal basis must therefore

- of course - to be assessed according to the legal sources available at the time of interest accrual. That was what Nycomed A/S (Takeda) and its advisors had to assume.

As far as can be seen, there are no factual disagreements of importance to the assessment of negligence. The disagreement is whether Nycomed A/S (Takeda) acted negligently by not realizing at the time of interest accrual that the interest was taxable (if it turns out to be so), *regardless of the fact* that the interest was received by Nycomed Sweden Holding 2 AB, which was undisputedly the correct income recipient. U.2016.2898H - RF Holding [...] concerned a situation where the Supreme Court found that distributed funds were diverted around the right income recipient, which was clearly negligent. This case is therefore irrelevant to the issue of negligence in the present case.

When assessing negligence, it may be useful to recall that the cases have arisen as a result of a coordinated action by the tax authorities, where initially 31 cases, and later a total of 150 cases of liability for non-withheld withholding tax have been raised as part of the "Danish Tax Agency's Capital Fund and Withholding Tax Project", cf. the Ministry of Taxation's reply to the Parliamentary Tax Committee of

October 28, 2019, even though there had previously been no Danish cases *at all* on the obligation to withhold interest tax with reference to the recipient company being a flow-through company.

As previously mentioned, in 2010, the responsible head of office at the Danish Tax Agency stated - appreciatively honestly - about the upcoming showdown in the courts [...]:

"We don't know if we will be successful. Our viewpoint is fairly new in tax practice, so we'll have to see what the Supreme Court says when it comes to make a decision."

The background is thus undoubtedly that the Danish Tax Agency has sought to break new ground with the implementation of this complex of cases. They had not found it necessary to

notify the potential withholding agents of the action and the new views that the tax authorities wanted to test beforehand.

11.3 *Nycomed A/S (Takeda) has not acted negligently in the interest imputations*

Among other things, in view of,

*that* the Claimant's understanding of the relevant rules is consistent with the administrative pronouncements regarding the understanding of the term "beneficial owner" as being the same as the "proper income recipient as existed at the time of interest accrual - - whether or not this constitutes an administrative practice

**3308**

or not, see the discussion above in sections 1, 2 and 10,

*that* Danish literature is in line with the tax authorities' previous practice,

it follows directly from the wording of the Interest/Royalty Directive (MS 381) that interest is exempt from withholding tax; and

*that* the European Court of Justice in its judgment of February 26, 2019 (against the recommendation of the Advocate General) has made a clear change in the administrative practice as applied by the Commission regarding the question whether the Interest/Royalty Directive requires effective taxation of the interest earned, see above in section 10.2.2,

*that* both the Commission and the Advocate General of the European Court of Justice were of the opinion that Takeda should succeed in the case, partly because Nycomed Sweden Holding 2 AB had to be considered the "beneficial owner" of the interest under the Directive, and partly because the Directive's anti-abuse provision was not considered implemented in Danish law, *that* there is great uncertainty at international level as to how the term "beneficial owner" should be interpreted, cf. See e.g. the OECD's draft comments from spring 2011 (MS 651-655), where it appears from the consultation responses (MS 659-676) that not even the proposal for the new (clarifying) comments contributes to reducing the prevailing uncertainty about the interpretation,

*that* the wording of SEL § 2(1)(c), last sentence, clearly means that there is no limited tax liability (and thus withholding obligation), and

*that* prior to the transactions the Nycomed Group (Takeda) obtained advice from a leading tax advisory firm, KPMG, which advised on the relevant loan structure without reserving any risk of withholding tax in connection with the proposed interest payments,

it is quite clear that Nycomed A/S (Takeda) has *not* shown *"negligence"*.

If the Danish Ministry of Taxation were to succeed on the issue of the withholding obligation, even though Nycomed S.C.A., SICAR is in principle considered to be the "beneficial owner" of the interest in question, i.e. as a result of the fact that the company in question is to be equated with a 1929 holding company and thus not covered by the Danish-Luxembourg DBO, cf. section 7.7 above, it should in particular be emphasized that the Ministry of Taxation confirmed to the Luxembourg tax authorities in 2006 - i.e. immediately before the first interest accrued in this case - that *Luxembourg Investment Funds* were covered by the Danish-Luxembourg DBO. A SICAR was as an investment company - in the same way as a Danish investment company - covered by section 19 of the Danish Capital Gains Tax Act.

- covered by the confirmation or can at least be equated with the investment companies which were thereby recognized as protected by the collective agreement, see section 7.7.8.7. Even if the High Court disregards the Ministry's (then) interpretation of the DBO, Nycomed A/S (Takeda) can under no circumstances be accused of negligence for not foreseeing that the Ministry's

interpretation was wrong, and in any case it demonstrates that Nycomed A/S (')'s interpretation of the DBO is within the scope of a very understandable - and thus excusable - misinterpretation.

Nor could it be read from the final protocol to the DBO with Luxembourg that the reservation for 1929 holding companies should also apply to a company such as Nycomed S.C.A., SICAR, and the Ministry of Taxation.

It was only 7 years after the case was brought (and 10 years after SKAT's decision) that the court found in favor of the argument that the final protocol should be interpreted broadly/purposefully, and after the Ministry of Taxation had abandoned another, erroneous argument about the importance of the company being considered transparent under Danish tax law, see section

7.7 If the Danish Ministry of Taxation had to spend 7 years - and the tax authorities more than 10 years - to come up with the argument of a broad interpretation/interpretation of purpose of the Final Protocol, Nycomed A/S (Takeda) cannot be blamed for not realizing back in 2007, 2008 and 2009 that Nycomed S.C.A., SICAR could not receive interest without paying Danish withholding tax (if this turns out to be the opinion of the High Court).

The case is thus that the legal sources available at the time of the establishment of the loan structure and the interest imputation *clearly* indicate that the interest was *tax-free*.

In the Eastern High Court's judgment of May 3, 2021 in the NetApp case, it is stated (p. 250, 2nd and 3rd paragraphs of the judgment) [...]:

"According to the available information, NetApp Denmark must have been aware of the actual circumstances of the dividend distribution, including that the purpose of incorporating NetApp Cyprus as an intermediary was solely to avoid Danish withholding tax as explained above.

Under these circumstances, the fact that in 2006 there was no final clarification of the legal question of whether there was sufficient legal authority to counter such an abuse of law cannot lead to NetApp Denmark being exempt from liability pursuant to section 69(1) of the Withholding Tax Act."

These premises can be interpreted to mean that the High Court imposes the risk of *legal* uncertainty regarding the application of the term "beneficial owner" on the potentially liable company and - in accordance with the opinion of the Ministry of Taxation - almost an objective responsibility for this. However, it should be noted that this part of the premises concerned the part of the dividend distribution where, in the opinion of the High Court, there was *no* actual flow-through to a beneficial owner in a country that could receive the dividend tax-free. In such a situation, the High Court has thus assessed,

**3309**

that an abusive situation existed and that the liability did not lapse because there was no "final clarification" of whether, on the basis of the "beneficial owner" concept, action could be taken against such abuse. The legal uncertainty thus concerned the very possibility of taking action against what the High Court considered to be an abuse of the DBO with Cyprus. Thus, it may have played a role in the High Court's assessment that NetApp, in the opinion of the High Court, had sought to exploit the DBO with Cyprus in an unfair manner, and that in such a situation it cannot be exonerated from liability when it ultimately turns out that the construction was justifiable.

However, if the main issue in Takeda's case should go against Takeda on the grounds that Nycomed S.C.A., SICAR is not protected by the DBO between Luxembourg and Denmark, the situation is significantly different. Here, the legal doubt will not concern the interpretation of the "beneficial owner" concept and whether there was abuse in the specific situation. If Takeda agrees that Nycomed S.C.A., SICAR was in principle the "beneficial owner" of the interest at issue in the case (as the company did not function as a "flow-through company"), but could not collect the interest without Danish withholding tax

due to the reservation in the Final Protocol, the interpretation doubt concerns the *Final Protocol to the DBO* in a situation where it is clear that Nycomed S.C.A., SICAR's establishment and presence in Luxembourg and its status as the 'beneficial owner' of the rents cannot be set aside on grounds of abuse. Any doubt as to interpretation that may exist

Copyright © 2023 Karnov Group Denmark A/S

The question of the interpretation of the Final Protocol is thus quite different from the question of whether NetApp Cyprus as a company established for the purpose could invoke the DBO, and as mentioned, Nycomed A/S (Takeda) had very good reasons to assume that Nycomed S.C.A., SICAR could invoke the agreement (and the Interest/Royalty Directive) when (if) the company was considered to be the (subsidiary) "rightful owner" of the interest income.

In addition, the present case differs significantly from the NetApp case in that Nycomed A/S (Takeda) - as mentioned above - was entitled to assume that Nycomed S.C.A., SICAR was in any event unconditionally protected by the interest rate agreement.

/Directive, even though the interest was not effectively taxed in Luxembourg, as established EU practice in this respect was not changed until the judgment of the Court of Justice of the European Union, and as the interest was not

"flowed through" this company to the owners.

Regarding case law in this area, it should be noted that it is not surprising that the Supreme Court in the decisions UfR 2004.362 H [...] and UfR 2008.2243 H [...] ruled in favor of the Ministry of Taxation that

"negligently". That seems reasonably clear in both cases. Neither of these judgments is therefore prejudicial to the present case.

The fact that the Supreme Court in the premises of the cases has mentioned that the withholding agent was *"aware"* of the facts that led to the withholding obligation cannot - as assumed by the Ministry of Taxation - be taken as an expression that this should be the decisive premise. On the contrary, the withholding agent's knowledge of the facts is the first condition for establishing "negligence", and the Supreme Court goes on to state that the withholding agent *"had no reason"* to assume that there was no withholding obligation.

It is further disputed that Nycomed A/S (Takeda) should be subject to a heightened diligence assessment because it allegedly circumvented a safeguard rule.

Firstly, it is disputed that SEL § 2(1)(d) on limited tax liability is a protective rule.

Secondly, it does not make sense to talk about a heightened due diligence assessment because the parties were connected in interest when the due diligence assessment concerns the legal subsumption. The legal assessment of whether an intermediate holding company such as Nycomed Sweden Holding 2 AB can invoke the DBO or the Directive is not affected by whether Nycomed Sweden Holding 2 AB was a minority or majority shareholder in Nycomed A/S (Takeda). The same applies to Nycomed S.C.A., SICAR's ability to invoke the DBO with Luxembourg. The Eastern High Court has not followed this view in the NetApp case. Against the above background, it is submitted that there is *no* basis for considering Nycomed A/S (Takeda) to have acted

*"negligently"*.

