# Exhibit 11, Part 2 of 3

Therefore, if the claim is upheld, the Ministry of Taxation must be acquitted.

As stated above, the presumption of abuse of interest-rate /A double taxation treaty raised when the recipient of the interest (the lender) cannot be regarded as the beneficial owner of the interest could, in the circumstances, be disproved under the Royalties Directive and a double taxation treaty.

As regards the Interest/Royalty Directive, the Court's judgment, as also described above, cf. section 6.1.1.3.2, leaves no doubt that the fact that the beneficial owner of the interest is resident for tax purposes in a state with which Denmark has concluded a double taxation treaty which could have been invoked if the beneficial owner had been the direct lender is not - per se - sufficient to rebut an established presumption of an abuse of the Interest/Royalty Directive. And, as also stated above, there is no evidence in the case law to suggest that anything else should apply as regards the assessment of whether there is an abuse of the Nordic double taxation agreement.

In this connection, it is noted that it must in any event be an additional condition that the amounts which in the given factual situation have flowed through to the beneficial owner of the interest in question, i.e. the person who is able to freely dispose of the use thereof, assessed according to the rules of the State in which the beneficial owner is resident, are subject to the taxing jurisdiction of that State, as otherwise there will be no protection against double taxation to be granted in the factual situation under the State's double taxation treaty with Denmark.

Against this background, the Ministry of Taxation must in all circumstances be acquitted of the subsidiary claim B), 1st indent.

Furthermore, the presumption of abuse of the Interest/Royalty Directive and a double taxation treaty raised when the recipient of the interest (the lender) cannot be considered the legal owner of the interest cannot be rebutted solely on the basis that "the direct or indirect investors in Nycomed S.C.A., SICAR", who may be natural persons, would not have been taxable in Denmark on the interest which they would have received if they had granted a loan to Nycomed.

In this connection, it is noted that it must at least be an additional condition that there is certain proof that the natural person in question in the actual situation has been the owner of the interest, and thus also proof that all ownership links between Nycomed and the given natural person have been "flow-through entities" because they were legally obliged to pass on the interest or because they had no real power to dispose of the interest due to the facts of the case.

Against this background, the Ministry of Taxation must therefore also in any event be dismissed for the subsidiary claim B), 2nd indent." *B-171-13 NTC Parent S.a.r.l. v. Skatteministeriet*

*NTC Parent S.a.r.l.* has in its summary pleading of August 2, 2021 stated inter alia:

"5. APPLICATION.

*5.1 Plaintiff's main claim - no limited tax liability on interest*

*5.1.1 The Interest-Royalties Directive*

It is generally claimed that Angel Lux Common S.a.r.l. is the rightful owner of the interest pursuant to the Interest/Royalty Directive, and that the taxation of the interest must therefore be waived, cf. section 2(1)(d) of the Corporation Tax Act [...].

The Ministry of Taxation's arguments that Angel Lux Common S.a.r.l. is the "rightful income recipient" and thus has limited tax liability under Danish law, but at the same time is denied the rights under the Interest Act.

/royalty directive, is contrary to the wording of the directive and the objectives pursued by the directive.

It appears from an interpretation of the wording that a company in a Member State is considered to be the beneficial owner of interest when it receives interest for its own use, unless it receives such interest payments as an intermediary, including as agent, etc. cf. Article 1(1), cf. (4) [...] of the Interest/Royalty Directive.

According to basic company law rules, a subsidiary is an independent legal entity that can enter into binding agreements on its own. Separate agreements are therefore required if a subsidiary is to be considered to act only as an intermediary.

A recipient who, like Angel Lux Common S.a.r.l., acts on its own behalf and at its own risk and expense cannot be compared to an intermediary and must be recognized as the rightful owner of the payment.

For these reasons, it follows from the wording of Article 1(1) of the Interest/Royalty Directive, read in conjunction with Article 1(4), that Angel Lux Common S.a.r.l. is the beneficial owner within the meaning of the Directive. In addition, (i) Angel Lux Common S.a.r.l. had civil ownership of the PECs in question and the related interest, (ii) Angel Lux Common S.a.r.l. had effective control over the interest, and

(iii) that Angel Lux Common S.a.r.l. had the real benefit and risk, and thus is also considered the beneficial owner, as the entity that economically received the interest earned and therefore had the possibility to freely dispose of its use, cf. the EU judgment at paragraph 89 (further section 5.1.6 below).

In addition, there is no basis under Article 5 of the Interest/Royalty Directive to deny Angel Lux Common S.a.r.l. the benefits of the Directive, as this requires internal Danish legal authority.

**3328**

Article 5 of the Interest/Royalty Directive *allows* for the introduction of national and international fraud and abuse rules [...]:

...

There is no fraud or abuse at all in this case, but in any case, Article 5 of the Interest/Royalty Directive states that it is, among other things, a condition that there must be a legal basis in internal Danish tax law to counter the fraud or abuse alleged by the Ministry of Taxation.

There was no such legal basis in Danish tax law, cf. case C-321/05, Kofoed (*"the Kofoed judgment"*), see further section 5.1.3 below.

*5.1.2 The double taxation treaty between Denmark and Luxembourg*

The taxability of interest received from sources in Denmark by companies resident in Luxembourg is governed by Article 11(1) of the Double Taxation Convention.

The provision reads as follows [...]: ...

It follows that the source state, here Denmark, cannot tax interest paid to a resident of Luxembourg if he is the "beneficial owner" of the interest. It is argued that Denmark cannot tax interest payments from NTCI ApS to Angel Lux Common S.a.r.l., as the latter is the beneficial owner of the interest payments/attributions also within the meaning of the Double Taxation Convention.

In the 2003 Commentary to the OECD Model Tax Convention, the issue of beneficial ownership of interest is primarily discussed in point 8 to Article 11. The comments have the following wording [...]:

...

From the commentary to the OECD treaty it can be deduced

U.2023.3198H

that agents and intermediaries and flow-through entities are not beneficial owners of interest. However, in the case of flow-through entities, it is a condition that the entity has such narrow powers that

Copyright © 2023 Karnov Group Denmark A/S

to dispose of the interest that it is effectively a nullity or administrator in relation to the interest.

Angel Lux Common S.a.r.l. is recognized in Luxembourg as an independent legal and tax entity and had civil ownership of the PECs in question and the related interest. In addition, Angel Lux Common S.a.r.l. had actual control over the interest, as well as the actual benefit and risk. Angel Lux Common S.a.r.l. is therefore neither a flow-through company nor a nullity in relation to the interest received from NTCI ApS, but rather its rightful owner.

This is emphasized by the fact that in this case there has been no channeling.

The vast majority of the interest was accrued (but not paid) by NTCI ApS on NTCI ApS' debt to Angel Lux Common S.a.r.l., and as explained in [...] Angel Lux Common
S.a.r.l. on July 10, 2008 over the accrued interest by converting it into shares in NTCI ApS. For Angel Lux Common S.a.r.l., the accrued interest constituted an asset in the form of a (part of a) claim on NTCI ApS until the conversion, and as this asset was not legally or actually paid on by Angel Lux Common S.a.r.l., there was no actual payment or flow-through in relation to the accrued interest. Debt and interest have thus "returned" to Nordic Telephone Company Investment ApS. A debt conversion in Angel Lux Common S.a.r.l. has not been made at the same time as the debt conversion in Nordic Telephone Company Investment ApS, which is why there is no onward channeling.

For this reason, Angel Lux Common S.a.r.l. must also be recognized as the rightful owner, cf. SKM 2012.121 ØLR [...].

*5.1.3 No national legal basis for denial of directive benefits*

It follows directly from Danish administrative practice and from the Court's decision in the Kofoed judgment that there must be internal Danish rules if NTCI ApS is to be denied exemption from interest tax under the Interest/Royalty Directive.

The Ministry of Taxation continues to argue that Article 11 of the Danish-Luxembourg Double Taxation Convention and section 2(1)(d) of the Danish Corporation Tax Act constitute such national or treaty provisions to combat fraud or abuse as stated in Article 5 of the Interest/Royalty Directive so that Denmark is not obliged to waive the withholding tax under the Interest/Royalty Directive.

This remains meaningless.

The plaintiff's position is clearly contrary to the "golden rule" according to which double taxation treaties cannot independently authorize taxation, which has been confirmed by the National Tax Tribunal in SKM 2010.268LSR (now SKM2012.121.ØLR) [...].

The mere rule of limited tax liability in the Corporation Tax Act § Section 2(1)(d) obviously does not constitute such an internal legal basis for the prevention of fraud and abuse. As already documented above, Angel Lux Common S.a.r.l. is undoubtedly the rightful income recipient of the interest payments from NTCI ApS, which is why there is no legal basis in Article 5 of the Directive to deny the company the benefits resulting from the Interest/Royalty Directive.

As also explained in the Eastern High Court's referral order to the Court of Justice, paragraphs 109-112 [...], there was no general statutory rule on combating abuse in 2006-2008 either. Such a protective rule was first adopted by Act no. 540 of
April 29, 2015 [...]. In addition, it is also agreed that

**3329**

the principle of substantive law does not provide a basis for setting aside the transactions carried out in this case [...].

The above questions should have been clarified when the Court answered questions 2.1 and 3 in the order for reference.

However, the Court chose to implement a change in practice (see section

5.1.5 below), which meant that the Court did not take a direct position on the questions.

However, both the Commission and the Advocate General contributed with their interpretation. In its written observations to the Court [...] the Commission clearly stated that neither section 2(1)(d) of the Corporation Tax Act nor Article 11 of the Double Taxation Convention can be regarded as implementing the provision in Article 5 of the Interest/Royalty Directive. Likewise, the Advocate General concluded in point 110 of his Opinion that [...]:

"*110. For this reason, the answer to questions 2.1 and 3 is that neither section 2(2)(d) [sic] of the Danish Corporation Tax Act nor a provision in a double taxation treaty which, as regards the taxation of interest, is based on the beneficial owner is sufficient to be regarded as implementing Article 5 of Directive 2003/49.*"

Both the Commission and the Advocate General thus supported the applicant's arguments.

However, as mentioned above, the Court's decision implemented a change in practice whereby EU directives "now" in themselves can be invoked by a Member State against citizens without the requirement of national transposition of the relevant provisions.

In line with the EU ruling, the Ministry of Taxation has expressed the view that even if there were no national or collective agreement rules to combat abuse at the time, the general EU law principle of prohibition of abuse of rights would apply.

This view is directly related to the Court's new case law and also constitutes yet another breach of current Danish administrative practice. However, as described in section 5.1.5 below, the principle of legal certainty prevents such a view from being accepted.

*5.1.4 Changing Danish practice*

When assessing whether the Ministry of Taxation's argumentation reflects a change in practice, it is not only relevant to look at the tax authorities' practice, but also relevant to take a closer look at the legislator and the Ministry of Taxation's (changing) views on the issue. In particular, the issue relates to the Ministry's view on the concepts of rightful income recipient, rightful owner, and the use of holding companies. Of relevance to this is therefore also the development of t h e  legal position regarding tax liability on dividends, which also includes the possibility of tax exemption if taxation is waived or reduced under an EU directive or a double taxation agreement, and where the question of the rightful owner of the payment is the same in both relationships.

In Denmark, foreign companies have had limited tax liability on dividends since January 1, 1970 [...].

In 1992, the Parent-Subsidiary Directive was implemented in Danish law [...], according to which dividends distributed by e.g. a Danish subsidiary to its EU parent company are exempt from withholding tax under certain conditions, cf. also Article 5 of the Parent-Subsidiary Directive [...].

In 1998, non-EU companies were also covered by the exemption from dividend tax [...]. It appears from the legislative history of the provision that [...] (our emphasis):

"*It is also proposed to abolish withholding tax on dividends paid to foreign parent companies when the Danish subsidiary is covered by the EU Parent-Subsidiary Directive, so that EU companies and non-EU companies are treated equally for tax purposes. This withholding tax can largely be avoided by incorporating holding companies in countries in relation to which Denmark is wholly or partially exempt from withholding tax. According to the proposal, income in a Danish subsidiary will*

*thus only be subject to Danish corporation tax in Denmark, and the foreign parent company will in this respect be taxed*

*in Denmark will be treated in the same way as a Danish parent company.*"

From the notes on revenue, it appears that [...] (our emphasis):

"With regard to *the tax exemption of dividends from Danish subsidiaries to foreign parent companies and dividends from foreign subsidiaries to Danish parent companies, the change will not affect dividends from and to another EU country, as these are already tax-free, but only in relation to countries outside the EU. There is no firm evidence for an assessment of the revenue impact. For example, there is no information about foreign parent companies' dividends from Denmark or about Danish parent companies' subsidiary dividends from non-EU countries. On the other hand, it must be included in the assessment that the current taxation can be circumvented by redirecting the dividends to companies in third countries, so that the dividends are not taxed in Denmark.*"

The comments can only be understood to mean that in 1998 the Ministry of Taxation believed that the incorporation of holding companies in other EU countries was a simple and legal application of the rules, and that the administrative burden of the rules could therefore just as well be removed.

In 2000, however, the Danish Ministry of Taxation had second thoughts. Under the auspices of ECOFIN, a special code of conduct group had examined 271 tax schemes in the EU countries and, as a result, expressed criticism of the Danish rules.

On November 10, 2000, bill no. 99 was therefore introduced to reintroduce taxation of dividends for

**3330**

parent companies in non-EU countries without a double tax treaty with Denmark.

The bill states that the change is due to external criticism, especially since [...]:

"(...) *that the Danish rules can be used to undermine other countries' taxation. Other countries that tax dividends from companies in these countries to parent companies in tax haven countries are therefore unhappy that their taxation can be circumvented by using the Danish holding rules.*

*It is therefore proposed as a Danish contribution to counteract the use of tax havens and to meet foreign criticism to introduce the 25% tax on dividend payments from a Danish subsidiary to its foreign parent company, but only in cases where the parent company is domiciled in a country outside the EU or in a country that does not have a double taxation agreement with Denmark.*"

By the adoption of the bill, the Danish holding rules are thus brought back to the situation in 1998, i.e. a legal situation where withholding tax could be avoided by depositing holding companies in countries in relation to which Denmark was wholly or partly prevented from withholding tax, cf. the preparatory works to the 1998 amendment cited above. For the same reason, the legislator also expected that the additional revenue from the proposal would be limited [...].

This situation gave rise to a number of questions during the bill's consideration.

In its answer to Committee Question 16 [...], the Tax Minister used the example of a parent company in the British Virgin Islands which has a subsidiary in Ireland.

If the Irish subsidiary is directly owned by the parent company in the Virgin Islands, Ireland will tax the dividend payment from the subsidiary to the parent company. The reintroduction of dividend taxation would mean that the Irish taxation could no longer be circumvented by incorporating a Danish holding company so that the Irish subsidiary distributes dividends to the Danish holding company, which in turn distributes the dividends

to the parent company in the Virgin Islands.

According to the bill, the Danish holding company will no longer be able to pay dividends tax-free to the parent company in the Virgin Islands. However, the Ministry of Taxation also confirms that [...] (our emphasis):

"*It is correct that the parent company in the Virgin Islands can still avoid Danish taxation of the dividends from the Irish company by transferring the shares in the Danish company to an intermediate holding company in Cyprus. In that case, Denmark will not tax the dividends as the parent company in Cyprus is covered by the Danish-Cypriot double taxation treaty.*"

In response to committee question 3 on the additional revenue [...], the Minister of Taxation replied:

"*However, the companies will be able to restructure themselves so that the shares in the Danish subsidiary are transferred to a subsidiary in a country to which dividend payments are still exempt from Danish dividend tax. This is advantageous if the dividends from here can be distributed to the actual parent company with a lower tax rate than the Danish tax rate, possibly without taxation at all.*

*Therefore, the revenue from such companies is estimated to be limited.*"

In response to committee question 15, which points out that the rules of the bill are not effective due to the possibility of using an intermediate holding company [...], the Minister of Taxation replied [...]:

"*It is argued that the proposed rules are not particularly effective as they can be avoided by an intermediate holding company in another country that is a member of the EU or has a double taxation treaty with Denmark and which has favorable tax rules.*

*I would like to note that in this case it is a case of the parent company in the tax haven country avoiding taxation by using the favorable rules in the other country.*"

Overall, there is no doubt that the Ministry of Taxation, when removing and reintroducing the dividend tax, has been fully aware of the possibility of using intermediate holding companies in EU or DBO countries and the possibility for Danish companies to pay tax-free dividends to such companies.

No special rules were laid down to counteract this, and there is no mention whatsoever that there may be an issue regarding the "rightful owner" of the dividends. This is despite the fact that the answers given by the Minister of Taxation obviously deal with pure flow-through companies.

This legal position was again confirmed by the answer to question 54 from the Minister of Taxation in 2004 when the Interest/Royalty Directive was implemented in Danish law [...].

In case law, emphasis is placed on whether the legislator has been aware of opportunities to circumvent rules, cf. e.g. U.2004.174 [...], where the Supreme Court concluded that it was a legal exploitation of a set of rules. Furthermore, the case law emphasizes whether the legislator has introduced recent legislation concerning the area in which the taxpayer acts, and the Supreme Court does not interpret a provision expansively if the legislator has been close to the problem without specifically reacting, cf. U.2007.736H [...] and U.2004.174H [...]. As described by Professor Anders Nørgaard Laursen in RR.SM.2020.0006 [...], it will be crucial in such situations if it can be shown that the legislator failed to react to a recognized circumvention opportunity. In such a case, it must be out of the question for the courts to intervene and "save" the tax authorities.

The legislator has been aware of the problem without specifically amending the law or inserting provisions to prevent

the use of EU intermediate holding companies, and at no time before the case complex on beneficial ownership has a

**3331**

expanding "beneficial owner" concept under the Directive or the double tax treaty.

This is supported by a statement from Head of Office Michael Dalvad Carlsen from SKAT to Jyllandsposten on September 14, 2009 (our emphasis) [...]:

"*Even if the money has not flowed through immediately in all cases, the same reasoning applies, namely that a company in Luxembourg without the right to dispose of the funds is not the rightful owner. They are the underlying owners, and therefore withholding tax must be levied. Whether we will be successful, we do not know. Our view is fairly new in tax practice, so we'll have to see what the Supreme Court says when it comes to make a decision.*" The Ministry of Taxation's (current) view on the use of EU intermediate holding companies thus also constitutes a change in Danish practice.

Such a change in practice cannot legally be implemented without prior notice, see e.g. U.1965.399.H [...] and U.1983.8.H [...], which is also described in the legal guide [...] - and naturally requires in any case that the new practice has legal authority.

This should also be seen in the context of the fact that, as far as is known, the tax authorities have not in a single case prior to these cases considered a foreign company to have limited tax liability on dividends on the basis that the company was not the rightful owner of the income, as this concept is now interpreted by the Danish Tax Agency. And not at all with reference to the fact that in this respect it was irrelevant whether Denmark had adopted legislative provisions aimed at preventing fraud and abuse.

In connection with the consideration of L 30 (2006/2007), the Minister of Taxation was thus asked to what extent and how the Danish Tax Agency (SKAT) checks whether a flow-through company should be recognized as the correct income recipient (question 10 of 21 November 2006). The Minister of Taxation states that [...]:

"*It is part of the tax assessment process to ensure that the conditions for not withholding dividend tax are met, including whether a foreign company is the beneficial owner of the dividend.*"

According to the Minister of Taxation, there has historically been a focus on the area, as it is part of the general tax assessment work to ensure that foreign companies are entitled to benefits under the double taxation treaties, including that the companies are the rightful owners of the dividends.

It is inherently not possible to show examples of a "negative decision" where the tax authorities choose not to intervene. Instead, it must be assumed that the Minister of Taxation had the necessary insight in the area to provide the following answer in connection with the same legislative process (answer to question 6 of November 21, 2006), where he [...]:

"*... cannot provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies.*" The above quote should be seen in the context of the focus on flow-through companies in connection with the legislative changes in 1998-2001, and that the Ministry of Taxation in 2003 specifically failed to conduct an investigation of flow-through companies, as the legislative amendment in 2001 had significantly removed the exploitation possibilities that had been criticized by the EU [...]. The same legislative amendment, in which the Minister of Taxation confirmed in committee questions the possibility of depositing intermediate holding companies. Similarly, in 2002, the Danish Tax Agency was of the opinion that an assessment of flow-through companies would not lead to many corrections [...].

The previous practice is probably due to the fact that the Ministry of Taxation originally considered the concept of "beneficial owner" to be very similar to the Danish concept of "rightful income recipient".

In an answer of November 6, 2006 to question S 474, the Minister of Taxation expressed the relationship between the rightful owner and the rightful income recipient as follows (our emphasis) [...]:

"*The starting point is that foreign companies that receive dividends from Danish companies have limited tax liability on the dividends. The tax liability is fulfilled by withholding 28 percent dividend tax. The principle is waived if the dividends are received by a company that owns at least 20 percent of the share capital in the dividend-paying company. The ownership requirement must be fulfilled for a continuous period of at least one year, within which period the dividend distribution must be made. It is a condition for the derogation that the taxation must be waived or reduced under the Parent-Subsidiary Directive or under a double taxation treaty with the state in which the dividend recipient is resident.*

*The limited tax liability - and the derogation - applies to the company that actually receives the dividend. The limited tax liability is therefore only waived if the foreign company that actually receives the dividend is covered by the Directive or a double taxation treaty. However, if the dividend is actually received by a company in a tax haven country, the dividend payment is not exempt from withholding tax.*

*The "beneficial owner" principle must therefore be applied to determine who "receives" the interest. The term "beneficial owner" is considered to be very similar to the term "beneficial owner" used in the double tax treaties. In the double tax treaties, withholding tax shall only be waived or reduced if the beneficial owner of the*

**3332**

*owner (beneficial owner) is resident in the other state. The provision is a safeguard against an ordinary taxed company being inserted as a conduit company between the dividend-paying Danish company and the final receiving foreign tax haven company. The provision applies even if several intermediate ordinary taxed companies are incorporated. The decisive factor is who is the correct income recipient/beneficial owner.*" The Minister of Taxation also expresses this opinion in connection with the consideration of L 116 (Act no. 308 of April 19, 2006), where the Minister in response to an inquiry from FSR states (our emphasis) [...]:

"*The limited tax liability for interest under the Corporation Tax Act*

*§ Section 2(1)(d) covers foreign companies that receive intra-group interest from Denmark. This limited tax liability lapses if the taxation is to be waived or reduced under the Interest/Royalty Directive or under a double taxation treaty.*

*In this connection, it should be noted that in relation to section 2(1)(d) of the Danish Corporation Tax Act, it must be determined based on the principle of the right income recipient who receives the interest.*

*Source taxation of the interest is only waived under the treaties if the beneficial owner of the interest is a resident of the other state. The same applies in the Interest/Royalty Directive, cf. Article 1(1) of the Directive. The benefits of the Directive may also be denied in the case of transactions that have tax evasion, avoidance or abuse as the main motive or one of the main motives.*

*If the private equity funds make equity and loan investments*

U.2023.3198H

*through holding companies, it will need to be assessed whether the holding company is the proper income recipient/beneficial owner of the interest income. A pure*

**3333**

*flow-through company in, for example, Luxembourg can, in my opinion, hardly be the rightful income recipient/rightful owner of the interest income. The Swiss Supreme Court has concluded that a pure flow-through holding company in Denmark was not the beneficial owner of dividend payments under the Danish-Swiss treaty."*

The Ministry of Taxation once again reiterates this position in a memo issued on March 20, 2007 regarding "Status på SKATs kontro- lindsats vedrørende kapitalfondes overtagelse af 7 danske koncer- ner". The press release states, among other things (our emphasis) [...]:

*"On this basis, it is investigated who is the final recipient - the "rightful income recipient" - of interest and dividends. The purpose is to determine whether this recipient is liable to pay tax to Denmark (limited tax liability) so that withholding tax can be withheld from the payments. This can normally only be done if the recipient is resident in a country with which Denmark has not concluded a double taxation treaty.*

*However, the cash flow often leaves Denmark to recipients in countries with which Denmark has signed a double tax treaty - DBO countries. This means that there is no limited tax liability to Denmark and that no withholding tax must be withheld. However, if the first recipient of the payments is not the final recipient - "rightful income recipient" - of the payments, but only a flow-through company, there may still be a limited tax liability for the final ("rightful") recipient."*

In this case, as mentioned, it is agreed that Angel Lux Common is considered the correct income recipient of the interest from NTCI [...]. Therefore, and as a change of administrative practice cannot be made retroactively or without adequate notice, cf. UfR 1965.399.H and UfR 1983.8.H, the Danish Tax Agency was not entitled in 2009-2010 with retroactive effect to 2006-2008 to change established practice as to whether foreign companies are the rightful owners of interest payments and on that basis raise a tax claim of DKK 925,764,961.

*5.1.5 Changes in EU law*

It is settled case-law of the Court of Justice that an interpretation of a rule of EU law given by the Court in the exercise of its jurisdiction under Article 267 TFEU elucidates and clarifies, to the extent necessary, the meaning and scope of that rule as it must be understood and applied or should have been understood and applied from its entry into force.

In these cases, the Court does not consider the new assessment as a change in practice, as the interpretation should in principle always have been understood and applied in this way. However, this consideration does not alter the fact that the Court does indeed make changes in practice based on developments in both the legal and political systems.

An example of this can be seen by comparing cases C-18/11, Philips and C-28/17, NN.

...

Thus, the development of the EU legislator's view on and fight against tax avoidance now led to a directly opposite conclusion on the previously decided question. What is remarkable about the Court's "new" practice in this area is also described in the legal literature [...].

It is also assumed in the practice of the Supreme Court and the Ministry of Taxation and also in the literature on judicial (sovereignty-absorbing) activism that the Court of Justice from time to time establishes new stricter EU requirements, see for example the Supreme Court's judgment reproduced in U.2017.824 H (Ajos) [...]. In such cases, the Court's interpretation can be

retroactive effect is not accepted in Danish law for reasons of legal certainty.

If the EU judgment is to be read as meaning that EU directives or the EU law principle of abuse can "now" *in itself be* invoked by a Member State against citizens, this is a new and stricter legal position, detrimental to citizens, which the Court has previously expressly considered to be incompatible with the principle of legal certainty, cf. the Kofoed judgment [...].

...

*5.1.5.1 Case C-321/05, Kofoed and others*

In case C-321/05, Kofoed, the Court had to decide, among other things, whether the general EU law principle of abuse of rights could be applied directly against a taxpayer if it has not been implemented in national (Danish) law.

Specifically, the Court had to decide on a share exchange and whether the Danish tax authorities could react to a possible abuse of the rules, even though Denmark had not adopted specific measures to implement Article 11 of Directive 90/434.

In July 2007, the answer from the Court of Justice was a clear "no".

The general EU law principle of abuse of rights cannot be applied directly against a taxpayer if it is not implemented in national law.

...

The Court delivered the Kofoed judgment in accordance with the proposal for a decision, and thus held that, although the Article 11(1)(a) referred to reflected the general Community law principle of prohibition of abuse of rights and that there were indications of such abuse in the case, the 1(a) of Directive 90/434 reflected the general Community law principle of prohibition of abuse of rights and that there were indications of such abuse in the case, the Danish tax authorities could not apply the principle of abuse without the provision having been transposed into Danish law or Danish law containing a principle prohibiting abuse of rights or other provisions on tax fraud or tax evasion which could be interpreted in accordance with Article 11, see paragraphs 38 and 40-42 of the Kofoed judgment.

The Danish tax authorities then had to acknowledge that there was no legal basis in Danish law to tax the share exchange.

The Kofoed judgment reflects a consistent and long-standing practice of the Court of Justice. This practice has been repeatedly confirmed in EU case law, as the Commission has also explained in its written observations to the Court [...]. Nor is there a single example in the case law cited in the EU judgment of an EU judgment that deviates from the Kofoed judgment in this respect.

In point 103 of his proposal for a decision in the EU judgment, Advocate General Kokott has again explained the current practice as it has been since the proposal and subsequent judgment in C-321/05, Kofoed in 2007

...

In direct connection with this, the Advocate General also emphasizes in point 104 why the same case law leads to the conclusion that the principle of prohibition of abuse of rights cannot be applied in this case either ...

...

In other words, in his proposed decision, the Advocate General has maintained and confirmed EU practice as it has been from the Kofoed judgment in 2007 until the EU judgment in 2019. It is the same statement of practice that was also put forward by the Commission and which was also put forward by the plaintiff and the Ministry of Taxation's counterparts in the other cases in the complex.

Just as in the Kofoed judgment, the answer to the question

prior to the EU judgment - was still "no" when assessing whether the general EU law principle of abuse of rights can be applied directly against a taxpayer if it has not been implemented in national law, or if Danish law did not at that time contain a principle prohibiting abuse of rights

U.2023.3198H

tax fraud or tax evasion that could be interpreted in accordance with the provision.

Prior to the EU ruling, the Ministry of Taxation was thus completely alone with its interpretation.

*5.1.5.2 Judgment of the Court of Justice in Case C-115/16 etc., N Luxembourg 1*

In the EU judgment, in direct contradiction to previous EU practice, the Commission's statement and the Advocate General's Opinion, the Court of Justice concluded that the general EU law principle of abuse of rights applies even without national transposition of Article 5 of the Interest/Royalty Directive, cf. the EU judgment at 117 [...].

...

This situation, where the result of the EU ruling is the diametric opposite of the Kofoed ruling and previous practice, and where the Court itself recognizes that it is necessary to disregard the Kofoed ruling, the Ministry of Taxation considers this nothing more than the Court's clarification and clarification of the legal situation.

Obviously, this view cannot be accepted.

In the Kofoed judgment, the Court was also directly asked to what extent the finding of a possible abuse of rights may have an impact on whether the EU abuse doctrine can be applied without national implementation. The Court states [...] that the referring court specifically asked whether the tax authorities could react to a possible abuse of rights, even though the national legislature had not adopted specific measures implementing Article 11 of Directive 90/434.

Under the heading *"On the possibility of taking account of a possible abuse of law", the* Court concluded that without national transposition, the principle of legal certainty precluded the application of the EU law principle of abuse [...]. Directives cannot as such

**3334**

can be invoked against a citizen, and therefore the Member State cannot invoke the EU law principle of abuse without implementation. And this even though there were "certain indications" of a possible abuse of law in the case [...].

The Court thus unambiguously states that national law *cannot take* into account a possible abuse of rights and apply the EU law principle of abuse if the principle has not been implemented in national law. In other words, the abuse assessment in this situation was effectively irrelevant to the access to benefits under EU law. If the Danish state has not introduced a national legal basis for applying the EU law abuse principle, the principle of legal certainty prevents the application of the principle.

In the case, the Ministry of Taxation tries to avoid this conclusion by rewriting the issue. It is stated that the case does not involve the imposition of an obligation on the citizen or an invocation of the abuse principle. Instead, it is a case where there is an abuse of rights and therefore it is simply a case of the objective conditions for obtaining an advantage under EU law not being met because the advantage is sought to be obtained by abuse of rights.

However, the fact remains that the Danish Ministry of Taxation, in a situation without national abuse provisions, wants to deny a benefit under EU law on the grounds that there has been an abuse of law. It is precisely this situation that the Court rejected in the Kofoed judgment. National law cannot take into account whether or not there has been an abuse of rights if the abuse principle has not been implemented in national law. It is on this crucial point that *the EU judgment has changed practice.* Regardless of the premises of the Kofoed judgment, the EU abuse principle can

*now be* invoked against a taxpayer without national implementation.

The EU judgment thus clearly constitutes a change in practice from the Kofoed judgment and other previous EU practice.

The Ministry of Taxation finds no support in either national or international legal literature, where the EU ruling is widely regarded as new practice and a sensational and distinguishing decision [...].

...

*5.1.5.3 Application of the new case law of the Court of Justice*

*First of all*, the Court of Justice has no jurisdiction to introduce this new practice.

The question of the direct application of an unwritten, ubiquitous and general principle of EU law, which does not require national provisions but can always have direct effect on citizens, is a question of sovereignty. Whether Denmark has specifically ceded sovereignty that gives the CJEU such a broad right to override national and EU law provisions can only be decided by the Danish courts.

When Denmark joined the EU in 1972, the Ministry of Justice explained that parts of EU law were directly applicable with direct effect for citizens [...] and such provisions became part of Danish law in the Accession Act [...]. However, in U.2017.824H [...], the Supreme Court ruled that it was (our emphasis) [...]:

"(...) *it is well known and also foreseen in the Act of Accession that the European Court of Justice may develop and establish general principles originating in the European Convention on Human Rights and similar treaties and in the common constitutional traditions of the Member States. However, such general principles are not directly applicable in Denmark under the Accession Act, and they cannot be invoked in disputes between private parties.*

The EU judgment states that the general EU law principle of abuse invoked by the Ministry of Taxation can be derived from established case law in a number of different areas [...]. However, the principle has no basis in any treaty provision.

The situation was the same in the Supreme Court's decision in U.2017.824H [...], ...

The Supreme Court concluded that the Act of Accession did not contain the necessary legal basis to apply a general principle of EU law with binding effect on private parties.

Based on this, the plaintiff argues that, in this case, there is also not the required express legal basis in the Danish Act of Accession to invoke the unwritten, general EU law principle of prohibition of abuse with direct effect against a citizen.

The principle of legal certainty also precludes the application of this new practice in this case, and denial of benefits under the Directive and invocation of the general EU law principle of abuse must therefore continue to require a legal basis in national law in this case. The principle of legal certainty is a fundamental principle of EU law which requires that a system which denies a taxpayer rights or imposes burdens on a taxpayer must be clear and unambiguous in order for the taxpayer to be in no doubt about his rights and obligations so that he can act accordingly, see C-143/93, Van Es Douanne Agenten.

In the same way that the Court in the NN case a number of years after the Phillips case had to decide on the same issue, the Court in this case in 2019 had to assess the practice that the Court itself established in the Kofoed judgment in 2007. In the time between Kofoed and the EU judgment, in 2012 the European Commission presented its Action Plan to strengthen the fight against tax fraud and tax evasion [...], which in the coming years would develop specific measures against tax fraud, including a recommendation to introduce general anti-abuse rules [...]. In 2016, the EU introduced a specific directive to combat tax

evasion, Article 6 of which included a general rule on

**3335**

combating abuse [...]. General safeguards were widespread in EU law in 2019 and were also introduced in Denmark in 2015. The bill for the Danish rule also refers to a memo published by the European Commission on counteracting the introduction of an EU intermediate holding company [...].

It is an obvious thought that the Court's new interpretation on the application of the general EU law abuse principle - as in the NN case - was driven by a perception that developments in the EU regarding tax avoidance are not reflected in the Kofoed judgment, and that it was therefore time to *change practice*.

In such circumstances, however, the consideration of legal certainty outweighs the primacy of EU law, see for comparison the assessments made by the Supreme Court in U.2012.3564H [...] and U.2017.824H [...].

*5.1.6 There is no abuse*

*5.1.6.1 Subjective and objective requirement*

In paragraph 124 of case C-115/16 (joined cases), the CJEU states that [...]:

...

It is thus a condition for establishing abuse that there are both objective circumstances and a subjective element intended to take unjustified advantage of EU law.

Below, a number of factors are discussed in more detail, which will show that there are no objective and subjective elements required to establish abuse.

It is thus maintained that under all circumstances there has been no abuse of law at all. This already follows from the fact that under Danish law there are no grounds for setting aside the transactions made in this case based on a principle of reality, respectively that SKAT and the Ministry of Taxation recognize Angel Lux Common S.a.r.l. as the correct income recipient [...].

*5.1.6.2 Joint establishment in Luxembourg*

As a preliminary remark, it should be noted that a private equity fund is a collective "investment fund" whose investors are mainly institutional investors or wealthy individuals. Thus, there will often be a large number of underlying investors in each private equity fund, as is the case in this case, [...].

In this case, hundreds of investors have pooled their investments in various private equity funds. The private equity funds have subsequently chosen to pool the funds together by establishing a joint consortium in order to have sufficient capital to make such a massive acquisition as the purchase of TDC A/S was.

In such a case, where several private equity funds invest in the same company, and in a situation where these private equity funds are not established in the same country, there is a need to gather the investors on a common platform. Thus, the investors need to have a common structure to make the investment through.

Private equity funds and other foreign investors have historically made their investments through Luxembourg, primarily due to the fact that Luxembourg is considered an attractive and stable legal, regulatory, financial and political country to invest through. As a result, the top layer of the investment structure was established in Luxembourg [...].

At the time of the original selection of Luxembourg as supreme "holding jurisdiction", it was irrelevant to the issue of withholding tax on interest where in the world the companies were domiciled, as the precondition for withholding tax on interest payments is that it is controlled debt. At the time of the establishment of the original holding companies in Luxembourg (summer and fall 2005), there was no controlled debt under Danish law and thus no limited tax liability. Juste-

The change of definition to controlled debt was first introduced by bill no. 116 of December 14, 2005 [...].

It is thus disputed that there is no credible business justification for the arrangement and that the sole reason for the arrangement is to provide the group with tax advantages.

The establishment of a holding structure when several investors invest together is well-known and commercially well-founded, as has also been established by the court, for example in the Canadian Federal Court of Appeal's judgment of April 26, 2009 regarding Prévost Car Inc. [...]. ...

In addition to the pooling of the investment in Luxembourg, there was also a need for a common holding structure in Denmark, as it offers a number of advantages in relation to the financing of the acquisition, including Danish joint taxation, the submission of a joint purchase offer and the possibilities for finalizing the purchase and in general the handling of the funds' joint investment [...].

*5.1.6.3 Civil law ownership*

Angel Lux Common S.a.r.l. was undisputedly the civil law owner of both the PECs issued by NTCI ApS and the related interest. The interest payments received were also taxable in Luxembourg [...] and Angel Lux Common S.a.r.l. has actually paid tax in Luxembourg on the interest payments.

The company's annual reports show that tax in 2007 amounted to EUR 180,066, while tax in 2008 amounted to EUR 104,228.

*5.1.6.4 Real control over interest rates*

It is submitted that Angel Lux Common had an independent right to dispose of the interest amounts.

Firstly, there were no legal restrictions on Angel Lux Commons' access to dispose of interest on PECs issued by NTCI ApS.

**3336**

Secondly, Angel Lux Common was not, in practice, subject to any restrictions whatsoever on the right to dispose of interest amounts received/attributed.

It thus followed from the terms of the PECs issued by Angel Lux Common that Angel Lux Common itself decided whether interest on PECs issued by Angel Lux Common should be charged or credited.

Furthermore, Angel Lux Common could decide that interest on PECs issued by Angel Lux Common should be paid in cash, by issuing additional PECs or by issuing shares in the company, cf. sections 2.2 and 3.1 of the terms and conditions of the PECs in question [...].

Angel Lux Common was thus not legally or practically obliged to use interest received from NTCI ApS for payment to Angel Lux Parent. Angel Lux Common has also not to a significant extent actually used interest amounts received from NTCI ApS to pay interest on the PECs issued by Angel Lux Common.

The addition of interest on NTCI ApS' debt to Angel Lux Common meant that Angel Lux Common's claim on NTCI ApS at each addition was increased by an amount corresponding to the added interest.

When Angel Lux Common on July 10, 2008 decided to convert the claim on NTCI ApS into shares in NTCI ApS, Angel Lux Common disposed of the accrued interest amounts as part of this conversion. The conversion of the claim on NTCI ApS, including the accrued interest, was thus decided by Angel Lux Common at an extraordinary general meeting in NTCI ApS on July 10, 2008.

The decision to dispose of the claim on NTCI ApS, including the accrued interest, by conversion to shares in NTCI ApS could legally only be made by Angel Lux Common and was also actually made by Angel Lux Common alone.

It would obviously be impossible for Angel Lux Common to decide to convert the accrued interest amounts into shares in NTCI ApS if Angel Lux Common in practice had no independent right to dispose of the interest.

Angel Lux Common's decision to convert the accrued interest thus documents that Angel Lux Common - as the only one - had the right to dispose of the interest.

Nor were decisions on how Angel Lux Common should dispose of the interest actually made by anyone other than the management of Angel Lux Common. On the contrary, all decisions regarding Angel Lux Common's disposition of the interest were made by the management of Angel Lux Common.

Angel Lux Common was thus not legally or factually obliged to use interest amounts received from NTCI ApS for payment to Angel Lux Parent.

As regards the PEC loan between NTCI ApS and Angel Lux Common, NTCI ApS decided whether interest on PECs issued by Nordic Telephone Company Investment ApS should be paid and when.

Furthermore, Nordic Telephone Company Investment ApS could decide that interest on PECs issued by Nordic Telephone Company Investment ApS should be paid in cash by issuing additional PECs or by issuing shares in the company. Both Nordic Telephone Company Investment ApS and Angel Lux Common thus had actual control over the interest payments to Angel Lux Common and Angel Lux Parent, respectively,

The fact that there was no debt conversion in Angel Lux Common at the same time as the debt conversion in Nordic Telephone Company Investment ApS reflects the fact that Angel Lux Common and Angel Lux Parent had full control over the mutual debt relationship.

It is disputed that the level of activity is of decisive importance to whether Angel Lux Common is the rightful owner. In this connection, it is noted that the physical framework and activity of any company is naturally adapted to the nature of the business carried out by the company in question.

At the time the interest was received, Angel Lux Common's purpose was to hold shares in NTCI. By its very nature, the activity of a holding company will be limited in scope, as one or a few annual general meetings and a few annual board meetings must be held to make the relevant and necessary decisions for the holding company. As mentioned in the introduction, Angel Lux Common has premises in Luxembourg, and the company has one employee.

Angel Lux Commons' activity thus corresponds to the activity of thousands of Danish and foreign holding companies, which the Danish tax authorities according to established practice (previously) - and rightly so - have considered to be the rightful owners of dividends distributed from subsidiaries.

In continuation of the above, it is argued that a company must be recognized as a beneficial owner also when it operates as a holding company, cf. the considerations in the Prévost judgment discussed above in section 5.1.6.2.

It should also be noted that in TfS 2004.542 H (Johnson Holding A/S) [...] the Supreme Court established that a holding company whose business consists solely of holding shares in one or more subsidiaries must be considered

**3337**

for traders in the application of the tax law rules. The reality is that Angel Lux Common S.a.r.l. carries out the activity that any holding company does, namely the holding of shares in one or more other companies and the disposal of the shares

- all in accordance with the decisions made by the holding company's management on an ongoing basis.

*5.1.6.5 Real benefit and risk*

The PECs issued did not have the same interest rate. PECs issued by NTCI ApS had an interest rate of 10%, while the interest rate of PECs issued by Angel Lux Common S.a.r.l. was 9.96875%.

Even if the two loans were to be viewed together, Angel Lux Common

S.a.r.l. can be sure of generating a profit at all times, which is also underlined by the fact that the company actually paid corporation tax in Luxembourg during the period in question.

The interest income has therefore had a real utility value for Angel Lux Common S.a.r.l.

*5.2 Plaintiff's alternative claim - ultimate owners*

*5.2.1 Introductory remarks*

The parties agree that the total withholding tax requirement must be fully or partially waived if the ultimate investors in the underlying capital funds are resident in an EU member state or a state with which Denmark has concluded a double taxation treaty.

The disagreement then consists of whether additional conditions can be set up for the reduction of withholding tax.

Originally, there was not the same disagreement, and it therefore also appears in several places in SKAT's original decision and case presentation that the withholding tax must be waived or reduced to the extent that the rightful owners of paid or credited interest are resident in a DBO or EU country, [...].

SKAT's decision and presentation of the case states [...]:

*"The two companies in Luxembourg, on the other hand, are considered to function as flow-through entities for the private equity funds and banks, which are mainly domiciled in countries without a double tax treaty with Denmark, and thus not entitled to obtain the benefits that follow from this.*

*The interest flows from the Danish part of the group through the companies in Luxembourg and on to the private equity funds and banks."*

SKAT's preliminary decision states that (our emphasis) [...]:

*"Against this background, SKAT is of the opinion that interest withholding tax must be withheld on the interest accrued/paid in Nordic Telephone Company Invest-ment ApS to Angel Lux Coomon S.á.r.l. in the period from May 1, 2006 to July 10, 2008.*

*However, this does not apply to the share of interest that ends up with the ultimate PECs owners who are resident in a DBO country."*

It further states (our emphasis):

*"If the company subsequently presents documentation showing that some of the private equity funds and banks are domiciled in countries with a double taxation treaty with Denmark, SKAT will make corrections to the basis for the calculation of the above."*

The case description goes on to state [...] (our emphasis):

*"SKAT has no knowledge of the underlying ownership structures, but it is SKAT's opinion that to the extent that the flow-through has occurred to companies domiciled in a DBO or EU country, a reduction (possibly a waiver) of the withholding tax may be required.*

*SKAT bases this assessment on the fact that the purpose of the requirement that the formal recipient of the interest is the beneficial owner of the interest is to prevent tax evasion and abuse. However, an abuse of the DBOs/EU law will not occur if the interest flows directly to a company in a DBO or EU country where it is considered taxable for the underlying owner."*

Thus, it has clearly been SKAT's view that the withholding tax must be waived or reduced to the extent that the ultimate owners of the interest payments are resident in an EU or DBO country.

However, it also appears that first SKAT [...] and then the Ministry of Taxation [...] end up setting additional - unauthorized - conditions that must be met before withholding tax is reduced or eliminated. Throughout the case, NTC has urged SKAT and subsequently the Ministry of Taxation to firstly state where the additional conditions are authorized and secondly, whether the conditions stated are exhaustive in the Ministry's opinion.

Neither SKAT nor the Ministry of Taxation have wanted to disclose any of this. Instead, the Ministry of Taxation has maintained that NTC can only fulfill the non-exhaustive and unauthorized documentation requirements. The Ministry of Taxation can then inform if there is a need for NTC to fulfill additional unauthorized documentation requirements.

It is generally argued that the requirements set out by the Danish Ministry of Taxation, including i) that the interest has demonstrably been passed on to the claimed beneficial owner, ii) that the intermediate "links" between the interest-receiving company and the claimed beneficial owner have not been able to dispose of the interest and iii) that the claimed beneficial owner itself has been able to dispose of the interest, have no support in internal Danish tax law, in double taxation treaties or in EU law.

**3338**

It is clear from the comments to the OECD Model Tax Convention, cf. points 9 and 11 to Article 11 [...], that there are basically no additional requirements as claimed by the Ministry of Taxation for beneficial owners to be entitled to relief.

It is argued that the large proportion of ultimate investors who are resident in DBO countries and thus entitled to waiver of Danish withholding tax on Danish interest income confirms that there is *no* flow-through relationship at *all*.

The ultimate investors are predominantly resident in DBO countries and would therefore not have been taxable to Denmark on interest income in any case.

Since there was no need for a flow-through structure, there is no "abuse" and no obligation to withhold Danish withholding tax can arise at all.

In any event, and regardless of the resolution of the question whether Angel Lux Common S.a.r.l. is the beneficial owner of the interest, the Danish withholding tax must at least be waived in relation to these investors.

*5.2.2 Ultimate beneficial owners*

If Angel Lux Common S.a.r.l. cannot be considered the beneficial owner of the interest, the ultimate beneficial owners must be identified. Obviously, another intermediate company cannot be chosen sporadically or arbitrarily unless it meets the criteria to be the beneficial owner of the interest on its own and after further analysis.

If Angel Lux Common S.a.r.l. is not recognized as the beneficial owner, it is argued that the underlying shareholders must be considered the beneficial owners. It is therefore also the double taxation treaties between Denmark and the states in which the underlying investors are domiciled that determine whether Denmark must reduce the withholding tax. This applies regardless of the fact that the beneficial owner is not the immediate recipient of the interest. As stated above, Angel Lux Parent S.a.r.l. is owned by a number of private equity funds: Permira, Apax, Blackstone, Providence and KKR. The underlying investors in the above-mentioned private equity funds include institutional investors, including pension funds, banks and insurance companies, foundations and universities, as well as private individuals.

Each of the above-mentioned private equity funds has prepared detailed statements of the underlying investors in the funds, including name, identification information, type of investor, percentage investment in the fund, whether there is a double taxation treaty with Denmark, etc. The statements have been prepared on the basis of underlying documentation for the circumstances in question.

These statements of the underlying investors in the private equity funds generally show that between 58% and 81% of the investors are covered by a double taxation treaty with Denmark. The vast majority of the underlying investors are domiciled in the United States, but there are also a small number of investors domiciled in Canada, various EU Member States, Cayman Island, Japan, etc.

The statements contain information about each individual investor and whether a double taxation treaty has been concluded between the investors' tax residence and Denmark.

...

An overview of the ultimate owners' resident status has previously been provided [...], which shows the percentage of investors covered by a double tax treaty between the investor's country of residence and Denmark.

On this basis, the following calculation of the reduction of the withholding tax requirement can be made:

*Interest tax collected per fund*

| | Total | Capital funds, united | Providen- this | Blacksto no | KKR | Apax | Permeria |
|---|---|---|---|---|---|---|---|
| Ownership share, Angel Lux Parent | 100% | 95,96% [...] | 17,68% | 23,49% | 19,62% | 15,74% | 19,43% |
| Interest tax, DKK | 817.238.912 [...] | 784.222.460 | 144.487.840 | 191.969.420 | [...] | [...] | 158.789.521 |

*Interest tax distributed per income year in DKK*

| | Total | Capital funds, united | Providen- this | Blacksto no | KKR | Apax | Permeria |
|---|---|---|---|---|---|---|---|
| *2006* | 258.382.378 | *247.943.730* | 45.682.004 | 60.694.021 | [...] | [...] | 50.203.696 |
| *2007* | 352.664.350 | *338.416.710* | 62.351.057 | 82.840.856 | [...] | [...] | 68.522.683 |
| | | | | | | | 40.063.141 |
| *2008* | 206.192.184 | *197.862.020* | 36.454.778 | 48.434.544 | [...] | [...] | **3339** |

*Reduction of the withholding tax requirement*

| | Capital funds, united | Providence | Blackstone | KKR | Apax | Permeria |
|---|---|---|---|---|---|---|
| **2006** | | | | | | |
| Ren-teskat, 2006 | 247.943.730 | 45.682.004 | 60.694.021 | 50.694.623 | 40.669.386 | 50.203.696 |
| Percentage share of invest- | | | | | | |
| Percentage share of invest- | | 65,63 % (E | | | | 79,77 % |
| headed by DBO | | II 765, 785, 789) | 70.28% (E II 817) | 73,40 % (E II 837) | 78.41% (E II 844) | (E II 859-863) |
| *Reduction, DKK* | *181.783.064* | *29.981.100* | *42.655.758* | *37.209.853* | *31.888.866* | *40.047.488* |
| **2007** | | | | | | |
| Interest tax 2007 | 338.416.710 | 62.351.057 | 82.840.856 | 69.192.745 | 55.509.369 | 68.522.683 |
| Percentage share of invest- | | | | | | |
| Percentage share of invest- | | 65,51 % (E | | | | 79,77 % |
| headed by DBO | | II 765, 785, 789) | 70.28% (E II 817) | 73,40 % (E II 837) | 78.41% (E II 844) | (E II 859-863) |
| *Reduction, DKK* | *248.039.647* | *40.846.177* | *58.220.553* | *50.787.475* | *43.524.896* | *54.660.544* |
| **2008** | | | | | | |
| Interest tax 2008 | 197.862.020 | 36.454.778 | 48.434.544 | 40.454.907 | 32.454.650 | 40.063.141 |
| Percentage share of invest- | | | | | | |
| Percentage share of invest- | | 65,57 % (E | | | | 79,77 % |
| headed by DBO | | II 765, 785, 789) | 70.28% (E II 817) | 73,40 % (E II 837) | 78.41% (E II 844) | (E II 859-863) |
| *Reduction, DKK* | *145.043.156* | *23.903.398* | *34.039.798* | *29.693.901* | *25.447.691* | *31.958.368* |
| *Overall reduction* | 574.865.866 | | | | | |

...

*5.2.3 Article 11 of the Model Agreement*

The scope of application of the double taxation treaties concluded by Denmark appears from Article 1 thereof. Article 1(1) of the Model Convention (2003 version) states the following [...]:

"*This Convention shall apply to persons who are residents of one or both of the Contracting States.*"

It follows that natural or legal persons resident in another country that has concluded a double taxation agreement with Denmark are covered by the double taxation agreement, including the right to waive or reduce withholding tax on interest.

Article 11 of the Model Tax Convention, which contains the possibility of reduction or elimination of withholding tax on interest, reads as follows [...]: ...

It follows from the provision that interest may be taxed in the state of the recipient. However, interest may also be taxed in the source country, but the source country's

Copyright © 2023 Karnov Group Denmark A/S

right of taxation is limited to the extent that the recipient is the beneficial owner. The wording of the provisions thus sets two conditions for the source country to reduce taxation. First, the recipient must be a resident of a Contracting State and second, the recipient must be the beneficial owner.

No further conditions are set for the reduction/elimination of the withholding tax.

*5.2.4 OECD comments on Article 11*

The comments support the conclusion that source country taxation should be relieved if the beneficial owner is a resident of a Contracting State, even if the beneficial owner is not the immediate recipient of the dividends.

Clause 8.2 of the comments to Article 11 of the Model Agreement states that (our emphasis) [...]:

"*Subject to the other conditions contained in this Article, the limitation on the right of taxation of the source State shall continue to exist where an agent or an intermediary resident of a Contracting State or of a third State is interposed between the recipient and the payer but*

*the beneficial owner is a resident of the other Contracting State. (The model text was amended in 1995 to clarify this point, which is in line with the view of all Member States). States wishing to express this more clearly are free to do so during bilateral negotiations.*"

Thus, the source state must reduce taxation if the beneficial owner is resident in another contracting state - regardless of whether the immediate recipient is not entitled to treaty relief. This is the double tax treaty between the state in which the paying company is resident and the state in which the beneficial owner is resident,

**3340**

to be applied when assessing whether Denmark should reduce/waive taxation.

The commentary to the Model Tax Convention does not impose any additional conditions for tax relief in the source country. According to the comments, it is sufficient that the beneficial owner is resident in a treaty state.

The Report of the Committee on Fiscal Affairs Section I. A. 2 states (emphasis added) [...]:

"*This report deals with the most important situation where of this kind, where a company situated in a treaty country is acting as a conduit for channeling income economically accruing to person in another State who is thereby able to take advantages "improper- ly" of the benefits provided by a tax treaty.*"

The purpose of making it a condition that the recipient of the interest is the beneficial owner is thus to prevent underlying owners from receiving *undue* benefits as a result of a double tax treaty. To the extent that the underlying owners *themselves* would have been entitled to treaty relief if the interest had been paid directly to them, there is no undue treaty relief, and there is no need to exclude the interest recipients from treaty relief.

As a result, there can be no flow-through company at all when a large number of the ultimate investors would not have to pay withholding tax in any case. Angel Lux Common S.a.r.l. cannot therefore be meaningfully considered a flow-through company, already in view of the resident status of the ultimate investors, and thus there is no withholding obligation at all.

At the very least, Denmark must reduce taxation to the extent that the underlying owners would have been entitled to relief if the interest had been paid directly to them. Otherwise, Denmark enriches itself unjustly and arbitrarily.

*5.2.5 Preparations, practice, etc.*

Regarding the issue of beneficial ownership, the Minister of Taxation stated in 2006 that:

"*The provision applies even if several intermediate ordinary taxed companies are contributed. The decisive factor is who is the rightful income recipient/beneficial owner.*", cf. answer to question S 474 [...].

Furthermore, the Minister stated in L 30 answer to question 5 of November 21, 2006 [...]:

"*The lapse of limited tax liability is conditional on the foreign company in question being the beneficial owner of the dividend.*

*A pure flow-through company resident abroad, e.g. Luxembourg, will not be the beneficial owner of the dividends, cf. the comments on Article 10 of the OECD Model Tax Convention (section 12.1).*

*However, the limited tax liability still lapses if the beneficial owner behind the flow-through company is domiciled in another country and Denmark, according to the parent/subsidiary directive*

*treaty or a double tax treaty with that country shall reduce or waive the taxation of the dividends.*"

The quote relates to withholding tax on dividends, but applies equally to withholding tax on interest.

In L 213 of April 18, 2007, Annex 26, the Minister stated (our underlining) [...]:

"*Forward payment of interest includes the situation where the recipient of the interest is taxed on the interest, but at the same time has a deduction for the interest that it pays to the other foreign company in the low-tax country, cf. the comments to L 119, 2003-2004. It should be noted that the other foreign company in this situation is considered to be the actual recipient of the interest payment. If this other company meets the conditions for being exempt from tax on the interest payment, the tax liability lapses.*

*It should be noted that if the immediate recipient of the interest payment repays the amount via a distribution, repayment of a loan or similar, it must be assessed whether the immediate recipient is the beneficial owner. If the ultimate recipient is deemed to be the beneficial owner, the conditions in section 2(1)(d) shall apply directly to the ultimate recipient.*"

(...) [...]

"*The beneficial owner principle is a safeguard against an ordinary taxed company being inserted as a conduit company between the dividend paying company and the final receiving foreign tax shelter company. The protection applies even if several intermediate ordinary taxed companies are interposed.*" As can be seen, all the quoted statements support the view that in relation to withholding tax, the ultimate owner must be considered, and that it is the double taxation agreement between Denmark and the country where the beneficial owner is resident that determines whether Denmark must grant treaty relief. Furthermore, it seems to be the opinion of the Minister of Taxation that there are no other conditions for treaty relief than that such relief is justified under the double taxation treaty between Denmark and the country where the beneficial owner is resident.

The Ministry of Taxation also issued a press release on March 20, 2007 regarding "Status of SKAT's control efforts regarding the takeover of 7 Danish groups by private equity funds", in which emphasis is again placed on,

**3341**

who is the final recipient of the interest and whether or not it is resident in a DBO country, while further conditions for treaty relief are again absent. Reference is made to section 5.1.4 above.

It follows from the above that withholding tax must only be withheld if the ultimate recipient is resident in a country with which Denmark has not concluded a double taxation treaty. Conversely, Denmark must grant treaty relief if the ultimate owner is resident in a DBO country. There is no basis for the additional conditions for treaty relief set out by the Ministry of Taxation.

*5.2.6 Ultimate owners summary*

It follows from the above that to the extent that the companies in Luxembourg are denied treaty relief on the basis that they are not the beneficial owners of the interest, all intermediate companies, whether resident in Contracting States or in third countries, must be looked through to the ultimate beneficial owners.

The ultimate beneficial owners in this case are the underlying investors in the five private equity funds. A large part of these are domiciled in states with which Denmark has entered into double

tax treaties, which is why they are entitled to a reduction or elimination of the withholding tax in accordance with the detailed provisions in the relevant double taxation treaty. Appendices 3 and 6-12 contain documentation for the underlying investors in the five private equity funds and that the majority of these are covered by a double taxation treaty with Denmark. In addition, all the banks, which are also investors through Angel Lux Parent, are all domiciled in the UK.

There is no legal basis for imposing additional conditions for relief for the ultimate owners other than that they would be entitled to relief if they had been the immediate recipients of the interest.

*5.3 Plaintiff's alternative claim - NTCI has not acted negligently and is not liable for the withholding tax*

For the sake of good order, it is submitted that even if Angel Lux Common S.a.r.l. had been subject to limited tax liability, NTCI ApS clearly had reasonable grounds to assume that there was no obligation to withhold tax at source. Thus, there has been no negligence, cf. section 69(1) of the Withholding Tax Act [...].

*Firstly*, the case does not involve the payment of interest to an overlying parent company or ultimate investors.

*Secondly*, as stated above, it has been the practice to consider foreign holding companies and intermediate holding companies as beneficial owners of dividends and interest payments received.

*Thirdly*, the Minister of Taxation has indicated that the concept of beneficial owner was very similar to the Danish concept "rightful income beneficiary", and Angel Lux Common S.a.r.l., the civil law owner of the PECs issued by NTCI ApS, is undisputed "rightful income recipient" of the interest thereon under Danish law.

*Fourthly*, with this case, the Danish Ministry of Taxation is testing a completely new viewpoint in Danish tax practice, which NTCI ApS for the same reason could not be expected to anticipate.

*Fifthly*, some of the Ministry of Taxation's arguments in support of this new view have already been tested and rejected by the Eastern High Court, which states that there is no Danish tax liability in a similar situation, see SKM2012.121.ØLR [...].

*Sixth*, SKAT received information on the ultimate investor structure and the Luxembourg structure no later than April 2, 2009. In SKAT's "Status note" of November 10, 2009, point 7, it appears [...]:

*"Problem Statement:*

If interest and dividends are paid to recipients in countries with which Denmark does not have a DBO, a tax portion must be withheld.

*Conclusion:*

The payments of interest and dividends made are not considered to be covered by these provisions. The interest is paid to a group company in Luxembourg and therefore no further action is taken on this basis."

At that time, SKAT was also of the opinion that NTCI ApS was *not* subject to withholding tax despite SKAT's full insight into the Luxembourg structure.

*Seventhly*, the Ministry of Taxation has recognized that the tax rate for the collection of the withholding tax was in violation of EU law. In the course of the case, the Ministry of Taxation has therefore also been forced to respond in the affirmative and reduce the tax claim to the current corporate tax rate. This emphasizes that the interpretation of the rules and EU law that NTCI ApS, according to the Ministry of Taxation, should clearly have been aware of, was not so clear - not even to the Ministry of Taxation.

*Eighth* and not least, NTCI ApS' interpretation of EU law regarding the requirement for national implementing measures and the application of the general EU law concept of abuse in

full compliance with previous EU practice, as well as the Commission's and the Advocate General's interpretation of this practice. It is therefore also presumed that NTCI ApS has been negligent in following this interpretation.

All of the above reasons individually and collectively confirm that NTCI ApS has not been negligent, cf. section 69(1) of the Withholding Tax Act, cf. TfS 2002.844.Ø [...] and UfR 1977.844.H [...].

**3342**

NTCI ApS is therefore not responsible for any missing payment."

In its summary pleading of August 2, 2021, *the Ministry of Taxation* has stated, among other things:

"*7. THE TAX MINISTRY'S ARGUMENTATION*

*7.1 Angel Lux Common is taxable on the interest*

Companies and associations etc. as mentioned in section 1(1) of the Act that are domiciled abroad are liable to pay tax under the Danish Corporation Tax Act to the extent that they receive interest from sources in this country regarding debt that a company or an association etc. covered by

§ Section 1 or point (a) has to legal persons as mentioned in section 3 B of the Tax Control Act (controlled debt), cf. section 2(1)(d), first sentence of the Act.

The purpose of the tax liability is, according to the comments to the individual provisions of the bill (section 10(1) of the bill), "to prevent a Danish company etc. from reducing Danish taxation by reducing the taxable income through interest payments to certain financial companies in low-tax countries if the foreign company etc. controls the Danish company etc." [...], which should be seen in the context that the purpose of the bill according to the general comments is, among other things, "to limit the opportunities for tax planning by deducting intra-group interest when the receiving group company pays no or very little tax on the interest deducted when calculating Danish taxable income" [...].

It is agreed between the parties *that* Angel Lux Common is a company within the meaning of section 1(1) of the Corporation Tax Act that has its registered office abroad, *that* Nordic Telephone Company Investment is a company covered by section 1 of the Act and *that* the loan in question from the former company to the latter company constitutes "controlled debt".

The starting point is therefore that Angel Lux Common is liable to pay tax on the interest in question and, as will be explained below, there is no basis for deviating from this starting point in the present case pursuant to the exemption rule in section 2(1)(d), third sentence, of the Danish Corporation Tax Act.

As mentioned, it follows from section 2(1)(d), third sentence, of the Danish Corporation Tax Act that the tax liability under the first sentence does not include interest if the taxation of the interest "shall" be waived or reduced under the Interest/Royalty Directive or under a double taxation agreement with the Faroe Islands, Greenland or the state where the receiving company etc. is resident.

In accordance with the wording of the provision, the aforementioned comments to the individual provisions of the bill [...] state that the limited tax liability does not include a company resident in another EU country "if the conditions of the Interest/Royalty Directive are met" *and* that the limited tax liability does not include interest payments to a foreign company resident in the Faroe Islands, Greenland or another country that has a double taxation agreement "if the agreement means that Denmark must waive or reduce the taxation of the interest."

The wording of the provision and the preparatory works thus indicate that an exemption from tax liability is only applicable if, according to

Copyright © 2023 Karnov Group Denmark A/S

The Interest/Royalty Directive or a double tax treaty imposes an unconditional obligation to waive or reduce taxation. If such an obligation does not follow from the directive or a double taxation treaty, the receiving company is liable to tax on the interest. The preparatory work of the provision also states that the tax authorities may take action in cases where the Interest/Royalty Directive and/or a double taxation treaty may be abused as part of a circumvention of the tax liability.

In connection with the committee reading of bill no. 119 of December 17, 2003, which forms the basis for the introduction of section 2(1)(d) of the Danish Corporation Tax Act, the Minister of Taxation stated in a response to an inquiry from FSR [...], among other things:

"Admittedly, there is a risk that, for example, a Danish company may seek to avoid the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation treaty, which does not have withholding tax on interest payments to foreign interest recipients, after which this company pays the interest to the company in the low-tax country.

In such cases, the Danish tax authorities will, however, after a specific assessment of the facts, be able to assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest payment is not covered by the EU Interest/Royalty Directive or the double taxation treaty."

*7.1.1 The taxation shall not be reduced or waived after interest /royalty directive*

It follows from Article 1(1) of the Interest/Royalty Directive that payments of interest arising in a Member State shall be exempt from any form of taxation in that State, whether by deduction at source or by assessment, provided that the 'beneficial owner' of the interest is a company of another Member State [...]. Neither Angel Lux Common nor Angel Lux Parent can claim the benefit of Article 1(1) of the Directive, *partly* because there is an abuse of rights and *partly* because neither company can be regarded as the beneficial owner of the interest.

**3343**

*7.1.1.1. There is a legal basis for refusing the benefits of the Directive by abuse of rights*

Article 5(1) of the Interest/Royalty Directive provides that the Directive does not preclude the application of national or contractual anti-abuse provisions and that Member States may withdraw benefits under the Directive or refuse to apply the Directive in the case of transactions for which tax evasion, avoidance or abuse is the principal motive or one of the principal motives [...].

It is the position of the Ministry of Taxation that there is a legal basis in national law for countering abuse of the kind at issue in the present case, cf. the detailed description in the duplicate p. 5-6 [...], but the decision in this case does not require a position on this issue.

There is a general principle of EU law that individuals may not rely on provisions of EU law, including provisions of directives, to enable them to abuse the law (paragraphs 96 and 101 of the judgment in this case). Thus, the principle of prohibition of abuse of rights also applies in the field of taxation where the obtaining of a tax advantage is *a principal aim* of the transaction at issue (paragraph 107 in fine of the judgment in conjunction with paragraph 127). As a result of *the* general EU law principle of prohibition of abuse of rights *and the* need to comply with that principle in the context of the implementation of EU law,

Member States are obliged to

to refuse advantages sought through abuse of rights, even in the absence of national or contractual anti-abuse rules (paragraph 111 of the judgment).

It is not a question of the Court having created a (new) legal position which did not apply prior to the judgment in the present case, or of the Court having changed its previous case law as expressed in, inter alia, case C-321/05, Kofoed, see the Court's judgment, paragraphs 122 ff. With the judgment, however, the Court has - within the framework of the jurisdiction conferred on it by Article 267 TFEU - *clarified the* meaning and scope of the principle of prohibition of abuse of rights as this principle must be applied to the present case.

Thus, it also follows from the Court's judgment that the EU law principle of legal certainty does not preclude denying the benefit of the Interest/Royalty Directive in the form of exemption from withholding tax where there is an abuse of rights, which is also expressly stated in the Court's judgment in case C-251/16, Cussens, paragraph 43 [...].

Nor is it the case that the Court's judgment has established an interpretation of the Interest/Royalty Directive which implies that the directive - in itself - creates *obligations* for citizens. Thus, where there is an abuse of rights and the citizen is *denied a benefit* under EU law for that reason, it is not a question of an obligation being imposed on the citizen under EU law, but rather that the objective conditions for obtaining a benefit under EU law are not met because the benefit is sought to be obtained by abuse of rights (paragraph 118 of the judgment).

Finally, it is not contrary to the Act on Denmark's accession to the European Union to deny the benefits of the Interest/Royalty Directive with reference to the general EU law principle of prohibition of abuse of rights. The present situation is thus *incomparable* to the situation that gave rise to the Supreme Court's judgment reproduced in U.2017.824H, Ajos [...], on which NTC relies.

The premises for the Supreme Court's judgment in the Ajos case show that it was decisive for the outcome of the case that there was a so-called "contra legem situation", i.e. a situation where it is not possible to interpret a national rule in accordance with the Directive within the framework of the methods of interpretation recognized in national law.

Such a situation does not exist in this case, where the Interest/Royalty Directive has been implemented by a simple reference to the Directive. The *wording of* section 2(1)(d) of the Danish Corporation Tax Act states that interest is subject to tax unless "the taxation of the interest shall be waived or reduced pursuant to Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States". It is therefore a narrow matter to apply an interpretation of section 2(1)(d) of the Danish Corporation Tax Act that is in accordance with the Interest/Royalty Directive and the general principle of prohibition of abuse of rights, as the Directive and the principle must be interpreted according to the Court's judgment.

As regards U.2012.3564H, Sawo [...], which NTC also relies on in this context, this judgment is also irrelevant for the determination of the present case. The case that gave rise to the judgment did not - any more than the present case - raise any question of the primacy of EU law.

Against this background, section 2(1)(1) of the Danish Corporation Tax Act

d) - in accordance with what the Eastern High Court has also concluded in SKM2021.304.ØLR on the provision's point c) on dividend tax - be interpreted to mean that an exemption from taxation of interest must be denied if the exemption is sought to

be obtained by abuse of rights, which depends on a specific assessment of the given circumstances.

*7.1.1.2 The Court's observations on the assessment of abuse of rights*

According to the judgment of the Court of Justice, in order to prove that there is abuse, *firstly,* a

**3344**

coincidence of objective circumstances showing that the objective pursued by the EU legislation has not been achieved even though the conditions laid down by that legislation have been formally complied with and, *second,* a subjective element consisting of an intention to benefit from the EU legislation by artificially creating the conditions necessary to obtain that benefit (paragraph 124 of the judgment of the Court in this case).

It is the examination of the cumulative circumstances which makes it possible to verify the existence of the elements constituting abuse and, in particular, whether the traders concerned have carried out purely formal or artificial transactions, devoid of any economic and commercial justification, with the principal aim of obtaining an undue advantage (paragraph 125 of the judgment). In its judgment, the Court set out the detailed principles for such an examination and provided a non-exhaustive list and description of the evidence that the advantage of the Interest/Royalty Directive in the form of exemption from taxation of interest is sought to be obtained by abuse in a given case.

According to the Court, a group of companies must - in cases such as the present

- is considered to be an artificial arrangement *when* it is not established for reasons reflecting economic reality, *when* it has a purely formal structure and *when* its main purpose or one of its main purposes is to obtain a tax advantage which is contrary to the object and purpose of the tax legislation applicable. This applies in particular where the payment of interest tax is avoided by introducing into the group structure a 'flow-through entity' between the company transferring the interest and the company which is the 'beneficial owner of the interest' (paragraph 127 of the judgment).

The fact that interest, in its entirety or substantially in its entirety, is passed on very shortly after receipt by the company which received it to entities which do not meet the conditions for application of the Interest/Royalty Directive is evidence of an arrangement designed to take undue advantage of the exemption from taxation resulting from the Directive (paragraph 128 of the judgment).

According to the Court's judgment, the artificial nature of an arrangement can *also be* supported by the fact that the group in question is structured in such a way that the company receiving the interest paid by the debtor company must itself pay that interest to a third company which does not meet the conditions for application of the Interest/Royalty Directive, with the result that the company only receives a negligible taxable income when operating as

"flow-through company" (paragraph 130 of the judgment). A company can be considered a pass-through entity if its only activity is to receive the interest and pass it on to the

"beneficial owner" or to other flow-through companies, see paragraph 131 of the judgment.

Evidence of the existence of an artificial arrangement in a given case may also be found (1) in the existence of various contracts between the companies involved in the financial transactions in question which give rise to intra-group cash flows which, as stated in Article 4 of the Interest/Royalty Directive, may have the purpose of the transfer of dividends from a recipient commercial company to shareholder entities in order to avoid paying tax or to

minimize the tax burden; 2) the method of financing the transactions; 3) in the assessment of the equity of the intermediate companies; and 4) in the lack of transparency of the 'flow-through' companies.

power to dispose financially of the interest received. In this context, it is not only a contractual or legal obligation of the company receiving the interest to pass it on to a third party that can constitute such an indication. There is also a ground for abuse if, on the facts of the case, the company has not 'substantially' enjoyed the rights to use and enjoy the interest (paragraph 132). Holding points such as those mentioned above may be considered *corroborated* if there is a coincidence or close temporal connection between, on the one hand, the entry into force of new tax legislation and, on the other hand, the initiation of complex financial transactions and the granting of loans within the same group, which may lead to an avoidance of the taxation introduced (paragraph 133). Such a coincidence or close temporal connection is not, however, a necessary condition for establishing an abuse, but may strengthen other indications of an abuse of law.

Finally, for the determination of whether there is an abuse of rights, it is irrelevant whether Denmark has concluded a double taxation treaty with the state where the beneficial owner of the interest is resident, according to which no withholding tax would have been withheld on the interest *if* it had been paid directly to the beneficial owner, see paragraphs 134 ff.

*7.1.1.3 There is an abuse of rights in the present case*

When the Court's instructions are coupled with the circumstances of the present case, it can be seen that there has been an abuse of rights.

Nordic Telephone Company Investment was originally in a direct debt relationship with the private equity funds in question until the end of April 2006, when the two Luxembourg companies, Angel Lux Parent and Angel Lux Common, were contributed between the private equity funds and Nordic Telephone Company Investment.

**3345**

For the purpose of deciding the case, (A) the formation of Angel Lux Common and Angel Lux Parent, (B) the debt relationship between the private equity funds and Angel Lux Parent, (C) the debt relationship between the latter and Angel Lux Common and (D) the debt relationship between the latter and Nordic Telephone Company Investment must be considered as one single and pre-arranged arrangement.

The aforementioned debts had *identical* principal amounts and bore the same interest, although the debt between Nordic Telephone Company Investment and Angel Lux Common bore interest at a rate of 10%, which was marginally higher (0.03125 percentage points) than the rate for the other debts. This chain of similar debt relationships meant that the interest from Nordic Telephone Company Investment, by virtue of the ongoing and simultaneous interest accruals, actually flowed through Angel Lux Common and Angel Lux Parent to the private equity funds to which Nordic Telephone Company Investment had originally had a direct debt relationship.

The arrangement was without commercial justification. NTC has not provided an explanation of the business rationale for the restructuring at the end of April 2006, which resulted in Angel Lux Common and Angel Lux Parent being inserted as intermediaries between Nordic Telephone Company Investment and the capital funds. A business rationale is also not apparent. From a business perspective, it would have been easiest to maintain the direct debt relationship that had existed between Nordic Telephone Company Investment and the capital funds from the beginning.

NTC's explanation that there was a need to bring the private equity funds together in a common holding company and NTC's

abstract invocation that private equity funds and other foreign investors had "historically" made their investments via Luxembourg, among other things

as a result of the legal, regulatory, financial and political attractiveness and stability of Luxembourg [...], says *nothing* about what the business rationale was for - in this case - setting up two new intermediate holding companies in Luxembourg and transferring these companies between the capital funds and Nordic Te- lephone Company Investment.

A structure of holding companies had already been established in Denmark through which the private equity funds had acquired the shares in TDC A/S, and it is also a fact that in December 2005 and January 2006 the private equity funds granted the loans in question directly to the top Danish company in this holding structure, Nordic Te- lephone Company Investment. It was only after the adoption of new Danish legislation in April 2006, which would have made the interest from the Danish holding company to the private equity funds taxable with effect from May 1, 2006, that the group found it necessary to set up two new intermediate holding companies in Luxembourg and incorporate them into the loan relationship between the private equity funds and the Danish company. While the arrangement had no business justification, it had an obvious and significant tax advantage. The restructuring at the end of April 2006 took place just a few days before the entry into force of the legislative amendment which, as mentioned, meant that the interest on the private equity funds' loans to Nordic Telephone Company Investment would have become taxable with effect from May 1, 2006, since the private equity funds could not invoke the Interest/Royalty Directive or a double taxation treaty, [...]. The arrangement established by the restructuring meant that the taxation of the interest from Nordic Telephone Company Investment - apart from the issue of abuse and the "beneficial owner" of the interest - would be waived under the Interest/Royalty Directive.

Against that background, it is unreasonable to assume that the main purpose or one of the main purposes of the arrangement was to obtain a tax advantage, namely to make interest from Nordic Telephone Company Investment tax-free by making the intermediate Luxembourg companies, unlike the underlying capital funds
- apart from the issue of beneficial ownership and abuse - could invoke the Interest/Royalty Directive and the Danish-Luxembourg double taxation treaty. The two Luxembourg companies' interest income was indeed taxable, but this was (largely) neutralized by the companies' equally large interest expenses. The establishment of the arrangement thus meant that interest that would have been taxable without the arrangement was made tax-free.

The circumstances leave no doubt that it was decided in advance by the underlying owners of the Luxembourg companies, namely the capital funds, that the interest from Nordic Telephone Company Investment was to be passed on to the capital funds, which is what happened, and that the Luxembourg companies invested were not given any real latitude to dispose of their respective interest income but merely acted as flow-through companies for the capital funds.

That the companies were in fact left with no room for maneuver to dispose of the revenues is amply cemented by the effective payment that took place in October 2006, where Nordic Telephone Company Investment - apart from some relatively marginal amounts
- made interest and principal payments directly to the private equity funds, i.e. bypassing both Angel Lux Common and Angel Lux Parent.

The fact that the Luxembourg companies acted merely as pass-through companies in relation to the interest in question is also confirmed by the fact that, according to the

**3346**

information about the companies' expenses, it must be assumed that the companies - apart from acting as flow-through companies - had no real actual economic activity of significance.

Copyright © 2023 Karnov Group Denmark A/S

Based on the available information, it must be assumed that Angel Lux Common and Angel Lux Parent, respectively, apart from the ownership of shares in subsidiaries, did not carry out any significant activities other than managing their loans to Nordic Telephone Company Investment and Angel Lux Common, respectively, and their debt to Angel Lux Parent and the private equity funds, respectively.

When the circumstances set out above are compared with the Court's guidance on the abuse assessment, it is clear that the main purpose of the arrangement was to take undue advantage of the exemption provided for in Article 1(1) of the Interest/Royalty Directive.

The Court has also found (paragraph 126 of the judgment) that in this case there are a number of indications that there is an abuse of rights, but in accordance with the division of jurisdiction between the Court and the referring courts, the Court has left it to the High Court to *verify* whether these indications are objective and consistent, and whether the NTC has had the opportunity to present counter-evidence.

Such a review should lead to the conclusion that there is an abuse of rights. All circumstances relevant to the abuse assessment were disclosed to the Court and no other circumstances have (subsequently) been demonstrated which indicate that the Court's (preliminary) assessment cannot stand up to review.

The NTC has not even made an attempt to explain what - rather than the simplest solution of retaining the already established direct loan from the capital funds to Nordic Telephone Company Investment - was the business rationale for the restructuring that resulted in the arrangement of (A) the formation of Angel Lux Common and Angel Lux Parent, (B) the debt relationship between the capital funds and Angel Lux Parent, (C) the debt relationship between the latter and Angel Lux Common and (D) the debt relationship between the latter and Nordic Telephone Company Investment. Since there is therefore an abuse of rights, both Angel Lux Common and Angel Lux Parent are prevented from benefiting from the exemption from withholding tax provided for in Article 1(1) of the Interest/Royalty Directive.

*7.1.1.4 The benefits of the Directive must also be denied because neither Angel Lux Common nor Angel Lux Parent is the beneficial owner of the interest* The wording of Article 1(1) of the Interest/Royalty Directive states that exemption from withholding tax is conditional on the recipient of the interest being the "beneficial owner" of the interest.

According to the judgment of the Court of Justice in the present case, the term 'beneficial owner' must be interpreted as meaning 'an entity which actually receives the interest paid to it' (paragraph 88 of the judgment). According to the Court, the term 'beneficial owner' does not refer to a formally identified recipient, but rather to 'the entity which, in economic terms, receives the interest earned and is therefore able to dispose freely of its use' (paragraph 89 of the judgment).

Finally, the Court has held that the concept of "beneficial owner" contained in double tax treaties based on the OECD Model Tax Convention and the commentaries thereto are relevant to the interpretation of the Interest/Royalty Directive (paragraph 90 of the judgment).

The assessment of whether a given company can be considered to be the

"legal owner", and the assessment of whether there has been an abuse of rights in a given case is in fact one and the same thing, which the Court's interpretation of, inter alia, the first question referred for a preliminary ruling, point (d)-(d).

f) whether the concept of 'rightful owner' is a testimony to (paragraph 123 of the judgment). This is also quite clearly expressed, for example, in paragraph 127 of the judgment.

For the reasons explained in the previous and following paragraphs, neither Angel Lux Common nor Angel Lux Parent can be regarded as the beneficial owner of the interest. For that reason too, they are precluded from claiming the benefit of Article 1(1) of the Interest/Royalty Directive.

*7.1.2 Taxation shall not be waived or reduced under the Danish-Luxembourg double tax treaty*

According to Article 11(1) [...] of the Denmark-Luxembourg Double Taxation Convention, interest arising in a Contracting State (Denmark) and paid to a resident of another Contracting State (Luxembourg) shall be taxable only in that other State (Luxembourg) if that person is the "beneficial owner" of the interest. According to the wording of this provision, Denmark is thus only obliged to waive the taxation of interest originating in Denmark if the recipient is the "beneficial owner" of the interest.

The term "beneficial owner of the interest" must be interpreted in accordance with the corresponding term in Article 11(1) of the OECD Model Tax Convention [...], as the Danish-Luxembourg Double Taxation Convention was concluded on the basis of the Model Convention. The Eastern High Court has already established that the concept of "beneficial owner" is an autonomous concept, i.e. that it has an independent content independent of the internal legislation of the contracting states, cf. both SKM2021.304.ØLR and SKM2012.121.ØLR [...]. The concept of "legal owner" should therefore *not be* interpreted in accordance with the concept of "rightful income recipient", which in Danish tax law

**3347**

is used as a term for the person who is considered to be taxable on a given income.

With the two judgments, the Eastern High Court has also already established that the tax authorities in cases such as the present one have been entitled - as happened - to include the comments to the OECD Model Tax Convention from 2003 when determining what is to be understood by the term "beneficial owner". The later commentaries from 2014 and 2017 are similarly relevant for interpretation, as these commentaries - like the 2003 commentaries - does not imply a changed understanding of Article 11(1) of the Model Agreement, but is merely a clarification.

It follows from the 2003 Commentary, paragraph 8.1 to Article 11(1) of the Model Convention [...] that it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax "where a resident of a Contracting State, otherwise than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question." Thus, a "conduit" will not be considered the beneficial owner "if, although it is the formal owner, it has in fact very narrow powers which, in relation to the income in question, make it a 'nullity' or administrator acting on behalf of other parties".

The 2014 Commentary, paragraph 10.2, which on this point is carried forward unchanged in the 2017 Commentary, clarifies that the immediate recipient of the interest may be denied the treaty benefit under Article 11(1) of the Model Tax Convention if the facts clearly show that the recipient - without being bound by a contractual or legal obligation to pass on the payments received to another person - "substantially" does not have the rights to use and enjoy the interest [...].

In the present case, the facts show that Angel Lux Common and Angel Lux Parent had no, or only very limited, power to dispose

of the interest that was initially paid to them.

Copyright © 2023 Karnov Group Denmark A/S

said company received by virtue of the loan to Nordic Telephone Company Investment.

As stated in section 7.1.1.3, (A) the formation of Angel Lux Common and Angel Lux Parent, (B) the debt relationship between the capital funds and Angel Lux Parent, (C) the debt relationship between the latter and Angel Lux Common and (D) the debt relationship between the latter and Nordic Telephone Company Investment must be regarded as one single and pre-arranged arrangement

Furthermore, as stated in section 7.1.1.3, the aforementioned debts had *similar* principal amounts and bore interest in (essentially) the same manner. This chain of similar debt relationships meant that the interest from Nordic Telephone Company Investment, by virtue of the ongoing and simultaneous interest accruals, actually flowed through Angel Lux Common and Angel Lux Parent to the private equity funds to which Nordic Telephone Company Investment had originally been directly indebted. Finally, as stated in point 7.1.1.3, the arrangement was without any commercial justification.

The stated circumstances prove *that* the arrangement was established with the (main) purpose that both Angel Lux Common and Angel Lux Parent were to act as flow-through entities for the interest in question, which without the arrangement would have become taxable pursuant to section 2(1)(d) of the Danish Corporation Tax Act. 1(1)(d) of the Danish Corporation Tax Act as of May 1, 2006, as the private equity funds undisputedly could not have claimed a treaty benefit themselves and *that* none of the companies could substantially dispose of the interest which was intended to be passed on to the private equity funds, which actually happened.

As mentioned above, the fact that the companies were not actually given any leeway to dispose of the proceeds is amply confirmed by the actual payment that took place in October 2006. Apart from some relatively marginal amounts, Nordic Telephone Company Investment made interest and principal payments directly to the capital funds, i.e. bypassing both Angel Lux Common and Angel Lux Parent.

For the assessment of whether Angel Lux Common must be considered the rightful owner of the interest for tax purposes, it is irrelevant that the interest was attributed to the principal (credited) and (only) later converted into shares in Nordic Telephone Company Investment.

The tax effects occurred (already) when the interest was attributed. A key element of the arrangement was that there was no effective payment of interest in any part of the transaction chain, as interest was attributed to the principal. The arrangement meant that the tax benefits in the form of deductions and exemption from withholding tax could be reaped immediately without any form of liquidity burdens for the participating companies, and so that the receivables in the form of the attributed interest could subsequently and without taxation be absorbed through the structure by payment transfers, offsets or conversions to capital shares. For the tax law assessment of whether Angel Lux Com- mon must be considered the rightful owner of the interest, it is therefore irrelevant that the interest was not paid effectively on an ongoing basis by e.g. a bank transfer, but was added to the principal of the loan.

The fact that the decision in 2008 to convert Angel Lux Commons' receivable (including accrued interest) from Nordic Telephone Company Investment to

**3348**

share capital in the Danish company may have been formally

decided by Angel Lux Common as sole shareholder at an extraordinary general meeting in the Danish company does not prove that Angel Lux Common was the rightful owner of the interest. This already follows from the fact that the flow of the interest to the private equity funds, as mentioned above, was all by virtue of the ongoing interest accruals. In addition, the

more, that it is unlikely - particularly in view of the size of the converted amounts and the provisions of the shareholders' agreement of 27 April 2006 [...] - that anyone other than the underlying capital funds could (actually) take and did take the decision to convert.

NTC's reliance on SKM2012.121.ØLR in relation to the company's view that the interest has "returned" to Nordic Telephone Company Investment is not sustainable. SKM2012.121.ØLR is on this point incomparable with the present case, as the dividends in that case were not passed on from the immediate recipient of the dividend, unlike in the present case where the interest from Nordic Telephone Company Investment was passed on from the immediate recipient of the interest, Angel Lux Common, via interest accruals on the back-to-back loans established between the Danish company and the capital funds. Against the above background, it must be held that neither Angel Lux Common nor Angel Lux Parent can be regarded as the beneficial owner of the interest in question within the meaning of Article 11(1) of the Danish-Luxembourg double taxation convention. Thus, the double taxation treaty does not lead to the interest being exempt from a tax liability under section 2(1)(d) of the Danish Corporation Tax Act.

*7.1.3 Taxation does not contradict a binding administrative practice*

In determining whether a tax liability in respect of the interest in question would be contrary to a binding, established administrative practice regarding the interpretation of section 2(1)(d), third sentence, of the Danish Corporation Tax Act. 1(d), third sentence, it must - as the High Court would otherwise have no occasion to decide the question - be assumed *that* the taxation must not be waived under the Interest/Royalty Directive because there is abuse, and *that the* taxation of the interest must not be reduced under Article 11(1) of the Danish-Luxembourg Double Taxation Convention, as Angel Lux Common (and neither Angel Lux Parent) cannot be considered the rightful owner of the interest.

In other words, it is therefore a question of the NTC claiming that the interest in question should be considered exempt from tax liability, *even though the* express condition in the third paragraph of section 2(1)(d) of the Corporation Tax Act for the interest to be exempt from tax liability is *not* met.

Since a principle of equality under administrative law cannot justify a claim for a legal position that is contrary to law, see U.2003.2005H [...], it is excluded that NTC's invocation of an administrative practice can lead to the exemption of the interest in question from a tax liability, already because such an exemption would thus be contrary to section 2(1)(d), third paragraph, express condition for granting an exemption.

In addition, SKAT's decision of March 18, 2011 in the present case does not represent a tightening of practice, as the decision did not change any established administrative practice.

It is incumbent on the NTC to prove the existence of the alleged practice from which the decision, according to the company, should deviate, see e.g. U.2011.3305H[...], but the company has not met this burden of proof. Thus, NTC has not demonstrated the existence of any previous decision according to which the tax authorities have considered interest to be exempt from a tax liability, even if the given circumstances - as in the present case - otherwise provided evidence to establish that the recipient had not had or had had such narrow powers to dispose of the interest that the company could not be considered the rightful owner of the interest.

Furthermore, the NTC has not identified any cases where the tax authorities have failed to take corrective action since the entry into force of section 2(1)(d) of the Corporation Tax Act with effect for interest relating to the period from and including April 2, 2004 in cases such as the following

present. Such non-intervention, if it had actually taken place, could not have been equated with a positive decision, cf. for example U.2017.2960H and U.2017.2979H [...].

Nor has NTC demonstrated in any other way that the tax authorities, after the entry into force of section 2(1)(d) of the Danish Corporation Tax Act. 1(d) of the Danish Corporation Tax Act and until SKAT's decision in the present case, the tax authorities should have followed a practice according to which interest has been deemed to be exempt from the tax liability resulting from the provision, even if the given circumstances otherwise provided evidence to establish that the recipient of the interest had not had or had had such narrow powers to dispose of the interest that the company could not be considered the rightful owner of the interest.

As described above under section 7.1, it appears from the preparatory works to section 2(1)(d) of the Danish Corporation Tax Act that the tax authorities may, after a specific assessment of the merits, deny the (immediate) recipient of the interest the benefits that otherwise follow from the Interest/Royalty Directive and any double taxation agreement, on the grounds that the recipient is not the legal owner of the interest.

The answers invoked by NTC, which the Minister of Taxation submitted after the entry into force of section 2(1)(1) of the Corporation Tax Act

**3349**

d), has stated in various contexts, does not constitute evidence that, at the time of SKAT's decision, a practice had been established according to which interest - in circumstances such as those in the present case - was considered to be exempt from a tax liability under this provision.

These are abstract statements or abstract answers to abstract questions. The statements and answers - like the invoked memorandum on the status of SKAT's control efforts regarding the acquisition of 7 Danish groups by private equity funds and the invoked statement from a head of office in SKAT - provide no evidence that SKAT has positively made a decision to follow a practice, according to which interest was considered exempt from a tax liability, even if, after a clarification of the given circumstances, there would be evidence to establish that the recipient had not had or had had such narrow powers to dispose of the interest that the company could not be considered the rightful owner of the interest.

Prior to SKAT's decision in this case, the Minister of Taxation had issued several answers stating that a parent company would not be able to claim the benefits of a double tax treaty if it was a "pure flow-through holding company", a "pure flow-through company", a "conduit" company, or a "flow-through company", cf. 1) Appendix 9 to Bill no. 116 of December 14, 2005 [...], 2) the tax minister's response to the committee's goals 2-10 after the submission of Bill No 30 of October 4, 2006 [...], 3) the Minister of Taxation's answer of November 6, 2006 to question S 474 [...] and 4) Appendix 26 regarding Bill No 213 of April 18, 2006 2007 [...], 5) the Minister's answer to committee question 86 [...] and 6) the revised answer [...] to the above bill. In all but the first of these responses, reference is even made to paragraph 12.1 of the comments to Article 10 (on dividends) of the OECD Model Tax Convention, and in the latter four responses it is further described in the responses themselves that "conduit" companies/"flow-through" companies include companies that "effectively have very narrow powers in relation to the income in question".

The ministerial responses, the memorandum on the status of SKAT's control efforts regarding the takeover of 7 Danish groups by private equity funds and the statement from a head of office in SKAT, which NTC invokes in support of the objection of a stricter practice, were also - unsuccessfully - invoked by the dividend-distributing companies in SKM2021.304.ØLR in support of the corresponding objection of a stricter practice.

Against this background, it should - in the same way as in SKM2021.304.ØLR - be established that SKAT's decision in this case did not change any binding, fixed administrative practice on which the NTC can rely under an administrative law principle of equality.

[...]

*7.2 NTC's alternative claim - about the "ultimate investors" in private equity funds*

Double taxation treaties other than the Danish-Luxembourg double taxation treaty provide no basis for Denmark to waive taxation of the interest in question. Double taxation treaties concern the treatment of income which for tax purposes must be regarded as originating in one contracting state, the source state (in this case Denmark), and which for tax purposes must be regarded as being received by a natural or legal person in the other contracting state. Accordingly, it follows from the wording of section 2(1)(d) of the Danish Corporation Tax Act that only the double taxation treaty with the state in which the receiving company is resident can lead to an exemption from tax liability. As Angel Lux Common is the rightful income recipient of the interest in question from Nordic Telephone Company Investment, it is (only) the Danish-Luxembourg double taxation treaty that can prevent Denmark from taxing the interest, provided that the conditions of the treaty are otherwise met, which - as described above - is not the case in this case.

However, when assessing whether taxation is precluded under the double tax treaty, it may be of importance whether the amount in question is channelled to a state with which a double tax treaty has been concluded. This is because the concept of "beneficial owner" is a concept aimed at preventing abuses consisting of a person acting through a legal person resident in a Contracting State with the main purpose of obtaining a treaty benefit that could not be obtained by the person directly. In situations where there are no indications of such abuse, because there is no tax advantage associated with the intermediary company, a treaty benefit in the form of exemption from taxation in the source state should not be denied.

As regards the Interest/Royalty Directive, it appears from the judgment of the Court in the present case that it is irrelevant for the purposes of the abuse assessment that some of the beneficial owners of the interest transferred by conduit companies are resident for tax purposes in a third country with which the source state has concluded a double taxation treaty (paragraph 135 of the judgment), However, according to the Court, if there is a situation where the interest would have been exempt if it had been transferred directly to the company resident in a third State, it cannot be "excluded" that the objective of a given group structure is not an abuse of law (paragraph 137 of the judgment).

**3350**

The Court has not given any guidance as to what is required to rebut the presumption of abuse, but the connection between paragraphs 135 and 137 of the judgment leaves no doubt that the fact that the beneficial owner of the interest is resident for tax purposes in a State, with which Denmark has concluded a double taxation treaty, which could have been invoked if the beneficial owner had been the direct lender, is not - per se - sufficient to rebut an established presumption of an abuse of the Interest/Royalty Directive. There is no evidence in the case law to suggest otherwise as regards the assessment of whether there is an abuse of the Danish-Luxembourg double taxation treaty.

In the present situation, the interest-receiving company (Angel Lux Common) is merely a "flow-through entity" through which the interest is channelled (via Angel Lux Parent, which is another "flow-through entity") to legal entities, namely the capital funds, which *cannot* claim a treaty advantage. As explained above, there are clear indications that the established arrangement is aimed at abusing the Danish-Luxembourg Double Taxation Treaty and the Interest/Royalty Directive.

The presumption of abuse of the Interest/Royalty Directive and the Danish-Luxembourg double taxation treaty *cannot be* rebutted merely by reference to the fact *that* the "ultimate investors" in the capital funds may be resident in a state with which the source country (Denmark) has concluded a double taxation treaty, with which the source country (Denmark) has concluded a double taxation treaty and *that* these persons - if they had been the direct recipients of the interest instead of Angel Lux Common - could have relied on a provision in this double taxation treaty on the waiver of taxation by the source country.

In a situation such as the present, strict requirements must be imposed on the proof that the arrangement (nevertheless) has not had an abuse of the Interest/Royalty Directive and the Danish-Luxembourg double taxation treaty as a main purpose.

Such evidence has not been produced, if only because there is *no* documentation as to who were the "ultimate investors" in the capital funds in question and where these investors were supposed to be resident for tax purposes.

The information in the summaries submitted by NTC [...] is disputed as undocumented. Appendix 3 is merely an overview on a "blank" piece of paper and therefore does not constitute documentation for the aforementioned facts, and the same applies to Appendices 6-12. The fact that the summaries in appendices 6-12 according to NTC have been prepared by the private equity funds on the basis of documentation held by the private equity funds [...] does not mean that the information in the summaries can be considered documented.

Furthermore, the information in appendices 6-12 is on a number of points completely summarized and/or incomplete, which is why it is in any case not suitable to form the basis for a possible reduction of the withholding tax requirement.

In addition, even if the undocumented information in the tables in Appendices 6-12 were to be used as a basis, it would not be sufficient to reduce the withholding tax requirement. As mentioned, the mere fact that the "ultimate investors" in the private equity funds may be resident in a country with which Denmark has entered into a double taxation treaty is *not* sufficient to disprove that there is an abuse of the withholding tax.

/The Royalties Directive and the Danish-Luxembourg Double Taxation Convention.

NTC must - at least - prove that the "ultimate investors" in the private equity funds as claimed by NTC were the rightful owners of the interest from Nordic Telephone Company Investment.

As the case stands, there is no basis to establish who was the rightful owner(s) of the interest from Nordic Telephone Company Investment.

In that connection, it should be noted that when the creditor, in this case Angel Lux Common, cannot be regarded as the beneficial owner of the interest, it is not incumbent on the tax authorities to determine who is the beneficial owner of the interest. Such an obligation, which cannot be inferred from the Interest/Royalty Directive, see paragraphs 143-145 of the judgment, cannot be inferred from the Danish-Luxembourg double taxation convention or from any other legal basis. As

U.2023.3198H

stated by the Court, it will often be impossible for the tax authorities of the source country to identify who

Copyright © 2023 Karnov Group Denmark A/S

who is the beneficial owner of the interest. This also applies in a situation where it is possible to identify the possible beneficial owners, as it will in all likelihood be impossible for the tax authorities and courts of the source state (Denmark) to determine which of two possible beneficial owners is the beneficial owner, cf. the judgment of the Court of Justice, paragraphs 143 and 144.

It is incumbent on NTC to demonstrate and prove who is the rightful owner of the interest if the company wishes to claim that the rightful owner is resident in a country with which Denmark has a double taxation treaty.

NTC has not even attempted to prove that the alleged "ultimate investors" were the beneficial owners of the interest, including that the private equity funds that received the interest through the flow-through entities Angel Lux Common and Angel Lux Parent are *not* the beneficial owners of the interest.

**3351**

Thus, there is no evidence *that* the private equity funds could not dispose freely of the interest, either because the private equity funds were legally obliged to pass on the interest or because, due to factual circumstances, they had no real power to dispose of the interest and thus merely acted as pass-through entities, and *that* the interest was passed on from the private equity funds to the alleged "ultimate investors". As regards the latter, it should be noted that there is no information, let alone documented information, as to what happened to the interest in question after it passed through Angel Lux Common and Angel Lux Parent to the capital funds.

NTC has stated that "The capital funds in the case are all established as fiscally transparent entities (Limited Partnerships) with the investors as limited partners" [...]. This is disputed as undocumented. There is no evidence that private equity funds are considered fiscally transparent in the states where they are domiciled.

There is also no evidence that the private equity funds are (also) considered tax transparent under the rules of the states where the "ultimate investors" are resident, which is a precondition for the double tax treaty between Denmark and the state where the "ultimate investors" are resident to apply if it had been the private equity funds that had been direct lenders to Nordic Telephone Company Investment.

For these reasons alone, the Ministry of Taxation must be acquitted of NTC's alternative claim.

It is noted *ex tuto* that the calculation of the amounts by which the withholding tax claim is to be reduced according to NTC's alternative claim is disputed as undocumented and incorrect, [...].

...

*7.3 NTC's more alternative claim - NTC is liable for the lack of withholding*

As the interest in question is subject to tax liability, cf. section 2(1)(d) of the Danish Corporation Tax Act, Nordic Telephone Company Investment (now NTC) should have withheld interest tax in connection with the crediting of the interest, cf. section 65 D(1) of the Withholding Tax Act. As mentioned, it follows from section 69(1) of the Withholding Tax Act that a person who fails to fulfill his obligation to withhold tax or who withholds too little tax is directly liable to the public authorities for payment of the missing amount, unless he proves that he has *not been* negligent in complying with the provisions of the Withholding Tax Act.

In determining whether the NTC has rebutted the statutory presumption of negligence, it must - as the High Court would otherwise have no reason to consider the issue - be assumed that there has been no binding administrative practice, which means that the NTC has not

the interest in question shall be deemed to be exempt from the tax liability that otherwise follows from section 2(1)(a) of the Danish Corporation Tax Act.

d). For this reason alone, it is untenable for the NTC to argue that there was a practice which gave it the right to assume that the interest could be credited without withholding interest tax.

There has also been no doubt about the interpretation of the term "rightful owner" that could have given the NTC an incentive to make such an assumption - on the contrary. As described above, it is abundantly clear from the preparatory works to section 2(1)(d) of the Danish Corporation Tax Act that the tax authorities, after a specific assessment of the facts, may deny the (immediate) recipient of the interest the benefits that otherwise follow from the Interest/Royalty Directive and any double taxation treaty, on the grounds that the recipient is not the beneficial owner of the interest.

The status memorandum of September 10, 2009 from SKAT, on which NTC relies [...], does not support that Nordic Telephone Company Invest- ment has not been negligent, cf. section 69(1) of the Withholding Tax Act. The status memorandum in question was one - out of many - continuously updated status memoranda prepared by SKAT's employees during the processing of the case, which described the current "stage" in relation to the various tax issues under investigation. Moreover, only a few weeks later - on December 2, 2009 - SKAT provided the company with a new status note stating that "[i]t can be established that payments/attributions of interest regarding PEC have been made to affiliated parties not resident in countries with which Denmark does not have a DBO, which is why the starting point is that interest tax should have been withheld" [...].

For the question of Nordic Telephone Company Investment's (now NTC's) liability under section 69(1) of the Withholding Tax Act, it will (therefore) be decisive that the company has been aware of the factual circumstances which lead to the *fact* that Angel Lux Common cannot be considered to have been the legal owner of the interest within the meaning of the Danish-Luxembourg double taxation treaty *and* that the benefit in the form of the exemption from withholding tax resulting from the withholding tax on interest cannot be considered to have

/The claim must be denied both because EU law cannot be invoked to enable abuse of law and because Angel Lux Common cannot be considered the rightful owner of the interest within the meaning of the directive, cf. the premises for the High Court's judgment reproduced in SKM2021.304.ØLR.

When - as in the present case - there is a basis for denying a tax benefit in the form of exemption from withholding tax because the benefit has been sought to be obtained by abuse of law, and the withholding agent is aware of this basis, the failure to withhold the withholding tax must thus - per se - be imputed to the withholding agent as being of a negligent nature.

**3352**

Since NTC has thus not rebutted the statutory presumption that the company has been negligent with regard to the failure to withhold interest tax, the company is, pursuant to section 69(1) of the Withholding Tax Act, directly liable to the public authorities for payment of the interest tax not withheld."

# VI. The High Court's reasoning and result

*B-2942-12 Takeda A/S under voluntary liquidation v Skattemini-steriet*

*Section 2(1)(d) of the Danish Corporation Tax Act*

It follows from section 2(1)(d) of the Corporation Tax Act as amended by Act No. 221 of March 31, 2004 that a company as

U.2023.3198H

mentioned in section 1(1) with its registered office abroad is liable to tax on interest it receives from a company in Denmark in the case of controlled debt, cf. section 3 B of the Tax Control Act.

U.2023.3198H

It is undisputed that Nycomed Sweden Holding 2 AB is covered by section 1(1) of the Corporation Tax Act and that the loan from the company to Nycomed A/S, to which the interest write-ups in question relate, is controlled debt.

However, it follows from section 2(1)(d), third sentence, that the tax liability does not include interest if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC (the Interest/Royalty Directive) or under a double taxation agreement with the state where the company is resident.

The case is therefore primarily about whether there is an obligation under the Interest/Royalty Directive or the Nordic Double Taxation Treaty to waive or reduce the taxation of interest.

*Interest/Royalty Directive*

The Interest/Royalty Directive has been implemented in Danish law by Act no. 221 of March 31, 2004 in such a way that section 2(1)(d) of the Danish Corporation Tax Act refers to the provisions of the Directive.

Accordingly, the provisions of the Directive apply to interest covered by section 2(1)(d) of the Danish Corporation Tax Act.

The Directive provides that payments of interest and royalties arising in a Member State shall be exempt from any form of tax in that State provided that the beneficial owner of the interest is a company of another Member State and that the interest is paid between associated companies, see Article 1(7). It is undisputed that the latter condition is fulfilled, as Nycomed A/S was wholly owned by Nycomed Sweden Holding 2 AB.

However, the Ministry of Taxation has argued that Nycomed Sweden Holding 2 AB (and similarly for Nycomed Sweden Holding 1 AB) cannot claim tax exemption under the Directive because the company cannot be considered the "rightful owner" of the interest and because there is an abuse of rights, cf. Article 5 of the Directive.

The Ministry of Taxation's arguments raise questions about the interpretation of the Interest/Royalty Directive.

As a preliminary remark, the High Court notes that the competence to decide on questions concerning the interpretation of EU law lies with the Court of Justice of the European Union, cf. Article 267 TFEU.

In the judgment of the Court of Justice of the European Union (Grand Chamber) of 26 February 2019 in this case and Case B-171-13, Joined Cases C-115/16, C-118/16, C-119/16 and C-299/16, the Court states on the interpretation of the concept of "beneficial owner" that it refers to an entity which actually receives the interest paid to it in economic terms and which therefore has the power to freely determine its use. Thus, the decisive factor is not whether the recipient is formally the owner of the interest. The Court further states that the concept of "beneficial owner" in Article 11 of the 1996 OECD Model Double Taxation Convention, as amended, and its commentary are relevant to the interpretation of the Directive.

On abuse of rights, the CJEU states that the general principle of EU law that citizens must not be able to rely on provisions of EU law to enable fraud or abuse must be interpreted as meaning that, in cases of fraud or abuse, national authorities and courts must refuse to grant a taxpayer the exemption from any form of tax on interest payments provided for in the Interest/Royalty Directive, even if there are no national or contractual provisions providing for such a refusal.

However, Takeda A/S has argued that an interpretation as established by the CJEU is contrary to section 2(1)(d) of the Danish Corporation Tax Act, so that tax exemption must be granted, regardless of whether there may be an abuse of the

Directive.

The High Court notes that the wording of the Danish Corporation Tax Act

§ Section 2(1)(d), which on tax exemption simply refers to interest

U.2023.3198H

/royalty directive, is not in conflict with the interpretation of the European Court of Justice. The High Court also finds that there is no evidence in the legislative history of the Act to assume that section 2(1)(d) is to be understood as providing for tax exemption also in cases that can be characterized as abuse of law as described by the European Court of Justice.

Thus, it appears from the legislative history of Act no. 221 of March 31, 2004, which introduced taxation of interest on intra-group loans paid to companies in non-EU countries without a double taxation treaty, that the purpose was to prevent a Danish company from reducing Danish taxation by reducing the taxable income through interest payments to certain financial companies in low-tax countries if the foreign company controls the Danish company. It also appears from the Minister of Taxation's comments sent to the Tax Committee on February 17, 2004

**3353**

regarding an inquiry from the Danish Association of State Authorized Public Accountants regarding the bill, that they were aware that there was a risk that the rules would be circumvented by the Danish company paying the interest to a company covered by the interest tax regime.

/In such cases, the Danish tax authorities may, based on a specific assessment of the facts, assume that the company that initially received the interest is not the beneficial owner of the interest. In such cases, the Danish tax authorities may, after a specific assessment of the facts, assume that the company that initially receives the interest is not the beneficial owner of the interest.

Against this background, the High Court finds that an interpretation of the interest

/As stated by the European Court of Justice, the Royal Directive is not in conflict with section 2(1)(d) of the Danish Corporation Tax Act.

Takeda A/S has further argued that what the CJEU has stated about a general principle of EU law according to which citizens must not be able to rely on EU law provisions with a view to enabling fraud or abuse is to be regarded as a principle at Treaty level which has direct effect on citizens and that Denmark has not ceded sovereignty to the CJEU to establish such a principle.

In addition, the High Court notes that in the present legal context, this is a principle that must be considered to be within the scope of an interpretation of the Interest/Royalty Directive and which does not conflict with Danish legislation or general Danish legal principles. The High Court therefore finds that an interpretation as stated by the CJEU does not in the present situation involve exceeding the competences entrusted to the EU institutions by the Act on Denmark's accession to the European Union. *The Nordic double taxation agreement*

It follows from Article 11 of the Nordic Double Taxation Convention that interest paid to a person resident in the other contracting state cannot be taxed in the state from which the interest originates if the recipient in the other contracting state is the beneficial owner of the interest, cf. section 2(1)(d) of the Corporation Tax Act.

As stated, the Ministry of Taxation has claimed that neither Nycomed Sweden Holding 1 AB nor Nycomed Sweden Holding 2 AB is the legal owner of the interest from Nycomed A/S.

The question is then how the term "beneficial owner" in the double taxation treaty should be understood.

The Agreement does not contain a definition of the term "beneficial owner". According to Article 3(2) of the Agreement, terms not defined in the Agreement shall, unless the context otherwise requires, have the meaning which they have in the law

of the Contracting State concerning the taxes covered by the Agreement.

Danish tax legislation does not appear to use the term "beneficial owner", which is also not a defined term in Danish law.

The term "beneficial owner" is not mentioned in the preparatory works to section 2(1)(c) or (d) of the Danish Corporation Tax Act, which both state that there is tax exemption for withholding tax on dividends and interest, respectively, if the taxation is to be reduced under a double taxation treaty.

There is no information about the negotiations with the Norwegian countries prior to the conclusion of the double taxation agreement. When interpreting the term "beneficial owner" in Article 11(1) of the Double Taxation Convention, the High Court therefore finds it relevant to include interpretations of the corresponding provision in the OECD Model Tax Convention, which has applied the term "beneficial owner" since 1977.

The OECD Model Convention does not contain a definition of the term "beneficial owner". In the commentary to the 1977 Model Convention, it is stated about "abuse of the convention" that the double taxation convention should not help tax avoidance or tax evasion, and that the concept of "beneficial owner" in e.g. Article 11 counters certain abusive situations. Abusive situations are referred to as artificial legal constructions, and as an example, the fact that a person disposes through a legal association formed in a State mainly in order to obtain benefits under a double tax treaty that could not be obtained by the person directly is mentioned. The commentary to Article 10 further states that the limitation on taxation cannot be applied when an intermediary is inserted between the beneficiary and the payer. Examples of an intermediary are an agent or a nominee.

Accordingly, the Commentary to the 2003 OECD Model Tax Convention states that the term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in the light of the intent and purpose of the Convention, including avoiding double taxation and preventing tax avoidance and evasion. In addition, the commentary to Article 11, in line with the 1977 comments on "artificial legal structures" and "intermediaries", states that it is not consistent with the purpose of the Convention to grant exemption from tax where a person, other than as agent or intermediary ("nominee relationship"), merely acts as a conduit for another person who actually receives the income in question. Finally, also in accordance with the 1977 comments, it is mentioned that the OECD Committee on Fiscal Affairs has on this basis concluded that a "conduit company" cannot normally be regarded as the

**3354**

beneficial owner if, although it is the formal owner, in reality it has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

The High Court notes that there is no basis for stating that an understanding of the term "beneficial owner", as stated above, would be contrary to section 2(1)(c) and (d) of the Danish Corporation Tax Act.

d. There is no basis for a different interpretation either in the wording of the provisions or in the preparatory works, cf. what is stated above about the preparatory works to Act no. 221 of March 31, 2004, which introduced taxation of interest on intra-group loans, and what is stated in the Danish Constitutional Court's judgment of May 3, 2021 in cases B-1980-12 and B-2173-12 about the preparatory works to Act no. 282 of April 25, 2001.

On this basis, an assessment must then be made of the specific interest charges in the case.

*Interest write-ups in 2007, 2008 and 2009*

It appears from the case that in the fall of 2006, a restructuring of the consortium was carried out which meant that the companies Nycomed S.C.A., SICAR, Nycomed Sweden Holding 1 AB and

Nycomed

Sweden Holding 2 AB was founded and contributed between the private equity funds and Nycomed A/S.

By loan agreement dated December 27, 2006, Nycomed A/S borrowed EUR 501 million from its parent company, Nycomed Sweden Holding 2 AB. It has been stated that the loan was financed by a capital increase from Nycomed Sweden Holding 1 AB to Nycomed Sweden Holding 2 AB.

By loan agreement also dated December 27, 2006, Nycomed Sweden Holding 1 AB borrowed EUR 498.5 million from its parent company, Nycomed S.C.A., SICAR. The interest rate on the two loans was fixed at EURIBOR + 8.0% and EURIBOR + 7.9% respectively. For both loans, it was a condition that accrued interest was to be added to the principal, which the borrower was not obliged to repay during the term of the loan. In 2007, 2008 and 2009, the loan between Nycomed A/S and Nycomed Sweden Holding 2 AB accrued interest of 61,444,992, 75,498,014 and 61,836,446 euros, respectively. In the same period, Nycomed Sweden Holding 2 AB made group contributions to Nycomed Sweden Holding 1 AB of 60,468,000, 75,621,000 and 60,353,294 euros, respectively, which were credited to Nycomed Sweden Holding 1 AB via the companies' intercompany account. Also in 2007, 2008 and 2009, the loan between Nycomed Sweden Holding 1 AB and Nycomed S.C.A., SICAR was credited with interest of 61,284,470, 72,866,092 and 60,825,103 euros respectively.

According to the company's annual reports, Nycomed Sweden Holding 2 AB had in 2007, 2008 and 2009 - in addition to interest income - other income of EUR 1,193,131, 1,726,601 and 1,238,442 respectively. In the same period, Nycomed Sweden Holding 1 AB had - according to the company's annual reports - in addition to the group contributions - only interest income of 4,191, 5,368 and 25,564 euro, respectively. It also appears that the two companies had identical boards of directors during the period. The High Court finds that a) the loan between Nycomed A/S and Nycomed Sweden Holding 2 AB, b) the simultaneous loan between Nycomed Sweden Holding 1 AB and Nycomed S.C.A., SICAR, c) the capital increase in Nycomed Sweden Holding 2 AB and d) the annual adoption of group contributions from Nycomed Sweden Holding 2 AB to Nycomed Sweden Holding 1 AB must be considered a single and pre-arranged arrangement.

Takeda A/S has in its statement of claim stated that the purpose of the specific structure was "to 'optimize' the Nycomed Group's effective tax rate by allowing Nycomed A/S to deduct the interest on the debt to Nycomed Sweden Holding 2 AB without having to pay tax on the interest anywhere else".

The High Court therefore finds that it must also be assumed that the involvement of the two Swedish companies in the arrangement - instead of Nycomed S.C.A., SICAR granting the loan directly to Nycomed A/S - had no commercial reason other than to obtain a possible tax advantage. According to the information about the organization of the arrangement, it must also be assumed that neither Nycomed Sweden Holding 2 AB nor Nycomed Sweden Holding 1 AB had any real right of disposal over the attributed interest or group contributions which flowed on to Nycomed S.C.A, SICAR in accordance with the purpose of the arrangement.

An overall assessment of the above-mentioned circumstances is found to lead to the conclusion that neither Nycomed Sweden Holding 2 AB nor Nycomed Sweden Holding 1 AB can be considered to be the beneficial owner of the interest, neither under Article 1(1) of the Interest/Royalty Directive nor Article 11(1) of the Nordic Double Taxation Convention. In this

assessment, it is considered irrelevant that the interest and group contributions were not effectively transferred through the group structure until 2011 in connection with the sale of Nycomed, as the tax effect already occurred in connection with the allocations/bookkeeping in 2007, 2008 and 2009 respectively.

According to the information available, the High Court finds that the interest has finally accrued to Nycomed S.C.A., SICAR.

The High Court finds that Takeda A/S' view that the investors in the private equity funds can be considered the rightful owners of the interest cannot be upheld. In this regard, emphasis is placed on the fact that there is no information that provides a basis for assuming that there is such a direct connection between the attribution of the interest to Nycomed, S.C.A., SICAR, and this company's distributions through capital reduction etc. to the private equity consortium that Nycomed, S.C.A., SICAR must be considered a flow-through company in the specific context.

**3355**

With regard to Nycomed S.C.A., SICAR, the CJEU states that where the company is effectively exempt from corporation tax (impôt sur le revenu des collectivités) in Luxembourg, cf. Article 3(a)(iii), the company cannot be considered to be a "company of a Member State" within the meaning of the Directive.

It is undisputed that the company is exempt from taxation in Luxembourg on the interest in question and therefore cannot claim the benefits of the Interest/Royalty Directive, regardless of whether it is the beneficial owner of the interest.

The question is then whether Takeda A/S can rely on the fact that Nycomed S.C.A, SICAR is covered by the double taxation agreement between Denmark and Luxembourg as a basis for tax exemption.

*Double tax treaty with Luxembourg*

It follows from Article 11 of the double taxation agreement with Luxembourg that the interest cannot be taxed in Denmark if the beneficial owner of the interest is resident in Luxembourg. However, according to the final protocol, this does not apply if the beneficial owner is a holding company subject to the special Luxembourg legislation, "at present the law of July 31, 1929 and the Grand Duchy's regulation of December 17, 1938".

It is undisputed that Nycomed, S.C.A., SICAR is resident in Luxembourg. The question is whether the company is covered by the final protocol and thus not tax exempt under the double taxation treaty.

Nycomed, S.C.A., SICAR is a limited partnership governed by the law of June 22, 2004 on Société d'investissement en capital à risque, i.e. investment companies with risk capital (SICAR law). To be covered by the law, the purpose of the company must be to invest in "securities representative of risk capital in order to benefit investors from the results of the management of their assets in return for the risk they support". It is also a requirement that the investments are only available to so-called "informed investors". An

"informed investor" must meet certain specified requirements, including being certified as having expertise and experience in investing in risk capital, and the investment must be at least 125,000 euros. The law does not appear to impose any other requirements on the company's investments.

The Company is not subject to income tax on income from the investments or from the sale of the investments.

A company covered by the Act of July 31, 1929 (1929 Act) is defined as a holding company whose sole purpose is to acquire shares, in whatever form, in other companies so that the company does not have its own "industrial activity" and is not a "commercial establishment open to the public". The company is not subject to income tax. There appear to be no other requirements for the company or its investments. The decree of December 17, 1938 applies to the same companies whose total share and bond capital is one billion francs or more and provides for a very limited taxation of interest and dividends paid to

investors.

The Final Protocol includes by its wording "holding companies" which are characterized by being subject to "the specific Luxembourg legislation" currently the 1929 Law and the 1938 Regulation.

According to its wording, the final protocol must also include holding companies regulated by legislation adopted after 1929 and 1938, insofar as this legislation has the same special characteristics as these laws.

Companies covered by the 1929 Act are only characterized by being holding companies whose purpose is to acquire shares in other companies, so that it does not have its own "industrial activity" and is not a "commercial establishment open to the public", and by not being subject to tax liability.

A company covered by the SICAR Act is only defined as a company whose purpose is to invest in "securities representative of risk capital in order to benefit investors from the results of the management of their assets in return for the risk they support". It is also a requirement that the investments are only available to so-called "informed investors".

The High Court finds that the SICAR Act, like the 1929 Act, covers holding companies that invest in other companies so that the investments are not available to the public. Both types of companies are essentially not subject to tax liability. The SICAR Act, like the smaller one, is more limited to investments in risk capital.

Against this background, the High Court finds that Nycomed. S.C.A., SICAR is covered by the final protocol of the double taxation treaty, so that the company is taxable on interest under section 2(1)(d) of the Danish Corporation Tax Act.

The fact that companies covered by the Luxembourg law of March 30, 1988 on SICAV and SICAF companies (the SICAV/SICAF Act) in SKAT's opinion is not covered by the final protocol and is thus tax exempt under section 2(1)(d) of the Danish Corporation Tax Act cannot lead to a different result.

It should be noted that companies covered by the SICAV/SICAF Act are not to be considered holding companies due to the Act's comprehensive rules on collective investment by the public according to the principle of risk diversification.

The fact that possibly other types of companies under Luxembourg law may be covered by the final protocol cannot lead to a different result.

*Preliminary conclusion*

Nycomed. S.C.A., SICAR must be deemed to be the beneficial owner of the interest in question and is therefore

**3356**

The company is generally liable for tax hereof in accordance with section 2(1)(d) of the Danish Corporation Tax Act. The company is not covered by the Danish-Luxembourg double taxation treaty.

*§ Section 2(1)(d), last sentence*

Takeda A/S has further argued that the tax liability of Nycomed Sweden Holding 2 AB in any event lapses pursuant to section 2(1)(d), last sentence, according to which the tax liability lapses if the receiving company proves that the foreign corporate taxation of the interest is at least ¾ of the Danish corporate taxation and that the company does not pay the interest to another foreign company which is subject to a corporate taxation of the interest that is less than ¾ of the Danish corporate taxation.

Takeda A/S has further stated that both Nycomed Sweden Holding 2 AB - and Nycomed Sweden Holding 1 AB, in the event that the interest is deemed to be paid on to this company in the form of the attributed group contributions - are taxable on

the interest, respectively the group contributions, in Sweden at a tax rate of 28 %, which is at least ¾ of the Danish corporate tax rate.

As stated above, the High Court finds that the interest in question has flowed through both Nycomed Sweden Holding 2 AB and Nycomed Sweden Holding 1 AB and on to Nycomed S.C.A, SICAR, which must be considered to be the rightful owner of the interest.

It is undisputed that Nycomed S.C.A., SICAR is not liable to tax on the interest and that this company therefore does not meet the requirement in section 2(1)(d), last sentence, to be subject to a corporate tax on the interest of at least ¾ of the Danish corporate tax rate. The conditions for tax exemption in section 2(1)(d) last sentence of the Danish Corporation Tax Act are thus not met. Section 2(1)(d), last sentence, of the Danish Corporation Tax Act therefore does not entail that Takeda A/S' tax liability on the interest lapses.

*Administrative practices*

Takeda A/S has argued that an interpretation of the Interest/Royalty Directive, as stated above, and thus of the Danish Corporation Tax Act

§ Section 2(1)(d) and an understanding of the concept of "beneficial owner" in the Double Taxation Convention, as stated above, constitutes a retroactive change of administrative practice which, according to the principles of administrative law, cannot be applied to the interest imputations that took place in the period 2007-2009.

The High Court finds that the preparatory works to section 2(1)(d) of the Danish Corporation Tax Act as worded by Act No. 221 of March 31, 2004, including the Minister of Taxation's answers to questions to the Tax Committee, cannot be regarded as an indication that Danish tax authorities would accept an abuse of law as described by the European Court of Justice or would grant a tax reduction under a double taxation treaty, regardless of the fact that the recipient of the interest imputation could not be considered the rightful owner thereof.

The Minister for Taxation thus stated in several answers to the Tax Committee in connection with the creation of Act no. 221 of 31. March 2004, that in the case where withholding tax is sought to be circumvented by a Danish company paying interest to a financial company in a low-tax country via a company in another country covered by the Interest/Royalty Directive or a double taxation agreement, the tax authorities may, after a specific assessment of the facts, assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest is therefore not covered by the Directive or the double taxation agreement.

It also appears from the Ministry of Taxation's memo of March 20, 2007 to the Danish Parliament's Tax Committee on the status of SKAT's control efforts that the acquisition of Danish companies by private equity funds in recent years has accounted for a larger and larger share of total business transfers, that the number, especially in 2005, proved to be a significant number with a large volume, and that SKAT has therefore focused on this type of transfer. It also appears that SKAT on this basis has initiated a control of a number of transfers in order to investigate who is the final recipient, the "right income recipient", of interest and dividends. The Minister of Taxation stated on May 15, 2007 that these investigations had not yet led to taxation of dividends distributed to flow-through companies. Cases concerning taxation of interest were not mentioned in the statement.

The significance of the preparatory works, including the Minister of Taxation's answers to questions to the Tax Committee, to the Corporation Tax Act

§ Section 2(1)(c) on taxation of dividend distributions and the tax authorities' administrative practice regarding taxation of dividends,

which Takeda A/S has also invoked, reference is made to what the High Court has stated in its judgment of May 3, 2021 in cases B-1980-12 and B-2173-12.

Against this background, there is no administrative practice that implies acceptance of arrangements such as the present one. Takeda A/S has therefore not been justified in assuming that the company

in a situation such as the present one, was tax exempt from the interest write-ups of DKK 369,057,895.

*Section 69(1) of the Withholding Tax Act*

It follows from section 65 D(1) of the Danish Withholding Tax Act that Nycomed A/S (now Takeda A/S) is responsible for withholding tax of DKK 369,057,895.

In a case such as the present one, where Takeda A/S has not fulfilled its withholding obligation, it follows from

**3357**

Section 69(1) of the Danish Withholding Tax Act states that Takeda A/S is directly liable to the public authorities for payment of the missing amount, unless the company proves that there has been no negligence on its part in complying with the provisions of the Withholding Tax Act.

According to the available information, Takeda A/S must have been aware of the actual circumstances in connection with the interest imputations and group contributions, including that the purpose of including Nycomed Sweden Holding 2 AB and Nycomed Sweden Holding 1 AB as intermediaries was solely to avoid Danish withholding tax as explained above.

Under these circumstances, the fact that at the time of the interest imputations in 2007-2009 there was no final clarification of how the concept of "beneficial owner" should be interpreted, and thus whether there was sufficient legal authority to counter an abuse of rights such as the present one, cannot lead to Takeda A/S being exempt from liability pursuant to section 69(1) of the Withholding Tax Act.

Takeda A/S is then liable to the public authorities for the payment of DKK 369,057,895 in withholding tax on interest.

*Conclusion*

Takeda A/S has indicated that their alternative claim B, as the lesser of the two, contains a claim for referral back for reconsideration by the Danish Tax Agency. The High Court has therefore found no basis for rejecting this claim.

The Ministry of Taxation is then acquitted in its entirety.

*Legal costs*

The parties have not submitted any comments regarding the amount of the legal costs.

Following the outcome of the case, Takeda A/S must pay a total of DKK 3,000,000 in legal costs to the Ministry of Taxation. In determining the amount, which is to cover legal expenses including VAT, account has been taken of the value of the case and the scope, importance and course of the case, including that the case has been referred to the European Court of Justice.

*B-171-13 NTC Parent S.a.r.l. v Skatteministeriet Section 2(1)(d) of the Danish Corporation Tax Act and the legislative amendment of May 1, 2006*

Pursuant to section 2(1)(d), first paragraph, of the Danish Corporation Tax Act, a foreign company is liable to pay tax to the extent that the company receives interest from sources in Denmark concerning debt that a company covered by section 1 has to foreign legal persons as mentioned in section 3 B of the Danish Tax Control Act. The provision thus concerns tax on interest paid to foreign legal entities which, as specified in section 3 B of the Tax Control Act, control the company to which the debt is owed.

Section 3 B of the Tax Control Act was amended by Act no. 308 of April 19, 2006 with effect from May 1, 2006 to the effect that capital funds, which as transparent tax subjects under Danish law had previously been exempt from the general scope of the provision, were covered by the provision under specified conditions. According to the preparatory works, the amendments

were specifically aimed at the situation where several private equity funds join forces to acquire a company and in this connection enter into an agreement on the exercise of joint control of the jointly owned companies included in the acquisition.

U.2023.3198H

In December 2005 and January 2006, the five private equity funds granted loans totaling EUR 1.8 billion to Nordic Telephone Company Investment ApS. So-called Preferred Equity Certificates (PECs) were issued for the loans. It is undisputed that the legislative amendment as of May 1, 2006 - under unchanged circumstances - would have meant that the interest on these loans with effect from May 1, 2006 would have been taxable under section 2(1)(d) of the Danish Corporation Tax Act. In this connection, it is undisputed that none of the private equity funds were companies that could invoke Directive 2003/49/EC (the Interest/Royalty Directive) or a double taxation treaty concluded with Denmark.

However, a few days before the amendment entered into force, a number of restructurings were carried out which meant that the company Angel Lux Common S.a.r.l., which was also established a few days before the amendment entered into force, became the new creditor on the above-mentioned loans from the capital funds to Nordic Telephone Company Investment ApS. The question in the case is whether the company Angel Lux Common S.a.r.l., which is domiciled in Luxembourg, can claim tax exemption pursuant to section 2(1)(d)(3) of the Corporation Tax Act, according to which the tax liability does not include interest if the taxation is to be waived or reduced under the Interest/Royalty Directive or under the double taxation agreement between Denmark and Luxembourg.

The Danish Ministry of Taxation has argued that neither the conditions in the Interest/Royalty Directive nor in the Double Taxation Convention with Luxembourg for waiving or reducing taxation are fulfilled, partly because there is an abuse of rights, partly because the company cannot be considered to be the "beneficial owner" of the interest under either the Interest/Royalty Directive or Article 11(1) of the Double Taxation Convention.

*The application of section 2(1)(d), third sentence of the Danish Corporation Tax Act* On the general understanding of the Interest/Royalty Directive, including the authority to refuse the benefits of the Directive in case of abuse of rights and the principles for the assessment thereof, reference is made to what the High Court has stated in the premise regarding case B-2942-12, Takeda A/S under voluntary liquidation against the Ministry of Taxation, see above.

Similarly, reference is made to the statement in the grounds of Case B-2942-12 concerning the understanding and application of the term "beneficial owner" as used in

**3358**

Article 11 of the Double Taxation Convention, as the provision in the Danish-Luxembourg Double Taxation Convention is identical to the provision in the Nordic Double Taxation Convention.

A specific assessment of the debt and associated interest must then be made.

*Interest rates on Nordic Telephone Company Investment ApS' loans in 2006, 2007 and 2008*

Nordic Telephone Company Investment ApS' debt relationship with Angel Lux Common S.a.r.l. was established when the PECs issued by Nordic Telephone Company Investment ApS to the private equity funds were transferred from the private equity funds to Angel Lux Parent S.a.r.l. on April 27, 2006, which transferred them to Angel Lux Common S.a.r.l. the same day. These transfers established new debt relationships between the private equity funds and Angel Lux Parent S.a.r.l. and between Angel Lux Parent S.a.r.l.

S.a.r.l. and Angel Lux Common S.a.r.l. with the same principal amount and at substantially the same interest rate. PECs were issued for the debt from Angel Lux Parent S.a.r.l. to the private

equity funds and from Angel Lux Common S.a.r.l. to Angel Lux Parent S.a.r.l. The majority of the interest was attributed to the principal of the individual debt relationships, while a smaller portion of the interest was effectively paid.

In the period October 6 to November 10, 2006, Nordic Telephone Company Investment ApS paid an interest amount of 55,872,414 euro

corresponding to approximately DKK 416 million and reduced the principal by

39,427,325 euros corresponding to approximately DKK 294 million, totaling 95,299,739 euros (approximately DKK 710 million). Of this total amount of EUR 95,299,739, interest and principal payments totaling EUR 606,857 were transferred to Angel Lux Common S.a.r.l. and EUR 398,510 to Angel Lux Parent S.a.r.l., while all other payments were made directly to the capital funds. After the payment, the debt ratio between all the companies - i.e. between Nordic Te- lephone Company Investment ApS and Angel Lux Common S.a.r.l., between Angel Lux Common S.a.r.l. and Angel Lux Parent S.a.r.l. and between Angel Lux Parent S.a.r.l. and the private equity funds - was reduced by

39,427,325 euros or an almost equivalent amount.

For the income years 2007 and 2008, Nordic Telephone Company Investment ApS has deducted interest expenses for tax purposes totaling 191,721,225 euro corresponding to DKK 1,410,657,397 and 110,606,219 euro corresponding to DKK 824,768,741 respectively. Of these amounts, interest paid to Angel Lux Common

S.a.r.l. 502,439 euros in 2007 and 2,880,370 euros in 2008, respectively, while the remaining amount is attributed interest. Corresponding amounts were recognized as interest income in both Angel Lux Common S.a.r.l. and Angel Lux Parent S.a.r.l. in both years, and both companies also expensed interest of a similar amount in both years. Nordic Telephone Company Investment ApS' outstanding debt and the unpaid accrued interest were converted to additional share capital for Angel Lux Common S.a.r.l. in Nordic Telephone Company Investment ApS on July 10, 2008.

As regards Angel Lux Parent S.a.r.l. and Angel Lux Common S.a.r.l., it is stated that these companies did not receive any additional liquidity apart from the individual amounts received from Nordic Telephone Company Investment ApS on October 6, 2006 and, as regards Angel Lux Common S.a.r.l., the two interest payments received in 2007 and 2008 respectively. Angel Lux Common S.a.r.l.'s only asset, apart from the shares in Nordic Telephone Company Investment ApS, was the claim on PECs in the same company. According to the accounting information, it can be assumed that Angel Lux Parent S.a.r.l. and Angel Lux Common S.a.r.l. did not carry out any significant activities other than administering the loans. The High Court then notes that Nordic Telephone Company Investment ApS originally had a direct debt relationship with the capital funds in question, and that according to the evidence, it must be assumed that the formation and contribution of the two Luxembourg companies, Angel Lux Parent S.a.r.l. and Angel Lux Common S.a.r.l., and the transactions made as a result thereof with regard to the debt relationships must be considered as a single and pre-arranged arrangement. It must also be assumed that the main purpose of the arrangement was to obtain tax exemption for the interest that would have been taxable without the arrangement. The management of all the companies involved consisted of the same group of persons, as stipulated in the consortium agreements, which otherwise contained carefully defined principles for the arrangement, including the controlling influence of the "Investors Committee". In those circumstances, the company Angel Lux Common S.a.r.l. had no real control over the interest income. The same applies to Angel Lux Parent S.a.r.l.

The purpose of the transactions in the new company structure does not appear to have had any commercial justification, but only to avoid taxation. The companies Angel Lux Common

S.a.r.l. and Angel Lux Parent S.a.r.l. have thus, in relation to the interest on the debt in question, only acted as flow-through companies. The High Court therefore finds that there is an abuse of rights.

Angel Lux Common S.a.r.l. cannot be considered the rightful owner of the interest and cannot claim tax exemption under

the Interest/Royalty Directive. Angel Lux Common S.a.r.l. cannot, for the same reasons, claim tax exemption under the Danish-Luxembourg double taxation treaty. It cannot lead to a different result that the majority of the interest

**3359**

was not paid on an ongoing basis, but was added to the principal amount of the loan, with the tax effect occurring at the time of the additions/recognition.

As regards the plea that SKAT's decision on withholding tax on interest is a retroactive change of an established administrative practice, reference is made to the High Court's premise on administrative practice in the case BS-2942-12, Takeda A/S under frivillig lik- vidation mod Skatteministeriet.

The main claim of NCT Parent S.a.r.l. is then dismissed.

*The alternative and further alternative claim*

In the event that Angel Lux Common S.a.r.l. is not considered the beneficial owner of the interest, NTC Parent S.a.r.l. has argued that the underlying investors in the five private equity funds should be considered the beneficial owners. Reference is made to the summaries prepared by each private equity fund presented at . It is further argued that there is no Danish limited tax liability for the part of the interest accruing to the ultimate investors who were resident in a jurisdiction with which Denmark had concluded a double taxation treaty in the relevant income years.

The Danish Ministry of Taxation has disputed that the summaries presented constitute sufficient proof of the identity of the underlying investors. The Ministry of Taxation has argued that in a situation such as the present one, where there is an arrangement with flow-through entities, strict requirements must be imposed on the proof that the arrangement has not been aimed at abusing the Interest/Royalty Directive and the Danish-Luxembourg Double Taxation Convention.

Initially, the High Court notes that SKAT cannot during the case processing up to or in connection with the decision made on March 18, 2011 be considered to have promised a tax reduction.

Furthermore, the High Court finds that it has not been established that the underlying investors in the five private equity funds must be considered to be the rightful owners of the interest from Nordic Telephone Company Investment ApS. In particular, there is no documentation of what happened to the cash flow after it ended up in the private equity funds.

Consequently, the Ministry of Taxation is dismissed for the subsidiary and the more subsidiary claim.

*The most alternative claim - Section 69(1) of the Withholding Tax Act*

It follows from section 65 D(1) of the Withholding Tax Act that Nordic Telephone Company Investment ApS (now NTC Parent S.a.r.l.) is responsible for withholding tax, which by SKAT's decision of October 5, 2015 was finally calculated at DKK 817,238,912.

In a case such as the present, where the withholding obligation has not been fulfilled, it follows from section 69(1) of the Withholding Tax Act that Nordic Telephone Company Investment ApS (now NTC Parent S.a.r.l.) is directly liable to the public authorities for payment of the missing amount, unless the company proves that there has been no negligence on its part in complying with the provisions of the Withholding Tax Act.

As it must be assumed that Nordic Telephone Company Investment ApS (now NTC Parent S.a.r.l.) has been aware of the factual circumstances of the interest payments/attributions, including that the purpose of inserting the two Luxembourg companies as intermediaries was solely to avoid Danish

withholding tax as explained above, Nordic Telephone Company Invest

ment ApS (now NTC Parent S.a.r.l.) to the public for the payment.

It cannot lead to a different result that at the time of the interest payments/attributions in 2006-2008 there was no final clarification of how the concept of "rightful owner" should be interpreted, and thus whether there was the necessary legal basis to counter an abuse of rights such as the present.

NTC Parent S.a.r.l. is then liable to the public for the payment of DKK 817,238,912.

On this basis, the Ministry of Taxation is also dismissed for the most subsidiary claim.

*Conclusion The* Ministry
of Taxation is dismissed.

*Costs of the proceedings*

The parties have not submitted any comments regarding the amount of the legal costs.

Following the outcome of the case, NTC Parent S.a.r.l. must pay a total of DKK 3,500,000 in legal costs to the Ministry of Taxation. In determining the amount, which is to cover legal expenses including VAT, account has been taken of the value of the case as well as the scope, importance and course of the case, including that the case has been referred to the European Court of Justice.

## For it is recognized as right

The Danish Ministry of Taxation is dismissed for the claims brought by Takeda A/S under voluntary liquidation in the case B-2942-12.

The claims brought by NTC Parent S.a.r.l. in the case B-171-13 are dismissed.

Takeda A/S under voluntary liquidation must pay DKK 3,000,000 in legal costs to the Danish Ministry of Taxation within 14 days. NTC Parent S.a.r.l. must pay DKK 3,500,000 to the Danish Ministry of Taxation within 14 days.

The legal costs are subject to interest according to section 8a of the Interest Act.

## Supreme Court ruling

In a previous instance, judgment was handed down by the 13th division of the Eastern High Court on
November 25, 2021 (...).

**3360**

Seven judges participated in the adjudication: Jens Peter Christensen, Vibeke Rønne, Michael Rekling, Lars Hjortnæs, Jan Schans Christensen, Ole Hasselgaard and Rikke Foersom.

## Claims

*Case 116/2021*

*The appellant, Takeda A/S in voluntary liquidation (formerly Nycomed A/S)*, claims that the respondent, Skattemini- steriet, must recognize that Takeda is not liable to withhold tax at source on interest of DKK 115,516,013, DKK 138,380,325 and DKK 115,161,557 respectively, a total of DKK 369,057,895, corresponding to 25% of the interest accrued in the years 2007, 2008 and 2009 on the loan from Nycomed Sweden Holding 2 AB at issue in the case, and that Takeda in any event is not liable for payment of the amounts not withheld.

Takeda has, in the alternative, submitted two parallel claims a) that the Ministry of Taxation must recognize that the withholding tax claims for the years 2007, 2008 and 2009 are reduced by DKK 1,615,932, DKK 1,935,776 and DKK 1,610,973, respectively, and b) that the case must be referred back for reconsideration by the Danish Tax Agency.

Takeda has also claimed that the Ministry of Taxation must

pay DKK 3,000,000 with interest from December 17, 2021. The claim for payment concerns repayment of legal costs paid by Takeda to comply with the High Court's judgment.

*The Ministry of Taxation* has requested that the decision be upheld.

With regard to Takeda's claim for repayment, the Ministry of Taxation has claimed acquittal.

*Case 117/2021*

*The appellant, NTC Parent S.à.r.l.,* claims that the respondent, the Danish Ministry of Taxation, must recognize that there is no Danish limited tax liability for interest on loans between Nordic Telephone Company Investment ApS (now NTC Parent) as debtor and Angel Lux Common S.à.r.l. as creditor in the income years 2006-2008 and that Nordic Telephone Company Investment is not responsible for payment of the amounts not withheld.

In the alternative, NTC Parent has claimed that the Ministry of Taxation must recognize that the withholding tax claim must be reduced by DKK 574,865,866 or such amount as otherwise determined by the court and, in the further alternative, that the case be referred back to the Danish Tax Agency for calculation of the interest portions that are taxable.

*The Ministry of Taxation* has requested that the decision be upheld.

## Supplementary case presentation

A number of additional documents have been submitted to the Supreme Court in case 116/2021 (Takeda), including shareholder lists as of December 31, 2007, December 31, 2008 and December 31, 2009 for Nycomed S.C.A., SICAR.

In addition, a decision of October 9, 2015 from SKAT on repayment of a total of DKK 23,103,203 in interest tax to Takeda has been submitted. The adjustment was due to the fact that the decision of December 13, 2010 had imposed 30% interest tax, but that the interest tax rate was actually 25% for the years 2007-2009. The interest tax imposed for the years 2007-2009 amounted to a total of DKK 369,057,895.

## Requester

*Takeda A/S in voluntary liquidation* has stated in detail, inter alia, that there has been no flow-through of interest from Nycomed Sweden Holding 2 to Nycomed Sweden Holding 1 or to anyone else. Nycomed Sweden Holding 2's payment of group contributions to Nycomed Sweden Holding 1 did not change the existing interest receivable, and the group contributions did not prevent Nycomed Sweden Holding 2 from disposing of the interest by converting it into equity in Nycomed A/S, as happened in connection with the sale of the Nycomed Group in 2011. Thus, there was no effective payment of interest. The group contributions were never paid to Nycomed Sweden Holding 1, and the debt was subsequently forgiven by Nycomed Sweden Holding 1.

Takeda has throughout the proceedings argued that Nycomed S.C.A., SICAR must be considered the beneficial owner of the interest if Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1 cannot be considered the beneficial owners of the interest. Payment of interest from Takeda directly to Nycomed S.C.A., SICAR would have been tax exempt under the double tax treaty with Luxembourg, and there can therefore be no abuse of rights if this company is considered the beneficial owner.

SICARs are not covered by Article 1 of the Final Protocol to the Double Taxation Convention. SICARs are also not comparable to the holding companies covered by the special Luxembourg legislation of 1929. There is no question of the SICAR law replacing or continuing the 1929 legislation on holding companies.

With reference to the Supreme Court's judgment in UfR 2023.1575, it is not disputed that Denmark is obliged to apply the general EU law principle of abuse and deny a taxable person the

exemption from withholding tax on interest resulting from the interest tax agreement.

/In the absence of national or collective agreement provisions providing for such a refusal, Takeda submits that there is an abuse under the Royalties Directive. Takeda does not

no longer claim that SKAT's decision of December 13, 2010 is a tightening of a fixed administrative practice with retroactive effect.

*The Ministry of Taxation* has stated that Nycomed Sweden Holding 2 and Nycomed Sweden

**3361**

Holding 1 were both flow-through entities. Nycomed Sweden Holding 2 was not legally obliged to make the annual group contributions to Nycomed Sweden Holding 1, but the group contributions were a required and necessary element of the tax arrangement. Without the deductible and thus neutralizing group contributions to Nycomed Sweden Holding 1, Nycomed Sweden Holding 2's interest income would have been taxed in Sweden.

It is irrelevant that the interest and group contributions were not effectively paid, but were added to the principal of the loan and posted to suspense accounts. The tax advantage in the form of the exemption from taxation in the source state, which was attempted to be obtained by abuse, was not conditional on effective payment. None of the tax effects generated by the Nycomed Group's tax arrangement was conditional on the effective payment of the interest or the group contributions.

Nycomed S.C.A., SICAR cannot be regarded as the beneficial owner of the interest. Even if this company were to be considered the beneficial owner of the interest, the double tax treaty with Luxembourg would not lead to a waiver of the taxation of interest already because the company must be considered to be a holding company covered by § 1 of the final protocol.

Section 1 of the Final Protocol is by its wording not limited to holding companies covered by the 1929 legislation or legislation which may replace such legislation. A SICAR functions as a holding company and, like 1929 holding companies, is subject to a special and favorable tax regime.

*Case 117/2021*

*NTC Parent S.à.r.l.* has stated in detail, inter alia, that Angel Lux Common was the rightful owner of the interest, which already follows from the fact that there was no channeling of the interest. The vast majority of the interest was attributed by Nordic Telephone Company Investment to this company's debt to Angel Lux Common, and on July 10, 2008, Angel Lux Common disposed of the attributed interest by converting it into shares in Nordic Telephone Company Investment. Debt and interest have thus "reverted" to Nordic Telephone Company Investment.

The attribution of interest on Nordic Telephone Company Investment's debt to Angel Lux Common resulted in the latter's receivable from Nordic Telephone Company Investment being increased by an amount equal to the interest at each attribution. For Angel Lux Common, until the debt conversion in 2008, the accrued interest was an asset in the form of a receivable from Nordic Telephone Company Investment. There was no debt conversion in Angel Lux Common at the same time as the debt conversion in Nordic Telephone Company Investment.

Angel Lux Commons' decision to convert the interest into equity proves that this company had the sole right to dispose of the interest.

*The Ministry of Taxation* has elaborated, inter alia, that when assessing whether there is abuse and whether Angel Lux Common and Angel Lux Parent must be considered the rightful owner of the interest or flow-through entities for tax purposes, it is irrelevant that only part of the interest was actually paid, while the rest was added to the loan principal. It is also irrelevant

whether the interest was subsequently converted into shares in Nordic Telephone Company Investment.

The tax arrangement was designed so that the tax benefits in the form of Nordic Telephone Company Investment's deduction for interest and Angel Lux Commons' exemption from withholding tax could be obtained immediately without any liquidity burdens for the participating companies. Subsequent payment transfers, conversions into shares or other transactions could then be carried out without paying tax.

When none of the tax law effects of the arrangement were conditional on or otherwise had any connection with effective payment, it makes no sense to make the finding of an abuse of law of the kind referred to in conditional on the effective payment of interest at each stage.

## The Supreme Court's reasoning and result

*Case background and issues*

On December 13, 2010, SKAT ruled that Nycomed A/S (now Takeda A/S under voluntary liquidation) under the Withholding Tax Act

§ Section 65 D, cf. section 2(1)(d) of the Danish Corporation Tax Act, was obliged to withhold tax totaling DKK 392,161,097 on interest accrued in 2007, 2008 and 2009 on an intra-group loan granted by Nyco- med Sweden Holding 2 AB in December 2006. By decision of October 9, 2015, SKAT reduced the interest tax imposed to a total of DKK 369,057,895.

On March 18, 2011, SKAT ruled under the same provisions that Nordic Telephone Company Investment ApS (now NTC Parent S.à.r.l.) was obliged to withhold tax totaling DKK 925,764,961 on interest paid or accrued in the period from May 2006 to July 2008 on an intra-group loan granted by Angel Lux Common S.à.r.l. in April 2006. By decision of October 5, 2015, SKAT reduced the interest tax imposed to a total of DKK 817,238,912.

In particular, the cases concern whether the taxation of the interest should be waived or reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States (the Interest/Royalty Directive) or

**3362**

waived under double taxation treaties with the Nordic countries and Luxembourg, respectively, cf. section 2(1)(d), 3rd sentence of the Danish Corporation Tax Act.

*Section 2(1)(d) of the Danish Corporation Tax Act*

It follows from section 2(1)(d) of the Danish Corporation Tax Act that Nycomed Sweden Holding 2 and Angel Lux Common are generally liable to pay tax on interest received from a company in Denmark in respect of controlled debt. The triggering of tax liability means that Nycomed A/S and Nordic Telephone Company Investment in the relevant years would be obliged to withhold interest tax, cf. section 65 D(1) of the Withholding Tax Act.

According to section 2(1)(d)(3) of the Danish Corporation Tax Act, the tax liability does not include interest if taxation of the interest is to be waived or reduced under the Interest/Royalty Directive or waived under a double taxation agreement with the state where the receiving company is resident.

*The Interest/Royalty Directive and CJEU case law*

Article 1(1) of the Interest/Royalty Directive provides that payments of interest arising in a Member State shall be exempt from any form of taxation in that State provided that the beneficial owner of the interest is a company of another Member State. According to Article 1(4), a company is considered to be the beneficial owner of interest only if it receives such payments for its own use, including as an intermediary, mandatary or authorized signatory for another person. It follows

from Article 1(7) that the provision applies only in the case of interest paid between associated companies.

Article 5 states that the Directive does not preclude the application of national or treaty provisions to combat fraud or abuse and that Member States may grant benefits under the Directive or refuse to apply it in the case of transactions for which tax evasion, avoidance or abuse is the principal motive or one of the principal motives.

By judgment of February 26, 2019 (Joined Cases C-115/16, C-118/16, C-119/16 and C-299/16), the European Court of Justice answered a number of questions referred for a preliminary ruling by the High Court in four cases, including the present cases concerning Takeda and NTC Parent. The Court held that Article 1(1) of the Interest/Royalty Directive, read in conjunction with Article 1(4), must be interpreted as meaning that the exemption from any form of tax on interest payments provided for therein is reserved solely to the beneficial owners of such interest, that is to say, entities which actually receive that interest in economic terms and which therefore have the power to determine its use freely. The Court further held that the general principle of EU law that individuals may not rely on provisions of EU law for the purpose of enabling fraud or abuse must be interpreted as meaning that, in the event of abuse, national authorities and courts must refuse to grant a taxpayer the exemption from any form of tax on interest payments provided for in Article 1(1), even in the absence of national or contractual provisions providing for such a refusal (paragraph 122). In its judgment of January 9, 2023 (UfR 2023.1575), the Supreme Court considered a number of general issues concerning taxation of dividends under section 2(1)(c) of the Danish Corporation Tax Act, Directive 90/435/EEC on a common system of taxation applicable in the case of parent companies/subsidiaries of different Member States (the Parent-Subsidiary Directive) and double taxation treaties between Denmark and Cyprus, Luxembourg and the USA. In the judgment, the Supreme Court ruled, among other things, that Danish courts must apply section 2(1)(c) of the Danish Corporation Tax Act, which contains a reference to parent companies.

/ Subsidiaries Directive, in accordance with this directive as interpreted by the judgment of the Court of Justice of the European Union of February 26, 2019 (cases C-116/16 and C-117/16 below), and that on that basis it is irrelevant whether there were Danish provisions on fraud and abuse at the times relevant to the taxation.

In accordance with the ruling of January 9, 2023, the Supreme Court finds that Danish courts must apply section 2(1)(d) of the Danish Corporation Tax Act, which contains a reference to the Interest/Royalty Directive, in accordance with this Directive as interpreted by the judgment of the European Court of Justice of 26 February 2019 (Joined Cases C-115/16, C-118/16, C-119/16 and C-299/16).

*Specifically on the abuse assessment*

In its judgment of February 26, 2019, the Court of Justice of the European Union ruled on the elements that constitute abuse of rights and the corresponding evidence. The Court stated, inter alia, that, although there are a number of elements in the cases before it which could lead to the conclusion that there is an abuse of rights, it is nevertheless for the referring courts to verify whether those elements are objective and consistent and whether the taxpayers have had the opportunity to provide evidence to the contrary (paragraph 126).

The Court also stated that a group which is not organized for reasons reflecting economic reality, which has a purely formal structure and whose main purpose or one of its main purposes is to obtain a tax advantage which is contrary to the object and purpose of the applicable tax legislation may be regarded as an artificial arrangement. According to the Court, this is particularly the case where the payment of interest tax is avoided by including in the group structure a flow-through entity between the company which

Copyright © 2023 Karnov Group Denmark A/S

transfers the interest and the company which is the rightful owner of the interest (paragraph 127).

### 3363

In addition, the Court held that, for the purposes of examining the group structure, it is irrelevant that some of the beneficial owners of the interest transferred by flow-through companies are resident for tax purposes in a third State with which the source State has concluded a double taxation convention and that the existence of such a convention cannot in itself preclude the existence of an abuse of rights (paragraph 135). However, in a situation where the interest would have been exempt if it had been transferred directly to a company established in a third State, it cannot be ruled out, according to the Court, that the objective of the group structure is not an abuse of rights. In such a case, the group's choice of such a structure instead of paying the interest directly to that company cannot be challenged (paragraph 137).

As regards the burden of proof of abuse, the Court held, inter alia, that, in order to refuse to recognize a company as the beneficial owner of interest or to establish the existence of an abuse of rights, a national authority is not required to determine the entity or entities which it regards as the beneficial owner of that interest (paragraph 145).

*Double tax treaties with the Nordic countries and Luxembourg*

The Danish double taxation treaties with the Nordic countries (treaty of September 23, 1996) and with Luxembourg (treaty of November 17, 1980) correspond substantially to the OECD Model Tax Convention of 1977 as regards provisions of importance to the present cases.

The Conventions contain in Article 11(1) substantially identical provisions according to which interest arising in a Contracting State and paid to a resident of another Contracting State may be taxed in that other State only if that person is the beneficial owner of the interest.

As stated by the Supreme Court in the judgment of January 9, 2023, the term "beneficial owner" must be understood in the light of the OECD Model Tax Convention, including the OECD's comments from 1977 on combating abuse and the revised comments from 2003. These comments state, inter alia, that the term "beneficial owner" is intended to ensure that double tax treaties do not facilitate tax avoidance or evasion through "artifice" and "elaborate legal constructions" that make it "possible to benefit both from the advantages resulting from certain domestic laws and from the tax advantages resulting from double tax treaties". The 2003 Revised Commentaries, which elaborate and clarify this, state, inter alia, that it would not be "consistent with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax in cases where a resident of a Contracting State acts, other than as agent or intermediary, merely as a conduit for another person who actually receives the income in question".

*Nycomed A/S (now Takeda)*

The restructuring of the Nycomed Group in 2006 included the incorporation of two Swedish companies (Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1), Nycomed A/S taking out a loan of EUR 501 million with Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1 taking out a loan of EUR 498.5 million with the Luxembourg company Nycomed S.C.A., SICAR, that the loan to Nycomed A/S was financed by a capital increase in Nycomed Sweden Holding 2 subscribed by Nycomed Sweden Holding 1, and that in 2007, 2008 and 2009 a resolution was passed to increase the capital of Nycomed Sweden

Group contribution corresponding to the interest on the loans from Nycomed Sweden Holding 2 to Nycomed Sweden Holding 1.

The Supreme Court finds that the purpose of the restructuring of the group as described in the High Court's judgment was to reduce Nycomed A/S' taxable income in Denmark with deductible interest expenses without the offsetting interest income being taxed within the group. The Supreme Court finds that the restructuring must be seen as an overall and pre-arranged tax arrangement.

For the reasons stated by the High Court, the Supreme Court finds that it cannot be assumed that Nycomed Sweden Holding 2 or Nycomed Sweden Holding 1 had the power to freely determine the use of the interest transferred from Nycomed A/S. The Supreme Court therefore agrees that neither of these companies is the beneficial owner of the interest, but that they must be considered flow-through companies that do not enjoy protection under the Interest/Royalty Directive. For the same reasons, the Supreme Court finds that neither Nycomed Sweden Holding 2 nor Nycomed Sweden Holding 1 can be considered the beneficial owner of the interest under the double taxation agreement with the Nordic countries, and that the companies therefore do not enjoy protection under the agreement either.

The Supreme Court finds that when assessing whether a company is to be considered the rightful owner of the interest or a flow-through entity, it is irrelevant whether the interest has been effectively paid or whether the interest has been added to the principal of the loan. In this regard, the Supreme Court notes that the addition of interest also involves a transfer of a capital asset, and that the tax effects with regard to the interest are not conditional on effective payment. Furthermore, it is irrelevant to the assessment whether the interest is subsequently converted into shares etc. as a conversion presupposes that there has been a prior transfer of the asset that the interest represents.

### 3364

What Takeda has stated about the significance of the lack of effective payment of the interest and the subsequent conversion of the interest into equity in Nycomed A/S in 2011 cannot lead to a different assessment of Nycomed Sweden Holding 2 and Nycomed Sweden Holding 1, which, as mentioned, must be regarded as flow-through companies.

The question is then whether Takeda has established that Nycomed S.C.A., SICAR is the rightful owner of the interest, cf. also paragraph 145 of the CJEU judgment of February 26, 2019.

Takeda has not produced the agreements entered into between Nycomed S.C.A., SICAR and the underlying capital funds and between the capital funds and their shareholders and investors. In this connection, the Supreme Court notes that the submitted "Management Shareholders Agreement" from July 2007 states, among other things, that an "Inve- stor Shareholders Agreement" had been concluded. The latter agreement, which could possibly shed light on what was agreed between Nycomed S.C.A., SICAR and the underlying capital funds, including the company's power to dispose of the interest, has not been produced. Nor has there been any other clarification of the agreements between the companies, capital funds, shareholders and investors in question.

The Supreme Court finds that Takeda has not demonstrated that Nycomed S.C.A., SICAR had the power to freely determine the allocation of the interest that it received from Nycomed A/S via the Swedish flow-through companies. There is therefore no basis for considering Nycomed S.C.A., SICAR to be the legal owner of the interest.

After all the above, the Supreme Court finds no reason to consider

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

whether Nycomed S.C.A., SICAR - if this company could be considered the rightful owner of the interest - would be covered by section 1 of the final protocol to the double taxation agreement with Luxembourg.

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

The Supreme Court notes that it is undisputed that Nycomed S.C.A., SI-CAR is not covered by the Interest/Royalty Directive and therefore already cannot claim the benefits under the Directive, cf. paragraph 153 of the CJEU judgment.

In support of the alternative claims, Takeda submits, inter alia, that the withholding tax claim must in any event be reduced in respect of shareholders no. 39 and no. 41, who are both direct shareholders in Nycomed S.C.A., SICAR. Takeda has also argued that the case should be referred back to the tax authorities to determine whether the other shareholders and investors in Nycomed S.C.A., SICAR can be regarded as the beneficial owners of the interest at the time of the interest imputation.

As stated above, the agreements between the companies, capital funds, shareholders and investors in question have not been clarified, and Takeda has not demonstrated that the said shareholders and investors in Nycomed S.C.A., SICAR are the beneficial owners of the interest. Against this background, the Supreme Court finds that the tax arrangement constitutes abuse. Nycomed Sweden Holding 2 is therefore liable to pay tax on the interest received from Nycomed A/S in 2007, 2008 and 2009, cf. section 2(1)(d) of the Danish Corporation Tax Act.

The Supreme Court notes that Takeda has not demonstrated that the conditions for the lapse of tax liability for Nycomed Sweden Holding 2 pursuant to section 2(1)(d), last sentence, of the Danish Corporation Tax Act are met.

As regards Takeda's arguments concerning the difference between the interest rate on the loan to Nycomed A/S granted by Nycomed Sweden Holding 2 and the interest rate on the loan to Nycomed Sweden Holding 1 granted by Nycomed S.C.A., SICAR, the Supreme Court notes that the interest payment was an integral part of the administration of the tax arrangement which constitutes abuse. Nycomed Sweden Holding 2 can therefore not be considered the rightful owner of any part of the interest that the company received from Nycomed A/S.

The Supreme Court agrees that Nycomed A/S was aware of the basis for the imputation of interest to Nycomed Sweden Holding 2 being taxable under section 2(1)(d) of the Danish Corporation Tax Act. No circumstances have been disclosed which can justify Nycomed A/S having had sufficient reason to believe that the imputed interest was not taxable. Nycomed A/S (now Takeda) is therefore liable for payment of DKK 369,057,895, cf. section 69(1) of the Danish Withholding Tax Act. *Nordic Telephone Company Investment (now NTC Parent) The* restructuring of the group in 2006 included the formation and incorporation of the two Luxembourg companies (Angel Lux Com- mon and Angel Lux Parent) and a number of transactions relating to the loans totaling EUR 1.8 billion that the private equity funds behind Nordic Telephone Company Investment's then parent company in Luxembourg had granted to the company in December 2005 and January 2006.

The Supreme Court finds that the purpose of the restructuring of the group as described in the High Court's judgment was to obtain tax exemption for interest that would otherwise have been taxable. The Supreme Court finds that the restructuring must be seen as an overall and pre-arranged tax arrangement.

For the reasons stated by the High Court, the Supreme Court finds that it cannot be assumed that Angel Lux Common and Angel Lux Parent had the power to freely determine the use of the interest transferred from Nordic Telephone Company Invest- ment. The Supreme Court therefore accepts that neither of these companies is the beneficial owner of the interest, but that they must be considered flow-through companies that do not enjoy protection under the Interest/Royalty Directive.

For the same reasons, the Supreme Court finds that neither Angel Lux Common nor Angel Lux Parent can be considered

**3365**

U.2023.3198H

the beneficial owner of the interest under the double tax treaty with Luxembourg and that the companies therefore do not enjoy protection under the treaty.

As stated in the Takeda case, the Supreme Court finds that in this assessment of whether a company is to be considered the beneficial owner of the interest or a flow-through entity, it is irrelevant whether the interest has been effectively paid or whether the interest has been added to the principal of the loan, just as it is irrelevant whether the interest has subsequently been converted into shares. What NTC Parent has stated about the significance of the fact that only a small part of the interest was effectively paid and the subsequent conversion of the interest into shares in Nordic Telephone Company Investment cannot lead to a different assessment of Angel Lux Common and Angel Lux Parent, which, as mentioned, must be considered flow-through companies.

In support of the alternative claim, NTC Parent has argued, among other things, that the withholding tax claim must be waived in whole or in part if the investors in the overlying capital funds can be considered the beneficial owners of the interest as several of the investors are resident in countries covered by double taxation treaties with Denmark. In support of the more subsidiary claim, NTC Parent has argued that the case should be referred back to the Danish Tax Agency for the purpose of calculating the taxable interest shares.

NTC Parent has not provided information on what finally happened to the interest after it had flowed through the Luxembourg companies.

The Supreme Court finds that NTC Parent has not demonstrated that the investors in the private equity funds behind the Luxembourg companies are the beneficial owners of the interests.

The Supreme Court agrees that it has not been demonstrated that taxation of the interest in question under section 2(1)(d) of the Danish Corporation Tax Act constitutes a retroactive change of an established administrative practice.

Based on the above, the Supreme Court finds that the tax arrangement constitutes abuse. Angel Lux Common is therefore liable to pay tax on the interest received from Nordic Telephone Company Investment in the period from May 2006 to July 2008, cf. section 2(1)(d) of the Danish Corporation Tax Act.

The Supreme Court agrees that Nordic Telephone Company Investment was aware of the basis for the interest payments and interest imputations to Angel Lux Common being taxable under section 2(1)(d) of the Danish Corporation Tax Act. No circumstances have been disclosed which can justify Nordic Telephone Company Investment having had sufficient reason to believe that the interest payments and interest imputations were not taxable. Nordic Telephone Company Investment (now NTC Parent) is therefore liable for payment of DKK 817,238,912, cf. section 69(1) of the Withholding Tax Act.

*Conclusion*

The Supreme Court upholds the verdict.

The Supreme Court acquits the Danish Ministry of Taxation of Takeda's claim for repayment of legal costs.

## For it is recognized as right

The judgment of the High Court is upheld.

The Danish Ministry of Taxation dismisses Takeda A/S under voluntary liquidation's claim for repayment.

In legal costs before the Supreme Court, Takeda A/S under voluntary liquidation must pay DKK 2,000,000 to the Danish Ministry of Taxation.

NTC Parent S.à r.l. shall pay the following costs before the

Supreme Court

DKK 2,500,000 to the Ministry of Taxation.

The ordered costs must be paid within 14 days of the date of this Supreme Court judgment and shall bear interest in accordance with section 8a of the Interest Act.

Copyright © 2023 Karnov Group Denmark A/S

**U.2023.3198**

**U.2023.3198**

*Vurdering efter selskabsskatteloven, EU-direktiv og dobbeltbeskatningsoverenskomster af renter på koncerninterne lån til udenlandske selskaber (beneficial-owner).*

*EU-ret 2 - International ret 5 - Skatter 311.2, 311.9 og 72.1.*

De to sager angik navnlig, om der var pligt til at indeholde skat af renter på koncerninterne lån ydet af udenlandske koncernforbundne selskaber. Sagerne skulle bedømmes efter dansk skattelovgivning, EU's rente-/royaltydirektiv og dobbeltbeskatningsoverenskomster med de nordiske lande og Luxembourg. Med hensyn til en række generelle spørgsmål om udtrykket »beneficial owner« og om, hvornår der efter EU-retten foreligger retsmisbrug, henviste Højesteret blandt andet til Højesterets dom i U 2023.1575, der angik sager om udbytter udloddet til udenlandske moderselskaber. Om begge sager udtalte Højesteret, at der i koncernen var gennemført en omstrukturering, der bl.a. indebar indskydelse af selskaber i henholdsvis Sverige og Luxembourg, og at denne omstrukturering måtte ses som et samlet og på forhånd tilrettelagt skattearrangement. Højesteret fastslog endvidere, at de indskudte selskaber måtte anses for gennemstrømningsselskaber, der ikke nød beskyttelse efter rente-/royaltydirektivet eller efter dobbeltbeskatningsoverenskomsterne. Efter de oplysninger, som parterne havde fremlagt, kunne det ikke fastlægges, hvad der endeligt var sket med renterne, efter de var strømmet gennem de indskudte selskaber, og det kunne derfor ikke fastlægges, hvem der var retmæssig ejer af renterne. Højesteret fastslog herefter, at skattearrangementerne udgjorde misbrug, og at der skulle have været indeholdt renteskat med henholdsvis ca. 369 mio. kr. og ca. 817 mio. kr.[1]

**3199**

**H.D. 4. maj 2023** *i sag 116/2021 og 117/2021 (1. afd.)*

(Jens Peter Christensen, Vibeke Rønne, Michael Rekling, Lars Hjortnæs, Jan Schans Christensen, Ole Hasselgaard og Rikke Foersom).

*Takeda A/S under frivillig likvidation (adv. Lasse Esbjerg Christensen og Søren Lehmann Nielsen, begge Kbh.)*
*NTC Parent S.à.r.l. (adv. Arne Møllin Ottosen, Kbh.)*
mod
*Skatteministeriet (adv. Søren Horsbøl Jensen, Kbh.)*

# Østre Landsrets dom 25. november 2021, B-2942-12 og B-171-13

## I. De nedlagte påstande og sagernes baggrund

*B-2942-12 Takeda A/S under frivillig likvidation mod Skatteministeriet*

SKAT traf den 13. december 2010 afgørelse om, at Nycomed A/S efter kildeskattelovens § 65 D, jf. selskabsskattelovens § 2, stk. 1, litra d, havde pligt til at indeholde kildeskat af de rentetilskrivninger, der blev foretaget i perioden 2007-2009 på et lån til selskabet ydet af selskabets moderselskab, Nycomed Sweden Holding 2 AB, med i alt 392.161.097 kr. SKAT har efterfølgende nedsat beløbet til 369.057.895 kr.

I 2011 erhvervede virksomheden Takeda Pharmaceutical Company Limited aktierne i Nycomed A/S, som efterfølgende skiftede navn til Takeda A/S.

SKATs afgørelse blev påklaget til Landsskatteretten, men forinden Landsskatteretten traf afgørelse i sagen, blev sagen den 9. juli 2012 indbragt for Retten i Roskilde i medfør af skatteforvaltningslovens § 48, stk. 2. Retten i Roskilde henviste ved kendelse af 24. august 2012 sagen til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

*Sagsøgeren, Takeda A/S under frivillig likvidation,* har nedlagt følgende påstande:

Principalt: Skatteministeriet skal anerkende, at Takeda A/S under frivillig likvidation ikke er indeholdelsespligtig af kildeskat af renter med henholdsvis 115.516.013 kr., 138.380.325 kr. og 115.161.557 kr., i alt 369.057.895 kr., svarende til 25 % af de i årene 2007, 2008 og 2009 tilskrevne renter på det i sagen omhandlede lån fra Nycomed Sweden Holding 2 AB, og at Takeda A/S under frivillig likvidation ikke er ansvarlig for betalingen af de ikke indeholdte beløb.

Subsidiært (sideordnede påstande):

(A) Skatteministeriet skal anerkende, at kildeskattekravene mod Takeda A/S under frivillig likvidation for årene 2007, 2008 og 2009 nedsættes med henholdsvis 1.615.932 kr., 1.935.776 kr. og 1.610.973 kr.

(B) Sagen hjemvises i øvrigt til fornyet behandling ved Skattestyrelsen med henblik på nedsættelse af kildeskattekravet til 0 kr., i det omfang det dokumenteres, at de direkte eller indirekte investorer i Nycomed S.C.A., SICAR på tidspunkterne for rentetilskrivningerne henholdsvis den 27. december 2007, den 27. december 2008 og den 27. december 2009 var 1) de »retmæssige ejere« af de omhandlede renter i henhold til en dobbeltbeskatningsoverenskomst mellem domicilstaten og Danmark, eller 2) fysiske personer.

Over for Skatteministeriets afvisningspåstand f.s.v.a. den subsidiære påstand B) har Takeda A/S under frivillig likvidation nedlagt påstand om frifindelse.

*Sagsøgte, Skatteministeriet,* har over for Takeda A/S under frivillig likvidations principale påstand og subsidiære påstand A) nedlagt påstand om frifindelse.

Over for selskabets subsidiære påstand B) har Skatteministeriet nedlagt principal påstand om afvisning, subsidiært frifindelse.

*B-171-13 NTC Parent S.a.r.l. mod Skatteministeriet*

SKAT traf den 18. marts 2011 afgørelse om, at Nordic Telephone Company Investment ApS efter kildeskattelovens § 65 D, jf. selskabsskattelovens § 2, stk. 1, litra d, havde pligt til at indeholde skat af de betalte/tilskrevne renter på aktionærlånet mellem Nordic Telephone Company Investment ApS og selskabet Angel Lux Common S.a.r.l. for perioden 1. maj 2006 til 10. juli 2008 med i alt 925.764.961 kr. SKAT nedsatte ved afgørelse af 5. oktober 2015 beløbet til 817.238.912 kr.

Nordic Telephone Company Investment ApS fusionerede i 2009 med Nordic Telephone Company Administration ApS som det fortsættende selskab. I 2010 blev Nordic Telephone Company Administration ApS opløst ved en skattefri grænseoverskridende fusion med Angel Lux Common S.a.r.l., der siden ændrede navn til NTC S.A. og efterfølgende er likvideret med overdragelse af bl.a. kravet i denne sag til NTC Parent S.a.r.l. NTC Parent S.a.r.l. har indbetalt den omhandlede renteskat til SKAT. Sagen er anlagt af NTC Parent S.a.r.l.

---

[1]    Se om lovforarbejder mv. i afsnittet om retsgrundlag i landsrettens dom. Se desuden U 2023.1575H og EU-Domstolens dom af 26. februar 2019 i de forenede sager C-115/16, C-118/16, C-119/16 og C-299/16 samt Niels Winther-Sørensen i RR.SM.2022.0001 »Kommentarer til udvalgte afgørelser - Kildeskat på renter« og i SR.2023.0075 »Højesterets dom om udbytteskat og beneficial ownership«.

U.2023.3198H

SKATs afgørelse blev påklaget til Landsskatteretten, men forinden Landsskatteretten traf afgørelse i sagen, blev sagen den 17. september 2012 indbragt for Københavns Byret, jf. skatteforvaltningslovens § 48, stk. 2. Københavns Byret henviste ved kendelse af 9. januar 2013 sagen til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

*Sagsøgeren, NTC Parent S.a.r.l.,* har nedlagt følgende endelige påstande:

Principalt: Skatteministeriet skal anerkende, at der ikke er dansk begrænset skattepligt af renter på lån mellem Nordic Telephone Company Investment ApS som debitor og Angel Lux Common S.a.r.l. som kreditor i indkomstårene 2006-2008.

Subsidiært: Skatteministeriet skal anerkende, at kildeskattekravet skal nedsættes med 574.865.866 kr. eller et sådant beløb, som i øvrigt fastsættes af retten.

Mere subsidiært: Sagen hjemvises til Skattestyrelsen til opgørelse af nedsættelsesbeløbene.

Mest subsidiært: Skatteministeriet skal anerkende, at Nordic Telephone Company Investment ApS ikke hæfter for kildeskatten på renter på PEC-lånene, jf. kildeskattelovens § 69.

*Skatteministeriet* har påstået frifindelse.

**3200**

## II. Sagsfremstilling

*B-2942-12 Takeda A/S under frivillig likvidation (Takeda A/S) mod Skatteministeriet*

*SKATs afgørelse af 13. december 2010*

Den 13. december 2010 traf SKAT afgørelse om, at Nycomed A/S skulle have indeholdt kildeskat i forbindelse med de rentetilskrivninger, der blev foretaget i årene 2007-2009 til fordel for selskabets moderselskab, Nycomed Sweden Holding 2 AB, ligesom Nycomed A/S ansås for at hæfte for skatten. Rentetilskrivningerne i perioden 2007-2009 udgjorde henholdsvis 462.064.052 kr., 553.521.299 kr. og 460.646.228 kr. SKAT opkrævede derfor renteskat i medfør af kildeskattelovens § 65 D, jf. selskabsskattelovens

§ 2, stk. 1, litra d, med henholdsvis 138.619.216 kr. (30 %), 138.380.325 kr. (25 %) og 115.161.557 kr. (25 %), i alt 392.161.097 kr. Skatteministeriet har efterfølgende anerkendt, at kildeskattekravet for 2007 skal nedsættes til 115.516.013 kr. (25 %), således at det samlede krav på kildeskat var på 369.057.895 kr.

Af SKATs afgørelse af 13. december 2010 fremgår bl.a.:

»*Beskrivelse af selskabet [Nycomed A/S]*

Selskabet blev stiftet med det formål at erhverve Nycomed-koncernen i forbindelse med en kapital-fondsovertagelse heraf. Selskabet aktivitet består alene af at eje aktierne i Nyco Holdings ApS, CVR-nr. 26812275, der dengang var det øverste danske holdingselskab for koncernen.

Koncernen er en europæisk markedsføringsdrevet medicinalvirksomhed. Virksomheden indkøber, udvikler, fremstiller og sælger en bred vifte af receptpligtige ('Rx') og andre »OCT«-medicinalog »comsumer health«-produkter.

I 1999 blev koncernen erhvervet af en kapitalfond oprettet af Nordic Capital V Limited (Nordic Capital). I 2002 erhvervede en ny kreds af kapitalfonde og et investeringsselskab koncernen af Nordic Capital. Det drejer sig om investeringsselskabet Carillion samt kapitalfonde oprettet af CSFB Private Equity, The Blackstone Group International Limited (Blackstone) og NIB Capital Private Equity. Sådanne rådgivere for kapitalfondene kaldes også sponsorer. I 2005 købte Nordic Capital 46,8 % af koncernen tilbage fra den tidligere ejerkreds.

Dette blev gjort ved stiftelsen af Nycomed A/S, der herefter erhvervede det daværende øverste danske moderselskab i koncernen - Nyco Holding A/S, CVR-nr. 26812275.

Ultimo 2006 opkøbte koncernen den tyske medicinalkoncern Altana Pharma. Dette blev gjort ved, at Nycomed Danmark ApS stiftede det tyske holdingselskab Nycomed Germany Holding GmbH, der herefter erhvervede det daværende øverste tyske moderselskab i koncernen - Altana Pharma AG.

*Talmæssig opgørelse*

Der skal indeholdes følgende renteskat:

| Dato tilskrivning | Beløb EUR | Kurs | Beløb i DKK | Renteskat i pct. | Renteskat i DKK |
|---|---|---|---|---|---|
| 27-12-2007 | 61.965.461 | 745,68 | 462.064.052 | 30 | 138.619.216 |
| 27-12-2008 | 74.258.291 | 745,40 | 553.521.299 | 25 | 138.380.325 |
| 27-12-2009 | 61.887.366 | 744,33 | 460.646.228 | 25 | 115.161.557 |
| I alt | 198.111.118 | | 1.476.231.579 | | 392.161.097 |

*Indeholdelse af kildeskat på renteudgifter*

*1. Sagens faktiske forhold*

*1.1. Koncern og ejerstruktur*

Nycomed A/S ejes fuldt ud af Nycomed Sweden Holding 2 AB. 96,85 % af Nycomed Sweden Holding 2 AB ejes af Nycomed Sweden Holding 1 AB. Resten ejes af koncernens ledelse. Nycomed Holding 1 AB ejes fuldt ud af Nycomed S.C.A., SICAR, der endeligt ejes af investorerne bag kapitalfondene. Nycomed Sweden Holding 2 AB og Nycomed Sweden Holding 1 AB er hjemmehørende i Sverige, medens Nycomed S.C.A., SICAR er hjemmehørende i Luxembourg.

Koncernoversigt pr. 31.12.2007 vedlægges som bilag 1. Den nøjagtige struktur i den underliggende del af koncernen, som følgelig ændrer sig løbende, er ikke så afgørende for denne sag, hvorfor alene oversigt pr. 31.12.2007 er vedlagt.

SKAT har forespurgt selskabet om ejerforholdet af Nycomed S.C.A., SICAR. I brev af 19. november 2010 har A og B fra KPMG på vegne af selskabet svaret, at selskabet for nuværende ikke er i besiddelse af detaljeret information om ejerkredsen, hvorfor information herom ikke kan indsendes.

*1.2. Lån mellem Nycomed A/S og Nycomed Sweden Holding 2 AB*

Den 27.12.2006 lånte Nycomed A/S 501 mio. EUR af Nycomed Sweden Holding 2 AB. Ifølge låneaftalens punkt 3.1 bliver gælden en gang om året forrentet med EURIBOR + 8,0 procentpoint. Lånet er primært anvendt til refinansiering af det eksisterende PIK-notelån, der blev optaget i 2005 i forbindelse med, at Nycomed A/S købte Nycomed-koncernen.

Medmindre andet aftales mellem låntager og långiver tilskrives renten hovedstolen, jf. aftalens punkt 3.2.

Lånet med tillæg af de i henhold til punkt 3.2 tilskrevne renter skal tilbagebetales i sin helhed 10 år efter aftalens indgåelse, d.v.s. den 27. december 2016.

Dog kan låntager til enhver tid indfri lånet helt eller delvist inden da, jf. aftalens punkt 4.2.

Hvis der skal indeholdes renteskat, skal låntager øge sin betaling, således at långiver får det samme udbetalt som om, der ikke var indeholdt renteskat.

**3201**

Renteudgifterne er bogført således:

*Regnskabsåret 2006*

| Tekst | Beløb EUR |
|---|---|
| Beregnet rente 27.12.2006 | 837.087,50 |

*Regnskabsåret 2007*

| Tekst | Beløb EUR |
|---|---|
| Rentetilskrivning 27.12.2006-26.12.2007 | 61.965.461,34 |
| Heraf beregnet rente 27.12.2006-31.12.2006 | -837.087,50 |
| Beregnet rente 27.12.2007-31.12.2007 | 799.285,85 |
| Bogført rente 2007 | 61.927.659,69 |

*Regnskabsåret 2008*

| Tekst | Beløb EUR |
|---|---|
| Rentetilskrivning 27.12.2007-26.12.2008 | 74.258.290,72 |

| Heraf beregnet rente 27.12.2007-31.12.2007 | -799.285,85 |
|---|---|
| Beregnet rente 27.12.2008-31.12.2008 | 389.071,12 |
| Bogført rente 2008 | 73.848.075,99 |

*Regnskabsåret 2009*

| Tekst | Beløb EUR |
|---|---|
| Rentetilskrivning 27.12.2008-26.12.2009 | 61.887.365,55 |
| Heraf beregnet rente 27.12.2008-31.12.2008 | -389.071,12 |
| Beregnet rente 27.12.2009-31.12.2009 | 338.136,74 |
| Bogført rente 2007 | 61.836.431,17 |

På grundlag af ovenstående kan tilskrivningen af renterne samt udviklingen i gælden opgøres således:

| Dato | Tekst | Beløb EUR |
|---|---|---|
| 27.12.2006 | Låneoptagelse | 501.000.000,00 |
| 27.12.2007 | Rentetilskrivning | 61.965.461,34 |
| 27.12.2008 | Rentetilskrivning | 74.258.290,72 |
| 27.12.2009 | Rentetilskrivning | 61.887.365,56 |
| 31.12.2009 | Beregnet rente 27.12.09-31.12.09 | 338.136,74 |
| | Bogført restgæld pr. 31.12.2009 | 699.449.254,36 |

### 1.3. Koncernbidrag mellem Nycomed Sweden Holding 2 AB og Nycomed Sweden Holding 1 AB

Nycomed Sweden Holding 2 AB har betalt følgende koncernbidrag til Nycomed Sweden Holding 1 AB:

| År | Beløb EUR |
|---|---|
| 2006 | 839.611 |
| 2007 | 60.468.000 |
| 2008 | 75.621.000 |
| 2009 | 60.353.294 |
| I alt | 197.281.905 |

Koncernbidragene betales ikke kontant men tilskrives over mellemregningen mellem de 2 selskaber.

I brev af 19. november 2010 har A og B fra KPMG bl.a. anført følgende vedrørende dette forhold:

*Der foreligger ikke en aftale om størrelsen af koncernbidraget, beregningen eller udbetalingen af koncernbidragene. Det besluttes derimod år for år og afhænger af mange ting, herunder blandt andet om de svenske krav for udbetaling af koncernbidrag er opfyldt. Her tænkes specielt på kravet om ejerskab på mere end 90 % hele året, jf. at ledelsen har en ejerandel i SWE2, som varierer.*

*Det er således ledelsen/bestyrelsen i SWE2, som beslutter, om der skal udbetales koncernbidrag m.v. Ledelsen skal naturligvis i den forbindelse vurdere, hvorvidt det er økonomisk ansvarligt at udbetale koncernbidrag.*

Koncernbidragene fratrækkes i (den svenske) skattepligtige indkomst for Nycomed Sweden Holding 2 AB, medens det indtægtsføres i Nycomed Sweden Holding 1 AB.

### 1.4. Lån mellem Nycomed Sweden Holding 1 AB og Nycomed S.C.A., SICAR

Nycomed Sweden Holding 1 AB lånte pr. 27.12.2006 498,5 mio. EUR af Nycomed S.C.A., SICAR.

Ifølge låneaftalens punkt 1 er der tale om et konvertibelt lån.

Af punkt 5 fremgår det, at gælden en gang om året bliver forrentet med EURIBOR + 7,9 procentpoint. Det fremgår endvidere, at renterne først forfalder til betaling sammen med hovedstolen.

Betingelserne for konverteringen fremgår af TERMS AND CONDITIONS FOR CONVERTIBLE DEBENTURE SERIES 2006:1.

Ifølge punkt 8 kan Nycomed Sweden Holding 1 AB indfri gælden ved udstedelse af aktier til Nycomed S.C.A., SICAR. Dette kan dog tidligst gøres 5 år efter gældens stiftelse (altså 27.12.2011) og senest 27.12.2060.

Nycomed Sweden Holding 1 AB har bogført følgende renteudgifter:

| År | Beløb EUR |
|---|---|
| 2006 | 837.087,50 |
| 2007 | 61.427.405,12 |
| 2008 | 75.403.757,25 |
| 2009 | 61.836.431,85 |
| I alt | 199.504.681,72 |

### 1.5. Beskrivelse af Nycomed Sweden Holding 2 AB

Foruden at eje Nycomed A/S har selskabet fra 2007 ifølge årsrapporten 10 ansatte, der beskæftiger sig med forskning og udvikling. Selskabets resultatopgørelse bortset fra renter og skat består af lønningsudgifterne til de 10 ansatte samt en ikke noteangivet driftsindtægt. Der er ikke aktiveret udviklingsomkostninger.

Derudover er der et svensk datterselskab ved navn Nycomed AB. Ifølge årsberetningen for 2007 blev 10 ansatte pr. 01.04.2007 overflyttet til Nycomed Sweden Holding 2 AB. Nycomed AB er ifølge årsberetningen alene et salgsselskab og har altså ikke tidligere haft aktivitet ved forskning og udvikling.

I brev af 1. oktober 2010 anmodede SKAT om følgende oplysninger vedrørende Nycomed Sweden Holding 2 AB:

**3202**

U.2023.3198H

- *Årsagen til, at de 10 medarbejdere blev overflyttet til Nyco-med Sweden Holding 2 AB, bedes oplyst.*
- *Det bedes oplyst, om de pågældende medarbejdere fik nye arbejdsopgaver i forbindelse med overflytningen herunder deres faglige forudsætninger for at varetage disse arbejds-opgaver. Årsagen hertil er, at Nycomed Sweden Holding 2 AB ifølge årsberetningen har arbejdet ved forskning og ud-vikling, medens Nycomed AB alene har virket som et salgs-selskab.*
- *Det bedes oplyst, om aktiviteten er erhvervet eller opstartet fra bunden.*
- *Hvis det er erhvervet, bedes kopi af aftalegrundlaget herfor indsendt. Der bedes i den forbindelse redegjort for, hvorfor der ikke er overdraget immaterielle aktiver af nogen art.*
- *Hvis den er opstartet fra bunden, det vil sige uden erhvervelse af udviklingsomkostninger, patenter, knowhow eller lignende, bedes der nærmere redegjort for hvilken type aktivitet, der er opstartet.*
- *Der bedes redegjort for, hvorfor der ikke er aktiveret udvik-lingsomkostninger.*
- *Det bedes oplyst, om de pågældende 10 medarbejdere fysisk er flyttet til en ny adresse og i givet bedes det oplyst, hvor de er flyttet fra og til.*

I brev af 19. november 2010 har A og B fra KPMG anført følgende vedrørende dette forhold:

*Nycomed Sweden Holding 2 AB*

*I forbindelse med købet af Altana i slutningen af 2006 gennemgår Nycomedkoncernen en større omstrukturering med henblik på at få integreret de 50 opkøbte enheder mest optimalt.*

*Et af elementerne i denne omstrukturering er at få diverse koncernfunktioner placeret mere hensigtsmæssigt i forhold til operationen, som i størrelse er mere end fordoblet i forhold til tidligere.*

*En af koncernens væsentlige opgaver, nemlig registrering af medicinske produkter hos myndigheder og arbejde i relation til kliniske forsøg, har hidtil delvist været varetaget af Nycomed AB, som også har fungeret som salgsselskab på det svenske marked.*

*Det er anset for uhensigtsmæssigt at have denne koncernfunktion placeret nede i strukturen og blandt andet af den grund stifter koncernen Nycomed Sweden Holding 2 AB (SWE2) og overdrager - ved en aktivitetsoverdragelse - registrering af medicinske produkter og monitorering af kliniske forsøg fra Nycomed AB til SWE2.*

*Vi har som ønsket vedlagt en kopi af overdragelsesaftalen inklusiv appendiks som bilag 5.*

*SWE2 overtager endvidere en del af det lejemål, som Nycomed AB bebor, og bliver således på samme adresse.*

*Der er altså ikke tale om, at der startes ny aktivitet op i SWE2. Det er den samme aktivitet, som før blev varetaget af Nycomed AB - nu blot mere hensigtsmæssigt placeret. Nycomed AB varetager herefter ingen koncernfunktioner, men er alene salgsselskab på det svenske marked. Herudover assisterer Nycomed AB SWE2 med bogføringsmæssig assistance og lønadministrationen for de 10 medarbejdere.*

*SWE2 er udelukkende finansieret med egenkapital og bliver i forbindelse med omstruktureringen moderselskab for Nycomed*

*A/S. Dette skyldes primært, at det ved fuld egenkapitalfinansiering er væsentligt nemmere at etablere et incitamentsprogram for ledelsen end, hvis det fælles selskab også optog gæld.*

*SWE2 ejes delvist af Nycomed Sweden Holding 1 AB (> 90 %) og delvist af ledelsen i koncernen (<10 %).*

*Det er således også i SWE2, at ledelsens incitamentsprogram etableres. SWE2 er således det øverste fælles selskab i koncernen, idet SWE1 alene er ejet af fondene via selskabet i Luxembourg.*

*Dette understøttes endvidere af, at den siddende bestyrelse omfatter repræsentanter for ejerne og således er fuldt beslutningsdygtig til at vedtage enhver disposition over aktiebesiddelsen i Nycomed-koncernen.*

*Endelig skal det understreges, at lånet fra SWE2 til Nycomed A/S er et ganske almindeligt lån indgået på sædvanlige markedsvilkår, samt at koncernen har overholdt alle regler om tynd kapitalisering, renteloft og EBIT-begrænsninger vedrørende fradragsret for renteudgifter. Lånet er endvidere en refinansiering af et indtil da eksternt lån - PIK notes.*

*Der eksisterer således ikke nogen form for misbrugssituation i relation til danske dobbeltbeskatningsoverenskomster eller i relation til rente/royalty direktivet.*

Overdragelsen mellem Nycomed AB og Nycomed Sweden Holding 2 AB er aftalt til den 2. april 2007, jf. overdragelsesaftalens punkt 4.1.

Af aftalens punkt 1.2 og 1.3 fremgår følgende:

*1.2 The Seller is active, inter alia, in the provision of services relating to clinical trials, medical in-formation and regulatory approvals (the part of Seller's operations relating to such services is hereinafter referred to as the »Business«).*

*1.3 The Seller now wish to transfer and the Buyer now wish to acquire the business assets and know-how relating to the Business on the terms set forth in this Agreement.*

Af aftalens punkt 2.1 fremgår følgende:

*2.1 The Business transferred under this Agreement shall comprise the following assets and contractual rights and obligations:*

(a)  *Assets and inventories, as set forth in Appendix 1;*

(b)  *Employees, with salaries, benefits and accrued vacation salaries as set forth in Appendix 2; and*

(c)  *Agreement and contractual rights and obligations, as set forth in Appendix 3.*

**3203**

Af aftalens punkt 3.1 fremgår det, at overdragelsessummen netto udgør -927.075 SEK, hvilket beløb Nycomed Sweden Holding 2 AB altså skal betale til Nycomed AB. Overdragelsessummen består af 225.641 SEK for driftsmidler (»Assets and inventories«) og - 1.152.716 SEK for feriepenge-forpligtelser (»accrued vacation salaries«). Driftsmidlerne består primært af skriveborde og PCere.

Litra c ovenfor omfatter indgået administrationsaftale, hvor Nycomed AB skal levere bl.a. bogføring og lønbogholderi til Nycomed Sweden Holding 2 AB samt indgået lejeaftale for kontorer.

Nycomed Sweden Holding 2 AB har haft følgende regnskabsmæssige driftsresultater for 2006-2009:

| Tekst | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Øvrige indtægter | 0 | 1.193.131 | 1.726.601 | 1.238.442 |
| Personaleudgifter | 0 | -1.851.855 | -4.912.421 | -6.275.092 |
| Øvrige eksterne omkost-ninger | 0 | -302.705 | -334.598 | -519.292 |
| Afskrivninger | 0 | -9.462 | -9.462 | -1.811 |
| Renteindtægter | 839.662 | 61.437.884 | 75.498.014 | 62.074.499 |

| | | | | |
|---|---|---|---|---|
| Renteudgifter | -50 | -7.263 | -118.861 | -1.322.232 |
| Resultat før skat | 839.612 | 60.459.730 | 71.849.273 | 55.194.514 |
| Skat | -235.091 | -16.931.000 | -21.173.880 | -16.089.639 |
| Resultat efter skat | 604.521 | 43.528.730 | 50.675.393 | 39.104.875 |

Skatterne kan specificeres således:

| Tekst | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Skat | -235.091 | -16.931.000 | -21.173.880 | -16.089.639 |
| Skatteværdi af koncernbidrag | 235.091 | 16.931.000 | 21.173.880 | 15.872.916 |
| Aktuel skat | 0 | 0 | 0 | -216.723 |

Den negative skat for 2009 betyder her, at der er tale om en udgift og altså derfor en skat, der skal betales.

Beløbene er i euro.

*1.6. Beskrivelse af Nycomed Sweden Holding 1 AB*

| Tekst | | | | |
|---|---|---|---|---|
| Øvrige eksterne omkostninger | 0 | 0 | -32.130 | -33.932 |
| Renteindtægter m.v. | 285 | 4.191 | 5.368 | 25.564 |
| Renteudgifter m.v. | -825.987 | -61.284.470 | -72.866.092 | -60.825.103 |
| Resultat før skat | -825.702 | -61.280.279 | -72.892.854 | -60.833.471 |
| Skat | 231.196 | 16.927.154 | 20.604.514 | 15.872.916 |
| Resultat efter skat | -594.506 | -44.353.125 | -52.288.340 | -44.960.555 |

Skatterne kan specificeres således:

| Tekst | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Skat af driftsresultat | 231.196 | 16.927.154 | 20.604.514 | 15.872.916 |
| Skat af koncernbidrag | -235.091 | -16.931.000 | -21.173.880 | -15.872.916 |
| Aktuel skat | -3.895 | -3.846 | -569.366 | 0 |

Den negative skat for 2006-2008 betyder her, at der er tale om en udgift og altså derfor en skat, der skal betales.

Beløbene er i euro.

*1.7. Beskrivelse af Nycomed S.C.A., SICAR*

»General Partner« (associé commandité) ejer en »General Partner Share«. De øvrige investorer (actionnaires commanditaires) ejer de øvrige aktier »Ordinary Shares«.

Ifølge vedtægterne træffer »General Partner« stort set alle beslutninger. De øvrige aktionærer har kun tegningsret på generalforsamlingen.

»General Partner« hæfter ubegrænset, medens de øvrige aktionærer hæfter begrænset.

»General Partner« er ikke berettiget til udbytte men får i stedet et årligt vederlag for »Management Fee«.

Dette selskab virker alene som holdingselskab for Nycomed Sweden Holding 2 AB.

Nycomed Sweden Holding 1 AB har haft følgende regnskabsmæssige driftsresultater for 2006-2009:

Selskabet aktivitet består alene i at eje aktierne i og fordringen hos Nycomed Sweden Holding 1 AB samt betaling af management fee til »General Partner«.

Selskabet betaler endvidere et mindre beløb til »Provision for domiciliation, corporate and accounting fees«. Det er betaling typisk til et advokatfirma for at have en postkasse og få foretaget regnskab og registrering i det lokale selskabs-register.

Selskabet betaler ikke skat af renteindtægterne. Det fremgår således af en note til årsrapporten, at SICAR-selskaber som udgangspunkt skal betale 29,63 % i

**3204**

renter men er fritaget for skat vedrørende de indtægter, der kan henføres til værdipapirer.

Nycomed S.C.A, SICAR har haft følgende regnskabsmæssige driftsresultater for 2006-2008:

| Tekst | 2006 | 2007 | 2008 |
|---|---|---|---|
| Andre eksterne omkostninger | -2.310,00 | -1.325.729,83 | -1.204.292,33 |
| Renteudgifter m.v. | -323,76 | -225,00 | -250,02 |
| Renteindtægter koncernforbundne selskaber | 825.986,81 | 61.732.642,83 | 72.416.763,39 |
| Øvrige renteindtægter m.v. | 303.003,18 | 66.796,59 | 24.520,43 |
| Urealiserede kursreguleringer | 0 | 49.200.000,00 | -16.300.000,00 |
| Resultat | 1.126.356,23 | 109.673.484,59 | 54.936.741,47 |

Der betales ikke indkomstskat. Beløbene er i euro. Regnskabet for 2009 forelægger endnu ikke.

*2. Begrundelse for forslag til ændring*

*2.1. Henvisning til love og regler*

…

*2.2. Foreløbig afgørelse af begrundelse herfor*

*2.2.1. Sagens formelle spørgsmål*

En afgørelse om indeholdelse af renteskat er ikke en ligningsmæssig ansættelse i lighed med ændring af ansættelse af indkomst- eller ejendomsværdiskat. Dette betyder, at afgørelsen/forvaltningsakten ikke er omfattet af en række særregler, der ellers gælder i skattesager.

I SKM2005.9.HR (SKM2002.45.ØLR) blev det fastslået, at pålæg af indeholdelse af A-skat efter kildeskattelovens § 69 ikke er en ligningsmæssig ansættelse omfattet af dagældende skattestyrelseslov (i dag skatteforvaltningsloven).

I almindelige skattesager ville SKAT have frist til at afsende forslag til ændring af skatteansættelsen for 2007 til senest den 1. maj 2011, jf. skatteforvaltningslovens § 26, stk. 1, 1. pkt. Selve skattekravet som følge heraf ville tidligst blive forældet et år efter ansættelsestidspunktet, jf. skatteforvaltningslovens § 34 a, stk. 2.

Som nævnt ovenfor gælder disse regler imidlertid ikke i denne sag, hvorfor det er forvaltningslovens almindelige bestemmelser, der skal gøres gældende. Derfor er SKAT ikke begrænset af en ansættelsesfrist. Til gengæld gælder 1 års reglen i § 34 a, stk. 2 heller ikke, hvorfor det er de almindelige forældelsesregler, der gælder. Ifølge den nye forældelseslovs § 29, stk. 1 trådte denne i kraft den 1. januar 2008. Den gælder som udgangspunkt også for fordringer stiftet før ikrafttrædelsen, jf. forældelseslovens § 30, stk. 1, 1. pkt. Fordringen forælder dog tidligst den 1. januar 2011, jf. § 30, stk. 1, 2. pkt. Det betyder altså, at renteskatten for 2007 som udgangspunkt forælder den 1. januar 2011.

Derfor er SKAT nødt til at gennemføre sagen meget hurtigt. Således skal renteskattekravet være forfalden til betaling og hvis denne ikke betales, skal der foretages tiltag om afbrydelse af forældelse, f.eks. anmodning om henstand med betalingen af skatten fra selskabets side. Alt dette skal nås inden udløbet af 2010.

En anden virkning af, at afgørelsen ikke er omfattet af de sædvanlige regler for skatteansættelser, er, at reglerne for udsendelse af agterskrivelse i skatteforvaltningslovens § 20 ikke gælder. Ifølge denne har SKAT som udgangspunkt en udvidet høringspligt. Det betyder, at SKAT har pligt til at høre den skattepligtige både vedrørende sagen faktiske som retlige indhold. Efter forvaltningslovens § 19, stk. 1, som gælder denne sag, har SKAT kun pligt til at høre vedrørende faktiske oplysninger af betydning for sagen som den skattepligtige ikke er bekendt med i forvejen.

I denne sag vælger SKAT dog at udsende agterskrivelse og sagsfremstilling på almindelig vis.

*2.2.2. Sagens materielle spørgsmål - indledning*

Hjemlen til at indeholde renteskat på koncerninterne renteudgifter er i selskabsskattelovens § 2, stk. 1, litra d og i kildeskattelovens § 65 D, stk. 1.

SKATs fremstilling struktureres således, at den interne ret først beskrives. Derefter tages der stilling til begrebet retmæssig ejer i relation til dobbeltbeskatningsoverenskomsten. Endelig tages der stilling til om der er fritaget for renteskat efter Rente-Royaltydirektivet.

*2.2.3. Intern ret*

Som nævnt umiddelbart ovenfor er hjemlen til at indeholde renteskat på koncerninterne renteudgifter i selskabsskattelovens § 2, stk. 1, litra d og i kildeskattelovens § 65 D, stk. 1.

Hjemlen til at indeholde renteskat blev indsat første gang ved Lov af 221 af 31.03.2004 om ændring af forskellige skattelove. Bestemmelsen er indsat i ændringslovens § 10, nr. 2.

Ifølge 1. pkt. i litra d omfatter adgangen til renteskat danske selskabers gæld til udenlandske juridiske personer omfattet af skattekontrollovens § 3 B.

Bestemmelserne i skattekontrollovens § 3 B beskriver, om skattepligtige er undergivet bestemmende indflydelse i form af ejerskab eller rådighed over stemmerettigheder, således at der direkte eller indirekte ejes mere end 50 % af aktiekapitalen eller rådes over mere end 50 % af stemmerne. Ved lov nr. 308 af 19. april 2006 blev der med virkning pr. 1. maj 2006 indsat en bestemmelse i § 3 B, stk. 2, 3. pkt. om, at der ved bedømmelsen af, om den skattepligtige anses for at have bestemmende indflydelse på en juridisk person, eller om der udøves en bestemmende indflydelse over den

**3205**

skattepligtige af en juridisk eller fysisk person, medregnes ejerandele og stemmerettigheder, som indehaves af andre selskabsdeltagere, med hvem selskabsdeltageren har en aftale om udøvelse af fælles bestemmende indflydelse.

I denne sag er der klart, at der er aftalt fælles ledelse for Nycomed S.C.A., SICAR. Således fremgår det af vedtægterne, at »General Partner« stort set træffer alle beslutninger, medens de øvrige aktionærer kun har tegningsret og generalforsamlingen. Således er betingelsen om, at der skal være tale om kontrolleret gæld, opfyldt.

Af selskabsskattelovens § 2, stk. 1, litra d, 3. pkt. fremgår det, at *Skattepligten omfatter ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende.*

Litra d er ændret flere gange siden da, men ikke vedrørende dette forhold. I dag fremgår bestemmelsen således uændret af litra d, 3. pkt. (senest ved Lovbekendtgørelse nr. 1001 af 26.10.2009 om indkomstbeskatning af aktieselskaber m.v.). Det er altså bl.a. forarbejderne til Lov nr. 221 af 31.03.2004, der relevante ved fortolkningen af bestemmelsen. Lovens bemærkninger fremgår af LLF 2003-12-17 nr. 119 om ændring af forskellige skattelove.

Af ændringslovens § 10, nr. 5 (Lov af 221 af 31.03.2004) blev følgende endvidere indsat:

*I § 2, stk. 2, indsættes efter 2. pkt.:*

*»Skattepligten i medfør af stk. 1, litra d og h, er endeligt opfyldt ved den i henhold til kildeskattelovens § 65 D foretagne indeholdelse af renteskat.«*

Kildeskattelovens § 65 D blev indsat ved samme ændringslov. Det fremgår således af ændringslovens § 4, nr. 4, at

*Efter § 65 C indsættes:*

*»§ 65 D. I forbindelse med enhver udbetaling eller godskrivning af renter til et selskab m.v., der er skattepligtigt efter selskabsskattelovens § 2, stk. 1, litra d, skal den, for hvis regning udbetalingen eller godskrivningen foretages, indeholde 30 pct. af den samlede rente. Det indeholdte beløb benævnes »renteskat«. Pligten til at indeholde renteskat påhviler selskaber, fonde og foreninger, der har hjemting her i landet. Hvis den, for hvis regning udbetaling eller godskrivning foretages, ikke har hjemting her i landet og udbetalingen eller godskrivningen foretages af en dertil befuldmægtiget, der har hjem-ting her i landet, påhviler det den befuldmægtigede at foretage indeholdelse. Bestemmelsen i § 46, stk. 3, finder tilsvarende anvendelse.*

Selskabsskattelovens § 2, stk. 2 blev på dette punkt afgørende ændret ved Lov nr. 335 af 07.05.2008 om ændring af forskellige skattelove.

Af ændringslovens § 12, nr. 1 fremgår det bl.a., at

*§ 2, stk. 2, 2.-5. pkt., ophæves, og i stedet indsættes:*

…

*Indkomstskatten i medfør af stk. 1, litra d og h, udgør 25 pct. af renterne og afståelsessummerne. Skattepligten er endeligt opfyldt ved den i henhold til kildeskattelovens § 65 D foretagne indeholdelse af renteskat. ……………………*

Af samme ændringslovs § 7, nr. 8 fremgår det endvidere, at

*I § 65 D, stk. 1, 1. pkt., ændres »30 pct.« til: »25 pct.«*

Begge bestemmelser blev vedtaget med virkning renter, der betales eller tilskrives den 1. april 2008 eller senere, jf. ændringslovens § 15, stk. 8.

### 2.2.3.1. Delkonklusion

Der er tale om renter af gæld til juridiske personer omfattet af skattekontrollovens § 3 B, hvorfor der som udgangspunkt er hjemmel til at indeholde renteskat.

Dette gælder dog ikke, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties (herefter kaldet Rente-Royaltydirektivet), der betales mellem associerede selskaber i forskellige medlemsstater, eller efter en dobbeltbeskatningsoverenskomst (herefter kaldet DBO) med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende. Der tages stilling hertil i punkt 1.2.2.4 og 1.2.2.5 nedenfor.

Satsen for renteskatten udgør 30 % for renterne, der blev tilskrevet 27.12.2007 og 25 % for renterne, der blev tilskrevet 27.12.2008 og 27.12.2009.

### 2.2.4. Spørgsmålet om beskatningen af renterne ville skulle frafaldes eller nedsættes efter en dobbeltbeskatningsoverenskomst

#### 2.2.4.1. Den fælles nordiske dobbeltbeskatningsoverenskomst

Renteindtægten tilgår Nycomed Sweden Holding 2 AB, der er hjemmehørende i Sverige. Der skal derfor tages stilling til, om Danmark - hvis der bliver indeholdt renteskat - ville være pligtig til at frafalde eller nedsætte beskatningen i henhold til den fællesnordiske dobbeltbeskatningsoverenskomst (BKI nr. 92 af 25/6 1997 af overenskomst af 23/9 1996 mellem de nordiske lande til undgåelse af dobbeltbeskatning for så vidt angår indkomst- og formueskatter).

Af DBO artikel 11, nr. 1 fremgår det, at

*Renter, der hidrører fra en kontraherende stat, og som betales til en i en anden kontraherende stat hjemmehørende person, kan kun beskattes i denne anden stat, hvis denne person er den retmæssige ejer af renterne.*

**3206**

I denne sag hidrører renterne fra Danmark og betales til Nycomed Sweden Holding 2 AB, der er hjemmehørende i Sverige. Efter bestemmelsen er udgangspunktet derfor, at Sverige har beskatningsretten.

Dermed er der som udgangspunkt ikke adgang til renteskat.

Som det fremgår, er det dog en forudsætning, at Nycomed Sweden Holding 2 AB er *retmæssig ejer* af renterne.

Der skal herefter tages stilling til, hvad der forstås ved begrebet retsmæssig ejer og hvorvidt Nycomed Sweden Holding 2 AB på denne baggrund kan betragtes som sådan.

#### 2.2.4.2. SKATs juridiske vurdering af begrebet retmæssig ejer

Udtrykket »retmæssig ejer« (på engelsk »beneficial owner«) har været benyttet i OECD's Modelkonvention og kommentarerne hertil siden revisionen af modelkonventionen i 1977. De i kommentarerne indeholdte bemærkninger om udtrykket »beneficial owner« er gradvist blevet præciseret, men der er ikke grundlag for at hævde, at der herved er sket materielle ændringer i relation til, hvad der forstås ved udtrykket.

I kommentarerne til Modelkonventionen er spørgsmålet om forståelsen af udtrykket »retmæssig ejer« nu navnlig behandlet i punkt 12, 12.1 og 12.2, til artikel 10, hvori følgende er anført (med de her tilføjede fremhævninger):

*»12. Kravet om retmæssigt ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt... til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Det gøres herved klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhæng og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.*

*12.1 Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men ingen dobbeltbeskatning opstår som følge heraf, da indkomstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.*

*12.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og betaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.«*

I relation til fortolkningen af begreberne retmæssig ejer og gennemstrømnings-selskaber henviser SKAT endvidere til daværende Skatteminister Kristian Jensens svar til Folketingets skatteudvalg på spørgsmål 2 vedrørende L-30 - Forslag til Lov om indgåelse af protokol om ændring af dobbeltbeskatningsoverenskomsten mellem Danmark og Amerikas Forenede Stater. Der blev her spurgt, hvorfor Danmark ikke som USA har taget forbehold mod brug af gennemstrømningsselskaber. I svaret anføres, at et land ikke skal indsætte forbehold om, at det vil anvende regler eller fortolkninger, som er nævnt i OECD-modellens bemærkninger.

Der er navnlig tre sager fra international retspraksis, der omhandler kvalificering af den »retmæssige ejer«.

…

Dommenes præjudikatværdi er begrænset af, at der er tale om udenlandske domstole. De danske domstole er følgelig som ud-

gangspunkt ikke forpligtet af den retspraksis, der dannes af udenlandske domstole. Imidlertid vedrører sagerne »beneficial owner« begrebet i Modeloverenskomsten, der også har retskildeværdi i Danmark, hvorfor dommene alligevel har en vis værdi.

Domstolene er Danmark har endnu ikke taget stilling til begrebet. SKAT har imidlertid tabt 2 sager ved Landsskatteretten. SKM2010.268.LSR omhandler kildeskat efter selskabsskattelovens § 2, stk. 1, litra c på udbytter og SKM2010.729.LSR omhandler rentekat som i

**3207**

denne sag. Sagerne vedrører det samme selskab og som i denne sag er pengene blevet i Luxembourg ikke vide-rekanaliseret til aktionærerne for det luxembourgske moderselskab. I begge sager lagde Landsskatteretten afgørende vægt på, at der ikke var fysisk gennemstrømning af midlerne gennem det luxembourgske moderselskab, hvorved det blev anset for retmæssig ejer af udbyttet (og renterne).

SKAT er imidlertid ikke enige i afgørelserne og har indbragt SKM2010.268.LSR for domstolene. SKM2010.729.LSR er så ny, at den endnu ikke er indbragt.

Derfor kan de 2 kendelser fra Landsskatteretten ikke lægges til grund.

*SKATs vurdering af den konkrete situation*

Nycomed koncernen har mellem de 4 øverste holdingselskaber 2 koncerninterne lån på ca. 500 mio. EUR. Da det er koncerninterne lån, er nettorenteudgiften for hele koncernen 0 kr. Alligevel er det konstrueret på en sådan måde, at renteudgiften fratrækkes i Nycomed A/S, medens den enten er skattemæssig neutral eller skattefri i de øvrige selskaber.

Således modsvares renteindtægten i Nycomed Sweden Holding 2 AB af en fradragsberettiget koncernbidrag. I Nycomed Sweden Holding 1 AB modsvares det skattepligtige koncernbidrag af en fradragsberettiget renteudgift til Nycomed S.C.A., SICAR, hvor renteindtægten er helt skattefri efter intern luxembourgsk skatteret.

Dette er netop kernesituationen, hvor rentekat er tiltænkt anvendt. Undtagelsen vedrørende DBOere er indført for at undgå dobbeltbeskatning. Tanken er, at hvis et andet land, hvormed Danmark har en DBO, har beskatningsretten til renteindtægten, vil renteindtægten også blive beskattet i dette land. Hele ideen er altså, at renten bliver beskattet én gang og kun én gang. Hvis undtagelsesbestemmelsen vedrørende DBOere ikke var der, ville der ofte opstå situationer, hvor der opstod dobbeltbeskatning og hvor DBOen ikke nødvendigvis ville løse herfor. Det er derimod ikke hensigten, at den modsvarende renteindtægt, som det er tilfældet i denne sag, slet ikke bliver beskattet.

Det er dog ikke tilstrækkeligt, at den omhandlede situation blot er i strid med lovens formål. Beskatning kræver følgelig også lovhjemmel. Forholdet har dog uden tvivl betydning, når afgrænsningen skal foretages i den konkrete situation.

Som det fremgår ovenfor under punkt 2.2.4.2, fremgår det af punkt 12 i kommentarerne til Model-konventionen, at

*Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.*

Bl.a. på den baggrund finder SKAT ikke, at der kan stilles krav om, at modtageren af renten f.eks. ifølge aftale er retlig forpligtet til at videresende beløbet. SKATs udlægning stemmer også bedre overens med en naturlig sproglig fortolkning af den engelske term for begrebet. »Beneficial owner« er altså den, der får gavn af renten i modsætning til »Legal owner«, der er den formelle ejer af renten. Desuden vil den begrænsede skattepligt altid opstå i koncerner, da det jo er en forudsætning, at der er tale om selskaber omfattet af

skattekontrollovens § 3 B. I kraft af parternes interessefællesskab har de ikke behov for at formalisere en juridisk binding til at sende beløbet videre. Hvis det var et krav, at den umiddelbare kreditor (her Nycomed Sweden Holding 2 AB) formelt/retligt er afskåret fra at råde over renten, ville der praktisk talt næppe være situationer, hvor rentekat overhovedet kan komme på tale, hvilket næppe kan være hensigten.

Efter SKAT opfattelse er det tilstrækkeligt, at Nycomed Sweden Holding 2 AB og Nycomed Sweden Holding 1 AB *reelt* ikke råder over renterne.

Spørgsmålet er herefter, om dette er tilfældet i denne sag.

Efter SKATs opfattelse er det på forhånd besluttet, at Nycomed Sweden Holding 2 AB skal sende renterne videre til Nycomed Sweden Holding 1 AB i form af koncerntilskud. I brevet af 19. november 2010 har A anført, at udbetalingen af koncernbidrag besluttes år for år af ledelsen i Nycomed Sweden Holding 2 AB.

SKAT finder det tvivlsomt, at det alene er ledelsen i Nycomed Sweden Holding 2 AB, der træffer beslutningen samt at det ikke på forhånd er afgjort, at koncernbidragene skal modsvare renteindtægten. Ledelsen ejer kun andele i Nycomed Sweden Holding 2 AB og således hverken i Nycomed Sweden Holding 1 AB eller i Nycomed S.C.A., SICAR. Derfor vil ledelsen alt andet lige ikke være interesseret i at sende tilskud til et selskab, de ikke have ejerandel i. Alligevel gør de det. Der vil heller ikke være en skattemæssig fordel for koncernen som helhed, hvis der ikke gives fradragsberettigede koncernbidrag til Nycomed Sweden Holding 1 AB. Desuden har A i brevet af 19. november 2010 anført, at repræsentanterne for ejerne af koncernen også er repræsenteret i bestyrelsen i Nycomed Sweden Holding 2 AB.

I brevet af 19. november 2010 fremgår det, at der var forretningsmæssige overvejelser bag overdragelsen af delaktiviteten fra Nycomed AB til Nycomed Sweden Holding 2 AB. SKAT skal ikke kunne afvise dette kategorisk. Imidlertid er omfanget af den overdragne aktivitet yderst begrænset i forhold størrelsen af koncernbidragene til Nycomed Sweden Holding 1 AB. Derfor kan den omhandlede aktivitet ikke tillægges afgørende betydning ved vurderingen af, om Nycomed Sweden Holding 2 AB reelt råder over renterne.

**3208**

SKAT finder det heller ikke afgørende, at renterne og koncernbidragene ikke betales, men alene tilskrives. Dette følger dels af de almindelige skattemæssige regler, hvor retserhvervelse/pligtpådragelse er afgørende uanset pengestrømme. Desuden fremgår det direkte af kildeskattelovens § 65 D, stk. 1, 1. pkt., at renteskatten såvel omfatter udbetalte som godskrevne renter.

SKAT finder, at statuering af (en anden) retmæssig ejer fordrer, at der er en vis sammenhæng mellem de forskellige lån og ydelser m.v. Det er der også i denne sag. Der er herved henset til, at begge lån er optaget den 27. december 2006 og har næsten samme hovedstol, rentesats og ydelse (ingen ydelse før indfrielse efter en årrække). Det kan ikke tillægges betydning, at ydelserne op til Nycomed S.C.A., SICAR skifter karakter, da der i stedet for et back to back lån mellem de 2 svenske selskaber er koncernbidrag. Det afgørende er, at ledelsen er betinget af hinanden og udligner skatten.

2.2.4.3. Delkonklusion

Hverken Nycomed Sweden Holding 2 AB eller Nycomed Sweden Holding 1 AB anses for retsmæssig ejer af de omhandlede renter.

Derfor er SKAT ikke afskåret fra at indeholde renteskat som følge at den fællesnordiske dobbeltbeskatningsoverenskomst.

**2.2.5. Spørgsmålet om beskatningen af renterne skal frafaldes efter Rente-Royaltydirektivet**

*2.2.5.1. Retmæssig ejer efter Rente-Royaltydirektivet*

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

Af de indledende bemærkninger i Rente-Royaltydirektivet 2003/49/EF fremgår bl.a. følgende (med SKATs fremhævninger):

*(1) På et indre marked, der har karakter af et hjemmemarked, bør transaktioner mellem selskaber fra forskellige medlemsstater ikke være undergivet ringere beskatningsvilkår end de vilkår, der gælder for de samme transaktioner mellem selskaber fra samme medlemsstat.*

*(2) Dette krav er i øjeblikket ikke opfyldt for så vidt angår betaling af renter og royalties; de nationale skattelovgivninger - eventuelt kombineret med bilaterale eller multilaterale overenskomster - kan måske ikke altid sikre afskaffelse af dobbeltbeskatning, og skattereglernes anvendelse medfører ofte tyngende administrative formaliteter og likviditetsproblemer for de pågældende selskaber.*

*(3) Det må sikres, at renter og royalties beskattes én gang i en medlemsstat.*

*(4) Den mest hensigtsmæssige måde at fjerne førnævnte formaliteter og problemer på og samtidig sikre, at nationale og tværnationale transaktioner behandles skattemæssigt ens, er at ophæve beskatningen af renter og royalties i den medlemsstat, hvor de opstår, uanset om beskatningen sker ved indeholdelse ved kilden eller ved skatteansættelse; det er især nødvendigt at ophæve sådanne skatter i forbindelse med betalinger mellem associerede selskaber i forskellige medlemsstater samt mellem sådanne selskabers faste driftssteder.*

*(5) Ordningen bør kun gælde for eventuelle renter eller royalties, der ville være blevet aftalt mellem betaleren og den retmæssige ejer, såfremt der ikke havde bestået en særlig forbindelse*

*(6) Medlemsstaterne må ikke afskæres fra at træffe passende foranstaltninger til bekæmpelse af svig og misbrug.*

…

*(10) Målet for dette direktiv, nemlig etablering af et fælles system for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, kan ikke i tilstrækkelig grad opfyldes af medlemsstaterne og kan derfor bedre gennemføres på fællesskabsplan; Fællesskabet kan derfor træffe foranstaltninger i overensstemmelse med subsidiaritetsprincippet, jf. traktatens artikel 5. I overensstemmelse med proportionalitetsprincippet, jf. nævnte artikel, går direktivet ikke ud over, hvad der er nødvendigt for at nå disse mål -*

Direktivets formål er således at sikre, at renter betalt over grænserne mellem medlemslandene behandles på samme vilkår som inden for grænserne i de enkelte medlemslande, men at denne ordning kun gælder for eventuelle renter, der ville blive aftalt såfremt der ikke havde bestået en særlig forbindelse. Derudover er formålet, at renterne beskattes i én medlemsstat, og at misbrug og svig kan bekæmpes.

Begrebet retmæssig ejer fremgår således allerede af de indledende bemærkninger. Derudover fremgår begrebet af art. 1, der har følgende ordlyd (med SKATs fremhævninger):

*»Artikel 1*

*…«*

Allerede af denne årsag er det utvivlsomt, at EU-retten ikke er til hinder for gennemførelse af en kildebeskatning af renterne i Danmark i tilfælde, hvor den retmæssige ejer ikke er hjemmehørende i EU.

Den omstændighed, at der indeholdes kildeskat på renter, når de betales til et ikke-hjemmehørende selskab, udgør ikke en restriktion i den frie bevægelighed, allerede fordi der ikke sker en skattemæssig forskelsbehandling.

Dette er også udtrykkeligt fastslået af EU-Domstolen i dom af 22. december 2008 i sag C-282/07, Truck Center,

…

Det er endvidere SKATs opfattelse, at EU-Domstolens praksis viser, at der ikke er noget til hinder for at afskære selskaber etableret i en anden medlemsstat fra at påberåbe sig EU-retten - herunder de harmoniserede regler, der følger af bl.a. moder-/datterselskabsdirektivet - når der må lægges til grund, at etableringen af et holdingselskab i en anden medlemsstat »tager sigte på at

**3209**

undgå kildeskat på betalinger til ikke-europæiske foretagender, hvis en sådan konstruktion ikke tjener noget kommercielt formål«, jf. Kommissionens fortolkning af »Rent kunstige arrangementer« offentliggjort i EUT 2008, C 116/13.

Selskabsskattelovens § 2, stk. 1, litra d, indebærer efter sin klare ordlyd, at Danmark ikke skal frafalde kildeskat, medmindre det efter Rente-Royaltydirektivet består en egentlig pligt hertil.

Sammenfattende er det SKATs opfattelse, at begrebet retmæssig ejer i relation til direktivet svarer til begrebet i relation til DBOerne. Som det fremgår ovenfor, har begrebet eksisteret i en årrække i OECDs Modeloverenskomst førend, det blev indført i Moder-datterselskabsdirektivet og Rente-Royaltydirektivet. Der ses i den forbindelse ikke at være noget, der tilsiger, at begrebet har en større eller mindre rækkevidde end i OECDs Modeloverenskomst. EU Domstolen har dog endnu ikke taget stilling til begrebet. Det forhold, at der i Rente-Royaltydirektivets artikel 1, stk. 4 alene henviser til og ikke som formidler, herunder som agent, mandatar eller bemyndiget signatar for en anden person, kan ikke føre til andet resultat, da angivelsen ikke er udtømmende.

Med samme begrundelse som anført under punkt 2.2.4.2 ovenfor anses hverken Nycomed Sweden Holding 2 AB eller Nycomed Sweden Holding 1 AB for retsmæssig ejer af de omhandlede renter i relation til Rente-Royaltydirektivet.

Herefter skal der tages stilling til, om Nycomed S.C.A., SICAR er retmæssig ejer. I forhold til de svenske selskaber er der den forskel, at der ikke er tale om gennemstrømning i den forstand, at renterne umiddelbart bliver viderekanaliseret til ejerne.

Som nævnt ovenfor under punkt 2.2.4.2 har SKAT tabt 2 sager i Landsskatteretten, fordi Landsskatteretten har lagt afgørende vægt på, at der netop ikke var gennemstrømning ud af det luxembourgske moderselskab. Imidlertid er/bliver kendelserne indbragt på domstolene, hvorfor SKAT forsat er af den opfattelse, at fysisk gennemstrømning nødvendigvis ikke er afgørende.

Som ligeledes nævnt ovenfor under punkt 2.2.4.2 fremgår det af punkt 12.1 i kommentarerne til Modeloverenskomsten, at et selskab ikke er retmæssig ejer, hvis det blot virker som en gennemstrømningsenhed. Dette er imidlertid ikke en u[d]tømmende afgrænsning af begrebet. Der er således ikke grundlag for at hævde, at det er den faktiske gennemstrømning, der er afgørende. En naturlig sproglig forståelse af Modeloverenskomsten samt kommentarerne hertil indebærer således, at der må lægges vægt på den formelle beløbsmodtagers reelle beføjelser i relation til at træffe afgørelser om, hvorledes der skal disponeres over det modtagne beløb.

I denne sag kan Nycomed S.C.A., SICAR som udgangspunkt disponere over aktivet på sædvanlig vis. Som juridisk person tegnes selskabet ganske vist af ejerne og især af general partner. Dette er jo også tilfældet for langt de fleste selskaber, uden at dette giver anledning til at anfægte, at selskabet er retmæssig ejer af en given fordring.

Som tidligere nævnt skal der imidlertid lægges vægt på bemærkningerne til Modeloverenskomstens punkt 12:

*Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteudgåelse.*

I denne sag har det ikke været nødvendigt at lave back to back lån til ejerne af Nycomed S.C.A., SICAR, da selskabet ikke skal betale skat af renteindtægterne. I stedet for renter vil ejerne senere få det samlede beløb (hovedstol og tilskrevne renter) som udbytte.

Derfor finder SKAT heller ikke, at Nycomed S.C.A., SICAR er retmæssig ejer af renteindtægterne. I stedet er det ejerne af dette selskab, der er retmæssige ejere.

*2.2.5.2. Antimisbrugsbestemmelse efter EU-retten og Rente-Royaltydirektivet*

Indledningsvis bemærkes det, at ved dispositioner, der har skatteunddragelse, skatteundgåelse eller misbrug som formål, kan der opstå situationer, hvor EU-borgeren ikke kan påberåbe sig beskyttelse efter EU-retten. Dette gælder både for konkrete forordninger og direktiver - herunder Rente-Royaltydirektivet - samt EU-traktaterne generelt, f.eks. TEUF artikel 63-66 om beskyttelsen af kapitalens fri bevægelighed.

*EU-Domstolens praksis*

Fra EU-Domstolens praksis om misbrugsbegrebet kan bl.a. henvises til Cadbury Schweppes-dommen (sag C-196/04, Cadbury Schweppes, Saml. 2006, s.I-7995), Halifax-dommen (sag C-255/02, Halifax, Saml. 2006, s. I-1609) og Part Service-dommen (sag C-425/06, Part Service Srl.).

EU-Domstolen udtaler i Cadbury-Schweppes-dommen i relation til de engelske CFC-regler bl.a.:

*.. for at en restriktion for etableringsfriheden vil kunne være begrundet i hensynet til bekæmpelse af misbrug, skal det specifikke formål med en sådan restriktion være at hindre adfærd, der består i at oprette rent kunstige arrangementer, der ikke bygger på nogen økonomisk realitet, med henblik på at undgå den normalt skyldige skat af overskud, der optjenes ved virksomhed, der udføres på det nationale område.*

Den momsretlige Halifax-dom omhandler gennemstrømningsselskaber, idet der i sagen var tale om en momsfritaget bank med 5 % momsfradrag, som lod sine relevante transaktioner passere et fuldt momspligtigt datterselskab med henblik på at opnå fuldt momsfradrag.

**3210**

Om dommen samt dommens betydning i den efterfølgende sag Part Service Srl. anføres i Momsvejledningen 2010-2, afsnit C.4., følgende:

*Fordele som følger af momslovenes bestemmelser, herunder reglerne om fradrag, kan ikke gøres gældende, når der transaktioner m.v. der begrunder denne ret, udgør et misbrug.*

*Det følger af EF-domstolens praksis, jf. sag C-255/02, Halifax plc., præmis 74 og 75, at konstateringen af misbrug kræver, at følgende betingelser er opfyldt:*

- *De omhandlede transaktioner - selvom de betingelser der er fastsat i de relevante bestemmelser formelt er overholdt - ville indebære, at der blev opnået en afgiftsfordel, som det ville stride mod formålet med disse bestemmelser at tildele.*
- *Det skal tillige fremgå af en samlet række objektive omstændigheder, at hovedformålet med de omhandlede transaktioner er opnåelsen af en afgiftsfordel.*

*At det er tilstrækkeligt for at konstatere misbrug, at det er hovedformålet - og herved ikke det eneste formål - med transaktionen at opnå en afgiftsfordel har EF-domstolen fastslået i den efterfølgende dom i sagen C-425/06 (Part Service Srl.)*

*Ved vurderingen af hovedformålet, kan transaktionernes rent kunstige karakter tillige med juridiske, økonomiske og/eller personlige forbindelser mellem de aktører, der tager del i planen vedrørende lettelse af afgiftsbyrden tages i betragtning, jf. Halifax-dommen præmis 81.*

Ved vurdering af hovedformålet med etableringen har EU-Domstolen lagt særlig vægt på, om der er substans i selskabets domicilland, eller om der er tale om et rent kunstigt arrangement, hvilket ikke kun indebærer formel etablering, men også faktisk udøvelse af økonomisk virksomhed.

*Rente-Royaltydirektivets artikel 5*

I relation til Rente-Royaltydirektivet fremgår følgende af artikel 5:

…

Der er altså en domstolsskabt praksis om det generelle EU-retlige misbrugsbegreb og en specifik misbrugsbestemmelse i Rente-Royaltydirektivets artikel 5. Som det fremgår nedenfor, er det SKATs opfattelse at nægte direktivets fordele på grundlag af begge dele.

*Implementering i dansk ret*

Udgangspunktet er, at direktiver ikke har umiddelbar virkning overfor medlemsstaterne. Disse har derfor pligt til at implementere det i deres lovgivning. Hvis dette ikke sker, kan borgeren påberåbe sig direktivet. Ud fra det såkaldte retssikkerhedsprincip kan medlemsstaten imidlertid ikke påberåbe sig et direktiv overfor borgeren.

Dette fremgår bl.a. af præmis 42 i Kofoed-dommen (sag C-321-05, Kofoed, Saml. 2007, s. I-5795):

…

Rente-Royaltydirektivet som sådan er implementeret i dansk ret. Dette fremgår af selskabsskattelovens § 2, stk. 1, litra d, 3. pkt.:

*Skattepligten omfatter ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties...*

*Misbrugsbestemmelsen i artikel 5 er fakultativ for medlemsstaterne (Dette direktiv udelukker ikke anvendelse af nationale............).*

Spørgsmålet er herefter, om det er tilstrækkeligt som i denne sag at vedtage, at direktivet (som helhed) er gældende eller om artikel 5 skal implementeres særskilt.

Det er SKATs opfattelse, at misbrugsbestemmelsen i artikel 5 er implementeret i selskabsskattelovens § 2, stk. 1, litra d. Bestemmelsen indebærer således efter sin klare ordlyd, at Danmark ikke skal frafalde renteskat, medmindre det efter Rente-Royaltydirektivet består en egentlig pligt hertil.

Dette følger af ordlyden: … *renterne skal frafaldes eller nedsættes....*

Der ses ikke at være noget i bemærkningerne til lovforslaget, der tilsiger en anden fortolkning.

Tværtimod understøttes SKATs fortolkning af bemærkningerne til lovforslaget til vedtagelsen af kildeskat på udbytter i selskabsskattelovens § 2, stk. 1, litra c.

3. punktum i denne bestemmelse fastsætter:

*Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende.*

Dette punktum blev indsat ved lov nr. 282 af 25. april 2001 (ændringslovens § 1, nr. 1), idet lovændringen havde til hensigt at genindføre kildebeskatningen af udbytter. I det oprindeligt fremsatte lovforslag (L 99 2000/0l) var bestemmelsen foreslået formuleret således:

*Det er en betingelse, at moderselskabet er hjemmehørende i en stat, som er medlem af EU, i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne eller i Grønland, samt at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF.*

Under behandlingen af dette forslag fremsatte skatteministeren imidlertid et ændringsforslag (LFB 2001-03-21 nr. 99) (svarende

til bestemmelsens endelige formulering), idet han begrundede dette således:

Det foreslås at præcisere, at det er en betingelse for den foreslåede skattefrihed, at Danmark skal frafalde beskatningen af det pågældende udbytte efter

**3211**

bestemmelserne i moder/datterselskabsdirektivet, eller at Danmark skal frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i dobbeltbeskatningsoverenskomsten med Færøerne, Grønland eller den pågældende anden stat.

Både ordlyden og forarbejderne viser således utvetydigt, at der skal gennemføres kildebeskatning, medmindre en sådan beskatning strider mod EU-retten og/eller DBO'erne.

Ved den efterfølgende vedtagelse af renteskatten i litra d, var det ikke nødvendigt med en sådan præcisering, da den korrekte ordlyd var med allerede i det fremsatte lovforslag.

*SKATs konkrete vurdering*

SKAT finder det klart, at misbrugsbestemmelsen i artikel 5 kan gøres gældende i den konkrete sag.

Under henvisning til det anførte i afsnit 2.2.4.2 ovenfor må det anses for godtgjort, at der er tale om transaktioner, der har skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde. Det er følgelig ikke optagelsen af selve lånet, der ikke anses for erhvervsmæssig begrundet. Derimod er det selve placeringen af arrangementet gennem 3 overliggende holdingselskaber, der muliggør, at renteudgiften fratrækkes med skattemæssig virkning i Nycomed A/S, medens renteindtægten ikke er skattepligtig i Nycomed S.C.A., SICAR.

Man kan herefter diskutere, om sondringen alene skal foretages ud fra ordlyden i artikel 5, stk. 2 eller om misbrugsbegrebet derudover er afgrænset af den generelle EU-domstolsskabte praksis på området. I så fald vil det ikke være tilstrækkeligt, at hovedmotivet er skatteundgåelse. Derudover skal der være tale om et rent kunstigt arrangement, hvor der udover de skattemæssige motiver for transaktionen ikke må være tale om udøvelse af faktisk økonomisk virksomhed.

SKAT finder imidlertid under alle omstændigheder, at der er tale om et sådan rent kunstigt arrangement.

For de første ses der ikke at være et umiddelbart forretningsmæssigt motiv for at have såvel Nycomed Sweden Holding 1 AB og Nycomed S.C.A., SICAR som overliggende holdingselskaber. Ledelsen af koncernen er som anført i Nycomed Sweden Holding 2 AB. Der ses endvidere ikke at være noget forretningsmæssigt motiv for at placere det øverste holdingselskab i Luxembourg. Driften foretages dels fra Nycomed Sweden Holding 2 AB og fra General Manager i Nycomed S.C.A., SICAR. For Nycomed S.C.A., SICARs vedkommende består dette dog alene af at vederlægge General Manager, hvilket sker ved en tilskrivning på en mellemregning. Derudover udgør aktiviteten alene besiddelse af aktieposten og fordringen. Det praktiske omkring bogføring, anmeldelse i det luxembourgske selskabsregister m.v. klares ved at betale tredjemand for »Provision for domiciliation, corporate and accounting fees«.

*Delkonklusion*

Hverken Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB eller Nycomed S.C.A., SICAR anses for retmæssig ejer efter Rente-Royaltydirektivet.

Misbrugsbestemmelsen i Rente-Royaltydirektivets artikel 5 anses for implementeret i dansk ret.

Misbrugsbestemmelsen anses for at kunne gøres gældende i den konkrete sag.

*2.2.6. Hæftelse for ikke indeholdt renteskat*

Af kildeskattelovens § 69, stk. 1 fremgår det, at

Den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, er over for det offentlige umiddelbart ansvarlig for betaling af manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i denne lov.

Det er altså Nycomed A/S, der har bevisbyrden for, at selskabet ikke burde have været opmærksom på, at det skulle have indeholdt kildeskat. Situationen, hvor den indeholdelsespligtige kan blive fritaget for hæftelse, er f.eks., hvor en lønmodtager snyder sin arbejdsgiver og dermed får udbetalt for store skattefrie godtgørelse uden, at det kan lastes arbejdsgiveren, at pågældende ikke opdagende dette.

Fritagelsen gælder imidlertid ikke i denne situation. Der er herved lagt vægt på, at selskabsskattelovens § 2, stk. 1, litra d er en værnsregel, at Nycomed koncernen i den konkrete situation har søgt at omgå denne værnsregel samt at der er tale om interesseforbundne parter.

Således hæfter Nycomed A/S for renteskatten.

*2.2.7. Nedslag i renteskatten på grundlag af ejerkredsen af Nycomed S.C.A., SICAR m.v.*

Da ejerne af Nycomed S.C.A., SICAR anses for retmæssige ejere af renteindtægten, kan det komme på tale, at der skal gives forholdsmæssigt nedslag i renteskatten, hvis ejerne skal fritages eller lempes efter en DBO eller efter Rente-Royaltydirektivet.

Hvis dette kan dokumenteres, vil SKAT følgelig give et sådant nedslag.

SKAT er i øjeblikket i gang med en transfer pricing kontrol af rentesatsen. Hvis rentesatsen ændres, vil renteskatten følgelig blive ændret i overensstemmelse hermed.

*2.2.8. Samlet konklusion*

Der anses for at være aftalt fælles ledelse i Nycomed S.C.A., SICAR.

Hverken Nycomed Sweden Holding 2 AB eller Nycomed Sweden Holding 1 AB anses for retmæssig ejer af de omhandlede renter i relation til den fællesnordiske dobbeltbeskatningsoverenskomst.

Hverken Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB eller Nycomed S.C.A., SICAR anses for retsmæssig ejer af de omhandlede renter i relation til Rente-Royaltydirektivet.

**3212**

I stedet anses ejerne af Nycomed S.C.A., SICAR for de retmæssige ejere.

I anden række gøres det gældende, at selvom Nycomed S.C.A., SICAR anses for retmæssig ejer, er selskabet ikke beskyttet af direktivet, idet misbrugsbestemmelsen i artikel 5 kan gøres gældende i den konkrete sag.

Derfor er der hjemmel til at indeholde renteskat, der kan opgøres således:

| Dato tilskrivning | Beløb EUR | Kurs | Beløb i DKK | Renteskat i pct. | Renteskat i DKK |
|---|---|---|---|---|---|
| 27-12-2007 | 61.965.461 | 745,68 | 462.064.052 | 30 | 138.619.216 |
| 27-12-2008 | 74.258.291 | 745,40 | 553.521.299 | 25 | 138.380.325 |
| 27-12-2009 | 61.887.366 | 744,33 | 460.646.228 | 25 | 115.161.557 |

U.2023.3198H

| | I alt | 198.111.118 | 1.476.231.579 | 392.161.097 |

*2.3. Selskabets opfattelse og begrundelse*

I brev af 9. december 2010 har A anført følgende:

*Nycomed A/S - Renteskat - j.nr. 28313519*

*Vi har modtaget SKATs forslag til afgørelse, dateret den 29. november 2010, om indeholdelse af renteskat for perioden 2006-09. Vi skal hermed på vegne af vores klient, fremkomme med følgende bemærkninger.*

*Faktuelle kommentarer til sagsfremstillingen*

*Vi har først at par faktuelle kommentarer til sagsfremstillingen. På side 1 fremgår det, at The Blackstone Group er ejer af Nycomed S.C.A., SICAR. Det er ikke tilfældet længere, idet gruppen solgte sin andel i 2006. På side 4 i afsnit 1.2 bør det tilføjes, at formålet med optagelse af lånet var at refinansiere det eksisterende PIK-note-lån, der blev optaget i 2005 i forbindelse med, at Nycomed A/S købte Nycomed-koncernen. Dette er endvidere omtalt på side 3, øverste halvdel.*

*Vurdering*

*Vi er ikke enige i SKATs vurdering af sagen. Efter vores vurdering har SKAT ikke grundlag for at kræve indeholdelse af renteskat.*

- *Nycomed Sweden Holding 2 AB (SEW2) er den retmæssige ejer af renteindtægterne og anvender blandt andet renteindtægterne til dækning af driftsudgifter og lønninger i selskabet. Selskabet har således fuld råderet over indtægten og er på ingen måde forpligtet til at betale renteindtægten videre.*
- *Nycomed A/S har haft renteudgifter på et helt almindeligt lån, der er optaget (koncerninternt) til indfrielse af et eksternt lån. Der eksisterer således ikke nogen form for misbrugssituation i forhold til dansk lovgivning m.v.*
- *I SKM 2010.729 LSR fik skatteyderen medhold i, at der ikke var grundlag for at kræve indeholdelse af renteskat, idet rentebeløbet ikke var betalt op igennem strukturen til de ultimative ejere (gennemstrømningsselskab). Der er heller ikke i denne sag tale om gennemstrømning. Der er ikke engang […] etableret et retsforhold mellem de svenske holdingselskaber. Alene af den grund kan der på ingen måde argumenteres for, at renteindtægten er strømmet igennem SWE2 og videre op igennem strukturen, at SWE2 dermed ikke er den retmæssige ejer af indkomsten.*

*At der sker gennemstrømning er ifølge Landsskatterettens egen afgørelse en altafgørende forudsætning for, at det overhovedet kan komme på tale at antage, at modtageren, her SWE2, ikke er den retmæssige ejer af indkomsten.*

*Af hensyn til det fremskredne tidspunkt har vi valgt ikke at argumentere yderligere for vores synspunkter for nuværende. Vi skal dog anmode SKAT om at genoverveje afgørelsen set i lyset af ovenstående og herefter fremsende en endelig afgørelse hurtigst muligt.*

*Afslutningsvis skal vi for god ordens skyld oplyse, at vi accepterer, at forældelsen efter forældelsesloven udskydes fra 31. december 2010 til 15. januar 2011.*

*2.4. Endelig afgørelse*

*Vedrørende de faktuelle forhold er sagsfremstillingen nu rettet til i overensstemmelse med det anførte i A's brev af 9. december 2010. Herefter tages der kort stilling til de 3 punkter, som er fremsat.*

…

*Således er der truffet afgørelse i overensstemmelse med det fremsendte forslag.«*

*Supplerende oplysninger om koncernen og lånene*

Efter det oplyste var Nycomed-koncernen i sagsperioden en verdensomspændende medicinalvirksomhed med i alt 12.500 ansatte,

herunder 600 i Danmark, og havde datterselskaber i over 70 lande. Koncernen blev i 2005 købt af et kapitalfondskonsortium med den nordiske kapitalfond Nordic Capital som den største ejer. Nycomed-koncernens øverste danske moderselskab var Nyco Holding ApS. Købet af Nyco Holding ApS skete gennem det nyoprettede holdingselskab Nycomed A/S (nu Takeda A/S), der var direkte ejer af deltagerne i kapitalfondskonsortiet. Til brug for købet af Nyco Holding A/S havde Nycomed A/S optaget et eksternt lån på ca. 400 mio. euro. I 2006 blev der foretaget en

**3213**

refinansiering af denne gæld og i den forbindelse etableredes følgende ejerstruktur:



Over 95 % af aktionærerne i Nycomed S.C.A, SICAR var forskellige kapitalfonde organiseret i skattemæssigt transparente enheder, typisk kommanditselskaber. Nycomed A/S har oplyst, at der var flere hundrede investorer i kapitalfondene, bl.a. pensionskasser, pengeinstitutter, investeringsforeninger og -selskaber, almindelige selskaber og privatpersoner. Nycomed A/S har endvidere oplyst, at disse investorer var hjemmehørende i en lang række jurisdiktioner, herunder inden for og uden for EU samt i og uden for stater, med hvilke Danmark har indgået en dobbeltbeskatningsoverenskomst, og at omkring ⅔ af de direkte investorer i kapitalfondene var selvstændige skattesubjekter, der var hjemmehørende inden for EU eller i en stat, med hvilken Danmark har indgået en dobbeltbeskatningsoverenskomst. Ud af de resterende investorer var en væsentlig del såkaldte »fund-of-funds«, dvs. skattetransparente enheder, hvor det ikke umiddelbart har været muligt at fremskaffe oplysninger om hjemstedet for investorerne heri.

Der er mellem parterne enighed om, at identiteten og hjemstedet på investorerne i de pågældende kapitalfonde ikke er dokumenteret under sagen.

Der er fremlagt en række ejerfortegnelser for Nycomed S.C.A., SICAR for perioden 2007-2011, hvoraf det fremgår, at aktionær nr. 39 var en privatperson - efter det oplyste med bopæl i USA - og aktionær nr. 41 var en svensk bank. Efter det oplyste havde de to aktionærer i den omhandlede periode hver en ejerandel på henholdsvis 0,25 % og 1,15 %.

I 2011 erhvervede virksomheden Takeda Pharmaceutical Company aktierne i Nycomed A/S og købte dermed Nycomed-koncernen (bortset fra koncernens aktiviteter i USA), jf. nærmere nedenfor. Nycomed A/S skiftede i den forbindelse navn til Takeda A/S.

*Nycomed S.C.A., SICAR*

Nycomed S.C.A., SICAR, var koncernens moderselskab. Selskabet, der var hjemmehørende i Luxembourg, var fuldt ud egenkapitalfinansieret. Selskabet blev drevet i selskabsformen *Société en commandite par actions* (»S.C.A.«). Selskabets komplementar, som varetog den daglige ledelse af selskabet, var Nycomed Luxco S.A. Det fremgår af de fremlagte årsrapporter, at henholdsvis fire og fem af de i alt syv ledelsesmedlemmer (Board of Directors) i Nycomed Luxco S.A. tillige var medlemmer af bestyrelserne i Nycomed Sweden Holding 1 AB og i Nycomed Sweden Holding 2 AB i den for sagen relevante periode.

Det er oplyst, at et S.C.A. er en selvstændig juridisk person og et selvstændigt skattesubjekt efter luxembourgsk ret. Parterne er enige om, at et S.C.A. på denne baggrund kan kvalificeres som en »hjemmehørende person« efter dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, og at det er indkomstskattepligtig i Luxembourg og derfor er pligtig at betale

**3214**

selskabsskat og lokal erhvervsskat i Luxembourg af selskabets indkomst.

Nycomed S.C.A., SICAR, var efter en luxembourgsk lov af 22. juni 2004 registreret som et såkaldt »Société d'investissement en capital à risque« (»SICAR«). Dette indebærer, at selskabet var fritaget for indkomstskat af indtjening, der hidrørte fra selskabets investeringer, dvs. renter, avancer og udbytter, ligesom selskabet var undtaget fra reglerne om indeholdelsespligt ved udlodning af udbytter.

Det er oplyst, at kapitalfondskonsortiet i forbindelse med refinansieringen af Nycomed A/S' eksterne lån indskød ca. 500 mio. euro i egenkapital i Nycomed, S.C.A., SICAR. Dette kapitalindskud var grundlaget for Nycomed, S.C.A., SICAR's lån på 498.500.000 euro til Nycomed Sweden Holding 1 AB. Selskabets investeringsportefølje bestod af en 100 % kapitalandel i Nycomed Sweden Holding 1 AB. Ud over ejerskabet af og udlånet til Nycomed Sweden Holding 1 AB udøvede Nycomed S.C.A., SICAR, ingen aktiviteter.

Lånet til Nycomed Sweden Holding 1 AB blev ydet den 27. december 2006. Ifølge låneaftalen forrentes lånet med en rente på EURIBOR + 7,9 %, der tilskrives hovedstolen hvert år den 27. december. Renterne på lånet blev tilskrevet hovedstolen og blev i selskabets årsrapporter for indkomstårene 2007, 2008 og 2009 anført som tilskrevne renter (renter i perioden fra den 28/12-27/12) på henholdsvis 61.765.962, 72.826.401 og 60.825.103 euro.

Nycomed, S.C.A., foretog i 2007-2009 hverken udlodninger eller anden betaling til kapitalfondene.

*Nycomed Sweden Holding 1 AB*

Nycomed Sweden Holding 1 AB's eneste aktivitet bestod i at være holdingselskab for Nycomed Sweden Holding 2 AB. Selskabet optog, som nævnt, et lån den 27. december 2006 hos sit moderselskab, Nycomed S.C.A., SICAR, på 498.500.000 euro. Selskabets bogførte renteudgifter vedrørende det omhandlede lån for indkomstårene 2007, 2008 og 2009 udgjorde ifølge selskabets årsrapporter (perioden fra 1/1-31/12) henholdsvis 61.284.470, 72.866.092 og 60.825.103 euro. Renterne blev i overensstemmelse med lånevilkårene løbende tilskrevet lånets hovedstol, og selskabet har foretaget fradrag for renterne ved opgørelsen af sin skattepligtige indkomst.

Pengene fra ovennævnte lån blev af Nycomed Sweden Holding 1 AB indskudt som egenkapital i Nycomed Sweden Holding 2 AB.

*Nycomed Sweden Holding 2 AB*

Nycomed Sweden Holding 2 AB, der var fuldt ud egenkapitalfinansieret, var ejet af Nycomed Sweden Holding 1 AB med ca. 97,5 % og af koncernledelsen med ca. 2,5 %. Selskabet havde i de omhandlede indkomstår samme bestyrelse som Nycomed Sweden

Holding 1 AB. Selskabet ejede i 2007-2009 ikke aktier i andre selskaber end Nycomed A/S.

Kapitalindskuddet fra Nycomed Sweden Holding 1 AB blev af Nycomed Sweden Holding 2 AB udlånt til Nycomed A/S ved en låneaftale af 27. december 2006.

Af årsrapporterne for 2007, 2008 og 2009 fremgår, at Nycomed Sweden Holding 2 AB havde to indtægtsposter, nemlig »Övriga intäkter« og »Renteintäkter och liknande resultatposter«. Selskabet havde ikke andre renteindtægter end renterne på lånet til Nycomed A/S. I 2007, 2008 og 2009 udgjorde renteindtægterne henholdsvis 98,1 %, 97,8 % og 98 % af selskabets samlede indtægter. De renter, der blev tilskrevet på lånet til Nycomed A/S, er indgået i opgørelsen af Nycomed Sweden Holding 2 AB's skattepligtige indkomst i de pågældende indkomstår. Renteindtægterne udgjorde henholdsvis 61.444.992, 75.498.014 og 61.836.446 euro.

Nycomed Sweden Holding 2 AB har i indkomstårene 2007-2009 - i overensstemmelse med de særlige svenske regler om skattemæssig resultatudjævning inden for en koncern i den svenske indkomstskattelovs kapitel 35 - ydet koncernbidrag til sit moderselskab, Nycomed Sweden Holding 1 AB, på henholdsvis 60.468.000, 75.621.000 og 60.353.294 euro.

Koncernbidragene var fradragsberettigede for det ydende selskab, Nycomed Sweden Holding 2 AB, og skattepligtige for det modtagende selskab, Nycomed Sweden Holding 1 AB.

Pr. 2. april 2007 overtog Nycomed Sweden Holding 2 AB den hidtil af det svenske selskab Nycomed AB drevne aktivitet med produktregistrering hos myndigheder og drevne administrativt arbejde i forbindelse med kliniske forsøg. Selskabet beskæftigede herefter ca. 10 medarbejdere.

Dagen før overtagelsen, den 1. april 2007, indgik Nycomed Sweden Holding 2 AB og selskabet Nycomed AB en »Service agreement«. Ifølge denne aftale var Nycomed AB forpligtet til at yde enhver administrativ bistand, som driften af den overdragne virksomhed måtte nødvendiggøre (»any administrative services that [Nycomed Sweden Holding 2 AB] may require from time to time«). Bistanden omfattede, men var ikke begrænset til, »accounting and financial services, HR and payroll services, IT and technical support services, services relating to invoicing and debt collection«. Samme dag indgik Nycomed Sweden Holding 2 AB og Nycomed AB endvidere en lejeaftale, hvorved førstnævnte lejede en del af Nycomed AB's domicil, hvor medarbejdere, der var omfattet af overdragelsen, forblev placeret.

*Nycomed A/S*

Nycomed A/S, der var det øverste danske koncernselskab, blev stiftet i 2005 af det konsortium, som købte Nycomed-koncernen samme år. I forbindelse med købet havde Nycomed A/S optaget et såkaldt PIK-lån

**3215**

(»Payment-in-Kind«) fra eksterne långivere. Renten på PIKlånet, der var optaget til kurs 99, og som udløb i 2013, udgjorde fast 11,75 %.

Dette lån blev som nævnt erstattet af et koncerninternt lån, idet Nycomed A/S ved låneaftale af 27. december 2006 lånte 501 mio. euro af moderselskabet, Nycomed Sweden Holding 2 AB, som blev anvendt til indfrielse af det omtalte PIK-lån. Ifølge aftalen udgør renten EURIBOR + 8 procentpoint, der tilskrives hovedstolen hvert år den 27. december. Renten udgjorde således per 1. januar 2007 12,03 %, mens den ultimo 2009 udgjorde 9,24 %. De årlige rentetilskrivninger for 2007, 2008 og 2009 udgjorde henholdsvis 61.444.992, 75.498.014 og 61.836.446 euro svarende til henholdsvis 462.064.052, 553.521.299 og 460.646.228 kr. Ifølge låneaftalen skulle lånet først indfries, når Nycomed A/S blev solgt.

Nycomed A/S har foretaget fradrag for de tilskrevne, ikke betalte, renter ved opgørelsen af sin skattepligtige indkomst. Nycomed A/S indeholdt ikke kildeskat af de tilskrevne renter.

*»Management Shareholders Agreement«*

Takeda A/S har i forbindelse med sagens behandling ved landsretten fremlagt en »Management Shareholders Agreement« fra juli 2007 mellem Nycomed Luxco S.A, Nycomed S.C.A., SICAR, Nycomed Sweden Holding 1 AB, Nycomed Sweden Holding 2 AB, Nycomed A/S, The Investor Shareholders og The Management Shareholders. Aftalen regulerer navnlig The Management Shareholders rettigheder og forpligtelser i forhold til ejerne af Nycomed. S.C.A., SICAR. The Management Shareholders ejer ifølge aftalen alene andele i Nycomed Sweden Holding 2 AB. Aftalen indeholder bl.a. en regulering af muligheder for at disponere over deres aktier, bestemmelser om misligholdelse af aftalen samt en regulering af »Exit«.

Det fremgår af aftalen, at der samtidig er indgået en »Investor Shareholders Agreement« mellem de samme parter med undtagelse af »The Management Shareholders«, og at denne aftale har forrang i tilfælde af uoverensstemmelse mellem de to aftaler i relation til »the Management Shareholders«. Aftalen har ikke været fremlagt under sagen.

*Salg af Nycomed-koncernen i 2011 og 2012 - »Exit«*

Den 19. maj 2011 blev der indgået aftale om salg af Nycomed-koncernen (bortset fra koncernens aktiviteter i USA) til Takeda Pharmaceutical Company. Overdragelsen blev gennemført ved, at Nycomed Sweden Holding 2 AB solgte sine aktier i Nycomed A/S (Takeda) til Takeda Pharmaceutical Company den 30. september 2011. Salgssummen for aktierne i Nycomed A/S udgjorde ca. 9,6 mia. euro.

På tidspunktet for gennemførelsen af overdragelsen af aktierne i Nycomed A/S til Takeda Pharmaceutical Company udgjorde Nycomed A/S' gæld til Nycomed Sweden Holding 2 AB på det omhandlede lån (inklusive tilskrevne renter) 812.900.414 euro.

Den 21. september 2011, umiddelbart inden gennemførelsen af aktieoverdragelsen, konverterede Nycomed Sweden Holding 2 AB hele sit tilgodehavende (inklusive tilskrevne renter) til ny aktiekapital i Nycomed A/S. De nytegnede aktier indgik i overdragelsen til Takeda Pharmaceutical Company.

Umiddelbart efter salget udloddede Nycomed Sweden Holding 2 AB en væsentlig del af salgsprovenuet (ca. 3,8 mia. euro) til sit moderselskab, Nycomed Sweden Holding 1 AB.

Nycomed Sweden Holding 1 AB videreudloddede den væsentligste del af de modtagne udbytter til sit moderselskab, Nycomed S.C.A., SICAR, ligesom selskabet i oktober 2011 indfriede sit lån (inklusive tilskrevne renter), i alt ca. 790 mio. euro, til Nycomed S.C.A., SICAR.

Nycomed Sweden Holding 1 AB havde på tidspunktet for salget ultimo september 2011 et tilgodehavende hos Nycomed Sweden

Holding 2 AB på ca. 248 mio. euro vedrørende ikke tilbagebetalte koncernbidrag. Denne gæld blev efterfølgende eftergivet ved, at Nycomed Sweden Holding 1 AB besluttede at yde sit datterselskab et tilskud (aktieägartilskott), hvorved gælden blev udlignet.

Efter salget af Nycomed A/S til Takeda Pharmaceutical Company fungerede Nycomed Sweden Holding 2 AB herefter som holdingselskab for det amerikanske driftsselskab gennem et mellemliggende amerikansk holdingselskab. Den 30. juli 2012 solgte Nycomed Sweden Holding 2 AB (som på dette tidspunkt havde ændret navn til Fougera Sweden Holding 2 AB) sine aktier i det amerikanske holdingselskab til det uafhængige selskab Sandoz Inc. Købesummen udgjorde ca. 1 mia. euro. Den væsentligste del af salgssummen blev i 2012 udloddet til Nycomed Sweden Holding 1 AB, der igen videreudloddede den væsentligste del heraf til sit moderselskab, Nycomed S.C.A., SICAR.

Nycomed S.C.A., SICAR, foretog tilbagebetaling af indskudt kapital samt udbetaling af provenu til sine investorer i forbindelse med kapitalnedsættelser i 2011 og 2012 med i alt ca. 6,1 mia. euro.

*B-171-13 NTC Parent S.a.r.l. mod Skatteministeriet*

*SKATs afgørelse af 18. marts 2011*

Den 18. marts 2011 traf SKAT afgørelse om, at Nordic Telephone Company Investment ApS havde pligt til at indeholde kildeskat af de rentebetalinger/-tilskrivninger, der blev foretaget i perioden fra den 1. maj 2006 til den 10. juli 2008 til fordel for selskabets moderselskab, Angel Lux Common S.a.r.l.

SKAT anførte i den forbindelse, at de to luxembourgske selskaber, Angel Lux Common S.a.r.l. og Angel Lux Parent S.a.r.l. efter SKATs opfattelse ikke kunne anses

**3216**

for retmæssige ejere (beneficial owner) i relation til de koncerninterne rentebetalinger/-tilskrivninger, men derimod måtte anses for at fungere som gennemstrømningsenheder for en række kapitalfonde og banker, der hovedsageligt er hjemmehørende i lande uden dobbeltbeskatningsoverenskomst med Danmark, og dermed ikke berettiget til at opnå de fordele, der følger heraf.

Af SKATs afgørelse af 18. marts 2011 fremgår bl.a.:

*»Gennemstrømning i form af rentetilskrivning*

*1. Beskrivelse af selskabet*

Nordic Telephone Company Investment ApS er det øverste danske moderselskab for en række danske selskaber, herunder TDC A/S. Koncernen ejer endvidere en række udenlandske datterselskaber.

Nordic Telephone Company Investment ApS blev stiftet den 10. november 2005. Selskabet er fra og med den 14. november 2005 indgået som datterselskab i en koncern. Selskabet er i perioden fra den 14. november 2005 ejet af selskaber i Luxembourg, som igen er ejet af en 5 store kapitalfonde, og fra den 28. april 2006 også af udenlandske banker med en mindre andel.

*2. Talmæssig opgørelse i DKK*

| Indkomstår | Renter for hele året | Heraf indeholdelsespligt for renter for perioden 1.5.-31.12.2006 | Heraf indeholdelsespligt for renter for perioden 1.1.-31.3.2008 | Heraf indeholdelsespligt for renter for perioden 1.4.-10.7.2008 | Renteskatteprocent | Renteskat |
|---|---|---|---|---|---|---|
| 2006 | 1.329.208.093 | 922.794.206 | | | 30 % | 276.838.262 |
| 2007 | 1.410.657.397 | | | | 30 % | 423.197.219 |
| 2008 | 824.768.741 | | 390.745.904 | | 30 % | 117.223.771 |
| | | | | 434.022.837 | 25 % | 108.505.709 |
| I alt | | | | | | 925.764.961 |

*3. Baggrund*

Copyright © 2023 Karnov Group Denmark A/S

Sagen omhandler, hvorvidt Nordic Telephone Company Investment ApS skal tilbageholde rentekildeskat af renterne på aktionærlån til Angel Lux Common S.à.r.l. for perioden fra 1. maj 2006 til 10. juli 2008.

Overordnet er der sket det, at 5 kapitalfonde med henblik på opkøb af TDC A/S i sidste halvår 2005 har etableret en koncern bestående af en række selskaber hjemmehørende i Luxembourg og i Danmark (afsnit 3.1).

Finansieringen af opkøbet af TDC A/S er bl.a. sket ved, at de 5 kapitalfonde m.fl. har udlånt midler til Nordic Telephone Company Investment ApS.

Lånene består af en særlig type erhvervsobligationer, *Preferred Equity Certificates* (benævnt PECs) udstedt af Nordic Telephone Company Investment ApS i december 2005 og januar 2006 (afsnit 3.2).

PECs er efterfølgende i april 2006 overdraget af de 5 kapitalfonde m.fl. til et nystiftet datterselskab i Luxembourg (Angel Lux Parent S.à.r.l.). Dette datterselskab overdrog straks lånet videre til endnu et nystiftet datterselskab (Angel Lux Common S.à.r.l.) (afsnit 3.3 og 3.4). Sidstnævnte datterselskab er således formelt kreditor i forhold til Nordic Telephone Company Investment ApS. Betalinger ved overdragelse af PECs er sket ved etablering af gældsforhold af tilsvarende størrelse.

Renterne ifølge PECs er betalt/tilskrevet i en kæde fra Nordic Telephone Company Investment ApS gennem selskaberne i Luxembourg til de 5 kapitalfonde m.fl. (gennemstrømning) (afsnit 4).

Renterne af PECs er betalt/tilskrevet i perioden fra udstedelsen den 21. december 2005 til 10. juli 2008, hvor der sker gældskonvertering af PECs udstedt af Nordic Telephone Company Investment ApS, herunder for akkumulerede renter.

*3.1. Koncernens etablering*

…

*3.1.1. De 5 kapitalfonde stifter 5 selskaber i Luxembourg*

*Kabler S.à.r.l.,* der er hjemmehørende i Luxembourg, bliver stiftet den 4. juli 2005 af:
• Permira Europe III L.P,1
• Permira Europe III L.P.2
• Permira Europe III, Gmbh & Co. Kg
• Permira Europe III Co-Investment Scheme
• Permira Investments Limited

*Angel Lux I S.à.r.l.,* der er hjemmehørende i Luxembourg, bliver stiftet den 8. november 2005 af Apax WW Nominees Ltd.

*Angel Lux II S.à.r.l.,* der er hjemmehørende i Luxembourg, bliver stiftet den 8. november 2005 af:
• Blackstone Family Communications Partnership (Cayman) L.P.
• Blackstone Family Investment Partnership (Cayman) IV-A L.P.
• Blackstone Capital Partners (Cayman) IV-A Lp.
• Blackstone Participation Partnership (Cayman) IV L.P.

Hvert selskab tegner ¼ af kapitalen.

*Angel Lux III S.à.r.l.,* der er hjemmehørende i Luxembourg, bliver stiftet den 8. november 2005 af Providence Equity Offshore Partners V LP.

*Angel Lux IV S.à.r.l.,* der er hjemmehørende i Luxembourg, bliver stiftet den 8. november 2005 af KKR Millennium Fund (Overseas) Limited Partnership.

**3217**

*3.1.2. Stiftelse af NTC-selskaberne i Danmark*

Nordic Telephone Company Investment ApS stiftes den 10. november 2005. Anparterne overdrages den 14. november 2005

til 5 nystiftede selskaber i Luxembourg - Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. og Kabler S.à.r.l.

Nordic Telephone Company Administration ApS og Nordic Telephone Company Finance ApS stiftes af Nordic Telephone Company Investment ApS henholdsvis den 15. og 10. november 2005.

Nordic Telephone Company Holding ApS stiftes af Nordic Telephone Company Finance ApS den 11. november 2005.

Nordic Telephone Company ApS stiftes den 21. oktober 2005 af ekstern advokat, og overtages af Nordic Telephone Company Holding ApS den 30. november 2005.

*3.2. Køb af aktier i TDC A/S*

Den 30. november 2005 erhverver Nordic Telephone Company ApS 10,08 % af aktiekapitalen i TDC A/S til en købesum på DKK 7.554.600.000 (ca. EUR 1 mia.). Samtidig afgiver Nordic Telephone Company ApS et offentligt købstilbud på den resterende aktiekapital i TDC A/S.

Ved en fondsbørsmeddelelse den 25. januar 2006 offentliggøres det, at Nordic Telephone Company ApS har modtaget salgsaccepter for 78,1 % af aktiekapitalen i TDC A/S og således herefter ejer 88,2 % af aktiekapitalen i TDC A/S.

Denne ejerandel blev efterfølgende reduceret til 87,9 %, som følge af tilbageførsel af medarbejderaktier i december 2006.

Erhvervelsen finansieres, som det nærmere beskrives i det følgende, dels ved låneoptagelse hos tredjemand, dels ved kapitalforhøjelser som foretages fra det ultimative danske moderselskab, Nordic Telephone Company Investment ApS og ned gennem den danske del af koncernen.

Midlerne til disse kapitalforhøjelser hidrører navnlig fra de 5 kapitalfonde. Kapitalen tilføres Nordic Telephone Company Investment ApS på to måder:

1.  For det første foretager de 5 selskaber i Luxembourg en kapitalforhøjelse i selskabet.

2.  For det andet optager selskabet lån hos de 5 kapitalfonde m.fl. I forbindelse med opkøb af TDC A/S udsteder Nordic Telephone Company Investment ApS således PECs ad to omgange.

Generelt er PECs et finansielt instrument, der minder om en forrentet erhvervsobligation. Køber af PECs bliver dermed reelt långiver til udstederen af PECs. De betalte renter anses af skattemyndighederne i visse lande som udbytte for ejeren af PECs (långiveren). Forskellen mellem aktier og PECs er bl.a., at aktionæren har sikkerhed i virksomheden og ejer en andel af virksomheden (egenkapitalen), mens PECs-ejeren har en sikkerhed som kreditor (i et tilgodehavende) i selskabet. PECs giver endvidere ikke stemmerettigheder.

*3.2.1. Den 21. december 2005 - udstedelse af PECs (afsnit a) og kapitaludvidelser (afsnit b)*

*3.2.1.a. Udstedelse af PECs*

Der udstedes PECs første gang den 21. december 2005 med en samlet værdi på i alt EUR 822.532.075 (ca. DKK 6,1 mia.).

PECs købes den 21. december 2005 af de 5 involverede kapitalfonde som långivere:

• Apax Partners Worldwide LLP (Guernsey, Channel Island)
• The Blackstone Group International Limited (Cayman Island)
• Providence Equity Partners Limited (Cayman Island)
• Kohlberg Kravis Roberts & Co. L.P. (Canada)
• Permira Advisers KB. (Guernsey og Tyskland)

Af »Subscription and Shareholders Agreement« (aktionæroverenskomsten) af den 7. december 2005 fremgår, at PEC-ejere ikke kan købe flere PECs, end hvad der svarer til deres ejerandel af selskabet. Alligevel er det de indirekte ejere af Nordic Telephone

Company Investement ApS, der altså køber de PECs, der udstedes den 21. december 2005.

Betingelserne for PECs findes i en del af lånedokumentet til PECs (»Exhibit A, PEC Terms«).

Det fremgår af lånedokumentet, at hver PEC har en nominel værdi på EUR 25, og at renten, »yield«, på PECs udgør nominelt 10 % p.a., der beregnes dag til dag (hermed skal der beregnes renters rente).

Det kan imidlertid af modtagne kontoudtog fra Nordic Telephone Company Investment konstateres, at renten beregnes af lånets hovedstol - uden de akkumulerede rentetilskrivninger, hvorfor der ikke er beregnet renters rente.

PEC-udsteder bestemmer, hvornår de vil betale renter og afdrag. En evt. betaling af renter vil ske ved betaling af de renter, der først er påløbet (en form for FIFO-princip). Renter og lån forfalder dog til betaling senest i 2054.

*3.2.1.b. Kapitaludvidelser*

…

*Kapitaludvidelser af selskaberne i Luxembourg:*

•   Apax WW Nominees Ltd. foretager en kapitaludvidelse i Angel Lux I S.à.r.l. med EUR 372.400 (ca. DKK 2,8 mio.).
•   Blackstone selskaberne foretager en kapitaludvidelse i Angel Lux II S.à.r.l. med EUR 451.125 (ca. DKK 3,4 mio.).
•   Providence Equity Offshore Partners V LP foretager en kapitaludvidelse i Angel Lux III S.à.r.l. med EUR 392.075 (ca. DKK 2,9 mio.).

   **3218**

•   KKR Millennium Fund (Overseas) Limited Partnership foretager en kapitaludvidelse i Angel Lux IV S.à.r.l. med EUR 420.600 (ca. DKK 3,1 mio.).
•   Permira selskaberne og Schroder Ventures Investments Limited foretager en kapitaludvidelse i Kabler S.à.r.l. med EUR 408.100 (den 20. december 2005) (ca. DKK 3 mio.).

*Kapitaludvidelser af selskaberne i Danmark:*

De fem selskaber i Luxembourg foretager en kapitaludvidelse den 21. december 2005 i Nordic Telephone Company Investment ApS med DKK 1.533.509.400 (ca. EUR 205,6 mio.).

Efterfølgende foretages der kapitalforhøjelser ned igennem den danske del af koncernen:

•   Nordic Telephone Company Investment ApS foretager en kapitaludvidelse i Nordic Telephone Company Administration ApS den 21. december 2005 med DKK 7.667.542.352 (ca. EUR 1 mia.).
•   Nordic Telephone Company Administration ApS foretager en kapitaludvidelse i Nordic Telephone Company Finance ApS den 21. december 2005 med DKK 7.667.542.352.
•   Nordic Telephone Company Finance ApS foretager en kapitaludvidelse i Nordic Telephone Company Holding ApS den 21. december 2005 med DKK 7.667.542.352.
•   Nordic Telephone Company Holding ApS foretager en kapitaludvidelse i Nordic Telephone Company ApS den 30. december 2005 med DKK 7.667.542.352 (hvilket dog allerede foregår den 30. november 2005).

*3.2.2. Den 25. januar 2006 - udstedelse af PECs (afsnit a) og kapitaludvidelser (afsnit b)*

*3.2.2.a. Udstedelse af PECs*

Der udstedes anden gang PECs af Nordic Telephone Company Investment ApS den 25. januar 2006. Dette sker med en samlet værdi på EUR 1.011.370.475 (ca. DKK 7,5 mio.).

Samlet er der herefter udstedt PECs for EUR 1.833.902.550 (ca. DKK 13,7 mio.).

Anden pulje PECs købes den 25. januar 2006 af følgende kapitalfonde og banker.:

•   Apax Partners Worldwide LLP (Guernsey, Channel Island)
•   The Blackstone Group International Limited (Cayman Island)
•   Providence Equity Partners Limited (Cayman Island)
•   Kohlberg Kravis Roberts & Co. L.P. (Canada)
•   Permira Advisers KB. (Guernsey og Tyskland)
•   Deutsche Bank
•   Credit Suisse
•   Barclays
•   JP Morgan
•   RBS

*3.2.2.b. Kapitaludvidelser*

…

*Kapitaludvidelser af selskaberne i Luxembourg:*

•   Apax WW Nominees Ltd. og Apax Angel Syndication Partners (Cayman) foretager en kapitaludvidelse i Angel Lux I S.à.r.l. med henholdsvis EUR 264.400 og EUR 85.225. Samlet EUR 349.625 (ca. DKK 2,6 mio.).
•   Blackstone selskaberne foretager en kapitaludvidelse i Angel Lux II S.à.r.l. med EUR 626.350 (ca. DKK 4,7 mio.).
•   Providence Equity Offshore Partners V LP og 3 andre Providenceselskaber foretager en kapitaludvidelse i Angel Lux III S.à.r.l. med EUR 418.800 (ca. DKK 3,1 mio.).
•   KKR Millennium Fund (Overseas) Limited Partnership samt 2 andre KKR selskaber foretager en kapitaludvidelse i Angel Lux IV S.à.r.l. med EUR 479.150 (ca. DKK 3,6 mio.).
•   Permira selskaberne og Schroder Ventures Investments Limited foretager en kapitaludvidelse i Kabler S.à.r.l. med EUR 470.675 (ca. DKK 3,5 mio.) (den 24. januar 2006).

*Kapitaludvidelser af selskaberne i Danmark:*

De fem selskaber i Luxembourg foretager en kapitaludvidelse den 25. januar 2006 i Nordic Telephone Company Investment ApS med DKK 1.748.584.013 (ca. EUR 234 mio.).

Følgende banker foretager en kapitaludvidelse i Nordic Telephone Company Investment ApS den 25. januar 2006 med DKK 137.645.044 (ca. EUR 18,4 mio.) og bliver hermed også anpartshavere:

•   Deutsche Bank AG, London
•   Credit Suisse International, London
•   Barcleys Capital PLC, London
•   J. P. Morgan Securities LTD., London
•   J. P. Morgan Whitefriars Inc., London
•   The Royal Bank og Scotland plc., London

Samlet sker der en kapitalforhøjelse i Nordic Telephone Company Investment ApS på DKK 1.886.229.057 (ca. EUR 252,8 mio.).

Efterfølgende foretages der kapitalforhøjelser ned igennem den danske del af koncernen:

•   Nordic Telephone Company Investment ApS foretager en kapitaludvidelse i Nordic Telephone Company Administration ApS med DKK 9.433.706.258 (ca. EUR 1,3 mia.).
•   Nordic Telephone Company Administration ApS foretager en kapitaludvidelse i Nordic Telephone Company Finance ApS med DKK 9.433.831.258 (ca. EUR 1,3 mia.).
•   Nordic Telephone Company Finance ApS foretager en kapitaludvidelse i Nordic Telephone Company

   **3219**

   Holding ApS med DKK 10.990.784.249 (ca. EUR 1,5 mia.) den 30. januar 2006.
•   Nordic Telephone Company Holding ApS foretager en kapitaludvidelse i Nordic Telephone Company ApS med DKK

U.2023.3198H

189.957.143 (ca. EUR 25,5 mio.) den 13. januar 2006 og DKK 59.025.461.110 (ca. EUR 7,9 mia.) den 30. januar 2006.

*3.3. Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l.*
*3.3.1. Stiftelse*

Angel Lux Common S.à.r.l., der er hjemmehørende i Luxembourg, stiftes den 25. april 2006 af de tidligere stiftede 5 selskaber i Luxembourg:

• Angel Lux I S.à.r.l.
• Angel Lux II S.à.r.l.
• Angel Lux III S.à.r.l.
• Angel Lux IV S.à.r.l.
• Kabler S.à.r.l.

Angel Lux Parent S.à.r.l., ligeledes hjemmehørende i Luxembourg, stiftes den 26. april 2006. Stiftelsen foretages af en række af selskaber m.m., som har relation til primært de fem kapitalfonde.

De 5 selskaber - Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. og Kabler S.à.r.l. - ejede Angel Lux Common S.à.r.l. fra dette selskabs stiftelse den 25. april 2006 indtil den 20. december 2007. Pr. sidstnævnte dato likvideres de 5 selskaber, således at Angel Lux Parent S.à.r.l. herefter ejer Angel Lux Common S.à.r.l.

Den 27. og 28. april 2006 sker følgende aktieombytninger:

• Alle anparter i Nordic Telephone Company Investment ApS overdrages til Angel Lux Common S.à.r.l.
• De fem selskaber i Luxembourg får alle ejerandele i Angel Lux Common S.à.r.l.
• Anparterne i de fem selskaber i Luxembourg overdrages til Angel Lux Parent S.à.r.l.
• Kapitalfondene og bankerne får alle ejerandele i Angel Lux Parent S.à.r.l.

…[Der henvises til oversigten indsat under afsnittet om Supplerende oplysninger om koncernen og lånene.]

*3.3.2. Overdragelse af PECs*

Den 27. april 2006 overdrages alle PECs fra de 5 kapitalfonde m.v. til Angel Lux Parent S.à.r.l., der samme dag overdrager dem til Angel Lux Common S.à.r.l.

Angel Lux Common S.à.r.l. er pr. den 27. april 2006 eneejer af alle PECs. Anskaffelsessummen er lig med hovedstolen uden vedhængende renter den 27. april 2006.

Hverken de 5 kapitalfonde eller Angel Lux Parent S.à.r.l. modtager effektiv betaling ved overdragelse af PECs. Betalingen sker ved, at der etableres et gældsforhold mellem i første række de 5 kapitalfonde m.v. og Angel Lux Parent S.à.r.l. og i anden række mellem Angel Lux Parent S.à.r.l. og Angel Lux Common S.à.r.l.

Angel Lux Common S.à.r.l. har fra den 27. april 2006 en gæld til Angel Lux Parent S.à.r.l. på samme beløb som Nordic Telephone Company Investment ApS har til Angel Lux Common S.à.r.l.

Ligeledes har Angel Lux Parent S.à.r.l. en gæld til kapitalfondene m.v. på samme beløb som Angel Lux Common S.à.r.l. har til Angel Lux Parent S.à.r.l.

Hovedstolen den 27. april 2006 udgør: EUR 1.833.902.550 (ca. DKK 13,7 mia.).

*3.4. Nedbringelse af gæld samt betaling af renter*

SKAT har modtaget en oversigt (»PEC status 31-12-2006«) fra Nordic Telephone Company Investment ApS. Heraf fremgår det, at selskabet den 6. oktober 2006 betaler et rentebeløb på EUR 55.872.414 (ca. DKK 416 mio.) samt nedbringer hovedstolen med EUR 39.427.325 (ca. DKK 294 mio.), svarende til i alt EUR 95.299.739 (ca. DKK 710 mio.).

Ud fra kontoudtog modtaget af Nordic Telephone Company Investment ApS fremgår betalingen af renter og afdrag [note udeladt] med følgende beløb:

| Dato | Beskrivelse | EUR | DKK |
|---|---|---|---|
| 06.10.2006 | Betalinger | 75.513.322 | ca. 563 mio. |
| 09.10.2006 | Betalinger | 18.407.300 | ca. 137 mio. |
| 10.11.2006 | Betalinger | 1.129.746 | ca. 8 mio. |
| | Tilgodehavende hos en PEC-ejer | 250.371 | ca. 2 mio. |
| | | 95.299.739 | ca. 710 mio. |

Betalingen sker efter følgende betalingssteps:
*Første step - TDC A/S udlodder udbytte*

Den 11. april 2006 udlodder TDC A/S et udbytte på DKK 43.481 mio. (ca. EUR 5,8 mia.)

Desuden udlodder TDC A/S den 29. juni 2006 ekstraordinært et udbytte på

DKK 862 mio. (ca. EUR 115 mio.) Af disse to udbytter udloddes samlet ca.

DKK 5 mia. (EUR 670 mio.) til mindretalsaktionærer.

Nordic Telephone Company ApS sender den 11. april 2006 deres udbytte fra TDC A/S videre til Nordic Telephone Company Holding ApS, DKK 39.533.903.000 (ca. EUR 5,3 mia.).

Nordic Telephone Company Holding ApS har optaget et eksternt lån - seniorfacility - i forbindelse med købet af TDC A/S. Nordic Telephone Company Holding ApS bruger det modtagne udbytte til at indfri seniorfacility-lånet. Men for at TDC A/S i første omgang overhovedet

**3220**

kan udlodde udbytte er de nødt til at optage et lån. De overtager derfor seniorfacility-lånet. Udlodning, gældsindfrielse og gældsovertagelse sker i sammenhæng.

*Andet step - Nordic Telephone Company Holding ApS udlodder udbytte*

Den 18. april 2006 udlodder Nordic Telephone Company Holding ApS udbytte til Nordic Telephone Company Finance ApS på DKK 2.363.867.000 (ca. EUR 316 mio.).

Nordic Telephone Company Finance ApS har ligeledes haft optaget et eksternt lån - PIK-lån [note udeladt] - i forbindelse med købet af TDC A/S. Nordic Telephone Company Finance ApS bruger det modtagne udbytte til at indfri PIKlånet.

*Tredje step - Nordic Telephone Company Finance ApS yder lån*

Den 4. oktober 2006 optager Nordic Telephone Company Finance ApS et nyt lån på EUR 95.800.000 (ca. DKK 718,5 mio.).

Nordic Telephone Company Finance ApS yder herefter et lån til Nordic Telephone Company Administration ApS på DKK 731.089.000 (ca. EUR 98 mio.).

*Fjerde step - Nordic Telephone Company Administration ApS udlodder udbytte*

Den 6. oktober 2006 bruger Nordic Telephone Company Administration ApS deres lån fra Nordic Telephone Company Finance ApS til at udlodde udbytte på DKK 712.851.000 (EUR 95,6 mio.) til Nordic Telephone Company Investment ApS.

*Femte step - Nordic Telephone Company Investment ApS betaler renter og afdrag*

Nordic Telephone Company Investment ApS bruger deres modtagne udbytte til at betale renter og afdrag på PECs, henholdsvis den 6. og 9. oktober 2006 og den 10. november 2006.

Det fremgår som nævnt af kontoudtoget, at Nordic Telephone Company Investment ApS i alt betaler EUR 95.299.739 (ca. DKK 710 mio.). Det fremgår af »PEC status 31-12-2006« fra selskabet,

at der betales EUR 55.872.414 (ca. DKK 416 mio.) i renter og EUR 39.427.325 (ca. DKK 294 mio.) i afdrag til de forskellige selskaber og banker i koncernen.

Heraf betaler de renter/afdrag på EUR 606.857 (ca. DKK 4,5 mio.) til Angel Lux Common S.à.r.l. og EUR 398.510 (ca. DKK 2,9 mio.) til Angel Lux Parent S.à.r.l.

Alle øvrige betalinger sker direkte til kapitalfonde og banker og omfatter både renter og afdrag.

Der sker efter betalingen en reduktion af gældsforholdet alle selskaber imellem med EUR 39.427.325 (ca. DKK 294 mio.). Reduktionen sker mellem Nordic Telephone Company Investment ApS og Angel Lux Common S.à.r.l., samt mellem Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l., og endelig mellem Angel Lux Parent S.à.r.l. i forhold til kapitalfondene og bankerne.

…

Nordic Telephone Company Investment ApS har i et brev af 20. april 2010 redegjort for pengestrømmene omkring PEC, herunder, at selskabet den 19. juni 2007 har betalt EUR 502.439 til PEC-ejere, men af årsregnskabet for 2007 for Angel Lux Common S.à.r.l., fremgår det, at Angel Lux Common S.à.r.l. kun har modtaget EUR 501.129 i 2007. Differencen er ikke oplyst overfor SKAT. Det fremgår ikke af regnskaberne for Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l., om beløbet på EUR 501.129 er viderebetalt til Angel Lux Parent S.à.r.l.

*3.5. Udstedelse af PECs i december 2006*

Den 7. december 2006 foretages der en mindre kapitaludvidelse af Angel Lux Parent S.à.r.l. med EUR 800. Udvidelsen foretages af HD Invest, Virum ApS …

Den 22. december 2006 udsteder Nordic Telephone Company Investment ApS desuden PECs til Angel Lux Common S.à.r.l.

Angel Lux Common S.à.r.l. får tilsvarende en forøgelse af deres gæld til Angel Lux Parent S.à.r.l.

Angel Lux Parent S.à.r.l. får ligeledes en forøgelse af deres gæld, hvor HD Invest, Virum ApS kommer ind som anpartshaver og PECs ejer med DKK 318.625 den 22. december 2006. Selve betalingen for PECs udvidelse sker i marts 2007.

*3.6. Status den 31. december 2006*

Den 31. december 2006 har Nordic Telephone Company Investment ApS en restgæld på PECs til Angel Lux Common S.à.r.l. på EUR 1.917.212.261 (ca. DKK 14,3 mia.).

Angel Lux Common S.à.r.l. har den 31. december 2006 en restgæld på PECs til Angel Lux Parent S.à.r.l. på EUR 1.917.445.886 (ca. DKK 14,3 mia.).

Angel Lux Parent S.à.r.l. har den 31. december 2006 en restgæld på PECs til kapitalfondene og bankerne på EUR 1.917.853.096 (ca. DKK 14,3 mia.).

Nordic Telephone Management Holding ApS stiftes den 20. december 2006 og kommer ind som anpartshaver i Nordic Telephone Company Investment ApS den 22. december 2006.

Nordic Telephone Management Holding ApS er primært ejet af Angel Lux Common S.à.r.l. med 81,3% og resten af ledende medarbejdere.

…

*4. Rentetilskrivningerne på PECs fra den 21. december 2005 til den 10. juli 2008*

*4.1. Indkomståret 2006:*

Nordic Telephone Company Investment ApS har for indkomståret 2006, på grund af forskudt regnskabsår, fratrukket følgende renteudgifter af PECs:

**3221**

|  | EUR | DKK |
| --- | --- | --- |
| 21. december 2005 - 31.december 2005 | 2.478.864 | 18.516.053 |
| 1. januar 2006 - 31. december 2006 | 175.811.961 | 1.329.208.093 |
| I alt fratrukket skattemæssigt | 178.290.825 | 1.347.724.146 |

Nordic Telephone Company Investment ApS betalte den 6. oktober 2006 renter på PECs, jf. ovenfor afsnit 3.4. Hovedstolen er således pr. 31. december 2006 forøget med følgende renter:

|  | EUR | DKK |
| --- | --- | --- |
| Samlede renteudgifter 21. december 2005 - 31. december 2006 | 178.290.825 | 1.347.724.146 |
| Betalte renter den 6. oktober 2006 | -55.872.414 | -416.462.940 |
| Akkumulerede renteudgifter 31. december 2006 | 122.418.411 | 931.261.206 |

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har indtægtsført følgende renteindtægter i 2006: Beløb i EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
| --- | --- | --- |
| Akkumulerede renteindtægter 31. december 2006 | 122.418.411 | 122.076.311 |
| Renteindtægter modtaget 6. oktober 2006 | 1.760.727 | 1.729.595 |
| I alt indtægtsført | 124.180.447 | 123.805.906 |

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har udgiftsført følgende renteudgifter i 2006: Beløb i EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
| --- | --- | --- |
| Akkumulerede renteudgifter 31. december 2006 | 122.076.311 | 122.101.996 |
| Betalte renteudgifter 6. oktober 2006 | 1.729.595 | 1.712.610 |

I alt udgiftsført          123.805.906      123.814.606

Angel Lux Parent S.à.r.l. har for 2006 indtægtsført de renteudgifter, som Angel Lux Common S.à.r.l. fratrækker for PECs.

Der er tale om tre forskellige låneforhold, der illustreres nedenfor for 2006: (Beløb i EUR):

| GÆLD | Investment | TILGODE | Common |
|---|---|---|---|
| Hovedstol | 1.833.902.550 | Hovedstol | 1.833.902.550 |
| Indfrielse | (39.427.325) | Indfrielse | (39.427.325) |
| Forøgelse | 318.625 | Forøgelse | 318.625 |
| Sum | 1.794.793.850 | Sum | 1.794.793.850 |
| Renter 10% | 122.418.411 | Renter 10% | 122.419.720 |
| Ultimo | 1.917.212.261 | Ultimo | 1.917.213.570 |

| GÆLD | | TILGODE | Parent |
|---|---|---|---|
| Hovedstol | 1.833.902.550 | Hovedstol | 1.833.902.550 |
| Indfrielse | (38.851.600) | Indfrielse | (38.851.600) |
| Forøgelse | 318.625 | Forøgelse | 318.625 |
| Sum | 1.795.369.575 | Sum | 1.795.369.575 |
| Renter | 122.076.311 | Renter | 122.076.311 |
| | 9,96875% | | 9,96875% |
| Ultimo | 1.917.445.886 | Ultimo | 1.917.445.886 |

| GÆLD | |
|---|---|
| Hovedstol | 1.833.902.550 |
| Indfrielse | (38.470.075) |
| Forøgelse | 318.625 |
| Sum | 1.795.751.100 |
| Renter | 122.101.996 |
| | 9,96875% |
| Ultimo | 1.917.853.096 |

Det fremgår af skemaet ovenfor, at hovedstolen primo 2006 er af samme størrelse, og at gælden ultimo 2006 er af næsten samme størrelse hos de tre selskaber.

Det fremgår desuden, at gældsnedbringelsen på EUR 39.427.325 (ca. DKK 294 mio.), jf. ovenfor afsnit 3.4. kan følges fra Nordic Telephone Company Investment

**3222**

ApS til Angel Lux Common S.à.r.l, men gælden fra Angel Lux Common S.à.r.l. til Angel Lux Parent S.à.r.l. er kun reduceret med EUR 38.851.600.

Gælden fra Angel Lux Parent S.à.r.l. til PEC-ejerne hos kapitalfondene og bankerne er kun reduceret med EUR 38.470.075.

SKAT er ikke bekendt med årsagen til forskellene i gældsnedbringelserne.

Videre fremgår det, at renten er 10 % p.a. i Nordic Telephone Company Investment ApS, mens den er 9,96875% p.a. i både Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l.

Angel Lux Parent S.à.r.l.'s gæld pr. 31. december 2006 til PEC-ejerne er sammensat således:

Beløb i EUR

| | Hovedstol | Skyldige renter | Gæld i alt 31.12.2006 |
|---|---|---|---|
| Apax | 282.989.375 | 19.241.847 | 302.231.222 |
| Blackstone | 421.854.900 | 28.684.000 | 450.538.900 |
| KKR | 352.262.200 | 23.952.049 | 376.214.249 |
| Permira | 348.946.375 | 23.726.589 | 372.672.964 |
| Providence | 317.467.075 | 21.586.156 | 339.053.231 |
| Deutsche Bank, London Branch | 23.475.125 | 1.596.190 | 25.071.315 |
| Crédit Suisse Securities Europe Limited | 16.252.000 | 1.105.054 | 17.357.054 |
| JP Morgan Whitefriars Inc | 3.524.500 | 239.648 | 3.764.148 |
| JP Morgan Securities Limited | 7.310.200 | 497.057 | 7.807.257 |
| Barclays Capital Princ. Invest. Limited | 10.834.675 | 736.703 | 11.571.378 |
| RBSM Invest. Limited | 10.834.675 | 736.703 | 11.571.378 |
| *TOTAL* | *1.795.751.100* | *122.101.996* | *1.917.853.096* |

Copyright © 2023 Karnov Group Denmark A/S

*4.2. Indkomståret 2007:*

For indkomståret 2007 har Nordic Telephone Company Investment ApS skattemæssigt fratrukket følgende renteudgifter af PECs:

|  | EUR | DKK |
|---|---|---|
| Akkumulerede renteudgifter 31. december 2007 | 191.218.786 | |
| Betalte renter den 19. juni 2007 | 502.439 | |
| I alt udgiftsført | 191.721.225 | 1.410.657.397 |

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har indtægtsført følgende renteindtægter i 2007:
Beløb i EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| Akkumulerede renteindtægter 31. december 2007 | 191.218.788 | 191.145.387 |
| Betalte renter i 2007 | 501.129 | |

| GÆLD | In vest ment | TILGODE | Common |
|---|---|---|---|
| Hovedstol | 1.917.212.261 | Hovedstol | 1.917.213.570[1] |
| Betaling | -502.439[2] | Betaling | -501.129 |
| Renter 10% | 191.721.225 | Renter 10% | 191.719.917 |
| Ultimo | 2.108.432.O47 | Ultimo | 2.108.432.358 |
| GÆLD | | TILGODE | Parent |
| Hovedstol | 1.917.445.886 | Hovedstol | L917.445.886 |
| Renter 9,96875% | 191.145.387 | Renter 9,96875% | 191.145.387 3223 |
| Ultimo | 2.108.591.273 | Ultimo | 2.108,591.273 |
| | | GÆLD | |
| | | Hovedstol | 1.917.853.096 |
| | | Renter 9,96875% | 191.164.588 |
| | | Ultimo | 2.109.017.684 |

I alt indtægtsført          191.719.917      191.145.387

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har udgiftsført følgende renteudgifter i 2007:
Beløb i EUR

|  | Angel Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| Akkumulerede renteudgifter 31. december 2007 | 191.145.387 | 191.164.588 |

Angel Lux Parent S.à.r.l. har for 2007 indtægtsført de renteudgifter, som Angel Lux Common S.à.r.l. fratrækker for PECs.

Bilag 9 indeholder en tabel med rentetilskrivningerne vedrørende PECs for indkomståret 2007 i de tre nævnte selskaber. Tabellen er baseret på ca. tal i EUR vedrørende Nordic Telephone Company Investment ApS, idet SKAT kun er i besiddelse af de præcise rentetilskrivninger fra dette selskab i danske kroner.

*BILAG 9 Rentetilskrivning indkomståret 2007 (beløb i EUR)*

*4.3. Indkomståret 2008:*

For indkomståret 2008 har Nordic Telephone Company Investment ApS skattemæssigt fratrukket følgende renteudgifter af PECs:

|  | EUR | DKK |
|---|---|---|
| Akkumulerede renteudgifter 1. januar 2008 - 10. juli 2008 | 107.725.849 | |
| Betalte renter den 27. juni 2008 | 2.880.370 | |
| I alt udgiftsført | 110.606.219 | 824.768.741 |

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har indtægtsført følgende renteindtægter i 2008:
Beløb i EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| 1. januar 2008 - 10. juli 2008 | 107.149.774 | |
| 1. januar 2008 - 31. december 2008 | | 210.515.257 |

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har udgiftsført følgende renteudgifter i 2008:
Beløb i EUR

|  | Angel Lux Common S.à.r.l. | Angel Lux Parent S.à.r.l. |
|---|---|---|
| 1. januar 2008 - 31. december 2008 | 210.515.257 | 210.221.308 |

Angel Lux Parent S.à.r.l. har for 2008 indtægtsført de renteudgifter, som Angel Lux Common S.à.r.l. fratrækker for PECs.

Bilag 10 indeholder en tabel med rentetilskrivningerne vedrørende PECs for indkomståret 2007 i de tre nævnte selskaber.

*BILAG 10 Rentetilskrivning indkomståret 2008 (beløb i EUR)*

| GÆLD | Investment | TILGODE | Common | | |
|---|---|---|---|---|---|
| Hovedstol | 2.108.431,047 | Hovedstol | 2.108.432,358 | | |
| Renter 10% | 110.606.219 | Renter 10% | 107.149,774 | | |
| Ultimo | INGEN[3] | Ultimo | INGEN | | |
| | | GÆLD | | | Parent |
| | | Hovedstol | 2.108.591.273 | TILGODE | 2.108.591.273 |
| | | Renter 9,96875% | 210.515.257 | Hovedstol Renter 9,96875% | 210.515.257 |
| | | Ultimo | 2.319,106.530 | Ultimo | 2,319.106.530 |
| | | | GÆLD | | |
| | | | Hovedstol | 2.109.017.684 | |
| | | | Renter 9,96875% | 210.221.30 | |
| | | | Ultimo | 2.319.258.992 | |

Det fremgår af tabellen, at renteudgifterne, som Nordic Telephone Company Investment ApS fratrækker i indkomståret 2008, er væsentligt reduceret i forhold til de 2 foregående indkomstår. Dette skyldes, at restgælden samt de ikke-betalte tilskrevne renter bliver konverteret til yderligere anpartskapital i Nordic Telephone Company Investment ApS den 10. juli 2008.

Renten er fortsat 10 % p.a. fra Nordic Telephone Company Investment ApS til Angel Lux Common S.à.r.l. indtil gældskonverteringen den 10. juli 2008.

Forrentningen mellem Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. er indtil den 9. juli 2008 9,96875% p.a., og samme procent er gældende videre fra Angel Lux Parent S.à.r.l. Det fremgår af årsregnskabet for Angel Lux Common S.à.r.l. for indkomståret 2009, at forrentningen af PECs mellem Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. bliver ændret den 9. juli 2008 fra 9,96875% p.a. til 10 % p.a. Forrentningen af PECs fra Angel Lux Parent S.à.r.l. til kapitalfondene og bankerne er forsat uændret 9,96875% p.a.

Regnskabet for 2009 for Angel Lux Parent S.à.r.l. er endnu ikke tilgængeligt, hvorfor SKAT ikke har kunnet konkludere, om der ligeledes sker en gældskonvertering her.

*5. Aktivitet i Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l.*

Angel Lux Parent S.à.r.l. og Angel Lux Common S.à.r.l. i Luxembourg har, ud fra hvad der fremgår af

**3224**

årsregnskaberne for indkomståret 2006-2008, en minimal fysisk tilstedeværelse i Luxembourg.

Af regnskabet for Angel Lux Common S.à.r.l. for 2006 fremgår det således på side 4, at der er udgifter på 8.701 EUR, som benævnes Other external charges samt udgifter på EUR 209.349 der er benævnt som Other operating charges. Disse er specificeret i bilag 4 (Annexe 4) (se tabel nedenfor).

Af regnskabet for Angel Lux Parent S.à.r.l. for 2006 fremgår det ligeledes på side 4, at der er udgifter på 3.337 EUR, som benævnes Other external charges, samt udgifter på EUR 127.031 der er benævnt som Other operating charges. Disse er specificeret i bilag 4 (Annexe 4) (se tabel nedenfor).

*Angel Lux Common S.à.r.l.*

| | |
|---|---|
| *Autres charges externes (Andre eksterne udgifter)* | *8.701* |
| Rémunération personnel *(løn)* | 7.810 |
| Cotisation sécurité sociale *(Sociale sikkerheds bidrag)* | 891 |
| *Autres charges opérationnelles (Andre driftsomkostninger)* | *209.349* |
| Loyers et charges locatives *(Leje og lokaleudgifter)* | 3.253 |
| Dépenses téléphone *(Telefonudgifter)* | 300 |
| Honoraires notaire *(Notar)* | 7.030 |
| Frais légaux *(Advokathonorar)* | 174.579 |
| Frais de comptabilité *(regnskabsomkostninger)* | 5.000 |
| Frais d'audit *(Revisionsomkostninger)* | 10.000 |
| Frais fiscaux *(omkostninger skat)* | 6.000 |
| Autres frais de personnel *(Andre personaleomkostninger)* | 1.324 |
| Secrétariat social *(løn)* | 424 |
| Voyage et subsistance *(Rejse og opholdsudgifter)* | 644 |

U.2023.3198H

| | |
|---|---|
| Dépenses fournitures *(Forsyningsudgifter)* | 511 |
| Autres frais de personnel *(Andre personaleomkostninger)* | 284 |
| SKATs oversættelse | |

*Angel Lux Parent S.à.r.l.*

| | |
|---|---|
| Autres charges externes *(Andre eksterne udgifter)* | 3.337 |
| Rémunération *(løn)* | 2.996 |
| Charges sociales *(Sociale sikkerheds bidrag)* | 341 |
| Autres charges opérationnelles *(Andre driftsomkostninger)* | 127.031 |
| Loyers et charges locatives *(Leje og lokaleudgifter)* | 3.253 |
| Honoraires notaire *(Notar)* | 58.250 |
| Frais légaux *(Advokathonorar)* | 43.170 |
| Frais de comptabilité *(regnskabsomkostninger)* | 5.000 |
| Frais d'audit *(Revisionsomkostninger)* | 10.000 |
| Frais fiscaux *(omkostninger skat)* | 6.000 |
| Secrétariat social *(løn)* | 324 |
| Voyage *(Rejse)* | 820 |
| Autres frais de personnel *(Andre personaleomkostninger)* | 214 |
| SKATs oversættelse | |

Af regnskaberne for Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. fremgår det således, at der betales beskedne udgifter til eventuelle ansatte og til indretning/leje af lokaler.

Indkomståret 2006 er første indkomstår for selskaberne i Luxembourg, hvormed dette kan være med til at forklare den store udgift til advokat og notar.

SKAT har efterspurgt dokumentation for udgiftsposterne hos både Nordic Telephone Company Investment ApS og myndighederne i Luxembourg i form af lejekontrakt, ansættelseskontrakter samt indregistrering i Luxembourg som arbejdsgiver. Desuden har SKAT anmodet myndighederne i Luxembourg om specifikation af omkostningerne til advokat samt notar. Materialet er ikke modtaget.

Selskaberne Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. får ikke tilført yderligere likviditet bortset fra de enkeltstående beløb de modtager fra Nordic Telephone Company Investment ApS den 6. oktober 2006 på henholdsvis 606.857 EUR og 398.510 EUR i forbindelse med betalingen af renter og afdrag, jf. ovenfor afsnit 3.4. I afsnit 4 ovenfor er beskrevet, at Nordic Telephone Company Investment ApS den 19. juni og den 27. juni 2008 betaler renteudgifter til PEC-ejerne på henholdsvis EUR 502. 439 og EUR 2.880.370. Derudover har selskaberne resterende likvider fra deres stiftelse, som kan dække underskuddene i selskaberne.

Ud fra regnskaberne kan det lægges til grund, Angel Lux Common S.à.r.l.'s eneste aktiv, ud over datterselskabsaktierne, er fordringen på PECs hos Nordic Telephone Company Investment ApS.

Myndighederne i Luxembourg har informeret SKAT om, at Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. er fuldt skattepligtige til Luxembourg.

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. har registreret hjemsted på adressen Boulevard de Prince Henri 41. SKAT har undersøgt adressen nærmere. Tilsyneladende anvendes adressen som kontorhotel. Der er ganske vist en bygning med kontorer, men

en søgning via google viser, at dette er adressen på flere forskellige (store som små) selskaber.

Adressen bliver også anvendt af selskaber, med direkte tilknytning til den ene af de 5 store kapitalfonde (Apax).

*6. Øvrige strukturændringer*

*6.1. De fem mellemliggende selskaber i Luxembourg*

Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. og Kabler S.à.r.l. likvideres alle den 20. december 2007.

**3225**

…

*6.2. Gældskonverteringen hos Nordic Telephone Company Investment ApS og Angel Lux Common S.à.r.l.*

Den 10. juli 2008 sker der en gældskonvertering hos Nordic Telephone Company Investment ApS af PECs af den resterende hovedstol samt akkumulerede renter.

Ejerstrukturen pr. 31. december 2008 er uændret fra ejerstrukturen 31. december 2007 …

Det fremgår af regnskaberne for Angel Lux Common S.à.r.l., at der sker en gældskonvertering i Angel Lux Common S.à.r.l. den 18. december 2009.

Regnskabet for 2009 for Angel Lux Parent S.à.r.l. er som nævnt endnu ikke tilgængeligt, hvorfor SKAT ikke har kunnet se ud af regnskabet, om der ligeledes sker en gældskonvertering her.

*6.3. Fusioner i danske selskaber i 2009*

I december 2009 vedtages følgende fusioner med tilbagevirkende kraft til 1. januar 2009:

• TDC A/S og Nordic Telephone Company ApS (med TDC A/S som det fortsættende selskab).

• Nordic Telephone Company Investment ApS, Nordic Telephone Company Administration ApS, Nordic Telephone Company Finance ApS og Nordic Telephone Company Holding ApS (med Nordic Telephone Company Administration ApS som det fortsættende selskab).

Den 18. december 2009 vedtages en aktieombytning, således at Angel Lux Parent S.à.r.l. overtager aktiebesiddelsen i Nordic Telephone Management Holding ApS fra Angel Lux Common S.à.r.l. …

*6.4. Udbytte i 2009 til kapitalfondene m.m.*

Den 22. april 2010 oplyste finansdirektøren i TDC A/S til pressen (Computer-world), at de schweiziske konkurrencemyndigheder ikke ville godkende TDC A/S' salg af en del af det schweiziske datterselskab, Sunrise. Et salg, som umiddelbart ville indbringe TDC A/S DKK 11 mia. I den forbindelse oplyser finansdirektøren, at koncernen ikke fortryder udbetalingen af DKK 6 mia. til aktionærerne.

Ved en pressemeddelelse fra den 17. december 2009 meddelte koncernen, at salget af Sunrice indbringer TDC A/S godt DKK 11 mia., hvorfor det er vedtaget at foretage en fremrykket udbyttebetaling på DKK 6 mia. til selskabets aktionærer i 2009.

Da 87,9 % af aktiekapitalen i TDC A/S er ejet af Angel Lux Common S.à.r.l., vil den største del af det ekstraordinære udbytte på DKK 6 mia. være kanaliseret via Angel Lux Common S.à.r.l.

Af årsregnskabet for Angel Lux Parent S.à.r.l. for indkomståret 2009 er oplyst, at selskabets gæld til Angel Lux Parent S.à.r.l. er konverteret til yderligere »anpartskapital« den 18. december 2009,

men udbyttet fra TDC A/S er ikke medregnet i årsregnskabet for Angel Lux Common S.à.r.l.

Udbytteandelen, som Angel Lux Common S.à.r.l. ses derfor være videreført til kapitalfondene. Det skal dog bemærkes, at SKAT ikke på nuværende tidspunkt er i besiddelse af årsregnskabet for Angel Lux Parent S.à.r.l. for indkomståret 2009, men i artiklen, hvor finansdirektøren i TDC A/S udtaler sig, er der ikke en tilbagevisning af, at udbyttet er endt hos kapitalfondene.

SKAT vil på et senere tidspunkt undersøge, om der i forbindelse med udbetalingen af udbytte i slutningen af 2009 til kapitalfondene burde have tilbageholdt udbytteskat.

*6.5. Fusion i 2010 af Angel Lux Common S.à.r.l. og Nordic Telephone Administration ApS*

I årsregnskabet for 2009 for Angel Lux Common S.a.r.l. er der på side 12 en information om, at bestyrelsen i selskabet den 15. januar 2010 har vedtaget at selskabet skal fusionere med Nordic Telephone Company Administration ApS med virkning fra den 1. januar 2010.

Den danske del af koncernen har i en storaktionærmeddelelse fra den 16. april 2010 meddelt, at det øverste danske selskab (fra den 1. januar 2009), Nordic Telephone Company Administration ApS fusioneres med Angel Lux Common S.a.r.l. med virkning fra den 1. januar 2010.

Angel Lux Common S.a.r.l. bliver det fortsættende selskab og Nordic Telephone Company Administration ApS opløses ved fusionen.

Derved vil Angel Lux Common S.a.r.l. blive ejeren af 87,9 % af aktierne i TDC A/S.

…

*7. Indeholdelse af renteskat*

*7.1. Intern ret*

Det er fastslået i selskabsskattelovens § 2, stk. 1, litra d, 1. pkt., at selskaber og foreninger mv. som nævnt i § 1, stk. 1, der har hjemsted i udlandet, bliver skattepligtige til Danmark, såfremt de oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab eller en forening m.v. omfattet af § 1 eller litra a har til juridiske personer som nævnt i skattekontrollovens § 3B (kontrolleret gæld). Efter selskabsskattelovens § 2 stk. 1, litra d, er der således som udgangspunkt begrænset skattepligt af koncerninterne renter.

Bestemmelserne i skattekontrollovens § 3 B beskriver, om skattepligtige er undergivet bestemmende indflydelse i form af ejerskab eller rådighed over stemmerettigheder, således at der direkte eller indirekte ejes mere end 50 % af aktiekapitalen eller rådes over mere end 50 % af stemmerne. Ved lov nr. 308 af 19. april 2006 blev der med virkning pr. 1. maj 2006 indsat en bestemmelse i § 3 B, stk. 2, 3. pkt. om, at der ved bedømmelsen af, om den skattepligtige anses for at have bestemmende indflydelse på en juridisk person, eller om der udøves en bestemmende indflydelse over den skattepligtige af en

**3226**

juridisk eller fysisk person, medregnes ejerandele og stemmerettigheder, som indehaves af andre selskabsdeltagere, med hvem selskabsdeltageren har en aftale om udøvelse af fælles bestemmende indflydelse.

Ligningslovens § 2, stk. 2, 3. pkt. beskriver, at ved bestemmende indflydelse forstås ejerskab eller rådighed over stemmerettigheder, således at der direkte eller indirekte ejes mere end 50 % af aktiekapitalen eller rådes over mere end 50 % af stemmerne.

Som en undtagelse til udgangspunktet, følger det af selskabsskattelovens § 2, stk. 1, litra d, at kildebeskatningen af renter skal frafaldes, når der efter en dobbeltbeskatningsoverenskomst eller rente-/royaltydirektivet 2003/49/EF består en forpligtelse til enten at

frafalde eller nedsætte kildebeskatningen. Hvornår undtagelsen finder anvendelse, afhænger dermed direkte af en fortolkning af dobbeltbeskatningsoverenskomsten og/eller rente-/royaltydirektivet.

Efter kildeskattelovens § 65 D skal der i forbindelse med enhver udbetaling eller godskrivning af renter til et selskab, der er skattepligtigt efter selskabsskattelovens § 2, stk. 1, litra d, indeholdes 30 % af den samlede rente. Fra den 1. april 2008 er satsen ændret til 25 %. Indeholdelsen foretages af den, for hvis regning udbetalingen eller godskrivningen foretages.

Skattepligten i medfør af § 2, stk. 1, litra d, er endeligt opfyldt ved den i henhold til kildeskattelovens § 65 D foretagne indeholdelse af renteskat, jf. selskabsskattelovens § 2, stk. 2, 3. pkt.

I henhold til bestemmelsen i kildeskattelovens § 69 indtræder der hæftelse for ikke indeholdt kildeskat, medmindre selskabet godtgør, at der ikke er udvist forsømmelse fra selskabets side.

*7.1.1. SKATs vurdering i nærværende sag*

Det er SKATs opfattelse, at betingelserne for, at der som udgangspunkt er begrænset skattepligt til Danmark af de omhandlede renter i medfør af selskabsskattelovens § 2, stk. 1, litra d, er opfyldt. Det er endvidere SKATs opfattelse, at denne beskatning hverken skal frafaldes i medfør af dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, jf. bekendtgørelse nr. 95 af 23. september 1982 af dobbeltbeskatningsoverenskomst af 17. november 1980, eller i medfør af rente-/royaltydirektivet jf. direktiv 2003/48/EF. I relation til sidstnævnte henvises der med hensyn til den nærmere begrundelse herfor til de to følgende afsnit nedenfor.

Bestemmelserne om »kontrollerende myndighed« fremgår som nævnt af skattekontrollovens § 3B.

Først den 27. april 2006 blev anparterne i Nordic Telephone Company Investment ApS ejet af Angel Lux Common S.à.r.l., og dermed af en anpartshaver, som havde ejerskabet til mere end 50 %, og dermed den bestemmende indflydelse. Den bestemmende indflydelse indtræder derfor først den 27. april 2006.

Ligningslovens § 2, stk. 2, 3 pkt. blev som nævnt vedtaget og trådte i kraft den 21. april 2006, og har virkning fra og med den 1. maj 2006, hvorved kredsen af parter, som kan have den bestemmende indflydelse blev udvidet, således at der også skal medregnes ejerandele og stemmerettigheder, som indehaves af andre selskabsdeltagere, med hvem selskabsdeltageren har en aftale om udøvelse af fælles bestemmende indflydelse.

I forhold til Nordic Telephone Company Investment ApS, så vil samtlige fonde og fondsejede selskaber samt banker, der er aktionærer i Angel Lux Parent S.à.r.l., og dermed indirekte ejer af Nordic Telephone Company Investment ApS, være omfattet af den udvidede bestemmelse om »bestemmende indflydelse«.

Det er dog en betingelse, som beskrevet i ligningslovens § 2, stk. 2, 3 pkt., at selskabsdeltageren har en aftale om udøvelse af fælles bestemmende indflydelse.

I »Second Amended and Restated Subscription and Shareholders Agreement« (aktionæroverenskomsten) af den 27. april 2006 er beskrevet om udøvelsen af den fælles bestemmende indflydelse vedrørende blandt andet ejerskabet til PECs, jf. blandt andet »Article VII, Transfers, 7.7 Certain Transferees to Become Parties«, hvorfor SKAT anser samtlige aktionærer i Angel Lux Parent S.à.r.l. for, at være omfattet af bestemmelserne i ligningslovens § 2, stk. 2, 3 pkt.

Dermed er der, i medfør af selskabsskattelovens § 2, stk. 1, litra d, hjemmel til at beskatte renter (begrænset skattepligt) hos udenlandske selskaber, fonde og foreninger mv. fra kilder i Danmark, når der er tale om kontrolleret gæld, jf. skattekontrollovens § 3B.

SKAT lægger til grund, at betingelserne for anvendelsen af de særlige undtagelser i selskabsskattelovens § 2, stk. 1, litra d, 3.- 7. punktum, ikke er til stede.

SKAT anser dermed renterne for omfattet af begrænset skattepligt i medfør af selskabsskattelovens § 2, stk. 1, litra d, 1. pkt.

Selskabet har ikke indeholdt renteskatten.

Det er SKATs opfattelse, at selskabet hæfter for den ikke indeholdte renteskat i medfør af kildeskattelovens § 69, idet selskabet har handlet forsømmeligt ved ikke at indeholde kildeskatten.

Det bemærkes i øvrigt, at anvendelsen af begrebet retmæssig ejer i dobbeltbeskatningsoverenskomsten og rente-/royaltydirektivet er udtryk for et værn mod misbrug af henholdsvis dobbeltbeskatningsoverenskomsten og rente-/royaltydirektivet, og at det er SKATs opfattelse, at der i relation til vurderingen af, om der er handlet forsømmeligt, jf. kildeskattelovens § 69, må stilles større krav til agtpågiveenheden, når der er tale om overholdelse af en værnsregel og betaling af renter til en nærtstående.

Det fremgår af »Second Amended and Restated Subscription and Shareholders Agreement«

**3227**

(aktionæroverenskomsten) af den 27. april 2006, at Angel Lux Parent S.à.r.l., Angel Lux Common S.à.r.l., Nordic Telephone Company Investment ApS, Nordic Telephone Company ApS og de fem mellemliggende selskaber i Luxembourg alle skal lade sig registrere som anpartsselskaber efter amerikansk lov [note slettet] samt at alle aktionærer og PEC ejere ligeledes skal følge amerikansk lov på dette punkt, jf. »Article XI, Additional covenants and agrements, 11.1 Certain Tax Matters«.

Ligeledes er i samme afsnit anført at PECs ikke vil blive anset som gæld, men derimod egenkapital efter amerikansk lov.

I afsnittet »Article XII Miscellaneous, 12.3 Notices« i »Second Amended and Restated Subscription and Shareholders Agreement« (aktionæroverenskomsten) af den 27. april 2006 fremgår det, at aftalen og spørgsmål omkring denne skal behandles efter amerikansk lov - medmindre det er nødvendigt at behandle enkelte punkter efter luxembourgsk eller dansk lov.

Ud fra »Second Amended and Restated Subscription and Shareholders Agreement« (aktionæroverenskomsten) af den 27. april 2006 fremgår det, at selskabet har ved at forsøge at sikre sig fordele, som hverken rente-/royaltydirektivet eller dansk-luxembourgske dobbeltbeskatningsoverenskomst tilsigtee adgang til, og ved bevidst at have deltaget i et arrangement uden nogen forretningsmæssig begrundelse, indladt sig på en risiko.

SKAT anser det for at være uden betydning, om der i perioden fra den 1. maj 2006 - 10. juli 2008 er foretaget en egentlig pengeoverførsel af de betalte renter, eller renterne dagligt er tilskrevet gælden. Kildeskattelovens § 65 D beskriver, at i forbindelse med enhver udbetaling eller godskrivning af rente, skal der ske tilbageholdelse af renteskat.

Forholdet om betaling contra tilskrivning er behandlet i ligningsvejledningen S.A.2.7, og det gør ingen skattemæssig forskel, om der sker fysisk pengeoverførsel eller ikke.

Selskabet hæfter dermed for den ikke indeholdte renteskat for perioden efter 1. maj 2006.

**7.1.2. For perioden indtil den 1. maj 2006**

SKAT anser selskaberne i Luxembourg, Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l. for at være koncernforbundne, men ikke kapitalfondene og deres selskaber samt bankerne efter de dagældende regler, hvorfor der ikke kan indeholdes kildeskat.

**7.2. OECDs Modeloverenskomst og den dansk-luxembourgske dobbeltbeskatnings-overenskomst**

Efter ordlyden af selskabsskattelovens § 2, stk. 1, litra d, 2. pkt., fraviges udgangspunktet om begrænset skattepligt af renter i tilfælde, hvor beskatningen skal frafaldes eller nedsættes i medfør af en dobbeltbeskatningsoverenskomst eller rente-/royaltydirektivet.

Dobbeltbeskatningsoverenskomsten af 17. november 1980 mellem Danmark og Luxembourg, jf. bekendtgørelse nr. 95 af 23. september 1982, fastsætter, at renter, der hidrører fra én kontraherende stat, og som betales til et selskab hjemmehørende i en anden kontraherende stat, kun - hvis dette selskab er »den retmæssige ejer« af renterne - kan beskattes i denne anden stat, jf. artikel 11, stk. 1.

Udgangspunktet i dobbeltbeskatningsoverenskomsten er derfor, at det ikke er muligt at anse renter betalt til et moderselskab i Luxembourg for omfattet af den begrænsede skattepligt i henhold til selskabsskattelovens § 2, stk. 1, litra d, idet kildebeskatningen afskæres.

Som det fremgår ovenfor, er det imidlertid efter dobbeltbeskatningsoverenskomstens ordlyd en betingelse for afskæringen af Danmarks ret til som kildestat at beskatte renter, at modtageren af renterne er »den retmæssige ejer«.

Udtrykket »retmæssig ejer« (på engelsk »beneficial owner«) har været benyttet i OECD's Modelkonvention og kommentarerne hertil siden revisionen af modelkonventionen i 1977. De i kommentarerne indeholdte bemærkninger om udtrykket »beneficial owner« er gradvist blevet præciseret, men der er ikke grundlag for at hævde, at der herved er sket materielle ændringer i relation til, hvad der forstås ved udtrykket.

I kommentarerne til Modelkonventionen er spørgsmålet om forståelsen af udtrykket »retmæssig ejer« nu navnlig behandlet i punkt 12, 12.1 og 12.2, til artikel 10, hvori følgende er anført (med de her tilføjede fremhævninger):

»*12. Kravet om retmæssigt ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt... til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Det gøres herved klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Udtrykket retmæssig ejer er anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.*

*12.1 Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men ingen*

**3228**

*dobbeltbeskatning opstår som følge heraf, da indkomstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis indkomsten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.*

*12.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og betaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.«*

I relation til fortolkningen af begreberne retmæssig ejer og gennemstrømnings-selskaber henviser SKAT endvidere til daværende Skatteminister Kristian Jensens svar til Folketingets skatteudvalg på spørgsmål 2 vedrørende L-30 - Forslag til Lov om indgåelse af protokol om ændring af dobbeltbeskatningsoverenskomsten mellem Danmark og Amerikas Forenede Stater. Der blev her spurgt, hvorfor Danmark ikke som USA har taget forbehold mod brug af gennemstrømningsselskaber. I svaret anføres, at et land ikke skal indsætte forbehold om, at der vil anvende regler eller fortolkninger, som er nævnt i OECD-modellens bemærkninger.

…

*7.2.1. SKATs vurdering i nærværende sag*

Det fremgår af modelkonventionen, kommentarerne hertil samt international retspraksis, at det afgørende ved fastlæggelsen af, hvorvidt den formelle beløbsmodtager er »retmæssig ejer«, er, i hvilket omfang den formelle beløbsmodtager har været beføjet til at disponere over det tilskrevne/modtagne beløb og kunnet drage nytte heraf.

Når den formelle beløbsmodtagers reelle beføjelser til at træffe afgørelse om, hvorledes der skal disponeres over tilskrevne/modtagne beløb, er meget snævre eller ikke-eksisterende, kan adgangen til at påberåbe sig dobbeltbeskatningsoverenskomsten således afskæres.

Dette indebærer, at et rentebeløb, som de(n) bagvedliggende ejer(e) på forhånd har besluttet at dirigere derhen, hvor det ønskes, uden at de mellemliggende selskaber får nogen reel mulighed for at disponere på anden måde end fastlagt af ejerne, ikke har de mellemliggende selskaber som »retmæssig ejer«.

Det er SKATs opfattelse, at de to luxembourgske selskaber, Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l., ikke har nogen selvstændig ret til at disponere over rentebeløbene og hermed ikke er retmæssig ejere.

Det er således SKATs opfattelse, at ingen af de to mellemliggende selskaber i Luxembourg, Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l., i relation til de koncerninterne rentebetalinger kan anses for retmæssig ejer (beneficial owner), jf. art. 11, stk. 1 i dobbeltbeskatningsoverenskomsten.

De to selskaber i Luxembourg anses derimod for at fungere som gennem-strømningsenheder for kapitalfondene og bankerne, der hovedsageligt er hjemmehørende i lande uden dobbeltbeskatningsoverenskomst med Danmark, og dermed ikke berettiget til at opnå de fordele, der følger heraf.

Renterne strømmer således fra den danske del af koncernen gennem selskaberne i Luxembourg og videre til kapitalfondene og bankerne.

Det kan efter SKATs opfattelse ikke tillægges afgørende betydning, at der er sket aflejring af 0,03125%, (forskellen mellem 10% rente i Danmark og 9,96875% rente i Luxembourg), i rentemarginal i det nederste af de to koncernselskaber i Luxemburg, Angel Lux Common S.à.r.l. Det forhold, at der i kraft af de på forhånd fastlagte rentesatser, er truffet beslutning om at »efterlade« et mindre beløb i Luxembourg - som ikke benyttes til kommercielle aktiviteter eller lign. - er således ikke ensbetydende med, at der har været nogen

reel bestemmelsesret fra Angel Lux Common S.à.r.l. side i relation til, hvorledes der skulle forholdes med tilskrevne/modtagne renter.

Det bemærkes også, at der ikke ses at være noget kommercielt formål med indskydelsen af de to luxembourgske holdingselskaber, som ikke ses at have andet formål end at søge at undgå dansk kildestatsbeskatning (eller opnå andre skattemæssige fordele).

Det er SKATs opfattelse, at der i nærværende sag er tale om misbrug af dobbeltbeskatningsaftalen mellem Danmark og Luxembourg.

Nægtelse af at lade koncernen drage fordel af dobbeltbeskatningsoverenskomstens fordele strider således efter SKATs opfattelse ikke imod overenskomstens overordnede formål om undgåelse af dobbeltbeskatning.

Såfremt SKAT accepterede at lade de luxembourgske selskaber være omfattet af dobbeltbeskatningsaftalen

**3229**

med Luxembourg og dermed være omfattet af undtagelsen i selskabsskattelovens § 2, stk. 1, litra d, ville der derimod være tale om tildeling af en formålsstridig fordel.

SKAT anser dermed rentebetalingen/-tilskrivningen for omfattet af skattepligt i medfør af selskabsskattelovens § 2, stk. 1, litra d.

*7.3. Forholdet til EU-retten*

Af de indledende bemærkninger i rente-/royaltydirektivet 2003/49/EF fremgår bl.a. følgende (med SKATs fremhævninger):

(1) *På et indre marked, der har karakter af et hjemmemarked, bør transaktioner mellem selskaber fra forskellige medlemsstater ikke være undergivet ringere beskatningsvilkår end de vilkår, der gælder for de samme transaktioner mellem selskaber fra samme medlemsstat.*

(2) *Dette krav er i øjeblikket ikke opfyldt for så vidt angår betaling af renter og royalties; de nationale skattelovgivninger -eventuelt kombineret med bilaterale eller multilaterale overenskomster - kan måske ikke altid sikre afskaffelse af dobbeltbeskatning, og skattereglernes anvendelse medfører ofte tyngende administrative formaliteter og likviditetsproblemer for de pågældende selskaber.*

(3) *Det må sikres, at renter og royalties beskattes én gang i en medlemsstat.*

(4) *Den mest hensigtsmæssige måde at fjerne førnævnte formaliteter og problemer på og samtidig sikre, at nationale og tværnationale transaktioner behandles skattemæssigt ens, er at ophæve beskatningen af renter og royalties i den medlemsstat, hvor de opstår, uanset om beskatningen sker ved indeholdelse ved kilden eller ved skatteansættelse; det er især nødvendigt at ophæve sådanne skatter i forbindelse med betalinger mellem associerede selskaber i forskellige medlemsstater samt mellem sådanne selskabers faste driftssteder.*

(5) *Ordningen bør kun gælde for eventuelle renter eller royalties, der ville være blevet aftalt mellem betaleren og den retmæssige ejer, såfremt der ikke havde bestået en særlig forbindelse*

(6) *Medlemsstaterne må ikke afskæres fra at træffe passende foranstaltninger til bekæmpelse af svig og misbrug.*

…

(10) *Målet for dette direktiv, nemlig etablering af et fælles system for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, kan ikke i tilstrækkelig grad opfyldes af medlemsstaterne og kan derfor bedre gennemføres på fællesskabsplan; Fællesskabet kan derfor træffe foranstaltninger i overensstemmelse med subsidiaritetsprincippet, jf. traktatens artikel 5. I overensstemmelse med proportionalitetsprincippet, jf. nævnte artikel, går direktivet ikke ud over, hvad der er nødvendigt for at nå disse mål -*

Direktivets formål er således at sikre, at renter betalt over grænserne mellem medlemslandene behandles på samme vilkår som inden for grænserne i de enkelte medlemslande, men at denne ordning kun gælder for eventuelle renter, der ville blive aftalt såfremt der ikke havde bestået en særlig forbindelse. Derudover er formålet, at renterne beskattes i én medlemsstat, og at misbrug og svig kan bekæmpes.

Begrebet retmæssig ejer fremgår således allerede af de indledende bemærkninger. Derudover fremgår begrebet af art. 1, der har følgende ordlyd …

Allerede af denne årsag er det utvivlsomt, at EU-retten ikke er til hinder for gennemførelse af en kildebeskatning af renterne i Danmark i tilfælde, hvor den retmæssige ejer ikke er hjemmehørende i EU.

Endvidere giver direktivet ved art. 5 medlemsstaterne mulighed for at nægte skatteydere direktivets fordele i de situationer, der har karakter af svig eller misbrug. Art. 5 har følgende ordlyd …

Anvendelsen af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne tjener netop til bekæmpelse af svig eller misbrug. I henhold til art. 5 er direktivet således ikke til hinder for, at der pålægges kildeskat, når den retmæssige ejer ikke er omfattet af en dobbeltbeskatningsoverenskomst med Danmark.

Den omstændighed, at der indeholdes kildeskat på renter, når de betales til et ikke-hjemmehørende selskab, udgør ikke en restriktion i den frie bevægelighed, allerede fordi der ikke sker en skattemæssig forskelsbehandling.

…

Det er endvidere SKATs opfattelse, at EU-Domstolens praksis viser, at der ikke er noget til hinder for at afskære selskaber etableret i en anden medlemsstat fra at påberåbe sig EU-retten - herunder de harmoniserede regler, der følger af bl.a. moder-/datterselskabsdirektivet - når det må lægges til grund, at etableringen af et holdingselskab i en anden medlemsstat »tager sigte på at undgå kildeskat på betalinger til ikke-europæiske foretagender, hvis en sådan konstruktion ikke tjener noget kommercielt formål«, jf. Kommissionens fortolkning af »Rent kunstige arrangementer« offentliggjort i EUR-Lex-52007DC0785.

Selskabsskattelovens § 2, stk. 1, litra d, indebærer efter sin klare ordlyd, at Danmark ikke skal frafalde kildeskat, medmindre det efter rente-/royaltydirektivet består en egentlig pligt hertil.

Fra EU-Domstolens praksis om misbrugsbegrebet kan bl.a. henvises til Cadbury Schweppes-dommen (sag C-196/04, Cadbury Schweppes, Saml. 2006, s.I-7995), Halifax-dommen (sag C-255/02, Halifax, Saml. 2006, s.

**3230**

I-1609) og Part Service-dommen (sag C-425/06, Part Service Srl.).

EU-Domstolen udtalte i Cadbury-Schweppes-dommen i relation til de engelske CFC-regler bl.a.:

»… *for at en restriktion for etableringsfriheden vil kunne være begrundet i hensynet til bekæmpelse af misbrug, skal det specifikke formål med en sådan restriktion være at hindre adfærd, der består i at oprette rent kunstige arrangementer, der ikke bygger på nogen økonomisk realitet, med henblik på at undgå den normalt skyldige skat af overskud, der optjenes ved virksomhed, der udføres på det nationale område.«*

Den momsretlige Halifax-dom omhandler gennemstrømningsselskaber, idet der i sagen var tale om en momsfritaget bank med 5 % momsfradrag, som lod sine relevante transaktioner passere et fuldt momspligtigt datterselskab med henblik på at opnå fuldt momsfradrag.

Om dommen samt dommens betydning i den efterfølgende sag Part Service Srl. anføres i Momsvejledningen 2010, afsnit C.4.,

»*Fordele som følger af momslovenes bestemmelser, herunder reglerne om fradrag, kan ikke gøres gældende, når de transaktioner m.v. der begrunder denne ret, udgør et misbrug.*

- *Det følger af EF-domstolens praksis, jf. sag C-255/02, Halifax plc., præmis 74 og 75, at konstateringen af misbrug kræver, at følgende betingelser er opfyldt:*
- *De omhandlede transaktioner - selvom de betingelser der er fastsat i de relevante bestemmelser formelt er overholdt - ville indebære, at der blev opnået en afgiftsfordel, som det ville stride mod formålet med disse bestemmelser at tildele.*

*Det skal tillige fremgå af en samlet række objektive omstændigheder, at hovedformålet med de omhandlede transaktioner er opnåelsen af en afgiftsfordel.*

*At det er tilstrækkeligt for at konstatere misbrug, at det er hovedformålet - og herved ikke det eneste formål - med transaktionen at opnå en afgiftsfordel har EF-domstolen fastslået i den efterfølgende dom i sagen C-425/06 (Part Service Srl.)*

*Ved vurderingen af hovedformålet, kan transaktionernes rent kunstige karakter tillige med juridiske, økonomiske og/eller personlige forbindelser mellem de aktører, der tager del i planen vedrørende lettelse af afgiftsbyrden tages i betragtning, jf. Halifaxdommen præmis 81.«*

Ved vurdering af hovedformålet med etableringen har EU-Domstolen lagt særlig vægt på, om der er substans i selskabets domicilland, eller om der er tale om et rent kunstigt arrangement, hvilket ikke kun indebærer formel etablering, men også faktisk udøvelse af økonomisk virksomhed.

SKAT er derfor af den opfattelse, at EU-retten ikke i videre omfang end de på Modelkonventionen baserede dobbeltbeskatningsaftaler kan anses for at afskære Danmark fra at gennemføre en kildestatsbeskatning af renter ud fra en betragtning om, at de pågældende beløbs retmæssige ejere er hjemmehørende uden for EU.

### 7.3.1. SKATs vurdering i nærværende sag

For at kunne bringe direktivets fordele i anvendelse er det en betingelse, at selskaberne i Luxembourg kan anses for at være den retmæssige ejer af renterne hidrørende fra de danske koncernselskaber. Det er SKATs vurdering, at denne betingelse ikke er opfyldt. Der henvises herved til det anførte i de foregående afsnit.

Endvidere henviser SKAT i nærværende sag til misbrugsbestemmelsen i direktivets art. 5, der ligeledes kan føre til, at direktivets fordele nægtes.

SKAT er opmærksom på Landsskatterettens kendelse af 3. marts 2010, offentliggjort som SKM2010.268 LSR, hvori Landsskatteretten har anført, at der ikke i dansk ret er hjemmel til at nægte et selskab de fordele, der følger af moder-/datterselskabsdirektivet, når selskabet er rette indkomstmodtager af udbyttet, og når de foretagne dispositioner ikke kan tilsidesættes ud fra realitetsbetragtninger.

Moder-/datterselskabsdirektivet indeholder ikke - på tilsvarende vis som rente-/royaltydirektivet - en udtrykkelig betingelse om, at det kun er den retmæssige ejer, der kan påberåbe sig direktivets bestemmelse om, at der ikke kan indeholdes kildeskat, men direktivet indeholder i artikel 1, stk. 2, en bestemmelse, der svarer til rente-/royaltydirektivets artikel 5.

I det omfang rente-/royaltydirektivets art. 5 skal anses for relevant, er SKAT -som det fremgår af ovennævnte - ikke enig i, at der alene kan være hjemmel til at nægte direktivets fordele ud fra den domstolsskabte praksis om rette indkomstmodtager eller ud fra realitetsbetragtninger. Derimod er det som anført SKATs opfattelse, at der er hjemmel til at nægte direktivets fordele både på grundlag af misbrugsbestemmelsen i direktivets artikel 5, og på grundlag af

den domstolsskabte praksis om det generelle EU-retlige misbrugs-begreb.

Det bemærkes i denne forbindelse, at Landsskatteretten i sin kendelse af 3. marts 2010 desuden konkret vurderede, at SKAT ikke havde godtgjort, at det i sagen omhandlede luxembourgske selskab ikke var retmæssig ejer af det pågældende udbyttebeløb. De faktiske omstændigheder, der førte Landsskatteretten til denne vurdering, er efter SKATs opfattelse ikke sammenlignelige med de faktiske omstændigheder i nærværende sag.

Det bemærkes også, at en endelig beslutning vedrørende indbringelse af Landsskatterettens kendelse af 3. marts 2010 for domstolene endnu ikke er taget.

SKAT anser de luxembourgske selskaber for at være indskudte mellemled, der ikke selv drager økonomisk fordel af rentebetalingen.

**3231**

SKAT finder således, at det ville være i strid med rente-/royalty-direktivets formål at lade koncernen opnå direktivets fordele.

*7.4. Selskabets bemærkninger*

SKAT modtog en skrivelse af 20. april 2010 fra Nordic Telephone Company Investment ApS hvoraf følgende fremgår:

*Som også anført under vores tidligere drøftelser er det vores opfattelse, at der ikke er noget belæg for, at NTC Investment ApS skulle have udvist forsømmelighed ved ikke at indeholde renteskat, jf. hertil kildeskattelovens § 69: »Den, som undlader at opfylde sin pligt til i indeholde skat, eller som indeholder denne med for lavt beløb, er over for det offentlige umiddelbart ansvarlig for betaling af manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i denne lov«.*

*Det er efter praksis SKAT, der skal bevise, at NTC Investment ApS har udvist forsømmelighed. Indtil videre har SKAT intet anført til støtte herfor, mens vi - som også anført blandt andet på mødet den 21. januar 2010 - har gennemført en række undersøgelser, som bekræfter at der ikke i forbindelse med rentetilskrivningerne/-betalingerne var noget grundlag for at antage, at der skulle have været indeholdt renteskat og dermed at der er udvist nogen forsømmelighed:*

• *Besigtigelse: Vi har været i Luxembourg og besøgt moderselskabet Angel Lux Common, mødt de ansatte, set lokalerne, inventaret og faciliteterne, samt set hvor bestyrelsen holder deres bestyrelsesmøder.*

• *Møder: Udover som nævnt at have mødt de ansatte, har vi på mødet i år i Luxembourg mødt to af Angel Lux Commons tre uafhængige bestyrelsesmedlemmer, som fortalte om bestyrelsesarbejdet.*

• *Undersøgelse af selskabsretlige forhold: Angel Lux Common er et selskab placeret i EU, og selskabsretligt samt skattemæssigt hjemmehørende i Luxembourg.*

• *Sammenligning med danske selskaber: Angel Lux Common er et »S.A.R.L.« selskab som svarer til dansk aktie/anpartsselskab, der efter en dansk synsvinkel kvalificeres som et selvstændigt skattesubjekt.*

• *Forholdt os til fordringens karakter: PECs kvalificeres som fordringer. Angel Lux Common. er ejer af PECs og kreditor for fordringen. En fordringsejer er rette indkomstmodtager for de renter, der betales iht. fordringen.*

• *Undersøgelse af EU-ret og DBO: Rente-/royaltydirektivet og dobbeltbeskatningsoverenskomsten med Luxembourg finder anvendelse og hver for sig fører de til, at der ikke skal indeholdes kildeskat.*

• *Undersøgt dansk litteratur og vejledninger: I SKATs egen kildeskattevejledning nævnes ikke en kildeskatsproblematik mellem et dansk selskab og et EU-selskab, og ej heller i anden litteratur fremgår, at der skulle være en kildeskatsproblematik, jf. eksempelvis vejledningen til blanket nr. 06.26 og ligningsvejledningen S.A.2.7.*

NTC Investment har foretaget en række undersøgelser, som bekræfter at der ikke i forbindelse med rentetilskrivningerne/-betalingerne var noget grundlag for at antage, at der skulle have været indeholdt renteskat og kan således ikke siges at have udvist forsømmelighed.

Hertil kommer, at der senest er offentliggjort bl.a. Landsskatterettens afgørelse SKM2010.268.LSR, som underkender SKATs påstand om indeholdelsespligt. Dette støttes af Skatterådet i SKM2010.240.SR.

*7.5. SKATs kommentarer til selskabets bemærkninger*

SKAT har gennemgået selskabets bemærkninger vedrørende spørgsmålet om forsømmelighed. Det er SKATs opfattelse, at selskabet jf. det foranstående har udvist forsømmelighed, idet det blandt andet fremgår af de aktionæraftaler, som er en del af hele aftalekomplekset, at der bevist skal handles således, at den opstillede konstruktion ikke genererer kildeskattet. Dette forhold har været kendt af alle led i koncernen, hvorfor forsømmelighedsaspektet tilbagevises.

*8. SKATs foreløbige afgørelse*

Det er på den baggrund SKATs opfattelse, at der skal ske indeholdelse af rentekildeskat af de tilskrevne/betalte renter i Nordic Telephone Company Investment ApS til Angel Lux Common S.à.r.l. i perioden fra 1. maj 2006 til den 10. juli 2008.

Det gælder dog ikke den andel af renterne, som ender hos de ultimative PECs-ejere, der er hjemmehørende i et DBO-land.

De skattemæssige konsekvenser for Nordic Telephone Company Investment ApS for indkomstårene 2006 - 2008 er herefter følgende:

| Indkomst-år | Renter for hele året | Heraf indeholdelsespligt for renter for perioden 1.5.-31.12.2006 | Heraf indeholdelsespligt for renter for perioden 1.1.-31.3.2008 | Heraf indeholdelses-pligt for renter for perioden 1.4.-10.7.2008 | Renteskatteprocent | Renteskat |
|---|---|---|---|---|---|---|
| 2006 | 1.339.208.093 | 922.794.206 | | | 30 % | 276.838.262 |
| 2007 | 1.410.657.397 | | | | 30 % | 423.197.219 |
| 2008 | 824.768.741 | | 390.745.904 | | 30 % | 117.223.771 |
| | | | | 434.022.837 | 25 % | 108.505.709 |
| | | | | | | 925.764.961 |
| I alt | | | | | | **3232** |

Såfremt selskabet efterfølgende fremkommer med dokumentation, der påviser, at der blandt kapitalfondene og bankerne er enkelte hjemmehørende i lande med en dobbeltbeskatningsoverenskomst med Danmark, vil SKAT foretage rettelser i grundlaget for beregningen af ovenstående.

Tilsvarende vil korrektion af grundlaget blive foretaget, såfremt SKAT foretager ændringer af rentesatsen for PECs.«

Det fremgår videre af SKATs afgørelse af 18. marts 2011, at selskabet i november 2010 klagede over SKATs foreløbige afgørelse af 28. april 2010 og redegjorde nærmere for sagen, men at dette ikke gav SKAT anledning til at ændre den foreløbige afgørelse. Følgende fremgår afslutningsvist af afgørelsen af 18. marts 2011:

»11. SKATs krav til dokumentation for bagvedliggende investorer for at frafalde eller nedsætte skattekravet

SKAT har den 17. marts 2011 i en mail til selskabets repræsentanter skrevet følgende:

Siden fremsendelsen af agterskrivelsen vedrørende indeholdelse af rentekildeskat har der som bekendt været afholdt en lang række møder mellem selskabet (for nemheds skyld benævnt TDC i det flg.) og SKAT vedrørende såvel denne agterskrivelse som de øvrige agterskrivelser, der var blevet fremsendt samtidig.

Det har under disse møder bl.a. været drøftet, om der var mulighed for at opnå en nedsættelse af og/eller en forligsmæssig løsning i relation til de omhandlede skattekrav.

For så vidt angår rentekildeskatten rejste TDC på et møde den 18. august 2010 kort spørgsmålet om, hvilke krav SKAT ville stille med hensyn til dokumentation for bagvedliggende investorer for at frafalde eller nedsætte skattekravet.

Spørgsmålet blev på ny rejst på det følgende møde den 18. november 2010, hvor TDC oplyste, at man ikke havde sin undersøgelse af de bagvedliggende ejere klar, og mødet blev (i relation til spørgsmålet om rentekildeskatten) afsluttet med en forespørgsel fra selskabets side, om der var mulighed for eventuelt at kunne forlige sagen. For at vurdere muligheden herfor ønskede selskabet at give udsættelse med forældelsesfristen, således at man kunne tilvejebringe oplysninger om de bagvedliggende ejere samt give SKAT adgang til gennemgang af materiale om de bagvedliggende ejere.

På det følgende møde den 6. januar 2011 drøftedes alene rentekildeskatten, og der blev af TDC fremvist en mappe fremvist angiveligt indeholdende en liste over de bagvedliggende ejere – en liste, som SKAT dog ikke fik mulighed for at se. SKAT oplyste, at det var op til virksomheden at fremlægge dokumentation vedrørende de bagvedliggende ejere, og at SKATs mulighed for på teoretisk plan præcist at forholde sig til problemstillingen var begrænsede, når man ikke havde kendskab til de bagvedliggende ejerstrukturer. Man oplyste dog om de yderligere krav, der generelt stilles til eventuelt frafald eller nedsættelse af kildebeskatningen.

Vedrørende kildeskatteproblemstillingen blev det herefter på møde den 4. februar 2011 oplyst af TDC, at de ikke anså det for sandsynligt, at der kunne opnås et tilfredsstillende resultat set fra kapitalfondenes side, og at man derfor ikke var positivt indstillet over for at give SKAT adgang til informationer om de bagvedliggende ejere.

Problemstillingen blev senest drøftet på et møde i mandags, den 14. marts 2011, hvor der fra TDCs side blev efterlyst en skriftlig redegørelse for de krav, som SKAT vil stille for at kunne frafalde eller nedsætte kildeskatten.

SKAT er principielt af den opfattelse, at TDC har fået al den information om SKATs holdning til problemstillingen, som SKAT har mulighed for at give, så længe TDC ikke vil fremkomme med oplysninger overhovedet om de bagvedliggende ejerstrukturer. Sådanne oplysninger er simpelthen nødvendige for, at SKAT mere konkret

kan vurdere, hvilke krav SKAT kan stille for at kildeskatten eventuelt kan frafaldes eller nedsættes.

Som følge af risikoen for forældelse vil SKAT træffe afgørelse i sagen senest i morgen den 18. marts 2011, da TDC har oplyst, at man ikke vil suspendere forældelsen yderligere. Da TDC, v. Christer Bell, i går telefonisk har givet udtryk for, at man – på trods af, at man ikke ønsker at forsøge at leve op til SKATs krav – ønsker en skriftlig redegørelse for de krav, som SKAT vil stille for at kunne frafalde eller nedsætte kildeskatten, skal SKAT dog oplyse følgende:

Det er SKATs opfattelse, at renterne er strømmet igennem holdingselskaberne i Luxembourg, og at disse skaber ikke kan påberåbe sig hverken DBO'en eller EU-retten (rente-/royaltydirektivet), fordi de ikke er renternes retmæssige ejere.

SKAT har intet kendskab til de bagvedliggende ejerstrukturer, men det er SKATs opfattelse, at i det omfang gennemstrømningen er sket til selskaber, der er hjemmehørende i et DBO- eller EU-land, vil der eventuelt skulle ske en nedsættelse (evt. et frafald) af kildeskatten.

SKAT baserer denne vurdering på, at hensigten med kravet om, at den formelle modtager af renterne er renternes retmæssige ejer, er at forhindre skatteunddragelse og misbrug. Et misbrug af DBO'erne/EU-retten vil imidlertid ikke forekomme, hvis renterne umiddelbart strømmer videre til et selskab i et DBO-eller EU-land og der betragtes som skattepligtige for den bagvedliggende ejer.

En sådan videregennemstrømning vil - i hvert fald som udgangspunkt - forudsætte, at den bagvedliggende (retmæssige) ejer har modtaget et beløb, der er

1) beløbsmæssigt identisk med det beløb, der i første led er strømmet videre,

**3233**

2) har samme karakter som det fra Danmark udbetalte beløb, dvs. beløbet må ikke have ændret karakter, således at det i domicillandet ikke undergives en beskatning efter samme regelsæt, som det ville være blevet, hvis beløbet var udbetalt direkte fra Danmark til den pågældende (retmæssige) ejer,

3) beløbet skal være modtaget og beskattet i samme indkomstperiode, som hvis det var blevet udbetalt direkte fra Danmark til den bagvedliggende (retmæssige) ejer.

Hvis renterne strømmer videre til en transparent enhed, rejser det særlige problemstillinger:

Hvis enheden anses for transparent efter både dansk ret og domicillandets ret, vil det isoleret set kunne tale for, at man skal anse næste led i ejerkæden for renternes retmæssige ejer. Hvis dette næste ejerleds domicil-land også anser enheden for transparent, vil der kunne være mulighed for at opnå en nedsættelse af kildeskatten ved påberåbelse af en DBO (eller evt. EU-retten) indgået mellem næste ejerleds domicil-land og Danmark (naturligvis under forudsætning af, at næste ejerled kan anses for retmæssig ejer, hvilket kan nødvendiggøre en undersøgelse af, om gennemstrømningen faktisk er stoppet i det pågældende led).

Anser næste ejerleds domicil-land derimod ikke enheden for transparent, vil næste ejerled ikke kunne påberåbe sig en eventuel DBO/EU-retten. Dette skyldes, at næste ejerled i så fald skattemæssigt (i sit hjemland) er blevet anset for modtager af renterne og derfor ikke vil være en person, der kan påberåbe sig DBO'en, jf. pkt. 6.5 i kommentarerne til artikel 1 i modelkonventionen, jf. også pkt. 54, 65 og 69-70 i »The Application of the OECD Model Tax Convention to Partnerships«.

Endelig kan nævnes, at selv om næste ejerleds domicil-land principielt betragter enheden som transparent, kan der være tilfælde, hvor næste ejerled ikke kan påberåbe sig en DBO, nemlig hvis der efter domicil-landets regler er mulighed for at vælge at anse enheden for ikke-transparent, jf. som eksempel herpå sagen refere-

ret i TfS2003.167.LSR hvor DBO'en mellem Danmark og USA ikke fandt anvendelse, idet USA ikke anså en (ellers transparent) enhed for transparent på grund af en anvendelse af check-the-box reglerne.

Det skal understreges, at SKAT i mangel af enhver form for oplysninger om de bagvedliggende ejerstrukturer mv. ingen mulighed har for at vide, i hvilket omfang disse betingelser er opfyldt, og SKAT kan heller ikke udelukke, at der i tilfælde af en nærmere undersøgelse af problemstillingen vil kunne opstå yderligere forhold, som skal inddrages i vurderingen.

På det foreliggende grundlag - hvor TDC har afvist at fremkomme med enhver form for oplysninger om, hvordan de bagvedliggende ejerstrukturer er indrettet - er det heller ikke muligt for SKAT præcist at vurdere, hvordan TDC i givet fald skal dokumentere, at betingelserne for frafald/nedsættelse af kildeskatten er opfyldt. Hvis TDC ønsker at forsøge at godtgøre, at betingelserne er opfyldt, vil SKAT dog naturligvis være villig til at drøfte disse dokumentationskrav.

SKAT har imidlertid forstået, at det er TDCs egen opfattelse, at de af SKAT opstillede krav ikke er opfyldt, og spørgsmålet om dokumentationskravenes omfang er derfor også kun af teoretisk interesse.

Som nævnt vil SKAT træffe afgørelse i sagen senest den 18. marts 2011, da TDC har oplyst, at man ikke vil suspendere forældelsen yderligere. Hvis der senest den 18. marts kl. 12 er fremkommet bemærkninger til denne mail, vil SKAT i videst muligt omfang forsøge at tage højde herfor i afgørelsen.

SKAT skal understrege, at den korte frist til at fremkomme med eventuelle bemærkninger skal ses i lyset af dels risikoen for forældelse, dels den omstændighed, at der er tale om en problemstilling, der har været gjort til genstand for drøftelser ved flere lejligheder, således at TDC er bekendt med SKATs synspunkter og først på mødet i mandags tilkendegav, at man ønskede en skriftlig redegørelse fra SKAT.

**11.1. SKATs bemærkninger til selskabets kommentarer af 18. marts 2011 om krav til dokumentation for bagvedliggende investorer**

Selskabet er den 18. marts 2001 fremkommet med kommentarer til ovenstående mail fra SKAT. Selskabets bemærkninger er anført under punkt »9.8. Bemærkninger til SKATs krav til dokumentation for bagvedliggende investorer for at frafalde eller nedsætte skattekravet«.

SKAT kan knytte følgende bemærkninger til den modtagne mail fra selskabets repræsentant:

- SKAT har ikke givet tilsagn om nedsættelse af renteskat, hvis de bagvedliggende selskaber havde hjemsted i et DBO-land.
  SKAT har derimod mundtligt og skriftligt fremført, at såfremt selskabet efterfølgende fremkommer med dokumentation, der påviser, at der blandt kapitalfondene og bankerne er enkelte hjemmehørende i lande med en dobbeltbeskatningsoverenskomst med Danmark, vil SKAT eventuelt foretage rettelser i grundlaget for beregningen af ovenstående.
  SKAT kan ikke på forhånd give afkald på kildeskat på et abstrakt grundlag, hvorfor det hele tiden har været nødvendigt med yderligere dokumentation om de bagvedliggende ejere.
- SKAT finder det ikke korrekt, som anført af selskabets repræsentant, at NTC S.A. har tilbudt SKAT disse oversigter til gennemgang, og således at SKAT ved stikprøver kan efterprøve investorernes hjemmehørendestatus.
  Tværtimod har repræsentanten på flere møder afvist at udlevere det eventuelle materiale, som repræsentanten er i besiddelse af.

**3234**

- SKAT finder endvidere ikke, at det er korrekt som angivet af selskabets repræsentant, at der i mail af 17. marts 2011 er udtrykt yderligere krav i forhold til de mundtlige krav, som er udtrykt i det mødeforløb, som har pågået siden den 6. januar 2011.
- Afslutningsvis er SKAT ikke enig i, som anført af selskabet, at der ikke kan stilles supplerende krav i henhold til kommentaren til OECD's modeloverenskomst samt EU-retten.

Hvis et bagvedliggende selskab i et DBO-land (eller en medlemsstat i EU) ikke skattemæssigt anses for modtager af renterne i hjemlandet, er det SKATs opfattelse, at selskabet ikke kan anses for at være en retmæssig ejer til renterne, der kan påberåbe sig beskyttelse mod kildeskatten i henhold til DBO'en og/eller EU-retten. At selskabet ikke kan påberåbe sig DBO'en følger bl.a. af pkt. 6.5 i kommentarerne til artikel 1 i modelkonventionen, jf. også pkt. 54, 65 og 69-70 i »The Application of the OECD Model Tax Convention to Partnerships«.

SKATs opfattelse anses ikke for at være i modstrid med OECD's modeloverenskomst samt EU-retten.

Den samlede konklusion er derfor, at ansættelsen fastholdes.«

SKAT traf den 5. oktober 2015 afgørelse om, at der skulle tilbagebetales i alt 108.526.049 kr. i renteskat for de omhandlede skatteår. Reguleringen skyldtes, at der ved afgørelsen af 18. marts 2011 var pålagt 30 % i renteskat, men at rentesatsen rettelig skulle være mindre, svarende til rentesatsen der gjaldt for beskatning af danske selskabers renteindtægter. Det samlede krav på kildeskat udgjorde herefter 817.238.912 kr.

*Supplerende oplysninger om koncernen og lånene*

Pr. 29. april 2006 var koncernstrukturen således (bilag 5 til SKATs afgørelse):



Selskabet Nordic Telephone Management Holding ApS stiftedes herefter den 20. december 2006 og kom ind som anpartshaver i Nordic Telephone Company Investment ApS den 22. december 2006. Nordic Telephone Management Holding ApS var primært ejet af Angel Lux Common S.a.r.l. med 81,3 % og resten af ledende medarbejdere i de danske selskaber.

De fem selskaber, Angel Lux I S.a.r.l., Angel Lux II S.a.r.l., Angel Lux III S.a.r.l., Angel Lux IV S.a.r.l. og Kabler S.a.r.l., blev likvideret pr. 20. december 2007,

**3235**

således at Angel Lux Parent S.a.r.l. herefter ejede Angel Lux Common S.a.r.l.

Pr. 31. december 2007 og 31. december 2008 var koncernstrukturen således (bilag 11 til SKATs afgørelse):

*BILAG 11 Koncernoversigt pr. 31. december 2007 og 31. december 2008*



*Selskaberne Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l.*

Angel Lux Common S.à.r.l. og Angel Lux Parent S.à.r.l., der blev stiftet henholdsvis den 25. og 26. april 2006, er begge fuldt skattepligtige til Luxembourg. Af brev af 10. juli 2008 fra skattemyndighederne i Luxembourg til de danske skattemyndigheder fremgår bl.a.:

»…In response to your information requested dated February 27th 2008, your reference 08-034555, W14612, regarding the Luxembourg companies Angel Lux Parent S.à.r.l., Angel Lux I S.à.r.l., Angel Lux II S.à.r.l., Angel Lux III S.à.r.l., Angel Lux IV S.à.r.l. Angel Lux Common S.à.r.l. and Kabler S.à.r.l, I am honoured to inform you:

»…The above mentioned companies are not covered by the law of 15 June 2004 or by any other law granting a special fiscal status.

The companies are fully liable to the corporation tax (l'impôt sur le revenue des collectivités), the capital tax (l'impôt sur la fortune), the communal trade tax (l'impôt commercial communal)…««

I perioden fra 2006-2008 havde Angel Lux Common S.à.r.l. driftsudgifter (eksklusive renteudgifter) på henholdsvis ca. 220.000, 140.000 og 700.000 euro, mens Angel Lux Parent S.à.r.l. havde driftsudgifter (eksklusive renteudgifter) på henholdsvis ca. 130.000, 290.000 og 2.140.000 euro. De pågældende udgifter vedrørte bl.a. løn, leje, udgifter til kontorhold, udgifter til eksterne rådgivere mv., som angivet i SKATs afgørelse pkt. 5.

Det fremgår af Angel Lux Common S.à.r.l.'s årsregnskaber for 2007 og 2008, at selskabet i gennemsnit havde to personer ansat på deltid i løbet af årene. Det

**3236**

fremgår af Angel Lux Parent S.à.r.l.'s årsregnskaber for 2007 og 2008, at selskabet i gennemsnit havde én person ansat på deltid i løbet af årene. Der foreligger ikke specifikationer af selskabernes omkostninger for 2007-2009.

Angel Lux Common S.á.r.l.'s eneste aktiv, ud over anparterne i Nordic Telephone Company Investment ApS, var fordringen i henhold til PECs udstedt af samme selskab.

*De fremlagte konsortieaftaler*

Af en aftale af 24. august 2005 benævnt »Project Angel - Consortium Heads of Terms« fremgår de fem kapitalfonde, Apax Partners Worldwide LLP (»Apax«), The Blackstone Group International Limited (»Blackstone«), Permira Advisers KB (»Permira«), Providence Equity Partners Limited (»Providence«) og Kohlberg Kravis Roberts & Co. Limited (»KKR«), som konsortiemedlemmer. Om »Governance« fremgår det bl.a. af aftalen:

»All significant decisions relating to the conduct of the transaction and, if the proposed transaction is consummated, relating to the business of the acquisition vehicles (collectively, »InvestCo«) and the acquired group (»Angel«) (i.e., decisions of a type customarily made by a board of directors or the shareholders/equity owners) will require the affirmative approval of at least 3 out of 5 of the Parties…«

Af den supplerende aftale af 16. november 2005 mellem samme fem kapitalfonde benævnt »Subscription and Shareholders Agreement« fremgår om »Investment Structure« bl.a.:

»In the event of any transaction that would trigger withholding taxes on any distribution to an Investor, each Investor will use its best efforts to structure any such transaction and/or amend the investment structure as may be reasona-bly advisable to avoid any such withholding taxes…«

Af samme aftale fremgår om »Governance« bl.a.:

»Each Investor will appoint one Danish Topco director and one Angel director (and, in each case, have one observer) and will appoint one representative to the Investors Committee.

Investors Committee operates on principle of approval of 3 of 5 Investors required. Matters listed on Annex A of this Term Sheet require the approval of the Investors Committee.

Certain »supermajority« matters as listed on Annex B of this Term Sheet require approval of 4 of 5 members of the Investors Committee.

An Investor loses rights to board and Investors Committee representatives when it ceases to hold over 50% of its original aggregate investment in Danish Topco shares and PECs.«

Af den opfølgende og mere uddybende aftale, som ligeledes er benævnt »Subscription and Shareholders Agreement«, af 7. december 2005 indgået mellem samme fem kapitalfonde, de fem selskaber i Luxembourg (Angel Lux I-IV og Kabler S.a.r.l.) samt de danske NTC-selskaber fremgår, at de fem navngivne medlemmer af »the Holdco Board« [NTC Investment ApS], er udpeget af hver af de

Copyright © 2023 Karnov Group Denmark A/S

fem kapitalfonde. Det fremgår endvidere bl.a.: »The same persons will also be members of the boards of directors of each Acquisition Subsidiary.«

Af aftalen fremgår tillige:

»ARTICLE IV

*CLOSING DATE ACTIONS*

4.1. *Board Actions.* On or prior to the Closing Date, the Holdco Board shall hold a meeting to consider the approval of all documents to be executed by each member of the Group at Closing and all matters contemplated or required by such documents and this Agreement.

4.2. *Subscription.* Subject to the terms and conditions hereof and the Equity Commitment Letters, on or prior to the Closing Date, the following actions will be taken:

(i)     Each Investor will irrevocably subscribe and pay for Shares and PECs as set forth in Exhibit B in an aggregate amount equal to its Equity Commitment in each case in accordance with Article III.

(ii)    …

(iii)   Holdco and each Acquisition Subsidiary, as applicable, will transfer the amounts received pursuant to this Section 4.2. to Bidco [Nordic Telephone Company ApS] in accordance with instructions received from the Holdco Board.

Exhibit B er ikke fremlagt for landsretten.

Såvel aftalen af 7. december 2005 og den efterfølgende aftale indgået den 25. januar 2006 benævnt »Amended and Restated Subscription and Shareholders Agreement« indeholder udførlige bestemmelser om bl.a. »Governance« and »Transfers«.

Endelig indeholder en aftale af 27. april 2006 benævnt »Second Amended and Restated Subscription and Shareholders Agreement« bl.a. bestemmelser om, at bestyrelsen for de nystiftede selskaber Angel Lux Common S.a.r.l. og Angel Lux Parent S.a.r.l. skulle bestå af de samme fem navngivne bestyrelsesmedlemmer som nævnt i aftalen af 7. december 2005. Det fremgår endvidere: »The same persons will also be members of the board of directors of each Acquisition Subsidiary.«

Af aftalen fremgår tillige:

»5.8 *Investors Committee.* The Investors agree that the principal governing body of their investment in the Group will be a committee of representatives of the Investors (the »*Investors Committee*«), to the fullest extent permitted by law, recognizing that the Investors Committee is a creation of contract and not of corporate law. The executive officers of the various members of the Group shall, in addition to their other duties, report to the Investors Committee if so requested. Each Investor shall take, and shall instruct its representative(s),

**3237**

nominee(s) or designee(s), as the case may be, on the Investors Committee, on each Board and any committee thereof and on the board or any similar governing body of each Subsidiary of Holdco (each, a »*Subsidiary Board*«) to take, any and all action within its power to effectuate any decision taken by the Investors Committee in respect of any matter contemplated by this Agreement to be subject to the approval of the Investors Committee or reasonably related to the investment of the Investors in the Shares and PECs, and an Investor shall not take, and shall instruct its representative(s), nominee(s) or designee(s), as the case may be, on the Investors Committee, on each Board and on any committee thereof and on each Subsidiary Board not to take, any action that would contravene any decision taken by the Investors Committee. Each Investor agrees that, unless and until any matter that requires the prior approval of the Investors as set forth in Section 5.11 or elsewhere in

this Agreement has been considered and either approved or rejected by the Investors Committee or if any other matter otherwise is considered and either approved or rejected by the Investors Committee, it shall take any and all actions to the extent such actions are within its power and control in its capacity as an investor in Holdco [Angel Lux Parent S.a.r.l.], and shall instruct its representative(s), nominee(s) or designee(s), as the case may be, on the Investors Committee, on each Board and on any committee thereof and on each Subsidiary Board to take any and all action within the power of such Person (i) to procure that such matter shall not be placed on the agenda of any meeting of a Board or any committee thereof or any Subsidiary Board or by any shareholders and that consideration of such matter at any meeting of a Board or committee thereof or any Subsidiary Board or by any shareholders otherwise shall be delayed and (ii) in any event, to refrain from voting on such matter (whether for or against) at any such meeting.

5.9 *Composition of Investors Committee.*

(a) The Investors Committee shall initially consist of five members. Each of the Investors shall designate one member of the Investors Committee (each such member, an »*Investor Representative*«). Each Investor's Investor Repre-sentative must also be such Investor's Shareholder Director. The chairman of the Investors Committee shall be elected by the Investors Committee. Each initial Investor Representative is identified below opposite the name of the designating Investor.

| Designating Investor | Investor Representative |
|---|---|
| Apax | C |
| Blackstone | D |
| KKR | E |
|  | G |
| Permira | F |
| Providence | G« |

Det er ubestridt, at de fem kapitalfonde er hjemmehørende i lande uden for EU uden dobbeltbeskatningsoverenskomst med Danmark.

NTC Parent S.a.r.l. har under sagens behandling i landsretten fremlagt oversigter over investorer udarbejdet af kapitalfondene samt oversigt over de ultimative investorers hjemmehørende-status. Skatteministeriet har bestridt, at disse oversigter udgør dokumentation for de bagvedliggende investorer.

## III. EU-Domstolens besvarelse af præjudicielle spørgsmål

Ved EU-Domstolens (Store Afdeling) dom af 26. februar 2019 i de forenede sager C-115/16, C-118/16, C-119/16 og C-299/16 besvarede Domstolen en række præjudicielle spørgsmål, som Østre Landsret ved kendelse af 19. februar 2016 havde stillet i fire sager, herunder de to sager omhandlet i nærværende dom (Takeda-sagen B-2942-12 er omhandlet i C-118/16, og NTC-sagen B-171-13 er omhandlet i C-115/16). Af dommen fremgår bl.a.:

»*Om det første spørgsmål, litra a)-c), det andet spørgsmål, litra a) og b), og det tredje spørgsmål i sag C-115/16, sag C-118/16, sag C-119/16 og sag C-299/16*

83 For det første ønsker de forelæggende retter med det første spørgsmål, litra a)-c), i sag C-115/16, sag C-118/16, sag C-119/16 og sag C-299/16 oplyst, hvilken fortolkning der skal anlægges af begrebet »retmæssig ejer« som omhandlet i artikel 1, stk. 1 og 4, i direktiv 2003/49. For det andet ønsker de forelæggende retter med det andet spørgsmål, litra a) og b), og det spørgsmål i sag C-118/16, sag C-119/16 og sag C-299/16 nærmere bestemt

U.2023.3198H

oplyst, om den bekæmpelse af svig eller misbrug, der er tilladt i medfør af artikel 5 i direktiv 2003/49, forudsætter, at der findes en national eller overenskomstmæssig anti-misbrugsbestemmelse som omhandlet i nævnte artikels stk. 1. De forelæggende retter ønsker navnlig oplyst, om en national eller overenskomstmæssig bestemmelse, der indeholder begrebet »retmæssig ejer«, kan anses for at udgøre et retsgrundlag, der gør det muligt at bekæmpe svig eller retsmisbrug.

*Begrebet »retmæssig ejer«*

84 Det bemærkes indledningsvis, at begrebet den »retmæssige ejer af [...] renter«, der er indeholdt i artikel 1, stk. 1, i direktiv 2003/49, ikke kan henvise til nationalretlige begreber af forskellig rækkevidde.

85 Det er i denne henseende blevet fastslået, at det fremgår af anden til fjerde betragtning til direktiv 2003/49, at direktivet har til formål at afskaffe dobbeltbeskatning vedrørende renter og royalties, der betales mellem associerede selskaber i forskellige

**3238**

medlemsstater, og at sikre, at disse betalinger beskattes én gang i en medlemsstat, idet den mest hensigtsmæssige måde at sikre, at nationale og tværnationale transaktioner behandles skattemæssigt ens, er at ophæve beskatningen af renter og royalties i den medlemsstat, hvor de opstår (dom af 21.7.2011, Scheuten Solar Technology, C-397/09, EU:C:2011:499, præmis 24).

86 Anvendelsesområdet for direktiv 2003/49 omfatter, således som det er afgrænset i direktivets artikel 1, stk. 1, derfor skattefritagelse af betalinger af renter eller royalties, som er opstået i kildestaten, forudsat at den retmæssige ejer deraf er et selskab med hjemsted i en anden medlemsstat eller et fast driftssted beliggende i en anden medlemsstat og tilhørende et selskab i en medlemsstat (dom af 21.7.2011, Scheuten Solar Technology, C-397/09, EU:C:2011:499, præmis 26).

87 Domstolen har i øvrigt fremhævet, at eftersom dette direktivs artikel 2, litra a), definerer renter som »indkomst af gældsfordringer af enhver art«, er det alene den retmæssige ejer, som kan modtage renter, der udgør indkomst af sådanne gældsfordringer (jf. i denne retning dom af 21.7.2011, Scheuten Solar Technology, C-397/09, EU:C:2011:499, præmis 27).

88 Begrebet »retmæssig ejer« som omhandlet i dette direktiv skal derfor fortolkes således, at det betegner en enhed, som reelt modtager de renter, som betales til den. Direktivets artikel 1, stk. 4, bestyrker denne henvisning til den økonomiske realitet, idet det heri præciseres, at et selskab i en medlemsstat kun anses for at være den retmæssige ejer af renter eller royalties, hvis det modtager disse betalinger til eget brug og ikke som formidler, herunder som agent, mandatar eller bemyndiget signatar for en anden person.

89 Hvor visse sprogversioner af artikel 1, stk. 1, i direktiv 2003/49, såsom den bulgarske, den franske, den lettiske og den rumænske, anvender udtrykket »modtager« [o.a.: svarende til på fransk »bénéficiaire«], anvender de øvrige sprogversioner, således som det fremgår af nærværende doms præmis 10, udtryk såsom »den faktiske modtager« [o.a.: svarende til på fransk »bénéficiaire effectif«] (den spanske, den tjekkiske, den estiske, den engelske, den italienske, den litauiske, den maltesiske, den portugisiske og den finske sprogversion), »den retmæssige ejer«/»den, som har brugsretten« [o.a.: svarende til på fransk »propriétaire«/»celui qui a le droit d'utiliser«] (den tyske, den danske, den græske, den kroatiske, den ungarske, den polske, den slovakiske, den slovenske og den svenske sprogversion), eller »den, som i sidste ende har retten« [o.a.: svarende til på fransk »celui qui a droit en dernier lieu« (den nederlandske sprogversion). Anvendelsen af disse forskellige udtryk vidner om, at udtrykket »modtageren« ikke tager sigte på en modtager, der identificeres formelt, men derimod den enhed, som

økonomisk set modtager de oppebårne renter og derfor har mulighed for frit at råde over anvendelsen heraf. I overensstemmelse med det i nærværende doms præmis 86 nævnte kan alene en enhed med hjemsted i EU udgøre den retmæssige ejer af renter, som kan være omfattet af den fritagelse, der er fastsat i artikel 1, stk. 1, i direktiv 2003/49.

90 Som det fremgår af forslaget til Rådets direktiv om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede virksomheder i forskellige medlemsstater, der blev forelagt den 6. marts 1998 (KOM(1998) 67 endelig), og som ligger til grund for direktiv 2003/49, lader direktivet sig desuden inspirere af artikel 11 i OECD's modelbeskatningsoverenskomst af 1996 og forfølger det samme formål som denne, nemlig at undgå international dobbeltbeskatning. Begrebet »retmæssig ejer«, som er indeholdt i bilaterale overenskomster, der er baseret på denne modelbeskatningsoverenskomst, samt de efterfølgende ændringer af nævnte modeloverenskomst og kommentarerne hertil, er derfor relevante for fortolkningen af nævnte direktiv.

91 Sagsøgerne i hovedsagerne har gjort gældende, at en fortolkning af begrebet den »retmæssige ejer af [...] renter eller royalties« som omhandlet i artikel 1, stk. 1, i direktiv 2003/49 i lyset af OECD's modelbeskatningsoverenskomst og de dertil hørende kommentarer ikke kan tillades, idet en sådan fortolkning ville være uden demokratisk legitimitet. Dette argument kan imidlertid ikke tiltrædes, idet en sådan fortolkning, selv hvis den er inspireret af OECD's tekster, sker på grundlag af direktivet - således som det fremgår af nærværende doms præmis 85-90 - der såvel i sig selv som i sin lovgivningsmæssige tilblivelseshistorie afspejler EU's demokratiske proces.

92 Det fremgår således af OECD's modelbeskatningsoverenskomst og de dertil hørende kommentarer, således som disse er gengivet i nærværende doms præmis 4-6, at begrebet »retmæssig ejer« hverken omfatter gennemstrømnings-selskaber eller er anvendt i en snæver teknisk forstand, men er anvendt med henblik på at undgå dobbeltbeskatning og forhindre skatteundgåelse og skatteunddragelse.

93 De bilaterale overenskomster, som medlemsstaterne indbyrdes har indgået med hinanden på grundlag af OECD's modelbeskatningsoverenskomst, såsom dobbeltbeskatningsoverenskomsten mellem de nordiske lande, vidner også om denne udvikling. Det må således fastslås, at disse overenskomster, der er gengivet i nærværende doms præmis 16-18, alle indeholder udtrykket »retmæssig ejer« som omhandlet i nævnte modeloverenskomst.

94 Det skal endvidere præciseres, at den blotte omstændighed, at det selskab, som modtager renter i en medlemsstat, ikke er renternes »retmæssige ejer«, ikke nødvendigvis betyder, at den i artikel 1, stk. 1, i direktiv

**3239**

2003/49 fastsatte fritagelse ikke finder anvendelse. Det er således tænkeligt, at sådanne renter i henhold hertil er fritaget i kildestaten, såfremt det selskab, som modtager renterne, overfører beløbet til en retmæssig ejer, der er hjemmehørende i EU og derudover opfylder samtlige de betingelser, i direktiv 2003/49 er fastsat for at kunne være omfattet af en sådan fritagelse.

*Spørgsmålet om, hvorvidt det er nødvendigt, at der findes en specifik national eller overenskomstmæssig bestemmelse, som gennemfører artikel 5 i direktiv 2003/49*

95 De forelæggende retter ønsker oplyst, om en medlemsstat for at bekæmpe retsmisbrug inden for rammerne af anvendelsen af direktiv 2003/49 skal have vedtaget en specifik national bestemmelse til gennemførelse af direktivet, eller om medlemsstaten kan henvise til nationale eller overenskomstmæssige anti-misbrugsprincipper eller -bestemmelser.

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

96 I denne henseende følger det af fast retspraksis, at der findes et almindeligt EU-retligt princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug (dom af 9.3.1999, Centros, C-212/97, EU:C:1999:126, præmis 24 og den deri nævnte retspraksis, af 21.2.2006, Halifax m.fl., C-255/02, EU:C:2006:121, præmis 68, af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 35, af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 27, og af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99).

97 Det påhviler borgerne at overholde dette almindelige retsprincip. Anvendelsen af EU-retten kan således ikke udvides til at dække handlinger, der gennemføres med det formål ved svig eller misbrug at drage nytte af de fordele, der er hjemlet i EU-retten (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 38, af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 27, og af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99).

98 Det følger således af dette princip, at en medlemsstat skal nægte at indrømme fordelene i EU-retlige bestemmelser, såfremt disse ikke er blevet påberåbt med henblik på at gennemføre målene med disse bestemmelser, men med henblik på at drage nytte af en EU-retlig fordel, selv om betingelserne for indrømmelse af denne fordel alene er opfyldt formelt.

99 Dette er f.eks. tilfældet, såfremt gennemførelsen af toldformaliteter ikke har fundet sted som led i en almindelig handel, men er rent formel og alene har haft til formål retsstridigt at profitere af monetære udligningsbeløb (jf. i denne retning dom af 27.10.1981, Schumacher m.fl., 250/80, EU:C:1981:246, præmis 16, og af 3.3.1993, General Milk Products, C-8/92, EU:C:1993:82, præmis 21) eller eksportrestitutioner (jf. i denne retning dom af 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, præmis 59).

100 Princippet om forbud mod retsmisbrug finder desuden anvendelse på så vidt forskellige områder som de frie varebevægelser (dom af 10.1.1985, Association des Centres distributeurs Leclerc og Thouars Distribution, 229/83, EU:C:1985:1, præmis 27), den frie udveksling af tjenesteydelser (dom af 3.2.1993, Veronica Omroep Organisatie, C-148/91, EU:C:1993:45, præmis 13), offentlige tjenesteydelseskontrakter (dom af 11.12.2014, Azienda sanitaria locale n. 5 »Spezzino« m.fl., C-113/13, EU:C:2014:2440, præmis 62), etableringsfriheden (dom af 9.3.1999, Centros, C-212/97, EU:C:1999:126, præmis 24), selskabsretten (dom af 23.3.2000, Diamantis, C-373/97, EU:C:2000:150, præmis 33), social sikring (dom af 2.5.1996, Paletta, C-206/94, EU:C:1996:182, præmis 24, af 6.2.2018, Altun m.fl., C-359/16, EU:C:2018:63, præmis 48, og af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99), transport (dom af 6.4.2006, Agip Petroli, C-456/04, EU:C:2006:241, præmis 19-25), socialpolitikken (dom af 28.7.2016, Kratzer, C-423/15, EU:C:2016:604, præmis 37- 41), restriktive foranstaltninger (dom af 21.12.2011, Afrasiabi m.fl., C-72/11, EU:C:2011:874, præmis 62) og merværdiafgift (moms) (dom af 21.2.2006, Halifax m.fl., C-255/02, EU:C:2006:121, præmis 74).

101 Hvad angår sidstnævnte område har Domstolen gentagne gange udtalt, at selv om bekæmpelse af svig, afgiftsunddragelse og muligt misbrug er et formål, som anerkendes og støttes i Rådets sjette direktiv 77/388/EØF af 17. maj 1977 om harmonisering af medlemsstaternes lovgivning om omsætningsafgifter - Det fælles merværdiafgiftssystem: ensartet beregningsgrundlag (EFT 1977, L 145, s. 1), udgør princippet om forbud mod misbrug et generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet misbrugt, har

hjemmel i traktaterne, i en forordning eller i et direktiv (jf. i denne retning dom af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 30 og 31).

102 Det følger heraf, at det generelle princip om forbud mod misbrug skal gøres gældende over for en person, såfremt denne påberåber sig visse EU-retlige regler, som fastsætter en fordel, på en måde, der ikke er i overensstemmelse med de mål, som disse regler har. Domstolen har således udtalt, at dette princip kan gøres gældende over for en afgiftspligtig person for navnlig at nægte vedkommende retten til momsfritagelse, også selv om der ikke findes bestemmelser i national ret, som foreskriver en sådan nægtelse (jf. i denne retning dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 62, og af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 33).

**3240**

103 I hovedsagerne er de regler, som ifølge SKAT er blevet misbrugt, bestemmelserne i direktiv 2003/49, der er blevet vedtaget med henblik på at fremme et indre marked, der har karakter af et hjemmemarked, og som i kildestaten fastsætter en skattefritagelse for renter, der betales til et associeret selskab med hjemsted i en anden medlemsstat. Som det fremgår af det direktivforslag, der er nævnt i nærværende doms præmis 90, er visse definitioner i dette direktiv inspireret af definitionerne i artikel 11 i OECD's modelbeskatningsoverenskomst af 1996.

104 Selv om artikel 5, stk. 1, i direktiv 2003/49 bestemmer, at direktivet ikke udelukker anvendelse af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug, kan denne bestemmelse ikke fortolkes således, at den udelukker anvendelsen af det generelle EU-retlige princip om forbud mod misbrug, som er omtalt i nærværende doms præmis 96-98. De transaktioner, som af SKAT hævdes at være udtryk for misbrug, er nemlig omfattet af EU-rettens anvendelsesområde (jf. i denne retning dom af 22.12.2010, Weald Leasing, C-103/09, EU:C:2010:804, præmis 42) og kan vise sig at være uforenelige med det formål, som dette direktiv forfølger.

105 Selv om artikel 5, stk. 2, i direktiv 2003/49 bestemmer, at medlemsstaterne kan tilbagekalde fordele i henhold til dette direktiv eller nægte at anvende direktivet i tilfælde af skatteunddragelse, skatteundgåelse eller misbrug, kan heller ikke denne bestemmelse fortolkes således, at den udelukker anvendelsen af det EU-retlige princip om forbud mod misbrug, for så vidt som anvendelsen af nævnte princip ikke er underlagt et krav om gennemførelse, som det er tilfældet for dette direktivs bestemmelser (jf. i denne retning dom af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 28 og 31).

106 Som det er anført i nærværende doms præmis 85, fremgår det af anden til fjerde betragtning til direktiv 2003/49, at direktivet har til formål at afskaffe dobbeltbeskatning vedrørende renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, samt mellem sådanne selskabers faste driftssteder, dels med henblik på at undgå tyngende administrative formaliteter og likviditetsproblemer for selskaberne, dels for at sikre, at nationale og tværnationale transaktioner behandles skattemæssigt ens.

107 Såfremt det imidlertid var tilladt at skabe finansielle konstruktioner alene med det formål at kunne drage nytte af de skattefordele, der følger af anvendelsen af direktiv 2003/49, ville dette ikke være i overensstemmelse med sådanne formål, men ville derimod være til skade for såvel den økonomiske samhørighed som det indre markeds funktion, idet det ville fordreje konkurrencevilkårene. Som generaladvokaten i det væsentlige har anført i punkt 63 i forslaget til afgørelse i sag C-115/16, gør det samme sig gældende, selv hvis de omhandlede transaktioner ikke udelukkende forfølger

et sådant formål, idet Domstolen har fastslået, at princippet om forbud mod misbrug finder anvendelse på skatteområdet, når opnåelse af en skattefordel er hovedformålet med den omhandlede transaktion (jf. i denne retning dom af 21.2.2008, Part Service, C-425/06, EU:C:2008:108, præmis 45, og af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 53).

108 Den ret, som skattepligtige personer har til at drage fordel af den indbyrdes skattekonkurrence medlemsstaterne imellem på grund af den manglende harmonisering af indkomstskatterne, er i øvrigt ikke til hinder for anvendelsen af det generelle princip om forbud mod misbrug. I denne henseende bemærkes, at direktiv 2003/49 har til formål at foretage en harmonisering på området for direkte skatter med henblik på at gøre det muligt for de erhvervsdrivende at drage fordel af det indre marked ved at ophæve dobbeltbeskatning, og at sjette betragtning til direktivet nærmere bestemt præciserer, at medlemsstaterne ikke må afskæres fra at træffe passende foranstaltninger til bekæmpelse af svig eller misbrug.

109 Selv om den omstændighed, at den skattepligtige person søger den skatteordning, der er den mest fordelagtige for personen, ganske vist ikke i sig selv kan danne grundlag for en generel formodning for svig eller misbrug (jf. i denne retning dom af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 50, af 29.11.2011, National Grid Indus, C-371/10, EU:C:2011:785, præmis 84, og af 24.11.2016, SECIL, C-464/14, EU:C:2016:896, præmis 60), forholder det sig ikke desto mindre således, at en sådan skattepligtig person ikke kan indrømmes en ret eller en fordel, der følger af EU-retten, såfremt den omhandlede transaktion økonomisk set er et rent kunstigt arrangement, hvis formål er at omgå den pågældende medlemsstats lovgivning (jf. i denne retning dom af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 51, af 7.11.2013, K, C-322/11, EU:C:2013:716, præmis 61, og af 25.10.2017, Polbud - Wykonawstwo, C-106/16, EU:C:2017:804, præmis 61-63).

110 Det følger af disse forhold, at det påhviler de nationale myndigheder og domstole at nægte at indrømme de fordele, der er fastsat i direktiv 2003/49, såfremt påberåbelsen heraf sker for at muliggøre svig eller misbrug.

111 I forhold til det generelle EU-retlige princip om forbud mod misbrug og nødvendigheden af at overholde dette princip inden for rammerne af gennemførelsen af EU-retten er det uden betydning for de nationale myndigheders forpligtelse til at nægte at indrømme de i

**3241**

direktiv 2003/49 fastsatte rettigheder, der påberåbes for at muliggøre svig eller misbrug, at der findes nationale eller overenskomstmæssige anti-misbrugsbestemmelser.

112 Sagsøgerne i hovedsagerne har påberåbt sig dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408), som vedrørte indrømmelsen af en skattefritagelse fastsat i Rådets direktiv 90/434/EØF af 23. juli 1990 om en fælles beskatningsordning ved fusion, spaltning, tilførsel af aktiver og ombytning af aktier vedrørende selskaber i forskellige medlemsstater (EFT 1990, L 225, s. 1), med henblik på at gøre gældende, at det følger af artikel 5, stk. 1, i direktiv 2003/49, at den omhandlede medlemsstat kun kan nægte at indrømme de fordele, som er fastsat i dette direktiv, såfremt den nationale lovgivning indeholder et særskilt og specifikt retsgrundlag i denne henseende.

113 Denne argumentation kan imidlertid ikke tiltrædes.

114 Domstolen bemærkede ganske vist i præmis 42 i dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408), at retssikkerhedsprincippet er til hinder for, at direktiver i sig selv kan skabe forplig-

telser for borgerne, og at de derfor ikke kan påberåbes af medlemsstaten over for borgerne.

115 Domstolen bemærkede endvidere, at en sådan konstatering ikke berører forpligtelsen for alle myndigheder i en medlemsstat til ved anvendelsen af national ret i videst muligt omfang at fortolke denne i lyset af direktivers ordlyd og formål for at fremkalde det med direktiverne tilsigtede resultat, idet disse myndigheder således har mulighed for at gøre en overensstemmende fortolkning af national ret gældende over for borgerne (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 45 og den deri nævnte retspraksis).

116 Det var på grundlag af disse betragtninger, at Domstolen opfordrede den forelæggende ret til at undersøge, om der i dansk ret fandtes en almindelig bestemmelse eller grundsætning, hvorefter der gjaldt et forbud mod retsmisbrug, eller andre bestemmelser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med den bestemmelse i direktiv 90/434, hvorefter en medlemsstat i det væsentlige kan nægte at indrømme den fradragsret, der er fastsat i dette direktiv, såfremt der er tale om en transaktion, der som sit væsentligste formål har en sådan svig eller unddragelse, og dernæst i givet fald at undersøge, om betingelserne for at anvende disse nationale bestemmelser var opfyldt i hovedsagen (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 46 og 47).

117 Selv hvis det i hovedsagerne skulle vise sig, at national ret ikke indeholder regler, der kan fortolkes i overensstemmelse med artikel 5 i direktiv 2003/49, kan det - uanset hvad Domstolen udtalte i dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408) - imidlertid ikke heraf udledes, at de nationale myndigheder og domstole er forhindret i at nægte at indrømme den fordel, der følger af den ret til fritagelse, der er fastsat i dette direktivs artikel 1, stk. 1, i tilfælde af svig eller retsmisbrug (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 54).

118 En nægtelse, der under omstændigheder gøres gældende over for en skattepligtig person, kan ikke henføres til den situation, som er omhandlet i nærværende doms præmis 114, idet en sådan nægtelse stemmer overens med det generelle EU-retlige princip om, at ingen kan gøre EU-retten gældende med henblik på at muliggøre svig eller misbrug (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 55 og 56 og den deri nævnte retspraksis).

119 For så vidt som forhold, der har karakter af svig eller misbrug, ikke kan danne grundlag for en ret i henhold til Unionens retsorden, således som det er anført i nærværende doms præmis 96, indebærer nægtelsen af en fordel i henhold til et direktiv ikke, at den berørte borger pålægges en forpligtelse i medfør af dette direktiv, men er blot en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel, som er fastsat i det nævnte direktiv for så vidt angår denne ret, alene er opfyldt formelt (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 57 og den deri nævnte retspraksis).

120 Under sådanne omstændigheder skal medlemsstaterne derfor nægte at indrømme den fordel, der i det foreliggende tilfælde følger af direktiv 2003/49, i overensstemmelse med det generelle princip om forbud mod misbrug, hvorefter EU-retten ikke kan dække erhvervsdrivendes retsstridige transaktioner (jf. i denne retning dom af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99).

121 Henset til konstateringen i ovennævnte doms præmis 111 er det ufornødent at besvare de forelæggende retters tredje spørgsmål,

U.2023.3198H

der nærmere bestemt vedrører spørgsmålet om, hvorvidt en bestemmelse i en dobbeltbeskatningsoverenskomst, som henviser til begrebet »retmæssig ejer«, kan udgøre et retsgrundlag til bekæmpelse af svig og misbrug inden for rammerne af direktiv 2003/49.

122 Henset til samtlige disse forhold skal det første spørgsmål, litra a)-c), og det andet spørgsmål, litra a) og b), i sag C-115/16, sag C-118/16, sag C-119/16 og C-299/16 besvares som følger:

**3242**

- Artikel 1, stk. 1, i direktiv 2003/49, sammenholdt med dette direktivs artikel 1, stk. 4, skal fortolkes således, at den fritagelse for enhver form for skat af rentebetalinger, der er fastsat heri, alene er forbeholdt sådanne renters retmæssige ejere, dvs. de enheder, som økonomisk set reelt modtager disse renter, og som derfor råder over beføjelsen til frit at fastlægge anvendelsen heraf.

- Det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for enhver form for skat af rentebetalinger, der er fastsat i artikel 1, stk. 1, i direktiv 2003/49, selv om det ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

*Om den første spørgsmål, litra d)-f), i sag C-115/16, sag C-118/16 og sag C-119/16, det første spørgsmål, litra d) og e), i sag C-299/16, det fjerde spørgsmål i sag C-115/16 og sag C-118/16, det femte spørgsmål i sag C-115/16, det sjette spørgsmål i sag C-118/16 og det fjerde spørgsmål i sag C-119/16 og sag C-299/16*

123 Med det første spørgsmål, litra d)-f), i sag C-115/16, sag C-118/16 og sag C-119/16, det første spørgsmål, litra d) og e), i sag C-299/16 samt det fjerde spørgsmål i sag C-115/16 og sag C-118/16 ønsker de forelæggende retter nærmere bestemt oplyst, hvilke elementer der udgør retsmisbrug, og på hvilken måde det kan påvises, at disse elementer foreligger. De ønsker i denne sammenhæng navnlig oplyst, om der kan foreligge retsmisbrug, såfremt den retmæssige ejer af renter, der overføres af gennemstrømningsselskaber, i sidste ende er et selskab med hjemsted i en tredjestat, med hvilken den pågældende medlemsstat har indgået en dobbeltbeskatningsoverenskomst. Med det femte spørgsmål i sag C-115/16, det sjette spørgsmål i sag C-118/16 og det fjerde spørgsmål i sag C-119/16 og sag C-299/16 ønsker de forelæggende retter nærmere bestemt oplyst, om en medlemsstat, der nægter at anerkende et selskab i en anden medlemsstat som retmæssig ejer af renter, er forpligtet til at fastlægge, hvilket selskab medlemsstaten i givet fald anser for den retmæssige ejer.

*Spørgsmålet om, hvilke elementer der udgør retsmisbrug, og de dertil hørende beviser*

124 Som det fremgår af Domstolens praksis, kræves der med henblik på at bevise, at der foreligger misbrug, dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (dom af 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, præmis 52 og 53, og af 12.3.2014, O. og B., C-456/12, EU:C:2014:135, præmis 58).

125 Det er således undersøgelsen af disse sammenfaldende omstændigheder, som gør det muligt at efterprøve, om de elementer, der udgør misbrug, foreligger, og navnlig om de pågældende erhvervsdrivende har foretaget rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål at opnå en uretmæssig fordel (jf. i

denne retning dom af 20.6.2013, Newey, C-653/11, EU:C:2013:409, præmis 47-49, af 13.3.2014, SICES m.fl., C-155/13, EU:C:2014:145, præmis 33, og af 14.4.2016, Cervati og Malvi, C-131/14, EU:C:2016:255, præmis 47).

126 Det tilkommer ikke Domstolen at vurdere de faktiske omstændigheder i hovedsagerne. Domstolen kan i en præjudiciel forelæggelsessag imidlertid i givet fald give de nationale domstole nærmere oplysninger med henblik på at vejlede dem ved bedømmelsen af de konkrete sager, som de skal pådømme. Selv om der i hovedsagerne foreligger en række holdepunkter, på baggrund af hvilke det ville kunne konkluderes, at der foreligger retsmisbrug, påhviler det ikke desto mindre de forelæggende retter at efterprøve, om disse holdepunkter er objektive og samstemmende, og om sagsøgerne i hovedsagerne har haft mulighed for at føre modbevis.

127 En koncern, som ikke er tilrettelagt af grunde, der afspejler den økonomiske realitet, som har en struktur, der er rent formel, og som har til hovedformål eller som af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse, kan anses for et kunstigt arrangement. Dette er navnlig tilfældet, når betalingen af renteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som overfører renterne, og det selskab, som er renternes retmæssige ejer.

128 Det udgør således et holdepunkt for at antage, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse, der er fastsat i artikel 1, stk. 1, i direktiv 2003/49, at disse renter i deres helhed eller stort set i deres helhed ganske kort tid efter modtagelsen heraf videreformidles af det selskab, som har modtaget dem, til enheder, som ikke opfylder betingelserne for anvendelse af direktiv 2003/49, enten fordi disse enheder ikke er hjemmehørende i en medlemsstat, fordi de ikke er stiftet under en af de former, som er omfattet af bilaget til nævnte direktiv, fordi de ikke er omfattet af en af de skatter, der er opregnet i nævnte direktivs artikel 3, litra a), nr. iii), uden at være omfattet af en fritagelse, eller fordi de ikke har karakter af associeret selskab som omhandlet i samme direktivs artikel 3, litra b).

**3243**

129 Enheder, hvis skattemæssige hjemsted er beliggende uden for EU, såsom de selskaber, der er omhandlet i sag C-119/16 og sag C-299/16, eller de kapitalfonde, der er omhandlet i sag C-115/16 og sag C-299/16, opfylder således ikke betingelserne for anvendelse af direktiv 2003/49. Såfremt renterne i disse sager var blevet betalt direkte af det danske selskab, der skyldte dem, til de modtagende enheder, som ifølge Skatteministeriet var renternes retmæssige ejere, ville Kongeriget Danmark have kunnet opkræve kildeskat.

130 Den kunstige karakter af et arrangement kan ligeledes underbygges ved, at den pågældende koncern er tilrettelagt således, at det selskab, der modtager de renter, der betales af debitorselskabet, selv skal betale disse renter til et tredje selskab, som ikke opfylder betingelserne for anvendelse af direktiv 2003/49, hvilket medfører, at dette selskab alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som gennemstrømningsselskab for at muliggøre pengestrømmen fra debitorselskabet til den enhed, som er de overførte beløbs retmæssige ejer.

131 Den omstændighed, at et selskab opererer som gennemstrømningsselskab, kan godtgøres, såfremt selskabets eneste aktivitet er at modtage renterne og videreoverføre dem til den retmæssige ejer eller til øvrige gennemstrømningsselskaber. Den manglende faktiske økonomiske aktivitet skal i denne henseende i lyset af de særlige kendetegn ved den pågældende økonomiske aktivitet udledes af en undersøgelse af samtlige relevante elementer vedrørende bl.a. driften af selskabet, dets regnskab, strukturen af selskabets omkost-

ninger og de reelt afholdte udgifter, det personale, som selskabet beskæftiger, og de lokaler og udstyr, som det råder over.

132 Det kan endvidere udgøre et holdepunkt for, at der foreligger et kunstigt arrangement, at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, der - således som det er anført i artikel 4 i direktiv 2003/49 - kan have til formål, at der fra et modtagende erhvervsdrivende selskab overføres udbytte til aktionærenheder med henblik på at undgå at betale skat eller at nedsætte skattebyrden mest muligt. Derudover kan der findes holdepunkter for, at der foreligger et sådant arrangement, i fremgangsmåden for transaktionernes finansiering, i vurderingen af de mellemliggende selskabers egenkapital og i gennemstrømningsselskabernes manglende beføjelser til at råde økonomisk over de modtagne renter. I denne henseende er det ikke alene en kontraktuel eller juridisk forpligtelse for det selskab, der modtager renterne, til at videreformidle dem til tredjemand, der kan udgøre et sådant holdepunkt, men ligeledes den omstændighed, at dette selskab, uden at være bundet af en sådan kontraktuel eller juridisk forpligtelse, »substantielt« - som anført af den forelæggende ret i sag C-115/16, sag C-118/16 og sag C-119/16 - ikke har rettighederne til at bruge og nyde disse midler.

133 Sådanne holdepunkter kan i øvrigt bestyrkes i tilfælde af sammenfald eller tidsmæssig nærhed mellem på den ene side ikrafttrædelsen af ny vigtig skattelovgivning, såsom den i hovedsagerne omhandlede danske lovgivning, som visse koncerner forsøger at omgå, og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern.

134 De forelæggende retter ønsker ligeledes nærmere bestemt oplyst, om der kan foreligge retsmisbrug, såfremt den retmæssige ejer af renter, der overføres af gennemstrømningsselskaber, i sidste ende er et selskab med hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af renterne, såfremt de var blevet betalt direkte til det selskab, der er hjemmehørende i denne tredjestat.

135 I denne henseende er det ved undersøgelsen af koncernstrukturen uden betydning, at visse af de retmæssige ejere af renter, som er blevet overført af gennemstrømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst. Det skal således fastslås, at den omstændighed, at der findes en sådan overenskomst, ikke i sig selv kan udelukke, at der foreligger retsmisbrug. En overenskomst af denne art kan dermed ikke rejse tvivl om, at der foreligger et retsmisbrug, hvis dette er behørigt godtgjort på grundlag af samtlige de faktiske omstændigheder, som bevidner, at de erhvervsdrivende har udført rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål uretmæssigt at drage fordel af den fritagelse for enhver form for skat, der er fastsat i artikel 1, stk. 1, i direktiv 2003/49.

136 Det skal hertil tilføjes, at mens en beskatning skal svare til en økonomisk realitet, kan den omstændighed, at der findes en dobbeltbeskatningsoverenskomst, ikke som sådan godtgøre realiteten af en betaling, der er foretaget til modtagere, som er hjemmehørende i den tredjestat, med hvilken denne overenskomst er indgået. Såfremt debitorselskabet for renterne ønsker at drage fordel af en sådan overenskomst, er det muligt for selskabet at betale disse renter direkte til de enheder, som har deres skattemæssige hjemsted i en stat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst.

137 Når dette er sagt, kan det heller ikke udelukkes, såfremt der foreligger en situation, hvor renterne ville have været fritaget, hvis de var blevet overført direkte til det selskab, som har sit hjemsted i en tredjestat, at

**3244**

målet med koncernstrukturen ikke er udtryk for retsmisbrug. I et sådant tilfælde kan koncernens valg af en sådan struktur i stedet for direkte betaling af renterne til nævnte selskab ikke anfægtes.

138 Såfremt den retmæssige ejer af en rentebetaling har sit skattemæssige hjemsted i en tredjestat, er nægtelsen af den fritagelse, der er fastsat i artikel 1, stk. 1, i direktiv 2003/49, i øvrigt på ingen måde underlagt en konstatering af, at der foreligger svig eller retsmisbrug. Som det i det væsentlige er anført i nærværende doms præmis 86, har denne bestemmelse udelukkende til formål at skattefritage betalinger af renter, som er opstået i kildestaten, såfremt renternes retmæssige ejer er et selskab med hjemsted i en anden medlemsstat eller et fast driftssted beliggende i en anden medlemsstat og tilhørende et selskab i en medlemsstat

139 Henset til samtlige disse elementer skal det første spørgsmål, litra d)-f), i sag C-115/16, sag C-118/16 og sag C-119/16, det første spørgsmål, litra d) og e), i sag C-299/16 og det fjerde spørgsmål i sag C-115/16 og sag C-118/16 besvares med, at det med henblik på at bevise, at der foreligger retsmisbrug, kræves dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel. Den omstændighed, at en række holdepunkter foreligger, kan godtgøre, at der foreligger retsmisbrug, forudsat at disse holdepunkter er objektive og samstemmende. Sådanne holdepunkter kan bl.a. være, at der findes gennemstrømningsselskaber, som ikke har nogen økonomisk begrundelse, og den rent formelle karakter af en koncerns struktur, af den finansielle konstruktion og af lån. Den omstændighed, at den medlemsstat, hvorfra renterne hidrører, har indgået en dobbeltbeskatningsoverenskomst med den tredjestat, hvor det selskab, som er renternes retmæssige ejer, er hjemmehørende, er uden betydning for en eventuel konstatering af, at der foreligger retsmisbrug.

*Bevisbyrden for, at der foreligger retsmisbrug*

140 Som det fremgår af artikel 1, stk. 11 og 12, samt af artikel 1, stk. 13, litra b), i direktiv 2003/49, bemærkes, at kildestaten kan pålægge et selskab, som har modtaget renter, at godtgøre, at selskabet er renternes retmæssige ejer i den forstand, hvori dette begreb er blevet præciseret i nærværende doms præmis 122, første led.

141 Domstolen har i øvrigt mere generelt udtalt, at der intet er til hinder for, at de berørte skattemyndigheder afkræver den skattepligtige de beviser, som de finder nødvendige for at foretage en korrekt ansættelse af de pågældende skatter og afgifter, og i givet fald afslår en anmodet fritagelse, hvis sådanne beviser ikke fremlægges (jf. i denne retning dom af 28.2.2013, Petersen og Petersen, C-544/11, EU:C:2013:124, præmis 51 og den deri nævnte retspraksis).

142 Såfremt en skattemyndighed i kildestaten har til hensigt at nægte et selskab, som har betalt renter til et selskab med hjemsted i en anden medlemsstat, den fritagelse, der er fastsat i artikel 1, stk. 1, i direktiv 2003/49, med den begrundelse, at der foreligger retsmisbrug, tilkommer det derimod denne myndighed at godtgøre, at de elementer, som udgør et sådant misbrug, foreligger ved at tage hensyn til samtlige relevante forhold, bl.a. den omstændighed, at det selskab, til hvilket renterne er blevet betalt, ikke er renternes retmæssige ejer.

143 I denne henseende tilkommer det ikke en sådan myndighed at fastlægge disse renters retmæssige ejer, men at godtgøre, at den hævdede retmæssige ejer blot er et gennemstrømningsselskab, hvorigennem et retsmisbrug har fundet sted. Det kan nemlig vise

sig umuligt at foretage en sådan fastlæggelse, navnlig eftersom de potentielle retmæssige ejere er ukendte. De nationale skattemyndigheder har ikke nødvendigvis de fornødne oplysninger med henblik på at kunne fastlægge disse retmæssige ejere, henset til kompleksiteten af visse finansielle konstruktioner og muligheden for, at de mellemliggende selskaber, der er involveret i konstruktionen, er hjemmehørende uden for EU. Det kan således kræves, at disse myndigheder fremlægger beviser, som det vil være umuligt for dem at føre.

144 Selv hvis de potentielle retmæssige ejere er kendte, er det desuden ikke nødvendigvis fastlagt, hvilke af disse der er eller vil blive de reelle retmæssige ejere. Såfremt et selskab, der modtager renter, har et moderselskab, som også selv har et moderselskab, vil det således med al sandsynlighed være umuligt for skattemyndighederne og domstolene i kildestaten at fastlægge, hvilket af disse to moderselskaber der er eller vil blive renternes retmæssige ejer. Der vil derudover kunne blive truffet beslutning om anvendelsen af disse renter efter skattemyndighedernes konstateringer vedrørende gennemstrømningsselskabet.

145 Det femte spørgsmål i sag C-115/16, det sjette spørgsmål i sag C-118/16 og det fjerde spørgsmål i sag C-119/16 og sag C-299/16 skal følgelig besvares med, at en national myndighed med henblik på at nægte at anerkende et selskab som retmæssig ejer af renter eller med henblik på at fastslå, at der foreligger retsmisbrug, ikke er forpligtet til at fastlægge, hvilken enhed eller hvilke enheder myndigheden anser for disse renters retmæssige ejer.

*Om det femte spørgsmål, litra a)-c), i sag C-118/16*

146 Med det femte spørgsmål, litra a)-c), i sag C-118/16 ønsker den forelæggende ret nærmere bestemt

**3245**

oplyst, om et SCA, der i henhold til luxembourgsk ret er godkendt som et SICAR, kan være omfattet af bestemmelserne i direktiv 2003/49. Det bemærkes, at dette spørgsmål kun er relevant, såfremt X SCA, SICAR skal anses for den retmæssige ejer af de renter, som nævnte selskab har modtaget fra X Denmark, hvilket det alene tilkommer den forelæggende ret at efterprøve.

147 Når dette er præciseret, skal det fremhæves, således som også Kommissionen og flere af de regeringer, der har afgivet indlæg, har gjort, at artikel 3, litra a), i direktiv 2003/49 underlægger egenskaben af »selskab i en medlemsstat«, som kan drage nytte af de i dette direktiv fastsatte fordele, opfyldelsen af tre betingelser. For det første skal dette selskab have en af de former, der er nævnt på listen i bilaget til direktivet. For det andet skal selskabet i overensstemmelse med skattelovgivningen i medlemsstaten anses for at være hjemmehørende i denne stat og må ikke i henhold til en dobbeltbeskatningsoverenskomst kunne anses for at være hjemmehørende uden for EU i skattemæssig henseende. For det tredje skal selskabet endelig være omfattet af en af de skatter, der er opregnet i artikel 3, litra a), nr. iii), i direktiv 2003/49 uden fritagelse eller af en identisk eller næsten tilsvarende skat, der efter dette direktivs ikrafttræden pålignes som supplement til eller i stedet for de eksisterende skatter.

148 Hvad angår den første betingelse skal denne - med forbehold af den forelæggende rets efterprøvelse - anses for at være opfyldt med hensyn til X SCA, SICAR, eftersom et SCA, der er godkendt som et SICAR, svarer til en af de selskabsformer, der er opregnet i bilaget til direktiv 2003/49, således som den luxembourgske regering har fremhævet i retsmødet.

149 Hvad angår den anden betingelse synes denne, med samme forbehold, ligeledes at være opfyldt, eftersom X SCA, SICAR er hjemmehørende i Luxembourg i skattemæssig henseende.

150 Hvad angår den tredje betingelse er det ubestridt, at X SCA, SICAR er omfattet af impôt sur le revenu des collectivités (selskabs-

skat) i Luxembourg, som er en af de skatter, der er opregnet i artikel 3, litra a), nr. iii), i direktiv 2003/49.

151 For det tilfælde, at det imidlertid måtte blive konstateret, således som SKAT har gjort gældende i tvisten i hovedsagen i sag C-118/16, at de renter, som X SCA, SICAR har modtaget, faktisk er fritaget for impôt sur le revenu des collectivités i Luxembourg, skal det således fastslås, at nævnte selskab ikke opfylder den ovenfor i nærværende doms præmis 147 nævnte tredje betingelse, og at selskabet derfor ikke kan anses for at være »selskab i en medlemsstat« som omhandlet i direktiv 2003/49. Det tilkommer imidlertid alene den forelæggende ret i givet fald at foretage den fornødne efterprøvelse heraf.

152 Denne fortolkning af rækkevidden af den i nærværende doms præmis 147 nævnte tredje betingelse understøttes dels af artikel 1, stk. 5, litra b), i direktiv 2003/49, hvoraf fremgår, at et fast driftssted kun kan anses for den retmæssige ejer af renter som omhandlet i dette direktiv, »hvis betalingerne af renter [som det modtager] udgør indtægter, der i den medlemsstat, hvor det faste driftssted er beliggende, er undergivet en af de skatter, der er anført i [direktivets] artikel 3, litra a), nr. iii) […]«, dels af direktivets formål, der er at sikre, at disse rentebetalinger beskattes én gang i en enkelt medlemsstat, som det i det væsentlige er anført i nærværende doms præmis 85.

153 Det femte spørgsmål, litra a)-c), i sag C-118/16 skal derfor besvares med, at artikel 3, litra a), i direktiv 2003/49 skal fortolkes således, at et SCA, der i henhold til luxembourgsk ret er godkendt som et SICAR, ikke kan kvalificeres som et selskab i en medlemsstat som omhandlet i dette direktiv, der kan være omfattet af den i direktivets artikel 1, stk. 1, fastsatte skattefritagelse, såfremt de renter, som nævnte SICAR har modtaget i en situation som den i hovedsagen omhandlede, er fritaget for impôt sur le revenu des collectivités i Luxembourg, hvilket det tilkommer den forelæggende ret at efterprøve.«

## IV. Retsgrundlag

*Selskabsskatteloven*

*Lovbekendtgørelse nr. 1125 af 21. november 2005 af lov om indkomstbeskatning af aktieselskaber mv. (Selskabsskatteloven)*

Lovbekendtgørelsens § 2, stk. 1, litra d, var affattet således:

»*§ 2.* Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1, der har hjemsted i udlandet, for så vidt de

…

d) oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab eller en forening m.v. omfattet af § 1 eller litra a har til udenlandske juridiske personer som nævnt i skattekontrollovens § 3 B (kontrolleret gæld). Dette gælder dog ikke for renter af fordringer, som er knyttet til et fast driftssted omfattet af litra a. Skattepligten omfatter ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende. Dette gælder dog kun, hvis det betalende selskab og det modtagende selskab er associeret som nævnt i dette direktiv i en sammenhængende periode på mindst 1 år, inden for hvilken betalingstidspunktet skal ligge. …«

**3246**

Ved lov nr. 308 af 19. april 2006 udgik ordet »udenlandske« af § 2, stk. 1, litra d, 1. pkt., der herefter omfattede både danske og udenlandske modtagere.

Bestemmelsen, som affattet i lovbekendtgørelse nr. 1125 af 21. november 2005 blev indsat i selskabsskatteloven ved lov nr. 221

Copyright © 2023 Karnov Group Denmark A/S

af 31. marts 2004. Af forarbejderne, lovforslag nr. L 119 af 17. december 2003, fremgår bl.a.:

»ALMINDELIGE BEMÆRKNINGER

1. Lovforslagets formål

Formålet med lovforslaget er

…

at gennemføre bestemmelserne i EU's rente-/royaltydirektiv,

…

at begrænse mulighederne for skatteplanlægning ved fradrag for koncerninterne renter, når det modtagende koncernselskab betaler ingen eller meget lidt i skat af de renter, der er fratrukket ved opgørelsen af dansk skattepligtig indkomst,

…

Lovforslagets indhold

…

4.3.3. Begrænset skattepligt af visse koncerninterne lån

Det foreslås, at fradragsretten for udgifter afholdt af et dansk selskab m.v. eller et fast driftssted i Danmark bortfalder, såfremt betalingen vedr. udgifterne efter udenlandske regler betragtes som koncerninterne skattefrie betalinger. Herud- over foreslås det, at rentebetalinger vedr. koncerninterne lån til selskaber i lande, som Danmark ikke har dobbeltbeskatningsaftaler med, beskattes gennem indeholdelse af en skat på 30 pct. Provenumæssigt har disse regler karakter af værnsregler, som vil forhindre en utilsigtet udhuling af grundlaget for selskabsskat og kulbrinteskat i Danmark.

…

Bemærkninger til de enkelte bestemmelser

…

Til § 10

Til nr. 1

Forslaget vedrører ændringer vedr. koncerninterne lån og forslaget om gennemførelse af rente-/royaltydirektivet i dansk skattelovgivning.

Det *foreslås* at indsætte en ny bestemmelse som litra d i selskabsskattelovens § 2, stk. 1, om begrænset skattepligt af koncerninterne renter. Formålet med bestemmelsen er at imødegå, at et dansk selskab m.v. nedsætter den danske beskatning ved at reducere den skattepligtige indkomst gennem rentebetalinger til visse finansielle selskaber i lavskatte-lande, hvis det udenlandske selskab m.v. kontrollerer det danske selskab m.v.

Udgangspunktet i den foreslåede § 2, stk. 1, litra d, 1. pkt. er, at den begrænsede skattepligt af renter alene skal omfatte renter af kontrolleret gæld, dvs. hvor det betalende og det modtagende selskab m.v. er koncernforbundet, som defineret i skattekontrollovens § 3 B.

b. Den begrænsede skattepligt skal ikke omfatte renter, som er omfattet af rente-/royalty-direktivet eller af en dobbeltbeskatningsoverenskomst mellem Danmark og Færøerne, Grønland eller det land, hvor det modtagende selskab er hjemmehørende, med den virkning, at beskatningen af renterne skal frafaldes eller nedsættes, jf. 3. pkt.

For det første betyder det, at den begrænsede skattepligt ikke omfatter et selskab, der er hjemmehørende i et andet EU-land, hvis rente-/royaltydirektivets betingelser er opfyldt.

…

For det andet betyder det, at den begrænsede skattepligt ikke skal omfatte rentebetalinger til et udenlandsk selskab, der er hjemmehørende i Færøerne, Grønland eller et andet land, som har en dobbeltbeskatningsoverenskomst med Danmark, hvis overenskomsten medfører, at Danmark skal frafalde eller nedsætte beskatningen af renterne.

Det er dansk politik ikke at indgå dobbeltbeskatningsoverenskomster med skattelyjurisdiktioner eller andre lavskatte-lande. Formålet med dobbeltbeskatningsoverenskomster er især at undgå international dobbeltbeskatning, så der er ikke noget særligt behov for at indgå overenskomster med sådanne lande.«

Den 17. februar 2004 besvarede skatteministeren en henvendelse fra Foreningen af Statsautoriserede Revisorer til Folketingets Skatteudvalg vedrørende ovennævnte lovforslag således (L119 - bilag 16):

»1. Selskabsskattelovens § 2, stk. 1, litra d

FSR kritiserer den foreslåede kildeskat på rentebetalinger til visse udenlandske finansielle selskaber.

…

FSR er tvivlende overfor, om renteskatten får den ønskede virkning, når ikke alle EU-lande har en tilsvarende lovgivning. Kommentar:

…

Der er ingen grund til at undlade at beskatte koncerninterne rentebetalinger her fra landet til rene skattely-selskaber, hvis formål er skattefri opsamling af renter, som andre koncernselskaber har fået fradrag for.

Det er rigtigt, at nogle EU-lande ikke har kildeskat på rentebetalinger til udenlandske modtagere. Det er heller ikke dansk skattepolitik at beskatte renter, som betales her fra landet til udenlandske rentemodtagere. Det ville blot fordyre dansk erhvervslivs låneoptagelse af forretningsmæssigt begrundet gæld. Imidlertid er det nødvendigt at begrænse mulighederne for skatteplanlægning ved, at dansk beskatning nedsættes ved koncerninterne rentebetalinger til et udenlandsk

**3247**

koncernselskab, som betaler ingen eller meget lav skat af de modtagne renter.

Den foreslåede kildeskat på renter er derfor målrettet, så den ikke omfatter alle rentebetalinger til udlandet. Kildeskatten gælder kun for rentebetalinger til visse finansielle selskaber i lande, som ikke er omfattet af EU's rente-/royaltydirektiv eller ikke har en dobbeltbeskatningsoverenskomst, der pålægger Danmark at nedsætte dansk skat af rentebetalinger til det pågældende land.

…

Den foreslåede kildeskat vil altså ikke omfatte rentebetalinger til långivere i de lande, som danske selskaber sædvanligvis har erhvervsforbindelser med. Det åbner ganske vist risiko for, at f.eks. et dansk selskab kan søge at omgå kildeskatten på rentebetalinger til et finansielt selskab i et lavskatte-land ved at betale renterne til et selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller en dansk dobbeltbeskatningsoverenskomst, og som ikke har kildeskat på rentebetalinger til udenlandske rentemodtagere, hvorefter dette selskab betaler renterne videre til selskabet i lavskattelandet. I sådanne tilfælde vil de danske skattemyndigheder imidlertid efter en konkret realitetsbedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskatte-landet, således at rentebetalingen hverken er omfattet af EU's rente-/royaltydirektiv eller dobbeltbeskatningsoverenskomsten.

Efter rente-/royaltydirektivets artikel 5, stk. 2, kan et EU-land nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteomgåelse eller misbrug som en væsentlig bevæggrund.

Bemærkningerne til OECD-modellen til dobbeltbeskatningsoverenskomster giver også en stat mulighed for at undlade at anvende en overenskomst i særlige tilfælde, jf. afsnittet om misbrug af overenskomsten i bemærkningerne til modellens artikel 1.

…

Hvis f.eks. et dansk selskab betaler renter til et finansielt selskab i et lavskatteland via et selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller en dansk dobbeltbeskatningsoverenskomst, vil skattemyndighederne efter en konkret realitetsbedømmelse kunne lægge til grund, at renterne ikke omfattet af direktivet eller overenskomsten.«

Den 22. marts 2004 besvarede skatteministeren en række spørgsmål in Folketingets Skatteudvalg vedrørende ovennævnte lovforslag således (L119 - bilag 71):

»*Spørgsmål 54.* Kan ministeren bekræfte, at også efter de seneste ændringer i reglerne for holdingselskaber, og efter vedtagelsen af nærværende lovforslag, vil det være sådan, at udlodninger og rentebetalinger til holdingselskaber på Cypern vil være skattefri (det vil sige uden dansk udbytte skat), selv om der ikke på Cypern vil ske beskatning af renter og udbytte?

*Svar:* For så vidt angår *udbytter*, medfører selskabsskattelovens § 2, stk. 1, litra c, at Danmark som hovedregel beskatter et udenlandsk selskab af udbytte fra et dansk selskab med 28 pct. af udbyttets bruttobeløb. Efter samme regel beskatter Danmark dog ikke et udenlandsk moderselskab af udbyttet, hvis beskatningen skal frafaldes eller nedsættes efter EU's moder/datterselskabsdirektiv eller en dobbeltbeskatningsoverenskomst.

Efter den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10 kan Danmark beskatte udbytte, som et dansk selskab udlodder til et selskab på Cypern. Hvis det cypriotiske selskab ejer mindst 25 pct. af det danske selskab, må den danske skat dog ikke overstige 10 pct. af udbyttets bruttobeløb. I andre tilfælde må skatten ikke overstige 15 pct.

Dobbeltbeskatningsoverenskomsten medfører altså, at Danmark skal nedsætte beskatningen af udbytte fra et dansk selskab til et moderselskab på Cypern. Selskabsskattelovens § 2, stk. 1, litra c, medfører så, at Danmark ikke beskatter udbyttet.

Nærværende lovforslag påvirker ikke selskabsskattelovens § 2, stk. 1, litra c. For så vidt angår renter, har Danmark hidtil ikke haft regler om beskatning af renter, som et udenlandsk selskab modtager fra en person eller et selskab her i landet.

Efter nærværende lovforslag indsættes der en ny regel i selskabsskattelovens § 2, stk. 1, litra d, hvorefter Danmark i fremtiden beskatter et udenlandsk selskab af renter, som det modtager fra et dansk selskab, med 30 pct. af renternes bruttobeløb, hvis visse betingelser i denne regel er opfyldt. Efter den samme regel beskatter Danmark dog ikke et udenlandsk moderselskab af renter, hvis beskatningen skal frafaldes eller nedsættes efter EU's rente-/royaltydirektiv eller en dobbeltbeskatningsoverenskomst.

Efter den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 11 kan Danmark beskatte renter, som et selskab på Cypern modtager fra kilder her i landet. Den danske skat må dog ikke overstige 10 pct. af renternes bruttobeløb.

Dobbeltbeskatningsoverenskomsten medfører altså, at Danmark skal nedsætte beskatningen af renter, som et selskab på Cypern modtager fra kilder her i landet. Den foreslåede regler i selskabsskattelovens § 2, stk. 1, litra d, medfører så, at Danmark ikke beskatter renterne.

Cypern bliver i den nærmeste fremtid medlem af EU. Dette vil medføre, at Danmark vil skulle frafalde beskatningen af udbytter og renter efter dels moder-/datterselskabsdirektivet og dels rente-/royaltydirektivet, herefter vil Danmark ikke opkræve kildeskat, selvom Danmark måtte ønske at gøre dette. Endelig skal det bemærkes, at den danske statskasse så vidt jeg kan se ikke lider noget provenutab ved, at der er placeret gennemstrømningsselskaber i Danmark.«

**3248**

Ved lov nr. 540 af 6. juni 2007 blev der med ikrafttræden den 1. juli 2007 i § 2, stk. 1, litra d, tilføjet følgende:

»Skattepligten bortfalder endvidere, hvis det modtagende selskab m.v. godtgør, at de udenlandske selskabsbeskatning af renterne udgør mindst ¾ af den danske selskabsbeskatning, samt at det ikke betaler renterne videre til et andet udenlandsk selskab m.v., som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning,«.

*Selskabsskatteloven § 3*

Af selskabsskatteloven § 3, jf. lovbekendtgørelse nr. 1745 af 14. december 2006, fremgår bl.a.:

»Undtaget fra skattepligten er:

[…]

19) Investeringsselskaber, jf. aktieavancebeskatningslovens § 19, bortset fra kontoførende investeringsforeninger, jf. lov om beskatning af medlemmer af kontoførende investeringsforeninger § 2, bortset fra udloddende investeringsforeninger, jf. ligningslovens § 16 C, stk. 1. […]«

*Skattekontrolloven § 3 B*

Bestemmelsen var i lovbekendtgørelse nr. 1126 af 24. november 2005 affattet således:

»§ 3 B. Skattepligtige,

1) hvorover fysiske eller juridiske personer udøver en bestemmende indflydelse,

2) der udøver en bestemmende indflydelse over juridiske personer,

3) der er koncernforbundet med en juridisk person,

4) der har et fast driftssted beliggende i udlandet, eller

5) der er en udenlandsk fysisk eller juridisk person med et fast driftssted i Danmark, skal i selvangivelsen afgive oplysninger om art og omfang af handelsmæssige eller økonomiske transaktioner med ovennævnte fysiske og juridiske personer og faste driftssteder (kontrollerede transaktioner). § 1, stk. 2, finder tilsvarende anvendelse.

*Stk.* 2 Ved bestemmende indflydelse forstås ejerskab eller rådighed over stemmerettigheder, således at der direkte eller indirekte ejes mere end 50 pct. af aktiekapitalen eller rådes over mere end 50 pct. af stemmerne. Ved bedømmelsen af, om den skattepligtige anses for at have bestemmende indflydelse på en juridisk person, eller om der udøves en bestemmende indflydelse over den skattepligtige af en juridisk eller fysisk person, medregnes aktier og stemmerettigheder, som indehaves af koncernforbundne selskaber, jf. kursgevinstlovens § 4, stk. 2, af personlige aktionærer og deres nærtstående, jf. ligningslovens § 16 H, stk. 2, eller af en fond eller trust stiftet af moderselskabet selv eller af de nævnte koncernforbundne selskaber, nærtstående m.v. eller af fonde eller truster stiftet af disse. Tilsvarende medregnes ejerandele og stemmerettigheder, som indehaves af en person omfattet af kildeskattelovens § 1 eller et dødsbo omfattet af dødsboskattelovens § 1, stk. 2, i fællesskab med nærtstående eller i fællesskab med en fond eller trust stiftet af den skattepligtige eller dennes nærtstående eller fonde eller truster stiftet af disse. Som nærtstående anses den skattepligtiges ægtefælle, forældre og bedsteforældre samt børn og børnebørn og disses ægtefæller eller dødsboer efter de nævnte personer. Stedbarns- og adoptivforhold sidestilles med oprindeligt slægtskabsforhold.

Stk. 3. Ved koncernforbundne juridiske personer forstås juridiske personer, hvor samme kreds af aktionærer har bestemmende indflydelse.

…«.

Ved lov nr. 308 af 19. april 2006, der trådte i kraft den 1. maj 2006, blev der efter i § 3 B, stk. 1, efter 1. pkt. indsat følgende:

»Med juridiske personer i nr. 1 sidestilles selskaber og foreninger m.v., der efter danske skatteregler ikke udgør et selvstændigt skatte-

tesubjekt, men hvis forhold er reguleret af selskabsretlige regler, en selskabsaftale eller en foreningsvedtægt.«

Ved samme lov blev § 3 B, stk. 3, affattet således:

»Ved koncernforbundne juridiske personer forstås juridiske personer, hvor samme kreds af selskabsdeltagere har bestemmende indflydelse, eller hvor der er fælles ledelse.«

Af lovforslag nr. 116 af 14. december 2005, der lå til grund for lov nr. 308 af 19. april 2006, fremgår bl.a.:

»*A. Justering af koncerndefinitionen i diverse værnsregler*

1. Baggrund for forslaget

I de senere år har flere danske og udenlandske kapitalfonde opkøbt danske koncerner. Opkøbet foretages gennem et til lejligheden oprettet dansk holdingselskab - eventuelt med en høj grad af lånefinansiering og dermed betydelige renteudgifter i det danske holdingselskab/targetselskab. Herved nedbringes umiddelbart den skattepligtige indkomst i Danmark i den pågældende koncern.

Kapitalfondene (private equity fondene) er typisk organiseret som kommanditselskaber. Ifølge dansk skatteret betragtes kommanditselskaber ikke som selvstændige skattesubjekter, men som skattemæssigt transparente enheder. Det er dermed de enkelte deltagere, der er skattepligtige. Det indebærer, at de danske værnsregler vedrørende tynd kapitalisering, armslængdeprincippet og kildeskat på renter til skattelylande, der har til formål at begrænse skatteplanlægning vedrørende gæld til koncernforbundne selskaber (kontrolleret gæld), ikke kan anvendes.

Årsagen er, at kapitalfonden ikke er et selvstændigt skattesubjekt og at ingen af investorerne ejer mere end 50 pct. af kapitalen/stemmerne i holdingselskabet. De

**3249**

gældende værnsregler forudsætter nemlig, at én skattepligtig (eller tilsvarende udenlandsk enhed) ejer mere end 50 pct. af kapitalen/stemmerne (direkte eller indirekte).

De gældende regler for kontrolleret gæld, hvis formål er at begrænse mulighederne for skatteminimering i internationale koncerner, er derfor ikke anvendelige på kapitalfonde.

Det foreslås, at de skattetransparente enheder i forhold til værnsreglerne om transfer pricing og tynd kapitalisering m.fl. sidestilles med selvstændige skattesubjekter. Dette medfører, at transaktioner mellem en kapitalfond og dets datterselskab er omfattet af transfer pricing reglerne, samt at gæld fra kapitalfonden anses for at være koncernintern gæld i reglerne om tynd kapitalisering og kildeskat på renter, selvom kapitalfonden ikke er et selvstændigt skattesubjekt. Kapitalfondene sidestilles dermed med blandt andre aktieselskaber.

Konsekvensen af, at kapitalfondene i de nuværende regler ikke er omfattet af værnsreglerne, er bl.a., at der ikke sker indeholdelse af kildeskat på renter og kursgevinster, der udbetales til kapitalfonden. Rentebetalingen anses nemlig for at være udbetalt direkte til investorerne. Disse er hver for sig ikke omfattet af værnsreglen, idet de ejer mindre end 50 pct. af kapitalen/stemmerne i det rentebetalende selskab.

Dette betyder, at følgende scenario er muligt:

Der oprettes et holdingselskab i Danmark. Holdingselskabet, som lånefinansieres af kapitalfonden, står for købet af aktierne i det danske selskab (targetselskabet).

Holdingselskabet og det danske targetselskab sambeskattes, hvorved holdingselskabs renteudgifter modregnes i targetselskabets skattepligtige indkomst.

Kapitalfonden er beliggende i et skattelyland, som Danmark ikke har og heller ikke kan forventes at få en dobbeltbeskatningsoverenskomst med. Kapitalfonden beskattes ikke eller beskattes meget lempeligt i skattelyet. Endvidere udveksler dette skattelyland ikke

oplysninger om, hvem investorerne i kapitalfonden er, til de lande, hvor investorerne er hjemmehørende.

Hvis kapitalfonden i stedet havde været et selvstændigt skattesubjekt, ville der skulle indeholdes kildeskat på alle rentebetalinger til kapitalfonde beliggende i lande, som ikke har en dobbeltbeskatningsoverenskomst med Danmark. Denne kildeskat skal forhindre, at det rentemodtagende udenlandske selskab slipper for beskatning eller beskattes meget lempeligt, samtidigt med at Danmark giver det rentebetalende selskab fradrag for renteudgifterne.

Med den foreslåede ændring sikres det, at der indeholdes kildeskat af rentebetalingen til kapitalfonden, i det omfang investorerne er selskaber mv. og er hjemmehørende i et land, som ikke har en dobbeltbeskatningsoverenskomst med Danmark.

En anden konsekvens af, at kapitalfondene i de nuværende regler ikke er omfattet af værnsreglerne, er, at reglerne om tynd kapitalisering ikke finder anvendelse. Kapitalfondens holdingselskab har dermed fradrag for renteudgifterne uanset størrelsen på gælden til kapitalfonden. Hvis kapitalfonden i stedet var et enkeltstående moderselskab til holdingselskabet, ville der ikke kunne opnås fradrag for renterne af gælden, i det omfang holdingselskabets gæld oversteg egenkapitalen med mere end forholdet 4:1.

De nuværende regler er ikke hensigtsmæssige. Der er ikke tvivl om, at kapitalfonden udøver bestemmende indflydelse på holdingselskabet, når investorerne i kapitalfonden agerer samlet. Lån fra kapitalfonden til holdingselskabet bør derfor være omfattet af reglerne om tynd kapitalisering. I realiteten er der således ikke forskel på den omtalte situation og situationen, hvor kapitalfonden er stiftet som et selskab i skatteretlig henseende.

Der foreslås en ændring af koncerndefinitionen i værnsreglerne om transfer pricing, tynd kapitalisering, kildeskat på koncerninterne renter og kildeskat på koncerninterne kursgevinster, således at gæld til transparente enheder, som f.eks. kommanditselskaber, anses for kontrolleret gæld på samme måde, som hvis den udenlandske långiver var et selskab. Konkret indføres et kriterium, hvorefter selskaber og foreninger, der ikke anses for at være selvstændige skattesubjekter, omfattes af værnsbestemmelserne, når de udøver bestemmende indflydelse over en skattepligtig og når deres forhold er reguleret af selskabsretlige regler, en selskabsaftale eller en foreningsvedtægt.

…

Til § 7

Til nr. 1

Med ændringer af koncerndefinitionen i skattekontrollovens § 3 B indføres der som udgangspunkt kildebeskatning af renter og kursgevinster, når kreditor er et kommanditselskab mv. og kommanditisterne er hjemmehørende i udlandet. Ændringen i selskabsskattelovens § 2, stk. 1, litra d, medfører, at der er kildeskat på rentebetalingerne, uanset om kommanditselskabet mv. er dansk eller udenlandsk.

Det er fortsat kommanditisterne, der er de begrænset skattepligtige subjekter. Kommanditisterne bliver med ændringen begrænset skattepligtige af renterne, når kommanditselskabet er koncernforbundet med debitorselskabet.

Kommanditisterne i kommanditselskabet anses som udgangspunkt for at være begrænset skattepligtige af renterne og kursgevinsterne.

Den begrænsede skattepligt omfatter imidlertid alene selskaber og foreninger mv. som nævnt i selskabsskattelovens § 1, der har hjemsted i udlandet, jf. således

**3250**

indledningen i selskabsskattelovens § 2. Den begrænsede skattepligt omfatter således ikke kommanditister, der er fysiske personer. Den omfatter heller ikke fysiske og juridiske personer, der er hjemmehørende i Danmark.

Den begrænsede skattepligt vil endvidere ikke omfatte renter og kursgevinster, hvis beskatningen skal frafaldes eller nedsættes efter rente-/royaltydirektivet. Undtagelsen forudsætter dog, at det betalende selskab og det modtagende selskab er associeret (25 procents ejerskab, jf. rente-/royaltydirektivet) i en sammenhængende periode på minimum 1 år.

Endelig bortfalder den begrænsede skattepligt, hvis beskatningen skal frafaldes eller nedsættes efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab (kommanditisten) er hjemmehørende.

Rentebetaleren skal således indeholde kildeskat af renter betalt til et kommanditselskab, når der i ejerkredsen findes begrænsede skattepligtige, dvs. selskaber og foreninger mv. hjemmehørende i et land, som ikke har en dobbeltbeskatningsoverenskomst med Danmark. Der skal kun indeholdes kildeskat af den del af rentebetalingen, der svarer til de begrænsede skattepligtiges ejerandel.

Det må formodes, at rentebetaleren i langt de fleste tilfælde vil kunne undlade at indeholde kildeskatter ved betaling til koncernforbundne skattemæssigt transparente enheder, idet det vil være de færreste interessentselskaber og kommanditselskaber mv., hvor der er ejere, der er juridiske personer hjemmehørende i et land, som Danmark ikke har en dobbeltbeskatningsoverenskomst med. De fleste rentebetalere vil derfor kunne udbetale renter til transparente enheder - uden overvejelser om indeholdelse af kildeskat.«

Af skatteministerens besvarelse af 3. marts 2006 til Folketingets Skatteudvalg vedrørende ovennævnte lovforslag nr. 116 af 14. december 2005 fremgår bl.a. (L116 - bilag 7):

»FSR: FSR [Foreningen af Statsautoriserede Revisorer] er bekendt med, at nogle få andre lande har kildeskat på renter. I disse tilfælde foretages kapitalfondenes aktie- og låneinvesteringer via holdingsselskaber i andre EU lande, f.eks. Luxembourg. Dette vil antageligt også blive situationen, hvis Danmark indfører kildeskat på rente. Konsekvensen vil herefter være, at rentebetalinger vil være omfattet af tynd kapitalisering. Yderligere vil konsekvensen være, at der løbende kan udloddes udbytter, hvilket i dag netop ikke sker, fordi Danmark har kuponskat på udbytter.

*Kommentar:* Den begrænsede skattepligt for renter efter selskabsskattelovens § 2, stk. 1, litra d, omfatter udenlandske selskaber, der oppebærer koncerninterne renter fra Danmark. Denne begrænsede skattepligt bortfalder, hvis beskatningen af renterne skal frafaldes eller nedsættes efter rente-/royalty direktivet eller efter en dobbeltbeskatningsoverenskomst.

I den forbindelse skal man være opmærksom på, at i forhold til selskabsskattelovens § 2, stk. 1, litra d, må det afgøres ud fra princippet om rette indkomstmodtager, hvem der oppebærer renterne.

Kildebeskatningen af renterne skal nemlig kun frafaldes efter overenskomsterne, hvis renternes retmæssige ejer er hjemmehørende i den anden stat. Tilsvarende gælder i rente-/royalty direktivet, jf. direktivets artikel 1, stk. 1. Direktivets fordele kan endvidere nægtes anvendt i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.

Hvis kapitalfondene foretager aktie- og låneinvesteringer via holdingsselskaber, vil det skulle vurderes, om holdingselskabet er rette indkomstmodtager/ retmæssig ejer af renteindkomsten. Et rent gennemstrømningsholdingselskab i eksempelvis Luxembourg kan efter min opfattelse næppe være rette indkomstmodtager /retmæssig ejer af renteindkomsten. Den schweiziske højesteret er kommet frem til, at et rent gennemstrømningsholdingselskab i Danmark ikke var retmæssig ejer til udbyttebetalinger efter den dansk-schweiziske overenskomst.«

Af betænkning afgivet af Folketingets Skatteudvalg den 22. marts 2006 efter 1. behandling af ovennævnte lovforslag fremgår bl.a.:

»§ 3 B, stk. 3, affattes således:

»*Stk. 3.* Ved koncernforbundne juridiske personer forstås juridiske personer, hvor samme kreds af selskabsdeltagere har bestemmende indflydelse, eller hvor der er fælles ledelse.««

[Udvidelse af definitionen på bestemmende indflydelse i transfer pricing-reglerne m.m., således at den omfatter aftaler om fælles bestemmende indflydelse og udvidelse af definitionen på koncernforbundne juridiske personer i transfer pricing-reglerne m.m., således at den tillige omfatter juridiske personer med fælles ledelse.]

…

Bemærkninger

…

Til nr. 6. …

Hvis flere opkøbende kapitalfonde i detaljeret grad aftaler, hvordan det opkøbte selskab i fremtiden skal ledes, agerer de som en samlet enhed. Der ses ikke at være forskel på denne situation og den situation, hvor de opkøbende kapitalfonde opretter et fælles interessentselskab med henblik på opkøbet. Sidstnævnte situation er omfattet af forslaget, førstnævnte situation bør derfor også omfattes af forslaget.

Det foreslås derfor, at når det skal bedømmes, om en kapitalfond har bestemmende indflydelse i et selskab, medregnes ejerandele og stemmerettigheder, som

**3251**

indehaves af andre selskabsdeltagere, med hvem kapitalfonden har en aftale om udøvelse af bestemmende indflydelse. Samtidig foreslås det, at bestemmelsen ligeledes skal gælde for selvstændige selskabsskattesubjekter så som aktieselskaber. Transfer pricing-reglerne m.fl. vil dermed få virkning, hvis to selskaber har aftalt fælles bestemmende indflydelse i et selskab, som de ejer (50/50).

Bestemmelsen vil alene finde anvendelse, når der foreligger en aftale om udøvelse af fælles bestemmende indflydelse. Bestemmelsen medfører ikke, at selskabsdeltagerne indbyrdes er koncernforbundne. Bestemmelsen medfører alene, at selskabsdeltagerne anses for at have bestemmende indflydelse i det fællesejede selskab. Såvel direkte som indirekte selskabsdeltagere vil blive anset for at have bestemmende indflydelse i det fællesejede selskab. Det er således ikke muligt at undgå at blive omfattet af bestemmelsen ved at indskyde et mellemliggende holdingselskab.

Bestemmelsen vil således finde anvendelse på så vel kapitalfondene som mellemholdingselskaber, når to kapitalfonde med hvert sit mellemholdingselskab har aftalt udøvelse af fælles bestemmende indflydelse. Dette vil gælde, uanset om aftalen er indgået mellem kapitalfondene eller mellem mellemholdingselskaberne.

Det vil bero på en konkret vurdering af den foreliggende aftale, om der foreligger en aftale om udøvelse af fælles bestemmende indflydelse. I denne vurdering kan indgå, om aftalen medfører

- fælles råden over flertallet af stemmerettigheder,
- fælles udnævnelse eller afsættelse af et flertal af medlemmerne i selskabets øverste ledelsesorgan eller
- fælles bestemmende indflydelse overs selskabets driftsmæssige og finansielle ledelse.

Kapitalfonde, der foretager en fælles investering, vil ofte aftale fælles bestemmende indflydelse. De deltagende kapitalfonde vil således i forbindelse med den fælles investering typisk aftale fælles retningslinjer på en række områder, f.eks. i form af en aktionæroverenskomst. Disse kan eksempelvis være følgende:

- Krav til minimumsinvestering/ejerandel og eventuelt om deltagelse i fremtidige kapitalforhøjelser for at finansiere yderligere opkøb.

Copyright © 2023 Karnov Group Denmark A/S

U.2023.3198H

- Ret til at kunne kræve at sælge på samme vilkår som en sælgende aktionær og pligt til at skulle sælge på samme vilkår som en sælgende aktionær (såkaldt tag along & drag along).

- Enighed om den fælles strategi med investeringen (investeringshorisont, eventuel foretrukken exitmåde).

- Aftale om fælles udpegning af bestyrelsesmedlemmer og bestyrelsens virke (bestemmelser, som typisk forekommer i bestyrelsens forretningsorden om møder, quorum, flertalsregler, krav til kvalificerede flertal i visse beslutninger m.v.).

- Retningslinjer for strategien for den købte virksomhed.

En aktionæroverenskomst er ikke i sig selv tilstrækkelig til at fastslå, at der er indgået en aftale om udøvelse af fælles bestemmende indflydelse. Visse aktionæroverenskomster indeholder eksempelvis bestemmelser om forkøbsret ved salg og bestemmelser om begrænsninger i pantsætningsadgangen. Sådanne bestemmelser medfører ikke i sig selv, at der udøves fælles bestemmende indflydelse.

Der vil i situationerne med fælles bestemmende indflydelse være tale om, at selskaberne eller kapitalfondene er uafhængige på en lang række punkter. De vil have forskellige investorkredse, ledelser, investeringsprofiler, forretningsstrategier og skattemæssige positioner, ligesom de meget vel hver for sig kan have investeringer i konkurrerende virksomheder. Før en konkret investering foretages, vil der ofte ikke være kontraktlige forpligtelser selskaberne og fondene imellem.

…

Til nr. 12

Der kan henvises til de tilsvarende ændringsforslag vedrørende ligningslovens § 2 (ændringsforslag nr. 6).

*Rådets direktiv 2003/49/EF af 3. juni 2003 om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater (rente-/royaltydirektivet)*

Direktivet bestemmer:

»Artikel 1
*Anvendelsesområde og procedure*

1. Betalinger af renter eller royalties, der opstår i en medlemsstat, fritages for enhver form for skat i denne stat, hvad enten den opkræves ved indeholdelse ved kilden eller ved skatteansættelse, forudsat at den retmæssige ejer af de pågældende renter eller royalties er et selskab i en anden medlemsstat eller et fast driftssted beliggende i en anden medlemsstat og tilhørende et selskab i en medlemsstat.

…

4. Et selskab i en medlemsstat anses kun for at være den retmæssige ejer af renter eller royalties, hvis det modtager disse betalinger til eget brug og ikke som formidler, herunder som agent, mandatar eller bemyndiget signatar for en anden person.

…

7. Denne artikel finder kun anvendelse, hvis det selskab, der er betaleren, eller det selskab, hvis faste driftssted anses for at være betaleren af renter eller royalties, er et selskab, som er associeret med det selskab, der er den retmæssige ejer, eller hvis faste driftssted anses for at være den retmæssige ejer af disse renter eller royalties.

…

**3252**

*Artikel 5*
*Svig og misbrug*

1. Dette direktiv udelukker ikke anvendelse af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug.

2. Medlemsstaterne kan tilbagekalde fordele i henhold til dette direktiv eller nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.

*Dobbeltbeskatningsoverenskomster*
*Den nordiske dobbeltbeskatningsoverenskomst*

Overenskomst af 23. september 1996 mellem de nordiske lande til undgåelse af dobbeltbeskatning for så vidt angår indkomst- og formueskatter bestemmer bl.a.:

»Artikel 3
*Almindelige definitioner*

…

2. Ved en kontraherende stats anvendelse af overenskomsten skal til enhver tid ethvert udtryk, som ikke er defineret deri, medmindre andet følger af sammenhængen, tillægges den betydning, som det har på dette tidspunkt i henhold til denne stats lovgivning om de skatter, på hvilke overenskomsten finder anvendelse, og den betydning som udtrykket har i skattelovgivningen i denne stat skal gå forud for den betydning udtrykket måtte være tillagt i denne stats anden lovgivning.

…

Artikel 11
*Renter*

1. Renter, der hidrører fra en kontraherende stat, og som betales til en i en anden kontraherende stat hjemmehørende person, kan kun beskattes i denne anden stat, hvis denne person er den retmæssige ejer af renterne.«

*Overenskomst med Luxembourg*

Overenskomst af 17. november 1988 med Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter bestemmer bl.a.:

»Artikel 3
*Almindelige definitioner*

…

2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

…

Artikel 11
*Renter*

1. Renter, der hidrører fra en kontraherende stat og betales til en person, der er hjemmehørende i den anden kontraherende stat, kan, hvis denne person er renternes retmæssige ejer, kun beskattes i denne anden stat.

…

*SLUTPROTOKOL*

Ved underskrivelsen af overenskomsten mellem Kongeriget Danmark og Storhertugdømmet Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter er undertegnede befuldmægtigede blevet enige om følgende bestemmelser, som skal udgøre en integrerende del af overenskomsten:

§ 1. Holdingselskaber

Ad artikel 1, 3 og 4:

Denne overenskomst finder ikke anvendelse på holdingselskaber som omfattet af den særlige luxembourgske lovgivning, for tiden loven af 31. juli 1929 og storhertugens forordning af 17. december 1938 (sat i kraft ved § 1, 7o, stykke 1 og 2, i loven af 27. december 1937). Overenskomsten finder heller ikke anvendelse på indkomst,

U.2023.3198H

som en person, der er hjemmehørende i Danmark, oppebærer fra sådanne selskaber, og heller ikke på aktier eller andre kapitalbeviser i selskaber af denne art, som en sådan person er ejer af.«

Af det lovforslag, der lå til grund for Luxembourgs indgåelse af dobbeltskatningsoverenskomsten med tilhørende slutprotokol med Danmark, fremgår bl.a. (uautoriseret oversættelse):

»stk. 1 i Slutprotokollen fastsættes det, at holdingselskaber i henhold til den luxembourgske lovgivning ikke er omfattet af konventionens anvendelsesområde.

Da disse holdingselskaber ikke er underlagt indkomst- eller formueskat, er de normalt ikke omfattet af dobbeltbeskatningsoverenskomsterne.

Når de høje kontraherende parter udtrykkeligt har nævnt luxembourgske holdingselskaber, er det utvivlsomt efter anmodning fra den danske medunderskriver, som ønskede at undgå forveksling mellem de skatter, der er nævnt i konventionen, og de abonnementsskatter [»impots d'abonnement«], der skal betales af holdingselskaberne.

Det er rigtigt, at udelukkelsen af holdingselskaber også kan ses som et tegn på, at vores aftalepartnere har mistillid til en af vores mest originale, skattemæssige og finansielle, institutioner.

Selv om vi næppe kan protestere mod udelukkelse af holdingselskaber fra konventionens anvendelsesområde, skal vi fortsat være opmærksomme på at sikre, at vores specifikke lovgivning ikke bliver angrebet frontalt at dem, der med rette eller urette anser sig selv for at være ofre for den.«

*Korrespondance mellem Danmark og Luxembourg om dobbeltbeskatningsoverenskomsten*

Den 10. juni 1992 forespurgte de luxembourgske myndigheder Skatteministeriet, om »Investment Funds

**3253**

under the Luxembourg law of March 30, 1988«, var omfattet af dobbeltbeskatningsoverenskomsten, eller omfattet af slutprotokollen og dermed undergivet dansk beskatning. I den forbindelse blev anført bl.a.:

»I think one cannot assimilate the Investment Funds to holding companies to the extent that would fall under paragraph 1 of the Final Protocol. The first reason is that this provision refers a particular legislation, namely the Act of 31 July 1929 and the Decree of 17 December 1938. As to the Investment Funds, they benefit by a fiscal regime totally independant from the one applying to holding companies. The second reason is that the two kinds of companies totally differ as to their structure and their activities.«

Den 14. oktober 1993 svarede Skatteministeriet, at man var af den opfattelse, at »the investment funds« ikke var omfattet af overenskomsten, idet de var omfattet af slutprotokollen om holdingselskaber. Der blev i den forbindelse anført bl.a.:

»However, I disagree with you that the two types of companies differ considerably as regards structure and types of activity. On the contrary, there seems to be a great similarity between them in every respect.

In the first place, both types have a high rate of option as regards form of or-ganization.

Secondly, both types of firms make investments in other firms only and do not carry out active business of trade or industry themselves. Also it is important to note that a holding company can be the administrator of an investment

Further, they are treated almost identically for fiscal purposes. Holding companies as well as investment funds are exempt from the greater part of the Luxembourg tax (including the taxes covered by the convention between Denmark and Luxembourg) as only a very small subscriptiontax is to be paid in both cases. Moreover,

they are subjected to the same fiscal treatment on distributions to or from a holding company or an investment fund respectively.

As a consequence of the above-mentioned and because to all appearances the laws concerning investment funds was not carried through until after the conclusion of the convention between Denmark and Luxembourg, Denmark is of the opinion that investment funds are covered by paragraph 1 of the final protocol and they can, therefore, not come under the provisions of the convention.«

Den 14. april 2005 besvarede Told og Skat ved en »tax consultant« i retsafdelingen, personbeskatningskontoret, en henvendelse fra angiveligt en bank i Luxembourg, at man kunne bekræfte, at Ligningsrådet i en afgørelse fra 1995 havde fastslået, at en enhed i en investment fund i Luxembourg, et Sicav, kan sammenlignes med en dansk investeringsfond. Told og Skat anførte herefter, at et Sicav »in such a case« er berettiget til de fordele, der følger af dobbeltskatningsoverenskomsten mellem Danmark og Luxembourg. Det er oplyst, at den omhandlede afgørelse fra Ligningsrådet er refereret i TfS 1995.195.

Skatteministeriet besvarede den 15. februar 2006 en officiel henvendelse fra de luxembourgske skattemyndigheder om, hvorvidt de danske skattemyndigheder, under henvisning til ovennævnte korrespondance af 14. april 2005, stadig anså luxembourgske »investment funds« for ikke at være omfattet af dobbeltbeskatningsoverenskomstens fordele, således:

»… I can inform you that I agree on the point view taken by the Central Customs and Tax Administration in mail of 14 April 2005. This means that Luxembourg investment funds qualify for benefits according to the Double Taxation between and Luxembourg.

Likewise it we consider the new Danish undertakings for collective invest-ments to be covered by the Double Taxation Treaty. As in the note from Ernst & Young, these undertaking are in practise tax exempt but the Danish residents, which own shares in the undertaking, are subject to taxation at an accrual basis of the increase in value of shares in the undertaking.«

På de luxembourgske skattemyndigheders hjemmeside på internettet vedrørende direkte skatter blev den 21. februar 2006 offentliggjort et nyhedsbrev, hvoraf fremgik bl.a. (uautoriseret oversættelse):

»Extension of the scope of the Double Taxation Convention concluded be-tween Denmark and Luxembourg to SICAVs / SICAFs

By exchanges of letters of December 30, 2005 and February 15, 2006, the Danish and Luxembourg tax authorities agreed that Luxembourg investment funds constituted in the form of SICAV / SICAF fall within the scope of the Tax Convention concluded between Denmark and Luxembourg on November 17, 1980.

The tax offices concerned will henceforth issue a certificate of tax residence serving as a supporting document.

Conversely, Danish collective investment undertakings also benefit from the provisions of the aforementioned Convention.«

*OECD's modeller for dobbeltbeskatningsoverenskomst med kommentarer*

Af OECD's model for dobbeltbeskatningsoverenskomst vedrørende indkomst og formue (1977) fremgår bl.a.:

»Artikel 3

*Almindelige definitioner*

…

2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri,

**3254**

tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

…

## Artikel 10
*Udbytte*

Udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

Stk. 2. Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, og i henhold til lovgivningen i denne stat, men den skat der pålignes må, såfremt modtageren er udbyttets retmæssige ejer, ikke overstige:

a) 5 pct. af bruttobeløbet af udbyttet, hvis den retmæssige ejer er et selskab (bortset fra et interessentskab og et kommanditselskab), der direkte ejer mindst 25 pct. Af kapitalen i det selskab, som udbetaler udbyttet;

b) 15 % af bruttobeløbet af udbyttet i alle andre tilfælde.

…

## Artikel 11
*Renter*

1. Renter, der hidrører fra en kontraherende stat og betales til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

2. Sådan rente kan imidlertid også beskattes i den kontraherende stat, hvorfra den hidrører, og i overensstemmelse med lovgivningen i denne stat, men den skat der pålignes må, såfremt rentebeløbets retmæssige ejer, ikke overstige 10 pct. af bruttobeløbet af renten. De kontraherende staters kompetente myndigheder skal ved gensidig aftale fastsætte de nærmere regler for gennemførelsen af denne begrænsning.

…«

Den engelske ordlyd af artikel 10 og 11 var sålydende:
»Dividends

1.    Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2.    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the low of that State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed:

a)     …

b)     …

…

Interests

1. Interest arising in a Contracting State and paid to a resident of the other Con-tracting State may be taxed in that other State.

2. However, such interest may also be taxed in the Contracting State in which it arises and according to the laws of that State, but if the recipient is the beneficial owner of the interest the tax so charged shall not exceed 10 per cent of the gross amount of the interest. The competent authorities of the Contracting States shall by mutual agreement settle the mode of application of this limitation.«

Af OECD's kommentarer hertil fremgår bl.a.:
»*MISBRUG AF OVERENSKOMSTEN*

7. Formålet med dobbeltbeskatningsoverenskomster er, ved fjernelse af international dobbeltbeskatning, at fremme udvekslingen af varer og tjenesteydelser og kapitalens og fysiske og juridiske personers bevægelighed. De bør imidlertid ikke hjælpe til skatteunddragelse eller skatteflugt. Det er vel rigtigt, at skatteydere, bortset fra dobbeltbeskatningsoverenskomster, har den mulighed at udnytte forskelle i skatteniveauer mellem staterne og de skattefordele, det følger af forskellige landes skattelove, men det tilkommer de berørte stater at vedtage bestemmelser i deres nationale lovgivning for at modvirke mulige kunstgreb. Sådanne stater vil følgelig i deres tosidede dobbeltbeskatningsoverenskomster ønske at bevare anvendelsen af sådanne bestemmelser i deres nationale love.

8. Derudover forstærker udvidelsen af netværket af dobbeltbeskatningsoverenskomster sådanne kunstgrebs virkning ved gennem dannelse af sædvanligvis kunstfærdige juridiske konstruktioner at gøre det muligt at drage fordel både af de fordele, der følger af visse nationale love, og af de skattelempelser, der følger af dobbeltbeskatningsoverenskomster.

9. Dette ville f.eks. være tilfældet, hvis en person (uanset om denne er hjemmehørende i en kontraherende stat eller ej) disponerede via en juridisk sammenslutning, der er dannet i en stat, væsentligst for at opnå fordele i henhold til overenskomsten, som ikke ville kunne opnås af personen direkte. Et andet tilfælde ville være, hvor en fysisk person i en kontraherende stat har såvel fast bolig som alle sine økonomiske interesser, herunder væsentlig andel i et selskab i denne stat, og som, væsentligst for at sælge andelen og undgå beskatning af kapitalgevinster i denne stat ved salget (som følge af artikel 13, stk. 4), overførte sin faste bolig til den anden kontraherende stat, hvor sådanne gevinster var undergivet lav eller ingen beskatning.

10. Nogle af disse situationer behandles i overenskomsten, f.eks. ved at indføre begrebet »retmæssig ejer« (i artiklerne 10, 11 og 12) og særlige bestemmelser for de såkaldte artistselskaber (artikel 17, stk. 2). Sådanne problemer nævnes også i kommentarerne til artikel 10 (pkt. 17 og 22), artikel 11 (pkt. 12) og artikel 12 (pkt. 7). Det kan være hensigtsmæssigt for kontraherende stater, at de i tosidede forhandlinger opnår enighed om, at skattelempelse

**3255**

ikke finder anvendelse i visse tilfælde, eller at opnå enighed om, at anvendelsen af nationale love mod skatteunddragelse ikke berøres af overenskomsten.

…

*KOMMENTAR TIL ARTIKEL 11 OM BESKATNING AF RENTER*
…

8. Efter stk. 2 finder begrænsningen af beskatning i kildestaten ikke anvendelse i tilfælde, hvor en mellemmand, såsom en agent eller en særligt udpeget person, er indskudt mellem modtager og betaler, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. Stater, der ønsker at gøre dette klarere, kan frit gøre det under bilaterale forhandlinger.

…

10. Stykket bestemmer ikke, om lempelsen i kildestaten skal være afhængig af, om renterne beskattes i bopælsstaten. Dette spørgsmål kan afgøres ved bilaterale forhandlinger.«

OECD's modeloverenskomst af 2003 artikel 10 og 11 indeholdt stort set enslydende bestemmelser. Af kommentarerne hertil fremgår bl.a.:
»Misbrug af overenskomsten

…

9.6 Muligheden for at anvende generelle antimisbrugsbestemmelser betyder ikke, at der ikke i skatteaftaler er behov for indsættelsen af specifikke bestemmelser, der har til formål at hindre særlige former for skatteundgåelse. Når særlige teknikker for skatteundgåelse er identificeret eller hvor anvendelsen af sådanne teknikker er særlig problemfyldt, vil det ofte være nyttigt i overenskomsten at indsætte bestemmelser, der fokuserer direkte på den relevante undgåelsesstrategi. Dette vil også være nødvendigt i tilfælde, hvor en stat, der går ind for det synspunkt, der er beskrevet i pkt. 9.2 ovenfor, er af den opfattelse, at dens nationale lovgivning mangler de antimisbrugsregler eller principper, der er nødvendige for på rette måde at imødegå en sådan strategi.

U.2023.3198H

10. Nogle former for skatteundgåelse er f.eks. allerede udtrykkeligt behandlet i overenskomsten, f.eks. ved indførelsen af begrebet »retmæssig ejer« (i art. 10, 11 og 12) og i særlige bestemmelser såsom art. 17, stk. 2, der omhandler de såkaldte artistselskaber. Sådanne problemer nævnes også i kommentarerne til art. 10 (pkt. 17 og 22), art. 11 (pkt. 12) og art. 12 (pkt. 7).

…

*Bestemmelser, der er udformet med henblik på enheder, der drager fordel af særligt fordelagtige skatteordninger*

21. Særlige typer af selskaber, der nyder skatteprivilegier i deres hjemmehørendestat, gør gennemstrømnings- (conduit-) arrangementer lettere og rejser spørgsmålet om skadelig skattekonkurrence.

I tilfælde, hvor skattefritagelse (eller næsten skattefritagelse) selskaber kan identificeres på særlige lovgivningsmæssige kendetegn, kan misbrug af beskatnings-overenskomster undgås ved at nægte disse selskaber aftalefordele, »udelukkelsesmetoden« (the exclusion approach). Da sådanne privilegier hovedsagelig indrømmes særlige typer af selskaber, således som disse er defineret i den erhvervsretlige lovgivning eller i landets skattelovgivning, vil den mest radikale løsning være at udelukke sådanne selskaber fra overenskomstens anvendelsesområde. En anden løsning er indsættelsen af en »beskyttelsesklausul« (safeguarding clause), der vil finde anvendelse på indkomst, der er modtaget eller betalt af sådanne selskaber og som kan udformes på følgende måde:

»Ingen bestemmelse i overenskomsten, der giver fritagelse for, eller nedsættelse af skat, skal finde anvendelse på indkomst, der modtages af, eller betales af et selskab, der falder ind under definitionen i § … i lov nr.…., eller som falder ind under enhver lignende bestemmelse, der er lovfæstet ved … efter undertegnelsen af overenskomsten.«

…

*OECD's kommentar til artikel 11 om beskatning af renter*

…

8. Kravet om retmæssigt ejerskab blev indsat i art. 11, stk. 2, for at tydeliggøre betydningen af ordene »betalt til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Det gøres herved klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til renteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

8.1 Lempelse af eller fritagelse for beskatning af en indkomstart indrømmes af kildestaten til en person, der er hjemmehørende i den anden kontraherende stat, for helt eller delvist at undgå den dobbeltbeskatning, der ellers ville følge af hjemmehørendestatens samtidige beskatning af indkomsten. Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i

**3256**

den anden stat, men ingen dobbeltbeskatning opstår som følge heraf, da indkomstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme

lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

8.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og udbetaleren, men den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.

…

10. Artiklen bestemmer ikke, om lempelsen i kildestaten skal være afhængig af, om renterne beskattes i bopælsstaten. Dette spørgsmål kan afgøres ved bilaterale forhandlinger.«

OECD's modeloverenskomst af 2014 indeholdt stort set enslydende bestemmelser. Af kommentarerne hertil fremgår bl.a.:

»9. Kravet om retmæssig ejer blev indsat i art. 11, stk. 2, for at tydeliggøre betydningen af ordene »betalt til en person, der er hjemmehørende«, således som de er benyttet i stk. 1 i denne artikel. Det fremgår tydeligt heraf, at kildestaten ikke er forpligtet til at opgive sine beskatningsrettigheder over renteindtægter blot fordi renterne blev betalt direkte til en person, der er hjemmehørende i en stat, som kildestaten har indgået en overenskomst med.

9.1 Da udtrykket »retmæssig ejer« blev tilføjet for at adressere de potentielle vanskeligheder ved anvendelsen af ordene »betalt til … en hjemmehørende« i stk. 1, var det hensigten, at det skulle fortolkes i denne sammenhæng, men ikke referere til nogen teknisk mening, som det ville kunne have efter den nationale lovgivning i en given stat (faktisk var det således, at da udtrykket blev tilføjet stykket, havde det i mange stater ikke en præcis lovgivningsmæssig betydning). Udtrykket »retmæssig ejer« er derfor ikke anvendt i en snæver, teknisk forstand (således som den betydning det har i trustlovgivningen i mange common law stater), men det skal derimod forstås i sin kontekst, i særdeleshed i relation til ordene »betalt … til en hjemmehørende«, og i lyset af hensigten og formålet med overenskomsten, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og omgåelse.

10. Lempelse af eller fritagelse for beskatning af en indkomstart indrømmes af kildestaten til en person, der er hjemmehørende i den anden kontraherende stat, for helt eller delvist at undgå den dobbeltbeskatning, der ellers ville følge af hjemmehørende statens samtidige beskatning af indkomsten. Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den direkte indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den direkte indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men ingen dobbeltbeskatning opstår som følge heraf, da indkomstmodtageren ikke anses for ejer af indkom-

sten i skattemæssig henseende i den stat, hvori han er hjemmehørende.

10.1 Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«2, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

10.2 I disse forskellige eksempler (agent, mellemmand, conduit selskab i dets egenskab af bemyndiget eller administrator), er den direkte modtager af renter ikke »den retmæssige ejer«, fordi modtagerens ret til at bruge og nyde renterne er begrænset af kontraktuelle eller juridiske forpligtelser til at videreformidle de modtagne betalinger til en anden person.

**3257**

En sådan forpligtelse vil sædvanligvis fremgå af relevante, juridiske dokumenter, men kan eventuelt også være til stede allerede i kraft af de faktiske omstændigheder, som ganske klart viser, at modtageren substantielt ikke har rettighederne til at bruge og nyde de renter, dog uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person. Denne type af forpligtelse omfatter ikke kontraktuelle eller juridiske forpligtelser, som ikke er betingede af viderebetalingen fra den direkte modtager, såsom en forpligtelse, der ikke er afhængig af modtagelsen af en sådan betaling, og som den direkte modtager har som debitor eller som part i finansielle transaktioner eller sædvanlige fordelingsforpligtelser i henhold til en pensionsaftale eller til kollektive investeringsenheder, som vil være berettiget til overenskomstfordele efter principperne angivet i pkt. 6.8 til 6.34 i kommentaren til art. 1. Hvor modtageren af en rente har retten til at bruge og nyde udbyttet, uden at være bundet af kontraktuelle eller juridiske forpligtelser til at videreformidle de betalinger, som han har modtaget, til en anden person, er modtageren »den retmæssige ejer« af disse renter. Det bør også bemærkes, at art. 11 henviser til den retmæssige ejer af renterne i modsætning til ejeren af de forskrivninger, hvorfra renterne kommer, og de kan være forskellige i visse situationer.

10.3 Det faktum, at en modtager af renteindtægter anses for at være den retmæssige ejer af disse renter, betyder imidlertid ikke, at den nedsættelse af skatten, der fremgår af stk. 2, automatisk skal indrømmes. Denne nedsættelse af skatten skal ikke indrømmes i tilfælde af misbrug af bestemmelsen (se også pkt. 8 ovenfor). Således som det forklares i afsnittet »Misbrug af overenskomsten« i kommentaren til art. 1, er der mange måder at behandle et conduit selskab på, og på et mere generelt plan, treaty shopping situationer. Disse omfatter specifikke anti-misbrugsbestemmelser i overenskomster, generelle anti-misbrugs bestemmelser og indhold-over-form eller økonomisk-substans anskuelser. Mens »retmæssig ejer« konceptet omfatter nogle former for skatteunddragelse (dvs. den type, der involverer indsættelse af en modtager, som er forpligtet til at videreformidle royaltiene til en anden person), er der andre typer, som det ikke omfatter:, det omfatter således ikke andre former for treaty shopping, og det må derfor ikke blive betragtet som et koncept, der på nogen måde begrænser anvendelsen af andre principper vedrørende sådanne forhold.

10.4 De ovenfor angivne forklaringer på begrebet »retmæssig ejer« gør det klart, at meningen med dette udtryk, som det fremgår af artiklens kontekst, må holdes adskilt fra andre fortolkninger af det samme begreb, men i andre sammenhænge, som vedrører identifikationen af den person (typisk en fysisk person), der har den ultimative kontrol over enhederne eller aktiverne. En sådan anden fortolkelse af begrebet »retsmæssig ejer« kan ikke anvendes ved fortolkningen af overenskomsten. Rent faktisk er det imidlertid således, at den forståelse af bestemmelsen, som henviser til en fysisk person, ikke kan forenes med den eksplicitte ordlyd af art. 10, stk. 2, litra a), som henviser til tilfælde, hvor et selskab er den retmæssige ejer af et udbytte. Begrebet »retmæssig ejer«, således som det anvendes i art. 10 og 11, har til formål at løse de problemer, der opstår ved anvendelsen af ordene »betalt til« i relation til udbytter og renter, fremfor de vanskeligheder, der relaterer sig til ejerskabet af aktier eller forskrivninger, hvorfra der kommer udbytter og renter. Af den årsag vil det ikke være hensigtsmæssigt, ved anvendelsen af disse artikler, at overveje anvendelsen af en fortolkning, der er blevet udviklet med henblik på at henvise til fysiske personer, der udøver: »ultimativ, effektiv kontrol over juridiske personer eller arrangementer«.

11. Det følger af de bestemmelser, som artiklen indeholder, at begrænsningen i kildestatens beskatningsret også finder anvendelse, når en mellemmand, således som en agent eller en repræsentant, der har hjemme i den kontraherende stat eller i en tredjestat, er indskudt mellem modtageren og betaleren, men den retmæssige ejer er hjemmehørende i den anden kontraherende stat (teksten blev ændret i 1995 og i 2014 for at tydeliggøre dette, hvilket er i overensstemmelse med holdningen hos alle medlemsstater).

…

13. Artiklen bestemmer ikke, om lempelsen i kildestaten skal være afhængig af, om renterne beskattes i bopælsstaten. Dette spørgsmål kan afgøres ved bilaterale forhandlinger.«

Den 27. november 2006 besvarede skatteministeren en række spørgsmål fra Folketingets Skatteudvalg i anledning af et lovforslag om ændring af Danmarks dobbeltbeskatningsoverenskomst med USA. Heraf fremgår bl.a.:

»*Spørgsmål 5:* Betyder den indgåede traktat, at der i Danmark skal tilbageholdes 5 pct. udbytteskat, hvis udbyttet fra et dansk selskab udbetales til et gennemstrømningsholdingsselskab i Luxembourg, der ejes af amerikanske kapitalfonde, hvor ingen ejerne har 80 pct. eller mere af stemmerettighederne?

*Svar:* Udgangspunktet er, at et udenlandsk selskab, der oppebærer udbytte fra danske selskaber, er begrænset skattepligtigt af udbyttet. Skattepligten opfyldes ved indeholdelse af 28 pct. udbytteskat. Selskabsskattelovens § 2, stk. 1, litra c, medfører, at der ikke er begrænset skattepligt, hvis udbytterne oppebæres af et selskab, der ejer mindst 20 pct. af aktiekapitalen i det udbyttegivende selskab. Det er bl.a. en betingelse, at beskatningen skal frafaldes eller nedsættes efter EU's

**3258**

moder-/datterselskabsdirektiv eller efter en dobbeltbeskatningsoverenskomst med det land, hvor det udenlandske selskab er hjemmehørende. Bortfaldet af begrænset skattepligt er betinget af, at det pågældende udenlandske selskab er den retmæssige ejer af udbyttet. Et rent gennemstrømningsselskab, som er hjemmehørende i udlandet, f. eks. Luxembourg, vil ikke være retmæssig ejer af udbyttet, jf. bemærkningerne til artikel 10 i OECDs modeloverenskomsten (afsnit 12.1).

Den begrænsede skattepligt bortfalder dog alligevel, hvis den retmæssige ejer bag ved gennemstrømningsselskabet er hjemmehørende i et andet land, og Danmark efter moder-/datterselskabsdirek-

tivet eller en dobbeltbeskatnings- overenskomst med dette land skal nedsætte eller undlade beskatning af udbyttet.«

*Direktiv 85/611/EØF om investeringsinstitutter*

Rådets direktiv 85/611/EØF af 20. december 1985 om samordning af love og administrative bestemmelser om visse institutter for kollektiv investering i værdipapirer (investeringsinstitutter) bestemte bl.a.:

»AFDELING I

Almindelige bestemmelser og anvendelsesomraade

*Artikel 1*

1. Medlemsstaterne lader bestemmelserne i dette direktiv gaelde for saadanne institutter for kollektiv investering i vaerdipapirer (investeringsinstitutter), som er beligende paa deres omraade.

2. Ved anvendelsen af dette direktiv og med forbehold af artikel 2 forstaas ved investeringsinstitutter saadanne foretagender, der har som eneste formaal at foretage kollektiv investering i vaerdipapirer af kapital tilvejebragt ved henvendelse til offentligheden, og hvis virksomhed bygger paa princippet om risikospredning, og - hvis andele paa forlangende af ihaendehaverne, skal tilbagekoebes eller indloeses direkte eller indirekte for midler af disse institutters formue. Det forhold, at et investeringsinstitut traeffer foranstaltninger med henblik paa, at kursvaerdien for dets andele ikke afviger vaesentligt fra nettovaerdien, ligestilles med saadanne tilbagekoeb eller indloesninger.

3. Disse institutter kan i henhold til loven oprettes ifoelge aftale (investeringsfonde administreret af administrationsselskaber) eller som »trusts« (»unit trusts«) eller i henhold til vedtaegter (investeringsselskab).

I henhold til dette direktiv omfatter udtrykket »investeringsfond« ligeledes begrebet »unit trust«.

4. Dette direktiv omfatter imidlertid ikke investeringsselskaber, hvis formue gennem datterselskaber hovedsagelig investeres i andre vaerdier end vaerdipapirer.

…

*Artikel 2*

1. Foelgende investeringsinstitutter anses ikke for investeringsinstitutter omfattet af dette direktiv: -lukkede investeringsinstitutter,

-investeringsinstitutter, der tilvejebringer kapital uden at soege at tilbyde deres andele til offentligheden i Faellesskabet eller en del af dette,

-investeringsinstitutter, hvis andele i henhold til fondsbestemmelserne eller investeringsselskabers vedtaegter kun maa saelges til offentligheden i tredjelande,

-de kategorier af investeringsinstitutter, der er fastlagt i bestemmelserne i den medlemsstat, hvor investeringsinstituttet er beligende, og for hvilke reglerne i afdeling V og artikel 36 paa grund af investeringsinstitutternes investerings- og laaneoptagelsespolitik er uhensigtsmaessige.

…

AFDELING V

Forpligtelser med hensyn til investeringsinstitutters investerings-politik

…

*Artikel 22*

1. Et investeringsinstitut maa ikke for mere end 5 % af sin formue investere i vaerdipapirer, der er udstedt af samme emittent.

2. Medlemsstaterne kan forhoeje den i stk. 1 naevnte graense til hoejst 10 %. I tilfaelde, hvor et investeringsinstitut fra samme emittent investerer i vaerdipapirer for mere end 5 % af sin formue, maa den samlede vaerdi af saadanne erhvervede vaerdipapirer, som instituttet ligger inde med, imidlertid ikke overstige 40 % af instituttets formue.

3. Medlemsstaterne kan forhoeje den i stk. 1 naevnte graense til hoejst 35 %, naar vaerdipapirerne er udstedt eller garanteret af en medlemsstat, af dennes lokale offentlige myndigheder, af et tredjeland eller af internationale institutioner af offentlig karakter, som en eller flere medlemsstater deltager i.

…

*Artikel 57*

1. Medlemsstaterne saetter senest den 1. oktober 1989 de noedvendige foranstaltninger i kraft for at efterkomme dette direktiv. De underretter straks Kommissionen herom.«

*Direktiv 2009/65/EF om investeringsinstitutter*

Europa-Parlamentets og Rådets direktiv 2009/65/EF af 13. juli 2009 om samordning af love og administrative bestemmelser om visse institutter for kollektiv investering i værdipapirer (investeringsinstitutter) bestemmer bl.a.:

»*Artikel 1*

1.    Dette direktiv finder anvendelse på institutter for kollektiv investering i værdipapirer (investeringsinstitutter), som er etableret på medlemsstaternes område.

2.    Ved anvendelsen af dette direktiv og med forbehold af artikel 3 forstås ved investeringsinstitut et foretagende:

**3259**

a)    der har som eneste formål at foretage kollektiv investering i værdipapirer eller i andre i artikel 50, stk. 1, nævnte likvide finansielle aktiver af kapital tilvejebragt ved henvendelse til offentligheden, og hvis virksomhed bygger på princippet om risikospredning, og

b)    hvis andele på forlangende af ihændehaverne tilbagekøbes eller indløses direkte eller indirekte for midler af disse institutters aktiver. Det forhold, at et investeringsinstitut træffer foranstaltninger med henblik på, at kursværdien for dets andele ikke afviger fra nettoværdien, ligestilles med sådanne tilbagekøb eller indløsninger.

Medlemsstaterne kan tillade, at investeringsselskaber består af flere investeringsafdelinger.

3.    De i stk. 2 nævnte institutter kan oprettes i henhold til aftale (investeringsfonde administreret af administrationsselskabet), som »trusts« («unit trusts«) eller i henhold til vedtægter (investeringsselskaber).

I henhold til dette direktiv omfatter:

a)    udtrykket »investeringsfond« ligeledes begrebet »unit trust«

b)    udtrykket »andele« i investeringsinstitutter ligeledes aktier i investeringsinstitutter.

4.    Dette direktiv omfatter ikke investeringsselskaber, hvis aktiver gennem datterselskaber hovedsagelig investeres i andre værdier end værdipapirer.

…

*Artikel 3*

Følgende institutter anses ikke for omfattet af dette direktiv:

a)    lukkede institutter for kollektiv investering

b)    institutter for kollektiv investering, der tilvejebringer kapital uden at søge at tilbyde deres andele til offentligheden i Fællesskabet eller en del af dette

c)    institutter for kollektiv investering, hvis andele i henhold til fondsbestemmelserne eller investeringsselskabers vedtægter kun må sælges til offentligheden i tredjelande

d)    de kategorier af institutter for kollektiv investering, der er fastlagt i bestemmelserne i den medlemsstat, hvor sådanne institutter for kollektiv investering er etableret, og for hvilke

reglerne i kapitel VII og artikel 83 på grund af institutternes investerings- og låneoptagelsespolitik er uhensigtsmæssige.

…

KAPITEL VII
FORPLIGTELSER MED HENSYN TIL INVESTERINGSINSTITUTTERS INVESTERINGSPOLITIK

…

### Artikel 50

1. Et investeringsinstituts portefølje består af en eller flere af følgende:

…

2. Et investeringsinstitut skal dog ikke:

a)   investere mere end højst 10 % af sine aktiver i andre værdipapirer eller pengemarkedsinstrumenter end de i stk. 1 nævnte, eller

b)   erhverve ædle metaller eller certifikater for disse.

Investeringsinstitutter kan accessorisk besidde likvide midler.

3. Et investeringsselskab kan erhverve løsøre eller fast ejendom, som er absolut påkrævet for den direkte udøvelse af dets virksomhed.

### Artikel 51

1. Et administrationsselskab eller investeringsselskab anvender en risikostyringsproces, der giver det mulighed for til enhver tid at overvåge og måle risikoen ved positionerne og deres bidrag til porteføljens samlede risikoprofil.

Det anvender en proces, der giver mulighed for at foretage en nøjagtig og uafhængig vurdering af værdien af OTC-derivaterne.

Det holder regelmæssigt de kompetente myndigheder i dets hjemland underrettet om de afledte instrumenters art, de underliggende risici, de kvantitative begrænsninger samt de metoder, der vælges til risikovurdering for transaktioner i afledte instrumenter, for hvert af de investeringsinstitutter, det administrerer.

…

### Artikel 52

1. Et investeringsinstitut investerer højst:

a)   5 % af sine aktiver i værdipapirer eller pengemarkedsinstrumenter, der er udstedt af samme emittent, eller

b)   20 % af sine aktiver i indskud hos den samme enhed.

Risikoen for investeringsinstituttets modpart i forbindelse med OTC-derivattransaktioner skal ikke overstige:

a)   10 % af dets aktiver, hvis modparten er et kreditinstitut som omhandlet i artikel 50, stk. 1, litra f), eller

b)   5 % af dets aktiver i øvrige tilfælde.

Direktivet indeholder endvidere bestemmelser om, at medlemsstaterne under nærmere anførte betingelser i et vist omfang kan forhøje de anførte grænser for investering.

Direktivet indeholder i øvrigt detaljerede regler om bl.a. myndighedsgodkendelse af investeringsinstitutter for at kunne udøve virksomhed, om forpligtelser med hensyn til oplysninger til investorer, herunder detaljerede oplysninger om de med investeringen forbundne risici, og om begrænsede muligheder for låneoptagelse.

*Relevant luxembourgsk lovgivning om beskatning af investeringer*
*Lov af 31. juli 1929*

Loven bestemte bl.a. (uautoriseret oversættelse):

**3260**

»Art. 1st. Will be considered as a Holding company, any luxembourgeoise company whose purpose is exclusive of the acquisition of participations, under some form whatsoever, in other Luxembourg companies bourgeois or foreign and management as well as the development of these participations, in a way that it does not have its own industrial activity and that it is not a commercial establishment open to the public. The portfolio of companies Holding pent understand Luxembourg public funds bourgeois or foreigners.

The Holding company will be exempt from tax on income, surcharge, additional pot rim and coupon tax, without having right to the refund of the tax on the coupon collected by the native obligations that it holds in wallet; she is also exempt additional centimes from the municipalities.

The Holding company will be subject to taxes following:

1.   The acts of formation and improvement of the society as well as deeds increasing share capital will be subject to the right proportional, established by art. 40 and 41 of the law of December 23, 1913, …

2.   The annual and compulsory subscription fee in charge of company titles, provided for by art. 34 and ss. of the law of December 23, 1913 …

3.   The stamp duty on securities issued by holding companies is due, under penalty of a fine an additional ten, within two months of registration de Parte creating these securities, …

Forordning af 17. december 1938 om beskatningsordningen for holdingselskaber, der modtager indskud bestående af et udenlandsk selskabs aktiver på mindst en milliard franc bestemte bl.a. (uautoriseret oversættelse):

### »Artikel 2.

(1) Når den samlede aktie- og obligationskapital i et holdingselskab som omhandlet i artikel 1 når op på en milliard francs eller modværdien heraf i guld, i en kontovaluta, der er relateret til guld, eller i en fremmed valuta, opkræves følgende skatter

(a) det obligatoriske årlige tegningsgebyr, der opkræves for værdipapirer fra holdingselskaber;

(b) indkomstskat, tillægsskat og supplerende skat, som kan påhvile direktører, kommissærer og likvidatorer med mindre end seks måneders ophold om året i Storhertugdømmet Luxembourg samt andre kreditorer end indehavere af obligationer eller andre omsættelige værdipapirer af lignende art med mindre end seks måneders ophold om året i Storhertugdømmet Luxembourg;

c) yderligere cent til fordel for kommunerne;

erstattes af en indkomstskat, som med udelukkelse af alle andre skatter kun opkræves af:

(a) renter, der betales til indehavere af obligationer og andre omsættelige instrumenter af lignende art;

b) udbytte udbetalt til aktionærerne;

c) vederlag og honorarer til direktører, kommissærer og likvidatorer, der er bosiddende mindre end seks måneder om året i Storhertugdømmet Luxembourg.

(2) Denne indkomstskat opkræves i henhold til følgende skalaer:

A. - Hvis de samlede renter, der hvert år betales til indehavere af obligationer og andre omsættelige værdipapirer af lignende art, når op på eller overstiger hundrede millioner (100 000 000) franc;

(a) tre procent (3 %) på renter, der betales til sådanne obligationsindehavere og andre værdipapirer;

b) 18 pct. (18 p.m.) på udbytte, bonusser og lønninger op til en maksimal uddeling på 50 millioner francs (50 millioner francs);

c) en promille (1 p.m.) af overskuddet af nævnte udbytter, honorarer og vederlag.

B. - Hvis de samlede renter, der hvert år betales til indehavere af obligationer og andre omsættelige instrumenter af lignende art, er mindre end hundrede millioner (100 millioner) franc:

(a) tre procent (3 %) på renter, der betales til sådanne obligationsindehavere og andre værdipapirer;

(b) tre procent (3 %) på udbytte, honorarer og vederlag, dog højst et beløb svarende til forskellen mellem hundrede millioner (100

millioner) og det samlede beløb af renter, der er betalt til indehavere af obligationer og andre omsættelige instrumenter af lignende art;

c) 18 pct. (18 p.m.) på overskuddet af udbytte, honorarer og vederlag op til en maksimal uddeling på 50 millioner francs;

d) en promille (1 p.m.) af overskuddet af nævnte udbytte, honorarer og vederlag.«

Ved Kommissionens beslutning af 19. juli 2006 blev det bestemt, at den skatteordning, der på det tidspunkt gjaldt i Luxembourg for holdingselskaber i henhold til lov af 31. juli 1929 var en statsstøtteordning, som er uforenelig med fællesmarkedet. Luxembourg blev pålagt at ophæve ordningen inden den 31. december 2006. Det er oplyst, at 1929-skatteordningen blev ophævet den 22. december 2006.

*Lov af 30. marts 1988 og lov af 20. december 2002 (SICAF og SICAV)*

Lov af 30. marts 1988 om institutter for kollektiv investering [Société d'Investissement à capital fixe og Société d'Investissement à capital variable] bestemmer bl.a. (uautoriseret oversættelse):

»DEL I: Institutter for kollektiv investeringg i værdipapirer
*Kapitel 1.*
*Generelle bestemmelser og anvendelsesområde*

Art. 1. (1) Denne del finder anvendelse på alle institutter for kollektiv investering i værdipapirer (investeringsinstitutter) beliggende i Storhertugdømmet Luxembourg.

**3261**

(2) I denne lovs forstand anses en institution for at være en UCITS-institution, jf. dog artikel 2

- hvis eneste formål er kollektiv investering i værdipapirer af kapital, der er tilvejebragt fra offentligheden, og som opererer efter princippet om risikospredning, og

- hvis andele efter anmodning fra deltagerne indløses direkte eller indirekte af organets aktiver. Sådanne indfrielser omfatter en UCITS' handling for at sikre, at børsværdien af dens andele ikke afviger væsentligt fra deres nettoaktivværdi.

(3) Disse organisationer kan være kontraktlige (gensidige fonde, der forvaltes af et administrationsselskab) eller den vedtægtsmæssige form (investeringsselskab).

(4) Denne del finder dog ikke anvendelse på investeringsselskaber, hvis aktiver gennem datterselskaber hovedsagelig investeres i andre ejendomme end værdipapirer.

…

Art. 2. Denne del vedrører ikke:

lukkede fonde,

UCI'er, der tilvejebringer kapital uden at fremme salget af deres andele til offentligheden i Det Europæiske Økonomiske Fællesskab eller en del af dette, UCI'er, hvis andele i henhold til deres vedtægter kun må sælges til offentligheden i lande, der ikke er medlemmer af Det Europæiske Økonomiske Fællesskab, kategorier af ucits, der er fastlagt af tilsynsmyndigheden, og for hvilke reglerne i kapitel 5 er uhensigtsmæssige på grund af deres investerings- og lånepolitik.

…

*Kapitel 3. Investeringsselskaber med variabel kapital i værdipapirer (SICAV)*

Art. 24. Investeringsselskaber med variabel kapital (SICAV'er) i henhold til denne del er selskaber, der har antaget form af et anonyme selskab i henhold til luxembourgsk lovgivning,

- hvis eneste formål er at investere deres midler i værdipapirer med henblik på at sprede investeringsrisici og give deres aktionærer mulighed for at drage fordel af resultaterne af forvaltningen af deres aktiver, og

- hvis aktier skal placeres blandt offentligheden ved et offentligt eller privat udbud, og hvis vedtægter fastsætter, at kapitalen til enhver tid skal svare til værdien af selskabets nettoaktiver.

…

*Kapitel 5. Investeringspolitik for et investeringsinstitut*

…

Art. 42. (1) Et investeringsinstitut må ikke investere mere end 10 % af sine aktiver i værdipapirer fra en enkelt udsteder. Desuden må den samlede værdi af de værdipapirer, som investeringsinstituttet har i udstedere, hvori det investerer mere end 5 % af sine aktiver, ikke overstige 40 % af værdien af investeringsinstituttets aktiver.

(2) Den i stk. 1 omhandlede grænse på 10 % kan være op til 35 %, hvis værdipapirerne er udstedt eller garanteret af en medlemsstat i Det Europæiske Økonomiske Fællesskab, af dets lokale offentlige myndigheder, af en stat, der ikke er en del af Det U-europæiske økonomiske Fællesskab eller af internationale offentlige organer, som en eller flere medlemsstater i Det Europæiske Økonomiske Fællesskab er medlemmer af.

(3) Den i stk. 1 omhandlede grænse på 10 % kan være op til 25 % for visse obligationer, hvis de er udstedt af et kreditinstitut, der har sit hovedsæde i en medlemsstat i Det Europæiske Økonomiske Fællesskab, og som ved lov er underlagt et særligt offentligt tilsyn, der har til formål at beskytte indehaverne af sådanne obligationer. Navnlig skal provenuet fra udstedelsen af sådanne obligationer i overensstemmelse med loven investeres i aktiver, der i tilstrækkelig grad dækker de forpligtelser, der følger heraf, i hele obligationernes gyldighedsperiode, og som prioriteres til tilbagebetaling af hovedstol og betaling af påløbne renter i tilfælde af udsteders misligholdelse. Hvis et investeringsinstitut investerer mere end 5 % af sine aktiver i de i dette stykke omhandlede obligationer udstedt af den samme udsteder, må den samlede værdi af disse investeringer ikke overstige 80 % af værdien af investeringsinstituttets aktiver.

(4) De i stk. 2 og 3 omhandlede værdipapirer tages ikke i betragtning ved beregningen af den i stk. 1 fastsatte grænse på 40 %.

De grænser, der er fastsat i stk. 1, 2 og 3, må ikke lægges sammen, og derfor må investeringer i værdipapirer fra samme udsteder, der foretages i overensstemmelse med stk. 1, 2 og 3, under ingen omstændigheder overstige i alt 35 % af investeringsinstituttets aktiver.

Art. 43. (1) Uanset artikel 42 kan tilsynsmyndigheden tillade, at et investeringsinstitut efter princippet om risikospredning investerer op til 100 % af sine aktiver i forskellige værdipapirer udstedt eller garanteret af en medlemsstat i Det Europæiske Økonomiske Fællesskab, af dens lokale myndigheder, af en stat, der ikke er medlem af Det Europæiske Økonomiske Fællesskab, eller af internationale offentlige organer, som en eller flere medlemsstater i Det Europæiske Økonomiske Fællesskab er medlem af. Tilsynsmyndigheden meddeler kun en sådan tilladelse, hvis den finder det godtgjort, at deltagerne i investeringsinstituttet nyder en beskyttelse, der svarer til den beskyttelse, som deltagere i investeringsinstitutter, der overholder de i artikel 42 fastsatte begrænsninger, nyder.

Disse investeringsinstitutter skal besidde værdipapirer fra mindst seks forskellige udstedelser, uden at værdipapirer fra en enkelt udstedelse må overstige 30 % af det samlede beløb.

(2) De i stk. 1 omhandlede ucits skal i deres vedtægter udtrykkeligt nævne de stater, lokale myndigheder eller

**3262**

internationale offentlige organer, der udsteder eller garanterer de værdipapirer, som de agter at investere mere end 35 % af deres aktiver i, i deres vedtægter.

(3) Desuden skal de i stk. 1 omhandlede ucits i deres prospekter eller i al reklamemateriale indeholde en fremtrædende erklæring, der gør opmærksom på denne tilladelse og angiver de stater, lokale myndigheder og internationale offentlige organer, i hvis værdipa-

pirer de agter at investere eller har investeret mere end 35 % af deres aktiver.

…

DEL II:
*Andre institutter for kollektiv investering*
*Kapitel 8.*
*Anvendelsesområde*

Art. 58. Denne del finder anvendelse på alle UCITS, der er udelukket i henhold til artikel 2 i denne lov, og på alle andre institutter for kollektiv investering, der er beliggende i Storhertugdømmet Luxembourg.

…

*Kapitel 9. Investeringsforeninger (Fonds communs de placement)*

Art. 60. Ved anvendelsen af denne del anses en investeringsfond for at være en uopdelt pulje af værdipapirer, der er sammensat og forvaltes efter princippet om risikospredning til fordel for uopdelte ejere, som kun er forpligtet op til deres investering, og hvis rettigheder er repræsenteret ved andele, der er bestemt til offentlig placering ved et offentligt eller privat udbud.

…

Art. 62. (1) En storhertuglig forordning, der vedtages på forslag eller efter indstilling fra tilsynsmyndigheden, kan navnlig fastsætte

…

d) den maksimale procentdel af værdipapirer af samme art, der er udstedt af samme organ, som den gensidige fond må besidde;

e) den maksimale procentdel af den gensidige fonds aktiver, der kan investeres i værdipapirer i samme samfund;

f) betingelserne og eventuelt de maksimale procentsatser, hvormed fællesfonden kan investere i værdipapirer fra andre institutter for kollektiv investering; …

*Kapitel 10. Investeringsselskaber med variabel kapital (SICAV)*

Art. 64. Ved anvendelsen af denne del kapital i henhold til denne del forstås investeringsselskaber, der har antaget form af et anonyme selskab i henhold til luxembourgsk lovgivning,

- hvis eneste formål er at investere deres midler i værdipapirer med henblik på at sprede investeringsrisikoen og lade investorerne få gavn af resultaterne af forvaltningen af deres aktiver, og

- hvis aktier skal placeres blandt offentligheden ved et offentligt eller privat udbud, og

- hvis vedtægter fastsætter, at kapitalen til enhver tid skal være lig med selskabets nettoformue.

…

Art. 66. (1) En storhertuglig forordning, der vedtages på forslag eller efter indstilling fra tilsynsmyndigheden, kan navnlig fastsætte

…

d) den maksimale procentdel af værdipapirer af samme art udstedt af samme enhed, som fonden må besidde;

e) den maksimale procentdel af fondens aktiver, som fonden må investere i værdipapirer fra en enkelt enhed;

f) betingelserne og eventuelt de maksimale procentsatser, som selskabet kan investere i værdipapirer i andre UCITS;

*Kapitel 17. Skattebestemmelser 1*

Art. 105. (1) Bortset fra kapitaltilførselsafgiften ved kapitaltilførsel i civile og kommercielle selskaber og den i artikel 108 nedenfor omhandlede tegningsafgift skal der ikke betales nogen anden skat af de i denne lov omhandlede institutter for kollektiv investering.

(2) Udbetalinger fra disse organisationer sker uden kildeskat og er beskattes ikke hos ikke-hjemmehørende skatteydere.«

Loven af 30. marts 1988 blev med visse overgangsbestemmelser erstattet af lov af 20. december 2002 om institutter for kollektiv investering mv. Loven indeholder af relevans for denne sag i det væsentlige samme bestemmelser som loven af 30. marts 1988. Af

loven fremgår, at den finder anvendelse på »investeringsinstitutter«, der er defineret som et institut for kollektiv investering i værdipapirer, der er omfattet at Rådets direktiv 85/611/EØF af 20. december 1985 om samordning af love og administrative bestemmelser om visse institutter for kollektiv investering i værdipapirer (investeringsinstitutter) med senere ændringer.

*Lov af 22. juni 2004 on Risk Capital Investment Company (SICAR)*

Af denne lov om SICAR-selskaber [Société d'investissement en capital à risque] - fremgår bl.a. (uautoriseret oversættelse):

»Art. 1st. (1) For the purposes of this law, a capital investment company shall be considered risk, in short SICAR, any company:

- which has adopted the form of a limited partnership, a limited partnership with shares, a cooperative company organized as a public limited company, a liability company or a public limited company incorporated under Luxembourg law, and

- whose object is the investment of its funds in securities representative of risk capital in order to benefit

**3263**

investors from the results of the management of their assets in return for the risk they support, and

- which reserves its securities for informed investors as defined in article 2 of this law, and

- whose articles of association provide that it is subject to the provisions of this law.

(2) Investment in risk capital is understood to mean the direct or indirect contribution of funds to entities with a view to their launch, development or IPO.

(3) The registered office and central administration of a Luxembourg SICAR must be located at Luxembourg.

Art. 2. A well-informed investor within the meaning of this law is the institutional investor, the professional investor as well as any other investor who meets the following conditions:

1) he has declared in writing his adherence to the status of informed investor and

2) he invests a minimum of 125,000 euros in the company, or

3) it benefits from an assessment, on the part of a credit institution, from another professional in the sector financial institution subject to rules of conduct within the meaning of Article II of Directive 93/22 / EEC, or of a management within the meaning of Directive 2001 / 107 / CE certifying its expertise, experience and knowledge to Appreciate an investment in risk capital adequately. The conditions of this article do not apply to general partners of limited partnerships.«

…

Chapter IX: Tax provisions

Art. 34. (1) The amended law of 4 December 1967 on income tax is amended as follows: …

(2) Do not constitute taxable income in the hands of a capital company referred to in this law, income from securities as well as income generated by the sale, or liquidation of these assets. Capital losses realized on the disposal of transferable securities as well as capital losses not realized but recognized as a result of the writedown of these assets cannot be deducted from taxable income of the company.«

*Lov af 11. maj 2005 (SPF)*

Af loven om »oprettelse af et familieformueforvaltningsselskab« [Société de gestion de patrimoine familial] fremgår navnlig (uautoriseret oversættelse):

»Art. 1. (1) I forbindelse med denne lov betragtes ethvert selskab som et familieformueforvaltningsselskab, forkortet SPF:

- som har antaget form af et selskab med begrænset ansvar, et aktieselskab, et anpartsselskab eller et andelsselskab, der er organiseret som et aktieselskab, og - hvis eneste formål er erhvervelse,

Copyright © 2023 Karnov Group Denmark A/S

besiddelse, forvaltning og realisering af finansielle aktiver som defineret i artikel 2 i denne lov, med udelukkelse af enhver kommerciel aktivitet, og

- som reserverer sine aktier eller andele til investorer som defineret i artikel 3 i denne lov, og

- hvis vedtægter udtrykkeligt fastsætter, at den er omfattet af bestemmelserne i denne lov. …

Art. 2 (1) Ved finansielle aktiver i denne lovs forstand forstås (i) finansielle instrumenter i henhold til loven af 5. august 2005 om finansiel sikkerhedsstillelse og (ii) kontanter og aktiver af enhver art, der opbevares på konto.

(2) SPF må kun besidde en andel i et selskab på betingelse af, at den ikke griber ind i ledelsen af selskabet.

Art. 3 (1) En kvalificeret investor i henhold til denne lov er en af følgende personer

a) en fysisk person, der handler som led i forvaltningen af sin private formue, eller

b) en formueenhed, der udelukkende handler i en eller flere fysiske personers private formueinteresser, eller

c) en mellemmand, der handler på vegne af investorer som omhandlet i litra a) eller b) i dette stykke.

Hver investor skal skriftligt erklære denne status til en repræsentant for SPF-selskabet eller, hvis det ikke er muligt, til SPF's bestyrelse.

(2) Værdipapirer, der udstedes af en SPF, må ikke placeres offentligt eller noteres på en fondsbørs.

*Kapitel II: Skattebestemmelser*

Art. 4 (1) SPF er fritaget for indkomstskat, kommunal erhvervsskat og formueskat.

(2) Enhver SPF, der i det indeværende regnskabsår har modtaget mindst 5 % af det samlede udbytte fra kapitalandele i ikke-bosiddende og ikke-børsnoterede selskaber, som ikke er underlagt en skat, der kan sammenlignes med selskabsskatten i henhold til den ændrede lov af 4. december 1967 om indkomstskat, er udelukket fra at være omfattet af den i stk. 1 omhandlede skatteordning.

(3) Et selskab, der er hjemmehørende i en EU-medlemsstat, og som er omfattet af artikel 2 i Rådets ændrede direktiv 90/435/EØF af 23. juli 1990 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, opfylder betingelsen om sammenlignelig beskatning.

Art. 5 (1) SPF er underlagt en årlig abonnementsskat på 0,25 %, men skatten heraf kan ikke være mindre end et årligt beløb på 100 euro. Abonnementsskatten må ikke overstige et beløb på hundrede og femogtyve tusinde euro om året.«

*Aktieavancebeskatningsloven § 19*

Aktieavancebeskatningsloven, jf. lovbekendtgørelse nr. 172 af 29. januar 2021, § 19, stk. 1 og 2 er affattet således:

»Ved et investeringsselskab forstås:

1. Et investeringsinstitut i henhold til Europa-Parlamentets og Rådets direktiv 2009/65/EF, jf. bilag 1.

Et selskab m.v., hvis virksomhed består i investering i værdipapirer m.v., og hvor andele i selskabet på

**3264**

forlangende af ihændehaverne skal tilbagekøbes for midler af selskabets formue til en kursværdi, der ikke i væsentlig grad er mindre end den indre værdi. Med tilbagekøb sidestilles, at en tredjemand tilkendegiver over for selskabet, at enten den pågældende eller en anden fysisk eller juridisk person på forlangende vil købe enhver andel til en kursværdi, der ikke i væsentlig grad er mindre end den indre værdi. Kravet om tilbagekøb på forlangende er opfyldt, selv om kravet kun imødekommes inden for en vis frist. Uanset at der ikke er pligt til tilbagekøb, anses selskabet for et investeringsselskab, hvis dets virksomhed består i kollektiv investering i værdipa-

pirer m.v. Ved kollektiv investering forstås, at selskabet har mindst 8 deltagere. Koncernforbundne og nærtstående deltagere, jf. kursgevinstlovens § 4, stk. 2, og denne lovs § 4, stk. 2, regnes i denne sammenhæng for én deltager.

*Stk. 2.* Et investeringsselskab som nævnt i stk. 1, nr. 2, 1. pkt., omfatter ikke et selskab m.v., hvis formue gennem datterselskaber hovedsagelig investeres i andre værdier end værdipapirer m.v. Ved et datterselskab forstås et selskab, hvori moderselskabet har bestemmende indflydelse, jf. ligningslovens § 2, stk. 2. Et investeringsselskab som nævnt i stk. 1, nr. 2, 4. pkt., omfatter ikke et selskab m.v., hvis mere end 15 pct. af selskabets regnskabsmæssige aktiver i løbet af regnskabsåret gennemsnitligt er placeret i andet end værdipapirer m.v. Til værdipapirer m.v. medregnes ikke aktier i et andet selskab, hvori førstnævnte selskab ejer mindst 10 pct. af aktiekapitalen, medmindre det andet selskab selv er et investeringsselskab, jf. stk. 1. Hvis et selskab har bestemmende indflydelse på et selskab, jf. ligningslovens § 2, stk. 2, ses der ved opgørelsen efter 3. pkt. bort fra disse aktier, og i stedet medregnes den andel af det andet selskabs aktiver, som svarer til førstnævnte selskabs direkte eller indirekte ejerforhold i det andet selskab.

*Stk. 3.* Et investeringsselskab som nævnt i stk. 1 omfatter ikke et investeringsinstitut med minimumsbeskatning, jf. ligningslovens § 16 C. Et investeringsselskab som nævnt i stk. 1 omfatter heller ikke en kontoførende forening, der opfylder betingelserne i § 2, stk. 2 og 3. pkt., i lov om beskatning af medlemmer af kontoførende investeringsforeninger.«

Bestemmelsen i § 19, stk. 2, blev oprindeligt indsat i avancebeskatningsloven ved lov nr. 98 af 10. februar 2009 med følgende ordlyd:

»*Stk. 3.* Et investeringsselskab som nævnt i stk. 2, nr. 2, 5. pkt., omfatter ikke et selskab m.v., hvis mere end 15 pct. af selskabets regnskabsmæssige aktiver i løbet af regnskabsåret gennemsnitligt er placeret i andet end værdipapirer m.v. Til værdipapirer m.v. medregnes ikke aktier i et andet selskab, hvori førstnævnte selskab ejer mindst 10 pct. af aktiekapitalen, medmindre det andet selskab selv er et investeringsselskab, jf. stk. 2. Hvis et selskab direkte eller indirekte har bestemmende indflydelse på eller ejer aktier i et koncernforbundet selskab, jf. ligningslovens § 2, stk. 2 og 3, ses der ved opgørelsen efter 1. pkt. bort fra disse aktier, og i stedet medregnes den andel af det andet selskabs aktiver, som svarer til førstnævnte selskabs direkte eller indirekte ejerforhold i det andet selskab.«

Af forarbejderne hertil, Tillægsbetænkning over Forslag til lov om ændring af selskabsskatteloven, fusionsskatteloven og forskellige andre love (Justering af rentefradragsbegrænsningsreglerne m.v.), afgivet af Skatteudvalget den 28. januar 2009, fremgår bl.a.:

»BEMÆRKNINGER …

Til nr. 2

Aktieavancebeskatningslovens § 19, stk. 3, medfører, at selskaber ikke skal anses som investeringsselskaber, selv om de opfylder betingelserne i stk. 2. For at undgå at begrebet investeringsselskaber bliver for omfattende, foreslås det at udvide undtagelsesreglen i stk. 3 og indsætte en ny undtagelse i et nyt stk. 5. Den nuværende bestemmelse i § 19, stk. 3, går ud på, at et selskab ikke er et investeringsselskab, hvis dets formue gennem et datterselskab hovedsagelig investeres i andre værdier end værdipapirer. Ved et datterselskab forstås, at holdingselskabet (moderselskabet) direkte eller indirekte råder over mere end halvdelen af aktiekapitalen eller halvdelen af stemmerne.

Den nye formulering af § 19, stk. 3, har som formål at undgå, at selskaber, der baserer sig på produktionsvirksomhed samt holdingselskaber i sædvanlige koncerner, der baserer sig på produktionsvirksomhed, bliver anset som et investeringsselskab omfattet af § 19

For det første foreslås det, at begrebet investeringsselskab ikke skal omfatte et selskab, hvis mere end 15 pct. af dets regnskabsmæssige aktiver gennemsnitligt i løbet af det pågældende regnskabsår er placeret i andre aktiver end værdipapirer, som omfattet af aktieavancebeskatningsloven eller kursgevinstbeskatningsloven.

For det andet foreslås det, at når et selskab ejer mere end 10 pct. af aktiekapitalen i et andet selskab, medregnes aktierne ikke som værdipapirer ved afgørelsen af, om det førstnævnte selskab skal anses som investeringsselskab. Dette gælder dog ikke, hvis det andet selskab er et investeringsselskab.«

*Belysning af administrativ praksis*

Der henvises til gennemgangen af administrativ praksis i landsrettens dom af 3. maj 2021 i sagerne B-1980-12 og B-2173-12.

*Relevant lovgivning gennemført efter SKATs afgørelser*

*Ligningslovens § 3*

Ved lov nr. 540 af 29. april 2015 blev der i ligningsloven indsat følgende bestemmelse:

»§ 3. Skattepligtige har ikke de fordele, der følger af direktiv 2011/96/EU om en fælles beskatningsordning

**3265**

for moder- og datterselskaber fra forskellige medlemsstater, direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater og direktiv 2009/133/EF om en fælles beskatningsordning ved fusion, spaltning, partiel spaltning, tilførsel af aktiver og ombytning af aktier vedrørende selskaber i forskellige medlemsstater og ved flytning af et SE's eller SCE's vedtægtsmæssige hjemsted mellem medlemsstater som implementeret i dansk lovgivning, til arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål eller der som et af hovedformålene har at opnå en skattefordel, som virker mod indholdet af eller formålet med direktiverne, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

*Stk. 2.* Ved anvendelsen af stk. 1 betragtes arrangementer eller serier af arrangementer som ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

*Stk. 3.* Skattepligtige har ikke fordel af en dobbeltbeskatningsoverenskomst, hvis det er rimeligt at fastslå under hensyn til alle relevante faktiske forhold og omstændigheder, at opnåelsen af fordelen er et af de væsentligste formål i ethvert arrangement eller enhver transaktion, som direkte eller indirekte medfører fordelen, medmindre det godtgøres, at indrømmelsen af fordelen under disse omstændigheder vil være i overensstemmelse med indholdet af og formålet med den pågældende bestemmelse i overenskomsten.

*Stk. 4.* Uanset stk. 3 skal stk. 1 og 2 anvendes ved vurderingen af, om en skattepligtig er udelukket fra fordelen i en bestemmelse i en dobbeltbeskatningsoverenskomst med et land, der er medlem af EU, hvis den skattepligtige alternativt kunne påberåbe sig en fordel i et af direktiverne om direkte beskatning.«

Ved lov nr. 1726 af 27. december 2018 blev ligningslovens § 3 affattet således:

»§ 3

Skattepligtige selskaber og foreninger m.v. skal ved indkomstopgørelsen og skatteberegningen se bort fra arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål, eller der som et af hovedformålene har at opnå en skattefordel, som virker mod formålet og hensigten med skatteretten, og som ikke er reelt under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

*Stk. 2.* Ved anvendelsen af stk. 1 betragtes arrangementer eller serier af arrangementer som ikke-reelle, i det omfang de

ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

*Stk. 3.* Indkomstopgørelsen og skatteberegningen skal foretages på baggrund af det reelle arrangement eller serie af arrangementer, hvis der ses bort fra arrangementer eller serier af arrangementer efter stk. 1.

*Stk. 4.* Stk. 1-3 finder tilsvarende anvendelse for andre deltagere i arrangementerne eller serierne af arrangementer, når deltagerne er skattepligtige omfattet af kildeskattelovens §§ 1 eller 2 eller dødsboskattelovens § 1, stk. 2.

*Stk. 5.* Skattepligtige har ikke fordel af en dobbeltbeskatningsoverenskomst, hvis det er rimeligt at fastslå under hensyn til alle relevante faktiske forhold og omstændigheder, at opnåelsen af fordelen er et af de væsentligste formål i ethvert arrangement eller enhver transaktion, som direkte eller indirekte medfører fordelen, medmindre det godtgøres, at indrømmelsen af fordelen under disse omstændigheder vil være i overensstemmelse med indholdet af og formålet med den pågældende bestemmelse i overenskomsten.

*Stk. 6.* Stk. 1-4 har forrang i forhold til stk. 5 ved vurderingen af, om en skattepligtig er udelukket fra fordelen i en dobbeltbeskatningsoverenskomst med et land, der er medlem af EU.

…«

*Rådets direktiv 2016/1164/EU af 12. juli 2016 om regler til bekæmpelse af metoder til skatteundgåelse, der direkte indvirker på det indre markeds funktion*

Af direktivet fremgår bl.a.:

»Artikel 1
*Anvendelsesområde*

Dette direktiv finder anvendelse på alle skattesubjekter, som er selskabsskattepligtige i en eller flere medlemsstater, herunder faste driftssteder i en eller flere medlemsstater for enheder, der er skattemæssigt hjemmehørende i et tredjeland.

…

Artikel 3
*Minimumsniveau af beskyttelse*

Dette direktiv er ikke til hinder for anvendelsen af nationale eller aftalebaserede bestemmelser, der har til formål at sikre et højere beskyttelsesniveau for nationale selskabsskattegrundlag.

…

Artikel 6
*Generel regel om bekæmpelse af misbrug*

1. Ved beregning af selskabsskattetilsvaret ser en medlemsstat bort fra arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål, eller der som et af hovedformålene har, at opnå en skattefordel, som virker mod formålet og hensigten med gældende skatteret, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

2. Med hensyn til stk. 1 betragtes arrangementer eller serier af arrangementer som værende ikke reelle, i det

**3266**

omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

3. Hvis der ses bort fra arrangementer eller serier af arrangementer, jf. stk. 1, beregnes skattetilsvaret i overensstemmelse med national ret.«

*Lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning*

Ved denne lov blev bestemmelserne i multilateral konvention af 24. november 2016 til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning, jf. lovens bilag 1, med virkning fra 1. juli 2019 gjort anven-

U.2023.3198H

delig på bl.a. de dobbeltbeskatningsoverenskomster, der er nævnt i lovens bilag 3, herunder overenskomst af 17. november 1980 mellem Danmark og Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter. Konventionen er tiltrådt og finder anvendelse for Luxembourg.

Af konventionens artikel 17 fremgår:

*»Forhindring af misbrug af aftaler*

1. Uanset de øvrige bestemmelser i en omfattet skatteaftale gives der ikke fordele efter den omfattede skatteaftale med hensyn til indkomst eller formue, hvis det i betragtning af alle relevante fakta og omstændigheder er rimeligt at antage, at opnåelse af denne fordel var et af hovedformålene med noget arrangement eller nogen transaktion, som direkte eller indirekte medførte denne fordel, medmindre det godtgøres, at opnåelse af denne fordel under disse omstændigheder ville være i overensstemmelse med genstanden for og formålet med de relevante bestemmelser i den omfattede skatteaftale.«

## V. Anbringender

*B-2942-13 Takeda A/S under frivillig likvidation mod Skatteministeriet Takeda A/S* under frivillig likvidation har i sit sammenfattende processkrift af 2. august 2021 anført bl.a.:

*»Til støtte for den principale påstand* gøres det principalt gældende, at Nycomed Sweden Holding 2 AB ikke er begrænset skattepligtig til Danmark af de pågældende renter, jf. SEL § 2, stk. 1, litra d, sammenholdt med artikel 11 i den nordiske DBO og rente-royaltydirektivet (2003/49/EF). Tilsvarende gøres det gældende, at heller ikke noget andet selskab i koncernen eller de bagvedliggende ejere er begrænset skattepligtige til Danmark af de pågældende renter. Nycomed A/S (Takeda) har derfor ikke har været pligtig at indeholde renteskat, jf. kildeskattelovens § 65 D.

I relation til DBO'en gøres det gældende, at Nycomed Sweden Holding 2 AB er *»rette indkomstmodtager«* og *»retmæssig ejer«* af renterne, jf. artikel 11, og derfor har krav på nedsættelse efter overenskomsten (jf. afsnit 7 nedenfor).

I relation til *rente-/royaltydirektivet (2003/49/EF)*, gøres det ligeledes gældende, at Nycomed Sweden Holding 2 AB er *»rette indkomstmodtager«* og *»retmæssig ejer«* af renterne.

Det gøres videre gældende, at indrømmelse af direktivets fordele hverken kan nægtes på grundlag af *misbrugsbestemmelsen i direktivets artikel 5* eller på grundlag af det såkaldte *»generelle EU-retlige princip om forbud mod misbrug«* (jf. afsnit 8.6 og 8.7 nedenfor).

Der foreligger *ikke* et *retsmisbrug* i sagen, hverken efter dansk ret, efter den nordiske DBO eller efter EU-retten, og selv hvis det var tilfældet, har Danmark konkret *ikke national hjemmel* til at imødegå dette. Dette anbringende er nævnlig behandlet ovenfor i det indledende afsnit 1.3, men behandles tillige nedenfor i afsnit 7.6 (vedrørende DBO'en) og i afsnit 8.4 (vedrørende direktivet).

Den omstændighed, at den af Skatteministeriet gjorde gennemstrømning af renter under alle omstændigheder, som nævnt, er endt i et andet DBO-land, Luxembourg, nemlig i det øverste moderselskab, Nycomed S.C.A., SICAR udelukker, at der har foreligget misbrug af rente-/royaltydirektivet eller efter den nordiske DBO. En direkte betaling af renter fra Nycomed A/S (Takeda) til Nycomed S.C.A., SICAR ville således, som nævnt, have været fritaget for dansk kildeskat i medfør af den dansk-luxembourgske DBO.

For det tilfælde, at landsretten måtte finde, at Nycomed Sweden Holding 2 AB ikke er »retmæssig ejer« af renterne, gøres det subsidiært gældende, at det luxembourgske bedstemoderselskab, Nycomed S.C.A., SICAR, er det eneste andet selskab i koncernstrukturen, der har oppebåret renteindkomst vedrørende de af sagen

omhandlede koncerninterne lån, i så fald må anses som den »retmæssige ejer« i stedet (med den konsekvens, at der vil skulle ske nedsættelse efter DBO'en mellem Danmark og Luxembourg, hvorefter der ikke foreligger noget misbrug i sagen). Dette anbringende behandles nedenfor i afsnit 7.7.

Til støtte for den principale påstand gøres det videre gældende, at betingelsen for bortfald af begrænset skattepligt i SEL § 2, stk. 1, litra d, sidste punktum, er opfyldt. Dette behandles i afsnit 9 nedenfor.

Subsidiært gøres det gældende, at SKATs afgørelse af 17. september 2010 er udtryk for en skærpelse af en fast administrativ praksis med tilbagevirkende kraft, og at den derfor ikke er lovlig. Dette behandles i afsnit 10.

Mere subsidiært gøres det gældende, at Nycomed A/S (Takeda) ikke hæfter for en eventuel kildeskat efter kildeskattelovens § 69, eftersom Nycomed A/S (Takeda) ikke har handlet »forsømmeligt« ved ikke at indeholde

### 3267

kildeskat i forbindelse med rentetilskrivningerne. Herom henvises til afsnit 11 nedenfor.

For det tilfælde at Nycomed S.C.A., SICAR heller ikke anses som »retmæssig ejer« af de af sagen omhandlede renter, gøres det - *til støtte for de subsidiære (sideordnede) påstande* - gældende,

(A)  at kildeskattekravet skal nedsættes til 0 kr., for så vidt angår det svenske børsnoterede selskab, Aktionær nr. 41, og for den fysiske person, der er hjemmehørende i USA, Aktionær nr. 39, som begge er direkte aktionærer i Nycomed S.C.A., SICAR, og disses (indirekte) andel af de omhandlede renter (ca. 1,40 %), eftersom disse to personer i så fald må anses som de »retmæssige ejere« for denne andel, og

(B)  at der herudover består et retskrav på nedsættelse af kildeskattekravet til 0 kr., i det omfang det - under en hjemvisning til Skattestyrelsen - dokumenteres, at de øvrige investorer i Nycomed S.C.A., SICAR, enten er (i) juridiske personer, der er »retmæssige ejere« af renterne i henhold til en DBO mellem Danmark og deres hjemland, eller (ii) fysiske personer (da der ikke i dansk ret er hjemmel til at opkræve kildeskat på renter vedrørende sådanne personer).

Til støtte for frifindelsespåstanden over for *sagsøgtes afvisningspåstand* gøres det gældende, at sagsøger har en åbenbar retlig interesse i at få prøvet sin subsidiære påstand.

Anbringenderne til støtte for de subsidiære påstande behandles nedenfor i afsnit 12.

*6 SEL § 2, STK. 1, LITRA D, FØRER IKKE TIL BEGRÆNSET SKATTEPLIGT AF RENTERNE*

Reglen om *udenlandske selskabers* begrænsede skattepligt til Danmark af renter godskrevet eller betalt af danske selskaber fremgår af SEL § 2, stk. 1, litra d, der for de omhandlede rentetilskrivninger havde følgende ordlyd […]:

…

Danmark har ikke indført regler om begrænset skattepligt af renter, der betales til *fysiske personer.*

Det fremgår af SEL § 2, stk. 1, litra d, at den begrænsede skattepligt alene omfatter renter, der vedrører såkaldt kontrolleret gæld. Denne betingelse er opfyldt i nærværende sag.

Det er herudover en betingelse, at beskatningen af renter ikke skal frafaldes eller nedsættes efter bestemmelserne i en *dobbeltbeskatningsoverenskomst eller* i *rente-/royaltydirektivet* (2003/49/EF). Hvis blot rentebeskatningen skal lempes efter én af disse retsforskrifter, foreligger der således *ikke* begrænset skattepligt til Danmark for den udenlandske rentemodtager.

Nærværende sag drejer sig derfor i første række om, hvorvidt denne betingelse er opfyldt.

Takeda gør gældende, at rentebeskatningen skal frafaldes eller nedsættes såvel efter den nordiske DBO (alternativt DBO'en mellem Danmark og Luxembourg) som efter rente-/royaltydirektivet, hvorfor Nycomed Sweden Holding 2 AB ikke er begrænset skattepligtig til Danmark af de pågældende renter. Der er dermed af denne grund ikke noget grundlag for opkrævning af kildeskat.

…

*7 KRAV PÅ NEDSÆTTELSE EFTER DEN NORDISKE DBO -*
*NYCOMED SWEDEN HOLDING 2 AB ER »RETMÆSSIG EJER«*
*AF RENTERNE*

7.1 *Generelt om DBO'en*

Det følger af artikel 11 i den dagældende *nordiske dobbeltbeskatningsoverenskomst af 23. september 1996* […], at kildestaten - i dette sag Danmark - ikke kan beskatte renter, der betales til en modtager i et andet nordisk land, hvis rentemodtageren er renternes »retmæssige ejer« - i den engelske tekst »*beneficial owner*«. Det er altså domicilstaten, i dette sag Sverige, der har den suveræne beskatningsret (som Sverige da også har udnyttet, idet renterne er blevet beskattet i Sverige).

Det gøres gældende, at Nycomed Sweden Holding 2 AB er »retmæssig ejer« af de omhandlede renter, og at Nycomed Sweden Holding 2 AB derfor har krav på nedsættelse efter artikel 11 i den nordiske DBO. Da der skal ske nedsættelse, foreligger der ikke begrænset skattepligt til Danmark, jf. SEL § 2, stk. 1, litra d.

Artikel 11 i den nordiske DBO svarer i princippet til artikel 11 i OECD's modeloverenskomst fra 1977 […]. »Retmæssig ejer« er en oversættelse af »*beneficial owner*« hidrørende fra OECD's 1977-modeloverenskomst.

Begrebet »retmæssig ejer« er hverken defineret i den nordiske DBO eller i modeloverenskomsten, og hovedproblemstillingen i dette sagskompleks vedrører netop fortolkningen af dette begreb.

I OECD's kommentarer til 1977-modeloverenskomsten, punkt 11 - som var de gældende kommentarer på tidspunktet for indgåelsen af DBO'en mellem de nordiske lande i 1996 - er det om begrebet anført […]:

»Efter stk. 2 finder begrænsningen af beskatningen i kildestaten ikke anvendelse i tilfælde, hvor en mellemmand, såsom *en agent eller en særligt udpeget person* [engelsk version: »agent or nominee«], er indskudt mellem modtager og betaler, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. Stater, der ønsker at gøre dette klarere, kan frit gøre det under bilaterale forhandlinger.« (Vores understregninger.)

Da Nycomed Sweden Holding 2 AB hverken er »agent« eller en »særligt udpeget person« (på engelsk: »nominee« […] for moderselskabet, Nycomed Sweden Holding 1 AB, for det ultimative moderselskab, Nycomed S.C.A., SICAR, eller for nogen anden person, er

**3268**

det efter 1977-kommentarerne klart, at Nycomed Sweden Holding 2 AB er »retmæssig ejer« efter DBO'en.

I 2003 udvidede OECD kommentarerne til at omfatte såkaldte *gennemstrømningsenheder.*

Kommentarerne blev således bl.a. i et nyt punkt 8.1 suppleret med følgende 3. pkt. […] (kommentaren findes i senere versioner i punkt 10):

»Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som *gennemstrømningsenhed« (conduit)* for en anden person, der rent faktisk modtager den

pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »*nullitet*« eller *administrator*, der handler på vegne af andre parter.« (Vores understregninger.)

Skattemyndighedernes fortolkning af »retmæssig ejer« i nærværende sag støttes på disse udvidede kommentarer, hvilket generelt er tiltrådt af Landsskatteretten i de sager i sagskomplekset, hvor Landsskatteretten har truffet afgørelse (hvilket altså ikke gælder nærværende).

Under nærværende sag støtter ministeriet også sin fortolkning på senere udarbejdede kommentarer til artikel 11, nemlig dem, der kom i 2014, dvs. 7 år efter de første renter i nærværende sag.

Østre Landsret har i sin dom af 3. maj 2021 i de første sager i sagskomplekset også tiltrådt en anvendelse af de pågældende kommentarer fra 2003 […].

Takeda er imidlertid uenig i dommen af 3. maj 2021 på dette punkt.

7.2 *»Retmæssig ejer« skal fortolkes i overensstemmelse med intern dansk ret*

Det gøres gældende, at begrebet »retmæssig ejer« skal fortolkes i overensstemmelse med *intern dansk skatteret.*

I dansk ret vil det være det domstolsskabte princip om »rette indkomstmodtager«, der finder anvendelse, således som også skatteministeren gentagne gange har bekræftet […].

Det kan uden videre fastslås, at Nycomed Sweden Holding 2 AB efter dansk ret er »rette indkomstmodtager« af de omhandlede renter, hvad Skatteministeriet også anerkender, jf. forelæggelseskendelsens punkt 50 […] og punkt 78 […]. Allerede af den grund er Nycomed Sweden Holding 2 AB også »retmæssig ejer« af de pågældende renter.

Når skatteministeren har forklaret Folketinget forud for vedtagelsen af SEL, at skattefriheden er afhængig af, at Nycomed Sweden Holding 2 AB er »rette indkomstmodtager« er det bindende for fortolkningen af SEL, uanset hvad den rette fortolkning af DBO'en er. Imidlertid følger det også af DBO'en, at begrebet »retmæssig ejer« skal fortolkes, sådan som dansk lovgivning har defineret »retmæssig ejer« - og her har man, som nævnt, utvivlsomt sat lighedstegn mellem »retmæssig ejer« og »rette indkomstmodtager«.

Artikel 3, stk. 2, i den nordiske DBO […] - og den tilsvarende bestemmelse i modeloverenskomsten fra 1977 […] - indeholder følgende fortolkningsregel:

»2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.«

»Retmæssig ejer« er ikke defineret i overenskomsten. Begrebet skal derfor fortolkes i overensstemmelse med intern dansk ret, »medmindre andet følger af sammenhængen«.

Det gøres gældende, at andet ikke følger af sammenhængen, og at begrebet derfor skal fortolkes i overensstemmelse med intern dansk ret, dvs. i overensstemmelse med princippet og retspraksis om »rette indkomstmodtager«.

Dette resultat er i overensstemmelse med den af de danske skattemyndigheder -forud for starten på »beneficial owner«-sagerne - anlagte fortolkning […].

Takeda har naturligvis noteret, at Østre Landsret i sin dom af 3. maj 2021 har bemærket, at »*det forhold, at begreberne »retmæssig ejer« og »rette indkomstmodtager« ikke anvendes sprogligt strin-*

*gent i forarbejderne ... ligeledes ikke [findes] at kunne føre til et andet resultat«.* Takeda er ikke enig heri.

Aage Michelsen giver i Festskrift til Ole Bjørn [...] udtryk for følgende generelle opfattelse:

»Anvendelsen af intern ret må ske i alle de tilfælde, hvor et internationalt skattespørgsmål ikke er løst i en dobbeltbeskatningsoverenskomst, som Danmark har indgået med et andet land.«

Det er ubestrideligt, at den nærmere forståelse af »retmæssig ejer« eller »beneficial owner« ikke er løst i overenskomsten.

Fortolkningen giver også god mening, når henses til den indledende bemærkning i punkt 8 i 2003-kommentarerne [...]:

»Kravet om retmæssig ejerskab blev indsat i artikel 11 for at tydeliggøre betydningen af ordene »betalt til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1.«

Sigtet med bestemmelsen har således været at fastslå, hvem der er den reelle modtager af renterne, og det er

### 3269

netop, hvad princippet om »rette indkomstmodtager« i dansk skatteret går ud på [...].

Jakob Bundgaard og Niels Winther-Sørensen er i SR-SKAT 2007.395 på linje hermed [...]:

»På baggrund af den nævnte danske retspraksis om internretlig fortolkning af begreber fra dobbeltbeskatningsoverenskomster må det forventdig antages, at de danske domstole vil være tilbøjelige til i hvert fald i en vis udstrækning at fortolke beneficial owner-begrebet i overensstemmelse med *intern dansk skatteret*. Eller med andre ord, at de danske domstole vil være tilbøjelige til at anse det selskab, der efter en dansk skatteretlig vurdering anses for *rette indkomstmodtager*, for også at være beneficial owner.« (Vores understregninger).

Den retspraksis, der henvises til, er U 1994.284 H [...] og TfS 2003.222 H

Synspunktet gentages af Jakob Bundgaard i SU 2011.31 [...].

Også Jens Wittendorff i SR-SKAT 2010.212, er af den opfattelse, at der skal foretages en internretlig fortolkning baseret på princippet om »rette indkomstmodtager« [...]. Det fremgår sammesteds, at myndighederne i flere andre stater, herunder USA, Storbritannien, Holland og Italien, anvender en internretlig fortolkning.

Yderligere skal nævnes, at Højesteret også i U.2012.2337 H [...] anvender intern dansk ret ved en fortolkning af en DBO.

Sagsøger er opmærksom på, at Østre Landsret ganske vist i den første domstolsafgørelse i »beneficial owner«-sagskomplekset (SKM 2012.121 (ISS-sagen) - [...]) - med støtte i Indofood-dommen [...] - har fundet, at der skal anvendes en *autonom* fortolkning. Tilsvarende synes Østre Landsret at have gjort i TDC- og NetApp-sagerne (dommen af 3. maj 2021, [...]).

Takeda er altså ikke enig heri.

*For det første* undrer det navnlig, at Østre Landsret (i ISS-sagen) har lagt mere vægt på Indofood-dommen, som er en civilretlig engelsk afgørelse, som skulle vurdere begrebets betydning i en sag om fortolkning af en låneaftale i indonesisk ret, end på den senere Prévost-sag [...], som er en skattesag afgjort af den kompetente domstol i kildestaten (Canada).

*For det andet* er det et faktum, at der i den *internationale litteratur* ikke er enighed om, hvad en *autonom* fortolkning - i givet fald - skal gå ud på.

En gennemgang af den foreliggende litteratur viser således, at usikkerheden om, hvad der skal forstås ved »retmæssig ejer« ved en autonom fortolkning, er total. Der er ganske enkelt ikke nogen konsensus om en »international fiscal meaning«.

*For det tredje* er der heller ikke i den internationale litteratur enighed om, hvorvidt der bør anvendes en internretlig fortolkning eller en autonom (international) fortolkning.

...

For det fjerde er den (beskedne) internationale retspraksis heller ikke éntydig. Indofood-dommen [...] synes, som nævnt, at lægge vægt på en international, autonom fortolkning, medens Prévost-sagen [...] synes at være i favør af en internretlig fortolkning.

OECD har i *sit public discussion draft* af 29. april 2011 [...], foreslået, at det indføjes i kommentarerne til artikel 10 (om udbytte), at »beneficial owner« skal underkastes en international fortolkning, men høringssvarene fra The City of London Law Society [...] og IBFD [...] bestrider, at der er dækning i artikel 3, stk. 2, for dette standpunkt.

På baggrund af de modtagne høringssvar udsendte OECD den 19. oktober 2012 [...] et nyt forslag til reviderede kommentarer vedrørende »retmæssig ejer«, hvori OECD - under hensyntagen til, at et flertal af høringssvarene har tilsluttet sig denne opfattelse - fastholdt sit oplæg til, at begrebet underkastes en autonom fortolkning. Dette viser i sig selv, at OECD er på »tynd is«, og at der -uanset OECD's politiske ønsker - fortsat var og er betydelig uenighed om spørgsmålet.

At 2014-kommentarernes punkt 10 [...] og 2017-kommentarernes punkt 10 [...] som følge af politiske overvejelser hos de embedsmænd, som udarbejder kommentarerne, peger i retning af, at begrebet skal fortolkes autonomt, ændrer ikke på, at der i hvert fald ikke i 2007-09 var (og for så vidt heller ikke sidenhen er kommet) den nødvendige internationale konsensus om begrebets forståelse, til at autonom fortolkning dengang gav mening.

At fortolke begrebet »beneficial owner« - »retmæssig ejer« - i overensstemmelse med dansk rets begreb »rette indkomstmodtager«, er endvidere en nødvendighed, når der som her rent faktisk ikke er tale om at fortolke overenskomsten, men tale om at fortolke dansk ret (SEL § 2, stk. 1, litra d), som henviser til overenskomsten, eftersom der reelt ikke er tale om at dele en beskatningsret med Sverige, men om at definere en skattefrihed, som udelukkende angår Danmarks interne beskatningsforhold. Dette er særligt oplagt, har forarbejderne til SEL § 2, stk. 1, litra c og litra d, entydigt bekræfter, at den danske begreb »rette indkomstmodtager« er ensbetydende med begrebet »beneficial owner«.

Selv hvis det var åbenbart, at man ved affattelsen af forarbejderne til SEL § 2, stk. 1, litra c, i 2001 tog fejl af begrebets betydning i modeloverenskomsten, ville de danske forarbejder stadig have forrang frem for overenskomsten, eftersom det var denne forståelse, som det danske Folketing lagde til grund ved vedtagelsen af SEL § 2, stk. 1 litra c - og efterfølgende med vedtagelsen af SEL § 2, stk. 1 litra d.

Konventionskonform fortolkning er heller ikke relevant, da Danmark ikke har lovet Sverige at gøre sin

### 3270

interne skattefrihed af renter afhængig af forståelsen af DBO'en. Det er et valg, som Danmark egenhændigt har truffet, og man skylder ikke Sverige traktatretligt at rette forståelsen af sin interne lovgivning til efter overenskomsten. Afgørende er alene, hvad det danske Folketing har forudsat ved vedtagelsen af SEL § 2, stk. 1, litra c og litra d.

Det gøres således gældende, at intern ret i hvert fald må anvendes, når der -som i denne sag - ikke kan peges på en anden international forståelse af begrebet. Og dette er i særlig grad gældende på tidspunktet for de afgørelser om de danske omhandlede rentetilskrivning i sagsperioden, 2007-09, og endnu mere klart, når det tages i betragtning, at den nordiske DBO er indgået i 1996 (endda som erstatning for en tidligere DBO, der indeholdt en tilsvarende bestemmelse).

Da der er enighed om, at Nycomed Sweden Holding 2 AB er »rette indkomstmodtager« efter dansk ret, er selskabet dermed også »retmæssig ejer«.

*7.3 OECD's udvidede kommentarer fra 2003 kan ikke inddrages ved fortolkningen*

Det er en kendsgerning, at Skatteministeriets ændrede fortolkning af »beneficial owner« (»retmæssig ejer«) er direkte foranlediget af - og oprindeligt udelukkende støttedes på - de udvidede kommentarer til modeloverenskomsten fra 2003 (om »gennemstrømningsselskaber«). Siden har ministeriet også påberåbt sig endnu senere tilkomne kommentarer, herunder fra 2014, jf. herom afsnit 7.5 nedenfor.

Danmarks DBO med de øvrige nordiske lande […] er fra 1996, og artikel 11 i overenskomsten svarer til OECD's modeloverenskomst. Da Danmark og de øvrige nordiske lande indgik overenskomsten, forelå alene OECD's kommentarer fra 1977 til modeloverenskomsten […].

Det er almindeligt antaget - nationalt og internationalt - at OECD's kommentarer til modeloverenskomsten kan inddrages ved fortolkningen af konkrete DBO'er.

For så vidt angår *retskildeværdien* af OECD's kommentarer henvises til Aage Michelsens artikel i Festskrift til Ole Bjørn […], og Michael Lang […], begge med henvisninger til en række internationale forfattere. Det fremgår heraf, at såfremt senere kommentarer er udtryk for en *ændring* i forhold til tidligere versioner - og ikke blot en *præcisering* - kan disse kommentarer ikke tillægges vægt, jf. tilsvarende Vogel, 3. udgave […]. Det er klart, at det, som drøftes hos disse forfattere, er det traktatretlige fortolkningsproblem i en tvist mellem to stater. Forfatterne forholder sig ikke til de retssikkerhedsmæssige problemstillinger, som opstår, når en OECD-kommentar præciserer eller ændrer en DBO, der - som tilfældet er i Danmark - gennem intern lovgivning har givet skatteyderne mulighed for at påberåbe sig en DBO-bestemmelse. Skatteydernes værn mod lovgivning og lovfortolkning med tilbagevirkende kraft afhænger af intern (forfatnings-)ret og er et fundamentalt andet spørgsmål end fortolkningen af en traktat mellem to stater.

Dansk retspraksis har alene accepteret, at præciserende kommentarer kan være relevante for fortolkningen af en DBO, jf. bl.a. U. 1993.143H (Texaco) […], U.1994.284H (professorreglen) (MS 789) og U.2003.988H (Halliburton) […]. Endvidere henvises til *retsforlig* af 3. februar 2000 indgået for Østre Landsret mellem Skatteministeriet og Casino Copenhagen. Forliget er gengivet i SU 2000.241 […].

Det gøres gældende, at de af Skatteministeriet påberåbte udvidede kommentarer fra 2003 - i hvert fald således som de af Skatteministeriet hævdes at skulle forstås - er udtryk for en markant *ændring* i forhold til kommentarerne fra 1977, eftersom de fører til det stik modsatte resultat af, hvad ministeriet lagde til grund i forarbejderne til SEL § 2, stk. 1, litra c i 2001. De kan derfor *ikke* inddrages ved fortolkningen af den nordiske DBO fra 1996.

Baggrunden for, at *efterfølgende kommentarer* ikke kan tillægges vægt, er, at disse ikke er godkendt af medlemsstaternes parlamenter og følgelig savner demokratisk legitimitet.

I et retssystem som det danske, hvor en dobbeltbeskatningsoverenskomst først bliver en del af dansk ret, når Folketinget har vedtaget en lov herom, er dette særligt klart. Det vil ganske enkelt være i strid med delegationsforbuddet i grundlovens § 43 at overlade lovgivningskompetence til de embedsmænd, herunder embedsmænd fra de enkelte landes skatteadministrationer, som formulerer kommentarerne.

Den omstændighed, at fortolkningen af en DBO har den videregående betydning, at den er afgørende for, om der overhovedet foreligger begrænset skattepligt efter SEL § 2, stk. 1, litra c og litra d, er yderligere med til at understrege, at de klare forarbejder til denne bestemmelse ikke kan tillægges vægt ved en ændring af OECD's kommentarer. Eftersom SEL § 2, stk. 1, litra c og litra d, om *interne*

hjemler, som definerer deres *interne* anvendelsesområde via en henvisning til en international traktat, vil selv behørigt aftalte ændringer af traktaten ikke kunne tillægges virkning for intern ret, *medmindre* traktatændringen og dens betydning for intern ret blev tiltrådt af Folketinget, eftersom en ændring af intern dansk ret alene gennem regeringens tiltrædelse af en traktatændring vil indebære en åbenlys tilsidesættelse af delegationsforbuddet i grundlovens § 43. Så meget desto mere tydeligt er det, at intern dansk ret *ikke* ændres, ved at nogle embedsmænd gennem OECD tiltræder en ændring af kommentarerne til OECD's modeloverenskomst.

Betydningen af OECD-kommentarer, som er fremkommet efter det tidspunkt, hvor den relevante

**3271**

overenskomst er indgået, kan ikke afgøres løsrevet fra den effekt, som kommentaren har på den sag, som er til pådømmelse. I det omfang en efterfølgende kommentar fører til, at udfaldet af en sag får det modsatte resultat, vil der klart være tale om en ændring, og der kan ikke lægges vægt på kommentaren.

I ISS-sagen (SKM2012.121.ØLR) vurderede Østre Landsret i præmisserne […], at OECD's kommentarer fra 2003 alene udgjorde en præcisering, men fastslog samtidig, at kommentarerne ikke havde betydning for udfaldet af den pågældende sag (jf. ordene »*I denne sag er det ufornødent at tage stilling til…*«, […]).

Når *Jakob Bundgaard og Niels Winther-Sørensen* i SR-SKAT 2007.395 tilsvarende antager […], at kommentarerne fra 2003 er »præciseringer«, skyldes det, at de samtidig lægger til grund, at kommentarerne »*ikke kan anses som særlig vidtgående*«, idet forfatterne antager […], at »beneficial owner« - i overensstemmelse med skattemyndighedernes tidligere fortolkning - skal fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« efter dansk ret. Under denne forudsætning er de nye kommentarer naturligvis ikke udtryk for en ændring.

I sin dom af 3. maj 2021 adresserer Østre Landsret ikke direkte spørgsmålet, men det følger af landsrettens præmisser, at landsretten ikke har fundet, at de efterfølgende kommentarer er ændringer af kommentarerne. Takeda er, som antydet, ikke enig heri (når det altså fører til, at udbytte-/rentemodtageren ikke anses som den »retmæssige ejer« efter de nyere kommentarer).

Det er i strid med *Wienerkonventionens artikel 31 og 32* […] at tillægge efterfølgende kommentarer vægt.

Navnlig kan disse ikke tjene som en »efterfølgende aftale« i artikel 31, stk. 3, litra (a)'s forstand, jf. *Michael Lang* […]: …

Efterfølgende kommentarer er heller ikke »*supplerende fortolkningsmidler*« i artikel 32's forstand, jf. *Michael Lang* […]: …

Den omstændighed, at OECD's embedsmænd i punkt 35 i introduktionen til *OECD-model-overenskomsten for 2003 […]* selv har givet udtryk, at ændringer i kommentarerne skal *anvendes* ved fortolkningen af tidligere overenskomster, ændrer ikke konklusionen ovenfor, jf. *Michael Lang* […]: …

Se også *Aage Michelsen* med henvisninger […]: …

På linje hermed er efterfølgende kommentarer i dansk retspraksis alene blevet anvendt som et fortolkningsbidrag, når der har været tale om *præciseringer,* jf. de allerede nævnte Højesterets domme i UfR 1993.143 H (Texaco) […] og TfS 2003.222 H (Halliburton) […].

Konklusionen er altså, at de udvidede kommentarer fra 2003 ikke er noget relevant bidrag til fortolkningen af den nordiske DBO. Nycomed Sweden Holding 2 AB er derfor - allerede af denne grund - »retmæssig ejer«, og der foreligger derfor ikke begrænset skattepligt.

*7.4 Nycomed Sweden Holding 2 AB er også »retmæssig ejer« af renterne efter 2003-kommentarerne*

For det tilfælde, at de udvidede kommentarer fra 2003 imidlertid måtte blive anset for kun at være en *præcisering* af begrebet »retmæssig ejer«, gøres det videre gældende, at Nycomed Sweden Holding 2 AB - også efter disse - må anses for »retmæssig ejer« af de omhandlede renter.

Takeda gør således også i dette tilfælde gældende, at »retmæssig ejer«-begrebet skal fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« i dansk ret, jf. således bl.a. *Jakob Bundgaard* og *Niels Winther-Sørensen* i SR-SKAT 2007.395 [...].

Men selv hvis der foretages en autonom fortolkning af begrebet, gøres det gældende, at Nycomed Sweden Holding 2 AB må anses for »retmæssig ejer« af de omhandlede renter efter 2003-kommentarerne.

Ved revisionen i 2003 blev punkt 8 i kommentarerne (til artikel 11 om renter) bl.a. udvidet med bemærkningen om, at udtrykket »retmæssig ejer« ikke er anvendt i en snæver teknisk betydning, men skal ses i sammenhæng med og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

Dette uddybes i punkt 8.1 med, at det for det første ikke ville være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildelandet skulle give lempelse ved betaling til en »agent eller mellemmand« (»agent or nominee«), da denne ikke er ejer af indkomsten og dermed ikke beskattes i sit bopælsland, hvorfor der ikke opstår dobbeltbeskatning. Dette svarer til kommentaren til 1977-modeloverenskomsten.

For det andet udtales - som noget nyt - om »gennemstrømningsselskaber« i punkt 8.1, 3. pkt., jf. også ovenfor i afsnit 7.1:

»Det ville *ligeledes* ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som *gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den på-ældende indkomst*. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »*gennemstrømningsselskab*« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, *reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.«* (Vores understregninger).

Skatteministeriet gør i dette sagskompleks generelt gældende, at punkt 8.1 i de udvidede kommentarer fra

**3272**

2003 skal forstås således, at der ved fastlæggelsen af, om den formelle beløbsmodtager er »retmæssig ejer«, alene skal lægges vægt på omfanget af den formelle beløbsmodtagers reelle beføjelser i relation til at træffe afgørelse om, hvorledes der skal disponeres over modtagne beløb. Efter dette standpunkt vil den formelle beløbsmodtager således ikke kunne anses som »retmæssig ejer«, såfremt denne i relation til den pågældende indkomst reelt ikke kan foretage dispositioner, der afviger fra de ultimative ejeres vilje (om at et modtaget beløb skal »dirigeres derhen, hvor det ønskes«).

Det bemærkes i denne forbindelse, at det af ordlyden af punkt 8.1 klart fremgår, at der opregnes 3 situationer, hvor en rentemodtager ikke er »retmæssig ejer«, nemlig hvis den pågældende er (1) »agent«, (2) »mellemmand« eller (3) »gennemstrømningsenhed (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst«. I den sidstnævnte situation kræves det yderligere, at gennem-strømningsenheden har »*meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter«.*

I denne sag er der imidlertid slet *ikke* sket *gennemstrømning* af renter fra rentemodtageren, Nycomed Sweden Holding 2 AB, til Nycomed Sweden Holding 1 AB eller til nogen anden person.

Den omstændighed, at Nycomed Sweden Holding 2 AB har ydet *koncernbidrag* til Nycomed Sweden Holding 1 AB, ændrer *ikke* herved. For det første har rentefordringen bestået uanset ydelsen af koncernbidrag, og koncernbidragene har således ikke været til hinder for, at Nycomed Sweden Holding 2 AB kunne disponere over renterne ved at konvertere disse til egenkapital i forbindelse med Exit'en i 2011. Hertil kommer, at de pågældende koncernbidrag rent faktisk aldrig blev betalt til Nycomed Sweden Holding 1 AB, eftersom dette selskab eftergav koncernbidragsgælden ved Exit'en.

Nycomed Sweden Holding 2 AB, der er fuldt ud egenkapitalfinansieret, har således ydet lånet til Nycomed A/S (Takeda) af *egne midler*, og renterne er alene kommet Nycomed Sweden Holding 2 AB til gode. Nycomed Sweden Holding 2 AB har stedse været ejer af renterne, som løbende er blevet tilskrevet hovedstolen (hvorved Nycomed Sweden Holding 2 AB har kunnet oppebære større rentebetalinger (rentes rente). Og rentefordringen har eksisteret helt frem til den 21. september 2011, hvor Nycomed Sweden Holding 2 AB valgte at konvertere fordringen til nye aktier, der indgik i overdragelsen til Takeda Pharmaceutical Company. Nycomed Sweden Holding 2 AB har på det tidspunkt konstateret en højere aktieavance, end hvis der ikke var sket konvertering af gælden og renterne forinden.

Ovenstående viser, at selskabet har haft den fulde glæde af renterne.

Takeda gør videre gældende, at den omstændighed, at salgsprovenuet fra salget af Nycomed A/S (Takeda) er udloddet fra Nycomed Sweden Holding 2 AB til Nycomed Sweden Holding 1 AB i slutningen af 2011 og i 2012 i forbindelse med ejerkonsortiets »Exit« (og videre op til Nycomed S.C.A., SICAR og dette selskabs ejere), ikke kan anses som en gennemstrømning af de omhandlede renter. Disse midler stammer således ikke fra rentedebitoren, det sagsogende selskab Nycomed A/S (Takeda), men fra den uafhængige køber af Nycomedkoncernen, Takeda Pharmaceutical Company.

Der synes at være enighed herom mellem parterne, jf. Skatteministeriets processkrift A (s. 3), hvor det hedder [...]:

»Takedas oplysning om, at Nycomed S.C.A., SICAR har foretaget tilbagebetaling af indskudt kapital samt udbetaling af provenu til sine investorer i forbindelse med kapitalnedsættelser i 2011 og 2012 (jf. forelæggelseskendelsen, pkt. 48), bestrides som udokumenteret, *ligesom det bestrides, at der med sådanne eventuelle betalinger skulle være sket en »videregennemstrømning« af de omhandlede renter.«* (Vores fremhævning).

Nycomed Sweden Holding 2 AB er allerede af disse grunde *ikke* et »*gennemstrømningsselskab*«.

Selv hvis det måtte blive lagt til grund, at der er sket »gennemstrømning« af de omhandlede renter gennem Nycomed Sweden Holding 2 AB til Nycomed Sweden Holding 1 AB og videre, bemærkes, at det yderligere fremgår af kommentarerne til modeloverenskomsten, er omfanget af *rådighedsretten* er væsentligt element i vurderingen af, om et gennemstrømningsselskab er den »retmæssige ejer« af indkomsten.

Pointen i kommentarerne er altså, at hvis det rentemodtagende selskab - her Nycomed Sweden Holding 2 AB - har viderekanaliseret de modtagne renter til de bagvedliggende ejere, skal der - ved vurderingen af, om selskabet er »retmæssig ejer« - lægges vægt på, om dette er et udslag af, at de bagvedliggende ejere har indskrænket selskabets rådighed over renterne.

Det gøres i den forbindelse gældende, at Nycomed Sweden Holding 2 AB i hele perioden frem til 2011 har kunnet disponere over rentefordringerne, og eventuelle kreditorer i Nycomed Sweden Holding 2 AB har tilsvarende kunnet søge sig fyldestgjort heri. Og ved konverteringen blev rentebeløbet en del af egenkapitalen i Nycomed A/S (Takeda).

Takeda gør dermed gældende, at Nycomed Sweden Holding 2 AB *ikke* har »*meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller »administrator, der handler på vegne af andre parter*«. Tværtimod, har Nycomed Sweden Holding 2 AB i det hele haft de samme beføjelser, som et hvilket som helst andet holdingselskab i en hvilken som helst anden koncern normalt har.

**3273**

Der har således navnlig ikke foreligget en *retlig forpligtelse* for Nycomed Sweden Holding 2 AB til at viderebetale de modtagne renter til Nycomed Sweden Holding 1 AB, jf. nærmere nedenfor i næste afsnit. Som det bl.a. fremgår af det pågældende afsnit, er det en betingelse for ikke at anse en rentemodtager som »retmæssig ejer«, at den pågældende har påtaget sig en *retlig forpligtelse* til at videreformidle de modtagne renter.

Det bestrides i den forbindelse, at alene den omstændighed, at de bagvedliggende ejere eller disses repræsentanter på forhånd måtte have truffet den overordnede beslutning om pengestrømmene, herunder tilskrivningen af renter hos Nycomed Sweden Holding 2 AB og dette selskabs betaling af koncernbidrag til Nycomed Sweden Holding 1 AB, skulle indebære, at Nycomed Sweden Holding 2 AB ikke kan anses for »retmæssig ejer« af renterne.

Alle større beslutninger i en hvilken som helst koncern - f.eks. om køb af selskaber, større udlodninger, etablering af finansieringsstruktur mv. - træffes sædvanligvis i første omgang af topledelsen i koncernen.

Herefter gennemføres beslutningerne af de relevante selskabsorganer i de respektive selskaber. Hverken de enkelte selskaber som sådan eller de enkelte ledelsesmedlemmer er som udgangspunkt forpligtede til at gennemføre de plan lagte beslutninger, men vægring herved kan naturligvis føre til, at de pågældende medlemmer udskiftes i overensstemmelse med selskabslovenes regler.

Det er ingen holdepunkter for, at kommentarernes punkt 8.1 skal fortolkes således, at det, der er en sædvanlig beslutningsprocedure i enhver koncern, automatisk diskvalificerer koncernens datterselskaber fra at være »retmæssige ejere« af modtagne renter hidrørende fra koncerninterne lån.

Realiteten er, at Skatteministeriets fortolkning af kommentarernes punkt 8.1 er så restriktiv, at det er vanskeligt - for ikke at sige umuligt - at pege på et mellemliggende holdingselskab, som ministeriet til kunne acceptere som »retmæssig ejer« af renter.

Herefter synes den eneste (reelle) betingelse, der efter Skatteministeriets opfattelse skal stilles for at frakende et mellemholdingselskab status som »retmæssig ejer«, at være, at det skal kunne påvises eller sandsynliggøres, at transaktionen har skatteundgåelse eller -unddragelse (eller »misbrug«) som formål eller konsekvens.

Skatteministeriets synspunkt er altså i realiteten, at hvis der kan påvises et *misbrug*, vil et mellemholdingselskab *aldrig være »retmæssig ejer«*, og dermed er der - efter Skatteministeriets egen fortolkning - ikke noget reelt indhold i kravet om »snævre beføjelser«.

Skatteministeriets fortolkning af begrebet »retmæssig ejer« må derfor i det hele afvises som *indholdsløs*.

Skatteministeriets fortolkning er da også klart i strid med Skatteministerens svar på spørgsmål 86 vedrørende L 213 af 22. maj 2007 […]: …

Sammenfattende gøres det således gældende, at Nycomed Sweden Holding 2 AB ikke kan anses for en »nullitet eller administrator«.

Sagsøgers forståelse støttes af Østre Landsrets dom af 20. december 2011 i ISS-sagen, hvor landsretten udtalte […]:

»For at et sådant mellemholdingselskab ikke kan anses for retmæssig ejer, må det kræves, at ejeren udøver en kontrol med selskabet, som ligger ud over den planlægning og styring på koncernplan, som sædvanligvis forekommer i internationale koncerner«.

Skatteministeriet har ikke godtgjort, at der foreligger en sådan særlig kvalificeret kontrol fra ejernes side i nærværende sag.

Sagsøgers forståelse støttes endvidere af nyere international praksis, herunder af Canadas Federal Court of Appeals dom af 26. februar 2009 i den ledende sag, Prévost […], selv om det anerkendes, at den internationale domspraksis om forståelsen af »retmæssig ejer«-begrebet ikke er éntydig.

…

*7.5 2014-kommentarerne - der skal foreligge en retlig forpligtelse til viderebetaling*

Mens denne sag har verseret er der kommet nye kommentarer fra OECD, nemlig i 2014 […], som også påberåbes af Skatteministeriet til støtte for, at Nycomed Sweden Holding 2 AB ikke er »retmæssig ejer« af de omhandlede renter.

Takeda gør gældende, at det nu eksplicit af 2014-kommentarernes punkt 10.2 fremgår, at det som udgangspunkt er en betingelse for at frakende en rentemodtager status som »retmæssig ejer« efter modeloverenskomsten, at der foreligger en forpligtelse til at videreformidle renterne til en anden person. Det hedder således […]: …

Efter Takedas opfattelse har det stedse været klart, at det er en nødvendig - men ikke tilstrækkelig - betingelse for at frakende en rentemodtager status som »retmæssig ejer« efter modeloverenskomsten, at der foreligger en retlig forpligtelse til at viderebetale renterne. 2014-kommentarerne tilføjer således på *dette punkt* ikke noget, som ikke var gældende i forvejen. Det er også bekræftet i den ledende dom, Prévost, fra 2009 […], der er omtalt ovenfor i afsnit 7.4.

En »agent eller mellemmand«, som nævnt i 1977-kommentarerne, er således klart forpligtet til at videreformidle de modtagne renter. Det ligger allerede i, at han netop er »agent eller mellemmand«. Det samme gælder for et »gennemstrømningsselskab« i 2003-kommentarerne.

Efter Skatteministeriets opfattelse er det uden betydning, på hvilket grundlag forpligtelsen består, men udtrykket »forpligtelse« (til at videreformidle) kan ikke gradbøjes. Enten består forpligtelsen, eller også består

**3274**

den ikke. Den relevante test er, om forpligtelsen kan gennemtvinges ved de nationale domstole. Hvis en anden end rentemodtageren således har et retskrav på at få renterne udleveret, som kan gennemtvinges ved domstolene, består der en forpligtelse for rentemodtageren til at videreformidle renterne.

I nærværende sag har der *ikke* bestået en retlig forpligtelse for Nycomed Sweden Holding 2 AB til at videreformidle renterne.

Skatteministeriet henholder sig til 2014-kommentarernes bemærkninger om, at modtageren - uden at have været bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle det modtagne rente til en anden person - »substantielt« ikke havde rettighederne til at »bruge og nyde« renterne.

Heroverfor gør Takeda gældende, at 2014-kommentarerne på dette punkt - hvis de skal forstås som hævdet af Skatteministeriet - *fuldstændigt ændrer* de hidtidige kommentarer til bestemmelsen - 7 år efter den første rentetilskrivning i nærværende sag - og er dermed utvivlsomt udtryk for en udvidelse - og ikke en præcisering - af »retmæssig ejer«-begrebet i 1977-kommentarerne. De kan derfor ikke finde anvendelse ved fortolkningen af DBO'er, der er

indgået før 2014. Den i nærværende sag relevant DBO mellem Danmark og de øvrige nordiske lande er indgået i 1996.

Endelig gøres det gældende, at det er aldeles usikkert, hvad der ligger i dette udsagn i kommentarerne, og at det derfor under alle omstændigheder ville være i strid med almindelige principper om retssikkerhed at tillægge det pågældende udsagn betydning.

Skatteministeriet tillægger det stor vægt, at Takeda ikke har fremlagt skriftlige aftaler eller lignende, der dokumenterer, at Nycomed Sweden Holding 2 AB -eller Nycomed S.C.A., SICAR for så vidt angår lånet mellem dette selskab og Nycomed Sweden Holding 1 AB - ikke var begrænset i sin ret til at råde fuldt ud over de pågældende renter.

Sagen er den, at der foreligger ikke nogen aftaler, der begrænser Nycomed Sweden Holding 2 AB's (eller Nycomed S.C.A., SI-CAR's) råden over de oppebårne renter, endsige nogen aftaler eller lignende, der overhovedet vedrører de koncerninterne lån - ud over selve lånedokumenterne (og hvoraf der i sagens natur ikke fremgår nogen begrænsninger). Skatteministeriet er tilsyneladende af den opfattelse, at der må foreligge aftaler mellem de bagvedliggende aktionærer vedrørende spørgsmålet om råden over renterne, f.eks. en forpligtelse til at betale disse videre. Men det gør der ikke.

Spørgsmålet om - og beslutninger vedrørende - dispositioner har således været en integreret del af kapitalfondsmanagerens (komplementaren i Nycomed S.C.A, SICAR's) ansvars- og arbejdsområde (naturligvis med endelig beslutningskompetence i de enkelte selskaber), og dette hænger sammen med, at ejerne ikke har ydet lån til de underliggende selskaber, herunder til Nycomed S.C.A., SICAR. Derimod har der naturligvis foreligget aftalemæssige forpligtelser til tilbagebetaling af indskudt kapital samt udbetaling af salgsprovenu i forbindelse med en Exit.

Takeda har i sagen fremlagt aktionæroverenskomsten mellem aktionærerne i Nycomed S.C.A., SICAR […], hvoraf ses, at der ikke er truffet bestemmelser vedrørende de koncerninterne lån. Takeda har endvidere fremlagt referater af de bestyrelsesmøder, hvor der er truffet beslutning om at yde de pågældende lån (E 267-293). Heller ikke heri nævnes nogen form for begrænsninger.

*7.6 Der foreligger ikke et misbrug af den nordiske DBO*

…

Takeda bestrider imidlertid, at der i nærværende sag foreligger et misbrug af den nordiske DBO.

Imødegåelse af misbrug kræver, at der er hjemmel hertil i *dansk ret*.

Parterne i nærværende sag er enige om, at der i 2007-09 fandtes to domstolsskabte regler til imødegåelse af misbrug, nemlig *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*, jf. forelæggelseskendelsens punkt 75-78 […].

Der er mellem parterne enighed om, at *realitetsgrundsætningen* ikke giver grundlag for at tilsidesætte de i nærværende sag foretagne dispositioner, jf. punkt 76. Tilsvarende er der mellem parterne enighed om, at rentemodtageren, Nycomed Sweden Holding 2 AB, er *»rette indkomstmodtager«* efter dansk ret, jf. punkt 78.

Skatteministeriet har under sagens forberedelse fremsat et nyt anbringende om, at der i dansk retspraksis skulle være udviklet *almindelige principper til imødegåelse af misbrug der rækker ud over realitetsgrundsætningen* (og - må det forstås - princippet om »rette indkomstmodtager«). Takeda har nedenfor i afsnit 8.4.1.3 tilbagevist dette anbringende.

Det er således en kendsgerning, *at* der i dansk ret fandtes regler til imødegåelse af misbrug, og *at* disse regler fører til, at der i denne sag *ikke* foreligger et misbrug efter dansk ret. I øvrigt er det fast højesteretspraksis, at der ikke kan foreligge misbrug, hvis det fremgår af forarbejderne, at lovgiver har været fuldt opmærksom på den omvistede problemstilling (hvilket er tilfældet i nærværende

sag), jf. U.2004.174H (Over-Hold ApS) […] og U.2007.736H (Finwill ApS - »elevatorsagen«) […].

Der fandtes ikke relevante antimisbrugsregler i den dagældende nordiske DBO.

Derimod indeholder DBO'ens artikel 11 bestemmelsen om, at rentemodtageren skal være »retmæssig ejer«, hvorom henvises til afsnit 7.1 - 7.5 ovenfor.

At der ikke foreligger misbrug af overenskomsten bekræftes bl.a. af, at den valgte struktur - med et

**3275**

»indskudt« mellemholdingselskab/gennemstrømnings-selskab - er direkte anvist af skatteministeren i forbindelse med besvarelsen af spørgsmål 16 til L 99 af 10. november 2000 som en legitim struktur i forbindelse med udlodning af udbytter […] - og dermed også i forbindelse med rentebetalinger, da det er samme betingelse (om »retmæssig ejer«), der gælder i begge situationer.

Dette er helt i overensstemmelse med Mogens Rasmussen og Dennis Bernhardt, begge Told- og Skatte-styrelsen, i SR-SKAT 2000.315 […]: …

Der var generel enighed blandt danske forfattere om disse synspunkter.

Hertil kommer, at formålet med de omhandlede rentebetalinger *ikke* var viderebetale disse til personer, der er hjemmehørende i lande uden DBO, jf. bl.a. ISS-dommen […], idet »gennemstrømningen«, hvis en sådan findes at være forekommet, under alle omstændigheder stoppede i et selskab i et andet DBO-land, nemlig i Nycomed S.C.A., SICAR, Luxembourg. Formålet var således på ingen måde at udøve »treaty shopping«.

ISS-dommen er da også på dette punkt fuldt ud fulgt op i Østre Landsrets dom af 3. maj 2021 i NetApp-sagen […], hvor landsretten netop har fastslået, at der ikke var noget grundlag for at statuere misbrug, når det lå fast, at midlerne var bestemt til at ende i et selskab, der var beliggende i et andet DBO-land (i sagen USA). Og i NetApp-sagen havde de »gennemstrømmede« midler endda »passeret« et selskab i et ikke-DBO-land. Dommen omtales nærmere nedenfor.

…

Det er en kendsgerning, at den valgte finansieringsstruktur indebærer, at Nycomed A/S (Takeda) opnår et rentefradrag i Danmark, og at Nycomed S.C.A., SICAR modtager en rente af nogenlunde samme størrelse (dog vedrørende et helt andet lån), som ikke er skattepligtig i Luxembourg. Denne »hybride« situation var således et af formålene med den konkret valgte lånestruktur, og der med at der opnåedes en skattefordel. Der skal imidlertid i den forbindelse erindres om, at lånet ikke blev ydet med dette som det væsentligste formål. Det væsentligste formål var således at indfri det bestående koncerneksterne lån (obligationerne), og lånet var således ikke blot etableret for at »skaffe« en rentefradragsret i Danmark. Rentefradraget eksisterede således allerede - endda med en forrentning, der set over perioden ville have været højere, end tilfældet var, for så vidt angår det interne lån. Og det skal videre bemærkes, at den pågældende skattefordel også ville have været til stede, hvis der i stedet var indgået en låneaftale direkte mellem Nycomed S.C.A., SICAR og Nycomed A/S (Takeda). Den er således ikke muliggjort af de mellemliggende svenske selskaber.

Det er uklart for Takeda, om Skatteministeriet gør gældende, at den omstændighed, at renterne er skattefrie i Luxembourg, skulle have betydning for, om Nycomed Sweden Holding 2 AB er »retmæssig ejer« af renterne. Takeda gør heroverfor gældende, at spørgsmålet om, hvorvidt Nycomed S.C.A., SICAR beskattes af renterne, er ganske uden betydning for, om Nycomed Sweden Holding 2 AB er »retmæssig ejer« af renterne.

Selv hvis den pågældende finansieringsstruktur - med rentefradrag uden modstående rentebeskatning - måtte anses for at udgøre et retsmisbrug (hvad der under alle omstændigheder tidligst - og muligvis - er skabt hjemmel til med Danmarks implementering af EU's antimisbrugsdirektiv i 2018, jf. nærmere nedenfor), er den adækvate sanktion imidlertid *ikke* at opkræve kildeskat på renterne, men derimod at nægte fradragsret for renterne i Danmark, jf. princippet i ligningslovens § 3 […].

Såfremt der havde været nogen som helst grund til at tro, at Danmark ville opkræve kildeskat på de omhandlede renter ved den valgte konstruktion, kunne koncernen som en fuldgod alternativ løsning altså have valgt at lade Nycomed S.C.A., SICAR, yde lånet direkte til Nycomed A/S (Takeda), idet der dermed ville have beskyttelse efter DBO'en mellem Danmark og Luxembourg.

Denne omstændighed, at den hævdede »rentegennemstrømning« stopper i Nycomed S.C.A., SICAR, Luxembourg, indebærer da også, at der ikke består noget grundlag for en antagelse om, at Nycomed A/S (Takeda) skulle have misbrugt den nordiske DBO.

Dette følger således direkte af Østre Landsrets dom af 3. maj 2021 vedrørende NetApp, for så vidt angår det udbytte, der faktisk blev videreudloddet fra NetApp Danmark til NetApp Cypern og videre til NetApp USA (gennem NetApp Bermuda). …

I øvrigt bemærkes, at OECD først med BEP S-projektet *(»Base Erosion and Profit Shifting Project«)*, der blev opstartet i 2013, og udgivelsen i 2015 af Action 6, »*Preventing the Granting of Treaty Benefits in In-appropriate Circumstances*« […], fremkom med et forslag til indførelsen af en generel misbrugsregel i staternes DBO'er til egentlig imødegåelse af treaty shopping. …

Dette initiativ blev fulgt op med, at en lang række medlemsstater, herunder Danmark, i 2016 indgik den Multilaterale Konvention (»MLI«), hvorved de deltagende stater fik muligheden for at ændre deres bestående DBO'er på flere områder, herunder ved at indsætte disse antitreaty-shopping regler. I Danmark blev MLI'en vedtaget af Folketinget i 2019 […].

Det er således først i 2019, at der er blevet indsat generelle antimisbrugsregler i de bestående danske DBO'er, herunder i den nordiske DBO.

…

7.7 *Subsidiært er Nycomed S C.A., SICAR »retmæssig ejer« af renterne og har krav på nedsættelse efter den dansk-luxembourgske DBO - derfor intet misbrug i sagen*

**3276**

Efter DBO'ens artikel 11, stk. 1 gælder følgende […]: …

Såfremt Nycomed S.C.A., SICAR anses som renternes »retmæssige ejer« følger det således direkte af DBO'en, at Danmark ikke kan beskatte renterne, og det følger dermed udtrykkeligt af SEL § 2, stk. 1, litra d, at rentekildeskatten bortfalder (eftersom beskatningen af renterne skal frafaldes efter i DBO).

…

7.7.1 *De retlige konsekvenser af at anse Nycomed S.C.A., SICAR som »retmæssig ejer« af renterne*

…

Under alle omstændigheder er det en betingelse for at anse Nycomed Sweden Holding 2 AB som et »gennemstrømningsselskab« og dermed som begrænset skattepligtig af de omhandlede renter, at »gennemstrømningen« er sket til investorer, som ikke er beskyttet af en DBO.

Østre Landsret har således i sin dom af 20. december 2011 (ISS-dommen, MS 931) fastslået, at det er en forudsætning for *ikke* at anerkende den umiddelbare beløbsmodtager som »retmæssig ejer«, at midlerne faktisk er strømmet videre til ikke-DBO beskyttede personer eller selskaber.

…

Hvis midlerne anses for at være gennemstrømmet de to svenske selskaber, er de ført videre til Nycomed S.C.A., SICAR i Luxembourg. Midlerne er dermed ikke ført til »*personer i tredjelande uden dobbeltbeskatningsoverenskomst«.*

Yderligere har Østre Landsret på tilsvarende vis i sin dom af 3. maj 2021 […] i den ene af de to første pilot-sager i dette sagskompleks - NetApp-sagen - fundet, at der ikke var grundlag for en antagelse om et misbrug af DBO'en mellem Danmark (hvor det udbytteudloddende selskab var hjemmehørende) og Cypern (hvor det udbyttemodtagende selskab var hjemmehørende), eftersom det i sagen fandtes godtgjort, at udbyttet rent faktisk blev betalt fra Cypern til Bermuda og derfra videre til det øverste moderselskab i USA, hvor midlerne endte (og hvor dette moderselskab var beskyttet af den dansk-amerikanske DBO).

…

Overført på nærværende sag indebærer den omstændighed, at den hævdede »rentegennemstrømning« stopper i Nycomed S.C.A., SICAR Luxembourg -dvs. i et andet DBO-land - at etableringen af de svenske selskaber ikke udgjorde noget misbrug af den nordiske DBO, eftersom renterne kunne være betalt direkte til Nycomed S.C.A., SICAR uden dansk kildeskat. Efter denne retsstilling er det således den nordiske DBO, som bevirker, at rentekildeskatten bortfalder, eftersom der ikke foreligger noget misbrug af den nordiske DBO, såfremt Nycomed S.C.A., SICAR Luxembourg anses for renternes »retmæssige ejer«.Om bortfaldet af den danske rentekildeskat sker med den begrundelse, at det i den konkrete situation i den dansk-luxembourgske DBO, der finder direkte anvendelse, således som Takeda ser det, eller med den begrundelse (som Østre Landsret antog i NetApp-sagen, og som er i overensstemmelse med Skatteministeriets synspunkt), at tilstedeværelsen af (og beskyttelsen under) DBO'er mellem Luxembourg og Danmark, bevirker, at der ikke foreligger et misbrug af den nordiske DBO, forekommer at være »en strid om ord«, som ikke skal forfølges nærmere.

…

Skatteministeriet stiller normalt krav om, at det - for at anerkende en person være »retmæssig ejer« af en modtaget rente (eller et udbytte) - dokumenteres, *at* indkomsten på forhånd var bestemt til at strømme videre til den pågældende person, *at* indkomsten rent faktisk strømmede dertil, *at* den pågældende person reelt har kunnet råde over indkomsten, og *at* den pågældende person ikke selv har fungeret som et »gennemstrømningsenhed« i relation til de pågældende midler.

Disse punkter vil på denne baggrund blive gennemgået i det følgende, og gennemgangen vil vise, at Nycomed S.C.A., SICAR opfylder alle betingelser for at kunne anses som den (alternative) »retmæssige ejer« af renterne.

7.7.2 *Renterne var på forhånd bestemt til at strømme videre til Nycomed S.C.A., SICAR*

…

Hvis landsretten altså lægger vægt på, at der i forbindelse med rentetilskrivningen blev skabt en kæde af tilgodehavender gennem de svenske selskaber, ligger der lige for at konstatere, at det så også på forhånd var bestemt, at Nycomed S.C.A., SICAR skulle være den endelige ejer af fordringskæden. Som nævnt […] var det jo også hele formålet med lånestrukturen, at der skulle skabes et koncerninternt lån på baggrund af egenkapital indskudt i Nycomed S.C.A., SICAR med (fortsat) rentefradragsret i Nycomed A/S (Takeda) og ingen beskatning andetsteds i koncernen. »Rentestrømmen« fra Nycomed A/S (Takeda) er således som planlagt endt i Nycomed S.C.A., SICAR (hvis man altså ser bort Nycomed Sweden Holding 2 AB som »retmæssig ejer«, selv om der ikke er sket til-