# Exhibit 11, Part 3 of 3

skrivning af renter mellem de svenske selskab, og selv om der ikke er sket effektiv betaling af renterne som følge af konvertering m.v., jf. bl.a. afsnit 7.1 - 7.5 ovenfor).

*7.7.3 Renterne strømmede rent faktisk videre til Nycomed S.C.A., SICAR*

…

Hvis landsretten måtte finde, at Nycomed Sweden Holding 2 AB ikke er »retmæssig ejer« af renterne tilskrevet på Nycomed A/S (Takeda)'s gæld til Nycomed Sweden Holding 2 AB, må det - som nævnt i

**3277**

foregående afsnit - nødvendigvis skyldes, at landsretten anser disse renter for gennem koncernbidraget (der ganske vist aldrig blev faktisk betalt) at være overført fra Nycomed Sweden Holding 2 AB til Nycomed Sweden Holding 1 AB, og at Nycomed Sweden Holding 1 AB efterfølgende skattemæssigt har videreført renterne til Nycomed S.C.A., SICAR grundet den rentetilskrivning, der skete på Nycomed Sweden Holding 1 AB's gæld til Nycomed S.C.A., SICAR.

På den baggrund kan det uden videre konstateres, at renterne, såfremt Nycomed Sweden Holding 2 AB ikke anses for »retmæssig ejer«, skattemæssigt blev videreført til Nycomed S.C.A., SICAR.

*7.7.4 Nycomed S.C.A., SICAR har reelt kunnet råde over renterne*

Også vedrørende dette punkt er det åbenlyst, at rådighedsretten over renterne lå hos Nycomed S.C.A., SICAR, såfremt den ikke lå hos de to svenske selskaber.

Der forelå således ikke nogen forudgående aftale eller forståelse om, hvad Nycomed S.C.A., SICAR skulle anvende renterne eller tilgodehavendet på renterne til. Sagen var jo den, at de bagvedliggende ejere af Nycomed S.C.A., SICAR (som jo i sagens natur må være de »mere alternative« »retmæssige ejere« af renterne, hvis ikke Nycomed S.C.A., SICAR er det, jf. herom nedenfor i afsnit 12) ikke havde ydet lån til selskabet, men i stedet indskudt egenkapital, hvorfor de ikke havde noget renteafkast.

Hertil kommer, at selve etableringen - og administrationen - af det koncerninterne lån var en integreret del af kapitalfondsmanagerens (komplementaren i Nycomed S.C.A, SICAR's) ansvars- og arbejdsområde (naturligvis med endelig beslutningskompetence i de enkelte selskaber). Det var således komplementaren (og dermed selskabet selv), der traf de reelle beslutninger herom.

I den anledning kan der anledning til at bemærke, at en renteindtægt på et koncerninternt lån ingen som helst driftsøkonomisk værdi skaber i en koncern. Ganske vist er der en renteindtægt i kreditor-selskabet (her Nycomed S.C.A, SICAR), men dette modsvares jo af en tilsvarende renteudgift i debitorselskabet (her Nycomed A/S (Takeda)). På konsolideret basis går det således i 0. Den eneste fordel ved et koncerninternt lån (hvad værdiskabelse angår) er, hvis man kan opnå en skattefordel, fordi fradragsretten for renteudgiften overstiger beskatningen af renteindtægten. Derved skabes der en skattebesparelse i koncernen, som ultimativt kommer ejerne til gode (da overskuddet efter skat forbedres). Dermed har ejerne heller intet ønske om at skulle have nogen som helst råden over renter på et sådant koncerninternt lån længere nede i strukturen.

Det, som rent faktisk skete, var, at Nycomed S.C.A., SICAR pr. 27. december 2006 lånte EUR 498,5 mio. til det øverste svenske moderselskab […]. Efterhånden som der blev tilskrevet renter på lånet, valgte Nycomed S.C.A., SICAR at lade de tilgodehavende renter stå som et yderligere, markedsmæssigt forrentet lån til debitor, Nycomed Sweden Holding 1 AB, således at renterne fra henholdsvis 2007, 2008 og 2009 blev tilskrevet tilgodehavendet hos Nycomed

Sweden Holding 1 AB, […]. Der er intet substantielt anført til støtte for, at Nycomed S.C.A., SICAR ikke i denne lange periode

kunne råde frit over rentefordringen og eventuelle afdrag herpå. Selskabet har da også haft den fulde glæde af renterne, eftersom tilskrivningen jo bevirkede, at lånet blev forøget -hvilket betød, at forrentningen det efterfølgende år blev større (rentes rente).

Hertil kommer, at det aktiv, som rentefordringen udgjorde, reelt tilhørte Nycomed S.C.A., SICAR, og at eventuelle kreditorer i Nycomed S.C.A., SICAR om nødvendigt kunne have fyldestgjort sig med rentefordringen.

Først i forbindelse med salget af Nycomed-koncernen i 2011 og 2012 - Exit'en - blev lånet indfriet […].

Nycomed S.C.A., SICAR gennemførte herefter en række kapitalnedsættelser med tilbagebetaling af indskudt kapital samt overførsel af provenuet fra tilbagebetalingen af lånet og provenuet fra salget af Nycomed-koncernen. Først på dette tidspunkt - og som følge af afhændelsen af Nycomed-koncernen i 2011 og 2012 - blev midlerne overført til Nycomed S.C.A., SICAR's kapitalejere. I øvrigt længe efter SKATs afgørelse - der en til prøvelse i denne sag - blev truffet.

Det forhold, at Nycomed S.C.A., SICAR flere år efter at være blevet ejer af rentefordringen afhændede sine investeringer, og overførte provenuet ved indfrielsen af fordringen sammen med det øvrige provenu ved salget af Nycomedkoncernen til sine kapitalejere, kan ikke anføres som begrundelse for, at Nycomed S.C.A., SICAR ikke var den reelle ejer - »retmæssige ejer« - af renterne (hvis ikke de svenske selskaber var det).

Som nærmere redegjort for i det følgende afsnit, har Skatteministeriet da også selv bemærket, at den omstændighed, at Nycomed S.C.A., SICAR i forbindelse med salget af Nycomed-koncernen i 2011 og 2012 gennemførte en kapitalnedsættelse med tilbagebetaling af indskudt kapital samt overførsel af provenuet fra salget af Nycomed A/S (Takeda) til kapitalejerne, ikke kan sidestilles med en viderebetaling af de omtvistede renter.

Nycomed S.C.A., SICAR var selvsagt ikke herre over, om og hvornår det ville lykkes at afhænde Nycomed-koncernen. Indtil salget var gennemført, måtte det derfor henstå som ganske usikkert, hvornår Nycomed S.C.A., SICAR kunne udlodde et eventuelt provenu til sine kapitalejere - og om der overhovedet blev noget provenu at udlodde.

**3278**

Hvis Skatteministeriet hævder, at der rent faktisk var aftaler, forståelser eller lignende, som afskar Nycomed S.C.A., SICAR fra at råde over renterne eller tilgodehavendet på renterne, må det påhvile Skatteministeriet at føre bevis herfor eller i det mindste redegøre for, hvori båndet på Nycomed S.C.A., SICAR's handlefrihed bestod. I den forbindelse bemærkes det, at Nycomed S.C.A., SICAR havde et velbegrundet forretningsmæssigt formål, som bestod i at være fælles investeringsselskab for et stort antal kapitalejere, som havde besluttet at investere i fællesskab, og at der ikke er nogen som helst begrundelse for en antagelse om, at Nycomed S.C.A., SICAR på forhånd skulle have forpligtet sig til at videreføre renterne.

Tværtimod var formålet - som netop nævnt - med den etablerede koncerninterne finansieringsstruktur fra Nycomed S.C.A., SICAR og videre ned til Nycomed A/S (Takeda), bl.a. at opnå den skattemæssige fordel, der lå i, at der var rentefradragsret i Danmark uden modstående (effektiv) beskatning af renterne hos Nycomed S.C.A., SICAR. Dette viser i sig selv, at der ikke skete viderestrømning af renter fra Nycomed S.C.A., SICAR - og at dette aldrig var planlagt at skulle ske. Der kan således ikke påvises noget forretningsmæssigt eller skattemæssigt formål med at kanalisere renterne videre til kapitalejerne.

Der var derfor ikke andre selskaber end Nycomed S.C.A., SICAR, der kunne råde over renterne/fordringen på det øverste svenske moderselskab.

### 7.7.5 Renterne er ikke strømmet videre til Nycomed S.C.A., SI-CAR's aktionærer

Der er ikke sket nogen videreoverførsel eller godskrivning af renter fra Nycomed S.C.A., SICAR til andre. Hvis Skatteministeriet hævder, at renterne er strømmet igennem også Nycomed S.C.A., SICAR, påhviler det Skatteministeriet at løfte bevisbyrden herfor eller i det mindste redegøre for, hvorledes den nære gennemstrømning angiveligt har fundet sted, hvilket ikke er sket.

Ejerne af Nycomed S.C.A., SICAR havde fuldt ud egenkapitalfinansieret Nycomed S.C.A., SICAR. Der var således ikke - og har aldrig været - ydet lån fra ejerkonsortiet til Nycomed S.C.A., SICAR, og der er derfor aldrig betalt renter fra Nycomed S.C.A., SICAR til dettes aktionærer. …

Der er da også enighed om, at den omstændighed, at Nycomed S.C.A., SICAR i forbindelse med salget af Nycomed-koncernen i 2011 og 2012 gennemførte kapitalnedsættelser mod tilbagebetaling af indskudt kapital samt overførsel af provenuet fra salget af Nycomed A/S (Takeda), ikke kan sidestilles med en vi-derebetaling af de omtvistede renter (hvoraf den første stammede fra 2007), jf. Skatteministeriets processkrift A (s. 3) - […], hvor det hedder:

»Takedas oplysning om, at Nycomed S.C.A., SICAR har foretaget tilbagebetaling af indskudt kapital samt udbetaling af provenu til sine investorer i forbindelse med kapitalnedsættelser i 2011 og 2012 (jf. forelæggelseskendelsen, pkt. 48), bestrides som udokumenteret, ligesom det bestrides, at der med sådanne eventuelle betalinger skulle være sket en »videregennemstrømning« af de omhandlede renter.« (Vores understregning).

Med ovenstående er det påvist, at Nycomed S.C.A., SICAR var den »retmæssige ejer« af renterne, såfremt de svenske selskaber ikke var det.

### 7.7.6 Nycomed S.C.A., SICAR er omfattet af DBO'en med Luxembourg

Det er ubestridt, at Nycomed S.C.A., SICAR er hjemmehørende i Luxembourg. Det forhold, at Nycomed S.C.A., SICAR alene realiserede indtægter, som var skattefrie efter Luxembourgs skattelovgivning, er - ligeledes ubestridt - ikke et forhold, der udelukker selskabet (og Luxembourg) fra at påberåbe sig DBO'en-ens artikel 11, hvorefter Danmark har afskåret sig fra at beskatte renter, som tilfalder selskaber, som er hjemmehørende i Luxembourg. Dette uddybes senere.

Skatteministeriet gør imidlertid gældende, at selskabet ikke er omfattet af DBO'en, eftersom selskabet ifølge Skatteministeriet er omfattet af en slutprotokol til DBO'en, som er udfærdiget i forbindelse med udfærdigelsen af den oprindelige DBO med Luxembourg i 1980, og som undtager såkaldte 1929-holdingsselskaber fra DBO'en.

Slutprotokollens § 1 har følgende ordlyd i den danske version […]: …

I al sin enkelhed er sagen den, at denne undtagelse helt klart efter ordlyden alene angår de særlige 1929-holdingsselskaber, og der er intet som helst grundlag for at nå til det resultat, at andre selskaber end de udtrykkeligt nævnte særlige 1929-holdingsselskaber også skulle være undtaget fra DBO'en.

…

Da Nycomed S.C.A., SICAR nyder beskyttelse efter den dansk-luxembourgske DBO, foreligger der dermed ikke et misbrug i sagen, og selskabet (eller Nycomed Sweden Holding 2 AB) er dermed ikke begrænset skattepligtig til Danmark, jf. SEL § 2, stk. 1, litra d, og der er derfor intet grundlag for kildeskatteindeholdelse.

### 7.7.7 Skatteministeriets (skiftende) argumentation i sagen

…

Takeda har aldrig påstået, at renterne var strømmet videre til investorerne i Nycomed S.C.A., SICAR. Takeda har blot indtaget det standpunkt, at hvis landsretten anser renterne for strømmet videre til investorerne, så ville også investorerne som - de mere »alternative« - »retmæssige ejere« have krav på bortfald af

**3279**

rentekildeskatten, jf. nærmere om dette subsidiære synspunkt nedenfor i afsnit 12.

… Når reviderede regnskaber i et EU-land viser, at Nycomed S.C.A., SICAR var ejeren af fordringen mod det øverste svenske selskab og renterne heraf, og regnskabet samtidig viser, at Nycomed S.C.A., SICAR var fuldt egenkapital-finansieret, er der intet grundlag for at antage, at renterne er strømmet videre gennem Nycomed S.C.A., SICAR.

…

### 7.7.7.2 Der er enighed om, at det er uden betydning, at Nycomed S.C.A., SICAR er transparent efter dansk skatteret

Herefter frafaldt ministeriet i duplikken af 10. januar 2020 anbringendet - dvs. efter mere end 7 års proces […]:

»Skatteministeriet frafalder anbringendet om, at Nycomed S.C.A., SICAR ikke kan være den retmæssige ejer af renterne i henhold til dobbeltbeskatningsoverenskomsten, allerede fordi selskabet er transparent efter dansk ret…«.

Til gengæld indtog Skatteministeriet i stedet et helt nyt standpunkt; nemlig at selskabet slet ikke er omfattet af den dansk-luxembourgske DBO med henvisning til § 1 i slutprotokollen (der undtager Luxembourgs såkaldte 1929-holdingselskaber), jf. gennemgangen heraf i det følgende afsnit.

### 7.7.8 Skatteministeriets nye anbringende om, at Nycomed S.C.A., SICAR ikke er omfattet af DBO'-en med Luxembourg

…

Takeda gør heroverfor gældende, at Nycomed S.C.A., SICAR ikke er omfattet af § 1 i slutprotokollen, og at selskabet derfor er beskyttet af den danskluxembourgske DBO. Takeda vil redegøre herfor i de følgende underafsnit.

…

### 7.7.8.2 Bevisbyrden for, at DBO'en mellem Danmark og Luxembourg skal forstås som hævdet af Skatteministeriet, påhviler ministeriet, og bevisbyrden er ikke løftet

Ordlyden og formålet med slutprotokollen er indlysende klar. Der er tale om en undtagelse, som specifikt angår 1929-holdingselskaberne og kun dem.

Ex tuto gøres det gældende, at det er Skatteministeriet, som har bevisbyrden for de faktiske og retlige forhold, som ministeriet måtte påberåbe sig til støtte for, at protokollens § 1 også omfatter et selskab som Nycomed S.C.A., SICAR.

…

Dette følger af almindelige bevisbyrderegler, men det gælder så meget desto mere her, fordi ministeriet er aftalepart, og dermed som den eneste har adgang til dokumenterne vedrørende forhandlingerne om bestemmelsen og dermed mulighed for at belyse forståelsen af og hensigten med bestemmelsen. Takeda har derimod ikke adgang til dette materiale. Ministeriet burde i det mindste have fremlagt dokumenter, der viser, at parterne (Danmark og Luxembourg) havde den hævdede fælles forståelse, som ligger langt ud over ordlyden af bestemmelsen. Dette er ikke sket. …

### 7.7.8.3 DBO'er omfatter helt generelt også skattefritagne enheder

For det første skal det konstateres, at det i international og også dansk sammenhæng er helt sædvanligt, at juridiske sammenslutninger er undtaget fra skat, enten af hele deres indkomst eller af visse

indkomster. Når en stat efter en DBO har aftalt sig frem til den eksklusive beskatningsret over en bestemt indkomst, indebærer det også retten for den pågældende stat til at fritage den pågældende indkoost for beskatning - uden den anden stats indblanding.

Danmark havde på tidspunktet for indgåelsen af DBO'en med Luxembourg i 1980 (og har fortsat) mange skattefritagne juridiske enheder. Der henvises til den dagældende selskabsskattelov § 3 […] og Ligningsvejledningen 1979 Selskaber pkt. S.A.3 […]. Navnlig skal fremhæves foreninger, jf. SEL § 1, stk. 1, nr. 6 (herunder erhvervsdrivende foreninger, der alene har omsætning med medlemmerne, jf. SEL § 1, stk. 5). Denne fritagelsesbestemmelse omfatter således f.eks. alle andelsboligforeninger, store sportslige organisationer og store almennyttige foreninger. Endvidere er en lang række enheder af offentligretlig karakter fritaget for skat, også selvom de ikke kan anses for en del af staten, jf. SEL § 3. Det gælder således visse trossamfund, havne, lufthavne, vandforsyningsselskaber, skoler, hospitaler og teatre.

Endvidere fremgår det, at almennyttige fonde kunne fritages fuldstændigt for skattepligt, jf. bekendtgørelse nr. 67 af 28. februar 1978 […] og Skattedepartementets cirkulære nr. 119 af 14. juni 1963 […].

For så vidt angår selskaber med finansiel aktivitet, er det værd at hæfte sig ved, at de dagældende danske regler (i 1980, da DBO'en med Luxembourg blev indgået) fritog pensionskasser, der var underdivet lov om tilsyn med pensionskasser fuldstændigt fra skat. Endvidere var realkreditinstitutter fritaget for indtægt ved den statutmæssige virksomhed, hvilket selvsagt omfattede renteindtægter fra låntagere med sæde i Luxembourg.

Yderligere fremgår det, at den stadigt gældende bestemmelse i statsskattelovens § 1, stk. 1, nr. 6, havde (og har) den konsekvens, at de juridiske enheder, som beskattes efter denne bestemmelse, alene er skattepligtige af erhvervsmæssige indtægter. Det var og er fast praksis, at skattepligten i denne situation ikke omfatter

**3280**

afkast af en likvid formue, herunder renteindtægter, som ikke henføres til virksomhedsdriften.

I 1980 havde det blandt andet den konsekvens, at alle andre fonde end de særskilt fritagne almennyttige fonde, kun var skattepligtige af eventuel erhvervsmæssig virksomhed, jf. det fremgår af Ligningsvejledningens afsnit S.A.3.2 […], at skattepligten *ikke omfatter renter af offentlige obligationer, pantebreve m.v. og bankindestående ud over beløb, der anvendes ved driften af den erhvervsmæssige virksomhed.«* Konsekvensen af dette var bl.a. at nogle af vores allerstørste erhvervsdrivende fonde efter de dagældende regler var skattefrie af afkastet af den formue, som ikke var en del af den erhvervsmæssige virksomhed.

Yderligere var det en konsekvens af bestemmelsen, at fagforeninger og arbejdsgiverforeninger var skattefrie, hvilket også gjaldt afkastet af den formue, som var hensat til strejker og lockouts.

Af helt særlig interesse for denne sag er det relevant at se nærmere på den datidige beskatning af investeringsforeninger. Indtil lov nr. 536 af 28. december 1979, som trådte i kraft den 1. januar 1980, var der kun givet særlige regler om kontoførende foreninger, jf. lovbekendtgørelse nr. 130 af 6. april 1967. Det fremgår af forarbejderne til 1979-loven (Folketingstidende 1979-1980, tillæg A, 2. saml., sp. 662), at der kun fandtes ganske få kontoførende investeringsforeninger. Herudover anføres samme sted om den retstilstand, som var gældende indtil 1. januar 1980:

»De certifikatudstedende investeringsforeninger omfattes af de gældende regler i selskabsskattelovens § 1, stk. 1, nr. 6, hvorefter de pågældende foreninger kun er skattepligtige for så vidt angår indtægt ved erhvervsmæssig virksomhed.

*I det omfang, hvori foreningen alene har til formål at modtage indskud fra medlemmerne og investere disse indskud i værdipapirer, udøver foreningen ikke erhvervsmæssig virksomhed, og investeringsforeningerne er derfor som helhed fritaget for skattepligt....«* [vores understregning].

Yderligere fremgår følgende af sp. 663:

»I de senere år er der oprettet en række certifikatudstedende investeringsforeninger, der ifølge deres vedtægter intet udlodder til medlemmerne, de såkaldte akkumulerende investeringsforeninger. Renter og udbytter samt kursgevinster tillægges foreningens formue og geninvesteres med den virkning, at certifikaterne stiger i værdi.

Efter reglerne i lov om særlig indkomstskat m.v. nedsættes den opgjorte fortjeneste ved afståelse af aktier med 5 pct., dog højst 4.000 kr., og de første 6.000 kr. af særlig indkomst er fritaget for beskatning. Disse fradrag i forbindelse med en afrundingsregel ved skattens beregning gør det muligt, at medlemmerne ved fortsatte afståelser og genanskaffelser af certifikater vil kunne realisere en skattefri fortjeneste på indtil 6.421 kr. årligt, en fortjeneste, der i virkeligheden hidrører fra de ubeskattede renter og udbytter, der er tillagt foreningens formue.

Det foreslås derfor, at certifikatudstedende investeringsforeninger fra den 1. januar 1980 inddrages under beskatning på lige fod med aktieselskaber og erhvervsdrivende foreninger, medmindre foreningen ifølge sine vedtægter er forpligtet til at udlodde samtlige indtjente renter og udbytter inden fristen for indgivelse af selvangivelse for det pågældende indkomstår. Herefter vil renter og udbytter være skattepligtig indkomst for foreningen, ligesom gevinst og tab ved afhændelse og indfrielse af værdipapirer skal medregnes ved foreningens indkomstopgørelse…

*Investeringsforeninger, der ifølge vedtægterne er forpligtet til at udlodde renter og udbytter inden fristen for indgivelse af selvangivelse, vil efter forslaget fortsat være fritaget for skattepligt, hvorimod medlemmerne løbende vil blive beskattet af udloddede beløb.«* (Vores understregning).

Loven blev vedtaget i den form, hvori den var fremsat.

På tidspunktet for indgåelsen af DBO'en med Luxembourg i november 1980 var således en meget betydelig del af danske selskaber m.v. skattefrie, og beskatningen af danske investeringsforeninger var også efter lovændringen i 1979 baseret på et princip om, at foreningerne var skattefrie.

Såfremt Danmark havde haft den tilgang til forhandlinger om dobbeltbeskatningsoverenskomster, at man ikke ville lade skattefritagne enheder være omfattet af DBO'erne, ville det derfor have betydning for de førnævnte danske skattefritagne enheder, da man jo ikke kan forvente, at Danmark kan fastholde kildeskat i forhold til skattefritagne enheder hjemmehørende i modpartslandet, samt at modpartslandet vil kræve også at kunne kildebeskatte skattefritagne enheder hjemmehørende i Danmark.

På tidspunktet for Luxembourgs tiltræden af DBO'en med Danmark havde Luxembourg også en række juridiske enheder ud over 1929-holdingselskabet, som ikke betalte skat. Navnlig kan nævnes selskabsformerne *»association sans but lucratif (ASBL)«* og *»fondation d'utilité publique«*, som er fritaget for skat på betingelse af, at de udelukkende varetager religiøse, kulturelle eller almennyttige formål, jf. artikel 161 i den luxembourgske indkomstskattelov (LITL) […] og artikel 3 i Gewerbesteuergesetz af 1. december 1936 (med senere ændringer) […].

Nu ligger det imidlertid også fast, at Danmark da heller ikke fortolker sine DBO'er på den måde, at det er en betingelse for overenskomstbeskyttelse af et selskab

**3281**

med indkomst fra kilder her i landet, at den pågældende udenlandske enhed rent faktisk er underlagt beskatning i det land, hvor enheden er hjemmehørende, jf. herom i det følgende.

…

Østre Landsret kan derfor lægge til grund, at den omstændighed, at Luxembourg ikke beskatter Nycomed S.C.A., SICAR af de omtvistede renter, ikke udgør nogen begrundelse for at nægte Nycomed S.C.A., SICAR beskyttelse efter DBO'en.

…

Det skal også bemærkes, at det forhold, at renterne ikke beskattes hos Nycomed S.C.A., SICAR ikke er udtryk for nogen form for misbrug af DBO'en eller Luxembourgs nationale lovgivning. Det er jo netop *meningen* med den luxembourgske lovgivning, at Nycomed S.C.A., SICAR ikke skal beskattes af de omtvistede renter, så længe selskabet opfylder de betingelser, som Luxembourg har opstillet for ikke-beskatning. Lige så vist som det er meningen, at der skal være skattefrihed for de danske selskaber, som efter intern dansk lovgivning er skattefrie.

Baggrunden for fortolkningen af slutprotokollens § 1 er således, at spørgsmålet om skattefritagne enheders DBO-beskyttelse er en velkendt problemstilling, som både Danmark og Luxembourg utvivlsomt har været opmærksomme på ved indgåelsen af DBO'en, og at det er Danmarks, Luxembourgs såvel som OECD-kommentarernes klare udgangspunkt, at et selskab har ernsskomstbeskyttelse, selvom det er skattefritaget i sit hjemstedsland.

Yderligere skal det fremhæves, at Danmark og Luxembourg kunne have aftalt en såkaldt »subject to tax«-klausul (dvs. en betingelse om effektiv beskatning) i tilknytning til DBO'ens artikel 11. Med en sådan klausul kunne kildestaten således have gjort skattefriheden af renter, som betales til en enhed i domicilstaten betinget af, at renteindtægten undergives effektiv beskatning i domicilstaten. En sådan klausul er f.eks. indeholdt i artikel 10 i Luxembourgs i sagsperioden gældende DBO af 1. april 1958 med Frankrig (som ændret ved protokol af 8. september 1970), […].

Når der ikke specifikt i en DBO er medtaget som en betingelse for kildelandets opgivelse af sin beskatningsret, at hjemstedslandet effektivt beskatter indkomsten (en »subject to tax«-klausul), så har Luxembourgsk praksis fastslået, at en sådan betingelse ikke kan indfortolkes i DBO'erne. Der kan henvises til afgørelse af 16. marts 2011 fra den luxembourgske administrative domstol […] og A. Steichen og L. Noguera: Double Non-taxation in Luxembourg gengivet i M. Lang: Avoidance of Double Taxation, 2003, s. 217 ff. […].

For så vidt angår renter og andre betalinger, der er fradragsberettigede i kildelandet, udgør det heller ikke noget problem, at modtagerlandet ikke beskatter de pågældende indkomster. Et kildeland, der finder det uhensigtsmæssigt, at f.eks. renter, der er fradragsberettigede i kildelandet, ikke beskattes i modtagerlandet, kan nemlig løse denne situation, uanset at DBO'erne ikke forhindrer en sådan situation. Der er nemlig intet i vejen for, at kildelandet indfører en ren intern regel, som går ud på at nægte debitor rentefradrag i kildestaten i disse tii fælde. Det ændrer ikke på, at modtageren er skattefri af renteindtægterne, men det giver en mulighed for den kildestat, som politisk har et ønske om at forhindre den asymmetri, der ligger i, at renterne fradrages i kildestaten, men ikke beskattes i modtagerstaten. Så længe nægtelsen af fradragsretten ikke er i strid med eventuelle diskriminationsbestemmelser i DBO'en, vil DBO'en ikke være til hinder for en sådan ensidig løsning baseret på kildelandets interne lovgivning om skattemæssigt fradrag for renter.

Danmark *har* indført værnsregler af denne type, men kun for nogle specifikke situationer, hvor situationen med fradragsret hos debitor og manglende beskatning hos kreditor opstår som følge af

forskellig retlig kvalifikation af afkastet i henholdsvis kildelandet og domicilstaten. Folketinget har derimod aldrig fundet anledning til at indføre en generel regel, hvorefter en dansk debitors fradragsret for renter skulle afhænge af, at kreditor rent faktisk beskattes af renteindtægten (hvad enten der er tale om en kreditor hjemmehørende i Danmark eller i udlandet).

Således vedtog Folketinget med virkning fra den 13. december 2006 følgende bestemmelse i SEL § 2 B (lov nr. 344 af 18. april 2007, § 1, nr. 1) […]:

»Stk. 1. Hvis et selskab eller en forening m.v. som nævnt i § 1 har gæld til.lign. til en person eller et selskab, som er hjemmehørende i udlandet, og fordringen m.v. efter udenlandske skatteregler anses for at være indskudt kapital, anses gælden m.v. ligeledes for at være egenkapital ved den danske indkomstopgørelse. 1. pkt. finder kun anvendelse, hvis den udenlandske person eller det udenlandske selskab har bestemmende indflydelse over selskabet, eller hvis selskaberne er koncernforbundne, jf. ligningslovens § 2.

Stk. 2. Kvalifikation efter stk. 1 medfører, at selskabets rentebetalinger og kurstab anses for at være udbytteudlodninger.

Stk. 3. Stk. 1 og 2 finder tilsvarende anvendelse på selskaber omfattet af § 2, stk. 1, litra a og b.«

Bestemmelsen indebar, at en dansk debitor nægtedes rentefradragsret i den særlige situation, hvor der efter dansk ret forelå et lån, medens kreditorlandet anser lånet for at være egenkapital og dermed renterne som (eventuelt skattefrie) udbytter. Bestemmelsen gjaldt endvidere kun låneforhold mellem koncernforbundne parter.

### 3282

Ved lov nr. 1726 af 27. december 2018 blev bestemmelsen med virkning fra den 1. januar 2020 afløst af SEL § 8 D […], der fortsat er begrænset til de situationer, hvor ikke-beskatningen af renteindtægterne hos kreditor skyldes en forskellig kvalifikation af betalingen i debitor-landet og kreditor-landet (såkaldt »hybridt mismatch«). Lovændringen i 2018 skyldtes tilpasning til EU's direktiv nr. 2017/952 (»Anti Tax Avoidance Directive II - ATAD II«) […], og det fremgår helt klart af direktivets præambel, pkt. 16, at hensigten med direktivet kun er at ramme de særlige situationer med hybridt mismatch […]: …

ATAD II - og dermed de nuværende danske regler er baseret på en rapport offentliggjort i OECD i oktober 2015 med titlen *»Neutralising the Effects of Hybrid Mismatch Arrangements«*. På s. 192 […] er anført et eksempel 1.5, hvor der foretages en fradragsberettiget betaling i et land til en skattefri enhed i et andet land. Begge implicerede stater er enige om, at der er tale om et gældsinstrument. Det fremgår af eksemplet, at der *ikke* er tale om et hybridt mismatch af den type, som man med rapporten opfordrer medlemsstaterne til at gribe ind over for.

Det er således klart, at Danmark - uanset DBO'erne - har mulighed for at forhindre, at renter fratrækkes »hjemme« uden at blive beskattet »ude«, men Danmark har kun valgt at gøre brug af denne mulighed på en måde, som ikke er relevant for denne sag, hvilket Danmark er i øvrigt på linje med EU og OECD på dette punkt. Nærværende sag angår da heller ikke Nycomed A/S (Takeda)'s ret til fradrag for renterne.

Baggrunden for fortolkningen af slutprotokollen er således, at det er helt utvivlsomt, at det ikke har været parternes hensigt med slutprotokollen generelt at holde skattefritagne selskaber udenfor DBO'en.

…

Det står også klart, at det er helt uantageligt, at slutprotokollen skulle afspejle et ønske fra Danmarks side om generelt at undtage et selskab fra DBO'ens anvendelsesområde, fordi selskabet var helt eller delvist skattefritaget i Luxembourg. Både Luxembourg og Danmark havde i 1980 en række forskellige skattefritagne enhe-

der, og det ville have alvorlige konsekvenser for mange danske skattefrie enheder, hvis Danmark havde den tilgang til DBO-forhandlinger, at skattefrie enheder ikke var DBO-beskyttet. Det fremgår dog også som nævnt af Den juridiske Vejledning, at Danmark sammen med størstedelen af OECD-landene har den tilgang til fortolkningen af DBO'er, at skattefrihed ikke udelukker et selskab fra overenskomstbeskyttelse.

…

I øvrigt er det slet ikke dokumenteret, at undtagelsen for 1929-holdingselskaber var begrundet i den manglende beskatning af selskabet.

7.7.8.4 *En ordlydsfortolkning af slutprotokollen fører klart til, at kun 1929-holdingselskaber er undtaget fra overenskomstbeskyttelse*

Det er i sagen ubestridt, at et S.C.A.-selskab - et kommanditaktieselskab - er omfattet af DBO'en.

Som vi redegør nærmere for nedenfor i afsnit 7.7.8.6, kunne bl.a. et S.C.A.-selskab på visse betingelser i Luxembourg blive underlagt et regulatorisk og skattemæssigt regelsæt forbeholdt et SICAR (*société d'-investissement en capital à risque*).

Spørgsmålet er, om et sådant S.C.A.-selskab, der opfylder betingelserne for den særlige regulatoriske og skattemæssige SICAR-status, som Luxembourg indførte i 2004, er omfattet af § 1 i slutprotokollen til DBO'en (der altså er indgået i 1980, dvs. før SICAR-lovgivningen blev vedtaget) om de såkaldte 1929-holdingselskaber, med den virkning at et SICAR-investeringsselskab er undtaget fra DBO-beskyttelse.

Takeda gør heroverfor gældende, at et investeringsselskab som et S.C.A., SICAR-selskab *ikke* er omfattet af slutprotokollens § 1, hvorfor Nycomed S.C.A., SICAR nyder beskyttelse efter DBO'en. […]

Den umiddelbare og ligefremme (og rigtige) forståelse af bestemmelsen er, at der er tale om en meget snæver undtagelse, som kun angår 1929-holdingselskaberne - og kun dem. 1. punktum identificerer 1929-holdingselskaberne på en meget ligefrem og koncis måde, som ikke giver mulighed for en udvidende fortolkning, og 2. punktum handler om at undtage indkomster og kapitalgevinster hidrørende fra nøjagtig de samme selskaber. Efter Wienerkonventionens artikel 31, stk. 1 […] gælder, at

»A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.«

…

Den vejledning nr. 74 af 28. april 1982 […], som Skatteministeriet selv udstedte i tilknytning til offentliggørelsen af DBO'en, indeholder ingen støtte for, at slutprotokollen skulle have et videre anvendelsesområde end 1929-holdingselskaberne. Vejledningen gengiver blot slutprotokollens tekst på dette punkt.

…

Ud over at et S.C.A., SICAR-selskab slet ikke sammenligneligt med et 1929-holdingselskab - hvilket vil blive dokumenteret under det næste punkt - så er der intet belæg for en sådan udvidende fortolkning af ordlyden af bestemmelsen.

Som det fremgår af teksten, adresserer bestemmelsens to punktummer et 1929-holdingselskab med henvisning til den for disse selskaber gældende lovgivning på tidspunktet for indgåelsen af DBO'en i 1980.

**3283**

I det *første* punktum adresseres spørgsmålet om, hvorvidt 1929-holdingselskabet selv nyder beskyttelse efter DBO'en. Det *andet* punktum vedrører investorerne i et 1929-holdingselskab og er toleddet, idet det først konstateres, at indkomst, som et dansk selskab oppebærer fra et 1929-holdingselskab (f.eks. en royalty), ikke er omfattet af DBO'en, ligesom det gælder for indkomst, som en

dansk person oppebærer på aktier i et 1929-holdingselskab (altså udbytte). Ordene »selskaber af denne art« henviser altså ikke til selskaber »tilsvarende« et 1929-holdingselskab, men refererer direkte til 1929-holdingselskabet (dvs. til »sådanne selskaber«, som omtalt i første led af bestemmelsen).

…

Af væsentlig betydning er det at bemærke, hvor nemt det havde været at formulere en ændring af teksten i protokollen, så det tydeligt fremgik, at 1929-holdingselskaberne kun var et eksempel, og at lignende selskaber også var undtaget fra protokollen - eller at skrive ligeud, at luxembourgske skattefritagne selskaber generelt var undtaget fra DBO'ens anvendelsesområde. Men det har aftaleparterne ikke gjort. Og det var fordi, at det ikke var meningen med slutprotokollen.

Den franske version …

Endvidere kan man søge til den engelske oversættelse …

I denne anledning skal der videre henvises til lovbemærkningerne til bemærkningerne til det lovforslag, der implementerede DBO'en i intern luxembourgsk ret (lovforslag nr. 2533 af 6. oktober 1981), og hvor det om Slutprotokollens stk. 1 hedder ([…] fransk original samt autoriseret oversættelse til dansk)):

»Til 1. stykke i Slutprotokollen

I dette stykke fastsættes det, at holdingselskaber i henhold til den luxembourgske særlovgivning ikke er omfattet af konventionens anvendelsesområde. *Det samme gælder for indkomst, som en person, der er hjemmehørende i Danmark, opnår fra sådanne selskaber og fra kapitalandele i dem.* Ordlyden svarer til den, der er anvendt i de fleste af de konventioner, som Luxembourg har indgået.«

Det fremgår heraf klart, at referencen, som Skatteministeriet hæfter sig ved, angår de samme selskaber.

Skatteministeriet har videre fremhævet, at der i bestemmelsen henvises til lovgivningen for 1929-holdingselskaber med anvendelsen af ordene »for tiden …..« /»pris en exécution…«.

Dette siger imidlertid alene det åbenbare, at den omstændighed, at de pågældende 1929-holdingselskaber måtte blive omfattet af en ny, ændret lovgivning, ikke ændrer deres status i henhold til DBO'en. Hensigten hermed var naturligvis blot at sikre, at Luxembourg ikke blot kunne erstatte den daværende lovgivning om 1929-holdingselskaber med en ny og dermed omgå bestemmelsen. Men det betyder jo ikke, at anden lovgivning vedrørende andre selskaber dermed bliver omfattet af den pågældende undtagelsesbestemmelse. …

… Der er intet belæg for, at de aftalelande skulle have ønsket andet end at undtage de pågældende 1929-holdingselskaber og kun dem. Dette understøttes da også af, at Skatteministeriet efterfølgende har godkendt andre (senere tilkomne) skattefritagne luxembourgske investeringsselskaber som omfattet af DBO'en, jf. nærmere nedenfor i afsnit 7.7.8.7.

Resultatet støttes af en række almindelige fortolkningsprincipper.

For det første bemærkes, at slutprotokollen anvender den fremgangsmåde, at den definerer de undtagne holdingselskaber ved en henvisning til en helt konkret selskabsdannelse i Luxembourgs interne lovgivning. Man har altså netop ikke forsøgt at definere det undtagne område ud fra objektive kriterier. Det taler i sig selv imod en udvidende formålsfortolkning af slutprotokollen. …

Slutprotokollen indeholder, som nævnt, en specifik undtagelse fra DBO'en. Slutprotokollen udtrykker dermed ikke en enighed om en fortolkning af DBO'-ens almindelige bestemmelser, men netop en fravigelse fra det resultat, der som udgangspunkt vil følge af bestemmelsen. Det er et almindeligt anerkendt for-tolkningsprincip, at undtagelser fortolkes indskrænkende, dvs. kun så langt som ordlyden af undtagelsen utvivlsomt rækker, jf. […].

…

Copyright © 2023 Karnov Group Denmark A/S

Endvidere er forbeholdet ensidigt - det er kun til gavn for Danmark, som bevarer en beskatningsret i forhold til indkomster, herunder renter, som tilflyder 1929-holdingselskaber. Selvom Luxembourg ikke beskattede 1929-holdingselskaber, har Luxembourg en åbenbar interesse i, at deres hjemmehørende selskaber ikke beskattes af andre lande. Det har derfor formodningen imod sig, at Luxembourg har haft til hensigt, at slutprotokollen skulle have et dækningsområde, som rakte ud over det, som klart følger af ordlyden. Som det vil fremgå af afsnit 7.7.8.7 nedenfor, har Luxembourg da også for så vidt angår investeringsforeninger og investeringsselskaber aktivt presset på for at få Danmark til at leve op til overenskomstens hovedregel om, at også skattefrie enheder nyder overenskomstbeskyttelse - og det med succes.

*7.7.8.5 En formålsfortolkning fører tilsvarende til, at kun 1929-holdingselskaber er undtaget fra overenskomstbeskyttelse.*

I det omfang Skatteministeriet støtter sit standpunkt på en formålsfortolkning af DBO'en og protokollen under henvisning til, at formålet har været at undgå skattefradrag i Danmark uden indregning af renterne i skattegrundlaget i Luxembourg, må det for det første

**3284**

gentages, at det *ikke* er et generelt formål med en DBO at undgå denne situation (jf. ovenfor i afsnit 7.7.8.3).

For det første er problemstillingen med fradragsret i et land og ingen beskatning i det andet land *(deduction without inclusion)* ganske enkelt ikke et spørgsmål om dobbeltbeskatning eller dobbelt ikke-beskatning. Dobbeltbeskatning foreligger, når den samme indkomst beskattes to gange. Dobbelt ikke-beskatning foreligger, når ingen stater beskatter en indkomst. Forholdet med fradragsret i et land og ingen beskatning i et andet land har en anden karakter, hvilket navnlig viser sig ved, at det kildeland, der af politiske grunde ikke bryder sig om at indrømme fradragsret hos en hjemmehørende debitor for en rente, som ikke beskattes hos en udenlandsk kreditor, har mulighed for at lovgive herimod ved ren national lovgivning, nemlig ved at nægte den hjemmehørende debitor fradragsret i en sådan situation, sådan som Danmark også til dels havde gjort det med SEL § 2B (nu SEL § 8D), jf. afsnit 7.7.8.3 ovenfor.

For det andet er det ikke misbrug af overenskomsten hverken fra Nycomed S.C.A., SICAR's side eller fra Luxembourgs side, at Nycomed S.C.A., SICAR kunne indtægtsføre renterne skattefrit, mens Nycomed A/S (Takeda) i Danmark fik fradrag for renterne. Skattefriheden er en konsekvens af den fulde beskatningskompetence, som Danmark har overladt Luxembourg, idet kompetencen til at beskatte også omfatter kompetencen til at undlade at beskatte, og idet Nycomed S.C.A., SICAR handler i fuld overensstemmelse med den luxembourgske lovgivning. Danske domstole har ingen censurret over for den måde, hvorpå Luxembourg udnytter - eller undlader at udnytte, som her - sin beskatningskompetence. Danmark kunne have stillet krav om effektiv beskatning som betingelse for at opgive sin beskatningsret i form af en »subject to tax«-klausul svarende til den, Frankrig havde med Luxembourg i disse staters DBO.

I den forbindelse kan der f.eks. henvises til TfS 1997.506 H ....

Afgørelsen viser, at så længe en koncernintern låneoptagelse sker på markedsvilkår og som led i en sædvanlig forretningsmæssig disposition, kan der ikke uden udtrykkelig hjemmel og alene ud fra misbrugsovervejelser ske nogen indskrænkning i debitors fradragsret, selvom kreditor ikke beskattes af renterne. Selve det forhold, at en kreditor ikke beskattes af en koncernintern renteindtægt, er ganske enkelt ikke odiøst, så længe den manglende beskatning - som her - er et udslag af lovgivers bevidste undladelse af at beskatte i den foreliggende situation. Derfor er der heller ikke noget grundlag for en formålsfortolkning, som alene støtter sig på en

implicit og uunderbygget antagelse om, at aftaleparterne har søgt at undgå denne situation, også når det drejer sig om andre selskaber end 1929-holdingselskaberne.

I øvrigt indrømmer Danmark modsat ikke skattefrihed for renteindtægter, blot fordi debitor ikke har skattemæssigt fradrag for renterne, hvad enten debitor er hjemmehørende i Danmark eller i udlandet, jf. f.eks. EU-Domstolens dom i C-593/14 Masco Denmark ApS (præmis 43) [...] og SKM 2019.6.SKTST [...].

...

Det fremgår [...] af ratificeringen af DBO'en i Luxembourg, at formålet med slutprotokollens § 1 var at skabe tydelighed omkring, at den »subscription tax«, som 1929-holdingselskaber betalte, ikke var omfattet af overenskomsten.

Således fremgår følgende af statsrådets indstilling af 8. december 1981 til det lovforslag, der implementerede DBO'en i luxembourgsk ret ([...] - fransk og her i egen oversættelse):

»I stk. 1 i Slutprotokollen fastsættes det, at holdingselskaber i henhold til den luxembourgske lovgivning ikke er omfattet af konventionens anvendelsesområde.

Da disse holdingselskaber ikke er underlagt indkomst- eller formueskat, er de normalt ikke omfattet af dobbeltbeskatningsoverenskomsterne.

*Når de høje kontraherende parter udtrykkeligt har nævnt luxembourgske holdingselskaber, er det utvivlsomt efter anmodning fra den danske medunderskriver, som ønskede at undgå forveksling mellem de skatter, der er nævnt i konventionen, og de abonnementsafgifter [»impots d'abonnement«], der skal betales af holdingselskaberne.*

Det er rigtigt, at udelukkelsen af holdingselskaber også kan ses som et tegn på, at vores aftalepartnere har mistillid til en af vores mest originale, skattemæssige og finansielle, institutioner.

*Selv om vi næppe kan protestere mod udelukkelse af holdingselskaber fra konventionens anvendelsesområde, skal vi fortsat være opmærksomme på at sikre, at vores specifikke lovgivning ikke bliver angrebet frontalt af dem, der med rette eller urette anser sig selv for at være ofre for den.«* (Vores understregninger).

Det fremgår heraf, at det var Danmark, som ønskede § 1 i slutprotokollen indført, og at formålet hermed var at undgå forvirring omkring, hvorvidt den »abonnementsafgift« - *»subscription tax«* - som 1929-holdingselskaber betalte årligt, var en skat omfattet af DBO'en. Hvis Skatteministeriet under disse omstændigheder gør gældende, at formålet med slutprotokollen i virkeligheden var at undgå, at luxembourgske selskaber, som ikke betalte skat eller kun en marginal skat, var omfattet af DBO'en, påhviler bevisbyrden Skatteministeriet.

Som det vil fremgå nedenfor, betaler Nycomed S.C.A., SICAR *ikke »subscription tax«.*

Det fremgår endvidere af ovenstående, at Luxembourg kunne acceptere en udelukkelse af 1929-holdingselskaberne, men at udelukkelsen af

**3285**

1929-holdingsel-skaberne samtidig skabte en opmærksomhed fra Luxembourg om ikke at lade sig udsætte for »frontalangreb« på landets øvrige fiskale og finansielle instrumenter. Det vil derfor ikke stemme med parternes fælles hensigt med slutprotokollen at bruge den som afsæt for en formålsfortolkning, som nægter overenskomstbeskyttelse til andre selskaber end netop 1929-holdingselskaberne.

Samlet set er der intet grundlag for at fortolke slutprotokollen hverken udvidende eller formålsbestemt.

*7.7.8.6 Et S.C.A., SICAR-selskab er ikke sammenligneligt med et 1929-holdingselskab*

Under alle omstændigheder er et luxembourgsk S.C.A., SICAR-selskab *ikke* identisk - endsige på nogen måde sammenligneligt - med et 1929-holdingselskab.

[…]

1929-holdingselskabet var underlagt forholdsvis simple krav:

- Der skulle være tale om holding-aktivitet i form af (passivt) ejerskab af aktier eller besiddelse af immaterielle aktiver (artikel 1). 1929-holdingselskaberne var således almindelige holdingselskaber, hvor der ikke var noget krav om det nærmere formål med investeringen eller ejerkredsen. Det vil sige, at det var selskaber, som var etableret med henblik på at eje de investerings-aktiver, som aktionærerne måtte ønske og over så lang en periode, som aktionærerne måtte finde hensigtsmæssigt.

- 1929-holdingselskabet var ikke målrettet professionel investeringsaktivitet. Der var således ikke krav til aktivsammensætningen, hverken i form af risikospredning eller i form af krav om, at 1929-holdingselskabet skulle investere i en bestemt type af aktiver.

- 1929-loven indeholdt ikke regler om investorbeskyttelse, ligesom lovgivningen i øvrigt ikke opstillede krav til investorerne; hverken i form af den indskudte kapital eller investorernes fagkundskab.

- 1929-holdingselskabet var ikke underlagt tilsyn fra Luxembourgs finanstilsyn, ligesom 1929-holdingselskabet ikke var underlagt nogen rapporteringsforpligtelser. Der var ikke pligt til revision af regnskaberne i et 1929-holdingselskab.

- 1929-regimets anvendelse var således tilgængeligt for alle, der ønskede at etablere et holdingselskab, uanset hvad man måtte ønske at investere i, så længe der var tale om et rent holdingselskab, som ikke udøvede erhvervsaktivitet i øvrigt. Enhver kunne overdrage sine aktier m.v. til et -eventuelt 100 % ejet - holdingselskab, og på grund af den manglende rapporterings- og revisionspligt undgå at andre - herunder skattemyndighederne - havde indsigt i holdingselskabets aktiviteter.

- For så vidt angår beskatningen af 1929-holdingselskabet, bemærkes, at disse selskaber var fuldstændigt fritaget for selskabsskat, og alene betalte en (symbolsk) *»subscription tax«*, jf. 1929-lovens artikel 1 […] (på 0,2 % af selskabets kapital). Selskabet var således subjektivt skattefritaget og havde ikke nogen forpligtelse til at indgive selvangivelse. På det grundlag kunne selskabet helt generelt heller ikke få udstedt et hjemstedscertifikat fra de luxembourgske skattemyndigheder (som ex af Luxembourgs DBO'er omfattet selskab).

En variant af 1929-holdingselskabet blev indført ved dekret af 17. december 1938 […], som også er nævnt i slutprotokollen. Heroverfor står selskaber omfattet af SICAR-loven […].

Et SICAR kan selskabsretligt antage forskellige former. Nycomed S.C.A., SICAR var som navnet angiver et S.C.A. (société en commandite par actions). Betegnelsen SICAR angiver, at selskabet har valgt at underlægge sig - og er registreret efter - SICAR-loven.

SICAR-loven er en del af Luxembourgs lovgivning om regulerede, kollektive investeringsselskaber, som beskrives i detaljer senere. Typisk for kollektive investeringsselskaber er, at deres formål er at muliggøre og understøtte flere, typisk mange investorers fælles investeringer i værdipapirer m.v. Som i Danmark er disse enheder ofte skattefritagne, fordi man søger at undgå, at kollektive investeringer medfører en merbeskatning i forhold til den situation, hvor hver enkelt investor investerer direkte.

Vælges SICAR-regimet, fravælges (passiv) holdingaktivitet samtidig; et SICAR må udelukkende investere i højrisikoaktiver,

dvs. aktiver, hvor SICAR'et ved sin investering deltager i udviklingen af det underliggende selskab. Når det underliggende selskab er kommet tilstrækkelig langt i sin udvikling, til at en investering i selskabet ikke længere er en investering i et højrisiko aktiv, skal SICAR-selskabet afstå sin investering. Et SICAR-selskabs formål er således ikke at besidde aktier som en langsigtet investering, men derimod at udvikle selskabet, således at selskabet vokser, for på den baggrund at afstå aktierne med den størst mulig gevinst for investorerne.

Det fremgår f.eks. af det luxembourgske finanstilsyns, CSSF's, meddelelse af 5. april 2006 […], hvor det hedder:

»In order to maximise profits from investments for the SICAR's shareholders, the SICAR will often intervene in management of the portfolio companies via an advisory activity or a representation in the managing bodies of the portfolio company, thereby aiming to create value in the latter through restructuring, modernisation, and by promoting any measures likely to improve the allocation of resources.«

**3286**

SICAR'er kan altså bruges til den aktivitet, som også varetages af danske private equity-/kapitalfonde, som har *aktiv ejerskab* med henblik på at udvikle og afvikle sin investering med størst muligt afkast. For så vidt angår spørgsmålet, om SICARet er et almindeligt holdingselskab, hedder det fra CSSF […]:

»Finally, it should be noted that as an investment company in risk capital, *the SICAR's declared intention shall be in general to acquire financial assets in order to sell them with a profit*, as opposed to a holding company which acquires to hold.« (Vores understregning).

Som det fremgår af SICAR-loven […] og af Finanstilsynets (CSSF's) meddelelse af 5. april 2006 […] er SICAR underlagt en lang række regulatoriske krav, herunder;

- CSSF skal godkende stiftelsen af et SICAR, jf. artikel 11 i SICAR-loven

- SICAR'et har løbende rapporteringsforpligtelser over for CSSF, som fører tilsyn med, at SICAR'et overholder sine forpligtelser, jf. artikel 11 og artikel 28 i SICAR-loven

- SICAR'et skal udpege en uafhængig depositar i form af et finansielt institut underlagt offentligt tilsyn, som skal sikre investorernes rettigheder, jf. artikel 9 i SICAR-loven

- SICAR'ets ledelse er underlagt et fit and proper-krav, jf. artikel 12, stk. 3 i SICAR-loven

- Kun visse kvalificerede investorer må investere i SICAR'et, jf. artikel 2 i SICAR-loven

For så vidt angår den skattemæssige behandling, er et S.C.A. (société en commandite par actions) et selvstændigt skattesubjekt under luxembourgsk ret. Det følger af artikel 159(1) (1A) i den luxembourgske indkomstskattelov […]. Udgangspunktet er her, at et S.C.A. er skattepligtigt af sin globale indkomst.

SICAR-loven indeholder dog også særlige skatteregler for SICAR-selskaber. Det følger således af SICAR-lovens artikel 34, stk. 2, at et SICAR's indtægter *fra investeringer i risikokapital* ikke indgår i SICAR'ets skattepligtige indkomst […]:

…

Et SICAR er således subjektivt skattepligtigt til Luxembourg, jf. Luxembourgs indkomstskattelov artikel 159(1) (1A) […] - og skal dermed indgive selvangivelse (og kan få et hjemstedscertifikat med henblik på dobbeltbeskatningslempelse) - men er objektivt fritaget fra skat af afkast hidrørende fra investering i højrisikoaktiver (og kun dette afkast). Hvis et SICAR-selskab realiserer tab eller må afskrive på sine investeringer i risikokapital, kan tabene heller ikke trækkes fra i selskabets almindelige skattepligtige indkomst.

Et SICAR betaler ikke formueskat (ud over minimumsformueskatten), og betaler ikke som 1929-holdingselskaberne en *subscription* tax på 0,01 % eller 0,05 %.

Det er korrekt, som fremhævet af Skatteministeriet, at Nycomed S.C.A., SICAR i de pågældende tre indkomstår ikke konkret har betalt indkomstskat i Luxembourg. Det fremgår af selskabets årsrapporter og skyldes altså, at selskabet alene har haft indtægter fra sine investeringer (dvs. de af sagen omhandlede renteindtægter).

Det bestrides imidlertid, at det dermed kan konkluderes - som Skatteministeriet synes at gøre - at »*selskabet således har været fuldstændig fritaget for direkte beskatning i Luxembourg*«, jf. ministeriets processkrift 3, s. 6.

Selskabet har ikke været »fritaget for direkte beskatning i Luxembourg«, men har været skattefri af visse indkomster fra sine investeringer. Og selskabets indtægter har i de pågældende år altså alene bestået af sådanne indtægter.

Havde Nycomed S.C.A., SICAR f.eks. haft renteindtægter, måske fra en placering i obligationer efter en Exit i en længere periode, ville disse renteindtægter have været skattepligtige for selskabet med den almindeligt gældende selskabsskattesats i Luxembourg, der i 2007 udgjorde 29,63 %.

På investorniveau - dvs. for investorer i SICAR'et, som er hjemmehørende i Luxembourg - så beskattes afkastet af et SICAR på samme måde som afkast fra andre luxembourgske selskabsskattepligtige selskaber, dvs. en fysisk person beskattes af udbytteudlodninger (ved udlodningen), og aktieavancer ved realisation efter nærmere regler. Beskatningen afhænder bl.a. af, om der handles i spekulationsøjemed, og hvor stor en andel af aktier aktionæren ejer i det underliggende selskab. Selskabsinvestorer med hjemsted i Luxembourg beskattes ligeledes af udbytteudlodninger og realisation, idet Luxembourg dog - ligesom Danmark - friholder visse udbytter og aktieavancer for skat (moderselskabsfritagelse).

Mens 1929-holdingselskaberne således har kunnet anvendes til private investeringer uden offentlig indsigt, revision og uden tidsbegrænsning og med en subjektiv, total skattefritagelse, er SICAR-ordningen en del af Luxembourgs system af regulerede, kollektive investeringsselskaber med et snævert defineret anvendelsesområde, underlagt offentligt tilsyn og revisionspligt. Skattefritagelsen er alene objektiv - dvs. for visse indtægter - og forbeholdt det almindeligt anerkendte formål om, at en flerhed af investorer gennem investeringsforeninger skal kunne pulje deres investeringer uden forøget beskatning til følge.

Ud over ovennævnte væsentlige forskelle bemærkes, at lovgivningen om 1929-holdingselskaberne blev ophævet i 2006 (med endelig virkning i 2011), jf. lov af 22. december 2006 [...] som følge af, at Europa-Kommissionen ved beslutning af 19. juli 2006 [...] havde fundet, at den skatteordning, der gjaldt for 1929-holdingselskaber, udgjorde *ulovlig statsstøtte*.

**3287**

I den forbindelse er det væsentligt at bemærke, at Kommissionen også har foretaget en undersøgelse af, hvorvidt et SICAR-selskab udgjorde ulovlig statsstøtte. I forbindelse med lovens vedtagelse åbnede Kommissionen således en undersøgelsessag, men henlagde sagen administrativt i 2011, jf. sag nr. 54 i bilaget til konkurrencekommissær Margrethe Vestagers brev af 29. april 2015 [...]. Kommissionen må således være nået til en modsatrettet konklusion, for så vidt angår SICAR-selskabet. Dette dokumenterer også, at der består en relevant forskel på de to selskaber.

Det understreges på ny, at det er Skatteministeriet, som har bevisbyrden for at oplyse og dokumentere de forhold i den luxembourgske regulering/beskatning, som påberåbes til støtte for, at SICAR'ene må sidestilles med 1929-holdingselskaberne i forhold til slutprotokollen (hvis protokollen da overhovedet skulle give mulighed for en sådan udvidende fortolkning, hvilket bestrides).

...

7.7.8.7 *Skatteministeriet har meddelt Luxembourg, at Danmark anser luxembourgske investeringsselskaber for omfattet af DBO'en - på trods af at de er fuldstændig fritaget for selskabsbeskatning*

... Skatteministeriet [har] i 2006 selv [...] bekræftet over for Luxembourg, at Danmark anser andre luxembourgske investeringsselskaber, der er fuldstændigt skattefritagne for selskabsskat i Luxembourg, for at være omfattet af DBO'en.

Den *10. juli 1992* spurgte de luxembourgske skattemyndigheder således de danske skattemyndigheder, om de var enige i, at luxembourgske investeringsselskaber omfattet af lov af 30. marts 1988 om kollektive investeringsselskaber *ikke* var omfattet af slutprotokollens § 1, og at de dermed havde DBO-beskyttelse [...].

...

Skatteministeriet svarede i *oktober 1993* [...], at de pågældende investeringsselskaber ikke var omfattet af DBO'en, fordi de var omfattet af § 1 i slutprotokollen om holdingselskaber, hvis formål ifølge ministeriet var at undgå dobbelt skattefritagelse.

...

12 år senere - i *juli og december 2005* - henvendte de luxembourgske skattemyndigheder sig imidlertid på ny til Skatteministeriet [...], idet de ønskede svar på, om Skatteministeriet fortsat mente, at luxembourgske investeringsselskaber faldt uden for DBO'ens anvendelsesområde i medfør af § 1 i slutprotokollen.

...

Herefter vendte Skatteministeriet på en tallerken, da ministeriets førende internationale ekspert, Ivar Nordland, besvarede de luxembourgske myndigheders fornyede henvendelse den *15. februar 2006* (dvs. inden etableringen af lånestrukturen i nærværende sag) således [...]:

»I can inform you that I agree on the point of view taken by the Central Cus-toms and Tax Administration in a mail of 14 April 2005. *This means that Luxembourg investment funds qualify for benefits ac-cording to the Double Taxation Treaty between Den-mark and Luxembourg.*

Likewise it we consider the new Danish undertakings for collective investments to be covered by the Double Taxation Treaty. As mentioned in the note from Ernst & Young, these undertakings are in practice tax exempt but the Danish residents, which own the shares in the undertaking, are subject to taxation at an accrual basis of the increase in value of the shares in the undertaking.« (Vores understregning).

Luxembourgske (og danske) investeringsselskaber var nu alligevel efter Skatteministeriets opfattelse omfattet af DBO'en.

Skatteministeriets svar henviser til »*Luxembourg investment funds*«, uden at det er præciseret, hvad der helt præcist sigtes til. Det fremgår af sammenhængen, at der i hvert fald henvises til SICAV og SICAF-selskaber, idet Luxembourgs skrivelse af 30. december 2005 [...] var vedlagt et brev af 22. november 2005 fra Nordea Bank S.A. [...], der udtrykkeligt henviser til SICAV'er. Nordeas brev var yderligere vedlagt uddrag af en guide fra revisionsvirksomheden Ernst & Young (»*Investment Funds in Luxembourg - A Technical Guide*« fra september 2005 [...], som omtaler såvel SICAV'er og SICAF'er. Det må være den »*note from Ernst & Young*«, som Ivar Nordland henviser til i brevet af 15. februar 2006.

Luxembourgs første henvendelse af 10. juli 1992 [...] angik udtrykkeligt »*In-vestment Funds under the Luxembourg law of March 30 1988*«, som omfatter SICAV'er og SICAFer, jf. nedenfor. Yderligere henviser Ivar Nordland i brevet af 15. februar 2006 til den ovenfor nævnte mail af 14. april 2005 fra Personbeskatnings-

kontoret, hvori der henvises til Skatterådets bindende svar vedrørende SICAV'er.

Selv om det på dette tidspunkt nyligt introducerede SICAR-selskab ikke specifikt er nævnt, er der ingen som helst grund til at tro, at Skatteministeriets generelt holdte svar ikke også skulle omfatte SICAR'er. I hvert fald tog Skatteministeriet ikke noget forbehold for SICAR-selskaber eller fandt anledning til nærmere at specificere, hvilke »Luxembourg investment funds« Skatteministeriet med brevet af 15. februar 2006 accepterede som værende omfattet af DBO'en. Og samtidig pointerede ministeriet da også, at ministeriets holdning betød, at de i Danmark nys indførte (og nærmest fuldstændigt skattefritagne) investeringsselskaber efter aktieavancebeskatningslovens § 19 (et »§ 19-selskab«) -»the new Danish undertakings for collective investments« - også måtte anses som værende omfattet af DBO'en.

**3288**

Sagen er under alle omstændigheder den, at korrespondancen demonstrerer, at Skatteministeriet ikke selv har fortolket slutprotokollen udvidende på den måde, at ethvert skattefritaget selskab, som opstod efter protokollens affattelse allerede på grund af skattefritagelsen måtte sidestilles med et 1929-holdingselskab. Heller ikke engang ethvert skattefritaget holdingselskab, dvs. et selskab, som hovedsageligt foretog værdipapirinvesteringer - f.eks. et § 19-selskab -kunne sidestilles med et 1929-holdingselskab. Man må formode, at Skatteministeriet er nået frem til dette resultat efter moden overvejelse, eftersom ministeriet tidligere havde indtaget den modsatte holdning, og meget tyder på, at det er Skatterådets afgørelse fra 1995 (som fremkom efter ministeriets oprindelige svar til Luxembourg i 1993), som har bevirket stemningsskiftet.

Der er her behov for at sætte Skatteministeriets svar ind i en større sammenhæng.

For det første er den i udbredt international (herunder dansk) anerkendelse af, at kollektive investeringsselskaber, som udgangspunkt, er berettigede til overenskomstbeskyttelse, selvom mange lande har fritaget denne type selskaber for skattepligt.

…

Som nævnt, lå det allerede ved overenskomstens indgåelse i 1980 fast, at også Danmark havde mange juridiske sammenslutninger, som ikke betalte skat, herunder investeringsforeninger.

Da Skatteministeriet selv henviser til »Danish undertakings for collective investments«, kan der være anledning til kort at gennemgå, hvordan Danmark på dette tidspunkt (hvor Skatteministeriet sender svaret til Luxembourg, dvs. i februar 2006) beskattede kollektive investeringsselskaber.

I februar 2006 fandtes der hovedsageligt fire former for kollektive investeringsselskaber:

- Kontoførende investeringsforeninger
- Bevisudstedende udloddende investeringsforeninger, jf. ligningslovens § 16 C
- Bevisudstedende akkumulerende investeringsforeninger
- Investeringsselskaber, jf. aktieavancebeskatningslovens § 19 (et § 19-selskab)

De grundlæggende karakteristika og den skattemæssige behandling af ovennævnte investeringsforeninger beskrives i lovforslag nr. 98 af 24. februar 2005 på s. 3864 […].

Det fremgår heraf, at kontoførende investeringsforeninger og bevisudstedende udloddende investeringsforeninger begge er skattefri jf. også § 1, stk. 1, nr. 6, jf. stk. 4, i den dagældende selskabsskattelov (lovbekendtgørelse nr. 1125 af 21. november 2005 - […]), mens bevisudstedende akkumulerende investeringsforeninger undergives selskabsbeskatning på lige fod med et aktie- eller anparts-

selskab jf. også § 1, stk. 1, nr. 5a, i den dagældende selskabsskattelov […].

Investeringsselskaber omfattet af den dagældende § 19 i aktieavancebeskatningsloven (lov nr. 1413 af 21. december 2005 - SMS 443) var i februar 2006 (og er fortsat i dag) skattefri efter § 3, stk. 1, nr. 19 i den dagældende selskabsskattelov […], men beskattedes med 15 % af udbytte modtaget fra danske selskaber, men er altså skattefri af renter (uanset hvor debitor er hjemmehørende) og udbytter modtaget fra udenlandske selskaber.

Danmark havde altså en interesse i, at disse danske skattefrie kollektive investeringsselskaber var beskyttet af DBO'en, for så vidt angår renter og udbytter fra kilder i Luxembourg, hvilket også tydeligt fremgår af Skatteministeriets svar til Luxembourg i 2006 […].

Som nævnt, henvises der i korrespondancen mellem Skatteministeriet og de luxembourgske skattemyndigheder til den luxembourgske lov af 30. marts 1988 […].

Loven af 30. marts 1988 […] blev ændret ved lov af 20. december 2002 […], og det var således i hvert fald det lovgrundlag, som Skatteministeriet og de luxembourgske skattemyndigheder sigtede til i februar 2006. Loven betegnes i det følgende som UCITS-loven. En redegørelse for reguleringen af luxembourgske investeringsforeninger/-selskaber kan derfor passende tage udgangspunkt heri.

Der er tale om en lovgivning, som har til hensigt at regulere kollektive investeringsenheder, og loven giver således regler om bl.a. tilrettelæggelse af investeringsaktiviteten (udstedelse og tilbagekøb af kapitalandele, regler om låntagning, hedging etc), markedsføring, tilsyn og revision. Der er således ikke tale om en lovgivning, der først og fremmest handler om den skattemæssige behandling.

Den selskabsretlige form er ikke afgørende for, hvordan en kollektiv investeringsenhed reguleres, men det er ikke alle selskabsformer, som er tilladte til enhver form for reguleret virksomhed. Selskabsbetegnelserne S.A., S.C.A., Sàrl m.v. siger ikke i sig selv noget om, hvorvidt et konkret selskab eventuelt er reguleret som et investeringsselskab.

Betegnelserne SICAV (société d'investissement à capital variable) og SICAF (société d'investissement á capital fixe) er to forskellige måder at indrette en investeringsenhed i Luxembourg, og den eneste forskel er, at SICAV betegner en enhed, som har variabel kapital, mens SICAF'er har en fast kapital, som kun kan ændres gennem egentlige kapitalforhøjelser eller nedsættelser. Heller ikke denne betegnelse er afgørende for, hvordan enheden behandles efter Luxembourgs lovgivning om kollektive investeringsselskaber.

UCITS-loven er opdelt i to dele, hvor investeringsenheder omfattet af den første del er såkaldte

**3289**

Undertakings for Collective Investment of Transferrable Securities (UCITS), dvs. investeringsselskaber, som har til hensigt at investere i noterede værdipapirer.

Andre investeringsselskaber omfattet af loven kaldes »Part II Investment Funds«.

I 2006 kunne en luxembourgsk selskab således være underlagt tilsyn og regulering som et investeringsselskab som

- en UCITS efter Part I af UCITS-loven,
- en Part II Investment Fund eller
- et SICAR efter SICAR-loven.

I 2007 blev der yderligere indført regulering af »fonds d'Investissement spécialisés - FIS« eller på engelsk »specialised investment fund - SIF«, jf. lov af 13. februar 2007 […]. Et investeringsselskab kunne herefter også være reguleret som en SIF. Da loven først blev vedtaget i 2007 eksisterede denne form for investeringsenhed ikke i 2006, hvor Skatteministeriet bekræftede at »Luxembourg

*investment funds«* var omfattet af DBO'en mellem Danmark og Luxembourg. I et bindende svar offentliggjort som SKM2012.214.SR […] bekræftede Skatterådet imidlertid under henvisning til den førnævnte korrespondance mellem Danmark og Luxembourg i perioden 1992-2006, at en investeringsenhed, der forventedes etableret som et SICAF-SIF SA, var omfattet af DBO'en.

Der var også andre regulerede former for kollektive investeringsenheder, som der ikke er grund til at gå i detaljer med her.

Det gælder for SIF, Part II Investment Funds som for SIF, at der er tale om regulerede enheder, som på forskellig måde har til formål at foretage kollektive investeringer og som på samme måde som SICAR er underlagt tilsyn af Luxembourgs finanstilsyn CSSF, jf. lov af 20. december 2002, kapitel 15, artikel 93 […]. Alle enheder skal have en depositar, som er en finansiel institution, jf. artikel 17 […], 34 […], 66 […] og 71 […] i lov af 20. december 2002 og artikel 81 […] i SIF-loven.

UCITS er fritaget for luxembourgsk skat, jf. artikel 127-129 i lov af 20. december 2002 […], men betaler abonnementsafgift *(»subscription tax«).*

Part II Investment Funds er fritaget fra luxembourgsk skat, jf. artikel 105 i lov af 30. marts 1988 (som videreført i kapitel 19 i lov af 20. december 2002). Skattefritagelsesbestemmelsen har følgende ordlyd […]: …

Artikel 108, som der refereres til i ovenstående citat, fastsætter forpligtelsen til at betale 0,01 % eller 0,05 % subscription tax […].

Enheder, der tilvælger status som en SIF, er underlagt en skattefritagelsesbestemmelse svarende til Part II Investment Funds. …

Subscription tax for SIF'er udgjorde 0,01 %, jf. artikel 68 i lov af 13. februar 2007.

Det gøres først og fremmest gældende, at Skatteministeriets korrespondance med de luxembourgske skattemyndigheder må forstås således, at tilsagnet om at anerkende ikke nærmere definerede *»Luxembourg investment funds«* også må have sigtet til SICAR'er, da de udgjorde en integreret del af Luxembourgs regelsæt om investeringsselskaber.

Under alle omstændigheders står det klart, at Skatteministeriet - efter nøje overvejelse og fuldt opmærksomme på de luxembourgske investeringsselskabers skattefrihed - anerkendte, at de enheder, som var reguleret af UCITS-loven, var beskyttede af DBO'en, og Skatterådet har siden anerkendt også SIF. Der er ingen regulatoriske eller skattemæssige forskelle, der kan begrunde, at et SICAR skulle være undtaget fra DBO'en i medfør af slutprotokollen, medens Part I Investment Funds (UCITS), Part II Investment Funds og SIF'er er anerkendt af henholdsvis Skatteministeriet og Skatterådet som beskyttede af DBO'en.

At kollektive investeringsenheder er skattefrie, er der intet mærkeligt i. Danmark havde - og har som nævnt - adskillige tilsvarende skattefrie enheder.

I øvrigt er forvaltning af investeringsforeninger en momsfritaget ydelse efter momsdirektivets artikel 135, stk. 1 […], som er gennemført ved den danske momslovs § 13, stk. 1, nr. 11 […]. Også denne fritagelse skyldes hensynet til at undgå en merbeskatning af sammenslutninger med kollektive investeringsformål.

Også på dette sted skal det nævnes, at det er Skatteministeriet, som har bevisbyrden, såfremt ministeriet hævder, at der er så afgørende forskel på et SICAR og de øvrige kollektive investeringsselskaber i den luxembourgske lovgivning, at netop et SICAR, men ikke alle de øvrige investeringsselskaber, kan nægtes overenskomstbeskyttelse efter en fortolkning af slutprotokollen, idet det selvsagt stadig bestrides, at slutprotokollen overhovedet giver mulighed for en udvidende formålsfortolkning i denne retning.

Det er således Skatteministeriet, der i givet fald må forsyne landsretten med en så fuldstændig dokumentation for den regulatoriske og skattemæssige behandling af 1929-holdingselskaber (og 1938-selskaber), SICAR'er, UCITS, Part II Investment Funds og SIF'er, at landsretten kan få fuldstændigt og betryggende grundlag for i givet fald at kunne fastslå, at SICAR'er i modsætning til UCITS,

Part II In-vestment Funds og SIFer skal behandles som 1929-holdingselskaber i forhold til DBO'en. …

7.7.8.8 *Luxembourg anser et SICAR-selskab for at være omfattet af DBO'en, og andre lande med lignende DBO-bestemmelser har (også) anerkendt et SICAR som værende DBO-beskyttet*

Som nævnt ovenfor, fremgår det af den korrespondance, som de luxembourgske og danske skattemyndigheder har haft, at Luxembourg anser sine investeringsselskaber for omfattet DBO'en, og altså ikke omfattes af slutprotokollens § 1. …

### 3290

At Luxembourg anser et SICAR-selskab for omfattet af sine DBO'er - hvad Skatteministeriet bestrider - fremgår ligeledes af diverse litteratur.

…

Endvidere har det betydning, at det kan dokumenteres, at andre lande har taget bredere forbehold over for 1929-holdingselskaber. Således er den tilsvarende bestemmelse i Luxembourgs DBO med Belgien (fra 1971), affattet således ([…] - engelsk IBFD oversættelse):

»Notwithstanding these provisions, the Convention shall not apply to the in-come or capital of holding companies resident in Luxembourg which benefit from special tax advantages under the terms of the Luxembourg law of 31 July 1929 and the decree law of 27 December 1937 *or any other similar law which would enter into force in Luxembourg after the signature of the Convention.«* (Vores understregning).

Denne bestemmelse har nok samme reelle indhold som den danske, men ordlyden giver dog langt bedre muligheder for en fortolkning - á la Skatteministeriets - hvorefter også »sammenlignelige« (fuldstændigt skattefritagne) skatteregimer omfattes. Men selvom denne formulering var tilgængelig, da Danmarks slutprotokol blev forhandlet i 1980, har Danmark og Luxembourg altså valgt en formulering, som var klart snævrere end den belgiske.

Det er nærliggende at antage, at årsagen er, at parternes hensigt var, at forbeholdet i den dansk/luxembourgske slutprotokol *udelukkende* skulle angå 1929-holdingselskaber - og netop ikke *»any other similar law which would enter into force in Luxembourg after the signature of the Convention«,* som jo præcis er Skatteministeriets standpunkt i denne sag.

Belgien har i øvrigt - på trods af den bredere undtagelsesbestemmelse - accepteret, at et SICAR-selskab er omfattet af den belgisk-luxembourgske DBO'en.

Dette følger af den belgiske *»Ruling Commissions«* afgørelse af 12. juli 2016 […]. …

…

Skatteministeriet henviser til en udtalelse af fra de canadiske skattemyndigheder af 24. oktober 2007 […], hvor skattemyndigheder konkluderer, at artikel 28, stk. 3, i DBO'en mellem Luxembourg og Canada *»bør finde anvendelse for at nægte SICAR'er og deres canadiske investorer fordelene ved konventionen«* […].

Det er klart, at den omstændighed, at et andet lands skattemyndigheder måtte indtage samme standpunkt som Skatteministeriet, ikke er noget vægtigt argument for, at det så også er rigtigt. Det er da også kun skattemyndigheden, ikke en klageinstans- eller domstolsafgørelse.

Copyright © 2023 Karnov Group Denmark A/S

I det pågældende tilfælde har de canadiske skattemyndigheders udtalelse imidlertid slet ingen bevis-værdi, eftersom den pågældende artikel 28, stk. 3, i DBO'en mellem Luxembourg og Canada adskiller sig på afgørende punkter fra stk. 1 i Slutprotokollen til DBO'en mellem Luxembourg og Danmark.

Artikel 28, stk. 3, i den pågældende DBO har (ifølge udtalelsen) følgende ordlyd […]:

»Konventionen finder ikke anvendelse på holdingselskaber som defineret i luxembourgsk speciallovgivning, aktuelt loven af 31. juli 1929 og storhertugdekretet af 17. december 1938, *eller anden lignende lov, der træder i kraft i Luxembourg efter underskrivelsen af aftalen, og heller ikke for selskaber, der i Luxembourg er omfattet af lignende skattelovgivning.* Den gælder heller ikke for indkomst, som en hjemmehørende i Canada har fra sådanne selskaber, eller aktier eller andre kapitalandele i sådanne selskaber, som en sådan person ejer.« (Vores understregninger).

Som det ses, indeholder DBO'en mellem Luxembourg og Canada netop den åbning for »lignende selskaber« efter »lignende skattelovgivning«, der måtte komme på et senere tidspunkt.

De canadiske skattemyndigheder foretog derfor deres vurdering på et ganske andet grundlag end, hvad der er tilfældet i nærværende sag.

[Det] bemærkes videre, at Canada i øvrigt heller ikke anerkender »almindelige« luxembourgske, skattefritagne investeringsforeninger/-selskaber som værende omfattet af DBO'en - altså i modsætning til, hvad Danmark gør, jf. ovenfor i afsnit 7.7.8.7. Der kan bl.a. henvises til […], som er en udtalelse fra de canadiske skattemyndigheder, og hvoraf fremgår, at Canada ikke anser et investeringsselskab i form af et SICAV for at være omfattet af DBO'en. Det er således ikke overraskende, at de canadiske skattemyndigheder indtager samme standpunkt vedrørende et SICAR.

*7.7.8.9 Sammenfattende om spørgsmålet om, hvorvidt et SICAR-selskab er omfattet af DBO'en med Luxembourg*

Det er ved ovenstående gennemgang i afsnit 7.7.8.1 - 7.7.8.8 påvist, at Skatteministeriets nye anbringende om, at et SICAR-selskab ikke er omfattet af den dansk-luxembourgske DBO (som omfattet af slutprotokollens stk. 1), intet som helst har for sig.

…

*8 SKATTEN SKAL FRAFALDES EFTER RENTE-/ROYALTYDI-REKTIVET*

*8.1 De objektive betingelser for fritagelse i direktivet er opfyldt*

*Det andet underanbringende* til Takedas principale anbringende om, at selskabet ikke har været forpligtet til at indeholde renteskat, går, som nævnt, ud på, at Nycomed Sweden Holding 2 AB har et ubetinget krav på, at renteskatten skal frafaldes efter rente-/royaltydirektivet.

Med *rente-/royaltydirektivet (2003/49/EF) […]* blev der indført en fælles beskatningsordning af renter og

**3291**

royalties, der betales mellem associerede selskaber i forskellige medlemsstater. Formålet med direktivet er at fritage renter, der betales mellem koncernforbundne selskaber, for kildeskat, dvs. beskatning i den stat, hvor låntager er hjemmehørende.

Bestemmelsen om, at der ikke kan pålægges kildeskat på rente findes i artikel 1, stk. 1 […]: …

Direktivet opstiller såvel et kapitalkrav som et ejertidskrav.

*Kapitalkravet* er fastlagt i artikel 1, stk. 7, jf. artikel 3, litra b) […], og udgjorde 25 % (dvs. krav om »*associering*«).

Ifølge artikel 1, stk. 10, jf. artikel 3, litra b), […], kan den enkelte medlemsstat indføre et *ejertidskrav* på højst 2 år. Ejertidskravet i SEL § 2, stk. 1, litra d, er på 1 år, og kravet er blot, at betalingstidspunktet skal ligge inden for denne periode […].

Efter rente-/royaltydirektivet er det (som efter DBO'en, jf. foregående afsnit 7, tillige en betingelse rentemodtageren er den »retmæssige ejer« af den modtagne rente. Dette står i modsætning til moder-/datterselskabsdirektivet (vedrørende udbytter) (90/435/EØF).

Dette vil blive behandlet umiddelbart nedenfor i afsnit 8.2.

Takeda gør gældende, at Nycomed Sweden Holding 2 AB, der ubestridt opfylder såvel associeringskravet som ejertidskravet i rente-/royaltydirektivet, jf. SEL § 2, stk. 1, litra d, ligesom selskabet er den »retmæssige ejer« af renterne, har et ubetinget krav på at blive fritaget for kildeskat på renterne fra Nycomed A/S (Takeda).

*8.2 Nycomed Sweden Holding 2 AB er også »retmæssig ejer« efter direktivet*

Rente-/royaltydirektivet indeholder - ligesom DBO'en - et krav om, at rentemodtageren skal være »retmæssig ejer« af de pågældende renter.

Rente-/royaltydirektivets artikel 1, stk. 4, har således følgende ordlyd […]: …

Ved sin dom af 26. februar 2019 i nærværende sag […] har EU-Domstolen slået fast, at begrebet »retmæssig ejer« som defineret i rente-/royaltydirektivets artikel 1, stk. 4, er et selvstændigt EU-retligt begreb.

Det hedder om fortolkningen heraf i præmis 88 […]: …

EU-Domstolen har i denne forbindelse udtalt (præmis 90) […], at direktivet har ladet sig inspirere af artikel 11 i OECD's modelbeskatningsoverenskomst fra

1996 og forfølger det samme formål som denne, nemlig at undgå international dobbeltbeskatning. På den baggrund konkluderes det i præmis 90:

»Begrebet »retmæssig ejer«, som er indeholdt i bilaterale overenskomster, der er baseret på denne modelbeskatningsoverenskomst, *samt de efterfølgende ændringer* af nævnte modeloverenskomst og kommentarerne hertil, er derfor relevante for fortolkningen af nævnte direktiv.« (Vores understregning).

EU-Domstolen har dog i præmis 91 understreget, at *»en sådan fortolkning, selv hvis den er inspireret af OECD's tekster, sker på grundlag af direktivet«*, og at fortolkningen derfor har demokratisk legitimitet.

Det må således lægges til grund, at OECD's udvidede kommentarer fra 2003 om »gennemstrømningsselskaber« dermed kan inddrages ved fortolkningen af direktivet.

Dette ændrer dog ikke ved, at 2003-kommentarerne ikke kan inddrages ved fortolkningen af den nordiske DBO, jf. ovenfor i afsnit 7.3.

Takeda gør gældende, at Nycomed Sweden Holding 2 AB også er »retmæssig ejer« af de omhandlede renter efter direktivet. Det fastholdes således, at Nycomed Sweden Holding 2 AB er »retmæssig ejer«, selv om 2003-kommentarerne måtte blive lagt til grund. Nycomed Sweden Holding 2 AB er altså ikke et »gennemstrømningsselskab«, jf. gennemgangen herom ovenfor i afsnit 7.4 og 7.5.

*8.3 Imødegåelse af misbrug kræver national hjemmel, jf. artikel 5 - Kofoeddommen (C-321/05)*

EU-lovgiver har overladt det til de enkelte medlemsstater at fastsætte eventuelle bestemmelser om misbrug af rente-/royaltydirektivet. Det hedder således i artikel 5 […]: …

Som det fremgår, er der tale om en *bemyndigelsesbestemmelse*. Hver enkelt medlemsstat kan således indføre eller opretholde præcis de *nationale* regler til bekæmpelse af misbrug, som den pågældende medlemsstat finder passende. Nationale anti-misbrugsregler skal dog i sig selv være forenelige med EU-retten, herunder de traktatsikrede frihedsrettigheder som fastlagt i EU-Domstolens praksis og ikke mindst *proportionalitetsprincippet*. EU-Domstolen påser altså, at anti-misbrugsreglerne ikke går for vidt.

*8.4 Der foreligger ikke misbrug efter de danske anti-misbrugsregler gældende i 2007 - 2009*

Som det fremgår af afsnit 1.3.2, forudsætter en medlemsstats påberåbelse af direktivets artikel 5, om *nationale bestemmelser*, at den pågældende medlemsstat enten har vedtaget en specifik national bestemmelse til gennemførelse af denne bestemmelse i medlemsstatens retssystem, *eller* at der i national ret findes almindelige bestemmelser eller grundsætninger om svig, misbrug m.v., der kan fortolkes i overensstemmelse med artikel 5. Det er altså helt op til den enkelte medlemsstat at afgøre, om og - i bekræftende fald - i hvilket omfang den ønsker at have anti-misbrugsregler.

Spørgsmålet er derfor, hvilke anti-misbrugsregler der var til rådighed for skattemyndighederne i 2007 - 2009, da rentetilskrivningerne fandt sted.

Parterne er enige om, at retsstillingen vedrørende anti-misbrugsregler i dansk ret i sagsperioden var som gengivet i forelæggelseskendelsens punkt 74-78 […].

**3292**

Det fremgår heraf, at der ikke i 2007-2009 fandtes en *generel lovbestemt regel om bekæmpelse af misbrug*. Danmark har først med virkning fra den 1. maj 2015 indført en sådan anti-misbrugsbestemmelse - som følge af den med direktiv 2015/121/EU vedtagne forpligtelse for medlemsstaterne til at indføre en sådan foranstaltning, for så vidt angår udbytter, jf. også nedenfor i afsnit 8.5.

Derimod er der i domstolspraksis udviklet den såkaldte *realitetsgrundsætning* (punkt 75) *og princippet om »rette indkomstmodtager«* (punkt 77).

…

De danske skattemyndigheder har altså to domstolsskabte instrumenter til rådighed over for misbrugstilfælde, nemlig *princippet om »rette indkomstmodtager«* og *realitetsgrundsætningen* (»substance-over-form«). Begge disse instrumenter er helt centrale for denne sag. Dels fordi de begge adresserer den foreliggende problemstilling, og dels fordi Skatteministeriet (og den danske lovgiver) helt frem til opstarten af dette sagskompleks i 2008 har været af den opfattelse, at netop disse instrumenter gav den fornødne (ønskede) beskyttelse over for misbrugstilfælde, jf. ovenfor afsnit 2.

Som det fremgår af forelæggelseskendelsens punkt 78 […], anerkender Skatteministeriet, at rentemodtageren, Nycomed Sweden Holding 2 AB, er *»rette indkomstmodtager«* af de omhandlede renter.

Tilsvarende anerkender Skatteministeriet i forelæggelseskendelsens punkt 76 […], at *realitetsgrundsætningen* ikke giver grundlag for at tilsidesætte de i sagen foretagne dispositioner. SKAT forsøgte oprindeligt at nægte fritagelse for beskatning i »beneficial owner«-sagerne« ud fra realitetsbetragtninger, men måtte erkende, at der ikke var grundlag herfor, jf. bl.a. dommene i *TfS 2003.889 H (Over-Hold ApS)* […] *og TfS 2006.1062 H (Finwill ApS - »Elevatorsagen«)* […].

Der er altså mellem parterne enighed om, at hverken *princippet om »rette indkomstmodtager«* eller *realitetsgrundsætningen* kan anføres til støtte for Skatteministeriets påstand.

Der foreligger således ikke misbrug efter de danske anti-misbrugsregler gældende i sagsperioden 2007-09.

Dette er tiltrådt af *Landsskatteretten* i udbyttesagerne (vedrørende de tilsvarende bestemmelser i moder-/datterselskabsdirektivet), hvorimod spørgsmål ikke blev fundet afgørende i rentesagerne, da rente-/royaltydirektivet indeholdt en -for Landsskatteretten - afgørende bestemmelse om »retmæssig ejer«.

8.4.1 *Skatteministeriets tre anbringender om, at der i sagsperioden konkret var hjemmel i dansk ret til at nægte direktivets fordele på grund af misbrug er ikke bæredygtige*

Skatteministeriet har i dette sagskompleks gjort tre anbringender gældende til støtte for, at der skulle være hjemmel i dansk ret til konkret at nægte direktivets fordele på grund af misbrug. De tre anbringender er omtalt nedenfor i afsnit 8.4.1.1 - 8.4.1.3.

Som det vil fremgå, er ingen af disse anbringender bæredygtige.

8.4.1.1 *SEL § 2, stk. 1, litra d, er ikke en sådan specifik national bestemmelse som omhandlet i direktivets artikel 5 (spørgsmål 2 til EU-Domstolen)*

Skatteministeriet gør gældende, at *SEL § 2, stk. 1, litra d, i sig selv* indeholder den fornødne interne hjemmel til at nægte direktivets fordele i tilfælde af misbrug. Synspunktet støttes på følgende sætning i bestemmelsen […]: …

…

Den generelle henvisning til direktivet indebærer altså en implementering af direktivet, som det ser ud, herunder med bemyndigelsesbestemmelsen i artikel 5, men den indebærer *ikke* en stillingtagen til, om bemyndigelsen skal udnyttes, og dermed heller *ikke* en implementering af en anti-misbrugsregel i dansk ret. Den blotte henvisning til direktivet antyder intet som helst om, at Danmark ved indførelsen af lovreglen i 2004 skulle have haft til hensigt at indføre en (fakultativ) national anti-misbrugsregel, endsige, hvad en sådan regel - i givet fald -skulle gå ud på.

Tværtimod er det en kendsgerning, at Skatteministeriet og den danske lovgiver allerede ved indførelsen af selskabsskattelovens § 2, stk. 1, litra c, i 2001 - om begrænset skattepligt på udbytter - konkret *ikke* fandt behov for og derfor heller *ikke* ønskede at indføre en anti-misbrugsregel, jf. ovenfor afsnit 2. Den forståelse af selskabsskattelovens § 2, stk. 1, litra c - og litra d - som Skatteministeriet nu gør gældende, og som er opfundet til dette sagskompleks, er således i *direkte strid med forarbejderne til denne bestemmelse fra 2001* (og dermed også til grundlaget for SEL § 2, stk. 1, litra d, om renter).

*Østre Landsrets spørgsmål 2.1 til EU-Domstolen […]* drejer sig om dette anbringende fra ministeriet.

I Kommissionens indlæg hedder det om ministeriets anbringende i punkt 36 […]: *»Denne tankegang kan efter kommissionens opfattelse ikke accepteres«,* hvilket begrundes i de efterfølgende punkter. Og i Kommissionens forslag til besvarelse af spørgsmål 2.1 hedder det […], at *SEL § 2, stk. 1, litra d, »ikke [kan] anses for at være en specifik national bestemmelse som omhandlet i direktivets artikel 5«.*

Tilsvarende hedder det i generaladvokatens forslag, punkt 120 […]:

*»*At denne grund skal spørgsmål 2.1 og 3 besvares med, at hverken *§ 2, stk. 2 [rettelig stk. 1], litra d,* i den danske selskabsskattelov eller en bestemmelse i en dobbeltbeskatningsoverenskomst, for så vidt angår beskatningen af renter tager udgangspunkt i den

**3293**

*retmæssige ejer,* er tilstrækkelige til at kunne betragtes som gennemførelse af artikel 5 i direktiv 2003/49.« (Vores understregning).

*EU-Domstolen* har ikke besvaret spørgsmål 2.1, da Domstolen i stedet valgte at introducere det »generelle EU-retlige princip om forbud mod misbrug«, som omtales nedenfor i afsnit 8.6, som et obligatorisk princip.

Som det fremgår, har Skatteministeriets anbringende intet som helst for sig.

8.4.1.2 *Betingelsen om »retmæssig ejer« i en DBO er ikke en sådan overenskomstmæssig anti-misbrugsbestemmelse, som er omfattet af direktivets artikel 5 (spørgsmål 3 til EU-Domstolen)*

…

Takeda gør gældende, at modeloverenskomstens betingelse om »retmæssig ejer« *ikke* kan anses for en bestemmelse, »som er nødvendig for at hindre svig og misbrug« i artikel 5's forstand. Betingelsen er således *ikke* en anti-misbrugsforanstaltning, men derimod en regel om, at kun den person, der er skattepligtssubjektet for renterne (den »retmæssige ejer«), kan påberåbe sig lempelse efter overenskomsten. Dette fremgår udtrykkeligt af punkt 8 i 1977-kommentarerne til OECD's modeloverenskomst […], der var gældende på tidspunktet for indgåelsen af den nordiske DBO. Dette hensyn varetages i direktivet i stedet af kapital- og ejertidskravet.

Det er almindeligt anerkendt i den internationale skattelitteratur, at modeloverenskomstens betingelse om »retmæssig ejer« ikke er en anti-misbrugsbestemmelse. …

Det gøres endvidere gældende, at udtrykket »*overenskomstmæssigt fastsatte bestemmelser*« i artikel 5, skal fortolkes således, at der har som forudsætning at medlemsstaten efter sin interne ret kan påberåbe sig DBO'en til skade for skatteyderen, hvilket ikke er muligt efter dansk ret, jf. forelæggelseskendelsens punkt 79 […].

Skatteministeriets synspunkt fører videre bl.a. til det selvmodsigende resultat, at en rentemodtager vil have en ringere beskyttelse efter direktivet i det tilfælde, hvor der findes en DBO (hvis mål er at lempe skatter) mellem de involverede lande, end i det tilfælde, hvor der ikke findes en sådan. F.eks. har Danmark siden 2009 ikke haft DBO'er med Frankrig og Spanien. Hvis synspunktet var rigtigt, ville Nycomed Sweden Holding 2 AB (og dermed Nycomed A/S (Takeda) som indeholdelsespligtig) for perioden efter 2009 således have været bedre stillet, såfremt Nycomed Sweden Holding 2 AB i stedet havde været hjemmehørende i Frankrig eller Spanien.

Hertil kommer, at der ikke er noget grundlag for at antage, at Skatteministeriet og den danske lovgiver ved indførelsen af SEL § 2, stk. 1, litra c, i 2001 havde noget som helst ønske om, at betingelsen i OECD's modeloverenskomst om »retmæssig ejer« skulle udstrækkes til at gælde for moder-/datterselskabs-direktivet (og dermed ligeledes for det efterfølgende rente-/royaltydirektivet) som en selvstændig anti-misbrugsregel. Tværtimod ligger det klart, at lovgiver lagde til grund, at der over det danske selskab kunne indskydes et mellemholdingselskab, som var »retmæssig ejer« af udbytte (og dermed af renter), […].

Også Skatteministeriets anbringende om, at betingelsen om »retmæssig ejer« er en overenskomstmæssig anti-misbrugsbestemmelse i artikel 5's forstand, med den virkning at Nycomed Sweden Holding 2 AB kan nægtes fritagelse i henhold til direktivet, er således *i direkte strid med forarbejderne til SEL § 2, stk. 1, litra c (og dermed til bestemmelsen i SEL § 2, stk. 1, litra d).*

*Østre Landsrets spørgsmål 3* til EU-Domstolen […] drejer sig om dette anbringende fra ministeriet.

*Kommissionen* afviser i sit indlæg, punkt 48-55, i det hele ministeriets anbringende og konkluderer i punkt 55 […]:

»Efter Kommissionens opfattelse kan en bestemmelse i en dobbeltbeskatningsoverenskomst, hvorefter beskatningen af renter afhænger af, om rentemodtageren anses for den retmæssige ejer af renterne eller ej, således ikke udgøre en »overenskomstmæssig anti-misbrugsbestemmelse« som omhandlet i direktivet artikel 5, stk. 1.«

Som det fremgår *af generaladvokatens* forslag, punkt 120 […], som er citeret ovenfor i afsnit 8.4.1.1, kom generaladvokaten til det samme resultat.

*EU-Domstolen* har heller ikke besvaret spørgsmål 3, da Domstolen i stedet valgte at introducere et obligatorisk »generelt EU-retlige princip om forbud mod misbrug«.

Heller ikke dette anbringende er således bæredygtigt.

8.4.1.3 *Der findes ikke i dansk ret almindelige principper til imødegåelse af misbrug ud over realitetsgrundsætningen (og princippet om »rette indkomstmodtager«)*

Skatteministeriet har i sagskomplekset - efter EU-Domstolens dom - fremsat et nyt anbringende om, at der i dansk retspraksis skulle være udviklet *almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen* (og - må det forstås - princippet om »rette indkomstmodtager«).

Der nævnes som eksempler herpå 3 højesteretsdomme (U.1998.245H […], U.2005.649H […] og U.2015.2277H […]), hvor dispositioner, der »*formelt* var blevet indrettet sådan, at en bestemt, gunstig skatteregel fandt anvendelse, er blevet tilsidesat i skattemæssig henseende med den begrundelse, at dispositionerne ikke havde noget »*forretningsmæssigt formål*« eller lignende. Der er også et eksempel på en højesteretsdom (U.1999.1714.H, […]), der har tilsidesat et skattearrangement uden at bruge en tilsvarende vending.

…

**3294**

Indledningsvis bemærkes, at alle 4 domme forelå, da parternes advokater rådgav Østre Landsret. Desuagtet fandt Skatteministeriet ikke anledning til at orientere landsretten om, at gengivelsen af retsstillingen i forelæggelseskendelsen var forkert, hvad ministeriet givetvis heller ikke mente, at den var.

Der henvises i så henseende til forarbejderne til lov nr. 540 af 29. april 2015 vedrørende indførelsen af en anti-misbrugsklausul vedrørende både moder-/datterselskabsdirektivet og rente-/royaltydirektivet i ligningslovens § 3. I lovforslaget (L 167 2014/15) har Skatteministeriet gengivet gældende ret forud for vedtagelsen af den nye misbrugsklausul, og dermed også i 2007 - 2009. Det hedder heri […]:

»Der findes ikke en generel lovbestemt regel om bekæmpelse af misbrug i dansk skattelovgivning. Efter dansk (rets)praksis sker beskatningen efter der er foretaget en bedømmelse af, hvad der faktisk er sket. Det betyder, at tomme og kunstige skattebetingede dispositioner kan tilsidesættes, således at beskatningen i stedet foretages i forhold til den modstående *realitet*. Dansk skatteret er altså grundlæggende helt på linje med international gældende principper om »*sub-stance over form*«.« (Vores understregninger).

Som det fremgår, svarer ministeriets gengivelse af gældende ret i lovforslaget til gengivelsen i forelæggelseskendelsen […], hvorved erindres om, at princippet om »rette indkomstmodtager« udspringer af realitetsgrundsætningen. Der er altså ikke nævnt anden *almindelige principper til imødegåelse af misbrug,* som Skatteministeriet nu hævder på basis af en række ældre domme.

Det er derfor ubetænkeligt at antage, at Skatteministeriets nye anbringende er et til lejligheden opfundet synspunkt. Realiteten er, at ministeriet har fortrudt sin anerkendelse i forelæggelseskendelsens punkt 76 […] af, »*at realitets-grundsætningen ikke giver grundlag for at tilsidesætte de i denne sag foretagne dispositioner*«, og nu i stedet forsøger at kvalificere den eksisterende retspraksis på en anden måde.

Det nye synspunkt har da heller ikke støtte - hverken i retspraksis eller litteratur.

De 3 førstnævnte domme er fuldgode eksempler på, at realitetsgrundsætningen er blevet anvendt til at tilsidesætte de pågældende arrangementer, mens den sidstnævnte dom, U.1999.1714.H om Hadsten Bank, er et eksempel på en fortolkning af aktieavancebeskatningslovens § 3 (om næringsaktier).

…

I alle de tre sager har skatteyderne forsøgt at »opstille kulisser«, så arrangementerne fremstår som »gangbare skattemæssige dispositioner«, men er blevet gennemskuet af domstolene.

[…] dommene er udtryk for en anvendelse af realitetsgrundsætningen. Det er således hovedreglen, at Skatteministeriet i sager om realitetsgrundsætningen gør gældende, at dispositionerne savner *»forretningsmæssigt formål«*. Dette bekræftes også af Jon Stokholms artikel […]:

»I diskussionen om realitetssynspunktet bruges ofte i flæng overvejelser om, hvorvidt en disposition var *»forretningsmæssigt begrundet«* eller en *»realitet«*. (Vores understregninger).

Skatteministeriet mangler også at forklare, hvordan ministeriet kan mene, at Nycomed Sweden Holding 2 AB er *»rette indkomstmodtager«*, jf. forelæggelseskendelsens punkt 78 (E 1097), og at dispositionerne *ikke* kan tilsidesættes efter *realitetsgrundsætningen*, jf. forelæggelseskendelsens punkt 76, hvilket altså betyder, at der *ikke* er tale om »tomme og kunstige, skattebetingede dispositioner«, og at substansen svarer til formen, jf. forelæggelseskendelsens punkt 75, samtidig med, at ministeriet hævder, at dispositionerne skal tilsidesættes, fordi de savner »forretningsmæssigt formål«.

…

Skatteministeriet mangler også helt grundlæggende at forklare, hvordan der overhovedet skulle kunne foreligge et misbrug, når lovgiver i forarbejderne til SEL § 2, stk. 1, litra c, har givet klart udtryk for, at indskydelsen af et cypriotisk mellemholdingselskab mellem et dansk selskab og dets moderselskab i et ikke-DBO land og en efterfølgende udbytteudlodning via mellemholdingselskabet til selskabet i ikke-DBO landet ikke udgør et misbrug.

Som det fremgår, findes der ikke i dansk ret *almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen* (og »rette indkomstmodtager«), og som kan føre til, at Nycomed Sweden Holding 2 AB nægtes fritagelse for beskatning i henhold til rente-/royaltydirektivet.

8.4.1.4 *Sammenfattende om Skatteministeriets tre hævdede hjemler i dansk ret til imødegåelse af misbrug af rente-/royaltydirektivet; hjemlerne findes ikke*

…

Konklusionen er derfor - som det også fremgår af Østre Landsrets forelæggelseskendelse - at misbrug alene kan imødegås med *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*, og her er parterne enige om, at disse anti-misbrugsregler ikke kan finde anvendelse i denne sag.

Der foreligger således ikke misbrug af direktivet efter dansk ret.

8.5 *Ændringen af moder-/datterselskabsdirektivet i 2015 (og forarbejderne hertil)* bekræftede, at imødegåelse af misbrug af skattedirektiverne fortsat kræver national lovhjemmel

…

Kommissionen offentliggjorde den 6. december 2012 *»En handlingsplan til styrkelse af bekæmpelsen af skattesvig og skatteunddragelse«*, KOM (2012) 722, […].

**3295**

…

Handlingsplanen indeholder en række forslag, henstillinger og initiativer. Under *overskriften »Henstilling vedrørende aggressiv skatteplanlægning«* hedder det bl.a. […]:

»Kommissionen henstiller ligeledes anvendelse af en *generel regel om anti-misbrug.* Det ville bidrage til at sikre sammenhæng og effektivitet på et område, hvor medlemsstaternes praksis varierer betragteligt.

EU-skattedirektiverne (direktiver om renter og royalties, fusioner og moder-/datterselskaber) åbner allerede for *medlemsstaternes anvendelse af beskyttelsesmekanismer mod misbrug.* Uden at gå imod EU's lovgivning kan medlemsstaterne bruge disse muligheder til at undgå skadelig skatteplanlægning.« (Vores understregninger).

…

Endelig hedder det i konklusionen […]:

»Skattesvig og skatteunddragelse er et problem med mange facetter, som kræver et koordineret og multidimensionelt modsvar. Aggressiv skatteplanlægning er ligeledes et problem, der kræver akut opmærksomhed. *Der er tale om globale udfordringer, som ingen enkelt medlemsstat kan imødegå alene.*

Denne handlingsplan udpeger en række specifikke foranstaltninger, som kan blive udviklet nu og i de kommende år. Den repræsenterer også et generelt bidrag til videre international debat om beskatning og har til formål at støtte G20-landene i det løbende arbejde på dette område. Kommissionen mener, at kombinationerne af disse handlingstiltag kan udgøre et *vidtrækkende og effektivt modsvar til de forskellige udfordringer, som skattesvig og unddragelse udgør*, og dermed bidrage til at øge retfærdigheden i medlemsstaternes skattesystemer, at sikre højst tiltrængte skatteindtægter og i sidste ende at tilskynde til et velfungerende indre marked.« (Vores understregninger).

I overensstemmelse med handlingsplanen fremsatte Kommissionen den 23. november 2013 et *forslag til ændring af moder-/datterselskabsdirektivet*, KOM (2013) 814 […], der bl.a. indeholdt et forslag om *en generel anti-misbrugsregel*, som det var *obligatorisk* for medlemsstaterne at indføre i deres nationale ret. Det hedder i bemærkningerne til forslaget […]:

»Bestemmelse om bekæmpelse af misbrug:

Af konsekvensanalysen fremgik det, at den mest effektive model ville være at opdatere de nuværende bestemmelser om bekæmpelse af misbrug i moder/datterselskabsdirektivet efter de generelle regler om bekæmpelse af misbrug, der blev foreslået i henstillingen om aggressiv skatteplanlægning fra december 2012, og gøre det obligatorisk for medlemsstaterne at vedtage den fælles bestemmelse om bekæmpelse af misbrug.

…

Endvidere vil der blive en ensartet anvendelse af EU-direktivet uden mulighed for »direktiv-shopping« (dvs. man undgår, at selskaber investerer gennem mellemled i medlemsstater, hvor bestemmelsen om bekæmpelse af misbrug er mindre stringent, eller hvor der ingen regler er).« (Vores understregninger).

Det hedder endvidere i forslaget […]:

»Bestemmelse om bekæmpelse af misbrug

Det nuværende moder/datterselskabsdirektiv giver medlemsstaterne mulighed for at anvende interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.
…

Når alle disse faktorer bliver taget i betragtning, er det klart, at et tiltag fra medlemsstaterne hver for sig ikke vil være så effektivt som et tiltag fra EU.«

Samtidig med fremsættelsen af ændringsforslaget til direktiv udsendte Kommissionen et Memo benævnt *»Questions and Answers on the Parent Subsidiary Directive« (MS 407). Under overskriften »Which companies would be affected by the new proposal?«* hedder det […]:

»Example 1: anti-abuse rule

Member State A has withholding taxes on dividend payments to parent companies resident in a non-EU-country X. Member State B has no withholding taxes on dividend payments to parent companies in country X.

If a subsidiary in Member State A is owned directly from country X, there will be withholding taxes on profit distributions.

If the parent company in country X sets up an intermediate subsidiary in MS B, the withholding tax in Member State A can be avoided. *Member State A cannot have withholding taxes on profit distributions to a parent company in another Member State under the PSD.*

The anti-abuse rule could be applicable in Member State A if the set-up is a wholly artificial arrangement where the essential purpose for the insertion of the intermediate company in Member State B is to avoid the withholding taxes in MS A, e.g. a letterbox company with no substance. *As a consequence of the application of the anti-abuse rule, the benefits of the Directive (including the nonapplication of the withholding) would be denied.*« (Vores understregninger.)

…

Det fremgår med al ønskelig tydelighed af eksemplet, at der efter moder-/datterselskabsdirektivet, således som det så ud for tilføjelsen af den obligatoriske anti-misbrugsregel i 2015 (»Current situation«), *ikke* var mulighed for at nægte fritagelse for kildeskat på udlodningen fra MS A til MS B - heller ikke selv om MS B måtte være et »Artificial Intermediate subsidiary«.

Med Rådets vedtagelse den 27. januar 2015 af *direktiv 2015/121/EU blev* artikel 1, stk. 2, i moder-/datterselskabsdirektivet - som svarer til artikel 5 i

**3296**

rente-/royaltydirektivet - herefter ændret, således at medlemsstaterne blev *forpligtet* til at implementere den generelle anti-misbrugsklausul.

Det hedder i ændringsdirektivets præambel bl.a. […]:

»(2) Det er nødvendigt at sikre, at direktiv 2011/96/EU ikke misbruges af skatteydere, der er omfattet af dets anvendelsesområde.

(3) Nogle medlemsstater anvender *interne bestemmelser eller overenskomster*, der tager sigte på at imødegå skatteunddragelse, skattesvig og misbrug på en generel eller mere specifik måde.

(4) Disse bestemmelser kan imidlertid have *forskellige grader af strenghed* og er under alle omstændigheder udformet til at afspejle de særlige forhold i den enkelte medlemsstats skattesystem. Endvidere er der *medlemsstater, som ikke har interne bestemmelser eller overenskomster* til at hindre misbrug.

(5) Derfor vil indførelsen af en *fælles minimumsregel* om bekæmpelse af misbrug i direktiv 2011/96/EU være af stor nytte med henblik på at hindre misbrug af dette direktiv og sikre større sammenhæng i anvendelsen heraf i de forskellige medlemsstater.

…

(9) Dette direktiv bør på ingen måde berøre medlemsstaternes mulighed for at anvende deres *interne bestemmelser eller overenskomster*, der tager sigte på at hindre skatteunddragelse, skattesvig eller misbrug.« (Vores understregninger.)

Ændringsdirektivets artikel 1 er sålydende […]:

»I direktiv 2011/96/EU erstattes artikel 1, stk. 2, af følgende stykker:

»2. Medlemsstaterne giver ikke de fordele, der er ved dette direktiv, til arrangementer eller serier af arrangementer, der er tilrettelagt med hovedformål, eller der som et af hovedformålene har, at opnå en *skattefordel, som virker mod indholdet af eller formålet med dette direktiv,* og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder.

Et arrangement kan omfatte flere trin eller dele.

3. Med hensyn til stk. 2 betragtes arrangementer eller serier af arrangementer som *ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.*

4. Dette direktiv er ikke til hinder for anvendelsen af *interne bestemmelser eller overenskomster*, som er nødvendige for at hindre skatteunddragelse, skattesvig og misbrug.« (Vores understregninger.)

Ved lov nr. 540 af 29. april 2015 implementerede Folketinget dette ændrede moder-/datterselskabs-direktiv, men ikke nok med det slog Folketinget flere fluer med ét smæk, idet lovgiver indførte en helt ny generel anti-misbrugsregel som *ligningslovens § 3* […].

Den danske lovgiver benyttede sig altså af lejligheden til ikke blot at lade bestemmelsen gælde for moder-/datterselskabsdirektivet, men også for rente-/royaltydirektivet og fusionsskat-tedirektivet. Der er også i ligningslovens § 3, stk. 2, indsat en generel anti-misbrugsregel vedrørende dobbeltbeskatningsoverenskomster.

Loven trådte i kraft med virkning for transaktioner fra og med den 1. maj 2015.

Som det fremgår, har Kommissionen, Rådet og Europa-Parlamentet stedse forudsat, at *imødegåelse af misbrug af moder-/datterselskabsdirektivet og rente-/royaltydirektivet kræver national hjemmel* i den medlemsstat, som påberåber sig misbruget. Dette fremgår (for så vidt angår moder-/datterselskabs-direktivet) direkte af *ordlyden* af den indtil 2015 gældende bestemmelse i direktivets artikel 1, stk. 2 - og rente-/royaltydirektivets artikel 5 - der begge indeholder en *bemyndigelse* til medlemsstaterne til at indføre anti-misbrugsregler, ligesom det er bekræftet af EU-Domstolen i *Kofoed-sagen* (C-321/05). For perioden efter den 1. maj 2015 fremgår det nu af moder-/datterselskabsdirektivets artikel 1, stk. 2 - 4, samt af ligningslovens § 3.

For Danmark betyder det, at skattemyndighederne indtil 2015 havde to instrumenter til rådighed til imødegåelse af misbrug: *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«.* Fra den 1. maj 2015 kan Danmark *tillige* anvende den obligatoriske misbrugsregel i ligningslovens § 3.

Set fra EU's side betyder det, at EU-lovgiver har sikret sig, at samtlige medlemsstater fra 2015 har fået implementeret den efter EU-lovgivers opfattelse ideelle anti-misbrugsregel vedrørende rente-/royaltydirektivet.

Blot for fuldstændighedens skyld bemærkes, at Rådet den 12. juli 2016 vedtog *direktiv* (EU) 2016/1164 (det såkaldte *skatteundgåelsesdirektiv),* der bl.a. indeholder en generel *anti-misbrugsregel* (artikel 6), svarende til den nye anti-misbrugsregel i moder-/datterselskabsdirektivet, men som gælder på alle områder. Reglen er implementeret i Danmark ved en ændring af ligningslovens § 3.

Skatteundgåelsesdirektivet indeholder bl.a. en forpligtelse for medlemsstaterne til at forhindre såkaldte hybride mismatches vedrørende låneforhold, dvs. den situation hvor der er rentefradrag i debitorlandet, mens der ikke sker beskatning i kreditorlandet, som følge af forskellige kvalifikationer af det pågældende lån.

De endelige rapporter om de 15 OECD-tiltag til bekæmpelse af BEPS blev offentliggjort den 5. oktober 2015, og der er efterfølgende gennemført et stort antal initiativer både i OECD- og EU-regi.

Den af G20/OECD og EU drevne proces rettet mod internationalt misbrug af skatteregler i det seneste årti har ikke blot ført til vedtagelsen af et stort antal nye anti-misbrugsregler, men har også ændret den politiske holdning til, hvornår der i det hele taget foreligger et misbrug.

**3297**

Det er derfor vigtigt at gøre sig klart, at spørgsmålet om, hvorvidt der på et givent tidspunkt har foreligget misbrug, skal vurderes i forhold til forståelsen af de anti-misbrugsregler, der var gældende på det pågældende tidspunkt.

*8.6 Det af EU-Domstolen foreslåede generelle EU-retlige princip om forbud mod misbrug har ikke - som hævdet af EU-Domstolen - direkte virkning for danske borgere*

*8.6.1 Baggrund*

*Østre Landsret* stillede i nærværende sag flere end 15 spørgsmål til EU-Domstolen.

…

Spørgsmål 2 drejede sig om, hvorvidt imødegåelse af misbrug af rente-/royaltydirektivet kræver *national hjemmel* i medfør af direktivets artikel 5.

Copyright © 2023 Karnov Group Denmark A/S

Generaladvokat Kokott foreslog i sin udtalelse af 1. marts 2018 - i overensstemmelse med EU-Domstolens besvarelse af det tilsvarende spørgsmål i Kofoed-dommen - at spørgsmålet skulle besvares med, at der *kræves national hjemmel* […]: …

EU-Domstolen kom i sin dom af 26. februar 2019 - højst overraskende - til det stik modsatte resultat, nemlig at der *ikke kræves national hjemmel*, jf. domskonklusionens punkt 2 […]: …

Som det kan ses, støtter Domstolen sit resultat på, at der skulle gælde et »*generelt EU-retligt princip om forbud mod misbrug*«, der kan *anvendes direkte over for borgerne*.

Generaladvokaten havde i sin udtalelse, punkt 120 […], afvist, at det generelle EU-retlige princip om forbud mod misbrug kunne påberåbes direkte over for borgerne, men heri var EU-Domstolen altså *ikke enig*.

Generaladvokaten havde gjort nøjagtigt det samme synspunkt om afvisning af det generelle EU-retlige princip om forbud mod misbrug gældende i sin udtalelse i Kofoed-sagen, punkt 66 og 67 […], men på daværende tidspunkt *fulgte* EU-Domstolen altså generaladvokaten.

Det er således en kendsgerning, at EU-Domstolen i sin afgørelse af 26. februar 2019 i nærværende sag har *underkendt Kofoed-dommen* og dermed *ændret praksis med tilbagevirkende kraft* - i hvert fald til 2005.

Takeda gør gældende, at det nævnte princip ikke er umiddelbart anvendeligt over for borgerne, eftersom EU-Domstolen ikke har kompetence til at træffe denne afgørelse, da Danmark ikke har afgivet suverænitet hertil.

*8.6.2 Nærmere om EU-Domstolens dom af 26. februar 2019*
EU-Domstolens konklusion er resultatet af en længere argumentationsrække i præmisserne.

…

Dette »generelle EU-retlige princip« er altså frit i luften svævende, har en højere retskildeværdi end selv traktaterne og kræver ikke forankring i national ret. En konkret anvendelse af princippet beror således ikke på en fortolkning af den relevante retsakt, men alene på princippets eksistens og højere rang, der så at sige går forud for indholdet af retsakten. Princippet er skabt af EU-Domstolen og kan kun fortolkes af EU-Domstolen, jf. domskonklusionen ovenfor.

…

Ifølge EU-Domstolen gælder princippet imidlertid også for de (få) direktiver, der findes på området for de direkte skatter (der ikke er harmoniseret), og dette gælder, selv om disse direktiver udtrykkeligt forudsætter, at misbrug kun kan imødegås, hvis der er hjemmel hertil i national ret. Det hedder således i præmis 104:

»104. Selv om artikel 5, stk. 1, i direktiv 2003/49 bestemmer, at direktivet ikke udelukker anvendelse af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug, kan denne bestemmelse ikke fortolkes således, at den udelukker anvendelsen af *det generelle EU-retlige princip om forbud mod misbrug*, som er omtalt i nærværende doms præmis 96-98. De transaktioner, som af SKAT hævdes at være udtryk for misbrug, er nemlig omfattet af EU-rettens anvendelsesområde … og kan vise sig at være uforenelige med det formål, som dette direktiv forfølger.« (Vores understregning). (Vores understregninger).

Eller sagt på en anden måde. Det generelle EU-retlige princip overtrumfer indholdet af den konkrete retsakt.

På den anførte baggrund konkluderer Domstolen i præmis 111 […]:

»111. I forhold til det *generelle EU-retlige princip om forbud mod misbrug* og nødvendigheden af at overholde dette princip inden for rammerne af gennemførelsen af EU-retten er det *uden betydning* for de nationale myndigheders forpligtelse til at nægte at indrømme de i direktiv 2003/49 fastsatte rettigheder, der påberåbes for at

muliggøre svig eller misbrug, *at der ikke findes nationale eller overenskomstmæssige anti-misbrugsbestemmelser.*« (Vores understregninger).

De efterfølgende præmisser, 112-120, indeholder Domstolens forsøg på at bortforklare, at *Kofoed-sagen (C-321/05)*, hvor Domstolen kom til det modsatte resultat, nemlig at der kræves national hjemmel, skulle have betydning for udfaldet af nærværende sag.

…

Domstolen forsøger at komme uden om denne tidligere begrundelse ved at foretage en semantisk omskrivning af problemstillingen. Det hedder således i præmis 119, at nægtelsen af en fordel i henhold til et direktiv ikke (længere) indebærer, at den berørte borger pålægges en forpligtelse i medfør af dette direktiv, »*men er blot en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel, som er*

**3298**

*fastsat i det nævnte direktiv for så vidt angår denne ret, alene er opfyldt formelt …*«.

Hokus pokus. Der er på denne måde en *forpligtelse* for borgeren blevet til en *manglende opfyldelse* af en betingelse. Men problemet er og bliver jo nøjagtigt det samme for borgeren. Borgeren kender ikke betingelserne (dvs. indholdet af anti-misbrugsreglerne). De fremgår stadig ikke af national ret, men svæver (nu) i et generelt EU-retligt princip, der end ikke kan aflæses i direktivet. De *retssikkerhedsmæssige betænkeligheder* er altså de samme - eller faktisk endnu større ved et generelt EU-retligt princip.

…

Der kan således ikke peges på nogen anden troværdig begrundelse for, at EU-Domstolen har ændret praksis, end at Domstolen - under indtryk af den moralske oprustning fra OECD's og EU's side siden 2012 - har *fortrudt Kofoeddommen*. Til gengæld har EU-Domstolen samtidig *tilsidesat ethvert hensyn til retssikkerheden* for EU's borgere.

…

*8.6.3 Reaktioner på dommen - overraskelse og kritik*
EU-Domstolens dom af 26. februar 2019 er selvsagt kommet som en *kæmpe overraskelse* for alle. Ingen vidste, at der eksisterede et *generelt EU-retligt princip om forbud mod misbrug, som var direkte anvendeligt over for borgerne*, på området for de direkte skatter (hvad der heller ikke gjorde før afsigelsen af dommen).

*Kommissionen* var således uvidende om dette princip. …

EU's lovgiver - *Rådet og Parlamentet* - der vedtog disse direktiver, var tilsvarende uvidende om det generelle uskrevne princip.

*Generaladvokat Kokott,* som også var generaladvokat i Kofoedsagen, kendte heller ikke til eksistensen af dette princip med det ovennævnte indhold. Hun foreslog derfor Domstolen at følge Kofoed-sagen og frarådede Domstolen at udvide princippet til området for de direkte skatter […].

Heller ikke *Landsskatteretten* kendte til det nye princip og forlod sig derfor i sin afgørelse i NetApp-sagen […] (og i udbytteskattesagerne generelt) på *Kofoed-dommen*.

Både den danske og den internationale litteratur har været overrasket og kritisk over for dommen.

…

Det er vanskeligt at forstå, hvad der har motiveret Domstolen til at foretage praksisændringen.

På tidspunktet for afsigelsen af dommen i 2019 havde *EU-lovgiver* for længst indført de af EU ønskede generelle anti-misbrugsregler, såvel i moder-/datterselskabsdirektivet (2015) som i skatteundgåelsesdirektivet (som gældende for også renter) (2016).

Domstolen føjede således ikke noget til retsstillingen, som ikke allerede gjaldt i henhold til disse regler - bortset fra den *tilbagevirkende kraft*. Det er vel derfor også realistisk bud, at Domstolen

foretog praksisændringen, fordi at af foreslæggelsesskendelsens punkt 76 og 78 fremgik, at parterne var enige om, at de i 2007 - 2009 til rådighed værende nationale misbrugsregler - realitetsgrundsætningen og princippet om »rette indkomstmodtager« - førte til, at der ikke forelå noget misbrug efter dansk ret. Kun ved at give dommen tilbagevirkende kraft kunne Domstolen således komme Skatteministeriet til undsætning.

Der findes næppe noget nationalt retssystem i den civiliserede verden, der vil acceptere, at en praksisændring kan have op mod 12 års tilbagevirkende kraft.

EU-Domstolen roser da normalt også sig selv af retssikkerhedsprincippet. Det har blot ikke fundet anvendelse i disse sager. Tværtimod.

Der er tale om retsskabende (politisk) virksomhed fra EU-Domstolens side. Domstolen har selv fundet på »det generelle EU-retlige princip om forbud mod misbrug«, bestemmer selv rækkevidden heraf, er den eneste domstol, der kan fortolke princippet og - viser det sig nu - kan give princippet tilbagevirkende kraft efter forgodtbefindende. Den demokratiske proces er kortsluttet. Såvel EU-lovgiver som den danske lovgiver er koblet af processen, og de danske domstole er forpligtede til at eksekvere EU-Domstolens dom, hvis indhold ligger milevidt fra legalitetsprincippet og Grundlovens § 43. Hvis der da ellers står til EU-Domstolen.

Læg hertil, at Domstolen overhovedet ikke har interesseret sig for den danske lovgivning om begrænset skattepligt for udbytter og renter (SEL § 2, stk. 1, litra c og litra d) og forarbejderne til navnlig litra c. Det er nemlig - efter EU-Domstolens opfattelse - fuldstændigt ligegyldigt, hvordan retsstillingen var i Danmark i 2007 - 2009. Da danske domstole skal blot rette ind efter, hvordan EU-Domstolen i dag (efter dens praksisændring i 2019) mener, at retsstillingen burde have været i Danmark i 2007, 2008 og 2009.

Bortset fra de danske skattemyndigheders opstart af »beneficial owner«-sagerne i 2008 baseret på en praksisændring, der fandt sted med den første afgørelse i dette sagskompleks ultimo 2008 (og tidligst med offentliggørelse i 2010), og som er i strid med forarbejderne til SEL § 2, litra c - og dermed litra d -er EU-Domstolens afgørelse i disse sager det største overgreb over for de berørte virksomheder, der har fundet sted i hele dette sagskompleks.

Hverken den danske stat eller virksomhederne har haft nogen mulighed for at indrette sig efter det, der af EU-Domstolen i dag hævdes at skulle være gældende EU-ret tilbage i 2007, 2008 og 2009.

### 8.6.4 De danske domstole er ikke forpligtede til at følge EU-Domstolens pålæg

Spørgsmålet er herefter, om de danske domstole er forpligtede til at følge EU-Domstolens pålæg om at

**3299**

anvende det omhandlede uskrevne »generelle EU-retlige princip om forbud mod misbrug«.

Dette spørgsmåls besvarelse henhører ikke under EU-Domstolens kompetence, som ellers forudsat af Domstolen i præmis 110 og 111.

Der er derimod tale om et dansk forfatningsretligt spørgsmål om, hvorvidt Danmark har afgivet suverænitet til, at EU-Domstolen kan fastsætte et sådant »generelt EU-retligt princip«, der svæver over og har prioritet forud for alle vedtagne EU-retlige normer, og som skal have direkte virkning for borgerne, og dette spørgsmål kan alene afgøres af de danske domstole.

Spørgsmålet er, om det er i orden, at EU-Domstolen - i strid med direktivets ordlyd - forsøger at kaste en »rednings krans« til de medlemsstater, der ikke måtte have vedtaget (efter Domstolens opfattelse) »tilstrækkelige« nationale anti-misbrugsregler. Det er naturligvis ikke.

Realiteten er nemlig, at Domstolen herved tiltager sig en kompetence, der tilkommer det danske folketing, og som fuldstændigt forrykker balancen mellem EU-Domstolen og de nationale domstole, og dette sker alene på bekostning af borgerne, som efterlades retsløse, fordi de ikke har mulighed for at forudse deres retsstilling.

Samtidig kortslutter EU-Domstolen ved at indføre et sådant »generelt EU-retligt princip« den demokratiske lovgivningsproces i EU.

Det følger af Højesterets dom i U.2017.824H (Ajos-dommen) [...], at et uskrevent generelt EU-retligt princip - i den nævnte sag det generelle EU-retlige ligebehandlingsprincip - ikke er umiddelbart anvendeligt over for en borger, medmindre der er udtrykkelig hjemmel hertil i den danske tiltrædelses-lov, hvilket der ikke var. Takeda gør gældende, at heller ikke i nærværende sag omhandlede uskrevne generelle EU-retlige princip om forbud mod misbrug har direkte virkning over for en borger, eftersom der ikke er udtrykkelig hjemmel hertil i den danske tiltrædelseslov.

#### 8.6.4.1 Generelt om direktiver

Det fremgår af TEUF artikel 288, at et direktiv er rettet til medlemsstaterne [...]: ...

Det følger heraf, at et direktiv alene kan finde anvendelse over for en dansk borger i den form, som det er implementeret i dansk ret. Borgeren skal altså kunne afæse sin retsstilling i dansk ret.

Det følger også heraf, at et direktiv ikke kan skabe forpligtelser for borgerne. Justitsministeriet har i en redegørelse af juli 1972 for visse retsstridige spørgsmål udtrykt det således [...]:

»Direktiver og beslutninger rettet til medlemsstaterne vil derfor i det højeste kunne give borgerne umiddelbare rettigheder. De kan aldrig medføre umiddelbare pligter for borgerne.« (Vores understregninger).

EU-Domstolen har i flere domme udtrykt det således, »at retssikkerhedsprincippet er til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgerne, og at de derfor ikke som sådan kan påberåbes af medlemsstaten over for borgerne«, jf. således bl.a. Kofoed-dommen præmis 42 [...].

Det samme må så meget desto mere gælde et uskrevent »generelt EU-retligt princip«, som svæver over direktiverne. Når EU-Domstolen har foretaget en semantisk omskrivning af denne problemstilling til, at nægtelsen af en fordel i denne situation blot er »en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel ... alene er opfyldt formelt«, er der tale om et skinargument. Det afgørende for retssikkerhedsvurderingen er, om borgeren har haft mulighed for at kende sin retsstilling, og her er borgeren endnu værre stillet i relation til et uskrevent »generelt EU-retligt princip«.

Det fremgår af TEUF artikel 289, stk. 1, at et direktiv vedtages af Europa-Parlamentet og Rådet i fællesskab på forslag af Kommissionen [...].

Derimod hører det under EU-Domstolens kompetence at fortolke et direktiv, jf. TEUF artikel 267 [...].

#### 8.6.4.2 Der er ikke tale om en fortolkning af rente-/royaltydirektivet

Skatteministeriet gør gældende, at Domstolen blot har udnyttet sin kompetence til at fortolke rente-/royaltydirektivet i medfør af TEUF artikel 267.

Heri er Takeda ikke enig. Domstolen har derimod udviklet et selvstændigt, uskrevent »generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet misbrugt, har hjemmel i traktaterne, i den forordning eller i et direktiv ...«, jf. præmis 101 [...].

En konkret anvendelse af princippet beror således ikke på en fortolkning af den relevante retsakt, men alene på princippets eksistens og højere rang, der så at sige går forud for indholdet af retsakten.

Copyright © 2023 Karnov Group Denmark A/S

Det konkrete indhold af rente-/royaltydirektivet har derfor ikke haft nogen som helst betydning for princippets anvendelse. Dette bekræftes også af domskonklusionen (punkt 2), hvoraf det fremgår, at det er »*det generelle EU-retlige princip*« - og ikke direktivet - der »*fortolkes*« […].

Når Domstolen har introduceret det generelle EU-retlige princip skyldes det ganske givet, at Domstolen har erkendt, at en fortolkning af direktivet ikke kunne føre til det ønskede resultat. Eller sagt på en anden måde: direktivfortolkningen i Kofoed-sagen var korrekt. For at nå det ønskede resultat har Domstolen derfor måttet ty til et »generelt EU-retligt princip«, der er højere rangerende end direktivet.

På denne måde har Domstolen bevæget sig ind på EU-lovgivers kompetenceområde. Dette er særligt tydeligt i denne sag, hvor EU-lovgiver i 2015 indsatte en

**3300**

generel anti-misbrugsregel i moder-/datter-selskabsdirektivet og i 2016 indsatte en tilsvarende generel anti-misbrugsregel (for alle andre områder af EU-retten) i skatteundgåelsesdirektivet. Domstolen har således med sin dom alene tilføjet den *tilbagevirkende kraft* af disse regler til 2005, hvilket Domstolen åbenbart ikke har fundet var i strid med rets-sikkerhedsprincippet.

8.6.4.3 *Danmark har ikke overladt suverænitet til EU-Domstolen til at fastsætte et misbrugsprincip med direkte virkning for borgerne - Højesterets dom i Ajos-sagen*

Det hedder i Højesterets præmisser i *Ajos-sagen* om spørgsmålet om *direkte virkning for borgerne* bl.a. […]: …

Som det fremgår, kan et generelt EU-retligt princip kun have direkte virkning for danske borgere, hvis Danmark i tiltrædelsesloven har afgivet suverænitet efter Grundlovens § 20 til, at dette kan ske.

Det gøres gældende, at heller ikke »det generelle EU-retlige princip om forbud mod misbrug« er forudset i tiltrædelsesloven, og at dette princip derfor ikke har direkte virkning over for borgerne. Af samme grund kan Østre Landsret se bort herfra.

Det bemærkes i øvrigt i denne sammenhæng, at Danmark ikke har overladt suverænitet til EU siden tiltrædelsen af Amsterdam-traktaten i 1998.

I øvrigt gøres det gældende, at *bevisbyrden* for, at Danmark har afgivet suverænitet til EU til at vedtage dette princip med direkte virkning for borgerne, påhviler den danske stat.

8.6.4.4 *Der foreligger en »contra legem« -situation*

Skatteministeriet gør i dette sagskompleks gældende, at nærværende sager adskiller sig fra Ajos-sagen, fordi der ikke i nærværende sag foreligger en »contra legem«-situation. …

Takeda er *ikke* enig heri. Der foreligger også i nærværende sag en »contra legem«-situation, og i øvrigt drejer det sig ikke blot om, hvorledes SEL § 2, stk. 1, litra d, skal fortolkes. Temaet er derimod, om en direkte anvendelse af det nævnte princip, vil påføre borgerne *forpligtelser,* som de efter dansk ret ikke allerede har - altså om borgerne vil blive *stillet ringere* end efter dansk ret, hvis princippet finder anvendelse. Dette beror ikke blot på en fortolkning af SEL § 2, stk. 1, litra d (under hensyntagen dens forarbejder), men også på rækkevidden af de danske anti-misbrugsregler tilbage i 2007.

Det er nødvendigt at se på *direktivet* og det *EU-retlige princip* hver for sig.

Der er ubestrideligt, at Danmark har foretaget en implementering af *direktivet*, der var (og fortsat er) korrekt, hvilket blev bekræftet af *Kofoed-dommen* i 2007. Parterne er således enige om, *at* der i dansk ret findes skabende ret til imødegåelse af misbrug, som der henvises til i direktivets artikel 5 (nemlig *realitetsgrundsætningen og princippet om »rette indkomstmodtager«),* og *at* disse regler konkret fører til, at der *ikke* foreligger et misbrug efter dansk ret,

jf. forelæggelseskendelsens punkt 74-78. Det er også en kendsgerning, at det af forarbejderne til SEL § 2, stk. 1, litra c, i 2001 - og dermed tillige vedrørende litra d i 2004 - udtrykkeligt fremgår, at lovgiver mente, at disse anti-misbrugsregler var tilstrækkelige, og at etableringen af gennemstrømningsselskaber ikke udgjorde et misbrug.

For så vidt angår det *EU-retlige princip*, som Domstolen har introduceret, forholder det sig anderledes. Hvis en direkte anvendelse af dette misbrugsprincip over for borgerne med tilbagevirkende kraft til 2007 måtte føre til det resultat, at der - stadig tilbage i 2007 - forelå misbrug, vil der være tale om en »contra legem«-situation, fordi de danske regler og den danske praksis på dette tidspunkt klart førte til, at der ikke forelå misbrug, og heller ikke vil kunne fortolkes anderledes på grundlag af det EU-retlige mis-brugsprincip, som er udviklet 12 år efter. I givet fald ville der altså blive indført en forpligtelse for borgerne, der ikke fulgte af dansk ret - en ændring af retstilstanden.

Der foreligger altså en »contra-legem« situation i forhold til det EU-retlige misbrugsprincip, hvis dets anvendelse måtte føre til, at der foreligger et misbrug. De danske domstole skal derfor blot undlade at lægge dette princip til grund.

Det udgør et selvstændigt forfatningsretligt problem, at dette princip slet ikke gjaldt i 2007. Også af denne grund, skal de danske domstole undlade at lægge princippet til grund.

8.6.4.5 *Konklusion*

Som ovenfor nævnt, har Danmark ikke overladt suverænitet til EU-Domstolen til at fastsætte et generelt misbrugsprincip med direkte virkning over for borgerne.

Allerede af denne grund skal de danske domstole undlade at lægge dette princip til grund.

Samme resultat følger af *retssikkerhedsprincippet*. Ifølge dette princip skal en dansk borger kunne regne med, at de regler, der gælder for borgeren i henhold til et givent direktiv, fremgår af dansk ret, og ikke af et uskrevent generelt EU-retligt princip, som ikke er en del af dansk ret, og som borgeren ikke har haft mulighed for at indrette sig efter.

Dette gælder så meget desto mere, når det generelle EU-retlige princip *strider mod ordlyden af direktivet*, og når hverken generaladvokaten, Kommissionen eller EU-lovgiver kendte til eksistensen af dette princip.

En anvendelse af misbrugsprincippet vil også være i strid med *legalitetsprincippet* i dansk ret og grundlovens § 43.

…

På den anførte baggrund gøres det gældende, at de danske domstole skal bortse fra EU-Domstolens pålæg

**3301**

om at nægte fritagelse efter direktivet, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

8.6.5 *Østre Landsrets dom af 3. maj 2021*

Nærværende spørgsmål om, hvorvidt de danske domstole er forpligtede til at følge EU-Domstolens pålæg om at anvende det omhandlede uskrevne »generelle EU-retlige princip om forbud mod misbrug« - som netop redegjort for i detaljer - var i sagens natur undergivet samme intensive behandling i de to første »beneficial owner«-sager i dette sagskompleks, TDC- og NetApp-sagerne, vedrørende udbytter (moder-/datterselskabsdirektivet), og hvor Østre Landsret afsagde dom den 3. maj 2021.

…

Østre Landsrets begrundelse er ikke helt let at forstå, men noget kunne tyde på, at landsretten har fundet, at der allerede i SEL § 2, stk. 1, litra d, er skabt den fornødne implementering af direktivets fakultative anti-misbrugsregel - qua henvisningen til, at ordlyden

henviser til direktivet - og at det dermed er unødvendigt at skulle tage stilling til det spørgsmålet om, hvorvidt Danmark forfatningsretligt er forpligtet til anvende det uskrevne EU-retlige princip uden intern hjemmel.

Østre Landsret har dermed ikke med NetApp-dommen direkte forholdt sig til de forfatningsretlige spørgsmål om suverænitetsafgørelse, hvilket imidlertid ville have været ønskværdigt - også af hensyn til Højesterets stillingtagen til spørgsmålet, når sagskomplekset skal vurderes af Højesteret.

Det siger sig selv, at Takeda ikke er enig i landsrettens afgørelse på dette punkt. Der henvises herved til begrundelsen, som gengivet ovenfor i afsnit 8.4.1.1, vedrørende spørgsmålet om, hvorvidt SEL § 2, stk. 1, litra d, allerede qua sin ordlyd indeholder en implementering af direktivets anti-misbrugsregel.

*8.7 Der foreligger heller ikke et misbrug efter det af EU-Domstolen skitserede misbrugsbegreb*

For det tilfælde, at Østre Landsret måtte fastslå, at det generelle EU-retlige princip om forbud mod misbrug har direkte virkning over for borgerne og derfor finder anvendelse i nærværende sag, gøres det gældende, at *ikke* foreligger noget misbrug efter dette princip under de i nærværende sag konkret foreliggende omstændigheder.

Da de øvrige betingelser i rente-/royaltydirektivet er opfyldt, har Nycomed Sweden Holding 2 AB derfor krav på fritagelse efter direktivet, og der foreligger - også af denne grund - ikke begrænset skattepligt til Danmark af de omhandlede renter.

Det bemærkes, at det er sagsøgte, Skatteministeriet, der har bevisbyrden for, at der i nærværende sag foreligger et misbrug af direktivet i henhold til det af EU-Domstolen opstillede generelle EU-retlige anti-misbrugsprincip.

Takeda gør gældende, at Skatteministeriet ikke har løftet - og heller ikke kan løfte - denne bevisbyrde.

Det af EU-Domstolen opstillede generelle EU-retlige anti-misbrugsprincip er defineret nærmere i dommens præmisser 124 og 125 [...]: ...

Det generelle misbrugsbegreb går altså ud på, at EU-retten ikke kan påberåbes i de tilfælde, hvor der er tale om et *rent retsarrangement, der ikke bygger på en økonomisk realitet, og hvis formål er at opnå utilsigtede skattemæssige fordele.*

Dette generelle misbrugsbegreb svarer til den *danske realitetsgrundsætning*, hvorefter *tomme og kunstige, skattebetingede dispositioner* kan tilsidesættes og erstattes med *realiteten*, jf. foreslæggelsesskendelsen punkt 77 [...].

Det er derfor ikke troværdigt, når Skatteministeriet, der anerkender, at der *ikke* foreligger et misbrug efter den danske realitetsgrundsætning, jf. foreslæggelsesskendelsens punkt 78 [...], påberåber sig, at der foreligger et misbrug efter EU-rettens generelle misbrugsbegreb.

Som det fremgår ovenfor i afsnit 8.4.1.3, har Skatteministeriet - efter EU-Domstolens dom - fremsat et nyt anbringende om, at der i dansk ret findes almindelige principper til imødegåelse af *misbrug uden for realitetsgrundsætningen.* Takeda har i samme afsnit tilbagevist dette nye anbringende.

Som EU-Domstolen også anfører i præmis 126 [...], tilkommer det ikke Domstolen at vurdere de faktiske omstændigheder i hovedsagerne - det tilkommer den nationale domstol, her Østre Landsret - men Domstolen har dog valgt at give en vis vejledning i form af en række faktorer, der vil kunne pege i retning af, at der foreligger et misbrug efter princippet, se således præmisserne 127 -138 [...].

...

Takeda gør således gældende, at der under hensyntagen til de helt særlige omstændigheder i nærværende sag ikke kan foreligge et misbrug. Betingelsen om, at hovedformålet med transaktionerne er at opnå en uretmæssig fordel er således ikke opfyldt i nærværende sag.

For det første - og som det er fremgået ovenfor, herunder i afsnit 7.6 - har det overordnede formål med, at Nycomed A/S (Takeda) optog det pågældende koncerninterne lån været at erstatte - refinansiere - et allerede bestående koncerneksternt lån (der over sagsperioden bag en højere forrentning). Der er således intet kunstigt eller »ikke-forretningsmæssigt begrundet« i det omhandlede lån, og dermed de omhandlede rentetilskrivninger.

Hertil kommer for det andet - og hvad der er lige så vigtigt - hele forhistorien omkring den danske implementering og fortolkning af skattedirektiverne, herunder i første omgang moder-/datterselskabs-direktivet - således som den er beskrevet ovenfor i afsnit 1 og 2, og

**3302**

den uforbeholdne stillingtagen til skattefrihed ved udlodning af udbytter til et cypriotisk mellemholdingselskab (der fungerer som et rent gennemstrømningsselskab). Når den danske lovgiver og skattemyndighederne fortolker et direktiv på den måde, at der - hvis de øvrige betingelser er opfyldt - er et ubetinget krav på fritagelse for kildeskat, hvis udbytte- eller rentemodtageren er »rette indkomstmodtager« af udbyttet eller renterne, så kan der naturligvis ikke være tale om et misbrug af direktivet, når skattemyndighederne efterfølgende ændrer sin opfattelse.

»Mellemholdingselskaber« - *treaty shopping* - er således direkte anvist af Skatteministeren kort tid før de dispositioner, der har udløst de enorme kildeskattekrav, som findes i dette sagskompleks.

Under disse omstændigheder giver det selvsagt ikke mening at tale om, at hovedformålet med transaktionerne har været at opnå en uretmæssig fordel.

Sammenfaldet af disse to ganske særlige forhold gør det åbenbart, at der ikke foreligger et misbrug i nærværende sag.

Den måske væsentligste grund til, at der ikke foreligger noget misbrug af direktivet i nærværende sag, er imidlertid den omstændighed, at der ikke foreligger nogen »gennemstrømning« af midler til et selskab, der er beliggende i en ikke-DBO-stat (eller som ikke er beskyttet af en DBO).

Der henvises herved til redegørelsen ovenfor i afsnit 7.6, hvoraf fremgår, at hele formålet med låne-strukturen således var, at der alene skulle være lån op til Nycomed S.C.A., SICAR i Luxembourg. Formålet var således på ingen måde at udøve »treaty shopping«. En betaling af renter direkte til Nycomed S.C.A., SICAR fra Nycomed A/S (Takeda) ville således også have været fritaget for beskatning, jf. ovenfor i afsnit 7.6 og 7.7.

Nycomed S.C.A., SICAR må således subsidiært anses som den »retmæssige ejer« af renterne, såfremt Nycomed Sweden Holding 2 AB ikke anses som sådan.

Og dermed er der intet som helst grundlag for at statuere misbrug, jf. såvel ISS-dommen [...] som Østre Landsrets dom af 3. maj 2021 i NetApp-sagen [...] (der nærmere er kommenteret ovenfor i afsnit 7.6).

Niels Winther-Sørensen har da også i SR.2019.174 [...] i sin kommentar til EU-Domstolens dom i nærværende sag bemærket følgende herom [...]:

»Læst i sammenhæng med den efterfølgende sætning i Rentedommens præmis 110 ... må man dog formentlig forstå Domstolens ræsonnement således, at man normalt ikke vil kunne statuere retsmisbrug og derved nægte fordelen efter moder-/datterselskabsdirektivet eller rente-/royaltydirektivet, hvis en direkte betaling fra det danske selskab til det pågældende selskab (som forudsættes at være den retmæssige ejer af betalingen) ville have været skattefri.«

Som det vil fremgå nedenfor af afsnit 10 og 11, indgår de netop beskrevne omstændigheder også som vægtige argumenter til støtte

for Takedas anbringender om, at der foreligger en (ulovlig) praksis-ændring med tilbagevirkende kraft, og at Nycomed A/S (Takeda) ikke kan have handlet forsømmeligt ved ikke at indeholde kildeskat.

*9 BETINGELSEN FOR BORTFALD AF BEGRÆNSET SKATTE PLIGT I SELSKABSSKATTELOVENS § 2, STK. 1, LITRA D, SIDSTE PUNKTUM, ER OPFYLDT*

…

Bestemmelsen har følgende ordlyd: …

Det følger heraf, at Nycomed Sweden Holding 2 AB ikke er begrænset skattepligtig til Danmark af renter, såfremt det godtgøres, at den udenlandske selskabsbeskatning af renterne udgør mindst ¾ af den danske selskabsbeskatning, og at Nycomed Sweden Holding 2 AB ikke betaler renterne videre til et andet udenlandsk selskab, som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning.

Den udenlandske selskabsbeskatning refererer til selskabsskattesatsen i det relevante land, dvs. Sverige, jf. SKM 2010.20 SR […].

Den første betingelse - om beskatning af renterne i Sverige - er opfyldt, eftersom renterne er beskattet med en selskabsskattesats på 28 % for indkomstårene 2007 og 2008 med 26,3 % for indkomståret 2009 (den danske selskabsskattesats var i de omhandlede indkomstår 25 %).

Den anden betingelse - at Nycomed Sweden Holding 2 AB ikke har betalt renterne videre til et andet udenlandsk selskab, som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning - er også opfyldt, eftersom selskabet slet ikke har betalt renter videre.

Selskabet var således fuldt ud egenkapitalfinansieret og havde dermed ikke optaget lån - f.eks. et back-to-back lån - hvorpå renterne kunne siges at være viderebetalt.

Den omstændighed, at Nycomed Sweden Holding 2 AB har ydet et koncernbidrag til Nycomed Sweden Holding 1 AB kan ikke sidestilles med, at der er betalt renter videre. Og endvidere bemærkes, at koncernbidragene rent faktisk aldrig blev betalt, da gælden, der opstod i forbindelse med ydelsen heraf, blev eftergivet af Nycomed Sweden Holding 1 AB i forbindelse med Exit'en i 2011, […]. Selv hvis koncernbidragene måtte anses at være »viderebetalt« til Nycomed Sweden Holding 1 AB, kan det imidlertid under alle omstændigheder konstateres, at også koncernbidragene er undergivet en selskabsbeskatning i Sverige, der ikke er mindre end ¾ af den danske selskabsbeskatning.

Det gøres hertil gældende, at bestemmelsen efter sin klare ordlyd - det er afgørende, hvad »det modtagende

**3303**

selskab« (her Nycomed Sweden Holding 2 AB) har gjort - *ikke* indeholder fornøden hjemmel til at tage hensyn til transaktioner højere oppe i koncernen.

Der kan således ikke efter bestemmelsens ordlyd tages hensyn til transaktioner - »viderebetalinger« - i andre led end mellem den umiddelbare modtager og dennes aftalepart, jf. ordet »det«, der henviser til »det modtagende selskab«. Der findes endvidere ikke i bestemmelsens forarbejder støtte herfor (hvilket Skatteministeriet da vist heller ikke har gjort gældende). Endelig er der ikke i bestemmelsen fastsat noget krav om »retmæssig ejer« eller lignende, der giver mulighed for at bortse fra den faktiske pengestrøm.

Det følger af almindelige fortolkningsprincipper, at en værnsregel (som SEL § 2, stk. 1, litra d, efter Skatteministeriets opfattelse er) ikke kan fortolkes ud over sin klare ordlyd, medmindre dette måtte have klar støtte i bestemmelsens forarbejder, hvilket må godtgøres af Skatteministeriet i denne sag. Her er der imidlertid ende ikke nogen som helst støtte i forarbejderne.

Det følger videre af almindelige fortolkningsprincipper af skattelovgivningen, at skattebestemmelser ikke bør fortolkes udvidende

eller med analogislutninger, eftersom det kræver klar lovhjemmel at opkræve skat, jf. grundlovens § 43.

Og såfremt lovgiver havde ønsket, at bortfald af skattepligt ikke skulle gælde ud over 2. led i en lånestruktur, havde det da også været særdeles let at formulere bestemmelsen med et sådant - ikke-udtømmende - indhold. Under alle omstændigheder kunne man have undladt at give bestemmelsen den klare ordlyd, som den har.

Selv hvis domstolene måtte komme frem til, at Nycomed Sweden Holding 2 AB ikke er beskyttet af den nordiske dobbeltbeskatningsoverenskomst eller rente-/royaltydirektivet, følger det således direkte af SEL § 2, stk. 1, litra d, sidste punktum, at der *ikke* kan foreligge begrænset skattepligt og dermed pligt til at indeholde kildeskat i relation til de af denne sag omhandlede rentetilskrivninger.

*10 SKATS AFGØRELSER ER UDTRYK FOR EN SKÆRPENDE (ULOVLIG) PRAKSISÆNDRING MED TILBAGEVIRKENDE KRAFT*

For det tilfælde, at Skatteministeriet måtte få medhold i, at der foreligger begrænset skattepligt efter SEL § 2, stk. 1, litra d, af de omhandlede renter, gør Takeda til støtte for den principale påstand *subsidiært* gældende, at SKATs afgørelse (og de synspunkter, det efterfølgende er blevet gjort gældende af skattemyndighederne) er udtryk for en *skærpelse af praksis med tilbagevirkende kraft*, og at en sådan praksisskærpelse ikke lovligt kan gennemføres. En praksisskærpelse kan således alene ske med fremadrettet virkning og med et passende varsel, for så vidt angår de nye synspunkter, som SKAT vil anse for afgørende for denne nye praksis, jf. således f.eks. U.1983.8 H […].

Den juridiske vejledning 2010-2 er i overensstemmelse hermed […]:

»*Varsling af ændring med fremtidig virkning*

Det er et grundlæggende forvaltningsretligt princip, at det kun er muligt at iværksætte en skærpende praksisændring med virkning for fremtiden og efter udmelding af et passende varsel, der giver borgerne mulighed for at indrette sig efter den ændrede retstilstand.

…

En praksisskærpelse skal offentliggøres på relevant måde, fx i form af en SKM-meddelelse (styresignal) eller ved særlig nyhedsmarkering i de juridiske vejledninger.«

En meddelelse om praksisskærpelse skal - såvel i form som indhold - udtrykkeligt angive, at der er tale om en skærpelse af praksis, og hvad den nye praksis går ud på.

Da SKAT ikke har varslet praksisskærpelsen, har SKAT ikke været berettiget til at opkræve renteskat.

Takeda gør gældende, at der foreligger en praksisskærpelse såvel i relation til *dobbeltbeskatningsoverenskomsten* som i relation til *rente-/royaltydirektivet*. Disse spørgsmål behandles hver for sig nedenfor.

Hvis Takeda får medhold vedrørende blot et af disse spørgsmål, skal Takeda have fuldt medhold i sin principale påstand.

*10.1 Praksisskærpelse i relation til DBO'en*

[…][Det fremgår] utvetydigt af *forarbejderne til SEL § 2, stk. 1, litra c,* fra 2001 - vedrørende begrænset skattepligt på udbytter - at der over et dansk datterselskab kan *indskydes et (cypriotisk) mellemholdingselskab*, hvorigennem udbyttet *viderekanaliseres*, med den virkning, at den kildeskat, der ellers ville blive udløst, undgås. Mellemholdingselskabet er altså »*retmæssig ejer«.* Det fremgår klart, at der er tale om *rene gennemstrømningsselskaber*, og skatteministerens svar indeholder ikke forbehold af nogen art.

I forbindelse med indførelsen af den begrænsede skattepligt på renter i 2004 i samme bestemmelses litra d, blev der ikke taget afstand herfra, hvorfor man fortsat måtte gå ud fra, at der gjaldt samme fortolkning vedrørende »retmæssig ejer«-begrebet i denne

henseende (hvilket da også var støttet af andre udtalelser fra ministeriet på det tidspunkt).

Skatteloves forarbejder, herunder ministersvar, spiller en betydelig rolle ved fortolkningen af lovene. Der kan findes talrige eksempler fra Højesteret på, at Skatteministeriet påberåber sig ministersvar, når de taler til ministeriets fordel. Og når skatteministeren i de omhandlede ministersvar i 2001 giver en klar og uforbeholden vejledning om, hvordan de til Danmark fra 1999 inviterede holdingstrukturer kan »omstrukturere sig« ud af den skattepligt, der introduceres i 2001 (for udbytte),

   **3304**

så gøres det gældende, at det nødvendigvis må følge deraf, at selskaber, der disponerer i overensstemmelse hermed, ikke misbruger nogen lovgivning - der foreligger således ikke set fra datidens norm (tilbage i sagsperioden) noget misbrug.

Der var altså på daværende tidspunkt fri adgang til *»treaty shopping«.*

Så længe mellemholdingselskabet var *civilretlig* ejer af aktierne i datterselskabet eller kreditor for det omhandlede lån - og dermed *ikke* var *agent* eller *stråmand*, eller der forelå *pro forma* - var mellemholdingselskabet »retmæssig ejer«. Der var ikke tale om et dansk særstandpunkt. Dette var den globale opfattelse.

Takeda disponerede i 2006 - som de øvrige selskaber, mod hvilke SKAT har rejst sager - i tillid til disse forarbejder ved at etablere Nycomed Sweden Holding 2 AB og den omhandlede lånestruktur.

Forarbejderne var baseret på en *internretlig fortolkning* af begrebet »retmæssig ejer«, dvs. en fortolkning hvor *»retmæssig ejer« fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« i dansk ret.* Det er ovenfor i afsnit 2.4 konkluderet, at lovgiver og skattemyndighederne ubrudt har fastholdt den internretlige fortolkning i perioden 1977-2008, hvilket fremgår af et stort antal udsagn navnlig fra Skatteministeriet.

Som det fremgår af afsnit 2.5, måtte Skatteministeriet - efter at »beneficial owner«-sagerne var startet op med den første afgørelse i november 2008 - erkende, at et udbytte- eller rentemodtagende mellem-holdingselskab klart måtte anses for »rette indkomstmodtager« efter dansk skatteret, og at den hidtil påberåbte fortolkning af »retmæssig ejer« derfor ikke kunne føre til det ønskede resultat (dvs. udbytte- eller rentebeskatning).

Skatteministeriet ændrede derfor praksis og gik i stedet over til en *autonom (internationalretlig) fortolkning* af »retmæssig ejer«, hvor der nu *ikke længere er lighedstegn mellem »retmæssig ejer« og »rette indkomstmodtager«.* Det er tværtimod *to vidt forskellige begreber*, der ikke har noget som helst med hinanden at gøre.

Med den nye autonome fortolkning af »retmæssig ejer« har Skatteministeriet -under henvisning til kommentarerne til modeloverenskomsten fra 2003 vedrørende »gennemstrømningsselskaber« - introduceret en *meget bred fortolkning* af begrebet »gennemstrømningsselskab«, der rammer ethvert ganske almindeligt mellemholdingselskab, hvilket står i skærende kontrast til den tidligere praksis.

Det er således en kendsgerning, at skattemyndighedernes nye praksis er *i direkte strid med de udtrykkelige forarbejder* til udbyttebestemmelsen fra 2001, hvoraf det udtrykkeligt fremgår, at et cypriotisk mellemholdingselskab, der alene etableres for at viderekanalisere udbytter til sit moderselskab, er »retmæssig ejer« af udbytterne og derfor nyder beskyttelse efter overenskomsten (og dermed den tilsvarende rentebestemmelse fra 2004).

Den nye praksis er således også *i strid med SKATs egen tidligere fortolkning af »retmæssig ejer«,* som først blev forladt i 2008, da de første »beneficial owner«-sager blev rejst.

Der er dermed tale om en *betydelig skærpelse af praksis* vedrørende fortolkningen af »retmæssig ejer«, der fører til det stik modsatte

resultat af det, der er forudsat i forarbejderne fra 2001, selv om lovgrundlaget er uændret.

Skatteministeriet bestrider, at der foreligger en praksisskærpelse, og gør til støtte herfor gældende, at der ikke foreligger en *fast administrativ praksis,* fordi der ikke findes retsafgørelser, der dokumenterer den hidtidige praksis.

Når der - som i forarbejderne til SEL § 2, stk. 1, litra c, fra 2001 (og dermed også vedrørende litra d) - foreligger en udtrykkelig udtalelse fra Skatteministeren om, hvorledes retsstillingen er, og når skattemyndighederne efterfølgende administrerer i overensstemmelse hermed, er det imidlertid fuldgod dokumentation for en fast praksis, som skatteyderne kan indrette sig i tillid til.

Når Skatteministerens udtalelse går ud på, at mellemholdingselskaber skal anses som »retmæssige ejere« (og »rette indkomstmodtagere«), er det indlysende, at der ikke findes retsafgørelser, der dokumenterer denne praksis. SKAT er jo enig med skatteyderne i, at der *ikke* skal indeholdes udbytte- (eller rente-) skat, og SKAT har derfor ikke haft nogen anledning til at rejse sager herom. Sådan har det været i 30 år.

Skatteministeriet gør videre gældende, at en eventuel (fejlagtigt) manglende ligningsmæssig indgriben og korrektion ikke kan konstituere praksis og ikke kan skabe nogen for SKAT bindende administrativ praksis om ikke at pålægge kildeskat af renter.

Takeda er naturligvis enig i dette generelle udsagn. Pointen er imidlertid, at den omstændighed, at der ikke tidligere er rejst sager herom, ikke beror på en ufuldstændig kontrol fra SKATs side, men derimod på en opfattelse af, at der ikke var grundlag for at føre disse sager.

Skatteministerens stillingtagen i forarbejderne til den konkrete problemstilling er dermed nøjagtig lige så god en dokumentation for retsstillingen, som en retsafgørelse ville have været, og det giver sig selv, at SKAT har fulgt skatteministerens udmelding.

At der er ændret praksis, er da også bekræftet i Jyllandsposten den 14. september 2010 af den embedsmand, som på daværende tidspunkt var talsmand for SKAT i »beneficial owner«-sagerne […]:

»Om vi så får medhold, ved vi ikke. *Vores synspunkt er ret nyt i skattepraksis,* så vi må se, hvad Højesteret siger, når den kommer til at tage stilling engang.« (Vores understregning).

   **3305**

Praksisændringen bekræftes også af den omstændighed, at mens SKAT i perioden 1977-2008, hvor SKAT benyttede den *internretlige fortolkning af »retmæssig ejer«,* ikke har rejst en eneste sag om nægtelse af overenskomstlempelse med den begrundelse, at modtageren ikke var »retmæssig ejer«, mens SKAT - efter at have skiftet til den *autonome fortolkning* i 2008 - på en gang har rejst et meget stort antal sager. Der er således i dette sagskompleks truffet afgørelse i 150 sager med krav om betaling af kildeskat på godt 6,8 mia. kr.

På den anførte baggrund gøres det således gældende, at der foreligger en skærpelse af *en fast administrativ praksis,* som burde have været varslet, og at denne ændrede praksis derfor ikke kan finde anvendelse i nærværende sag.

…

10.2 *Praksisskærpelse i relation til rente-/royaltydirektivet*

10.2.1 *Praksisskærpelse vedrørende rente-/royaltydirektivets antimisbrugsklausul*

Som det fremgår af afsnit 8.6 ovenfor, kom EU-Domstolen i sin dom af 26. februar 2019 i nærværende sag […] - højst overraskende - til det resultat, at imødegåelse af misbrug af moder-/datter-selskabsdirektivet *ikke kræver national hjemmel.*

…

Det er altså en kendsgerning, at EU-Domstolen med sin afgørelse af 26. februar 2019 har *underkendt Kofoed-dommen* og dermed *ændret praksis med tilbagevirkende kraft*.

*Landsskatteretten* har naturligvis i udbyttesagerne, hvor Landsskatteretten gav selskaberne medhold, lagt Kofoed-dommen til grund (mens spørgsmålet ikke var afgørende for Landsskatteretten i rentesagerne).

…

Der findes næppe noget nationalt retssystem i den civiliserede verden, der vil acceptere, at en praksis-ændring kan have 14 års tilbagevirkende kraft.

Takeda gør i sagen, som nævnt ovenfor, gældende, at det nævnte princip *ikke har direkte virkning for borgerne*, eftersom EU-Domstolen ikke har kompetence til at træffe denne afgørelse, da *Danmark ikke har afgivet suverænitet* hertil. Der henvises til afsnit 8.6.4, hvor der detaljeret er redegjort dette synspunkt.

…

For det tilfælde, at Takeda *ikke måtte få medhold i, at det generelle EU-retlige princip ikke har direkte virkning for borgerne*, således at princippet principielt kan finde anvendelse i *dansk ret*, gøres det gældende, at princippet efter *dansk forvaltningsret* kun kan finde anvendelse med *fremtidig virkning*.

Princippet kan således ikke finde anvendelse i nærværende sag, der drejer sig om 2007, 2008 og 2009, fordi det ville være udtryk for en betydelig *praksisskærpelse med tilbagevirkende kraft*.

Det er således i afsnit 2 ovenfor dokumenteret, at den danske administrative praksis i sagsperioden ikke baserede sig på, at der gjaldt et *generelt EU-retligt princip om forbud mod misbrug, der havde direkte virkning over for borgerne*. Tværtimod, var det den almindelige opfattelse både i Danmark og i EU på daværende tidspunkt, at der frit kunne foretages treaty- og direktivshopping. At princippet ikke engang gjaldt i EU, dokumenteres af, at *Kofoed-dommen* i 2007 kom til det resultat, at imødegåelse af misbrug krævede *national lovhjemmel*.

Blot for den gode ordens skyld bemærkes, at anvendelse af et direktiv i en medlemsstat altid er udtryk for anvendelse af *national ret*. Dette gælder, hvad enten der er tale om anvendelse af medlemsstatens egen lovgivning eller almindelige retsgrundsætninger udviklet af medlemsstatens domstole, eller om der - som i nærværende sag - er tale om, at EU-Domstolen har fastsat et princip med direkte virkning for borgerne, hvis dette ellers måtte blive godkendt af medlemsstatens domstole. Derfor er det også *medlemsstatens processuelle og forvaltningsretlige regler*, der skal benyttes ved retsanvendelsen.

Da en anvendelse af det generelle EU-retlige forbud mod misbrug under de nævnte forudsætninger vil være udtryk for en praksisskærpelse med tilbagevirkende kraft, kan dette princip således ikke lægges til grund for afgørelsen af sagen.

10.2.2 *Praksisskærpelse vedrørende rente-/royaltydirektivets bestemmelse om beskatning*

Ud over den i foregående afsnit væsentlige praksisændring foretaget af EU-Domstolen i sin dom i nærværende, indeholder EU-Domstolens dom imidlertid en - endnu mere overraskende - praksisændring vedrørende Domstolens fortolkning af rente-/royaltydirektivet, nemlig vedrørende spørgsmålet om, hvorvidt et S.C.A., SICAR selskab er omfattet af direktivets beskyttelse, når det i sit hjemland - her Luxembourg - konkret er fritaget for beskatning af de renter, der hævdes omfattet af direktivet.

EU-Domstolen har således i dommens præmis 151 […] fundet, at Nycomed S.C.A., SICAR ikke kan nyde beskyttelse efter rente-/royaltydirektivet, såfremt selskabet »faktisk er fritaget« for luxembourgsk selskabsbeskatning af de omhandlede renter.

EU-Domstolen har således reelt indført en »subject-to-tax«-betingelse (krav om effektiv beskatning for at opnå beskyttelse) i direktivet, hvilket kom som et lyn fra klar himmel, navnlig set i lyset af, at Kommissionen *flere gange* har udtalt, at der ikke gælder en sådan betingelse, og at Kommissionen flere gange tidligere forgæves har fremsat forslag om at indføre en sådan betingelse i direktivet (hvilket visse medlemsstater dog blokerede for, jf. den nedenfor citerede kommentarartikel til dommen). Der kan også henvises til, at

**3306**

Kommissionens indstilling i sagen var i overensstemmelse hermed, jf. punkt 85 og 86 […], ligesom generaladvokat Kokott også i sin indstilling var enig i, at Nycomed S.C.A., SICAR var omfattet af direktivet, uanset om selskabet var skattefritaget af de konkrete renter, jf. præmis 97 […].

EU-Domstolen har således også på dette punkt udøvet en vidtgående retsskabende aktivitet og har i den forbindelse kortsluttet den demokratiske proces.

…

Takeda gør *ikke* gældende, at denne praksisændring fra EU-Domstolen ikke kan gennemføres lovligt i nærværende sag, da den pågældende praksis er fastslået at EU-Domstolen i den konkrete sag og som det organ, der fortolker EU-retten. Nycomed S.C.A., SICAR nyder således ikke direktivbeskyttelse (men fortsat overenskomstbeskyttelse), men det gøres derimod gældende, at denne praksisændring »tæller med« med betydelig vægt, når det skal afgøres, om Nycomed A/S (Takeda) har *handlet forsømmeligt* ved ikke at indeholde renteskat i forbindelse med de omhandlede rentetilskrivninger, jf. nærmere nedenfor i afsnit 11.

10.3 *Nærmere om retspraksis*

Som nævnt har der ikke siden 1983 været tvivl om eksistensen af det forvaltningsretlige princip, hvorefter skattemyndighederne er afskåret fra at ændre deres praksis i skærpende retning med tilbagevirkende kraft, jf. U. 1983.8 H […] og Den juridiske vejledning […], som er citeret ovenfor.

Landsrettens dom i U.2012.2337 H […] er et *skoleeksempel* på, hvilke minimumskrav der må stilles til skattemyndighederne for, at en skærpende praksisændring kan få virkning for borgerne. … Landsretten fandt, at praksisændringen først ved offentliggørelsen i Retsinformation måtte anses for offentliggjort på en sådan måde, at den kunne tillægges retsvirkning over for virksomheden, der som sagsøgeren havde anvendt arbejdsudlejet arbejdskraft. … For Højesteret bestred Skatteministeriet ikke, at praksisændringen først kunne få virkning fra den 1. november 1997.

Størstedelen af retspraksis efter Højesterets dom i U.1983.8 H […] handler navnlig om *beviset* for, hvad skattemyndighedernes praksis så rent faktisk gik ud på. Denne konkrete bevisvurdering afgøres selvsagt efter de faktiske omstændigheder fra sag til sag. I nærværende sag er beviset i form af skatteministerens egne redegørelser til Folketinget overvældende.

… I nærværende sag er det evident, at skattemyndighederne først har tilrettet beskrivelsen af administrativ praksis i overensstemmelse med den opfattelse, som man nu gør gældende, *efter* at skattemyndighederne i 2008 indledte den kontrolaktion, som har ført til bl.a. denne sag mod Takeda.

…

I U.2015.915 H […], U.2017.2960 H […] og U.2017.2979 H […] forsøgte skatteyderne at føre beviset for praksis ved at henvise til lang tids ikke-indgriben fra skattemyndighedernes side, hvilket Højesteret ikke godtog. Det er *ikke* Takedas synspunkt, at beviset for skattemyndighedernes praksis udgøres af lang tids ikke-indgriben. Noget andet er, at når skatteministeren over for Folketinget redegør for en praksis og for, hvordan en lovbestemmelse skal

forstås, så følger skattemyndighederne naturligvis ministerens ud-
melding. Det ville da være besynderligt, hvis der forelå datidige
afgørelser, som viste, at skattemyndighederne reelt havde en anden
praksis end den, som fremgik af skatteministerens redegørelser. I
Takedas sag er det imidlertid Skatteministeriet, som hævder, at
skattemyndighedernes praksis i tiden indtil 2008 var en anden, end
skatteministeren havde fortalt Folketinget i 2001.

…

Den af Skatteministeriet hævdede retstilstand, der strider mod de
udtrykkelige forarbejder til SEL § 2 kan således kun tilvejebringes
ad lovgivningsvejen.

Takeda er naturligvis opmærksom på, at Østre Landsret i sin dom
af 3. maj 2021 i den første sag i dette sagskompleks, NetApp-sagen
[…], fandt, at der under tilsvarende omstændigheder *ikke* forelå en
praksisændring i sagen (for så vidt angår fortolkningen af »retmæs-
sig ejer«-begrebet).

…

Det fremgår af Takedas bemærkninger ovenfor i afsnit 10.1 og
10.2, at Takeda ikke er enig i Østre Landsrets afgørelse på dette
punkt. Dommen er på dette punkt anket til Højesteret af NetApp.

…

## 11 NYCOMED A/S (TAKEDA) HÆFTER IKKE FOR EN EVEN-
## TUEL RENTESKAT - KILDE-SKATTELOVENS § 69

### 11.1 Regelgrundlaget og indledende bemærkninger

For det tilfælde, at der måtte gives Skatteministeriet medhold i,
at de omhandlede renter er undergivet begrænset skattepligt til
Danmark, gøres det - mest subsidiært - gældende, at Nycomed A/S
(Takeda) ikke hæfter for den ikke indeholdte kildeskat.

Spørgsmålet om, hvorvidt kildeskatten kan opkræves hos Nyco-
med A/S (Takeda), beror på bestemmelsen i kildeskattelovens §
69, der er sålydende […]:

…

Det hedder endvidere i SKATs Vejledning om indeholdelse af A-
skat og AM-bidrag 2007-4, afsnit K.2.2 […]:

»Uanset at skattemelserne har omvendt bevisbyrde, har det i
retspraksis vist sig, at det er told- og skatteforvaltningen, der skal
bevise, at den indeholdelses-pligtige har handlet forsømmeligt.«

Allerede fordi Nycomed A/S (Takeda)'s forståelse af de relevante
regler er i overensstemmelse med den

**3307**

administrative praksis, som skattemyndighederne ubrudt har fulgt
gennem årene vedrørende begrebet »beneficial owner«, hvorefter
begrebet var sidestillet med rette indkomstmodtager, er det åbenbart,
at Nycomed A/S (Takeda) ikke har udvist »forsømmelighed«.

Som nævnt i foregående afsnit, har Østre Landsret ganske vist i
NetApp-dommen af 3. maj 2021 fundet, at der ikke forelå en fast
administrativ praksis. Takeda er uenig heri, men selv hvis skatte-
myndighedernes mange tilkendegivelser om begrebet »retmæssig
ejer« som værende lig med det danske »rette indkomstmodtager«-
begreb ikke findes at konstituere en administrativ praksis, som
Nycomed A/S (Takeda) kan støtte ret på, så har udsagnene under
alle omstændigheder givet anledning til tilstrækkelig kvalificeret
tvivl om fortolkningen, at det ikke kan lægges Nycomed A/S (Ta-
keda) til last, at selskabet - til syvende og sidst - tog fejl, jf. nærmere
herom nedenfor.

…

### 11.2 Nærmere om betingelserne for indeholdelsespligt efter kilde-
### skattelovens § 69

Kildeskattelovens § 69 gælder ikke kun hæftelse for rentekildeskat,
men også hæftelse for ikke-indeholdt A-skat, arbejdsudlejeskat
m.v. Der kan derfor henses til retspraksis om manglende indehol-
delse af andre skatter end rentekildeskat, når det skal bedømmes,
hvad der forstås ved hæftelsespådragende forsømmelighed.

Det fremgår af bl.a. UfR 1977.844 H (ikke-hæftelse […]),
SKM2002.470.ØLR Ø (ikke-hæftelse […]) og UfR 2018.3119 H
(hæftelse […]), at også vildfarelse om den korrekte retlige fortolk-
ning og subsumption kan fritage for hæftelsesansvar. Der er heller
ikke noget i ordlyden af bestemmelsen, som antyder, at det kun er
ukendskab til de relevante faktiske forhold, som er af betydning.

Højesteret vurderede i UfR 1977.844 H, at den potentielt inde-
holdelsespligtige havde haft »en sådan føje« til at kunne gå ud fra,
at der ikke var indeholdelsespligt, at der ikke var handlet forsømme-
ligt. Landsretten brugte i SKM2002.470.ØLR det udtryk, at det
relevante cirkulære i den pågældende situation ikke førte til »et
entydigt resultat« og frifandt skatteyderen for hæftelse. Hvis den
potentielt indeholdelsespligtiges standpunkt derfor har været udtryk
for en rimeligt begrundet forståelse af retsgrundlaget og en rimeligt
begrundet subsumption, vil der derfor ikke være handlet forsømme-
ligt - heller ikke selvom det til syvende og sidst viser sig, at den
potentielt indeholdelsespligtiges standpunkt ikke var holdbart.

I UfR 2018.3119 H afhang spørgsmålet om skattepligt af, om
rette indkomstmodtager af udbyttet var en hollandsk fond eller
fondens stifter, som var bosat i Storbritannien. Højesteret fastslog
i præmisserne […], at der forelå hæftelse og henviste bl.a. til, at
det fremgik af Ligningsvejledningen *forud for vedtagelsen af ud-
byttet* at udenlandske fonde ikke var rette indkomstmodtagere, hvis
fonden ikke opfyldte de danske betingelser for at anse en fond for
et i forhold til stifteren uafhængigt retssubjekt.

Nycomed A/S (Takeda)'s forståelse af retsgrundlaget må derfor
- selvfølgelig -bedømmes efter de tilgængelige retskilder på rente-
tilskrivningstidspunkterne. Det var jo, hvad Nycomed A/S (Takeda)
og dets rådgivere havde at gå ud fra.

Så vidt ses, er der ikke faktuelle uenigheder af betydning for for-
sømmeligheds-bedømmelsen. Uenigheden går på, om Nycomed
A/S (Takeda) handlede forsømmeligt ved på rentetilskrivningstids-
punkterne ikke at indse, at renterne var skattepligtige (hvis de altså
viser sig at være det), *uanset* at renterne blev oppebåret af Nycomed
Sweden Holding 2 AB, der ubestridt var rette indkomstmodtager.
U.2016.2898H - RF Holding […] handlede om en situation, hvor
Højesteret lagde til grund, at udloddede midler blev ledt uden om
rette indkomstmodtager, hvilket indlysende var forsømmeligt.
Denne sag er derfor uden betydning for forsømmelighedsspørgsmå-
let i nærværende sag.

Ved forsømmelighedsvurderingen kan det være nyttigt at erindre
om, at sagerne er opstået som følge af en koordineret aktion fra
skattemyndighedernes side, hvor man har rejst i første omgang 31
sager, senere i alt 150 sager om hæftelse for ikke-indeholdt kildeskat
som en del af »Skattestyrelsens Kapital-fonds- og kildeskattepro-
jekt«, jf. Skatteministeriets svar til Folketingets Skatteudvalg af
28. oktober 2019, selvom der ikke tidligere havde været danske
sager *overhovedet* om pligt til indeholdelse af renteskat under
henvisning til, at det modtagende selskab var et gennemstrømnings-
selskab.

Som tidligere nævnt, udtalte den ansvarlige kontorchef i Skattesty-
relsen - påskønnelsesværdigt ærligt - i 2010 om det kommende
opgør ved domstolene […]:

»Om vi så får medhold, ved vi ikke. Vores synspunkt er ret nyt i
skattepraksis, så vi må se, hvad Højesteret siger, når den kommer
til at tage stilling engang.«

Baggrunden er således utvivlsomt, at Skattestyrelsen med iværk-
sættelsen af dette sagskompleks har søgt at pløje ny jord. Man
havde ikke fundet det fornødent forinden at varsle de potentielt
indeholdelsespligtige om aktionen og de nye synspunkter, som
skattemyndighederne ønskede at afprøve.

### 11.3 Nycomed A/S (Takeda) har ikke handlet forsømmeligt ved
### rentetilskrivningerne

Copyright © 2023 Karnov Group Denmark A/S

Bl.a. henset til,

*at* sagsøgers forståelse af de relevante regler er i overensstemmelse med de administrative tilkendegivelser vedrørende forståelsen af begrebet »retmæssig ejer« som værende det samme som den »rette indkomstmodtager, som der forelå på rentetilskrivningstidspunkterne - hvad enten dette konstituerer en administrativ praksis

**3308**

eller ej, jf. gennemgangen heraf ovenfor i afsnit 1, 2 og 10,

*at* dansk litteratur er på linje med skattemyndighedernes tidligere praksis,

*at* det følger direkte af ordlyden af rente-/royaltydirektivet (MS 381), at renter er fritaget for kildeskat, og

*at* EU-Domstolen ved sin dom af 26. februar 2019 (imod Domstolens generaladvokats indstilling) har foretaget en klokkeklar ændring af den administrative praksis, som anvendt af Kommissionen vedrørende spørgsmålet, om rente-/royaltydirektivet forudsætter effektiv beskatning af de oppebårne renter, jf. ovenfor i afsnit 10.2.2,

*at* såvel Kommissionen som EU-Domstolens generaladvokat var af den opfattelse, at Takeda skulle have medhold i sagen, dels da Nycomed Sweden Holding 2 AB måtte anses som den »retmæssige ejer« af renterne efter direktivet, og dels da der direktivets antimisbrugsbestemmelse ikke ansås for implementeret i dansk ret,

*at* der på international plan er stor usikkerhed om, hvorledes begrebet »beneficial owner« skal fortolkes, jf. bl.a. OECD's forslag til kommentarer fra foråret 2011 (MS 651-655), hvor det af høringssvarene (MS 659-676) fremgår, at end ikke forslaget til de nye (præciserende) kommentarer bidrager til at mindske den usikkerhed, der hersker om fortolkningen,

*at* ordlyden af SEL § 2, stk. 1, litra c, sidste punktum klart fører til, at der ikke foreligger begrænset skattepligt (og dermed indeholdelsespligt), og

*at* Nycomed-koncernen (Takeda) forinden transaktionerne indhentede rådgivning hos et førende skatterådgivningsfirma, KPMG, der anviste den pågældende lånestruktur uden at tage forbehold om nogen risiko for kildeskat i forbindelse med de påtænkte rentebetalinger,

er det ganske klart, at Nycomed A/S (Takeda) *ikke* har udvist *»forsømmelighed«.*

Såfremt Skatteministeriet måtte få medhold i spørgsmålet om indeholdelsespligt, selv om Nycomed S.C.A., SICAR i princippet anses som den »retmæssige ejer« af de omhandlede renter, dvs. som følge af, at det pågældende selskab skal sidestilles med et 1929-holdingselskab og dermed ikke er omfattet af den dansk-luxembourgske DBO, jf. ovenfor i afsnit 7.7, skal det navnlig fremhæves, at Skatteministeriet i 2006 - dvs. umiddelbart før de første rentetilskrivninger i denne sag - bekræftede over for de luxembourgske skattemyndigheder, at *»Luxembourg Investment Funds«* var omfattet af den dansk-luxembourgske DBO. At SICAR var som et investeringsselskab - på samme måde som et dansk investeringsselskab omfattet af aktieavancebeskatningslovens § 19 - omfattet af bekræftelsen eller kan i hvert fald sidestilles med de investeringsselskaber, som derved blev anerkendt som overenskomstbeskyttede, jf. afsnit 7.7.8.7. Selv hvis landsretten tilsidesætter ministeriets (daværende) forståelse af DBO'en, kan det under ingen omstændigheder tilregnes Nycomed A/S (Takeda) som forsømmeligt, at selskabet ikke forudså, at ministeriets fortolkning var forkert, og i hvert fald demonstrerer det, at Nycomed A/S (')s fortolkning af DBO'en ligger inden for rammerne af en særdeles forståelig - og dermed undskyldelig -fejlfortolkning.

Det kunne heller ikke læses ud af slutprotokollen til DBO'en med Luxembourg, at forbeholdet for 1929-holdingselskaber også skulle gælde et selskab som Nycomed S.C.A., SICAR, og Skatteministe-

riet fandt da også først 7 år efter sagens anlæg (og 10 år efter SKATs afgørelse) på argumentet om, at slutprotokollen burde fortolkes udvidende/formålsbestemt, og efter at Skatteministeriet havde opgivet et andet, fejlagtigt argument om betydningen af, at selskabet måtte anses som transparent efter dansk skatteret, jf. afsnit 7.7. Når Skatteministeriet skulle bruge 7 år - og skattemyndighederne dermed mere end 10 år - på at finde på argumentet om udvidende fortolkning/formålsfortolkning af slutprotokollen, kan det ikke bebrejdes Nycomed A/S (Takeda), at selskabet tilbage i 2007, 2008 og 2009 ikke indså, at Nycomed S.C.A., SICAR ikke kunne modtage renter uden at betale dansk kildeskat (såfremt dette altså viser sig at være kildeskattens opfattelse).

Sagen er således den, at de retskilder, som var tilgængelige på tidspunktet for etableringen af låne-strukturen og rentetilskrivningerne, *entydigt* taler for, at renterne var *skattefri*.

I Østre Landsrets dom af 3. maj 2021 i NetApp-sagen hedder det (dommens s. 250, 2. og 3. afsnit) […]:

»NetApp Danmark må efter de foreliggende oplysninger have været bekendt med de faktiske omstændigheder ved udbytteudlodningen, herunder at formålet med at indskyde NetApp Cypern som et mellemled alene var at undgå dansk kildebeskatning som redegjort ovenfor.

Under disse omstændigheder kan det forhold, at der i 2006 blev forelå en endelig afklaring af det retlige spørgsmål, der var fornøden hjemmel til at imødegå et sådant retsmisbrug, ikke føre til, at NetApp Danmark bliver ansvarsfri i medfør af kildeskattelovens § 69, stk. 1.«

Disse præmisser kan opfattes således, at landsretten pålægger det potentielt indeholdelsespligtige selskab risikoen for den *retlige* usikkerhed om anvendelsen af begrebet »beneficial owner« og - i overensstemmelse med Skatteministeriets opfattelse - vel nærmest et objektivt ansvar herfor. Her skal man dog være opmærksom på, at denne del af præmisserne angik den del af udbytteudlodningen, hvor der efter landsrettens opfattelse *ikke* forelå en faktisk gennemstrømning til en »beneficial owner« i et land, som kunne modtage udbyttet skattefrit. I en sådan situation har landsretten altså vurderet,

**3309**

at der forelå en misbrugssituation, og at hæftelsesansvaret ikke bortfaldt, fordi der ikke var en »endelig afklaring« af, om man på basis af »beneficial owner«-begrebet kunne skride ind over for et sådant misbrug. Den retlige usikkerhed angik altså selve muligheden for at skride ind over for det, som landsretten anså for misbrug af DBO'en med Cypern. Det har således mulighed spillet en rolle for landsrettens vurdering, at NetApp efter landsrettens opfattelse havde søgt at udnytte DBO'en med Cypern på en illoyal måde, og at det i en sådan situation ikke kan diskulpere for hæftelsesansvar, når det til syvende og sidst viser sig, at konstruktionen kunne tilsidesættes.

Såfremt hovedspørgsmålet i Takedas sag skulle gå Takeda imod med den begrundelse, at Nycomed S.C.A., SICAR ikke er beskyttet af DBO'en mellem Luxembourg og Danmark, foreligger der imidlertid en væsentlig anderledes situation. Her vil den retlige tvivl nemlig ikke angå fortolkningen af »beneficial owner«-begrebet, og hvorvidt der i den konkrete situation forelå misbrug. Såfremt Takeda får medhold i, at Nycomed S.C.A., SICAR i princippet var den »retmæssige ejer« af de af sagen omhandlede renter (da selskabet ikke har fungeret som et »gennemstrømningsselskab«), men ikke kunne oppebære renterne uden dansk kildeskat som følge af forbeholdet i slutprotokollen, angår fortolkningstvivlen *slutprotokollen til DBO'en* i en situation, hvor det ligger fast, at Nycomed S.C.A., SICAR's etablering og tilstedeværelse i Luxembourg og status som renternes »retmæssige ejer« ikke kan tilsidesættes ud fra misbrugsbetragtninger. Den fortolkningstvivl, som måtte være

om forståelsen af slutprotokollen har således en ganske anden karakter end spørgsmålet om, hvorvidt NetApp Cypern som et til lejligheden oprettet selskab kunne påberåbe sig DBO'en, og som nævnt havde Nycomed A/S (Takeda) altså særdeles gode grunde til at antage, at Nycomed S.C.A., SICAR kunne påberåbe sig overenskomsten (og rente-/royalty-direktivet), når (hvis) nu selskabet måtte blive anset som den (subsidiære) »retmæssige ejer« af renteindtægterne.

Hertil kommer, at der i nærværende sag består den væsentlige forskel i forhold til NetApp-sagen, at Nycomed A/S (Takeda) - som nævnt ovenfor - havde føje til at gå ud fra, at Nycomed S.C.A., SICAR under alle omstændigheder var ubetinget beskyttet af rente-/royaltydirektivet, selv om der ikke skulle ske effektiv beskatning af renterne i Luxembourg, idet en fast EU-praksis herfor først blev ændret med EU-Domstolens dom, og da renterne i øvrigt ikke »gennemstrømmede« dette selskab videre til ejerne.

Om retspraxis på dette område bemærkes, at det ikke kan undre, at Højesteret i afgørelserne UfR 2004.362 H […] og UfR 2008.2243 H […] har givet Skatteministeriet medhold i, at der var handlet »forsømmeligt«. Det forekommer rimeligt klart i begge sager. Ingen af disse domme er derfor præjudicerende for nærværende sag.

Den omstændighed, at Højesteret i præmisserne i sagerne har nævnt, at den indeholdelsespligtige var »bekendt« med de faktiske forhold, der førte til, at der forelå indeholdelsespligt, kan ikke - som antaget af Skatteministeriet - tages udtryk for, at dette skulle være den afgørende præmis. Tværtimod, er den indeholdelsespligtiges kendskab til de faktiske forhold den første betingelse for at statuere »forsømmelighed«, og Højesteret fortsætter da også med at konstatere, at den indeholdelsespligtige »ikke har haft føje« til at antage, at der ikke var indeholdelsespligt.

Det bestrides endvidere, at Nycomed A/S (Takeda) skulle være underlagt en skærpet agtsomhedsbedømmelse, fordi det angiveligt var tale om omgåelse af en værnsregel.

For det første bestrides det, at SEL § 2, stk. 1, litra d, om begrænset skattepligt er en værnsregel.

For det andet giver der ikke nogen mening at tale om en skærpet agtsomhedsbedømmelse, fordi parterne var interesseforbundne, når agtsomhedsvurderingen drejer sig om den juridiske subsumption. Den juridiske bedømmelse af, om et mellemholdingselskab som Nycomed Sweden Holding 2 AB kan påberåbe sig DBO'en eller direktivet er jo upåvirket af, om Nycomed Sweden Holding 2 AB var minoritetsaktionær eller majoritetsaktionær i Nycomed A/S (Takeda). Tilsvarende gælder for Nycomed S.C.A., SICAR's muligheder for at påberåbe sig DBO'en med Luxembourg. Østre Landsret har da heller ikke fulgt dette synspunkt i NetApp-sagen.

På den anførte baggrund gøres det samlet set gældende, at det ikke er grundlag for at anse Nycomed A/S (Takeda) for at have handlet »forsømmeligt«.

*12 ANBRINGENDER TIL STØTTE FOR DE SUBSIDIÆRE PÅSTANDE*

12.1 *De subsidiære påstande og Takedas hovedanbringender*
[…]

Sagsøgte, Skatteministeriet, har over for Takedas subsidiære påstand (B) principalt nedlagt påstand om afvisning, subsidiært om frifindelse.

Over for Skatteministeriets afvisningspåstand har Takeda nedlagt påstand om frifindelse.

*Til støtte for den subsidiære påstand (A)* gør Takeda overordnet gældende, at -såfremt hverken Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB eller Nycomed S.C.A., SICAR anses som den »retmæssige ejer« af de af sagen omhandlede renter - så skal kildeskattekravet under alle omstændigheder nedsættes til 0 kr., for så vidt angår

i. det svenske børsnoterede selskab, Aktionær nr. 41, der er (direkte) aktionær i Nycomed S.C.A., SICAR, eftersom dette selskab i så fald må anses som den

**3310**

»retmæssige ejer« af de omhandlede renter for dette selskabs ejerandel (ca. 1,15 %) (og er DBO-beskyttet), og
ii. den i USA hjemmehørende fysiske person, Aktionær nr. 39, der ligeledes er (direkte) aktionær i Nycomed S.C.A., SICAR, da denne person i så fald må anses som den »retmæssige ejer« af de omhandlede renter for denne persons ejerandel (ca. 0,25 %), og da vedkommende er en fysisk person (da der ikke i dansk ret er hjemmel til at opkræve kildeskat på renter betalt til udenlandske fysiske personer)

Dette anbringende behandles i det følgende afsnit 12.2.

Til støtte for den subsidiære hjemvisningspåstand (B) gør Takeda overordnet gældende, at der herudover - dvs. i tillæg til det af den subsidiære påstand (A) omhandlede krav - består et retskrav på nedsættelse af kildeskattekravet til 0 kr., i det omfang Takeda under en hjemvisning til Skattestyrelsen dokumenterer, at de direkte eller indirekte investorer i Nycomed S.C.A., SICAR på tidspunkterne for rentetilskrivningerne var 1) de »retmæssige ejere« af de omhandlede renter i henhold til en DBO mellem domicilstaten og Danmark, eller 2) fysiske personer (da der ikke i dansk ret er hjemmel til at opkræve kildeskat på renter vedrørende sådanne personer).

Disse anbringender behandles nedenfor i afsnit 12.3.

Den overordnede begrundelse for, at der består et retskrav på bortfald af kildeskatten i forhold til de nævnte (bagvedliggende) personer, er, at der - i dette subsidiære scenarie - ikke foreligger noget misbrug af hverken den nordiske DBO eller rente-/royaltydirektivet i forhold til disse investorer, eftersom en rentebetaling direkte til disse investorer ubetinget ville være fritaget for dansk kildeskat, jf. den tilsvarende problemstilling ovenfor i afsnit 7.7 vedrørende spørgsmålet om, hvorvidt der skal ske nedsættelse som følge af, at Nycomed S.C.A., SICAR alternativt må anses som den »retmæssige ejer« af renterne.

Som nævnt det anførte sted, kan det således alene komme på tale at bortse fra den umiddelbare modtager af en rente (eller et udbytte), dvs. statuere misbrug, såfremt midlerne er strømmet til et selskab, der er hjemmehørende i en stat, med hvilken Danmark ikke har en DBO (eller til et selskab, der ikke er omfattet af en DBO), eller at midlerne er bestemt hertil, og at dette selskab er den »retmæssig ejer« af midlerne.

Dette følger både af ISS-dommen […], ligesom det nu også følger af Østre Landsrets dom af 3. maj 2021 i NetApp-sagen […].

…

12.2 *Kildeskattekravet skal nedsættes i forhold til de to aktionærer i Nycomed S.C.A., SICAR; Aktionær nr. 41, Sverige, og Aktionær nr. 39, USA*

For det tilfælde at hverken Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB eller Nycomed S.C.A., SICAR anses som »retmæssig ejer« af de af sagen omhandlede renter, gøres det gældende, at det i så fald må være de direkte (eller indirekte) aktionærer eller investorer i Nycomed S.C.A., SICAR, der må være de »retmæssige ejere« af renterne. Der er ikke andre muligheder.

SKAT har da også i den indbragte afgørelse i sagen […] lagt til grund, at det er investorerne i Nycomed S.C.A., SICAR, der er de »retmæssige ejere«. Det hedder således […]: …

Som det fremgår af redegørelsen ovenfor i afsnit 4.6, udgør aktionærkredsen i Nycomed S.C.A., SICAR, for over 95 %'s vedkommende af kapitalfonde, der er organiseret i skattemæssigt transparente enheder, typisk udenlandske *limited partnerships*, dvs. kom-

manditselskaber. Investorerne i disse kapitalfonde er således *i skattemæssig henseende* direkte aktionærer i Nycomed S.C.A., SI-CAR. Antallet af investor i disse enheder udgør flere hundrede.

Der findes dog også enkelte ikke-skattetransparente enheder, der er direkte aktionærer i Nycomed S.C.A., SICAR, herunder den svenske, børsnoterede bank, Aktionær nr. 41, og den i USA hjemmehørende fysiske person, Aktionær nr. 39, jf. ovenfor i afsnit 4.6. Som det fremgår af det pågældende afsnit, ejede Aktionær nr. 41 153.121 stk. ud af 13.316.572 stk. aktier, svarende til en ejerandel på ca. 1,15 %, mens Aktionær nr. 39 ejede 33.162 stk., svarende til ca. 0,25 %. De to aktionærers samlede ejerandel udgjorde dermed ca. 1,40 %.

På denne baggrund har Takeda altså nedlagt den subsidiære påstand (A) om nedsættelse af kildeskattekravene for årene 2007, 2008 og 2009 med henholdsvis 1.615.932 kr., 1.935.776 kr. og 1.610.973 kr.: …

Når Takeda har valgt at udtage Aktionær nr. 41 og Aktionær nr. 39 til særskilt behandling og omfattet af en selvstændig subsidiær påstand - (A) - skyldes det, at begge disse aktionærer udgør enkle og illustrative eksempler at henvise til i relation til spørgsmålet om, hvilke betingelser der med rette kan stilles for at opnå en nedsættelse af kildeskattekravet i det scenarie, hvor ingen af de mellemliggende selskaber (Nycomed Sweden Holding 2 AB, Nycomed Sweden Holding 1 AB eller Nycomed S.C.A., SICAR) kan anerkendes som værende »retmæssig ejer« af de af sagen omhandlede renter.

Da investorerne i de skattetransparente kapitalfonde, som nævnt, udgør flere hundrede selskaber m.v., har Takeda altså valgt alene at lade landsretten bedømme spørgsmålet om nedsættelse af kildeskattekravet i forhold til den »retmæssig ejer« i forhold til to specifikke investorer.

Og herudover - såfremt landsretten måtte finde det godtgjort, at de pågældende investorer (eller blot én af

**3311**

dem) berettiger til en nedsættelse af kildeskattekravet - lægger sagsøger op til, at landsretten kan hjemvise sagen i forhold til øvrige investorer, der måtte opfylde tilsvarende betingelser (og altså lade skatteforvaltningen foretage den ligningsmæssig opgave, der består i at vurdere, om de af landsretten udstukne betingelser for nedsættelse af kildeskattekravet er opfyldt i forhold til de investorer, der måtte mene sig berettiget til nedsættelse), jf. nærmere nedenfor i afsnit 12.3.

Takeda gør, som nævnt, i denne forbindelse gældende, at - når ingen af de mellemliggende selskaber kan anses som den »retmæssige ejer« af de omhandlede renter - så er der ikke andre muligheder end at anse aktionærerne/investorerne i Nycomed S.C.A., SICAR, som de »retmæssige ejere« heraf. Og to af disse investorer er altså Aktionær nr. 41 og Aktionær nr. 39.

Aktionær nr. 41 er et svensk selskab, der er omfattet af den nordiske DBO.

Og Aktionær nr. 39 er en fysisk person, der er hjemmehørende i USA (med hvilket land Danmark også har en DBO). I forhold til en fysisk person gøres det gældende, at det er uden betydning for spørgsmålet om nedsættelse, om vedkommende er omfattet af en DBO. Danmark har således ikke intern hjemmel til at opkræve renteskat over for en udenlandsk fysisk person (dvs. dette gælder, uanset hvor denne måtte være skattemæssig hjemmehørende), hvorfor der under omstændigheder ikke kan foreligge noget misbrug i forhold til en sådan person, der måtte anses som den (alternative) »retmæssige ejer« af en rente. I dette konkrete scenarie spiller dette spørgsmål dog ingen rolle, eftersom Aktionær nr. 39 er hjemmehørende i en DBO-stat. …

Skatteministeriet er enig med Takeda i, at der (i hvert fald i princippet) kan ske nedsættelse af kildeskattekravet, såfremt det godtgøres, at de bagvedliggende ejere er de »retmæssige ejere« af renterne. Skatteministeriet stiller i den forbindelse bl.a. krav om, at renterne vi skattemæssig henseende er henført til disse personer«, jf. om denne betingelse senere i dette afsnit.

Takeda finder det vanskeligt at forstå Skatteministeriets synspunkter i relation til dette nedsættelsesspørgsmål …

Problemet er imidlertid, at der ikke findes sådant skriftligt materiale, som Skatteministeriet forestiller sig. Og pengestrømmene er i øvrigt klart oplyste i denne sag - og har længe været det, jf. bl.a. beskrivelsen i foreliggelseskendelsen […].

Ministeriet kan således ikke dække sig ind under manglende faktuelle oplysninger.

…

Og Skatteministeriet kan i øvrigt heller ikke dække sig ind under EU-Domstolens tilkendegivelse (efter rente-/royaltydirektivet) om, at det ikke er skattemyndighedernes opgave at udpege den »retmæssige ejer«.

…

Skatteministeriet gør gældende, at det - for at nedsættelse af kravet kan komme på tale - skal godtgøres, at den pågældende investor ikke selv er et »gennemstrømningsselskab« for de pågældende renter.

Det bemærkes hertil, at det synes at være helt åbenbart, at disse midler ikke kan være »gennemstrømmet« den fysiske person, Aktionær nr. 39 (hvad Skatteministeriet da vist nok heller ikke gør gældende), men heller ikke den *børsnoterede* bank, Aktionær nr. 41, til dette selskabs mange tusinde aktionærer. Det må således uden videre kunne lægges til grund, at midlerne er kommet Aktionær nr. 41 fuldt ud til gode, jf. også redegørelsen ovenfor i afsnit 4.6, hvoraf fremgår, at banken foretog investeringen i Nycomed S.C.A., SICAR for egen regning (og altså ikke på vegne en kunde).

Skatteministeriet har under sagen hævdet, at det er en betingelse for nedsættelse, at den person, der anses som den »retmæssige ejer« af renterne, også i sit hjemland skal have indtægtsført de pågældende renter efter lokale regler - eller at renterne i hvert fald efter lokale regler skal anses for at skulle henføres til den pågældende person i skattemæssig henseende.

Takeda bestrider, at der kan stilles en sådan betingelse for nedsættelse af kildeskattekravet.

I den forbindelse erindres om, at de bagvedliggende investorer i nærværende sag rent faktisk ikke har modtaget de af sagen omhandlede renter - eller nogen andre renter - hvorfor disse renteindtægter i sagens natur ikke i skattemæssig henseende kan anses for at være henførbare til de pågældende personer efter de for disse personer gældende lokale regler.

Sagen er den, at den af ministeriet opstillede betingelse *aldrig* vil kunne opfyldes i situationer, hvor der ikke er sket faktisk gennemstrømning af de omhandlede renter til de personer, der - på trods heraf og - til syvende og sidst anses som de »retmæssige ejere« af renterne, og hvor Danmark som kildeland står alene med synspunktet om, at den umiddelbare rentemodtager (eller andre efterfølgende rente-modtagere, her Nycomed S.C.A., SICAR) ikke er den »retmæssige ejer«.

Takeda er således ikke enig i, at der med rette kan opstilles en betingelse om, at renterne skal være omfattet af beskatningskompetencen i det land, hvori den »retmæssige ejer« er skattemæssigt hjemmehørende.

Det gøres således for det første gældende, at der gælder et såkaldt *look-through* princip efter DBO'erne, således at den person, der er den »retmæssige ejer« af en indkomst, kan påberåbe sig en eventuel DBO mellem den pågældendes hjemland og kildelandet (Danmark).

Dette er der vist enighed om mellem parterne, ligesom dette nu også følger af Østre Landsrets dom af 3. maj 2021 i NetApp-sagen […].

**3312**

I de særlige tilfælde hvor det alene er kildelandet, her Danmark, der anser vedkommende for »retmæssig ejer« af den pågældende indkomst - f.eks. fordi der ikke har været nogen faktisk pengestrøm til vedkommende person som i nærværende sag - gøres det videre gældende, at kildelandet også er forpligtet til at føre *denne fiktion* helt igennem og lægge til grund, at vedkommende rent faktisk også har modtaget den pågældende indkomst og dermed kan påberåbe sig en eventuel DBO mellem pågældendes bopælsland og Danmark.

Danmark kan selvsagt ikke både *blæse og have mel i munden* ved at hæve, at den pågældende er »retmæssig ejer« af en indtægt, men at vedkommende ikke kan påberåbe sig en eventuel DBO, da dette efter ministeriets opfattelse kræver, at vedkommendes hjemland indtager samme standpunkt. I så tilfælde ville den pågældende skatteyder i »retmæssig ejer«-scenariet *de facto* blive stillet dårligere, end hvis vedkommende rent faktisk havde modtaget den pågældende indkomst, altså været formel långiver. Der erindres i denne forbindelse om, at der jo ikke foreligger - eller kan foreligge - noget misbrug af en DBO i forhold til en »retmæssig ejer« i et andet DBO-land, for så vidt angår renter (da der ikke er intern hjemmel til at beskatte, når der skal ske nedsættelse efter en DBO).

Et af problemerne i disse sager er, at Skatteministeriet foretager en kunstig adskillelse af »*rette indkomstmodtager*« (skattepligtssubjektet) og den »*retmæssige ejer*«. Skatteministeriet er således gældende, at den umiddelbare rentemodtager (i sagen Nycomed Sweden Holding 2 AB) er »rette indkomst-modtager« og dermed skattepligtssubjektet, da den »retmæssige ejer«, hvorfor denne rentemodtager ikke har krav på overenskomst- og direktivbeskyttelse.

Såvel DBO'erne som rente-/royaltydirektivet har imidlertid som forudsætning, at den »retmæssige ejer« er skattepligtssubjektet og dermed - efter dansk ret -også er »rette indkomstmodtager«.

Skatteministeriets *konstruktion* (om adskillelse af rette indkomstmodtager« og »retmæssig ejer«) bliver en *contradictio in adjecto*, når Skatteministeriet - som betingelse for, at de bagvedliggende ejere har krav på nedsættelse efter en DBO - stiller krav om, at renterne er omfattet af den pågældende stats beskatningskompetence.

Sagen er nemlig den, at Skatteministeriet gør gældende, at det er den umiddelbare rentemodtager (Nycomed Sweden Holding 2 AB), der er »rette indkomstmodtager« (og dermed skattepligtssubjektet) af renterne, samtidig med at Skatteministeriet (som betingelse for nedsættelse) stiller krav om, at de samme renter er skattepligtige i den bagvedliggende ejers hjemstat, hvilket er det samme som at sige, at den bagvedliggende ejer skal være »rette indkomstmodtager« af de samme renter, hvilket selvsagt er en umulighed.

Også dette viser, at der i denne situation ikke med rette kan opstilles en betingelse om, at renterne skal være omfattet af beskatningskompetencen i det land, hvori den »retmæssige ejer« er skattemæssigt hjemmehørende.

*12.3 Kildeskattekravet skal nedsættes i forhold til visse øvrige investorer ved hjemvisning af sagen til Skattestyrelsen*

I foregående afsnit, 12.2, har Takeda påvist, at der skal ske nedsættelse af kildeskattekravet i forhold til specifikke investorer, nemlig Aktionær nr. 41, Sverige, og Aktionær nr. 39, USA, eftersom disse personer må anses som de »retmæssige ejere« af renterne i dette subsidiære scenarie, blandt andet da der er tale om en fysisk person og et selskab, der ikke selv kan anses for at være »gennemstrømningsselskab« i relation til de omhandlede renter, og som i øvrigt nyder beskyttelse efter en DBO mellem selskabets

bopælsland og Danmark. Der foreligger således under alle omstændighederne ikke noget misbrug af den nordiske DBO (eller af rente-/royaltydirektivet) i forhold til disse to personer.

Aktionær nr. 41 og Aktionær nr. 39 er, som nævnt, direkte aktionær i Nycomed S.C.A., SICAR.

Som nævnt indledningsvis i dette afsnit 12, er de øvrige aktionærer i selskabet primært skattetransparente kommanditselskaber, hvorfor det i relation til disse aktionærer er nødvendigt at vurdere nedsættelsesspørgsmålet - misbruget - i forhold til kommanditisterne i disse selskaber, da de i skattemæssig henseende anses som de direkte aktionærer i Nycomed S.C.A., SICAR.

På tilsvarende vis som for Aktionær nr. 41 og Aktionær nr. 39 vil der således skulle ske nedsættelse i forhold til disse øvrige investorer, såfremt disse *enten* kan godtgøre, at de selv er de »retmæssige ejere« efter en DBO med Danmark, dvs. at de ikke selv er »gennemstrømningsselskaber« for de pågældende renter, og at de i øvrigt er hjemmehørende i et DBO-land (og omfattet af den pågældende DBO), *eller* at de er fysiske personer (da der, som nævnt, slet ikke er i dansk ret er hjemmel til at opkræve kildeskat af renter oppebåret af udenlandske fysiske personer).

Da investorerne i de skattetransparente kapitalfonde udgør flere hundrede selskaber m.v., har Takeda, som tidligere nævnt, valgt alene at lade landsretten bedømme spørgsmålet om nedsættelse af kildeskattekravet i forhold til den »retmæssige ejer« i forhold til to specifikke investorer og herudover - såfremt landsretten måtte finde det godtgjort, at de pågældende investorer (eller blot én af dem) berettiger til en nedsættelse af kildeskattekravet - lægger Takeda op til, at landsretten skal hjemvise sagen i forhold til øvrige investorer, der måtte opfylde tilsvarende betingelser (og altså lade skatteforvaltningen foretage den ligningsmæssig opgave, der består i at vurdere, om de af landsretten udstukne betingelser for nedsættelse af kildeskattekravet er opfyldt i

**3313**

forhold til de investorer, der måtte mene sig berettiget til nedsættelse).

For så vidt angår spørgsmålet om, at det i denne forbindelse ifølge Skatteministeriet skal godtgøres, »*at den hævdede retsmæssige ejer ikke blot har været endnu en gennemstrømningsenhed, men har haft reelle beføjelser til selv at råde over renterne*«, bemærker Takeda, at disse flere hundrede investorer i de skattetransparente kapitalfonde hver især alene ejer en meget lille andel af den samlede investering, og at de pågældende investorer derfor ingen reel indflydelse har haft på de beslutninger, der har ført til, at det er disse bagvedliggende investorer, der - i givet fald - anses som »retmæssige ejere« af renterne. Hertil kommer, at disse investorer bl.a. omfatter en lang række selvstændige skattesubjekter, der per definition ikke selv ville kunne anses som »gennemstrømningsselskaber«, så som pensionskasser, banker, visse investeringsforeninger, stats- og kommunale enheder, universiteter mv.

Da disse bagvedliggende investorer under alle omstændigheder slet ikke har ydet noget lån - og dermed ikke har modtaget nogen renter, jf. ovenfor - har det klart formodningen imod sig, at disse investorer selv skulle have etableret et »gennemstrømningsarrangement« desangående. Der er derfor intet grundlag for en antagelse om, at disse investorer ikke skulle være de »retmæssige ejere« af de omhandlede renter.

Af samme grund er der ikke behov for at stille krav om, at hver af disse investorer dokumenterer, at de ikke selv er gennemstrømningsselskaber.

Det gøres derfor gældende, at det er tilstrækkeligt - under hjemvisningen - at påvise, at den pågældende investor (et selskab), der er direkte aktionær i Nycomed S.C.A., SICAR i skattemæssig

Copyright © 2023 Karnov Group Denmark A/S

henseende, er hjemmehørende er hjemmehørende i et DBO-land og er en af overenskomsten omfattet person.

Ex tuto gøres det imidlertid gældende, at den påviste direkte aktionær subsidiært må påvise, at selskabet ikke i sig selv er en »gennemstrømningsenhed«. Det gøres i den forbindelse gældende, at dette, som nævnt, uden videre vil være tilfældet, for så vidt angår universiteter, stater og statsenheder, forsikringsselskaber og pensionsselskaber.

For så vidt angår de investorer i Nycomed S.C.A., SICAR, der i skattemæssig henseende er direkte aktionærer i selskabet, og som er fysiske personer, bemærkes, at Danmark slet ikke har indført begrænset skattepligt for renter for fysiske personer.

Såfremt Takeda i nærværende sag havde betalt de omhandlede renter direkte til kapitalfondene, dvs. direkte til investorerne/kommanditisterne heri, ja så havde det ubestridt ikke været grundlag for at opkræve dansk kildeskat, i det omfang kommanditisterne var fysiske personer. Danmark har således ikke intern hjemmel til at beskatte en udenlandsk fysisk person af renter.

Alene af den grund kan der ikke opstå noget misbrug af den nordiske DBO, når - og i det omfang - de pågældende renter anses for at være gennemstrømmet til en fysisk person i nærværende sag, jf. også ovenfor i foregående afsnit vedrørende Aktionær nr. 39.

Det er uklart, om Skatteministeriet gør gældende, at Takeda også i denne henseende må dokumentere, at den pågældende fysiske person er hjemmehørende i et DBO-land.

Takeda gør i givet fald heroverfor gældende, at dette krav ikke kan stilles i forhold til en fysisk person, da der jo netop aldrig vil være grundlag for at opkræve kildeskat over for en sådan person, uanset hvor den pågældende er hjemmehørende.

Til støtte for den nedlagte frifindelsespåstand over for *sagsøgtes afvisningspåstand* gøres det gældende, at Takeda har en åbenbar retlig interesse i at få prøvet sin subsidiære påstand (B).

Som nævnt i foregående afsnit, udgør antallet af potentielle investorer, der kunne komme i betragtning i forbindelse med en nedsættelse af kildeskattekravet i dette subsidiære scenarie, flere hundrede selskaber m.v. Takeda har derfor valgt ikke belaste retssagen - og landsretten - med en omfattende bevisførelse vedrørende hver enkelt af disse op imod 500 investorer.

I stedet har Takeda ladet det være op til landsretten at bedømme de retlige spørgsmål omkring kravene til nedsættelse af kildeskattekravet i forhold til to specifikke investor, og så i øvrigt at nedlægge en hjemvisningspåstand, for så vidt angår de øvrige investorer, der potentielt kunne berettige til en nedsættelse.

Det er således helt afgørende for Takeda at få rettens stillingtagen til de retlige spørgsmål omkring kravene til nedsættelse, som parterne måtte være uenige om, således at den opgave, der - i givet fald - hjemvises til Skattestyrelsen, alene er at forholde sig til den forelagte dokumentation.

Der er således under ingen omstændigheder tale om en hypotetisk situation, som hævdet af Skatteministeriet, men derimod et særdeles relevant - og beløbsmæssigt væsentligt - punkt i dette subsidiære scenarie.

Og dermed skal Takeda frifindes for Skatteministeriets afvisningspåstand.«

*Skatteministeriet* har i sit sammenfattende processkrift af 2. august 2021 anført bl.a.:

*»6. SKATTEMINISTERIETS ARGUMENTATION*
6.1 *Nycomed Sweden Holding 2 er skattepligtig af renterne*

Skattepligt i henhold til selskabsskatteloven påhviler selskaber og foreninger mv. som nævnt i lovens § 1, stk. 1, der har hjemsted i udlandet, for så vidt de oppebærer renter fra kilder her i landet vedrørende gæld,

som et selskab eller en forening m.v. omfattet af § 1 eller litra a) har til juridiske personer som nævnt i skattekontrollovens § 3 B (kontrolleret gæld), jf. lovens § 2, stk. 1, litra d), første punktum.

Formålet med skattepligten er ifølge bemærkningerne til lovforslagets enkelte bestemmelser (lovforslagets § 10, nr. 1), »at imødegå, at et dansk selskab m.v. nedsætter den danske beskatning ved at reducere den skattepligtige indkomst gennem rentebetalinger til visse finansielle selskaber i lav-skattelande, hvis det udenlandske selskab m.v. kontrollerer det danske selskab m.v.« […], hvilket skal ses i sammenhæng med, at formålet med lovforslaget ifølge de almindelige bemærkninger bl.a. er »at begrænse mulighederne for skatteplanlægning ved fradrag for koncerninterne renter, når det modtagende koncernselskab betaler ingen eller meget lidt i skat af de renter, der er fratrukket ved opgørelsen af dansk skattepligtig indkomst« […].

Der er mellem parterne enighed om, *at* Nycomed Sweden Holding 2 er et selskab som nævnt i selskabsskattelovens § 1, stk. 1, der har hjemsted i udlandet, *at* Nycomed er et selskab omfattet af lovens § 1, og *at* det omhandlede lån udgør »kontrolleret gæld«.

Udgangspunktet er derfor, at Nycomed Sweden Holding 2 er skattepligtig af de omhandlede renter, og dette udgangspunkt er der i det foreliggende tilfælde ikke grundlag for at fravige - hverken i medfør af undtagelsesreglen i selskabsskattelovens § 2, stk. 1, litra d), tredje punktum, eller undtagelsesreglen i bestemmelsens sidste punktum.

*6.1.1 Skattepligten er ikke bortfaldet i medfør af selskabsskattelovens § 2, stk. 1, litra d), tredje punktum*

Af selskabsskattelovens § 2, stk. 1, litra d), tredje punktum, følger som nævnt, at skattepligten efter første punktum ikke omfatter renter, hvis beskatningen af renterne »skal« frafaldes eller nedsættes efter rente-/royaltydirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende.

I overensstemmelse med bestemmelsens ordlyd er det i de førnævnte bemærkninger til lovforslagets enkelte bestemmelser […] anført, *dels* at den begrænsede skattepligt ikke omfatter et selskab, der er hjemmehørende i et andet EU-land, »hvis rente-/royaltydirektivets betingelser er opfyldt«, *dels* at den begrænsede skattepligt ikke omfatter rentebetalinger til et udenlandsk selskab, der er hjemmehørende i Færøerne, Grønland eller et andet land, som har en dobbeltbeskatningsoverenskomst, »hvis overenskomsten medfører, at Danmark skal frafalde eller nedsætte beskatningen af renterne.«

Det fremgår således af bestemmelsens ordlyd og forarbejder, at en undtagelse fra skattepligten alene kommer på tale, hvis der efter rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst består en ubetinget pligt til at frafalde eller nedsætte beskatningen. Følger en sådan pligt ikke af direktivet eller en dobbeltbeskatningsoverenskomst, er det modtagende selskab skattepligtig af renterne.

Af bestemmelsens forarbejder fremgår endvidere, at skattemyndighederne vil kunne skride ind over for tilfælde, hvor rente-/royaltydirektivet og/eller en dobbeltbeskatningsoverenskomst måtte blive misbrugt som led i en omgåelse af skattepligten.

I forbindelse med udvalgsbehandlingen af lovforslag nr. 119 af 17. december 2003, der ligger til grund for indførelsen af selskabsskattelovens § 2, stk. 1, litra d), anførte skatteministeren således i et svar på en henvendelse fra FSR […] bl.a.:

»Det åbner ganske vist risiko for, at f.eks. et dansk selskab kan søge at omgå kildeskatten på rentebetalinger til et finansielt selskab i et lavskatte-land ved at betale renterne til et selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller en dansk dobbeltbeskatningsoverenskomst, og som ikke har kildeskat på

**3314**

rentebetalinger til udenlandske rentemodtagere, hvorefter dette selskab betaler renterne videre til selskabet i lav-skatte-landet.

I sådanne tilfælde vil de danske skattemyndigheder imidlertid efter en konkret realitets-bedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskatte-landet, således at rentebetalingen hverken er omfattet af EU's rente-/royaltydirektiv eller dobbeltbeskatnings-overenskomsten.«

*6.1.1.1 Beskatningen skal ikke nedsættes eller frafaldes efter rente-/royaltydirektivet*

Betalinger af renter, der opstår i en medlemsstat, fritages for enhver form for skat i denne stat, hvad enten den opkræves ved indeholdelse ved kilden eller ved skatteansættelse, forudsat at den »retsmæssige ejer« af de pågældende renter er »et selskab i en anden medlemsstat«, jf. rente-/royaltydirektivets artikel 1, stk. 1 […].

Efter Domstolens besvarelse af landsrettens femte præjudicielle spørgsmål (litra a)-c)) i denne sag, er det *ubestridt*, at Nycomed S.C.A., SICAR ikke kan gøre den fordel, der følger af direktivets artikel 1, stk. 1, gældende, allerede fordi selskabet ikke er »et selskab i en anden medlemsstat« […]. Rente-/royaltydirektivet havde med andre ord ikke været til hinder for en kildebeskatning af renterne, hvis det omhandlede lån var blevet ydet (direkte) af Nycomed S.C.A., SICAR i stedet for af Nycomed Sweden Holding 2.

For såvel Nycomed Sweden Holding 2 som Nycomed Sweden Holding 1 gælder det ligeledes, at de ikke kan påberåbe sig direktivets fordel, *dels* fordi der foreligger retsmisbrug, *dels* fordi ingen af selskaberne kan anses for renternes retsmæssige ejer.

**3315**

*6.1.1.1.1 Der er hjemmel til at afslå direktivets fordele ved retsmisbrug*

Ifølge rente-/royaltydirektivets artikel 5, stk. 1, udelukker direktivet ikke anvendelsen af national eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af misbrug, og medlemsstaterne kan ifølge bestemmelsens stk. 2 tilbagekalde fordele i henhold til direktivet eller nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde […].

Det er Skatteministeriets standpunkt, at der i national ret er hjemmel til imødegåelse af misbrug af den art, der er tale om i den foreliggende sag […], men afgørelsen af sagen gør ikke en stillingtagen til dette stridspunkt påkrævet.

Der gælder nemlig et almindeligt og generelt EU-retligt princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser, herunder direktivbestemmelser, med henblik på at muliggøre rets-misbrug (præmisserne 96 og 101 i Domstolens dom i denne sag, […]). Princippet om forbud mod retsmisbrug finder således også anvendelse på skatteområdet, når opnåelse af en skattefordel er et *hovedformål* med den omhandlede transaktion (dommens præmis 107 in fine sammenholdt med præmis 127, […]). Som følge af *dels* det generelle EU-retlige princip om forbud mod retsmisbrug, *dels* nødvendigheden af at overholde dette princip inden for rammerne af gennemførelsen af EU-retten, er medlemsstaterne forpligtet til at afslå fordele, som søges opnået ved retsmisbrug, selv om der ikke findes nationale eller overenskomstmæssige regler til bekæmpelse af misbrug (dommens præmis 111, […]).

Der er ikke tale om, at Domstolen med dommen i den foreliggende sag har skabt en (ny) retsstilling, der ikke gjaldt forud for dommen, eller at Domstolen har ændret sin hidtidige praksis, således som den er kommet til udtryk i bl.a. sag C-321/05, Kofoed, jf. Domstolens dom, præmis 122 ff […]. Med dommen har Domstolen derimod - inden for rammerne af den kompetence, som tilkommer Domstolen i medfør af artikel 267 TEUF - *belyst og præciseret* betydningen

og rækkevidden af princippet om forbud mod retsmisbrug, således som dette princip skal anvendes på den foreliggende sag.

Af Domstolens dom følger således også, at det EU-retlige retssikkerhedsprincip heller ikke er til hinder for at nægte rente-/royaltydirektivets fordel i form af fritagelse for kildeskat, når der foreligger retsmisbrug, hvad der også fremgår udtrykkeligt af Domstolens dom i sag C-251/16, Cussens, præmis 43 […].

Der er heller ikke tale om, at Domstolen med sin dom i den foreliggende sag har fastslået en fortolkning af rente-/royaltydirektivet, som indebærer, at direktivet - i sig selv - skaber *forpligtelser* for borgerne. I tilfælde, hvor der foreligger retsmisbrug, og hvor borgeren af denne grund *nægtes en fordel* i henhold til EU-retten, er der således ikke tale om, at borgeren pålægges en forpligtelse efter EU-retten, men derimod at de objektive betingelser for at opnå en fordel i henhold til EU-retten ikke er opfyldt, fordi fordelen søges opnået ved retsmisbrug (dommens præmis 119, […]).

Endelig er det ikke i strid med loven om Danmarks tiltrædelse af den Europæiske Union at nægte rente-/royaltydirektivets fordele med henvisning til det generelle EU-retlige princip om forbud mod retsmisbrug. Den foreliggende situation er således *usammenlignelig* med situationen, der gav anledning til Højesterets dom gengivet i U.2017.824H, Ajos […], som Takeda påberåber sig.

Af præmisserne for Højesterets dom i Ajos-sagen fremgår, at det for sagens udfald var udslagsgivende, at der med Højesterets ord forelå en såkaldt »contra legem-situation«, dvs. en situation, hvor det ikke inden for rammerne af de for-tolkningsmetoder, der er anerkendt i national ret, er muligt at fortolke en national regel direktivkonformt.

En sådan situation foreligger ikke i denne sag, hvor rente-/royaltydirektivet er blevet gennemført ved en simpel henvisning til direktivet. Af selskabsskattelovens § 2, stk. 1, litra d)'s *ordlyd* følger således, at renter er omfattet af skattepligten, medmindre »beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF on en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater«. Det er derfor en smal sag at anlægge en fortolkning af selskabsskattelovens § 2, stk. 1, litra d), der er i overensstemmelse med rente-/royaltydirektivet og det almindelige princip om forbud mod retsmisbrug, således som direktivet og princippet skal fortolkes ifølge Domstolens dom.

På den anførte baggrund må selskabsskattelovens § 2, stk. 1, litra d) - i overensstemmelse med hvad Østre Landsret også er kommet frem til i SKM2021.304.ØLR om bestemmelsens litra c) om udbytteskat - fortolkes således, at en fritagelse for beskatning af renter skal nægtes, hvis fritagelsen søges opnået ved retsmisbrug, hvad der kommer an på en konkret vurdering af de givne omstændigheder.

*6.1.1.1.2 Domstolens bemærkninger om bedømmelsen af, om der foreligger retsmisbrug*

Ifølge Domstolens dom kræves der med henblik på at bevise, at der foreligger misbrug *for det første* et sammenfald af objektive omstændigheder, hvoraf fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, og *for det andet* et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves

**3316**

for at opnå denne fordel (præmis 124 i Domstolens dom i denne sag […].

Det er undersøgelsen af de sammenfaldende omstændigheder, som gør det muligt at efterprøve, om de elementer, der udgør misbrug, foreligger, og navnlig om de pågældende erhvervsdrivende har foretaget rent formelle eller kunstige transaktioner, der savner

Copyright © 2023 Karnov Group Denmark A/S

enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål at opnå en uretmæssig fordel (dommens præmis 125 […]).

Domstolen har i dommen anvist de nærmere principper for en sådan undersøgelse og foretaget en ikke-udtømmende opregning og beskrivelse af holdepunkter for, at rente-/royaltydirektivets fordel i form af fritagelse for beskatning af renter i et givent tilfælde søges opnået ved misbrug.

Ifølge Domstolen må en koncern - i sager som den foreliggende - anses for et kunstigt arrangement, *når* den ikke er etableret af grunde, der afspejler den økonomiske realitet, *når* den har en struktur, der er rent formel, og *når* den har til hovedformål eller som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse. Det gælder navnlig, når betalingen af renteskat undgås ved i koncernstrukturen at indskyde en »gennemstrømningsenhed« mellem det selskab, som overfører renterne, og det selskab, som er »renternes retmæssige ejer« (dommens præmis 127).

Den omstændighed, at renter i deres helhed eller stort set i deres helhed ganske kort tid efter modtagelsen videreformidles af det selskab, som har modtaget dem, til enheder, som ikke opfylder betingelserne for anvendelse af rente-/royaltydirektivet, er et holdepunkt for, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse for beskatning, der følger af direktivet (dommens præmis 128).

Ifølge Domstolen kan den kunstige karakter af et arrangement *ligeledes* underbygges ved, at den pågældende koncern er struktureret på en sådan måde, at det selskab, der modtager de renter, der betales af debitorselskabet, selv skal betale disse renter til et tredje selskab, som ikke opfylder betingelserne for anvendelse af rente-/royaltydirektivet, med den følge at selskabet alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som »gennemstrømningsselskab« (dommens præmis 130). Et selskab kan anses for et gennem-strømningsselskab, hvis selskabets eneste aktivitet er at modtage renterne og videreoverføre dem til den »retmæssige ejer« eller til øvrige »gennemstrømningsselskaber«, jf. nærmere dommens præmis 131.

Holdepunkter for, at der er i et givent tilfælde er tale om et kunstigt arrangement, kan *endvidere* findes 1) i den omstændighed at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, der - således som det er anført i rente-/royaltydirektivets artikel 4 - kan have til formål, at der fra et modtagende erhvervsdrivende selskab overføres udbytte til aktionærenheder med henblik på at undgå at betale skat eller at nedsætte skattebyrden mest muligt, 2) fremgangsmåden for transaktionernes finansiering, 3) i vurderingen af de mellemliggende selskabers egenkapital og 4) i »gennemstrømnings-selskabernes« manglende beføjelser til at råde økonomisk over de modtagne renter. Det er i den forbindelse ikke kun en kontraktuel eller juridisk forpligtelse for det selskab, der modtager renterne, til at videreformidle dem til tredjemand, der kan udgøre sådant et holdepunkt. Der foreligger også et holdepunkt for misbrug, hvis selskabet efter en bedømmelse af sagens faktiske omstændigheder »substantielt« ikke har haft rettighederne til at bruge og nyde renterne (dommens præmis 132, […]).

Holdepunkter som de ovenfor nævnte kan anses for *bestyrkede*, hvis der er et sammenfald eller en nær tidsmæssig sammenhæng mellem på den ene side ikrafttrædelsen af ny skattelovgivning som for eksempel skattesatskattelovens § 2, stk. 1, litra d), og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern, som kan føre til en omgåelse af den indførte beskatning (præmis 133). Et sådant sam-

menfald eller en sådan nær tidsmæssig sammenhæng er omvendt ikke en nødvendig betingelse for at godtgøre et misbrug, men kan altså bestyrke andre holdepunkter for, at der foreligger et retsmisbrug.

Endelig er det for konstateringen af, om der foreligger et retsmisbrug, uden betydning, om Danmark med den stat, hvor renternes retmæssige ejer er hjemmehørende, har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af renterne, *hvis* de var blevet betalt direkte til den retmæssige ejer, jf. hertil præmisserne 134 ff.

6.1.1.1.3 Der foreligger retsmisbrug i den foreliggende sag

Når Domstolens anvisninger kobles med den foreliggende sags omstændigheder, kan det konstateres, at der foreligger et tilfælde af retsmisbrug.

For sagens afgørelse må A) lånet mellem Nycomed og Nycomed Sweden Holding 2, B) det samtidige lån mellem Nycomed Sweden Holding 1 og Nycomed S.C.A., SICAR, C) Nycomed Sweden Holding 1's samtidige kapitalindskud i Nycomed Sweden Holding 2 samt D) den årlige vedtagelse af koncernbidrag fra Nycomed Sweden Holding 2 til Nycomed Sweden Holding 1 betragtes som ét samlet og på forhånd tilrettelagt arrangement.

Det beror ikke på nogen tilfældighed, at de 2 lån blev indgået samme dag og bortset fra, hvad der samlet set må betegnes som betydningsløse marginaler, havde

**3317**

samme hovedstol og vilkår. Det er endvidere *usandsynligt*, at Nycomed Sweden Holding 2 - ved et rent tilfælde og endda i tre på hinanden følgende år - årligt ydede et koncernbidrag til Nycomed Sweden Holding 1 af en størrelsesorden, som stort set svarede til årets rentetilskrivning på Nycomed S.C.A., SICARs lån til samme selskab. Landsretten kan derfor uden betænkeligheder lægge til grund, at der er tale om et på forhånd tilrettelagt arrangement.

Det bemærkes i øvrigt, at koncernbidragene fra Nycomed Sweden Holding 2 var nødvendige for, at Nycomed Sweden Holding 1 kunne opfylde sine renteforpligtelser over for Nycomed S.C.A., SICAR, da Nycomed Sweden Holding 1 Holding ikke havde andre indtægtskilder, hvormed selskabets renteforpligtelser kunne honoreres, således at der fortsat var balance i selskabets regnskaber.

Skatteministeriet gør ikke gældende, at der for Nycomed Sweden Holding 2 bestod en *kontraktuel* forpligtelse til at betale koncernbidragene til Nycomed Sweden Holding 1. I koncernforhold som det i denne sag foreliggende er en sådan retlig forpligtelse upåkrævet og derfor overflødig. Det gælder ikke kun, men dog navnlig i en situation som den foreliggende, hvor de to selskaber havde identiske bestyrelser. Det er da også en kendsgerning, at bidragene faktisk blev ydet gang på gang på gang, og at de faktisk - gang på gang på gang - kunne dække Nycomed Sweden Holding 1's renteforpligtelser.

Arrangementet bevirkede rent faktisk, at hverken Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 var overladt noget råderum til at disponere over deres indtægter i form af renter henholdsvis koncernbidrag. Begge selskaber var gennemstrømningsenheder.

Arrangementet var uden forretningsmæssig begrundelse. Forretningsmæssigt havde det været mest enkelt, hvis der var blevet etableret et direkte låneforhold mellem Nycomed og Nycomed S.C.A., SI-CAR. Koncernen var i givet fald sluppet for de øgede papirbyrder og i det hele taget det administrative bøvl, der var forbundet med det yderligere koncerninterne låneforhold, gennemførelsen af en kapital-forhøjelse og vedtagelsen af de årlige koncernbidrag. De tilsyneladende selvskabte plager havde imidlertid en skattemæssig fordel, eftersom beskatningen af renterne fra Nycomed til Nycomed Sweden Holding 2 - bortset fra spørgsmålet om rets-

misbrug og renters »retmæssige ejer« - skulle frafaldes efter rente-/royaltydirektivet.

Omstændighederne efterlader ingen tvivl om, arrangementet havde som formål at skaffe Nycomed S.C.A, SICAR (eller kapitalfondene) en fordel af rente-/royaltydirektivet, som selskabet (eller kapital-fondene) ikke selv kunne have gjort gældende, nemlig fritagelse for beskatning i kildestaten. Renterne var ganske vist skattepligtige for Nycomed Sweden Holding 2, men indtægterne blev skattemæssigt neutraliseret af de fradragsberettigede koncernbidrag til Nycomed Sweden Holding 1. På samme måde blev renteindragene, der var skattepligtige for Nycomed Sweden Holding 1, skattemæssigt neutraliseret af de fradragsberettigede renteudgifter knyttet til lånet fra Nycomed S.C.A., SICAR, der efter luxembourgsk ret var fritaget for at betale skat af renterne, og hvis investorer ikke blev kildebeskattet af afkast fra selskabet. Arrangementet medførte altså, at skattepligtige renter blev gjort skattefrie, hvilket i overmål opvejede ulemperne af, hvad der altså umiddelbart kunne fremstå som unødige og ubelejlige plager.

Når de anførte omstændigheder sammenholdes med Domstolens anvisninger for misbrugsvurderingen, ligger det lige for at fastslå, at arrangementet havde som et hovedformål uretmæssigt at drage fordel af den fritagelse, der er fastsat i rente-/royaltydirektivets artikel 1, stk. 1.

Domstolen har da også fastslået (dommens præmis 126, […]), at der i denne sag er en række holdepunkter for, at der foreligger retsmisbrug, men i overensstemmelse med kompetencefordelingen mellem Domstolen og de forelæggende retter, har Domstolen overladt det til landsretten at *efterprøve*, dels om disse holdepunkter er objektive og sammenstemmende, dels om Takeda har haft mulighed for at føre modbevis.

En sådan efterprøvelse bør munde ud i den konklusion, at der foreligger et tilfælde af retsmisbrug. Alle omstændigheder af relevans for misbrugsvurderingen var oplyst over for Domstolen, og der er ikke (efterfølgende) godtgjort andre omstændigheder, som giver belæg for, at Domstolens (foreløbige) vurdering ikke kan holde for en efterprøvelse.

Takeda har ikke engang gjort et forsøg på at forklare, hvad der - fremfor den nemmeste løsning med et direkte lån fra Nycomed S.C.A., SICAR til Nycomed - var den forretningsmæssige begrundelse for arrangementet med A) lånet mellem Nycomed og Nycomed Sweden Holding 2, B) det samtidige lån mellem Nycomed Sweden Holding 1 og Nycomed S.C.A., SICAR, C) Nycomed Sweden Holding 1's samtidige kapitalindskud i Nycomed Sweden Holding 2 samt D) den årlige vedtagelse af koncernbidrag fra Nycomed Sweden Holding 2 til Nycomed Sweden Holding 1.

Da der altså foreligger retsmisbrug, er både Nycomed Sweden Holding 2 og Nycomed Sweden Holding 1 afskåret fra at drage fordel af den fritagelse for kildeskat, der er fastsat i rente-/royaltydirektivets artikel 1, stk. 1.

6.1.1.1.4 Direktivets fordele skal også afslås, fordi hverken Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 er renternes retsmæssige ejer

Det fremgår af ordlyden af rente-/royaltydirektivets artikel 1, stk. 1, at fritagelse for kildebeskatning er

**3318**

betinget af, at modtageren af renterne er renternes »retmæssige ejer«.

Begrebet »retmæssig ejer« skal ifølge Domstolen dom i den foreliggende sag fortolkes således, at »det betegner en enhed, som reelt modtager de renter, som betales til den« (dommens præmis 88, ES3 s. 1395). Udtrykket »retmæssig ejer« tager ifølge Domstolen ikke sigte på en modtager, der identificeres formelt, men derimod på »den enhed, som økonomisk set modtager de oppebårne renter

og derfor har mulighed for frit at råde over anvendelsen heraf« (dommens præmis 89).

Endelig har Domstolen fastslået, at begrebet »retsmæssig ejer«, som er indeholdt i dobbeltbeskatningsoverenskomster, der er baseret på OECD's modelbeskatningsoverenskomst, samt kommentarerne hertil, er relevante for fortolkningen af rente-/royaltydirektivet (dommens præmis 90).

Vurderingen af, om et givent selskab kan anses for renternes »retsmæssige ejer«, og vurderingen af, om der i det givne tilfælde foreligger et retsmisbrug, går i realiteten ud på det, som Domstolens udlægning af bl.a. det første præjudicielle spørgsmål, litra d)-f) om begrebet »retmæssig ejer« er et vidnesbyrd om (dommens præmis 123, […]). Det er også kommet ganske klart til udtryk i f.eks. dommens præmis 127 […].

Af de grunde, der er redegjort for i det foregående afsnit og det følgende afsnit, kan hverken Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 anses for renternes retsmæssige ejer. Også af den grund er selskaberne afskåret fra at gøre den fordel, der følger af rente-/royaltydirektivets artikel 1, stk. 1, gældende.

*6.1.1.2 Beskatningen skal ikke frafaldes eller nedsættes efter den nordiske dobbeltbeskatningsoverenskomst*

Ifølge den nordiske dobbeltbeskatningsoverenskomsts artikel 11, stk. 1 […], kan renter, der hidrører fra en kontraherende stat (Danmark), og som betales til en i en anden kontraherende stat (Sverige) hjemmehørende person, kun beskattes i denne anden stat (Sverige), hvis denne person er den »retmæssige ejer« af renterne. Efter ordlyden af denne bestemmelse er Danmark altså kun forpligtet til at frafalde beskatningen af renter, der hidrører fra Danmark, hvis modtageren er renternes »retsmæssige ejer«.

Begrebet »renternes retmæssige ejer« må fortolkes i overensstemmelse med det tilsvarende begreb i OECD's modeloverenskomsts artikel 11, stk. 1 […], idet den nordiske dobbeltbeskatningsoverenskomst er indgået på grundlag af modeloverenskomsten.

Østre Landsret har allerede fastslået, at begrebet »retmæssig ejer« er et autonomt begreb, dvs. at det har et selvstændigt indhold uafhængigt af de kontraherende staters interne lovgivning, jf. både SKM2021.304.ØLR og SKM2012.121.ØLR […]. Begrebet »retmæssig ejer« skal derfor *ikke* fortolkes i overensstemmelse med begrebet »rette indkomstmodtager«, der i dansk skatteret bruges som betegnelse for den, der må anses for at være skattepligtig af en given indtægt.

Med de to domme har Østre Landsret også allerede fastslået, at skattemyndighederne i sager som den foreliggende har været berettiget til - som sket - at inddrage kommentarerne til OECD's modeloverenskomst fra 2003 ved fastlæggelsen af, hvad der nærmere skal forstås ved begrebet »retmæssig ejer«. De senere kommentarer fra 2014 og 2017 udgør på tilsvarende vis relevante fortolkningsbidrag, eftersom disse kommentarer - ligesom 2003-kommentarerne - ikke indebærer en ændret forståelse af modeloverenskomstens artikel 11, stk. 1, men alene har karakter af præciseringer.

Af 2003-kommentarerne, pkt. 8.1 til modeloverenskomstens artikel 11, stk. 1 […], følger, at det ikke vil være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skal indrømme lempelse eller fritagelse for skat »i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden vis end som agent eller mellemmand, blot fungerer som 'gennemstrømningsenhed' (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.« Et »gennemstrømningsselskab« vil således ikke kunne anses for den retmæssige ejer, »hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en 'nullitet' eller administrator, der handler på vegne af andre parter«.

U.2023.3198H

I 2014-kommentaren, pkt. 10.2, som på dette punkt er blevet videreført uden ændringer i 2017-kommentaren, er det præciseret, at den umiddelbare modtager af renterne vil kunne nægtes den overenskomstmæssige fordel, der følger af modeloverenskomstens artikel 11, stk. 1, hvis de faktiske omstændigheder klart viser, at modtageren - uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person - »substantielt« ikke har rettighederne til at bruge og nyde renterne […].

I den foreliggende sag viser de faktiske omstændigheder, at Nycomed Sweden Holding 2 og Nycomed Sweden Holding 1 ikke havde eller kun havde meget snævre beføjelser til at disponere over de renter, som første nævnte selskab modtog i kraft af lånet til Nycomed.

Som anført under punkt 6.1.1.1.3 må A) lånet mellem Nycomed og Nycomed Sweden Holding 2, B) det samtidige lån mellem Nycomed Sweden Holding 1 og Nycomed S.C.A., SICAR, C) Nycomed Sweden Holding 1's samtidige kapitalindskud i Nycomed Sweden Holding 2 samt D) den årlige vedtagelse af koncernbidrag fra Nycomed Sweden Holding 2 til Nycomed Sweden Holding 1 betragtes som ét samlet og på forhånd tilrettelagt arrangement.

**3319**

Som det også er anført under det nævnte punkt, beror det ikke på nogen tilfældighed, *at* de 2 lån blev indgået samme dag og bortset fra, hvad der samlet set må betegnes som betydningsløse marginaler, havde samme hovedstol og vilkår, eller at Nycomed Sweden Holding 2 - gang på gang på gang - ydede et koncernbidrag til Nycomed Sweden Holding 1 af en størrelsesorden, som stort set svarede til årets rentetilskrivning på Nycomed S.C.A., SICARs lån til samme selskab.

Hertil kommer i øvrigt, at Nycomed Sweden Holding 2 uden renterne fra Nycomed ville have været ude af stand til at yde de omhandlede koncernbidrag til Nycomed Sweden Holding 1, som uden koncernbidragene ville have været ude af stand til at afholde renteudgifterne, som lånet fra Nycomed S.C.A., SICAR gav anledning til. Og endelig var arrangementet uden nogen forretningsmæssig begrundelse.

De anførte omstændigheder godtgør, *at* arrangementet blev etableret med det (hoved-)formål, at såvel Nycomed Sweden Holding 1 som Nycomed Sweden Holding 2 skulle virke som gennemstrømningsenheder for de omhandlede renter, der uden arrangementet ville have været skattepligtige i medfør af selskabsskattelovens § 2, stk. 1, litra d), og *at* ingen af selskaberne substantielt kunne disponere over renterne, der på forhånd var bestemt til at blive videreført til Nycomed S.C.A., SICAR (eller kapitalfondene), hvilket faktisk også skete. I tilknytning hertil bemærkes, at renterne, hvis Nycomed S.C.A., SI-CAR havde været den direkte långiver, ville have været skattepligtige, idet selskabet hverken ville kunne have påberåbt sig rente-/royaltydirektivet, jf. ovenfor, eller den dansk-luxembourgske dobbeltbeskatningsoverenskomst, jf. nærmere herom nedenfor.

Når der er tale om et sådant på forhånd tilrettelagt arrangement, spiller det ingen rolle, at Nycomed Sweden Holding 2 kanaliserede beløbet videre som koncernbidrag, eftersom substansen i arrangementet uden alle omstændigheder var, at selskabet ikke havde reelle beføjelser til at råde over renterne, eftersom det utvivlsomt på forhånd var besluttet, at selskabet til Nycomed Holding Sweden 1 skulle yde koncernbidrag (stort set) svarende til renter, der blev tilskrevet lånet til Nycomed.

For bedømmelsen af, om Nycomed Sweden Holding 2 i skatteretlig henseende må anses for renternes retmæssige ejer, er det ligeledes uden betydning, at renterne blev tilskrevet hovedstolen (god-

skrevet) og (først) senere blev konverteret til kapitalandele i selskabet.

De skatteretlige virkninger indtrådte nemlig (allerede) ved rentetilskrivningen. For arrangementet var det et bærende element, at der i ingen af transaktionskædens led skete effektiv betaling af renter eller koncernbidrag, idet renter blev tilskrevet hovedstolen, og koncernbidragene blev posteret på en mellemregningskonto. Arrangementet indebar, at de skattemæssige fordele i form af fradrag og fritagelse for kildebeskatning kunne høstes straks uden nogen form for likviditetsmæssige belastninger for de deltagende selskaber, og således de i betalingsoverførsler, modregninger eller konverteringer til kapital-andele uden yderligere skattemæssige konsekvenser kunne gennemføres efterfølgende, hvad der i øvrigt faktisk også skete, jf. forelæggelseskendelsens pkt. 40-44 […]. For den skatteretlige bedømmelse af, om Nycomed Sweden Holding 2 må anses for renternes retmæssige ejer, er det derfor uden betydning, at renterne ikke hvert år den 27. december blev betalt effektivt ved f.eks. en bankoverførelse, men blev tilskrevet lånets hovedstol.

På den anførte baggrund må det fastslås, at hverken Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 i den nordiske dobbeltbeskatningsoverenskomst artikel 11, stk. 1's forstand kan anses for de omhandlede renters restmæssige ejer. Dobbeltbeskatningsoverenskomsten fører dermed ikke til, at renterne bliver fritaget for en skattepligt efter selskabsskattelovens § 2, stk. 1, litra d).

*6.1.1.3 Beskatningen skal ikke frafaldes i medfør af den dansk-luxembourgske dobbeltbeskatningsoverenskomst*

6.1.1.3.1 Nycomed S.C.A., SICAR er ikke omfattet af den dansk -luxembourgske dobbeltbeskatningsoverenskomst

Overenskomsten af 17. november 1980 mellem Danmark og Luxembourg til undgåelse af dobbeltbeskatning for så vidt angår indkomst- og formueskatter (den dansk-luxembourgske dobbeltbeskatningsoverenskomst) giver intet grundlag for, at Danmark skal frafalde beskatningen af de omhandlede renter, allerede fordi Nycomed S.C.A., SICAR ikke er omfattet af dobbeltbeskatningsoverenskomsten.

Af § 1 i slutprotokollen, som blev indgået mellem Danmark og Luxembourg samtidig med overenskomsten i 1980, og som efter sin ordlyd udgør en integreret del af overenskomsten, fremgår […]:
…

1929-loven, der blev ophævet i 2006, er beskrevet i Kommissionens beslutning af 19. juli 2006 offentliggjort i EU-tidende L 366/47 den 21. december 2006 […]. Et selskab omfattet af 1929-loven (herefter benævnt »1929-holdingselskab«) var ikke i sig selv en særlig juridisk selskabsform, men en særlig skattemæssig kvalifikation, som et luxembourgsk selskab, såsom et S.A. eller et S.A.R.L., kunne vælge. 1929-holdingselskaber var fritaget for direkte beskatning i Luxembourg, såsom selskabsskat og kommunal erhvervsskat, og var derfor ikke skattepligtige i Luxembourg af dividender, renter, royalties og kapitalgevinster, som sådanne selskaber modtog, ligesom selskabernes udbetaling af dividende, royalties og renter var fritaget for kildeskat, jf. beslutningens pkt. 21 […].

**3320**

Til gengæld skulle et 1929-holdingselskab betale dels en kapitaltilførselsafgift på 1 pct. ved kapitalindskud eller tilførsel af aktiver, dels en årlig tegningsafgift (abonnementsafgift) på 0,2 pct. af den indbetalte selskabskapital og af emissionspræmiernes værdi, jf. beslutningens pkt. 24. For at et selskab kunne være omfattet af 1929-loven, var det en betingelse, at selskabet kun beskæftigede sig med køb, besiddelse og udnyttelse af enhver form for kapitalinteresserer i andre luxembourgske eller udenlandske selskaber, herunder i form af køb, besiddelse, forvaltning og salg af kapitalandele i selskaber samt udstedelse af lån til selskaber, hvori det

Copyright © 2023 Karnov Group Denmark A/S

havde en direkte kapitalandel, og et af loven omfattet selskab kunne ikke udøve erhvervsvirksomhed for egen regning, jf. beslutningens pkt. 26-28 […]. 1929-loven blev ophævet i 2006, som følge af at det var EU-Kommissions opfattelse, at lovens særlige skattefordele for de af loven omfattede selskaber indebar ulovlig statsstøtte.

En ordlydsfortolkning af slutprotokollens artikel 1 efterlader ingen tvivl om, at det *ikke* kun er selskaber omfattet af 1929-loven og 1938-forordningen, der falder uden for anvendelsesområdet for den dansk-luxembourgske dobbeltbeskatningsoverenskomst, jf. ordene »den særlige luxembourgske lovgivning, for tiden« og »selskaber af denne art«, men at bestemmelsen *også* gælder for selskaber af tilsvarende art, der er blevet oprettet i henhold til lovgivning, som Luxembourg har gennemført *efter* indgåelsen af den dansk-luxembourgske dobbeltbeskatningsoverenskomst, jf. navnlig ordene »for tiden«.

Det siger endvidere sig selv, at formålet med slutprotokollens artikel 1 er at modvirke, at luxembourgske selskaber, som i Luxembourg er fritaget for beskatning af indtægtsarter, der er omfattet af den dansk-luxembourgske dobbeltbeskatningsoverenskomst, benyttes som instrumenter til, at indtægter kan oppebæres, uden at der betales nogen skat i hverken Danmark eller Luxembourg (dobbelt ikke-beskatning). Det bemærkes i tilknytning hertil, at dobbeltbeskatningsoverenskomster, der er indgået på grundlag af OECD's modeloverenskomst, har til formål dels at undgå dobbeltbeskatning dels at forhindre skatteunddragelse og skatteundgåelse.

En ordlyds- og formålsfortolkning af slutprotokollens artikel 1 fører til, at den dansk-luxembourgske dobbeltbeskatningsoverenskomst *ikke* finder anvendelse på Nycomed S.C.A., SICAR.

Ordningen med SICAR-selskaber blev indført i Luxembourg ved lov af 15. juni 2004. SICAR-selskabet er - ligesom 1929-holdingselskabet - ikke i sig selv en særlig juridisk selskabsform, men en særlig skattemæssig kvalifikation, som et luxembourgsk selskab kan vælge. Et SICAR er defineret som et sådan risikovilligt investeringsselskab, for hvilket der gælder en betingelse om, at selskabets kapital er investeret i aktiver (såsom aktier, obligationer og fordringer mv.), der er behæftet med en vis risiko.

Et SICAR er i principet indkomstskattepligtigt i Luxembourg og skal betale selskabsskat og lokal erhvervsskat i Luxembourg af selskabets indkomst, men et SICAR er imidlertid *fritaget* for indkomstskat af indtjening, der hidrører fra selskabets investeringer, herunder renter, udbytter og avancer, ligesom det ikke skal indeholde skat ved udlodning af udbytte eller udbetaling af renter eller ved udbetaling af midler ved likvidation af selskabet. Da et SICAR netop er et investeringsselskab, er der altså i praksis fritaget for beskatning, hvilket også stemmer med, at Nycomed S.C.A., SICAR ingen skat har betalt i Luxembourg, fordi selskabets indtægter har været skattefrie efter luxembourgsk skattelovgivning […].

På den anførte baggrund må SICAR-selskaber - henset til det formål, som slutprotokollens § 1 tager sigte på, og til bestemmelsens ordlyd - sidestilles med 1929-holdingsselskaber som værende et selskab af tilsvarende art, med den følge at den dansk-luxembourgske dobbeltbeskatningsoverenskomst ikke finder anvendelse på SICAR-selskaber. Det må herved tages i betragtning, navnlig at det særlige skatte-regime, der gælder for SICAR-selskaber, reelt er lige så fordelagtigt som det, der gjaldt for 1929-holdingsselskaber, og i øvrigt at et SICAR-selskab efter sin karakter i bund og grund er et holdingselskab.

Da Nycomed S.C.A. slet ikke er omfattet af den dansk-luxembourgske dobbeltbeskatningsoverenskomst må det altså - allerede af den grund - fastslås, at dobbeltbeskatningsoverenskomsten ikke kan give grundlag for, at Danmark skal frafalde beskatningen af de omhandlede renter.

### 6.1.1.3.2 Takeda har ikke godtgjort, at Nycomed S.C.A., SICAR må anses for renternes retsmæssige ejer

Selv om Nycomed S.C.A., SICAR måtte være omfattet af den dansk-luxembourgske dobbeltbeskatningsoverenskomst, giver dobbeltbeskatningsoverenskomsten ikke grundlag for, at Danmark skal frafalde beskatningen af renterne.

Dobbeltbeskatningsoverenskomster angår behandlingen af indtægter, der i skattemæssig henseende må betragtes som hidrørende fra én kontraherende stat, kildestaten (i dette tilfælde Danmark), og som skattemæssigt må anses for at blive oppebåret af en fysisk eller juridisk person i den anden kontraherende stat. I overensstemmelse hermed følger det af ordlyden af selskabsskattelovens § 2, stk. 1, litra d), at det kun er dobbeltbeskatningsoverenskomsten med den stat, hvori det modtagende selskab er hjemmehørende, som kan føre til en fritagelse for skattepligt. Da Nycomed Sweden Holding 2 er rette indkomstmodtager af de omhandlede renter fra Nycomed, er det (kun) den nordiske

**3321**

dobbeltbeskatningsoverenskomst, der kan afskære Danmark fra at beskatte renterne, forudsat at overenskomstens betingelser herfor ellers er opfyldt, hvad der imidlertid - som beskrevet ovenfor - ikke er tilfældet i denne sag.

Ved vurderingen af, om en beskatning er afskåret efter rente-/royaltydirektivet eller den nordiske dobbeltbeskatningsoverenskomst, vil det dog - efter omstændighederne - kunne tillægges betydning, om det pågældende beløb viderekanaliseres til en stat, hvormed der er indgået en dobbeltbeskatningsoverenskomst. Det skyldes, at begrebet »retmæssig ejer« er et begreb, der tager sigte på at hindre misbrug, der består i, at en person disponerer via en juridisk person, der kan påberåbe sig en direktivbestemt eller overenskomstmæssig fordel, med det hovedformål at opnå en sådan fordel, som ikke ville kunne opnås af personen direkte. I situationer, hvor der ikke er indikationer på et sådant misbrug, fordi der ikke i relation til beskatning er nogen fordel forbundet med det mellemliggende selskab, bør en overenskomstmæssig fordel i form af fritagelse for en beskatning i kildestaten ikke nægtes.

Hvad angår rente-/royaltydirektivet, fremgår det af Domstolens dom i den foreliggende sag, at det med hensyn til misbrugsvurderingen er uden betydning, at visse af de retmæssige ejere af de renter, som er blevet overført at gennem-strømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst (dommens præmis 135, […]), men ifølge Domstolen det kan dog - hvis der foreligger en situation, hvor renterne ville have været fritaget, hvis de var blevet overført direkte til det selskab, som har sit hjemsted i en tredjestat - ikke »udelukkes«, at målet med en given koncernstruktur ikke er udtryk for retsmisbrug (dommens præmis 137).

Domstolen har ikke givet anvisninger for, hvad der nærmere skal til, for at en formodning for misbrug kan anses for afkræftet, men sammenhængen mellem dommens præmis 135 og 137 efterlader ingen tvivl om, at den omstændighed, at renternes retsmæssige ejer er skattemæssigt hjemmehørende i en stat, hvormed Danmark har indgået en dobbeltbeskatningsoverenskomst, som kunne have været påberåbt, hvis den retsmæssige ejer havde været den direkte långiver, ikke - per se - er tilstrækkeligt til at afkræfte en etableret formodning for et misbrug af rente-/royaltydirektivet. Der er ikke retskildemæssige holdepunkter for, at der skulle gælde noget andet, hvad angår vurderingen af, om der foreligger et misbrug af den nordiske dobbeltbeskatningsoverenskomst.

Bortset fra, at Nycomed S.C.A., SICAR som beskrevet ovenfor ikke er omfattet af den dansk-luxembourgske dobbeltbeskatningsoverenskomst, kan den etablerede formodning for, at der foreligger et misbrug af rente-/royaltydirektivet og den nordiske dobbelt-

skatningsoverenskomst ikke afkræftes med henvisning til, at Nycomed S.C.A., SICAR - hvis det havde været længere i stedet for Nycomed Sweden Holding 2 - kunne have påberåbt sig den dansk-luxembourgske dobbeltbeskatningsoverenskomst artikel 11, stk. 1, alene fordi Takeda ikke har godtgjort, at Nycomed S.C.A., SICAR i den faktisk foreliggende situation var renternes retmæssige ejer.

Når den, der fremtræder som fordringshaver (i dette tilfælde Nycomed Sweden Holding 2), ikke kan anses for renternes retsmæssige ejer, påhviler det således ikke skattemyndighederne at fastslå, hvem der så er renternes retmæssige ejer. En sådan pligt, der ikke kan udledes af rente-/royaltydirektivet, jf. hertil Domstolens dom i den foreliggende sag, præmis 143-145 […], kan således heller ikke udledes af den nordiske dobbeltbeskatningsoverenskomst eller af noget andet retligt grundlag. Som anført af Domstolen vil det nemlig ofte være umuligt for kildelandets skattemyndigheder at afdække, hvem der er renternes retsmæssige ejer. Det gælder også i en situation, hvor det er muligt at indkredse de mulige retsmæssige ejere, da det med al sandsynlighed vil være umuligt for kildestatens (Danmarks) skattemyndigheder og domstole at fastslå, hvilken af to mulige retsmæssige ejere, der er den retsmæssige ejer, jf. hertil Domstolens dom, præmis 143 og 144.

I en situation som den foreliggende, hvor der er klare holdepunkter for at fastslå, at det på forhånd fastlagte arrangement med A) lånet mellem Nycomed og Nycomed Sweden Holding 2, B) det samtidige lån mellem Nycomed Sweden Holding 1 og Nycomed S.C.A., SI-CAR, C) Nycomed Sweden Holding 1's samtidige kapitalindskud i Nycomed Sweden Holding 2 samt D) den årlige vedtagelse af koncernbidrag fra Nycomed Sweden Holding 2 til Nycomed Sweden Holding 1 har taget sigte på et misbrug af rente-/royaltydirektivet og den nordiske dobbeltbeskatningsoverenskomst, må der derfor også stilles strenge krav til beviset for, at arrangementet (alligevel) ikke har haft et misbrug af direktivet og dobbeltbeskatningsoverenskomsten som et hovedformål. Det påhviler derfor Takeda at føre et positivt bevis, som giver grundlag for med sikkerhed at fastslå, at Nycomed S.C.A., SICAR har været renternes retsmæssige ejer.

Takeda kan således ikke løfte sin bevisbyrde ved blot at indtage det standpunkt, at hvis Skatteministeriet ikke anerkender, at Nycomed S.C.A., SICAR er renternes retsmæssige ejer, må ministeriet anerkende, at selskabets »investorer« er renternes retsmæssige ejer, og når ministeriet så heller ikke vil det, så *skal* ministeriet anerkende, at Nycomed S.C.A., SICAR er renternes retsmæssige ejer.

Takeda skal derimod føre bevis for, at renterne enten forblev i Nycomed S.C.A., SICAR, eller hvis de blev

**3322**

kanaliseret videre, at en sådan viderekanalisering *ikke* på forhånd var bestemt, således at selskabet har haft mulighed for frit at råde over renterne og derfor må anses for renternes retmæssige ejer. Et sådant bevis er ikke blevet ført.

Det forhold, at de omhandlede renter antageligt er blevet ført videre fra Nycomed S.C.A., SICAR til selskabets investorer i 2011 og 2012, dvs. nogle år efter tilskrivningen af de omhandlede renter fra Nycomed (2007-2009), udelukker ikke *eo ipso*, at Nycomed S.C.A., SICAR har fungeret som »gennemstrømningsenhed«, idet et sådant spørgsmålet ikke kan afklares, uden der er blevet bragt klarhed over, hvilke rammer der var for selskabets dispositioner med hensyn til den investerede kapital og afkast heraf.

Takeda har imidlertid ikke fremlagt den eller de aftaler, der utvivlsomt har været indgået mellem Nycomed S.C.A., SICAR samt kapitalfondene og/eller sidstnævntes investorer om sådanne rammer, og hvis eksistens Takeda heller ikke har benægtet.

Den ovenfor omtalte »Management Shareholders Agreement«, regulerer ikke rammerne for Nycomed S.C.A., SICARs dispositioner med hensyn til den investerede kapital og afkastet heraf. Den i aftalen omtalte »Investor Shareholders Agreement«, hvori Nycomed S.C.A., SICAR og administrationsselskabet Nycomed Luxco samt kapitalfondene også var parter, forekommer derimod efter sin benævnelse og de deltagende parter at være relevant for en afklaring af rammerne, men denne aftale har Takeda *ikke* fremlagt.

Når der ikke er blevet bragt klarhed over, hvilke rammer der var udstukket for Nycomed S.C.A., SICARs dispositioner med hensyn til den investerede kapital og afkastet heraf, er der ikke det fornødne grundlag for at fastslå, om selskabet har været renternes retmæssige ejer eller ej, og det er derfor udelukket, at den etablerede formodning for, at der foreligger et misbrug af rente-/royaltydirektivet og den nordiske dobbeltbeskatningsoverenskomst kan afkræftes med henvisning til, at Nycomed S.C.A., SICAR - hvis det havde været længere i stedet for Nycomed Sweden Holding 2 - kunne have påberåbt sig den dansk-luxembourgske dobbeltbeskatningsoverenskomst artikel 11, stk. 1. Også af den grund kan den dansk-luxembourgske dobbeltbeskatningsoverenskomst ikke føre til, at Danmark skal frafalde beskatningen af de omhandlede renter.

*6.1.1.4 En beskatning strider ikke imod en bindende administrativ praksis*

Ved afgørelsen af, om en skattepligt med hensyn til de omhandlede renter vil stride imod en bindende, fast administrativ praksis vedrørende fortolkningen af selskabsskattelovens § 2, stk. 1, litra d), tredje punktum, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at beskatningen ikke skal frafaldes efter rente-/royaltydirektivet, fordi det foreligger misbrug, og at beskatningen af renterne ej heller skal nedsættes efter den nordiske dobbeltbeskatningsoverenskomsts artikel 11, stk. 1, eftersom Nycomed Sweden Holding 2 ikke (og ej heller Nycomed Sweden Holding 1) kan anses for renternes retmæssige ejer.

Der er derfor med andre ord tale om, at Takeda med sit praksissynspunkt gør krav på, at de omhandlede renter skal anses for undtaget fra en skattepligt, *selv om* selskabsskattelovens § 2, stk. 1, litra d), tredje punktums udtrykkelige betingelse for, at renterne er undtaget fra skattepligten, *ikke* er opfyldt.

Da en forvaltningsretlig lighedsgrundsætning ikke kan begrunde et krav om en retsstilling, der strider imod loven, jf. hertil U.2003.2005H […], er det udelukket, at Takedas påberåbelse af en administrativ praksis kan føre til, at de omhandlede renter undtages fra en skattepligt, allerede fordi en sådan undtagelse altså vil stride imod selskabsskattelovens § 2, stk. 1, litra d), tredje punktums udtrykkelige betingelse for, at en undtagelse kan indrømmes.

Hertil kommer, at SKATs afgørelse af 13. december 2010 […] ikke er udtryk for en praksisskærpelse, eftersom afgørelsen alene ændrede på noget fast administrativ praksis.

Det påhviler Takeda at føre bevis for eksistensen af den hævdede praksis, som afgørelsen ifølge selskabet skulle fravige, jf. f.eks. U.2011.3305H […], men selskabet har ikke løftet denne bevisbyrde. Takeda har således ikke påvist eksistensen af nogen tidligere afgørelse, hvorefter skattemyndighederne har anset renter for at være undtaget fra en skattepligt, selv om de givne omstændigheder - ligesom i den foreliggende sag - ellers gav belæg for at fastslå, at modtageren ikke havde haft eller havde haft så snævre beføjelser til at disponere over renterne, at selskabet ikke kunne anses for renternes retmæssige ejer.

Takeda har endvidere ikke påvist tilfælde, hvor skattemyndighederne siden selskabsskattelovens § 2, stk. 1, litra d)'s ikrafttrædelse med virkning for renter, der vedrører tiden fra og med den 2. april 2004, skulle have forsømt at gribe korrigerende ind i tilfælde som

det foreliggende. En sådan manglende indgriben ville, hvis der faktisk havde fundet sted, i øvrigt heller ikke kunne være blevet sidestillet med en positiv afgørelse, jf. f.eks. U.2017.2960H og U.2017.2979H […].

Takeda har heller ikke på anden vis godtgjort, at skattemyndighederne efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra d), og indtil SKATs afgørelse i den foreliggende sag skulle have fulgt en praksis, hvorefter renter er blevet anset for at være undtaget fra den skattepligt, der følger af bestemmelsen, selv om de givne omstændigheder ellers gav belæg for at fastslå, at

**3323**

modtageren af renterne ikke havde haft eller havde haft så snævre beføjelser til at disponere over renterne, at selskabet ikke kunne anses for renternes retmæssige ejer.

De påberåbte svar, som skatteministeren gav i forbindelse med Folketingets Skatteudvalgs behandling af lovforslaget, som efter et ændringsforslag resulterede i indførelsen af selskabsskattelovens § 2, stk. 1, *litra c)* om begrænset skattepligt af udbytter, udgør således ikke noget bevis for eksistensen af en bindende praksis, som afgørelserne i den foreliggende sag skulle ændre på.

Østre Landsret har i SKM2021.304.ØLR fastslået, at de påberåbte svar ikke udgør noget bevis for eksistensen af en administrativ praksis, hvorefter skattemyndighederne skulle have anset udbytter for at være undtaget fra den skattepligt, der følger af selskabsskattelovens § 2, stk. 1, *litra c)*, selvom modtageren af udbyttet ikke havde haft eller havde haft så snævre beføjelser til at disponere over udbyttet, at modtageren ikke kunne anses for udbyttets retmæssige ejer. Ministersvarene udgør så lidt desto mindre et bevis for eksistensen af en bindende administrativ praksis, som SKATs afgørelse i denne sag, der angår bestemmelsens *litra d)*, skulle ændre på.

I tilknytning hertil bemærkes, at det tilmed - således som det også er beskrevet ovenfor under punkt 6.1.1 - fremgår af forarbejderne til selskabsskattelovens § 2, stk. 1, litra d), at skattemyndighederne efter en konkret realitetsbedømmelse vil kunne nægte renternes (umiddelbare) modtager fordelene, der ellers følger af rente-/royaltydirektivet og en eventuel dobbeltbeskatningsoverenskomst, med den begrundelse at modtageren ikke er renternes retsmæssige ejer.

De af Takeda påberåbte svar, som skatteministeren efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra d), har afgivet i forskellige sammenhænge, udgør heller ikke et bevis for, at der på tidspunktet for SKATs afgørelse var etableret en praksis, hvorefter renter - under omstændigheder som i denne sag foreliggende - blev betragtet som værende undtaget fra en skattepligt efter denne bestemmelse.

Der er tale om abstrakte svar på abstrakte spørgsmål. Svarene giver - ligesom det påberåbte notat om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner - intet belæg for, at SKAT positivt skulle have truffet en beslutning om at følge en praksis, hvorefter renter blev anset for undtaget fra en skattepligt, selv om der efter en oplysning og en konkret vurdering af de givne omstændigheder ville være belæg for at fastslå, at modtageren ikke havde haft eller havde haft så snævre beføjelser til at disponere over renterne, at selskabet ikke kunne anses for renternes retmæssige ejer.

Forud for SKATs afgørelse i denne sag og den første af de i sagen omhandlede rentetilskrivninger havde skatteministeren afgivet adskillige svar, hvoraf fremgår, at et moderselskab ikke ville kunne påberåbe sig fordelene af en dobbeltbeskatningsoverenskomst, hvis det var et »rent gennemstrømningsholdingselskab«, et »rent gennemstrømningsselskab«, et »conduit« selskab, eller et »gennemstrømningsselskab«, jf. 1) bilag 9 til lovforslag nr. 116 af 14. de-

cember 2005 […], 2) skatteministerens svar på udvalgsspørgsmål 2-10 efter fremsættelsen af lovforslag nr. 30 af 4. oktober 2006 […], 3) skatteministerens svar af 6. november 2006 på spørgsmål S 474 […] og 4) bilag 26 vedrørende lovforslag nr. 213 af 18. april 2007 […], 5) ministerens svar på udvalgsspørgsmål 86 […] og 6) det reviderede svar herpå […] til førnævnte lovforslag. I alle de nævnte svar, bortset fra det første, er der endog henvist til pkt. 12.1 i bemærkningerne til artikel 10 (om udbytte) i OECD's modeloverenskomst, og i de 4 sidstnævnte svar er det ydermere beskrevet i selve svarene, at »conduit« selskaber/»gennemstrømningsselskaber« omfatter selskaber, der »reelt har meget snævre beføjelser i relation til den pågældende indkomst«.

De efterfølgende ministersvar og notatet om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner, som Takeda påberåber sig til støtte for indsigelsen om en praksis-skærpelse, blev også - forgæves - påberåbt af de udbytteudloddende selskaber i SKM2021.304.ØLR til støtte for den tilsvarende indsigelse om en praksisskærpelse.

På den anførte baggrund bør det - på tilsvarende vis som i SKM2021.304.ØLR - fastslås, at SKATs afgørelse i denne sag ikke ændrede på nogen bindende, fast administrativ praksis, som Takeda i medfør af en forvaltningsretlig lighedsgrundsætning kan støtte ret på.

*6.1.2 Skattepligten er ikke bortfaldet i medfør af selskabsskattelovens § 2, stk. 1, litra d), sidste punktum*

Ifølge selskabsskattelovens § 2, stk. 1, litra d), sidste punktum, bortfalder skattepligten efter bestemmelsens første punktum endvidere, hvis det modtagende selskab m.v. godtgør, *at* den udenlandske selskabsbeskatning af renterne udgør mindst ¾ af den danske selskabsbeskatning, samt *at* det ikke betaler renterne videre til et andet udenlandsk selskab m.v., som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning.

Denne undtagelsesbestemmelse, der kan være relevant, hvis det modtagende selskab ikke er omfattet er rente-/royaltydirektivet eller ikke er hjemmehørende i stat, som Danmark har indgået en dobbeltbeskatningsoverenskomst med, skal ses i lyset af, at skattepligten, som beskrevet ovenfor, blev indført med det formål at begrænse mulighederne for skatteplanlægning ved fradrag for koncerninterne renter, når det modtagende udenlandske koncernselskab betaler ingen eller meget lidt i skat af de renter, der er fratrukket ved opgørelsen af dansk skattepligtig indkomst.

**3324**

En sådan situation foreligger netop ikke, hvis det modtagende selskab er undergivet en (udenlandsk) beskatning, der i det væsentligste svarer til den danske selskabsbeskatning, *forudsat* at renterne ikke bliver betalt videre til et andet udenlandsk selskab, som betaler ingen eller meget lidt i skat af renterne.

Takeda har ikke godtgjort, at betingelserne for et bortfald af skattepligten er opfyldt - tværtimod.

En stillingtagen til Takedas påberåbelse af selskabsskattelovens § 2, stk. 1, litra d), *sidste punktum*, forudsætter nemlig, at skattepligten ikke er bortfaldet i medfør af bestemmelsens *tredje punktum*. For landsrettens stillingtagen til, om betingelserne for en skattefritagelse i henhold til selskabsskattelovens § 2, stk. 1, litra d), sidste punktum, er opfyldt, må det derfor lægges til grund, at såvel Nycomed Sweden Holding 2 som Nycomed Sweden Holding 1 var »gennemstrømningsenheder« for de omhandlede renter, der således blev kanaliseret videre til Nycomed S.C.A, SICAR, som var undergivet en selskabs-beskatning af renterne, der var mindre end ¾ af den danske selskabsbeskatning, eftersom selskabet ifølge Luxembourgsk ret var *fritaget* for at betale skat af renterne.

Det må derfor også fastslås, *at* renterne, som Nycomed Sweden Holding 2 modtog, i selskabsskattelovens § 2, stk. 1, litra d), sidste

Copyright © 2023 Karnov Group Denmark A/S

punktums forstand er blevet betalt videre til et andet udenlandsk selskab, som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning, og *at* betingelserne for en skattefritagelse dermed *ikke* er opfyldt.

En sådan forståelse af undtagelsesreglen har entydig støtte i motivet for betingelsen om, at det modtagende selskab - for at et bortfald af skattepligten kan komme på tale - skal godtgøre, at det ikke betaler renterne videre til et andet udenlandsk selskab m.v., som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning.

Formålet med betingelsen er (selvsagt) at forhindre, at undtagelsen bliver misbrugt som et instrument til at opnå en motivstridig skattefritagelse, hvilket bestemmelsens tilblivelseshistorie heller ikke efterlader nogen tvivl om.

Herom bemærkes, at ind til den 1. juli 2007 fulgte det af selskabsskattelovens § 2, stk. 1, litra d), sidste punktum, at skattepligten efter første punktum bortfaldt, hvis det modtagende selskab godtgjorde, at det ikke ville være omfattet af selskabsskattelovens § 32, hvis det havde været kontrolleret eller under væsentlig indflydelse af et her i landet hjemmehørende selskab m.v., jf. § 32, stk. 6, *samt* at det ikke betalte renterne videre til et andet udenlandsk selskab m.v., som ville opfylde betingelserne i § 32 [...].

Af bemærkningerne til lovforslaget fremgår om selskabsskattelovens § 2, stk. 1, litra d), sidste punktum [...]:

Denne undtagelse gælder dog ikke, hvis selskabet kanaliserer betalingen videre til et andet udenlandsk selskab, der ikke er kontrolleret af et dansk selskab, såfremt det andet udenlandske selskab er hjemmehørende i et land med lav beskatning og mere end 1/3 af dets indkomst består af CFC-indkomst. I så fald vil det selskab, som modtager renterne her fra landet, nok blive beskattet af renterne, men samtidig vil det få fradrag for de renter, som det selv betaler videre til det andet udenlandske selskab i lavskatte-landet.

Formålet med betingelsen om, at renterne ikke må blive kanaliseret videre, er således tydeligvis at forhindre, at undtagelsen bliver misbrugt til at opnå en skattefritagelse, der strider imod motivet for indførelsen af skattepligten.

I den foreliggende sag er der netop tale om, at renterne via det modtagende selskab (Nycomed Sweden Holding 2) er blevet kanaliseret videre, med den følge at der hverken er blevet betalt skat af renterne i Sverige eller i Luxembourg. Derfor tilsiger en motivfortolkning altså entydigt, at skattepligten under de foreliggende omstændigheder gælder uden undtagelse, hvilket også er foreneligt med ordlyden af selskabsskattelovens § 2, stk. 1, litra d), sidste punktum, der ikke giver grundlag at fastslå, at det for spørgsmålet om et bortfald af skattepligten skulle være afgørende, om renterne betales videre som fradragsberettigede renter eller f.eks. som fradragsberettigede koncernbidrag, eller om renterne kanaliseres videre til et lavskatte-land via en yderligere gennemstrømningsenhed.

Det må i det hele taget kræve meget klare holdepunkter i ordlyden af og forarbejderne til selskabsskattelovens § 2, stk. 1, litra d), sidste punktum, for at kunne komme frem til en fortolkning, hvorefter anvendelsesområdet for denne undtagelsesregel skulle dække tilfælde, hvor det modtagende selskab er afskåret fra at påberåbe sig undtagelsesreglen i bestemmelsens tredje punktum, fordi selskabet har tjent som en gennemstrømningsenhed i koncernens forsøg på at opnå en motivstridig skattefritagelse ved at misbruge rente-/royaltydirektivet og en eventuel dobbeltbeskatningsoverenskomst.

Sådanne (klare) holdepunkter findes der ingen af, hvilket skyldes, at det ville være meningsløst, hvis undtagelsesreglen i selskabsskattelovens § 2, stk. 1, litra d), *sidste punktum*, omfattede misbrug, der udelukker en skattefritagelse efter bestemmelsens *tredje punktum*.

*6.2 Takeda er ansvarlig for den manglende indeholdelse*

Da de omhandlede renter er omfattet af skattepligten, jf. selskabsskattelovens § 2, stk. 1, litra d), skulle Takeda i forbindelse med godskrivningen af de omhandlede renter have indeholdt renteskat heraf, jf. kildeskattelovens § 65 D, stk. 1.

**3325**

Af kildeskattelovens § 69, stk. 1, følger som nævnt, at den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre han godtgør, at der *ikke* er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i kildeskatteloven.

Ved afgørelsen af, om Takeda har afkræftet den lovbestemte formodning for forsømmelighed, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at der ikke har været nogen bindende administrativ praksis, hvorefter de omhandlede renter skal anses for at være undtaget fra den skattepligt, der ellers følger af selskabsskattelovens § 2, stk. 1, litra d). Allerede af den grund er det uholdbart, når Takeda gør gældende, at der forelå en administrativ praksis, som gav selskabet føje til at antage, at renterne kunne godskrives uden indeholdelse af renteskat.

Den påberåbte »betydelig[e] tvivl« om fortolkningen begrebet »retmæssig ejer«, jf. stævningen, s. 49, har heller ikke givet Takeda føje til en sådan antagelse - tværtimod. Som beskrevet ovenfor fremgår det til overflod af forarbejderne til selskabsskattelovens § 2, stk. 1, litra d), at skattemyndighederne efter en konkret realitetsbedømmelse vil kunne nægte renternes (umiddelbare) modtager fordelene, der ellers følger af rente-/royaltydirektivet og en eventuel dobbeltbeskatningsoverenskomst, med den begrundelse at modtageren ikke er renternes retmæssige ejer.

For spørgsmålet om Takedas ansvar efter kildeskattelovens § 69, stk. 1, bliver det (dermed) udslagsgivende, at selskabet har været bekendt med de faktiske omstændigheder, som fører til, *dels* at Nycomed Sweden Holding 2 ikke kan anses for at have at været renternes retsmæssige ejer i den nordiske dobbeltbeskatningsoverenskomsts forstand, *dels* at fordelen i form af kildeskattefritagelsen, der følger af rente-/royaltydirektivet, skal nægtes, både fordi EU-retten ikke kan påberåbes med henblik på at muliggøre retsmisbrug, og fordi Nycomed Sweden Holding 2 heller ikke kan anses for renternes retmæssige ejer i direktivets forstand, jf. således også præmisserne for landsrettens dom gengivet i KM2021.304.ØLR.

Når der - som i den foreliggende sag - er grundlag for at nægte en skattemæssig fordel i form af kilde-skattefritagelse, fordi fordelen er søgt opnået ved retsmisbrug, og den indeholdelsespligtige er bekendt med dette grundlag, må den manglende indeholdelse af kildeskatten således - per se - tilregnes den indeholdelsespligtig som værende af en forsømmelig karakter.

Da Takeda altså ikke har afkræftet den lovbestemte formodning for, at der fra selskabets side er udvist forsømmelighed med hensyn til den manglende indeholdelse af renteskat, er selskabet i medfør af kildeskattelovens § 69, stk. 1, over for det offentlige umiddelbart ansvarlig for betaling af de ikke-indeholdte renteskatter.

...

*6.4 Takedas subsidiære påstande*

Skatteministeriet forstår Takedas synspunkter sådan, at en stillingtagen til selskabets subsidiære påstande er irrelevant, hvis landsretten kommer frem til, at den dansk-luxembourgske dobbeltbeskatningsoverenskomst ikke kan påberåbes, (allerede) fordi Nycomed S.C.A., SICAR ikke er omfattet af dobbeltbeskatningsoverenskomsten, eftersom Takeda gør gældende, at Nycomed S.C.A., SICAR må anses for renternes retmæssige ejer, hvis hverken Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 er renternes

Copyright © 2023 Karnov Group Denmark A/S

retsmæssige ejer, jf. hertil processkrift III […]. Som ministeriet forstår det bliver en i stillingtagen til Takedas subsidiære påstande altså kun relevant, hvis landsretten måtte komme frem til, at Nycomed S.C.A., SICAR er omfattet af den dansk-luxembourgske dobbeltbeskatningsoverenskomst, men samtidig kommer frem til, at det ikke er blevet godtgjort, at selskabet er renternes retsmæssige ejer.

### 6.4.1 Der er ikke grundlag for at tage den subsidiære påstand (A) til følge

Efter omstændighederne vil den formodning for misbrug af rente-/royaltydirektivet og en dobbeltbeskatningsoverenskomst, der rejses, når modtageren af renterne (långiveren) ikke kan anses for renternes retsmæssige ejer, kunne afkræftes, jf. punkt 6.1.1.3.2 ovenfor. I så henseende er det imidlertid ikke tilstrækkeligt at henvise til, at en dobbeltbeskatningsoverenskomst kunne have været påberåbt, hvis långiveren havde været en anden end den, der i den faktisk foreliggende situation er långiveren, men altså ikke kan anses for renternes retsmæssige ejer.

For en etableret formodning for misbrug kan anses for afkræftet, er det - i hvert fald - en grundlæggende betingelse, at den, der i den faktisk foreliggende situation - påviseligt - er renternes retsmæssige ejer, ikke ville have været skattepligtig af de omhandlede renter, hvis den pågældende havde været den direkte långiver. Det påhviler Takeda at føre bevis for, at denne betingelse er opfyldt.

Allerede fordi Takeda ikke har ført bevis endsige sikkert bevis for, at [den svenske bank] og [den amerikanske privatperson] har været de retmæssige ejere af en del af de omhandlede renter, skal det beløb, som Takeda over for det offentlige er ansvarlig for betaling af, ikke nedsættes med de i påstanden anførte beløb.

Takeda kan således som det også er anført ovenfor ikke løfte sin bevisbyrde ved at henvise til, at når Skatteministeriet ikke vil anerkende, at Nycomed S.C.A., SICAR er renternes retsmæssige ejer, så skal ministeriet

**3326**

anerkende, at[den svenske bank] og [den amerikanske privatperson] er de retsmæssige ejere af en del af renterne. Hvis Takeda vil gøre gældende, at [den svenske bank] og [den amerikanske privatperson] er de retmæssige ejere, må Takeda føre et positivt bevis herfor, men et sådan positivt bevis er ikke fremlagt.

Det er således fortsat udokumenteret, at de omhandlede renter er strømmet videre fra Nycomed S.C.A., SICAR til [den svenske bank] og [den amerikanske privatperson]. Der foreligger ingen dokumentation for, at Nycomed S.C.A., SICAR har udbetalt nogen beløb til [den svenske bank] og [den amerikanske privatperson], endsige dokumentation for, hvad grundlaget for sådanne betalinger måtte have været, eller hvornår sådanne betalinger måtte have fundet sted.

Takeda har så lidt desto mindre ført et positivt bevis for, at en del af de omhandlede renter på forhånd har været bestemt til at strømme videre til [den svenske bank] og [den amerikanske privatperson], og at Nycomed S.C.A., SICAR ikke har kunnet råde over renterne, enten fordi selskabet har været retlig forpligtet til at føre renterne videre, eller fordi selskabet på grund af de faktiske omstændigheder ikke har haft reelle beføjelser til at råde over renterne og dermed blot har fungeret som (endnu) en gennemstrømningsenhed.

Når der, som beskrevet ovenfor, ikke er blevet bragt klarhed over, hvilke rammer der var udstukket for Nycomed S.C.A., SICARs dispositioner med hensyn til den investerede kapital og afkastet heraf, er der ikke det fornødne grundlag for at fastslå, om selskabet har været renternes retsmæssige ejer eller ej.

Og den bevistvivl, der består med hensyn til, om Nycomed S.C.A., SICAR er renternes retsmæssige ejer eller ej, kommer Takeda til skade, da selskabet har bevisbyrden til spørgsmålet om, hvem der er

renternes retsmæssige ejer, ikke kan løfte sin bevisbyrde ved blot at henvise til, at hvis Skatteministeriet ikke vil anerkende, at Nycomed S.C.A., SICAR er renternes retmæssige ejer, så skal ministeriet anerkende, at investorerne i selskabet er renternes retmæssige ejer eller omvendt.

På den anførte baggrund bør Skatteministeriet frifindes for Takedas subsidiære påstand A).

### 6.4.2 Den subsidiære påstand B)
### 6.4.2.1 Påstanden bør afvises

Med den subsidiære påstand B) forsøger Takeda at indhente et responsum fra domstolene. Således som påstanden er udformet tager den nemlig ikke sigte på at fastslå, at hvad retsstillingen er i den konkret foreliggende situation, således som denne situation er blevet oplyst for domstolene, men på at fastslå de abstrakte betingelser for, at Takeda kan gøre krav på, at det beløb, som Takeda over for det offentlige er ansvarlig for betaling af, skal nedsættes. Domstolene har imidlertid ikke til opgave at afgive et sådant responsum.

Efter grundlovens § 63, stk. 1, tilkommer det domstolene at efterprøve den offentlige forvaltnings afgørelser. En sådan efterprøvelse kan resultere i en hjemvisning til en fornyet administrativ behandling, men en hjemvisning er betinget af, at der er noget galt med den afgørelse, som domstolsprøvelsen angår. En hjemvisning kan således kun komme på tale, hvis domstolsprøvelsen giver grundlag for at fastslå, at den indbragte afgørelse er baseret på en forkert retsopfattelse eller er behæftet med en væsentlig sagsbehandlingsfejl, eller hvis bevisførelsen for domstolene giver belæg for at forslå, at de faktiske oplysninger, der er blevet lagt til grund for afgørelsen, er forkerte eller i hvert fald utilstrækkelige.

Påstandens udformning og de anbringender, som Takeda fremfører til støtte for påstanden, viser imidlertid, at en hjemvisning ikke tager sigte på, at skattemyndighederne skal rette op på fejl, der er blevet fastslået ved domstolsprøvelsen, men derimod at sagen skal hjemvises »med henblik på«, at skattemyndighederne skal ændre den indbragte afgørelse, »i det omfang« Takeda senere dokumentere de i påstanden anførte forhold.

Sagen er således den, at en domskonklusion svarende til den subsidiære påstand B) ikke fører til en ændring af partternes indbyrdes retsstilling, idet en ændring altså er betinget af, at Takeda senere dokumenterer de i påstanden anførte forhold.

Takeda har i det hele taget ikke en retlig interesse i at få dom for, hvad der skal gælde, hvis selskabet på et senere tidspunkt måtte fremlægge oplysninger, som domstolene er uden kendskab til.

På den anførte baggrund bør det fastslås, at den subsidiære påstand B) ikke kan tages under pådømmelse og derfor vil være at afvise.

De samme argumenter gøres gældende til støtte for den subsidiære frifindelsespåstand, for det tilfælde at landsretten måtte finde, at argumenterne fører til frifindelse i stedet for afvisning.

Til støtte for afvisningspåstanden gøres det endvidere gældende, at den subsidiære påstand B) er for upræcis og generelt affattet til, at den kan danne grundlag for en domskonklusion. Det bemærkes herved, at det kræver en konkret oplysning og vurdering af sagens faktiske omstændigheder, for at det kan fastslås, hvem der på de i påstanden anførte tidspunkter var »de direkte eller indirekte investorer i Nycomed S.C.A., SICAR«, og hvem der var »de 'retmæssige ejere' af de omhandlede renter«. Da påstanden således er (for) upræcis og generelt affattet, er den altså uegnet til at danne grundlag for en domskonklusion. Også af den grund bør det fastslås, at påstanden ikke kan tages under pådømmelse og derfor vil være at afvise.

### 6.4.2.2 Der er ikke grundlag for at tage påstanden til følge

Således som den subsidiære påstand B) er udformet, er der ikke grundlag for at tage påstanden til følge.

**3327**

Derfor må Skatteministeriet, hvis påstanden tages under pådømmelse, frifindes.

Som anført ovenfor vil den formodning for misbrug af rente-/royaltydirektivet og en dobbeltbeskatningsoverenskomst, der rejses, når modtageren af renterne (långiveren) ikke kan anses for renternes retsmæssige ejer, efter omstændighederne kunne afkræftes.

Hvad angår rente-/royaltydirektivet, efterlader Domstolens dom, således som det også er beskrevet ovenfor, jf. punkt 6.1.1.3.2, ingen tvivl om, at den omstændighed, at renternes retsmæssige ejer er skattemæssigt hjemmehørende i en stat, hvormed Danmark har indgået en dobbeltbeskatningsoverenskomst, som kunne have været påberåbt, hvis den retsmæssige ejer havde været den direkte långiver, ikke - per se - er tilstrækkeligt til at afkræfte en etableret formodning for et misbrug af rente-/royaltydirektivet. Og der er som også anført ovenfor ingen retskildemæssige holdepunkter for, at der skulle gælde noget andet, hvad angår vurderingen af, om der foreligger et misbrug af den nordiske dobbeltbeskatningsoverenskomst.

Det bemærkes i tilknytning hertil, at det i hvert fald må være en yderligere betingelse, at de beløb, som i den givne faktisk foreliggende situation er strømmet igennem til de omhandlede renters retsmæssige ejer, dvs. den, der har mulighed for frit at råde over anvendelsen heraf, bedømt efter reglerne i den stat, hvor den retsmæssige er hjemmehørende, er omfattet af denne stats beskatningskompetence, da der ellers ikke i den faktisk foreliggende situation vil være nogen beskyttelse imod dobbeltbeskatning at indrømme efter statens dobbeltbeskatningsoverenskomst med Danmark.

På den anførte baggrund må Skatteministeriet under alle omstændigheder frifindes for den subsidiære påstand B), 1. led.

Den formodning for misbrug af rente-/royaltydirektivet og en dobbeltbeskatningsoverenskomst, der rejses, når modtageren af renterne (långiveren) ikke kan anses for renternes retsmæssige ejer, kan endvidere ikke afkræftes alene ved henvisning til, at »de direkte eller indirekte investorer i Nycomed S.C.A., SICAR«, som måtte være fysiske personer, ikke ville have været skattepligtige til Danmark af de renter, som de ville have oppebåret, hvis de havde ydet et lån til Nycomed.

Det bemærkes i tilknytning hertil, at det i hvert fald må være en yderligere betingelse, at der føres et sikkert bevis for, at den pågældende fysiske person i den faktisk foreliggende situation har været renternes retsmæssige ejer, og dermed også bevis for, at alle ejerled mellem Nycomed og den givne fysiske person har været »gennemstrømningsenheder«, fordi de har været retlig forpligtet til at føre renterne videre, eller fordi de på grund af de faktiske omstændigheder ikke have haft reelle beføjelser til at råde over renterne.

På denne baggrund må Skatteministeriet derfor også under alle omstændigheder frifindes for den subsidiære påstand B), 2. led.«

*B-171-13 NTC Parent S.a.r.l. mod Skatteministeriet*

*NTC Parent S.a.r.l.* har i sit sammenfattende processkrift af 2. august 2021 anført bl.a.:

»*5. ANBRINGENDER*

*5.1 Sagsøgers principale påstand - ingen begrænset skattepligt på renter*

*5.1.1 Rente-royaltidirektiv*

Det gøres overordnet gældende, at Angel Lux Common S.a.r.l. er den retsmæssige ejer af renterne i medfør af rente-/royaltydirektivet, samt at beskatningen af renterne dermed skal frafalde, jf. selskabsskattelovens § 2, stk. 1, litra d […].

Skatteministeriets anbringender om, at Angel Lux Common S.a.r.l. er »rette indkomstmodtager« og dermed begrænset skattepligtig efter dansk ret, men samtidig nægtes rettighederne efter rente-/royaltydirektivet, er i strid med direktivets ordlyd og de formål, der forfølges med direktivet.

Det fremgår af en ordlydsfortolkning, at et selskab i en medlemsstat anses for at være den retsmæssige ejer af renter, når det modtager renter til eget brug, medmindre det modtager sådanne rentebetalinger som formidler, herunder som agent mv., jf. rente-/royaltydirektivets artikel 1, stk. 1, jf. stk. 4 […].

Ifølge grundlæggende selskabsretlige regler er et datterselskab et selvstændigt retssubjekt, der selv kan indgå bindende aftaler. Der kræves derfor særskilte aftaler, hvis et datterselskab kun skal anses for at agere som formidler.

En modtager, der som Angel Lux Common S.a.r.l. handler på egne vegne og for egen regning og risiko, kan ikke sammenlignes med en formidler og skal anerkendes som retsmæssig ejer af betalingerne.

Af disse grunde følger det isoleret og samlet set allerede af ordlyden af rente-/royaltydirektivets artikel 1, stk. 1, jf. stk. 4, at Angel Lux Common S.a.r.l. er den retsmæssige ejer i direktivets forstand.

Hertil kommer, (i) at Angel Lux Common S.a.r.l. havde civilt ejerskab af de omhandlede PECs og de dertil hørende renter, (ii) at Angel Lux Common S.a.r.l. havde reel råden over renterne, samt (iii) at Angel Lux Common S.a.r.l. havde den reelle nytte og risiko, og dermed også anses som den retsmæssige ejer, som den enhed, som økonomisk set modtog de oppebårne renter og derfor havde mulighed for frit at råde over anvendelsen heraf, jf. EU-Dommens pr. 89 (yderligere afsnit 5.1.6 nedenfor).

Herudover er der ikke i medfør af artikel 5 i rente-/royaltydirektivet grundlag for at nægte Angel Lux Common S.a.r.l. de fordele, der følger af direktivet, da dette kræver intern dansk hjemmel.

**3328**

Rente-/royaltydirektivet giver i art. 5 *mulighed* for at indføre nationale og folkeretlige svigs- og misbrugsregler […]:

…

Der foreligger slet ikke svig eller misbrug i nærværende sag, men under alle omstændigheder fremgår det af rente-/royaltydirektivets art. 5, at det bl.a. er en betingelse, at der skal være hjemmel i intern dansk skatteret til at imødegå det af Skatteministeriet påståede svig eller misbrug.

Der var ingen sådan hjemmel i dansk skatteret, jf. hertil sag C-321/05, Kofoed (»*Kofoed-dommen*«), se yderligere afsnit 5.1.3 nedenfor.

*5.1.2 Dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg*

Beskatningsretten til renter, der fra kilder i Danmark oppebæres af selskaber, der er hjemmehørende i Luxembourg, er reguleret i dobbeltbeskatningsoverenskomstens artikel 11, stk. 1.

Bestemmelsen har følgende ordlyd […]: …

Det følger heraf, at kildestaten, her Danmark, ikke kan beskatte renter, der betales til en person, der er hjemmehørende i Luxembourg, såfremt vedkommende er den »retmæssige ejer« af renterne.

Det gøres gældende, at Danmark ikke kan beskatte rentebetalinger fra NTCI ApS til Angel Lux Common S.a.r.l., da sidstnævnte er retmæssig ejer af rentebetalingerne/tilskrivningerne også i dobbeltbeskatningsoverenskomstens forstand.

I 2003-kommentarerne til OECD modeloverenskomsten er problematikken omkring retmæssig ejer af renter primært omtalt under punkt 8 til artikel 11. Kommentarerne har følgende ordlyd […]:

…

Af kommentarerne til OECD's overenskomst kan det udledes, at agenter og mellemmænd samt gennemstrømningsselskaber ikke er retmæssige ejere af renter. For så vidt angår gennemstrømningsselskaber er det dog en betingelse, at selskabet har så snævre beføjelser

til at råde over renterne, at det reelt i relation til renten er en nullitet eller administrator.

Angel Lux Common S.a.r.l anerkendes i Luxembourg som et selvstændigt rets- og skattesubjekt, og havde civilt ejerskab af de omhandlede PECs og de dertil hørende renter. Derudover havde Angel Lux Common S.a.r.l. reel råden over renterne, samt den reelle nytte og risiko. Angel Lux Common S.a.r.l er derfor hverken et gennemstrømningsselskab eller en nullitet i forhold til renter modtaget fra NTCI ApS, men derimod dets retmæssige ejer.

Det understreges af, at der i denne sag ikke er sket nogen videre-kanalisering.

Langt den væsentligste del af renterne blev af NTCI ApS tilskrevet (men ikke betalt) på NTCI ApS' gæld til Angel Lux Common S.a.r.l, og som redegjort for […] disponerede Angel Lux Common S.a.r.l. den 10. juli 2008 over de tilskrevne renter ved at konvertere disse til anparter i NTCI ApS. For Angel Lux Common S.a.r.l. udgjorde de tilskrevne renter indtil konverteringen et aktiv i form af en (del af en) fordring på NTCI ApS, og da dette aktiv ikke blev juridisk eller faktisk viderebetalt fra Angel Lux Common S.a.r.l, har der således i forhold til de tilskrevne renter ikke været tale om nogen form for faktisk viderebetaling eller gennemstrømning.

Gæld og renter er således »vendt tilbage« til Nordic Telephone Company Investment ApS. Der er ikke foretaget en gældskonvertering i Angel Lux Common S.a.r.l. samtidig med gældskonverteringen i Nordic Telephone Company Investment ApS, hvorfor der ikke foreligger en viderekanalisering.

Også af den grund skal Angel Lux Common S.a.r.l. anerkendes som den retmæssige ejer, jf. SKM 2012.121 ØLR […].

### 5.1.3 Ingen national hjemmel til nægtelse af direktivfordele

Det følger direkte af dansk administrativ praksis, samt af Domstolens afgørelse i Kofoed-dommen, at der skal foreligge interne danske regler, såfremt NTCI ApS skal kunne nægtes fritagelse for renteskat efter rente-/royaltydirektivet.

Skatteministeriet argumenterer fortsat for, at den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 11 og selskabsskattelovens § 2, stk. 1, litra d, udgør sådanne nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug som anført i rente-/royaltydirektivets artikel 5, således at Danmark ikke er forpligtet til at frafalde kildeskatten i henhold til rente-/royaltydirektivet.

Dette er fortsat meningsløst.

Sagsøgers holdning strider åbenlyst mod »den gyldne regel«, hvorefter dobbeltbeskatningsoverenskomster ikke selvstændigt kan hjemle beskatning, hvilket er bekræftet af Landsskatteretten i SKM 2010.268LSR (nu SKM2012.121.ØLR) […].

Den blotte regel om begrænset skattepligt i selskabsskattelovens § 2, stk. 1, litra d udgør selvsagt heller ikke en sådan intern hjemmel til hindring af svig og misbrug. Som allerede dokumenteret ovenfor er Angel Lux Common S.a.r.l. utvivlsomt rette indkomstmodtager af rentebetalingerne fra NTCI ApS, hvorfor der heller ikke i direktivets artikel 5 er hjemmel til at nægte selskabet de fordele der følger af rente-/royaltydirektivet.

Som der også blev redegjort for i Østre Landsrets forelæggelseskendelse til Domstolen, pkt. 109-112 […], fandtes der heller ikke i 2006-2008 en generel lovbestemt regel om bekæmpelse af misbrug. En sådan værnsregel blev først vedtaget ved lov nr. 540 af 29. april 2015 […]. Derudover er der også enighed om, at

**3329**

realitetsgrundsætningen ikke giver grundlag for at tilsidesætte de i denne sag foretagne dispositioner […].

Ovenstående spørgsmål skulle have været afklaret ved Domstolens besvarelse af spørgsmål 2.1 og 3 i forelæggelseskendelsen. Domstolen valgte imidlertid at gennemføre en praksisændring (se afsnit

5.1.5 nedenfor), der medførte at Domstolen ikke tog direkte stilling til spørgsmålene.

Både Kommission og generaladvokaten bidrog dog imidlertid med deres fortolkning. Kommissionen har i sit skriftlige indlæg til Domstolen […] klart anført, at hverken selskabsskattelovens § 2, stk. 1, litra d eller dobbeltbeskatningsoverenskomstens artikel 11 kan anses som en gennemførelse af bestemmelsen i rente-/royalty-direktivets artikel 5. Ligeledes kom generaladvokaten i pkt. 110 i sit forslag til afgørelse frem til, at […]:

»110. *Af denne grund kan spørgsmål 2.1 og 3 besvares med, at hverken § 2, stk. 2, litra d [sic], i den danske selskabsskattelov eller en bestemmelse i en dobbeltbeskatningsoverenskomst, der for så vidt angår beskatningen af renter tager udgangspunkt i den retmæssige ejer, er tilstrækkelige til at kunne betragtes som gennemførelse af artikel 5 i direktiv 2003/49.«*

Både Kommissionen og generaladvokaten støttede således sagsøgers anbringender.

Som nævnt gennemførte Domstolen imidlertid ved afgørelsen en praksisændring, hvorefter EU-direktiver »nu« i sig selv kan påberåbes af en medlemsstat over for borgerne uden krav om national gennemførelse af de relevante bestemmelser.

Skatteministeriet har på linje med EU-Dommen fremsat et synspunkt om, at selv hvis der på tidspunktet ikke fandtes nationale eller overenskomstmæssige regler til bekæmpelse af misbrug, ville det generelle EU-retlige princip om forbud mod retsmisbrug finde anvendelse.

Dette synspunkt har direkte sammenhæng med Domstolens nye praksis og udgør samtidig også endnu et brud på dagældende dansk administrativ praksis. Som nærmere beskrevet i afsnit 5.1.5 lige nedenfor er retssikkerhedsprincippet imidlertid til hinder for at et sådan synspunkt kan tiltrædes.

### 5.1.4 Ændring af dansk praksis

Ved vurderingen af, om Skatteministeriets argumentation er udtryk for en praksisændring, er det ikke alene relevant at se på skattemyndighedernes praksis, men ligeledes relevant at se nærmere på lovgiver og Skatteministeriets (skiftende) syn på problemstillingen.

Problemstillingen vedrører navnlig ministeriets syn på begreberne rette indkomstmodtager, retmæssig ejer, samt anvendelsen af holdingselskaber. Af relevans herfor er derfor også udviklingen i retstilstanden vedrørende skattepligt på udbytter, der ligeledes indeholder mulighed for skattefrihed, hvis beskatningen frafaldes eller nedsættes efter et EU-direktiv eller en dobbeltbeskatningsoverenskomst, og hvor spørgsmålet om den retmæssige ejer af betalingen er den samme i begge relationer.

I Danmark har udenlandske selskaber været begrænset skattepligtige af udbytter siden 1. januar 1970 […].

I 1992 blev moder-/datterselskabsdirektivet implementeret i dansk ret […], hvorefter udbytte som f.eks. et dansk datterselskab udlodder til sit EU-moderselskab, fritages for kildeskat under visse betingelser, jf. også artikel 5 i moder-/datterselskabsdirektivet […].

I 1998 blev også ikke-EU-selskaber omfattet af fritagelsen for udbytteskat […]. Det fremgår af forarbejderne til bestemmelsen, at […] (vores understregning):

»*Det foreslås endvidere at afskaffe kildeskatten på udbytter betalt til udenlandske moderselskaber, når det danske datterselskab er omfattet af EU's moder/datterselskabsdirektiv, således at EU-selskaber og ikke-EU-selskaber skattemæssigt behandles ens. Denne kildeskat kan i vidt omfang undgås ved at indskyde holdingselskaber i lande, i forhold til hvilke Danmark helt eller delvist er afskåret fra at indeholde kildeskat. Indkomst i et dansk datterselskab vil efter forslaget således i Danmark alene blive pålagt dansk selskabsskat, og det udenlandske moderselskab vil i den henseende skattemæssigt*

*i Danmark blive behandlet på samme made som et dansk moderselskab.«*

Af de provenumæssige bemærkninger fremgår det, at […] (vores understregning):

*»M.h.t. skattefritagelsen af udbytter fra danske datterselskaber til udenlandske moderselskaber og udbytter fra udenlandske datterselskaber til danske moderselskaber vil ændringen ikke have betydning for udbytte fra og til et andet EU-land, da disse i forvejen er skattefri, men alene i forhold til lande uden for EU. Der er ikke faste holdepunkter for en bedømmelse af provenuvirkningen. Bl.a. er der ikke oplysninger om udenlandske moderselskabers udbytter fra Danmark eller om danske moderselskabers datterselskabsudbytte fra ikke-EU-lande. På den anden side må det inddrages i vurderingen, at den gældende beskatning kan omgås ved omdirigering af udbytterne til andre EU-lande i 3. lande, således at udbytterne ikke beskattes her i landet.«*

Bemærkningerne kan kun forstås således, at Skatteministeriet i 1998 mente, at indskydelse af holdingselskaber i EU-land var en simpel og lovlig anvendelse af regelsættet, og at man derfor ligeså godt kunne fjerne den administrative byrde ved reglerne.

I 2000 kom Skatteministeriet imidlertid på andre tanker. En særlig adfærdskodeks-gruppe havde i ECOFIN-regi undersøgt 271 skatteordninger i EU-landene og i forlængelse heraf udtrykt kritik af det danske regelsæt.

Den 10. november 2000 blev lovforslag nr. 99 derfor fremsat om genindførelse af udbyttebeskatning for

**3330**

moderselskaber i ikke-EU-lande uden dobbeltbeskatningsoverenskomst med Danmark.

Af lovforslaget fremgår det, at ændringen skyldes kritik udefra, navnlig idet […]:

*»(…), at de danske regler kan anvendes til at udhule andre landes beskatning. Andre lande, som beskatter udbytter fra selskaber i disse lande til moderselskaber i skattely-lande, er derfor utilfreds med, at deres beskatning kan omgås ved hjælp af de danske holdingregler.*

*Det foreslås derfor et bidrag fra dansk side til at modvirke brugen af skattely og for at imødekomme udenlandsk kritik at genindføre skatten på 25 pct. af udbyttebetalinger, fra et dansk datterselskab til dets udenlandsk moderselskab, men kun i tilfælde, hvor moderselskabet er hjemmehørende i et land uden for EU eller i et land, som ikke har en dobbeltbeskatningsoverenskomst med Danmark.«*

Ved vedtagelsen af lovforslaget bringes de danske holdingregler således tilbage til situationen i 1998, dvs. en retstilstand, hvor kildeskat kunne undgås ved at indskyde holdingselskaber i lande, i forhold til hvilke Danmark helt eller delvist var afskåret fra at indeholde kildeskat, jf. de ovenfor citerede forarbejder til 1998-ændringen. Af samme årsag forventede lovgiver også, at merprovenuet ved forslaget ville være begrænset […].

Netop denne situation affødte en del spørgsmål under lovforslaget behandling.

I sin besvarelse af udvalgsspørgsmål 16 […] anvendte skatteministeren et eksempel med et moderselskab på De Britiske Jomfruøer, som har et datterselskab i Irland.

Hvis det irske datterselskab er ejet direkte af moderselskabet på Jomfruøerne, vil Irland beskatte udbyttebetaling fra datterselskab til moderselskab. Genindførelsen af udbyttebeskatning ville medføre, at den irske beskatning ikke længere kunne omgås ved at indskyde et dansk holdingselskab, så det irske datterselskab udlodder udbytte til det danske holdingselskab, der videreudlodder udbyttet til moderselskabet på Jomfruøerne.

Det danske holdingselskab vil efter lovforslaget ikke længere kunne udbetale udbytte skattefri til moderselskabet på Jomfruøerne. Skatteministeriet bekræfter imidlertid også, at […] (vores understregning):

*»Det er korrekt, at moderselskabet på Jomfruøerne fortsat kan undgå den danske beskatning af udbytterne fra det irske selskab ved at overdrage aktierne i det danske selskab til et mellem-holdingselskab på Cypern. I så fald vil Danmark ikke beskatte udbyttet, da moderselskabet på Cypern er omfattet af den danskcypriotiske dobbeltbeskatningsoverenskomst.«*

Til besvarelse af udvalgsspørgsmål 3 om merprovenuet […], svarede skatteministeren:

*»Selskaberne vil imidlertid kunne omstrukturere sig, således at aktierne i det danske datterselskab overdrages til et datterselskab i et land, hvortil udbyttebetalinger fortsat er fritaget for dansk udbytteskat. Dette er fordelagtigt, hvis udbyttet herfra kan videreudloddes til det egentlige moderselskab med en beskatning, som er lavere end den danske, eventuelt helt uden beskatning.*

*Derfor skønnes provenuet fra sådanne selskaber at blive begrænset.«*

Til besvarelse af udvalgsspørgsmål 15, hvor der påpeges, at lovforslagets regler ikke er effektive på grund af muligheden for anvendelse af et mellemholdingselskab […], svarede skatteministeren […]:

*»Det anføres, at de foreslåede regler ikke er særligt effektive, idet de kan undgås ved et mellem-holdingselskab i et andet land, som er med i EU eller har en dobbeltbeskatningsoverenskomst med Danmark, og som har gunstige skatteregler.*

*Jeg vil hertil bemærke, at der i så fald er tale om, at moderselskabet i skattelyland omgår beskatningen ved hjælp af de gunstige regler i det andet land.«*

Samlet set er der ingen tvivl om, at Skatteministeriet ved fjernelsen og genindførelsen af udbytteskatten har været fuldt ud opmærksom på muligheden for at anvende mellem-holdingselskaber i EU eller DBO-lande og på danske skatteskabers mulighed for at udbetale skattefrit udbytte til sådanne selskaber.

Der ikke blev fastsat særlige regler for at modvirke dette, og der nævnes ikke på nogen måde, at der i den forbindelse kan være en problemstilling vedrørende den »retmæssige ejer« af udbyttet. Dette til trods for, at Skatteministeriens besvarelser helt åbenbart omhandler rene gennemstrømningsselskaber.

Denne retstilstand blev igen bekræftet ved svar på spørgsmål 54 fra Skatteministeren i 2004 om implementeringen af rente-/royaltydirektivet i dansk ret […].

I retspraksis lægges der vægt på, om lovgiver har været opmærksom på muligheden for at omgå regelsæt, jf. bl.a. U.2004.174 […], hvor Højesteret kom frem til, at der var tale om lovlig udnyttelse af et regelsæt. Endvidere lægges i retspraksis vægt på, om lovgiver har indført nyere lovgivning vedrørende det område, som skatteyderen agerer indenfor, og Højesteret fortolker ikke en bestemmelse udvidende, såfremt lovgiver har været tæt på problemstillingen uden specifikt at reagere, jf. U.2007.736H […] og U.2004.174H […]. Som det også er beskrevet af professor Anders Nørgaard Laursen i RR.SM.2020.0006 […] vil det få afgørende betydning i sådanne situationer, hvis det kan påvises, at lovgiver undlod at reagere på en erkendt omgåelsesmulighed. I et sådan tilfælde må det være udelukket for domstolene at gribe ind og »redde« skattemyndighederne.

Lovgiver har været opmærksom på problemstillingen uden specifikt at ændre loven eller indsætte bestemmelser til at hindre anvendelsen af EU mellemholdingselskaber, ligesom der på intet tidspunkt før sagskomplekset om beneficial ownership har været anvendt et

**3331**

udvidende »retmæssig ejer«-begreb under direktivet eller dobbelt-beskatningsoverenskomsten.

Dette understøttes af en udtalelse fra kontorchef Michael Dalvad Carlsen fra SKAT til Jyllandsposten den 14. september 2009 (vores understregning) […]:

»*Selv om pengene ikke er strømmet igennem med det samme i alle sager, så gælder den samme begrundelse, nemlig at et selskab i Luxembourg uden råderet og dispositionsret over midlerne, ikke er de retmæssige ejere. Det er de bagvedliggende ejere, og derfor skal der opkræves kildeskat. Om vi så får medhold, ved vi ikke. Vores synspunkt er ret nyt i skattepraksis, så vi må se hvad Højesteret siger, når den kommer til at tage stilling engang.*«

Skatteministeriets (nuværende) synspunkt om anvendelsen af EU mellemholding selskaber udgør dermed også en ændring af dansk praksis.

En sådan praksisændring kan ikke lovligt gennemføres uden forudgående varsel, jf. bl.a. U.1965.399.H […] og U.1983.8.H […], hvilket også er beskrevet i den juridiske vejledning […] - og kræver naturligvis under alle omstændigheder, at den nye praksis har lovhjemmel.

Dette skal også ses i sammenhæng med, at skattemyndighederne så vidt vides ikke i et eneste tilfælde forud for disse sager har anset et udenlandsk selskab for at være begrænset skattepligtig af udbytter ud fra en betragtning om, at selskabet ikke var den retmæssige ejer af indkomsten, uden dette begreb nu fortolkes af Skattestyrelsen. Og slet ikke med henvisning til, at det i den henseende var uden betydning om Danmark havde vedtaget lovbestemmelser med sigte på at hindre svig og misbrug.

I forbindelse med behandlingen af L 30 (2006/2007) blev skatteministeren således spurgt om, i hvilket omfang og hvorledes Skattestyrelsen (SKAT) kontrollerer, om et gennemstrømningsselskab skal anerkendes som rette indkomstmodtager (spørgsmål 10 af 21. november 2006). Skatteministeren udtaler, at […]:

»*Det indgår i den ligningsmæssige behandling at påse, at betingelserne for ikke at indeholde udbytteskat er opfyldt, herunder om et udenlandsk selskab er retmæssig ejer af udbyttet.*«

Ifølge skatteministeren har der således historisk været fokus på området, idet det indgår som en del af det almindelige ligningsarbejde at påse, at udenlandske selskaber er berettiget til fordele efter dobbeltbeskatningsoverenskomsterne, herunder at selskaberne er retmæssige ejere af udbytterne.

Det er i sagens natur ikke muligt at fremvise eksempler på en »negativ afgørelse«, hvor skattemyndighederne vælger ikke at gribe ind. I stedet må det lægges til grund, at skatteministeren havde den fornødne indsigt på området til at fremkomme med følgende besvarelse i forbindelse med samme lovbehandling (svar på spørgsmål 6 af 21. november 2006), hvor han […]:

»*… ikke kan oplyse eksempler på udenlandske gennemstrømningsselskaber, som de danske skattemyndigheder ikke har accepteret som retmæssig ejer af udbytte fra danske selskaber.*«

Ovenstående citat skal navnlig ses i sammenhæng med den fokus, der var på gennemstrømningsselskaber i forbindelse med lovændringerne i 1998-2001, samt at Skatteministeriet i 2003 specifikt undlod at gennemføre en undersøgelse af gennemstrømningsselskaber, idet lovændringen i 2001 i væsentlig omfang havde fjernet udnyttelsesmulighederne, som var blevet kritiseret af EU […]. Den selvsamme lovændring, hvor Skatteministeren i udvalgsspørgsmål bekræftede muligheden for at indskyde mellem-holdingselskaber. Ligeledes var det i 2002 Skattestyrelsens opfattelse, at en ligning af gennemstrømningsselskaber ikke ville føre til mange korrektioner […].

Den tidligere praksis hænger antagelig sammen med, at Skatteministeriet oprindeligt betragtede begrebet retmæssig ejer/»beneficial owner« som værende meget lig det danske begreb »rette indkomstmodtager«.

Skatteministeren har således i et svar af 6. november 2006 på spørgsmål S 474 udtrykt forholdet mellem retmæssig ejer og rette indkomstmodtager som følger (vores understregning) […]:

»*Udgangspunktet er, at udenlandske selskaber, der oppebærer udbytter fra danske selskaber, er begrænset skattepligtige af udbytterne. Skattepligten opfyldes ved indeholdes af 28 pct. udbytteskat.*

*Udgangspunktet fraviges, hvis udbytterne oppebæres af et selskab, der ejer mindst 20 pct. af aktiekapitalen i det udbyttegivende selskab. Ejerskabskravet skal være opfyldt i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningen skal ligge. Det er en betingelse for fravigelsen, at beskatningen skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor udbyttemodtageren er hjemmehørende.*

*Den begrænsede skattepligt - og fravigelsen - gælder for det selskab, der reelt oppebærer udbyttet. Den begrænsede skattepligt fraviges derfor kun, hvis det udenlandske selskab, der reelt oppebærer udbyttet, er omfattet af direktivet eller en dobbeltbeskatningsoverenskomst. Oppebæres udbyttet derimod reelt af et selskab i et skatteleyland, er udbyttebetalingen ikke undtaget fra kildebeskatningen.*

*Princippet om rette indkomstmodtager må således anvendes for at fastslå, hvem der »oppebærer« renterne. Udtrykket »rette indkomstmodtager« må anses for at være meget lig udtrykket »beneficial owner«, som anvendes i dobbeltbeskatningsoverenskomsterne. I dobbeltbeskatnings-overenskomsterne skal kildebeskatning kun frafaldes eller nedsættes, hvis udbytternes retmæssige*

**3332**

*ejer (beneficial owner) er hjemmehørende i den anden stat.*

*Bestemmelsen er et værn mod, at et almindeligt beskattet selskab indskydes som »conduit« selskab mellem det udbyttebetalende danske selskab og det endeligt modtagende udenlandske skattely-selskab. Bestemmelsen finder anvendelse, selvom der indskydes flere mellemliggende almindeligt beskattede selskaber. Det afgørende er, hvem der er den rette indkomstmodtager/retmæssig ejer.*«

Skatteministeren fremsætter også denne opfattelse i forbindelse med behandlingen af L 116 (lov nr. 308 af 19. april 2006), hvor ministeren som svar på en henvendelse fra FSR udtaler (vores understregning) […]:

»*Den begrænsede skattepligt for renter efter selskabsskattelovens § 2, stk. 1, litra d, omfatter udenlandske selskaber, der oppebærer koncerninterne renter fra Danmark. Denne begrænsede skattepligt bortfalder, hvis beskatningen skal frafaldes eller nedsættes efter rente-/royaltydirektivet eller efter en dobbeltbeskatningsoverenskomst.*

*I den forbindelse skal man være opmærksom på, at i forhold til selskabsskattelovens § 2, stk. 1, litra d, må det afgøres ud fra princippet om rette indkomstmodtager, hvem der oppebærer renterne.*

*Kildebeskatning af renterne skal nemlig kun frafaldes eller overensskomsterne, hvis renternes retmæssige ejer er hjemmehørende i den anden stat. Tilsvarende gælder i rente-/royaltydirektivet, jf. direktivets artikel 1, stk. 1. Direktivets fordele kan endvidere nægtes anvendt i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.*

*Hvis kapitalfondene foretager aktie- og låneinvesteringer via holdingselskaber, vil det skulle vurderes, om holdingselskabet er rette indkomstmodtager/retmæssig ejer af renteindkomsten. Et ret*

*gennemstrømningsselskab i eksempelvis Luxembourg kan efter min opfattelse næppe være rette indkomstmodtager/retmæssig ejer af renteindkomsten. Den schweiziske højesteret er kommet frem til, at et rent gennemstrømningsholdingselskab i Danmark ikke var retmæssig ejer til udbyttebetalinger efter den dansk - schweiziske overenskomst.«*

Skatteministeriet gentager endnu engang denne holdning i et notat udsendt den 20. marts 2007 vedrørende »Status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner«. I pressemeddelelsen hedder det blandt andet (vores understregning) […]:

*»På grundlag heraf undersøges der hvem, der er den endelige modtager - »rette indkomstmodtager« - af renter og udbytter. Formålet er at fastslå, om denne modtager er skattepligtig til Danmark (begrænset skattepligtig), således at der kan tilbageholdes kildeskat i udbetalingerne. Dette kan normalt kun ske, hvis modtageren er hjemmehørende i et land hvormed Danmark ikke har indgået dobbeltbeskatningsoverenskomst.*

*Imidlertid forlader pengestrømmen oftest Danmark netop til modtagere i lande, hvormed Danmark har indgået dobbeltbeskatningsoverenskomst - DBO-lande. Det betyder, at der ikke er begrænset skattepligt til Danmark, og at der ikke skal indeholdes kildeskat. Hvis den første modtager af betalingerne imidlertid ikke er den endelige modtager - »rette indkomstmodtager« - af betalingerne, men derimod kun et gennemstrømningsselskab, kan der alligevel være tale om begrænset skattepligt for den endelige (»rette«) modtager.«*

I denne sag er der som nævnt enighed om, at Angel Lux Common anses for den rette indkomstmodtager af renterne fra NTCI […].

Derfor, og da en ændring af administrativ praksis ikke kan ske med tilbagevirkende kraft og i øvrigt ikke uden et passende varsel, jf. UfR 1965.399.H og UfR 1983.8.H, var Skattestyrelsen heller ikke berettiget til i 2009-2010 med tilbagevirkende kraft for 2006-2008 at ændre fast praksis for, om udenlandske selskaber er retmæssige ejere af rentebetalinger, og på den baggrund rejse et skattekrav på 925.764.961 DKK.

*5.1.5 EU-retlige ændringer*

Det fremgår af Domstolens faste praksis, at den fortolkning, som Domstolen foretager af en EU-retlig regel under udøvelse af sin kompetence i henhold til artikel 267 TEUF, i nødvendigt omfang belyser og præciserer betydningen og rækkevidden af den pågældende regel, således som den skal forstås og anvendes, henholdsvis burde have været forstået og anvendt fra sin ikrafttræden.

Domstolen betragter i disse tilfælde ikke den nye bedømmelse som en praksisændring, idet fortolkningen principielt altid burde have været forstået og anvendt på denne måde. Denne betragtning ændrer dog ikke på det faktum, at Domstolen rent faktisk gennemfører praksisændringer baseret på udviklingen i både det juridiske og politiske system.

Et eksempel på dette kan ses ved at sammenholde sagerne C-18/11, Philips og C-28/17, NN.

…

Udviklingen i EU-lovgivers syn på og bekæmpelse af skatteundgåelse førte altså nu til en direkte modsat konklusion på det tidligere afgjorte spørgsmål. Det opsigtsvækkende ved Domstolens »nye« praksis på dette område er også beskrevet i den juridiske litteratur […].

Det antages også i praksis fra Højesteret og af Skatteministeriet og i øvrigt også i litteraturen om retlig (suverænitetsabsorberende) aktivisme, at Domstolen fra tid til anden opstiller nye skærpede EU-krav, jf. eksempelvis Højesterets dom gengivet i U.2017.824 H (Ajos) […]. I sådanne tilfælde kan Domstolens fortolkning med

tilbagevirkende kraft ikke accepteres i dansk ret af hensyn til retssikkerheden.

Såfremt EU-Dommen skal læses således, at EU-direktiver eller det EU-retlige misbrugsprincip »nu« *i sig selv* kan påberåbes af en medlemsstat over for borgerne, er der tale om en ny og skærpet retsstilling, forringende for borgerne, som Domstolen hidtil udtrykkeligt har anset for værende uforeneligt med retssikkerhedsprincippet, jf. Kofoed-dommen […].

…

*5.1.5.1 Sag C-321/05, Kofoed og frem*

I sag C-321/05, Kofoed skulle Domstolen bl.a. tage stilling til, om det almindelige EU-retlige princip om retsmisbrug kunne anvendes direkte over for en skatteyder, hvis det er ikke er gennemført i national (dansk) ret.

Konkret skulle Domstolen tage stilling til en aktieombytning, og om de danske skattemyndigheder kunne reagere på et eventuelt retsmisbrug af reglerne, selv om Danmark ikke havde vedtaget specifikke foranstaltninger til gennemførelse af artikel 11 i direktiv 90/434.

I juli 2007 var svaret fra Domstolen var klart »nej«.

Det almindelige EU-retlige princip om retsmisbrug kan ikke anvendes direkte over for en skatteyder, hvis det er ikke er gennemført i national ret.

…

Domstolen afsagde Kofoed-dommen i overensstemmelse med forslaget til afgørelsen, og fastslog dermed, at selvom den omhandlede artikel 11, stk. 1, litra a), i direktiv 90/434 afspejlede det almindelige fællesskabsretlige princip om forbud mod retsmisbrug, og at der i sagen forelå indicier på et sådant misbrug, kunne de danske skattemyndigheder ikke anvende misbrugsprincippet uden at bestemmelsen var gennemført i dansk ret eller, at dansk ret indeholdte en grundsætning med et forbud mod retsmisbrug, eller andre bestemmelser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med artikel 11, jf. Kofoed-dommens pr. 38 og 40-42.

De danske skattemyndigheder måtte herefter anerkende, at der ikke i dansk ret var hjemmel til at beskatte aktieombytningen.

Kofoed-dommen er udtryk for en fast og langvarig praksis fra Domstolen. Denne praksis er gentagne gange bekræftet i EU-praksis, som Kommissionen også har redegjort for i sit skriftlige indlæg til Domstolen […]. Der er heller ikke i den praksis, som nævnes i EU-Dommen, ét eneste eksempel på en EU-dom, der afviger fra Kofoed-dommen i denne henseende.

I pkt. 103 i sit forslag til afgørelse i EU-Dommen har generaladvokat Kokott igen redegjort for gældende praksis, som den har set ud siden forslag og efterfølgende dom i C-321/05, Kofoed i 2007
…

I direkte sammenhæng hermed understreger generaladvokaten i pkt. 104 også, hvorfor samme retspraksis fører til, at princippet om forbud mod retsmisbrug heller ikke kan anvendes i denne sag …

…

Ved sit forslag til afgørelse har generaladvokaten med andre ord fastholdt og bekræftet EU-praksis, som den har været fra Kofoeddommen i 2007 frem til EU-Dommen i 2019. Det er den samme redegørelse for praksis, som også blev fremført af Kommissionen og som også blevet fremført af sagsøger og Skatteministeriets modparter i de øvrige sager i komplekset.

Præcis som i Kofoed-dommen var svaret på spørgsmålet - forud for EU-Dommen - fortsat »nej«, når det skulle vurderes om det almindelige EU-retlige princip om retsmisbrug kan anvendes direkte overfor en skatteyder, hvis det er ikke er gennemført i national ret, eller hvis dansk ret ikke på daværende tidspunkt indeholdte en grundsætning med et forbud mod retsmisbrug, eller andre bestem-

**3333**

Copyright © 2023 Karnov Group Denmark A/S

melser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med bestemmelsen.

Forud for EU-Dommen stod Skatteministeriet dermed helt og aldeles alene med sin fortolkning.

### 5.1.5.2 Domstolens afgørelse i sag C-115/16 mv., N Luxembourg I

Domstolen kom ved EU-Dommen i direkte modstrid med hidtidig EU-praksis, Kommissionens redegørelse og generaladvokatens forslag til afgørelse frem til, at det almindelige EU-retlige princip om misbrug finder anvendelse, selv uden national gennemførelse af rente-/royaltydirektivets artikel 8, jf. EU-Dommens pr. 117 […].

…

Denne situation, hvor resultatet i EU-Dommen er det diametralt modsatte af Kofoed-dommen og tidligere praksis, og hvor Domstolen selv anerkender, at det er nødvendigt at se bort fra Kofoed-dommen, anser Skatteministeriet som intet mere end Domstolens belysning og præcisering af retstilstanden.

Dette synspunkt kan selvsagt ikke tiltrædes.

I Kofoed-dommen blev Domstolen også direkte spurgt om hvorvidt konstatering af et evt. retsmisbrug kan have indflydelse på om det EU-retlige misbrugsdoktrin kan finde anvendelse uden national gennemførelse. Det anføres af Domstolen […], at den forelæggende ret nærmere bestemt ønskede oplyst, om skattemyndighederne kunne reagere på et eventuelt retsmisbrug, selv om den nationale lovgiver ikke havde vedtaget specifikke foranstaltninger til gennemførelse af artikel 11 i direktiv 90/434.

Under overskriften *»Om muligheden for at tage hensyn til et eventuelt retsmisbrug«* kom Domstolen frem til at uden en national gennemførelse var retssikkerhedsprincippet *til hinder* for anvendelsen af det EU-retlige misbrugsprincip […]. Direktiver kan ikke som sådan

**3344**

påberåbes overfor en borger, og medlemsstaten kan derfor heller ikke uden implementering påberåbe sig det EU-retlige misbrugsprincip. Og dette selvom der i sagen var »visse indicier« på et evt. retsmisbrug […].

Domstolen fastsætter altså utvetydigt, at den nationale ret *ikke* kan tage hensyn til et evt. retsmisbrug og anvende det EU-retlige misbrugsprincip, hvis princippet ikke er gennemført i national ret. Med andre ord var misbrugsvurderingen i denne situation reelt uden betydning for adgangen til fordele efter EU-retten. Hvis den danske stat ikke har indført national hjemmel til at anvendelse EU-rettens misbrugsprincip, er retssikkerhedsprincippet til hinder for anvendelsen af princippet.

Skatteministeriet forsøger i sagen at komme uden om denne konklusion ved at omskrive problemstillingen. Det anføres, at der i sagen ikke er tale om at der pålægges en forpligtelse for borgeren eller en påberåbelse af misbrugsprincippet. I stedet er der tale om et tilfælde, hvor der for foreligger retsmisbrug og derfor er det blot er tale om at de objektive betingelser for at opnå en fordel i henhold til EU-retten ikke er opfyldt, fordi fordelen søges opnået ved retsmisbrug.

Faktum er dog fortsat at Skatteministeriet, i en situation uden nationale mis-brugsbestemmelser, ønsker at nægte en fordel under EU-retten med henvisning til, at der sket retsmisbrug. Det er netop denne situation som Domstolen ved Kofoed-dommen afviste. Den nationale ret kan ikke tage hensyn til om der er sket retsmisbrug eller ej, hvis misbrugsprincippet ikke er gennemført i national ret.

Det er på dette afgørende punkt, at *EU-Dommen har ændret praksis*. Uanset Kofoed-dommens præmisser, kan det EU-retlige misbrugsprincip *nu* påberåbes over for en skatteyder uden national gennemførelse.

EU-Dommen udgør dermed også klart en praksisændring fra Kofoed-dommen og hidtidig øvrig EU-praksis.

Skatteministeriet finder da heller ingen støtte i hverken den nationale eller internationale juridiske litteratur, hvor EU-Dommen vidt og bredt betragtes som ny praksis og en opsigtsvækkende og skelsættende afgørelse […].

…

### 5.1.5.3 Anvendelse af Domstolens nye praksis

Denne nye praksis har Domstolen for det *første* slet ikke kompetence til at indføre.

Spørgsmålet om den direkte anvendelse af et uskrevet, allestedsgældende og generelt EU-retlig princip, der ikke kræver nationale bestemmelser, men til stadighed kan have direkte virkning for borgerne, er et spørgsmål om suverænitet. Hvorvidt Danmark konkret kan have afgivet suverænitet, der giver EU-Domstolen en sådan vid adgang til at overtrumfe nationale og EU-retlige bestemmelser, kan alene afgøres af de danske domstole.

Ved Danmarks indtræden i EU i 1972 redegjorde Justitsministeriet for, at dele af EU-retten var umiddelbart anvendelig med direkte virkning for borgerne […] og sådanne bestemmelser blev i tiltrædelsesloven en del af dansk ret […]. Højesteret har dog i U.2017.824H […] fastslået, at det var (vores understregning) […]:

»(…) *velkendt og også forudset i tiltrædelsesloven, at EU-Domstolen kan udvikle og fastslå generelle principper, der har deres oprindelse i Den Europæiske Menneskerettighedskonvention og tilsvarende traktater og i medlemsstaternes fælles forfatningsmæssige traditioner. Sådanne generelle principper er imidlertid efter tiltrædelsesloven ikke umiddelbart anvendelige i Danmark, og de kan således ikke påberåbes i tvister mellem private.*

I EU-Dommen anføres det, at det almindelige EU-retlige misbrugsprincip, som Skatteministeriet påberåber, kan udledes af fast retspraksis på en række forskellige områder […]. Princippet har imidlertid ikke grundlag i nogen traktatbestemmelse.

Situation var den samme i Højesterets afgørelse i U.2017.824H […], …

Højesterets konklusion var herefter, at tiltrædelsesloven ikke indeholdt den nødvendige hjemmel til at anvende et almindeligt EU-retligt princip med forpligtende virkning over for private.

Med afsæt heri gøres det af sagsøger gældende, at der heller ikke i denne sag er den påkrævede udtrykkelige hjemmel i den danske tiltrædelseslov til at påberåbe det omhandlede uskrevne, generelle EU-retlige princip om forbud mod misbrug med direkte virkning over for en borger.

Retssikkerhedsprincippet udelukker tillige anvendelsen af denne nye praksis i sagen, og nægtelse af fordele efter direktivet og påberåbelse af det almindelige EU-retlige misbrugsprincip må i denne sag derfor fortsat kræve hjemmel i national ret. Retssikkerhedsprincippet er et grundlæggende EU-retligt princip, som kræver, at en ordning, der nægter en skattepligtig rettigheder eller pålægger en skattepligtig byrder, er klar og utvetydig, for at den skattepligtige ikke skal være i tvivl om sine rettigheder og pligter, således at han kan handle derefter, jf. C-143/93, Van Es Douanne Agenten.

På samme måde som Domstolen i NN-sagen en årrække efter Phillips-sagen skulle tage stilling til selvsamme problemstilling, skulle Domstolen i denne sag i 2019 foretage en bedømmelse af den praksis, som Domstolen selv fastslog i Kofoed-dommen i 2007. I tiden fra Kofoed til EU-dommen fremsatte EU-kommissionen i 2012 sin handlingsplan til styrkelse af bekæmpelsen af skattesvig og skatteunddragelse […], der i de kommende år skulle udvikle specifikke foranstaltninger mod skattesvig, herunder en anbefaling om indførelse af generelle anti-misbrugsregler […]. I 2016 indførte EU da også et særligt direktiv til bekæmpelse af skatteunddragelse, der i artikel 6 netop indeholdt en generel regel om

**3335**

bekæmpelse af misbrug […]. Generelle værnsregler var i 2019 så-ledes udbredt i EU-retten og blev i 2015 også indført i Danmark. I lovforslaget til den danske regel henvises der også til et memo offentliggjort af EU-kommissionen om imødegåelse af netop ind-skydelse af et EU mellem-holding selskab […].

Det er en oplagt tanke, at Domstolens nye fortolkning om anven-delsen af det almindelige EU-retlige misbrugsprincip - som i NN-sagen - var drevet af en opfattelse af, at udviklingen i EU omkring skatteundgåelse ikke er afspejlet i Kofoed-dommen, og at det i Domstolens optik derfor var på tide at *ændre praksis*.

Under sådanne omstændigheder vejer hensynet til retssikkerhed imidlertid højere end EU-rettens forrang, jf. til sammenligning de vurderinger som Højesteret foretog i U.2012.3564H […] og U.2017.824H […].

*5.1.6 Der foreligger ikke misbrug*

*5.1.6.1 Subjektivt og objektivt krav*

I præmis 124 i sag C-115/16 (forenede sager) udtaler EU-domsto-len, at […]:

…

Det er således en betingelse for at statuere misbrug, at der forelig-ger både objektive omstændigheder og et subjektivt element, der har til hensigt uberettiget at drage fordel af EU-retten.

Nedenfor belyses nærmere en række forhold, hvoraf det vil fremgå, at der ikke foreligger sådanne objektive og subjektive ele-menter, der kræves for at statuere misbrug.

Det fastholdes således, at der under alle omstændigheder konkret slet ikke er sket retsmisbrug. Dette følger også allerede af, at der ikke efter dansk ret er holdepunkter til støtte for at tilsidesætte de i denne sag foretagne dispositioner ud fra en realitetsgrundsætning, henholdsvis at SKAT og Skatteministeriet anerkender Angel Lux Common S.a.r.l. som rette indkomstmodtager […].

*5.1.6.2 Fælles etablering i Luxembourg*

Indledningsvist skal det bemærkes, at en kapitalfond er udtryk for en fælles »investeringsforening«, hvis investorer hovedsageligt er institutionelle investorer eller velhavende enkeltpersoner. Der vil således ofte være tale om et større antal bagvedliggende investo-rer i hver enkelt kapitalfond, som det også er tilfældet i denne sag, […].

I denne sag er der tale om, at hundredevis af investorer har samlet deres investering i forskellige kapitalfonde. Kapitalfondene har efterfølgende valgt at pulje midlerne sammen ved at etablere et samlet konsortium for dermed at have tilstrækkelig kapital til at foretage så massivt et opkøb som købet af TDC A/S var.

I sådant et tilfælde, hvor flere kapitalfonde investerer i samme selskab, og i en situation hvor disse kapitalfonde ikke er etableret i samme land, er der være behov for at samle investorerne på en fælles platform. Investorerne har således behov for at have en fælles struktur til at foretage investeringen igennem.

Kapitalfonde og andre udenlandske investorer har historisk fore-taget deres investeringer via Luxembourg, primært som følge af, at Luxembourg juridisk, regulatorisk, finansielt og politisk anses for et attraktivt og stabilt land at investere igennem. Som følge heraf blev det øverste lag af investerings struturen etableret i Luxembourg […].

På tidspunktet for det oprindelige valg af Luxembourg som øverste »holding-jurisdiktion« var det uden betydning for spørgsmålet om kildeskat og renter, hvor i verden selskaberne var hjemmehørende, idet forudsætningen for, at der kan blive tale om kildeskat på rente-betalinger, er, at der er tale om kontrolleret gæld. På tidspunktet for stiftelsen af de oprindelige holdingselskaber i Luxembourg (sommeren og efteråret 2005) var der slet ikke tale om kontrolleret gæld efter dansk ret og dermed ingen begrænset skattepligt. Juste-

ringen af definitionen til kontrolleret gæld blev først fremsat ved lovforslag nr. 116 af 14. december 2005 […].

Det bestrides således, at der ikke er en troværdig forretningsmæs-sig begrundelse for arrangementet, og at baggrunden herfor alene skulle være at tilegne koncernen skattemæssige fordele.

Etablering af en holdingstruktur, når flere investerer sammen, er velkendt og forretningsmæssigt velbegrundet, som det også er lagt til grund af retten fx i den canadiske Federal Court of Appeals dom af 26. april 2009 vedrørende Prévost Car Inc. […]. …

Udover samlingen af investeringen i Luxembourg, var der derud-over behov for en fælles holdingstruktur i Danmark, idet det inde-bærer en række fordele i forhold til finansieringen af erhvervelsen, herunder dansk sambeskatning, fremsættelse af samlet købstilbud og mulighederne for endelig gennemførelse af købet og i det hele håndteringen af fondenes fælles investering […].

*5.1.6.3 Civilretligt ejerskab*

Angel Lux Common S.a.r.l. var ubestridt den civilretlige ejer af såvel de af NTCI ApS udstedte PECs som de dertilhørende renter.

De modtagne rentebetalinger var ligeledes skattepligtige i Luxembourg […], og Angel Lux Common S.a.r.l. har også rent faktisk betalt skat i Luxembourg af rentebetalingerne.

Af selskabets årsrapporter fremgår det således, at skatten i 2007 udgjorde EUR 180.066, mens skatten i 2008 udgjorde EUR 104.228.

*5.1.6.4 Reel råden over renterne*

Det gøres gældende, at Angel Lux Common havde selvstændig ret til at disponere over rentebeløbene.

Der var for det første ingen juridiske begrænsninger i Angel Lux Commons adgang til at disponere over renter på PECs udstedt af NTCI ApS.

**3336**

For det andet var Angel Lux Common heller ikke i praksis under-lagt nogen som helst begrænsninger i adgangen til at disponere over modtagne/tilskrevne rentebeløb.

Det fulgte således af vilkårene for de af Angel Lux Common ud-stedte PECs, at Angel Lux Common selv traf beslutning om, hvorvidt renter på PECs udstedt af Angel Lux Common skulle be-tales eller tilskrives.

Endvidere kunne Angel Lux Common træffe beslutning om, at renter på PECs udstedt af Angel Lux Common skulle betales kon-tant, ved udstedelse af yderligere PECs eller ved udstedelse af ka-pital-andele i selskabet, jf. således pkt. 2.2 og 3.1 i vilkårene for de pågældende PECs […].

Angel Lux Common var således ikke retligt eller praktisk forpligtet til at anvende rentebeløb modtaget fra NTCI ApS til betaling til Angel Lux Parent. Angel Lux Common har da heller ikke i væsent-ligt omfang faktisk anvendt rentebeløb modtaget fra NTCI ApS til betaling af renter på de af Angel Lux Common udstedte PECs.

Tilskrivningen af renter på NTCI ApS' gæld til Angel Lux Com-mon medførte, at Angel Lux Commons fordring på NTCI ApS ved hver tilskrivning blev forøget med et beløb svarende til de tilskrevne renter.

Da Angel Lux Common den 10. juli 2008 besluttede at konvertere fordringen på NTCI ApS til anparter i NTCI ApS, disponerede Angel Lux Common således over et led i denne konvertering over de tilskrevne rentebeløb. Konverteringen af fordringen på NTCI ApS, herunder de tilskrevne renter, blev således besluttet af Angel Lux Common på en ekstraordinær generalforsamling i NTCI ApS den 10. juli 2008.

Beslutningen om at disponere over fordringen på NTCI ApS, herunder de tilskrevne renter, ved konvertering til anparter i NTCI ApS kunne juridisk set alene tages af Angel Lux Common og blev også faktisk alene taget af Angel Lux Common.

Det ville selvsagt være umuligt for Angel Lux Common at træffe beslutning om at konvertere de tilskrevne rentebeløb til anparter i NTCI ApS, hvis Angel Lux Common i praksis ikke havde nogen selvstændig ret til at disponere over renterne.

Angel Lux Commons beslutning om konvertering af de tilskrevne renter dokumenterer således, at Angel Lux Common - som den eneste - havde ret til at disponere over renterne.

Beslutninger om, hvorledes Angel Lux Common skulle disponere over renterne, blev heller ikke rent faktisk truffet af andre end ledelsen i Angel Lux Common. Tværtimod er samtlige beslutninger vedrørende Angel Lux Commons råden over renterne truffet af ledelsen i Angel Lux Common.

Angel Lux Common var således ikke retligt eller faktisk forpligtet til at anvende rentebeløb modtaget fra NTCI ApS til betaling til Angel Lux Parent.

For så vidt angår PEC-lånet mellem NTCI ApS og Angel Lux Common traf NTCI ApS selv beslutning om, hvorvidt renter på PEC's udstedt af Nordic Telephone Company Investment ApS skulle betales samt tidspunktet herfor.

Endvidere kunne Nordic Telephone Company Investment ApS træffe beslutning om, at renter på PECs udstedt af Nordic Telephone Company Investment ApS skulle betales kontant ved udstedelse af yderligere PECs eller ved udstedelse af kapitalandele i selskabet.

Både Nordic Telephone Company Investment ApS og Angel Lux Common havde således reel råden over rentebetalingerne til henholdsvis Angel Lux Common og Angel Lux Parent,

Det forhold, at der ikke blev foretaget en gældskonvertering i Angel Lux Common samtidig med gældskonverteringen i Nordic Telephone Company Investment ApS, afspejler netop, at Angel Lux Common og Angel Lux Parent havde fuld rådighed over det indbyrdes gældsforhold.

Det bestrides, at aktivitetsniveauet har afgørende betydning for, om Angel Lux Common er retmæssig ejer. I den forbindelse bemærkes, at de fysiske rammer og aktiviteten i ethvert selskab naturligvis er afpasset efter karakteren af den virksomhed, som det pågældende selskab varetager.

Angel Lux Common havde på tidspunktet for modtagelsen af renterne til formål at eje aktier i NTCI. I sagens natur vil et holdingselskabs aktivitet have begrænset omfang, idet der dog skal afholdes en enkelt eller få årlige generalforsamlinger og få årlige bestyrelsesmøder for at træffe de for holdingselskabet relevante og nødvendige beslutninger. Som nævnt indledningsvist råder Angel Lux Common over lokaler i Luxembourg, ligesom selskabet har en person ansat.

Angel Lux Commons aktivitet svarer således til den aktivitet, der er i tusindvis af danske og udenlandske holdingselskaber, som de danske skattemyndigheder efter fast praksis (tidligere) - og med rette - har anset som retmæssige ejere af udbytter udloddet fra datterselskaber.

Det gøres i forlængelse af ovenstående gældende, at et selskab skal anerkendes som retmæssig ejer, også når det driver virksomhed som holdingselskab, jf. hertil betragtningerne i Prévost-dommen behandlet ovenfor i punkt 5.1.6.2.

Det bemærkes endvidere, at Højesteret i TfS 2004.542 H (Johnson Holding A/S) [...] har fastslået, at et holdingselskab, hvis virksomhed alene består i at besidde kapitalandele i ét eller flere datterselskaber, må anses

**3337**

for erhvervsdrivende ved anvendelsen af de skatteretlige regler.

Realiteten er at Angel Lux Common S.a.r.l udøver den virksomhed, som ethvert holdingselskab gør, nemlig besidde kapital er ejerandele i et eller flere andre selskaber og disponering over ejerandelene

- alt i overensstemmelse med de beslutninger, som holdingselskabets ledelse løbende træffer.

*5.1.6.5 Reel nytte og risiko*

De udstedte PECs forrentedes ikke ens. PECs udstedt af NTCI ApS forrentedes med 10 %, mens forrentningen af PECs udstedt af Angel Lux Common S.a.r.l. var 9,96875 %.

Selv hvis de to lån skulle ses samlet, ville Angel Lux Common S.a.r.l. til enhver tid være sikker på at generere et overskud, hvilket også understreges af, at selskabet faktisk har betalt selskabsskat i Luxembourg i den omhandlede periode.

Renteindtægterne har derfor haft en reel nytteværdi for Angel Lux Common S.a.r.l.

*5.2 Sagsøgers subsidiære påstand - ultimative ejere*

*5.2.1 Indledende bemærkninger*

Der er enighed mellem parterne om, at det samlede kildeskattekrav helt eller delvist skal frafaldes, såfremt de ultimative investorer i de overliggende kapitalfonde er hjemmehørende i en EU-medlemsstat eller en stat, som Danmark har indgået en dobbeltbeskatningsoverenskomst med.

Uenigheden består herefter i, om der kan opstilles yderligere betingelser for lempelse af kildeskat.

Oprindeligt var der ikke samme uenighed, og det fremgår derfor også adskillige steder af SKATs oprindelige afgørelse og sagsfremstilling, at kildeskatten skal frafaldes eller nedsættes i det omfang, de retmæssige ejere af betalte eller godskrevne renter er hjemmehørende i et DBO- eller EU-land, [...].

I SKATs afgørelse og sagsfremstilling anføres [...]:

»*De to selskaber i Luxembourg anses derimod for at fungere som gennem-strømningsenheder for kapitalfondene og bankerne, der hovedsagligt er hjemmehørende i lande uden dobbeltbeskatningsoverenskomst med Danmark, og dermed ikke berettiget til at opnå de fordele, der følger heraf.*

*Renterne strømmer således fra den danske del af koncernen gennem selskaberne i Luxembourg og videre til kapitalfondene og bankerne.*«

Af SKATs foreløbige afgørelse anføres, at (vores understregning) [...]:

»*Det er på den baggrund SKATs opfattelse, at der skal ske indeholdelse af rentekildeskat af de tilskrevne/betalte renter i Nordic Telephone Company Invest-ment ApS til Angel Lux Coomon S.á.r.l. i perioden fra 1. maj 2006 til den 10. juli 2008.*

*Det gælder dog ikke den andel af renter, som ender hos de ultimative PECs-ejere. der er hjemmehørende i et DBO-land.*«

Videre anføres (vores understregning):

»*Såfremt selskabet efterfølgende fremkommer med dokumentation, der påviser, at der blandt kapitalfondene og bankerne er enkelte hjemmehørende i lande med en dobbeltbeskatningsoverenskomst med Danmark, vil SKAT foretage rettelser i grundlaget for beregningen af provenuet.*«

I sagsfremstillingen anføres der videre [...] (vores understregning):

»*SKAT har intet kendskab til de bagvedliggende ejerstrukturer, men det er SKATs opfattelse, at i det omfang gennemstrømningen er sket til selskaber, der er hjemmehørende i et DBO- eller EU-land, vil der eventuelt skulle ske en nedsættelse (evt. et frafald) af kildeskatten.*

*SKAT baserer denne vurdering på, at hensigten med kravet om at den formelle modtager af renterne er renternes retmæssige ejer, er at forhindre skatteunddragelse og misbrug. Et misbrug af DBO'erne/EU-retten vil imidlertid ikke forekomme, hvis renterne umiddelbart strømmer videre til et selskab i et DBO- eller EU-land og dér betragtes som skattepligtige for den bagvedliggende ejer.*«

Det har således klart været SKAT's opfattelse, at kildeskatten skal frafaldes eller nedsættes i det omfang de ultimative ejere af rente-betalingerne er hjemmehørende i et EU- eller DBO-land.

Det fremgår dog videre, at først SKAT […] og herefter Skattemi-nisteriet […] ender med at opstille yderligere - uhjemlede - betin-gelser, som skal være opfyldt førend kildeskat skal nedsættes eller bortfalde. NTC har under hele sagen opfordret først SKAT og ef-terfølgende Skatteministeriet til for det første at angive, hvor de yderligere betingelser er hjemlet og for det andet, om de oplyste betingelser efter ministeriets opfattelse er opfattede.

Ingen af delene har SKAT eller Skatteministeriet ønsket at oplyse. I stedet har Skatteministeriet fastholdt at NTC blot kan opfylde de ikke-udtømmende og uhjemlede dokumentationskrav. Herefter kan Skatteministeriet oplyse om der behov for at NTC opfylder yderlig-ere uhjemlede dokumentationskrav.

Det gøres overordnet gældende, at de af Skatteministeriet opstil-lede krav, herunder i) at renterne påviseligt er videreført til den hævdede retmæssige ejer, ii) at de mellemliggende »led« mellem det rentemodtagende selskab og den hævdede retmæssige ejer ikke har kunnet råd over renterne og iii) at den hævdede retmæssige ejer selv har kunnet råde over renterne, hverken har støtte i intern dansk skatteret, i dobbeltbeskatningsoverenskomster eller i EU-retten.

**3338**

At der helt grundlæggende ikke gælder supplerende krav som påstået af Skatteministeriet for at »beneficial owners« har ret til lempelse fremgår klart af kommentarerne til OECDs modelove-renskomst, jf. pkt. 9 og 11 til artikel 11 […].

Det gøres gældende, at den store andel af ultimative investorer, som er hjemmehørende i DBO-lande og dermed berettigede til frafald af dansk kildeskat på dansk renteindkomst, bekræfter, at der *slet ikke* er tale om et gennemstrømningsforhold.

De ultimative investorer er helt overvejende hjemmehørende i DBO-lande og ville således under alle omstændigheder ikke have været skattepligtige til Danmark af renteindkomst.

Da der således ikke var behov for en gennemstrømningsstruktur, foreligger der heller ikke »misbrug«, og der kan ikke opstå pligt til at indeholde dansk kildeskat overhovedet.

Under alle omstændigheder og uanset afgørelsen af spørgsmålet om, hvorvidt Angel Lux Common S.a.r.l. er retmæssig ejer af ren-terne, skal den danske kildeskat i det mindste frafaldes i forhold til disse investorer.

*5.2.2 Ultimative retmæssige ejere*

Såfremt Angel Lux Common S.a.r.l. ikke kan betragtes som den retmæssige ejer af renterne må der findes frem til de ultimative retmæssige ejere. Der kan naturligvis ikke sporadisk eller arbitrært vælges et andet mellemliggende selskab, medmindre dette i sig selv og efter en nærmere analyse opfylder kriterierne for at være den retmæssige ejer af renterne.

Anerkendes Angel Lux Common S.a.r.l. ikke som retmæssig ejer, gøres det gældende, at de bagvedliggende aktionærer skal anses for de retmæssige ejere. Det er derfor også dobbeltbeskatningsove-renskomsterne mellem Danmark og de stater, hvori de bagvedlig-gende investorer er hjemmehørende, der er afgørende for, om Danmark skal lempe kildebeskatningen. Dette gælder uanset, at den retmæssige ejer ikke er den umiddelbare modtager af renterne.

Som anført ovenfor ejes Angel Lux Parent S.a.r.l. af en række kapitalfonde: Permira, Apax, Blackstone, Providence og KKR. De bagvedliggende investorer i ovenævnte kapitalfonde omfatter dels institutionelle investorer, herunder pensionsselskaber, banker og forsikringsselskaber, dels fonde og universiteter, men herudover også privatpersoner.

Hver af ovennævnte kapitalfonde har udarbejdet detaljerede opgø-relser over de bagvedliggende investorer i fondene, herunder navn, identifikationsoplysninger, typen af investor, procentvis investering i fonden, om der består en dobbeltbeskatningsoverenskomst med Danmark mv. Opgørelserne er udarbejdet på baggrund af bagved-liggende dokumentation for de pågældende forhold.

Disse opgørelser af de bagvedliggende investorer i kapitalfondene viser overordnet set, at mellem 58 % og 81 % af investorerne er omfattet af en dobbeltbeskatningsoverenskomst med Danmark. Langt hovedparten af de bagvedliggende investorer er hjemmehø-rende i USA, dog er der herudover også en mindre række investorer, som er hjemmehørende i Canada, diverse EU-medlemsstater, Cayman Island, Japan m.fl.

Opgørelserne indeholder oplysninger om hver enkelt investor samt hvorvidt der mellem investorenes skattemæssige hjemsted og Danmark er indgået en dobbeltbeskatningsoverenskomst.

…

En oversigt over de ultimative ejeres hjemmehørende-status er tidligere fremlagt […], hvoraf fremgår de procentvise andele af investorer, der er omfattet af en dobbeltbeskatningsoverenskomst mellem den pågældende investors domicilland og Danmark.

På denne baggrund kan der opstilles følgende opgørelse af ned-sættelse af kildeskattekravet:

*Opkrævet renteskat fordelt pr. fond*

|  | Totalt | Kapitalfonde, samlet | Providen-ce | Blacksto-ne | KKR | Apax | Permeria |
|---|---|---|---|---|---|---|---|
| Ejerandel, Angel Lux Parent | 100 % | 95,96 % […] | 17,68 % […] | 23,49 % […] | 19,62 % [..] | 15,74 % […] | 19,43 % […] |
| Renteskat, DKK | 817.238.912 […] | 784.222.460 | 144.487.840 | 191.969.420 | 162.625 | 136.745 | 158.789.521 |

*Renteskat fordelt pr. indkomstår i DKK*

|  | Totalt | Kapitalfonde, samlet | Providen-ce | Blacksto-ne | KKR | Apax | Permeria |
|---|---|---|---|---|---|---|---|
| *2006* | 258.382.378 | *247.943.730* | 45.682.004 | 60.694.021 | 38.360 | 41.086 | 50.203.696 |
| *2007* | 352.664.350 | *338.416.710* | 62.351.057 | 82.840.856 | 49.285 | 55.989 | 68.522.683 |
|  |  |  |  |  |  |  | 40.063.141 |
| *2008* | 206.192.184 | *197.862.020* | 36.454.778 | 48.434.544 | 49.740 | 32.560 | **3339** |

*Nedsættelse af kildeskattekravet*

| | Kapitalfonde, samlet | Providence | Blackstone | KKR | Apax | Permeria |
|---|---|---|---|---|---|---|
| **2006** | | | | | | |
| Renteskat, 2006 | 247.943.730 | 45.682.004 | 60.694.021 | 50.694.623 | 40.669.386 | 50.203.696 |
| Procentvis andel af investorer omfattet af DBO | | 65,63 % (E II 765, 785, 789) | 70,28 % (E II 817) | 73,40 % (E II 837) | 78,41 % (E II 844) | 79,77 % (E II 859-863) |
| *Nedsættelse, DKK* | *181.783.064* | *29.981.100* | *42.655.758* | *37.209.853* | *31.888.866* | *40.047.488* |
| **2007** | | | | | | |
| Renteskat 2007 | 338.416.710 | 62.351.057 | 82.840.856 | 69.192.745 | 55.509.369 | 68.522.683 |
| Procentvis andel af investorer omfattet af DBO | | 65,51 % (E II 765, 785, 789) | 70,28 % (E II 817) | 73,40 % (E II 837) | 78,41 % (E II 844) | 79,77 % (E II 859-863) |
| *Nedsættelse, DKK* | *248.039.647* | *40.846.177* | *58.220.553* | *50.787.475* | *43.524.896* | *54.660.544* |
| **2008** | | | | | | |
| Renteskat 2008 | 197.862.020 | 36.454.778 | 48.434.544 | 40.454.907 | 32.454.650 | 40.063.141 |
| Procentvis andel af investorer omfattet af DBO | | 65,57 % (E II 765, 785, 789) | 70,28 % (E II 817) | 73,40 % (E II 837) | 78,41 % (E II 844) | 79,77 % (E II 859-863) |
| *Nedsættelse, DKK* | *145.043.156* | *23.903.398* | *34.039.798* | *29.693.901* | *25.447.691* | *31.958.368* |
| *Samlet nedsættelse* | *574.865.866* | | | | | |

…

### 5.2.3 Modeloverenskomsten artikel 11

Anvendelsesområdet for de af Danmark indgåede dobbeltbeskatningsoverenskomster fremgår af disses artikel 1. Af modeloverenskomstens (2003-version) artikel 1, stk. 1, fremgår følgende […]:

»Denne overenskomst skal finde anvendelse på personer, der er hjemmehørende i en eller begge de kontraherende stater.«

Det følger heraf, at de fysiske eller juridiske personer hjemmehørende i et andet land, der har indgået en dobbeltbeskatningsoverenskomst med Danmark, er omfattet af dobbeltbeskatningsoverenskomsten, herunder retten til frafald eller nedsættelse af kildeskat på renter.

Artikel 11 i modeloverenskomsten, der indeholder muligheden for nedsættelse eller bortfald af kildeskat på renter, har følgende ordlyd […]: …

Af bestemmelsen følger, at renter kan beskattes i modtagerens stat. Renter kan dog også beskattes i kildelandet, men kildelandets beskatningsret begrænses i det omfang, modtageren er den retmæssige ejer. Bestemmelsernes ordlyd fastsætter således to betingelser for, at kildelandet skal nedsætte beskatning. For det første skal modtageren være hjemmehørende i en kontraherende stat, og for det andet skal modtageren være den retmæssige ejer.

Der opstilles ingen yderligere betingelser for nedsættelse/bortfald af kildeskatten.

### 5.2.4 OECD kommentarer til artikel 11

Kommentarerne støtter den konklusion, at beskatning i kildelandet skal lempes, hvis den retsmæssige ejer er hjemmehørende i en kontraherende stat, uanset at den retmæssige ejer ikke er den umiddelbare modtager af udbyttet.

Af modeloverenskomstens pkt. 8.2 i kommentarerne til artikel 11 fremgår det, at (vores understregning) […]:

»Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og udbetaleren, men

*den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.«*

Kildestaten skal således lempe beskatningen, hvis den retmæssige ejer er hjemmehørende i en anden kontraherende stat - dette uanset, om den umiddelbare modtager ikke er berettiget til overenskomstlempelse. Det er herved dobbeltbeskatningsoverenskomsten mellem den stat, hvori det betalende selskab er hjemmehørende og den stat, hvori den retmæssige ejer er hjemmehørende,

**3340**

der skal finde anvendelse ved vurderingen af, om Danmark skal nedsætte/frafalde beskatning.

Kommentarerne til modeloverenskomsten stiller ikke yderligere betingelser for, at beskatning i kildelandet skal lempes. Det er således i følge kommentarerne tilstrækkeligt, at den retmæssige ejer er hjemmehørende i en overenskomststat.

I Rapporten fra Committee for Fiscal Affairs afsnit I. A. 2 fremgår (vores understregning) […]:

*»This view deals with the most important situation where of this kind, where a company situated in a treaty country is acting as a conduit for channeling income economically accruing to person in another State who is thereby able to take advantages »improperly« of the benefits provided by a tax treaty.«*

Hensigten med at stille som betingelse, at modtageren af renterne er den retmæssige ejer, er således at hindre, at bagvedliggende ejere *uretmæssigt* får fordele som følge af en dobbeltbeskatningsoverenskomst. I det omfang de bagvedliggende ejere *selv* ville have været berettiget til overenskomstlempelse, hvis renterne var betalt direkte til disse, er der ikke tale om uretmæssig overenskomstlempelse, og der er herved heller ikke behov for at afskære rentemodtagerne for overenskomstlempelse.

Dette fører til, at der således slet ikke kan være tale om noget gennemstrømningsselskab, når et større antal af de ultimative investorer under alle omstændigheder ikke ville skulle betale kildeskat.

Angel Lux Common S.a.r.l. kan således ikke meningsfuldt anses for et gennemstrømningsselskab, allerede når henses til de ultimative investorers hjemmehørende-status, og dermed er der heller ikke nogen indeholdelsespligt overhovedet.

I det mindste skal Danmark lempe beskatningen i det omfang, de bagvedliggende ejere ville have været berettiget til lempelse i det omfang renterne var udbetalt direkte til dem. I modsat fald beriger Danmark sig uretmæssigt og vilkårligt.

*5.2.5 Forarbejder, praksis mv.*

Vedrørende spørgsmålet om »beneficial ownership« har skatteministeren i 2006 udtalt, at:

*»Bestemmelsen finder anvendelse selvom der indskydes flere mellemliggende almindeligt beskattede selskaber. Det afgørende er, hvem der er den rette indkomstmodtager/retmæssige ejer.«*, jf. svar på spørgsmål S 474 […].

Videre anførte ministeren i L 30 svar på spørgsmål 5 af 21. november 2006 […]:

*»Bortfaldet af begrænset skattepligt er betinget af, at det pågældende udenlandske selskab er den retmæssige ejer af udbyttet.*

*Et rent gennemstrømningsselskab, som er hjemmehørende i udlandet, f.eks. Luxembourg, vil ikke være retmæssig ejer af udbyttet, jf. bemærkningerne tit artikel 10 i OECDs modeloverenskomst (afsnit 12.1).*

*Den begrænsede skattepligt bortfalder dog alligevel, hvis den retmæssige ejer bag ved gennemstrømningsselskabet er hjemmehørende i et andet land, og Danmark efter moder/datterselskabsdirek-*

*tivet eller en dobbeltbeskatningsoverenskomst med dette land skal nedsætte eller undlade beskatning af udbyttet.«*

Citatet vedrører kildeskat på udbytte, men gælder tilsvarende for kildeskat på renter.

I L 213 af 18. april 2007, bilag 26 anførte ministeren (vores understregning) […]:

*»Viderebetaling af renterne omfatter den situation, hvor rentemodtageren nok bliver beskattet af renterne, men samtidigt har fradrag for de renter, som det selv betaler til det andet udenlandske selskab i lavskattelandet, jf. således bemærkningerne til L 119, 2003-2004. Det bemærkes, at det andet udenlandske selskab i denne situation anses for at være den reelle modtager af rentebetalingen. Opfylder dette andet selskab betingelserne for at være undtaget fra skattepligt af rentebetalingen, bortfalder skattepligten.*

*Det skal bemærkes, at hvis den umiddelbare modtager af rentebetalingen vide-rebetaler beløbet via en udlodning, tilbagebetaling af lån eller lignende skal det vurderes, om den umiddelbare modtager er den rette indkomstmodtager (beneficial owner). Hvis den endelige beløbsmodtager må anses for at være beneficial owner, finder betingelserne i § 2, stk. 1, litra d, umiddelbar anvendelse på den endelige beløbsmodtager.«*

(…) […]

*»Princippet om beneficial owner (retmæssig ejer) er et værn mod, at et almindeligt beskattet selskab indskydes som »conduit« selskab mellem det udbyttebetalende selskab og det endelig modtagende udenlandske skattelyselskab. Værnet finder anvendelse, selvom der indskydes flere mellemliggende almindeligt beskattede selskaber.«*

Som det ses, støtter samtlige citerede udtalelser den opfattelse, at der i forhold til indeholdelse af kildeskat skal ses på den ultimative ejer, og at det er dobbeltbeskatningsoverenskomsten mellem Danmark og det land, hvor den retmæssige ejer er hjemmehørende, der er afgørende for, om Danmark skal yde overenskomstlempelse.

Det synes videre at være skatteministerens holdning, at der ikke stilles andre betingelser for overenskomstlempelse, end at en sådan lempelse er berettiget i henhold til den dobbeltbeskatningsoverenskomsten mellem Danmark og det land, hvor den retmæssige ejer er hjemmehørende.

Skatteministeriet udsendte desuden en pressemeddelelse den 20. marts 2007 vedrørende »Status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner«, i hvilken der igen lægges vægt på,

**3341**

hvem der er den endelige modtager af renterne, og om denne er hjemmehørende i et DBO-land eller ej, mens yderligere betingelser for overenskomstlempelse igen er fraværende. Der henvises til afsnit 5.1.4 ovenfor.

Det følger af ovenstående, at der kun skal tilbageholdes kildeskat, hvis den endelige modtager er hjemmehørende i et land, som Danmark ikke har indgået dobbeltbeskatningsoverenskomst med. Modsat skal Danmark yde overenskomstlempelse, hvis den ultimative ejer er hjemmehørende i et DBO-land. Der er intet grundlag for de yderligere betingelser for overenskomstlempelse, som opstilles af Skatteministeriet.

*5.2.6 Sammenfatning vedr. ultimative ejere*

Det følger af ovenstående, at i det omfang selskaberne i Luxembourg nægtes overenskomstlempelse ud fra den betragtning, at selskaberne ikke er retmæssige ejer af renterne, må der ses igennem alle mellemliggende selskab, uanset om disse er hjemmehørende i kontraherende stater eller i tredjestater, til de ultimative retmæssige ejere.

De ultimative retmæssige ejere er i nærværende tilfælde de bagvedliggende investorer i de fem kapitalfonde. En stor del af disse er hjemmehørende i stater, med hvilke Danmark har indgået dob-

Copyright © 2023 Karnov Group Denmark A/S

beltbeskatningsoverenskomster, hvorfor de er berettigede til nedsættelse eller bortfald af kildeskatten i henhold til de nærmere betingelser herfor i den pågældende dobbeltbeskatningsoverenskomst.

Der er med bilag 3 og 6-12 fremlagt dokumentation for de bagvedliggende investorer i de fem kapitalfondene samt at hovedparten af disse er omfattet af en dobbeltbeskatningsoverenskomst med Danmark. Hertil kommer at alle bankerne, der ligeledes er investorer gennem Angel Lux Parent, alle er hjemmehørende i UK.

Der er ikke hjemmel til at opstille yderligere betingelser for overenskomstlempelse for de ultimative ejere, end at disse ville være berettigede til overenskomstlempelse, hvis de havde været de umiddelbare modtagere af renterne.

*5.3 Sagsøgers mere subsidiære påstand - NTCI har ikke handlet forsømmeligt og hæfter ikke for kildeskatten*

Det gøres for god ordens skyld gældende, at selv hvis Angel Lux Common S.a.r.l. havde været begrænset skattepligtig, havde NTCI ApS helt åbenbart rimelig grund til at antage, at der ikke forelå pligt til at indeholde kildeskat. Der er således ikke udvist forsømmelighed, jf. kildeskattelovens § 69, stk. 1 […].

For det *første* er der ikke i sagen tale om udbetaling af renter til et overliggende moderselskab eller ultimative investorer.

For det *andet* har det som også anført ovenfor været praksis at anse udenlandske holdingselskaber og mellemholdingselskaber som retmæssige ejere af modtagne udbytter og rentebetalinger.

For det *tredje* har Skatteministeren tilkendegivet, at begrebet retmæssig ejer/»beneficial owner« var meget lig det danske begreb »rette indkomstmodtager«, og Angel Lux Common S.a.r.l., som er den civilretlige ejer af de af NTCI ApS udstedte PEC's, er ubestridt »rette indkomstmodtager« af renterne heraf efter dansk ret.

For det *fjerde* er Skatteministeriet med bl.a. denne sag i gang med at afprøve et i dansk skattepraksis helt nyt synspunkt, som NTCI ApS af samme grund ikke kunne forventes at foregribe.

For det *femte* er en del af Skatteministeriets anbringender til støtte for dette nye synspunkt allerede blevet afprøvet og afvist af Østre Landsret, der fastslår, at der ikke er dansk skattepligt i en lignende situation, jf. SKM2012.121.ØLR […].

For det *sjette* modtog SKAT oplysninger om strukturen vedrørende de ultimative investorer og Luxembourg-strukturen senest 2. april 2009. I SKATs »Statusnotat« af 10. november 2009, punkt 7 fremgår det […]:

»*Problemstilling:*

Hvis der betales renter og udbytter til modtagere i lande, som Danmark ikke har en DBO med, skal der tilbageholdes en skatteandel.

*Konklusion:*

De foretagne betalinger af renter og udbytter anses ikke at være omfattet af disse bestemmelser. Renterne betales til et koncernselskab i Luxembourg, hvorfor der ikke foretages yderligere på det foreliggende grundlag.«

Det var således på dette tidspunkt også SKATs opfattelse, at NTCI ApS *ikke* var indeholdelsespligtig trods SKATs fulde indsigt i Luxembourg-strukturen.

For det *syvende* har Skatteministeriet anerkendt, at skattesatsen for opkrævningen af kildeskatten var i strid med EU-retten. Skatteministeriet har i sagsforløbet derfor også været nødsaget til at tage bekræftende til genmæle og nedsætte skattekravet til den dagældende selskabsskattesats. Dette understreger, at den fortolkning af regelsættet og EU-retten som NTCI ApS ifølge Skatteministeriet klart burde have været bevidst om, ikke var så klar endda - heller ikke for Skatteministeriet..

For det *ottende* og ikke mindst var NTCI ApS' fortolkning af EU-retten vedrørende kravet om nationale gennemførelsesforanstaltninger og anvendelsen af det generelle EU-retlige misbrugsbegreb i

fuld overensstemmelse med tidligere EU-praksis, samt Kommissionens og generaladvokatens fortolkning af denne praksis. Det har derfor også formodningen mod sig, at NTCI ApS har udvist forsømmelighed ved at følge denne fortolkning.

Samtlige ovenstående grunde bekræfter hver for sig og samlet set, at NTCI ApS ikke har udvist forsømmelighed, jf. kildeskattelovens § 69, stk. 1, jf. TfS 2002. 844.Ø […] og UfR 1977.844.H […].

**3342**

NTCI ApS er derfor heller ikke ansvarlig for den evt. manglende indbetaling.«

*Skatteministeriet* har i sit sammenfattende processkrift af 2. august 2021 anført bl.a.:

»*7. SKATTEMINISTERIETS ARGUMENTATION*

*7.1 Angel Lux Common er skattepligtig af renterne*

Skattepligt i henhold til selskabsskatteloven påhviler selskaber og foreninger mv. som nævnt i lovens § 1, stk. 1, der har hjemsted i udlandet, for så vidt de oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab eller en forening m.v. omfattet af § 1 eller litra a) har til juridiske personer som nævnt i skattekontrollovens § 3 B (kontrolleret gæld), jf. lovens § 2, stk. 1, litra d), første punktum.

Formålet med skattepligten er ifølge bemærkningerne til lovforslagets enkelte bestemmelser (lovforslagets § 10, nr. 1) »at imødegå, at et dansk selskab m.v. nedsætter den danske beskatning ved at reducere den skattepligtige indkomst gennem rentebetalinger til visse finansielle selskaber i lav-skattelande, hvis det udenlandske selskab m.v. kontrollerer det danske selskab m.v.« […], hvilket skal ses i sammenhæng med, at formålet med lovforslaget ifølge de almindelige bemærkninger bl.a. er »at begrænse mulighederne for skatteplanlægning ved fradrag for koncerninterne renter, når det modtagende koncernselskab betaler ingen eller meget lidt i skat af de renter, der er fratrukket ved opgørelsen af dansk skattepligtig indkomst« […].

Der er mellem parterne enighed om, at Angel Lux Common er et selskab som nævnt i selskabsskattelovens § 1, stk. 1, der har hjemsted i udlandet, at Nordic Telephone Company Investment er et selskab omfattet af lovens § 1, og *at* det omhandlede lån fra førstnævnte selskab til sidstnævnte selskab udgør »kontrolleret gæld«.

Udgangspunktet er derfor, at Angel Lux Common er skattepligtig af de omhandlede renter, og dette udgangspunkt er der, som der vil blive redegjort for i det følgende, i det foreliggende tilfælde ikke grundlag for at fravige i medfør af undtagelsesreglen i selskabsskattelovens § 2, stk. 1, litra d), tredje punktum.

Af selskabsskattelovens § 2, stk. 1, litra d), tredje punktum, følger som nævnt, at skattepligten efter første punktum ikke omfatter renter, hvis beskatningen af renterne »skal« frafalde eller nedsættes efter rente-/royaltydirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende.

I overensstemmelse med bemærkningens ordlyd er det i de førnævnte bemærkninger til lovforslagets enkelte bestemmelser […] anført, *dels* at den begrænsede skattepligt ikke omfatter et selskab, der er hjemmehørende i et andet EU-land, »hvis rente-/royaltydirektivets betingelser er opfyldt«, *dels* at den begrænsede skattepligt ikke omfatter rentebetalinger til et udenlandsk selskab, der er hjemmehørende i Færøerne, Grønland eller andet land, som har en dobbelt-beskatningsoverenskomst, »hvis overenskomsten medfører, at Danmark skal frafalde eller nedsætte beskatningen af renterne.«

Det fremgår således af bestemmelsens ordlyd og forarbejder, at en undtagelse fra skattepligten alene kommer på tale, hvis der efter

rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst består en ubetinget pligt til at frafalde eller nedsætte beskatningen. Følger en sådan pligt ikke af direktivet eller en dobbeltbeskatningsoverenskomst, er det modtagende selskab skattepligtig af renterne.

Af bestemmelsens forarbejder fremgår endvidere, at skattemyndighederne vil kunne skride ind over for tilfælde, hvor rente-/royaltydirektivet og/eller en dobbeltbeskatningsoverenskomst måtte blive misbrugt som led i en omgåelse af skattepligten.

I forbindelse med udvalgsbehandlingen af lovforslag nr. 119 af 17. december 2003, der ligger til grund for indførelsen af selskabsskattelovens § 2, stk. 1, litra d), anførte skatteministeren således i et svar på en henvendelse fra FSR […] bl.a.:

»Det åbner ganske vist risiko for, at f.eks. et dansk selskab kan søge at omgå kildeskatten på rentebetalinger til et finansielt selskab i et lavskatte-land ved at betale renterne til et dansk selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller en dansk dobbeltbeskatningsoverenskomst, og som ikke har kildeskat på rentebetalinger til udenlandske rentemodtagere, hvorefter dette selskab betaler renterne videre til selskabet i lav-skatte-landet.

I sådanne tilfælde vil de danske skattemyndigheder imidlertid efter en konkret realitets-bedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskatte-landet, således at rentebetalingen hverken er omfattet af EU's rente-/royaltydirektiv eller dobbeltbeskatningsoverenskomsten.«

*7.1.1 Beskatningen skal ikke nedsættes eller frafaldes efter rente-/royaltydirektivet*

Det følger af rente-/royaltydirektivets artikel 1, stk. 1, at betalinger af renter, der opstår i et medlemsstat, fritages for enhver form for skat i denne stat, hvad enten den opkræves ved indeholdelse ved kilden eller ved skatteansættelse, forudsat at den »retsmæssige ejer« af de pågældende renter er et selskab i en anden medlemsstat […].

Hverken Angel Lux Common eller Angel Lux Parent kan påberåbe sig den fordel, der følger af direktivets artikel 1, stk. 1, *dels* fordi der foreligger retsmisbrug, *dels* fordi ingen af selskaberne kan anses for renternes retmæssige ejer.

**3343**

*7.1.1. Der er hjemmel til at afslå direktivets fordele ved retsmisbrug*

Ifølge rente-/royaltydirektivets artikel 5, stk. 1, udelukker direktivet ikke anvendelsen af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af misbrug, og medlemsstaterne kan ifølge bestemmelsens stk. 2 tilbagekalde fordele i henhold til direktivet eller nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde […].

Det er Skatteministeriets standpunkt, at der i national ret hjemmel til imødegåelse af misbrug af den art, der er tale om i den foreliggende sag, jf. nærmere beskrivelsen i duplikken s. 5-6 […], men afgørelsen af denne sag gør ikke en stillingtagen til det spørgsmål påkrævet.

Der gælder nemlig et almindeligt og generelt EU-retligt princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser, herunder direktivbestemmelser, med henblik på at muliggøre rets-misbrug (præmisserne 96 og 101 i Domstolens dom i denne sag). Princippet om forbud mod retsmisbrug finder således også anvendelse på skatteområdet, når opnåelse af en skattefordel er et *hovedformål* med den omhandlede transaktion (dommens præmis 107 in fine sammenholdt med præmis 127). Som følge af *dels* det generelle EU-retlige princip om forbud mod retsmisbrug, *dels* nødvendigheden af at overholde dette princip inden for rammerne af den indførelse af EU-retten, er medlemsstaterne forpligtet til

at afslå fordele, som søges opnået ved retsmisbrug, selv om der ikke findes nationale eller overenskomstmæssige regler til bekæmpelse af misbrug (dommens præmis 111).

Der er ikke tale om, at Domstolen med dommen i den foreliggende sag har skabt en (ny) retsstilling, der ikke gjaldt forud for dommen, eller at Domstolen har ændret sin hidtidige praksis, således som den er kommet til udtryk i bl.a. sag C-321/05, Kofoed, jf. Domstolens dom, præmis 122 ff. Med dommen har Domstolen derimod - inden for rammerne af den kompetence, som tilkommer Domstolen i medfør af artikel 267 TEUF - *belyst og præciseret* betydningen og rækkevidden af princippet om forbud mod retsmisbrug, således som dette princip skal anvendes på den foreliggende sag.

Af Domstolens dom følger således også, at det EU-retlige retssikkerhedsprincip heller ikke er til hinder for at nægte rente-/royaltydirektivets fordel i form af fritagelse for kildeskat, når der foreligger retsmisbrug, hvad der også fremgår udtrykkeligt af Domstolens dom i sag C-251/16, Cussens, præmis 43 […].

Der er heller ikke tale om, at Domstolen med sin dom har fastslået en fortolkning af rente-/royaltydirektivet, som indebærer, at direktivet - i sig selv - skaber *forpligtelser* for borgerne. I tilfælde, hvor der foreligger retsmisbrug, og hvor borgeren af denne grund *nægtes en fordel* i henhold til EU-retten, er der således ikke tale om, at borgeren pålægges en forpligtelse efter EU-retten, men derimod at de objektive betingelser for at opnå en fordel i henhold til EU-retten ikke er opfyldt, fordi fordelen søges opnået ved retsmisbrug (dommens præmis 118).

Endelig er det ikke i strid med loven om Danmarks tiltrædelse af den Europæiske Union at nægte rente-/royaltydirektivets fordele med henvisning til det generelle EU-retlige princip om forbud mod rets-misbrug. Den foreliggende situation er således *usammenlignelig* med situationen, der gav anledning til Højesterets dom angivet i U.2017.824H, Ajos […], som NTC påberåber sig.

Af præmisserne for Højesterets dom i Ajos-sagen fremgår, at det for sagens udfald var udslagsgivende, at der med Højesterets ord forelå en såkaldt »contra legem-situation«, dvs. en situation, hvor det ikke inden for rammerne af de for-tolkningsmetoder, der er anerkendt i national ret, er muligt at fortolke en national regel direktivkonformt.

En sådan situation foreligger ikke i denne sag, hvor rente-/royaltydirektivet er blevet gennemført ved en simpel henvisning til direktivet. Af selskabsskattelovens § 2, stk. 1, litra d)'s *ordlyd* følger således, at renter er omfattet af skattepligten, medmindre »beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater«. Det er derfor en smal sag at anlægge en fortolkning af selskabsskattelovens § 2, stk. 1, litra d), der i overensstemmelse med rente-/royaltydirektivet og det almindelige princip om forbud mod retsmisbrug, således som direktivet og princippet skal fortolkes ifølge Domstolens dom.

Hvad angår U.2012.3564H, Sawo […], som NTC også påberåber sig i denne sammenhæng, er også denne dom uden relevans for afgørelsen af den foreliggende sag. Sagen, der gav anledning til dommen, rejste - lige så lidt som den foreliggende sag - noget spørgsmål om EU-rettens forrang.

På den anførte baggrund må selskabsskattelovens § 2, stk. 1, litra d) - i overensstemmelse med hvad Østre Landsret også er kommet frem til i SKM2021.304.ØLR om bestemmelsens litra c) om udbytteskat - fortolkes således, at en fritagelse for beskatning af renter skal nægtes, hvis fritagelsen søges opnået ved retsmisbrug, hvad der kommer an på en konkret vurdering af de givne omstændigheder.

Copyright © 2023 Karnov Group Denmark A/S

*7.1.1.2 Domstolens bemærkninger om bedømmelsen af, om der foreligger retsmisbrug*

Ifølge Domstolens dom kræves der med henblik på at bevise, at der foreligger misbrug *for det første* et

**3344**

sammenfald af objektive omstændigheder, hvoraf fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, og *for det andet* et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (præmis 124 i Domstolens dom i denne sag).

Det er undersøgelsen af de sammenfaldende omstændigheder, som gør det muligt at efterprøve, om de elementer, der udgør misbrug, foreligger, og navnlig om de pågældende erhvervsdrivende har foretaget rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål at opnå en uretmæssig fordel (dommens præmis 125).

Domstolen har i dommen anvist de nærmere principper for en sådan undersøgelse og foretaget en ikke-udtømmende opregning og beskrivelse af holdepunkter for, at rente-/royaltydirektivets fordel i form af fritagelse for beskatning af renter i et givent tilfælde søges opnået ved misbrug.

Ifølge Domstolen må en koncern - i sager som den foreliggende - anses for et kunstigt arrangement, *når* den ikke er etableret af grunde, der afspejler den økonomiske realitet, *når* den har en struktur, der er rent formel, og *når* den har til hovedformål eller som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse. Det gælder navnlig, når betalingen af renteskat undgås ved i koncernstrukturen at indskyde en »gennemstrømningsenhed« mellem det selskab, som overfører renterne, og det selskab, som er »renternes retmæssige ejer« (dommens præmis 127).

Den omstændighed, at renter i deres helhed eller stort set i deres helhed ganske kort tid efter modtagelsen videreformidles af det selskab, som har modtaget dem, til enheder, som ikke opfylder betingelserne for anvendelse af rente-/royaltydirektivet, er et holdepunkt for, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse for beskatning, der følger af direktivet (dommens præmis 128).

Ifølge Domstolen kan den kunstige karakter af et arrangement *ligeledes* underbygges ved, at den pågældende koncern er struktureret på en sådan måde, at det selskab, der modtager de renter, der betales af debitorselskabet, selv skal betale disse renter til et tredje selskab, som ikke opfylder betingelserne for anvendelse af rente-/royaltydirektivet, med den følge at selskabet alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som »gennemstrømningsselskab« (dommens præmis 130). Et selskab kan anses for et gennemstrømningsselskab, hvis selskabets eneste aktivitet er at modtage renterne og videreoverføre dem til den »retmæssige ejer« eller til øvrige gennemstrømningsselskaber, jf. nærmere dommens præmis 131.

Holdepunkter for, at der er i et givent tilfælde er tale om et kunstigt arrangement, kan endvidere findes 1) i den omstændighed at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, der - således som det er anført i rente-/royaltydirektivets artikel 4 - kan have til formål, at der fra et modtagende erhvervsdrivende selskab overføres udbytte til aktionæremheder med henblik på at undgå at betale skat eller at nedsætte skattebyrden mest muligt, 2) fremgangsmåden for transaktionernes finansiering, 3) i vurderingen af de mellemliggende selskabers egenkapital og 4) i »gennemstrømnings-selskabernes« mang-

lende beføjelser til at råde økonomisk over de modtagne renter. Det er i den forbindelse ikke kun en kontraktuel eller juridisk forpligtelse for det selskab, der modtager renterne, til at videreformidle dem til tredjemand, der kan udgøre sådant et holdepunkt. Der foreligger også et holdepunkt for misbrug, hvis selskabet efter en bedømmelse af sagens faktiske omstændigheder »substantielt« ikke har haft rettighederne til at bruge og nyde renterne (præmis 132).

Holdepunkter som de ovenfor nævnte kan anses for *bestyrkede*, hvis der er et sammenfald eller en nær tidsmæssig sammenhæng mellem på den ene side ikrafttrædelsen af ny skattelovgivning, og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern, som kan føre til en omgåelse af den indførte beskatning (præmis 133). Et sådant sammenfald eller en sådan nær tidsmæssig sammenhæng er omvendt ikke en nødvendig betingelse for at godtgøre et misbrug, men kan altså bestyrke andre holdepunkter for, at der foreligger et retsmisbrug.

Endelig er det for konstateringen af, om der foreligger et retsmisbrug, uden betydning, om Danmark med den stat, hvor renternes retmæssige ejer er hjemmehørende, har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af renterne, *hvis* de var blevet betalt direkte til den retmæssige ejer, jf. hertil præmisserne 134 ff.

*7.1.1.3 Der foreligger retsmisbrug i den foreliggende sag*

Når Domstolens anvisninger kobles med den foreliggende sags omstændigheder, kan det konstateres, at der foreligger et tilfælde af retsmisbrug.

Nordic Telephone Company Investment stod oprindeligt i et direkte gældsforhold til de omhandlede kapitalfonde frem til slutningen af april 2006, hvor der mellem kapitalfondene og Nordic Telephone Company Investment blev indskudt de to luxembourgske selskaber, Angel Lux Parent og Angel Lux Common.

**3345**

For sagens afgørelse må (A) stiftelsen af Angel Lux Common og Angel Lux Parent, (B) gældsforholdet mellem kapitalfondene og Angel Lux Parent, (C) gældsforholdet mellem sidstnævnte og Angel Lux Common samt (D) gældsforholdet mellem sidstnævnte og Nordic Telephone Company Investment betragtes som ét samlet og på forhånd tilrettelagt arrangement.

De nævnte gældsforhold havde *ens* hovedstole og blev forrentet på samme vis, idet gældsforholdet mellem Nordic Telephone Company Investment og Angel Lux Common dog blev forrentet med en sats på 10 pct., der var marginalt højere (0,03125 procentpoint) end satsen for de andre gældsforhold. Denne kæde af ens gældsforhold indebar, at renterne fra Nordic Telephone Company Investment i kraft af de løbende og samtidige rentetilskrivninger faktisk strømmede igennem Angel Lux Common og Angel Lux Parent til kapitalfondene, som Nordic Telephone Company Investment oprindeligt havde stået i et direkte gældsforhold til.

Arrangementet var uden forretningsmæssig begrundelse. NTC er ikke kommet med en forklaring på den forretningsmæssige begrundelse for omstruktureringen i slutningen af april 2006, der medførte, at Angel Lux Common og Angel Lux Parent blev indskudt som mellemled mellem Nordic Telephone Company Investment og kapitalfondene. En forretningsmæssig begrundelse er da heller ikke til at få øje på. Set fra et forretningsmæssigt perspektiv havde det været nemmest at bevare det direkte gælds-forhold, der fra begyndelsen havde bestået imellem Nordic Telephone Company Investment og kapital-fondene.

NTC's forklaring om, at der var behov for at samle kapitalfondene i et fælles holdingselskab, og NTC's abstrakte påberåbelse af, at kapitalfonde og andre udenlandske investorer »historisk« skulle have foretaget deres investeringer via Luxembourg, blandet andet

som følge af at Luxembourg juridisk, regulatorisk, finansielt og politisk anses for et attraktivt og stabilt land […], siger *intet* om, hvad den forretningsmæssige begrundelse var for - i det foreliggende tilfælde - at stifte to nye mellem-holdingselskaber i Luxembourg og indskyde disse selskaber mellem kapitalfondene og Nordic Telephone Company Investment.

Der var allerede etableret en struktur af holdingselskaber i Danmark, som kapitalfondene havde erhvervet aktierne i TDC A/S gennem, og det er da også en kendsgerning, at kapitalfondene i december 2005 og januar 2006 ydede de omhandlede lån direkte til det øverste danske selskab i denne holdingstruktur, Nordic Telephone Company Investment. Det var først efter vedtagelsen af nye danske lovregler i april 2006, som ville have gjort renterne fra det danske holdingselskab til kapitalfondene skattepligtige med virkning fra den 1. maj 2006, at koncernen fandt behov for at oprette to nye mel-lemholdingselskaber i Luxembourg og indskyde disse i låneforholdet mellem kapitalfondene og det danske selskab.

Hvor arrangementet var uden forretningsmæssig begrundelse, havde den til gengæld en åbenlys og betydelig skattemæssig fordel.

Omstruktureringen i slutningen af april 2006 fandt nemlig sted blot få dage før ikrafttrædelsen af den lovændring, der som nævnt medførte, at renterne på kapitalfondenes lån til Nordic Telephone Company Investment ville være blevet skattepligtige med virkning fra den 1. maj 2006, eftersom kapitalfondene ikke kunne påberåbe sig rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst, […]. Det arrangement, der blev etableret med omstruktureringen, indebar, at beskatningen af renterne fra Nordic Telephone Company Investment - bortset fra spørgsmålet om misbrug og renters »retmæssige ejer« - skulle frafaldes efter rente-/royaltydirektivet.

Det er på denne baggrund ubetænkeligt at lægge til grund, at arrangementet havde som hovedformål eller som et af sine hovedformål at opnå en skattefordel, nemlig at gøre renter fra Nordic Telephone Company Investment skattefrie, ved at de mellemliggende luxembourgske selskaber modsat de bagvedliggende kapitalfonde - bortset fra spørgsmålet om retmæssig ejer og misbrug - kunne påberåbe sig rente-/royaltydirektivet og den dansk-luxembourgske dobbeltbeskatningsoverenskomst. De luxembourgske selskabers renteindtægter var ganske vist skattepligtige, men disse blev (stort set) neutraliseret af selskabernes lige så store renteudgifter. Etableringen af arrangementet medførte således, at renter, der uden arrangementet ville have været skatpligtige, blev gjort skattefrie.

Omstændighederne efterlader ingen tvivl om, at det på forhånd var bestemt af de luxembourgske selskabers bagvedliggende ejere, nemlig kapitalfondene, at renterne fra Nordic Telephone Company Investment skulle videreføres til kapitalfondene, hvilket også var det, som skete, og at de indskudte luxembourgske selskabers ikke var overladt noget reelt råderum til at disponere over deres respektive renteindtægter, men blot fungerede som gennemstrømningsselskaber for kapitalfondene.

At selskaberne faktisk ikke var overladt noget råderum til at disponere over indtægterne, cementeres til overflod af den effektive betaling, der fandt sted i oktober 2006, hvor Nordic Telephone Company Investment - bortset fra nogle relativt set marginale beløb - foretog betaling af renter og afdrag direkte til kapitalfondene, dvs. uden om såvel Angel Lux Common som Angel Lux Parent.

At de luxembourgske selskaber blot fungerede som gennemstrømningsselskaber i relation til de omhandlede renter, bestyrkes også af, at det efter de foreliggende

**3346**

oplysninger om selskabernes udgifter må lægges til grund, at selskaberne - ud over at fungere som gennemstrømningsselskaber - ikke havde nogen reel faktisk økonomisk aktivitet af betydning.

Det må baggrund af de foreliggende oplysninger lægges til grund, at Angel Lux Common henholdsvis Angel Lux Parent ud over ejerskabet af ejerandele i datterselskaber ikke udøvede andre betydende aktiviteter end at administrere deres lån til Nordic Telephone Company Investment henholdsvis Angel Lux Common og deres gæld til Angel Lux Parent henholdsvis kapitalfondene.

Når de anførte omstændigheder sammenholdes med Domstolens anvisninger for misbrugsvurderingen, ligger det lige for at fastslå, at arrangementet havde som et hovedformål uretmæssigt at drage fordel af den fritagelse, der er fastsat i rente-/royaltydirektivets artikel 1, stk. 1.

Domstolen har da også fastslået (dommens præmis 126), at der i denne sag er en række holdepunkter for, at der foreligger retsmisbrug, men i overensstemmelse med kompetencefordelingen mellem Domstolen og de forelæggende retter, har Domstolen overladt det til landsretten at *efterprøve*, dels om disse holdepunkter er objektive og samstemmende, dels om NTC har haft mulighed for at føre modbevis.

En sådan efterprøvelse bør munde ud i den konklusion, at der foreligger et tilfælde af retsmisbrug. Alle omstændigheder af relevans for misbrugsvurderingen var oplyst over for Domstolen, og der er ikke (efterfølgende) godtgjort andre omstændigheder, som giver belæg for, at Domstolens (foreløbige) vurdering ikke kan holde for en efterprøvelse.

NTC har ikke engang gjort et forsøg på at forklare, hvad der - fremfor den nemmeste løsning med at beholde det allerede etablerede direkte lån fra kapitalfondene til Nordic Telephone Company Investment - var den forretningsmæssige begrundelse for omstruktureringen, der resulterede i arrangementet med (A) stiftelsen af Angel Lux Common og Angel Lux Parent, (B) gældsforholdet mellem kapital-fondene og Angel Lux Parent, (C) gældsforholdet mellem sidstnævnte og Angel Lux Common samt (D) gældsforholdet mellem sidstnævnte og Nordic Telephone Company Investment.

Da der altså foreligger retsmisbrug, er både Angel Lux Common og Angel Lux Parent afskåret fra at drage fordel af den fritagelse for kildeskat, der er fastsat i rente-/royaltydirektivets artikel 1, stk. 1.

*7.1.1.4 Direktivets fordeles skal også afslås, fordi hverken Angel Lux Common eller Angel Lux Parent er renternes retsmæssige ejer*

Det fremgår af ordlyden af rente-/royaltydirektivets artikel 1, stk. 1, at fritagelse for kildebeskatning er betinget af, at modtageren af renterne er renternes »retmæssige ejer«.

Begrebet »retmæssig ejer« skal ifølge Domstolen dom i den foreliggende sag fortolkes således, at »det betegner en enhed, som reelt modtager af renter, som betales til den« (dommens præmis 88). Udtrykket »retmæssig ejer« tager ifølge Domstolen ikke sigte på en modtager, der identificeres formelt, men derimod på »den enhed, som økonomisk set modtager de oppebårne renter og derfor har mulighed for frit at råde over anvendelsen heraf« (dommens præmis 89).

Endelig har Domstolen fastslået, at begrebet »retsmæssig ejer«, som er indeholdt i dobbeltbeskatningsoverenskomster, der er baseret på OECD's modelbeskatningsoverenskomst, samt kommentarerne hertil, er relevante for fortolkningen af rente-/royaltydirektivet (dommens præmis 90).

Vurderingen af, om et givent selskab kan anses for renternes »retsmæssige ejer«, og vurderingen af, om der i det givne tilfælde foreligger et retsmisbrug, går i realiteten ud på ét, hvilket Domstolens udlægning af bl.a. det første præjudicielle spørgsmål, litra d)-f) om begrebet »retmæssig ejer« er et vidnesbyrd om (dommens præmis 123). Det er også kommet ganske klart til udtryk i f.eks. dommens præmis 127.

Af de grunde, der er redegjort for i det foregående punkt og det følgende punkt, kan hverken Angel Lux Common eller Angel Lux Parent anses for renternes retsmæssige ejer. Også af den grund er selskaberne afskåret fra at gøre den fordel, der følger af rente/royaltydirektivets artikel 1, stk. 1, gældende.

*7.1.2 Beskatningen skal ikke frafaldes eller nedsættes efter den dansk-luxembourgske dobbeltbeskatningsoverenskomst*

Ifølge den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 11, stk. 1 […], kan renter, der hidrører fra en kontraherende stat (Danmark), og som betales til en i en anden kontraherende stat (Luxembourg) hjemmehørende person, kun beskattes i denne anden stat (Luxembourg), hvis denne person er den »retmæssige ejer« af renterne. Efter ordlyden af denne bestemmelse er Danmark altså kun forpligtet til at frafalde beskatningen af renter, der hidrører fra Danmark, hvis modtageren er renternes »retmæssige ejer«.

Begrebet »renternes retmæssige ejer« må fortolkes i overensstemmelse med det tilsvarende begreb i OECD's modeloverenskomsts artikel 11, stk. 1 […], idet den dansk-luxembourgske dobbeltbeskatningsoverenskomst er indgået på grundlag af modeloverenskomsten.

Østre Landsret har allerede fastslået, at begrebet »retmæssig ejer« er et autonomt begreb, dvs. at det har et selvstændigt indhold uafhængigt af de kontraherende staters interne lovgivning, jf. både SKM2021.304.ØLR og SKM2012.121.ØLR […]. Begrebet »retmæssig ejer« skal derfor *ikke* fortolkes i overensstemmelse med begrebet »rette indkomstmodtager«, der i dansk skatteret

**3347**

bruges som betegnelse for den, der må anses for at være skattepligtig af en given indtægt.

Med de to domme har Østre Landsret også allerede fastslået, at skattemyndighederne i sager som den foreliggende har været berettiget til - som sket - at inddrage kommentarerne til OECD's modeloverenskomst fra 2003 ved fastlæggelsen af, hvad der nærmere skal forstås ved begrebet »retmæssig ejer«. De senere kommentarer fra 2014 og 2017 udgør på tilsvarende vis relevante fortolkningsbidrag, eftersom disse kommentarer - ligesom 2003-kommentarerne - ikke indebærer en ændret forståelse af modeloverenskomstens artikel 11, stk. 1, men alene har karakter af præciseringer.

Af 2003-kommentarerne, pkt. 8.1 til modeloverenskomstens artikel 11, stk. 1 […], følger, at det ikke vil være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skal indrømme lempelse eller fritagelse for skat »i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden vis end som agent eller mellemmand, blot fungerer som 'gennemstrømningsenhed' (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.« Et »gennemstrømningsselskab« vil således ikke kunne anses for den retmæssige ejer, »hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en 'nullitet' eller administrator, der handler på vegne af andre parter«.

I 2014-kommentareren, pkt. 10.2, som på dette punkt er blevet videreført uden ændringer i 2017-kommentareren, er det præciseret, at den umiddelbare modtager af renterne vil kunne nægtes den overenskomstmæssige fordel, der følger af modeloverenskomstens artikel 11, stk. 1, hvis de faktiske omstændigheder klart viser, at modtageren - uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person - »substantielt« ikke har rettighederne til at bruge og nyde renterne[…].

I den foreliggende sag viser de faktiske omstændigheder, at Angel Lux Common og Angel Lux Parent ikke havde eller kun havde meget snævre beføjelser til at disponere over de renter, som først-

nævnte selskab modtog i kraft af lånet til Nordic Telephone Company Investment.

Som anført under punkt 7.1.1.3 må (A) stiftelsen af Angel Lux Common og Angel Lux Parent, (B) gældsforholdet mellem kapitalfondene og Angel Lux Parent, (C) gældsforholdet mellem sidstnævnte og Angel Lux Common samt (D) gældsforholdet mellem sidstnævnte og Nordic Telephone Company Investment betragtes som ét samlet og på forhånd tilrettelagt arrangement

Endvidere havde de nævnte gældsforhold, som anført under punkt 7.1.1.3, ens hovedstole og blev forrentet på (stort set) samme vis. Denne kæde af ens gældsforhold indebar, at renterne fra Nordic Telephone Company Investment i kraft af de løbende og samtidige rentetilskrivninger faktisk strømmede igennem Angel Lux Common og Angel Lux Parent til kapitalfondene, som Nordic Telephone Company Investment oprindeligt havde stået i et direkte gældsforhold til. Endelig var arrangementet, som anført under punkt 7.1.1.3, uden nogen forretningsmæssig begrundelse.

De anførte omstændigheder godtgør, *at* arrangementet blev etableret med det (hoved-)formål, at såvel Angel Lux Common som Angel Lux Parent skulle virke som gennemstrømningsenheder for de omhandlede renter, der uden arrangementet ville være blevet skattepligtige i medfør af selskabsskattelovens § 2, stk. 1, litra d), pr. 1. maj 2006, da kapitalfondene ubestridt ikke selv kunne have påberåbt sig en overenskomstmæssig fordel, og *at* ingen af selskaberne substantielt kunne disponere over renterne, der på forhånd var bestemt til at blive videreført til kapitalfondene, hvilket faktisk også skete.

At selskaberne faktisk ikke var overladt noget råderum til at disponere over indtægterne, cementeres som nævnt ovenfor til overflod af den effektive betaling, der fandt sted i oktober 2006. Bortset fra nogle relativt set marginale beløb foretog Nordic Telephone Company Investment nemlig betaling af renter og afdrag direkte til kapitalfondene, dvs. uden om såvel Angel Lux Common som Angel Lux Parent.

For bedømmelsen af, om Angel Lux Common i skatteretlig henseende må anses for renternes retmæssige ejer, er det uden betydning, at renterne blev tilskrevet hovedstolen (godskrevet) og (først) senere blev konverteret til kapitalandele i Nordic Telephone Company Investment.

De skatteretlige virkninger indtrådte nemlig (allerede) ved rentetilskrivningen. For arrangementet var det et bærende element, at der i ingen af transaktionskædens led skete effektiv betaling af renter, idet renter blev tilskrevet hovedstolen. Arrangementet indebar, at de skattemæssige fordele i form af fradrag og fritagelse for kildebeskatning kunne høstes straks uden nogen form for likviditetsmæssige belastninger for de deltagende selskaber, og således at tilgodehaverenderne i form af de tilskrevne renter efterfølgende og uden beskatning kunne suges op igennem konstruktionen ved betalingsoverførsler, modregninger eller konverteringer til kapitalandele. For den skatteretlige bedømmelse af, om Angel Lux Common må anses for renternes retmæssige ejer, er det derfor uden betydning, at renterne ikke løbende blev betalt effektivt ved f.eks. en bankoverførsel, men blev tilskrevet lånets hovedstol.

Det forhold, at beslutningen i 2008 om at konvertere Angel Lux Commons fordring (inkl. tilskrevne renter) på Nordic Telephone Company Investment til

**3348**

anpartskapital i det danske selskab formelt måtte være blevet truffet af Angel Lux Common som eneanpartshaver på en ekstraordinær generalforsamling i det danske selskab, beviser ikke, at Angel Lux Common var retmæssig ejer af renterne. Dette følger allerede at, at gennemstrømningen af renterne til kapitalfondene som nævnt allerede var sket i kraft af de løbende rentetilskrivninger. Dertil kom-

mer, at det - navnlig taget i betragtning af størrelsen af de konverterede beløb og bestemmelserne i aktionæroverenskomsten af 27. april 2006 [...] - er usandsynligt, at andre end de bagvedliggende kapitalfondene (reelt) kunne tage og faktisk også tog beslutningen om konverteringen.

NTC's påberåbelse af SKM2012.121.ØLR i forhold til selskabets synspunkt om, at renterne er »vendt tilbage« til Nordic Telephone Company Investment, er ikke holdbar. SKM2012.121.ØLR er på dette punkt usammenlignelig med den foreliggende sag, eftersom udbytterne i den pågældende sag ikke blev ført videre fra den umiddelbare modtager af udbyttet, modsat hvad der er tilfældet i den foreliggende sag, hvor renterne fra Nordic Telephone Company Investment blev ført videre fra den umiddelbare rentemodtager, Angel Lux Common, via rentetilskrivninger på de back-to-back lån, der var etableret mellem det danske selskab og kapitalfondene.

På den anførte baggrund må det fastslås, at hverken Angel Lux Common eller Angel Lux Parent i den dansk-luxembourgske dobbeltbeskatningsoverenskomst artikel 11, stk. 1's forstand kan anses for de omhandlede renters retmæssige ejer. Dobbeltbeskatningsoverenskomsten fører dermed ikke til, at renterne skal fritages for en skattepligt efter selskabsskattelovens § 2, stk. 1, litra d).

*7.1.3 En beskatning strider ikke imod en bindende administrativ praksis*

Ved afgørelsen af, om en skattepligt med hensyn til de omhandlede renter vil stride imod en bindende, fast administrativ praksis vedrørende fortolkningen af selskabsskattelovens § 2, stk. 1, litra d), tredje punktum, må det - da landsretten ellers ikke har anledning til at tage stilling til spørgsmålet - lægges til grund, *at* beskatningen ikke skal frafaldes efter rente-/royaltydirektivet, fordi der foreligger misbrug, og *at* beskatningen af renterne ej heller skal nedsættes efter den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 11, stk. 1, eftersom Angel Lux Common ikke (og ej heller Angel Lux Parent) kan anses for renternes retmæssige ejer.

Der er derfor med andre ord tale om, at NTC med sit praksissynspunkt gør krav på, at de omhandlede renter skal anses for undtaget fra en skattepligt, *selv om* selskabsskattelovens § 2, stk. 1, litra d), tredje punktums udtrykkelige betingelse for, at renterne er undtaget fra skattepligten, *ikke* er opfyldt.

Da en forvaltningsretlig lighedsgrundsætning ikke kan begrunde et krav om en retsstilling, der strider imod loven, jf. hertil U.2003.2005H [...], er det udelukket, at NTCs påberåbelse af en administrativ praksis kan føre til, at de omhandlede renter undtages fra en skattepligt, allerede fordi en sådan undtagelse altså vil stride imod selskabsskattelovens § 2, stk. 1, litra d), tredje punktums udtrykkelige betingelse for, at en undtagelse kan indrømmes.

Hertil kommer, at SKATs afgørelse af 18. marts 2011 i den foreliggende sag ikke er udtryk for en praksisskærpelse, eftersom afgørelsen ikke ændrede på nogen fast administrativ praksis.

Det påhviler NTC at føre bevis for eksistensen af den hævdede praksis, som afgørelsen ifølge selskabet skulle fravige, jf. f.eks. U.2011.3305H[...], men selskabet har ikke løftet denne bevisbyrde. NTC har således ikke påvist eksistensen af nogen tidligere afgørelse, hvorefter skattemyndighederne har anset renter for at være undtaget fra en skattepligt, selv om de givne omstændigheder - ligesom i den foreliggende sag - ellers gav belæg for at fastslå, at modtageren ikke havde haft eller havde haft så snævre beføjelser til at disponere over renterne, at selskabet ikke kunne anses for renternes retmæssige ejer.

NTC har endvidere ikke påvist tilfælde, hvor skattemyndighederne siden selskabsskattelovens § 2, stk. 1, litra d)'s ikrafttrædelse med virkning for renter, der vedrører tiden fra og med den 2. april 2004, skulle have forsømt at gribe korrigerende ind i tilfælde som det foreliggende. En sådan manglende indgriben ville, hvis den faktisk havde fundet sted, i øvrigt heller ikke kunne være blevet sidestillet med en positiv afgørelse, jf. f.eks. U.2017.2960H og U.2017.2979H [...].

NTC har heller ikke på anden vis godtgjort, at skattemyndighederne efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra d), og indtil SKATs afgørelse i den foreliggende sag skulle have fulgt en praksis, hvorefter renter er blevet anset for at være undtaget fra den skattepligt, der følger af bestemmelsen, selv om de givne omstændigheder ellers gav belæg for at fastslå, at modtageren af renterne ikke havde haft eller havde haft så snævre beføjelser til at disponere over renterne, at selskabet ikke kunne anses for renternes retmæssige ejer.

Som beskrevet ovenfor under punkt 7.1 fremgår det af forarbejderne til selskabsskattelovens § 2, stk. 1, litra d), at skattemyndighederne efter en konkret realitetsbedømmelse vil kunne nægte renternes (umiddelbare) modtager fordelene, der ellers følger af rente-/royaltydirektivet og en eventuel dobbeltbeskatningsoverenskomst, med den begrundelse at modtageren ikke er renternes retsmæssige ejer.

De af NTC påberåbte svar, som skatteministeren efter ikrafttrædelsen af selskabsskattelovens § 2, stk. 1, litra

**3349**

d), har afgivet i forskellige sammenhænge, udgør ikke et bevis for, at der på tidspunktet for SKATs afgørelse var etableret en praksis, hvorefter renter - under omstændigheder som i denne sag foreliggende - blev betragtet som værende undtaget fra en skattepligt efter denne bestemmelse.

Der er tale om abstrakte udtalelser eller abstrakte svar på abstrakte spørgsmål. Udtalelserne og svarene giver - ligesom det påberåbte notat om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner og den påberåbte udtalelse fra en kontorchef i SKAT - intet belæg for, at SKAT positivt skulle have truffet en beslutning om at følge en praksis, hvorefter renter blev anset for undtaget fra en skattepligt, selv om der efter en oplysning og en konkret vurdering af de givne omstændigheder ville være belæg for at fastslå, at modtageren ikke havde haft eller havde haft så snævre beføjelser til at disponere over renterne, at selskabet ikke kunne anses for renternes retsmæssige ejer.

Forud for SKATs afgørelse i denne sag havde skatteministeren afgivet adskillige svar, hvoraf fremgår, at et moderselskab ikke ville kunne påberåbe sig fordelene af en dobbeltbeskatningsoverenskomst, hvis det var et »rent gennemstrømningsholdingselskab«, et »rent gennemstrømningsselskab«, et »conduit« selskab, eller et »gennemstrømningsselskab«, jf. 1) bilag 9 til lovforslag nr. 116 af 14. december 2005 [...], 2) skatteministerens svar på udvalgsspørgsmål 2-10 efter fremsættelsen af lovforslag nr. 30 af 4. oktober 2006 [...], 3) skatteministerens svar af 6. november 2006 på spørgsmål S 474 [...]og 4) bilag 26 vedrørende lovforslag nr. 213 af 18. april 2007 [...], 5) ministerens svar på udvalgsspørgsmål 86 [...] og 6) det reviderede svar herpå [...] til førnævnte lovforslag. I alle de nævnte svar, bortset fra det første, er der endog henvist til pkt. 12.1 i bemærkningerne til artikel 10 (om udbytte) i OECD's modeloverenskomst, og i de 4 sidstnævnte svar er det ydermere beskrevet i selve svarene, at »conduit« selskaber/»gennemstrømningsselskaber« omfatter selskaber, der »reelt har meget snævre beføjelser i relation til den pågældende indkomst«.

De ministersvar, notatet om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af 7 danske koncerner og udtalelsen fra en kontorchef i SKAT, som NTC påberåber sig til støtte for indsigelsen om en praksisskærpelse, blev også - forgæves - påberåbt af de udbytteudloddende selskaber i SKM2021.304.ØLR til støtte for den tilsvarende indsigelse om en praksisskærpelse.

På den anførte baggrund bør det - på tilsvarende vis som i SKM2021.304.ØLR - fastslås, at SKATs afgørelse i denne sag ikke ændrede på nogen bindende, fast administrativ praksis, som NTC i medfør af en forvaltningsretlig lighedsgrundsætning kan støtte ret på.

[…]

*7.2 NTC's subsidiære påstand - om de »ultimative investorer« i kapitalfondene*

Andre dobbeltbeskatningsoverenskomster end den dansk-luxembourgske dobbeltbeskatningsoverenskomst giver intet grundlag for, at Danmark skal frafalde beskatningen af de omhandlede renter.

Dobbeltbeskatningsoverenskomster angår behandlingen af indtægter, der i skattemæssig henseende må betragtes som hidrørende fra én kontraherende stat, kildestaten (i dette tilfælde Danmark), og som skattemæssigt må anses for at blive oppebåret af en fysisk eller juridisk person i den anden kontraherende stat. I overensstemmelse hermed følger det af ordlyden af selskabsskattelovens § 2, stk. 1, litra d), at det kun er dobbeltbeskatningsoverenskomsten med den stat, hvori det modtagende selskab er hjemmehørende, som kan føre til en fritagelse for skattepligt. Da Angel Lux Common er rette indkomstmodtager af de omhandlede renter fra Nordic Telephone Company Investment, er det (kun) den dansk-luxembourgske dobbeltbeskatningsoverenskomst, der kan afskære Danmark fra at beskatte renterne, forudsat at overenskomstens betingelser herfor ellers er opfyldt, hvad der imidlertid - som beskrevet ovenfor - ikke er tilfældet i denne sag.

Ved vurderingen af, om en beskatning er afskåret efter den danskluxembourgske dobbeltbeskatningsoverenskomst, vil det dog kunne tillægges betydning, om det pågældende beløb viderekanaliseres til en stat, hvormed der er indgået en dobbeltbeskatningsoverenskomst. Det skyldes, at begrebet »retmæssig ejer« er et begreb, der tager sigte på at hindre misbrug, der består i, at en person disponerer via en juridisk person, der er hjemmehørende i en kontraherende stat, med det hovedformål at opnå en overenskomstmæssig fordel, som ikke ville kunne opnås af personen direkte. I situationer, hvor der ikke er indikationer på et sådant misbrug, fordi der ikke i relation til beskatning er nogen fordel forbundet med det mellemliggende selskab, bør en overenskomstmæssig fordel i form af fritagelse for en beskatning i kildestaten ikke nægtes.

Hvad angår rente-/royaltydirektivet, fremgår det af Domstolens dom i den foreliggende sag, at det med hensyn til misbrugsvurderingen er uden betydning, at visse af de retmæssige ejere af de renter, som er blevet overført af gennem-strømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst (dommens præmis 135), men ifølge Domstolen kan det dog - hvis der foreligger en situation, hvor renterne ville have været fritaget, hvis de var blevet overført direkte til det selskab, som har sit hjemsted i en tredjestat - ikke »udelukkes«, at målet med en given koncernstruktur ikke er udtryk for retsmisbrug (dommens præmis 137).

**3350**

Domstolen har ikke givet anvisninger for, hvad der nærmere skal til, for at en formodning for misbrug kan anses for afkræftet, men sammenhængen mellem dommens præmis 135 og 137 efterlader ingen tvivl om, at den omstændighed, at renternes retmæssige ejer er skattemæssigt hjemmehørende i en stat, hvormed Danmark har indgået en dobbeltbeskatningsoverenskomst, som kunne have været påberåbt, hvis den retsmæssige ejer havde været den direkte långiver, ikke - per se - er tilstrækkeligt til at afkræfte en etableret formodning for et misbrug af rente-/royaltydirektivet. Der er ellers retskildemæssige holdepunkter for, at der skulle gælde noget andet, hvad angår vurderingen af, om der foreligger et misbrug af den dansk-luxembourgske dobbeltbeskatningsoverenskomst.

I den foreliggende situation er der tale om, at det rentemodtagende selskab (Angel Lux Common) blot udgør en »gennemstrømningsenhed«, hvorigennem renterne ledes (via Angel Lux Parent, som er endnu en »gennemstrømningsenhed«) til juridiske enheder, nemlig kapitalfondene, som *ikke* kan påberåbe sig en overenskomstmæssig fordel. Som der er redegjort for ovenfor, er der klare holdepunkter for at fastslå, at det etablerede arrangement tager sigte på et misbrug af den dansk-luxembourgske dobbeltbeskatningsoverenskomst og rente-/royaltydirektivet.

Den herved etablerede formodning for, at der foreligger et misbrug af rente-/royaltydirektivet og den dansk-luxembourgske dobbeltbeskatningsoverenskomst, kan *ikke* afkræftes blot med henvisning til, *at* de »ultimative investorer« i kapitalfondene måtte være hjemmehørende i en stat, som kildelandet (Danmark) har indgået en dobbeltbeskatningsoverenskomst med, og *at* disse personer - hvis de havde været de direkte modtagere af renterne i stedet for Angel Lux Common - kunne have påberåbt sig en bestemmelse i denne dobbeltbeskatningsoverenskomst om kildestatens frafald af en beskatning.

I en situation som den foreliggende må der stilles strenge krav til beviset for, at arrangementet (alligevel) ikke har haft et misbrug af rente-/royaltydirektivet og den dansk-luxembourgske dobbeltbeskatningsoverenskomst som et hovedformål.

Et sådant bevis er ikke ført, allerede fordi det er *ingen* dokumentation er for, hvem der var de »ultimative investorer« i de omhandlede kapitalfonde, og hvor disse investorer skulle være skattemæssigt hjemmehørende.

Oplysningerne i de oversigter, som NTC har fremlagt […], bestrides som udokumenterede. Bilag 3 er en oversigt på et »blankt« stykke papir og udgør derfor ikke dokumentation for de nævnte forhold, og det samme gælder bilag 6-12. Det forhold, at oversigterne i bilag 6-12 ifølge NTC er udarbejdet af kapitalfondene på baggrund af dokumentation, som kapitalfondene er i besiddelse af […], gør ikke, at oplysningerne i opgørelserne kan anses for dokumenterede.

Endvidere er oplysningerne i bilag 6-12 på en række punkter helt summariske og/eller ufuldstændige, hvorfor de under alle omstændigheder ikke er egnet til at danne grundlag for en eventuel nedsættelse af kildeskattekravet.

Dertil kommer, at selv hvis man måtte lægge de udokumenterede oplysninger i oversigterne i bilag 6-12 til grund, ville det ikke være tilstrækkeligt til, at der skal ske en nedsættelse af kildeskattekravet. Som nævnt er det blotte forhold, at de »ultimative investorer« i kapitalfondene måtte være hjemmehørende i et land, hvormed Danmark har indgået en dobbeltbeskatningsoverenskomst, nemlig *ikke* tilstrækkeligt til at afkræfte, at der er tale om misbrug af rente-/royaltydirektivet og den dansk-luxembourgske dobbeltbeskatningsoverenskomst.

NTC må - i hvert fald - godtgøre, at de »ultimative investorer« i kapitalfondene som hævdet af NTC var de retmæssige ejere af renterne fra Nordic Telephone Company Investment.

Således om sagen foreligger oplyst, er der intet grundlag for at fastslå, hvem der var retmæssig ejer(-e) af renterne fra Nordic Telephone Company Investment.

Det bemærkes i den forbindelse, at når den, der fremtræder som fordringshaver, i dette tilfælde Angel Lux Common, ikke kan anses for renternes retsmæssige ejer, påhviler det ikke skattemyndighederne at fastslå, hvem der så er renternes retmæssige ejer. En sådan pligt, der ikke kan udledes af rente-/royaltydirektivet, jf. hertil dommens præmis 143-145, kan heller ikke udledes af den dansk-luxembourgske dobbeltbeskatningsoverenskomst eller af noget andet retligt grundlag. Som anført af Domstolen vil det nemlig ofte være umuligt for kildelandets skattemyndigheder at afdække, hvem

der er renternes retsmæssige ejer. Det gælder også i en situation, hvor det er muligt at indkredse de mulige retmæssige ejere, da det med al sandsynlighed vil være umuligt for kildestatens (Danmarks) skattemyndigheder og domstole at fastslå, hvilken af to mulige retsmæssige ejere, der er den retsmæssige ejer, jf. hertil Domstolens dom, præmis 143 og 144.

Det påhviler NTC at påvise og godtgøre, hvem der er renternes retmæssige ejer, såfremt selskabet ønsker at påberåbe sig, at den retsmæssige ejer er hjemmehørende i et land, hvormed Danmark har en dobbeltbeskatningsoverenskomst.

NTC har ikke forsøgt at føre bevis for, at de hævdede »ultimative investorer« var de retmæssige ejere af renterne, herunder at kapitalfondene, som modtog renterne via gennemstrømningsenhederne Angel Lux Common og Angel Lux Parent, *ikke* er de retmæssige ejer af renterne.

**3351**

Der er således ikke ført bevis for, *at* kapitalfondene ikke har kunne råde frit over renterne, enten fordi kapitalfondene har været retligt forpligtet til at føre renterne videre, eller fordi de pga. af faktiske omstændigheder ikke har haft reelle beføjelser til at råde over renterne og dermed blot har fungeret som gennemstrømningsenheder, og *at* renterne er blevet ført videre fra kapitalfondene til de hævdede »ultimative investorer«. Vedrørende sidstnævnte bemærkes, at der ikke foreligger oplysninger, endsige dokumenterede oplysninger om, hvad der er sket med de omhandlede renter, efter at de er strømmet gennem Angel Lux Common og Angel Lux Parent til kapitalfondene.

NTC har anført, at »Kapitalfondene i sagen er alle etableret som skattemæssigt transparente enheder (Limited Partnerships - kommanditselskaber) med investorerne som limited partners (kommanditister)« […]. Dette bestrides som udokumenteret. Der er ingen dokumentation for, at kapitalfondene anses som skattemæssigt transparente i de stater, hvor de er hjemmehørende.

Der er heller ingen dokumentation for, at kapitalfondene (også) anses som skattemæssigt transparente efter reglerne i de stater, hvor de »ultimative investorer« er hjemmehørende, hvilket er en forudsætning for, at en dobbeltbeskatningsoverenskomst mellem Danmark og den stat, hvori de »ultimative investorer« er hjemmehørende, ville have kunnet finde anvendelse, hvis det havde været kapitalfondene, der havde været direkte långivere til Nordic Telephone Company Investment.

Allerede af disse grunde skal Skatteministeriet frifindes for NTC's subsidiære påstand.

Det bemærkes *ex tuto*, at den beløbsmæssige opgørelse af de beløb, som kildeskattekravet ifølge NTCs subsidiære påstand skal nedsættes med, bestrides som udokumenteret og forkert, […].

…

*7.3 NTC's mere subsidiære påstand - NTC er ansvarlig for den manglende indeholdelse*

Da de omhandlede renter er omfattet af skattepligten, jf. selskabsskattelovens § 2, stk. 1, litra d), skulle Nordic Telephone Company Investment (nu NTC) i forbindelse med betalingen af renterne have indeholdt renteskat heraf, jf. kildeskattelovens § 65 D, stk. 1.

Af kildeskattelovens § 69, stk. 1, følger som nævnt at, den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre han godtgør, at der *ikke* er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i kildeskatteloven.

Ved afgørelsen af, om NTC har afkræftet den lovbestemte formodning for forsømmelighed, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at der i hvert fald er en vis risiko for, at der er nogen bindende administrativ praksis, hvoref-

ter de omhandlede renter skal anses for at være undtaget fra den skattepligt, der ellers følger af selskabsskattelovens § 2, stk. 1, litra d). Allerede af den grund er det uholdbart, når NTC gør gældende, at der forelå en praksis, som gav selskabet føje til at antage, at renterne kunne godskrives uden indeholdelse af renteskat.

Der har heller ikke været en tvivl om fortolkningen af begrebet »retmæssig ejer«, der har kunnet givet NTC føje til en sådan antagelse - tværtimod. Som beskrevet ovenfor fremgår det til overflod af forarbejderne til selskabsskattelovens § 2, stk. 1, litra d), at skattemyndighederne efter en konkret realitetsbedømmelse vil kunne nægte renternes (umiddelbare) modtager fordelene, der ellers følger af rente-/royaltydirektivet og en eventuel dobbeltbeskatningsoverenskomst, med den begrundelse at modtageren ikke er renternes retmæssige ejer.

Det statusnotat af 10. september 2009 fra SKAT, som NTC påberåber sig […], støtter ikke, at Nordic Telephone Company Investment ikke har udvist forsømmelighed, jf. kildeskattelovens § 69, stk. 1. Det pågældende statusnotat var et - ud af mange - løbende opdaterede statusnotater, som SKATs medarbejdere udarbejdede under behandlingen af sagen, og som beskrev det aktuelle »stade« i relation til de forskellige skattemæssige forhold, som blev undersøgt. I øvrigt udleverede SKAT allerede få uger efter - den 2. december 2009 - et nyt statusnotat til selskabet, hvori det var anført, at »[d]et kan konstateres, at der vedrørende PEC er foretaget betalinger/tilskrivninger af renter til koncernforbundne parter, som ikke er hjemmehørende i lande, som Danmark ikke har en DBO med, hvorfor udgangspunktet er, at der skulle have været tilbageholdt renteskat« […].

For spørgsmålet om Nordic Telephone Company Investments (nu NTC's) ansvar efter kildeskattelovens § 69, stk. 1, bliver det (derimod) udslagsgivende, at selskabet har været bekendt med de faktiske omstændigheder, som fører til, *dels* at Angel Lux Common ikke kan anses for at have at været renternes retsmæssige ejer i den dansk-luxembourgske dobbeltbeskatningsoverenskomsts forstand, *dels* at fordelen i form af kildeskattefritagelsen, der følger af rente-/royaltydirektivet, skal nægtes, dels fordi EU-retten ikke kan påberåbes med henblik på at muliggøre retsmisbrug, og fordi Angel Lux Common heller ikke kan anses for renternes retmæssige ejer i direktivets forstand, jf. således også præmisserne for landsrettens dom gengivet i SKM2021.304.ØLR.

Når der - som i den foreliggende sag - er grundlag for at nægte en skattemæssig fordel i form af kilde-skattefritagelse, fordi fordelen er søgt opnået ved retsmisbrug, og den indeholdelsespligtige er bekendt med dette grundlag, må den manglende indeholdelse af kildeskatten således - per se - tilregnes den indeholdelsespligtig som værende af en forsømmelig karakter.

**3352**

Da NTC altså ikke har afkræftet den lovbestemte formodning for, at der fra selskabets side er udvist forsømmelighed med hensyn til den manglende indeholdelse af renteskat, er selskabet i medfør af kildeskattelovens § 69, stk. 1, over for det offentlige umiddelbart ansvarlig for betaling af de ikke-indeholdte renteskatter.«

## VI. Landsrettens begrundelse og resultat

*B-2942-12 Takeda A/S under frivillig likvidation mod Skatteministeriet*

*Selskabsskattelovens § 2, stk. 1, litra d*

Det følger af selskabsskattelovens § 2, stk. 1, litra d, som affattet ved lov nr. 221 af 31. marts 2004, at et selskab som nævnt i § 1, stk. 1, med hjemsted i udlandet er skattepligtig af renter, som det oppebærer fra et selskab her i landet, når der er tale om kontrolleret gæld, jf. skattekontrollovens § 3 B.

Det er ubestridt, at Nycomed Sweden Holding 2 AB er omfattet af selskabsskattelovens § 1, stk. 1, og at lånet fra selskabet til Nycomed A/S, som de omhandlede rentetilskrivninger vedrører, er kontrolleret gæld.

Det følger dog af § 2, stk. 1, litra d, 3. punktum, at skattepligten ikke omfatter renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF (rente-/royaltydirektivet) eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor selskabet er hjemmehørende.

Sagen drejer sig derfor i første række om, hvorvidt der i medfør af rente-/royaltydirektivet eller den nordiske dobbeltbeskatningsoverenskomst er pligt til i frafalde eller nedsætte beskatningen af renterne.

*Rente-/royaltydirektivet*

Rente-/royaltydirektivet er implementeret i dansk ret ved lov nr. 221 af 31. marts 2004 på den måde, at selskabsskattelovens § 2, stk. 1, litra d, henviser til bestemmelserne i direktivet.

Direktivets bestemmelser finder herefter efter deres indhold anvendelse på renter omfattet af selskabsskattelovens § 2, stk. 1, litra d.

Direktivet bestemmer, at betalinger af renter og royalties, der opstår i en medlemsstat, fritages for enhver form for skat i denne stat, forudsat at den retmæssige ejer af renterne er et selskab i en anden medlemsstat, og at der er tale om renter, der betales mellem associerede selskaber, jf. artikel 1, stk. 7. Det er ubestridt, at sidstnævnte betingelse er opfyldt, idet Nycomed A/S var 100 % ejet af Nycomed Sweden Holding 2 AB.

Skatteministeriet har imidlertid gjort gældende, at Nycomed Sweden Holding 2 AB (og tilsvarende for Nycomed Sweden Holding 1 AB) ikke kan påberåbe sig skattefritagelse efter direktivet, fordi selskabet ikke kan anses for renternes »retmæssige ejer«, og fordi der foreligger retsmisbrug, jf. direktivets artikel 5.

Skatteministeriets anbringender rejser spørgsmål om fortolkning af rente-/royaltydirektivet.

Landsretten bemærker indledningsvist, at kompetencen til at afgøre spørgsmål om fortolkningen af EU-retten henhører under EU-Domstolen, jf. TEUF artikel 267.

I EU-Domstolens (Store Afdeling) dom af 26. februar 2019 i denne sag og sag B-171-13, forenede sager C-115/16, C-118/16, C-119/16 og C-299/16, udtaler Domstolen om fortolkningen af begrebet »retmæssig ejer«, at det betegner en enhed, som økonomisk set reelt modtager af renter, som betales til den, og som derfor råder over beføjelsen til frit at fastlægge anvendelsen heraf. Det afgørende er således ikke, om modtageren formelt er ejer af renterne. Domstolen udtaler endvidere, at begrebet »retmæssig ejer« i artikel 11 i OECD's model for dobbeltbeskatningsoverenskomster fra 1996 med efterfølgende ændringer og kommentarerne hertil er relevante for fortolkningen af direktivet.

Om retsmisbrug udtaler EU-Domstolen, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for enhver form for skat af rentebetalinger, der er fastsat i rente-/royaltydirektivet, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

Takeda A/S har imidlertid gjort gældende, at en forståelse som fastslået af EU-Domstolen strider imod selskabsskattelovens § 2, stk. 1, litra d, skal der indrømmes skattefritagelse, uanset om der måtte foreligge et retsmisbrug af direktivet.

Landsretten bemærker herom, at ordlyden af selskabsskattelovens § 2, stk. 1, litra d, der om skattefritagelse blot henviser til rente-/royaltydirektivet, ikke er i modstrid med EU-Domstolens fortolkning. Landsretten finder ligeledes, at der ikke i lovens forarbejder er holdepunkter for at antage, at § 2, stk. 1, litra d, skal forstås således, at der hjemles skattefritagelse også i tilfælde, der kan karakteriseres som retsmisbrug som beskrevet af EU-Domstolen.

Det fremgår således af forarbejderne til lov nr. 221 af 31. marts 2004, hvorved man indførte beskatning af renter på koncerninterne lån, som betales til selskaber i ikke-EU-lande uden en dobbeltbeskatningsoverenskomst, at formålet var at imødegå, at et dansk selskab modtager den danske beskatning ved at reducere den skattepligtige indkomst gennem rentebetalinger til visse finansielle selskaber i lavskatte-lande, hvis det udenlandske selskab kontrollerer det danske selskab. Det fremgår endvidere af skatteministerens bemærkninger sendt til Skatteudvalget den 17. februar 2004

**3353**

vedrørende en henvendelse fra Foreningen af Statsautoriserede Revisorer i anledning af lovforslaget, at man var opmærksom på, at der var en risiko for, at reglerne ville blive søgt omgået ved, at det danske selskab betalte renterne til et selskab omfattet af rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst, som derpå betalte renterne videre til et selskab i et lavskatte-land. De danske skattemyndigheder vil i sådanne tilfælde efter en konkret realitetsbedømmelse kunne lægge til grund, at det selskab, som i første omgang modtager renterne, ikke er renternes retmæssige ejer.

På denne baggrund finder landsretten, at en fortolkning af rente-/royaltydirektivet, som anført af EU-Domstolen, ikke er i strid med selskabsskattelovens § 2, stk. 1, litra d.

Takeda A/S har endvidere gjort gældende, at det af EU-Domstolen anførte om et generelt EU-retligt princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, er at betragte som et princip på traktatniveau, der har direkte virkning for borgerne, og at Danmark ikke har overladt suverænitet til EU-Domstolen til at fastsætte et sådant princip.

Hertil bemærker landsretten, at der i den foreliggende retlige sammenhæng er tale om et princip, der må anses for at ligge inden for rammerne af en fortolkning af rente-/royalty-direktivet, og som ikke strider imod dansk lovgivning eller generelle danske retsprincipper. Landsretten finder derfor, at en fortolkning som anført af EU-Domstolen ikke i den foreliggende situation indebærer en overskridelse af de kompetencer, der er overladt til EU's institutioner ved loven om Danmarks tiltrædelse af Den Europæiske Union.

*Den nordiske dobbeltbeskatningsoverenskomst*

Det følger af artikel 11 i den nordiske dobbeltbeskatningsoverenskomst, at renter, der udbetales til en person, der er hjemmehørende i den anden kontraherende stat, ikke kan beskattes i den stat, hvorfra renterne stammer, hvis modtageren i den anden kontraherende stat er retmæssig ejer af renterne, jf. i overensstemmelse hermed selskabsskattelovens § 2, stk. 1, litra d.

Som anført har Skatteministeriet gjort gældende, at hverken Nycomed Sweden Holding 1 AB eller Nycomed Sweden Holding 2 AB er retsmæssig ejer af renterne fra Nycomed A/S.

Spørgsmålet er herefter, hvordan begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsten skal forstås.

Overenskomsten indeholder ikke en definition af begrebet »retmæssig ejer«. Ifølge overenskomstens artikel 3, stk. 2, har begreber, der ikke er defineret i overenskomsten, medmindre andet følger af sammenhængen, tillægges den betydning, som det har i den kontraherende stats lovgivning om de skatter, der er omfattet af overenskomsten.

Dansk skattelovgivning ses ikke at anvende begrebet »retmæssig ejer«, der heller ikke er et nærmere defineret begreb i dansk ret.

Begrebet »retmæssig ejer« er hverken omtalt i forarbejderne til selskabsskattelovens § 2, stk. 1, litra c eller litra d, der begge bestemmer, at der er skattefritagelse for kildeskat af henholdsvis udbytter og renter, hvis beskatningen skal nedsættes efter en dobbeltbeskatningsoverenskomst.

Der foreligger ikke oplysninger om forhandlingerne med de nordiske lande forud for indgåelsen af dobbeltbeskatningsoverenskomsten. Ved fortolkningen af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomstens artikel 11, stk. 1, finder landsretten det derfor relevant at inddrage fortolkningsbidrag vedrørende den tilsvarende bestemmelse i OECD's modeloverenskomst, der har anvendt begrebet »retmæssig ejer« siden 1977.

OECD's modeloverenskomst indeholder ikke en definition af begrebet »retmæssig ejer«. I kommentarerne til modeloverenskomsten fra 1977 er om »misbrug af overenskomsten« anført bl.a., at dobbeltbeskatningsoverenskomsten ikke bør hjælpe til skatteunddragelse eller skatteflugt, og at begrebet »retmæssig ejer« i bl.a. artikel 11 imødegår visse misbrugssituationer. Som misbrug omtales kunstfærdige juridiske konstruktioner, og som eksempel nævnes det forhold, at en person disponerer via en juridisk sammenslutning, der er dannet i en stat, væsentligst for at opnå fordele i henhold til en dobbeltbeskatningsoverenskomst, som ikke ville kunne opnås af personen direkte. Af kommentarerne til artikel 10 fremgår endvidere, at begrænsningen i beskatningen ikke kan benyttes, når et mellemled (»intermediary«) skydes ind mellem den berettigede og udbetaleren. Som eksempler på et mellemled nævnes en agent eller en udpeget person (»nominee«).

I kommentarerne til OECD's modeloverenskomst fra 2003 anføres i overensstemmelse hermed, at udtrykket »retmæssig ejer« ikke er anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse. Det anføres herudover i kommentaren til artikel 11, i tråd med 1977-kommentarerne om »kunstfærdige juridiske konstruktioner« og »mellemled«, at det ikke er i overensstemmelse med formålet med overenskomsten at indrømme fritagelse for skat, hvor en person, på anden måde end som agent eller mellemmand (»nominee relationship«) blot fungerer som gennemstrømningsenhed (»conduit«) for en anden person, der rent faktisk modtager den pågældende indkomst. Endelig nævnes, tillige i overensstemmelse med 1977-kommentarerne, at OECD's Committee on Fiscal Affairs på denne baggrund har konkluderet, at et »gennemstrømningsselskab« normalt ikke kan anses for den

**3354**

retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

Landsretten bemærker, at der ikke er grundlag for at statuere, at en forståelse af begrebet »retmæssig ejer«, som anført ovenfor, skulle være i strid med selskabsskattelovens § 2, stk. 1, litra c og d. Der ses hverken i ordlyden af bestemmelserne eller i forarbejderne hertil grundlag for en anden fortolkning, jf. det ovenfor anførte om forarbejderne til lov nr. 221 af 31. marts 2004, hvorved man indførte beskatning af renter på koncerninterne lån, og det i landsrettens dom af 3. maj 2021 i sagerne B-1980-12 og B-2173-12 anførte om forarbejderne til lov nr. 282 af 25. april 2001.

På dette grundlag skal der herefter foretages en vurdering af de konkrete rentetilskrivninger i sagen.

*Rentetilskrivninger i 2007, 2008 og 2009*

Det fremgår af sagen, at der i efteråret 2006 blev foretaget en omstrukturering af konsortiet, der indebar, at selskaberne Nycomed S.C.A., SICAR, Nycomed Sweden Holding 1 AB og Nycomed

Sweden Holding 2 AB blev stiftet og indskudt mellem kapitalfondene og Nycomed A/S.

Ved låneaftale af 27. december 2006 lånte Nycomed A/S 501 mio. euro af sit moderselskab, Nycomed Sweden Holding 2 AB. Det er oplyst, at finansieringen af lånet skete ved en kapitalforhøjelse fra Nycomed Sweden Holding 1 AB til Nycomed Sweden Holding 2 AB.

Ved låneaftale ligeledes af 27. december 2006 lånte Nycomed Sweden Holding 1 AB 498,5 mio. euro af sit moderselskab, Nycomed S.C.A., SICAR. Renten på de to lån var fastsat til henholdsvis EURIBOR + 8,0 % og EURIBOR + 7,9 %. For begge lån var det et vilkår, at påløbne renter skulle tillægges hovedstolen, som låntager ikke var forpligtet til at afdrage på i lånets løbetid.

Lånet mellem Nycomed A/S og Nycomed Sweden Holding 2 AB blev i 2007, 2008 og 2009 tilskrevet renter med henholdsvis 61.444.992, 75.498.014 og 61.836.446 euro. I samme periode ydede Nycomed Sweden Holding 2 AB koncernbidrag til Nycomed Sweden Holding 1 AB med henholdsvis 60.468.000, 75.621.000 og 60.353.294 euro, som blev tilskrevet Nycomed Sweden Holding 1 AB over selskabernes indbyrdes mellemregningskonto. Ligeledes i 2007, 2008 og 2009 blev lånet mellem Nycomed Sweden Holding 1 AB og Nycomed S.C.A., SICAR tilskrevet renter med henholdsvis 61.284.470, 72.866.092 og 60.825.103 euro.

Nycomed Sweden Holding 2 AB havde i 2007, 2008 og 2009 ifølge selskabets årsrapporter - ud over renteindtægterne - øvrige indtægter på henholdsvis 1.193.131, 1.726.601 og 1.238.442 euro. Nycomed Sweden Holding 1 AB havde i samme periode ifølge selskabets årsrapporter - ud over koncernbidragene - alene renteindtægter på henholdsvis 4.191, 5.368 og 25.564 euro. Det fremgår derudover, at de to selskaber i perioden havde identiske bestyrelser.

Landsretten finder, at a) lånet mellem Nycomed A/S og Nycomed Sweden Holding 2 AB, b) det samtidige lån mellem Nycomed Sweden Holding 1 AB og Nycomed S.C.A., SICAR, c) kapitalforhøjelsen i Nycomed Sweden Holding 2 AB og d) den årlige vedtagelse af koncernbidrag fra Nycomed Sweden Holding 2 AB til Nycomed Sweden Holding 1 AB må anses for et samlet og på forhånd tilrettelagt arrangement.

Takeda A/S har i sit påstandsdokument anført, at formålet med den konkrete struktur var »at »optimere« Nycomed-koncernens effektive skattesats, ved at Nycomed A/S ville opnå fradrag for renterne på gælden til Nycomed Sweden Holding 2 AB, uden at der skulle betales skat af renterne noget andet sted«.

Landsretten finder derfor, at det endvidere må lægges til grund, at indskydelsen af to svenske selskaber i arrangementet - i stedet for at Nycomed S.C.A., SICAR ydede lånet direkte til Nycomed A/S - ikke havde nogen forretningsmæssig begrundelse ud over at opnå en mulig skattefordel. Efter oplysningerne om arrangementets tilrettelæggelse må det endvidere lægges til grund, at hverken Nycomed Sweden Holding 2 AB eller Nycomed Sweden Holding 1 AB havde nogen reel råderet over de tilskrevne renter, henholdsvis koncernbidrag, som strømmede videre til Nycomed S.C.A, SICAR i overensstemmelse med formålet med arrangementet.

En samlet vurdering af de nævnte forhold findes at føre til, at hverken Nycomed Sweden Holding 2 AB eller Nycomed Sweden Holding 1 AB kan anses for at være retmæssig ejer af renterne, hverken efter rente-/royaltydirektivets artikel 1, stk. 1, eller den nordiske dobbeltbeskatningsoverenskomst artikel 11, stk. 1. Ved denne vurdering findes det at være uden betydning, at renterne og koncernbidragene først effektivt blev ført op igennem koncernstrukturen i 2011 i forbindelse med salget af Nycomed, idet den skattemæssige virkning indtrådte allerede ved tilskrivningerne/bogføringen i henholdsvis 2007, 2008 og 2009.

Således som sagen foreligger oplyst, finder landsretten, at renterne endeligt er tilflydt Nycomed S.C.A., SICAR.

Landsretten finder, at der ikke kan gives Takeda A/S medhold i deres synspunkt om, at investorerne i kapitalfondene kan anses for de retmæssige ejere af renterne. Der er herved lagt vægt på, at der ikke foreligger oplysninger, der giver grundlag for at antage, at der er en sådan direkte sammenhæng mellem tilskrivningen af renterne hos Nycomed, S.C.A., SICAR, og dette selskabs udlodninger gennem kapitalnedsættelse mv. til kapitalfondskonsortiet, at Nycomed, S.C.A., SICAR må anses som et gennemstrømningsselskab i den konkrete sammenhæng.

**3355**

For så vidt angår Nycomed S.C.A, SICAR udtaler EU-domstolen, at i det tilfælde, hvor selskabet faktisk er fritaget for selskabsskat (impôt sur le revenu des collectivités) i Luxembourg, jf. artikel 3, litra a, nr. iii, kan selskabet ikke anses for at være et »selskab i en medlemsstat« i direktivets forstand.

Det er ubestridt, at selskabet i Luxembourg er fritaget for beskatning af de omhandlede renter, og at selskabet derfor ikke kan påberåbe sig fordelene i rente-/royaltydirektivet, uanset om selskabet måtte være renternes retmæssige ejer.

Spørgsmålet er herefter, om Takeda A/S som grundlag for skattefritagelse kan påberåbe sig, at Nycomed S.C.A, SICAR er omfattet af dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg.

*Dobbeltbeskatningsoverenskomsten med Luxembourg*

Det følger af dobbeltbeskatningsoverenskomsten med Luxembourg artikel 11, at renterne ikke kan beskattes i Danmark, såfremt den retmæssige ejer af renterne er hjemmehørende i Luxembourg. Dette gælder ifølge slutprotokollen dog ikke, hvis den retmæssige ejer er et holdingselskab, som er omfattet af den særlige luxembourgske lovgivning, »for tiden loven af 31. juli 1929 og storhertugens forordning af 17. december 1938«.

Det er ubestridt, at Nycomed, S.C.A., SICAR er hjemmehørende i Luxembourg. Spørgsmålet er, om selskabet er omfattet af slutprotokollen og dermed ikke er skattefritaget i henhold til dobbeltbeskatningsoverenskomsten.

Nycomed, S.C.A., SICAR er et kommanditselskab, der er omfattet af lov af 22. juni 2004 om Société d'investissement en capital à risque, dvs. investeringsselskaber med risikokapital (SICAR-loven). For at være omfattet af loven, skal selskabets formål være at investere i »securities representative of risk capital in order to benefit investors from the results of the management of their assets in return for the risk they support«. Det er endvidere et krav, at investeringerne kun er tilgængelige for såkaldte »informed investors«. I »informed investor« skal opfylde nogle nærmere angivne krav, herunder være certificeret som havende ekspertise og erfaring med investering i »risk capital«, og investeringen skal være på mindst 125.000 euro. Loven ses ikke herudover at stille krav til selskabets investeringer.

Selskabet er ikke underlagt indkomstskat af indtægter fra investeringerne eller fra salg af investeringerne.

Et selskab omfattet af lov af 31. juli 1929 (1929-loven) er defineret som et holdingselskab, hvis eneste formål er at erhverve andele, i en hvilken som helst form, i andre selskaber, således at selskabet ikke har egen »industrial activity« og ikke er et »commercial establishment open to the public«. Selskabet er undtaget indkomstskat. Der ses ikke at være andre krav til selskabet eller dets investeringer. Forordningen af 17. december 1938 omhandler samme selskaber, hvis samlede aktie- og obligationskapital er på en milliard franc eller derover, og fastsætter en meget begrænset beskatning af renter og udbytter betalt til investorerne.

Slutprotokollen omfatter efter sin ordlyd »holdingselskaber«, som er karakteriseret ved at være omfattet af »den særlige luxembourgske lovgivning »for tiden« 1929-loven og 1938-forordningen.

Slutprotokollen må efter sin ordlyd herefter tillige omfatte holdingselskaber, der er reguleret af lovgivning vedtaget efter 1929 og 1938, for så vidt denne lovgivning har samme særlige karakteristika som disse love.

Selskaber omfattet af 1929-loven ses alene at være karakteriseret ved dels at være holdingselskaber, hvis formål er at erhverve andele i andre selskaber, således at det ikke har egen »industrial activity« og ikke er et »commercial establishment open to the public«, dels ved ikke at være underlagt skattepligt.

Et selskab omfattet af SICAR-loven ses alene at være defineret som et selskab, hvis formål skal være at investere i »securities representative of risk capital in order to benefit investors from the results of the management of their assets in return for the risk they support«. Det er endvidere et krav, at investeringerne kun er tilgængelige for såkaldte »informed investors«.

Landsretten finder, at SICAR-loven ligesom 1929-loven omfatter holdingselskaber, der investerer i andre selskaber, således at investeringerne ikke er tilgængelige for offentligheden. Begge selskabstyper er i det væsentlige ikke underlagt skattepligt. SICAR-loven er som det mindre i det mere begrænset til investeringer i risikokapital.

På denne baggrund finder landsretten, at Nycomed. S.C.A., SICAR er omfattet af dobbeltbeskatningsoverenskomstens slutprotokol, således er selskabet er skattepligtig af renter efter selskabsskattelovens § 2, stk. 1, litra d.

Det forhold, at selskaber omfattet af den luxembourgske lov af 30. marts 1988 om SICAV og SICAF selskaber (SICAV/SICAF-loven) efter SKATs opfattelse ikke er omfattet af slutprotokollen og dermed er skattefritaget efter selskabsskattelovens § 2, stk. 1, litra d, kan ikke føre til et andet resultat.

Det bemærkes herved, at selskaber omfattet af SICAV/SICAF-loven ikke er at anse som holdingselskaber som følge af lovens omfattende regler om kollektiv investering fra offentligheden efter princippet om risikospredning.

Heller ikke det forhold, at muligt andre selskabstyper efter luxembourgsk lovgivning vil kunne være omfattet af slutprotokollen kan føre til et andet resultat.

*Foreløbig konklusion*

Nycomed. S.C.A., SICAR må anses for at være den retmæssige ejer af de omhandlede renter og er derfor

**3356**

som udgangspunkt skattepligtig heraf i henhold til selskabsskattelovens § 2, stk. 1, litra d. Selskabet er ikke omfattet af den dansk-luxemburgske dobbeltbeskatningsoverenskomst.

*§ 2, stk. 1, litra d, sidste punktum*

Takeda A/S har endvidere gjort gældende, at skattepligten for Nycomed Sweden Holding 2 AB under alle omstændigheder bortfalder i medfør af § 2, stk. 1, litra d, sidste punktum, hvorefter skattepligten bortfalder, hvis det modtagende selskab godtgør, at den udenlandske selskabsbeskatning af renterne udgør mindst ¾ af den danske selskabsbeskatning, samt at selskabet ikke betaler renterne videre til et andet udenlandsk selskab, som er undergivet en selskabsbeskatning af renterne, der er mindre end ¾ af den danske selskabsbeskatning.

Takeda A/S har nærmere anført, at både Nycomed Sweden Holding 2 AB - og Nycomed Sweden Holding 1 AB, i det tilfælde at renterne måtte blive anset for viderebetalt til andet selskab i form af de tilskrevne koncernbidrag - er skattepligtig(e) af renterne, henholdsvis koncernbidragene, i Sverige med en skattesats på 28 %, hvilket udgør mindst ¾ af den danske selskabsbeskatning.

Som anført ovenfor finder landsretten, at de omhandlede renter er strømmet igennem både Nycomed Sweden Holding 2 AB og Nycomed Sweden Holding 1 AB og videre til Nycomed S.C.A, SICAR, der må anses for at være renternes retmæssige ejer.

Det er ubestridt, at Nycomed S.C.A., SICAR ikke er skattepligtig af renterne, og at dette selskab derfor ikke opfylder kravet i § 2, stk. 1, litra d, sidste underled, om at være underlagt en selskabsbeskatning af renterne på mindst ¾ af den danske selskabsbeskatning.

Betingelserne for skattefritagelse i selskabsskattelovens § 2, stk. 1, litra d, sidste punktum, er således ikke opfyldt. Selskabsskattelovens § 2, stk. 1, litra d, sidste punktum, medfører derfor ikke, at Takeda A/S' skattepligt af renterne bortfalder.

*Administrativ praksis*

Takeda A/S har gjort gældende, at en fortolkning af rente-/royaltydirektivet, som ovenfor anført, og dermed af selskabsskattelovens § 2, stk. 1, litra d, og en forståelse af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsten, som ovenfor anført, udgør en ændring af administrativ praksis med tilbagevirkende kraft, der efter forvaltningsretlige principper ikke kan finde anvendelse på de rentetilskrivninger, der fandt sted i perioden 2007-2009.

Landsretten finder, at forarbejderne til selskabsskattelovens § 2, stk. 1, litra d, som affattet ved lov nr. 221 af 31. marts 2004, herunder skatteministerens besvarelse af spørgsmål til Skatteudvalget, ikke kan anses som en tilkendegivelse om, at danske skattemyndigheder ville acceptere en retsmisbrug, som beskrevet af EU-Domstolen, eller ville indrømme skattenedsættelse i henhold til en dobbeltbeskatningsoverenskomst, uanset at modtageren af rentetilskrivningerne ikke kunne anses som retmæssig ejer heraf.

Skatteministeren udtalte således i flere besvarelser til Skatteudvalget i forbindelse med tilblivelsen af lov nr. 221 af 31. marts 2004, at i det tilfælde, hvor kildebeskatningen søges omgået ved, at et dansk selskab betaler renter til et finansielt selskab i et lavskatteland via et selskab i et andet land, som er omfattet af rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst, vil skattemyndighederne efter en konkret realitetsbedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskattelandet, således at renterne derfor ikke er omfattet af direktivet eller dobbeltbeskatningsoverenskomsten.

Det fremgår endvidere af Skatteministeriets notat af 20. marts 2007 til Folketingets Skatteudvalg om status på SKATs kontrolindsats, at kapitalfondes overtagelse af danske virksomheder gennem de senere år har givet anledning til en større og større andel af de samlede virksomhedsoverdragelser, har antallet specielt i 2005 har vist sig at udgøre et betydeligt antal med en stor volumen, og at SKAT derfor har rettet fokus på denne type overdragelser. Det fremgår endvidere, at SKAT på denne baggrund har indledt en kontrol af en række overdragelser med henblik på at undersøge, hvem der er den endelige modtager, »rette indkomstmodtager«, af renter og udbytter. Skatteministeren oplyste den 15. maj 2007, at disse undersøgelser endnu ikke havde ført til udbyttebeskatning af udlodningerne til gennemstrømningsselskaber. Sager om beskatning af renter blev ikke omtalt i udtalelsen.

Om betydningen af forarbejderne, herunder skatteministerens besvarelse af spørgsmål til Skatteudvalget, til selskabsskattelovens § 2, stk. 1, litra c, om beskatning af udbytteudlodninger, samt skattemyndighedernes administrative praksis vedrørende beskatning af udbytter, som Takeda A/S tillige har påberåbt sig, henvises til det, som landsretten har anført herom i sin dom af 3. maj 2021 i sagerne B-1980-12 og B-2173-12.

På denne baggrund findes der ikke at foreligge en administrativ praksis, der indebærer accept af arrangementer som det foreliggende. Takeda A/S har derfor ikke haft føje til at antage, at selskabet i en situation som den foreliggende var skattefritaget af de omhandlede rentetilskrivninger på 369.057.895 kr.

*Kildeskattelovens § 69, stk. 1*

Det følger af kildeskattelovens § 65 D, stk. 1, at Nycomed A/S (nu Takeda A/S) er ansvarlig for at indeholde kildeskatten på 369.057.895 kr.

I et tilfælde som det foreliggende, hvor Takeda A/S ikke har opfyldt sin indeholdelsespligt, følger det af

**3357**

kildeskattelovens § 69, stk. 1, at Takeda A/S over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre selskabet godtgør, at der ikke er udvist forsømmelighed fra selskabets side ved iagttagelse af kildeskattelovens bestemmelser.

Takeda A/S må efter de foreliggende oplysninger have været bekendt med de faktiske omstændigheder i forbindelse med rentetilskrivningerne og koncernbidragene, herunder at formålet med at indskyde Nycomed Sweden Holding 2 AB og Nycomed Sweden Holding 1 AB som mellemled alene var at undgå dansk kildebeskatning som redegjort for ovenfor.

Under disse omstændigheder kan det forhold, at der på tidspunktet for rentetilskrivningerne i 2007-2009 ikke forelå en endelig afklaring af, hvorledes begrebet »retmæssig ejer« skal fortolkes, og dermed om der var fornøden hjemmel til at imødegå et retsmisbrug som det foreliggende, ikke føre til, at Takeda A/S bliver ansvarsfri i medfør af kildeskattelovens § 69, stk. 1.

Takeda A/S hæfter herefter over for det offentlige for betalingen af 369.057.895 kr. i kildeskat af renter.

*Konklusion*

Takeda A/S har tilkendegivet, at deres subsidiære påstand B som det mindre i det mere indeholder en påstand om hjemvisning til fornyet behandling ved Skattestyrelsen. Landsretten har derfor ikke fundet grundlag for at afvise denne påstand.

Skatteministeriet frifindes herefter i det hele.

*Sagsomkostninger*

Parterne er ikke fremkommet med bemærkninger vedrørende sagsomkostningernes størrelse.

Efter sagens udfald skal Takeda A/S betale sagsomkostninger til Skatteministeriet med i alt 3.000.000 kr. Ved fastsættelsen af beløbet, der er til dækning af udgifter til advokatbistand inkl. moms, er der taget hensyn til sagens værdi samt sagens omfang, betydning og forløb, herunder at sagen har været forelagt EU-Domstolen.

*B-171-13 NTC Parent S.a.r.l. mod Skatteministeriet*

*Selskabsskattelovens § 2, stk. 1, litra d, og lovændringen pr. 1. maj 2006*

I henhold til selskabsskattelovens § 2, stk. 1, litra d, første punktum, påhviler der et udenlandsk selskab skattepligt, for så vidt selskabet oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab omfattet af § 1 har til udenlandske juridiske personer som nævnt i skattekontrollovens § 3 B. Bestemmelsen angår således skat på renter til udenlandske, juridiske personer, der som nærmere bestemt i skattekontrollovens § 3 B kontrollerer det selskab, som gælden påhviler.

Skattekontrollovens § 3 B blev ved lov nr. 308 af 19. april 2006 med ikrafttræden den 1. maj 2006 ændret med den virkning, at kapitalfonde, der som transparente skattesubjekter efter dansk ret hidtil havde været undtaget fra bestemmelsens generelle anvendelsesområde, under nærmere angivne betingelser blev omfattet af bestemmelsen. Ifølge forarbejderne var ændringerne særligt møntet på den situation, hvor flere kapitalfonde går sammen om at opkøbe et selskab og i den forbindelse indgår en aftale om udøvelse af fælles bestemmende indflydelse på de fællesejede selskaber, som indgår i købet.

Copyright © 2023 Karnov Group Denmark A/S

De fem kapitalfonde ydede i december 2005 og januar 2006 lån på i alt 1,8 mia. euro til Nordic Telephone Company Investment ApS. Der blev for lånene udstedt såkaldte Preferred Equity Certificates (PECs). Det er ubestridt, at lovændringen pr. 1. maj 2006 - ved uændrede forhold - ville have medført, at renterne på disse lån med virkning fra den 1. maj 2006 var blevet skattepligtige efter selskabsskattelovens § 2, stk. 1, litra d. Det er i den forbindelse ubestridt, at ingen af kapitalfondene var selskaber, som kunne påberåbe sig direktiv 2003/49/EF (rente-/royaltydirektivet) eller en dobbeltbeskatningsoverenskomst indgået med Danmark.

Der blev imidlertid få dage før, at lovændringen trådte i kraft, foretaget en række omstruktureringer, der indebar, at selskabet Angel Lux Common S.a.r.l., som også blev stiftet få dage før ikrafttrædelsen af lovændringen, blev ny kreditor på de ovennævnte lån fra kapitalfondene til Nordic Telephone Company Investment ApS.

Spørgsmålet i sagen er, om selskabet Angel Lux Common S.a.r.l., der er hjemmehørende i Luxembourg, kan påberåbe sig skattefritagelse i medfør af selskabsskattelovens § 2, stk. 1, litra d, 3. punktum, hvorefter skattepligten ikke omfatter renter, hvis beskatningen skal frafaldes eller nedsættes efter rente-/royaltydirektivet eller efter dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg.

Skatteministeriet har gjort gældende, at hverken betingelserne i rente-/royaltydirektivet eller i dobbeltbeskatningsoverenskomsten med Luxembourg for at frafalde eller nedsætte beskatningen er opfyldt, dels fordi der foreligger retsmisbrug, dels fordi selskabet ikke kan anses for at være renternes »retmæssige ejer« efter hverken rente-/royaltydirektivet eller dobbeltbeskatningsoverenskomstens artikel 11, stk. 1.

*Anvendelsen af selskabsskattelovens § 2, stk. 1, litra d, 3. punktum*
Om den generelle forståelse af rente-/royaltydirektivet, herunder om hjemlen til at afslå direktivets fordele ved retsmisbrug og principperne for bedømmelsen heraf, henvises til det, som landsretten har anført i præmissen vedrørende sag B-2942-12, Takeda A/S under frivillig likvidation mod Skatteministeriet, jf. ovenfor.

På samme måde henvises til det anførte i præmissen vedrørende sag B-2942-12 om forståelsen og anvendelsen af begrebet »retmæssig ejer« som anvendt i

**3358**

dobbeltbeskatningsoverenskomstens artikel 11, idet bestemmelsen i den dansk-luxembourgske dobbeltbeskatningsoverenskomst er enslydende med bestemmelsen i den nordiske dobbeltbeskatningsoverenskomst.

Der tages herefter foretages en konkret vurdering af den omhandlede gæld med tilhørende renter.

*Renterne på Nordic Telephone Company Investment ApS' lån i 2006, 2007 og 2008*
Nordic Telephone Company Investment ApS' gældsforhold til Angel Lux Common S.a.r.l. blev stiftet ved, at de PECs, som Nordic Telephone Company Investment ApS havde udstedt til kapitalfondene, den 27. april 2006 blev overdraget fra kapitalfondene til Angel Lux Parent S.a.r.l., der samme dag overdrog dem videre til Angel Lux Common S.a.r.l. Ved disse overdragelser blev der etableret nye gældsforhold henholdsvis mellem kapitalfondene og Angel Lux Parent S.a.r.l. og henholdsvis mellem Angel Lux Parent S.a.r.l. og Angel Lux Common S.a.r.l. med samme hovedstol og med stort set samme rentesats. Der blev for gælden udstedt PECs fra Angel Lux Parent S.a.r.l. til kapitalfondene og fra Angel Lux Common S.a.r.l. til Angel Lux Parent S.a.r.l. Hovedparten af renterne blev tilskrevet hovedstolen for de enkelte gældsforhold, mens en mindre del af renterne blev betalt effektivt.

I perioden 6. oktober til 10. november 2006 betalte Nordic Telephone Company Investment ApS et rentebeløb på 55.872.414 euro

svarende til ca. 416 mio. danske kr. og nedbragte hovedstolen med 39.427.325 euro svarende til ca. 294 mio. danske kr., i alt 95.299.739 euro (ca. 710 mio. danske kr.). Af dette samlede beløb på 95.299.739 euro blev der overført renter og afdrag på i alt 606.857 euro til Angel Lux Common S.a.r.l. og 398.510 euro til Angel Lux Parent S.a.r.l., mens alle øvrige betalinger skete direkte til kapitalfondene. Efter betalingen skete der en reduktion af gældsforholdet mellem alle selskaberne - dvs. mellem Nordic Telephone Company Investment ApS og Angel Lux Common S.a.r.l., mellem Angel Lux Common S.a.r.l. og Angel Lux Parent S.a.r.l. og mellem Angel Lux Parent S.a.r.l. og kapitalfondene - med 39.427.325 euro eller et nærmest tilsvarende beløb.

For indkomståret 2007 og 2008 er det oplyst, at Nordic Telephone Company Investment ApS skattemæssigt har fratrukket renteudgifter med henholdsvis i alt 191.721.225 euro svarende til 1.410.657.397 kr. og 110.606.219 euro svarende til 824.768.741 kr. Af disse beløb udgør betalte renter til Angel Lux Common S.a.r.l. henholdsvis 502.439 euro i 2007 og 2.880.370 euro i 2008, mens det resterende beløb er tilskrevne renter. Tilsvarende beløb er i begge årene bogført som renteindtægter hos både Angel Lux Common S.a.r.l. og Angel Lux Parent S.a.r.l., ligesom begge selskaber også i begge år har udgiftsført renter af tilsvarende størrelse. Nordic Telephone Company Investment ApS' restgæld samt de ikke-betalte tilskrevne renter blev den 10. juli 2008 konverteret til yderligere anpartskapital for Angel Lux Common S.a.r.l. i Nordic Telephone Company Investment ApS.

Om Angel Lux Parent S.a.r.l. og Angel Lux Common S.a.r.l. er det oplyst, at disse selskaber ikke fik tilført yderligere likviditet bortset fra de enkeltstående beløb, som de modtog fra Nordic Telephone Company Investment ApS den 6. oktober 2006, og for så vidt angår Angel Lux Common S.a.r.l. tillige de to rentebetalinger modtaget i henholdsvis 2007 og 2008. Angel Lux Common S.a.r.l.'s eneste aktiv, ud over anparterne i Nordic Telephone Company Investment ApS, var fordringen på PECs i samme selskab. Det kan efter de regnskabsmæssige oplysninger lægges til grund, at Angel Lux Parent S.a.r.l. og Angel Lux Common S.a.r.l. ikke udøvede andre aktiviteter af betydning end at administrere låneforholdene.

Landsretten bemærker herefter, at Nordic Telephone Company Investment ApS oprindeligt stod i et direkte gældsforhold til de omhandlede kapitalfonde, og at det efter bevisførelsen må lægges til grund, at stiftelsen og indskydelsen af de to luxembourgske selskaber, Angel Lux Parent S.a.r.l. og Angel Lux Common S.a.r.l., og de dispositioner, der som følge heraf blev foretaget for så vidt angår gældsforholdene, i det hele må betragtes som ét samlet og på forhånd tilrettelagt arrangement. Det må endvidere lægges til grund, at hovedformålet med arrangementet var at opnå skattefrihed for renterne, der uden arrangementet ville have været skattepligtige. Ledelsen i alle de involverede selskaber bestod af samme persongruppe, således som det var fastlagt i konsortieaftalerne, der i øvrigt indeholdt nøje fastlagte principper for arrangementet, herunder om bestemmende indflydelse fra »Investors Committee«. Selskabet Angel Lux Common S.a.r.l. havde under disse omstændigheder ingen reel råderet over renteindtægterne. Det samme gør sig gældende for Angel Lux Parent S.a.r.l.

Formålet med transaktionerne i den nye selskabsstruktur ses ikke at have haft nogen forretningsmæssig begrundelse, men alene til formål at undgå beskatning. Selskaberne Angel Lux Common S.a.r.l. og Angel Lux Parent S.a.r.l. har således i relation til de omhandlede renter på gælden alene fungeret som gennemstrømningsselskaber. Landsretten finder herefter, at der foreligger retsmisbrug.

Angel Lux Common S.a.r.l. kan herefter ikke anses som renternes retmæssige ejer og kan ikke påberåbe sig skattefritagelse efter

rente-/royaltydirektivet. Angel Lux Common S.a.r.l. kan af de samme grunde heller ikke påberåbe sig skattefritagelse efter den dansk-luxembourgske dobbeltbeskatningsoverenskomst. Det kan ikke føre til et andet resultat, at den overvejende del af renterne

**3359**

ikke blev betalt løbende, men blev tilskrevet lånets hovedstol, idet den skattemæssige virkning indtrådte ved tilskrivningerne/bogføringen.

For så vidt angår anbringendet om, at SKATs afgørelse om kildeskat på renterne er en ændring med tilbagevirkende kraft af en fast administrativ praksis, henvises til landsrettens præmis om administrativ praksis i sagen BS-2942-12, Takeda A/S under frivillig likvidation mod Skatteministeriet.

Herefter frifindes Skatteministeriet for NCT Parent S.a.r.l.'s principale påstand.

*Den subsidiære og mere subsidiære påstand*

For det tilfælde, at Angel Lux Common S.a.r.l. ikke måtte blive anset for retmæssig ejer af renterne, har NTC Parent S.a.r.l. gjort gældende, at de bagvedliggende investorer i de fem kapitalfonde skal anses for de retmæssige ejere. Der er henvist til de fremlagte oversigter udarbejdet af hver kapitalfond. Det er nærmere gjort gældende, at der ikke er dansk begrænset skattepligt for den del af renterne, som tilkommer de ultimative investorer, som var hjemmehørende i en jurisdiktion, som Danmark i de pågældende indkomstår havde indgået en dobbeltbeskatningsoverenskomst med.

Skatteministeriet har bestridt, at de fremlagte oversigter udgør tilstrækkeligt bevis for identiteten af de bagvedliggende investorer. Skatteministeriet har gjort gældende, at der i en situation som den foreliggende, hvor der er tale om et arrangement med gennemstrømningsenheder, må stilles strenge krav til beviset for, at arrangementet alligevel ikke har haft et misbrug af rente-/royaltydirektivet og den dansk-luxembourgske dobbeltbeskatningsoverenskomst som formål.

Landsretten bemærker indledningsvist, at SKAT ikke under sagsbehandlingen op til eller i forbindelse med afgørelsen truffet den 18. marts 2011 kan anses for at have givet tilsagn om skattenedsættelse.

Landsretten finder endvidere, at det ikke er godtgjort, at de bagvedliggende investorer i de fem kapitalfonde skal anses for at være de retmæssige ejere af renterne fra Nordic Telephone Company Investment ApS. Der foreligger således navnlig ingen dokumentation for, hvad der er sket med pengestrømmen, efter at den er endt i kapitalfondene.

Som følge heraf frifindes Skatteministeriet for den subsidiære og den mere subsidiære påstand.

*Den mest subsidiære påstand - kildeskattelovens § 69, stk. 1*

Det følger af kildeskattelovens § 65 D, stk. 1, at Nordic Telephone Company Investment ApS (nu NTC Parent S.a.r.l.) er ansvarlig for at indeholde kildeskatten, som ved SKATs afgørelse af 5. oktober 2015 blev endeligt opgjort til 817.238.912 kr.

I et tilfælde som det foreliggende, hvor indeholdelsespligten ikke er opfyldt, følger det af kildeskattelovens § 69, stk. 1, at Nordic Telephone Company Investment ApS (nu NTC Parent S.a.r.l.) over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre selskabet godtgør, at der ikke er udvist forsømmelighed fra selskabets side ved iagttagelse af kildeskattelovens bestemmelser.

Da det må lægges til grund, at Nordic Telephone Company Investment ApS (nu NTC Parent S.a.r.l.) har været bekendt med de faktiske omstændigheder ved rentebetalingerne/-tilskrivningerne, herunder at formålet med at indskyde de to luxembourgske selskaber som mellemled alene var at undgå dansk kildebeskatning som redegjort for ovenfor, hæfter Nordic Telephone Company Invest-

ment ApS (nu NTC Parent S.a.r.l.) over for det offentlige for betalingen.

Det kan ikke føre til et andet resultat, at der på tidspunktet for rentebetalingerne/-tilskrivningerne i 2006-2008 ikke forelå en endelig afklaring af, hvorledes begrebet »retmæssig ejer« skal fortolkes, og dermed om der var fornøden hjemmel til at imødegå et retsmisbrug som det foreliggende.

NTC Parent S.a.r.l. hæfter herefter over for det offentlige for betalingen af 817.238.912 kr.

På denne baggrund frifindes Skatteministeriet ligeledes for den mest subsidiære påstand.

*Konklusion*

Skatteministeriet frifindes.

*Sagsomkostninger*

Parterne er efter fremkommet med bemærkninger vedrørende sagsomkostningernes størrelse.

Efter sagens udfald skal NTC Parent S.a.r.l. betale sagsomkostninger til Skatteministeriet med i alt 3.500.000 kr. Ved fastsættelsen af beløbet, der er til dækning af udgifter til advokatbistand inkl. moms, er der taget hensyn til sagens værdi samt sagens omfang, betydning og forløb, herunder at sagen har været forelagt EU-Domstolen.

## Thi kendes for ret

Skatteministeriet frifindes for de af Takeda A/S under frivillig likvidation nedlagte påstande i sagen B-2942-12.

Skatteministeriet frifindes for de af NTC Parent S.a.r.l. nedlagte påstande i sagen B-171-13.

I sagsomkostninger for landsretten skal Takeda A/S under frivillig likvidation inden 14 dage betale 3.000.000 kr. til Skatteministeriet.

I sagsomkostninger for landsretten skal NTC Parent S.a.r.l. inden 14 dage betale 3.500.000 kr. til Skatteministeriet.

Sagsomkostningerne forrentes efter rentelovens § 8 a.

## Højesterets dom

I tidligere instans er afsagt dom af Østre Landsrets 13. afdeling den 25. november 2021 (…).

**3360**

I pådømmelsen har deltaget syv dommere: Jens Peter Christensen, Vibeke Rønne, Michael Rekling, Lars Hjortnæs, Jan Schans Christensen, Ole Hasselgaard og Rikke Foersom.

## Påstande

*Sag 116/2021*

Appellanten, Takeda A/S under frivillig likvidation (tidligere Nycomed A/S), har nedlagt påstand om, at indstævnte, Skatteministeriet, skal anerkende, at Takeda ikke er indeholdelsespligtig af kildeskat på renter med henholdsvis 115.516.013 kr., 138.380.325 kr. og 115.161.557 kr., i alt 369.057.895 kr., svarende til 25 % af de i årene 2007, 2008 og 2009 tilskrevne renter på det i sagen omhandlede lån fra Nycomed Sweden Holding 2 AB, og at Takeda under alle omstændigheder ikke er ansvarlig for betalingen af de ikke indeholdte beløb.

Takeda har subsidiært nedlagt to sideordnede påstande om, a) at Skatteministeriet skal anerkende, at kildeskattekravene for årene 2007, 2008 og 2009 nedsættes med henholdsvis 1.615.932 kr., 1.935.776 kr. og 1.610.973 kr., og b) at sagen i øvrigt skal hjemvises til fornyet behandling ved Skattestyrelsen.

Takeda har desuden nedlagt påstand om, at Skatteministeriet skal betale 3.000.000 kr. med procesrente fra den 17. december 2021. Betalingspåstanden vedrører tilbagebetaling af sagsomkostninger, som Takeda har betalt til opfyldelse af landsrettens dom.

Skatteministeriet har nedlagt påstand om stadfæstelse.

Over for Takedas påstand om tilbagebetaling har Skatteministeriet nedlagt påstand om frifindelse.

*Sag 117/2021*

*Appellanten, NTC Parent S.à.r.l.,* har nedlagt påstand om, at indstævnte, Skatteministeriet, skal anerkende, at der ikke er dansk begrænset skattepligt af renter på lån mellem Nordic Telephone Company Investment ApS (nu NTC Parent) som debitor og Angel Lux Common S.à.r.l. som kreditor i indkomstårene 2006-2008, og at Nordic Telephone Company Investment ikke er ansvarlig for betalingen af de ikke indeholdte beløb.

NTC Parent har subsidiært nedlagt påstand om, at Skatteministeriet skal anerkende, at kildeskattekravet skal nedsættes med 574.865.866 kr. eller et sådant beløb, som i øvrigt fastsættes af retten, og mere subsidiært, at sagen hjemvises til Skattestyrelsen til opgørelse af de renteandele, som er skattepligtige.

*Skatteministeriet* har nedlagt påstand om stadfæstelse.

## Supplerende sagsfremstilling

Der er for Højesteret fremlagt en række yderligere bilag i sag 116/2021 (Takeda), herunder aktionærfortegnelser pr. 31. december 2007, 31. december 2008 og 31. december 2009 for Nycomed S.C.A., SICAR.

Der er desuden fremlagt afgørelse af 9. oktober 2015 fra SKAT om tilbagebetaling af i alt 23.103.203 kr. i renteskat til Takeda. Reguleringen skyldtes, at der ved afgørelsen af 13. december 2010 var pålagt 30 % i renteskat, men at satsen for renteskat rettelig udgjorde 25 % for årene 2007-2009. Den pålagte renteskat for årene 2007-2009 udgjorde herefter i alt 369.057.895 kr.

## Anbringender

*Takeda A/S under frivillig likvidation* har uddybende anført bl.a., at der ikke er sket gennemstrømning af renter fra Nycomed Sweden Holding 2 til Nycomed Sweden Holding 1 eller til nogen anden. Nycomed Sweden Holding 2's ydelse af koncernbidrag til Nycomed Sweden Holding 1 ændrede ikke ved den bestående rentefordring, og koncernbidragene var ikke til hinder for, at Nycomed Sweden Holding 2 kunne disponere over renterne ved at konvertere dem til egenkapital i Nycomed A/S, som det skete i forbindelse med salg af Nycomedkoncernen i 2011. Der skete således ikke effektiv betaling af renter. Koncernbidragene blev aldrig betalt til Nycomed Sweden Holding 1, og gælden blev efterfølgende eftergivet af Nycomed Sweden Holding 1.

Takeda har under hele sagen gjort gældende, at Nycomed S.C.A., SICAR må anses som den retmæssige ejer af renterne, hvis Nycomed Sweden Holding 2 og Nycomed Sweden Holding 1 ikke kan anses for renternes retmæssige ejere. Betaling af renter fra Takeda direkte til Nycomed S.C.A., SICAR ville have været skattefritaget efter dobbeltbeskatningsoverenskomsten med Luxembourg, og der kan derfor ikke foreligge retsmisbrug, hvis dette selskab anses som retmæssig ejer.

SICAR-selskaber er ikke omfattet af § 1 i slutprotokollen til dobbeltbeskatningsoverenskomsten. SICAR-selskaber er heller ikke sammenlignelige med de holdingselskaber, der var omfattet af den særlige luxembourgske lovgivning fra 1929. Der er ikke tale om, at SICAR-loven erstattede eller videreførte 1929-lovgivningen om holdingselskaber.

Med henvisning til Højesterets dom i UfR 2023.1575 bestrides det ikke, at Danmark er forpligtet til at anvende det generelle EU-retlige misbrugsprincip og nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af renter, der følger af rente-/royaltydirektivet, såfremt der foreligger misbrug efter dette princip, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse. Takeda gør heller

ikke længere gældende, at SKATs afgørelse af 13. december 2010 er udtryk for en skærpelse af en fast administrativ praksis med tilbagevirkende kraft.

*Skatteministeriet* har uddybende anført bl.a., at Nycomed Sweden Holding 2 og Nycomed Sweden

### 3361

Holding 1 begge var gennemstrømningsenheder. Nycomed Sweden Holding 2 var ikke retligt forpligtet til at yde de årlige koncernbidrag til Nycomed Sweden Holding 1, men koncernbidragene var et forudsat og nødvendigt element i skattearrangementet. Uden de fradragsberettigede og dermed neutraliserende koncernbidrag til Nycomed Sweden Holding 1 ville Nycomed Sweden Holding 2's renteindtægter være blevet beskattet i Sverige.

Det er uden betydning, at renterne og koncernbidragene ikke blev betalt effektivt, men tilskrevet lånets hovedstol og posteret på mellemregningskonti. Den skattemæssige fordel i form af fritagelsen for beskatning i kildestaten, som blev forsøgt tilegnet ved misbrug, var ikke betinget af effektiv betaling. Ingen af de skatteretlige virkninger, som Nycomed-koncernens skattearrangement gav anledning til, var betinget af effektiv betaling af renterne eller koncernbidragene.

Nycomed S.C.A., SICAR kan ikke anses som renternes retmæssige ejer. Selv hvis dette selskab måtte blive anset som retmæssig ejer af renterne, vil dobbeltbeskatningsoverenskomsten med Luxembourg ikke føre til, at rentebeskatningen skal frafaldes, allerede fordi selskabet må anses for at være et holdingselskab omfattet af § 1 i slutprotokollen.

Slutprotokollens § 1 er efter sin ordlyd ikke begrænset til holdingselskaber omfattet af 1929-lovgivningen eller lovgivning, som måtte træde i stedet for denne lovgivning. Et SICAR-selskab fungerer som et holdingselskab og er ligesom 1929-holdingselskaberne undergivet et særligt og gunstigt skatteregime.

*Sag 117/2021*

*NTC Parent S.à.r.l.* har uddybende anført bl.a., at Angel Lux Common var renternes retmæssige ejer, hvilket ikke skete nogen viderekanalisering af renterne. Langt den væsentligste del af renterne blev af Nordic Telephone Company Investment tilskrevet dette selskabs gæld til Angel Lux Common, og Angel Lux Common disponerede den 10. juli 2008 over de tilskrevne renter ved at konvertere dem til anparter i Nordic Telephone Company Investment. Gæld og renter er således »vendt tilbage« til Nordic Telephone Company Investment.

Tilskrivningen af renter på Nordic Telephone Company Investments gæld til Angel Lux Common medførte, at dette selskabs fordring på Nordic Telephone Company Investment ved hver tilskrivning blev forøget med et beløb svarende til renterne. For Angel Lux Common udgjorde de tilskrevne renter indtil gældskonverteringen i 2008 et aktiv i form af en fordring på Nordic Telephone Company Investment. Der blev ikke foretaget gældskonvertering i Angel Lux Common samtidig med gældskonverteringen i Nordic Telephone Company Investment.

Angel Lux Commons beslutning om at konvertere renterne til kapitalandele dokumenterer, at dette selskab som det eneste havde ret til at disponere over renterne.

*Skatteministeriet* har uddybende anført bl.a., at det ved vurderingen af, om der foreligger misbrug, og om Angel Lux Common og Angel Lux Parent i skatteretlig henseende må anses for renternes retmæssige ejer eller for gennemstrømningsenheder, er uden betydning, at der kun er sket effektiv betaling af en del af renterne, mens resten blev tilskrevet lånets hovedstol. Det er også uden betydning, om renterne efterfølgende blev konverteret til kapitalandele i Nordic Telephone Company Investment.

Skattearrangementet var tilrettelagt sådan, at de skattemæssige fordele i form af Nordic Telephone Company Investments fradrag for renterne og Angel Lux Commons fritagelse for kildebeskatning kunne opnås straks uden nogen form for likviditetsmæssige bestninger for de deltagende selskaber. Efterfølgende betalingsoverførsler, konverteringer til kapitalandele eller andet kunne så gennemføres, uden at der derved skulle betales skat.

Når ingen af arrangementets skatteretlige virkninger var betinget af eller i øvrigt havde nogen sammenhæng med effektiv betaling, savner det mening at lade konstateringen af et retsmisbrug af den omhandlede art være betinget af, at der i de enkelte led er sket effektiv betaling af renter.

## Højesterets begrundelse og resultat

### *Sagernes baggrund og problemstillinger*

SKAT traf den 13. december 2010 afgørelse om, at Nycomed A/S (nu Takeda A/S under frivillig likvidation) efter kildeskattelovens § 65 D, jf. selskabsskattelovens § 2, stk. 1, litra d, havde pligt til at indeholde skat med i alt 392.161.097 kr. af renter, der i 2007, 2008 og 2009 var tilskrevet på et koncerninternt lån ydet af Nycomed Sweden Holding 2 AB i december 2006. SKAT nedsatte ved afgørelse af 9. oktober 2015 den pålagte renteskat til i alt 369.057.895 kr.

Den 18. marts 2011 traf SKAT efter de samme bestemmelser afgørelse om, at Nordic Telephone Company Investment ApS (nu NTC Parent S.à.r.l.) havde pligt til at indeholde skat med i alt 925.764.961 kr. af renter, der i perioden fra maj 2006 til juli 2008 var blevet betalt eller tilskrevet på et koncerninternt lån ydet af Angel Lux Common S.à.r.l. i april 2006. SKAT nedsatte ved afgørelse af 5. oktober 2015 den pålagte renteskat til i alt 817.238.912 kr.

Sagerne angår navnlig, om beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater (rente-/royaltydirektivet), eller

**3362**

frafaldes efter dobbeltbeskatningsoverenskomster med henholdsvis de nordiske lande og Luxembourg, jf. selskabsskattelovens § 2, stk. 1, litra d, 3. pkt.

### *Selskabsskattelovens § 2, stk. 1, litra d*

Det følger af selskabsskattelovens § 2, stk. 1, litra d, at Nycomed Sweden Holding 2 og Angel Lux Common som udgangspunkt er skattepligtige af renter, som de oppebærer fra et selskab her i landet, når der er tale om kontrolleret gæld. Udløsning af skattepligt indebærer, at Nycomed A/S og Nordic Telephone Company Investment i de relevante år ville have pligt til at indeholde renteskat, jf. kildeskattelovens § 65 D, stk. 1.

Efter selskabsskattelovens § 2, stk. 1, litra d, 3. pkt., omfatter skattepligten ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter rente-/royaltydirektivet eller frafaldes efter dobbeltbeskatningsoverenskomst med den stat, hvor det modtagende selskab er hjemmehørende.

### *Rente-/royaltydirektiv og EU-Domstolens praksis*

Det fremgår af rente-/royaltydirektivets artikel 1, stk. 1, at betalinger af renter, der opstår i en medlemsstat, fritages for enhver form for skat i denne stat, forudsat at den retmæssige ejer af renterne er et selskab i en anden medlemsstat. Efter artikel 1, stk. 4, anses et selskab kun for at være den retmæssige ejer af renter, hvis det modtager disse betalinger til eget brug og ikke som formidler, herunder som agent, mandatar eller bemyndiget signatar for en anden person. Det følger af artikel 1, stk. 7, at bestemmelsen kun finder anvendelse, hvis der er tale om renter, der betales mellem associerede selskaber.

Det fremgår af artikel 5, at direktivet ikke udelukker anvendelse af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug, og at medlemsstaterne kan tilbagekalde fordele i henhold til direktivet eller nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.

EU-Domstolen har ved dom af 26. februar 2019 (forenede sager C-115/16, C-118/16, C-119/16 og C-299/16) besvaret en række præjudicielle spørgsmål, som landsretten havde stillet i fire sager, herunder i de foreliggende sager vedrørende Takeda og NTC Parent. Domstolen udtalte, at rente-/royaltydirektivets artikel 1, stk. 1, sammenholdt med stk. 4, skal fortolkes sådan, at den fritagelse for enhver form for skat af rentebetalinger, der er fastsat heri, alene er forbeholdt sådanne renters retmæssige ejere, dvs. enheder, som økonomisk set reelt modtager disse renter, og som derfor råder over beføjelsen til frit at fastlægge anvendelsen heraf. Domstolen udtalte endvidere, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for enhver form for skat af rentebetalinger, der er fastsat i artikel 1, stk. 1, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse (præmis 122).

Højesteret har i dom af 9. januar 2023 (UfR 2023.1575) taget stilling til en række generelle problemstillinger vedrørende udbyttebeskatning efter selskabsskattelovens § 2, stk. 1, litra c, direktiv 90/435/EØF om en fælles beskatningsordning for moder-/datterselskaber fra forskellige medlemslande (moder-/datterselskabsdirektivet) og dobbeltbeskatningsoverenskomster mellem Danmark og henholdsvis Cypern, Luxembourg og USA. I dommen har Højesteret fastslået bl.a., at danske domstole skal anvende selskabsskattelovens § 2, stk. 1, litra c, der indeholder en henvisning til moder-/datterselskabsdirektivet, i overensstemmelse med det dette direktiv som fortolket ved EU-Domstolens dom af 26. februar 2019 (forenede sager C-116/16 og C-117/16), og at det på den baggrund er uden betydning, om der forelå danske bestemmelser om svig og misbrug på de tidspunkter, der er relevante for beskatningen.

I overensstemmelse med det anførte i dommen af 9. januar 2023 finder Højesteret, at danske domstole skal anvende selskabsskattelovens § 2, stk. 1, litra d, om rentebeskatning, der indeholder en henvisning til rente-/royaltydirektivet, i overensstemmelse med dette direktiv som fortolket ved EU-Domstolens dom af 26. februar 2019 (forenede sager C-115/16, C-118/16, C-119/16 og C-299/16).

### *Særligt om misbrugsvurderingen*

EU-Domstolen har i dommen af 26. februar 2019 udtalt sig om, hvilke elementer der udgør retsmisbrug og de dertil hørende beviser. Domstolen udtalte bl.a., at selv om der foreligger en række holdepunkter i de forelagte sager, på baggrund af hvilke det ville kunne konkluderes, at der foreligger retsmisbrug, påhviler det ikke desto mindre de forelæggende retter at efterprøve, om disse holdepunkter er objektive og samstemmende, og om skatteyderne har haft mulighed for at føre modbevis (præmis 126).

Domstolen udtalte også, at en koncern, som ikke er tilrettelagt af grunde, der afspejler den økonomiske realitet, som har en struktur, der er rent formel, og som har til hovedformål eller som har et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse, kan anses for et kunstigt arrangement. Ifølge Domstolen er dette navnlig tilfældet, når betalingen af renteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som

overfører renterne, og det selskab, som er renternes retmæssige ejer (præmis 127).

### 3363

Desuden udtalte Domstolen, at det ved undersøgelsen af koncernstrukturen er uden betydning, at visse af de retmæssige ejere af de renter, som er blevet overført af gennemstrømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst, og at den omstændighed, at der findes en sådan overenskomst, ikke i sig selv kan udelukke, at der foreligger retsmisbrug (præmis 135). Såfremt der foreligger en situation, hvor renterne ville have været fritaget, hvis de var blevet overført direkte til et selskab, som har sit hjemsted i en tredjestat, kan det ifølge Domstolen dog ikke udelukkes, at målet med koncernstrukturen ikke er udtryk for retsmisbrug. I et sådant tilfælde kan koncernens valg af en sådan struktur i stedet for direkte betaling af renterne til det nævnte selskab ikke anfægtes (præmis 137).

Om bevisbyrden for, at der foreligger misbrug, udtalte Domstolen bl.a., at en national myndighed med henblik på at nægte at anerkende et selskab som retmæssig ejer af renter eller med henblik på at fastslå, at der foreligger retsmisbrug, ikke er forpligtet til at fastlægge, hvilken enhed eller hvilke enheder myndigheden anser for disse renters retmæssige ejer (præmis 145).

### Dobbeltbeskatningsoverenskomsterne med de nordiske lande og Luxembourg

De danske dobbeltbeskatningsoverenskomster med de nordiske lande (overenskomst af 23. september 1996) og med Luxembourg (overenskomst af 17. november 1980) svarer for så vidt angår bestemmelser af betydning for de foreliggende sager i alt væsentligt til OECD's modeloverenskomst fra 1977.

Overenskomsterne indeholder i artikel 11, stk. 1, i det væsentlige enslydende bestemmelser, hvorefter renter, der hidrører fra en kontraherende stat, og som betales til en person, der er hjemmehørende i en anden kontraherende stat, kun kan beskattes i denne anden stat, hvis denne person er den retmæssige ejer af renterne.

Som fastslået af Højesteret i dommen af 9. januar 2023 må udtrykket »retmæssig ejer« forstås i lyset af OECD-modeloverenskomsten, herunder OECD's kommentarer fra 1977 om imødegåelse af misbrug og de reviderede kommentarer fra 2003. Af disse kommentarer fremgår bl.a., at udtrykket »retmæssig ejer« har til formål at sikre, at dobbeltbeskatningsoverenskomster ikke hjælper til skatteunddragelse eller skatteflugt gennem »kunstgreb« og »kunstfærdige juridiske konstruktioner«, der gør det »muligt at drage fordel både af de fordele, der følger af visse nationale love, og af de skattelempelser, der følger af dobbeltbeskatningsoverenskomster«. I de reviderede kommentarer fra 2003, hvor dette er uddybet og præciseret, er det anført bl.a., at det ikke vil være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst«.

### Nycomed A/S (nu Takeda)

Omstruktureringen af Nycomed-koncernen i 2006 indebar bl.a., at der i koncernen blev indskudt to svenske selskaber (Nycomed Sweden Holding 2 og Nycomed Sweden Holding 1), at Nycomed A/S optog et lån på 501 mio. euro hos Nycomed Sweden Holding 2 samtidig med, at Nycomed Sweden Holding 1 optog et lån på 498,5 mio. euro hos det luxembourgske selskab Nycomed S.C.A., SICAR, at lånet til Nycomed A/S blev finansieret ved en kapitalforhøjelse i Nycomed Sweden Holding 2, der blev tegnet af Nycomed Sweden Holding 1, og at der i 2007, 2008 og 2009 blev vedta-

get koncernbidrag svarende til renterne på lånene fra Nycomed Sweden Holding 2 til Nycomed Sweden Holding 1.

Højesteret lægger til grund, at formålet med omstruktureringen af koncernen som nærmere beskrevet i landsrettens dom var at nedbringe Nycomed A/S' skattepligtige indkomst i Danmark med fradragsberettigede renteudgifter, uden at de modstående renteindtægter blev beskattet inden for koncernen. Højesteret finder, at omstruktureringen må ses som et samlet og på forhånd tilrettelagt skattearrangement.

Af de grunde, der er anført af landsretten, finder Højesteret, at det ikke kan lægges til grund, at Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 rådede over beføjelsen til frit at kunne fastlægge anvendelsen af de renter, som blev overført fra Nycomed A/S. Højesteret tiltræder derfor, at ingen af disse selskaber er renternes retmæssige ejer, men at de må anses for gennemstrømningsselskaber, der ikke nyder beskyttelse efter rente-/royaltydirektivet.

Højesteret finder af de samme grunde, at hverken Nycomed Sweden Holding 2 eller Nycomed Sweden Holding 1 kan anses for renternes retmæssige ejer efter dobbeltbeskatningsoverenskomsten med de nordiske lande, og at selskaberne derfor heller ikke nyder beskyttelse efter overenskomsten.

Højesteret finder, at det ved vurderingen af, om et selskab skal anses for renternes retmæssige ejer eller skal anses som en gennemstrømningsenhed, er uden betydning, om der er sket effektiv betaling af renterne, eller om renterne er tilskrevet lånets hovedstol. Højesteret bemærker herved, at også rentetilskrivning indebærer en overførsel af et formuegode, og at de skattemæssige virkninger med hensyn til renterne ikke er betinget af effektiv betaling. Det er endvidere uden betydning for vurderingen, om renterne efterfølgende er konverteret til kapitalandele mv., idet en konvertering netop forudsætter, at der forinden er sket en overførsel af det formuegode, som renterne udgør.

### 3364

Det, som Takeda har anført om betydningen af, at der ikke skete effektiv betaling af renterne, og den senere konvertering af renterne til egenkapital i Nycomed A/S i 2011, kan herefter ikke føre til en anden vurdering af Nycomed Sweden Holding 2 og Nycomed Sweden Holding 1, der som nævnt må anses som gennemstrømningsselskaber.

Spørgsmålet er herefter, om Takeda har godtgjort, at Nycomed S.C.A., SICAR er renternes retmæssige ejer, jf. herved også præmis 145 i EU-Domstolens dom af 26. februar 2019.

Takeda har ikke fremlagt de indgåede aftaler mellem Nycomed S.C.A., SICAR og de bagvedliggende kapitalfonde og mellem kapitalfondene og deres aktionærer og investorer. Højesteret bemærker herved, at det af den fremlagte »Management Shareholders Agreement« fra juli 2007 fremgår bl.a., at der var indgået en »Investor Shareholders Agreement«. Sidstnævnte aftale, der eventuelt ville kunne belyse, hvad der var aftalt mellem Nycomed S.C.A., SICAR og de bagvedliggende kapitalfonde, herunder om selskabets beføjelse til at råde over renterne, er ikke fremlagt. Der er heller ikke på anden vis skabt klarhed over aftalerne mellem de omhandlede selskaber, kapitalfonde, aktionærer og investorer.

Højesteret finder herefter, at Takeda ikke har godtgjort, at Nycomed S.C.A., SICAR rådede over beføjelsen til frit at fastlægge anvendelsen af de renter, som selskabet modtog fra Nycomed A/S via de svenske gennemstrømningsselskaber. Der er derfor ikke grundlag for at anse Nycomed S.C.A., SICAR for renternes retmæssige ejer.

Efter det anførte finder Højesteret ikke anledning til at tage stilling til, om Nycomed S.C.A., SICAR - hvis dette selskab kunne anses som renternes retmæssige ejer - ville være omfattet af § 1 i slutprotokollen til dobbeltbeskatningsoverenskomsten med Luxembourg.

U.2023.3198H

Højesteret bemærker, at det er ubestridt, at Nycomed S.C.A., SI-CAR ikke er omfattet af rente-/royaltydirektivet og allerede derfor ikke kan påberåbe sig fordelene efter direktivet, jf. herved præmis 153 i EU-Domstolens dom.

Takeda har til støtte for de subsidiære påstande anført bl.a., at kildeskattekravet under alle omstændigheder skal nedsættes for så vidt angår aktionær nr. 39 og nr. 41, der begge er direkte aktionærer i Nycomed S.C.A., SICAR. Takeda har desuden anført, at sagen skal hjemvises til skattemyndighederne med henblik på fastlæggelse af, om de øvrige aktionærer og investorer i Nycomed S.C.A., SI-CAR på tidspunkterne for rentetilskrivningerne kan anses som renternes retmæssige ejere.

Som anført ovenfor er der ikke tilvejebragt klarhed over aftalerne mellem de omhandlede selskaber, kapitalfonde, aktionærer og investorer, og Takeda har ikke godtgjort, at de nævnte aktionærer og investorer i Nycomed S.C.A., SICAR er renternes retmæssige ejere.

På den anførte baggrund finder Højesteret, at skattearrangementet udgør misbrug. Nycomed Sweden Holding 2 er herefter skattepligtig af de renter, som selskabet modtog fra Nycomed A/S i 2007, 2008 og 2009, jf. selskabsskattelovens § 2, stk. 1, litra d.

Højesteret bemærker, at Takeda ikke har godtgjort, at betingelserne for bortfald af skattepligten for Nycomed Sweden Holding 2 i medfør af selskabsskattelovens § 2, stk. 1, litra d, sidste pkt., er opfyldt.

Hvad angår det, som Takeda har anført om forskellen mellem rentesatsen på lånet til Nycomed A/S ydet af Nycomed Sweden Holding 2 og rentesatsen på lånet til Nycomed Sweden Holding 1 ydet af Nycomed S.C.A., SICAR, bemærker Højesteret, at rentemarginalen var et integreret led i administrationen af skattearrangementet, der udgør misbrug. Nycomed Sweden Holding 2 kan derfor ikke anses for retmæssig ejer af nogen del af de renter, som selskabet modtog fra Nycomed A/S.

Højesteret tiltræder, at Nycomed A/S var bekendt med grundlaget for, at rentetilskrivningerne til Nycomed Sweden Holding 2 er skattepligtige efter selskabsskattelovens § 2, stk. 1, litra d. Der er ikke heroverfor oplyst forhold, som kan begrunde, at Nycomed A/S har haft tilstrækkelig føje til at tro, at rentetilskrivningerne ikke var skattepligtige. Nycomed A/S (nu Takeda) er derfor ansvarlig for betaling af 369.057.895 kr., jf. kildeskattelovens § 69, stk. 1.

*Nordic Telephone Company Investment (nu NTC Parent)*

Omstruktureringen af koncernen i 2006 indebar bl.a. stiftelsen og indskydelsen af de to luxembourgske selskaber (Angel Lux Common og Angel Lux Parent) og en række dispositioner med hensyn til de lån på i alt 1,8 mia. euro, som kapitalfondene bag Nordic Telephone Company Investments daværende moderselskab i Luxembourg havde ydet til selskabet i december 2005 og januar 2006.

Højesteret lægger til grund, at formålet med omstruktureringen af koncernen som nærmere beskrevet i landsrettens dom var at opnå skattefritagelse for renter, der ellers ville have været skattepligtige. Højesteret finder, at omstruktureringen må ses som et samlet og på forhånd tilrettelagt skattearrangement.

Af de grunde, der er anført af landsretten, finder Højesteret, at det ikke kan lægges til grund, at Angel Lux Common og Angel Lux Parent rådede over beføjelsen til frit at fastlægge anvendelsen af de renter, som blev overført fra Nordic Telephone Company Investment. Højesteret tiltræder derfor, at ingen af disse selskaber er renternes retmæssige ejer, men at de må anses for gennemstrømningsselskaber, der ikke nyder beskyttelse efter rente-/royaltydirektivet.

Højesteret finder af de samme grunde, at hverken Angel Lux Common eller Angel Lux Parent kan anses for

**3365**

renternes retmæssige ejer efter dobbeltbeskatningsoverenskomsten med Luxembourg, og at selskaberne derfor heller ikke nyder beskyttelse efter overenskomsten.

Som anført i sagen vedrørende Takeda finder Højesteret, at det ved denne vurdering af, om et selskab skal anses for renternes retmæssige ejer eller skal anses som en gennemstrømningsenhed, er uden betydning, om der er sket effektiv betaling af renterne, eller om renterne er tilskrevet lånets hovedstol, ligesom det er uden betydning, om renterne efterfølgende er konverteret til kapitalandele.

Det, som NTC Parent har anført om betydningen af, at der alene skete effektiv betaling af en mindre del af renterne, og den efterfølgende konvertering af renterne til kapitalandele i Nordic Telephone Company Investment, kan herefter ikke føre til en anden vurdering af Angel Lux Common og Angel Lux Parent, der som nævnt må anses som gennemstrømningsselskaber.

NTC Parent har til støtte for den subsidiære påstand anført bl.a., at kildeskattekravet helt eller delvist skal frafaldes, hvis investorerne i de overliggende kapitalfonde kan anses som renternes retmæssige ejere, idet flere af investorerne er hjemmehørende i lande omfattet af dobbeltbeskatningsoverenskomster med Danmark. NTC Parent har til støtte for den mere subsidiære påstand anført, at sagen skal hjemvises til Skattestyrelsen med henblik på opgørelse af de skattepligtige renteandele.

NTC Parent har ikke fremlagt oplysninger om, hvad der endeligt skete med renterne, efter at de var strømmet gennem de luxembourgske selskaber.

Højesteret finder herefter, at NTC Parent ikke har godtgjort, at investorerne i kapitalfondene bag de luxembourgske selskaber er renternes retmæssige ejere.

Højesteret tiltræder, at det ikke er godtgjort, at beskatning af de omhandlede renter efter selskabsskattelovens § 2, stk. 1, litra d, er udtryk for en ændring med tilbagevirkende kraft af en fast administrativ praksis.

Efter det anførte finder Højesteret, at skattearrangementet udgør misbrug. Angel Lux Common er herefter skattepligtig af de renter, som selskabet modtog fra Nordic Telephone Company Investment i perioden fra maj 2006 til juli 2008, jf. selskabsskattelovens § 2, stk. 1, litra d.

Højesteret tiltræder, at Nordic Telephone Company Investment var bekendt med grundlaget for, at rentebetalingerne og rentetilskrivningerne til Angel Lux Common er skattepligtige efter selskabsskattelovens § 2, stk. 1, litra d. Der er ikke heroverfor oplyst forhold, som kan begrunde, at Nordic Telephone Company Investment har haft tilstrækkelig føje til at tro, at rentebetalingerne og rentetilskrivningerne ikke var skattepligtige. Nordic Telephone Company Investment (nu NTC Parent) er derfor ansvarlig for betaling af 817.238.912 kr., jf. kildeskattelovens § 69, stk. 1.

*Konklusion*

Højesteret stadfæster dommen.

Højesteret frifinder Skatteministeriet for Takedas påstand om tilbagebetaling af sagsomkostninger.

## Thi kendes for ret

Landsrettens dom stadfæstes.

Skatteministeriet frifindes for Takeda A/S under frivillig likvidations påstand om tilbagebetaling.

I sagsomkostninger for Højesteret skal Takeda A/S under frivillig likvidation betale 2.000.000 kr. til Skatteministeriet.

I sagsomkostninger for Højesteret skal NTC Parent S.à.r.l. betale 2.500.000 kr. til Skatteministeriet.

De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse og forrentes efter rentelovens § 8 a.