# Exhibit 12, Part 1 of 2

**U.2023.4403**
**U.2023.4403**

Julie Arnth Jørgensen).

***A company in Luxembourg was liable to pay tax in Denmark on dividends distributed from a Danish subsidiary, as there was an abuse of rights under the EU Directive and the double taxation treaty, and the Danish company was obliged to withhold the tax. Withholding interest on the tax claim was not a violation of Article 6 of the Convention on Human Rights or Article 47 of the EU Charter.***

*EU law 1.4 - Monetary system etc. 5.7 - Taxes 311.1, 311.2 and 8.*

The case concerned in particular whether a Danish company, H ApS, was obliged to withhold tax on a dividend of approximately DKK 1.8 billion, which H ApS had distributed to a company in Luxembourg, and if so, whether H ApS was liable for payment of the amount to be withheld. Furthermore, there was a question of interest on any tax claim. H ApS argued that the dividend distribution did not constitute an abuse of rights, as H ApS could have been liquidated and the liquidation proceeds transferred directly to the shareholders in Panama without taxation. The Supreme Court stated that the tax assessment should be based on the dividend distribution that was actually made and not on a fundamentally different disposition in the form of liquidation, which the company had opted out of. The possibility of liquidation without taxation was therefore irrelevant to the tax assessment, including whether there was an abuse of rights. Furthermore, the Supreme Court found that the dividend distribution constituted an abuse of rights under EU law of the benefits under the Parent-Subsidiary Directive and that the company in Luxembourg was not the beneficial owner of the dividend under the double taxation agreement between Denmark and Luxembourg. The company in Luxembourg was therefore, according to section 2(1)(c) of the Danish Corporation Tax Act, liable to tax on

**4404**

the dividend, which H ApS was consequently obliged to withhold tax on, cf. section 65(1) of the Withholding Tax Act. The Supreme Court also found that H ApS was aware of the basis for the distribution to the company in Luxembourg being taxable, and that no circumstances had been disclosed which could justify that H ApS had had sufficient reason to believe that the dividend was not taxable. It could not lead to a different assessment that the group obtained advice from KPMG on the arrangement, which involved legal abuse. Finally, the Supreme Court found that interest in accordance with the Danish Collection of Taxes Act, the purpose of which is, among other things, to encourage payment of tax due, did not violate H ApS' right to a fair trial under Article 6 of the Convention on Human Rights or Article 47 of the EU Charter. In this connection, the Supreme Court stated that there was no such doubt as to the interpretation of Article 47 of the EU Charter that there was a basis for a reference for a preliminary ruling to the European Court of Justice. The Supreme Court then upheld the High Court's judgment with the amendment that the tax claim should be subject to interest under section 7 of the Collection Act with effect from December 21, 2010.[1]

**H.D. June 23, 2023 *in case 34/2022 (2. afd.)***

(Poul Dahl Jensen, Hanne Schmidt, Oliver Talevski, Jan Schans Chri- stensen, Kristian Korfits Nielsen, Jørgen Steen Sørensen and

U.2023.4403H

*Heavy Transport Holding Denmarks ApS (attorney Søren Lehmann Nielsen, Copenhagen)*
against
*Ministry of Taxation (attorney Søren Horsbøl Jensen, Copenhagen)*

## Eastern High Court's judgment of March 31, 2022, B-721-13 [SKM2022.469.ØLR]

### Background to the case and the parties' claims

In a decision dated December 7, 2007, SKAT considered Heavy Transport Holding Denmark ApS liable to withhold tax at source of DKK 503,803,440 on paid dividends of DKK 1,799,208,000 transferred from the Danish company to the company's parent company in Luxembourg, Heavy Transport Finance (Luxembourg) SA, Luxembourg.

By decision of August 29, 2012, the National Tax Tribunal changed the decision. The National Tax Tribunal found that the dividend could not be considered to be covered by the limited tax liability in the Danish Corporation Tax Act.

§ Section 2(1)(c).

On November 28, 2012, the Ministry of Taxation brought the ruling of the Danish National Tax Court before the Copenhagen City Court in order to establish that Heavy Transport Holding Denmark ApS was liable to withhold dividend tax of DKK 503,803,440.

By order of February 27, 2012, the District Court referred the case to the Eastern High Court pursuant to section 226(1) of the Danish Administration of Justice Act.

*The applicant, Skatteministeriet*, has finally made the following claim:

The defendant, Heavy Transport Holding Denmark ApS, must acknowledge that it is obliged to withhold dividend tax in the amount of DKK 449,824,500, corresponding to 25% of the dividend of DKK 1,799,298,000, which was distributed by the defendant on May 23, 2007, and that the defendant is liable for payment of the amount not withheld plus interest pursuant to section 7 of the Danish Collection Act with effect from December 21, 2010.

The Ministry of Taxation has claimed acquittal of Heavy Transport Holding Denmark ApS' alternative and more alternative claim. As can be seen, the Ministry of Taxation's claim has been changed in relation to the claim made in the summons. The Ministry has stated that this is a correction in the form of a change in the tax rate from 28% to 25% due to the fact that the tax rate for limited tax liability on dividends under section 2(1)(c), cf. subsection (3), of the Danish Corporation Tax Act was reduced to 25% with effect from January 1, 2007, cf. section 1(6) and section 17(3) of Act no. 652 of June 8, 2016.

*The defendant, Heavy Transport Holding Denmark ApS,* has made a main claim for acquittal, alternatively that the Danish Ministry of Taxation must recognize that interest cannot be paid on the withholding tax claim covered by the plaintiff's claim earlier than 14 days after the courts may have upheld the plaintiff's claim. In the further alternative, Heavy Transport Holding Denmark ApS claims that the Ministry of Taxation must recognize that interest on the withholding tax claim under section 7 of the Danish Collection Act in the period from 21 December 2010 and until 14 days after the delivery of a judgment that may find in favour of the Ministry of Taxation in the case must be paid exclusively under the said provision, and thus that the claim must not be included in the tax account under the rules on one tax account in Chapter 5 of the Danish Collection Act.

The case has been postponed pending, among other things, the CJEU's answers to preliminary questions in two similar dividend tax cases, B-1980-12 and B-2173-12, brought by the Ministry of Taxation against NetApp Denmark ApS and TDC A/S respectively. The Grand Chamber of the European Court of Justice

---

1    See the notes to U 2023.1575H.

The High Court answered the preliminary questions by judgment of 26 February 2019 in the joined cases C-116/16 and C-117/16, and the High Court subsequently gave judgment in both cases on 3 May 2021. The judgment has been appealed to the Supreme Court. In case B-1980-12, the High Court subsequently delivered its judgment on July 2, 2021

**4405**

on a separate issue of business of the withholding tax requirement.

The points of dispute in this case largely coincide with the disputed issues in the two cases mentioned above, B-1980-12 and B-2173-12. Namely, firstly, whether the foreign (here Luxembourg) parent company is liable to tax on the dividends from the Danish subsidiary, because the conditions for the taxation of the dividends under section 2(1)(c) of the Danish Corporation Tax Act must be waived or reduced. 1(c) of the Danish Corporation Tax Act to be waived or reduced pursuant to either the provisions of Council Directive 90/435 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States ("the Parent-Subsidiary Directive"), as amended by Directive 2003/123/EC, or pursuant to a double taxation convention (in this case the double taxation convention with Luxembourg of November 17, 1980) are not met. In particular, it is disputed whether the granting of exemption under the Directive can be conditional on the absence of abuse as further defined in the European Court of Justice's judgment of February 26, 2019 in the cases C-116/16 and C-117/16, and whether the Luxembourg company must be considered a "beneficial owner" within the meaning of the double taxation agreement. If the Luxembourg company is considered taxable, the next question is whether there is a binding administrative practice that excludes taxation. If taxation is not excluded for this reason, the final question is whether Heavy Transport Holding Denmark ApS is liable for payment of the dividend tax pursuant to section 69 of the Withholding Tax Act, as the company has not demonstrated that it has not acted negligently by not, cf. section 65(1) of the Companies Act, not having withheld dividend tax when it was decided that dividends would be paid. To the extent that the Ministry of Taxation may be successful in this claim, there is also a dispute regarding the withholding tax claim.

## Case presentation

*The order brought before the court*

The National Tax Tribunal's ruling of August 29, 2012 reads as follows:

"11-00530

Participated in the decision: Ingrid Otzen, Karin Bøgh Pedersen, HC. Thomsen and Mikkel Baadsgaard

Complaint:    Heavy Transport Holding Denmark

Income        ApS 2007

year:          SKAT's decision of December 7, 2010

Complaint
about:

The complaint concerns withholding tax on dividends, cf. section 2 of the Corporation Tax Act,
subsection (1)(c), cf. the Withholding Tax
Act 65. *The National Tax Tribunal's
decision Income year 2007*

SKAT has deemed the Company liable to withhold tax on dividends paid of DKK 1,799,298,000 with DKK 503,803,440.
The National Tax Tribunal changes the decision.

*Meeting etc.*

The representative has had a meeting with the National Tax

The Danish company, whose activity consisted solely of holding shares in the Dutch company, was owned by the Panama companies: Heavy Transport Group Inc (74.17%) and Incomara Holdings SA (25.83%).

On December 22, 2006, the company sold the shares in the Dutch company to a third party for gross approximately USD 375 million.

On January 16, 2007, the shares in the Company were sold to its sister company, the Luxembourg company, Heavy Transport Finance SA, for 326 million US dollars.

The ownership structure looks like this:



The proceeds from the sale of the Dutch company were received by the Company according to SKAT on January 15, 2007, according to the representative on January 17, 2007. Immediately prior to the closing of the sale, one of the sold company's ships was wrecked. As there was a dispute between the seller and the buyer as to which of them should bear the loss of the shipwreck, a part of the sales price was deposited in an escrow account. The net sales price of approximately USD 325 million was transferred to the Luxembourg parent company on January 22, 2007 in an interim account and from there on January 24, 2007 to the Panama companies for the purpose of obtaining loans for the acquisition of the Danish company.

The acquisition of the Danish company by the Luxembourg company was thus financed by loans from the Danish company to the Luxembourg company. On May 23, 2007, the Danish company

company 325 million U.S. dollars to

**4406**

the Luxembourg company, which was set off against the claim on the Luxembourg company. The transfer of the amount from the Danish

Tribunal's case manager. The representative has also testified before the members of the court at a court hearing.

Case details

The company Heavy Transport Holding Denmark ApS (the Company) acquired part (54.5%) of the share capital of the Dutch company Dockwise Transport NV, which operates within offshore etc.

company to the Luxembourg company was, as mentioned, made as a loan, as the distribution could only subsequently be adopted at the general meeting.

According to the Luxembourg company's annual reports for 2006 and 2007, assets at year-end amounted to 803,877 U.S. dollars and 1,404,906 U.S. dollars respectively. Shareholders' equity amounted to 6,245

U.S. dollar and -268,798 U.S. dollar.

According to the Company, the funds from the distribution (together with other funds) of Heavy Transport Group Inc. via contribution in subsidiary have been invested in new business activities within the EU.

Regarding the Luxembourg company, it is stated that the company was founded in 2004 in order to handle the financing of Heavy Transport Holding Denmark ApS and to act as the parent company of the Danish company, which happened with the transfer on January 16, 2007. The company, which has no employees, has together with 5 sister companies located in Luxembourg, which are all part of Heerema-

Group, outsourced the company's administration to the Luxembourg-based service company Heerema Group Service SA, which has 3 employees at the head office in Luxembourg and 8 employees in the company's Dutch branch. This company handles bookkeeping, banking, publication of consolidated accounts, etc. for the companies, while the actual management, including management decisions, is made by the management of Heavy Transport Finance SA.

*SKAT's decision*

SKAT has deemed the Company liable to withhold dividend tax, cf. section 2(1)(c) of the Danish Corporation Tax Act, cf. section 65 of the Danish Withholding Tax Act, of DKK 503,803,440.

As justification for the decision, reference is made to the Corporation Tax Act

§ Section 2(1)(c), first sentence, according to which companies domiciled abroad are generally liable to pay tax to Denmark on dividends received from sources in Denmark. An exception to the taxation is if the taxation is to be waived under a double taxation agreement or under the Parent-Subsidiary Directive 90/435/EEC, cf. the current Danish Corporation Tax Act section 2(1)(c), 4th sentence.

Reference is also made to section 65(1) of the Danish Withholding Tax Act, according to which companies must generally withhold dividend tax in connection with any adoption or decision to pay or credit dividends. According to the provision in section 69 of the Withholding Tax Act, liability arises for withholding tax not withheld unless the company proves that there has been no negligence on its part.

*The Danish-Luxembourg Double Taxation Convention (Decree No. 95 of September 23, 1982).*

Under the Danish-Luxembourg double tax treaty, dividends may be taxed in the contracting state in which the company paying the dividend is resident, but the tax imposed if the recipient is the "beneficial owner" of the dividend may not exceed specified limits, cf. Article 10(2).

According to the wording of the double tax treaty, it is thus a condition for the exclusion of Denmark's right to tax dividends as a source state that the Luxembourg recipient of the dividend is its "beneficial owner".

The term "beneficial owner" has been used in the OECD Model Convention and its commentaries since the revision of the Model Convention in 1977. The comments contained in the commentaries on the term "beneficial owner" have gradually been clarified, but there is no basis for claiming that there has been any material change in relation to what is meant by the term.

In the comments to the Model Convention, the question of the understanding of the term "beneficial owner" is now mainly addressed in points 12, 12.1 and 12.2, to Article 10, where the following is stated (with SKAT's emphasis):

"12. The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words 'paid..., to a resident' as used in paragraph 1 of the Article. This makes it clear that *the source State is not obliged* to waive its right to tax dividend income merely because the income was paid directly to a resident of a State with which the source State has concluded a treaty. *The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including to avoid double taxation and to prevent tax avoidance and evasion.*

12.1 Where income is paid to a resident of a Contracting State acting as an agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax solely on the basis of the immediate receipt of the income.

status of the recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation is a resident of the other state, but no double taxation arises as a result since the income recipient is not considered the owner of the income for tax purposes in the state in which he is resident. It would also *not be in accordance with the intent and purpose of the Convention if the source State were to grant relief or exemption from tax* in cases where a resident of a Contracting State, otherwise than as agent or intermediary, *merely acts as*

*4407*

*"conduit" for another person who actually receives the income in question.* For these reasons, the report prepared by the Committee on Fiscal Affairs concludes

"Double Taxation Conventions and the Use of Conduit Companies ", a "flow-through" company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

12.2 Subject to the other conditions of the Article, the limitation on the source State's right of taxation shall continue to exist where an agent or an intermediary, resident in a Contracting State or in a third State, is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is consistent with the understanding of all Member States). States wishing to express this more clearly are free to do so during bilateral negotiations,"

In particular, there are three cases from international case law that deal with the qualification of the "beneficial owner".

*The Bank of Scotland case* was decided by the French Conseil d'État on December 29, 2006. The case concerned a US parent company that had a wholly owned subsidiary in France. The parent company sold the right to receive predetermined dividends on non-voting preferred shares in the subsidiary for a period of 3 years to Bank of Scotland, which was located in the UK. This resulted in the US parent company being paid an amount which was, however, less than the amount of dividends paid to Bank of Scotland over the 3-year period pursuant to the dividend right. The French Conseil d'État found that the arrangement was effectively equivalent to a loan from Bank of Scotland to the US parent company and that the sole purpose of the arrangement was to obtain a tax benefit under the Franco-British double tax treaty to which the US parent company would not otherwise be entitled. The US parent company, which had disposed of the dividends and directed them to the bank to which the "loan" was to be repaid, was deemed to be the beneficial owner.

In *the Indofoods case*, decided by the UK Court of Appeal on March 2, 2006, bonds had been issued through a company in Mauritius, raising capital which was on-lent to Indofoods in Indonesia on the same terms. A Dutch company, Newco, was intended to be established and incorporated between the company in Mauritius and Indofoods in Indonesia and incorporated in the loan relationships of these companies - so there would be "back-to-back" loans. The question was then whether Newco would be considered a "beneficial owner" in relation to interest income from Indofoods in Indonesia. In the case, it was held that there was no practical possibility other than that an interest amount paid from Indofoods in Indonesia to Newco would be immediately passed on to cover Newco's obligation to pay exactly the same interest amount to the company in Mauritius. This was not considered to qualify as

"the

full privilege", which was necessary for Newco to qualify as the "beneficial owner". As a result, the UK Court of Appeal held that Newco would not qualify as a "beneficial owner" in relation to the interest payments from Indofoods. Although the Dutch company would not be legally obliged to Indofoods to pass on the interest income, it was sufficient that the income had in practice already been disposed of in such a way that it would never actually be subject to Newco's disposal.

The concept of "beneficial owner" was also addressed in the Canadian Federal Court of Appeal's judgment of February 26, 2009 in *the Prévost case*. The case involved Volvo and a British company, Henlys, establishing a Dutch holding company, Prévost Holding BV, which owned shares in a joint venture. Over a number of years, significant amounts were distributed to the Dutch holding company, and these amounts were - in accordance with the shareholders' agreement entered into between Volvo and Henlys - proportionally redistributed to the two shareholders. The issue in the case was whether Prévost Holding BV was the "beneficial owner" in relation to dividends from the underlying company, Prévost Car Inc. The Canadian Federal Court of Appeal found this to be the case, as the term

"beneficial owner" was defined as follows, see paragraph 100 of the Canadian TAX Court decision and paragraph 13 of the Canadian Federal Court of Appeal decision: "*the beneficial owner of dividends is the person who receives the dividends for his or her own use and enjoyment and assumes the risk and control of the dividend he or she received.*" The judgment in Prévost seems to assume that the formal recipient is the "beneficial owner", unless the recipient is legally obliged to dispose in a certain respect. In SKAT's opinion, this is not supported by the Model Tax Convention, the comments thereto or elsewhere. On the contrary, the concept of "beneficial owner" is based on a

"substance over form approach" and it is not compatible with this approach that the definition of the concept requires a legal obligation to pass on the payment to the party deemed to be "beneficial owner".

In this case, it is SKAT's opinion that the Luxembourg company is not a "beneficial owner", as it has no independent right to dispose of the dividend amount.

The Luxembourg company is thus considered to act as a flow-through entity for

**4408**

Panama companies. There is a close and direct link between the dividends distributed from the Danish company to the Luxembourg company and the amounts that were paid as debt repayments / purchase of shares from the Luxembourg company to the Panama companies.

The terms of payment for the purchase of the shares are thus directly linked to the loan and the dividend from the Danish company, as the amount was forwarded to the Panama companies immediately after receipt as payment for the purchase of the shares in the Danish company. Subsequently, the Luxembourg company has not been able to independently dispose of the distribution from the Danish company.

The fact that the Luxembourg company functioned as a pure flow-through company is emphasized by the fact that the company had no assets other than shares in and claims on the underlying subsidiary, debts to other group companies, interest expenses, interest income and bank deposits, and another company in the group (Heerema Group Service SA) took care of the administration.

In addition, there appears to be no commercial purpose for the incorporation of the Luxembourg holding company, which appears to have no other purpose than to seek to avoid Danish withholding tax (or obtain other tax advantages).

The fact that the construction is composed so that the amount passed on from the Luxembourg company to the two Panama companies is repayment of debt / purchase of shares instead of dividends may be due to the fact that, according to SKAT's information, withholding tax must be withheld on dividends from Luxembourg to Panama, while no withholding tax must be withheld on repayment of debt / purchase of shares.

It is SKAT's opinion that in this case it is a case of using the company in Luxembourg and thus the double taxation agreement between Denmark and Luxembourg to avoid Danish withholding tax, which is why the agreement cannot be invoked.

It is SKAT's opinion that this case is an abuse of the double taxation agreement between Denmark and Luxembourg.

Refusal to allow the group to benefit from the advantages of the double taxation treaty thus does not, in SKAT's opinion, conflict with the overall purpose of the treaty to avoid double taxation.

If SKAT agreed to allow the Luxembourg company to be covered by the double taxation agreement with Luxembourg and thus be covered by the exemption in section 2(1)(c) of the Danish Corporation Tax Act, this would, however, constitute the granting of an improper advantage.

SKAT thus considers the dividend payment to be subject to tax liability pursuant to section 2(1)(c) of the Danish Corporation Tax Act.

Regarding the Company's comments on "rightful income recipient", it is noted that the principle of "rightful income recipient" cannot be compared to the concept of "beneficial owner" under the double taxation treaty. The concept of "beneficial owner" is not a technical concept, but rather an auxiliary concept to avoid tax evasion. In SKAT's opinion, the Luxembourg company is the rightful income recipient of the distributed dividend, but is not the "beneficial owner" of the dividend.

*Parent/Subsidiary Directive 90/435/EEC.*

It follows from Article 5 of the Parent-Subsidiary Directive that profits distributed by a subsidiary to its parent company are exempt from withholding tax. The starting point is thus that no withholding tax can be imposed on dividends distributed to companies domiciled in another Member State when the parent company meets the capital requirement and the ownership period requirement of the Directive.

However, this starting point can be derogated from. Article 1(2) of the Directive states that the Directive does not preclude the application of national provisions or agreements necessary to prevent fraud and abuse.

Section 2(1)(c) of the Danish Corporation Tax Act clearly implies that Denmark must not waive withholding tax unless there is an actual obligation to do so under the Parent-Subsidiary Directive. To the extent that EU law does not prevent withholding tax from being withheld, withholding tax on dividends must thus be withheld.

It is SKAT's opinion that the case law of the European Court of Justice shows that there is nothing to prevent companies established in another Member State from invoking EU law - including the harmonized rules that follow from i.a. the Parent-Subsidiary Directive - when it must be assumed that the establishment of a holding company in another Member State "is intended to avoid withholding tax on payments to non-European companies if such a structure serves no commercial purpose", cf. the Commission's interpretation of "Purely artificial arrangements", published in OJ 2008, C 116/13.

The use of the concept of "beneficial owner" in the double taxation conventions also serves precisely to combat fraud or abuse within the meaning of Article 1(2) of the Directive. Thus, the Directive does not preclude the imposition of withholding tax where "the beneficial

owner" is not covered by a double taxation treaty with Denmark.

In order to apply the benefits of the Directive, it is a condition that the company in Luxembourg can be considered to be the "beneficial owner" of the dividend from the Danish company. It is SKAT's assessment that this condition is not met.

Thus, SKAT considers the Luxembourg company to be a intermediary that does not itself benefit financially from the exchange payment. In SKAT's opinion

**4409**

it would therefore be contrary to the purpose of the Parent-Subsidiary Directive to allow the group to benefit from the Directive.

As section 2(1)(c) of the Danish Corporation Tax Act by its wording makes the waiver of withholding tax conditional on the existence of an obligation to waive withholding under EU law, the conditions for waiving withholding tax are not met.

*Negligence, cf. section 69 of the Withholding Tax Act.*

Regarding the Company's claim that the Company is not liable for the interest tax not withheld pursuant to section 69 of the Withholding Tax Act, it is noted that the wording of section 69 of the Withholding Tax Act states that it is the withholding agent who must prove that there has been no negligence on his part. The starting point in the Withholding Tax Act

§ Section 69 is that a company that fails to fulfill its obligation to withhold tax is directly liable for the payment of missing amounts. This principle is deviated from if the company proves that there has been no "negligence" on its part.

This case concerns non-withholding of withholding tax on dividends distributed on May 23, 2007. The rule in section 2(1)(c) of the Danish Corporation Tax Act was introduced by Act no. 282 of April 25, 2001.

On November 6, 2006, in a reply to Morten Homann (SF) (Morten Homann's inquiry of October 30, 2006), the Minister of Taxation stated the following:

A pure flow-through holding company in for example Luxembourg will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.2).

In 2004, during the processing of L 119 2003/2004, the Minister of Taxation also stated the following in a reply to the Association of State Authorized Public Accountants (FSR's inquiry of 10 February 2004):

Admittedly, there is a risk that, for example, a Danish company may seek to avoid the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation treaty, which does not have withholding tax on interest payments to foreign interest recipients, after which this company pays the interest to the company in the low-tax country.

In such cases, however, the Danish tax authorities will, after a specific assessment of the facts, be able to assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest payment is not covered by the EU Interest/Royalty Directive or the double taxation treaty.

According to Article 5(2) of the Interest/Royalty Directive, an EU country may refuse to apply the Directive in the case of transactions that have tax evasion, avoidance or abuse as a significant motive.

The notes to the OECD Model Double Taxation Conventions also allow a state not to apply a treaty in special cases, see the section on treaty abuse in the notes to Article 1 of the Model.

It must therefore be assumed that the company should have been aware of this issue at the time of the distribution.

Copyright © 2023 Karnov Group Denmark A/S                                                                                          page 9

of dividends and that the company, by attempting to secure advantages to which neither the Parent-Subsidiary Directive nor the double taxation treaty between Denmark and Luxembourg provides access, has taken on a risk which the company has not clarified or sought to clarify.

The use of the term "beneficial owner" in the double taxation agreement is a safeguard against abuse of the double taxation agreement and the Parent-Subsidiary Directive. When assessing whether there has been negligence, cf. section 69 of the Withholding Tax Act, special demands must be made on due diligence when it comes to compliance with a protective rule that deals with transactions between related parties.

SKAT is of the opinion that the company has been aware of the basis for the withholding obligation and therefore could not reasonably assume that there was no withholding obligation, which according to established Supreme Court case law is decisive for whether the withholding agent must be considered to have shown negligence, see e.g. UfR 2008, page 2243 H (SKM 2008.613 HR).

It is therefore SKAT's opinion that the company has shown negligence, and it is therefore also SKAT's opinion that the company is liable for the payment of the withholding tax on the dividend.

*The company's claim and arguments*

The company's representative has claimed that the company's withholding obligation regarding dividends to the parent company is annulled, cf. section 2(1)(c) of the Danish Corporation Tax Act, cf. section 65 of the Danish Withholding Tax Act, as being unjustified.

*The Parent/Subsidiary Directive.*

The purpose of the Parent-Subsidiary Directive is, among other things, to prevent double taxation of subsidiaries' profits. The directive has therefore introduced a common system for the taxation of subsidiary profits distributed to a parent company.

The Directive only has an objective ownership requirement as a basis for the tax exemption of dividends, namely a requirement of at least 15% ownership (2007). The objective conditions are stated directly in the Danish Corporation Tax Act § Section 2(1)(c).

Article 1(2) of the Directive states that "the Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud or abuse".

**4410**

A prerequisite for the application of the provision is thus that there is a legal basis in Danish domestic law to override the application of the Directive.

In the representative's opinion, no such legal basis exists.

*"Beneficial owner".*

The term "beneficial owner" is not defined in Danish tax legislation, neither in the Withholding Tax Act's provisions on withholding tax nor in the Corporation Tax Act's provisions on limited tax liability. Nor is the term defined in other Danish tax legislation.

Thus, the term "beneficial owner" does not have an independent content in Danish tax legislation and only appears from article 10 of the double taxation treaty between Denmark and Luxembourg, including the OECD Model Convention.

Denmark's double taxation treaty with Luxembourg aims to prevent and alleviate double taxation, but does not provide an independent legal basis for taxation that does not follow from internal rules. The provision in Art. 10 cannot be used as an internal legal basis to deny the Luxembourg company the tax exemption that follows from section 2(1)(c) of the Danish

Corporation Tax Act, including as a legal basis to apply Art. 1(2) of the Parent-Subsidiary Directive. In addition, it is SKAT that is obliged to determine who is the beneficial owner.

In the Company's opinion, the Luxembourg company is the "beneficial owner" of the dividend, as the concept of "beneficial owner" cannot be extended beyond "rightful income recipient" as defined in section 4 of the State Tax Act.

It is therefore not possible, as claimed by SKAT, that the Luxembourg company is on the one hand the rightful income recipient (civil law owner of shares) of the dividend, but at the same time not the "rightful owner" of the dividend.

SKAT therefore lacks both legal authority and basis to set aside the tax exemption for the dividends declared from the Danish company to the Luxembourg company with reference to the concept of "beneficial owner".

*Subsidy - State Tax Act 4.*

According to section 16 A of the Tax Assessment Act, everything distributed by the company to current (direct) shareholders or unitholders is included in dividends.

If SKAT's views are accepted, according to which the payment from the Danish company does not rightfully belong to the Luxembourg company, but rather to the overlying shareholder companies, it is not a dividend.

In that case, these are payments to indirect shareholders. Such indirect payments cannot be qualified as dividends. Instead, the payments must be qualified as grants.

Section 31 D of the Danish Corporation Tax Act on tax-free grants covers grants made by a parent company to subsidiaries or subsidiary subsidiaries, including sister companies. However, the provision does not apply to grants made by a subsidiary to a parent company. Such grants are treated in accordance with section 4 of the State Tax Act.

SKAT's view of "beneficial owner" therefore implies that the payment from the Danish company cannot be qualified as a dividend, but rather as a grant covered by section 4 of the Danish State Tax Act.

The limited tax liability under section 2(1)(c) of the Danish Corporation Tax Act only covers dividends, cf. section 16A of the Danish Taxation Act, and grants covered by section 31D of the Danish Corporation Tax Act.

This means that there is no legal basis for imposing withholding tax on the payment from the Danish company to the Luxembourg company in this situation either.

*Negligence.*

Section 69 of the Withholding Tax Act states that: "Anyone who fails to fulfill his obligation to withhold tax or who withholds too little tax shall be directly liable to the public authorities for payment of the missing amount, unless he proves that he has not been negligent in complying with the provisions of this Act".

In order to have shown negligence, it follows from practice that there must be a clear and unambiguous obligation to withhold or that the withholding agent has repeatedly (even after orders) failed to comply with its withholding obligation. The Danish company has not previously distributed dividends. The company has reported and submitted the dividend declaration to SKAT. The withholding requirement could thus have been imposed by SKAT in immediate continuation of the submission of tax returns and dividend declarations. SKAT's passivity is a clear indication that SKAT at the time did not itself believe that the company had a duty to withhold dividend tax.

SKAT has not documented that in 2007 there was a practice for Danish subsidiaries of EU parent companies to withhold tax at source on dividend payments when the objective conditions of the Parent-Subsidiary Directive were met.

SKAT's decision is therefore a tightening of established administrative practice, which cannot be enforced retroactively. Reference is made to Hans Severin Hansen's article: The great hypocrisy - About the "beneficial owner" cases (TfS2011.537).

The Company is therefore of the opinion that the company cannot be required to pay withholding tax on the distributed dividend with reference to the fact that negligence has been shown

It is therefore the Company's overall opinion that SKAT's decision on the withholding obligation must be annulled as unjustified.

**4411**

## The National Tax Tribunal's comments and reasoning

According to section 2(1)(c) of the Danish Corporation Tax Act, companies domiciled abroad are generally subject to limited tax liability on dividends, cf. sentence 1. However, this does not apply to dividends received by a company that owns at least 15% of the share capital (in 2007) in the dividend-paying company for a continuous period of at least one year, within which period the dividend distribution date must be within, cf. sentences 2 and 3. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a double taxation agreement with the state in which the company is resident, cf. sentence 4.

According to Article 10(1) of the Double Taxation Convention between Denmark and Luxembourg of November 17, 1980, dividends may be taxed in the source state. However, the tax imposed may not - if the recipient is the beneficial owner of the dividend and the beneficial owner is a company that directly owns at least 25% of the capital of the distributing company - not exceed 5% of the gross amount of the dividend.

The provision corresponds to Article 10 of the OECD Model Tax Convention. The commentary to Article 10(12) of the Model Tax Convention states, among other things, that the beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid to a resident person" as used in Article 10(1). The term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in light of the intent and purpose of the treaty, including avoiding double taxation and preventing tax evasion and avoidance. Clause 12.1 states that a person acting in the capacity of agent or intermediary cannot be considered a beneficial owner. It also states that a person who, other than as an agent or intermediary, merely acts as a conduit for another person who actually receives the income in question cannot be considered a beneficial owner either. Reference is made to the report of the Committee on Fiscal Affairs, which states that a conduit company cannot normally be regarded as the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or trustee acting on behalf of other parties.

The "rightful owner" concept cannot therefore be assumed to coincide with Danish tax law's "rightful income recipient" concept.

The Luxembourg company, Heavy Transport Finance (Luxembourg) SA, which was founded in 2004 and is owned by two Panama companies, acquired the Danish sister company, Heavy Transport Holding Denmark ApS, for 326 million US dollars on January 17, 2007. Prior to the transfer to the sister company, the Danish company had sold its share of shares in the Dutch company, Dockwise Transport NV, after more than three years of ownership for a net amount of USD 325 million. The proceeds from the sale were loaned to the Luxembourg

company on January 22, 2007, and on January 24, 2007, the proceeds were transferred to the two Panama companies to finance the company's purchase of the shares in the Danish company. On May 24, 2007, the Luxembourg company's debt to the Danish company was settled by dividends from the Danish subsidiary.

In these circumstances, where the (consecutive) transactions made within a short period of time have taken place between interested parties, including parties resident in countries outside the EU, and with which no double taxation agreement has been concluded, it is incumbent on the Company as the party with access to the evidence to prove that the benefits of the agreement on the elimination of Danish withholding tax shall apply.

It has been stated that the Danish company's loan on January 22, 2007 to the Luxembourg parent company was used to pay the two Panama companies for the shares in the Danish company. Furthermore, it has been stated that the Danish company's distribution on May 24, 2007 to the parent company settled this company's debt to the Danish company. It is thus undisputed that the distributions from the Danish company were transferred to the Luxembourg company and from there transferred to the Panama companies. It is therefore not established that the Luxembourg company can be considered the "rightful owner" of the dividends received.

The Luxembourg company is thus not entitled to the treaty's tax exemption for dividends, cf. Article 10.

According to Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, Article 5, dividends distributed by a subsidiary to its parent company are exempt from withholding tax.

The general provisions of the Parent-Subsidiary Directive do not include a reservation on abuse. Article 1(2), on the other hand, allows Member States to derogate from the Directive in the event of tax abuse, etc.

Article 1(2) of the Directive thus states that the Directive does not preclude the application of domestic provisions or agreements necessary to prevent fraud and abuse. In the Danish National Tax Tribunal's decision of December 16, 2011 (TfS 2012.26), which concerns a company's obligation to withhold dividend tax on dividends paid to the parent company in Cyprus, the company was not considered liable to withhold dividend tax. The decision was based on

**4412**

emphasis on the fact that Denmark has not adopted legislative provisions aimed at preventing fraud and abuse, cf. Article 1(2) of the Directive. The legally established and functioning Cypriot company was, despite the fact that its only - or essentially only - activity was to own shares in the Danish company, considered to be the proper recipient of the dividends. The dividend was then exempt from withholding tax, cf. Article 5 of the Directive, and was thus not covered by the limited tax liability, cf. section 2(1)(c) of the Danish Corporation Tax Act.

In accordance with this, and since, based on practice, the transactions made cannot be disregarded, the dividend transferred from the Danish company to the parent company in Luxembourg, which is a legally established and operating company in Luxembourg, is not considered to be covered by the limited tax liability, cf. section 2(1)(c) of the Danish Corporation Tax Act.

SKAT's decision is amended accordingly."

*Additional information regarding the run-up to the distribution*

The parties have pointed out that there were in fact three sellers of Dockwise Transport N.V., namely, Heerema Transport Finance (Luxembourg) S.A. (not identical to the parent company of Heavy Transport Holding Denmark ApS to which the distribution was later made), Heavy Transport Holding Denmark ApS, and Wilh. Wilhelmsen Netherlands B.V., of which the two companies in the Heerema group, Heerema Transport Finance

(Luxembourg) S.A. and Heavy Transport Holding Denmark ApS together held 76% of the share capital in the sold company, and Wilh. Wilhelmsen Netherlands B.V. held the remaining part. Wilh. Wilhelmsen ASA and Heerema Holding

Construction Inc. were listed as guarantors in the purchase agreement. The buyer was Delphi Acquisition Holding I B.V.

The agreement contained a number of warranties, which in particular concerned a shipwreck suffered by one of the transferred ships. In the opinion of the Ministry of Taxation, these indemnities entailed a significant risk for the sellers. The agreement also contained various provisions on guarantee and escrow,

Prior to Heavy Transport Holding Denmark ApS' loan to the Luxembourg parent company in January 2007 to finance the Luxembourg company's acquisition of Heavy Transport Holding Denmark ApS - which, as stated in the ruling of the Danish National Tax Tribunal, was subsequently set off against the dividend distributed to the Luxembourg company on May 23, 2007 - KPMG had confirmed in an email correspondence on June 8 - July 24, 2006 with A from the Heerema Group, of which Heavy Transport Holding Denmark ApS is a part, copied to various other employees of the group. June - July 24, 2006 with A from the Heerema Group, of which Heavy Transport Holding Denmark ApS is a part, and with a copy to various other employees in the group, confirmed that the distribution of dividends to the Luxembourg parent company would not trigger taxation in Denmark, cf. Article 5(1) of the Parent-Subsidiary Directive, provided that the company in Luxembourg met the conditions of the Directive. From A's email of June 8, 2006, in which B from KPMG in a reply email of June 12, 2006 had inserted his answers to A's questions (the answers are here highlighted in italics):

"Please treat this information as very confidential

As you know HTH ownes 54,51 % of the stock of Dockwise Transport NV, established in the Netherlands Antilles but resident in the Netherlands and subject to Netherlands taxation under the tonnage tax regime

We envisage that HTH will sell its Dockwise shares in the very near future (or by way of a public offering). If our expectations will become reality the proceeds will exceed the historical costprice with large numbers.

This means a capital gain will be realized, but I assume this gain will fall under the participation exemption, please confirm. [*If the shares have been owned for more than three year, gain will not be subject to tax, The rules apply regardless of how many shares the company owns, and regardless of whether the shares are in a Danish or foreign company*,

The next step is then to repatriate the gains to the shareholders. The loan from the Luxembourg finance company can be redeemed, but the remainder of the gain will then still be very substantial.

Currently we were working on a transfer of the shares of HTH Denmark to a new Luxembourg holding company. We have now stopped this proces because of this new event.

If HTH Denmark is to be liquidated after it has realized the capital gain, will the liquidation proceeds to the Panama shareholder be tax free? [*B] The liquidation proceeds will be treated as if the Pa- nama shareholder had sold the shares, According to internal Da- nish legislation a foreign shareholder is not taxable in Denmark, Consequently, the capital gain will not be taxed in Denmark, However watch up for the pitfall !!!!! If any funds are transferred to the shareholder in a different year than the final year, this will be treated as dividend and as Denmark has no tax treaty with Pa- nama a 28 % withholding tax will apply. Therefore no payment should be made in advance. All funds should be left until the final day of taxation.*

If not what other possibility do we have to repatriate the funds to the shareholders? Your comments and or suggestions will be appre- ciated,"

A then asked the following in an email dated June 30, 2006:

"Dear all

In order to avoid a maybe lenghty "waiting" period in Denmark I would like to have your opinion what the position would be if the shares of HTH Denmark Aps are sold to the Luxembourg entity

Heavy Transport Finance Luxembourg SA. I take it the transfer of these

**4413**

shares by the current Panamanian owner will have to be at actual market rate, we probably will be able to have an indication of this market rate from the bank that is handling the sale of the Dockwise shares for us. If this will have negative effects could I please request you all to work out another scenario that will enable us to avoid tax on the envisaged capital gain and a quick repatriation of the gains to our ultimate Panamanian owner if that is possible."

In an email dated July 17, 2006 to A with a copy to i.a. B from KPMG, D from KPMG stated:

"Further to our telephone conversation of last Friday, 14 July 2006, I would - after discussion with F - like to confirm my proposal to structure the contemplated transaction in such a way that Heavy Transport Holding Denmark ApS ("HTF Denmark") first sells the shares in Dockwise Transport NV, and only in a second step to sell HTF Denmark to Heavy Transport Finance Luxembourg SA.

The transaction steps would thus be the following:

1)   Sale of the shares in Dockwise Transport NV by HTF Den- mark, realizing the capital gain
2)   Sale of HTF Denmark by the Panamanian shareholder at market price to Heavy Transport Finance Luxembourg SA, in consideration for debt (HTF Denmark being a mere cash box after the sale of the Dockwise shares, the market value is then known)
3)   Transfer of the funds by HTF Denmark to Heavy Transport Finance Luxembourg SA by way of dividend
4)   Repatriation of the funds by Heavy Transport Finance Luxembourg SA to Panamanian shareholder by repayment of the debt resulting from step 2)

In this scenario, the clause in the sales contract providing that the sales price will be adjusted, depending on the price obtained for the later sale of Dockwise Transport NV by HTF Denmark (as di- scussed last week), which would be required if HTF Denmark was sold to Luxembourg before the sale of Dockwise Transport NV, could be avoided.

The dividend received by Heavy Transport Finance Luxembourg SA from HTF Denmark should give rise to a corresponding write- down in value of the participation in HTF Denmark, i.e., this opera- tion should not result in a profit in the commercial and tax accounts of the company, and should thus be tax neutral even if the condi- tions of the Luxembourg participation exemption, in the present case in particular the minimum detention period of 12 months (before or alter the dividend payment), were not met.

Furthermore, the funds received by Heavy Transport Finance Luxembourg SA though the dividend should equal the amount of Heavy Transport Finance Luxembourg SA's debt to the Panamanian shareholder, i.e. all the funds received could be repatriated to Pana- ma through the repayment of the debt.

From a discussion I had with B this afternoon, I understand this solution is also feasible from a Danish tax point of view, i.e. the dividend could be paid be HTF Denmark to Luxembourg in exemption of Danish withholding tax (no "abuse of law", etc.). B - *please conflrm*.

We hope that the above is of assistance. Please do not hesitate to contact us if you have any questions or comments."

Subsequently, in B's absence, D requested the requested confirmation from another Danish KPMG employee.

By email dated July 24, 2006, G and H from KPMG in Denmark

then stated:

"As for the set-up described in your e-mail below and the contem- plated transactions steps (1-4) we have the following comments:

1)  As a first step it is contemplated that Heavy Transport Hol- ding Denmark ApS (HTF Denmark) sells its shares in Dock- wise Transport NV. Provided all the shares have been hold for more than 3 years any capital gain on the sale of the shares would tax exempt in Denmark. This would imply that no capital increase should have happen within the 3 years.

2)  As a second step it is contemplated that HTF Denmark will be sold to Heavy Transport Finance Luxembourg SA. The disposal of shares in HTF Denmark is not relevant for Danish tax purposes.

    However, the transfer of shares in HTF Denmark has an ef- fect on the possibility for the Danish company to utilize any losses carried forward in the company. The limitation means that the tax losses in the Danish company can only be set off against positive trading income and not against income from passive investments and the leasing of depreciable machinery and ships.

3)  *Distribution of dividends:*

    We assume that the Luxembourg company is recognized as a company for Danish tax purposes. Moreover we assume that the Luxembourg company is eligible for benefits under the EU Parent-Sub directive, i.e. that the conditions in the Parent/Sub. directive are met, Any dividend payments that are distributed from HTF Denmark to Heavy Transport Luxembourg SA subsequently to the sale are exempt from withholding tax, provided the Luxembourg company fulfills the *1 year holding requirement*, i.e., holds the shares in the Danish company fora period of at least twelve months within the dividend distribution is made.

    **4414**

    The Danish exemption of withholding taxes on dividends is also applicable to dividends distributed before completion of the holding period of at least 1 year, provided the Luxembourg company subsequently fulfills the holding period requirement.

    Please note that it is very important that the Danish company is not liquidated until the 1 year holding period requirement is fulfilled. Otherwise withholding tax at 28 % must be paid to the Danish tax authorities (most of this may however be reclaimed in accordance with the double tax treaty between Luxembourg and Denmark.)

The parties disagree on whether it can be assumed that the correspondence presented is the entirety of KPMG's advice on the distribution.

In this connection, Heavy Transport Holding Denmark ApS has also submitted an email from A dated December 15, 2010 in which he forwards the above-mentioned email thread to the law firm Delacour Dania with a request for an assessment of whether some of the defendants in the Heerama Group, in view of the advice that had been obtained prior to the transaction, could incur liability in connection with the case initiated at that time by SKAT regarding payment of dividend tax.

The parties agree that part of the purchase price for Dockwise Transport N.V. was retained by the buyer as security for the buyer's possible claims arising from the sinking of one of the transferred vessels. This was the reason why Heavy Transport Holding Denmark ApS alone was paid USD 325 million, which occurred either on the 15th or 16th of the month.

January 17, 2007.

The loan agreement mentioned in the Danish National Tax Court's ruling with "effective date" January 22, 2007 between the contributed Luxem-

Burgundian parent company, Heavy Transport Finance (Luxembourg) SA and Heavy Transport Holding Denmark ApS can be found at , among others:

"WHEREAS:

1)   On January 22, 2006 Lender has transferred an amount of US$ 325.000.000 to Borrower on its bank account with Fortis Bank in Luxembourg with communication interim dividend,

2)   Due to the fact that the audited annual accounts of the Lender were not completed on the date January 22, 2007, the Parties recognize this distribution as a short term loan until the gene- ral meeting of shareholders of the Lender decides on an ordi- nary distribution of dividends.

The transfer of the loan amount of USD 325,000,000 from Heavy Transport Holding Denmark ApS to Heavy Transport Finance (Luxembourg) SA was marked "INTERIM DIVIDEND". In a pleading dated February 2, 2022, Heavy Transport Holding Denmark ApS has stated:

"Heavy Transport Holding Denmark ApS does not dispute that the incorporation of the intermediate holding company in Luxembourg - as mentioned

- was done with the main purpose of not triggering Danish withholding tax, but it is argued in this connection that it is naturally included in the abuse assessment whether there were other ways in which the funds could be paid tax-free to the owners in Panama. There were, as a very simple declaration of payment could have been made - and in that connection the funds could have been distributed to the shareholders in Panama without deduction of Danish withholding tax."

The same appears from the company's summary pleading, cf. the reproduction of this below.

The parties agree that the Luxembourg holding company had no assets and activities other than the holding of shares in Heavy Transport Holding Denmark ApS.

*Subsequent processes*

The management report in Heavy Transport Holding Denmark ApS' annual accounts for 2006 states that, as in previous years, the company's activity consisted of holding shares in the subsidiary Dockwise Transport N.V. As stated below, the company sold its shares in the subsidiary in 2006. The company is expected to be liquidated in the long term." The management report in the annual report for 2007 states that

"[t]he company's activity previously consisted of holding shares in the subsidiary Dockwise Transport N.V. The company sold its shares in the subsidiary in 2006 and has been without activity in 2007. The final calculation of the sales price for the shares is still pending. As in 2006, approximately USD 52 million has been reserved to cover possible claims from the buyer. The company is expected to be wound up in the long term." The management report in the annual report for 2009 states that "... Activity has been limited in 2009. On July 13, 2009, the buyers of the shares informed Heavy Transport Holding Denmark ApS that due to the considerable repair costs of the acquired vessel MS3, additional compensation is required from the sellers. The company's share of the claim amounts to approximately USD 24.4 million. The claim has been rejected as unfounded and is expected to be settled at no cost to the company. The company is expected to be wound up in the long term."

KPMG stated on behalf of Heavy Transport Holding Denmark ApS in the company's comments of November 23, 2010 to SKAT's proposal for imposition of withholding tax of November 5, 2010, among other things:

"SKAT's description of the facts of the case makes it appear as

if it is an "arrangement" established to avoid withholding tax on the dividend distribution.

This representation is completely wrong.

Heavy Transport Finance Luxembourg SA could have simply liquidated Heavy Transport Holding Denmark ApS and paid out the shares realized in the Danish company as liquidation proceeds.

now, which until July 1, 2007 was treated as a disposal of shares. Denmark has

**4415**

neither rules on limited tax liability nor rules on withholding tax on the disposal of shares or on liquidation distributions distributed in the income year in which the company is finally liquidated.

The fact that Heavy Transport Holding Denmark ApS was not liquidated was solely due to an ongoing civil dispute with the buyer of the shares in Dockwise N.V., according to which a liquidation would entail that a number of deposits had to be made to the buyer of Dockwise

N.V. for the claims made under the purchase agreement.

The distribution of dividends is thus not an abuse of the EU Parent-Subsidiary Directive or the double taxation agreement between Denmark and Luxembourg."

By letter dated December 27, 2010, Heavy Transport Holding Denmark ApS reserved its right to claim damages against KPMG and requested KPMG to issue a declaration of suspension. On December 29, 2010, KPMG submitted an interim declaration of suspension, which was valid until the end of January 2011, and on August 9, 2011, a suspension agreement was entered into until further notice, as KMPG could terminate the agreement with 30 days' notice. Heavy Transport Holding Denmark ApS has in a pro- ceedings of February 2, 2022 stated that KPMG has terminated the suspension agreement in July 2018, and as the Heerema Group assessed that any claim for damages against KPMG was time-barred, they have not pursued it.

In the management report in Heavy Transport Holding Denmark ApS' annual accounts for 2010, it states

"*The company's main activities*

The company's activity previously consisted of holding shares in the subsidiary Dockwise Transport N.V. The company sold its shares in the subsidiary in 2006. The activity in 2010 has been limited. The outstanding debt with the buyers of shares in the subsidiary Dockwise Transport N.V. was settled in 2010 without payment for the company." The settlement agreement concluded with the buyers of Dockwise Transport N.V. states that the case was settled on the condition that the buyers retained the part of the purchase price they had withheld and that the sellers retained the part of the purchase price they had received.

During the National Tax Tribunal's consideration of the case, an office meeting was held in the case on August 30, 2011 with the participation of the company's representatives, the law firm Plesner v/lawyers Hans Severin Hansen and Lasse Esbjerg Christensen and the accounting firm KPMG v/ Anders Lundvig and Claus Engelsted. The minutes of the meeting state, among other things:

"It was noted that had it not been for the dispute in connection with the shipwreck, the Danish company would have been liquidated, in which case there would not have been a case." The lawyers representing Heavy Transport Holding Den- mark ApS in this case also represented NetApp Denmark ApS in the case B-1980-12, which was decided in the High Court by judgment of 3 May 2021. On 4 December 2015, one of these lawyers, Anders Endicott Pedersen, wrote as follows to a fellow employee in SKAT, Betaling & Regnskab

"Hi ...

We've discussed this before.

The cases concerning dividend withholding tax have been won by the taxpayers in the National Tax Tribunal, and the Ministry of Taxation has brought the cases before the courts (where they are now on their way to the European Court of Justice).

For example, in the NetApp case [...] - where the withholding tax claim is approximately DKK 185 million - interest on the claim is currently running at approximately DKK 3.4 million per month, which corresponds to a - non-deductible - interest rate

of the principal at 22% p.a. - and the interest rate is only increasing as a result of the interest rate calculation.

Is it possible for the company to deposit the amount now so that no further interest will accrue on payment if the case is lost? The company agrees that the amount will not accrue interest on repayment if the case is won by the taxpayer."

SKAT, Payment and Accounting replied by email of December 5, 2015 as follows:

"Hi Anders

Unfortunately, it is not possible for the company to deposit the amount now. SKAT finds that it is not possible to make the requested payment and thus stop the interest imputation when there is no claim.

This decision is valid until the High Court may change it.

Similar inquiries have been answered in the same way."

In the first pleading submitted in this case after the above-mentioned correspondence, which is a duplicate of November 9, 2020, Heavy Transport Holding Denmark ApS stated, inter alia, that "[i]f the Ministry of Taxation were to be upheld that the debt has existed since SKAT's decision of December 7, 2010, it is claimed in the third row that the tax administration as a public authority has in all circumstances been unjustified in refusing to receive the withholding tax amount and that the Ministry of Taxation must therefore indemnify the defendant for this."

By email of January 19, 2021 to the Danish Tax Agency, lawyer Anders Endicott Pedersenen requested a statement of the withholding tax claim in this case with the addition of default interest as of April 2, 2021. (It appears from the email that at that time it was expected that the main hearing would be scheduled, which would mean that a judgment would be issued no later than April 2, 2021). The lawyer stated in this connection:

"The company has won the case at the National Tax Tribunal, and the Ministry of Taxation has brought the case before the courts.

**4416**

The company has therefore not had the opportunity to pay the tax claim in order to stop the addition of interest in the event that the Ministry of Taxation should win the case in court." The Ministry of Taxation has confirmed that Heavy Transport Holding Denmark ApS would have received the same answer if Heavy Transport Holding Denmark ApS, in the same way as NetApp Denmark ApS, had approached the Ministry of Taxation and requested access to pay the amount owed according to the Ministry of Taxation, subject to recovery.

*How to proceed*

*The Ministry of Taxation* has essentially proceeded in accordance with the pleas set out in the Ministry's summary pleading of February 21, 2022, which states (references to extract and material collection omitted):

"*2. POINTS OF CONTENTION.*

On May 23, 2007, Heavy Transport Holding Denmark decided to distribute DKK 1,799,298,000 to the parent company Heavy Transport Finance (Luxembourg) S.A. (Heavy Transport Finance (Luxembourg)) without withholding dividend tax.

Section 65(1) of the Withholding Tax Act stipulates that the company in question must withhold dividend tax (MS1 p. 18) in connection with any adoption or decision to pay or credit dividends. However, according to subsection (5) of the provision, *no* withholding tax is withheld on dividends received by a company resident abroad from a company resident in Denmark if the dividend in question is not subject to tax, cf. section 2(1)(c) of the Corporation Tax Act.

According to the latter provision, in short, a foreign parent company is not liable to tax on dividends from a foreign parent company.

Danish subsidiary, on condition that the taxation of the dividend is to be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (the Parent-Subsidiary Directive) or under a double taxation treaty with the Faroe Islands, Greenland or the state where the parent company is resident. If the condition is *not* met, withholding tax must be withheld in connection with the adoption or decision to pay or credit dividends in accordance with the starting point under section 65(1) of the Withholding Tax Act. A person who fails to fulfill his obligation to withhold tax or who withholds too little tax shall be directly liable to the public authorities for payment of the missing amount, unless he proves that he has not been negligent in complying with the provisions of the Withholding Tax Act, cf. this Act.

§ Section 69(1) (MS1 p. 21).

The present case *primarily* concerns whether Heavy Transport Finance (Luxembourg) is liable to tax on the dividends in question pursuant to section 2(1)(c) of the Danish Corporation Tax Act. In that regard, the question is whether the taxation should be waived or reduced under the provisions of the Parent-Subsidiary Directive or under the Convention of November 17, 1980 with Luxembourg for the avoidance of double taxation and the establishment of provisions on mutual administrative assistance in respect of taxes on income and capital (the Danish-Luxembourg Double Taxation Convention). If this question is answered in the negative, it must then be decided whether - as claimed by Heavy Transport Holding Denmark - there is a binding administrative practice according to which the dividends are exempt from a tax liability even though neither the Parent-Subsidiary Directive nor the Danish-Luxembourg Double Taxation Convention entails that the tax must be waived or reduced.

If there is a tax liability, the *second* issue is whether Heavy Transport Holding Denmark has demonstrated that the company's failure to withhold dividend tax cannot be imputed to the company as negligent.

As it appears from the decision, the National Tax Tribunal concluded *that* Heavy Transport Finance (Luxembourg) was not liable to pay tax on the dividends, as according to the National Tax Tribunal the taxation should be waived under the Parent-Subsidiary Directive, and *that* Heavy Transport Holding Denmark consequently had not violated a withholding obligation.

Further, questions have been raised before the courts regarding the attribution of default interest on the amount that Heavy Transport Holding Denmark may owe the public authorities.

*3. JUDGMENT OF THE COURT OF JUSTICE IN JOINED CASES C-116/16 AND C-117/16, T DENMARK*

In the present case, no preliminary questions have been referred to the European Court of Justice. However, the case has been stayed pending the Court of Justice's decision on the preliminary rulings in cases C-116/16 and 117/16, which had been referred by the Eastern High Court. The Court ruled on February 26, 2019 judgment in the two cases. With this judgment, the necessary clarification of the EU law issues raised by the present case has been achieved. The Court's answers to the preliminary questions are included in the Ministry of Taxation's argumentation below.

*4. ØSTRE LANDSRET'S JUDGMENTS OF 3. MAY 2021 AND 2. JULY 2021*

*On May 3, 2021, the* Eastern High Court ruled in the two main cases that had given rise to the Court's judgment in the joined

cases C-116/16 and C-117/16, T Danmark, namely case B-1980-12, Skatte- ministiet v NetApp Denmark ApS, and case B-2173-12, Skatte- ministiet v TDC A/S (published as SKM2021.304.ØLR).

**4417**

The cases now pending before the Supreme Court concern, like the present case, whether the companies' parent companies are liable to tax on dividends from the companies pursuant to section 2(1)(c) of the Danish Corporation Tax Act. Furthermore, the case between the Ministry of Taxation and NetApp Denmark ApS, like the present case, concerns whether the company is liable for the failure to withhold dividend tax.

With the judgment, the Eastern High Court has clarified the questions of principle that the present case (also) raises. The High Court has thus established that section 2(1)(c) of the Danish Corporation Tax Act provides a legal basis for denying exemption from withholding tax under a double taxation treaty and the Parent-Subsidiary Directive, partly on the grounds that the companies receiving dividends are not the legal owners of the dividends, and partly that there is abuse.

As regards the question whether the taxation of the dividends should be waived or reduced under a double tax treaty with the state in which the respective parent companies are domiciled, it follows from the premises of the judgment *that* the concept of "beneficial owner" is an autonomous concept that is different from the concept of "beneficial owner of income" and *that* the decisive factor in assessing whether the recipient of a dividend can be considered the beneficial owner of the dividend is whether the recipient has *actually been* able to dispose of the dividend.

Furthermore, the Eastern High Court has ruled that it is not contrary to a binding administrative practice to consider the parent companies liable for tax on the exchanges in question.

Finally, it follows from the premises of the High Court's judgment that the decisive factor for the assessment of whether a distributing company in accordance with section 69(1) of the Withholding Tax Act is liable for a failure to withhold dividend tax is whether the withholding agent must be deemed to have been aware of the facts justifying the tax liability and thus the breached withholding obligation.

By judgment of 2 July 2021 in case B-1980-12, Skatteministeriet v NetApp Denmark ApS, the Eastern High Court ruled in favor of the Ministry of Taxation on the deferred dispute about interest, which is identical to the dispute about interest that also exists in the present case.

As mentioned, the cases are pending before the Supreme Court. The hearing is scheduled for December 5-8 and 12, 2022.

On November 25, 2021, the Eastern High Court ruled in two cases concerning liability for failure to withhold interest tax. The two cases raise questions of principle of the same nature as the cases that have been provisionally decided in the High Court's judgment of 3 May 2021, and in the judgment of 25 November 2021, the High Court has followed the line laid down in the judgment of 3 May 2021. The judgment in two cases on interest tax has been appealed to the Supreme Court, where the main hearing is scheduled for 17-20 April 2023.

*5. THE DECISIVE CIRCUMSTANCES*

Heavy Transport Holding Denmark was founded in 2003. In the same year, the company, together with another non-affiliated company, acquired all shares in a Dutch company, Dockwise Transport

N.V. Heavy Transport Holding Denmark was owned by two Panamanian companies, namely Heavy Transport Group Inc (74.17%) and In- comara Holdings S.A. (25.83%). The Panamanian companies were not affiliated.

On December 22, 2006, an agreement was signed for the transfer of all shares in Dockwise Transport N.V. (ES p. 137). On January 15, 2007, Heavy Transport Holding Denmark received USD 325 million in connection with the sale (ES p. 261).

On January 16, 2007, Heavy Transport Group Inc. and Incomara Holdings S.A. transferred their shares in Heavy Transport Holding Denmark to a jointly owned company in Luxem-

bourg, namely Heavy Transport Finance (Luxembourg), which was empty. According to the agreements, the purchase price amounted to a total of USD 326 million, which the Luxembourg company then owed the Panamanian companies.

On January 22, 2007, a Short Term Loan of USD 325 million was agreed between Heavy Transport Holding Denmark as lender and Heavy Transport Finance (Luxembourg) as borrower. According to the agreement, Heavy Transport Holding Denmark transferred the amount to Heavy Transport Finance (Luxembourg)'s bank on the same day with the indication "interim dividend".

This is stated in the loan agreement:

"Due to the fact that the audited annual accounts of the Lender were not completed on the date January 22, 2007, the Parties recognize this distribution as a short term loan until the general meeting of shareholders of the Lender decides on an ordinary distribution of dividends."

In accordance with the terms of the loan agreement, the amount of USD 325 million was transferred on January 22, 2007 from Heavy Transport Holding Denmark's bank to Heavy Transport Finance (Luxembourg)'s bank with the indication "Interim Dividend", which is also described in Heavy Transport Finance (Luxembourg)'s annual report for 2007.

Two days later, on January 24, 2007, the USD 325 million was transferred to the Panamanian companies, Heavy Transport Group Inc. and Incomara Holdings S.A.

On May 23, 2007, a general meeting in Heavy Transport Holding Denmark resolved to distribute USD 325 million (equivalent to DKK 1,799,298,000) to Heavy Transport Finance (Luxembourg). The dividend was paid in

**4418**

in accordance with article 3 of the loan agreement offset against the Short Term Loan. Heavy Transport Holding Denmark did not withhold dividend withholding tax.

It can be assumed that Heavy Transport Finance (Luxembourg) was contributed between Heavy Transport Holding Denmark and the Panamanian companies with the main purpose of avoiding Danish dividend tax.

*6. THE TAX MINISTRY'S ARGUMENTATION*

*6.1 Heavy Transport Finance (Luxembourg) is taxable on the dividend*

According to section 2(1)(c) of the Danish Corporation Tax Act, companies and associations etc. as mentioned in the Act are liable for tax under the Act

§ Section 1(1), which are domiciled abroad, insofar as they receive dividends covered by section 16 A(1) of the Danish Tax Assessment Act, to which the dividend at issue in the case can be attributed. However, the tax liability does not include dividends received by a company etc. (the parent company) that owns at least 15 pct. of the share capital of the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie, on the "condition" that "the taxation of the dividend shall be waived or reduced under the provisions of the [Parent/Subsidiary Directive] or under a double taxation treaty with the Faroe Islands, Greenland or the state where the company is resident."

Thus, it appears from the wording of the provision that the exemption from tax liability is only applicable if there is an unconditional obligation to waive or reduce taxation under the Parent-Subsidiary Directive or a double taxation treaty between Denmark and the state in which the parent company is resident, which is also cemented in the legislative history of the provision. The legislative power has thus chosen the approach

of letting the Parent-Subsidiary Directive and a possible double taxation treaty govern whether a dividend is subject to a tax liability or not.

Sections 6.1.1.1 and 6.1.2 describe the interpretation of the Danish-Luxembourg Double Taxation Convention and the Parent-Subsidiary Directive, respectively, while section 6.1.3 provides an overall argumentation that the tax authorities have been entitled to refuse to grant the benefits resulting from the Convention and the Directive, respectively, under the circumstances.

### 6.1.1 The abstract interpretation of the Danish-Luxembourg double taxation treaty

According to Article 10(2) of the Danish-Luxembourg Double Taxation Convention, dividends may be taxed in the Contracting State in which the company paying the dividends is resident, but the tax imposed may not exceed specified limits,

"if the recipient is the beneficial owner of the dividend". According to the wording of this provision, Denmark is thus only obliged to reduce the taxation of dividends paid by a Danish company if the recipient is the "beneficial owner" of the dividends.

The term "beneficial owner of the dividends" must be interpreted in accordance with the corresponding term in Article 10 of the OECD Model Tax Convention, as the Danish-Luxembourg Double Taxation Convention was concluded on the basis of the Model Convention.

The fact that the benefit of Article 10(2) of the Model Convention can only be claimed by the beneficial owner of the dividend was introduced as an express condition when the Model Convention was revised in 1977. The condition was introduced to make it clear that the source State is not obliged to waive its right to tax dividend income merely because the income is paid directly to a resident of a State with which the source State has concluded a treaty, cf. the 2003 commentary, paragraph 12 to Article 10 of the Model Convention.

Thus, it also appears from the 1977 commentary, points 7-10 to Article 1 of the Model Convention that the concept of "beneficial owner" is intended to curb abuse in the form of "artful legal constructions", more specifically the "artifice" where a person disposes through a legal association formed in a Contracting State primarily to obtain benefits under the Convention which could not be obtained by the person directly. The term "beneficial owner" is an autonomous concept, i.e. it has an independent content independent of the internal legislation of the contracting states, cf. SKM2012.121.ØLR, Østre Landsret's judgment of

3 May 2021 and most recently the High Court's judgment of 25 November 2021. The term "rightful owner" should therefore not be interpreted in accordance with the term "rightful income recipient", which in Danish tax law is used as a term for the person who must be considered to be taxable on a given income.

With the three judgments, the Eastern High Court has also established that the tax authorities in cases such as the present case have been entitled to - as happened - include the comments to the OECD Model Tax Convention from 2003 when determining what is to be understood by the term "beneficial owner". The later comments from 2014 and 2017 must similarly be considered to constitute relevant interpretative contributions, as these comments - like the 2003 comments - do not imply a changed understanding of Article 10(2) of the Model Law, but are merely clarifications.

From the 2003 Commentary, section 12.1 to Article 10(2) of the Model Convention, it follows that it would not be in accordance with the intent and purpose of the Convention if the source state were to grant relief or exemption from tax "in cases where a person,

**4419**

resident in a Contracting State, other than as an agent or

intermediary, is merely acting as a 'flow-through'.

conduit for another person who actually receives the income in question." Thus, a "conduit company" will not be considered the beneficial owner "if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a 'nullity' or administrator acting on behalf of other parties."

In the 2014 Commentary, section 12.4, which has been continued in the 2017 Commentary, it is clarified that the immediate recipient of the proceeds may be denied the benefit of the agreement resulting from Article 10(2) of the Model Agreement if the facts clearly show that the recipient
- without being bound by a contractual or legal obligation to pass on the payments received to another person
"substantially"/in fact" do not have the rights to use and enjoy the proceeds received.

It also follows from the premises of the Eastern High Court's judgment of May 3, 2021 that the recipient of a dividend cannot be considered the legal owner of the dividend if the recipient has not had a "real right of disposal" over it. In the premises for the judgment of November 25, 2021, the High Court has similarly established that a recipient of interest cannot be considered the legal owner of the interest if the recipient has not had a "real right of disposal" over the interest.

*6.1.2 The abstract interpretation of the Parent-Subsidiary Directive*

*6.1.2.1* According to Article 1(2) of the Parent-Subsidiary Directive, *the* Directive does not prevent the application of internal provisions or agreements necessary to prevent fraud and abuse. It is the view of the Ministry of Taxation that a national provision such as section 2(1)(c) of the Corporation Tax Act is precisely such a domestic provision within the meaning of Article 1(2) of the Directive, according to which an advantage under the Directive may be refused if the advantage is sought to be obtained by fraud or abuse (ES p. 104-105), but the resolution of the case does not require a ruling on this contentious issue. From the judgment of the Court of Justice of 26. February 2019 in the joined cases C-116/16 and C-117/16, T Denmark, it appears that, in response to the Østre Landsret's first question for a preliminary ruling, the Court of Justice has stated that the general principle of EU law, according to which citizens must not be able to rely on EU law provisions in order to enable fraud or abuse, must be interpreted as follows, that, in the event of fraud or abuse, the national authorities and courts *must* refuse to grant a taxpayer the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of the Parent-Subsidiary Directive, *even in the* absence of national or treaty provisions providing for such a refusal, cf. In this regard, see paragraph 95 of the judgment and paragraphs 75-94, on which the answer is based. It is not a question of the Court of Justice having created a (new) legal position with the answer to the High Court's first preliminary question that did not apply prior to the judgment, or of the Court of Justice having changed its previous practice as expressed in, inter alia, case C-321/05, Kofoed, see paragraphs 84-90 of the judgment. With the judgment, the Court - within the framework of the jurisdiction conferred on it by Article 267 TFEU - has merely clarified the meaning and scope of the principle of prohibition of abuse of rights, in so far as that principle must be applied to cases such as the present one.

Furthermore, it is not the case that the Court of Justice, with its judgment, has established an interpretation of the Parent-Subsidiary Directive which means that the Directive - in itself - creates *obligations* for citizens, which would have been incompatible with the principle of legal certainty. Thus, in cases

where there is an abuse of law and the citizen is *denied a benefit* under EU law for this reason, it is not a question of imposing an obligation on the citizen

under EU law. Instead, the objective conditions for obtaining an advantage under EU law are not fulfilled because the advantage is sought to be obtained by abuse of rights (paragraph 90 of the judgment).

Thus, it also follows from the Court's judgment that the EU law principle of legal certainty does not prevent denying the benefit of the Parent-Subsidiary Directive in the form of exemption from withholding tax when there is an abuse of rights, which is also expressly stated in the Court's judgment in case C-251/16, Cussens, paragraph 43. In the cases decided by the Eastern High Court with the judgment of May 3, 2021, the defendant companies also invoked - in vain - the principle of legal certainty. Finally, it is not contrary to the Act on Denmark's Accession to the European Union to deny the benefits of the Parent-Subsidiary Directive with reference to the general EU law principle of prohibition of abuse of rights. The present situation is thus not similar to the situation that gave rise to the Supreme Court's judgment in U.2017.824H, Ajos.

The grounds for the Supreme Court's judgment in the Ajos case show that it was decisive for the outcome of the case that there was, in the words of the Supreme Court, a "contra legem situation", i.e. a situation where it is not possible to interpret a national rule in accordance with the directive within the framework of the interpretation methods recognized in national law. Such a situation does not exist in the present case, where the Parent-Subsidiary Directive has been transposed

**4420**

by a simple reference to the Directive. The wording of section 2(1)(c) of the Danish Corporation Tax Act thus implies that dividends are subject to tax unless "the taxation of the dividends shall be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States". Thus, as also emphasized above, the legislator has chosen the approach of letting the Parent-Subsidiary Directive (and any double taxation treaty) govern whether a dividend is subject to a tax liability or not. As a result, it is a narrow matter to apply an interpretation of section 2(1)(c) of the Danish Corporation Tax Act that is in accordance with the Parent-Subsidiary Directive and the general principle of prohibition of abuse of rights, as the Directive and the principle must be interpreted according to the Court's judgment in the joined cases C-116/16 and C-117/16, T Denmark.

Against this background, section 2(1)(1) of the Danish Corporation Tax Act

c) - in accordance with what the Eastern High Court has also stated in its judgment of May 3, 2021 - be interpreted to mean that the exemption from taxation of dividends that otherwise follows from the Parent-Subsidiary Directive must be denied if the exemption in the given case is sought to be obtained by abuse of law, which depends on a specific assessment of the given circumstances.

*6.1.2.2 The Court's comments on the assessment of abuse*

According to the judgment of the Court of Justice in Joined Cases C-116/16 and C-117/16 T Denmark, in order to prove abuse, there must be, *first,* a coincidence of objective circumstances showing that the objective pursued by the EU legislation h a s  not been achieved even though the conditions laid down in that legislation have been formally complied with and, *second,* a subjective element consisting in an intention to benefit from the EU legislation by artificially creating the conditions necessary to obtain that benefit (paragraph 97 of the judgment). In the judgment, the Court set out the detailed principles for such an examination and listed and described -

non-exhaustively - the evidence that the benefit of the Parent-Subsidiary Directive in the form of exemption from taxation of dividends in a given case is sought to be obtained by abuse.

According to the Court, in cases such as the present one, a group must be regarded as an artificial arrangement *where* it is not established for reasons which reflect economic reality, *where* it has a

structure that is purely formal and *when* it has as its main purpose or as one of its main purposes to obtain a tax advantage that defeats the object and purpose of the applicable tax legislation. That applies in particular where the payment of withholding tax is avoided by introducing into the group structure a flow-through entity between the company transferring the dividends and the company which is the beneficial owner of the dividends (paragraph 100).

According to the Court, the fact that a dividend is redistributed in its entirety or substantially in its entirety very shortly after receipt by the company which received it to entities which do not satisfy the conditions for the application of the Parent-Subsidiary Directive is thus evidence of an arrangement intended to take undue advantage of the exemption from taxation resulting from the Directive (paragraph 101 of the judgment).

According to the Court's judgment, the artificial nature of an arrangement can also be supported by the fact that the group in question is structured in such a way that the company receiving the dividend must itself redistribute that dividend to a third company which does not meet the conditions for application of the Parent-Subsidiary Directive, with the result that the company only receives negligible taxable income when it acts as a conduit company to enable the flow of funds from the subsidiary to the entity which is the 'beneficial owner' of the amounts transferred (paragraph 103 of the judgment).

A company can be considered a flow-through company if the company's only activity is to receive the dividend and redistribute it to the beneficial owner or to other flow-through companies, see paragraph 104 of the judgment. The (lack of) actual economic activity must be assessed on the basis of all relevant elements concerning, inter alia, the operation of the company, its accounts, the structure of the company's costs and the expenses actually incurred, the staff employed by the company and the premises and equipment at its disposal.

Evidence of the existence of an artificial arrangement in a given case may also be found (1) in the existence of different contracts between the companies involved in the financial transactions in question which give rise to intra-group flows of funds, (2) in the method of financing the transactions, (3) in the assessment of the equity of the intermediate companies and (4) in the lack of power of the flow-through companies to dispose financially of the dividends received. In this context, it is not only a contractual or legal obligation for the company receiving the dividend to distribute it to a third party that may constitute such an indication. There is also a basis for abuse if, after an assessment of the facts of the case, the company has not "substantially" had the rights to use and enjoy the proceeds (paragraph 105). Circumstances such as those mentioned above can be considered corroborated if there is a coincidence or a close temporal connection between, on the one hand

**4421**

the entry into force of new tax legislation, such as section 2(1)(c) of the Corporation Tax Act, and, on the other hand, the implementation of complex financial transactions and the granting of loans within the same group (paragraph 106). Such a coincidence or close temporal connection, on the other hand, is not a necessary condition for establishing an abuse, but may corroborate other indications of the existence of an abuse.

Finally, it is irrelevant for the determination of whether there is an abuse of rights whether Denmark has concluded a double taxation treaty with the state where the beneficial owner of the dividends is resident, under which no tax would have been withheld

withholding tax on the dividend if it had been paid directly to the beneficial owner (paragraphs 107 ff).

*6.1.3 The benefits of both the Danish-Luxembourg double tax treaty and the Parent-Subsidiary Directive have rightly been rejected*

For the determination of the case, (A) the contribution of the Luxembourg company, Heavy Transport Finance (Luxembourg), between Heavy Transport Holding Denmark on the one hand and the Panamanian companies, Heavy Transport Group Inc. and Incomara Holdings S.A. on the other hand, (B) the simultaneous establishment of the debt relationship between the Luxembourg company and the Panamanian companies in the amount of USD 326 million, (C) the immediately subsequent transfer of USD 325 million by the Danish company to the Luxembourg company. USD to the Luxembourg company as a "Short Term Loan"/"Interim dividend", (D) the Luxembourg company's onward transfer of this amount to the Panamanian companies and (E) the Danish company's distribution of dividends of USD 325 million, which was offset against the granted Short Term Loan to the Luxembourg company, are considered as one single and pre-arranged arrangement.

The arrangement meant that the Panamanian companies - apart from the issue of the "beneficial owner" of the dividend and abuse of rights - could receive the amount of USD 325 million tax-free, which would not have been possible without the arrangement, as Heavy Transport Holding Denmark would have had to withhold dividend tax on a distribution directly to the Panamanian companies, as these companies, unlike the Luxembourg company, could neither have claimed the benefits of the Parent-Subsidiary Directive nor of a double tax treaty.

As the arrangement stood, Heavy Transport Finance (Luxembourg) had no real power to dispose of the dividend of USD 325 million in question, which, after its adoption at the general meeting - in accordance with the agreement - was set off against the Short Term Loan/Interim Dividend of USD 325 million that it had already received from Heavy Transport Holding Denmark and passed on to the companies in Panama. The Luxembourg company thus functioned merely as a flow-through entity, which is consistent with Heavy Transport Holding Denmark's admission that the Luxembourg company was incorporated with the main purpose of avoiding Danish dividend tax.

Based on the above, Heavy Transport Finance (Luxembourg) cannot be considered to be the legal owner of the dividend within the meaning of Article 10(2) of the Danish-Luxembourg Double Taxation Convention. Thus, the treaty does not entail any obligation for Denmark to reduce the taxation of the dividend and therefore does not lead to the dividend being exempt from a tax liability under section 2(1)(c) of the Danish Corporation Tax Act.

Since Heavy Transport Finance has been incorporated as a flow-through entity for the proceeds, it also follows from the Court's instructions for the assessment of abuse that the arrangement must be regarded as an artificial arrangement established for the main purpose of obtaining an undue advantage. Since there is thus an abuse of rights, invoking the benefits of the Parent-Subsidiary Directive is excluded. Therefore, the Directive does not lead to the dividend being exempt from tax liability under section 2(1)(c) of the Danish Corporation Tax Act.

The fact that, under the rules applicable until July 1, 2007, liquidation proceeds could be distributed tax-free to a foreign parent company is irrelevant to the finding that, in the actual situation, this is an artificial arrangement which lacks any economic and commercial justification and which has been implemented with the main purpose of taking undue advantage of the exemption from withholding tax provided for in Article 5 of the Parent-Subsidiary

Article 10(2) of the Luxembourg Double Taxation Convention is laid down with regard to the taxation of dividends by the source State (Denmark). The finding of such an abuse of rights is not affected by whether the taxpayer - if a fundamentally different restructuring had been carried out than the one actually carried out

- could have obtained a tax benefit under the other rules that would have applied in the counterfactual situation.

There is no basis in the case-law for a contrary position. Heavy Transport Holding Denmark's reliance on paragraph 110 of the judgment of the Court of Justice in Joined Cases C-116/16 and C-117/16 T Danmark is therefore untenable.

The premise forms part of the answer to the question referred to in paragraph 107. That question refers to the situation in which the facts of the case make it possible to establish that the beneficial owner of the dividends in question is a company of a third State, with

**4422**

which the source state has concluded a double tax treaty according to which no withholding tax would have been withheld on dividends if they had been distributed directly to the company resident in that third state.

Paragraphs 108-110 of the judgment state that such circumstances cannot call into question the existence of an abuse of rights where it is established that an arrangement devoid of any economic and commercial justification has been put in place with the principal aim of taking unfair advantage of the parent company.

/However, it cannot be "excluded" that the objective of a group structure is not an abuse of law if there is a situation where the dividend would be exempt from withholding tax if it had been distributed directly to the company with its registered office in a third State.

In the present case, there is - undisputedly - no question of the beneficial owner of the dividends in question being a company in a third country with which Denmark has concluded a double taxation agreement. The Court's answer to the question referred to in paragraph 107 is therefore irrelevant to the resolution of the present case. For the same reason, the present case also differs from the situation in the NetApp case, where the Eastern High Court, as far as one of the dividends was concerned, found that there was no abuse of the Parent-Subsidiary Directive and the Danish-Cypriot Double Taxation Convention, as, according to the High Court, the facts of the case provided evidence to establish with certainty that the legal owner of the dividends was a company in the US, with which Denmark has concluded a double taxation treaty that could be invoked as a basis for a tax reduction.

Thus, neither in the Court of Justice's judgment in the joined cases C-116/16 and C-117/16, T Denmark, nor in the judgment of the Eastern High Court in the NetApp case does Heavy Transport Holding Denmark support that the finding of abuse of rights should be affected by whether the taxpayer - if a fundamentally different restructuring had been carried out than the one actually carried out - could have obtained a tax advantage under the other rules that would have been applicable. Heavy Transport Holding Denmark's statement that the group, if it had had "the slightest idea that the dividend model indicated by KPMG would result in a Danish withholding tax of approximately half a billion Danish kroner", would have dropped the actually implemented arrangement and instead carried out an "accelerated liquidation under section 59 of the Danish Companies Act", is disputed as being a postulate.

There is no evidence to suggest that Heavy Transport Holding Denmark's Panamanian owners, particularly in the circumstances, in order to expedite a liquidation before July 1, 2007, would have provided for the payment of all due and unpaid debts *and*

assumed joint and several and unlimited liability for all the company's debts, whether due, undue or disputed, cf. section 59(1) and (3) of the Danish Limited Liability Companies Act (current version). The postulate is a free ride, and it speaks for itself that a liquidation according to section 59 (current) of the Danish Limited Liability Companies Act, which is now presented as a completely easy and burden-free procedure, was not actually implemented.

However, it is not necessary, in order to decide the case, to assess the credibility of Heavy Transport Holding Denmark's postulate. The argument that a restructuring other than that actually carried out could have resulted in a tax advantage under rules other than those applicable to the situation actually in question cannot raise any doubt as to the existence of an abuse of rights where there is evidence to show that the arrangement implemented in the real world, lacked any economic and commercial justification and had as its main purpose to take undue advantage of the Parent-Subsidiary Directive and a double taxation treaty, as is the case in the present case, where it is recognized that the main purpose of the arrangement was to avoid Danish taxation of dividends. The fact that the dividend in question must thus be considered taxable pursuant to section 2(1)(c) of the Danish Corporation Tax Act because the tax is neither waived nor reduced under the Parent-Subsidiary Directive or a double taxation treaty does not mean that a "dummy fine" is imposed. It is merely a question of subjecting the dividend to the taxation which - under the actual circumstances - follows from the law.

When Heavy Transport Holding Denmark challenges the taxation that follows from the Act in the circumstances of the case with reference to the fact that the group would have disposed differently if it had had "the slightest idea that the dividend model shown by KPMG would result in a Danish withholding tax of approximately half a billion Danish kroner", it is essentially a question of the company being treated as if permission had been granted under section 29 of the Danish Tax Administration Act to reverse a private-law transaction. However, such permission is excluded for many reasons, among other things, because a permission under subsection (1), no. 1 of the provision is conditional on the changed transaction not being predominantly motivated by a desire to save or defer tax, which - if anything - in cases of abuse of rights, see e.g. U.2016.767H.

*6.2 The tax liability is not contrary to a binding, established administrative practice*

In determining whether a tax liability in respect of the dividends in question would be contrary to a binding treaty,

**4423**

established administrative practice, it must - as the High Court would otherwise have no reason to decide the question - be assumed *that* the taxation must not be waived under Article 5(1) of the Parent-Subsidiary Directive because there is abuse, and *that* the taxation of the dividend must not be reduced under Article 10(2) of the Danish-Luxembourg Double Taxation Convention because Heavy Transport Finance (Luxembourg) cannot be considered the rightful owner of the dividend.

In other words, it is therefore the case that Heavy Transport Holding Denmark with its practical viewpoint claims that the dividend in question must be considered exempt from tax liability, even though the express condition for the dividend to be exempt from tax liability in section 2(1)(c) of the Danish Corporation Tax Act is not met. Neither a principle of equality under administrative law nor a principle of expectation can justify a claim for a legal position that is contrary to the express

wording of the Act.

In addition, SKAT's decision of December 7, 2010 does not represent a tightening of practice, as it did not change any established administrative practice.

It is incumbent on Heavy Transport Holding Denmark to provide evidence of the existence of the alleged practice which, according to the company, the decision should deviate from, cf. e.g. U.2011.3305H, but the company has not met this burden of proof.

The company's argumentation for a practice tightening, including the company's invocation and interpretation of a number of ministerial responses, is identical to the argumentation that Net- App Denmark ApS unsuccessfully put forward in the case, which was decided by the Eastern High Court's judgment of 3 May 2021. The Eastern High Court has thus already established that Heavy Transport Holding Denmark's argumentation is untenable.

Against the above background, it must similarly be established that SKAT's decision in this case did not change any binding, established administrative practice that Heavy Transport Holding Denmark can rely on.

*6.3 Heavy Transport Holding Denmark is responsible for the non-compliance*

As the dividend in question is subject to tax, cf. section 2(1)(c) of the Danish Corporation Tax Act, Heavy Transport Holding Denmark should have withheld dividend tax in connection with its decision to pay the dividend, cf. section 65(1) of the Danish Withholding Tax Act.

Section 69(1) of the Withholding Tax Act states that a person who fails to fulfill his obligation to withhold tax or who withholds too little tax is directly liable to the public authorities for payment of the missing amount unless he proves that he has not been negligent in complying with the provisions of the Withholding Tax Act. According to the law, there is thus a presumption of liability.

In determining whether Heavy Transport Holding Denmark has rebutted the statutory presumption of negligence, it must - as the High Court would otherwise have no reason to consider the issue - it is assumed that there has been no binding, fixed administrative practice according to which the dividend in question must be deemed to be exempt from the tax liability that otherwise follows from section 2(1)(c) of the Danish Corporation Tax Act. For this reason alone, it is untenable for Heavy Transport Holding Denmark to claim that there was an administrative practice which gave the company reason to assume that the distribution could be made without withholding tax on dividends.

In addition, when the general meeting of Heavy Trans- port Holding Denmark decided to pay the dividend in question, which took place on May 23, 2007, the Minister for Taxation had given several answers stating that a parent company would *not be* able to invoke the benefits of a double tax treaty if it was a "pure flow-through holding company", a "pure flow-through company" or a "conduit" company, cf. 1) Appendix 9 to bill no. 116 of December 14, 2005, 2) the Minister of Taxation's answer to committee questions 2-10 after the presentation of bill no. 30 of October 4, 2006 and 3) the Minister of Taxation's answer to question S 474. In the latter two answers, reference is even made to paragraph 12.1 of the comments to Article 10 (on dividends) of the OECD Model Tax Convention, and in the latter answer it is even stated in the answer itself that "conduit" companies include companies that "has very narrow powers in relation to the income in question".

For the assessment of whether Heavy Transport Holding

Denmark has shown negligence, i.e. negligent conduct, with regard to the failure to comply with the withholding obligation, it is irrelevant that prior to the decision to distribute the

dividend was sought advice from KPMG, cf. U.2018.3845H. A withholding agent cannot make itself immune from liability under section 69(1) of the Withholding Tax Act by obtaining advice from a lawyer or accountant.

It is also disputed as undocumented that KMPG had given unreserved advice that the distribution in question, which was decided by the general meeting on May 23, 2007, could be completed without withholding tax. The e-mail correspondence from August 2006, which is invoked by Heavy Transport Holding Denmark as evidence of the unreserved advice, is not accompanied by a statement from KPMG to the effect *that* the e-mail correspondence constitutes the full advice which KPMG provided to the group regarding the arrangement in question with the incorporation of a Luxembourg company between Heavy Transport Holding Denmark and its Panamanian owners and *that* the Heerema group

**4424**

could continue to rely on the advice when the decision to distribute was made on May 23, 2007.

In order to determine whether Heavy Transport Holding Denmark is liable for the failure to withhold dividend tax, the only decisive factor is that the company was undisputedly aware of the facts which lead to, *firstly,* that Heavy Transport Finance (Luxembourg) cannot be considered to have been the legal owner of the dividend within the meaning of the Danish-Luxembourg double taxation treaty, and *secondly,* that the advantage in the form of the exemption from withholding tax resulting from the Parent-Subsidiary Directive must be denied because EU law cannot be invoked to enable abuse of rights. Under these circumstances, the company is liable for the failure to withhold, cf. the premises of the Eastern High Court's judgment of May 3, 2021 and the High Court's judgment of November 25, 2021.

*6.4 Interest on arrears*

If a company has paid too little in taxes and duties etc., the company will be required to pay the amount due within 14 days of the demand for payment, cf. section 5(1) of the Collection Act.

SKAT's decision of December 7, 2010 that Heavy Transport Holding Denmark was liable for payment of withholding tax not withheld constitutes a demand for payment within the meaning of section 5(1) of the Danish Collection Act. Heavy Transport Holding Denmark was therefore required to pay an amount corresponding to the withholding tax not withheld on the dividend no later than December 21, 2010. The company did not pay the amount, which must therefore bear interest from December 21, 2010, cf. section 7(1) of the Collection Act. In this context, it is irrelevant that SKAT's decision was changed by the National Tax Tribunal, cf. the Eastern High Court's judgment of July 2, 2021 mentioned above.

Contrary to what Heavy Transport Holding claims, there has been no cut-off of the interest imputation. The company's objection that "the tax administration as a public authority has in any event been unjustified in refusing to receive the withholding tax amount and that the Ministry of Taxation must therefore indemnify the defendant for this" is without factual basis, as the company has not offered the tax administration to pay an amount corresponding to the dividend tax not withheld.

In addition, a cut-off of interest accrual only occurs if the interest-bearing claim is paid without reservation for recovery, cf. the Eastern High Court's judgment of July 2, 2021.

Against this background, judgment should be given in accordance with the (independent) claim of the Ministry of Taxation, including the part of the claim relating to interest.

Finally, the High Court should uphold the Ministry's claim for acquittal against Heavy Transport Holding Denmark's more subsidiary claim.

The rules on a single tax account in Chapter 5 of the Collection Act were introduced with Act no. 513 of June 7, 2006 and basically mean that payments from and to companies etc. regarding most taxes and duties etc. are included in a single balance statement (the tax account), so that payments are automatically offset according to a balance principle, cf. sections 16 and 16a, paragraph 1 of the Collection Act.

If the total sum of registered overdue claims on the company's account exceeds the total sum of registered and overdue receivables to the company, the difference (the debit balance) constitutes the total amount that the company owes the customs and tax administration, cf. section 16 a, subsection 2, section 1 of the Collection Act. Such a debit balance shall bear interest in accordance with section 16c(1), from which it follows that a debit balance bears interest at the rate stipulated in section 7(1), cf. (2), and that the interest is calculated daily and added monthly. If such a debit balance exceeds DKK 5,000, the amount must be paid immediately, cf.

§ Section 16c(4).

If the total sum of registered and due claims for payments from the company is less than the registered and due claims for payments to the company, the difference (the credit balance) constitutes the company's total receivable from the customs and tax administration, see section 16a(2), second sentence. Such a credit balance that does not bear interest, see section 16c(3), must be paid to the company's NemKonto according to the rules in section 16c(5).

The wording of section 16a of the Tax Collection Act makes a distinction between when claims are *registered* in the tax account and from which point in time such claims *affect (are debited)* the balance statement. It follows from section 16a(3) of the Tax Collection Act that claims for payments from companies are *registered* on the tax account from the time when this is stated or when the claim can be calculated with certainty. It also follows from section 16a(4) of the Collection Act that claims for payments from businesses *affect (are debited)* the balance statement under subsection 2 from the latest timely payment date.

It follows from the wording of the provisions that a claim is *registered* in the tax account when a declaration has been made or when the claim can be determined with certainty, cf. paragraph 3, but that the claim *affects (is debited)* the balance statement at the time of the last timely payment date, cf. paragraph 4.

The decisive time for the impact (debiting) of the balance statement - and thus for interest according to section 16c(1) - is thus the latest timely payment date for the given amount, and therefore Heavy Transport Holding Denmark's position, which forms the basis for the company's more alternative claim, is not sustainable, which has been established by the Eastern High Court's judgment of July 2, 2021."

**4425**

*Heavy Transport Holding Denmark ApS* has essentially proceeded in accordance with the pleas set out in the company's summary pleading of February 23, 2022, which states (references to extracts and materials omitted):

"*5. DETAILS OF THE FACTS*

5.1 *Heerema Group and the transactions made*

The Heerema Group is a Dutch shipping and contracting company primarily engaged in the development, construction, transportation, installation and de-installation of offshore structures for the energy industry.

The ultimate owner of the group is shipowner I, who lives in the Netherlands.

In 2003, the Heerema Group and the Norwegian shipping company, Wilh. Wilhelmsen decided to join forces in a joint venture to buy the shares of the Dutch shipping company Dockwise, which was also active in the offshore construction industry.

Heerema Group would participate in the joint venture with an ownership share of 54.5%.

Heerema's shareholding was to be held by the group's company in Panama, Heavy Transport Group Inc. together with a business partner (through the company Incomare Holdings S.A., Panama), and the parties chose to make the acquisition of the 54.5% through a newly established Danish holding company, Heavy Transport Danmark, i.e. the defendant company in this case. Heavy Transport Group Inc. owned 74.17

% of Heavy Transport Danmark, while Incomare Holding S.A. owned the remaining 25.83 %.

The activity in Heavy Transport Danmark consisted solely of being a holding company for Dockwise.

By agreement dated December 22, 2006 (E 137), the shareholders, including Heavy Transport Danmark, sold the shares in Dockwise to an independent third party - the equity fund 3i - for a total purchase price of USD 703,600,000.

The deal was completed on January 12, 2007 with the payment of the purchase price - less an escrow amount of USD 100 million - to the shareholders (of which Heavy Transport Denmark's share amounted to USD 325 million).

Heavy Transport Danmark was then without activity and thus ready for liquidation.

If the company had been liquidated (before July 1, 2007) - e.g. by a declaration of payment under section 59 of the Danish Limited Liability Companies Act - the liquidation proceeds could have been paid to the shareholders in Panama, Heavy Transport Group Inc. and Incomare Holdings S.A., without deduction of Danish withholding tax under section 16 A of the Danish Tax Assessment Act.

However, after obtaining unreserved advice from the accounting firm KPMG, the shareholders chose an alternative solution of establishing an intermediate holding company in Luxembourg and distributing dividends.

On January 16, 2007, the two shareholders, Heavy Transport Group Inc. and Incomare Holdings S.A., transferred the shares in Heavy Transport Danmark to a newly incorporated company in Luxembourg, Heavy Transport Luxembourg, for USD 326 million against issuance of a promissory note. After the transfer, Heavy Transport Danmark lent USD 325 million to Heavy Transport Luxembourg - now its parent company - on demand terms. Heavy Transport Luxembourg used the loan proceeds to pay the debt to the two shareholders regarding the acquisition of the shares in Heavy Transport Danmark.

At a general meeting in Heavy Transport Danmark on May 23, 2007, it was decided to distribute a dividend of DKK 1,799,298,000 (corresponding to approximately USD 325 million) to the parent company, Heavy Transport Luxembourg.

The dividend distribution was used by Heavy Transport Luxembourg to settle the company's debt to Heavy Transport Denmark. As Heavy Transport Danmark, according to the unreserved advice obtained from KPMG, see below, was of the opinion that the dividend was exempt from withholding tax as a parent company dividend, no withholding tax was deducted.

*5.2 KPMG's advice*

Around the summer of 2006, it became clear to the Heerema Group that the shares in Dockwise were to be sold, so the Group sought tax advice from KPMG in Luxembourg and Denmark on the issue of taxation of the sale proceeds, including payment to Heavy Transport Denmark's two shareholders in Panama.

An e-mail correspondence between A from the Heerema Group and various KPMG tax advisors has been submitted as an annex to the case.

It appears from this that on June 8, 2006, A asks about the consequences of a liquidation of the Danish company and the distribution of liquidation proceeds to the shareholders in Panama, which B from KPMG

confirms will be tax-free (provided that you do not distribute the proceeds before the liquidation is approved).

Later - on June 30, 2006 - A ("to avoid a lengthy waiting period") asks for a sale of the shares in the Danish company to Heavy Transport Luxembourg - and a transfer of the sale proceeds to the two shareholders in Panama. In this connection, KPMG, Luxembourg, proposed the dividend model described in the previous paragraph, and KPMG, Luxembourg, wanted KPMG Denmark's confirmation of what B had already stated orally, namely that there were no negative tax consequences in the form of Danish withholding tax ("no abuse of law etc."). H, KPMG

Denmark, then confirmed that the dividend would be tax-free as long as Heavy Transport Luxembourg was a company covered by the Parent-Subsidiary Directive and that the company maintained an ownership period of at least 12 months in relation to Heavy Transport Luxembourg.

**4426**

Denmark. There were no other reservations, such as "rightful owner" or misuse.

KPMG thus confirms without reservation that no Danish withholding tax will be triggered in connection with the intended dividend from Heavy Transport Danmark to Heavy Transport Luxembourg and this company's onward payment of the funds to the two Panama companies. After SKAT had raised the withholding tax claim against Heavy Transport Danmark in 2010, the Heerema Group informed KPMG that the Group intended to hold KPMG liable for the loss that the Group might suffer if the withholding tax case was lost, see E

281. In this connection, an agreement on suspension of the limitation period was entered into between the parties (E 283). Subsequently - in July 2018 - KPMG terminated the suspension agreement. As any claim for damages against KPMG was deemed to be time-barred, the Heerema Group has not subsequently pursued the claim against KPMG.

...

*PART III HEAVY TRANSPORT DANMARK'S SUBMISSIONS*
*8 SEL § 2(1)(C) DOES NOT LEAD TO LIMITED TAX LIABILITY OF THE PROCEEDS*

It appears from SEL § 2(1)(c) (MS 13) that the limited tax liability *does not apply to* dividends received by a parent company holding at least 15% (2007) of the share capital in a subsidiary for a continuous period of at least 1 year, within which period the dividend distribution date must fall. These conditions, which correspond to the conditions that must be met for a Danish parent company to receive tax-free dividends, are - undisputedly - met in this case.

In addition, it is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of a *double taxation treaty or the Parent-Subsidiary Directive* (90/435/EEC). If only the taxation of dividends is to be reduced in accordance with *one of these legal provisions*, there is thus *no* limited tax liability to Denmark for the foreign dividend recipient.

This case is therefore primarily about whether this condition is met.

Heavy Transport Denmark claims that the taxation of dividends must be waived or reduced under both the DBO between Denmark and Luxembourg *and* the Parent-Subsidiary Directive, which is why Heavy Transport Luxembourg is not subject to limited tax liability to Denmark on the dividends in question. For this reason, there is no basis for levying withholding tax.

Section 9 below deals with the question of Denmark's

obligation to reduce taxation of dividends under the Danish-Luxembourg DBO, while the question of waiver under the Parent-Subsidiary Directive - the question that has been subject to

preliminary reference to the CJEU - is discussed below in section 10.

### 9 CLAIM FOR A REDUCTION ACCORDING TO THE DANISH LUXEMBOURG DBO - HEAVY TRANSPORT LUXEMBOURG IS THE "RIGHTFUL OWNER" OF THE PROCEEDS

#### 9.1 General about the DBO

It follows from Article 10 of the current *Danish-Luxembourg Income Tax Convention of November 17, 1980* (MS 407) that the source state - in this case Denmark - has the right to tax dividends, but that a reduction (to 5 or 15 %) must be made if the recipient of the dividend is the "*beneficial* owner" of the dividend.

It is claimed that Heavy Transport Luxembourg is the "legal owner" of the dividend in question and that Heavy Transport Luxembourg is therefore entitled to a reduction under Article 10 of the Danish-Luxembourg DBO. Since a reduction must be made, there is no limited tax liability to Denmark, cf. SEL section 2(1)(c).

Article 10 of the Danish-Luxembourg DBO corresponds in principle to Article 10 of the 1977 OECD Model Convention. ... "Legal owner" is a translation of "*beneficial owner*".

The term "beneficial owner" is neither defined in the Danish-Luxembourg DBO nor in the Model Agreement, and the main issue in this complex of cases concerns the interpretation of this term.

In the OECD's comments to the 1977 Model Agreement, point 12 - which were the comments applicable at the time of the conclusion of the DBO between Denmark and Luxembourg in 1980 - it is stated about the concept:

"Subject to paragraph 2, the limitation on the taxing rights of the source State shall not apply where an intermediary, such as an *agent* or *nominee*, is interposed between the beneficiary and the payer, unless the beneficial owner is a resident of the other Contracting State. States wishing to express this more clearly are free to do so during bilateral negotiations." (Our emphasis).

As Heavy Transport Luxembourg is neither an "agent" nor an "nominee" for the company's two shareholders, Heavy Transport Group Inc. or Incomare Holdings S.A., it is clear from the 1977 comments that Heavy Transport Luxembourg is the "beneficial owner" under the DBO.

In 2003, the OECD expanded the comments to include so-called *flow-through devices*.

The comments were thus supplemented with the following in section 12.1, among other things:

"It would also be inconsistent with the intent and purpose of the Agreement for the source State to grant relief or exemption from

**4427**

tax in cases where a resident of a Contracting State acts, other than as agent or intermediary, merely as a *conduit* for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a "conduit company" cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "*nullity*" or *administrator* acting on behalf of other parties." (Our emphasis). The tax authorities' interpretation of "beneficial owner" in the case at hand is based on these extended comments, which has been accepted by the National Tax Tribunal in the order appealed.

In the present case, the Ministry also bases its interpretation on later comments on Article 10, namely those issued in 2014, i.e. 7 years after the dividend distribution in this case.

#### 9.2 "*Rightful owner*" *must be interpreted in accordance with Danish domestic law*

It is argued that the term "beneficial owner" must be interpreted in accordance with *Danish domestic tax law*.

In Danish law, it will be the court-created principle of "right income recipient" that applies, as the Minister of Taxation has repeatedly confirmed...

It can be established without further ado that Heavy Transport Luxembourg is the "rightful income recipient" of the dividends in question under Danish law. This is in accordance with what the Ministry of Taxation also generally recognizes in this complex of cases, see e.g. paragraph 25 and paragraph 59 of the referral order for NetApp. This is also what the National Tax Tribunal has assumed. For this reason alone, Heavy Transport Luxembourg is also the "rightful owner" of the dividend in question.

When the Minister of Taxation has explained to the Danish Parliament prior to the adoption of SEL that the tax exemption is dependent on Heavy Transport Luxembourg being the "rightful income recipient", this is binding for the interpretation of SEL, regardless of what the correct interpretation of the DBO is. However, it also follows from the DBO that the concept of "beneficial owner" must be interpreted as defined by Danish law "rightful owner" - and here, as mentioned, the equivalence between "rightful owner" and "rightful recipient of income" has undoubtedly been made. Article 3(2) of Denmark's DBO with Luxembourg - and the corresponding provision in the 1977 model agreement - contains the following rule of interpretation:

"2. In the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies."

"Beneficial owner" is not defined in the agreement. The term must therefore be interpreted in accordance with Danish domestic law,

"unless the context requires otherwise".

It is argued that nothing else follows from the context and that the concept must therefore be interpreted in accordance with domestic Danish law, i.e. in accordance with the principle and case law on "rightful income recipient".

This result is in accordance with the interpretation adopted by the Danish tax authorities - prior to the start of the beneficial owner cases - ...

Heavy Transport Danmark has of course noted that the Eastern High Court in its judgment of May 3, 2021 in the NetApp case has noted that "*the fact that the terms "rightful owner" and "rightful income recipient" are not used linguistically rigorously in the preparatory works ... cannot lead to a different result*".

Heavy Transport Denmark does not agree with this.

In Festskrift til Ole Bjørn, Aage Michelsen expresses the following general opinion:

"Domestic law must be applied in all cases where an international tax issue is not resolved in a double taxation agreement that Denmark has concluded with another country."

It is undeniable that the precise understanding of "beneficial owner" is not resolved in the agreement.

The interpretation also makes sense in view of the introductory remark in paragraph 12 of the 2003 comments:

"The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid ... to a resident"

U.2023.4403H

as used in paragraph 1 of that Article."

The purpose of the provision has thus been to determine who is the *real recipient of* the dividend, and this is precisely what the principle of "rightful income recipient" in Danish tax law is about ... Jakob Bundgaard and Niels Winther-Sørensen are in line with this in SR-SKAT 2007.395:

"Based on the aforementioned Danish case law on domestic interpretation of concepts from double taxation treaties, it must probably be assumed that the Danish courts will be inclined, at least to a certain extent, to interpret the beneficial owner concept in accordance with *domestic Danish tax law*. In other words, the Danish courts will be inclined to consider the company that, according to a Danish tax law assessment, is considered the *right income recipient*, to also be the beneficial owner." (Our emphasis).

**4428**

The case law referred to is U 1994.284 H and TfS 2003.222 H.

The view is repeated by Jakob Bundgaard in SU 2011.31.

Jens Wittendorff in SR-SKAT 2010.212, is also of the opinion that a domestic interpretation based on the principle of "right income recipient" must be made. It appears there that the authorities in several other states, including the US, the UK, the Netherlands and Italy, apply a domestic law interpretation.

Furthermore, it should be mentioned that the Supreme Court in U.2012.2337 H also applies internal Danish law when interpreting a DBO.

Heavy Transport Danmark is aware that in the first court decision in the "beneficial owner" case complex (SKM 2012.121 (the ISS case)) - supported by the Indo-Food judgment - the Eastern High Court has found that an *autonomous* interpretation must be applied. Similarly, the Eastern High Court seems to have applied an autonomous interpretation in the TDC and NetApp cases (judgment of May 3, 2021). Heavy Transport Danmark does not agree with this.

*Firstly,* it is particularly surprising that the Eastern High Court (in the ISS case) has placed more emphasis on the Indofood judgment, which is an English civil law decision assessing the meaning of the term in a case concerning the interpretation of a loan agreement in Indonesian law, than on the later Prévost case, which is a tax case decided by the competent court in the source state (Canada).

*Secondly,* it is a fact that in the *international literature* there is no consensus on what an autonomous interpretation - if any - should be.

A review of the available literature thus shows that there is total uncertainty as to what is meant by "beneficial owner" in an autonomous interpretation. There is simply no consensus on an "international fiscal meaning".

*Thirdly, there is* also no consensus in the international literature as to whether a domestic law interpretation or an autonomous (international) interpretation should be applied.

*Vogel* and Baker are thus of the opinion that an "international fiscal meaning" should be sought, but they recognize that there is no such "international fiscal meaning" - nor is there agreement on it.

However, *Baker* is of the opinion that an inter-jurisdictional interpretation must first be made and should only be rejected if it is inconsistent with the context of the agreement:

"If the "context" is to require the non-application of the domestic law meaning, then it is logical that a domestic law meaning should first have been determined and this meaning must be regarded as inappropriate in the context of the treaty."

*Jiménez, on the* other hand, is of the opinion that interpretation must be made on the basis of domestic law.

*Fourthly,* the (modest) international case law is not unambiguous either.

In its *public discussion draft* of April 29, 2011, the OECD has proposed to include in the comments to Article 10 that "beneficial owner" should be subject to an international interpretation, but the consultation responses from The City of London Law Society and IBFD dispute that this position is supported by Article 3(2).

Based on the responses received, on October 19, 2012, the OECD issued a new proposal for revised comments regarding "rightful owner", in which the OECD - taking into account the fact that a majority of the responses to the consultation agreed with this view - maintained its proposal that the concept be subject to an autonomous interpretation. This in itself shows that the OECD is on "thin ice" and that - regardless of the OECD's political wishes - there was and still is considerable disagreement on the issue.

The fact that point 12.1 of the 2014 comments (MS 496) and point 12.1 of the 2017 comments, as a result of political considerations by the experts who prepare the comments, point in the direction of the concept being interpreted autonomously, does not change the fact that at least in 2007 there was not (and has not been since) the necessary international consensus on the understanding of the concept for autonomous interpretation to make sense at that time.

Furthermore, interpreting the concept of "beneficial owner" in accordance with the Danish law concept of "rightful income recipient" is a necessity when, as here, it is not actually a question of interpreting the treaty, but of interpreting Danish law (SEL § 2(1)(c)), which refers to the treaty, since it is not actually a question of sharing a taxing right with Luxembourg, but of defining a tax exemption which exclusively concerns Denmark's internal taxation relations. This is particularly obvious when the preparatory works to SEL § 2(1)(c) unambiguously confirm that the Danish concept of "rightful income recipient" is synonymous with the concept of "beneficial owner".

Even if it were evident that the wording of the preparatory works to SEL section 2(1)(c) in 2001 was mistaken about the meaning of the concept in the model agreement, the Danish preparatory works would still take precedence over the agreement, as it was this understanding that the Danish Parliament based on when adopting SEL § Section 2(1)(c).

Convention-compliant interpretation is also not relevant, as Denmark has not promised Luxembourg to make its internal tax exemption of dividends dependent on the interpretation of the DBO. This is a choice that Denmark has made on its own, and it does not owe Luxembourg a treaty obligation to correct the understanding of its internal

**4429**

legislation after the agreement. The only decisive factor is what the Danish Parliament has assumed when adopting SEL § 2(1)(c).

It is thus argued that domestic law must at least be applied when - as in this case - no other international understanding of the concept can be pointed to. This is particularly true at the time of the 2007 dividend distribution at issue in the case and is even more evident when considering that the Danish-Luxembourg DBO was concluded in 1980.

As it is agreed that Heavy Transport Luxembourg is a "proper recipient of income" under Danish law, the company is therefore also "rightful owner".

9.3 *Heavy Transport Luxembourg is also the "rightful owner" of the proceeds after the 2003 comments*

In the event, however, that the expanded comments of 2003 are considered to be merely a *clarification* of the concept of 'beneficial owner', it is further submitted that Heavy Transport Luxembourg - also under those comments - must be considered the 'beneficial owner' of the interest in question.

Copyright © 2023 Karnov Group Denmark A/S

Heavy Transport Danmark thus also in this case claims that the "rightful owner" concept must be interpreted in accordance with the principle of "rightful income recipient" in Danish law, see e.g. *Jakob Bundgaard* and *Niels Winther-Sørensen* in SR- SKAT 2007.395.

However, even if an *autonomous* interpretation of the concept is made, it is submitted that Heavy Transport Luxembourg must be regarded as

"beneficial owner" of the dividends in question under the 2003 Commentaries.

In the 2003 revision, paragraph 12 of the commentary, e.g. , was expanded with the remark that the term "beneficial owner" is not used in a narrow technical sense, but must be seen in the context and in the light of the intent and purpose of the treaty, including avoiding double taxation and preventing tax avoidance and tax evasion.

This is elaborated in point 12.1 by stating that firstly, it would not be in accordance with the intent and purpose of the treaty if the source country were to grant relief on payment to an "agent or nominee" ("agent or nominee"), as he or she is not the owner of the income and thus not taxed in his or her country of residence, which is why no double taxation arises. This corresponds to the commentary to the 1977 Model Tax Convention.

Secondly, something new is stated about "flow-through companies" in section 12.1:

"It would *also* be inconsistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State acts, otherwise than as an agent or intermediary, merely as a *conduit for another person who actually receives the income in question*. For these reasons, the report "Double Taxation Con- ventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a *conduit company* cannot normally be regarded as the beneficial owner if, although it is the formal owner, it *actually has very narrow powers which, in relation to the income in question, make it a*

*"nullity" or administrator acting on behalf of other parties*." (Emphasis added).

In this set of cases, the Ministry of Taxation generally argues that point 12.1 of the extended comments from 2003 must be understood to mean that, when determining whether the formal recipient is

"beneficial owner", emphasis must be placed solely on the extent of the actual powers of the formal recipient in relation to deciding how to dispose of the amounts received. According to this view, the formal recipient will thus not be considered a "beneficial owner" if, in relation to the income in question, he cannot actually make dispositions that deviate from the will of the ultimate owners (that an amount received must be disposed of). "directed to where it is desired").

In this context, it should be noted that the wording of paragraph 12.1 clearly states that there are 3 situations in which a recipient of dividends is not a "beneficial owner", namely if it is (1) an "agent", (2) an "intermediary" or (3) a "conduit for another person who actually receives the income in question". In the latter situation, it is further required that the conduit entity has "very narrow powers which, in relation to the income in question, make it a

"nullity" or administrator acting on behalf of other parties". Thus, as stated in the comments, the extent of the *right of disposal* is an essential element in determining whether a passthrough entity is the "beneficial owner" of the income.

The point of the comments is that if the dividend-receiving

company has channeled the received dividends to the downstream companies, the

When assessing whether the company is a "beneficial owner", emphasis must be placed on whether this is a result of the underlying owners having restricted the company's disposal of the dividend.

It is submitted that Heavy Transport Luxembourg has *not* "very narrow powers which, in relation to the income in question, make it a "nullity" or "administrator acting on behalf of other parties". On the contrary, Heavy Transport Luxembourg has, on the whole, had the same powers as any other holding company in any other group of companies would normally have.

**4430**

In particular, there was thus no legal obligation for Heavy Transport Luxembourg to pay the dividends received to Heavy Transport Danmark Bermuda as repayment of debt, see further below in the next section. As stated in the section in question, it is a condition for not considering a dividend recipient as "beneficial owner" that the recipient has assumed a *legal obligation* to pass on the dividends received. In that connection, it is disputed that the mere fact that the underlying owners or their representatives may have made the overall decision on the distribution of dividends in advance should be decisive for Heavy Transport Luxembourg not to be considered the "beneficial owner" of the dividends.

All major decisions in any group - such as the acquisition of companies, major distributions, the establishment of a financing structure, etc. - are usually initially made by the top management of the group.

The decisions are then implemented by the relevant corporate bodies of the respective companies. Neither the individual companies as such nor the individual board members are generally obliged to implement the planned decisions, but refusal to do so can of course lead to the members in question being replaced in accordance with the rules of the Companies Act.

There is no evidence that point 12.1 of the comments should be interpreted to mean that what is a customary decision-making procedure in any group automatically disqualifies the group's subsidiaries from being "beneficial owners" of dividends received.

The reality is that the Ministry of Taxation's interpretation of section 12.1 of the comments is so restrictive that it is difficult - if not impossible - to identify an intermediate holding company that the Ministry would accept as the "beneficial owner" of dividends.

Accordingly, the only (real) condition that, in the opinion of the Tax Ministry, must be imposed in order to deny an intermediate holding company the status of "beneficial owner" is that it must be demonstrated or made probable that the transaction has tax avoidance or evasion (or "abuse") as its purpose or consequence.

In reality, the Ministry of Taxation's view is that if an *abuse* can be demonstrated, an intermediate holding company will *never be a "beneficial owner"*, and thus - according to the Ministry of Taxation's own interpretation - there is no real content in the requirement of "narrow powers". The Ministry of Taxation's interpretation of the concept of "beneficial owner" must therefore be rejected as *meaningless*.

The Ministry of Taxation's interpretation is also clearly *contrary to the Minister of Taxation's answer* to question 86 regarding L 213 of May 22, 2007:

"However, a *flow-through (holding) company* cannot be equated with an agent or an intermediary. *Such a company is registered and fully taxable in the country in which it is domiciled and the starting point is quite clear that a holding company is entitled to contract protection.* ...

There are thus very narrow limits for when Danish tax authorities can override a duly registered and fully registered company.*

*taxable foreign company* and as stated in the answer to question 6 regarding bill L 30, there are no examples of Danish tax authorities refusing to recognize a foreign holding company and thus considering it a nullity." (Our emphasis).

In summary, it is thus submitted that Heavy Transport Luxembourg cannot be considered a "nullity or administrator". The defendant's understanding is supported by the Eastern High Court's judgment of December 20, 2011 in the ISS case, where the High Court stated:

"In order for such an intermediate holding company not to be considered a legal owner, it must be required that the owner exercises control over the company that goes beyond the planning and management at group level that usually occurs in international groups".

The Ministry of Taxation has not demonstrated the existence of such special qualified control by the owners in this case.

The defendant's understanding is further supported by recent international case law, including the Canadian Federal Court of Appeal's decision of February 26, 2009 in the leading case, Prévost, although it is acknowledged that the international case law on the understanding of the concept of "beneficial owner" is not unambiguous.

...

Applied to the present case, Heavy Transport Luxembourg is also clearly the "beneficial owner" of the dividends at issue in the case. On February 24, 2012, the Tax Court of Canada decided a similar "beneficial owner" case regarding royalties in *Velcro Canada Inc.* As in the Prévost case, the court found that an intermediate holding company was the "beneficial owner" of the income received, even though there was an obligation to pass on a significant portion of it, as the court, among other things The court emphasized, among other things, that there was a commingling of funds at the intermediate holding company, and it found that - in order to break the *corporate veil* - it was required that the intermediate holding company had "absolutely no discretion" in relation to the funds received (which was not the case).

The Canadian courts have thus established that it is a necessary - but not sufficient - condition for denying the recipient of a given income the status of "beneficial owner" of that income that there is a

**4431**

legal obligation to pass on the income in question.

This has subsequently been clearly cemented in point 12.4 in the latest comments from 2014 to the model agreement, see section 9.4 below.

The Canadian Supreme Court has also very recently - on November 26, 2021 - ruled in the so-called Alta Energy case, which concerned whether a structure with a Luxembourg intermediate holding company constituted an abuse of the Canada-Luxembourg DBO. The ruling, which came out in the taxpayer's favor (like the Prévost case) ...

In this context, the Ministry of Taxation refers in particular to the English Court of Appeal's judgment in the so-called Indofood case and the French Conseil d'Etat's judgment in the so-called Bank of Scotland case, both from 2006.

In its decision in the ISS case, the Eastern High Court also refers to the Indo-Food judgment, although it is noted that it concerned the question of whether to apply a domestic or autonomous interpretation of the term "rightful owner".

However, it is worth noting that the Indofood case was not a tax case, but rather a civil case concerning the interpretation of contractual terms in a loan agreement governed by English law,

which admittedly involved a (hypothetical) tax law issue.

...

Heavy Transport Denmark argues that the case is not as good a precedent as the Canadian tax rulings, as it was a civil case - an interpretation of an agreement - and not a tax case, and as it was a hypothetical question whose answer would impose a burdensome restructuring on one party without certainty as to whether it would be tax compliant. In paragraph 48 of the judgment, the English court stated that it would not be reasonable for Indofood to engage in litigation with the Indonesian tax authorities, which Indofood risked losing.

9.4 *2014 comments - there must be a legal obligation for onward payment*

While this case has been pending, new comments have been made by the OECD, namely in 2014, which are also invoked by the Ministry of Taxation to support that Heavy Transport Luxembourg is not the "beneficial owner" of the dividends in question.

Heavy Transport Denmark argues that it is now explicitly stated in section 12.4 of the 2014 comments that it is generally a condition for denying a dividend recipient the status of "beneficial owner" under the model agreement that there is an obligation to pass on the proceeds to another person. It states:

"12.4 In these various examples (agent, intermediary, conduit company in its capacity as nominee or trustee), the direct recipient of dividends is not the "beneficial owner" because the recipient's right to *use and enjoy the dividends is limited by contractual or legal obligations to pass on* the payments received to another person. Such an obligation will usually be evidenced by relevant legal documents, but may also be present by virtue of the factual circumstances which clearly show that the recipient substantially does not have the rights to use and enjoy the proceeds without being bound by a contractual or legal obligation to pass on the payments received to another person. ... Where the recipient of a dividend has the right to *use and enjoy the dividend without being bound by any contractual or legal obligation to pass on* the payments he has received to another person, the recipient is the "beneficial owner" of those dividends. ..." (Our emphasis).

In Heavy Transport Denmark's view, it has always been clear that it is a necessary - but not sufficient - condition for denying a dividend recipient the status of "beneficial owner" under the model agreement that there is a legal obligation to pay the dividend. The 2014 Commentaries thus do not add anything *on this point* that was not already applicable. This is also confirmed in the leading judgment, Prévost, from 2009, mentioned above in section 9.3.

An "agent or intermediary", as mentioned in the 1977 comments, is thus clearly obliged to pass on the proceeds received. This is already inherent in the very fact that he is an "agent or intermediary". The same applies to a "flow-through company" in the 2003 comments.

In the opinion of the Ministry of Taxation, it is irrelevant on what basis the obligation exists, but the term "obligation" (to pass on) cannot be graded. Either the obligation exists or it does not. The relevant test is whether the obligation is enforceable in the national courts. Thus, if someone other than the recipient of the proceeds has a legally enforceable right to receive the proceeds that can be enforced in the courts, there is an obligation on the recipient of the proceeds to pass on the proceeds.

In this case, there was no legal obligation for Heavy Transport Luxembourg to pass on the proceeds.

The Ministry of Taxation refers to the 2014 comments that the recipient - without having been bound by a contract - is not obliged to pay the

Copyright © 2023 Karnov Group Denmark A/S

contractual or legal obligation to pass on the received proceeds to another person - did not "substantially" have the rights to "use and enjoy" the proceeds.

Heavy Transport Danmark argues that the 2014- comments on this point - if they are to

**4432**

is understood as claimed by the Ministry of Taxation - *completely changes* the previous comments to the provision - 7 years after the dividend distribution in this case - and is thus undoubtedly an extension - and not a clarification - of the "beneficial owner" concept in the 1977 comments. Therefore, they cannot be applied when interpreting DBOs concluded before 2014. The DBO between Denmark and Luxembourg relevant in this case was concluded in 1980.

Finally, it is submitted that the meaning of this statement in the comments is entirely uncertain and that it would therefore in any event be contrary to general principles of legal certainty to attribute significance to the statement in question.

*9.5 There is no abuse of the DBO*

In the "beneficial owner" complex of cases, the Danish Ministry of Taxation generally argues that there must be an abuse for a dividend-receiving company to be denied collective agreement protection. Heavy Transport Danmark agrees with this.

However, Heavy Transport Danmark disputes that there is an abuse of the Danish-Luxembourg DBO in the present case.

Countering abuse requires a legal basis in *Danish law.*

In this complex of cases, the parties agree that in 2007 there were *two court-created rules* to counteract abuse, namely *the principle of reality* and the *principle of "rightful income recipient"*. This can be seen, among other things, in paragraphs 56-59 of the order for reference in the NetApp case (MSX).

Thus, the parties agree that the *substantive principle* does not provide a basis for setting aside the transactions made in the complex of cases, see paragraph 57. Similarly, the parties agree that the beneficiaries in these cases, here Heavy Transport Luxembourg, are *"proper income recipients"* under Danish law, cf. paragraph 59.

In the complex of cases - after the CJEU's judgment - the Danish Ministry of Taxation has made a new plea that *general principles* have been developed in Danish case law *to counteract abuse that go beyond the reality principle* (and - it must be understood - the principle of "rightful income recipient"). Heavy Transport Danmark has below in section 10.4.1.3 refuted this argument.

It is thus a fact *that* Danish law had rules to counteract abuse, and *that* these rules mean that there is *no* abuse under Danish law in this case. Moreover, it is settled Supreme Court practice that there can be no abuse if it appears from the legislative history that the legislator has been fully aware of the disputed issue (which is the case in this case), cf. U.2004.174H (Over-Hold ApS) and U.2007.736H (Finwill ApS - the "elevator case").

There were no relevant anti-abuse rules in the Danish-Luxembourg DBO.

On the other hand, Article 10 of the DBO contains the provision that the dividend recipient must be the "beneficial owner", see sections 9.1 - 9.4 above.

That there is no abuse of the agreement is confirmed by the fact that the chosen structure - where Heavy Transport Luxembourg acts as a holding company for Heavy Transport Denmark - is directly instructed by the Minister of Taxation in connection with the answer to

question 16 to L 99 of November 10, 2000 as a legitimate structure for the distribution of dividends...

This is fully in accordance with Mogens Rasmussen and Dennis Bernhardt, both Told- og Skattestyrelsen, in SR-SKAT 2000.315:

"It is thus generally assumed among OECD member countries that a double tax treaty that follows the OECD model does not contain a legal basis to counter "treaty-shopping".

...

A company incorporated in a contracting country should thus be entitled to treaty protection, i.e. be considered the *"beneficial owner"*, even if, as is the case with the many new holding companies in Denmark, it is obvious that the purpose is tax minimization." There was general agreement among Danish authors on these points of view.

In addition, the group structure in question with the incorporation of Heavy Transport Luxembourg was not at all necessary for Heavy Transport Denmark to distribute the purchase price from the sale of the Dockwise shares to the two shareholders in Panama without Danish tax.

If there had been any reason whatsoever to believe that Denmark would levy withholding tax on the dividend in question by the chosen construction, e.g. by refusing directive protection (which there was no reason to do, e.g. as unconditional tax advice had been obtained, see below), the group could, as a satisfactory alternative solution, have chosen to let Heavy Transport Danmark, which after the sale was without activity, liquidate by a simple declaration of payment liquidation under the Danish Companies Act

§ Section 59, in which connection the liquidation proceeds, i.e. a largely equivalent amount, could *undisputedly and indisputably* have been distributed to the shareholders, Heavy Transport Group Inc. of Panama and Incomare Holdings S.A. of Panama, *without deduction of Danish withholding tax*, cf. section 16 A of the Danish Tax Assessment Act.

And thus the entire basis for considering the chosen structure of "insertion of an intermediate holding company" to be an abuse to the ground disappears.

As will be shown below in section 0, the CJEU has ruled that the anti-abuse principle (at least the EU law principle that also after 2016 forms the basis for

**4433**

the now statutory Danish general anti-abuse principle in section 3 of the Danish Income Tax Act) is as follows:

...

Even though it may be argued, supported by the Eastern High Court's TDC and Takeda judgments, that the contribution of Heavy Transport Luxembourg and this company's receipt and forwarding of the funds in question constitute an "artificial arrangement that is not based on an economic reality", the second part of the anti-abuse principle - that it must have been done with the purpose of obtaining unintended tax advantages (which, one must understand, could not have been obtained in the absence of the artificial arrangement in question) - is not fulfilled in a situation like the present one, where there was already *a perfectly good alternative* (actually an easier alternative) to channel the funds to the two shareholders in Panama *without Danish withholding tax*.

The Danish legislator has been fully aware that no withholding tax would be payable on a distributed liquidation proceeds in the event of liquidation, even if the recipient was resident in a non-DBO state. As this was not considered politically desirable, the legislator changed this legal position with effect from July 1, 2007.

Copyright © 2023 Karnov Group Denmark A/S

U.2023.4403H

The Ministry of Taxation does not dispute that liquidation proceeds would have been tax-free for the two shareholders if they had issued a declaration of dissolution before July 1, 2007 in accordance with the daily

However, the Ministry argues that the fact that the group could have liquidated Heavy Transport Denmark and distributed the liquidation proceeds directly to the owners in Panama without deduction of Danish withholding tax does not change the fact that in the actual situation there is abuse. As just explained, this is disputed.

It is of course not disputed that the contribution of the intermediate holding company in Luxembourg - as mentioned - was made with the main purpose of not triggering Danish withholding tax on the planned (ordinary) dividend distribution (or in other words; It is not disputed that Heavy Transport Danmark could not have made a distribution of an ordinary dividend directly to a shareholder in Panama without withholding tax), but it is argued in this connection that it is of course part of the abuse assessment whether there were other ways in which the funds could be paid tax-free to the owners in Panama. And there were.

In this connection, the Danish Ministry of Taxation disputes that Heavy Transport Danmark was "ready for liquidation" after the company's sale of the shares in Dockwise, as the company was party to an ongoing civil dispute with the buyer of the shares.

It is true that in connection with the sale of the shares in Dockwise, a discussion - and later a dispute - arose with the buyer as a result of the sinking of one of the company's ships shortly before the signing of the sales agreement on December 22, 2006. The parties needed to determine the extent of the damage and the possible adjustment of the purchase price in connection with this. As a result, USD 100 million of the purchase price was withheld from an escrow account in connection with the closing of the transaction on January 12, 2007, as security for losses related to the accident. The case was finally closed in 2010 after the sellers had given the buyer a non-repair notice in 2009, i.e. a notice that the vessel was totally damaged. The retained amount of USD 100 million (with certain minor adjustments for insurance payments etc.) was therefore paid (refunded) to the buyer (and the purchase price reduced by this amount).

But it is worth noting that the amount distributed to Heavy Transport Danmark in May 2007 was of course the purchase price without the share retained as collateral, and it would therefore have been the same amount that could have been distributed in a liquidation at the same time.

It is correct that the accident in question immediately made a planned liquidation of the Danish seller company difficult. However, it does not require any further explanation that the group would have chosen to carry out a liquidation of the Danish company - which it could have done *without any possibility of objection from the buyer* under section 59 of the Danish Limited Liability Companies Act - if the group had had the slightest idea that the dividend model suggested by KPMG would result in a Danish withholding tax of approximately half a billion DKK.

As mentioned, the liquidation could have been effected by an accelerated (declaration of payment) liquidation under section 59 of the Danish Limited Liability Companies Act, in which connection all Heavy Transport Danmark's obligations and rights under the share transfer agreement, among other things, would have been assumed by the company's shareholders (MS 24). As a result of this legal succession, the company's potential creditors have precisely no possibility of objecting to such a liquidation. However, it should also be noted that Heavy Transport Danmark was also permitted under clause 16 of the share transfer agreement to transfer rights and obligations under the agreement to a group company.

Finally, it should be noted that the parent companies of the two selling groups, Heerema Holding Construction, Inc. and Wilh. Wilhelmsen ASA, were also parties to the agreement as guarantors

for the seller's obligations. The buyer was thus in no way disadvantaged by a liquidation of the Danish company.

Heerema did not opt for liquidation at the beginning of 2007 in connection with the sale, as the group had previously contacted its tax advisor, KPMG in Luxembourg, precisely because of the planned sale

**4434**

and Denmark to investigate whether there were alternatives to a liquidation in connection with a sale of the shares and repatriation of the sale proceeds to the shareholders in Panama. In this connection, KPMG advised the Group - without reservation - on the possibility of incorporating an intermediate holding company in Luxembourg and then making a dividend distribution, cf. further details below. As there was then an adequate alternative to liquidation, this solution was chosen. However, no tax advantage was obtained in this way, which rules out considerations of abuse.

If the construction in question is assumed to constitute a misuse, the consequence will be that the group will receive a gigantic "stupid fine" of half a billion kroner (+ interest).

In addition to the fact that this circumstance will in any case rebut any presumption of abuse by the
"model", it also shows that it is in any case impossible to consider the Danish company to have acted negligently in the case, see further below in section 12.

Not surprisingly, the Ministry of Taxation - which can see that the existence of a tax-free alternative is a problem for the Ministry - tries to deny that the Heerema Group could have carried out a payment declaration liquidation of Heavy Transport Danmark if the company had had the slightest idea that there was a risk of having to pay a tax of half a billion kroner.

Such a liquidation is thus described as a "pure hypothesis". In this connection, the Ministry of Taxation claims that it is unlikely that Heavy Transport Denmark's Panamanian shareholders, in order to expedite a liquidation before July 1, 2007, would have e n s u r e d  payment of all due and unpaid debts and assumed joint and unlimited liability for all the company's debts, due and undue or disputed.

...

In addition, it should be noted that it must naturally be assumed that the two shareholders would do everything possible to avoid an (unforeseen and unnecessary) tax expense of half a billion kroner, including "rushing through a liquidation before July 1, 2007".

This would, as mentioned by the Ministry of Taxation, have required two things; firstly, to ensure "payment of all due and undue debts", and secondly, to assume joint and unlimited liability for all the company's debts, due and undue or disputed.

As regards the first point - payment of all debts due and unpaid - this would have been quite easy as there were not many debts in the Danish company (which had no other activities than owning Dockwise). In this regard, it should be noted in particular that the claim raised against Heavy Transport Danmark in its capacity as seller of the shares in Dockwise cannot be considered a (due or undue) "debt" w i t h i n  t h e  meaning of the Danish Private Limited Companies Act, as the claim was disputed (and thus a "potential" debt that would be assumed by the shareholders of the company).

And as regards the second point, that the two shareholders were to assume joint and unlimited liability for all the company's debts, whether due, undue or disputed - i.e. also in relation to the claims raised against Heavy Transport Danmark

by the share buyer, 3i - it requires no further explanation that the shareholders

would of course be ready to do so, as the group's parent company

-As mentioned above, Heerema Holding Construction, Inc. was a party to the share transfer agreement and thus already liable for the claims raised. And since Heavy Transport Danmark had no other activity - and had never had any other activity - there is no reason to consider other potential (unknown) liability claims.

Thus, there is no basis whatsoever for the Ministry of Taxation's assumptions that the group could not or would not have liquidated Heavy Transport Danmark if it had known that a tax claim of the exorbitant size in question would otherwise be triggered.

And in summary, there is no basis for assuming that Heavy Transport Denmark and Heavy Transport Luxembourg have abused the Danish-Luxembourg DBO to obtain a tax advantage for the Panamanian shareholders that was not always available to these shareholders.

Accordingly, the Eastern High Court has stated in the NetApp case:

"As it would have been possible to distribute dividends directly from NetApp Denmark to NetApp USA without triggering Danish withholding tax, and as it is established that the distribution took place as part of a planned dividend repatriation to the group's American parent company, the High Court finds that there is no abuse of the Danish-Cypriot double taxation treaty or of the Parent-Subsidiary Directive."

Similarly, the distribution in this case was undisputedly part of a plan to repatriate the funds to Panama and it would have been possible to distribute liquidation proceeds directly from Heavy Transport Luxembourg to the shareholders in Panama.

It should also be noted that it was not until the BEPS project ("Base Erosion and Profit Shifting Project"), launched in 2013, and the publication in 2015 of Action 6, "Preventing the Granting of Treaty Benefits in Inappropriate

**4435**

Circumstances", came up with a proposal for the introduction of a general abuse rule in the states' DBOs to actually counteract *treaty shopping*. This involved the introduction of a so-called LOB provision ("limitation on benefits") and a so-called PPT ("Principal Purpose Test"), i.e. a general anti-avoidance clause. This initiative was followed by a large number of member states, including Denmark, entering into the Multilateral Convention ("MLI") in 2016, whereby the participating states were given the opportunity to amend their existing DBOs in several areas, including by inserting these anti-treaty shopping rules. In Denmark, the MLI was adopted by the Danish Parliament in 2019.

Thus, it is only with effect from January 1, 2020 - as regards withholding taxes - that general anti-abuse rules have been inserted in the existing Danish DBOs, including the Danish-Luxembourg DBO. However, this anti-abuse provision would not apply in this case either, as it is crucial that the taxpayer obtains a tax benefit that was not already available to the taxpayer.

But even in cases where states have introduced general anti-abuse rules, it has recently been shown that there is no basis for setting aside legal company formations on the basis of abuse considerations even if they are an expression of treaty shopping. It must be assumed that the establishment of a company also for tax reasons is not an abuse of the agreements, as this possibility has been known and accepted by the participating states.

This follows the Canadian Supreme Court's decision of November 26, 2021 in the so-called Alta Energy case.

The case concerned whether a structure with a Luxembourg intermediate holding company constituted an abuse of the Canada-Luxembourg DBO.

...

This judgment also emphasizes that in the present case (where there is not even a general anti-abuse rule in the relevant DBO) there can be no abuse of the Danish-Luxembourg DBO. In this regard, it is noted that Denmark - like Canada

- has exempted certain Luxembourg holding companies from collective agreement protection, cf. the protocol to Denmark's DBO with Luxembourg, but it is undisputed that the protocol's exemption provision is not relevant to Heavy Transport Luxembourg. The Eastern High Court has not had the opportunity to consider this issue either in the NetApp case, which concerned the DBO with Cyprus, or in the Takeda case, where the beneficial owner was domiciled in Luxembourg and the dispute concerned the interpretation of the Protocol. In the TDC cases, the Canadian judgment has not been invoked for the simple reason that the judgment has only emerged after the judgment in the TDC cases.

That companies that were not resident in Luxembourg could establish a company in Luxembourg for tax purposes was therefore already foreseen when the DBO was concluded, and for this reason the concept of beneficial owner cannot be given a broader meaning than it had when the agreement was concluded in 1980. What the Ministry of Taxation today claims to be abuse was in 1980 a foreseen consequence of the DBO with Luxembourg.

*10 TAX MUST BE WAIVED UNDER THE PARENT-SUBSIDIARY DIRECTIVE*

10.1 *The objective conditions for exemption in the directive are fulfilled* The *second subclaim* to Heavy Transport Danmark's main plea that the company has not been obliged to withhold dividend tax is, as mentioned, that Heavy Transport Luxembourg has an unconditional claim for the dividend tax to be waived under the Parent-Subsidiary Directive.

The *Parent-Subsidiary Directive (90/435/EEC)* (MS 335) introduced a common system of taxation for parent and subsidiary companies from different Member States. The purpose of the directive is to exempt dividends and other distributions of profits paid by subsidiaries to their parent companies from withholding tax. The Directive was amended by *Council Directive 2003/123/EC* (MS 339).

The provision that no withholding tax can be imposed on dividends is found in *Article 5(1)* (as amended in 2003)...

The Directive sets both a capital requirement and a holding period requirement. *The capital requirement is laid* down in Article 3(1) (as amended in 2003) and amounted to 15% in 2007.

According to Article 3(2), each Member State may introduce a maximum *holding period of* 2 years. The ownership period requirement in SEL section 2(1)(c) is 1 year, and the only requirement is that the distribution must be within this period.

It is claimed that Heavy Transport Luxembourg, which unconditionally fulfills both the capital requirement and the ownership period requirement in the Parent/Subsidiary Directive, has an *unconditional claim* to be exempt from withholding tax on the dividend from Heavy Transport Denmark.

This was accepted by *the National Tax Tribunal* in its ruling of August 29, 2012.

10.2 *No "rightful owner" condition in the directive*

It is a fact that the Parent-Subsidiary Directive - unlike the Interest/Royalty Directive (2003/49/EC) - *does not* contain a

U.2023.4403H

condition that the parent company must be the *"beneficial owner"* *of the* dividends received.

This is not an error or oversight, but rather an *opt-out*. In this context, it should be noted *that the* 'beneficial owner' requirement has been

Copyright © 2023 Karnov Group Denmark A/S

contained in the model agreement since 1977 *that* the extension of OECD comments

**4436**

to this concept emerged in early 2003, *the* Interest/Royalty Directive was adopted by the Council on June 3, 2003, and that this Directive contains a "beneficial owner" requirement (while granting Member States the right to introduce domestic anti-abuse provisions), and the Parent/Subsidiary Directive was amended by the Council on December 22, 2003, *without* the Council finding reason to include a "beneficial owner" provision. The EU legislator has thus - in addition to the fact that Article 1(2) gives Member States the possibility to introduce anti-abuse provisions under domestic law - considered *the capital requirement and the* two-year *holding period requirement* as sufficient conditions for obtaining tax exemption for dividends. This is also confirmed by the *Commission in its* submission to the European Court of Justice in the NetApp case:

"19. It should be noted at the outset that *the Directive does not use the term "beneficial owner"* to define its scope. Thus, it is not decisive for the application of the tax exemption in the Directive whether the recipient of the dividends is the beneficial owner thereof. What is decisive for the tax exemption is that the recipient of the dividends meets the conditions set out in Articles 2-4 of the Directive." (Our emphasis).

*Advocate General Kokott's* opinion in the Net App case states similarly:

"86. Subsequently, it is also asked whether the beneficial owner as referred to in the Parent-Subsidiary Directive should be interpreted in the same way as the beneficial owner as referred to in the Interest/Royalty Directive. This question can also be answered in the negative, since *the Parent-Subsidiary Directive*, as stated above (paragraph 34) [should be paragraph 43], takes a different approach from the Interest/Royalty Directive and thus *deliberately omits the concept of beneficial owner.*" (Our emphasis).

This has also been applied by *the National Tax Tribunal* in the ruling of

August 29, 2012.

10.3 *Countering abuse requires national legal basis, see Article 1(2) -Kofoed judgment (C-321/05)*

The EU legislator has left it up to each Member State to determine any provisions on abuse of the Parent-Subsidiary Directive. *Article 1(2)* (from 1990), which was in force in 2007, states

"2. This Directive shall not preclude the application of *internal provisions or agreements* necessary to prevent fraud and abuse." (Our emphasis).

As can be seen, this is an *enabling provision*. Thus, each Member State may introduce or maintain whatever *national* anti-abuse rules it deems appropriate. However, national anti-abuse rules must in themselves be compatible with EU law, including the freedoms guaranteed by the Treaty as established in the case law of the European Court of Justice and not least the *principle of proportionality*. The CJEU thus ensures that the anti-abuse rules do not go too far.

Heavy Transport Denmark argues that it follows *directly* from *the wording* of Article 1(2) of the Directive that a denial of the benefits of the Directive requires a legal *basis in national law*. That a legal basis in national law is required also follows from the fact that a directive is directed at the Member States (and not at citizens) and that citizens must be able to read their legal position in the national legislation.

The European Court of Justice's judgment of July 5, 2007 in *the*

*Kofoed case (C-321/05),* which concerned the corresponding provision in Article 11 of the Merger Tax Directive, is consistent with this.

The case concerned whether a Danish citizen had a legal claim to apply the Merger Tax Directive's rules on tax exemption

the

share exchange in a case where - as the Court stated in paragraph 39 - there were "certain indications" which could justify the application of the abuse provision in Article 11 of the Directive, when Denmark had not introduced a specific national provision to implement this article in Danish law.

The European Court of Justice expressly states that only *internal Danish legislation* on abuse of rights, tax fraud or tax evasion can justify a derogation from the directive's tax exemption provisions. This is stated in the conclusion of the judgment:

"Consequently, Article 8(1) of Directive 90/434 precludes, in principle, the taxation of such an exchange of shares, unless *national legislation* on abuse of rights, tax fraud or tax avoidance can be interpreted in accordance with Article 11(1)(a) of that directive and thus justify taxation of the exchange." (Our emphasis).

These national legal provisions do not have to consist of *legislation,* but can also be *unwritten legal principles* (such as in Danish law the principle of realities and the principle of "right income receipt"), see paragraphs 44-46.

In paragraphs 38-42, the CJEU expressly rejects that the *"general Community law principle of prohibition of abuse of rights"* as reflected in Article 11(1)(a) can be invoked against individuals in the absence of a national legal basis. The reasoning is that *"the principle of legal certainty precludes directives per se from creating obligations for citizens. Directives as such cannot therefore be relied on by the Member State against citizens',* see paragraph 42.

The CJEU followed *Advocate General Kokott's* Opinion of February 8, 2007, paragraphs 66 and 67 of which state:

"66. Only a *direct* application of Article 11(1)(a) of Directive 90/434 to the detriment of Hans Markus

**4437**

Kofoed and Niels Toft would be excluded for the Danish authorities. Thus, a Member State cannot invoke a provision of a directive that it has not itself implemented against a citizen. According to established case law, a directive cannot *in itself* create obligations for citizens, and a directive provision cannot therefore be invoked *as such* against citizens.

67. Similarly, the competent authorities cannot rely *directly* on *any general principle of Community law prohibiting abuse of rights in* relation to individuals. In cases falling within the scope of Directive 90/434, such a principle has found specific expression and has been given concrete expression in Article 11(1)(a) of that directive. ...' (Emphasis added).

*The Kofoed judgment* thus confirmed what already appears from the wording of Article 1(2) of the Parent-Subsidiary Directive, namely that countering abuse requires a *national legal basis*.

It also appears from the Ministry of Taxation's comment on the Kofoed judgment in TfS 2008.45 DEP that the ministry subsequently responded forcefully in the main case.

In its decision of August 29, 2012, *the National Tax Tribunal* based its decision on the Kofoed judgment.

10.4 *There is no abuse according to the Danish anti-abuse rules applicable in 2007*

...

The parties agree that the legal position regarding anti-abuse rules in Danish law in 2007 was as set out in paragraphs 55-59 of the preliminary ruling in the NetApp case.

...

As set out in paragraphs 25 and 59 of the NetApp Referral Order, the Ministry of Taxation acknowledges that the dividend recipient, NetApp Cyprus, is the *"proper income recipient"* of

Copyright © 2023 Karnov Group Denmark A/S

dividends, which also applies in the present case as far as Heavy Transport Luxembourg is concerned.

Similarly, the Danish Ministry of Taxation acknowledges in paragraph 57 of the referral ruling that *the reality principle* does not provide a basis for setting aside the transactions made in the case. SKAT originally tried to deny exemption from taxation in the "beneficial owner cases" based on considerations of reality, but had to recognize that there was no basis for this, cf. the judgments in *TfS 2003.889 H (Over- Hold ApS)* and *TfS 2006.1062 H (Finwill ApS - "Elevatorsagen")*. Thus, the parties agree that neither the *principle of "rightful income recipient"* nor the *principle of reality* can be invoked in support of the Ministry of Taxation's claim.

There is thus no abuse according to the Danish anti-abuse rules applicable in 2007.

This has been accepted by *the National Tax Tribunal* in the ruling brought before it.

**10.4.1** *The Danish Ministry of Taxation's three arguments that in 2007 there was a specific legal basis in Danish law to deny the benefits of the directive due to abuse are not sustainable*

The Ministry of Taxation has made three arguments in support of the claim that there should be a legal basis in Danish law to specifically deny the benefits of the Directive due to abuse.

...

**10.4.1.1** *SEL § 2(1)(c) is not a specific national provision within the meaning of Article 1(2) of the Directive (question 1.1 to EUD in the NetApp case)*

The Ministry of Taxation argues that *section 2(1)(c) of the SEL in itself* contains the necessary internal legal basis to deny the benefits of the Directive in case of abuse. The view is based on the following sentence in the provision:

"It is a condition [for tax exemption] that the taxation of the dividends *must be* waived ... under the provisions of Directive 90/435/EEC ... (Our emphasis).

The view is rather that Denmark does not *"must"* waive withholding tax unless there is an obligation to do so under the Directive, which - according to the view - does not exist if there is an abuse. The mere reference to the directive should thus -according to the view

- imply an exercise of the authorization in Article 1(2) and thus that a national anti-abuse rule is (automatically) introduced in Danish law.

It should be obvious that the Ministry of Taxation's artificial attempt to "create" a statutory anti-abuse rule is not sustainable. For many reasons.

Not even the logic is in place, because the postulated result is included as a precondition for the reasoning. Thus, when the Ministry of Taxation claims that there is no obligation to waive withholding tax if there is abuse, this is only a correct premise if Denmark has (already) chosen to implement an anti-abuse provision in accordance with Article 1(2), but this is not the case. The first premise of the argumentation thus presupposes the result, and the argumentation is thus circular.

The general reference to the Directive thus implies an implementation of the Directive as it stands, including the authorization provision in Article 1(2), but it does *not* imply a position on whether the authorization should be used, and thus *not* an implementation of an anti-abuse rule in Danish law. The mere reference to the Directive suggests nothing whatsoever about Denmark's intention to introduce an (optional) national anti-abuse rule when introducing the statutory rule in 2001, let alone what such a rule - if any - should be about.

On the contrary, it is a fact that the Ministry of Taxation and the Danish legislator, when introducing SEL section 2(1)(c) in 2001,

specifically *did not* find the need and

**4438**

therefore did *not* want to introduce an anti-abuse rule, .... The understanding of SEL § 2(1)(c), which the Ministry of Taxation now claims, and which is invented for this case, is thus *in direct conflict with the legislative history of this provision from 2001*.

As can be seen ... the legislator was also fully aware that if additional abuse rules beyond the generally applicable rules (the reality principle and the principle of "rightful income recipients") were desired, this should, according to Article 1(2) of the Directive, be done by supplementary legislation, as was also done in connection with the original implementation of the Directive by Act No. 219 of April 3, 1992.

*The Eastern High Court's question 1.1* to the CJEU in the NetApp case concerns this plea from the Ministry.

In the *Commission's* submission, the Ministry's argument in point 9 states: *"In the Commission's view, this line of reasoning cannot be accepted"*, which is substantiated in the following points. And the Commission's proposed answer to question 1.1 states that SEL § 2(1)(c) *"cannot be considered to be a specific national provision within the meaning of Article 1(2) of the Directive"*.

Similarly, the *Advocate General's* proposal states in point 106:

"For this reason, the answer to questions 1.1 and 2 is that neither *§ Section 2(2) [now (1)](c) of the Danish Corporation Tax Act* or a provision of a double taxation treaty which, as regards the taxation of distributed dividends, is based on the *beneficial owner*, is sufficient to be regarded as implementing Article 1(2) of the Parent-Subsidiary Directive." (Our emphasis).

*The CJEU* has not answered question 1.1 as the Court instead chose to introduce the "general EU law principle of prohibition of abuse" which is discussed below in section 10.6.

As can be seen, the Ministry of Taxation's plea has no merit whatsoever.

*The National Tax Tribunal* has also rejected this plea in the appealed decision.

10.4.1.2 *The "beneficial owner" condition in a DBO is not a contractual anti-abuse provision covered by Article 1(2) of the Directive (question 2.1 to the EUD in the NetApp case)*

The Ministry of Taxation further argues that the condition of *"beneficial owner"* in the double taxation agreement between Denmark and Luxembourg (from 1980) is such an anti-abuse provision covered by Article 1(2) of the Directive. In this view, it is therefore irrelevant that the Directive itself does not set out a requirement for "beneficial owner".

This artificial attempt to "create" an internal anti-abuse rule is not sustainable either. As mentioned above in section 10.2, it was an *opt-out* when the EU legislator did not include a "beneficial owner" condition in the Directive, as confirmed by the Commission and the Advocate General. Therefore, this condition cannot (automatically) be included "by the back door".

Heavy Transport Denmark also argues that the "beneficial owner" condition of the Model Law *cannot be* considered a provision "necessary to prevent fraud and abuse" within the meaning of Article 1(2). The condition is thus *not* an anti-abuse measure, but rather a rule that only the person who is the taxpayer of the proceeds (the "beneficial owner") can claim relief under the treaty. This is explicitly stated in paragraph 12 of the 1977 Commentary to the OECD Model Tax Convention, which was in force at the time of the conclusion of the Danish-Luxembourg Double Taxation Convention in 1980. In the Directive, this consideration is instead taken care of by the capital and ownership period requirement.

Copyright © 2023 Karnov Group Denmark A/S

It is widely recognized in the international tax literature that the "beneficial owner" condition of the Model Tax Convention is not an anti-abuse provision. For example, *Professor Adolfo Martin Jiménez*, World Tax Journal, 2010, is of the opinion that "beneficial owner" is an "attribution-of-income rule" - like the principle of "rightful income recipient" in Danish law - and not an "anti-avoidance rule". Therefore, it is not an "economic interpretation", but a "legal interpretation", and the intention of the parties is therefore irrelevant:

"Therefore, unlike in the case of anti-avoidance rules, the subjective intentions of the parties are irrelevant in the beneficial-ownership analysis, which is, in our opinion, only concerned with *attributing income to a given person.*" (Our emphasis).

*Philip Baker* QC, Double Taxation Conventions, 2010 (MS 2241), who states that *"un- fortunately, the meaning of the phrase still remains less than fully clear"*, agrees, suggesting that the determination of who is the "beneficial owner" depends on who has a claim to the amount in the event of bankruptcy of the recipient.

It is further submitted that the term *'conventions'* in Article 1(2) must be interpreted as meaning that it presupposes that the Member State may, under its domestic law, rely on the double taxation convention to the detriment of the taxpayer, which is not possible under Danish law.

The view of the Ministry of Taxation leads, among other things, to the contradictory result that a recipient of dividends will have less protection under the Directive in the case where

**4439**

there is a double tax treaty (aimed at easing taxes) between the countries involved than in the case where there is none. For example, Denmark has not had a double tax treaty with Spain since 2009. If the view were correct, Heavy Transport Luxembourg (and thus Heavy Transport Denmark as withholding agent) for the period after 2009 would thus have been better off if Heavy Transport Luxembourg had been resident in Spain instead.

In addition, there is no basis for assuming that the Ministry of Taxation and the Danish legislator when introducing SEL § Section 2(1)(c) in 2001 had no desire whatsoever to extend the meaning of the OECD Model Convention on "beneficial owner" to apply to the Parent-Subsidiary Directive as an independent anti-abuse rule. On the contrary, it is clear that the legislator assumed that an intermediate holding company could be inserted above the Danish company, which was the "beneficial owner" of the exchange ...

The Ministry of Taxation's argument that the condition of "beneficial owner" is an anti-abuse provision within the meaning of Article 1(2), with the effect that Heavy Transport Luxembourg can be denied exemption under the Directive, is thus *in direct conflict with the preparatory works to SEL § 2(1)(c).*

*Østre Landsret's question 2* to the European Court of Justice in the NetApp case (MS 1772) concerns this plea from the Ministry.

In paragraphs 18 to 25 of its observations, *the Commission* generally rejects the plea raised by the Ministry and concludes in paragraph 25:

"In the Commission's view, a provision in a double taxation convention concluded between two Member States and drafted in accordance with the OECD Model Convention, under which the taxation of dividends depends on whether or not the recipient of the dividends is regarded as the *beneficial owner* of the dividends, *cannot* therefore *constitute a 'treaty anti-abuse provision' within the meaning of Article 1(2) of the Directive.*" (Our emphasis).

As stated in point 106 of the *Advocate General's* Opinion, quoted above in section 10.4.1.1, the Advocate General came to the same conclusion.

*The CJEU* has not answered question 2 either, as the Court instead chose to introduce the "general EU law principle of prohibition of abuse".

Thus, this plea is not sustainable either. *The National Tax Tribunal* has also rejected this plea in the appealed decision.

10.4.1.3 *There are no general principles in Danish law to counter abuse outside of the principle of reality (and the principle of "rightful income recipient")*

In the complex of cases after the referral to the CJEU, the Ministry of Taxation has made a new plea that *general principles have been developed in Danish case law to counter abuse that go beyond the reality principle* (and - it must be understood - the principle of "rightful income recipient").

Examples of this are 3 Supreme Court rulings (U.1998.245H, U.2005.649H and U.2015.2277H, where transactions that had been *"formally"* arranged so that a certain favorable tax rule applied were set aside for tax purposes on the grounds that the transactions had no *"business purpose"* or similar. There is also an example of a Supreme Court ruling (U.1999.1714.H, which has overruled a tax arrangement without using a corresponding reversal.

After the parties' lawyers in connection with the preparation of the Eastern High Court's referral order of 19. February 2016 in the Net App case jointly advised the High Court that the legal position in Denmark in 2005 and 2006 was such that there was no general statutory rule on combating abuse, but that there were two court-created instruments that could form the basis for taking action against abuse, namely *the reality principle* and the *principle of "rightful income recipient"*, the Ministry of Taxation now believes that *other general principles* apply in addition to this *to counteract abuse.*

First of all, it should be noted that all four judgments were available when the parties' lawyers advised the Eastern High Court. Nevertheless, the Ministry of Taxation did not find reason to inform the High Court that the representation of the legal position in the referral order was incorrect, which the Ministry certainly did not believe it was.

In this respect, reference is made to the preparatory works to Act no. 540 of April 29, 2015 regarding the introduction of an anti-abuse clause concerning the Parent-Subsidiary Directive in section 3 of the Danish Taxation Act (LL). In the bill (L 167 2014/15), the Ministry of Taxation has reproduced the applicable law prior to the adoption of the new abuse clause, and thus also in 2005 and 2006. It states herein:

"There is no general statutory anti-abuse rule in Danish tax legislation. According to Danish (legal) practice, taxation takes place after an assessment has been made of what has actually happened. This means that unreal and artificial tax-related transactions can be set aside, so that taxation is instead based on the opposite *reality*. Danish tax law is thus fundamentally in line with internationally applicable principles of *substance over form.*" (Our emphasis). As can be seen, the Ministry's presentation of applicable law in the bill corresponds to the presentation in the preliminary ruling, whereby it is recalled that the principle of

**4440**

"rightful income recipient" derives from the principle of reality. Thus, there is no mention of *other general principles to counteract abuse*, as the Ministry of Taxation now claims on the basis of a number of older judgments.

It is therefore unthinkable to assume that the Ministry of Taxation's new plea is a viewpoint invented for the occasion. The reality is that the Ministry has regretted its acknowledgment in paragraph 57 of the order for reference ... and is now instead trying to qualify the existing case law in a different way.

The new viewpoint has no support - neither in case law nor in literature.

The three first-mentioned judgments are perfect examples of the principle of reality being used to set aside the arrangements in question, while the last-mentioned judgment, U.1999.1714.H on Hadsten Bank, is an example of an interpretation of section 3 of the Danish Capital Gains Tax Act (on business shares).

...

In all three cases, the taxpayers tried to "set the stage" so that the events appear as "viable tax arrangements", but were seen through by the courts.

The Ministry of Taxation's only reason for these cases not being covered by the reality principle is that it has been part of the courts' premises for setting aside the arrangements that the transactions had no *"business purpose"* or similar.

However, this is rather a *sign* that the judgments are an expression of an application of the reality principle. It is thus the general rule that the Ministry of Taxation in cases concerning the reality principle claims that the transactions lack *"commercial purpose"*.

...

The Ministry of Taxation also fails to explain how the Ministry can consider that Heavy Transport Luxembourg is the *"proper recipient of income"*, cf. the principle in paragraph 59 of the NetApp ruling, and that the transactions *cannot be* set aside under *the principle of substance*, cf. Paragraph 57 of the same order for reference, which means that they are *not* "empty and artificial tax-related transactions" and that the substance corresponds to the form, cf. paragraph 56 of the order for reference, while the Ministry claims that the transactions must be set aside because they lack "commercial purpose".

It simply doesn't make any sense.

The Ministry of Taxation also fundamentally fails to explain how there could be an abuse at all, when the legislator in the preparatory works to SEL § 2(1)(c) has clearly stated that the incorporation of a Cypriot intermediate holding company between a Danish company and its parent company in a non-DBO country and a subsequent dividend distribution via the intermediate holding company to the company in the non-DBO country *does not* constitute an abuse.

As can be seen, there are no *general principles* in Danish law *to counteract abuses that go beyond the principle of reality* (and "rightful income recipient") and which may lead to Heavy Transport Luxembourg being denied exemption from taxation under the Parent-Subsidiary Directive.

10.4.1.4  *To summarize the Ministry of Taxation's three claimed legal bases in Danish law to counter abuse of the Parent-Subsidiary Directive: the legal bases do not exist*

As stated in sections 10.4.1.1 - 10.4.1.3 above, none of the three specific legal bases claimed by the Ministry of Taxation exist in Danish law to counteract abuse of the Parent-Subsidiary Directive.

The conclusion is therefore - as also stated in the Eastern High Court's referral order - that abuse can only be countered with *the principle of reality* and the *principle of "right income recipient"*, and the parties agree that these anti-abuse rules cannot be applied in this case.

Thus, there is no abuse of the directive under Danish law.

The ruling of *the National Tax Tribunal* is in accordance with this.

**10.5** *The amendment of the Parent-Subsidiary Directive in 2015 (and its legislative history) confirms that countering abuse of the directive still requires a national legal basis*

On December 6, 2012, the Commission published *"An action plan to strengthen the fight against tax fraud and tax evasion"*, COM(2012) 722.

Prior to this, the Commission (and the CJEU) had, in relation to the misuse of EU legal acts, mostly focused on the fact that Member States' internal anti-abuse rules *must not go too far* in relation to excluding the benefits resulting from EU legal acts, ...

However, with the action plan of December 6, 2012, "the whistle sounded differently". The EU joined the fight against tax fraud and tax evasion in earnest. This happened at the same time as the G20 countries and the OECD launched the so-called *BEPS project (Base Erosion and Profit Shifting)*. At this time, there was a *significant international rearmament* in the fight against tax fraud and tax evasion.

The action plan contains a number of proposals, recommendations and initiatives. ...

In line with the Action Plan, on November 23, 2013, the Commission presented a *proposal to amend the Parent-Subsidiary Directive*, COM(2013) 814, which included a proposal for a *general anti-abuse rule that* was *mandatory* for Member States to implement in their national law.

...

At the same time as submitting the amendment to the Directive, the Commission issued a *Memo* entitled

**4441**

*"Questions and Answers on the Parent Subsidiary Directive.*

...

It is clear from the example that under the Parent-Subsidiary Directive as it stood before the addition of the mandatory anti-abuse rule in 2015 ("Current situation"), it was *not* possible to deny exemption from withholding tax on the distribution from MS A to MS B - even if MS B may be a

"Artificial Intermediate subsidiary".

With the adoption of *Directive 2015/121/EU* by the Council on January 27, 2015, Article 1(2) of the Parent-Subsidiary Directive was amended to *require* Member States to implement the general anti-abuse clause.

...

By Act no. 540 of April 29, 2015, the new general anti-abuse rule has been implemented in Danish law as *section 3 of the Danish Tax Assessment Act*. The Danish legislator has taken the opportunity to apply the provision not only to the Parent-Subsidiary Directive, but also to the Interest/Royalty Directive and the Merger Tax Directive. A general anti-abuse rule concerning double taxation treaties has also been inserted in section 3(2) of the Danish Tax Act.

The law came into force with effect for transactions as of May 1, 2015.

As can be seen, the Commission, the Council and the European Parliament have always assumed that *countering abuse of the Parent-Subsidiary Directive requires a national legal basis* in the Member State invoking the abuse. This follows directly from the *wording* of the provision in Article 1(2) of the Directive applicable until 2015, which *authorizes* Member States to introduce anti-abuse rules, as confirmed by the European Court of Justice in the *Kofoed case (C-321/05)*. For the period after May 1, 2015, it appears from Article 1, paragraphs 2 - 4, and from LL § 3.

For Denmark, this means that until 2015, the tax authorities had two instruments available to counter abuse: *the principle of fairness* and *the "right income recipient" principle.*

From May 1, 2015, Denmark can *also* apply the mandatory abuse rule in LL § 3.

From an EU perspective, this means that the EU legislator has ensured that from 2015 all Member States have implemented what the EU legislator considers to be the ideal anti-abuse rule regarding the Parent-Subsidiary Directive.

Just for the sake of completeness, it should be noted that on July 12, 2016, the Council adopted *Directive (EU) 2016/1164 (the so-called Tax Avoidance Directive),* which among other things contains a *general anti-abuse rule* (Article 6), similar to the new anti-abuse rule in the Parent-Subsidiary Directive, but which applies in all areas. The rule has been implemented in Denmark through an amendment to LL § 3.

The final reports on the 15 OECD anti-BEPS measures were published on October 5, 2015, and a large number of initiatives have subsequently been implemented both at the OECD and EU level. The G20/OECD and EU driven process against international tax abuse over the last decade has not only led to the adoption of a large number of new anti-abuse rules, but has also changed the political view on what constitutes an abuse in the first place.

It is therefore important to realize that the question of whether abuse has occurred at a given time must be assessed in relation to the understanding of the anti-abuse rules applicable at that time.

10.6 *The general EU law principle of prohibition of abuse proposed by the CJEU has not - as claimed by the CJEU - Direct impact for citizens*

10.6.1 *Background information*

In the NetApp case, *the Eastern High Court* asked 15 questions to the EU Court of Justice.

*Advocate General Kokott,* who was also Advocate General in the Kofoed case (C-321/05), proposed - supported by the Commission - that all the questions should be answered in NetApp's favor, but *the CJEU* came to the opposite conclusion.

Question 1 concerned whether countering abuse of the Parent-Subsidiary Directive requires a *national legal basis* under Article 1(2) of the Directive, as discussed in the previous sections. Advocate General Kokott proposed in his opinion of March 1, 2018

- in accordance with the CJEU's answer to the corresponding question in the Kofoed judgment - that the question should be answered by saying that a *national legal basis is required*:

"The answer to Question 1 is that a *Member State cannot rely on Article 1(2)* of Directive 2011/96/EU on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States *if that State has not implemented that provision.*"

In its judgment of February 26, 2019, the European Court of Justice - most surprisingly - came to the exact opposite conclusion, namely that *no national legal basis is required*, see point 2 of the judgment conclusion:

...

As can be seen, the Court bases its finding on the existence of a *"general principle of EU law prohibiting abuse"*, which can be *applied directly to citizens*.

In his opinion, points 99 and 100, the Advocate General had denied that the general EU law principle of prohibition of abuse could be invoked directly against citizens, but the European Court of Justice *did not agree*.

The Advocate General had made exactly the same point about the rejection of the general EU law

**4442**

principle of prohibition of abuse in its opinion in the Kofoed

case, paragraphs 66 and 67, but at that time the EU Court of Justice *followed* the Advocate General.

It is thus a fact that the European Court of Justice in its decision of February 26, 2019 in the NetApp case has *overturned the Kofoed judgment* and thus *changed practice retroactively* - at least to 2005.

Heavy Transport Denmark argues that the said principle is not directly applicable to citizens, as the EU Court of Justice does not have jurisdiction to make this decision, as Denmark has not ceded sovereignty.

10.6.2 *More about the CJEU's judgment of February 26, 2019*
*The* CJEU's conclusion is the result of a longer line of argumentation in the premises.

...

This "general principle of EU law" is thus floating in the air, has a higher legal source value than even the treaties and does not require anchoring in national law. A concrete application of the principle does not depend on an interpretation of the relevant legal act, but solely on the existence and higher rank of the principle, which, so to speak, precedes the content of the legal act. The principle is created by the CJEU and can only be interpreted by the CJEU, see the conclusion of the judgment above.

In paragraph 76, the Court mentions that the general prohibition of abuse has been applied with direct effect to individuals in the field of *VAT law* and refers to the two well-known precedents *Italmoda (C-131/13 and others)* and *Cussens and others (C-251/16)*.

However, according to the ECJ, the principle also applies to the (few) directives that exist in the area of *direct taxes* (which are not harmonized), even though these directives expressly provide that abuse can only be countered if there is a legal basis for this in national law. Thus, it is stated in paragraph 77: The following paragraphs 84-92 contain the Court's attempt to explain away that *the Kofoed case (C321/05)*, where the Court came to the opposite conclusion, namely that a national legal basis is required, should have a bearing on the outcome of the present case.

Let it be said right away. It does not succeed, and the Court ends up "throwing in the towel". Because it *cannot be* explained away.

The Court starts in paragraph 86 by faithfully reporting that the *principle of legal certainty* was very crucial to the outcome of the Kofoed case:

...

The Court attempts to circumvent this earlier reasoning by making a semantic rewriting of the problem. Thus, it states in paragraph 91, ...

Hocus pocus. In this way, an *obligation* for the citizen has become a *failure to fulfill a condition*. But the problem remains exactly the same for the citizen. The citizen does not know the conditions (i.e. the content of the anti-abuse rules). They are still not stated in national law, but (now) float in a general principle of EU law that cannot even be read in the directive. The *legal certainty concerns* are therefore the same - or actually even greater with a general principle of EU law.

This justification for abandoning the previous practice does not appear convincing and, for lack of better arguments, the Court of Justice has also chosen to fully defend its position in paragraph 89:

...

Thus, no other credible reason can be given for why the CJEU has changed its practice than that the Court - under the impression of the moral rearmament of the OECD and the EU since 2012 - has *regretted the Kofoed judgment*. On the other hand, the CJEU

has simultaneously *disregarded any consideration for legal certainty* for EU citizens.

See, for example, *Niels Winther-Sørensen* in SR.2019.174:

"Thus, the CJEU must now be considered to have abandoned the opinion that was so clearly formulated in the Kofoed judgment.

U.2023.4403H

...

Thus, one must, among other things, understand the CJEU's argumentation to mean that if a case like the Kofoed case were to be decided today, the Court would state that Kofoed should be denied the right to invoke the Merger Tax Directive, even though no national rules on fraud and abuse had been implemented."

### 10.6.3 Reactions to the verdict - surprise and criticism

The CJEU judgment of February 26, 2019 has obviously come as a *huge surprise* to everyone. Nobody knew that there was a *general principle of EU law prohibiting abuse that was directly applicable to citizens in the area of direct taxes* (and there wasn't until the ruling).

*The Commission* was thus unaware of this principle. If the principle had applied, it would not have been necessary for the Commission to propose the introduction of a mandatory general anti-abuse clause in the Parent-Subsidiary Directive in 2015. The example in the Commission memo of November 25, 2013 also assumed that no such principle applied. Similarly, it would not have been necessary to insert a general anti-abuse clause in the Tax Avoidance Directive in 2016.

For the same reason, the Commission also suggested in its submission that the Court should answer Question 1 in accordance with the Kofoed judgment.

The EU legislator - the *Council and Parliament* - who adopted these directives were similarly unaware of the general unwritten principle.

**4443**

*Advocate General Kokott*, who was also the Advocate General in Kofoed, was also unaware of the existence of this principle with the above content. She therefore suggested that the Court follow the Kofoed case and advised the Court against extending the principle to the field of direct taxation (MS 1831).

*The National Tax Tribunal was* not aware of the new principle either and therefore relied on *the Kofoed* ruling in its decision of August 29, 2012. Both the Danish and international literature has been surprised and critical of the ruling.

See for example.

...

It is difficult to understand what motivated the Court to make the change in practice.

At the time of the judgment in 2019, the *EU legislator* had long since introduced the general anti-abuse rules desired by the EU, both in the Parent/Subsidiary Directive (2015) and in the Tax Avoidance Directive (2016).

Thus, the Court did not add anything to the legal position that did not already apply under these rules - apart from the *retroactive effect*. It is therefore a realistic assumption that the Court made the change in practice, because it appeared from paragraphs 57 and 59 of the order for reference that the parties agreed that the national rules on abuse available in 2005 and 2006 - the reality principle and the principle of "rightful income recipient" - meant that there was *no* abuse under Danish law. Only by giving the judgment retroactive effect could the Court come to the rescue of the Ministry of Taxation.

There is hardly any national legal system in the civilized world that would accept that a change in practice can have a 14-year retroactive effect.

The European Court of Justice usually prides itself on the *principle of legal certainty*. It has simply not been applied in these cases. On the contrary.

This is *law-making (political) activity on the* part of the European Court of Justice. The Court itself invented the "general EU law principle of prohibition of abuse", determines its scope,

is the only court that can interpret the principle and - as it shows

It is now - can give the principle retroactive effect as it sees fit. The democratic process is short-circuited. Both the EU legislator and the Danish legislator are disconnected from the process, and the Danish courts are obliged to execute the CJEU's judgment, the content of which is miles away from *the principle of legality* and *Section 43 of the Danish Constitution*. If it is up to the European Court of Justice.

Add to this the fact that the Court has taken no interest whatsoever in the Danish legislation on limited tax liability (SEL § 2(1)(c)) and the preparatory works to this provision. In the opinion of the CJEU, it is completely irrelevant what the legal position was in Denmark in 2007. The Danish courts must simply comply with how the CJEU today (after the change in practice in 2019) believes that the legal position should have been in Denmark in 2007. Apart from the Danish tax authorities' initiation of the "beneficial owner" cases in 2008 based on a change in practice that took place in 2008 - and published a few years later with the first national tax court rulings - and which is contrary to the preparatory works to SEL section 2(1)(c), the CJEU's decision in these cases is the *greatest assault on* the affected companies that has taken place in this entire case complex.

Neither the Danish state nor the companies have had any opportunity to adapt to what the European Court of Justice today claims to be applicable EU law as far back as 2007.

### 10.6.4 *Danish courts are not obliged to follow the orders of the European Court of Justice*

The question is then whether the Danish courts are obliged to follow the CJEU's order to apply the unwritten "general EU law principle of prohibition of abuse". The answer to this question *does not* fall within the jurisdiction of *the CJEU,* as otherwise assumed by the Court in paragraphs 82 and 83. Instead, it is a question of Danish constitutional law as to whether Denmark has ceded sovereignty to the CJEU to establish such a "general principle of EU law" that overrides and takes precedence over all adopted EU law norms and which must have direct effect on citizens, and this question can *only be* decided by the *Danish courts*.

The question is whether it is okay for the European Court of Justice - contrary to the wording of the directive - to try to throw a 'lifeline' to those Member States that may not have adopted (in the Court's view) 'sufficient' national anti-abuse rules. Of course, it is not.

The reality is that the Court of Justice thereby assumes a competence that belongs to the Danish Parliament and completely upsets the balance between the CJEU and the national courts, and this is done solely at the expense of the citizens, who are left lawless because they have no way of predicting their legal position. At the same time, by introducing such a 'general principle of EU law', the CJEU short-circuits the democratic legislative process in the EU.

It follows from *the Supreme Court's judgment in U.2017.824H (the Ajos judgment)* that an unwritten general EU law principle - in that case the general EU law principle of equal treatment - is not directly applicable to a citizen unless there is an express legal basis for this in the Danish Accession Act, which there was not.

#### 4444

Heavy Transport Denmark argues that the unwritten general EU law principle of prohibition of abuse in this case does not have direct effect against a citizen either, as there is no express legal basis for this in the Danish Accession Act.

### 10.6.4.1 *General about directives*

The third paragraph of Article 288 TFEU states that a *directive*

is addressed to the Member States:

...

It follows that a directive can only apply to a Danish citizen in the form in which it is implemented in Danish law. In other words, the citizen must be able to read their legal position in Danish law. It also follows that a directive *cannot* create *obligations* for citizens. In a report of July 1972 on certain constitutional law issues, the Ministry of Justice expressed it as follows:

"Directives and decisions addressed to the Member States can therefore at most give citizens direct *rights*. They can never create direct *obligations* for citizens." (Our emphasis).

In several judgments, the European Court of Justice has stated that *"the principle of legal certainty precludes directives per se from creating obligations for citizens and that they cannot therefore as such be relied on by the Member State against citizens"*, cf. *the Kofoed judgment*, paragraph 42 and the judgment in the NetApp case, paragraph 86.

The same must all the more apply to an *unwritten "general principle of EU law"* that hovers over the directives. When the European Court of Justice has semantically rewritten this problem to mean that the denial of a benefit in this situation is merely *"a consequence of the finding that the objective conditions for obtaining the intended benefit ... are only formally fulfilled"*, this is a specious argument. The decisive factor for the legal certainty assessment is whether the citizen has had the opportunity to know his legal position, and here the citizen is even worse off in relation to an unwritten "general principle of EU law".

Article 289(1) TFEU states that a directive shall be *adopted* jointly by the European Parliament and the Council on a proposal from the Commission.

On the other hand, it falls within the competence of the CJEU to *interpret* a directive within the meaning of Article 267(1) TFEU.

10.6.4.2 *This is not an interpretation of the Parent-Subsidiary Directive*

The Ministry of Taxation argues that the Court has merely exercised its competence to *interpret* the Parent-Subsidiary Directive pursuant to Article 267 TFEU.

Heavy Transport Denmark does not agree with this. On the contrary, the Court has developed an independent, unwritten *"general principle of EU law which applies irrespective of the question whether the rights and advantages which have been abused are based on the Treaties, a regulation or a directive ..."*, see paragraph 75.

A concrete application of the principle is thus *not* based on a *pre-interpretation* of the relevant legal act, but solely on the *existence and higher rank of the principle,* which, so to speak, precedes the content of the legal act. The specific content of the Parent-Subsidiary Directive has therefore had no bearing whatsoever on the application of the principle. This is also confirmed by the conclusion of the judgment (point 2), which states that it is *"the general principle of EU law"* - and not the directive - that is *"interpreted"*.

The reason why the Court of Justice has introduced the general principle of EU law is certainly because the Court has recognized that an interpretation of the directive could not lead to the desired result. Or to put it another way: the interpretation of the directive in the Kofoed case was correct. Therefore, in order to achieve the desired result, the Court has had to resort to a "general principle of EU law", which ranks higher than the Directive.

In this way, the Court of Justice has moved into the competence of the EU legislator. This is particularly evident in this case, where

in 2015 the EU legislator inserted a general anti-abuse rule in the parent /Directive and in 2016 inserted a similar general anti-abuse rule (for all other areas of EU law) in the Tax Avoidance Directive. Thus, with its judgment, the Court of Justice has only

added the *retroactive effect* of these rules to 2005, which the Court apparently did not find to be contrary to the principle of legal certainty.

10.6.4.3 *Denmark has not ceded sovereignty to the CJEU to establish an abuse principle with direct effect on citizens - Supreme Court ruling in the Ajos case*

The Supreme Court's premises in *the Ajos case* on the issue of *direct effect on citizens* state, among other things

"Whether a rule of EU law can be given the effect in Danish law that EU law requires *depends primarily on the Act on Denmark's accession to the European Union.*

Pursuant to section 2 of the Act, powers which, according to the Constitution, are vested in the national authorities may be exercised by the institutions of the European Union t o  the extent provided for in the treaties etc. mentioned in section 4. pursuant to section 3, the provisions of the treaties etc. mentioned in § Section 4, in force in Denmark to the extent that they are directly applicable in Denmark under EU law.

...

Such a situation, where a *principle at treaty level under EU law must have direct (obligatory) effect and take precedence over opposing Danish law* in a dispute between private parties, without the principle having a basis in any specific treaty provision, *is not foreseen in the Accession Act.*

**4445**

Against this background, we find that there is *no* basis for establishing that the EU law principle of non-discrimination on grounds of age ... *has been made directly applicable in Denmark by the Accession Act.*

...

*In summary, we find that the Accession Act does not contain a legal basis for allowing the unwritten principle of prohibition of discrimination on the basis of age to supersede the current provision in section 2a(3) of the Danish Salaried Employees Act in a dispute between private parties to the extent that the* provision is in conflict with the prohibition.

If the Supreme Court were to refrain from applying the provision in this situation, the Supreme Court would be acting outside the scope of its judicial power." (Emphasis added).

As it appears, a general principle of EU law can only have direct effect on Danish citizens if Denmark has ceded sovereignty under section 20 of the Danish Constitution in the Accession Act for this to happen. It is argued that "the general EU law principle of prohibition of abuse" is not foreseen in the Act of Accession, and that this principle therefore does not have direct effect on citizens. For the same reason, the Eastern High Court can disregard this.

It should also be noted in this context that Denmark has not ceded sovereignty to the EU since joining the Amsterdam Treaty in 1998.

Furthermore, it is argued that *the burden of proof that* Denmark has ceded sovereignty to the EU to adopt this principle with direct effect for citizens lies with the Danish state.

10.6.4.4 *The existence of a contra legem situation* The Skatteministeriet submits that the present case differs from the Ajos case because there is no *contra* legem *situation* in the present case.

"contra legem" situation. The Ministry thus believes that an interpretation of section 2(1)(c) of SEL can be applied that is in accordance with both the Parent-Subsidiary Directive and the general EU law principle of prohibition of abuse, and in this connection seems to be of the opinion that the simple reference in the provision to the fact that the tax liability does not apply if

taxation is to be waived under the Directive means that any interpretation of the Directive or EU law must be applied.

Heavy Transport Danmark *does not* agree with this. There is also in this case a "contra legem" situation, and in addition

it is not just about how SEL § 2(1)(c) should be interpreted. Rather, the issue is whether a direct application of the said principle will impose *obligations* on citizens that they do not already have under Danish law - i.e. whether citizens will be placed at a *disadvantage* compared to Danish law if the principle is applied. This depends not only on an interpretation of SEL section 2(1)(c) (taking into account its preparatory works), but also on the scope of the Danish anti-abuse rules back in 2005.

It is necessary to look at *the directive* and the *EU law principle* separately.

There is no dispute that Denmark has implemented the *Directive* correctly (and continues to do so), as confirmed by *the Kofoed judgment* in 2007. Thus, the parties agree *that* Danish law contains the anti-abuse rules referred to in Article 1(2) of the Directive (namely the principle of *reality* and the *principle of "rightful income recipient"*), and *that* these rules specifically lead to *no* abuse under Danish law, cf. paragraph 5559 of the NetApp referral order. It is also a fact that the preparatory works to SEL section 2(1)(c) in 2001 expressly state that the legislator believed that these anti-abuse rules were sufficient and that the establishment of flow-through companies did not constitute an abuse.

The situation is different with regard to the *principle of EU law* that the Court of Justice has induced. If a direct application of this principle of abuse against citizens with retroactive effect to 2005 were to lead to the result that - still back in 2005
- If there was abuse, it would be a "contra legem" situation, because the Danish rules and Danish practice at that time clearly led to the absence of abuse and could not be interpreted differently based on the EU law principle of abuse developed 14 years later. In that case, an obligation would be introduced for citizens that did not follow from Danish law - a change in the legal situation.

There is thus a "contra-legem" situation in relation to the EU law principle of abuse if its application would lead to the existence of an abuse. The Danish courts must therefore simply refrain from applying this principle.

It constitutes an independent constitutional problem that this principle did not apply at all in 2005. Also for this reason, the Danish courts must refrain from applying the principle.

10.6.4.5 *Conclusion*

As mentioned above, Denmark has not ceded sovereignty to the CJEU to establish a general principle of abuse with direct effect on citizens.

For this reason alone, the Danish courts must refrain from applying this principle.

The same result follows from *the principle of legal certainty*. According to this principle, a Danish citizen must be able to expect that the rules that apply to the citizen under a given directive are stated in Danish law, and not in an unwritten general principle of EU law, which is not part of Danish law and which the citizen has not had the opportunity to adapt to.

**4446**

This is all the more so when the general principle of EU law *contradicts the wording of the directive* and when neither the general counsel, the Commission nor the EU legislator knew of the existence of this principle.

An application of the abuse principle would also be contrary to *the principle of legality* in Danish law and *Section 43 of the Danish Constitution*.

In U.2020B.277, *Niels Fenger and Morten Broberg* have commented on the Ajos judgment as follows:

"However, it is difficult to escape the clear feeling that the

Supreme Court's interpretation of the Accession Act was made in light of a

fundamental ideological disagreement with the CJEU as regards the latter's *remarkable ability to "discover" unwritten legal principles*. ... Although it is not clear from the grounds of the Supreme Court, it is hardly unreasonable to assume that the Supreme Court was influenced in particular by a *general reluctance to impose duties on private individuals which they could not have foreseen at the time of action.* ...

Furthermore, Supreme Court Judge Lars Hjortnæs has noted that the Supreme Court's interpretation of the Accession Act was characterized by a view that:

"no-one in the Danish legislature (or society at large) had ever, nor could have imagined even in their wildest fantasies that the CJEU would think of making a principle not enshrined in any Treaty provision create obligations for private citizens by requiring it to take precedence over contravening national law in disputes between individuals. *In other words, no-one had ever thought it possible or even given it a thought that the CJEU would in effect draft an addendum to the Treaty, as it were, despite TFEU Article 19 and not allowing for the EU principle of legal certainty to play any role when deciding whether to apply the non-discrimination principle directly and horizontally.*" (Our emphasis).

Against this background, it is argued that the Danish courts must disregard the CJEU's order to refuse exemption under the Directive, even if there are no national or collective agreement provisions prescribing such a refusal.

10.6.5 *The Eastern High Court's judgments of May 3, 2021 and November 25 2021*

The present question of whether the Danish courts are obliged to follow the CJEU's order to apply the unwritten "general EU law principle of prohibition of abuse" - as just explained in detail - was inherently subject to the same intensive treatment in the first two beneficial owner cases in this case complex, the TDC and NetApp cases, regarding dividends (the Parent-Subsidiary Directive), and where the Eastern High Court ruled on May 3, 2021.

The judgment states on this issue:

...

The Eastern High Court's reasoning is not entirely easy to understand, but something could indicate that the High Court has found that section 2(1)(d) of SEL has already created the necessary implementation of the directive's optional anti-abuse rule - through the reference to the wording referring to the directive - and that it is therefore unnecessary to consider the question of whether Denmark is constitutionally obliged to apply the unwritten EU law principle without internal legal basis.

With the NetApp judgment, the Eastern High Court has thus not directly addressed the constitutional issue of sovereignty determination.

It goes without saying that Heavy Transport Danmark does not agree with the High Court's decision on this point.

In its judgment of 25 November 2021 in the two subsequent pilot cases in this case complex, NTC Parent and Takeda, the Eastern High Court first repeats what the High Court stated in the NetApp judgment:

...

As seen in the NetApp judgment, the High Court rejected the Danish Ministry of Taxation's statements (from 2001 on the possibility of the deposit of a Cypriot intermediate holding company) as being of *"such a general, explanatory nature that they cannot be regarded as statements that the Danish tax authorities would accept an abuse of law as described by the European Court of Justice".*

Now - regarding interest - the High Court refers to a statement from the Minister of Taxation from 2004, which states that the Danish tax authorities

*According to a concrete assessment of the merits* - i.e. according to the Danish principle of merits - the authorities could assume that the company that initially receives the interest is not the legal owner of the interest.

This is in full agreement with Heavy Transport Danmark's presentation of the relevant statement from the Minister in 2004 ...., where it is stated that the statement from the Minister of Taxation shows that the question of "rightful owner" of interest is based on a *"concrete assessment of the facts"*, and that there was nothing new or surprising in this, as the principle of *"rightful income recipient" is* precisely that a concrete assessment of the facts must be made in order to determine who is the "rightful income recipient" (and thus the subject of tax liability).

The problem with the reasoning is simply that it *does not* harmonize with the fact that the Ministry of Taxation in the case in question, and in this case complex in general, agrees with the taxpayer that the Danish principle of reality cannot lead to disregarding the transactions referred to in the cases, including the formal dividend/interest recipient - in this case Heavy Transport Luxembourg - as the person who has received the income in question with tax effect (see, for example, paragraphs 48 and 50 of the NetApp referral ruling.

**4447**

However, with regard to the constitutional issue, the Eastern High Court supplements its reasoning with the following:

...

Unfortunately, these additional comments only provide a conclusion (that this is a principle whose interpretation is within the scope of the interpretation of the Directive), but not a justification as to why this principle - which is thus found to be directly enforceable against citizens without implementation - is considered to fall within that framework. In particular, how the case differs from the principle at issue in Ajos.

10.7 *There is also no abuse according to the concept of abuse outlined by the European Court of Justice*

In the event that the Eastern High Court were to find that the general EU law principle of prohibition of abuse has direct effect on citizens and therefore applies in this case - which the Eastern High Court has found in the previous cases in this case complex - it is argued that there is *no* abuse according to this principle in the circumstances of this case.

As the other conditions of the Parent-Subsidiary Directive are fulfilled, Heavy Transport Luxembourg is therefore entitled to exemption under the Directive and - also for this reason - there is no limited tax liability to Denmark of the dividend in question.

It should be noted that it is the plaintiff, the Danish Ministry of Taxation, which has the burden of proof that in this case there is an abuse of the directive in accordance with the general EU law anti-abuse principle established by the European Court of Justice.

Heavy Transport Denmark argues that the Ministry of Taxation has not lifted - and cannot lift - this burden of proof.

The general EU law anti-abuse principle established by the CJEU is defined in more detail in paragraphs 97 and 98 of the judgment:

...

The general concept of abuse means that EU law cannot be invoked in cases where there is a *purely artificial arrangement that is not based on an economic reality and whose purpose is to obtain unintended tax advantages*.

This general concept of abuse corresponds to the *Danish principle of reality*, according to which *empty and artificial, tax-related dispositions* can be set aside and replaced with *reality*, cf.

paragraph 56 of the referral order ...

It is therefore not credible when the Ministry of Taxation, which recognizes that there is *no* abuse according to the Danish substantive principle, cf. paragraph 57 of the NetApp referral ruling, claims that there is an abuse according to the general concept of abuse under EU law.

...

As the CJEU also states in paragraph 99, it is not for the Court to assess the facts of the main proceedings
- It is up to the national court, in this case the Eastern High Court - but the Court has chosen to provide some guidance in the form of a number of factors that may indicate that there is an abuse under the principle, see paragraphs 100-106.

However, it is important in this context to realize that the CJEU has made a general statement, i.e. without taking into account the subjective circumstances that may exist in the specific situations. It is therefore up to the national courts to make the final assessment in light of the subjective and national specific circumstances that may exist.

And this is crucial in this case when the High Court is to make its assessment of whether there is an abuse of the directive.

Heavy Transport Danmark thus argues that, taking into account the very special circumstances of this case, there *can* be no abuse. The condition that the *main purpose of the transactions is to obtain an undue advantage* is thus *not* met in this case.

Firstly - and as explained in detail above in section 9.5 in support of no abuse under the DBO - the group structure in question with the insertion of Heavy Transport Luxembourg as an intermediate holding company was not at all necessary for Heavy Transport Denmark to be able to distribute the purchase price from the sale of the Dockwise shares to the two shareholders in Panama *without* Danish tax.

If there had been any reason whatsoever to believe that Denmark would levy withholding tax on the dividends in question by the chosen construction, i.a. by refusing directive protection, the group could, as a satisfactory alternative solution, have chosen to let Heavy Transport Danmark, which after the sale was without assets, liquidate by a simple declaration of payment liquidation under section 59 of the Danish Limited Liability Companies Act, in which connection the liquidation proceeds could *undisputedly and indisputably* have been distributed to the shareholders, Heavy Transport Group Inc, Panama, and Incomare Holdings S.A., Panama, *without withholding Danish withholding tax*, cf. the Danish
§ 16 A.

And thus, the entire basis for considering the chosen structure of "insertion of an intermediate holding company" to be an abuse of rights disappears to the ground.

The view is supported by the CJEU's answer to question 5 in the NetApp case, where the Court stated the following (paragraph 110):

**4448**

...

*Niels Winther-Sørensen* has in his comment to the judgment in SR.2019.174 remarked the following

"Read in conjunction with the following sentence in paragraph 110 of the Dividend Judgment ... one must, however, probably understand the Court's reasoning to mean that *it will not normally be possible to establish abuse of rights* and thereby deny the benefit under the Parent/Subsidiary Directive or the Interest/Royalty Directive *if a direct payment from the Danish company to the company in question* (which is assumed to be the rightful owner of the payment) *would have been tax-free.*" In

the NetApp case, this was also the reason why the Eastern High Court did not find that there was any abuse in the case with regard to the large dividend at issue in the case.

...

Although what is directly referred to by the CJEU is the situation where a (similar) dividend distribution could have been made directly to the final recipient *without* Danish withholding tax, it is argued that the principle is equally valid in a situation like the present one where the dividend could have been distributed directly to the final recipients in Panama *without* Danish withholding tax in connection with a simple payment declaration liquidation of the Danish company.

Otherwise, the consequence will be that the group will receive an actual - and gigantic - "stupidity fine" of half a billion kroner (+ interest).

...

*Secondly,* and just as importantly, there is the whole history of the Danish implementation and interpretation of the directive ..., and the unconditional position on tax exemption when distributing dividends to a Cypriot intermediate holding company. When the Danish legislator and the tax authorities interpret a directive in such a way that - if the other conditions are met - there is an unconditional claim for exemption from withholding tax if the dividend recipient is the "rightful income recipient" of the dividend, then there can of course be no abuse of the directive when the tax authorities subsequently change their opinion (with retroactive effect).

"Intermediary companies" - *treaty shopping* - were thus directly instructed by the Minister of Taxation shortly before the transactions that have triggered the enormous withholding tax claims found in this complex of cases. Under these circumstances, it obviously *does not make* sense to say that the *main purpose of the* transactions was to obtain an *undue* advantage.

The coincidence of these two very special circumstances makes it evident that there is no abuse of rights in this case.

...

*11 THE TAX AUTHORITIES' DECISIONS ARE AN AGGRAVATING (ILLEGAL) CHANGE IN PRACTICE WITH RETROACTIVE EFFECT*

In the event that the Danish Ministry of Taxation is successful in its claim that there is limited tax liability under section 2(1)(c) of the Danish Income Tax Act in respect of the dividend in question, Heavy Transport Danmark argues, in support of its claim for acquittal, that SKAT's decision (and the views that have subsequently been asserted by the tax authorities) is a *retroactive tightening of practice*, and that such tightening of practice cannot lawfully be implemented. Thus, a tightening of practice can only be made with prospective effect and with an appropriate notice as regards the new views that SKAT will consider decisive for this new practice, see e.g. U.1983.8 H.

The legal guidance 2010-2 is in line with this:

...

A notice of stricter practices must - both in form and content - explicitly state that the practice is being tightened and what the new practice is about.

As SKAT has not notified the tightening of practice, SKAT has not been entitled to collect dividend tax.

Heavy Transport Denmark argues that there is a tightening of practice in relation to *both the Double Taxation Convention and* the *Parent-Subsidiary Directive*. These issues are dealt with separately below.

If Heavy Transport Danmark is successful on just one of these issues, Heavy Transport Danmark must be fully successful in its claim for acquittal.

*11.1 Clarification of practice in relation to the double taxation*

*agreement*

As it appears ... it is unambiguously stated in *the preparatory works to SEL § 2(1)(c)* from 2001 that over a Danish subsidiary

can be *injected into a (Cypriot) intermediate holding company* through which the dividends *are channelled*, with the effect that the dividend tax that would otherwise be triggered is avoided.

The intermediate holding company is therefore the *"beneficial owner"*. It is clear that these are *pure flow-through companies*, and the tax minister's response does not contain reservations of any kind. At that time, there was thus free access to *"treaty shopping"*. As long as the intermediate holding company was the *civil law owner of the* shares in the subsidiary - and thus was *not an agent* or *straw man* or a *pro forma* - the intermediate holding company was the "beneficial owner". This was not a Danish special position. This was the global view.

The High Court can thus assume that the preparatory works from 2001 have the content mentioned here.

In 2007, Heavy Transport Denmark, in full confidence in these processes - supported by reputable

**4449**

tax advisors - by establishing an intermediate holding company in another EU state, Luxembourg, and making a dividend distribution there.

The preparatory works were based on an *interpretation* of *the* concept of

"rightful owner", i.e. an interpretation where *"rightful owner" is interpreted in accordance with the principle of "rightful income recipient" in Danish law*. It has been concluded above ... that the legislator and the tax authorities have continuously maintained the internal law in the period 1977-2008, as evidenced by a large number of statements especially from the Ministry of Taxation.

As it appears ... the Ministry of Taxation had to recognize - after the "beneficial owner" cases had started in 2008 - that a dividend-receiving intermediate holding company clearly had to be considered a "beneficial owner" under Danish tax law, and that the previously invoked interpretation of "beneficial owner" could therefore not lead to the desired result (taxation of dividends).

As a result, the Ministry of Taxation changed its practice and adopted an *autonomous (international law) interpretation* of "rightful owner", where *"rightful owner" and "rightful income recipient" are no longer equated*. On the contrary, they are *two completely different concepts that have nothing to* do with each other.

With the new autonomous interpretation of "beneficial owner", the Ministry of Taxation has - with reference to the comments to the Model Law Agreement of 2003 regarding "flow-through companies" - introduced a *very broad interpretation* of the term "flow-through company", which affects any ordinary holding company, which is in stark contrast to the previous practice.

It is thus a fact that the tax authorities' new practice is *in direct conflict with the explicit preparatory work* for this provision from 2001, which expressly states that a holding company in another DBO country established solely for the purpose of channeling dividends to its parent company is the "beneficial owner" of the dividends and therefore enjoys protection under the treaty.

The new practice is thus also *contrary to SKAT's own previous interpretation of "beneficial owner"*, which was only abandoned in 2008 when the first "beneficial owner" cases were raised.

This is a *significant tightening of the practice* regarding the interpretation of "rightful owner", which leads to the exact opposite result of what was intended in the legislative history from 2001, even though the legal basis is unchanged.

The Ministry of Taxation disputes that there has been a tightening of practice and argues that there has been no *established administrative practice* because there are no court decisions documenting the previous practice.

When - as in the preparatory works to SEL section 2(1)(c) from 2001

- t h e r e is an explicit statement from the Minister of Taxation,

However, when the tax authorities subsequently administer accordingly, it is ample evidence of an established practice that taxpayers can rely on.

When the Minister of Taxation states that intermediate holding companies are to be regarded as "beneficial owners" (and "rightful income recipients"), it is clear that there are no court decisions documenting this practice. SKAT agrees with taxpayers that *no* dividend tax should be withheld, and SKAT has therefore had no reason to raise cases about this. This has been the case for 30 years.

The Ministry of Taxation further argues that a possible (erroneous) lack of tax assessment intervention and correction cannot constitute practice and cannot create any administrative practice binding on SKAT not to impose withholding tax on dividends.

The defendant naturally agrees with this general statement. However, the point is that the fact that no cases have previously been raised in this regard is not due to incomplete control by SKAT, but rather to a perception that there was no basis for conducting these cases.

The Minister of Taxation's position in the preparatory works on the specific issue is thus just as good a documentation of the legal position as a court decision would have been, and it goes without saying that SKAT has followed the Minister of Taxation's statement.

Moreover, it is baroque to discuss whether SKAT has changed its practice when everyone knows that this is the case. This was also confirmed in Jyllandspo- sten on September 14, 2010 by the official who at the time was the spokesperson for SKAT in the "beneficial owner" cases:

"We don't know if we will be successful. *Our view is fairly new in tax practice*, so we'll have to see what the Supreme Court says when it comes to make a decision." (Our emphasis).

The change in practice is also confirmed by the fact that during the period 1977-2008, when SKAT used the *internal law interpretation* of "beneficial owner", SKAT did not raise a single case of denial of relief under the agreement on the grounds that the recipient was not the "beneficial owner", while SKAT - after switching to the *autonomous interpretation* in 2008 - has raised a very large number of cases all at once. In this complex of cases, decisions have been made in 150 cases with claims for payment of withholding tax of just over DKK 6.8 billion.

Against the above background, it is thus claimed that there is a *tightening of an established administrative practice* which should have been notified and that this changed practice cannot therefore be applied in the present case.

...

**4450**

11.2 *Practice clarification in relation to the Parent/Subsidiary Directive*

...

It is therefore a fact that the European Court of Justice, with its decision of February 26, 2019, has *overturned the Kofoed judgment* and thus *changed practice retroactively*.

...

In the *event* that Heavy Transport Danmark *does not agree that the general EU law principle does not have direct effect on citizens*, so that the principle can in principle be applied in *Danish law*, it is argued that the principle under *Danish administrative law* can only be applied with *future effect*.

The principle cannot therefore be applied in the present case, which concerns 2007, because it would represent a significant *tightening of practice with retroactive effect*.

It is ... documented above that the Danish administrative practice back in 2007 was not based on the fact that there was a *general EU law principle prohibiting abuse that had direct effect on citizens*. ...

Just for the sake of good order, it should be noted that the application of a directive in a Member State is always an expression of the application of *national law*. This applies whether it is the application of the Member State's own legislation or general legal principles developed by its courts, or whether - as in the present case

- is that the European Court of Justice has established a principle with direct effect for citizens, if this is otherwise approved by the courts of the Member State. Therefore, it is also the *Member State's procedural and administrative law rules* that must be applied when applying the law.

Since an application of the *general EU law prohibition against abuse* under the above-mentioned conditions would constitute a *retroactive change in practice*, this principle cannot be used as a basis for the decision of the case.

11.3 *More about the case law*

As mentioned, since 1983 there has been no doubt about the existence of the principle of administrative law according to which the tax authorities are prevented from changing their practice in a stricter direction with retroactive effect, cf. U.1983.8 H and Den juridiske vejledning... The High Court's judgment in U.2012.2337 H is a *textbook example* of the minimum requirements that must be imposed on the tax authorities for a stricter change in practice to take effect for citizens. In the case, the Eastern High Court agreed that the Danish tax authorities were entitled to change practice in connection with the hiring out of work to Denmark by Dutch butchers, as the concept of hiring out work should be interpreted according to internal Danish law. The change in practice was published on May 5, 1997 in Tidsskrift for Skatteret and was also mentioned in Skat Udland in May 1997. It was also published in Retsinformation on September 25, 1997. The High Court found that the change in practice could not be considered published in such a way that it could be given legal effect against companies that, like the plaintiff, had used hired labor until it was published in Retsinformation. However, the High Court found that the company should be granted a certain shorter notice to initiate the withholding of A-tax, which is why the plaintiff was not considered liable for the lack of payment of A-tax until November 1, 1997. Before the Supreme Court, the Ministry of Taxation did not dispute that the change in practice could only take effect from November 1, 1997.

Most of the case law following the Supreme Court's judgment in U.1983.8 H is mainly about *the evidence* of what the tax authorities' practice actually amounted to. This specific assessment of evidence is, of course, decided on a case-by-case basis according to the facts of each case. In the case at hand, the evidence in the form of the Minister of Taxation's own statements to the Danish Parliament is overwhelming.

U.2000.1509 H is thus an evidentiary case that is not prejudicial to the present case. ...

In U.2011.3305 H, it is frankly difficult to see what constituted the taxpayers' alleged evidence of contrary practice. Neither the High Court nor the Supreme Court could see it.

In U.2015.915 H, U.2017.2960 H and U.2017.2979 H, the taxpayers to prove the practice by referring to a long period of non-intervention by the tax authorities, which the Supreme Court did not accept. It is *not* Heavy Transport Denmark's view that the proof of the tax authorities' practice consists of a long period of non-intervention. Another thing is that when the Minister of Taxation explains a practice to the Danish Parliament and how a statutory provision should be understood, the tax authorities naturally follow the Minister's statement. ...

In U.2020.1923 H, the alleged evidence consisted mainly of a number of unpublished decisions from subordinate tax authorities that supported the taxpayer's view. The Supreme Court referred to the fact that the decisions were contrary to clear statements in the preparatory works, and

that the unpublished decisions did not constitute a binding administrative practice. The case is therefore not comparable to Heavy Transport Denmark's situation.

Another thing is that the tax authorities in this case are not entitled to tighten their practice at all.

The legal situation claimed by the Ministry of Taxation, which is contrary to the express preparatory works to SEL § 2(1)(c), can thus only be achieved through *legislation*.

Heavy Transport Danmark is of course aware that the Eastern High Court in its judgment of May 3, 2021 in the first case in this case complex, the NetApp case, found that

**4451**

in similar circumstances, there was *no* change of practice in the case (as regards the interpretation of the concept of "beneficial owner").

....

Heavy Transport Danmark ... does [not] agree with the decision of the Eastern High Court on this point. In particular, it is remarkable when it is concluded that there is no administrative practice when at the same time the High Court refers to the Minister of Taxation's answer and statement from 2006 and 2007, which clearly states that there are no examples of foreign flow-through companies that the Danish tax authorities have not accepted as "rightful owner" of dividends from Danish companies. Furthermore, it is difficult to understand that a statement on the interpretation of the legislation - and the use of intermediate holding companies as flow-through companies - such as the one made by the Minister in his reply to the Danish Parliament in 2001, should have no significance whatsoever when assessing whether a practice exists, including - as elaborated in the next section - whether a taxpayer has acted negligently by doing exactly what the Minister indicates.

In its subsequent judgment of 25 November 2021 in the next two pilot cases, the Eastern High Court has in fact repeated its reasoning.

The judgments have been appealed to the Supreme Court on this point by the liable companies.

*12 HEAVY TRANSPORT DANMARK IS NOT LIABLE FOR ANY DIVIDEND TAX - SECTION 69 OF THE WITHHOLDING TAX ACT*

*12.1 The regulatory framework and introductory remarks*

In the event that the Danish Ministry of Taxation is successful in its claim that the dividend in question is subject to limited tax liability to Denmark, it is claimed - most alternatively - that Heavy Transport Denmark is not liable for the withholding tax not withheld.

The question of whether the withholding tax can be collected from Heavy Transport Denmark is based on the provision in section 69 of the Withholding Tax Act ....

It is also stated in SKAT's Guide on withholding A-tax and AM contributions 2005-1:

"Regardless of the fact that the provisions reverse the burden of proof, case law has shown that it is the customs and tax administration that must prove that the withholding agent has acted negligently." Already because Heavy Transport Danmark's understanding of the relevant rules is in accordance with the administrative practice that the tax authorities have continuously followed over the years, including that the National Tax Tribunal has ruled in Heavy Transport Danmark's favor that there is *no* withholding obligation, Heavy Transport Danmark believes that it is obvious that Heavy Transport Danmark has *not* shown *"negligence"*.

As mentioned in the previous section, the Eastern High Court

did find in the NetApp judgment of May 3, 2021 and in the Takeda and NTC judgment of November 25, 2021 that there was no established administrative practice. Heavy Transport Danmark disagrees with this, but even if the tax authorities' many statements on the concept of "beneficial owner" as being equal to the Danish "rightful income model" were to be accepted by the Danish tax authorities

takes" concept is not found to constitute an administrative practice that Heavy Transport Danmark can rely on, the statements have in any case given rise to sufficient qualified doubt about the interpretation that Heavy Transport Danmark cannot be held responsible if the company - ultimately - was wrong, see below.

In SU 2010.387, *Jakob Bundgaard* also agrees that there can be no negligence in view of the "practice" followed by the authorities.

In its judgment of May 3, 2021 in the NetApp case, the Eastern High Court was also of the opinion that the fact that the National Tax Court had ruled in favor of NetApp did not play any role in the negligence assessment. Naturally, Heavy Transport Danmark does not agree with this either, cf. further below.

12.2 *More details about the conditions for withholding obligation under section 69 of the Withholding Tax Act*

Section 69 of the Withholding Tax Act applies not only to liability for dividend withholding tax, but also to liability for non-withheld A-tax, work rental tax

etc. Therefore, reference can be made to case law on failure to withhold taxes other than withholding tax on dividends when assessing what is meant by negligence giving rise to liability.

It appears from e.g. UfR 1977.844 H (non-liability), SKM2002.470.ØLR Ø (non-liability) and UfR 2018.3119 H (liability) that misunderstanding of the correct legal interpretation and subsumption may also be exempt from liability. Nor is there anything in the wording of the provision that suggests that it i s only ignorance of the relevant facts that is of importance. In UfR 1977.844 H, the Supreme Court found that the potential withholding agent had had "such a sense" to be able to assume that there was no withholding obligation that there was no negligence. In SKM2002.470.ØLR, the High Court used the expression that the relevant circular in the situation in question did not lead to "an unambiguous result" and acquitted the taxpayer of liability. Therefore, if the position of the potential withholding agent has been an expression of a reasonably justified understanding of the legal basis and a reasonably justified subsumption, there will be no negligence - even if it ultimately turns out that the position of the potential withholding agent was not tenable.

In UfR 2018.3119 H, the question of tax liability depended on whether the right income recipient of the dividend was a

**4452**

Dutch foundation or the founder of the foundation, who was resident in the UK. The Supreme Court ruled that liability existed and referred, among other things, to the fact that it appeared from the Taxation Guidelines *prior to the adoption of the dividend* that foreign foundations were not proper income recipients if the foundation did not meet the Danish conditions for considering a foundation to be an independent legal entity in relation to the founder.

Heavy Transport Denmark's understanding of the legal basis must therefore

- of course - be judged according to the legal sources available at the time of the distribution. That was what the company and its advisors had to go by.

As far as can be seen, there are no factual disagreements of importance to the assessment of negligence. The dispute is whether the defendant company acted negligently by not realizing at the time of the distribution that the dividend was taxable (if it turns out to be so), *regardless of the fact* that the dividend was received by Heavy Transport Luxembourg, which was undisputedly the rightful income recipient.

It should be noted that the case U.2016.2898H - RF Holding concerned a situation where the Supreme Court found that the distributed funds were diverted around the right income recipient, which was obviously negligent. This case is therefore irrelevant to the issue of negligence in this case.

When assessing negligence, it may be useful to recall that the cases arose as a result of a coordinated action by the tax authorities, where initially 31 cases were raised, later a total of 150 cases on liability for unwithheld dividend tax as part of the "Danish Tax Agency's Capital Fund and Withholding Tax Project", cf. The Ministry of Taxation's response to the Danish Parliament's Tax Committee of October 28, 2019, even though there had previously been no Danish cases *at all* on the obligation to withhold dividend tax with reference to the fact that the receiving company was a flow-through company.

As previously mentioned, in 2010, the head of the responsible office in the Danish Tax Agency stated - commendably honestly - about the upcoming showdown in the courts:

...

The background is thus undoubtedly that the Danish Tax Agency has sought to break new ground with the implementation of this complex of cases. They had not found it necessary to notify the potential withholding agents of the action and the new views that the tax authorities wanted to test beforehand.

**12.3 *Heavy Transport Danmark has not acted negligently when distributing dividends in 2007***

Among other things, in view of,

*that* the defendant's understanding of the relevant rules is in accordance with the administrative practice that the tax authorities have continuously followed over the years, cf. the review thereof above in sections 2 and 3, including that the specific situation is almost identical to the Tax Minister's instructions in his answer to question 16 to the Danish Parliament's Tax Committee during the consideration of L 99/2000 (reintroduction of taxation of dividends for parent companies),

*that* it follows directly from the wording of the Parent-Subsidiary Directive that dividends are exempt from withholding tax, including that the Directive does not require the parent company to be the "beneficial owner",

*that* Danish literature is in line with the tax authorities' previous practice,

*that* at international level there is great uncertainty as to how the term "beneficial owner" should be interpreted, cf. e.g. the OECD's proposed comments from spring 2011, where it appears from the consultation responses that not even the proposal for the new (clarifying) comments contributes to reducing the prevailing uncertainty about the interpretation, and

*that* prior to the transactions, the Heavy Transport Danmark group obtained advice from a leading tax advisory firm, KP-MG, which recommended the relevant solution with the establishment of a Luxembourg intermediate holding company without reserving any risk of withholding tax in connection with the intended distribution of dividends,

it is clear that Heavy Transport Danmark has *not* been "*negligent*".

However, as mentioned, this becomes quite obvious when one also considers that the National Tax Tribunal has ruled in favor of Heavy Transport Danmark that there is *no* withholding obligation. The National Tax Tribunal's interpretation of EU law, which had a positive result for the defendant, was also supported by the Advocate General of the European Court of Justice and by the Commission.

The fact that the European Court of Justice in a - in the opinion of most commentators - highly surprising and problematic judgment more than 12 years after the dividend distribution in this case has deviated from its established practice that directive provisions are not effective for citizens if they have not been implemented in national law, cf. also the Kofoed judgment, does

not change the answer to the question of whether there is negligence.

The case is thus that the legal sources available at the time of the distribution *clearly* indicate that the distribution was *taxable*.

*tea-free*. You *can*'t expect a Danish taxpayer to be more knowledgeable about EU law than the European Court of Justice's own Advocate General and the Commission - or the National Tax Tribunal for that matter.

The Ministry of Taxation argues that Heavy Transport Denmark should have conducted further investigations to clarify whether the conditions for non-withholding were met.

However, the fact is that Heavy Transport Denmark conducted exactly the studies that you can

**4453**

expect, namely to consult one of the leading tax consultancy firms, KPMG, which proposed the construction in question completely unreservedly. And since this was precisely the method that the Ministry of Taxation itself had indicated to the Danish Parliament, the sustainability of the chosen scheme seemed so obvious that Heavy Transport Denmark found no reason to conduct further investigations

- Which is more than you can ask for.

And what else should have been done? An inquiry to SKAT in 2006 would - based on the legislative history of the provision on limited tax liability in 2001 - undoubtedly have led to the same result. And if SKAT had been of the opinion that dividend tax should be withheld, an appeal to the highest administrative tax authority - the National Tax Tribunal - would have led to a change in SKAT's decision, cf. the appealed decision.

In addition, the chosen construction did not in any way appear to be "aggressive tax planning" or anything similar, as it is clear that the group - as a perfectly acceptable alternative - could have chosen to carry out a declaration of payment liquidation of the Danish company in May 2007 (where the dividend distribution took place) with distribution of the liquidation proceeds (i.e. the same funds) *without deduction of Danish withholding tax*. Which, of course, the group would have done if it had had the slightest inkling that the chosen alternative of incorporating an intermediate holding company in Luxembourg and distributing dividends that way would trigger a Danish withholding tax - a "dummebøde" - of half a billion kroner

+ an even higher amount in (inevitable) late payment interest.

In its judgment of May 3, 2021 in the NetApp case (p. 250, 2nd and 3rd paragraphs of the judgment), the Eastern High Court stated the following:

The Eastern High Court's judgment of November 25, 2021 in the Takeda case states similarly (p. 306, 2nd and 3rd paragraphs of the judgment):

...

These premises can be interpreted to mean that the High Court imposes the risk of *legal* uncertainty regarding the application of the term "beneficial owner" on the potentially liable companies and - in accordance with the opinion of the Ministry of Taxation - almost an objective responsibility for this.

Naturally, Heavy Transport Danmark does not agree with this. It is clear that Heavy Transport Danmark has been aware of the actual circumstances of the case, but Heavy Transport Danmark has, as just explained, had the right to assume that, among other things, the Tax Minister's unreserved statements were valid, and it cannot be held against Heavy Transport Danmark if the company - ultimately - may have been wrong.

And that the Eastern High Court in the NetApp case found that the fact that the National Tax Tribunal had ruled in NetApp's favor and that the country's highest tax authority (in the same way as the European Commission and the Advocate General of the European Court of Justice) had thus not understood the rules did not play any role in the negligence assessment, is in Heavy

Transport Danmark's opinion highly surprising - but probably a natural consequence of the *de facto* objective liability applied by the High Court. As stated, Heavy Transport Danmark does not agree with this assessment.

The Ministry of Taxation argues that it cannot be assumed in the case that KPMG gave unreserved advice that the dividends at issue in the case were tax exempt. In this connection, the Ministry of Taxation refers to the fact that the e-mail correspondence presented in the case is not accompanied by a statement from KPMG stating that the e-mail correspondence presented constitutes the full advice that KPMG has provided to the group regarding the arrangement in question with the contribution of a company in Luxembourg between Heavy Transport Danmark and the latter company's owners in Panama, and that the Heerema group could still rely on the advice when the decision on distribution was made on May 23, 2007. It is noted in this connection that there is no other (follow-up/confirming) advice and that it is clear from the correspondence in what context the advice was to be used. The Group has followed the model advised by KPMG to the letter. The reliance on the advice is also evident from the fact that the group found that KPMG had potentially acted in a liable manner.

The Ministry of Taxation is thus trying to dispute the facts.

Regarding case law in this area, it should be noted that it is not surprising that the Supreme Court in the decisions UfR 2004.362 H and UfR 2008.2243 H ruled in favor of the Ministry of Taxation that it had acted "negligently". This seems reasonably clear in both cases. None of these judgments are therefore prejudicial to the present case.

The fact that the Supreme Court in the premises of the cases has mentioned that the withholding agent was *"aware"* of the facts that led to the withholding obligation cannot - as assumed by the Ministry of Taxation - be taken as an expression that this should be the decisive premise. On the contrary, the withholding agent's knowledge of the facts is the first condition for establishing "negligence", and the Supreme Court goes on to state that the withholding agent *"had no reason"* to assume that there was no withholding obligation.

It is disputed that Heavy Transport Danmark should be subject to a heightened diligence assessment because there was allegedly circumvention of a safeguard rule. Firstly, it is disputed that SEL § Section 2(1)(c) on limited tax liability is a protective rule. In addition to this

**4454**

The reality was that the disputed funds, as mentioned, could have been transferred tax-free to the two shareholders in Panama without Danish withholding tax by a simple declaration of payment liquidation. The establishment of Heavy Transport Luxembourg and the dividend distribution to it therefore did not appear as an option that was "too good to be true", but merely as a more practical alternative to the already tax-free solution, which was otherwise obvious if the advisors had not proposed the solution with Heavy Transport Luxembourg.

It does not make sense to talk about a heightened due diligence assessment because the parties were connected in interest when the due diligence assessment is about the legal subsumption. The legal assessment of whether an intermediate holding company such as Heavy Transport Luxembourg can invoke the DBO or the Directive is not affected by whether Heavy Transport Luxembourg was a minority or majority shareholder in Heavy Transport Denmark.

Finally, it is noted that the consideration of distributing dividends to Heavy Transport Luxembourg as an alternative to liquidation arose from normal business transactions. The Danish company had sold the underlying operating company at a profit, and the consideration of repatriating the proceeds was a commercially justified consideration. At least in such a situation,

there is a duty on professional advisors - sanctioned by liability - to disclose generally known ways to achieve the commercially justified goal, including indicating

the path that results in the least possible tax payment, see U.1985.589H (MS 619) and U.2005.3151H (MS 711), even if such advice is in some ways to the detriment of the public purse.

It would therefore be contradictory and unacceptable if such advice on an almost objective basis is considered negligent in terms of section 69 of the Withholding Tax Act, if it later turns out that the approach was not sustainable. A specific assessment should therefore be made of whether the advisor and taxpayer at the time of disposition had a reasonable basis for assuming that a course of action would be accepted for tax purposes - even if there were tax considerations behind the chosen course of action. It has been fully demonstrated here that it was reasonable to assume that the approach would be accepted, as the advisors' legal opinion was supported by the National Tax Tribunal, the Commission and the Advocate General.

Against this background, it is claimed that there is *no* basis for considering Heavy Transport Danmark to have acted *"negligently"*.

### 13 PLEAS IN LAW IN SUPPORT OF THE ALTERNATIVE CLAIMS

13.1 *Introductory remarks*

...

The issue of interest on the withholding tax claim at issue in the case, which amounts to approximately DKK 450 million, has developed into a real scandal. At the expected date of judgment (May 3, 2022), the amount of interest claimed by the Ministry of Taxation will amount to approximately *DKK 808 million*. This exorbitant amount is - in addition to the temporal scope of the case - mainly due to two factors; Firstly, the state charges a (non-deductible) "usury interest" (which exceeds the market interest rate by several hundred percent, especially due to the interest element), and secondly, Heavy Transport Danmark has at no time during the litigation had the opportunity to pay the amount with reservation of recovery, as the tax authorities in these cases have consistently refused to accept the tax claim on the grounds that - as long as the decision of the National Tax Tribunal has not been overturned - there is no claim. If the Ministry of Taxation's claim is upheld, it will thus - irrefutably - have cost Heavy Transport Danmark DKK 808 million to have the tax claim of approximately DKK 450 million tested.

As mentioned, the Ministry of Taxation is of the opinion that any withholding tax claim must bear interest from 14 days after SKAT's decision of December 7, 2010 (i.e. from December 21, 2010).

The Ministry of Taxation thus considers SKAT's decision to be the decisive "demand" for the calculation of default interest under section 5 of the Danish Collection Act, despite the fact that Heavy Transport Danmark was upheld by the National Tax Tribunal in 2012 that the company was *not* obliged to withhold tax at source. The fact that the company won the case in the National Tax Tribunal has, among other things The consequence is that the Danish Tax Agency *does not* consider Heavy Transport Danmark to have a debt to the tax authorities (even though the tax authorities have sued the company for the claim), which is why the Danish Tax Agency - during the trial - has denied Heavy Transport Danmark and other companies in a similar situation the opportunity to pay the alleged withholding tax claim in order to avoid interest charges (in the event that the courts should find in favor of the Ministry of Taxation and set aside the decision of the National Tax Tribunal). This was even though the companies waived the right to claim compensatory interest in the event that they were successful in the case and the amount had to be repaid.

In addition, the Ministry of Taxation is of the opinion that the withholding tax claim should not only bear interest on the already high (and non-deductible) interest on arrears according to the Collection Act.

section 7 of the Act (in this case 0.8% or 0.7% per month), but must also earn interest in accordance with the rules on a single tax account since these rules came into force in 2013, i.e. a monthly interest accrual must be made, which means that interest must be calculated (and paid) in this

**4455**

so far almost 10 years since the rules came into force (even though the company has not had any payable debt during the period). Currently, *monthly* interest of approximately DKK 8.8 million is accrued, corresponding to an annual interest rate on the principal of approximately 23.5%.

It should also be noted that in these few (probably 4-5) dividend withholding tax cases (where the taxpayers have been upheld b y t h e   National Tax Tribunal and where the cases have been brought before the courts by the Ministry of Taxation), the Tax Agency has refused to calculate the amount of moral interest that the companies must pay if the Ministry of Taxation is successful in the case .... As it appears, the reason is that the withholding tax claim is not included as a debt in the company's tax account. Heavy Transport Danmark has therefore had to make its own calculations, and according to these, the Ministry of Taxation's views, as mentioned, have the financial consequence that payable default interest will have accrued on the principal (which thus amounts to approximately DKK 450 million) with approximately DKK 808 million as of the expected date of the Eastern High Court judgment on May 3, 2022.

If Heavy Transport Danmark is acquitted by the High Court's judgment and the Ministry of Taxation then appeals the judgment to the Supreme Court, Heavy Transport Danmark will (in the opinion of the Ministry of Taxation) only be deemed to have (rightly) made the claim when - and if - the High Court (or the Supreme Court) upholds the claim. later, an additional DKK 229 million in default interest will have accrued, bringing the total - unavoidable - default interest to approximately DKK 1,037 million, or far more than double the principal amount.

In addition to the fact that the default interest rate is far higher than the market interest rate and that Heavy Transport Danmark, as mentioned, has not been able to ward off the default interest, the default interest - unlike other interest - is not deductible when calculating the taxable income. The actual default interest is thus even higher than the aforementioned 23.5% p.a. (which interest rate should be compared to a market interest rate level for companies that currently does not exceed (effectively) 3% p.a.).

When the state charges interest on late payment of a size as in this case, and at the same time refuses to receive the tax amount during the processing of the case, the citizen (the company) can in reality be cut off from having a substantive tax claim reviewed by the courts. Thus, very few companies can afford to "bet" DKK 808 million in default interest in order to have a tax claim of DKK 450 million tested, and in any case, the interest claim is completely disproportionate to the principal amount. In the opinion of the Ministry of Taxation, the company's only possibility of avoiding the interest in question is to respond affirmatively in the case, with the consequence that Heavy Transport Danmark is cut off from judicial review of the claim. However, it cannot have been the intention of the default interest rules to cut off the citizen from the right of appeal and judicial review. The idea that Heavy Transport Danmark should *de facto* be prevented from having the case reviewed (by responding in the affirmative) is also quite absurd, considering that Heavy Transport Danmark won the case in the National Tax Tribunal and that in such a case - where the taxpayer is sued by the state - the legislator has decided that Heavy Transport Danmark's legal costs

in the court proceedings must be *fully* covered by the public sector according to the rules on reimbursement of costs in tax cases, see Chapter 19 of the Tax Administration Act.

It should be noted that the previous Minister of Taxation, in his Legal Certainty Package V entitled "A showdown with unreasonable tax rules" from April 2019, also proposed the introduction of the possibility of paying a tax claim in a situation like the present one, where it is the Ministry of Taxation that sues the citizen, so that the citizen is not met with a large, unreasonable and (allegedly) unavoidable interest claim if the citizen loses the case.

The Ministry of Taxation is thus fully aware that the collection of interest is contrary to the principle of legal certainty.

As will be seen, Heavy Transport Denmark claims that there is no legal basis for this charge either.

13.2 *Pleas in law in support of the alternative claim*

...

13.2.1 *Interest can only be accrued with effect 14 days after a ruling in favor of the Ministry of Taxation*

In support of Heavy Transport Danmark's alternative claim, the company thus *primarily* argues that the claim in section 5(1) of the Collection Act, *under the circumstances of the case,* can only be considered (rightly) made when - and if - the High Court (or the Supreme Court) may uphold the claim made by the Ministry of Taxation.

The National Tax Tribunal's decision of August 29, 2012 is that there is *no* withholding obligation. There is therefore no tax claim. This is the final result of the administrative processing. With the decision of the National Tax Tribunal, SKAT's decision of December 7, 2010 is repealed. It no longer exists - and the withholding tax claim is thus gone. Any tax already paid (and any default interest paid) will be refunded with the addition of reimbursement interest.

Also, the claim made is gone. When the administrative proceedings have ended with the conclusion that there is no claim, it makes no sense to claim that there is still a claim.

**4456**

The tax authorities' refusal to accept payment in these dividend cases fully documents that the tax authorities are also of the opinion that *no* claim exists.

The Ministry of Taxation has brought the decision of the National Tax Tribunal before the courts, cf. section 63 of the Constitution. Thus, it is the decision of the National Tax Tribunal - and not SKAT's decision - that is subject to review by the courts. Therefore, a (valid) claim can only exist at the earliest when - and if - the courts determine that Heavy Transport Danmark is liable for a tax claim. Only from this point in time can Heavy Transport Danmark be in mora.

This understanding is supported by an interpretation of the Collection Act

§ Section 5 supplemented by general principles of administrative law and rules of contract law on creditor's rights etc.

Section 5(1) of the Collection Act states:

...

Section 7(1) of the Collection Act - which is the provision on which the Ministry bases its interest claim - states:

...

The latest due date for payment is thus no later than 14 days after the demand for payment. If the amount is paid within this deadline, there is no legal basis for claiming interest on the amount.

This is explicitly supported in the explanatory notes to § 5, cf. bill no. 19 of October 6, 1999 ....

Heavy Transport Denmark argues that the provision on interest is based on the clear assumption that there is a "latest timely payment date", i.e. a date on which the taxpayer can pay the amount charged *without* being charged interest for late payment under the Act.

And further that it follows from a literal interpretation of section 5(1) of the Collection Act that there is no basis for the provision

relevant "claim" before the court could have ruled in favor of against the Ministry of Taxation.

At present, there is only one administrative law decision, namely the decision made by the National Tax Tribunal as the highest administrative appeals body on August 29, 2012, which ruled that Heavy Transport Danmark was not obliged to withhold tax at source. SKAT's decision (demand for payment) of December 7, 2010 has thus lapsed.

The claim under section 5 of the Collection Act therefore only arises when - and if - the High Court (or the Supreme Court) rules in favor of the Ministry of Taxation in the amount claimed.

The fact that the tax administration's original decision/demand has lapsed is supported by the fact that the tax administration - during the present legal proceedings

- has denied the (very few) companies that are in the same situation as Heavy Transport Denmark the opportunity to make payment of the alleged withholding tax claim (in order to avoid further interest imputation), see further below in section 13.2.2.

Heavy Transport Danmark's view is thus supported by the fact that the tax authorities have not considered themselves entitled to receive the amount for which they have sued Heavy Transport Danmark.

It simply makes no sense to talk about Heavy Transport Denmark being in "mora" when Heavy Transport Denmark cannot pay and thereby release itself from a debt. Thus, "default interest" cannot be charged either.

In this connection, the Ministry of Taxation has noted that a judgment in favor of the Ministry of Taxation will not be of a constitutive nature, but rather (only) of a declaratory nature.

Heavy Transport Danmark does not agree with this, and it is not important how the judgment is characterized.

However, the decisive factor is that the administrative proceedings have ended with the highest tax authority - the National Tax Court - deciding that the withholding tax claim does not exist, which is also the reason why the tax administration has not considered itself entitled to receive the claimed amount.

Heavy Transport Danmark currently has no debt to the tax authorities. As mentioned, it will only arise if - and at the time when - the Ministry of Taxation's claim is upheld by the courts.

The Ministry of Taxation understandably refers to the Eastern High Court's judgment of July 2, 2021 regarding the corresponding default interest issue in the NetApp case.

In the judgment, the Eastern High Court found that interest must be paid on the claim from 14 days after the claim according to SKAT's decision.

...

In an email dated December 4, 2015, NetApp Denmark ApS inquired about the possibility of depositing the disputed amount. The content of the inquiry must be understood to mean that it is an offer of payment subject to recovery. This is a revocable disposition.

The High Court finds that such a revocable disposition, if it had been carried out, could not result in a final release of NetApp Denmark ApS with the effect that no interest is payable for the period until final payment is made.

Since no payment with discharging effect has been offered, a refusal to accept the amount cannot be regarded as creditor mora with the effect that no interest is payable from the time of refusal.

As stated in the judgment, the High Court has based its decision on the fact that the judgment stating that SKAT's claim is correct is of a declaratory nature (and thus "revives" the original claim). As stated, Heavy Transport Danmark does not agree with this.

Neither does NetApp, as the company has appealed the judgment to the Supreme Court.

**4457**

*13.2.2 Interest cannot be earned during the court proceedings*

In the second row, it is submitted that the tax administration, as a public authority, was in any event unjustified in refusing to accept the withholding tax amounts in this case and that the Ministry of Taxation has therefore forfeited the right to collect interest from the date of the decision of the National Tax Tribunal.

As mentioned in the introduction, the National Tax Tribunal has ruled in favor of SKAT in the interest withholding tax cases, while the National Tax Tribunal has ruled in favor of the taxpayers in the dividend withholding tax cases, including this case. As far as is known, the National Tax Tribunal has ruled in 4 or 5 dividend cases. As far as we know, the Ministry of Taxation has brought all these dividend cases before the courts. The undersigned represents - and has from the start of the cases represented - 3 of these companies, including NetApp.

Since the cases were brought before the courts in 2011/2012, there have been ongoing discussions with the tax administration about whether payment could be made of the withholding tax claims raised by SKAT, and for which the Ministry of Taxation had now sued the companies. The purpose of this was, of course, to avoid (further) default interest accruing on the claims while the cases were pending before the courts, in case the Ministry of Taxation should win the cases.

Taxpayers did not have the same problem in the interest withholding tax cases, as the companies were able to pay the tax claims as the cases were lost in the National Tax Tribunal. The vast majority of the

- If not all - companies with interest withholding tax cases have probably made payments of withholding tax precisely in order to avoid (further) default interest.

However, after some time for reflection, the Danish Tax Agency had to announce that they were not authorized to receive payment, as there was no tax claim. The companies thus had no debt to the Tax Agency.

As lawyers for NetApp - but also for Heavy Transport Danmark and a third company in the same situation, Copenhagen Air- ports Denmark Holding ApS - we wanted in 2015 (when the cases were only ready to be submitted to the European Court of Justice after three years) to make a last attempt to make a payment, even though the tax authorities' position was already known.

In an email correspondence dated December 4, 2015, we therefore - admittedly directly on behalf of NetApp Denmark, but in reality on behalf of all companies in the same situation - asked the Danish Tax Agency about the possibility of paying the claimed tax claim to stop any interest claim. At the same time, we stated that the company would not claim interest on the amount upon repayment to the company if the lawsuit was won by the company.

However, the Tax Agency again refused to accept payment with reference to the fact that "there is no authority to make the requested payment". This must be understood to mean that the Tax Agency did not believe that there was a legal basis for the proposed scheme, which is also the position of the Ministry of Taxation.

Heavy Transport Denmark disputes that the Danish Tax Agency as a public authority did not have the authority to accept the amount for which the Ministry has summoned the company.

In general, it is argued that the tax administration without a specific legal basis is of course entitled to receive payment that it believes it is owed, regardless of whether there is a pending dispute about the legitimacy of the collection. Although the Tax Agency is obliged to follow the ruling of the National Tax Tribunal and pay the taxpayer a possible receivable if the taxpayer so wishes, this does not mean that the Tax Agency is prevented from receiving a payment under a reservation of recovery.

Copyright © 2023 Karnov Group Denmark A/S                                              page 79

It is argued that the Danish Tax Agency has the authority to exercise general creditor powers on behalf of the state, including receiving payments with reservation of recovery, and it follows from general principles of administrative law, including in particular a principle of proportionality, that the Danish Tax Agency must receive payment (with reservation of recovery) if there are no weighty and objective considerations, which is not the case in this case.

In its judgment of July 2, 2021 in the NetApp case (on the separated interest issue), the Eastern High Court has ruled on the similar question raised in the case in question - a judgment that the Ministry of Taxation naturally refers to.

In the judgment, the majority of the Eastern High Court has thus found no basis for attributing any payment offer any significance to the interest rate.

...

Heavy Transport Denmark naturally does not agree with the majority vote. NetApp has, as mentioned, also appealed the judgment to the Supreme Court. In this case, the Danish Ministry of Taxation argues that Heavy Transport Denmark has in any case not offered the tax administration to pay an amount corresponding to the withholding tax not withheld.

It should be noted that Heavy Transport Danmark knew that SKAT would not accept payment, so it did not make sense to make an actual offer of payment.

Indirectly, however, an offer has been made.

It appears from the above-mentioned email correspondence between (NetApp and) Heavy Transport

**4458**

Denmark's lawyer and SKAT from 2015 that the inquiry has a certain general character, as it refers to "the cases concerning dividend withholding tax" ... where ... "the Ministry of Taxation has brought the cases before the courts", and "example" a specific case (NetApp). As far as the defendant is aware, the issue in question is, as mentioned, only relevant to 4 or 5 potentially liable companies, of which the undersigned represents the 3 companies; NetApp Denmark ApS, Copenhagen Airports Denmark Holding ApS and Heavy Transport Danmark.

And it appears from the letter that SKAT generally refuses to accept payment in similar cases.

Even if the correspondence in question was considered to relate solely to a specific inquiry on behalf of a specific taxpayer, NetApp Denmark ApS, which is thus represented by the same lawyer, it is argued that on this basis - i.e. when the defendant's lawyer was aware of SKAT's general position - it cannot be required that Heavy Transport Danmark formally (also) offered payment. It thus makes no sense - and is an expression of pure formalism - that the defendant on this basis should have formally sent an identical letter when the answer was known.

The Ministry of Taxation also seems to have the view that Heavy Transport Denmark's position will lead to all taxpayers being able to refuse to pay default interest. However, this is not true. If the Danish Tax Agency changes its practice, it will of course require a specific request and payment from the taxpayer to discontinue the addition of interest, but if the courts find that the tax authorities' practice has been unlawful, the taxpayers must be treated as if the tax authorities had allowed payment with reservation of right to request, without the taxpayers being required to send a request to the tax authorities, which according to the tax authorities' - unlawful - practice has been hopeless.

*13.3 Pleas in law in support of the further alternative claim*

*13.3.1 Interest shall not be calculated according to the rules on a single tax account in chapter 5 of the Collection Act*

Heavy Transport Holding Denmark ApS' more subsidiary claim is that the Ministry of Taxation must acknowledge that the interest on the withholding tax claim under section 7 of the Collection Act in the period from

December 21, 2010 and until 14 days after the delivery of a judgment that may find in favor of the Ministry of Taxation in the case, must in any case be made exclusively in accordance with section 7 of the Collection Act, and thus that the claim must not before the said date be included in the tax account under the rules on one tax account in chapter 5 of the Collection Act

In support of this claim, Heavy Transport Denmark asserts that, in any case, there is no legal basis in the Collection Act to include the "debt" in the tax account from the time in question (14 days after SKAT's decisions) and that, among other things, interest cannot be calculated on

"the debt".

The interest in the period until 14 days after the delivery of a judgment that may find in favor of the Ministry of Taxation in the case must thus (exclusively) be made according to the main rule in section 7 of the Collection Act, i.e. with simple interest.

When calculated with simple interest, the default interest as of May 3, 2022 will amount to approximately DKK 482 million (as opposed to the amount of approximately DKK 808 million that would have accrued if compound interest had to be paid). Thus, the compound interest element under the tax account system is in itself a significant part of the - already unreasonable - (basic) interest that, in the opinion of the Ministry of Taxation, must be paid, despite the fact that there has been no debt that Heavy Transport Denmark has been able to pay during the period.

It goes without saying that it is "adding fuel to the fire" - and thus even more unfair - to top up the return with an interest rate, i.e. a return on the interest that the company has not been able to avoid by paying the principal.

However, this is not only unreasonable, but also, in Heavy Transport Denmark's opinion, unlawful.

As mentioned above, section 7(1) of the Collection Act - which is the provision on which the Ministry bases its interest claim - reads as follows:

...

The starting point under the Collection of Taxes Act is thus that a claim is subject to a single interest accrual (i.e. upon payment), i.e. without compound interest (simple interest), unless the rules in Chapter 5 of the Act (on one tax account) apply (where interest is accrued monthly, i.e. compound interest is calculated, see below).

The rules on a single tax account in Chapter 5 of the Collection Act were introduced by Act no. 513 of June 7, 2006 - but only came into force on August 1, 2013 - and basically mean that payments from and to companies regarding most taxes and duties (and interest thereon) are included in a single balance statement (the tax account), so that payments are automatically offset according to a balance principle, cf. sections 16 and 16a(1) of the Collection Act.

If the total sum of registered overdue claims on the company's account exceeds the total sum of registered and overdue receivables to the company, the difference (the debit balance) constitutes the total amount that the company owes the customs and tax administration, cf. section 16a(2)(1) of the Collection Act. Such a debit balance bears interest in accordance with section 16c(1), whereby a debit balance bears interest at the rate specified in

**4459**

§ Section 7(1), cf. (2), and that interest is calculated daily and

added monthly. If such a debit balance exceeds DKK 5,000, the amount must be paid immediately, cf. section 16c(4).

Copyright © 2023 Karnov Group Denmark A/S

If the total sum of registered and due claims for payments from the company is less than the registered and due claims for payments to the company, the difference (the credit balance) constitutes the company's total receivable from the customs and tax administration, see section 16a(2), second sentence. Such a credit balance that does not bear interest, see section 16c(3), must be paid to the company's Nemkonto according to the rules in section 16c(5).

In the general comments (section 1.3) to the bill on the introduction of a single tax account (L 205 - 2005/06) (MS 165) it states, among other things:

...

Section 16a of the Act thus states, among other things:

...

Section 16c(1) of the Act further states:

...

The company's debt to the public sector (the debit balance) is thus subject to interest at the rate set out in section 7 of the Act and with monthly additions. The fact that the interest is added monthly means, as mentioned, that compound interest is charged if the company does not pay the debt (equalizes the balance).

The preparatory works to the provisions do not address how to deal with the tax account's rules in a situation such as the present one, where the taxpayer has won a case in the National Tax Tribunal, after which the case is brought before the courts by the Ministry of Taxation, and where the taxpayer allegedly has no possibility of payment, as the claim is not registered on the tax account during these court proceedings (and where the claim then "reappears" at a later date by debiting the tax account). On the whole, (usual) appeal situations, including deferral, are not addressed at all in the bill.

Heavy Transport Denmark argues that in order for a claim against a company for payment of tax to affect (be debited) the sales statement (tax account), there must be certainty that the claim exists, and the latest payment date for the amount must have passed.

There is only certainty that the claim exists when - and if - the court rules in favor of the Ministry of Taxation. In addition, it makes no sense to talk about a previous (and now "resurrected") "latest payment date" when there is no possibility to pay into the tax account (as there is no registered debt).

As mentioned several times, payment cannot be made at the moment, as the claim does not exist (and there is uncertainty as to whether it will exist). Thus, the claim can only be debited to the tax account at this time, and thus the interest for the period until the court's decision must be made according to the general rules in section 7 of the Collection Act (if interest is to be paid at all, cf. the views discussed above), i.e. with one interest addition, or - in other words - without compound interest.

It makes no sense to talk about the existence of a (chargeable) debt at a time when the "debtor" cannot discharge it, including that the "latest due date for payment of the debt" has passed in these very special circumstances.

The Ministry of Taxation submits that, according to the wording and provisions of the Act, a distinction must be made between when claims are registered in the tax account and from which time such claims affect (are debited) the balance statement, and that the time at which claims for payments affect (are debited) the balance statement (and are included as part of the interest-bearing balance) can - and often will - be at a different time than the time of registration in the tax account.

At least the latter is agreed upon.

What is crucial in this context, however, is that the debiting of the balance under paragraph 4 of the provision takes place "from the latest timely

payment date for the amount". And as mentioned, there is no such date in sight, as the company cannot release itself from the "debt" by payment at this time.

In its judgment of July 2, 2021, the Eastern High Court also considered this interest issue, and the High Court found that there was a legal basis for interest on the debt according to the tax office rules.

...

As it appears, the High Court has also on this point relied on the fact that the judgment stating that SKAT's claim is correct is of a declaratory nature. The High Court thus disregards the special circumstance that it is a question of charging default interest, which is normally charged when the debtor has been unwilling or unable to pay its tax debt (which Heavy Transport Danmark has not been able to do), or - as referred to in the preparatory works cited in the premises - that the company has not made a declaration, and that on this point it is a question of the interest that would then accrue on the interest on the tax debt, ie. compound interest.

NetApp has, as mentioned, appealed the verdict to the Supreme Court."

*The legal basis*

*Denmark's accession to the European Communities*

In the Ministry of Justice's report of July 1972 on certain constitutional issues in connection with Danish accession to the European Communities (printed in Nordisk Tidsskrift for International Ret, 1971, p. 65 ff) it states

**4460**

"*4. The practice of the Court of Justice ...*

Of course, further developments in the Court's case law in this area cannot be excluded. However, as mentioned earlier, there is no possibility to enforce the Court's decisions against the Member States. One should therefore not overestimate the Court's ability to change the nature of the Communities on its own. In this as in other areas, the Court's possibilities are limited to what can be achieved in the long run politically in the individual Member States...

*SECTION V*

*Denmark's general obligations as a member of the European Communities ... 1. The obligation of direct application of certain Community rules*

*a. The content of the obligation and the possibility of fulfilling it under applicable Danish law*

As a member of the European Communities, Denmark undertakes an obligation to organize its legal order in such a way that certain Community rules are directly applicable by Danish courts and administrative authorities...

... and a Treaty provision cannot displace an express rule of domestic law with which it may conflict.

A legal basis for the direct application in Denmark of the Community rules mentioned here, as mentioned below under b, must therefore be created through an amendment of current Danish law.

*b. Which Community rules does the obligation cover?*

Immediately applicable are first and foremost the Community acts called "regulations". ...

The Community acts referred to as 'decisions' are described as binding in their entirety on those to whom they purport to be addressed. Decisions are therefore directly applicable even when they are addressed to individual citizens or businesses in the Member States. However, most decisions are addressed to the Member States themselves.

There are also certain provisions in the Treaties themselves that are directly applicable. ...

Finally, the Court has held in a few decisions that provisions [in directives and decisions] may in special cases be directly applicable. ...

*2. The relationship between directly applicable Community law and Danish law (the question of the "primacy" of Community law)*

...

Following the decision in Costa-ENEL, there can be no doubt as to the position of the Community Court."

*Treaty on European Union*

Article 6 of the Treaty on European Union - as adopted by the Lisbon Treaty - reads as follows:

"*Article 6: Fundamental rights*

1. The Union recognizes the rights, freedoms and principles set out in the Charter of Fundamental Rights of 7 December 2000, as adapted at Strasbourg on 12 December 2007, which has the same legal value as the Treaties. The provisions of the Charter do not extend in any way the powers of the Union as defined in the Treaties. The rights, freedoms and principles set out in the Charter shall be interpreted in accordance with the general provisions of Title VII of the Charter concerning its interpretation and application and with due regard to the explanations referred to in the Charter, which indicate the sources of these provisions.

2. The Union shall accede to the European Convention for the Protection of Human Rights and Fundamental Freedoms. Accession to that Convention shall not affect the powers of the Union as laid down in the Treaties.

3. Fundamental rights, as guaranteed by the European Convention for the Protection of Human Rights and Fundamental Freedoms and as they result from the constitutional traditions common to the Member States, constitute general principles of Union law."

*Corporate Tax Act*

*Consolidated Act no. 585 of August 7, 1991 of the Act on income taxation of limited liability companies etc. (Corporation Tax)*

Section 2(1)(c) of the Consolidated Act was worded as follows:

"*§ 2.* Tax liability under this Act shall also apply to companies and associations etc. as mentioned in section 1(1) and (2) which are domiciled abroad, insofar as they

...

c) receives dividend income etc. in which withholding tax must be withheld pursuant to section 65 of the Withholding Tax Act, receives dividends otherwise covered by section 16 A(1) of the Danish Taxation Act or receives disposal sums covered by section 16 B(2) or (5) of the Danish Taxation Act,"

*Implementation of the Parent/Subsidiary Directive, 1992*

Council Directive of 23 July 1990 on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (90/435/EEC) (Parent-Subsidiary Directive) provides:

"*Article 1*

1. Each Member State shall apply this Directive:

- on profits received by companies in that Member State as dividends from their subsidiaries in other Member States

- on profits distributed by companies of that Member State to companies of other Member States of which they are subsidiaries.

2. This Directive shall not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse.

**4461**

*Article 2*

For the purposes of this Directive, the term 'company of a Member State' means any company: (a) organized in one of the forms listed in the Annex to this Directive ...

*Article 3*

1. In this directive:

a) parent company shall be deemed to be at least any company of a Member State which meets the conditions laid down in Article 2 and whose

the holding in a company of another Member State fulfilling the same conditions is at least 25%.

b) subsidiary shall mean a company in whose capital another company has the holding referred to in point (a).

...

*Article 5*

1. The dividends distributed by a subsidiary to its parent company are exempt from withholding tax, at least when the parent company has a capital share in the subsidiary of at least 25%.

*Article 9*

This Directive is addressed to the Member States."

The Directive was implemented in Danish law by Act no. 219 of April 3, 1992, so that section 2 of the Corporation Tax Act was inserted after paragraph 4:

"*Paragraph 5.* The tax liability pursuant to subsection (1)(c) shall not apply to dividends received by a company resident in a state that is a member of the European Communities from a company resident in this country. It is a condition that the company receiving the dividend - the parent company - has owned at least 25 percent of the share capital of the company paying the dividend - the subsidiary - either throughout the income year in which the dividend is received or for a continuous period of at least two years up to the time the dividend is received. It is also a condition that both the parent company and the subsidiary are covered by the concept of company of a Member State in Article 2 of Directive 90/435/EEC."

The general comments to the bill (bill no. L 20 of October 3, 1991), which formed the basis for this, state, among other things:

"3. ...

The Parent-Subsidiary Directive was adopted by the Council of Economic and Finance Ministers on July 23, 1990. On June 6, 1990, the Danish Parliament's Tax Committee submitted a statement to the Danish Parliament's Market Committee on the Parent-Subsidiary Directive (Alm. del bilag 243). The directive is printed as an annex to this bill.

The Parent-Subsidiary Directive aims to harmonize Member States' tax rules to avoid economic double taxation of the part of a subsidiary's profits distributed as dividends to its parent company in another Member State.

The Directive is based on the basic principle that the profits of a subsidiary are taxed only in the subsidiary and in the state where the subsidiary is resident.

The Directive therefore provides that when dividends are distributed from a subsidiary to a parent company in another Member State, the state where the subsidiary is resident may not levy withholding tax on the dividends. The directive also contains rules stating that the parent company is not taxed on the dividends from the subsidiary.

The State in which the parent company is resident may either not tax the dividend or tax the dividend but allow a deduction from the parent company's tax for the portion of the subsidiary's tax relating to the dividend.

a) Under the current rules of the Danish Corporation Tax Act and the Danish Withholding Tax Act, a parent company resident in another EC Member State has limited tax liability in Denmark on dividends from a Danish subsidiary. The tax is 30 percent of the dividend.

It is proposed that the limited tax liability of dividends is abolished in this situation.

Similarly, it is proposed that no withholding tax should be withheld on dividends that a parent company in another EC Member State receives from its Danish subsidiary.

However, the existing double taxation treaties with the other EC Member States already prevent or limit Denmark's access to taxation of dividends.

...

4. Revenue implications.

Copyright © 2023 Karnov Group Denmark A/S

...

The proposal to exempt dividends from a subsidiary in Denmark to a parent company domiciled in another Member State from taxation is estimated on the basis of Danmarks Nationalbank's currency statistics to result in a loss of revenue of up to DKK 20 million annually. DKK 20 million annually."

The special notes to the bill (bill no. L 20 of October 3, 1991), which formed the basis for this, state, among other things:

"The proposed provisions in § 3, no. 1 and §§ 6 - 8 concern the implementation of the Parent-Subsidiary Directive in Danish tax legislation.

To #1.

According to section 2(1)(c) of the Danish Corporation Tax Act, a parent company resident abroad has limited tax liability insofar as it receives dividend income etc. in which withholding tax must be withheld pursuant to section 65 of the Withholding Tax Act, receives dividends otherwise covered by section 16 A(1) of the Assessment Act or receives disposal sums covered by section 16 B(2) or (5) of the Assessment Act.

...

According to Article 5(1) of the Parent-Subsidiary Directive, dividends distributed by a subsidiary to its

**4462**

parent company is exempt from withholding tax, at least when the parent company has a capital share of at least 25 percent.

...

It is therefore proposed that a new subsection 5 be added to section 2 of the Danish Corporation Tax Act stating that the tax liability under section 2(1)(c) does not include dividends received by a parent company resident in an EC Member State as dividends from a company resident in Denmark. It must be a condition that the parent company has owned at least 25 percent of the share capital in the subsidiary throughout the income year in which the dividend is received. It must also be a condition that both the parent company and the subsidiary are covered by the Parent-Subsidiary Directive, i.e. that they are covered by the term "company in a Member State" in Article 2 of the Parent-Subsidiary Directive.

The term "company of a Member State" is defined in Article 2 of the Directive as any company,

a)   which takes one of the forms mentioned in an annex to the Directive,

b)   which, according to the tax laws of a Member State, is considered to be resident in that State for tax purposes and which is not considered to be resident outside the Community under a double taxation convention with a third country,

c)   which is also subject, without option and without exemption, to one of the taxes referred to in Article 2(c) of the Directive or to any other tax which replaces one of those taxes.

As far as Denmark is concerned, only limited liability companies and private limited companies that are taxable under section 1(1)(1)(1) of the Danish Corporation Tax Act will be able to meet the conditions for being a "company in a Member State".

According to Article 1(2) of the Parent-Subsidiary Directive, the Directive does not prevent the application of internal provisions or agreements necessary to prevent fraud and abuse. It is therefore proposed in *section 3(1) of* the bill that the provision in section 16 B(5), third sentence, of the Danish Income Tax Act is amended so that it also includes dividends as referred to in section 2(5) of the Danish Corporation Tax Act. Reference is made to the comments to section 3(1). It is proposed in *section 7*

*that* a new subsection (5) be added to section 65 of the Withholding Tax Act stating that, when the same conditions

are fulfilled, no withholding tax shall be levied on dividends received by a parent company resident in a Member State of the Community from a company resident in this country."

The above-mentioned comments to section 3(1) of the bill regarding section 16B(5) of the Danish Tax Assessment Act state, among other things:

"When disposing of subsidiary shares, parent companies may be covered by section 16 B(5) of the Danish Taxation Act, whereby the disposal sum is taxed as dividends at the parent company, even though a dividend payment from subsidiary to parent company would be tax-free under section 13(1)(2) and (3) of the Danish Corporation Tax Act.

The rule is intended to prevent a company's shareholders from circumventing dividend taxation by, for example, allowing the company to transfer its business to a subsidiary, after which the subsidiary shares are transferred to a holding company controlled by the same shareholder group as the selling company. Without section 16 B of the Tax Assessment Act, the shareholders would be able to withdraw funds from the company in the event of a subsequent sale or liquidation of the parent company without giving up influence over the business.

If a Danish parent company disposes of shares so that the parent company must include the disposal sum in the taxable income pursuant to section 16 B(5) of the Danish Taxation Act, the subsidiary cannot, under current rules, distribute tax-free dividends to a Danish parent company pursuant to section 13(1)(2) and (3) of the Danish Corporation Tax Act in the income year in question and in the two preceding income years prior to the disposal of shares. The distributed dividends must instead be included in the calculation of the receiving company's taxable income for the years in which the distributions have taken place.

The reason for the rule is that the parent company selling the shares should not be able to reduce taxation according to section 16 B(5) of the Tax Assessment Act by emptying the subsidiary through tax-free dividends prior to the share sale.

According to Article 1(2) of the Parent-Subsidiary Directive, the Directive does not prevent the application of internal provisions or agreements necessary to prevent fraud and abuse. As a result of the Directive, a new provision on tax-free dividends is introduced in section 2(5) of the Danish Corporation Tax Act. The rationale for taxing parent companies on disposal sums according to section 16 B(5) of the Danish Income Tax Act, even where a dividend distribution from the subsidiary would be tax-free, applies equally to limited taxable parent companies (with Danish shareholders) and fully taxable parent companies. It is therefore proposed that the new rule on tax-free dividends received by a parent company resident in an EC state from a Danish subsidiary should also not apply in the relevant income year and in the two most recent income years preceding the transfer of shares, if this is covered by section 16 B of the Danish Tax Assessment Act."

*Abolition of dividend taxation regarding e.g. distribution of dividends from Danish subsidiaries to foreign parent companies, 1998*

By Act no. 1026 of December 23, 1998 amending various tax acts (International Taxation of Dividends and Share Profits etc.), section 2(1)(c) of the Corporation Tax Act was amended to read as follows:

"Tax liability under this Act shall also apply to companies and associations etc. as mentioned in section 1(1) and (2) that are domiciled a b r o a d , i n s o f a r a s  they

...

c) receives dividends covered by section 16 A(1) of the Danish Taxation Act or transfer sums covered by section 16 B of the Danish Taxation Act. The tax liability does not apply to dividends received by a company etc. (the parent company) that owns at least 25 percent of the share capital of the dividend-paying company (the subsidiary)

**4463**

for a continuous period of at least one year, within which period the dividend distribution date must fall. It is a condition that the subsidiary is covered by the concept of company of a Member State in Article 2 of Directive ...". 90/435/EEC,

§ Section 2(5) was repealed at the same time.

At the same time, *section 13 of the Danish* Corporation Tax Act was worded as follows:

"Section 13. The taxable income shall not include:

...

2.   Dividends which the companies and associations etc. mentioned in section 1(1), no. 1-2 d, 3a-5 and 5b, receive from shares or units in companies covered by section 1(1), no. 1 and 2, or companies resident abroad. However, this only applies if the dividend-receiving company, the parent company, owns at least 25 percent of the share or unit capital in the dividend-giving company, the subsidiary, for a continuous period of at least one year, within which period the dividend distribution date must lie.

..."

The general comments to the bill (bill no. L 53 of October 21, 1998), which formed the basis for this, state, among other things:

"It is proposed to reorganize the taxation of dividends and share distributions received by Danish parent companies and individual shareholders from companies abroad, and it is proposed to abolish the Danish withholding tax on dividends paid by Danish subsidiaries to foreign parent companies.

...

It is proposed [...] to abolish withholding tax on dividends paid to foreign parent companies when the Danish subsidiary is covered by the EU Parent-Subsidiary Directive, so that EU companies and non-EU companies are treated equally for tax purposes. This withholding tax can largely be avoided by incorporating holding companies in countries in relation to which Denmark is wholly or partially exempt from withholding tax.

...

*Revenue remarks*

Regarding the tax exemption of dividends from Danish subsidiaries to foreign parent companies and dividends from foreign subsidiaries to Danish parent companies, the change will not affect dividends from and to another EU country, as these are already tax-free, but only in relation to countries outside the EU.

There is no firm basis for an assessment of the revenue effect. Among other things, there is no information about foreign parent companies' dividends from Denmark or about Danish parent companies' subsidiary dividends from non-EU countries. On the other hand, it must be taken into account in the assessment that the current taxation can be circumvented by redirecting the dividends to companies in third countries, so that the dividends are not taxed in Denmark."

The comments to the individual provisions of the bill state, among other things:

"To § 1, points 1 and 2.

Dividends paid from a Danish subsidiary to a foreign parent company are subject to limited tax liability to Denmark, cf. section 2(1)(c) of the Danish Corporation Tax Act. The tax liability is fulfilled by the dividend-paying Danish company withholding tax of 25 percent on the dividends paid to the foreign shareholder. This applies whether the foreign shareholder is a natural person or a company, and regardless of whether it is a parent/subsidiary relationship or not.

However, there are two very important exceptions in parent-

/Directive, cf. section 2(5), and the double taxation treaties that Denmark has entered into.

The Parent-Subsidiary Directive (Directive 90/435/EEC) stipulates, among other things, that a Member State may not levy withholding tax when dividends are paid from a subsidiary in a Member State to a parent company in

subsidiary relationships, namely the exceptions resulting from the EU Parent-Subsidiary Directive.

another. The limit for the ownership share in parent-subsidiary relationships is set at 25 percent in the Directive, and a company must be covered by one of the types of companies listed in an annex to the Directive before the Directive applies. However, the Directive does not prevent a Member State from setting an ownership limit lower than 25 percent or from not levying withholding tax on the payment of dividends from companies other than those listed in the Annex to the Directive. In such cases, there is of course no obligation for the parent company state to apply the provisions of the Directive.

The double tax treaties each set an upper limit for how high a withholding tax the two states can impose on dividend payments. In parent-subsidiary relationships, this will typically be a maximum withholding tax rate of 5-10%, but there is nothing to prevent either state from taxing at a lower rate or not taxing at all. The limit for the ownership share in the parent

/The most commonly used rate is 25%, but 10% is used in some collective agreements.

It is generally proposed to abolish withholding tax on dividends paid to foreign parent companies when the Danish subsidiary is covered by the EU's

**4464**

Parent/Subsidiary Directive so that EU companies and non-EU companies are treated equally."

*Reintroduction of dividend taxation regarding e.g. distribution of dividends from Danish subsidiaries to parent companies in non-EU countries without a double taxation agreement with Denmark, 2001* By Act no. 282 of April 25, 2001 amending the Corporation Tax Act, section 2(1)(c), third sentence, was amended so that the provision was worded as follows:

"Tax liability under this Act shall also apply to companies and associations etc. as mentioned in section 1(1) and (2) that are domiciled a b r o a d , i n s o f a r  a s  they

...

c) receives dividends covered by section 16 A(1) of the Tax Assessment Act or transfer sums covered by section 16 B of the Tax Assessment Act. The tax liability does not apply to dividends received by a company etc. (the parent company) that owns at least 25 percent of the share capital of the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must fall. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC or under a double tax treaty with the Faroe Islands, Greenland or the state where the company is resident."

In the original bill no. L 99 of November 10, 2000, section 2(1)(c), 3rd sentence, had the following wording:

"It is a condition that the parent company is resident in a state that is a member of the EU, in a state with which Denmark has a double taxation agreement, in the Faroe Islands or in Greenland, and that the subsidiary is covered by the concept of company in a Member State in Article 2 of Directive 90/435/EEC."

The general comments to the bill state, among other things:

"Act no. 1026 of December 23, 1998 therefore repealed the taxation of dividends received by a foreign parent company from its Danish subsidiary, regardless of where the parent company is domiciled. ...

However, experience has shown that the new rules opened up for the establishment of Danish holding companies with the sole purpose of avoiding taxation in other countries, and that this possibility has been marketed by Danish tax advisors abroad. In cases where a subsidiary in e.g. an EU country is owned by a parent company in a tax haven without double taxation treaties, the group can often avoid the taxation that the former country would implement by directly distributing dividends from the subsidiary in that country to its foreign parent company by incorporating a Danish holding company. The bill to reintroduce the dividend tax for parent companies in non-EU countries without a double tax treaty with Denmark is also a contribution to the international efforts to counteract harmful tax competition or harmful tax practices, both within the EU and the OECD.

...

The Danish holding rules differ from the corresponding rules in other countries in that the Danish rules entail tax exemption both for dividend payments from a foreign subsidiary and for dividend payments to a foreign parent company. As mentioned, this means that the Danish rules can be used to undermine other countries' taxation. Other countries that tax dividends from companies in these countries to parent companies in tax haven countries are therefore dissatisfied that their taxation can be circumvented using the Danish holding rules.

It is therefore proposed as a Danish contribution to counteract the use of tax havens and to meet foreign criticism to introduce the 25% tax on dividend payments from a Danish subsidiary to its foreign parent company, but only in cases where the parent company is domiciled in a country outside the EU or in a country that does not have a double taxation agreement with Denmark."

On November 24, 2000, the Minister of Taxation responded to an inquiry from Ernst & Young to the Danish Parliament's Tax Committee as follows:

"*Question 1:* Please confirm that a company or other legal person is considered to be resident in an EU or DBO country, cf. the proposed provision in SEL § 2(1)(c), if it is resident in an EU or DBO country either under the tax legislation or under the company/fund legislation in that country.

*Question 2*: Please confirm that in relation to the proposed provision in section 2(1)(c) of the SEL, it is irrelevant whether a company resident in an EU country, cf. the answer to question 1, is covered by the concept of a company in Article 2 of the EU Parent/Data Company Directive.

*Answer:*

...

However, the abolition of dividend withholding tax from a Danish subsidiary to a foreign parent company was abused by the establishment of Danish holding companies with the sole purpose of circumventing other countries' taxation.

The purpose of bill L 99 is thus to prevent this abuse while at the same time taking into account the exceptions to the main rule of 25% withholding tax that Denmark is obliged to have under the Parent-Subsidiary Directive or a double taxation treaty.

**4465**

In relation to SEL section 2(1)(c), a foreign parent company can thus only avoid the general withholding tax of 25 percent if it is covered by the term "a company in a Member State" in the parent company's

/or under a Danish double taxation treaty is resident abroad, insofar as the dividends are covered by the double taxation treaty, or under a Danish double taxation treaty is resident abroad, insofar as the dividends are covered by the double taxation treaty.

One. The registered office under company law is not decisive for the definition of the concept of registered office in SEL § 2(1)(c).

Of course, it is still a requirement to avoid the ordinary dividend withholding tax that the other conditions in SEL section 2(1)(c) are also met. This means that the parent company owns at least 25 percent of the share capital in the subsidiary for a continuous period of at least 12 consecutive months, and that the subsidiary is covered by Article 2 of the Parent-Subsidiary Directive."

On November 28, 2000, the Minister of Taxation responded to an inquiry from Arthur Andersen to the Danish Parliament's Tax Committee as follows:

"In a letter dated November 21, 2000, Arthur Andersen contacted the Tax Committee to present some views on the bill's condition that the parent company is domiciled in a state with which Denmark has a double tax treaty.

...

As stated in my comments to an inquiry from Ernst & Young regarding the bill, it is crucial whether the dividend from the Danish subsidiary is covered by a double taxation treaty with the country where the foreign parent company is domiciled."

On January 10, 2001, the Minister of Taxation answered an inquiry from the Association of State Authorized Public Accountants to the Danish Parliament's Tax Committee as follows:

"The Association of State Authorized Public Accountants has in a letter of

On November 28, 2000, the tax committee was again contacted to comment on the answer to some questions in Ernst & Young's referral.

According to the answer in question (L 99 - Appendix 5), a foreign parent company can only avoid Danish taxation of dividends from a subsidiary in Denmark if the parent company is covered by the concept

"a company in a Member State" in Article 2 of the Parent-Subsidiary Directive, or according to a Danish double taxation agreement is resident abroad to the extent that the dividend is covered by the agreement.

In the association's view, there is no support for this interpretation either in the wording of the proposed provision or in the comments to it. However, the association agrees that the delimitation in the answer is an extension of the bill.

I should note that responses to the tax committee on a proposed provision are contributions to the interpretation of the provision in the same way as the comments to the provision.

The proposed provision must therefore be interpreted in accordance with that answer.

To make this absolutely clear, I will propose an amendment that clarifies the proposed provision."

On January 10, 2001, the Minister of Taxation sent the following amendments to the bill to the Danish Parliament's Tax Committee:

"(Clarification of conditions for tax exemption of dividends - postponement of entry into force)

To § 1

1. Point 1 is replaced by the following:

"In section 2(1)(c), the third sentence is replaced by the following:

"It is a condition that the taxation of the dividends must be waived or reduced in accordance with the provisions of Directive 90/435/EEC or under a double tax treaty with the Faroe Islands, Greenland or the state where the company is resident,"

... To

1)

The amendment aims to clarify the proposed provision.

U.2023.4403H

 The proposed provision is that only dividends distributed by a
Danish subsidiary to its shareholders are tax-free.

Copyright © 2023 Karnov Group Denmark A/S

foreign parent company that is resident in the Faroe Islands, in Greenland, in another EU state or in a state with which Denmark has a double taxation treaty. When Danish subsidiaries distribute dividends to other foreign parent companies, however, the dividends are taxed at 28%.

It is proposed to clarify that it is a condition for the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent-Subsidiary Directive or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the provisions of the double taxation agreement with the Faroe Islands, Greenland or the other state concerned."

Also on January 10, 2001, the Minister of Taxation sent the following comments on a newsletter to the Parliamentary Tax Committee:

"Cyprus IBCs [International Business Companies] gain importance as a result of developments in Denmark":

"...

The purpose of the bill is to counter the circumvention of other countries' taxation, for example for a parent company in the British Virgin Islands that has a subsidiary in Ireland.

If the Irish subsidiary is directly owned by the parent company in the Virgin Islands, Ireland will tax the dividend payment from the subsidiary to the parent company.

Irish taxation can currently be avoided by incorporating a Danish holding company so that the Irish subsidiary

**4466**

distributes dividends to the Danish holding company, which in turn distributes the dividends to the parent company in the Virgin Islands. According to the EU's parent company /Ireland is not allowed to tax the dividends under the EUSD, and under the current Danish rules, Denmark does not tax dividends either.

The bill counters this construction, as Denmark will in the future tax dividends distributed by a Danish company to a parent company in the Virgin Islands.

It is correct that the parent company in the Virgin Islands can still avoid Danish taxation of the dividends from the Irish company by transferring the shares in the Danish company to an intermediate holding company in Cyprus. In that case, Denmark will not tax the dividends as the parent company in Cyprus is covered by the Danish-Cypriot double taxation treaty.

However, as mentioned in the article, the parent company in the Virgin Islands can also avoid the dividend tax by replacing the Danish holding company with a holding company in Cyprus, so that the Irish subsidiary distributes the dividend to the company in Cyprus.

The example shows that it is no longer the Danish rules, but rather the favorable rules of Cyprus that are the prerequisite for the parent company in the Virgin Islands to circumvent the Irish taxation of dividends."

On January 11, 2001, the Minister of Taxation sent the following reply to the Danish Parliament's Tax Committee:

"*Question 3:*

Can the statement in the comments "Against this background, the additional revenue generated by the proposal is estimated to be limited" be clarified? What is estimated to be involved?

*Answer:*

The bill assumes that foreign parent companies domiciled in non-EU countries without a double tax treaty with Denmark will abandon the Danish subsidiaries established solely as part of an international tax structure. In these situations, the proposed dividend tax will not generate any revenue.

If, on the other hand, parent companies in these non-EU countries without a double taxation agreement with Denmark have Danish

subsidiaries with a real business activity, these companies could be directly affected by the proposal.

However, the companies will be able to restructure themselves so that the shares in the Danish subsidiary are transferred to a subsidiary in a country to which dividend payments are still exempt from Danish dividend tax. This is advantageous if the dividends can be distributed to the actual parent company with a lower tax rate than the Danish tax rate, possibly without taxation at all. Therefore, the revenue from such companies is estimated to be limited. There is no basis for a numerical estimate of this."

Also on January 11, 2001, the Minister of Taxation sent the following reply to the Parliamentary Tax Committee:

"Ole Bjørn [chairman of the Danish Tax Assessment Board and professor of tax law at the University of Southern Denmark]
...

Furthermore, he believes that the bill's rules are not very effective, as the proposed taxation can be avoided by depositing an intermediate holding company.

Comment:

...

It is argued that the proposed rules are not particularly effective as they can be avoided by an intermediate holding company in another country that is a member of the EU or has a double taxation treaty with Denmark and which has favorable tax rules.

I would note that in this case, it is a case of the parent company in the tax haven country avoiding taxation by using the favorable rules in the other country."

On February 26, 2001, the Minister of Taxation sent the following reply to the Danish Parliament's Tax Committee:

"*The inquiry:* It is the opinion of the Association of State Authorized Public Accountants that it is inappropriate that the internal Danish dividend taxation rules for foreign companies are linked to the DBO in the manner described in the amendment proposal, including whether the company in question in the home country is fiscally transparent. The Minister for Taxation is therefore encouraged to consider whether the aim of the bill can be achieved without the internal Danish rules depending on whether the DBO applies.

*Comment:* I do not believe that the purpose of the bill can be achieved without the internal Danish rules depending on whether the dividend is waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive or a double taxation treaty. It is essential that the Danish withholding tax on dividends is only waived when the dividends are received by a company that is taxed according to the general rules for companies in the country in question."

On March 26, 2001, the Minister of Taxation sent the following reply to the Danish Parliament's Tax Committee:

"*Question 23:* Please comment on the attached article of March 23, 2001 from Børsen: "Skattefrihed for udbytte udhules udhules". *Answer:* Børsen's article of 23 March 2001 criticizes my proposed amendment to the bill on holding companies, as the proposal erodes the tax exemption for dividends. The bill limits the current rule whereby Denmark does not tax dividends paid by a Danish subsidiary to its foreign parent company. According to the bill, the rule will in future only apply if the parent company is resident in an EU country or a country that has a double taxation treaty with Denmark. In other cases, Denmark will be required to levy a tax of 28% of the dividend.

...

During the consideration of the bill, Ernst & Young made a referral (L 99 - Appendix 2) to the tax committee and

**4467**

asked about the effect of the proposal on companies that are domiciled in another EU country or in another country that has a double taxation treaty with Denmark, but which nevertheless

Copyright © 2023 Karnov Group Denmark A/S

are not protected by the Directive or the Agreement. In a reply to the tax committee (L 99 - Annex 5) I stated that these companies cannot receive dividends from a Danish subsidiary without the proposed taxation.

In a communication to the tax committee (L 99 - Appendix 10), the Danish Association of State Authorized Public Accountants stated that, in the association's opinion, this delimitation is in line with the bill, but lacks the necessary support in the wording of the proposed provision.

Against this background, I proposed an amendment which clarifies that the decisive condition for tax exemption for dividends is that Denmark must waive or reduce the taxation of the dividend under the Parent-Subsidiary Directive or a Danish double taxation treaty.

..."

It appears from the report on the proposal to amend the Danish Corporation Tax Act (Tax Committee L99, Appendix 43) that the Minister of Taxation proposed the following amendments during the committee's consideration:

"In *section 2(1)(c)*, the *third sentence* is replaced by the following:

"It is a condition that the taxation of the dividends must be waived or reduced in accordance with the provisions of Directive 90/435/EEC or under a double tax treaty with the Faroe Islands, Greenland or the state where the company is resident".

[Clarification of conditions for tax exemption of dividends]

Remarks

...

The amendment aims to clarify the proposed provision.

The proposed provision is that only dividends distributed by a Danish subsidiary to its foreign parent company resident in the Faroe Islands, Greenland, another EU state or a state with which Denmark has a double taxation treaty are tax-free. When Danish subsidiaries distribute dividends to other foreign parent companies, however, the dividends are taxed at 28%.

It is proposed to clarify that it is a condition for the proposed tax exemption that Denmark must waive the taxation of the dividend in question in accordance with the provisions of the Parent-Subsidiary Directive or that Denmark must waive or reduce the taxation of the dividend in question in accordance with the provisions of the double taxation agreement with the Faroe Islands, Greenland or the other state concerned."

*Concerning taxation of participants in transparent parent companies* In Act no. 1375 of 20 December 2004 amending the Companies Tax Act and the Withholding Tax Act (Implementation of amendments to the Parent-Subsidiary Directive), a fourth sentence was inserted after section 2(1)(c), after the third sentence, with the following wording:

"Furthermore, the tax liability shall not apply to dividends received by shareholders of parent companies as mentioned in the second sentence which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States but which are considered to be transparent entities for the purposes of taxation in this country. It is a condition that the shareholder is not resident in this country."

The bill (no. L 27 of October 7, 2004) on which this is based states, among other things:

"*General comments Background and*
*purpose of the bill*

On December 22, 2003, the Council adopted a directive (2003/123/EC) amending the Parent-Subsidiary Directive (90/435/EEC).

...

*2.1.1.* ...

The amending directive is printed as annex 1 to this bill. Annex 2 to the bill compares the provisions of the Parent-Subsidiary Directive with the provisions of the Amending Directive.

The amending directive entails,

- that the Parent-Subsidiary Directive can apply to a larger number of legal entities etc. than before, including the European Company (SE) and the European Cooperative Society (SCE),

...

2.2.2.5 Transparent companies

The new companies included in the list of companies referred to in Article 2(1)(a) are subject to corporate tax in their Member State of residence, but some of them, due to their legal characteristics, are considered by other Member States as fiscally transparent. According to the recitals to the amending Directive, Member States that treat non-resident taxpaying companies as fiscally transparent on this basis should provide appropriate tax relief in respect of income that is part of the tax base of the parent company.

...

*3.2.5 Transparent companies*

...

Transparent companies are not covered by the limited tax liability on dividends from Danish companies pursuant to section 2(1)(c) of the Danish Corporation Tax Act, as the tax liability under this provision is for companies and associations etc. as mentioned in section 1(1) of the Danish Corporation Tax Act. Thus, there is no need for a provision stating that transparent companies that are covered by the parent company's /Subsidiaries Directive, is not limited

**4468**

taxable in Denmark on dividends from Danish subsidiaries.

According to Danish rules, the tax liability of dividends accruing to a transparent company is the responsibility of the shareholders.

It is therefore proposed that foreign shareholders in a transparent company covered by the Parent-Subsidiary Directive should not have limited tax liability in Denmark on dividends from the transparent company's Danish subsidiary. This should apply regardless of whether the shareholder is a company or a natural person and regardless of the shareholder's ownership interest in the transparent company.

...

*Comments on the individual provisions*
*For point 4*
Please refer to the general comments, section 3.2.5.

According to section 2(1)(c), second sentence, of the Danish Corporation Tax Act, dividends received from foreign companies, associations etc. are tax-free if the dividend-receiving company etc. (the parent company) owns at least 20 percent (15 percent, 10 percent, cf. the amendments proposed under nos. 1 and 2) of the share capital in the dividend-giving company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of the Parent-Subsidiary Directive or under a double taxation treaty with the Faroe Islands, Greenland or the state where the company is resident.

According to the proposal, the tax liability shall also not apply to dividends received by participants in parent companies included in the list of companies referred to in Article 2(1)(a) of the Parent-Subsidiary Directive, but which are considered to be

transparent entities for tax purposes in Denmark.

It must be a condition that the shareholder is not resident in Denmark.

This means that foreign shareholders in a transparent parent company covered by the Parent-Subsidiary Directive,

not be subject to limited tax liability in Denmark on dividends from the transparent company's Danish subsidiary. This shall apply regardless of whether the shareholder is a company or a natural person and regardless of the shareholder's ownership interest in the transparent company." Section 2(1)(c) of the Danish Corporation Tax Act was at the time of the rulings in the NetApp case on September 28, 2005 and October 13, 2006 as follows (Consolidated Act no. 111 of February 19

2004, as last amended by Act No. 1375 of December 20, 2004):

"§ 2. Tax liability under this Act shall also apply to companies and associations, etc. as mentioned in section 1(1), which are domiciled abroad, insofar as they

...

receives dividends covered by section 16 A(1) of the Danish Tax Assessment Act, except for distributions from bond-based investment funds as mentioned in section [...] of the Danish Capital Gains Tax Act, or receives disposal sums covered by section 16 B of the Danish Tax Assessment Act. The tax liability does not include dividends received by a company etc. (the parent company) that owns at least 10 percent of the share capital in the dividend-paying company (the subsidiary) for a continuous period of at least one year, within which period the dividend distribution date must lie. However, for dividend distributions in the calendar years 2005 and 2006, the ownership share mentioned in the second sentence shall be 20 percent, and for dividend distributions in the calendar years 2007 and 2008, the ownership share mentioned in the second sentence shall be 15 percent. It is a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on a common system of taxation for parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the company is domiciled. Furthermore, the tax liability does not include dividends received by participants in parent companies as mentioned in the second sentence, which are included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, but which are considered to be transparent entities when taxed in Denmark. It is a condition that the shareholder is not resident in this country"

By Act no. 525 of June 12, 2009, the Danish Corporation Tax Act

§ Section 2(1)(c), 3rd-6th sentences, changed to read as follows:

"The tax liability does not include dividends on subsidiary shares, cf. *section 4 A of the Danish Capital Gains Tax Act,* when the taxation of dividends from the subsidiary is to be waived or reduced under the provisions of Directive 90/435/EEC on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the parent company is resident. Furthermore, the tax liability does not include dividends from group company shares, cf. *section 4 B of the Danish Shareholding Tax Act,* which are not subsidiary shares when the group company receiving the dividend is resident in a state that is a member of the EU/EEA and the taxation of dividends would have been waived or reduced under the provisions of Directive 90/435/EEC or the double taxation treaty with the state in question if they had been subsidiary shares. Furthermore, the tax liability shall not apply to dividends received by shareholders of parent companies included in the list of companies referred to in Article 2(1)(a) of Directive 90/435/EEC on the common system of value added tax.

**4469**

tax regime for parent companies and subsidiaries from different Member States, but which are considered to be transparent entities when taxed in Denmark. It is a condition that the shareholder is not resident in this country,"

By the same act, section 4 A of the Capital Gains Tax Act was worded as follows:

*Definition of subsidiary shares*

§ 4 A. Subsidiary shares are shares owned by a company that owns at least 10% of the share capital in the subsidiary, cf. however, subsections 2-4.

*Subsection 2.* It is a condition under subsection (1) that the subsidiary is covered by section 1(1), no. 1-2 a, 2 d-2 h and 3 a-5 b of the Danish Corporation Tax Act or that the taxation of dividends from the subsidiary is waived or reduced in accordance with the provisions of Directive 90/435/EEC on a common system of taxation for parent companies and subsidiaries from different Member States or under a double taxation agreement with the Faroe Islands, Greenland or the state where the subsidiary is resident.

*Subsection 3.* The subsidiary shares are considered to be owned directly by the parent company's corporate shareholders covered by section 1 or section 2(1)(a) of the Danish Corporation Tax Act in cases where

1) the parent company's primary function is ownership of subsidiary shares and group company shares, cf. section 4 B,
2) the parent company does not exercise real economic activity regarding the shareholding and
3) more than 50 percent of the share capital in the parent company is directly or indirectly owned by companies covered by section 1 or section 2(1)(a) of the Danish Corporation Tax Act that would not be able to receive dividends tax-free through direct ownership of the shares in the individual subsidiary, and
4) the shares in the parent company are not admitted to trading on a regulated market or a multilateral trading facility.

*Paragraph 4. ...*"

From the bill (no. L 202 of April 22, 2009) on which the amendment is based, the comments to the individual provisions of the bill regarding the proposed wording of section 2(1)(c)(3)-(5) of the Danish Corporation Tax Act state, among other things:

"To #5...

In addition, the provision is proposed to be simplified so that the dividends that are tax-free are instead defined with reference to the definition of subsidiary shares and group company shares proposed to be inserted in the Danish Capital Gains Tax Act, cf. section 1(6) of the bill. However, it is a condition that the dividend-receiving group company is resident in the Faroe Islands, Greenland or a state that is a member of the EU/EEA and which exchanges information with Denmark. The rewording only entails minor substantive changes.

Reference is also made to the comments to the bill's § Section 1, no. 10 on tax exemption for profits on subsidiary shares.

The 4th sentence of section 2(1)(c) of the Danish Corporation Tax Act is proposed to be repealed, as the content is no longer relevant.

To no. 6 [In section 2(1)(c), 6th sentence, which becomes the 5th sentence, is deleted: "as mentioned in the 3rd sentence."]

This is a consequential change as a result of the bill's § 14, no. 5."

*Equation guides*

From the tax assessment guidelines, section D.D., chapter III, article 10 on exchanges, published on January 29, 2003, it appears, among other things:

"Dividends paid by a company shall, as a general rule, be taxable in the State of which the beneficial owner of the dividends is a resident. However, the Contracting States may agree that, subject to certain specified limitations, dividends may also be taxed in the State of which the company is a resident.

...

When a Danish company covered by SEL section 1(1), no. 1, 2, 2e and 4 distributes dividends, the company must, according to the main rule in KSL section 65(1), withhold dividend tax at 28%. The rule also applies to the distribution of dividends to companies that are tax resident abroad."

According to the tax guide section D.D, chapter III, article 10 on dividends, published on July 14, 2003, among other things:

"Dividends paid by a company shall, as a general rule, be taxable in the State of which the beneficial owner of the dividends is a resident. However, the Contracting States may agree that, subject to certain specified limitations, dividends may also be taxed in the State of which the company is a resident.

In the 2003 update, the commentary now clarifies that the term "beneficial owner" should not be understood in a narrow technical context, but rather in the context of the purpose of the treaty, including the avoidance or evasion of taxation. An agent or nominee is not a beneficial owner, nor is a conduit company ("straw man") or so-called fiduciaries, which are persons who are formally owners of an asset, but where the return accrues to a beneficiary. A beneficial owner in a contracting state can invoke the treaty regardless of the presence of an intermediary."

The legal guidance version 2010-2 section A.A.7.1.5 states, inter alia:

"Notification of change with future effect

It is a fundamental principle of administrative law that it is only possible to initiate an aggravating

**4470**

change in practice with effect for the future and after giving adequate notice to allow citizens to adapt to the changed legal situation.

...

What constitutes adequate notice depends entirely on the specific circumstances, i.e. the amount of time citizens are deemed to need to adapt to the change in practice. A change in practice must be published in an appropriate manner, e.g. In the form of a SKM notification (control signal) or by special news marking in the legal guidelines."

*Shedding light on administrative practices*

The Minister of Taxation's answer of November 6, 2006 to question S 474 to the Parliamentary Law Secretariat states, among other things:

"*Question:* Can the Minister confirm that dividends from Danish companies, if the ownership share exceeds 20 percent, can be paid tax-free to a parent company in e.g. Luxembourg and then transferred to a tax haven country?

*Answer:*

...

The limited tax liability - and the derogation - applies to the company that actually *receives* the dividend. The limited tax liability is therefore only waived if the foreign company that actually receives the dividend is covered by the Directive or a double tax treaty. However, if the dividend is actually received by a company in a tax haven country, the dividend payment is not exempt from withholding tax.

The "beneficial owner" principle must therefore be applied to determine who "receives" the interest. The term "beneficial owner" is considered to be very similar to the term "beneficial owner" used in the double tax treaties. In the double tax treaties, withholding tax shall only be waived or reduced if the beneficial owner of the dividends is a resident of the other state.

The provision is a safeguard against an ordinary taxed company being inserted as a conduit company between the dividend-paying Danish company and the final receiving foreign tax haven company. The provision applies even if several intermediate ordinary taxed companies are incorporated. The decisive factor is who is the correct income recipient/beneficial owner.

"Conduit" companies include companies that, although they are the

formal owner, actually have very narrow powers in relation to the income in question. In relation to the dividends, the company is a "nominee" or trustee acting on behalf of other parties, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

A pure flow-through holding company in e.g. Luxembourg will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.2). It should be noted that the Swiss Supreme Court has concluded that a pure flow-through holding company in Denmark was not the beneficial owner of dividend payments under the Danish-Swiss treaty.

It should be mentioned that the Parent-Subsidiary Directive does not imply that dividend payments to flow-through companies must be recognized.

In conclusion, it should be noted that there is no taxation of dividends when dividends are paid to, for example, a parent company covered by the Parent-Subsidiary Directive if this company is the beneficial owner of the dividend, even if the parent company is owned by a company resident in a tax haven. Who is the beneficial owner of the dividend is determined on a case-by-case basis."

In continuation of this, on November 27, 2006, the Minister of Taxation gave the following answer to the Danish Parliament's Tax Committee:

"*Question 5:...*

*Answer:...*

The lapse of limited tax liability is conditional on the foreign company in question being the beneficial owner of the dividend.

A pure flow-through company resident abroad, e.g. Luxembourg, will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

However, the limited tax liability will lapse if the beneficial owner of the flow-through company is resident in another country and Denmark, according to the Parent-Subsidiary Directive or a double tax treaty with that country, must reduce or waive taxation of the dividend.

...

*Question 6:* ...

*Answer:* I cannot provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as the rightful owner of dividends from Danish companies.

...

*Question 10:* To what extent and how does SKAT check when dividends are distributed to flow-through holding companies where no withholding tax is withheld due to double tax treaties or the EU Parent-Subsidiary Directive? whether the relevant flow-through holding company must be approved as the rightful income recipient of the dividend, or whether the dividend recipient is the shareholder of the flow-through holding company and - if this shareholder is resident in a tax haven country - whether the Danish subsidiary must withhold dividend tax from the dividend distribution?

**4471**

*Answer:* ...

It is part of the tax assessment process to ensure that the conditions for not withholding dividend tax are met, including whether a foreign company is the rightful owner of the dividend.

A memo of March 20, 2007 to the Danish Parliament's Tax Committee on the status of SKAT's control efforts regarding the takeover of seven Danish groups by private equity funds states, among other things:

U.2023.4403H

"In recent years, the acquisition of Danish companies by private equity funds has accounted for a larger and larger share of total business transfers. SKAT has obtained information that

More than 80 Danish companies have been acquired by Danish or foreign private equity funds in recent years.

A private equity fund is usually a limited partnership where a number of investors have provided capital. With the investors' equity as a basis, significant sums are borrowed from banks and other financial entities for the acquisition of Danish companies.

A typical model will show that investors set up a Danish holding company that is responsible for the acquisition of the Danish company. The holding company, which buys the Danish company from the previous shareholders, receives the money for the acquisition via loans from banks and investors in the private equity fund.

In general, SKAT focuses on corporate transactions, as experience shows that there is often a risk of errors when calculating taxable income in this area. As the private equity funds' share of the Danish market for corporate transactions has been increasing, and especially in 2005 they have proved to constitute a significant number with a large volume, SKAT has focused on this type of acquisitions. Based on SKAT's information on takeovers of Danish companies by private equity funds, seven acquisitions of Danish companies were selected for closer inspection. In the selection, emphasis was placed on representing different private equity funds, different types of companies and differences in volume. The purpose was, among other things, to subsequently assess whether the tax treatment of the acquisition at the individual company depended on which private equity fund had acquired the company.

In SKAT, a working group was initially set up whose purpose was to create an overview of the theoretical basis for a tax assessment of the private equity funds' acquisitions with a view to the subsequent specific control of the 7 acquisitions.

...

Based on this, it is investigated who is the final recipient - the "right income recipient" - of interest and dividends. The purpose is to determine whether this recipient is liable to pay tax in Denmark (limited taxpayer), so that withholding tax can be withheld from the payments. This can normally only be done if the recipient is resident in a country with which Denmark has not entered into a double taxation treaty.

However, the cash flow often leaves Denmark to recipients in countries with which Denmark has signed a double tax treaty - DBO countries. This means that there is no limited tax liability to Denmark and that no withholding tax must be withheld. However, if the first recipient of the payments is not the final recipient - the "rightful income recipient" - of the payments, but only a flow-through company, there may still be a limited tax liability for the final ("rightful") recipient.

Therefore, SKAT is looking for information that can document who is the last and final link in the chain, and whether this link is located in a non-DBO country. With the latter countries, Denmark typically does not have agreements on assistance or exchange of information.

Just as importantly, SKAT must also seek documentation that the recipients located between Denmark and the final recipient of dividends or interest / capital gains can be regarded as flow-through companies, so that the final ("correct") recipient in the non-DBO country can be subject to limited tax liability to Denmark as mentioned."

The Minister of Taxation's answer of May 15, 2007 (questions 75-77) to the Danish Parliament's Tax Committee regarding bill no. L 213 on amendment of the Corporation Tax Act and various other tax acts (CFC taxation and measures against capital funds etc.) states, among other things:

"*Question 75:*

Has Skat still not implemented dividend taxation of so-called flow-through companies?"

*Answer:*

In a special control effort, SKAT has focused on the takeover of Danish groups by private equity funds. In this connection, SKAT is working to obtain information about the recipients of the cash flows leaving Denmark in the form of dividends and interest, as SKAT wants documentation that it is the "final recipient" who is also the correct income recipient of the dividends and interest income. Only when this is clarified can it be assessed whether Denmark is entitled to withholding tax on the amounts paid out.

This investigation has not yet led to dividend taxation of distributions to flow-through entities."

The Minister of Taxation's reply of May 22, 2007 to the Danish Parliament's Tax Committee regarding bill no. L 213 on amendment of the Corporation Tax Act and various other tax laws (CFC taxation and measures against capital funds etc.) states, among other things:

"*The individual elements of the bill*

...

**4472**

§ 1, no. 1 - Withholding tax on interest

It is proposed that the provision on withholding tax on interest in SEL section 1(d) be adjusted to take into account the amendment of the CFC rules. …

...

*Tax Minister's comment:*

...

It should be noted that if the immediate recipient of the interest payment passes on the amount via a distribution, repayment of a loan or similar, it must be assessed whether the immediate recipient is the beneficial owner. If the ultimate recipient is deemed to be the beneficial owner, the conditions in section 2(1)(d) apply directly to the ultimate recipient.

...

§ 1, no. 6 - Incoming interest from subsidiaries

It appears from the comments that incoming dividends will not be tax-free even if the dividends are distributed by a company within the EU/E0S or a country that has a double tax treaty with Denmark if this company is a "flow-through company" between the Danish parent company and the subsidiary resident outside the EU/E0S or in a country that does not have a double tax treaty with Denmark. The Ministry is asked to elaborate on what is decisive for a company to be considered a "flow-through company". FSR does not understand the idea that a dividend by "flowing through" a group can be re-qualified when there is no doubt that the dividend has passed through the individual companies, which is unquestionable when the dividend is declared.

...

Tax Minister's comment:

The beneficial owner principle is a safeguard against an ordinary taxed company being inserted as a conduit company between the dividend paying company and the final receiving foreign tax shelter company. The protection applies even if several intermediate ordinary taxed companies are inserted.

What matters is who is the legal owner of the proceeds.

"Conduit" companies include companies that. although it is the formal owner, has in fact very narrow powers in relation to the income in question. In relation to the dividend, the company is a "nominee" or trustee acting on behalf of other parties, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1).

Copyright © 2023 Karnov Group Denmark A/S

A pure flow-through holding company in e.g. an EU country will therefore not be the beneficial owner of the dividend. In this connection, it should be mentioned that the Parent-Subsidiary Directive does not imply that dividend payments through flow-through companies must be recognized."

The Minister of Taxation's reply of May 22, 2007 to the Danish Parliament's Tax Committee regarding the same bill states, among other things:

*"Question 86:*

"Should the answer to question 75 be understood to mean that SKAT has not previously examined the basis for tax exemption for dividends transferred to so-called flow-through companies, despite the fact that the Minister for Taxation has referred several times previously - for example during the consideration of bill L 30 from the current session - that taxation will occur in such cases?"

...

*Answer: ...*

I have explained SKAT's action strategy to the Tax Committee on several previous occasions, and I can inform you that the 2007 action plan states that companies that either do not pay tax or pay very little tax are a special focus area. The special TP assessment centres established in 2005 - and the units that control the largest companies in Denmark - are thus obliged to prioritize this particular area.

...

This procedure ensures that an agent or an intermediary (e.g. a bank) of a person in a third country will not be entitled to a reduction of the withholding tax even if the agent or intermediary is resident in a contracting country. This follows from the fact that the agent or intermediary is not considered the owner of the income for tax purposes in the state in which he is resident.

However, a flow-through (holding) company cannot be equated with an agent or an intermediary. Such a company is registered and fully taxable in the country in which it is domiciled and the starting point is clearly that a holding company is entitled to contract protection.

When the OECD model was updated in 2005, a new point 12.1 in the commentary to Article 10 (dividends) referred to an OECD report according to which a holding company should not be considered to be the beneficial owner of the dividend in very specific circumstances. It must be the case that the holding company actually has very narrow powers which, in relation to the income in question, make it a "nullity" or an administrator acting on behalf of other parties.

Thus, there are very narrow limits for when Danish tax authorities can override a duly registered and fully taxable foreign company and as stated in the answer to question 6 regarding bill L 30, there are no examples of Danish tax authorities refusing to recognize a foreign holding company and thus considering it a nullity." The Minister for Taxation clarified the above answer in a revised answer to the Danish Parliament's Tax Committee on May 29, 2007 as follows:

**4473**

"A holding company cannot be equated with an agent or an intermediary. Such a company is registered and fully taxable in the country in which it is domiciled - and the starting point is that a holding company is entitled to contractual protection.

However, it follows from paragraph 12.1 of the commentary to Article 10 of the OECD Model (dividends) that pure flow-through companies should not be considered to be the beneficial owner of the dividend.

Pass-through companies effectively have very narrow powers in

relation to the income in question, making it a "nullity" or an administrator acting on behalf of other parties.

It depends on a specific assessment whether a holding company is a flow-through company."

*Judgment of the Court of Justice of the European Union of February 26 in joined cases C-116/16 and C-117/16*

In the judgment of the European Court of Justice (Grand Chamber) of February 26, 2019 in the joined cases C-116/16 and C-117/16, the Court answered a number of questions referred for a preliminary ruling by the Eastern High Court in the cases B-1980-12 and B-2173-

12 The judgment states, inter alia:

'*As regards the first to third questions and points (a) to (c) of the fourth question in the main proceedings*

68 By its first to third questions and fourth questions (a) to (c) in the main proceedings, the referring court asks, in particular, whether the combating of fraud or abuse permitted by Article 1(2) of Directive 90/435 requires the existence of a national or treaty-based anti-abuse provision within the meaning of that article. Second, it asks whether a double taxation convention drafted in accordance with the OECD Model Tax Convention and containing the concept of 'beneficial owner' can constitute a treaty-based anti-abuse provision within the meaning of Article 1(2) of Directive 90/435. Third, the referring court asks whether the concept of 'beneficial owner' [in French 'bénéficiaire effectif'] is a concept of EU law which must be understood in the same way as the concept of 'beneficial owner' [in French "bénéficiaire"] contained in Article 1(1) of Directive 2003/49 and whether, for the purposes of interpreting that provision, it is possible to take account of Article 10 of the 1977 OECD Model Tax Convention. In particular, the referring court asks whether a provision containing the concept of 'beneficial owner' can be regarded as constituting a legal basis which makes it possible to combat fraud or abuse of rights.

69 As a preliminary point, it is necessary to examine the first question in the main proceedings, by which the referring court seeks to ascertain whether, in order to combat abuse of rights in the context of the application of Directive 90/435, a Member State must have adopted a specific national provision transposing that directive or whether it may refer to national or contractual anti-abuse principles or provisions.

70 In this regard, it follows from settled case law that there is a general principle of EU law that citizens must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse (judgment of 9.3.1999, Centros, C-212/97, EU:C:1999:126, paragraph 24 and the case law cited therein, of 21.2.2006, Halifax and Others, C-255/02, EU:C:2006:121, paragraph 68,

of 12.9.2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 35, of 22.11.2017, Cussens and others, C-251/16, EU:C:2017:881, paragraph 27, and of 11.7.2018,

Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

71 It is incumbent on citizens to comply with this general principle of law. The application of EU law cannot therefore be extended to cover acts carried out with the aim of benefiting, by fraud or abuse, from advantages conferred by EU law (see, to that effect, judgments of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraph 38; of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 27, and of 11.7.2018, Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99).

72 It follows from that principle that a Member State must refuse to grant the benefits of provisions of European Union law

where they have been invoked not in order to achieve the objectives of those provisions but in order to benefit from a

Copyright © 2023 Karnov Group Denmark A/S

EU law advantage, even if the conditions for granting this advantage are only formally fulfilled.

73 This is the case, for example, where the implementation of customs formalities was not carried out in the ordinary course of trade but was purely formal and had the sole purpose of unlawfully profiting from monetary compensation (see, to that effect, judgment of 27 October 1981, Schumacher and Others, 250/80, EU:C:1981:246, paragraph 16, and judgment of 3 March 1993, General Milk Products, C-8/92, EU:C:1993:82, paragraph 21) or export refunds (see, to that effect, judgment of 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, paragraph 59).

74 The principle of prohibition of abuse of rights also applies in areas as diverse as the free movement of goods (judgment of 10 January 1985, Association des Centres distributeurs Leclerc and Thouars Distribution, 229/83, EU:C:1985:1, paragraph 27), the freedom to provide services (judgment of 3.2.1993, Veronica Omroep Organisatie, C-148/91, EU:C:1993:45, paragraph 13), public service contracts (judgment of 11.12.2014, Azienda sanitaria locale n. 5 "Spezzino" and Others, C-113/13, EU:C:2014:2440, paragraph 62), freedom of establishment (judgment of 9.3.1999, Centros, C-212/97, EU:C:1999:126, paragraph

**4474**

24), company law (judgment of 23.3.2000, Diamantis, C-373/97, EU:C:2000:150, paragraph 33), social security (judgments of 2.5.1996, Pa- letta, C-206/94, EU:C:1996:182, paragraph 24, of 6.2.2018, Altun and others, C-359/16, EU:C:2018:63, paragraph 48, and of 11.7.2018,
Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99), transport (judgment of 6.4.2006, Agip Petroli, C-456/04, EU:C:2006:241, paragraphs 19-25), social policy (judgment of 28.7.2016, Kratzer, C-423/15, EU:C:2016:604, paragraphs 37-41), restrictive measures (judgment of 21.12.2011, Afrasiabi and Others, C-72/11, EU:C:2011:874, paragraph 62) and value added tax (VAT) (judgment of 21.2.2006, Halifax and others, C-255/02, EU:C:2006:121, paragraph 74).

75 In the latter area, the Court of Justice has repeatedly stated that although combating fraud, tax evasion and possible abuse is an objective recognized and supported by the Sixth Council Directive 77/388/EEC of 17 May 1977 on the harmonization of the laws of the Member States relating to turnover taxes - Common system of value added tax: uniform basis of assessment (OJ 1977 L 145, p. 1), the principle of prohibition of abuse is a general principle of EU law which applies irrespective of whether the rights that have been abused have a basis in the Treaties, a regulation or a directive. 1), the principle of prohibition of abuse is a general principle of EU law which applies irrespective of whether the rights and advantages that have been abused are based on the Treaties, a regulation or a directive (see, to that effect, judgment of 22.11.2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraphs 30 and 31).

76 It follows that the general principle of prohibition of abuse must be applied against a person who relies on certain rules of European Union law which confer an advantage in a manner which is not consistent with the objectives of those rules. The Court has thus held that that principle may be relied on against a taxable person in order, in particular, to deny him the right to exemption from VAT, even in the absence of provisions of national law providing for such a denial (see, to that effect, judgment of 18 December 2014, Schoenimport "Italmoda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 62, and of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881,
paragraph 33).

77 Although Article 1(2) of Directive 90/435 provides that it does not preclude the application of internal provisions or agreements necessary to prevent fraud and abuse, that provision cannot be interpreted as precluding the application of the general EU law principle of prohibition of abuse referred to in paragraphs 70 to 72 of this judgment. The transactions alleged by SKAT to be abusive,

Copyright © 2023 Karnov Group Denmark A/S

fall within the scope of EU law (see, to that effect, judgment of 22 December 2010, Weald Leasing, C-103/09, EU:C:2010:804, paragraph 42) and may prove to be incompatible with the objective pursued by that directive.

78 In that regard, as is apparent from the first and third recitals in the preamble to Directive 90/435, the purpose of that directive is to facilitate the amalgamation of companies at European Union level by establishing competition-neutral tax rules for such amalgamations of companies from different Member States in order to enable undertakings to adapt to the requirements of the internal market, increase their productivity and strengthen their competitive position at international level. 79 However, if the creation of financial arrangements were permitted for the sole purpose of benefiting from the tax advantages resulting from the application of Directive 90/435, that would not be consistent with such objectives but would, on the contrary, be detrimental to the functioning of the internal market, since it would distort competition. As the Advocate General essentially states in point 51 of his Opinion in Case C-116/16, the same applies even if the transactions at issue do not pursue exclusively such an objective, since the Court has held that the principle of the prohibition of abuse applies in the tax field where the obtaining of a tax advantage is the main objective of the transaction at issue (see, to that effect, judgment of 21 February 2008, Part Service, C-425/06, EU:C:2008:108, paragraph 45, and of 22 November 2017, Cussens and Others, C-251/16, EU:C:2017:881, paragraph 53).

80 Moreover, the right of taxpayers to benefit from tax competition between Member States as a result of the lack of harmonization of income taxes does not preclude the application of the general principle prohibiting abuse. In that regard, it should be noted that Directive 90/435 was intended to achieve harmonization in the field of direct taxation by laying down competition-neutral tax rules and that it was not intended to prevent Member States from taking appropriate measures to combat fraud and abuse. 81 Although the fact that the taxpayer seeks the tax regime which is most advantageous to him cannot in itself give rise to a general presumption of fraud or abuse (see, to that effect, the judgment in judgments of 12 September 2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 50, of 29 November 2011, National Grid Indus, C-371/10, EU:C:2011:785, paragraph 84, and of 24 November 2016, SECIL,
C-464/14, EU:C:2016:896, paragraph 60), it is nevertheless the case that such a taxable person cannot be granted a right or benefit arising from EU law if the transaction in question is, in economic terms, a purely artificial arrangement intended to circumvent the legislation of the Member State concerned (see, to that effect, judgment of 12 September 2006, Cadbury Schweppes and Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, paragraph 51, of

**4475**

7.11.2013, K, C-322/11, EU:C:2013:716, paragraph 61, and of 25.10.2017, Polbud - Wykonawstwo, C-106/16, EU:C:2017:804, paragraphs 61-63).

82 It follows that it is for the national authorities and courts to refuse to grant the advantages provided for in Directive 90/435 where they are invoked in order to facilitate fraud or abuse.

83 In relation to the general EU law principle of prohibition of abuse and the need to comply with that principle in the context of the implementation of EU law, the obligation on national authorities to refuse to grant the rights provided for in Directive 90/435 which are relied on in order to prevent abuse is irrelevant.

Copyright © 2023 Karnov Group Denmark A/S

fraud or abuse that there are no national or collective agreement anti-abuse provisions.

84 The defendants in the main proceedings rely on the judgment of 5 July 2007 in Case C-321/05 Kofoed [2007] EU:C:2007:408, concerning the grant of a tax exemption provided for in Council Directive 90/434/EEC of 23 July 1990 on the common system of taxation applicable to mergers, divisions, transfers of assets and exchanges of shares concerning companies of different Member States (OJ 1990 L 225, p. 1) 1), claiming that it follows from Article 1(2) of Directive 90/435 that the Member State concerned may refuse to grant the advantages provided for in that directive only if its national legislation contains a separate and specific legal basis in that regard.

85 However, this argument cannot be accepted.

86 In paragraph 42 of the judgment of July 5, 2007, Kofoed (C-321/05, EU:C:2007:408), the Court noted that the principle of legal certainty precludes directives per se from creating obligations for individuals and that they cannot therefore be relied on as such by Member States against individuals.

87 The Court further noted that such a finding is without prejudice to the obligation on all the authorities of a Member State, when applying national law, to interpret it as far as possible in the light of the wording and purpose of directives in order to achieve the result intended by those directives, since those authorities are thus able to rely on a consistent interpretation of national law against individuals (see, to that effect, judgment of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraph 45 and the case-law cited therein).

88 It was on the basis of those considerations that the Court called on the referring court to examine whether Danish law contained a general rule or principle prohibiting the abuse of rights or other provisions on tax fraud or tax evasion which could be interpreted in conformity with the provision of Directive 90/434, according to which a Member State may essentially refuse to grant the right of deduction provided for by that directive in the case of a transaction which has as its principal purpose such fraud or evasion and then, if appropriate, to examine whether the conditions for applying those national provisions were essentially satisfied (see judgment of 5 July 2007, Kofoed, C-321/05, EU:C:2007:408, paragraphs 46 and 47).

89 Even if it were to transpire in the main proceedings that national law does not contain rules which can be interpreted in accordance with Article 1(2) of Directive 90/435, it cannot - notwithstanding what the Court stated in its judgment of 5. July 2007, Kofoed (C-321/05, EU:C:2007:408) - it cannot, however, be inferred that national authorities and courts are precluded from refusing to grant the benefit of the right to exemption provided for in Article 5 of that directive in cases of fraud or abuse of rights (see, by analogy, judgment of 18 December 2014, Schoenim- port 'Italmoda' Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 54).

90 A refusal applied in such circumstances to a taxable person cannot fall within the situation referred to in paragraph 86 of the present judgment, since such a refusal is consistent with the general principle of EU law that no one may rely on EU law for the purpose of enabling fraud or abuse (see, by analogy, judgment of 18 December 2014, Schoenimport "Italmoda" Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraphs 55 and 56 and the case law cited therein).

91 In so far as facts of a fraudulent or abusive nature cannot form the basis of a right under the European Union legal order, as

stated in paragraph 70 of this judgment

the denial of a benefit under a directive, such as Directive 90/435, does not impose an obligation on the citizen concerned under that directive, but is merely the consequence of the finding that the objective conditions for obtaining the benefit sought, laid down by that directive for the purposes of that right, are satisfied only formally (see, by analogy, judgment of 18 December 2014, Schoenimport 'Italmoda' Mariano Previti and Others, C-131/13, C-163/13 and C-164/13, EU:C:2014:2455, paragraph 57 and the case-law cited therein).

92 In such circumstances, Member States must therefore refuse to grant the advantage resulting from Directive 90/435, in accordance with the general principle of prohibition of abuse, according to which EU law cannot cover unlawful transactions by traders (see, to that effect, judgment of 11.7.2018,

**4476**

Commission v Belgium, C-356/15, EU:C:2018:555, paragraph 99 and the case law cited therein).

93 Having regard to the finding in paragraph 72 of this judgment, it is unnecessary to answer the second question referred by the referring court in those two cases, which concerns, in particular, whether a provision of a double taxation convention which refers to the concept of 'beneficial owner' may constitute a legal basis for combating fraud and abuse in the context of Directive 90/435. 94 In those circumstances, it is also unnecessary to answer the third question and the fourth questions (a) to (c) in the two cases concerning the interpretation of the same concept of 'beneficial owner', since those questions are referred only in the event that the answer to the second question in the two cases is affirmative. 95 In the light of all those factors, the answer to the first question in the two cases must be that the general principle of EU law, according to which individuals must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse, must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxpayer the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of Directive 90/435, even in the absence of national provisions or collective agreements providing for such a refusal.

*Questions 4(d) and (e), 5 and 8 in the main proceedings*

96 By its fourth questions (d) and (e) and its fifth and eighth questions in the main proceedings, the referring court asks, in particular, which elements constitute an abuse of rights and how the existence of those elements can be established. In that regard, the referring court asks, in particular, whether a company may be regarded as having actually received dividends from its subsidiary where that company is required, under a contractual or legal obligation, to redistribute those dividends to third parties or where it is apparent from the facts that, without being bound by such a contractual or legal obligation, that company does not 'substantially' have the rights to 'use and enjoy those funds' within the meaning of the comments on the 1977 OECD Model Tax Convention adopted in 2014. It also wants to know whether there could be an abuse of rights if the beneficial owner of dividends transferred by flow-through companies is ultimately a company resident in a third country with which the Member State concerned has concluded a double taxation treaty. By the eighth question in those two cases, the referring court also asks, more specifically, whether a Member State which refuses to recognize a company of another Member State as the beneficial owner of dividends is required to determine which company it considers to be the beneficial owner, if any.

Copyright © 2023 Karnov Group Denmark A/S

*The question of which elements constitute an abuse of rights and the related evidence*

97 As is apparent from the case-law of the Court of Justice, proof of abuse requires, on the one hand, a combination of objective circumstances showing that the objective pursued by the EU legislation has not been achieved even though the conditions laid down in that legislation have been formally complied with and, on the other, a subjective element consisting of an intention to take advantage of the EU legislation by artificially creating the conditions necessary to obtain that advantage (judgment of 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, paragraphs 52 and 53, and of 12.3.2014, O. and B., C-456/12, EU:C:2014:135, paragraph 58).

98 It is therefore the examination of those coinciding circumstances which makes it possible to verify the existence of the elements constituting abuse and, in particular, whether the economic operators concerned have carried out purely formal or artificial transactions, lacking any economic and commercial justification, with the principal aim of obtaining an undue advantage (see, to that effect, judgment of 20 June 2013, Newey, C-653/11, EU:C:2013:409, paragraphs 47-49; judgment of 13 March 2014, SICES a n d  Others, C-155/13,
EU:C:2014:145, paragraph 33, and of 14.4.2016, Cervati and Malvi, C-131/14, EU:C:2016:255, paragraph 47).

99 It is not for the Court to assess the facts of the main proceedings. However, the Court may, in a reference for a preliminary ruling, provide the national court, where appropriate, with detailed information in order to guide it in its assessment of the specific cases before it. Although in the cases in the main proceedings there are a number of factors from which it could be concluded that there has been an abuse of rights, it is nevertheless for the national court to ascertain whether those factors are objective and consistent and whether the defendants in the main proceedings have had an opportunity to present evidence to the contrary.

100 A group which is not organized for reasons reflecting economic reality, which has a purely formal structure and which has as its main purpose or as one of its main purposes the obtaining of a tax advantage which is contrary to the object and purpose of the applicable tax legislation may be considered an artificial arrangement. This is particularly the case when the payment of dividend tax is avoided by including in the group structure a flow-through entity between the company distributing the dividend and the company which is the beneficial owner of the dividend.

**4477**

101 The fact that all or virtually all of those dividends are redistributed shortly after their receipt by the company which received them to entities which do not satisfy the conditions for the application of Directive 90/435 constitutes evidence of an arrangement intended to take undue advantage of the exemption provided for in Article 5 of Directive 90/435, either because those entities are not resident in a Member State, because they are not constituted in one of the forms covered by that directive, because they are not subject to one of the taxes listed in Article 2(c) of that directive or because they are not 'parent companies' and do not satisfy the conditions laid down in Article 3 of that directive.

102 Thus, entities whose tax residence is outside the European Union, as appears to be the case with the companies referred to in Case C-117/16 or the capital funds referred to in Case C-116/16, do not satisfy the conditions for the application of Directive 90/435. If the dividends in those cases had been paid directly by the

Danish company which was to pay them to the entities which, according to the Ministry of Taxation, were the beneficial owners of the dividends, the Kingdom of Denmark would have been able to levy withholding tax.

103 The artificial nature of an arrangement may also be supported by the fact that the group in question is organized in such a way that the company which receives the dividends paid by the debtor company must itself redistribute those dividends to a third company which does not satisfy the conditions for the application of Directive 90/435, with the result that that company receives negligible taxable income only when it acts as a conduit company to enable the flow of funds from the debtor company to the entity which is the beneficial owner of the amounts transferred.

104 The fact that a company operates as a flow-through company can be established if the only activity of the company is to receive the dividends and redistribute them to the beneficial owner or to other flow-through companies. In this regard, the lack of actual economic activity must, in the light of the specific characteristics of the economic activity in question, be deduced from an examination of all relevant elements relating, inter alia, to the operation of the company, its accounts, the structure of its costs and the expenses actually incurred, the staff it employs and the premises and equipment at its disposal.

105 Evidence of the existence of an artificial arrangement may also be found in the existence of different contracts between the companies involved in the financial transactions in question, which give rise to intra-group cash flows, in the method of financing the transactions, in the assessment of the equity capital of the intermediate companies and in the lack of power of the flow-through companies to dispose financially of the dividends received. In that regard, it is not only the contractual or legal obligation of the company receiving the dividends to redistribute them to third parties which may constitute such a factor, but also the fact that, without being bound by such a contractual or legal obligation, that company does not 'substantially', as the referring court states, have the rights to use and enjoy those dividends.

106 Such evidence may, moreover, be corroborated in cases of coincidence or proximity in time between, on the one hand, the entry into force of important new tax legislation, such as the Danish legislation at issue in the main proceedings or the American legislation referred to in paragraph 51 of this judgment and, on the other hand, the implementation of complex financial transactions and the granting of loans within the same group.

107 The referring court also asks specifically whether there may be an abuse of rights where the beneficial owner of dividends transferred by flow-through companies is ultimately a company resident in a third State with which the source State has concluded a double taxation convention under which no withholding tax would have been levied on the dividends if they had been distributed directly to the company resident in that third State.

108 In that regard, the fact that some of the beneficial owners of the dividends transferred by flow-through companies are resident for tax purposes in a third State with which the source State has concluded a double taxation convention is irrelevant when examining the group structure. It must therefore be held that the mere existence of such a convention does not preclude the existence of an abuse of rights. Thus, the existence of such a convention cannot call into question the existence of an abuse of rights if it is duly established on the basis of all the facts which show that the economic operators carried out purely formal or artificial transactions, devoid of any economic and commercial justification, with the principal aim of taking undue advantage of the exemption from withholding tax provided for in Article 5

of Directive 90/435.

109 It should be added that, while taxation must correspond to an economic reality, the existence of a double taxation treaty cannot as such establish the reality of a payment made to recipients resident in the third State with which that treaty has been concluded. If the debtor company wishes to deduct from the proceeds

**4478**

benefit of such a treaty, it is possible for the company to distribute these dividends directly to the entities that are resident for tax purposes in a state with which the source state has concluded a double tax treaty.

110 Having said that, if there is a situation where the dividend would have been exempt if it had been distributed directly to the company domiciled in a third State, it cannot be excluded that the objective of the group structure is not an abuse of rights. In such a case, the group's choice of such a structure instead of direct distribution of the dividend to that company cannot be challenged.

111 Moreover, where the beneficial owner of a dividend distribution is resident for tax purposes in a third State, the refusal of the exemption provided for in Article 5 of Directive 90/435 is in no way subject to a finding of fraud or abuse of rights. the third recital in its preamble, the purpose of that directive is to eliminate, through the establishment of a common system of taxation, any discrimination between cooperation between companies from different Member States as compared with cooperation between companies from the same Member State and thus to facilitate company mergers at EU level (judgment of 8 March 2017, Wereldhave Belgium and Others, C-448/15, EU:C:2017:180, paragraph 25 and the case law cited therein). As emphasized in paragraph 78 of the present judgment, the directive thus seeks to ensure the tax neutrality of the distribution of dividends by a subsidiary established in one Member State to its parent company established in another Member State, since it follows from Article 1 of the directive that it covers only profits received by companies of a Member State as dividends from their subsidiaries established in other Member States (see, to that effect, the judgment in Case C-448/15 Wereldhave Belgium and Others, paragraph 25 and the case-law cited) order of 4 June 2009, KBC Bank and Beleggen, Risicokapitaal, Beheer, C-439/07 and C-499/07, EU:C:2009:339, paragraph 62 and the case-law cited).

113 The mechanisms of Directive 90/435, in particular Article 5 thereof, are therefore designed to deal with situations in which the exercise by Member States of their power of taxation could lead, if the mechanisms did not apply, to double taxation of dividends distributed by a subsidiary to its parent company (judgment of 8 March 2017, Wereldhave Belgium and Others, C-448/15, EU:C:2017:180, paragraph 39). However, such mechanisms cannot apply if the beneficial owner of the dividends is a company whose tax residence is outside the EU, since the exemption from withholding tax on those dividends in the Member State from which the dividends are distributed may in such a case result in the dividends not being effectively taxed within the EU.

114 In the light of all those factors, the answer to Question 4(d) and (e) in the main proceedings must be that, in order to prove an abuse of rights, there must be, first, a combination of objective circumstances showing that the objective pursued by the European Union legislation has not been achieved despite formal compliance with the conditions laid down by that legislation and, second, a subjective element consisting in an intention to take advantage of the European Union legislation by artificially creating the conditions necessary to obtain that advantage. The existence of a number of elements may establish an abuse of

rights, provided that those elements are objective and consistent. Such evidence may include, inter alia, the existence of flow-through companies which do not

has no economic justification, and the purely formal nature of a group's structure, of the financial construction and of loans. *The burden of proof for the existence of an abuse of rights*

115 It should be noted that Directive 90/435 does not lay down any rules as to who bears the burden of proof of abuse. 116 However, as the Danish and German Governments have submitted, it is for companies wishing to benefit from the exemption from withholding tax on dividends provided for in Article 5 of Directive 90/435 to prove that they satisfy the objective conditions laid down by that directive. There is therefore nothing to prevent the tax authorities concerned from requiring the taxpayer to provide the evidence which they consider necessary for a specific assessment of the taxes in question and, where appropriate, from refusing a requested exemption if such evidence is not provided (see, to that effect, judgment of 28 February 2013, Petersen and Petersen, C-544/11, EU:C:2013:124, paragraph 51 and the case-law cited).

117 On the other hand, where a tax authority of the source State intends to refuse the exemption provided for in Article 5 of Directive 90/435 to a company which has distributed dividends to a company established in another Member State on the ground of abuse of rights, it is for that authority to establish the existence of the elements constituting such abuse by taking account of all relevant factors, including the fact that the company to which the dividends were distributed is not the beneficial owner of the dividends.

118 In that regard, it is not for such an authority to determine the beneficial owner of those proceeds but to establish that the alleged beneficial owner is merely a conduit company through which an abuse of rights has taken place. Such a determination may prove impossible, particularly since the potential beneficial owners are unknown. National tax authorities may not have the necessary information to determine these beneficial owners, given the complexity of certain types of abuse.

**4479**

financial arrangements and the possibility that the intermediate companies involved in the arrangement are domiciled outside the EU. Thus, these authorities cannot be required to provide evidence that it would be impossible for them to provide.

119 Moreover, even if the potential beneficial owners are known, it is not necessarily established which of them are or will be the beneficial owners. In the present case, the referring court in Case C-117/16 stated that, although the parent company of Y Cyprus is Y Bermuda, domiciled in Bermuda, the latter's parent company is Y USA, domiciled in the United States. If the referring court were to find that Y Cyprus is not the beneficial owner of the dividends, it would therefore, in all likelihood, be impossible for the tax authorities and the courts of the Member State from which the dividends originate to determine which of those two parent companies is or will be the beneficial owner of the dividends. In particular, a decision on the use of these dividends could be taken following the findings of the tax authorities concerning the flow-through company.

120 The answer to the eighth question in the main proceedings must therefore be that, in order to refuse to recognize a company as the beneficial owner of dividends or to establish an abuse of rights, a national authority is not required to determine which entity or entities it considers to be the beneficial owner of those dividends."

*Legislation on taxation of interest and royalties*

Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States

states, inter alia:

*"Article 1*
*Scope and procedure*

1. Payments of interest or royalties arising in a Member State shall be exempt from any form of tax in that State, whether collected by deduction at source or by assessment, provided that the beneficial owner of such interest or royalties is a company of another Member State or a permanent establishment situated in another Member State of a company of a Member State.

...

4. A company of a Member State shall be considered the beneficial owner of interest or royalties only if it receives such payments for its own use and not as an intermediary, including as agent, mandatary or authorized signatory for another person. ...

*Article 5*
*Fraud and abuse*

1. This Directive shall not preclude the application of national or collectively agreed anti-fraud or anti-abuse provisions.

2. Member States may revoke benefits under this Directive or refuse to apply this Directive in the case of transactions for which tax evasion, avoidance or abuse is the principal motive or one of the principal motives." By bill no. L 119 of December 17, 2003, the Minister of Taxation proposed an amendment to, among other things, section 2(1) of the Danish Corporation Tax Act by inserting a point d with the following wording:

"receives interest from sources in this country concerning debt which a company or an association etc. covered by section 1 or point a has to foreign legal persons as mentioned in section 3 B of the Tax Control Act (controlled debt). However, this does not apply to interest on receivables linked to a permanent establishment covered by point a. The tax liability does not include interest if the taxation of the interest is to be waived or reduced under Directive 2003/49/EC on a common system of taxation applicable to interest and royalties paid between associated companies in different Member States, or under a double taxation agreement with the Faroe Islands, Greenland or the state where the receiving company etc. is resident. However, this only applies if the paying company and the receiving company are associated as referred to in this Directive for a continuous period of at least 1 year, within which the time of payment must fall."

The explanatory notes to the bill state that the purpose of the bill was, among other things, to limit the possibilities for tax planning by deduction of intra-group interest when the receiving group company pays no or very little tax on the interest deducted in the calculation of Danish taxable income, however, so that the limited tax liability should not include interest covered by the Interest/Royalty Directive or a double taxation agreement.

On 17 February 2004, the Minister of Taxation submitted comments to the Danish Parliament's Tax Committee regarding an inquiry from the Association of State Authorized Public Accountants about the proposed provision. Among other things, it appears from this:

"Comment:

...

However, it is necessary to limit the possibilities for tax planning by reducing Danish taxation on interest payments to a foreign group company that pays no or very low tax on the interest received.

The proposed withholding tax on interest is therefore targeted so that it does not cover all interest payments abroad. The withholding tax only applies to interest payments to certain financial companies in countries that are not covered by the EU Interest/Royalty Directive or do not have a double tax regime.

tax treaty that requires Denmark to reduce Danish tax on interest payments to the country in question.

...

**4480**

Admittedly, this opens up the risk that, for example, a Danish company may seek to avoid the withholding tax on interest payments to a financial company in a low-tax country by paying the interest to a company in another country covered by the EU Interest/Royalty Directive or a Danish double taxation treaty, which does not have withholding tax on interest payments to foreign interest recipients, after which this company pays the interest to the company in the low-tax country.

In such cases, however, the Danish tax authorities will, after a specific assessment of the facts, be able to assume that the beneficial owner of the interest is not the company in the other country, but the financial company in the low-tax country, so that the interest payment is not covered by the EU Interest/Royalty Directive or the double taxation treaty.

According to Article 5(2) of the Interest/Royalty Directive, an EU country may refuse to apply the Directive in the case of transactions that have tax evasion, avoidance or abuse as a significant motive.

The notes to the OECD Model Double Taxation Conventions also allow a state not to apply a convention in special cases, cf. the section on abuse of the convention in the notes to Article 1 of the Model."

On March 8, 2004, the Minister of Taxation submitted a response to the Danish Parliament's Tax Committee regarding the proposed legislation. This states, among other things:

"*Question 47:* Will the Minister state how many holding companies of the type mentioned in Jan Larsen's inquiry are governed in Denmark, i.e. holding companies that are owned by foreign companies and that own subsidiaries abroad, while there is no actual business activity in Denmark?

*Answer.*

Since the study was initiated in 2000, the holding rules have been changed. The change was made by law no. 282 of April 25, 2001 (L 99, 2000/01).

...

The method to avoid the dividend tax was to incorporate a Danish holding company (a flow-through company).

...

The change ensures that the Danish holding rules no longer provide tax exemption for distributions to countries outside the EU with which Denmark does not have a double taxation agreement (including tax shelter countries).

...

Thus, there no longer seems to be the same need for the study as when it was initiated. This is because the legislative amendment has to a significant extent removed the exploitation opportunities that formed the basis for the criticism of the Danish holding rules.

...

Finally, there aren't many corrections to be gained from an equation or audit of the flow-through companies.

The need for a new investigation is less than when the original investigation was initiated. This is because the rules have been changed so that the opportunities for abuse have been significantly reduced, cf. the above-mentioned changes to the law in 2001. Furthermore, a renewed investigation will - like the investigation that has now been completed - require considerable resources. Resources that will be diverted from the control resources.

In addition, based on the experience gained from the investigation,

it must be assumed that there is no guarantee that a credible
result could be obtained if the investigation continued.

Copyright © 2023 Karnov Group Denmark A/S

*Dividends*

It is therefore my opinion that a review should not be initiated."

On March 22, 2004, the Minister of Taxation submitted a reply to the Parliamentary Tax Committee regarding the proposed legislation. This states, among other things:

"*Question 54.* Can the Minister confirm that even after the latest changes to the rules for holding companies, and after the adoption of this bill, it will be the case that distributions and interest payments to holding companies in Cyprus will be tax-free (i.e. without Danish dividend tax), even though interest and dividends will not be taxed in Cyprus?

*Answer:* As far as dividends are concerned, the Corporation Tax Act

§ Section 2(1)(c) states that, as a general rule, Denmark taxes a foreign company on dividends from a Danish company at 28% of the gross amount of the dividend. However, according to the same rule, Denmark does not tax a foreign parent company on dividends if the taxation is to be waived or reduced under the EU Parent-Subsidiary Directive or a double taxation treaty.

According to Article 10 of the Danish-Cypriot double tax treaty, Denmark may tax dividends distributed by a Danish company to a company in Cyprus. However, if the Cypriot company owns at least 25 percent of the Danish company, the Danish tax may not exceed 10 percent of the gross amount of the dividend. In other cases, the tax may not exceed 15%.

The double taxation treaty thus entails that Denmark must reduce the taxation of dividends from a Danish company to a parent company in Cyprus. Section 2(1)(c) of the Danish Corporation Tax Act then means that Denmark does not tax the dividend.

This bill does not affect section 2(1)(c) of the Danish Corporation Tax Act.

...

The double taxation treaty thus means that Denmark must reduce the taxation of interest that a company in Cyprus receives from sources here in Denmark.

**4481**

The proposed rules in section 2(1)(d) of the Danish Corporation Tax Act means that Denmark will not tax the interest.

Cyprus will become a member of the EU in the near future. This will mean that Denmark will have to waive the taxation of dividends and interest according to the Parent/Subsidiary Directive and the Interest Directive.

/In accordance with the Royalties Directive, Denmark will not collect withholding tax, even if Denmark wishes to do so. Finally, it should be noted that, as far as I can see, the Danish treasury does not suffer any loss of revenue from the fact that flow-through companies are located in Denmark."

*Double taxation treaties The treaty with Luxembourg*

The Convention of November 17, 1980 with Luxembourg for the avoidance of double taxation and the establishment of provisions for mutual administrative assistance in respect of taxes on income and capital states, inter alia:

"*Article 3.*
*Common definitions*

...

*Paragraph 2.* As regards the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

...

*Article 10.*

Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the dividends, exceed:

a)    5 percent of the gross amount of the dividend if the beneficial owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b)    15% of the gross amount of the dividend in all other cases.

...

FINAL PROTOCOL

By signing the Convention between the Kingdom of Denmark and the Grand Duchy of Luxembourg for the avoidance of double taxation and the establishment of provisions for mutual administrative assistance in respect of taxes on income and on capital, the undersigned Plenipotentiaries have agreed on the following provisions which shall form an integral part of the Convention:

*§ 1.* Holding companies

Re Articles 1, 3 and 4:

This Convention shall not apply to holding companies within the meaning of the special Luxembourg legislation, at present the Law of July 31, 1929 and the Grand-Ducal Regulation of December 17, 1938 (brought into force by Article 1, 7o, paragraphs 1 and 2, of the Law of December 27, 1937). Nor shall the Convention apply to income derived by a resident of Denmark from such companies, nor to shares or other securities in companies of this kind of which such a person is the owner."

*OECD model double tax treaty with countries*

The OECD Model Double Taxation Convention on Income and Capital (1977) states, among other things:

"Article 3

Common definitions

...

2. As regards the application of this Convention in a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has under the law of that State concerning the taxes to which the Convention applies.

...

Article 10

Dividends

Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

*Paragraph 2.* However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but the tax so charged shall not, if the recipient is the beneficial owner of the dividends, exceed:

a)    5 percent of the gross amount of the dividend if the beneficial owner is a company (other than a partnership and a limited partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b)    15% of the gross amount of the proceeds in all other cases. The English wording of Article 10 was as follows:

"Dividends

1    Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2    However, such dividends may also be taxed in the Contrac- ting State of which the company paying the

**4482**

dividends is a resident and according to the low of that State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed

a)    ....

b)    ....

The OECD's comments on this state, among other things:
"*ABUSE OF THE COLLECTIVE AGREEMENT*

7. The purpose of double taxation conventions is to facilitate, through the elimination of international double taxation, the exchange of goods and services and the movement of capital and natural and legal persons. However, they should not assist tax avoidance or evasion. While it is true that, apart from double taxation conventions, taxpayers have the possibility of taking advantage of differences in tax levels between States and the tax advantages resulting from the tax laws of different countries, it is up to the States concerned to adopt provisions in their national legislation to counteract possible artifices. Consequently, such States will wish to maintain the application of such provisions in their domestic laws in their bilateral double tax treaties.

8. In addition, the expansion of the network of double taxation treaties reinforces the effect of such artifices by making it possible, through the creation of usually elaborate legal constructions, to benefit both from the advantages resulting from certain national laws and from the tax reductions resulting from double taxation treaties.

9. This would be the case, for example, where a person (whether a resident of a Contracting State or not) disposes through a legal association formed in a State primarily to obtain benefits under the treaty that could not be obtained by the person directly. Another case would be where an individual in a Contracting State has both a permanent home and all his economic interests, including a substantial interest in a company in that State, and essentially to sell the interest and avoid taxation of capital gains in that State on the sale (as a result of Article 13(4)), transferred his permanent home to the other Contracting State where such gains were subject to low or no taxation.

10. Some of these situations are addressed in the Agreement, e.g. by introducing the concept of "beneficial owner" (in Articles 10, 11 and 12) and special provisions for the so-called performers' societies (Article 17(2)). Such problems are also mentioned in the comments on Articles 10 (points 17 and 22), 11 (point 12) and 12 (point 7). It may be appropriate for Contracting States to agree in bilateral negotiations that tax relief is not applicable in certain cases or to agree that the application of domestic anti-avoidance laws is not affected by the agreement.

...

*COMMENT ON ARTICLE 10*
*REGARDING TAXATION OF DIVIDENDS*

...

12. Pursuant to paragraph 2, the limitation of the right of taxation of the source State shall not apply where an intermediary, such as an agent or nominee, is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other State.

State Party. States that wish to express this more clearly are free to do so during bilateral negotiations.

...

22. Attention is generally drawn to the following cases: The beneficial owner of dividends arising in a Contracting State is a company which is a resident of the other Contracting State. All or part of its capital is owned by shareholders resident outside that other State. Its practice is not to distribute its profits in the form of dividends and it enjoys favorable tax treatment (private investment company, basic company). The question may arise whether, in the case of such a company, it is justified in the source State of the dividends to grant the restriction on taxation provided for in paragraph 2. It seems advisable, when bilateral negotiations are conducted, to agree on specific exceptions to the taxation rule laid down in this Article in order to determine the treatment to be applied to such companies."

The OECD Model Agreement of 2003 reads as follows:
"Article 3
Common definitions

...

2. As regards the application of the Agreement at any time by a Contracting State, any term not defined therein shall, unless the context otherwise requires, have the meaning which it has at that time under the law of that State concerning the taxes to which the Agreement applies. Any meaning in the tax laws applicable in that State shall prevail over the meaning which that term has in the other laws of that State. ...

Article 10
Dividend
s

1. Dividends paid by a company which is a resident of one of the Contracting States to a resident of the other Contracting State may be taxed in that State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and in accordance with

**4483**

with the laws of that State, but if the beneficial owner of the proceeds is a resident of the other Contracting State, the tax imposed shall not exceed

a) 5 percent of the gross dividend if the eligible recipient is a company (other than a partnership) that directly owns at least 25 percent of the capital of the company paying the dividend;

b) 15% of the gross yield in all other cases."

...

Comments on the OECD Model Agreement

...

*Abuse of the collective agreement*

9.6 The possibility to use general anti-abuse provisions does not mean that there is no need for tax treaties to include specific provisions aimed at preventing particular forms of tax avoidance. Where particular techniques of tax avoidance have been identified or where the use of such techniques is particularly problematic, it will often be useful to include provisions in the agreement that focus directly on the relevant avoidance strategy. This will also be necessary in cases where a State advocating the view described in paragraph 9.2 above considers that its domestic law lacks the anti-abuse rules or principles necessary to properly address such a strategy.

10. For example, some forms of tax avoidance are already explicitly addressed in the agreement, such as the introduction of the concept of

"beneficial owner" (in Articles 10, 11 and 12) and in specific provisions such as Article 17(2), which deals with the so-called artist companies. Such problems are also mentioned in the comments to Art. 10 (points 17 and 22), Art. 11 (point 12) and Art. 12 (point 7).

...

OECD commentary on Article 10 on taxation of dividends

...

12. The beneficial ownership requirement was inserted in Article 10(2) to clarify the meaning of the words "paid....to a resident" as used in paragraph 1 of the Article. This makes it clear that the source State is not obliged to waive its right to tax dividend income merely because the income is paid directly to a resident of a State with which the source State has concluded a treaty. The term beneficial owner is not used in a narrow technical sense, but must be viewed in the context and in light of the intent and purpose of the treaty, including the avoidance of double taxation and the prevention of tax avoidance and evasion.

12.1 Where income is paid to a resident of a Contracting State acting in his capacity as agent or intermediary, it would not be consistent with the intent and purpose of the Convention for the source State to grant relief or exemption solely on the basis of the status of the immediate recipient of the income as a resident of the other Contracting State. The immediate recipient of the income in this situation is a resident of the other State, but no double taxation arises as a result since the income recipient is not considered the owner of the income for tax purposes in the State of which he is a resident. It would also be inconsistent with the intent and purpose of the Convention for the source State to grant relief or exemption from tax in cases where a resident of a Contracting State, other than as agent or intermediary, merely acts as a conduit for another person who actually receives the income in question. For these reasons, the report "Double Taxation Conventions and the Use of Conduit Companies" prepared by the Committee on Fiscal Affairs concludes that a conduit company cannot normally be considered the beneficial owner if, although it is the formal owner, it actually has very narrow powers which, in relation to the income in question, make it a "nullity" or administrator acting on behalf of other parties.

12.2 Subject to the other conditions of the Article, the limitation on the taxing rights of the source State continues to exist when an agent or an intermediary resident in a Contracting State or in a third State is interposed between the beneficial owner and the payer, unless the beneficial owner is resident in the other Contracting State. (The model text was amended in 1995 to clarify this point, which is consistent with the understanding of all member States). States wishing to express this more clearly are free to do so in bilateral acts."

The English version of clause 12.2 reads as follows:

"Subject to the other conditions imposed by the Article, the limitation of tax in the State of source remains available when an inter- mediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State...".

The OECD's comments of 2014 to Article 10 of the Model Agreement state, among other things:

"12.4 In these various examples (agent, intermediary, conduit company in its capacity as nominee or trustee), the direct recipient of the dividend is not the "beneficial owner" because

the recipient's right to use and enjoy the proceeds is limited by contractual or legal obligations to disclose the

**4484**

payments received to another person. Such an obligation will usually be evidenced by relevant legal documents, but may also be present by virtue of factual circumstances that clearly show that the recipient does not substantially have the rights to use and enjoy the proceeds without being bound by a contractual or legal obligation to pass on the payments received to another person. This type of obligation does not include contractual or legal obligations that are not conditional on the onward payment by the direct recipient, such as an obligation that is not dependent on the receipt of such payment and that the direct recipient has as a debtor or as a party to financial transactions, or customary distribution obligations under a pension agreement or to collective investment entities that would be entitled to collective bargaining benefits under the principles set out in paragraphs 6.8 to 6.34 of the commentary to Art.

1. Where the recipient of a dividend has the right to use and enjoy the dividend, without being bound by contractual or legal obligations to pass on the payments he has received to another person, the recipient is the "beneficial owner" of those dividends. It should also be noted that Art. 10 refers to the beneficial owner of the dividends as opposed to the owner of the shares and they may be different in certain situations.

12.5 However, the fact that the recipient of a dividend is deemed to be the beneficial owner of such dividend does not mean that the provisions of paragraph 2 shall automatically apply. The benefits of these provisions should not be granted in case of abuse (see also paragraphs 17 and 22 below). As explained in the section "Abuse of the treaty" in the commentary to Article 1, there are many ways to treat a conduit company, and generally treaty shopping situations. These include specific anti-abuse provisions in agreements, general anti-abuse provisions, and content-over-form or economic-substance approaches. While

While the "beneficial owner" concept includes some forms of tax avoidance (i.e. the type involving the insertion of a recipient who is obliged to pass on the royalties to another person), there are other types that are not covered; it does not include other forms of treaty shopping, and therefore it must not be regarded as a concept that in any way limits the application of other principles concerning such matters."

*Legislation implemented after the decisions of the National Tax Tribunal Council Directive 2015/121/EU of 27 January 2015 amending Directive 2011/96/EU on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States*

The directive states, among other things:

"Whereas:

...

(9) This Directive should in no way affect the possibility for Member States to apply their domestic provisions or conventions aimed at preventing tax evasion, tax fraud or abuse.

...

*Article 1*

In Directive 2011/96/EU, Article 1(2) is replaced by the following paragraphs:

"2. Member States shall not grant the benefits of this Directive to arrangements or series of arrangements which are designed for the principal purpose, or which have as one of their principal purposes, of obtaining a tax advantage which would operate against the content or purpose of this Directive and which are not genuine in the light of all the relevant facts and circumstances.

Copyright © 2023 Karnov Group Denmark A/S

An event can include multiple steps or parts.

3. For the purposes of paragraph 2, events or series of events shall be considered not to be genuine to the extent that they are not organized for well-founded commercial reasons reflecting economic reality.

4. This Directive shall not prevent the application of domestic provisions or agreements necessary to prevent tax evasion, tax fraud and abuse."

3. The directive amendment was implemented in Danish law by Act no. 540 of April 29, 2015 amending the Tax Assessment Act as follows:

"*1.* In the *footnote* to the title of the Act, the following *second* and *third sentences are* added:

"The Act contains provisions implementing parts of Council Directive 2011/96/EU of 30 November 2011 on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, Official Journal of the European Union 2011, No. L 345, page 8, as amended. The Act contains provisions implementing parts of Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States, Official Journal of the European Union 2003, no. L 157, page 49, as amended."

*2.* After § 2 is inserted:

"*§ 3.* Taxpayers do not enjoy the benefits resulting from Directive 2011/96/EU on a common system of taxation applicable in the case of parent companies and subsidiaries of different Member States, Directive 2003/49/EC on a common system of taxation applicable to interest and royalty payments made between associated companies of different Member States and Directive 2009/133/EC on the common system of taxation applicable to mergers, divisions, partial divisions, transfers of assets and exchanges of shares concerning companies of different Member States and to the transfer of an SE's or SCE's

**4485**

between Member States as implemented in Danish law, to arrangements or series of arrangements which are organized with the main purpose or which have as one of their main purposes the obtaining of a tax advantage which is contrary to the content or purpose of the Directives and which are not genuine taking into account all relevant facts and circumstances. An arrangement may comprise several steps or parts.

*Paragraph 2.* For the purposes of subsection (1), events or series of events are considered not real to the extent that they are not organized for well-founded commercial reasons that reflect economic reality. *Paragraph 3.* A taxpayer shall not benefit from a double taxation convention if it is reasonable to conclude, taking into account all relevant facts and circumstances, that the obtaining of the benefit is one of the essential purposes of any arrangement or transaction which directly or indirectly gives rise to the benefit, unless it is established that the granting of the benefit in those circumstances would be consistent with the substance and purpose of the relevant provision of the convention.

*Paragraph 4.* Notwithstanding paragraph 3, paragraphs 1 and 2 shall apply when assessing whether a taxpayer is excluded from the benefit of a provision of a double taxation agreement with an EU Member State if the taxpayer could alternatively claim a benefit under one of the Directives on direct taxation."

The underlying bill (bill no. L 167 of March 20, 2015) states, among other things:

"*3.3.4. Applicable law*

There is no general statutory anti-abuse rule in Danish tax legislation. According to Danish (legal) practice, taxation takes place after an assessment has been made of what has actually happened. This means that empty and artificial tax-related transactions can be disregarded, so that the taxation is instead based on what actually happened.

Copyright © 2023 Karnov Group Denmark A/S

be rectified in relation to the opposing reality. Danish tax law is therefore fundamentally in line with internationally applicable principles of "substance over form".

The adopted amendment of the Parent-Subsidiary Directive implies that a generally worded provision on combating abuse of the Parent-Subsidiary Directive must be included in tax legislation. It is assessed that the new provision in the directive could have a broader scope of application than the current (legal) practice.

...

*3.3.5. The proposed legislation*

It is proposed that an international anti-avoidance clause be introduced in Danish tax legislation to combat abuse in connection with cross-border transactions covered by the Parent-Subsidiary Directive.

The circumvention clause is an implementation of an amendment to the directive adopted at the EU Council meeting on January 27, 2015.

...

Finally, it is proposed that the entry into force must take place before the deadline set out in the Parent-Subsidiary Directive. It is proposed that both avoidance clauses will take effect for transactions, arrangements or series of arrangements as of May 1, 2015.

The introduction of a circumvention clause does not limit the existing possibilities to override or re-qualify on other grounds.

...

*Comments on the individual provisions of the bill*

...

On November 25, 2013, the European Commission has in a published memo given the following example where the circumvention clause will apply:

Parent company in country C (non-EU)

Subsidiary in country B (EU) Subsidiary in country A (EU)

According to internal rules in country A, withholding tax must be withheld on dividends to parent companies domiciled outside the EU. This means that if the company in country A is directly owned by the company in country C, any dividend distribution must be taxed at source in country A.

In country B, there is no similar rule on withholding tax on dividends to non-EU parent companies.

If the parent company in country C contributes a holding company in country B, i.e. between A and C, it is possible to avoid the withholding tax on dividends to country C, as the Parent-Subsidiary Directive does not allow withholding tax on dividends between subsidiaries and parent companies resident in the EU, i.e. between countries A and B.

If the main purpose or one of the main purposes of the incorporation of the company in country B has been to avoid withholding tax on dividends from the subsidiary in country A, e.g. because the subsidiary in country B is a so-called "mailbox company" without much substance, country A will be able to deny the subsidiary the benefits of the Parent-Subsidiary Directive and withhold tax on the distribution with reference to the avoidance clause.

In relation to the above example, it should be noted that this is basically a classic flow-through example, which is already covered by the rule in section 2(1)(c) of the Danish Corporation Tax Act, as the subsidiary in country B cannot be considered to be the beneficial owner of the dividend. It should be noted that there are a number of cases pending before the courts on this very issue.

If the objective analysis of all relevant facts and circumstances instead shows that an event or parts thereof are organized for well-founded commercial reasons that reflect the economic

**4486**

Copyright © 2023 Karnov Group Denmark A/S

reality, there will be a real disposition and the circumvention clause will therefore not be applicable, cf. paragraph 2.

Paragraph 3 further proposes that the benefits of a double tax treaty shall be lost if it is reasonable to conclude, taking into account all relevant facts and circumstances, that the obtaining of the benefit is one of the essential purposes of any arrangement or transaction which directly or indirectly gives rise to the benefit, unless it is established that the granting of the benefit in those circumstances would be consistent with the substance and purpose of the relevant provision of the treaty."

*Council Directive 2016/1164/EU of 12 July 2016 laying down rules for combating tax avoidance practices that directly affect the functioning of the internal market*

The above-mentioned directive states, among other things:

*"Article 1*
*Scope of application*

This Directive shall apply to all taxable persons liable to corporate tax in one or more Member States, including permanent establishments in one or more Member States of entities resident for tax purposes in a third country.

...

*Article 3 Minimum level*
*of protection*

This Directive shall not preclude the application of national or treaty-based provisions aimed at ensuring a higher level of protection of national corporate tax bases. ...

*Article 6*
*General anti-abuse rule*

1.  When calculating the corporate tax liability, a Member State shall disregard arrangements or series of arrangements which are organized with the main purpose, or which have as one of their main purposes, the obtaining of a tax advantage which is contrary to the object and purpose of the applicable tax law and which are not genuine taking into account all relevant facts and circumstances. An arrangement may include several steps or parts.

2.  For the purposes of paragraph 1, events or series of events shall be considered not to be genuine to the extent that they are not organized for well-founded commercial reasons reflecting economic reality.

3.  If events or series of events referred to in paragraph 1 are disregarded, the tax liability shall be calculated in accordance with national law.

*Act no. 327 of March 30, 2019 on the application of the multilateral convention for the implementation of measures in double taxation laws to prevent tax erosion and profit shifting* By this Act, the provisions of the multilateral convention of 24 November 2016 for the implementation of measures in double taxation agreements to prevent tax erosion and profit shifting, cf. Annex 1 of the Act, with effect from 1 July 2019 applied to, among other things, the double taxation agreements mentioned in Annex 3 of the Act, including the agreement of 11 October 2010 between the Kingdom of Denmark and the Republic of Cyprus for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income. It is stated that Cyprus has acceded to the Convention. Article 7 of the Convention states:

'Article                     7(11)
Prevention of abuse of contracts

1. Notwithstanding any other provision of a covered tax treaty, no benefit shall be granted under the covered tax treaty with respect to income or capital if, taking into account all relevant facts and circumstances, it is reasonable to assume that obtaining

that benefit

was one of the principal purposes of any arrangement or transaction which directly or indirectly conferred that benefit, unless it is established that the obtaining of that benefit in those circumstances would be consistent with the object and purpose of the relevant provisions of the covered tax treaty."

*The Collection Act*

Section 5(1) and section 7(1) of chapter 2 of the Collection of Taxes and Duties etc. of the Collection Act had the following wording in 2010, cf. Executive Order no. 1402 of December 7, 2010 of the Act on the Collection of Taxes and Duties etc:

"*§ 5*. If it is found that a company has submitted an incorrect declaration or report to the income register of amounts covered by section 2(1), fourth sentence, so that the company has paid too little in taxes or duties etc. or has been paid too much in reimbursement, the company will be required to pay the amount due within 14 days of demand.

*Stk. 2....*"

"*7*. If an amount is not paid on time or if payment has been deferred, monthly interest shall be paid as determined in accordance with paragraph 2 plus 0.8 percentage points for each month commenced from

1. of the month in which the amount is payable. However, for withholding taxpayers covered by section 2(6), the interest according to the first sentence regarding A-tax and labor market contributions shall be paid for each commenced month calculated from the first of the month following the last timely payment date. The interest cannot be deducted when calculating the taxable income.

*(2) ....*".

The provisions are currently as follows, cf. Consolidated Act no. 573 of May 6, 2019:

"*§ 5*. If it is established that a company has submitted an incorrect declaration or report of amounts covered by

**4487**

§ section 2(1), fourth sentence, so that the company has paid too little in taxes or duties etc. or has been paid too much in compensation, the company shall be required to pay the amount due within 14 days of demand for payment. *Stk. 2. ...*"

"*Section 7*. If an amount is not paid on time or if payment has been deferred, a monthly interest rate as determined in accordance with subsection (2) plus 0.7 percentage points shall be paid from the last timely payment date for the amount and until the amount is paid. Interest is calculated daily. Interest cannot be deducted when calculating taxable income. For amounts collected in accordance with the rules in Chapter 5, the provision on balance interest in section 16c(1) applies. *Subsection 2...*"

The provisions in sections 5 and 7 of the Collection Act were introduced by Act no. 169 of March 15, 2000 (Act on the collection of taxes and duties etc.). The special comments to the bill (bill L 19 of October 6, 1999), which formed the basis for this, state, among other things:

"*To § 5.*

Paragraph 1 concerns tax and duty amounts due as a result of incorrect declarations. The proposed rules are the same as those that currently apply under the VAT Act, the Payroll Tax Act and most excise tax acts. The rules state that an amount adjusted due to incorrect declarations must be paid within 14 days. If the amount is paid before this deadline, no interest is charged. If the amount is paid after the 14 days, interest will be charged from the day the claim for back payment is made. This would mean a change for labor market contributions and withheld A-tax, which today accrue interest from the time when the amount

should have been paid. In favor of such a principle is that - for these types of equivalents - it is at this time that the amount is (or should have been) withheld. Against this, however, is the fact that in the case of a subsequent declaration it can be difficult to

It is easy to divide the arrears into individual periods - with the month as the tax period, there will be 12 periods per year that the arrears must be divided into, with separate interest calculation for each period. This seems unnecessarily cumbersome. At the same time, there is currently no interest credit for A-tax and AM contributions that are repaid at a later date. This can mean that a company that makes retroactive adjustments a few years back and needs a total refund may risk having to pay more in interest than the amount they have overpaid. Against this background, it is proposed that interest only accrues from the 1st of the month in which the last timely payment date falls, cf. section 7.

..."

The provisions of the Collection Act on a single tax account, cf. Executive Order no. 573 of May 6, 2019, state, among other things:

"Chapter 5

*One tax account*

*§ 16.* The following payments from and to companies, corporations, foundations and associations, public authorities, institutions

etc. are included in an overall balance statement (the tax account) according to the rules in this chapter:

1) Taxes and duties covered by section 1(1) and (2) of this Act.

2) Payments under the Corporation Tax Act, the Taxation of Foundations Act, the Share Savings Account Act, the Hydrocarbon Tax Act, the Customs Act, the Act on Accelerated Repayment of Certain Taxes, the Act on Tax on Damage Insurance, the Registration Tax Act and the Act on Tax on Contributions to Labor Market Insurance and Work Accident Compensation, etc.

3) ...

...

6) Fines, fees and interest relating to the above laws and payments.

*§ Section 16 a.* Receipts and payments of taxes and duties etc. covered by section 16 are automatically offset according to a balance principle. Notification of offsetting appears on the tax account.

*Subsection 2.* If the total sum of registered overdue claims on the company's account exceeds the total sum of registered and overdue receivables to the company, the difference (debit balance) constitutes the total amount that the company owes the customs and tax administration. If, on the other hand, the total sum of registered and due claims for payments from the company is less than the registered and due claims for payments to the company, the difference (the credit balance) represents the company's total receivable from the customs and tax administration.

*Subsection 3.* Claims for receipts and payments are registered in the tax account from the time when they are declared or when the claims can be determined with certainty.

*Subsection 4.* Claims for payments from companies affect (are debited) the balance statement under subsection (2) from the latest timely payment date for the amount. Subsection 5. Payments from businesses for the fulfillment of claims under subsection (4) affect (are credited) the balance statement under subsection (2) from the payment date regardless of the payment method.

*Subsection 6.* Receivables to companies covered by this chapter affect (are credited) the balance statement under subsection (2) from the time when the amount can be calculated under section 12.

*Subsection 7.* Payments to companies for fulfillment of claims under subsection (6) affect (are debited) the balance statement

under subsection (2) at the time when payment is made to the company.

*Paragraph 8.* Where a company's payment is used in whole or in part to pay a debit balance that is composed of several claims, the payment is used to cover the oldest due claim first.

*Stk. 9.* ...

**4488**

...

*§ Section 16 c.* A debit balance bears interest at the rate stipulated in section 7(1), see (2). Interest is calculated daily and added monthly. The interest is not deductible. A debit balance of DKK 200 or less does not accrue interest after the registration of the termination of the business. *Stk. 2....*

*Paragraph 3.* A credit balance does not accrue interest.

*Subsection 4.* If a debit balance for a company exceeds DKK 5,000, the entire amount must be paid immediately, and the Customs and Tax Administration will send a reminder letter to the company. The Customs and Tax Administration does not send reminders for a debit balance of DKK 5,000 or less....

*Subsection 5.* A credit balance is paid to the company's Nemkonto, unless the company has requested an amount limit for payment of a credit balance. A limit for payment of a credit balance may not exceed DKK 200,000. Payment of a credit balance cannot be made until at least DKK 200 can be paid out. Regardless of the third sentence, companies can request payment of any amount regardless of size. Payment of a credit balance cannot be made if the company fails to submit returns for completed periods or to provide the customs and tax administration with information in accordance with section 2 of the Tax Control Act, cf. section 12(4). A credit balance of DKK 200 or less belonging to a discontinued business will lapse 3 years after the registration of the discontinuation of the business. The time limit in the 6th sentence cannot be interrupted or suspended.

*Subsection 6.* Payment of a credit balance awaits overdue tax and duty claims if the claim has the last timely payment deadline within five working days of the credit balance arising. However, if the credit balance arises as a result of the company's response for a settlement period being negative, the credit balance will be paid no later than after the deadline in section 12(2).

..."

The provisions for a single tax account were introduced by Law 513 of

June 7, 2006 (Act amending the Collection Act, the Corporate Tax Act and various other acts (Collection via one tax account)). The rules did not enter into force until August 1, 2013, cf. Executive Order no. 577 of May 30, 2013.

The general comments to bill no. L 205 of March 29, 2006, which formed the basis for the law, state, among other things:

"1.1...

The purpose of One Tax Account ("the tax account") is that all payments between the customs and tax administration and the companies are gathered and will in future be made via one and the same account, i.e. that the customs and tax administration's claims for payments from companies and the companies' claims for payments from the customs and tax administration are automatically offset according to a balance-like principle. The establishment of the tax account is expected to facilitate payment/collection for both businesses and the customs and tax administration, and to give businesses the opportunity to quickly and easily determine via online access to the tax account whether they owe amounts or have amounts due to the customs and tax administration.

...

*1.3 The purpose of the tax account*

The primary purpose of the tax account is to facilitate and simplify the administration of payments to and from the customs and tax administration for both businesses and authorities. Under current rules, payments to the customs and tax administration are settled and registered in a number of different accounts and in a number of different IT systems in the customs

and tax administration. The payments are thus regarded as separate processes, which means that it can be difficult to get a comprehensive overview of the individual company's dealings with the customs and tax administration.

In addition, the existing collection system means that significant resources are spent on correctly placing incorrect amounts or amounts that do not specify what the amount should cover.

With the introduction of the tax account, all payments to and from the customs and tax administration will be registered and settled via the tax account. In practice, companies will only have to pay amounts owed to one and the same account (the tax account). The tax account will also include any amounts owed to the company by the customs and tax administration, such as negative VAT, any refunds of previously paid taxes or other back payments or refunds to which the company may be entitled.

The tax account introduces a "balance principle" that is comparable to that of a bank account. Payments in and payments out will automatically be offset against each other and the balance of the account can thus be negative (debit balance) or positive (credit balance), similar to a bank account. In accordance with the balance system, any payment to the customs and tax administration will be included in the tax account and will be used to cover any debit balance.

...

*3.1 The balance principle*

...

With the introduction of the tax account, the customs and tax administration's attention in terms of collection will focus *solely* on the balance at any given time and not on the individual claim(s) of which this balance is composed. This also means that a collection will focus on the balance at any given time and that the calculation of default interest will focus on the debit balance and not on the individual claim/arrears.

**4489**

As the default interest rate under the existing rules is not uniform for the individual claims - even though there has been some harmonization with the Collection Act - it is necessary to harmonize the individual interest rates, see section 3.5 below for more information on determining the interest rate and interest calculation of a debit and a credit balance respectively.

...

There are no changes to the basic rules for how and when declarations and payments must be made for individual claims. For those claims that are fully covered by the rules of the Collection Act, the declaration and payment deadlines in section 2 of the Act will continue to apply, while e.g. VAT, customs duties and (on-account) corporate taxes will continue to follow the declaration deadlines set out in the respective legislation.

...

*3.5 Interest rate harmonization and conversion to overnight rates*

...

As far as long-term arrears are concerned, the implementation of the tax account will mean that higher interest is paid for long-term arrears than for short-term arrears. This follows, among other things, from the interest rate principle. For companies that are in arrears with corporation tax for more than approx. 2 months, the interest rate will be higher than today, as the same interest rate as will be applied for e.g. VAT and A-tax. This will typically apply to companies that are in serious liquidity difficulties, under suspension of payments, bankruptcy, etc. while the ordinary corporate tax payment is not affected.

...

*3.7 Debit and credit time for the tax account*

The question of when the tax account (balance) is affected (debited or credited) is decisive for the point in time from which default interest must be calculated and when the debit balance limit of DKK 5,000 must be considered exceeded, and as a result, a reminder is sent out to the company for the entire balance.

The question of when the balance is affected is relevant both for claims/amounts that the company must pay and for claims/amounts that the companies are owed. A distinction must be made between, on the one hand, the calculation of claims and their impact on the balance and, on the other hand, the actual payments from companies and the customs and tax administration and their impact on the account.

Claims on the company will be debited to the tax account on the last timely payment date for that claim. Claims that are known before the actual payment deadline may be shown (charged) on the tax account before the last timely payment date, but will not be included as part of the interest-bearing balance. With regard to the requirements that depend on the company's declaration, it is a prerequisite for correct debiting that the declaration has been made at all. If the company has not made a declaration, the customs and tax administration must make a preliminary determination. Such a determination will always be made after the time of declaration and payment, and the determined amount will therefore be debited - with retroactive effect - to the last timely payment date for the claim in question. ...

*3.8 Estimated determinations*

According to section 4 of the Collection Act, the customs and tax administration can set a discretionary amount if the company has not declared for the previous settlement period within the set deadline. As stated, the implementation of the tax account does not change the rules regarding declarations and deadlines etc. Thus, individual declarations must continue to be made for each taxable person, and if no declaration is made, the amount will still have to be determined on a discretionary basis. If such a determination is made, it is the amount determined that is debited to the balance of the tax account and will thus be included in any default interest calculation. If a declaration is subsequently made, the declared amount will replace the estimated amount. If the estimated amount has been set too high or too low in relation to the subsequent correct declaration, this means that the default interest calculation has been made on a balance that has been either too high or too low. Interest is subsequently corrected back to the original deadline for the declaration that interest has been calculated on a debit or credit balance that is either too high or too low.

The intention is thus to carry out what can be described as a full "rollback". This means that the previous discretionary determination and the associated calculated interest are completely deleted. The correct amount is retroactively inserted and correct interest is then calculated on this amount. This is in contrast to a "net solution", where the calculated interest etc. is not changed back in time, but only an adjustment amount is calculated, which is then either debited or credited to the balance.

A solution that involves "full rollback" will mean that the company can follow all movements, i.e. the deletion of the previous estimate and the associated interest and the insertion of the correct amount and the associated interest. This solution will thus give the company a full overview of the movements and corrections that have been made to the balance. ... The special notes to bill no. L 205 of March 29, 2006 state, among other things:

**4490**

"To #9.

...

*The proposed section 16(1)* states that all the payments mentioned in the provision from and to companies, corporations, foundations and associations are included in an overall balance statement according to the rules in the proposed chapter 5. The

U.2023.4403H

provision thus defines who and what (which claims) are covered
by the rules on the tax account.

Copyright © 2023 Karnov Group Denmark A/S

...

No. 1 includes all payments relating to taxes and duties covered by section 1(1) and (2) of the Collection Act. This means that all payments relating to taxes and duties for which companies, corporations, foundations and associations must be registered fall under the tax account. In practice, this means A-tax, payroll tax, VAT, labor market contributions, withheld dividend tax, royalty tax and interest tax according to sections 66, 66A and 66B of the Withholding Tax Act and all excise duties.

...

*The proposed section 16a(1)* states that, by virtue of the balance principle, automatic offsetting of incoming and outgoing payments from and to the companies takes place. The term "set-off" means actual set-off with offsetting claims, as described in section 2.4, but in this context the term also means that payments from the companies are written off against any existing debit balance according to the FIFO principle.

...

*The proposed section 16a(2)* establishes the concepts of debit balance and credit balance. A debit balance means that the company's debt to the customs and tax administration exceeds any receivables from the customs and tax administration. A credit balance indicates the opposite, i.e. that the company's receivables exceed the company's debt to the customs and tax administration. The terms debit balance and credit balance are used in several places in the proposed rules.

*The proposed provisions in section 16a(3)-(7)* determine the time from which a claim for payment (a receivable) from and a claim for payment (a receivable) to the company affects the statement of account, as well as when the actual receipts and payments to cover such claims and receivables affect the statement of account. Paragraph 3 establishes the time when a claim for a payment can be shown (posted) on the tax account. The fact that an incoming or outgoing payment is displayed/assigned means that when looking it up via the online access that is established, the tax account will show which claims or receivables have already been calculated and which are due for payment in the near future. Receivables can thus appear on the tax account from the time when the company has made the declaration on which the receivable is based, or at the time when the receivable can be determined with certainty in another way. For example, this may be a situation where no declaration has been made, but where the calculation of a receivable is based on a check of the company's circumstances.

When it is stated that a claim (or receivable) must be determinable with certainty, it does not mean that the claim underlying the receivable cannot be reversed at any subsequent time.

The wording only indicates that the claim in question must be based on the company's own declaration or another form of "certain", statement and not just be an expression of a simple estimate. Paragraph 4 states that a claim (receivable) on a company only affects (is debited) the balance statement - and thus also affects the interest calculation basis - from the last timely payment date for the amount in question. Until that time, the amount will (where possible) simply be shown (posted) on the tax account. The fact that interest is only calculated from the last timely payment date is i n  a c c o r d a n c e  w i t h  current practice.

Paragraph 5 provides that the payment related to a claim affects (is credited) the balance statement from the day on which the company makes the payment, i.e. the day on which the company (physically) pays the amount in question in a bank, bank or

directly to the tax authorities. If the payment is made electronically, the payment is considered to be made on the day the amount is withdrawn from

...Paragraphs 6 and 7 determine when a claim for payment to the company (a receivable) and the related actual payment in practice affect (are credited and debited respectively) the statement of financial position.

...

*The provisions of the proposed section 16c(1-6)* contain rules on interest on debit and credit balances, respectively, and rules on when a debit balance falls due for payment and rules on payment of a credit balance. According to the proposed paragraph 1, a debit balance bears interest at the default interest rate set out in section 7(1), cf. paragraph 2, of the Collection Act. The interest rate is 0.8% per month, equivalent to approximately 10% annually. The interest is calculated daily (overnight interest) and added monthly and is not deductible. Thus, in contrast to the existing rules, interest is calculated on a daily basis and compound interest is calculated. However, exceeding the payment deadline by just one day does not - as is the case today - trigger one to two months' interest. With the implementation of the tax account, interest will only be payable for the number of days by which the payment deadline is actually exceeded."

By Act no. 998 of August 30, 2015 (Act amending the Collection Act and the Corporation Tax Act (Amendment))

**4491**

of interest surcharge for the settlement of corporation tax and limitation of the balance on the tax account etc.)), section 16c(4) was worded as follows:

"*Stk. 4.* A credit balance is paid to the company's Nemkonto, unless the company has requested an amount limit for payment of a credit balance. A limit for payment of a credit balance may not exceed DKK 200,000. Payment of a credit balance cannot be made until at least DKK 100 can be paid out. Regardless of the third sentence, companies can request payment of any amount regardless of size. Payment of a credit balance cannot be made if the company fails to submit returns for completed periods or to submit a tax return, cf. section 12(4)."

The general comments to bill no. L 6 of July 3, 2015, which formed the basis for the legislative amendment, state, among other things:

"*3.1.2.*

In the current financial climate, which is characterized by low or negative interest rates, the possibility of having amounts in the tax account without negative interest rates may be attractive to companies that have liquidity to invest. Against this background, it is the assessment of the Government that the companies' access to have large amounts in the tax account without the amounts being matched by a specific due claim should be limited, among other things in order to strengthen the effectiveness of Danmarks Nationalbank's monetary policy instructions and ensure that SKAT cannot be used as a bank."

The aforementioned Act no. 513 of June 7, 2006, which introduced the rules on a single tax account, also introduced the current wording of section 7(1) of the Collection Act.

The special notes to bill no. L 205 of March 29, 2006, which formed the basis for this, state:

"To #3.

With the implementation of the tax account, all incoming and outgoing payments to companies are included in a single balance statement, where offsetting is automatic. The focus will only be on whether the company's tax account is in debit or credit, i.e. whether the company owes or is owed money from the customs and tax administration. A debit balance can be composed of several claims, A-tax, VAT, customs, etc. These

claims accrue interest according to the current rules with different interest rates. In order to consistently apply the balance principle and thus achieve the greatest administrative benefits, it is essential that the same

(harmonized) default interest rate in relation to the balance at any time - regardless of what claims this may be composed of. As stated in section 3.5 under the general comments above, a future harmonized monthly interest rate of 0.8% will have to be set based on the assumption of revenue neutrality.

It is proposed that the existing interest provision in section 7(1), cf. (2), of the Collection Act be used as the basis for calculating interest on the debit balance at any time under the proposed section 16c on balance interest. The existing interest provision in section 7 of the Collection Act is retained in its current form, i.e. with a fixed percentage rate (a surcharge) under subsection (1) and a variable rate under subsection (2). ... The interest calculation is proposed to be changed so that day-to-day interest is calculated with monthly interest accrual. This means that companies will only pay default interest (incl. compound interest) for the actual number of days that the payment deadline is exceeded as opposed to today, where late payment triggers one to two months' interest. It is proposed to add a reference to the fact that amounts included in the tax account follow the rules on balance interest in the proposed section 16c.

..."

The former tax minister's political proposal "Retssikker-hedspakke V, Et opgør med urimelige skatteregler" published on April 12, 2019 states, among other things:

"Deposit - possibility of payment if the Ministry of Taxation takes a case to court

A taxpayer should not risk significant interest imputation in the special cases where the Ministry of Taxation chooses to bring a decision from the National Tax Tribunal before the courts or appeal a judgment. Several companies have thus requested an option to make voluntary payments to avoid later interest imputation. As the rules stand today, there is no legal basis for the taxpayer to voluntarily pay tax while the court case is pending. Experience shows that the cases can take up to several years. If the Ministry of Taxation is then successful, the taxpayer will be charged interest accumulated from the time of the last timely payment for the disputed tax claim.

Today, the rules are such that individuals will have to pay interest of 4.8% annually on the increase in income tax and a company will have to pay interest of 8.4% annually (2019 figures) on the increase in corporate tax. The interest is calculated from September 1 (individuals) and November 1 (companies) of the year following the income year for which the tax is increased and until the payment of the tax on the annual statement issued as a result of the judgment.

To increase legal certainty, it is proposed that the rules can be changed so that taxpayers in certain cases are given the opportunity to voluntarily pay (deposit) an amount corresponding to the disputed tax claim. In this way, citizens and companies are protected against large interest charges in the future if the courts later rule in favor of the Tax Ministry in the case."

*Tax Administration Act*

Section 51(1) and (6) of the Tax Administration Act was amended by Act No. 427 of June 6, 2005:

**4492**

"*Deferral in connection with an appeal*

*§ 51. Upon* application, the Customs and Tax Administration may defer payment of the part of a tax to which an appeal against the assessment relates. However, this does not apply to decisions under customs legislation, cf. Article 244 of Council Regulation (EEC) No. 2913/92 of 12 October 1992 establishing the Community Customs Code.

*Stk. 2. ...*

*Paragraph 6.* Deferment is conditional on the deferred amount accruing interest at the interest rate in the relevant act from the due dates defined in the same act. Deferment also includes interest and any interest already accrued."

The special notes to the provision, cf. bill no. L 110 of February 24, 2005, state, among other things:

"To section 51.

The provision is a statutory confirmation of section 27 of Executive Order no. 520 of 25 June 2002 on the division of authorities and case allocation, with one change, cf. section 2, second sentence. The provision in section 27 reflects a long-standing practice.

Under current law, an appeal does not have suspensive effect, unless otherwise provided, cf. e.g. section 38 of the State Tax Act.

However, it is standard practice in the tax area that if a complaint is made about a tax assessment, a deferral of payment of the part of the tax to which the complaint relates is granted upon request as a starting point. However, this does not apply if there is an imminent danger that the tax will not be paid if deferral is granted, for example if the taxpayer is moving abroad. Alternatively, security may be required to grant the deferral. ...."

## The High Court's reasoning and result

*Section 2(1)(c) of the Danish Corporation Tax Act*

It follows from section 2(1)(c) of the current Corporation Tax Act, as amended by Act no. 282 of April 25, 2001, that a company as mentioned in section 1(1) with its registered office abroad is liable to tax on dividends covered by section 16A(1) of the Assessment Act.

It is established that the dividend received by Heavy Transport Finance (Luxembourg) SA, Luxembourg in 2007 is generally taxable under this provision.

Furthermore, it is agreed that the Luxembourg company, upon receipt of dividends in 2007, fulfilled the requirements for ownership share and ownership period in relation to the dividend-paying subsidiary, Heavy Transport Holding Denmark ApS, which is a first condition for obtaining tax exemption under section 2(1)(c) of the current Corporation Tax Act. According to the provision, it is also a condition that the taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC (the Parent-Subsidiary Directive), as amended by Directive 2003/123/EC, or under a double taxation treaty with the state where the company is resident. It is undisputed that the two companies are covered by the Directive as parent and subsidiary respectively.

The dispute in the case concerns, first and foremost, whether, pursuant to the parent

/The Parent-Subsidiary Directive or the Double Taxation Convention with Luxembourg is an obligation to waive or reduce taxation. *Parent/Subsidiary Directive*

It follows from Article 5(1) of the Parent-Subsidiary Directive that profits distributed by a subsidiary to its parent company are exempt from withholding tax. The provision was originally implemented in Danish law by Act no. 219 of April 3, 1992 and was at the time of distribution in 2007 implemented by Act no. 282 of April 25, 2001, as last amended by Act no. 1375 of December 20, 2004, by reference to the Directive in section 2(1)(c) of the Danish Corporation Tax Act.

In its judgment of 26 February 2019 in Joined Cases C-116/16 and C-117/16, the Court of Justice of the European Union ruled that the general principle of EU law that individuals must not be able to rely on provisions of EU law for the purpose of enabling

fraud or abuse must be interpreted as meaning that, in cases of fraud or abuse, national authorities and courts must refuse to grant a taxable person the exemption from withholding tax on dividends distributed by a subsidiary to its parent company, provided for in Article 5 of the Parent-Subsidiary Agreement.

/Subsidiaries Directive, even if there are no national or international

Copyright © 2023 Karnov Group Denmark A/S

contractual provisions providing for such a refusal. The Court has also indicated that proof of an abuse of rights requires, first, a combination of objective circumstances showing that the objective pursued by the EU legislation has not been achieved, even though the conditions laid down by that legislation have been complied with, and, second, a subjective element consisting of an intention to take advantage of the EU legislation by artificially creating the conditions necessary to obtain that advantage. The existence of a number of elements may establish the existence of an abuse of rights, provided that those elements are objective and consistent. Such evidence may include, inter alia, the existence of flow-through companies that have no economic justification and the purely formal nature of a group's structure, financial structure and loans. It also states that it is not necessary for the tax authority to determine which entity or entities it considers to be the beneficial owner of that dividend. Finally, the Court states that, where there is such fraud or abuse, the application of the freedoms guaranteed by the Treaty on European Union (TFEU) cannot be invoked with

**4493**

in order to challenge the legislation of the first Member State governing the taxation of those dividends.

Heavy Transport Holding Denmark ApS has argued that the principle of prohibition of abuse of rights established by the European Court of Justice cannot be given direct effect by Danish courts, as the European Court of Justice does not have jurisdiction to establish such a principle, and as the transfer of jurisdiction is not provided for in the Danish Accession Act, cf. the Supreme Court's judgment reproduced in U2017.824 (Ajos).

In the judgment reproduced in U1998.800 (Maastricht), the Supreme Court held that the fact that the precise definition of the powers granted to the Community institutions may give rise to doubt and that the competence to decide such questions of interpretation is assigned to the European Court of Justice (now the European Court of Justice) cannot in itself be considered incompatible with the requirement of certainty in section

(20) The fact that the EC Court of Justice, when interpreting the Treaty, also attaches importance to other elements of interpretation than the wording of the provisions, including the purpose of the Treaty, is not contrary to the assumptions underlying the Accession Act, nor is it in itself incompatible with the requirement of certainty in section 20(1) of the Constitution. The same applies to the ECJ's law-making activities within the framework of the Treaty. From the Maastricht judgment and the corresponding judgment reproduced in U2013.1451 (Lisbon), also follows that

"[t]he Act of Accession recognizes that the competence to review the legality and validity of Community acts is vested in the ECJ. This means that Danish courts cannot consider an EC act inapplicable in Denmark without the question of its compatibility with the Treaty having been examined by the ECJ, and that Danish courts can generally assume that the ECJ's decisions in this regard are within the limits of the transfer of sovereignty. However, the Supreme Court finds that it follows from the determination requirement in section 20(1) of the Danish Constitution, together with the Danish courts' right to review the constitutionality of laws, that the courts cannot be deprived of the right to review the question of whether an EC act exceeds the limits of the surrender of sovereignty made by the Act of Accession. Danish courts must therefore consider a Community act inapplicable in Denmark if the extraordinary situation should arise that it can be established with the necessary certainty that a Community act upheld by the European Court of Justice is based

on an application of the Treaty that lies outside the surrender of sovereignty under the Act of Accession. Similarly

shall apply with regard to the rules and principles of Community law based on the case-law of the Court of Justice of the European Communities."

In the judgment reported in U2017.824 H (Ajos), the Supreme Court stated that "the CJEU has jurisdiction to decide questions concerning the interpretation of EU law, cf. Article 267 TFEU. It is thus for the CJEU to determine whether a rule of EU law has direct effect overriding a conflicting national provision, including in disputes between private parties. Whether a rule of EU law can be given the effect in Danish law that EU law requires depends primarily on the Act on Denmark's accession to the European Union." The Supreme Court also ruled that principles developed or established on the basis of Article 6(3) TFEU and the provisions of the EU Charter, including Article 21 of the Charter on non-discrimination, have not been made directly applicable in Denmark after the Act of Accession.

In accordance with the aforementioned judgments, the High Court finds that it is for the CJEU to determine the content of EU law and, as in the judgment of 26 February 2019 in Joined Cases C-116/16 and C-117/16, to establish that the general principle of EU law, established in a number of previous judgments, see, inter alia, the judgment of 9. March 1999 in Case C-212/97 Centros and the case-law cited in paragraph 24 of the Centros judgment, the general principle of EU law, established in a significant number of different areas of law, that individuals must not be able to rely on provisions of EU law for the purpose of enabling fraud or abuse, must be interpreted as meaning that, in the event of fraud or abuse, the national authorities and courts must refuse to grant a taxpayer the exemption from withholding tax on dividends distributed by a subsidiary to its parent company provided for in Article 5 of the Parent-Subsidiary Directive, even in the absence of national provisions or collective agreements providing for such a refusal. It is also up to the Court of Justice of the European Union to specify the circumstances in which such an abuse of rights exists. The fact stated by Heavy Transport Holding Denmark ApS that the CJEU has changed its practice in relation to the judgment of July 5, 2007 in case C-321/05 (Kofoed) cited by the company cannot lead to a different result.

Furthermore, the CJEU's interpretation of the principle in question and the resulting adjustment of when the tax exemption under Article 5 of the Parent-Subsidiary Directive can be invoked cannot be considered to be based on an application of the TFEU that is outside the surrender of sovereignty under the Accession Act.

The wording of section 2(1)(c) of the Danish Corporation Tax Act, which essentially only refers to the Parent-Subsidiary Directive, does not prevent an understanding of the provision that is consistent with the interpretation of the general EU law principle of abuse and Article 5 of the Directive as applied by the European Court of Justice. Furthermore, there is a general presumption that the legislator has intended an interpretation of the Danish Implementation Act that is in accordance with the EU law principles.

**4494**

provisions implemented by the Act as interpreted by the European Court of Justice. Furthermore, in the opinion of the High Court, the statements made by the Minister of Taxation in connection with the drafting of the Act concerning the possibility of incorporating an intermediate holding company in Cyprus are not of such a nature that the interpretation of the Parent-Subsidiary Directive established by the CJEU cannot be applied in this case.

*"Beneficial owner" - the double taxation treaty*

As stated in the judgment reproduced in TfS 2012.182, the term "beneficial owner" has been used in the OECD Model Tax Convention since 1977, but is not otherwise a known concept in Danish law. In the OECD Model Tax Convention from 1977, which forms the basis for the double taxation agreement between Denmark and

and Luxembourg from 1980 and in the model agreement from 2003, the

"rightful owner" is not defined in detail, but certain guidelines on the understanding of the concept are given in the comments to the agreements. As stated in the aforementioned judgment and in the High Court's judgment of 3 May 2021 in cases B-1980-12 and B-2173-12, the requirement that the recipient is the beneficial owner should, as far as possible, be interpreted in accordance with the international understanding expressed in, among other things, the comments to the model agreement. In this connection, the subsequent comments from 2003 to Article 10(2) of the Model Agreement are clarifications compared to the original comments to the Model Agreement from 1977. The comments from 2003 can therefore be included in the interpretation of the concept of beneficial owner.

As stated in the aforementioned judgment of 3 May 2021, there is no basis for assuming that an interpretation of what is stated in the Danish Corporation Tax Act

§ Section 2(1)(c) on waiver or reduction under a double tax treaty that is consistent with the international understanding of the term "beneficial owner" in the 1977 OECD Model Tax Convention is contrary to section 2(1)(c) of the Act

c. The statements made by the Minister of Taxation in connection with the creation of the Act on the possibility of incorporating an intermediate holding company in Cyprus and the not very strict application of the legislative history of the terms "beneficial owner" and "rightful income recipient" cannot lead to a changed assessment in this case either. The same applies to what Heavy Transport Holding Denmark ApS has stated about Canadian case law and the final protocol to the double taxation agreement with Luxembourg.

*Administrative practices*

The Minister of Taxation's answers to questions to the Tax Committee, to section 2(1)(c) of the Corporation Tax Act, as amended by Act No. 219 of April 3, 1992, by Act No. 1026 of December 23, 1998 and by Act No. 282 of April 25, 2001, including the statements made by the Minister of Taxation in connection with the creation of Act No. 282 of

25 April 2001 on the possibility of depositing a holding company, for example, in Cyprus and thereby avoiding Danish taxation and the possibility of "restructuring", cannot, cf. the judgment of 3 May 2021 in cases B-1980-12 and B-2173-12, be understood as an admission that Danish tax authorities would accept an abuse of law as described by the European Court of Justice or would grant a tax reduction under a double taxation treaty, even though the recipient of the dividend could not be considered the rightful owner thereof. The same applies to the fact that the Minister of Taxation in his reply of November 27, 2006 to the Danish Parliament's Tax Committee stated that he could not "provide examples of foreign flow-through companies that the Danish tax authorities have not accepted as beneficial owners of dividends from Danish companies."

In this connection, it is noted that, prior to the decision on the distribution in this case and the previous loan, the Minister for Taxation stated in a reply to the Danish Parliament's Law Secretariat of November 6, 2006 that "[t]he limited tax liability - and the derogation - applies to the company that actually *receives* the dividend. The limited tax liability is therefore only waived if the foreign company that actually receives the dividend is covered by the Directive or a double taxation treaty. However, if the dividend is actually received by a company in a tax haven country, the dividend payment is not exempt from withholding tax. Thus, the "rightful income recipient" principle must be applied to determine who "receives" the interest. The term "beneficial

owner" is considered to be very similar to the term "beneficial owner" used in the double tax treaty. In the double tax treaties, withholding tax shall only be waived or reduced if the beneficial owner of the dividends is resident in the other state. The provision is a safeguard against an ordinary taxed company being deposited as a

"conduit" company between the dividend-paying Danish company and the final receiving foreign tax shelter company. The provision applies even if several intermediate ordinary taxed companies are contributed. The decisive factor is who is the correct income recipient/beneficial owner. "Conduit" companies include, among other things, companies that, although the formal owner, actually have very narrow powers in relation to the income in question. The company is in relation to the dividend a "nullity" or trustee acting on behalf of other parties, cf. the comments to Article 10 of the OECD Model Tax Convention (paragraph 12.1)." In a further reply of November 27, 2006 to the Danish Parliament's Tax Committee, the Minister of Taxation further stated that "[t]he waiver of limited tax liability is conditional on the foreign company in question being the beneficial owner of the dividend. A pure

**4495**

A flow-through company resident abroad, e.g. Luxembourg, will not be the beneficial owner of the dividend, cf. the comments to Article 10 of the OECD Model Tax Convention (section 12.1). However, the limited tax liability will lapse if the beneficial owner behind the flow-through company is resident in another country and Denmark under the Parent-Subsidiary Directive or a double tax treaty with that country must reduce or waive taxation of the dividend."

It also appears from the Ministry of Taxation's memorandum of March 20, 2007 to the Danish Parliament's Tax Committee on the status of SKAT's control efforts that the acquisition of Danish companies by private equity funds in recent years has accounted for a larger and larger share of total business transfers, that the number, especially in 2005, proved to be a significant number with a large volume, and that SKAT has therefore focused on this type of transfers. It also appears that SKAT has on this basis initiated a control of a number of transfers in order to investigate who is the final recipient, the "right income recipient", of interest and dividends. On May 15, 2007, the Minister of Taxation stated that these investigations had not yet led to dividend taxation of the distributions to flow-through companies.

Against the aforementioned background, prior to the decision on distribution in this case and the previous loan, there cannot be assumed to have been an administrative practice of allowing arrangements which, according to the judgment of the EU Court of Justice in the joined cases C-116/16 and C-117/16, constitute fraud or abuse of the provision on exemption from withholding tax on dividends under Article 5 of the Parent-Subsidiary Directive, or which entails that dividends are paid without withholding tax on dividends to a company which is not a 'beneficial owner' within the meaning of the double taxation convention with Luxembourg. The fact that the tax authorities have not disregarded such arrangements prior to the distribution in 2007 cannot be equated with a positive decision in this respect, cf. the Supreme Court's judgment reproduced in U2020.1923 H.

*The actual distribution*

On May 23, 2007, Heavy Transport Holding Denmark ApS distributed USD 325 million, corresponding to DKK 1,799,298,000, to its parent company Heavy Transport Finance (Luxembourg) SA.

The amount was set off by the Danish company against a claim on the Luxembourg parent company arising from a loan of the same amount that Heavy Transport Finance (Luxembourg) SA had taken out in Heavy Transport Holding Denmark ApS on January 22, 2007 to pay the purchase price for the company. Heavy Transport Finance (Luxembourg) SA purchased Heavy

Transport Holding Denmark ApS from the two companies, Heavy Transport Group Inc. and Incomara Holdings SA, both domiciled in Panama and owners of both the Danish and Luxembourg companies. The purchase price was paid on 24.

January 2007 transferred from Heavy Transport Finance (Luxembourg) SA to the Panamanian companies.

The loan from Heavy Transport Holding Denmark ApS to Heavy Transport Finance (Luxembourg) SA of USD 325 million is in the loan agreement between the parties of January 22, 2007 referred to as "interim dividend", and it appears that the amount is paid as a "short term loan" until a future general meeting in Heavy Transport Holding Denmark ApS can decide to distribute a dividend to the parent company of the same amount. The loan agreement also stipulates that the loan must be repaid on demand or immediately after the adoption of the dividend payment by offsetting it.

It is undisputed that the company Heavy Transport Finance (Luxembourg) SA was set up as an intermediate holding company between the Panamanian companies and Heavy Transport Holding Denmark ApS for the purpose of ensuring that no Danish withholding tax was triggered by the dividend distribution.

As regards the activities of Heavy Transport Finance (Luxembourg) SA, it also appears that the company, which, according to the information provided, was established in 2004 for the purpose of financing Heavy Transport Holding Denmark ApS and after January 22, 2007 as the parent company of the company, had (and has) no employees, as the company's administration is outsourced to a group company in Luxembourg, Heerema Group Service SA. It is undisputed that the parent company had no other activity when it took over the Danish company. Heavy Transport Finance (Luxembourg) SA's annual accounts for 2007 show that the company's assets at December 31, 2007 consisted of cash of USD 148,551 and financial assets of
USD 1,255,355 in the subsidiary Heavy Transport Holding Denmark ApS.

Against this background, the High Court finds that Heavy Transport Finance (Luxembourg) SA was obliged to and was only able to repay the loan of USD 325 million to Heavy Transport Holding Denmark ApS by set-off against the dividends received and thus had no real right of disposal over the dividends. Accordingly, and as the purpose of the transactions was undisputedly to avoid Danish taxation of the dividends in connection with the repatriation of the funds to the shareholders in Panama, Heavy Transport Finance (Luxembourg) SA cannot be considered the rightful owner of the dividends, cf. Article 10(2) of the double taxation treaty, which is why the tax should generally not be reduced under the rules of the treaty. Heavy Transport Finance (Luxembourg) SA is also not entitled to tax exemption under the Parent-Subsidiary Directive, as

**4496**

The company must be considered a flow-through company without independent economic and commercial justification, and thus must be characterized as an artificial arrangement whose sole purpose has been to obtain tax exemption under the Directive, cf. the judgment of 26 February 2019 in the joined cases C-116/16 and C-117/16.

*The significance of the possibility of a possible liquidation under section 59 of the current Limited Liability Companies Act*

However, Heavy Transport Holding Denmark ApS has argued that there is no abuse of the Parent-Subsidiary Directive, since the two shareholders in Panama, Heavy Transport Group Inc. and Incomara Holdings SA, instead of incorporating the company, Heavy Transport Finance (Luxembourg) SA, to receive and distribute the ordinary dividends from Heavy Transport Holding Denmark ApS to the Panamanian companies, could have chosen to have the Danish company liquidated pursuant to section 59 of

the Danish Limited Liability Companies Act, whereby the distributed liquidation proceeds from the parent company in Luxembourg would have been tax-free for the two shareholders.

In its judgment of 26 February 2019, paragraphs 108-110, the Court of Justice of the European Union ruled on the situation where there is a double taxation treaty concluded between the source state and the third state in which the beneficial owners of the dividends transferred by the flow-through company have their tax residence. The Court held that such circumstances cannot in themselves preclude the existence of an abuse of rights. In that regard, the Court stated that if it is duly established, on the basis of all the facts, that the economic operators carried out purely formal or artificial transactions, devoid of any economic and commercial justification, with the principal aim of taking undue advantage of the parent/subsidiary's exemption from withholding tax, such an agreement cannot call into question the existence of an abuse of rights. The Court further stated that if there is a situation where the dividends would have been exempt from tax if they had been distributed directly to the company resident in a third country, it cannot be excluded that the objective of the group structure is not an abuse of rights.

The High Court notes that a liquidation pursuant to section 59 of the Danish Limited Liability Companies Act is a fundamentally different business transaction from the dividend payment and entails correspondingly different legal consequences, including the requirement contained in the provision for the personal, joint and several and unlimited liability of the shareholders for all debt, including undue and disputed debt. The fact that the beneficial owners of the dividends could have chosen to liquidate the Danish company pursuant to section 59 of the Danish Limited Liability Companies Act and thereby have obtained tax exemption of the liquidation proceeds cannot therefore lead to the conclusion that there is no legal abuse of the parent/subsidiary directive's access to tax exemption in a situation like the present. In addition, in view of the civil dispute with the buyers of the company Dockwise Transport N.V. as a result of a shipwreck, there is no reason to assume that such liquidation was a real alternative to the dividend payment at the time when the distribution took place.

As a result, Heavy Transport Finance (Luxembourg) SA is taxable on the dividend in the amount of DKK 449,824,500.

*Section 69(1) of the Withholding Tax Act*

It follows from section 65(1) of the Withholding Tax Act that Heavy Transport Holding Denmark ApS is responsible for withholding tax of DKK 449,824,500.

As Heavy Transport Holding Denmark ApS has not fulfilled this withholding obligation, Heavy Transport Holding Denmark ApS is directly liable to the public authorities for payment of the missing amount under section 69(1) of the Withholding Tax Act, unless Heavy Transport Holding Denmark ApS proves that the company has not been negligent in complying with the provisions of the Withholding Tax Act.

According to the available information, Heavy Transport Holding Denmark ApS has been aware of the actual circumstances of the dividend distribution, including that the purpose of including the Luxembourg parent company as an intermediary was solely to avoid Danish withholding tax as stated above.

Under these circumstances, the fact that at the beginning of 2007 there was no final clarification of the legal question of whether there was sufficient legal authority to counter such abuse of law cannot lead to Heavy Transport Holding Denmark ApS being exempt from liability under section 69(1) of the Withholding Tax Act. The same applies to the advice that the company received from KPMG in the summer of 2006. Heavy Transport Holding Denmark ApS is therefore liable for the payment of

DKK 449,824,500 in dividend tax.

*Pension*

It follows from section 7(1) of the Danish Debt Collection Act that interest must be paid as stipulated in the provision if the amount due is not paid on time. According to section 5(1) of the Collection Act, the last day for timely payment is 14 days after demand for payment.

SKAT has issued a demand for payment, cf. section 5(1) of the Act, on

December 7, 2010 with payment deadline 14 days after December 21

2010.

The Ministry of Taxation has claimed that, on this basis, interest must be paid from this date. Heavy Transport Holding Den- mark ApS has principally claimed that interest should only be calculated from 14

**4497**

days after the courts have ruled in favor of the Danish Ministry of Taxation that Heavy Transport Holding Denmark ApS has a duty to withhold dividend tax and that the company is liable for the payment of the amount not withheld.

The High Court has stated above that SKAT was entitled to make the demand of December 7, 2010. The fact that the National Tax Tribunal reversed SKAT's decision of December 7, 2010 does not change the fact that interest must be paid on the claim from 14 days after the demand of December 7, 2010.

The question is then whether the amount must also be included in the tax account, cf. chapter 5 of the Collection Act, and thus earn interest according to the rules on balance interest. The rules on interest on the balance imply that interest must be paid on the default interest, cf. section 7(1)(4) of the Collection Act, cf. section 16c(1), according to which the interest determined in accordance with section 7(1), cf. (2), must be calculated daily and added monthly.

It is agreed that the claim by its nature is covered by the rules on balance interest.

Heavy Transport Holding Denmark ApS has claimed in the alternative that the amount cannot be included in the tax account until 14 days after the courts have ruled in favor of the Ministry of Taxation that the company has a duty to withhold and pay dividend tax. In support of this, it is stated that the amount cannot be included in the tax account until there is certainty that the claim exists, cf. section 16a(3) of the Collection Act, and that the latest timely payment date, cf. section 16a(4) of the Collection Act, only exists when the courts have made a decision on this.

As stated in the High Court's judgment of July 2, 2021 in case B-1980-12, the term "latest timely payment date" in section 16a(4) of the Collection Act must be understood in accordance with section 5 of the Collection Act, i.e. that the latest timely payment date is 14 days after SKAT's demand of December 7, 2010. Hereafter and according to the comments to the bill on which the introduction of the provisions on a tax account and interest calculation of claims on payments is based (Bill L 205 of March 29, 2006) cited in the premise of the judgment of July 2, 2021), the claim for dividend tax must bear interest in accordance with the provision on balance interest in section 16 c(1) of the Collection Act from the entry into force of the Act on August 1, 2013.

Heavy Transport Holding Denmark ApS has further argued that the company would have paid the amount of withholding tax that the Ministry of Taxation considered the company liable to pay with a reservation for recovery if the Ministry of Taxation had not refused to receive the amount, and that it follows from general principles of administrative law, including the principle

of proportionality, that the tax authorities should have accepted to receive such payment, as there are no objective counter considerations.

The lawyers for NetApp Denmark ApS in case B-1980-12 also represent Heavy Transport Holding Denmark ApS in this case.

After the answer of December 5, 2015, which one of these lawyers received from the tax authorities to the question about the possibility of

reservation of recovery to deposit the dividend tax that the Ministry of Taxation believed NetApp Denmark ApS owed, it had to be considered out of the question that the Ministry of Taxation would have accepted that Heavy Transport Holding Denmark ApS would have paid the dividend tax amount to the tax authorities under reservation of recovery. During this case, the Ministry of Taxation has confirmed that it would not have accepted such a proposal.

Considering the amount of interest accrued under section 7(1) of the Collection Act and, from August 1, 2013, also under the rules on balance interest, the High Court finds that it must be assumed that Heavy Transport Holding Denmark ApS - if NetApp Denmark ApS had received an affirmative answer in December 2015 - would have paid the withholding tax amount to the tax authorities shortly thereafter on terms of repayment if the company had won this case.

The minority in the judgment of July 2, 2021 in case B-1980-12 stated the following on the issue of access to such payment:

"Neither the wording of the Collection Act nor the preparatory works mention how the tax administration should deal with the issue of interest in cases where a taxpayer or a withholding agent offers payment of a claim raised by the tax administration, but which has been rejected by the National Tax Tribunal and subsequently upheld by the tax authorities, who have brought the National Tax Tribunal's decision before the courts.

In addition to the obligations arising from the relevant legal basis, the tax administration is bound by general principles of administrative law, including the principles of objectivity and proportionality. In the present situation, where NetApp Danmark ApS has offered payment of the claim, and where SKAT has refused to accept payment with reference to the decision of the National Tax Tribunal and lack of legal basis, even though the tax authorities have at the same time maintained the claim and filed legal action, I find that the above principles mean that SKAT is precluded from claiming interest on the claim pursuant to section 7 of the Collection Act in the period after NetApp Danmark ApS' offer of payment. In this connection, I have, among other things, considered that such a result does not conflict with the purpose of the default interest rules in the Collection Act, and that no counter considerations have been pointed out that speak in favor of maintaining the requirement for payment of default interest in the period after the offer of payment.

**4498**

Neither the fact that NetApp Denmark ApS, which, as mentioned, was successful in the National Tax Court, did not offer payment based on an acknowledgment of the claim, nor the fact that the national court's judgment of May 3, 2021 is of a declaratory nature, can in my opinion justify a different result.

I therefore vote to uphold the Ministry of Taxation's claim in part so that NetApp Denmark ApS is ordered to acknowledge that interest must be added to the amount not withheld pursuant to section 7 of the Collection Act with effect from October 1, 2010 to *) December 4, 2015. I note that the Ministry of Taxation has not claimed interest in the alternative."

For the reasons stated by the minority and with the remark that the minority's position is in accordance with general principles of legal certainty and the principle of access to due process, the High Court finds that the Ministry of Taxation's claim for interest can only be partially upheld, so that Heavy Transport Holding Denmark ApS is ordered to pay interest under section 7 of the Danish Collection Act with effect from December 21, 2010 to January 5, 2016, with interest being added again under section 7

of the Collection Act one week after the delivery of this judgment.

*Conclusion and legal costs*

It follows from the above that the Ministry of Taxation's claim is upheld, so that Heavy Transport Holding Denmark ApS must recognize,

that Heavy Transport Holding Denmark ApS is obliged to withhold dividend tax in the amount of DKK 449,824,500, corresponding to 25% of the dividend of DKK 1,799,298,000, which was distributed from Heavy Transport Holding Denmark ApS on May 23, 2007, and that Heavy Transport Holding Denmark ApS is liable for payment of the amount not withheld plus interest under section 7 of the Danish Collection Act with effect from December 21, 2010 to January 5, 2016.

Heavy Transport Holding Denmark ApS must pay a total of DKK 2,004,000 in legal costs before the High Court to the Ministry of Taxation. The amount includes DKK 4,000 for court fees and DKK 2,000,000 for legal fees including VAT. The amount to cover legal fees has been determined based on an assessment of what is deemed reasonable according to the scope and nature of the case, the amount of work and the responsibility associated with the conduct of the case, as well as taking into account practice in similar cases involving large values. It has been taken into account that this case has been heard in accordance with the cases decided by the High Court's judgments of 3 May and 2 July 2021. It has also been taken into account that the Ministry of Taxation has not been fully successful in the interest claim.

## For it is recognized as right

Heavy Transport Holding Denmark ApS must acknowledge that it is obliged to withhold dividend tax in the amount of DKK 449,824,500, corresponding to 25% of the dividend of DKK 1,799,298,000, which was distributed from Heavy Transport Holding Denmark ApS on May 23, 2007, and that Heavy Transport Holding Denmark ApS is liable for payment of the amount not withheld plus interest under section 7 of the Danish Collection Act with effect from December 21, 2010 to January 5, 2016, with interest under section 7 of the Danish Collection Act being added again one week after the delivery of this judgment.

Heavy Transport Holding Denmark ApS must pay DKK 2,004,000 in legal costs to the Danish Ministry of Taxation.

The judgment must be paid within 14 days of the date of this judgment. The legal costs shall bear interest in accordance with section 8a of the Interest Act.

## Supreme Court ruling

In a previous instance, judgment was handed down by the 10th division of the Eastern High Court on
March 31, 2022 (B-721-13).

Seven judges participated in the ruling: Poul Dahl Jensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Kristian Korfits Nielsen, Jørgen Steen Sørensen and Julie Arnth Jørgensen.

## Claims

*The appellant, Heavy Transport Holding Denmark ApS,* claims that the Court should
*In the first instance*

The respondent, the Danish Ministry of Taxation, must acknowledge that Heavy Transport Holding Denmark is not liable to withhold tax at source on dividends in the amount of DKK 449,824,500 corresponding to 25% of the dividend of DKK 1,799,298,000 distributed by Heavy Transport Holding Denmark on 23 May 2007, and that Heavy Transport Holding Denmark is not liable for payment of the amount not withheld.

The Ministry of Taxation must pay Heavy Transport Holding Denmark DKK 2,004,000 with procedural interest from the company's payment of the amount in question to the Ministry of Taxation.

The claim for payment concerns repayment of legal costs paid by the company to comply with the High Court's judgment.
*Alternatively*

The Ministry of Taxation must recognize that the Ministry's claim for dividend tax of DKK 449,824,500 does not accrue interest until 14 days after the High Court's judgment.
*More subsidiary*

The Ministry of Taxation must acknowledge that the withholding tax claim in the period from December 21, 2010 and until April 14, 2022 shall only bear interest in accordance with section 7 of the Collection Act and that the claim shall therefore not be included in the tax account under the rules on one tax account in chapter 5 of the Collection Act.

**4499**

Finally, Heavy Transport Holding Denmark has requested the Supreme Court to refer a question to the Court of Justice of the European Union pursuant to Article 267 of the Treaty on the Functioning of the European Union for a preliminary ruling on the compatibility of the Danish default interest rules with Article 47 of the Charter of Fundamental Rights of the European Union.

*The Ministry of Taxation* has made the following claims:

The judgment of the High Court is confirmed with the amendment that the amount which Heavy Transport Holding Denmark, according to the judgment, is liable for payment of is to be subject to interest under section 7 of the Danish Collection of Debts Act with effect from 21 December 2010, alternatively interest under section 7 of the Danish Collection of Debts Act with effect from 21 December 2010. December 2010 until the time when the Supreme Court finds that no interest can be claimed under section 7 of the Danish Collection of Debts Act, from which time interest will be added in accordance with section 8(1) of the Danish Interest Act, or alternatively interest in accordance with section 8(1) of the Danish Interest Act from the institution of the case on November 28, 2012.

With regard to Heavy Transport Holding Denmark's claim for repayment of legal costs, the Ministry of Taxation has claimed acquittal.

The Ministry of Taxation has expressed its opposition to a preliminary reference to the European Court of Justice.

## Explanations

*A* has explained, inter alia, that he has a financial background. He joined the Heerema Group in 1986 and in 1999 he became group manager of taxation in the Heerema Group, a position he held until his retirement in 2015.

In 2002, Denmark introduced new legislation on holding companies, which made it attractive for multinational companies to establish holding companies in Denmark. There were a number of tax advantages as a result of the Parent-Subsidiary Directive, and no tax was payable on distributions to companies outside Denmark. For this reason, and due to problems with the group structure, the Heerema Group decided to establish holding companies in Denmark. In 2006, the group had four holding companies in Denmark. There was no activity in the holding companies other than pure holding activities such as owning shares.

In 2007, the group dissolved three of the Danish holding companies when Denmark changed its tax legislation and it was no longer attractive to have holding companies in Denmark. They already had holding companies in Luxembourg and wanted to use these instead. There were no problems dissolving the three holding companies, which were accepted by the Danish tax authorities without further ado.

In relation to the sale of the company Dockwise Transport N.V., he assisted with the tax issues. It was the director of the Heerema Group who decided that Dockwise should be sold.

Negotiations for the sale of Dockwise started in 2006. Before the final agreement was signed, one of Dockwise's ships sank. Therefore, there was a need to amend the agreement. An amount

of USD 100 million was deposited, which was continuously paid to the buyer for each day the ship could not be used. He does not remember if the deposit covered the entire liability. He was informed by their legal department about the matter. He believes that the buyer wanted more money in addition to the deposited amount, but he does not think they got it. He was not involved in this.

He was responsible for the tax aspect of the sale of Dockwise and the repatriation of dividends from this sale to the parent company. He had correspondence with KPMG about this in 2006. The correspondence shows the full advice. They were told by KPMG without reservation that they would not be taxed on the dividend distribution in Denmark.

In addition to the email correspondence, they also had phone calls about the repatriation of dividends from the sale of Dockwise. Again, KPMG did not make any reservations about their tax advice. The group was also advised by others, including the law firm Kromann Reumert, who said the same as KPMG and who also made no reservations. They held physical meetings with Kromann Reumert. Minutes of these meetings were probably taken, but he does not have access to them and they probably no longer exist.

KPMG continued as advisor to the Heerema Group after the distribution had been made and they did not later express any reservations regarding their advice on the taxation of the distribution. KPMG was also the auditor of the entire Heerema Group, including Heavy Transport Holding Denmark.

When the Heerema Group dissolved the other three Danish holding companies in 2007, they did not really discuss whether Heavy Transport Holding Denmark should be dissolved in the same way, as they did not consider it necessary. They talked about it, but as they had no concerns about the dividend distribution solution, they did not consider it necessary to investigate further. Furthermore, it was not necessary to investigate the process further as they had experience with the process from the dissolution of the other three Danish holding companies.

After SKAT had raised a claim for payment of withholding tax, they entered into an agreement with KPMG to postpone the statute of limitations for KP-MG's possible advisor liability. After he retired, he heard that KPMG wanted to terminate this agreement, but that is only what he heard from his successor.

## Requester

*Heavy Transport Holding Denmark* has in light of the Supreme Court's judgment of January 9, 2023 (UfR 2023.1575) waived

**4500**

its arguments *that the* "legal owner" concept must be interpreted in accordance with internal Danish law, *that* there must be a legal obligation to continue payment in order for a recipient to be considered a "flow-through company", *that* countering abuse requires a national legal basis, *that the* general principle of prohibition of abuse established by the European Court of Justice cannot be given effect in Danish law, and *that* SKAT's decision is an aggravation of an established administrative practice with retroactive effect.

Heavy Transport Holding Denmark has also reiterated its submissions and has stated in particular that it is acknowledged that the purpose of establishing Heavy Transport Finance (Luxem- bourg) SA was primarily to enable further payment to the two shareholders in Panama of the proceeds from the sale of Dockwise Transport

N.V. without Danish withholding tax, as the shareholders could not receive a dividend distribution directly without Danish withholding tax. It is also recognized that the funds were paid to the shareholders in Panama in a manner in which Heavy Transport Finance (Luxembourg), according to the current practice, did not have real control over the funds, and that this basically indicates that Heavy Transport Finance (Luxembourg) is considered to be a flow-through company in relation to the funds.

However, the question of whether the immediate recipient of the proceeds must be considered to be the rightful owner thereof must be assessed

in light of the purpose of the double tax treaty with Luxembourg to avoid double taxation and to prevent the avoidance or evasion of taxes. If no tax advantage is obtained by the established arrangement that was not already present, the primary purpose of the arrangement cannot be assumed to be contrary to the purpose of the double tax treaty and thus the basic precondition for a finding of abuse is not present.

In this specific case, the funds could have been distributed directly to the parent companies in Panama through a liquidation without triggering withholding tax.

The benefits under the EU Parent-Subsidiary Directive can neither be denied on the basis of the abuse provision in Article 1(2) of the Directive nor on the basis of the so-called general EU law principle of prohibition of abuse, as there is no attempt to obtain an undue tax advantage.

It may be argued that the contribution of Heavy Transport Finance (Luxembourg) and the receipt and transfer of the funds in question by that company constituted an artificial arrangement which was not based on an economic reality. However, the requirement in the EU abuse principle that it must have been done for the purpose of obtaining undue tax advantages is not met in a situation such as the present one, where there was a perfectly adequate and factually easier alternative in the form of liquidation to channel the funds to the shareholders in Panama without Danish withholding tax. Although paragraph 110 of the CJEU judgment of February 26, 2019 (Joined Cases C-116/16 and C-117/16) concerns the situation where a similar dividend distribution could have been made directly to the final recipient without Danish withholding tax, the principle is also applicable in a situation like the present one, where the dividend could have been distributed directly to the final recipients in Panama without Danish withholding tax by distributing liquidation proceeds.

Denial of tax exemption with reference to an abuse principle is based on the fact that the courts disregard the formal corporate law constructions and instead focus on the economic reality, but this assessment cannot at the same time hold the taxpayer to have formally chosen to proceed according to the tax law rules on dividend distribution when it is actually a liquidation distribution or when the taxpayer could just as well have chosen to carry out a liquidation.

As regards liability for any withholding tax under section 69(1) of the Withholding Tax Act, the Supreme Court's premises in UfR 2023.1575 H and UfR 2023.3198 H must be understood to mean that in these cases no documentation was presented for the advice the companies had received.

With the documentation presented for the advice from KPMG, which is supported by the explanation before the Supreme Court by A, and the subsequent agreements between the Heerema Group and KPMG, it has been established that KPMG unreservedly advised that the dividend was tax-free. What Heavy Transport Holding Denmark and KPMG did not foresee in 2006 and 2007 was that above the Danish legislation and the Danish court-created practice hovered a mandatory EU law principle of abuse with direct effect for citizens.

In UfR 1977.844 H, the Supreme Court established that uncertainty about the legal interpretation and subsumption may lead to a lack of the necessary negligence under section 69(1) of the Withholding Tax Act, which was confirmed in UfR 2018.3119 H.

Therefore, there has been no negligence, cf. the Withholding Tax Act § 69.

As far as interest on any tax claim is concerned, the Ministry

of Taxation's main interest claim means that it would have cost approximately DKK 936 million to have the tax claim of approximately DKK 450 million tested.

Default interest of this amount, combined with the lack of a deposit option, constitutes an obstacle to effective access to justice, as the prospect of having to pay default interest far exceeding the tax claim if the case is lost puts disproportionate pressure on the taxpayer to abandon the case.

**4501**

Article 6 of the European Convention on Human Rights is applicable in the present case as the claim for default interest has no connection to the main claim. Furthermore, the default interest has the character of a fine or similar penal instrument. The interest charged in the present situation exceeds what is necessary for even a generous financial compensation for the loss suffered by the State by not having the withholding tax at its disposal from the time when the Ministry of Taxation issued the demand for payment.

The Danish interest rules in combination with the lack of possibility to interrupt the interest upon payment or deposit also violate Article 47 of the Charter of Fundamental Rights of the European Union, as the interest in itself can prevent a taxpayer from bringing an action against the public authorities. The interest on late payment is grossly disproportionate.

The legislator has hardly weighed the state's economic interests against the citizen's access to justice. The state has overlooked the unreasonable consequences of particularly high default interest on tax claims combined with the fact that the state has not established a scheme that allows for deposit in the special situation where the citizen has been upheld by the National Tax Tribunal.

Although the Supreme Court in UfR 2023.1575 H has stated that there is no basis for assuming that the interest constitutes a violation of Article 47 of the EU Charter, there is at least such doubt about the interpretation of the provision that the Supreme Court should refer the question to the European Court of Justice. This is a potential violation of the EU Charter in an area that has not been addressed by the CJEU before and where the total interest claim is unreasonable. It is thus highly relevant that the Supreme Court asks the CJEU about the limits of the financial burdens that may be imposed on a citizen as a consequence of bringing a case. With a referral to the CJEU, it can also be investigated whether there is still a basis for setting aside the Danish legislation. *The Ministry of Taxation* has repeated its arguments and has stated in particular that the taxation must be based on the transactions that Heavy Transport Holding Denmark actually made. There is no legal basis for basing taxation on counterfactual circumstances, such as a liquidation that was not carried out.

Moreover, there is no evidence to assume that Heavy Transport Holding Denmark's Panamanian shareholders would, under the circumstances, have ensured payment of all due and undue debts and assumed joint and several unlimited liability for all the company's debts, whether due, undue or disputed, in order to expedite a liquidation before the amendment of the Act on July 1, 2007, cf. section 59 of the Danish Limited Liability Companies Act as amended.

As regards tax liability under section 69(1) of the Withholding Tax Act, it is decisive that Heavy Transport Holding Denmark was aware of the facts which form the basis for Heavy Transport Finance (Luxembourg) not being considered the rightful owner of the dividend under the Danish-Luxembourg double taxation treaty and that the benefit in the form of tax exemption under the Parent-Subsidiary Directive must be denied as a result of abuse of rights. It is irrelevant that prior to the decision to distribute the dividend in question, advice was obtained from KPMG.

With regard to interest on the tax claim, there is no basis for assuming that interest under the Collection of Taxes Act entails an infringement of Heavy Transport Holding Denmark's rights

under Article 6 of the Convention on Human Rights or Article 47 of the EU Charter, cf. UfR 2023.1575 H.

As there is an abuse of the Parent-Subsidiary Directive, Heavy Transport Holding Denmark cannot invoke rights guaranteed by the EU Charter in order to challenge the legislation regulating taxation, including interest under the Collection Act, cf. the judgment of the European Court of Justice of 26 February 2019 (Joined Cases C-116/16 and C-117/16). Already for this reason, it is not necessary to refer questions to the CJEU for a preliminary ruling.

Furthermore, there is no doubt as to the interpretation of EU law that requires a reference for a preliminary ruling on the interpretation of the provision in Article 47 of the EU Charter.

## The Supreme Court's reasoning and result

*Case background and issues*

On December 7, 2010, SKAT ruled that Heavy Transport Holding Denmark ApS, pursuant to section 65 of the Withholding Tax Act, cf. section 2(1)(c) of the Danish Corporation Tax Act, was obliged to withhold tax totaling DKK 503,803,440 from the dividend of DKK 1,799,298,000 that Heavy Transport Holding Denmark distributed to Heavy Transport Finance (Luxembourg) SA on May 23, 2007. Subsequently, the tax amount has been corrected to DKK 449,824,500, corresponding to 25% of the dividend.

On August 29, 2012, the Danish National Tax Tribunal ruled that Heavy Transport Holding Denmark was not obliged to withhold tax on the distribution.

The case concerns whether Heavy Transport Holding Denmark was obliged to withhold dividend tax. If so, the case also concerns whether Heavy Transport Holding Denmark is liable for payment of the amount subject to withholding tax, cf. section 69(1) of the Withholding Tax Act. If so, the case also concerns the question of interest on the amount.

*Taxation of dividends*

According to section 2(1)(c) of the Danish Corporation Tax Act, exemption from tax liability of Heavy Transport requires

**4502**

Holding Denmark's distribution of DKK 1,799,298,000 to Heavy Transport Finance (Luxembourg) on May 23, 2007, that taxation of the dividend must be waived or reduced in accordance with the provisions of Directive 90/435/EEC on the common system of taxation applicable in the case of parent companies and subsidiaries of different Member States (the Parent-Subsidiary Directive) or under the double taxation agreement between Denmark and Luxembourg.

Heavy Transport Holding Denmark has acknowledged that the parent company in Luxembourg was an intermediate holding company set up for that purpose, which received the dividend for the purpose of paying it to the shareholders in Panama (Heavy Transport Group Inc. and Incomara Holdings SA), to whom the dividend could not have been directly distributed tax-free. However, Heavy Transport Holding Denmark has argued that there is no abuse of rights under the Parent-Subsidiary Directive or the Double Taxation Treaty because the company could have been liquidated and the liquidation proceeds distributed directly to the shareholders in Panama tax-free.

The Supreme Court finds that the tax assessment must be based on the dividend distribution actually made from Heavy Transport Holding Denmark to Heavy Transport Finance (Luxembourg) on May 23, 2007 and not on a fundamentally different transaction in the form of liquidation of Heavy Transport Holding Denmark, which the group had opted out of. The fact

that the tax legislation in force at the time until July 1, 2007 made it possible to liquidate Heavy Transport Holding Denmark and transfer the liquidation proceeds directly to the shareholders in Panama without taxation therefore has no bearing on the tax assessment, including whether there is an abuse of rights.

Accordingly, the Supreme Court finds that the distribution of dividends on May 23, 2007 constituted an abuse under EU law of the advantages provided by the Parent-Subsidiary Directive, and that Heavy Transport Finance (Luxembourg) was not the dividend's "beneficial owner" under the double taxation agreement between Denmark and Luxembourg, see also the Supreme Court's judgment of January 9, 2023 (UfR 2023.1575).

Against this background, the Supreme Court agrees that Heavy Transport Finance (Luxembourg) is liable to pay tax on the dividend pursuant to section 2(1)(c) of the Danish Corporation Tax Act, and that Heavy Transport Holding Denmark was consequently obliged to withhold tax on the amount, cf. section 65(1) of the Danish Withholding Tax Act.

*Liability under section 69 of the Withholding Tax Act*

Heavy Transport Holding Denmark was aware of the basis for the distribution on May 23, 2007 to Heavy Transport Finance (Luxembourg) being taxable under section 2(1)(c) of the Danish Corporation Tax Act. No facts have been disclosed to justify Heavy Transport Holding Denmark having had sufficient reason to believe that the dividend was not taxable. It cannot lead to a different assessment that the group obtained advice from KPMG on the arrangement, which, as stated above, involved abuse of rights. On this basis, the Supreme Court agrees that Heavy Transport Holding Denmark is liable for payment of tax on the distribution under section 69(1) of the Withholding Tax Act.

*Interest rate issues*

It follows from sections 5(1) and 7(1) of the Collection Act that the next due date for payment of the amount owed was 14 days after SKAT's demand for payment of December 7, 2010, i.e. December 21, 2010. According to section 7 of the Danish Collection of Taxes Act, the Ministry of Taxation's claim must bear interest from December 21, 2010, regardless of the fact that Heavy Transport Holding Denmark has not had access to deposit the disputed amount, cf. the Supreme Court's judgment of January 9, 2023 (UfR 2023.1575). In the same judgment, the Supreme Court ruled that it follows from sections 16a(4) and 16c(1) of the Danish Collection of Taxes Act that a tax claim such as the one at issue must, with effect from August 1, 2013, when the rules on a single tax account entered into force, be debited to the balance of the company's tax account, that the debit balance on the account must bear interest at the rate stipulated in section 7(1), cf. (2), and that the interest is calculated daily and added monthly, i.e. with compound interest.

The Supreme Court finds that interest in accordance with the Collection of Taxes Act, the purpose of which is, inter alia, to encourage payment of tax due, does not violate Heavy Transport Holding Denmark's right to a fair trial under Article 6 of the European Convention on Human Rights or Article 47 of the Charter of Fundamental Rights of the European Union, cf. the judgment of January 9, 2023.

The Supreme Court further finds that there is no such doubt as to the interpretation of Article 47 of the Charter as to justify a reference for a preliminary ruling to the European Court of Justice. In this regard, the Supreme Court notes in particular that the case involves an abuse under EU law of the advantages provided by the Parent-Subsidiary Directive, and that the interest scheme of the Collection Act has not prevented the company from bringing the present case before the courts.

The Supreme Court then upholds the Ministry of Taxation's claim that the tax claim must be subject to interest under section 7 of the Collection Act from December 21, 2010. This means that with effect from August 1, 2013, the tax claim is also subject to interest according to Chapter 5 of the Collection Act on a single tax account.

*Conclusion*

The High Court's judgment is upheld with the change that the tax claim of DKK 449,824,500 is subject to interest according to section 7 of the Collection Act with effect from December 21, 2010.

**4503**

Consequently, the Ministry of Taxation is dismissed for Heavy Transport Holding Denmark's claim for repayment of legal costs.

## For it is recognized as right

The High Court's judgment is upheld with the amendment that DKK 449,824,500 must be added interest according to section 7 of the Collection Act with effect from December 21, 2010.

The Danish Ministry of Taxation dismisses Heavy Transport Holding Denmark ApS' claim for repayment of legal costs.

Heavy Transport Holding Denmark ApS must pay DKK 1,000,000 in legal costs to the Danish Ministry of Taxation.

The sums ordered must be paid within 14 days of the delivery of this Supreme Court judgment. The amount of legal costs before the Supreme Court shall bear interest in accordance with section 8a of the Interest Act.

Copyright © 2023 Karnov Group Denmark A/S

**U.2023.4403**

**U.2023.4403**

***Selskab i Luxemborg var skattepligtig i Danmark af udbytte udloddet fra dansk datterselskab, idet der forelå retsmisbrug efter EU-direktiv og dobbeltbeskatningsoverenskomst, og det danske selskab var pligtig at indeholde skatten. Forrentning af skattekravet var ikke en krænkelse af Menneskerettighedskonventionens artikel 6 eller EU-Charterets artikel 47.***

*EU-ret 1.4 - Pengevæsen m.v. 5.7 - Skatter 311.1, 311.2 og 8.*

Sagen angik navnlig, om et dansk selskab, H ApS, havde pligt til at indeholde skat af et udbytte på ca. 1,8 mia. kr., som H ApS havde udloddet til et selskab i Luxemburg, og i givet fald om H ApS var ansvarlig for betaling af det indeholdelsespligtige beløb. Endvidere var der spørgsmål om forrentning af et eventuelt skattekrav. H ApS anførte, at udbytteudlodningen ikke indebar retsmisbrug, idet H ApS kunne været blevet likvideret og likvidationsprovenuet overført direkte til aktionærerne i Panama uden beskatning. Højesteret udtalte, at den skattemæssige bedømmelse skulle baseres på den udbytteudlodning, som faktisk blev foretaget, og ikke på en grundlæggende anden disposition i form af likvidation, som selskabet havde fravalgt. Muligheden for likvidation uden beskatning var derfor uden betydning for den skattemæssige bedømmelse, herunder for, om der forelå retsmisbrug. Endvidere fandt Højesteret, at der ved udbytteudlodningen forelå retsmisbrug efter EU-retten af fordelene i henhold til moder-/datterselskabsdirektivet, at selskabet i Luxembourg ikke var udbyttets retmæssige ejer (»beneficial owner«) efter dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg. Selskabet i Luxemborg var derfor efter selskabsskattelovens § 2, stk. 1, litra c, skattepligtig af

**4404**

udbyttet, som H ApS som følge heraf havde pligt til at indeholde skat af, jf. kildeskattelovens § 65, stk. 1. Højesteret fandt endvidere, at H ApS var bekendt med grundlaget for, at udlodningen til selskabet i Luxemburg var skattepligtig, og at der ikke heroverfor var oplyst forhold, som kunne begrunde, at H ApS havde haft tilstrækkelig føje til at tro, at udbyttet ikke var skattepligtigt. Det kunne ikke føre til en anden vurdering, at koncernen indhentede rådgivning fra KPMG om arrangementet, der indebar retsmisbrug. Endelig fandt Højesteret, at forrentning i overensstemmelse med opkrævningsloven, der har til formål bl.a. at tilskynde til betaling af skyldig skat, ikke indebar en krænkelse af H ApS' ret til retfærdig rettergang efter Menneskerettighedskonventionens artikel 6 eller EU-Charterets artikel 47. Højesteret udtalte i den forbindelse, at der ikke var en sådan tvivl om forståelsen af EU-Charterets artikel 47, at der var grundlag for præjudiciel forelæggelse for EU-Domstolen. Højesteret stadfæstede herefter landsrettens dom med den ændring, at skattekravet skulle forrentes efter opkrævningslovens § 7 med virkning fra den 21. december 2010.[1]

**H.D. 23. juni 2023** *i sag 34/2022 (2. afd.)*

(Poul Dahl Jensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Kristian Korfits Nielsen, Jørgen Steen Sørensen og Julie Arnth Jørgensen).

---

[1]     Se noterne til U 2023.1575H.

*Heavy Transport Holding Denmarks ApS (adv. Søren Lehmann Nielsen, Kbh.)*
mod
*Skatteministeriet (adv. Søren Horsbøl Jensen, Kbh.)*

## Østre Landsrets dom 31. marts 2022, B-721-13 [SKM2022.469.ØLR]

### Sagens baggrund og parternes påstande

I en afgørelse af 7. december 2007 anså SKAT Heavy Transport Holding Denmark ApS for pligtig at indeholde kildeskat på 503.803.440 kr. af betalte udbytter på 1.799.208.000 kr., der var overført fra det danske selskab til selskabets moderselskab i Luxembourg, Heavy Transport Finance (Luxembourg) SA, Luxembourg.

Ved kendelse af 29. august 2012 ændrede Landsskatteretten afgørelsen. Landsskatteretten fandt herved, at udbyttet ikke kunne anses for omfattet af den begrænsede skattepligt i selskabsskattelovens § 2, stk. 1, litra c.

Skatteministeriet indbragte den 28. november 2012 Landsskatterettens kendelse for Københavns Byret med henblik på at få fastslået, at Heavy Transport Holding Denmark ApS var indeholdelsespligtig af udbytteskatten på 503.803.440 kr.

Byretten har ved kendelse af 27. februar 2012 henvist sagen til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

*Sagsøgeren, Skatteministeriet,* har endeligt nedlagt følgende påstand:

Sagsøgte, Heavy Transport Holding Denmark ApS, skal anerkende, at der er pligt til at indeholde udbytteskat med 449.824.500 kr., svarende til 25 % af udbyttet på 1.799.298.000 kr., der den 23. maj 2007 blev besluttet udloddet fra sagsøgte, samt at sagsøgte er ansvarlig for betaling af det ikke indeholdte beløb med tillæg af renter efter opkrævningslovens § 7 med virkning fra den 21. december 2010.

Skatteministeriet har påstået frifindelse overfor Heavy Transport Holding Denmark ApS' subsidiære og mere subsidiære påstand.

Skatteministeriets påstand er, som det fremgår, ændret i forhold til den i stævningen nedlagte påstand. Ministeriet har oplyst, at der er tale om en korrektion i form af en ændring af skattesatsen fra 28 pct. til 25 pct., der skyldes, at skattesatsen for begrænset skattepligt af udbytte efter selskabsskattelovens § 2, stk. 1, litra c), jf. stk. 3, med virkning fra den 1. januar 2007 blev nedsat til 25 pct., jf. lov nr. 652 af 8. juni 2016, § 1, nr. 6, og § 17, stk. 3.

*Sagsøgte, Heavy Transport Holding Denmark ApS,* har nedlagt principal påstand om frifindelse, subsidiært, at Skatteministeriet skal anerkende, at der ikke kan ske forrentning af det af sagsøgers påstand omfattede kildeskattekrav tidligere end 14 dage efter, at domstolene måtte have givet sagsøger medhold i den nedlagte påstand. Mere subsidiært har Heavy Transport Holding Denmark ApS nedlagt påstand om, at Skatteministeriet skal anerkende, at forrentningen af kildeskattekravet efter opkrævningslovens § 7 i perioden fra den 21. december 2010 og indtil 14 dage efter afsigelsen af en dom, der måtte give Skatteministeriet medhold i sagen, udelukkende skal ske efter den nævnte bestemmelse, og dermed at kravet ikke skal indgå på skattekontoen efter reglerne om én skattekonto i opkrævningslovens kapitel 5.

Sagen har været udsat på bl.a. EU-Domstolens besvarelse af præjudicielle spørgsmål i to lignende udbytteskattesager, B-1980-12 og B-2173-12, anlagt af Skatteministeriet mod henholdsvis NetApp Denmark ApS og TDC A/S. EU-Domstolens Store Afde-

ling besvarede de præjudicielle spørgsmål ved dom af 26. februar 2019 i de forenede sager C-116/16 og C-117/16, og landsretten afsagde herefter dom i begge sager den 3. maj 2021. Dommen er anket til Højesteret. I sag B-1980-12 har landsretten efterfølgende afsagt dom den 2. juli 2021

**4405**

om et udskilt spørgsmål om forretning af kildeskattekravet.

Tvistepunkterne i denne sag er i vidt omfang sammenfaldende med de omstridte spørgsmål i de to nævnte sager, B-1980-12 og B-2173-12. Nemlig i første række om det udenlandske (her luxembourgske) moderselskab er skattepligtigt af udbyttet fra det danske datterselskab, fordi betingelserne for, at beskatningen af udbyttet efter selskabsskattelovens § 2, stk. 1, litra c, skal frafaldes eller nedsættes, i medfør af enten bestemmelserne i Rådets direktiv 90/435 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater (»moder/-datterselskabsdirektivet«), som ændret ved direktiv 2003/123/EF, eller efter en dobbeltbeskatningsoverenskomst (her dobbeltbeskatningsoverenskomsten med Luxembourg af 17. november 1980) ikke er opfyldt. Det er herunder navnlig omtvistet om indrømmelse af fritagelse efter direktivet kan betinges af, at der ikke foreligger misbrug som nærmere fastlagt i EU-Domstolens dom af 26. februar 2019 i de forenede sager C-116/16 og C-117/16, og om det luxembourgske selskab skal anses for »retmæssig ejer« i dobbeltbeskatningsoverenskomstens forstand. Hvis det luxembourgske selskab anses for skattepligtigt, er spørgsmålet dernæst, om der foreligger en bindende administrativ praksis, der udelukker beskatning. Hvis beskatning ikke er udelukket af denne grund, er spørgsmålet endelig, om Heavy Transport Holding Denmark ApS i medfør af kildeskattelovens § 69 hæfter for betaling af udbytteskatten, idet selskabet ikke har godtgjort ikke at have handlet forsømmeligt ved ikke, jf. selskabsskattelovens § 65, stk. 1, at have indeholdt udbytteskat, da det blev bestemt, at der skulle udbetales udbytte. For så vidt, som Skatteministeriet måtte få medhold heri, er der endvidere tvist om forretning af kildeskattekravet.

## Sagsfremstilling

*Den indbragte kendelse*

Landsskatterettens kendelse af 29. august 2012 lyder som følger:
»11-00530

I afgørelsen har deltaget: Ingrid Otzen, Karin Bøgh Pedersen, H.C. Thomsen og Mikkel Baadsgaard

Klager:     Heavy Transport Holding Denmark ApS

Indkomstår:   2007

Klage over:  SKATs afgørelse af 7. december 2010

Klagen angår kildeskat på udbytte, jf. selskabsskattelovens § 2, stk. 1, litra c, jf. kildeskattelovens 65.
*Landsskatterettens afgørelse*
*Indkomståret 2007*

SKAT har anset Selskabet for pligtig til at indeholde skat af betalte udbytter på 1.799.298.000 kr. med 503.803.440 kr.
Landsskatteretten ændrer afgørelsen.
*Møde mv.*

Repræsentanten har haft møde med Landsskatterettens sagsbehandler. Repræsentanten har endvidere udtalt sig for rettens medlemmer på et retsmøde.

Sagens oplysninger

Selskabet Heavy Transport Holding Denmark ApS (Selskabet) erhvervede efter stiftelsen i 2003 en del (54,5 %) af aktiekapitalen i det hollandske selskab, Dockwise Transport NV, der driver virksomhed indenfor offshore mv.

Det danske selskab, hvis aktivitet alene bestod i besiddelsen af aktier i det hollandske selskab, var ejet af Panama-selskaberne: Heavy Transport Group Inc. (74,17 %) og Incomara Holdings SA (25,83 %).

Selskabet solgte den 22. december 2006 aktierne i det hollandske selskab til tredjemand for brutto ca. 375 mio. U.S. dollar.

Den 16. januar 2007 blev anparterne i Selskabet solgt til søsterselskabet, det luxembourgske selskab, Heavy Transport Finance SA, for 326 mio. U.S. dollar.

Ejerstrukturen ser herefter således ud:



Salgssummen fra salget af det hollandske selskab blev modtaget af Selskabet ifølge SKAT den 15. januar 2007, ifølge repræsentanten den 17. januar 2007. Umiddelbart før »closing« af salget var et af det solgte selskabs skibe forlist. Da der var tvist mellem sælger og køber om, hvem af dem, der skulle bære tabet ved forliset, blev en andel af salgssummen indsat på spærret konto. Nettosalgssummen på ca. 325 mio. U.S.dollar blev den 22. januar 2007 overført til det luxembourgske moderselskab på en mellemregning og derfra den 24. januar 2007 videreoverført til Panama-selskaberne til indfrielse af lån til erhvervelse af det danske selskab.

Det luxembourgske selskabs erhvervelse af det danske selskab blev således finansieret ved udlån fra det danske selskab til det luxembourgske selskab. Den 23. maj 2007 udloddede det danske selskab 325 mio. U.S. dollar til

**4406**

det luxembourgske selskab, som blev modregnet i fordringen på det luxembourgske selskab. Overførslen af beløbet fra det danske selskab til det luxembourgske selskab skete som nævnt som lån, da udlodningen først efterfølgende kunne vedtages på generalforsamling.

Ifølge det luxembourgske selskabs årsrapporter for 2006 og 2007 andrager aktiver ultimo årene henholdsvis 803.877 U.S. dollar og 1.404.906 U.S. dollar. Egenkapitalen andrager henholdsvis 6.245 U.S. dollar og -268.798 U.S. dollar.

Ifølge Selskabet er midlerne fra udlodningen (sammen med andre midler) af Heavy Transport Group Inc. via indskud i datterselskab investeret i nye erhvervsmæssige aktiviteter inden for EU.

Om det luxembourgske selskab er oplyst, at selskabet blev stiftet i 2004 med henblik på at varetage finansieringen af Heavy Transport Holding Denmark ApS, samt for at fungere som moderselskab for det danske selskab, hvilket skete med overdragelsen den 16. januar 2007. Selskabet, der ingen ansatte har, har sammen med 5 søsterselskaber beliggende i Luxembourg, der alle indgår i Heerema-

gruppen, outsourcet selskabets administration til det Luxembourg-baserede serviceselskab Heerema Group Service SA, der har 3 ansatte på hovedkontoret i Luxembourg og 8 ansatte i selskabets hollandske filial. Dette selskab varetager bogføring, bankforretninger, offentliggørelse af konsoliderede regnskaber mv. for selskaberne, mens den egentlige ledelse, herunder ledelsesmæssige beslutninger, træffes af ledelsen i Heavy Transport Finance SA.

*SKATs afgørelse*

SKAT har anset Selskabet for indeholdelsespligtigt af udbytteskat, jf. selskabsskattelovens § 2, stk. 1, litra c, jf. kildeskattelovens § 65, med 503.803.440 kr.

Som begrundelse for afgørelsen er henvist til selskabsskattelovens § 2, stk. 1, litra c, 1. pkt., hvorefter selskaber, der har hjemsted i udlandet, som udgangspunkt er skattepligtige til Danmark af udbytte, der oppebæres fra kilder her i landet. En undtagelse fra beskatningen er, hvis denne skal frafaldes efter en dobbeltbeskatningsoverenskomst eller efter moder-/datterselskabsdirektivet 90/435/EØF, jf. dagældende selskabsskattelovs § 2, stk. 1, litra c, 4. pkt.

Endvidere er henvist til kildeskattelovens § 65, stk. 1, hvorefter selskaber som udgangspunkt skal indeholde udbytteskat i forbindelse med enhver vedtagelse eller beslutning om udbetaling eller godskrivning af udbytte. Efter bestemmelsen i kildeskattelovens § 69 indtræder der hæftelse for ikke indeholdt kildeskat, medmindre selskabet godtgør, at der ikke er udvist forsømmelse fra selskabets side.

*Den dansk-luxembourgske dobbeltbeskatningsoverenskomst (bekg. nr. 95 af 23. september 1982).*

Efter den dansk-luxembourgske dobbeltbeskatningsoverenskomst kan udbytte beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, men den skat der pålignes, såfremt modtageren er udbyttets »retmæssige ejer«, må ikke overstige nærmere fastsatte grænser, jf. art. 10, stk. 2.

Efter dobbeltbeskatningsoverenskomstens ordlyd er det således en betingelse for afskæringen af Danmarks ret til som kildestat at beskatte udbytter, at den luxembourgske modtager af udbyttet er dets »retmæssige ejer«.

Udtrykket »retmæssig ejer« (på engelsk »beneficial owner«) har været benyttet i OECD's Modelkonvention og kommentarerne hertil siden revisionen af modelkonventionen i 1977. De i kommentarerne indeholdte bemærkninger om udtrykket »beneficial owner« er gradvist blevet præciseret, men der er ikke grundlag for at hævde, at der herved er sket materielle ændringer i relation til, hvad der forstås ved udtrykket.

I kommentarerne til Modelkonventionen er spørgsmålet om forståelsen af udtrykket »retmæssig ejer« nu navnlig behandlet i punkt 12, 12.1 og 12.2, til artikel 10, hvori følgende er anført (med SKATs fremhævninger):

»12. Kravet om retmæssig ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene 'betalt... til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Det gøres herved klart, at *kildestaten ikke er forpligtet* til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. *Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.*

12.1 Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare ind-

komstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men ingen dobbeltbeskatning opstår som følge heraf da indkomstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes *ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat* i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, *blot fungerer som*

**4407**

»gennemstrømningsenhed« *(conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.* Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies », at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

12.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og betaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse). Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger,«

Der er navnlig tre sager fra international retspraksis, der omhandler kvalificering af den »retmæssige ejer«.

*Bank of Scotland-sagen* blev afgjort af den franske Conseil d'État den 29. december 2006. Sagen angik et moderselskab i USA, der havde et helejet datterselskab i Frankrig. Moderselskabet solgte retten til at modtage forudfastlagte udbytter af stemmeløse præferenceaktier i datterselskabet i en periode på 3 år til Bank of Scotland, der var beliggende i Storbritannien. Herved opnåedes det, at det amerikanske moderselskab fik udbetalt et beløb, der dog var mindre end det udbyttebeløb, der over den 3-årige periode blev betalt til Bank of Scotland i medfør af udbytteretten. Den franske Conseil d'État fandt, at der var tale om et arrangement, der reelt svarede til et lån fra Bank of Scotland til moderselskabet i USA, og at det eneste formål med arrangementet var at opnå en skattemæssig fordel i medfør af den fransk-britiske dobbeltbeskatningsoverenskomst, som det amerikanske moderselskab ellers ikke ville være berettiget til. Det amerikanske moderselskab, der havde disponeret over udbyttet og dirigeret det hen til banken, hvortil »lånet« skulle tilbagebetales, blev anset for at være den retmæssige ejer.

I *Indofoods-sagen*, der blev afgjort af den britiske Court of Appeal den 2. marts 2006, var der gennem et selskab på Mauritius udstedt obligationer, hvorved der var rejst kapital, som blev videreudlånt til Indofoods i Indonesien på samme vilkår. Et hollandsk selskab, Newco, var påtænkt stiftet og indskudt mellem selskabet på Mauritius og Indofoods i Indonesien samt indskudt i disse selskabers låneforhold - så der ville foreligge »back-to-back«-lån. Spørgsmålet var herefter, om Newco ville blive anset som »retmæssig ejer« i relation til renteindtægter fra Indofoods i Indonesien. I sagen blev det lagt til grund, at der ikke var nogen anden praktisk mulighed end, at et rentebeløb udbetalt fra Indofoods i Indonesien til Newco umiddelbart ville blive videreført til dækning af Newcos forpligtelse til at betale nøjagtigt samme rentebeløb til selskabet på Mauritius. Dette blev ikke anset for at kunne betegnes som »the

full privilege«, der var nødvendig for at Newco kunne kvalificeres som »den retmæssige ejer«. Herefter fandt den britiske Court of Appeal, at Newco ikke ville kunne anses for »retmæssig ejer« i forhold til rentebetalingerne fra Indofoods. Selv om det hollandske selskab ikke ville være retligt forpligtet over for Indofoods til at viderebetale renteindtægterne, var det således tilstrækkeligt, at der i praksis allerede var disponeret på sådan måde over indkomsten, at den reelt aldrig ville være undergivet Newcos rådighed.

Begrebet »beneficial owner« var ligeledes omhandlet i den canadiske Federal Court of Appeal's dom af 26. februar 2009 i *Prévost-sagen*. Der var i sagen tale om, at Volvo sammen med et britisk selskab, Henlys, havde stiftet et hollandsk holdingselskab, Prévost Holding BV, som ejede aktier i et joint venture. Der blev over en årrække udloddet betydelige beløb til det hollandske holdingselskab, og disse beløb blev - i overensstemmelse med den aktionæroverenskomst, der var indgået mellem Volvo og Henlys - forholdsmæssigt videreudloddet til de to aktionærer. Spørgsmålet i sagen var, om Prévost Holding BV var »retmæssig ejer« i relation til udbytte fra det underliggende selskab, Prévost Car Inc. Dette fandt den canadiske Federal Court of Appeal var tilfældet, idet begrebet »beneficial owner« blev defineret således, jf. præmis 100 i afgørelsen fra den canadiske TAX Court og præmis 13 i afgørelsen fra den canadiske Federal Court of Appeal: »*the beneficial owner of dividends is the person who receives the dividends for his or her own use and enjoyment and assumes the risk and control of the dividend he or she received.*« Dommen i Prévost-sagen synes at antage, at den formelle beløbsmodtager er den »retmæssige ejer«, medmindre beløbsmodtageren er retligt forpligtet til at disponere i en bestemt henseende. Dette har efter SKATs opfattelse hverken støtte i Modeloverenskomsten, kommentarerne hertil eller andetsteds. Tværtimod er begrebet »beneficial owner« støttet på en »substance over form-tankegang« og det er ikke foreneligt med denne tankegang, at der ved fastlæggelse af begrebet stilles krav om en retlig forpligtelse til viderebetaling til den, der anses for »beneficial owner«.

I nærværende sag er det SKATs opfattelse, at det luxembourgske selskab ikke er »retmæssig ejer«, da det ikke har nogen selvstændig ret til at disponere over udbyttebeløbet.

Det luxembourgske selskab anses således for at fungere som gennemstrømningsenhed for

**4408**

Panama-selskaberne. Der er nær og direkte sammenhæng mellem det udbytte, der blev udloddet fra det danske selskab til det luxembourgske selskab, og de beløb, der blev viderebetalt som afdrag på gæld / køb af aktier fra det luxembourgske selskab til Panama-selskaberne.

Vilkårene for betaling for købet af anparterne er således knyttet direkte sammen med lånet og udbyttet fra det danske selskab, idet beløbet umiddelbart efter modtagelsen blev videresendt til Panamaselskaberne som betaling for køb af anparterne i det danske selskab.

Herefter har det luxembourgske selskab ikke selvstændigt kunne råde over udbyttet fra det danske selskab.

At selskabet i Luxembourg har fungeret som rent gennemstrømningsselskab er understreget af, at der i selskabet ikke var andre aktiver end andele i og fordringer på det underliggende datterselskab, gæld til andre koncernselskaber, renteudgifter, renteindtægter og bankindestående, ligesom et andet selskab i koncernen (Heerema Group Service SA) har varetaget administrationen.

Hertil kommer, at der ikke ses at være noget kommercielt formål med indskydelsen af det luxembourgske holdingselskab, som ikke ses at have andet formål end at søge at undgå dansk kildestatsbeskatning (eller opnå andre skattemæssige fordele).

At konstruktionen er sammensat således, at beløbet, der viderebetales fra det luxembourgske selskab til de to Panama-selskaber, er afdrag på gæld / køb af aktier i stedet for udbytte, skyldes muligvis, at der efter SKATs oplysninger skal indeholdes kildeskat på udbytter fra Luxembourg til Panama, mens der ikke skal indeholdes kildeskat på afdrag på gæld / køb af aktier.

Det er SKATs opfattelse, at der i nærværende sag er tale om at anvende selskabet i Luxembourg og dermed dobbeltbeskatningsaftalen mellem Danmark og Luxembourg til at undgå dansk kildeskat, hvorfor overenskomsten ikke kan påberåbes.

Det er SKATs opfattelse, at der i nærværende sag er tale om misbrug af dobbeltbeskatningsaftalen mellem Danmark og Luxembourg.

Nægtelse af at lade koncernen drage fordel af dobbeltbeskatningsoverenskomstens fordele strider således efter SKATs opfattelse ikke imod overenskomstens overordnede formål om undgåelse af dobbeltbeskatning.

Såfremt SKAT accepterede at lade det luxembourgske selskab være omfattet af dobbeltbeskatningsaftalen med Luxembourg og dermed være omfattet af undtagelsen i selskabsskattelovens § 2, stk., 1. litra c, ville der derimod være tale om tildeling af en formålsstridig fordel.

SKAT anser dermed udbyttebetalingen for omfattet af skattepligt i medfør af selskabsskattelovens § 2, stk. 1, litra c.

Til Selskabets bemærkninger om »rette indkomstmodtager« er bemærket, at princippet om »rette indkomstmodtager« ikke kan sammenlignes med begrebet »retmæssig ejer« efter dobbeltbeskatningsoverenskomsten. Begrebet »retmæssig ejer« er ikke et teknisk begreb, men derimod et hjælpebegreb til at undgå skatteunddragelse.

Det luxembourgske selskab er efter SKATs opfattelse rette indkomstmodtager af det udloddede udbytte, men er ikke »retmæssig ejer« af udbyttet.

*Moder-/datterselskabsdirektivet 90/435/EØF.*

Det følger af artikel 5 i moder-/datterselskabsdirektivet, at det overskud, som et datterselskab udlodder til sit moderselskab, fritages for kildeskat. Udgangspunktet er dermed, at der ikke kan pålægges kildeskat ved udbytteudlodninger til selskaber hjemmehørende i en anden medlemsstat, når moderselskabet opfylder kapitalkravet og ejertidskravet i direktivet.

Dette udgangspunkt kan dog fraviges. Det er således anført i direktivets artikel 1, stk. 2, at direktivet ikke er til hinder for anvendelsen af nationale bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Selskabsskattelovens § 2, stk. 1, litra c, indebærer efter sin klare ordlyd, at Danmark ikke skal frafalde kildeskat, medmindre der efter moder-/datterselskabsdirektivet består en egentlig pligt hertil. I det omfang, EU-retten ikke er til hinder for indeholdelse af kildeskat, skal der således ske indeholdelse af udbytteskat.

Det er SKATs opfattelse, at EU-Domstolens praksis viser, at der ikke er noget til hinder for at afskære selskaber etableret i en anden medlemsstat fra at påberåbe sig EU-retten - herunder de harmoniserede regler, der følger af bl.a. moder-/datterselskabsdirektivet - når det må lægges til grund, at etableringen af et holdingselskab i en anden medlemsstat »tager sigte på at undgå kildeskat på betalinger til ikke-europæiske foretagender, hvis en sådan konstruktion ikke tjener noget kommercielt formål «, jf. Kommissionens fortolkning af »Rent kunstige arrangementer«, offentliggjort i EUT 2008, C 116/13.

Anvendelsen af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsterne har desuden netop til bekæmpelse af svig eller misbrug, som omhandlet i direktivets art. 1, stk. 2. Direktivet er således ikke til hinder for, at der pålægges kildeskat, når »den ret-

mæssige ejer« ikke er omfattet af en dobbeltbeskatningsoverenskomst med Danmark.

For at kunne bringe direktivets fordele i anvendelse er det en betingelse, at selskabet i Luxembourg kan anses for at være »den retmæssige ejer« af udbyttet fra det danske selskab. Det er SKATs vurdering, at denne betingelse ikke er opfyldt.

SKAT anser således det luxembourgske selskab for at være et indskudt mellemled, der ikke selv drager økonomisk fordel af udbyttebetalingen. Efter SKATs opfattelse

**4409**

ville det derfor være i strid med moder-/datterselskabsdirektivets formål at lade koncernen opnå direktivets fordele.

Da selskabsskattelovens § 2, stk. 1, litra c, efter sin ordlyd gør undladelse af indeholdelse af kildeskat betinget af, at den efter EU-retten består en pligt til at undlade indeholdelse, er betingelserne for at undlade indeholdelse ikke opfyldt.

*Forsømmelighed, jf. kildeskattelovens § 69.*

Til Selskabets påstand om, at selskabet ikke hæfter for den ikke indeholdte renteskat i medfør af kildeskattelovens § 69, er bemærket, at det fremgår af ordlyden af kildeskattelovens § 69, at det er den indeholdelsespligtige, der skal godtgøre, at der ikke er udvist forsømmelighed fra hans side. Udgangspunktet i kildeskattelovens § 69 er, at et selskab, der undlader at opfylde sin pligt til at indeholde skat, er umiddelbart ansvarlig for betalingen af manglende beløb. Dette udgangspunkt fraviges, hvis selskabet godtgør, at der ikke er udvist »forsømmelighed« fra selskabets side.

Nærværende sag omhandler manglende indeholdelse af kildeskat vedrørende udbytte udloddet den 23. maj 2007. Reglen i selskabsskattelovens § 2, stk. 1, litra c, blev indført ved lov nr. 282 af 25. april 2001.

Den 6. november 2006 oplyste Skatteministeren i et svar til Morten Homann (SF) (Morten Homanns henvendelse af 30. oktober 2006) følgende:

Et rent gennemstrømningsholdingselskab i eksempelvis Luxembourg vil ikke være rette indkomstmodtager /beneficial owner af udbyttet, jf. således kommentarerne til artikel 10 i OECD's modeloverenskomsten (pkt. 12.2).

Skatteministeren havde endvidere i 2004, under behandlingen af L 119 2003/2004 oplyst i et svar til Foreningen af Statsautoriserede Revisorer (FSR's henvendelse af 10. februar 2004) følgende:

Det åbner ganske vist risiko for, at f.eks. et dansk selskab kan søge at omgå kildeskatten på rentebetalinger til et finansielt selskab i et lavskatteland ved at betale renterne til et selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller dansk dobbeltbeskatningsoverenskomst, og som ikke har kildeskat på rentebetalinger til udenlandske rentemodtagere, hvorefter dette selskab betaler renterne videre til selskabet i lavskattelandet.

I sådanne tilfælde vil de danske skattemyndigheder imidlertid efter en konkret realitetsbedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskattelandet, således at rentebetalingen hverken er omfattet af EU's rente-/royaltydirektiv eller dobbeltbeskatningsoverenskomsten.

Efter rente-/royaltydirektivets artikel 5, stk. 2, kan et EU-land nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteomgåelse eller misbrug som en væsentlig bevæggrund.

Bemærkningerne til OECD-modellen til dobbeltbeskatningsoverenskomster giver også en stat mulighed for at undlade at anvende en overenskomst i særlige tilfælde, jf. afsnittet om misbrug af overenskomsten i bemærkningerne til modellens artikel 1.

Det må herefter lægges til grund, at selskabet burde have været vidende om nærværende problemstilling på tidspunktet for udlod

ningen af udbytte, og at selskabet ved at forsøge at sikre sig fordele, som hverken moder-/datterselskabsdirektivet eller dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg tilsigter adgang til, har indladt sig på en risiko, som selskabet ikke har afklaret eller søgt afklaret.

Anvendelse af begrebet »retmæssig ejer« i dobbeltbeskatningsoverenskomsten er udtryk for et værn mod misbrug af dobbeltbeskatningsoverenskomsten og moder-datterselskabsdirektivet. Ved vurderingen af, om der er handlet forsømmeligt, jf. kildeskattelovens § 69, må stilles særlige krav til agtpågivenheden, når der er tale om overholdelse af en værnsregel, der omhandler dispositioner mellem interesseforbundne parter.

Det er SKATs opfattelse, at selskabet har været bekendt med grundlaget for, at der forelå indeholdelsespligt, og derfor ikke med føje har kunnet lægge til grund, at der ikke forelå indeholdelsespligt, hvilket efter fast højesteretspraksis er afgørende for, om den indeholdelsespligtige må anses for at have udvist forsømmelighed, jf. f.eks. UfR 2008, side 2243 H (SKM 2008.613 HR).

Det er derfor SKATs opfattelse, at selskabet har vist forsømmelighed, og det er derfor således også SKATs opfattelse, at selskabet hæfter for betalingen af kildeskatten på udbyttet.

*Selskabets påstand og argumenter*

Selskabets repræsentant har nedlagt påstand om, at selskabets indeholdelsespligt vedrørende udbytte til moderselskabet ophæves, jf. selskabsskattelovens § 2, stk. 1, litra c, jf. kildeskattelovens § 65, som værende uberettiget.

*Moder-/datterselskabsdirektivet.*

Formålet med moder-datterselskabsdirektivet er bl.a. at hindre dobbeltbeskatning af datterselskabers overskud. Direktivet har derfor indført en fælles ordning for beskatning af datterselskabers overskud, der udloddes til et moderselskab.

Direktivet har alene et objektivt ejerkrav som grundlag for udbytters skattefrihed, nemlig et krav om mindst 15 % ejerskab (2007). De objektive betingelser fremgår direkte af selskabsskattelovens § 2, stk. 1, litra c.

Af direktivets art. 1, stk. 2, fremgår følgende: »at direktivet ikke er til hinder for anvendelse af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig eller misbrug«.

**4410**

En forudsætning for anvendelse af bestemmelsen er således, at der i intern dansk ret findes hjemmel til at tilsidesætte anvendelsen af direktivet.

Efter repræsentantens opfattelse findes en sådan hjemmel ikke.

*»Retmæssig ejer« (beneficial owner).*

Begrebet »retmæssig ejer« er ikke defineret i dansk skattelovgivning, hverken i kildeskattelovens bestemmelser om indeholdelse af kildeskat eller i selskabsskattelovens bestemmelser om begrænset skattepligt. Begrebet ses heller ikke defineret i øvrige danske skattelove.

Begrebet »retmæssig ejer« har således ikke et selvstændigt indhold i dansk skattelovgivning og fremgår alene af art. 10 i dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, herunder af OECD's modelkonvention.

Danmarks dobbeltbeskatningsoverenskomst med Luxembourg har til formål at hindre og lempe dobbeltbeskatning, men giver ikke selvstændig hjemmel til beskatning, der ikke følger af interne regler. Bestemmelsen i art. 10 kan ikke anvendes som intern hjemmel til at nægte det luxembourgske selskab skattefriheden, der følger af selskabsskattelovens § 2, stk. 1, litra c, herunder som hjemmel til at bringe moder-datterselskabsdirektivets art. 1, stk. 2, i anvendelse.

Hertil kommer, at det er SKAT, der er forpligtet til at fastlægge, hvem der er »beneficial owner«.

Copyright © 2023 Karnov Group Denmark A/S

Efter Selskabets opfattelse er det luxembourgske selskab »den retmæssige ejer« af udbyttet, idet begrebet »retmæssig ejer« ikke kan udstrækkes videre end »rette indkomstmodtager«, således som begrebet er defineret i statsskattelovens § 4.

Det er derfor ikke muligt, som hævdet af SKAT, at det luxembourgske selskab på ene side er rette indkomstmodtager (civilretligt ejer af aktier) af udbyttet, men samtidig ikke »den retmæssige ejer« af udbyttet.

SKAT savner derfor både hjemmel og grundlag til at tilsidesætte skattefriheden for udbyttet deklareret fra det danske selskab til det luxembourgske selskab med henvisning til begrebet »retmæssig ejer«.

*Tilskud - statsskattelovens 4.*

Efter ligningslovens § 16 A henregnes alt, hvad der af selskabet udloddes til aktuelle (direkte) aktionærer eller anpartshavere til udbytte.

Lægges SKATs synspunkter til grund, hvorefter betalingen fra det danske selskab ikke retmæssigt tilhører det luxembourgske selskab, men derimod de overliggende aktionærselskaber, er der ikke tale om udbytte.

I så fald er der tale om betalinger til indirekte aktionærer. Sådanne indirekte betalinger kan ikke kvalificeres som udbytte. I stedet skal betalingerne kvalificeres som tilskud.

Selskabsskattelovens § 31 D om skattefri tilskud omfatter tilskud ydet af et moderselskab til datterselskaber eller datterdatterselskaber, herunder søsterselskaber. Bestemmelsen finder derimod ikke anvendelse på tilskud ydet fra et datterselskab til et overliggende selskab. Sådanne tilskud behandles efter statsskattelovens § 4.

SKATs synspunkt om »retmæssig ejer« indebærer derfor, at betalingen fra det danske selskab ikke kan kvalificeres som et udbytte, men derimod som et tilskud omfattet af statsskattelovens § 4.

Den begrænsede skattepligt efter selskabsskattelovens § 2, stk. 1, litra c, omfatter alene udbytter, jf. ligningslovens § 16A, og tilskud omfattet af selskabsskattelovens § 31 D.

Det medfører, at der heller ikke i denne situation er hjemmel til at pålægge kildeskat på betalingen fra det danske selskab til det luxembourgske selskab.

*Forsømmelighed.*

Det fremgår af kildeskattelovens § 69, at: »Den som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, er overfor det offentlige umiddelbart ansvarlig for betaling af manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i denne lov«.

For at kunne have udvist forsømmelighed følger det af praksis, at der skal være en klar og entydig forpligtelse til at foretage indeholdelse, eller at den indeholdelsespligtige gentagne gange (eventuelt efter pålæg) ikke har overholdt sin indeholdelsesforpligtelse.

Det danske selskab har ikke tidligere udloddet udbytte. Selskabet har indberettet og indsendt udbytteerklæringen til SKAT. Krav om indeholdelse kunne således være pålagt af SKAT i umiddelbar forlængelse af indsendelsen af selvangivelse og udbytteerklæringer. SKATs passivitet er et klart udtryk for, at SKAT på daværende tidspunkt ikke selv var af den opfattelse, at der påhvilede selskabet en pligt til at indeholde udbytteskat.

SKAT har ikke dokumenteret, at der i 2007 var praksis for, at danske datterselskaber af EU moderselskaber skulle indeholde kildeskat på udbyttebetalinger, når moder-/datterselskabsdirektivets objektive betingelser var opfyldt.

SKATs afgørelse er derfor udtryk for en skærpelse af fast administrativ praksis, der ikke kan håndhæves med tilbagevirkende kraft. Der er henvist bl.a. henvist til Hans Severin Hansens artikel: Det store hykleri - Om »beneficial owner« sagerne (TfS2011.537).

Det er herefter Selskabets opfattelse, at selskabet ikke kan pålægges pligt til at indbetale kildeskat på det udloddede udbytte med henvisning til, at der er udvist forsømmelighed

Det er herefter Selskabets samlede opfattelse, at SKATs afgørelse om indeholdelsespligt skal ophæves som uberettiget.

**4411**

## Landsskatterettens bemærkninger og begrundelse

Ifølge selskabsskattelovs § 2, stk. 1, litra c, er selskaber, der har hjemsted i udlandet, som udgangspunkt begrænset skattepligtige af udbytte, jf. 1. pkt. Dette gælder dog ikke udbytte, som oppebæres af et selskab, der ejer mindst 15 % af aktiekapitalen (i 2007) i det udbyttegivende selskab i en sammenhængende periode på mindst 1 år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge, jf. 2. og 3. pkt. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor selskabet er hjemmehørende, jf. 4. pkt.

Ifølge dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg af 17. november 1980 artikel 10, stk. 1, kan udbytte beskattes i kildestaten. Den skat, der pålægges, må dog - såfremt modtageren er udbyttets retsmæssige ejer, og denne er et selskab, der direkte ejer mindst 25 % af kapitalen i det udloddende selskab - ikke overstige 5 % af bruttobeløbet af udbyttet.

Bestemmelsen svarer til artikel 10 i OECD's modeloverenskomst. Af kommentar til modeloverenskomstens artikel 10 punkt 12 fremgår blandt andet, at kravet om retmæssigt ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Udtrykket »retmæssig ejer« er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse. Af punkt 12.1 fremgår, at en person, der handler i sin egenskab af agent eller mellemmand, ikke kan anses som retmæssig ejer. Endvidere fremgår, at en person, der på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst, ligeledes heller ikke kan anses for retmæssig ejer. Der er henvist til rapport fra Committee on Fiscal Affairs, hvoraf fremgår, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

»Retmæssig ejer«-begrebet kan herefter ikke uden videre antages at være sammenfaldende med dansk skatterets »rette indkomstmodtager«-begreb.

Det luxembourgske selskab, Heavy Transport Finance (Luxembourg) SA, der blev stiftet i 2004, og er ejet af to Panama-selskaber, erhvervede den 17. januar 2007 det danske søsterselskab, Heavy Transport Holding Denmark ApS, for 326 mio. U.S. dollar. Det danske selskab havde forud for overførslen til søsterselskabet afhændet sin andel af aktier i det hollandske selskab, Dockwise Transport NV efter godt 3 års ejerskab for netto 325 mio. U.S. dollar. Provenuet fra salget blev den 22. januar 2007 udlånt til det luxembourgske selskab, hvor beløbet den 24. januar 2007 blev videreoverført til de to Panama-selskaber til finansiering af selskabets køb af anparterne i det danske selskab. Den 24. maj 2007 blev det luxembourgske selskabs gæld til det danske selskab udlignet ved udbytte fra det danske selskab.

Under disse omstændigheder, hvor de inden for en kortere periode foretagne (sammenhængende) transaktioner er sket mellem interesseforbundne parter, herunder parter hjemmehørende i lande, som er beliggende udenfor EU, og hvormed der ikke er indgået dobbeltbeskatningsaftale, påhviler det Selskabet som den part, der har adgang til beviserne, at godtgøre, at overenskomstens fordele om bortfald af dansk kildeskat skal finde anvendelse.

Det er oplyst, at det danske selskabs udlån den 22. januar 2007 til det luxembourgske moderselskab blev anvendt til betaling til de to Panama-selskaber for anparterne i det danske selskab. Endvidere er oplyst, at det danske selskabs udlodning den 24. maj 2007 til moderselskabet udlignede dette selskabs gæld til det danske selskab.

Det er således ubestridt, at udlodningerne fra det danske selskab blev overført til det luxembourgske selskab, og derfra videreoverført til Panama-selskaberne. Det findes herefter ikke godtgjort, at det luxembourgske selskab kan anses for »den retmæssige ejer« af det modtagne udbytte.

Det luxembourgske selskab er dermed ikke berettiget til overenskomstens skattefrihed for udbytter, jf. artikel 10.

Ifølge direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, artikel 5, fritages udbytte, som et datterselskab udlodder til sit moderselskab, for kildeskat.

I moder-/datterselskabsdirektivets almindelige bestemmelser kan der ikke indlæses et misbrugsforbehold. I artikel 1, stk. 2 gives medlemsstaterne derimod mulighed for at fravige direktivet i tilfælde af skattemisbrug mv.

Af direktivets artikel 1, stk. 2 fremgår således, at direktivet ikke er til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Ved Landsskatterettens kendelse af 16. december 2011 (TfS 2012.26), som vedrører et selskabs indeholdelsespligt af udbytteskat for udbytte udbetalt til moderselskab på Cypern, blev selskabet ikke anset for indeholdelsespligtigt af udbytteskat. Ved afgørelsen blev lagt

**4412**

vægt på, at Danmark ikke har vedtaget lovbestemmelser med sigte på at hindre svig og misbrug, jf. direktivets artikel 1, stk. 2. Det lovligt stiftede og fungerende cypriotiske selskab blev, uanset at selskabets eneste - eller i det væsentligste eneste - aktivitet var at eje anparter i det danske selskab, derpå anset for rette indkomstmodtager af udbyttet. Udbyttet var herefter fritaget for kildeskat, jf. direktivets artikel 5, og var dermed ikke omfattet af den begrænsede skattepligt, jf. selskabsskattelovens § 2, stk. 1, litra c.

I overensstemmelse hermed, og da der ud fra praksis i øvrigt ikke kan ske tilsidesættelse af de foretagne dispositioner, anses det omhandlede udbytte, der er overført fra det danske selskab til moderselskabet i Luxembourg, som er et lovligt stiftet og fungerende selskab i Luxembourg, ikke for omfattet af den begrænsede skattepligt, jf. selskabsskattelovens § 2, stk. 1. litra c.

SKATs afgørelse ændres i overensstemmelse hermed.«

*Yderligere oplysninger vedrørende forløbet op til udlodningen*

Parterne har gjort opmærksom på, at der rettelig var tre sælgere af Dockwise Transport N.V., nemlig, Heerema Transport Finance (Luxembourg) S.A. (ikke identisk med Heavy Transport Holding Denmark ApS' moderselskab til hvilket udlodning senere skete), Heavy Transport Holding Denmark ApS, og Wilh. Wilhelmsen Netherlands B.V., hvoraf de to selskaber i Heerema-koncernen, Heerema Transport Finance (Luxembourg) S.A. og Heavy Transport Holding Denmark ApS tilsammen besad 76 % af aktiekapitalen i det solgte selskab, og Wilh. Wilhelmsen Netherlands B.V. besad den resterende del. Wilh. Wilhelmsen ASA og Heerema Holding

Construction Inc. var anført som garanter i købsaftalen. Køberen var Delphi Acquisition Holding I B.V.

Aftalen indeholdt en række indeståelser, som navnlig angik et forlis som et af de overdragne skibe havde lidt. Efter Skatteministeriets opfattelse indebar disse indeståelser en betydelig risiko for sælgerne. Aftalen indeholdt tillige forskellige bestemmelser om garanti og om »Escrow«,

Forud for Heavy Transport Holding Denmark ApS' lån til det luxembourgske moderselskab i januar 2007 til finansiering af det luxembourgske selskabs erhvervelse af Heavy Transport Holding Denmark ApS - der som anført i Landsskatterettens kendelse - efterfølgende blev modregnet i det den 23. maj 2007 til det luxembourgske selskab udloddede udbytte - havde KPMG i en mailkorrespondance den 8. juni - 24. juli 2006 med A fra Heeremakoncernen, hvori Heavy Transport Holding Denmark ApS indgår, og med kopi til forskellige andre medarbejdere i koncernen, bekræftet, at udlodning af udbytte til det luxembourgske moderselskab ikke ville udløse beskatning i Danmark, jf. moder/-datterselskabsdirektivets artikel 5, stk. 1, forudsat selskabet i Luxembourg opfyldte betingelserne i direktivet. Af A's mail af 8. juni 2006, hvori B fra KPMG i en svarmail af 12. juni 2006 havde indsat sine svar på A's spørgsmål fremgår (svarene er her fremhævet med kursiv):

»Please treat this information as very confidential

As you know HTH ownes 54,51 % of the stock of Dockwise Transport NV, established in the Netherlands Antilles but resident in the Netherlands and subject to Netherlands taxation under the tonnage tax regime

We envisage that HTH will sell its Dockwise shares in the very near future (or by way of a public offering). If our expectations will become reality the proceeds will exceed the historical costprice with large numbers.

This means a capital gain will be realised, but I assume this gain will fall under the participation exemption, please confirm. *[B] If the shares have been owned for more than three year, gain will not be subject to tax, The rules apply regardless of how many shares the company owns, and regardless of whether the shares are in a Danish or foreign company,*

The next step is then to repatriate the gains to the shareholders.

The loan from the Luxembourg finance company can be redeemed, but the remainder of the gain will then still be very substantial.

Currently we were working on a transfer of the shares of HTH Denmark to a new Luxembourg holding company. We have now stopped this proces because of this new event.

If HTH Denmark is to be liquidated after it has realised the capital gain, will the liquidation proceeds to the Panama shareholder be tax free? *[B] The liquidation proceeds will be treated as if the Panama shareholder had sold the shares, According to internal Danish legislation a foreign shareholder is not taxable in Denmark, Consequently, the capital gain will not be taxed in Denmark, However watch up for the pitfall !!!!! If any funds are transferred to the shareholder in a different year than the final year, this will be treated as dividend and as Denmark has no tax treaty with Panama a 28 % withholding tax will apply. Therefore no payment should be made in advance. All funds should be left until the final day of taxation.*

If not what other possibility do we have to repatriate the funds to the shareholders? Your comments and or suggestions will be appreciated,«

A spurgte herefter i en mail af 30. juni 2006 om følgende:

»Dear all

In order to avoid a maybe lenghty »waiting« period in Denmark I would like to have your opinion what the position would be if the shares of HTH Denmark Aps are sold to the Luxembourg entity

Heavy Transport Finance Luxembourg SA. I take it the transfer of these

**4413**

shares by the current Panamanian owner will have to be at actual market rate, we probably will be able to have an indication of this market rate from the bank that is handling the sale of the Dockwise shares for us. If this will have negative effects could I please request you all to work out another scenario that will enable us to avoid tax on the envisaged capital gain and a quick repatriation of the gains to our ultimate Panamanian owner if that is possible.«

I en mail af 17. juli 2006 til A med kopi til bl.a. B fra KPMG anførte D fra KPMG:

»Further to our telephone conversation of last Friday, 14 July 2006, I would - after discussion with F - like to confirm my proposal to structure the contemplated transaction in such a way that Heavy Transport Holding Denmark ApS (»HTF Denmark«) first sells the shares in Dockwise Transport NV, and only in a second step to sell HTF Denmark to Heavy Transport Finance Luxembourg SA.

The transaction steps would be the following:

1)    Sale of the shares in Dockwise Transport NV by HTF Denmark, realizing the capital gain
2)    Sale of HTF Denmark by the Panamanian shareholder at market price to Heavy Transport Finance Luxembourg SA, in consideration for debt (HTF Denmark being a mere cash box after the sale of the Dockwise shares, the market value is then known)
3)    Transfer of the funds by HTF Denmark to Heavy Transport Finance Luxembourg SA by way of dividend
4)    Repatriation of the funds by Heavy Transport Finance Luxembourg SA to Panamanian shareholder by repayment of the debt resulting from step 2)

In this scenario, the clause in the sales contract providing that the sales price will be adjusted, depending on the price obtained for the later sale of Dockwise Transport NV by HTF Denmark (as discussed last week), which would be required if HTF Denmark was sold to Luxembourg before the sale of Dockwise Transport NV, could be avoided.

The dividend received by Heavy Transport Finance Luxembourg SA from HTF Denmark should give rise to a corresponding write-down in value of the participation in HTF Denmark, i.e. this operation should not result in a profit in the commercial and tax accounts of the company, and should thus be tax neutral even if the conditions of the Luxembourg participation exemption, in the present case in particular the minimum detention period of 12 months (before or after the dividend payment), were not met.

Furthermore, the funds received by Heavy Transport Finance Luxembourg SA though the dividend should equal the amount of Heavy Transport Finance Luxembourg SA's debt to the Panamanian shareholder, i.e. all the funds received could be repatriated to Panama through the repayment of the debt.

From a discussion I had with B this afternoon, I understand this solution is also feasible from a Danish tax point of view, i.e. the dividend could be paid be HTF Denmark to Luxembourg in exemption of Danish withholding tax (no »abuse of law«, etc.). B - *please confirm*.

We hope that the above is of assistance. Please do not hesitate to contact us if you have any questions or comments.«

Efterfølgende anmodede D i B's fravær en anden dansk KPMG medarbejder om den efterspurgte bekræftelse.

Ved mail af 24. juli 2006 anførte G og H fra KPMG i Danmark herefter:

»As for the set-up described in your e-mail below and the contemplated transactions steps (1-4) we have the following comments:

1)    As a first step it is contemplated that Heavy Transport Holding Denmark ApS (HTF Denmark) sells its shares in Dockwise Transport NV. Provided all the shares have been hold for more than 3 years any capital gain on the sale of the shares would tax exempt in Denmark. This would imply that no capital increase should have happen within the 3 years.
2)    As a second step it is contemplated that HTF Denmark will be sold to Heavy Transport Finance Luxembourg SA. The disposal of shares in HTF Denmark is not relevant for Danish tax purposes.

However, the transfer of shares in HTF Denmark has an effect on the possibility for the Danish company to utilize any losses carried forward in the company. The limitation means that the tax losses in the Danish company can only be set off against positive trading income and not against income from passive investments and the leasing of depreciable machinery and ships.

3)    *Distribution of dividends:*
We assume that the Luxembourg company is recognized as a company for Danish tax purposes. Moreover we assume that the Luxembourg company is eligible for benefits under the EU Parent-Sub directive, i.e. that the conditions in the Parent/Sub. directive are met, Any dividend payments that are distributed from HTF Denmark to Heavy Transport Luxembourg SA subsequently to the sale are exempt from withholding tax, provided the Luxembourg company fulfills the *1 year holding requirement*, i,e, holds the shares in the Danish company fora period of at least twelve months within the dividend distribution is made.

**4414**

The Danish exemption of withholding taxes on dividends is also applicable to dividends distributed before completion of the holding period of at least 1 year, provided the Luxembourg company subsequently fulfils the holding period requirement.

Please note that it is very important that the Danish company is not liquidated until the 1 year holding period requirement is fulfilled. Otherwise withholding tax at 28 % must be paid to the Danish tax authorities (most of this may however be reclaimed in accordance with the double tax treaty between Luxembourg and Denmark.)

Parterne er uenige om, hvorvidt det kan lægges til grund, at den korrespondance, der er fremlagt, er hele KPMG's rådgivning om udlodningen.

Heavy Transport Holding Denmark ApS har i den forbindelse yderligere fremlagt en mail fra A af 15. december 2010, hvori han videresender den ovennævnte mailtråd til advokatfirmaet Delacour Dania med anmodning om en bedømmelse af, om nogle af de ansvarlige i Heerama-koncernen, henset til den rådgivning, man behørigt havde indhentet forud for transaktionen, ville kunne ifalde ansvar i anledning af den på det tidspunkt af SKAT indledte sag om betaling af udbytteskat.

Parterne er enige om, at en del af købesummen for Dockwise Transport N.V. blev tilbageholdt af køberen til sikkerhed for køberens mulige krav som følge af et af de overdragne skibes forlis. Dette var årsagen til, at Heavy Transport Holding Denmark ApS alene fik udbetalt 325 mio. USD, hvilket skete enten den 15. eller 17. januar 2007.

Af den i Landsskatterettens kendelse nævnte låneaftale med »effective date« den 22. januar 2007 mellem det indskudte Luxem-

bourgske moderselskab, Heavy Transport Finance (Luxembourg) SA og Heavy Transport Holding Denmark ApS fremgår bl.a.:

»WHEREAS:

1)  On January 22, 2006 Lender has transferred an amount of US$ 325.000.000 to Borrower on its bank account with Fortis Bank in Luxembourg with communication interim dividend,

2)  Due to the fact that the audited annual accounts of the Lender were not completed on the date January 22, 2007, the Parties recognize this distribution as a short term loan until the general meeting of shareholders of the Lender decides on an ordinary distribution of dividends.

Som tekst ved overførslen af lånebeløbet på 325.000.000 USD fra Heavy Transport Holding Denmark ApS til Heavy Transport Finance (Luxembourg) SA var anført »INTERIM DIVIDEND«.

Heavy Transport Holding Denmark ApS har i processkrift af 2. februar 2022 angivet:

»Heavy Transport Holding Denmark ApS bestrider ikke, at indskydelsen af mellemholdingselskabet i Luxembourg - som nævnt - skete med det hovedformål ikke at udløse danske kildeskat, men det gøres i den forbindelse gældende, at det naturligvis indgår i misbrugsvurderingen, om der var andre måder, hvorpå midlerne skattefrit kunne udbetales til ejerne i Panama. Det var der jo, idet man kunne have foretaget en ganske simpel betalingserklæringslikvidation - og i den forbindelse udloddet midlerne til aktionærerne i Panama uden indeholdelse af dansk kildeskat.«

Tilsvarende fremgår af selskabets sammenfattende processkrift, jf. gengivelsen af dette nedenfor.

Parterne er enige om, at det luxembourgske holdingselskab ikke havde andre aktiver og aktiviteter end besiddelsen af aktier i Heavy Transport Holding Denmark ApS.

*Efterfølgende forløb*

Af ledelsesberetningen i Heavy Transport Holding Denmark ApS' årsregnskab for 2006 fremgår, at [s]elskabets aktivitet bestod i lighed med tidligere år i at besidde aktier i datterselskabet Dockwise Transport N.V. Som anført nedenfor har selskabet afhændet sine aktier i datterselskabet i 2006. Selskabet forventes på sigt afviklet.«

Af ledelsesberetningen i årsregnskabet for 2007 fremgår, at »[s]elskabets aktivitet bestod tidligere i at besidde aktier i datterselskabet Dockwise Transport N.V. Selskabet afhændede sine aktier i datterselskabet i 2006 og har været uden aktivitet i 2007. Endelig opgørelse af salgssummen for aktierne udestår fortsat. I lighed med 2006 er reserveret ca. USD 52 mio. til dækning af mulige krav fra køber. Selskabet forventes på sigt afviklet.« Af ledelsesberetningen i årsregnskabet for 2009 fremgår, at »… Aktiviteten har i 2009 været begrænset. Køberne af aktierne har den 13. juli 2009 meddelt Heavy Transport Holding Denmark ApS, at grundet de betydelige reparationsomkostninger af det overtagne skib MS3 kræves en yderligere kompensation af sælgerne. Selskabets andel af kravet udgør ca. 24,4 mio. USD. Kravet er blevet tilbagevist som grundløst og forventes afsluttet uden omkostninger for selskabet. Selskabet forventes på sigt afviklet.«

KPMG anførte på vegne Heavy Transport Holding Denmark ApS i selskabets bemærkninger af 23. november 2010 til SKAT's forslag om pålæg af kildeskat af 5. november 2010 bl.a.:

»SKATs beskrivelse af sagens faktiske omstændigheder får det til at fremstå, som om der er tale om et »arrangement«, der er etableret for at undgå kildeskat på udbyttet ved udlodningen.

Denne fremstilling er helt forkert.

Heavy Transport Finance Luxembourg SA kunne blot have likvideret Heavy Transport Holding Denmark ApS og udbetalt aktieavancen, der er realiseret i det danske selskab som likvidationsprove-

nu, der frem til 1. juli 2007 behandles som afståelse af aktier. Danmark har

**4415**

hverken regler om begrænset skattepligt eller regler om indeholdelse af kildeskat ved afståelse af aktier eller på likvidationsudlodninger udloddet i det indkomstår, hvori selskabet endeligt likvideres.

At Heavy Transport Holding Denmark ApS ikke blev likvideret, skyldes alene en igangværende civilretlig tvist med køber af aktierne i Dockwise N.V., hvorefter en likvidation ville indebære, at der skulle foretages en række indeståelser over for køber af Dockwise N.V. for de fremsatte krav i henhold til købsaftale.

Udlodningen af udbytte er således ikke et misbrug af EU's moder-datterselskabsdirektiv eller dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg.«

Ved brev af 27. december 2010 tog Heavy Transport Holding Denmark ApS forbehold for erstatningskrav over for KPMG og anmodede KPMG om at afgive en suspensionserklæring. KPMG afgav den 29. december 2010 en foreløbig suspensionserklæring, der gjaldt til udgangen af januar 2011, og efter ikke fremlagte forlængelser heraf blev den 9. august 2011 indgået en suspensionsaftale indtil videre, idet KMPG med 30 dages varsel ville kunne opsige aftalen. Heavy Transport Holding Denmark ApS har i processkrift af 2. februar 2022 oplyst, at KPMG har opsagt suspensionsaftalen i juli 2018, og da Heerema-koncernen vurderede, at et eventuelt erstatningskrav mod KPMG var forældet, har man ikke forfulgt det.

I ledelsesberetningen i Heavy Transport Holding Denmark ApS' årsregnskab i 2010 står der bl.a.:

*»Virksomhedens væsentligste aktiviteter*

Selskabets aktivitet bestod tidligere i at besidde aktier i datterselskabet Dockwise Transport N.V. Selskabet afhændede sine aktier i datterselskabet i 2006. Aktiviteten har i 2010 været begrænset.

Udestående med køberne af aktier i datterselskabet Dockwise Transport N.V. er i 2010 blevet forligt uden betaling for selskabet.«

Det fremgår af den forligsaftale, der er indgået med køberne af Dockwise Transport N.V., at sagen blev forligt på vilkår om, at køberne beholdt den del af købesummen, som de havde holdt tilbage, og at sælgerne beholdt den del af købesummen, som de havde modtaget.

Der blev i Landsskatteretten under denne rets behandling af sagen holdt kontormøde i sagen den 30. august 2011 med deltagelse af selskabets repræsentanter, advokatfirmaet Plesner v/advokat Hans Severin Hansen og Lasse Esbjerg Christensen samt revisionsfirmaet KPMG v/ Anders Lundvig og Claus Engelsted. Af mødereferatet fremgår bl.a.:

»Det blev bemærket, at havde det ikke været for tvisten i forbindelse med det forliste skib, ville det danske selskab have været likvideret, og i hvilket tilfælde der ikke havde været en sag.«

Advokaterne, der repræsenterer Heavy Transport Holding Denmark ApS i denne sag, repræsenterede også NetApp Denmark ApS i den sag B-1980-12, der i landsretten er afgjort ved dom af 3. maj 2021. Den 4. december 2015 skrev en af disse advokater, Anders Endicott Pedersen, som følger til en medarbejdet i SKAT, Betaling & Regnskab:

»Hej …

Vi har drøftet dette før.

De sager, der vedrører udbyttekildeskat, er vundet af skatteyderne i Landsskatteretten, og Skatteministeriet har indbragt sagerne for domstolene (hvor de nu er på vej til EU-Domstolen).

F.eks. i NetApp-sagen […] - hvor kildeskattekravet er på ca. 185 mio. kr. - løber der pt. renter på kravet med ca. 3,4 mio. kr. pr. måned, hvilket svarer til en - ikke-fradragsberettiget - forrentning

af hovedstolen på 22 % p.a. - og renten er kun stigende som følge af rentes renteberegning.

Er det muligt for selskabet at deponere beløbet nu, således at der ikke påløber yderligere renter til betaling ved en tabt sag? Selskabet er indforstået med, at beløbet ikke forrentes ved tilbagebetaling, såfremt sagen vindes af skatteyderen.«

SKAT, Betaling og Regnskab svarede ved mail af 5. december 2015 følgende:

»Hej Anders

Det er desværre ikke muligt for selskabet at deponere beløbet nu.

SKAT finder, at der ikke er adgang til at foretage den anmodede indbetaling og på den måde stoppe rentetilskrivningen, når der ikke består et krav.

Denne afgørelse er gældende indtil Landsretten eventuelt ændrer den.

Lignende henvendelser er besvaret enslydende.«

I det første processkrift afgivet i denne sag efter den ovennævnte korrespondance, som er en duplik af 9. november 2020, anførte Heavy Transport Holding Denmark ApS bl.a., at »[h]vis Skatteministeriet måtte få medhold i, at gælden har bestået siden SKATs afgørelse af 7. december 2010, gøres det i tredje række gældende, at skatteforvaltningen som offentlig myndighed under alle omstændigheder har været uberettiget til at nægte at modtage kildeskattebeløbet, og at Skatteministeriet derfor må skadesløsholde sagsøgte herfor.«

Ved mail af 19. januar 2021 til Skattestyrelsen efterspurgte advokat, Anders Endicott Pedersenen opgørelse af kildeskattekravet i denne sag med tillæg af morarenter pr. den 2. april 2021. (Det fremgår af mailen, at man på det tidspunkt påregnede en berammelse af hovedforhandlingen, der ville betyde, at der ville blive afsagt dom senest den 2. april 2021). Advokaten anførte i den forbindelse:

»Selskabet har vundet sagen ved Landsskatteretten, og Skatteministeriet har indbragt sagen for domstolene.

**4416**

Selskabet har derfor ikke haft mulighed for at indbetale skattekravet med henblik på at stoppe rentetilskrivningen for det tilfælde, at Skatteministeriet måtte vinde sagen ved domstolene.«

Skatteministeriet har bekræftet, at Heavy Transport Holding Denmark ApS ville have fået samme svar, hvis Heavy Transport Holding Denmark ApS på samme måde som NetApp Denmark ApS havde henvendt sig og anmodet om adgang til at indbetale det ifølge Skatteministeriet skyldige beløb med forbehold om tilbagesøgning.

*Procedure*

*Skatteministeriet* har i det i et væsentlige procederet i overensstemmelse med de anbringender, der fremgår af ministeriets sammenfattende processkrift af 21. februar 2022, hvori der hedder (henvisninger til ekstrakt og materialesamling udeladt):

»*2. STRIDSPUNKTER*

Den 23. maj 2007 besluttede Heavy Transport Holding Denmark at udlodde 1.799.298.000 kr. til moderselskabet Heavy Transport Finance (Luxembourg) S.A. (Heavy Transport Finance (Luxembourg)) uden at indeholde udbytteskat.

Af kildeskattelovens § 65, stk. 1, følger, at vedkommende selskab i forbindelse med enhver vedtagelse eller beslutning om udbetaling eller godskrivning af udbytte skal indeholde udbytteskat (MS1 s. 18). Ifølge bestemmelsens stk. 5 indeholdes der dog *ikke* udbytteskat i udbytte, som et selskab, der er hjemmehørende i udlandet, modtager fra et selskab, der er hjemmehørende her i landet, når det pågældende udbytte er omfattet af skattepligten, jf. selskabsskattelovens § 2, stk. 1, litra c).

Efter sidstnævnte bestemmelse gælder det kort fortalt, at et udenlandsk moderselskab ikke er skattepligtig af udbytte fra et

dansk datterselskab, på betingelse af at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater (moder-/datterselskabsdirektivet) eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor moderselskabet er hjemmehørende. Hvis betingelsen *ikke* er opfyldt, skal der altså i overensstemmelse med udgangspunktet efter kildeskattelovens § 65, stk. 1, ske indeholdelse af udbytteskat i forbindelse med vedtagelsen eller beslutningen om udbetaling eller godskrivning af udbytte.

Den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, er over for det offentlig umiddelbart ansvarlig for betaling af manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i kildeskatteloven, jf. denne lovs § 69, stk. 1 (MS1 s. 21).

Den foreliggende sag angår *i første række*, om Heavy Transport Finance (Luxembourg) i medfør af selskabsskattelovens § 2, stk. 1, litra c), er skattepligtig af det omhandlede udbytte. Spørgsmålet er i så henseende nærmere, om beskatningen skal frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter Overenskomst af 17. november 1980 med Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter (den dansk-luxembourgske dobbeltbeskatningsoverenskomst). Hvis dette spørgsmål besvares benægtende, skal der herefter tages stilling til, om der - som hævdet af Heavy Transport Holding Denmark - foreligger en bindende administrativ praksis, hvorefter udbytterne er undtaget fra en skattepligt, selvom hverken moder-/datterselskabsdirektivet eller den dansk-luxembourgske dobbeltbeskatningsoverenskomst medfører, at beskatningen skal frafaldes eller nedsættes.

Hvis der består en skattepligt, angår sagen *i anden række*, om Heavy Transport Holding Denmark har godtgjort, at selskabets undladelse af at indeholde udbytteskat ikke kan tilregnes selskabet som forsømmelig.

Som det fremgår af den indbragte afgørelse, kom Landsskatteretten frem til, *at* Heavy Transport Finance (Luxembourg) ikke var skattepligtig af udbytterne, idet beskatningen ifølge Landsskatteretten skulle frafaldes efter moder-/datterselskabsdirektivet, og *at* Heavy Transport Holding Denmark følgelig ikke havde tilsidesat en indeholdelsespligt.

For domstolene er der yderligere blevet rejst spørgsmål med hensyn til tilskrivning af morarenter af det beløb, som Heavy Transport Holding Denmark måtte være det offentlige skyldig.

*3. DOMSTOLENS DOM 1 DE FORENEDE SAGER C-116/16 OG C- 117/16, T DANMARK*

I den foreliggende sag er der ikke blevet stillet præjudicielle spørgsmål til EU-Domstolen. Sagen har derimod været udsat på Domstolens afgørelse af de præjudicielle sager C-116/16 og 117/16, som var blevet forelagt af Østre Landsret. Domstolen afsagde den 26. februar 2019 dom i de to sager. Med denne dom er der sket den fornødne afklaring af de EU-retlige spørgsmål, som den foreliggende sag rejser. Domstolens besvarelse af de præjudicielle spørgsmål er inddraget i Skatteministeriets argumentation nedenfor.

*4. ØSTRE LANDSRETS DOMME AF 3. MAJ 2021 OG 2. JULI 2021*

Østre Landsret afsagde *den 3. maj 2021* deldom i de to hovedsager, der havde givet anledning til Domstolens dom i de forenede sager C-116/16 og C-117/16, T Danmark, nemlig sag B-1980-12, Skatteministeriet mod NetApp Denmark ApS, og sag B-2173-12, Skatteministeriet mod TDC A/S (offentliggjort som SKM2021.304.ØLR).

**4417**

Sagerne, der nu verserer for Højesteret, angår ligesom den foreliggende sag, om selskabernes moderselskaber i medfør af selskabsskattelovens § 2, stk. 1, litra c), er skattepligtige af udbytter fra selskaberne. Endvidere angår sagen mellem Skatteministeriet og NetApp Denmark ApS ligesom den foreliggende sag, om selskabet er ansvarligt for den manglende indeholdelse af udbytteskat.

Med dommen har Østre Landsret afklaret de principielle spørgsmål, som den foreliggende sag (også) rejser. Landsretten har således fastslået, at der er hjemmel i selskabsskattelovens § 2, stk. 1, litra c), til at nægte kildeskattefritagelse efter en dobbeltbeskatningsoverenskomst og moder-/datterselskabsdirektivet, med den begrundelse dels at de udbyttemodtagende selskaber ikke er udbytternes retmæssige ejere, dels at der er tale om misbrug.

Hvad angår spørgsmålet, om beskatningen af udbytterne skal frafaldes eller nedsættes efter en dobbeltbeskatningsoverenskomst med den stat, hvori de respektive moderselskaber er hjemmehørende, følger det af præmisserne for dommen, *at* begrebet »retmæssig ejer« er et autonomt begreb, der er forskelligt fra begrebet »rette indkomstmodtager«, og *at* det for bedømmelsen af, om modtageren af et udbytte kan anses for udbyttets retsmæssige ejer, er udslagsgivende, om modtageren *reelt* har kunnet råde over udbyttet.

Østre Landsret har endvidere fastslået, at det ikke strider imod en bindende administrativ praksis at anse moderselskaberne for skattepligtige af de omhandlede ombytter.

Endelig følger det af præmisserne for landsrettens dom, at det afgørende for bedømmelsen af, om et udloddende selskab i medfør af kildeskattelovens § 69, stk. 1, er ansvarlig for en manglende indeholdelse af udbytteskat, er, om den indeholdelsespligtige må anses for at have været bekendt med de faktiske omstændigheder, der begrunder skattepligten og dermed den tilsidesatte indeholdelsespligt.

Ved dom af 2. juli 2021 i sag B-1980-12, Skatteministeriet mod NetApp Denmark ApS, afgjorde Østre Landsret til Skatteministeriets fordel det udskudte stridsspørgsmål om forrentning, der er identisk med den strid om forrentning, som også består i den foreliggende sag.

Sagerne verserer som nævnt for Højesteret. Der er berammet hovedforhandling til foretagelse den 5.-8. og 12. december 2022.

Den 25. november 2021 afsagde Østre Landsret i to sager, der angår ansvar for manglende indeholdelse af renteskat. De to sager rejser principielle spørgsmål af den samme art som sagerne, der foreløbigt er blevet afgjort med landsrettens dom af 3. maj 2021, og i dommen af 25. november 2021 har landsretten fulgt den linje, der er blevet lagt ned deldommen af 3. maj 2021. Dommen i to sager om renteskat er anket til Højesteret, hvor hovedforhandling er berammet til foretagelse den 17.-20. april 2023.

### 5. DE UDSLAGSGIVENDE OMSTÆNDIGHEDER

Heavy Transport Holding Denmark blev stiftet i 2003. Samme år købte selskabet i fællesskab med et andet købe-koncernforbundet selskab samtlige kapitalandele i et hollandsk selskab, Dockwise Transport

N.V. Heavy Transport Holding Denmark var ejet af to panamanske selskaber, nemlig Heavy Transport Group Inc. (74,17 pct.) og Incomara Holdings S.A. (25,83 pct.). De panamanske selskaber var ikke koncernforbundne.

Den 22. december 2006 blev der indgået aftale om overdragelse af samtlige kapitalandele i Dockwise Transport N.V. (ES s. 137). Købesummen udgjorde ca. 700 mio. USD. Den 15. januar 2007 modtog Heavy Transport Holding Denmark 325 mio. USD i anledning af salget (ES s. 261).

Den 16. januar 2007 overdrog Heavy Transport Group Inc. og Incomara Holdings S.A. deres kapitalandele i Heavy Transport Holding Denmark til et af dem i fællesskab ejet selskab i Luxembourg, nemlig Heavy Transport Finance (Luxembourg), der var tomt. Købesummen udgjorde ifølge aftalerne i alt 326 mio. USD, hvilket beløb det luxembourgske selskab herefter var de panamanske selskaber skyldigt.

Den 22. januar 2007 blev der indgået aftale om et »Short Term Loan« på 325 mio. USD mellem Heavy Transport Holding Denmark som långiver og Heavy Transport Finance (Luxembourg) som låntager. Af aftalen fremgår, at Heavy Transport Holding Denmark samme dag overførte beløbet til Heavy Transport Finance (Luxembourg)'s bank med angivelsen »interim dividend«.

Af låneaftalen fremgår herom:

»Due to the fact that the audited annual accounts of the Lender were not completed on the date January 22, 2007, the Parties recognize this distribution as a short term loan until the general meeting of shareholders of the Lender decides on an ordinary distribution of dividends.«

I overensstemmelse med det anførte i låneaftalen blev beløbet på 325 mio. USD den 22. januar 2007 overført fra Heavy Transport Holding Denmarks bank til Heavy Transport Finance (Luxembourg)'s bank med angivelsen »Interim Dividend«, hvilket tillige er beskrevet i Heavy Transport Finance (Luxembourg)'s årsrapport for 2007.

To dage senere, dvs. den 24. januar 2007, blev de 325 mio. USD videreoverført til de panamanske selskaber, Heavy Transport Group Inc. og Incomara Holdings S.A.

Den 23. maj 2007 blev det på en generalforsamling i Heavy Transport Holding Denmark besluttet at udlodde 325 mio. USD (svarende til 1.799.298.000 kr.) til Heavy Transport Finance (Luxembourg). Udbyttet blev i

**4418**

overensstemmelse med låneaftalens artikel 3 modregnet i »the Short Term Loan«. Heavy Transport Holding Denmark foretog ikke indeholdelse af udbytteskat.

Det kan for sagens afgørelse lægges til grund, at Heavy Transport Finance (Luxembourg) blev indskudt mellem Heavy Transport Holding Denmark og de panamanske selskaber med det hovedformål at undgå dansk udbytteskat.

### 6. SKATTEMINISTERIETS ARGUMENTATION

#### 6.1 Heavy Transport Finance (Luxembourg) er skattepligtig af udbyttet

Ifølge selskabsskattelovens § 2, stk. 1, litra c), påhviler skattepligt i henhold til loven selskaber og foreninger m.v. som nævnt i lovens § 1, stk. 1, der har hjemsted i udlandet, for så vidt de oppebærer udbytte omfattet af ligningslovens § 16 A, litra 1, hvortil det i sagen omhandlede udbytte kan henregnes. Skattepligten omfatter dog ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 15 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge, på »betingelse« af, »at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i [moder-/datterselskabsdirektivet] eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende.«

Det fremgår således af bestemmelsens ordlyd, at fritagelsen for skattepligt alene kommer på tale, hvis der efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst mellem Danmark og den stat, hvori moderselskabet er hjemmehørende, består en ubetinget pligt til at frafalde eller nedsætte beskatningen, hvilket også er cementeret i bestemmelsens forarbejder. Lovgivningsmagten har altså valgt den tilgang at lade moder-/datterselskabsdirektivet og en eventuel dobbeltbeskatningsoverenskomst være styrende for, om et udbytte er omfattet af en skattepligt eller ej.

I afsnit 6.1.1 og 6.1.2 redegøres der for fortolkningen af den dansk-luxembourgske dobbeltbeskatningsoverenskomst henholdsvis moder-/datterselskabsdirektivet, medens der i afsnit 6.1.3 følger en samlet argumentation for, at skattemyndighederne efter de foreliggende omstændigheder har været berettiget til at nægte indrømmelse af de fordele, der følger af overenskomsten henholdsvis direktivet.

### 6.1.1 Den abstrakte fortolkning af den dansk-luxembourgske dobbeltbeskatningsoverenskomst

Ifølge den dansk-luxembourgske dobbeltbeskatningsoverenskomst, artikel 10, stk. 2, kan udbytte beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, men den skat, der pålignes, må ikke overstige nærmere fastsatte grænser, »såfremt modtageren er udbyttets retsmæssige ejer«. Efter ordlyden af denne bestemmelse er Danmark altså kun forpligtet til at nedsætte beskatningen af udbytte, der udbetales af et dansk selskab, hvis modtageren er udbyttets »retsmæssige ejer«.

Begrebet »udbyttets retsmæssige ejer« må fortolkes i overensstemmelse med det tilsvarende begreb i OECD's modeloverenskomsts artikel 10, idet den dansk-luxembourgske dobbeltbeskatningsoverenskomst er indgået på grundlag af modeloverenskomsten.

At fordelen, der følger af modeloverenskomstens artikel 10, stk. 2, alene kan påberåbes af udbyttets retmæssige ejer, blev indført som en udtrykkelig betingelse, da modeloverenskomsten blev revideret i 1977. Betingelsen blev indført for at gøre det klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart bliver betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst, jf. 2003-kommentaren, pkt. 12 til modeloverenskomstens artikel 10.

Det fremgår således også af 1977-kommentaren, pkt. 7-10 til modeloverenskomstens artikel 1, at begrebet »retmæssig ejer« har sigte på at dæmme op over for misbrug i form af »kunstfærdige juridiske konstruktioner«, nærmere bestemt det »kunstgreb«, hvor en person disponerer via en juridisk sammenslutning, der er dannet i en kontraherende stat, væsentligst for at opnå fordele i henhold til overenskomsten, som ikke ville kunne opnås af personen direkte.

Begrebet »retmæssig ejer« er et autonomt begreb, dvs. at det har et selvstændigt indhold uafhængigt af de kontraherende staters interne lovgivning, jf. SKM2012.121.ØLR, Østre Landsrets dom af 3. maj 2021 og senest landsrettens dom af 25. november 2021. Begrebet »retmæssig ejer« skal derfor ikke fortolkes i overensstemmelse med begrebet »rette indkomstmodtager«, der i dansk skatteret bruges som betegnelse for den, der må anses for at være skattepligtig af en given indkomst.

Med de tre domme har Østre Landsret også fastslået, at skattemyndighederne i sager som den foreliggende har været berettiget til - som sket - at inddrage kommentarerne til OECD's modeloverenskomst fra 2003 ved fastlæggelsen af, hvad der nærmere skal forstås ved begrebet »retmæssig ejer«. De senere kommentarer fra 2014 og 2017 må anses for på tilsvarende vis at udgøre relevante fortolkningsbidrag, eftersom disse kommentarer - ligesom 2003-kommentarerne - ikke indebærer en ændret forståelse af modeloverenskomstens artikel 10, stk. 2, men alene har karakter af præciseringer.

Af 2003-kommentarerne, pkt. 12.1 til modeloverenskomstens artikel 10, stk. 2, følger, at det ikke vil være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skal indrømme lempelse eller fritagelse for skat »i tilfælde, hvor en person,

**4419**

der er hjemmehørende i en kontraherende stat, på anden vis end som agent eller mellemmand, blot fungerer som 'gennemstrøm-

ningsenhed' (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.« Et »gennemstrømningsselskab« vil således ikke kunne anses for den retmæssige ejer, »hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser som, i relation til den pågældende indkomst, gør det til en 'nullitet' eller administrator, der handler på vegne af andre parter.«

I 2014-kommentareren, pkt. 12.4, som på dette punkt er blevet videreført i 2017-kommentareren, er det præciseret, at den umiddelbare modtager af udbyttet vil kunne nægtes den overenskomstmæssige fordel, der følger af modeloverenskomstens artikel 10, stk. 2, hvis de faktiske omstændigheder klart viser, at modtageren - uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person - »substantielt«/i realiteten« ikke har rettighederne til at bruge og nyde det modtagne udbytte.

Af præmisserne for Østre Landsrets dom af 3. maj 2021 følger også, at modtageren af et udbytte ikke kan anses for udbyttets retsmæssige ejer, hvis modtageren ikke har haft en »reel råderet« over det. I præmisserne for dommen af 25. november 2021 har landsretten på tilsvarende vis fastslået, at en modtager af renter ikke kan anses for renternes retsmæssige ejer, hvis den pågældende ikke har haft en »reel råderet« over renterne.

### 6.1.2 Den abstrakte fortolkning af moder-/datterselskabsdirektivet

#### 6.1.2.1 Direktivets fordel skal afslås, når der foreligger misbrug

Ifølge moder-/datterselskabsdirektivets artikel 1, stk. 2, er direktivet ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

Det er Skatteministeriets standpunkt, at en national bestemmelse som selskabsskattelovens § 2, stk. 1, litra c), netop er en sådan intern bestemmelse som omhandlet i direktivets artikel 1, stk. 2, hvorefter en fordel i henhold til direktivet kan nægtes, hvis fordelen søges opnået ved svig eller misbrug (ES s. 104105), men afgørelsen af sagen nødvendiggør ikke en stillingtagen til dette stridsspørgsmål.

Af Domstolens dom af 26. februar 2019 i de forenede sager C-116/16 og C-117/16, T Danmark, fremgår nemlig, at Domstolen som svar på Østre Landsrets første præjudicielle spørgsmål har anført, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug *skal* nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i moder-/datterselskabsdirektivets artikel 5, *selv om* der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse, jf. hertil dommens præmis 95 og dommens præmisserne 75-94, som svaret er baseret på. Der er ikke tale om, at Domstolen med sit svar på landsrettens første præjudicielle spørgsmål har skabt en (ny) retsstilling, der ikke gjaldt forud for dommen, eller at Domstolen har ændret sin hidtidige praksis, således som den er kommet til udtryk i bl.a. sag C-321/05, Kofoed, jf. hertil dommens præmis 84-90. Med dommen har Domstolen inden for rammerne af den kompetence, som tilkommer Domstolen i medfør af artikel 267 TEUF - blot belyst og præciseret betydningen og rækkevidden af princippet om forbud mod retsmisbrug, således som dette princip skal anvendes på sager som den foreliggende.

Der er endvidere ikke tale om, at Domstolen med sin dom har fastslået en fortolkning af moder-/datterselskabsdirektivet, som indebærer, at direktivet - i sig selv - skaber *forpligtelser* for borgerne, hvad der i givet fald ville have været uforeneligt med retssikkerhedsprincippet. I tilfælde, hvor der foreligger retsmisbrug, og hvor borgeren af denne grund *nægtes en fordel* i henhold til EU-retten, er der således ikke tale om, at borgeren pålægges en forpligtelse

efter EU-retten. Der er derimod tale om, at de objektive betingelser for at opnå en fordel i henhold til EU-retten ikke er opfyldt, fordi fordelen søges opnået ved retsmisbrug (dommens præmis 90).

Af Domstolens dom følger således også, at det EU-retlige retssikkerhedsprincip heller ikke er til hinder for at nægte moder-/datterselskabsdirektivets fordel i form af fritagelse for kildeskat, når der foreligger retsmisbrug, hvad der også udtrykkeligt er fastslået i Domstolens dom i sag C-251/16, Cussens, præmis 43. I sagerne, som Østre Landsret afgjorde med dommen af 3. maj 2021, påberåbte de sagsøgte selskaber sig også - forgæves - retssikkerhedsprincippet.

Endelig er det ikke i strid med loven om Danmarks tiltrædelse af den Europæiske Union at nægte moder-/datterselskabsdirektivets fordele med henvisning til det generelle EU-retlige princip om forbud mod retsmisbrug. Den foreliggende situation er således usammenlignelig med situationen, der gav anledning til Højesterets dom gengivet i U.2017.824H, Ajos.

Af præmisserne for Højesterets dom i Ajos-sagen fremgår, at det for sagens udfald var udslagsgivende, at der med Højesterets ord forelå en »contra legem-situation«, dvs. en situation, hvor det ikke inden for rammerne af de fortolkningsmetoder, der er anerkendt i national ret, er muligt at fortolke en national regel direktivkonformt.

En sådan situation foreligger ikke i denne sag, hvor moder-/datterselskabsdirektivet er blevet gennemført

#### 4420

ved en simpel henvisning til direktivet. Af selskabsskattelovens § 2, stk. 1, litra c)'s ordlyd følger således, at udbytte er omfattet af skattepligten, medmindre »beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater«. Lovgivningsmagten har således, som også fremhævet ovenfor, valgt den tilgang at lade moder-/datterselskabsdirektivet (og en eventuel dobbeltbeskatningsoverenskomst) være styrende for, om et udbytte er omfattet af en skattepligt eller ej.

Det er som følge heraf en smal sag at anlægge en fortolkning af selskabsskattelovens § 2, stk. 1, litra c), der er i overensstemmelse med moder-/datterselskabsdirektivet og det almindelige princip om forbud mod retsmisbrug, således som direktivet og princippet skal fortolkes ifølge Domstolens dom i de forenede sager C-116/16 og C-117/16, T Danmark.

På den anførte baggrund må selskabsskattelovens § 2, stk. 1, litra c) - i overensstemmelse med hvad Østre Landsret også har fastslået i sin dom af 3. maj 2021 - fortolkes således, at den fritagelse for beskatning af udbytter, der ellers følger af moder-/datterselskabsdirektivet, skal nægtes, hvis fritagelsen i det givne tilfælde søges opnået ved retsmisbrug, hvad der kommer an på en konkret vurdering af de givne omstændigheder.

##### 6.1.2.2 Domstolens bemærkninger om misbrugsbedømmelsen

Ifølge Domstolens dom i de forenede sager C-116/16 og C-117/16, T Danmark, kræves der med henblik på at bevise, at der foreligger misbrug, *dels* et sammenfald af objektive omstændigheder, hvoraf fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, *dels* et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (dommens præmis 97).

Domstolen har i dommen anvist de nærmere principper for en sådan undersøgelse og foretaget en - ikkeudtømmende - opregning og beskrivelse af holdepunkter for, at moder-/datterselskabsdirektivets fordel i form af fritagelse for beskatning af udbytter i et givent tilfælde søges opnået ved misbrug.

Ifølge Domstolen må en koncern i sager som den foreliggende anses for et kunstigt arrangement, *når* den ikke er etableret af grunde, der afspejler den økonomiske realitet, *når* den har en

struktur, der er rent formel, og *når* den har til hovedformål eller som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse. Det gælder navnlig, når betalingen af udbytteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som overfører udbytterne, og det selskab, som er udbytternes retmæssige ejer (præmis 100).

Den omstændighed, at et udbytte i dets helhed eller stort set i dets helhed ganske kort tid efter modtagelsen videreudloddes af det selskab, som har modtaget det, til enheder, som ikke opfylder betingelserne for en anvendelse af moder-/datterselskabsdirektivet, er således ifølge Domstolen et holdepunkt for, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse for beskatning, der følger af direktivet (dommens præmis 101).

Ifølge Domstolens dom kan den kunstige karakter af et arrangement ligeledes underbygges ved, at den pågældende koncern er struktureret på en sådan måde, at det selskab, der modtager udbyttet, selv skal videreudlodde dette udbytte til et tredje selskab, som ikke opfylder betingelserne for en anvendelse af moder/selskabsdirektivet, med den følge at selskabet alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som gennemstrømningsselskab for at muliggøre pengestrømmen fra datterselskabet til den enhed, som er de overførte beløbs »retmæssige ejer« (dommens præmis 103).

Et selskab kan anses for et gennemstrømningsselskab, hvis selskabets eneste aktivitet er at modtage udbyttet og videreudlodde det til den retmæssige ejer eller til øvrige gennemstrømningsselskaber, jf. dommens præmis 104. Den (manglende) faktiske økonomiske aktivitet skal bedømmes på grundlag af samtlige relevante elementer vedrørende bl.a. driften af selskabet, dets regnskaber, strukturen af selskabets omkostninger og de reelt afholdte udgifter, det personale, som selskabet beskæftiger, og de lokaler og det udstyr, som det råder over.

Holdepunkter for, at der i et givent tilfælde er tale om et kunstigt arrangement, kan også findes 1) i den omstændighed, at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, 2) i fremgangsmåden for transaktionernes finansiering, 3) i vurderingen af de mellemliggende selskabers egenkapital og 4) i gennemstrømningsselskabernes manglende beføjelser til at råde økonomisk over de modtagne udbytter. Der er i den forbindelse ikke kun en kontraktuel eller juridisk forpligtelse for det selskab, der modtager udbyttet, til at videreudlodde det til tredjemand, der kan udgøre et sådant holdepunkt. Der foreligger også et holdepunkt for misbrug, hvis selskabet er den bemyndelse af sagens faktiske omstændigheder »substantielt« ikke har haft rettighederne til at bruge og nyde udbyttet (præmis 105).

Holdepunkter som de ovenfor nævnte kan anses for bestyrkede, hvis der er et sammenfald eller en nær tidsmæssig sammenhæng mellem på den ene side

#### 4421

ikrafttrædelsen af ny skattelovgivning som for eksempel selskabsskattelovens § 2, stk. 1, litra c), og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern (præmis 106). Et sådant sammenfald eller en sådan nær tidsmæssig sammenhæng er omvendt ikke en nødvendig betingelse for at godtgøre et misbrug, men kan altså bestyrke andre holdepunkter for, at der foreligger et misbrug.

Endelig er det for konstateringen af, om der foreligger et retsmisbrug, uden betydning, om Danmark med den stat, hvor udbytternes retmæssige ejer er hjemmehørende, har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt

Copyright © 2023 Karnov Group Denmark A/S

kildeskat af udbyttet, hvis det var blevet betalt direkte til den retmæssige ejer (præmisserne 107 ff).

*6.1.3 Fordelene af såvel den dansk-luxembourgske dobbeltbeskatningsoverenskomst som moder-/datterselskabsdirektivet er med rette blevet afslået*

For sagens afgørelse må (A) indskydelsen af det luxembourgske selskab, Heavy Transport Finance (Luxembourg), mellem på den ene side Heavy Transport Holding Denmark og på den anden side de panamanske selskaber, Heavy Transport Group Inc. og Incomara Holdings S.A., (B) den samtidige etablering af gældsforhold mellem det luxembourgske selskab og de panamanske selskaber på 326 mio. USD, (C) det danske selskabs umiddelbart efterfølgende overførsel af 325 mio. USD til det luxembourgske selskab som et »Short Term Loan«/»Interim dividend«, (D) det luxembourgske selskabs videreoverførsel af dette beløb til de panamanske selskaber og (E) det danske selskabs udlodning af udbytte på 325 mio. USD, der modregnedes i det ydede »Short Term Loan« til det luxembourgske selskab, betragtes som ét samlet og på forhånd tilrettelagt arrangement.

Arrangementet indebar, at de panamanske selskaber - bortset fra spørgsmålet om udbyttets »retmæssige ejer« og retsmisbrug - kunne modtage beløbet på 325 mio. USD skattefrit, hvad der uden arrangementet ikke havde været muligt, eftersom Heavy Transport Holding Denmark skulle have indeholdt udbytteskat af en udlodning direkte til de panamanske selskaber, da disse selskaber i modsætning til det luxembourgske selskab hverken kunne have påberåbt sig fordelene af moder-/datterselskabsdirektivet eller af en dobbeltbeskatningsoverenskomst.

Således som arrangementet var lagt til rette, var Heavy Transport Finance (Luxembourg) uden reelle beføjelser til at råde over det omhandlede udbytte på 325 mio. USD, der efter vedtagelsen på generalforsamlingen - i overensstemmelse med det aftalte - blev modregnet i det »Short Term Loan«/»Interim Dividend« på 325 mio. USD, som selskabet allerede havde modtaget fra Heavy Transport Holding Denmark og videreført til selskaberne i Panama. Det luxembourgske selskab fungerede således blot som en gennemstrømningsenhed, hvilket stemmer med Heavy Transport Holding Denmarks indrømmelse af, at det luxembourgske selskab blev indskudt med det hovedformål at undgå dansk udbytteskat.

Heavy Transport Finance (Luxembourg) kan på den anførte baggrund ikke anses for at være udbyttets retsmæssige ejer i den dansk-luxembourgske dobbeltbeskatningsoverenskomsts artikel 10, stk. 2's forstand. Overenskomsten indebærer dermed ingen forpligtelse for Danmark til at nedsætte beskatningen af udbyttet og fører derfor ikke til, at udbyttet skal fritages for en skattepligt efter selskabsskattelovens § 2, stk. 1, litra c).

Da Heavy Transport Finance er blevet indskudt som gennemstrømningsenhed for udbyttet, følger det endvidere af Domstolens anvisningerne for misbrugsbedømmelsen, at arrangementet må anses for et kunstigt arrangement, der er blevet etableret med det hovedformål at opnå en uretmæssig fordel. Da der således foreligger et retsmisbrug, er en påberåbelse af moder-/datterselskabsdirektivets fordele udelukket. Derfor fører direktivet heller ikke til, at udbyttet skal fritages for en skattepligt efter selskabsskattelovens § 2, stk. 1, litra c).

At et likvidationsprovenu efter de indtil 1. juli 2007 gældende regler kunne udloddes skattefrit til et udenlandsk moderselskab, er uden betydning for konstateringen af, at der i den faktisk foreliggende situation er tale om et kunstigt arrangement, der savner enhver økonomisk og forretningsmæssig begrundelse, og som er blevet sat i værk med det hovedformål uretmæssigt at drage fordel *dels* af den fritagelse for kildeskat, der er fastsat i moder-/datterskabsdirektivets artikel 5, *dels* af den begrænsning, der i den danske

luxembourgske dobbeltbeskatningsoverenskomst artikel 10, stk. 2, er fastsat med hensyn til kildestaten (Danmarks) beskatning af udbytte. Konstateringen af et sådant retsmisbrug berøres nemlig ikke af, om den skattepligtige - hvis der var blevet foretaget en grundlæggende anden omstrukturering end den faktisk gennemførte - kunne have opnået en skattefordel efter de andre regler, der ville have været gældende i en kontrafaktiske situation.

Der er intet retskildemæssigt grundlag for et modsat standpunkt. Heavy Transport Holding Denmarks påberåbelse af præmis 110 i Domstolens dom i de forenede sager C-116/16 og C-117/16, T Danmark, er således uholdbar.

Præmissen indgår som en del af besvarelsen af det i præmis 107 refererede spørgsmål. Dette spørgsmål tager sigte på den situation, hvor de faktiske foreliggende omstændigheder giver belæg for at fastslå, at det givne udbyttes retmæssige ejer er et selskab i en tredjestat, med

**4422**

hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af udbytte, såfremt det var blevet udloddet direkte til det selskab, der er hjemmehørende i denne tredjestat.

Af dommens præmis 108-110 fremgår, at sådanne omstændigheder ikke kan rejse tvivl om, at der forligger et retsmisbrug, når det er godtgjort, at der foreligger et arrangement, der savner enhver økonomisk og forretningsmæssig begrundelse, og som er blevet sat i værk med det hovedformål at drage uretmæssig fordel af moder-/datterselskabsdirektivet, idet det dog ikke kan »udelukkes«, at målet med en koncernstruktur ikke er udtryk for retsmisbrug, hvis der foreligger en situation, hvor det givne udbytte ville være fritaget for kildeskat, hvis det var blevet udloddet direkte til det selskab, som har sit hjemsted i en tredjestat.

I den foreliggende sag er der - ubestridt - ikke tale om, at det omhandlede udbyttes retmæssige ejer er et selskab i tredjeland, med hvilket Danmark har indgået en dobbeltbeskatnings-overenskomst. Domstolens besvarelse af det i præmis 107 refererede spørgsmål er derfor uden relevans for afgørelsen af den foreliggende sag. Den foreliggende sag adskiller sig af samme grund også fra den situation, der forelå til pådømmelse i NetApp-sagen, hvor Østre Landsret, for så vidt angik det ene af udbytterne, fastslog, at der ikke forelå misbrug af moder-/datterselskabsdirektivet og den dansk-cypriotiske dobbeltbeskatningsoverenskomst, da de i sagen faktisk foreliggende omstændigheder ifølge landsretten gav belæg for med sikkerhed at fastslå, at udbyttets retsmæssige ejer var et selskab i USA, med hvem Danmark har indgået en dobbeltbeskatningsoverenskomst, der kunne påberåbes som grundlag for en skattenedsættelse.

Heavy Transport Holding Denmark har altså hverken i Domstolens dom i de forenede sager C-116/16 og C-117/16, T Danmark, eller i Østre Landsrets dom i NetApp-sagen støtte for, at konstateringen af retsmisbrug skulle blive berørt af, om den skattepligtige - hvis der var blevet foretaget en grundlæggende anden omstrukturering end den faktisk gennemførte - kunne have opnået en skattefordel efter de andre regler, der i givet fald ville have fundet anvendelse.

Heavy Transport Holding Denmarks udsagn om, at koncernen, hvis den havde haft »den mindste anelse om, at den af KPMG anviste udbyttemodel ville medføre en dansk kildeskat på ca. en halv milliard kroner«, ville have droppet det faktisk gennemførte arrangement og i stedet foretaget en »accelereret likvidation efter anpartsselskabslovens § 59«, bestrides som værende et postulat.

Der er ingen holdepunkter for at antage, at Heavy Transport Holding Denmarks panamanske ejere, navnlig under de givne omstændigheder, for at haste en likvidation igennem inden den 1. juli 2007, ville have sørget for betaling af al forfalden og uforfalden gæld og

påtaget sig en solidarisk og ubegrænset hæftelse for al selskabets gæld, forfalden som uforfalden eller omtvistet, jf. hertil anpartsselskabslovens § 59, stk. 1 og 3 (dagældende). Postulatet er en gratis omgang, og det taler for sig selv, at en likvidation efter anpartsselskabslovens § 59 (dagældende), der nu præsenteres som en helt igennem nem og byrdefri fremgangsmåde, faktisk ikke blev gennemført.

For sagens afgørelse er det imidlertid upåkrævet at tage stilling til troværdigheden af Heavy Transport Holding Denmarks postulat. Påberåbelsen af, at en andan omstrukturering end den faktisk gennemførte kunne have resulteret i en skattefordel efter andre regler end dem, der har fundet anvendelse i den faktisk foreliggende situation, kan nemlig ikke rejse nogen tvivl om, at der foreligger et retsmisbrug, når der er belæg for at fastslå, at det arrangement, som blev gennemført i den virkelige verden, savnede enhver økonomisk og forretningsmæssig begrundelse og havde som hovedformål uretmæssigt at drage fordel af moder-/datterselskabsdirektivet og af en dobbeltbeskatningsoverenskomst, således som det er tilfældet i den foreliggende sag, hvor det som nævnt er erkendt, at arrangementet havde som hovedformål at undgå dansk udbyttebeskatning.

At det omhandlede udbytte således må anses for skattepligtigt i medfør af selskabsskattelovens § 2, stk. 1, litra c), fordi beskatningen hverken skal frafaldes eller nedsættes efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst, er ikke udtryk for, at der pålægges en »dummebøde«. Der er blot tale om, at udbyttet undergives den beskatning, der - under de faktiske foreliggende omstændigheder - følger af loven.

Når Heavy Transport Holding Denmark anfægter den beskatning, der under de faktiske foreliggende omstændigheder følger af loven, med henvisning til, at koncernen ville have disponeret anderledes, hvis den havde haft »den mindste anelse om, at den af KPMG anviste udbyttemodel ville medføre en dansk kildeskat på ca. en halv milliard kroner«, er der i bund og grund tale om, at selskabet vil stilles som om, at der i medfør af skatteforvaltningslovens § 29 var givet tilladelse til omgørelse af en privatretlig disposition. En sådan tilladelse er imidlertid af mange grunde udelukket, bl.a. fordi en tilladelse i henhold til bestemmelsens stk. 1, nr. 1, er betinget af, at den ændrede disposition ikke i overvejende grad må have været båret af hensyn til at spare eller udskyde skat, hvad der - om noget - er tale om i tilfælde af retsmisbrug, jf. f.eks. U.2016.767H.

*6.2 Skattepligten strider ikke imod en bindende, fast administrativ praksis*

Ved afgørelsen af, om en skattepligt med hensyn til det omhandlede udbytte vil stride imod en bindende,

**4423**

fast administrativ praksis, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, *at* beskatningen ikke skal frafaldes efter moder-/datterselskabsdirektivets artikel 5, stk. 1, fordi der foreligger misbrug, og *at* beskatningen af udbyttet ej heller skal nedsættes efter den dansk-luxembourgske dobbeltbeskatningsoverenskomst artikel 10, stk. 2, fordi Heavy Transport Finance (Luxembourg) ikke kan anses for udbyttets retmæssige ejer.

Der er derfor med andre ord tale om, at Heavy Transport Holding Denmark med sit praksissynspunkt gør krav på, at det omhandlede udbytte skal anses for undtaget fra en skattepligt, selvom selskabsskattelovens § 2, stk. 1, litra c)'s udtrykkelige betingelse for, at udbyttet er undtaget fra skattepligten, ikke er opfyldt. Hverken en forvaltningsretlig lighedsgrundsætning eller et forventningsprincip kan begrunde et krav om en retsstilling, der strider imod lovens udtrykkelige ordlyd.

Hertil kommer, at SKATs afgørelse af 7. december 2010 ikke er udtryk for en praksisskærpelse, eftersom den ikke ændrede på nogen fast administrativ praksis.

Det påhviler Heavy Transport Holding Denmark at føre bevis for eksistensen af den hævdede praksis, som afgørelsen ifølge selskabet skulle fravige, jf. f.eks. U.2011.3305H, men selskabet har ikke løftet denne bevisbyrde.

Selskabets argumentation for, at der skulle være tale om en praksisskærpelse, herunder selskabets påberåbelse og udlægning af en række ministersvar, er identisk med den argumentation, som Net-App Denmark ApS forgæves fremførte i sagen, der blev afgjort med Østre Landsrets dom af 3. maj 2021. Østre Landsret har således allerede fastslået, at Heavy Transport Holding Denmarks argumentation er uholdbar.

Det må på den anførte baggrund på tilsvarende vis fastslås, at SKATs afgørelse i denne sag ikke ændrede på nogen bindende, fast administrativ praksis, som Heavy Transport Holding Denmark kan støtte ret på.

*6.3 Heavy Transport Holding Denmark er ansvarlig for den manglende indeholdelse*

Da det omhandlede udbytte er omfattet af skattepligten, jf. selskabsskattelovens § 2, stk. 1, litra c), skulle Heavy Transport Holding Denmark i forbindelse med dets vedtagelse om udbetaling af udbyttet have indeholdt udbytteskat heraf, jf. kildeskattelovens § 65, stk. 1.

Af kildeskattelovens § 69, stk. 1, følger som nævnt, at den, som undlader at opfylde sin pligt til at indeholde skat, eller som indeholder denne med for lavt beløb, over for det offentlige er umiddelbart ansvarlig for betaling af det manglende beløb, medmindre han godtgør, at der ikke er udvist forsømmelighed fra hans side ved iagttagelse af bestemmelserne i kildeskatteloven. Ifølge loven gælder der altså et præsumptionsansvar.

Ved afgørelsen af, om Heavy Transport Holding Denmark har afkræftet den lovbestemte formodning for forsømmelighed, må det - da landsretten ellers ikke ville have anledning til at tage stilling til spørgsmålet - lægges til grund, at der ikke har været nogen bindende fast, administrativ praksis, hvorefter det omhandlede udbytte skal anses for at være undtaget fra den skattepligt, der ellers følger af selskabsskattelovens § 2, stk. 1, litra c). Allerede af den grund er det uholdbart, når Heavy Transport Holding Denmark gør gældende, at der forelå en administrativ praksis, som gav selskabet føje til at antage, at udlodningen kunne foretages uden indeholdelse af udbytteskat.

Hertil kommer, at da der på generalforsamlingen i Heavy Transport Holding Denmark blev truffet beslutning om udbetaling af det omhandlede udbytte, hvilket skete den 23. maj 2007, var skatteministeren afgivet flere svar, hvoraf fremgår, at et moderselskab *ikke* ville kunne påberåbe sig fordelene af en dobbeltbeskatningsoverenskomst, hvis det var et »rent gennemstrømningsholdingselskab«, et »rent gennemstrømningsselskab« eller et »conduit« selskab, jf. 1) bilag 9 til lovforslag nr. 116 af 14. december 2005, 2) skatteministerens svar på udvalgsspørgsmål 2-10 efter fremsættelsen af lovforslag nr. 30 af 4. oktober 2006 og 3) skatteministerens svar på spørgsmål S 474. I de to sidstnævnte svar er der endog henvist til pkt. 12.1 i bemærkningerne til artikel 10 (om udbytte) i OECD's modeloverenskomst, og i det sidstnævnte svar er det ligefrem i selve svaret anført, at »conduit« selskaber omfatter selskaber, der »reelt har meget snævre beføjelser i relation til den pågældende indkomst«.

For bedømmelsen af, om Heavy Transport Holding Denmark med hensyn til den manglende iagttagelse af indeholdelsespligten har udvist forsømmelighed, dvs. en uagtsom adfærd, er det uden betydning, at der forinden beslutningen om at udlodde det omhandlede

udbytte blev søgt rådgivning hos KPMG, jf. U.2018.3845H. En indeholdelsespligtig kan ikke gøre sig selv immun over for et ansvar efter kildeskattelovens § 69, stk. 1, ved at indhente rådgivning fra en advokat eller revisor.

Det bestrides i øvrigt som udokumenteret, at KMPG havde givet uforbeholden rådgivning om, at den omhandlede udlodning, hvorom generalforsamlingen traf beslutning den 23. maj 2007, kunne besluttes uden indeholdelse af kildeskat. E-mailkorrespondancen fra august 2006, der af Heavy Transport Holding Denmark påberåbes som dokumentation for den uforbeholdne rådgivning, er nemlig ikke ledsaget af en erklæring fra KPMG om, at e-mailkorrespondancen udgør den fulde rådgivning, som KPMG ydede til koncernen vedrørende det omhandlede arrangement med indskydelsen af et luxembourgsk selskab mellem Heavy Transport Holding Denmark og dets panamanske ejere, og at Heeremakoncernen

**4424**

fortsat kunne henholde sig til rådgivningen, da beslutningen om udlodning blev truffet den 23. maj 2007.

For afgørelsen af spørgsmålet, om Heavy Transport Holding Denmark er ansvarlig for den manglende indeholdelse af udbytteskat, bliver det alene udslagsgivende, at selskabet ubestridt var bekendt med de faktiske omstændigheder, som fører til, *dels* at Heavy Transport Finance (Luxembourg) ikke kan anses for at have været udbyttets retsmæssige ejer i den dansklixembourgske dobbeltbeskatningsoverenskomsts forstand, *dels* at fordelen i form af kildeskattefritagelsen, der følger af moder-/datterselskabsdirektivet, skal nægtes, fordi EU-retten ikke kan påberåbes med henblik på at muliggøre retsmisbrug. Under disse omstændigheder er selskabet ansvarlig for den manglende indeholdelse, jf. præmisserne for Østre Landsrets dom af 3. maj 2021 og landsrettens dom af 25. november 2021.

*6.4 Morarenter*

Hvis en virksomhed har betalt for lidt i skatter og afgifter m.v., afkræves virksomheden det skyldige beløb til betaling senest 14 dage efter påkrav, jf. opkrævningslovens § 5, stk. 1.

SKATs afgørelse af 7. december 2010 om, at Heavy Transport Holding Denmark var ansvarlig for betaling af ikke-indeholdt udbytteskat, udgør et påkrav som omhandlet i opkrævningslovens § 5, stk. 1. Heavy Transport Holding Denmark skulle derfor betale et beløb svarende til den ikke indeholdte kildeskat vedrørende udlodningen senest den 21. december 2010. Selskabet indbetalte ikke beløbet, som derfor skal forrentes fra den 21. december 2010, jf. opkrævnings-lovens § 7, stk. 1. Det er i den sammenhæng uden betydning, at SKATs afgørelse blev ændret af Landsskatteretten, jf. Østre Landsrets ovenfor nævnte dom af 2. juli 2021.

I modsætning til, hvad Heavy Transport Holding gør gældende, er der ikke sket nogen afskæring af rentetilskrivningen. Selskabets indsigelse om, »at skatteforvaltningen som offentlig myndighed under alle omstændigheder har været uberettiget til at nægte at modtage kildeskattebeløbet, og at Skatteministeriet derfor må skadesløsholde sagsøgte herfor«, er uden faktuelt grundlag, eftersom selskabet ikke har tilbudt Skatteforvaltningen at betale et beløb svarende til den ikke indeholdte udbytteskat.

Hertil kommer i øvrigt, at en afskæring af rentetilskrivning kun indtræffer, hvis den rentebærende fordring betales uden forbehold for tilbagesøgning, jf. Østre Landsrets dom af 2. juli 2021.

På den anførte baggrund bør der afsiges dom i overensstemmelse med Skatteministeriets (selvstændige) påstand, herunder den del af påstanden, som angår forrentning.

Endelig bør landsretten tage ministeriets frifindelsespåstand over for Heavy Transport Holding Denmarks mere subsidiære påstand til følge.

Reglerne om én skattekonto i opkrævningslovens kapitel 5 blev indført med lov nr. 513 af 7. juni 2006 og indebærer grundlæggende, at ind- og udbetalinger fra og til virksomheder m.v. angående de fleste skatter og afgifter m.v. indgår i én samlet saldoopgørelse (skattekontoen), således at ind- og udbetalinger automatisk modregnes efter et saldoprincip, jf. herved opkrævningslovens §§ 16 og 16 a, stk. 1.

Hvis den samlede sum af registrerede forfaldne krav på virksomhedens konto overstiger den samlede sum af registrerede og forfaldne tilgodehavender til virksomheden, udgør forskellen (debetsaldoen) det samlede beløb, som virksomheden skylder told- og skatteforvaltningen, jf. opkrævningslovens § 16 a, stk. 2, 1. pkt. En sådan debetsaldo forrentes efter § 16 c, stk. 1, hvoraf følger, at en debetsaldo forrentes med den rente, der er fastsat i § 7, stk. 1, jf. stk. 2, og at renten beregnes dagligt og tilskrives månedligt. Hvis en sådan debetsaldo overstiger 5.000 kr., skal beløbet straks indbetales, jf. § 16 c, stk. 4.

Er der tale om, at den samlede sum af registrerede og forfaldne krav på indbetalinger fra virksomheden er mindre end de registrerede og forfaldne krav på udbetalinger til virksomheden, udgør forskellen (kreditsaldoen) virksomhedens samlede tilgodehavende fra told- og skatteforvaltningen, jf. § 16 a, stk. 2, 2. pkt. En sådan kreditsaldo, der ikke forrentes, jf. § 16 c, stk. 3, skal udbetales til virksomhedens NemKonto efter reglerne i § 16 c, stk. 5.

Det fremgår af ordlyden af opkrævningslovens § 16 a, at der sondres mellem, hvornår krav *registreres* på skattekontoen, og fra hvilket tidspunkt sådanne krav *påvirker (debiteres)* saldoopgørelsen. Det følger således af opkrævningslovens § 16 a, stk. 3, at krav på indbetalinger fra virksomheder *registreres* på skattekontoen fra det tidspunkt, hvor der er sket angivelse heraf, eller hvor kravet med sikkerhed kan opgøres. Det følger videre af opkrævningslovens § 16 a, stk. 4, at krav på indbetalinger fra virksomheder *påvirker (debiteres)* saldoopgørelsen efter stk. 2 fra den seneste rettidige betalingsdag.

Af bestemmelsernes ordlyd følger altså, at et krav *registreres* på skattekontoen, når der er sket angivelse, eller hvor kravet med sikkerhed kan opgøres, jf. stk. 3, men at kravet *påvirker (debiteres)* saldoopgørelsen på tidspunktet for den sidste rettidige betalingsdag, jf. stk. 4.

Det afgørende tidspunkt for påvirkningen (debitering) af saldoopgørelsen - og dermed for forrentning ifølge § 16 c, stk. 1 - er altså den seneste rettidige betalingsdag for det givne beløb, og derfor er Heavy Transport Holding Denmarks standpunkt, som ligger til grund for selskabets mere subsidiære påstand, ikke holdbart, hvilket er blevet fastslået med Østre Landsrets dom af 2. juli 2021.«

**4425**

*Heavy Transport Holding Denmark ApS* har i det i et væsentlige procederet i overensstemmelse med de anbringender, der fremgår af selskabets sammenfattende processkrift af 23. februar 2022, hvori det hedder (henvisninger til ekstrakt og materialesamling udeladt):

»*5. NÆRMERE OM DE FAKTISKE FORHOLD*
*5.1 Heerema-koncernen og de foretagne dispositioner*

Heerema-koncernen er en hollandsk rederi- og entreprenørvirksomhed, der primært beskæftiger sig med at udvikle, bygge, transportere, installere og afinstallere offshore-konstruktioner for energibranchen.

Koncernens ultimative ejer er skibsreder I, der bor i Holland.

I 2003 besluttede Heerema-koncernen og det norske rederi, Wilh. Wilhelmsen, at gå sammen i et joint venture om at købe aktierne i det hollandske rederi, Dockwise, der ligeledes var beskæftiget inden for offshore-entreprenørindustrien.

Copyright © 2023 Karnov Group Denmark A/S

Heerema-koncernen skulle deltage i joint venturet med en ejerandel på 54,5 %.

Heeremas aktiepost skulle ejes af koncernens selskab i Panama, Heavy Transport Group Inc., sammen med en forretningspartner (gennem selskabet Incomare Holdings S.A., Panama), og parterne valgte at foretage købet af de 54,5 % gennem et nystiftet dansk holdingselskab, Heavy Transport Danmark, dvs. det sagsøgte selskab i nærværende sag. Heavy Transport Group Inc. ejede 74,17 % af Heavy Transport Danmark, mens Incomare Holding S.A. ejede de resterende 25,83 %.

Aktiviteten i Heavy Transport Danmark bestod udelukkende i at være holdingselskab for Dockwise.

Ved aftale af 22. december 2006 (E 137) solgte aktionærerne, herunder Heavy Transport Danmark, aktierne i Dockwise til en uafhængig tredjemand -kapitalfonden 3i - for en samlet købesum på USD 703.600.000.

Aftalen blev gennemført (completed) den 12. januar 2007 med udbetaling af købesummen - minus et beløb deponeret på en såkaldt escrow på USD 100 mio. -til aktionærerne (og hvoraf Heavy Transport Danmarks andel udgjorde USD 325 mio.).

Heavy Transport Danmark var herefter uden aktivitet og dermed likvidationsmodent.

Såfremt selskabet var blevet likvideret (inden den 1. juli 2007) - f.eks. ved en betalingserklæring efter dagældende anpartsselskabslovs § 59 - kunne likvidationsprovenuet være udbetalt til aktionærerne i Panama, Heavy Transport Group Inc. og Incomare Holdings S.A., uden indeholdelse af dansk kildeskat efter ligningslovens § 16 A.

Efter indhentet, uforholden rådgivning fra revisionsfirmaet KPMG valgte aktionærerne imidlertid en alternativ løsning med etablering af et mellemholdingselskab i Luxembourg og en udlodning af udbytte.

Den 16. januar 2007 overdrog de to aktionærer, Heavy Transport Group Inc. og Incomare Holdings S.A., således aktierne i Heavy Transport Danmark til et nystiftet selskab i Luxembourg, Heavy Transport Luxembourg, for USD 326 mio. mod udstedelse af et gældsbrev. Efter overdragelsen udlånte Heavy Transport Danmark USD 325 mio. til Heavy Transport Luxembourg - dvs. nu dets moderselskab - på anfordringsvilkår. Heavy Transport Luxembourg anvendte låneprovenuet til betaling af gælden til de to aktionærer vedrørende købet af anparterne i Heavy Transport Danmark.

På en generalforsamling i Heavy Transport Danmark den 23. maj 2007 blev der herefter truffet beslutning om at udlodde et udbytte på 1.799.298.000 kr. (svarende til ca. USD 325 mio.) til moderselskabet, Heavy Transport Luxembourg.

Udbytteudlodningen blev af Heavy Transport Luxembourg anvendt til udligning af selskabets gæld til Heavy Transport Danmark.

Da Heavy Transport Danmark efter den indhentede, uforholdne, rådgivning fra KPMG, jf. nærmere nedenfor, var af den opfattelse, at udbyttet var fritaget for kildeskat som et moderselskabsudbytte, blev der ikke foretaget indeholdelse af kildeskat.

### 5.2 KPMG's rådgivning

Omkring sommeren 2006 stod det klart for Heerema-koncernen, at aktierne i Dockwise skulle sælges, hvorfor koncernen indhentede skatterådgivning hos KPMG i Luxembourg og Danmark vedrørende spørgsmålet om beskatning af salgsprovenuet, herunder ved betaling til Heavy Transport Danmarks to aktionærer i Panama.

Der er som bilag i sagen fremlagt en e-mail-korrespondance mellem A fra Heerema-koncernen og diverse KPMG-skatterådgivere.

Det fremgår heraf, at A den 8. juni 2006 spørger til konsekvenserne af en likvidation af det danske selskab og udlodningen af likvidationsprovenu til aktionærerne i Panama, hvilket B fra KPMG

bekræfter vil være skattefrit (forudsat at man ikke udlodder provenuet før likvidationens vedtagelse).

Senere - den 30. juni 2006 - spørger A (»to avoid a lenghty waiting period«) til et salg af aktierne i det danske selskab til Heavy Transport Luxembourg - og en viderebetaling af salgsprovenuet til de to aktionærer i Panama. KPMG, Luxembourg, foreslår i den forbindelse den udbyttemodel, som er beskrevet i foregående afsnit, og KPMG, Luxembourg, ønskede KPMG Danmarks bekræftelse på, hvad B allerede havde oplyst mundtligt, nemlig at der ikke var nogen negative skattemæssige konsekvenser i form af dansk kildeskat (»no abuse of law etc.«). H, KPMG

Danmark, bekræftede herefter, at udbyttet ville være skattefrit, sålænge Heavy Transport Luxembourg var et selskab, der var omfattet af moder-/datterselskabsdirektivet, og at selskabet oppretholdt en ejertidsperiode på mindst 12 måneder i forhold til Heavy Transport

**4426**

Danmark. Der var ingen andre forbehold, herunder f.eks. om »retmæssig ejer« eller misbrug.

KPMG bekræfter således uden forbehold, at der ikke vil blive udløst dansk kildeskat i forbindelse med det påtænkte udbytte fra Heavy Transport Danmark til Heavy Transport Luxembourg og dette selskabs viderebetaling af midlerne til de to Panama-selskaber.

Efter at SKAT havde rejst kildeskattekravet mod Heavy Transport Danmark i 2010, meddelte Heeremakoncernen KPMG, at koncernen agtede at holde KPMG erstatningsansvarlig for det tab, som koncernen måtte lide, såfremt kildeskattesagen måtte blive tabt, jf. E 281. I den forbindelse blev der indgået en aftale om suspension af forældelsesfristen mellem parterne (E 283). Efterfølgende - i juli 2018 - har KPMG opsagt suspensionsaftalen. Da et eventuelt erstatningskrav mod KPMG vurderedes at være forældet, har Heeremakoncernen ikke herefter forfulgt kravet mod KPMG.

…

*DEL III HEAVY TRANSPORT DANMARKS ANBRINGENDER 8 SEL § 2, STK. 1, LITRA C, FØRER IKKE TIL BEGRÆNSET SKATTEPLIGT AF UDBYTTET*

Det fremgår af SEL § 2, stk. 1, litra c (MS 13), at den begrænsede skattepligt *ikke* omfatter udbytte, som oppebæres af et moderselskab, der ejer mindst 15 % (2007) af aktiekapitalen i et datterselskab i en sammenhængende periode på mindst 1 år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Disse betingelser, der svarer til de betingelser, som skal være opfyldt, for at et dansk moderselskab kan modtage skattefrit udbytte, er - ubestridt - opfyldt i nærværende sag.

Det er herudover en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i en *dobbeltbeskatningsoverenskomst eller* i *moder-/datterselskabsdirektivet* (90/435/EØF). Hvis blot udbyttebeskatningen skal lempes efter *én af disse retsforskrifter*, foreligger der således *ikke* begrænset skattepligt til Danmark for den udenlandske udbyttemodtager.

Denne sag drejer sig derfor i første række om, hvorvidt denne betingelse er opfyldt.

Heavy Transport Danmark gør gældende, at udbyttebeskatningen skal frafaldes eller nedsættes såvel efter DBO'en mellem Danmark og Luxembourg *som* efter moder-/datterselskabsdirektivet, hvorfor Heavy Transport Luxembourg ikke er begrænset skattepligtig til Danmark af det pågældende udbytte. Der er dermed af denne grund ikke noget grundlag for opkrævning af kildeskat.

Nedenfor i afsnit 9 behandles spørgsmålet om Danmarks forpligtelse til nedsættelse af udbyttebeskatning efter den dansk-luxembourgske DBO, mens spørgsmålet om frafald efter moder-/datterselskabs-direktivet - det spørgsmål, der har været undergivet

U.2023.4403H

præjudiciel forelæggelse for EU-Domstolen - behandles nedenfor i afsnit 10.

### 9 KRAV PÅ NEDSÆTTELSE EFTER DEN DANSK-LUXEMBOURGSKE DBO - HEAVY TRANSPORT LUXEMBOURG ER »RETMÆSSIG EJER« AF UDBYTTET

#### 9.1 Generelt om DBO'en

Det følger af artikel 10 i den dagældende *dansk-luxembourgske obbeltbeskatningsoverenskomst af 17. november 1980* (MS 407), at kildestaten - i denne sag Danmark - har ret til at beskatte udbytter, men at der skal ske nedsættelse (til 5 eller 15 %), hvis udbyttemodtageren er udbyttets *retmæssige ejer* - i den engelske tekst »*beneficial owner*«.

Det gøres gældende, at Heavy Transport Luxembourg er »retmæssig ejer« af det omhandlede udbytte, og at Heavy Transport Luxembourg derfor har krav på nedsættelse efter artikel 10 i den dansk-luxembourgske DBO. Da der skal ske nedsættelse, foreligger der ikke begrænset skattepligt til Danmark, jf. SEL § 2, stk. 1, litra c.

Artikel 10 i den dansk-luxembourgske DBO svarer i princippet til artikel 10 i OECD's modeloverenskomst fra 1977. … Retmæssige ejer« er en oversættelse af »*beneficial owner*«.

Begrebet »retmæssig ejer« er hverken defineret i den dansk-luxembourgske DBO eller i modeloverenskomsten, og hovedproblemstillingen i dette sagskompleks vedrører netop fortolkningen af dette begreb.

I OECD's kommentarer til 1977-modeloverenskomsten, punkt 12 - som var de gældende kommentarer på tidspunktet for indgåelsen af DBO'en mellem Danmark og Luxembourg i 1980 - er det om begrebet anført:

»I henhold til stk. 2 kan begrænsningen i kildestatens beskatningsret ikke benyttes, når et mellemled, såsom en *agent* eller en *udpeget person*, skydes ind mellem den berettigede og udbetaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.« (Vores fremhævninger).

Da Heavy Transport Luxembourg hverken er »agent« eller en »udpeget person« (på engelsk: »nominee« for selskabets to aktionærer, Heavy Transport Group Inc. eller Incomare Holdings S.A., er det efter 1977-kommentarerne klart, at Heavy Transport Luxembourg er »retmæssig ejer« efter DBO'en.

I 2003 udvidede OECD kommentarerne til at omfatte såkaldte *gennemstrømnings-enheder*.

Kommentarerne blev således bl.a. i punkt 12.1 suppleret med følgende:

»Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for

**4427**

skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »*gennemstrømningsenhed« (conduit)* for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som i relation til den pågældende indkomst, gør det til en »*nullitet*« eller *administrator*, der handler på vegne af andre parter.« (Vores fremhævninger).

Skattemyndighedernes fortolkning af »retmæssig ejer« i nærværende sag støttes af disse udvidede kommentarer, hvilket er tiltrådt af Landsskatteretten ved den indbragte kendelse.

Under nærværende sag støtter ministeriet også sin fortolkning på senere udarbejdede kommentarer til artikel 10, nemlig dem, der kom i 2014, dvs. 7 år efter udbytteudlodningen i nærværende sag.

#### 9.2 »Retmæssig ejer« skal fortolkes i overensstemmelse med intern dansk ret

Det gøres gældende, at begrebet »retmæssig ejer« skal fortolkes i overensstemmelse med *intern dansk skatteret*.

I dansk ret vil der være det domstolsskabte princip om »rette indkomstmodtager«, der finder anvendelse, således som også skatteministeren gentagne gange har bekræftet …

Det kan uden videre fastslås, at Heavy Transport Luxembourg efter dansk ret er »rette indkomstmodtager« af det omhandlede udbytte. Dette er i overensstemmelse med, hvad Skatteministeriet også generelt anerkender i dette sagskompleks, jf. f.eks. punkt 25 og punkt 59 i forelæggelseskendelsen for NetApp. Det er også, hvad Landsskatteretten har lagt til grund. Allerede af den grund er Heavy Transport Luxembourg også »retmæssig ejer« af det pågældende udbytte.

Når skatteministeren har forklaret Folketinget forud for vedtagelsen af SEL, at skattefriheden er afhængig af, at Heavy Transport Luxembourg er »rette indkomstmodtager« er det bindende for fortolkningen af SEL, uanset hvad den rette fortolkning af DBO'en er. Imidlertid følger det også af DBO'en, at begrebet »retmæssig ejer« skal fortolkes, sådan som dansk lovgivning har defineret »retmæssig ejer« - og her har man, som nævnt, utvivlsomt sat ligehedstegn mellem »retmæssig ejer« og »rette indkomstmodtager«.

Artikel 3, stk. 2, i Danmarks DBO med Luxembourg - og den tilsvarende bestemmelse i modeloverenskomsten fra 1977- indeholder følgende fortolkningsregel:

»2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.«

»Retmæssig ejer« er ikke defineret i overenskomsten. Begrebet skal derfor fortolkes i overensstemmelse med intern dansk ret, »medmindre andet følger af sammenhængen«.

Det gøres gældende, at andet ikke følger af sammenhængen, og at begrebet derfor skal fortolkes i overensstemmelse med intern dansk ret, dvs. i overensstemmelse med princippet og retspraksis om »rette indkomstmodtager«.

Dette resultat er i overensstemmelse med den af de danske skattemyndigheder -forud for starten på »beneficial owner«-sagerne - anlagte fortolkning …

Heavy Transport Danmark har naturligvis noteret, at Østre Landsret i sin dom af 3. maj 2021 i NetAppsagen har bemærket, at »*det forhold, at begreberne »retmæssig ejer« og »rette indkomstmodtager« ikke anvendes sprogligt stringent i forarbejderne … ligeledes ikke [findes] at kunne føre til et andet resultat«.*

Heavy Transport Danmark er ikke enig heri.

Aage Michelsen giver i Festskrift til Ole Bjørn udtryk for følgende generelle opfattelse:

»Anvendelsen af intern ret må ske i alle de tilfælde, hvor et internationalt skattespørgsmål ikke er løst i en dobbeltbeskatningsoverenskomst, som Danmark har indgået med et andet land.«

Det er ubestrideligt, at den nærmere forståelse af »retmæssig ejer« eller »beneficial owner« ikke er løst i overenskomsten.

Fortolkningen giver også god mening, når henses til den indledende bemærkning i punkt 12 i 2003kommentarerne:

»Kravet om retmæssig ejerskab blev indsat i artikel 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt … til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1.«

Sigtet med bestemmelsen har således været at fastslå, hvem der er den *reelle modtager* af udbyttet, og det er netop, hvad princippet om »rette indkomstmodtager« i dansk skatteret går ud på …

Jakob Bundgaard og Niels Winther-Sørensen er i SR-SKAT 2007.395 på linje hermed:

»På baggrund af den nævnte danske retspraksis om internretlig fortolkning af begreber fra dobbeltbeskatningsoverenskomster må det formentlig antages, at de danske domstole vil være tilbøjelige til i hvert fald i en vis udstrækning at fortolke beneficial owner-begrebet i overensstemmelse med *intern dansk skatteret*. Eller med andre ord, at de danske domstole vil være tilbøjelige til at anse det selskab, der efter en dansk skatteretlig vurdering anses for *rette indkomstmodtager*, for også at være beneficial owner.« (Vores fremhævninger).

**4428**

Den retspraksis, der henvises til, er U 1994.284 H og TfS 2003.222 H.

Synspunktet gentages af Jakob Bundgaard i SU 2011.31.

Også Jens Wittendorff i SR-SKAT 2010.212, er af den opfattelse, at der skal foretages en internretlig fortolkning baseret på princippet om »rette indkomstmodtager«. Det fremgår sammesteds, at myndighederne i flere andre stater, herunder USA, Storbritannien, Holland og Italien, anvender en internretlig fortolkning.

Yderligere skal nævnes, at Højesteret også i U.2004.2337 H anvender intern dansk ret ved en fortolkning af en DBO.

Heavy Transport Danmark er opmærksom på, at Østre Landsret ganske vist i den første domstolsafgørelse i »beneficial owner«-sagskomplekset (SKM 2012.121 (ISS-sagen) - ) - med støtte i Indofooddommen - har fundet, at der skal anvendes en *autonom* fortolkning. Tilsvarende synes Østre Landsret at have anvendt autonom fortolkning i TDC- og NetApp-sagerne (dommen af 3. maj 2021).

Heavy Transport Danmark er altså ikke enig heri.

*For det første* undrer det navnlig, at Østre Landsret (i ISS-sagen) har lagt mere vægt på Indofooddommen, som er en civilretlig engelsk afgørelse, som skulle vurdere begrebets betydning i en sag om fortolkning af en låneaftale i indonesisk ret, end på den senere Prévost-sag, som er en skattesag afgjort af den kompetente domstol i kildestaten (Canada).

*For det andet* er det et faktum, at der i den *internationale litteratur* ikke er enighed om, hvad en autonom fortolkning - i givet fald - skal gå ud på.

En gennemgang af den foreliggende litteratur viser således, at usikkerheden om, hvad der skal forstås ved »retmæssig ejer« ved en autonom fortolkning, er total. Der er ganske enkelt ikke nogen konsensus om en »international fiscal meaning«.

*For det tredje* er der heller ikke i den internationale litteratur enighed om, hvorvidt der bør anvendes en internretlig fortolkning eller en autonom (international) fortolkning.

*Vogel* og Baker er således af den opfattelse, at der skal tilstræbes en »international fiscal meaning«, men de erkender, at der ikke eksisterer - og heller ikke er enighed om - en sådan »international fiscal meaning«.

*Baker* er dog af den opfattelse, at der først skal foretages en internretlig fortolkning, og at denne kun skal forkastes, hvis den ikke er i overensstemmelse med overenskomstens sammenhæng:

»If the »context« is to require the non-application of the domestic law meaning, then it is logical that a domestic law meaning should first have been determined and this meaning must be regarded as inappropriate in the context of the treaty.«

*Jiménez* Er derimod af den opfattelse, at der skal foretages en fortolkning på grundlag af intern ret.

*For det fjerde* er den (beskedne) internationale retspraksis heller ikke éntydig. …

OECD har i sit *public discussion draft* af 29. april 2011 foreslået, at det indføjes i kommentarerne til artikel 10, at »beneficial owner« skal underkastes en international fortolkning, men høringssvarene fra The City of London Law Society og IBFD bestrider, at der er dækning i artikel 3, stk. 2, for dette standpunkt.

På baggrund af de modtagne høringssvar udsendte OECD den 19. oktober 2012 et nyt forslag til reviderede kommentarer vedrørende »retmæssig ejer«, hvori OECD - under hensyntagen til, at et flertal af høringssvarene har tilsluttet sig denne opfattelse - fastholdt sit oplæg til, at begrebet underkastes en autonom fortolkning. Dette viser i sig selv, at OECD er på »tynd is«, og at der - uanset OECD's politiske ønsker - fortsat var og er betydelig uenighed om spørgsmålet.

At 2014-kommentarernes pkt. 12.1 (MS 496) og 2017-kommentarernes pkt. 12.1 som følge af politiske overvejelser hos de embedsmænd, som udarbejder kommentarerne, peger i retning af, at begrebet skal fortolkes autonomt, ændrer ikke på, at der i hvert fald ikke i 2007 var (og for så vidt heller ikke sidenhen er kommet) den nødvendige internationale konsensus om begrebets forståelse, til at autonom fortolkning dengang gav mening.

At fortolke begrebet »beneficial owner« - »retmæssig ejer« - i overensstemmelse med dansk rets begreb »rette indkomstmodtager«, er endvidere en nødvendighed, når der som her rent faktisk ikke er tale om at fortolke overenskomsten, men tale om at fortolke dansk ret (SEL § 2, stk. 1, litra c), som henviser til overenskomsten, eftersom der reelt ikke er tale om at dele en beskatningsret med Luxembourg, men om at definere en skattefrihed, som udelukkende angår Danmarks interne beskatningsforhold. Dette er særligt oplagt, når fortolkningen til SEL § 2, stk. 1, litra c, entydigt bekræfter, at det danske begreb »rette indkomstmodtager« er ensbetydende med begrebet »beneficial owner«.

Selv hvis det var åbenbart, at man ved affattelsen af forarbejderne til SEL § 2, stk. 1, litra c, i 2001 tog fejl af begrebets betydning i modeloverenskomsten, ville de danske forarbejder stadig have forrang frem for overenskomsten, eftersom det var denne forståelse, som det danske Folketing lagde til grund ved vedtagelsen af SEL § 2, stk. 1 litra c.

Konventionskonform fortolkning er heller ikke relevant, da Danmark ikke har lovet Luxembourg at gøre sin interne skattefrihed af udbytter afhængig af forståelsen af DBO'en. Det er et valg, som Danmark egenhændigt har truffet, og man skylder ikke Luxembourg traktatretligt at rette forståelsen af sin interne

**4429**

lovgivning til efter overenskomsten. Afgørende er alene, hvad det danske Folketing har forudsat ved vedtagelsen af SEL § 2, stk. 1, litra c.

Det gøres således gældende, at intern ret i hvert fald må anvendes, når der - som i denne sag - ikke kan peges på en anden international forståelse af begrebet. Og dette er i særlig grad gældende på tidspunktet for den af sagen omhandlede udbytteudlodning i 2007 og endnu mere klart, når det tages i betragtning, at den dansk-luxembourgske DBO er indgået i 1980.

Da der er enighed om, at Heavy Transport Luxembourg er »rette indkomstmodtager« efter dansk ret, er selskabet dermed også »retmæssig ejer«.

9.3 *Heavy Transport Luxembourg er også »retmæssig ejer« af udbyttet efter 2003-kommentarerne*

For det tilfælde, at de udvidede kommentarer fra 2003 imidlertid måtte blive anset for kun at være en *præcisering* af begrebet »retmæssig ejer«, gøres det videre gældende, at Heavy Transport Luxembourg - også efter disse - må anses for »retmæssig ejer« af de omhandlede renter.

Heavy Transport Danmark gør således også i dette tilfælde gældende, at »retmæssig ejer«-begrebet skal fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« i dansk ret, jf. således bl.a. *Jakob Bundgaard* og *Niels Winther-Sørensen* i SR-SKAT 2007.395.

Men selv hvis der foretages en *autonom* fortolkning af begrebet, gøres det gældende, at Heavy Transport Luxembourg må anses for »retmæssig ejer« af det omhandlede udbytte efter 2003-kommentarerne.

Ved revisionen i 2003 blev punkt 12 i kommentarerne bl.a. udvidet med bemærkningen om, at udtrykket »retmæssig ejer« ikke er anvendt i en snæver teknisk betydning, men skal ses i sammenhæng med og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

Dette uddybes i punkt 12.1 med, at det for det første ikke ville være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildelandet skulle give lempelse ved beskatning til en »agent eller mellemmand« (»agent or nominee«), da denne ikke er ejer af indkomsten og dermed ikke beskattes i sit domicilland, hvorfor der ikke opstår dobbeltbeskatning. Dette svarer til kommentaren til 1977-modeloverenskomsten.

For det andet udtales - som noget nyt - om »gennemstrømningsselskaber« i punkt 12.1:

»Det ville *ligeledes* ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »*gennemstrømningshed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst.* Af disse grunde konkluderer den af Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »*gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.*« (Vores fremhævninger).

Skatteministeriet gør i dette sagskompleks generelt gældende, at punkt 12.1 i de udvidede kommentarer fra 2003 skal forstås således, at der ved fastlæggelsen af, om den formelle beløbsmodtager er »retmæssig ejer«, alene skal lægges vægt på omfanget af den formelle beløbsmodtagers reelle beføjelser i relation til at træffe afgørelse om, hvorledes der skal disponeres over modtagne beløb. Efter dette standpunkt vil den formelle beløbsmodtager således ikke kunne anses som »retmæssig ejer«, såfremt denne i relation til den pågældende indkomst reelt ikke kan foretage dispositioner, der afviger fra de relative ejeres vilje (om at et modtaget beløb skal »dirigeres derhen, hvor det ønskes«).

Det bemærkes i denne forbindelse, at det af ordlyden af punkt 12.1 klart fremgår, at der opregnes 3 situationer, hvor en udbyttemodtager ikke er »retmæssig ejer«, nemlig hvis den pågældende er (1) »agent«, (2) »mellemmand« eller (3) »gennemstrømningsenhed (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst«. I den sidstnævnte situation kræves det yderligere, at gennemstrømningsenheden har »meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter«.

Som det fremgår af kommentarerne, er omfanget af *rådighedsretten* således et væsentligt element i vurderingen af, om et gennemstrømningsselskab er den »retmæssige ejer« af indkomsten.

Pointen i kommentarerne er altså, at hvis det udbyttemodtagende selskab har viderekanaliseret det modtagne udbytte til de bagvedliggende ejere, skal der - ved vurderingen af, om selskabet er »retmæssig ejer« - lægges vægt på, om dette er et udslag af, at de bagvedliggende ejere har indskrænket selskabets rådighed over udbyttet.

Det gøres gældende, at Heavy Transport Luxembourg *ikke* har »meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller »administrator, der handler på vegne af andre parter«. Tværtimod, har Heavy Transport Luxembourg i det hele haft de samme beføjelser, som et hvilket som helst andet holdingselskab i en hvilken som helst anden koncern normalt har.

### 4430
Der har således navnlig ikke foreligget en retlig forpligtelse for Heavy Transport Luxembourg til at viderebetale de modtagne udbytte til Heavy Transport Danmark Bermuda som afdrag på gæld, jf. nærmere nedenfor i næste afsnit. Som det bl.a. fremgår af det pågældende afsnit, er det en betingelse for ikke at anse en udbyttemodtager som »retmæssig ejer«, at den pågældende har påtaget sig en *retlig forpligtelse* til at videreformidle det modtagne udbytte.

Det bestrides i den forbindelse, at alene den omstændighed, at de bagvedliggende ejere eller disses repræsentanter på forhånd måtte have truffet den overordnede beslutning om udbytteudlodningen, skulle være afgørende for, at Heavy Transport Luxembourg ikke kan anses for »retmæssig ejer« af udbyttet.

Alle større beslutninger i en hvilken som helst koncern - f.eks. om køb af selskaber, større udlodninger, etablering af finansieringsstruktur mv. - træffes sædvanligvis i første omgang af topledelsen i koncernen.

Herefter gennemføres beslutningerne af de relevante selskabsorganer i de respektive selskaber. Hverken de enkelte selskaber som sådan eller de enkelte ledelsesmedlemmer er som udgangspunkt forpligtede til at gennemføre de planlagte beslutninger, men vægring herved kan naturligvis føre til, at de pågældende medlemmer udskiftes i overensstemmelse med selskabslovenes regler.

Det er ingen holdepunkter for, at kommentarernes punkt 12.1 skal fortolkes således, at det, der er en sædvanlig beslutningsprocedure i enhver koncern, automatisk diskvalificerer koncernens datterselskaber fra at være »retmæssig ejer« af modtagne udbytter.

Realiteten er, at Skatteministeriets fortolkning af kommentarernes punkt 12.1 er så restriktiv, at det er vanskeligt - for ikke at sige umuligt - at pege på et mellemliggende holdingselskab, som ministeriet vil kunne acceptere som »retmæssig ejer« af udbyttet.

Herefter synes den eneste (reelle) betingelse, der efter Skatteministeriets opfattelse skal stilles for at frakende et mellemholdingskab status som »retmæssig ejer«, at være, at det skal kunne påvises eller sandsynliggøres, at transaktionen har skatteundgåelse eller -unddragelse (eller »misbrug«) som formål eller konsekvens.

Skatteministeriets synspunkt er altså i realiteten, at hvis der kan påvises et *misbrug*, vil et mellemholdingskab *aldrig være »retmæssig ejer«*, og dermed er der - efter Skatteministeriets egen fortolkning - ikke noget reelt indhold i kravet om »snævre beføjelser«.

Skatteministeriets fortolkning af begrebet »retmæssig ejer« må derfor i det hele afvises som *indholdsløs*.

Skatteministeriets fortolkning er da også klart *i strid med Skatteministerens svar* på spørgsmål 86 vedrørende L 213 af 22. maj 2007:

»Et *gennemstrømningsselskab (holdingselskab)* kan imidlertid ikke sidestilles med en agent eller en mellemmand. *Et sådant selskab er indregistreret og fuldt skattepligtigt i det land, hvori der er hjemmehørende og udgangspunktet er helt klart, at et holdingselskab har krav på aftalebeskyttelse. …*

*Der er således meget snævre grænser for hvornår danske skattemyndigheder kan tilsidesætte et behørigt indregistreret og fuldt*

Copyright © 2023 Karnov Group Denmark A/S

*skattepligtigt udenlandsk selskab* og som anført i svaret til spørgs-mål 6 vedrørende lovforslag L 30 er der heller ikke eksempler på, at danske skattemyndigheder har nægtet at anerkende et udenlandsk holdingselskab og således anset det for en nullitet.« (Vores frem-hævninger).

Sammenfattende gøres det således gældende, at Heavy Transport Luxembourg ikke kan anses for en »nullitet eller administrator«.

Sagsøgtes forståelse støttes af Østre Landsrets dom af 20. decem-ber 2011 i ISS-sagen, hvor landsretten udtalte:

»For at et sådant mellemholdingselskab ikke kan anses for retmæs-sig ejer, må det kræves, at ejeren udøver en kontrol med selskabet, som ligger ud over den planlægning og styring på koncernplan, som sædvanligvis forekommer i internationale koncerner«.

Skatteministeriet har ikke godtgjort, at der foreligger en sådan særlig kvalificeret kontrol fra ejernes side i nærværende sag.

Sagsøgtes forståelse støttes endvidere af nyere international praksis, herunder af Canadas Federal Court of Appeals dom af 26. februar 2009 i den ledende sag, Prévost, selv om det anerkendes, at den internationale domspraksis om forståelsen af »retmæssig ejer«-begrebet ikke er éntydig.

…

Overført til nærværende sag er Heavy Transport Luxembourg tillige klart »retmæssig ejer« af det af sagen omhandlede udbytte.

Den 24. februar 2012 afgjorde The Tax Court of Canada en tilsva-rende sag om »retmæssig ejer« vedrørende royalties i sagen *Velcro Canada Inc.* Her fandt retten på samme måde som i Prévostsagen, at et mellemliggende holdingselskab var den »retmæssig ejer« af den modtagne indkomst, også selv om der var en forpligtelse til at viderebetale en betydelig del heraf, idet domstolen bl.a. lagde vægt på, at der skete en sammenblanding af midler hos det mellemlig-gende holdingselskab, ligesom den fandt, at der - for at bryde den selskabsretlige barriere (*corporate veil*) - måtte stilles krav om, at mellemholdingselskabet havde »absolutely no discretion« i forhold til de modtagne midler (hvad der således ikke var tale om).

De canadiske domstole har således slået fast, at det er en nødven-dig - men ikke tilstrækkelig - betingelse for at frakende modtageren af en given indkomst status som den »retmæssige ejer« heraf, at der foreligger en

**4431**

retlig forpligtelse til at viderebetale den pågældende indkomst.

Dette er efterfølgende klart cementeret i punkt 12.4 i de seneste kommentarer fra 2014 til modeloverenskomsten, jf. afsnit 9.4 ne-denfor.

Den canadiske Supreme Court har endvidere for ganske nylig - den 26. november 2021 - truffet afgørelse i den såkaldte Alta Energy-sag, der handlede om, hvorvidt en struktur med et luxem-bourgsk mellemholdingselskab udgjorde et misbrug af den cana-disk-luxembourgske DBO. Dommen, der faldt ud til skatteyderens fordel (som Prévost-sagen) …

Skatteministeriet henholder sig i denne sammenhæng navnlig til den engelske Court of Appeal's dom i den såkaldte Indofood-sag og den franske Conseil d'Etat's dom i den såkaldte Bank of Scot-land-sag, begge fra 2006.

Østre Landsret henviser også i sin afgørelse i ISS-sagen til Indo-food-dommen, idet det dog bemærkes, at det var vedrørende spørgsmålet, om der skal anvendes en internretlig eller autonom fortolkning af begrebet »retmæssig ejer«.

Det er imidlertid værd at notere, at Indofood-sagen ikke var en skattesag, men derimod en civil sag om fortolkning af aftalevilkår i en låneaftale underlagt engelsk ret, der ganske vist involverede et (hypotetisk) skatteretligt spørgsmål.

…

Heavy Transport Danmark gør gældende, at sagen ikke er et lige så godt domspræjudikat som de canadiske skattedomme, eftersom der var tale om en civil sag - en fortolkning af en aftale - og ikke en skattesag, og eftersom der var tale om et hypotetisk spørgsmål, hvis svar ville pålægge den ene part en byrdefuld omstrukturering uden vished for, om det skatteretligt holdt. Den engelske domstol udtrykte således i dommens præmis 48, at det ikke ville være rime-ligt, at Indofood skulle ud i en retssag med de indonesiske skatte-myndigheder, som Indofood risikerede at tabe.

9.4 *2014-kommentarerne - der skal foreligge en retlig forpligtelse til viderebetaling*

Mens denne sag har verseret er der kommet nye kommentarer fra OECD, nemlig i 2014, som også påberåbes af Skatteministeriet til støtte for, at Heavy Transport Luxembourg ikke er »retmæssig ejer« af det omhandlede udbytte.

Heavy Transport Danmark gør gældende, at det nu eksplicit af 2014-kommentarernes punkt 12.4 fremgår, at det som udgangspunkt er en betingelse for at frakende en udbyttemodtager status som »retmæssig ejer« efter modeloverenskomsten, at der foreligger en forpligtelse til at videreformidle udbyttet til en anden person. Det hedder således:

»12.4 I disse forskellige eksempler (agent, mellemmand, conduit selskab i dets egenskab af bemyndiget eller administrator), er den direkte modtager af udbytte ikke »den retmæssige ejer«, fordi modtagerens ret til at bruge og nyde udbytterne er begrænset af *kontraktuelle eller juridiske forpligtelser til at videreformidle* de modtagne betalinger til en anden person. En sådan forpligtelse vil sædvanligvis fremgå af relevante, juridiske dokumenter, men kan eventuelt også være til stede allerede i kraft af de faktiske omstæn-digheder, som ganske klart viser, at modtageren substantielt ikke har rettighederne til at bruge og nyde de udbytter, dog uden at være bundet af en kontraktuel eller juridisk forpligtelse til at viderefor-midle de modtagne betalinger til en anden person. … Hvor modta-geren af et udbytte har retten til at *bruge og nyde udbyttet, uden at være bundet af kontraktuelle eller juridiske forpligtelser til at vi-dereformidle* de betalinger, som han har modtaget, til en anden person, er modtageren »den retmæssige ejer« af disse udbytter. …« (Vores fremhævninger).

Efter Heavy Transport Danmarks opfattelse har det stedse været klart, at det er en nødvendig - men ikke tilstrækkelig - betingelse for at frakende en udbyttemodtager status som »retmæssig ejer« efter modeloverenskomsten, at der foreligger en retlig forpligtelse til at viderebetale udbyttet. 2014-kommentarerne tilføjer således *på dette punkt* ikke noget, som ikke var gældende i forvejen. Det er også bekræftet i den ledende dom, Prévost, fra 2009, der er omtalt ovenfor i afsnit 9.3.

En »agent eller mellemmand«, som nævnt i 1977-kommentarerne, er således klart forpligtet til at videreformidle det modtagne udbytte. Det ligger allerede i, at han netop er »agent eller mellemmand«. Det samme gælder for et »gennemstrømningsselskab« i 2003-kommentarerne.

Efter Skatteministeriets opfattelse er det uden betydning, på hvilket grundlag forpligtelsen består, men udtrykket »forpligtelse« (til at videreformidle) kan ikke gradbøjes. Enten består forpligtelsen, eller også består den ikke. Den relevante test er, om forpligtelsen kan gennemtvinges ved de nationale domstole. Hvis en anden end ud-byttemodtageren således har et retskrav på at få udbyttet udleveret, som kan gennemtvinges ved domstolene, består der en forpligtelse for udbyttemodtageren til at videreformidle udbyttet.

I nærværende sag har der ikke bestået en retlig forpligtelse for Heavy Transport Luxembourg til at videreformidle udbyttet.

Skatteministeriet henholder sig til 2014-kommentarernes bemærk-ninger om, at modtageren - uden at have været bundet af en kon-

traktuel eller juridisk forpligtelse til at videreformidle det modtagne udbytte til en anden person - »substantielt« ikke havde rettighederne til at »bruge og nyde« udbyttet.

Heroverfor gør Heavy Transport Danmark gældende, at 2014-kommentarerne på dette punkt - hvis de skal

**4432**

forstås som hævdet af Skatteministeriet - *fuldstændigt ændrer* de hidtidige kommentarer til bestemmelsen - 7 år efter udbytteudlodningen i nærværende sag - og er dermed utvivlsomt udtryk for en udvidelse - og ikke en præcisering - af »retmæssig ejer«-begrebet i 1977-kommentarerne. De kan derfor ikke finde anvendelse ved fortolkningen af DBO'er, der er indgået før 2014. I den nærværende sag relevant DBO mellem Danmark og Luxembourg er indgået i 1980.

Endelig gøres det gældende, at det er aldeles usikkert, hvad der ligger i dette udsagn i kommentarerne, og at det derfor under alle omstændigheder ville være i strid med almindelige principper om retssikkerhed at tillægge det pågældende udsagn betydning.

*9.5 Der foreligger ikke et misbrug af DBO'en*

Skatteministeriet gør i »beneficial owner«-sagskomplekset generelt gældende, at der skal foreligge et misbrug, for at et udbyttemodtagende selskab kan nægtes overenskomstbeskyttelse. Heri er Heavy Transport Danmark enig.

Heavy Transport Danmark bestrider imidlertid, at der i nærværende sag foreligger et misbrug af den dansk-luxembourgske DBO.

Imødegåelse af misbrug kræver, at der er hjemmel hertil i *dansk ret*.

Parterne er i dette sagskompleks enige om, at der i 2007 fandtes *to domstolsskabte regler* til imødegåelse af misbrug, nemlig *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*. Dette ses bl.a. i punkt 56-59 i forelæggelseskendelsen i NetAppsagen (MSX).

Der er således mellem parterne enighed om, at *realitetsgrundsætningen* ikke giver grundlag for at tilsidesætte de i sagskomplekset foretagne dispositioner, jf. punkt 57. Tilsvarende er der mellem parterne enighed om, at udbyttemodtagerne i disse sager, her Heavy Transport Luxembourg, er *»rette indkomstmodtagere«* efter dansk ret, jf. punkt 59.

Skatteministeriet har i sagskomplekset - efter EU-Domstolens dom - fremsat et nyt anbringende om, at der i dansk retspraksis skulle være udviklet *almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen* (og - må det forstås - princippet om »rette indkomstmodtager«). Heavy Transport Danmark har nedenfor i afsnit 10.4.1.3 tilbagevist dette anbringende.

Det er således en kendsgerning, *at* der i dansk ret fandtes regler til imødegåelse af misbrug, og *at* disse regler fører til, at der i denne sag *ikke* foreligger et misbrug efter dansk ret. I øvrigt er det fast højesteretspraksis, at der ikke kan foreligge misbrug, hvis det fremgår af forarbejderne, at lovgiver har været fuldt opmærksom på den omtvistede problemstilling (hvilket er tilfældet i nærværende sag), jf. U.2004.174H (Over-Hold ApS) og U.2007.736H (Finwill ApS -»elevatorsagen«).

Der fandtes ikke relevante anti-misbrugsregler i den dansk-luxembourgske DBO.

Derimod indeholder DBO'ens artikel 10 bestemmelsen om, at udbyttemodtageren skal være »retmæssig ejer«, hvorom henvises til afsnit 9.1 - 9.4 ovenfor.

At der ikke foreligger misbrug af overenskomsten bekræftes bl.a. af, at den valgte struktur - hvor Heavy Transport Luxembourg fungerer som holdingselskab for Heavy Transport Danmark - er direkte anvist af skatteministeren i forbindelse med besvarelsen af

spørgsmål 16 til L 99 af 10. november 2000 som en legitim struktur i forbindelse med udlodning af udbytter …

Dette er helt i overensstemmelse med Mogens Rasmussen og Dennis Bernhardt, begge Told- og Skattestyrelsen, i SR-SKAT 2000.315:

»Det er således blandt OECD's medlemslande generelt antaget, at en dobbeltbeskatningsoverenskomst, der følger OECD-modellen, ikke indeholder hjemmel til at imødegå »treaty-shopping« …

…

Et selskab, der er stiftet i et aftaleland, bør således være berettiget til aftalebeskyttelse, dvs. betragtes som den *»retmæssige ejer«*, selvom det, som det f.eks. er tilfældet med de mange nye holdingselskaber i Danmark, er åbenbart, at formålet er skatteminimering.«

Der var generel enighed blandt danske forfattere om disse synspunkter.

Hertil kommer, at den pågældende koncernstruktur med indskydelsen af Heavy Tranport Luxembourg slet ikke var nødvendig for at Heavy Transport Danmark kunne udlodde købesummen fra salget af Dockwise-aktierne til de to aktionærer i Panama uden dansk skat.

Såfremt der havde været nogen som helst grund til at tro, at Danmark ville opkræve kildeskat af det omhandlede udbytte ved den valgte konstruktion, bl.a. ved at nægte direktivbeskyttelse (hvad der altså ikke var grund til, bl.a. da der var indhentet uforbeholden skatterådgivning herom, jf. herom senere), så kunne koncernen som en fuldgod alternativ løsning have valgt at lade Heavy Transport Danmark, der jo efter salget var uden aktivitet, likvidere via en simpel betalingserklæringslikvidation efter anpartsselskabslovens § 59, i hvilken forbindelse likvidationsprovenuet, dvs. et stort set tilsvarende beløb, *ubestridt og ubestrideligt* kunne være udloddet til aktionærerne, Heavy Transport Group Inc., Panama, og Incomare Holdings S.A., Panama, *uden indeholdelse af dansk kildeskat*, jf. ligningslovens § 16 A.

Og dermed bortfalder hele grundlaget for at anse den valgte konstruktion med »indskydelse af et mellemholdingselskab« for et misbrug til jorden.

Som det vil fremgå nedenfor i afsnit 0, har EU-Domstolen fastslået, at anti-misbrugsprincippet (i hvert fald det EU-retlige, som også efter 2016 danner grundlag for

**4433**

det nu lovfæstede danske generelle antimisbrugsprincip i ligningslovens § 3) går ud på følgende:

…

Selv om det med støtte i Østre Landsrets TDC- og Takeda-domme muligvis kan hævdes, at indskydelsen af Heavy Transport Luxembourg og dette selskabs modtagelse og videresendelse af de omhandlede midler udgør en »kunstigt arrangement, der ikke bygger på en økonomisk realitet«, så er andet led i anti-misbrugsgrundsætningen - om at det skal være sket med det formål at opnå utilsigtede skattemæssige fordele (der, må man forstå, ikke kunne være opnået i fraværet af det pågældende, kunstige arrangement) - jo netop ikke opfyldt i en situation som den foreliggende, hvor der jo altafrede var *et fuldgodt alternativ* (faktisk et nemmere alternativ) til at kanalisere midlerne op til de to aktionærer i Panama *uden dansk kildeskat*.

Den danske lovgiver har været fuldt bevidst om, at der ikke ved en likvidation ville være kildeskat på et udloddet likvidationsprovenu, selv om modtageren var hjemmehørende i en ikke-DBO-stat. Da dette ikke fandtes politisk ønskværdigt, ændrede lovgiver med virkning fra den 1. juli 2007 denne retstilstand.

Skatteministeriet bestrider ikke, at et likvidationsprovenu ville have været skattefri for de to aktionærer, såfremt de inden den 1. juli 2007 havde udstedt en opløsningserklæring efter den dagælden-

de anpartsselskabslov § 59, f.eks. på samme tidspunkt som den af sagen omhandlede udbytteudlodning, men ministeriet gør gældende, at den omstændighed, at koncernen kunne have likvideret Heavy Transport Danmark og udloddet likvidationsprovenuet direkte til ejerne i Panama uden indeholdelse af dansk kildeskat, ikke ændrer på, at der i den faktisk foreliggende situation er tale om misbrug.

Som netop redegjort for, bestrides dette.

Det bestrides naturligvis ikke, at indskydelsen af mellemholdingselskabet i Luxembourg - som nævnt - skete med det hovedformål ikke at udløse dansk kildeskat ved den planlagte (almindelige) udbytteudlodning (eller sagt med andre ord: det bestrides ikke, at Heavy Transport Danmark ikke ville kunne have foretaget en udlodning af et almindeligt udbytte direkte til en aktionær i Panama uden indeholdelse af kildeskat), men det gøres i denne forbindelse gældende, at det naturligvis indgår i misbrugsvurderingen, om der var andre måder, hvorpå midlerne skattefrit kunne udbetales til ejerne i Panama. Og det var der altså.

Skatteministeriet bestrider så i denne forbindelse, at Heavy Transport Danmark var »likvidationsmodent« efter selskabets salg af aktierne i Dockwise, eftersom selskabet var part i en igangværende civilretlig tvist med køberen af aktierne.

Det er korrekt, at der i forbindelse med salget af aktierne i Dockwise opstod en diskussion - og senere tvist - med køberen, som følge af at et af selskabets skibe sank kort før underskrivelsen af salgsaftalen den 22. december 2006. Og parterne skulle i den forbindelse finde ud af skadernes omfang og den mulige regulering af købesummen i samme anledning. Der blev derfor i forbindelse med gennemførelsen af handlen den 12. januar 2007 tilbageholdt USD 100 mio. af købesummen på en escrow til sikkerhed for tab i forbindelse med ulykken. Sagen blev endelig afsluttet i 2010, efter at sælgerne i 2009 havde givet køberen et såkaldt »non-repair notice«, dvs. en meddelelse om, at skibet var totalskadet. Det tilbageholdte beløb på USD 100 mio. (med visse mindre reguleringer for forsikringsudbetalinger m.v.) blev derfor udbetalt (tilbagebetalt) til køberen (og købesummen reduceret med dette beløb).

Men det er værd at bemærke, at det beløb, der blev udloddet til Heavy Transport Danmark i maj 2007 naturligvis var købesummen uden den andel, der var tilbageholdt som sikkerhedsstillelse, og det ville derfor have været det samme beløb, der kunne være udloddet ved en likvidation på samme tidspunkt.

Det er korrekt, at den pågældende ulykke umiddelbart besværliggjorde en påtænkt likvidation af det danske sælgerselskab. Det kræver imidlertid ikke nogen nærmere forklaring, at koncernen havde valgt at gennemføre en likvidation af det danske selskab - hvad man altså kunne have gjort *uden indsigelsesmulighed fra køber* efter dagældende anpartsselskabslovs § 59 - såfremt koncernen havde haft den mindste anelse om, at den af KPMG anviste udbyttemodel ville medføre en dansk kildeskat på ca. en halv milliard kroner.

Likvidationen kunne, som nævnt, være sket ved en accelereret (betalingserklærings) likvidation efter anpartsselskabslovens § 59, i hvilken forbindelse alle Heavy Transport Danmarks forpligtelser og rettigheder i henhold til aktieoverdragelsesaftalen, blandt andet, ville være overtaget af selskabets aktionærer (MS 24). Som følge af denne legale succession har selskabets potentielle kreditorer netop ingen indsigelsesmulighed over for en sådan likvidation. Til al overflod bemærkes dog videre, at det også var tilladt Heavy Transport Danmark efter aktieoverdragelsesaftalens pkt. 16 at overdrage rettigheder og forpligtelser efter aftalen til et koncernforbundet selskab.

Og så bemærkes det i denne forbindelse endeligt, at de to sælgende koncerners moderselskaber, Heerema Holding Construction, Inc., og Wilh. Wilhelmsen ASA, også var parter i aftalen som garanter

for sælgers forpligtelser. Køber var dermed på ingen måde dårligere stillet ved en likvidation af det danske selskab.

Heerema valgte ikke en likvidation i starten af 2007 i forbindelse med salget, eftersom koncernen jo netop som følge af det påtænkte salg tidligere havde rettet henvendelse til sin skatterådgiver, KPMG i Luxembourg

**4434**

og Danmark, for at undersøge, om der var alternativer til en likvidation i forbindelse med et salg af aktierne og hjemtagning af salgsprovenuet til aktionærerne i Panama. Og i den forbindelse rådgav KPMG koncernen - uforbeholdent - om muligheden for at indskyde et mellemholdingselskab i Luxembourg og derefter foretage en udbytteudlodning, jf. nærmere herom nedenfor. Da der herefter forelå et fuldgodt alternativ til en likvidation, var det denne løsning, der blev valgt. Der blev imidlertid ikke opnået nogen skattefordel herved, hvilket udelukker misbrugsbetragtninger.

Såfremt den pågældende konstruktion antages at udgøre et misbrug, vil konsekvensen altså være, at koncernen modtager en gigantisk »dummebøde« på en halv milliard kroner (+ renter).

Ud over at denne omstændighed under alle omstændigheder afkræfter en eventuel formodning for misbrug ved den pågældende »model«, viser den i øvrigt også, at det i hvert fald er udelukket at anse det danske selskab for at have handlet forsømmeligt i sagen, jf. nærmere nedenfor i afsnit 12.

Skatteministeriet - der godt kan se, at det er et problem for ministeriet, at der bestod et skattefrit alternativ - forsøger, ikke overraskende, at afvise, at Heerema-koncernen kunne have gennemført en betalingserklæringslikvidation af Heavy Transport Danmark, såfremt selskabet havde haft den mindste anelse om, at der bestod en risiko for at skulle betale en skat på en halv milliard kroner.

En sådan likvidation beskrives således som en »ren hypotese«.

Skatteministeriet hævder i den forbindelse, at det er usandsynligt, at Heavy Transport Danmarks panamanske anpartshavere, for at haste en likvidation igennem inden den 1. juli 2007, ville have sørget for betaling af al forfalden og uforfalden gæld og påtaget sig en solidarisk og ubegrænset hæftelse for al selskabets gæld, forfalden som uforfalden eller omtvistet.

…

Hertil bemærkes, at det naturligvis må have formodningen for sig, at de aktionærer ville gøre alt, hvad der stod dem muligt, for at undgå en (uforudset og unødvendig) skatteudgift på en halv milliard kroner Herunder at »haste en likvidation igennem inden den 1. juli 2007«.

Dette ville, som nævnt af Skatteministeriet, have krævet to ting; for det første at sørge for »betaling af al forfalden og uforfalden gæld«, og for det andet at påtage sig en solidarisk og ubegrænset hæftelse for al selskabets gæld, forfalden som uforfalden eller omtvistet.

For så vidt angår første punkt - betaling af al forfalden og uforfalden gæld - ville dette have været ret let, da der ikke var mange gældsposter i det danske selskab (der jo ikke havde andre aktiviteter end at eje Dockwise). Og det skal i den forbindelse navnlig bemærkes, at det krav, der var rejst mod Heavy Transport Danmark i dets egenskab af at være sælger af aktierne i Dockwise, ikke i denne forbindelse kan anses som en (forfalden eller uforfalden) »gæld« i anpartsselskabslovens forstand, da kravet jo var omtvistet (og dermed en »potentiel« gæld, som ville blive overtaget af selskabets aktionærer).

Og hvad angår det andet punkt, at de to aktionærer skulle påtage sig en solidarisk og ubegrænset hæftelse for al selskabets gæld, forfalden som uforfalden eller omtvistet - dvs. også i forhold til de krav, der var rejst mod Heavy Transport Danmark af aktiekøberen, 3i - kræver det ikke nogen nærmere forklaring, at aktionærerne

selvfølgelig ville være parate til det, idet koncernens moderselskab -Heerema Holding Construction, Inc. - som nævnt ovenfor jo allerede var part i aktieoverdragelsesaftalen og dermed allerede hæftede for de rejste krav. Og da Heavy Transport Danmark ikke havde anden aktivitet - og aldrig havde haft anden aktivitet - er der ikke grund til at overveje andre potentielle (ukendte) hæftelseskrav.

Der er således overhovedet intet grundlag for Skatteministeriets antagelser om, at koncernen ikke kunne eller ville have likvideret Heavy Transport Danmark, såfremt man havde vidst, at der i modsat fald ville blive udløst et skattekrav af den omhandlede eksorbitante størrelse.

Og sammenfattende er der således heller ikke noget grundlag for en antagelse om, at Heavy Transport Danmark og Heavy Transport Luxembourg har misbrugt den dansk-luxembourgske DBO til at opnå en skattefordel for de panamanske aktionærer, som ikke allerede stod til disse aktionærers rådighed.

I overensstemmelse hermed har Østre Landsret i NetApp-sagen udtalt:

»Idet ville have været muligt at udlodde udbytte direkte fra Net-App Denmark til NetApp USA, uden at dette vile have udløst dansk kildeskat, og da det findes godtgjort, at udlodningen skete som led i en planlagt udbyttehjemtagning til koncernens amerikanske moderselskab, finder landsretten, at der hverken foreligger retsmisbrug af den dansk-cypriotiske dobbeltbeskatnings-overenskomst eller af moder-/datterselskabsdirektivet.«

På samme måde var udlodningen i denne sag ubestridt et led i en plan om at hjemtage midlerne til Panama, og det ville ubestridt have været muligt at udlodde et likvidationsprovenu direkte fra Heavy Transport Luxembourg til aktionærerne i Panama.

I øvrigt bemærkes, at OECD først med BEPS-projektet (»Base Erosion and Profit Shifting Project«), der blev opstartet i 2013, og udgivelsen i 2015 af Action 6, »Preventing the Granting of Treaty Benefits in Inappropriate

**4435**

Circumstances«, fremkom med et forslag til indførelsen af en generel misbrugsregel i staternes DBO'er til egentlig imødegåelse af *treaty shopping*. Der var således tale om indførelse af en såkaldt LOB-bestemmelse (»limitation on benefits«) samt en såkaldt PPT (»Principal Purpose Test«), dvs. en generel anti-avoidance klausul.

Dette initiativ blev fulgt op med, at en lang række medlemsstater, herunder Danmark, i 2016 indgik den Multilaterale Konvention (»MLI«), hvorved de deltagende stater fik muligheden for at ændre deres bestående DBO'er på flere områder, herunder ved at indsætte disse anti-treaty-shopping regler. I Danmark blev MLI'en vedtaget af Folketinget i 2019.

Det er således først med virkning fra og med 1. januar 2020 - for så vidt angår kildeskatter - at der er blevet indsat generelle anti-misbrugsregler i de bestående danske DBO'er, herunder den dansk-luxembourgske DBO. Denne misbrugsbestemmelse ville dog heller ikke finde anvendelse i denne sag, da det er afgørende, at skatteyderen opnår en skattefordel, som ikke i forvejen var tilgængelig for skatteyderen.

Men selv i de tilfælde, hvor staterne har indført generelle anti-misbrugsregler, har det for ganske nylig vist sig, at der ikke er grundlag for ud fra misbrugsbetragtninger at tilsidesætteulovlige selskabsdannelser selv om de er udtryk for treaty shopping. Det må nemlig lægges til grund, at etablering af et selskab også af skattemæssige grunde ikke er udtryk for misbrug af overenskomsterne, idet denne mulighed har været kendt og accepteret af de deltagende stater.

Dette følger af den canadiske Supreme Courts afgørelse af 26. november 2021 i den såkaldte Alta Energysag.

Sagen handlede om, hvorvidt en struktur med et luxembourgsk mellemholdingselskab udgjorde et misbrug af den canadisk-luxembourgske DBO.

…

Også denne dom understreger, at der ikke i nærværende sag (hvor der ikke engang findes en generel anti-misbrugsregel i den relevante DBO) kan foreligge noget misbrug af den dansk-luxembourgske DBO. I den forbindelse bemærkes, at Danmark - ligesom Canada - har undtaget visse Luxembourgske holdingselskaber fra overenskomstbeskyttelse, jf. protokollen til Danmarks DBO med Luxembourg, men det er ubestridt, at protokollens undtagelsesbestemmelse ikke er relevant for Heavy Transport Luxembourg. Dette forhold har Østre Landsret ikke haft lejlighed til at inddrage hverken i NetApp-sagen, som handlede om DBO'en med Cypern, eller i Takeda-sagen, hvor den retmæssige ejer var hjemmehørende i Luxembourg og tvisten netop angik fortolkningen af protokollen. I TDC-sagerne har den canadiske dom ikke været påberåbt af den enkle grund, at dommen først er fremkommet efter, at der er afsagt dom i TDC-sagerne.

At virksomheder, som ikke var hjemmehørende i Luxembourg kunne etablere et selskab i Luxembourg af skattemæssige grunde var derfor forudset allerede ved DBO'ens indgåelse, og af den grund kan begrebet retmæssig ejer ikke ud fra misbrugsbetragtninger eller ligesinde gives en bredere betydning, end det havde ved aftaleindgåelsen i 1980. Det, som Skatteministeriet i dag hævder er misbrug, var i 1980 en forudset konsekvens af DBO'en med Luxembourg.

*10 SKATTEN SKAL FRAFALDES EFTER MODER-/DATTER-SELSKABSDIREKTIVET*

10.1 *De objektive betingelser for fritagelse i direktivet er opfyldt*

Det *andet underanbringende* til Heavy Transport Danmarks principale anbringende om, at selskabet ikke har været forpligtet til at indeholde udbytteskat, går, som nævnt, ud på, at Heavy Transport Luxembourg har et ubetinget krav på, at udbytteskatten skal frafaldes efter moder-/datterselskabs-direktivet.

Med *moder-/datterselskabsdirektivet (90/435/EØF)* (MS 335) blev der indført en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater. Formålet med direktivet er at fritage udbytte og andre udlodninger af overskud, som datterselskaber betaler til deres moderselskaber, for kildeskat. Direktivet er ændret ved *Rådets direktiv 2003/123/EF* (MS 339).

Bestemmelsen om, at der ikke kan pålægges kildeskat på udbytte findes i *artikel 5, stk. 1,* (som ændret i 2003)…

Direktivet opstiller såvel et kapitalkrav som et ejertidskrav.

*Kapitalkravet* er fastlagt i artikel 3, stk. 1, (som ændret i 2003) og udgjorde i 2007 15 %.

Ifølge artikel 3, stk. 2, kan den enkelte medlemsstat indføre et *ejertidskrav* på højst 2 år. Ejertidskravet i SEL § 2, stk. 1, litra c, er på 1 år, og kravet er blot, at udlodningen skal ligge inden for denne periode.

Det gøres gældende, at Heavy Transport Luxembourg, der ubestridt opfylder såvel kapitalkravet som ejertidskravet i moder-/datterselskabsdirektivet, har et *ubetinget krav* på at blive fritaget for kildeskat på udbyttet fra Heavy Transport Danmark.

Dette er tiltrådt af *Landsskatteretten* i kendelsen af 29. august 2012.

10.2 *Ikke betingelse om »retmæssig ejer« i direktivet*

Det er en kendsgerning, at moder-/datterselskabsdirektivet - i modsætning til rente-/royaltydirektivet (2003/49/EF) - *ikke* indeholder en betingelse om, at moderselskabet skal være »*retmæssig ejer*« af det modtagne udbytte.

Det er ikke en fejl eller forglemmelse, men derimod et *fravalg*. I den forbindelse bemærkes, at kravet om »retmæssig ejer« har været

indeholdt i modeloverenskomsten siden 1977, *at* udvidelsen af OECD's kommentarer

**4436**

til dette begreb fremkom i begyndelsen af 2003, *at* rente-/royalty-direktivet blev vedtaget af Rådet den 3. juni 2003, og at dette direktiv indeholder et krav om »retmæssig ejer« (samtidig med at det tillægger medlemsstaterne en ret til at indføre internretlige anti-misbrugsbestemmelser), samt *at* moder-/datterselskabsdirektivet blev ændret af Rådet den 22. december 2003, *uden* at Rådet fandt anledning til at medtage en bestemmelse om »retmæssig ejer«. EU-lovgiver har således - ud over at der ved artikel 1, stk. 2, er tillagt medlemsstaterne en mulighed for at indføre internretlige anti-misbrugsbestemmelser - anset *kapitalkravet og ejertidskravet* på 2 år som tilstrækkelige betingelser for at opnå skattefrihed for udbytter.

Dette bekræftes også af *Kommissionen* i indlægget til EU-Domstolen i NetApp-sagen:

»19. Det bemærkes indledningsvis, at *direktivet ikke benytter begrebet »retmæssig ejer«* til afgrænsning af dets anvendelsesområde. Det er således ikke afgørende for anvendelsen af skattefritagelsen i direktivet, hvorvidt modtageren af udbytte er den retmæssige ejer heraf. Det afgørende for skattefritagelsen er, at udbyttemodtageren opfylder betingelserne i direktivets artikel 2-4.« (Vores fremhævning).

Tilsvarende hedder det i *generaladvokat Kokotts* udtalelse i Net-App-sagen:

»86. Efterfølgende ønskes det endvidere oplyst, om udbyttemodtageren som omhandlet i moder-/datterselskabsdirektivet skal fortolkes på samme måde som den retmæssige ejer som omhandlet i rente-/royaltydirektivet. Dette spørgsmål kan ligeledes besvares benægtende, eftersom *moder-/datterselskabsdirektivet* som anført ovenfor (punkt 34) [skal være punkt 43] anvender en anden tilgang end rente-/royaltydirektivet og dermed *bevidst undlader at anvende begrebet retmæssig ejer*.« (Vores fremhævning).

Dette er også lagt til grund af *Landsskatteretten* i kendelsen af 29. august 2012.

10.3 *Imødegåelse af misbrug kræver national hjemmel, jf. artikel 1, stk. 2 -Kofoed-dommen (C-321/05)*

EU-lovgiver har overladt det til de enkelte medlemsstater at fastsætte eventuelle bestemmelser om misbrug af moder-/datterselskabsdirektivet. Det hedder således i *artikel 1, stk. 2* (fra 1990), der var gældende i 2007:

»2. Dette direktiv er ikke til hinder for anvendelsen af *interne bestemmelser eller overenskomster*, som er nødvendige for at hindre svig og misbrug.« (Vores fremhævning).

Som det fremgår, er der tale om en *bemyndigelsesbestemmelse.* Hvert enkelt medlemsstat kan således indføre eller opretholde præcis de *nationale* regler til bekæmpelse af misbrug, som den pågældende medlemsstat finder passende. Nationale anti-misbrugsregler skal dog i sig selv være forenelige med EUretten, herunder de traktatsikrede frihedsrettigheder som fastlagt i EU-Domstolens praksis og ikke mindst *proportionalitetsprincippet.* EU-Domstolen påser altså, at anti-misbrugsreglerne ikke går for vidt.

Heavy Transport Danmark gør gældende, at det fremgår *direkte* af *ordlyden* af direktivets artikel 1, stk. 2, at en nægtelse af direktivets fordele kræver *hjemmel i national ret.* At der kræves hjemmel i national ret følger også af, at et direktiv er rettet mod medlemsstaterne (og ikke mod borgerne), og at borgerne skal kunne aflæse deres retsstilling i den nationale lovgivning.

EU-Domstolens dom af 5. juli 2007 i *Kofoed-sagen (C-321/05,* der drejede sig om den tilsvarende bestemmelse i fusionsskattedirektivets artikel 11, er i overensstemmelse hermed.

Sagen drejede sig om, hvorvidt en dansk statsborger havde et retskrav på at anvende fusionsskattedirektivets regler om skattefri

aktieombytning i et tilfælde, hvor der - som Domstolen udtalte i præmis 39 - var »visse indicier«, som kunne begrunde en anvendelse af misbrugsbestemmelsen i direktivets artikel 11, når Danmark ikke havde indført en specifik national bestemmelse til gennemførelse af denne artikel i dansk ret.

EU-domstolen fastslår udtrykkeligt, at det alene er *interne danske retsforskrifter* om retsmisbrug, skattesvig eller skatteunddragelse, der kan begrunde en fravigelse af direktivets skattefritagelsesbestemmelser. Det hedder således i domskonklusionen:

»Følgelig er artikel 8, stk. 1, i direktiv 90/434 principielt til hinder for, at en sådan ombytning af selskabsandele beskattes, medmindre *nationale retsforskrifter* om retsmisbrug, skattesvig eller skatteunddragelse kan fortolkes i overensstemmelse med nævnte direktivs artikel 11, stk. 1, litra a), og dermed begrunde at ombytningen beskattes.« (Vores fremhævning).

Disse nationale retsforskrifter behøver ikke at bestå i *lovgivning*, men kan også være *uskrevne retsgrundsætninger* (såsom i dansk ret realitetsgrundsætningen og princippet om »rette indkomstmodtager«), jf. præmis 44-46.

I præmis 38-42 afviser EU-Domstolen udtrykkeligt, at det »almindelige fællesskabsretlige princip om forbud mod retsmisbrug« som afspejlet i artikel 11, stk. 1, litra a) kan gøres gældende over for borgerne, hvis der ikke består en national hjemmel hertil. Begrundelsen er, at *retssikkerhedsprincippet [er] til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgerne. Direktiver kan derfor ikke som sådan påberåbes af medlemsstaten over for borgerne«,* jf. præmis 42.

EU-Domstolen fulgte *generaladvokat Kokotts* forslag til afgørelse af 8. februar 2007, hvor det i punkt 66 og 67 hedder:

»66. Kun en *direkte* anvendelse af artikel 11, stk. 1, litra a), i direktiv 90/434 til skade for Hans Markus

**4437**

Kofoed og Niels Toft ville være udelukket for de danske myndigheder. Således kan en medlemsstat ikke over for en borger påberåbe sig en direktivbestemmelse, som den ikke selv har gennemført. Ifølge fast retspraksis kan et direktiv ikke *i sig selv* skabe forpligtelser for borgerne, og en direktivbestemmelse kan derfor ikke *som sådan* påberåbes over for borgerne.

67. Lige så lidt kan de kompetente myndigheder i øvrigt over for borgerne *direkte* påberåbe sig et *eventuelt almindeligt fællesskabsretligt princip om, at retsmisbrug er forbudt.* For så vidt angår tilfælde, som er omfattet af anvendelsesområdet for direktiv 90/434 har et sådant princip fundet specifikt udtryk og er blevet konkretiseret i direktivets artikel 11, stk. 1. litra a). …« (Vores fremhævning).

*Kofoed-dommen* bekræftede altså det, der allerede fremgår af ordlyden af moder-/datterselskabs-direktivets artikel 1, stk. 2, nemlig at imødegåelse af misbrug kræver *national hjemmel.*

Det fremgår i øvrigt af Skatteministeriets kommentar til Kofoed-dommen i TfS 2008.45 DEP, at ministeriet efterfølgende tog bekræftende til genmæle i hovedsagen.

*Landsskatteretten* har i sin kendelse af 29. august 2012 lagt Kofoed-dommen til grund.

10.4 *Der foreligger ikke misbrug efter de danske anti-misbrugsregler gældende i 2007*

…

Parterne er enige om, at retsstillingen vedrørende anti-misbrugsregler i dansk ret i 2007 var som gengivet i punkt 55-59 i forelæggelseskendelsen i NetApp-sagen.

…

Som det fremgår af NetApp-foreleggelseskendelsens punkt 25 og punkt 59, anerkender Skatteministeriet, at udbyttemodtageren, NetApp Cypern, er *»rette indkomstmodtager«* af de omhandle

Copyright © 2023 Karnov Group Denmark A/S

udbytter, hvilket tilsvarende gælder i nærværende sag, for så vidt angår Heavy Transport Luxembourg.

Tilsvarende anerkender Skatteministeriet i forelæggelseskendelsens punkt 57, at *realitetsgrundsætningen* ikke giver grundlag for at tilsidesætte de i sagen foretagne dispositioner. SKAT forsøgte oprindeligt at nægte fritagelse for beskatning i »beneficial owner-sagerne« ud fra realitetsbetragtninger, men måtte erkende, at der ikke var grundlag herfor, jf. bl.a. dommene i *TfS 2003.889 H (Over-Hold ApS)* og *TfS 2006.1062 H (Finwill ApS - »Elevatorsagen«)*.

Der er altså mellem parterne enighed om, at hverken *princippet om »rette indkomstmodtager«* eller *realitetsgrundsætningen* kan anføres til støtte for Skatteministeriets påstand.

Der foreligger således ikke misbrug efter de danske anti-misbrugs-regler gældende i 2007.

Dette er tiltrådt af *Landsskatteretten* ved den indbragte kendelse.

10.4.1 *Skatteministeriets tre anbringender om, at der i 2007 konkret var hjemmel i dansk ret til at nægte direktivets fordele på grund af misbrug, er ikke bæredygtige*

Skatteministeriet har gjort tre anbringender gældende til støtte for, at der skulle være hjemmel i dansk ret til konkret at nægte direktivets fordele på grund af misbrug.

…

10.4.1.1 *SEL § 2, stk. 1, litra c, er ikke en sådan specifik national bestemmelse som omhandlet i direktivets artikel 1, stk. 2 (spørgsmål 1.1 til EUD i NetApp-sagen)*

Skatteministeriet gør gældende, at *SEL § 2, stk. 1, litra c, i sig selv* indeholder den fornødne interne hjemmel til at nægte direktivets fordele i tilfælde af misbrug. Synspunktet støttes på følgende sætning i bestemmelsen:

»Det er en betingelse [for skattefritagelse], at beskatningen af udbyttet *skal* frafaldes … efter bestemmelserne i direktiv 90/435/EØF … (Vores fremhævning).

Synspunktet går nærmere ud på, at Danmark ikke »skal« frafalde kildeskat, medmindre der efter direktivet består en pligt hertil, og det gør der - efter synspunktet - ikke, hvis der foreligger et misbrug. Den blotte henvisning til direktivet skulle således - efter synspunktet - indebære en udnyttelse af bemyndigelsen i artikel 1, stk. 2, og dermed, at der (automatisk) er indført en national anti-misbrugsregel i dansk ret.

Det turde være åbenbart, at Skatteministeriets kunstige forsøg på at »skabe« en lovbestemt anti-misbrugsregel ikke er holdbar. Af mange grunde.

End ikke logikken er på plads, fordi det postulerede resultat indgår som en forudsætning for ræsonnementet. Når Skatteministeriet således hævder, at der ikke er pligt til at frafalde kildeskat, hvis der foreligger misbrug, er dette kun en korrekt forudsætning, hvis Danmark i overensstemmelse med artikel 1, stk. 2, (allerede) har valgt at implementere en anti-misbrugsbestemmelse, men det er jo ikke tilfældet. Den første præmis i argumentationen forudsætter således resultatet, og argumentationen er dermed cirkulær.

Den generelle henvisning til direktivet indebærer altså en implementering af direktivet, som det ser ud, herunder med bemyndigelsesbestemmelsen i artikel 1, stk. 2, men den indebærer *ikke* en stillingtagen til, om bemyndigelsen skal udnyttes, og dermed heller *ikke* en implementering af en anti-misbrugsregel i dansk ret. Den blotte henvisning til direktivet antyder intet som helst om, at Danmark ved indførelsen af lovreglen i 2001 skulle have haft til hensigt at indføre en (fakultativ) national anti-misbrugsregel, endsige, hvad en sådan regel - i givet fald - skulle gå ud på.

Tværtimod er det en kendsgerning, at Skatteministeriet og den danske lovgiver ved indførelsen af SEL § 2, stk. 1, litra c, i 2001 konkret *ikke* fandt behov for og

derfor heller *ikke* ønskede at indføre en antimisbrugsregel, …. Den forståelse af SEL § 2, stk. 1, litra c, som Skatteministeriet nu gør gældende, og som er opfundet til denne sag, er således *i direkte strid med forarbejderne til denne bestemmelse fra 2001*.

Som det fremgår … var lovgiver også helt opmærksom på, at hvis der ønskedes yderligere misbrugsregler end det almindeligt gældende (realitetsgrundsætning og princippet om »rette indkomstmodtager«), skulle dette i henhold til direktivets artikel 1, stk. 2, ske ved supplerende lovgivning, således som det også skete i forbindelse med direktivets oprindelige implementering ved lov nr. 219 af 3. april 1992.

*Østre Landsrets spørgsmål 1.1* til EU-Domstolen i NetApp-sagen drejer sig om dette anbringende fra ministeriet.

I *Kommissionens* indlæg hedder det om ministeriets anbringende i punkt 9: »*Denne tankegang kan efter kommissionens opfattelse ikke accepteres*«, hvilket begrundes i de efterfølgende punkter. Og i Kommissionens forslag til besvarelse af spørgsmål 1.1 hedder det, at SEL § 2, stk. 1, litra c, *»ikke [kan] anses for at være en specifik national bestemmelse som omhandlet i direktivets artikel 1, stk. 2«*.

Tilsvarende hedder det i *generaladvokatens* forslag, punkt 106: »Af denne grund skal spørgsmål 1.1 og 2 besvares med, at hverken *§ 2, stk. 2 [rettelig stk. 1], litra c, i den danske selskabsskattelov* eller en bestemmelse i en dobbeltbeskatningsoverenskomst, der for så vidt angår beskatningen af udloddet udbytte tager udgangspunkt i den *retmæssige ejer*, er tilstrækkelige til at kunne betragtes som gennemførelse af moder-/datterselskabsdirektivet artikel 1, stk. 2.« (Vores fremhævninger).

*EU-Domstolen* har ikke besvaret spørgsmål 1.1, da Domstolen i stedet valgte at introducere det »generelle EU-retlige princip om forbud mod misbrug«, som omtales nedenfor i afsnit 10.6.

Som det fremgår, har Skatteministeriets anbringende intet som helst for sig.

*Landsskatteretten* har da også i den indbragte kendelse afvist dette anbringende.

10.4.1.2 *Betingelsen om »retmæssig ejer« i en DBO er ikke en sådan overenskomstmæssig anti-misbrugsbestemmelse, som er omfattet af direktivets artikel 1, stk. 2 (spørgsmål 2.1 til EUD i NetApp-sagen)*

Skatteministeriet gør endvidere gældende, at betingelsen om *»retmæssig ejer«* i dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg (fra 1980) er en sådan overenskomstmæssig anti-misbrugsbestemmelse, som er omfattet af direktivets artikel 1, stk. 2. Efter dette synspunkt er det altså uden betydning, at direktivet ikke selv opstiller et krav om »retmæssig ejer«.

Heller ikke dette kunstige forsøg på at »skabe« en intern antimisbrugsregel er holdbart. Som nævnt ovenfor i afsnit 10.2, var det udtryk for et *fravalg*, når EU-lovgiver ikke medtog en betingelse om »retmæssig ejer« i direktivet, hvilket er bekræftet af Kommissionen og generaladvokaten. Denne betingelse kan derfor heller ikke (automatisk) komme ind »ad bagvejen«.

Heavy Transport Danmark gør i øvrigt gældende, at modeloverenskomstens betingelse om »retmæssig ejer« *ikke* kan anses for en bestemmelse, »som er nødvendig for at hindre svig og misbrug« i artikel 1, stk. 2's forstand. Betingelsen er således *ikke* en antimisbrugsforanstaltning, men derimod en regel om, at kun den person, der er skattepligtssubjektet for udbyttet (den »retmæssige ejer«), kan påberåbe sig lempelse efter overenskomsten. Dette fremgår udtrykkeligt af punkt 12 i 1977-kommentarerne til OECD's modeloverenskomst, der var gældende på tidspunktet for indgåelsen af den dansk-luxembourgske dobbeltbeskatningsoverenskomst i 1980. Dette hensyn varetages i direktivet i stedet af kapital- og ejertidskravet.

**4438**

Copyright © 2023 Karnov Group Denmark A/S

Det er almindeligt anerkendt i den internationale skattelitteratur, at modeloverenskomstens betingelse om »retmæssig ejer« ikke er en anti-misbrugsbestemmelse. Som eksempel kan nævnes, at *professor Adolfo Martin Jiménez*, World Tax Journal, 2010, er af den opfattelse, at »retmæssig ejer« er en »attribution-of-income rule« (indkomst-allokeringsregel) - ligesom princippet om »rette indkomstmodtager« i dansk ret - og ikke en »anti-avoidance rule« (anti-misbrugsregel). Der skal derfor ikke foretages en »economic interpretation«, men derimod en »legal interpretation«, og parternes hensigt er derfor uden betydning:

»Therefore, unlike in the case of anti-avoidance rules, the subjective intentions of the parties are irrelevant in the beneficial-ownership analysis, which is, in our opinion, only concerned with *attributing income to a given person.*« (Vores fremhævning).

Også *Philip Baker*, QC, Double Taxation Conventions, 2010 (MS 2241), der generelt om begrebet »retmæssig ejer« udtaler, at »*unfortunately, the meaning of the phrase still remains less than fully clear*«, er på linje hermed, idet han foreslår, at afgørelsen af, hvem der er den »retmæssige ejer«, beror på, hvem der har krav på beløbet i tilfælde af modtagerens konkurs.

Det gøres endvidere gældende, at udtrykket »*overenskomster*« i artikel 1, stk. 2, skal fortolkes således, at det har som forudsætning, at medlemsstaten efter sin interne ret kan påberåbe sig dobbeltbeskatningsoverenskomsten til skade for skatteyderen, hvilket ikke er muligt efter dansk ret.

Skatteministeriets synspunkt fører bl.a. til det selvmodsigende resultat, at en udbyttemodtager vil have en ringere beskyttelse efter direktivet i det tilfælde, hvor

**4439**

der findes en dobbeltbeskatningsoverenskomst (hvis mål er at lempe skatter) mellem de involverede lande, end i det tilfælde, hvor der ikke findes en sådan. F.eks. har Danmark siden 2009 ikke haft en dobbeltbeskatningsoverenskomst med Spanien. Hvis synspunktet var rigtigt, ville Heavy Transport Luxembourg (og dermed Heavy Transport Danmark som indeholdelsespligtig) for perioden efter 2009 således have været bedre stillet, såfremt Heavy Transport Luxembourg i stedet havde været hjemmehørende i Spanien.

Hertil kommer, at der ikke er noget grundlag for at antage, at Skatteministeriet og den danske lovgiver ved indførelsen af SEL § 2, stk. 1, litra c, i 2001 havde noget som helst ønske om, at betingelsen i OECD's modeloverenskomst om »retmæssig ejer« skulle udstrækkes til gælde for moder-/datterselskabsdirektivet som en selvstændig anti-misbrugsregel. Tværtimod ligger det klart, at lovgiver lagde til grund, at der over det danske selskab kunne indskydes et mellemholdingselskab, som var »retmæssig ejer« af udbyttet …

Også Skatteministeriets anbringende om, at betingelsen om »retmæssig ejer« er en overenskomstmæssig anti-misbrugsbestemmelse i artikel 1, stk. 2's forstand, med den virkning at Heavy Transport Luxembourg kan nægtes fritagelse i henhold til direktivet, er således *i direkte strid med forarbejderne til SEL § 2, stk. 1, litra c.*

*Østre Landsrets spørgsmål 2* til EU-Domstolen i NetApp-sagen (MS 1772) drejer sig om dette anbringende fra ministeriet.

*Kommissionen* afviser i sit indlæg, punkt 18-25, i det hele ministeriets anbringende og konkluderer i punkt 25:

»Efter Kommissionens opfattelse kan en bestemmelse i en dobbeltbeskatningsoverenskomst indgået mellem to medlemsstater og udformet i overensstemmelse med OECD's modeloverenskomst, i henhold til hvilken beskatningen af udbytte afhænger af, om udbyttemodtageren anses for den retmæssige ejer af udbyttet eller ej, således ikke udgøre en »overenskomstmæssig anti-misbrugsbestemmelse« som omhandlet i direktivet artikel 1, stk. 2.« (Vores fremhævninger).

Som det fremgår af *generaladvokatens* forslag, punkt 106, som er citeret ovenfor i afsnit 10.4.1.1, kom generaladvokaten til det samme resultat.

*EU-Domstolen* har heller ikke besvaret spørgsmål 2, da Domstolen i stedet valgte at introducere det »generelle EU-retlige princip om forbud mod misbrug«.

Heller ikke dette anbringende er således bæredygtigt.

*Landsskatteretten* har da også i den indbragte kendelse afvist dette anbringende.

10.4.1.3 *Der findes ikke i dansk ret almindelige principper til imødegåelse af misbrug uden for realitetsgrundsætningen (og princippet om »rette indkomstmodtager«)*

Skatteministeriet har i sagskomplekset efter forelæggelsen for EU-Domstolen fremsat et nyt anbringende om, at der i dansk retspraksis skulle være udviklet *almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen* (og - må det forstås - princippet om »rette indkomstmodtager«).

Der nævnes som eksempler herpå 3 højesteretsdomme (U.1998.245H, U.2005.649H og U.2015.2277H, hvor dispositioner, der »formelt« var blevet indrettet sådan, at en bestemt, gunstig skatteregel fandt anvendelse, er blevet tilsidesat i skattemæssig henseende med den begrundelse, at dispositionerne ikke havde noget *forretningsmæssigt formål* eller lignende. Der er også et eksempel på en højesteretsdom (U.1999.1714.H, der har tilsidesat et skattearrangement uden at bruge en tilsvarende vending.

Efter at parternes advokater i forbindelse med udarbejdelsen af Østre Landsrets forelæggelseskendelse af 19. februar 2016 i Net-App-sagen i fællesskab har rådgivet landsretten om, at retsstillingen i Danmark i 2005 og 2006 var således, at der ikke fandtes en generel lovbestemt regel om bekæmpelse af misbrug, men at der derimod var to domstolsskabte instrumenter, der kunne danne grundlag for at gribe ind over for misbrug, nemlig *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*, mener Skatteministeriet altså nu, at der ved siden heraf gælder *andre almindelige principper til imødegåelse af misbrug.*

Indledningsvis bemærkes, at alle 4 domme forelå, da parternes advokater rådgav Østre Landsret. Desuagtet fandt Skatteministeriet ikke anledning til at orientere landsretten om, at gengivelsen af retsstillingen i forelæggelseskendelsen var forkert, hvad ministeriet givetvis heller ikke mente, at den var.

Der henvises i så henseende til forarbejderne til lov nr. 540 af 29. april 2015 vedrørende indførelsen af en anti-misbrugsklausul vedrørende moder-/datterselskabsdirektivet i ligningslovens (LL) § 3. I lovforslaget (L 167 2014/15) har Skatteministeriet angivet gældende ret forud for vedtagelsen af den nye misbrugsklausul, og dermed også i 2005 og 2006. Det hedder her:

»Der findes ikke en generel lovbestemt regel om bekæmpelse af misbrug i dansk skattelovgivning. Efter dansk (rets)praksis sker beskatningen efter der er foretaget en bedømmelse af, hvad der faktisk er sket. Det betyder, at tomme og kunstige skattebetingede dispositioner kan tilsidesættes, således at beskatningen i stedet foretages i forhold til den modstående *realitet.* Dansk skatteret er altså grundlæggende helt på linje med international gældende principper om »*substance over form*«.« (Vores fremhævninger).

Som det fremgår, svarer ministeriets gengivelse af gældende ret i lovforslaget til gengivelsen i forelæggelseskendelsen, hvorved erindres om, at princippet om

**4440**

»rette indkomstmodtager« udspringer af realitetsgrundsætningen. Der er altså ikke nævnt *andre almindelige principper til imødegåelse af misbrug*, som Skatteministeriet nu hævder på basis af en række ældre domme.

Det er derfor ubetænkeligt at antage, at Skatteministeriets nye anbringende er et til lejligheden opfundet synspunkt. Realiteten er, at ministeriet har fortrudt sin anerkendelse i forelæggelseskendelsens punkt 57 - og nu i stedet forsøger at kvalificere den eksisterende retspraksis på en anden måde.

Det nye synspunkt har da heller ikke støtte - hverken i retspraksis eller litteratur.

De 3 førstnævnte domme er fuldgode eksempler på, at realitetsgrundsætningen er blevet anvendt til at tilsidesætte de pågældende arrangementer, mens den sidstnævnte dom, U.1999.1714.H om Hadsten Bank, er et eksempel på en fortolkning af aktieavancebeskatningslovens § 3 (om næringsaktier).

…

I alle de tre sager har skatteyderne forsøgt at »opstille kulisser«, så arrangementerne fremstår som »gangbare skattemæssige dispositioner«, men er blevet gennemskuet at domstolene.

Skatteministeriets eneste begrundelse for, at disse sager ikke skulle være omfattet af realitetsgrundsætningen, er, at det er indgået i domstolens præmisser for at tilsidesætte arrangementerne, at dispositionerne ikke havde noget »forretningsmæssigt formål« eller lignende.

Dette er imidlertid snarere et kendetegn på, at dommene er udtryk for en anvendelse af realitetsgrundsætningen. Det er således hovedreglen, at Skatteministeriet i sager om realitetsgrundsætningen gør gældende, at dispositionerne savner »forretningsmæssigt formål«.

…

Skatteministeriet mangler også at forklare, hvordan ministeriet kan mene, at Heavy Transport Luxembourg er »rette indkomstmodtager«, jf. princippet i NetApp-forelæggelseskendelsens punkt 59, og at dispositionerne ikke kan tilsidesættes efter realitetsgrundsætningen, jf. samme forelæggelseskendelses punkt 57, hvilket altså betyder, at der ikke er tale om »tomme og kunstige, skattebetingede dispositioner«, og at substansen svarer til formen, jf. forelæggelseskendelsens punkt 56, samtidig med at ministeriet hævder, at dispositionerne skal tilsidesættes, fordi de savner »forretningsmæssigt formål«.

Det giver ganske enkelt ikke nogen mening.

Skatteministeriet mangler også helt grundlæggende at forklare, hvordan der overhovedet skulle kunne foreligge et misbrug, når lovgiver i forarbejderne til SEL § 2, stk. 1, litra c, har givet klart udtryk for, at indskydelsen af et cypriotisk mellemholdingselskab mellem et dansk selskab og dets moderselskab i et ikke-DBO land og en efterfølgende udbytteudlodning via mellemholdingselskabet til selskabet i ikke-DBO landet ikke udgør et misbrug.

Som det fremgår, findes der ikke i dansk ret almindelige principper til imødegåelse af misbrug, der rækker ud over realitetsgrundsætningen (og »rette indkomstmodtager«), og som kan føre til, at Heavy Transport Luxembourg nægtes fritagelse for beskatning i henhold til moder-/datterselskabsdirektivet.

**10.4.1.4** *Sammenfattende om Skatteministeriets tre hævdede hjemler i dansk ret til imødegåelse af misbrug af moder-/datterselskabsdirektivet: hjemlerne findes ikke*

Som det fremgår af afsnit 10.4.1.1 - 10.4.1.3 ovenfor, findes ingen af de af Skatteministeriet hævdede tre konkrete hjemler i dansk ret til imødegåelse af misbrug af moder-/datterselskabsdirektivet.

Konklusionen er derfor - som det også fremgår af Østre Landsrets forelæggelseskendelse - at misbrug alene kan imødegås med realitetsgrundsætningen og princippet om »rette indkomstmodtager«, og her er parterne enige om, at disse anti-misbrugsregler ikke kan finde anvendelse i denne sag.

Der foreligger således ikke misbrug af direktivet efter dansk ret. Landsskatterettens kendelse er i overensstemmelse hermed.

**10.5** *Ændringen af moder-/datterselskabsdirektivet i 2015 (og forarbejderne hertil) bekræfter, at imødegåelse af misbrug af direktivet fortsat kræver national lovhjemmel*

Kommissionen offentliggjorde den 6. december 2012 »En handlingsplan til styrkelse af bekæmpelsen af skattesvig og skatteunddragelse«, KOM(2012) 722.

Forud herfor havde Kommissionen (og EU-Domstolen) i relation til misbrug af EU's retsakter mest fokuseret på, at medlemsstaternes interne anti-misbrugsregler *ikke måtte gå for vidt* i relation til at udelukke de fordele, der fulgte af EU's retsakter, …

Med handlingsplanen af 6. december 2012 »fik piben imidlertid en anden lyd«. EU meldte sig for alvor ind i kampen mod skattesvig og skatteunddragelse. Det skete samtidig med, at G20-landene og OECD påbegyndte det såkaldte *BEPS-projekt (Base Erosion and Profit Shifting)*. Der skete således på dette tidspunkt en *markant international oprustning* i kampen mod skattesvig og skatteunddragelse.

Handlingsplanen indeholder en række forslag, henstillinger og initiativer. …

I overensstemmelse med handlingsplanen fremsatte Kommissionen den 23. november 2013 et *forslag til ændring af moder-/datterselskabsdirektivet*, KOM(2013) 814, der b.la. indeholdt et forslag om en *generel anti-misbrugsregel*, som det var *obligatorisk* for medlemsstaterne at indføre i deres nationale ret.

…

Samtidig med fremsættelsen af ændringsforslaget til direktivet udsendte Kommissionen et *Memo* benævnt

**4441**

»Questions and Answers on the Parent Subsidiary Directive«.

…

Det fremgår med al ønskelig tydelighed af eksemplet, at der efter moder-/datterselskabsdirektivet, således som det før tidføjelsen af den obligatoriske anti-misbrugsregel i 2015 (»Current situation«), *ikke* var muligt for at nægte fritagelse for kildeskat på udlodningen fra MS A til MS B - heller ikke selv om MS B måtte være et »Artificial Intermediate subsidiary«.

Med Rådets vedtagelse den 27. januar 2015 af *direktiv 2015/121/EU* blev artikel 1, stk. 2, i moder-/datterselskabsdirektivet ændret, således at medlemsstaterne blev *forpligtet* til at implementere den generelle anti-misbrugsklausul.

…

Ved lov nr. 540 af 29. april 2015 er den nye generelle anti-misbrugsregel blevet implementeret i dansk ret som *ligningslovens (LL) § 3*. Den danske lovgiver har benyttet lejligheden til ikke blot at lade bestemmelsen gælde for moder-/datterselskabsdirektivet, men også for rente-/royaltydirektivet og fusionsskattedirektivet. Der er også i LL § 3, stk. 2, indsat en generel anti-misbrugsregel vedrørende dobbeltbeskatningsoverenskomster.

Loven trådte i kraft med virkning for transaktioner fra og med den 1. maj 2015.

Som det fremgår, har Kommissionen, Rådet og Europa-Parlamentet stedse forudsat, at *imødegåelse af misbrug af moder-/datterselskabsdirektivet kræver national hjemmel* i den medlemsstat, som påberåber sig misbruget. Dette fremgår direkte af *ordlyden* af den indtil 2015 gældende bestemmelse i direktivets artikel 1, stk. 2, der indeholder en *bemyndigelse* til medlemsstaterne til at indføre anti-misbrugsregler, ligesom det er bekræftet af EU-Domstolen i *Kofoedsagen (C-321/05)*. For perioden efter den 1. maj 2015 fremgår det af artikel 1, stk. 2 - 4, samt af LL § 3.

For Danmark betyder der, at skattemyndighederne indtil 2015 havde to instrumenter til rådighed til imødegåelse af misbrug: *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*.

Copyright © 2023 Karnov Group Denmark A/S