# Exhibit 12, Part 2 of 2

Fra den 1. maj 2015 kan Danmark *tillige* anvende den obligatoriske misbrugsregel i LL § 3.

Set fra EU's side betyder det, at EU-lovgiver har sikret sig, at samtlige medlemsstater fra 2015 har fået implementeret den efter EU-lovgivers opfattelse ideelle anti-misbrugsregel vedrørende moder-/datterselskabsdirektivet.

Blot for fuldstændighedens skyld bemærkes, at Rådet den 12. juli 2016 vedtog *direktiv (EU) 2016/1164 (det såkaldte skatteundgåelsesdirektiv)*, der bl.a. indeholder en *generel anti-misbrugsregel* (artikel 6), svarende til den nye anti-misbrugsregel i moder-/datterselskabsdirektivet, men som gælder på alle områder. Reglen er implementeret i Danmark ved en ændring af LL § 3.

De endelige rapporter om de 15 OECD-tiltag til bekæmpelse af BEPS blev offentliggjort den 5. oktober 2015, og der er efterfølgende gennemført et stort antal initiativer både i OECD- og EU-regi.

Den af G20/OECD og EU drevne proces rettet mod internationalt misbrug af skatteregler i det seneste årti har ikke blot ført til vedtagelsen af et stort antal nye anti-misbrugsregler, men har også ændret den politiske holdning til, hvornår der i det hele taget foreligger et misbrug.

Det er derfor vigtigt at gøre sig klart, at spørgsmålet om, hvorvidt der på et givent tidspunkt har foreligget misbrug, skal vurderes i forhold til forståelsen af de anti-misbrugsregler, der var gældende på det pågældende tidspunkt.

10.6 *Det af EU-Domstolen foreslåede generelle EU-retlige princip om forbud mod misbrug har ikke - som hævdet af EU-Domstolen - direkte virkning for borgerne*

10.6.1 *Baggrund*

Østre Landsret stillede i NetApp-sagen 15 spørgsmål til EU-Domstolen.

*Generaladvokat Kokott*, der også var generaladvokat i Kofoed-sagen (C-321/05), foreslog - støttet af Kommissionen - at alle spørgsmålene skulle besvares i NetApps favør, men *EU-Domstolen* kom til det modsatte resultat.

Spørgsmål 1 drejede sig om, hvorvidt imødegåelse af misbrug af moder-/datterselskabsdirektivet kræver *national hjemmel* i medfør af direktivets artikel 1, stk. 2, som drøftet i de foregående afsnit.

Generaladvokat Kokott foreslog i sin udtalelse af 1. marts 2018 - i overensstemmelse med EU-Domstolens besvarelse af det tilsvarende spørgsmål i Kofoed-dommen - at spørgsmålet skulle besvares med, at der *kræves national hjemmel*:

»Spørgsmål 1 skal besvares således, at en *medlemsstat ikke kan påberåbe sig artikel 1, stk. 2*, i direktiv 2011/96/EU om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, *hvis den pågældende stat ikke har gennemført denne bestemmelse*.«

EU-Domstolen kom i sin dom af 26. februar 2019 - højst overraskende - til det stik modsatte resultat, nemlig at der *ikke kræves national hjemmel*, jf. domskonklusionens punkt 2:

…

Som det kan ses, støtter Domstolen sit resultat på, at der skulle gælde et *»generelt EU-retligt princip om forbud mod misbrug«*, der kan *anvendes direkte over for borgerne*.

Generaladvokaten havde i sin udtalelse, punkt 99 og 100, afvist, at det generelle EUretlige princip om forbud mod misbrug kunne påberåbes direkte over for borgerne, men heri var EUDomstolen altså *ikke enig*.

Generaladvokaten havde gjort nøjagtigt det samme synspunkt om afvisning af det generelle EU-retlige

**4442**

princip om forbud mod misbrug gældende i sin udtalelse i Kofoed-sagen, punkt 66 og 67, men på daværende tidspunkt *fulgte* EU-Domstolen altså generaladvokaten.

Det er således en kendsgerning, at EU-Domstolen i sin afgørelse af 26. februar 2019 i NetApp-sagen har *underkendt Kofoed-dommen* og dermed *ændret praksis med tilbagevirkende kraft* - i hvert fald til 2005.

Heavy Transport Danmark gør gældende, at det nævnte princip ikke er umiddelbart anvendeligt over for borgerne, eftersom EU-Domstolen ikke har kompetence til at træffe denne afgørelse, da Danmark ikke har afgivet suverænitet hertil.

10.6.2 *Nærmere om EU-Domstolens dom af 26. februar 2019*

EU-Domstolens konklusion er resultatet af en længere argumentationsrække i præmisserne.

…

Dette »generelle EU-retlige princip« er altså frit i luften svævende, har en højere retskildeværdi end selv traktaterne og kræver ikke forankring i national ret. En konkret anvendelse af princippet beror således ikke på en fortolkning af den relevante retsakt, men alene på princippets eksistens og højere rang, der så at sige går forud for indholdet af retsakten. Princippet er skabt af EU-Domstolen og kan kun fortolkes af EU-Domstolen, jf. domskonklusionen ovenfor.

I præmis 76 nævner Domstolen, at det generelle forbud mod misbrug er blevet anvendt med direkte virkning over for borgerne inden for *momsretten*, og Domstolen henviser til de velkendte præjudikater *Italmoda (C-131/13 m.fl.)* og *Cussens m.fl. (C-251/16)*.

Ifølge EU-Domstolen gælder princippet imidlertid også for de (få) direktiver, der findes på området for de *direkte skatter* (der ikke er harmoniseret), og dette gælder, selv om disse direktiver udtrykkeligt forudsætter, at misbrug kun kan imødegås, hvis der er hjemmel hertil i national ret. Det hedder således i præmis 77:

De efterfølgende præmisser 84-92 indeholder Domstolens forsøg på at bortforklare, at *Kofoed-sagen (C321/05)*, hvor Domstolen kom til det modsatte resultat, nemlig at der kræves national hjemmel, skulle have betydning for udfaldet af nærværende sag.

Lad det være sagt med det samme. Det lykkes ikke, og Domstolen ender da også med at »kaste håndklædet i ringen«. Det *kan* nemlig *ikke* bortforklares.

Domstolen starter i præmis 86 med loyalt at referere, at *retssikkerhedsprincippet* var meget afgørende for udfaldet af Kofoed-sagen:

…

Domstolen forsøger at komme uden om denne tidligere begrundelse ved at foretage en semantisk omskrivning af problemstillingen. Det hedder således i præmis 91, …

Hokus pokus. På denne måde er en *forpligtelse* for borgeren blevet til en *manglende opfyldelse af en betingelse*. Men problemet er og bliver jo nøjagtigt det samme for borgeren. Borgeren kender ikke betingelserne (dvs. indholdet af anti-misbrugsreglerne). De fremgår stadig ikke af national ret, men svæver (nu) i et generelt EU-retligt princip, der end ikke kan aflæses i direktivet. De *retssikkerhedsmæssige betænkeligheder* er altså de samme - eller faktisk endnu større ved et generelt EU-retligt princip.

Denne begrundelse for at forlade den tidligere praksis forekommer ikke overbevisende, og i mangel af bedre argumenter har Domstolen da også valgt at helgardere sit synspunkt i præmis 89:

…

Der kan således ikke peges på nogen anden troværdig begrundelse for, at EU-Domstolen har ændret praksis, end at Domstolen - under indtryk af den moralske oprustning for OECD's og EU's side siden 2012 - har *fortrudt Kofoed-dommen*. Til gengæld har EU-Domstolen samtidig *tilsidesat ethvert hensyn til retssikkerheden* for EU's borgere.

Se således f.eks. *Niels Winther-Sørensen* i SR.2019.174:

»EU-Domstolen må således nu anses at have forladt den udtalelse, der så klart blev formuleret i Kofoed-dommen.

…

Man må således bl.a. forstå EU-Domstolens argumentation således, at Domstolen, hvis et sagsforhold som i Kofoed-sagen i dag skulle afgøres, ville udtale, at man skulle nægte Kofoed retten til at påberåbe sig fusionsskattedirektivet, selv om der ikke var gennemført nationale regler om svig og misbrug.«

#### 10.6.3 Reaktioner på dommen - overraskelse og kritik

EU-Domstolens dom af 26. februar 2019 er selvsagt kommet som en *kæmpe overraskelse* for alle. Ingen vidste, at der eksisterede et *generelt EU-retligt princip om forbud mod misbrug, som over var direkte anvendeligt over for borgeren, på området for de direkte skatter* (hvad der heller ikke gjorde før afsigelsen af dommen).

*Kommissionen* var således uvidende om dette princip. Hvis princippet havde været gældende, havde det jo ikke været nødvendigt for Kommissionen at foreslå indsættelsen af en obligatorisk generel anti-misbrugsklausul i moder-/datterselskabsdirektivet i 2015. Også eksemplet i Kommissionens memo af 25. november 2013 forudsatte, at der ikke gjaldt et sådant princip. Tilsvarende havde det heller ikke været nødvendigt at indsætte en generel anti-misbrugsklausul i skatteundgåelsesdirektivet i 2016.

Af samme grund foreslog Kommissionen også i sit indlæg, at Domstolen skulle besvare spørgsmål 1 i overensstemmelse med *Kofoed-dommen*.

EU's lovgiver - *Rådet og Parlamentet* - der vedtog disse direktiver, var tilsvarende uvidende om det generelle uskrevne princip.

**4443**

*Generaladvokat Kokott*, som også var generaladvokat i Kofoed-sagen, kendte heller ikke til eksistensen af dette princip med det ovennævnte indhold. Hun foreslog derfor Domstolen at følge Kofoed-sagen og frarådede Domstolen at udvide princippet til området for de direkte skatter (MS 1831).

Heller ikke *Landsskatteretten* kendte til noget princip og forlod sig derfor i sin afgørelse af 29. august 2012 på *Kofoed-dommen*.

Både den danske og den internationale litteratur har været overrasket og kritisk over for dommen.

Se således f.eks.

…

Det er vanskeligt at forstå, hvad der har motiveret Domstolen til at foretage praksisændringen.

På tidspunktet for afsigelsen af dommen i 2019 havde *EU-lovgiver* for længst indført de af EU ønskede generelle anti-misbrugsregler, såvel i moder-/datterselskabsdirektivet (2015) som i skatteundgåelsesdirektivet (2016).

Domstolen føjede således ikke noget til retsstillingen, som ikke allerede gjaldt i henhold til disse regler - bortset fra den *tilbagevirkende kraft*. Det er vel derfor også et realistisk bud, at Domstolen foretog praksisændringen, fordi det af forelæggelseskendelsens punkt 57 og 59 fremgik, at parterne var enige om, at de i 2005 og 2006 til rådighed værende nationale misbrugsregler - realitetsgrundsætningen og princippet om »rette indkomstmodtager« - førte til, at der *ikke* forelå noget misbrug efter dansk ret. Kun ved at give dommen tilbagevirkende kraft kunne Domstolen således komme Skatteministeriet til undsætning.

Der findes næppe noget nationalt retssystem i den civiliserede verden, der vil acceptere, at en praksisændring kan have 14 års tilbagevirkende kraft.

EU-Domstolen roser da normalt også sig selv af *retssikkerhedsprincippet*. Det har blot ikke fundet anvendelse i disse sager. Tværtimod.

Der er tale om *retsskabende (politisk) virksomhed* fra EU-Domstolens side. Domstolen har selv fundet på »det generelle EU-retlige princip om forbud mod misbrug«, bestemmer selv rækkevidden heraf, er den eneste domstol, der kan fortolke princippet og - viser

---

det sig nu - kan give princippet tilbagevirkende kraft efter forgodtbefindende. Den demokratiske proces er kortsluttet. Såvel EU-lovgiver som den danske lovgiver er koblet af processen, og de danske domstole er forpligtede til at eksekvere EU-Domstolens dom, hvis indhold ligger milevidt fra *legalitetsprincippet* og *Grundlovens § 43*. Hvis det da ellers står til EU-Domstolen.

Læg hertil, at Domstolen overhovedet ikke har interesseret sig for den danske lovgivning om begrænset skattepligt (SEL § 2, stk. 1, litra c) og forarbejderne til denne bestemmelse. Det er nemlig - efter EU-Domstolens opfattelse - fuldstændigt ligegyldigt, hvordan retsstillingen var i Danmark i 2007. De danske domstole skal blot rette ind efter, hvordan EU-Domstolen i dag (efter praksisændringen i 2019) mener, at retsstillingen burde have været i Danmark i 2007.

Bortset fra de danske skattemyndigheders opstart af »beneficial owner«-sagerne i 2008 baseret på en praksisændring, der fandt sted i 2008 - og offentliggjort et par år senere med de første landsskatteretskendelser - og som er i strid med forarbejderne til SEL § 2, stk. 1, litra c, er EU-Domstolens afgørelse i disse sager det *største overgreb* over for de berørte virksomheder, der har fundet sted i hele dette sagskompleks.

Hverken den danske stat eller virksomhederne har haft nogen mulighed for at indrette sig efter det, der af EU-Domstolen i dag hævdes at skulle være gældende EU-ret helt tilbage i 2007.

#### 10.6.4 De danske domstole er ikke forpligtede til at følge EU-Domstolens pålæg

Spørgsmålet er herefter, om de danske domstole er forpligtede til at følge EU-Domstolens pålæg om at anvende det omhandlede uskrevne »generelle EU-retlige princip om forbud mod misbrug«.

Dette spørgsmåls besvarelse henhører *ikke* under *EU-Domstolens* kompetence, som ellers forudsat at Domstolen i præmis 82 og 83.

Der er derimod tale om et dansk forfatningsretligt spørgsmål om, hvorvidt Danmark har afgivet suverænitet til, at EU-Domstolen kan fastsætte et sådant »generelt EU-retligt princip«, der svæver over og har prioritet forud for alle vedtagne EU-retlige normer, og som skal have direkte virkning for borgerne, og dette spørgsmål kan *alene* afgøres af de *danske domstole*.

Spørgsmålet er, om det er i orden, at EU-Domstolen - i strid med direktivets ordlyd - forsøger at kaste en »redningskrans« til de medlemsstater, der ikke måtte have vedtaget (efter Domstolens opfattelse) »tilstrækkelige« nationale anti-misbrugsregler. Det er det naturligvis ikke.

Realiteten er nemlig, at Domstolen herved tiltager sig en kompetence, der tilkommer det danske folketing, og som fuldstændigt forrykker balancen mellem EU-Domstolen og de nationale domstole, og dette sker alene på bekostning af borgerne, som efterlades retsløse, fordi de ikke har mulighed for at forudse deres retsstilling.

Samtidig kortslutter EU-Domstolen ved at indføre et sådant »generelt EU-retligt princip« den demokratiske lovgivningsproces i EU.

Det følger af *Højesterets dom i U.2017.824H (Ajos-dommen)*, at et uskrevent generelt EUretligt princip - i den nævnte sag det generelle EU-retlige ligebehandlingsprincip - ikke er umiddelbart anvendeligt over for en borger, medmindre der er udtrykkelig hjemmel hertil i den danske tiltrædelseslov, hvilket der ikke var.

**4444**

Heavy Transport Danmark gør gældende, at heller ikke det i nærværende sag omhandlede uskrevne generelle EU-retlige princip om forbud mod misbrug har direkte virkning over for en borger, eftersom der ikke er udtrykkelig hjemmel hertil i den danske tiltrædelseslov.

##### 10.6.4.1 Generelt om direktiver

Det fremgår af TEUF artikel 288, stk. 3, at et *direktiv* er rettet til medlemsstaterne:

…

Det følger heraf, at et direktiv alene kan finde anvendelse over for en dansk borger i den form, som det er implementeret i dansk ret. Borgeren skal altså kunne aflæse sin retsstilling i dansk ret.

Det følger også heraf, at et direktiv *ikke* kan skabe *forpligtelser* for borgeren. Justitsministeriet har i en redegørelse af juli 1972 for visse statsretslige spørgsmål udtrykt det således:

»Direktiver og beslutninger rettet til medlemsstaterne vil derfor i det højeste kunne give borgerne umiddelbare *rettigheder*. De kan aldrig medføre umiddelbare *pligter* for borgerne.« (Vores fremhævninger).

EU-Domstolen har i flere domme udtrykt det således, »*at retssikkerhedsprincippet er til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgeren, og at de derfor ikke som sådan kan påberåbes af medlemsstaten over for borgerne*«, jf. således *Kofoeddommen* præmis 42 og dommen i NetApp-sagen præmis 86.

Det samme må så meget desto mere gælde et *uskrevent »generelt EU-retligt princip«*, som svæver over direktiverne. Når EU-Domstolen har foretaget en semantisk omskrivning af denne problemstilling til, at nægtelsen af en fordel i denne situation blot er *»en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel ... alene er opfyldt formelt«*, er der tale om et skinargument. Det afgørende for retssikkerhedsvurderingen er, om borgeren har haft mulighed for at kende sin retsstilling, og her er borgeren endnu værre stillet i relation til et uskrevent »generelt EU-retligt princip«.

Det fremgår af TEUF artikel 289, stk. 1, at et direktiv *vedtages* af Europa-Parlamentet og Rådet i fællesskab på forslag af Kommissionen.

Derimod hører det under EU-Domstolens kompetence at *fortolke* et direktiv, jf. TEUF artikel 267, stk. 1.

10.6.4.2 *Der er ikke tale om en fortolkning af moder-/datterselskabsdirektivet*

Skatteministeriet gør gældende, at Domstolen blot har udnyttet sin kompetence til at *fortolke* moder-/datterselskabsdirektivet i medfør af TEUF artikel 267.

Heri er Heavy Transport Danmark ikke enig. Der er derimod udviklet et selvstændigt, uskrevent *»generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet misbrugt, har hjemmel i traktaterne, i en forordning eller i et direktiv ...«*, jf. præmis 75.

En konkret anvendelse af principppet beror således *ikke* på en *fortolkning* af den relevante retsakt, men alene på *principppets eksistens og højere rang*, der så at sige går forud for indholdet af retsakten. Det konkrete indhold af moder-/datterselskabsdirektivet har derfor ikke haft nogen som helst betydning for principppets anvendelse. Dette bekræftes også af domskonklusionen (punkt 2), hvoraf det fremgår, at det er *det generelle EU-retlige princip« - og ikke direktivet - der *»fortolkes«*.

Når Domstolen har introduceret det generelle EU-retlige princip skyldes det ganske givet, at Domstolen har erkendt, at en fortolkning af direktivet ikke kunne føre til det ønskede resultat. Eller sagt på en anden måde: direktivfortolkningen i Kofoed-sagen var korrekt. For at nå det ønskede resultat har Domstolen derfor måttet ty til et »generelt EU-retligt princip«, der er højere rangerende end direktivet.

På denne måde har Domstolen bevæget sig ind på EU-lovgivers kompetenceområde. Dette er særligt tydeligt i denne sag, hvor EU-lovgiver i 2015 indsatte en generel anti-misbrugsregel i moder-/datterselskabsdirektivet og i 2016 indsatte en tilsvarende generel anti-misbrugsregel (for alle andre områder af EU-retten) i skatteundgåelsesdirektivet. Domstolen har således med sin dom alene

tilføjet den *tilbagevirkende kraft* af disse regler til 2005, hvilket Domstolen åbenbart ikke har fundet var i strid med retssikkerhedsprincippet.

10.6.4.3 *Danmark har ikke overladt suverænitet til EU-Domstolen til at fastsætte et misbrugsprincip med direkte virkning for borgerne - Højesterets dom i Ajos-sagen*

Det hedder i Højesterets præmisser i *Ajos-sagen* om spørgsmålet om *direkte virkning for borgerne* bl.a.:

»Om en EU-retlig regel kan tillægges den virkning i dansk ret, som kræves, *beror i første række på loven om Danmarks tiltrædelse af Den Europæiske Union*.

Efter lovens § 2 kan beføjelser, som efter grundloven tilkommer rigets myndigheder, udøves af Den Europæiske Unions institutioner i det omfang, det er fastsat i de traktater mv., som er nævnt i § 4. Efter § 3 sættes bestemmelserne i de traktater mv., som er nævnt i § 4, i kraft i Danmark i det omfang, de efter EU-retten er umiddelbart anvendelige i Danmark.

…

En sådan situation, hvor et *princip på traktatniveau efter EU-retten skal have direkte (pligtskabende) virkning og tillægges forrang for modstående dansk lov* i en tvist mellem private, uden at principppet har grundlag i nogen bestemt traktatbestemmelse, *er ikke forudsat i tiltrædelsesloven.*

**4445**

På den baggrund finder vi, at der *ikke* er grundlag for at fastslå, at det EU-retlige princip om forbud mod forskelsbehandling på grund af alder … *ved tiltrædelsesloven er gjort umiddelbart anvendeligt i Danmark.*

…

*Sammenfattende finder vi herefter, at tiltrædelsesloven ikke indeholder hjemmel til i en tvist mellem private at lade det uskrevne princip om forbud mod forskelsbehandling på grund af alder fortrænge den dagældende bestemmelse i funktionærlovens § 2 a, stk. 3, i det omfang bestemmelsen er i strid med forbuddet.*

Hvis Højesteret i denne situation skulle undlade at anvende bestemmelsen, ville Højesteret handle uden for rammerne af sin beføjelse som dømmende magt.« (Vores fremhævninger).

Som det fremgår, kan et generelt EU-retligt princip kun have direkte virkning for danske borgere, hvis Danmark i tiltrædelsesloven har afgivet suverænitet efter Grundlovens § 20 til, at dette kan ske.

Det gøres gældende, at heller ikke »det generelle EU-retlige princip om forbud mod misbrug« er forudsat i tiltrædelsesloven, og at dette princip derfor ikke har direkte virkning over for borgerne. Af samme grund kan Østre Landsret se bort herfra.

Det bemærkes i øvrigt i denne sammenhæng, at Danmark ikke har overladt suverænitet til EU siden tiltrædelsen af Amsterdam-traktaten i 1998.

I øvrigt gøres det gældende, at *bevisbyrden* for, at Danmark har afgivet suverænitet til EU til at vedtage dette princip med direkte virkning for borgerne påhviler den danske stat.

10.6.4.4 *Der foreligger en »contra legem«-situation*

Skatteministeriet gør gældende, at nærværende sag adskiller sig fra Ajos-sagen, fordi der ikke i nærværende sag foreligger en »contra legem«-situation. Ministeriet mener således, at der kan anlægges en fortolkning af SEL § 2, stk. 1, litra c, der er i overensstemmelse med både moder-/datterselskabs-direktivet og det generelle EU-retlige princip om forbud mod misbrug, og synes i den forbindelse at være af den mening, at den simple henvisning i bestemmelsen til, at skattepligten ikke gælder, hvis beskatningen skal frafaldes efter direktivet, betyder, at en fuldstændig fortolkning af direktivet eller EU-retten herved skal lægges til grund.

Heavy Transport Danmark er *ikke* enig heri. Der foreligger også i nærværende sag en »contra legem« situation, og i øvrigt drejer

det sig ikke blot om, hvorledes SEL § § 2, stk. 1, litra c, skal fortolkes. Temaet er derimod, om en direkte anvendelse af det nævnte princip, vil påføre borgerne *forpligtelser*, som de efter dansk ret ikke allerede har - altså om borgerne vil blive *stillet ringere* end efter dansk ret, hvis princippet finder anvendelse. Dette beror ikke blot på en fortolkning af SEL § 2, stk. 1, litra c (under hensyntagen dens forarbejder), men også på rækkevidden af de danske anti-misbrugsregler tilbage i 2005.

Det er nødvendigt at se på *direktivet* og det *EU-retlige princip* hver for sig.

Der er ubestrideligt, at Danmark har foretaget en implementering af *direktivet*, der var (og fortsat er) korrekt, hvilket blev bekræftet af *Kofoed-dommen* i 2007. Parterne er således enige om, *at* der i dansk ret findes sådanne regler til imødegåelse af misbrug, som der henvises til i direktivets artikel 1, stk. 2, (nemlig *realitetsgrundsætningen* og *princippet om »rette indkomstmodtager«*), og *at* disse regler konkret fører til, at der *ikke* foreligger et misbrug efter dansk ret, jf. NetApp-forelæggelseskendelsens punkt 5559. Det er også en kendsgerning, at det af forarbejderne til SEL § 2, stk. 1, litra c, i 2001 udtrykkeligt fremgår, at lovgiver mente, at disse anti-misbrugsregler var tilstrækkelige, og at etableringen af gennemstrømningsselskaber ikke udgjorde et misbrug.

For så vidt angår det *EU-retlige princip*, som Domstolen har introduceret, forholder det sig anderledes. Hvis en direkte anvendelse af dette misbrugsprincip over for borgerne med tilbagevirkende kraft til 2005 måtte føre til det resultat, at der - stadig tilbage i 2005 - forelå misbrug, vil der være tale om en »contra legem«-situation, fordi de danske regler og den danske praksis på dette tidspunkt klart førte til, at der ikke forelå misbrug, og heller ikke vil kunne fortolkes anderledes på grundlag af det EU-retlige misbrugsprincip, som er udviklet 14 år efter. I givet fald ville der altså blive indført en forpligtelse for borgerne, der ikke fulgte af dansk ret - en ændring af retstilstanden.

Der foreligger altså en »contra-legem« situation i forhold til det EU-retlige misbrugsprincip, hvis dets anvendelse måtte føre til, at der foreligger et misbrug. De danske domstole skal derfor blot undlade at lægge dette princip til grund.

Det udgør et selvstændigt forfatningsretligt problem, at dette princip slet ikke gjaldt i 2005. Også af denne grund, skal de danske domstole undlade at lægge princippet til grund.

### 10.6.4.5 Konklusion

Som ovenfor nævnt, har Danmark ikke overladt suverænitet til EU-Domstolen til at fastsætte et generelt misbrugsprincip med direkte virkning over for borgerne.

Allerede af denne grund skal de danske domstole undlade at lægge dette princip til grund.

Samme resultat følger af *retssikkerhedsprincippet*. Ifølge dette princip skal en dansk borger kunne regne med, at de regler, der gælder for borgeren i henhold til et givent direktiv, fremgår af dansk ret, og ikke af et uskreven generelt EU-retligt princip, som ikke er en del af dansk ret, og som borgeren ikke kan have haft mulighed for at indrette sig efter.

**4446**

Dette gælder så meget desto mere, når det generelle EU-retlige princip *strider mod ordlyden af direktivet*, og når hverken generaladvokaten, Kommissionen eller EU-lovgiver kendte til eksistensen af dette princip.

En anvendelse af misbrugsprincippet vil også være i strid med *legalitetsprincippet* i dansk ret og *grundlovens § 43*.

*Niels Fenger og Morten Broberg* har i U.2020B.277 kommenteret Ajos-dommen således:

»Det er dog vanskeligt at sige sig fri for en klar fornemmelse af, at Højesterets fortolkning af tiltrædelsesloven skete i lyset af en grundlæggende retsideologisk uenighed med EU-Domstolen med hensyn til sidstnævntes *bemærkelsesværdige evne til at »opdage« uskrevne retsgrundsætninger.* ... Selv om det ikke fremgår af Højesterets præmisser, er det næppe en urimelig antagelse, at Højesteret navnlig har været påvirket af en *generel modvilje mod, at private skulle kunne pålægges pligter, som de private retssubjekter ikke kunne have forudset på handlingstidspunktet.* ...

Endvidere har højesteretsdommer Lars Hjortnæs bemærket, at Højesterets fortolkning af tiltrædelsesloven var præget af et synspunkt om, at:

»no-one in the Danish legislature (or society at large) had ever, nor could have imagined even in their wildest fantasies that the CJEU would think of making a principle not enshrined in any Treaty provision create obligations for private citizens by requiring it to take precedence over contravening national law in disputes between individuals. *In other words, no-one had ever thought it possible or even given it a thought that the CJEU would in effect draft an addendum to the Treaty, as it were, despite TFEU Article 19 and not allowing for the EU principle of legal certainty to play any role when deciding whether to apply the non-discrimination principle directly and horizontally.«* (Vores fremhævninger).

På den anførte baggrund gøres det gældende, at de danske domstole skal bortse fra EU-Domstolens pålæg om at nægte fritagelse efter direktivet, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

### 10.6.5 Østre Landsrets domme af 3. maj 2021 og 25. november 2021

Nærværende spørgsmål om, hvorvidt de danske domstole er forpligtede til at følge EU-Domstolens pålæg om at anvende det omhandlede uskrevne »generelle EU-retlige princip om forbud mod misbrug« - som netop redegjort for i detaljer - var i sagens natur undergivet samme intensive behandling i de to første »beneficial owner«-sager i dette sagskompleks, TDC- og NetApp-sagerne, vedrørende udbytter (moder-/datterselskabsdirektivet), og hvor Østre Landsret afsagde dom den 3. maj 2021.

I dommen hedder det om dette spørgsmål:

...

Østre Landsrets begrundelse er ikke helt let at forstå, men noget kunne tyde på, at landsretten har fundet, at der allerede i SEL § 2, stk. 1, litra d, er skabt den fornødne implementering af direktivets fakultative anti-misbrugsregel - qua henvisningen til, at ordlyden henviser til direktivet - og at det dermed er ufornødent at skulle tage stilling til det spørgsmålet om, hvorvidt Danmark forfatningsretligt er forpligtet til anvende det uskrevne EU-retlige princip om intern hjemmel.

Østre Landsret har dermed ikke med NetApp-dommen direkte forholdt sig til det forfatningsretlige spørgsmål om suverænitetsafgørelse.

Det siger sig selv, at Heavy Transport Danmark ikke er enig i landsrettens afgørelse på dette punkt. ...

I sin dom af 25. november 2021 i de to efterfølgende pilot-sager i dette sagskompleks, NTC Parent og Takeda, gentager Østre Landsret først, hvad landsretten udtalte i NetApp-dommen:

...

Som det ses i NetApp-dommen, afviste landsretten Skatteministeriets udlandsret (fra 2001 om muligheden for indskydelsen af et cypriotisk mellemholdingselskab) som værende af *»en sådan generel, forklarende, karakter, at de ikke kan anses for tilkendegivelser om, at de danske skattemyndigheder ville acceptere et retsmisbrug, som beskrevet af EU-Domstolen«.*

Nu - vedrørende renter - henviser landsretten til en udtalelse fra Skatteministeren fra 2004, hvoraf fremgår, at de danske skattemyn-

digheder *efter en konkret realitetsbedømmelse* - dvs. efter den danske realitetsgrundsætning - kunne lægge til grund, at det selskab, som i første omgang modtager renterne, ikke er renternes retmæssige ejer.

Dette er i fuld overensstemmelse med Heavy Transport Danmarks fremstilling af den pågældende udtalelse fra ministeren i 2004 …., hvor det er anført, at skatteministeren viser, at spørgsmålet om »retmæssig ejer« af renter beror på en *»konkret realitetsbedømmelse«*, og at der heri ikke var noget nyt eller overraskende, da princippet om *»rette indkomstmodtager«* går netop ud på, at der skal foretages en konkret realitetsbedømmelse med henblik på at fastslå, hvem der er »rette indkomstmodtager« (og dermed skattepligtssubjektet).

Problemet med begrundelsen er blot, at den *ikke* harmonerer med, at Skatteministeriet i den pågældende sag, og i dette sagskompleks helt generelt er enig med skatteyderen i, at den danske realitetsgrundsætning ikke kan føre til, at man tilsidesætter de af sagernes omhandlede transaktioner, herunder den formelle udbytte-/rentemodtager - i denne sag Heavy Transport Luxembourg - som den person, der med skattemæssig virkning har oppebåret den pågældende indkomst, (jf. f.eks. NetApp-forelæggelseskendelsens punkt 48 og punkt 50.

**4447**

For så vidt angår det forfatningsretlige spørgsmål, supplerer Østre Landsret imidlertid sin begrundelse med følgende:

…

Disse supplerende bemærkninger bidrager desværre alene med en konklusion (om at der er tale om et princip, hvis fortolkning ligger inden for rammerne af fortolkningen af direktivet), men ikke med en begrundelse for, hvorfor dette princip - der altså findes at kunne håndhæves direkte over for borgerne uden implementering - anses for at ligge inden for disse rammer. Herunder hvorved sagen adskiller sig fra det princip, der var til prøvelse i Ajos-sagen.

*10.7 Der foreligger heller ikke et misbrug efter det af EU-Domstolen skitserede misbrugsbegreb*

For det tilfælde, at Østre Landsret måtte fastslå, at det generelle EU-retlige princip om forbud mod misbrug har direkte virkning over for borgerne og derfor finder anvendelse i nærværende sag - hvad Østre Landsret altså har fundet i de hidtidige sager i dette sagskompleks - gøres det gældende, at der *ikke* foreligger noget misbrug efter dette princip under de i nærværende sag konkret foreliggende omstændigheder.

Da de øvrige betingelser i moder-/datterselskabsdirektivet er opfyldt, har Heavy Transport Luxembourg derfor krav på fritagelse efter direktivet, og der foreligger - også af denne grund - ikke begrænset skattepligt til Danmark af det omhandlede udbytte.

Det bemærkes, at det er sagsøger, Skatteministeriet, der har bevisbyrden for, at der i nærværende sag foreligger et misbrug af direktivet i henhold til det af EU-Domstolen opstillede generelle EU-retlige antimisbrugsprincip.

Heavy Transport Danmark gør gældende, at Skatteministeriet ikke har løftet - og heller ikke kan løfte - denne bevisbyrde.

Det af EU-Domstolen opstillede generelle EU-retlige anti-misbrugsprincip er defineret nærmere i dommens præmisser 97 og 98:

…

Det generelle misbrugsbegreb går altså ud på, at EU-retten ikke kan påberåbes i tilfælde af, hvor der er tale om et *rent kunstigt arrangement, der ikke bygger på en økonomisk realitet, og hvis formål er at opnå utilsigtede skattemæssige fordele.*

Dette generelle misbrugsbegreb svarer til den *danske realitetsgrundsætning,* hvorefter *tomme og kunstige, skattebetingede dispositioner* kan tilsidesættes og erstattes med *realiteten,* jf. forelæggelseskendelsen punkt 56 …

Det er derfor ikke troværdigt, når Skatteministeriet, der anerkender, at der *ikke* foreligger et misbrug efter den danske realitetsgrundsætning, jf. NetApp-forelæggelseskendelsens punkt 57, påberåber sig, at der foreligger et misbrug efter EU-rettens generelle misbrugsbegreb.

…

Som EU-Domstolen også anfører i præmis 99 tilkommer det ikke Domstolen at vurdere de faktiske omstændigheder i hovedsagerne - det tilkommer den nationale domstol, her Østre Landsret - men Domstolen har dog valgt at give en vis vejledning i form af en række faktorer, der vil kunne pege i retning af, at der foreligger et misbrug efter princippet, se således præmisserne 100-106.

Det er imidlertid i denne forbindelse væsentligt at gøre sig klart, at EU-Domstolen herved har udtalt sig helt generelt, dvs. uden at inddrage de subjektive forhold, der måtte foreligge i de konkrete situationer. Det er således op til de nationale domstole at foretage den endelige vurdering i lyset af de subjektive og nationale særlige omstændigheder, der måtte foreligge.

Og dette er helt afgørende i nærværende sag, når landsretten skal foretage sin bedømmelse af, om der foreligger et misbrug af direktivet.

Heavy Transport Danmark gør således gældende, at der under hensyntagen til de helt særlige omstændigheder i nærværende sag ikke *kan* foreligge et misbrug. Betingelsen om, at *hovedformålet med transaktionerne er at opnå en uretmæssig fordel* er således *ikke* opfyldt i nærværende sag.

For det første - og som redegjort detaljeret for ovenfor i afsnit 9.5 til støtte for, at der ikke foreligger noget misbrug efter DBO'en - var den pågældende koncernstruktur med indskydelsen af Heavy Tranport Luxembourg som mellemholdingselskab slet ikke nødvendig for at Heavy Transport Danmark kunne udlodde købesummen fra salget af Dockwise-aktierne til de to aktionærer i Panama *uden* dansk skat.

Såfremt der havde været nogen som helst grund til at tro, at Danmark ville opkræve kildeskat af det omhandlede udbytte ved den valgte konstruktion, bl.a. ved at nægte direktivbeskyttelse, så kunne koncernen som en fuldgod alternativ løsning nemlig have valgt at lade Heavy Transport Danmark, der jo efter salget var uden aktivitet, likvidere ved en simpel betalingserklæringslikvidation efter anpartsselskabslovens § 59, i hvilken forbindelse likvidationsprovenuet *ubestridt og ubestrideligt* kunne være udloddet til aktionærerne, Heavy Transport Group Inc., Panama, og Incomare Holdings S.A., Panama, *uden indeholdelse af dansk kildeskat,* jf. ligningslovens § 16 A.

Og dermed bortfalder hele grundlaget for at anse den valgte konstruktion med »indskydelse af et mellemholdingselskab« for et retsmisbrug til jorden.

Synspunktet støttes af EU-Domstolens svar på spørgsmål 5 i NetApp-sagen, hvor Domstolen udtalte følgende (præmis 110):

**4448**

…

*Niels Winther-Sørensen* har i sin kommentar til dommen i SR.2019.174 bemærket følgende herom:

»Læst i sammenhæng med den efterfølgende sætning i Udbyttedommens præmis 110 … må man dog formentlig forstå Domstolens ræsonnement således, at *man normalt ikke vil kunne statuere retsmisbrug* og derved nægte fordelen efter moder-/datterselskabsdirektivet eller rente-/royaltydirektivet, *hvis en direkte betaling fra det danske selskab til det pågældende selskab* (som forudsættes at være den retmæssige ejer af betalingen) *ville have været skattefri.«*

Og det var da også dette, der i NetApp-sagen førte til, at Østre Landsret ikke fandt, at der forelå noget misbrug i sagen, for så vidt angår det af sagen omhandlede store udbytte.

…

Selv om det, der direkte henvises til af EU-Domstolen, er den situation, hvor en (tilsvarende) udbytteudlodning kunne være sket direkte til den endelige modtager *uden* dansk kildeskat, gøres det gældende, at princippet er lige så validt i en situation som den foreliggende, hvor udbyttet kunne være udloddet direkte til den endelige modtagere i Panama *uden* dansk kildeskat i forbindelse med en simpel betalingserklæringslikvidation af det danske selskab.

I modsat fald vil konsekvensen da også være, at koncernen modtager en egentlig -og gigantisk - »dummebøde« på en halv milliard kroner (+ renter).

…

Hertil kommer *for det andet* - og hvad der er lige så vigtigt - hele forhistorien omkring den danske implementering og fortolkning af direktivet …, og den uforbeholdne stillingtagen til skattefrihed ved udlodning af udbytte til et cypriotisk mellemholdingselskab. Når den danske lovgiver og skattemyndighederne fortolker et direktiv på den måde, at der - hvis de øvrige betingelser er opfyldt - er et ubetinget krav på fritagelse for kildeskat, hvis udbyttemodtageren er »rette indkomstmodtager« af udbyttet, så kan der naturligvis ikke være tale om et misbrug af direktivet, når skattemyndighederne efterfølgende ændrer sin opfattelse (med tilbagevirkende kraft).

»Mellemholdingselskaber« - *treaty shopping* - er således direkte anvist af Skatteministeren kort tid før de dispositioner, der har udløst de enorme kildeskattekrav, som findes i dette sagskompleks.

Under disse omstændigheder giver det selvsagt *ikke* mening at tale om, at *hovedformålet* med transaktionerne har været at opnå en *uretmæssig* fordel.

Sammenfaldet af disse to ganske særlige forhold gør det åbenbart, at der ikke foreligger et retsmisbrug i nærværende sag.

…

### 11 SKATS AFGØRELSER ER UDTRYK FOR EN SKÆRPENDE (ULOVLIG) PRAKSISÆNDRING MED TILBAGEVIRKENDE KRAFT

For det tilfælde, at Skatteministeriet måtte få medhold i, at der foreligger begrænset skattepligt efter SEL § 2, stk. 1, litra c, af det omhandlede udbytte, gør Heavy Transport Danmark til støtte for frifindelsespåstanden *subsidiært* gældende, at SKATs afgørelse (og de synspunkter, der efterfølgende er blevet gjort gældende af skattemyndighederne) er udtryk for en *skærpelse af praksis med tilbagevirkende kraft*, og at en sådan praksisskærpelse ikke lovligt kan gennemføres. En praksisskærpelse kan således alene ske med fremadrettet virkning og med et passende varsel, for så vidt angår de nye synspunkter, som SKAT vil anse for afgørende for denne nye praksis, jf. således f.eks. U.1983.8 H.

Den juridiske vejledning 2010-2 er i overensstemmelse hermed:

…

En meddelelse om praksisskærpelse skal - såvel i form som indhold - udtrykkeligt angive, at der er tale om en skærpelse af praksis, og hvad den nye praksis går ud på.

Da SKAT ikke har varslet praksisskærpelsen, har SKAT ikke været berettiget til at opkræve udbytteskat.

Heavy Transport Danmark gør gældende, at der foreligger en praksisskærpelse *såvel* i relation til *dobbeltbeskatningsoverenskomsten* som i relation til *moder-/datterselskabsdirektivet*. Disse spørgsmål behandles hver for sig nedenfor.

Hvis Heavy Transport Danmark får medhold vedrørende blot en af disse spørgsmål, skal Heavy Transport Danmark have fuldt medhold i frifindelsespåstanden.

#### 11.1 Praksisskærpelse i relation til dobbeltbeskatningsoverenskomsten

Som det fremgår … fremgår det utvetydigt af *forarbejderne til SEL § 2, stk. 1, litra c*, fra 2001, at der over et dansk datterselskab

kan *indskydes et (cypriotisk) mellemholdingselskab*, hvorigennem udbyttet *viderekanaliseres*, med den virkning, at den udbytteskat, der ellers ville blive udløst, undgås.

Mellemholdingselskabet er altså *»retmæssig ejer«*. Det fremgår klart, at der er tale om *rene gennemstrømningsselskaber*, og skatteministerens svar indeholder ikke forbehold af nogen art. Der var altså på daværende tidspunkt fri adgang til *»treaty shopping«*. Så længe mellemholdingselskabet var *civilretlig ejer* af aktierne i datterselskabet - og dermed *ikke* var *agent* eller *stråmand*, eller der forelå *pro forma* - var mellemholdingselskabet *»retmæssig ejer«*. Der var ikke tale om et dansk særstandpunkt. Dette var den globale opfattelse.

Landsretten kan således lægge til grund, at forarbejderne fra 2001 har det her nævnte indhold.

Heavy Transport Danmark disponerede i 2007 i fuld tillid til disse forarbejder -støttet af velrenommerede

**4449**

skatterådgivere - ved at etablere et mellemholdingselskab i en anden EU-stat, Luxembourg, og foretage en udbytteudlodning hertil.

Forarbejderne var baseret på en *internretlig fortolkning* af begrebet »retmæssig ejer«, dvs. en fortolkning hvor *»retmæssig ejer« fortolkes i overensstemmelse med princippet om »rette indkomstmodtager« i dansk ret*. Det er ovenfor … konkluderet, at lovgiver og skattemyndighederne ubrudt har fastholdt den internretlige fortolkning i perioden 1977-2008, hvilket fremgår af et stort antal udsagn navnlig fra Skatteministeriet.

Som det fremgår … måtte Skatteministeriet - efter at »beneficial owner«-sagerne var startet op i 2008 - erkende, at et udbyttemodtagende mellemholdingselskab klart måtte anses for »rette indkomstmodtager« efter dansk skatteret, og at den hidtil påberåbte fortolkning af »retmæssig ejer« derfor ikke kunne føre til det ønskede resultat (udbyttebeskatning).

Skatteministeriet ændrede derfor praksis og gik i stedet over til en *autonom (internationalretlig) fortolkning* af »retmæssig ejer«, hvor der nu *ikke længere er ligehedstegn mellem »retmæssig ejer« og »rette indkomstmodtager«*. Det er tværtimod *to vidt forskellige begreber*, der ikke har noget som helst med hinanden at gøre.

Med den nye autonome fortolkning af »retmæssig ejer« har Skatteministeriet -under henvisning til kommentarerne til modeloverenskomsten fra 2003 vedrørende »gennemstrømningsselskaber« - introduceret en *meget bred fortolkning* af begrebet »gennemstrømningsselskab«, der rammer ethvert ganske almindeligt mellemholdingselskab, hvilket står i skærende kontrast til den tidligere praksis.

Det er således en kendsgerning, at skattemyndighedernes nye praksis er *i direkte strid med de udtrykkelige forarbejder* til denne bestemmelse fra 2001, hvoraf det udtrykkeligt fremgår, at et mellemholdingselskab i et andet DBO-land, der alene etableres for at viderekanalisere udbytter til sit moderselskab, er »retmæssig ejer« af udbyttet og derfor nyder beskyttelse efter overenskomsten.

Den nye praksis er således også *i strid med SKATs egen tidligere fortolkning af »retmæssig ejer«*, som først blev forladt i 2008, da de første »beneficial owner«-sager blev rejst.

Der er dermed tale om en *betydelig skærpelse af praksis* vedrørende fortolkningen af »retmæssig ejer«, der fører til det stik modsatte resultat af det, der er forudsat i forarbejderne fra 2001, selv om lovgrundlaget er uændret.

Skatteministeriet bestrider, at der foreligger en praksisskærpelse, og gør til støtte herfor gældende, at der ikke har foreligget en *fast administrativ praksis*, fordi der ikke findes retsafgørelser, der dokumenterer den hidtidige praksis.

Når der - som i forarbejderne til SEL § 2, stk. 1, litra c, fra 2001 - foreligger en udtrykkelig udtalelse fra Skatteministeren om,

hvorledes retsstillingen er, og når skattemyndighederne efterfølgende administrerer i overensstemmelse hermed, er det imidlertid fuldgod dokumentation for en fast praksis, som skatteyderne kan indrette sig i tillid til.

Når Skatteministerens udtalelse går ud på, at mellemholdingselskaber skal anses som »retmæssige ejere« (og »rette indkomstmodtagere«), er det klart, at der ikke findes retsafgørelser, der dokumenterer denne praksis. SKAT er jo enig med skatteyderne i, at der *ikke* skal indeholdes udbytteskat, og SKAT har derfor ikke haft nogen anledning til at rejse sager herom. Sådan har det været i 30 år.

Skatteministeriet gør videre gældende, at en eventuel (fejlagtigt) manglende ligningsmæssig indgriben og korrektion ikke kan konstituere praksis og ikke kan skabe nogen for SKAT bindende administrativ praksis om ikke at pålægge kildeskat af udbytter.

Sagsøgte er naturligvis enig i dette generelle udsagn. Pointen er imidlertid, at den omstændighed, at der ikke tidligere er rejst sager herom, ikke beror på en ufuldstændig kontrol fra SKATs side, men derimod på en opfattelse af, at der ikke var grundlag for at føre disse sager.

Skatteministerens stillingtagen i forarbejderne til den konkrete problemstilling er dermed nøjagtig lige så god en dokumentation for retsstillingen, som en retsafgørelse ville have været, og det giver sig selv, at SKAT har fulgt skatteministerens udmelding.

I øvrigt er det barokt at drøfte, om SKAT har ændret praksis, når alle ved, at det er tilfældet. Dette er da også bekræftet i Jyllandsposten den 14. september 2010 af den embedsmand, som på daværende tidspunkt var talsmand for SKAT i »beneficial owner«-sagerne:

»Om vi så får medhold, ved vi ikke. *Vores synspunkt er ret nyt i skattepraksis*, så vi må se, hvad Højesteret siger, når den kommer til at tage stilling engang.« (Vores fremhævning).

Praksisændringen bekræftes også af den omstændighed, at mens SKAT i perioden 1977-2008, hvor SKAT benyttede den *internretlige fortolkning* af »retmæssige ejer«, ikke har rejst en eneste sag om nægtelse af overenskomstlempelse med den begrundelse, at modtageren ikke var »retmæssig ejer«, mens SKAT - efter at have skiftet til den *autonome fortolkning* i 2008 - på en gang har rejst et meget stort antal sager. Der er således i dette sagskompleks truffet afgørelse i 150 sager med krav om betaling af kildeskat på godt 6,8 mia. kr.

På den anførte baggrund gøres det således gældende, at der foreligger en *skærpelse af en fast administrativ praksis*, som burde have været varslet, og at denne ændrede praksis derfor ikke kan finde anvendelse i nærværende sag.

…

**4450**

11.2 *Praksisskærpelse i relation til moder-/datterselskabsdirektivet*

…

Det er altså en kendsgerning, at EU-Domstolen med sin afgørelse af 26. februar 2019 har *underkendt Kofoed-dommen* og dermed *ændret praksis med tilbagevirkende kraft*.

…

For det tilfælde, at Heavy Transport Danmark *ikke måtte få medhold i, at det generelle EU-retlige princip ikke har direkte virkning for borgerne*, således at princippet principielt kan finde anvendelse i *dansk ret*, gøres det gældende, at princippet efter *dansk forvaltningsret* kun kan finde anvendelse med *fremtidig virkning*.

Princippet kan således ikke finde anvendelse i nærværende sag, der drejer sig om 2007, fordi det ville være udtryk for en betydelig *praksisskærpelse med tilbagevirkende kraft*.

Det er … ovenfor dokumenteret, at den danske administrative praksis tilbage i 2007 var baseret på, at der gjaldt et *generelt EU-retligt princip om forbud mod misbrug, der havde direkte virkning over for borgerne*.

Blot for god ordens skyld bemærkes, at anvendelse af et direktiv i en medlemsstat altid er udtryk for anvendelse af *national ret*. Dette gælder, hvad enten der er tale om anvendelse af medlemsstatens egen lovgivning eller almindelige retsgrundsætninger udviklet af medlemsstatens domstole, eller om der - som i nærværende sag - er tale om, at EU-Domstolen har fastsat et princip med direkte virkning for borgerne, hvis dette ellers måtte blive godkendt af medlemsstatens domstole. Derfor er det også *medlemsstatens processuelle og forvaltningsretlige regler*, der skal benyttes ved retsanvendelsen.

Da en anvendelse af det *generelle EU-retlige forbud mod misbrug* under de nævnte forudsætninger vil være udtryk for en *praksisskærpelse med tilbagevirkende kraft*, kan dette princip således ikke lægges til grund for afgørelsen af sagen.

11.3 *Nærmere om retspraksis*

Som nævnt har der ikke siden 1983 været tvivl om eksistensen af det forvaltningsretlige princip, hvorefter skattemyndighederne er afskåret fra at ændre deres praksis i skærpende retning med tilbagevirkende kraft, jf. U.1983.8 H og Den juridiske vejledning…

Landsrettens dom i U.2012.2337 H er et *skoleeksempel* på, hvilke minimumskrav der må stilles til skattemyndighederne for, at en skærpende praksisændring kan få virkning for borgerne. Østre Landsret tiltrådte i sagen, at de danske skattemyndigheder var berettigede til at ændre praksis i forbindelse med arbejdsudleje til Danmark af hollandske slagtere, eftersom arbejdsudlejebegrebet skulle fortolkes efter intern dansk ret. Praksisændringen blev offentliggjort den 5. maj 1997 i Tidsskrift for Skatteret og blev også i maj 1997 omtalt i Skat Udland. Den blev endvidere offentliggjort i Retsinformation den 25. september 1997. Landsretten fandt, at praksisændringen først ved offentliggørelsen i Retsinformation måtte anses for offentliggjort på en sådan måde, at den kunne tillægges retsvirkning over for virksomheder, der som sagsøgeren havde anvendt arbejdsudlejet arbejdskraft. Landsretten fandt dog, at der burde indrømmes virksomheden et vist kortere varsel til at iværksætte indeholdelsen af A-skat, hvorfor sagsøger først fra og med den 1. november 1997 blev anset for ansvarlig for den manglende afregning af A-skat. For Højesteret bestred Skatteministeriet ikke, at praksisændringen først kunne få virkning fra den 1. november 1997.

Størstedelen af retspraksis efter Højesterets dom i U.1983.8 H handler navnlig om *beviset* for, hvad skattemyndighedernes praksis så rent faktisk gik ud på. Denne konkrete bevisvurdering afgøres selvsagt efter de faktiske omstændigheder fra sag til sag. I nærværende sag er beviset i form af skatteministerens egne redegørelser til Folketinget overvældende.

U.2000.1509 H er således en bevissag, der ikke er præjudicerende for nærværende sag. …

I U.2011.3305 H er det ærligt talt svært at se, hvad der udgjorde skatteyderens påståede bevis for modgående praksis. Heller ikke landsretten eller Højesteret kunne se det.

I U.2015.915 H, U.2017.2960 H og U.2017.2979 H forsøgte skatteyderne at føre beviset for praksis ved at henvise til lang tids ikke-indgriben fra skattemyndighedernes side, hvilket Højesteret ikke godtog. Det er *ikke* Heavy Transport Danmarks synspunkt, at beviset for skattemyndighedernes praksis udgøres af lang tids ikke-indgriben. Noget andet er, at når skatteministeren overfor Folketinget redegør for en praksis og for, hvordan en lovbestemmelse skal forstås, så følger skattemyndighederne naturligvis ministerens udmelding. …

I U.2020.1923 H bestod det angivelige bevis navnlig i et antal ikke offentliggjorte afgørelser fra underordnede ligningsmyndigheder, som støttede skatteyderens synspunkt. Højesteret henviste til, at afgørelserne var i strid med klare udtalelser i forarbejderne, og

Copyright © 2023 Karnov Group Denmark A/S

U.2023.4403H

at de ikke offentliggjorte afgørelser ikke udgjorde en bindende administrativ praksis. Sagen er derfor ikke sammenlignelig med Heavy Transport Danmarks situation.

Noget helt andet er, at skattemyndighederne i nærværende sag slet ikke er berettiget til at foretage en praksisskærpelse.

Den af Skatteministeriet hævdede retstilstand, der strider mod de udtrykkelige forarbejder til SEL § 2, stk. 1, litra c, kan således kun tilvejebringes ad *lovgivningsvejen.*

Heavy Transport Danmark er naturligvis opmærksom på, at Østre Landsret i sin dom af 3. maj 2021 i den første sag i dette sagskompleks, NetApp-sagen, fandt, at

**4451**

der under tilsvarende omstændigheder *ikke* forelå en praksisændring i sagen (for så vidt angår fortolkningen af »retmæssig ejer«-begrebet).

….

Heavy Transport Danmark … er [ikke] enig i Østre Landsrets afgørelse på dette punkt. Navnlig er det bemærkelsesværdigt, når der hos de ikke foreligger nogen administrativ praksis, når nu landsretten samtidig henviser til Skatteministerens svar og redegørelse fra 2006 og 2007, hvoraf det klart fremgår, at der ikke findes eksempler på udenlandske gennemstrømningsselskaber, som de danske skattemyndigheder ikke har accepteret som »retmæssig ejer« af udbytte fra danske selskaber. Det er endvidere vanskeligt at forstå, at en udtalelse om fortolkningen af lovgivningen - og anvendelsen af mellemholdingselskaber som gennemstrømningsselskaber - som den, ministeren kom med i sit svar til Folketinget i 2001, ikke skulle have nogen som helst betydning, når det skal vurderes, om der foreligger en praksis, herunder - hvad der uddybes i næste afsnit - om en skatteyder har handlet forsømmeligt ved at gøre nøjagtigt det, som skatteministeren anviser.

Østre Landsret har i sin efterfølgende dom af 25. november 2021 i de to næste pilotsager i realiteten gentaget sin begrundelse.

Dommene er på dette punkt anket til Højesteret af de hæftende selskaber.

*12 HEAVY TRANSPORT DANMARK HÆFTER IKKE FOR EN EVENTUEL UDBYTTESKAT - KILDESKATTELOVENS § 69*

*12.1 Regelgrundlaget og indledende bemærkninger*

For det tilfælde, at der måtte gives Skatteministeriet medhold i, at det omhandlede udbytte er undergivet begrænset skattepligt til Danmark, gøres det - mest subsidiært - gældende, at Heavy Transport Danmark ikke hæfter for den ikke-indeholdte kildeskat.

Spørgsmålet om, hvorvidt kildeskatten kan opkræves hos Heavy Transport Danmark, beror på bestemmelsen i kildeskattelovens § 69 ….

Det hedder endvidere i SKATs Vejledning om indeholdelse af A-skat og AM-bidrag 2005-1:

»Uanset at bestemmelserne har omvendt bevisbyrde, har det i retspraksis vist sig, at det er told- og skatteforvaltningen, der skal bevise, at den indeholdelsespligtige har handlet forsømmeligt.«

Allerede fordi Heavy Transport Danmarks forståelse af de relevante regler er i overensstemmelse med den administrative praksis, som skattemyndighederne ubrudt har fulgt gennem årene, herunder at Landsskatteretten har givet Heavy Transport Danmark medhold i, at der *ikke* er indeholdelsespligt, er det efter Heavy Transport Danmarks opfattelse åbenbart, at Heavy Transport Danmark *ikke* har udvist »*forsømmelighed*«.

Som nævnt i foregående afsnit, har Østre Landsret ganske vist i NetApp-dommen af 3. maj 2021 og i Takeda- og NTC-dommen af 25. november 2021 fundet, at der ikke forelå en fast administrativ praksis. Heavy Transport Danmark er uenig heri, men selv hvis skattemyndighedernes mange tilkendegivelser om begrebet »retmæssig ejer« ikke var værende lig med det danske »rette indkomstmod-

tager«-begreb ikke findes at konstituere en administrativ praksis, som Heavy Transport Danmark kan støtte ret på, så har udsagnene under alle omstændigheder givet anledning til tilstrækkelig kvalificeret tvivl om fortolkningen, at det ikke kan lægges Heavy Transport Danmark til last, hvis selskabet - til syvende og sidst -tog fejl, jf. nærmere herom nedenfor.

*Jakob Bundgaard* er i øvrigt i SU 2010.387 på linje med, at der ikke kan være udvist forsømmelighed henset til den »praksis«, som myndighederne har fulgt.

Østre Landsret var i sin dom af 3. maj 2021 i NetApp-sagen endvidere af den opfattelse, at den omstændighed, at Landsskatteretten havde givet NetApp medhold i sagen, ikke spillede nogen rolle for forsømmelighedsvurderingen. Dette er Heavy Transport Danmark naturligvis heller ikke enig i, jf. nærmere nedenfor.

*12.2 Nærmere om betingelserne for indeholdelsespligt efter kildeskattelovens § 69*

Kildeskattelovens § 69 gælder ikke kun hæftelse for udbyttekildeskat, men også hæftelse for ikke-indeholdt A-skat, arbejdsudlejeskat m.v. Der kan derfor henses til retspraksis om manglende indeholdelse af andre skatter end udbyttekildeskat, når det skal bedømmes, hvad der forstås ved hæftelsespådragende forsømmelighed.

Det fremgår af bl.a. UfR 1977.844 H (ikke-hæftelse), SKM2002.470.ØLR Ø (ikke-hæftelse) og UfR 2018.3119 H (hæftelse), at også vildfarelse om den korrekte retlige fortolkning og subsumption kan fritage for hæftelsesansvar. Der er heller ikke noget i ordlyden af bestemmelsen, som antyder, at det kun er ukendskab til de relevante faktiske forhold, som er af betydning.

Højesteret vurderede i UfR 1977.844 H, at den potentielt indeholdelsespligtige havde haft »en sådan føje« til at kunne gå ud fra, at der ikke var indeholdelsespligt, at der ikke var handlet forsømmeligt. Landsretten brugte i SKM2002.470.ØLR det udtryk, at det relevante cirkulære i den pågældende situation ikke førte til »et entydigt resultat« og frifandt skatteyderen for hæftelse. Hvis den potentielt indeholdelsespligtiges standpunkt derfor har været udtryk for en rimeligt begrundet forståelse af retsgrundlaget og en rimeligt begrundet subsumption, vil der derfor ikke være handlet forsømmeligt - heller ikke selvom det til syvende og sidst viser sig, at den potentielt indeholdelsespligtiges standpunkt ikke var holdbart.

I UfR 2018.3119 H afhang spørgsmålet om skattepligt af, om rette indkomstmodtager af udbyttet var en

**4452**

hollandsk fond eller fondens stifter, som var bosat i Storbritannien. Højesteret fastslog i præmisserne, at der forelå hæftelse og henviste bl.a. til, at det fremgik af Ligningsvejledningen *forud for vedtagelsen af udbyttet*, at udenlandske fonde ikke var rette indkomstmodtagere, hvis fonden ikke opfyldte de danske betingelser for at anse en fond for at i forhold til stifteren uafhængigt retssubjekt.

Heavy Transport Danmarks forståelse af retsgrundlaget må derfor - selvfølgelig -bedømmes efter de tilgængelige retskilder på udlodningstidspunktet. Det var jo, hvad selskabet og dets rådgivere havde at gå ud fra.

Så vidt ses, er der ikke faktuelle uenigheder af betydning for forsømmelighedsbedømmelsen. Uenigheden går på, om det sagsøgte selskab handlede forsømmeligt ved på udlodningstidspunkterne ikke at indse, at udbyttet var skattepligtigt (hvis det altså viser sig at være det), *uanset* at udbyttet blev oppebåret af Heavy Transport Luxembourg, der ubestridt var rette indkomstmodtager.

Det bemærkes herved, at sagen U.2016.2898H - RF Holding handlede om en situation, hvor Højesteret lagde til grund, at de udloddede midler blev ledt uden om rette indkomstmodtager, hvilket indlysende var forsømmeligt. Denne sag er derfor uden betydning for forsømmelighedsspørgsmålet i nærværende sag.

Ved forsømmelighedsvurderingen kan det være nyttigt at erindre om, at sagerne er opstået som følge af en koordineret aktion fra skattemyndighedernes side, hvor man har rejst i første omgang 31 sager, senere i alt 150 sager om hæftelse for ikke-indeholdt udbytteskat som en del af »Skattestyrelsens Kapitalfonds- og kildeskatteprojekt«, jf. Skatteministeriets svar til Folketingets Skatteudvalg at 28. oktober 2019, selvom der ikke tidligere havde været danske sager *overhovedet* om pligt til indeholdelse af udbytteskat under henvisning til, at det modtagende selskab var et gennemstrømningsselskab.

Som tidligere nævnt, udtalte den ansvarlige kontorchef i Skattestyrelsen -påskønnelsesværdigt ærligt - i 2010 om det kommende opgør ved domstolene:

…

Baggrunden er således utvivlsomt, at Skattestyrelsen med iværksættelsen af dette sagskompleks har søgt at pløje ny jord. Man havde ikke fundet det fornødent forinden at varsle de potentielt indeholdelsespligtige om aktionen og de nye synspunkter, som skattemyndighederne ønskede at afprøve.

12.3 *Heavy Transport Danmark har ikke handlet forsømmeligt ved udbytteudlodningen i 2007*

Bl.a. henset til,

*at* sagsøgtes forståelse af de relevante regler er i overensstemmelse med den administrative praksis, som skattemyndighederne ubrudt har fulgt gennem årene, jf. gennemgangen heraf ovenfor i afsnit 2 og 3, herunder at den konkrete situation er nærmest identisk med skatteministerens anvisning i sit svar på spørgsmål 16 til Folketingets Skatteudvalg under behandlingen af L 99/2000 (genindførelsen af udbyttebeskatningen for moderselskaber),

*at* det følger direkte af ordlyden af moder-/datterselskabsdirektivet, at udbyttet er fritaget for kildeskat, herunder at direktivet ikke stiller krav om, at moderselskabet skal være »retmæssig ejer«,

*at* dansk litteratur er på linje med skattemyndighedernes tidligere praksis,

*at* der på internationalt plan er stor usikkerhed om, hvorledes begrebet »beneficial owner« skal fortolkes, jf. bl.a. OECD's forslag til kommentarer fra foråret 2011, hvor det af høringssvarene fremgår, at end ikke forslaget til de nye (præciserende) kommentarer bidrager til at mindske den usikkerhed, der hersker om fortolkningen, og

*at* Heavy Transport Danmark-koncernen forinden transaktionerne indhentede rådgivning hos et førende skatterådgivningsfirma, KPMG, der anviste den pågældende løsning med etableringen af et luxembourgsk mellemholdingselskab uden at tage forbehold om nogen risiko for kildeskat i forbindelse med den påtænkte udbytteudlodning,

er det klart, at Heavy Transport Danmark *ikke* har udvist *»forsømmelighed«.*

Dette bliver imidlertid, som nævnt, helt åbenbart, når der endvidere henses til, at Landsskatteretten har givet Heavy Transport Danmark medhold i, at der *ikke* er indeholdelsespligt. Landsskatterettens EU-retlige fortolkning, der bar det for sagsøgte positive resultat, blev endvidere støttet af EU-Domstolens generaladvokat, af Kommissionen.

At EU-domstolen ved en - efter de fleste kommentatorers opfattelse - højst overraskende og problematisk dom mere end 12 år efter udbytteudlodningen i nærværende sag har fraveget sin faste praksis om, at direktivbestemmelser ikke har virkning for borgerne, hvis de ikke er implementeret i national ret, jf. også Kofoed-dommen, ændrer ikke ved svaret på spørgsmålet om, hvorvidt der foreligger forsømmelighed.

Sagen er således den, at øtresteskilder, som var tilgængelige på udlodningstidspunktet, *entydigt* taler for, at udlodningen var *skat-*

*tefri*. Man *kan* ikke forlange, at en dansk skatteyder skal være klogere på EUretten end EU-Domstolens egen generaladvokat og Kommissionen - eller Landsskatteretten for den sags skyld.

Skatteministeriet gør vist nok gældende, at Heavy Transport Danmark burde have foretaget nærmere undersøgelser med henblik på at afklare, om betingelserne for manglende indeholdelse var opfyldt.

Sagen er imidlertid den, at Heavy Transport Danmark foretog nøjagtig de undersøgelser, som man kan

**4453**

forvente, nemlig at konsultere et af de førende skatterådgivningsfirmaer, KPMG, som altså foreslog den pågældende konstruktion helt uforbeholdent. Og da det netop var den metode, som Skatteministeriet selv havde anvist over for Folketinget, forekom holdbarheden af den valgte ordning så åbenbar, at Heavy Transport Danmark ikke fandt anledning til at foretage yderligere undersøgelser - hvad man da heller ikke kan forlange.

Og hvad skulle man ellers have gjort yderligere? En forespørgsel til SKAT i 2006 ville - på baggrund af forarbejderne til bestemmelsen om begrænset skattepligt i 2001 - utvivlsomt have ført til samme resultat. Og hvis SKAT havde været af den opfattelse, at der skulle indeholdes udbytteskat, ville en klage til den øverste administrative ligningsmyndighed - Landsskatteretten - jo have ført til en ændring af SKATs afgørelse, jf. den indbragte afgørelse.

Hertil kommer, at den valgte konstruktion da heller ikke på nogen måde fremstod som »aggressiv skatteplanlægning« eller noget tilsvarende, eftersom det jo ligger fast, at koncernen - som et fuldgodt alternativ - kunne have valgt at foretage en betalingserklæringslikvidation af det danske selskab i maj 2007 (hvor udbytteudlodningen skete) med udlodning af likvidationsprovenuet (altså de samme midler) *uden indeholdelse af dansk kildeskat*. Hvilket koncernen naturligvis havde gjort, såfremt man havde haft den mindste anelse om, at det valgte alternativ med indskydelsen af et mellemholdingselskab i Luxembourg og udlodning af udbytte den vej ville udløse en dansk kildeskat - en »dummebøde« -på en halv milliard kroner + et endnu højere beløb i (uundgåelige) morarenter.

Østre Landsret har i sin dom af 3. maj 2021 i NetApp-sagen (dommens s. 250, 2. og 3. afsnit) udtalt følgende:

I Østre Landsrets dom af 25. november 2021 i Takeda-sagen hedder det tilsvarende (dommens s. 306, 2. og 3. afsnit):

…

Disse præmisser kan opfattes således, at landsretten pålægger de potentielt indeholdelsespligtige selskaber risikoen for den *retlige* usikkerhed om anvendelsen af begrebet »beneficial owner« og og - i overensstemmelse med Skatteministeriets opfattelse - vel nærmest et objektivt ansvar herfor.

Heri er Heavy Transport Danmark naturligvis ikke enig. Det er klart, at Heavy Transport Danmark har kendt til de faktiske omstændigheder i sagen, men Heavy Transport Danmark har, som netop redegjort for, med god ret haft føje til at gå ud fra, at bl.a. Skatteministerens uforbeholdne udsagn var valide, og det kan ikke lægges Heavy Transport Danmark til last, hvis selskabet - til syvende og sidst -måtte have taget fejl.

Og at Østre Landsret i NetApp-sagen fandt, at den omstændighed, at Landsskatteretten havde givet NetApp medhold i sagen, og at landets øverste ligningsmyndighed (på samme måde som Europa-Kommissionen og EU-Domstolens generaladvokat) dermed ikke havde forstået reglerne, ikke spillede nogen rolle for forsømmelighedsvurderingen, er efter Heavy Transport Danmarks opfattelse højst overraskende - men jo nok et naturlig konsekvens af det *de facto* objektive ansvar, som landsretten har anvendt. Som det er fremgået, er Heavy Transport Danmark ikke enig i denne vurdering.

Skatteministeriet gør vist nok gældende, at det ikke i sagen kan lægges til grund, at KPMG afgav en uforbeholden rådgivning om, at der var skattefrihed for det af sagen omhandlede udbytte. Skatteministeriet henviser i den forbindelse til, at den i sagen fremlagte e-mailkorrespondance ikke er ledsaget af en erklæring fra KPMG om, at den fremlagte mailkorrespondance udgør den fulde rådgivning, som KPMG har ydet til koncernen vedrørende det omhandlede arrangement med indskydelsen af et selskab i Luxembourg mellem Heavy Transport Danmark og sidstnævntes selskabs ejere i Panama, og at Heerema-koncernen fortsat kunne henholde sig til rådgivningen, da beslutningen om udlodning blev truffet den 23. maj 2007.

Det bemærkes i den forbindelse, at der ikke foreligger anden (opfølgende/bekræftende) rådgivning, og at det af korrespondancen klart fremgår, i hvilken forbindelse rådgivningen skulle anvendes. Koncernen har jo til punkt og prikke fulgt den model, som KPMG rådgav om. At man fæstede lid til rådgivningen ses jo også derved, at koncernen fandt, at KPMG potentielt havde handlet ansvarspådragende.

Skatteministeriet forsøger således at bestride faktum.

Om retspraksis på dette område bemærkes, at det ikke kan undre, at Højesteret i afgørelserne UfR 2004.362 H og UfR 2008.2243 H har givet Skatteministeriet medhold i, at der var handlet »forsømmeligt«. Det forekommer rimeligt klart i begge sager. Ingen af disse domme er derfor præjudicerende for nærværende sag.

Den omstændighed, at Højesteret i præmisserne i sagerne har nævnt, at den indeholdelsespligtige var »bekendt« med de faktiske forhold, der førte til, at der forelå indeholdelsespligt, kan ikke - som antaget af Skatteministeriet - tages som udtryk for, at dette skulle være den afgørende præmis. Tværtimod, er den indeholdelsespligtiges kendskab til de faktiske forhold den første betingelse for at statuere »forsømmelighed«, og Højesteret fortsætter da også med at konstatere, at den indeholdelsespligtige »ikke har haft føje« til at antage, at der ikke var indeholdelsespligt.

Det bestrides, at Heavy Transport Danmark skulle være underlagt en skærpet agtsomhedsbedømmelse, fordi der angiveligt var tale om omgåelse af en værnsregel. For det første bestrides det, at SEL § 2, stk. 1, litra c, om begrænset skattepligt er en værnsregel. Hertil

**4454**

kommer, at realiteten var, at de omtvistede midler, som nævnt, kunne være overført skattefrit til de to aktionærer i Panama uden dansk kildeskat ved en simpel betalingserklæringslikvidation. Etableringen af Heavy Transport Luxembourg og udbytteudlodningen dertil, fremstod derfor ikke som en mulighed, der »var for god til at være sand«, men blot som et mere praktisk alternativ til den i forvejen skattefrie løsning, som ellers lå lige for, såfremt rådgiverne ikke havde foreslået løsningen med Heavy Transport Luxembourg.

Det giver ikke nogen mening at tale om en skærpet agtsomhedsbedømmelse, fordi parterne var interesseforbundne, når agtsomhedsvurderingen drejer sig om den juridiske subsumption. Den juridiske bedømmelse af, om et mellemholdingselskab som Heavy Transport Luxembourg kan påberåbe sig DBO'en eller direktivet er jo upåvirket af, om Heavy Transport Luxembourg var minoritetsaktionær eller majoritetsaktionær i Heavy Transport Danmark.

Endelig bemærkes det, at overvejelserne om at udlodde udbytte til Heavy Transport Luxembourg som alternativ til en likvidation udspring af sædvanlige forretningsmæssige dispositioner. Det danske selskab havde solgt det underliggende driftsselskab med gevinst, og overvejelserne om hjemtagningen af provenuet var en forretningsmæssigt begrundet overvejelse. I hvert fald i en sådan situation hviler der en pligt på professionelle rådgivere - sanktioneret af erstatningsansvar - til at oplyse om almindeligt kendte veje til at få forretningsmæssigt begrundede mål og herunder anvise

den vej, som udløser den mindst mulige skattebetaling, jf. U.1985.589H (MS 619) og U.2005.3151H (MS 711), også selvom sådan rådgivning på sin vis sker til skade for statskassen.

Det vil derfor være selvmodsigende og uacceptabelt, hvis en sådan rådgivning få et nærmest objektivt grundlag anses for forsømmelig i henseende til kildeskattelovens § 69, såfremt det senere viser sig, at fremgangsmåden ikke var holdbar. Der bør derfor foretages en konkret vurdering af, om rådgiver og skatteyder på dispositionstidspunktet havde et rimeligt grundlag for at antage, at en fremgangsmåde ville blive accepteret skattemæssigt - også selvom der lå skattemæssige overvejelser bag den valgte fremgangsmåde. Det er her til fulde demonstreret, at det var rimeligt at antage, at fremgangsmåden ville blive accepteret, idet rådgivernes retsopfattelse fandt støtte både hos Landsskatteretten, Kommissionen og generaladvokaten.

På den anførte baggrund gøres det samlet gældende, at der *ikke* er grundlag for at anse Heavy Transport Danmark for at have handlet »*forsømmeligt«*.

*13 ANBRINGENDER TIL STØTTE FOR DE SUBSIDIÆRE PÅSTANDE*

13.1 *Indledende bemærkninger*

…

Spørgsmålet om forrentning af det af sagen omhandlede kildeskattekrav, der altså udgør ca. 450 mio. kr., har udviklet sig til en egentlig skandale. Det af Skatteministeriet påståede morarentebeløb vil på det forventede domsafsigelsestidspunkt (den 3. maj 2022) nemlig beløbe sig til ca. *808 mio. kr.* Dette exorbitante beløb skyldes - ud over sagens tidsmæssige udstrækning -navnlig to forhold; dels at staten opkræver en (ikke-fradragsberettiget) »ågerrente« (der navnlig som følge af rentes rente-elementet overstiger markedsrenten med flere hundrede procent), og dels at Heavy Transport Danmark på intet tidspunkt under retssagen har haft mulighed for at betale beløbet med tilbagesøgningsforbehold, da skattemyndighederne i disse sager konsekvent har nægtet at modtage skattekravet med den begrundelse, at der - så længe Landsskatterettens kendelse ikke er underkendt - ikke eksisterer noget krav. Hvis Skatteministeriet får medhold i sin påstand, vil det således - uafværgeligt - have kostet Heavy Transport Danmark 808 mio. kr. at få prøvet skattekravet på ca. 450 mio. kr.

Skatteministeriet er, som nævnt, af den opfattelse, at et eventuelt kildeskattekrav skal forrentes fra og med 14 dage efter SKATs afgørelse af 7. december 2010 (dvs. fra og med den 21. december 2010).

Skatteministeriet anser således SKATs afgørelse for at være det for morarenteberegning afgørende »påkrav« efter opkrævningslovens § 5, på trods af at Heavy Transport Danmark i 2012 har fået medhold af Landsskatteretten i, at selskabet *ikke* var forpligtet til at indeholde kildeskat. At selskabet således har vundet sagen i Landsskatteretten har bl.a. haft den konsekvens, at Skattestyrelsen *ikke* anser Heavy Transport Danmark for at have en gæld til skattemyndighederne (selv om skattemyndighederne altså har stævnet selskabet for kravet), hvorfor Skattestyrelsen - under retssagen - har nægtet Heavy Transport Danmark og andre selskaber i en tilsvarende situation muligheden for at foretage indbetaling af det påståede kildeskattekrav med henblik på at afværge rentetilskrivninger (for det tilfælde at domstolene måtte give Skatteministeriet medhold og tilsidesætte Landsskatterettens afgørelse). Og det endda, selvom selskaberne fraskriver sig retten til at kræve kompensationsrenter, såfremt de måtte få medhold i sagen, og beløbet dermed skulle tilbagebetales.

Hertil kommer, at Skatteministeriet i sagen er af den opfattelse, at kildeskattekravet ikke blot skal forrentes med den i forvejen høje (og ikke-fradrags-berettigede) morarente efter opkrævningslo-

vens § 7 (i nærværende sag 0,8 %, henholdsvis 0,7 %, pr. måned), men tillige skal forrentes efter reglerne om én skattekonto siden disse reglers ikrafttræden i 2013, dvs. at der skal foretages en månedlig rentetilskrivning, hvilket indebærer, at der skal beregnes (og betales) rentes rente i denne

**4455**

foreløbigt næsten 10årige periode siden reglernes ikrafttræden (selv om selskabet altså ikke har haft nogen betalbar gæld i perioden). I øjeblikket påløber der således en *månedlig* rente på ca. 8,8 mio. kr., svarende til en årlig rente af hovedstolen på ca. 23,5 %.

Det bemærkes videre, at Skattestyrelsen i disse få (vist nok 4-5) udbyttekildeskattesager (hvor skatteyderne har fået medhold i Landsskatteretten, og hvor sagerne er indbragt for domstolene af Skatteministeriet) har afvist at foretage en beregning af det morarentebeløb, som selskaberne skal betale, såfremt Skatteministeriet får medhold i sagen …. Som det fremgår, er begrundelsen, at kildeskattekravet ikke indgår som en gæld på selskabets skattekonto.

Heavy Transport Danmark har derfor måttet foretage sine egne beregninger, og ifølge disse har Skatteministeriets synspunkter, som nævnt, den økonomiske konsekvens, at der vil være påløbet betalbare morarenter på hovedstolen (der altså udgør ca. 450 mio. kr.) med ca. 808 mio. kr. pr. den forventede dato for Østre Landsrets dom den 3. maj 2022.

Bliver Heavy Transport Danmark frifundet ved landsrettens dom, og Skatteministeriet herefter anker dommen til Højesteret, vil Heavy Transport Danmark (efter Skatteministeriets opfattelse) forts først kan anses for fremsat (med rette), når - og hvis - landsretten (eller Højesteret) måtte give Skatteministeriet medhold i den nedlagte påstand. senere, hvilet der være påløbet yderligere 229 mio. kr. i morarenter, hvilket dermed bringer den samlede - uundgåelige - morarente op på ca. 1.037 mio. kr., eller langt mere end det dobbelte af hovedstolen.

Ud over at morarentesatsen er langt højere end markedsrenten, og at Heavy Transport Danmark, som nævnt, ikke har haft mulighed for at afværge morarenten, gælder, at morarenten - i modsætning til andre renter - ikke er fradragsberettiget ved opgørelsen af den skattepligtige indkomst. Den reelle morarente er dermed endnu højere end de nævnte 23,5 % p.a. (hvilken rente skal sammenholdes med et markedsrenteniveau for virksomheder, der for tiden ikke oversiger (effektivt) 3 % p.a.).

Når staten opkræver morarenter af en størrelse som i denne sag, og samtidig nægter at modtage skattebeløbet under sagens behandling, kan borgeren (virksomheden) i realiteten afskæres fra at få et materielt skattekrav prøvet ved domstolene. Det er således nok de færreste virksomheder, der har råd til at »satse« ca. 808 mio. kr. i morarenter for at få prøvet et skattekrav på 450 mio. kr., og under alle omstændigheder er rentekravet fuldstændigt disproportionalt i forhold til hovedstolen. Virksomhedens eneste mulighed for at undgå de pågældende renter er efter Skatteministeriets opfattelse at tage bekræftende til genmæle i sagen, med den konsekvens at Heavy Transport Danmark afskæres fra domstolsprøvelse af kravet.

At afskære borgeren fra klageadgang og domstolsprøvelse, kan imidlertid ikke have været intentionen med morarentereglerne. At Heavy Transport Danmark *de facto* skulle være afskåret fra at få sagen prøvet (ved at tage bekræftende til genmæle), er da også en ganske absurd tanke, når det tages i betragtning, at Heavy Transport Danmark vandt sagen i Landsskatteretten, og at lovgiver i øvrigt i et sådant tilfælde - hvor skatteyder er sagsøgt af staten - har bestemt, at Heavy Transport Danmarks sagsomkostninger ved domstolsbehandlingen skal dækkes *fuldt ud* af det offentlige efter reglerne om omkostningsgodtgørelse i skattesager, jf. skatteforvaltningslovens kapitel 19.

Det bemærkes hertil, at den foregående skatteminister da også i sin Retssikkerhedspakke V med titlen »Et opgør med urimelige skatteregler« fra april 2019 lagde op til, at der skulle indføres mulighed for at betale et skattekrav i en situation som den foreliggende, hvor det er Skatteministeriet, der sagsøger borgeren, således at borgeren ikke bliver mødt med et stort, urimeligt og (angiveligt) uundgåeligt rentekrav, såfremt borgeren taber sagen.

Skatteministeriet er således fuldt ud opmærksom på, at renteopkrævningen er i strid med retssikkerhedsprincippet.

Som det vil fremgå, gør Heavy Transport Danmark gældende, at der heller ikke hjemmel til denne opkrævning.

13.2 *Anbringender til støtte for den subsidiære påstand*

…

13.2.1 *Forrentning kan først ske med virkning 14 dage efter en dom, der måtte give Skatteministeriet medhold*

Til støtte for Heavy Transport Danmarks subsidiære påstand gør selskabet altså *i første række* gældende, at påkravet i opkrævningslovens § 5, stk. 1, *under de i sagen foreliggende omstændigheder* først kan anses for fremsat (med rette), når - og hvis - landsretten (eller Højesteret) måtte give Skatteministeriet medhold i den nedlagte påstand.

Landsskatterettens afgørelse af 29. august 2012 går ud på, at der *ikke* er indeholdelsespligt. Der består derfor ikke noget skattekrav. Dette er det endelige resultatet af den administrative behandling. Med Landsskatterettens afgørelse er SKATs afgørelse af 7. december 2010 ophævet. Den eksisterer altså ikke længere - og kildeskattekravet er dermed væk. En eventuelt allerede indbetalt skat (og eventuelt indbetalte morarenter) tilbagebetales med tillæg af godtgørelsesrenter.

Også det fremsatte påkrav er væk. Når den administrative sagsbehandling er afsluttet med, at der ikke består et krav, giver det ingen mening at hævde, at der fortsat foreligger et påkrav.

**4456**

Skattemyndighedernes afvisning i disse udbyttesager af at modtage betaling dokumenterer til fulde, at også skattemyndighederne er af den opfattelse, at der *ikke* eksisterer noget krav.

Skatteministeriet har indbragt Landsskatterettens afgørelse for domstolene, jf. grundlovens § 63. Det er altså Landsskatterettens afgørelse - og ikke SKATs afgørelse - der er til prøvelse ved domstolene. Der kan derfor tidligst foreligge et (gyldigt) påkrav, når - og hvis - domstolene måtte fastslå, at Heavy Transport Danmark hæfter for et skattekrav. Først fra dette tidspunkt kan Heavy Transport Danmark være i mora.

Denne forståelse støttes af en fortolkning af opkrævningslovens § 5 suppleret af almindelige forvaltningsretlige principper samt obligationsretlige regler om fordringshavermora m.v.

I opkrævningslovens § 5, stk. 1, hedder det:

…

I opkrævningslovens § 7, stk. 1 - som er den bestemmelse, ministeriet støtter sit rentekrav på - hedder det:

…

Seneste rettidige betalingstidspunkt er således senest 14 dage efter påkrav. Betales beløbet inden for denne frist, er der ikke hjemmel til at kræve beløbet forrentet.

Dette har udtrykkelig støtte i lovbemærkningerne til § 5, jf. lovforslag nr. 19 af 6. oktober 1999 ….

Heavy Transport Danmark gør gældende, at bestemmelsen om forrentning har som klar forudsætning, at der foreligger en »seneste rettidige betalingsdag«, dvs. en dag, på hvilken skatteyderen kan indbetale det opkrævede beløb, *uden* at blive opkrævet forsinkelsesrenter efter loven.

Og videre at det følger af en ordlydsfortolkning af opkrævningslovens § 5, stk. 1, at der ikke foreligger noget for bestemmelsen

Copyright © 2023 Karnov Group Denmark A/S

relevant »påkrav«, før at domstolen måtte have givet medhold til Skatteministeriet.

I øjeblikket eksisterer der således kun én forvaltningsretlig afgørelse, nemlig den afgørelse, som Landsskatteretten som øverste administrative klageinstans traf den 29. august 2012 - og som fastslog, at Heavy Transport Danmark ikke var forpligtet til at indeholde kildeskat. SKATs afgørelse (påkrav om betaling) af 7. december 2010 er dermed bortfaldet.

Påkravet efter opkrævningslovens § 5 opstår derfor først, når - og hvis - landsretten (eller Højesteret) giver Skatteministeriet medhold i den nedlagte beløbsmæssige påstand.

At skatteforvaltningens oprindelige afgørelse/påkrav er bortfaldet, støttes netop af, at skatteforvaltningen - under nærværende retssag - har nægtet de (ganske få) selskaber, der står i samme situation som Heavy Transport Danmark, muligheden for at foretage betaling af det påståede kildeskattekrav (med henblik på at undgå yderligere rentetilskrivninger), jf. nærmere nedenfor i afsnit 13.2.2.

Heavy Transport Danmarks synspunkt støttes således af, at skattemyndighederne ikke har ment sig berettiget til at modtage det beløb, som de har stævnet Heavy Transport Danmark for.

Det giver ganske enkelt ingen mening at tale om, at Heavy Transport Danmark er i »mora«, når Heavy Transport Danmark ikke kan betale og derved frigøre sig for en gæld. Dermed kan der heller ikke opkræves »morarenter«.

Skatteministeriet har i denne forbindelse bemærket, at en dom, som giver Skatteministeriet medhold, ikke vil være af konstitutiv karakter, men derimod (alene) af konstaterende karakter.

Dette er Heavy Transport Danmark altså ikke enig i, og i øvrigt er det ikke afgørende, hvorledes dommen karakteriseres.

Det afgørende er derimod, at den administrative sagsbehandling er afsluttet med, at den øverste ligningsmyndighed - Landsskatteretten - har truffet afgørelse om, at kildeskattekravet ikke består, hvilket altså også er baggrunden for, at skatteforvaltningen ikke har ment sig berettiget til at modtage det påstævnte beløb.

Heavy Transport Danmark har således i øjeblikket ingen gæld til skattemyndighederne. Den opstår, som nævnt, først hvis - og på det tidspunkt hvor - Skatteministeriet måtte få medhold i sin beløbspåstand ved domstolene.

Skatteministeriet henholder sig forståeligt nok til Østre Landsrets dom af 2. juli 2021 vedrørende det tilsvarende morarentespørgsmål i NetApp-sagen.

I dommen har Østre Landsret fundet, at der skal betales renter af kravet fra 14 dage efter påkravet i henhold til SKATs afgørelse.
…

NetApp Denmark ApS forespurgte ved mail af 4. december 2015 om muligheden for at deponere det omtvistede beløb. Henvendelsen må efter sit indhold forstås således, at der er tale om et tilbud om betaling med forbehold for tilbagesøgning. Der er herved tale om en genkaldelig disposition.

Landsretten finder, at en sådan genkaldelig disposition, såfremt den var blevet gennemført, ikke ville kunne medføre en endelig frigørelse af NetApp Denmark ApS med den virkning, at der ikke skal betales renter for perioden, indtil endelig betaling sker.

Da der ikke er tilbudt betaling med frigørende virkning, kan afvisning af at modtage beløbet endvidere ikke anses for fordringshavermora med den virkning, at der ikke skal betales renter fra tidspunktet for afvisning.

Som det fremgår af dommen, har landsretten baseret sin afgørelse på, at den dom, der fastslår, at SKATs krav er rigtigt, er af konstaterende karakter (og dermed »genopliver« det oprindelige påkrav).

Heavy Transport Danmark er, som det er fremgået, ikke enig heri. Det er NetApp heller ikke, idet selskabet har anket dommen til Højesteret.

**4457**

### 13.2.2 Forretning kan ikke ske under domstolsbehandlingen

I anden række gøres det gældende, at skatteforvaltningen som offentlig myndighed under alle omstændigheder har været uberettiget til at nægte at modtage kildeskattebeløbene i dette sagskompleks, og at Skatteministeriet af denne grund har fortabt retten til at opkræve renter fra og med tidspunktet for Landsskatterettens kendelse.

Som nævnt indledningsvis, har Landsskatteretten i dette sagskompleks givet SKAT medhold i rentekildeskattesagerne, mens Landsskatteretten har givet skatteyderne medhold i udbyttekildeskattesagerne, herunder nærværende. Der er, så vidt vides, tale om, at Landsskatteretten har truffet afgørelse i 4 eller 5 udbyttesager.

Skatteministeriet har, så vidt vides, indbragt alle disse udbyttesager for domstolene. Undertegnede repræsenterer - og har fra sagernes opstart repræsenteret - 3 af disse selskaber, herunder NetApp.

Siden sagernes indbringelse for domstolene i 2011/2012, har der pågået drøftelser med skatteforvaltningen om, hvorvidt der kunne ske indbetaling af de kildeskattekrav, der var rejst af SKAT, og for hvilke Skatteministeriet nu havde stævnet selskaberne. Formålet hermed var naturligvis at undgå, at der skulle påløbe (yderligere) morarenter af kravene, mens sagerne verserede for domstolene, for det tilfælde at Skatteministeriet måtte vinde sagerne.

Samme problemstilling havde skatteyderne ikke i rentekildeskattesagerne, idet selskaberne her kunne foretage indbetaling af skattekravene, da sagerne jo var tabt i Landsskatteretten. Langt de fleste - om ikke alle - selskaber med rentekildeskattesager har vist nok foretaget betalinger af kildeskatten med henblik på netop at undgå (yderligere) morarenter.

Efter nogen betænkningstid måtte Skattestyrelsen imidlertid meddele, at de ikke havde hjemmel til at modtage betaling, eftersom der ikke forelå noget skattekrav. Selskaberne havde således ikke nogen gæld til Skattestyrelsen.

Som advokater for NetApp - men jo også for Heavy Transport Danmark og et tredje selskab i samme situation, Copenhagen Airports Denmark Holding ApS - ønskede vi i 2015 (hvor sagerne efter tre års tilløbstid først var klar til at blive forelagt for EU-Domstolen) at gøre et sidste forsøg på at foretage indbetaling, selv om Skattestyrelsens holdning allerede var kendt.

Ved mail-korrespondance af den 4. december 2015 forespurgte vi derfor - ganske vist direkte på vegne NetApp Danmark, men jo i realiteten på vegne alle selskaber i samme situation - Skattestyrelsen om muligheden for at betale det hævdede skattekrav for at stoppe et eventuelt rentekrav. Vi erklærede samtidig, at selskabet i givet fald ikke ville fremsætte krav om forrentning af beløbet ved tilbagebetaling til selskabet, såfremt retssagen måtte blive vundet af selskabet.

Skattestyrelsen afslog imidlertid igen at tage imod betaling med henvisning til, at der ikke »er adgang til at foretage den anmodede indbetaling«. Det må forstås således, at Skattestyrelsen ikke mente, at der var hjemmel til at gå ind på den foreslåede ordning, hvilket jo også er Skatteministeriets standpunkt.

Heavy Transport Danmark bestrider, at Skattestyrelsen som offentlig myndighed ikke har haft hjemmel til at tage imod det beløb, som ministeriet har stævnet selskabet for.

Det gøres hertil overordnet gældende, at skatteforvaltningen uden specifik hjemmel selvfølgelig har adgang til at modtage betaling, som man mener at have til gode, uanset om der verserer en tvist om berettigelsen af opkrævningen. Selvom Skattestyrelsen er forpligtet til at følge Landsskatterettens kendelse og udbetale skatteyderen et evt. tilgodehavende, hvis denne ønsker det, er det ikke ensbetydende med, at Skattestyrelsen er afskåret fra at modtage en betaling under tilbagesøgningsforbehold.

Det gøres herved gældende, at Skattestyrelsen har kompetencen til at udøve almindelige kreditorbeføjelser på statens vegne og herunder modtage betalinger med tilbagesøgningsforbehold, og det følger af almindelige forvaltningsretlige grundsætninger, herunder navnlig et proportionalitetsprincip, at Skattestyrelsen skal modtage betaling (under tilbagesøgningsforbehold), hvis der ikke foreligger vægtige og saglige modhensyn, hvilket ikke er tilfældet i denne sag.

Østre Landsret har i sin dom af 2. juli 2021 i NetApp-sagen (om det udskilte rentespørgsmål) taget stilling til det tilsvarende spørgsmål rejst i den pågældende sag - en dom, som Skatteministeriet naturligvis henholder sig til.

I dommen har Østre Landsrets flertal således ikke fundet grundlag for at tillægge en eventuel betalingstilbud nogen betydning for forrentningen.

…

Heavy Transport Danmark er naturligvis ikke enig i flertallets votum. NetApp har, som nævnt, også anket dommen til Højesteret.

Skatteministeriet gør i nærværende sag vist nok gældende, at Heavy Transport Danmark under alle omstændigheder slet ikke har tilbudt skatteforvaltningen at betale et beløb svarende til den ikke indeholdte kildeskat.

Hertil bemærkes, at Heavy Transport Danmark jo vidste, at SKAT ikke ville tage imod betaling, hvorfor det ikke gav mening at fremkomme med et egentligt tilbud om betalingen.

Indirekte er der imidlertid fremsat et tilbud.

Det fremgår således af den oven for omtalte mail-korrespondance mellem (NetApp og) Heavy Transport

**4458**

Danmarks advokat og SKAT fra 2015, at henvendelsen har en vis generel karakter, idet den refererer til »de sager, der vedrører udbyttekildeskat« … hvor … »Skatteministeriet har indbragt sagerne for domstolene«, og som »eksempel« en specifik sag (NetApp).

Så vidt sagsøgte er bekendt, er den pågældende problemstilling, som nævnt, alene relevant for 4 eller 5 potentielt indeholdelsespligtige selskaber, hvoraf undertegnede altså repræsenterer de 3 selskaber; NetApp Denmark ApS, Copenhagen Airports Denmark Holding ApS samt Heavy Transport Danmark.

Og det fremgår af skrivelsen, at SKAT helt generelt afviser at tage mod betaling i tilsvarende sager.

Selv om den pågældende korrespondance måtte blive anset for alene at vedrøre en konkret henvendelse på vegne en specifik skatteyder, NetApp Denmark ApS, der altså er repræsenteret af samme advokat, gøres det gældende, at på dette grundlag - dvs. når sagsøgtes advokat var bekendtgjort med SKATs generelle holding - ikke kan kræves, at Heavy Transport Danmark formelt (også) tilbød betaling. Det giver således ingen mening - og er et udtryk for ren formalisme - at sagsøgte på dette grundlag formelt skulle have sendt et identisk brev, når man kendte svaret.

Skatteministeriet har i øvrigt vist nok det synspunkt, at Heavy Transport Danmarks standpunkt vil føre til, at alle skatteydere vil kunne afvise at betale morarenter. Dette er dog ikke rigtigt. Hvis Skattestyrelsen ændrer praksis, til det selvsagt fremover kræve en konkret anmodning og betaling fra skatteyderens side for at afbryde rentetilskrivningen, men hvis domstolene når frem til, at skattemyndighedernes praksis har været retsstridig, skal skatteyderne stilles, som om skattemyndigheder havde tilladt indbetaling med tilbagesøgningsforbehold, uden at det kræves, at skatteyderne har afsendt en anmodning til skattemyndighederne, som efter skattemyndighedernes - retsstridige - praksis har afvist at modtage betalingen.

**13.3 Anbringender til støtte for den mere subsidiære påstand**

13.3.1 *Forrentning skal ikke ske efter reglerne om én skattekonto i opkrævningslovens kapitel 5*

Heavy Transport Holding Denmark ApS' mere subsidiære påstand går ud på, at Skatteministeriet skal anerkende, at forrentningen af kildeskattekravet efter opkrævningslovens § 7 i perioden fra den 21. december 2010 og indtil 14 dage efter afsigelsen af en dom, der måtte give Skatteministeriet medhold i sagen, under alle omstændigheder udelukkende skal ske efter opkrævningslovens § 7, og dermed at kravet ikke før det nævnte tidspunkt skal indgå på skattekontoen efter reglerne om én skattekonto i opkrævningslovens kapitel 5.

Til støtte for denne påstand gør Heavy Transport Danmark gældende, at der under alle omstændigheder ikke er hjemmel i opkrævningsloven til at lade »gælden« indgå på skattekontoen fra og med det pågældende tidspunkt (14 dage efter SKATs afgørelser), og at der dermed bl.a. ikke kan ske beregning af rentes rente af »gælden«.

Forrentningen i perioden indtil 14 dage efter afsigelsen af en dom, der måtte give Skatteministeriet medhold i sagen, skal dermed (udelukkende) ske efter hovedreglen i opkrævningslovens § 7, dvs. med simpel rente.

Ved beregning med simpel rente vil morarenterne pr. den 3. maj 2022 udgøre ca. 482 mio. kr. (i modsætning til det beløb på ca. 808 mio. kr., der vil være påløbet, såfremt der skal betales renters rente). Rentes rente-elementet under skattekontosystemet således i sig selv en betydelig del af den - i forvejen urimelige - (grund-)rente, der efter Skatteministeriets opfattelse skal betales, på trods af at der ikke i perioden har bestået en gæld, som Heavy Transport Danmark har kunnet betale.

Det siger sig selv, at det er at »hælde benzin på bålet« - og dermed endnu mere urimeligt - at toppe forrentningen op med en rentes rente, altså en forrentning af den rente, som selskabet ikke har kunnet undgå ved at betale hovedstolen.

Det er dog ikke blot urimeligt, men også efter Heavy Transport Danmarks opfattelse uhjemlet.

Som nævnt ovenfor, har opkrævningslovens § 7, stk. 1 - som er den bestemmelse, ministeriet støtter sit rentekrav på - følgende ordlyd:

…

Udgangspunktet efter opkrævningsloven er således, at et krav forrentes med én rentetilskrivning (nemlig ved betaling), dvs. uden rentes rente (simpel rente), medmindre reglerne i lovens kapitel 5 (om én skattekonto) finder anvendelse (hvor der sker månedlige rentetilskrivninger, dvs. der beregnes rentes rente, jf. nærmere nedenfor).

Reglerne om én skattekonto i opkrævningslovens kapitel 5 blev indført ved lov nr. 513 af 7. juni 2006 - men dog først sat i kraft med virkning pr. 1. august 2013 - og indebærer grundlæggende, at ind- og udbetalinger fra og til virksomheder angående de fleste skatter og afgifter (og renter heraf) indgår i én samlet saldoopgørelse (skattekontoen), således at ind- og udbetalinger automatisk modregnes efter et saldoprincip, jf. herved opkrævningslovens § 16 og § 16 a, stk. 1.

Hvis den samlede sum af registrerede forfaldne krav på virksomhedens konto overstiger den samlede sum af registrerede og forfaldne tilgodehavender til virksomheden, udgør forskellen (debetsaldoen) det samlede beløb, som virksomheden skylder told- og skatteforvaltningen, jf. opkrævningslovens § 16 a, stk. 2, 1. pkt. En sådan debetsaldo forrentes efter § 16 c, stk. 1, hvoraf følger, at en debetsaldo forrentes med den rente, der er fastsat i

**4459**

§ 7, stk. 1, jf. stk. 2, og at renten beregnes dagligt og tilskrives månedligt. Hvis en sådan debetsaldo overstiger 5.000 kr., skal beløbet straks indbetales, jf. § 16 c, stk. 4.

Er der tale om, at den samlede sum af registrerede og forfaldne krav på indbetalinger fra virksomheden er mindre end de registrerede og forfaldne krav på udbetalinger til virksomheden, udgør forskellen (kreditsaldoen) virksomhedens samlede tilgodehavende hos told- og skatteforvaltningen, jf. § 16 a, stk. 2, 2. pkt. En sådan kreditsaldo, der ikke forrentes, jf. § 16 c, stk. 3, skal udbetales til virksomhedens Nemkonto efter reglerne i § 16 c, stk. 5.

I de almindelige bemærkninger (pkt. 1.3) til lovforslaget om indførelsen af én skattekonto (L 205 - 2005/06) (MS 165) hedder det bl.a.:

…

I lovens § 16 a hedder det således bl.a.:

…

I lovens § 16 c, stk. 1, hedder det videre:

…

Selskabets gæld til det offentlige (debetsaldoen) forrentes således med den rente, der fremgår af lovens § 7, og med månedlige tilskrivninger. At renten tilskrives månedligt, indebærer, som nævnt, at der opkræves rentes rente, såfremt virksomheden ikke betaler gælden (udligner saldoen).

Der er ikke i forarbejderne til bestemmelserne taget stilling til, hvorledes der skal forholdes i forhold til skattekontoens regler i en situation som den foreliggende, hvor skatteyder har vundet en sag i Landsskatteretten, hvorefter sagen indbringes for domstolene af Skatteministeriet, og hvor skatteyderen angiveligt ikke har mulighed for indbetaling, da kravet ikke anser denne domstolsbehandling er registreret på skattekontoen (og hvor kravet så »genopstår« på et senere tidspunkt ved debitering på skattekontoen). I det hele taget er (sædvanlige) klagesituationer, herunder henstand, slet ikke adresseret i lovforslaget.

Heavy Transport Danmark gør gældende, at der - for at et krav mod et selskab på indbetaling af skat skal påvirke (debiteres) saldoopgørelsen (skattekontoen) - skal foreligge vished for, at kravet består, ligesom den seneste rettidige betalingsdag for beløbet skal være overskredet.

Der foreligger først vished for, at kravet består, når - og hvis - domstolen måtte give Skatteministeriet medhold i den nedlagte påstand. Hertil kommer, at det ikke giver mening at tale om en tidligere (og nu »genopstået«) »seneste rettidige betalingsdag«, når der ikke er mulighed for at indbetale til skattekontoen (idet der ikke er registreret nogen gæld).

Som nævnt flere gange, kan der nemlig ikke ske betaling i øjeblikket, da kravet ikke eksisterer (og der er uvished om, hvorvidt det kommer til at eksistere). Dermed kan kravet først debiteres skattekontoen på dette tidspunkt, og dermed skal forrentningen for perioden indtil domstolens afgørelse ske efter de almindelige regler i opkrævningslovens § 7 (hvis der overhovedet skal ske forrentning, jf. synspunkterne gennemgået ovenfor), dvs. med én rentetilskrivning, eller - sagt med andre ord - uden rentes rente.

Det giver ingen mening at tale om, at der består en (rentetilskrivningsberettiget) gæld på et tidspunkt, hvor »debitor« ikke kan frigøre sig herfor, herunder at »seneste rettidige betalingsdag for beløbet« er overskredet under disse helt særlige omstændigheder.

Skatteministeriet gør gældende, at der efter lovens ordlyd og forarbejder skal sondres mellem, hvornår krav registreres på skattekontoen, og fra hvilket tidspunkt sådanne krav påvirker (debiteres) saldoopgørelsen, og at det tidspunkt, på hvilket krav på indbetalinger påvirker (debiteres) saldoopgørelsen (og indgår som en del af den rentebærende saldo), dermed kan - og ofte vil - ligge på et andet tidspunkt end tidspunktet for registreringen på skattekontoen.

I hvert fald det sidste er der enighed om.

Det afgørende i denne sammenhæng er dog, at debiteringen på saldoen efter bestemmelsens stk. 4 sker »fra den seneste rettidige

betalingsdag for beløbet«. Og som nævnt foreligger der ikke i øjeblikket en sådan, da selskabet ikke kan frigøre sig for »gælden« ved betaling på nuværende tidspunkt.

Østre Landsret har i sin dom af 2. juli 2021 også taget stilling til dette forrentningsspørgsmål, og landsretten fandt, at der var hjemmel til at lade gælden forrente efter skattekontoreglerne.

…

Som det fremgår, har landsretten også på dette punkt støttet sig på, at den dom, der fastslår, at SKATs krav er rigtigt, er af konstaterende karakter. Landsretten bortser dermed fra den særlige omstændighed, at der er tale om opkrævning af en morarente, der normalt opkræves, når debitor ikke har villet eller kunnet betale sin skattegæld (hvad Heavy Transport Danmark altså ikke har haft mulighed for), eller - som der er henvist til i de i præmisserne citerede forarbejder - at virksomheden ikke har foretaget angivelse, og at der på dette punkt er tale om de renter, der i så fald løber på renterne af skattegælden, dvs. renters rente.

NetApp har, som nævnt, anket dommen til Højesteret.«

### Retsgrundlaget

#### Danmarks tiltrædelse af De europæiske Fællesskaber

I Justitsministeriets redegørelse af juli 1972 for visse statsretlige spørgsmål i forbindelse med dansk tiltrædelse af De europæiske Fællesskaber (trykt i Nordisk Tidsskrift for International Ret, 1971, s. 65 ff) hedder det bl.a.:

### 4460

»4. Domstolens praksis …

Man kan naturligvis ikke udelukke en videre udvikling i Domstolens praksis på dette område. Imidlertid er der som tidligere nævnt ingen mulighed for at gennemtvinge Domstolens afgørelser over for medlemsstaterne. Man må derfor ikke overvurdere Domstolens mulighed for på egen hånd at ændre Fællesskabernes karakter. Domstolens muligheder er på dette som på andre områder begrænset til, hvad der i det lange løb kan opnås politisk dækning for i de enkelte medlemsstater…

#### AFSNIT V

#### Danmarks almindelige forpligtelser som medlem af De europæiske Fællesskaber … 1. Forpligtelsen til umiddelbar anvendelse af visse fællesskabsregler

##### a. Forpligtelsens indhold og muligheden for at opfylde den efter gældende dansk ret

Som medlem af De Europæiske Fællesskaber påtager Danmark sig en forpligtelse til at indrette sin retsorden på en sådan måde, at visse fællesskabsregler anvendes umiddelbart af danske domstole og administrative myndigheder …

… og en traktatbestemmelse kan ikke fortrænge en udtrykkelig intern retsregel, som den måtte stride imod.

Der må således gennem en ændring af gældende dansk ret skabes en hjemmel for den umiddelbare anvendelse i Danmark af de her omtalte fællesskabsregler, der er nævnt nedenfor under b.

##### b. Hvilke fællesskabsregler omfatter forpligtelsen?

Umiddelbart anvendelige er først og fremmest de fællesskabsakter, der kaldes »forordninger«. …

De fællesskabsakter, der kaldes »beslutninger«, beskrives som bindende i alle enkeltheder for dem, de angiver at være rettet til. Beslutninger er derfor også umiddelbart anvendelige, når de er rettet til enkelte borgere eller virksomheder i medlemsstaterne. De fleste beslutninger rettes imidlertid til medlemsstaterne selv.

Der er også visse bestemmelser i selve traktaterne, der er umiddelbart anvendelige. …

Domstolen har endelig i enkelte afgørelser fastslået, at bestemmelser [i direktiver og beslutninger] i særlige tilfælde kan være umiddelbart anvendelige. …

*2. Forholdet mellem umiddelbart anvendelig fællesskabsret og dansk lovgivning (spørgsmålet om fællesskabsrettens »forrang«)*

…

Efter afgørelsen i Costa-ENEL sagen kan der ikke være tvivl om fællesskabsdomstolens stilling.«

*Traktaten om Den Europæiske Union*

Artikel 6 i Traktaten om Den Europæiske Union - som vedtaget ved Lissabon-traktaten - har følgende ordlyd:

»*Artikel 6: Grundlæggende rettigheder*

1. Unionen anerkender de rettigheder, friheder og principper, der findes i chartret om grundlæggende rettigheder af 7. december 2000 som tilpasset den 12. december 2007 i Strasbourg, der har samme juridiske værdi som traktaterne. Chartrets bestemmelser udvider ikke på nogen måde Unionens beføjelser som fastsat i traktaterne.

Rettighederne, frihederne og principperne i chartret skal fortolkes i overensstemmelse med de almindelige bestemmelser i chartrets afsnit VII vedrørende fortolkning og anvendelse af chartret og under behørigt hensyn til de forklaringer, der henvises til i chartret, og som anfører kilderne til disse bestemmelser.

2. Unionen tiltræder den europæiske konvention til beskyttelse af menneskerettigheder og grundlæggende frihedsrettigheder. Tiltrædelse af denne konvention ændrer ikke Unionens beføjelser som fastsat i traktaterne.

3. De grundlæggende rettigheder, som er garanteret ved den europæiske konvention til beskyttelse af menneskerettigheder og grundlæggende frihedsrettigheder, og som de følger af medlemsstaternes fælles forfatningsmæssige traditioner, udgør generelle principper i EU-retten.«

*Selskabsskatteloven*

*Lovbekendtgørelse nr. 585 af 7. august 1991 af lov om indkomstbeskatning af aktieselskaber m.v. (Selskabsskat)*

Lovbekendtgørelsens § 2, stk. 1, litra c, var affattet således:

»*§ 2*. Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1 og 2, der har hjemsted i udlandet, for så vidt de

…

c) oppebærer udbytteindtægter m.v., i hvilke der i henhold til kildeskattelovens § 65 skal foretages indeholdelse af udbytteskat, modtager udbytter i øvrigt omfattet af ligningslovens § 16 A, stk. 1, eller modtager afståelsessummer omfattet af ligningslovens § 16 B, stk. 2 eller 5,«

*Implementering af moder-/datterselskabsdirektivet, 1992*

Rådets direktiv af 23. juli 1990 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater (90/435/EØF) (moder-/datterselskabsdirektivet) bestemmer:

»*Artikel 1*

1. Hver medlemsstat anvender dette direktiv:

- på overskud, som selskaber i denne medlemsstat modtager som udbytte fra deres datterselskaber i andre medlemsstater

- på overskud, som selskaber i denne medlemsstat udlodder til selskaber i andre medlemsstater, som de er datterselskaber af.

2. Dette direktiv er ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug.

**4461**

*Artikel 2*

Ved udtrykket »selskab i en medlemsstat« forstås i dette direktiv ethvert selskab: a) der er organiseret i en af de former, der er anført i bilaget til dette direktiv …

*Artikel 3*

1. I dette direktiv:

a) betegnes som moderselskab mindst ethvert selskab i en medlemsstat, der opfylder betingelserne i artikel 2, og hvis andel i ka-

pitalen i et selskab i en anden medlemsstat, der opfylder de samme betingelser, er på mindst 25 %

b) forstås ved datterselskab et selskab, i hvis kapital et andet selskab har den i litra a) omhandlede andel.

…

*Artikel 5*

1. Det udbytte, som et datterselskab udlodder tir sit moderselskab, fritages for kildeskat, i det mindste når moderselskabet har en kapitalandel i datterselskabet på mindst 25 %. …

*Artikel 9*

Dette direktiv er rettet til medlemsstaterne.«

Direktivet blev implementeret i dansk ret ved lov nr. 219 af 3. april 1992, således at der i selskabsskattelovens § 2 efter stk. 4, blev indsat:

»*Stk. 5.* Skattepligten i medfør af stk. 1, litra c, omfatter ikke udbytte, som et selskab, der er hjemmehørende i en stat, der er medlem af De Europæiske Fællesskaber, modtager i udbytte fra et selskab, der er hjemmehørende her i landet. Det er en betingelse, at det udbyttemodtagende selskab - moderselskabet - har ejet mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab - datterselskabet - enten i hele det indkomstår, hvori udbyttet er modtaget, eller i en sammenhængende periode på mindst to år frem til det tidspunkt, hvor udbyttet modtages. Det er endvidere en betingelse, at såvel moderselskabet som datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF.«

Af de generelle bemærkninger til lovforslaget (lovforslag nr. L 20 af 3. oktober 1991), der lå til grund herfor, fremgår bl.a.:

»3. …

Moder-/datterselskabsdirektivet blev vedtaget af Rådet af økonomi- og finansministre den 23. juli 1990. Folketingets Skatteudvalg har den 6. juni 1990 afgivet udtalelse til Folketingets Markedsudvalg om bl.a. moder-/datterselskabsdirektivet (Alm. del bilag 243). Direktivet er optrykt som bilag til dette lovforslag.

Moder-/datterselskabsdirektivet går ud på at harmonisere medlemsstaternes skatteregler for at undgå økonomisk dobbeltbeskatning af den del af et datterselskabs overskud, der udloddes som udbytte til dets moderselskab i en anden medlemsstat.

Direktivet går ud fra det grundprincip, at overskuddet i et datterselskab alene skal beskattes i datterselskabet og i den stat, hvor datterselskabet er hjemmehørende.

Direktivet har derfor regler om, at ved udlodning af udbytte fra et datterselskab til et moderselskab i en anden medlemsstat må den stat, hvor datterselskabet er hjemmehørende, ikke opkræve udbytteskat af udbyttet. Direktivet har endvidere regler om, at moderselskabet ikke skal beskattes af udbyttet fra datterselskabet.

Den stat, hvor moderselskabet er hjemmehørende, kan enten undlade at beskatte udbyttet eller beskatte udbyttet, men give fradrag i moderselskabets skat for den del af datterselskabets skat, der vedrører udbyttet.

a) Efter de gældende regler i selskabsskatteloven og kildeskatteloven er et moderselskab, der er hjemmehørende i en anden EF-medlemsstat, begrænset skattepligtig i Danmark af udbytte fra et dansk datterselskab. Skatten udgør 30 pct. af udbyttet.

Det foreslås, at den begrænsede skattepligt af udbytte ophæves i denne situation.

Det foreslås tilsvarende, at der ikke skal indeholdes udbytteskat i udbytte, som et moderselskab i en anden EF-medlemsstat modtager fra dets danske datterselskab.

De gældende dobbeltbeskatningsoverenskomster med de andre EF-medlemsstater afskærer eller begrænser imidlertid allerede nu Danmarks adgang til udbyttebeskatningen.

…

4. Provenumæssige konsekvenser.

…

Forslaget om at fritage udbytte fra et datterselskab her i landet til et moderselskab hjemmehørende i en anden medlemsstat fra beskatning skønnes på grundlag af Nationalbankens valutastatistik at medføre et provenutab på op mod 20 mill. kr. årligt.«

Af de specielle bemærkninger til lovforslaget (lovforslag nr. L 20 af 3. oktober 1991), der lå til grund herfor, fremgår bl.a.:

»De foreslåede bestemmelser i § 3, nr. 1 og §§ 6 - 8 vedrører gennemførelsen af moder-/datterselskabsdirektivet i dansk skattelovgivning.

Til nr. 1.

Ifølge selskabsskattelovens § 2, stk. 1, litra c, er et moderselskab, der er hjemmehørende i udlandet, begrænset skattepligtig for så vidt det modtager udbytteindtægter m.v., i hvilke der i henhold til kildeskattelovens § 65 skal foretages indeholdelse af kildeskat, modtager udbytter i øvrigt omfattet af ligningslovens § 16 A, stk. 1, eller modtager afståelsessummer omfattet af ligningslovens § 16 B, stk. 2 eller stk. 5.

…

Ifølge moder-/selskabsdirektivets artikel 5, stk. 1, skal udbytte, som et datterselskab udlodder til sit

**4462**

moderselskab, fritages for kildeskat, i hvert fald når moderselskabet har en kapitalandel på mindst 25 pct.

…

Det foreslås derfor, at der i selskabsskatteloven § 2 som et nyt stk. 5 indsættes en bestemmelse om, at skattepligten i medfør af § 2, stk. 1, litra c, ikke omfatter udbytte, som et moderselskab, der er hjemmehørende i en EF-medlemsstat, modtager i udbytte fra et selskab, der er hjemmehørende her i landet. Det skal være en betingelse, at moderselskabet i hele det indkomstår, hvori udbyttet er modtaget, har ejet mindst 25 pct. af aktiekapitalen i datterselskabet. Det skal endvidere være en betingelse, at såvel moderselskab som datterselskabet er omfattet af moder-/datterselskabsdirektivet, det vil sige, at de er omfattet af begrebet »selskab i en medlemsstat« i moder-/datterselskabsdirektivets artikel 2.

Begrebet »selskab i en medlemsstat« er i direktivets artikel 2 defineret som ethvert selskab,

a)  der antager en af de former, der er nævnt i et bilag til direktivet,

b)  som ifølge skattelovgivningen i en medlemsstat anses for at være hjemmehørende i denne stat i skatteretlig forstand, og som i henhold til en overenskomst om dobbeltbeskatning med tredieland ikke anses for at være hjemmehørende uden for Fællesskabet,

c)  som desuden uden valgmulighed og uden fritagelse er omfattet af en af de former for skat, der er nævnt i direktivets artikel 2, litra c, eller enhver anden form for skat, der træder i stedet for en af de nævnte former for skat.

For Danmarks vedkommende vil alene aktieselskaber og anpartsselskaber, der er skattepligtige efter selskabsskattelovens § 1, stk. 1, nr. 1, kunne opfylde betingelserne for at være et »selskab i en medlemsstat«.

Ifølge moder-/datterselskabsdirektivets artikel 1, stk. 2, er direktivet ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug. Det foreslås derfor i lovforslagets *§ 3, nr. 1*, at bestemmelsen i ligningslovens § 16 B, stk. 5, 3. punktum, ændres således, at den også kommer til at omfatte udbytte som omhandlet i selskabsskattelovens § 2, stk. 5. Der henvises til bemærkningerne til § 3, nr. 1.

Det foreslås i *§ 7*, at der i kildeskattelovens § 65 som et nyt stk. 5 indsættes en bestemmelse om, at der, når de samme betingelser er opfyldte, ikke skal indeholdes udbytteskat af udbytte, som et moderselskab, der er hjemmehørende i en EF-medlemsstat, modtager fra et selskab, der er hjemmehørende her i landet.«

Af de nævnte bemærkninger til lovforslagets § 3, nr. 1, vedrørende ligningslovens § 16 B, stk. 5, fremgår bl.a.:

»Moderselskaber kan ved afståelse af datterselskabsaktier være omfattet af ligningslovens § 16 B, stk. 5, hvorved afståelsessummen beskattes som udbytte hos moderselskabet, selvom en udbytteudlodning fra datter-til moderselskab ville være skattefri efter selskabsskattelovens § 13, stk. 1, nr. 2, og stk. 3.

Reglen skal hindre, at et selskabs aktionærer omgår udbyttebeskatningen ved for eksempel at lade selskabet overdrage sin virksomhed til et datterselskab, hvorefter datterselskabsaktierne afstås til et holdingselskab, som kontrolleres af samme aktionærkreds som det sælgende selskab. Uden ligningslovens § 16 B ville aktionærerne ved efterfølgende salg eller likvidation af moderselskabet kunne tage midler ud af selskabet uden at afgive indflydelse på virksomheden.

Afstår et dansk moderselskab aktier, således at moderselskabet skal medregne afståelsessummen i den skattepligtige indkomst efter ligningslovens § 16 B, stk. 5, kan datterselskabet efter gældende regler ikke udlodde skattefrit udbytte til et dansk moderselskab efter selskabsskattelovens § 13, stk. 1, nr. 2, og stk. 3, i det pågældende samt i de to forudgående indkomstår forud for aktieafståelsen. De udloddede udbytter skal i stedet medregnes ved opgørelsen af det modtagende selskabs skattepligtige indkomst for de år, hvor udlodningerne har fundet sted.

Reglen er begrundet i, at moderselskabet, der afstår aktierne, ikke skal kunne nedsætte beskatningen efter ligningslovens § 16 B, stk. 5, ved forud for aktieafståelsen at tømme datterselskabet gennem skattefri udbytter.

Moder-/datterselskabsdirektivet er efter direktivets artikel 1, stk. 2, ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug. Som følge af direktivet indføres der en ny bestemmelse om skattefrit udbytte i selskabsskattelovens § 2, stk. 5. Begrundelsen for efter ligningslovens § 16 B, stk. 5, at beskatte moderselskaber af afståelsessummer, også hvor en udbytteudlodning fra datterselskabet ville være skattefri, gælder i samme grad begrænset skattepligtige moderselskaber (med danske aktionærer) som fuldt skattepligtige moderselskaber. Det foreslås derfor, at den nye regel om skattefri udbytter, som et moderselskab hjemmehørende i en EF-stat modtager fra et dansk datterselskab, heller ikke skal finde anvendelse i det pågældende samt i de to senest forudgående indkomstår forud for aktieafståelsen, hvis denne er omfattet af ligningslovens § 16 B.«

*Afskaffelse af udbyttebeskatning vedrørende bl.a. udlodning af udbytte fra danske datterselskaber til udenlandske moderselskaber, 1998*

Ved lov nr. 1026 af 23. december 1998 om ændring af forskellige skattelove (International beskatning af udbytter og aktieavancer m.v.) fik selskabsskattelovens § 2, stk. 1, litra c, følgende ordlyd:

»Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1 og 2, der har hjemsted i udlandet, for så vidt de

**4463**

…

c)  oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, eller afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet)

i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Det er en betingelse, at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF, …«.

§ 2, stk. 5, blev samtidig ophævet.

Selskabsskattelovens *§ 13* blev samtidig affattet således:

»§ 13. Til den skattepligtige indkomst medregnes ikke:

…

2. Udbytte, som de i § 1, stk. 1, nr. 1-2 d, 3 a-5 og 5 b, nævnte selskaber og foreninger m.v. modtager af aktier eller andele i selskaber omfattet af § 1, stk. 1, nr. 1 og 2, eller selskaber hjemmehørende i udlandet. Dette gælder dog kun, hvis det udbyttemodtagende selskab, moderselskabet, ejer mindst 25 pct. af aktie- eller andelskapitalen i det udbyttegivende selskab, datterselskabet, i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodnings-tidspunktet skal ligge.

…«

Af de almindelige bemærkninger til lovforslaget (lovforslag nr. L 53 af 21. oktober 1998), der lå til grund herfor, fremgår bl.a.:

»Det foreslås at omlægge beskatningen af udbytter og aktieavancer, som oppebæres af danske moderselskaber og personaktionærer fra selskaber i udlandet, ligesom det foreslås at afskaffe den danske kildeskat på udbytter betalt af danske datterselskaber til udenlandske moderselskaber. …

…

Det foreslås […] at afskaffe kildeskatten på udbytter betalt til udenlandske moderselskaber, når det danske datterselskab er omfattet af EU's moder-/datterselskabsdirektiv, således at EU-selskaber og ikke-EU-selskaber skattemæssigt behandles ens. Denne kildeskat kan i vidt omfang undgås ved at indskyde holdingselskaber i lande, i forhold til hvilke Danmark helt eller delvist er afskåret fra at indeholde kildeskat.

…

*Provenumæssige bemærkninger*

M.h.t. skattefritagelsen af udbytter fra danske datterselskaber til udenlandske moderselskaber og udbytter fra udenlandske datterselskaber til danske moderselskaber vil ændringen ikke have betydning for udbytte fra og til et andet EU-land, da disse i forvejen er skattefri, men alene i forhold til lande uden for EU.

Der er ikke faste holdepunkter for en bedømmelse af provenuvirkningen. Bl.a. er der ikke oplysninger om udenlandske moderselskabers udbytter fra Danmark eller om danske moderselskabers datterselskabsudbytte fra ikke-EU-lande. På den anden side må det inddrages i vurderingen, at den gældende beskatning kan omgås ved omdirigering af udbytterne til selskaber i 3. lande, således at udbytterne ikke beskattes her i landet.«

Af bemærkningerne til lovforslagets enkelte bestemmelser fremgår bl.a.:

»Til § 1, nr. 1 og 2.

Udbytte, som betales fra et dansk datterselskab til et udenlandsk moderselskab, er undergivet begrænset skattepligt til Danmark, jf. selskabsskattelovens § 2, stk. 1, litra c. Skattepligten opfyldes ved, at det udbytteudbetalende danske selskab indeholder en kildeskat på 25 pct. af det udbytte, der betales til den udenlandske aktionær. Dette gælder, hvad enten den udenlandske aktionær er en fysisk person eller et selskab, og uanset om der er tale om moder-/datterselskabsforhold eller ej.

Imidlertid findes der to meget vigtige undtagelser i moder-/datterselskabs-forhold, nemlig de undtagelser, der følger af EU's moder-

/datterselskabs-direktiv, jf. § 2, stk. 5, og af de dobbeltbeskatnings-overenskomster, som Danmark har indgået.

moder-/datterselskabsdirektivet (direktiv 90/435/EØF) bestemmer bl.a., at en medlemsstat ikke må opkræve kildeskat, når udbytte betales fra et datterselskab i en medlemsstat til et moderselskab i en anden. Grænsen for ejerandelen i moder-/datterselskabsforhold er i direktivet fastsat til 25 pct., og et selskab skal være omfattet af en af de selskabstyper, der er opregnet i et bilag til direktivet, før direktivet finder anvendelse. Direktivet hindrer dog ikke en medlemsstat i at fastsætte en grænse for ejerandel, som er lavere end 25 pct., eller i at undlade at opkræve kildeskat ved udbetaling af udbytte fra andre selskaber end de, der er opregnet i direktivets bilag. I sådanne tilfælde er der selvsagt ikke noget, der forpligter moderselskabsstaten til at anvende direktivets bestemmelser.

Dobbeltbeskatningsoverenskomsterne fastsætter hver især en overgrænse for, hvor høj en kildeskat de to stater kan lægge på udbyttebetalinger. I moder-/datterselskabsforhold vil der typisk være tale om en maximal kildestatsbeskatning på 5-10 pct., men der er intet, der forhindrer en af staterne i at beskatte med en lavere sats eller helt undlade at beskatte. Grænsen for ejerandelen i moder-/datterselskabsforhold sættes oftest til 25 pct., men 10 pct. anvendes dog i visse overenskomster.

Det foreslås generelt at afskaffe kildeskatten på udbytter betalt til udenlandske moderselskaber, når det danske datterselskab er omfattet af EU's

**4464**

moder-/datterselskabsdirektiv, således at EU-selskaber og ikke-EU-selskaber ligestilles.«

*Genindførelse af udbyttebeskatning vedrørende bl.a. udlodning af udbytte fra danske datterselskaber til moderselskaber i ikke-EU-lande uden dobbeltbeskatningsoverenskomst med Danmark, 2001*

Ved lov nr. 282 af 25. april 2001 om ændring af selskabsskatteloven blev § 2, stk. 1, litra c, 3. pkt., ændret, således at bestemmelsen fik følgende ordlyd:

»Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1 og 2, der har hjemsted i udlandet, for så vidt de

…

c) oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, eller afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 25 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende,«.

I det oprindeligt fremsatte lovforslag nr. L 99 af 10. november 2000, havde § 2, stk. 1, litra c, 3. pkt., følgende ordlyd:

»Det er en betingelse, at moderselskabet er hjemmehørende i en stat, som er medlem af EU, i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med, på Færøerne i Grønland, samt at datterselskabet er omfattet af begrebet selskab i en medlemsstat i artikel 2 i direktiv 90/435/EØF,«.

Af de almindelige bemærkninger til lovforslaget fremgår bl.a.:

»Lov nr. 1026 af 23. december 1998 ophævede derfor beskatningen af udbytte, som et udenlandsk moderselskab modtog fra dets danske datterselskab, uanset hvor moderselskabet er hjemmehørende. …

Erfaringen har imidlertid vist, at de ny regler åbnede op for etablering af danske holdingselskaber, som alene har til formål at omgå andre landes beskatning, og at denne mulighed er blevet markedsført af danske skatterådgivere i udlandet. I tilfælde, hvor et datterselskab i f.eks. et EU-land er ejet af et moderselskab i et skattely uden dobbeltbeskatningsoverenskomster, kan koncernen ofte undgå den beskatning, som det førstnævnte land ville gennemføre ved direkte udlodning af udbytter fra datterselskabet i dette land til dets udenlandske moderselskab ved at indskyde et dansk holdingselskab.

Lovforslaget om at genindføre udbytteskatten for moderselskaber i ikke-EU-lande uden om dobbeltskatningsoverenskomst med Danmark er også et bidrag til de internationale bestræbelser på at modvirke skadelig skattekonkurrence eller skadelig skattepraksis, som foregår både i EU-regi og i OECD-regi.

…

De danske holdingregler adskiller sig fra andre landes tilsvarende regler derved, at de danske regler medfører skattefritagelse bade for udbyttebetalinger fra et udenlandsk datterselskab og for udbyttebetalinger til et udenlandsk moderselskab. Det medfører som nævnt, at de danske regler kan anvendes til at uduhle andre landes beskatning. Andre lande, som beskatter udbytter fra selskaber i disse lande til moderselskaber i skattely-lande, er derfor utilfreds med, at deres beskatning kan omgås ved hjælp af de danske holdingregler.

Det foreslås derfor som et bidrag fra dansk side til at modvirke brugen af skattely og for at imødekomme udenlandsk kritik at genindføre skatten på 25 pct. af udbyttebetalinger fra dansk datterselskab til dets udenlandsk moderselskab, men kun i tilfælde, hvor moderselskabet er hjemmehørende i et land uden for EU eller i et land, som ikke har en dobbeltbeskatningsoverenskomst med Danmark.«

Den 24. november 2000 besvarede skatteministeren en henvendelse fra Ernst & Young til Folketingets Skatteudvalg således:

»*Spørgsmål 1:* Det ønskes bekræftet, at et selskab eller en anden juridisk person anses at være hjemmehørende i et EU- eller DBO-land, jf. den foreslåede bestemmelse i SEL § 2, stk. 1, litra c, såfremt det er hjemmehørende i et EU- eller DBO-land enten efter skattelovgivningen eller efter selskabs-/fondslovgivningen i det pågældende land.

*Spørgsmål 2:* Det ønskes bekræftet, at det i relation til den foreslåede bestemmelse i SEL § 2, stk. 1, litra c, er uden betydning for, om et selskab, der er hjemmehørende i et EU-land, jf. svaret på spørgsmål 1, er omfattet af begrebet et selskab i EU's moder-/datterselskabsdirektivs artikel 2.

*Svar:*

…

Afskaffelsen af udbyttekildeskatten fra et dansk datterselskab til et udenlandsk moderselskab blev imidlertid misbrugt ved etablering af danske holdingselskaber, som alene havde til formål at omgå andre landes beskatning.

Formålet med lovforslag L 99 er således at forhindre dette misbrug samtidig med, at lovbestemmelsen tager højde for de undtagelser til hovedreglen om 25 pct. kildeskat, som Danmark er forpligtet til at have efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst.

**4465**

I relation til SEL § 2, stk. 1, litra c, kan et udenlandsk moderselskab således kun undgå den almindelige kildeskat på 25 pct., hvis det er omfattet af begrebet »et selskab i et medlemsstat« i moder-/datterselskabsdirektivs artikel 2, eller i henhold til en dansk dobbeltbeskatningsoverenskomst er hjemmehørende i udlandet, for så vidt udbyttet er omfattet af dobbeltbeskatningsoverenskomst-

en. Det selskabsretlige hjemsted er ikke afgørende for definitionen af hjemstedsbegrebet i SEL § 2, stk. 1, litra c.

Det er selvfølgelig stadig et krav for at undgå den almindelige udbyttekildeskat, at de andre betingelser i SEL § 2, stk. 1, litra c, også er opfyldt. Det vil sige, at moderselskabet ejer mindst 25 pct. af aktiekapitalen i datterselskabet i en sammenhængende periode på mindst 12 fortløbende måneder, og at datterselskabet er omfattet af moder-/datterselskabsdirektivets artikel 2.«

Den 28. november 2000 besvarede skatteministeren en henvendelse fra Arthur Andersen til Folketingets Skatteudvalg således:

»Arthur Andersen har i en henvendelse af 21. november 2000 rettet henvendelse til Skatteudvalget for at fremsætte nogle synspunkter vedr. lovforslagets betingelse om, at moderselskabet er hjemmehørende i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med.

…

Som oplyst i mine bemærkninger til en henvendelse fra Ernst & Young til lovforslaget er det afgørende, om udbyttet fra det danske datterselskab er omfattet af en dobbeltbeskatningsoverenskomst med det land, hvor det udenlandske moderselskab er hjemmehørende.«

Den 10. januar 2001 besvarede skatteministeren en henvendelse fra Foreningen af Statsautoriserede Revisorer til Folketingets Skatteudvalg således:

»Foreningen af Statsautoriserede Revisorer har i en skrivelse af 28. november 2000 påny rettet henvendelse til skatteudvalget for at kommentere svaret på nogle spørgsmål i Ernst & Young's henvendelse.

Efter det pågældende svar (L 99 - bilag 5) kan et udenlandsk moderselskab kun undgå dansk beskatning af udbytte fra et datterselskab her i landet, hvis moderselskabet er omfattet af begrebet »et selskab i en medlemsstat« i moder-/datter-selskabsdirektivets artikel 2, eller i henhold til en dansk dobbeltbeskatningsoverenskomst er hjemmehørende i udlandet, for så vidt udbyttet er omfattet af overenskomsten.

Efter foreningens opfattelse er der ikke støtte for denne fortolkning hverken i den foreslåede bestemmelses ordlyd eller i bemærkningerne hertil. Men foreningen er enig i, at afgrænsningen i svaret ligger i forlængelse af lovforslaget.

Jeg skal hertil bemærke, at besvarelser til skatteudvalget om en foreslået bestemmelse er bidrag til fortolkning af bestemmelsen på samme måde som bemærkningerne til bestemmelsen.

Den foreslåede bestemmelse skal derfor fortolkes i overensstemmelse med det nævnte svar.

For at gøre dette helt klart vil jeg fremsætte et ændringsforslag, som tydeliggør den foreslåede bestemmelse.«

Den 10. januar 2001 sendte Skatteministeren til Folketingets Skatteudvalg følgende ændringsforslag til lovforslaget:

»(Tydeliggørelse af betingelser for skattefrihed af udbytter - udsættelse af ikrafttrædelsen)

Til § 1

1. Nr. 1 affattes således:

»I § 2, stk. 1, litra c, affattes 3. pkt. således:

»Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 9O/435/EØF eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende,«

…

Til 1)

Ændringsforslaget går ud på at tydeliggøre den foreslåede bestemmelse.

Den foreslåede bestemmelse går ud på, at der kun gælder skattefrihed for udbyt ter, som et dansk datterselskab udlodder til dets

Copyright © 2023 Karnov Group Denmark A/S

udenlandske moderselskab, der er hjemmehørende på Færøerne, i Grønland, i en anden EU-stat eller i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med. Når danske datterselskaber udlodder udbytte til andre udenlandske moderselskaber, skal udbyttet derimod beskattes med 28 pct.

Det foreslås at præcisere, at det er en betingelse for den foreslåede skattefrihed, at Danmark skal frafalde beskatningen af det pågældende udbytte efter bestemmelserne i moder-/datterselskabsdirektivet, eller at Danmark skal frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i dobbeltbeskatningsoverenskomsten med Færøerne, Grønland eller den pågældende anden stat.«

Ligeledes den 10. januar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende kommentarer til et »newsletter«: »Cyprus IBCs [International Business Companies] gain importance as a result of developments in Denmark«:

»…

Lovforslagets formål er at imødegå omgåelse af andre landes beskatning, f.eks. for et moderselskab på De Britiske Jomfruøer, som har et datterselskab i Irland.

Hvis det irske datterselskab er ejet direkte af moderselskabet på Jomfruøerne, vil Irland beskatte udbyttebetaling fra datterselskab til moderselskab.

Den irske beskatning kan i dag omgås ved at indskyde et dansk holdingselskab, så det irske datterselskab

**4466**

udlodder udbytte til det danske holdingselskab, der videreudlodder udbyttet til moderselskabet på Jomfruøerne. Efter EU's moder-/datterselskabsdirektiv må Irland ikke beskatte udbytterne, og efter de nuværende danske regler beskatter Danmark heller ikke.

Lovforslaget imødegår denne konstruktion, idet Danmark i fremtiden vil beskatte udbytte, som et dansk selskab udlodder til et moderselskab på Jomfruøerne.

Det er korrekt, at moderselskabet på Jomfruøerne fortsat kan undgå den danske beskatning af udbytterne fra det irske selskab ved at overdrage aktierne i det danske selskab til et mellem-holdingselskab på Cypern. I så fald vil Danmark ikke beskatte udbyttet, da moderselskabet på Cypern er omfattet af den danskcypriotiske dobbeltbeskatning[s]overenskomst.

Men som nævnt i artiklen kan moderselskabet på Jomfruøerne også undgå udbyttebeskatningen ved at erstatte det danske holdingselskab med et holdingselskab på Cypern, så det irske datterselskab udlodder udbyttet til selskabet på Cypern.

Eksempel viser altså, at det ikke længere er de danske regler, men derimod Cyperns gunstige regler, der er forudsætningen for, at moderselskabet på Jomfruøeme kan omgå den irske beskatning af udbyttet.«

Den 11. januar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Spørgsmål 3:

Kan udtrykket i bemærkningerne »På denne baggrund skønnes merprovenuet ved forslaget at være begrænset« uddybes? Hvad skønnes der at blive tale om?

Svar:

I lovforslaget er det antaget, at udenlandske moderselskaber, som er hjemmehørende i lande uden for EU uden dobbeltbeskatningsoverenskomst med Danmark, vil opgive de danske datterselskaber, der alene et etableret som led i en international skattekonstruktion. I disse situationer vil den foreslåede udbytteskat ikke indbringe noget provenu.

Er der derimod tale om, at moderselskaber i disse lande udenfor EU uden dobbeltbeskatningsoverenskomst med Danmark har danske

datterselskaber med en egentlig erhvervsaktivitet, vil disse selskaber umiddelbart kunne blive berørt af forslaget.

Selskaberne vil imidlertid kunne omstrukturere sig, således at aktierne i det danske datterselskab overdrages til et datterselskab i et land, hvortil udbyttebetalinger fortsat er fritaget for dansk udbytteskat. Dette er fordelagtigt, hvis udbyttet herfra kan videreudloddes til det egentlige moderselskab med en beskatning, som er lavere end den danske, eventuelt helt uden beskatning. Derfor skønnes provenuet fra sådanne selskaber at blive begrænset. Der er ikke holdepunkter for et talmæssigt skøn herover.«

Ligeledes den 11. januar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Ole Bjørn [formanden for Ligningsrådet og professor i skatteret ved Syddansk Universitet] …

Desuden mener han, at lovforslagets regler ikke er særligt effektive, idet den foreslåede beskatning kan undgås ved at indskyde et mellem-holdingselskab.

Kommentar:

…

Det anføres, at de foreslåede regler ikke er særligt effektive, idet de kan undgås ved et mellem-holdingselskab i et andet land, som er med i EU eller har en dobbeltbeskatningsoverenskomst med Danmark, og som har gunstige skatte regler.

Jeg vil herved bemærke, at der i så fald er tale om, at moderselskabet i skattelylandet omgår beskatningen ved hjælp af de gunstige regler i det andet land.«

Den 26. februar 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Henvendelsen: Det er Foreningen af Statsautoriserede Revisorers opfattelse, at det er uhensigtsmæssigt, at de interne danske udbyttebeskatningsregler for udenlandske selskaber på den i ændringsforslaget beskrevne måde knyttes til DBO'en, herunder hvorvidt det pågældende selskab i hjemlandet er skattemæssigt transparent. Skatteministeren opfordres derfor til at overveje, om lovforslagets sigte kan opnås, uden at de interne danske regler beror på, hvorvidt DBO'en finder anvendelse.

Kommentar: Jeg mener ikke, at lovforslagets sigte kan opnås, uden at de interne danske regler beror på, om udbyttet frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst. Det er centralt, at den danske kildeskat på udbytter kun frafaldes, når udbyttet oppebæres af et selskab, der beskattes efter de almindelige regler for selskaber i det pågældende land.«

Den 26. marts 2001 sendte skatteministeren til Folketingets Skatteudvalg følgende svar:

»Spørgsmål 23: Ministeren bedes kommentere vedlagte artikel af 23. marts 2001 fra Børsen: »Skattefrihed for udbytte udhules«.

Svar: Børsens artikel den 23. marts 2001 kritiserer mit ændringsforslag til lovforslaget om holdingselskaber, idet forslaget udhuler skattefriheden for udbytter. Lovforslaget begrænser den nuværende regel, hvorefter Danmark ikke beskatter udbytter, som et dansk datterselskab betaler til dets udenlandske moderselskab. Efter det fremsatte lovforslag skal reglen i fremtiden alene gælde, hvis moderselskabet er hjemmehørende i et EU-land eller et land, som har en dobbeltbeskatningsoverenskomst med Danmark. I andre tilfælde skal Danmark efter forslaget opkræve en skat på 28 pct. af udbyttet.

…

Under behandlingen af lovforslaget rettede Ernst & Young henvendelse (L 99 -bilag 2) til skatteudvalget og

**4467**

spurgte om forslagets virkning for de selskaber, som nok er hjemmehørende i et andet EU-land eller i et andet land, der har en dobbeltbeskatningsoverenskomst med Danmark, men som alligevel

ikke er beskyttet af direktivet eller overenskomsten. I et svar til skatteudvalget (L 99 -bilag 5) oplyste jeg, at disse selskaber ikke kan modtage udbytter fra et dansk datterselskab uden den foreslåede beskatning.

Foreningen af Statsautoriserede Revisorer udtalte i en henvendelse til skatteudvalget (L 99 - bilag 10), at denne afgrænsning efter foreningens opfattelse ligger i forlængelse af lovforslaget, men savner fornøden støtte i den foreslåede bestemmelses ordlyd.

På den baggrund fremsatte jeg et ændringsforslag, som præciserer, at den af grunde betingelse for skattefrihed for udbytte er, at Danmark skal frafalde eller nedsætte beskatningen af udbyttet efter moder-/datterselskabsdirektivet eller en dansk dobbeltbeskatningsoverenskomst.

…«

Det fremgår af betænkning over forslaget til lov om ændring af selskabsskatteloven (Skatteudvalget L99 bilag 43), at skatteministeren under udvalgets behandling fremsatte følgende ændringsforslag:

»I *§ 2, stk. 1, litra c,* affattes *3. pkt.* således:

»Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes bestemmelserne i direktiv 90/435/EØF efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende«.

[Tydeliggørelse af betingelser for skattefrihed af udbytter]

Bemærkninger

…

Ændringsforslaget går ud på at tydeliggøre den foreslåede bestemmelse.

Den foreslåede bestemmelse går ud på, at der kun gælder skattefrihed for udbytter, som et dansk datterselskab udlodder til dets udenlandske moderselskab, der er hjemmehørende på Færøerne, i Grønland, i en anden EU-stat eller i en stat, som Danmark har en dobbeltbeskatningsoverenskomst med. Når danske datterselskaber udlodder udbytte til andre udenlandske moderselskaber, skal udbyttet dermed beskattes med 28 pct.

Det foreslås at præcisere, at det er en betingelse for den foreslåede skattefrihed, at Danmark skal frafalde beskatningen af det pågældende udbytte efter bestemmelserne i moder-/datterselskabsdirektivet, eller at Danmark skal frafalde eller nedsætte beskatningen af det pågældende udbytte efter bestemmelserne i dobbeltbeskatningsoverenskomsten med Færøerne, Grønland eller den pågældende anden stat.«

*Vedrørende beskatning af deltagere i transparente moderselskaber*

Ved lov nr. 1375 af 20. december 2004 om ændring af selskabsskatteloven og kildeskatteloven (Implementering af ændring af moder-/datterselskabsdirektivet) blev der efter § 2, stk. 1, litra c, efter 3. pkt., indsat 4. pkt. med følgende ordlyd:

»Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber som nævnt i 2. pkt., der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet.«

Af det til grund herfor fremsatte lovforslag (nr. L 27 af 7. oktober 2004) fremgår bl.a.:

»*Almindelige bemærkninger*

*Lovforslagets baggrund og formål*

Rådet har 22. december 2003 vedtaget et direktiv (2003/123/EF) om ændring af moder-/datterselskabsdirektivet (90/435/EØF).

…

*2.1.1.* …

Ændringsdirektivet er optrykt som bilag 1 til dette lovforslag. I bilag 2 til lovforslaget er moder-/datterselskabsdirektivets bestemmelser sammenholdt med ændringsdirektivets bestemmelser.

Ændringsdirektivet indebærer,

- at moder-/datterselskabsdirektivet kan finde anvendelse på et større antal juridiske personer m.v. end hidtil, herunder det europæiske selskab (SE) og det europæiske andelsselskab (SCE),

…

2.2.2.5. Transparente selskaber

De nye virksomheder, der medtages på listen over selskaber, der er omhandlet i artikel 2, stk. 1, litra a, er selskabsskattepligtige i den medlemsstat, hvor de er hjemmehørende, men nogle af dem betragtes på grund af deres juridiske karakteristika af andre medlemsstater som skattemæssigt transparente. Ifølge betragtningerne til ændringsdirektivet bør medlemsstater, der behandler ikke-hjemmehørende skattepligtige selskaber som skattemæssigt transparente på dette grundlag, give en passende skattelettelse med hensyn til indtægter, der er en del af moderselskabets beskatningsgrundlag.

…

*3.2.5. Transparente selskaber*

…

Transparente selskaber er ikke omfattet af den begrænsede skattepligt af udbytte fra danske selskaber i henhold til selskabsskattelovens § 2, stk. 1, litra c, idet skattepligten i henhold til denne bestemmelse påhviler selskaber og foreninger m.v. som nævnt i selskabsskattelovens § 1, stk. 1. Der er således ikke behov for en bestemmelse om, at transparente selskaber, der er omfattet af moder-/datterselskabsdirektivet, ikke er begrænset

**4468**

skattepligtige i Danmark af udbytte fra danske datterselskaber.

Efter de danske regler påhviler skattepligten af udbytte, der tilfalder et transparent selskab, selskabsdeltagerne.

Det foreslås derfor, at udenlandske selskabsdeltagere i et transparent selskab, der er omfattet af moder-/datterselskabsdirektivet, ikke skal være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab. Dette skal gælde, uanset om selskabsdeltageren er et selskab eller en fysisk person og uanset selskabsdeltagerens ejerandel i det transparente selskab.

…

*Bemærkninger til de enkelte bestemmelser*

*Til nr. 4*

Der henvises til de almindelige bemærkninger, afsnit 3.2.5.

Ifølge selskabsskattelovens § 2, stk. 1, litra c, 2. pkt., er udbytte modtaget af udenlandske selskaber, foreninger m.v. skattefrit, hvis det udbyttemodtagende selskab m.v. (moderselskabet) ejer mindst 20 pct. (15 pct., 10 pct., jf. de under nr. 1 og 2 foreslåede ændringer) af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i moder-/datterselskabsdirektivet eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende.

Efter forslaget skal skattepligten heller ikke omfatte udbytte, som modtages af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i moder-/datterselskabsdirektivets artikel 2, stk. 1, litra a, men som ved beskatningen her i landet anses for at være transparente enheder.

Det skal være en betingelse, at selskabsdeltageren ikke er hjemmehørende i Danmark.

Det vil sige, at udenlandske selskabsdeltagere i et transparent moderselskab, der er omfattet af moder-/datterselskabsdirektivet,

Copyright © 2023 Karnov Group Denmark A/S

U.2023.4403H

ikke skal være begrænset skattepligtige i Danmark af udbytte fra det transparente selskabs danske datterselskab. Dette skal gælde, uanset om selskabsdeltageren er et selskab eller en fysisk person og uanset selskabsdeltagerens ejerandel i det transparente selskab.«

Selskabsskattelovens § 2, stk. 1, litra c, var på tidspunktet for udlodningerne i NetApp-sagen den 28. september 2005 og den 13. oktober 2006 sålydende (lovbekendtgørelse nr. 111 af 19. februar 2004, som senest ændret ved lov nr. 1375 af 20. december 2004):

»§ 2. Skattepligt i henhold til denne lov påhviler endvidere selskaber og foreninger m.v. som nævnt i § 1, stk. 1, der har hjemsted i udlandet, for så vidt de

…

oppebærer udbytte omfattet af ligningslovens § 16 A, stk. 1, bortset fra udlodninger fra obligationsbaserede investeringsforeninger som nævnt i aktieavancebeskatningslovens § […], eller oppebærer afståelsessummer omfattet af ligningslovens § 16 B. Skattepligten omfatter ikke udbytte, som oppebæres af et selskab m.v. (moderselskabet), der ejer mindst 10 pct. af aktiekapitalen i det udbyttegivende selskab (datterselskabet) i en sammenhængende periode på mindst et år, inden for hvilken periode udbytteudlodningstidspunktet skal ligge. Ved udbytteudlodninger i kalenderårene 2005 og 2006 udgør den i 2. pkt. nævnte ejerandel dog 20 pct., og ved udbytteudlodninger i kalenderårene 2007 og 2008 udgør den i 2. pkt. nævnte ejerandel 15 pct. Det er en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor selskabet er hjemmehørende. Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber som nævnt i 2. pkt., der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet«

Ved lov nr. 525 af 12. juni 2009 blev bl.a. selskabsskattelovens § 2, stk. 1, litra c, 3.- 6. pkt., ændret til at have følgende ordlyd:

»Skattepligten omfatter ikke udbytte af datterselskabsaktier, jf. *aktieavancebeskatningslovens § 4 A*, når beskatningen af udbyttet fra datterselskabet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor moderselskabet er hjemmehørende. Skattepligten omfatter endvidere ikke udbytte af koncernselskabsaktier, jf. *aktieavancebeskatningslovens § 4 B*, der ikke er datterselskabsaktier, når det udbyttemodtagende koncernselskab er hjemmehørende i en stat, der er medlem af EU/EØS, og udbyttebeskatningen skulle være frafaldet eller nedsat efter bestemmelserne i direktiv 90/435/EØF eller dobbeltbeskatningsoverenskomsten med den pågældende stat, hvis der havde været tale om datterselskabsaktier. Skattepligten omfatter endvidere ikke udbytte, som oppebæres af deltagere i moderselskaber, der er optaget på listen over de selskaber, der er omhandlet i artikel 2, stk. 1, litra a, i direktiv 90/435/EØF om en fælles

**4469**

beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, men som ved beskatningen her i landet anses for at være transparente enheder. Det er en betingelse, at selskabsdeltageren ikke er hjemmehørende her i landet,«

Ved samme lov blev aktieavancebeskatningsloven § 4 A affattet

*»Definition af datterselskabsaktier*

*§ 4 A.* Ved datterselskabsaktier forstås aktier, som ejes af et selskab, der ejer mindst 10 pct. af aktiekapitalen i datterselskabet, jf. dog stk. 2-4.

*Stk. 2.* Det er en betingelse efter stk. 1, at datterselskabet er omfattet af selskabsskattelovens § 1, stk. 1, nr. 1-2 a, 2 d-2 h og 3 a-5 b, eller at beskatningen af udbytter fra datterselskabet frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor datterselskabet er hjemmehørende.

*Stk. 3.* Datterselskabsaktierne anses for ejet direkte af moderselskabets selskabsaktionærer omfattet af selskabsskattelovens § 1 eller § 2, stk. 1, litra a, i tilfælde, hvor

1) moderselskabets primære funktion er ejerskab af datterselskabsaktier og koncernselskabsaktier, jf. § 4 B,

2) moderselskabet ikke udøver reel økonomisk virksomhed vedrørende aktiebesiddelsen og

3) mere end 50 pct. af aktiekapitalen i moderselskabet direkte eller indirekte ejes af selskaber omfattet af selskabsskattelovens § 1 eller § 2, stk. 1, litra a, der ikke ville kunne modtage udbytter skattefrit ved direkte ejerskab af aktierne i det enkelte datterselskab, og

4) aktierne i moderselskabet ikke er optaget til handel på et reguleret marked eller en multilateral handelsfacilitet.

*Stk. 4.* ….«

Af det til grund for lovændringen fremsatte lovforslag (nr. L 202 af 22. april 2009) fremgår af bemærkningerne til lovforslagets enkelte bestemmelser vedrørende forslaget til affattelsen af selskabsskattelovens § 2, stk. 1, litra c, 3.-5. pkt., bl.a.:

»Til nr. 5 …

Derudover foreslås bestemmelsen forenklet, således at de udbytter, der er skattefri, i stedet defineres med en henvisning til den definition af datterselskabsaktier og koncernselskabsaktier, der foreslås indsat i aktieavancebeskatningsloven jf. lovforslagets § 1, nr. 6. Det er dog en betingelse, at det udbyttemodtagende koncernselskab er hjemmehørende på Færøerne, i Grønland eller en stat, der er medlem af EU/EØS, og som udveksler oplysninger med Danmark.

Omformuleringen medfører alene mindre realitetsændringer.

Der kan endvidere henvises til bemærkningerne til lovforslagets § 1, nr. 10 om skattefrihed for avancer på datterselskabsaktier.

4. pkt. i selskabsskattelovens § 2, stk. 1, litra c, foreslås ophævet, da indholdet ikke længere er aktuelt.

Til nr. 6 [I § 2, stk. 1, litra c, 6. pkt., der bliver 5. pkt., udgår: »som nævnt i 3. pkt.]

Der er tale om en konsekvensændring som følge af lovforslagets § 14, nr. 5.«

*Ligningsvejledningen*

Af ligningsvejledningen pkt. D.D., kapitel III, artikel 10 om udbytter, offentliggjort den 29. januar 2003 fremgår bl.a.:

»Udbytte, der udbetales fra et selskab, beskattes som udgangspunkt i den stat, hvor den retmæssige ejer af udbyttet er hjemmehørende. De kontraherende stater kan dog aftale, at udbyttet under visse nærmere begrænsninger også beskattes i den stat, hvor selskabet er hjemmehørende.

…

Når et dansk selskab omfattet af SEL § 1, stk. 1, nr. 1, 2, 2e og 4 udlodder udbytte, skal selskabet efter hovedreglen i KSL § 65, stk. 1 indeholde udbytteskat med 28 pct. Reglen gælder tillige for udlodning af udbytte til selskaber, der er skattemæssigt hjemmehørende i udlandet.«

Af ligningsvejledningen pkt. D.D, kapitel III, artikel 10 om udbytter, offentliggjort den 14. juli 2003 fremgår bl.a.:

»Udbytte, der udbetales fra et selskab, beskattes som udgangspunkt i den stat, hvor den retmæssige ejer af udbyttet er hjemmehørende. De kontraherende stater kan dog aftale, at udbyttet under visse nærmere begrænsninger også beskattes i den stat, hvor selskabet er hjemmehørende.

I 2003-opdateringen er det i kommentaren nu præciseret, at begrebet »retmæssig ejer« ikke skal forstås i en snæver teknisk sammenhæng, men snarere skal forstås ud fra en formålsfortolkning af overenskomsten, herunder hensynet til at undgå eller omgå beskatning. En agent eller nominee er ikke retmæssige ejere, det samme gælder et conduitselskab (»stråmand«) eller såkaldte fiduciares, som er personer, der formelt er ejere af et aktiv, men hvor afkastet tilkommer en »beneficiary«. En retmæssig ejer i en kontraherende stat kan påberåbe sig overenskomsten, uanset at en mellemmand er indskudt.«

Af den juridiske vejledning version 2010-2 pkt. A.A.7.1.5 fremgår bl.a.:

»Varsling af ændring med fremtidig virkning

Det er et grundlæggende forvaltningsretligt princip, at det kun er muligt at iværksætte en skærpende

**4470**

praksisændring med virkning for fremtiden og efter udmelding af et passende varsel, der giver borgerne mulighed for at indrette sig efter den ændrede retstilstand.

…

Hvad der skal forstås som et passende varsel afhænger helt af de konkrete omstændigheder, dvs. hvilket tidsrum borgerne skønnes at have behov for til at kunne indrette sig efter praksisskærpelsen.

En praksisskærpelse skal offentliggøres på relevant måde, fx. I form af en SKM-meddelelse (styresignal) eller ved særlig nyhedsmarkering i de juridiske vejledninger.«

*Belysning af administrativ praksis*

Af skatteministerens svar af 6. november 2006 på spørgsmål S 474 til Folketingets Lovsekretariat fremgår bl.a.:

»*Spørgsmål:* Kan ministeren bekræfte, at udbytte fra danske selskaber, såfremt ejerandelen overstiger 20 pet., kan udbetales skattefrit til et moderselskab i f.eks. Luxembourg og herfra overføres videre til et egentligt skattelyland?

*Svar:*

…

Den begrænsede skattepligt - og fravigelsen - gælder for det selskab, der reelt *oppebærer* udbyttet. Den begrænsede skattepligt fraviges derfor kun, hvis det udenlandske selskab, der reelt oppebærer udbyttet, er omfattet af direktivet eller en dobbeltbeskatningsoverenskomst. Oppebæres derimod reelt af et selskab i et skattelyland, er udbyttebetalingen ikke undtaget fra kildebeskatningen.

Princippet om rette indkomstmodtager må således anvendes for at fastslå, hvem der er »oppebærer« renterne. Udtrykket »rette indkomstmodtager« må anses for at være meget lig udtrykket »beneficial owner«, som anvendes i dobbeltbeskatningsoverenskomsten. I dobbeltbeskatningsoverenskomsterne skal kildebeskatningen kun frafaldes eller nedsættes, hvis udbyttemes retmæssige ejer (beneficial owner) er hjemmehørende i den anden stat.

Bestemmelsen er et værn mod, at et almindeligt beskattet selskab indskydes som »conduit« selskab mellem det udbyttebetalende danske selskab og det endeligt modtagende udenlandske skattelyselskab. Bestemmelsen finder anvendelse, selvom der indskydes flere mellemliggende almindeligt beskattede selskaber. Det afgørende er, hvem der er den rette indkomstmodtager/ retmæssige ejer. »Conduit« selskaber omfatter bl.a. selskaber, der, skønt det er den

formelle ejer, reelt har meget snævre beføjelser i relation til den pågældende indkomst. Selskabet er i relation til udbyttet en »nullitet« eller administrator, der handler på vegne af andre parter, jf. kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.1).

Et rent gennemstrømningsholdingselskab i eksempelvis Luxembourg vil ikke være rette indkomstmodtager /beneficial owner af udbyttet, jf. således kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.2). Det kan bemærkes, at den schweiziske højesteret er kommet frem til, at et rent gennemstrømningsholdingselskab i Danmark ikke var retmæssig ejer til udbyttebetalinger efter den dansk-schweiziske overenskomst.

Det skal nævnes, at moder-/datterselskabsdirektivet ikke indebærer, at udbyttebetalinger til gennemstrømnings selskaber skal anerkendes.

Afslutningsvis skal det bemærkes, at der ikke sker udbyttebeskatning, når udbytte udbetales til f.eks. et moderselskab omfattet af moder-/datterselskabs-direktivet, hvis dette selskab er den reelle modtager af udbyttet, selvom moderselskabet er ejet af et selskab hjemmehørende i et skattely. Hvem der er udbyttets reelle modtager, afgøres ud fra en konkret vurdering.«

I forlængelse heraf afgav skatteministeren den 27. november 2006 til Folketingets Skatteudvalg bl.a. følgende svar:

»*Spørgsmål 5:*…

*Svar:*…

Bortfaldet af begrænset skattepligt er betinget af, at det pågældende udenlandske selskab er den retmæssige ejer af udbyttet.

Et rent gennemstrømningsselskab, som er hjemmehørende i udlandet, f.eks. Luxembourg, vil ikke være retmæssig ejer af udbyttet, jf. bemærkningerne til artikel 10 i OECDs modeloverenskomsten (afsnit 12.1).

Den begrænsede skattepligt bortfalder dog alligevel, hvis den retmæssige ejer bag ved gennemstrømningsselskabet er hjemmehørende i et andet land, og Danmark efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst med dette land skal nedsætte eller undlade beskatning af udbyttet.

…

*Spørgsmål 6:* …

*Svar:* Jeg kan ikke oplyse eksempler på udenlandske gennemstrømningsselskaber, som de danske skattemyndigheder ikke har accepteret som retmæssig ejer af udbytte fra danske selskaber.

…

*Spørgsmål 10:* I hvilket omfang og hvorledes kontrollerer SKAT, når der udloddes udbytte til gennemstrømningsholdingselskaber, hvor der ikke er indeholdt udbytteskat på grund af dobbeltbeskatningsoverenskomster eller EU's moder-/datterselskabsdirektiv, om det pågældende gennemstrømningsholdingselskab skal godkendes som rette indkomstmodtager af udbyttet, eller om udbyttemodtager er aktionæren i gennemstrømningsholdingselskab, og - hvis denne aktionær er hjemmehørende i et skattelyland - om det danske datterselskab skal indeholde udbytteskat i udbytteudlodningen?

**4471**

*Svar:* …

Det indgår i den ligningsmæssige behandling at påse, at betingelserne for ikke at indeholde udbytteskat er opfyldt, herunder om et udenlandsk selskab er retmæssig ejer af udbyttet.

Af notat af 20. marts 2007 til Folketingets Skatteudvalg om status på SKATs kontrolindsats vedrørende kapitalfondes overtagelse af syv danske koncerner fremgår bl.a.:

»Kapitalfondes overtagelse af danske virksomheder har gennem de senere år udgjort en større og større andel af de samlede virksomhedsoverdragelser. SKAT har indhentet informationer om, at

mere end 80 danske virksomheder gennem de senere år er blevet overtaget af danske eller udenlandske kapitalfonde.

En kapitalfond er normalt et kommanditselskab, hvor en række investorer har stillet kapital til rådighed. Med investorernes egenkapital som basis, lånes der betydelige summer i banker og andre finansielle enheder til købet af danske virksomheder.

En typisk model vil vise at investorer opretter en dansk holdingselskab, som står for opkøbet af den danske virksomhed. Holdingselskabet, som opkøber det danske selskab af den hidtidige aktionærkreds, får pengene til opkøbet via lån fra banker og investorer i kapitalfonden.

Helt generelt har SKAT fokus på virksomhedshandler, idet erfaringen viser, at der ofte er risiko for fejl ved opgørelse af den skattepligtige indkomst på dette område. Da kapitalfondenes andel af det danske marked for virksomhedshandler har været stigende, og specielt i 2005 har vist sig at udgøre et betydeligt antal med en stor volumen, har SKAT rettet fokus på denne type overtagelser.

På basis af SKATs informationer om kapitalfondes overtagelse af danske virksomheder er der udvalgt 7 opkøb af danske virksomheder til nærmere kontrol. Ved udvælgelsen lagde man vægt på, at få repræsenteret forskellige kapitalfonde, forskellige virksomhedstyper og forskel i volumen. Formålet var bl.a. efterfølgende at vurdere, om den skattemæssige behandling af opkøbet hos det enkelte selskab, var afhængig af hvilken kapitalfond der havde købt virksomheden.

I SKAT blev der indledningsvis nedsat en arbejdsgruppe. hvis formål var at skabe overblik over det teoretiske grundlag for en skattemæssig vurdering af kapitalfondenes overtagelser med henblik på den efterfølgende konkrete kontrol af de 7 opkøb.

…

På grundlag heraf undersøges det hvem, der er den endelige modtager - »rette indkomst modtager« - af renter og udbytter. Formålet er at fastslå, om denne modtager er skattepligtig til Danmark (begrænset skattepligtig), således at der kan tilbageholdes kildeskat i udbetalingerne. Dette kan normalt kun ske, hvis modtageren er hjemmehørende i et land hvormed Danmark ikke har indgået dobbeltbeskatningsoverenskomst.

Imidlertid forlader pengestrømmen oftest Danmark netop til modtagere i lande, hvormed Danmark har indgået dobbeltbeskatningsoverenskomst - DBO-lande. Det betyder, at der ikke er begrænset skattepligt til Danmark, og at der ikke skal indeholdes kildeskat. Hvis den første modtager af betalingerne imidlertid ikke er den endelige modtager - »rette indkomstmodtager« - af betalingerne, men derimod kun et gennemstrømningsselskab, kan der alligevel være tale om begrænset skattepligt for den endelige (»rette«) modtager.

Derfor leder SKAT efter oplysninger, som kan dokumentere, hvem der er det sidste og endelige led i kæden, og om dette led ligger i et ikke-DBO-land. Med sidstnævnte lande uden overenskomst har Danmark typisk ikke aftaler om bistand eller udveksling af oplysning.

Nok så vigtigt er det, at SKAT også skal søge dokumentation for, at de modtagere, der ligger mellem Danmark og den endelige modtager af udbytter eller renter/kursgevinster, kan betragtes som gennemstrømningsselskaber, således at den endelige (»rette«) modtager i ikke-DBO-landet som nævnt kan pålægges begrænset skattepligt til Danmark.«

Af skatteministerens svar af 15. maj 2007 (spørgsmål 75-77) til Folketingets Skatteudvalg vedrørende lovforslag nr. L 213 om ændring af selskabsskatteloven og forskellige andre skattelove (CFC-beskatning og indgreb mod kapitalfonde m.v.) fremgår bl.a.:

»*Spørgsmål 75:*

*Har Skat fortsat ikke gennemført udbyttebeskatning af såkaldte gennemstrømningsselskaber?«*

*Svar:*

Ved en særlige kontrolindsats har SKAT sat fokus på kapitalfondes overtagelse af danske koncerner. I den forbindelse arbejder SKAT med at fremskaffe oplysninger om modtagere af de pengestrømme, der forlader Danmark i form af udbytter og renter, idet SKAT vil have dokumentation for, at det er den »endelige modtager«, der også er rette indkomstmodtager til udbytterne og renteindtægterne. Først når dette er afklaret, kan det vurderes om Danmark har krav på kildeskat af de udbetalte beløb.

Denne undersøgelse har endnu ikke ført til udbyttebeskatning af udlodninger til gennemstrømningsselskaber.«

Af skatteministerens svar af 22. maj 2007 til Folketingets Skatteudvalg vedrørende lovforslag nr. L 213 om ændring af selskabsskatteloven og forskellige andre skattelove (CFC-beskatning og indgreb mod kapitalfonde m.v.) fremgår bl.a.:

»*Lovforslagets enkelte elementer*

…

**4472**

§ 1, nr. 1 - Kildeskat på renter

Det foreslås, at bestemmelsen om kildeskat på renter i SEL § stk. 1, litra d, justeres under hensyn til ændringen af CFC-reglerne. …

…

*Skatteministerens kommentar:*

…

Det skal bemærkes, at hvis den umiddelbare modtager af rentebetalingen viderebetaler beløbet via en udlodning, tilbagebetaling af lån eller lignende skal det vurderes, om den umiddelbare modtager er den rette indkomstmodtager (beneficial owner). Hvis den endelige beløbsmodtager må anses for at være beneficial owner, finder betingelserne i § 2, stk. 1, litra d, umiddelbar anvendelse pa den endelige beløbsmodtager.

…

§ 1, nr. 6 - Indgående renter fra datterselskaber

Det fremgår af bemærkningerne, at indgående udbytter ikke vil være skattefri, selvom udbytterne udloddes af et selskab inden for EU/E0S eller et land, som har en dobbeltbeskatningsoverenskomst med Danmark, hvis dette selskab er et »gennemstrømningsselskab« mellem det danske moderselskab og datterselskabet der er hjemmehørende uden for EU/E0S i et land, som ikke har dobbeltbeskatningsoverenskomst med Danmark. Ministeriet bedes uddybe, hvad der er afgørende for, at et selskab anses for et »gennemstrømningsselskab«. FSR er uforstående overfor tankegangen om, at et udbytte ved at »gennemstrømme« en koncern kan om kvalificeres, når der ikke er tvivl om, at udbyttet har passeret de enkelte selskaber, hvilket er utvivlsomt, nar udbyttet deklareres.

…

Skatteministerens kommentar:

Principppet om beneficial owner (retmæssig ejer) er et værn mod, at et almindeligt beskattet selskab indskydes som »conduit« selskab mellem det udbyttebetalende selskab og det endeligt modtagende udenlandske skattelyselskab. Værnet finder anvendelse, selvom det indskydes flere mellemliggende almindeligt beskattede selskaber.

Det afgørende er, hvem der er den retsmæssige ejer af udbyttet. »Conduit« selskaber omfatter bl.a. selskaber, der. skønt det er den formelle ejer, reelt har meget snævre beføjelser i relation til den pågældende indkomst. Selskabet er i relation til udbyttet en »nullitet« eller administrator, der handler på vegne af andre parter, jf. kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.1).

Et rent gennemstrømningsholdingselskab i f.eks. et EU-land vil derfor ikke være beneficial owner af udbyttet. Det skal i den forbindelse nævnes, at moder-/datterselskabsdirektivet ikke indebærer, at udbyttebetalinger gennem gennemstrømningsselskaber skal anerkendes.«

Af skatteministerens svar af 22. maj 2007 til Folketingets Skatteudvalg vedrørende samme lovforslag fremgår bl.a.:

»*Spørgsmål 86:*

»Skal besvarelsen af spørgsmål 75 forstås således, at SKAT ikke tidligere har undersøgt grundlaget for skattefrihed for udbytte overført til såkaldte gennemstrømningsselskaber, på trods af at skatteministeren flere gange tidligere - f.eks. under behandlingen af lovforslag L 30 fra indeværende samling - har henvist til, at der vil ske beskatning i sådanne tilfælde?«

…

*Svar:* …

Jeg har flere gange tidligere overfor skatteudvalget redegjort for SKATs indsatsstrategi og kan oplyse, at det af indsatsplanen 2007 fremgår, at et særligt indsatspunkt er selskaber, der enten ikke betaler skat eller kun betaler meget lidt skat. De særlige TP-ligningscentre, som blev etableret i 2005 - og de enheder, der kontrollerer de største selskaber i Danmark - er således forpligtet til at prioritere netop dette område.

…

Denne procedure sikrer, at en agent eller en mellemmand (f.eks. en bank) for en person i et tredjeland ikke vil være berettiget til nedsættelse af udbytteskatten selvom agenten eller mellemmanden er hjemmehørende i et aftaleland. Dette følger af, at agenten eller mellemmanden ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende.

Et gennemstrømningsselskab (holdingselskab) kan imidlertid ikke sidestilles med en agent eller en mellemmand. Et sådant selskab er indregistreret og fuldt skattepligtigt i det land, hvori det er hjemmehørende og udgangspunktet er helt klart, at et holdingselskab har krav på aftalebeskyttelse.

Ved opdateringen af OECD-modellen i 2005 blev der i et nyt punkt 12.1 i kommentaren til artikel 10 (udbytter) omtalt en OECD-rapport, ifølge hvilken et holdingselskab under ganske særlige omstændigheder ikke bør anses for at være den retmæssige ejer af udbyttet. Der skal være tale om, at holdingselskabet reelt har meget snævre beføjelser, som i relation til den pågældende indkomst gør det til en »nullitet« eller en administrator, der handler på vegne af andre parter.

Der er således meget snævre grænser for hvornår danske skattemyndigheder kan tilsidesætte at behørigt indregistreret og fuldt skattepligtigt udenlandsk selskab og som anført i svaret til spørgsmål 6 vedrørende lovforslag L 30 er der heller ikke eksempler på, at danske skattemyndigheder har nægtet at anerkende et udenlandsk holdingselskab og således anset det for en nullitet.«

Skatteministeren præciserede ovenstående svar ved et revideret svar til Folketingets Skatteudvalg den 29. maj 2007 bl.a. således:

**4473**

»Et holdingselskab kan ikke sidestilles med en agent eller en mellemmand. Et sådant selskab er indregistreret og fuldt skattepligtigt i det land, hvori det er hjemmehørende, og - udgangspunktet er, at et holdingselskab har krav på aftalebeskyttelse.

Det følger imidlertid af punkt 12.1 i kommentaren til OECD-modellens artikel 10 (udbytter) at rene gennemstrømningsselskab bør ikke anses for at være den retmæssige ejer af udbyttet.

Gennemstrømningsselskabet har reelt meget snævre beføjelser i relation til den pågældende indkomst, hvilket gør det til en »nullitet« eller en administrator, der handler på vegne af andre parter.

Det beror på en konkret vurdering, om et holdingselskab er et gennemstrømningsselskab.«

*EU-Domstolens dom af 26. februar i de forenede sager C-116/16 og C-117/16*

Ved EU-Domstolens (Store Afdeling) dom af 26. februar 2019 i de forenede sager C-116/16 og C-117/16 besvarede Domstolen en række præjudicielle spørgsmål, som Østre Landsret ved kendelser af 19. februar 2016 havde stillet i sagerne B-1980-12 og B-2173-12. Af dommen fremgår bl.a.:

»*Om det første til tredje spørgsmål og det fjerde spørgsmål, litra a)-c), i hovedsagerne*

68 Med det første til tredje spørgsmål og det fjerde spørgsmål, litra a)-c), i hovedsagerne ønsker den forelæggende ret nærmere bestemt oplyst, om den bekæmpelse af svig eller misbrug, der er tilladt i medfør af artikel 1, stk. 2, i direktiv 90/435, forudsætter, at der findes en national eller overenskomstmæssig anti-misbrugsbestemmelse som omhandlet i nævnte artikel. For det andet ønsker den oplyst, om en dobbeltbeskatningsoverenskomst, der er udfærdiget i overensstemmelse med OECD's modelbeskatningsoverenskomst og indeholder begrebet »retmæssig ejer«, kan udgøre en overenskomstmæssig anti-misbrugsbestemmelse som omhandlet i artikel 1, stk. 2, i direktiv 90/435. For det tredje ønsker den forelæggende ret oplyst, om det nævnte begreb »retmæssig ejer« [på fransk »bénéficiaire effectif«] er et EU-retligt begreb, som skal forstås på samme måde som begrebet »retmæssig ejer« [på fransk »bénéficiaire«], der er indeholdt i artikel 1, stk. 1, i direktiv 2003/49, og om det med henblik på fortolkningen af denne bestemmelse er muligt at tage hensyn til artikel 10 i OECD's modelbeskatningsoverenskomst af 1977. Den forelæggende ret ønsker navnlig oplyst, om en bestemmelse, der indeholder begrebet »retmæssig ejer«, kan anses for at udgøre en retsgrundlag, der gør det muligt at bekæmpe svig eller retsmisbrug.

69 Indledningsvis skal hovedsagernes første spørgsmål undersøges, hvormed den forelæggende ret ønsker oplyst, om en medlemsstat for at bekæmpe retsmisbrug inden for rammerne af anvendelsen af direktiv 90/435 skal have vedtaget en specifik national bestemmelse til gennemførelse af direktivet, eller om medlemsstaten kan henvise til nationale eller overenskomstmæssige anti-misbrugsprincipper eller -bestemmelser.

70 I denne henseende følger det af fast retspraksis, at der findes et almindeligt EU- retligt princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug (dom af 9.3.1999, Centros, C-212/97, EU:C:1999:126, præmis 24 og den deri nævnte retspraksis, at 21.2.2006, Halifax m.fl., C-255/02, EU:C:2006:121, præmis 68, af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 35, af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 27, og af 11.7.2018, Kommissionen mod Belgien, C- 356/15, EU:C:2018:555, præmis 99).

71 Det påhviler borgerne at overholde dette almindelige retsprincip. Anvendelsen af EU-retten kan således ikke udvides til at dække handlinger, der gennemføres med det formål ved svig eller misbrug at drage nytte af de fordele, der er hjemlet i EU- retten (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 38, af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 27, og af 11.7.2018, Kommissionen mod Belgien, C- 356/15, EU:C:2018:555, præmis 99).

72 Det følger således af dette princip, at en medlemsstat skal nægte at indrømme fordelene i EU-retlige bestemmelser, såfremt disse ikke er blevet påberåbt med henblik på at gennemføre målene med disse bestemmelser, men med henblik på at drage nytte af en

EU-retlig fordel, selv om betingelserne for indrømmelse af denne fordel alene er opfyldt formelt.

73 Dette er f.eks. tilfældet, såfremt gennemførelsen af toldformaliteter ikke har fundet sted som led i en almindelig handel, men er rent formel og alene har haft til formål retsstridigt at profitere af monetære udligningsbeløb (jf. i denne retning dom af 27.10.1981, Schumacher m.fl., 250/80, EU:C:1981:246, præmis 16, og af 3.3.1993, General Milk Products, C-8/92, EU:C:1993:82, præmis 21) eller eksportrestitutioner (jf. i denne retning dom af 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, præmis 59).

74 Principppet om forbud mod retsmisbrug finder desuden anvendelse på så vidt forskellige områder som de frie varebevægelser (dom af 10.1.1985, Association des Centres distributeurs Leclerc og Thouars Distribution, 229/83, EU:C:1985:1, præmis 27), den frie udveksling af tjenesteydelser (dom af 3.2.1993, Veronica Omroep Organisatie, C-148/91, EU:C:1993:45, præmis 13), offentlige tjenesteydelseskontrakter (dom af 11.12.2014, Azienda sanitaria locale n. 5 »Spezzino« m.fl., C-113/13, EU:C:2014:2440, præmis 62), etableringsfriheden (dom af 9.3.1999, Centros, C-212/97, EU:C:1999:126, præmis

**4474**

24), selskabsretten (dom af 23.3.2000, Diamantis, C-373/97, EU:C:2000:150, præmis 33), social sikring (dom af 2.5.1996, Paletta, C-206/94, EU:C:1996:182, præmis 24, af 6.2.2018, Altun m.fl., C-359/16, EU:C:2018:63, præmis 48, og af 11.7.2018, Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99), transport (dom af 6.4.2006, Agip Petroli, C-456/04, EU:C:2006:241, præmis 19-25), socialpolitikken (dom af 28.7.2016, Kratzer, C-423/15, EU:C:2016:604, præmis 37- 41), restriktive foranstaltninger (dom af 21.12.2011, Afrasiabi m.fl., C-72/11, EU:C:2011:874, præmis 62) og merværdiafgift (moms) (dom af 21.2.2006, Halifax m.fl., C-255/02, EU:C:2006:121, præmis 74).

75 Hvad angår sidstnævnte område har Domstolen gentagne gange udtalt, at selv om bekæmpelse af svig, afgiftsunddragelse og muligt misbrug er et formål, som anerkendes og støttes i Rådets sjette direktiv 77/388/EØF af 17. maj 1977 om harmonisering af medlemsstaternes lovgivning om omsætningsafgifter - Det fælles merværdiafgiftssystem: ensartet beregningsgrundlag (EFT 1977, L 145, s. 1), udgør princippet om forbud mod misbrug et generelt EU-retligt princip, som finder anvendelse uafhængigt af spørgsmålet om, hvorvidt de rettigheder og fordele, der er blevet misbrugt, har hjemmel i traktaterne, i en forordning eller i et direktiv (jf. i denne retning dom af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 30 og 31).

76 Det følger heraf, at det generelle princip om forbud mod misbrug skal gøres gældende over for en person, såfremt denne påberåber sig visse EU-retlige regler, som fastsætter en fordel, på en måde, der ikke er i overensstemmelse med de mål, som disse regler har. Domstolen har således udtalt, at dette princip kan gøres gældende over for en afgiftspligtig person for navnlig at nægte vedkommende retten til momsfritagelse, også selv om der ikke findes bestemmelser i national ret, som foreskriver en sådan nægtelse (jf. i denne retning dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C- 164/13, EU:C:2014:2455, præmis 62, og af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 33).

77 Selv om artikel 1, stk. 2, i direktiv 90/435 bestemmer, at direktivet ikke er til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre svig og misbrug, kan denne bestemmelse ikke fortolkes således, at den udelukker anvendelsen af det generelle EU-retlige princip om forbud mod misbrug, som er omtalt i nærværende doms præmis 70-72. De transaktioner, som af SKAT hævdes at være udtryk for misbrug,

er nemlig omfattet af EU-rettens anvendelsesområde (jf. i denne retning dom af 22.12.2010, Weald Leasing, C-103/09, EU:C:2010:804, præmis 42) og kan vise sig at være uforenelige med det formål, som dette direktiv forfølger.

78 Som det i denne henseende fremgår af første og tredje betragtning til direktiv 90/435, har direktivet til formål at lette sammenslutningen af selskaber på EU- plan ved at fastsætte konkurrenceneutrale beskatningsregler for disse sammenslutninger af selskaber fra forskellige medlemsstater, så virksomhederne får mulighed for at tilpasse sig det indre markeds krav, øge deres produktivitet og styrke deres konkurrencemæssige position på internationalt plan.

79 Såfremt det imidlertid var tilladt at skabe finansielle konstruktioner alene med det formål at kunne drage nytte af de skattefordele, der følger af anvendelsen af direktiv 90/435, ville dette ikke være i overensstemmelse med sådanne formål, men ville derimod være til skade for det indre markeds funktion, idet det ville fordreje konkurrencevilkårene. Som generaladvokaten i det væsentlige har anført i punkt 51 i forslaget til afgørelse i sag C-116/16, gør det samme sig gældende, selv hvis de omhandlede transaktioner ikke udelukkende forfølger et sådant formål, idet Domstolen har fastslået, at princippet om forbud mod misbrug finder anvendelse på skatteområdet, når opnåelse af en skattefordel er hovedformålet med den omhandlede transaktion (jf. i denne retning dom af 21.2.2008, Part Service, C-425/06, EU:C:2008:108, præmis 45, og af 22.11.2017, Cussens m.fl., C-251/16, EU:C:2017:881, præmis 53).

80 Den ret, som skattepligtige personer har til at drage fordel af den indbyrdes skattekonkurrence medlemsstaterne imellem på grund af den manglende harmonisering af indkomstskatterne, er i øvrigt ikke til hinder for anvendelsen af det generelle princip om forbud mod misbrug. I denne henseende bemærkes, at direktiv 90/435 havde til formål at foretage en harmonisering på området for direkte skatter ved at fastsætte konkurrenceneutrale beskatningsregler, og at det ikke tilsigtede at afskære medlemsstaterne fra at træffe passende foranstaltninger til bekæmpelse af svig og misbrug.

81 Selv om den omstændighed, at den skattepligtige person søger den skatteordning, der er den mest fordelagtige for personen, ganske vist ikke i sig selv kan danne grundlag for en generel formodning for svig eller misbrug (jf. i denne retning dom af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 50, af 29.11.2011, National Grid Indus, C-371/10, EU:C:2011:785, præmis 84, og af 24.11.2016, SECIL, C- 464/14, EU:C:2016:896, præmis 60), forholder det sig ikke desto mindre således, at en sådan skattepligtig person ikke kan indrømmes en ret eller en fordel, der følger af EU-retten, såfremt den omhandlede transaktion økonomisk set er et rent kunstigt arrangement, hvis formål er at omgå den pågældende medlemsstats lovgivning (jf. i denne retning dom af 12.9.2006, Cadbury Schweppes og Cadbury Schweppes Overseas, C-196/04, EU:C:2006:544, præmis 51, af

**4475**

7.11.2013, K, C- 322/11, EU:C:2013:716, præmis 61, og af 25.10.2017, Polbud - Wykonawstwo, C-106/16, EU:C:2017:804, præmis 61-63).

82 Det følger af disse forhold, at det påhviler de nationale myndigheder og domstole at nægte at indrømme de fordele, der er fastsat i direktiv 90/435, såfremt påberåbelsen heraf sker for at muliggøre svig eller misbrug.

83 I forhold til det generelle EU-retlige princip om forbud mod misbrug og nødvendigheden af at overholde dette princip inden for rammerne af gennemførelsen af EU-retten er det uden betydning for de nationale myndigheders forpligtelse til at nægte at indrømme de i direktiv 90/435 fastsatte rettigheder, der påberåbes for at mu-

liggøre svig eller misbrug, at der ikke findes nationale eller overenskomstmæssige anti-misbrugsbestemmelser.

84 De sagsøgte i hovedsagerne har påberåbt sig dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408), som vedrørte indrømmelsen af en skattefritagelse fastsat i Rådets direktiv 90/434/EØF af 23. juli 1990 om en fælles beskatningsordning ved fusion, spaltning, tilførsel af aktiver og ombytning af aktier vedrørende selskaber i forskellige medlemsstater (EFT 1990, L 225, s. 1) med henblik på at gøre gældende, at det følger af artikel 1, stk. 2, i direktiv 90/435, at den omhandlede medlemsstat kun kan nægte at indrømme de fordele, som er fastsat i dette direktiv, såfremt den nationale lovgivning indeholder et særskilt og specifikt retsgrundlag i denne henseende.

85 Denne argumentation kan imidlertid ikke tiltrædes.

86 Domstolen bemærkede ganske vist i præmis 42 i dom af 5. juli 2007, Kofoed (C- 321/05, EU:C:2007:408), at retssikkerhedsprincippet er til hinder for, at direktiver i sig selv kan skabe forpligtelser for borgerne, og at de derfor ikke som sådan kan påberåbes af medlemsstaten over for borgerne.

87 Domstolen bemærkede endvidere, at en sådan konstatering ikke berører forpligtelsen for alle myndigheder i en medlemsstat til ved anvendelsen af national ret i videst muligt omfang at fortolke denne i lyset af direktivers ordlyd og formål for at fremkalde det med direktiverne tilsigtede resultat, idet disse myndigheder således har mulighed for at gøre en overensstemmende fortolkning af national ret gældende over for borgerne (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 45 og den deri nævnte retspraksis).

88 Det var på grundlag af disse betragtninger, at Domstolen opfordrede den forelæggende ret til at undersøge, om der i dansk ret fandtes en almindelig bestemmelse eller grundsætning, hvorefter der gjaldt et forbud mod retsmisbrug, eller andre bestemmelser om skattesvig eller skatteunddragelse, som kunne fortolkes i overensstemmelse med den bestemmelse i direktiv 90/434, hvorefter en medlemsstat i det væsentlige kan nægte at indrømme den fradragsret, der er fastsat i dette direktiv, såfremt der er tale om en transaktion, der som sit væsentligste formål har en sådan svig eller unddragelse, og dernæst i givet fald at undersøge, om betingelserne for at anvende disse nationale bestemmelser var opfyldt i hovedsagen (jf. i denne retning dom af 5.7.2007, Kofoed, C-321/05, EU:C:2007:408, præmis 46 og 47).

89 Selv hvis det i hovedsagerne skulle vise sig, at national ret ikke indeholder regler, der kan fortolkes i overensstemmelse med artikel 1, stk. 2, i direktiv 90/435, kan det - uanset hvad Domstolen udtalte i dom af 5. juli 2007, Kofoed (C-321/05, EU:C:2007:408) - imidlertid ikke heraf udledes, at de nationale myndigheder og domstole er forhindret i at nægte at indrømme den fordel, der følger af den ret til fritagelse, der er fastsat i dette direktivs artikel 5, i tilfælde af svig eller retsmisbrug (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 54).

90 En nægtelse, der under sådanne omstændigheder gøres gældende over for en skattepligtig person, kan ikke henføres til den situation, som er omhandlet i nærværende doms præmis 86, idet en sådan nægtelse stemmer overens med det generelle EU-retlige princip om, at ingen kan gøre EU-retten gældende med henblik på at muliggøre svig eller misbrug (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 55 og 56 og den deri nævnte retspraksis).

91 For så vidt som forhold, der har karakter af svig eller misbrug, ikke kan danne grundlag for en ret i henhold til Unionens retsorden, således som det er anført i nærværende doms præmis 70, indebærer

nægtelsen af en fordel i henhold til et direktiv, såsom direktiv 90/435, ikke, at den berørte borger pålægges en forpligtelse i medfør af dette direktiv, men er blot en konsekvens af konstateringen af, at de objektive betingelser for opnåelsen af den tilstræbte fordel, som er fastsat i det nævnte direktiv for så vidt angår denne ret, alene er opfyldt formelt (jf. analogt dom af 18.12.2014, Schoenimport »Italmoda« Mariano Previti m.fl., C-131/13, C-163/13 og C-164/13, EU:C:2014:2455, præmis 57 og den deri nævnte retspraksis).

92 Under sådanne omstændigheder skal medlemsstaterne derfor nægte at indrømme den fordel, der følger af direktiv 90/435, i overensstemmelse med det generelle princip om forbud mod misbrug, hvorefter EU-retten ikke kan dække erhvervsdrivendes retsstridige transaktioner (jf. i denne retning dom af 11.7.2018,

**4476**

Kommissionen mod Belgien, C-356/15, EU:C:2018:555, præmis 99 og den deri nævnte retspraksis).

93 Henset til konstateringen i nærværende doms præmis 72 er det ufornødent at besvare den forelæggende rets andet spørgsmål i de to sager, der nærmere bestemt vedrører spørgsmålet om, hvorvidt en bestemmelse i en dobbeltbeskatningsoverenskomst, som henviser til begrebet »retmæssig ejer«, kan udgøre et retsgrundlag til bekæmpelse af svig og misbrug inden for rammerne af direktiv 90/435.

94 På denne baggrund er det ligeledes ufornødent at besvare det tredje spørgsmål og det fjerde spørgsmål, litra a)-c), i de to sager, der vedrører fortolkningen af samme begreb om den »retmæssige ejer«, eftersom disse spørgsmål alene er forelagt for det tilfælde, at de to sagers andet spørgsmål måtte blive besvaret bekræftende.

95 Henset til samtlige disse forhold skal det første spørgsmål i de to sager besvares med, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i direktiv 90/435, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse.

*Om det fjerde spørgsmål, litra d) og e), og det femte og det ottende spørgsmål i hovedsagerne*

96 Med det fjerde spørgsmål, litra d) og e), og det femte og det ottende spørgsmål i hovedsagerne ønsker den forelæggende ret nærmere bestemt oplyst, hvilke elementer der udgør retsmisbrug, og på hvilken måde det kan påvises, at disse elementer foreligger. I denne henseende ønsker den forelæggende ret navnlig oplyst, om et selskab kan anses for reelt at have modtaget udbytte fra sit datterselskab, såfremt dette selskab i henhold til en kontraktuel eller juridisk forpligtelse skal videreudlodde dette udbytte til tredjemand, eller såfremt det fremgår af de faktiske omstændigheder, at dette selskab, uden at være bundet af en sådan kontraktuel eller juridisk forpligtelse, »substantielt« ikke har rettighederne til at »bruge og nyde disse midler« som omhandlet i de kommentarer til OECD's modelbeskatningsoverenskomst af 1977, der blev vedtaget i 2014. Den ønsker også oplyst, om der kan foreligge retsmisbrug, såfremt den retmæssige ejer af udbytte, der overføres af gennemstrømningsselskaber, i sidste ende er et selskab med hjemsted i en tredjestat, med hvilken den pågældende medlemsstat har indgået en dobbeltbeskatningsoverenskomst. Med det ottende spørgsmål i de to sager ønsker den forelæggende ret endvidere nærmere bestemt oplyst, om en medlemsstat, der nægter at anerkende et selskab i en anden medlemsstat som retmæssig ejer af udbytte, er forpligtet til at fastlægge, hvilket selskab medlemsstaten i givet fald anser for den retmæssige ejer.

U.2023.4403H

*Spørgsmålet om, hvilke elementer der udgør retsmisbrug, og de dertil hørende beviser*

97 Som det fremgår af Domstolens praksis, kræves der med henblik på at bevise, at der foreligger misbrug, dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel (dom af 14.12.2000, Emsland-Stärke, C-110/99, EU:C:2000:695, præmis 52 og 53, og af 12.3.2014, O. og B., C-456/12, EU:C:2014:135, præmis 58).

98 Det er således undersøgelsen af disse sammenfaldende omstændigheder, som gør det muligt at efterprøve, om de elementer, der udgør misbrug, foreligger, og navnlig om de pågældende erhvervsdrivende har foretaget rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål at opnå en uretmæssig fordel (jf. i denne retning dom af 20.6.2013, Newey, C-653/11, EU:C:2013:409, præmis 47-49, af 13.3.2014, SICES m.fl., C-155/13, EU:C:2014:145, præmis 33, og af 14.4.2016, Cervati og Malvi, C-131/14, EU:C:2016:255, præmis 47).

99 Det tilkommer ikke Domstolen at vurdere de faktiske omstændigheder i hovedsagerne. Domstolen kan i en præjudiciel forelæggelsessag imidlertid i givet fald give den nationale domstol nærmere oplysninger med henblik på at vejlede den ved bedømmelsen af de konkrete sager, som den skal pådømme. Selv om der i hovedsagerne foreligger en række holdepunkter, på baggrund af hvilke det ville kunne konkluderes, at der foreligger retsmisbrug, påhviler det ikke desto mindre den forelæggende ret at efterprøve, om disse holdepunkter er objektive og samstemmende, og om de sagsøgte i hovedsagerne har haft mulighed for at føre modbevis.

100 En koncern, som ikke er tilrettelagt af grunde, der afspejler den økonomiske realitet, som har en struktur, der er rent formel, og som har til hovedformål eller som et af sine hovedformål at opnå en skattefordel, som virker mod formålet og hensigten med den skattelovgivning, der finder anvendelse, kan anses for et kunstigt arrangement. Dette er navnlig tilfældet, når betalingen af udbytteskat undgås ved i koncernstrukturen at indskyde en gennemstrømningsenhed mellem det selskab, som uddeler udbyttet, og det selskab, som er udbyttets retmæssige ejer.

**4477**

101 Det udgør således et holdepunkt for at antage, at der foreligger et arrangement, som har til formål uretmæssigt at drage fordel af den fritagelse, der er fastsat i artikel 5 i direktiv 90/435, at dette udbytte i sin helhed eller stort set i sin helhed ganske kort tid efter modtagelsen heraf videreudloddes af det selskab, som har modtaget det, til enheder, som ikke opfylder betingelserne for anvendelse af direktiv 90/435, enten fordi disse enheder ikke er hjemmehørende i en medlemsstat, fordi de ikke er stiftet under en af de former, som er omfattet af nævnte direktiv, fordi de ikke er omfattet af en af de skatter, der er opregnet i nævnte direktivs artikel 2, litra c), eller fordi de ikke har karakter af »moderselskab« og ikke opfylder de betingelser, der er fastsat i samme direktivs artikel 3.

102 Enheder, hvis skattemæssige hjemsted er beliggende uden for EU, sådan som det synes at være tilfældet for de selskaber, der er omhandlet i sag C-117/16, eller de kapitalfonde, der er omhandlet i sag C-116/16, opfylder således ikke betingelserne for anvendelse af direktiv 90/435. Såfremt udbyttet i disse sager var blevet betalt direkte af det danske selskab, der skulle udbetale dem, til de enheder, som ifølge Skatteministeriet var udbyttets retmæssige ejere, ville Kongeriget Danmark have kunnet opkræve kildeskat.

103 Den kunstige karakter af et arrangement kan ligeledes underbygges ved, at den pågældende koncern er tilrettelagt således, at det selskab, der modtager det udbytte, der betales af debitorselskabet, selv skal videreudlodde dette udbytte til et tredje selskab, som ikke opfylder betingelserne for anvendelse af direktiv 90/435, hvilket medfører, at dette selskab alene oppebærer en ubetydelig skattepligtig indkomst, når det opererer som gennemstrømningsselskab for at muliggøre pengestrømmen fra debitorselskabet til den enhed, som er de overførte beløbs retmæssige ejer.

104 Den omstændighed, at et selskab opererer som gennemstrømningsselskab, kan godtgøres, såfremt selskabets eneste aktivitet er at modtage udbyttet og videreudlodde det til den retmæssige ejer eller til øvrige gennemstrømningsselskaber. Den manglende faktiske økonomiske aktivitet skal i denne henseende i lyset af de særlige kendetegn ved den pågældende økonomiske aktivitet udledes af en undersøgelse af samtlige relevante elementer vedrørende bl.a. driften af selskabet, dets regnskab, strukturen af selskabets omkostninger og de reelt afholdte udgifter, det personale, som selskabet beskæftiger, og de lokaler og det udstyr, som det råder over.

105 Der kan endvidere findes holdepunkter for, at der foreligger et kunstigt arrangement, i den omstændighed, at der findes forskellige kontrakter mellem de selskaber, der er involveret i de omhandlede finansielle transaktioner, som giver anledning til pengestrømme inden for koncernen, samt i fremgangsmåden for transaktionernes finansiering, i vurderingen af de mellemliggende selskabers egenkapital og i gennemstrømningsselskabernes manglende beføjelser til at råde økonomisk over det modtagne udbytte. I denne henseende er det ikke alene en kontraktuel eller juridisk forpligtelse for det selskab, der modtager udbyttet, til at videreudlodde det til tredjemand, der kan udgøre et sådant holdepunkt, men ligeledes den omstændighed, at dette selskab, uden at være bundet af en sådan kontraktuel eller juridisk forpligtelse, »substantielt«, således som den forelæggende ret har anført det, ikke har rettighederne til at bruge og nyde dette udbytte.

106 Sådanne holdepunkter kan i øvrigt bestyrkes i tilfælde af sammenfald eller tidsmæssig nærhed mellem på den ene side ikrafttrædelsen af ny vigtig skattelovgivning, såsom den i hovedsagerne omhandlede danske lovgivning eller den i nærværende doms præmis 51 nævnte amerikanske lovgivning, og på den anden side iværksættelsen af komplekse finansielle transaktioner og ydelsen af lån inden for samme koncern.

107 Den forelæggende ret ønsker ligeledes nærmere bestemt oplyst, om der kan foreligge retsmisbrug, såfremt den retmæssige ejer af udbytte, der overføres af gennemstrømningsselskaber, i sidste ende er et selskab med hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst, hvorefter der ikke ville være blevet indeholdt kildeskat af udbyttet, såfremt det var blevet udloddet direkte til det selskab, der er hjemmehørende i denne tredjestat.

108 I denne henseende er det ved undersøgelsen af koncernstrukturen uden betydning, at visse af de retmæssige ejere af det udbytte, som er blevet overført af gennemstrømningsselskaber, har deres skattemæssige hjemsted i en tredjestat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst. Det skal således fastslås, at den omstændighed, at der findes en sådan overenskomst, ikke i sig selv kan udelukke, at der foreligger retsmisbrug. En overenskomst af denne art kan dermed ikke rejse tvivl om, at der foreligger et retsmisbrug, hvis dette er behørigt godtgjort på grundlag af samtlige de faktiske omstændigheder, som bevidner, at de erhvervsdrivende har udført rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål uretmæssigt at drage fordel af den fritagelse for kildeskat, der er fastsat i direktiv 90/435.

109 Det skal hertil tilføjes, at mens en beskatning skal svare til en økonomisk realitet, kan den omstændighed, at der findes en dobbeltbeskatningsoverenskomst, ikke som sådan godtgøre realiteten af en betaling, der er foretaget til modtagere, som er hjemmehørende i den tredjestat, med hvilken denne overenskomst er indgået. Såfremt debitorselskabet for udbyttet ønsker at drage

**4478**

fordel af en sådan overenskomst, er det muligt for selskabet at udlodde dette udbytte direkte til de enheder, som har deres skattemæssige hjemsted i en stat, med hvilken kildestaten har indgået en dobbeltbeskatningsoverenskomst.

110 Når dette er sagt, kan det heller ikke udelukkes, såfremt der foreligger en situation, hvor udbyttet ville have været fritaget, hvis det var blevet udloddet direkte til det selskab, som har sit hjemsted i en tredjestat, at målet med koncernstrukturen ikke er udtryk for retsmisbrug. I et sådant tilfælde kan koncernens valg af en sådan struktur i stedet for direkte udlodning af udbyttet til nævnte selskab ikke anfægtes.

111 Såfremt den retmæssige ejer af en udbytteudlodning har sit skattemæssige hjemsted i en tredjestat, er nægtelsen af den fritagelse, der er fastsat i artikel 5 i direktiv 90/435, i øvrigt på ingen måde underlagt en konstatering af, at der foreligger svig eller retsmisbrug.

112 Dette direktiv har, således som det b.la. fremgår af tredje betragtning hertil, til formål ved indførelse af en fælles beskatningsordning at fjerne enhver forskelsbehandling af samarbejde mellem selskaber fra forskellige medlemsstater i forhold til samarbejde mellem selskaber fra samme medlemsstat og således lette sammenslutninger af selskaber på EU-plan (dom af 8.3.2017, Wereldhave Belgium m.fl., C-448/15, EU:C:2017:180, præmis 25 og den deri nævnte retspraksis). Som det er fremhævet i nærværende doms præmis 78, tilsigter direktivet således at sikre den skattemæssige neutralitet af udbytteudlodning fra et datterselskab, der er beliggende i en medlemsstat, til dettes moderselskab, der er hjemmehørende i en anden medlemsstat, idet det fremgår af direktivets artikel 1, at det alene omfatter overskud, som selskaber i en medlemsstat modtager som udbytte fra deres datterselskaber med hjemsted i andre medlemsstater (jf. i denne retning kendelse af 4.6.2009, KBC Bank og Beleggen, Risicokapitaal, Beheer, C-439/07 og C-499/07, EU:C:2009:339, præmis 62 og den deri nævnte retspraksis).

113 Mekanismerne i direktiv 90/435, navnlig direktivets artikel 5, er derfor udformet med henblik på de situationer, hvor medlemsstaternes udøvelse af deres beskatningsbeføjelse kunne føre til - såfremt mekanismerne ikke fandt anvendelse - at udbytte, som et datterselskab udlodder til sit moderselskab, undergives dobbeltbeskatning (dom af 8.3.2017, Wereldhave Belgium m.fl., C-448/15, EU:C:2017:180, præmis 39). Sådanne mekanismer kan derimod ikke finde anvendelse, såfremt udbyttets retmæssige ejer er et selskab, hvis skattemæssige hjemsted er beliggende uden for EU, eftersom fritagelsen for kildeskat af nævnte udbytte i den medlemsstat, hvorfra udbyttet udloddes, i et sådant tilfælde risikerer at medføre, at udbyttet ikke beskattes effektivt inden for EU.

114 Henset til samtlige disse forhold skal hovedsagernes fjerde spørgsmål, litra d) og e), besvares med, at der med henblik på at bevise, at der foreligger retsmisbrug, kræves dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i et hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel. Den omstændighed, at en række holdepunkter foreligger, kan godtgøre, at der foreligger retsmisbrug, forudsat at disse holdepunkter er objektive og samstemmende. Sådanne holdepunkter kan bl.a. være, at der findes gennemstrømningsselskaber, som ikke har nogen økonomisk begrundelse, og den rent formelle karakter af en koncerns struktur, af den finansielle konstruktion og af lån.

*Bevisbyrden for, at der foreligger retsmisbrug*

115 Det bemærkes, at direktiv 90/435 ikke indeholder bestemmelser om, hvem der bærer bevisbyrden for, at der er tale om misbrug.

116 Som den danske og den tyske regering har gjort gældende, påhviler det imidlertid de selskaber, som ønsker at opnå den fritagelse for kildeskat af udbytte, der er fastsat i artikel 5 i direktiv 90/435, at godtgøre, at de opfylder de objektive betingelser, som direktivet fastsætter. Der er således intet til hinder for, at de berørte skattemyndigheder afkræver den skattepligtige de beviser, som de finder nødvendige for at foretage en konkret ansættelse af de pågældende skatter og afgifter, og i givet fald afslår en anmodet fritagelse, hvis sådanne beviser ikke fremlægges (jf. i denne retning dom af 28.2.2013, Petersen og Petersen, C-544/11, EU:C:2013:124, præmis 51 og den deri nævnte retspraksis).

117 Såfremt en skattemyndighed i kildestaten har til hensigt at nægte et selskab, som har udbetalt udbytte til et selskab med hjemsted i en anden medlemsstat, den fritagelse, der er fastsat i artikel 5 i direktiv 90/435, med den begrundelse, at der foreligger retsmisbrug, påhviler det derimod denne myndighed at godtgøre, at de elementer, som udgør et sådant misbrug, foreligger ved at tage hensyn til samtlige relevante forhold, bl.a. den omstændighed, at det selskab, til hvilket udbyttet er blevet udloddet, ikke er udbyttets retmæssige ejer.

118 I denne henseende påhviler det ikke en sådan myndighed at fastlægge dette udbyttes retmæssige ejer, men at godtgøre, at den hævdede retmæssige ejer blot er et gennemstrømningsselskab, hvorigennem et retsmisbrug har fundet sted. Det kan nemlig vise sig umuligt at foretage en sådan fastlæggelse, navnlig eftersom de potentielle retmæssige ejere er ukendte. De nationale skattemyndigheder har ikke nødvendigvis de fornødne oplysninger med henblik på at kunne fastlægge disse retmæssige ejere, henset til kompleksiteten af visse

**4479**

finansielle konstruktioner og muligheden for, at de mellemliggende selskaber, der er involveret i konstruktionen, er hjemmehørende uden for EU. Der kan således ikke kræves, at disse myndigheder fremlægger beviser, som det vil være umuligt for dem at føre.

119 Selv hvis de potentielle retmæssige ejere er kendte, er det desuden ikke nødvendigvis fastlagt, hvilke af disse der er eller vil blive de reelle retmæssige ejere. I det foreliggende tilfælde har den forelæggende ret vedrørende sag C- 117/16 således anført, at selv om Y Cyprus' moderselskab er Y Bermuda, der er hjemmehørende på Bermuda, er sidstnævntes moderselskab Y USA, der er hjemmehørende i De Forenede Stater. Såfremt den forelæggende ret måtte finde, at Y Cyprus ikke er udbyttets retmæssige ejer, vil det dermed med al sandsynlighed være umuligt for skattemyndighederne og domstolene i den medlemsstat, hvorfra udbyttet hidrører, at fastlægge, hvilket af disse moderselskaber der er eller vil blive udbyttets retmæssige ejer. Der vil navnlig kunne blive truffet beslutning om anvendelsen af dette udbytte efter skattemyndighedernes konstateringer vedrørende gennemstrømningsselskabet.

120 Det ottende spørgsmål i hovedsagerne skal følgelig besvares med, at en national myndighed med henblik på at nægte at anerkende et selskab som retmæssig ejer af udbytte eller med henblik på at fastslå, at der foreligger retsmisbrug, ikke er forpligtet til at fastlægge, hvilken enhed eller hvilke enheder myndigheden anser for dette udbyttes retmæssige ejer.«

*Lovgivning om beskatning af renter og royalties*

Af Rådets direktiv 2003/49/EF af 3. juni 2003 om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, fremgår bl.a.:

»*Artikel 1*
*Anvendelsesområde og procedure*

1. Betalinger af renter eller royalties, der opstår i en medlemsstat, fritages for enhver form for skat i denne stat, hvad enten den opkræves ved indeholdelse ved kilden eller ved skatteansættelse, forudsat at den retmæssige ejer af de pågældende renter eller royalties er et selskab i en anden medlemsstat eller et fast driftssted beliggende i en anden medlemsstat og tilhørende et selskab i en medlemsstat.

…

4. Et selskab i en medlemsstat anses kun for at være den retmæssige ejer af renter eller royalties, hvis det modtager disse betalinger til eget brug og ikke som formidler, herunder som agent, mandatar eller bemyndiget signatar for en anden person. …

*Artikel 5*
*Svig og misbrug*

1. Dette direktiv udelukker ikke anvendelse af nationale eller overenskomstmæssigt fastsatte bestemmelser til bekæmpelse af svig eller misbrug.

2. Medlemsstaterne kan tilbagekalde fordele i henhold til dette direktiv eller nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteundgåelse eller misbrug som væsentligste bevæggrund eller en af de væsentligste bevæggrunde.«

Ved lovforslag nr. L 119 af 17. december 2003 foreslog skatteministeren ændring af bl.a. selskabsskattelovens § 2, stk. 1, ved indsættelse af et litra d med følgende ordlyd:

»oppebærer renter fra kilder her i landet vedrørende gæld, som et selskab eller en forening m.v. omfattet af § 1 eller litra a har til udenlandske juridiske personer som nævnt i skattekontrollovens § 3 B (kontrolleret gæld). Dette gælder dog ikke for renter af fordringer, som er knyttet til et fast driftssted omfattet af litra a. Skattepligten omfatter ikke renter, hvis beskatningen af renterne skal frafaldes eller nedsættes efter direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, eller efter en dobbeltbeskatningsoverenskomst med Færøerne, Grønland eller den stat, hvor det modtagende selskab m.v. er hjemmehørende. Dette gælder dog kun, hvis det betalende selskab og det modtagne selskab er associeret som nævnt i dette direktiv i en sammenhængende periode på mindst 1 år, inden for hvilken betalingstidspunktet skal ligge.«

Af bemærkningerne til lovforslaget fremgår, at formålet hermed bl.a. var at begrænse mulighederne for skatteplanlægning ved fradrag for koncerninterne renter, når det modtagende koncernselskab betaler ingen eller meget lidt i skat af de renter, der er fratrukket ved opgørelsen af dansk skattepligtig indkomst, dog således at den begrænsede skattepligt ikke skulle omfatte renter, som er omfattet af rente-/royaltydirektivet eller en dobbeltbeskatningsoverenskomst.

Den 17. februar 2004 afgav skatteministeren bemærkninger til Folketingets Skatteudvalg vedrørende en henvendelse fra Foreningen af Statsautoriserede Revisorer om den foreslåede bestemmelse. Heraf fremgår bl.a.:

»*Kommentar:*

…

Imidlertid er det nødvendigt at begrænse mulighederne for skatteplanlægning ved, at dansk beskatning nedsættes ved koncerninte[r]ne rentebetalinger til et udenlandsk koncernselskab, som betaler ingen eller meget lav skat af de modtagne renter.

Den foreslåede kildeskat på renter er derfor målrettet, så den ikke omfatter alle rentebetalinger til udlandet. Kildeskatten gælder kun for rentebetalinger til visse finansielle selskaber i lande, som ikke er omfattet af EU's rente-/royaltydirektiv eller ikke har en dobbelt-

beskatningsoverenskomst, der pålægger Danmark at nedsætte dansk skat af rentebetalinger til det pågældende land.

…

**4480**

Det åbner ganske vist risiko for, at f.eks. et dansk selskab kan søge at omgå kildeskatten på rentebetalinger til et finansielt selskab i et lavskatte-land ved at betale renterne til et selskab i et andet land, som er omfattet af EU's rente-/royaltydirektiv eller en dansk dobbeltbeskatningsoverenskomst, og som ikke har kildeskat på rentebetalinger til udenlandske rentemodtagere, hvorefter dette selskab betaler renterne videre til selskabet i lavskatte-landet.

I sådanne tilfælde vil de danske skattemyndigheder imidlertid efter en konkret realitetsbedømmelse kunne lægge til grund, at renternes retmæssige ejer ikke er selskabet i det andet land, men det finansielle selskab i lavskatte-landet, således at rentebetalingen hverken er omfattet af EU's rente-/royaltydirektiv eller dobbeltbeskatningsoverenskomsten.

Efter rente-/royaltydirektivets artikel 5, stk. 2, kan et EU-land nægte at anvende direktivet i tilfælde af transaktioner, der har skatteunddragelse, skatteomgåelse eller misbrug som en væsentlig bevæggrund.

Bemærkningerne til OECD-modellen til dobbeltbeskatningsoverenskomster giver også en stat mulighed for at undlade at anvende en overenskomst i særlige tilfælde, jf. afsnittet om misbrug af overenskomsten i bemærkningerne til modellens artikel 1.«

Den 8. marts 2004 afgav skatteministeren et svar til Folketingets Skatteudvalg vedrørende den foreslåede lovgivning. Heraf fremgår bl.a.:

»*Spørgsmål 47:* Vil ministeren oplyse, hvor mange holdingselskaber af den art, der er anført i Jan Larsens henvendelse, der er registreret i Danmark, dvs. holdingselskaber, der er ejet af udenlandske selskaber, og som ejer datterselskaber i udlandet, medens der ikke er nogen egentlig forretningsmæssig aktivitet i Danmark?

*Svar:* …

Holdingreglerne er siden undersøgelsen blev igangsat i 2000 blevet ændret. Ændringen er foretaget ved lov nr. 282 af 25. april 2001 (L 99, 2000/01).

…

Metoden til undgåelse af udbytteskatten var at indskyde et dansk holdingselskab (et gennemstrømningsselskab).

…

Ved ændringen er det sikret at de danske holdingregler ikke længere giver skattefrihed ved udlodning til lande udenfor EU, som Danmark ikke har dobbeltbeskatningsoverenskomst med (herunder skattelylande).

…

Der synes dermed ikke længere at være samme behov for undersøgelsen, som da den blev igangsat. Dette skyldes, at lovændringen i væsentligt omfang har fjernet de udnyttelsesmuligheder, som dannede grundlag for kritikken af de danske holdingregler.

…

Endelig er der ikke mange korrektioner at hente ved en ligning eller revision af gennemstrømningsselskaberne.

Behovet for en fornyet undersøgelse er mindre, end da den oprindelige undersøgelse blev igangsat. Dette skyldes, at reglerne er ændret, således at misbrugsmulighederne er blevet væsentligt reduceret, jf. således det ovenfor anførte om lovændringen i 2001. En fornyet undersøgelse vil endvidere - i lighed med den nu afsluttede undersøgelse - kræve store ressourcer. Ressourcer, som i givet fald vil fragå kontrolressourcerne.

Hertil kommer, at det på baggrund af de erfaringer, der er indhentet ved undersøgelsen, må antages, at der ikke er nogen garanti for, at der kunne opnås et troværdigt resultat, hvis undersøgelsen fortsatte.

U.2023.4403H

Det er derfor min opfattelse, at der ikke bør igangsættes en fornyet undersøgelse.«

Den 22. marts 2004 afgav skatteministeren et endnu svar til Folketingets Skatteudvalg vedrørende den foreslåede lovgivning. Heraf fremgår bl.a.:

»*Spørgsmål 54.* Kan ministeren bekræfte, at også efter de seneste ændringer i reglerne for holdingselskaber, og efter vedtagelsen af nærværende lovforslag, vil det være sådan, at udlodninger og rentebetalinger til holdingselskaber på Cypern vil være skattefri (det vil sige uden dansk udbytte skat), selv om der ikke på Cypern vil ske beskatning af renter og udbytte?

*Svar:* For så vidt angår udbytter, medfører selskabsskattelovens § 2, stk. 1, litra c, at Danmark som hovedregel beskatter et udenlandsk selskab af udbytte fra et dansk selskab med 28 pct. af udbyttets bruttobeløb. Efter samme regel beskatter Danmark dog ikke et udenlandsk moderselskab af udbyttet, hvis beskatningen skal frafaldes eller nedsættes efter EU's moder-/datterselskabsdirektiv eller en dobbeltbeskatningsoverenskomst.

Efter den dansk-cypriotiske dobbeltbeskatningsoverenskomsts artikel 10 kan Danmark beskatte udbytte, som et dansk selskab udlodder til et selskab på Cypern. Hvis det cypriotiske selskab ejer mindst 25 pct. af det danske selskab, må den danske skat dog ikke overstige 10 pct. af udbyttets bruttobeløb. I andre tilfælde må skatten ikke overstige 15 pct.

Dobbeltbeskatningsoverenskomsten medfører altså, at Danmark skal nedsætte beskatningen af udbytte fra et dansk selskab til et moderselskab på Cypern. Selskabsskattelovens § 2, stk. 1, litra c, medfører så, at Danmark ikke beskatter udbyttet.

Nærværende lovforslag påvirker ikke selskabsskattelovens § 2, stk. 1, litra c.

…

Dobbeltbeskatningsoverenskomsten medfører altså, at Danmark skal nedsætte beskatningen af renter, som et selskab på Cypern modtager fra kilder her i landet.

**4481**

Den foreslåede regler i selskabsskattelovens § 2, stk. 1, litra d, medfører så, at Danmark ikke beskatter renterne.

Cypern bliver i den nærmeste fremtid medlem af EU. Dette vil medføre, at Danmark vil skulle frafalde beskatningen af udbytter og renter efter dels moder-/datterselskabsdirektivet og dels rente-/royaltydirektivet, herefter vil Danmark ikke opkræve kildeskat, selvom Danmark måtte ønske at gøre dette. Endelig skal det bemærkes, at den danske statskasse så vidt jeg kan se ikke lider noget provenutab ved, at der er placeret gennemstrømningsselskaber i Danmark.«

*Dobbeltbeskatningsoverenskomster*

*Overenskomsten med Luxembourg*

Af overenskomst af 17. november 1980 med Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter fremgår bl.a.:

»*Artikel 3.*
*Almindelige definitioner*

…

*Stk. 2.* Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

…

*Artikel 10.*
*Udbytte*

Udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, og i henhold til lovgivningen i denne stat, men den skat, der pålægges, må, såfremt modtageren er udbyttets retsmæssige ejer, ikke overstige:

a)  5 pct. af bruttobeløbet af udbyttet, hvis den retsmæssige ejer er et selskab (bortset fra et interessentskab og et kommanditselskab), der direkte ejer mindst 25 pct. af kapitalen i det selskab, som udbetaler udbyttet;

b)  15 pct. af bruttobeløbet af udbyttet i alle andre tilfælde.

…

SLUTPROTOKOL

Ved underskrivelsen af overenskomsten mellem Kongeriget Danmark og Storhertugdømmet Luxembourg til undgåelse af dobbeltbeskatning og til fastsættelse af bestemmelser om gensidig administrativ bistand for så vidt angår indkomst- og formueskatter er undertegnede befuldmægtigede blevet enige om følgende bestemmelser, som skal udgøre en integrerende del af overenskomsten:

*§ 1.* Holdingselskaber

Ad artikel 1, 3 og 4:

Denne overenskomst finder ikke anvendelse på holdingselskaber som omfattet af den særlige luxembourgske lovgivning, for tiden loven af 31. juli 1929 og storhertugens forordning af 17. december 1938 (sat i kraft ved § 1, 7o, stykke 1 og 2, i loven af 27. december 1937). Overenskomsten finder heller ikke anvendelse på indkomst, som en person, der er hjemmehørende i Danmark, oppebærer fra sådanne selskaber, og heller ikke på aktier eller andre kapitalbeviser i selskaber af denne art, som en sådan person er ejer af.«

*OECD's model for dobbeltbeskatningsoverenskomst med kommentarer*

Af OECD's model for dobbeltbeskatningsoverenskomst vedrørende indkomst og formue (1977) fremgår bl.a.:

»Artikel 3
Almindelige definitioner

…

2. Ved anvendelsen af denne overenskomst i en kontraherende stat skal, medmindre andet følger af sammenhængen, ethvert udtryk, som ikke er defineret deri, tillægges den betydning, som det har i denne stats lovgivning om de skatter, hvorpå overenskomsten finder anvendelse.

…

Artikel 10
Udbytte

Udbytte, som udbetales af et selskab, der er hjemmehørende i en kontraherende stat, til en person, der er hjemmehørende i den anden kontraherende stat, kan beskattes i denne anden stat.

*Stk. 2.* Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, hvori det selskab, der betaler udbyttet, er hjemmehørende, og i henhold til lovgivningen i denne stat, men den skat der pålignes må, såfremt modtageren er udbyttets retsmæssige ejer, ikke overstige:

a)  5 pct. af bruttobeløbet af udbyttet, hvis den retsmæssige ejer er et selskab (bortset fra et interessentskab og et kommanditselskab), der direkte ejer mindst 25 pct. Af kapitalen i det selskab, som udbetaler udbyttet;

b)  15 % af bruttobeløbet af udbyttet i alle andre tilfælde.

Den engelske ordlyd af artikel 10 var sålydende:
»Dividends

1 Dividends paid by a company which is a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2 However, such dividends may also be taxed in the Contracting State of which the company paying the

**4482**

dividends is a resident and according to the low of that State, but if the recipient is the beneficial owner of the dividends the tax so charged shall not exceed:

a) …

b) ….

Af OECD's kommentarer hertil fremgå bl.a.:

»MISBRUG AF OVERENSKOMSTEN

7. Formålet med dobbeltbeskatningsoverenskomster er, ved fjernelse af international dobbeltbeskatning, at fremme udvekslingen af varer og tjenesteydelser og kapitalens og fysiske og juridiske personers bevægelighed. De bør imidlertid ikke hjælpe til skatteunddragelse eller skatteflugt. Det er vel rigtigt, at skatteydere, bortset fra dobbeltbeskatningsoverenskomster, har den mulighed at udnytte forskelle i skatteniveauer mellem staterne og de skattefordele, der følger af forskellige landes skattelove, men det tilkommer de berørte stater at vedtage bestemmelser i deres nationale lovgivning for at modvirke mulige kunstgreb. Sådanne stater vil følgelig i deres tosidede dobbeltbeskatningsoverenskomster ønske at bevare anvendelsen af sådanne bestemmelser i deres nationale love.

8. Derudover forstærker udvidelsen af netværket af dobbeltbeskatningsoverenskomster sådanne kunstgrebs virkning ved gennem dannelse af sædvanligvis kunstfærdige juridiske konstruktioner at gøre det muligt at drage fordel både af de fordele, der følger af visse nationale love, og af de skattelempelser, der følger af dobbeltbeskatningsoverenskomster.

9. Dette ville f.eks. være tilfældet, hvis en person (uanset om denne er hjemmehørende i en kontraherende stat eller ej) disponerede via en juridisk sammenslutning, der er dannet i en stat, væsentligst for at opnå fordele i henhold til overenskomsten, som ikke ville kunne opnås af personen direkte. Et andet tilfælde ville være, hvor en fysisk person i en kontraherende stat har såvel fast bolig som alle sine økonomiske interesser, herunder væsentlig andel i et selskab i denne stat, og som, væsentligst for at sælge andelen og undgå beskatning af kapitalgevinster i denne stat ved salget (som følge af artikel 13, stk. 4), overførte sin faste bolig til den anden kontraherende stat, hvor sådanne gevinster var undergivet lav eller ingen beskatning.

10. Nogle af disse situationer behandles i overenskomsten, f.eks. ved at indføre begrebet »retmæssig ejer« (i artiklerne 10, 11 og 12) og særlige bestemmelser for de såkaldte artistselskaber (artikel 17, stk. 2). Sådanne problemer nævnes også i kommentarerne til artikel 10 (pkt. 17 og 22), artikel 11 (pkt. 12) og artikel 12 (pkt. 7). Det kan være hensigtsmæssigt for kontraherende stater, at de i tosidede forhandlinger opnår enighed om, at skattelempelse ikke finder anvendelse i visse tilfælde, eller at opnå enighed om, at anvendelsen af nationale love mod skatteunddragelse ikke berøres af overenskomsten.

…

*KOMMENTAR TIL ARTIKEL 10*
*VEDRØRENDE BESKATNING AF UDBYTTE*

…

12. I henhold til stk. 2 kan begrænsningen i kildestatens beskatningsret ikke benyttes, når et mellemled, såsom en agent eller en udpeget person, skydes ind mellem den berettigede og udbetaleren, medmindre den retmæssige ejer er hjemmehørende i den anden

kontraherende stat. Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale forhandlinger.

…

22. Opmærksomheden henledes i al almindelighed på følgende tilfælde: Den retmæssige ejer til udbytte, der hidrører fra en kontraherende stat, er et selskab, der er hjemmehørende i den anden kontraherende stat. Hele kapitalen eller dele deraf ejes af aktionærer, der er hjemmehørende uden for denne anden stat. Selskabets praksis er ikke at udbetale sin fortjeneste i form af udbytte, og det nyder en begunstigede skattemæssig behandling (privat investeringsselskab, basisselskab). Der kan stilles det spørgsmål, om det for et sådant selskab er berettiget i udbyttets kildestat at indrømme den beskatningsbegrænsning, der er fastsat i stk. 2. Det synes formålstjenligt, når der føres bilaterale forhandlinger at træffe aftale om særlige undtagelser fra den beskatningsregel, der er fastlagt i denne artikel, for at fastsætte den behandling, der skal anvendes på sådanne selskaber.«

OECD's modeloverenskomst af 2003 har følgende ordlyd:

»Artikel 3
Almindelige definitioner

…

2. Ved anvendelsen af overenskomsten til enhver tid af en kontraherende stat skal ethvert udtryk, som ikke er defineret deri, medmindre andet følger af sammenhængen, tillægges den betydning, som det har på dette tidspunkt i henhold til denne stats lovgivning om de skatter, på hvilke overenskomsten finder anvendelse. Enhver betydning i de skattelove, der anvendes i denne stat, skal gå forud for den betydning, dette udtryk måtte være tillagt i denne stats anden lovgivning. …

Artikel 10
Udbytter

1. Udbytte, som udbetales af et selskab, der er hjemmehørende i en af de kontraherende stater, til en person, som er hjemmehørende i den anden kontraherende stat, kan beskattes i denne stat.

2. Sådant udbytte kan imidlertid også beskattes i den kontraherende stat, i hvilken det selskab, der udbetaler udbyttet, er hjemmehørende, og i overensstemmelse

**4483**

med lovgivningen i denne stat, men hvis den retmæssige ejer af udbyttet er hjemmehørende i den anden kontraherende stat, må den skat, der pålægges, ikke overstige:

a) 5 pct. af bruttoudbyttet, hvis den berettigede modtager er et selskab (bortset fra et interessentskab), som direkte ejer mindst 25 pct. af kapitalen i det selskab, som udbetaler udbyttet;

b) 15 pct. af bruttoudbyttet i alle andre tilfælde.«

…

Kommentarer til OECD's modeloverenskomst

…

*Misbrug af overenskomsten*

9.6 Muligheden for at anvende generelle antimisbrugsbestemmelser betyder ikke, at der ikke i skatteaftaler er behov for indsættelsen af specifikke bestemmelser, der har til formål at hindre særlige former for skatteundgåelse. Når særlige teknikker for skatteundgåelse er identificeret eller hvor anvendelsen af sådanne teknikker er særlig problemfyldt, vil det ofte være nyttigt i overenskomsten at indsætte bestemmelser, der fokuserer direkte på den relevante undgåelsesstrategi. Dette vil også være nødvendigt i tilfælde, hvor en stat, der går ind for det synspunkt, der er beskrevet i pkt. 9.2 ovenfor, er af den opfattelse, at dens nationale lovgivning mangler de antimisbrugsregler eller principper, der er nødvendige for på rette måde at imødegå en sådan strategi.

10. Nogle former for skatteundgåelse er f.eks. allerede udtrykkeligt behandlet i overenskomsten, f.eks. ved indførelsen af begrebet

»retmæssig ejer« (i art. 10, 11 og 12) og i særlige bestemmelser såsom art. 17, stk. 2, der omhandler de såkaldte artistselskaber. Sådanne problemer nævnes også i kommentarerne til art. 10 (pkt. 17 og 22), art. 11 (pkt. 12) og art. 12 (pkt. 7).

…

  OECD's kommentar til artikel 10 om beskatning af udbytte

…

  12. Kravet om retmæssigt ejerskab blev indsat i art. 10, stk. 2, for at tydeliggøre betydningen af ordene »betalt….til en person, der er hjemmehørende«, således som de anvendes i artiklens stk. 1. Det gøres herved klart, at kildestaten ikke er forpligtet til at give afkald på sin beskatningsret til udbytteindkomst, blot fordi indkomsten umiddelbart blev betalt til en person, der er hjemmehørende i en stat, med hvilken kildestaten har indgået en overenskomst. Udtrykket retmæssig ejer er ikke anvendt i en snæver teknisk betydning, men skal ses i sammenhængen og i lyset af overenskomstens hensigt og formål, herunder at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse.

  12.1 Når en indkomst betales til en person, der er hjemmehørende i en kontraherende stat og som handler i sin egenskab af agent eller mellemmand, vil det ikke være i overensstemmelse med hensigten og formålet med overenskomsten, at kildestaten indrømmer lempelse eller skattefritagelse alene på grundlag af den umiddelbare indkomstmodtagers status som en person, der er hjemmehørende i den anden kontraherende stat. Den umiddelbare indkomstmodtager er i denne situation en person, der er hjemmehørende i den anden stat, men ingen dobbeltbeskatning opstår som følge heraf, da indkomstmodtageren ikke anses for ejer af indkomsten i skattemæssig henseende i den stat, hvori han er hjemmehørende. Det ville ligeledes ikke være i overensstemmelse med hensigten og formålet med overenskomsten, hvis kildestaten skulle indrømme lempelse af eller fritagelse for skat i tilfælde, hvor en person, der er hjemmehørende i en kontraherende stat, på anden måde end som agent eller mellemmand, blot fungerer som »gennemstrømningsenhed« (conduit) for en anden person, der rent faktisk modtager den pågældende indkomst. Af disse grunde konkluderer an Committee on Fiscal Affairs udarbejdede rapport »Double Taxation Conventions and the Use of Conduit Companies«, at et »gennemstrømningsselskab« normalt ikke kan anses for den retmæssige ejer, hvis det, skønt det er den formelle ejer, reelt har meget snævre beføjelser, som, i relation til den pågældende indkomst, gør det til en »nullitet« eller administrator, der handler på vegne af andre parter.

  12.2 Med forbehold af artiklens andre betingelser vedbliver begrænsningen i kildestatens beskatningsret at eksistere, når en agent eller en mellemmand, hjemmehørende i en kontraherende stat eller i en tredjestat, er indskudt mellem den berettigede og udbetaleren, medmindre den retmæssige ejer er hjemmehørende i den anden kontraherende stat. (Modelteksten blev ændret i 1995 for at tydeliggøre dette punkt, som er i overensstemmelse med alle medlemsstaternes opfattelse.) Stater, der ønsker at udtrykke dette tydeligere, kan frit gøre det under bilaterale handlinger.«

  Den engelske version af punkt 12.2 er således:

  »Subject to the other conditions imposed by the Article, the limitation of tax in the State of source remains available when an intermediary, such as an agent or nominee located in a Contracting State or in a third State, is interposed between the beneficiary and the payer but the beneficial owner is a resident of the other Contracting State …«.

  Af OECD's kommentarer af 2014 til artikel 10 i modeloverenskomsten fremgår bl.a.:

  »12.4 I disse forskellige eksempler (agent, mellemmand, conduit selskab i dets egenskab af bemyndiget eller administrator), er den direkte modtager af udbytte ikke »den retmæssige ejer«, fordi modtagerens ret til at bruge og nyde udbytterne er begrænset af kontraktuelle eller juridiske forpligtelser til at videreformidle de

**4484**

modtagne betalinger til en anden person. En sådan forpligtelse vil sædvanligvis fremgå af relevante, juridiske dokumenter, men kan eventuelt også være til stede allerede i kraft af de faktiske omstændigheder, som ganske klart viser, at modtageren substantielt ikke har rettighederne til at bruge og nyde de udbytter, dog uden at være bundet af en kontraktuel eller juridisk forpligtelse til at videreformidle de modtagne betalinger til en anden person. Denne type af forpligtelse omfatter ikke kontraktuelle eller juridiske forpligtelser, som ikke er betingede af viderebetalingen fra den direkte modtager, såsom en forpligtelse, der er afhængig af modtagelsen af en sådan betaling, og som den direkte modtager har som debitor eller som part i finansielle transaktioner, eller sædvanlige fordelingsforpligtelser i henhold til en pensionsaftale eller til kollektive investerings enheder, som vil være berettigede til overenskomstfordele efter principperne angivet i pkt. 6.8 til 6.34 i kommentaren til art. 1. Hvor modtageren af et udbytte har retten til at bruge og nyde udbyttet, uden at være bundet af kontraktuelle eller juridiske forpligtelser til at videreformidle de betalinger, som han har modtaget, til en anden person, er modtageren »den retmæssige ejer« af disse udbytter. Det bør også bemærkes, at art. 10 henviser til den retmæssige ejer af udbytterne i modsætning til ejeren af de aktier, og de kan være forskellige i visse situationer.

  12.5 Det forhold, at modtageren af et udbytte anses for være den retmæssige ejer af disse udbytter, betyder imidlertid ikke, at bestemmelserne i stk. 2 automatisk skal finde anvendelse. Fordelene ved disse bestemmelser skal ikke indrømmes i tilfælde af misbrug (se også pkt. 17 og 22 nedenfor). Således som det forklares i afsnittet »Misbrug af overenskomsten« i kommentaren til art. 1, er der mange måder at behandle et conduit selskab på, og generelt treaty shopping situationer. Disse omfatter specifikke anti-misbrugsbestemmelser i overenskomster, generelle anti-misbrugs bestemmelser og indhold-over-form eller økonomisk-substans anskuelser. Mens »retmæssig ejer« konceptet omfatter nogle former for skatteunddragelse (dvs. den type, der involverer indsættelse af en modtager, som er forpligtet til at videreformidle royaltiene til en anden person), er der andre typer, som ikke er omfattet; det omfatter således ikke andre former for treaty shopping, og det må derfor ikke blive betragtet som et koncept, der på nogen måde begrænser anvendelsen af andre principper vedrørende sådanne forhold.«

  *Lovgivning gennemført efter Landsskatterettens afgørelser*

  *Rådets direktiv 2015/121/EU af 27. januar 2015 om ændring af direktiv 2011/96/EU om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater*

  Af direktivet fremgår bl.a.:

  »ud fra følgende betragtninger:

…

  9) Dette direktiv bør på ingen måde berøre medlemsstaternes mulighed for at anvende deres interne bestemmelser eller overenskomster, der tager sigte på at hindre skatteunddragelse, skattesvig eller misbrug.

…

*Artikel 1*

  I direktiv 2011/96/EU erstattes artikel 1, stk. 2, af følgende stykke:

  »2. Medlemsstaterne giver ikke de fordele, der er ved dette direktiv, til arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål, eller der som et af hovedformålene har, at opnå en skattefordel, som virker mod indholdet af eller formålet med dette direktiv, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder.

Et arrangement kan omfatte flere trin eller dele.

3. Med hensyn til stk. 2 betragtes arrangementer eller serier af arrangementer som ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

4. Dette direktiv er ikke til hinder for anvendelsen af interne bestemmelser eller overenskomster, som er nødvendige for at hindre skatteunddragelse, skattesvig og misbrug.««

3. Direktivændringen blev implementeret i dansk ret ved lov nr. 540 af 29. april 2015 om ændring af ligningsloven således:

»1. I *fodnoten* til lovens titel indsættes som *2.* og *3. pkt.:*

»Loven indeholder bestemmelser, der gennemfører dele af Rådets direktiv 2011/96/EU af 30. november 2011 om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, EU-Tidende 2011, nr. L 345, side 8, med senere ændringer. Loven indeholder bestemmelser, der gennemfører dele af Rådets direktiv 2003/49/EF af 3. juni 2003 om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater, EU-Tidende 2003, nr. L 157, side 49, med senere ændringer.«

*2.* Efter § 2 indsættes:

»§ 3. Skattepligtige har ikke de fordele, der følger af direktiv 2011/96/EU om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater, direktiv 2003/49/EF om en fælles ordning for beskatning af renter og royalties, der betales mellem associerede selskaber i forskellige medlemsstater og direktiv 2009/133/EF om en fælles beskatningsordning ved fusion, spaltning, partiel spaltning, tilførsel af aktiver og ombytning af aktier vedrørende selskaber i forskellige medlemsstater og ved flytning af et SE's eller SCE's

**4485**

vedtægtsmæssige hjemsted mellem medlemsstater som implementeret i dansk lovgivning, til arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål eller der som et af hovedformålene har at opnå en skattefordel, som virker mod indholdet af eller formålet med direktiverne, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

*Stk. 2.* Ved anvendelsen af stk. 1 betragtes arrangementer eller serier af arrangementer som ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed. *Stk. 3.* Skattepligtige har ikke fordel af en dobbeltbeskatningsoverenskomst, hvis det er rimeligt at fastslå under hensyn til alle relevante faktiske forhold og omstændigheder, at opnåelsen af fordelen er et af de væsentligste formål i ethvert arrangement eller enhver transaktion, som direkte eller indirekte medfører fordelen, medmindre det godtgøres, at indrømmelsen af fordelen under disse omstændigheder vil være i overensstemmelse med indholdet af og formålet med den pågældende bestemmelse i overenskomsten.

*Stk. 4.* Uanset stk. 3 skal stk. 1 og 2 anvendes ved vurderingen af, om en skattepligtig er udelukket fra fordelen i en bestemmelse i en dobbeltbeskatningsoverenskomst med et land, der er medlem af EU, hvis den skattepligtige alternativt kunne påberåbe sig en fordel i et af direktiverne om direkte beskatning.««

Af det til grund herfor fremsatte lovforslag (lovforslag nr. L 167 af 20. marts 2015) fremgår bl.a.:

»*3.3.4. Gældende ret*

Der findes ikke en generel lovbestemt regel om bekæmpelse af misbrug i dansk skattelovgivning. Efter dansk (rets)praksis sker beskatningen efter der er foretaget en bedømmelse af, hvad der faktisk er sket. Det betyder, at tomme og kunstige skattebetingede dispositioner kan tilsidesættes, således at beskatningen i stedet fo-

retages i forhold til den modstående realitet. Dansk skatteret er altså grundlæggende helt på linje med internationalt gældende principper om »substance over form«.

Den vedtagne ændring af moder-/datterselskabsdirektivet indebærer, at der skal indsættes en generelt formuleret bestemmelse om bekæmpelse af misbrug af moder-/ datterselskabsdirektivet i skattelovgivningen. Det vurderes, at den nye bestemmelse i direktivet vil kunne have et bredere anvendelsesområde end den nuværende (rets)praksis.

…

*3.3.5. Lovforslaget*

Det foreslås, at der i dansk skattelovgivning indføres en international omgåelsesklausul til bekæmpelse af misbrug i forbindelse med grænseoverskridende transaktioner omfattet af moder-/datterselskabsdirektivet.

Omgåelsesklausulen er en gennemførsel af en ændring af direktivet, der er vedtaget på EU-rådsmødet den 27. januar 2015.

…

Endelig foreslås det, at ikrafttræden skal ske før den tidsfrist, der er fastsat i moder-/datterselskabsdirektivet. Det foreslås, at begge omgåelsesklausuler får virkning for transaktioner, arrangementer eller serier af arrangementer fra og med den 1. maj 2015.

Indførelsen af en omgåelsesklausul begrænser ikke de gældende muligheder for at tilsidesætte eller omkvalificere på andet grundlag.

…

*Bemærkninger til lovforslagets enkelte bestemmelser*

…

EU-kommissionen har den 25. november 2013 i et offentliggjort memo angivet følgende eksempel, hvor omgåelsesklausulen vil finde anvendelse:

Moderselskab i land C (uden for EU)

Datterselskab i land B (EU)

Datterdatterselskab i land A (EU)

Efter interne regler i land A skal der indeholdes kildeskat på udbytter til moderselskaber, der er hjemmehørende uden for EU. Dette indebærer, at hvis selskabet i land A er ejet direkte af selskabet i land C, skal en eventuel udbytteudlodning kildebeskattes i land A.

I land B er der ikke en tilsvarende regel om indeholdelse af kildeskat på udbytter til moderselskaber uden for EU.

Hvis moderselskabet i land C indskyder et holdingselskab i land B, dvs. mellem A og C, så er det muligt at undgå kildeskatten på udbytter til land C, da moder-/datterselskabsdirektivet ikke tillader kildeskat på udbytter mellem datterselskaber og moderselskaber hjemmehørende i EU, dvs. mellem land A og B.

Hvis hovedformålet eller et af hovedformålene med indskydelsen af selskabet i land B har været at undgå kildeskat på udbytter fra datterdatterselskabet i land A, f.eks. fordi datterselskabet i land B er et såkaldt »postkasseselskab« uden større substans, vil land A kunne nægte datterdatterselskabet fordelene i moder-/datterselskabsdirektivet og indeholde kildeskat på udlodningen med henvisning til omgåelsesklausulen.

Til ovenstående eksempel bemærkes, at der grundlæggende er tale om et klassisk gennemstrømningseksempel, som allerede er dækket af reglen i selskabsskattelovens § 2, stk. 1, litra c, da datterselskabet i land B ikke kan anses for at være den retmæssige ejer af udbyttet. Det bemærkes, at der verserer en række sager ved domstolene om netop dette forhold.

Hvis den objektive analyse af alle relevante faktiske forhold og omstændigheder i stedet viser, at et arrangement eller dele heraf er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske

**4486**

virkelighed, vil der være tale om en reel disposition, og omgåelsesklausulen vil derfor ikke kunne finde anvendelse, jf. stk. 2.

Det foreslås desuden i stk. 3, at fordelene ved en dobbeltbeskatningsoverenskomst bortfalder, hvis det er rimeligt at fastslå under hensyn til alle relevante faktiske forhold og omstændigheder, at opnåelsen af fordelen er et af de væsentligste formål i ethvert arrangement eller enhver transaktion, som direkte eller indirekte medfører fordelen, medmindre det godtgøres, at indrømmelsen af fordelen under disse omstændigheder vil være i overensstemmelse med indholdet af og formålet med den pågældende bestemmelse i overenskomsten.«

*Rådets direktiv 2016/1164/EU af 12. juli 2016 om regler til bekæmpelse af metoder til skatteundgåelse, der direkte indvirker på det indre markeds funktion*

Af ovennævnte direktiv fremgår bl.a.:

*»Artikel 1*

*Anvendelsesområde*

Dette direktiv finder anvendelse på alle skattesubjekter, som er selskabsskattepligtige i en eller flere medlemsstater, herunder faste driftssteder i en eller flere medlemsstater for enheder, der er skattemæssigt hjemmehørende i et tredjeland.

…

*Artikel 3*

*Minimumsniveau af beskyttelse*

Dette direktiv er ikke til hinder for anvendelsen af nationale eller aftalebaserede bestemmelser, der har til formål at sikre et højere beskyttelsesniveau for nationale selskabsskattegrundlag. …

*Artikel 6*

*Generel regel om bekæmpelse af misbrug*

1. Ved beregning af selskabsskattetilsvaret ser en medlemsstat bort fra arrangementer eller serier af arrangementer, der er tilrettelagt med det hovedformål, eller der som et af hovedformålene har, at opnå en skattefordel, som virker mod formålet og hensigten med gældende skatteret, og som ikke er reelle under hensyntagen til alle relevante faktiske forhold og omstændigheder. Et arrangement kan omfatte flere trin eller dele.

2. Med hensyn til stk. 1 betragtes arrangementer eller serier af arrangementer som værende ikke reelle, i det omfang de ikke er tilrettelagt af velbegrundede kommercielle årsager, der afspejler den økonomiske virkelighed.

3. Hvis der ses bort fra arrangementer eller serier af arrangementer, jf. stk. 1, beregnes skattetilsvaret i overensstemmelse med national ret.

*Lov nr. 327 af 30. marts 2019 om anvendelse af multilateral konvention til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning*

Ved denne lov blev bestemmelserne i multilateral konvention af 24. november 2016 til gennemførelse af tiltag i dobbeltbeskatningsoverenskomster til forhindring af skatteudhuling og overskudsflytning, jf. lovens bilag 1, med virkning fra 1. juli 2019 gjort anvendelig på bl.a. de dobbeltbeskatningsoverenskomster, der er nævnt i lovens bilag 3, herunder aftale af 11. oktober 2010 mellem Kongeriget Danmark og Republikken Cypern til undgåelse af dobbeltbeskatning og forhindring af skatteunddragelse for så vidt angår indkomstskatter. Det er oplyst, at konventionen er tiltrådt af Cypern.

Af konventionens artikel 7 fremgår:

*»Artikel 7(11)*

*Forhindring af misbrug af aftaler*

1. Uanset de øvrige bestemmelser i en omfattet skatteaftale gives der ikke fordele efter den omfattede skatteaftale med hensyn til indkomst eller formue, hvis det i betragtning af alle relevante fakta og omstændigheder er rimeligt at antage, at opnåelse af denne fordel

var et af hovedformålene med noget arrangement eller nogen transaktion, som direkte eller indirekte medførte denne fordel, medmindre det godtgøres, at opnåelse af denne fordel under disse omstændigheder ville være i overensstemmelse med genstanden for og formålet med de relevante bestemmelser i den omfattede skatteaftale.«

*Opkrævningsloven*

Opkrævningslovens § 5, stk. 1, og § 7, stk. 1, i lovens kapitel 2 om afregning af skatter og afgifter m.v. havde i 2010 følgende ordlyd, jf. bekendtgørelse nr. 1402 af 7. december 2010 af lov om opkrævning af skatter og afgifter m.v.:

*»§ 5.* Hvis det konstateres, at en virksomhed har afgivet urigtig angivelse eller indberetning til indkomstregisteret af beløb omfattet af § 2, stk. 1, 4. pkt., således at virksomheden har betalt for lidt i skatter eller afgifter m.v. eller har fået udbetalt for meget i godtgørelse, afkræves virksomheden det skyldige beløb til betaling senest 14 dage efter påkrav.

*Stk. 2.* …«

*»§ 7.* Betales et beløb ikke rettidigt, eller er der ydet henstand med betalingen, skal der betales en månedlig rente som fastsat efter stk. 2 med tillæg af 0,8 procentpoint for hver påbegyndt måned fra den 1. i den måned, i hvilken beløbet skal betales. For indeholdelsespligtige omfattet af § 2, stk. 6, betales renten efter 1. pkt. vedrørende A-skat og arbejdsmarkedsbidrag dog fra den 1. i den måned, hvori beløbet skulle have været angivet, og frem til beløbet betales. Renten beregnes dagligt. Renten kan ikke fratrækkes ved opgørelsen af den skattepligtige indkomst.

*Stk. 2.* …«.

Bestemmelserne er i dag sålydende, jf. lovbekendtgørelse nr. 573 af 6. maj 2019:

*»§ 5.* Hvis det konstateres, at en virksomhed har afgivet urigtig angivelse eller indberetning af beløb omfattet af

**4487**

§ 2, stk. 1, 4. pkt., således at virksomheden har betalt for lidt i skatter eller afgifter m.v. eller har fået udbetalt for meget i godtgørelse, afkræves virksomheden det skyldige beløb til betaling senest 14 dage efter påkrav. *Stk. 2.* …«

*»§ 7.* Betales et beløb ikke rettidigt, eller er der ydet henstand med betalingen, skal der betales en månedlig rente som fastsat efter stk. 2 med tillæg af 0,7 procentpoint regnet fra den seneste rettidige betalingsdag for beløbet, og frem til beløbet betales. Renten beregnes dagligt. Renten kan ikke fratrækkes ved opgørelsen af den skattepligtige indkomst. For beløb, der opkræves efter reglerne i kapitel 5, finder bestemmelsen om saldoforrentning i § 16 c, stk. 1, anvendelse. *Stk. 2.* …«

Bestemmelserne i opkrævningslovens §§ 5 og 7 blev indført ved lov nr. 169 af 15. marts 2000 (lov om opkrævning af skatter og afgifter m.v.). Af de specielle bemærkninger til lovforslaget (lovforslag L 19 af 6. oktober 1999), der lå til grund herfor, fremgår bl.a.:

*»Til § 5*

Stk. 1 angår skyldige skatte- og afgiftsbeløb som følge af urigtige angivelser. Der foreslås regler, som i dag gælder efter momsloven, lønsumsafgiftsloven og de fleste punktafgiftslove. Reglerne går ud på, at et beløb, der efterreguleres som følge af urigtige angivelser, skal betales inden 14 dage. Betales beløbet inden denne frist, sker der ingen forrentning. Betales beløbet efter de 14 dage, forrentes beløbet fra den dag, efterbetalingskravet er fremsat. Dette vil betyde en ændring for arbejdsmarkedsbidrag og indeholdt A-skat, der i dag forrentes fra det tidspunkt, hvor beløbet skulle have været indbetalt. For et sådant princip taler -ved disse typer af tilsvar - at det er på dette tidspunkt, beløbet er (eller burde have været) indeholdt. Imod taler dog, at det ved en efterangivelse kan være vanske-

ligt at opdele efteropkrævningen i enkelte perioder - med måneden som afgiftsperiode vil der være 12 perioder pr. år, som efteropkrævningen skal fordeles på, med separat renteberegning for hver periode. Dette virker unødig omstændeligt. Samtidig gives der i dag ingen rentegodtgørelse for A-skat og AM-bidrag, der tilbagebetales på et senere tidspunkt. Det kan betyde, at en virksomhed, der efterregulerer nogle år tilbage, og skal have penge tilbage totalt set, kan risikere at skulle betale mere i renter, end det beløb, de har betalt for meget. På denne baggrund foreslås det, at der først påløber renter fra den 1. i den måned, hvor der er sidste rettidige indbetalingsdag, jf. § 7.

…«

Af opkrævningslovens bestemmelser om én skattekonto, jf. lovbekendtgørelse nr. 573 af 6. maj 2019, fremgår bl.a.:

»Kapitel 5

*Én skattekonto*

§ 16. Nedenstående ind- og udbetalinger fra og til virksomheder, selskaber, fonde og foreninger, offentlige myndigheder, institutioner m.v. indgår i en samlet saldoopgørelse (skattekontoen) efter reglerne i dette kapitel:

1) Skatter og afgifter omfattet af denne lovs § 1, stk. 1 og 2.

2) Betalinger efter selskabsskatteloven, fondsbeskatningsloven, aktiesparekontoloven, kulbrinteskatteloven, toldloven, lov om fremskyndet tilbagebetaling af visse afgifter, lov om afgift af skadesforsikringer, tinglysningsafgiftsloven og lov om afgift af bidraget til Arbejdsmarkedets Erhvervssikring og af arbejdsulykkeserstatninger m.v.

3) …

…

6) Bøder, gebyrer og renter vedrørende de ovennævnte love og betalinger.

§ 16 a. Ind- og udbetalinger af skatter og afgifter m.v. omfattet af § 16, modregnes automatisk efter et saldoprincip. Meddelelse om modregning fremgår af skattekontoen.

*Stk. 2.* Overstiger den samlede sum af registrerede forfaldne krav på virksomhedens konto den samlede sum af registrerede og forfaldne tilgodehavender til virksomheden, udgør forskellen (debetsaldoen) det samlede beløb, som virksomheden skylder told- og skatteforvaltningen. Er den samlede sum af registrerede og forfaldne krav på indbetalinger fra virksomheden derimod mindre end de registrerede og forfaldne krav på udbetalinger til virksomheden, udgør forskellen (kreditsaldoen) virksomhedens samlede tilgodehavende fra told- og skatteforvaltningen.

*Stk. 3.* Krav på ind- og udbetalinger registreres på skattekontoen fra det tidspunkt, hvor der er sket angivelse heraf, eller hvor kravene med sikkerhed kan opgøres.

*Stk. 4.* Krav på indbetalinger fra virksomheder påvirker (debiteres) saldoopgørelsen efter stk. 2 fra den seneste rettidige betalingsdag for beløbet. Stk. 5. Indbetalinger fra virksomheder til opfyldelse af krav efter stk. 4 påvirker (krediteres) saldoopgørelsen efter stk. 2 fra indbetalingsdagen uanset betalingsmetoden.

*Stk. 6.* Tilgodehavender til virksomheder omfattet af dette kapitel påvirker (krediteres) saldoopgørelsen efter stk. 2 fra det tidspunkt, hvor beløbet kan opgøres efter § 12.

*Stk. 7.* Udbetalinger til virksomheder til opfyldelse af krav efter stk. 6 påvirker (debiteres) saldoopgørelsen efter stk. 2 på det tidspunkt, hvor der sker udbetaling til virksomheden.

*Stk. 8.* Hvor virksomheders indbetaling helt eller delvis anvendes til betaling af en debetsaldo, der er sammensat af flere krav, går betalingen til dækning af det ældst forfaldne krav først.

*Stk. 9.* …

**4488**

…

§ 16 c. En debetsaldo forrentes med den rente, der er fastsat i § 7, stk. 1, jf. stk. 2. Renten beregnes dagligt og tilskrives månedligt. Renten er ikke fradragsberettiget. En debetsaldo på 200 kr. eller derunder forrentes ikke efter registreringen af virksomhedens ophør.

*Stk. 2.* …

*Stk. 3.* En kreditsaldo forrentes ikke.

*Stk. 4.* Overstiger en debetsaldo for en virksomhed 5.000 kr., skal hele beløbet indbetales straks, og told- og skatteforvaltningen udsender et rykkerbrev herom til virksomheden. Told- og skatteforvaltningen udsender ikke rykkerbreve om en debetsaldo på 5.000 kr. eller derunder….

*Stk. 5.* En kreditsaldo udbetales til virksomhedens Nemkonto, medmindre virksomheden har ønsket en beløbsgrænse for udbetaling af en kreditsaldo. En beløbsgrænse for udbetaling af en kreditsaldo kan højst udgøre 200.000 kr. Udbetaling af en kreditsaldo kan ikke ske, før der kan udbetales mindst 200 kr. Virksomheder kan uanset 3. pkt. anmode om at få ethvert beløb uanset størrelse udbetalt. Udbetaling af en kreditsaldo kan ikke ske, hvis virksomheden mangler at indsende angivelser for afsluttede perioder eller at give told- og skatteforvaltningen oplysninger efter skattekontrollovens § 2, jf. § 12, stk. 4. En kreditsaldo på 200 kr. eller derunder tilhørende en ophørt virksomhed bortfalder 3 år efter registreringen af virksomhedens ophør. Fristen efter 6. pkt. kan ikke afbrydes eller suspenderes.

*Stk. 6.* Udbetaling af en kreditsaldo afventer forfaldne skatte- og afgiftskrav, hvis kravet har sidste rettidige betalingsfrist inden for 5 hverdage fra kreditsaldoens opståen. Opstår kreditsaldoen som følge af, at virksomhedens tilsvar for en afregningsperiode er negativt, udbetales kreditsaldoen dog senest efter fristen i § 12, stk. 2.

…«

Bestemmelserne om én skattekonto blev indført ved lov 513 af 7. juni 2006 (lov om ændring af opkrævningsloven, selskabsskatteloven og forskellige andre love (Opkrævning via én skattekonto)). Reglerne trådte først i kraft den 1. august 2013, jf. bekendtgørelse nr. 577 af 30. maj 2013.

Af de generelle bemærkninger til lovforslag nr. L 205 af 29. marts 2006, der lå til grund for loven, fremgår bl.a.:

»1.1…

Hensigten med Én Skattekonto (»skattekontoen«) er, at alle betalinger mellem told- og skatteforvaltningen og virksomhederne samles og fremover sker via én og samme konto, dvs., at told- og skatteforvaltningens krav på indbetalinger fra virksomheder og virksomhedernes krav på udbetalinger fra told- og skatteforvaltningen automatisk modregnes efter et saldolignende princip. Etableringen af skattekontoen forventes at lette betalingen/opkrævningen for både virksomhederne og told- og skatteforvaltningen samt at give virksomhederne mulighed for hurtigt og enkelt via online-adgang til skattekontoen at konstatere, om de skylder beløb eller har beløb til gode hos told- og skatteforvaltningen.

…

*1.3 Formålet med skattekontoen*

Det primære formål med skattekontoen er at lette og forenkle administrationen af betalinger til og fra told- og skatteforvaltningen for både virksomhederne og myndighederne. Efter gældende regler afregnes og registreres indbetalinger til told- og skatteforvaltningen på en række forskellige konti og i en række forskellige it-systemer i told- og skatteforvaltningen. Indbetalingerne betragtes således som adskilte forløb, hvilket betyder, at det kan være vanskeligt at danne sig et samlet overblik over den enkelte virksomheds mellemværende med told- og skatteforvaltningen.

Herudover betyder det eksisterende opkrævningssystem, at der bruges betydelige ressourcer på korrekt placering af fejlbehæftede beløb eller beløb, hvor det ikke er angivet, hvad beløbet skal dække.

Med indførelsen af skattekontoen vil alle betalinger til og fra told- og skatteforvaltningen blive registreret og afregnet via skattekontoen. I praksis vil virksomhederne således fremover kun skulle indbetale skyldige beløb til én og samme konto (skattekontoen). På skattekontoen indgår også de beløb, som virksomhederne har til gode fra told- og skatteforvaltningen, som f.eks. negativ moms, eventuelt tilbagebetaling af tidligere indbetalte afgifter eller andre efter-eller tilbagebetalingsbeløb, som virksomheden måtte have krav på.

Med skattekontoen indføres et »saldoprincip«, som er sammenlignelig med det, man kender fra en bankkonto. Indbetalinger og udbetalinger vil automatisk blive modregnet hinanden og det udvisende, som kontoen har, kan således - i lighed med en bankkonto - være negativt (debetsaldo) eller positivt (kreditsaldo). Enhver indbetaling til told- og skatteforvaltningen vil således i overensstemmelse med saldosystemet indgå på skattekontoen, og blive anvendt til dækning af en eventuel debetsaldo.

…

*3.1 Saldoprincippet*

…

Med indførelsen af skattekontoen vil told- og skatteforvaltningens opmærksomhed i opkrævningsmæssig sammenhæng *alene* rette sig mod den til enhver tid værende saldo og ikke mod den eller de enkelte krav, som denne saldo er sammensat. Dette betyder også, at en opkrævning vil rette sig mod den til enhver tid værende saldo, og at beregningen af morarenter vil rette sig mod debetsaldoen og ikke mod det enkelte krav/den enkelte restance.

**4489**

Da morarenten efter de eksisterende regler ikke er ensartet for de enkelte krav - selvom der med opkrævningsloven er sket en vis harmonisering - er det nødvendig at harmonisere de enkelte rentesatser, jf. nærmere om fastsættelse af rentesats og renteberegning af henholdsvis en debet- og en kreditsaldo under afsnit 3.5 nedenfor.

…

Der ændres ikke i de grundlæggende regler for, hvordan og hvornår, der skal ske angivelse og indbetaling vedrørende de enkelte krav. For så vidt angår de krav, der er fuldt og helt omfattet af opkrævningslovens regler, vil det således fortsat være angivelses- og betalingsfristerne i lovens § 2, der vil være gældende, mens f.eks. moms, told og (aconto)selskabsskatter fortsat vil følge de angivelsesfrister, der er fastsat i de respektive lovgivninger.

…

*3.5. Renteharmonisering og omlægning til dag til dag-rente*

…

For så vidt angår de længerevarende restancer, vil gennemførelsen af skattekontoen betyde, at der betales højere rente for langvarige restancer end for kortvarige restancer. Det følger bl.a. af rentesrenteprincippet. For selskaber, der er i restance med selskabsskat i mere end ca. 2 måneder, vil der således blive tale om en højere morarente end i dag, idet der vil blive anvendt samme rente som vedrørende f.eks. moms og A-skat. Der vil typisk være tale om virksomheder, der er i alvorlige likviditetsvanskeligheder, under betalingsstandsning, konkurs mv., mens den almindelige selskabsskattebetaling ikke påvirkes.

…

*3.7 Debiterings- og krediteringstidspunktet for skattekontoen*

Spørgsmålet om fra, hvilket tidspunkt skattekontoen (saldoen) påvirkes (debiteres eller krediteres) er afgørende for fra hvilket tidspunkt, der skal beregnes morarente samt for, hvornår debetsaldogrænsen på 5.000 kr. skal anses for overskredet, og der som følge heraf sendes en rykker ud til virksomheden for hele saldobeløbet.

Spørgsmålet om tidspunktet for saldoens påvirkning er aktuelt både for krav/beløb, som virksomheden skal betale, og for krav/beløb, som virksomhederne har til gode. Der må sondres på den ene side mellem opgørelsen af krav og disses påvirkning af saldoen og på den anden side de faktiske betalinger fra henholdsvis virksomhederne og told- og skatteforvaltningen og disses påvirkning af kontoen.

Krav på virksomheden vil blive debiteret skattekontoen på den sidste rettidige betalingsdag for det pågældende krav. Krav, der er kendte inden den faktiske betalingsfrist, vil kunne vises (konteres) på skattekontoen inden sidste rettidige betalingsdag, men vil ikke indgå som en del af den rentebærende saldo. For så vidt angår de krav, som afhænger af virksomhedens angivelse, er det en forudsætning for korrekt debitering, at angivelsen i det hele taget er sket. Hvis virksomheden ikke har angivet, må told- og skatteforvaltningen foretage en foreløbig fastsættelse heraf. En sådan fastsættelse vil altid komme til tidsmæssigt at ligge efter angivelses- og betalingstidspunktet, og det fastsatte beløb vil derfor blive debiteret - med tilbagevirkende kraft - til den sidste rettidige betalingsdato for det pågældende krav. …

*3.8 Skønsmæssige fastsættelser*

Efter opkrævningslovens § 4 kan told- og skatteforvaltningen skønsmæssigt fastsatte et tilsvar, hvis ikke virksomheden indenfor den fastsatte frist har angivet for den forgangne afregningsperiode.

Med skattekontoens gennemførelse ændres der som anført ikke i regelsættet vedr. angivelse og frister mv. Der skal således fortsat ske individuel angivelse af de enkelte tilsvar, og der vil fortsat, hvor der ikke sker angivelse, skulle ske en skønsmæssig fastsættelse af beløbet. Foretages der en sådan fastsættelse af beløbet, er det det fastsatte beløb, der debiteres skattekontoens saldo, og som dermed kommer til at indgå i en eventuel morarenteberegning. Sker der efterfølgende en angivelse, vil det angivne beløb erstatte det skønsmæssigt fastsatte beløb. Har det skønsmæssigt fastsatte beløb været for højt eller for lavt sat i forhold til den efterfølgende korrekte angivelse, betyder dette, at morarenteberegningen således er sket af en saldo, der har været enten for høj eller for lav. Der korrigeres efterfølgende tillige af den oprindelige frist for angivelsen for, at der har været beregnet rente af en for høj eller for lav sat debetsaldo - eller kreditsaldo.

Hensigten er således, at der skal foretages, hvad der kan betegnes som en fuld »tilbagerulning«. Det vil sige, at den hidtidige skønsmæssige fastsættelse og de dertil knyttede beregnede renter helt slettes. Det korrekte beløb indsættes med tilbagevirkende kraft, og der beregnes herefter korrekte renter af dette beløb. Dette står i modsætning til en »nettoløsning«, hvor der ikke tilbage i tid ændres i beregnede renter mv. men blot foretages et reguleringsbeløb, som så enten debiteres eller krediteres saldoen.

En løsning der indebærer »fuld tilbagerulning« vil betyde, at virksomheden kan følge alle bevægelser, dvs. sletningen af den hidtidige skønsmæssige ansættelse og de dertil hørende renter og indsættelsen af det korrekte beløb samt de hertil knyttede renter. Denne løsning vil således give virksomheden det fulde overblik over de bevægelser og korrektioner, der har været på saldoen. …

Af de specielle bemærkninger til lovforslag nr. L 205 af 29. marts 2006 fremgår bl.a.:

**4490**

»Til nr. 9

…

*I den foreslåede § 16, stk. 1*, fastslås, at alle de i bestemmelsen nævnte betalinger fra og til virksomheder, selskaber, fonde og foreninger indgår i en samlet saldoopgørelse efter reglerne i det foreslåede kapitel 5. Bestemmelsen afgrænser således hvem og hvad (hvilke fordringer), der er omfattet af reglerne om skattekontoen.

…

Nr. 1 omfatter alle betalinger, som vedrører skatter og afgifter omfattet af opkrævningslovens § 1, stk. 1 og 2. Hermed falder alle betalinger vedrørende skatter og afgifter, som virksomheder, selskaber, fonde og foreninger skal registreres for, ind under skattekontoen. Det vil i praksis sige A-skat, lønsumsafgift, moms, arbejdsmarkedsbidrag, indeholdt udbytteskat, royaltyskat og renteskat efter henholdsvis kildeskattelovens §§ 66, 66A og 66B samt alle punktafgifterne.

…

*I den foreslåede § 16a, stk. 1,* fastslås det, at der i kraft af saldoprincippet sker automatisk modregning af ind- og udbetalinger fra og til virksomhederne. Med udtrykket »modregning« forstås egentlig modregning med modgående krav, sådan som det er beskrevet i afsnit 2.4, men udtrykket dækker i denne sammenhæng tillige over, at indbetalinger fra virksomhederne afskrives på en evt. eksisterende debetsaldo efter FIFO-princippet.

…

*I den foreslåede § 16a, stk. 2,* fastslås begreberne debetsaldo og kreditsaldo. En debetsaldo er udtryk for, at virksomhedens skyld til told- og skatteforvaltningen overstiger virksomhedens eventuelle tilgodehavender fra told- og skatteforvaltningen. En kreditsaldo er udtryk for det modsatte, dvs., at virksomhedens tilgodehavender overstiger virksomhedens skyld til told- og skatteforvaltningen. Begreberne debetsaldo og kreditsaldo anvendes flere steder i de foreslåede regler.

*De foreslåede bestemmelser i § 16a, stk. 3-7,* fastsætter fra hvilket tidspunkt et krav på indbetaling (en fordring) fra og et krav på en udbetaling (et tilgodehavende) til virksomheden påvirker saldoopgørelsen, samt hvornår de faktiske ind- og udbetalinger til dækning af sådanne fordringer og tilgodehavender påvirker saldoopgørelsen.

I stk. 3 fastslås tidspunktet for, hvornår et krav på en ind- eller udbetaling kan vises (konteres) på skattekontoen. At en ind- eller udbetaling vises/konteres betyder, at det ved opslag via den onlineadgang, der etableres, vil fremgå af skattekontoen, hvilke fordringer eller tilgodehavender der allerede er opgjorte, og som forfalder til betaling indenfor nær fremtid. Fordringer kan således vises på skattekontoen fra det tidspunkt, hvor virksomheden har foretaget den angivelse, der ligger til grund for fordringen, eller på det tidspunkt, hvor fordringen på anden vis med sikkerhed kan opgøres. Der kan f.eks. være tale om en situation, hvor der ikke er sket angivelse, men hvor opgørelsen af en fordring beror på en kontrol af virksomhedens forhold.

Når det anføres, at en fordring (eller et tilgodehavende) skal kunne opgøres med sikkerhed, er det ikke ensbetydende med, at det krav, der ligger til grund for fordringen, ikke på noget efterfølgende tidspunkt vil kunne omgøres.

Formuleringen er alene udtryk for, at det pågældende krav skal bero på kvalificerede og angivelse eller en anden form for »sikker«, gørelse og ikke blot være udtryk for et simpelt skøn.

I stk. 4 fastslås det, at et krav (en fordring) på en virksomhed først påvirker (debiteres) saldoopgørelsen – og dermed også påvirker renteberegningsgrundlaget – fra den sidste rettidige betalingsdag for det pågældende beløb. Indtil dette tidspunkt vil beløbet (hvor det er muligt) blot være vist (konteret) på skattekontoen. At der først beregnes renter fra den sidste rettidige betalingsdag er i overensstemmelse med den gældende praksis.

Stk. 5 indeholder bestemmelse om, at den til et krav knyttede indbetaling påvirker (krediteres) saldoopgørelsen fra den dag, hvor virksomheden foretager indbetaling, dvs. den dag, hvor virksomheden (fysisk) indbetaler det pågældende beløb i pengeinstitut, bank eller direkte hos skattemyndighederne. Foretages betalingen elektronisk anses betalingen for sket den dag, hvor beløbet hæves fra

virksomhedens konto. …Stk. 6 og 7 fastlægger tidspunktet for, hvornår henholdsvis et krav på udbetaling til virksomheden (et tilgodehavende) og den hermed forbundne faktiske udbetaling i praksis påvirker (henholdsvis krediteres og debiteres) saldoopgørelsen.

…

*Bestemmelserne i den foreslåede § 16c, stk. 1-6,* indeholder regler om forrentning af henholdsvis en debet- og en kreditsaldo og regler om, hvornår en debetsaldo forfalder til indbetaling samt regler om udbetaling af en kreditsaldo. Efter den foreslåede stk. 1 forrentes en debetsaldo med den i opkrævningslovens § 7, stk. 1, jf. stk. 2, fastsatte morarentesats. Rentesatsen udgør 0,8 pct. pr. måned, svarende til ca. 10 pct. årligt. Renten beregnes dagligt (dag til dagrente) og tilskrives månedligt, og er ikke fradragsberettiget. Der regnes således i modsætning til de eksisterende regler med daglig renteberegning og rentes rente. Derimod udløser en overskridelse af betalingsfristen med blot en enkelt dag ikke - som det er tilfældet i dag - én til to måneders rente. Der vil med gennemførelsen af skattekontoen kun skulle betales rente for det antal dage, som betalingsfristen faktisk overskrides med.«

Ved lov nr. 998 af 30. august 2015 (lov om ændring af opkrævningsloven og selskabsskatteloven (Ændring

**4491**

af rentetillæg for afregning af selskabsskat og begrænsning af indestående på skattekontoen m.v.)) blev § 16 c, stk. 4, affattet således:

»*Stk. 4.* En kreditsaldo udbetales til virksomhedens Nemkonto, medmindre virksomheden har ønsket en beløbsgrænse for udbetaling af en kreditsaldo. En beløbsgrænse for udbetaling af en kreditsaldo kan højst udgøre 200.000 kr. Udbetaling af en kreditsaldo kan ikke ske, før der kan udbetales mindst 100 kr. Virksomheden kan uanset 3. pkt. anmode om at få ethvert beløb uanset størrelse udbetalt. Udbetaling af en kreditsaldo kan ikke ske, hvis virksomheden mangler at indsende angivelser for afsluttede perioder eller at indsende selvangivelse, jf. § 12, stk. 4.«

Af de generelle bemærkninger til lovforslag nr. L 6 af 3. juli 2015, der lå til grund for lovændringen, fremgår bl.a.:

»*3.1.2. Lovforslaget*

I det nuværende finansielle klima, der er præget af lav eller negativ forrentning, kan en mulighed for at have beløb stående på skattekontoen uden negativ forrentning være attraktiv for virksomheder, der har likviditet, som ønskes placeret. På den baggrund er det regeringens vurdering, at virksomhedens adgang til at have store beløb stående på skattekontoen, uden at beløbene er modsvaret af en konkret forfalden fordring, bør begrænses bl.a. med henblik på at styrke effektiviteten af Nationalbankens pengepolitiske instrumenter og sikre at SKAT ikke kan anvendes som bank.«

Ved nævnte lov nr. 513 af 7. juni 2006, hvorved reglerne om én skattekonto blev indført, fik opkrævningslovens § 7, stk. 1, samtidig sin nugældende formulering.

Af de specielle bemærkninger til lovforslag nr. L 205 af 29. marts 2006, der lå til grund herfor, fremgår:

»Til nr. 3

Med gennemførelsen af skattekontoen indgår alle ind- og udbetalinger til virksomhederne i en samlet saldoopgørelse, hvor modregning sker automatisk. Fokus vil alene rette sig mod, hvorvidt virksomhedens skattekonto er i debet eller i kredit, dvs. om virksomheden skylder eller har penge til gode fra told- og skatteforvaltningen. En debetsaldo kan være sammensat af flere fordringer, A-skat, moms, told mv. Disse krav forrentes efter de gældende regler med forskellige rentesatser. Med henblik på konsekvent at kunne lægge saldoprincippet til grund og dermed opnå de største administrative fordele er det væsentligt, at der anvendes en og samme

Copyright © 2023 Karnov Group Denmark A/S

(harmoniserede) morarentesats i relation til den enhver tid værende saldo - uanset hvilke fordringer denne måtte være sammensat af.

Som det fremgår af afsnit 3.5 under de almindelige bemærkninger ovenfor, vil der ud fra en forudsætning om provenuneutralitet, skulle fastsættes en fremtidig harmoniseret månedlig rentesats på 0,8 pct.

Det foreslås, at den eksisterende rentebestemmelse i opkrævningslovens § 7, stk. 1, jf. stk. 2, lægges til grund for forrentning af den til enhver tid værende debetsaldo efter den foreslåede § 16c om saldoforrentning. Den eksisterende rentebestemmelse i opkrævningslovens § 7 fastholdes i den form den har nu, dvs. med en fast procentsats (et tillæg) efter stk. 1 og en variabel sats efter stk. 2. …

Renteberegningen foreslås ændret således, at der fremover beregnes dag til dagrente med månedlig rentetilskrivning. Herved kommer virksomhederne kun til at betale morarente (inkl. rentes rente) for det faktiske antal dage, som betalingsfristen overskrides i modsætning til i dag, hvor for sen betaling udløser én til to måneders rente.

Der foreslås indsat en henvisning til, at beløb der indgår på skattekontoen følger reglerne om saldoforrentning i den foreslåede § 16c.

…«

Af den daværende skatteministers politiske udspil »Retssikkerhedspakke V, Et opgør med urimelige skatteregler« offentliggjort den 12. april 2019 fremgår bl.a.:

»Deponering - mulighed for indbetaling, hvis Skatteministeriet indbringer en sag for domstolene

En skatteyder bør ikke risikere væsentlige rentetilskrivninger i de særlige tilfælde, hvor Skatteministeriet vælger at indbringe en afgørelse fra Landsskatteretten for domstolene eller anke en dom.

Flere virksomheder har således efterspurgt en mulighed for at kunne foretage frivillige indbetalinger for at undgå senere rentetilskrivning. Som reglerne er i dag, er der ikke hjemmel til, at skatteyderen frivilligt kan indbetale skat, mens retssagen verserer. Erfaringer viser, at sagerne kan tage op til flere år. Hvis Skatteministeriet herefter får medhold, vil skatteyderen blive opkrævet renter, der er akkumuleret fra tidspunktet for den seneste rettidige betaling for det omstridte skattekrav.

I dag er reglerne sådan, at personer vil skulle betale renter på 4,8 pct. årligt af forhøjelsen af indkomstskatten, og et selskab vil skulle betale renter på 8,4 pct. årligt (2019-tal) af forhøjelsen af selskabsskatten. Renterne beregnes fra henholdsvis 1. september (personer) og 1. november (selskaber) i året efter det indkomstår, for hvilket skatten forhøjes, og frem til betalingen af skatten på den årsopgørelse, der udskrives som følge af dommen.

For at øge retssikkerheden lægges der op til, at reglerne kan ændres, så skatteyderne i visse tilfælde gives mulighed for frivilligt at indbetale (deponere) et beløb svarende til det omstridte skattekrav. Hermed sikres borgere og virksomheder fremadrettet mod store rentetilskrivninger, hvis domstolene senere giver Skatteministeriet medhold i sagen.«

*Skatteforvaltningsloven*

Skatteforvaltningslovens § 51, stk. 1 og stk. 6, fik sin nuværende affattelse ved lov nr. 427 af 6. juni 2005:

**4492**

»*Henstand i forbindelse med klage*

*§ 51.* Told- og skatteforvaltningen kan efter ansøgning give henstand med betaling af den del af en skat, som en klage over opgørelsen vedrører. Det gælder dog ikke afgørelser efter toldlovgivningen, jf. artikel 244 i Rådets forordning (EØF) nr. 2913/92 af 12. oktober 1992 om indførelse af en EF-toldkodeks.

*Stk. 2.* ...

…

*Stk. 6.* Henstand betinges af, at henstandsbeløbet forrentes med rentesatsen i den pågældende lov fra de i samme lov definerede forfaldstidspunkter. Henstand omfatter også rente samt eventuelt allerede påløbne renter.«

Af de specielle bemærkninger til bestemmelsen, jf. lovforslag nr. L 110 af 24. februar 2005, fremgår bl.a.:

»Til § 51

Bestemmelsen er en lovfæstelse af § 27 i bekendtgørelse nr. 520 af 25. juni 2002 om myndighedsinddeling og sagsudlægning, med en enkelt ændring, jf. stk. 2, 2. pkt. Bestemmelsen i § 27 er udtryk for en mangeårig praksis.

Efter gældende ret har en klage ikke opsættende virkning, medmindre andet er bestemt, jf. f.eks. statsskattelovens § 38.

Det er imidlertid fast praksis på skatteområdet, at hvis der klages over en skatteansættelse, så gives der efter anmodning som udgangspunkt henstand med betaling af den del af skatten, som klagen vedrører. Dette gælder dog ikke, hvis der er en nærliggende fare for, at skatten ikke vil blive betalt, hvis der ydes henstand, f.eks. hvis den skattepligtige er ved at flytte til udlandet. Alternativt kan der kræves sikkerhedsstillelse for at give henstand.…«

## Landsrettens begrundelse og resultat

*Selskabsskattelovens § 2, stk. 1, litra c*

Det følger af § 2, stk. 1, litra c, i dagældende selskabsskattelov, som affattet ved lov nr. 282 af 25. april 2001, at et selskab som nævnt i § 1, stk. 1, med hjemsted i udlandet er skattepligtig af udbytter omfattet af ligningslovens § 16 A, stk. 1.

Der ligger fast, at det udbytte, som Heavy Transport Finance (Luxembourg) SA, Luxembourg modtog i 2007, som udgangspunkt er skattepligtigt efter denne bestemmelse.

Der er endvidere enighed om, at det luxembourgske selskab ved modtagelsen af udbytte i 2007 opfyldte de krav om ejerandel og ejertid i forhold til det udbyttegivende datterselskab, Heavy Transport Holding Denmark ApS, der er en første betingelse for at opnå skattefrihed efter dagældende selskabsskattelov § 2, stk. 1, litra c. Efter bestemmelsen er det endvidere en betingelse, at beskatningen af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF (moder-/datterselskabsdirektivet), som ændret ved direktiv 2003/123/EF, eller efter en dobbeltbeskatningsoverenskomst med den stat, hvor selskabet er hjemmehørende. Det er ubestridt, at de to selskaber er omfattet af direktivet som henholdsvis moder- og datterselskab.

Tvisten i sagen angår i første række, om der i medfør af moder-/datterselskabsdirektivet eller dobbeltbeskatningsoverenskomsten med Luxembourg er pligt til at frafalde eller nedsætte beskatningen.

*Moder-/datterselskabsdirektivet*

Det følger af moder-/datterselskabsdirektivets artikel 5, stk. 1, at det overskud, som et datterselskab udlodder til sit moderselskab, fritages for kildeskat. Bestemmelsen er oprindeligt gennemført i dansk ret ved lov nr. 219 af 3. april 1992 og var på udlodningstidspunktet i 2007 gennemført som sket ved lov nr. 282 af 25. april 2001, som senest ændret ved lov nr. 1375 af 20. december 2004, ved henvisning i selskabsskattelovens § 2, stk. 1, litra c, til direktivet.

EU-Domstolen har ved dom af 26. februar 2019 i de forenede sager C-116/16 og C-117/16 fastslået, at det generelle EU-retlige princip, hvorefter borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i moder-/datterselskabsdirektivet, selv om der ikke findes nationale eller

overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse. Domstolen har endvidere angivet, at der for at bevise retsmisbrug, kræves dels et sammenfald af objektive omstændigheder, hvoraf det fremgår, at det formål, som EU-lovgivningen forfølger, ikke er opnået, selv om betingelserne i denne lovgivning formelt er overholdt, dels et subjektivt element, der består i en hensigt om at drage fordel af EU-lovgivningen ved kunstigt at skabe de betingelser, der kræves for at opnå denne fordel. Den omstændighed, at en række holdepunkter foreligger, kan godtgøre, at der foreligger retsmisbrug, forudsat at disse holdepunkter er objektive og samstemmende. Sådanne holdepunkter kan bl.a. være, at der findes gennemstrømningsselskaber, som ikke har nogen økonomisk begrundelse, og den rent formelle karakter af en koncerns struktur, af den finansielle konstruktion og af lån. Det fremgår endvidere, at det ikke er nødvendigt, at skattemyndigheden fastlægger, hvilken enhed eller hvilke enheder myndigheden anser for dette udbyttes retmæssige ejer. Endelig fastslår Domstolen, at når der foreligger sådant svig eller misbrug, kan anvendelsen af de friheder, der er sikret ved Traktaten om Den Europæiske Union (TEUF) ikke gøres gældende med

**4493**

henblik på at anfægte den lovgivning i den førstnævnte medlemsstat, som regulerer beskatningen af dette udbytte.

Heavy Transport Holding Denmark ApS har gjort gældende, at det af EU-Domstolen fastlagte princip om forbud mod retsmisbrug ikke kan tillægges direkte virkning af danske domstole, da EU-Domstolen ikke har kompetence til at fastlægge et sådant princip, og da overladelse af kompetence hertil ikke er hjemlet i den danske tiltrædelseslov, jf. tilsvarende Højesterets dom gengivet i U2017.824 (Ajos).

Højesteret har i dommen gengivet i U1998.800 (Maastricht) fastslået, at det forhold, at den nærmere fastlæggelse af de beføjelser, der er indrømmet Fællesskabets institutioner, kan give anledning til tvivl, og at kompetencen til at afgøre sådanne fortolkningsspørgsmål er henlagt til EF-domstolen (nu EU-Domstolen), kan ikke i sig selv anses for uforeneligt med bestemthedskravet i grundlovens § 20. At EF-domstolen ved fortolkning af traktaten også lægger vægt på andre fortolkningsmomenter end bestemmelsernes ordlyd, herunder traktatens formål, er ikke i strid med de forudsætninger, som er lagt til grund ved tiltrædelsesloven, og er heller ikke i sig selv uforeneligt med bestemthedskravet i grundlovens § 20, stk. 1. Det samme gælder om EF-domstolens retsskabende virksomhed inden for traktatens rammer. Af Maastricht-dommen og tilsvarende dommen gengivet i U2013.1451 (Lissabon) følger endvidere, at »[v]ed tiltrædelsesloven er det anerkendt, at kompetencen til at prøve lovligheden og gyldigheden af EF-retsakter tilkommer EF-domstolen. Dette indebærer, at danske domstole ikke kan anse en EF-retsakt for uanvendelig i Danmark, uden at spørgsmålet om dens forenelighed med Traktaten har været prøvet af EF-domstolen, og at danske domstole i almindelighed kan lægge til grund, at EF-domstolens afgørelser herom ligger inden for suverænitetsafgivelsens grænser. Højesteret finder imidlertid, at det følger af bestemthedskravet i grundlovens § 20, stk. 1, sammenholdt med danske domstoles adgang til at prøve loves grundlovsmæssighed, at domstolene ikke kan fratages adgangen til at prøve spørgsmål om, hvorvidt en EF-retsakt overskrider grænserne for den ved tiltrædelsesloven foretagne suverænitetsafgivelse. Danske domstole må derfor anse en EF-retsakt for uanvendelig i Danmark, hvis der skulle opstå den ekstraordinære situation, at det med den fornødne sikkerhed kan fastslås, at en EF-retsakt, der er opretholdt af EF-domstolen, bygger på en anvendelse af Traktaten, der ligger uden for suverænitetsafgivelsen ifølge tiltrædelsesloven. Tilsvarende

gælder med hensyn til fællesskabsretlige regler og retsprincipper, som beror på EF-domstolens praksis.«

I dommen gengivet i U2017.824 H (Ajos) udtalte Højesteret videre, at »EU-Domstolen har kompetence til at afgøre spørgsmål om fortolkningen af EU-retten, jf. TEUF artikel 267. Det henhører således under EU-Domstolen at afgøre, om en regel efter EU-retten har direkte virkning med forrang for en modstående national bestemmelse, herunder også i tvister mellem private. Om en EU-retlig regel kan tillægges den virkning i dansk ret, som EU-retten kræver, beror i første række på loven om Danmarks tiltrædelse af Den Europæiske Union.« Højesteret fastslog endvidere, at principper, der er udviklet eller fastlagt på grundlag af TEUF artikel 6, stk. 3, samt bestemmelserne i EU-charteret, herunder charterets artikel 21 om ikke-forskelsbehandling, ikke efter tiltrædelsesloven er gjort umiddelbart anvendelige i Danmark.

Landsretten finder i overensstemmelse med de nævnte domme, at det tilkommer EU-Domstolen at fastlægge indholdet af EU-retten og herunder som sket i dommen af 26. februar 2019 i de forenede sager C-116/16 og C-117/16 at fastslå, at det i en række tidligere domme, jf. herved bl.a. dom af 9. marts 1999 i sag C-212/97, Centros, og den i Centrosdommens præmis 24 nævnte retspraksis, på et betydeligt antal forskellige retsområder fastslåede almindelige EU-retlige princip om, at borgerne ikke må kunne påberåbe sig EU-retlige bestemmelser med henblik på at muliggøre svig eller misbrug, skal fortolkes således, at de nationale myndigheder og domstole i tilfælde af svig eller misbrug skal nægte en skattepligtig person indrømmelsen af den fritagelse for kildeskat af udbytte, som et datterselskab udlodder til sit moderselskab, der er fastsat i artikel 5 i moder/-datterselskabs-direktivet, selv om der ikke findes nationale eller overenskomstmæssige bestemmelser, der foreskriver en sådan nægtelse. Det tilkommer ligeledes EU-Domstolen at angive under hvilke omstændigheder, der foreligger et sådant retsmisbrug. Det af Heavy Transport Holding Denmark ApS anførte om, at EU-Domstolen har ændret praksis set i forhold til den af selskabet påberåbte dom af 5. juli 2007 i sag C-321/05 (Kofoed), kan ikke føre til et andet resultat.

EU-Domstolens fortolkning af det pågældende princip og den heraf følgende justering af, hvornår skattefritagelsen efter moder/-datterselskabsdirektivets artikel 5 kan påberåbes, kan endvidere ikke anses for at bygge på en anvendelse af TEUF, der ligger uden for suverænitetsafgivelsen ifølge tiltrædelsesloven.

Ordlyden af selskabsskattelovens § 2, stk. 1, litra c, som i det væsentlige blot henviser til moder/-datterselskabsdirektivet, er ikke til hinder for en forståelse af bestemmelsen, der stemmer overens med den af EU-Domstolen anlagte fortolkning af det generelle EU-retlige princip om misbrug og direktivets artikel 5. Der gælder endvidere en almindelig formodning for, at lovgiver har tilsigtet en fortolkning af den danske gennemførelseslov, der er i overensstemmelse med de EU-retlige

**4494**

bestemmelser, der gennemføres ved loven, som de fortolkes af EU-Domstolen. De udtalelser, som skatteministeren fremkom med i forbindelse med tilblivelsen af loven, om muligheden for at indskyde et mellemholdingselskab på Cypern, er efter landsrettens opfattelse endvidere ikke af et indhold, som medfører, at den forståelse af moder/-datterselskabsdirektivet, som EU-Domstolen har fastlagt, ikke kan finde anvendelse i denne sag.

»*Retmæssig ejer*« - dobbeltbeskatningsoverenskomsten

Som anført i dommen gengivet i TfS 2012.182 har begrebet »beneficial owner« (»retmæssig ejer«) været anvendt i OECDs modeloverenskomster siden 1977, men er ikke et i øvrigt kendt begreb i dansk ret. I OECD modeloverenskomsten fra 1977, som ligger til grund for dobbeltbeskatningsoverenskomsten mellem Danmark

og Luxembourg fra 1980, og i modeloverenskomsten fra 2003 er »retmæssig ejer« ikke nærmere defineret, men der er i kommentarerne til overenskomsterne givet visse retningslinjer om forståelsen af begrebet. Som antaget i den nævnte dom samt i landsrettens dom af 3. maj 2021 i sagerne B-1980-12 og B-2173-12 bør kravet om, at modtageren er retmæssig ejer, så vidt muligt fortolkes i overensstemmelse med den internationale forståelse, der er kommet til udtryk i blandt andet kommentarerne til modeloverenskomsten. I den forbindelse har de efterfølgende kommentarer fra 2003 til modeloverenskomstens artikel 10, stk. 2, karakter af præciseringer set i forhold til de oprindelige kommentarer til modeloverenskomsten fra 1977. Kommentarerne fra 2003 kan derfor inddrages ved fortolkningen af begrebet retmæssig ejer.

Der er, som anført i den nævnte dom af 3. maj 2021, ikke grundlag for at antage, at en fortolkning af det danske i selskabsskattelovens § 2, stk. 1, litra c, om frafald eller nedsættelse i henhold til en dobbeltbeskatningsoverenskomst, der stemmer overens med den internationale forståelse af begrebet »retmæssig ejer« i OECD modeloverenskomsten fra 1977, strider mod lovens § 2, stk. 1, litra c. Skatteministerens udtalelser i forbindelse med lovens tilblivelse om muligheden for at indskyde et mellemholdingselskab på Cypern og den ikke ganske stringente anvendelse i forarbejderne af begreberne »retmæssig ejer« og »rette indkomstmodtager« kan heller ikke i denne sag føre til en ændret vurdering. Det samme gælder det, som Heavy Transport Holding Denmark ApS har anført, om canadisk retspraksis og slutprotokollen til dobbeltbeskatningsoverenskomsten med Luxembourg.

*Administrativ praksis*

Skatteministerens besvarelser af spørgsmål til Skatteudvalget, til selskabsskattelovens § 2, stk. 1, litra c, som affattet ved lov nr. 219 af 3. april 1992, ved lov nr. 1026 af 23. december 1998 og ved lov nr. 282 af 25. april 2001, herunder de udtalelser, som skatteministeren fremkom med i forbindelse med tilblivelsen af lov nr. 282 af 25. april 2001 om muligheden for at indskyde et holdingselskab eksempelvis på Cypern og derved undgå dansk beskatning og om muligheden for at »omstrukturere sig«, kan, jf. dommen af 3. maj 2021 i sagerne B-1980-12 og B-2173-12, ikke forstås som en tilkendegivelse om, at danske skattemyndigheder ville acceptere et retsmisbrug, som beskrevet i EU-Domstolen, eller ville indrømme skattenedsættelse i henhold til en dobbeltbeskatningsoverenskomst, uanset at modtageren af udbyttet ikke kunne anses som retmæssig ejer heraf. Det samme gælder den omstændighed, at skatteministeren i svar af 27. november 2006 til Folketingets Skatteudvalg angav, at han ikke kunne »oplyse eksempler på udenlandske gennemstrømningsselskaber, som de danske skattemyndigheder ikke har accepteret som retmæssige ejere af udbytte fra danske selskaber.«.

Det bemærkes i den forbindelse, at skatteministeren, forud for beslutningen om udlodning i denne sag og det forudgående lån, i et svar til Folketingets Lovsekretariat af 6. november 2006 angav bl.a., at »[d]en begrænsede skattepligt - og fravigelsen - gælder for det udbyttet, der reelt *oppebærer* udbyttet. Den begrænsede skattepligt fraviges derfor kun, hvis det udenlandsk selskab, der reelt oppebærer udbyttet, er omfattet af direktivet eller en dobbeltbeskatningsoverenskomst. Oppebæres udbyttet derimod reelt af et selskab i et skatteland, er udbyttebetalingen ikke undtaget fra kildebeskatningen. Princippet om rette indkomstmodtager må således anvendes for at fastslå, hvem der »oppebærer« renterne. Udtrykket »rette indkomstmodtager« må anses for at være meget lig udtrykket »beneficial owner«, som anvendes i dobbeltbeskatningsoverenskomsten. I dobbeltbeskatningsoverenskomsterne skal kildebeskatningen kun frafalds eller nedsættes, hvis udbyttets retmæssige ejer (beneficial owner) er hjemmehørende i den anden stat. Bestemmelsen er et værn mod, at et almindeligt beskattet selskab indskydes som

»conduit« selskab mellem det udbyttebetalende danske selskab og det endeligt modtagende udenlandske skattelyselskab. Bestemmelsen finder anvendelse, selvom der indskydes flere mellemliggende almindeligt beskattede selskaber. Det afgørende er, hvem der er den rette indkomstmodtager/ retmæssige ejer. »Conduit« selskaber omfatter bl.a. selskaber, der, skønt det er den formelle ejer, reelt har meget snævre beføjelser i relation til den pågældende indkomst. Selskabet er i relation til udbyttet en »nullitet« eller administrator, der handler på vegne af andre parter, jf. kommentarerne til artikel 10 i OECDs modeloverenskomsten (pkt. 12.1).« I et yderligere svar af 27. november 2006 til Folketingets Skatteudvalg anførte skatteministeren endvidere, at »[b]ortfaldet af begrænset skattepligt er betinget af, at det pågældende udenlandske selskab er den retmæssige ejer af udbyttet. Et rent

**4495**

gennemstrømningsselskab, som er hjemmehørende i udlandet, f.eks. Luxembourg, vil ikke være retmæssig ejer af udbyttet, jf. bemærkningerne til artikel 10 i OECDs modeloverenskomsten (afsnit 12.1). Den begrænsede skattepligt bortfalder dog alligevel, hvis den retmæssige ejer bag ved gennemstrømningsselskabet er hjemmehørende i et andet land, og Danmark efter moder-/datterselskabsdirektivet eller en dobbeltbeskatningsoverenskomst med dette land skal nedsætte eller undlade beskatning af udbyttet.«

Det fremgår tillige af Skatteministeriets notat af 20. marts 2007 til Folketingets Skatteudvalg om status på SKATs kontrolindsats, at kapitalfondes overtagelse af danske virksomheder gennem de senere år har udgjort en større og større andel af de samlede virksomhedsoverdragelser, at antallet specielt i 2005 har vist sig at udgøre et betydeligt antal med en stor volumen, og at SKAT derfor har rettet fokus på denne type overdragelser. Det fremgår endvidere, at SKAT på denne baggrund har indledt en kontrol af en række overdragelser med henblik på at undersøge, hvem der er den endelige modtager, »rette indkomstmodtager«, af renter og udbytter. Skatteministeren oplyste den 15. maj 2007, at disse undersøgelser endnu ikke havde ført til udbyttebeskatning af udlodningerne til gennemstrømningsselskaber.

På den nævnte baggrund kan der forud for beslutningen om udlodning i denne sag og det forudgående lån, ikke antages at have været en administrativ praksis om at tillade arrangementer, der efter EU-Domstolens dom i de forenede sager C-116/16 og C-117/16 udgør svig eller misbrug af bestemmelsen om fritagelse for kildeskat af udbytte efter artikel 5 i moder/-datterselskabsdirektivet, eller som indebærer, at udbytte udbetales uden indeholdelse af udbytteskat til et selskab, som ikke efter den ovennævnte forståelse af dobbeltbeskatningsoverenskomsten med Luxembourg er »retmæssige indehaver«. Den omstændighed, at skattemyndighederne ikke forud for udlodningen i 2007 har tilsidesat sådanne arrangementer, kan herved ikke sidestilles med en positiv afgørelse herom, jf. tilsvarende Højesterets dom gengivet i U2020.1923 H.

*Den konkrete udlodning*

Den 23. maj 2007 udloddede Heavy Transport Holding Denmark ApS 325 mio. USD, svarende til 1.799.298.000 kr., til sit moderselskab Heavy Transport Finance (Luxembourg) SA.

Beløbet blev af det danske selskab modregnet i en fordring på det luxembourgske moderselskab hidrørende fra et lån på samme beløb, som Heavy Transport Finance (Luxembourg) SA havde optaget i Heavy Transport Holding Denmark ApS den 22. januar 2007 til betaling af købesummen for selskabet. Heavy Transport Finance (Luxembourg) SA købte Heavy Transport Holding Denmark ApS af de to selskaber, Heavy Transport Group Inc. og Incomara Holdings SA, der begge var hjemmehørende i Panama og ejere af både det danske og Luxembourgske selskab. Købesummen blev den 24.

januar 2007 overført fra Heavy Transport Finance (Luxembourg) SA til de panamanske selskaber.

Lånet fra Heavy Transport Holding Denmark ApS til Heavy Transport Finance (Luxembourg) SA på 325 mio. USD er i låneaftalen mellem parterne af 22. januar 2007 benævnt som »interim dividend«, og det fremgår, at beløbet udbetales som et »short term loan«, indtil det på en kommende generalforsamling i Heavy Transport Holding Denmark ApS kan vedtages at udlodde et udbytte til moderselskabet på samme beløb. Det er endvidere bestemt i låneaftalen, at lånet skal tilbagebetales efter påkrav eller umiddelbart efter vedtagelsen af udbyttebetalingen ved modregning heraf.

Det er ubestridt, at selskabet Heavy Transport Finance (Luxembourg) SA blev indsat som et mellemholdingselskab mellem de panamanske selskaber og Heavy Transport Holding Denmark ApS med det formål at sikre, at der ikke blev udløst dansk kildeskat ved den skete udbytteudlodning.

Om aktiviteterne i Heavy Transport Finance (Luxembourg) SA fremgår i øvrigt, at selskabet, der blev stiftet i 2004 efter det oplyste med henblik på at varetage finansieringen af Heavy Transport Holding Denmark ApS og efter den 22. januar 2007 som moderselskab for selskabet, ikke havde (og har) nogen ansatte, idet selskabets administration og outsourcet til et koncernselskab i Luxembourg, Heerema Group Service SA. Det er ubestridt, at moderselskabet ikke havde nogen anden aktivitet, da det overtog det danske selskab. Af Heavy Transport Finance (Luxembourg) SA's årsregnskab for 2007 fremgår, at selskabets aktiver pr. 31. december 2007 bestod af en kontantbeholdning på 148.551 USD og finansielle aktiver på 1.255.355 USD i datterselskabet Heavy Transport Holding Denmark ApS.

På den nævnte baggrund lægger landsretten til grund, at Heavy Transport Finance (Luxembourg) SA var forpligtet til og desuden kun var i stand til at tilbagebetale lånet på de 325 mio. USD til Heavy Transport Holding Denmark ApS ved modregning i det modtagne udbytte og således ikke havde nogen reel råderet over udbyttet. Herefter og da formålet med transaktionerne ubestridt har været at undgå danske beskatning af udbyttet i forbindelse med midlernes hjemtagelse til aktionærerne i Panama, kan Heavy Transport Finance (Luxembourg) SA ikke anses som retmæssig ejer af udbyttet, jf. dobbeltbeskatningsoverenskomstens artikel 10, stk. 2, hvorfor skatten som udgangspunkt ikke skal nedsættes efter overenskomstens regler. Heavy Transport Finance (Luxembourg) SA er heller ikke berettiget til skattefritagelse efter moder-/datterselskabsdirektivet, da

**4496**

selskabet må anses for et gennemstrømningsselskab uden selvstændig økonomisk og forretningsmæssig begrundelse, og dermed må karakteriseres som et kunstigt arrangement, hvis eneste formål har været at opnå skattefritagelse efter direktivet, jf. dommen af 26. februar 2019 i de forenede sager C-116/16 og C-117/16.

*Betydningen af muligheden for en eventuel likvidation efter dagældende anpartsselskabslovs § 59*

Heavy Transport Holding Denmark ApS har imidlertid gjort gældende, at der ikke foreligger et retsmisbrug af moder-/datterselskabsdirektivet, eftersom de to aktionærer i Panama, Heavy Transport Group Inc. og Incomara Holdings SA, i stedet for at indskyde selskabet, Heavy Transport Finance (Luxembourg) SA, til at modtage og viderefordelle det ordinære udbytte fra Heavy Transport Holding Denmark ApS til de panamanske selskaber, kunne have valgt at lade det danske selskab likvidere i medfør af dagældende anpartsselskabslovs § 59, hvorved et udloddet likvidationsprovenu fra moderselskabet i Luxembourg ville have været skattefrit for de to aktionærer.

EU-Domstolen har i dommen af 26. februar 2019, præmisserne 108-110, udtalt sig om den situation, hvor der findes en dobbeltbeskatningsoverenskomst indgået mellem kildestaten og tredjestat, hvori de retmæssige ejere af det udbytte, som er blevet overført af gennemstrømningsselskabet, har deres skattemæssige hjemsted. Domstolen fastslog, at sådanne omstændigheder ikke i sig selv kan udelukke, at der foreligger retsmisbrug. Domstolen udtalte herved, at hvis det er behørigt godtgjort på grundlag af samtlige faktiske omstændigheder, som bevidner, at de erhvervsdrivende har udført rent formelle eller kunstige transaktioner, der savner enhver økonomisk og forretningsmæssig begrundelse, med det hovedformål uretmæssigt at drage fordel af moder-/datterselskabets fritagelse for kildeskat, kan en sådan overenskomst ikke rejse tvivl om, at der foreligger et retsmisbrug. Domstolen anførte endvidere, at foreligger der en situation, hvor udbyttet ville have været fritaget for skat, hvis det var blevet udloddet direkte til det selskab, der har sit hjemsted i et tredjeland, kan det ikke udelukkes, at målet med koncernstrukturen ikke er udtryk for retsmisbrug.

Landsretten bemærker, at en likvidation i medfør af dagældende anpartsselskabslovs § 59 er en grundlæggende forskellig forretningsmæssig disposition fra den skete udbyttebetaling og indebærer tilsvarende forskellige retlige følger, herunder det i bestemmelsen indeholdte krav om anpartshavernes personlige, solidariske og ubegrænsede hæftelse for al gæld, herunder uforfalden og omtvistet gæld. Den omstændighed, at de retmæssige ejere af udbyttet angiveligt kunne have valgt at likvidere det danske selskab i medfør af dagældende anpartsselskabslovs § 59 og derved kunne have opnået skattefrihed af likvidationsprovenuet, kan dermed ikke føre til, at der ikke foreligger et retsmisbrug af moder-/datterselskabsdirektivets adgang til skattefritagelse i en situation som den foreliggende.

Hertil kommer i øvrigt, at det allerede henset til den civilretlige tvist med køberne af selskabet Dockwise Transport N.V. som følge af et forlist skib, ikke er holdepunkter for at antage, at en sådan likvidation var et reelt alternativ til den skete udbyttebetaling på tidspunktet, hvor udlodningen fandt sted.

Heavy Transport Finance (Luxembourg) SA er som følge heraf skattepligtig af udbyttet med 449.824.500 kr.

*Kildeskattelovens § 69, stk. 1*

Det følger af kildeskattelovens § 65, stk. 1, at Heavy Transport Holding Denmark ApS er ansvarlig for at indeholde kildeskatten på 449.824.500 kr.

Da Heavy Transport Holding Denmark ApS ikke har opfyldt denne indeholdelsespligt, er Heavy Transport Holding Denmark ApS efter kildeskattelovens § 69, stk. 1, umiddelbart ansvarlig over for det offentlige for betaling af det manglende beløb, medmindre Heavy Transport Holding Denmark ApS godtgør, at der ikke er udvist forsømmelighed fra selskabets side ved iagttagelse af kildeskattelovens bestemmelser.

Efter de foreliggende oplysninger har Heavy Transport Holding Denmark ApS været bekendt med de faktiske omstændigheder ved udbytteudlodningen, herunder at formålet med at indskyde det luxembourgske moderselskab som et mellemled alene var at undgå dansk kildebeskatning som angivet ovenfor.

Under disse omstændigheder kan det forhold, at der i begyndelsen af 2007 ikke forelå en endelig afklaring af det retlige spørgsmål, om der var fornøden hjemmel til at imødegå et sådant retsmisbrug, ikke føre til, at Heavy Transport Holding Denmark ApS er ansvarsfri iefter kildeskattelovens § 69, stk. 1. Det samme gælder den rådgivning, som selskabet modtog fra KPMG i sommeren 2006.

Heavy Transport Holding Denmark ApS hæfter derfor for betalingen af 449.824.500 kr. i udbytteskat.

*Rente*

Det følger af opkrævningslovens § 7, stk. 1, at der skal betales renter som fastsat i bestemmelsen, hvis det skyldige beløb ikke betales rettidigt. Efter opkrævningslovens § 5, stk. 1, er sidste rettidige betalingsdag 14 dage efter påkrav.

SKAT har afgivet påkrav, jf. lovens § 5, stk. 1, om betaling den 7. december 2010 med betalingsfrist 14 dage efter den 21. december 2010.

Skatteministeriet har nedlagt påstand om, at der på denne baggrund skal betales renter fra denne dato. Heavy Transport Holding Denmark ApS har heroverfor principalt påstået, at renter først skal beregnes fra 14

**4497**

dage efter, at domstolene har givet Skatteministeriet medhold i, at der påhviler Heavy Transport Holding Denmark ApS en pligt til at indeholde udbytteskat, og at selskabet er ansvarlig for betalingen af det ikke indeholdte beløb.

Landsretten har ovenfor konstateret, at SKAT var berettiget til at fremsætte påkravet af 7. december 2010. Den omstændighed, at Landsskatteretten omgjorde SKATs afgørelse af 7. december 2010 ændrer ikke på, at der herefter efter opkrævningsloven skal betales renter af kravet fra 14 dage efter påkravet af 7. december 2010.

Spørgsmålet er dernæst, om beløbet tillige skal indgå på skattekontoen, jf. opkrævningslovens kapitel 5, og dermed forrentes efter reglerne om saldoforrentning. Reglerne om saldoforrentning indebærer herved, at der skal betales renter af morarenten, jf. opkrævningslovens § 7, stk. 1, 4. pkt., jf. § 16 c, stk. 1, hvorefter den rente, der er fastsat efter § 7, stk. 1, jf. stk. 2, skal beregnes dagligt og tilskrives månedligt.

Der er enighed om, at kravet efter sin karakter er omfattet af reglerne om saldoforrentning.

Heavy Transport Holding Denmark ApS har nedlagt en subsidiær påstand om, at beløbet først kan indgå på skattekontoen fra 14 dage efter, at domstolene har givet Skatteministeriet medhold i, at der påhviler selskabet en pligt til at indeholde og betale udbytteskat. Til støtte herfor er det anført, at beløbet ikke kan indgå på skattekontoen, før der er vished om, at kravet består, jf. opkrævningslovens § 16 a, stk. 3, og at seneste rettidige betalingsdag, jf. opkrævningslovens § 16 a, stk. 4, først foreligger, når domstolene har truffet en afgørelse herom.

Som anført i landsrettens dom af 2. juli 2021 i sag B-1980-12 må udtrykket »seneste rettidige betalingsdag« i opkrævningslovens § 16 a, stk. 4, forstås i overensstemmelse med opkrævningslovens § 5, dvs. at seneste rettidige betalingsdag er 14 dage efter SKATs påkrav af 7. december 2010. Herefter og efter de i præmissen i dommen af 2. juli 2021 citerede bemærkninger til det lovforslag, der ligger til grund for indførelsen af bestemmelserne om en skattekonto og renteberegning af krav på indbetalinger (Lovforslag L 205 af 29. marts 2006), skal kravet på udbytteskat forrentes efter bestemmelsen om saldoforrentning i opkrævningslovens § 16 c, stk. 1, fra lovens ikrafttræden den 1. august 2013.

Heavy Transport Holding Denmark ApS har yderligere gjort gældende, at selskabet ville have indbetalt det udbytteskattebeløb, som Skatteministeriet anså selskabet for skyldigt at betale med et tilbagesøgningsforbehold, hvis Skatteministeriet ikke havde nægtet at modtage beløbet, og at det følger af almindelige forvaltningsretlige grundsætninger, herunder proportionalitetsprincippet, at skattemyndighederne burde have accepteret at modtage sådan betaling, da der ikke foreligger saglige modhensyn.

Advokaterne for NetApp Denmark ApS i sag B-1980-12 repræsenterer også Heavy Transport Holding Denmark ApS i nærværende sag.

Efter det svar af 5. december 2015, som en af disse advokater fik fra skattemyndighederne på spørgsmålet om mulighed for med forbehold om tilbagesøgning at deponere den udbytteskat, som skatteministeriet mente, at NetApp Denmark ApS skyldte, måtte det anses for udelukket, at Skatteministeriet ville have accepteret, at Heavy Transport Holding Denmark ApS til skattemyndighederne betalte udbytteskattebeløbet under tilbagesøgningsforbehold. Skatteministeriet har under denne sag bekræftet, at man ikke ville have accepteret et sådant forslag.

Henset til størrelsen af de renter, der påløber efter opkrævningslovens § 7, stk. 1, og fra den 1. august 2013 tillige efter reglerne om saldoforrentning, finder landsretten, at det må betragtes til grund, at Heavy Transport Holding Denmark ApS - hvis NetApp Denmark ApS havde modtaget et bekræftende svar i december 2015 - ganske kort tid herefter ville have indbetalt kildeskattebeløbet til skattemyndighederne på vilkår om tilbagebetaling, såfremt selskabet måtte vinde denne sag.

Mindretallet i dommen af 2. juli 2021 i sag B-1980-12 udtalte om spørgsmålet om adgang til sådan indbetaling følgende:

»Det er hverken i opkrævningslovens ordlyd eller forarbejder omtalt, hvordan skatteforvaltningen skal forholde sig til spørgsmålet om forrentning i de tilfælde, hvor en skatteyder eller en indeholdelsespligtig tilbyder betaling af et krav, som skatteforvaltningen har rejst, men som er underkendt af Landsskatteretten, og som herefter er fastholdt af skattemyndighederne, der har indbragt Landsskatterettens afgørelse for domstolene.

Foruden de forpligtelser, der følger af det relevante lovgrundlag, er skatteforvaltningen bundet af almindelige forvaltningsretlige principper, herunder principperne om saglighed og proportionalitet.

I den foreliggende situation, hvor NetApp Danmark ApS har tilbudt betaling af kravet, og hvor SKAT har afslået at modtage betaling under henvisning til Landsskatterettens afgørelse og manglende hjemmel, selv om skattemyndighederne samtidig har fastholdt kravet og indgivet sagsanlæg, finder jeg, at en ovennævnte principper indebærer, at SKAT er afskåret fra at kræve forrentning af kravet i medfør af opkrævningslovens § 7 i perioden efter NetApp Denmarks ApS' tilbud om betaling. Jeg har herved bl.a. tillagt det betydning, at et sådant resultat ikke strider mod formålet med morarentereglerne i opkrævningsloven, og at der ikke er peget på modhensyn, der taler for at opretholde kravet om betaling af morarenter i perioden efter tilbuddet om betaling.

**4498**

Hverken den omstændighed, at NetApp Denmark ApS, der som nævnt fik medhold i Landsskatteretten, ikke tilbød betaling på baggrund af en anerkendelse af kravet, eller det forhold, at landsrettens dom af 3. maj 2021 er af konstaterende karakter, kan efter min opfattelse begrunde et andet resultat.

Jeg stemmer derfor for at tage Skatteministeriets påstand delvist til følge således, at NetApp Denmark ApS tilpligtes at anerkende, at det ikke indeholdte beløb skal tillægges renter efter opkrævningslovens § 7 med virkning fra den 1. oktober 2010 til den *) 4. *december* 2015. Jeg bemærker, at Skatteministeriet ikke har nedlagt subsidiær påstand om procesrenter.«

Af de af mindretallet nævnte grunde og med bemærkning om, at det af mindretallet anførte er i overensstemmelse med almindelige retssikkerhedsmæssige principper og princippet om adgang til retfærdig rettergang, finder landsretten, at Skatteministeriets rentepåstand kun kan tages delvist til følge, således at Heavy Transport Holding Denmark ApS tilpligtes at betale rente efter opkrævningslovens § 7 med virkning fra den 21. december 2010 til den 5. januar 2016, idet den 1 uge efter afsigelsen af denne dom på ny tillægges rente efter opkrævningslovens § 7.

*Konklusion og sagsomkostninger*

Af ovenstående følger, at Skatteministeriets påstand tages til følge, således at Heavy Transport Holding Denmark ApS skal anerkende,

at der er pligt til at indeholde udbytteskat med 449.824.500 kr., svarende til 25 % af udbyttet på 1.799.298.000 kr., der den 23. maj 2007 blev besluttet udloddet fra Heavy Transport Holding Denmark ApS, samt at Heavy Transport Holding Denmark ApS er ansvarlig for betaling af det ikke indeholdte beløb med tillæg af renter efter opkrævningslovens § 7 med virkning fra den 21. december 2010 til den 5. januar 2016.

Heavy Transport Holding Denmark ApS skal betale sagsomkostninger for landsretten til Skatteministeriet med i alt 2.004.000 kr. Beløbet omfatter 4.000 kr. til retsafgift og 2.000.000 kr. til udgifter til advokatbistand inkl. moms. Beløbet til dækning af udgifterne til advokatbistand er fastsat ud fra en vurdering af, hvad der efter sagens omfang og karakter samt arbejdets omfang og det ansvar, der er forbundet med sagens førelse, skønnes rimeligt, samt henset til praksis i lignende sager om store værdier. Det er taget i betragtning, at denne sag er hovedforhandlet efter de sager, der er afgjort ved landsrettens domme af 3. maj og 2. juli 2021. Det er tillige indgået, at Skatteministeriet ikke har fået fuldt medhold i rentepåstanden.

## Thi kendes for ret

Heavy Transport Holding Denmark ApS skal anerkende, at der er pligt til at indeholde udbytteskat med 449.824.500 kr., svarende til 25 % af udbyttet på 1.799.298.000 kr., der den 23. maj 2007 blev besluttet udloddet fra Heavy Transport Holding Denmark ApS, samt at Heavy Transport Holding Denmark ApS er ansvarlig for betaling af det ikke indeholdte beløb med tillæg af renter efter opkrævningslovens § 7 med virkning fra den 21. december 2010 til den 5. januar 2016, idet der 1 uge efter afsigelsen af denne dom på ny tillægges rente efter opkrævningslovens § 7.

I sagsomkostninger for landsretten skal Heavy Transport Holding Denmark ApS betale 2.004.000 kr. til Skatteministeriet.

Det idømte skal betales inden 14 dage efter denne doms afsigelse.

Sagsomkostningerne forrentes efter rentelovens § 8 a.

## Højesterets dom

I tidligere instans er afsagt dom af Østre Landsrets 10. afdeling den 31. marts 2022 (B-721-13).

I pådømmelsen har deltaget syv dommere: Poul Dahl Jensen, Hanne Schmidt, Oliver Talevski, Jan Schans Christensen, Kristian Korfits Nielsen, Jørgen Steen Sørensen og Julie Arnth Jørgensen.

## Påstande

*Appellanten, Heavy Transport Holding Denmark ApS,* har nedlagt følgende påstande:

*Principalt*

Indstævnte, Skatteministeriet, skal anerkende, at Heavy Transport Holding Denmark ikke er indeholdelsespligtig af kildeskat på udbytter med 449.824.500 kr. svarende til 25 % af udbyttet på 1.799.298.000 kr., der den 23. maj 2007 blev besluttet udloddet fra Heavy Transport Holding Denmark, samt at Heavy Transport Holding Denmark ikke er ansvarlig for betaling af det ikke indeholdte beløb.

Skatteministeriet skal til Heavy Transport Holding Denmark betale 2.004.000 kr. med procesrente fra selskabets betaling af det ommhandlede beløb til Skatteministeriet.

Betalingspåstanden vedrører tilbagebetaling af sagsomkostninger, som selskabet har betalt til opfyldelse af landsrettens dom.

*Subsidiært*

Skatteministeriet skal anerkende, at Skatteministeriets krav på udbytteskat på 449.824.500 kr. ikke skal forrentes før 14 dage efter landsrettens dom.

*Mere subsidiært*

Skatteministeriet skal anerkende, at kildeskattekravet i perioden fra den 21. december 2010 og indtil den 14. april 2022 udelukkende skal forrentes efter opkrævningslovens § 7, og at kravet dermed ikke skal indgå på skattekontoen efter reglerne om én skattekonto i opkrævningslovens kapitel 5.

### 4499

Endelig har Heavy Transport Holding Denmark anmodet Højesteret om i medfør af artikel 267 i Traktaten om Den Europæiske Unions Funktionsmåde præjudicielt at forelægge spørgsmål for EU-Domstolen om de danske morarentereglers forenelighed med artikel 47 i Den Europæiske Unions Charter om grundlæggende rettigheder.

*Skatteministeriet* har nedlagt følgende påstande:

Landsrettens dom stadfæstes med den ændring, at det beløb, som Heavy Transport Holding Denmark ifølge dommen er ansvarlig for betaling af, tillægges renter efter opkrævningslovens § 7 med virkning fra den 21. december 2010, subsidiært renter efter opkrævningslovens § 7 med virkning fra den 21. december 2010 indtil det tidspunkt, hvor Højesteret finder, at der ikke kan kræves renter efter opkrævningslovens § 7, fra hvilket tidspunkt der tillægges sædvanlig procesrente efter rentelovens § 8, stk. 1, mere subsidiært sædvanlig procesrente efter rentelovens § 8, stk. 1, fra sagens anlæg den 28. november 2012.

Over for Heavy Transport Holding Denmarks påstand om tilbagebetaling af sagsomkostninger har Skatteministeriet nedlagt påstand om frifindelse.

Skatteministeriet har udtalt sig imod præjudiciel forelæggelse for EU-Domstolen.

## Forklaringer

*A* har forklaret bl.a., at han har en finansiel baggrund. Han startede i Heerema-koncernen i 1986, og i 1999 blev han ansvarlig for koncernskat (»group manager of taxation«) i Heerema-koncernen, hvilket han var, indtil han gik på pension i 2015.

I 2002 indførte Danmark ny lovgivning omkring holdingselskaber, som gjorde det attraktivt for multinationale selskaber at etablere holdingselskaber i Danmark. Der var en række skattemæssige fordele bl.a. som følge af moder-/datterselskabsdirektivet, og der skulle ikke betales skat af udlodning til selskaber udenfor Danmark.

Derfor, og da de havde problemer med koncernens struktur, besluttede Heerema-koncernen at etablere holdingselskaber i Danmark. I 2006 havde koncernen fire holdingselskaber i Danmark. Der var ingen aktivitet i holdingselskaberne udover rene holdingaktiviteter med bl.a. at eje aktier.

I 2007 opløste koncernen tre af de danske holdingselskaber, da Danmark ændrede skattelovgivningen, og det derfor ikke længere var attraktivt at have holdingselskaberne i Danmark. De havde allerede holdingselskaber i Luxembourg og ville derfor anvende disse i stedet. Der var ingen problemer med at opløse de tre holdingselskaber, som blev accepteret af de danske skattemyndigheder uden videre.

I forhold til salget af selskabet Dockwise Transport N.V. bistod han med det skattemæssige. Det var direktøren for Heerema-koncernen, der besluttede, at Dockwise skulle sælges.

Forhandlingerne om salget af Dockwise startede i 2006. Før den endelige aftale blev underskrevet, forliste et af Dockwises skibe. Derfor var der behov for at ændre aftalen. Der blev deponeret et beløb på 100 mio. USD, som løbende blev udbetalt til køber for hver dag, skibet ikke kunne anvendes. Han husker ikke, om deponeringen dækkede hele ansvaret. Han blev informeret af deres juridiske afdeling om sagen. Han mener, at køber ønskede flere penge udover det deponerede beløb, men han tror ikke, de fik det. Dette var han ikke involveret i.

Copyright © 2023 Karnov Group Denmark A/S

Han var ansvarlig for det skattemæssige aspekt omkring salget af Dockwise og hjemtagning af udbytte fra dette salg til moderselskabet. Han havde en korrespondance med KPMG om dette i 2006. Korrespondancen viser den fulde rådgivning. De fik at vide af KPMG uden forbehold, at de ikke ville blive beskattet af udbytteudlodningen i Danmark.

Udover mailkorrespondancen havde de også telefonopkald omkring hjemtagning af udbytte fra salget af Dockwise. KPMG tog heller ikke her forbehold omkring deres skattemæssige rådgivning. Koncernen blev også rådgivet af andre, bl.a. advokatfirmaet Kromann Reumert, der sagde det samme som KPMG, og som ligeledes ikke tog nogen forbehold. De holdt fysiske møder med Kromann Reumert. Der blev formentlig udarbejdet mødereferater fra disse møder, men han har ikke adgang til dem, og de eksisterer formentlig ikke længere.

KPMG fortsatte som rådgiver for Heerema-koncernen efter, at udlodningen var sket, og de kom ikke senere med forbehold omkring deres rådgivning om beskatning af udlodningen. KPMG var endvidere revisor for hele Heerema-koncernen, herunder for Heavy Transport Holding Denmark.

I forbindelse med at Heerema-koncernen opløste de tre andre danske holdingselskaber i 2007, diskuterede de ikke rigtig, om Heavy Transport Holding Denmark skulle opløses på samme måde, da de ikke anså det for nødvendigt. De talte om det, men da de ikke havde bekymringer omkring løsningen med udlodning af udbytte, anså de det ikke for nødvendigt at undersøge nærmere. Det var endvidere ikke nødvendigt at undersøge nærmere omkring processen, da de havde erfaring med processen fra opløsningen af de andre tre danske holdingselskaber.

Efter at SKAT havde rejst krav om betaling af kildeskat, indgik de en aftale med KPMG om at udskyde forældelsesfristen for KPMG's mulige rådgiveransvar. Efter at han gik på pension, har han hørt, at KPMG ønskede at ophæve denne aftale, men det er alene, hvad han har hørt fra sin efterfølger.

## Anbringender

*Heavy Transport Holding Denmark* har i lyset af Højesterets dom af 9. januar 2023 (UfR 2023.1575) frafaldet

 **4500**

sine anbringender om, *at* »retsmæssig ejer«-begrebet skal fortolkes i overensstemmelse med intern dansk ret, *at* der skal foreligge en retlig forpligtelse til viderebetaling, for at en beløbsmodtager kan anses for at være et »gennemstrømningsselskab«, *at* imødegåelse af misbrug kræver national hjemmel, *at* det af EU-Domstolen fastslåede generelle princip om forbud mod misbrug ikke kan tillægges virkning i dansk ret, og *at* SKATs afgørelse er udtryk for en skærpelse af en fast administrativ praksis med tilbagevirkende kraft.

Heavy Transport Holding Denmark har i øvrigt gentaget sine anbringender og har uddybende anført navnlig, at det anerkendes, at formålet med etableringen af Heavy Transport Finance (Luxembourg) SA primært var at muliggøre en viderebetaling til de aktionærer i Panama af provenuet fra salget af Dockwise Transport N.V. uden dansk kildeskat, idet aktionærerne ikke kunne modtage en udbytteudlodning direkte uden dansk kildeskat. Det anerkendes endvidere, at midlerne blev viderebetalt til aktionærerne i Panama på en måde, hvorpå Heavy Transport Finance (Luxembourg) efter den nu foreliggende praksis ikke havde reel råderet over midlerne, og at dette som udgangspunkt taler for, at Heavy Transport Finance (Luxembourg) reelt kunne anses for at være et gennemstrømningsselskab i relation til midlerne.

Spørgsmålet om, hvorvidt den umiddelbare modtager af udbyttet må anses for at være retmæssig ejer heraf, må imidlertid bedømmes

i lyset af formålet med dobbeltbeskatningsoverenskomsten med Luxembourg om at undgå dobbeltbeskatning og forhindre skatteunddragelse og skatteundgåelse. Hvis der ikke opnås en skattefordel ved det etablerede arrangement, som ikke var til stede i forvejen, kan det primære formål med arrangementet ikke antages at være i strid med dobbeltbeskatningsoverenskomstens formål, og dermed er den grundlæggende forudsætning for at statuere et misbrug ikke til stede.

I den konkrete sag kunne midlerne være blevet udloddet direkte til moderselskaberne i Panama gennem en likvidation uden at udløse kildeskat.

Fordelene efter EU's moder-/datterselskabsdirektiv kan hverken nægtes på grundlag af misbrugsbestemmelsen i direktivets artikel 1, stk. 2, eller på grundlag af det såkaldte generelle EU-retlige princip om forbud mod misbrug, idet der ikke foreligger noget forsøg på at opnå en uretmæssig skattefordel.

Det kan muligvis hævdes, at indskydelsen af Heavy Transport Finance (Luxembourg) og dette selskabs modtagelse og videresendelse af de omhandlede midler udgjorde et kunstigt arrangement, der ikke byggede på økonomisk realitet. Forudsætningen i EU's misbrugsgrundsætning om, at det skal være sket med det formål at opnå uretmæssige skattemæssige fordele, er dog ikke opfyldt i en situation som den foreliggende, hvor der forelå et fuldgodt og faktisk nemmere alternativ i form af likvidation til at kanalisere midlerne til aktionærerne i Panama uden dansk kildeskat. Selv om præmis 110 i EU-Domstolens dom af 26. februar 2019 (forenede sager C-116/16 og C-117/16) angår den situation, hvor en tilsvarende udbytteudlodning kunne være sket direkte til den endelige modtager uden dansk kildeskat, er princippet også anvendeligt i en situation som den foreliggende, hvor udbyttet kunne være udloddet direkte til de endelige modtagere i Panama uden dansk kildeskat ved udlodning af et likvidationsprovenu.

Nægtelse af skattefrihed med henvisning til en misbrugsgrundsætning baserer sig på, at domstolene ser bort fra de formelle selskabsretlige konstruktioner for i stedet at fokusere på den økonomiske realitet, men ved denne bedømmelse kan man ikke samtidig fastholde skatteyderen på, at denne rent formelt har valgt at gå frem efter de skatteretlige regler om udbytteudlodning, når der reelt er tale om en likvidationsudlodning, eller når skatteyderen lige så vel kunne have valgt at gennemføre en likvidation.

For så vidt angår hæftelse for en eventuel udbytteskat efter kildeskattelovens § 69, stk. 1, må Højesterets præmisser i UfR 2023.1575 H og i UfR 2023.3198 H forstås sådan, at der i de nævnte sager ikke var fremlagt dokumentation for den rådgivning, som selskaberne havde modtaget.

Med den fremlagte dokumentation for rådgivningen fra KPMG, der er understøttet af forklaringen for Højesteret af A, samt de efterfølgende aftaler mellem Heerema-koncernen og KPMG er det godtgjort, at KPMG uden forbehold rådgav om, at udbyttet var skattefrit. Det, som Heavy Transport Holding Denmark og KPMG ikke forudså i 2006 og 2007, var, at der oven over den danske lovgivning og den danske domstolsskabte praksis svævede et obligatorisk EU-retligt misbrugsprincip med direkte virkning for borgerne.

Højesteret har i UfR 1977.844 H fastslået, at usikkerhed om den retlige fortolkning og subsumption kan føre til, at der ikke foreligger den fornødne forsømmelighed efter kildeskattelovens § 69, stk. 1, hvilket er bekræftet i UfR 2018.3119 H.

Der er derfor ikke udvist forsømmelighed, jf. kildeskattelovens § 69.

For så vidt angår forrentning af et eventuelt skattekrav, fører Skatteministeriets principale rentepåstand til, at det vil have kostet ca. 936 mio. kr. at få prøvet skattekravet på ca. 450 mio. kr.

Morarenter af den foreliggende størrelse kombineret med den manglende mulighed for deponering udgør en hindring for en reel adgang til domstolsprøvelse, idet udsigten til at skulle betale morarenter, der langt overstiger skattekravet, såfremt sagen tabes, lægger et uproportionalt pres på skatteyderen for at opgive sagen.

**4501**

Den Europæiske Menneskerettighedskonventions artikel 6 finder anvendelse i den foreliggende sag, da kravet om morarenter ingen sammenhæng har med hovedkravet. Desuden har morarenternes karakter af en bøde eller lignende pønalt instrument. Renten, som opkræves i den foreliggende situation, overstiger, hvad der er nødvendigt for selv en rundhåndet finansiel kompensation for det tab, som staten har lidt ved ikke at have rådighed over udbytteskatten fra det tidspunkt, hvor Skatteministeriet afgav påkrav.

De danske renteregler i kombination med den manglende mulighed for at afbryde forrentningen ved betaling eller deponering strider endvidere mod artikel 47 i Den Europæiske Unions Charter om grundlæggende rettigheder, idet forrentningen i sig selv kan afholde en skatteyder fra at føre sag mod det offentlige. Morarenterne er aldeles uproportionale.

Lovgiver har næppe afvejet hensynet til statens økonomiske interesser over for borgerens adgang til domstolsbehandling. Staten har overset de urimelige konsekvenser af særligt høje morarenter på skyldige skattekrav kombineret med det forhold, at staten ikke har etableret en ordning, som muliggør deponering i den særlige situation, hvor borgeren har fået medhold ved Landsskatteretten.

Selv om Højesteret i UfR 2023.1575 H har udtalt, at der ikke er grundlag for at antage, at forrentningen udgør en overtrædelse af artikel 47 i EU-Charteret, består der i det mindste en sådan tvivl om fortolkning af bestemmelsen, at Højesteret bør forelægge spørgsmålet for EU-Domstolen. Der er tale om en potentiel overtrædelse af EU-Charteret på et område, som ikke ses behandlet af EU-Domstolen før, og hvor det samlede rentekrav er urimeligt. Det er således særdeles relevant, at Højesteret spørger EU-Domstolen om, hvor grænserne går for, hvilke økonomiske byrder der må lægges på en borger som konsekvens af at føre en sag. Med en forelæggelse for EU-Domstolen kan det endvidere undersøges, om der alligevel er grundlag for at tilsidesætte den danske lovgivning.

*Skatteministeriet* har gentaget sine anbringender og har anført navnlig, at beskatningen må baseres på de dispositioner, som Heavy Transport Holding Denmark faktisk foretog. Der er ikke hjemmel til at basere en beskatning på kontrafaktiske omstændigheder, såsom en likvidation, der ikke blev gennemført.

Der er i øvrigt ingen holdepunkter for at antage, at Heavy Transport Holding Denmarks panamanske aktionærer under de givne omstændigheder for at haste en likvidation igennem inden lovændringen den 1. juli 2007 ville have sørget for betaling af al forfalden gæld og uforfalden gæld samt påtaget sig en solidarisk ubegrænset hæftelse for al uforfalden gæld, forfalden som uforfalden eller omtvistet, jf. dagældende anpartsselskabslovs § 59.

For så vidt angår skattehæftelse efter kildeskattelovens § 69, stk. 1, er det afgørende, at Heavy Transport Holding Denmark var bekendt med de faktiske omstændigheder, som danner grundlag for, at Heavy Transport Finance (Luxembourg) ikke kan anses for at være udbyttets retmæssige ejer efter den dansk-luxembourgske dobbeltbeskatningsoverenskomst, og at fordelen i form af skattefritagelse efter moder-/datterselskabsdirektivet skal nægtes som følge af retsmisbrug. Det er uden betydning, at der forinden beslutningen om at udlodde det omhandlede udbytte blev indhentet rådgivning hos KPMG.

Med hensyn til forrentning af skattekravet er der ikke grundlag for at antage, at en forrentning efter opkrævningsloven indebærer en krænkelse af Heavy Transport Holding Denmarks rettigheder

efter artikel 6 i Menneskerettighedskonventionen eller artikel 47 i EU-Charteret, jf. UfR 2023.1575 H.

Da der foreligger misbrug af moder-/datterselskabsdirektivet, kan Heavy Transport Holding Denmark ikke påberåbe sig rettigheder sikret ved EU-Charteret med henblik at at anfægte den lovgivning, der regulerer beskatning, herunder forrentning efter opkrævningsloven, jf. EU-Domstolens dom af 26. februar 2019 (forenede sager C-116/16 og C-117/16). Allerede derfor er det ikke nødvendigt at forelægge præjudicielle spørgsmål for EU-Domstolen.

Endvidere består der ikke tvivl om forståelsen af EU-retten, som nødvendiggør præjudiciel forelæggelse om fortolkningen af bestemmelsen i artikel 47 i EU-Charteret.

## Højesterets begrundelse og resultat

*Sagens baggrund og problemstillinger*

SKAT traf den 7. december 2010 afgørelse om, at Heavy Transport Holding Denmark ApS efter kildeskattelovens § 65, jf. selskabsskattelovens § 2, stk. 1, litra c, havde pligt til at indeholde skat med i alt 503.803.440 kr. af det udbytte på 1.799.298.000 kr., som Heavy Transport Holding Denmark den 23. maj 2007 udloddede til Heavy Transport Finance (Luxembourg) SA. Efterfølgende er skattebeløbet korrigeret til 449.824.500 kr. svarende til 25 % af udbyttet.

Landsskatteretten traf den 29. august 2012 afgørelse om, at Heavy Transport Holding Denmark ikke havde pligt til at indeholde skat af udlodningen.

Sagen angår, om Heavy Transport Holding Denmark havde pligt til at indeholde udbytteskat. Hvis det er tilfældet, angår sagen endvidere, om Heavy Transport Holding Denmark er ansvarlig for betaling af det indeholdelsespligtige beløb, jf. kildeskattelovens § 69, stk. 1. I givet fald angår sagen tillige spørgsmålet om forrentning af det beløbet.

*Beskatning af udbyttet*

Efter selskabsskattelovens § 2, stk. 1, litra c, forudsætter fritagelse for skattepligt af Heavy Transport

**4502**

Holding Denmarks udlodning den 23. maj 2007 på 1.799.298.000 kr. til Heavy Transport Finance (Luxembourg), at beskatning af udbyttet skal frafaldes eller nedsættes efter bestemmelserne i direktiv 90/435/EØF om en fælles beskatningsordning for moder- og datterselskaber fra forskellige medlemsstater (moder-/datterselskabsdirektivet) eller efter dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg.

Heavy Transport Holding Denmark har anerkendt, at moderselskabet i Luxembourg var et til formålet indskudt mellemholdingselskab, som modtog udbyttet med henblik på at viderebetale dette til aktionærerne i Panama (Heavy Transport Group Inc. og Incomara Holdings SA), hvortil udbyttet ikke direkte kunne være udloddet skattefrit. Heavy Transport Holding Denmark har imidlertid anført, at der ikke foreligger retsmisbrug efter moder-/datterselskabsdirektivet eller dobbeltbeskatningsoverenskomsten, fordi selskabet kunne være blevet likvideret og likvidationsprovenuet udloddet direkte til aktionærerne i Panama skattefrit.

Højesteret finder, at den skattemæssige bedømmelse skal baseres på den udbytteudlodning, som faktisk blev foretaget fra Heavy Transport Holding Denmark til Heavy Transport Finance (Luxembourg) den 23. maj 2007 og ikke på en grundlæggende anden disposition i form af likvidation af Heavy Transport Holding Denmark, som koncernen havde fravalgt. Det forhold, at den dagældende skattelovgivning indtil den 1. juli 2007 gav mulighed for at likvidere Heavy Transport Holding Denmark og overføre likvidationsprovenuet direkte til aktionærerne i Panama uden beskatning, har derfor ingen betydning for den skattemæssige bedømmelse, herunder for om der foreligger retsmisbrug.

Herefter finder Højesteret, at der ved udbytteudlodningen den 23. maj 2007 forelå retsmisbrug efter EU-retten af de fordele, som moder-/datterselskabsdirektivet giver, og at Heavy Transport Finance (Luxembourg) ikke var udbyttets »retmæssige ejer« (»beneficial owner«) efter dobbeltbeskatningsoverenskomsten mellem Danmark og Luxembourg, jf. herved også Højesterets dom af 9. januar 2023 (UfR 2023.1575).

På denne baggrund tiltræder Højesteret, at Heavy Transport Finance (Luxembourg) efter selskabsskattelovens § 2, stk. 1, litra c, er skattepligtig af udbyttet, og at Heavy Transport Holding Denmark som følge heraf havde pligt til at indeholde skat af beløbet, jf. kildeskattelovens § 65, stk. 1.

*Ansvar efter kildeskattelovens § 69*

Heavy Transport Holding Denmark var bekendt med grundlaget for, at udlodningen den 23. maj 2007 til Heavy Transport Finance (Luxembourg) er skattepligtig efter selskabsskattelovens § 2, stk. 1, litra c. Der er ikke heroverfor oplyst forhold, som kan begrunde, at Heavy Transport Holding Denmark har haft tilstrækkelig føje til at tro, at udbyttet ikke var skattepligtigt. Det kan ikke føre til en anden vurdering, at koncernen indhentede rådgivning fra KPMG om arrangementet, der som ovenfor anført indebar retsmisbrug.

På denne baggrund tiltræder Højesteret, at Heavy Transport Holding Denmark efter kildeskattelovens § 69, stk. 1, er ansvarlig for betaling af skat vedrørende udlodningen.

*Rentespørgsmål*

Det følger af opkrævningslovens § 5, stk. 1, og § 7, stk. 1, at seneste rettidige betalingsdag for det skyldige beløb var 14 dage efter SKATs påkrav af 7. december 2010, dvs. den 21. december 2010.

Skatteministeriets krav skal efter opkrævningslovens § 7 forrentes fra den 21. december 2010, uanset at Heavy Transport Holding Denmark ikke har haft adgang til at deponere det omstridte beløb, jf. Højesterets dom af 9. januar 2023 (UfR 2023.1575). Højesteret har i samme dom fastslået, at det følger af opkrævningslovens § 16 a, stk. 4, og § 16 c, stk. 1, at et skattekrav som det foreliggende med virkning fra den 1. august 2013, hvor reglerne om én skattekonto trådte i kraft, skal debiteres saldoopgørelsen på virksomhedens skattekonto, at debetsaldoen på kontoen skal forrentes med den rente, der er fastsat i § 7, stk. 1, jf. stk. 2, og at renten beregnes dagligt og tilskrives månedligt, dvs. med rentes rente.

Højesteret finder, at forrentning i overensstemmelse med opkrævningsloven, der har til formål bl.a. at tilskynde til betaling af skyldig skat, ikke indebærer en krænkelse af Heavy Transport Holding Denmarks ret til retfærdig rettergang efter artikel 6 i Den Europæiske Menneskerettighedskonvention eller artikel 47 i Den Europæiske Unions Charter om grundlæggende rettigheder, jf. herved den nævnte dom af 9. januar 2023.

Højesteret finder endvidere, at der ikke er en sådan tvivl om forståelsen af Chartrets artikel 47, at der er grundlag for præjudiciel forelæggelse for EU-Domstolen. Højesteret bemærker herved navnlig, at der i sagen foreligger retsmisbrug efter EU-retten af de fordele, som moder-/datterselskabsdirektivet giver, og at opkrævningslovens renteordning ikke har forhindret selskabet i at føre den foreliggende sag ved domstolene.

Højesteret tager herefter Skatteministeriets påstand om, at skattekravet skal forrentes efter opkrævningslovens § 7 fra den 21. december 2010, til følge. Dette indebærer, at skattekravet med virkning fra den 1. august 2013 også forrentes efter opkrævningslovens kapitel 5 om én skattekonto.

*Konklusion*

Landsrettens dom stadfæstes med den ændring, at skattekravet på 449.824.500 kr. forrentes efter opkrævningslovens § 7 med virkning fra den 21. december 2010.

Som følge heraf frifindes Skatteministeriet for Heavy Transport Holding Denmarks påstand om tilbagebetaling af sagsomkostninger.

## Thi kendes for ret

Landsrettens dom stadfæstes med den ændring, at 449.824.500 kr. skal tillægges rente efter opkrævningslovens § 7 med virkning fra den 21. december 2010.

Skatteministeriet frifindes for Heavy Transport Holding Denmark ApS' påstand om tilbagebetaling af sagsomkostninger.

I sagsomkostninger for Højesteret skal Heavy Transport Holding Denmark ApS betale 1.000.000 kr. til Skatteministeriet.

De idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse. Sagsomkostningsbeløbet for Højesteret forrentes efter rentelovens § 8 a.