# Exhibit 13, Part 4 of 4

faktureret North Channel Bank herfor. Spørgsmålet er dernæst, om A burde have forstået det. A vidste, hvor farlig den her type transaktion er. Advarselslamperne havde blinket, siden han modtog den første henvendelse. Han vidste, at det var et område, hvor der snydes. Cum/ex og dobbeltrefusion var frisk i hukommelsen. A havde ikke bare brug for, men også pligt til at få et fuldt overblik. A vidste, at den engelske transaktionsbeskrivelse var en »læse-let-version« af illustrationen af det, som North Channel Bank og pensionsplanen ville gøre.

Holder man de to transaktionsbeskrivelser op mod hinanden, kan man se, at den tyske tekst er væsentligt længere og mere detaljeret og blandt andet indeholder oplysninger om, hvad der sker på kontosiden. Det burde Bech-Bruun have spurgt nærmere ind til. Selv med den transaktionsbeskrivelse, som A fik forelagt på engelsk, var det ikke udelukket, at tredjemand var den samme. Det fremgår tydeligt af den tyske transaktionsbeskrivelse, og det engelsk resumé havde jo til formål at bringe A's forståelse »på linje« med illustrationen. Der er ikke noget, der tilsiger, at Jones Day hverken ved fremsendelse af transaktionsbeskrivelsen eller under møder afholdt om modellen med Bech-Bruun har prøvet at holde det skjult for A, at tredjemand var den samme.

Selv hvis det måtte lægges til grund, at A ikke forstod den tyske transaktionsbeskrivelse fuldt ud, ændrer det ikke på det faktum, at han har fået beskrivelsen tilsendt, og at den indeholder tegninger og tal, som ikke er afhængige af sproglig forståelse. A burde derfor have forstået beskrivelsen, som har karakter af en masterplan for, hvad parterne i arrangementet havde tænkt sig at gøre såvel sammen som hver for sig. Beskrivelsen af bankens rolle er meget detaljeret og viser bankens centrale rolle i arrangementet. Den omstændighed, at beskrivelsen er udarbejdet på tysk, indikerer da også, at beskrivelsen er udarbejdet af den tyske bank - North Channel Bank. Med denne masterplan i hånden kunne

**822**

Bech-Bruun se, at det her var bankens model, og Bech-Bruun fik det faktisk at vide, da man fra Jones Day fik oplyst, at banken overvejede en ændring i strukturen. Bech-Bruun kunne derfor se, at der var noget helt galt i bankens beskrivelse af sammenhængen. Dét burde have fået Bech-Bruun til at kigge nærmere efter og kræve dokumentet oversat, hvis A virkeligt ikke forstod essensen. En oversat version viste klart, at det var ulovligt og i bedste fald proforma - og at det var uden aktier.

*Retspraksis*

Bech-Bruun er undergivet et strengt professionsansvar.

Ved UfR 2000.2267 H blev det fastslået, at hvis man som bank udsteder en depoterklæring uden at have aktierne, skal man redegøre for, at man ikke har aktierne, og at de er hos tredjemand. Denne ansvarsstandard kan overføres til North Channel Bank. North Channel Bank vidste, og det kunne Bech-Bruun se, at aktierne i bedste fald ville være hos sælgerens långiver, når udbyttet forfaldt. Og at udbyttet dermed i bedste fald ville være hos denne tredjemand. Hvis North Channel Bank alligevel valgte at udstede en nota, måtte North Channel Bank - med Højesterets ord - samtidig hermed gøre opmærksom på, at aktierne og udbyttet var hos en tredjemand, der ikke var valgt af banken. Hvis North Channel Bank havde taget et sådant forbehold i sine udbyttenotaer, havde SKAT naturligvis spurgt om baggrunden herfor.

I Højesteretsdommen var depoterklæringerne fremkaldt ved svig fra de to aktionærers side, og de havde mulighed for at tilegne sig størstedelen af det erstatningsbeløb, som ville komme fra et erstatningskrav mod erklæringsgiver. Under de omstændigheder var der ikke grundlag for et krav mod banken, da man jo ikke kan få erstatning for en forkert erklæring, som man selv har fremkaldt ved svig. Det er ikke samme situation i nærværende sag, hvor det er Skatte-

forvaltningen, der som skadelidt tredjemand kræver erstatning af Bech-Bruun for, at Bech-Bruun har godkendt, at North Channel Bank kunne udstede udbyttenotaer uden at tage forbehold.

Den centrale praksis på rådgiveransvarsområdet er selskabstømmersagerne, og den ledende dom om rådgiveransvar er UfR 2000.365/2 H (Thrane-dommen), hvor der blev lagt vægt på, at salget af overskudsselskabet ikke var en normal forretningsmæssig disposition, og at der under de omstændigheder, hvorunder salget havde fundet sted, var særlig anledning for sælgeren og sælgers rådgivere til at være opmærksom på risikoen for tilsidesættelse af skattevæsenets interesser.

Det er en helt tilsvarende situation i denne sag, idet transaktionerne skabte en ikke ubetydelig risiko for tab, uden at Bech-Bruun gjorde noget for at afværge skattevæsenets tab, og Bech-Bruun har med sine forudsætninger alene og uden held forsøgt at skrive sig ud af problemerne.

Den ansvarsnorm, der blev fastslået ved UfR 2000.365/2 H, er også anvendt i de sager i selskabstømmerkomplekset, hvor der skete frifindelse, herunder f.eks. UfR 2006.145 H, der blandt andet viste, at der er en ganske vidtgående undersøgelsespligt for sælgeren - eller for andre aktører, som medvirker til transaktioner uden forretningsmæssigt formål, der skaber risiko for tab for skattemyndighederne.

Bech-Bruuns adfærd ved rådgivningen af North Channel Bank skal ses i forhold til praksis fra selskabstømmersagerne, men der må foretages en skærpet bedømmelse af Bech-Bruun, fordi den præsenterede model slet ikke havde noget forretningsmæssigt formål, heller ikke på overfladen. A havde desuden indset risikoen for, at modellen kunne anvendes til dobbelt refusion, som er klart ulovligt. Der var desuden en række forhold, som indebar, at der kunne rejses spørgsmål om, hvorvidt pensionsplanen overhovedet var udbyttemodtager, og kernen i behovet for rådgivningen var derfor uberettiget refusion. Hvis normen fra selskabstømmersagerne skal følges, er Bech-Bruun derfor erstatningsansvarlige over for Skatteforvaltningen, men situationen er skærpet for Bech-Bruun i forhold til selskabstømmersagerne, fordi Bech-Bruun har rådgivet om en model, mens der i selskabstømmersagerne alene var ydet rådgivning om én konkret transaktion.

I både udbyttesagerne og selskabstømmersagerne har aktørerne forsøgt at retfærdiggøre deres modeller med henvisning til abstrakte tanker om »huller« og teoretiske gevinstmuligheder. I selskabstømmersagerne var spekulationen, om man kunne tjene på den latente skattebyrde. I udbyttesagerne er spekulationen, om man kunne lave en markedsarbitrage og tjene penge på sin skattefordel ved handler omkring udbyttedatoen. I begge tilfælde er det meget svært at forstå, hvordan fortjenesten skulle være der på markedsvilkår, men det er nemt at forstå rationalet, hvis der er tale om svindel.

*Ansvarsnorm - legal opinion*

Bech-Bruuns synspunkter om ansvarsnormen for rådgivning ydet i form af en legal opinion vil være udtryk for en nyskabelse, som ikke skal tillades i dansk ret.

Rådgivere er ansvarlige for deres rådgivning. Man kan begrænse et opdrag eller undlade at kigge på nogle konkrete forhold i en analyse, men man kan ikke skrive sig ud af tingene, som Bech-Bruun forsøger at gøre. Legal opinions er på den måde ikke noget særligt. Der er jo ikke tale om, at North Channel Bank indhentede et abstrakt responsum. North Channel Bank præsenterede en model for, hvad de havde tænkt sig at gøre, og Bech-Bruun skulle forholde sig til den model. Det kunne de gøre i form af en legal opinion, men hvis de kunne se, at modellen skabte risici for staten som tredjemand, kunne de ikke afværge disse risici ved at indsætte nogle forbehold i deres legal opinion.

**823**

Bech-Bruun måtte enten skrive klart til North Channel Bank, at banken ville risikere straf- eller erstatningsansvar, hvis banken medvirkede til disse transaktioner, eller kontakte den danske stat og oplyse om det potentielle bedrageri, som deres klient havde sat i gang. Forbehold i en legal opinion er noget, man kan bruge inter partes, men det er ikke noget, der kan afværge risikoen for statens tab.

*Kausalitet og adækvans*

Bech-Bruuns legal opinion er eller må forventes at blive påberåbt af blandt andre bankens tidligere ledelse og bankens hovedaktionærer under de verserende straffesager.

Rådgivningen handlede om bankens ansvar for at udstede udbyttenotaer for nogle påtænkte transaktioner. Rådgivningen blev altså indhentet for, at North Channel Bank kunne udstede denne standarddokumentation, og sagens dokumenter viser, hvordan man brugte rådgivningen før, under og efter forløbet.

Der var en tæt tidsmæssig sammenhæng mellem rådgivningen og ansøgningerne om refusion til SKAT. Bech-Bruuns udkast var endeligt på plads den 5. maj 2014, hvor der blev sendt til North Channel Bank. Jones Days overlæggernotat blev sendt til North Channel Bank den 9. maj 2014, og de første refusionsansøgninger blev forelagt for SKAT den 12. maj 2014.

Der var en klar forbindelse mellem Bech-Bruuns ansvarspådragende adfærd og Skatteforvaltningens tab. Overordnet set blev rådgivningen indhentet for at udstede udbyttenotaer. North Channel Bank indhentede rådgivning fra Bech-Bruun, inden der blev indsendt refusionsansøgninger til SKAT. Det var først, da Bech-Bruun havde godkendt modellen, at de første ansøgninger blev sendt afsted. North Channel Bank efterspurgte rådgivning, fordi North Channel Bank skulle bruge den.

Bech-Bruun har forsøgt at vende spørgsmålet om på hypotetiske måder. Ville North Channel Bank have indsendt ansøgninger, hvis Bech-Bruun ikke havde afgivet sin opinion? Ville svindlerne have benyttet en anden bank end North Channel Bank, hvis North Channel Bank ikke havde været tilgængelig? Det er kontrafaktiske spørgsmål, og de kan ikke fjerne kausaliteten. Man må konstatere, at man aldrig finder ud af det. For Bech-Bruun afgav sin opinion, og derfor var North Channel Bank tilgængelig som bank for svindlen. Det er op til Bech-Bruun at bevise, at North Channel Bank ville have handlet alligevel, hvis ikke Bech-Bruun havde rådgivet som sket. Der er altså årsagssammenhæng mellem rådgivningen og tabet.

Bech-Bruun var med sin rådgivning en del af opsætningen af de uretmæssige refusionsansøgninger, der endte med at påføre Skatteforvaltningen et milliardtab. Selvom Bech-Bruun ikke forsætligt deltog i et strafbart bedrageri, ændrer det ikke på, at Bech-Bruun faktisk spillede en rolle i opsætningen. En aktør, der deltager i planlægningen af en model, er ansvarlig for den skade, som modellen forvolder. Det er et solidarisk ansvar med de øvrige ansvarlige aktører.

Det var mange og tunge aktører, så som banker, pensionsplaner, selskaber stiftet i forskellige jurisdiktioner og advokater, som sammen bedrog SKAT. Det var et komplekst setup. Aktørerne bestod dels af svindlere, som f.eks. bagmændene og banken, men også aktører, der ikke havde forsæt til svindel, men som medvirkede ved uagtsom eller groft uagtsom adfærd, fordi de ikke tænkte sig om, f.eks. Bech-Bruun, som godkendte modellen. Disse aktører er sammen ansvarlige for det tab, som de tilsammen har forvoldt. Dette fælles ansvar så man også i selskabstømmersagerne.

*Det juridiske grundlag for vurderingen af årsagssammenhæng.*

Der er for det første som minimum en lempet bevisbyrde for årsagssammenhæng i et tilfælde som dette, hvor der er tale om et rådgiveransvar. For det andet er bevisbyrden lempet, fordi Bech-

Bruun har lavet klare fejl i sin rådgivning. Det betyder, at bevisbyrden i denne sag reelt er vendt om, jf. UfR 2002.2000 H, hvor Højesteret fastslog, at der ved en klar advokatfejl kun kan statueres ansvarsfrihed, hvis det med en betydelig grad af sandsynlighed må antages, at der ikke er årsagssammenhæng. Højesteret vendte altså reelt bevisbyrden om, således at skadevolder skulle bevise, at der ikke var kausalitet. I denne sag, hvor Bech-Bruun også har begået klare fejl, må samme princip gælde, og Bech-Bruun skal med en betydelig grad af sikkerhed godtgøre, at der ikke er årsagssammenhæng.

Skatteforvaltningen har endvidere henvist til UfR 2002.2176 H om en banks culpøse udsendelse af en urigtig fondsbørsmeddelelse i forbindelse med en aktieemission, hvor det blev anført, at tvivl om årsagssammenhæng ikke skal komme skadevolder til gode, hvis der er handlet med klar culpa.

Bech-Bruun har rådgivet med klare fejl i et meget risikofyldt miljø. Tvivl om, hvordan tingene var faldet ud, hvis de ikke havde afgivet deres rådgivning, skal ikke komme dem til gode. Bech-Bruun skal i stedet bevise, at deres rådgivning ikke var nødvendig for North Channel Bank, og det har Bech-Bruun ikke givet en god forklaring på.

Allerede en rent kronologisk gennemgang af hændelsesforløbet viser, at der var en grund til, at North Channel Bank søgte rådgivning hos Bech-Bruun, og at der således er årsagssammenhæng. Internt i North Channel Bank blev der lavet en plan for projektet, der blev kaldt »Fennec«. Den 29. januar 2014 blev denne plan sendt rundt i North Channel Bank, og man kan se, at en af opgaverne er »Legal Opinion til Fennec-proces«. Ledelsen i North Channel Bank var angivet som ansvarlige for dette punkt. Denne interne plan viser således,

**824**

hvordan denne opinion havde betydning for opstarten af projektet. Opgaven havde deadline ved den grønne streg - altså starten af uge 10, hvilket var i starten af marts 2014. På det tidspunkt havde Bech-Bruun ydet deres rådgivning i form af en opinion af 21. februar 2014. Den opinion var et ikke-underskrevet udkast, men den var reelt endelig fra Bech-Bruuns side på dette tidspunkt. De ændringer, som blev foretaget i løbet af april og maj måned, ændrede ikke ved Bech-Bruuns konklusion. Den 5. maj 2014 lå Bech-Bruuns rådgivning fast. Den 9. maj 2014 sendte Jones Day den opdaterede tyske udtalelse, som lå på toppen af Bech-Bruuns opinion, og tre dage senere blev de første refusionsansøgning med North Channel Bank-udbyttenotaer sendt til SKAT. Der er en tydelig sammenhæng mellem Bech-Bruuns rådgivning og ansøgningerne om refusion.

Bech-Bruuns rådgivning angik, om det var strafbart eller ansvarspådragende, og North Channel Bank bad via Jones Day om en »bør«-opinion. Både projektets opbygning og formål viser, at Bech-Bruuns rådgivning selvfølgelig havde betydning. Det samme gør den tidsmæssige sammenhæng. Der er altså årsagssammenhæng mellem Bech-Bruuns rådgivning og North Channel Banks adfærd, uanset om North Channel Bank har tilsidesat KYC-reglerne og NPP-procedurerne. Den omstændighed, at North Channel Bank afholder en udgift på 14.650 euro i forbindelse med indhentelse af rådgivning fra Bech-Bruun understreger, at man skulle bruge rådgivningen, og at der er årsagssammenhæng mellem rådgivningen og de uberettigede refusioner.

North Channel Banks brug af rådgivningen fremgår også af forløbet efter, at Bech-Bruun havde afgivet sin opinion. North Channel Bank bogførte transaktionerne på sine depoter og sine konti. Og North Channel Bank genererede udbyttenotaer ved hjælp af Dwpbanks system WP2, som om det var en almindelig og legitim bankforretning.

Dette hænger sammen med, at North Channel Bank netop var en bank. En tysk reguleret bank undergivet det tyske finanstilsyn BaFin, og banken henviste over for BaFin til de indhentede legal opinions, herunder fra Bech-Bruun.

Det er ikke ansvarsfritagende for Bech-Bruun som professionel rådgiver, at man er blevet ført bag lyset af banken. Bech-Bruun havde alle de oplysninger, der skulle til for at nå det rigtige resultat. Bech-Bruun leverede værktøjerne til svindlen i form af uretmæssig udstedelse af udbyttenotaer ved at blåstemple og rådgive om modellen. Der er således årsagssammenhæng, når North Channel Bank har udstedt udbyttenotaer i strid med de faktiske forhold, men i overensstemmelse med den model, som Bech-Bruun vurderede. Det gælder uanset, om North Channel Bank bogførte de fiktive handler, præcist som Bech-Bruun havde forudsat.

North Channel Bank foretog de transaktioner, som Bech-Bruun rådgav om. Dokumenterne i sagen viser, at North Channel Bank fulgte den samme systematik for samtlige af de transaktioner i North Channel Bank, der ligger til grund for erstatningskravet. Det var ikke udelukket, at tredjemand i Bech-Bruuns legal opinion var den samme, hvilket vil sige, at der kunne være tale om et lukket kredsløb i banken mellem tre parter. Det var også det faktum, der var blevet præsenteret for Bech-Bruun.

Bech-Bruuns indsigelse om, at der jo ikke blev foretaget nogen transaktioner overhovedet, fordi der ikke var aktier, har ingen betydning for vurderingen af årsagssammenhængen. Fraværet af realitet og aktier i transaktionskæden var jo muligt, fordi transaktionerne var cirkulære, og det var muliggjort ved Bech-Bruuns transaktionsbeskrivelse. Svindlen og strukturen var så gennemført, at den kunne skabe spor på tværs af konti og depoter, og regnskabsteknisk og som en skrivebordsøvelse var der transaktioner. Det er et røgslør, når Bech-Bruun har henvist til tidspunkterne for bogføring og rækkefølgerne af transaktionerne i depoterne og konti.

Bech-Bruun har henvist til, at de første transaktioner blev gennemført den 14. marts 2014, og at de første udbyttenotaer blev udstedt den 24. marts 2014. Derudover har Bech-Bruun fremhævet, at Bech-Bruuns opinion først blev endeligt afgivet den 4. august 2014.

Ingen af disse indsigelser rykker ved, at der var årsagssammenhæng mellem Bech-Bruuns rådgivning og de uberettigede ansøgninger, der førte til tabet.

North Channel Bank gik i gang med at bogføre handler allerede i marts måned. På det tidspunkt havde Bech-Bruun den 21. februar 2014 lavet et endeligt udkast om, at der ikke burde være risiko for hverken strafansvar eller erstatningsansvar, og var klar til afregne herfor. Der var således tale om en ganske endelig vurdering. Hvis North Channel Bank begyndte at bogføre transaktioner i tillid hertil, ændrer det ikke på årsagssammenhængen, eftersom Bech-Bruuns rådgivning var et langt rådgivningsforløb med samme konklusion hele vejen igennem. Indtil udbyttenotaerne blev indsendt til SKAT, var der desuden tale om et lukket kredsløb uden eksterne aktører, hvor man uden risiko kunne rulle transaktionerne tilbage. Risikoen opstod først, da North Channel Banks udbyttenotaer blev indsendt til SKAT, og der er en nøje tidsmæssig årsagssammenhæng med Bech-Bruuns rådgivning. Bech-Bruuns udkast var endeligt på plads den 5. maj 2014, hvor det blev sendt til North Channel Bank. Jones Days overlæggernotat blev sendt til North Channel Bank den 9. maj 2014, og den første refusionsansøgning blev sendt afsted den 12. maj 2014. Det afgørende er, at North Channel Bank opfattede udkastet som endeligt og agerede i tillid til det, og at

**825**

det ikke senere blev ændret. Forløbet efter 5. maj 2014 viser også, at Bech-Bruun også selv anså underskriften som en formalitet.

*Adækvans*

Bech-Bruun har bevisbyrden for manglende adækvans, og den er ikke løftet. Bech-Bruun kan som erhvervsdrivende advokat ikke komme uden om ansvaret for sin rådgivning med henvisning til, at Bech-Bruun ikke kunne påregne konsekvensernes af sin rådgivning. Bech-Bruun ydede rådgivning om, hvorvidt banken ved at udstede standarddokumentation kunne blive strafansvarlig. Så udstedte banken standarddokumentation og blev straffet. Det har i den sammenhæng ingen betydning, om banken straffes for medvirken eller direkte bedrageri.

Man rådgav endda om bankens erstatningsansvar. Og så gjorde banken noget erstatningsansvarligt. Det er den mest påregnelige konsekvens, hvis Bech-Bruuns rådgivning var forkert. Konkret rådgav Bech-Bruun om, hvorvidt banken ville kunne blive erstatningsansvarlig for statens tab, såfremt der blev anmodet uretmæssigt på baggrund af bankens udstedte dokumentation. Det er altså ikke alene åbenlyst, at staten kan lide tab. Faktisk byggede rådgivningen på en forudsætning om tab hos det danske skattevæsen baseret på bankens dokumentation. Dette tab kan ikke være upåregneligt.

Modellen indebar en risiko for svindel, og forbeholdene i legal opinion afhjalp ikke dette.

SKAT's forvaltning har ikke betydning for adækvansen. Bech-Bruun vidste, at det bevis, der skulle vedlægges ansøgninger om refusion af udbytteskat, udgjordes af den standarddokumentation, som Bech-Bruun rådede North Channel Bank til ansvarsfrit at udstede.

Størrelsen af det tab, som Skatteforvaltningen har lidt, har ikke noget med adækvans at gøre. Det er derfor også uden betydning, om tabet står i forhold til Bech-Bruuns salær.

*Egen skyld og accept af risiko*

Bech-Bruun har ikke løftet bevisbyrden for, at Skatteforvaltningen har udvist egen skyld eller accepteret en risiko for at blive udsat for bedrageri. Bech-Bruun fik foretalgt den model, der har givet anledning til svindlen, og overså groft uagtsomt alle faresignalerne, hvilket har afsmittende effekt på en eventuel egen skyld, hvis grundlæggende relevans dermed blegner. Det er samfundsmæssigt uholdbart, hvis man åbner op for begrænsning af ansvaret eller helt ansvarsfrihed i forhold til en rådgiver, der har indgået om en model, der ender i svindel. Der er gjort juridisk op med et sådant synspunkt - også i forhold til egen skyld - i blandt andet selskabstømmerkomplekset. Her var det ansvarspådragende at rådgive i en sådan situation, hvor risikoen for tab var nærliggende - og erstatningskravene skulle ikke nedsættes med henvisning til egen skyld. Det siger også sig selv, at staten, og navnlig Skatteforvaltningen, hvor mere end 1.000 mia. kr. strømmer igennem årligt, og som i høj grad er afhængig af, at tredjeparter indberetter og afgiver erklæringer korrekt og loyalt, vil være chanceløs i et samfund, hvor der ansvarsfrit kan opfordres til at afgive erklæringer, hvor man ikke er sikker på, at det man erklærer sig om, er rigtigt.

