# Exhibit 14

*U.2021.5249*

# Ø.L.K. September 29, 2021, in 1st instance case 14. afd. BS-26436/2020-OLR

Edition in agreements that the Tax Administration had entered into as part of the recovery of approximately DKK 12.7 billion for the Danish state.

The Tax Administration, which believed that a law firm had acted negligently by advising a German bank, had made a claim for payment of more than DKK 700 million. During the case, the law firm requested that the Tax Administration be ordered to present a creditor agreement that the Tax Administration had entered into with the German bank, as well as a settlement agreement made with 61 American pension plans, including prior drafts of these agreements and correspondence related to the negotiations.

The law firm had advised the German bank on the issuance of documentation for share ownership to be used for requests to the Danish tax authorities for dividend tax refunds, and the German bank had subsequently assisted American pension plans with documentation for share ownership. The Tax Administration objected, particularly on the grounds that the material was subject to confidentiality. The High Court noted that if the requested material was confidential, an order for disclosure could only be granted if the material was found to be of decisive importance for the clarification of the case, and the interest in confidentiality should be outweighed by the interest in the clarification of the case. The High Court found no basis to overturn the assessments that the information was confidential and exempt from access. Regarding the interests behind confidentiality, the Tax Administration stated that confidentiality had been agreed upon, and a breach of this could constitute a breach of the settlement agreement and affect the payment of the settlement amount. It could also negatively impact the Tax Administration's future settlement opportunities. The request also included internal and confidential legal advice, and sharing this could have unforeseeable consequences for the Tax Administration's ability to recover billions of kroner. The law firm particularly wished to shed light on the basis for the size of the claim directed against it. The High Court found that information in the creditor agreement and the settlement agreement, with accompanying appendices regarding the basis for and the size of the claims against the individual settlement parties, which formed the basis for the claim directed against the law firm and which was continuously adjusted as payments were made under the settlement agreement, would be of decisive importance for the clarification of the case. The High Court assumed that these matters could not be clarified in any other way than by presenting redacted versions of the two agreements with the accompanying appendices. The case was also of a principal nature, and information regarding the content of the agreements was already to some extent part of the case, and it also appeared from the case that TV2 and Politiken were in possession of at least excerpts of the settlement agreement. On this basis, and

given the nature of the considerations highlighted by the Tax Administration behind confidentiality, the High Court found that there were such special circumstances that the interest in confidentiality regarding the above-mentioned information must give way to the interest in clarifying the case. The requests concerning these agreements were therefore granted. The High Court did not grant the requests for prior drafts of the creditor agreement and drafts of the settlement agreement, as well as correspondence related to the negotiations of these agreements. The High Court emphasized that it was not proven that the requested additional material would be of decisive importance for the outcome of the case.

(Bloch Andersen, Benedikte Holberg, and Anne Bendfeldt Westergaard). The Tax Administration (attorney Boris Frederiksen and attorney Steffen Sværke, both from Copenhagen) versus A Law Firm (attorney Ole Spiermann, Copenhagen)

## Østre Landsrets court book September 29, 2021, BS-26436/2020-OLR

The defendant, A Law Firm, has by request for disclosure dated January 20, 2021, requested that the plaintiff, the Tax Administration, be ordered to present the following material, pursuant to Section 298, subsection 1 of the Administration of Justice Act:

1. Creditor agreement with B Bank entered into by either the Tax Administration or the Danish Tax Agency on September 11, 2019, along with any other related agreements (the entire agreement complex).
2. Prior drafts of the aforementioned creditor agreement shared with B Bank, SØIK, or others outside the Tax Administration, as well as correspondence related to negotiations of the creditor agreement and the earlier letter of intent dated May 16, 2019, including the letter from July 6, 2018, from B Bank to the Ministry of Taxation and the letter from October 2018 from B Bank to the Tax Administration (both letters are mentioned on page 5 of the letter of intent).
3. Settlement agreement from May 2019 with 61 American pension plans and a number of associated individuals and companies, entered into by either the Tax Administration or the Danish Tax Agency, along with any other related agreements (the entire agreement complex).
4. Prior drafts of the aforementioned settlement agreement shared with one or more settlement parties, B Bank, SØIK, or others outside the Tax Administration, as well as correspondence related to negotiations of the settlement agreement.

The Tax Administration has submitted a claim that the request for disclosure should be 'denied, or alternatively, that the disclosure be limited to (parts of) the settlement and the creditor agreement.

After exchanging written submissions regarding the request for disclosure, the Tax Administration submitted some excerpts of the settlement agreement (item 3 of the request for disclosure) in pleading C dated July 6, 2021.

A Law Firm has subsequently maintained the request for disclosure in its entirety.

## Claims in the Main Case

The case was brought by the Tax Administration in June 2020, and the following revised claims have been made against A Law Firm according to the Tax Administration's pleading 2 dated September 3, 2021:

*Claim 1*

A Law Firm is ordered to pay DKK 722,290,313.77 to the Tax Administration with interest from September 3, 2021, until payment is made.

*Claim 2*

A Law Firm is ordered to pay DKK 447,357,276.28 to the Tax Administration.

*Claim 3*

A Law Firm is ordered to pay DKK 78,129,171.06 to the Tax Administration.

A Law Firm has claimed acquittal.

## Briefly about the case

The case concerns whether A Law Firm has incurred liability for damages in connection with A Law Firm's advice in 2014 to the German bank B Bank on issuing documentation for ownership of shares for use in applications to the Danish tax authorities for refund of dividend tax.

According to the Danish Tax Administration, the advice to B Bank concerned the question of whether the bank risked incurring criminal or tort liability to the Danish state for issuing documentation for ownership of Danish shares. A Law Firm received the assignment from the German law firm C on behalf of B Bank and A Law Firm provided a legal opinion on the issue to law firm C/B Bank.

B Bank subsequently assisted a number of US pension plans with documentation for ownership of shares (so-called Credit Advices) for use in requests for payment of refunds of withheld dividend tax. B Bank acted as custodian, i.e. as the custodian bank holding the share for the refund claimant, and when issuing the Credit Advices, B Bank assisted the pension plans with dividend refund claims to the Danish tax authorities for a total of DKK 1,135,775,342.

On September 23, 2019, B Bank was sentenced to a fine of DKK 110 million by the Court in Glostrup after admitting complicity in fraud in the dividend case complex.

In January 2020, The National Audit Office ("Rigsrevisionen") submitted a memorandum on the settlement between the Danish Tax Agency and 61 American pension plans and others, which A Law Firm wishes to present (item 3 of the request for production).

The memo, which also touches on the creditor agreement with B Bank (item 1 of the request for redaction), states the following, among other things:

*"The Treasury's settlement with 61 US pension plans and others from May 2019*

1. In the fall of 2019, the State Auditors requested Rigsrevisionen to conduct a factual review of the settlement that the Danish Tax Agency entered into with 61 American pension plans and a number of related persons and companies in May 2019, cf. section 8 of the Auditor General Act. The settlement covers 61 pension plans, 56 natural persons and 102 companies. Rigsrevisionen has also obtained a report from the Ministry of Taxation on the overall initiatives to get the approximately DKK 12.7 billion back to the Danish state.

   …

I. The Ministry of Taxation's initiatives to get the approximately DKK 12.7 billion in unjustified dividend refunds back to the Danish state

*Introduction*

2. Between January 1, 2012, and August 6, 2015, Denmark is believed to have been exposed to a total amount of approximately DKK 12.7 billion in dividend tax refund fraud. The DKK 12.7 billion originates from payments made under the so-called form scheme. The Danish Tax Agency has subsequently investigated the banking scheme, and in February 2019, the agency identified 4 recoveries totaling DKK 828,000 in the banking scheme that could be linked to actors involved in the suspected fraud in the form scheme. The actors had thus applied for reimbursement in both the form scheme and the bank scheme. Since 2015, the Danish Tax Agency, with the assistance of the Attorney General, has worked to recover the approximately DKK 12.7 billion back to the treasury by means of civil lawsuits and other civil law measures.

In the following, we will review the Ministry of Taxation's initiatives to get the approximately DKK 12.7 billion back to the Danish treasury, including primarily the Danish Tax Agency's settlement with 61 US pension plans and others, which was reached in May 2019. The main features of the settlement are that the 61 pension plans and others must pay an amount of DKK 1.6 billion to the Danish state. In connection with the agreement, a separate agreement has been reached with a German bank that has been involved in part of the reimbursement setup that the Danish Tax Agency waives its claim against the bank on agreed terms.

3. The review is based on correspondence with the Ministry of Taxation, including a statement from the Ministry of Taxation prepared by the Danish Tax Agency on the settlement with the 61 US pension plans and others. The report contains the information that the Ministry of Taxation believes can be made public. Rigsrevisionen has also been presented with the settlement at a meeting with the Danish Tax Agency at Kammeradvokaten and has had the opportunity to read the selected parts of the settlement text, which we report on in this memo. The purpose was to verify the Tax Agency's information and thereby quality assure Rigsrevisionen's own descriptions.

Rigsrevisionen has not assessed the content of the settlement but has only prepared a factual account. The only assessment we make is the assessment of the legality of entering into a settlement.

II.  *Authority to settle and reach agreements in litigation*

4. There is nothing to prevent the Tax Agency from reaching a settlement instead of litigating in court. The authority to enter into a settlement is found in section 2.4.3 of the budget guidelines on expenses imposed by judgment, etc. which states "It is possible to incur unforeseeable expenses that it must be considered highly probable, possibly after obtaining an opinion from the Attorney General, that the state will be ordered to pay in the event of a lawsuit". It is assumed that section 2.4.3 also covers cases in favor of the state, cf. the Ministry of Transport and Energy's answer of 16 November 2005 to the Finance Committee's question no. 1 of 7 November 2005 regarding the settlement reached between Banedanmark and Bombardier Transportation.

This in combination with section 2.2.3 of the budget guidelines on the general considerations when allocating funds, which are "... that due economic considerations must be shown in the allocation", means that it is important to ensure the best possible economic result, also taking into account the costs involved.

This means that the specific assessment must be based on considerations such as the legal outcome of any civil action against the parties and the benefits that may result from a settlement

for the Tax Agency, but also that the financial costs that may be involved in carrying out various legal steps must be taken into account.

*The appropriateness of the settlement - the background for the Ministry of Taxation and the Tax Agency's decision to settle*

5.  The settlement is an offshoot of how the Ministry of Taxation has decided to implement its overall strategy of recovering the DKK 12.7 billion through civil litigation. Rigsrevisionen has neither assessed whether the overall strategy is appropriate nor whether it has been implemented appropriately.

    Furthermore, Rigsrevisionen has not assessed the financial appropriateness of the settlement reached but notes that the Danish Tax Agency and the Attorney General had considered the appropriateness of the settlement prior to its conclusion, and that the Ministry of Taxation has agreed with the assessment of the Attorney General and the Danish Tax Agency that the most appropriate and best financial result is obtained by entering into the settlement.

6.  The Danish Tax Agency has stated that the assessment of entering into a settlement is based on the weighing of a number of factors, including, on the one hand, the possible legal outcomes of any civil actions against the parties and the litigation risk associated therewith, the lack of opportunity to obtain detailed insight into the settlement parties' ability to pay or lack thereof and the risk of undermining any ability to pay with lengthy legal proceedings and, on the other hand, the immediate benefits for the Danish Tax Agency that follow from the settlement.

    The Danish Tax Agency has also stated that, according to the Agency's US representatives, the settlement result corresponds to the outcome under US law if the Agency were to succeed in any civil action that the refund applications were unjustified, without at the same time establishing that the parties to the settlement committed fraud. However, the Danish Tax Agency has stated that there is also a risk that the Agency would not be successful at all.

    The specific description of the litigation risks is confidential, as it could be used by counterparties in any future litigation.

7.  Rigsrevisionen notes that it is the opinion of the Attorney General and the Danish Tax Agency that both the settlement agreement and the agreement with the bank are the most financially advantageous solution for the Danish state in this part of the case complex.

The Danish Tax Agency has also stated that it is also the assessment that the separate agreement in relation to Denmark's total claim against the German bank is a crucial prerequisite for the bank to be sold in free trade and that bankruptcy can thus be avoided.

8. The Danish Tax Agency has further stated that the benefits of the settlement are the immediate payment of DKK 950 million and the recognition of the additional obligation of at least DKK 650 million. In addition, the terms of the settlement parties' obligation to cooperate with the Agency on the disclosure of the cases (discussed below) and thus support the Agency's case management in the other civil actions, including against the principals in the case. Finally, the Danish Tax Agency has stated that it is presumed to be an advantage that the Agency in the other many lawsuits can inform that a settlement has been reached where a number of natural and legal persons have agreed to repay the amounts they themselves have received in connection with the refunds.

