# Exhibit 20

**U.1955.13H**

*Set-off with repayment obligation to the Audit Committee in claims for compensation for lost chattels, taken into custody by the freedom movement.*

*Money management etc. 5.4 Money management etc. 9*

♦ **14**

**Set-off**[1] - A claim for damages against the bankruptcy estate of Captain S in connection with the loss of chattels belonging to S after they had been taken into custody by the freedom movement on May 5, 1945, it was held that a repayment obligation on S pursuant to Act no. 500 of October 9, 1945 with respect to amounts received in German service could be set off pursuant to section 15 of the Bankruptcy Act. It was thereby assumed that the debtor according to the compensation claim, Erstatningsudvalget af 1945, and the creditor according to the repayment claim, Revisionsudvalget for tyske Betalinger, had to be regarded as the same legal entity, namely the Danish state,[2] whereby both claims had to be considered to have arisen before the commencement of the bankruptcy on July 25, 1946, as it was irrelevant under the circumstances that the final amount of the claims could only be determined later.[3]

**H. D. November 5, 1954 in case 303/1953**

*Ministry of Defense (Erstatningsudvalget af 1945), Audit Committee for German Payments and Ministry of Finance (High Court Judge Poul Schmith)*
mod
*Former Captain Poul Sommer's bankruptcy estate (Supreme Court lawyer Jakob E. Gelting by order).*

## Eastern High Court

### Judgment of the Eastern High Court of June 16, 1953 (IX afd.).

When the German occupying forces in Denmark surrendered in May 1945, Poul Sommer and his wife, Mrs. Karen Ragnhild Sommer, fled from their home in the villa "Stensbo" near Jonstrup, having previously given the keys to the local parish council chairman, Chr. Hauch, having previously handed over the keys to the villa, where they left bookkeeping items and other items of considerable value. In the following period, the couple remained in hiding under assumed names until they were found living on the farm "Bakkely" near Viborg around July 20, 1946. Sommer was then imprisoned on charges of violating the Penal Code supplement. The criminal case resulted in him being convicted by the Eastern High Court of
April 6, 1949, pursuant to sections 10(1) and 16 of the Criminal Code Supplement
paragraph 1, no. 6, and was sentenced to imprisonment for 12 years.
  Before Sommer entered German military service in 1941, he, who ran a trading and engineering company in Copenhagen, was declared bankrupt by the probate department of the Maritime and Commercial Court. The estate proceedings were concluded in September 1942 pursuant to section 97 of the Bankruptcy Act. After his imprisonment in 1946, his estate was, pursuant to a petition received by the probate court for Viborg købstad etc. on July 25, 1946, from one of the former creditors, reopened in bankruptcy proceedings by decree issued on September 6, 1946

by said probate court.

The items left in the villa "Stensbo" had been removed from the villa immediately after the surrender. During a police investigation carried out after Sommer's imprisonment at the request of the spouses to find out what had become of the chattels, it was revealed that the parish council chairman had been asked by the spouses to move or store their belongings according to the guidelines that might be established after the capitulation, and that he had received DKK 200 from them to cover the costs of this. Immediately afterwards, the parish councilor handed the key to the local leader of the resistance movement, Officer Elling Christensen. At his request, the belongings were transferred to Jonstrup camp, where they were placed under lock and key. A small part was later transferred from the Jonstrup camp to Kløvermarks- vejen, but most of it has disappeared. In this connection, it is reported that after the capitulation of the "Red Cross" and Social Jews, the Jonstrup camp was used to house German and Austrian refugees, and it is believed that they stole the chattels, inter alia to use them as fuel for fires for heating. The camp was guarded first by members of the resistance movement, later by the Life Guards and the C.B. service.

**15**

After the defense attorney appointed for Sommer during the criminal proceedings, Chief Judge Dragsted, on behalf of the couple, had sought to obtain compensation by contacting the authorities and institutions that could be assumed to have been responsible for the loss of the property, as well as the insurance company Nye Danske af 1864, where they were insured for fire and burglary theft, he notified by letter of 1. October 1946, he filed a claim for compensation with the compensation committee established by the then Ministry of War in December 1945 (Erstat- ningsudvalget af 1945), which claim was later

calculated to approximately DKK 57,000.

In a letter dated August 5, 1947, the Compensation Committee informed Chief Judge Dragsted, "- - - - that they are willing to pay an amount of DKK 35,000.00 for full and final settlement of the case, subject to the sanction of the Audit Committee for German Payments, it being noted that the amount has been determined taking into account the uncertainty with regard to what has been present and lost and with regard to the value of the chattels.

- - - - The amount will be sent to the Audit Committee. - - - - -"

In the meantime, disagreement had arisen between Sommer and his wife on the one hand and the bankruptcy estate on the other hand as to who was entitled to the compensation. The couple claimed that, according to the marriage contract of May 25, 1939, the lost property, or most of it, was her separate property and that she alone was entitled to the compensation, whereas, in the opinion of the bankruptcy estate, the estate was entitled to dispose of the claim for compensation as the claim was Sommer's. In a letter dated October 15, 1947, Chief Attorney Dragsted, who on June 24, 1947 had informed the Audit Committee of the bankruptcy estate's position, then requested the Audit Committee for German Payments' consent to the payment of the compensation amount of DKK 35,000 to the bankruptcy estate, "as the Audit Committee probably has no preferential position on the compensation amount in relation to the other creditors in Poul Sommers' bankruptcy estate."

The Audit Committee's reply letter of December 1, 1947 states:

- - - - - - - - - - - - - - - - - - - - - - - - - - -

"It appears from the case that the aforementioned compensation offer has been made because the majority of Poul Sommer's belongings were lost after they were taken into custody on May 5, 1945.

1 Cf. R. nsl. Aps 507, T. f. R. 1953 p. 518, Ussing: Dansk Obligationsret, alm. del (3rd ed.) p. 413, Illum: Modregning i Konkurs p. 140 and Arnholm: Strejftog.

2 Cf. R. nsl. Aps 507.

**3** Cf. H. D. in U. f. R. 1950 p. 621 with note 1.

of the Freedom Movement, and that the offer of payment of the compensation amount is made subject to the sanction of the Audit Committee. From the case pending before the Audit Committee, it thus appears that Poul Sommer, for his activities in the German service, has received amounts which he could be ordered to repay pursuant to Section 10(1) of Act No. 500 of October 9, 1945 on Repayment of Profits etc. in the German Interest, cf. Act No. 400 of July 12, 1946.

As a consequence of this, it must be announced that the Audit Committee must hold that the compensation amount in question cannot be paid to the estate until a repayment claim pursuant to the above Act has been calculated and - pursuant to section 15 of the Bankruptcy Act - reduced in the compensation amount."

