# Exhibit 29

U.2010.959Ø

***Reversal of payments to SKAT pursuant to section 67 of the Bankruptcy Act.***

*Bankruptcy and other insolvency law 27.4.*

- The electrical installation company S was declared bankrupt with August 16, 2007 as the deadline. The bankruptcy estate claimed that S's payments to SKAT on June 7, 2007 of DKK 60,000 and on June 29, 2007 of DKK 80,000 and DKK 87,485, respectively, should be reversed pursuant to section 67 or section 74 of the Bankruptcy Act. The District Court acquitted SKAT. The High Court found that although the payments had not been made all at once, they had to be considered a single payment as they were payments to the same creditor within a short period after lien had been imposed. It was undisputed that the payments accounted for 45% and 38% of the total payments into and out of the overdraft account in the period from June 7, 2007 to the due date of August 16, 2007. Even though the payments did not completely exhaust S's liquid assets, the payments were found to have decisively reduced S in bankruptcy's solvency when the size of the payments was compared to the other movements in the overdraft facility, the drawing options on the overdraft facility and S's assets as stated in the report under section 125(3) of the Bankruptcy Act. The evidence also showed that the payments were made in direct connection with SKAT's collection of a debt partly accumulated over a long period of time and that the mortgagee emphasized during meetings that the director might lose his license as an electrical installer. Under these circumstances, the payments could not be considered ordinary. The conditions for avoidance under section 67(1) of the Bankruptcy Act were therefore met, and the bankruptcy estate's claim was therefore upheld.

**Ø.L.D. December 23, 2009 in appeal 15. afd. no. B-2107-09**
(Henrik Bitsch, B. Vollmond, Anna Lindgren (deputy)).

*N. Elektric ApS under konkurs v/kurator, advokat Casper Moltke (adv. Piya Mukherjee, Kbh.)*
mod
*SKAT*
*Tax Center Copenhagen (Km.adv. v/adv. Boris Frederiksen v/adv.fm. Sune Dalgaard-Nielsen, Copenhagen).*

## City Courts

### Frederiksberg Court judgment July 16, 2009.

*Background to the case and the parties' claims.*

This case, filed on August 22, 2008, concerns the annulment of 3 payments received by the defendant, SKAT, prior to the bankruptcy of N. Elektric APS.

The plaintiff, N. Elektric ApS in bankruptcy represented by the trustee in bankruptcy, Casper Moltke, claims that the defendant be ordered to pay DKK 227,485 to the plaintiff plus the usual procedural interest from the institution of proceedings until payment is made.

The defendant has claimed acquittal.

*The information in the case.*

During an attachment meeting on June 7, 2007 at the defendant's premises, N. Elektric ApS (hereinafter the company) paid a check in the amount of DKK 60,000, which went to partially cover an A-tax arrears. The check was withdrawn from the company's account on June 12, 2007, whereby the company's

overdraft amounted to DKK 497,974.10. The maximum for the credit was
500,000 kr.

**960**

On June 11, 2007, the defendant attached the company's five cars. The company's arrears to the defendant were calculated at DKK 525,955 on that day.

On June 29, 2007, the company paid the defendant DKK 87,485 to cover outstanding A-taxes for May 2007 and DKK 80,000 in VAT on account for Q1 2007. With these payments, the company's overdraft amounted to DKK 456,331.24.

On August 16, 2007, the company filed for bankruptcy. The bankruptcy decree was issued on August 23, 2007. The deadline date in the estate is August 16, 2007.

The parties agree that the payments on the company's overdraft facility in the period from June 7, 2007 to August 16, 2007 amounted to DKK 500,286.96, and that the payments in the same period, including payments to the defendant, amounted to DKK 599,609.47.

In a letter dated September 13, 2007 from the defendant to the plaintiff, the defendant reported a claim in the estate of DKK 651,579 and stated that the defendant agreed that the attachment of June 11, 2007 in the company's cars had lapsed pursuant to section 71 of the Bankruptcy Act and that the defendant would arrange for cancellation of the attachment in the car register.

In the trustee's report of 26 November 2008 pursuant to section 125(3) of the Bankruptcy Act, the assets of the estate are calculated at DKK 241,017.

*Explanations.*

Karsten Høyer Nielsen and mortgagee Anette Jeanne Olesen have given evidence during the case.

The judgment does not contain a complete statement of the case, cf. section 218a(2) of the Danish Administration of Justice Act.