*12  PLEAS IN LAW IN SUPPORT OF THE ALTERNATIVE CLAIMS*

*12.1  The alternative claims and Takeda's main pleas in law*

[...]

The defendant, the Ministry of Taxation, has against Takeda's alternative claim (B) principally claimed rejection, alternatively acquittal.

Takeda has claimed dismissal of the Ministry of Taxation's motion to dismiss.

*In support of the alternative claim (A),* Takeda submits in general that -if neither Nycomed Sweden Holding 2 AB,

Nycomed Sweden Holding 1 AB nor Nycomed S.C.A., SICAR, is considered the "rightful owner" of the interest at issue

- then the withholding tax requirement must in any case be reduced to DKK 0, as far as

i.   the Swedish listed company, Shareholder no. 41, which is a (direct) shareholder of Nycomed S.C.A., SICAR, as this company must then be considered as the

**3310**

the "beneficial owner" of the interest in question for that company's ownership interest (approximately 1.15%) (and is DBO-protected), and

ii.  the natural person resident in the United States, Shareholder No. 39, who is also a (direct) shareholder in Nycomed S.C.A., SICAR, as this person must be considered the "beneficial owner" of the interest in question for this person's ownership interest (approximately 0.25%) and as this person is a natural person (as there is no legal basis in Danish law to levy withholding tax on interest paid to foreign natural persons).

This plea is addressed in the following section 12.2.

In support of the alternative claim for referral (B), Takeda generally claims that in addition - i.e. in addition to the claim referred to in the alternative claim (A) - there is a legal claim for reduction of the withholding tax claim to DKK 0, to the extent that Takeda during a referral to the Danish Tax Agency documents that the direct or indirect investors in Nycomed S.C.A., SICAR at the time of the interest imputations were 1) the "beneficial owners" of the interest in question under a DBO between the state of domicile and Denmark, or 2) natural persons (as there is no legal basis in Danish law to levy withholding tax on interest concerning such persons).

These pleas are addressed below in section 12.3.

The overall reason for the existence of a legal claim for lapse of the withholding tax in relation to the mentioned (underlying) persons is that - in this alternative scenario - there is no abuse of either the Nordic DBO or the Interest/Royalty Directive in relation to these investors, as an interest payment directly to these investors would be unconditionally exempt from Danish withholding tax, cf. the similar issue above in section 7.7 concerning the question of whether a reduction should be made as a result of Nycomed S.C.A., SICAR must alternatively be considered as the

"rightful owner" of the interest.

As mentioned above, it is only possible to disregard the immediate recipient of an interest (or dividend), i.e. establish abuse, if the funds have flowed to a company resident in a state with which Denmark does not have a DBO (or to a company not covered by a DBO), or that the funds are intended for this purpose and that this company is the "beneficial owner" of the funds.

This follows both from the ISS judgment [...], just as it now also follows from the Eastern High Court's judgment of May 3, 2021 in the NetApp case [...].

...

**12.2** *The withholding tax requirement must be reduced in relation to the two shareholders in Nycomed S.C.A., SICAR; Shareholder no. 41, Sweden, and Shareholder no. 39, USA*

In the event that neither Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB nor Nycomed S.C.A., SICAR is considered the "beneficial owner" of the interest at issue in the case, it is submitted that the direct (or indirect) shareholders or investors in Nycomed S.C.A., SICAR must be the "beneficial owners" of the interest. There are no other possibilities.

In the decision in the case [...], SKAT has also assumed that the investors in Nycomed S.C.A., SICAR, are the "rightful owners". It states [...]: ...

As stated above in section 4.6, more than 95% of the shares in Nycomed S.C.A., SICAR, are held by private equity funds organized in tax-transparent entities, typically foreign *limited partnerships,* i.e. com-

mandate companies. The investors in these private equity funds are thus direct shareholders of Nycomed S.C.A., SI-CAR *for tax purposes. The* number of investors in these entities amounts to several hundred. However, there are also a few non-tax-transparent entities that are direct shareholders in Nycomed S.C.A., SICAR, including the Swedish listed bank, Shareholder no. 41, and the US resident natural person, Shareholder no. 39, see above in section 4.6.

153,121 out of 13,316,572 shares, corresponding to an ownership share of approx. 1.15%, while shareholder no. 39 owned 33,162 shares, corresponding to approx. 0.25%. The two shareholders' total ownership share thus amounted to approx. 1.40%.

On this basis, Takeda has therefore submitted the alternative claim (A) for reduction of the withholding tax requirements for the years 2007, 2008 and 2009 by DKK 1,615,932, DKK 1,935,776 and

1,610,973 kr: ...

The reason why Takeda has chosen to select Shareholder No. 41 and Shareholder No. 39 for separate treatment and covered by a separate subsidiary claim - (A) - is that both these shareholders constitute simple and illustrative examples to refer to in relation to the question of what conditions can rightfully be imposed to obtain a reduction of the withholding tax claim in the scenario where none of the intervening companies (Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB or Nycomed S.C.A., SICAR) can be recognized as being the "beneficial owner" of the interest at issue in the case.

As the investors in the tax-transparent capital funds, as mentioned, constitute several hundred companies etc., Takeda has thus chosen to let the High Court alone assess the issue of reduction of the withholding tax claim in relation to the "rightful owner" in relation to two specific investors.

In addition, if the High Court finds that the investors in question (or just one of the investors) are

**3311**

them) justifies a reduction of the withholding tax requirement - the plaintiff suggests that the High Court may refer the case back to the High Court in relation to other investors who may meet similar conditions (and thus let the tax administration perform the tax assessment task of assessing whether the conditions set out by the High Court for a reduction of the withholding tax requirement are met in relation to the investors who may consider themselves entitled to a reduction), see further below in section 12.3.

In that regard, Takeda submits, as stated above, that, since none of the intermediate companies can be regarded as the 'rightful owner' of the interest in question, there is no alternative but to regard the shareholders/investors in Nycomed S.C.A., SICAR, as the 'rightful owners' thereof. And two of these investors are Shareholder no. 41 and Shareholder no. 39.

Shareholder no. 41 is a Swedish company covered by the Nordic DBO.

And Shareholder no. 39 is a natural person resident in the USA (with which country Denmark also has a DBO). In relation to a natural person, it is argued that it is irrelevant to the question of reduction whether the person is covered by a DBO. Thus, Denmark has no domestic authority to levy interest tax on a foreign natural person (i.e. this applies regardless of where he or she may be resident for tax purposes), which is why under the circumstances there can be no abuse in relation to such a person, who may be considered the (alternative)

"beneficial owner" of an interest. In this specific scenario, however, this question is irrelevant as Shareholder No. 39 is

domiciled in a DBO state. ...

The Ministry of Taxation agrees with Takeda that (at least in principle) there may be a reduction of the withholding tax requirement if it is established that the underlying owners are the "beneficial owners" of the interest. In this connection, the Ministry of Taxation requires, among other things, that the interest is "attributed to these persons for tax purposes", see about this condition later in this section.

Takeda finds it difficult to understand the point of view of the Ministry of Taxation in relation to this reduction issue...

However, the problem is that there is no such written material as the Ministry of Taxation imagines. And the cash flows are clearly stated in this case - and have been for a long time, cf. the description in the referral order [...].

The Ministry cannot hide behind a lack of factual information.

...

And the Ministry of Taxation cannot hide behind the European Court of Justice's statement (under the Interest/Royalty Directive) that it is not the tax authorities' task to identify the "legal owner".

...

The Ministry of Taxation argues that - in order for a reduction of the claim to be considered - it must be proven that the investor in question is not itself a "flow-through company" for the interest in question.

It should be noted that it seems quite obvious that these funds could not have "flowed through" the natural person, Shareholder no. 39 (which the Danish Ministry of Taxation does not claim), but neither could the *listed* bank, Shareholder no. 41, to this company's many thousands of shareholders. It must therefore be assumed without further ado that the funds have fully benefited Shareholder no. 41, cf. also the statement above in section 4.6, which states that the bank made the investment in Nycomed S.C.A., SICAR for its own account (and thus not on behalf of a customer). During the case, the Ministry of Taxation has argued that it is a condition for reduction that the person deemed to be the "beneficial owner" of the interest must also have recognized the interest in question as income in his home country according to local rules - or that the interest must at least according to local rules be deemed to be attributable to the person in question for tax purposes.

Takeda disputes that such a condition can be imposed for the reduction of the withholding tax requirement.

In this connection, it is recalled that the underlying investors in this case have not actually received the interest in question - or any other interest - which is why this interest income cannot be considered to be attributable to the persons in question for tax purposes according to the local rules applicable to these persons.

The fact is that the condition set by the Ministry can *never be* fulfilled in situations where there has been no actual flow-through of the interest in question to the persons who - despite this - are ultimately considered the "beneficial owners" of the interest, and where Denmark as the source country stands alone with the view that the immediate interest recipient (or other subsequent interest recipients, here Nycomed S.C.A., SICAR) is not the "beneficial owner".

Thus, Takeda does not agree that a condition that the interest must be subject to the taxing jurisdiction of the country in which the "beneficial owner" is resident for tax purposes can legitimately be imposed.

Firstly, it is argued that a so-called *look-through* principle applies under the DBOs, so that the person who is the "beneficial owner" of an income can invoke any DBO between the person's home country and the source country (Denmark).

The parties seem to agree on this, just as this now also follows from the Eastern High Court's judgment of May 3, 2021 in the NetApp case [...].

**3312**

In the special cases where it is only the source country, here Denmark, that considers the person concerned to be the "rightful owner" of the income in question - for example because there has been no actual cash flow to the person concerned as in this case - it is further argued that the source country is also obliged to carry *this fiction* all the way through and assume that the person concerned has actually also received the income in question and can thus invoke a possible DBO between the person's country of residence and Denmark. Obviously, Denmark cannot *have it* both *ways* by claiming that the person in question is the "rightful owner" of an income, but that he or she cannot invoke a possible DBO, as the Ministry believes that this requires the person's home country to take the same position. In that case, in the "beneficial owner" scenario, the taxpayer in question would *de facto* be worse off than if he or she had actually received the applicable income, i.e. been a formal lender. In this connection, it is recalled that there is not - or can not be

- some abuse of a DBO in relation to a "beneficial owner" in another DBO country in respect of interest (as there is no domestic authority to tax when a reduction is to be made under a DBO). One of the problems in these cases is that the Ministry of Taxation makes an artificial separation of the *"rightful income recipient"* (the taxable entity) and the *"rightful owner"*. Thus, the Ministry of Taxation claims that the immediate interest recipient (in the case Nycomed Sweden Holding 2 AB) is the "rightful income recipient" and thus the taxable subject, but not the "beneficial owner", which is why this interest recipient is not entitled to treaty and directive protection.