Hertil kommer, at der var tale om svindel, som ikke kun ramte Danmark, men som også fandt sted i en række andre lande. Alene i Europa er tabene opgjort til 410 mia. kr. Dette vidner dels om, at det ikke var særlige forhold ved den danske kontrol, som gjorde, at svindlen blev rettet mod Danmark, dels om, hvor voldsomt dette bedrageri egentlig var. Bech-Bruun har bedt landsretten om at vurdere, om Skatteforvaltningen har handlet ansvarspådragende i sin indretning og administration af udbytteområdet i perioden 2007-2015. Bech-Bruun har bevisbyrden herfor og har forsøgt at løfte denne ved at fremlægge brudstykker af det fulde billede. Bech-Bruun har ikke præsenteret landsretten for et grundlag, der efter Skatteforvaltningens opfattelse gør det muligt for landsretten at tage stilling til spørgsmålet om egen skyld og accept af risiko.

*Det generelle forløb*

Det er Bech-Bruuns standpunkt, at forvaltningen var uforsvarlig, hvilket kan tilregnes SKAT (nu Skatteforvaltningen), og at det var en direkte følge af den uforsvarlige forvaltning, at der kunne svindles som sket.

Bech-Bruun har i sit påstandsdokument peget på de rapporter fra SIR, Statsrevisorerne, Rigsrevisionen og Bech-Bruun selv, der er udarbejdet efter, at svindlen var blevet opdaget. Ingen af disse rapporter er udtryk for en erstatningsretlig vurdering af SKAT's ageren eller indeholder en konkret vurdering af ansøgningerne, der indeholdt dokumentation fra North Channel Bank eller nogle af de øvrige ansøgninger.

Det er grundlæggende forkert, at kontrollen i forhold til nærværende sag har været uforsvarlig. Kontrollen indeholdt et meget stærkt dokumentationskrav, hvor der indgik en erklæring fra en bank, der fremstod som en uafhængig tredjepart, og som viste, at det ansøgeren anmodede om, var korrekt: At det ansøgende selskab ejede aktierne, da de lå i selskabets depot på udlodningsdagen, at ansøgeren havde fået udbetalt et nettoudbytte, og at der var indeholdt udbytteskat i Danmark. Når en uafhængig tredjemand bekræfter oplysninger, der i øvrigt er afgivet på tro og love til SKAT, er man kontrolmæssigt i mål.

Bech-Bruun har henvist til, at der i 2006 og 2007 var advarsler om udfordringer i administrationen af udbytteskat, hvor man blandt andet havde svært ved at kontrollere ejerskab til aktierne.

Bech-Bruun slår i forløbet ned på kritik, men overser helheden og opfølgningen på denne kritik. Hertil kommer, at kritikken ligger langt tilbage i tid.

**826**

F.eks. satte Skatteforvaltningen i både 2010 og 2013 SIR til at vurdere området. Der følges op på revisionens gennemgang, og området er i løbende fokus. Området har aldrig været overset. I SIR's rapport fra 2013 vurderes det desuden, at kontrollen i blanketordningen er solid.

Bech-Bruun fremhæver i forløbet en række ønsker til forskellige løsninger på en grundlæggende udfordring hos SKAT, nemlig udfordringen med at kontrollere de reelle ejere af aktierne, når der søges om refusion af indeholdt udbytteskat, men overser, at der ikke var fokus på de egentlige krav til refusionsansøgningerne og kontrollen heraf. Der var nogle gode og solide dokumentationskrav i den kontrol.

Der var ikke konkrete tegn på svindel, og det var derfor ikke et område, hvor der skulle ske en hasteprioritering af ressourcer i denne periode. Man skal også huske på, at risiko for svindel er til stede på alle områder i skatteforvaltningen. At Bech-Bruun peger på risikoen for svindel som noget særligt, er ikke retvisende. Denne information skal indgå i det store risikobillede på skatteforvaltningens område. Bech-Bruun skal på baggrund af det fulde billede godtgøre, at man skulle have prioriteret anderledes ved at nedprioritere sine midler f.eks. på momsområdet for at tilføre flere ressourcer til udbytteområdet. Bech-Bruun har kun belyst udbytteområdet - og er dermed ikke i nærheden af at løfte bevisbyrden. Der var ikke nogen viden om svindel før 2015.

Den svindel, som V6 begik i 2007, gav anledning til en fuld og grundig sagsbehandling og har ingen forbindelse til svindlen i 2014 og 2015.

På tidspunktet for SIR's rapport fra 2010 var der endnu ikke konstateret svindel, og rapporten blev desuden afløst af den senere rapport fra 2013. Rapporten blev forelagt i overensstemmelse med gældende regler, og der skete opfølgning på rapporten, som ikke kunne betegnes som særligt kritisk på daværende tidspunkt. Rapporten havde en karakter, så der skulle gøres noget, men der var ikke aktuel svig. Man skal se den i forhold til risikobilledet i hele

Rapporten førte til nedsættelsen af en arbejdsgruppe, der skulle fokusere på den manglende afstemningsmulighed mellem udbytteangivelsen og indberetningen af udbyttemodtagerne, og disse problemer blev løst gennem blandt andet regelændringer. I forhold til den tekniske behandling af udenlandske aktionærer valgte man at arbejde på en international løsning i OECD under TRACEprojektet, da der var tale om et globalt problem. Det er ikke ansvarspådragende, at man valgte at gå videre med TRACE-projektet, selv om det i sidste ende ikke blev realiseret.

SIR fulgte selv op på rapporten fra 2010 med sin rapport fra 2013, der blev forelagt i overensstemmelse med retningslinjerne. Rapporten fra 2013 var ikke kritisk i forhold til blanketordningen, hvor SIR konkluderede, at kontrolprocesserne var i orden.

Der er ikke noget grundlag for at antage, at opfølgningen på revisionsrapporterne fra 2010 og 2013 trods klare advarsler og anbefalinger i rapporterne var aldeles mangelfuld og bar præg af manglende ledelsesmæssig involvering samt udskydelse eller lukning af punkter til opfølgning uden belæg herfor.

Bech-Bruuns henvisning til SIR's rapport fra 2014 er ikke relevant, idet denne rapport ikke specifikt vedrører opfølgning på udbytteområdet, men den generelle opfølgning på SIR's rapporter.

SIR's rapport fra 2015 blev udarbejdet under stort tidspres i umiddelbar forlængelse af, at man havde opdaget svindlen, og på et tidspunkt, hvor svindlens omfang og den tekniske udførelse endnu ikke var afdækket, herunder om der var tale om anvendelse af forfalskede dokumenter, eller om der var tale om anvendelse af rigtige dokumenter, men med urigtigt indhold. Det hører også med, at rapporten blev udarbejdet på et tidspunkt, hvor man vidste, at der var sket svindel i et meget stort omfang, og at SIR's konklusioner derfor må læses i bagklogskabens lys. Det er iøjnefaldende, at SIR's vurdering af området er meget anderledes end den vurdering, som SIR havde i særligt 2013. Endelig skal man også holde sig for øje, at rapporten ikke er udtryk for en erstatningsretlig vurdering. Hverken SIR eller senere Rigsrevisionen har forholdt sig til sagsbehandlingen af ansøgningerne med dokumentation fra North Channel Bank.

Den omstændighed, at ansvaret for udbytteadministrationen har været fordelt på flere, indebærer ikke, at der ikke er nogen, der er ansvarlige. De enkelte, der har ansvaret for delprocesserne, bærer ansvaret, og det overordnede ansvar er i sidste ende forankret hos direktøren, således som det også anføres af SIR. Det kunne måske have været ansvarspådragende, hvis der slet ikke fandtes nogen, som var ansvarlige, men det var ikke tilfældet. Det er ikke ansvarspådragende, at man har spredt ansvaret ud på flere.

Den af Bech-Bruun fremhævede fejl, der i 2013 og 2014 medførte, at en deklareret ejer og 100 pct. refusion ikke kunne gennemføres i systemet 3S i relation til to børsnoterede selskaber, er ikke udtryk for egen skyld. Det var ét blandt flere hjælpemidler, og den manglende funktionalitet gjorde ikke, at man ikke tjekkede det relevante.

Der er heller ikke forhold i regnskabsgodkendelserne, der indikerer egen skyld. Udsving i refusionerne på udbytteskat blev registreret. Dette skete første gang i den lokale godkendelse for maj 2014, og baggrunden herfor blev undersøgt, hvorefter det plausibelt blev konkluderet, at stigningen i refusioner skyldes, at man modtog flere ansøgninger fra amerikanske pensionsplaner, der i

**827**

stigende grad ejede danske aktier. Dertil kommer, at indtægter fra udbytteskatterne også steg fra 2005 til 2015 (til juni) fra 6,69 til 18,51 mia. kr., altså ca. 177 pct. Refusionerne steg noget mere fra 1,18 til 8,73 mia. kr., altså 640 pct. Det er store stigninger. Man kan også se, at der kontinuerligt er et provenu fra udbytteskatten. Den samlede værdi af det danske aktiemarked var endvidere stigende og nærmede sig 2.000 mia. kr. i 2014 og 2015. Endelig var

regnskabskontrollernes primære funktion i departementet alene at fungere som retningspil på, om de konjunkturvurderinger, der blev udarbejdet tre gange om året, var nogenlunde retvisende. Tallene kunne ikke bruges til en tilbundsgående årsagssammenhængsforklaring.

Borger- og retssikkerhedschefens faktuelle redegørelse fra februar 2016 kan ikke tages til indtægt for, at der skal foretages tilbundsgående udvidet sagsbehandling af alle skattearter på SKAT's område, og at SKAT's sagsbehandling som hævdet af Bech-Bruun har været i strid med det forvaltningsretlige officialprincip. Skattemyndighederne ikke bare kan, men også skal prioritere hensynene. Særligt på udbytteområdet har der været en fornuftig afvejning. Man havde skabt et meget solidt udgangspunkt, hvor der i dokumentationskravene lå en verificering af ansøgers oplysninger. Man prioriterede sagsbehandlingstiden både af hensyn til borgeren og statskassen på grund af risiko for rentebelastning, og samtidig varetog man hensynet til, at Danmark skulle være et attraktivt land at investere i.

Karakteren og omfanget af den kontrol, som SKAT har foretaget af de konkrete ansøgninger, rækker videre end en formel kontrol.

Den hårde kritik i Rigsrevisionens rapport fra 2016 er udtryk for bagklogskab. Rigsrevisionen var selv løbende involveret i området og modtog SIR's rapporter, som ikke førte til nogen bemærkninger fra Rigsrevisionen på daspunkterne eller til forbehold på statens regnskab.

Lovændringen fra 2012 og det anførte i forarbejderne til denne lovændring er uden relevans for denne sag.

*Konkrete ansøgninger*

Bech-Bruun skal ikke kun påpege ansvarspådragende adfærd hos myndigheden. Bech-Bruun skal også godtgøre, at denne adfærd har en sammenhæng med, at der er udbetalt i henhold til de ansøgninger, som blev indsendt med dokumentation fra North Channel Bank. Bech-Bruun har imidlertid ikke kunnet pege på noget som helst i de ansøgninger, som er relevante for bedømmelsen af sagen her, der burde have fået SKAT's medarbejdere til at reagere. Ansøgningerne er vedlagt ægte dokumentation fra to tredjeparter, der verificerer det, som ansøgeren angiver. En bank reguleret af det tyske finanstilsyn, der bekræfter, at der er en aktiebeholdning, og at der er modtaget et nettoudbytte. Og et certifikat fra IRS, der bekræfter oplysningerne om skattepligt i USA. Begge tredjeparter med en naturlig høj troværdighed.

Det er således ikke godtgjort af Bech-Bruun, at selv hvis man havde haft en anden kontrol, ville netop disse ansøgninger være blevet afvist. Det er ikke godtgjort, at der er begået fejl nogen steder i skatteforvaltningen ved behandlingen af disse ansøgninger.

*Forløbet i sommeren 2015*

Bech-Bruun har anført, at SKAT burde have standset udbetalingerne allerede i juni 2015, og i tabsopgørelsen har Bech-Bruun fratrukket alt efter advokatens første henvendelse til SKAT den 16. juni 2015.

Henvendelsen blev behandlet »efter bogen« og gav straks anledning til undersøgelser og henvendelser til blandt andre V6, men der var ikke tale om en »brændende platform«. Det var først, da man fik henvendelsen fra de engelske skattemyndigheder, herunder den 6. august 2015 en liste med 185 selskaber og oplysningerne om forestående angreb mod SKAT den 10. august 2016, at der var et sikkert grundlag for at træffe beslutning om at standse betalingerne af refusion af udbytteskat. SKAT har således ikke udvist egen skyld ved ikke at standse betalingerne på et tidligere tidspunkt. Uanset om SKAT måtte have udvist egen skyld, er Bech-Bruuns adfærd imidlertid så groft uforsvarlig, at en eventuel udvist egen skyld ikke kan tillægges nogen betydning.

*Accept af risiko*

SKAT har ikke ved tilrettelæggelsen af administrationen på udbytteskatteområdet accepteret en risiko, som kan medføre bortfald eller reduktion af Bech-Bruuns erstatningsansvar. Det ville være mærkværdigt, hvis der forelå accept af risiko i alle tilfælde, hvor der alene er risiko for svindel på grund af mulige udfordringer i systemer og kontrolmæssige sammenhænge. Det vil indebære, at erstatning i svigssammenhænge ikke er mulig.

*Tab*

Tabet er det beløb, som Skatteforvaltningen har udbetalt i tillid til de udbyttenotaer, som North Channel Bank udarbejdede som led i den model, som Bech-Bruun rådgav om. I perioden fra den 12. maj 2014 til den 22. juli 2015 blev der således udbetalt i alt 1.135.775.442,18 kr. som følge af refusionsanmodninger fra i alt 27 pensionsplaner. Bech-Bruun har ikke bestridt den beløbsmæssige opgørelse.

Skatteforvaltningens samlede tab udgør 12,7 mia. kr., hvoraf ca. 1,1 mia. kr. (godt 8 pct.) foruden Bech-Bruun er forvoldt af North Channel Bank, en række pensionsplaner og en række andre aktører. Disse aktører er efter dansk rets almindelige regler solidarisk ansvarlige for tabet. Bech-Bruuns indsigelser om, at der skulle gælde en subsidiær hæftelse over for Skatteforvaltningen, er fuldstændigt løsrevet fra virkeligheden og dansk jura. Skatteforvaltningen kan kræve sit fulde tab dækket af hver af skadevolderne, men selvfølgelig ikke mere end

**828**

100 pct. Skatteforvaltningen har derfor udtaget stævning mod disse aktører, inklusive Bech-Bruun.

*Forligsaftalen*

En række aktører i udbyttesagen har henvendt sig til Skatteforvaltningen med henblik på at indgå forlig. Bech-Bruun er ikke en af disse aktører. Skatteforvaltningen har i den forbindelse og som led i sin tabsbegrænsning indgået et forlig, der er af betydning for denne sag. Forliget er et samlet løsning, der er indgået med 61 pensionsplaner, 56 fysiske personer og 102 selskaber. Af disse 61 pensionsplaner indgår kun 26 af denne sags 27 pensionsplaner, der brugte North Channel Bank. Aftalen dækker således en langt større del af udbyttesagen end den del, som Bech-Bruun er ansvarlig for.

Bech-Bruun har forsøgt at karakterisere forliget som usædvanligt. Der er dog intet usædvanligt i, at skadelidte forsøger at dække sit tab. Forliget må tage højde for den internationale og komplekse natur af den svindel, som Bech-Bruun rådgav om. I overensstemmelse med hvad der er sædvanligt, er forliget i denne sag også fortroligt. Det har landsretten også fastslået, idet der alene er afsagt kendelse om en begrænset edition i dele af forliget under denne sag. Skatteforvaltningen har derfor fremlagt dele af forliget, sideaftale til forliget, en interkreditoraftale med blandt andre North Channel Bank og en sideaftale til denne aftale. De to sidstnævnte er ikke en del af forliget, men kan få betydning for kravet mod Bech-Bruun. Disse dele af de pågældende aftaler dokumenterer grundlaget for og størrelsen af kravene mod de enkelte forligsparter, herunder hvilke poster der indgår i forligsbeløbene, vilkår for indbetaling af forligsbeløbet samt oplysninger om forretning. Der er allerede betalt ca. 1 mia. kr. i henhold til forliget.

Forliget dækker over et samlet tab på 2.937.851.407 kr., hvor kravet i denne sag dækker ca. 1,1 milliard altså kun udgør lidt under 37 pct. Forliget omfatter dermed knap 1,8 milliarder, som ikke har noget med North Channel Bank og Bech-Bruun at gøre. Med andre ord vedrører over halvdelen af forliget et helt andet tab.

Betalingsforpligtelsen i forliget er en samlet forpligtelse, og betalingerne på ca. 1 mia. kr. kan derfor ikke direkte henføres til de enkelte forligsparter.

Der er enighed om, at Skatteforvaltningen ikke kan få dækket sit tab to gange, og at kravet mod Bech-Bruun skal reduceres med de

betalinger, som Skatteforvaltningen modtager fra en forligspart, i det omfang betalingen dækker det tab, som Bech-Bruuns er solidarisk ansvarlig for. Bech-Bruun skal derimod ikke krediteres med betalinger, der intet har med Bech-Bruuns skadevoldende handling at gøre.

Et klart udgangspunkt for en fordelingsmekanisme for betalinger i henhold til forliget kan findes ved en fordeling efter hovedstolene i forliget. Det ville altså betyde, at de føromtalte 37 pct. ville blive styrende for en fordeling.

Skatteforvaltningen har imidlertid valgt en fordeling efter mekanismerne i selve forliget. Det er en mere retvisende metode, som stiller Bech-Bruun endnu bedre. Forliget indebærer, at alle parterne skal fralægge sig det refusionsbeløb, som uretmæssigt er blevet udbetalt fra Skatteforvaltningen. Forligsparterne skal dog ikke betale den del, som er betalt til andre aktører, der ikke er en del af forliget. Det er dette, som er beskrevet som nettoprovenuet i forligsaftalens pkt. 2, litra e, nr. 1-4, og det er metoden til opgørelse af grundlaget for samt størrelsen og posterne i forligskravet. Forliget svarer til, hvad der efter amerikansk ret ville skulle betales, hvis Skatteforvaltningen i sine retssager fik medhold i, at pensionsplanernes ansøgninger var uberettigede uden at kunne dokumentere, at der forelå svig.

Fra Skatteforvaltningens side spares således store retssagsomkostninger og procesrisiko. Skatteforvaltningen får deroverfor betalt, hvad der som et blandt flere mulige udfald kan forventes i en retssag. Forskellen mellem nettoprovenuet og bruttoprovenuet kan forfølges hos sagens øvrige aktører, dvs. hos dem som har modtaget de omtalte beløb eller medvirket på andet grundlag.

Det er et rimeligt og objektivt udgangspunkt for opgørelsen af en forligssum. Det er meget misvisende, når Bech-Bruun har forsøgt at udlægge forliget som værende »en særdeles favorabel ordning«. Om ordningen faktisk er favorabel, er imidlertid underordnet for denne sag. Hvis nogen solidarisk ansvarlige er utilfredse med fordelingen, kan de gøre noget ved det. Det følger af princippet om aftalers relativitet, at aftaler ikke har virkning for tredjemand. Bech-Bruun er derfor ikke afskåret fra at søge regres hos Bech-Bruuns medansvarlige. Og omvendt kan Bech-Bruun frit nyde tabsnedsættelsen. Bech-Bruun bliver altså kun stillet bedre ved forligsaftalen. Hvis der ikke var indgået forlig, ville Skatteforvaltningen ikke have modtaget noget beløb, og Bech-Bruun ville som solidarisk skadevolder kunne dømmes for det fulde beløb i denne sag.

Opgørelsen af nettoprovenuet sker med udgangspunkt i et fast beløb på 1,55 mia. kr., som skal betales under alle omstændigheder, og som kan reguleres opad, hvis det viser sig, at forligsparterne har modtaget en større andel af refusionerne end dette beløb. Reguleringen af forligssummen sker ved, at der udarbejdes en nettoprovenuliste, en såkaldt Net Proceeds List, som er en opgørelse over, hvad forligsparterne har opgjort og dokumenteret deres nettoprovenu til. Skatteforvaltningen foretager en kontrol af denne liste, jf. forligets pkt. 2, litra e. Skatteforvaltningen gør gældende, at nettoprovenuet på listen er højere, end hvad forligsparterne selv havde beregnet efter aftalens principper.

**829**

Skatteforvaltningen og Bech-Bruun har sammenfaldende interesser. Skatteforvaltningen har en klar interesse i, at forligssummen er så høj som muligt, og det vil ultimativt reducere kravet, som Bech-Bruun hæfter for. Det totale nettoprovenu ligger mellem ca. 1.728 mio. kr. og 1.765 mio. kr., og det indebærer en forhøjelse af forligsbeløbet fra 1,55 mia. kr. Beløbene er opgjort og dokumenteret på baggrund af en meget stor mængde underliggende dokumenter. Det er også baggrunden for, at det har taget så lang tid at udarbejde en nettoprovenuliste. Ifølge aftalen er det denne liste, der er bestemmende for, at der er spænd i listen, som parterne

skal blive enige om, inden der er en endelig nettoprovenuliste, og der er en proces herfor i forliget. Spændet for det endelige nettoprovenu og dermed forligsbeløbet er man enige om, og det kan Bech-Bruun som tredjemand ikke retmæssigt gøre indsigelser imod. Bech-Bruun har med andre ord ingen retlig interesse i at få indsigt i den betydelige mængde af dokumenter, som nettoprovenulisten er udarbejdet på baggrund af. Bech-Bruuns eventuelle indsigelser imod en sådan opgørelse og fordeling i nettoprovenulisten må altså skulle håndteres som en del af et muligt regreskrav.

Nettoprovenulisten er et egnet instrument til at opgøre og fordele fortjenesten mellem de pensionsplaner, der anvendte North Channel Bank som depotbank, og dem, som ikke gjorde. Listen viser, hvilke poster forliget er opbygget af, og dermed hvor store dele der vedrører eksempelvis North Channel Bank.