9. Rigsrevisionen cannot assess whether the decision to enter into the settlement is the best one, but agrees that the Tax Agency and the Attorney General have included relevant considerations in the decision.

*III.    The Danish Tax Agency's civil law pursuit of the approximately DKK 12.7 billion*

10. The Danish Tax Agency has stated that since 2015, with the assistance of the Danish Attorney General, the Agency has worked to recover the approximately DKK 12.7 billion to the Danish Treasury by means of civil actions and other civil law measures, including civil discovery, document seizures, freezing of money, etc. The alleged fraud has been reported to SØIK, which is pursuing the case criminally.

The Danish Tax Agency has stated that the status is that legal proceedings have been brought against a total of 490 companies and individuals in the US, UK, Dubai, Malaysia and Denmark. In total, claims have been raised for the full amount of approximately DKK 12.7 billion.

11. The Danish Tax Agency has further stated that the overall aim of the civil law measures is to create that all possibilities to recover the loss of DKK 12.7 billion are pursued and exhausted. Against this background, the Danish Tax Agency and the Attorney General's Office have adopted a strategy whereby the refund amounts paid out are sought back from the pension plans and companies that have applied for and received refunds, at the same time as claims are raised against the main backers who are suspected of being behind the alleged fraud and against the natural and legal persons who are suspected of having received a share of the financial proceeds.

As the cases are clarified, the possibility of bringing claims against any banks, advisors and other contributing actors will also be considered on an ongoing basis.

12. The Danish Tax Agency further states that of the total amount of approximately DKK 12.7 billion paid out by the former SKAT in unjustified dividend refunds, approximately DKK 11 billion was paid out on the basis of applications from a large number of US pension plans. In addition, approximately DKK 1.5 billion was paid out based on applications from a number of Malaysian companies, while approximately DKK 100 million can be attributed to applications from a UK pension plan. In addition, an amount of approximately DKK 100 million (miscellaneous) has been paid out.

...

In connection with the cases, a number of assets have been seized. Currently, assets worth an estimated DKK 3.3 billion to DKK 3.5 billion have been seized. This has been done to ensure that assets belonging to the defendants are not hidden or otherwise made inaccessible while the Tax Agency's cases are pending before the courts. For the United States, the cases are currently consolidated in the United States District Court for the Southern District of New York.

13. The Danish Tax Agency has stated that several parties have been sued jointly and severally for the total claim (i.e. in some cases double coverage has been sought). However, Denmark can never recover more than the approximately DKK 12.7 billion in connection with the civil actions.

In addition, the Danish Tax Agency has stated that as part of the pursuit of the DKK 12.7 billion, the agency has so far entered into a total of 3 settlements. The largest settlement, which Rigsrevisionen discusses in more detail in this memo, has a settlement amount of DKK 1.6 billion. The other two settlements are on a smaller scale with settlement sums of DKK 4.3 million and DKK 3.9 million respectively. The DKK 4.3 million and DKK 3.9 million correspond to the full reimbursement amounts recovered by 2 US pension plans. As part of these settlements, the two pension plans have committed to cooperate with the Danish Tax Agency and support the Agency's other actions in the dividend case. It is a condition of these settlements that if the Danish Tax Agency later receives payment from other actors who have received part of the reimbursement sum, the pension plans will be reimbursed these amounts, as the Agency can only receive coverage for its claims once. In such cases, the pension plans end up repaying only what they have received.

...

IV.    *The settlement with 61 US pension plans and others*

14. At the end of May 2019, the Danish Tax Agency reached a settlement with 61 US pension plans and a number of related individuals and companies as part of the overall case complex on dividend refunds.

*Background for the settlement*

15. The Danish Tax Agency has stated that the background was that representatives of a large group of American pension plans and a number of related companies and individuals contacted the Danish Tax Agency's representative - the Attorney General - at the end of 2016 in connection with the Agency's preparation of the civil law measures, as they wanted to enter into a dialogue about a possible settlement. In the end, 118 pension plans that had been involved in refund applications totaling DKK 5.7 billion were included in the negotiations. The dialog continued until the end of 2018, when the Danish Tax Agency decided to discontinue the negotiations on the recommendation of the Attorney General's Office, as it did not seem possible to reach a conciliatory solution that was attractive to all parties.

In early 2019, the representatives of 75 of the original 118 pension plans again contacted the Attorney General's Office, waiving a number of previously imposed conditions, including a requirement of impunity. Later, the 75 pension plans were reduced to 61 plans.

…

…61 pension plans and others - which the settlement ends up covering - have applied for dividend refunds totaling DKK 2.9 billion. Net, the 61 pension plans and others have been paid DKK 1.6 billion.

After detailed discussions between the Tax Agency and the Attorney General's Office, analysis of the information obtained at the time through the civil law measures, and an assessment of the various legal outcomes of the cases, it was decided, according to the Tax Agency - in agreement with the Ministry of Taxation and the then Minister of Taxation - to work towards a settlement, and at the end of May 2019, this resulted in a settlement agreement with the 61 pension plans and others.

43 of the 118 pension plans have been sued in the US in early 2019, while the remaining 14 pension plans have been sued in November 2019…

In addition to receiving a portion of the approximately DKK 2.9 billion in refunds, some of the settling parties have also participated in the recovery of refunds via 19 other US pension plans that are not part of the settlement. These 19 pension plans have independently recovered approximately DKK 1.2 billion. The Danish Tax Agency has stated that claims have been filed against these actors.

*The main features of the settlement - from DKK 2.9 billion to DKK 1.6 billion*

16. The main features of the settlement agreement are that the 61 pension plans and others must pay a minimum amount of DKK 1.55 billion to the Danish state. According to the Danish Tax Agency's information, the amount corresponds to the amount received directly or indirectly by the parties to the settlement from the DKK 2.9 billion that the 61 pension plans have applied for in dividend refunds, as well as a smaller amount that some of the parties to the settlement have received via the other 19 pension plans. Finally, there is an additional amount of at least DKK 50 million from the German bank, which is assumed to independently pay an amount corresponding to the bank's profit, which is why the total settlement amount adds up to DKK 1.6 billion.

...

---the 61 pension plans etc. [have] in total ... applied for a dividend refund of DKK 2.9 billion but have received a net payment of DKK 1.6 billion.

17. The Danish Tax Agency has stated that the strategy behind the settlement has been to recover the amount that the parties to the settlement have received of the total refund amount regardless of size, and to receive relevant information and documents about the fraudulent scheme in order to strengthen the Danish Tax Agency's ability to prosecute the other actors in the case for the remaining amount.

18. Rigsrevisionen notes that the settlement amount has been calculated as the amount that the parties to the settlement have received directly or indirectly according to the Danish Tax Agency's information.

Rigsrevisionen also notes that SKAT's payments of the DKK 2.9 billion were made to the paying agents. From the disbursement agents, the amounts received - minus an "administration amount" - were paid to a total of four so-called custodians. From these custodians - who were also paid directly or indirectly for their work in issuing documentation for ownership of the fictitious shares - a significantly smaller amount was thus paid to the 61 pension plans and a number of associated persons and companies.

The Danish Tax Agency has stated that all paying agents and custodians involved are currently being sued. However, the information reviewed by the Attorney General in connection with the verification of the settlement amount shows that part of the amounts withheld by the involved custodians appears to have been transferred to a number of offshore companies that are presumed to be owned and or controlled by the persons behind these custodians. The Danish Tax Agency also states that it is continuously assessed whether these offshore companies should also be included in the cases brought, or whether it is sufficient that the withheld amounts have been recovered from both the participating custodians and the presumed principals behind the alleged fraud. However, a claim has still been raised for the full amount paid out.

*Terms of the agreement - duty to cooperate*

19. The settlement contains a condition regarding the settling parties' duty to cooperate with the Danish Tax Agency in the investigation of the cases, including making material relevant to the Danish Tax Agency's civil action available to the Danish Tax Agency and the Attorney General. The settlement also gave the Danish Tax Agency access to verify whether the parties to the settlement have actually (i.e. net) received the approximately DKK 1.6 billion.

In the event that the Danish Tax Agency's verification shows that the parties to the settlement have received more than the approximately DKK 1.6 billion, the settlement amount will be increased accordingly. However, according to the settlement text, the amount can never be less than DKK 1.6 billion.

20. With regard to the verification of whether the settlement parties have actually received DKK 1.6 billion, the Attorney General together with the Danish Tax Agency's US representatives are reviewing the cash flows from the former SKAT to the settlement parties. Before the end of 2019, the Danish Tax Agency received all material for the cash flow analyses from the settlement parties.

The material will be reviewed by the Attorney General and the Danish Tax Agency's US representatives in early 2020 in order to determine the final settlement amount.

21. It appears from the settlement that the settling parties have undertaken to cooperate with the Danish Tax Agency and the Attorney General in relation to the Agency's other civil actions, including making material relevant to the Danish Tax Agency's civil actions available to the Danish Tax Agency and the Attorney General.

The Danish Tax Agency has stated that, together with the Attorney General's Office, the Agency is in the process of obtaining and reviewing a large amount of material from the parties to the settlement.

Rigsrevisionen notes that the settlement states that the parties to the settlement - as part of this obligation to cooperate - must also document to which other actors in the reimbursement set-up the difference between the amount recovered by the pension plans and the amount received by the plans etc. has been allocated. The Danish Tax Agency has stated that these actors include the principals of the set-up and other peripheral actors as well as companies, banks etc. used in this connection.

*Payment agreement - when and how will the DKK 1.6 billion be paid?*

22. According to the agreement, the settlement amount of DKK 1.6 billion will be paid in several installments: an immediate payment of DKK 950 million and a residual payment of DKK 650 million, which will be settled within a period of up to 4 years. Any outstanding balance of the final payment will accrue interest after 2 years. Rigsrevisionen has verified that the Danish Tax Agency's claim for the DKK 650 million can be recovered legally immediately if the payment is not made as agreed.

23. Rigsrevisionen notes that the amount of DKK 950 million was paid in the summer of 2019 and recognized as income on account 38.11.01.

*Table 2*

*Amount operators have to pay*

| Operators | Amount |
|---|---|
| Fast payment of settlement amount | DKK 650 million. |
| Direct payment from the German bank | Minimum DKK 50 million (the bank's profit as custodian) |
| Fine claim against the German bank | DKK 110 million (decided by the Court in Glostrup in September 2019) - offset against the claim against the main shareholders |
| The main shareholders of the German bank are liable for | 600 million DKK. |

Personal taxes. On account 38.11.01, income from dividend tax and expenses from dividend tax refunds are booked. The DKK 950 million from the settlement is thus booked correctly.

The agreement regarding the German bank and the main shareholders

24. With regard to the remaining payment of DKK 650 million, the Danish Tax Agency has stated that, according to the settlement agreement, part of this amount will be financed by the sale of a German bank in which three of the parties to the settlement are main shareholders.

Table 2 shows the amounts relating to the remaining payment under the settlement with the 61 US pension plans and others.

It appears from Table 2 that a minimum of DKK 50 million must be paid by the German bank directly, as it is estimated to be the profit that the bank has made in connection with its participation in the recovery of reimbursement amounts, while the 3 main shareholders of the bank are liable for the payment of the DKK 600 million.

The reason why the bank must pay the DKK 50 million is that it has acted as custodian in connection with applications for dividend refunds from the 61 pension plans for approximately DKK 1.1 billion of the approximately DKK 2.9 billion that the 61 pension plans and others have been involved in.

25. In parallel with the settlement agreement, the Danish Tax Agency has entered into a separate creditor agreement with the German bank stating that the Danish Tax Agency will waive its claim for the DKK 1.1 billion against the bank if the Danish state receives approximately 86% of the possible sale price in connection with a possible sale of the bank. The 86% of the sale price will be offset against the settlement amount. The remaining approx. 14% will go to the bank's other creditors in other countries, which must also be settled before the bank can be sold.

The separate creditor agreement with the bank to waive the claim in relation to the DKK 1.1 billion has, according to the Danish Tax Agency, been necessary to ensure that the bank can be sold in free trade and not go bankrupt, whereby the Agency would have the prospect of recovering a significantly smaller part of its claim against the bank's shareholders and possibly not be able to recover the entire remaining part of the settlement amount of DKK 650 million.