After the bankruptcy estate's lawyer, Supreme Court lawyer Thorsøe-Jacobsen, protested to the Audit Committee against the set-off claim, the Audit Committee issued an order on September 23, 1948, whereby Sommer was ordered to pay DKK 25,400 to the Treasury pursuant to section 10(1) of Act no. 500 of October 9, 1945, cf. Act no. 400 of July 12, 1946, namely the salary he received from the German side during his German war service in the period from November 1941 to the capitulation.

**16**

On October 12, 1948, Supreme Court Attorney Thorsøe-Jacobsen, on behalf of the bankruptcy estate, received payment of the difference between the

lost chattels, DKK 35,000, and in the DKK 25,400 referred to in the order, or DKK 9,600, for which amount he acknowledged with reservations for further compensation and interest.

After it had been determined by the State Directorate of Taxation that there would be no summer tax refund, on June 25, 1949, the Compensation Committee arranged for the DKK 25,400, as requested by the Audit Committee in a letter to the Ministry of Defense dated June 17, 1949, to be transferred to "the Ministry of Finance account pursuant to Act No. 259, 406, 499 and 500 of 1945 etc.", of which Supreme Court Judge Thorsøe-Jacobsen was informed the same day.

By writ of summons dated 19 December 1950, Mrs. Sommer brought an action against the Ministry of Defence and the bankruptcy estate claiming, among other things, that the Ministry be ordered to pay DKK 15,615.28 øre as her share of the compensation awarded by the compensation committee, and that the bankruptcy estate be ordered to acknowledge that she was entitled to such a share. The case was concluded by court settlement on March 2, 1953, which included, among other things, that the Treasury through the Compensation Committee would pay her DKK 3,400 without interest and for full settlement.

In this case, brought on March 20, 1951 against the Ministry of Defense, the Audit Committee for German Payments and the Ministry of Finance as defendants, the bankruptcy estate of former Captain Poul Sommer has, after having been granted leave to sue, finally submitted the following claim:

A.    Principally: *That* the Ministry of Defense (Erstatningsudvalget af 1945) be ordered to pay the plaintiff DKK 22,000 with interest at 5% annually from 5 August 1947,

*that the* Audit Committee for German Payments be ordered to acknowledge that, the transfer ordered, at the latest by letter of June 17, 1949 to the Ministry of Defense, to the "Ministry of Finance's account pursuant to Act no. 259, 406, 499 and 500 of 1945 etc." of DKK 25,400 is unjustified for DKK 22,000,

*that* the Ministry of Finance be ordered to acknowledge that it is unjustified in demanding and receiving DKK 22,000 from the Ministry of Defense and the Audit Committee for German Payments on the above account. The amount of DKK 22,000 is the difference between the residual compensation, DKK 25,400, and the amount due to Mrs. Sommer under the settlement of 2 March 1953, DKK 3,400.

B.    In the alternative: That the defendants jointly and severally be ordered to pay DKK 2,998.94 with interest at 5 percent annually from the institution of the proceedings. The amount constitutes interest on the withheld compensation amount, namely 5% of DKK 35,000 in the period August 5, 1947 to November 4, 1948, for 15 years. months...... 2187 kr. 50 øre 5 pct. of 25,400 kr. in the period November 5, 1948 to June 25, 1949, 230 days

|  | |
|---|---|
| 811 - | 44 - |
| 2998 kr. | 94 cents |

The defendants have argued for acquittal.

It is stated that the Compensation Committee of 1945 consists of 5 members, of which the chairman and 3 others belong to the Ministry of Defense or related institutions, while the Ministry of Finance is represented by 1 member. About the

**17**

The committee also has the following information in a letter from the same dated September 21, 1951:

"The Compensation Committee has been established by administrative measure, as the committee was set up by the War Ministry on December 5, 1945 after prior agreement with the Ministry of Finance on the guidelines and on the payment of

expenses.

The committee was set up with the task of dealing with compensation issues arising from the activities of the resistance movement in the period after May 5, 1945.

This primarily involved the processing and finalization of such compensation cases submitted to the resistance movement,

Copyright © 2023 Karnov Group Denmark A/S

which had not yet been decided by the regions and which were now forwarded for decision by the War Department, and the committee's task was formulated as follows with regard to these cases:

"partly to ensure that all unresolved cases that fall under or can be resolved by other institutions are referred to them, and partly for the remaining cases to ensure that there is a basis for granting compensation and, if so, that the compensation awarded must be considered reasonable and does not exceed the limits laid down in the Act of October 1, 1945 on compensation to victims of the occupation, insofar as a comparison with the conditions in this area can be drawn in the special cases."

  By announcement in the daily press and by circular letter to the police director in Copenhagen and all police chiefs, it was announced in January 1946 that the War Ministry had established a committee "Erstatningsudvalget af 1945, address the War Ministry" to deal with claims for compensation  in connection with damages that may have arisen from the activities of the resistance movement after the capitulation

Copyright © 2023 Karnov Group Denmark A/S

and which are not covered by the provisions of the Act of October 1, 1945 on compensation to victims of the occupation or Act no. 490 of October 9, 1945 on redress for wrongful internment. The new cases received thereafter have been processed according to the same guidelines as the cases taken over from the resistance movement, and the cases have been decided after prior investigation - often at the committee's request - by the police or the region.

According to the agreement with the Ministry of Finance, the expenses associated with the committee's activities were paid from the expected supplementary appropriation under the resistance movement's account, but so that compensation cases of major financial significance and cases where there is doubt about the state's liability for compensation are submitted to the appropriation authorities. Regarding the committee's cash situation, it should be noted that the committee as such has no independent cash box, but in cases where the committee agrees to pay compensation, the committee contacts the Ministry of Defense's 10th office - - - - directly, which arranges for the amount to be paid.

In relation to the Ministry of Finance, the cash ratio is then as one ministry's cash ratio to the other.

The procedure of offsetting in cooperation with the Audit Committee for German Payments was initiated by the Compensation Committee at the beginning of 1947, and the procedure is still followed by the Committee. Written agreements between the two committees do not appear to exist. However, in each case that has been investigated by the police, the committee has asked the police for an opinion on whether any compensation could be paid to

**18**

the injured parties themselves, and the committee has, among other things, been informed of cases where there was a question of repayment of profits from activities in the German interest.