*The views of the parties.*

In its statement of claim of June 8, 2009, the applicant states the following:

*Regarding avoidance under section 67 of the Bankruptcy Act*

*that* the payments to the defendant in the 3-month period prior to the bankruptcy estate's due date of August 16, 2007 are cash-exhausting payments that did not appear to be ordinary,

*that* the level of activity in N. Elektric ApS (the Company) prior to the bankruptcy is irrelevant to the assessment under section 67 of the Bankruptcy Act, as avoidance is only based on the liquidity-exhausting effect of the payments,

*that* the payments both collectively and individually resulted in a significant deterioration of the Company's ability to pay,

*that* the defendant had such knowledge of the Company's financial situation that the payments did not appear to be ordinary,

*that* the payments are voidable pursuant to section 67 of the Bankruptcy Act.

*Regarding avoidance under section 74 of the Bankruptcy Act*

*that* it must have been clear to the defendant after the meeting in early June 2007 that the Company was at imminent risk of bankruptcy, *that* the defendant knew or should have known at the time the payments were made that the Company's liquidity crisis was not of a temporary or transitory nature,

*that* the defendant has abused its bargaining power and knowledge of the company to pressure the Company to make the payments in question,

*that* the defendant has thereby obtained a creditor-distorting advantage,

*that* the payments from the overdraft facility have *not been* made with Sparekassen Lolland's consent and/or participation,

*that* the payments are voidable pursuant to section 74 of the Bankruptcy Act as an improper transaction in favor of creditors.

*Regarding the defendant's payment to the bankruptcy estate*

*that* the defendant is obliged to disclaim the enrichment obtained or, alternatively, to pay damages to the plaintiff, see sections 75 and 76 of the Bankruptcy Act, corresponding to the claim made.

In its statement of claim of June 8, 2009, the defendant has stated the following: *that* the payments made by the plaintiff to the defendant have not, cf. section 67(1) of the Bankruptcy Act, decisively reduced the plaintiff's ability to pay,

*that* the payments were otherwise received by the defendant as an ordinary part of the defendant's activities as a tax and duty collecting authority,

*that* the plaintiff has not documented that there are circumstances which, to the outside world, including the defendant, would lead to the payments appearing to be non-ordinary,

*that* it is disputed that at the time of receipt of the payments the defendant had such knowledge that the defendant realized or should have realized that the plaintiff was or became insolvent when the payments were made and that consequently there is no enrichment which the defendant must waive under section 67 of the Bankruptcy Act, see section 75 of the Bankruptcy Act, or compensation, see section 74, see section 76 of the Bankruptcy Act

*that* the activity in the company prior to the bankruptcy has significance for the assessment under section 67 of the Bankruptcy Act, see ØLD of June 26, 2008, attached as Appendix B,

*that the* activity in the company in conjunction with the size of the payments means that these have not significantly impaired the company's ability to pay or can be considered improper, and

*that* the defendant did not know or should not have known before July 4, 2007 that the company had more than temporary payment difficulties.

During the main hearing, the defendant elaborated that the last two payments, made on June 29, 2007, appeared to be ordinary payments of current tax and VAT, and that the first payment of DKK 60,000, viewed in isolation, did not significantly impair the company's ability to pay.

**961**

The parties have essentially proceeded accordingly.

## The Court's reasoning and decision:

Based on the evidence, the Court finds that the payments to the defendant on June 29, 2007 related to A-tax for May 2007, where the deadline for timely payment was June 11, 2007, and VAT on account for Q1 2007, where the deadline for payment was May 10, 2007. Based on the witness statements, it is also assumed that it was normal for the company to pay taxes and VAT late.

The Court finds that these payments have appeared to be ordinary payments as part of the company's daily operations. Already as a result of this, the conditions for avoidance under section 67 of the Bankruptcy Act are not met in respect of these payments.

With regard to the payment of the DKK 60,000 paid by check on June 7, 2007, the court assumes that this payment was made to partially cover an A-tax arrears. The parties agree that the payments in the period from June 7, 2007 to August 16, 2007 on the company's overdraft facility amounted to DKK 500,286.96, and that the payments in the same period, including the payments to the defendant, amounted to DKK 599,609.47. It also appears from the report of November 26, 2008 pursuant to section 125(3) of the Bankruptcy Act that the assets were calculated at DKK 241,017. Considering *that the* payment of the DKK 60,000 only constitutes about 10% of the total payments on the account in the period in question when the payments amounted to just over DKK 500,000, *the* payment does not constitute more than about 25% of the assets according to the report under section 125(3) of the Bankruptcy Act.

125(3), and the fact *that* it can be assumed that the company stayed within the maximum overdraft facility when making the payment, the payment of the DKK 60,000 is not considered to have significantly reduced the company's ability to pay. There is therefore no basis for reversal of this payment pursuant to section 67 of the Bankruptcy Act.

According to the evidence, it is assumed that the company stated to the defendant until July 4, 2007 that the company's liquidity crisis was temporary and that the assets in the estate amounted to approximately DKK 1.1 million. Furthermore, the Court does not find that there are circumstances which mean that the defendant should have known otherwise. Already as a result of the assumption that the defendant was not aware of the company's insolvency and should not have been aware of it when the payments were made, the conditions for avoidance under section 74 of the Bankruptcy Act are not present either.