However, both the DBOs and the Interest/Royalty Directive presuppose that the "beneficial owner" is the taxpayer and thus - under Danish law - also the "rightful income recipient".

The Ministry of Taxation's *construction* (on the separation of "rightful income recipient" and "rightful owner") becomes a *contradictio in adjecto* when the Ministry of Taxation - as a condition for the underlying owners to be entitled to a reduction under a DBO - requires that the interest is covered by the taxing jurisdiction of the state in question.

The fact is that the Ministry of Taxation claims that it is the immediate interest recipient (Nycomed Sweden Holding 2 AB) that is the "rightful income recipient" (and thus the subject of tax liability) of the interest, while the Ministry of Taxation (as a condition for reduction) requires that the same interest is taxable in the underlying owner's home state, which is the same as saying that the underlying owner must be the "rightful income recipient" of the same interest, which is obviously an impossibility.

This also shows that in this situation it is not justifiable to impose a condition that the interest must be subject to the tax jurisdiction of the country in which the "beneficial owner" is resident for tax purposes.

12.3 *The withholding tax requirement must be reduced in relation to certain other investors by referring the case to the Danish Tax Agency*

In the previous section, 12.2, Takeda has demonstrated that the withholding tax requirement must be reduced in relation to two specific investors, namely Shareholder No. 41, Sweden, and Shareholder No. 39, USA, as these persons must be considered the "beneficial owners" of the interest in this alternative scenario, inter alia, as it concerns a natural person and a company that

cannot itself be considered a "flow-through company" in relation to the interest in question and which otherwise enjoys protection under a DBO between

country of residence and Denmark. Thus, under all circumstances, there is no abuse of the Nordic DBO (or of the interest /royalty directive) in relation to these two individuals.

Shareholder no. 41 and Shareholder no. 39 are, as mentioned, direct shareholders in Nycomed S.C.A., SICAR.

As mentioned at the beginning of this section 12, the other shareholders of the company are primarily tax-transparent limited partnerships, which is why in relation to these shareholders it is necessary to assess the deduction issue - the abuse - in relation to the limited partners in these companies, as they are considered the direct shareholders of Nycomed S.C.A., SICAR for tax purposes.

In the same way as for Shareholder no. 41 and Shareholder no. 39, there will thus be a reduction in relation to these other investors if they can *either* prove that they themselves are the "beneficial owners" under a DBO with Denmark, ie. that they are not themselves "flow-through companies" for the interest in question and that they are otherwise resident in a DBO country (and covered by the DBO in question), *or* that they are natural persons (since, as mentioned, there is no legal basis in Danish law to levy withholding tax on interest earned by foreign natural persons).

As the investors in the tax-transparent capital funds constitute several hundred companies etc, Takeda has, as previously mentioned, chosen only to let the High Court assess the issue of reduction of the withholding tax requirement in relation to the "beneficial owner" in relation to two specific investors and in addition - if the High Court is satisfied that the investors in question (or just one of them) are entitled to a reduction of the withholding tax requirement - Takeda suggests that the High Court should refer the case back to the High Court in relation to other investors who may meet similar conditions (and thus let the tax administration perform the tax assessment task of assessing whether the conditions set out by the High Court for reduction of the withholding tax requirement are met in

**3313**

to the investors who may consider themselves entitled to a reduction).

With regard to the question that, according to the Ministry of Taxation, it must be proven *"that the alleged beneficial owner was not just another flow-through entity, but had real power to dispose of the interest itself"*, Ta- keda, that these several hundred investors in the tax-transparent capital funds each own only a very small share of the total investment, and that these investors therefore had no real influence on the decisions that led to the fact that it is these underlying investors who - if applicable - are considered to be the "legal owners" of the interest. In addition, these investors include a large number of independent tax entities that by definition could not themselves be considered "flow-through entities", such as pension funds, banks, certain investment funds, state and municipal entities, universities, etc.

As these underlying investors have in any case not granted any loan at all - and thus have not received any interest, cf. above - there is a clear presumption against these investors having established a "flow-through arrangement" in this respect. There is therefore no basis for assuming that these investors are not the "rightful owners" of the interest in question.

For the same reason, there is no need to require each of these investors to document that they are not themselves flow-through entities.

It is therefore submitted that it is sufficient - on remand - to demonstrate that the investor concerned (a company), which is a

direct shareholder of Nycomed S.C.A., SICAR for tax purposes

**3314**

is resident in a DBO country and is a person covered by the agreement.

Ex tuto, however, it is argued that the proven direct shareholder must alternatively demonstrate that the company is not in itself a "flow-through entity". It is submitted in this connection that, as stated above, this will be the case without further ado as regards universities, States and State entities, insurance companies and pension companies.

As regards the investors in Nycomed S.C.A., SICAR who are direct shareholders of the company for tax purposes and who are natural persons, it should be noted that Denmark has not introduced any limited tax liability for interest for natural persons.

If Takeda in this case had paid the interest in question directly to the private equity funds, i.e. directly to the investors/limited partners, there would undisputedly have been no basis for charging Danish withholding tax to the extent that the limited partners were natural persons. Thus, Denmark has no domestic authority to tax a foreign natural person on interest.

For this reason alone, no abuse of the Norwegian DBO can arise when - and to the extent - the interest in question is deemed to have flowed through to a natural person in the present case, cf. also above in the previous paragraph regarding Shareholder no. 39.

It is unclear whether the Ministry of Taxation claims that Takeda must also in this respect prove that the natural person in question is resident in a DBO country.

Takeda argues that this requirement cannot be imposed on a natural person, as there will never be a basis for collecting withholding tax from such a person, regardless of where that person is resident.

In support of its motion to dismiss the *defendant's motion to dismiss,* Takeda submits that it has a clear legal interest in having its alternative claim (B) reviewed.

As mentioned in the previous section, the number of potential investors that could be considered for a reduction of the withholding tax requirement in this alternative scenario amounts to several hundred companies etc. Takeda has therefore chosen not to burden the trial court - and the High Court - with extensive evidence regarding each of these up to 500 investors.

Instead, Takeda has left it up to the High Court to assess the legal issues surrounding the requirements for reduction of the withholding tax requirement in relation to two specific investors, and then to make a remand claim in respect of the other investors who could potentially qualify for a reduction.

It is thus crucial for Takeda to obtain the court's opinion on the legal issues concerning the requirements for reduction that the parties may disagree on, so that the task that - if applicable - is referred to the Danish Tax Agency, is only to relate to the documentation submitted.

Thus, this is by no means a hypothetical situation, as claimed by the Ministry of Taxation, but a highly relevant - and significant in terms of amount - point in this alternative scenario.

And thus Takeda must be acquitted of the Ministry of Taxation's claim for dismissal."

In its summary pleading of August 2, 2021, *the Ministry of Taxation* has stated, among other things:

"*6. THE TAX MINISTRY'S ARGUMENTATION*

6.1 *Nycomed Sweden Holding 2 is liable to pay tax on the interest* Tax liability under the Danish Corporation Tax Act applies to companies and associations etc. as mentioned in section 1(1) of the Act that are domiciled abroad, insofar as they receive interest from sources in Denmark regarding debt,

which a company or an association etc. covered by section 1 or point (a) has to legal persons as mentioned in section 3 B of the Danish Tax Control Act (controlled debt), cf. section 2(1)(d), first sentence of the Act. The purpose of the tax liability is, according to the comments to the individual provisions of the bill (section 10(1) of the bill), "to counteract that a Danish company etc. reduces Danish taxation by reducing the taxable income through interest payments to certain financial companies in low-tax countries if the foreign company etc. controls the Danish company etc." [...], which should be seen in the context that the purpose of the bill according to the general comments is, among other things, "to limit the opportunities for tax planning by deducting intra-group interest when the receiving group company pays no or very little tax on the interest deducted when calculating Danish taxable income" [...].

The parties agree *that* Nycomed Sweden Holding 2 is a company as mentioned in section 1(1) of the Danish Corporation Tax Act that is domiciled abroad, *that* Nycomed is a company covered by the Act

§ 1 and *that the* loan in question constitutes "controlled debt". The starting point is therefore that Nycomed Sweden Holding 2 is liable to pay tax on the interest in question, and in the present case there is no basis for deviating from this starting point - neither pursuant to the exemption rule in section 2(1)(d), third sentence, of the Danish Corporation Tax Act nor the exemption rule in the last sentence of the provision.

*6.1.1 The tax liability has not lapsed pursuant to section 2(1)(d), third sentence of the Danish Corporation Tax Act*

As mentioned, it follows from section 2(1)(d), third sentence, of the Danish Corporation Tax Act that the tax liability under the first sentence does not include interest if the taxation of the interest "shall" be waived or reduced under the Interest/Royalty Directive or under a double taxation agreement with the Faroe Islands, Greenland or the state where the receiving company etc. is resident.

In accordance with the wording of the provision, the aforementioned comments to the individual provisions of the bill [...] state that the limited tax liability does not include a company resident in another EU country "if the conditions of the Interest/Royalty Directive are met" *and* that the limited tax liability does not include interest payments to a foreign company resident in the Faroe Islands, Greenland or another country that has a double taxation agreement "if the agreement entails that Denmark must waive or reduce the taxation of the interest."

The wording of the provision and the preparatory work thus indicate that an exemption from the tax liability is only applicable if there is an unconditional obligation to waive or reduce taxation under the Interest/Royalty Directive or a double taxation treaty. If such an obligation does not follow from the directive or a double taxation treaty, the receiving company is liable to tax on the interest. The preparatory work of the provision also states that the tax authorities may take action in cases where the Interest/Royalty Directive and/or a double taxation treaty may be abused as part of a circumvention of the tax liability.

In connection with the committee reading of bill no. 119 of December 17, 2003, which forms the basis for the introduction of section 2(1)(d) of the Danish Corporation Tax Act, the Minister of Taxation stated in a response to an inquiry from FSR [...], among other things:

"There is a risk that, for example, a Danish company may seek to avoid the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a

company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation treaty and which does not have withholding tax on

interest payments to foreign interest recipients, after which this company pays the interest to the company in the low-tax country.

In such cases, however, the Danish tax authorities will, after a specific assessment of the facts, be able to assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest payment is not covered by the EU Interest/Royalty Directive or the double taxation treaty."

*6.1.1.1 Taxation should not be reduced or waived under the Interest/Royalty Directive*

Payments of interest arising in a Member State shall be exempt from any form of tax in that State, whether collected by deduction at source or by assessment, provided that it is

The "beneficial owner" of that interest is "a company of another Member State" within the meaning of Article 1(1) of the Interest/Royalty Directive [...].