Listen viser, at mellem 398,1 mio. kr. og 400,8 mio. kr. kan føres til ansøgninger fra pensionsplaner, der alene har indsendt ansøgninger baseret på udbyttenotaer udstedt af North Channel Bank. Derudover kan mellem 244,3 mio. kr. og 246,5 mio. kr. henføres til North Channel Bank-andelen af ansøgninger fra pensionsplaner, der både har anvendt North Channel Bank og en eller flere andre custodians. North Channel Banks andel udgør altså ifølge forligsparternes opgørelse 642.482.368 kr. ud af 1.728.414.356 kr. Ifølge Skatteforvaltningen udgør andelen 647.306.924 kr. ud af 1.764.762.172 kr. I begge tilfælde udgør andelen således omkring 37 pct., hvilket er meget tæt på den andel, der ville følge af en fordeling efter hovedstolen.

Det betyder altså, at et beløb på mellem 642,4 og 647,3 mio. kr. vil være betalt på den del af kravet, som Bech-Bruun er erstatningsansvarlig for, hvis forligsaftalen opfyldes fuldt ud. Bech-Bruun får dermed krediteret betalinger svarende til den del af forliget, som kan henføres til den del af tabet, som Bech-Bruun er ansvarlig for. Omvendt krediteres Bech-Bruun ikke for betalinger vedrørende den del af forliget, som intet har med Bech-Bruuns ansvar at gøre. Det er meget rimeligt og i overensstemmelse med forligets opgørelse af forligssummen. Og det er en betingelse, som stiller Bech-Bruun bedre end ved andre af Skatteforvaltningens retmæssige alternativer, idet man f.eks. kunne have anvendt betalingerne til forlods at dække renter på kravet.

Kravet mod Bech-Bruun skal kun nedskrives, når og hvis Skatteforvaltningen modtager betaling i henhold til forliget. Forligsparterne har på nuværende tidspunkt faktisk betalt 1.010.139.979,41 kr. Det er disse betalinger, der skal bruges til at nedskrive kravet. Betalingerne kan ikke henføres til nogen af de enkelte forligsparter. Indbetalingerne må derfor være en forholdsmæssig betaling af kravet på 1.728-1.765 mio. kr., hvilket afspejler opgørelsesmetoden for forligsaftalen. Dette indebærer en forholdsmæssig fordeling på ca. 37 pct.

På stævningstidspunktet havde Skatteforvaltningen opgjort North Channel Banks andel af forligskravet til ca. 634 mio. kr., ud af en samlet mindre forligssum på 1.550 mio. kr. Det svarer til en fordeling på ca. 40,93 pct. Dette har Skatteforvaltningen ladet komme Bech-Bruun til fordel. Skatteforvaltningen har således nedskrevet kravet mod Bech-Bruun med 40,93 pct. af den modtagne milliard frem for 37 pct., svarende til ca. 400 mio. kr. Det nedskrevne krav mod Bech-Bruun udgør herefter 722.290.313,77 kr. Det stiller Bech-Bruun bedre end det oplagte udgangspunkt med en fordeling baseret på hovedstolen og også bedre end fordelingen efter den faktiske fordeling af forligskravet, som fremgår af nettoprovenulisten.

Bech-Bruun har ikke kunnet anvise en anden model for, hvordan betalinger i henhold til forliget skal fordeles, og det er hverken et reelt eller et seriøst forslag, at enhver betaling skal bruges til at nedskrive kravet mod Bech-Bruun én til én.

Skatteforvaltningen har fremlagt alle relevante oplysninger, der foreligger på nuværende tidspunkt til brug for opgørelsen i henhold til forliget, og Skatteforvaltningen har i øvrigt tilgodeset Bech-Bruun ved valg af metode. Under de omstændigheder og henset til grovheden af Bech-Bruuns ansvarspådragende adfærd må enhver uklarhed i fordelingen komme Bech-Bruun til skade.

*Letter Agreement og interkreditoraftale*

Ved siden af forligsaftalen er der indgået en såkaldt letter agreement - en sideaftale, hvorefter der også skal ske en særskilt tilbagebetaling af gebyrer, der er tilfaldet North Channel Bank. Beløbet skal mindst udgøre 50 mio. kr. En sådan betaling forudsætter dog, at det er muligt at gennemføre et salg af banken. Der er også indgået en kreditoraftale, hvorefter Skatteforvaltningen også vil modtage 86,97 pct. af salgssummen ved et salg af North Channel Bank. Det beløb til Bech-Bruun blive godskrevet, hvis den indgåede salgsaftale gennemføres. Hvis det ikke sker, går North Channel Bank konkurs.

Baggrunden for kreditoraftalen er at sikre, at statens tab dækkes bedst muligt, idet en konkurs vil føre til en

**830**

beskeden dividende (om nogen), ligesom SØIK's bødekrav vil være efterstillet. Der er således tale om et tiltag, som stiller alle aktører i sagen bedre.

Banken er imidlertid endnu ikke endeligt solgt, og Bech-Bruun blokerer for et salg af banken ved ikke at trække procestilsvarslingen af banken under denne sag tilbage.

Hvis landsretten mod forventning skulle finde, at kravet ikke kan opgøres endeligt på nuværende tidspunkt, kan det ikke føre til, at Bech-Bruun skal frifindes. Det gør ikke Bech-Bruun mindre ansvarlig for det tab, som den danske statskasse har lidt, at Danmark har forsøgt at tabsbegrænse bedst muligt. Skatteforvaltningen skal i så fald have medhold i sin subsidiære eller mere subsidiære påstand.

*Forældelse og passivitet*

Skatteforvaltningens krav mod Bech-Bruun er ikke forældet eller bortfaldet ved passivitet.

Forældelsesfristen er tre år, og fristen regnes i udgangspunktet fra skadens indtræden, jf. forældelseslovens § 2, stk. 4, og § 3, stk. 1. Det for denne sag centrale er imidlertid den almindelige suspensionsregel, der fremgår af § 3, stk. 2.

Skatteforvaltningen blev bekendt med indholdet af Bech-Bruuns rådgivning den 29. juni 2018 (oversat i august 2018). Dette er det tidligste tidspunkt, hvor forældelsen kan løbe fra, og da stævning er indleveret den 8. juni 2020, kan kravet ikke være forældet.

Bech-Bruun har anført, at North Channel Bank blev politianmeldt den 24. august 2016, og at forligsforhandlinger med blandt andet ejerne af North Channel Bank blev indledt allerede i 2016.

Forløbet med North Channel Bank-forhandlingerne strakte sig over lang tid, men de begyndte først i begyndelsen af 2019. SKAT Særlig Kontrol havde inden da fra sommeren 2015 efterforsket udbyttesagen og aktørerne heri med henblik på at søge penge tilbage og foretage politianmeldelser. Man ønskede også at holde involverede erstatningsretligt ansvarlige.

Skatteforvaltningen var imidlertid ikke blevet bekendt med Bech-Bruuns rådgivning og indholdet heraf, før man modtog KPMG-rapporten i sommeren 2018, hvor de to opinions var vedlagt som bilag. Der er ikke noget grundlag for at fastslå, at Skatteforvaltningen var kommet i besiddelse af rapporten tidligere end i sommeren 2018, og der er intet grundlag for at fastslå, at Skatteforvaltningens manglende opfyldelse af opfordringer vanskeliggør Bech-Bruun og landsrettens bedømmelse af spørgsmålet, og at dette forhold skal komme Skatteforvaltningen til skade. Brevet af 6. februar 2017 fra de tyske skattemyndigheder til KPMG i Tyskland ændrer ikke

Tilsvarende gælder mailen 10. oktober 2016 fra de tyske skattemyndigheder til SKAT som svar på SKATs forespørgsel af 5. oktober 2016. I mailen peges der på aktier og volumen samt en tysk bank, som Bech-Bruun og et unavngivent tysk advokatfirma skulle have afgivet en erklæring til.

Dette er ikke tilstrækkeligt til at suspendere forældelsen. Der skal mere til, og man skal herunder kende til indholdet af rådgivningen. Der er tale om et erstatningskrav og først, når man kender til sagens faktum, kan forældelsesfristen begynde at løbe. Skatteforvaltningen skal således kunne konkludere, at der er fejlrådgivet, og at der er årsagssammenhæng. Det kunne man ikke på daværende tidspunkt med de oplysninger, der fremgår af mailen.

Skattestyrelsen forsøgte at få udleveret yderligere oplysninger fra de tyske myndigheder, ligesom man sideløbende forsøgte at få udleveret materiale om

North Channel Bank, herunder ved den anmodning, der synes at have givet anledning til brevet af 6. februar 2017. Efter modtagelsen af mailen af 10. oktober 2016 iværksatte Skatteforvaltningen yderligere undersøgelser. Trods flere rykkere blev materialet imidlertid aldrig udleveret. De tyske myndigheder endte efter halvandet år - i sommeren 2018 - med at afvise at udlevere oplysningerne med henvisning til, at oplysningerne var blevet udleveret til SØIK.

Den omstændighed, at SØIK har fået oplysningerne i 2017, og at de indgår i grundlaget for kendelserne fra Retten i Lyngby, ændrer ikke ved, at materialet ikke er tilgået Skattestyrelsen fra SØIK.

Bech-Bruun har ikke løftet bevisbyrden for, at Skatteforvaltningen har udvist retsfortabende passivitet.

*Rentekravet*

Skatteforvaltningen sendte rentepåkrav den 2. april 2020. Det betyder, at der efter reglen i rentelovens § 3, stk. 2, er krav på renter fra 30 dage derefter, dvs. fra den 2. maj 2020. Det omfatter altså renterne herfra - og dermed også renterne fra sagsanlæg. Det er Skatteforvaltningens principale påstand 3 sammen med den løbende forrentning i påstand 1. Påstand 3 er en beløbsmæssig opgørelse af rentekravet fra netop den 2. maj 2020, hvor forrentning vil starte efter rentelovens § 3, stk. 2, og frem til den 3. september 2021. Det er datoen, hvor Skatteforvaltningen sidst har nedjusteret sin påstand grundet betalinger fra andre end Bech-Bruun. Den løbende forrentning efter den 3. september 2021 er omfattet af Skatteforvaltningens påstand 1.

Opgørelsen af påstanden er ubestridt, men Bech-Bruun gør gældende, at der skal betales renter med en lavere sats eller slet ikke under henvisning til, at kravet er så tvivlsomt, at Bech-Bruun har »god grund« til at afvente retsafgørelse før betaling, og at staten ikke har renteudgifter til finansiering under de nuværende konjunkturer.

Skatteforvaltningens krav er ikke tvivlsomt, og Skatteforvaltningen har krav på renter fra påkrav eller i

**831**

hvert fald fra sagsanlæg. Statens renteudgiftsniveau kan ikke tillægges betydning, når staten skal tilkendes procesrente. Frafaldet af renter i henhold til forligsaftalen med bankens ejer og kunder kan ikke føre til, at Bech-Bruun ikke skal betale lovpligtige renter. Forliget regulerer forholdet mellem parterne og begrænser ikke krav mod tredjemænd.

Skatteforvaltningen gør gældende, at »særlige forhold« begrunder, at Skatteforvaltningens krav skal forrentes fra udbetalingstidspunkterne efter rentelovens § 3, stk. 5, jf. Skatteforvaltningens principale påstand 2. Bech-Bruun er erstatningsansvarlig for rådgivning, der har ført til et milliardtab for den danske statskasse ved strafbart forhold, og det er f.eks. denne situation, der er omfattet af bestemmelsen.

Skatteforvaltningen har desuden henvist til, at Bech-Bruun ikke oplyste om sin rådgivning, ligesom Bech-Bruun vidste, at forudsætningen for rådgivningens relevans var, at staten ville lide tab, og at klienten var i tvivl, om det kunne være strafbart. Bech-Bruuns adfærd i sagen, hvor der er udvist ligegyldighed og sket tilsidesættelse af hensynet til statens interesser, udgør således et særligt forhold, der taler for, at der skal betales renter fra udbetalingstidspunktet.

Skatteforvaltningens rentekrav støttes desuden af den adfærd, som Bech-Bruun udviste i de år, der fulgte efter afsløringen af udbyttesagen og den løbende afdækning af Bech-Bruuns rolle. Bech-Bruun fortsatte med at rådgive North Channel Bank i 2015 og 2017 - også samtidig med udførelsen af en uvildig advokatundersøgelse for Skatteministeriet. Ved disse nye spørgsmål fra North Channel Bank burde alle alarmklokker igen have ringet. Ved et opslag i den gamle sag ville man kunne læse rådgivningen i bagklogskabens lys og med viden om udbyttesagen.

Bech-Bruuns rådgivning kom først for dagen, da skattemyndighederne modtog den udarbejdede legal opinion som bilag til KPMG-rapporten i sommeren 2018. Skattemyndighederne fik ingen oplysninger om hverken Bech-Bruuns korrespondance med Jones Day eller om, at Bech-Bruun skulle have modtaget den tyske masterplan. De oplysninger fik skattemyndighederne først i 2019 og ikke fra Bech-Bruun. I den mellemliggende periode førte Skatteministeriet sag om inhabilitet mod Bech-Bruun ved Advokatnævnet og domstolene, hvor Bech-Bruun påberåbte sig tavshedspligten og derfor ikke gav Skatteministeriet indblik i den korrespondance, der er fremlagt i denne sag. Bech-Bruun kom i stedet med beskrivelser af rådgivningen, som efter Skatteforvaltningens opfattelse ikke er rigtig.

Forløbet viser, hvordan Skatteforvaltningen har været forhindret i at rejse kravet, indtil Skatteforvaltningen fra anden side fik fremskaffet de oplysninger, der gjorde det muligt at rejse et erstatningskrav imod Bech-Bruun.

Skatteforvaltningen har efter sagens omfang og karakter ikke brugt for lang tid på at stævne Bech-Bruun, og man har ikke villet rejse krav, før grundlaget herfor var undersøgt og vurderet. Der er derfor ikke grundlag for hverken helt eller delvist at afvise rentekravet.

*Bech-Bruun*

*Bech-Bruun* har anført navnlig, at Bech-Bruun ikke er del af udbyttesagen, og at der ikke er nogen sammenhæng mellem Bech-Bruuns legal opinion og det bedrageri, som North Channel Bank begik.

Bedrageriet er imidlertid blevet det spejl, hvorigennem Skatteforvaltningen retrospektivt bedømmer sagens faktum i forhold til Bech-Bruun på grundlag af brudstykker og udokumenterede antagelser, herunder mere generelle og urigtige antagelser om kursdannelsen ved udlodninger, om at der ikke kan udstedes to udbyttenotaer i forhold til en og samme aktie, hvilket samtidig er et nyt anbringende, der må afvises af landsretten, jf. retsplejelovens § 363, og om påstået markedspraksis, hvorefter blandt andet aftaler om køb af aktier i 2014 blev opfyldt efter tre dage (T+3) med levering af aktier, og at udbytte blev udbetalt dagen efter (T+4).

*Sagens oplysning*

Sagen har båret præg af Skatteforvaltningens manglende bidrag til sagens oplysning.

Offentlige myndigheder er underlagt almindelige forvaltningsretlige regler og principper også som parter i en retssag, og myndigheder vedkender sig almindeligvis »en naturlig forpligtelse til at medvirke til sagens oplysning«, jf. UfR 1998.16 H. Det er en naturlig forpligtelse, som i særdeleshed må gælde, når myndigheden selv er kravstiller, og kravet er betydeligt.

Inddragelsen af Bech-Bruun som sagsøgt hænger sammen med de aftaler, som North Channel Bank og bankens ejere og kunder har indgået med de danske skattemyndigheder.

Bech-Bruun har under sagens forberedelse fremsat en række opfordringer om både forligsaftalen og kreditoraftalen, som Skatteforvaltningen ikke har ønsket at opfylde, hvilket førte til Bech-Bruuns editionsbegæring af 20. januar 2021. Ved kendelse af 29. september 2021 meddelte landsretten Skatteforvaltningen editionspålæg vedrørende nærmere angivne dele af kreditoraftalen og forligsaftalen. Oplysningerne er nødvendige for at afgøre, hvilke betalinger i henhold til forligsaftalen der hidrører fra pensionsplaner, der har anvendt Dividend Credit Advices udstedt af North Channel Bank i ansøgninger om refusion af udbytteskat, og som således utvivlsomt skal fratrækkes i et krav mod Bech-Bruun. Skatteforvaltningen har valgt ikke at opfylde editionspålægget, idet det fremlagte materiale, hvoraf langt det meste er overstreget, er aldeles utilstrækkeligt hertil.

Editionspålægget er heller ikke opfyldt med oplysningerne i den fremlagte »Net Proceeds List«, der er uden

**832**

dokumentation. Skatteforvaltningen har medgivet, at der foreligger en sådan underliggende dokumentation, men har henvist til, at dokumentationen er omfattende, sagen uvedkommende og undergivet fortrolighed.

Det er efter Bech-Bruuns opfattelse helt uforståeligt, at dette materiale ikke er delt med sagsøgte og landsretten, også henset til editionspålægget.

Der er således fortsat ikke dokumentation for, hvem der har betalt en milliard til skattemyndighederne, eller hvor stor en del der kan henføres til North Channel Bank. Skatteforvaltningen har heller ikke villet oplyse, hvem Bech-Bruun skulle være solidarisk ansvarlig med, ligesom Skatteforvaltningen ikke egenhændigt har villet fortælle, hvem der indgås forlig med, hvem der betaler, og hvad der betales.

I bedømmelsen af den utilstrækkelige opfyldelse af editionspålægget bør landsretten desuden inddrage, at Skatteforvaltningen tidligere har givet forkerte oplysninger om forligsaftalen, herunder antallet af pensionsplaner, der havde anvendt Dividend Credit Advices fra North Channel Bank, og som var parter i forligsaftalen.

Bech-Bruun har ikke noget imod, at advokatfirmaets eksterne korrespondance indgår i sagen, men det forudsætter lighed, som Bech-Bruun ikke har opnået, heller ikke på anden hånd gennem kammeradvokatens datarum, hvortil en brøkdel af materialet er blevet udvalgt.

Skatteforvaltningen har haft ubegrænset adgang til bankens arkiv, mens banken samtidig har nægtet Bech-Bruun enhver adgang.

Banken har til fordel for skattemyndighederne givet afkald på sine advokaters tavshedspligt og senere også til Bech-Bruun, men banken har alligevel nægtet Bech-Bruun adgang til at føre vidne, og staten har i den forbindelse undladt at gøre sin indflydelse gældende.

Staten aftalte fortrolighed med parterne i forligsaftalen og kreditoraftalen, selvom staten samtidig overvejede at rejse krav mod Bech-Bruun, hvor aftalerne ville få betydning.

I sit sammenfattende processkrift fremsatte Skatteforvaltningen et nyt anbringende, som landsretten har afvist at tage i betragtning, og efterfølgende er Skatteforvaltningen fremkommet med nye processkrifter og flere hundrede siders nye bilag. Det nye anbringende er nu under proceduren genfremsat i en ny forklædning. Blandt de nye bilag er desuden mailen af 10. oktober 2016 fra de tyske skattemyndigheder, som går imod alt, hvad sagsøger har hævdet under forberedelsen, og som efter Bech-Bruuns opfattelse godtgør, at Skatteforvaltningens eventuelle krav er forældet. Der er blandt de

Copyright © 2024 Karnov Group Denmark A/S

nye bilag også fremlagt enkeltuddrag fra den korrespondance med amerikanske skattemyndigheder, som man ellers under forberedelsen nægtede indsigt i og fortsat gør i andre dele.

Denne sagsførelse fra Skatteforvaltningens side må indgå ved bevisbedømmelsen af sagens faktum.

*Manglende ansvarsgrundlag*

Grundlæggende foreligger der ikke et ansvarsgrundlag for Bech-Bruun. Hertil kræves culpa.

Skatteforvaltningen skal godtgøre, at Bech-Bruun bedømt i forhold til det konkrete opdrag ikke gjorde, hvad der kan forventes af en advokat. Hertil kræves efter retspraksis, at normbruddet er såvel konkret som væsentligt. Ingen af disse krav er blot tilnærmelsesvis opfyldt.

Det fremgår udtrykkeligt af Bech-Bruuns legal opinion, at North Channel Bank ville modtage udbytte (eller kompensationsbetaling svarende hertil), og at det ville være modtagelsen heraf, som ville begrunde bankens udstedelse af udbyttenota (Dividend Credit Advice).

Til grund for både I's tax opinion og Bech-Bruuns legal opinion ligger således en utvivlsom modtagelse af udbytte. Spørgsmålet i tax opinion er, om betingelserne for at søge den indeholdte udbytteskat refunderet ville være opfyldt (ikke mindst realitet og retmæssigt ejerskab til udbyttet for den amerikanske pensionsplan). Spørgsmålet i Bech-Bruuns legal opinion er, om banken ville have nogen risici i den situation, hvor SKAT på grundlag af en ansøgning udbetaler refusion af udbytteskat, men efterfølgende revurderer den konkrete transaktion og modsat tax opinion kommer frem til, at betingelserne for refusion alligevel ikke er opfyldt, nemlig at det ikke er pensionsplanen, som er retmæssig ejer.

At North Channel Bank rent faktisk valgte at udstede notaer uden overhovedet at have modtaget nogen udbytter (eller kompensationsbetalinger svarende hertil), har intet at gøre med hverken tax opinion eller legal opinion og kan ikke begrunde ansvar for Bech-Bruun.

Grundlæggende anses en advokat ikke i forhold til tredjemand for at have medvirket til gennemførelse af sin klients transaktioner (eller mangel på samme), blot fordi advokaten forinden har rådgivet klienten om klientens retsstilling, eksempelvis afgivet en legal opinion.

Det er urigtigt, når Skatteforvaltningen har anført, at relevansen af Bech-Bruuns legal opinion forudsatte tab for SKAT. Tværtimod er det både velbegrundet og sædvanligt, at en bank søger at afdække sine risici, og det gjaldt naturligvis også i forbindelse med, at North Channel Bank overvejede at udbyde et nyt produkt. A bedømte en situation uden at tage stilling til, om risikoen for tab for staten var sandsynlig eller ej.

I forhold til legal opinions er det fastslået i retspraksis, at en advokats eventuelle ansvar skal bedømmes på grundlag af advokatens opdrag som aftalt med klienten, herunder angivne forudsætninger, jf. UfR 2005.2534 H.

Bech-Bruuns opdrag var at afgive en legal opinion om en tysk banks risici efter dansk ret og som

**833**

underleverandør til et internationalt advokatfirma, som tog sig af de regulatoriske spørgsmål, der henhørte under tysk ret. Bech-Bruuns opdrag og forventningerne til Bech-Bruun efter culpareglen må afgøres med blik herfor.

En legal opinion kan kun påberåbes af klienten, jf. UfR 2005.918 H, og de forbehold, der tages i en sådan legal opinion, kan man støtte ret på, jf. UfR 2005.2037 H. Ligeledes er det fastslået, at en advokat ikke er ansvarlig for forhold, som er dækket af forudsætninger i legal opinion, jf. UfR 2005.2037 H.