In continuation of this, the Danish Tax Agency has stated that the condition of letting the sales proceeds from the bank finance part of the settlement amount was a crucial condition of the settlement agreement. The Danish Tax Agency has thus stated that it was a prerequisite for the parties to the US settlement that the sale price of the bank was included in the financing of the settlement, and thus no settlement would have been reached - and a larger amount raised for the Treasury - without such an agreement.

26. the Danish Tax Agency has stated that in order to enable both the settlement agreement and the agreement with the bank, which was entered into before a possible fine claim raised by SØIK against the bank had been clarified, it was also necessary for the Danish Tax Agency to assume the potential financial risk of a possible fine claim against the bank. According to the agency, the bank's sale in free trade is thus dependent on the bank being able to demonstrate to a potential buyer that it can cover all its creditors' claims within the sale price.

The Danish Tax Agency has further stated that this means that the criminal fine of DKK 110 million, which the bank subsequently agreed in the Court in Glostrup on September 23, 2019, will therefore be offset against the 86% of the sale price from the bank. The 86% will thus cover both the fine and a share of the settlement amount - or in other words, both the civil claims and the fine claim.

The bank was fined DKK 110 million for having contributed to the unauthorized payment of approximately DKK 1.1 billion from the Danish treasury, which the bank profited from, e.g. in fees. "The crime was committed by a number of actors entering into a number of fictitious share trades between them. This created a document trail that showed that American so-called pension plans had received stock dividends and were therefore owed dividend tax in Denmark. The bank played an important role in the creation of the document trail, which could be used to recover unjustified dividend tax from the Danish state" ....

The fine must be paid by the bank. Rigsrevisionen can thus establish that the fine must in principle be paid by the formally convicted party, i.e. the bank, which is not covered by the settlement with the 61 pension plans and others. The settlement was reached with the main shareholders of the bank and is structured in such a way that the fine of DKK 110 million is covered by the Danish state receiving 86% of the sale price when the bank is sold. This means that the 86% of the sales price is offset against the DKK 650 million, after which the main shareholders are liable for the remaining amount, but for a maximum of DKK 600 million, see table 2. The agreement on the settlement does not preclude SØIK from possibly bringing criminal proceedings against the main shareholders of the bank at a later date.

27. As mentioned above, the Danish Tax Agency has stated that the agreement in relation to the German bank is the best possible solution to cover the Danish state's losses in this part of the case complex, and the Agency finds that in this context it is immaterial whether the repaid amount accrues to the Treasury via the Danish Tax Agency as a settlement sum or via the FIU as a fine claim.

*The settlement's provisions on criminal proceedings and waiver of civil claims*

28. It appears from the settlement with the 61 pension plans etc. that the agreement does not affect the FIU's ability to conduct a criminal case against the parties to the settlement. As mentioned above, the Danish Tax Agency and the Attorney General's Office initiated negotiations with an initially larger group of settlement parties at the end of 2016, which continued until the end of 2018. The Danish Tax Agency has stated that, early in the negotiation process, parts of the originally larger settlement group expressed a wish to include impunity as a settlement condition. However, this wish was rejected by the Attorney General at the first meeting between the parties in Copenhagen in the summer of 2016. The rejection of impunity has subsequently been maintained in the negotiations.

29. The settlement also states that the Danish Tax Agency has undertaken to waive all civil claims it has against the parties to the settlement for the full refund amount they have been involved in paying out, i.e. for the difference between DKK 2.9 billion and DKK 1.6 billion, but as previously mentioned, others (paying agents, custodians etc.) are prosecuted for the DKK 1.3 billion.

…

V.  *Summary of the case*

31. In summary, Rigsrevisionen can state that the Danish Tax Agency, in collaboration with the Danish Attorney General's Office and a number of foreign law firms, is pursuing the Danish state's losses through a number of civil law measures. Rigsrevisionen also notes that it is the Danish Tax Agency's overall strategy to ensure that all possibilities to cover or limit the Danish state's losses are pursued and exhausted. A settlement has been reached with 61 US pension plans and others (56 natural persons and 102 companies), which has so far resulted in a repayment of DKK 950 million out of a minimum settlement sum of DKK 1.6 billion. The remaining minimum of DKK 650 million is expected to be paid within a 4-year period. The remaining minimum of DKK 650 million is, among other things, dependent on a German bank being sold in free trade, as part of the sale price must be settled with the Danish Tax Agency. The German bank has admitted its role in the dividend case and agreed to pay a fine of DKK 110 million. However, according to the agreement, the fine will be offset against the Danish Tax Agency's claim against the main shareholders, as the bank's assets are not sufficient to cover the bank's total liabilities, including the claim raised by the Danish Tax Agency and the criminal fine imposed on the bank.

With regard to the remaining payment of DKK 650 million, Rigsrevisionen also notes that the payment is thus dependent on the sale of the bank and the main shareholders' ability to pay in

general. However, the bank's main shareholders are liable for the payment of DKK 600 million, regardless of whether the bank is sold.

Furthermore, Rigsrevisionen notes that the settlement with the 61 pension plans and others means that the Danish Tax Agency has undertaken to waive all civil claims that the Agency has against the settling parties in relation to the full reimbursement amount in this part of the case complex. Conversely, the settlement allows the Danish Tax Agency to obtain additional information from the pension plans about the net amount they have received in dividend refunds and what amounts have accrued to others, as they have committed to cooperate and provide information under the settlement agreement. The settlement does not preclude the possibility of criminal prosecution of the settling parties.

...\"

On November 27, 2020, the National Tax Tribunal upheld the Tax Agency's refusal of a request for access to the settlement agreement and the creditors' agreement (points 1 and 3 of the request for production). According to the decision, the members of the National Tax Tribunal have reviewed the agreements and "[w]hen reviewing the documents, it was found that the settlement agreement with the US pension plans contains, among other things, information about the parties, the background of the settlement, terms and conditions, payment, choice of law, confidentiality and jurisdiction. The credit agreement entered into between the Danish Tax Agency and a German bank and others contains, among other things, information about the parties, their roles, the background to the agreement, terms, conditions and settlement, choice of law and confidentiality."

The parties' main submissions on the merits

[Omitted] ...

The parties' pleas in law on the motion to compel

[Omitted] ...

## Legal basis

Section 298(1) of the Danish Administration of Justice Act states that the court may, at the request of a party, order the opposing party to produce documents that are subject to its control and which the party will rely on during the proceedings, unless this would reveal information about matters that the opposing party would be excluded or exempted from giving evidence about as a witness, see sections 169-172.

According to section 300 of the Danish Administration of Justice Act, the party making such a request must state the facts to be proved by the documents and the grounds on which the party supports that the other party is in possession of the documents.

Section 169(1) of the Code of Civil Procedure states that public officials or others acting in a public or related equivalent office may not, without the consent of the competent authority, be required to give evidence on matters in respect of which they are bound by a duty of confidentiality in the public interest. However, if consent is refused and the giving of the statement is found to be of decisive importance to the outcome of the case, the court may, pursuant to section 169(2), order the authority concerned to explain to the court the reasons for the refusal. If the court then finds that the interests of secrecy should prevail over the interests of the case, it may, with certain specified exceptions that are not relevant to this case, order that a witness statement must be given.

Section 170(3) of the Danish Administration of Justice Act also states that the court may decide that testimony shall not be given on matters in respect of which a witness has a statutory duty of confidentiality and the secrecy of which is of significant importance.

The travaux préparatoires to section 169(2) of the Administration of Justice Act, cf. report no. 316/1962, p. 2930, state the following, among other things:

"Even if consent is then required for the giving of a statement, it is not, however, a given that the authority in question's refusal to allow a civil servant to give a statement should be unchallengeable. The public interests that may justify the obligation of professional secrecy vary greatly in strength, and so do the grounds for exclusion from the obligation to testify. In some cases, for example, a state enterprise may be very similar to a private commercial enterprise, in which case the rules governing the duty of employees to testify should in principle be no different from those applicable to employees of private enterprises. In other cases, confidentiality is required for reasons of vital socio-economic interests, the security of the State or its relations with foreign powers. In such cases, the obligation to testify should only be imposed in exceptional cases, if ever, and then possibly only subject to special precautionary rules. In cases that fall between these extremes, the decision on the question of compulsory testimony should be based on a balancing of the public interest in secrecy against the importance of the case in question in itself and the importance of the statement for the investigation of the case.

It is proposed that the previous rule on the consent of the competent superior authority to the testimony of civil servants be maintained within the scope of the new rule on the duty of civil servants to testify, but that the courts be given the opportunity to set aside a refusal of consent from the competent authority to the giving of a statement. According to the committee's proposal (new subsection 1 in section 169 of the Administration of Justice Act), it is a condition for setting aside a refusal of consent that the giving of the

statement is of crucial importance to the investigation of the case, and the authority must, before the court makes its decision, explain to the court the reasons for the refusal. The explanation can probably usually be given in writing and without compromising the information that is the subject of the testimony. The parties are not entitled to be informed of the statement given, cf. the expression: "to the court". ...

Even though, in the Committee's opinion, the proposed new rule on overriding the administration's refusal of consent will only be applied to a limited extent, the Committee attaches considerable importance to the rule because it - in accordance with a general trend in recent legislation - subjects the administration's decisions to a desirable control for reasons of legal certainty and at the same time emphasizes that consent to giving a statement should only be refused in cases where crucial public interests in secrecy apply. The Committee has considered whether the change in the existing legal situation brought about by the proposed rule should cover all cases in which the consent of the superior authority is required, or whether its decision should be final in cases where the duty of secrecy is justified on the grounds of vital socio-economic interests, national security or its relations with foreign powers. ... However, the Committee has found the proposed rule of judicial review of administrative decisions in this area to be of such importance and the risk of court decisions infringing reasonable considerations of public interest to be so modest that there is not sufficient reason to make an exception to the rule of judicial review for these special cases."

The special notes to section 169 of the Administration of Justice Act, cf. bill no. 19/1964, section 1, no. 9, state the following:

"TO section 169.

The provision, which corresponds to section 169(1) of the Committee's draft A, states that civil servants or others acting in a public or equivalent capacity may not without the consent of the competent authority be required to give evidence on matters in respect of which they have a duty of confidentiality in the public interest. If the duty of confidentiality is not imposed in the public interest, the question of the duty to testify shall be decided according to the rule in section 170(3) of the bill.
In the opinion of the Ministry of Justice, it is well-founded when the committee limits the provision to only apply where the duty of confidentiality is imposed in the public interest, so that only in these cases the consent of the competent authority is required for the giving of testimony. In this connection, it must be emphasized that the provision also applies where the duty of confidentiality is primarily justified in the interests of private individuals, but where the public has a special interest in private individuals being able to freely provide information without having to fear that the duty of confidentiality will be breached. I such cases, the duty of confidentiality must also be said to be imposed in the public interest. As a single example of areas where this viewpoint is important, the administration of legislation on child and youth welfare can be mentioned.

To paragraph 1. ...

To paragraph 2. In accordance with the committee's draft, the provision gives the court the right to decide that a witness statement must be given even if the authority concerned has refused to consent to the giving of the statement. However, when drafting the proposal, the Ministry of Justice has found it necessary - also with regard to Denmark's obligations under treaty law - to limit the provision so that it does not apply if the refusal is justified on grounds of national security or its relations with foreign powers."

The following applies to the authorities' duty of secrecy:

Section 17(1) of the Tax Administration Act states that the tax authorities, under liability pursuant to sections 152, 152a and 152c-152f of the Penal Code, must observe unconditional secrecy towards unauthorized persons with regard to information about a natural or legal person's financial, business or private life that they become aware of in the performance of their work.

According to section 27(1)(2) of the Public Administration Act, a person working in the public administration has a duty of confidentiality, cf. section 152 and sections 152c-152f of the Penal Code, with regard to information about operational or business matters etc. insofar as it is of significant financial importance to the person or company to which the information relates that the information is not disclosed. According to section 27(4)(3), there is also a duty of confidentiality with regard to information that it is otherwise necessary to keep secret in order to safeguard essential considerations of the public's economic interests, including the performance of the public's business activities.

The Access to Public Administration Files Act contains the following provisions, among others:
According to section 30(2) of the Act, the right of access to documents does not include information about e.g. operational or business conditions or the like if it is of significant financial importance to the person or company the information concerns that the request is not granted.

Section 33(3) of the Access to Public Administration Files Act also states that the right of access to documents may be restricted to the extent necessary to protect important public economic interests, including the performance of the public sector's business activities.

In addition, it follows from section 35 of the Access to Public Administration Files Act that the duty to disclose information is limited by special provisions on professional secrecy laid down by law or pursuant to law for persons acting in public service or office.