The question as to whether the Compensation Committee has asserted recourse claims against any of those responsible for the loss underlying the case, including the insurance company, must be answered in the negative." The Audit Committee for German Payments is established pursuant to Act no. 330 of July 12, 1945 "by the Minister of Trade, Industry and Shipping in consultation with the Minister of Finance, the Minister of Justice and Danmarks Nationalbank". The Committee is responsible for making decisions on the payment to the Treasury of profits from business activities

etc. in the German interest pursuant to Act no. 500 of October 9, 1945, among other things in the cases mentioned in section 10, where "Persons - - - - who have otherwise had financial dealings with the German Wehrmacht - - - - may be ordered to repay to the Treasury that part of the income thereby obtained which exceeds what may be considered appropriate in view of the circumstances of the individual case". Furthermore, section 18 of the Act stipulates that the Committee may, in exceptional circumstances, reduce or even completely waive the repayment requirement. In a letter dated July 19, 1951, the Committee stated the following:

"The budget and accounts of the Audit Committee form part of the budget and accounts of the Ministry of Trade, and the Audit Committee's expenses are included in the Finance Act and the state accounts as well as certain funds originating from the occupation period.

However, the Audit Committee's repayment account with the Central Bank of Denmark is only listed as holdings. In accordance with Act no. 330 of

12 July 1945 on the audit of certain German payments, § 3, the Audit Committee may demand that specified amounts be deposited in the National Bank of Denmark as security for the claims of the Treasury. These amounts shall be credited to the said account for the account of the persons concerned. When a demand for deposit is made, it shall be expressly stated that if the amount deposited proves to be too large in the final calculation, the difference will be repaid.

When payment of the refund amount is finally established, i.e. s. if applicable, only after the State Directorate of Taxation has calculated the

the reimbursement amount due to the person concerned, the amount is transferred to "the account of the Ministry of Finance pursuant to Act No. 259, 406, 499 and 500 of 1945 etc.".

Pursuant to Act No. 322 of June 19, 1946 concerning administrators and the State's claims to fines and confiscation amounts pursuant to Penal Code supplements No. 259 of June 1, 1945 and No. 406 of August 28, 1945, Section 11, amounts received by confiscation pursuant to said Acts shall be deposited in a specially established account with the Ministry of Finance in the National Bank of Denmark. Provisions regarding the use of the amount deposited in this account will be made by special law. Similar provisions are found in the Audit Acts of October 9, 1945, sections 14 and 20, respectively." In support of its main claim, the bankruptcy estate has in particular argued that the basic condition for set-off, i.e. reciprocity of debts, is lacking here, as the estate's claim for damages is against a state authority, namely the Ministry of Defense, while the counterclaim, the state's repayment claim, has been determined by another state authority, the Audit Committee for German

**19**

Payments that fall under the Ministry of Commerce. It must be considered applicable law that a citizen who has a claim against a state authority cannot use it to offset a claim from another state authority. Where the situation - as here - is the reverse, a similar rule must apply, and it must be considered quite inadmissible that the Compensation Committee of 1945 withheld the compensation determined by letter of August 5, 1947 and later ordered it transferred to the aforementioned account of the Ministry of Finance to give another administrative body, the Audit Committee for German Payments, access to seek coverage in the compensation for a recovery claim, the amount of which, moreover, was only determined at a much later date. In this connection, the estate refers to the fact that every debt relationship with the state is always centered on a specific administrative branch as the decisive counterparty and that each administrative branch - which is also reflected in the Finance Acts and the state accounts - generally acts independently in contractual relationships. To deviate from this in the event of bankruptcy is unfair to the other creditors.

Even if reciprocity in the culpability is assumed to exist, the estate is of the opinion that set-off cannot take place. It must - at best for the defendants - be considered doubtful whether the claim for compensation from the Compensation Committee did not finally come into existence until the Committee's letter of August 5, 1947, as it was previously uncertain whether there was a claim for compensation against any state authority at all and if so, what amount could rightfully be claimed. But in any case, the counterclaim cannot be considered to have arisen until the Audit Committee's order of September 23, 1948, since until then, according to the above-mentioned statutory provisions, the Audit Committee was free to decide whether repayment should be demanded at all. As the counterclaim thus arose after the commencement of the bankruptcy, set-off under section 15 of the Bankruptcy Act is excluded. Considering further that the declaration of set-off was not made in connection with the Compensation Committee's letter of 5 August 1947, but only in the same committee's letter of 25 June 1949 to Supreme Court Attorney Thorsøe-Jacobsen, the withholding of compensation must be characterized as a misuse of power. The alternative claim, which is made in the event that set-off is present, is based on the fact that the request for set-off, as stated, cannot be considered to have been made until June 25, 1949, which is why

the estate must be entitled to the calculated interest for the period from August 5, 1947 to June 25, 1949.

In response, the defendants argue that the award of damages of 35,000 DKK cannot be described as a coincidence; there was

Copyright © 2023 Karnov Group Denmark A/S

On the contrary, a clear basis for the claim to the Compensation Committee, whose decision has been made after careful consideration.

The defendants also dispute the claim that there has not been the reciprocity necessary for set-off. When a private citizen cannot use his claim against a state authority for set-off against a claim from another state authority, this, the defendants claim, is not due to lack of reciprocity, but to practical administrative considerations, in addition to which the special consideration of the debtor's security is irrelevant vis-à-vis a state authority. The fact that the Ministry of Defense and the Ministry of Commerce must be regarded as a single entity in the present case is, in the view of the defendants, beyond dispute. In that regard, they point out that the division of official business between the

**20**

individual ministries do not have a fixed framework, but are subject to changes based on expediency. In addition, the ministries are closely linked in financial and accounting terms. In view of this and the tasks incumbent on the compensation committee and the audit committee respectively, it must be considered entirely legal that the two committees, as happened in recent cases, have sought to cooperate according to the guidelines stated above, whereby repayment amounts determined by the audit committee have to a large extent been offset against the same person in the compensation amount determined by the compensation committee. It is incorrect that the offsetting statement was not made until June 25, 1949, as such statement is clearly contained in the Audit Committee's letter of December 1, 1947.

The defendants deny that there is a misuse of power in the withholding of the compensation amount. The Compensation Committee's promise in its letter of August 5, 1947 to pay compensation of DKK 35,000 was conditional on the Audit Committee's sanction. The Compensation Committee had not assumed any further obligation to pay out, and the withholding of the amount until the Audit Committee's decision was available was therefore lawful.

Finally, the defendants argue that the basis for both claims clearly existed before the commencement of the bankruptcy. As regards the repayment claim in particular, it is thus based on Sommer's German war service and the Act of October 9, 1945, and the fact that the claim, among other things due to Sommer's disappearance, like the claim for damages, could not be calculated to a specific amount before the commencement of the bankruptcy, must be irrelevant to the right of set-off.

With regard to the bankruptcy estate's alternative claim, the defendants have argued that there is no legal basis for this claim as the basis for the compensation payment, DKK 35,000, is not an agreement but tortious acts for which the resistance movement is liable, cf. section 62 of the Danish Debt Instruments Act.