The defendant's claim for acquittal is then upheld.

With regard to legal costs, the court finds that the plaintiff must pay legal costs to the defendant. These are fixed according to the nature and outcome of the case at DKK 30,000, which constitutes adequate coverage of legal expenses.

- - -

## Eastern High Court

### *Østre Landsret's verdict.*

Frederiksberg Court's judgment of 16 July 2009 - - - - is appealed by N. Elektric ApS in bankruptcy by trustee in bankruptcy, attorney Casper Moltke, claiming as before the City Court that SKAT, Skattecenter København, is ordered to pay DKK 227,485 with process interest from the commencement of the case.

The respondent, SKAT, Copenhagen Tax Center, has claimed that the decision should be upheld.

*Case presentation*

N. Elektric ApS was declared bankrupt on August 23, 2008 on the basis of a petition of August 16, 2008.

According to the company's first financial statements for the period August 16, 2005 to December 31, 2006, the company had a net loss of
DKK 484,446 and a negative equity of DKK 359,446.

An unaudited balance sheet for the period January 1, 2007 to September 30, 2007 shows that the company had a turnover of DKK 1,369,227.11 and a contribution margin of DKK 149,709.97, which, after deducting costs for sales and administrative expenses and rent, resulted in a negative net result of DKK 324,752.81.

The company ceased operations in mid-July 2007.

The parties agree that the total payments into and out of the cash account in the period June 7, 2007 to August 16, 2007 amounted to DKK 500,286.96 and DKK 599,609.47 respectively, and that the disputed payments in relation to this amount to 45% and 38% respectively.

According to the debt book list, on September 13, 2007, the respondent filed a total claim in the bankruptcy estate of DKK 651,579.

In the report of November 26, 2008 pursuant to section 125(3) of the Bankruptcy Act, the estate's assets are estimated at DKK 241,017. The company's payments to SKAT amount to 94.4% in relation to this.

*Explanations*

Karsten Høyer Nielsen and Anette Jeanne Olesen gave evidence in the High Court.

*Karsten Høyer Nielsen* has further explained that the reason why there were five board members was that they had all previously been employed by Torben Nielsen's company. Torben Nielsen had a large part of the customer contact, but did not perform work himself. The company's largest customer was Brøndby Municipality, which generated less revenue at the end of the period. The five board members were liable pro rata for the overdraft. A-tax and VAT were paid by the

not paid on time, and SKAT sent reminders and warnings , but there were no meetings with SKAT until June 7, 2007. On May 1, 2007, the bank rejected two payments as there was no cover on the

**962**

The overdraft. The wholesalers were paid on account, as the company did not have the funds to cover their full receivables. If Torben Niel- sen, who received DKK 300,000 in salary, had resigned or been dismissed, it would have reduced the company's costs. The witness had a meeting with SparBankVest, who demanded that Torben Nielsen resigned as a condition for lending the company money. One of Torben Nielsen's companies had previously gone bankrupt, but he was not personally bankrupt. The information that one of Torben Nielsen's companies had previously gone bankrupt had a negative impact on the banks. DKK 60,000 was paid by check to delay the payment a little. SKAT's case officer arrived at the amount based on the information the witness provided about the company's finances. The witness brought bank statements to the 2nd and 3rd meeting with SKAT, but not to the first meeting. On June 28, 2007, the witness proposed to pay DKK 130,000, which was what the company had available after payments to wholesalers. The reason why VAT and A-tax had not been paid for the first quarter of 2007 was that the money came in too slowly.

It was SKAT's caseworker who determined the distribution of the

DKK 130,000 between VAT and A-tax. SKAT also wanted the registration certificates for the company's cars handed over, but did not demand that the company be deprived of the cars. At one of the meetings, it was said that SKAT would investigate whether the witness's authorization as an electrician could be revoked. This came as a shock to the witness, as a revocation of the company's only authorization would not only have led to the immediate termination of the company, but would also affect the witness's own future business opportunities. It was his understanding that if payment was not made, SKAT would turn the key to the company. He discussed the payment issue with the other board members. After June 28, 2007, it became clear that Torben Nielsen did not want to resign, and it was therefore decided to file for bankruptcy. The witness cannot remember why DKK 16,055 was paid on July 2, 2007, while the other amounts were paid on June 28, 2007. The payments to SKAT were to prevent the company from being closed, not to favor SKAT.