Following the Court's answer to the fifth question referred by the High Court (points (a) to (c)) in this case, it is *not disputed that* Nycomed S.C.A., SICAR cannot claim the advantage conferred by Article 1(1) of the directive simply because it is not 'a company of another Member State' [...]. In other words, the Interest/Royalty Directive would not have precluded withholding tax on the interest if the loan at issue had been granted (directly) by Nycomed S.C.A., SICAR instead of by Nycomed Sweden Holding 2.

Both Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1 cannot invoke the benefit of the Directive, *partly* because there is an abuse of rights and *partly* because none of the companies can be considered the legal owner of the interest.

**3315**

6.1.1.1.1 There is a legal basis for refusing the benefits of the Directive for abuse of rights

Article 5(1) of the Interest/Royalty Directive provides that the Directive does not preclude the application of national or contractual anti-abuse provisions and that Member States may withdraw benefits under the Directive or refuse to apply the Directive in the case of transactions for which tax evasion, avoidance or abuse is the principal motive or one of the principal motives [...].

It is the position of the Ministry of Taxation that there is a legal basis in national law for countering abuse of the kind at issue in the present case [...], but the decision of the case does not require a position on this point of contention.

There is a general principle of EU law that individuals may not rely on provisions of EU law, including provisions of directives, to enable them to abuse the law (paragraphs 96 and 101 of the judgment in this case, [...]). Thus, the principle of the prohibition of abuse of rights also applies in the field of taxation where the obtaining of a tax advantage is *a principal aim* of the transaction at issue (paragraph 107 in fine in conjunction with paragraph 127 of the judgment, [...]). As a consequence of the general principle of EU law prohibiting abuse of rights, on the *one hand, and the* need to comply with that principle in the context of the implementation of EU law, on the *other,* Member States are obliged to deny advantages sought through abuse of rights, even in the absence of national or contractual anti-abuse rules (paragraph 111 of the judgment, [...]).

It is not a question of the Court having created a (new) legal position with the judgment in the present case that did not apply prior to the judgment, or of the Court having changed its previous practice, as expressed in, inter alia, case C-321/05, Kofoed, cf. the Court's judgment, paragraphs 122 ff [...]. With the judgment, however, the Court has

- in the context of the jurisdiction conferred on the Court of Justice by Article 267 TFEU, *elucidated and clarified the* meaning

and the scope of the principle of prohibition of abuse of rights as it applies to the present case.

Thus, it also follows from the Court's judgment that the EU law principle of legal certainty does not preclude denying the benefit of the Interest/Royalty Directive in the form of exemption from withholding tax where there is an abuse of rights, which is also expressly stated in the Court's judgment in case C-251/16, Cussens, paragraph 43 [...].

Nor is it the case that the Court of Justice, with its judgment in the present case, has established an interpretation of the Interest/Royalty Directive which means that the directive - in itself - creates *obligations* for citizens. Thus, where there is an abuse of rights and the citizen *is denied a benefit* under EU law for that reason, it is not a question of an obligation under EU law being imposed on the citizen, but rather of the objective conditions for obtaining a benefit under EU law not being fulfilled because the benefit is sought by abuse of rights (paragraph 119 of the judgment, [...]).

Finally, it is not contrary to the Act on Denmark's accession to the European Union to deny the benefits of the Interest/Royalty Directive with reference to the general EU law principle of prohibition of abuse of rights. Thus, the present situation is *not comparable* to the situation that gave rise to the Supreme Court's judgment reproduced in U.2017.824H, Ajos [...], relied on by Takeda.

The premises for the Supreme Court's judgment in the Ajos case show that it was decisive for the outcome of the case that there was a so-called "contra legem situation", i.e. a situation where it is not possible to interpret a national rule in accordance with the Directive within the framework of the methods of interpretation recognized in national law.

Such a situation does not exist in this case, where the Interest/Royalty Directive has been implemented by a simple reference to the Directive. The *wording of* section 2(1)(d) of the Danish Corporation Tax Act states that interest is subject to tax unless "the taxation of the interest shall be waived or reduced pursuant to Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States". It is therefore a narrow matter to apply an interpretation of section 2(1)(d) of the Danish Corporation Tax Act that is in accordance with the Interest/Royalty Directive and the general principle of prohibition of abuse of rights, as the Directive and the principle must be interpreted according to the Court's judgment.

Against this background, section 2(1)(1) of the Danish Corporation Tax Act

d) - in accordance with what the Eastern High Court has also concluded in SKM2021.304.ØLR on the provision's point c) on dividend tax - be interpreted to mean that an exemption from taxation of interest must be denied if the exemption is sought to be obtained by abuse of rights, which depends on a specific assessment of the given circumstances.

6.1.1.1.2 The Court's observations on the assessment of abuse of rights

According to the Court's judgment, proof of abuse requires, *first,* a combination of objective circumstances showing that the objective pursued by the EU legislation has not been achieved even though the conditions laid down in that legislation have been formally complied with and, *second,* a subjective element consisting of an intention to benefit from the EU legislation by artificially creating the conditions required

**3316**

to obtain that advantage (paragraph 124 of the judgment of the

Court of Justice in this case [...].

It is the examination of the coinciding circumstances that makes it possible to verify the existence of the elements constituting abuse and, in particular, whether the economic operators concerned have carried out purely formal or artificial transactions that lack

any economic and commercial justification, with the principal aim of obtaining an undue advantage (paragraph 125 of the judgment [...]).

In the judgment, the Court has indicated the detailed principles for such an examination and made a non-exhaustive list and description of evidence that the benefit of the Interest/Royalty Directive in the form of exemption from taxation of interest in a given case is sought to be obtained by abuse.

According to the Court, a group of companies must - in cases such as the present

- is considered to be an artificial arrangement *when* it is not established for reasons reflecting economic reality, *when* it has a purely formal structure and *when* its main purpose or one of its main purposes is to obtain a tax advantage which operates against the object and purpose of the applicable tax legislation. This is particularly the case where the payment of interest tax is avoided by introducing into the group structure a 'flow-through entity' between the company transferring the interest and the company which is the 'beneficial owner of the interest' (paragraph 127 of the judgment).

The fact that interest, in its entirety or substantially in its entirety, is passed on very shortly after receipt by the company which received it to entities which do not qualify for the application of the Interest/Royalty Directive is evidence of an arrangement designed to take undue advantage of the exemption from taxation resulting from the Directive (paragraph 128 of the judgment).

According to the Court's judgment, the artificial nature of an arrangement can *also be* supported by the fact that the group in question is structured in such a way that the company receiving the interest paid by the debtor company must itself pay that interest to a third company which does not meet the conditions for application of the Interest/Royalty Directive, with the result that the company only receives a negligible taxable income when operating as

"flow-through company" (paragraph 130 of the judgment). A company can be considered a pass-through entity if its only activity is to receive the interest and pass it on to the

"beneficial owner" or to other "flow-through entities", see paragraph 131 of the judgment.

Evidence of the existence of an artificial arrangement in a given case may *also be* found (1) in the existence of various contracts between the companies involved in the financial transactions in question which give rise to intra-group cash flows which, as stated in Article 4 of the Interest/Royalty Directive, may have the purpose of the transfer of dividends from a recipient commercial company to shareholder entities in order to avoid paying tax or minimize the tax burden; 2) the method of financing the transactions; 3) the assessment of the equity of the intermediate companies; and 4) the lack of power of the 'flow-through' companies to dispose financially of the interest received. In this context, it is not only a contractual or legal obligation for the company receiving the interest to pass it on to third parties that can constitute such a point of reference. There is also a basis for abuse if, on the facts of the case, the company has not 'substantially' had the rights to use and enjoy the interest (paragraph 132 of the judgment, [...]).

Points of view such as those mentioned above may be regarded as *corroborated* if there is a coincidence or close temporal connection between, on the one hand, the entry into force of new tax legislation such as section 2(1)(d) of the Corporation Tax Act and, on the other hand, the initiation of complex financial transactions and the granting of loans within the same group which may lead to an avoidance of the taxation introduced

(paragraph 133). Such an inter-

Conversely, coincidence or such a close temporal connection is not a necessary condition for proving abuse, but may corroborate other evidence of an abuse of rights.

Finally, it is irrelevant for the determination of whether there is an abuse of rights whether Denmark has concluded a double taxation treaty with the state where the beneficial owner of the interest is resident, according to which no withholding tax would have been withheld on the interest *if* it had been paid directly to the beneficial owner, see paragraphs 134 ff.

6.1.1.1.3 There is an abuse of rights in the present case

When the Court's instructions are coupled with the circumstances of the present case, it can be concluded that there has been an abuse of rights.

For the determination of the case, A) the loan between Nycomed and Nycomed Sweden Holding 2, B) the simultaneous loan between Nycomed Sweden Holding 1 and Nycomed S.C.A., SICAR, C) Nycomed Sweden Holding 1's simultaneous capital contribution in Nycomed Sweden Holding 2 and D) the annual adoption of group contributions from Nycomed Sweden Holding 2 to Nycomed Sweden Holding 1 must be considered as one single and pre-arranged arrangement.

It is no coincidence that the two loans were concluded on the same day and apart from what can only be described as insignificant margins, the

**3317**

same principal and terms. Furthermore, it is *unlikely* that Nycomed Sweden Holding 2 - by pure coincidence and even for three consecutive years - made an annual group contribution to Nycomed Sweden Holding 1 of an amount that roughly corresponded to the annual interest accrued on Nycomed S.C.A., SICAR's loan to the same company. The High Court therefore has no hesitation in finding that this is a pre-arranged arrangement.

It is also noted that the group contributions from Nycomed Sweden Holding 2 were necessary for Nycomed Sweden Holding 1 to meet its interest obligations to Nycomed S.C.A., SICAR, as Nycomed Sweden Holding 1 Holding had no other sources of income with which to meet its interest obligations so that the company's accounts remained in balance.

The Ministry of Taxation does not claim that Nycomed Sweden Holding 2 had a *contractual* obligation to pay the group contributions to Nycomed Sweden Holding 1. In group relationships such as the one in this case, such a legal obligation is unnecessary and therefore superfluous. This applies not only, but especially in a situation such as the present case, where the two companies had identical boards of directors. It is also a fact that the contributions were in fact made again and again and again and that they were in fact - again and again and again - able to cover Nycomed Sweden Holding 1's interest obligations.

The arrangement effectively meant that neither Nycomed Sweden Holding 2 nor Nycomed Sweden Holding 1 was left any leeway to dispose of their income in the form of interest or group contributions. Both companies were flow-through entities.