Allerede denne højesteretspraksis gør det klart, at der ikke er noget ansvarsgrundlag for Bech-Bruun i anledning af legal opinion af 4.

august 2014. Skatteforvaltningens argumentation er en konstruktion opstillet til lejligheden - en fiktion, som blot vidner om, at Skatteforvaltningens krav er uden retligt grundlag.

Det er således en grundlæggende mangel ved Skatteforvaltningens argumentation - og i øvrigt i strid med skattemyndighedernes senere anbefalinger mod grænseoverskridende skatteunddragelse fra november 2014 - at der ses bort fra Bech-Bruuns opdrag.

Det faldt uden for Bech-Bruuns begrænsede opdrag at bedømme skatteretlige forhold, ligesom det faldt uden for opdraget at vurdere elementer i transaktionsbeskrivelsen, herunder købsaftaler, låneaftaler og terminskontrakter, som også alle kunne være undergivet fremmed ret, jf. afsnit 2 og 7 i legal opinion, såvel som parterne til disse aftaler.

Den omfattende tyske transaktionsbeskrivelse, som Skatteforvaltningen har henvist til i sin argumentation for, at Bech-Bruun har handlet ansvarspådragende ved rådgivning af North Channel Bank, blandt andet fordi man ved en gennemgang af beskrivelsen ville kunne konstatere, at transaktionsmønsteret var cirkulært og uden forretningsmæssig formål, var efter aftale med Jones Day udtrykkeligt ikke en del af det grundlag, som A skulle udarbejde sin legal opinion på, og den tyske transaktionsbeskrivelse er derfor helt uden betydning for sagen.

En yderligere grundlæggende mangel ved Skatteforvaltningens argumentation er, at Skatteforvaltningen forbigår, at Bech-Bruuns legal opinion var en såkaldt »should«-opinion og altså indikerede en vis tvivl og risiko.

Tillige er det en grundlæggende mangel, at Skatteforvaltningen i sin bedømmelse af udvalgte dele af transaktionsbeskrivelsen i afsnit 3 af legal opinion blot ser bort fra afsnit 3.4 og 3.9 såvel som forudsætninger i afsnit 4 og forbehold i afsnit 5 (samt tillige kvalifikationer i afsnit 7).

Forudsætningerne indgår som en afgørende del af legal opinion, og konklusionen heri kan ikke læses løsrevet fra de 13 udtrykkelige forudsætninger, der fremgår af legal opinions afsnit 4.

Forbeholdene i afsnit 5 i legal opinion efterlader ikke tvivl om, hvordan Bech-Bruun havde bedømt situationen, hvis North Channel Banks kunder slet ikke ville eje nogen aktier, eller hvor North Channel Bank ville bekræfte kunders modtagelse af udbytte i form af udbyttenotaer (Dividend Credit Advices), selvom banken aldrig havde modtaget nogen faktisk pengestrøm svarende til udbyttebeløbet, endsige en situation hvor banken ikke blot ville virke som depotbank, men selv begå bedrageri.

Legal opinion efterlader således ingen tvivl om, hvordan Bech-Bruun ville have bedømt bedrageri fra North Channel Banks side med udstedelse af Dividend Credit Advice uden modtagelse af udbytter og uden reelle aktier og reelle pengestrømme.

Skatteforvaltningens krav bygger i øvrigt på en antagelse om, at en advokat, der afgiver en legal opinion, har pligt til at efterprøve faktum og forudsætninger, ligesom advokaten ikke skulle kunne tage forbehold. Den antagelse er grundlæggende forkert, hvilket standardmæssigt fremgår af en legal opinion og således også af Bech-Bruuns legal opinion af 4. august 2014. Hensyn til tredjemand ændrer ikke herpå.

Advokatansvar over for tredjemand kræver noget særligt, jf. UfR 2005.918 H, hvor en advokat ikke havde pådraget sig erstatningsansvar over for investorer ved at afgive legal opinions om et projekt, som viste sig at være uden økonomisk realitet, da det ikke var investorerne, som advokaten havde rådgivet og afgivet legal opinions til.

Skatteforvaltningen henviser for sit vedkommende til højesteretspraksis i sager om selskabstømning. Det har formentlig den baggrund, at der i sagerne blev statueret erstatningsansvar over for skattemyndighederne som tredjemand. Denne retspraksis støtter

Copyright © 2024 Karnov Group Denmark A/S

dog slet Skatteforvaltningens synspunkt. Skatteforvaltningen argumenterer for en betydelig skærpelse af den foreliggende retspraksis i strid med dansk rets almindelige erstatningsregler.

I UfR 2000.365 H om selskabstømning tog Højesteret udgangspunkt i, at handlen med overskudsselskaber ikke var »en normal forretningsmæssig disposition«, og at det måtte fremstå som »en nærliggende mulighed« for sælger og sælgers rådgivere, at der ville ske selvfinansiering, altså at købet af overskudsselskabet ville blive finansieret med selskabets egne midler. Det indebar ifølge præmisserne en tabsrisiko for skattevæsenet som kreditor i overskudsselskabet. Højesteret lagde vægt på, at rådgiverne »anbefalede salget og forestod dets gennemførelse«. Ifølge Højesteret var det »ved salget«, at man forsømte at tage hensyn til skattevæsenets risiko, idet sælger og sælgers rådgivere har intet »reelt« gjorde for at afværge denne risiko. Det var baggrunden for, at Højesteret statuerede erstatningsansvar »ved

**834**

salget af overskudsselskabet«. Det var således rådgivernes involvering i gennemførelsen, som var ansvarspådragende i forhold til skattemyndighederne.

Det ses også af frifindende domme, som ikke blev indbragt for Højesteret, jf. eksempelvis FED 2000.884 V og TfS 2000.732 V samt landsrettens dom vedrørende en revisor gengivet i UfR 2004.2955 H (revisor var ikke inddraget i ankesagen for Højesteret).

I selskabstømmerkomplekset blev også købers bank fundet erstatningsansvarlig, men med en anden begrundelse, jf. UfR 2000.365 H. Banker på købersiden havde således haft positiv viden om overtrædelsen af selvfinansieringsforbuddet, idet disse banker kunne se, at selskabet blev erhvervet for egne midler, og denne lovovertrædelse havde tilmed ifølge Højesteret været »afgørende for bankens risikovurdering«. Ikke desto mindre gjorde bankerne »intet … for at afværge den heraf følgende risiko for tilsidesættelse af skattevæsenets interesser«. Til sammenligning blev banker på sælgersiden frifundet, uanset de udmærket kunne besidde købsaftale og have samme viden som både sælgers rådgivere og købers bank, jf. eksempelvis UfR 2004.3027 H.

Retspraksis i sager om selskabstømning viser, at end ikke positiv viden i sig selv kan begrunde ansvar efter dansk rets almindelige erstatningsregler, idet der hertil tillige kræves enten rådgivning »ved overdragelsen«, altså i forbindelse med den konkrete transaktion, eller en sikring af egne interesser på klar bekostning af tredjemands interesser.

Retspraksis i sager om selskabstømning understreger derfor, at der ikke er et ansvarsgrundlag for Bech-Bruun.

Bech-Bruun havde intet grundlag for at nære mistanke til North Channel Bank, endsige positiv viden om en lovovertrædelse. Bech-Bruun anbefalede ikke kunder i North Channel Bank at gennemføre transaktioner. Bech-Bruun bistod heller ikke ved gennemførelsen af konkrete transaktioner, ligesom Bech-Bruun ingen rolle havde i forhold til de konkrete ansøgninger, som efter det oplyste påførte SKAT et tab. Bech-Bruun gennemgik heller ikke efterfølgende nogen konkrete transaktioner.

Hvad Bech-Bruun i overensstemmelse med sit opdrag gjorde, var alene på et generelt plan og inden for nærmere angivne forudsætninger og forbehold at bedømme juridiske risici for North Channel Bank som depotbank i tilknytning til en model for kundetransaktioner. Bech-Bruun udtalte sig ikke om, hvorvidt transaktioner ville opfylde de skatteretlige betingelser for udbytteskat, ikke mindst i form af retmæssigt ejerskab. Tværtimod tog de juridiske risici, som Bech-Bruun bedømte, udgangspunkt i, at betingelserne (herunder om retmæssigt ejerskab) måtte vise sig ikke at være opfyldt.

Konkret er konklusionen i Bech-Bruuns legal opinion korrekt, og banken ville således heller ikke være ifaldet erstatningsansvar (endsige strafansvar), såfremt banken rent faktisk alene havde virket som depotbank og alene udstedt notaer ved faktisk modtagelse af udbytter og eller kompensationsbetalinger svarende hertil.

Bech-Bruun hverken havde eller burde have haft den ringeste anelse om, at banken skulle have haft til hensigt eller ville være i stand til at gennemføre bedrageri af den art, som banken senere vedtog en betydelig bøde for, jf. herved tilsvarende FED 1999.368 Ø. Der var således den væsentlige forskel til selskabstømmersagerne, at mens selskabstømmersagerne angik en faktisk handel med aktier, var der i nærværende sag tale om ren fiktion, idet der ingen aktier var at handle, og det var helt ukendt for rådgiver. I modsætning til selskabstømmersagerne blev A forholdt oplysninger om selve transaktionen.

Videre må det indgå i bedømmelsen af Bech-Bruun, at Bech-Bruun ikke var involveret i konkrete transaktioner eller ansøgninger om refusion af udbytteskat, mens SKAT i behandlingen af de konkrete ansøgninger herom accepterede helt at undlade materiel kontrol, uanset risici for svig og bedrageri var SKAT og Skatteministeriet bekendt. Det var SKAT og ikke Bech-Bruun, som havde muligheden for at konstatere, at noget var galt med de konkrete ansøgninger. Samtidig var Bech-Bruun uvidende om, at SKAT i strid med gældende regler ikke udførte materiel kontrol, førend der blev udbetalt refusion af udbytteskat.

En grundlæggende forskel til selskabstømning er, at i selskabstømmersagerne lå overskudsselskaberne så at sige inde med SKAT's penge, mens pengene her var i statskassen og undergivet SKAT's kontrol. Risikobilledet her var altså væsentligt mindre end i selskabstømmersagerne.

Bech-Bruun vil ikke kunne ifalde solidarisk ansvar med de kriminelle personer og selskaber, som deltog i bedrageriet, eksempelvis North Channel Bank og personer med tilknytning til banken. En rådgiver, der på et indledende og generelt plan måtte have handlet simpelt uagtsomt, kan ikke pålægges at hæfte solidarisk med kriminelle parter, der har handlet konkret og forsætligt. Skatteforvaltningen har desuden i vidt omfang ikke villet oplyse, hvem Bech-Bruun skulle være solidarisk ansvarlig med.

*Manglende årsagssammenhæng*

Skatteforvaltningen har ikke løftet bevisbyrden for årsagssammenhæng mellem Skatteforvaltningens tab og den rådgivning, der er ydet af Bech-Bruun. Det er således ikke Bech-Bruuns rådgivning, der er årsag til SKAT's tab i form af udbetalinger af 1,1 mia. kr. på grundlag af refusionsansøgninger bilagt udbyttenotaer fra North Channel Bank.

Skatteforvaltningens synspunkt om, at bevisbyrden på grund af klare fejl begået af Bech-Bruun under

**835**

rådgivningen reelt er blevet vendt om, således at bevisbyrden for, at der ikke er årsagssammenhæng, ligger hos Bech-Bruun, har ingen støtte i retspraksis, jf. herved navnlig UfR 2015.2075 H.

Bech-Bruuns legal opinion er slet ikke egnet til at indgå i sammenhæng af konkrete ansøgninger om refusion af udbytteskat. Legal opinion er således ikke afgivet til en kunde med aktier og udbytter, og legal opinion angår ikke en konkret transaktion, ligesom legal opinion ikke vedrører den skatteretlige bedømmelse af en sådan transaktion. Der er således tale om en legal opinion, som ikke angår skatteret, men erstatningsret, og som er afgivet til en bank, som ikke er skattesubjekt i Danmark. Den er ikke afgivet til Skatteforvaltningen, og der er ikke nogen sammenhæng til Skatteforvaltningen som tredjemand i tilknytning til legal opinion.

Den manglende årsagsforbindelse udstilles af Skatteforvaltningens argumentation, som starter og slutter med bemærkningen om, at

North Channel Bank skulle bruge vurderingen til »noget«, men uden at konkretisere, hvad dette »noget« skulle være.

Det må i alle tilfælde være klart, at Bech-Bruuns legal opinion ikke kunne bruges til »noget«, førend den var afgivet den 4. august 2014.

A afgav sin legal opinion den 4. august 2014 ud fra retsstillingen den dag, hvilket var lang tid efter, at produktionen af udbyttenotaer var sat i gang og også lang tid efter, at mange ansøgninger var sendt i maj 2014, og store refusioner var udbetalt og tab lidt at SKAT, omend endnu ikke erkendt.

Den tidsmæssige udfordring har Skatteforvaltningen søgt løst ved i stedet at henvise til udkast af 5. maj 2014 til legal opinion, som Jones Day har fremsendt til North Channel Bank.

Dette må imidlertid afvises, allerede fordi dette femte udkast slet ikke blev delt med Bech-Bruun. Herudover kan underskrivelse, som først skete den 4. august 2014, på ingen måde behandles som en formalitet, ligesom det i øvrigt fremgår af sammenhængen, at legal opinion ikke var endelig, førend underskrivelsen havde fundet sted.

Et udkast til en legal opinion er ikke en legal opinion. Udkastet af 5. maj 2014 var udarbejdet af Jones Day, og Bech-Bruun havde på dette tidspunkt ikke afsluttet sin rådgivning, hvilket også kommer til udtryk ved, at Jones Day efter den 5. maj 2014 vendte tilbage og bad A om at underskrive og afgive legal opinion, hvilket skete den 4. august 2014.

At udkastet af 5. maj 2014 skulle have været af central betydning for banken, modsiges i øvrigt også af, at banken ikke kunne lokalisere noget udkast, da KPMG spurgte. Hvis udkastet af 5. maj havde været opfattet som væsentligt for North Channel Bank, ville banken have gemt det og været i stand til at præsentere det, da der blev spurgt.

Den manglende årssammenhæng viser sig også på anden måde end i en tidsmæssig sammenhæng. Legal opinion handler således om en tysk banks risici mere generelt i forhold til et nyt produkt, og den indgår i sammenhæng med blandt andet en tysk legal opinion. Det viser, at eventuel anvendelse af legal opinion har at gøre med regulatoriske forhold i Tyskland - og på produktniveau snarere end på transaktionsniveau.

Der er heller ikke noget grundlag for at hævde, at ansøgningerne ikke ville være blevet indsendt i fravær af Bech-Bruuns legal opinion. Tværtimod fremgår det af sagens oplysninger, at North Channel Banks planlægning af bedrageriet var sat i værk mere end et halvt år før, at Bech-Bruun overhovedet blev kontaktet, ligesom en tysk legal opinion fra Jones Day (med danske og belgiske opinions vedhæftet) efter det oplyste ikke var et tema før januar 2014.

Bech-Bruuns legal opinion skulle ikke bruges over for danske myndigheder og er heller ikke anvendt i Danmark. Tværtimod ville SKAT have foretaget udbetalingerne i anledning af ansøgninger fra kunder i North Channel Bank, selvom Bech-Bruun ikke havde afgivet nogen legal opinion.

Den blev således ikke brugt i forbindelse med ansøgninger til SKAT og var slet ikke afgivet til eller delt med ansøgere, Y eller reclaimagenter, og den var også uegnet til at blive delt med danske myndigheder, fordi den angik fortrolig rådgivning om risici for en bank og ikke en ansøger i den tænkte situation, hvor SKAT ville finde, at ansøger, pensionsplanen, ikke var retmæssig ejer.

Der er heller ingen indikation af, at legal opinion skulle anvendes internt i den tyske bank for at overbevise nogen om, at man kunne give sig i kast med transaktionerne - og i hvert fald ikke i forhold til bankens ledelse, som var gået i gang med et velplanlagt bedrageri, og som til formålet anvendte andre e-mailadresser end bankens.

Der er heller ikke noget, som indikerer, at legal opinion skulle bruges over for uindviede medarbejdere i banken, som der var et

behov for at overbevise for eksempel i compliance eller en anden kontrolfunktion. Det støttes også af, at legal opinion blev bestilt af bankens direktion i overensstemmelse med den milestone-plan, som Skatteforvaltningen har henvist til. Hvis det havde været compliance eller en anden kontrolfunktion, som havde haft behov for legal opinion, ville anmodningen være udgået derfra og ikke fra direktionen. Det er også en kendsgerning, at compliance ikke var et fokuspunkt for banken.

I stedet syntes legal opinions at have været et beredskab til ekstern brug over for tyske myndigheder, sådan som man efterfølgende forgæves forsøgte fra bankens side i forbindelse med BaFins henvendelse af 17. juni 2015.

**836**

Legal opinion var således del af et cover up, men har ikke været bestemmende for banken. Det kan lægges til grund, at banken havde gjort, som den gjorde, også selvom legal opinions ikke var kommet efterfølgende. Intet tyder på, at legal opinions var en nødvendig milestone for at igangsætte bedrageriet.

Meget tyder endelig på, at North Channel Bank var én blandt flere kanaler, og at bedrageriet ville have fortsat med andre custodians, hvis Bech-Bruun eller Jones Day ikke havde afgivet legal opinions. Også af denne grund er der ikke støtte for Skatteforvaltningens synspunkt om årsagssammenhæng.

Det papirspor, der blev efterladt i North Channel Bank, siger heller ikke noget om årsagssammenhæng.

*Manglende påregnelighed*

Skatteforvaltningens tab var ikke påregneligt for Bech-Bruun.

Grundlæggende har Bech-Bruuns afgivelse af legal opinion til North Channel Bank ikke øget den fare eller risiko, som var forbundet med SKAT's forvaltning af ansøgninger om refusion af udbytteskat, og slet ikke når der henses til North Channel Banks vedtagelse af bøde for bedrageri, som i sig selv er et upåregneligt forhold, jf. herved også afsnit 6.3.1 i legal opinion. Strafbart forhold vil normalt fritage for erstatningsansvar på grund af manglende påregnelighed.

A bedømte et muligt strafansvar for banken, men det angik medvirken til skattesvig, ikke bedrageri. Det tab, som Skatteforvaltningen har lidt som følge af North Channel Banks bedrageri, er ikke en følge af Bech-Bruuns legal opinion, og det er slet ikke en påregnelig følge.

North Channel Bank handlede i strid med, hvad banken oplyste til Jones Day og Bech-Bruun og i strid med, hvad der stod i legal opinion, både hvad angår faktumbeskrivelsen heri (pkt. 3.4) og forudsætningerne, herunder f.eks. forudsætning nr. 5 om ejerskab eller ret til udbytte, nr. 10 om virke alene som depotbank og normale procedurer for depotbanker og nummer 11 om standardgebyrer. Bedrageriet udviklede sig således ikke i en retning svarende til Bech-Bruuns legal opinion. Det var ikke påregneligt for Bech-Bruun, at North Channel Bank ville indgå i »transaktioner«, som ikke var forenelige med den aftalte beskrivelse i Bech-Bruuns legal opinion, eller at North Channel Bank ville gøre dette i en anden rolle end som depotbank, endsige at North Channel Bank ville udstede urigtige udbyttenotaer.

Ansøgningerne angår desuden påståede aktiebesiddelser, som var både enorme og helt urealistiske, såvel bedømt ud fra pensionsplanernes som North Channel Banks karakter, hvilket også har været bemærket af SØIK. Der er tale om 82 ansøgninger, som samlet ville forudsætte aktiebesiddelser for et meget stort milliardbeløb. Det kan man sammenholde med, at A ikke vidste, om der overhovedet skulle være tale om mere end en enkelt eller nogle få transaktioner.

Der er tillige et voldsomt misforhold mellem det salær på 14.650 euro, som Bech-Bruun modtog for udarbejdelse af legal opinion, og størrelsen af det rejste krav.

Den manglende påregnelighed har herudover også støtte i Skatteforvaltningens forligsaftale med pensionsplaner og andre formodede svindlere, der efter det oplyste alene er blevet afkrævet deres egen berigelse svarende til omkring halvdelen af det refunderede beløb fra SKAT, endda uden tillæg af renter. En lige behandling af Bech-Bruun indebærer en reduktion af erstatningskravet til det faktisk modtagne beskedne salær fratrukket omkostninger.

*Forældelse*

Forældelsesfristen for det krav, som Skatteforvaltningen har rejst mod Bech-Bruun er tre år, og fristen regnes i udgangspunktet fra skadens indtræden, dvs. udbetalingen af refusion af udbytteskat, som fandt sted i perioden fra den 17. juni 2014 til den 6. august 2015.

Stævningen af 8. juni 2020 blev dermed udtaget lang tid efter udløbet af forældelsesfristen, og Skatteforvaltningen har ikke fremlagt dokumentation for, at forældelsesfristen har været suspenderet efter § 3, stk. 2, i forældelsesloven, eller at kravet i øvrigt ikke er forældet ved passivitet.

Retspraksis viser ingen sympati for kreditorer, som ikke rettidigt har forfulgt krav, når de faktisk har haft kendskab til de omstændigheder, som kunne begrunde et muligt krav. Det gælder, selvom kreditor måtte være en offentlig myndighed. Tærsklen er ikke høj, jf. UfR 2010.277 H og UfR 2017.2023 H.

Konkret i forhold til North Channel Bank selv har SKAT ikke været i undskyldelig uvidenhed om hverken kravet eller banken fra den 24. august 2016, hvor SKAT selv politianmeldte banken.

I forhold til det rejste krav mod Bech-Bruun er det afgørende, hvornår SKAT ikke længere var i undskyldelig uvidenhed om, at Bech-Bruun havde rådgivet North Channel Bank i forhold til transaktioner i udbyttesagen. Afgørende er altså, hvornår sagsøger fik at vide eller burde have forstået, at Bech-Bruun havde rådgivet North Channel Bank omkring bankens involvering i transaktioner omfattet af udbyttesagen.

Det er ikke som hævdet af Skatteforvaltningen først med modtagelsen den 29. juni 2018 af KPMG's rapport af 29. juni 2016, at Skatteforvaltningen fik eller burde have fået kendskab til Bech-Bruuns rådgivning og det potentielle erstatningskrav.