The High Court ruled

## Decision

*General remarks*

It follows from section 298(1) in conjunction with section 169(2) of the Danish Administration of Justice Act that if the requested material is subject to secrecy, an order for disclosure may only be granted if the material is found to be of decisive importance to the disclosure of the case and the interests of secrecy are found to outweigh the interests of disclosure. When deciding the latter question, the considerations underlying the duty of secrecy must be weighed against the interests of the case, see e.g. U 2017.816 H.

The High Court finds no basis to set aside the Tax Administration's and - as regards the creditors' agreement and the settlement agreement - the National Tax Tribunal's assessment that the information is subject to secrecy and exempt from access, cf. section 17 of the Tax Administration Act and sections 35 and 33(3) of the Access to Public Administration Files Act.

Regarding the considerations behind the duty of confidentiality, the Tax Administration has stated that confidentiality has been agreed, and a breach of this could have an impact as a breach of the settlement agreement and for payment of the settlement amount. It could also have a negative impact on the Tax Administration's future settlement possibilities if the impression arises that the Tax Administration or Danish authorities in general do not respect confidentiality agreements. The request also includes internal and confidential legal advice, and sharing this could have incalculable consequences for the Tax Administration's ability to recover billions, especially in relation to the question of how the Tax Administration must thereby be considered to have waived its legal privilege in the foreign lawsuits. If applicable, the edition must be limited to very specific documents and very specific sections of the relevant documents, e.g. only the settlement and/or the creditors' agreement and only the provisions concerning e.g. confidentiality, settlement amount and/or interest.

With the requested evidence, A Law Firm wishes to shed light on the information and context of the case, including the basis for the size of the claim which is directed against A Law Firm and which is continuously adjusted as payments are made in accordance with the settlement agreement, and the material is stated to be of importance to questions of compliance with the duty to limit losses, foreseeability, passivity and limitation.

The question is then whether the material requested to be produced in accordance with items 1-4 of the request for production is of crucial importance to the disclosure of the case, and if so, whether the interests of secrecy should prevail over the interests of disclosure.

*Re points 1 and 3 of the petition:*

These parts of the request for production concern the creditor agreement between the Danish Tax Administration/Tax Agency and B Bank and the settlement agreement from May 2019 between the Danish Tax Administration/Tax Agency and 61 American pension plans and others, both together with any other related agreements.

The High Court notes that the excerpt of the settlement agreement already presented shows that there are annexes to the agreement. There is no other information that any other agreements have been concluded in connection with the creditor and settlement agreements.

The High Court finds that information in the agreements and related appendices about the basis and size of the claims against the individual settlement parties, which form the basis of the claim in this case against A Law Firm and which is continuously adjusted as payments are made in accordance with the settlement agreement, will be crucial to the disclosure of the case. Information about the size of the claims against the individual settlement parties also includes information about which items are included in the settlement amounts, what has already been paid by the individual settlement parties, terms for payment of the settlement amount and information about interest.

It is assumed that these matters cannot be illustrated in any other way than by presenting extracted versions of the two agreements and related annexes.

The case, which is of a fundamental nature and has been referred to the High Court for hearing at first instance, cf. section 226(1) of the Danish Administration of Justice Act, concerns the question of whether A Law Firm, in its advisory services to B Bank, has acted in breach of responsibility towards the Tax Administration, which has made a claim of more than DKK 700 million against A Law Firm. Information regarding the content of the agreements is already included to a certain extent in the case, as there is a letter of intent issued prior to the conclusion of the creditor agreement, and the settlement agreement and partly the creditor agreement are described in detail in Rigsrevisionen's memo of January 2020. It also appears from the case that TV2 and Politiken are in possession of at least excerpts of the settlement agreement. In addition, at the time the agreement was entered into, it was obvious that the content of the agreements could be of importance to, among others, A Law Firm.

Against this background and according to the nature of the considerations highlighted by the Tax Administration behind the duty of secrecy, the High Court finds that there are such exceptional circumstances that the consideration for secrecy in relation to the above-mentioned information must give way to the consideration for the disclosure of the case.

*Re points 2 and 4 of the petition:*

These parts of the request for production relate to prior drafts of the creditor agreement shared with B Bank SØIK or others outside the Tax Administration, as well as correspondence in connection with negotiations on the creditor agreement and the previous letter of intent of May 16, 2019, and prior drafts of the settlement agreement shared with one or more settlement parties, B Bank SØIK or others outside the Tax Administration, as well as correspondence in connection with negotiations on this agreement.

A production order has been granted regarding parts of the two agreements, see above, and it has not been established that the requested additional material, which otherwise appears to be requested for the purpose of an investigative review, will be of crucial importance to the outcome of the case. Points 2 and 4 of the requests for redaction will therefore not be granted.

Against the above background, A Law Firm's request is granted as set out below.

## For it is determined

The Tax Administration is ordered to produce the creditor agreement of September 11, 2019 between B Bank and the Tax Administration/Tax Agency and the settlement agreement of May 28, 2019 between 61 American Pension Plans et al. and the Danish Tax Administration/Tax Agency, both with appendices, as regards the parts of the agreements with appendices that concern the basis for and size of the claims against the individual settlement parties, including information on which items are included in the settlement amounts, what has already been paid by the individual settlement parties, terms for payment of the settlement amount and information on interest.

U.2021.5249

# Ø.L.K. 29. september 2021 *i 1.-instanssag 14. afd. BS-26436/2020-OLR*

Edition i aftaler som Skatteforvaltningen havde indgået som et led i tilbagesøgning af ca. 12,7 mia. kr. til den danske stat.

Skatteforvaltningen, der mente, at et advokatpartnerselskab ved rådgivning af en tysk bank havde handlet ansvarspådragende, havde fremsat krav om betaling af mere end 700 mio. kr. Under sagen anmodede advokatpartnerselskabet om, at Skatteforvaltningen blev pålagt at fremlægge en kreditoraftale, som Skatteforvaltningen havde indgået med den tyske bank og en forligsaftale indgået med 61 amerikanske pensionsplaner samt forudgående udkast til disse aftaler og korrespondance i tilknytning til forhandlingerne.

*5250*

Advokatpartnerselskabet havde rådgivet den tyske bank om udstedelse af dokumentation for ejerskab af aktier til brug for anmodninger til de danske skattemyndigheder om refusion af udbytteskat, og den tyske bank havde efterfølgende bistået amerikanske pensionsplaner med dokumentation for ejerskab af aktier. Skatteforvaltningen protesterede navnlig med henvisning til, at materialet var underlagt tavshedspligt. Landsretten bemærkede, at hvis det ønskede materiale var underlagt tavshedspligt, kunne editionspålæg kun meddeles, hvis materialet fandtes at være af afgørende betydning for sagens oplysning, og hensynet til hemmeligholdelse fandtes at burde vige for hensynet til sagens oplysning. Landsretten fandt ikke grundlag for at tilsidesætte vurderingerne, hvorefter oplysningerne var underlagt tavshedspligt og undtaget fra aktindsigt. Om hensynene bag tavshedspligten havde Skatteforvaltningen anført, at der var aftalt fortrolighed, og en overtrædelse heraf ville kunne få betydning som misligholdelse af forligsaftalen og for betaling af forligssummen. Det ville desuden kunne have negativ indvirkning på Skatteforvaltningens fremtidige forligsmuligheder. Begæringen omfattede også intern og fortrolig juridisk rådgivning, og en deling heraf kunne få uoverskuelige konsekvenser for Skatteforvaltningens mulighed for at inddrive milliardbeløb. Advokatpartnerselskabet ønskede navnlig at belyse grundlaget for størrelsen af det krav, som var rettet mod advokatpartnerselskabet. Landsretten fandt, at oplysninger i kreditoraftalen og forligsaftalen med tilhørende bilag om grundlaget for og størrelsen af krav mod de enkelte forligsparter, der lå til grund for det krav, som var rettet mod advokatpartnerselskabet, og som løbende blev reguleret i takt med, at der skete indbetalinger i henhold til forligsaftalen, ville være af afgørende betydning for sagens oplysning. Landsretten lagde til grund, at disse forhold ikke kunne belyses på anden vis end ved fremlæggelse af ekstraherede udgaver af de to aftaler med tilhørende bilag. Sagen var endvidere af principiel karakter, og oplysninger vedrørende indholdet af aftalerne indgik i forvejen i et vist omfang i sagen, og det fremgik desuden af sagen, at TV2 og Politiken var i besiddelse af i hvert fald uddrag af forligsaftalen. På denne baggrund og efter karakteren af de af Skatteforvaltningen fremhævede hensyn bag tavshedspligten fandt landsretten, at der forelå sådanne ganske særlige omstændigheder, at hensynet til hemmeligholdelse i relation til de ovennævnte oplysninger måtte vige for hensynet til sagens oplysning. Begæringerne vedrørende disse aftaler blev derfor taget til følge. Landsretten tog ikke begæringerne om forudgående udkast til kreditoraftalen henholdsvis udkast til forligsaftalen såvel som korrespondance i tilknytning til forhandlinger om disse aftaler til følge. Landsretten lagde herved vægt på, at det ikke var godtgjort, at det ønskede yderligere materiale ville være af afgørende betydning for sagens udfald.

## Østre Landsrets retsbog 29. september 2021, BS-26436/2020-OLR

*Sagsøgte, A Advokatpartnerselskab*, har ved editionsbegæring af 20. januar 2021 anmodet om, at sagsøgeren,

Skatteforvaltningen, pålægges at fremlægge følgende materiale, jf. retsplejelovens § 298, stk. 1:

1. Kreditoraftale med B Bank indgået af enten Skatteforvaltningen eller Skattestyrelsen den 11. september 2019, tillige med eventuelle andre aftaler i tilknytning hertil (det samlede aftalekompleks).

2. Forudgående udkast til nævnte kreditoraftale delt med B Bank SØIK eller andre uden for Skatteforvaltningen, såvel som korrespondance i tilknytning til forhandlinger om kreditoraftalen og den tidligere hensigtserklæring af 16. maj 2019, heriblandt brev af 6. juli 2018 fra B Bank til Skatteministeriet og brev fra oktober 2018 fra B Bank til Skatteforvaltningen (begge breve er omtalt på side 5 i hensigtserklæringen).

3. Forligsaftale fra maj 2019 med 61 amerikanske pensionsplaner og en række dertil knyttede personer og selskaber, indgået af enten Skatteforvaltningen eller Skattestyrelsen, tillige med eventuelle andre aftaler i tilknytning hertil (det samlede aftalekompleks).

4. Forudgående udkast til nævnte forligsaftale delt med en eller flere forligsparter, B Bank SØIK eller andre uden for Skatteforvaltningen, såvel som korrespondance i tilknytning til forhandlinger om forligsaftalen.

*Skatteforvaltningen* har nedlagt påstand om, at editionsbegæringen »ikke tages til følge, subsidiært at editionen begrænses til (dele af) forliget og kreditor aftalen«. Efter skriftveksling om editionsbegæringen har Skatteforvaltningen ved processkrift C af 6. juli 2021 fremlagt enkelte uddrag af forligsaftalen (editionsbegæringens pkt. 3). A Advokatpartnerselskab har efterfølgende fastholdt editionsbegæringen i sin helhed.

*5251*

## Påstande i hovedsagen

Sagen er anlagt af Skatteforvaltningen i juni 2020, og der er nedlagt følgende reviderede påstande over for A Advokatpartnerselskab jf. Skatteforvaltningens processkrift 2 af 3. september 2021: *Påstand 1* A Advokatpartnerselskab tilpligtes at betale 722.290.313,77 kr. til Skatteforvaltningen med tillæg af renter fra den 3. september 2021, til betaling sker. *Påstand 2* A Advokatpartnerselskab - tilpligtes at betale 447.357.276,28 kr. til Skatteforvaltningen. *Påstand 3* A Advokatpartnerselskab tilpligtes at betale 78.129.171,06 kr. til Skatteforvaltningen. A Advokatpartnerselskab har påstået frifindelse.