The Court finds that it must agree with the bankruptcy estate that the reciprocity in the debt relationships necessary for the set-off to be initiated has not been present in the present case, as in the two debt relationships in question, where the State is debtor and creditor respectively, the State is represented by two administrative bodies under different ministries whose tasks are not in the same area and therefore cannot be considered as a unit, whereby it is noted that the cooperation which according to the information actually took place between the compensation committee and the audit committee cannot be seen to lead to a different result. Since the defendants in their proceedings have acknowledged that Sommer had an indisputable claim to compensation for the lost chattels as a result of the circumstances

of the resistance movement, the Compensation Committee has lacked the opportunity in its letter of August 5, 1947 to make the payment of the compensation amount of DKK 35,000 conditional on the Audit Committee's sanction, which is why the withholding of the amount for set-off has not been justified.

Copyright © 2023 Karnov Group Denmark A/S

entitled, all the more so as the audit committee's claim for recovery cannot be assumed to have come into existence before the commencement of the bankruptcy proceedings according to the content of sections 10 and 18 of Act no. 500 of October 9, 1945 but not until the audit committee's decision of September 23, 1948. Consequently, the bankruptcy estate's main claim will be upheld. - - -

## Supreme Court

### 21

### Supreme Court ruling.

The appealed judgment was handed down by the Eastern High Court. Nine judges participated in the judgment.

Before the Supreme Court, the appellants have repeated their claim for acquittal. The respondent has principally claimed that the judgment should be upheld and has thus repeated its alternative claim submitted to the High Court.

Regarding the presentation in the judgment, it should be noted that the difference amount of DKK 9600 was not paid until November 4, 1948.

With regard to the application of section 15 of the Bankruptcy Act, the debtor under Sommers' claim for damages and the creditor under the repayment claim under Act no. 500 of October 9, 1945 must be considered the same legal entity, namely the Danish state. As both claims must be considered to have arisen before the commencement of the bankruptcy proceedings, and as it is found to be of no decisive importance in the present circumstances that the final amount of the claims could not be determined until later, the conditions for set-off under section 15 of the Bankruptcy Act are found to have been met, and the appellants will therefore be acquitted of the respondent's main claim.

Finally, as there is no basis for the interest claim raised in the defendant's alternative claim, the appellants will on the whole be acquitted.

With regard to the costs of the case for both courts, the following will apply.

### *For it is known to be right:*

*The appellants, the Ministry of Defense (Erstatningsudvalget af 1945), the Audit Committee for German Payments and the Ministry of Finance, should be acquitted of charges by the respondent, former Captain Poul Sommer's bankruptcy estate, in this case.*

*The respondent pays DKK 3000 in legal costs for both courts to the appellants.*

*The respondent shall pay to the public authorities the court fees before the Supreme Court which would have had to be paid if the case had not been tax-free for the appellants.*

*Attorney Gelting is awarded DKK 800 in fees before the Supreme Court, which, together with the fees awarded to Attorney Thorsøe-Jacobsen and Attorney Ivar Hoppe by the High Court's judgment, DKK 600 and DKK 200 respectively, are paid by the public authorities. The court ordered them to be paid within 15 days of the Supreme Court's judgment.*

**U.1955.13H**

### Modregning med tilbagebetalingspligt overfor Revisionsudvalget i erstatningskrav for bortkomne effekter, taget i forvaring af frihedsbevægelsen.

*Pengevæsen m.v. 5.4 Pengevæsen m.v. 9*

♦ **14**

**Modregning**[1] – Overfor et kaptajn S's konkursbo tilhørende erstatningskrav i anledning af, at effekter tilhørende S var bortkomne, efter at de den 5. maj 1945 var taget i forvaring af frihedsbevægelsen, fandtes en S i henhold til lov nr. 500 af 9. oktober 1945 påhvilende tilbagebetalingspligt med hensyn til beløb, modtagne i tysk tjeneste, i medfør af konkurslovens § 15 at kunne bringes i modregning. Det antoges herved, at debitor ifølge erstatningskravet, Erstatningsudvalget af 1945, og kreditor ifølge tilbagebetalingskravet, Revisionsudvalget for tyske Betalinger, måtte betragtes som det samme retssubjekt, nemlig den danske stat,[2] hvorhos begge krav måtte anses opstået inden konkursens begyndelse den 25. juli 1946, idet det efter omstændighederne måtte være uden beydning, at kravenes endelige størrelse først senere kunne fastslås.[3]

**H. D. 5. novbember 1954 i sag 303/1953**

*Forsvarsministeriet (Erstatningsudvalget af 1945), Revisionsudvalget for tyske Betalinger og Finansministeriet (landsretssagfører Poul Schmith)*
mod
*fhv. kaptajn Poul Sommers konkursbo (højesteretssagfører Jakob E. Gelting efter ordre).*

## Østre Landsret

### Østre Landsrets dom 16. juni 1953 (IX afd.).

Da de tyske besættelsestropper i Danmark kapitulerede i maj 1945, flygtede Poul Sommer med sin hustru, fru Karen Ragnhild Sommer, fra ægtefællernes bopæl i villa „Stensbo" ved Jonstrup efter forinden til den stedlige sognerådsformand, Chr. Hauch, at have overgivet nøglerne til villaen, hvor de efterlod indbogenstande og andre effekter til betydelig værdi. I den følgende tid holdt ægtefællerne sig skjult under påtagne navne, indtil de omkring den 20. juli 1946 blev fundet boende på gården „Bakkely" ved Viborg. Sommer blev derefter fængslet som sigtet for overtrædelse af straffelovstillæget. Straffesagen resulterede i, at han ved Østre Landsrets ankedom af 6. april 1949 i medfør af straffelovstillægets § § 10, stk. 1, og 16 stk. 1, nr. 6, idømtes fængsel i 12 år.

Inden Sommer i 1941 trådte i tysk krigstjeneste blev han, der i København drev et handels- og ingeniørfirma, erklæret konkurs ved Sø- og Handelsrettens skifteafdeling. Bobehandlingen sluttedes i september 1942 i medfør af konkurslovens § 97. Efter hans fængsling i 1946 blev hans bo i henhold til begæring, modtaget af skifteretten for Viborg købstad m. v. den 25. juli 1946, fra en af de tidligere kreditorer påny taget under konkursbehandling ved dekret, afsagt den 6. september 1946 af nævnte skifteret.