*Anette Jeanne Olsen* has additionally explained, among other things, that she does not recall being shown bank statements from the company's bank. This is not usual - they are more interested in what assets there are. The director explained about the overdraft facility and that there might be an agreement with a new bank or investor. At the meeting on July 4, 2007, it was reported that there were problems with financing the continued operation. The CEO began to stutter when he felt under pressure. The annual report is not normally given much importance as it is not "fresh" information. The company's annual report was also not available until late in the process, and the witness cannot remember if she saw it. Instead, it is normal to request quarterly financial statements, balance sheets and invoices. Prior to June 7, 2007, there had been 9 garnishments, but the witness is not aware whether garnishments had been made or the transactions had been in vain. What was of interest was the current situation.

Payments are credited first on current claims. Frequent meetings are common in cases like this one, where the circumstances were unresolved. If payments had not been made, the outstanding claims would have been garnished.

*Procedures*
The parties have raised the same pleas as before the district court and proceeded accordingly.

Copyright © 2023 Karnov Group Denmark A/S                                    page 5

**The High Court's reasoning and result:**

The disputed amount is the sum of the payments that N. Elektric ApS made to SKAT on June 7, 2007 of DKK 60,000 and on June 29, 2007 of DKK 80,000 and DKK 87,485 respectively. Regardless of the fact that the payments were not made all at once, the High Court finds that they must be considered a single payment, as they are payments to the same creditor within a short period of time after the lien has been imposed.

It is undisputed that the payments amounted to 45% and 38% of the total deposits and withdrawals on the overdraft account in the period from June 7, 2007 to the due date of August 16, 2007. Regardless of the fact that the payments did not completely exhaust the company's liquid assets, the payments are found to have significantly impaired N. Elektric ApS in bankruptcy's ability to pay when the size of the payments is compared to the other movements on the overdraft facility, the drawing options on the overdraft facility and the company's assets as stated in the report under section 125(3) of the Bankruptcy Act.

According to the evidence, it is also established that the payments were made in direct connection with SKAT's collection of a debt, some of which had accumulated over a long period of time, and that the mortgagee emphasized during the meetings that the director might lose his license as an electrical installer. Under these circumstances, the payments cannot be considered ordinary.

The conditions for avoidance under section 67(1) of the Danish Bankruptcy Act are therefore met, and the appellant's claim is therefore upheld. Considering the outcome, nature and scope of the case, SKAT, Copenhagen Tax Center, must pay N. Elektric ApS in bankruptcy DKK 63,520 in legal costs for both instances, of which DKK 52,000 is to cover lawyers' fees and DKK 11,520 is to cover court fees.

O. - -

**U.2010.959Ø**

***Omstødelse af betalinger til SKAT i medfør af konkurslovens § 67.***

*Konkurs- og anden insolvensret 27.4.*

♦ Elinstallationsfirmaet S blev erklæret konkurs med den 16. august 2007 som fristdag. Konkursboet påstod S' betalinger til SKAT den 7. juni 2007 med 60.000 kr. og den 29. juni 2007 med henholdsvis 80.000 kr. og 87.485 kr. omstødt i medfør af konkurslovens § 67 eller § 74. Byretten frifandt SKAT. Landsretten fandt, at uanset betalingerne ikke var sket på en gang, måtte de betragtes som en samlet betaling, da der var tale om betalinger til samme kreditor inden for en kortere periode, efter at der var foretaget udlæg. Det var ubestridt, at betalingerne udgjorde henholdsvis 45 % og 38 % af de samlede ind- og udbetalinger på kassekreditkontoen i perioden fra den 7. juni 2007 til fristdagen den 16. august 2007. Selv om betalingerne ikke fuldstændig udtømte S' likvide midler, fandtes betalingerne afgørende at have forringet S under konkurs' betalingsevne, når størrelsen af betalingerne sammenholdtes med de øvrige bevægelser på kassekreditten, trækningsmulighederne på kassekreditten samt S' aktivmasse som opgjort i redegørelsen i medfør af konkurslovens § 125, stk. 3. Efter bevisførelsen lagdes det endvidere til grund, at betalingerne blev foretaget i direkte sammenhæng med SKAT 's inddrivelse af en til dels gennem længere tid oparbejdet gæld, og at pantefogeden under møder fremhævede, at direktøren eventuelt ville miste sin autorisation som elinstallatør. Betalingerne kunne under disse omstændigheder ikke anses for at være ordinære. Betingelserne for omstødelse i medfør af konkurslovens § 67, stk. 1, var derfor til stede, hvorfor konkursboets påstand blev taget til følge.