The arrangement was without commercial justification. From a business perspective, it would have been simpler if a direct loan relationship had been established between Nycomed and Nycomed S.C.A., SI-CAR. The group would then have avoided the increased paperwork and generally the administrative hassle associated with the additional intercompany loan relationship, the implementation of a capital increase and the adoption of the annual group contributions. However, the seemingly self-created nuisance had a tax advantage, as the taxation of the interest from Nycomed to Nycomed Sweden Holding 2 - apart from the

question of the legal and tax consequences - was not

Copyright © 2023 Karnov Group Denmark A/S

abuse and the "rightful owner" of the interest - should be waived after the interest
/royalty directive.

The circumstances leave no doubt that the arrangement was intended to provide Nycomed S.C.A, SICAR (or the capital funds) with a benefit of the Interest/Royalty Directive that it (or the capital funds) could not have claimed itself, namely exemption from taxation in the source state. Although the interest was taxable for Nycomed Sweden Holding 2, the income was neutralized for tax purposes by the deductible group contributions to Nycomed Sweden Holding 1. Similarly, the group contributions taxable for Nycomed Sweden Holding 1 were neutralized for tax purposes by the deductible interest expenses related to the loan from Nycomed S.C.A, SICAR, which under Luxembourg law was exempt from paying tax on the interest and whose investors were not taxed at source on returns from the company. The arrangement thus meant that taxable interest was made tax-free, which more than offset the disadvantages of what could appear to be unnecessary and self-created nuisances.

When the circumstances set out above are compared with the Court's guidance on the abuse assessment, it is clear that the main purpose of the arrangement was to take undue advantage of the exemption provided for in Article 1(1) of the Interest/Royalty Directive.

The Court also found (paragraph 126 of the judgment, [...]) that there are a number of indications of an abuse of rights in this case, but, in accordance with the division of jurisdiction between the Court and the national courts, the Court left it to the High Court to *ascertain* whether those indications are objective and consistent and whether Takeda has had the opportunity to adduce counter-evidence.

Such a review should lead to the conclusion that there is an abuse of rights. All circumstances relevant to the abuse assessment were disclosed to the Court and no other circumstances have (subsequently) been demonstrated which indicate that the Court's (preliminary) assessment cannot stand up to review.

Takeda has not even made an attempt to explain what - rather than the easiest solution of a direct loan from Nycomed S.C.A., SICAR to Nycomed - was the business rationale for the arrangement with A) the loan between Nycomed and Nycomed Sweden Holding 2, B) the simultaneous loan between Nycomed Sweden Holding 1 and Nycomed S.C.A., SICAR, C) Nycomed Sweden Holding 1's simultaneous capital contribution in Nycomed Sweden Holding 2 and D) the annual adoption of group contributions from Nycomed Sweden Holding 2 to Nycomed Sweden Holding 1.

Since there is thus an abuse of rights, both Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1 are prevented from benefiting from the exemption from withholding tax provided for in Article 1(1) of the Interest/Royalty Directive.

6.1.1.1.4 The benefits of the Directive must also be denied because neither Nycomed Sweden Holding 2 nor Nycomed Sweden Holding 1 is the legal owner of the interest

It follows from the wording of Article 1(1) of the Interest/Royalty Directive that exemption from withholding tax is

**3318**

conditional on the recipient of the interest being the "beneficial owner" of the interest.

According to the judgment of the Court of Justice in the present case, the term 'beneficial owner' must be interpreted as 'designating an entity which actually receives the interest paid to

it' (paragraph 88 of the judgment, ES3 p. 1395). According to the Court, the term 'beneficial owner' does not refer to a formally identified recipient, but rather to 'the entity which, in economic terms, receives the interest earned

and is therefore free to determine its use' (paragraph 89 of the judgment).

Finally, the Court has held that the concept of "beneficial owner" contained in double tax treaties based on the OECD Model Tax Convention and the commentaries thereto are relevant to the interpretation of the Interest/Royalty Directive (paragraph 90 of the judgment).

The assessment of whether a given company can be considered to be the
"legal owner", and the assessment of whether there has been an abuse of rights in a given case is in fact one and the same thing, which the Court's interpretation of, inter alia, the first question referred for a preliminary ruling, point (d)-(d).

f) whether the concept of 'rightful owner' is a testimony to (paragraph 123 of the judgment, [...]). It is also quite clearly expressed, for example, in paragraph 127 of the judgment [...].

For the reasons explained in the previous and following sections, neither Nycomed Sweden Holding 2 nor Nycomed Sweden Holding 1 can be considered the beneficial owner of the interest. Also for this reason, the companies are precluded from claiming the benefit of Article 1(1) of the Interest/Royalty Directive.

*6.1.1.2 Taxation shall not be waived or reduced under the Nordic Double Taxation Convention*

According to Article 11(1) [...] of the Nordic Double Taxation Convention, interest arising in a Contracting State (Denmark) and paid to a resident of another Contracting State (Sweden) may be taxed in that other State (Sweden) only if that person is the "beneficial owner" of the interest. According to the wording of this provision, Denmark is thus only obliged to waive the taxation of interest arising in Denmark if the recipient is the "beneficial owner" of the interest.

The term "beneficial owner of the interest" must be interpreted in accordance with the corresponding term in Article 11(1) of the OECD Model Tax Convention [...], as the Nordic Double Taxation Convention was concluded on the basis of the Model Convention.

The Eastern High Court has already established that the term "beneficial owner" is an autonomous concept, i.e. that it has an independent content independent of the internal legislation of the contracting states, see both SKM2021.304.ØLR and SKM2012.121.ØLR [...]. The concept of "legal
Therefore, the term "beneficial owner" should *not be* interpreted in accordance with the concept of "rightful income recipient", which in Danish tax law is used as a term for the person who is deemed to be taxable on a given income.

With the two judgments, the Eastern High Court has also already established that the tax authorities in cases such as the present one have been entitled - as happened - to include the comments to the OECD Model Tax Convention from 2003 when determining what is to be understood by the term "beneficial owner". The later commentaries from 2014 and 2017 are similarly relevant for interpretation, as these commentaries - like the 2003 commentaries
- does not imply a changed understanding of Article 11(1) of the Model Agreement, but is merely a clarification.

It follows from the 2003 Commentary, paragraph 8.1 to Article 11(1) of the Model Convention [...] that it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax "where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question." Thus, a "conduit" will not be considered the beneficial owner "if, although it is the

formal owner, it has in fact very narrow powers which, in relation to the income in question, make it a 'nullity' or administrator acting on behalf of other parties".

The 2014 Commentary, paragraph 10.2, which has been carried forward unchanged in the 2017 Commentary, clarifies that the immediate recipient of the interest may be denied the treaty benefit under Article 11(1) of the Model Tax Convention if the facts clearly show that the recipient - without being bound by a contractual or legal obligation to pass on the payments received to another person - "substantially" does not have the rights to use and enjoy the interest [...].

In the present case, the facts show that Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1 had no, or only very limited, power to dispose of the interest received by the first company by virtue of the loan to Nycomed.

As set out in section 6.1.1.1.1.3, A) the loan between Nycomed and Nycomed Sweden Holding 2, B) the simultaneous loan between Nycomed Sweden Holding 1 and Nycomed S.C.A., SICAR, C) Nycomed Sweden Holding 1's simultaneous capital contribution in Nycomed Sweden Holding 2 and D) the annual adoption of group contributions from Nycomed Sweden Holding 2 to Nycomed Sweden Holding 1 must be considered as one single pre-arranged arrangement.

**3319**

As also stated under the above-mentioned point, it is no coincidence *that* the two loans were entered into on the same day and, apart from what must be described as insignificant margins, had the same principal and terms, or that Nycomed Sweden Holding 2 - time after time after time - made a group contribution to Nycomed Sweden Holding 1 of an amount which roughly corresponded to the interest accrued for the year on Nycomed S.C.A., SICAR's loan to the same company.

In addition, without the interest from Nycomed, Nycomed Sweden Holding 2 would have been unable to make the group contributions in question to Nycomed Sweden Holding 1, which without the group contributions would have been unable to pay the interest expenses arising from the loan from Nycomed S.C.A., SICAR. Finally, the arrangement was without any commercial justification.

The stated circumstances establish *that* the arrangement was established with the (main) purpose that both Nycomed Sweden Holding 1 and Nycomed Sweden Holding 2 were to act as flow-through entities for the interest in question, which without the arrangement would have been taxable pursuant to section 2(1)(d) of the Corporation Tax Act, and *that* none of the companies could substantially dispose of the interest which was intended to be passed on to Nycomed S.C.A., SICAR (or the capital funds), which in fact happened. In this connection, it is noted that if Nycomed S.C.A., SICAR had been the direct lender , the interest would have been taxable, as the company could not have invoked the Interest/Royalty Directive, cf. above, or the Danish-Luxembourg double taxation treaty, cf. further below.

In the case of such a pre-arranged arrangement, it is irrelevant that Nycomed Sweden Holding 2 channeled the amount as a group contribution, since the substance of the arrangement was in any event that the company had no real power to dispose of the interest, since it was undoubtedly decided in advance that the company would make a group contribution to Nycomed Holding Sweden 1 (roughly) corresponding to the interest that was attributed to the loan to Nycomed.

For the assessment of whether Nycomed Sweden Holding 2 must be considered the rightful owner of the interest for tax purposes, it is equally irrelevant that the interest was attributed to the principal (good

written) and (only) later converted into shares in the company.

The tax effects occurred (already) at the time of the interest attribution. A key element of the arrangement was that there was no effective payment of interest or group contributions at any stage of the transaction chain, as interest was attributed to the principal and the group contributions were posted to an interim account. The arrangement meant that the tax benefits in the form of deductions and exemption from withholding tax could be reaped immediately without any kind of liquidity burden for the participating companies and so that payment transfers, set-offs or conversions to capital shares could be carried out subsequently without further tax consequences, which in fact also happened, see paragraphs 40-44 of the order for reference [...]. For the tax law assessment of whether Nycomed Sweden Holding 2 must be considered the rightful owner of the interest, it is therefore of no significance that the interest was not effectively paid each year on December 27 by, for example, a bank transfer, but was added to the principal of the loan. Against the above background, it must be held that neither Nycomed Sweden Holding 2 nor Nycomed Sweden Holding 1 can be regarded as the residual owner of the interest in question within the meaning of Article 11(1) of the Nordic Double Taxation Convention. Thus, the double taxation treaty does not lead to the interest being exempt from a tax liability under section 2(1)(d) of the Danish Corporation Tax Act.