Ved vurderingen af dette spørgsmål er mailen af 10. oktober 2016 fra de tyske myndigheder til SKAT afgørende. Denne mail, der fremkom knap ti måneder efter SKAT's tredje politianmeldelse af 24. august 2016 mod blandt andre North Channel Bank, indeholder

**837**

oplysninger af et sådant indhold og en sådan karakter sammenholdt med de øvrige for SKAT tilgængelige oplysninger, at der ikke kan være tvivl om, at den vedrører North Channel Banks aktiviteter under udbyttesagen. V3, der var medunderskriver på politianmeldelsen og gennem længere tid havde været beskæftiget med sagen, har forklaret, at han også modtog denne mail. Det er åbenbart, at mailen handlede om North Channel Bank, og det må SKAT i oktober 2016 have indset - eller burde i hvert fald have indset. Hvad SKAT fik med mailen af 10. oktober 2016 var således essensen af KPMG's rapport i form af oplysningen om, at Bech-Bruun havde rådgivet North Channel Bank omkring bankens involvering i transaktionerne. Det er således forkert, når Skatteforvaltningen i stævningen, replikken, processkrift 1 og det sammenfattende processkrift har anført, at SKAT først med modtagelsen af KPMG-rapporten i juni 2018 fik oplyst, at North Channel Bank var blevet rådgivet af Bech-Bruun omkring bankens involvering i de for sagen

omhandlede transaktioner. Det fik SKAT ord til andet at vide i oktober 2016, og fra det tidspunkt løb forældelsesfristen.

Det kan ikke begrunde suspension af forældelsesfristen, at V3 ikke på daværende tidspunkt gjorde sig nærmere overvejelser om, hvem banken kunne være eller undersøgte dette nærmere. Tilsvarende gælder i forhold til SKAT's efterfølgende forsøg på at indhente supplerende oplysninger fra de tyske myndigheder. De tyske myndigheder delte således den 10. oktober 2016 fuldt tilstrækkelige oplysninger til, at SKAT måtte konkludere, at der var et potentielt krav mod Bech-Bruun.

Et eventuelt krav mod Bech-Bruun er derfor forældet.

*Accept af risiko*

Skattemyndighederne har accepteret risikoen for, at der kunne ske svindel med refusion af udbytteskat. Dette er belyst ved de undersøgelser af udbytteadministrationen, der blev iværksat efter offentliggørelsen af den formodede svindel i august 2015, og som indeholder en sønderlemmende kritik af udbytteadministrationen og kontrollen på området.

Allerede i forbindelse med et notat af 29. september 2006 til direktionen i SKAT om den såkaldte TDC-sag blev det anført, at ikke var muligt at se, hvem der var modtager af udbytterne. Det blev også drøftet på et møde den 9. oktober 2006 i udbytteadministrationen, ligesom spørgsmålet om administrationen på udbytteområdet blev behandlet i SKAT's problemkatalog af 7. november 2006. I notat af 5. september 2007 blev det blandt andet anført, at udbytteadministrationen stort set tilbagebetaler indeholdt dansk udbytteskat i henhold til dobbeltbeskatningsoverenskomster uden (mulighed for) at kontrollere andet, end at den begrænsede skattepligt er attesteret. Denne svigsrisiko, der var lagt åben frem, blev accepteret i SKAT. Gennem årene fastholdt skattemyndighederne denne accept af risiko. Selvom spørgsmålet blev overvejet fra tid til anden, blev der ikke reelt foretaget noget for at imødegå risikoen, der blev gentaget i Skatteministeriets Interne Revisions rapport fra 2010. Den arbejdsgruppe, der blev nedsat på baggrund af rapporten fra 2010, forholdt sig således ikke til risikoen for svig. En lovændring i 2012, hvor Folketinget blev stillet i udsigt, at det måtte forventes, at skattemyndighederne fremover ville øge fokuseringen og kontrollen vedrørende tilbagebetaling af kildeskatter for at sikre, at der ikke skete uretmæssig tilbagebetaling af udbytterefusion, førte ikke til, at det blev indført kontrol på området. Skatteministeriets Interne Revisions rapport fra 2013 førte - trods stigende refusioner - heller ikke til, at der blev indført kontrol på udbytterefusionsområdet, idet man reelt henholdt sig til et eventuelt kommende samarbejde i OECD.

Skatteministeriets egen efterfølgende evaluering af indsatsen på udbytteområdet samt Rigsrevisionens og statsrevisorernes konklusioner vidner om, at man har accepteret risikoen, og at forvaltningen på området blev tilregnelig for SKAT har været uforsvarlig.

Den uforsvarlige forvaltning på udbytteskatteområdet kan tilregnes SKAT, og det var en direkte følge af den uforsvarlige forvaltning, at der kunne svindles som sket.

I den situation kan man ikke senere vende sig mod en rådgiver og på grundlag af culpareglen og en påstået uagtsomhed få dækket det hul i statskassen, som realiseringen af denne risiko har efterladt. Det gælder i særdeleshed ikke, når man i 2012, før svindlen startede, forsikrede folketing og offentlighed om, at man bestemt udførte kontrol og ville øge fokus på det.

Skatteforvaltningen kan ikke undskylde sig med myndighedernes prioritering af ressourceanvendelse - i særdeleshed ikke i en sag som denne, hvor det er Skatteforvaltningen selv, som er kravstiller. Dansk rets almindelige erstatningsregler giver ikke hjemmel til at uddelegere eller privatisere myndighedsopgaver såsom kontrol af

ansøgninger og heller ikke den økonomiske risiko forbundet hermed.

Indførelsen af nye kontrolforanstaltninger i marts 2016 i forbindelse med genoptagelse af refusion af udbytteskat har også vist, at det var muligt nemt og hurtigt at etablere et kontrolsystem, der i langt højere grad sikrede SKAT mod uberettiget at refundere indeholdt udbytteskat. Dette burde være sket langt tidligere.

*Egen skyld*

Skatteforvaltningens har udvist egen skyld ved en kombination af undladelser og handlinger. SKAT foretog ingen reel kontrol og havde ingen adækvate reaktioner på de mange advarsler, som blev fremsat. SKAT behandlede de modtagne ansøgninger og sendte pengene til ansøgerne - eller rettere til de fire reclaim-agenter, som var de eneste, SKAT var i kontakt med.

### 838

Konkret skal SKAT's accept af risiko og egen skyld over en periode på hen ved ti år sammenlignes med A's adfærd i forbindelse med udarbejdelse af legal opinion, som pågik over et halvt år og med langt færre oplysninger.

I forhold til SKAT er der en lang række andre forhold, som, hvis de havde været håndteret på en forsvarlig måde, hver især ville have forhindret svindlen eller i hvert fald - hvis den ikke helt var undgået - ville have ført til, at den var konstateret på et væsentlig tidligere tidspunkt, og før North Channel Bank overhovedet gik i gang i foråret 2014.

Skatteministeriet levede ikke op til de formelle kontrolkrav, der følger af Skatteministeriets regnskabsinstruks, og der blev slet ikke foretaget en materiel kontrol, selvom dette var et krav efter såvel regnskabsinstruksen som almindelige forvaltningsretlige regler, herunder legalitetsprincippet og officialmaksimen.

Den konkrete sagsbehandling af de enkelte ansøgninger var desuden mangelfuld. Ingen af ansøgningerne indeholdt således en certificering fra den udenlandske skattemyndighed til bekræftelse af, at »the beneficial owner is covered« af den relevante dobbeltbeskatningsoverenskomst, jf. herved § 22, stk. 2, litra e, i dobbeltbeskatningsoverenskomsten mellem USA og Danmark. SKAT's accept af alene at modtage et skattecertifikat som forklaret af V4 og V6 levede ikke op til dette krav. Når SKAT forlod sig alene på dette certifikat og så stort på blankettens forventning om en certificering i forhold til dobbeltbeskatningsoverenskomsten, var der tale om en klar og væsentlig mangel. Certifikaterne fra skattemyndighederne kom desuden i forskellige former, herunder et stort antal med angivelsen »void«, uden at det gav anledning til kontrol eller tilbagesendelse af ansøgningerne. Også fuldmagtsdokumenterne, der alle er baseret på fuldmagter udstedt af Y burde også have givet anledning til undren og nærmere undersøgelse hos SKAT. Efter V4's og V6's forklaringer er det imidlertid ubetænkeligt at konkludere, at fuldmagtsforhold og tegningsregler ikke indgik i kontrollen trods kravet i regnskabsinstruksen om at kontrollere dokumenters ægthed og gyldighed som led i formel kontrol. Det burde også have givet anledning til overvejelse, at Y forenede en lang række helt ukendte pensionsplaner. Ansøgningerne, som North Channel Bank var involveret i, angik desuden udbytterefusion vedrørende de samme syv danske selskaber, ligesom aktiebesiddelserne fremstod meget ensartede.

Der var således tale et systemisk problem. Udbytteadministrationen blev opfattet som et bogholderikontor og opgaven som en tasteopgave.

V6 accepterede alle ansøgninger og forestod en bevidstløs stempling, således som det af V6 også fastslået i landsrettens dom af 23. maj 2018 i straffesagen mod ham. Der var tale om en groft uforsvarlig ordning, hvor man lod en enkelt HK-medarbejder uden

nogen monitorering være alene om at behandle og imødekomme ansøgninger med udbetalinger.

Det er også udtryk for egen skyld, at SKAT's sagsbehandler V6 var kriminel og derfor uegnet til at være ansat i SKAT.

Simple talanalyser ville desuden have vist, at der var noget helt galt i udbytteadministrationen. Svindlens andel af de samlede refusioner i blanketordningen udgjorde 89 pct. i 2012-2015 og 95 pct., hvis man ser på 2014 og 2015 alene. I 2010-2012 var bankordningen mere end dobbelt så stor som blanketordningen, men i 2013, hvor svindlen for alvor tog fat, blev bankordningen overhalet af blanketordningen, og den eksploderede i 2014 og 2015. I 2014 var blanketordningen mere end dobbelt så stor som bankordningen, og i 2015 - til og med 6. august, hvor man iværksatte udbetalingsstoppet - var blanketordningen otte gange så stor som bankordningen. Refusionsprocenten steg fra omkring 11-12 pct. i 2010 og 2011 til 17 pct. i 2012 og til lige under 50 pct. i 2014 og 2015.

Forløbet i sommeren 2015 var også udtryk for egen skyld fra skattemyndighedernes side og fører til, at der ikke er noget tab, der kan kræves erstattet af Bech-Bruun.

De udbetalinger, som fandt sted efter den første henvendelse fra advokaten om mulig svindel, det vil sige udbetalinger efter den 16. juni 2015, er således fortabt ved egen skyld. Anmeldelsen fra advokaten angiver klart, at der er tale om en igangværende svindel, der indebærer, at der skal handles hurtigt, og skattemyndighederne burde have reageret langt hurtigere, end tilfældet var ved først at standse betalingerne i august 2016.

*Tabsopgørelse og editionspålæg*

Det tab, som Skatteforvaltningen har lidt, kan ikke gøres gældende mod Bech-Bruun.

Det krav, som Skatteforvaltningen gør gældende mod Bech-Bruun, tager udgangspunkt i, at der i perioden fra den 17. juni 2014 til den 6. august 2015 i refusion af udbytteskat blev udbetalt i alt 1.135.775.442,18 kr. til amerikanske pensionsplaner, som i deres ansøgninger havde anvendt en Dividend Credit Advice udstedt af North Channel Bank. Herfra har Skatteforvaltningen fratrukket 413.485.128,41 kr. i anledning af betalinger i henhold til forligsaftalen fra maj 2019, hvorefter kravet er opgjort til 722.290.313,77 kr. (med tillæg af renter).

Bech-Bruun har ikke grundlag for at anfægte den talmæssige opgørelse af det udbetalte beløb på i alt 1.135.775.442,18 kr., men dette beløb indebærer på den anden side ikke dokumentation af et tab, som Skatteforvaltningen kan kræve dækket af Bech-Bruun.

A's legal opinion blev afgivet den 4. august 2014, og tab lidt før dette tidspunkt kan derfor ikke gøres

### 839

gældende over for Bech-Bruun. Der skal således ses bort fra ansøgninger fra før den 4. august 2014. Det betyder, at der skal fratrækkes et beløb på 282.329.482,50 kr.

SKAT burde endvidere have standset udbetalingerne straks, at man fik den konkrete henvendelse fra advokaten, og senest den 16. juni 2015. Det betyder, at udbetalinger foretaget efterfølgende ikke udgør tab, som kan gøres gældende mod Bech-Bruun. Dette beløb udgør 317.898.703,83 kr.

Allerede som følge af disse periodiseringer skal Skatteforvaltningens samlede udbetalinger på 1,1 mia. kr. i en tabsopgørelse reduceres med 282 mio. kr. for tiden før den 4. august 2014 og med 318 mio. kr. for tiden efter den 16. juni 2015. Det bringer beløbet fra 1,1 mia. kr. ned til 600.228.186,33 kr.

Herudover skal SKAT's krav reduceres på grund af det forlig, som skattemyndighederne har indgået. Bech-Bruun kender ikke det endelige forligsbeløb, men Skatteforvaltningen har oplyst, at der i henhold til aftalen er betalt lidt over 1 mia. kr. Bech-Bruun har imidlertid ikke fået dokumentation for, hvor stor en del af

denne betaling, der kan føres tilbage til brug af udbyttenotaer fra North Channel Bank, herunder i første række de 27 pensionsplaner, som brugte sådanne udbyttenotaer.

Af den modtagne milliard allokerer Skatteforvaltningen imidlertid 413 mio. kr. til pensionsplaner, som anvendte udbyttenotaer fra North Channel Bank. Ifølge sagsøger skal det resterende beløb yderligere reduceres med 413 mio. kr., dvs. fra 600 mio. kr. til 187 mio. kr. Bech-Brun kan imidlertid ikke vide, at reduktionen ikke er større og i princippet rækker op til den fulde milliard, idet der ikke er nogen dokumentation for den fordeling, som Skatteforvaltningen har foretaget på de enkelte custodians, herunder North Channel Bank. Dermed kan et tab heller ikke godtgøres over for Bech-Bruun, idet den allerede modtagne forligssum på 1 mia. kr. overstiger det beløb, som overhovedet ville kunne indtales som tab over for Bech-Bruun. Uden nogen dokumentation for, hvad net-toprovenuet er for pensionsplaner, der har anvendt North Channel Bank, og uden dokumentation for, hvad der er betalt af de enkelte forligsparter, må hele det beløb, der er betalt, henføres til North Channel Bank og dermed fradrages i kravet mod Bech-Bruun, hvilket vil sige det fulde beløb på lidt over 1 mia. kr.

I det omfang der er indgået et forlig med reclaimagenterne, som har taget sig af ansøgninger, der vedrører North Channel Bank, såvel som ansøgninger, der vedrører andre custodians, må en del af forligsbeløbene skulle henføres til North Channel Bank og dermed fradrages i kravet mod Bech-Bruun. Dette - da eventuelle andre forligsaftaler som Bech-Bruun ikke kender til - fører også til, at Skatteforvaltningens tabsopgørelse ikke kan lægges til grund.

Der er derfor ikke dokumenteret et tab, som Skatteforvaltningen kan gøre gældende mod Bech-Bruun.

*Tabsbegrænsningspligt og subsidiære påstande*

Skatteforvaltningen har forsømt at iagttage sin tabsbegrænsnings-pligt og er også af den grund afskåret fra at gøre krav gældende mod Bech-Bruun.

Tilbagesøgning af de beløb, som skattemyndighederne uberettiget har udbetalt, må i det hele gå forud for et erstatningskrav mod Bech-Bruun, og krav mod Bech-Bruun må forudsætte, at Skatteforvaltningen har dokumenteret, at tilbagesøgning ikke har været mulig. En sådan dokumentation foreligger ikke.

Hertil kommer, at forligsaftalen fra maj 2019 i sig selv udgør en tilsidesættelse af tabsbegrænsningspligten.

Bech-Bruun har nedlagt en subsidiær påstand om frifindelse for tiden og har gjort gældende, at der under alle omstændigheder ikke på nuværende tidspunkt er det fornødne grundlag for at pålægge Bech-Bruun at betale erstatning.

En dom over Bech-Bruun - og Bech-Bruuns opfyldelse deraf - må således antages at ville have den konsekvens, at eksempelvis Skatteforvaltningens forligsparter kunne undlade at foretage yderligere betaling i henhold til forligsaftalen, idet Skatteforvaltningen i modsat fald ville opnå dobbelt dækning for sit krav. Henset til, at Skatteforvaltningen allerede har et ubetalt krav mod forligspar-terne, og den foreliggende kriminalitet skal beløbet i første række søges opkrævet hos de formodede svindlere, før et eventuelt krav kan rettes mod Bech-Bruun, jf. herved også princippet i UfR 2000.2267 H.

Den subsidiære påstand, som Skatteforvaltningen har nedlagt i processkrift 3 af 19. november 2021, er med sin henvisning til »skadevirk til North Channel Bank« ubestemt og mere favnende end Skatteforvaltningens anbringender. Påstanden bør derfor afvises. Subsidiært bør Bech-Bruun frifindes for påstanden, ligesom Bech-Bruun bør frifindes for den mere subsidiære påstand nedlagt i processkrift 4 af 17. december 2021.

*Renter*

Der er intet grundlag for at anvende rentelovens § 3, stk. 5, i overensstemmelse med Skatteforvaltningens påstand herom.

Derimod er det nærliggende at anvende rentelovens § 5, stk. 3, til helt at ophæve renterne under henvisning til princippet også udtrykt i forarbejderne til gældsbrevsloven (som før renteloven indeholdt regler om procesrente) vedrørende tilfælde, hvor et krav er så tvivlsomt, at skyldneren kan have god grund til at afvente en retsafgørelse inden betaling. Det gælder med særlig styrke i forhold til staten, som ikke under de nuværende konjunkturer har renteud-gifter til finansiering.

Bech-Bruun har endvidere anført, at Skatteforvaltningens afkald på forrentning i forhold til bankens ejere

**840**

og kunder må tillægges virkning også for Bech-Bruun. Det bør ikke accepteres, at Skatteforvaltningen med den ene hånd har tilbudt de formodede svindlere lempelige vilkår, herunder rentefrihed, mens Skatteforvaltningen forlanger, at Bech-Bruun skal behandles, som om det var Bech-Bruun, der havde været skyldig i bedrageriet.

I alle tilfælde er der ikke noget grundlag for at forlange et eventuelt erstatningskrav forrentet fra et tidligere tidspunkt end sagens anlæg, jf. herved rentelovens § 3, stk. 3. Det er ikke Bech-Bruun, der har begået bedrageri, ligesom der ikke har været nogen berigelse eller anden likviditetsfordel for Bech-Bruun. Endvidere har Skatteforvaltningen først fremsat krav seks år efter de uberettigede udbeta-linger, hvilket skal sammenholdes med skattemyndighedernes ac-cept af risiko og den udviste egen skyld.

## Landsrettens begrundelse og resultat

Sagen angår et erstatningskrav fra Skatteforvaltningen mod Bech-Bruun I/S i anledning af den rådgivning, som advokat A ydede North Channel Bank i 2014 vedrørende et muligt ansvar for banken ved at medvirke til et påtænkt skattearrangement med refusion af dansk udbytteskat. Advokat A kommunikerede herom med advo-kater fra advokatfirmaet Jones Days tyske afdeling.

På daværende tidspunkt refunderede SKAT indeholdt dansk ud-bytteskat efter ansøgning vedlagt dokumentation for udbetaling af udbytte med indeholdt dansk udbytteskat samt dokumentation for, at udbyttemodtageren var omfattet af en dobbeltbeskatningsove-renskomst, hvorefter udbyttet ikke var skattepligtigt i Danmark. Det var et helt centralt element for refusion, at der forelå en udbyt-tenota (Dividend Credit Advice).

Allerede efter den indledende mail af 3. februar 2014 fra advokat H og A's svar herpå samme dato og opdraget er det klart, at A's opgave var at vurdere North Channel Banks mulige straf- eller er-statningsansvar ved at udstede en Dividend Credit Advice, herunder ved at der i arrangementet ville blive udstedt to Dividend Credit Advices for samme udbytte, hvorved der ville være risiko for, at der ville blive søgt og udbetalt dobbelt refusion af udbytteskat. North Channel Banks mulige ansvar ville være mest nærliggende, hvis modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, ikke skattemæssigt ville være rette udbyttemod-tager.

A havde således allerede fra opgavens start en særlig anledning til at udvise forsigtighed ved sin rådgivning. Rådgivningen, der må betegnes som modelrådgivning, må derfor bedømmes efter en skærpet culpanorm. SKAT (senere Skatteforvaltningen) vil som skadelidt kunne gøre et sådant culpaansvar gældende, selv om rådgivningen er ydet over for opdragsgiver, men der foreligger ikke herudover nogen særlig forpligtelse til at varetage SKAT's interes-ser.

A underskrev og afgav den 4. august 2014 en erklæring (Danish Opinion), i form af en legal opinion, som North Channel Banks forhold i skattearrangementet. Efter mailkorrespondancen den 5.

maj 2014 og den efterfølgende mail af 23. juni 2014 fra K og A's fakturering samme dag må det imidlertid lægges til grund, at indholdet af rådgivningen lå fast allerede den 5. maj 2014.

I forhold til A's rådgivning foreligger to helt forskellige hovedspørgsmål. For det første, om A har handlet culpøst ved at konkludere, at North Channel Bank »ikke bør være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion« ved gennemførelsen af de transaktioner, der er beskrevet i skattearrangementet. Dette indebærer en juridisk bedømmelse af transaktionerne. For det andet, om A har handlet culpøst ved ikke at have indset det, som viste sig at blive tilfældet, at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme. Dette indebærer en bedømmelse af, hvad der måtte antages faktisk at ville ske.

*Rådgivningen om de beskrevne transaktioner*

Bedømmelsen af A's ansvar for rådgivningen kan ikke foretages alene på grundlag af konklusionen i hans Danish Opinion, men må inddrage det samlede indhold i denne, herunder både den beskrevne model (de påtænkte transaktioner) i pkt. 3 og de udtrykkelige forudsætninger herfor i pkt. 4, set i lyset af opdraget og de informationer, A havde modtaget i rådgivningsforløbet. Der kan således ikke ses bort fra forudsætninger og forbehold.

Til grund for rådgivningen lå tidligt i forløbet en Danish Tax Opinion af 27. juni 2012, udarbejdet af advokat I fra Hannes Snellmann Advokatpartnerselskab, der vedrørende den deri beskrevne model blandt andet konkluderede, at en amerikansk pensionsfond bør være berettiget til at kræve fuld refusion af det danske indeholdte udbytte på aktierne (dvs. den danske udbytteskat) i henhold til dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Under rådgivningsforløbet blev den af advokat I beskrevne model imidlertid ændret på forskellige punkter, dels på initiativ af opdragsgiver dels på initiativ af A. Hertil kom, at A fik yderligere oplysninger om modellen i forhold til de oplysninger, der fremgik af advokat I's tax opinion. Der forelå således ikke en tax opinion vedrørende den model, A rådgav om, og dermed heller ikke en udefrakommende skatteretlig bedømmelse af, om modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, skattemæssigt ville være rette udbyttemodtager.