## Kort om sagen

Sagen drejer sig om, hvorvidt A Advokatpartnerselskab har pådraget sig erstatningsansvar i anledning af A Advokatpartnerselskabs rådgivning i 2014 af den tyske bank B Bank om udstedelse af dokumentation for ejerskab af aktier til brug for anmodninger til de danske skattemyndigheder om refusion af udbytteskat. Rådgivningen til B Bank angik ifølge Skatteforvaltningen spørgsmålet om, hvorvidt banken risikerede at ifalde strafferetligt eller erstatningsretligt ansvar over for den danske stat for at udstede dokumentation for ejerskab af danske aktier. A Advokatpartnerselskab modtog opdraget fra det tyske advokatfirma C på vegne af B Bank og A Advokatpartnerselskab afgav en legal opinion om spørgsmålet til advokatfirma C/ B Bank. B Bank bistod efterfølgende en række amerikanske pensionsplaner med dokumentation for ejerskab af aktier (såkaldte Credit Advices) til brug for anmodninger om udbetaling af refusion af indeholdt udbytteskat. B Bank optrådte som »custodian«, dvs. som den depotbank, der besad aktien for den refusionssøgende, og B Bank bistod ved udstedelse af Credit Advices pensionsplanerne med ansøgninger om udbytterefusion over for de danske skattemyndigheder for samlet 1.135.775.342 kr. Den 23. september 2019 blev B Bank ved Retten i Glostrup idømt en bøde på 110 mio. kr. efter at have erkendt medvirken til bedrageri i udbyttesagskomplekset. Rigsrevisionen har i januar 2020 afgivet et notat om det forlig mellem Skattestyrelsen og 61 amerikanske pensionsplaner m.fl., som A Advokatpartnerselskab ønsker fremlagt (editionsbegæringens pkt. 3). Af notatet, der også berører kreditoraftalen med B Bank (editionsbegæringens pkt. 1), fremgår blandt andet følgende: »*Skattestyrelsens forlig med 61 amerikanske pensionsplaner mfl. fra maj 2019* 1. Statsrevisorerne har i efteråret 2019 anmodet Rigsrevisionen om en *faktuel gennemgang* af det forlig, som Skattestyrelsen indgik med 61 amerikanske pensionsplaner og en række dertil knyttede personer og selskaber i maj 2019, jf. rigsrevisorlovens § 8. Forliget omfatter 61 pensionsplaner, 56 fysiske personer og 102 selskaber. Rigsrevisionen har endvidere indhentet en redegørelse fra Skatteministeriet om de samlede initiativer for at få de ca. 12,7 mia. kr. tilbage til den danske stat. ... *I. Skatteministeriets*

perioden 1. januar 2012 - 6. august 2015 blev Danmark formentlig udsat for svindel med refusion af udbytteskat for et samlet beløb på ca. 12,7 mia. kr. De 12,7 mia. kr. stammer fra udbetalinger i den såkaldte *blanketordning.* Skattestyrelsen har efterfølgende undersøgt *bankordningen,* og i februar 2019 konstaterede styrelsen 4 tilbagesøgninger på et samlet beløb på 828.000 kr. i bankordningen, som kunne kædes til aktører, der indgik i den formodede svindel i blanketordningen. Aktørerne havde således søgt om refusion i både blanketordningen og bankordningen. Siden 2015 har Skattestyrelsen med bistand fra Kammeradvokaten arbejdet for at få de ca. 12,7 mia. kr. tilbage til statskassen ved hjælp af civile søgsmål og andre civilretlige tiltag. Vi gennemgår i det følgende Skatteministeriets initiativer for at få de ca. 12,7 mia. kr. tilbage til den danske statskasse, herunder primært Skattestyrelsens forlig med 61 amerikanske pensionsplaner mfl., som blev indgået i maj 2019. Forliget går i hovedtræk ud på, at de 61 pensionsplaner mfl. skal betale et beløb på 1,6 mia. kr. til den danske stat. I tilknytning til aftalen er der indgået en separat aftale med en tysk bank, som har været involveret i en del af refusionssetuppet, at Skattestyrelsen frafalder sit krav mod banken på nærmere aftalte betingelser. 3. Gennemgangen baserer sig på brevveksling med Skatteministeriet, herunder en redegørelse fra Skatteministeriet udarbejdet af Skattestyrelsen om forliget med de 61 amerikanske pensionsplaner mfl. Redegørelsen indeholder de oplysninger, som Skatteministeriet mener kan offentliggøres. Rigsrevisionen har desuden på et møde med Skattestyrelsen hos Kammeradvokaten fået forevist forliget og har haft mulighed for at læse de udvalgte dele af forligsteksten, som vi redegør for i dette notat. Formålet var at få verificeret Skattestyrelsens oplysninger og dermed kvalitetssikre Rigsrevisionens egne beskrivelser. Rigsrevisionen har *ikke* vurderet forligets indhold, men alene udarbejdet en faktuel redegørelse. Den eneste vurdering, vi foretager, er vurderingen af lovligheden af at indgå et forlig.

*II. Hjemmel til at indgå forlig og aftaler i forbindelse med retssager* 4. Der er intet til hinder for, at Skattestyrelsen kan indgå et forlig i stedet for at føre en retssag ved en domstol. Hjemlen til at indgå forlig findes i budgetvejledningens pkt. 2.4.3 om udgifter pålagt ved dom mv., hvoraf fremgår: »*Der er adgang til at afholde uforudselige udgifter, som det må anses for overvejende sandsynligt, eventuelt efter indhentet udtalelse fra Kammeradvokaten, at staten i tilfælde af en retssag vil blive dømt til at betale*«. Det antages, at pkt. 2.4.3 også dækker sager til gunst for staten, jf. i øvrigt Transport- og Energiministeriets svar fra 16. november 2005 på Finansudvalgets spørgsmål nr. 1 af 7. november 2005 vedrørende indgået forlig mellem Banedanmark og Bombardier Transportation. Dette i kombination med budgetvejledningens pkt. 2.2.3 om de almindelige hensyn ved disponering, som er: »*… at der ved disponeringen skal vises skyldige økonomiske hensyn*«, betyder, at det gælder om at sikre sig det bedst mulige økonomiske resultat, også under hensyntagen til omkostningerne herved. Dvs. at den konkrete vurdering bl.a. må bygge på overvejelser om det juridiske udfald af eventuelle civile søgsmål mod parterne og de fordele, der eventuelt vil følge af et forlig for Skattestyrelsen, men også at der må skeles til de økonomiske omkostninger, der kan være ved at gennemføre forskellige sagsskridt. *Forligets hensigtsmæssighed - baggrunden for Skatteministeriet og Skattestyrelsens beslutning om at indgå forlig* 5. Forliget er en udløber af, hvordan Skatteministeriet har besluttet at implementere sin samlede strategi om at få de 12,7 mia. kr. tilbage via civile retsskridt. Rigsrevisionen har hverken vurderet, om den samlede strategi er hensigtsmæssig, eller om den er implementeret hensigtsmæssigt. Rigsrevisionen har endvidere *ikke* vurderet den økonomiske hensigtsmæssighed af det forlig, der er indgået, men kan konstatere, at Skattestyrelsen og Kammeradvokaten forud for forligets indgåelse havde overvejet hensigtsmæssigheden, og at Skatteministeriet har tiltrådt Kammeradvokatens og Skattestyrelsens vurdering af, at det mest hensigtsmæssige og bedste økonomiske resultat fås ved at indgå forliget. 6. Skattestyrelsen har oplyst, at vurderingen af at indgå forlig er baseret på afvejningen af en række forhold, herunder på den ene side de mulige juridiske udfald af eventuelle civile søgsmål mod parterne og den procesrisiko, der er forbundet hermed, den manglende mulighed for aktuelt at opnå nærmere indsigt i forligsparternes betalingsevne eller mangel på samme og risiko for at udhule en eventuel betalingsevne med langvarige søgsmål og på den anden side de umiddelbare fordele for Skattestyrelsen, der følger af forliget. Skattestyrelsen har endvidere anført, at forligsresultatet ifølge styrelsens amerikanske repræsentanter svarer til udfaldet efter amerikansk ret, hvis styrelsen i eventuelle civile søgsmål måtte få medhold i, at refusionsansøgningerne var uberettigede, uden at det samtidig statueres, at der foreligger svig hos forligsparterne. Skattestyrelsen har anført, at der dog også består en risiko for, at styrelsen slet ikke ville få medhold. Den konkrete beskrivelse af procesrisiciene er fortrolig, da denne vil kunne blive anvendt af modparter i eventuelle kommende retssager. 7. Rigsrevisionen har konstateret, at det er Kammeradvokatens og Skattestyrelsens opfattelse, at både forligsaftalen og aftalen med banken er den økonomisk mest fordelagtige løsning for den danske stat i denne del af

sagskomplekset. Skattestyrelsen har ligeledes oplyst, at det samtidig er vurderingen, at den separate aftale i forhold til Danmarks samlede krav mod den tyske bank er en afgørende forudsætning for, at banken kan sælges i fri handel, og at en konkurs dermed kan undgås. 8. Skattestyrelsen har videre oplyst, at fordelene ved forliget er den umiddelbare betaling på 950 mio. kr. og anerkendelsen af den yderligere forpligtelse på minimum 650 mio. kr. Hertil kommer vilkåret om forligsparternes pligt til at samarbejde med styrelsen om sagernes oplysning (omtales nedenfor) og dermed understøttelse af styrelsens sagsførelse i de øvrige civile søgsmål, herunder mod sagens hovedmænd. Skattestyrelsen har endelig oplyst, at det formodes at være en fordel, at styrelsen i de øvrige mange søgsmål kan oplyse, at der er indgået et forlig, hvor et antal fysiske og juridiske personer har indvilget i at tilbagebetale de beløb, som de selv har modtaget i forbindelse med refusionerne. 9. Rigsrevisionen kan ikke vurdere, om beslutningen om at indgå forliget er den bedste, men er enig i, at det er relevante hensyn, som Skattestyrelsen og Kammeradvokaten har ladet indgå i beslutningen. *III. Skattestyrelsens civilretlige forfølgelse af de ca. 12,7 mia. kr.* 10. Skattestyrelsen har oplyst, at styrelsen siden 2015 med bistand fra Kammeradvokaten har arbejdet på at få de ca. 12,7 mia. kr. tilbage til den danske statskasse ved hjælp af civile søgsmål og andre civilretlige tiltag, herunder civilretlig edition, dokumentbeslaglæggelser, indefrysninger af penge mv. Den formodede svindel er anmeldt til SØIK, der forfølger sagen strafferetligt. Skattestyrelsen har oplyst, at status er, at der er anlagt retssager mod i alt 490 selskaber og personer i henholdsvis USA, England, Dubai, Malaysia og Danmark. Der er i alt rejst krav for det fulde beløb på ca. 12,7 mia. kr. 11. Skattestyrelsen har videre oplyst, at det overordnede sigte med de civilretlige tiltag er at skabe

sikkerhed for, at alle muligheder for at inddække tabet på 12,7 mia. kr. forfølges og udtømmes. Skattestyrelsen og Kammeradvokaten har på den baggrund lagt en strategi, hvor de udbetalte refusionsbeløb søges tilbage hos de pensionsplaner og selskaber, der har ansøgt om og modtaget refusion, samtidig med at der rejses krav over for de hovedbagmænd, der formodes at stå bag den formodede svig, og over for de fysiske og juridiske personer, der formodes at have fået andel i det økonomiske udbytte. Efterhånden som sagerne oplyses, vil der også løbende blive taget stilling til muligheden for at rejse krav over for eventuelle banker, rådgivere og andre medvirkende aktører. 12. Skattestyrelsen oplyser yderligere, at ud af det samlede beløb på ca. 12,7 mia. kr., der er udbetalt fra det daværende SKAT i uberettiget udbytterefusion, er ca. 11 mia. kr. udbetalt på baggrund af ansøgninger fra et større antal amerikanske pensionsplaner. Herudover er ca. 1,5 mia. kr. udbetalt på baggrund af ansøgninger fra en række malaysiske selskaber, mens ca. 100 mio. kr. kan henføres til ansøgninger fra en engelsk pensionsplan. Derudover er der udbetalt et beløb på ca. 100 mio. kr. (diverse). ... I forbindelse med sagerne er der taget arrest i en række aktiver. Aktuelt drejer det sig om, at der er foretaget arrest i aktiver for anslået mellem 3,3 mia. kr. og 3,5 mia. kr. Dette er sket med henblik på at sikre, at aktiver, der tilhører de sagsøgte, ikke bliver skjult eller på anden måde gjort utilgængelige, mens Skattestyrelsens sager verserer ved domstolene. For USA's vedkommende er sagerne indtil videre samlet ved retten i Southern District i New York. 13. Skattestyrelsen har oplyst, at flere aktører er sagsøgt solidarisk for det samlede krav (dvs. at der i visse tilfælde er søgt dobbeltdækning). Danmark kan dog aldrig samlet få mere end de ca. 12,7 mia. kr. tilbage i forbindelse med de civile søgsmål. Desuden har Skattestyrelsen oplyst, at styrelsen som led i forfølgelsen af de 12,7 mia. kr. indtil videre har indgået i alt 3 forlig. Det største forlig, som Rigsrevisionen nærmere omtaler i dette notat, har en forligssum på 1,6 mia. kr. De 2 øvrige forlig er af mindre skala med forligssummer på henholdsvis 4,3 mio. kr. og 3,9 mio. kr. De 4,3 mio. kr. og de 3,9 mio. kr. svarer til de fulde refusionsbeløb, som 2 amerikanske pensionsplaner har tilbagesøgt. Som led i disse forlig har de 2 pensionsplaner forpligtet sig til at samarbejde med Skattestyrelsen og understøtte styrelsens øvrige søgsmål i udbyttesagen. Det er et vilkår i disse forlig, at hvis Skattestyrelsen senere modtager betaling fra andre aktører, der har modtaget en del af refusionssummen, tilbagebetales pensionsplanerne disse beløb, da styrelsen kun kan modtage dækning for sine krav én gang. Pensionsplanerne ender i sådanne tilfælde med kun at tilbagebetale, hvad de har modtaget. ... *IV. Forliget med 61 amerikanske pensionsplaner mfl.* 14. Ultimo maj 2019 indgik Skattestyrelsen et forlig med 61 amerikanske pensionsplaner og en række dertil knyttede personer og selskaber i en del af det samlede sagskompleks om udbytterefusion. *Baggrund for forliget* 15. Skattestyrelsen har oplyst, at forhistorien var, at repræsentanter for en større gruppe amerikanske pensionsplaner og en række dertil knyttede selskaber og personer ultimo 2016 i forbindelse med styrelsens forberedelse af de civilretlige tiltag rettede henvendelse til Skattestyrelsens repræsentant - Kammeradvokaten - idet de ønskede at indgå i dialog om en mulig forligsmæssig løsning. Det endte med, at 118 pensionsplaner, der havde været involveret i refusionsansøgninger på i alt 5,7 mia. kr., blev omfattet af forhandlingerne. Dialogen fortsatte indtil