De i villa „Stensbo" efterladte indbogenstande m. v. var umiddelbart efter kapitulationen blevet fjernet fra villaen. Ved en politiundersøgelse, som efter Sommers fængsling på ægtefællernes begæring foretoges til oplysning om, hvad der var blevet af effekterne, oplystes det, at sognerådsformanden af ægtefællerne var blevet anmodet om at foretage flytning eller opbevaring af deres ejendele efter de retningslinier, som eventuelt måtte blive fastsat efter kapitulationen, og at han af dem havde modtaget 200 kr. til bestridelse af udgifterne herved. Umiddelbart efter afleverede sognerådsformanden nøglen til den stedlige leder af modstandsbevægelsen, officiant Elling Christensen. På dennes foranledning blev ejendelene overført til Jonstruplejren, hvor de anbragtes under lås. Fra Jonstruplejren overførtes senere en mindre del til Kløvermarks- vejen, medens hovedparten er forsvundet. I denne forbindelse er det oplyst, at Jonstruplejren efter kapitulationen af „Røde Kors" og socialtjenesten benyttedes til anbringelse af tyske og østrigske flygtninge, og det formenes, at disse har stjålet af effekterne, blandt andet til fyring. Lejren var under bevogtning først af modstandsbevægelsens folk, senere af Livgarden og C.B.-tjenesten.

**15**

Efter at den for Sommer under straffesagen beskikkede forsvarer, overretssagfører Dragsted på ægteparrets vegne ved henvendelse til de myndigheder og institutioner, der måtte antages at have ansvaret for ejendelenes bortkomst, samt til forsikringsaktieselskabet Nye Danske af 1864, hvori de var brand- og indbruds-tyveriforsikret, havde søgt at opnå erstatning, anmeldte han ved skrivelse af 1. oktober 1946 erstatningskrav overfor det af det daværende Krigsministerium i december 1945 nedsatte erstatningsudvalg (Erstatningsudvalget af 1945), hvilket krav senere opgjordes til ca. 57.000 kr.

I en skrivelse af 5. august 1947 meddelte erstatningsudvalget overretssagfører Dragsted, „– – – at man er villig til med Forbehold af Sanktion fra Revisionsudvalget for tyske Betalinger at udbetale et Beløb paa Kr. 35.000,00 til fuld og endelig Afgørelse af Sagen, idet herved bemærkes, at Beløbet er fastsat under hensyn til Usikkerheden med Hensyn til, hvad der har været til Stede og er bortkommet samt med Hensyn til Værdien af Effekterne.

– – – Beløbet vil blive tilsendt Revisionsudvalget. – – –"

I mellemtiden var der mellem Sommer og hans hustru på den ene side og konkursboet på den anden side opstået uenighed om, hvem erstatningen tilkom. Af ægteparret henvistes således til, at det bertkomne indbo, eller dog størstedelen heraf, i henhold til ægtepagt af 25. maj 1939 var hendes særeje, og at hun alene havde krav på erstatningen, medens rådigheden over erstatningskravet efter konkursboets formening tilkom dette, da kravet var Sommers. Overretssagfører Dragsted, der den 24. juni 1947 havde underrettet erstatningsudvalget om konkursboets standpunkt, anmodede herefter i en skrivelse af 15. oktober 1947 Revisionsudvalget for tyske Betalinger om samtykke til, at erstatningsbeløbet på 35.000 kr. udbetaltes til konkursboet, „da Revisionsudvalget formentlig ikke har nogen Fortrinsstilling til Erstatningsbeløbet i Forhold til de andre Kreditorer i Poul Sommers Konkursbo."

I revisionsudvalgets svarskrivelse af 1. december 1947 hedder det:

––––––––––––––––––––––––

"Det fremgaar af Sagen, at det nævnte Erstatningstilbud er fremsat 1 Anledning af, at Størstedelen af det Poul Sommer tilhørende Indbo er bortkommet, efter at det den 5. Maj 1945 var taget i For-

---

1 H. R. T. 1954 p. 611.
2 Jfr. U. f. R. 1914 A p. 507, T. f. R. 1953 p. 518, Ussing: Dansk Obligationsret, alm. del (3. udg.) p. 413, Illum: Modregning i Konkurs p. 140 og Arnholm: Strejftog.
3 Jfr. H. D. i U. f. R. 1950 p. 621 med note 1.

Copyright © 2023 Karnov Group Denmark A/S

varing af Frihedsbevægelsen, og at Tilbudet om Erstatningsbeløbets Udbetaling er fremsat med Forbehold af Revisionsudvalgets Sanktion. Af den for Revisionsudvalget verserende Sag fremgaar det derhos, at Poul Sommer for sin Virksomhed i tysk Tjeneste har modtaget Beløb, som han i Henhold til § 10, Stk. 1. i Lov Nr. 500 af 9. Oktober 1945 om Tilbagebetaling af Fortjeneste m. v. i tysk Interesse, jfr. Lov Nr. 400 af 12. Juli 1946, vil kunne tilpligtes at tilbagebetale.

Foranlediget heraf skal man meddele, at Revisionsudvalget maa holde for, at det omhandlede Erstatningsbeløb ikke kan udbetales til Boet, forinden et Tilbagebetalingskrav i Henhold til ovennævnte Lov er opgjort og – i Medfør af Konkurslovens § 15 – afkortet i Erstatningsbeløbet."

Efter at der fra konkursboets sagfører, højesteretssagfører Thorsøe-Jacobsen, overfor revisionsudvalget var protesteret mod modregningskravet, afsagde revisionsudvalget den 23. september 1948 en kendelse, hvorved det i medfør af § 10, stk. 1, i lov nr. 500 af 9. oktober 1945, jfr. lov nr. 400 af 12. juli 1946, pålagdes Sommer til statskassen at indbetale 25.400 kr., nemlig den af ham under hans tyske krigstjeneste i tiden fra november 1941 til kapitulationen fra tysk side modtagne løn.

**16**

Den 12. oktober 1948 erholdt højesteretssagfører Thorsøe-Jacobsen på konkursboets vegne udbetalt differencen mellem det for de bortkomne effekter fastsatte erstatningsbeløb, 35.000 kr., og i de i kendelsen omtalte 25.400 kr., eller 9600 kr., for hvilket beløb han kvitterede med forbehold om yderligere erstatningsbeløb samt renter.

Efter at det af Statens Ligningsdirektorat var fastslået, at der ikke ville være at yde Sommer skatterefusion, foranledigede erstatningsudvalget den 25. juni 1949, at de 25.400 kr., således som af revisionsudvalget i en skrivelse til Forsvarsministeriet af 17. juni 1949 forlangt, blev overført til „Finansministeriets konto i henhold til lov nr. 259, 406, 499 og 500 af 1945 m m", hvorom højesteretssagfører Thorsøe-Jacobsen samme dag fik underretning.