**Ø.L.D. 23. december 2009 i anke 15. afd. nr. B-2107-09**
(Henrik Bitsch, B. Vollmond, Anna Lindgren (kst.)).

*N. Elektric ApS under konkurs v/kurator, advokat Casper Moltke (adv. Piya Mukherjee, Kbh.)*
mod
*SKAT*
*Skattecenter København (Km.adv. v/adv. Boris Frederiksen v/adv.fm. Sune Dalgaard-Nielsen, Kbh.).*

## Byretten

### Frederiksberg Rets dom 16. juli 2009.

*Sagens baggrund og parternes påstande.*

Denne sag, der er anlagt den 22. august 2008, vedrører spørgsmålet om omstødelse af 3 betalinger, som sagsøgte, SKAT, modtog forud for N. Elektric APS' konkurs.

Sagsøgeren, N. Elektric ApS under konkurs ved kurator, advokat Casper Moltke, har nedlagt påstand om, at sagsøgte tilpligtes at betale 227.485 kr. til sagsøgeren med tillæg af sædvanlig procesrente fra sagens anlæg, indtil betaling sker.

Sagsøgte har nedlagt påstand om frifindelse.

*Oplysningerne i sagen.*

Under udlægsmøde den 7. juni 2007 hos sagsøgte betalte N. Elektric ApS (herefter selskabet) check stor 60.000 kr., som gik til delvis dækning af en A-skatterestance. Checken blev hævet på selskabets konto den 12. juni 2007, hvorved trækket på selskabets kassekredit kom op på 497.974,10 kr. Maksimum for kreditten var 500.000 kr.

**960**

Den 11. juni 2007 foretog sagsøgte udlæg i selskabets 5 biler. Selskabets restance til sagsøgte blev den pågældende dag opgjort til 525.955 kr.

Den 29. juni 2007 betalte selskabet til sagsøgte 87.485 kr. til dækning af skyldige A-skatter for maj 2007 og 80.000 kr. i acontomoms for 1. kvartal 2007. Ved disse betalinger kom trækket på selskabets kassekredit op på 456.331,24 kr.

Selskabet indgav den 16. august 2007 egenbegæring om konkurs. Konkursdekret blev afsagt den 23. august 2007. Fristdagen i boet er den 16. august 2007.

Der er mellem parterne enighed om, at indbetalingerne på selskabets kassekredit i perioden fra den 7. juni 2007 til den 16. august 2007 udgjorde 500.286,96 kr., og at udbetalingerne i samme periode inklusive betalingerne til sagsøgte udgjorde 599.609,47 kr.

I skrivelse af 13. september 2007 fra sagsøgte til sagsøgeren anmeldte sagsøgte et krav i boet på 651.579 kr. og meddelte, at sagsøgte var enig i, at udlægget af 11. juni 2007 i selskabets biler var bortfaldet i medfør af konkurslovens § 71, og at sagsøgte ville sørge for aflysning af udlægget i bilbogen.

I kurators redegørelse af 26. november 2008 i henhold til konkurslovens § 125, stk. 3, er aktiverne i boet opgjort til 241.017 kr.

*Forklaringer.*

Der er under sagen afgivet forklaring af Karsten Høyer Nielsen og pantefoged Anette Jeanne Olesen.

Dommen indeholder ikke en fuldstændig sagsfremstilling, jf. retsplejelovens § 218 a, stk. 2.

*Parternes synspunkter.*

Sagsøgeren har i påstandsdokument af 8. juni 2009 anført følgende:

*Vedrørende omstødelse efter konkurslovens § 67*

*at* betalingerne til sagsøgte i 3-måneders-perioden forud for konkursboets fristdag den 16. august 2007 er likviditetsudtømmende betalinger, som ikke fremtrådte som ordinære,

*at* aktivitetsniveauet i N. Elektric ApS (Selskabet) forud for konkursen er uden betydning for vurderingen efter konkurslovens § 67, idet omstødelse alene sker på baggrund af betalingernes likviditetsudtømmende virkning,

*at* indbetalingerne både tilsammen og hver for sig medførte, at Selskabets betalingsevne afgørende er blevet forringet,

*at* sagsøgte havde et sådan kendskab til Selskabets økonomiske situation, at indbetalingerne ikke fremstod som ordinære,

*at* betalingerne er omstødelige i medfør af konkurslovens § 67.

*Vedrørende omstødelse efter konkurslovens § 74*

*at* det efter mødet primo juni 2007 måtte have stået klart for sagsøgte, at Selskabet var i overhængende risiko for at gå konkurs,

*at* sagsøgte på tidspunktet for betalingernes gennemførelse vidste eller burde have vidst, at Selskabets likviditetskrise ikke var af midlertidig eller forbigående karakter,

*at* sagsøgte har misbrugt sin forhandlingsmæssige styrke og kendskabet til virksomheden til at presse Selskabet til at foretage de omhandlende indbetalinger,

*at* sagsøgte herved har opnået en kreditorforrykkende begunstigelse,

*at* indbetalingerne fra kassekreditten *ikke* er sket med Sparekassen Lollands samtykke og/eller medvirken,

*at* betalingerne er omstødelige i medfør af konkurslovens § 74 som en utilbørlig kreditorbegunstigende disposition.