*6.1.1.3 Taxation shall not be waived pursuant to the Danish-Luxembourg double taxation treaty*

6.1.1.3.1 Nycomed S.C.A., SICAR is not covered by the Danish -The Convention of 17 November 1980 between Denmark and Luxembourg for the avoidance of double taxation with respect to taxes on income and capital (the Danish-Luxembourg Double Taxation Convention) provides no basis for Denmark to waive taxation of the interest in question, already because Nycomed S.C.A., SICAR is not covered by the Double Taxation Convention.

Article 1 of the Final Protocol, which was concluded between Denmark and Luxembourg at the same time as the 1980 Agreement and which by its wording forms an integral part of the Agreement, states [...]:

...

The 1929 Act, which was repealed in 2006, is described in the Commission Decision of July 19, 2006 published in the Official Journal L 366/47 on December 21, 2006 [...]. A company governed by the 1929 law (hereinafter referred to as "1929 holding company") was not a special legal form of company per se, but a special tax qualification that a Luxembourg company, such as an S.A. or an S.A.R.L., could choose. 1929 holding companies were exempt from direct taxation in Luxembourg, such as corporation tax and municipal business tax, and were therefore not taxable in Luxembourg on dividends, interest, royalties and capital gains received by such companies, and the payment of dividends, royalties and interest by such companies was exempt from withholding tax, see paragraph 21 of the decision [...].

**3320**

On the other hand, a 1929 holding company had to pay a capital duty of 1 % on the contribution of capital or assets and an annual subscription tax of 0,2 % of the paid-up share capital and of the value of the share premiums, cf. point 24 of the resolution. In order for a company to be covered by the 1929 Act, it was a condition that the company was only engaged in the acquisition, holding and exploitation of any kind of capital interests in other Luxembourg or foreign companies, including the acquisition,

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

holding, management and sale of shares in companies and the granting of loans to companies in which it held shares.

Copyright © 2023 Karnov Group Denmark A/S

had a direct shareholding, and a company covered by the Act could not carry on business activities on its own account, cf. points 26-28 of the decision [...]. The 1929 Act was repealed in 2006 as a result of the European Commission's view that the Act's special tax advantages for the companies covered by the Act constituted illegal state aid.

A literal interpretation of Article 1 of the Final Protocol leaves no doubt that it is *not* only companies covered by the 1929 Act and the 1938 Regulation that fall outside the scope of the Danish-Luxembourg double taxation agreement, cf. the words "the special Luxembourg legislation, for the time being" and "companies of this kind", but that the provision *also* applies to companies of a similar kind established under legislation implemented by Luxembourg *after* the conclusion of the Danish-Luxembourg Double Taxation Convention, cf. in particular the words "at present".

It also goes without saying that the purpose of Article 1 of the final protocol is to prevent Luxembourg companies, which in Luxembourg are exempt from taxation of types of income covered by the Danish-Luxembourg double taxation treaty, from being used as instruments to receive income without paying any tax in either Denmark or Luxembourg (double non-taxation). In this connection, it should be noted that double taxation treaties concluded on the basis of the OECD Model Tax Convention aim partly to avoid double taxation and partly to prevent tax evasion and tax avoidance.

An interpretation of the wording and purpose of Article 1 of the Final Protocol leads to the conclusion that the Danish-Luxembourg Double Taxation Convention *does not* apply to Nycomed S.C.A., SICAR. The system of SICAR companies was introduced in Luxembourg by law of June 15, 2004. The SICAR is - like the 1929 holding company - not a special legal form of company per se, but a special tax qualification that a Luxembourg company can choose. A SICAR is defined as a so-called risk-bearing investment company, which is subject to the condition that the company's capital is invested in assets (such as shares, bonds and receivables, etc.) that are subject to a certain risk.

A SICAR is in principle subject to income tax in Luxembourg and must pay corporate income tax and local business tax in Luxembourg on the company's income, but a SICAR is however *exempt* from income tax on earnings derived from the company's investments, including interest, dividends and profits, and is not subject to tax on the distribution of dividends or payment of interest or on the distribution of funds upon liquidation of the company. Since a SICAR is an investment company, it is therefore in practice exempt from taxation, which is also consistent with the fact that Nycomed S.C.A., SICAR has paid no tax in Luxembourg because its income has been tax exempt under Luxembourg tax law [...].

In the light of the above, SICARs must - in view of the purpose of section 1 of the final protocol and the wording of the provision - be equated with 1929 holding companies as being a company of a similar nature, with the consequence that the Danish-Luxembourg double taxation convention does not apply to SICARs. In this regard, it must be taken into account, in particular, that the special tax regime applicable to SICARs is in fact as advantageous as that applicable to 1929 holding companies and, moreover, that a SICAR is essentially a holding company by its nature.

As Nycomed S.C.A. is not at all covered by the Danish-Luxembourg double taxation agreement, it must therefore - for this reason alone - be established that the double taxation agreement cannot provide a basis for Denmark to waive the taxation of the interest in question.

6.1.1.3.2 Takeda has not established that Nycomed S.C.A., SICAR is the beneficial owner of the interest

Even though Nycomed S.C.A., SICAR may be covered by the Danish-Luxembourg double taxation treaty, the double taxation treaty does not provide a basis for Denmark to waive taxation of the interest.

Double taxation treaties concern the treatment of income which for tax purposes must be regarded as originating from one contracting state, the source state (in this case Denmark), and which for tax purposes must be regarded as being received by a natural or legal person in the other contracting state. Accordingly, it follows from the wording of section 2(1)(d) of the Danish Corporation Tax Act that only the double taxation treaty with the state in which the receiving company is resident can lead to an exemption from tax liability. As Nycomed Sweden Holding 2 is the proper recipient of the interest in question from Nycomed, it is (only) the Nordic

**3321**

double tax treaty that may preclude Denmark from taxing the interest, provided that the conditions of the treaty are otherwise met, which - as described above - is not the case in this case.

When assessing whether a taxation is foreclosed under the interest

/However, under the Royalties Directive or the Nordic Double Taxation Convention, it may - depending on the circumstances - be relevant whether the amount in question is channelled to a state with which a double taxation treaty has been concluded. This is because the concept of "beneficial owner" is a concept aimed at preventing abuses consisting of a person disposing through a legal person that can claim a benefit under a directive or treaty with the main purpose of obtaining such a benefit that could not be obtained by the person directly. In situations where there are no indications of such abuse, because there is no tax advantage associated with the intermediate company, a treaty benefit in the form of exemption from taxation in the source state should not be denied.

As regards the Interest/Royalty Directive, it follows from the judgment of the Court in the present case that the fact that some of the beneficial owners of the interest transferred by flow-through companies are resident for tax purposes in a third State with which the source State has concluded a double taxation treaty is irrelevant for the purposes of the abuse assessment (paragraph 135 of the judgment, [...]), but according to the Court, in a situation where the interest would have been exempt if it had been transferred directly to the company resident in a third State, it cannot be "excluded" that the objective of a given group structure is not an abuse of law (paragraph 137 of the judgment). The Court has not given any guidance as to what is required to rebut the presumption of abuse, but the connection between paragraphs 135 and 137 of the judgment leaves no doubt that the fact that the beneficial owner of the interest is resident for tax purposes in a State, with which Denmark has concluded a double taxation treaty, which could have been invoked if the beneficial owner had been the direct lender, is not - per se - sufficient to rebut an established presumption of an abuse of the Interest/Royalty Directive. There are no indications in the case law that anything else should apply to the assessment of whether there is an abuse of the Nordic double taxation treaty.

Apart from the fact that Nycomed S.C.A., SICAR as described above is not covered by the Danish-Luxembourg double tax treaty, the established presumption of abuse of the Interest/Royalty Directive and the Nordic double tax treaty

cannot be rebutted.

tax treaty cannot be refuted on the basis that Nycomed S.C.A., SICAR - if it had been the lender instead of Nycomed Sweden Holding 2 - could have invoked Article 11(1) of the Danish-Luxembourg double taxation convention, if only because Takeda has not established that Nycomed S.C.A., SICAR was the beneficial owner of the interest in the actual situation.

Thus, when the party claiming the interest (in this case Nycomed Sweden Holding 2) cannot be regarded as the legal owner of the interest, it is not incumbent on the tax authorities to determine who is the legal owner of the interest. Such an obligation, which cannot be inferred from the Interest/Royalty Directive, see, to that effect, the judgment of the Court in the present case, paragraphs 143-145 [...], cannot be inferred from the Nordic Double Taxation Convention or from any other legal basis. As stated by the Court, it will often be impossible for the tax authorities of the source country to identify the beneficial owner of the interest. This also applies in a situation where it is possible to identify the possible beneficial owners, as it will most likely be impossible for the tax authorities and courts of the source state (Denmark) to determine which of two possible beneficial owners is the beneficial owner, cf. the Court's judgment, paragraphs 143 and 144.

In a situation such as the present one, where there is clear evidence to establish that the prearranged arrangement of A) the loan between Nycomed and Nycomed Sweden Holding 2, B) the simultaneous loan between Nycomed Sweden Holding 1 and Nycomed S.C.A., SI- CAR, C) Nycomed Sweden Holding 1's simultaneous capital contribution in Nycomed Sweden Holding 2 and D) the annual adoption of group contributions from Nycomed Sweden Holding 2 to Nycomed Sweden Holding 1 was aimed at an abuse of the Interest/Royalty Directive and the Nordic Double Taxation Convention, strict requirements must therefore also be imposed on the proof that the arrangement (nevertheless) did not have an abuse of the Directive and the Double Taxation Convention as a main purpose. It is therefore incumbent on Takeda to provide positive evidence that provides a basis for establishing with certainty that Nycomed S.C.A., SICAR has been the beneficial owner of the interest.

Thus, Takeda cannot discharge its burden of proof by simply taking the position that if the Ministry of Taxation does not recognize that Nycomed S.C.A., SICAR is the beneficial owner of the interest, it must recognize that its "investors" are the beneficial owner of the interest, and when it does not do so, it *must* recognize that Nycomed S.C.A., SICAR is the beneficial owner of the interest.

Takeda, on the other hand, must prove that the interest either remained in Nycomed S.C.A., SICAR, or if it was

**3322**

channeled, that such channeling was *not* predetermined, so that the company has had the opportunity to freely dispose of the interest and must therefore be considered the rightful owner of the interest. Such proof has not been provided.

The fact that the interest at issue was presumably transferred from Nycomed S.C.A., SICAR to its investors in 2011 and 2012, that is to say, some years after the attribution of the interest at issue from Nycomed (2007-2009), does not *eo ipso facto* preclude Nycomed S.C.A., SICAR acted as a 'flow-through entity', since such a question cannot be resolved without clarification of the framework within which the company acted with regard to the capital invested and the return on it.