**841**

A var bevidst herom, idet han i erklæringen i pkt. 5.2 udtrykkeligt gav udtryk for, at dette indebar et usikkerhedsmoment ved konklusionen.

Ifølge pkt. 2.1.1 i A's erklæring vurderes ikke den skattemæssige behandling i Danmark af andre parter end North Channel Bank i den påtænkte transaktion. Videre indeholder erklæringen i pkt. 4.5-7 forskellige forudsætninger om ejerskab til aktierne. Dette ejerskab må efter deres ordlyd og sammenhængen samt A forklaring for landsretten anses for at angå det juridiske/civilretlige ejerskab til aktierne og ikke det skatteretlige ejerskab.

Erklæringen indeholder således ikke nogen stillingtagen til eller forudsætning om, at modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, skattemæssigt ville være rette udbyttemodtager. Som anført ovenfor ville North Channel Banks mulige ansvar imidlertid være mest nærliggende, hvis modtageren af den Dividend Credit Advice, North Channel Bank ville udstede, ikke skattemæssigt ville være rette udbyttemodtager. Spørgsmålet for A var således, om North Channel Bank ville pådrage sig ansvar for at udstede en Dividend Credit Advice uden viden om eller stillingtagen til, om modtageren skattemæssigt ville være rette udbyttemodtager.

A foretog da også overvejelser om betydningen af risikoen for, at udbyttemodtageren ikke anses for skattemæssigt at ville være rette udbyttemodtager. A forklarede således for landsretten, at det skattemæssige ejerskab var centralt for hans rådgivning, at han vurderede, at I's tax opinion var korrekt, og at han lagde denne til grund. A gjorde endvidere i konklusionen i pkt. 5.2.1 - 5.2.3 udtrykkeligt opmærksom på tre forskellige omstændigheder, som forhindrede ham i at nå en mere definitiv vurdering af North Channel Banks position. Disse omstændigheder omhandlede alle det skattemæssige ejerskab.

Det blev allerede tidligt i mailkorrespondancen beskrevet for A at North Channel Banks rolle i arrangementet ville være begrænset til at levere tjenester som depotbank til parterne i arrangementet. A indsatte i overensstemmelse hermed udtrykkelige forudsætninger i erklæringens pkt. 4.9 til 4.12, der skulle sikre, at banken udelukkende var depotbank og agerede som sådan i overensstemmelse med både egne standardprocedurer og normale depotbankprocedurer.

Landsretten finder på den ovenfor anførte baggrund ikke, at A under de i erklæringen angivne forudsætninger har handlet culpøst ved ikke i erklæringen udtrykkeligt at forholde sig til, om modtageren af udbyttet skattemæssigt ville være rette udbyttemodtager, konkludere, at dette ville være tilfældet, og som konsekvens heraf fraråde North Channel Bank at deltage i arrangementet.

Parterne har under landsrettens behandling af sagen har været enige om, at sælgerens salg af de lånte aktier indebærer en skattemæssig afståelse af disse, hvilket indebærer, at pensionsplanen skatteretligt anses for retmæssig ejer af aktierne, medmindre pensionsplanen har disponeret over aktierne på en sådan måde, at det skatteretlige ejerskab er overgået til tredjemand. Landsretten finder, at der i det mindste ikke er en sådan sikkerhed for, at pensionsplanen ved udlån af aktierne eller ved indgåelse af forwardaftalerne som beskrevet i arrangementet ikke længere skal anses for ejer af aktierne i skattemæssig henseende, at det kan anses for culpøst at anse det skatteretlige ejerskab for at forblive hos pensionsplanen.

Det forhold, at der af en anden bank tidligere er udstedt en Dividend Credit Advice for udbyttet, indebærer ikke i sig selv, at North Channel Bank er berettiget til at udstede en Dividend Credit Advice for det samme udbytte, når modtageren af denne Dividend Credit Advice er såvel civilretligt ejer, således som forudsat, som rette skattemæssige ejer.

Det bemærkes endvidere, at der næppe kan tænkes noget ansvar for North Channel Bank, såfremt tredjemand, der i arrangementet udlåner aktierne til sælger, søger refusion af udbytteskat, selv om vedkommende ikke vil være berettiget hertil. Den pågældende tredjemand har i arrangementet ingen relation til North Channel Bank, banken har ikke udstedt nogen Dividend Credit Advice til ham, og banken har ifølge forudsætningen i pkt. 4.13 ingen grund til at antage eller oplysninger eller viden om, hvorvidt tredjemanden vil indgive ansøgning om refusion af udbytteskat på aktierne. En sådan ansøgning og refusion ville da også være strafbar som bedrageri.

A's rådgivning, der som anført er en »should-opinion«, om transaktioner udført i overensstemmelse med den angivne model kan således ikke anses for culpøs.

*Papirtransaktioner uden aktier og reelle pengestrømme.*

Spørgsmålet er herefter, om A burde have indset det, som viste sig at blive tilfældet - at interessenterne i skattearrangementet ville disponere således, at skattearrangementet ville blive cirkulært, og at det enten var proforma eller udelukkende bestod af papirtransaktioner uden aktier og reelle pengestrømme.

Landsretten bemærker, at gennemførelse af skattearrangementet som proforma eller uden aktier og reelle pengestrømme strafferetligt

må anses som almindeligt bedrageri, der blot er kamufleret ved komplicerede transaktioner.

Landsretten finder, at det efter A's forklaring ikke kan lægges til grund, at A gennemgik og forstod det tyske diagram. A meddelte således den 14. april 2014, da han modtog diagrammet, at hans tyskkundskaber

**842**

uheldigvis var utilstrækkelige til det krævede niveau, og han gav opdragsgiver tre muligheder for at løse denne situation, herunder at opdragsgiver skulle betale (en beskeden sum) for oversættelse heraf. Opdragsgiver valgte imidlertid en anden mulighed - nemlig den, at A i stedet skulle basere sin videre rådgivning på den tidligere model med nogle ændringer og den af K udarbejdede mere over-ordnede engelske tekstbeskrivelse af transaktionerne, som A fik tilsendt dagen efter. Det følger heraf, at A efter aftale med sin op-dragsgiver ikke skulle inddrage det tyske diagram ved sin rådgiv-ning.

Landsretten finder, at det ikke kan anses for culpøst, at A ved forudsætningerne i erklæringens pkt. 4.9 til 4.12 om bankens rolle udelukkende som almindelig depotbank, bestemmelserne i pkt. 3 om risikoovervågning mv., pkt. 3.4 om pensionsplanens modtagelse af udbyttet og forudsætningerne i pkt. 4.5-4.7 om aktier og udbytte gik ud fra, at interessenterne i skattearrangementet ville disponere i overensstemmelse med modellen, således at arrangementet ikke ville blive cirkulært, og således at der var tale om reelle aktier og pengestrømme.

Landsretten finder således ikke, at A har handlet culpøst ved sin rådgivning ved ikke at have indset, at modellen ville blive brugt til at bedrage den danske statskasse for udbytteskat, og som konse-kvens heraf frarådet anvendelsen af modellen.

Landsretten tager derfor Bech-Bruun I/S' principale påstand om frifindelse til følge.

Landsretten bemærker i øvrigt, at Skatteforvaltningen ved de ovenfor angivne anbringender ikke kan anses for at have fremsat et nyt anbringende og således være gået uden for rammerne af landsrettens kendelse af 28. februar 2022.

*Sagsomkostninger*

Sagsomkostningens størrelse udgøres af et erstatningskrav på ca. 725 mio. kr. med tillæg af renter, i alt ca. 1,25 mia. kr.

Sagen har været hovedforhandlet i 18 retsdage. Der har været en omfattende forberedelse, herunder med kendelse om edition. Der foreligger ikke oplysninger om, hvor mange advokattimer der er anvendt på sagen.

Sagsomkostningerne i en sag om så store værdier må efter praksis fastsættes skønsmæssigt efter en vurdering af, hvad der kan anses for rimeligt, også under hensyn til sagens omfang og karakter. Der skal endvidere tages hensyn til både arbejdets omfang og det ansvar, der er forbundet med sagens førelse.

På denne baggrund fastsættet landsretten sagsomkostningerne til Bech-Bruun I/S til 6 mio. kr. ekskl. moms til dækning af udgifter til advokatbistand.

Herudover skal Skatteforvaltningen refundere Bech-Bruun I/S' udgifter til oversættelser med 189.953,70 kr.

**Thi kendes for ret**

Bech-Bruun I/S frifindes.

I sagsomkostninger skal Skatteforvaltningen inden 14 dage betale 6.189.953,70 kr. til Bech-Bruun I/S. Beløbet forrentes efter rente-lovens § 8 a.

**Højesterets dom**

I tidligere instans er afsagt dom af Østre Landsrets 12. afdeling den 28. april 2022 (…).

I pådømmelsen har deltaget fem dommere: Jens Peter Christensen, Ole Hasselgaard, Rikke Foersom, Peter Mørk Thomsen og Moham-mad Ahsan.

**Påstande**

*Appellanten, Skatteforvaltningen,* har nedlagt påstand om, at (1) indstævnte, Bech-Bruun I/S, skal betale 705.821.108,92 kr. med renter fra den 28. september 2023, at (2) Bech-Bruun skal betale 446.605.946,27 kr., og at (3) Bech-Bruun skal betale 201.954.297,55 kr.

Skatteforvaltningen har endvidere nedlagt påstand om, at (4) Bech-Bruun skal tilbagebetale 6.189.953,70 kr., som Skatteforvaltningen har betalt til opfyldelse af landsrettens dom, med procesrente fra den 24. maj 2022.

Skatteforvaltningen har subsidiært nedlagt påstand om, at Bech-Bruun skal anerkende at være erstatningsansvarlig for rådgivningen til North Channel Bank. Mere subsidiært skal Bech-Bruun anerken-de at være erstatningsansvarlig for Skatteforvaltningens tab som følge af ansøgninger om refusion af indeholdt udbytteskat dateret i perioden 12. maj 2014 til 22. juli 2015 baseret på Credit Advices udstedt af North Channel Bank, subsidiært i en kortere periode.

*Bech-Bruun* har over for Skatteforvaltningens påstande 1-3 påstået stadfæstelse, over for påstand 4 påstået frifindelse, over for den subsidiære påstand påstået afvisning, subsidiært frifindelse, og over for den mere subsidiære påstand påstået frifindelse.

**Supplerende sagsfremstilling**

For Højesteret er der fremkommet yderligere materiale om bl.a. North Channel Banks forhold, tab, forlig og opgørelse af krav samt SKATs forhold.

**Forklaringer**

Der er for Højesteret afgivet supplerende forklaring af A.

**Anbringender**

*Skatteforvaltningen* har anført navnlig, at Bech-Bruun er erstatnings-ansvarlig for Skatteforvaltningens tab på 1.135.775.442,18 kr., som opstod ved, at en række pensionsplaner, banker, finansfolk, beta-lingsagenter og advokater med forskellig involvering konstruerede et

**843**

kriminelt setup, der forledte SKAT (i dag Skatteforvaltningen) til at udbetale det nævnte beløb. Setuppet gik i sin essens ud på, at skattefrie, amerikanske pensionsplaner fremstod som modtagere af dansk beskattet udbytte baseret på udbyttenotaer fra en tysk bank, North Channel Bank, selv om de aldrig havde modtaget ud-bytte, og de fik dermed refusion af udbytteskat med urette.

Bech-Bruun påtog sig at udarbejde en legal opinion om, at North Channel Bank ikke burde være erstatningsansvarlig eller strafansvar-lig for sin deltagelse i setuppet. Ved at afgive den nævnte legal opinion medvirkede Bech-Bruun til, at North Channel Bank udsted-te ægte, men indholdsmæssigt forkerte udbyttenotaer. Bech-Bruun var bekendt med, at ansøgning om refusion af udbytteskat krævede bankdokumentation for modtagelse af udbytte (udbyttenota), og at North Channel Bank ville udstede den pågældende dokumentation. Bech-Bruun vidste, at hvis Bech-Bruun afgav en »should-opinion« om, at banken ikke ville ifalde ansvar, så ville banken deltage i setuppet og udstede udbyttenotaer. Bech-Bruuns afgivelse af en legal opinion med den ønskede konklusion var en aktiv handling fra Bech-Bruuns side. Handlingen var culpøs. Bech-Bruun kunne have afstået fra at rådgive eller afgivet sin legal opinion med den modsatte - og dermed korrekte - konklusion.

Bech-Bruun fik gennem et transaktionsdiagram mulighed for at få fuld indsigt i den model, der skulle anvendes til svindlen. Bech-

Bruun vidste derfor, at North Channel Bank havde fuld indsigt i, hvad der foregik. Når North Channel Bank samtidig deltog som depotbank ved at udstede udbyttenotaer, ville banken være ansvarlig, hvis ansøgningerne var uretmæssige, uanset om bankens rolle var stor eller lille.

Bech-Bruun var bevidst om risikoen og dermed de potentielle konsekvenser af rådgivningen - nemlig statens tab - og skulle derfor i sin rådgivning have sikret sig, at man ikke medvirkede til, at der ville ske uretmæssig refusion. Den forpligtelse levede Bech-Bruun ikke op til.

I selskabstømmersagerne fastslog domstolene, at rådgiverne for sælgerne havde pligt til at varetage skattevæsenets interesser, ligesom også sælgerne havde. Den pligt har Bech-Bruun også. Til forskel fra selskabstømmersagerne var Bech-Bruun imidlertid opmærksom på risikoen for, at skattemyndighederne led tab, og det var selve kernen af det, som Bech-Bruun udtalte sig om. Bech-Bruuns ansvar er strengere, end hvad der følger af selskabstømmersagerne, idet Bech-Bruuns klient, North Channel Bank, ikke svarer til sælgerne i selskabstømmersagerne, men til de kriminelle købere. Bech-Bruun rådgav den bedømte bank.

Ansvaret for Bech-Bruun skal bedømmes som et ansvar for medvirken. Bech-Bruuns ansvar skal bedømmes ud fra den skadegørende handling under inddragelse af, hvad skadevolderen eventuelt måtte have aftalt med de øvrige aktører i setuppet.

Bech-Bruun blev advaret om risikoen for dobbeltrefusion og såvel uretmæssige som kriminelle refusioner. Det er yderst sjældent i erstatningssager, at skadevolderen er blevet så direkte advaret om de potentielle skadevirkninger af handlingerne. Mailen af 3. februar 2014 fra advokatfirmaet Jones Day indeholdt klare risikosignaler, selv om der blev taget forbehold for, at man endnu ikke havde set et »structure paper«. Der er intet i sagen, som understøtter, at en sådan mail skulle være sædvanlig. Jones Days mail burde have givet ekstra anledning til forsigtighed, da det fremgik, at Jones Day var villig til at rådgive banken, selv om banken vidste, at dens kunder ville lave potentielt kriminelle transaktioner, dobbeltrefusion, skattesvindel og udbyttearbitrage. Jones Days eneste fokus var, om banken ville risikere ansvar for dette og ikke, om svindel mv. kunne undgås. Dette forhold, der må betegnes som en advarsel, skærper således kravene til Bech-Bruun. Derfor burde Bech-Bruun have sikret sig imod, at deres rådgivning ville kunne bruges til strafbare forhold, når Jones Day gjorde eksplicit opmærksom på risikoen herfor.

Bech-Bruun forstod, at der var risiko for uretmæssig refusion på grund af cum/ex. Henset til advarslen og forståelsen heraf burde Bech-Bruun i sin rådgivning have sikret sig, at der ikke blev skabt mulighed for at ansøge om uretmæssig refusion, men selv om Bech-Bruun straks indså denne risiko for uberettiget refusion, blev det ikke håndteret. Bech-Bruun endte i stedet med at godkende, at North Channel Bank udstedte udbyttenotaer i netop en cum/ex-model.

Bech-Bruun accepterede brug af den kriminelle cum/ex-model, der ikke tjente et legitimt formål. Bech-Bruun kunne se, at der ikke var noget forretningsmæssigt formål. Det eneste indsete formål var udbyttearbitrage, men modellen var kontraproduktiv til at søge udbytterefusion. Den var derimod egnet til svindel. Det gav ingen mening, at handlerne blev struktureret som cum/ex, hvis der var tale om almindelige handler eller udbyttearbitrage. I givet fald kunne man handle på sædvanlige vilkår. Derimod gav det god mening, hvis formålet var at opnå uretmæssig refusion. Bech-Bruun var klar over, at cum/ex var en fravigelse af sædvanlige markedsvilkår, der kunne bruges til kriminelle handlinger. Bech-Bruun valgte således at rådgive om transaktioner uden forretningsmæssigt

formål, hvor der gælder strenge krav til rådgivers agtpågivenhed henset til risikoen for misbrug eller kriminelle formål.

Sammen og hver for sig var cum/ex-modellen, udbyttenotaen uden modtagelse af udbytte og kompensationsbetalinger under aktielån uforklarlige, hvis formålet var at lave skattearbitrage. Hvis aktørerne i modellen havde en aktiepost, havde det været simpelt blot at

**844**

overføre aktierne til pensionsplanen, der ville fremstå som ejer, modtage udbytte og udbyttenota samt ansøge om refusion. De uforklarlige forhold gav derimod mening, hvis formålet var at søge refusion uden aktier.

Bech-Bruun kunne se og accepterede, at der ville blive udstedt to udbyttenotaer for ét udbytte, og at der dermed blev udstedt urigtig dokumentation for indeholdelse af udbytteskat. Bech-Bruun undlod bevidst at sætte sig ind i det tyske transaktionsdiagram, der viste svindelmodellen i klartekst. Transaktionsdiagrammet, som Bech-Bruun modtog, viste, hvordan svindlen skulle struktureres med bogføringsposteringer, der udlignede hinanden, og hvor der alligevel skulle udstedes udbyttenotaer. Selv på overfladen var det tydeligt af transaktionsdiagrammet, at handlerne var proforma, og ved nærmere gennemsyn fremgår det, at »handlerne« foregik uden aktier, penge og dermed udbytter. Bech-Bruun havde henset til omstændighederne pligt til at forstå modellen som helhed, før Bech-Bruun udtalte sig herom, og Bech-Bruun kunne ikke ved sin rådgivning vælge efter aftale med klienten at se bort fra viden, som Bech-Bruun var i besiddelse af.

Bech-Bruun burde have indset, at udbyttenotaerne ville stride mod straffelovens § 163, idet North Channel Bank ikke vidste, om notaen (erklæringen) var korrekt. Hvis gerningsindholdet i § 163 realiseres, og der samtidig er berigelsesforsæt, er der overhængende risiko for bedrageri efter straffelovens § 279, hvilket North Channel Bank er blevet dømt for. Bech-Bruun havde oplysningerne til at indse denne risiko.

Bech-Bruun vidste, at North Channel Banks udbyttenotaer skulle bruges til at søge om refusion af dansk udbytteskat. Bech-Bruun burde derfor under alle omstændigheder have sikret sig, at pensionsplanen var skatteretlig ejer, idet North Channel Banks udbyttenotaer kendeligt skulle bruges over for de danske skattemyndigheder i en model, som banken var en del af og havde fuld indsigt i. Bech-Bruun kunne netop se, at pensionsplanen ikke var skatteretlig ejer af udbyttet.

Bech-Bruun var ekspert i udbyttebeskatning og havde omfattende praktisk erfaring, herunder med udenlandske aktionærer. Bech-Bruuns forsvar består i synspunkter om begrænsninger i opdrag, forudsætninger og forbehold. Man kan ikke skrive sig ud af et professionsansvar over for tredjemand. Advokater er tværtimod forpligtede til at udvise kritisk sans og undersøge mistænkelige forhold, inden rådgivning ydes. Bech-Bruun har således begået grove og klare, ansvarspådragende fejl.

Bech-Bruuns legal opinion blev sendt mandag den 5. maj 2014. Fredag den 9. maj 2014 afgav Jones Day sin legal opinion baseret på bl.a. Bech-Bruuns legal opinion. Mandag den 12. maj 2014 modtog SKAT de første refusionsansøgninger baseret på udbyttenotaer fra North Channel Bank. Bech-Bruun vidste, at udbyttenotaerne skulle føre til udbetaling af udbytterefusion fra den danske statskasse. North Channel Bank og de andre i bedrageriet involverede aktører anmodede selvfølgelig om Bech-Bruuns rådgivning, fordi de skulle bruge den. Udbetalingen af udbytterefusion er således en forsætlig følge af rådgivningen, og refusionen er en kausal følge af denne rådgivning.

Den nære tidsmæssige sammenhæng mellem Bech-Bruuns indholdsmæssige endelige legal opinion og de første uberettigede refu-

Copyright © 2024 Karnov Group Denmark A/S

sionsansøgninger med udbyttenotaer fra North Channel Bank er tydelig. Det var en konkret formuleret opgave, at Bech-Bruuns legal opinion skulle indhentes. Da den første positive konklusion fra Bech-Bruun forelå, kunne de første forberedelseshandlinger iværksættes, og da den endelige rådgivning forelå, kunne refusionsansøgningerne indgives.

Konkret beviser Bech-Bruuns opdrag, rådgivningsforløbet, gennemførelsen af transaktionerne, som Bech-Bruun rådgav om, den efterfølgende anvendelse af Bech-Bruuns rådgivning og Bech-Bruuns senere bekræftelse af rådgivningen sammen og hver for sig, at der er årsagssammenhæng mellem Bech-Bruuns ansvarspådragende rådgivning af North Channel Bank og Skatteforvaltningens tab.

Årsagssammenhængen mellem Bech-Bruuns ansvarspådragende rådgivning og Skatteforvaltningens tab følger endvidere af, at der ikke er relevante forskelle - hvis nogen overhovedet - på beskrivelsen i Bech-Bruuns legal opinion og de bogførte transaktioner.

Skatteforvaltningens tab var en adækvat følge af Bech-Bruuns ansvarspådragende rådgivning. Bech-Bruun kunne se, at der ville blive søgt om refusion på grundlag af de udbyttenotaer, som Bech-Bruun godkendte, at North Channel Bank kunne udstede, og Bech-Bruun interesserede sig ikke for størrelsen på ansøgningerne og dermed Skatteforvaltningens tab, før der blev gjort et erstatningskrav gældende imod Bech-Bruun.

Det var også påregneligt for Bech-Bruun, at udbyttenotaer fra North Channel Bank kunne blive brugt i forbindelse med uberettigede refusionsansøgninger, der ville medføre et tab for Skatteforvaltningen, såfremt Bech-Bruun godkendte setuppet. Hvorvidt disse udbyttenotaer ville have et urigtigt indhold, fordi setuppet blev gennemført med proforma-transaktioner eller uden reelle aktie- og pengestrømme, er uden betydning, men Bech-Bruun var faktisk i besiddelse af oplysninger til at indse, at det skulle være uden aktier og penge. Eftersom setuppet skulle gennemføres uden aktier og penge, var Skatteforvaltningens potentielle tab som følge af uberettigede refusionsansøgninger med udbyttenotaer fra North Channel Bank svært at afgrænse. Det var således ikke upåregneligt for Bech-Bruun, at Skatteforvaltningens tab kunne blive meget stort, og Bech-Bruun kan

**845**

derfor ikke under henvisning til tabets størrelse undsige sig ansvar. Bech-Bruun vidste endda, at en enkelt refusionsansøgning kunne angå et meget stort beløb.