ultimo 2018, hvor Skattestyrelsen på Kammeradvokatens anbefaling besluttede at afbryde forhandlingerne, da det ikke syntes muligt at opnå en forligsmæssig løsning, der var attraktiv for alle parter. Primo 2019 rettede repræsentanterne for 75 af de oprindelige 118 pensionsplaner på ny henvendelse til Kammeradvokaten, idet de samtidig frafaldt en række tidligere stillede betingelser, herunder et krav om straffrihed. Senere blev de 75 pensionsplaner reduceret til 61 planer. … … 61 pensionsplaner mfl. - som forliget ender med at omfatte - har ansøgt om udbytterefusion på i alt 2,9 mia. kr. Netto har de 61 pensionsplaner mfl. fået udbetalt 1,6 mia. kr. Efter nærmere drøftelser mellem Skattestyrelsen og Kammeradvokaten, analyse af de oplysninger, der på davarende tidspunkt var tilvejebragt via de civilretlige tiltag, og en vurdering af de forskellige juridiske udfald af sagerne, blev det ifølge Skattestyrelsen - efter aftale med Skatteministeriets departement og den davarende skatteminister - besluttet at arbejde mod en forligsmæssig løsning, og ultimo maj 2019 resulterede det i en forligsaftale med de 61 pensionsplaner mfl. 43 af de 118 pensionsplaner er primo 2019 blevet sagsøgt i USA, mens de resterende 14 pensionsplaner er blevet sagsøgt i november 2019 … Nogle af forligsparterne har - ud over at modtage en del af refusionsbeløbet på ca. 2,9 mia. kr. - også deltaget i tilbagesøgningen af refusionsbeløb via 19 andre amerikanske pensionsplaner, som ikke er en del af forliget. Disse 19 pensionsplaner har selvstændigt tilbagesøgt ca. 1,2 mia. kr. Skattestyrelsen har oplyst, at der er rejst krav mod disse aktører.

*5254*

*Forliget i hovedtræk - fra 2,9 mia. kr. til 1,6 mia. kr.* 16. Forligsaftalen går i hovedtræk ud på, at de 61 pensionsplaner mfl. skal betale et beløb på minimum 1,55 mia. kr. til den danske stat. Beløbet svarer ifølge Skattestyrelsens oplysninger til det beløb, som forligsparterne direkte eller indirekte selv har modtaget af de 2,9 mia. kr., som de 61 pensionsplaner har ansøgt om i udbytterefusion, samt et mindre beløb, som en del af forligsparterne har modtaget via de andre 19 pensionsplaner. Endelig kommer yderligere et beløb på minimum 50 mio. kr. fra den tyske bank, der selvstændigt forudsættes at betale et beløb modsvarende bankens fortjeneste, hvorfor det samlede forligsbeløb summerer op til de 1,6 mia. kr. … … de 61 pensionsplaner mfl. [har] i alt … ansøgt om udbytterefusion på 2,9 mia. kr., men netto har fået udbetalt 1,6 mia. kr. 17. Skattestyrelsen har oplyst, at strategien bag forliget har været at få tilbagebetalt det beløb, som forligsparterne har modtaget af det samlede refusionsbeløb uanset størrelse, og at modtage relevante oplysninger og dokumenter om svindelsetuppet med henblik på at styrke Skattestyrelsens muligheder for at retsforfølge de øvrige aktører i sagen for restbeløbet. 18. Rigsrevisionen kan konstatere, at forligsbeløbet er opgjort til det beløb, som forligsparterne ifølge Skattestyrelsens oplysninger direkte eller indirekte har modtaget. Rigsrevisionen kan videre konstatere, at SKATs udbetalinger af de 2,9 mia. kr. blev foretaget til udbetalingsagenterne. Fra *udbetalingsagenterne* blev de modtagne beløb - minus et »administrationsbeløb« - betalt videre til i alt 4 såkaldte *custodians*. Fra disse custodians - som også tog sig direkte eller indirekte betalt for deres arbejde med at udstede dokumentation for ejerskab af de fiktive aktier - blev der således udbetalt et væsentligt mindre beløb til de 61 pensionsplaner og en række tilknyttede personer og selskaber. Skattestyrelsen har oplyst, at alle involverede betalingsagenter og custodians på nuværende tidspunkt er sagsøgt. De oplysninger, som Kammeradvokaten har gennemgået i forbindelse med efterprøvelsen af forligsbeløbet, viser imidlertid, at en del af de beløb, som de involverede custodians har tilbageholdt, umiddelbart ser ud til at være overført til en række offshoreselskaber, der formodes at være ejet og eller kontrolleret af personerne bag disse custodians. Skattestyrelsen oplyser endvidere, at det løbende vurderes, om disse offshoreselskaber også skal medindrages i de anlagte sager, eller om det er tilstrækkeligt, at de tilbageholdte beløb er tilbagesøgt hos dels de medvirkende custodians, dels de formodede hovedmænd bag den formodede svig. Der er dog fortsat rejst krav for det fulde udbetalte beløb. *Vilkår i aftalen - pligt til samarbejde* 19. Forliget indeholder et vilkår om forligsparternes pligt til at samarbejde med Skattestyrelsen om sagernes oplysning, herunder at gøre materiale, som er relevant for Skattestyrelsens civile søgsmål, tilgængeligt for Skattestyrelsen og Kammeradvokaten. Skattestyrelsen fik med forliget også adgang til at efterprøve, om forligsparterne også faktisk (dvs. netto) har modtaget de ca. 1,6 mia. kr. I det tilfælde, at Skattestyrelsens efterprøvning viser, at forligsparterne har modtaget mere end de ca. 1,6 mia. kr., forhøjes forligsbeløbet tilsvarende. Beløbet kan dog i henhold til forligsteksten aldrig blive mindre end 1,6 mia. kr. 20. Med hensyn til efterprøvelsen af, om forligsparterne faktisk har modtaget 1,6 mia. kr., er Kammeradvokaten sammen med Skattestyrelsens amerikanske repræsentanter ved at gennemgå pengestrømmene fra det davarende SKAT til forligsparterne. Skattestyrelsen modtog inden udgangen af 2019 alt materiale til brug for pengestrømsanalyserne fra forligsparterne. Materialet gennemgås af Kammeradvokaten og Skattestyrelsens amerikanske repræsentanter primo 2020 med henblik på at fastlægge det endelige forligsbeløb. 21. Det fremgår af forliget, at forligsparterne har forpligtet sig til at samarbejde med Skattestyrelsen og Kammeradvokaten i

forhold til styrelsens øvrige civile søgsmål, herunder at gøre materiale, som er relevant for Skattestyrelsens civile søgsmål, tilgængeligt for Skattestyrelsen og Kammeradvokaten. Skattestyrelsen har oplyst, at styrelsen sammen med Kammeradvokaten er i gang med at indhente og gennemgå en større mængde materiale fra forligsparterne. Rigsrevisionen kan konstatere, at det af forliget fremgår, at forligsparterne - som en del af denne samarbejdsforpligtelse - i øvrigt skal dokumentere, til hvilke andre aktører i refusionssetuppet differencen mellem det beløb, pensionsplanerne har tilbagesøgt, og det beløb, planerne mfl. har modtaget, er tilgået. Skattestyrelsen har oplyst, at disse aktører bl.a. omfatter setuppets hovedmænd og andre perifere aktører samt selskaber, banker mv., som er anvendt i den forbindelse. *Betalingsaftale - hvornår og hvordan betales de 1,6 mia. kr.* 22. Forligssummen på de 1,6 mia. kr. skal ifølge aftalen falde i flere rater: en straksbetaling på 950 mio. kr. og en restbetaling på 650 mio. kr., som skal afvikles inden for en periode på op til 4 år. Eventuelle udeståender af restbetalingen forrentes efter 2 år. Rigsrevisionen har fået verificeret, at Skattestyrelsens krav på de 650 mio. kr. umiddelbart kan inddrives retsligt, hvis ikke betalingen falder som aftalt. 23. Rigsrevisionen kan konstatere, at beløbet på de 950 mio. kr. er indbetalt i sommeren 2019 og indtægtsført på konto 38.11.01.

Tabel 2 Beløb, aktørerne skal betale

| Aktører | Beløb |
| --- | --- |
| Rastbetaling af forligssum | 650 mio. kr. |
| Direkte betaling fråden tyske bank | Minimum 50 mio. kr. (bankensfortjeneste som custodian) |
| Bødekrav mod den tyske bank | 110 mio. kr. (vadtaget ved Retten i Glostrup i september 2019) - modregnes i kravet mod hovedaktionærerne |
| Hovedaktionærerne i den tyske bank hæfter for | 600 mio. kr. |

Personskatter. På konto 38.11.01 bogføres indtægter fra udbytteskat og udgifter fra refusion af udbytteskat. De 950 mio. kr. fra forliget er således bogført korrekt. *Aftalen vedrørende den tyske bank og hovedaktionærerne* 24. Med hensyn til restbetalingen på de 650 mio. kr. har Skattestyrelsen oplyst, at en del af dette beløb ifølge forligsaftalen vil blive finansieret ved salget af en tysk bank, hvor 3 af forligsparterne er hovedaktionærer. Tabel 2 viser de beløb, som vedrører restbetalingen ifølge forliget med de 61 amerikanske pensionsplaner mfl. Det fremgår af tabel 2, at minimum 50 mio. kr. skal betales af den tyske bank direkte, idet det skønnes at være den fortjeneste, som banken har haft i forbindelse med sin deltagelse i tilbagesøgningen af refusionsbeløb, mens de 3 hovedaktionærer i banken hæfter for betalingen af de 600 mio. kr. Grunden til, at banken skal betale de 50 mio. kr. er, at den har fungeret som *custodian* i forbindelse med ansøgninger om udbytterefusion fra de 61 pensionsplaner for ca. 1,1 mia. kr. af de ca. 2,9 mia. kr., som de 61 pensionsplaner mfl. har været involveret i. 25. Skattestyrelsen har parallelt med forligsaftalen indgået en *separat kreditoraftale* med den tyske bank om, at Skattestyrelsen vil frafalde sit krav på de 1,1 mia. kr. mod banken, hvis den danske stat i forbindelse med et eventuelt salg af banken modtager ca. 86 % af den eventuelle salgssum. De 86 % af salgssummen vil blive modregnet i forligssummen. De resterende ca. 14 % tilfalder bankens øvrige kreditorer i andre lande, som også skal afvikles, før banken kan sælges. Den separate kreditoraftale med banken om at frafalde kravet i forhold til de 1,1 mia. kr. har ifølge Skattestyrelsen været nødvendig for at sikre, at banken kan sælges i fri handel og ikke gå konkurs, hvormed styrelsen ville have udsigt til at få dækket en væsentlig mindre del af sit krav mod bankens aktionærer og eventuelt ikke kunne få dækket hele den resterende del af forligssummen på de 650 mio. kr. Skattestyrelsen har i forlængelse heraf oplyst, at vilkåret om at lade salgssummen fra banken finansiere en del af forligssummen var et afgørende vilkår for forligsaftalen. Skattestyrelsen har således oplyst, at det var en forudsætning for aftaleparterne i det amerikanske forlig, at salgssummen af banken indgik i finansieringen af forliget, og der var dermed slet ikke indgået et forlig - og skaffet et større beløb til statskassen - uden en sådan aftale. 26. Skattestyrelsen har oplyst, at for at muliggøre dels forligsaftalen, dels aftalen med banken, der blev indgået, inden et eventuelt bødekrav rejst af SØIK mod banken var afklaret, har det endvidere været nødvendigt for Skattestyrelsen at påtage sig den potentielle økonomiske risiko for et eventuelt bødekrav mod banken. Bankens salg i fri handel er således ifølge styrelsen afhængig af, at banken