Ved stævning af 19. december 1950 anlagde fru Sommer sag mod Forsvarsministeriet og konkursboet med påstand blandt andet om, at ministeriet dømtes til betaling af 15.615 kr. 28 øre som hendes andel i den af erstatningsudvalget indrømmede erstatning, og at konkursboet dømtes til at anerkende, at hun var berettiget til en sådan andel. Sagen afsluttedes ved retsforlig den 2. marts 1953, blandt andet gående ud på, at statskassen gennem erstatningsudvalget til hende betaler 3400 kr. uden renter og til fuld afgørelse.

Under denne sag, der er anlagt den 20. marts 1951 mod Forsvarsministeriet, Revisionsudvalget for tyske Betalinger og Finansministeriet som sagsøgte, har fhv. kaptajn Poul Sommers konkursbo efter meddelt bevilling til fri proces herefter endeligt nedlagt følgende påstand:

A. Principalt: *At* Forsvarministeriet (Erstatningsudvalget af 1945) tilpligtes at betale sagsøgeren 22.000 kr. med renter 5 pct. årlig fra den 5. august 1947,

*at* Revisionsudvalget for tyske Betalinger tilpligtes at anerkende, at den senest ved skrivelse af 17. juni 1949 til Forsvarsministeriet beordrede overførsel til „Finansministeriets konto i henhold til lov nr. 259, 406, 499 og 500 af 1945 m. m." af 25.400 kr. er uberettiget for 22.000 kr.s vedkommende,

*at* Finansministeriet tilpligtes at anerkende, at det er uberettiget til at forlange og at modtage på ovennævnte konto fra Forsvarsministeriet og Revisionsudvalget for tyske Betalinger 22.000 kr. Beløbet 22.000 kr. er differencen mellem resterstatningen, 25.400 kr. og det fru Sommer i henhold til forliget af 2. marts 1953 tilkommende beløb 3400 kr.

B. Subsidiært: At de sagsøgte in solidum tilpligtes at betale 2998 kr. 94 øre med renter 5 pct. årlig fra sagens anlæg. Beløbet udgør renter af det tilbageholdte erstatningsbeløb, nemlig 5 pct. af 35.000 kr. i tiden 5. august 1947 til 4. november 1948, i 15 måneder...... 2187 kr. 50 øre 5 pct. af 25.400 kr. i tiden 5. november 1948 til 25. juni 1949, 230 dage

| | | |
|---|---|---|
| | 811 - | 44 - |
| | 2998 kr. | 94 øre |

De sagsøgte har procederet til frifindelse.

Det er oplyst, at Erstatningsudvalget af 1945 består af 5 medlemmer, af hvilke formanden og 3 andre tilhører Forsvarsministeriet eller derunder hørende institutioner, medens Finansministeriet er repræsenteret ved 1 medlem. Om

**17**

udvalget foreligger iøvrigt gennem en skrivelse fra samme af 21. september 1951 følgende oplysninger:

„Erstatningsudvalget er oprettet ved administrativ foranstaltning, idet udvalget under 5. december 1945 nedsattes af krigsministeriet efter forudgående aftale med finansministeriet om retningslinierne og om udgifternes afholdelse.

Udvalget nedsattes med den opgave at behandle erstatningsspørgsmål hidrørende fra modstandsbevægelsens virksomhed i tiden efter 5. maj 1945.

Det drejede sig i første række om behandling og færdigbehandling af sådanne til modstandsbevægelsen indgåede erstatningssager, som endnu ikke var afgjort ved regionerne, og som nu fremsendtes til afgørelse ved krigsministeriets foranstaltning, og udvalgets opgave formuleredes for så vidt angår disse sager nærmere således: „dels at foranledige, at alle ikke afgjorte sager, som henhører under eller kan afgøres ved andre institutioner, henvises til disse, dels for de herefter resterende sagers vedkommende at påse, at der overhovedet er grundlag for at yde erstatning og i bekræftende fald, at de fastsatte erstatninger må anses for rimelige og bl. a. ikke overstiger de grænser, som er fastsat i lov af 1. oktober 1945 om erstatning til besættelsestidens ofre, for så vidt en sammenligning med forholdene på dette område kan drages i de specielle tilfælde."

Ved meddelelse i dagspressen og ved cirkulæreskrivelse til politidirektøren i København og samtlige politimestre bekendtgjordes det derhos i januar 1946, at der af krigsministeriet var nedsat et udvalg „Erstatningsudvalget af 1945, adresse krigsministeriet" til behandling af erstatningskrav i anledning af skader, som måtte være opstået ved modstandsbevægelsens virksomhed efter kapitula-

Copyright © 2023 Karnov Group Denmark A/S

tionen, og som ikke omfattes af bestemmelserne i loven af 1. oktober 1945 om erstatning til besættelsestidens ofre eller lov nr. 490 af 9. oktober 1945 om oprejsning for uforskyldt internering. De herefter indkomne nye sager er blevet behandlet efter samme retningslinier som de fra modstandsbevægelsen overtagne sager, og sagernes afgørelse er truffet efter forudgående undersøgelse – oftest på udvalgets foranledning – ved politi eller region.

De med udvalgets virksomhed forbundne udgifter afholdtes efter den med finansministeriet trufne aftale på forventet tillægsbevilling under modstandsbevægelsens konto, men således at erstatningssager af større financiel betydning samt sager, hvor der opstår tvivl om statens erstatningspligt, forelægges for bevillingsmyndighederne.

Om udvalgets kasseforhold bemærkes, at udvalget som sådant ingen selvstændig kasse har, men i de tilfælde, hvor erstatningsudbetaling tiltrædes af udvalget, retter udvalget direkte henvendelse til forsvarsministeriets 10. kontor – – –, som foranlediger beløbet udbetalt.

I relation til finansministeriet er kasseforholdet herefter som det ene ministeriums kasseforhold til det andet.

Fremgangsmåden med modregning i samarbejde med revisionsudvalget for tyske betalinger indledte erstatningsudvalget i begyndelsen af året 1947, og fremgangsmåden følges – – – fremdeles af udvalget. Skriftlige aftaler herom imellem de 2 udvalg ses ikke at foreligge. Men udvalget har i hver enkelt sag, der er gået til politiundersøgelse, anmodet politiet om en udtalelse om, hvorvidt et eventuelt erstatningsbeløb vil kunne udbetales til

### 18

skadelidte selv, og udvalget er bl. a. derigennem blevet underrettet om de tilfælde, hvor der var spørgsmål om tilbagebetaling af fortjeneste ved virksomhed i tysk interesse.

Spørgsmålet om, hvorvidt erstatningsudvalget har gjort regreskrav gældende imod nogen af de for det til grund for sagen liggende tab ansvarlige, herunder forsikringsselskabet, må besvares benægtende.''