*Vedrørende sagsøgtes betaling til konkursboet*

*at* sagsøgte er pligtig at fralægge sig den opnåede berigelse, subsidiært svare sagsøger erstatning, jf. konkurslovens §§ 75 og 76, svarende til den nedlagte påstand.

Sagsøgte har i påstandsdokument af 8. juni 2009 anført følgende:

*at* de fra sagsøgeren til sagsøgte foretagne betalinger ikke, jf. konkurslovens § 67, stk. 1, på afgørende vis har forringet sagsøgerens betalingsevne,

*at* betalingerne i øvrigt af sagsøgte er modtaget som et ordinært led i sagsøgtes virksomhed som oppebørselsmyndighed for skatter og afgifter,

*at* sagsøgeren ej heller har dokumenteret, at der foreligger forhold, der for omverdenen, herunder sagsøgte, måtte føre til, at betalingerne fremstod som værende ikke-ordinære,

*at* det bestrides, at sagsøgte på tidspunktet for betalingernes modtagelse har haft en sådan viden, at sagsøgte indså eller burde have indset, at sagsøger ved betalingernes gennemførelse var eller blev insolvent, og at der som følge heraf ikke foreligger en berigelse, som sagsøgte skal fralægge sig efter konkurslovens § 67, jf. konkurslovens § 75, eller en erstatning, jf. konkurslovens § 74, jf. konkurslovens § 76,

*at* aktiviteten i selskabet forud for konkursen har betydning for vurderingen efter konkurslovens § 67, jf. ØLD af 26. juni 2008, vedlagt som bilag B,

*at* aktiviteten i selskabet sammenholdt med betalingernes størrelse betyder, at disse ikke på afgørende vis har forringet selskabets betalingsevne eller kan anses for utilbørlige, og

*at* sagsøgte ikke før den 4. juli 2007 havde eller burde have haft kendskab til, at selskabet havde mere end forbigående betalingsvanskeligheder.

Sagsøgte har uddybende under hovedforhandlingen anført, at de to sidste indbetalinger, foretaget den 29. juni 2007, har fremtrådt som ordinære indbetalinger af løbende skat og moms, og at den første indbetaling på 60.000 kr. isoleret set ikke på afgørende måde har forringet selskabets betalingsevne.

**961**

Parterne har i det væsentligste proceduret i overensstemmelse hermed.

### Rettens begrundelse og afgørelse:

Retten lægger efter bevisførelsen til grund, at betalingerne til sagsøgte den 29. juni 2007 vedrørte henholdsvis A-skat for maj måned 2007, hvor betalingsfristen for rettidig betaling var den 11. juni 2007, og acontomoms for 1. kvartal 2007, hvor betalingsfristen var den 10. maj 2007. Det lægges endvidere på baggrund af vidneforklaringerne til grund, at det var normalt for selskabet at betale skatter og moms for sent.

Retten finder, at disse betalinger har fremtrådt som ordinære betalinger som led i selskabets daglige drift. Allerede som følge heraf er betingelserne for omstødelse i henhold til konkurslovens § 67 ikke opfyldt for så vidt angår disse betalinger.

For så vidt angår betalingen af de 60.000 kr., betalt med check den 7. juni 2007, lægger retten til grund, at denne betaling gik til delvis dækning af en A-skatterestance. Der er mellem parterne enighed om, at indbetalingerne i perioden fra den 7. juni 2007 til den 16. august 2007 på selskabets kassekredit udgjorde 500.286,96 kr., og at udbetalingerne i samme periode, inklusive betalingerne til sagsøgte, udgjorde 599.609,47 kr. Det fremgår endvidere af redegørelsen af 26. november 2008 i henhold til konkurslovens § 125, stk. 3, at aktiverne er opgjort til 241.017 kr. Henset til *at* betalingen af de 60.000 kr. alene udgør ca. 10% af de samlede udbetalinger på kontoen i den pågældende periode, hvor indbetalingerne udgjorde godt 500.000 kr., *at* betalingen ikke udgør mere end ca. 25% af aktiverne i henhold til redegørelsen efter konkurslovens § 125, stk. 3, samt til *at* det kan lægges til grund, at selskabet ved indbetalingen holdt sig inden for kassekredittens maksimum, findes betalingen af de 60.000 kr. ikke afgørende at have forringet selskabets betalingsevne. Der er herefter ej heller grundlag for omstødelse af denne betaling i henhold til konkurslovens § 67.