However, Takeda has not produced the agreement(s) that undoubtedly existed between Nycomed S.C.A., SICAR and the private equity funds and/or the latter's investors on such

framework, the existence of which Takeda has not denied.

The "Management Shareholders Agreement" referred to above does not regulate the framework for Nycomed S.C.A., SICAR's dispositions with regard to the invested capital and the return thereof. The "Investor Shareholders Agreement" referred to in the agreement, to which Nycomed S.C.A., SICAR and the management company Nycomed Luxco as well as the capital funds were also parties, appears by its name and the parties involved to be relevant for a clarification of the framework, but Takeda has *not* submitted this agreement.

In the absence of clarification of the framework for Nycomed S.C.A., SICAR's transactions with regard to the invested capital and the return thereon, there is no basis for establishing whether or not the company was the beneficial owner of the interest, and it is therefore impossible to rebut the established presumption of abuse of the Interest/Royalty Directive and the Nordic Double Taxation Convention on the basis that Nycomed S.C.A., SICAR - if it had been the lender instead of Nycomed Sweden Holding 2 - could have invoked Article 11(1) of the Danish-Luxembourg Double Taxation Convention. Also for this reason, the Danish-Luxembourg Double Taxation Convention cannot lead to Denmark having to waive taxation of the interest in question.

### 6.1.1.4 Taxation does not contradict a binding administrative practice

In determining whether a tax liability in respect of the interest in question would be contrary to a binding, established administrative practice regarding the interpretation of section 2(1)(d), third sentence, of the Danish Corporation Tax Act. 1(d), third sentence, it must - as the High Court would otherwise have no occasion to decide the question - be assumed that the taxation must not be waived under the Interest/Royalty Directive due to abuse, and that the taxation of the interest must not be reduced under Article 11(1) of the Nordic Double Taxation Convention, as Nycomed Sweden Holding 2 (and neither Nycomed Sweden Holding 1) cannot be considered the rightful owner of the interest.

In other words, it is therefore the case that Takeda, by its practice, claims that the interest in question must be regarded as exempt from tax liability, *even though the* express condition in the third paragraph of Section 2(1)(d) of the Corporation Tax Act that the interest is exempt from tax liability is *not* met.

Since a principle of equality under administrative law cannot justify a claim for a legal position contrary to law, see U.2003.2005H [...], it is excluded that Takeda's invocation of an administrative practice can lead to the exemption of the interest in question from a tax liability, already because such an exemption would thus be contrary to section 2(1)(d)(3) of the Corporation Tax Act's express condition for an exemption to be granted.

In addition, SKAT's decision of December 13, 2010 [...] does not represent a tightening of practice, as the decision did not change any established administrative practice.

It is incumbent on Takeda to prove the existence of the alleged practice from which it claims the decision deviated, see e.g. U.2011.3305H [...], but it has not met this burden of proof. Takeda has thus not demonstrated the existence of any previous decision according to which the tax authorities have considered interest to be exempt from a tax liability, even if the given circumstances - as in the present case - would otherwise support a finding that the recipient had not had or had had such narrow powers to dispose of the interest that the company could not be considered the beneficial owner of the interest.

Furthermore, Takeda has not demonstrated any instances in which the tax authorities have failed to take corrective action

since the entry into force of section 2(1)(d) of the Corporation Tax Act with effect for interest relating to the period from and including April 2, 2004, in cases such as

the present case. Such non-intervention, if it had actually taken place, could not have been equated with a positive decision, see e.g. U.2017.2960H and U.2017.2979H [...].

Nor has Takeda otherwise demonstrated that, after the entry into force of section 2(1)(d) of the Danish Corporation Tax Act and until SKAT's decision in the present case, the tax authorities should have followed a practice according to which interest has been deemed to be exempt from the tax liability resulting from the provision, even if the circumstances otherwise warranted a finding that

**3323**

the recipient of the interest had not had or had had such narrow powers to dispose of the interest that the company could not be considered the rightful owner of the interest.

The answers given by the Minister of Taxation in connection with the Danish Parliament's Tax Committee's consideration of the bill, which, following an amendment, resulted in the introduction of the Danish Corporation Tax Act
§ Section 2(1)*(c)* on the limited tax liability of dividends thus does not constitute evidence of the existence of a binding practice which the decisions in the present case would change.

In SKM2021.304.ØLR, the Eastern High Court has ruled that the invoked answers do not constitute evidence of the existence of an administrative practice according to which the tax authorities should have considered dividends to be exempt from the tax liability resulting from section 2(1)*(c) of the Danish* Corporation Tax Act, even though the recipient of the dividend had not had or had had such narrow powers to dispose of the dividend that the recipient could not be considered the legal owner of the dividend. Nevertheless, the ministerial answers constitute evidence of the existence of a binding administrative practice, which SKAT's decision in this case, which concerns *paragraph (d) of* the provision, should change.

In connection with this, it is noted that - as also described above under section 6.1.1 - it also appears from the preparatory works to section 2(1)(d) of the Danish Corporation Tax Act that the tax authorities, after a specific assessment of the merits, may deny the (immediate) recipient of the interest the benefits that otherwise follow from the Interest/Royalty Directive and any double taxation treaty, on the grounds that the recipient is not the legal owner of the interest.

The answers relied on by Takeda, which the Minister for Taxation has given in various contexts after the entry into force of section 2(1)(d) of the Corporation Tax Act, do not constitute evidence that, at the time of SKAT's decision, a practice had been established according to which interest - in circumstances such as in the present case - was considered to be exempt from a tax liability under that provision.

These are abstract answers to abstract questions. The answers provide
- like the memorandum on the status of SKAT's control efforts regarding the takeover of 7 Danish groups by private equity funds - no evidence that SKAT should have made a positive decision to follow a practice according to which interest was considered exempt from a tax liability, even though, after information and a specific assessment of the given circumstances, there would be evidence to establish that the recipient had not had or had had such narrow powers to dispose of the interest that the company could not be considered the rightful owner of the interest.

Prior to SKAT's decision in this case and the first of the interest imputations at issue in the case, the Minister of Taxation had given separate answers stating that a parent company would not

be able to invoke the benefits of a double tax treaty if it was a "pure flow-through holding company", a "pure flow-through company", a "conduit" company or a "flow-through company", cf. 1) Appendix 9 to bill no. 116 of December 14, 2017, cf.

cember 2005 [...], 2) the Minister of Taxation's answer to committee questions 2-10 after the presentation of bill no. 30 of October 4, 2006 [...], 3) the Minister of Taxation's answer of November 6, 2006 to question S 474 [...] and 4) Appendix 26 regarding bill no. 213 of April 18

2007 [...], 5) the Minister's answer to committee question 86 [...] and 6) the revised answer [...] to the above bill. In all but the first of these responses, reference is even made to paragraph 12.1 of the comments to Article 10 (on dividends) of the OECD Model Tax Convention, and in the latter 4 responses it is further described in the responses themselves that "conduit" companies/"flow-through" companies include companies that "effectively have very narrow powers in relation to the income in question".

The subsequent ministerial replies and the memorandum on the status of SKAT's control efforts regarding the takeover of 7 Danish groups by private equity funds, which Takeda invokes in support of the objection of a stricter practice, were also - in vain - invoked by the dividend distributing companies in SKM2021.304.ØLR in support of the corresponding objection of a stricter practice.

Against this background, it should - in a similar manner as in SKM2021.304.ØLR - be established that SKAT's decision in this case did not change any binding, established administrative practice that Takeda can rely on under an administrative law principle of equality.

*6.1.2 The tax liability has not lapsed pursuant to section 2(1)(d), last sentence of the Danish Corporation Tax Act*

According to the last sentence of section 2(1)(d) of the Danish Corporation Tax Act, the tax liability under the first sentence of the provision will lapse if the receiving company etc. proves *that the* foreign corporate taxation of the interest is at least ¾ of the Danish corporate taxation and *that* it does not pay the interest to another foreign company etc. that is subject to a corporate taxation of the interest that is less than ¾ of the Danish corporate taxation. This exemption provision, which may be relevant if the receiving company is not covered by the Interest/Royalty Directive or is not resident in a state with which Denmark has concluded a double taxation treaty, should be seen in light of the fact that the tax liability, as described above, was introduced with the purpose of limiting the possibilities for tax planning by deducting intra-group interest when the receiving foreign group company pays no or very little tax on the interest deducted when calculating Danish taxable income.

**3324**

Such a situation does not exist if the receiving company is subject to (foreign) taxation that essentially corresponds to Danish corporate taxation, *provided* that the interest is not paid to another foreign company that pays no or very little tax on the interest.

Takeda has not demonstrated that the conditions for a lapse of tax liability are met - on the contrary.

A position on Takeda's invocation of the Corporate Tax Act § Section 2(1)(d), *last sentence*, presupposes that the tax liability has not lapsed pursuant to the *third sentence of* the provision. For the High Court's assessment of whether the conditions for a tax exemption under section 2(1)(d), last sentence, of the Danish Corporation Tax Act are met, it must therefore be assumed that both Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1 were

"flow-through units" for the interest in question, which was thus channeled to Nycomed S.C.A., SICAR, which was subject to a corporate tax on the interest that was less than ¾ of the Danish corporate tax rate, since the company was *exempt from* paying

tax on the interest under Luxembourg law.

It must therefore also be held *that* the interest received by Nycomed Sweden Holding 2, in section 2(1)(d), last sentence, of the Corporation Tax Act

Copyright © 2023 Karnov Group Denmark A/S

paragraph has been paid on to another foreign company that is subject to a corporate taxation of the interest that is less than ¾ of the Danish corporate taxation, and *that the* conditions for a tax exemption are thus *not* met.

Such an understanding of the exemption rule has clear support in the reason for the condition that the receiving company - in order for a lapse of the tax liability to be considered - must prove that it does not pass on the interest to another foreign company etc. that is subject to a corporate taxation of the interest that is less than ¾ of the Danish corporate taxation.

The purpose of the condition is (obviously) to prevent the exemption from being misused as an instrument to obtain an unjustified tax exemption, which the history of the provision leaves no doubt about.

It should be noted that until July 1, 2007, it followed from section 2(1)(d), last sentence, of the Danish Corporation Tax Act that the tax liability under the first sentence lapsed if the receiving company proved that it would not be covered by section 32 of the Danish Corporation Tax Act if it had been controlled or significantly influenced by a company etc. resident in Denmark, cf. section 32(6), *and* that it did not pay the interest to another foreign company etc. that would meet the conditions in section 32 [...].