Skatteforvaltningen har bevist tabet. Det er ubestridt, at Skatteforvaltningen har lidt et tab på 1.135.775.442,18 kr. ved at udbetale refusion i henhold til uretmæssige refusionsansøgninger vedlagt udbyttenotaer fra North Channel Bank. Skatteforvaltningen har reduceret sit krav med de betalinger, som Skatteforvaltningen har modtaget fra andre skadevoldere. Reduktionen er sket forholdsmæssigt, da betalingerne er modtaget fra skadevoldere, der havde medvirket til såvel North Channel Bank-delen som øvrige uretmæssige refusionsansøgninger. Hovedstolen udgør herefter 705.821.108,92 kr.

Tabet er forvoldt af North Channel Bank, Bech-Bruun og øvrige, der har medvirket til de uretmæssige refusionsansøgninger. Når der er flere skadevoldere, der alle er ansvarlige for et tab, hæfter disse solidarisk, hvorefter skadelidte frit kan vælge, hvilken skadevolder denne vil gå efter.

Bech-Bruun gør gældende, at deres erstatningsansvar skal bortfalde som følge af Skatteforvaltningens egen skyld og accept af risiko. Det er Bech-Bruuns bevisbyrde, og det er ikke bevist.

Skatteforvaltningen har været udsat for et enestående groft bedrageri, hvor en gruppe af bank- og finansfolk koordinerede et internationalt, komplekst og omfangsrigt svindelsetup. Dette bedrageri

kan ikke bebrejdes Skatteforvaltningen. Det kan alene bebrejdes de personer, virksomheder og rådgivere, der deltog og rådgav. Ingen hos Skatteforvaltningen var bekendt med, at der blev svindlet i udbyttesagen.

Synspunktet om accept af risiko giver ikke mening. At der er risiko for uretmæssige refusionsansøgninger, er et grundvilkår, som SKAT deler med alle andre, der udbetaler penge. Det gælder særligt på områder med masseadministration, f.eks. moms og sociale ydelser. Der er i øvrigt risici forbundet med alle dele af skatteforvaltningen, og ressourcefordelingen er et prioriteringsspørgsmål - ikke en accept af risiko.

SKATs administration af udbytterefusionsområdet var i overensstemmelse med hjemmelsgrundlaget. Det underliggende finansielle system, som SKAT skulle foretage kontrol med refusion på baggrund af, er enkelt og standardiseret, særligt når der er tale om børsnoterede selskaber. Systemets robusthed bekræftes videre af, hvor kompliceret et setup svindlerne i den danske udbyttesag skulle etablere for, at de kunne lykkes med svindlen.

SKAT har foretaget både formel og materiel kontrol, før der skete udbetaling. Det er således konstateret, at de »nødvendige oplysninger« samt foreskrevne underbilag og dokumentationer« foreligger, og at »satser og beregninger« er korrekte. Det er herved også kontrolleret, at »oplysningerne er sandsynlige«, idet en udenlandsk skattemyndighed og en uafhængig troværdig part - en bank - har erklæret det.

Den 16. juni 2015 modtog Særlig Kontrol i SKAT anmeldelse om formodet svindel med refusion af udbytteskat. Der var ikke grundlag for på dette tidspunkt i juni 2015 at indstille samtlige udbetalinger på området. Henvendelserne nævnte »en formodet svindel« for op til 500 mio. kr., og de indeholdt ikke konkrete beviser. Først med oplysningerne fra de engelske skattemyndigheder kunne oplysningerne fra den første anmeldelse bekræftes i et sådant omfang, at det kunne vurderes, om der var tilstrækkeligt grundlag for at gribe ind. Den 6. august 2015, samme dag som SKAT modtog oplysningerne fra de engelske skattemyndigheder, blev udbetalingerne af refusion stoppet.

Skatteforvaltningens krav er ikke forældet. Forældelsesfristen var suspenderet, indtil Skatteforvaltningen modtog tilstrækkelige faktiske oplysninger til at vurdere, at der var grundlag for at udtage stævning mod Bech-Bruun, jf. forældelseslovens § 3, stk. 2. Sådanne faktiske oplysninger modtog Skatteforvaltningen tidligst den 29. juni 2018, hvor Skatteforvaltningen fik Bech-Bruuns legal opinion. Da stævningen er udtaget under tre år fra denne dato, er kravet ikke forældet.

Mailen af 10. oktober 2016 fra Finanzamt für Steuerstrafsachen und Steuerfahndung Wuppertal til Skatteforvaltningen gav ikke anledning til at igangsætte undersøgelser af Bech-Bruun med den konsekvens, at Skatteforvaltningen på et - ukendt - tidspunkt i den efterfølgende periode »burde have fået kendskab« til erstatningskravet mod Bech-Bruun. Mailen gav Skatteforvaltningen grundlag for at rejse et erstatningskrav mod Bech-Bruun.

Selv hvis der måtte være en videregående undersøgelsespligt, kan den i hvert fald ikke indebære, at Skatteforvaltningen burde have skaffet sig indsigt i Bech-Bruuns rådgivning forud for den 8. juni 2017. Indtræden af en undersøgelsespligt ophæver ikke suspensionsperioden. Suspensionen ophører først, når kreditor fik eller burde have fået tilstrækkelige oplysninger til at vurdere sit krav. Suspensionen ophører alene, hvis kreditors uvidenhed kan bebrejdes kreditor. Det kan derfor aldrig være på tidspunktet, hvor en eventuel undersøgelsespligt begynder.

Skatteforvaltningens krav skal i henhold til rentelovens § 3, stk. 5, forrentes fra udbetalingstidspunktet, idet skaden er påført ved

Copyright © 2024 Karnov Group Denmark A/S

retsstridig adfærd, og Skatteforvaltningen har været afskåret fra at rejse kravet på et tidligere tidspunkt.

Hvis Højesteret finder, at kravet ikke kan opgøres på det foreliggende grundlag, skal Bech-Bruun dømmes til at anerkende sit erstatningsansvar i henhold til

**846**

Skatteforvaltningens subsidiære eller mere subsidiære påstand.

*Bech-Bruun* har anført navnlig, at der ikke foreligger et ansvarsgrundlag. Under omstændigheder som de foreliggende, hvor en advokat ubestridt ikke var bekendt med klientens bedrageri, kræver ansvar over for tredjemand i overensstemmelse med retspraksis i det mindste, at advokaten har været konkret involveret og begået en klar fejl af en vis grovhed, som advokaten kan bebrejdes i en sådan grad, at advokaten skal bære tabet. Disse grundlæggende betingelser for brud på ansvarsnormen er på ingen måde opfyldt.

En legal opinion er en retlig vurdering af et givent faktum afgivet til en klient. Klientens formål med en legal opinion er at få afdækket en retlig risiko, mens advokaten i sin legal opinion vil gøre sig umage for ikke at udtale sig om andet end det faktum, der forelægges, eller påtage sig anden risiko end fornødent efter advokatens opdrag. Faktum i en legal opinion er fastlagt sammen med klienten, hvortil kommer forudsætninger og kvalifikationer, som ligeledes er aftalt med klienten. Faktum og forudsætninger hverken efterprøves eller verificeres. Generelt kræver advokatansvar over for tredjeparter noget særligt, og det gælder i særdeleshed for en legal opinion, der efter sit indhold alene kan påberåbes af klienten.

Bech-Bruuns legal opinion af 4. august 2014 havde til formål at bedømme »ansvarsmæssige konsekvenser for NCB af at fungere som depotbank« efter dansk ret. Emnet var en hypotetisk situation, som var opstillet med henblik på vurdering af bankens risici ud fra nærmere angivne forudsætninger og forbehold. En sådan risikovurdering er et typeeksempel på anvendelsesområdet for legal opinion, og det er helt almindeligt i en risikovurdering at inddrage »worst case«. Bech-Bruun udtalte sig ikke i legal opinion om, hvorvidt bankens kunde ville opfylde de skatteretlige betingelser for refusion af udbytteskat. Tværtimod tog de juridiske risici, som Bech-Bruun bedømte, udgangspunkt i den hypotetiske situation, at SKAT efterfølgende måtte finde, at betingelserne i dansk skatteret ikke var opfyldt, herunder ikke mindst betingelsen om retmæssigt ejerskab. For at statuere ansvarsgrundlag ville det være nødvendigt, men ikke tilstrækkeligt, at Bech-Bruun i forbindelse med udarbejdelsen af legal opinion burde have indset, at North Channel Bank ville begå bedrageri. Det er der intet grundlag for.

Vurderingen af ansvarsgrundlag må tage udgangspunkt i Bech-Bruuns opdrag. Opdraget angik en legal opinion, og det fremgik, at »det spørgsmål, der skal besvares i min opinion er, om klienten ud fra et dansk skatteretlig perspektiv kan gøres ansvarlig eller endda retsforfølges for at støtte/facilitere en skatteunddragelse begået af en af de andre aktører i denne transaktion (hvilket var årsagen til, at vi anmodede om at få udleveret den danske tax opinion)«. Bekymringen gik således på opfyldelse af almindelige betingelser for refusion af udbytteskat og knyttede sig ikke til banken, men til bankens kunde og transaktion.

Som situationen blev fremstillet for Bech-Bruun, var der et legitimt behov for rådgivning, og det var fuldt ud berettiget for Bech-Bruun at påtage sig opdraget. Ethvert andet dansk advokatfirma med de fornødne kompetencer ville have gjort det samme. Bech-Bruun antog naturligvis, i overensstemmelse med I's tax opinion og ligesom Jones Day, at der ville være aktier, og at der ville blive modtaget udbytte efter indeholdelse af udbytteskat. Det forhold, at A ikke kendte til andre forretningsmæssige formål med kundens skattefordel, at og bankens kunde således øjensynligt engagerede sig i udbyttearbitrage, ændrede ikke noget.

Skatteforvaltningen har lagt meget betydelig vægt på den tyske transaktions-oversigt, som ifølge Skatteforvaltningen skulle vise, at transaktionen alene bestod af tre parter og ville være cirkulær. Imidlertid kunne A ikke forstå den tyske transaktionsoversigt, og den udgik efter aftale af rådgivningen og blev på Jones Days ansvar erstattet med den engelske transaktionsbeskrivelse.

Bech-Bruun konkluderede i legal opinion, at »NCB bør ikke være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion«, og at »NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion«. Der var således tale om en såkaldt »should«-opinion, idet brugen af ordet »should« (»bør«) angav en vis usikkerhed i vurderingen og dermed en vis risiko. Det fremgår udtrykkeligt, at Bech-Bruun ikke nærmere efterprøvede, endsige »blåstemplede« transaktionsbeskrivelsen eller forudsætningerne. Ydermere blev der formuleret tre udtrykkelige forbehold i tilknytning til konklusionen om erstatningsansvar.

Skatteforvaltningen søger i sin argumentation i denne sag at se bort fra de nævnte forhold og omgøre den faste forståelse af legal opinions. Argumentationen bygger på ukendte konstruktioner om, at en advokat, der afgiver en legal opinion, skulle have pligt til at efterprøve faktum og forudsætninger, ligesom advokaten ikke skulle kunne tage forbehold, og det skulle i særdeleshed gælde i forhold til tredjeparter.

De tre forbehold og legal opinion i sin helhed efterlader ikke tvivl om, hvordan Bech-Bruun havde bedømt en situation, hvor North Channel Banks kunder slet ikke ville eje nogen aktier, således at der ville være tale om bedrageri. A havde fra begyndelsen gjort det klart, at udbytteskat ikke kunne blive refunderet mere end én gang. Han fik senere lejlighed til at understrege, at bankens kunde ikke kunne søge refusion af udbytteskat

**847**

uden ejerskab til aktier med ret til udbytte på tidspunktet for udlodningen.

Det bestrides, at »T+3« var markedspraksis. Der er ikke grundlag for at hævde, at afvigelse fra dette eller andre påståede markedsvilkår skulle have været usædvanligt eller ubegrundet, endsige mistænkeligt, ligesom en eventuel mistanke ikke ville vedrøre banken som depotvirksomhed. Særligt hvad angår »cum/ex« og Skatteforvaltningens sammenligninger til Tyskland, har skattemyndighederne generelt oplyst, at sagen ikke havde lighed med de tidligere begivenheder i Tyskland.

Ansvarsspørgsmål i tilfælde af andres bedrageri melder sig underliden for revisorer, og Højesteret har her udvist tilbageholdenhed med at pålægge erstatningsansvar, jf. f.eks. UfR 2014.1346 H.

Retspraksis i sagerne om selskabstømning viser, at positiv viden om en overdragelse, som ikke er en normal forretningsmæssig disposition, og som indebefatter et betydeligt »merprovenu«, ikke i sig selv begrunder ansvar efter dansk rets almindelige erstatningsregler. Hertil kræves yderligere konkret deltagelse af en vis væsentlighed (medvirken). Til forskel fra selskabstømmersagerne anbefalede Bech-Bruun ikke kunder i North Channel Bank at gennemføre transaktioner, ligesom Bech-Bruun ingen dialog havde med banken og slet ikke bankens kunder. Bech-Bruun bistod heller ikke ved gennemførelsen af konkrete transaktioner, og Bech-Bruun havde ingen rolle med hensyn til de konkrete ansøgninger, som påførte SKAT tab.

I den foreliggende sag er der ikke grundlag for en skærpet ansvarsnorm. At bankkunders deltagelse i udbyttearbitrage skulle begrunde skærpelse af ansvarsnormen, kan ikke gælde for den advokat, som i overensstemmelse med sit opdrag afgiver legal opinion til banken om bankens, modsat bankkundens, retlige stilling. For

den advokat, der rådgiver en bank, kan det ikke begrunde skærpelse af ansvarsnormen, at også en anden bank efter omstændighederne kan udstede nota i anledning af samme udbytte. Tværtimod må det være almindeligt, særligt ved kompensationsbetalinger. Ydermere angik legal opinion den hypotetiske situation, at SKAT efterfølgende fandt, at bankens kunde ikke var berettiget til refusion af udbytteskat, og hvor det ville være forventeligt, at en anden kunde i en anden bank kunne være berettiget hertil.

Anbefalingerne i Skatteministeriets rapport fra november 2014 om styrket rådgiver- og branchesamarbejde til imødegåelse af grænseoverskridende skatteunddragelse - hvoraf flere med virkning fra juli 2019 er afspejlet i nye bestemmelser i de advokatetiske regler - ville ikke give grundlag for kritik af Bech-Bruun, selv hvis de havde foreligget tidligere, og selv hvis Bech-Bruun konkret havde ydet skatterådgivning.

Bech-Bruun kan ikke ifalde solidarisk ansvar med de kriminelle personer og selskaber, som har handlet konkret og forsætligt i bedrageri.

De fiktive transaktioner i North Channel Bank var i direkte modstrid med Bech-Bruuns legal opinion på talrige punkter, herunder udtrykkelige forudsætninger og forbehold.

Der mangler både årsagssammenhæng og påregnelighed. Bedrageriet med forsætlig udstedelse af urigtige notaer var i gang, inden Jones Day og Bech-Bruun afgav sine legal opinions. Der er al mulig grund til at antage, at bedrageriet ville have været begået, selv om de nævnte legal opinions ikke forelå. Den eneste eventuelle brug af legal opinions var over for revisionen og myndighederne i Tyskland, som imidlertid ikke krævede legal opinions, og som i øvrigt først vil henvende sig lang tid efter, at udbyttenotaer var udstedt til kunder.

Skatteforvaltningen har bevisbyrden for årsagssammenhæng. Årsagssammenhæng nævner grundlæggende, at North Channel Bank ikke ville have begået bedrageri i fravær af Bech-Bruuns legal opinion. Der er ikke den mindste bevismæssige støtte herfor.

Hvis North Channel Bank teoretisk havde anset en eller flere legal opinions for at have betydning for, om banken ville begå bedrageri ved registrering af fiktive aktie- og pengebevægelser og forsætlig udstedelse af urigtige notaer, ville banken forinden have haft Jones Days og Bech-Bruuns legal opinions på plads i endelig, underskreven form. Det skete ikke. Endelige legal opinions blev først efterspurgt i juli 2014 og alene afgivet i august og september 2014.

Mulig brug af legal opinion havde at gøre med bankens regulatoriske forhold i Tyskland. Bech-Bruuns legal opinion skulle og kunne ikke bruges i Danmark. Med hensyn til Tyskland er der ingen dokumentation for, at Jones Days eller Bech-Bruuns legal opinions blev anvendt internt i North Channel Bank som beslutningsgrundlag eller andet. En eventuel ekstern anvendelse over for eksempelvis en myndighed krævede færdiggørelse og underskrift. Udkastene af 2. maj og 9. maj 2014 (om dansk, tysk og belgisk ret) udgjorde ikke rådgivning, som en advokat kan ifalde ansvar for. Udkastene af 2. maj og 9. maj 2014 lå i tid godt nok forud for indgivelsen af refusionsansøgningerne til SKAT i Danmark, men ikke forud for registreringer og udstedelse af udbyttenotaer i Tyskland. Det er afgørende, idet registreringer og udstedelse af udbyttenotaer involverede banken, mens ansøgninger om refusion af udbytteskat ikke gjorde det. Faktisk havde udbyttenotaerne forladt banken lang tid inden indgivelsen af refusionsansøgningerne, og udbyttenotaerne var herefter undergivet andres kontrol. Udkastene til legal opinion fra februar 2014 lå ganske rigtigt forud også for registreringer og udstedelse af udbyttenotaer i Tyskland, men begrunder ikke

årsagssammenhæng. Udkastene udgjorde endnu mindre end majudkastene rådgivning, som en advokat ville kunne ifalde ansvar for.

Det hævdede tab er ikke en påregnelig følge af Bech-Bruuns legal opinion. Grundlæggende har Bech-Bruuns afgivelse af legal opinion til North Channel Bank ikke øget den fare eller risiko, som var forbundet med SKATs forvaltning af ansøgninger om refusion af udbytteskat.

Det var ikke påregneligt for Bech-Bruun, at kunden i North Channel Bank ville indgå i en »transaktion«, som ikke var forenelig med transaktionsbeskrivelsen i Bech-Bruuns legal opinion, eller at banken ville indtage en anden rolle end som depotvirksomhed, endsige at banken ville begå bedrageri ved at registrere fiktive aktie- og pengebevægelser og forsætligt udstede urigtige notaer.

Det var heller ikke påregneligt, at refusionerne angik påståede aktiebesiddelser, som var både enorme og helt urealistiske, såvel bedømt ud fra pensionsplanernes som North Channel Banks karakter.

Et eventuelt krav er forbudt ved forældelse. Forældelsesfristen skal regnes senest fra den 10. oktober 2016, hvor SKAT af de tyske myndigheder fik oplyst, at Bech-Bruun havde udstedt »erklæring« om, at en tysk bank involveret i »udbyttesagen« som depotbank havde forholdt sig »lovligt«. Hvis SKAT dengang retligt havde ment, at der kunne være et ansvarsgrundlag for en dansk rådgiver, fik SKAT med mailen det faktuelle grundlag. Den eneste tyske bank, som optrådte i »udbyttesagen«, var North Channel Bank, og de oplyste volumener i mailen svarede til udbyttenotaerne udstedt af denne bank, som SKAT selv havde indsamlet og analyseret. Dette havde ført til en politianmeldelse af banken i august 2016, hvilket var kort forinden modtagelsen af mailen af 10. oktober 2016. På tidspunktet for udtagelse af stævning i juni 2020 var kravet således forældet.

Skatteforvaltningen har bevisbyrden for suspension af forældelsesfristen, og den bevisbyrde har Skatteforvaltningen ikke løftet.

Det ligger i den 3-årige forældelsesfrist, at kreditor uan have et arbejde at udføre, mens forældelsesfristen løber. Forældelsesfristen løber således ikke først fra det tidspunkt, hvor kravstiller har fuldt overblik over sagsforløbet eller kommer i besiddelse af et bevis, som kravstiller tillægger særlig betydning.

Der foreligger accept af risiko og egen skyld. I 2007 valgte SKAT og Skatteministeriet med fuldt overlæg ikke at udføre nogen materiel kontrol med ansøgninger om refusion af udbytteskat, og dette valg blev fastholdt, uagtet at Skatteministeriet i 2012 oplyste det modsatte til Folketinget, og uagtet at SKAT fra 2012 til 2015 udbetalte stadigt stigende milliardbeløb på grundlag af ansøgninger fra ukendte amerikanske pensionsplaner. Det kom bag på alle og selvfølgelig også på Bech-Bruun, at der var tale om bedrageri. SKAT kunne og burde have opdaget, at refusionsansøgningerne indgivet i 2014 vedlagt udbyttenotaer udstedt af North Channel Bank var usædvanlige. SKAT burde meget hurtigt have konstateret, at noget var rivravruskende galt.

Den af SKAT udviste accept af risiko forhindrer ikke Skatteforvaltningen i at gennemføre krav mod de personer, der forsætligt har begået eller medvirket til bedrageri, men den udelukker erstatningskrav mod Bech-Bruun.

Forvaltningen af udbytteområdet har været uforsvarlig, hvilket kan tilregnes SKAT (nu Skatteforvaltningen) som egen skyld. Det var en direkte følge af den uforsvarlige forvaltning, at refusioner blev udbetalt i overensstemmelse med ansøgninger vedlagt notaer fra North Channel Bank, og det ville være uantageligt at pålægge Bech-Bruun at bære konsekvenserne heraf. I en sag som den foreliggende, hvor det er myndigheden selv, der er ansvarlig, og det uden betydning, at offentligretlige forpligtelser til kontrol ikke i

U.2024.746H - SKM2024.123.HRH

udgangspunktet søger at beskytte skattepligtige eller rådgivere. Skatteforvaltningens mulighed for at prioritere ressourcer giver ikke adgang til at spare alle ressourcer væk og derved uddelegere den forudsatte kontrol til private rådgivere.

Endvidere er det udtryk for egen skyld, at SKAT først den 6. august 2015 satte behandlingen af ansøgninger om refusion af udbytteskat i bero, selv om SKAT allerede den 16. juni 2015 modtog den første henvendelse fra en dansk skatteadvokat om den formodede svindel.