videre oplyst, at det betyder, at den strafferetlige bøde, som banken efterfølgende har vedtaget i Retten i Glostrup den 23. september 2019 på 110 mio. kr., derfor vil blive modregnet i de 86 % af salgssummen fra banken. De 86 % vil således dække både bødestraf og en andel af forligssummen - eller med andre ord både de civilretlige krav og bødekravet. Banken fik bøden på de 110 mio. kr. for at have medvirket til, at der uberettiget blev udbetalt ca. 1,1 mia. kr. fra den danske statskasse, hvilket banken tjente på, bl.a. i gebyrer. *»Forbrydelsen blev begået ved, at et antal aktører indgik i en række fiktive aktiehandler imellem sig. Det skabte et dokumentspor, der viste, at amerikanske såkaldte pensionsplaner havde modtaget aktieudbytte og derfor havde udbytteskat til gode i Danmark. Banken spillede en vigtig rolle i udfærdigelsen af dokumentsporet, der kunne bruges til at få udbetalt uberettiget udbytteskat fra den danske stat«....* Bøden skal betales af banken. Rigsrevisionen kan dermed konstatere, at bøden i princippet skal betales af den formelt dømte, dvs. banken, som ikke er omfattet af forliget med de 61 pensionsplaner mfl. Forliget er indgået med hovedaktionærerne i banken og er skruet sammen på en sådan måde, at bødekravet på de 110 mio. kr. dækkes ved, at den danske stat får 86 % af salgssummen ved afhændelsen af banken. Dvs. at de 86 % af salgssummen modregnes i de 650 mio. kr., hvorefter hovedaktionærerne hæfter for det resterende beløb, dog for maks. 600 mio. kr., jf. tabel 2. Aftalen om forliget afskærer ikke SØIK fra eventuelt senere at rejse en straffesag mod hovedaktionærerne i banken.

*5256*

27. Som nævnt ovenfor har Skattestyrelsen oplyst, at aftalen i forhold til den tyske bank er den bedst mulige løsning for at inddække den danske stats tab i denne del af sagskomplekset, og styrelsen finder, at det i den sammenhæng er uvæsentligt, om det tilbagebetalte beløb tilfalder statskassen via Skattestyrelsen som forligssum eller via SØIK som bødekrav. *Forligets bestemmelser om straffesager og frafald af civile krav* 28. Det fremgår af forliget med de 61 pensionsplaner mfl., at aftalen ikke påvirker SØIK's mulighed for at føre en straffesag mod forligsparterne. Som nævnt ovenfor indledte Skattestyrelsen og Kammeradvokaten forhandlinger med en oprindeligt større kreds af forligsparter i slutningen af 2016, som fortsatte indtil ultimo 2018. Skattestyrelsen har oplyst, at dele af den oprindeligt større forligskreds tidligt i forhandlingsforløbet ytrede ønske om at lade straffrihed indgå som forligsvilkår. Dette ønske blev dog afvist af Kammeradvokaten allerede på det første møde mellem parterne i København i sommeren 2016. Afvisningen af straffrihed er efterfølgende fastholdt i forhandlingerne. 29. Det fremgår videre af forliget, at Skattestyrelsen har forpligtet sig til at frafalde alle civile krav, som styrelsen har mod forligsparterne, for *det fulde* refusionsbeløb, de har været involveret i udbetaling af, dvs. for forskellen mellem de 2,9 mia. kr. og de 1,6 mia. kr., men som tidligere nævnt retsforfølges andre (udbetalingsagenter, custodians mfl.) for de 1,3 mia. kr. ... *V. Sammenfatning* 31. Sammenfattende kan Rigsrevisionen konstatere, at Skattestyrelsen i samarbejde med Kammeradvokaten og en række udenlandske advokatkontorer via en række civilretlige tiltag forfølger den danske stats tab. Rigsrevisionen kan videre konstatere, at det er Skattestyrelsens overordnede strategi at skabe sikkerhed for, at alle muligheder for at inddække eller begrænse den danske stats tab forfølges og udtømmes. Der er herunder indgået et forlig med 61 amerikanske pensionsplaner mfl. (56 fysiske personer og 102 selskaber), som indtil videre har medført en tilbagebetaling på 950 mio. kr. ud af en forligssum på minimum 1,6 mia. kr. De resterende minimum 650 mio. kr. forventes indbetalt inden for en 4-årig periode. De resterende minimum 650 mio. kr. er bl.a. afhængige af, at en tysk bank bliver solgt i fri handel, idet en del af salgssummen herfra skal afregnes med Skattestyrelsen. Den tyske bank har erkendt sin rolle i udbytterusen og vedtaget en bøde på 110 mio. kr. Bøden vil dog ifølge aftalen blive modregnet i Skattestyrelsens krav mod hovedaktionærerne, da bankens aktiver ikke er tilstrækkelige til at dække bankens samlede forpligtelser, herunder det krav, Skattestyrelsen har rejst, og den strafferetlige bøde, banken er idømt. Med hensyn til restbetalingen på de 650 mio. kr. kan Rigsrevisionen i øvrigt konstatere, at betalingen således er afhængig af salget af banken og hovedaktionærernes betalingsevne i øvrigt. Bankens hovedaktionærer hæfter dog for betalingen af 600 mio. kr., uanset om banken bliver solgt. Videre kan Rigsrevisionen konstatere, at forliget med de 61 pensionsplaner mfl. indebærer, at Skattestyrelsen har forpligtet sig til at frafalde alle civile krav, som styrelsen har mod forligsparterne i forhold til det fulde refusionsbeløb i denne del af sagskomplekset. Omvendt åbner forliget for, at Skattestyrelsen kan få yderligere informationer fra pensionsplanerne om, hvilket beløb de netto har modtaget i udbytterefusion, og hvilke beløb der er tilgået andre, idet de ifølge forligsaftalen, har forpligtet sig til at samarbejde og stille oplysninger til rådighed. Forliget afskærer ikke muligheden for strafferetlig forfølgelse af forligsparterne. ...« Landsskatteretten har den 27. november 2020 stadfæstet Skattestyrelsens afslag på en anmodning om aktindsigt i forligsaftalen og kreditoraftalen (editionsbegæringens pkt. 1 og 3). Det fremgår af afgørelsen, at Landsskatterettens medlemmer har gennemgået aftalerne, og »Ived gennemgangen af dokumenterne blev det

konstateret, at forligsaftalen med de amerikanske pensionsplaner blandt andet indeholder oplysninger om parterne, baggrunden for forliget, vilkår og betingelser, betaling, lovvalg, fortrolighed og jurisdiktion. Kreditoraftalen indgået mellem Skattestyrelsen og en tysk bank m.fl. indeholder blandt andet oplysninger om parterne, deres roller, baggrunden for aftalen, vilkår, betingelser og afvikling, lovvalg og fortrolighed.« *Parternes hovedanbringender vedrørende realiteten* [Udeladt] … *Parternes anbringender vedrørende editionsbegæringen* [Udeladt] …

## Retsgrundlag

Det fremgår af retsplejelovens § 298, stk. 1, at retten efter begæring af en part kan pålægge modparten at fremlægge dokumenter, som er undergivet dennes rådighed, og som parten vil påberåbe sig under sagen, medmindre der derved vil fremkomme oplysning om forhold, som modparten ville være udelukket fra eller fritaget for at afgive forklaring om som vidne, jf. §§ 169-172. Efter retsplejelovens § 300 må den part, der fremsætter en sådan begæring, angive de kendsgerninger, der skal bevises ved dokumenterne, samt de grunde, hvorpå parten støtter, at modparten er i besiddelse af dokumenterne. Af retsplejelovens § 169, stk. 1, fremgår, at tjenestemænd eller andre, der handler i offentligt eller dermed

*5257*

ligestillet hverv, ikke uden samtykke af vedkommende myndighed må afkræves vidneforklaring om forhold, med hensyn til hvilke der i det offentliges interesse påhviler dem tavshedspligt. Hvis samtykke nægtes, og forklaringens afgivelse findes at være af afgørende betydning for sagens udfald, kan retten dog efter § 169, stk. 2, pålægge vedkommende myndighed over for retten at redegøre for grundene til nægtelsen. Finder retten herefter, at hensynet til hemmeligholdelse bør vige for hensynet til sagens oplysning, kan den med visse nærmere angivne undtagelser, der ikke er relevante for denne sag, bestemme, at vidneforklaring skal afgives. Det fremgår endvidere af retsplejelovens § 170, stk. 3, at retten kan bestemme, at forklaring ikke skal afgives om forhold, med hensyn til hvilke et vidne i medfør af lovgivningen har tavshedspligt, og hvis hemmeligholdelse har væsentlig betydning. Af forarbejderne til retsplejelovens § 169, stk. 2, jf. betænkning nr. 316/1962, s. 2930, fremgår bl.a. følgende: »Selv om samtykke herefter kræves til afgivelse af forklaring, er det imidlertid ikke dermed givet, at vedkommende myndigheds afslag på at lade en tjenestemand afgive vidneforklaring bør være uanfægteligt. De offentlige interesser, der kan begrunde tavshedspligt, er af vidt forskellig styrke, og det er begrundelsen for udelukkelse fra vidnepligt hermed også. Undertiden kan der således være tale om en statsvirksomhed, der stort set svarer til en privat erhvervsvirksomhed; i så fald bør der med hensyn til de ansattes vidnepligt i princippet ikke gælde andre regler end for ansatte ved private virksomheder. I andre tilfælde er tavshedspligt pålagt af hensyn til afgørende samfundsøkonomiske interesser, statens sikkerhed eller dens forhold til fremmede magter. I så fald bør vidnepligt kun ganske undtagelsesvis, om nogensinde, pålægges og da eventuelt alene under iagttagelse af særlige forsigtighedsregler. I de tilfælde, der ligger mellem disse ydergrupper, bør afgørelsen af spørgsmålet om vidnepligt bero på en afvejelse af det offentliges interesse i hemmeligholdelse over for betydningen af den pågældende sag i sig selv og af forklaringens afgivelse for sagens oplysning. Den hidtidige regel om samtykke af vedkommende overordnede myndighed til tjenestemænds vidneforklaring foreslås opretholdt inden for området af den nye regel om tjenestemænds vidnepligt, men således at der åbnes domstolene mulighed for at tilsidesætte en negtelse af samtykke fra vedkommende myndighed til afgivelse af forklaring. Efter udvalgets forslag herom (nyt stk. 1 i retsplejelovens § 169) er det en betingelse for tilsidesættelse af nægtelse af samtykke, at forklaringens afgivelse er af afgørende betydning for sagens oplysning, og myndigheden skal, inden retten træffer sin afgørelse, over for retten redegøre for grundene til nægtelsen. Redegørelsen kan formentlig som oftest gives skriftligt og uden prisgivelse af de oplysninger, hvorom vidneførslens genstand drejer sig. Parterne har ikke krav på at blive bekendt med den afgivne redegørelse, jfr. udtrykket: »over for retten«. … Selv om der efter udvalgets opfattelse kun i beskedent omfang vil blive anvendelse for den her foreslåede nye regel om tilsidesættelse af administrationens nægtelse af samtykke, tillægger udvalget reglen væsentlig betydning, fordi den - i overensstemmelse med en almindelig tendens i nyere lovgivning - undergiver administrationens afgørelser en af retssikkerhedshensyn ønskelig kontrol og samtidig understreger, at samtykke til afgivelse af forklaring kun bør nægtes i sager, hvor afgørende offentlige interesser i hemmeligholdelse gør sig gældende. Udvalget har overvejet, om den ændring, der ved den foreslåede regel sker i den hidtidige retstilstand, bør omfatte alle tilfælde, i hvilke den overordnede myndigheds samtykke kræves, eller om dennes afgørelse bør være endelig i tilfælde, hvor tavshedspligten er begrundet i hensyn til afgørende samfundsøkonomiske interesser, statens sikkerhed eller dens forhold til fremmede magter. … Udvalget har imidlertid fundet den foreslåede regel