Revisionsudvalget for tyske Betalinger er nedsat i henhold til lov nr. 330 af 12. juli 1945 „af Ministeren for Handel, Industri og Søfart efter Samraad med Finansministeren, Justitsministeren og Danmarks Nationalbank''. Under udvalget hører at træffe afgørelser om tilbagebetaling til statskassen af fortjeneste ved erhvervsvirksomhed m. v. i tysk interesse i medfør af lov nr. 500 af 9. oktober 1945, blandt andet i de i § 10 nævnte tilfælde, hvor „Personer – – – som iøvrigt har haft økonomiske Mellemværender med den tyske Værnemagt – – – kan tilpligtes at tilbagebetale til Statskassen den Del af den derved oppebaarne Indtægt, som ligger ud over, hvad der under Hensyn til Forholdene i det enkelte Tilfælde maa anses for passende''. Endvidere bestemmes det i lovens § 18, at udvalget, når ganske særlige omstændigheder taler derfor, kan nedsætte eller endog helt frafalde kravet om tilbagebetaling. Udvalget har i en skrivelse af 19. juli 1951 oplyst følgende:

„Revisionsudvalgets budget og regnskab udgør en del af handelsministeriets budget og regnskab, og revisionsudvalgets udgifter optages på finansloven og statsregnskabet såvel som visse fonds hidrørende fra besættelsestiden.

Revisionsudvalgets tilbagebetalingskonto i Danmarks nationalbank opføres derimod kun som beholdning. I henhold til lov nr. 330 af 12. juli 1945 om revision af visse tyske betalinger, § 3, kan revisionsudvalget til sikkerhed for statskassens krav forlange, at der deponeres nærmere fastsatte beløb i Danmarks nationalbank. Disse beløb krediteres for de pågældendes regning på nævnte konto. Ved deponeringskravstillelse gøres udtrykkelig opmærksom på, at såfremt ved den endelige opgørelse det deponerede beløb har vist sig at være for stort, vil differencen blive tilbagebetalt.

Når betaling af tilbagebetalingsbeløbet endelig er fastslået, d. v. s. eventuelt først efter at statens ligningsdirektorat har beregnet det

den pågældende tilkommende refusionsbeløb, overføres beløbet til „finansministeriets konto i henhold til lov nr. 259, 406, 499 og 500 af 1945 m. m.''.

I henhold til lov nr. 322 af 19. juni 1946 angående administratorer samt statens krav på bøde og konfiskationsbeløb i henhold til straffelovstillæggene nr. 259 af 1. juni 1945 og nr. 406 af 28. august 1945 § 11 skal beløb, der indkommer ved konfiskation i henhold til nævnte love indsættes på en dertil særlig oprettet konto med finansministeriet i Danmarks nationalbank. Bestemmelse med hensyn til anvendelse af det på denne konto indsatte beløb vil være at træffe ved særlig lov. Tilsvarende bestemmelse findes i revisionslovene af 9. oktober 1945 henholdsvis § 14 og § 20.''

Konkursboet har til støtte for sin principale påstand navnlig gjort gældende, at grundbetingelsen for modregning, nemlig gensidighed i skyldfor- holdene, her mangler, idet boets erstatningskrav haves mod een statsmyndighed, nemlig Forsvarsministeriet, medens modkravet, statens tilbagebetalingskrav, er fastsat af en anden statsmyndighed, Revisionsudvalget for tyske

### 19

Betalinger, som sorterer under Handelsministeriet. Det må anses for gældende ret, at en statsborger, som har et krav mod een statsmyndighed, ikke kan anvende det til modregning i et krav fra en anden statsmyndighed. Hvor forholdet – som her – er det omvendte, må en tilsvarende regel gælde, og det må anses som ganske utilstedeligt, at Erstatningsudvalget af 1945 har tilbageholdt den ved skrivelse af 5. august 1947 fastsatte erstatningsydelse og senere beordret den overført til Finansministeriets fornævnte konto for at give et andet forvaltningsorgan, Revisionsudvalget for tyske Betalinger, adgang til i erstatningen at søge dækning for et tilbagesøgningskrav, hvis størrelse iøvrigt først blev fastsat på et langt senere tidspunkt. Boet henviser herved til, at ethvert skyldforhold over for staten altid er koncentreret om en bestemt administrationsgren som den afgørende modpart, og at hver administrationsgren – hvilket finanslovene og statsregnskabet også giver udtryk for – i det hele handler selvstændigt i kontraktsforhold. At gøre afvigelse herfra i konkurstilfælde, er ubilligt overfor de andre kreditorer.

Selv om gensidighed i skyldforholdene måtte antages at foreligge, kan modregning efter boets formening alligevel ikke finde sted. Det må nemlig – i bedste fald for de sagsøgte – anses for tvivlsomt, om ikke kravet på erstatning hos erstatningsudvalget først er kommet endelig til eksistens ved udvalgets skrivelse af 5. augnst 1947, idet det forinden måtte henstå som usikkert, om der overhovedet havdes erstatningskrav mod nogen statsmyndighed og i bekræftende fald, hvilket beløb der med rette kunne kræves. Men under alle omstændigheder kan det fremsatte modkrav først anses opstået ved revisionsudvalgets kendelse af 23. september 1948, idet det indtil da i henhold til de foran gengivne lovbestemmelser stod revisionsudvalget frit at bestemme, om tilbagebetaling overhovedet skulle kræves. Da modfordringen således er opstået efter konkursens begyndelse, er modregning efter konkurslovens § 15 udelukket. Når yderligere henses til, at modregningserklæring ikke er afgivet i forbindelse med erstatningsudvalgets skrivelse af 5. august 1947, men først ved samme udvalgs skrivelse af 25. juni 1949 til højesteretssagfører Thorsøe-Jacobsen, må den skete tilbageholdelse af erstatningsbeløhet herefter karakteriseres som magtfordrejning.

Den subsidiære påstand, der er nedlagt for det tilfælde, at modregning er til stede, er begrundet med, at modregningsbegæringen, som anført, først kan anses fremsat den 25. juni 1949, hvorfor boet må have krav på de beregnede renter for tiden fra den 5. august 1947 til den 25. juni 1949.

De sagsøgte har heroverfor anført, at ydelsen af erstatningen på 35.000 kr. ikke kan betegnes som nogen tilfældighed; der forelå

tværtimod et klart grundlag for kravet overfor erstatningsudvalget, hvis afgørelse er truffet efter omhyggelige overvejelser.