Det lægges efter bevisførelsen til grund, at selskabet over for sagsøgte indtil den 4. juli 2007 gav udtryk for, at selskabets likviditetskrise var midlertidig, og at aktiverne i boet udgjorde ca. 1,1 mio. kr. Retten finder endvidere ikke, at der foreligger omstændigheder, som medfører, at sagsøgte burde have haft kendskab til andet. Allerede som følge af at det lægges til grund, at sagsøgte ikke kendte til selskabets insolvens og ej heller burde have kendt hertil, da betalingerne fandt sted, er betingelserne for omstødelse i henhold til konkurslovens § 74 ej heller til stede.

Sagsøgtes frifindelsespåstand tages herefter til følge.

Med hensyn til sagsomkostninger finder retten, at sagsøgeren skal betale sagsomkostninger til sagsøgte. Disse fastsættes efter sagens karakter og udfald til 30.000 kr., der udgør passende dækning af udgifter til advokatbistand.

- - -

### Østre Landsret

### *Østre Landsrets dom.*

Frederiksberg Rets dom af 16. juli 2009 - - - er anket af N. Elektric ApS under konkurs v/kurator, advokat Casper Moltke med påstand som for byretten om, at SKAT, Skattecenter København, dømmes til at betale kr. 227.485 kr. med procesrente fra sagens anlæg.

Indstævnte, SKAT, Skattecenter København, har påstået stadfæstelse.

*Sagsfremstilling*

N. Elektric ApS blev taget under konkursbehandling den 23. august 2008 på baggrund af en egenbegæring af 16. august 2008.

Ifølge selskabets første årsregnskab for perioden 16. august 2005 til 31. december 2006 havde selskabet et negativt årsresultat på 484.446 kr. og en negativ egenkapital på 359.446 kr.

Af en urevideret balance for perioden 1. januar 2007 til 30. september 2007 fremgår, at selskabet havde en omsætning på 1.369.227,11 kr. og et dækningsbidrag på 149.709,97 kr., der fratrukket omkostninger til blandt andet salgs- og administrationsomkostninger og husleje medførte et negativt nettoresultat på 324.752,81 kr.

Selskabets drift ophørte medio juli 2007.

Parterne er enige om, at de samlede ind- og udbetalinger på kassekreditkontoen i perioden 7. juni 2007 til den 16. august 2007 udgjorde henholdsvis 500.286,96 kr. og 599.609,47 kr., og at de omtvistede betalinger i forhold hertil udgør henholdsvis 45 % og 38 %.

Ifølge gældbogslisten anmeldte indstævnte den 13. september 2007 et samlet krav i konkursboet på 651.579 kr.

I redegørelse af 26. november 2008 i medfør af konkurslovens § 125, stk. 3, er boets aktiver anslået til 241.017 kr. Selskabets betalinger til SKAT udgør i forhold hertil 94,4 %.

*Forklaringer*

Der er i landsretten afgivet forklaring af Karsten Høyer Nielsen og Anette Jeanne Olesen.

*Karsten Høyer Nielsen* har supplerende forklaret bl.a., at baggrunden for, at de var fem bestyrelsesmedlemmer, var, at alle tidligere havde været ansat i Torben Nielsens firma. Torben Nielsen havde en stor del af kundekontakten, men udførte ikke arbejde selv. Virksomhedens største kunde var Brøndby Kommune, der gav mindre omsætning i slutningen af perioden. De fem bestyrelsesmedlemmer hæftede pro rata for kassekreditten. A-skat og moms blev

ikke betalt til tiden, og SKAT sendte rykkere og advarsler, men der var ikke møder med SKAT før den 7. juni 2007. Den 1. maj 2007 afviste banken to betalinger, da der ikke var dækning på

**962**

kassekreditten. Grossisterne blev betalt a conto, da man ikke havde midler til at dække deres fulde tilgodehavende. Hvis Torben Nielsen, der fik 300.000 kr. i løn, var gået af eller var blevet afskediget, ville det have mindsket selskabets omkostninger. Vidnet havde et møde med SparBankVest, der som betingelse for at låne selskabet penge stillede krav om, at Torben Nielsen udtrådte. Et af Torben Nielsens selskaber var tidligere gået konkurs, men han var ikke personlig konkurs. Oplysningerne om, at et af Torben Nielsens selskaber tidligere var gået konkurs, påvirkede bankerne negativt.

Der blev betalt 60.000 kr. med check for at trække betalingen lidt. SKAT's sagsbehandler kom frem til beløbet ud fra de oplysninger, vidnet gav om selskabets økonomi. Vidnet havde kontoudtog med til det 2. og 3. møde hos SKAT, men ikke til det første møde. Vidnet foreslog den 28. juni 2007 at betale 130.000 kr., hvilket var, hvad selskabet havde til rådighed efter betalinger til grossister. Baggrunden for, at der ikke var betalt moms og A-skat for 1. kvartal 2007, var, at pengene kom for langsomt ind.