The explanatory notes to the bill state that the last sentence of section 2(1)(d) of the Corporate Tax Act [...]:

However, this exception does not apply if the company channels the payment to another foreign company that is not controlled by a Danish company, provided that the other foreign company is resident in a low tax country and more than 1/3 of its income consists of CFC income. In that case, the company that receives the interest from Denmark will probably be taxed on the interest, but at the same time it will get a deduction for the interest that it pays to the other foreign company in the low tax country.

The purpose of the condition that the interest must not be re-channeled is thus clearly to prevent the exemption from being misused to obtain a tax exemption contrary to the motive for the introduction of the tax liability.

In the present case, it is precisely the case that the interest has been channeled via the receiving company (Nycomed Sweden Holding 2), with the result that no tax has been paid on the interest in Sweden or Luxembourg. Therefore, an interpretation of the motive unambiguously indicates that the tax liability under the present *circumstances* applies without exception, which is also consistent with the wording of the last sentence of Section 2(1)(d) of the Danish Corporation Tax Act, which does not provide a basis for determining that the question of a lapse of the tax liability should be determined by whether the interest is paid on as deductible interest or, for example, as deductible group contributions, or whether the interest is channeled to a low tax country via an additional flow-through entity.

In general, it must require very clear evidence in the wording of and the preparatory works to section 2(1)(d), last sentence, of the Danish Corporation Tax Act in order to arrive at an interpretation according to which the scope of this exemption rule should cover cases where the receiving company is precluded from invoking the exemption rule in the third sentence of the provision because the company has served as a flow-through entity in the group's attempt to obtain an unjustified tax exemption by abusing the interest-tax exemption.

/royalty directive and a possible double taxation treaty. There is no such (clear) evidence, which is because it would be meaningless if the exemption rule in section 2(1)(d), *last sentence, of the Danish* Corporation Tax Act included abuse that excludes a tax

exemption under the *third paragraph of* the provision.

*6.2 Takeda is responsible for the non-compliance*

As the interest in question is subject to tax liability, cf. section 2(1)(d) of the Danish Corporation Tax Act, Takeda should have withheld interest tax in connection with the crediting of the interest in question, cf. section 65 D(1) of the Danish Withholding Tax Act.

**3325**

As mentioned, section 69(1) of the Withholding Tax Act states that a person who fails to fulfill his obligation to withhold tax or who withholds too little tax is directly liable to the public authorities for payment of the missing amount, unless he proves that he has *not been* negligent in complying with the provisions of the Withholding Tax Act.

In determining whether Takeda has rebutted the statutory presumption of negligence, it must - as the High Court would otherwise have no reason to consider the issue - be assumed that there has been no binding administrative practice according to which the interest in question must be deemed to be exempt from the tax liability that otherwise follows from section 2(1)(d) of the Danish Corporation Tax Act. For this reason alone, it is untenable for Takeda to claim that there was an administrative practice which gave the company reason to assume that the interest could be credited without withholding tax on interest.

The claimed "considerable doubt" about the interpretation of the term

"rightful owner", cf. the writ of summons, p. 49, has not led Takeda to such an assumption - on the contrary. As described above, it is abundantly clear from the legislative history of section 2(1)(d) of the Danish Corporation Tax Act that the tax authorities may, after a concrete assessment of the facts, deny the (immediate) recipient of the interest the benefits that otherwise follow from the Interest/Royalty Directive and any double taxation treaty, on the grounds that the recipient is not the beneficial owner of the interest.

For the question of Takeda's liability under section 69(1) of the Withholding Tax Act. 1, it will (however) be decisive that the company has been aware of the facts leading to the conclusion that Nycomed Sweden Holding 2 cannot be considered to have been the legal owner of the interest within the meaning of the Nordic Double Taxation Act, *secondly,* that the advantage in the form of the exemption from withholding tax resulting from the Interest/Royalty Directive must be denied, both because EU law cannot be invoked to enable abuse of rights and because Nycomed Sweden Holding 2 cannot be regarded as the beneficial owner of the interest within the meaning of the Directive either, cf. thus also the premises for the High Court's judgment reproduced in KM2021.304.ØLR. When - as in the present case - there is a basis for denying a tax benefit in the form of exemption from withholding tax because the benefit has been sought to be obtained by abuse of rights and the withholding agent is aware of this basis, the failure to withhold the withholding tax must thus - per se - be imputed to the withholding agent as being of a negligent nature.

Since Takeda has thus not rebutted the statutory presumption of negligence on its part with regard to the failure to withhold interest tax, the company is, pursuant to section 69(1) of the Withholding Tax Act, directly liable to the public authorities for payment of the interest tax not withheld.

...

6.4 Takeda's alternative claims

The Danish Ministry of Taxation understands Takeda's views to mean that a position on the company's alternative claims is irrelevant if the High Court concludes that the Danish-

Luxembourg double taxation treaty cannot be invoked (already) because Nycomed S.C.A., SICAR is not covered by the double tax treaty, since Takeda argues that Nycomed S.C.A., SICAR must be considered the beneficial owner of the interest if neither Nycomed Sweden Holding 2 nor Nycomed Sweden Holding 1 is the owner of the interest.

legal owner, cf. pleading III [...]. As the Ministry understands it, a decision on Takeda's alternative claims will only be relevant if the High Court finds that Nycomed S.C.A., SICAR is covered by the Danish-Luxembourg double taxation treaty, but at the same time finds that it has not been established that the company is the beneficial owner of the interest.

*6.4.1 There is no basis to uphold the alternative claim (A)*

Under the circumstances, the presumption of abuse of interest rate /In this respect, it could be argued that the Royalties Directive and a double taxation treaty raised when the recipient of the interest (the lender) cannot be considered the beneficial owner of the interest could be disproved, see point 6.1.1.3.2 above. In this respect, however, it is not sufficient to refer to the fact that a double taxation treaty could have been invoked if the lender had been someone other than the person who in the actual situation is the lender but cannot be considered the beneficial owner of the interest.

In order for an established presumption of abuse to be rebutted, it is - at the very least - a basic condition that the person who, in the factual situation - demonstrably - is the beneficial owner of the interest would not have been liable to tax on that interest if he had been the direct lender. It is for Takeda to prove that that condition is fulfilled.

Already because Takeda has not proved, let alone proved conclusively, that [the Swedish bank] and [the American private individual] were the beneficial owners of part of the interest in question, the amount for which Takeda is liable to the public authorities must not be reduced by the amounts set out in the claim.

As stated above, Takeda cannot lift its burden of proof by referring to the fact that when the Ministry of Taxation will not recognize that Nycomed S.C.A., SICAR is the legal owner of the interest, the Ministry must

**3326**

acknowledge that [the Swedish bank] and [the US individual] are the beneficial owners of a portion of the interest. If Takeda wants to claim that [the Swedish bank] and [the US private individual] are the beneficial owners, Takeda must provide positive proof, but no such positive proof has been provided.

Thus, it remains undocumented that the interest in question has flowed on from Nycomed S.C.A., SICAR to [the Swedish bank] and [the US private individual]. There is no evidence that Nycomed S.C.A., SICAR has paid any amounts to [the Swedish bank] and [the US private individual], let alone evidence of what the basis for such payments may have been or when such payments may have been made.

Takeda has nevertheless provided positive evidence that part of the interest in question was intended in advance to flow on to [the Swedish bank] and [the American private individual] and that Nycomed S.C.A., SICAR could not dispose of the interest, either because it was legally obliged to pass on the interest or because it had no real power to dispose of the interest due to the factual circumstances and thus merely acted as (another) flow-through entity.

When, as described above, no clarification has been provided as to the framework within which Nycomed S.C.A., SICAR's transactions with regard to the invested capital and the return thereon were carried out, there is no basis for determining whether or not the company was the beneficial owner of the interest.

And the doubt as to whether or not Nycomed S.C.A., SICAR is the legal owner of the interest is prejudicial to Takeda, since, as regards the question of who is

the beneficial owner of the interest cannot discharge its burden of proof by simply stating that if the Ministry of Taxation will not recognize that Nycomed S.C.A., SICAR is the beneficial owner of the interest, then the Ministry must recognize that the investors in the company are the beneficial owner of the interest or vice versa.

Against this background, the Ministry of Taxation should be acquitted of Take's alternative claim A).

*6.4.2 The alternative claim B)*

*6.4.2.1 The claim should be rejected*

With the alternative claim B) Takeda seeks to obtain a response from the courts. As drafted, it does not seek to establish the legal position in the specific situation as it has been presented to the courts, but to establish the abstract conditions under which Takeda can claim a reduction in the amount for which it is liable to the public authorities. However, it is not for the courts to issue such a responsum. According to section 63(1) of the Constitution, it is for the courts to review the decisions of the public administration. Such a review may result in a referral for a new administrative procedure, but a referral is conditional on there being something wrong with the decision under judicial review. Thus, a remittal can only be considered if the judicial review provides grounds for establishing that the decision appealed is based on an incorrect understanding of the law or is subject to a significant procedural error, or if the evidence before the courts provides evidence to suggest that the facts on which the decision was based are incorrect or at least insufficient.

However, the wording of the claim and the arguments put forward by Takeda in support of it show that the purpose of a remittal is not to require the tax authorities to correct errors established in the judicial review, but rather to remit the case 'with a view' to requiring the tax authorities to amend the contested decision 'to the extent' that Takeda subsequently proves the facts alleged in the claim.

The case is thus that a verdict corresponding to the alternative claim B) does not lead to a change of the parties' mutual legal position, as a change is thus conditional on Takeda later documenting the facts stated in the claim.

Takeda has no legal interest at all in obtaining a judgment as to what should apply if it were to present information at a later date that the courts are unaware of.

In the light of the foregoing, it should be held that the alternative claim B) cannot be adjudicated and will therefore have to be dismissed. The same arguments are made in support of the alternative claim for acquittal in case the High Court finds that the arguments lead to acquittal instead of dismissal.

In support of the motion to dismiss, it is further argued that the alternative claim B) is too imprecise and generally worded to form the basis for a conclusion of judgment. In this regard, it is noted that it requires specific information and assessment of the facts of the case in order to establish who were "the direct or indirect investors in Nycomed S.C.A., SICAR" at the times stated in the claim and who were "the 'legal owners' of the interests in question". As the allegation is thus (too) imprecise and generally worded, it is thus unsuitable as a basis for a conclusion of judgment. Also for this reason, it should be stated that the claim is inadmissible and must therefore be rejected.

*6.4.2.2 There is no basis for upholding the claim* As the alternative claim B) is formulated, there is no basis for upholding the claim.

**3327**