SKAT har ikke lidt noget tab. Det bestrides ikke, at SKAT uberettiget udbetalte i alt 1.135.775.442,18 kr. i refusion af udbytteskat på grundlag af ansøgninger vedlagt udbyttenotaer udstedt af North Channel Bank. En tabsopgørelse skal begrænses til den relevante periode, hvorfor der skal ses bort fra notaer for samlet mindst 600.228.186,33 kr., hvortil kommer, at modtagne betalinger fra andre skal fradrages. Skatteforvaltningen har oplyst at have modtaget 1.010.424.596,73 kr. i henhold til den hemmelige forligsaftale fra maj 2019 med blandt andre bankens ejere og kunder, men trods editionspålæg har Skatteforvaltningen undladt at dokumentere, hvilke betalinger der skal henføres til udbyttenotaer udstedt af North Channel Bank. Skatteforvaltningen kan ikke undskylde sig med eventuel selvskabt bevisnød, og et tab er herefter ikke godtgjort.

Det følger af almindelig obligationsret, at skadelidte i tilfælde, hvor der er tale om flere skadeforhold, hvert med sine skadevoldere, og hvor en skadelidt modtager delvise betalinger fra nogle skadevoldere, er forpligtet til at fordele betalingerne på de skadeforhold, som betalingerne angår.

Der er ikke noget i vejen for, at den samlede betaling i henhold til forligsaftalen på 1.010.424.596,73 kr. kan

**849**

stamme fra forligsparter, der er ansvarlige for »NCB-andelen«. Uden dokumentation for, om de modtagne betalinger angår »NCB-andelen«, er der ikke anden mulighed, end at den fulde betaling må fradrages i kravet mod Bech-Bruun.

Hertil kommer, at Skatteforvaltningen har forsømt at iagttage sin tabsbegrænsningspligt og også af den grund er afskåret fra at gøre krav gældende mod Bech-Bruun. Tilbagesøgning af de beløb, som skattemyndighederne uberettiget har udbetalt, må i det hele gå forud for et erstatningskrav mod Bech-Bruun, og et krav mod Bech-Bruun må forudsætte, at Skatteforvaltningen dokumenterer, at tilbagesøgning ikke har været mulig.

Skatteforvaltningens højst usædvanlige rentekrav bestrides i det hele. Tværtimod gælder, at et rentekrav i en sag som den foreliggende skal bortfalde, subsidiært skal rentesatsen reduceres, jf. rentelovens § 3, stk. 5, og § 5, stk. 3. I alle tilfælde er der intet grundlag for at forrente et eventuelt erstatningskrav fra et tidligere tidspunkt end sagens anlæg, jf. § 3, stk. 4.

## Højesterets begrundelse og resultat

*1. Sagens baggrund og problemstillinger*

Bech-Bruun I/S rådgav i 2014 den tyske bank, North Channel Bank, om bankens mulige ansvar ved at medvirke i transaktioner med danske børsnoterede aktier. Transaktionerne indebar, at North Channel Bank udstedte udbyttenotaer (Dividend Credit Advice), der kunne anvendes ved indgivelse af ansøgninger til SKAT (nu Skatteforvaltningen) om refusion af udbytteskat.

I løbet af 2014 og 2015 udstedte North Channel Bank udbyttenotaer, der i perioden fra den 12. maj 2014 til den 22. juli 2015 af såkaldte reclaim agents blev vedlagt ansøgninger til SKAT om refusion af udbytteskat til amerikanske pensionsplaner, der som følge af dobbeltbeskatningsoverenskomst mellem USA og Danmark havde en fordelagtig udbytteskatteposition. På baggrund af de modtagne ansøgninger udbetalte SKAT i alt 1.135.775.442,18 kr.

Refusionsansøgningerne viste sig efterfølgende i det hele at være uberettigede. Parterne er i den forbindelse enige om, at refusionsansøgningerne var baseret på fiktive transaktioner, idet der hverken var aktier, udbytter eller pengestrømme.

North Channel Bank vedtog den 23. september 2019 i Retten i Glostrup en bøde på 110 mio. kr. for bedrageri af særlig grov beskaffenhed. Ved bødevedtagelsen erkendte North Channel Bank sig skyldig i, at banken i perioden 2014-2015 havde registreret fiktive aktie- og pengebevægelser og udstedt udbyttenotaer, som indeholdt urigtige oplysninger om udbetaling af udbytte af danske aktier, og som bankens medgerningsmænd på vegne af amerikanske pensionsplaner anvendte til uberettiget at få udbetalt ikke under 1,1 mia. kr. fra danske skattemyndigheder. Banken opnåede herved en uberettiget berigelse på ikke under 55 mio. kr.

Sagens hovedspørgsmål er, om Bech-Bruun på baggrund af rådgivningen af North Channel Bank er erstatningsansvarlig for det tab, som Skatteforvaltningen har lidt som følge af de nævnte uberettigede refusioner af udbytteskat.

Sagen angår beløbsmæssigt lidt over 700 mio. kr. med tillæg af renter, idet Skatteforvaltningen har reduceret kravet på i alt ca. 1,135 mia. kr. med betalinger, som Skatteforvaltningen har modtaget gennem forlig indgået med forskellige aktører, der har deltaget ved indgivelse af uberettigede refusionsansøgninger, herunder refusioner baseret på udbyttenotaer udstedt af North Channel Bank.

Der er under sagen rejst spørgsmål om ansvarsgrundlag, årsagsforbindelse, adækvans, tabsopgørelse, egen skyld og accept af risiko, forældelse og renter.

*2. Generelt om ansvarsvurderingen*

Ved vurderingen af, om en advokat ved sin rådgivning af en klient har handlet ansvarspådragende over for skattemyndighederne, er det afgørende, om advokaten på uforsvarlig måde har tilsidesat skattemyndighedernes interesser. Om dette er tilfældet, beror på en samlet vurdering af omstændighederne på tidspunktet for advokatens rådgivning.

I vurderingen indgår som et centralt element, om de dispositioner, som advokaten har rådgivet om, havde et forretningsmæssigt formål, og om dispositionerne havde en usædvanlig karakter.

Herudover indgår det nærmere indhold af advokatens opdrag samt den rådgivning, som advokaten har ydet i det enkelte tilfælde.

*3. Den konkrete ansvarsvurdering*

*3.1. Rådgivningsforløbet*

Advokatfirmaet Jones Day i Tyskland rettede den 3. februar 2014 ved mail henvendelse til Bech-Bruun. Af en dansk oversættelse af mailen fremgår bl.a., *at* North Channel Bank ikke selv skulle være part i den omhandlede transaktion, men alene levere tjenesteydelser, *at* parterne i transaktionen »vil realisere en skattefordel i Danmark, som formentlig består i dobbelt refusion af indeholdt udbytteskat«, *at* North Channel Bank var bekymret for, om man skulle være opmærksom på »problemer« i Danmark, f.eks. »skattesvig«, og *at* der indtil for nylig havde været smuthuller i den tyske skattelovgivning, som gav mulighed for dobbelt refusion, men at de tyske skattemyndigheder »undersøger nu disse transaktioner og forsøger at gøre gældende, at de er misbrug eller endda strafbare forhold«. Af svar samme dag til advokatfirmaet Jones Day fra advokat A, der forestod Bech-Bruuns rådgivning af North Channel Bank, fremgår bl.a., *at* transaktioner som de beskrevne »kan indebære mulighed for, at to aktionærer kan ansøge om

**850**

refusion af den samme kildeskat … ('cum/ex-transaktioner')«, og *at* sådanne transaktioner er »generelt problematiske set ud fra et juridisk perspektiv, og oftest er det ikke muligt at give den form for opinion om juridiske og ansvarsmæssige spørgsmål, som de involverede parter normalt ansøger om«.

Den 5. februar 2014 anførte Jones Day bl.a., at North Channel Bank gerne ville have et salærtilbud, og at bankens rolle »vil være begrænset til at levere tjenester som depotbank til parterne i cum/ex-transaktionen«. Hertil svarede Bech-Bruun samme dag bl.a., at salæret ville være omkring 6.000-7.000 euro, og at »disse strukturer typisk er problematiske i henhold til dansk ret«.

Jones Day spurgte den 6. februar 2014 Bech-Bruun, om en legal opinion kunne være en begrundet »should-opinion«, »(dvs. 'NCB [North Channel Bank] bør ikke være genstand for strafferetlig forfølgning mv.') med visse rimelige forudsætninger (f.eks. at handle i god tro, henholde sig til en ekspert-opinion, ingen deltagelse i - potentielt - uberettiget skattefordel mv.) og forbehold (ingen præcedens/retspraksis mv.)«. I et svar af 7. februar 2014 gentog Bech-Bruun, at den omhandlede transaktion er »problematisk fra et dansk juridisk synspunkt«, at »bør-niveau kan ikke loves«, og at »For at foretage denne vurdering skal vi have et fuldt overblik over transaktionen og klientens rolle, herunder hvad der foregår i Danmark«.

I de følgende dage var der yderligere mailveksling mellem Jones Day og Bech-Bruun bl.a. på grundlag af en »tax opinion« af 27. juni 2012, som Bech-Bruun modtog den 10. februar 2014. Denne »tax opinion« var udarbejdet af bl.a. advokat I og angik spørgsmålet om de danske skattemæssige konsekvenser for en amerikansk pensionsplans deltagelse i transaktioner med danske børsnoterede aktier. I Jones Days mail af 13. februar 2014 anføres bl.a., at advokatfirmaet ikke har behov for en »genbekræftelse … ud fra et skattemæssigt perspektiv, men en begrundet skatteanalyse af den risiko, som vores klient kan være eksponeret for, hvis de handler som depotbank i dette projekt«, og at det relevante spørgsmål er, om North Channel Bank efter dansk skatteret »kan gøres ansvarlig eller endda retsforfølges for at støtte/facilitere en skatteunddragelse begået af en af de andre aktører i denne transaktion…«.

I tiden herefter fortsatte dialogen mellem Bech-Bruun og Jones Day, og Bech-Bruun modtog den 10. april 2014 et transaktionsdiagram, der var udarbejdet på tysk. Den 15. april 2014 modtog Bech-Bruun et resumé på engelsk af de påtænkte transaktioner og den 22. april 2014 et revideret engelsk resumé. I forlængelse af modtagelsen af det første engelske resumé skrev Bech-Bruun den 16. april 2014 til Jones Day bl.a., at man havde læst den nye »faktuelle beskrivelse«, at »der faktisk er en indikation af, at transaktionen er en cum/ex-transaktion, hvilket var vores oprindelige bekymring, men som vi følte, at vi kunne udelukke efter at have læst tax opinion«, og at den nye faktuelle beskrivelse »synes … under alle omstændigheder at udelukke, at vi beholder forudsætning 5 i vores udkast til opinion, da USPF [amerikansk pensionsplan] erhverver cum udbytteaktier fra en Sælger, som ikke ejer (eller leverer) cum udbytteaktier, og USPF kan derfor pr. definition ikke være ejer af cum udbytteaktier på udbytte-godkendelsesdatoen«.

Bech-Bruun afgav under rådgivningsforløbet flere udkast til legal opinion. Bech-Bruun afgav det første udkast til legal opinion den 18. februar 2014, det andet udkast den 20. februar 2014, det tredje udkast den 15. april 2014, det fjerde udkast den 23. april 2014 og det femte udkast den 2. maj 2014.

I det femte udkast anføres det i pkt. 2 (»Scope«) i en dansk oversættelse af legal opinion, at den angår »om NCB er skattepligtig i Danmark, NCB's civilretlige ansvar for et tab lidt af den danske stat og danske strafferetlige spørgsmål for NCB som følge af transaktionen …«.

I pkt. 3 (»Påtænkte transaktioner«) beskrives de påtænkte transaktioner i form af køb, salg og lån af aktier samt North Channel Banks udstedelse af udbyttenota.

I konklusionen i pkt. 5 (»Opinion«) anføres bl.a., at »NCB bør ikke være underlagt dansk civilretligt ansvar, som indebærer pligt til at kompensere den danske stat for eventuelle tab som følge af bankens rolle i den påtænkte transaktion«, men at en række nærmere angivne omstændigheder »forhindrer os dog i at nå frem til en mere definitiv vurdering af NCB's position«. I pkt. 5 anføres det også, at »NCB bør ikke være underlagt dansk strafferetligt ansvar som følge af sin rolle i den påtænkte transaktion«.

Den 4. august 2014 sendte Bech-Bruun en underskrevet legal opinion til Jones Day, der i alt væsentligt svarede til det femte udkast af 2. maj 2014.

### 3.2. Ansvarsvurderingen

Højesteret finder, at advokat A - på baggrund af dialogen med Jones Day, indholdet af det tyske transaktionsdiagram, de engelske resuméer af de påtænkte transaktioner og transaktionsbeskrivelserne i legal opinion - måtte indse, at der var en nærliggende risiko for, at North Channel Bank sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat.

I den forbindelse har Højesteret lagt vægt på, at advokat A allerede efter Jones Days mail af 3. februar 2014, hvor han blev gjort opmærksom på risikoen for dobbelt refusion af udbytteskat, havde særlig anledning til at være opmærksom på risikoen for tilsidesættelse af skattemyndighedernes interesser ved, at der blev søgt om uberettiget refusion. Der var anledning til yderligere

**851**

at skærpe opmærksomheden på grund af de transaktionsbeskrivelser, som han efterfølgende modtog under rådgivningsforløbet. Advokat A befandt sig således i et skærpet ansvarsmiljø.

Endvidere har Højesteret lagt vægt på, at de påtænkte transaktioner - der indgik i en såkaldt cum/ex-model - fremstod uden forretningsmæssig begrundelse.

Advokat A havde under rådgivningsforløbet flere gange udtalt sin bekymring over, at transaktionsmodellen fremstod som en cum/ex-model, og at modellen generelt var problematisk. Alligevel undlod han efter sin forklaring at sætte sig nærmere ind i indholdet af det tyske transaktionsdiagram. Hertil kommer, at han vidste, at en udbyttenota udgjorde et vigtigt dokument som grundlag for refusion af udbytteskat.

Da advokat A som anført måtte indse, at der var en nærliggende risiko for, at North Channel Bank sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat, har han på uforsvarlig måde tilsidesat skattemyndighedernes interesser ved at rådgive banken som sket, herunder ved i sin legal opinion at anføre, at banken »ikke bør være underlagt« et civilretligt eller strafferetligt ansvar for sin deltagelse. Advokat A har således handlet ansvarspådragende over for Skatteforvaltningen.

Det kan under de foreliggende omstændigheder ikke føre til en anden vurdering, at advokat A havde indsat en række forudsætninger og forbehold i sin legal opinion.

Det kan heller ikke føre til en anden vurdering, at den model for uberettiget refusion af udbytteskat, som advokat A's rådgivning angik, blev anvendt uden brug af aktier eller udbytte.

### 4. Årsagsforbindelse

Bech-Bruun har anført bl.a., at det begåede bedrageri ville have været gennemført, selv hvis Bech-Bruuns legal opinion ikke havde foreligget, og at der derfor ikke er den fornødne årsagsforbindelse mellem Bech-Bruuns rådgivning og det tab, som Skatteforvaltningen led som følge af uretmæssig refusion af udbytteskat.

Ved vurderingen af, om der foreligger årsagsforbindelse, finder Højesteret at de grunde, som landsretten har anført, at indholdet af Bech-Bruuns rådgivning lå fast allerede den 5. maj 2014, hvor Jones Day videresendte Bech-Bruuns legal opinion af 2. maj 2014 til North Channel Bank. Banken modtog den 9. maj 2014 Jones Days legal opinion. De første refusionsansøgninger vedlagt bankens udbyttenotaer blev indgivet til SKAT den 12. maj 2014. Der foreligger

Copyright © 2024 Karnov Group Denmark A/S

således en nær tidsmæssig forbindelse mellem Bech-Bruuns afgivelse af legal opinion den 5. maj 2014 og indgivelsen af de første uberettigede refusionsansøgninger.

På den anførte baggrund finder Højesteret, at det må lægges til grund, at der foreligger den fornødne årsagsforbindelse mellem Bech-Bruuns ansvarspådragende rådgivning og det forhold, at Skatteforvaltningen har lidt et tab som følge af uretmæssig refusion af udbytteskat.

*5. Adækvans*

Ved vurderingen af, om Bech-Bruuns erstatningsansvar bør begrænses ud fra betragtninger om manglende adækvans, må der på den ene side lægges vægt på, at Bech-Bruun som nævnt ovenfor måtte indse, at der var en nærliggende risiko for, at North Channel Bank sammen med andre var involveret i at udarbejde en model for uberettiget refusion af udbytteskat. Bech-Bruun vidste således, at banken deltog aktivt i udarbejdelsen af modellen, og Bech-Bruun måtte indse det som en nærliggende mulighed, at banken ikke var i god tro. Uanset dette anfører Bech-Bruun i sin legal opinion, at banken »ikke bør være underlagt« et civilretligt eller strafferetligt ansvar for sin deltagelse.

På den anden side må der lægges vægt på, at den uberettigede refusion af udbytteskat, der skete på grundlag af udbyttenotaer udstedt af North Channel Bank, foregik ved, at der blev bogført fiktive transaktioner, sådan at størrelsen af Skatteforvaltningens tab var uafhængig af reelle aktier og udbytter.

Højesteret finder herefter, at Bech-Bruuns erstatningsansvar ikke kan omfatte det fulde beløb på 705.821.108,92 kr., der fremgår af Skatteforvaltningens påstand 1, jf. nærmere pkt. 8 nedenfor.

*6. Skatteforvaltningens tab*

Bech-Bruun har fremsat indsigelser mod Skatteforvaltningens tabsopgørelse, herunder at den er foretaget uden hensyn til, hvad der som følge af det forlig, der blev indgået den 28. maj 2019 mellem på den ene side Skatteforvaltningen og på den anden side et stort antal pensionsplaner og andre aktører, som deltog i de uberettigede refusionsansøgninger, er betalt *af* de pensionsplaner, hvis ansøgning om refusion var baseret på udbyttenotaer udstedt af North Channel Bank.

Af det nævnte forlig fremgår, at forligsparterne hæfter solidarisk *for* nærmere angivne beløb, som de enkelte pensionsplaner har fået udbetalt. Skatteforvaltningens fradrag i kravet mod Bech-Bruun er derfor sket ud fra, i hvilket omfang indbetalingerne fra forligsparterne forholdsmæssigt kan henføres til de pensionsplaner, der har anvendt udbyttenotaer fra North Channel Bank og ikke ud fra, hvad der er betalt *af* den enkelte pensionsplan.

Højesteret finder, at det i den foreliggende situation var velbegrundet, at Skatteforvaltningen indgik de omhandlede forlig, herunder forliget af 28. maj 2019, og at Skatteforvaltningen under de foreliggende omstændigheder var berettiget til at foretage fradrag af forligsparternes indbetalinger som sket.

*7. Egen skyld og accept af risiko*

Højesteret finder, at der ikke foreligger forhold, der kan begrunde, at Bech-Bruuns erstatningsansvar

**852**

bortfalder eller begrænses ud fra betragtninger om egen skyld eller accept af risiko.

*8. Størrelsen af Skatteforvaltningens krav*

Efter det anførte om ansvarsgrundlag, årsagsforbindelse, tabsgørelse, egen skyld og accept af risiko kan Skatteforvaltningens krav mod Bech-Bruun opgøres til 705.821.108,92 kr.; i overensstemmelse med Skatteforvaltningens påstand 1.

På baggrund af det, der er anført under pkt. 5 om adækvans, finder Højesteret, at Bech-Bruuns erstatningsansvar ud fra en samlet vurdering ikke bør omfatte et beløb på 400 mio. kr.

*9. Forældelse*

Højesteret finder, at forældelsesfristen ikke løb fra tidspunkterne for Skatteforvaltningens udbetalinger til pensionsplaner (skadens indtræden), jf. forældelseslovens § 2, stk. 4. Forældelsesfristen var således suspenderet og ville herefter først løbe fra det tidspunkt, hvor Skatteforvaltningen fik eller burde have fået kendskab til fordringen eller skyldneren.

Skatteforvaltningen har anlagt sagen den 8. juni 2020, og det er derfor afgørende, om suspensionen af forældelsesfristen var ophørt den 8. juni 2017, idet Skatteforvaltningens krav i givet fald vil være forældet ved sagens anlæg på grund af den 3-årige forældelsesfrist.

Bech-Bruun har gjort gældende navnlig, at suspensionen af forældelsesfristen ophørte med den mail af 10. oktober 2016, som Skatteforvaltningen modtog fra de tyske myndigheder. Højesteret finder, at Skatteforvaltningen på baggrund af indholdet af den pågældende mail ikke fik eller burde have fået kendskab til, at Bech-Bruun var ansvarlig skadevolder (skyldner), jf. forældelseslovens § 3, stk. 2.

Højesteret finder, at der heller ikke i øvrigt foreligger omstændigheder, der kan begrunde, at suspensionen af forældelsesfristen var ophørt den 8. juni 2017. Skatteforvaltningens krav mod Bech-Bruun var således ikke forældet ved sagens anlæg den 8. juni 2020.

*10. Rente*

Højesteret finder, at der ikke er grundlag for at forrente Skatteforvaltningens krav fra et tidligere eller senere tidspunkt end den dag, hvor sagen blev anlagt, jf. rentelovens § 3, stk. 2, 4 og 5, eller for, at forrentningen skal ske med en lavere rentesats, jf. lovens § 5, stk. 3.

Skatteforvaltningens krav skal derfor forrentes med procesrente fra sagens anlæg den 8. juni 2020.

*11. Samlet konklusion*

Bech-Bruun skal til Skatteforvaltningen betale 400 mio. kr. med procesrente fra den 8. juni 2020. Højesteret tager således Skatteforvaltningens påstand 1 og 3 delvist til følge og frifinder Bech-Bruun for Skatteforvaltningens påstand 2.

Højesteret tager endvidere Skatteforvaltningens påstand 4 om tilbagebetaling af sagsomkostninger for landsretten til følge.

*12. Sagsomkostninger*

Efter sagens karakter, omfang og udfald finder Højesteret, at Bech-Bruun skal betale delvise sagsomkostninger for landsret og Højesteret med i alt 12.394.000 kr. til Skatteforvaltningen. Heraf er 12 mio. kr. til dækning af advokatudgift, og 394.000 kr. er til dækning af retsafgift.

## Thi kendes for ret

Bech-Bruun I/S skal betale 400.000.000 kr. til Skatteforvaltningen med procesrente fra den 8. juni 2020.

Bech-Bruun I/S skal til Skatteforvaltningen tilbagebetale 6.189.953,70 kr. med procesrente fra den 24. maj 2022.

I sagsomkostninger for landsret og Højesteret skal Bech-Bruun I/S betale i alt 12.394.000 kr. til Skatteforvaltningen.

De idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.

Sagsomkostningsbeløbet forrentes efter rentelovens § 8 a.

Copyright © 2024 Karnov Group Denmark A/S