om domstolskontrol med administrationens afgørelser på dette område så betydningsfuld og risikoen for domstolsafgørelser, der tilsidesætter rimelige hensyn til det offentliges interesser, så beskeden, at der ikke er tilstrækkelig grund til at gøre undtagelse fra reglen om domstolskontrol for disse særlige tilfælde.« Af de specielle bemærkninger til retsplejelovens § 169, jf. lovforslag nr. 19/1964, § 1, nr. 9, fremgår følgende: »TIL § 169. Bestemmelsen, der svarer til § 169, stk. 1, i udvalgets udkast A, går ud på, at tjenestemænd eller andre, der handler i offentligt eller dermed ligestillet hverv, ikke uden samtykke af vedkommende myndighed må afkræves vidneforklaring om forhold, med hensyn til hvilke der *i det offentliges interesse* påhviler dem tavshedspligt. Er tavshedspligten *ikke pålagt i det offentliges interesse,* afgøres spørgsmålet om vidneplikt efter reglen i forslagets § 170, stk. 3. Efter justitsministeriets opfattelse er det velbegrundet, når udvalget begrænser bestemmelsen til kun at gælde, hvor tavshedspligten er pålagt i det offentliges interesse, således at der kun i disse tilfælde kræves samtykke fra vedkommende myndighed til afgivelse af vidneforklaring. Det må i denne forbindelse fremhæves, at bestemmelsen også finder anvendelse, hvor tavshedspligten vel i første række er begrundet i hensynet til private, men hvor det offentlige dog har en særlig interesse i, at private frit kan henvende sig med oplysninger uden at behøve at frygte, at tavshedspligten vil blive brudt. I

*5258*

sådanne tilfælde må tavshedspligten siges at være pålagt også i det offentliges interesse. Som et enkelt eksempel på områder, hvor dette synspunkt har betydning, kan nævnes administrationen af lovgivningen om børne- og ungdomsforsorg. *Til stk. 1.* … *Til stk. 2.* Bestemmelsen giver - i overensstemmelse med udvalgets udkast - retten adgang til at bestemme, at vidneforklaring skal afgives, selv om vedkommende myndighed har nægtet at give samtykke til forklaringens afgivelse. Ved udarbejdelsen af forslaget har justitsministeriet imidlertid fundet det nødvendigt - også under hensyn til de traktatretlige forpligtelser, der påhviler Danmark - at begrænse bestemmelsen, således at den ikke gælder, hvis nægtelsen er begrundet med hensynet til statens sikkerhed eller dens forhold til fremmede magter.« Om myndigheders tavshedspligt gælder bl.a. følgende: Af skatteforvaltningslovens § 17, stk. 1, fremgår, at skattemyndighederne under ansvar efter §§ 152, 152 a og 152 c-152 f i straffeloven skal iagttage ubetinget tavshed over for uvedkommende med hensyn til oplysninger om en fysisk eller en juridisk persons økonomiske, erhvervsmæssige eller privatlivet tilhørende forhold, som de under varetagelsen af deres arbejde bliver bekendt med. Efter forvaltningslovens § 27, stk. 1, nr. 2, har den, der virker inden for den offentlige forvaltning, tavshedspligt, jf. straffelovens § 152 og §§ 152 c-152 f, med hensyn til bl.a. oplysninger om drifts- eller forretningsforhold el.lign., for så vidt det er af væsentlig økonomisk betydning for den person eller virksomhed, oplysningerne angår, at oplysningerne ikke videregives. Efter § 27, stk. 4, nr. 3, er der endvidere tavshedspligt med hensyn til oplysninger, som det i øvrigt er nødvendigt at hemmeligholde for at varetage væsentlige hensyn til det offentliges økonomiske interesser, herunder udførelsen af det offentliges forretningsvirksomhed. Vedrørende adgangen til aktindsigt indeholder offentlighedsloven bl.a. følgende bestemmelser: Efter lovens § 30, nr. 2, omfatter retten til aktindsigt ikke oplysninger om bl.a. drifts- eller forretningsforhold el.lign., for så vidt det er af væsentlig økonomisk betydning for den person eller virksomhed, oplysningerne angår, at anmodningen ikke imødekommes. Det fremgår endvidere af offentlighedslovens § 33, nr. 3, at retten til aktindsigt kan begrænses, i det omfang det er nødvendigt til beskyttelse af væsentlige hensyn til det offentliges økonomiske interesser, herunder udførelsen af det offentliges forretningsvirksomhed. Herudover følger det af offentlighedslovens § 35, at pligten til at meddele oplysninger er begrænset af særlige bestemmelser om tavshedspligt fastsat ved lov eller med hjemmel i lov for personer, der virker i offentlig tjeneste eller hverv. Landsretten afsagde

## Kendelse

*Generelle bemærkninger* Det følger af retsplejelovens § 298, stk. 1, sammenholdt med § 169, stk. 2, at hvis det ønskede materiale er underlagt tavshedspligt, kan editionspålæg kun meddeles, hvis materialet findes at være af afgørende betydning for sagens oplysning, og hensynet til hemmeligholdelse findes at burde vige for hensynet til sagens oplysning. Ved afgørelsen af det sidstnævnte spørgsmål skal der ske en afvejning af de hensyn, der ligger bag tavshedspligten, over for hensynet til sagens oplysning, jf. herved f.eks. U 2017.816 H. Landsretten finder ikke grundlag for at tilsidesætte Skatteforvaltningens og - for så vidt angår kreditoraftalen og forligsaftalen - Landsskatterettens vurdering, hvorefter oplysningerne er underlagt tavshedspligt og undtaget fra aktindsigt, jf. skatteforvaltningslovens § 17 og offentlighedslovens § 35 og § 33, nr. 3. Om hensynene bag tavshedspligten har Skatteforvaltningen anført, at der er aftalt fortrolighed, og en overtrædelse heraf vil kunne få betydning som misligholdelse af forligsaftalen og for betaling af

forligssummen. Det vil desuden kunne have negativ indvirkning på Skatteforvaltningens fremtidige forligsmuligheder, hvis der opstår indtryk af, at Skatteforvaltningen eller danske myndigheder generelt ikke respekterer aftaler om fortrolighed. Begæringen omfatter også intern og fortrolig juridisk rådgivning, og en deling heraf kan få uoverskuelige konsekvenser for Skatteforvaltningens mulighed for at inddrive milliardbeløb, navnlig i forhold til spørgsmålet om, hvorledes Skatteforvaltningen derved må anses at have frafaldet sit *legal privilege* i de udenlandske sagsanlæg. Edition skal i givet fald begrænses til helt konkrete dokumenter og helt konkretiserede afsnit i de relevante dokumenter, f.eks. alene forliget og/eller kreditoraftalen og alene de bestemmelser, der angår f.eks. fortrolighed, forligsbeløb og/eller forrentning. A Advokatpartnerselskab ønsker med den begærede bevisførelse at belyse sagens oplysning og sammenhæng, herunder grundlaget for størrelsen af det krav, som er rettet mod A Advokatpartnerselskab og som løbende reguleres i takt med, at der sker indbetalinger i henhold til forligsaftalen, ligesom materialet angives at have betydning for spørgsmål om iagttagelse af tabsbegrænsningspligt, påregnelighed, passivitet og forældelse. Det er herefter spørgsmålet, om det materiale, der efter editionsbegæringens pkt. 1-4 ønskes fremlagt, er af afgørende betydning for sagens oplysning, og i givet fald, om hensynet til hemmeligholdelse findes at burde vige for hensynet til sagens oplysning.

*5259*

*Ad begæringens pkt. 1 og 3:* Disse dele af editionsbegæringen angår dels kreditoraftalen mellem Skatteforvaltningen/Skattestyrelsen og B Bank dels forligsaftalen fra maj 2019 mellem Skatteforvaltningen/Skattestyrelsen og 61 amerikanske pensionsplaner m.fl., begge tillige med eventuelle andre aftaler i tilknytning hertil. Landsretten bemærker, at det af det allerede fremlagte uddrag af forligsaftalen fremgår, at der er knyttet bilag til aftalen. Der er ikke i øvrigt oplysninger om, at der skulle være indgået andre aftaler i tilknytning til kreditor- og forligsaftalerne. Landsretten finder, at oplysninger i aftalerne med tilhørende bilag om grundlaget for og størrelsen af de krav mod de enkelte forligsparter, der ligger til grund for det krav, som under denne sag er rettet mod A Advokatpartnerselskab og som løbende reguleres i takt med, at der sker indbetalinger i henhold til forligsaftalen, vil være af afgørende betydning for sagens oplysning. Til oplysninger om størrelsen af kravene mod de enkelte forligsparter hører også oplysninger om, hvilke poster der indgår i forligsbeløbene, hvad der allerede måtte være betalt af de enkelte forligsparter, vilkår for indbetaling af forligsbeløbet samt oplysninger om forrentning. Det lægges til grund, at disse forhold ikke kan belyses på anden vis end ved fremlæggelse af ekstraherede udgaver af de to aftaler med tilhørende bilag. Sagen, der er af principiel karakter og er henvist til landsretten til behandling i 1. instans, jf. retsplejelovens § 226, stk. 1, vedrører spørgsmålet om, hvorvidt A Advokatpartnerselskab ved sin rådgivning af B Bank har handlet ansvarspådragende over for Skatteforvaltningen, idet der fremsat et krav på mere end 700 mio. kr. over for A Advokatpartnerselskab. Oplysninger vedrørende indholdet af aftalerne indgår i forvejen i et vist omfang i sagen, idet der foreligger en hensigtserklæring afgivet forud for indgåelsen af kreditoraftalen, og forligsaftalen og til dels kreditoraftalen er nærmere omtalt i Rigsrevisionens notat af januar 2020. Det fremgår desuden af sagen, at TV2 og Politiken er i besiddelse af i hvert fald uddrag af forligsaftalen. Hertil kommer, at det på tidspunktet for aftaleindgåelsen måtte anses for nærliggende, at aftalernes indhold kunne være af betydning for bl.a. A Advokatpartnerselskab. På denne baggrund og efter karakteren af de af Skatteforvaltningen fremhævede hensyn bag tavshedspligten finder landsretten, at der foreligger sådanne ganske særlige omstændigheder, at hensynet til hemmeligholdelse i relation til de ovennævnte oplysninger må vige for hensynet til sagens oplysning. *Ad begæringens pkt. 2 og 4:* Disse dele af editionsbegæringen angår dels forudgående udkast til kreditoraftalen delt med B Bank SØIK eller andre uden for Skatteforvaltningen, såvel som korrespondance i tilknytning til forhandlinger om kreditoraftalen og den tidligere hensigtserklæring af 16. maj 2019, dels forudgående udkast til forligsaftalen delt med en eller flere forligsparter, B Bank SØIK eller andre uden for Skatteforvaltningen, såvel som korrespondance i tilknytning til forhandlinger om denne aftale. Der er meddelt editionspålæg vedrørende dele af de to aftaler, jf. ovenfor, og der findes ikke godtgjort, at det ønskede yderligere materiale, der i øvrigt synes begæret fremlagt til brug for en undersøgelsespræget gennemgang, vil være af afgørende betydning for sagens udfald. Editionsbegæringens pkt. 2 og 4 tages derfor ikke til følge. På den anførte baggrund tages A Advokatpartnerselskabs begæring til følge som nedenfor bestemt.

## Thi bestemmes

Det pålægges Skatteforvaltningen at fremlægge kreditoraftale af 11. september 2019 mellem B Bank og Skatteforvaltningen/Skattestyrelsen og forligsaftale af 28. maj 2019 mellem 61 amerikanske pensionsplaner m.fl. og

Skatteforvaltningen/Skattestyrelsen, begge med tilhørende bilag, for så vidt angår de dele af aftalerne med bilag, der vedrører grundlaget for og størrelsen af kravene mod de enkelte forligsparter, herunder oplysninger om, hvilke poster der indgår i forligsbeløbene, hvad der allerede måtte være betalt af de enkelte forligsparter, vilkår for indbetaling af forligsbeløbet samt oplysninger om forrentning. …