De sagsøgte bestrider endvidere påstanden om, at der ikke har foreligget den for medregning nødvendige gensidighed. Når en privatmand ikke kan benytte sin fordring mod een statsmyndighed til modregning i et krav fra anden statsmyndighed, har dette, hævder de sagsøgte, ikke sin begrundelse i manglende gensidighed, men i praktiske administrative hensyn, hvortil kommer, at det særlige hensyn til skyldnerens sikkerhed er uden betydning overfor en statsmyndighed. At Forsvarsministeriet og Handelsministeriet i det her omhandlede forhold må betragtes som en enhed, anser de sagsøgte for uomtvisteligt. De henviser herved til, at fordelingen af embedsforretningerne mellem de

### 20

enkelte ministerier ikke ligger i faste rammer, men undergives ændringer ud fra hensigtsmæssighedssynspunkter. Hertil kommer den intime sammenknytning mellem ministerierne i financiel og regnskabsmæssig henseende. Under hensyn hertil og til de opgaver, som påhviler henholdsvis erstatningsudvalget og revisionsudvalget, må det anses for fuldt ud lovligt, at de to udvalg, som sket i nærværende tilfælde, har søgt samarbejde efter de foran oplyste retningslinier, hvorefter tilbagebetalingsbeløb, fastsat af revisionsudvalget, i vid udstrækning er blevet modregnet over for samme person i erstatningsbeløbet, fastsat af erstatningsudvalget. Det er urigtigt, at modregningserklæringen først er fremsat den 25. juni 1949, idet sådan erklæring tydeligt indeholdes i revisionsudvalgets skrivelse af 1. december 1947.

De sagsøgte afviser, at der foreligger magtfordrejning ved tilbageholdelsen af erstatningsbeløbet. Erstatningsudvalgets tilsagn i udvalgets skrivelse af 5. august 1947 om udbetaling af en erstatning på 35.000 kr. var betinget af revisionsudvalgets sanktion. Nogen forpligtelse til udbetaling derudover havde erstatningsudvalget ikke påtaget sig, og tilbageholdelsen af beløbet, indtil revisionsudvalgets kendelse forelå, var derfor retmæssig.

Endelig hævder de sagsøgte, at grundlaget for begge de to fordringer forelå klart inden konkursens begyndelse. Hvad særlig tilbagebetalingskravet angår, er dette således baseret på Sommers tyske krigstjeneste og loven af 9. oktober 1945, og den omstændighed, at kravet, blandt andet på grund af Sommers forsvinden, ligesom erstatningskravet ikke kunne opgøres til et bestemt beløb inden konkursens indtræden, må være uden betydning for adgangen til modregning.

Med hensyn til konkursboets subsidiære påstand har de sagsøgte anført, at der ikke er hjemmel for dette krav, da grundlaget for erstatningsydelsen, 35.000 kr. ikke er nogen aftale, men skadegørende handlinger, for hvilke modstandsbevægelsen har ansvaret, jfr. herved gældsbrevlovens § 62.

Retten finder at måtte give konkursboet medhold i, at den for iværksættelse af modregning nødvendige gensidighed i skyldforholdene ikke har været til stede i det foreliggende tilfælde, idet staten i de to heromhandlede skyldforhold, hvor den er henholdsvis debitor og kreditor, er repræsenteret af to under forskellige ministerier sorterende forvaltningsorganer, hvis opgaver ikke ligger på samme område og derfor ikke kan betragtes som en enhed, hvorved bemærkes, at det samarbejde, som efter det oplyste faktisk har fundet sted mellem erstatningsudvalget og revisionsudvalget, ikke ses at kunne medføre et andet resultat. Da derhos de sagsøgte ved deres procedure har anerkendt, at Sommer som følge af modstandsbevægelsens forhold havde et uomtvisteligt krav på erstatning for de bortkomne effekter, har erstatningsudvalget savnet føje til i sin skrivelse af 5. august 1947 at betinge udbetalingen af erstatningsbeløbet 35.000 kr. af revisionsudvalgets sanktion, hvorfor den skete tilbageholdelse af beløbet til modregning ikke har været be-

rettiget, så meget mere, som revisionsudvalgets tilbagesøgningskrav efter indholdet af §§ 10 og 18 i lov nr. 500 af 9. oktober 1945 ikke kan antages at være kommet til eksistens inden konkursens begyndelse, men først ved revisionsudvalgets kendelse af 23. september 1948. Som følge heraf vil konkursboets principale påstand være at tage til følge. – – –

## Højesteret

### 21
### Højesterets dom.

Den indankede dom er afsagt af Østre Landsret.

I pådømmelsen har ni dommere deltaget.

For Højesteret har appellanterne gentaget deres påstand om frifindelse. Indstævnte har principalt påstået stadfæstelse og har derhos gentaget sin for landsretten nedlagte subsidiære påstand.

Til fremstillingen i dommen bemærkes, at det dernævnte differencebeløb 9600 kr. først er udbetalt den 4. november 1948.

Med hensyn til anvendelsen af konkurslovens § 15 findes debitor ifølge Sommers erstatningskrav og kreditor ifølge tilbagebetalingskravet efter lov nr. 500 af 9. oktober 1945 at måtte betragtes som samme retssubjekt, nemlig den danske stat. Idet dernæst begge krav må anses opstået inden konkursens begyndelse, og idet det under de foreliggende omstændigheder findes at være uden afgørende betydning, at kravenes endelige størrelse først senere kunne fastslås, findes betingelserne for modregning efter konkurslovens § 15 i det hele at have foreligget, og appellanterne vil derfor være at frifinde for indstævntes principale påstand.

Idet der endelig ikke, som sagen foreligger oplyst, findes at være fornødent grundlag for det i indstævntes subsidiære påstand rejste rentekrav, vil appellanterne i det hele være at frifinde.

Med hensyn til sagens omkostninger for begge retter vil der være at forholde som nedenfor anført.

### Thi kendes for ret:

*Appellanterne, Forsvarsministeriet (Erstatningsudvalget af 1945), Revisionsudvalget for tyske Betalinger og Finansministeriet, bør for tiltale af indstævnte, fhv. kaptajn Poul Sommers konkursbo, i denne sag fri at være.*

*I sagsomkostninger for begge retter betaler indstævnte 3000 kr. til appellanterne.*

*Til det offentlige betaler indstævnte de retsafgifter for Højesteret, som skulle erlægges, såfremt sagen ikke havde været afgiftsfri for appellanterne.*

*I salær for Højesteret tillægges der højesteretssagfører Gelting 800 kr., der tilligemed de højesteretssagfører Thorsøe-Jacobsen og landsretssagfører Ivar Hoppe ved landsrettens dom tillagte salærer, henholdsvis 600 kr. og 200 kr. udredes af det offentlige.*

*Det idømte at udrede inden 15 dage efter denne højesteretsdoms afsigelse.*

Copyright © 2023 Karnov Group Denmark A/S