Det var SKAT's sagsbehandler, der bestemte fordelingen af de 130.000 kr. mellem moms og A-skat. SKAT ville også have registreringsattesterne på selskabets biler udleveret, men krævede ikke, at selskabet blev frataget rådigheden over bilerne. Det blev på et af møderne sagt, at SKAT ville undersøge, om vidnets autorisation som elinstallatør kunne tilbagekaldes. Det kom som et chok for vidnet, da en fratagelse af selskabets eneste autorisation ikke alene ville have medført selskabets øjeblikkelige ophør, men også ville påvirke vidnets egne videre erhvervsmuligheder. Det var hans opfattelse, at hvis der ikke blev betalt, ville SKAT dreje nøglen om for firmaet. Han drøftede betalingsspørgsmålet med de øvrige bestyrelsesmedlemmer. Efter den 28. juni 2007 stod det klart, at Torben Nielsen ikke ønskede at udtræde, og det blev derfor besluttet at begære selskabet konkurs. Vidnet kan ikke huske, hvorfor der den 2. juli 2007 blev betalt 16.055 kr., mens de øvrige beløb blev betalt den 28. juni 2007. Betalingerne til SKAT var for at hindre, at selskabet blev lukket, ikke for at begunstige SKAT.

*Anette Jeanne Olsen* har supplerende forklaret bl.a., at hun ikke erindrer at have fået forevist kontoudskrifter fra selskabets bank. Det er ikke sædvanligt - man er mere interesseret i, hvilke aktiver der er. Direktøren fortalte om kassekreditten, og at der muligvis ville blive indgået aftale med en ny bank eller investor. På mødet den 4. juli 2007 blev det oplyst, at der var problemer med at finansiere den fortsatte drift. Direktøren begyndte at stamme, da han følte sig presset. Man tillægger normalt ikke årsrapporten den store betydning, da det ikke er »friske« oplysninger. Selskabets årsrapport var også først tilgængelig sent i forløbet, og vidnet kan ikke huske, om hun så den. I stedet er det normalt at rekvirere kvartalsregnskab, saldobalance og fakturaer. Forud for den 7. juni 2007 havde der været 9 udlægsforretninger, men vidnet er ikke klar over, om der var blevet foretaget udlæg, eller forretningerne havde været forgæves. Det, der havde interesse, var den nuværende situation.

Man krediterer først betalinger på de løbende krav. Det er almindeligt med hyppige møder i sager som den foreliggende, hvor forholdene var uafklarede. Hvis der ikke var blevet betalt, ville man have foretaget udlæg i udestående fordringer.

*Procedurer*

Parterne har gjort de samme anbringender gældende som for byretten og proceduret i overensstemmelse hermed.

**Landsrettens begrundelse og resultat:**

Det omtvistede beløb fremkommer som summen af de betalinger, N. Elektric ApS foretog til SKAT den 7. juni 2007 med 60.000 kr. og den 29. juni 2007 med henholdsvis 80.000 kr. og 87.485 kr. Uanset at betalingerne ikke er sket på en gang, finder landsretten, at de må betragtes som en samlet betaling, da der er tale om betalinger til samme kreditor inden for en kortere periode, efter at der er foretaget udlæg.

Det er ubestridt, at betalingerne udgjorde henholdsvis 45 % og 38 % af de samlede ind- og udbetalinger på kassekreditkontoen i perioden fra den 7. juni 2007 til fristdagen den 16. august 2007.

Uanset at betalingerne ikke fuldstændig udtømte selskabets likvide midler, findes betalingerne afgørende at have forringet N. Elektric ApS under konkurs' betalingsevne, når størrelsen af betalingerne sammenholdes med de øvrige bevægelser på kassekreditten, trækningsmulighederne på kassekreditten samt selskabets aktivmasse som opgjort i redegørelsen i medfør af konkurslovens § 125, stk. 3.

Efter bevisførelsen lægges det endvidere til grund, at betalingerne blev foretaget i direkte sammenhæng med SKAT's inddrivelse af en til dels gennem længere tid oparbejdet gæld, og at pantefogeden under møderne fremhævede, at direktøren eventuelt ville miste sin autorisation som elinstallatør. Betalingerne kan under disse omstændigheder ikke anses for at være ordinære.

Betingelserne for omstødelse i medfør af konkurslovens § 67, stk. 1, er derfor til stede, hvorfor appellantens påstand tages til følge.

Under hensyn til sagens udfald, karakter og omfang skal SKAT, Skattecenter København, i sagsomkostninger for begge instanser til N. Elektric ApS under konkurs betale 63.520 kr., hvoraf 52.000 kr. er til dækning af salær til advokat, og 11.520 kr. er til dækning af retsafgift.

- - -