# Exhibit 30

**U.2016.1870H**

***No liability for SKAT's losses in connection with VAT carousel fraud.***

*Taxes 5.9 - Company law 13.3 and 14.2 .*

♦ A was the main shareholder, board member and - until April 2004 - director of C A/S, which was engaged in brokerage trading primarily in mobile phones and IT components. In the period from November 2003 to November 2004, C A/S carried out a number of brokerage transactions. Subsequently, it turned out that previous stages of turnover had failed to pay sales VAT to SKAT, S, on goods that C A/S had purchased and resold to foreign companies participating in the fraud. T, who was the head of C A/S' brokerage company, was sentenced to 5 years' imprisonment for debtor fraud in the form of VAT carousel fraud. S brought a claim against A for compensation for the loss of approximately DKK 144 million that S had suffered when C A/S was repaid the VAT that the former trading partners had fraudulently evaded from S. It was S's main point of view that A, as ultimate principal shareholder and board member as well as general manager of C A/S - in the period until April 2004 also as managing director - had acted irresponsibly by not ensuring a proper organization and adequate supervision of the company's brokerage business. The Supreme Court found that S had not proved that A had acted irresponsibly due to the division of tasks between him and T or due to a lack of supervision or control of the brokerage business. A was therefore acquitted.[1]

**H.D. February 11, 2016 in case 227/2014 (1. afd.)**

*Ministry of Taxation*
*SKAT (Km.adv. v/adv. Boris Frederiksen Kbh.)*
mod
*Peer Kølendorf (adv. Tom Kári Kristjánsson, Copenhagen).*

## Eastern High Court

***Østre Landsrets judgment October 31, 2014, (15. afd.) B-1802-09***

(B. Vollmond, Norman E. Cleaver, Janni Christoffersen (ext.)).
*Introduction*

This case, which was brought before the District Court in Lyngby on March 2, 2009, was referred to the Eastern High Court by order of June 24, 2009 pursuant to Section 226(1) of the Danish Administration of Justice Act.

The case concerns whether the defendant, Peer Kølendorf, in his capacity as director, board member and main shareholder of Comitel International A/S (now Selskabet af 21. September 2006 A/S in bankruptcy) has incurred liability for damages towards the plaintiff, Skatteministeriet, SKAT Hovedcentret (hereinafter SKAT), by causing Comitel International A/S to repay VAT relating to deliveries to Comitel International A/S in the period from November 2003 to November 2004, which previous trading partners had fraudulently evaded SKAT through debtor fraud.

SKAT has claimed that Peer Kølendorf must pay SKAT the principal amount of DKK 144,080,700, alternatively a smaller amount determined by the court, with the addition of usual procedural interest from the filing of the case until payment is made.

Peer Kølendorf has claimed acquittal.

During the case, SKAT has submitted a procedural statement according to which SKAT will transfer the right to dividends in the bankruptcy estates of companies that were part of the trading chains to Peer Kølendorf if he is convicted in accordance with SKAT's claim and pays the full amount to SKAT before the outstanding dividend amounts are finally settled.

*Case presentation*
*1. Case background*

The transactions at issue took place from November 2003 to November 2004 (the case period) on the international brokerage market and involved IT components and so-called internet access cards that provided access to porn sites on the internet.

Subsequently, SKAT, SØK and Kammeradvokaten uncovered that previous turnover links by systematic debtor fraud after the execution of the case's transactions had made themselves unable to pay SKAT the outgoing VAT/sales VAT on goods that Comitel International A/S bought and resold to other foreign companies that participated in the fraud.

### 1871

It turned out that the head of the brokerage department at Comitel International A/S, T, with knowledge of the fraud at an earlier stage, had purchased Comitel International A/S's goods and resold them to companies in the Far East, which companies were controlled by persons participating in the fraud.

The deductions referred to in the case have, based on conditions established by SKAT, been subject to a tax inspection, which led to SKAT's decision of July 20, 2006 requiring Comitel International A/S to repay the VAT. The company did not have the means to pay this amount to SKAT.

The transactions involved in the case and the non-payment of sales tax at earlier stages have resulted in prison sentences for debtor fraud for a number of the people involved. During the investigation, which revealed the VAT-related criminality (hereinafter referred to as VAT carousel fraud), the case has been named "Yellow Fever" by the authorities. Neither Comitel International A/S nor Peer Kølendorf has been charged in the case.

*2. Peer Kølendorf*

Peer Kølendorf, who holds a master's degree in political science and law, has run his own business in the radio and telecommunications industry since 1966, when he started a one-man company, Danish-Italian Film Co. at the age of 17. The company evolved into the Comitel Group.

Peer Kølendorf was for a number of years a member and at times chairman of Leverandørforeningen for Radio- og Telekommunika- tion (LRK), which later became part of the trade association IT-Bran- chen (ITB), and from 2001 to 2009 he was a member of the main board of ITB.

In an editorial in LRK's member magazine from 1998 entitled "Stop VAT fraud", Peer Kølendorf mentioned that it was devastating for the mobile phone industry to be associated with VAT fraud, and the industry wanted to help the authorities stop VAT carousels by registering the serial numbers of mobile phones.

---

1 U 2007.497 H, U 2011.3382 H, U 2012.1727 H, the European Court of Justice's judgment of 21 June 2012 in the joined cases C-80/11 and C-142/11, especially paragraphs 53-66, Morten Samuelsson: Bestyrelsesansvaret (1997), pp. 176-78, 181-86 and 205, Ida Rosenberg et al: Aktieselskabsloven med

ændringer senest af 23. december 1998, 6th edition (1999), p. 276, Thorbjørn Sofsrud: Bestyrelsens beslutning og ansvar (1999), p. 305 f. and 441 f., Bernhard Gomard and Peer Schaumburg-Müller: Kapitalselskaber og erhvervsdrivende fonde, 8th edition (2015), p. 612, Bernhard Gomard in U 1971B.117, the same in U 1993B.145 and Reino Nielsen in SR.2003.0164.

In a response from 1998 to the Eastern High Court on behalf of the Chamber of Commerce, Peer Kølendorf stated, among other things:

"The mobile phone market is both a general merchandise market and a broker market. The general merchandise market is primarily national, while the broker market is primarily international.

In the broker market, deals are almost always done over the phone and usually without subsequent written agreements.

All market participants with knowledge of this brokerage market know that contracting and delivery is a matter of trust. Many companies appear and disappear in a short time, as anyone with just a phone and fax and without a normal company setup can operate in the market. Product lifecycles are very short and prices are constantly falling.

...

Market participants range from multi-billion dollar international intermediaries to small merchandise brokers who run their business from home with no employees and no stock.

...

The margins in the broker market are very small, typically 3-6 percent.

Market participants are aware that particularly low prices usually indicate that the goods are stolen or don't exist at all - or they are companies that avoid paying VAT on national resale within the EU area, allowing the companies to go bankrupt before VAT is due."

During the trial (B-2178/97) in the Eastern High Court in 1999, Peer Kølendorf testified as an expert witness about price deviations as an indicator of possible VAT fraud and the players in the broker market:

"If the witness had received such an offer, he would have gone to the police. If the witness receives offers for cell phones that are just 10% below the market price, he reports it to Customs & Tax.

By an experienced market participant, the witness understands a market participant who has been operating in the market for a few months with 30-40 contracts per month."

As chairman of LRK, Peer Kølendorf participated in meetings with SKAT in 1998 and in the Ministry of Taxation in 2000, where the possibilities for reducing the risk of VAT fraud were discussed, including the issue of joint liability between buyer and seller for payment of VAT.

The minutes from a meeting on November 17, 1998 between Peer Kølen- dorf and a number of employees from SKAT state, among other things:

"PK was very interested in clarifying what precautions the industry can take to protect itself against the rogue operators in the market. PK explained how Danitas seeks to protect itself against these.

The company normally checks VAT numbers on foreign business connections (primarily buyers) when establishing trade. Actual credit assessments are not performed.

...

It was agreed that PK would make sure that TSR Kbh. gets the company's supplier directory ...

During the inspection visit on October 19, 1998, the region received the company's customer file."

An article in Computerworld on December 3, 2001 states, among other things:

"Comitel CEO Peer Kølendorf meets VAT carousel scammers two to three times a year. In his capacity as chairman of the association for mobile and telecommunications, he is therefore

**1872**

telecommunications, MTB, has joined the fight against the phenomenon." In an e-mail dated January 24, 2008 from chairman Ole Eklund to the association's main board, the IT industry's Distributor Committee recommended

see that Peer Kølendorf was excluded if he did not resign himself, as the Distributor Committee found that Comitel International A/S acted ethically questionable and contrary to good industry practice by acting on the international broker market, which in industry circles and by the authorities was designated as an area with VAT carousel fraud. They also referred to the fact that Comitel International A/S had been involved in the "Yellow Fever" complex.

The minutes of the ITB Executive Board meeting on February 28, 2008 show that the Executive Board decided to reject the Distributor Committee's recommendation, referring to the fact that neither companies in the Comitel Group nor Peer Kølendorf had been charged or convicted of conduct in violation of good industry practice, and that no specific conduct from companies in the Comitel Group or Peer Kølendorf that constituted a violation of good industry practice had been proven.

*3. Comitel Group*

Comitel A/S (CVR no ---------.  formerly Danitas Radio A/S) became

founded in 1974 by Peer Kølendorf. The company was initially engaged in the sale of photographic equipment, but the range gradually developed into the sale of radio communication equipment and mobile phones. In 1998/99, the company got a professional board of directors, which on June 20, 2003 decided to split Comitel A/S, which became the start of the Comitel Group.

Comitel A/S was at the demerger split into three companies: Comitel International A/S (CVR no. ) , Comitel Aktiebesidelse A/S (CVR no. - - - -) and Comitel Danmark A/S (CVR no. - - - - -  also Comitel Management A/S). After this, the original Comitel A/S ceased to exist.

The broker division, which was engaged in import and export primarily within the radio and telecommunications industry, was transferred to Comitel International A/S, and the broker activity was basically continued unchanged. Comitel International A/S had the same board of directors and management as Comitel A/S had had. For accounting purposes, the demerger was carried out with effect from January 1, 2003, but Comitel's brokerage activities were actually carried out under the auspices of Comitel A/S in 2003 and Comitel International A/S from 2004. For a period, Comitel International A/S settled VAT under the old Comitel A/S' VAT registration number after consultation with SKAT.

The telesales division, which was engaged in trading and service activities primarily within the radio, telecommunications and IT industry, was transferred to Comitel Danmark A/S.

According to the Board of Directors' demerger plan from June 2003, the majority of the broker division's sales within the radio and telecommunications industry were exports to Europe and the Far East, and that the majority of the telecom sales division's activities, which as mentioned included the IT industry, primarily concerned the Danish market.

Comitel Aktiebesiddelse A/S was transferred Comitel A/S' shares in the companies SMS A/S and CBB A/S. SMS A/S was subsequently sold to the Norwegian Schibsted Group, and CBB A/S, where Peer Kølendorf was chairman of the board, was subsequently sold to Te- lenor.

After the demerger of Comitel A/S, all shares in the three receiving companies (Comitel International A/S, Comitel Aktiebesiddelse A/S and Comitel Danmark A/S) were owned by Kathrine holding A/S (CVR no      later Comitel holding A/S), which in

2012 merged with Kathrine holding A/S (CVR no.

w

Comitel A/S).

Logistics tasks, administration and accounting functions etc. in the group were handled by Comitel Danmark A/S after the demerger. Comitel International A/S paid approximately DKK 2 million per year for this back office function.

*4. Comitel International A/S - ownership, organization and finances*

Comitel International A/S, which was founded on July 1, 2002 under the name VICh 6881 A/S, changed its name to Comitel International A/S in connection with the demerger of Comitel A/S, the management and board were replaced, and the company was notified for registration

for VAT on July 1, 2003 and began its activities thereafter. On September 3, 2002 and December 3, 2003, one and two of the shares (a total of 0.6% of the share capital) in Kathrine holding A/S, which among other things owned the total share capital of Comitel International A/S, were transferred to T. Prior to this, Kathrine holding A/S had been wholly owned by Peer Kølendorf, who was thus the ultimate sole shareholder of Comitel International A/S.

On March 1, 2003, 150 of the shares in Kathrine Holding A/S were transferred to Peer Kølendorf's daughter, Kathrine Stoffregen Kølendorf. Peer Kølendorf remained the main shareholder in the company.

Peer Kølendorf was CEO of the spun-off companies, including Comitel International A/S, in the period until April 16, 2004. When the "Yellow Fever" trades began on 10 November 2003, the broker activity was organizationally placed as a division of the then Comitel A/S, and it was then placed in Comitel International A/S, still with T as manager.

When Peer Kølendorf resigned from Comitel International A/S' Executive Board on April 16, 2004, T was appointed CEO and as such had continued responsibility for

**1873**

broker activities. He now reported to the Board of Directors, including Peer Kølendorf, and joined the Board himself on June 1, 2004. At the same time as T became CEO, the company's subscription rights were changed so that the CEO could not subscribe for the company alone, but only in association with at least one board member.

During the period in question, Steen Erik Mønsted was Chairman of the Board of Comitel International A/S and Peer Kølendorf was a board member. In the period from June 3, 2003 to June 1, 2004, Lars Thinggaard and Torben Svanberg were also members of the Board of Directors.

In 2001, Comitel A/S had a turnover of approximately DKK 591 million and a negative result of approximately DKK 3.3 million.

In 2002, Comitel A/S doubled its turnover to approximately DKK 1.2 billion. In the management report, this development was attributed to increasing international sales of mobile phones. The year's activities led to a result of approximately DKK 7.8 million.

According to the annual report for 2005, the key figures for Comitel International A/S developed as follows:

| (t.kr.) | 2003 | 2004 | 2005 |
|---|---|---|---|
| Net revenue | 724.205 | 2.213.391 | 2.333.343 |
| Results | 1.493 | 8.374 | 6.579 |

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| T | 1.281.852.629 kr. | 881,294,404 kr. | 299.549.911 kr. |
| Sheng Tang | 530.425.448 kr. | 879,337,153 kr. | 230.636.720 kr. |
| Christina Evers | 373.344,960 kr. | 572,758,720 kr. (resigned Sept. 2005) | - |

During the case, information has been presented that shows both

| | | | |
|---|---|---|---|
| Shareholders' equity ult. | 4.673 | 13.047 | 19.625 |
| Average number of employees | 6 | 5 | 4 |

Comitel International A/S' gross margins in 2003-2005 were typically between 1% and 6%. The company's operating margin in 2003-2005 was between 0.15% and 0.61%.

Comitel's total turnover was approximately DKK 846 million in 2003 and almost DKK 2.4 billion in 2004.

Comitel Danmark A/S provided all administrative functions (back office) to Comitel International A/S. No dividend was paid for the years 2002-2004.

Comitel International A/S' turnover in 2003 was mainly generated by the company acting as a broker "matching" buyers and sellers of mobile phones and IT components. The company's management did not find the profit of approximately DKK 1.5 million satisfactory, and the result was attributed in the management report to a decline in sales in the UK market. The company's sales efforts were then focused more on Asia and the Arab countries in the latter part of 2003.

Comitel International A/S made purchases from Solid Trading ApS in the period November 10 to December 30, 2003. These purchases, which are included in the case, had a total value of DKK 268 million. Comitel International A/S then resold the goods with a gross profit of DKK 7.4 million.

According to the information provided, Comitel International A/S exported goods worth DKK 203 million in 2003, including IT parts worth DKK 143 million, corresponding to 70%. Furthermore, Comitel A/S, which in part of 2003 continued to operate the Group's brokerage business, exported goods worth DKK 276 million, of which mobile phones accounted for DKK 267 million (97%) and IT parts for DKK 3 million (1%). In total, mobile phones amounted to DKK 327 million (69%) and IT parts to DKK 146 million (31%).

Comitel International A/S' turnover in 2004 was still mainly generated by the company acting as a broker matching buyers and sellers of mobile phones and IT components. The company carried out 1,200 brokerage transactions in 2004.

In the period January to March 2004, Comitel International A/S made purchases from Solid Trading ApS covered by the case for a total value of approximately DKK 180 million. Purchases in June, August and November 2004 from Trademark International ApS and J Corp ApS, respectively, covered by the case amounted to a total of approximately DKK 120 million.

In 2004, Comitel International A/S reportedly exported goods worth DKK 190 million, including mobile phones worth DKK 82 million (43

%), IT parts for DKK 32 million (17%) and internet access cards/porn cards for DKK 29 million (15%).

A statement of sales figures for Comitel International's brokers 2004-2006 shows:

lower and higher turnover per employee in other brokerage

UfR ONLINE

U.2016.1870H

companies than in Comitel International A/S.

Comitel's annual reports for 2003, 2004 and 2005 state that the company's "most significant operating risk is linked to the ability to match buyer and seller and thereby avoid losses on purchased lots.

It is also important for the company to enter into agreements with serious buyers."

The minutes from the board meetings on 18 March, 2 September and 17 December 2004 in Comitel International A/S show that an account was given of developments in the company's conditions, including market conditions, project development, organization and finances, including

Copyright © 2023 Karnov Group Denmark A/S

Accounting figures and copies of receipts for paid taxes and fees were distributed.

The board minutes from the meeting on March 18, 2004 state, among other things:

*"Market conditions*:

**1874**

Sales development is not following the budget. Mobile phone sales in particular are lagging behind. In retrospect, the board pressured the mobile phone brokers into a budget they were reluctant to accept, but IT sales are going well. And money is being made.

Kathrine holding A/S in relation to CIA:

There is increasing trade with Dubai and Hong Kong, and in this connection the holding company has purchased an apartment in Dubai, which will be completed in December 2006. A bank account has also been opened at Emirates Bank in Dubai. The account can be managed online in line with Danske Bank's Telebanking Service.

In Hong Kong, the holding company plans to establish a company that can independently trade mobile phones and IT parts with the rest of the world. However, the money transactions will be managed centrally from Copenhagen. No decision has yet been made on the plans.

*Economy*:

Printouts of the financial position given at the end of 2003 (initially as consolidated accounts for Comitel and Comitel International) and figures for January and February 2004 were presented to the Board. *Organization*:

There have been staff changes, as A resigned at the end of February. No replacement has been hired for him, but T has hired an assistant, Janne Bodé, who helps keep track of the many transactions.

*Generational change*:

For the time being, the intention is to keep CIA and not seek to sell or merge the company.

*ad 5*

It was decided to appoint T as CEO of the company and consequently amend the articles of association. The board of directors proposed that a director's contract should be established in this connection."

*5. Comitel International A/S' product range*

The product range of the Comitel Group evolved from the sale of photo articles to the sale of radio communication equipment and mobile phones.

In the demerger plan from June 2003, the broker division was described as the driving business for import and export primarily within the radio and telecommunications industry, and Comitel Inter- national A/S was formally registered under the industry code *465220: Wholesale of telecommunications equipment.*

At an internal meeting in 2003, T suggested that the broker division should start trading in IT goods, which the board then decided to do.

The minutes of the board meeting on September 4, 2003 state, among other things:

"The broker department is still lagging far behind budget. The trade stoppage caused by the new UK customs/tax rules cannot be compensated by sales to other countries in the short term, but we are constantly working to expand both market area and product selection. The IT broker ... resigned during the probationary period and a new one is being sought through the agency."

An internal memo dated October 25, 2003 prepared by Peer Kølen- dorf on strategic thoughts states, among other things:

"It turns out that our turnover of over DKK 1 billion in the broker area in 2002 was far too low. We all thought we had

achieved a larger share of the broker market, but the accounts from competitors such as Tel-ka, Dansk Radio Teknik and Sunico for 2002 show

much bigger numbers. Sunico, who is virtually the sole owner of the company in Nørrebro, had a turnover of DKK 3.7 billion in 2003.

The broker market for mobile phones has fallen drastically this year after the UK Customs and Excise intervention, and studies of the markets abroad show that we have not been able to reach the core of the trade that has been going on and which is now starting to pick up again. We have therefore tried to find some new salespeople for the department. We have hired two new ones, but have dismissed them again. We have also taken the opportunity to dismiss our freight forwarder, who has failed several times.

Sheng Tang is a skilled salesman who has good relations with Samsung, but - - - -, which is located in Jutland - at home - has not made any sales for a long time.

We have now hired 2 new brokers specifically for the IT area. This happened in early and mid-October, and the results should show very quickly if they are real brokers.

...

The world is not black and white. If there are good customers who demand goods that do not fit within the above definition, we should not reject them in advance ... Our relations with the Far East should be used, but not used uncritically."

Comitel's magazine "Fokus" from December 2003 states, among other things, that:

"For a number of years, Comitel has built a solid trading business in mobile phones by exploiting the price difference in different geographical areas of the world.

As the margins on each individual unit are quite small, high volume is required to secure the desired profit. Prices in the market are constantly changing and trading on these terms is therefore associated with a certain risk, even if all precautions are taken.

...

For example, twice in the past 5 years, Comitel has experienced very large-scale thefts during the transportation of goods. ... the cases have highlighted the risks in this type of trade.

...

**1875**

At the same time, the sale of computer components has now also become part of Comitel's international business area."

In August and November 2004, Comitel International A/S also entered into a number of transactions with J Corp ApS for the purchase of Internet Access cards worth a total of approximately DKK 92 million, which were resold to three companies located in Hong Kong and Indonesia. These cards provided access to websites with pornographic content. Comitel International A/S had neither previously nor subsequently traded in a similar product range, but the group had traded in other types of value-bearing cards.

*6. What the case is about*

Every month, Peer Kølendorf submitted information to the tax authorities about the company's potential and current suppliers and customers established during the previous month. Until the end of 2002, the information was sent to his contact person at the Danish Customs and Tax Agency. By e-mail dated December 2, 2002, the Agency requested that the information be sent to Mia Pedersen, ToldSkat Copenhagen, and Peer Kølendorf then sent her monthly statements of Comitel's new suppliers and customers. The three Danish supplier companies, Solid Trading ApS, Trademark International ApS and J Corp ApS, and all buyers in the transactions involved in the case appeared from lists that Peer Kølendorf submitted to SKAT.

Comitel International A/S also submitted its purchase invoices for Solid Trading A/S and all sales invoices to SKAT for accelerated payment of negative VAT.

Solid Trading ApS, Trademark International ApS and J Corp ApS were registered for VAT with the authorities, and the companies declared VAT.

The trades in question were executed in the following three periods:

1) Purchases from Solid Trading ApS in the period November 1, 2003 - March 31, 2004. Comitel International A/S paid VAT on purchases from Solid Trading ApS totaling DKK 114,761,052.

2) Purchases from Trademark International ApS in the period June 1, 2004
- July 31, 2004. Comitel International A/S paid a total of DKK 6,130,916 in VAT.

3) Purchase from J Corp ApS in August 2004 and November 2004 respectively. Comitel International A/S paid a total of DKK 23,188,732 in VAT.

Comitel International A/S sold/exported the goods purchased from the three Danish companies mentioned above to a number of buyers in the Far East, primarily Hong Kong and in some cases in Singapore and Indonesia.

The total relieved VAT amounted to a total of DKK 144,080,700.

The three Danish companies have been placed in bankruptcy proceedings after the end of the trade agreement, and SKAT will only receive very limited coverage for its claims in the bankruptcy estates of the companies in question.

SKAT's description of the transactions in the case states:

### 6.1. First trading chain - Solid Trading ApS

The company, incorporated on July 1, 2002, was subsequently acquired by B or a company controlled by it and changed its legal form on

On March 4, 2003, the company was renamed Solid Trading ApS (CVR no. - - - -) with address at - - - - Copenhagen Ø. B was the company's director throughout the period from January 9, 2003 and until the bankruptcy order was issued on April 21, 2004.

Until the bankruptcy, Solid Trading ApS operated as a trading company with purchase and resale of IT components (primarily CPU units and RAM modules).

B and Comitel International A/S' broker A had previously been colleagues in the Danish brokerage company BlueCom.

The responsible broker for the trades at Comitel International A/S was T, who entered into the trades, unless otherwise stated.

*November 2003*

| No. | Description | VAT DKK |
|-----|-------------|---------|
| 6 | On November 10, 2003 Solid Trading ApS invoiced Comitel 12,960 "Pentium IV 2.4 533mhz" units for GBP 1,166,400 excluding VAT. | Not included in the loss statement |
|   | On November 28, 2003 Comitel invoiced the lot to Fusion R. under the description "Intel CPU P4 2.4 533 mhz" for GBP 1,201,392 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | |
| 1 | On November 20, 2003, Solid Trading ApS invoiced Comitel International A/S (hereinafter "Comitel") two batches of 4,032 units of "Intel Pentium 4 2.6GhZ FSB533 Open box" for GBP 375,984 excluding VAT and 4,320 "Intel CPU P4 2.4 533mhz" for GBP 388,800 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.052.637 |
|   | On November 28, 2003 Comitel invoiced the latter lot to Fusion R. under the description "Intel CPU P4 2.4 533 mhz" for GBP 400,464 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | |
|   | **1876** | |
| 2 | Solid Trading ApS invoiced Comitel on November 20, 2003 for 10,500 units of "PC333 512MB DDR" for GBP 420,000 excluding VAT. The batch was delivered to Comitel's warehouse. | 1.116.581 |
|   | On November 28, 2003, Comitel invoiced the lot to Fusion R. as "Ram DDR 512" for GBP 432,600 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | |
| 4 | Solid Trading ApS invoiced Comitel on November 26, 2003 for 2,500 "PC133 1G SO-Dimm PC-133" for GBP 257,250 excluding VAT. | 686.613 |

Comitel invoiced the lot to Digimate (hK) Ltd. on
November 28, 2003 as "1G SO- DIMM Module
PC133(OEM) for GBP 265,000 (no VAT as export
out of EU). The payment terms were C.O.D. (cash
on delivery).

UfR ONLINE                                                                                                                                             U.2016.1870H

| No. | Description | |
|---|---|---|
| 5 | On November 26, 2003 Solid Trading ApS invoiced Comitel 2,500 units of "Compact Flash Memory (2.0GB)" for GBP 228,750 excluding VAT.<br><br>On November 28, 2003 Comitel invoiced the lot to Profile Onwards Ltd. under the name "Compact Flash Memory (2.0GB) for GBP 253,000 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 610.545 |
| 3 | Solid Trading ApS invoiced Comitel on November 28, 2003 for 14,400 units of "Intel CPU P4 2.4 533 mhz" for GBP 1,314,000 excluding VAT. The batch was delivered to Comitel's warehouse.<br><br>Comitel invoiced the lot to Fusion R. on December 1, 2003 under the description "Intel CPU P4 2.4 533 mhz" for GBP 1,353,600 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 3.155.236 |
| 7 | Solid Trading ApS invoiced Comitel on November 28, 2003 for 2,800 units of "1GB DDR Module PC-466" for GBP 244,720 excluding VAT. The batch was delivered to Comitel's warehouse.<br><br>On December 2, 2003 Comitel invoiced the lot to Digimate Ltd. as "1GB DDR MODU- LE PC-466" for GBP 252,000 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 652.925 |
| 8 | On November 28, 2003 Solid Trading ApS invoiced Comitel 2,500 units of "1GB DDR memory model PC- 3700" for GBP 218,500 excluding VAT. The batch was delivered to Comitel's warehouse.<br><br>Comitel invoiced Profile Onwards Ltd. on December 2, 2003 under the name "1GB DDR ME-MORY MODULE PC3700 (64" for GBP 225,000 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 582.969 |
| 9 | On November 28, 2003 Solid Trading ApS invoiced Comitel 5,500 units of "1GB DDR memory module PC 466" for GBP 561,000 excl. "1GB DDR memory module PC 466" for GBP 1,479,000 excluding VAT. On December 1, 2003, Solid Trading ApS also invoiced Comitel 10,000 "PC333 512MB DDR" for GBP 422,500 excluding VAT.<br>VAT. The batch was delivered to Comitel's warehouse.<br><br>On December 9 and 12, 2003, Comitel invoiced the lot to Fusion R. on two invoices under the designations "1G DDR MODULE PC-466" and "512 MB DDR PC333" for a total of GBP 2,529,125 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 5.442.822 |
| | | 13.300.328 |
| | IN EVERYTHING | |

*December 2003*

| No. | Description | |
|---|---|---|
| 11 | On December 3, 2003 Solid Trading ApS invoiced Comitel 2,600 "P1G SO-DIMM PC-133" and 12,960 "512MB USB FLASH MEMORY" for a total of GBP 434,730.40 excluding VAT.<br><br>On December 5, 2003 Comitel invoiced the first lot to | Digimate Ltd. as "1 G SO-DIMM Module PC-133" for GBP 234,000 (no VAT as export outside the EU) and |

*VAT DKK*

1.155.568

**1877**

|    |                                                                                                                                                                                                                                                                                   |          |
|----|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|----------|
|    | the latter lot to Profile Onwards Ltd. under the name "Flash IC (Comp to K9K1G ...)" for GBP 213,840 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). The goods were separately insured with the freight forwarder.                               |          |
| 12 | Solid Trading ApS invoiced Comitel on December 8, 2003 for 1,800 "PC133 1G SO-Dimm PC-133 (OEM)" for GBP 194,130 excluding VAT. The batch was delivered to Comitel's warehouse.                                                                                                     | 512.794  |
|    | On the same day Comitel invoiced the lot to Profile Onwards Ltd. as "1G SO-DIMM Module PC-133 (OEM)" for GBP 200,160 (no VAT as export out of the EU). The payment terms were prepayment.                                                                                           |          |
| 13 | Solid Trading ApS invoiced Comitel on December 8, 2003 2,500 pieces of "1G DDR memory model PC-3700" for GBP 213,375 excluding VAT. The batch was delivered to Comitel's warehouse.                                                                                                 | 563.630  |
|    | On the same day, Comitel invoiced the lot to Digimate (hK) Ltd. as "1G DDR MEMORY MODULE PC-3700 (64" for GBP 220,000.) The payment terms were prepayment.                                                                                                                          |          |
| 15 | Solid Trading ApS invoiced Comitel on December 9, 2003 9,500 "1GB DDR memory module PC 466" for GBP 957,125 excl. VAT and 10,000 "PC333 512MB DDR" for GBP 455,000 excluding VAT. The batch was delivered to Comitel's warehouse.                                                   | 3.735.989 |
|    | Comitel invoiced both parties to Fusion on December 12, 2003 R. under the designations "1G DDR MODULE PC-466" and "512MB DDR PC333" for a total of GBP 1,426,625 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery).                                 |          |
| 16 | On December 10, 2003 Solid Trading ApS invoiced Comitel 500 pcs. "1G DDR memory model PC-3700" for GBP 43,650 excluding VAT and 2,540 pcs. "512mb compact flash card" for GBP 156,464 excluding VAT. The batches were delivered to Comitel's warehouse.                             | 530.062  |
|    | On December 12, 2003 Comitel invoiced both lots to Digi- mate (hK) Ltd. under the terms "1G DDR MEMORY MO- DULE PC-3700 (64" and "512mb Compact flash card" for a total of GBP 206,290 (no VAT as export outside the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. |          |
| 17 | Solid Trading ApS invoiced Comitel on December 10, 2003 2,200 pieces of "1GB DDR memory module PC 466" for GBP 187,660 (excl. VAT). The lot was delivered to Comitel's warehouse.                                                                                                   | 497.074  |
|    | Comitel invoiced the lot to Profile Onwards Ltd. on December 12, 2003 under the description "1GB DDR MODULE PC466" for GBP 193,600 (no VAT as export out of the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse.                                 |          |
| 14 | On December 12, 2003, Solid Trading ApS invoiced Comitel for two batches of 5,760 "Pentium IV 2.8 533Mhz, tray" and 11,520 "Pentium IV 3Ghz 533Mhz, tray" for GBP 672,480 excluding VAT and GBP 2,039,040 excluding VAT respectively. The lots were delivered to Comitel's warehouse. | 7.162.480 |

On the same day, Comitel invoiced the latter batch to Fusion R. under the designation "Intel Pentium 4 3.0GhZ FSB533" for GBP 2,059,776 (no VAT). The payment terms were C.O.D. (cash on delivery). On December 18, 2003 Comitel invoiced the entire the former batch to Fusion R. under the designation "Intel Pentium 4 2.8GhZ FSB533" for GBP 679,392 (no VAT as export out of the EU). The payment terms were prepayment.

**1878**

18    On December 15, 2003, Solid Trading ApS invoiced Comitel    495.048
2,808 units of "2G Flash IC/Compactiable", 500 units of "1G DDR me-

mory model PC-3700" and 600 "P1G SO-DIMM PC133" for a total of GBP 186,659.04 excluding VAT. The lot was delivered to Comitel's warehouse.

On December 19, 2003, Comitel invoiced the lot to Digimate (hK) Ltd. under the designations "2G flash IC/Compatible to Flash K9K2G08UOM-YCBO", "1G DDR MEMORY MODULE PC-3700(64)" and "1G SO-DIMM Module PC-133 (OEM)" for a total of GBP 192,432 (no VAT as export out of the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse.

| | | |
|---|---|---|
| 19 | Solid Trading ApS invoiced Comitel on December 15, 2003 6,480 pieces of "2G Flash IC/Compactiable" for a total of GBP 179,172 excluding VAT. The lot was delivered to Comitel's warehouse.<br><br>On December 19, 2003 Comitel invoiced the lot to Profile Onwards Ltd. as "2G flash IC/Compatible to Flash K9K2G08UOM-YCBO" for a total of GBP 184,680 (no VAT as export outside the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. | 475.191 |
| 10 | Solid Trading ApS invoiced Comitel on December 16, 2003 3,000 "PC333 512MB DDR" for GBP 150,000 excluding VAT.<br><br>On December 18, 2003 Comitel invoiced the lot to Fusion R. under the designation "512MB DDR PC333" for 154,500 (no VAT as export out of the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. | 395.205 |
| 20 | Solid Trading ApS invoiced Comitel on December 16, 2003 10,500 "1GB DDR memory module PC 466" for GBP 1,071,000 excluding VAT. The batch was delivered to Comitel's warehouse.<br><br>On December 19, 2003 Comitel invoiced the lot to Fusion R. under the designation "1G DDR MODULE PC-466" for GBP 1,102,500 (no VAT as export out of the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. | 2.821.764 |
| 23 | Solid Trading ApS invoiced Comitel on December 16, 2003 50,000 "Infineon TSOP" for GBP 1,240,000 excluding VAT. The batch was delivered to Comitel's warehouse.<br><br>On December 18, 2003, Comitel invoiced the lot to Fusion R. under the name "Infineon TSOP" for GBP 1,300,000 (no VAT). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. | 3.267.028 |
| 24 | On 16 December 2003 Solid Trading ApS invoiced Comitel 123,970 pieces of "Samsung Branded Dice Program" for GBP 1,791,366.50 excluding VAT. The batch was delivered to Comitel's warehouse.<br><br>Comitel invoiced the entire lot to Fusion on December 18, 2003 R. under the name "Samsung Branded Dice Programe" for GBP 1,840,954.50 (no VAT). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. | 4.719.712 |
| 25 | Solid Trading ApS invoiced Comitel on December 16, 2003 6,480 pieces of "2G flash IC/Compatible to Flash K9K2G08UOM- YCBO" for GBP 181,116 excluding VAT. The lot was delivered to Comitel's warehouse.<br><br>On December 19, 2003 Comitel invoiced the entire lot to Best Concord Technology Ltd. as "2G flash IC/Com- patiable to Flash K9K2G08UOM-YCBO" for GBP 186,624 (no VAT as export outside the EU). The payment terms were prepayment. Comitel's invoice was issued by Marie Kruse. | 477.186 |

UfR ONLINE                                                                                              U.2016.1870H

26    Solid Trading ApS invoiced on December 16, 2003 Comitel
      19,440 pieces of "2G flash IC/Compatible to Flash
      K9K2G08UOM- YCBO" for GBP 533,628 excluding VAT.
      The lot was delivered to Comitel's warehouse.

      Comitel invoiced the lot to Profile Onwards Ltd. on December
      19, 2003 under the description "2G flash IC/Compatible to
      Flash K9K2G08UOM-YCBO" for GBP 550,152 (no VAT as
      export outside the EU). The payment terms were prepayment.
      Comitel's invoice was issued by Marie Kruse.

29    Solid Trading ApS invoiced Comitel on December 16, 2003 for
      12,960 units of "2G Flash IC/Compactiable" for GBP 362,232
      excluding VAT.

      On December 19, 2003 Comitel invoiced the lot to Digimate
      (hK) Ltd. as "2G flash IC/Compatiable to Flash
      K9K2G08UOM-YCBO" for GBP 373,248 (no VAT as export
      outside the EU). The payment terms were prepayment.
      Comitel's invoice was issued by Marie Kruse.

21    Solid Trading ApS invoiced Comitel on December 17, 2003
      14,400 "Pentium IV 3.2Ghz" for GBP 3,294,720 excluding VAT.
      The batch was delivered to Comitel's warehouse. Prior to this,
      Solid Trading ApS had invoiced the goods as "2.8 Ghz" on
      December 15, 2003 and issued a credit note for this on
      December 17, 2003.

      On December 19, 2003 Comitel invoiced the lot to Fusion R. as
      "Intel Pentium 4 3.2GhZ" for GBP 3,355,200 (no VAT as
      export out of the EU). The payment terms were prepayment.
      Comitel's invoice was issued by Marie Kruse.

27    Solid Trading ApS invoiced Comitel on December 17, 2003
      9,500 pcs "1G DDR MODULE PC-466" for GBP 969,000 excl.
      VAT. The batch was delivered to Comitel's warehouse.

      On December 19, 2003 Comitel invoiced the lot to Fusion R. as
      "1G DDR MODULE PC-466" for GBP 997,500 (no VAT as
      export out of the EU). The payment terms were prepayment.
      Comitel's invoice was issued by Marie Kruse.

28    Solid Trading ApS invoiced Comitel on December 17, 2003
      10,000 "1G SO-DIMM Module PC-133 (OEM" for GBP
      450,000 excl. VAT.) The batch was delivered to Comitel's
      warehouse.

      On December 19, 2003, Comitel invoiced the lot to Fusion R. as
      "1G SO-DIMM Module PC-133 (OEM)" for GBP 463,500 (no
      VAT as export out of the EU). The payment terms were
      prepayment. Comitel's invoice was issued by Marie Kruse.

22    Solid Trading ApS invoiced Comitel on December 18, 2003 for
      212,960 units of "Infineon TSOP" for GBP 3,503,192
      excluding VAT. The batch was delivered to Comitel's
      warehouse.

      Comitel invoiced the lot to Fusion R. on the same day under the
      designation "Infineon TSOP" for GBP 3,599,024 (no VAT as
      export out of the EU). The payment terms were prepayment.
      Comitel's invoice was issued by Marie Kruse.

30    Solid Trading ApS invoiced Comitel on December 29, 2003
      5,000 "1G DDR PC-4000" for GBP 485,000 excluding VAT.
      The lot was delivered to Comitel's warehouse.

      Comitel invoiced 1,000 units to Best Concord Technology Ltd.
      the same day for GBP 100,000 (no VAT as export out of the
      EU),
      2,000 units to Profile Onwards Ltd. for GBP 200,000 (no VAT as
      export out of EU) and 2,000 units to Digimate (hK) Ltd. for
      GPB
      200,000 (no VAT as export out of the EU). The payment terms

were
prepa
yment
.

1.405.950

**1879**

954.373

8.719.724

2.564.531

1.190.959

9.229.860

1.282.025

| | | |
|---|---|---|
| 32 | Solid Trading ApS invoiced Comitel on December 30, 2003 for 5,760 "Intel Pentium 4 3.2GhZ" for GBP 1,313,280 excluding VAT. The batch was delivered to Comitel's warehouse. | 3.473.855 **1880** |
| | On January 13, 2004, Comitel invoiced the lot to four different buyers, of which 2,016 pieces to Digimate (hK) Ltd. for GBP 469,728 (no VAT as export outside the EU), 1,440 pieces to Profile Onwards Ltd. for GBP 335,520 (no VAT as export outside the EU), 864 pieces to Best Concord Technology Ltd. for GBP 201,312 (no VAT as export outside the EU) and Fusion R. 1,440 pieces for GBP 335,520 (no VAT as export out of the EU). The payment terms were prepayment. | 55.630.008 |
| | IN EVERYTHING | |

*January 2004*

| No. | Description | VAT DKK |
|---|---|---|
| 31 | On January 5, 2004 Solid Trading ApS invoiced Comitel 10,000 units. "PC133 512MB" for GBP 477,500 excluding VAT. The batch was delivered to Comitel's warehouse. On January 28, 2004 Comitel invoiced the lot to Digimate (hK) Ltd. under the name "512MB DDR PC133" for GBP 491,500 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 1.265.351 |
| 33 | On January 5, 2004 Solid Trading ApS invoiced Comitel 9,500 units. "1GB DDR memory module PC 466" for GBP 1,011,750 excluding VAT. The lot was delivered to Comitel's warehouse. On January 15, 2004, Comitel invoiced the batch to two different buyers, 4,000 units to Profile Onwards Ltd. for GBP 433,600 (no VAT as export out of the EU) and 5,500 units to Digimate (hK) Ltd. for GBP 596,200 (no VAT as export out of the EU). The payment terms were prepayment. | 2.681.087 |
| 34 | On January 5, 2004 Solid Trading ApS invoiced Comitel 50,000 units. "Infineon TSOP" for GBP 1,335,000 excluding VAT. The batch was delivered to Comitel's warehouse. On January 26, 2004, Comitel invoiced the consignment to two different buyers, 14,500 units to Profile Onwards Ltd. for GBP 398,750 (no VAT as export outside the EU) and a total of 35,500 units to Digimate (hK) Ltd. for a total of GBP 976,250 (no VAT as export outside the EU). The payment terms were prepayment. Comitel's invoices were issued by T and Marie Kruse. | 3.537.683 |
| 36 | On January 12, 2004 Solid Trading ApS invoiced Comitel 7,400 units. "1GB DDR memory module PC 466" for GBP 786,250 excluding VAT. The lot was delivered to Comitel's warehouse. Comitel invoiced the lot to two buyers: On January 26, 2004, 3,750 units of "1G DDR MODULE PC-3700" to Profile Onwards Ltd. "1G DDR MODULE PC-3700" to Digimate (hK) Ltd. for GBP 243,787.50 (no VAT as export out of the EU); and on January 27, 2004, 1,400 "1G DDR MODULE PC466" to Digimate (hK) Ltd. for GBP 151,690 (no VAT as export out of the EU). The order requisitions were dated January 26 and 27, 2004. The payment terms were C.O.D. (cash on delivery) and prepayment. Comitel's invoices were issued by T and Marie Kruse. | 2.114.069 |
| 35 | Solid Trading ApS invoiced Comitel on January 13, 2004 for 212,960 units of "Infineon TSOP" for GBP 3,694,856 excluding VAT. The batch was delivered to Comitel's warehouse. | 9.975.742 |

On January 26, 2004, Comitel invoiced the lot to Asia Time Technologies Ltd. on a total of four invoices under the name "Infineon TSOP" for a total of GBP 3,801,336 (no VAT as export out of the EU). The order requests from Asia Time Technologies Ltd. were dated 14th, 16th, 17th and 18th January 2004.

Copyright © 2023 Karnov Group Denmark A/S

and January 19, 2004. The payment terms were prepayment. Comitel's invoices were issued by T and Marie Kruse.

IN EVERYTHING                                                      19.573.932

**1881**

*February 2004*

| No. | Description | VAT DKK |
|---|---|---|
| 37 | On February 4, 2004, Solid Trading ApS invoiced Comitel for three invoices totaling 8,064 "Pentium IV 3.2Ghz" for a total of GBP 1,798,272 excluding VAT. The batch was delivered to Comitel's warehouse. | 4.912.564 |
| | On February 6, 2004, Comitel invoiced all three lots on three invoices to C Trading AB under the designation "Intel Pentium 4 3.2Ghz" for GBP 1,816,013.80 (no VAT as export out of the EU). The order requisitions from C Trading AB were dated February 4 and 6, 2004. The payment terms were C.O.D. (cash on delivery). Comitel's invoices were issued by T's secretary, Janne Bode. | |
| 38 | Solid Trading ApS invoiced Comitel on February 4, 2004 for 19,000 units of "1GB DDR memory module PC 466" for GBP 1,947,500 excluding VAT. The batch was delivered to Comitel's warehouse. | 5.320.229 |
| | On February 6, 10 and 11, 2004, Comitel invoiced the lot on three invoices to C Trading AB under the name "1G DDR MODULE PC-466" for a total of GBP 1,967,450 (no VAT as export out of the EU). The order requests from C Trading AB were dated February 4, 6 and 9, 2004. The payment terms were C.O.D. (cash on delivery). Comitel's invoices were issued by Janne Bode. | |
| 39 | On February 6, 2004, Solid Trading ApS invoiced Comitel 6,100 units. "PC333 512MB DDR" for GBP 247,050 excluding VAT. | 665.272 |
| | On February 12, 2004, Comitel invoiced the batch to C Trading AB under the designation "512MB DDR PC333" for GBP 250,710 (no VAT as export out of the EU). The order requisition from C Trading AB was dated February 12, 2004. The payment terms were C.O.D. (cash on delivery). Comitel's invoice was issued by Janne Bode. | |
| | IN EVERYTHING | 10.898.065 |

On February 10, 2004, Mia Pedersen, SKAT Økokrim, wrote to Peer Kølendorf requesting the lists of new suppliers and customers for January 2004, as she had not received them. In an e-mail on the same day she wrote:

"Thank you for your quick response and the cooperation we have had.

If you have any questions regarding VAT carriers, you are always welcome to contact me."

The e-mail correspondence shows that the lists had been forwarded by Peer Kølendorf to other employees at SKAT who had asked him to do so.

*March 2004*

| No. | Description | VAT DKK |
|---|---|---|
| 40 | On March 1, 2004 Solid Trading ApS invoiced Comitel 11,000 units. "PC466 PC3700 1GB DDR SO-DIMM" for GBP 998,250 excluding VAT. The batch was delivered to Comitel's warehouse. | 2.782.797 |
| | On March 15, 2004, Comitel invoiced the lot and another 500 pieces (possibly from trade no. 42) to Network Trading Company under the description "1GB DDR MEMORY MODULE PC-3700 (64" for GBP 1,075,250 (no VAT as export out of the EU). The order requisition was dated March 3, 2004. The payment terms were prepayment. Comitel's invoice was issued by Janne Bode. | |
| 41 | On March 1, 2004 Solid Trading ApS invoiced Comitel 2,880 units. "Pentium IV 3.2Ghz" for GBP 440,640 excluding VAT. The lot was delivered right to Comitel's warehouse. | 1.228.361 |

On March 9, 2004, Comitel invoiced the lot to Free Trade Investments Limited as "Intel Pentium 4 3.2GhZ" for GBP 449,280 (no VAT as export out of the EU). The order requisition was dated March 2, 2004. The payment terms were prepayment. Comitel's Invoice is issued by Janne Bode.

Copyright © 2023 Karnov Group Denmark A/S

On March 1, 2004 Solid Trading ApS invoiced Comitel 8,000 units. "PC466 PC3700 1GB DDR SO-DIMM" for GBP 726,000 excluding VAT.

42 The batch was delivered to Comitel's warehouse.    2.023.852

On March 9, 2004, Comitel invoiced 7,500 units to Network Trading Company under the designation "1GB DDR MEMORY MODULE PC-3700 (64" for GBP 701,250 (no VAT as export outside the EU). The terms of payment were prepayment. Comitel's invoice was issued by Janne Bode.

**1882**

On March 1, 2004 Solid Trading ApS invoiced Comitel 2,592 units. "Pentium IV 3.2Ghz" for GBP 396,576 excluding VAT. The lot was delivered    1.105.525

43 right to Comitel's warehouse.

On March 9, 2004, Comitel invoiced 3,168 units (possibly also from trade no. 44) to Free Trade Investments Limited under the designation "Intel Pentium 4 3.2GhZ" for GBP 494,208 (no VAT). The order request was dated March 4, 2004. The payment terms were prepayment. Comitel's invoice was issued by Janne Bode.

On March 1, 2004 Solid Trading ApS invoiced Comitel 4,032 units. "Pentium IV 3.2Ghz" for GBP 616,896 excluding VAT. The lot was delivered    1.719.706

44 right to Comitel's warehouse.

Comitel invoiced 3,456 units to Free Trade Inve- stments Limited on March 10, 2004 under the name "Intel Pentium 4 3.2GhZ" for GBP 539,136 (no VAT as export out of the EU). The order requisition was dated March 8, 2004. The payment terms were prepayment. Comitel's invoice was issued by Janne Bode.

On March 1, 2004 Solid Trading ApS invoiced Comitel 6,100 units. "PC333 512MB DDR" for GBP 247,050 excluding VAT. The batch was

45 delivered to Comitel's warehouse.    688.695

On March 15, 2004 Comitel invoiced the lot to Network Trading Company as "512MB DDR PC333" for GBP 254,370 (no VAT as export out of the EU). The order requisition was dated March 8, 2004. The payment terms were prepayment. Comitel's invoice was issued by Janne Bode.

On March 12, 2004 Solid Trading ApS invoiced Comitel 68,600 units. "Branded Samsung Dice program for GBP 1,239,602 excluding VAT.

46 The batch was delivered to Comitel's warehouse.    3.389.041

On March 15, 2004, Comitel invoiced the entire lot to Free Trade In vestments Limited under the name "Samsung Branded Dice Progra- me" for GBP 1,270,472 (no VAT). The order requisition was dated March 15, 2004. The payment terms were prepayment. Comitel's invoice was issued by Janne Bode.

On March 12, 2004 Solid Trading ApS invoiced Comitel 49,000 units. "Branded Samsung Dice program for GBP 885,430 excluding VAT.

47 The batch was delivered to Comitel's warehouse.    2.420.743

On 16 March 2004, Comitel invoiced the batch to Free Trade Invest- ments Limited under the name "Samsung Branded Dice Programe" for GBP 907,480 (no VAT as export out of the EU). The purchase order was dated March 15, 2004. The payment terms were pre-payment. Comitel's invoice was issued by Janne Bode.

IN EVERYTHING    15.358.720

The 47 trades between Comitel International A/S and Solid Trading ApS took place in the period from November 10, 2003 to March 12, 2004, and Comitel International A/S discharged VAT paid to Solid Trading ApS in the amount of DKK 114,761,052.

In trade no. 6 (November 10, 2003) it has not been possible to identify an importing company in which losses were generated for the treasury by debtor fraud before the VAT settlement. The

deducted VAT for this trade is therefore not included in the Ministry of Taxation's loss statement.

On a form, signed on March 25, 2004, about a short periodic control for the period August 2003 to December 2003 at Comitel International A/S, SKAT noted "Everything ok" regarding negative VAT and added "no serious remarks in connection with previous control", "good knowledge of the "old" company" and "risky due to the trade in mobile phones and computer equipment". previous control", "good knowledge of the "old" company" and "risk-oriented due to the trade with mobile phones and computer equipment". The

It also appears that SKAT inspected a batch of mobile phones and RAM blocks at the company's freight forwarder and "shock absorbers" worth approximately DKK 28 million at the company.

On the same day, SKAT wrote to the Danish Customs and Tax Agency that a disbursement/card periodic inspection has been carried out at Comitel A/S and Comitel International A/S. The control made a re-posting and had no other comments.

On April 22, 2004, SKAT wrote to the Danish Customs and Tax Agency about payment control for January 2004 to March 2004. SKAT believed that there was a lack of invoicing between

**1883**

Comitel International A/S' main part and export part (the main part was linked to the regular VAT registration, while the export part was linked to an export VAT registration with accelerated return.

payment of purchase VAT). There are no comments regarding Comitel International A/S' "external" transactions.

On May 5, 2004 SKAT released Comitel International A/S' negative VAT for April 2004 with the remark "less risk".

*6.2 Other trade chain - Trademark International ApS*

Comitel International A/S started trading with Trademark International ApS on June 16, 2004, i.e. just over 3 months after the last trade with Solid Trading ApS, and 4 trades were completed in the period June 16-24, 2004.

Trademark International ApS was founded on July 2, 2003 (CVR no. - - - - ), and F, who had previously been employed by BlueCom, joined the company as director.

Responsible broker for the trades with Trademark International ApS was T.

| No. | Description | VAT DKK |
|---|---|---|
| | | 297,050 |
| 1 | On June 16, 2004, Trademark International ApS invoiced Comitel International A/S (hereinafter "Comitel") 1,152 "Intel Pentium 4 2.8GhZ FSB533" for USD 184,320 excluding VAT. The order requisition is dated June 17, 2004. The lot was delivered to Comitel's warehouse. | |
| | On June 21, 2004 Comitel invoiced the lot to Asia-Power Solution Gmbh for USD 189,792 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 1.638.594 |
| 2 | Trademark International ApS invoiced Comitel on June 18, 2004 7,000 "Magicstore Microdrive 2.2Gb" for USD 1,016,750 excluding VAT. The order requisition was dated June 21, 2004. The lot was delivered to Comitel's warehouse. | |
| | On June 23, 2004 Comitel invoiced the lot to Asia-Power Solution Gmbh for USD 1,047,200 (no VAT as export out of the EU). The payment terms were C.O.D. (cash on delivery). | 2.089.717 |
| 3 | Trademark International ApS invoiced Comitel on June 21, 2004 39,200 pieces of "Samsung Controller s3c72e8df DICE" and 8,640 pieces of "IC 32M*64 pc2100 OBM Memory" for a total of USD 1,296,672 excluding VAT. The lot was delivered to Comitel's warehouse. | 2.105.555 |
| | There is no sales invoice from Comitel. | |
| 4 | On June 24, 2004, Trademark International ApS invoiced Comitel for a number of components for a total of USD 1,306,500 excluding VAT. The batch was delivered to Comitel's warehouse. | |
| | There is no sales invoice from Comitel. | |

During the trade between Comitel International A/S and Trademark International ApS, Trademark International ApS complied with agreed terms on delivery and payment etc. In connection with these transactions, Comitel International A/S paid VAT totaling DKK 6,130,916.

*6.3 Third trade chain - J Corp ApS*

In August 2004, Comitel International A/S made 15 trades with J Corp ApS, and after 2½ months - in November 2004 - another 4 trades with J Corp ApS.

J Corp ApS was founded on October 23, 2003, and on January 8, 2004, C, who was the owner of the company, joined as director. C had previously been employed by Solid Trading ApS.

The responsible broker for the trades at Comitel International A/S was T, unless otherwise stated.

*August 2004*

| No | Description | |
|---|---|---|
| 1 | On August 13, 2004, J Corp ApS invoiced Comitel International A/S (hereinafter "Comitel") 20,000 and 8,500 "Phone4x internet access cards" respectively for a total of USD 1,514,775 excluding VAT. Comitel paid the invoices on August 17 and 19, 2004. The batch was delivered to Comitel's warehouse. | lot to Aspen Group Limited for a total of USD 1,561,800 (no VAT; invoice date unknown). According to the pro forma invoices, the payment was "Cash on delivery" (cash). Comitel's pro forma invoices are issued by T and Janne Bode. |
| | On August 13 and 16, 2004, Comitel issued pro forma invoices for the | |

*VAT DKK*
2.305.260,33

**1884**

The lot was delivered to Comitel's warehouse.

2    On August 17, 2004, J Corp ApS invoiced Comitel for 5,000 "Phone4x internet access cards" for USD 265,750 excluding VAT. The lot was delivered to Comitel's warehouse.

On August 23, 2004 Comitel issued a proforma invoice for 5,500 units (the remaining 500 units may be related to trade no. 5) "Phone4x internet access card" to Unicorn Properties Ltd. for USD 301,400 (no VAT; invoice date unknown). The order requisition from Unicorn Properties Ltd. was dated August 19, 2004. The payment terms were C.O.D. (cash on delivery). Comitel's pro forma invoice was issued by Janne Bode.

3    On August 17, 2004, J Corp ApS invoiced Comitel 10,000 units. "Phone4x internet access card" for USD 531,500 excluding VAT. The lot was delivered to Comitel's warehouse.

On the same day, Comitel issued a pro forma invoice for 2,300 units to PT. Beryl Indo Perkasa for USD 126,040 (no VAT; invoice date unknown). The payment was received on August 18, 2004. Comitel issued the
August 23, 2004 pro forma invoice for the remaining lot (7,700 pieces) to Unicorn Properties Ltd. for USD 421,960 (no VAT; invoice date unknown). The order requisition from Unicorn Properties Ltd. was dated
August 19, 2004. The payment terms were C.O.D. (cash on delivery). Comitel's pro forma invoices were issued by T and Janne Bode.

4    On August 17, 2004, J Corp ApS invoiced Comitel 10,000 units. "Phone4x internet access card" for USD 531,500 excluding VAT. The lot was delivered to Comitel's warehouse.

On August 23, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 548,000 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 19, 2004. Comitel's invoice was issued by Janne Bode.

5    On August 18, 2004, J Corp ApS invoiced Comitel 15,000 units. "Phone4x internet access card" for USD 797,250 excluding VAT. The lot was delivered to Comitel's warehouse.

On the same day Comitel issued a pro forma invoice for 14,500 units (remaining 500 units possibly sold in trade no. 2) to Unicorn Properties Ltd. for USD 794,600 (no VAT; invoice date unknown). The payment was received on August 18, 2004. The payment terms were C.O.D. (cash on delivery). Comitel's pro forma invoice was issued by Christina Evers.

6    On August 18, 2004, J Corp ApS invoiced Comitel 15,000 units. "Phone4x internet access card" for USD 797,250 excluding VAT. The lot was delivered to Comitel's warehouse.

On August 23, 2004, Comitel issued a pro forma invoice on the batch of two pro forma invoices to Unicorn Properties Ltd. for a total of USD 822,000 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisitions from Unicorn Properties Ltd. were dated August 19, 2004. Comitel's pro forma invoices were issued by Janne Bode.

7    On August 23, 2004, J Corp ApS invoiced Comitel 12,000 units. "Phone4x internet access card" for USD 637,800 excluding VAT. The lot was delivered to Comitel's warehouse.

On August 27, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 657,600 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisitions from Unicorn Properties Ltd. were dated August 24, 2004. Comitel's pro forma invoice was issued by Janne Bode.

8    On August 23, 2004, J Corp ApS invoiced Comitel 13,000 units. "Phone4x internet access card" for USD 690,950 excluding VAT.

400.392,24

800.784,48

800.784,48

1.201.914,17

1.201.914,17

968.148,51

1.048.827,55
**1885**

On August 27, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 712,400 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 24, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| 9 | On August 23, 2004, J Corp ApS invoiced Comitel 14,000 units. "Phone4x internet access card" for USD 744,100 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.129.506,60 |

On August 27, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 767,200 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 24, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| 10 | On August 23, 2004, J Corp ApS invoiced Comitel 14,500 units. "Phone4x internet access card" for USD 770,675 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.169.846,12 |

On August 27, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 794,600 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 25, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| 11 | On August 23, 2004, J Corp ApS invoiced Comitel 15,000 units. "Phone4x internet access card" for USD 797,250 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.210.185,64 |

On August 27, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 822,000 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 25, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| 12 | On August 23, 2004, J Corp ApS invoiced Comitel 15,500 units. "Phone4x internet access card" for USD 823,825 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.250.525,16 |

On August 27, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 849,400 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 25, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| 13 | On August 23, 2004, J Corp ApS invoiced Comitel 18,000 units. "Phone4x internet access card" for USD 956,700 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.452.222,77 |

On August 23, 2004, Comitel issued a pro forma invoice for the entire lot to Unicorn Properties Ltd. for USD 986,400 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 23, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| | | 1.306.597,08 |
| 14 | On August 26, 2004, J Corp ApS invoiced Comitel 16,000 units. "Phone4x internet access card" for USD 850,400 excluding VAT. The lot was delivered to Comitel's warehouse. | **1886** |

On August 31, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 876,800 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated August 31, 2004. Comitel's pro forma invoice was issued by Janne Bode.

| | | |
|---|---|---|
| | | 1.674.077,51 |
| 15 | On August 26, 2004, J Corp ApS invoiced Comitel 20,500 units. "Phone4x internet access card" for USD 1,089,575 excluding VAT. The item was delivered to Comitel's warehouse. | |

On August 31, 2004, Comitel issued a pro forma invoice for the lot to Unicorn Properties Ltd. for USD 1,123,400 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). Order

The requisition from Unicorn Properties Ltd. was dated August 31, 2004. Comitel's pro forma invoice was issued by Janne Bode.

IN EVERYTHING                                                    17.920.986,81

*November 2004*

| No. | Description | VAT DKK |
|---|---|---|
| 16 | On November 10, 2004, J Corp ApS invoiced Comitel 18,000 units. "Phone4x internet access card" for USD 783,000 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.156.334,40 |
| | On November 30, 2004, Comitel invoiced the lot to Aspen Group Limited for USD 806,400. The payment terms were cash on delivery (COD). The order requisitions from Aspen Group Limited were dated November 29, 2004. Comitel's invoice is issued by Janne Bode. | |
| 17 | On November 12, 2004, J Corp ApS invoiced Comitel 22,000 units. "Phone4x internet access card" for USD 957,000 excluding VAT. The lot was delivered to Comitel's warehouse. | 1.413.297,60 |
| | On November 23, 2004, Comitel issued a pro forma invoice for 20,000 units to Unicorn Properties Ltd. for USD 896,000 (no VAT; invoice date unknown) and on the same day invoiced 2,000 units to Unicorn Properties Ltd. for USD 89,600 (no VAT). The payment terms were C.O.D. (cash on delivery). Comitel's pro forma invoice and invoice are issued by Janne Bode. | |
| 18 | On November 12, 2004, J Corp ApS invoiced Comitel 15,000 units. "Phone4x internet access card" for USD 652,500 excluding VAT. The lot was delivered to Comitel's warehouse. | 963.612,00 |
| | On November 17, 2004, Comitel invoiced the entire lot to Aspen Group Limited for USD 672,000 (no VAT). The payment terms were cash on delivery (cash on delivery). The order requisition from Aspen Group Limited was dated November 15, 2004. Comitel's invoice was issued by Janne Bode. | |
| 19 | On November 12, 2004, J Corp ApS invoiced Comitel 27,000 units. "Phone4x internet access card" for USD 1,174,500 excluding VAT. The item was delivered to Comitel's warehouse. | 1.734.501,60 |
| | On November 19, 2004, Comitel issued pro forma invoices for the lot to Unicorn Properties Ltd. for a total of USD 1,209,600 (no VAT; invoice date unknown). The payment terms were C.O.D. (cash on delivery). The order requisition from Unicorn Properties Ltd. was dated 19. November 2004. Comitel's pro forma invoices are issued by Janne Bode | |
| | IN EVERYTHING | 5.267.745,60 |

The transactions concerned internet access cards worth a total of approximately DKK 92 million, which were resold to three companies located in Hong Kong and Indonesia. Based on the available invoice material, it is not possible to determine the nominal value of the traded cards, which provided access to websites with pornographic content. The Comitel company Comitel Consumer Electronics had previously traded prepaid cards, but not cards of the type in question.

During the trade between Comitel International A/S and J Corp ApS, J Corp ApS complied with agreed terms on delivery and payment etc. and Comitel International A/S paid a total of DKK 23,188,732 in VAT in these transactions.

**1887**

According to SKAT's statement, the total VAT paid by Comitel International A/S on the transactions with Solid Trading ApS, Trademark International ApS and J Corp ApS amounts to a total of DKK 144,080,700.

*7. The "yellow fever" case complex*

After the case was settled, the coherence of the trade chains was covered in a collaboration between SKAT, SØK and Kammeradvokaten.

UfR ONLINE

U.2016.1870H

It is undisputed that Peer Kølendorf could only have had knowledge of Comitel International A/S' own transactions and own circumstances in general.

*7.1 SKAT's investigations and the subsequent uncovering*

In September 2002, SKAT carried out an inspection visit at Solid Trading ApS regarding a specific trade transaction in connection with SKAT having received a request for assistance/request for verification from the British authorities stating that Solid Trading ApS had purchased goods from a British company which the British authorities suspected was involved in VAT fraud. At the request of the British authorities, SKAT thus obtained invoice material regarding Solid Trading ApS' trade with this company.

In a memo dated May 26, 2004, Kenn Hoffmann Jensen and Jørgen Eggert stated under the heading "Description of Solid Trading ApS' involvement in connection with the purchase and resale of computer components in Denmark":

"In the period from December 2002 until November 2003, the undersigned had, partly on the basis of a request from the

Copyright © 2023 Karnov Group Denmark A/S

English authorities and partly on its own initiative reviewed the company's purchase and sale transactions and payments.

It soon became clear that during that period the company had almost exclusively purchased computer components from British companies involved in VAT carousel deals and resold these computer components to an Italian company.

The status of this part of the case is currently awaiting answers from the UK and Italian authorities. The answers are expected to provide a picture of the company's knowledge of and participation in VAT fraud in England."

In March 2003, SKAT carried out another inspection at Solid Trading. Due to the nature of the goods traded by Solid Trading ApS, the rapidly growing turnover of Solid Trading ApS and the verification requests received from England, SKAT then initiated an increased monitoring of Solid Trading ApS. Solid Trading ApS had no VAT arrears to SKAT, as the company during this period primarily bought from and sold to other EU countries with the effect that these transactions were VAT neutral.

The ongoing monitoring of Solid Trading ApS meant, among other things, that in connection with the quarterly payment of any negative VAT to the company, it was checked whether the conditions for releasing the VAT were present. The purpose of the payment control was also to monitor whether the company initiated imports from third countries with subsequent domestic sales, or whether the company made domestic purchases of goods with subsequent export to the EU or third countries, as there was a risk that the company could accumulate either a significant VAT arrears, which potentially would not be settled, or a significant negative VAT response and thereby potentially incur a loss for SKAT.

In October 2003, Peer Kølendorf submitted information to SKAT that Solid Trading ApS was a new supplier, and Comitel submitted monthly purchase invoices from Solid Trading ApS together with other purchase invoices in connection with Comitel's wish to obtain an accelerated payment of the monthly negative VAT response. In January 2004, based on Solid Trading ApS' VAT returns for October, November and December 2003, SKAT established that Solid Trading ApS had had significantly higher domestic sales of goods than previously. SKAT therefore began a reconciliation of the sales VAT declared by Solid Trading ApS by reviewing the company's sales invoices, whereby it was established that Solid Trading ApS had begun selling to Comitel International A/S in November 2003 and that it was this trade that justified Solid Trading ApS' VAT declarations.

In connection with the reconciliation of Solid Trading ApS' sales VAT, SKAT also obtained invoice material from Comitel International A/S regarding the company's resale of the goods received from Solid Trading ApS.

On January 12, 2004, SKAT's Economic Crime Department held a meeting with SKAT Copenhagen regarding the trade, and on January 19, 2004, SKAT visited Comitel International A/S and requested documentation regarding the trade with Solid Trading ApS. SKAT's review of the material obtained showed that Solid Trading ApS had acquired the goods sold to Comitel International A/S from Trademark International ApS. However, these transactions were essentially VAT neutral for Solid Trading ApS, and no arrears arose until later in the process. Furthermore, Solid Trading ApS continuously and in a timely manner declared its VAT liability. In the first chain of trade covered by this case, the missing trader was Network Trading ApS, and in the subsequent criminal case against T and others, SKAT's employee Kenn Hoffmann Jensen gave testimony and stated the following:

"In January 2004, Customs & Tax realized ... that something was very wrong in a company called Network Trading. It had purchased goods from several Hong Kong companies

**1888**

and sold them on to Trademark, which in turn had sold on to Solid. Solid had sold on to Comitel, which had resold the goods to companies in Hong Kong. When they realized how things were connected, they sat down with their colleagues from Køge.

...

They compared the information from Køge with that from Copenhagen and could see that it was a chain trade."

In connection with the inspection of Network Trading ApS, SKAT found that this company had purchased CPU units from Quantum, a company domiciled in Hong Kong, and then resold these to Trademark International ApS. This information, combined with the information from the review of Comitel International A/S' sales invoices, showed that Comitel International A/S' customers were partly identical to Network Trading ApS' suppliers.

Based on this, SKAT set up a steering group whose purpose was to coordinate cooperation on the pending control cases and assess the control initiatives from SKAT. The steering group consisted of persons from SKAT (the Economic Crime Department and the relevant tax regions), the Danish Customs and Tax Administration, SØK (as investigating authority) and Kammeradvokaten (as attorney in bankruptcy estates and as the state's lawyer) and held its first meeting on March 16, 2004. The minutes of this meeting show, among other things, that the procedure for the "new" VAT carousels was discussed. The steering committee met again on June 2 and June 28, 2004, where it was discussed which strategy to choose in relation to the companies involved.

At that time, SKAT was only aware of the supply chains surrounding Network Trading ApS and the loss threatening this company in March 2004, and the focus was thus mainly on Network Trading ApS and on ensuring that a similar company did not arise after the termination of Network Trading ApS' activities that could potentially cause SKAT a loss. The purpose of the follow-up inspection of Solid Trading ApS was therefore to counteract the risk of SKAT again being faced with a loss in a new importing company.

SKAT found that in February and March 2004, Solid Trading ApS generated and declared a positive VAT return of approximately DKK 28 million. The VAT return for February 2004 totaling DKK 11,523,725 was due on 25 March 2004. The payment for March 2004 was due on April 26, 2004. Solid Trading ApS did not declare VAT for March 2004, and a preliminary assessment was therefore made with a corresponding amount of DKK 500,000, which was subsequently replaced by a supplementary declaration of DKK 17,096,500.

In mid-March 2004, at SKAT's request, the customs control stopped a consignment of RAM modules and a consignment of CPU units at Copenhagen Airport, which Solid Trading ApS had imported from the company Asia Time Technologies Ltd. which was also one of Comitel International A/S' customers. At the time of the inspection, these goods, which were subsequently found to be dummies, had been resold to Comitel International A/S.

Solid Trading ApS issued a credit note to Comitel International A/S regarding these goods, which were never delivered to Comitel International A/S.

From this point in time, the commercial activity of Solid Trading ApS ceased, and on March 23, 2004, SKAT received a telephone message from the bookkeeper at Solid Trading ApS stating that, as a result of the detention of the consignment at

Copenhagen Airport, the company

did not feel able to pay the company's VAT liability, which at the time amounted to DKK 11 million for February 2004 alone.

Based on the overdue VAT arrears, the justified doubt about the quality of the goods and the fact that Solid Trading ApS according to its accounts was without sufficient assets, SKAT filed the

On March 31, 2004, a bankruptcy petition was filed against the company, and the company was declared bankrupt on April 21, 2004.

At the time, Peer Kølendorf was not aware of the real reason for Solid Trading's bankruptcy, as Solid Trading ApS simply stated that they had paid for goods and then been cheated by the supplier as the reason for the bankruptcy.

After Solid Trading ApS' bankruptcy, the trustee, represented by attorney Boris Frederiksen, began his own investigations into the trading process. Attorney Boris Frederiksen gave testimony during the criminal proceedings against, among others, T and stated below:

"[The bankruptcy estates of Network Trading ApS and Solid Trading ApS] decided to pursue the claims in Hong Kong [i.e. the unfulfilled claims] that caused the bankruptcies] and had discussions with the management of the bankrupt companies. If it was a VAT carousel arrangement, it was in a different way than previously seen." In a memo dated July 1, 2004 to SKAT managers east of the Great Belt, the steering committee stated that it feared that Roxy World Trading ApS, which at that time had no arrears to SKAT and which continuously declared and paid VAT on time, could be the next importer company in the case complex that could not pay its VAT liability when due. This company was the importer company in the trading chain in which Comitel International A/S purchased goods from Trademark International ApS in June 2004. On July 1, 2004 Roxy World Trading ApS thus failed to pay the sales VAT on the goods that were sold to Comitel three sales stages later, which sales VAT had to be paid to SKAT at the end of July 2004. The invoice used for the payment of

**1889**

The company had used the cash in the VAT return to purchase goods/IT components from an English supplier. Immediately after these goods/IT components had been delivered to Roxy World Trading ApS, the company stated that it had been subjected to a robbery at the company's address, whereby the delivered goods were stolen. The steering committee's memo of July 1, 2004 also states:

"At the meeting, SØK stated that there was no basis for initiating a police investigation against all the companies involved...

Since SØK could not enter the case on the present basis, it was decided that ToldSkat would work towards an administrative decision (the so-called Bond house model) against Comitel (the broker).

The group must therefore point out that while working towards an administrative decision, VAT will continue to be paid to Comitel.

At the time when a possible decision is made, the consequence must be that the payments to Comitel will be stopped. The Chamber's lawyer has pointed out that this may result in a not insignificant claim for damages against the state treasury."

The alleged robbery against Roxy World Trading ApS on July 21, 2004 allegedly resulted in Roxy World Trading ApS not being able to pay the sales tax to SKAT on the due date. After the completion of the criminal investigation of the VAT fraud, the robbery turned out to be a fake in order to justify/legitimize the

non-payment of sales tax to SKAT. As Roxy World Trading ApS was unable to pay the VAT due, the company was declared bankrupt by the Bankruptcy Court in Roskilde.

SKAT's and SØK's investigations revealed that in the period from 1 November 2003 until the end of November 2004, a number of persons had conspired to organize a number of transactions in which a number of Danish companies (Network Trading ApS, Solid Trading ApS, Roxy World Trading ApS, J. N. Trading v/D and C. B. Trading v/E) had imported IT components and, at the end of the case period, pornographic cards to Denmark primarily from the Far East and in a few cases from other EU countries, which had subsequently been sold to two Danish brokers, Comitel International A/S and Plug & Play A/S, respectively, via transactions between intermediary Danish companies and then sold to the Far East.

These transactions meant that the importing company, e.g. Network Trading ApS, received a VAT refund corresponding to the sales VAT collected on the domestic sales. This VAT refund was declared to the tax authorities, but never paid, as the persons behind the fraud conspired to set up events that would appear to subsequent investigations as extraordinary commercial risks, which meant that the company in question was unable to pay the VAT due at the time the VAT amount fell due.

The VAT due amounted to an estimated DKK 92 million for Network Trading ApS, an estimated DKK 30 million for Solid Trading ApS, an estimated DKK 12 million for Roxy World Trading ApS, an estimated DKK 12 million for J. N. Trading v/D
- estimated DKK 25 million and C. B. Trading v/E - estimated DKK 30 million - or a total of almost DKK 200 million.

SKAT refunded VAT to the company that, as the last Danish link in the trade chain, acquired the goods and paid the VAT to its suppliers to subsequently re-export the goods without charging VAT to the Far East, which in the transactions covered by this case was Comitel International A/S. The VAT paid to the supplier was refunded by SKAT the following month.

The transactions in Denmark included the companies Network Trading ApS, Solid Trading ApS, Roxy World Trading ApS, C. B. Trading v/E, J. N. Trading v/D, Trademark International ApS, Plug & Play A/S, J Corp ApS and Comitel International A/S.

The foreign companies involved in the transactions, which after the criminal investigation proved to be controlled by the same group of persons, included the companies Espace IT B.V., the Netherlands, Asia-Power Solution Gmbh, Switzerland, Asia Time Technologies Ltd, Hong Kong, Aspen Group Ltd, Hong Kong, Dream Automobiles Ltd, England, Empire Ornaments & Jewellery, Hong Kong, Fusion R., Singapore, Gala Technology, Hong Kong, Global Way Enterprise Ltd., Hong Kong, Global Crown Technologies Ltd., Hong Kong, Ideal hardware Ltd., Hong Kong, Isotech International Corporation, British Virgin Islands, Mass Gain Pacific Ltd, Maximum Evolution, Hong Kong, Maximum Evolution PTE Ltd, Singapore, Microtronica Ltd, British Virgin Islands, Network Trading Co. Ltd, Quantum Network Asia, Remy Ltd, Roxy World Trading Co. Ltd, and Uni-corn Properties Ltd.

In a number of "Yellow Fever" transactions, it was found that Comitel International A/S' customer in the Far East repurchased exactly the same type and number of goods that the Danish importing company had purchased from Comitel International A/S' customer. In addition, in a number of the transactions in the case, it was found that the addresses, fax numbers, director and bank account numbers of the original supplier and the final buyer (Comitel International A/S' customer) coincide.

During SKAT's investigations, the trustee's processing of the Danish bankruptcy estates in question and the Public Prosecutor for Serious Economic Crime's investigation in the criminal case, it was found that a number of people,

**1890**

including B (Solid Trading ApS), F (Trademark International ApS), T (Comitel International A/S), C (J Corp ApS and C Trading AB), E (C. B. Trading), D (J. N. Trading), I (Network Trading ApS), G (Roxy World Trading ApS) and H (a number of the foreign companies) had jointly conspired to arrange the relevant transactions with the aim of retaining in the Danish importing companies the VAT amounts which subsequent members had paid to the companies. These VAT amounts were evaded from the companies, which meant that none of the Danish importers/companies in question were able to settle the VAT liability at the due date. The evasion was attempted to be concealed by establishing a number of extraordinary commercial risks, either through prepayments, payment for dummy/worthless goods, robberies or fictitious loans to companies located in China and Taiwan.

From August 2004, SKAT assessed whether it was possible to withhold Comitel International A/S' VAT response, i.e. to withhold the company's VAT deduction, but only found a basis for this when a proposal for a decision to deny the deduction was submitted on December 6, 2004.

*7.2 Solid Trading ApS*

In the period from B's acquisition of the company until November/December 2003, the company's main activity consisted of purchasing IT components from sellers in England and subsequently reselling these to an Italian company.

However, from November 2003 until the end of March 2004, Solid Trading ApS changed its buying and selling pattern, as it purchased IT components, CPU units/RAM blocks, from Trademark International ApS, which originated from the Danish company Network Trading ApS' import of the products in question from a number of companies in Hong Kong and Singapore. The goods purchased by Solid Trading ApS from Trademark International ApS were resold to Comitel International A/S, which then sold the goods in question to a number of buyer companies in Hong Kong and Singapore, which to a certain extent were identical to the companies that had originally sold the goods to Network Trading ApS.

The "missing trader" company, i.e. the company in which the evaded sales VAT was deposited, in the trading chains in which Comitel International A/S purchased goods from Solid Trading ApS, was the company Network Trading ApS in 34 of the transactions in the first trading chain. In the remaining transactions in the first trade chain, the "missing trader" company was Solid Trading ApS.

Solid Trading ApS' sales VAT to SKAT (approx. DKK 88.5 million) arising from the goods that the company invoiced to Comitel International A/S in November 2003 - January 2004 was largely offset by Solid Trading ApS' purchase VAT on the goods that Solid Trading ApS purchased from Trademark International ApS during the period. The very limited "difference" for the period was paid. The company did not pay the sales VAT for February and March 2004 to SKAT (approximately DKK 26.3 million). Due to the new method of purchasing goods in the Far East, the company had assumed the role of "importing company" and thus had no purchase VAT to deduct in the VAT return.

In the spring of 2004, Solid Trading ApS went bankrupt because the company had made prepayments for goods that turned out to be worthless. This was discovered when the consignment was stopped in connection with customs control at Copenhagen Airport in March 2004. SKAT has filed a claim of DKK 28,877,861 against Solid Trading ApS in bankruptcy.

*7.3 Trademark International ApS*

In the chain of trade in which Comitel International A/S purchased goods from Trademark International ApS, the "missing trader" company was Roxy World Trading ApS. Trademark International ApS was

briefly converted into a limited liability company on January 1, 2005, before the company was again converted into a private limited company on March 2, 2005. F was the company's director until October 3, 2006. He was also a member of the Board of Directors during the short period when the company was registered as a limited liability company. The company has most recently submitted an annual report for the financial year 2004/2005.

Trademark International ApS was placed under compulsory dissolution on January 8, 2007 on the basis of a compulsory dissolution petition from the Danish Commerce and Companies Agency on the same date. A bankruptcy decree was issued on February 20, 2007. SKAT has not filed a claim in the bankruptcy estate, as the evaded sales VAT in this trade chain was deposited in the importing company, Roxy World Trading ApS. During the period, Trademark International ApS largely offset the sales VAT arising from the sale to Comitel International A/S with the purchase VAT arising from the purchase from Roxy World Trading ApS.

*7.4 J Corp ApS*

J Corp ApS last submitted an annual report for the financial year 2004/2005. Mr. C remained CEO until the time of submission of the petition for compulsory dissolution on 16 April 2007.

C was also the owner of the Swedish-registered company C Trading AB, which was also involved in the trade with Solid Trading ApS.

In August and November 2004, J Corp ApS purchased internet access cards worth approximately DKK 92 million from J. N. Trading v/D. The internet access cards were imported by J. N. Trading v/D imported from a number of companies based in the Far East. They were Internet access cards that provided access to Internet websites with

**1891**

pornographic content, was subsequently resold by J Corp ApS to Comitel International A/S.

In the chain of trade where Comitel International A/S purchased goods from J Corp ApS, the "missing trader" company J. N. Trading v/D. J Corp ApS was placed under compulsory dissolution by the probate department of the Maritime and Commercial Court on May 7, 2007, and a bankruptcy order was issued on June 25, 2007. SKAT has filed a claim for DKK 31,212 in the bankruptcy estate, as the evaded sales VAT in this trading chain was deposited in the importing company J. N. Trading v/D.

J Corp ApS paid the sales VAT that the company invoiced to Comitel International A/S to SKAT.

*7.5 Other Danish companies*

Network Trading ApS was founded on October 20, 2003 and went into suspension of payments on February 17, 2004 and was subsequently declared bankrupt on May 17, 2004. The company's director was a Singaporean-Chinese immigrant to Denmark, I.

In the period from November 2003 until the suspension of payments, the company operated as a trading company with purchase and resale of IT components (CPU units and RAM modules). Net- work Trading ApS' purchases from companies in Hong Kong and Singapore during the period amounted to approximately GBP 33.7 million. The goods were part of the trading chain with Trademark International ApS, Solid Trading ApS and Co- mitel International A/S, which ultimately sold the goods to customers in the Far East.

Before the suspension of payments and the subsequent bankruptcy, the company's auditor and the company's director, I,

traveled to Hong Kong in order to collect the receivable from the prepayment made to Quantum. SKAT was thus met with a real business reason why the company was unable to pay its arrears to SKAT on the due date of February 10, 2004. In order to explore the possibility of recovering the prepaid amount, CEO I agreed with SKAT to allow the company to enter into suspension of payments. Efforts were initiated to recover the amount, and Quantum offered Network Trading ApS to pay the amount over 18 months, as the company

Copyright © 2023 Karnov Group Denmark A/S

had used the prepaid amount to pay various suppliers.

Network Trading ApS' auditor stated in his testimony during the criminal proceedings against T, among others, that he and the auditor for Plug & Play A/S had jointly investigated whether there was any overlap, which he could not establish. SKAT has filed a claim for DKK 92,750,144 in Network Trading ApS in bankruptcy.

J. N. Trading was a business personally run by D, which was registered for VAT on August 1, 2004.

Between August and November 2004, the company imported Internet access cards that provided access to websites with pornographic content from Maximum Evolution, Hong Kong. In August 2004, 279,372 cards were delivered, all at a unit price of USD 52.50, while in November 2004, 104,307 cards were delivered at a unit price of USD 42.00. J. N. Trading resold 283,500 of the purchased internet access cards to J Corp ApS. Of these

201,500 cards were sold in August 2004 at a unit price of USD 52.75, while 82,000 cards were sold in November 2004 at a unit price of USD 42.75. The sales price according to the invoices issued by J. N. Trading to J Corp ApS amounted to USD 17,668,281.25, corresponding to DKK 105,715,116.53 including VAT.

J Corp ApS subsequently resold all the acquired internet access porn cards to Comitel International A/S, which thereby obtained a deduction for VAT paid to J Corp ApS of DKK 23,188,732.

In terms of VAT, the transactions were largely neutral in J Corp ApS.

D was declared bankrupt on July 5, 2005, and SKAT has a receivable from the bankruptcy estate regarding unpaid sales VAT for Q3 2004 of DKK 17,707,447 and for Q4 2004 of DKK 5,176,922. SKAT has thus notified claims for DKK 24,372,461 in the bankruptcy estate.

Roxy World Trading ApS was founded on December 10, 2003 by G, who was also the director. From February 17, 2004 to August 9, 2004, the company operated as a trading company purchasing IT components from Hong Kong, which the company resold to Solid Trading ApS. The company never submitted an annual report and was declared bankrupt on August 9, 2004. As mentioned, the bankruptcy was due to the fact that the company, contrary to the truth, stated that it had been subjected to armed robbery and was therefore unable to pay its debt to SKAT. SKAT has filed a claim in the bankruptcy estate for DKK 12,350,178.

C&B Trading was a company run by E personally, which was registered on October 8, 2004. The company was deregistered with SKAT on February 2, 2005. However, the company was effectively discontinued at the beginning of December 2004, at which time the last of a total of 32 transactions carried out by C&B Trading for a total value of approximately DKK 130 million including VAT was completed. The company's activities consisted of trading in IT components purchased from a Dutch supplier and subsequently resold to Trademark International ApS. E was declared bankrupt on March 15, 2005, and SKAT has filed a claim of DKK 29,499,264.62 in the bankruptcy estate.

*8. The curation of the traded goods, product names as well as pricing and payment*

**1892**

During the proceedings, it was agreed that the transactions in chain 1 included both genuine goods and dummies, that the goods in chain 2 were stairs and that the transactions in chain 3 included genuine goods.

In several of the transactions covered by the case, there are differences in the sales designation appearing in the invoice material and in the purchase orders. In some of the invoices, the generally formulated sales descriptions "Samsung Branded Dice" and "Infinion TSOP" were used, which PricewaterhouseCoopers in a statement of March 29, 2006 to SKAT considered insufficient to identify existing products.

ter. However, the specific product designations appear to a certain extent in purchase orders.

It has also been stated that the product name "Intel Pentium 4 3.0 Ghz 533 Mhz" on purchase orders and invoices in trade no. 14 is not correct, as Intel does not have a product with the stated specifications. In certain other trades, a correct product description has been used

- "Intel Pentium 4 3.0 Ghz 800 Mhz" and a goods inspection confirming this. Regarding the pricing of Intel CPUs, SKAT has, based on an analysis of the transactions and information obtained from Intel, stated that Comitel International A/S in several cases made purchases at prices higher than Intel's list prices. Peer Kølen- dorf has stated that market prices on the broker market cannot be compared with list prices for distributor companies and has also disputed SKAT's basis of calculation and conclusion.

The internet access cards are stated on purchase and sales invoices with the designation "Phone4x internet access cards" without any indication of nominal value. In a report dated July 19, 2005 from Nordisk Erhvervs Vurdering containing an assessment of internet access cards from the bankruptcy estate of JN Trading, it is concluded that the websites to which these cards gave access were largely outdated, of poor quality and out of order. Furthermore, the websites infected the user's computer with viruses. The report also states that the profit margin on the cards between wholesaler and retailer was likely to be no less than 200% and the cards would subsequently be sold to the end user at face value.

There were no third-party payments in the "Yellow Fever" trades, while this was the case for some of the other trades. In some of the "Yellow Fever" trades, payments were split. In one case - transaction no. 35 - the goods were handed over before approximately DKK 20 million, corresponding to approximately half of the total sales price, had been paid. During the criminal proceedings, T explained that this was because there was a good relationship with the customer and that it was sometimes necessary to take a risk.

*9. SKAT's proposed decision of December 6, 2004*

On December 6, 2004, the Copenhagen Tax Center sent a proposal for a decision to Comitel International A/S for the collection of DKK 191,488,442, which was based, among other things, on the result of a control initiated in March 2004 regarding transactions in which Solid Trading ApS, Network Trading ApS, Trademark International ApS and the company Comitel International A/S had participated.

Of the amount claimed, DKK 114,761,052 related to a refund of purchase VAT for transactions with Solid Trading ApS in the VAT periods from November 1, 2003 to March 31, 2004, while DKK 76,727,390 related to an unapproved VAT-free sale made in the VAT periods from January 1, 2002 to July 31, 2002, which has no connection with this case.

SKAT's proposed decision presupposed that the refund/refusal of deduction of purchase VAT should be based on an objective finding that the transactions - according to SKAT - were part of a "closed circuit" and were "without economic reality", as in SKAT's opinion it was irrelevant whether Comitel International A/S had been subjectively aware that the preceding parties had intended not to pay sales VAT.

At the time, a case was pending before the European Court of Justice (Joined Cases C-354/03, C-355/03 and C-484/03, Bond house) on the question of which objective and/or subjective conditions must be met in order for the tax authorities to deny deductions, so SKAT's final decision awaited the Court's decision.

*10. Comitel Group's response to the consultation*

On January 31, 2005, Comitel's lawyer at the time submitted a consultation response on behalf of Comitel International A/S in continuation of SKAT's proposed decision. The consultation response states, among other things:

"In 2003, the board decided to expand the product range with IT parts. The background for this decision was mainly due to the fact that the company had considerable insight into logistics and has "spot trading" in connection with the sale of products such as mobile phones, which are sold very quickly and frequently, so that a lot is often sold to a buyer before the lot has been physically delivered to Comitel. In connection with the Board's decision, an employee was assigned to Comitel with special insight into trade in IT parts.

...

In connection with any contact with a new supplier or a new customer, Comitel follows a fixed procedure for investigating the supplier's/customer's circumstances. Comitel thus examines, among other things, the customer's registration conditions with public authorities, financial conditions and takes references on the customer.

Furthermore, since 2001, Comitel has in every case when trading with a new supplier/customer, followed every single point that appears in the British customs authorities' so-called Code of Conduct,

**1893**

which has been drawn up in cooperation between the British authorities and the British mobile phone industry. A copy of the memorandum of understanding between HM Customs and Excise and the Mobile Phone Industry containing the Code of Conduct is attached as Appendix 2.

...

Throughout the years, Comitel has had good contact with Customs Tax, as it has been important to comply with all rules. It has been discussed at board level whether Comitel should be on the international market, as anyone with a minimum of experience knows that there are companies among buyers and sellers that establish VAT carousels.

Comitel decided several years ago that, as a very old player in the market for mobile phones in particular, it should not leave this market just because problems with VAT carousels have arisen, but naturally ensure that all rules were followed and that any suspicion of VAT carousels should lead to rejection of customer or supplier relationships.

Customs Tax has always received many inquiries from Comitel stating companies and circumstances that could indicate VAT fraud. If Comitel has been offered goods cheaper than on the world market, Customs Tax has been informed. However, Told Skat has not been able to respond with warnings not to trade with certain companies, but Comitel has understood from Told Skat that they have often been pleased with the information they have given Told Skat when they have experienced situations that could indicate irregularities. For several years, Comitel has emailed lists of all new customers and suppliers month by month to help Customs Tax follow developments and intervene in time. Over the past six months, however, Comitel has experienced a more confident attitude from Customs Tax, as something that could indicate, according to Comitel's information, an attempt at VAT fraud, has been answered with Comitel buying or selling if the formalities (VAT numbers etc.) were in order.

For many years, Comitel has nevertheless found that a certain percentage, perhaps 10-20% of international trade, has in one way or another been linked to VAT carousels. There have been a number of visits, especially from UK Customs/Excise, where Comitel has been able to provide correct documentation for compliance with VAT rules, but where a link in the trade chain, according to the UK authorities, has not fulfilled its VAT obligations.

With reference to what has been described above, Comitel nevertheless believed that it was unreasonable to close all international trade because only a part of this trade is included in the VAT car-

fraud. Therefore, the Board of Directors has periodically supported the continuation of the company, observing all the checks and balances that it is possible for a private company to carry out.

...

3. Trading with Solid Trading ApS

3.1 The emergence of trade

At Comitel, Solid Trading's name was often seen on the internet on the website www.internationalcomputerbrokers.com. This site is a site where companies in the IT parts market can find out if there are goods to buy and sell.

In 2003, Comitel hired a new employee who had previously worked for the company Bluecom. Bluecom is a company that trades in IT parts. The employee was assigned to Comitel in order to strengthen Comitel's trade in IT parts. The employee in question knew B, who was the owner of Solid Trading, as the employee had been a colleague of B at Bluecom.

After several meetings at both Comitel and Solid Trading, and studies about Solid Trading in the industry, as well as - not least telephonic contact with Customs & Tax, which had no comments on this - the trade with mobile phones and IT components started.

The business with Solid Trading was continuously expanded. Solid Trading had good contacts with IT suppliers, as B had been in the industry at Bluecom for several years and thus had connections to suppliers who could deliver goods in large volumes. Regarding the cooperation with Solid Trading, it should be noted that all agreements on deliveries and payments were respected. At times, Comitel bought goods that Solid Trading had customers for, so that Comitel was sometimes a supplier to Solid Trading. The trade thus went both ways, as is often seen in the industry.

...

3.3 Control of goods and inspections by buyers of goods

The goods were often delivered to Comitel's warehouse on hammershusgade

11. They were delivered by 3x34 or the freight forwarder, Kühne & Nagel. In some cases, the goods were delivered at Kühne & Nagel and Comitel gave Kühne & Nagel instructions on where to send the goods.

The goods were counted on arrival and the item numbers and sealing of the goods were checked, as the seal has a major impact on the price of the goods. For example, an open box of CPUs will often be 2-3% cheaper than a closed box directly from the supplier. At Comitel, T was responsible for the IT parts business. During the period, Comitel received almost daily shipments of goods from Solid Trading. Every day, T - sometimes together with an employee - checked the goods received. In each case, he made sure that the right goods had been delivered and that the quantity was correct.

**1894**

When goods were delivered in sealed boxes, the seal was not broken, as the goods are traded on the condition that they are "sealed boxes", i.e. delivered in an unbroken and sealed package.

At the beginning of the trading relationship with the Hong Kong company (Fusion R), a representative of the company to which Comitel supplied IT parts came three or four times from Hong Kong. He checked the goods at Comitel's warehouse at 11 Hammer Street. He made sure that the goods were as agreed. This was done before shipment and payment to Solid Trading, because both Comitel and Comitel's customer wanted to be sure that they were real goods that could be used in the usual way.

3.4 trading with others than Solid Trading

Comitel has been trading with companies from the Far East for a long time and has many contacts and long relationships there.

Comitel is contacted daily by new customers from all parts of the world. Contact with customers in Hong Kong is made by email and telephone, after which Comitel visits Hong Kong at the same time as the annual electronics fair, which Comitel has attended for many years to find new customers and suppliers. Comitel also visits old business partners in Hong Kong.

It is also important for Comitel to have visited its high-volume customers, as there will sometimes be credit to these customers due to time differences and as prices vary a lot within a short period of time.

All goods are shipped from Denmark with freight forwarders from Comitel's own warehouse or from one of Comitel's freight forwarders' warehouses. Insurance has also been paid for the transports.

...

4. Comments to Customs Tax's presentation of the case

...

4.2.1.2. Comitel not part of other VAT carousels

On page 4 of the statement of case, Told Skat states that Told Skat is "not aware that Comitel has previously made transactions of the nature described in this statement of case". If what Customs Tax refers to with the term "transactions of the nature described in this statement of case" are transactions that can be assumed to be part of a VAT carousel, Comitel is satisfied with such a statement. Comitel has at no time - not even in connection with the purchases from Solid Trading A/S - had knowledge of or had reason to assume that the company was party to transactions that may be part of a possible VAT carousel.

...

4.2.1.4 Knowledge of the links in the supply chain

Furthermore, Told Skat states on page 4 of the statement of case that Solid Trading ApS has purchased the goods resold to Comitel by the companies Network Trading ApS and Trademark International ApS. It should be noted that Comitel - as usual - had no knowledge of who Solid Trading's suppliers were. It is quite natural that a supplier does not provide its trading partner with information about who the supplier's suppliers are. Comitel has thus had no knowledge of the origin of the goods it purchased from Solid Trading A/S.

4.2.1.5 Control of goods

As mentioned, Comitel has inspected the goods received. Comitel is therefore puzzled that Customs Tax in the case presentation on page 15 states that Comitel, upon request, has stated that the company does not perform physical inspection of the goods, and that Comitel should have directly stated that it does not perform any actual goods inspection of the purchased batches of goods.

Comitel does not understand where Customs Tax got the information in question. Comitel has even informed Customs Tax in a letter dated July 8, 2004, which is attached as appendix 11, as follows about the inspection of the goods received:

"We usually do a physical check upon receipt of goods. This varies greatly depending on the goods and suppliers involved. IT components are randomly checked but not when unpacking the original sealed packaging, as the goods lose value. Mobile phones are also randomly checked. The checks are carried out either by our own staff or by the freight forwarder (for a fee). If we have had a long-term business relationship with the supplier, the control measures are relaxed over time if no errors have been found for a long time. In the period from January 1, 2002 to June 29, 2004 we have not changed the control procedure."

Furthermore, Customs Tax states on page 15 of the case presentation that

"it is a product that is not included on Comitel's website

Copyright © 2023 Karnov Group Denmark A/S

as part of the company's usual product range and which are not offered for sale like their other products".

It is not clear which "goods" Customs Tax is referring to, but Comitel assumes that Customs Tax is referring to IT parts (i.e. CPU, RAM and TSOP. It is true that you cannot find these items on Comitel's website. This is due to the fact that Comitel compiles the information about the product range on the website based on an assessment of which products in the range are of interest to the general public. As mentioned, Comitel's range of IT parts is only of interest to business-to-business customers. In addition, the website is not aimed at customers and suppliers to Comitel International A/S, but at Comitel's Danish sales and Comitel's export of primarily hobby electronics products. There is not yet a website for Comitel International A/S.

**1895**

Furthermore, the purpose clause in the articles of association of Comitel International A/S states that the company trades in IT parts.

On pages 8-9 of the statement of case, Told Skat states that in a case where Told Skat carried out an inspection of each of the goods included in a transaction, it was found that goods sold by Solid Trading ApS to Comitel were "fake/dummy". In this connection, it is stated that the goods were found to be either worthless or counterfeit.

As stated by Customs Tax, this has been a single case of the many transactions that have taken place between Solid Trading ApS and Comitel. In all cases where Comitel has carried out a check of the goods - which happened in the vast majority of the transactions, cf. the notes above - Comitel has, by checking the factory-sealed boxes of goods, been able to establish that the contents of the boxes corresponded to the goods covered by the transactions. The example shows that checks have been carried out."

At the time of the preparation of the consultation response, T was CEO of Comitel International A/S and in this capacity he participated in the preparation of the response together with Peer Kølendorf and the company's advisors, and he also participated in meetings with SKAT together with Peer Kølendorf and the company's advisors.

*11. SKAT's decision of July 20, 2006*

Following the European Court of Justice's judgment of January 12, 2006 in the joined cases Optigen Ltd (case C-354/03), Fulcrum Electronics Ltd (case C-355/03) and Bond house Systems Ltd (case C-484/03) v Commissioners of Customs & Excise, SKAT prepared the decision of July 20, 2006 to deny deductions based on a subjective model, where the authority based on the European Court of Justice judgment emphasized that Comitel International A/S had or could have known the nature of the transactions.

In the decision, a claim was raised against Comitel International A/S for repayment of a total amount of DKK 220,808,090. As stated in the proposed decision of December 6, 2004

DKK 76,727,390, including a case that is not related to the transactions covered by this case, as it concerned an additional charge for an unapproved VAT-exempt export sale made in the VAT periods from January 1, 2002 to July 31, 2002.

SKAT's decision is stated under the heading "Conclusion/preliminary decision":

"In SKAT's opinion, given the nature of the consignment of goods stopped at Copenhagen Airport in March 2004 and the fact that they turned out to be dummies, it is legitimate to question whether existing goods were actually circulated in the previous transactions or whether the transactions only included similar dummies.

On the basis of the checks SKAT has carried out on the transactions in question, it has not been possible to establish whether

the goods Comitel has traded in have been real and thus actually existed.

...

The "fictitious nature" of the transactions is supported by the fact that both the companies Network Trading ApS and Comitel A/S appear to have been incorporated for the purpose of establishing an anonymous "garbage can company", Network Trading ApS, and for the purpose of obtaining an expected problem-free payment of the negative VAT liability in connection with Comitel A/S' re-export of the goods in question to the Far East.

This is further supported by the trade patterns followed, where goods are shipped to Hong Kong from Denmark, despite being originally produced in China.

In 4 of the trades, it can be objectively established that Comitel's customer is repurchasing the same batch of goods that they themselves have sold to Denmark (trade no. 4, 5, 7 and 8), and thus it can be established that Comitel's customer has had no real business reason and thus a need to repurchase the goods, and this is done at a much higher price than what they were originally sold for.

In SKAT's opinion, it has not at any time been the intention that the goods in question should be sold at the retail level. This is supported by the fact, according to what has been verified, the goods have not been suitable for such a sale.

Finally, it can be seen that in 4 of the 47 trades analyzed, there was a completely closed circuit. In addition, there are 14 trades where it is highly likely that there is a closed circuit, as the trades are between companies where the original supplier to and the final buyer from Denmark have the same address, fax number and in one case the same director and bank account number.

SKAT assesses that the remaining 32 trades, where the actual trading pattern and participants coincide with the other trades, have not been sold at a retail price either. In all the trades, goods are sold back to Hong Kong at a higher price than they were originally sold to Denmark for.

Comitel has also been the only company that has maintained a real profit margin.

The trades were thus carried out solely to evade VAT, where Comitel was "paid" for its participation by being able to obtain a profit on the goods. The stated intention of the trades is supported by the previously mentioned flow chart found on Solid Trading's computer.

**1896**

Based on the above circumstances, SKAT cannot consider the transactions carried out to be real.

If Comitel cannot prove that there have been both real goods and real trading partners, it is SKAT's opinion that the right of deduction can be excluded for that reason alone.

If Comitel proves that the invoices in question reflect real trade in goods, it is SKAT's assessment that deductions for the transactions with Solid Trading ApS can be denied, as Comitel had or could have been aware of the intention of Comitel's trading partners and/or the fraudulent nature of the transactions that were either prior to or after the transactions that Comitel itself carried out.

...

The assessment is based on the principles laid down in the judgment of the Court of Justice of the European Communities in Optigen Ltd (Case C-354/03), Fulcrum Electronics Ltd (Case C-355/03) and Bond house Systems Ltd (Case C-484/03) v Commissioners of Customs & Excise

- SKAT's preliminary decision

Input VAT is reduced by DKK 114,761,052 regarding deliveries from Solid Trading A/S in the period November 1, 2003 to March 31, 2004."

Similar reasons are given in the aforementioned decision of July 20, 2006 to deny deductibility for paid input VAT of DKK 6,130,916 regarding supplies from Trademark International ApS in June 2004 and to deny deductibility for paid VAT of DKK 23,188,732 corresponding to supplies from J Corp ApS in August and November 2004.

The denial of the right of deduction in SKAT's decision was thus based on the fact that SKAT found it established that Comitel International A/S - where T was employed/director - knew or should have known that the transactions carried out in connection with Comitel International A/S' purchase of goods from Solid Trading ApS, Trademark International ApS and J Corp ApS, respectively, were part of fraud-related trade chains, which also meant that Comitel International A/S knew or could have known that VAT evasion would take place after the transactions were completed.

T was subsequently convicted of particularly serious debtor fraud for the trades and transactions he carried out on behalf of Comitel International A/S.

On the basis of an investigation of Comitel's foreign trading partners in 2003 and 2004 carried out via foreign authorities, SKAT also stated in its decision of July 20, 2006 that it was SKAT's clear opinion that the vast majority of the company's international sales were VAT carousel-related. SKAT referred to the fact that 5 of Comitels International A/S' customers, CT-Service handels Gmbh, CT Mobile Trading, NU Communications Ltd., Ocean 3 Ltd. and Osseni Telecomunicacoes Ida, which had accounted for 63.9% of the total deliveries, were designated as "missing traders" by the foreign authorities.

Comitel International A/S appealed SKAT's decision to the National Tax Tribunal, but the appeal was abandoned by the company after the conviction of T, which is why SKAT's decision of July 20, 2006 is final in relation to Comitel International A/S.

*12. Criminal cases*

Based on the inspection initiated by SKAT concerning Comitel International A/S' transactions with the companies Solid Trading ApS, Trademark International ApS and J Corp ApS as well as the investigations carried out by the trustee in Network Trading ApS and Solid Trading ApS concerning the mentioned companies and their management, the bankruptcy estates and SKAT submitted a joint request for a police investigation to the State Prosecutor for Special Economic Crime on January 20, 2005 concerning the activities in the companies Network Trading ApS, Solid Trading ApS and Trademark International ApS and the persons behind these companies.

The trustee in bankruptcy subsequently filed an independent police report against the Hong Kong companies Quantum Network Asia Pacific Ltd. and Asia Time Technologies Ltd. and the group of persons behind these companies with the police authorities in Hong Kong.

SKAT informed the Danish Parliament of the following (Folketingets Skatteud- valgs bilag 27 (2007/2008, 2. saml., SAU alm. del), quarterly report from SKAT, 3rd quarter 2007, page 9):

"...'Yellow Fever' is also known as the 3rd generation of carousel fraud cases, as it is the latest and most sophisticated scheme to date. The defendants have imported goods - including IT components and cell phones - VAT-free from countries outside the EU. ..."

The criminal investigation led to a case against all involved

except B (who was then wanted by Interpol), in which the Copenhagen City Court ruled on October 4, 2007, and the Eastern High Court ruled on appeal on October 28, 2008. B was extradited to Denmark in 2009. The criminal case against him was treated as a

confession case, in which the Copenhagen City Court handed down judgment on October 27, 2010.

*12.1 Copenhagen City Court's judgment of October 4, 2007 and the Eastern Regional Court's judgment of October 28, 2008*

In the indictment of July 7, 2006, charges were brought against T, who had conducted the relevant transactions in Comitel International A/S, for particularly serious debtor fraud under section 286(2), cf. section 283(1)(3), of the Danish Criminal Code.

In the same indictment, charges were brought against H (a number of foreign companies), F (Trademark International ApS), C (J Corp ApS and C Trading AB), G (Roxy

**1897**

World Trading ApS), D (J. N. Trading) and E (C&B Trading).

Peer Kølendorf was not questioned or charged by the police during the criminal proceedings and he was not indicted. He gave testimony in his capacity as a member of the management of Comitel International A/S. During the criminal proceedings, SKAT's employee Reino Nielsen explained, among other things:

"When asked by lawyer Peter Trudsø about the sentence in the article [which the witness wrote in 2003] that one way to avoid being involved in VAT fraud is to contact the local Customs & Tax Office, the witness explained that this possibility was stated in a circular to the law. If a company was in doubt about whether a purchase order or invoice was problematic, they could present it to Customs & Tax, which could then check the company that wanted to sell or buy the goods. In this way, the company in question could be instrumental in uncovering any VAT fraud.

The witness explained that the processing of such a request could take from an hour to a few days from receiving the document in question. When asked by Brinkmann about companies that continuously submitted invoices, the witness explained that they constantly received verification requests from abroad. In this connection, they agreed with the companies that they could submit invoices etc. on an ongoing basis, and some chose on a voluntary basis to submit the information electronically, so that Customs & Tax had them available and were at the forefront of the situation in terms of exchanging information. This ongoing information did not always lead to an inspection of the companies. They were also used to identify any Danish VAT carousel arrangements."

In the Copenhagen City Court's judgment of October 4, 2007, T was found guilty and sentenced to imprisonment for 4 years and 6 months, cf. section 286(2), cf. section 283(1), no. 3, of the Danish Criminal Code, for his involvement in the transactions with Solid Trading ApS, Trademark International ApS and J Corp ApS to have evaded public VAT by carrying out a number of transactions without commercial reality.

In the Eastern High Court's judgment of October 28, 2008, T's sentence was increased to imprisonment for 5 years.

The other defendants in the case were also found guilty of debtor fraud of a particularly serious nature.

*12.2 Copenhagen City Court judgment of October 27, 2010*

In the Copenhagen City Court's judgment of 27 October 2010, B (Solid Trading ApS) was found guilty and sentenced to imprisonment for 5 years and 6 months, cf. section 286(2), cf. section 283(1), no. 3, of the Danish Criminal Code on particularly serious debtor fraud.

During the case, B testified about his involvement in Solid Trading ApS and the "Yellow Fever" case complex.

Regarding case 1, where Network Trading ApS was the importer, he explained, among other things:

"There were both real goods and dummies that were passed around the chain several times."

Regarding case 2, where Solid Trading ApS was the import company, he explained, among other things:

"The defendant has further explained that he was aware that the goods sent around the chain were dummies. The goods used were dummies because genuine goods would be exposed to an excessive risk of loss of value while being passed around the chain and because the dummies required less capital."

On the facts of the case 5, where J. N. Trading v/D was the importer company, he explained, among other things:

"They switched to a real product, real debit cards that could be used to buy access to sex sites, because they had previously stopped a chain of fictitious goods. No one could say that the payment cards were worthless."

*13. Comitel International A/S after the "Yellow Fever" traders*

Today, Comitel A/S (CVR no. - - - -) is owned by Kathrine Stoffregen Kølendorf with 75% and Peer Kølendorf with 25%. The company still owns the full share capital of Selskabet af 21. september 2006 A/S under konkurs - former Comitel International A/S.

In 2006, the number of employees in Comitel International A/S decreased so that in this financial year there were on average two employees (in addition to the employees in Comitel Danmark A/S). This was due to the closure of the broker division. Mr. T, who at that time was charged with particularly serious debtor fraud in the "Yellow Fever" case complex, was dismissed in July 2006. Peer Kølendorf was reinstated as CEO on July 1, 2006, a position he held until the company's bankruptcy.

The company's turnover was DKK 530.2 million and the company realized a loss of approximately DKK 3.4 million, which according to the management report was affected by a loss on stocks in a very competitive market. The company's equity in 2005-2006 was, according to the annual report

DKK 19,625,233 as of December 31, 2005 and DKK 16,247,761 as of December 31, 2006. No dividends were paid during the period.

In September 2006, Comitel International A/S wound up its activities and changed its name to Selskabet af 21. september 2006 A/S. The management report from the company's annual report for 2006 states, among other things:

"Following the implementation of a change in legislation in mid-2006, which may entail a risk that the company may be held jointly and severally liable to suppliers and customers for VAT, management decided to reduce the

**1898**

activities in the company until the consequences of the new rules are clarified."

The company had no commercial activities in 2007. In October 2007, Comitel International A/S filed for bankruptcy as the company had insufficient funds to meet the repayment claim according to SKAT's decision. On October 23, 2007, the company was declared bankrupt.

SKAT subsequently decided that Comitel International A/S' parent company was jointly and severally liable for the VAT. This decision was appealed to the National Tax Tribunal, which ruled in favor of the company. The decision of the National Tax Tribunal has not been appealed to the courts, and the decision is therefore final.

*14. Statements from SKAT about VAT carousel fraud*

An article in SR-SKAT 2003.164 "VAT carousel fraud - how can you protect yourself from becoming an unwitting participant in an illegal VAT carousel?" by Reino Nielsen, SKAT Økokrim, contains suggestions for companies' routines in relation to suppliers and customers. Among other things, it states:

"Because you're dealing with fraudsters in these situations, it's of course not always easy to see if you're getting involved in a criminal VAT carousel trade. But there are of course some warning signs to be aware of,

and there is also the possibility to seek guidance from advisors and from Told-Skat.

Especially in the company's purchasing function, it is important that precautions are taken and that you use "common sense" and not be blinded by the prospect of a quick profit. First and foremost, it's important to take special care when dealing with "high-risk" goods such as mobile phones, computer components and accessories, consumer electronics, etc.

...

If the overall assessment is that you have general doubts about the credibility of the supplier or customer, then you should either refrain from trading, or you should secure yourself as best you can. One way to protect yourself - or perhaps to help uncover a fraudster - may be to contact the local ToldSkat." In an article in Jyllands-Posten published on May 21, 2004, SKAT stated:

"After several years where the so-called VAT carousel fraud has almost been eradicated in Denmark, Customs & Tax fears that new cases are on the way, resulting in millions in losses for the treasury.

...

A year ago, Customs & Tax, which monitors the area very closely, had no carousel cases with threatening million-dollar losses. But now the authorities are investigating three cases."

*15. Reports on the broker market*

Reports from Hewlett-Pakard and KPMG with descriptions of the broker market have been submitted during the case.

Hewlett-Packard's report *"An Analysis of the Excess Electronic Components Market"* (February 1999) states, inter alia:

"There are two markets in which electronic components are bought and sold:

• the primary market in which producers purchase components for their normal production needs through contracts with manufacturers or franchised distributors;

• the excess market (also known as the secondary or grey market) in which surplus components - those owned but no longer required by producers - are bought and sold through intermediaries.

A simple way of describing the difference between the two mar- kets is as follows. Goods sold on the primary market have never been owned by anyone other than their manufacturer or the franchi- sed distributor whom the manufacturer has agreed to supply for the purposes of sale to producers. Goods sold on the secondary, or excess market, have already been through the process of sale to producers, and are being resold by them because they are surplus to their requirements. Suppliers in the primary market do not, as a general rule, buy surpluses; and so the excess market devel- oped to mediate between those with surpluses and shortages. To be sold in this market, components are required to be unused and still in their original manufacturer's packaging.

...

Although the two markets are nominally separate and independent, in reality there is some blurring of the boundaries between them. For example, producers sometimes buy from the excess market to meet their normal production needs.

...

The main characteristics of the market include:

• its large scale;

• a high degree of competition;

• volatility;

• the absence of a free flow of information;

• producers who require anonymity when trading;

• the lack of standardized descriptions and specifications of many components;

• the importance o[f] up-to-date knowledge of market conditions;

Copyright © 2023 Karnov Group Denmark A/S

• the variable speed with which participants are embracing new technology;

• an absence of controls or regulations to govern activities in the market.

**1899**

...

The principal risks include:

• engaging in bad trades;

• being financially exploited

...

Glossary of Terms

...

Brokering: The process of locating a good for a known customer where the broker does not take ownership of the good. Goods are usually bought on cash on delivery terms, and the broker generally requires a purchase order from the customer before proceeding with the purchase. When the broker receives the goods, they are forwarded to the customer after their conformity to description has been approved, a process described as usually taking two or fewer hours."

KPMG's report "The Grey Market" (2002) states, among other things:

"As a result, it is estimated that USD $20-40 billion of computer electric product passes through the gray market per year resulting in a loss of margin to OEMs of between USD $1.2 to USD $4.8 billion per year."

*16. Code of Conduct*

As an appendix to the consultation response of January 31, 2005 to SKAT, Comitel International A/S enclosed a draft "Memorandum of Under- standing between HM Customs and Excise and the Mobile Phone Industry" containing "Code of Conduct".

The Code of Conduct, dated December 21, 2000, states:

"This Code of Conduct is associated with, and forms part of, the Memorandum of Understanding between hM Customs and Excise and the Mobile Phone Industry.

It will be applied by distributors within the industry, but is suppor- ted and endorsed by manufacturers and network providers.

Major distributors who are signatories to the Memorandum of Understanding have agreed that they will adhere to the following procedures when purchasing mobile phones from a new supplier or supplying mobile phones to a new customer.

*Purchasing from a new supplier*

The following factors will be considered before purchasing stock from a new supplier:

• How long have they been trading and do they have any history in the trade?

• Does the supplier have sufficient knowledge of the industry to warrant their level of anticipated business?

• Is the business registered for VAT?

• If the trader is new to the business how can he have the contacts to provide products at such an attractive price?

• Is the suggested price per unit too low for the type, age and model of the phone?

• Should this product be provided at this price at this time?

• Are the delivery arrangements for the goods financially viable and do you know where they come from?

• Have they been unable to sell to your competitors - if so why?

• Will the IMEI numbers of each phone be shown on invoices?

• Have you met the supplier - if not do you have to contact them through a third party?

• What knowledge do credit search companies used by you

have of the supplier?

• Is the supplier's bank account in a different town or country to their main business address?

• Do you recognize the person supplying you with the mobile phones; have they changed their name or other details to present a new identity?

• Does the supplier use a local address; do you know if the address is a residential or accommodation address?

• Is payment or part-payment for the mobile phones being made to a third party?

• Do you have doubts over the supplier's credibility or feel there is risk attached to the deal - is it good business acumen to trade with this person?

• Is there a similarity between the invoices/paperwork of different suppliers?

If you decide to purchase from the supplier obtain a copy of the supplier's headed paper and VAT certificate, notify hM Customs and Excise of impending trade and request confirmation from hM Customs and Excise of the validity of the VAT number.

If you decide *not* to go ahead with the purchase, notify HM Customs and Excise.

*Supplying to a new customer*

The following factors should be considered before supplying stock to a new customer:

• How long have they been trading and do they have any history in the trade?

• Does the customer have sufficient knowledge of the industry to warrant their level of anticipated business?

• Have they been unable to purchase stock from your competitors
- if so why?

• Does the customer always want to buy, no matter what the price?

• Are the goods to be delivered to the country where the customer is resident or are they to be delivered to another country?

• Will the country of destination of your goods be the same as the country that your customer operates in and will payment originate from that country?

• Is their courier or shipper reputable - if goods are being exported will original documents be available?

• What are the arrangements for payment - do you trust the custo- mer?

**1900**

• Have you met the customer - if not do you have to contact them through a third party?

• What knowledge do credit search companies used by you have of the customer?

• Is the customer's bank account in a different town or country to their main business address?

• Do you have doubts over the customer's credibility or feel there is risk attached to the deal - is it good business acumen to trade with this person?

If you decide to supply the customer, obtain a copy of the custo-mer's headed paper and VAT certificate, notify hM Customs and Excise of impending trade and request confirmation from hM Customs and Excise of the validity of the VAT number.

If you decide *not* to go ahead with the sale, notify HM Customs and Excise."

*17. VAT legislation*

As of April 1, 2003, VAT on purchases in and sales to third countries was declared in the same way as for EU trade, so there was no basis for distinguishing between EU VAT carousels and VAT carousels involving third countries.

Act no. 408 of May 8, 2006, which entered into force on July 1, 2006, introduced a legal basis in section 46(9) of the VAT Act to impose a so-called notification on a business participating in the trade chain.

to exercise greater vigilance in future transactions. Failure to comply with the notification may result in the company being held jointly and severally liable for payment of VAT, cf. section 46(9) of the VAT Act.

It is a condition for issuing such a notification that SKAT has suffered a loss as a result of an established intentional or grossly negligent evasion of tax payment.

The notification rule in section 46(9) of the VAT Act provides a legal basis for imposing specific orders to act on the company in question. The comments to the bill thus explicitly state that the company can be ordered to be aware of:

"unusual invoicing, payment and flow of goods (e.g. third party payments where payment is made to someone other than the seller, unconventional trading channels, unusually large batches of goods, etc.) and goods traded at prices that deviate from the market price and where there is no correlation between the price, quality and quantity of the goods (e.g. traded at a price lower than the lowest market price)."

Furthermore, the notes state that the notification may include orders for physical product control and registration of product identity.

*18. The loss statement*

During the case it has been stated that the estimated dividend to SKAT in the bankruptcy estate of Solid Trading ApS is DKK 6,672,177.38, in the bankruptcy estate of J.N. Trading v/D is DKK 4,456,093.73 and in the bankruptcy estate of Selskabet af 21. September 2006 (former Comitel International A/S) is DKK 5,028,125.22.

In the bankruptcy estate of Roxy World Trading ApS, a dividend of DKK 2,678,214 has been paid to SKAT.

In relation to Comitel International A/S, SKAT withheld negative VAT regarding November 2004 of DKK 41,989,806, of which DKK 5,267,745.60 related to the transactions in November 2004 with J Corp ApS. Comitel International A/S was granted deferment of payment of sales VAT of DKK 39,011,628, and the difference of DKK 2,978,178 has according to SKAT been set off against the company's debt of DKK 220 million to SKAT.

As a result of T's involvement in the fraud, the Comitel Group's insurance company agreed to pay an insurance sum of DKK 10 million from a crime insurance policy taken out by the Group. However, the insurance sum, less the deductible of DKK 50,000, was deposited as it was unclear from the policy wording whether the Comitel Group or the bankruptcy estate of Comitel International A/S was entitled to the amount. The Comitel Group has agreed that the bankruptcy estate is entitled to the amount (the sum insured less the deductible), and the expected dividend to SKAT is excluded from the loss calculation.

*Explanations*

During the case, statements were given by Peer Kølendorf, T, Ole Stangegaard, Steen Erik Mønsted, Flemming Lind Johansen, Kenn Hoffman Jensen, Mia B. E. Hansen (formerly Pedersen), Reino Nielsen, Jørn Rosenmeier, Ole Eklund and Kim Østrup.

*Peer Kølendorf* has explained that he will turn 66 in a few days. He started importing walkie-talkies from Japan at the age of 18. Being the entrepreneurial type, he applied for an exemption to start his own business before he turned 18, and he received his business license a few days after his 18th birthday. He has been trading with the Far East from the very beginning and his company continues to import goods from there, now mostly from China, where it also has goods produced under its own brand. He decided early on to stay in the radio communications business. The company dealt with land mobile radios both for

hobby use and for professional use in workplaces, in trucks and in the navy. His principle has always been that you keep your promises. A deal is a deal. It was in 1975-76 that Danitas started up with cell phones. Brokerage of cell phones began later because they received inquiries from, among others.

from Sweden when there was a shortage of phones. It was natural to see if they were available elsewhere. Their brokerage turnover increased steadily. In 2001-2002, it exceeded SEK 1 billion. The business grew steadily, and when he turned 50, he decided to become a professional board member of Danitas Radio. It became a reality in June

**1901**

1999. Through his position as chairman of the Radio and Telecommunications Industry Association, he inquired about possible candidates and was recommended Ole Stangegaard, who became chairman of the board. He and Ole Stangegaard then found Lars Thinggaard, who was a trained accountant, and Torben Svanholm, who had been employed by Sonofon. These were professional people, so there was no way he could "overrule" them, even though he was the main shareholder. If he had tried to do so, they would have left the table. After six months, Ole Stangegaard suggested that they should try to grow the company, and Ole Stangegaard saw international brokerage as a growth area. It required borrowing and hiring more people. He was a bit skeptical because the business was doing well, but they decided to give it a try.

He had seen how the phone brokerage business had grown throughout the 90s, but revenue was and is very volatile. "It is entirely dependent on whether the manufacturers' planning is right in relation to demand. If manufacturers have too few devices, the broker market takes off and prices rise. This can be the result of successful campaigns, for example, where it turns out along the way that the factories can't deliver. The ability to deliver is the most important thing.

He has never been a broker himself. A broker sits by the phone all the time and keeps an eye on the market. Before the euro, it was also very important to be aware of exchange rate changes, as even a small change in the exchange rate could be crucial to the result. They had ongoing experience with brokerage, including insurance coverage, where they had an unfortunate case in England where Codan would not cover. The warehouse has always been insured. They switched to Tryg, which had stricter security requirements, e.g. for storage facilities and transportation, including securing the vans, but in return they got a lower premium. For the money transactions, they used Danske Bank, which has traditionally had good IT systems, and it worked well with the bank's London branch. It was important to be absolutely certain that the payments had actually been made. Contact with suppliers and customers was established via the newly appointed brokers, who had experience in the field and were good at developing their networks.

There was a check of the items before payment. The finance department created the item with a general item number and name in their system, e.g. Nokia 6210. It was always the broker who had to make sure that it was the right item, for example a specific variant of a Nokia 6210 phone, that was delivered.

He doesn't remember Danitas having anything to do with a VAT carousel in Finland in the late 90s. They were careful not to buy too cheap because it could be an indication that something was wrong. He believes he got the Code of Con- duct for the Mobile Phone Industry at a meeting in England and they talked about it in the company. The employees knew that it was important to pay attention to the points listed in it, but they also knew that you were not "home free" just because you had checked the points mentioned. It was emphasized that within the EU it was essential to check that there was a valid VAT number. After 2000, he no longer instructed the brokers because T had become head of the broker department. The trades that were covered by

"Yellow Fever" is no different from their other deals. Nor were they alone in trading both phones and IT components.

T, who was trained as an electromechanical engineer, was employed from 1992-1996 as a technician, but he followed when the technical part of the company was sold off. In 2000, when the name change to Comitel was celebrated with a reception, T was there and expressed his desire to participate in the development of the company. T was then hired as a business developer, but he was also responsible for their internal IT installations. T attended the board meetings and it was he who proposed to start brokering IT components. The board was on board with the idea and they started in 2003.

The strategy memo dated October 25, 2003 was prepared by him for the board. The vision of controlled growth and above-average profitability was forward-looking and optimistic. "Controlled growth" meant that they must not lose control. They needed to leverage the skills they had built up so far in the mobile phone space and hire new people with IT skills. T, who was very good at IT, was in charge. An above-average profit margin is always the dream, and with a target of a turnover of DKK 2 billion by 2005, significant growth was on the cards, but it would depend on market conditions whether the growth would come from mobile phones or IT. It was clearly the broker department that would drive revenue. He didn't believe that the revenue target could be met, so it was surprising that it could be done. No actual market research was done prior to the decision to enter the IT business, but the brokers, and T in particular, had listened to the usual "market talk" and talked to freight forwarders. The intention was not to trade in specific items, but typically core components of a certain value, such as microprocessors and RAM. There was no market strategy because it was all about exploiting opportunities in the market, and it would be utopian to think that you could predict developments.

There was one overall budget for the broker area and it was an annual budget that was divided by 12, because it couldn't be predicted more accurately, and the budget they made was both "undershot" and overshot.

**1902**

The broker section of the strategy memo reflected the situation in 2003. Financial figures for 2002 showed that they did not have as good a grip on the market as they thought. They had heard about the British authorities' drastic intervention in the mobile phone sector, which had serious consequences even for companies that had not been involved in fraudulent activities, but still had their receivables frozen. However, it was not the same in Denmark, and they believed that the broker market was on the rise again.

The two named people mentioned, Michael Simonsen and Sheng Tang, were telephone brokers. In the IT broker area, they hired new people whose names he cannot remember today. He was not in a position to find people with IT skills and was therefore not involved in hiring the new employees. T found them partly through his network and partly through agencies. T was made CEO to show that he actually functioned as such.

Before 2000, the company had been visited by UK authorities investigating VAT fraud. The company provided copies of invoices of transactions and was told that they had done nothing wrong. He believes that, based on their experience, they acted with sufficient caution. In 2003 or 2004, when there was mention of VAT carousels again, it was discussed in the board and the conclusion was that they would not leave the market just because fraudsters were entering the industry. They talked about necessary security measures, including sending lists of suppliers and customers to SKAT, which they had started doing around 2000. He had created an IT program so that the lists of new customers and suppliers could be generated and printed. He printed the lists himself and sent them to SKAT. His impression was that the collaboration

with SKAT was good, and from the emails he received back from SKAT, he also got the impression that the lists were important. The fact that they sent in the lists had nothing to do with the brokers' control of transactions and goods. They had an example of a batch of phones that a broker inspected at the freight forwarder at the airport, where the packaging was wrong and it seemed to be a batch that had been traded many times. They rejected the transaction and reported the matter to SKAT. SKAT went out and looked at the batch shortly afterwards. Out of curiosity, he asked SKAT about the matter afterwards, but they replied that they could not give him any information. He is disappointed that SKAT has not given him the slightest warning. When he is quoted in an article as saying that he encountered VAT fraud 2-3 times a year, he was referring to the case of a batch of phones, but he also experienced a young man from a Dutch company offering Nokia phones that were 10% cheaper than Nokia. He also informed SKAT about this inquiry. His experience was that the company's routines and controls were observed. It was the broker's responsibility to ensure that the goods were as ordered, and there were examples of them rejecting deliveries. After 2000, when T became head of the brokerage division, they continued the established routines and controls to avoid getting involved in VAT fraud, but also to avoid commercial risks. He believed that they had effective controls, but that turned out to be wrong. He couldn't guarantee that there wasn't a "Trojan horse" in the business.

He feared VAT carousels and talked to T about it. Therefore, he is very disappointed with what T did. The board and he agreed that they should do everything they could to stay away from it. From what had happened in the UK, they knew there was a risk that they could run into it, but the perception was that it was happening in intra-EU trade and you had to make sure not to buy too cheaply. He knew that there could be many stages of trade before the fraud was realized, even though back in 2003 the terms "missing trader" or "garbage company" were not used. They were visited 2-3 times by the British authorities, where they handed over invoices for use in the investigation in England, and SKAT also requested information from other foreign authorities.

He came up with the idea for CBB mobile in 1999, when people started being able to pay by credit card on the Internet, thus bypassing the prepaid card retailers. The SMS company was primarily T's idea. It was started because it was known that 3G was coming, which would enable the development of content services. SMS sold ringtones and logos. T participated in the development of both companies, which were sold in 2004. T was his right-hand man and a highly trusted employee. T also participated in the "strategy day" where the board discussed the company's challenges and threats. T was also responsible for a project with E-taletid, which became the company hallo.dk, which was sold in 2011.

They established the customer-divided organization in Comitel in 2003. He was the managing director. The Consumer department was the mobile telephony area in Denmark. The Business department was the business area with land mobile radios for the professional market. T was responsible for the Broker department, and finally there was the Export department, which took care of the original area of electronics for hobby use, where there was export within Europe.

The company had premises in a condominium at 11 Hammershusgade, which he owned and rented out to the company. There were just over 30 employees on almost 1000 m$^2$. He had an office in one corner and typically had an open door. Closest to his office were the finance and accounting people and an employee who took care of advertising. Further away sat the 5 employees of Comitel International,

**1903**

where the brokerage was taking place. The brokers sat together and could hear each other talking on the phone. However, Christina Evers worked from home some of the time. Next to the broker department sat the 4 employees who handled sales to the Danish market, and in SMS sat 5 employees. CBB mobile was located elsewhere and had around 60-70 employees, some of them part-time. In the office furthest away from him sat the head of the business department, and at that end of the lease also sat 2 engineers. There was a warehouse on the floor where 2 full-time employees and 3 high school students worked as part-time packers. On the floor below, they had also rented space from another landlord. Many of the employees were part-time, and in total he had about 75 FTEs under him. He was at work there daily from 8:30 to 16:30.

In his daily work, he moved around the premises and talked to the employees, even during breaks and lunch. It wasn't a huge corporation, so they saw each other all the time and the brokers were happy and proud to talk about their deals, but he wasn't into the details of their work.

It was T who introduced Solid Trading ApS as a possible supplier. The defendant searched for information about the director, B, in the Business Register, but B was young and had only been involved in two companies. There was nothing negative to see, so he had no objections. He knew that T had visited Solid Trading ApS on Skudehavnsvej, so he assumed that T had done the necessary research. He does not remember meeting B.

He has not approved any transactions, neither those covered by "Yellow Fever" nor others. He has certified documents when no one else was present, but it was usually T and one of the finance people who certified. He continuously followed the company's finances, and it was a regular item on the board meetings to review key figures. With regard to his certification of a voucher for the purchase of lagka- ge, which SKAT has highlighted, it was he himself who had made the purchase on the road on the occasion of an employee's birthday, and therefore it was natural that he endorsed the voucher. It was the case that vouchers related to more private consumption, such as telephone vouchers, usually had to be approved by a person above the person in question. Therefore, he also typically approved T's phone and travel bills. They decided to get an apartment in England because they had a lot of travel activity there. The defendant could manage the bank account alone. In other cases, two people were needed to manage the account, one of whom had to be from the finance department. It was necessary that payment could be released without his presence when a batch of goods was con- trolled. He does not believe that T could manage alone, even when he became director. T did not handle financial tasks as such.

At one point, Sheng Tang, who was a broker, asked him for advice on a trade, but he replied that he could not advise on it because it would require him to spend a lot of time familiarizing himself with the market. The available amount for the entire brokerage department was the loan limit of DKK 50 million that had been agreed with the bank in order to finance the trades. Sometimes the brokerage department had to stop the deal because there was no more money. This could cause the others to be a little upset if T had traded for the entire amount himself. The credit limit was never exceeded. It was about the relationship with the bank. He didn't find it strange that some of the "Yellow Fever trades" were over DKK 40 million, because the board believed that the liquidity limit should be utilized. This is a prerequisite for earning as much as possible. He had not given guidelines on when T should consult him, but if the

company wanted to invest in a completely different market, he expected to be consulted. For example, T proposed trading in clothing, which was turned down.

He did not check goods in the warehouse himself, but he has seen brokers do it. Sometimes the goods were at their freight forwarder Kuehne and Nagel in Brøndby, where the broker drove out and checked. Other times, it was left to the freight forwarder to check on behalf of

Comitel. When you had traded smoothly with the same supplier a few times, the checks were done randomly. It was crucial that the brokers checked the goods before payment was made to avoid being cheated. Sealed IT components lost value if the seal was broken. There was only a small profit margin on them anyway, so you had to trust that the contents were as stated on the package. Phones were only function tested to a limited extent, mainly to check if they were locked to a particular provider. You couldn't draw up a rigid list of checks, it varied and was up to the broker. He does not recall any examples of problems arising as a result of inadequate checks.

The checklist presented regarding the export of mobile phones was probably made when they only traded in mobile phones, but it does not appear to be product-specific, not even in the fields that are specifically checked. It was used by the brokers to remember relevant conditions. The brokers worked hard and were able to make deals on the phone while they were on their way to the freight forwarder to check the goods. The broker didn't have to check every single component, because that was impossible. In relation to the transactions in "Yellow Fever" with 2.6 million components, it must have been a check of the number of units, because IT goods were also sealed. He had not made guidelines for the brokers or trained them, as they knew what to do. They had talked about not breaking the seal in the

**1904**

the board, but he can't say anything further about what that means in this specific case.

They didn't have special tools, including ground spikes, in the warehouse as they did in the workshop. Although IT goods are sensitive and the seal should not be broken, they should be transported in the normal way.

He believes he got the Code of Conduct at a meeting in London. He certainly did not get it from the Danish authorities. He used the Code of Conduct as a source of inspiration, but it was not an exhaustive list that the broker could just tick off. The broker had to be aware of and think about all relevant issues, but it was fundamental that the VAT number within the EU had to be validated. He believes it was correct when Comitel wrote to SKAT in the consultation response of January 31, 2005 that the company followed the Code of Conduct, but this also meant that it was not used as a rigid checklist. The Code of Conduct was implemented by him talking to T about it, and they agreed to include the recommendations in their control. It was up to T to take it further. VAT numbers of trading partners in the EU can be checked via an EU website, and the individual broker was responsible for this. The numbers had to be stated in the report to SKAT.

T himself told about the case in England with Vaneypeco and Texmart, where their payment was frozen on an account. This was in in the fall of 2004. The transaction was not part of the "Yellow Fever traders". He was not himself aware that there had been a breach of the principle of simultaneity, nor could he have discovered it. He and the chairman of the board pointed it out to T in a meeting, because it was a serious matter. They then contacted their lawyer in England. The example of splitting the payment into 4 parts, which relates to a transaction in January 2004 with Asia Time Technologies, he has not heard of before in connection with this case.

He monitored the monthly turnover of each department and, if necessary, discussed it with the department. He paid particular attention to cost deviations. It is characteristic of brokerage that turnover can vary greatly. Monthly fluctuations of between DKK 10 and 100 million were not unusual, so the turnover in

November 2003 was nothing special. In 2002, they had had a turnover of over DKK 2 billion, so the big

The amount did not give rise to any special considerations either. The global IT market was huge, and Comitel only accounted for a fraction of it. He was only down to the individual invoices if they were not paid, and none of the deals in "Yellow Fever" were not paid.

It was an error on the part of their auditors that the demerger of Comitel did not take place in 2002, but only in December 2003, but throughout 2003 Comitel International operated as an independent division. The Chairman of the Board, Ole Stangegaard, resigned in 2003 due to age, and Steen Erik Mønsted, who had previously joined the board, then became Chairman of the Board. Lars Thinggaard and Torben Svanberg resigned in mid-2004 after the sale of CBB. They wanted to join the holding company's board of directors, but he wanted people with insight into securities administration. They parted ways peacefully.

He knew that the goods purchased from Solid Trading ApS were sold to the Far East, and it made him feel safe that the goods went outside the EU, because until then he had only heard about VAT carousels within the EU. He does not remember T telling him anything about how he made contact with buyers, but T had been on several trips to Dubai and the Far East, so he was not surprised that he had these contacts. T was good at creating and maintaining networks. He and Steen Erik Mønsted went on a trip with T where they met with suppliers.

He did not discuss prices of products in general with T, and he only heard that some Intel products were overpriced in connection with this case. It is the broker's job to be aware of prices. In a start-up phase with a new supplier, it was natural to check more.

He has no knowledge of IT components and the extent to which they can be function tested. If it was possible, his expectation was that T would take care of it. He did not put any restrictions on what tests the brokers could do. He heard that Solid Trading ApS had been cheated in connection with a trade in the Far East and went bankrupt. It must have been T who told him. He only learned in connection with the case that T was assigned customers in the Far East by Solid Trading ApS. He was not surprised that it was T who had the highest turnover in the brokerage business.

He was not informed that they started trading with Trade-mark International ApS and did not approve the transactions in June 2004. It was only in relation to Solid Trading ApS that he had checked the conditions in the Business and Companies Register. It was T's task to make the necessary investigations.

He was informed by T and agreed that they would start trading in Internet access cards for porn sites in August 2004. T was a business developer, so it was his job to investigate whether there was a market for new products. He didn't find this type of product to be that different from their previous sales of prepaid cards. T said that he had tested the cards. It was probably only a few that had been tested, because a card became worthless when the code field was scratched. He did not know the pricing of the cards, and he does not remember receiving information about the buyers. He saw the result of the activity in the statistics core, but was not privy to the details.

**1905**

They rarely received complaints, and typically only when devices were missing from a delivery. There were significantly fewer complaints about the IT components than about other goods. He wasn't surprised because they were more expensive goods and therefore of higher quality.

It was convenient to have bank accounts in other countries because the money transfers were faster. He doesn't remember exactly when they started having accounts abroad. He believes that it is not uncommon to carry out transactions for amounts larger than equity. It was

the prerequisite for growth, and their credit line with the bank was DKK 50 million.

They were not usually a stocking brokerage. Sometimes a customer would run away from a deal and you had to get rid of the goods as quickly as possible, and selling in that situation often resulted in losses.

At one point, they had the opportunity to buy cell phones from Samsung's Stockholm branch because Sheng Tang had a good contact there and it turned out that the phones were best sold in Hong Kong. They bought several hundred million SEK worth of phones. I think the cell phones ended up in China. He doesn't know if they were sold to a broker. He was comfortable selling goods out of the EU because there was no problem with VAT fraud, he thought. Everything seemed normal. If there was also fraud with the cell phones, then T has failed on an even larger scale than previously thought.

Comitel International stopped brokerage in 2006, after T had been charged. He had known T for a long time and had great confidence in him. T was a highly placed employee who had been given employee shares on two occasions, but he turned out to be a "Trojan horse". It was a terrible thing to discover and the main reason why he then found it too risky to be in the broker market. When the charge came against T, he and the board didn't believe it. He could not see that anything had gone wrong along the way, and afterwards he reviewed the trades himself and could not find anything wrong either. Even when the charges were filed, he found it hard to believe, but as it risked damaging the company's image to keep T, he was fired. He hasn't seen T since he himself testified in the criminal case. It's not very pleasant to see him again. It was incomprehensible to him that the Distributors' Association, which was a subcommittee of the IT Industry Association, tried to get him out of the association in 2007 because he had had a criminal employee. It also turned out that it was only the Distributørforening's member on the main board who supported the expulsion, and the main board reacted to the fact that part of the Distributørforening's basis for trying to expel him was the ethical rules the association itself had adopted, stating that parallel imports were prohibited. The board felt that this could violate competition rules, so those rules were quickly abolished.

A "bad climate" arose after he tried to warn Jørn Rosenmeier against a sales manager he himself had dismissed in the late 90s, and it subsequently turned out that the person in question had been involved in incorrect invoicing of some B&O speakers. The employee in question was hired by Jørn Rosenmeier and started broker trading, which led to him writing a letter to Jørn Rosenmeier. In addition, basically

distributors "hate" the brokers, so he believes that Jørn Rosenmeier has tried to get back at him.

He was very shocked to receive the summons in this case. He was responsible for running the company in a prudent manner, but does not believe he had the opportunity to discover the VAT fraud, which was very professionally and skillfully executed. It was not because of the nature of the transactions Comitel International was involved in that Comitel's role in the VAT fraud in the "Yellow Fever" transactions was discovered, but because information was found at the other parties involved, including T.

As CEO, his own job was to ensure that things worked so that the employees could do their jobs. This applied to Comitel International as well as the rest of the group. Financial management was an important area for him, but he delegated a lot to the employees. He has not held any board positions or

directorships outside the Comitel Group, and he spent most of his time at Comitel International and Comitel, which was housed in the premises in Hammershusgade. He cannot say,

how much time he spent on this and that part of the group. At times he spent the majority of his time at Comitel International, especially managing the finances and banking, but this was at a general level, because it was impossible to keep up with the details. He checked the bank account every day, because there were large amounts going in and out. He monitored the bank account at a total level, i.e. he saw the entries, but was not interested in the individual entries.

He presented the turnover figures to the board together with the CFO and handed out a standard printout with totals, which was what the board was interested in. Behind the individual figures there could be 100 different accounts, and they could be itemized if desired. The board had full confidence in T.

In addition to financial management, the defendant performed many different managerial tasks, which can be difficult to describe. Among other things, he talked to the staff and took care of matters relating to the property and the lease to make things work.

### 1906

He still can't see in hindsight what he realistically should have done to discover that something was wrong with the trades in "Yellow Fever".

The "Trojan horse" they had in the company made sure it looked right.

They only accepted third-party payments when there was a reasonable explanation for it, because it could be a sign that something was wrong. A broker could be a private individual trading from their basement, and in such a situation they could accept third-party payments.

He believes that he has not seen the witness statement that T gave at the end of 2004 in Nottingham Crown Court in connection with the Vaneypeco/Texmart case, which states inter alia that third party payments were normal industry practice and occurred in 30 % of Comitel's transactions. He believes that 30% is much too high. He did not specifically monitor the company's third-party payments, but he and T talked about it.

SKAT expressed a desire to obtain lists of Comitel International's customers and suppliers, so he assumed that it was relevant to them, which the email correspondence presented during the case also shows. He does not believe it was the most important control measure, but he took it upon himself to ensure that the lists were correct. The lists showed companies that had been created in Comitel's system. These were customers and suppliers that you had done business with or planned to do business with. The lists did not provide insight into how much was traded. He never received a response from SKAT on the content of the lists. He expected that SKAT would let him know if fraud was found regarding some of the companies they traded with, but this was not something SKAT had explicitly promised.

Comitel routinely submitted sales invoices to SKAT every month because they then received the export VAT faster. Purchase invoices were submitted when SKAT asked for them.

When Comitel International went bankrupt, the company's documents were handed over to the trustee. There may also have been relevant documents relating to Comitel International with freight forwarders and in the Comitel Group, from which services were purchased.

A checklist such as the one submitted for order numbers 743 and 774 and purchase number 729 on November 12, 2004 of internet access cards concerns the individual transaction at order level. It does not concern the customer or the market. The Code of Conduct was the first time he had seen a list of points of attention coming from a public authority. He had tried to get a list from SKAT earlier. It was probably in 1998 as chairman of the industry association at the meeting with SKAT. Physical testing and control was not something he knew anything about at the time. He hasn't seen many of their products, but the ones he saw were sealed and it wasn't possible

to take something out without breaking the seal. He also knows that some IT components can be damaged by the mere touch.

The brokers had a fixed salary and were also on commission. He believes the basic salary was DKK 25,000 per month, but they could earn large amounts. Typically, they had their own customers and did not trade with the same ones, but it could depend on personal relationships. The other brokers may have seen items from T's trades in the warehouse, but apparently there was nothing different about these trades. Neither internally nor externally did anyone suggest that anything was wrong. It was also SKAT's assessment that the fraud was done in a different way than previously known. It's sad that the state has suffered such a huge loss. T was not paid commission, which was one of the reasons why he received a shareholding and DKK 1 million when he became CEO. He had known T for a long time - since he was 23 years old - and therefore thought he knew a lot about him. He and his wife have been to T's home 2-3 times, but they did not otherwise socialize privately.

*Mr. T* has explained that he started working for the company in 1992 in the workshop where he repaired communication radios and walkie-talkies. He is a certified Novell administrator and has an education as a PhP programmer. Back then he was very interested in and very knowledgeable about IT. He made a good contact with Nokia and managed to get an agreement for warranty repairs on Nokia phones. He became the manager of the workshop. At some point, together with a colleague in the industry, he started the company Teleservice, which did repairs without sales. That's why he left Danitas. After alleged disagreements, he resigned from Teleservice, which also ended up being sold. Peer Kølendorf, with whom he had been in regular contact, offered him to return to Danitas/Comi- tel, and he was hired as a business developer at Comitel on August 7, 2000. He was to look at new ideas and whether the business could be optimized. The company was already brokering cell phones. Initially, he was not a broker himself, but carried out an assessment of the activities with a view to business development. This was before 2003. He could see that there was a world of opportunity that he thought could be better utilized than the broker department at the time. He therefore tried to initiate the development himself and, together with the existing brokers, tried to get new customers and suppliers.

He discussed general issues with Peer Kølendorf on a daily basis, and it wasn't just about the broker market. They also discussed customers and suppliers if there was something special. For example, if contact with a supplier was resumed, as happened with people in Hong Kong that Peer Kølendorf had known for many years. The old contacts in Hong Kong and elsewhere were used to establish new ones

**1907**

contacts. He became more and more involved in the broker activity. It was up to him to set guidelines. Peer Kølendorf's role in the broker area was at the information level. Peer Kølendorf did not request information about either suppliers or customers, but depending on the situation, he sometimes informed Peer Kølendorf about new customers. This was done verbally. Peer Kølendorf kept an eye on the statistics for turnover and took care of reporting customers and suppliers to SKAT on CVR numbers.

The goods they traded had to be in the technology area, i.e. cell phones and IT. He doesn't remember exactly when the decision to trade in IT components was made. He was probably the one who suggested they go into brokering IT components because he had a penchant for IT. He believes that the first trades in IT components went from the Netherlands to the UK, but at first there wasn't much trading. He was introduced to Solid Trading ApS by an employee at Comitel International, who had previously worked with the person behind Solid Trading.

ding ApS. He came into contact with customers at electronics fairs, for example in Hong Kong, on broker sites on the Internet and by phone. This was also the case with the "Yellow Fever" traders. The other brokers were also in contact with Solid Trading ApS, but in connection with the "Yellow Fever" traders, he was the primary contact. He was also the main contact with the buyers in Hong Kong, but when he was traveling, the other brokers took over.

He remembers having contact with the company Asia Time Technologies Ltd. in Hong Kong, but does not remember who originally got the company in as a customer of Comitel International.

He was not interested in how Asia Time Technologies Ltd. had found its way to Comitel. At one point, three Hong Kong-based companies visited the office, but he doesn't remember which ones. He also recognizes the other names of foreign companies in

The "Yellow Fever" traders listed in the overview on page 10 of the Copenhagen City Court's judgment of October 4, 2007, including Aspen Group Ltd. and Fusion R, but does not remember details about them or how contact with them was established. It was not Peer Kølen-dorf who was responsible for contacting the companies.

He doesn't remember if he told Peer Kølendorf directly that Solid Trading ApS could supply IT components, but they probably talked about getting a business up and running. They talked regularly on a daily basis, and he was the one who informed Peer Kølendorf. Peer Kølendorf had no contact with Solid Trading ApS. He did not inform Peer Kølendorf even if they made a big deal such as the one with Asia Time Technologies Ltd. Peer Kølendorf may have become aware of it from the statistics or from the fact that the brother had his "arms above his head" after a big deal. He doesn't remember Peer Kølendorf asking about prices.

When he arrived, control routines had been established in the broker department in relation to goods, suppliers and customers. He admits what he said during the criminal trial about checking VAT numbers and goods, among other things. He believes they tried to follow the guidelines in the English Code of Conduct, which was discussed at meetings in FTI, which was the English organization for brokers. He and Peer Kølendorf were in complete agreement that they should avoid VAT carousels. Peer Kølendorf also provided articles from SKAT and others on the subject.

Peer Kølendorf often asked if they had done inventory counting and control. The IT components came into their own warehouse, while cell phones were typically stored at the freight forwarder. Everyone in the broker department participated in checking and counting, even in the "Yellow Fever" dealers. He participated in the checks himself and made sure that the other brokers did the checks. If the boxes were open, they checked the contents and took samples for inspection. IT components were packed in transparent bags. If the boxes were closed and sealed, they counted the boxes, checked the labels and that the seal was in order all around, i.e. that the right type of tape was used. Goods lost value if the seal was broken. The market talked about "open box" and

"sealed box", and the price of the two types was not the same. Neither the purchase order nor the invoice stated whether they were open or sealed boxes, but it was agreed over the phone. As a broker, you knew what was coming, and then you checked whether the item received was as agreed. For example, the invoice said "RAM blocks", but verbally or in an MSN message, RAM

blocks of 1 gigabyte had been agreed. There was no documentation trail. If the goods were not as agreed, the customer had to say yes or no to what could be delivered. You could also contact the supplier. He had a customer before he purchased goods. Each trade had a control form with checkboxes, but he doesn't remember if they filled out the form when trading IT components. It was a control form from earlier times. He doesn't remember there being

problems with goods not arriving as agreed, even if you don't know each other very well.

No warranty or guarantee was sold, so there were no complaints. When a phone had the Nokia name stamped on it and Nokia could see the relevant data in the device itself, Nokia would handle the complaint. If it was IT components that didn't work, he would contact the supplier and try to do something about it, but he was under no legal obligation to do so. Comitel International marketed itself at trade fairs and broker meetings and on broker sites on the Internet.

**1908**

He and the other brokers had an ongoing dialog about where the most money could be made. He does not remember any disagreements about using the DKK 50 million limit, even though he spent DKK 40 million on a trade with Asia Time Technologies Ltd, for example. Nor was it something he discussed with Peer Kølendorf. He was not on a professional salary.

It was only payments for goods that required approval. He couldn't approve payments himself, but he sent it to the bookkeeper and was notified when it was paid. He doesn't remember what paperwork he had to fill out in this connection, but there were certainly some.

It may well be true that it was on his initiative that they started trading Internet access cards for porn sites in the fall of 2004. It was similar to the prepaid cards they were already trading, and he had seen the cards in Hong Kong where they were in stores, and he thought there was a market. He did not do a formalized investigation of the cards. He does not remember whether Peer Kølendorf asked about the dealers with the cards. He does not remember the correspondence with the buyers in connection with the trade with the cards.

He was employed as a business developer until he became CEO, but that didn't change his everyday life. He didn't attend board meetings, but sometimes came in and answered questions. Peer Kølendorf also briefed him on what they were talking about. He attended the strategy day.

There was no difference between the "Yellow Fever" trades and other trades before and after this period. They were also handled by the same employees. He remembers that they did not want third party payments because it could "smell something suspicious". He does not recall the witness statement he was required to give at Nottingham Crown Court in relation to the Vaneypeco/Texmart case, which is in draft form in the case.

He was very much involved in the operation of CBB Mobil on the technical side, but not in the sales process. It didn't interest him. In relation to SMS, he also took care of the technical and personnel aspects until it was sold off.

He was spending more and more time on broker activities while working on CBB Mobil and SMS, so he was also spending evenings.

*Ole Stangegaard* has explained that he was Chairman of the Board of Danitas, later Comitel, from November 6, 1998 to June 2003. He was trained as a line officer and in 1960 he helped start Datacentralen, where he became deputy director. He then worked with IT in both EAC and the consultancy firm Price Waterhouse, where he was a partner for 9 years. Until two years ago, he was chairman of the board of several companies in the IT field, including the company Milestone.

Peer Køhlendorf wanted a professional board and he was offered the position of chairman. The other two board members were Torben Svanberg, who had a background in the mobile phone industry, and Lars Thinggaard, who is a trained accountant

and now CEO

in Milestone. He personally had no experience in the broker area.

His impression of the company was very positive from the start. It had a solid financial foundation and seemed well-run. Peer Kølendorf's behavior in relation to the board was trustworthy. Things were in order with the necessary separation of functions, and there were written rules and procedures for the employees in a staff handbook. When the board asked questions, they were answered promptly, which was a sign of a well-run organization.

They held a board meeting every 2-3 months and he visited the company at least once a month to meet with Peer Kølendorf. He experienced a good atmosphere in the company and among the staff.

He and Peer Kølendorf met with the company's bank every six months, and the feedback from the bank was that everything was in order. Payments were made on time and agreements were kept. Once a year, there was also a meeting about the company's insurance situation.

The Board of Directors received regular reports on revenue, costs and results at an overall level. They discussed the individual departments if necessary, but it was not the board's job to control the situation at department level when, as was the case with Comitel, the CEO provided the necessary information. There were discussions in the board, but consensus was always reached without a vote and Peer Kølendorf implemented the decisions loyally. A strategy meeting was held once a year. Peer Kølendorf lived up to his expectations to a high degree

- both as a businessman and in human behavior and righteousness. As CEO of an organization of Comitel's size, it was Peer Kølendorf's responsibility to set guidelines, monitor performance and make sure the organization functioned, but he did not have to be involved in the details of daily operations or bookkeeping functions. The board was satisfied with the way Peer Kølendorf fulfilled the role.

He had a meeting with T when Peer Kølendorf expressed a desire to hire him as a business developer. He trusted T, who appeared to be a professional and enterprising person, so he supported the hiring. There was a good personal relationship between Peer Kølendorf and T, who was part of the daily management. He did not experience any breach of trust on T's part during his time as chairman.

T occasionally attended board meetings and presented interesting proposals based on his knowledge of the industry and market conditions. T's proposal to expand the

**1909**

the brokerage business to include IT components was interesting to the board because it is unhealthy for a company to "stand on one leg". At the same time, the expansion could be based on the existing organization and the support functions, such as accounting, that were already in place, so it made sense. There was no strategic plan in place, but the board had set ambitious growth targets for the company and the broker expansion could help achieve them. It was right at the end of his chairmanship that the board decided to go ahead with the proposal, and it was T who had to implement it. A business plan was unnecessary because Peer Kølendorf and T knew the area so well, and it was just a matter of adding a new product group and hiring a few more people.

The board emphasized that the relationship with the authorities, including SKAT, should be in order, and each board meeting began with the distribution of receipts for paid A-tax and VAT. The board was familiar with the concept of VAT carousels, and it was referred to with great disgust, but it was not something

they discussed in depth. He knew that Peer Kølendorf submitted lists of customers and suppliers to SKAT and knew the names of employees in the company.

and the board was also presented with such lists on one occasion. He does not recall the word VAT carousel being used in connection with the lists. They were submitted for the purpose of correct settlement in relation to SKAT.

He knew that Peer Kølendorf was paying close attention to VAT issues, and he had not heard anything about the company being close to a VAT carousel. That would definitely have made the board react. He does not recall any specific articles where Peer Kølendorf has commented on VAT carousels, but it may well be something they have talked about.

He doesn't remember any mention of a Code of Conduct, but the board knew that goods were inspected randomly. It was good business practice, so there was no need to write it down. The board did not hear anything about missing payments, and he knew from the meetings with the bank that the large payment flows were under control. He does not remember specific names of trading partners. The board did not go into detail about it.

He does not recall any particular consideration behind the formulation of "special risks" in the management report in the 2002 annual report, of which he is a co-signatory. Management must always strive for seriousness in conducting business, and the significant risks are obsolete goods, rogue trading partners and inability to pay. He trusted that Peer Kølendorf had the organization in place to ensure that the business was conducted in a responsible manner.

In 2007, when he saw a report in Computerworld that the Distributors Association was trying to get Peer Kølendorf expelled from the industry association, he was outraged. He found it unfair and uncollegial and offered Peer Kølendorf his assistance. He and Peer Kølendorf had a meeting with the chairman and director of the IT industry association, where he expressed his opinion on what he perceived as a personal vendetta against Peer Kølendorf.

*Steen Erik Mønsted* has explained that he became a member of the board of Comitel in February 2003 and since June 2003 he has been chairman of the board. He originally started as a management consultant in T. Bak-Jensen and AIM. He then entered the grocery industry and was first CEO of Frellsen and then BS Supermarke- der, which during his time became the Fakta chain to compete in the discount market. When he returned home after a three-year stay abroad, where he was CEO of Gate Gourmet in England and Ireland with management responsibility for 2,000 employees, Peer Kølendorf offered him to join Comitel's board. He has known Peer Kølendorf for 25 years, where they sat in a VL group together. He knows about brokerage in the grocery sector. He had no knowledge of IT, and he had to be a generalist. There were others on the board with technical insight.

He has never met a company that was as well organized as Comitel. The board functioned well and could fully follow the overall operation and get the information it wanted. There was a fixed template for the board meetings with presentations and reporting, and Peer Kølendorf is a highly professional leader who delegated and organized the company in an appropriate way, but at the same time was always on the ball and showed a high degree of due diligence in terms of reporting and documentation. He sees Peer Kølendorf as an honest, friendly, social and very diligent person who has fully lived up to his expectations. There were quarterly board meetings, and in addition, he met with Peer Kølendorf 2-3 times a month.

At the board meetings, there were reports on the budget and liquidity. If there was a need for information about market conditions, it was T who gave a verbal report. A standard report was presented at the meetings, which also included a profit and loss statement, and there could also be reports on staff changes and salary conditions, as well as the information sent to SKAT.

UfR ONLINE

U.2016.1870H

He cannot say why IT components were not mentioned on the standard report presented at the board meeting on September 2, 2004, but it was added later. He remembers seeing debtor and creditor lists, but they were not always attached to the accounting figures for the board meetings.

T was a key person in the company, which is why he was appointed director of the broker department. By February 2003, T was a business developer and seemed very

**1910**

competent in IT and telephony. T was knowledgeable, practical and had a large network. He knew that Peer Kølendorf had a great deal of trust in T, and so did he himself. He had not experienced a breach of trust from T before the Vaneypeco/Texmart case in England. He and Peer Kølendorf made it very clear that it was unacceptable that T had released goods before payment had been made. He remembers that T came up with the proposal to expand the brokerage business with IT components because he had received inquiries about RAM, among other things. The board initially rejected it, but it came up again, and it was a natural extension of the fact that the company already had a well-functioning broker department and associated support functions such as bank flow and a competent freight forwarder. At one point, there was a proposal to expand into clothing trade, but they decided to limit the area to what T had knowledge of, so it became IT and mobile phones.

There was no written presentation for the Board's decision on broker trading in IT components. The Board found that T's oral presentation of the market conditions was a sufficient and good basis. Comitel was a small player, but if the company could gain even a small market share, it would give a good result. The decision was that T should hire people, but otherwise use the existing apparatus of the company and utilize its own expertise and network.

They discussed the issue of VAT carousels in the board. The board was interested in covering themselves, and they knew about Peer Kølendorf's cooperation with SKAT and had seen the lists of trading partners that were submitted. He found it reassuring that SKAT - unlike Comitel itself - could see the upstream and downstream stages of trade, and he assumed that they would be notified if something was wrong. The routine of submitting lists was already in place when he joined the board. The board's attitude was that they couldn't be police officers, but "masters in their own house".

They talked about the Code of Conduct, and it was T's job to make sure that these guidelines were followed. He remembers that there was an example of a company without a VAT number that Comitel refused to do business with. He believes they did everything possible to avoid VAT carousels and Comitel was not informed that they were involved in any such thing.

From where he was sitting, he saw no difference between the "Yellow Fever" trades and other trades. It's a division that only happened afterwards. He received regular reports on revenue figures and was pleased with the positive development, but Comitel's trades were small compared to the market as a whole, and there were usually large fluctuations, so there were no alarm bells ringing. A DKK 40 million trade was a "nice" trade, but neither small nor large out of the ordinary. He knew that other companies were trading for the same amount. As far as he knows, attempts to map the size of the broker market have not been successful.

The board asked to see the control of the goods and in spring 2003 they were given a demonstration in their own warehouse by T. The forwarder carried out a similar check of the goods that Comitel did not have in stock itself or checked with the forwarder. The board did not subsequently verify that checks were carried out,

Copyright © 2023 Karnov Group Denmark A/S

which he considered neither necessary nor the task of the Board of Directors. The Board of Directors trusted that goods were inspected, as happens in all business relationships, and there has been no reason to believe otherwise.

He had heard about the company Solid Trading ApS and knew that Comitel started trading in IT components with the company in November 2003. T told about his visit to Solid Trading ApS and mentioned that everything looked fine and the company was registered for VAT.

He sees the remarks about special risks in the management report in the annual report for 2003 as standard audit remarks. You have to deal with serious buyers and that means being aware and using common sense and checking VAT numbers.

It was "in the blood" of Comitel and did not require a special system. The remarks in the 2003 annual report about the decline in the UK market were due to the UK authorities' intervention against

"hotbeds in the industry". The remark in the same place about focusing on sales work in Asia should be seen in light of the fact that they considered whether the company could start something in Dubai, but it was abandoned after T had investigated the situation.

The fact that T was appointed director of the broker department in April 2004 did not lead to changes in Peer Kølendorf's role in the company, nor did he expect it to. Peer Kølendorf continued to have overall responsibility for the company's operations and took care of the financial and liquidity matters, including reporting to the Board of Directors, but Peer Kølendorf was not an expert in the broker area and did not have T's network and technical insight. When it came to the broker area, the board turned to T, and he saw it as a strengthening of that part of the business that T was given full responsibility.

As far as he remembers, he was only later told that Comitel was dealing with internet access cards, but it was within the agreed framework and when the market was there, it was fine.

He was dismayed by SKAT's letter of December 6, 2004 denying deduction of VAT, and this was discussed by the Board. Peer Kølendorf and T took care of the subsequent process. It did not give rise to any changes in the company's procedures or

**1911**

control measures in relation to T, and at this point he did not even consider withdrawing from the brokerage business. He had a strong belief that what they were doing was okay.

The broker activity was shut down in 2006, partly because T, who was the linchpin of that part of the business, was gone and partly because of the change in the law on joint and several liability. Neither Peer Kø- lendorf nor anyone else had the expertise to run the brokerage business further, and going forward the company will mainly focus on a property portfolio.

*Flemming Lind Johansen* has explained that he is educated in and has worked for a number of years in the customs service, including with control of the broker industry in 1994. From 2001 until 2012, when he started his own consultancy business, he was a partner in KPMG and Ernest & Young, where he advised on VAT. He is the author of several books on VAT and is an external lecturer in VAT law at CBS. He assisted Comitel in 2004 and 2005 as an advisor because Peer Kø- lendorf had asked him to check Comitel's procedures and the brokers' knowledge of VAT rules within the EU based on the OB Invest case, where Comitel had sold to Norway, which was not a member of the EU.

When SKAT's first draft decision regarding the "Yellow Fever" trades was issued in December 2004, he conducted a review of the trades as an advisor to Comitel and was also involved in the

consultation response that Comitel submitted on January 31, 2005.

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2016.1870H

He reviewed the accounting material, including bank statements relating to the transactions, and found nothing remarkable. There were no unrealistic amounts compared to Comitel's trading in general. He checked the suppliers, i.e. Trademark International ApS and Solid Trading ApS, and found nothing unusual. Both companies had submitted annual accounts and had an auditor. The only thing he wondered about was that Solid Trading ApS had been registered with an address in a holiday home, but later the company's address had been changed to Skudehavnsvej. It was difficult to investigate the customers as they were companies in the Far East, but he believed that fraud at that stage would be difficult due to customs control out of the EU and import control in the Far Eastern country in question. However, he is aware that export control is not something that happens consistently.

He did not check whether goods had been inspected in each individual transaction. Nor did he note whether payments had been made to third parties or whether credit had been granted. He considered the product declarations on the goods as they were stated in the documents and did not notice anything in this connection, including the indications "Infineon TS- OP" or "Samsung Branded Dice". He believes that, partly due to his work in customs, he had sufficient knowledge to be able to assess the product descriptions, even though it is a constantly evolving market.

He happened to be present at Comitel when T's workplace was searched. It was a serious situation that led to further investigations, among other things, the company requested access to SKAT's information about Solid Trading ApS, but SKAT did not believe that anything relevant could be found therein. Only later did he have the opportunity to review information about Solid Trading ApS, where he noted, among other things, that the company had paid both the security company and the insurance company, which indicated real trade in the company. He also asked T if he was aware of a person mentioned in SKAT's first draft decision. T replied that he did not know the person in question, who was also not known in broker circles.

He believes that SKAT had not been sufficiently careful in its investigations of Comitel's export declarations, as his investigation showed that an export declaration had been made by Comitel's freight forwarder, but the declaration had been made under a so-called "dummy number" that anyone can use at SKAT.

He believes that there is a significant risk for brokers of not getting paid for the goods being sold, so it is customary to sell "on hold", i.e. the broker does not deliver goods until they have been paid. At the same time, it is important not to pay your supplier before the broker has checked the goods, which is difficult with IT components because the value is reduced if you open packaged goods. Payment to third parties can be a sign of something suspicious, but can also occur in very real transactions. In his opinion, it is a characteristic of the brokerage industry to "play with closed cards", otherwise the broker makes himself redundant as an intermediary. He believes that submitting lists of suppliers and customers to SKAT is a commonly known precaution because it gives SKAT an overview of trading patterns and allows them to see who is trading in the market.

*Kenn Hoffmann Jensen* has explained that he still works as a special consultant at SKAT in the Department of Special Control and deals with cases of more serious financial crime, but it is now a nationwide department. At the time of the "Yellow Fever trades", he was in the North Zealand-Bornholm region.

Among other things, he had the power of control over Solid Trading ApS, which was previously called Nemesis ApS. The first time he came across the company was in connection with a so-called verification request from the British authorities in September 2002. His colleague Jørgen Eg-

Copyright © 2023 Karnov Group Denmark A/S

gert was at the company to obtain information about a transaction involving two British companies that the British authorities had requested. In early 2003, a verification request was received again from the British authorities.

**1912**

authorities, and he had contact with the company himself. There were several requests concerning Solid Trading ApS regarding purchases from English companies and resale to an Italian company. They received no response from the UK authorities to the information they sent to them, but did not ask for it either. They sent a request for information to the Italian authorities, but did not receive a response.

In October 2003, he and Jørgen Eggert visited Solid Trading, which had requested payment of export VAT of almost DKK 4 million. They found nothing to prevent payment, but asked the central unit in SKAT to contact the British authorities because they believed that Solid Trading ApS was part of a VAT carousel. In December 2003, they were visited by two English police officers who brought material home. In mid-January 2004, he called the British police and was told that the case was under investigation, but heard nothing further.

In February 2004, they received an inquiry from Region Køge about the company Network Trading ApS, which had accumulated an amount of DKK 90 million in VAT due for Q3 2003 and January 2004. Network Trading ApS had resold goods purchased in Hong Kong to Tra- demark International ApS in Vejle, which had resold the goods to Solid Trading ApS, which in turn had resold the goods to Comitel, which had sold the goods back to Hong Kong. The payments were usually made by Trademark International ApS paying directly to Network Trading ApS' supplier in Hong Kong, but in a transaction in January 2004, this routine was deviated from and Network Trading ApS prepaid DKK 90 million to the supplier Quantum in Hong Kong, which turned out not to deliver and did not subsequently refund the amount. This led to Network Trading ApS' failure to pay VAT of approximately DKK 90 million and to the company subsequently going bankrupt. Region Køge handled the case regarding Network Trading ApS, and he took no action at this time and had no contact with the case manager regarding Trademark International ApS in Region Vejle.

He attended the meeting on March 16, 2004 with representatives from three tax regions, the Chamber of Commerce, SØK and the Danish Customs and Tax Administration, where it was decided, among other things, to set up a steering group on action "Yellow Fever". It was the management of his region that initiated the meeting to find common ground so that they could close the VAT fraud chain. It was probably he who had invited SØK along. At the meeting, it was decided to put a customs block on the relevant companies, and this was also done in relation to Solid Trading ApS. This meant that goods purchased from the Far East were opened by customs officers to verify the contents. This is not a common thing to do, but Solid Trading ApS had gone from trading within the EU and Denmark to importing from a third country, so it was an attempt to hedge against future events. Two days later, a prepaid consignment from Hong Kong to Solid Trading ApS was stopped at the airport as described in ToldSkat's memorandum of April 2, 2004, which he can admit. As a result, Solid Trading ApS was unable to pay VAT of DKK 11 million for February and DKK 17 million for March 2004, and the company subsequently went bankrupt. The batch of goods turned out to be fakes and not counterfeit as stated in the memo.

He does not recall that they had received a tip about Solid Trading ApS from outside. It must have been on the basis of the inspections they carried out that they learned about the company's trade with the Far East. He does not remember how many inspections they carried out in the fall

2003, but they never saw the cleared goods in the warehouse. A customs profile or customs block can be graduated based on available information and can be applied to a specific item. In early 2004, he only had theses to work with. When third-party prepayments were made, he suspected chain fraud.

Detecting VAT carousels has not become easier, even though SKAT has introduced a unified organization, because the trade chain has become longer and goods move in and out of the EU. Communication in SKAT is better, but the cases are harder. The planned "Early Warning System", described in an article in their trade union magazine, did not materialize. The system they got instead is not as good.

In a memo dated February 2, 2004, he mentioned a conversation with a colleague, Charlotte Vindelev, from the Copenhagen Region, who was responsible for paying negative VAT to Comitel. As stated in the memo, she had asked Comitel for invoices and payment documentation regarding purchases from Solid Trading ApS during the inspection visit. Prior to this, Charlotte Vindelev had contacted him to find out about Solid Trading ApS. They did not discuss the risk of VAT fraud before her visit.

When negative VAT returns are to be paid, a gradation is made of which control is to be carried out. There are 7 categories and the higher the category, the better the documentation required before payment is made. If you end up in a category 5, 6 or 7, the control will typically involve a visit to the company.

*Mia B. E. Hansen* has explained that she is currently a special consultant in SKAT's special control department, where she works with VAT fraud. In 2000-2003, she worked in the Copenhagen Region in an audit group, where she, among other things, answered verification requests from foreign authorities. She has a 4-year education as a clerk in Customs Tax and also has a "spearhead education" in VAT.

She started working with Comitel in 2000 because SKAT received many verification requests

**1913**

from abroad regarding the company's trades. They were handled by three case handlers. It was an employee in the department "Large companies" that were responsible for the payment of negative VAT to Comitel. She cannot say exactly how many verification requests SKAT received regarding Comitel. The procedure was that she wrote to the company and asked for information about the transactions, and it was very stringent with Comitel, where Poul Elmelund responded quickly. They received no feedback on the information that SKAT sent to the foreign authorities. She was also responsible for a couple of other brokerage companies, one of which was as big as Comitel. She remembers Peer Kølendorf submitting lists of suppliers and customers, but cannot say exactly when he started doing this. At the time, there was no structured monitoring of VAT carousels, and the idea was that if SKAT received information from the large brokers, it would provide an overview and the information could be passed on to the relevant tax region for investigation. She does not remember who initiated the scheme. She received and reviewed the lists from Peer Kølendorf in 2002 and 2003. If there were new Danish companies on the list, she sent information about this to the relevant tax region, which then assessed whether anything should be investigated in that connection. The lists did not indicate the size of the trade, and she does not remember asking for this information.

Peer Kølendorf did not receive feedback about the companies on the submitted lists of customers and suppliers, and she would also have breached her duty of confidentiality if she had done so. Once in 2001, she received a report about a company from Comi-tel, and even then she did not give Peer Kølendorf any feedback on what the report led to.

She has not been able to find the lists from Peer Kølendorf in the archive, which may be because the archive has moved physical address several times, just as SKAT has gone from manual to fully electronic case processing.

She doesn't remember being asked by Peer Kølendorf whether trading with Solid Trading was a good idea. She would also only have been able to tell whether the company was registered for VAT. SKAT can only disclose information about other companies if it is part of the justification of a decision.

Until the "Yellow Fever" steering committee meeting on March 16, 2004, she was not aware that there had been any reason to check Comitel beyond the usual. She would expect to have heard if there were special circumstances concerning the company. The discussions about Comitel that Charlotte Vindelev, who worked in another department in Region Copenhagen, had with Kenn Hoffmann Jensen from Region North Zealand, and which appear from a memo dated February 2, 2004, are not known to her.

She does not know when she received the invitation to the steering committee meeting on March 16, 2004. SØK was there to discuss theories about the VAT carousel. At the meeting, Comitel was mentioned as a buyer in the supply chain, but there was no factual documentation about the company at the meeting, and they did not discuss specific names or whether the company was doing anything criminal. At the meeting, they mostly talked about the transaction chain and process and the theses it gave rise to.

The form for short periodic checks is used for payment checks, but she does not know the background to the check at Comi- tel that led to a form signed on March 25, 2004. She heard about it at one of the steering committee meetings. It was probably not at the meeting on March 16, 2004.

SKAT considered whether there was a basis for withholding negative VAT in relation to Comitel, but did not find a basis for this until the VAT for November 2004. In March 2004, the trading process had not been uncovered. This did not happen until later in 2004. The entire trade chain had to be uncovered and there had to be an overview of the invoicing before it was justifiable to withhold negative VAT. It is a serious matter to refuse payment because the company risks going bankrupt, so they had to be absolutely sure of the basis.

It was not until June 2004 that SKAT began to uncover the chain of trade in the "Yellow Fever" transactions. From March to June, there was an interlude where SKAT was in doubt as to whether there was a basis for denying deductions and, among other things, asked for assistance from Kammeradvo- katen. She requested material about the "Yellow Fever" traders from Co- mitel on June 29, 2004 and received some of it on July 16, 2004. She received the latter in September 2004. During the summer, she also obtained material from the other tax regions. When SKAT asked Comitel for material, SKAT received it without undue delay.

Following SKAT's proposed decision of December 6, 2004, she participated in a meeting with Comitel on January 27, 2005, after which Comitel submitted a consultation response on January 31, 2005. Peer Kølendorf, T and the company's lawyer participated in the meeting. She does not recall that there were any deviations in the consultation response from the discussions at the meeting.

In March 2005 they received the Advocate General's recommendation in the Bond-house case [Joined Cases C-354/03, C-355/03 and C-484/03], which raised the question of whether the Comi- tel case was sufficiently documented. Therefore, they decided to ask authorities in Europe for information on whether any of Com- mitel's trading partners could be characterized as "missing trader". They wrote in June

2005. She was on maternity leave from September 2005 to May/June 2006 and was therefore not involved in writing the final decision, but SKAT's conclusion in the decision of July 20, 2006 that the majority of Comitel's international sales

**1914**

was VAT carousel related is based on the responses received from the foreign authorities.

For example, the Luxembourg authorities stated in a reply of July 9, 2005, which is part of file 68 in the case, that the company Vaneypeco was a garbage company.

As regards the companies NU Communications Ltd. and Ocean 3 Ltd. SKAT's conclusion is based on an assessment of the information provided by the British authorities about the companies. This conclusion is based on information that the companies have had frequent changes in management and high turnover of secretaries as well as changes in trading patterns and consequently deregistration of the company shortly after large amounts have been traded with Comitel.

She does not recall having had discussions about Comitel with foreign authorities. SKAT's analysis is based on the foreign authorities' written responses.

In 2003 and 2004, there were only limited customs checks on exports and physical checks were rare.

SKAT had not had any bad experiences with Comitel in the past. Deadlines for delivery of material were met, and the company called and made appointments if time was needed to find the requested material.

She has issued notifications to companies a couple of times since it became possible in 2006. The notification means that SKAT presents the company with information about VAT fraud and points out how the company can protect itself against it in the future. There was no guidance material for brokers in 2003-2004. It was not until the notification rule was introduced that a checklist was added to the notification.

The part of the Comitel case concerning the sale to the Norwegian company OB Invest, but where delivery was made to England, is still pending. SKAT received information from Norway on May 19, 2004 and could see that there were other matters concerning Comitel that needed to be investigated.

*Reino Nielsen* has explained that he is currently chief consultant in SKAT's special control department. In 2003 and 2004, he worked in ToldSkat's planning office and was tasked with coordinating the regions' work with VAT carousels and being responsible for international contact in this area. In 2003, he had worked in this area for several years.

He first heard about "Yellow Fever" trades in early 2004, either in January or February. He was contacted by a caseworker who thought something looked strange, and a meeting was called on March 16, 2004. He does not remember today whether the inquiry from the case officer concerned Network Trading ApS or Solid Trading ApS. It was the planning office that initiated the steering committee because companies in several regions were involved and there were also cross-border transactions. He may have called the meeting himself. He does not remember what notice was given, or whether it was by phone or e-mail. He believes it was after Network Trading ApS had gone bankrupt.

The novelty of the "Yellow Fever" trades was that they were traded out of the EU, which made it difficult to get information about the companies involved because there is no global system like the EU to exchange information. You couldn't just pull in information from Hong Kong and Singapore. The second thing was that

In the chain transactions known so far, the "bin company" usually failed to declare and pay VAT. In "Yellow Fever", the "garbage can company" had declared VAT, but then something unexpected happened to the assets, after which the VAT could not be paid and the company went bankrupt.

Copyright © 2023 Karnov Group Denmark A/S

His role in the steering committee was to bring parties together and he involved the Attorney General because the need to secure assets by arrest or otherwise could arise. This was normal practice. He also involved the Public Prosecution Service because in relation to the "garbage can company" - in this case Network Trading ApS - it was relevant to consider whether a criminal offense had been committed, and the police investigation could also uncover criminal offenses in later links in the commercial chain. The prosecution quickly withdrew from the case again because VAT had been declared in the "trash can company" and there was therefore not considered to be a criminal basis. The police did not initiate an investigation until Roxy World was robbed in the summer of 2004, which turned out to be a fake robbery. It was the police in Roskilde who investigated and found that it was debtor fraud and not, as usual, gross tax fraud under section 289 of the Criminal Code. In the steering group, they worked with theses, but it was not part of the thesis that Comitel was part of a criminal network. Only later did it turn out that Comitel could be seen as a common denominator for the companies involved, and it was not until the fall of 2004 that Comitel came under the spotlight in connection with something criminal.

In 2003, at the request of some state-authorized public accountants, he wrote an article in their association's magazine about how to avoid becoming an unwitting participant in an illegal VAT carousel. They were looking for advice for businesses. The article was inspired by the British Code of Conduct. In the article, there is a lot of focus on too low prices, because this was a characteristic of the previously known VAT carousels, where the goods were destined for end users. Today, the advice is to be aware of price deviations, and they can be both upwards and downwards. The article also mentions the system of contacting SKAT as a way to make sure, but the problem with this was that SKAT could not provide information to the company at that time,

**1915**

who made a report, about the outcome of any investigation. However, SKAT could use the information to uncover a trade chain and use the information in Denmark, or inform foreign authorities about foreign companies involved. The scheme was not originally intended for the VAT carousel area, but was introduced as part of efforts to combat undeclared work, so that the authorities could carry out checks more quickly, and the reporting company could avoid criminal liability in return.

Product control is not mentioned in the article because SKAT had not seen the "closed circuits" in the previous VAT carousels, and it seemed obvious to carry out product control, but today he would have written it differently.

The "Yellow Fever" case was a contributing factor to SKAT getting a unified organization.

There are no customs checks when goods leave the EU. An export declaration is submitted. Customs controls on imports from third countries are based on a risk assessment and are random. There is a possibility of control, which there is not between EU countries. When it was decided to place a customs profile on Solid Trading ApS in March 2004, it was the result of a risk assessment.

He had a meeting with the IT industry association in 2005 in the wake of the Bond-house decision [Joined Cases C-354/03, C-355/03 and C-484/03]. As far as he remembers, it was SKAT that initiated the meeting in order to discuss whether SKAT and the industry could jointly do something to prevent VAT carousels.

*Jørn Rosenmeier* has explained that he has a degree in business administration and started importing and exporting IT parts under the auspices of a company that originally traded in radios. This developed from the early 1980s until the company, which had around 100 employees, was acquired by an American company in 2010, where he was hired as CEO.

U.2016.1870H

Dry. The company imported branded IT products, but also CPUs and RAM, from all over the world and was a distributor in Denmark and Norway. In 2000, he had built a new headquarters with a large warehouse and saw the potential for radio and IT dealers to take over the mobile phone trade, so he decided to try his hand at this market.

He hired K, who had previously been an employee at Comitel, in order to build up an agency. In this connection, he received a letter from Peer Kølendorf, who drew attention to the Danish Marketing Practices Act's provision on trade secrets due to K's knowledge of the mobile phone sector. The company traded in accessories for phones, and K said that by trading on the broker market, they could "exploit imperfections in the market" by fluctuating supply and demand for certain goods. He later hired two additional employees, Torben Nielsen and Henrik Johansen, both of whom had also been employed by Comitel and had worked as a team. Henrik Johansen made the trades and Torben Nielsen did the paperwork and inspected the goods. He dismissed K after some time, but hired a few more employees to broker cell phones.

The brokers made it clear that they were used to having a limit of DKK 10 million or more to trade for, but he did not have such a large amount available in the company, so he set a limit of DKK 3 million, so that for trades up to DKK 3 million he had to be informed afterwards, while trades above that required prior approval. The brokers also explained about the "ship on hold" principle and that everything had to move very quickly in the broker market with large trades. The brokers were not happy with the limit, which they found far too small. He noticed that there was often trading with new customers and with companies unknown to him, and after about 6 months he became so suspicious that he asked his financial manager to contact SKAT in Aalborg, also because he had seen articles about VAT fraud. SKAT asked for a list of customers in England and then wrote back that there were no immediate danger signals. After about a year, SKAT wrote that one of the customers had gone bankrupt with a large VAT debt. This was in 2001. They therefore agreed to forward all paperwork on future transactions to SKAT. After a few months, SKAT informed him that several of the company's customers had subsequently gone bankrupt. He questioned the two employees and they admitted that brokers met at the annual CeBit fair in Hanover and agreed on VAT carousels, including which companies would end up as trash companies. They stated that this was something they had also done during their time at Comitel, and SKAT in Denmark did not care because it did not involve the loss of Danish public funds.

After that, he immediately stopped brokering. He initially believed in 'market imperfections' but now believes it to be 'fraud and humbug'. After he shut down, he was visited by the UK authorities who spent a week investigating the trades and he knows they stopped several VAT carousels as a result.

When he reacted to his initial suspicions, it wasn't because of any shortcomings in the documents and invoices, because they looked ok, except for the fact that these were unknown suppliers and customers. Overall, it just seemed too good to be true. The brokering of cell phones took place from the beginning of 2001 to the end of 2001. The company's trade in CPUs and RAM was different because they bought for stock and knew their customers. He has also bought and sold IT components on the broker market, and it is his opinion that

**1916**

You can't be in doubt about when real brokerage is taking place.

It is characteristic that there will be a lot of small trades to different buyers to get rid of a large lot. There will be

Copyright © 2023 Karnov Group Denmark A/S

be multiple customers making contact and you want to know who the end customer is. In his opinion, the right broker market is not characterized by large trades.

You can visually inspect IT goods without opening the packages. Opening the packages requires special equipment, as CPUs are sensitive to static electricity and are therefore shipped in special bags.

He co-founded the Distributor Committee in 2003 and was a member until 2008. The Distributor Committee set ethical guidelines to ensure proper industry standards and prevent VAT fraud and trade in stolen goods. One of the points was that you must know the origin of the goods. The distributor committee got SKAT to give a lecture on VAT carousels, and he told a journalist at Computerworld about his experience from the broker trade in 2001. The Distributor Committee found it untenable that Peer Kølendorf sat on the IT Industry Association's main board when Comitel was one of the best-selling companies in the broker market. Comitel had a huge turnover with just a few employees, and he is of the opinion that there was no real trade, because a market of that nature did not exist in reality. He discussed the situation informally with the director of the IT Industry Association and was assured that Peer Kølendorf would not be re-elected to the main board, but it happened anyway. He was reprimanded for publicly criticizing members of the trade association, which led to his resignation in 2008.

*Ole Eklund* has explained that he is the CEO of Also A/S, a large European wholesaler and distributor of IT and consumer electronics. Also A/S buys goods from all the major manufacturers, HP, Lenovo, Microsoft, IBM, Intel and others, and the buyers are large retail chains such as Fona and professional companies such as Atea. He has been in the distribution industry since 1990 and has previously worked at Ingram Mikro A/S and Magirus Nordic A/S.

He has been a member of the main board of the IT Industry Association since 2003, when Magirus Nordic A/S joined and the Distributor Committee was established. He became chairman of the Distributor Committee from the start. The purpose of the committee was to "clean up" because IT distributors were in a bad light after cases of bad and fake goods. He first encountered VAT carousels in 2001-02, and it became a major issue in 2003 and 2004, when SKAT had also become more involved. The Distributor Committee wanted to create ethical guidelines for the industry and get the message out that a three-man company that turns over a billion dollars by "just moving boxes" cannot be compared to real distributors who add real value in the retail chain in the form of logistics, warehousing and technical staff who can educate customers. He represented the IT Industry Association in the collaboration initiated by SKAT in 2005. It was Reino Nielsen who participated from SKAT. The Distributor Committee was disbanded again in the spring of 2008, immediately after the Peer Kølendorf case had been dealt with. At that point, it no longer made sense in relation to the market to retain the committee. The Distributor Committee's "ethical charter" was removed in 2008, when the IT Industry Association conducted a cross-sectoral review of all the committees' guidelines.

He has not lost business in competition with Comitel, and Comitel has not delivered to his customers. There have always been companies that make a living by sourcing goods that are not available, but in his opinion there is no real market for a Danish company to buy abroad and sell abroad. Distributors only sell nationally, so from a business perspective he believes there is only marginal competition between distributors and brokers. The

main competition for distributors is other distributors, so it

Copyright © 2023 Karnov Group Denmark A/S

his attitude towards the brokerage industry is not based on envy.

He doesn't believe he was the initiator of the Peer Kølendorf exclusion case, but he was the chairman of the Distributor Committee and it was on the minds of the committee members. When the matter came up in 2007 in the wake of the "Yellow Fever" traders, it was the last straw because there had been discussions in 2002 and 2003 and media reports warning that the broker market was "shark-infested waters". After it emerged that T was involved, a unanimous Distributor Committee wanted to get the IT Industry Association on board and emphasize that even though Peer Kølendorf had no legal responsibility, the management was ethically responsible for what had happened. There was disagreement in the executive board, and the matter ended in a vote that did not support the expulsion of Peer Kølendorf. He still believes that it was right to recommend expulsion, if only from an ethical and moral point of view.

When the Distributor Committee's recommendation of January 24, 2008 to expel Peer Kølendorf mentions that Comitel has been involved in "supplying fuel to the VAT carousels", it was based on information from SKAT that there was 10% fraud in the broker market, and therefore fuel was supplied when a company operated in that market. He was not aware of whether Comitel's trades had actually led to losses for SKAT. He does not remember whether he had an action plan from SKAT in connection with the preparation of the recommendation.

He remembers the dialog with Martin Vollmer at SKAT, which appears in an e-mail dated 28 March 2005. His response

**1917**

on common practices for buying and selling IT components is based on his own industry knowledge. He believes that it is normal to get complaints on IT products in the range of 0-5% because they are fragile goods. The price development of IT components fluctuates, but he believes that in the fall of 2003 there was a period of falling prices.

*Kim Østrup* has explained that he graduated with a degree in political science in 1971 and has worked for IBM for 45 years, where he was Vice President and part of IBM's management team from 1992 to January 1, 2013. He has represented IBM on the board of the IT Industry Association, where he was also chairman for a 4-year period. He has also served on a number of other boards.

He got to know Peer Kølendorf when the Danish Association of Suppliers of Radio and Telecommunications initiated a collaboration with the IT Industry Association in 1998, while he was chairman. Peer Kølendorf became a member of the main board, and the fact that Peer Kølendorf was a director of a brokerage company did not give rise to any considerations. He was familiar with the broker market from IBM. If stocks were full, goods were sent out to the market, and this applied to both large and small components. Pricing could depend on currency exchange rate changes, and brokers would move the goods around. IBM didn't like that, and it was a market that management was aware of. He has not been involved in broker trading himself. To his knowledge, no other members of the IT Industry Association's main board ran a brokerage business, but HP and Microsoft, for example, must have been aware of it. To his knowledge, there was no association for brokers.

He had the impression that Comitel was a well-run business that had "several legs to stand on" and had achieved good results, and that Peer Kølendorf was a professional businessman. He has had no business relationship with Comitel or Peer Kølendorf.

Copyright © 2023 Karnov Group Denmark A/S

He was familiar with the turnover figures in the "Yellow Fever" deals, and it didn't seem unrealistic to him or the others in the IT Industry Association.

The Distributor Committee was established in November 2003 to include this segment in the IT Industry Association. There is no doubt that brokers and distributors have very different business models and compete with each other.

In early 2007, he became aware of the Distributor Committee's ethical guidelines from 2004, which had not been approved by the main board. They included a ban on buying counterfeit products, which he considered unsustainable in relation to EU rules. It was these ethical guidelines that the Distributor Committee in early summer 2007 initially cited as the basis for excluding Peer Kølendorf, which was flatly rejected by the main board. This was done verbally.

Later in 2007, after T had been convicted, the Distributor Committee recommended expulsion, stating that Peer Kølendorf, by operating in the broker market, had violated the IT Industry Association's general guideline to act in accordance with good industry practice. It was stated that SKAT had repeatedly warned against being in this market, which the Chairman of the Distributor Committee, Ole Eklund, could not document when the Executive Committee asked about this.

The Executive Committee therefore recommended to the Executive Board that there should be no expulsion because it was legitimate to be in the broker market and neither Comitel nor Peer Kølendorf had been charged or convicted. At the Executive Board meeting on February 28, 2008, the District Committee's recommendation was rejected with all votes except for the member of the District Committee.

He remembers that the Executive Committee and the secretariat were deep into the matter and found the recommendation unfounded, and when asked at the main board meeting, the Chairman of the Distributor Committee, Ole Eklund, did not come up with a single argument that there had been a violation of good industry practice.

*How to proceed*

*SKAT* has essentially proceeded in accordance with its summary pleading of September 29, 2014, which states:

*"SKAT's main arguments*

The Board of Directors and the Executive Board are jointly responsible for the management of the company's affairs, cf. section 54(1) of the current Danish Companies Act and correspondingly sections 115 and 117 of the current Danish Companies Act. It is the overall responsibility of the board of directors to ensure proper organization of the company's activities, cf. section 54(1) of the Public Limited Companies Act. The Executive Board, on the other hand, is responsible for the day-to-day management of the company, cf. section 54(2) of the Public Limited Companies Act.

The role of the executive board in this context is thus decisively different from that of the board of directors, which is of a more general nature, whereas the role of the executive board in connection with the operation of the company is to manage the company on a daily basis, i.e. take care of the daily operation of the company. The executive board must thus to a much greater extent than the board of directors be presumed to know all the company's transactions and financial position, and the executive board will therefore much more easily be said to have acted culpably if other losses are incurred, cf. Jørgen Boe: Bestyrelsesmedlemmers og direktørers ansvar, UfR 1984B, page 395 [U 1984B.385].

Peer Kølendorf was in the period from November 1, 2003 to

1. December 2004 director and/or board member of and the ultimate owner of Comitel International A/S'. During the same period, Comitel International A/S was an active participant in - and a necessary

**1918**

and thus a crucial prerequisite for the implementation of - the transactions that together made up the Yellow Fever complex and the largest VAT carousel in Danish history.

Comitel International A/S was aware of the real nature and purpose of the transactions.

In SKAT's opinion, the same assessment of liability must be applied for the entire period, as Peer Kølendorf's resignation as CEO on April 16, 2004 did not change the actual management conditions in the company, and as Peer Kølendorf was aware of the lack of control of the company's broker traders when he resigned. Peer Kølendorf was an industry expert and knew about VAT carousels and their characteristics. Peer Kølendorf also knew how to avoid participating in transactions that were part of VAT carousels, and Peer Kølendorf was aware that trading in IT components was a new area for Comitel International A/S and an area that was exposed to VAT carousels and fake goods. Peer Kølendorf himself estimated that 10-20% of the transactions on the market were part of VAT carousel fraud.

Despite this, he authorized his brokers to enter into trades for DKK 50 million and then let them trade without any interference or control from the company's executive management.

It is firmly established in case law and legal literature that the more a board member distances himself or herself from a detailed responsibility, the greater the control responsibility that must be imposed on the board member. Thus, it is not without responsibility for the board of directors to distance itself from detailed knowledge of the company's activities, as it is merely a matter of the response standard changing to a control responsibility, cf. e.g. UfR 1962, page 151 H and UfR 1962, page 452 h. The same applies to the executive board, which, however, is also assumed by the legislator to have detailed knowledge of operations in order to manage the day-to-day operations.

Peer Kølendorf did not participate in the settlement of the broker trades and had no specific knowledge of the trades. As a board member, Peer Kølendorf was therefore all the more obliged to actively monitor the broker activity, including implementing concrete and relevant guidelines for the brokers and ensuring compliance.

As CEO, Peer Kølendorf also had an active duty to be involved in operations, to have detailed knowledge of the company's activities and to keep a closer eye on the company's business area, the company's operations and the employees.

Instead, according to Peer Kølendorf, he refrained from actively controlling the brokerage activity, including trades in IT components and porn cards, which trading activity he left entirely to his sales manager, later director, T.

The fact that Peer Kølendorf failed to perform his executive function to the relevant extent cannot relieve him of his liability. A division of duties does not relieve the Executive Board of liability in relation to third parties.

Peer Kølendorf was aware of and accepted the trades that T entered into on behalf of the company in the period from November 10, 2003 until the end of November 2004, and Peer Kølendorf entered this market without seeking in any relevant way to protect himself from participating in VAT carousel related trades.

On the contrary, Peer Kølendorf accepted that Comitel International A/S participated in transactions where the volume both in traded units and price, the invoice material, lack of real product control, omission of usual control mechanisms such as registration of batch numbers/serial numbers etc. involved such great risks that it did not make sense for an industry expert,

unless Peer Kølendorf had closer insight into the connection between Comitel International A/S' supplier and customers and the purpose of the transactions.

It is therefore SKAT's opinion that there were both general and specific problem indicators, including both regarding the broker market and the specific transactions that gave Peer Kølendorf reason to provide information in order to uncover possible fraudulent circumstances, cf. in this connection Thorbjørn Sofsrud: Bestyrelsesansvaret, 1999, page 442. However, Peer Kølendorf failed to react to these problem indicators, despite having reasonable cause to do so, and he therefore neglected to make an obvious assessment of whether the company should refrain from the Yellow Fever trades.

In SKAT's opinion, this must indicate that Peer Kølen- dorf grossly negligently failed to properly manage his business and failed to consider the specific and general risks that the Yellow Fever transactions entailed for Co- mitel International A/S.

The size of the organization must also be taken into account in the liability assessment, cf. e.g. Morten Samuelsson and Kjeld Søgaard: Bestyrel- sesansvaret, 1997, page 181. Therefore, much higher demands must be placed on management's detailed knowledge of operations in smaller companies. Especially if a small company's sole owner and director manages the operations on their own and, through breach of law etc. causes third party losses, the dividing line between liability and liability in damages will be thin, and it does not take much to establish liability, cf. Erik Werlauff: Company Law, 9th edition, 2013, page 580.

The fact that Comitel International A/S was a small company with only 5-6 employees, that Peer Kølendorf was a member of both the Executive Board and the Board of Directors at the start of the transaction, and that he had a controlling influence, should thus lead to an aggravating assessment of liability.

**1919**

over the company, as he was the ultimate principal shareholder. The management has a duty to monitor that there is economic reality behind the company's transactions, cf. UfR 2005, page 918 h, where the Supreme Court ordered a board member of a Canadian company to respond to a participant in a circular investment project, as the board member should have realized that the project could be without economic reality. This duty applies to all members of the management, but must be particularly obvious for the executive board, which, unlike the board, has detailed insight into the daily operations.

As CEO and board member, Peer Kølendorf had a duty to ensure the organization and compliance of relevant control measures that were suitable to prevent Comitel International A/S from being involved in fictitious transactions that could result in losses for SKAT.

This did not happen.

A stricter assessment is applied where the management's actions or omissions, which cause a creditor loss, have been intended to provide the management with a personal benefit. It should thus lead to a stricter assessment that Peer Kølendorf was the ultimate owner of Comitel International A/S and the group to which the company belonged, which is why he had a personal financial interest in the profits generated by the Yellow Fever traders for the company.

As a consequence of the above, it is summarized that Peer Kølendorf, in his capacity as director, board member and ultimate main shareholder of Comitel International A/S, has acted in a tortuous manner towards SKAT by the allocation of and the lack of control over the operation of his business.

In continuation of the above, it can be assumed that Peer Kølendorf knew that there was an imminent risk of SKAT suffering losses as a consequence of the extensive problems with fraud-related transactions in the market for mobile phones and IT

components. This fact must lead to a stricter assessment of liability.

In connection with the above, it is further asserted,

that Peer Kølendorf, through his many years of experience in the mobile phone and IT industry and his work in the industry association LRK (later IT-Branchen), was fully aware of the industry's problems with VAT carousel fraud,

that Peer Kølendorf was aware of the ordinary commercial risks of brokerage transactions and the risk of being involved in transactions without economic reality, resulting in legal violations and losses for SKAT,

that the start of trading IT components in Yellow Fever stores was a new market area for the Comitel Group,

that these deals involved both completely new customers and suppliers that did not originate from either Peer Kølendorf's or the Co- mitel Group's existing network,

that Comitel International A/S generated an immediate and exponential increase in turnover in the triple-digit millions in business with these new customers, suppliers and product range,

that the high turnover occurred despite the fact that the company failed to market itself as a broker in any way through usual media, including by not having a website,

that this market was actually cultivated overnight, while at the same time, from the very first trade, lucrative trades were made with very large batches of goods, which in all cases were exclusively bought from and sold to other brokers,

that the turnover per employee in Comitel International A/S far exceeded comparable companies in the market, which Peer Kølendorf was undoubtedly aware of,

that the employed brokers had a disproportionately high authorization to enter into transactions of DKK 50 million, which was not customary in the industry and, given the company's modest capital base, was in itself unjustifiable,

that just one failed trade could thus lead to the loss of the company's full capital base without management's involvement or approval, that the company that Peer Kølendorf was responsible for operating did not actually have any form of control or procedures that were suitable for hedging transactions with potential loss risks for Comitel International A/S or SKAT,

that Comitel International A/S did not comply with relevant recommendations, including the English Code of Conduct, which Peer Kølendorf himself has emphasized to SKAT,

that it is undocumented and - given B's statement during the criminal case, the number of units traded and the often inadequate description of goods on purchase and sales invoices - unlikely that any real goods control was carried out in the Yellow Fever transactions,

that serial or batch numbers were not registered despite this being a relevant and usual control measure to avoid VAT carousel fraud and otherwise guard against usual commercial risks,

that according to the explanations given during the criminal proceedings and the assessment report of the consignment of goods stopped at Copenhagen Airport, it can be assumed that the goods in the trade in IT components to a very large extent were dummies, dummies or counterfeit goods, and that the same goods passed through Comitel International A/S' warehouse several times,

**1920**

that Comitel International A/S in several of the transactions purchased and resold goods at prices that significantly deviated from the market price, that it should have seemed extremely unlikely to Peer Kølendorf that Comitel International A/S'

UfR ONLINE

U.2016.1870H

customers would purchase goods from Comitel International A/S at a price that far exceeded the prices on the authorized market,

Copyright © 2023 Karnov Group Denmark A/S

that the invoice material - which was the only written basis for the transactions and was fully accessible to Peer Kølendorf - in several cases contained inadequate or meaningless product descriptions, which was particularly true in the largest transactions,

that the meaningless product descriptions made it impossible to check whether the delivered goods corresponded to what Comitel International A/S had ordered from its supplier and what Comitel International A/S had received a purchase order for from its customer,

that the meaningless product descriptions would have prompted an industry expert director to conduct further investigations into the transactions,

that Solid Trading ApS, Trademark International ApS and J Corp ApS in almost all of the Yellow Fever trades could, at very short notice, deliver exactly the number of IT components/porn cards that Comitel International A/S' customers in the Far East demanded, which, given the very large volume of the orders, must have seemed extremely unlikely to an industry-savvy director,

that the volume in the individual Yellow Fever trades was far larger than usual trades in the broker market for IT components, including Comitel International A/S' other trades,

that, given the sensitive nature of the goods, it would have prompted an industry-savvy director to question the reality of the transactions that not one of the Yellow Fever traders received any complaints about the goods,

that Comitel International A/S in a specific transaction granted credit of DKK 20 million to a newly founded company in Hong Kong with which Comitel International A/S had not previously traded, without Peer Kølendorf finding reason to sanction this or tighten control of T,

that a very significant part of Comitel International A/S' turnover with EU traders in the same period must also be assumed to be VAT fraud-related, which Comitel International A/S should have realized given the large number of verification requests from other European tax authorities regarding Comitel International A/S' trading partners,

that it can be assumed that at least 30% of the payments to Comitel International A/S - outside the Yellow Fever transactions - in the period relevant to the case were third-party payments, which is a typical characteristic of VAT carousel-related transactions,

that Peer Kølendorf, if he had monitored Comitel International A/S' incoming and outgoing payments, could very easily have obtained knowledge of the receipt of third-party payments and that Comitel International A/S without commercial justification made split payments and received split payments in a number of Yellow Fever transactions,

that the start-up of the porn card business also represented a new - and in relation to Comitel International A/S' previous activity - different market area with completely new customers and suppliers,

that Peer Kølendorf failed to take a closer look at who these new customers and suppliers were,

that there was no real broker market for trading in porn cards and that Peer Kølendorf could not justifiably take a different view,

that the invoice material in the porn card transactions also contained inaccurate product descriptions and pricing that did not allow for significant margins in later sales stages,

that the porn cards were of such poor quality that they had to be considered obsolete,

that Peer Kølendorf did not have any form of control over T, who single-handedly carried out the Yellow Fever trades and, according to Peer Kølendorf, also more or less single-handedly made product purchases.

Copyright © 2023 Karnov Group Denmark A/S

troll in the trade of 2.6 million IT components and 288,500 porn cards,

that Peer Kølendorf could not be in good faith that a real and sufficient goods inspection was carried out,

that the sum of the many unusual circumstances associated with the operation of Comitel International A/S in general and specifically the Yellow Fever transactions should have given Peer Kølendorf reason to conduct a closer examination of the activities in the company, that Peer Kølendorf, if he had conducted such closer examinations, should have become aware of his company's participation in the extensive VAT carousel fraud scheme and thus have refrained from carrying out the transactions in question and also draw the necessary consequences going forward,

that Peer Kølendorf had obvious reason and opportunity to identify the unusual and risky circumstances surrounding the fictitious trades, but did not act on any of the circumstances in his business, as Peer Kølendorf left the management of the daily operations to T without any form of supervision or control,

that the control measures claimed by Peer Kølendorf, the existence of which Peer Kølendorf must bear the burden of proof, are undocumented,

that Peer Kølendorf's liability must be assessed in light of the fact that Comitel International A/S was a small company with few employees, and that Peer Kølendorf was a management member and main shareholder in the company throughout the period,

**1921**

that the liability must be further assessed in light of the attention that Peer Kølendorf should have paid to the brokerage business due to the size of the turnover and the recognized risks of the activity,

that Peer Kølendorf's management positions in the other parts of the Comitel Group do not change this,

that the above omissions, both in isolation and in total, were likely to cause tax losses for SKAT, which was known to Peer Kølendorf,

that the omissions caused SKAT a loss for unjustified deducted VAT in the amount of DKK 144,080,700, which constitutes SKAT's claim for compensation in this case,

that SKAT's case processing cannot result in a reduction or lapse of the claim for compensation, and the claim is neither fully nor partially time-barred, and

that, considering the degree of fault, Peer Kølendorf's liability for damages should not be mitigated pursuant to the Danish Companies Act or the Danish Tort Liability Act.

In relation to the claimed own fault that SKAT according to Peer Kølendorf should have shown, it is argued that SKAT - unlike Peer Kølendorf - did not have its daily operations in Comitel International A/S and as the tax collection authority for taxes and duties did not have the same access to control the employed brokers and the company's transactions as the company's management.

It is thus contradictory when Peer Kølendorf in the present case on the one hand claims that, as an industry expert executive, board member and ultimate main shareholder of Comitel International A/S, he could not and should not have discovered that the company to a very large extent entered into transactions without economic reality and with obsolete goods, while SKAT, in Peer Kølendorf's opinion, should have stopped those involved in the Yellow Fever complex at a much earlier stage.

Furthermore, it should be emphasized that SKAT, both in terms of control and recovery, reacted immediately at the time when there were indications of fraud and risk of loss, and that SKAT has made considerable efforts, including in connection with the financing of arrest proceedings, SKAT's bankruptcy petition and

security in relation to estate administration costs for the Danish bankruptcy estates involved in order to stop the ongoing activity and limit SKAT's losses.

SKAT also immediately involved the State Prosecutor for Special Economic Crime (SØK - now SØIK) in the case when the risk of loss became apparent in Network Trading ApS in March 2004.

When SKAT did not withhold Comitel International A/S' VAT pursuant to section 12(3) of the Collection Act, this was because SKAT did not have the necessary specific knowledge of the fraudulent nature of the transactions and Comitel International A/S' knowledge thereof at the time of payment, and the conditions for withholding VAT were therefore not met at that time.

Thus, at the time of the last payment of negative VAT regarding the trade with Solid Trading ApS, SKAT had no basis for assuming that the trades were part of an organized set-up aimed at intentionally evading VAT or that Co- mitel International A/S was an active part of this set-up.

It was not until December 2004 that SKAT had progressed so far in the collection of information and the analysis of the collected information that SKAT

- on a purely objective basis - found that a proposal for a decision to deny deduction could be sent for consultation to Comitel International A/S.

If SKAT had nevertheless withheld Comitel International A/S' VAT, this would have been an unauthorized exercise of authority, which could justify a basis of liability for SKAT.

Even if SKAT had already in March 2004 had justified assumptions that Solid Trading ApS deliberately did not intend to settle its VAT liability, it is noted that SKAT did not at that time have the necessary authority to notify Co- mitel International A/S of such a suspicion.

It is finally claimed that SKAT's loss is fully documented.

The withholding of Comitel International A/S' negative VAT response for November 2004, which was due for payment on December 20, 2004, led, following protests from Peer Kølendorf that the withholding was made on an unjustified basis, to Comitel International A/S being granted a deferment of payment of a positive VAT response stated on Comitel International A/S' main registration. The withholding of Comitel International A/S' negative VAT liability for the month of November 2004 therefore only entailed a net withholding of DKK 2 million.

At the request of Peer Kølendorf, the deferral was granted solely as a consequence of Comitel International A/S not being able to pay its positive VAT liability after the withholding of the negative VAT liability, and SKAT thus agreed to grant a deferral to offset the liquidity burden on Comitel International A/S. The withholding of the negative VAT for the month of November 2004 and the subsequent notification of deferment of payment of the positive VAT liability due must thus be viewed together in relation to the loss assessment. This means that SKAT's loss must only be reduced by the net retention of DKK 2 million."

Regarding the calculation of the loss, SKAT has further stated that there is no basis for reducing the claim by

**1922**

the dividends in the bankrupt companies involved in the "Yellow Fever" complex, as the bankruptcy estates must generally be considered empty. However, SKAT has made a binding procedural declaration to transfer the right to the dividends to Peer Kølendorf if he is convicted in accordance with SKAT's claim and pays the full amount to SKAT before the outstanding dividend amounts are finally settled.

SKAT has furthermore stated that Peer Kølendorf's submission of customer and supplier lists to SKAT cannot be attributed independent significance, already because the lists contained very little information - also less than SKAT itself could retrieve from the common EU VAT system (the VIES system) - and SKAT would therefore not be able to relate to the activities solely on the basis of these, which Peer Kølendorf has neither been promised nor could have had a legitimate expectation of.

Finally, SKAT has disputed that the claim against Peer Kølendorf is wholly or partly time-barred and has principally argued that a 20-year limitation period applies as SKAT's loss has arisen as a direct consequence of a crime for which a penalty has been imposed in a public criminal case, see section 1(1)(5) in fine of the 1908 Limitation Act, see DL 5-14-4. Alternatively, it is claimed that the claim is covered by the current 5-year limitation period and that the limitation period has been suspended at least until SKAT's first proposal for a decision on December 6, 2004, which is why limitation had not occurred when the case was brought.

*Peer Kølendorf* has essentially proceeded in accordance with his summary pleading of September 29, 2014, which states, among other things:

*"1 The issue at hand*

1.1 *The VAT system*

• In the VAT system, the seller of a product collects VAT on the sale from the buyer on behalf of SKAT, and the seller then pays the VAT to SKAT. SKAT bears the risk that the seller pays the VAT to SKAT, and the buyer is therefore entitled to a VAT refund from SKAT (VAT deduction), even if the seller does not pay the VAT to SKAT. The VAT system's inherent risk of the seller's - or a previous joint's - failure to pay the VAT is thus incumbent on SKAT.

• As an exception, the Kittel judgment of July 2006 (MS 2, p. 297) [case C-439/04] states that if the buyer knew or ought to have known that "the transaction was part of VAT fraud" - and that the VAT paid by the buyer to the seller will therefore not be passed on to SKAT - then the buyer may be refused a VAT refund. The decisive factor is the buyer's knowledge or ought knowledge *when paying the purchase price including VAT to the seller*. If the buyer learns *after* the payment to the seller that the seller fraudulently does not intend to pay the VAT, this has no bearing on the buyer's claim for a VAT refund.

1.2 *SKAT's overall arguments*

• SKAT has generally claimed that Peer Kølendorf has acted in breach of responsibility by causing Comitel to receive a VAT refund from SKAT, which a preceding link subsequently fraudulently evaded SKAT by debtor fraud.

• The *action* that Peer Kølendorf is accused of is that he caused the VAT to be refunded to Comitel. According to the Ministry, the act is *unlawful* because Peer Kølendorf should have known at the time of the refund that a preceding party would fraudulently fail to pay the VAT to SKAT, and that a VAT refund to Comitel was thus unjustified.

1.3 *Peer Kølendorf's overall arguments*

• Peer Kølendorf generally argues that he should not have known that the VAT refund would turn out to be unjustified due to the subsequent fraud in other companies. The VAT had been paid for goods which, according to a board decision, were included in Comitel's product range and which were purchased and resold as part of the company's ordinary trading activities.

• A claim for damages in a situation like this has never been raised before in Danish law. The Danish Ministry of Taxation is claiming compensation from Peer Kølendorf in a situation *where*

Copyright © 2023 Karnov Group Denmark A/S

the company in which he was the main shareholder and

member of the management of, by a highly placed and trusted employee in association with persons outside the company was fraudulently used as a tool to commit debtor fraud in *other* companies, *where* the company's involvement consisted of conducting commercial transactions with commodities as part of the company's ordinary operations, and *where* Peer Kølendorf has not profited from the transactions or the fraud committed, on the contrary.

### 2 Briefly about Comitel

### 2.1 Company management and structure

• T was hired in 1992 and stayed with the company until 1996. During this period, he developed the company's workshop from a repair shop for its own products with 3-4 employees to a service workshop for e.g. Nokia phones with 10 employees. He left the company to start up the company TeleService. It was later sold to the Fleggaard/Dangaard Group.

• In 1998, the company got a professional board of directors. Ole Stangegaard, who had helped establish *Statens Datacentral* and *ØK Data,* became chairman, and Torben Svanberg, who had been CEO of *Sonofon,* which had entered into agreements with Comitel as a broker of mobile phones, and Lars Thinggaard, a trained accountant who had been in the IT industry since 1994. The board of directors

**1923**

consisted of the three and Peer Kølendorf until June 2003.

• In 2000, T joined the company again, this time as part of the company's day-to-day management, reporting directly to Peer Kølendorf. He had the title of business developer and took over responsibility for the bridge department.

• In June 2003, Ole Stangegaard resigned from the board and Steen

E. Mønsted became the new chairman of the board. He had considerable experience from retail companies and had, among other things, been involved in founding the Fakta chain.

• At the start of the case period in autumn 2003, the company was organized with Peer Kølendorf as CEO and with staff functions in the form of *business development, IT, finance/logistics* and *technology/development.*

• The company had 4 customer-oriented business areas (departments): *Consumer, Business, Broker* and *Export.* To support the operation of these customer-oriented departments, there was a unit responsible for *internet* and *marketing,* a unit responsible for *sales* and *purchasing* processing, and a unit handling the company's *warehouse* ...

• In 2003, the company was a distributor for a number of leading international *telecommunications equipment* manufacturers including *Nokia, Motorola, Ericsson, Siemens, NEC, Samsung and Mitsubishi,* with resellers being its primary customers...

• Comitel also distributed *land mobile radios* from the major manufacturers.

• The company also sold *private radios* under its own brand *Danita.* Private radio had been the company's main business since 1966, and the products were developed and designed in Denmark and produced in factories in the Far East. The company's share of the private radio market at the time was 85%.

• The company also sold *hobby radios* from Cobra and *Panasonic* and *PMR systems* and equipment from *Simoco, Maxon, Kenwood* and *Motorola...*

• In 2003, the Group also included the subsidiary *SMS A/S,* which had activities with priced ringtones and logos for mobile phones. Comitel A/S also owned 50% of CBB Mobil A/S, where Peer Kølendorf was chairman of the board at the time.

• In 2003, there was an average of 30-35 people in the company's office in Østerbro, which Comitel A/S shared with the wholly owned subsidiary SMS A/S.

### 2.2 Broker departments

• In the mid-1990s, the company gradually started *brokering* cell phones. In 1995, turnover was DKK 70 million, and it grew to over DKK 1 billion in 2002. The margin on the trade was modest, and the turnover thus contributed only minimally to the result. Since the start of broker trading in the mid-nineties and after the appointment of a professional board of directors, the brokerage business had continuously been given a firmer framework.

• From the end of 2003 to the end of 2004, Comitel traded 1,221 different product numbers in the mobile phone and IT broker markets.

• Comitel completed just over 1,200 brokerage trades in 2004.

• Peer Kølendorf was not a broker himself, and he was not involved in the specific trades, but he was based at the group's office and had access to all information about the group's activities, including broker trades.

*3 The basis of liability*

*3.1 The company was soundly organized and capitalized*

• The company had the competencies necessary to operate the company's business areas (departments) in a responsible and appropriate manner, including management, finance and economics (accounting, bookkeeping, receipts and payments), warehousing (receipt, storage and dispatch of goods), logistics (transportation of goods to and from the company and insurance of the goods), purchasing, sales, marketing, workshop and product development, IT and business development.

• The company had the capital needed for ongoing operations.

*3.2 The company's daily operations were properly organized and monitored*

• The daily operations were organized with appropriate routines and business procedures and with a separation of personnel between the relevant functions in the company. The company had existed for 37 years at the time of the first transactions in the case, and Peer Kølendorf had been responsible for and supervised that the daily operations of the company were sound throughout the years.

• As CEO, he issued instructions and guidelines and ensured that these were implemented through proper routines and business procedures.

• He was also responsible for implementing the strategy set by the board within the company's individual business areas.

• Peer Kølendorf supervised by being present in the office on a daily basis to monitor the individual business areas and by being available to all employees for sparring and assistance if any questions or problems arose, and he regularly discussed large and small issues with the employees. He did not have detailed insight into the dozens of transactions the company entered into each year, and he delegated the actual running of the business areas to their managers.

• Staff management and other personnel matters were also largely handled by Peer Kølendorf at the time.

• As CEO, Peer Kølendorf was responsible for the company's finances and provided ongoing supervision

**1924**

with the economy, including the development of each department's revenue and costs, and he provided budget follow-up to the department heads, including T.

• As CEO and board member of Comitel A/S and Comitel International A/S and later as board member of Comitel International A/S, Peer Kølendorf performed his management duties in a fully adequate manner.

*3.3 The company had deep and long-standing experience in the international broker market*

Copyright © 2023 Karnov Group Denmark A/S

• International brokerage is a legal - and socially beneficial - activity that is protected by competition rules and competition authorities.

• Since the mid-nineties, the company had built up a significant brokerage business in the international brokerage market for mobile phones.

• The special skills necessary for operating an international brokerage business had gradually been built up, and the necessary routines and business procedures, including in relation to control of goods, suppliers and customers, were fully in place when the case began in 2003.

*3.4 The company was aware of and guarded against VAT fraud in broker trading*

• The company worked closely with customs and tax authorities:

• At a meeting at the Danish Customs and Tax Agency in 1998, the company was made aware that the company had sold cell phones to companies that had subsequently turned out to be *missing traders.* According to the agency's meeting minutes, Peer Kølendorf had been interested in hearing how VAT carousels could be avoided, and it was agreed that he would forward the supplier and customer list to the agency.

• Peer Kølendorf then sent information about the brokerage company's new or intended suppliers and customers to the agency every month until 2002. During this period, the company avoided transactions where a supplier or customer was involved in VAT carousels (at no time up to 2002 did the company receive new information from the Agency that a supplier or customer had been involved in VAT fraud).

• In *2000*, Peer Kølendorf participated in meetings with the Ministry of Taxation, where the department presented a bill which meant that a company could release itself from liability if the company reported the transactions with the other company to the customs and tax authorities. In 1999, the authorities had similarly issued a circular (No. 123/1999) stating that this was a release from criminal liability. This confirmed that a crucial precaution against VAT carousels was to make relevant information available to the authorities.

• In 2002, the Danish Customs and Tax Agency asked Peer Kølendorf to send information about new suppliers and customers to Mia E.B. Hansen at Told-Skat Copenhagen. Peer Kølendorf continued to send the information every month, and from 2002 until the end of the case period in *November 2004, the* company received no information that a supplier or customer was involved in VAT carousel fraud. Peer Kølendorf understood this to mean that the company had not purchased from or sold to a company that subsequently turned out to be *missing trader* or otherwise related to VAT fraud during the period.

• Prior to the case period, the company had regularly been asked for documentation for use by ToldSkat Copenhagen in responding to so-called *verification requests* from foreign authorities. Neither this resulted in information to Comitel or Peer Kølen- dorf that Comitel had at any time traded with fraudulent companies.

• Every month, the company submitted purchase and sales invoices to ToldSkat Copenhagen's payment control (Charlotte Vindelev and Kurt Enok) in connection with requests for refund of purchase VAT to the company. The region thus had a complete basis for assessing the company's claims for VAT refunds. From January 2004, Peer Kølendorf *also* sent information about new suppliers and customers directly to Charlotte Vindelev at her request.

• Peer Kølendorf ensured that SKAT had information about all the broker department's trades, suppliers and customers throughout the case period.

• Peer Kølendorf also ensured that the brokerage department took appropriate *measures* internally against VAT carousels, and he actively informed about VAT carousels and the danger signals both internally and in industry magazines and the daily press in the period from 1998 to 2001.

• England was particularly plagued by VAT carousels, and Peer Kølendorf had received a Code of Conduct from the English customs and excise authorities with danger signals and precautions, which he instructed T and the brokers to familiarize themselves with so that the brokers could be aware of them. T confirmed this in his testimony in the criminal case, and he also stated that Peer Kølendorf distributed articles about VAT carousels in the broker department

...

• *In summary, routines, business procedures and control measures had* been continuously developed and incorporated in the broker department in the years prior to the case period, and the measures appeared to Peer Kølendorf to be *effective* in terms of avoiding VAT carousels. After the meeting with the Danish Customs and Tax Agency in 1998, the company was *never* informed that trading partners had been involved in VAT fraud.

**1925**

*3.5 The board decided to expand the product range*

• The board wanted the company to expand the product range in the brokerage department so that it was not solely based on trading in mobile phones.

• The head of the broker department, T, then made a proposal in early 2003 to expand the product range to include IT components.

• At a strategy seminar in February 2003 and subsequently at a board meeting, T motivated his proposal in more detail, and the board then decided that T could expand the product range to IT components. It was discussed whether he could expand the product range beyond mobile phones and IT components, and it was decided that other products should be related to the existing business, so that the product range could not be expanded to, for example, clothing (suits or other).

• The Board had confidence in T's analysis and information that, inter alia, there was an international broker market for these IT goods, *that* it was a very large and rapidly growing market, *that* his proposal for IT components was motivated by demand from existing customers, and *that* he could utilize *the broker platform* and the existing network for these goods.

• The Board of Directors' and Peer Kølendorf's trust in T was based on T's previous conduct and performance in the company, including not least in relation to the establishment and development of CBB Mobil and SMS A/S. He had been employed in the company from *1992 to 1996* and again from *2000,* and at no time prior to the case period had he betrayed the trust that the Board of Directors and Peer Kølendorf had shown him, and he had performed the tasks entrusted to him in a skillful, dutiful and diligent manner.

• The board's decision to grant T's proposal to expand the product range thus rested on a sound basis.

*3.6 T executed the board's decision*

• The board's decision could be executed immediately by T in his capacity as head of the broker department, as it was merely an extension of the existing product range, so that the routines, business procedures and control measures that had been established could and should also be applied to the new product types to which the board had allowed an extension.

Copyright © 2023 Karnov Group Denmark A/S

• Following the board's decision, brokers were hired who had experience in international broker trading with IT components.

nents, and as head of the broker department, it was T who took care of this.

• It was not necessary for Peer Kølendorf as CEO to participate in T's execution of the board's decision to expand the product range, nor did the board expect this.

### 3.7 *T was responsible for the purchase and resale of goods from Solid Trading ApS*

• The trade in goods purchased from Solid Trading is an execution of the board's decision to expand the product range. T asked Peer Kølendorf to review publicly available records about the company and the people behind it. Peer Kølendorf found that nothing incriminating had been registered about the company or the CEO. Moreover, he was not involved in the establishment of the trade with Solid Trading and the other considerations and investigations that were carried out.

• As a broker, T was required to critically assess the overall circumstances of a trade, including prices, suppliers, customers and the goods traded, and Peer Kølendorf had no reason to believe that he did not do this and was otherwise aware of known danger signals.

• The brokers had a total liquidity of DKK 50 million, which they could use at their own discretion. As the head of the broker department, T had to distribute the liquidity if there was not enough liquidity for all trades.

• A broker could not make the payment for the goods themselves, and usually the finance department took care of payments, but Peer Kølendorf occasionally approved a payment if there was a practical need, for example during a holiday period. Transportation and insurance of the goods was arranged either by the company's employed freight forwarder or a freight forwarding company. If a forwarding company was used, it often carried out the goods inspection. If the goods passed through Comitel's warehouse, a broker usually took care of the goods control, or several brokers if the quantity of goods required this. The release of the goods to the buyers was the responsibility of the sellers once the company had received payment for the goods. It was not allowed to sell on credit or to release the goods without receiving payment. The warehouse staff recorded the arrival and departure of goods in the warehouse.

• Peer Kølen-dorf was not required to approve trades within the monetary limit, and he has not approved the trades in the case or their terms.

• In October 2003, ToldSkat Copenhagen (Mia E.B. Hansen) was informed that Solid Trading ApS was a new supplier, and the region (Charlotte Vindelev) received copies of all purchase invoices from Solid Trading for use in assessing the refund of purchase VAT to Comi- tel. Similarly, the region (Charlotte Vindelev) received the sales invoices for the buyers of the goods, also for the payment of VAT. The region thus had all the information about the transactions as a basis for the region's assessment of Comitel's claim for payment of the VAT.

• The individual transactions that were subsequently entered into with Solid Trading ApS on an ongoing basis over the next 5 months were within the monetary framework that had been set out

**1926**

for the brokers, and the transactions appeared to Peer Kølendorf as a normal broker dealer. He was aware that deals were being made and that the goods were being sold to buyers in the Far East, where T had built up a network, partly based on Comitel's existing network. Based on T's information about the market potential, the Board had expected a large turnover, and the current turnover did not deviate from what was expected or from

the turnover the company had on a monthly basis in 2002, when the turnover was approximately DKK 1.2 billion.

• Trade with Solid Trading ApS ceased due to its bankruptcy. The bankruptcy was explained that the company had been let down by a supplier.

• Peer Kølendorf has not acted responsibly in relation to these trades.

### 3.8 *Purchase and resale of goods from Trademark International ApS*

• The trades took place in the period June 16 - 24, 2004. Peer Kølendorf was not informed about the trades prior to the completion of the trades.

• As with the trade with Solid Trading, SKAT was fully informed.

• Peer Kølendorf has not acted responsibly in relation to these trades.

### 3.9 *Purchase and resale of goods from J Corp ApS*

• The transactions took place in two separate time periods. Prior to the trades, Peer Kølendorf had been informed by T that there was a market for so-called internet access cards that provide access to websites with pornographic material, and that he would investigate the possibilities of starting to trade in these. Comitel was at that time trading other value-bearing cards.

• Peer Kølendorf was not informed about the individual trades as they were within the limits of the brokers. The trades took place over two periods. The first ran from August 13 - 26, 2004. The second ran from November 10-12, 2004. However, the company has never received a VAT refund for the November trades, as SKAT chose to withhold the VAT. SKAT is therefore not entitled to a refund of the VAT on these transactions.

• As with the trade with Solid Trading, SKAT was fully informed.

• Peer Kølendorf has not acted responsibly in relation to these trades.

### 3.10 *The uncovering of the fraud and T's complicity in it*

• The above is how the circumstances appeared to Peer Kølendorf when the deals were completed in 2003 and 2004.

• In the 10 years that have passed since the last dealings in the case, SKAT, the Attorney General, the police, Comitel and Peer Kølendorf have used considerable resources to map every detail about the companies, people and transactions involved. A significant part of the information that can now be presented about the case complex could not and should not have been known to Peer Kølendorf.

• The fraud in the case was carried out in a way that had never been seen before. It was a closed circuit where the people behind the fraud had infiltrated every link in the trading chain. At Comitel, it was a highly placed and trusted employee, T, who abused his position to make the deals.

• Unlike previously, there were no missing traders in the chains. The emptied companies were all VAT registered and correctly declared the VAT due, but due to extraordinary circumstances, including a fake robbery, they were unable to pay the VAT to SKAT, and the companies went bankrupt.

• The goods were also sold and shipped to a third country where the goods could not immediately be used for VAT fraud again, but had to go through potentially 4 customs controls (export from Denmark, import into the third country, export from the third country and import into Denmark again) to be used for VAT fraud again.

• Despite the bankruptcies of Network Trading and Solid Trading in early 2004, Comitel and Peer Kølendorf were not informed by SKAT that the companies' bankruptcy could be related to VAT fraud until *after all their transactions.*

### 3.11 *Subsequent findings*

• After the case, IT distributors Jørn Rosenmeier and Ole Eklund, as well as Reino Nielsen from SKAT, have given rise to a number of articles about VAT carousels in Computerworld newspaper,

and they have also commented on VAT carousels in these. The Yellow Fever case gave rise to VAT carousels - which had otherwise been considered almost "eradicated" - once again becoming a topic that was taken up by SKAT and the newspaper. The industry and SKAT have become wiser after the Yellow Fever case, and there has not been a carousel like this since.

• In the present case, where SKAT has imposed liability for damages on Peer Kølendorf personally, the decisive factor is how the relevant circumstances appeared to him at the time of the transactions referred to in the case and the knowledge and experience about VAT carousels that existed at the time. What is relevant is not the knowledge and information that only an extensive, long-term police investigation has subsequently been able to uncover.

• SKAT has highlighted certain circumstances which, according to SKAT, are fraud indicators. However, these are matters that Peer Kølendorf either could not have known about during the case period or should not have known about, and to a large extent Peer Kølendorf has not been able to relate to the highlighted matters until long after the case period.

**1927**

• During the 10 years that have passed since the last transaction in the case, SKAT has continuously identified new "danger signals" or "unusual circumstances" that Peer Kølendorf should have been aware of *during the case period*. A number of these have been dropped again. In the following, we comment on some of the issues that SKAT maintains that Peer Kølendorf should have been aware of during the case period:

• *Imprecise product names in invoices*. These are isolated examples that only appear after a number of transactions had been completed with Solid Trading and the business relationship was thus well established. It was T's task as a broker to ensure sufficient documentation for purchases and sales, either in the invoice itself or in other written material. Peer Kølendorf had no reason to believe that T did not routinely ensure this.

• *Goods inspection*. As in any other trading business, a relevant and effective goods inspection had to be carried out before payment for the goods. Peer Kølendorf was not involved in the inspection of the goods, which T as broker was responsible for. Peer Kølendorf had no reason to believe that T did not perform the relevant and effective goods inspection that all brokers must perform.

• *Control of suppliers and customers*. All brokers had to check and take a critical approach to suppliers and customers. Peer Kølen- dorf had no reason to believe that T as the responsible broker did not do this in relation to suppliers and customers in the transactions in question.

...

• *Revenue development and size*. As a broker and as head of the brokerage department, T had to take a critical view of suppliers, customers and the market potential for a product, and Peer Kølendorf had no reason to believe that T's information about this to the Board was not correct. Reports from hP Labs and KPMG confirmed that there was a significant international broker market for IT components. The expectation of the Board and Peer Kølendorf was that significant revenue could be generated with the new product types using the existing broker department's *platform*.

• *The broker market was infected with VAT fraud*. In Denmark, there were only a few VAT carousels in the years leading up to the case, and none of them were large enough to attract media attention. According to SKAT, it had succeeded in "eradicating" VAT carousels in Denmark, and it was also understood by the players that SKAT in Denmark - in cooperation with the market players - had effectively managed to avoid VAT carousels. Comitel and Peer Kølendorf were very aware of VAT carousels and implemented relevant and effective measures against them.

• *Release of goods without payment*. A broker was not allowed to release goods without simultaneous payment. Peer Kølendorf had no knowledge that this had apparently happened in one case during the case period. The release did not appear in the case documents, and payment was received within a short period of time.

• *Selling on credit*. A broker was not allowed to sell on credit terms, and this did not happen in any of the trades in the case.

• *Comitel was assigned customers by Solid Trading*. If this is the case, it is not something that Peer Kølendorf had or could have knowledge of. Only T would have knowledge of this. Referral of customers would be a danger signal that a broker should react to.

• *Comitel split payments*. Peer Kølendorf had received no information about payments being split, not even from the company's finance department. SKAT has argued that the splitting could be to circumvent the insurance, but this makes no sense and is not substantiated. The most likely scenario is that an order is shipped successively, precisely to minimize the transport risk, and that the payment is therefore divided so that the payment is made at each partial release. The insurance coverage was related to *shipments* and not *orders/invoices*.

• *Pricing of goods*. It goes without saying that brokers had to be critical about the price of a product. It was common knowledge that too *low* prices indicated a VAT carousel. A broker should of course also consider whether the price was too high. If T was offered goods at too high a price, he should have reacted to this, and the same applies if the price did not make sense for other reasons. Peer Kølendorf had no reason to believe that this routine and commercially justified precaution was not observed. In the few cases where, according to SKAT, there were prices that should have given rise to further investigations, it is disputed that the prices deviated from the market price. SKAT has not documented that this was the case.

• *IMEI, serial and batch numbers*. There are only IMEI numbers on mobile phones. (Even for mobile phones, it quickly became clear that it was not practically possible to register IMEI numbers. Nor was it something that SKAT in Denmark expressed an expectation of). If it was practically possible to register serial or batch numbers, as SKAT suggested immediately before the main hearing in this case, this could of course have been done. Peer Kølendorf has not approved that no registration took place, and Peer Kølendorf had no reason to believe that T did not take the precautions that were possible.

• *Comitel did not receive complaints*. Minor complaints were not to be reported to Peer Kølendorf as managing director, and Peer Kølendorf has therefore not during the case period considered whether there were complaints in relation to the transactions. After the case period, it has

**1928**

it could be established that there were no complaints regarding the batches of goods themselves. Complaints regarding individual products were not received until a few months after the sale, when the products had reached the end user and were tested by him.

...

3.12 *SKAT and the police*

• SKAT received all information about the transactions, including suppliers, customers and the size of the turnover, via information from Comitel. SKAT could thus have carried out a chain audit as early as the beginning of December 2003 and thus before payment of VAT on the first transactions to Comitel.

• According to SKAT's internal memos, by February 2004

SKAT had an overview of the entire trade chain and thus had more information available than was available in Comitel and thus - potentially - for Peer Kølendorf.

• In March 2004, SKAT had also carried out a goods inspection and a functional test of goods that had been stopped at customs and which should have been delivered to Comitel, but which were never delivered. These goods turned out to be dummies.

• SKAT had found a diagram of the trading chains on a computer belonging to B, including the chain that was not liquidated until June 2004. B should only have known Solid Trading's supplier and customer.

• Regardless of access to this material and thus to significantly more information than Peer Kølendorf could access on both before and after the case, SKAT only in *December 2004* believed to have grounds to deny Comitel the right to deduct the purchase VAT on the transactions with Solid Trading one year earlier. SKAT's proposal for a decision from December 2004 to deny deduction was also based on an "objective model", which was considered acceptable at the time, as even at that time there was no basis for SKAT to assume that anyone at Comitel *had participated in the fraud or should have had knowledge of the fraud.* Until the *beginning of 2005, the* police refused to initiate an investigation, despite the fact that the police had participated in meetings with SKAT about the case and that SKAT had more information to base its assessment on than Peer Kølendorf had.

• It is a condition for the VAT refund to Co- mitel to be unjustified - and thus for Peer Kølendorf *to* have acted unlawfully at all - that a preceding link would not pay the VAT due to *fraud.* But how can SKAT claim that Peer Kølendorf should have known *during the case period* that a preceding link would fraudulently fail to pay the VAT - i.e. should have known that SKAT, based on the objective model applicable at the time, had grounds to deny the deduction - when SKAT and the police on a more complete basis did not have a suspicion of VAT fraud that could justify denying the deduction until up to *a year later*? How could Peer Kølendorf have known this in December 2003 when the purchase VAT on the first transactions was refunded?

• SKAT's arguments in the case are based on post-rationalizations.

• In the criminal case, Peer Kølendorf explained, among other things, that *"The nature of the broker market is such that what may look unusual from the outside is usual, and criminal elements can hide in the crowd."* ...

3.13 *IT industry association*

• Following the criminal conviction of T in 2007, the Distributor Committee raised a case at the end of 2007 to expel Peer Kølendorf from the IT industry association. The chairman of the Distributor Committee, Ole Eklund, claimed on behalf of the committee that Comitel and Peer Kølendorf had acted in violation of good industry practice.

• At the beginning of 2008, the IT industry association's executive committee and main board determined that Comitel and Peer Kølendorf had not acted contrary to good industry practice as a result of T's involvement in the Yellow Fever trades, and in particular they determined that acting in the IT broker market as Comitel had done was not contrary to good industry practice. Representatives of IBM, HP and Microsoft, among others, participated in the decision on this issue, where the distributor committee's recommendation to exclude Peer Kølendorf was rejected. These companies are all closely involved in the IT broker market and thus have a thorough knowledge of it.

• SKAT's argument that expanding the product range to IT components was a liability is thus in conflict with the decision made by the Executive Committee and the Executive Board of the IT industry association.

*4 Causation and adequacy*

4.1 *Causal link*

• It is a condition for a person to incur liability for culpable conduct that the culpable conduct *actually*

*has caused* the damage. When assessing this, one must fundamentally ask whether the damage would have occurred regardless of the culpable conduct. In UfR 2011.354 Ø (Danica White), a ship had been hijacked by South African pirates. The crew members claimed compensation, and the High Court found that the captain had acted culpably by not establishing sufficient control measures. Nevertheless, the High Court acquitted the shipping company, as additional control measures would not have prevented the hijacking and thus the damage.

• The Supreme Court has also ruled that these principles also apply to duties of investigation and their significance. UfR 2006.145 H (Procuritas) concerned a settlement of damages in connection with a

**1929**

company emptying case. Here, the sellers were acquitted with reference to lack of causality, as compliance with their duty of investigation would not have prevented the company from being emptied and the state treasury from suffering a loss.

• Moreover, SKAT has not explained what other control measures would potentially have uncovered, including proving that they would have prevented the loss.

• Since T participated in the fraud, other or additional control measures cannot be expected to have revealed to Comitel or Peer Kølendorf that the transactions were entered into with intent to commit fraud in other companies.

• Peer Kølendorf argues that the causality condition has not been met and that SKAT has the burden of proof that this condition has been met.

*4.2 Adequacy*

• When assessing *adequacy, it* must be taken into account that actual crime committed by a trusted employee and a member of management in collusion with a third party is usually unlikely, and is at least more unlikely than, for example, ordinary carelessness and sloppiness. The latter occasionally occurs in a well-meaning and law-abiding workforce, whereas as a general rule it must be assumed that no crime is committed.

• Peer Kølendorf and Comitel had no basis for or reason to suspect that T had suddenly become involved in crime. Since the crime manifested itself in companies other than Comitel, Peer Kølendorf had no way of detecting this either.

• Peer Kølendorf argues that the ad equivalence condition has not been met and that SKAT has the burden of proof that the ad equivalence condition has been met.

*5 Own fault and loss mitigation*

• If Peer Kølendorf should have known that there was intent to defraud upstream, this applies all the more to SKAT.

• SKAT can postpone the VAT refund if the basis for the claim is not documented by the taxpayer, or if there is an obvious risk of loss when paying the VAT to the company, cf. section 12 of the Collection Act.

• For almost a year before Solid Trading started trading with Comitel, SKAT had monitored Solid Trading and established that the company's transactions were related to VAT carousels. SKAT was informed of Comitel's intended trade with Solid Trading in October 2003, and for the purpose of paying VAT to Comitel, SKAT received all purchase invoices from Solid Trading and sales invoices to the companies in the Far East. Based on the standard applied by SKAT in the present case against Comitel, SKAT should have performed a chain audit on the basis of this information before payment to Comitel, and thus all links in the turnover chain and the related invoices would have been uncovered. If SKAT had established this basis, SKAT would have concluded before the first payment to Comitel that

no VAT should be paid to Comitel until the basis for the payment was documented by the company.

Copyright © 2023 Karnov Group Denmark A/S

Withholding VAT is an interim remedy that does not require the same suspicion as a final decision to deny the right to deduct.

• It is an expression of an irresponsible organization and an irresponsible organization of the control work in SKAT if the information that Comitel regularly sent to SKAT was not exchanged with the region to which Solid Trading belonged. In any case, Peer Kølendorf was entitled to assume that SKAT was organized in such a way and had organized the control work in such a way that relevant information was exchanged in a timely manner between the relevant parts of SKAT. If this has not been the case, it is an expression of own fault and acceptance of risk to such an extent that the claim against Peer Kølendorf as a whole lapses or at least must be significantly reduced.

• If SKAT's comments in the case about SKAT's inspection work are to be understood to mean that not even the individual persons in ToldSkat Copenhagen coordinated their inspection activities regarding a

"risk company" such as Comitel, which since 1998 had submitted information about suppliers, customers and invoices from and to these to SKAT, this is an expression of such an irresponsible way of organizing itself and such an irresponsible way of organizing the control that SKAT must also for this reason bear the claimed loss itself.

• In the case, SKAT first denied that Comitel sent information about new suppliers and customers to SKAT on a monthly basis, and when Comitel then documented the transmission of information for one month, SKAT continued to deny this, after which SKAT denied that information had been sent for more than this one month. Only when Comitel documented that information had also been submitted for other months did SKAT acknowledge having received the information, but then claimed that the information was partly incomplete and partly only used for the "general assessment" of the company. SKAT finally surrendered when Peer Kølendorf was able to document that it was originally the Danish Customs and Tax Agency that had requested and received the information about suppliers and customers, and that the cooperation with SKAT could be dated back to 1998.

• SKAT has stated that the consistent and repeated incorrect denials of having received information from Peer Kølendorf are due to a "misfiling" by an employee at SKAT. This is completely unbelievable. Since 1998, the information has been forwarded every month, first to a person at the Danish Customs and Tax Agency and then from 2002 and

**1930**

from then on to Mia E.B. Hansen, and from January 2004 also to Char- lotte Vindelev in ToldSkat Copenhagen's payment control. If *all* these people misfiled the material that Comitel and Peer Kølendorf submitted every month from 1998 to 2004, then SKAT's business processes and control procedures were so irresponsible that SKAT's information about the case cannot be given any weight. And even the alleged misfiling in no way explains SKAT's denials of having received the information at all, as SKAT's employee (Mia Han- sen) has explained that she could remember receiving the information and its purpose, but simply could not find it.

• If SKAT has been so upset that Comitel and Peer Kølendorf's cooperation with SKAT was documented, it is probably due to two factors: *Firstly, the* cooperation shows that Peer Kølendorf has actively and relevantly protected the interests of SKAT and Comitel. *Secondly, the* cooperation shows that SKAT has completely failed Comitel and Peer Kølendorf and, for that matter, itself.

• It appears from the case material that Rosenmeier, which had

been requested to send information about customers to the customs and tax region of Aalborg, was informed by this region that a customer had gone bankrupt and had probably been a missing trader. The region inquired about the same a few months later.

The region's action is no more than what a company that spends resources on collecting and submitting information to SKAT is entitled to expect from SKAT. However, ToldSkat Copenhagen did nothing to Comitel; not even when Solid Trading went bankrupt in March 2004 did Peer Kølendorf receive useful information from SKAT.

• In February 2004, the supplier to Solid Trading goes bankrupt, and from this point on it should have been even clearer to SKAT based on the standard that SKAT applies in this case against Comitel that SKAT should not have refunded VAT to Comitel. The payment of VAT in March 2004 is even made at a time when 13 people at SKAT, SØIK and Kammeradvokaten have been summoned to the first meeting in the Yellow Fever case. In the relationship between SKAT and Peer Kølendorf, the risk of the back payment to Comitel - and thus the risk of whether Comitel can later refund the VAT - lies entirely with SKAT. SKAT realized the risk, as stated in the meeting notes, but chose to take the risk as SKAT did not want to risk a claim for damages from Comitel if the withholding proved unjustified. SKAT has thus deliberately avoided the risk of a claim for damages, and SKAT has thus deliberately put Peer Kølendorf at risk of subsequently being faced with a claim for damages from SKAT. (Incidentally, it is not true that SKAT risked a claim for damages. According to the Danish Collection Act, unauthorized withholding of VAT is compensated with *interest)*.

• The additional information that came to light during the spring and summer of 2004 made it even clearer that SKAT should withhold the VAT.

*6 The loss statement*

• The loss statement is disputed as undocumented.

• Peer Kølendorf can only be liable for damages for the part of the loss that stems from transactions in relation to which he may have acted irresponsibly. However, SKAT has not claimed why Peer Kølendorf should be liable for damages in connection with each specific transaction. In general, SKAT has not attributed the amount of the claim to Peer Kølendorf's specific liability for any of the transactions in the case. Only if the High Court were to find that the actual expansion of the product range was liable, the High Court could thus uphold SKAT's claim.

• Amounts recovered by the state, including to the bankruptcy estates of the fraud companies and the bankruptcy estate of Comitel International A/S, must be deducted from the claim against Peer Kølendorf. Comitel had taken out crime insurance, and the insurance sum will be paid to the bankruptcy estate of Comitel International A/S.

• The VAT amount relating to the transactions in November 2004 must be excluded from the loss calculation. Peer Kølendorf has not incurred liability for damages already because the VAT has never been paid to Comitel by SKAT. The unlawful act for which Peer Kølendorf is accused consists of obtaining an - according to SKAT - unjustified payment of VAT, and Peer Kølendorf can obviously not be liable for damages for a *futile attempt* to get the VAT paid. If the entire amount is not waived, part of the claim amount will not be attributable to any loss.

*7 Relaxation of liability for damages*

• If the High Court finds that Peer Kølendorf is liable for damages, the defendant argues that the liability should be reduced, cf. section 24(1) of the Danish Tort Liability Act and section 143(1) of the Danish Companies Act (now section 363(1) of the Danish Companies Act).

• As an example of a case where relief has been granted, see

UfR 2010.3203 H (Tivoli Night), where liability was reduced for a director, despite the fact that it was a (trademark) infringement that was committed grossly negligently and later even intentionally. The Maritime and Commercial Court in its judgment, which was upheld by the Supreme Court,

emphasis on the fact that the director had not made a personal profit from the infringement and that he was indirectly affected by the sanctions imposed on the company. On a similar basis, any liability for damages that Peer Kølendorf may incur in this case must be mitigated. Peer Kølendorf has earned nothing in connection with

**1931**

with the transactions in the case. For the financial years in the case period and up to the bankruptcy of Comitel International A/S, no dividends have been paid by the company. On the contrary, Peer Kølendorf has suffered a significant loss in connection with the company going bankrupt.

• At the same time, Peer Kølendorf - prompted and supported by SKAT itself - had a firm belief that the measures taken were effective. If the High Court were to find that this belief was not justified, the defendant considers the claim to be exorbitant and unreasonably onerous.

• In this case, there are also very special circumstances, in light of the fact that in the case of liability for damages, Peer Kølendorf was let down by a long-standing trusted and high-ranking employee and, for part of the period, also a member of the company's management, who participated in the fraud in a personal and professional breach of trust, *and* by the injured party (SKAT) itself.

• The alleged claim for damages significantly exceeds the funds available to Peer Kølendorf for the payment of damages, even with contributions from third parties.

*8 Concluding remarks*

• Liability for damages for Peer Kølendorf in this case will lead to incalculable consequences, as a completely normal and ordinary organization of a company will no longer be possible without the risk of incurring liability for damages. A trusted employee's fraudulent behavior in relation to completely normal business transactions should not trigger liability. Such a legal situation would lead to paralyzing legal uncertainty."

Regarding the examples highlighted by SKAT of transactions with imprecise product designations in invoices, Peer Kølendorf has further stated that with regard to the designations "Infineon TSOP" and

"Samsung Branded Dice Program", the exact product specification of the goods in question appears from the submitted purchase orders, and the product types can be found in Samsung's product overviews, which is why it is disputed that these are non-existing products. Peer Kølendorf has also stated that it is correct as pointed out by SKAT that there are no CPU units of the type "Intel Pentium 4 3.0 Ghz, 533 Mhz", which is why there is an inaccuracy in a specific transaction. However, the correct description of the existing component, namely "Pentium 4 3.0 Ghz 800 Mhz", appears from another documented trade transaction where a goods inspection was carried out.

Peer Kølendorf has also argued that SKAT's claim is partially time-barred, as a 5-year limitation period applies from the time the claim arose, which in the specific case must in principle be the time of the declaration of VAT, alternatively the time of payment of the VAT deductions for November and December 2003, which is why in principle DKK 100.4 million, alternatively DKK 77.4 million, of the claim was time-barred at the time the case was brought.

Finally, Peer Kølendorf has stated that meeting a claim for compensation from SKAT of more than DKK 30-40 million would be ruinous for him.

**The High Court's reasoning and result**

Peer Kølendorf has been running his own business in the radio and telecommunications industry since 1966. The company, which began trading in the broker market for mobile phones in the mid-1990s, was professionally managed in 1999 and changed its name to Comitel in 2000. When the company was split into three companies with effect

From January 1, 2003, the broker activity was transferred to Comitel Inter- national A/S, where Peer Kølendorf was the ultimate principal shareholder and board member as well as CEO in the period until April 16, 2004.

This case concerns whether Peer Kølendorf has incurred personal liability for the loss incurred by SKAT as a result of unpaid sales VAT from brokerage transactions carried out from November 2003 to November 2004, which were part of planned VAT fraud. The head of Comitel International A/S' broker department, T, was sentenced to 5 years imprisonment for his participation.

It is assumed that Peer Kølendorf did not know that the transactions in question, which included IT components and internet access cards, were part of VAT carousel fraud, but that he was aware that prior to the transactions in this case, there had been problems with VAT fraud in brokerage transactions within the EU with, among other things, mobile phones and IT components.

SKAT does not claim that trading on the broker market for IT components was in itself a liability, which is why the question for the High Court is whether Peer Kølendorf's management and operation of Comitel International A/S in the period November 2003 to November 2004 was a liability.

Based on the explanations given, it is assumed that Peer Kølendorf's managerial tasks regarding the entire group with approx. 75 FTEs, including Comitel International A/S, were unchanged during the period in question, and that, with the consent of the Board of Directors, his main task was to ensure the overall organizational and financial framework, which included daily checks of the bank entries at total level, including to ensure that the liquidity limit of DKK 50 million agreed with the bank was not exceeded, control of the monthly revenue, cost and profit figures and budget follow-up.

### 1932

T, who had been employed by the company from 1992-96 as an electro-mechanic and later head of the workshop, was hired in August 2000 as a business developer with a fixed salary and a share option scheme, and he was appointed CEO of Comitel International A/S on April 16, 2004 and joined the board on June 1, 2004. From his appointment in August 2000 until July 2006, when he was dismissed, Mr. T was responsible for the company's broker trading.

Peer Kølendorf, Ole Stangegaard and Steen Erik Mønsted have unanimously explained that T was a key person in the company due to his professional competence within IT and mobile telephony and his personal network, and that he enjoyed a very high degree of trust from the Executive Board and Board of Directors, which was also the reason for his appointment as CEO.

According to the evidence, it is assumed that the brokerage trade with mobile phones had not given rise to problems under T's management in 2000-2003, and that the prerequisite for the board's decision in 2003 to expand the brokerage activities to include trade with IT components was T's competence and the fact that the company already had the necessary incorporated procedures for handling goods, customers and suppliers and an established organizational framework with bookkeeping function, forwarding agent and warehouse.

The board minutes show that the board received regular reports on the company's financial, market and organizational conditions, and receipts for paid taxes and duties were presented. It is also assumed that the chairman of the board and Peer Kølendorf had regular meetings with the bank and the insurance company, and

that in the spring of 2003, the board was given a demonstration of a goods inspection at the company's warehouse.

Copyright © 2023 Karnov Group Denmark A/S

Under the stated circumstances, including in particular T's long-standing, central role in the company, and considering that there is no information that the operational and organizational framework in Comitel International A/S was unusual for brokerage companies, it is not established that Peer Kølendorf has acted in breach of responsibility by letting T manage the daily operation of the brokerage activities as happened.

By agreement with SKAT, Peer Kølendorf had been submitting monthly lists of the company's new customers and suppliers to SKAT for several years before the case arose, which SKAT had indicated as a way to protect itself from becoming involved in VAT fraud. Sales invoices were submitted monthly for VAT refunds, and purchase invoices were submitted at the request of SKAT. In several cases, the company had also provided SKAT with information about its transactions for use in responding to verification requests from foreign authorities in connection with uncovering possible fraud. In a payment inspection of the company in the spring of 2004 concerning the period August - December 2003, SKAT stated, among other things, that everything was fine regarding negative VAT, and there were no serious remarks in connection with previous inspections. During the inspection, SKAT also inspected the inventory. As regards the payment control for January to March 2004, there were no remarks regarding the company's external transactions, and on May 5, 2004, SKAT released negative VAT for April 2004 with the remark

"less risk".

It is therefore assumed that in the period 2002 and until SKAT's proposed decision in December 2004, SKAT's contact with the company did not provide information that gave Peer Kølendorf reason to initiate further investigations of the company's broker activities.

According to the available information, including Reino Nielsen's explanation, the VAT fraud in the "Yellow Fever" transactions was carried out in a new way, among other things by trading the goods outside the EU. Peer Kølendorf has explained that he found it reassuring that Co- mitel International A/S sold goods outside the EU because he had only heard of VAT fraud within the EU.

The company has been trading with the Far East for many years, and T, who handled the transactions, was experienced and reputable. Against this background, Peer Kølendorf is found not to have acted responsibly by not checking the new customers in the Far East, with whom T stated to have entered into cooperation.

Furthermore, according to the evidence, there is no basis to justify the concurring statements from Peer Kølendorf, Steen Erik Mønsted and T that product control was a normal part of the brokerage business to counter the commercial risk and that it was T's responsibility to instruct and supervise the brokers' compliance with the company's procedures for the business.

The High Court must therefore assume that Peer Kølendorf had a legitimate expectation that the usual goods inspection would be carried out.

Comitel A/S had a turnover of DKK 1.2 billion in 2002. Comitel International A/S had a turnover of DKK 724 million in 2003, DKK 2.2 billion in 2004 and DKK 2.3 billion in 2005.

The case covers 30 purchases in November and December 2003 from Solid Trading ApS for a total amount of DKK 268 million. As far as 2004 is concerned, the case covers a total of 39 purchases from Solid Trading ApS, Trademark International ApS and J Corp ApS for a total amount of approximately DKK 300 million. The purchases in 2004 are divided into 5 in January, 3 in February, 8 in March, 4 in June, 15 in August and 4 in November. In 2004, Comitel International A/S carried out just over 1,200 broker trades.

Copyright © 2023 Karnov Group Denmark A/S

**1933**

The company's results for the years 2003-2005 were approximately DKK 1.5 million, DKK 8.4 million and DKK 6.6 million. No dividends were paid for the years 2003 and up to the company's bankruptcy.

It is also assumed that in connection with the "Yellow Fever" trades, the liquidity limit was not exceeded and there were no missing payments.

After an overall assessment of the information about Comitel International A/S' trade in IT components, there is no basis for assuming that Peer Kølendorf, based on the scope and profit of the brokerage transactions that T carried out as part of "Yellow Fever" complex, had such an opportunity to check these trades more closely that, by failing to do so, he has acted in breach of responsibility.

As stated, Peer Kølendorf is found not to have acted responsibly by leaving the daily operation of the broker activities to T, and the High Court finds that it was neither a normal part of Peer Kølendorf's work as director or board member to check product descriptions and pricing, which according to the information provided would also require in-depth knowledge of the current market conditions. Against this background, SKAT's statements about inaccurate product descriptions and unexplained deviations from the market price cannot lead to a different result.

Especially with regard to the trades in August and November 2004 with internet access cards, the evidence shows that Peer Kølendorf approved a proposal from T to initiate this trade, that the basis for this was T's information that there was a market for this in the Far East, and that the company traded with other value-bearing cards. Against this background, it is not established that Peer Kølendorf in this connection acted irresponsibly by not conducting further investigations regarding the trades in question.

The High Court then acquitted Peer Kølendorf.

SKAT must pay legal costs to Peer Kølendorf with a total of DKK 5,000,000 incl. VAT to cover legal expenses. When determining the amount, in addition to the value of the case, the scope, duration and importance of the case have been taken into account.

- - -

## Supreme Court

### Supreme Court ruling

In a previous instance, judgment was handed down by the 15th division of the Eastern High Court on October 31, 2014.

Five judges participated in the adjudication: Jytte Scharling, Jon Stokholm, Henrik Waaben, Oliver Talevski and Jan Schans Christen- sen.

*Claims*

The parties have repeated their claims.

*Requester*

*The Ministry of Taxation* has essentially repeated its arguments and additionally stated, among other things, that the assessment of Peer Kølendorf's liability as director of Comitel International A/S must not take into account his other duties in other companies in the group. The assessment of liability in relation to section 54(2) of the current Danish Companies Act must only be made in relation to the company in which the management member has served as a director and thus been responsible for the daily operations. Furthermore, it is of no significance to Peer Kølendorf's liability in relation to third parties that he had

obtained the board of directors' acceptance that he had a limited involvement in the daily operations of Comitel International and that he only had a formal responsibility for establishing the overall organizational and financial framework. This

This is particularly true in a situation where the company had only one activity and 5-6 employees. In such circumstances, there is no possibility or need for delegation without control from the CEO to the extent that occurred in Comitel International. Peer Kølendorf's lack of involvement in the daily operations is an aggravating factor in a situation such as this.

It is the opinion of the Ministry of Taxation that Comitel International in the period from the beginning of November 2003 and throughout 2004 only to a very limited extent traded with suppliers and customers who were not involved in VAT fraud. Based on answers that the Ministry has received from authorities in other EU countries about Comitel International's trading partners in 2003 and 2004, it must be assumed that the activity in Comitel International, including the "Yellow Fever" trades from the spin-off of the broker activity until the end of 2004, to a very significant extent - at least 80% - involved trading with companies that were presumably involved in VAT fraud, including as "missing traders".

By receiving customer lists and carrying out payment controls in Comitel International, SKAT has not created a legitimate expectation in Peer Kølendorf that the company's brokerage trade was not related to VAT fraud. In connection with a payment control pursuant to section 74(1) of the VAT Act, SKAT does not carry out an actual examination of the activities in question or other approval of the company's accounts. A payment control can therefore not be equated with an actual tax control.

*Peer Kølendorf* has essentially repeated his submissions and additionally stated, inter alia, that it is disputed that goods sold by Comitel International to EU trading partners were used to commit VAT fraud. The answers from authorities in other EU countries about Comitel International's trading partners in 2003 and 2004 do not constitute documentation for this. In any case, there is

**1934**

circumstances, these were circumstances that he did not know or should not have known about. Neither SKAT nor foreign authorities indicated - despite ongoing contact - that Comitel International had traded with "missing traders", which reassured him that the company's precautions were effective.

It affects the assessment of a citizen's liability to SKAT what SKAT has instructed the citizen to do, especially when the citizen has subsequently complied with these instructions for a number of years and was not informed by SKAT at any time in the period leading up to the case that the company had done something wrong or that the company had been involved in a transaction that had led to a VAT loss for Denmark or another country.

*Supplementary case presentation*

The material presented to the Supreme Court regarding Comitel International's trading partners in other EU countries in the period 2003-2004, including information from the British and Spanish business registers, shows, among other things, that some of the companies that Comitel International traded with during the period have been deregistered, while others are still registered.

*Explanations*

Sheng Tang and Stina Grøndahl (formerly Christina Evers) have given evidence to the Supreme Court and Peer Kølendorf has given supplementary evidence.

*Sheng Tang* has explained, among other things, that he was educated in China, from where he has what corresponds to an MSc. He came to Denmark in 1991, but has not studied in this country. He has had many different jobs before joining Comitel, including telecom software company Build Systems. He also worked in an export company for six years, where he was export manager. The work in the export company consisted of exporting Danish speakers to China and the rest of the Far East. He believes it was in 2001 that he was hired

in Comitel. At Comitel, he was responsible for the mobile phone business with Asian countries, which was booming at the time. When he joined Comitel, he had an interview with Peer Kølendorf. He was hired in the broker department. In the beginning, he dealt exclusively with cell phones. For the first five months, there was nothing to do. It was difficult because brokerage is all about contacts and relationships, and in the beginning you have none. After five months, he got hold of Samsung in Stockholm and things went well from there. For example, Samsung sold leftover batches to Hong Kong and other Asian countries. He has never traded in CPUs and IT components.

He believes there were four brokers when he was hired. The other brokers also only sold cell phones. T, who did not initially work in brokerage, was also at Comitel at the time. There was a difference in the customers the brokers handled. You had your own customers. For example, he was the only one who had a customer relationship with Samsung.

When he was hired, his boss was - - - - , who was the group leader. Peer Kølendorf was not involved in broker trading at all. As far as he knows, none of the brokers had contact with Peer Kølendorf. Peer Kølendorf was present in the company on a daily basis, but was not involved in his work at all. Peer Kølendorf was not involved in the details of the brokerage company. He does not believe that Peer Kølendorf had insight into the details of the brokerage market, and he did not have daily sparring with Peer Kølendorf.

His authority to trade was unlimited, provided he had a buyer and a seller. For example, he could buy 3-5,000 car phones at a unit price of DKK 1,500. He could make such a trade without asking. There were no cases where his trades needed approval. For example, he bought 20,000 and 30,000 cell phones from Samsung without being asked. He does not believe that he first had to check whether there was enough liquidity to make the transaction, for example. When customers bought, it was in cash and no credit was used.

It was Michael Simonsen who told him how to handle the practical things, such as customer checks and VAT issues etc. Later, it was T he referred to. He cannot pinpoint exactly when he started referring to T. Nor can he remember whether budgets were made in relation to how much the brokers should charge. He received a fixed salary and commission. The commission was very low in the beginning. It was a matter of thousandths of a percent. The commission went up a few years after he was hired.

Customers for his suppliers, such as Samsung, could be based in the Netherlands or Hong Kong, for example. The customers were different. Regarding the table showing his customers, suppliers and turnover figures in 2004-2006, it may well be true that his customers were primarily European companies, but there were also major deals with companies in Hong Kong, such as Starup Trading Company and HCT holding Ltd.

"hK" next to it in the lineup. It must have been possible to get higher prices from the European customers.

His customers in the Far East were brokers. They were relationships he had built and, in part, customers he had acquired. The broker market is all about relationships. Relationships can be both short and long. A customer may call in and say they need something, and then a trade is made. Such a relationship is typically short. The relationship with Samsung was long. The brokerages he dealt with had been around for many years, but there were also some that were brand new. From the list of his customers, suppliers and turnover figures in 2004, he

does not remember Vaneypeco Consulting or Osseni Telecomunication LDA. He doesn't think there were any examples of customers being shared. He does not know,

**1935**

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2016.1870H

How customers were distributed when a broker quit. There was no distribution key.

The only instructions he was subject to was that he had to fill out a form. The form was a piece of paper where you had to check the existence of a company, its suppliers and customers. You had to check if the company was "ok". He can't remember what else you had to check about the customer. If it was a Danish company, you could call Customs and Tax. If a check had to be made on a customer or a supplier, he was the one to call. He can't remember if there were written guidelines in addition to the form. There were monthly meetings where the brokers were instructed to be careful if they did not know where the goods came from. The brokers were not told that they were not allowed to trade, but simply that they should be careful. He cannot remember if he has seen a Code of Conduct from England.

It was the freight forwarder who checked the goods. Sometimes, if the goods were in Denmark, the brokers did the checks themselves. In most of the deals he was involved in, it was the freight forwarder who checked the goods. It was very rare for them to get goods in for inspection. He has sometimes been to the freight forwarder's premises to check, but brokers do not normally check the warehouse. In the case of "triangular trade", i.e. when the goods did not arrive in Denmark, it was always the freight forwarder who carried out the checks. In this case, the goods were sent directly from, for example, Sweden to Hong Kong and did not pass through a Danish freight forwarder.

He didn't get complaints. You don't get that in the broker market. It may happen, but he has never experienced it himself. He was not aware of the term "VAT carousel" in 2001-2003, but he later became familiar with the concept.

The relationship with T, who was sweet and kind, was good. T had more to say than Peer Kølendorf on a daily basis. T was the head of the broker department, but he had many things going on. T had to do with business development. He didn't know T's customers and suppliers, and there was no competition between T and him.

*Stina Grøndahl* has explained, among other things, that she has a commercial education. Before joining Comitel, she was employed by Santec International, also as a broker, and KISS Technology, owned by Sisco Systems. Later, she moved to Funen and started her own business. In her own company, she was engaged in brokerage as before. She sought out customers and sold goods. At some point she got tired of the brokerage business. She became a restaurateur, but it didn't work out. For a short period after that, she was employed as a sales consultant at Fyns Amtsavis. She saw Comitel's advertisement in the summer of 2003, applied for the job and got it. She was with Comitel from October 2003.

She had an interview at T and did not meet Peer Kølendorf in that connection. She was hired by Comitel in order to get Comitel into the market for IT components that Comitel wanted to add to its product range. These were also IT components she had previously worked with. In her previous job, she bought and sold to customers all over the world. These could be broker-to-broker deals and deals with suppliers, distributors and manufacturers. You just had to deal with real and valid companies.

When she joined Comitel, she had to report to T. The first time she met Peer Kølendorf was on her first day at work. In general, she had nothing to do with Peer Kølendorf. He was present in the company when she was there, but she had a home office, so she didn't spend much time in the company building herself.

Peer Kølendorf had nothing to do with the broker activity, including customers, suppliers and products. T. Peer Kølendorf of

course followed the numbers, whether things were going well or badly, but

Copyright © 2023 Karnov Group Denmark A/S

Peer Kølendorf had nothing to do with the broker part of the company.

When she joined Comitel in 2003, there was a young man called A. He was also from the broker industry, and they were going to work together to build a market for IT components.

T had to approve her trades, as liquidity had to be available. The trades took place as an interdisciplinary collaboration. They were large trades and there were several people who needed liquidity. If others had large trades, you couldn't necessarily execute them all. The fact that there weren't unlimited funds didn't cause much friction.

She dealt with all kinds of IT components, such as CD-ROM drives, DVD drives, CPUs and RAM pads. She didn't have her own customers as such. The customers were Comitels, but she found them and had the relationship with the customer. The customer did business with her, but because she was employed by a reputable company.

There was only a written guideline that you could not smoke, even during breaks. There were no guidelines about not dealing with certain customers. It was "cash on delivery", so Comitel only needed to receive the money before releasing goods. There were no written guidelines on the supplier side either.

She knew about VAT carousels when she was hired. It was something they discussed and were very aware of. Customs and Tax also came in several times to discuss VAT carousels, but Customs and Tax couldn't give them a clear guideline either. They had no guidelines on how to avoid VAT carousels, but they were aware of where the goods came from. It was a jungle, so they were careful. She can

**1936**

not say anything more about how this vigilance was expressed. However, she was very aware that it was a proper trade. For example, she consulted with T and might take references on the customer or supplier. She does not believe that she has been presented with a Code of Conduct. She does not know what it means.

The goods they bought went through a freight forwarder, so there was no inventory control. They had a returns warehouse, but it was very limited in size. She "traded cardboard boxes" that she didn't see the contents of. It was the freight forwarder who carried out the goods inspection. The inspection was based on a specific agreement with the freight forwarder. The boxes were opened by the freight forwarder before payment was made. This was because there was a lot of fraud and it was a security for the customer and for Comi- tel.

She was with Comitel for about a year and a half. She quit because she got a better offer. Regarding the list of her customers, suppliers and turnover figures in 2004-2005, she can confirm that her customers and suppliers were mainly from Europe. There wasn't a market in the East at all. They struggled to enter the market in the East, but it was not possible. Many deals with companies in the East didn't materialize due to things like exchange rate fluctuations, higher freight costs and the time factor. They couldn't match the market at all. It wasn't because the market was too dangerous, but because they couldn't match it. The market in the East was also not her strength.

She does not recall that there was a form to fill out when she got a new customer or supplier. Regarding Sheng Tang's explanation that there was a new customer and supplier form to fill out, she and Sheng worked in very different markets. There was a lot more control with the mobile phone market, where the turnover and deals are bigger. It's easier to sell cell phones that everyone can use than IT components. *Peer Kølendorf* has also

explained that the division of roles between T and him was that he set guidelines for and delegated

Copyright © 2023 Karnov Group Denmark A/S

tasks to the T. Responsibility is about taking on an obligation. He delegated tasks to T when it came to the broker part of Comitel's business, and T took on this obligation. T and he walked up to each other every day. The door was always open and there was an ongoing dialog between them.

He checked what was happening in the company by looking at the IT system. He could see which customers and suppliers the company had, but he did not go into detail and did not check which companies were involved. The checks were done at least once a month, sometimes on a weekly basis.

He sent information to Customs and Tax once a month. There were specific routines for what to do. Customs and Tax received the information about all new customers and suppliers in a raw form. It was the finance department that had the back office function, including bookkeeping, the responsibility for incoming and outgoing payments and for registering new item numbers, customers and suppliers etc. T as a salesperson was not involved in this. None of the brokers were authorized to make outgoing payments, which should normally be made by two brokers. None of the brokers were on the list of people authorized to approve outgoing payments. However, the brokers had access to the IT system and could see when and if money had come in, which meant that goods could be released to the customer. For example, T could not issue a credit note to the customer. In the words of his accountant, issuing a credit note was the same as issuing a check, which had to go through the finance department. He considered this segregation of duties to be a relevant and sufficient segregation. It was what he could do. He could not be involved in the brokerage activity itself, which was done over the phone and handled by the salespeople.

In terms of the guidelines he set out for T, he believes that you have to be careful not to be too rigid, so there was no actual list. Management and T looked at the Code of Conduct from England, which they were inspired by. Customs and Tax couldn't formulate guidelines either. In addition to making sure you didn't trade with the wrong people, it was very much a matter of intuition and asking your other trading partners.

In 2003, the broker business in Comitel A/S was spun off to Comitel International A/S. In Comitel International A/S there were only brokers. The other functions besides buying and selling, such as telephone, reception, warehouse and finance, including deposits and withdrawals, were still in Comitel A/S. Comitel International A/S paid monthly for the services provided by Comitel A/S. Comitel International A/S could not function without Comitel A/S.

When he became CEO of the parent company, Comitel A/S, in connection with the demerger, T became COO of Comitel International A/S. There was no major difference in the way he and T worked. The fact that T was appointed CEO in April 2004 thus made no difference in practice. Even after the demerger, it was he and not T who had cooperated with Customs and Tax.

The statement in his testimony before the High Court that T was appointed as a director because "he actually functioned as such" indicates that the management thought it was reasonable that T was given the title of director of the brokerage company. As operations manager, T was effectively acting as a director, but the overall supervision he provided was the same after his appointment.

With regard to his statement before the High Court - which is not included in the High Court judgment - that a

**1937**

employee "must be responsible for what he does", this means that he had imposed a responsibility and obligation on T as an employee. If you as an employee do not take on the obligation or responsibility imposed on you, you will be reprimanded and, in the worst case, fired. He

did not consider the legal responsibility he was still subject to as CEO in his wording.

T was hired as a business developer and took care of new things. It was T who was responsible for the broker activity, and he was not surprised that T got this activity going. T had also previously started other new things, such as CBB Mobil A/S and SMS A/S, which were big successes. Moreover, it was not only T who was in charge of the IT broker part. Other IT brokers were also employed.

A "serious buyer" is a buyer who keeps their word. Once a buyer has entered into an agreement, which will typically be followed up by a fax - nowadays an email - it is important that the buyer honors their commitment and pays. The "rogue buyer" is the one who, for example, drops out because the price of the product has changed when the product is on its way and the deal is no longer lucrative. You don't want to do business with them again. The problem arises when you're left with a batch that you haven't finally sold. In the broker market, there is no point in pursuing trading partners with legal action that can take years. It's better to take a loss and move on.

Overall, he has professional knowledge of the broker market, but if a product name is mentioned to him, he can't necessarily say what it is. He has been in the industry for 50 years, but he doesn't know technical terms because he's not trained for that. That's why he has hired people who have technical knowledge. For him, Comitel was selling hardware. He doesn't believe that you have to be technically trained to run a commercial business. "The most important thing in the broker market is of course the price, but the most important thing is the ability to deliver. You may be able to buy components cheaper from a factory, but if the factory can't deliver, it doesn't matter. This applies to both IT components and mobile phones.

He has "price insight" in the sense that he knows how prices on the brokerage market are created, but he did not know the price of the individual goods. He saw the names of the company's customers, so he knew their names, but he did not know them specifically because he did not participate in the brokerage activity itself.

Before this case, he had never heard of a so-called "Trojan horse" where a senior employee of a company is complicit in the fraud, which means that it is not only trading partners who commit the fraud.

The remark in the management report in Comitel International A/S' annual report for 2006 that the reason why the company ceased broker activity was that liability was introduced for VAT not paid at earlier stages in the revenue chain is not covered. To elaborate, it is very difficult to know what a trading partner far down the chain is doing. It was also a contributing factor that T, who was head of the broker department, left the company. When he became aware that something was wrong, he tried to go back to see if he could have spotted it. He couldn't. This fact was enough to say that he could not continue the brokerage business. It was also a contributing factor that he had reported continuously to Customs and Tax, which did not lead to the fraud being uncovered until quite late. It was a new form of fraud that had not previously been known.

He assumed that if Customs and Tax had information that gave rise to suspicion of VAT carousel fraud, he would have received it. When Comitel saw something that looked suspicious, they reported it. For example, it could be cardboard boxes that looked wrong. Customs and Tax then went to the freight forwarder. Afterwards, he didn't hear much more than that they might have said thank you for the tip. He has also experienced that he was

offered Nokia phones much cheaper than they could be bought from the factory. They reported that too and were thanked. In relation to the lists he sent to Customs and Tax with new customers

Copyright © 2023 Karnov Group Denmark A/S

and suppliers, he would have expected to be alerted if he suspected there was a new form of VAT carousel he wasn't aware of, but he received no warnings.

He cannot pinpoint the exact time of the problems in relation to the English market, which are mentioned in the High Court judgment. "It's probably because English customs had begun to take action against VAT carousels, which there were none in Denmark at the time. In England, they stepped in and stopped the payment of negative VAT, which stopped the entire English broker market. In one case, this affected a Danish company, and it also affected the market in which Comitel International A/S traded.

Compared to the revenue target of DKK 2 billion formulated at the end of 2003, such a target in the broker market is an expression of hope and a guess. It is impossible to say how the market will develop. It requires that there are goods that someone is missing. In that case, you resort to the broker market because you can't get the goods from the factories. If the factories had instead produced more than they could use, the goal would not have been met. The DKK 2 billion probably reflects the fact that the company had an ambitious board. The target turned out to be met, but it could just as well have gone the other way. It was, for example, the relationship with good customers such as Samsung, that made it possible to achieve the goal.

The revenue target was for T and his employees to realize. This was not done in such a way that the board simply set a target.

**1938**

The goal was set together with T, and he does not believe that it was a goal that T and his employees were pressured into. There was managerial support for achieving the goal, for example by ensuring that liquidity was available. He was not involved in finding customers, suppliers and products himself.

In relation to Stina Grøndahl's statement that there were problems regarding trade with the Far East, he had not heard of such problems before. The question is how much Stina Grøndahl knew about it, as she herself primarily traded with European companies.

He had an ongoing dialog with T. Instructions on measures against VAT carousel fraud, for example, were given based on what they had heard and read. In this way, they were warned about what kind of VAT carousels were being used. For example, if the price offered was lower than the market price, this was a danger sign, but it was not something for which clear guidelines could be set. Another danger sign, as mentioned, could be a 'rogue buyer'.

To avoid doing business with companies that engaged in VAT carousel fraud, they would ask around the industry and take references when they got new trading partners. This was something the salespeople had to cultivate themselves, and he typically didn't take references himself. He took references himself when he started trading with Solid Trading ApS, which was a Danish company. He had no contact with people in the broker market and could only do his own research in Denmark.

He can't say that a certain percentage of a bridge company's turnover will be related to VAT carousel fraud, but they knew about VAT carousel fraud from articles. According to the articles, there were no problems in Denmark.

He was aware that in 2003 the VAT rules had been changed so that the rules were the same in relation to trade with companies in Europe and third countries, including Hong Kong, but customs control was not the same. Here the rules were very different. In relation to trade with third countries, VAT carousel fraud was not obvious, as there were high costs associated with sending goods

to Hong Kong, for example.

He received no commitment from Customs and Tax that he would be notified if Customs and Tax suspected VAT fraud, but he expected to receive information about a possible misuse of VAT.

Copyright © 2023 Karnov Group Denmark A/S

thought, because he sent lists to Customs and Tax and received reminders if the lists did not arrive. Therefore, he expected the lists to be used for something. He did not know what the lists were used for, but assumed that they were used to follow the goods, for example to Hong Kong. No one from Customs and Tax has told him that the goods could be followed to Hong Kong, but he believes that Customs and Tax has that option.

He was not made aware of the internal documents from Customs and Tax, which show that meetings had already taken place in 2003 regarding, among other things, suspected VAT fraud, before this case.

He and his companies are not currently in possession of bookkeeping and accounting material relating to Comitel International A/S. "There is some electronic bookkeeping, but it is aggregated and you can't see much. For example, you can't allocate revenue to periods.

He does not know specific product designations and does not know, for example, that "Infineon TSOP" is a microprocessor and what "Samsung Branded Dice" means. He has been importing electronics for 50 years and doesn't think this knowledge is necessary to run a trading business.

He believes that T asked him in connection with Comitel entering the porn card business. He does not know why Comitel left the market.

### The Supreme Court's reasoning and result

#### Case background and main problem

The case concerns whether Peer Kølendorf is liable for damages for the loss of DKK 144,080,700 suffered by the Danish Ministry of Taxation when Comitel International A/S was refunded VAT relating to the period November 2003 to November 2004, which previous trading partners fraudulently evaded SKAT. The head of Comitel International's bridge business, T, has been sentenced to 5 years imprisonment for debtor fraud in the form of participation in VAT carousel fraud as part of the so-called "Yellow Fever" case complex.

The main point of view of the Ministry of Taxation is that Peer Kølendorf as ultimate principal shareholder and board member as well as general manager of Comitel International - in the period until 16 April 2004 also as registered director - has acted irresponsibly by not ensuring a proper organization and adequate supervision of the company's brokerage business.

#### The assessment of responsibility

The question of Peer Kølendorf's liability for damages must be assessed according to the general rule of damages under Danish law (the fault rule), according to which the decisive factor is whether Peer Kølendorf has caused SKAT's loss intentionally or negligently (recklessly), cf. section 140 of the current Danish Companies Act and section 361 of the current Companies Act.

As stated by the High Court, it must be assumed that Peer Kølendorf did not know that the relevant transactions with IT components and internet access cards were part of VAT carousel fraud. Peer Kølendorf can therefore only be liable for damages if the Danish Ministry of Taxation proves that he has shown reckless conduct in connection with the organization or supervision of the company's brokerage business. From his work in the industry, Peer Kølendorf had knowledge of previously used VAT carousels on

**1939**

the broker market and the risks of fraud associated with it. Regardless of this and regardless of the general risk of VAT fraud in the broker market, in the Supreme Court's opinion, Peer Kølendorf's entry into the broker market for IT components, etc.

cannot in itself be considered liable, which the Ministry of Taxation has not claimed.

Furthermore, the fact that the company's brokerage business was not structured so that the company only made use of the right to deduct VAT after the company had

Copyright © 2023 Karnov Group Denmark A/S

had checked that the previous stages had declared and paid the VAT.

Whether Peer Kølendorf in organizing or supervising the company's brokerage business exhibited reckless conduct depends on the specific circumstances of the case, including whether he failed to organize the company's business so that the company refrained from acting in cases where the circumstances gave rise to suspicion of fraud or irregularities in previous trading stages. The brokerage business, which was originally a department of Comitel A/S and included trading in radio communication equipment and mobile telephones, was transferred to Comitel International as part of the demerger of the company in 2003. Mr. T had been employed by Comitel from 1992-96 as an electromechanic and later head of the workshop. In August 2000, he was employed as a business developer and responsible for the brokerage of mobile phones in Comitel, and as part of the restructuring he was transferred to Comitel International. In 2003, on T's initiative, the Board of Directors decided to expand the brokerage business to include trading in IT components.

As stated by the High Court, T was a key person in the company due to his professional competence within IT and mobile telephony and his personal network. The brokerage of mobile phones had not given rise to any problems under his management in 2000-2003, and he enjoyed a high degree of trust from the Executive Board and the Board of Directors. Mr. T was hired as general manager of the brokerage business because the board and management wanted to use his expertise and network to develop this business.

Based on the evidence, including the testimony given, the Supreme Court assumes that Peer Kølendorf, who considered T as his right-hand man, instructed him to ensure that the brokers took measures to prevent Comitel International from becoming involved in VAT carousel fraud.

Peer Kølendorf, who had an office in the same premises as the few other employees in Comitel International, had daily contact with T and the other brokers and continuously followed up on the development of the company's finances, including turnover, costs, result and budget, just as he followed the movements on the company's bank accounts daily. The evidence does not provide a basis for establishing that Peer Kølendorf, through his contact with T and the other brokers or through his control of the company's finances etc. should have suspected that previous trading partners were involved in VAT fraud. The information that the Ministry of Taxation has received from authorities in other EU countries about Comitel International's EU trading partners in 2003 and 2004 cannot lead to a different assessment.

In addition to the aforementioned control of the company's finances, etc. Peer Kølendorf sent monthly lists of the company's new customers and suppliers to SKAT for several years by agreement with SKAT. This must be assumed to have contributed to Peer Kølendorf's perception that the company had taken the necessary precautions to avoid becoming involved in VAT carousel fraud.

Against this background, the Supreme Court finds that it has not been proven that Peer Kølendorf has shown reckless behavior in the distribution of tasks between him and T or as a result of lack of supervision or control of the brokerage company.

Peer Kølendorf is therefore not liable for SKAT's loss.

*Conclusion*

The Supreme Court upholds the verdict.

**For it is recognized as right**

*The judgment of the High Court is upheld*

*In legal costs before the Supreme Court, the Ministry of Taxation must pay*

*DKK 3,750,000 to Peer Kølendorf.*

Copyright © 2023 Karnov Group Denmark A/S

*The ordered costs must be paid within 14 days of the date of this Supreme Court judgment and shall bear interest in accordance with section 8a of the Interest Act.*

Copyright © 2023 Karnov Group Denmark A/S

**U.2016.1870H**

### Ikke erstatningsansvar for SKATs tab i forbindelse med momskarruselsvig.

*Afgifter 5.9 - Selskabsret 13.3 og 14.2 .*

♦ A var hovedaktionær, bestyrelsesmedlem og - indtil april 2004 - direktør i C A/S, som drev brokerhandel med navnlig mobiltelefoner og it-komponenter. C A/S foretog i perioden fra november 2003 til november 2004 en række brokerhandler. Efterfølgende viste det sig, at tidligere omsætningsled ved skyldnersvig havde undladt at afregne salgsmoms til SKAT, S, af varer, som C A/S havde købt og videresolgt til udenlandske selskaber, der deltog i svigen. T, der var leder af C A/S' brokervirksomhed, blev idømt 5 års fængsel for skyldnersvig i form af momskarruselsvig. S rejste krav mod A om erstatning for det tab på ca. 144 mio. kr., som S havde lidt ved, at C A/S fik tilbagebetalt den moms, som de tidligere handelsled svigagtigt havde unddraget S. Det var S' hovedsynspunkt, at A som ultimativ hovedaktionær og bestyrelsesmedlem samt daglig leder af C A/S - i perioden frem til april 2004 tillige som registreret direktør - havde handlet ansvarspådragende ved ikke at sikre en forsvarlig organisering af og et tilstrækkeligt tilsyn med selskabets brokervirksomhed. Højesteret fandt, at S ikke havde godtgjort, at A ved den opgavefordeling, der var mellem ham og T, eller som følge af manglende tilsyn eller kontrol med brokervirksomheden havde udvist uforsvarlig adfærd. A blev derfor frifundet.[1]

**H.D. 11. februar 2016 i sag 227/2014 (1. afd.)**

Skatteministeriet
SKAT (Km.adv. v/adv. Boris Frederiksen Kbh.)
mod
Peer Kølendorf (adv. Tom Kári Kristjánsson, Kbh.).

## Østre Landsret

### Østre Landsrets dom 31. oktober 2014, (15. afd.) B-1802-09

(B. Vollmond, Norman E. Cleaver, Janni Christoffersen (kst.)).

*Indledning*

Denne sag, der er anlagt ved Retten i Lyngby den 2. marts 2009, er ved kendelse af 24. juni 2009 henvist til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

Sagen drejer sig om, hvorvidt sagsøgte, Peer Kølendorf, i sin egenskab af direktør, bestyrelsesmedlem og hovedaktionær i Comitel International A/S (nu Selskabet af 21. september 2006 A/S under konkurs) har pådraget sig et erstatningsansvar over for sagsøger, Skatteministeriet, SKAT Hovedcentret (herefter SKAT), ved at foranledige, at Comitel International A/S vedrørende leverancer til Comitel International A/S i perioden fra november 2003 til november 2004 fik tilbagebetalt moms, som forudgående handelsled svigagtigt havde unddraget SKAT ved skyldnersvig.

SKAT har nedlagt påstand om, at Peer Kølendorf til SKAT skal betale principalt 144.080.700 kr., subsidiært at af retten fastsat mindre beløb, med tillæg af sædvanlig procesrente fra sagens anlæg, til betaling sker.

Peer Kølendorf har påstået frifindelse.

SKAT har under sagen afgivet en proceserklæring, hvorefter SKAT transporterer retten til dividender i konkursboerne efter selskaber, der indgik i handelskæderne, til Peer Kølendorf, hvis han dømmes i overensstemmelse med SKATs påstand og betaler det fulde beløb til SKAT, inden de udestående dividendebeløb endeligt afregnes.

*Sagsfremstilling*

*1. Sagens baggrund*

Handlerne, som sagen vedrører, fandt sted fra november 2003 til november 2004 (sagsperioden) på det internationale brokermarked og omfattede it-komponenter og såkaldte internet access-kort, der gav adgang til pornosider på internettet.

Efterfølgende afdækkede SKAT, SØK og Kammeradvokaten, at tidligere omsætningsled ved systematisk skyldnersvig efter gennemførelsen af sagens handler havde sat sig ude af stand til tover for SKAT at indbetale den udgående moms/salgsmoms af varer, som Comitel International A/S købte og videresolgte til andre udenlandske selskaber, der deltog i svigen.

**1871**

Det viste sig, at lederen af brokerafdelingen hos Comitel International A/S, T, med viden om svigen i tidligere led havde købt varerne til Comitel International A/S og videresolgt disse til selskaber i Fjernøsten, hvilke selskaber var kontrolleret af personer, der deltog i svigen.

De i sagen omhandlede fradrag har, baseret på forhold konstateret af SKAT, været genstand for en afgiftsmæssig kontrol, som førte til SKATs afgørelse af 20. juli 2006 med krav om tilbagebetaling af momsen over for Comitel International A/S. Selskabet havde ikke midler til at betale dette beløb til SKAT.

De af sagen omfattede handler og den manglende indbetaling af salgsmomsen i tidligere led har resulteret i fængselsdomme for skyldnersvig til en række af de involverede personer. Sagen har under efterforskningen, som afslørede den momsrelaterede kriminalitet (herefter benævnt momskarruselsvig), af myndighederne fået navnet »Gul Feber«. Hverken Comitel International A/S eller Peer Kølendorf har været sigtet i sagen.

*2. Peer Kølendorf*

Peer Kølendorf, der er cand.polit. og cand.jur, har siden 1966, hvor han som 17-årig startede en enkeltmandsvirksomhed, Dansk-Italiensk Film Co., drevet egen virksomhed inden for radio- og telekommunikationsbranchen. Virksomheden udviklede sig til Comitelkoncernen.

Peer Kølendorf var i en længere årrække medlem af og i perioder formand for Leverandørforeningen for Radio- og Telekommunikation (LRK), der senere blev en del af brancheforeningen IT-Branchen (ITB), og fra 2001 til 2009 var han medlem af hovedbestyrelsen i ITB.

I en leder i LRK's medlemsblad fra 1998 med titlen »Stop momssvindel« omtalte Peer Kølendorf, at det var ødelæggende for mobiltelefonbranchen at blive forbundet med momssvig, og branchen ville blandt andet ved registrering af mobiltelefoners serienumre hjælpe myndighederne med at stoppe momskarruseller.

---

[1] U 2007.497 H, U 2011.3382 H, U 2012.1727 H, EU-Domstolens dom af 21. juni 2012 i de forenede sager C-80/11 og C-142/11, særligt præmis 53-66, Morten Samuelsson: Bestyrelsesansvaret (1997), s. 176-78, 181-86 og 205, Ida Rosenberg m.fl.: Aktieselskabsloven med ændringer senest af 23. december 1998, 6. udg. (1999), s. 276, Thorbjørn Sofsrud: Bestyrelsens beslutning og ansvar (1999), s. 305 f. og 441 f., Bernhard Gomard og Peer Schaumburg-Müller: Kapitalselskaber og erhvervsdrivende fonde, 8. udg. (2015), s. 612, Bernhard Gomard i U 1971B.117, samme i U 1993B.145 og Reino Nielsen i SR.2003.0164.

Copyright © 2023 Karnov Group Denmark A/S

I et responsum fra 1998 til Østre Landsret på vegne af handelskammeret udtalte Peer Kølendorf blandt andet:

»Markedet for mobiltelefoner er såvel et almindeligt varemarked som et varemæglermarked. Det almindelige varemarked er primært nationalt, mens varemæglermarkedet primært er internationalt.

På varemæglermarkedet indgås aftaler næsten altid over telefonen og som oftest uden efterfølgende skriftlige aftaler.

Alle markedsdeltagere med kendskab til dette varemæglermarked ved, at aftaleindgåelse og levering er et spørgsmål om tillid. Mange firmaer opstår og forsvinder efter kort tid, idet enhver med blot en telefon og fax og uden et normalt firma-setup kan operere på markedet. Produkternes livscyklus er meget kort, og priserne konstant faldende.

…

Markedsdeltagerne er alt, lige fra internationale mellemhandlere med flere milliarder kroner i omsætning til små varemæglere, som driver virksomheden hjemmefra uden ansatte og uden lager.

…

Avancerne på varemæglermarkedet er meget små, typisk 3-6 procent.

Markedsdeltagerne er klar over, at specielt lave priser normalt indikerer, at varerne er stjålne eller slet ikke eksisterer - eller der er tale om firmaer, som inden for EU-området undslår sig fra at afregne moms ved nationalt videresalg, idet de lader firmaerne gå konkurs, før momsen skal afregnes.«

Under retssagen (B-2178/97) i Østre Landsret i 1999 afgav Peer Kølendorf herefter forklaring som sagkyndigt vidne om blandt andet prisafvigelser som indikator for mulig momssvig og aktørerne på brokermarkedet:

»Såfremt vidnet havde fået et sådant tilbud, ville han være gået til politiet. Hvis vidnet får tilbud på mobiltelefoner, der ligger bare 10 % under markedsprisen, anmelder han det til Told & Skat.

Ved en erfaren markedsdeltager forstår vidnet en markedsdeltager, der har opereret på markedet i et par måneder med indgåelse af 30-40 kontrakter pr. måned.«

Peer Kølendorf deltog i egenskab af formand for LRK blandt andet i møder med SKAT i 1998 og i Skatteministeriets Departement i år 2000, hvor mulighederne for at reducere risikoen for momskaruseller blev drøftet, herunder spørgsmålet om solidarisk hæftelse mellem køber og sælger for betaling af moms.

Af referatet fra møde den 17. november 1998 mellem Peer Kølendorf og en række medarbejdere fra SKAT fremgår blandt andet:

»PK var meget interesseret i at få afklaring af, hvilke forholdsregler man i branchen kan tage, for at sikre sig mod de useriøse operatører på markedet. PK redegjorde for hvordan Danitas søger at værne sig mod disse.

Selskabet checker normalt momsnumre på udenlandske forretningsforbindelser (primært købere) ifm etablering af samhandel. Egentlige kreditvurderinger foretages ikke.

…

Det blev aftalt, at PK ville sørge for at TSR Kbh. får selskabets leverandørkartotek …

Regionen har ifm kontrolbesøg den 19. oktober 98 modtaget selskabets kundekartotek.«

Af en artikel i Computerworld den 3. december 2001 fremgår blandt andet:

»Comitel-direktør Peer Kølendorf møder momskarrusel-svindlere to til tre gange årligt. Han er derfor i sin egenskab af formand for foreningen for mobil og

**1872**

telekommunikation, MTB, gået ind i kampen mod fænomenet.«

IT-Branchens Distributørudvalg indstillede i en e-mail af 24. januar 2008 fra formanden Ole Eklund til foreningens hovedbestyrelse, at Peer Kølendorf blev ekskluderet, hvis han ikke selv udtrådte, idet Distributørudvalget fandt, at Comitel International A/S handlede etisk angribeligt og i strid med god brancheskik ved at agere på det internationale brokermarked, som i branchekredse og af myndighederne var udpeget som et område med momskarruselsvig. Der henvistes endvidere til, at Comitel International A/S var blevet inddraget i »Gul Feber«-komplekset.

Af referat af ITB hovedbestyrelsesmøde den 28. februar 2008 fremgår, at hovedbestyrelsen besluttede at afvise Distributørudvalgets indstilling, under henvisning til at hverken selskaber i Comitelkoncernen eller Peer Kølendorf var sigtet eller domfældt for adfærd i strid med god brancheskik, og at der ikke var påvist konkret adfærd fra selskaber i Comitel-koncernen eller Peer Kølendorf, der udgjorde en overtrædelse af god brancheskik.

### 3. Comitel-koncernen

Comitel A/S (CVR-nr. - - - - tidligere Danitas Radio A/S) blev stiftet i 1974 af Peer Kølendorf. Selskabet beskæftigede sig oprindeligt med salg af fotoartikler, men sortimentet udviklede sig efterhånden til salg af radiokommunikationsudstyr og mobiltelefoner.

I 1998/99 fik selskabet en professionel bestyrelse, som den 20. juni 2003 traf beslutning om at spalte Comitel A/S, hvilket blev starten til Comitel-koncernen.

Comitel A/S blev ved spaltningen ophørsspaltet til tre selskaber: Comitel International A/S (CVR-nr. - - -), Comitel Aktiebesiddelse A/S (CVR-nr. - - -) samt Comitel Danmark A/S (CVR-nr. - - - - tillige Comitel Management A/S). Herefter ophørte det oprindelige Comitel A/S.

Brokerdivisionen, der drev virksomhed ved import og eksport fortrinsvis inden for radio- og telekommunikationsbranchen, blev overdraget til Comitel International A/S, og brokeraktiviteten blev i udgangspunktet videreført uændret. Comitel International A/S havde samme bestyrelse og direktion, som Comitel A/S havde haft. Regnskabsmæssigt blev spaltningen gennemført med virkning fra den 1. januar 2003, men Comitels brokeraktivitet blev i 2003 faktisk udført i regi af Comitel A/S og fra 2004 i Comitel International A/S. I en periode afregnede Comitel International A/S efter samråd med SKAT moms under det gamle Comitel A/S' momsregistreringsnummer.

Telesalgsdivisionen, der drev virksomhed ved handel og service fortrinsvis inden for radio-, telekommunikations- og IT-branchen, blev overdraget til Comitel Danmark A/S.

Det fremgår af bestyrelsens spaltningsplan fra juni 2003, at hovedparten af brokerdivisionens salg inden for radio- og telekommunikationsbranchen skete som eksport til Europa og Fjernøsten, og at hovedparten af telesalgsdivisionens virksomhed, der som nævnt omfattede IT-branchen, primært vedrørte det danske marked.

Comitel Aktiebesiddelse A/S fik overdraget Comitel A/S' aktier i selskaberne SMS A/S og CBB A/S. SMS A/S blev efterfølgende solgt til den norske Schibsted-koncern, og CBB A/S, hvor Peer Kølendorf var bestyrelsesformand, blev efterfølgende solgt til Telenor.

Efter ophørsspaltningen af Comitel A/S var samtlige aktier i de tre modtagende selskaber (Comitel International A/S, Comitel Aktiebesiddelse A/S samt Comitel Danmark A/S) ejet af Kathrine holding A/S (CVR-nr. - - - - senere Comitel holding A/S), som i 2012 fusionerede med Kathrine holding A/S (CVR-nr. - - - - nu Comitel A/S).

Logistikopgaver, administration og regnskabsfunktioner mv. i koncernen blev efter spaltningen varetaget af Comitel Danmark A/S. Comitel International A/S betalte ca. 2 mio. kr. om året for denne »back office«-funktion.

### 4. Comitel International A/S - ejerforhold, organisation og økonomi

Copyright © 2023 Karnov Group Denmark A/S

Comitel International A/S, der var stiftet den 1. juli 2002 under navnet VICh 6881 A/S, skiftede i forbindelse med Comitel A/S' ophørsspaltning navn til Comitel International A/S, direktion og bestyrelse blev udskiftet, og selskabet blev anmeldt til registrering for moms den 1. juli 2003 og begyndte herefter sine aktiviteter.

Den 3. september 2002 og den 3. december 2003 blev henholdsvis én og to af aktierne (i alt 0,6 % af aktiekapitalen) i Kathrine holding A/S, der blandt andet ejede den samlede aktiekapital i Comitel International A/S overdraget til T. Forud herfor havde Kathrine holding A/S været ejet 100 % af Peer Kølendorf, som derigennem var den ultimative eneaktionær i Comitel International A/S.

Den 1. marts 2003 blev 150 af aktierne i Kathrine holding A/S overdraget til Peer Kølendorfs datter, Kathrine Stoffregen Kølendorf. Peer Kølendorf var fortsat hovedaktionær i selskabet.

Peer Kølendorf var direktør i de fraspaltede selskaber, herunder i Comitel International A/S, i perioden indtil den 16. april 2004.

Da »Gul Feber«-handlerne begyndte den 10. november 2003, var brokeraktiviteten organisatorisk placeret som en division af det daværende Comitel A/S, og den blev herefter placeret i Comitel International A/S, fortsat med T som chef.

Da Peer Kølendorf den 16. april 2004 udtrådte af Comitel International A/S' direktion, blev T udnævnt til direktør og havde som sådan fortsat ansvar for

**1873**

brokeraktiviteterne. Han rapporterede nu til bestyrelsen, herunder Peer Kølendorf, og indtrådte selv i bestyrelsen 1. juni 2004. Samtidig med at T blev direktør, ændredes tegningsretten i selskabet, således at direktøren ikke kunne tegne selskabet alene, men kun i forening med mindst ét bestyrelsesmedlem.

I sagsperioden var Steen Erik Mønsted formand for Comitel International A/S' bestyrelse, og Peer Kølendorf var bestyrelsesmedlem. I perioden fra 3. juni 2003 indtil 1. juni 2004 var Lars Thinggaard og Torben Svanberg endvidere medlemmer af bestyrelsen.

I 2001 havde Comitel A/S en omsætning på ca. 591 mio. kr. og et negativt resultat på ca. 3,3 mio. kr.

I 2002 havde Comitel A/S fordoblet omsætningen til ca. 1,2 mia. kr. Denne udvikling blev i ledelsesberetningen tilskrevet et stigende internationalt salg af mobiltelefoner. Årets aktiviteter førte til et resultat på ca.7,8 mio. kr.

Ifølge årsrapporten for 2005 udviklede nøgletallene for Comitel International A/S sig således:

| (t.kr.) | 2003 | 2004 | 2005 |
|---|---|---|---|
| Nettoomsætning | 724.205 | 2.213.391 | 2.333.343 |
| Resultat | 1.493 | 8.374 | 6.579 |

| | 2004 | 2005 | 2006 |
|---|---|---|---|
| T | 1.281.852.629 kr. | 881.294.404 kr. | 299.549.911 kr. |
| Sheng Tang | 530.425.448 kr. | 879.337.153 kr. | 230.636.720 kr. |
| Christina Evers | 373.344,960 kr. | 572.758.720 kr. (fratrådt sept. 2005) | - |

Der er under sagen fremlagt oplysninger, der viser både mindre og højere omsætning pr. medarbejder i andre brokervirksomheder end i Comitel International A/S.

Af Comitels årsrapporter for 2003, 2004 og 2005 fremgår, at selskabets »væsentligste driftsrisiko er knyttet til evnen til at matche køber og sælger og derved undgå at lide tab på indkøbte varepartier.

| | | | |
|---|---|---|---|
| Egenkapital ult. | 4.673 | 13.047 | 19.625 |
| Gns. antal beskæftigede | 6 | 5 | 4 |

Comitel International A/S' bruttoavancer lå i 2003-2005 typisk på mellem 1 % og 6 %. Selskabets overskudsgrad var i 2003-2005 på mellem 0,15 % og 0,61 %.

Comitels samlede omsætning var på ca. 846 mio. kr. i 2003 og knap 2,4 mia. kr. i 2004.

Comitel Danmark A/S leverede alle administrative funktioner (back office) til Comitel International A/S. Der blev ikke udbetalt udbytte for årene 2002-2004.

Comitel International A/S' omsætning i 2003 blev hovedsagelig genereret ved, at selskabet som broker »matchede« købere og sælgere af mobiltelefoner eller it-komponenter. Selskabets ledelse fandt ikke overskuddet på ca. 1,5 mio. kr. tilfredsstillende, og resultatet blev i ledelsesberetningen tilskrevet nedgang i salget på det engelske marked. Selskabets salgsarbejde blev herefter i højere grad fokuseret på Asien og de arabiske lande i den sidste del af 2003.

Comitel International A/S foretog i perioden 10. november til 30. december 2003 køb hos Solid Trading ApS. Disse køb, der er omfattet af sagen, havde en samlet værdi af 268 mio. kr. Comitel International A/S videresolgte herefter varerne med en bruttofortjeneste på 7,4 mio. kr.

Efter det oplyste eksporterede Comitel International A/S i 2003 varer for 203 mio. kr., herunder it-dele for 143 mio. kr., svarende til 70 %. Endvidere eksporterede Comitel A/S, som i en del af 2003 fortsat drev koncernens brokervirksomhed, varer for 276 mio. kr., heraf mobiltelefoner for 267 mio. kr. (97 %) og it-dele for 3 mio. kr. (1 %). Dvs. i alt mobiltelefoner for 327 mio. kr. (69 %) og it-dele for 146 mio. kr. (31 %).

Comitel International A/S' omsætning i 2004 blev fortsat hovedsagelig genereret ved, at selskabet som broker »matchede« købere og sælgere af mobiltelefoner og it-komponenter. Selskabet gennemførte 1.200 brokerhandler i 2004.

Comitel International A/S foretog i perioden januar til marts 2004 køb hos Solid Trading ApS omfattet af sagen for en samlet værdi af ca. 180 mio. kr. Køb i juni, august og november 2004 hos henholdsvis Trademark International ApS og J Corp ApS omfattet af sagen udgjorde et samlet beløb på ca. 120 mio. kr.

I 2004 eksporterede Comitel International A/S ifølge det oplyste varer for 190 mio. kr., herunder mobiltelefoner for 82 mio. kr. (43 %), it-dele for 32 mio. kr. (17 %) og internet access-kort/pornokort for 29 mio. kr. (15 %).

Af en opgørelse over salgstal for Comitel Internationals brokere 2004-2006 fremgår:

Desuden er det væsentligt for selskabet, at der indgås aftaler med seriøse købere«.

Af referaterne fra bestyrelsesmøderne den 18. marts, 2. september og 17. december 2004 i Comitel International A/S fremgår, at der blev redegjort for udviklingen i selskabets forhold, herunder markedsforhold, projektudvikling, organisation og økonomi, hvorunder

der blev omdelt regnskabstal og kvitteringskopier for indbetalte skatter og afgifter.

Af bestyrelsesreferatet fra mødet den 18. marts 2004 fremgår blandt andet:

»*Markedsforholdene*:

*1874*

Salgsudviklingen følger ikke budgettet. Det er især mobiltelefonsalget, som halter efter. Set i bakspejlet pressede bestyrelsen mobiltelefonbrokerne til et budget, de ikke var meget for at acceptere, men IT-salget går godt. Og der tjenes penge.

Kathrine holding A/S i relation til CIA:

Der foregår en stigende handel med Dubai og Hongkong og i denne forbindelse har holdingselskabet købt en lejlighed i Dubai, som vil stå færdig i december 2006. Der er ligeledes oprettet en bankkonto i Emirates Bank i Dubai. Kontoen kan styres online på linje med Danske Banks Telebankservice.

I Hongkong har holdingselskabet planer om at etablere et selskab, der selvstændigt kan handle med mobiltelefoner og IT-dele med resten af verden. Pengetransaktionerne skal dog styres centralt fra København. Der er endnu ikke taget stilling til planerne.

*Økonomi*:

Udskrifter af den økonomiske stilling given ultimo 2003 (i første omgang som konsolideret regnskab for Comitel og Comitel International) og tal for januar og februar 2004 blev forelagt bestyrelsen.

*Organisation*:

Der er sket udskiftninger i personalet, idet A er opsagt ultimo februar. Der er ikke ansat nogen afløser for ham, men T har ansat en assistent, Janne Bodé, som hjælper med at holde styr på de mange handler.

*Generationsskifte*:

Det er indtil videre meningen at beholde CIA og ikke søge at sælge eller fusionere selskabet.

*ad 5*

Det blev vedtaget at ansætte T som administrerende direktør for selskabet og som konsekvens heraf ændre vedtægterne. Bestyrelsen foreslog, at der i denne forbindelse skulle oprettes en direktørkontrakt.«

*5. Comitel International A/S' varesortiment*

Sortimentet i Comitel-koncernen udviklede sig fra salg af fotoartikler til salg af radiokommunikationsudstyr og mobiltelefoner.

I spaltningsplanen fra juni 2003 blev brokerdivisionen beskrevet som den drivende virksomhed ved import og eksport fortrinsvis inden for radio- og telekommunikationsbranchen, og Comitel International A/S var formelt registreret under branchekoden *465220: Engroshandel med telekommunikationsudstyr.*

På et internt møde i 2003 foreslog T, at brokerdivisionen skulle begynde at handle med it-varer, hvilket bestyrelsen herefter traf beslutning om.

Af referat af bestyrelsesmøde den 4. september 2003 fremgår blandt andet:

»Brokerafdelingen halter fortsat meget bagud for budgettet. Handelsstoppet, som det engelske told/skats nye regler har medført, kan ikke på kort tid kompenseres af salg til andre lande, men der arbejdes konstant på at udvide både markedsområde og produktudvalget. IT-brokeren … sagde sin stilling op i prøvetiden og der søges efter en ny gennem bureau.«

Af et internt notat af 25. oktober 2003 udarbejdet af Peer Kølendorf om strategiske tanker fremgår blandt andet:

»Det har vist sig, at vor omsætning på over 1 mia. kr. på brokerområdet i 2002 var alt for ringe. Vi troede alle, at vi havde opnået en større del af brokermarkedet, men regnskaberne fra konkurrenterne, f.eks. Tel-ka, Dansk Radio Teknik og Sunico for 2002 viser

meget større tal. Sunico, som stort set er ene mand i firmaet på Nørrebro, har omsat for 3,7 mia. kr. i 2003.

Brokermarkedet for mobiltelefoner er faldet drastisk i år efter indgriben fra det engelske told/skat, og undersøgelser af markederne i udlandet viser, at vi slet ikke har haft fat i kernen af den handel, som er foregået, og som nu er ved at komme lidt i gang igen. Vi har derfor forsøgt at finde nogle nye sælgere til afdelingen. Vi har haft ansat to nye, men har afskediget dem igen. Vi har benyttet lejligheden til også at afskedige vor speditør, som flere gange har fejlet.

Sheng Tang er en dygtig sælger, som har gode relationer til Samsung, men - - -, som er placeret i Jylland - hjemme - har ikke præsteret noget salg længe.

Vi har nu ansat 2 nye brokere specielt til IT-området. Det er sket i begyndelsen og midten af oktober, og resultaterne skal vise sig meget hurtigt, hvis der er tale om rigtige brokere.

…

Verden er ikke sort/hvid. Er der gode kunder, som efterspørger varer, der ikke holder sig inden for ovennævnte definition skal vi ikke på forhånd afvise dem … Vore relationer til Fjernøsten skal bruges, men ikke bruges ukritisk.«

Af Comitels blad »Fokus« fra december 2003 fremgår blandt andet:

»Comitel har gennem en årrække opbygget en solid forretning på såkaldt trading inden for mobiltelefoner ved at udnytte den prisforskel, der er på forskellige geografiske områder i verden.

Da avancerne på hver enkelt enhed er ganske små, skal der stor volumen til for at sikre den ønskede fortjeneste. Priserne på markedet skifter konstant, og handel på disse betingelser er derfor forbundet med en vis risiko, selvom alle forbehold tages.

…

Det er f.eks. sket to gange i de forløbne 5 år, at Comitel har været ude for meget store tyverier under transport af varer. … sagerne har understreget risikoen i den form for handel.

…

*1875*

Samtidig er salg af computer komponenter nu også blevet en del af Comitels internationale forretningsområde.«

I august og november 2004 indgik Comitel International A/S endvidere en række handler med J Corp ApS om indkøb af Internet Access-kort til en værdi af i alt ca. 92 mio. kr., som blev videresolgt til tre selskaber beliggende i Hongkong og Indonesien. Disse kort gav adgang til hjemmesider med pornografisk indhold. Comitel International A/S havde hverken tidligere eller efterfølgende handlet med tilsvarende varesortiment, men koncernen havde handlet med andre typer af værdibærende kort.

*6. Sagens handler*

Peer Kølendorf indsendte hver måned efter aftale oplysninger til skattemyndighederne om virksomhedens potentielle og aktuelle leverandører og kunder oprettet i den forløbne måned. Indtil ultimo 2002 blev oplysningerne sendt til hans kontaktperson hos Told- og Skattestyrelsen. Ved e-mail af 2. december 2002 bad styrelsen om, at oplysningerne fremover blev sendt til Mia Pedersen, ToldSkat København, og Peer Kølendorf indsendte herefter hver måned oplysninger over Comitels nye leverandører og aftagere til hende.

De tre danske leverandørselskaber, Solid Trading ApS, Trademark International ApS og J Corp ApS, og samtlige aftagere i de handler, som indgår i sagen, fremgik af lister, som Peer Kølendorf indsendte til SKAT. Comitel International A/S indsendte endvidere sine købsfakturaer vedrørende Solid Trading A/S og alle salgsfakturaer til SKAT med henblik på fremskyndt udbetaling af negativ moms.

Solid Trading ApS, Trademark International ApS og J Corp ApS var momsregistreret hos myndighederne, og selskaberne angav moms.

De handler, som sagen vedrører, blev gennemført i følgende tre perioder:

1) Køb fra Solid Trading ApS i perioden 1. november 2003 - 31. marts 2004. Comitel International A/S afløftede moms vedrørende køb fra Solid Trading ApS med i alt 114.761.052 kr.

2) Køb fra Trademark International ApS i perioden 1. juni 2004 - 31. juli 2004. Comitel International A/S afløftede moms med i alt 6.130.916 kr.

3) Køb fra J Corp ApS i henholdsvis august 2004 samt november 2004. Comitel International A/S afløftede moms med i alt 23.188.732 kr.

Comitel International A/S solgte/eksporterede de fra de tre nævnte danske selskaber indkøbte varer til en række købere i Fjernøsten, primært Hongkong og i enkelte tilfælde i Singapore og Indonesien.

Den samlede afløftede moms udgjorde i alt 144.080.700 kr.

De tre danske selskaber er efter samhandlens afslutning taget under konkursbehandling, og SKAT vil i de pågældende konkursboer kun få meget begrænset dækning for sine krav i de pågældende selskaber.

Af SKATs beskrivelse af sagens handler fremgår:

### 6.1. Første handelskæde - Solid Trading ApS

Selskabet, der blev stiftet den 1. juli 2002, blev efterfølgende erhvervet af B eller et af denne kontrolleret selskab og ændrede den 4. marts 2003 navn til Solid Trading ApS (CVR-nr. - - -) med adresse på - - - København Ø. B var selskabets direktør i hele perioden fra 9. januar 2003 og frem til konkursdekretets afsigelse den 21. april 2004.

Solid Trading ApS drev indtil konkursen virksomhed som handelsselskab med indkøb og videresalg af it-komponenter (primært CPU-enheder og RAM-moduler).

B og Comitel International A/S' broker A havde tidligere været kolleger i den danske brokervirksomhed BlueCom.

Ansvarlig broker for handlerne hos Comitel International A/S var T, der indgik handlerne, medmindre andet er angivet.

*November 2003*

| Nr. | Beskrivelse | Moms DKK |
|---|---|---|
| 6 | Solid Trading ApS fakturerede den 10. november 2003 Comitel 12.960 stk. »Pentium IV 2,4 533mhz« for GBP 1.166.400 ekskl. moms.<br><br>Comitel fakturerede den 28. november 2003 partiet til Fusion R. under betegnelsen »Intel CPU P4 2,4 533 mhz« for GBP 1.201.392 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | Ikke medregnet i tabsopgørelsen |
| 1 | Solid Trading ApS fakturerede den 20. november 2003 Comitel International A/S (herefter »Comitel«) to partier af henholdsvis 4.032 stk. »Intel Pentium 4 2.6GhZ FSB533 Open box« for GBP 375.984 ekskl. moms og 4.320 stk. »Intel CPU P4 2,4 533mhz« for GBP 388.800 ekskl. moms. Partiet blev leveret til Comitels lager.<br><br>Comitel fakturerede den 28. november 2003 sidstnævnte parti til Fusion R. under betegnelsen »Intel CPU P4 2,4 533 mhz« for GBP 400.464 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery).<br><br>**1876** | 1.052.637 |
| 2 | Solid Trading ApS fakturerede den 20. november 2003 Comitel 10.500 stk. »PC333 512MB DDR« for GBP 420.000 ekskl. moms. Partiet blev leveret til Comitels lager.<br><br>Comitel fakturerede den 28. november 2003 partiet til Fusion R. under betegnelsen »Ram DDR 512« for GBP 432.600 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | 1.116.581 |
| 4 | Solid Trading ApS fakturerede den 26. november 2003 Comitel 2.500 stk. »PC133 1G SO-Dimm PC-133« for GBP 257.250 ekskl. moms.<br><br>Comitel fakturerede den 28. november 2003 partiet til Digimate (hK) Ltd. under betegnelsen »1G SO-DIMM Module PC133(OEM) for GBP 265.000 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | 686.613 |

UfR ONLINE                                                                U.2016.1870H

| 5 | Solid Trading ApS fakturerede den 26. november 2003 Comitel 2.500 stk. »Compact Flash Memory (2.0GB)« for GBP 228.750 ekskl. moms. | 610.545 |
| | Comitel fakturerede den 28. november 2003 partiet til Profile Onwards Ltd. under betegnelsen »Compact Flash Memory (2.0GB) for GBP 253.000 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | |
| 3 | Solid Trading ApS fakturerede den 28. november 2003 Comitel 14.400 stk. »Intel CPU P4 2,4 533 mhz« for GBP 1.314.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 3.155.236 |
| | Comitel fakturerede den 1. december 2003 partiet til Fusion R. under betegnelsen »Intel CPU P4 2,4 533 mhz« for GBP 1.353.600 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | |
| 7 | Solid Trading ApS fakturerede den 28. november 2003 Comitel 2.800 stk. »1GB DDR Module PC-466« for GBP 244.720 ekskl. moms. Partiet blev leveret til Comitels lager. | 652.925 |
| | Comitel fakturerede den 2. december 2003 partiet til Digimate Ltd. under betegnelsen »1GB DDR MODU-LE PC-466« for GBP 252.000 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | |
| 8 | Solid Trading ApS fakturerede den 28. november 2003 Comitel 2.500 stk. »1GB DDR memory model PC-3700« for GBP 218.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 582.969 |
| | Comitel fakturerede den 2. december 2003 til Profile Onwards Ltd. under betegnelsen »1GB DDR ME-MORY MODULE PC3700 (64« for GBP 225.000 (ingen moms, da eksport ud af EU). Betalingsbetingel-serne var C.O.D. (cash on delivery). | |
| 9 | Solid Trading ApS fakturerede den 28. november 2003 Comitel 5.500 stk. »1GB DDR memory module PC 466« for GBP 561.000 ekskl. moms samt 14.500 stk. »1GB DDR memory module PC 466« for GBP 1.479.000 ekskl. moms. Den 1. december 2003 faktu-rerede Solid Trading ApS endvidere Comitel 10.000 stk. »PC333 512MB DDR« for GBP 422.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 5.442.822 |
| | Comitel fakturerede den 9. og 12. december 2003 partiet til Fusion R. på to fakturaer under betegnelserne »1G DDR MODULE PC-466« og »512 MB DDR PC333« for i alt GBP 2.529.125 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | |
| | I ALT | 13.300.328 |

*December 2003*

| Nr. | *Beskrivelse* | *Moms DKK* |
|---|---|---|
| 11 | Solid Trading ApS fakturerede den 3. december 2003 Comitel 2.600 stk. »P1G SO-DIMM PC-133« og 12.960 stk. »512MB USB FLASh MEMORY« for i alt GBP 434.730,40 ekskl. moms. | 1.155.568 **1877** |
| | Comitel fakturerede den 5. december 2003 førstnævnte parti til Digimate Ltd. under betegnelsen »1 G SO-DIMM Module PC-133« for GBP 234.000 (ingen moms, da eksport ud af EU) og | |

| | | |
|---|---|---|
| | sidstnævnte parti til Profile Onwards Ltd. under betegnelsen »Flash IC (Comp to K9K1G …)« for GBP 213.840 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). Varerne var særskilt forsikret hos speditøren. | |
| 12 | Solid Trading ApS fakturerede den 8. december 2003 Comitel 1.800 stk. »PC133 1G SO-Dimm PC-133 (OEM)« for GBP 194.130 ekskl. moms. Partiet blev leveret til Comitels lager. | 512.794 |
| | Comitel fakturerede samme dag partiet til Profile Onwards Ltd. under betegnelsen »1G SO-DIMM Module PC-133 (OEM)« for GBP 200.160 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). | |
| 13 | Solid Trading ApS fakturerede den 8. december 2003 Comitel 2.500 stk. »1G DDR memory model PC-3700« for GBP 213.375 ekskl. moms. Partiet blev leveret til Comitels lager. | 563.630 |
| | Comitel fakturerede samme dag partiet til Digimate (hK) Ltd. under betegnelsen »1G DDR MEMORY MODULE PC-3700 (64« for GBP 220.000.) Betalingsbetingelserne var prepayment (forudbetaling). | |
| 15 | Solid Trading ApS fakturerede den 9. december 2003 Comitel 9.500 stk. »1GB DDR memory module PC 466« for GBP 957.125 ekskl. moms og 10.000 stk. »PC333 512MB DDR« for GBP 455.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 3.735.989 |
| | Comitel fakturerede den 12. december 2003 begge partier til Fusion R. under betegnelsen »1G DDR MODULE PC-466« og »512MB DDR PC333« for i alt GBP 1.426.625 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | |
| 16 | Solid Trading ApS fakturerede den 10. december 2003 Comitel 500 stk. »1G DDR memory model PC-3700« for GBP 43.650 ekskl. moms og 2.540 stk. »512mb compact flash card« for GBP 156.464 ekskl. moms. Partierne blev leveret til Comitels lager. | 530.062 |
| | Comitel fakturerede den 12. december 2003 begge partier til Digimate (hK) Ltd. under betegnelserne »1G DDR MEMORY MODULE PC-3700 (64« og »512mb Compact flash card« for i alt GBP 206.290 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 17 | Solid Trading ApS fakturerede den 10. december 2003 Comitel 2.200 stk. »1GB DDR memory module PC 466« for GBP 187.660 (ekskl. moms). Partiet blev leveret til Comitels lager. | 497.074 |
| | Comitel fakturerede den 12. december 2003 partiet til Profile Onwards Ltd. under betegnelsen »1GB DDR MODULE PC466« for GBP 193.600 (ingen moms, da eksport ud af EU). Betalings-betingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 14 | Solid Trading ApS fakturerede den 12. december 2003 Comitel to partier af henholdsvis 5.760 stk. »Pentium IV 2,8 533Mhz, tray« og 11.520 stk. »Pentium IV 3Ghz 533Mhz, tray« for henholdsvis GBP 672.480 ekskl. moms og GBP 2.039.040 ekskl. moms. Parti-erne blev leveret til Comitels lager. | 7.162.480 |
| | Comitel fakturerede samme dag sidstnævnte parti til Fusion R. under betegnelsen »Intel Pentium 4 3.0GhZ FSB533« for GBP 2.059.776 (ingen moms). Betalingsbetingelserne var C.O.D. (cash on delivery). Comitel fakturerede den 18. december 2003 hele førstnævnte parti til Fusion R. under betegnelsen »Intel Pentium 4 2.8GhZ FSB533« for GBP 679.392 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). | |
| | **1878** | |
| 18 | Solid Trading ApS fakturerede den 15. december 2003 Comitel 2.808 stk. »2G Flash IC/Compactiable«, 500 stk. »1G DDR me- | 495.048 |

mory model PC-3700« og 600 stk. »P1G SO-DIMM PC133« for i alt GBP 186.659,04 ekskl. moms. Partiet blev leveret til Comitels lager.

Comitel fakturerede den 19. december 2003 partiet til Digimate (hK) Ltd. under betegnelserne »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO«, »1G DDR MEMORY MODULE PC-3700(64« og »1G SO-DIMM Module PC-133 (OEM)« for i alt GBP 192.432 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

| 19 | Solid Trading ApS fakturerede den 15. december 2003 Comitel 6.480 stk. »2G Flash IC/Compactiable« for i alt GBP 179.172 ekskl. moms. Partiet blev leveret til Comitels lager. | 475.191 |

Comitel fakturerede den 19. december 2003 partiet til Profile Onwards Ltd. under betegnelsen »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO« for i alt GBP 184.680 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

| 10 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 3.000 stk. »PC333 512MB DDR« for GBP 150.000 ekskl. moms. | 395.205 |

Comitel fakturerede den 18. december 2003 partiet til Fusion R. under betegnelsen »512MB DDR PC333« for 154.500 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

| 20 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 10.500 stk. »1GB DDR memory module PC 466« for GBP 1.071.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 2.821.764 |

Comitel fakturerede den 19. december 2003 partiet til Fusion R. under betegnelsen »1G DDR MODULE PC-466« for GBP 1.102.500 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

| 23 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 50.000 stk. »Infineon TSOP« for GBP 1.240.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 3.267.028 |

Comitel fakturerede den 18. december 2003 partiet til Fusion R. under betegnelsen »Infineon TSOP« for GBP 1.300.000 (ingen moms). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

| 24 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 123.970 stk. »Samsung Branded Dice Program« for GBP 1.791.366,50 ekskl. moms. Partiet blev leveret til Comitels lager. | 4.719.712 |

Comitel fakturerede den 18. december 2003 hele partiet til Fusion R. under betegnelsen »Samsung Branded Dice Programe« for GBP 1.840.954,50 (ingen moms). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

| 25 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 6.480 stk. »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO« for GBP 181.116 ekskl. moms. Partiet blev leveret til Comitels lager. | 477.186 |

Comitel fakturerede den 19. december 2003 hele partiet til Best Concord Technology Ltd. under betegnelsen »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO« for GBP 186.624 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse.

U.2016.1870H

| | | |
|---|---|---|
| 26 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 19.440 stk. »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO« for GBP 533.628 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.405.950 **1879** |
| | Comitel fakturerede den 19. december 2003 partiet til Profile Onwards Ltd. under betegnelsen »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO« for GBP 550.152 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 29 | Solid Trading ApS fakturerede den 16. december 2003 Comitel 12.960 stk. »2G Flash IC/Compactiable« for GBP 362.232 ekskl. moms. | 954.373 |
| | Comitel fakturerede den 19. december 2003 partiet til Digimate (hK) Ltd. under betegnelsen »2G flash IC/Compatiable to Flash K9K2G08UOM-YCBO« for GBP 373.248 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 21 | Solid Trading ApS fakturerede den 17. december 2003 Comitel 14.400 stk. »Pentium IV 3,2Ghz« for GBP 3.294.720 ekskl. moms. Partiet blev leveret til Comitels lager. Forinden havde Solid Trading ApS den 15. december 2003 faktureret varerne som »2,8 Ghz« og udstedt kreditnota herfor den 17. december 2003. | 8.719.724 |
| | Comitel fakturerede den 19. december 2003 partiet til Fusion R. under betegnelsen »Intel Pentium 4 3.2GhZ« for GBP 3.355.200 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 27 | Solid Trading ApS fakturerede den 17. december 2003 Comitel 9.500 stk. »1G DDR MODULE PC-466« for GBP 969.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 2.564.531 |
| | Comitel fakturerede den 19. december 2003 partiet til Fusion R. under betegnelsen »1G DDR MODULE PC-466« for GBP 997.500 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 28 | Solid Trading ApS fakturerede den 17. december 2003 Comitel 10.000 stk. »1G SO-DIMM Module PC-133 (OEM« for GBP 450.000 ekskl. moms.) Partiet blev leveret til Comitels lager. | 1.190.959 |
| | Comitel fakturerede den 19. december 2003 partiet til Fusion R. under betegnelsen »1G SO-DIMM Module PC-133 (OEM)« for GBP 463.500 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 22 | Solid Trading ApS fakturerede den 18. december 2003 Comitel 212.960 stk. »Infineon TSOP« for GBP 3.503.192 ekskl. moms. Partiet blev leveret til Comitels lager. | 9.229.860 |
| | Comitel fakturerede samme dag partiet til Fusion R. under betegnelsen »Infineon TSOP« for GBP 3.599.024 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Marie Kruse. | |
| 30 | Solid Trading ApS fakturerede den 29. december 2003 Comitel 5.000 stk. »1G DDR PC-4000« for GBP 485.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.282.025 |
| | Comitel fakturerede samme dag 1.000 stk. til Best Concord Technology Ltd. for GBP 100.000 (ingen moms, da eksport ud af EU), 2.000 stk. til Profile Onwards Ltd. for GBP 200.000 (ingen moms, da eksport ud af EU) og 2.000 stk. til Digimate (hK) Ltd. for GPB 200.000 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). | |

| | | |
|---|---|---|
| 32 | Solid Trading ApS fakturerede den 30. december 2003 Comitel 5.760 stk. »Intel Pentium 4 3.2GhZ« for GBP 1.313.280 ekskl. moms. Partiet blev leveret til Comitels lager. | 3.473.855 **1880** |

Comitel fakturerede den 13. januar 2004 partiet til fire forskellige købere, heraf 2.016 stk. til Digimate (hK) Ltd. for GBP 469.728 (ingen moms, da eksport ud af EU), 1.440 stk. til Profile Onwards Ltd. for GBP 335.520 (ingen moms, da eksport ud af EU), 864 stk. til Best Concord Technology Ltd. for GBP 201.312 (ingen moms, da eksport ud af EU) og Fusion R. 1.440 stk. for GBP 335.520 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling).

| I ALT | | 55.630.008 |
|---|---|---|

*Januar 2004*

| *Nr.* | *Beskrivelse* | *Moms DKK* |
|---|---|---|
| 31 | Solid Trading ApS fakturerede den 5. januar 2004 Comitel 10.000 stk. »PC133 512MB« for GBP 477.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.265.351 |

Comitel fakturerede den 28. januar 2004 bl.a. partiet til Digimate (hK) Ltd. under betegnelsen »512MB DDR PC133« for GBP 491.500 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery).

| 33 | Solid Trading ApS fakturerede den 5. januar 2004 Comitel 9.500 stk. »1GB DDR memory module PC 466« for GBP 1.011.750 ekskl. moms. Partiet blev leveret til Comitels lager. | 2.681.087 |
|---|---|---|

Comitel fakturerede den 15. januar 2004 partiet til to forskellige købere, heraf 4.000 stk. til Profile Onwards Ltd. for GBP 433.600 (ingen moms, da eksport ud af EU) og 5.500 stk. til Digimate (hK) Ltd. for GBP 596.200 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling).

| 34 | Solid Trading ApS fakturerede den 5. januar 2004 Comitel 50.000 stk. »Infineon TSOP« for GBP 1.335.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 3.537.683 |
|---|---|---|

Comitel fakturerede den 26. januar 2004 partiet til to forskellige købere, heraf 14.500 stk. til Profile Onwards Ltd. for GBP 398.750 (ingen moms, da eksport ud af EU) og i alt 35.500 stk. til Digimate (hK) Ltd. for i alt GBP 976.250 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var prepayment (forudbetaling). Comitels fakturaer er udstedt af T og Marie Kruse.

| 36 | Solid Trading ApS fakturerede den 12. januar 2004 Comitel 7.400 stk. »1GB DDR memory module PC 466« for GBP 786.250 ekskl. moms. Partiet blev leveret til Comitels lager. | 2.114.069 |
|---|---|---|

Comitel fakturerede partiet til to købere: Den 26. januar 2004 3.750 stk. »1G DDR MODULE PC-3700« til Profile Onwards Ltd. for 406.312,50 (ingen moms, da eksport ud af EU) og 2.250 stk. »1G DDR MODULE PC-3700« til Digimate (hK) Ltd. for GBP 243.787,50 (ingen moms, da eksport ud af EU); og den 27. januar 2004 1.400 stk. »1G DDR MODULE PC466« til Digimate (hK) Ltd. for GBP 151.690 (ingen moms, da eksport ud af EU). Ordrerekvisitionerne var dateret den 26. og 27. januar 2004. Betalingsbetingelserne var C.O.D. (cash on delivery) og prepayment (forudbetaling). Comitels fakturaer er udstedt af T og Marie Kruse.

| 35 | Solid Trading ApS fakturerede den 13. januar 2004 Comitel 212.960 stk. »Infineon TSOP« for GBP 3.694.856 ekskl. moms. Partiet blev leveret til Comitels lager. | 9.975.742 |
|---|---|---|

Comitel fakturerede den 26. januar 2004 partiet til Asia Time Technologies Ltd. på i alt fire fakturaer under betegnelsen »Infineon TSOP« for i alt GBP 3.801.336 (ingen moms, da eksport ud af EU). Ordrerekvisitionerne fra Asia Time Technologies Ltd. var dateret den 14., 16.

og 19. januar 2004. Betalingsbetingelserne var prepayment (forudbeta-ling). Comitels fakturaer er udstedt af T og Marie Kruse.

I ALT                                                                          19.573.932

**1881**

*Februar 2004*

| Nr. | Beskrivelse | Moms DKK |
|-----|-------------|----------|
| 37 | Solid Trading ApS fakturerede den 4. februar 2004 Comitel på tre fakturaer i alt 8.064 stk. »Pentium IV 3,2Ghz« for i alt GBP 1.798.272 ekskl. moms. Partiet blev leveret til Comitels lager. | 4.912.564 |
| | Comitel fakturerede den 6. februar 2004 alle tre partier på tre fakturaer til C Trading AB under betegnelsen »Intel Pentium 4 3.2Ghz« for GBP 1.816.013,80 (ingen moms, da eksport ud af EU). Ordrerekvisitionerne fra C Trading AB var dateret den 4. og 6. februar 2004. Betalingsbetin-gelserne var C.O.D. (cash on delivery). Comitels fakturaer er udstedt af T's sekretær, Janne Bode. | |
| 38 | Solid Trading ApS fakturerede den 4. februar 2004 Comitel 19.000 stk. »1GB DDR memory module PC 466« for GBP 1.947.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 5.320.229 |
| | Comitel fakturerede den 6., 10. og 11. februar 2004 partiet på tre faktu-raer til C Trading AB under betegnelsen »1G DDR MODULE PC-466« for i alt GBP 1.967.450 (ingen moms, da eksport ud af EU). Ordrerek-visitionerne fra C Trading AB var dateret den 4., 6. og 9. februar 2004. Betalingsbetingelserne var C.O.D. (cash on delivery). Comitels faktu-raer er udstedt af Janne Bode. | |
| 39 | Solid Trading ApS fakturerede den 6. februar 2004 Comitel 6.100 stk. »PC333 512MB DDR« for GBP 247.050 ekskl. moms. | 665.272 |
| | Comitel fakturerede den 12. februar 2004 partiet til C Trading AB under betegnelsen »512MB DDR PC333« for GBP 250.710 (ingen moms, da eksport ud af EU). Ordrerekvisitionen fra C Trading AB var dateret den 12. februar 2004. Betalingsbetingelserne var C.O.D. (cash on deli-very). Comitels faktura er udstedt af Janne Bode. | |
| | I ALT | 10.898.065 |

Den 10. februar 2004 skrev Mia Pedersen, SKAT Økokrim, til Peer Kølendorf og efterspurgte listerne for januar 2004 over nye leverandører og kunder, idet hun ikke havde modtaget dem. I en e-mail samme dag skrev hun:

»Tak for dit hurtige svar og det samarbejde vi har haft.

Såfremt du har nogen spørgsmål der retter sig imod momskarru-seller er du altid velkommen til at kontakte mig.«

Af e-mailkorrespondancen fremgår, at listerne var blevet fremsendt af Peer Kølendorf til andre medarbejdere i SKAT, der havde anmo-det ham herom.

*Marts 2004*

| Nr. | Beskrivelse | Moms DKK |
|-----|-------------|----------|
| | Solid Trading ApS fakturerede den 1. marts 2004 Comitel 11.000 stk. »PC466 PC3700 1GB DDR SO-DIMM« for GBP 998.250 ekskl. moms. | |
| 40 | Partiet blev leveret til Comitels lager. | 2.782.797 |
| | Comitel fakturerede den 15. marts 2004 partiet samt yderligere 500 stk. (muligvis fra handel nr. 42) til Network Trading Company under betegnelsen »1GB DDR MEMORY MODULE PC-3700 (64« for GBP 1.075.250 (ingen moms, da eksport ud af EU). Ordrerekvisitionen var dateret den 3. marts 2004. Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |
| | Solid Trading ApS fakturerede den 1. marts 2004 Comitel 2.880 stk. »Pentium IV 3,2Ghz« for GBP 440.640 ekskl. moms. Partiet blev leve- | |
| 41 | ret til Comitels lager. | 1.228.361 |
| | Comitel fakturerede den 9. marts 2004 partiet til Free Trade Investments Limited under betegnelsen »Intel Pentium 4 3.2GhZ« for GBP 449.280 (ingen moms, da eksport ud af EU). Ordrerekvisitionen var dateret den 2. marts 2004. Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |

| | |
|---|---:|
| Solid Trading ApS fakturerede den 1. marts 2004 Comitel 8.000 stk. »PC466 PC3700 1GB DDR SO-DIMM« for GBP 726.000 ekskl. moms. 42 Partiet blev leveret til Comitels lager. | 2.023.852 |
| Comitel fakturerede den 9. marts 2004 7.500 stk. til Network Trading Company under betegnelsen »1GB DDR MEMORY MODULE PC-3700 (64« for GBP 701.250 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |

**1882**

| | |
|---|---:|
| Solid Trading ApS fakturerede den 1. marts 2004 Comitel 2.592 stk. »Pentium IV 3,2Ghz« for GBP 396.576 ekskl. moms. Partiet blev leveret til Comitels lager. 43 | 1.105.525 |
| Comitel fakturerede den 9. marts 2004 3.168 stk. (muligvis tillige fra handel nr. 44) til Free Trade Investments Limited under betegnelsen »Intel Pentium 4 3.2GhZ« for GBP 494.208 (ingen moms). Ordrerekvisitionen var dateret den 4. marts 2004. Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |
| Solid Trading ApS fakturerede den 1. marts 2004 Comitel 4.032 stk. »Pentium IV 3,2Ghz« for GBP 616.896 ekskl. moms. Partiet blev leveret til Comitels lager. 44 | 1.719.706 |
| Comitel fakturerede den 10. marts 2004 3.456 stk. til Free Trade Investments Limited under betegnelsen »Intel Pentium 4 3.2GhZ« for GBP 539.136 (ingen moms, da eksport ud af EU). Ordrerekvisitionen var dateret den 8. marts 2004. Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |
| Solid Trading ApS fakturerede den 1. marts 2004 Comitel 6.100 stk. »PC333 512MB DDR« for GBP 247.050 ekskl. moms. Partiet blev leveret til Comitels lager. 45 | 688.695 |
| Comitel fakturerede den 15. marts 2004 partiet til Network Trading Company under betegnelsen »512MB DDR PC333« for GBP 254.370 (ingen moms, da eksport ud af EU). Ordrerekvisitionen var dateret den 8. marts 2004. Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |
| Solid Trading ApS fakturerede den 12. marts 2004 Comitel 68.600 stk. »Branded Samsung Dice programme« for GBP 1.239.602 ekskl. moms. Partiet blev leveret til Comitels lager. 46 | 3.389.041 |
| Comitel fakturerede den 15. marts 2004 hele partiet til Free Trade Investments Limited under betegnelsen »Samsung Branded Dice Programe« for GBP 1.270.472 (ingen moms). Ordrerekvisitionen var dateret den 15. marts 2004. Betalingsbetingelserne var prepayment (forudbetaling). Comitels faktura er udstedt af Janne Bode. | |
| Solid Trading ApS fakturerede den 12. marts 2004 Comitel 49.000 stk. »Branded Samsung Dice programme« for GBP 885.430 ekskl. moms. Partiet blev leveret til Comitels lager. 47 | 2.420.743 |
| Comitel fakturerede den 16. marts 2004 partiet til Free Trade Investments Limited under betegnelsen »Samsung Branded Dice Programe« for GBP 907.480 (ingen moms, da eksport ud af EU). Ordrerekvisitionen var dateret den 15. marts 2004. Betalingsbetingelserne var forudbetaling. Comitels faktura er udstedt af Janne Bode. | |
| I ALT | 15.358.720 |

De anførte 47 handler mellem Comitel International A/S og Solid Trading ApS fandt sted i perioden fra den 10. november 2003 til 12. marts 2004, og Comitel International A/S aftog moms, som var betalt til Solid Trading ApS, med i alt 114.761.052 kr.

I handel nr. 6 (den 10. november 2003) har det ikke været muligt at identificere et importerende selskab, hvori der blev genereret tab for statskassen ved skyldnersvig inden momsafregningen. Den fradragede moms for denne handel er derfor ikke medregnet i Skatteministeriets tabsopgørelse.

På et skema, underskrevet den 25. marts 2004, om kortperiodisk kontrol for perioden august 2003 til december 2003 hos Comitel International A/S, noterede SKAT »Alt ok« vedrørende negativ moms og tilføjede »ingen alvorlige bemærkninger ifm. tidligere kontrol«, »godt kendskab til den »gamle« virksomhed« og »risikobetonet pga. handelen med mobiltelefoner og edb-udstyr«. Det

fremgår endvidere, at SKAT foretog besigtigelse af et parti mobiltelefoner og RAM-klodser hos selskabets speditør og af »støddudelageret« til en værdi af ca. 28 mio. kr. hos selskabet.

Samme dag skrev SKAT til Told- og Skattestyrelsen, at der var foretaget udbetalings-/kortperiodisk kontrol hos Comitel A/S og Comitel International A/S. Kontrollen foretog en ompostering og havde ikke i øvrigt bemærkninger.

Den 22. april 2004 skrev SKAT til Told- og Skattestyrelsen om udbetalingskontrol for januar 2004 til marts 2004. SKAT mente, at der manglede fakturering mellem

**1883**

Comitel International A/S' hoveddel og eksportdel (hoveddelen var knyttet til den almindelige momsregistrering, mens eksportdelen var knyttet til en eksportmomsregistrering med fremrykket tilbage-

betaling af købsmoms). Der er ikke bemærkninger vedrørende Comitel International A/S' »eksterne« handler.

Den 5. maj 2004 frigav SKAT Comitel International A/S' negative moms for april 2004 med bemærkningen »mindre risiko«.

*6.2 Anden handelskæde - Trademark International ApS*

Comitel International A/S begyndte samhandlen med Trademark International ApS den 16. juni 2004, dvs. lidt over 3 måneder efter den sidste handel med Solid Trading ApS, og der blev gennemført 4 handler i perioden 16.-24. juni 2004.

Trademark International ApS blev stiftet den 2. juli 2003 (CVR-nr. - - - ), og F, der tidligere havde været ansat hos BlueCom, indtrådte som direktør for selskabet.

Ansvarlig broker for handlerne med Trademark International ApS var T.

| Nr. | Beskrivelse | Moms DKK |
|---|---|---|
| 1 | Trademark International ApS fakturerede den 16. juni 2004 Comitel International A/S (herefter »Comitel«) 1.152 stk. »Intel Pentium 4 2.8GhZ FSB533« for USD 184.320 ekskl. moms. Ordrerekvisitionen er dateret den 17. juni 2004. Partiet blev leveret til Comitels lager.<br><br>Comitel fakturerede den 21. juni 2004 partiet til Asia-Power Solution Gmbh for USD 189.792 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | 297.050 |
| 2 | Trademark International ApS fakturerede den 18. juni 2004 Comitel 7.000 stk. »Magicstore Microdrive 2.2Gb« for USD 1.016.750 ekskl. moms. Ordrerekvisitionen var dateret den 21. juni 2004. Partiet blev leveret til Comitels lager.<br><br>Comitel fakturerede den 23. juni 2004 partiet til Asia-Power Solution Gmbh for USD 1.047.200 (ingen moms, da eksport ud af EU). Betalingsbetingelserne var C.O.D. (cash on delivery). | 1.638.594 |
| 3 | Trademark International ApS fakturerede den 21. juni 2004 Comitel 39.200 stk. »Samsung Controller s3c72e8df DICE« og 8.640 stk. IC 32M*64 pc2100 OBM Memory« for i alt USD 1.296.672 ekskl. moms. Partiet blev leveret til Comitels lager.<br><br>Der foreligger ingen salgsfaktura fra Comitel. | 2.089.717 |
| 4 | Trademark International ApS fakturerede den 24. juni 2004 Comitel en række komponenter i alt USD 1.306.500 ekskl. moms. Partiet blev leveret til Comitels lager.<br><br>Der foreligger ingen salgsfaktura fra Comitel. | 2.105.555 |

Under samhandlen mellem Comitel International A/S og Trademark International ApS overholdt Trademark International ApS aftalte vilkår om levering og betaling mv. Comitel International A/S afløftede i forbindelse med disse handler moms med i alt 6.130.916 kr.

*6.3 Tredje handelskæde - J Corp ApS*

I august 2004 foretog Comitel International A/S 15 handler med J Corp ApS, og efter 2½ måned - i november 2004 - yderligere 4 handler med J Corp ApS.

J Corp ApS blev stiftet den 23. oktober 2003, og den 8. januar 2004 indtrådte C, der nu ejer af selskabet, som direktør. C havde tidligere været ansat i Solid Trading ApS.

Ansvarlig broker for handlerne hos Comitel International A/S var T, medmindre andet er angivet.

*August 2004*

| Nr. | Beskrivelse | Moms DKK |
|---|---|---|
| 1 | J Corp ApS fakturerede den 13. august 2004 Comitel International A/S (herefter »Comitel«) henholdsvis 20.000 stk. og 8.500 stk. »Phone4x internet access card« for i alt USD 1.514.775 ekskl. moms. Comitel betalte fakturaerne den 17. og 19. august 2004. Partiet blev leveret til Comitels lager.<br><br>Comitel udstedte henholdsvis den 13. og 16. august 2004 proformafakturaer for partiet til Aspen Group Limited for i alt USD 1.561.800 (ingen moms; fakturadato ukendt). Ifølge proformafakturaerne var betalingen »Efterkrav« (kontant). Comitels proformafakturaer er udstedt af T og Janne Bode. | 2.305.260,33 |

**1884**

| | | |
|---|---|---|
| 2 | J Corp ApS fakturerede den 17. august 2004 Comitel 5.000 stk. »Phone4x internet access card« for USD 265.750 ekskl. moms. Partiet blev leveret til Comitels lager. | 400.392,24 |
| | Comitel udstedte den 23. august 2004 proformafaktura på 5.500 stk. (de overskydende 500 stk. har muligvis sammenhæng med handel nr. 5) »Phone4x internet access card« til Unicorn Properties Ltd. for USD 301.400 (ingen moms; fakturadato ukendt). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 19. august 2004. Betalingsbetingelserne var C.O.D. (cash on delivery). Comitels proformafaktura er udstedt af Janne Bode. | |
| 3 | J Corp ApS fakturerede den 17. august 2004 Comitel 10.000 stk. »Phone4x internet access card« for USD 531.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 800.784,48 |
| | Comitel udstedte samme dag proformafaktura på 2.300 stk. til PT. Beryl Indo Perkasa for USD 126.040 (ingen moms; fakturadato ukendt). Betalingen blev modtaget den 18. august 2004. Comitel udstedte den 23. august 2004 proformafaktura på det resterende parti (7.700 stk.) til Unicorn Properties Ltd. for USD 421.960 (ingen moms; fakturadato ukendt). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 19. august 2004. Betalingsbetingelserne var C.O.D. (cash on delivery). Comitels proformafakturaer er udstedt af T og Janne Bode. | |
| 4 | J Corp ApS fakturerede den 17. august 2004 Comitel 10.000 stk. »Phone4x internet access card« for USD 531.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 800.784,48 |
| | Comitel udstedte den 23. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 548.000 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 19. august 2004. Comitels faktura er udstedt af Janne Bode. | |
| 5 | J Corp ApS fakturerede den 18. august 2004 Comitel 15.000 stk. »Phone4x internet access card« for USD 797.250 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.201.914,17 |
| | Comitel udstedte samme dag proformafaktura på 14.500 stk. (resterende 500 stk. muligvis solgt i handel nr. 2) til Unicorn Properties Ltd. for USD 794.600 (ingen moms; fakturadato ukendt). Betalingen blev modtaget den 18. august 2004. Betalingsbetingelserne var C.O.D. (cash on delivery). Comitels proformafaktura er udstedt af Christina Evers. | |
| 6 | J Corp ApS fakturerede den 18. august 2004 Comitel 15.000 stk. »Phone4x internet access card« for USD 797.250 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.201.914,17 |
| | Comitel udstedte den 23. august 2004 proformafaktura på partiet på to proformafakturaer til Unicorn Properties Ltd. for i alt USD 822.000 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionerne fra Unicorn Properties Ltd. var dateret den 19. august 2004. Comitels proformafakturaer er udstedt af Janne Bode. | |
| 7 | J Corp ApS fakturerede den 23. august 2004 Comitel 12.000 stk. »Phone4x internet access card« for USD 637.800 ekskl. moms. Partiet blev leveret til Comitels lager. | 968.148,51 |
| | Comitel udstedte den 27. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 657.600 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionerne fra Unicorn Properties Ltd. var dateret den 24. august 2004. Comitels proformafaktura er udstedt af Janne Bode. | |
| 8 | J Corp ApS fakturerede den 23. august 2004 Comitel 13.000 stk. »Phone4x internet access card« for USD 690.950 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.048.827,55 |

**1885**

Comitel udstedte den 27. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 712.400 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 24. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 9 | J Corp ApS fakturerede den 23. august 2004 Comitel 14.000 stk. »Phone4x internet access card« for USD 744.100 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.129.506,60 |

Comitel udstedte den 27. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 767.200 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 24. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 10 | J Corp ApS fakturerede den 23. august 2004 Comitel 14.500 stk. »Phone4x internet access card« for USD 770.675 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.169.846,12 |

Comitel udstedte den 27. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 794.600 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 25. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 11 | J Corp ApS fakturerede den 23. august 2004 Comitel 15.000 stk. »Phone4x internet access card« for USD 797.250 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.210.185,64 |

Comitel udstedte den 27. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 822.000 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 25. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 12 | J Corp ApS fakturerede den 23. august 2004 Comitel 15.500 stk. »Phone4x internet access card« for USD 823.825 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.250.525,16 |

Comitel udstedte den 27. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 849.400 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 25. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 13 | J Corp ApS fakturerede den 23. august 2004 Comitel 18.000 stk. »Phone4x internet access card« for USD 956.700 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.452.222,77 |

Comitel udstedte den 23. august 2004 proformafaktura på hele partiet til Unicorn Properties Ltd. for USD 986.400 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 23. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 14 | J Corp ApS fakturerede den 26. august 2004 Comitel 16.000 stk. »Phone4x internet access card« for USD 850.400 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.306.597,08 **1886** |

Comitel udstedte den 31. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 876.800 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 31. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | | |
|---|---|---|
| 15 | J Corp ApS fakturerede den 26. august 2004 Comitel 20.500 stk. »Phone4x internet access card« for USD 1.089.575 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.674.077,51 |

Comitel udstedte den 31. august 2004 proformafaktura på partiet til Unicorn Properties Ltd. for USD 1.123.400 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordre-

rekvisitionen fra Unicorn Properties Ltd. var dateret den 31. august 2004. Comitels proformafaktura er udstedt af Janne Bode.

| | I ALT | 17.920.986,81 |

*November 2004*

| Nr. | Beskrivelse | Moms DKK |
|-----|-------------|----------|
| 16 | J Corp ApS fakturerede den 10. november 2004 Comitel 18.000 stk. »Phone4x internet access card« for USD 783.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.156.334,40 |
| | Comitel fakturerede den 30. november 2004 partiet til Aspen Group Limited for USD 806.400. Betalingsbetingelserne var efterkrav (kontant). Ordrerekvisitionerne fra Aspen Group Limited var dateret den 29. november 2004. Comitels faktura er udstedt af Janne Bode. | |
| 17 | J Corp ApS fakturerede den 12. november 2004 Comitel 22.000 stk. »Phone4x internet access card« for USD 957.000 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.413.297,60 |
| | Comitel udstedte den 23. november 2004 proformafaktura på 20.000 stk. til Unicorn Properties Ltd. for USD 896.000 (ingen moms; fakturadato ukendt) og fakturerede samme dag 2.000 stk. til Unicorn Properties Ltd. for USD 89.600 (ingen moms). Betalingsbetingelserne var C.O.D. (cash on delivery). Comitels proformafaktura og faktura er udstedt af Janne Bode. | |
| 18 | J Corp ApS fakturerede den 12. november 2004 Comitel 15.000 stk. »Phone4x internet access card« for USD 652.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 963.612,00 |
| | Comitel fakturerede den 17. november 2004 hele partiet til Aspen Group Limited for USD 672.000 (ingen moms). Betalingsbetingelserne var efterkrav (kontant). Ordrerekvisitionen fra Aspen Group Limited var dateret den 15. november 2004. Comitels faktura er udstedt af Janne Bode. | |
| 19 | J Corp ApS fakturerede den 12. november 2004 Comitel 27.000 stk. »Phone4x internet access card« for USD 1.174.500 ekskl. moms. Partiet blev leveret til Comitels lager. | 1.734.501,60 |
| | Comitel udstedte den 19. november 2004 proformafakturaer på partiet til Unicorn Properties Ltd. for i alt USD 1.209.600 (ingen moms; fakturadato ukendt). Betalingsbetingelserne var C.O.D. (cash on delivery). Ordrerekvisitionen fra Unicorn Properties Ltd. var dateret den 19. november 2004. Comitels proformafakturaer er udstedt af Janne Bode | |
| | I ALT | 5.267.745,60 |

Handlerne vedrørte internet access-kort til en værdi af i alt ca. 92 mio kr., som blev videresolgt til tre selskaber beliggende i Hongkong og Indonesien. På baggrund af det foreliggende fakturamateriale er det ikke muligt at fastslå den pålydende værdi af de handlede kort, der gav adgang til hjemmesider med pornografisk indhold.

Comitel-selskabet Comitel Consumer Electronics havde tidligere handlet med taletidskort, men ikke med kort af den pågældende type.

Under samhandlen mellem Comitel International A/S og J Corp ApS overholdt J Corp ApS aftalte vilkår om levering og betaling mv., og Comitel International A/S afløftede i disse handler moms med i alt 23.188.732 kr.

**1887**

Den samlede afløftede moms i Comitel International A/S af handlerne med Solid Trading ApS, Trademark International ApS og J Corp ApS udgør ifølge SKATs opgørelse påstandsbeløbet på i alt 144.080.700 kr.

*7. »Gul feber«-sagskomplekset*

Efter sagens handler blev sammenhængen i handelskæderne afdækket i et samarbejde mellem SKAT, SØK og Kammeradvokaten.

Det er ubestridt, at Peer Kølendorf som udgangspunkt alene har kunnet have viden om Comitel International A/S' egne handler og egne forhold i øvrigt.

*7.1 SKATs undersøgelser og den efterfølgende afdækning*

I september 2002 foretog SKAT kontrolbesøg hos Solid Trading ApS vedrørende et konkret handelsforløb i forbindelse med, at SKAT havde modtaget en bistandsanmodning/verifikationsanmodning fra de engelske myndigheder, der oplyste, at Solid Trading ApS havde købt varer fra et engelsk selskab, som de engelske myndigheder havde mistanke om, var involveret i momssvig. SKAT indhentede således efter anmodning fra de engelske myndigheder fakturamateriale vedrørende Solid Trading ApS' handel med dette selskab.

I et notat af 26. maj 2004 anførte Kenn hoffmann Jensen og Jørgen Eggert under overskriften »Beskrivelse af Solid Trading ApS' engagement i forbindelse med indkøb og videresalg af edb komponenter i Danmark« blandt andet:

»Undertegnede havde i tidsrummet december 2002 og frem til november 2003 løbende dels på baggrund af anmodning fra de

engelske myndigheder og dels på eget initiativ gennemgået selskabets købs og salgstransaktioner og betalinger.

Det stod hurtigt klart, at selskabet i nævnte periode næsten udelukkende havde aftaget edb komponenter fra engelske selskaber, som var involveret i momskarruselhandler og videresolgte disse edb komponenter til et italiensk selskab.

Status på denne del af sagen er indtil videre, at der afventes svar fra de engelske og italienske myndigheder. Svarene forventes at give et billede af selskabets viden om og deltagelse i momskarruselsvig i England.«

I marts måned 2003 foretog SKAT igen kontrol hos Solid Trading. Henset til karakteren af de varer, som Solid Trading ApS handlede med, den hastigt voksende omsætning i Solid Trading ApS og de fra England modtagne verifikationsanmodninger iværksatte SKAT herefter en øget overvågning af Solid Trading ApS. Solid Trading ApS havde ingen momsrestancer til SKAT, idet selskabet i denne periode primært købte fra og solgte til andre EU-lande med den virkning, at disse handler var momsmæssigt neutrale.

Den løbende overvågning af Solid Trading ApS indebar blandt andet, at der i forbindelse med den kvartalsvise udbetaling af eventuel negativ moms til selskabet blev kontrolleret, om betingelserne for at frigive momsen var til stede. Udbetalingskontrollen havde også til formål at overvåge, om selskabet påbegyndte import fra tredjelande med et efterfølgende indenlandsk salg, eller om selskabet foretog indenlandske varekøb med efterfølgende eksport til EU- eller tredjelande, idet der herved var en risiko for, at selskabet kunne oparbejde enten en betydelig momsrestance, som potentielt ville blive afregnet, eller et betydeligt negativt momstilsvar og derved potentielt pådrage SKAT et tab.

Peer Kølendorf indsendte i oktober 2003 oplysning til SKAT om, at Solid Trading ApS var ny leverandør, ligesom Comitel månedligt indsendte købsfakturaerne fra Solid Trading ApS sammen med andre købsfakturaer i forbindelse med Comitels ønske om at opnå en fremskyndet udbetaling af det månedlige negative momstilsvar.

I januar 2004 konstaterede SKAT på baggrund af Solid Trading ApS' momsangivelser for oktober, november og december 2003, at Solid Trading ApS havde haft et betydeligt større indenlandsk varesalg end hidtil. SKAT påbegyndte derfor en afstemning af den af Solid Trading ApS angivne salgsmoms ved en gennemgang af selskabets salgsfakturaer, hvorved det blev konstateret, at Solid Trading ApS i november 2003 havde påbegyndt salg til Comitel International A/S, og at det var denne samhandel, der begrundede Solid Trading ApS' momsangivelser.

I forbindelse med afstemningen af Solid Trading ApS' salgsmoms indhentede SKAT tillige fakturamateriale fra Comitel International A/S vedrørende selskabets videresalg af de fra Solid Trading ApS modtagne varer.

Den 12. januar 2004 afholdt SKATs Økokrimafdeling møde med SKAT København vedrørende samhandlen, og den 19. januar 2004 var SKAT på kontrolbesøg hos Comitel International A/S og anmodede som anført om dokumentation vedrørende samhandlen med Solid Trading ApS. SKATs gennemgang af det indhentede materiale viste, at Solid Trading ApS havde erhvervet de til Comitel International A/S solgte varer fra Trademark International ApS. I al væsentlighed var disse handler dog momsmæssigt neutrale for Solid Trading ApS, og der opstod ikke restancer før senere i forløbet. Endvidere angav Solid Trading ApS løbende og rettidigt sit tilsvar.

I den første handelskæde omfattet af denne sag var skraldespandsselskabet (missing trader) Network Trading ApS, og i den efterfølgende straffesag mod blandt andre T afgav SKATs medarbejder Kenn Hoffmann Jensen vidneforklaring og oplyste herunder:

»I januar 2004 gik det op for Told & Skat … at der var noget rivende galt i et firma, der hed Network Trading. Det havde købt varer fra adskillige Hongkong-firmaer

**1888**

og solgt dem videre til Trademark, der igen havde solgt videre til Solid. Solid havde solgt videre til Comitel, der havde videresolgt varerne til selskaber i Hongkong. Da de blev klar over, hvordan tingene hang sammen, satte de sig sammen med kollegaerne fra Køge.

…

De sammenholdt oplysningerne fra Køge med dem fra København og kunne se, at det var en kædehandel.«

SKAT konstaterede i forbindelse med kontrollen af Network Trading ApS, at dette selskab havde indkøbt CPU-enheder fra det i Hongkong domicilerede selskab, Quantum, og herefter videresolgt disse til Trademark International ApS. Disse oplysninger sammenholdt med oplysningerne fra gennemgangen af Comitel International A/S' salgsfakturaer viste, at Comitel International A/S' kunder for en dels vedkommende var identiske med Network Trading ApS' leverandører.

SKAT nedsatte på baggrund heraf en styregruppe, som havde til formål at koordinere samarbejdet omkring de verserende kontrolsager samt vurdere de kontrolmæssige initiativer fra SKATs side. Styregruppen bestod af personer fra SKAT (Økokrimafdelingen og, de relevante skatteregioner), Told- og Skattestyrelsen, SØK (som efterforskningsmyndighed) og Kammeradvokaten (som kurator i konkursboer og som statens advokat) og afholdt sit første møde den 16. marts 2004. Af referatet heraf fremgår blandt andet, at fremgangsmåden ved »de »nye« momskarruseller« drøftedes.

Styregruppen afholdt møder igen den 2. juni og 28. juni 2004, hvor det blandt andet blev drøftet, hvilken strategi der skulle vælges i forhold til involverede selskaber.

SKAT havde på dette tidspunkt udelukkende kendskab til handelskæderne omkring Network Trading ApS og det i dette selskab i marts 2004 truende tab, og fokus var således hovedsagelig rettet mod Network Trading ApS og mod at sikre sig, at der ikke efter ophøret af aktiviteten i Network Trading ApS' opstod et tilsvarende selskab, der potentielt kunne påføre SKAT et tab. Den opfølgende kontrol af Solid Trading ApS havde derfor til formål at imødegå risikoen for, at SKAT på ny blev mødt med et tab i et nyt importerende selskab.

SKAT konstaterede, at Solid Trading ApS i februar og marts måned 2004 genererede og angav et positivt momstilsvar i størrelsesordenen ca. 28 mio kr. Tilsvaret for februar måned 2004 på i alt 11.523.725 kr. forfaldt den 25. marts 2004. Tilsvaret for marts 2004 forfaldt den 26. april 2004. Solid Trading ApS angav ikke moms for marts 2004, og der blev derfor foretaget foreløbig fastsættelse med tilsvar på kr. 500.000 kr., som efterfølgende blev erstattet af efterangivelse på kr. 17.096.500 kr.

Medio marts 2004 standsede toldkontrollen på SKATs foranledning en sending RAM-moduler og en sending CPU-enheder i Københavns Lufthavn. Solid Trading ApS havde importeret fra selskabet Asia Time Technologies Ltd., som tillige var en af Comitel International A/S' kunder. Disse varer, der ved efterfølgende undersøgelser viste sig at være attrapper, var på tidspunktet for kontrollen videresolgt til Comitel International A/S.

Solid Trading ApS udstedte kreditnota til Comitel International A/S vedrørende disse varer, som aldrig blev leveret til Comitel International A/S.

Fra dette tidspunkt ophørte den handelsmæssige aktivitet i Solid Trading ApS, og den 23. marts 2004 modtog SKAT telefonisk underretning fra bogholderen hos Solid Trading ApS om, at selskabet som følge af tilbageholdelsen af varepartiet i Københavns Lufthavn

ikke så sig i stand til at betale selskabets momstilsvar, der på daværende tidspunkt beløb sig til 11 mio. kr. alene for februar måned 2004.

På baggrund af den forfaldne momsrestance, den begrundede tvivl om varernes bonitet samt det forhold, at Solid Trading ApS ifølge dets regnskaber var uden tilstrækkelige aktiver, indgav SKAT den 31. marts 2004 konkursbegæring mod selskabet, og selskabet blev erklæret konkurs den 21. april 2004.

Peer Kølendorf fik ikke på daværende tidspunkt kendskab til den reelle baggrund for Solid Tradings konkurs, idet Solid Trading ApS som årsag til konkursen blot oplyste at have betalt for varer og derefter at være blevet snydt af leverandøren.

Efter Solid Trading ApS' konkurs påbegyndte kurator, v/advokat Boris Frederiksen, sine egne undersøgelser af handelsforløbet. Advokat Boris Frederiksen afgav vidneforklaring under straffesagen mod blandt andre T og oplyste herunder:

»[Konkursboerne efter Network Trading ApS og Solid Trading ApS] besluttede at forfølge kravene i Hongkong [dvs. de uopfyldte krav, der var årsag til konkurserne] og havde drøftelser med ledelsen i de konkursramte selskaber. Hvis det var et momskarruselsarrangement, var det på en anden måde, end man tidligere havde set.«

I notat af 1. juli 2004 til SKAT-chefer øst for Storebælt oplyste styregruppen, at den frygtede, at Roxy World Trading ApS, der på daværende tidspunkt ingen restancer havde til SKAT, og som løbende angav og betalte moms rettidigt, kunne være den næste importørvirksomhed i sagskomplekset, som ikke kunne betale sit momstilsvar ved forfaldstid. Dette selskab var importørvirksomheden i handelskæden, hvori Comitel International A/S i juni måned 2004 købte varer fra Trademark International ApS. Den 1. juli 2004 manglede Roxy World Trading ApS således at afregne salgsmomsen af de varer, som tre omsætningsled senere blev solgt til Comitel, hvilken salgsmoms skulle indbetales til SKAT ultimo juli 2004. Den til brug for betalingen af

**1889**

momstilsvaret værende likviditet var af selskabet anvendt til at indkøbe varer/it-komponenter hos en engelsk leverandør. Umiddelbart efter at disse varer/it-komponenter var blevet leveret til Roxy World Trading ApS, angav selskabet, at det var blevet udsat for et røveri på selskabets adresse, hvorved de leverede varer blev stjålet.

Af styregruppens notat af 1. juli 2004 fremgår endvidere:

»På mødet tilkendegav SØK, at der på det foreliggende grundlag ikke var belæg for at indlede en politimæssig efterforskning mod alle de involverede selskaber …

Da SØK således ikke på det foreliggende grundlag kunne gå ind i sagen, blev det besluttet, at ToldSkat arbejder hen mod en adminstrativ afgørelse (den såkaldte Bond house-model) mod Comitel (brokeren).

Gruppen skal derfor gøre opmærksom på, at mens man arbejder sig frem mod en administrativ afgørelse, vil der fortsat blive udbetalt moms til Comitel.

På det tidspunkt, hvor en eventuel afgørelse bliver truffet, må konsekvensen være, at udbetalingerne til Comitel stoppes. Kammeradvokaten har gjort opmærksom på, at dette kan medføre et ikke ubetydeligt erstatningskrav mod statskassen.«

Det påståede røveri mod Roxy World Trading ApS den 21. juli 2004 afstedkom angiveligt, at Roxy World Trading ApS ikke kunne afregne salgsmomsen til SKAT på forfaldstidspunktet. Efter gennemførelsen af den strafferetlige efterforskning af momskarrusellen viste røveriet sig at være fingeret med henblik på over for SKAT at kunne begrunde/legitimere den manglende betaling af salgsmomsen. Da Roxy World Trading ApS ikke var i stand til at betale den skyldige moms, blev selskabet taget under konkursbehandling ved Skifteretten i Roskilde.

SKATs og SØKs undersøgelser afdækkede, at en række personer i perioden fra den 1. november 2003 og frem til udgangen til november 2004 havde samvirket om at tilrettelægge en række handler, i hvilken forbindelse et antal danske selskaber (Network Trading ApS, Solid Trading ApS, Roxy World Trading ApS, J. N. Trading v/D og C. B. Trading v/E) havde importeret først it-komponenter og i slutningen af sagsperioden pornokort til Danmark fra primært Fjernøsten og i enkelte tilfælde fra andre EU-lande, som efterfølgende via handler mellem mellemliggende danske selskaber var blevet solgt til til danske brokere, henholdsvis Comitel International A/S og Plug & Play A/S, for derefter at blive solgt til Fjernøsten.

Disse handler indebar, at det importerede selskab, f.eks. Network Trading ApS, fik et momstilsvar svarende til den ved det indenlandske salg opkrævede salgsmoms. Dette momstilsvar blev angivet over for afgiftsmyndighederne, men aldrig betalt, idet personerne bag svindlen samvirkede om at etablere begivenheder, der for de efterfølgende undersøgelser skulle fremstå som ekstraordinære kommercielle risici, og som medførte, at det pågældende selskab på tidspunktet for momsbeløbets forfald ikke var i stand til at betale den skyldige moms.

Den skyldige moms udgjorde hos henholdsvis Network Trading ApS - anslået 92 mio. kr., Solid Trading ApS - anslået 30 mio. kr., Roxy World Trading ApS - anslået 12 mio. kr., J. N. Trading v/D - anslået 25 mio. kr. og C. B. Trading v/E - anslået 30 mio. kr. - eller i alt knap 200 mio. kr.

SKAT tilbagebetalte moms til det selskab, der som det sidste danske led i handelskæden erhvervede varerne og betalte momsen til sine leverandører for efterfølgende at reeksportere varerne uden opkrævning af moms til Fjernøsten, hvilket i de af denne sag omfattede handler var Comitel International A/S. Momsen, som var betalt til leverandøren, tilbagebetaltes af SKAT i den følgende måned.

Handlerne i Danmark omfattede selskaberne Network Trading ApS, Solid Trading ApS, Roxy World Trading ApS, C. B. Trading v/E, J. N. Trading v/D, Trademark International ApS, Plug & Play A/S, J Corp ApS samt Comitel International A/S.

De udenlandske selskaber, der indgik i handlerne, og som efter den strafferetlige efterforskning viste sig at være kontrollerede af samme personkreds, omfattede selskaberne Espace IT B.V., holland, Asia-Power Solution Gmbh, Schweiz, Asia Time Technologies Ltd, Hongkong, Aspen Group Ltd., Hongkong, Dream Automobiles Ltd., England, Empire Ornaments & Jewellery, Hongkong, Fusion R., Singapore, Gala Technology, Hongkong, Global Way Enterprise Ltd., Hongkong, Global Crown Technologies Ltd., Hongkong, Ideal hardware Ltd., Hongkong, Isotech International Corporation, British Virgin Islands, Mass Gain Pacific Ltd., Maximum Evolution, Hongkong, Maximum Evolution PTE Ltd., Singapore, Microtronica Ltd., British Virgin Islands, Network Trading Co. Ltd. Quantum Network Asia, Remy Ltd., Roxy World Trading Co. Ltd., og Unicorn Properties Ltd.

I et antal »Gul Feber«- handler blev det konstateret, at Comitel International A/S' kunde i Fjernøsten tilbagekøbte præcis samme type og antal varer, som det danske importerende selskab havde købt fra Comitel International A/S' kunde. Herudover er det i en række af sagens handler konstateret, at der er sammenfald mellem den oprindelige leverandørs og den endelige købers (Comitel International A/S' kunde) adresser, fax-numre, direktør og bankkontonumre.

Ved SKATs undersøgelser, kurators behandling af de omhandlede danske konkursboer og Statsadvokaten for Særlig Økonomisk Kriminalitets efterforskning i straffesagen blev det konstateret, at en række personer,

Copyright © 2023 Karnov Group Denmark A/S

**1890**

heriblandt B (Solid Trading ApS), F (Trademark International ApS), T (Comitel International A/S), C (J Corp ApS og C Trading AB), E (C. B. Trading), D (J. N. Trading), I (Network Trading ApS), G (Roxy World Trading ApS) samt H (en række af de udenlandske selskaber) i fællesskab havde samvirket om at tilrettelægge de pågældende handler med det formål i de danske importørselskaber at beholde de momsbeløb, som efterfølgende led havde betalt til selskaberne. Disse momsbeløb blev unddraget selskaberne, hvilket førte til, at ingen af de pågældende danske importørselskaber/-virksomheder var i stand til at afregne det opståede momstilsvar på forfaldstidspunktet. Unddragelsen blev forsøgt skjult via etableringen af en række ekstraordinære kommercielle retter, enten ved forudbetalinger, betaling for attrapper/værdiløse varer, røverier eller fiktive udlån til selskaber beliggende i Kina og Taiwan.

SKAT vurderede fra august måned 2004, om der var mulighed for at tilbageholde Comitel International A/S' momstilsvar, dvs. at tilbageholde selskabets momsfradrag, men fandt først grundlag herfor, da der forelå et forslag til afgørelse om nægtelse af fradrag den 6. december 2004.

*7.2 Solid Trading ApS*

I perioden fra B's erhvervelse af selskabet og frem til november/december 2003 bestod selskabets hovedaktivitet af indkøb af it-komponenter fra sælgere i England og efterfølgende videresalg af disse til italienske selskaber.

Fra november 2003 og frem til slutningen af marts 2004 ændrede Solid Trading ApS imidlertid købs- og salgsmønster, idet selskabet købte it-komponenter, CPU-enheder/RAM-blokke, fra Trademark International ApS, der hidrørte fra det danske selskab Network Trading ApS' import af de pågældende produkter fra en række selskaber i Hongkong og Singapore. De af Solid Trading ApS fra Trademark International ApS indkøbte varer blev videresolgt til Comitel International A/S, der derefter solgte de pågældende varer til en række købsselskaber i Hongkong og Singapore, som i et vist omfang var identiske med de selskaber, der oprindeligt havde solgt varerne til Network Trading ApS.

»Missing trader«-selskabet, dvs. det selskab, hvori den unddragne salgsmoms blev aflejret, i de handelskæder, hvori Comitel International A/S købte varer af Solid Trading ApS, var i 34 af sagens handler i den første handelskæde selskabet Network Trading ApS. I de resterende handler i den første handelskæde var »missing trader«-selskabet Solid Trading ApS.

Solid Trading ApS' salgsmoms til SKAT (ca. 88,5 mio. kr.) hidrørende fra de varer, som selskabet fakturerede til Comitel International A/S i november 2003 - januar 2004, modsvaredes stort set af Solid Trading ApS' købsmoms på de varer, som Solid Trading ApS aftog fra Trademark International ApS i perioden. Den beløbsmæssigt meget begrænsede »difference« for perioden blev betalt. Selskabet betalte ikke salgsmomsen for februar og marts 2004 til SKAT (ca. 26,3 mio. kr.). Selskabet havde grundet den nye metode med indkøb af varer i Fjernøsten overtaget rollen »som importerende selskab« og havde således ingen købsmoms til fradrag i momstilsvaret.

I foråret 2004 gik Solid Trading ApS konkurs, fordi selskabet havde foretaget forudbetaling af varer, som viste sig at være værdiløse. Dette blev konstateret, da værepartiet blev stoppet i forbindelse med toldkontrol i Københavns Lufthavn i marts 2004. SKAT har anmeldt et krav i Solid Trading ApS under konkurs på 28.877.861 kr.

*7.3 Trademark International ApS*

I den handelskæde, hvori Comitel International A/S købte varer af Trademark International ApS, var »missing trader«-selskabet Roxy World Trading ApS. Trademark International ApS blev

kortvarigt omdannet til et aktieselskab den 1. januar 2005, inden selskabet igen blev omdannet til et anpartsselskab den 2. marts 2005. F var selskabets direktør fra den 3. oktober 2006. Han var tillige medlem af bestyrelsen i den korte periode, hvor selskabet var registreret som et aktieselskab. Selskabet har senest aflagt årsrapport for regnskabsåret 2004/2005.

Trademark International ApS blev taget under tvangsopløsning den 8. januar 2007 på baggrund af en tvangsopløsningsbegæring fra Erhvervs- og Selskabsstyrelsen af samme dato. Konkursdekret blev afsagt den 20. februar 2007. SKAT har ikke anmeldt krav i konkursboet, da den unddragne salgsmoms i denne handelskæde blev aflejret i det importerende selskab, Roxy World Trading ApS.

Trademark International ApS udlignede i perioden stort set salgsmomsen opstået ved salget til Comitel International A/S med købsmomsen følgende af indkøbet hos Roxy World Trading ApS.

*7.4 J Corp ApS*

J Corp ApS aflagde senest årsrapport for regnskabsåret 2004/2005. C forblev direktør frem til tidspunktet for tvangsopløsningsbegæringens fremsendelse den 16. april 2007.

C var tillige ejer af det svensk indregistrerede selskab C Trading AB, der også indgik i samhandlen med Solid Trading ApS.

J Corp ApS købte i henholdsvis august og november 2004 internet access-kort til en værdi på ca. 92 mio. kr. hos J. N. Trading v/D. Internet access-kortene var af J. N. Trading v/D importeret fra en række i Fjernøsten hjemmehørende selskaber. De omhandlede internet access-kort, der gav adgang til internethjemmesider med

**1891**

pornografisk indhold, blev efterfølgende af J Corp ApS videresolgt til Comitel International A/S.

I den handelskæde, hvor Comitel International A/S købte varer fra J Corp ApS, var »missing trader«-selskabet J. N. Trading v/D. J Corp ApS blev taget under tvangsopløsning af Sø- og handelsrettens skifteafdeling den 7. maj 2007, og konkursdekret blev afsagt den 25. juni 2007. SKAT har anmeldt krav for 31.212 kr. i konkursboet, idet den unddragne salgsmoms i denne handelskæde blev aflejret i det importerende selskab J. N. Trading v/D.

J Corp ApS betalte salgsmomsen, som selskabet fakturerede til Comitel International A/S, til SKAT.

*7.5 Andre danske selskaber*

Network Trading ApS blev stiftet den 20. oktober 2003 og gik i betalingsstandsning den 17. februar 2004 for herefter at blive taget under konkursbehandling den 17. maj 2004. Selskabets direktør var en til Danmark indvandret singaporekineser, I.

Selskabet drev i perioden fra november 2003 og frem til betalingsstandsningen virksomhed som handelsselskab med indkøb og videresalg af it-komponenter (CPU-enheder og RAM-moduler). Network Trading ApS' køb hos selskaber i Hongkong og Singapore i perioden udgjorde ca. GBP 33,7 mio. Varerne indgik i handelskæden med Trademark International ApS og Solid Trading ApS og Comitel International A/S, som afslutningsvis solgte varerne til kunder i Fjernøsten.

Inden betalingsstandsningen og den efterfølgende konkurs rejste selskabets revisor og selskabets direktør, I, til Hongkong med henblik på at indrive tilgodehavendet fra den foretagne forudbetaling hos Quantum. SKAT blev således mødt med en reel forretningsmæssig begrundelse for, at selskabet på forfaldstidspunktet den 10. februar 2004 var ude af stand til at betale sin restance til SKAT.

Med henblik på at afdække muligheden for at tilbagesøge det forudbetalte beløb indvilligede direktør, I, efter aftale med SKAT i at lade selskabet træde i betalingsstandsning. Der blev iværksat bestræbelser på at indrive beløbet, og Quantum tilbød Network Trading ApS at afdrage beløbet over 18 måneder, idet selskabet

Copyright © 2023 Karnov Group Denmark A/S

havde anvendt det forudbetalte beløb til betaling af diverse leveran-dører.

Network Trading ApS' revisor oplyste i sin vidneforklaring under straffesagen mod blandt andre T, at han og revisoren for Plug & Play A/S sammen havde undersøgt, om der var noget sammenfald, hvilket han ikke kunne konstatere, om der var. SKAT har anmeldt krav for 92.750.144 kr. i Network Trading ApS under konkurs.

J. N. Trading var en af D personligt drevet virksomhed, som blev momsregistreret den 1. august 2004.

Virksomheden importerede i perioden fra august til november 2004 internet access-kort, der gav adgang til hjemmesider med pornografisk indhold, fra Maximum Evolution, Hongkong. I august 2004 blev der leveret 279.372 kort, alle til en enhedspris på 52,50 USD, mens der i november 2004 blev leveret 104.307 kort til en enhedspris på 42,00 USD. J. N. Trading videresolgte 283.500 af de indkøbte internet access-kort til J Corp ApS. Af disse blev 201.500 stk. solgt i august måned 2004 til en enhedspris på 52,75 USD, mens der i november 2004 blev solgt 82.000 kort til en enhedspris på 42,75 USD. Salgsprisen i henhold til de af J. N. Trading til J Corp ApS udstedte fakturaer udgjorde 17.668.281,25 USD, modsvarende 105.715.116,53 danske kroner inkl. moms.

J Corp ApS videresolgte efterfølgende samtlige de erhvervede internet access-pornokort til Comitel International A/S, der herved opnåede fradrag for moms betalt til J Corp ApS med 23.188.732 kr.

Momsmæssigt var handlerne stort set neutrale i J Corp ApS.

D blev erklæret konkurs den 5. juli 2005, og SKAT har hos konkursboet et tilgodehavende vedrørende ikke betalt salgsmoms vedrørende 3. kvartal 2004 på 17.707.447 kr. og for 4. kvartal 2004 på 5.176.922 kr. SKAT har således samlet anmeldt krav for 24.372.461 kr. i konkursboet.

Roxy World Trading ApS blev stiftet den 10. december 2003 af G, som også var direktør. Selskabet drev fra den 17. februar 2004 til den 9. august 2004 virksomhed som handelsselskab med indkøb af it-komponenter fra Hongkong, som selskabet videresolgte til Solid Trading ApS. Selskabet aflagde aldrig årsrapport og blev taget under konkursbehandling den 9. august 2004. Konkursen skyldtes som nævnt, at selskabet i strid med sandheden oplyste at være blevet udsat for væbnet røveri og derfor ikke så sig i stand til at betale sin skyld til SKAT. SKAT har anmeldt et krav i konkursboet for 12.350.178 kr.

C&B Trading var en af E personligt drevet virksomhed, som blev registreret den 8. oktober 2004. Virksomheden blev afregistreret hos SKAT den 2. februar 2005. Virksomheden blev imidlertid reelt indstillet primo december 2004, på hvilket tidspunkt den sidste af i alt 32 handler gennemført af C&B Trading til en samlet værdi af ca. 130 mio. kr. inkl. moms blev gennemført. Virksomhedens aktiviteter bestod i handel med it-komponenter, der blev indkøbt hos en hollandsk leverandør og efterfølgende videresolgt til Trademark International ApS. E blev erklæret konkurs den 15. marts 2005, og SKAT har anmeldt et krav i konkursboet på 29.499.264,62 kr.

*8. Kuransen af de handlede varer, varebetegnelser samt prissætning og betaling*

**1892**

Der har under sagen været enighed om, at handlerne i kæde 1 omfattede både ægte varer og attrapper, at varerne i kæde 2 var attrapper, og at handlerne i kæde 3 omfattede ægte varer.

I flere af de af sagen omfattede handler er der forskelle i den varebetegnelse, som fremgår af fakturamaterialet og af købsordren. Der er i en del af fakturaerne anvendt de generelt formulerede varebetegnelser »Samsung Branded Dice« og »Infinion TSOP«, som PricewaterhouseCoopers i en erklæring af 29. marts 2006 til SKAT har anset som utilstrækkelige til at identificere eksisterende produk-ter. De konkrete varebetegnelser fremgår imidlertid i et vist omfang af købsordrer.

Det er endvidere oplyst, at varebetegnelsen »Intel Pentium 4 3.0 Ghz 533 Mhz« på købsordrer og fakturaer i handel nr. 14 ikke er korrekt, idet Intel ikke har et produkt med de angivne specifikatio-ner. I visse andre handler er der anvendt en korrekt varebetegnelse - »Intel Pentium 4 3.0 Ghz 800 Mhz« og gennemført varekontrol, der bekræfter dette. Vedrørende prissætningen af Intel CPU'er har SKAT på baggrund af en analyse af handlerne og indhentede op-lysninger fra Intel anført, at Comitel International A/S i flere tilfæl-de foretog indkøb til priser højere end Intels listepriser. Peer Kølen-dorf har anført, at markedspriser på brokermarkedet ikke kan sammenlignes med listepriser for distributørvirksomheder og har i øvrigt bestridt SKATs beregningsgrundlag og konklusion.

For så vidt angår internet access-kortene er de på købs- og salgs-fakturaer anført med betegnelsen »Phone4x internet access cards« uden angivelse af pålydende værdi. I en rapport af 19. juli 2005 fra Nordisk Erhvervs Vurdering indeholdende en vurdering af internet access-kort fra konkursboet efter JN Trading konkluderes det, at de hjemmesider, som disse kort gav adgang til, i vidt omfang var forældede, af ringe kvalitet og ude af drift. Endvidere inficerede hjemmesiderne brugerens computer med virus. I rapporten anføres også, at avancen på kortene mellem grossist og detailled måtte formodes at være på ikke under 200 %, og kortene ville efterfølgen-de blive solgt til slutbrugeren for pålydende værdi.

Der forekom ikke tredjepartsbetalinger i »Gul Feber«-handlerne, mens det var tilfældet med hensyn til en del af de andre handler. I visse af »Gul Feber«-handlerne skete der opsplitning af betalinger-ne. I et enkelt tilfælde - handel nr. 35 - blev varerne udleveret, før ca. 20 min. kr., svarende til ca. halvdelen af den samlede salgspris, var betalt. Under straffesagen har T forklaret, at det var, fordi der var en god relation til kunden, og at det somme tider var nødvendigt at løbe en risiko.

*9. SKATs forslag til afgørelse af 6. december 2004*

Den 6. december 2004 sendte Skattecenter København forslag til afgørelse over for Comitel International A/S om afkrævning af 191.488.442 kr., hvilket blandt andet var baseret på resultatet af kontrol opstartet i marts 2004 vedrørende handler, hvori bl.a. Solid Trading ApS, Network Trading ApS, Trademark International ApS og selskabet Comitel International A/S havde deltaget.

Af det krævede beløb vedrørte 114.761.052 kr. tilbagebetaling af købsmoms for handler med Solid Trading ApS i momsperioderne fra 1. november 2003 til 31. marts 2004, mens 76.727.390 kr. vedrørte et ikke godkendt momsfrit salg foretaget i momsperioderne fra 1. januar 2002 til 31. juli 2002, som ikke har sammenhæng med denne sag.

SKATs forslag til afgørelse forudsatte, at tilbagebetalingen/nægt-elsen af fradrag for købsmoms skulle ske på baggrund af en objek-tiv konstatering af, at handlerne - ifølge SKAT - indgik i et »lukket kredsløb« og var »uden økonomisk realitet«, idet den efter SKATs opfattelse var uden betydning, om Comitel International A/S sub-jektivt havde været vidende om, at forudgående led havde til hensigt ikke at afregne salgsmoms.

Der verserede på det pågældende tidspunkt en sag ved EU-Dom-stolen (de forenede sager C-354/03, C-355/03 og C-484/03, Bond house) om spørgsmålet om, hvilke objektive og/eller subjektive betingelser der skal være opfyldt, for at skattemyndighederne kan nægte fradrag, hvorfor SKATs endelige afgørelse afventede Dom-stolens afgørelse.

*10. Comitel-koncernens høringssvar*

Comitels daværende advokat afgav den 31. januar 2005 hørings-svar på vegne af Comitel International A/S i forlængelse af SKATs forslag til afgørelse. Af høringssvaret fremgår blandt andet:

»I 2003 traf bestyrelsen beslutning om at udvide varesortimentet med IT-dele. Baggrunden for denne beslutning lå især i det forhold, at selskabet havde betydelig indsigt i logistikforhold og »spothandler« i forbindelse med salg af produkter, der som mobiltelefoner omsættes meget hastig og hyppigt, således at et parti ofte er solgt til en køber, inden partiet fysisk er blevet leveret til Comitel. I tilknytning til bestyrelsens beslutning blev tilknyttet en medarbejder til Comitel med særlig indsigt i handel med IT-dele.

…

I forbindelse med enhver kontakt med en ny leverandør eller en ny kunde, følger Comitel en fast procedure for undersøgelse af leverandørens/kundens forhold. Comitel undersøger således blandt andet kundens registreringsmæssige forhold hos offentlige myndigheder, økonomiske forhold og tager referencer på kunden.

Endvidere har Comitel siden 2001 i ethvert tilfælde, når man ville foretage handel med en ny leverandør/kunde, fulgt hvert enkelt punkt, som fremgår af de britiske toldmyndigheders såkaldte Code of Conduct,

**1893**

som er opstillet i samarbejde mellem de britiske myndigheder og den britiske mobiltelefonbranche. Kopi af memorandum of understanding between hM Customs and Excise and the Mobile Phone Industry indeholdende Code of Conduct vedlægges som bilag 2.

…

Comitel har gennem alle år haft god kontakt med Told Skat, idet man har lagt vægt på at overholde alle regler. Det har på bestyrelsesplan været diskuteret, om Comitel skulle være på det internationale marked, da alle, der har et minimum af erfaring, er vidende om, at der blandt købere og sælgere er firmaer, som etablerer momskarruseller.

Comitel har for flere år siden besluttet, at man som meget gammel aktør på markedet for især mobiltelefoner, ikke skulle forlade dette marked, blot fordi der er opstået problemer med momskarruseller, men naturligvis sørge for, at alle regler blev overholdt, og at enhver mistanke om momskarrusel skulle føre til afvisning af kunde- eller leverandørforhold.

Told Skat har altid modtaget mange henvendelser fra Comitel med angivelse af firmaer og forhold, som kunne tyde på momskarruselsvindel. Er Comitel blevet tilbudt varer billigere end på verdensmarkedet, er Told Skat orienteret. Told Skat har dog ikke kunnet svare tilbage med advarsler om at undlade at handle med bestemte firmaer, men Comitel har forstået på Told Skat, at man ofte har været glad for den underretning, som man har givet Told Skat, når man har oplevet situationer, der blot kunne antyde uregelmæssigheder. Således har Comitel gennem flere år mailet listerne med alle ny kunder og leverandører måned for måned for at hjælpe Told Skat med at følge udviklingen og kunne gribe ind i tide.

Gennem det seneste halve år har Comitel dog erfaret en mere sikker holdning fra Told Skat, idet noget, der kunne tyde på efter Comitels oplysninger at være forsøg på momssvindel, er blevet besvaret med, at Comitel skulle købe eller sælge, hvis formalia (momsnumre etc.) var i orden.

Gennem mange år har Comitel trods alt måttet konstatere, at en vis procentdel, måske 10-20 % af den international[e] handel, på en eller anden måde har haft forbindelse med momskarruseller. Der har været en del besøg især fra det britiske Customs/Excise, hvor Comitel har kunnet fremlægge korrekt dokumentation for overholdelse af momsreglerne, men hvor et led i handelskæden efter de britiske myndigheders oplysninger ikke har opfyldt sine momsmæssige forpligtelser.

Med henvisning til hvad der er beskrevet ovenfor, har Comitel alligevel ment, at det var urimeligt at skulle lukke for al international handel, fordi blot en del af denne handel indgår i momskarru-

selsvindel. Derfor har bestyrelsen med jævne mellemrum bakket op om at fortsætte under iagttagelse af alle former for kontrol, som det er muligt for et privat firma at foretage.

…

3. Handel med Solid Trading ApS
3.1 handelens opståen

Hos Comitel havde man ofte lagt mærke til Solid Tradings navn på internettet på hjemmesiden www.internationalcomputerbrokers.com. Denne side er en side, hvor virksomheder, der er i markedet med IT-dele, kan finde ud af, om der er varer at købe og sælge.

I 2003 ansatte Comitel en ny medarbejder, som tidligere havde været ansat i virksomheden Bluecom. Bluecom er en virksomhed, som handler med IT-dele. Medarbejderen blev tilknyttet Comitel med henblik på at styrke Comitels handel inden for IT-dele. Den pågældende medarbejder kendte B, som var indehaver af Solid Trading, idet medarbejderen havde været kollega med B hos Bluecom.

Efter flere møder både hos Comitel og hos Solid Trading, og undersøgelser om Solid Trading i branchen, samt - ikke mindst telefonisk kontakt til Told & Skat, der ikke havde nogen kommentarer hertil - startede samhandlen med mobiltelefoner samt IT komponenter.

Samhandlen med Solid Trading blev løbende udbygget. Solid Trading havde gode kontakter hos IT leverandører, da B havde været i branchen hos Bluecom i flere år og dermed havde forbindelse til leverandører, der kunne levere varer i stor volumen. Der skal om samarbejdet med Solid Trading noteres, at alle aftaler om leverancer og betalinger blev overholdt. Til tider købte Comitel varer, som Solid Trading havde kunder til, således at Comitel til tider var leverandør til Solid Trading. Handlen gik dermed begge veje, som det ofte ses i branchen.

…

3.3 Kontrol med varer og kontrolbesøg fra aftagere af varer

Varerne blev ofte leveret på Comitels lager på hammershusgade 11. De blev leveret af 3x34 eller speditøren, Kühne & Nagel. I visse tilfælde blev varerne leveret hos Kühne & Nagel, og Comitel gav Kühne & Nagel instruktioner om, hvor varerne skulle sendes hen.

Varerne blev ved ankomsten optalt og varenumre samt forsegling af varen blev kontrolleret, da forseglingen har stor betydning for varens pris. Til eksempel kan nævnes, at en åben kasse CPU ofte vil være 2-3 % billigere end en lukket kasse direkte fra leverandør.

Hos Comitel var T ansvarlig for handlerne med IT-dele. I perioden modtog Comitel stort set dagligt sendinger af varer fra Solid Trading. Hver dag kontrollerede T - nogle gange sammen med en medarbejder - de modtagne varer. Han sikrede sig i hvert enkelt tilfælde, at det var de rigtige varer, der var leveret, og at antallet var rigtigt.

**1894**

Når der blev leveret varer i forseglede kasser, blev forseglingen ikke brudt, da der handles på vilkår, at der er tale om »sealed boxes«, det vil sige varer, der leveres i en ubrudt og forseglet pakning.

I begyndelsen af samhandelsforholdet med Hongkong-virksomheden (Fusion R) kom der tre til fire gange en person fra Hongkong, som var repræsentant for den virksomhed, som Comitel leverede IT-dele til. Han kontrollerede varerne på Comitels lager i hammershusgade 11. Han sikrede sig, at varerne var som aftalt. Dette skete inden forsendelse og betaling til Solid Trading, fordi både Comitel og Comitels kunde ville være sikker på, at der var tale om rigtige varer, som kunne anvendes på sædvanlig vis.

3.4 handel med andre end Solid Trading

Comitel har gennem lang tid handlet med selskaber fra Fjernøsten, og har mange kontakter og lange relationer der.

Comitel bliver dagligt kontaktet af nye kunder fra alle verdensdele. Kontakt til kunder i Hongkong opstår pr. mail og telefon, hvorefter Comitel aflægger besøg i Hongkong samtidig med den årlige elektronikmesse, som Comitel har deltaget på i mange år for at finde nye kunder og leverandører. Comitel besøger også gamle samhandelspartnere i Hongkong.

Det er også vigtigt for Comitel at have aflagt besøg hos sine kunder, der aftager høj volumen, da der til tider vil forekomme kredit til disse kunder pga. tidsforskelle, og da priserne varierer meget inden for ganske kort tid.

Samtlige varer er sendt fra Danmark med speditører fra Comitels eget lager eller fra en af Comitels speditørers lager. Der er også betalt forsikringer for transporterne.

…

4. Bemærkninger til Told Skats sagsfremstilling

…

4.2.1.2. Comitel ikke led i andre momskaruseller

På side 4 i sagsfremstillingen anfører Told Skat, at Told Skat ikke er »bekendt med, at Comitel tidligere har foretaget handler af den i denne sagsfremstilling beskrevne karakter«. Hvis det, som Told Skat sigter til med betegnelsen »handler af den i denne sagsfremstilling beskrevne karakter«, er handler, som kan antages at være led i en momskarrusel, er Comitel tilfreds med en sådan konstatering. Comitel har ikke på noget tidspunkt - heller ikke i forbindelse med indkøbene hos Solid Trading A/S - haft kendskab til eller haft grund til at antage, at selskabet var part i handler, som kan være led i en mulig momskarrusel.

…

4.2.1.4 Kendskab til leddene i handelskæden

Endvidere anfører Told Skat side 4 i sagsfremstillingen, at Solid Trading ApS har indkøbt de varer, som videresælges til Comitel af selskaberne Network Trading ApS og Trademark International ApS. Hertil bemærkes, at Comitel ikke - som sædvanligt - har haft noget kendskab til, hvem Solid Tradings leverandører var. Det er ganske naturligt, at en leverandør ikke giver sin samhandelspartner oplysning om, hvem leverandørens leverandører er. Comitel har således intet kendskab haft til, hvorfra de varer, som selskabet købte hos Solid Trading A/S, stammede.

4.2.1.5 Kontrol af varer

Som nævnt har Comitel foretaget kontrol af de modtagne varer. Det giver derfor Comitel anledning til undren, at Told Skat i sagsfremstillingen på side 15 anfører, at Comitel på forespørgsel har oplyst, at selskabet ikke foretager fysisk kontrol af varerne, og at Comitel direkte skulle have oplyst, at man ikke foretager nogen reel varekontrol af de indkøbte vareportier.

Comitel står uforstående over for, hvorfra Told Skat har de pågældende oplysninger. Comitel har endda til Told Skat i brev af 8. juli 2004, der vedhæftes som bilag 11, oplyst følgende om kontrollen af modtagne varer:

»Vi foretager normalt en fysisk kontrol ved modtagelse af varer. Det er meget forskelligt alt efter hvilke varer og hvilke leverandører, der er tale om. IT-komponenter kontrolleres stikprøvevis mens ikke ved udpakning af den originale plomberede emballage, da varen derved mister værdi. Mobiltelefoner kontrolleres også stikprøvevis. Kontrollerne udføres enten af vort eget personale eller af speditøren (mod betaling). Har vi haft langvarige forretningsforbindelser med leverandøren, slækkes kontrolforanstaltningerne over tiden, hvis man gennem længere tid ikke har fundet fejl. I perioden fra 1. januar 2002 til 29. juni 2004 har vi ikke ændret kontrolproceduren.«

Endvidere anfører Told Skat på side 15 i sagsfremstillingen, at »der er tale om en vare, som på Comitels hjemmeside ikke indgår

som en del af selskabets sædvanlige varesortiment, og som heller ikke udbydes til salg ligesom deres øvrige produkter«.

Det fremgår ikke »varer«, som Told Skat sigter til, men Comitel går ud fra, at Told Skat sigter til IT-dele (det vil sige CPU, RAM og TSOP). Det er rigtigt, at man ikke kan finde disse varer på Comitels hjemmeside. Det hænger sammen med, at Comitel sammensætter oplysningerne om sortiment på hjemmesiden ud fra en vurdering af, hvilke produkter i sortimentet, den brede offentlighed har interesse for. Som nævnt er Comitels sortiment vedrørende IT-dele udelukkende af interesse for business-to-business kunder.

Hertil kommer, at hjemmesiden ikke er rettet mod kunder og leverandører til Comitel International A/S, men mod Comitels danske salg og Comitels eksport af primært hobbyelektronikvarer. Der findes endnu ikke nogen hjemmeside for Comitel International A/S.

**1895**

I øvrigt fremgår det af formålsbestemmelsen i vedtægterne for Comitel International A/S, at selskabet handler med IT-dele.

På side 8-9 i sagsfremstillingen anfører Told Skat, at Told Skat i et tilfælde, hvor der blev foretaget kontrol af hver af de af en handel omfattede varer, kunne konstatere, at varer, som blev solgt af Solid Trading ApS til Comitel, var »falske/attrapper«. Det anføres i den forbindelse, at det blev konstateret, at varerne enten var uden værdi eller varemærkeforfalsket.

Som Told Skat anfører, har der været tale om et enkelt tilfælde af de mange handler, som er foregået mellem Solid Trading ApS og Comitel. I alle tilfælde, hvor Comitel har udført en kontrol af varerne - hvilket skete i langt den overvejende del af handlerne, jf. bemærkningerne herom ovenfor - har Comitel ved kontrol af de fra fabrikken forseglede kasser med varer kunnet konstatere, at kassernes indhold svarede til de varer, som handlerne omfattede. Eksemplet viser, at kontrol har været udført.«

På tidspunktet for udarbejdelsen af høringssvaret var T direktør for Comitel International A/S, og han medvirkede i denne egenskab ved udarbejdelsen af svaret sammen med Peer Kølendorf og selskabets rådgivere, ligesom han sammen med Peer Kølendorf og selskabets rådgivere deltog i møder med SKAT.

*11. SKATs afgørelse af 20. juli 2006*

Efter EU-Domstolens dom af 12. januar 2006 i de forenede sager Optigen Ltd (sag C-354/03), Fulcrum Electronics Ltd (sag C-355/03) og Bond house Systems Ltd (sag C-484/03) mod Commissioners of Customs & Excise udarbejdede SKAT afgørelsen af 20. juli 2006 om nægtelse af fradrag baseret på en subjektiv model, hvor myndigheden på baggrund af EU-Domstolens dom lagde vægt på, at Comitel International A/S havde eller kunne have kendskab til handlernes karakter.

Ved afgørelsen blev der over for Comitel International A/S rejst krav om tilbagebetaling af et samlet beløb på i alt 220.808.090 kr. Som anført i forslaget til afgørelse af 6. december 2004 vedrørte 76.727.390 kr. heraf en sag, der ikke har sammenhæng med de af denne sag omfattede handler, idet der her var tale om en efteropkrævning for et ikke godkendt momsfrit eksportsalg foretaget i momsperioderne fra 1. januar 2002 til 31. juli 2002.

I SKATs afgørelse fremgår under overskriften »Konklusion/foreløbig afgørelse«:

»Det er SKATs opfattelse, at der henset til karakteren af det vareparti, der i marts måned 2004 blev standset i Københavns Lufthavn, og det forhold, at der viste sig at være tale om attrapper, berettiget vil kunne stilles tvivl om, hvorvidt der i de forudgående handler reelt var cirkuleret eksisterende varer, eller hvorvidt handlerne alene omfattede tilsvarende attrapper.

På baggrund af de kontrolforanstaltninger SKAT har foretaget af de pågældende handler har det ikke været muligt at konstatere, om

de varer Comitel har handlet med, har været reelle og dermed faktisk har eksisteret.

…

Handlernes »fiktive karakter« underbygges af, at såvel selskaberne Network Trading ApS som Comitel A/S forekommer indskudt med henblik på dels at etablere et anonymt »skraldespandsselskab«, Network Trading ApS, og dels med henblik på at på at opnå en forventelig problemfri udbetaling af det negative momstilsvar i forbindelse med Comitel A/S' reeksport af de omhandlede varer til fjernøsten.

Dette understøttes endvidere af de fulgte handelsmønstre, hvor varerne sendes til Hongkong fra Denmark, på trods af at varerne oprindeligt produceres i Kina.

I 4 af handlerne kan det objektivt konstateres at Comitels kunde tilbagekøber det samme parti varer, de selv har solgt til Danmark (handel nr. 4, 5, 7 og 8), og dermed kan det konstateres, at Comitels kunde ikke har haft nogen reel forretningsmæssig begrundelse og dermed behov for at tilbagekøbe varerne, og dette sker oven i købet til en langt højere pris, end det de oprindeligt er solgt for.

Det har efter SKAT's opfattelse heller ikke på noget tidspunkt været meningen, at de omhandlede varer skulle omsættes i detailleddet. Dette støttes af, at varerne, efter hvad der er kontrolleret, slet ikke har været egnet til at sådan[t] salg.

Endelig kan det konstateres, at i 4 af de 47 handler, der er analyseret, er der handlet i et komplet lukket kredsløb. Herudover er der 14 handler, hvor der med altovervejende sandsynlighed er tale om et lukket kredsløb, da handlerne er sket mellem selskaber, hvor den oprindelige leverandør til og den endelige aftager fra Danmark har sammenfald i adresser, faxnumre og i tilfælde samme direktør og bankkontonummer.

SKAT vurderer, at de resterende 32 handler, hvor selve handelsmønstret og deltagerne heri er sammenfaldende med de andre handler, heller ikke har været bragt til omsætning til et detailled. I alle handlerne sælges varer retur til Hongkong til en højere pris, end de oprindeligt er solgt til Danmark for.

Comitel har endvidere været det eneste selskab, der har opretholdt en reel avance.

Handlerne er således alene gennemført for at unddrage moms, hvor Comitel er blevet »betalt« for sin medvirken ved at kunne opnå en avance på varerne. Den konstaterede hensigt med handlerne understøttes af det tidligere omtalte flow chart fundet på Solid Tradings computer.

**1896**

SKAT kan på baggrund af ovenstående omstændigheder ikke anse de gennemførte handler for værende reelle.

Såfremt Comitel ikke kan godtgøre, at der har været tale om såvel reelle varer som reelle samhandelspartnere, er det SKATs opfattelse, at fradragsretten kan udelukkes allerede af den grund.

Såfremt Comitel godtgør, at de foreliggende fakturaer er udtryk for reelle varehandler, er det SKATs vurdering, at fradrag for handlerne med Solid Trading ApS kan nægtes, da Comitel havde eller kunne have kendskab til hensigten hos Comitels samhandelspartnere og/eller den svigagtige karakter af de transaktioner, som lå enten forud for eller efter de transaktioner, som Comitel selv gennemførte.

…

Vurderingen er baseret på de principper, som er fastlagt i EF-Domstolens dom i de forende sager Optigen Ltd (sag C-354/03), Fulcrum Electronics Ltd (sag C-355/03) og Bond house Systems Ltd (sag C-484/03) mod Commissioners of Customs & Excise

- SKATs foreløbige afgørelse

Indgående moms nedsættes med 114.761.052 kr. vedrørende leverancer fra Solid Trading A/S i perioden 1. november 2003 til 31. marts 2004.«

Tilsvarende begrundelser anføres i den nævnte afgørelse af 20. juli 2006 for at nægte fradragsret for betalt indgående moms med 6.130.916 kr. vedrørende leverancer fra Trademark International ApS i juni 2004 samt for at nægte fradragsret for betalt moms 23.188.732 kr. modsvarende leverancer fra J Corp ApS i august og november 2004.

Nægtelsen af fradragsretten i SKATs afgørelse var således begrundet i, at SKAT fandt det godtgjort, at Comitel International A/S - hvori T var ansat/direktør - vidste eller burde have vidst, at de handler, der var gennemført i forbindelse med Comitel International A/S' køb af varer fra henholdsvis Solid Trading ApS, Trademark International ApS og J Corp ApS indgik i svigsrelaterede handelskæder, hvorfor der tillige var tale om, at Comitel International A/S vidste eller kunne vide, at der efter handlernes gennemførelse ville finde momsunddragelse sted.

T er efterfølgende dømt for skyldnersvig af særlig grov beskaffenhed for de handler og transaktioner, han gennemførte på vegne af Comitel International A/S.

På grundlag af en undersøgelse af Comitels udenlandske samhandelspartnere i 2003 og 2004 gennemført via udenlandske myndigheder tilkendegav SKAT i afgørelsen af 20. juli 2006 endvidere, at det var SKATs klare opfattelse, at langt den overvejende andel af virksomhedens internationale salg var momskarruselrelateret. SKAT henviste herved blandt andet til, at 5 af Comitels International A/S' aftagere, CT-Service handels Gmbh, CT Mobile Trading, NU Communications Ltd., Ocean 3 Ltd. og Osseni Telecomunicacoes Ida, der havde tegnet sig for 63,9 % af de samlede leverancer, af de udenlandske myndigheder blev betegnet som »missing traders«.

Comitel International A/S klagede over SKATs afgørelse til Landsskatteretten, men klagen blev opgivet af selskabet efter domfældelsen af T, hvorfor SKATS afgørelse af 20. juli 2006 er endelig i forhold til Comitel International A/S.

*12. Straffesagerne*

Baseret på den af SKAT opstartede kontrol vedrørende Comitel International A/S' handler med selskaberne Solid Trading ApS, Trademark International ApS og J Corp ApS samt de af kurator i Network Trading ApS og Solid Trading ApS gennemførte undersøgelser vedrørende de nævnte selskaber samt disses ledelse indgav konkursboerne og SKAT den 20. januar 2005 fælles anmodning om politimæssig efterforskning til Statsadvokaten for Særlig Økonomisk Kriminalitet både vedrørende aktiviteterne i selskaberne Network Trading ApS, Solid Trading ApS samt Trademark International ApS og personerne bag disse selskaber.

Kurator i konkursboerne indgav efterfølgende selvstændig politianmeldelse mod Hongkong-selskaberne Quantum Network Asia Pacific Ltd. og Asia Time Technologies Ltd. samt personkredsen bag disse selskaber til politimyndighederne i Hongkong.

Til Folketinget oplyste SKAT følgende (Folketingets Skatteudvalgs bilag 27 (2007/2008, 2. saml., SAU alm. del), kvartalsrapport fra SKAT, 3. kvartal 2007, side 9):

»… »Gul Feber« kaldes også 3. generation af karruselvigssager, idet der er tale om det seneste og indtil nu mest sofistikerede koncept. De tiltalte har importeret varer - blandt andet it-komponenter og mobiltelefoner - momsfrit fra lande uden for EU. …«

Den straffesag efterforskning førte til en sag mod de involverede bortset fra B (som da var eftersøgt af Interpol), hvori Københavns Byret afsagde dom den 4. oktober 2007, og Østre Landsret efter anke afsagde dom den 28. oktober 2008. B blev udleveret til Danmark i 2009. Straffesagen mod ham blev behandlet som en

tilståelsessag, hvori Københavns Byret afsagde dom den 27. oktober 2010.

*12.1 Københavns Byrets dom af 4. oktober 2007 og Østre Landsrets dom af 28. oktober 2008*

Ved anklageskrift af 7. juli 2006 blev der rejst tiltale mod T, der havde forestået de pågældende handler i Comitel International A/S, for skyldnersvig af særlig grov beskaffenhed efter straffelovens § 286, stk. 2, jf. § 283, stk. 1, nr. 3.

Der blev ved samme anklageskrift rejst tiltale mod H (en række udenlandske selskaber), F (Trademark International ApS), C (J Corp ApS og C Trading AB), G (Roxy

**1897**

World Trading ApS), D (J. N. Trading) og E (C&B Trading).

Peer Kølendorf blev ikke afhørt eller sigtet af politiet under straffesagen, og han var ikke tiltalt. Han afgav vidneforklaring i sin egenskab af medlem af ledelsen i Comitel International A/S.

Under straffesagen forklarede SKATs medarbejder Reino Nielsen blandt andet:

»Adspurgt af advokat Peter Trudsø om sætningen i artiklen [som vidnet skrev i 2003] om, at en mulighed for at undgå at blive involveret i momssvig er at rette henvendelse til det lokale Told- & Skattekontor, forklarede vidnet, at denne mulighed fremgik af et cirkulære til loven. Hvis en virksomhed var i tvivl om, hvorvidt en købsordre eller faktura var problematisk, kunne man fremvise den til Told & Skat, der på den baggrund kunne gå på kontrol i den virksomhed, der ville sælge eller købe varerne. På den måde kunne den pågældende virksomhed være medvirkende til at få opklaret eventuelt momssvig.

Vidnet forklarede, at behandlingen af en sådan forespørgsel kunne tage fra en time til ganske få dage, fra man fik det pågældende bilag.

Adspurgt af Brinkmann omkring virksomheder, der indsendte fakturaer, forklarede vidnet, at de konstant fik verifikationsanmodninger fra udlandet. I den forbindelse aftalte de med virksomhederne, at de løbende kunne indsende fakturaer mv., og nogle valgte på frivillig basis at indsende oplysningerne elektronisk, så Told & Skat havde dem liggende og var på forkant med situationen i forhold til at udveksle oplysninger. Disse løbende informationer førte ikke i alle tilfælde til en kontrol i virksomhederne. Man brugte dem også til at identificere eventuelle danske momskarrusel-arrangementer.«

Ved Københavns Byrets dom af 4. oktober 2007 blev T fundet skyldig og idømt fængsel i 4 år og 6 måneder, jf. straffelovens § 286, stk. 2, jf. § 283, stk. 1, nr. 3, om skyldnersvig af særlig grov beskaffenhed, for via sin medvirken til bl.a. transaktionerne med Solid Trading ApS, Trademark International ApS samt J Corp ApS at have uddraget det offentlige moms ved gennemførslen af en række transaktioner uden forretningsmæssig realitet.

Ved Østre Landsrets dom af 28. oktober 2008 blev straffen for T skærpet til fængsel i 5 år.

De øvrige tiltalte i sagen blev ligeledes fundet skyldige i skyldnersvig af særlig grov beskaffenhed.

*12.2 Københavns Byrets dom af 27. oktober 2010*

Ved Københavns Byrets dom af 27. oktober 2010 blev B (Solid Trading ApS) fundet skyldig og idømt fængsel i 5 år og 6 måneder, jf. straffelovens § 286, stk. 2, jf. § 283, stk. 1, nr. 3, om skyldnersvig af særlig grov beskaffenhed.

Under sagen afgav B forklaring om sin involvering i Solid Trading ApS og »Gul Feber«-sagskomplekset.

Om sagens forhold 1, hvor Network Trading ApS var importørselskab, forklarede han blandt andet:

»Der var både tale om ægte varer og attrapper, der blev sendt rundt i kæden flere gange.«

Om sagens forhold 2, hvor Solid Trading ApS var importørselskab, forklarede han blandt andet:

»Tiltalte har supplerende forklaret, at han var bekendt med, at de varer, der blev sendt rundt kæden var attrapper eller dummies. De anvendte varer var attrapper, fordi ægte varer ville være udsat for en for stor risiko for værditab, mens de blev sendt rundt i kæden, og fordi attrapperne krævede mindre kapital.«

Om sagens forhold 5, hvor J. N. Trading v/D var importørvirksomhed, forklarede han blandt andet:

»De gik over til et reelt produkt, ægte betalingskort, der kunne bruges til køb af adgang til sexsider, fordi de tidligere havde fået stoppet en kæde med fiktive varer. Om betalingskortene ville ingen kunne sige, at de var uden værdi.«

*13. Comitel International A/S efter »Gul Feber«-handlerne*

I dag ejes Comitel A/S (CVR-nr. - - -) af Kathrine Stoffregen Kølendorf med 75 % og Peer Kølendorf med 25 %. Selskabet ejer fortsat den fulde aktiekapital i Selskabet af 21. september 2006 A/S under konkurs - tidligere Comitel International A/S.

I 2006 faldt antallet af ansatte i Comitel International A/S, således at der i dette regnskabsår gennemsnitlig var to ansatte (foruden de ansatte i Comitel Danmark A/S). Dette skyldtes, at brokerdivisionen blev lukket. T, som på dette tidspunkt var sigtet for skyldnersvig af særlig grov beskaffenhed i »Gul Feber«-sagskomplekset, blev i juli 2006 afskediget. Peer Kølendorf genindtrådte den 1. juli 2006 som direktør, hvilket han var frem til selskabets konkurs.

Selskabets omsætning var på 530,2 mio. kr., og selskabet realiserede et underskud på ca. 3,4 mio. kr., som ifølge ledelsesberetningen var påvirket af et tab på lagre i et meget konkurrencepræget marked.

Selskabets egenkapital i 2005-2006 var ifølge årsregnskabet 19.625.233 kr. pr. 31. december 2005 og 16.247.761 kr. pr. 31. december 2006. Der blev ikke udbetalt udbytte i perioden.

I september 2006 afviklede Comitel International A/S sine aktiviteter og ændrede navn til Selskabet af 21. september 2006 A/S.

Af ledelsesberetningen fra selskabets årsrapport for 2006 fremgår blandt andet:

»Efter gennemførelse af lovændring medio 2006, som kan medføre risiko for at selskabet kan blive gjort solidarisk ansvarlig overfor leverandører og kunders momstilsvar, besluttede ledelsen at nedrulle

**1898**

aktiviteterne i selskabet indtil konsekvenserne af de nye regler er klarlagt.«

Selskabet havde ingen erhvervsmæssige aktiviteter i 2007.

Comitel International A/S indleverede i oktober 2007 egen konkursbegæring, idet selskabet var uden tilstrækkelige midler til at opfylde tilbagebetalingskravet ifølge SKATs afgørelse. Den 23. oktober 2007 blev selskabet erklæret konkurs.

SKAT traf efterfølgende afgørelse om, at Comitel International A/S' moderselskab hæftede solidarisk for momsen. Denne afgørelse blev indbragt for Landsskatteretten, der gav selskabet medhold. Landsskatterettens kendelse er ikke blevet indbragt for domstolene, og afgørelsen er således endelig.

*14. Udtalelser fra SKAT om momskarruselsvig*

En artikel i SR-SKAT 2003.164 »Momskarruselsvig - hvordan kan man sikre sig mod uforvarende at blive medspiller i en ulovlig momskarrusel?« af Reino Nielsen, SKAT Økokrim, indeholder forslag til virksomheders rutiner i forhold til leverandører og kunder. Heri anføres blandt andet:

»Da man i disse situationer har med svindlere at gøre, er det selvfølgelig ikke altid lige nemt at gennemskue, om man er ved at blive involveret i en kriminel momskarruselhandel. Men der er selvfølgelig nogle advarsels-tegn, man kan være opmærksom på,

Copyright © 2023 Karnov Group Denmark A/S

og der er også mulighed for at søge vejledning hos rådgivere og hos Told•Skat.

Specielt i virksomhedens indkøbsfunktion er det vigtigt, at der blive taget nogle forholdsregler, og at man i det hele taget bruger »sund fornuft« og ikke kun lader sig forblænde af udsigten til en hurtig gevinst. Først og fremmest er det vigtigt at tage sig særligt i agt, når der handles med »høj-risiko« varer som f.eks. mobiltele-foner, computerkomponenter og -tilbehør, forbrugerelektronik osv.

…

Hvis den samlede vurdering er, at man nærer generel tvivl om leverandørens eller kundens troværdighed, så skal man enten lade være med at handle, eller også bør man sikre sig, så godt man kan.

En måde at sikre sig på - eller måske som hjælp til at få afsløret en svindler - kan være at rette henvendelse til det lokale ToldSkat.«

I en artikel i Jyllands-Posten bragt den 21. maj 2004 oplyste SKAT:

»Efter flere år, hvor den såkaldte momskarruselsvindel på det nærmeste har været udryddet i Danmark, frygter Told & Skat, at nye sager er på vej og det med milliontab for statskassen til følge.

…

For et år siden havde Told & Skat, som overvåger området meget tæt, ingen karruselsager med truende milliontab. Men nu undersøger myndighederne tre sager.«

*15. Rapporter om brokermarkedet*

Der er under sagen fremlagt rapporter fra henholdvis hewlett-Pac-kard og KPMG med beskrivelser af brokermarkedet.

Af hewlett-Packards rapport »*An Analysis of the Excess Electronic Components Market*« (februar 1999) fremgår blandt andet:

»There are two markets in which electronic components are bought and sold:

• the primary market in which producers purchase components for their normal production needs through contracts with manufac-turers or franchised distributors;

• the excess market (also known as the secondary or grey market) in which surplus components - those owned but no longer required by producers - are bought and sold through intermediaries.

A simple way of describing the difference between the two mar-kets is as follows. Goods sold on the primary market have never been owned by anyone other than their manufacturer or the franchi-sed distributor whom the manufacturer has agreed to supply for the purposes of sale to producers. Goods sold on the secondary, or excess market, have already been through the process of sale to producers, and are being resold by them because they are surplus to their requirements. Suppliers in the primary market do not, as a general rule, buy back surpluses; and so the excess market devel-oped to mediate between those with surpluses and shortages. To be sold in this market, components are required to be unused and still in their original manufacturer's packaging.

…

Although the two markets are nominally separate and independent, in reality there is some blurring of the boundaries between them. For example, producers sometimes buy from the excess market to meet their normal production needs.

…

The main characteristics of the market include:

• its large scale;

• a high degree of competition;

• volatility;

• the absence of a free flow of information;

• producers who require anonymity when trading;

• the lack of standardised descriptions and specifications of many components;

• the importance o[f] up-to-date knowledge of market conditions;

• the variable speed with which participants are embracing new technology;

• an absence of controls or regulations to govern activities in the market.

**1899**

…

The principal risks include:

• engaging in bad trades;

• being financially exploited

…

Glossary of Terms

Brokering: The process of locating a good for a known customer where the broker does not take ownership of the good. Goods are usually bought on cash on delivery terms, and the broker generally requires a purchase order from the customer before proceeding with the purchase. When the broker receives the goods, they are forwarded to the customer after their conformity to description has been approved, a process described as usually taking two or fewer hours.«

Af KPMGs rapport »The Grey Market« (2002) fremgår blandt andet:

»As a result, it is estimated that USD $20-40 billion of computer electric product passes through the grey market per year resulting in a loss of margin to OEMs of between USD $1.2 to USD $4.8 billion per year.«

*16. Code of Conduct*

Som bilag til høringssvaret af 31. januar 2005 til SKAT vedlagde Comitel International A/S et udkast til »Memorandum of Under-standing between hM Customs and Excise and the Mobile Phone Industry« indeholdende »Code of Conduct«.

Af Code of Conduct, dateret 21. december 2000, fremgår:

»This Code of Conduct is associated with, and forms part of, the Memorandum of Understanding between hM Customs and Excise and the Mobile Phone Industry.

It will be applied by distributors within the industry, but is suppor-ted and endorsed by manufacturers and network providers.

Major distributors who are signatories to the Memorandum of Understanding have agreed that they will adhere to the following procedures when purchasing mobile phones from a new supplier or supplying mobile phones to a new customer.

*Purchasing from a new supplier*

The following factors will be considered before purchasing stock from a new supplier:

• How long have they been trading and do they have any history in the trade?

• Does the supplier have sufficient knowledge of the industry to warrant their level of anticipated business?

• Is the business registered for VAT?

• If the trader is new to the business how can he have the contacts to provide products at such an attractive price?

• Is the suggested price per unit too low for the type, age and model of the phone?

• Should this product be provided at this price at this time?

• Are the delivery arrangements for the goods financially viable and do you know where they come from?

• Have they been unable to sell to your competitors - if so why?

• Will the IMEI numbers of each phone be shown on invoices?

• Have you met the supplier - if not do you have to contact them through a third party?

• What knowledge do credit search companies used by you have of the supplier?

• Is the supplier's bank account in a different town or country to their main business address?

• Do you recognize the person supplying you with the mobile phones; have they changed their name or other details to present a new identity?

• Does the supplier use a local address; do you know if the address is a residential or accommodation address?

• Is payment or part-payment for the mobile phones being made to a third party?

• Do you have doubts over the supplier's credibility or feel there is risk attached to the deal - is it good business acumen to trade with this person?

• Is there a similarity between the invoices/paperwork of different suppliers?

If you decide to purchase from the supplier obtain a copy of the supplier's headed paper and VAT certificate, notify hM Customs and Excise of impending trade and request confirmation from hM Customs and Excise of the validity of the VAT number.

If you decide *not* to go ahead with the purchase, notify hM Customs and Excise.

*Supplying to a new customer*

The following factors should be considered before supplying stock to a new customer:

• How long have they been trading and do they have any history in the trade?

• Does the customer have sufficient knowledge of the industry to warrant their level of anticipated business?

• Have they been unable to purchase stock from your competitors - if so why?

• Does the customer always want to buy, no matter what the price?

• Are the goods to be delivered to the country where the customer is resident or are they to be delivered to another country?

• Will the country of destination of your goods be the same as the country that your customer operates in and will payment originate from that country?

• Is their courier or shipper reputable - if goods are being exported will original documents be available?

• What are the arrangements for payment - do you trust the customer?

**1900**

• Have you met the customer - if not do you have to contact them through a third party?

• What knowledge do credit search companies used by you have of the customer?

• Is the customer's bank account in a different town or country to their main business address?

• Do you have doubts over the customer's credibility or feel there is risk attached to the deal - is it good business acumen to trade with this person?

If you decide to supply the customer, obtain a copy of the customer's headed paper and VAT certificate, notify hM Customs and Excise of impending trade and request confirmation from hM Customs and Excise of the validity of the VAT number.

If you decide *not* to go ahead with the sale, notify hM Customs and Excise.«

*17. Momslovgivningen*

Fra den 1. april 2003 blev moms af køb i og salg til tredjelande angivet på samme måde som ved EU-handel, hvorfor der herefter ikke var grundlag for at sondre mellem EU-momskarruseller og momskarruseller, som involverer tredjelande.

Ved lov nr. 408 af 8. maj 2006, som trådte i kraft 1. juli 2006, blev der i momslovens § 46, stk. 9, indført hjemmel til ved en såkaldt notifikation at pålægge en i handelskæden deltagende virk-

somhed at udvise større agtpågivenhed ved fremtidige handler. Manglende iagttagelse af notifikationen kan indebære, at virksomheden pålægges solidarisk hæftelse for betaling af momsen, jf. momslovens § 46, stk. 9.

Det er en betingelse for udstedelse af en sådan notifikation, at SKAT har lidt et tab som følge af en konstateret forsætlig eller grov uagtsom unddragelse af afgiftsbetaling.

Notifikationsreglen i momslovens § 46, stk. 9, giver hjemmel til at pålægge den pågældende virksomhed konkrete handlepåbud. Af bemærkningerne til lovforslaget fremgår det således udtrykkeligt, at virksomheden kan pålægges at være opmærksom på:

»usædvanlige fakturerings-, betalings- og vareflow (eksempelvis tredjepartsbetalinger, hvor betaling sker til en anden end sælger, utraditionelle handelskanaler, usædvanlig store varepartier mv.) samt varer, der handles til priser, der afviger fra markedsprisen, og hvor der ikke er sammenhæng mellem varens pris, kvalitet og mængde (f.eks. handles til en pris, der er lavere end laveste markedspris).«

Endvidere angiver bemærkningerne, at notifikationen kan indeholde påbud om fysisk varekontrol og registrering af vareidentitet.

*18. Tabsopgørelsen*

Det er under sagen oplyst, at den estimerede dividende til SKAT i konkursboet efter Solid Trading ApS er 6.672.177,38 kr., i konkursboet efter J.N. Trading v/D 4.456.093,73 kr. og i konkursboet efter Selskabet af 21. september 2006 (tidligere Comitel International A/S) 5.028.125,22 kr.

I konkursboet efter Roxy World Trading ApS er der udbetalt en dividende på 2.678.214 kr. til SKAT.

I forhold til Comitel International A/S tilbageholdt SKAT negativ moms vedrørende november 2004 på 41.989.806 kr., hvoraf 5.267.745,60 kr. vedrørte handlerne i november måned 2004 med J Corp ApS. Comitel International A/S fik henstand med indbetaling af salgsmoms på 39.011.628 kr., og differencen på 2.978.178 kr. er ifølge SKAT modregnet i selskabets gæld på 220 mio. kr. til SKAT.

Som følge af T's medvirken til svigen anerkendte Comitel-koncernens forsikringsselskab at udbetale en forsikringssum på 10 mio. kr. fra en af koncernen tegnet kriminalitetsforsikring. Forsikringssummen, fratrukket selvrisikoen på 50.000 kr., blev dog deponeret, da det var uklart efter policeteksten, om Comitel-koncernen eller konkursboet efter Comitel International A/S var berettiget til beløbet. Comitel-koncernen har erklæret sig enig i, at konkursboet er berettiget til beløbet (forsikringssummen fratrukket selvrisikoen), og den forventede dividende til SKAT fragår i tabsopgørelsen.

*Forklaringer*

Der er under sagen afgivet forklaring af Peer Kølendorf, T, Ole Stangegaard, Steen Erik Mønsted, Flemming Lind Johansen, Kenn Hoffman Jensen, Mia B. E. Hansen (tidligere Pedersen), Reino Nielsen, Jørn Rosenmeier, Ole Eklund og Kim Østrup.

*Peer Kølendorf* har forklaret, at han fylder 66 år om få dage. Han begyndte som 18-årig at importere walkie-talkies fra Japan. Han var iværksættertype og søgte dispensation til at starte egen virksomhed, før han blev 18 år, og han fik næringsbrevet nogle dage efter sin 18 års fødselsdag. Han har handlet med Fjernøsten helt fra starten, og hans virksomhed importerer fortsat varer derfra, nu mest fra Kina, hvor den også får produceret varer under eget brand. Han besluttede tidligt at holde sig inden for forretningsområdet radiokommunikation. Virksomheden handlede med landmobile radioer både til hobbybrug og til professionelt brug på arbejdspladser, i lastbiler og i marinen. Hans princip har hele vejen igennem været, at man holder, hvad man lover. En aftale er en aftale. Det var i 1975-76, at Danitas startede op med mobiltelefoner. Brokerhandel med mobiltelefoner begyndte senere, fordi de fik forespørgsler bl.a.

Copyright © 2023 Karnov Group Denmark A/S

fra Sverige, når der var mangel på telefoner. Så var det naturligt at undersøge, om de kunne fås andre steder. Deres omsætning på brokerhandlen steg løbende. I 2001-2002 kom den over 1 mia. kr.

Virksomheden udviklede sig stille og roligt, og da han fyldte 50 år, besluttede han at få en professionel bestyrelse i Danitas Radio. Det blev i realiteten i juni

**1901**

1999. Gennem sit hverv som formand for Radio- og Telekommunikationsbrancheforeningen forhørte han sig om mulige personer, og han fik anbefalet Ole Stangegaard, der blev bestyrelsesformand. Han og Ole Stangegaard fandt derefter frem til Lars Thinggaard, der var revisoruddannet, og Torben Svanholm, der havde været ansat i Sonofon. Det var professionelle mennesker, og derfor var der ikke tale om, at han kunne »overrule« dem, selv om han var hovedaktionær. Hvis han havde forsøgt på det, så ville de have forladt bestyrelsen. Efter et halvt års tid foreslog Ole Stangegaard, at de skulle prøve at få firmaet til at vokse, og Ole Stangegaard så den internationale brokerhandel som et vækstområde. Det krævede låntagning og ansættelse af flere folk. Han var selv lidt skeptisk, fordi virksomheden gik godt, men de besluttede at prøve.

Han havde set, hvordan brokerhandlen med telefoner var vokset gennem 90'erne, men omsætningen var og er meget svingende. Den er helt afhængig af, om producenternes planlægning er rigtig i forhold til efterspørgslen. Hvis producenterne har for få apparater, kommer der gang i brokermarkedet, og priserne stiger. Det kan for eksempel være en følge af succesfulde kampagner, hvor det så viser sig undervejs, at fabrikkerne ikke kan levere. Leveringsevnen er det vigtigste.

Han har aldrig selv været broker. En broker sidder ved telefonen hele tiden og holder øje med markedet. Før euroen kom, var det også meget vigtigt at være opmærksom på valutakursændringer, da selv en lille kursændring kunne være afgørende for resultatet. De gjorde sig løbende erfaringer med brokerhandlen, bl.a. med forsikringsdækningen, hvor de havde en uheldig sag i Zürland, hvor Codan ikke ville dække. Lageret har altid været forsikret. De skiftede til Tryg, som stillede strengere krav til sikkerheden, f.eks. til lagerfaciliteter og transporter, herunder sikring af varebilerne, men til gengæld fik de en lavere præmie. Til pengetransaktionerne brugte de Danske Bank, der traditionelt har haft gode it-systemer, og det fungerede godt med bankens afdeling i London. Det var vigtigt at kunne være helt sikker på, at betalingerne ikke faktisk var sket. Kontakten til leverandører og kunder blev skabt via de mangsatte brokere, der havde erfaring inden for området og var gode til at udvikle deres netværk.

Der blev kontrol af varerne, før man betalte. Økonomiafdelingen oprettede varen med et generelt varenummer og navn i deres system, f.eks. Nokia 6210. Det var altid brokeren, der skulle sikre sig, at det var den rigtige vare, f.eks. en bestemt variant af en Nokia 6210-telefon, som var leveret.

Han husker ikke, at Danitas i slutningen af 90'erne skulle have haft noget med en momskarrusel i Finland at gøre. De var opmærksomme på ikke at købe for billigt, fordi det kunne være indicium på, at noget var galt. Han mener, han fik det omtalte Code of Conduct for the Mobile Phone Industry på et møde i England, og de talte om det i virksomheden. Medarbejderne vidste, at det var vigtigt at være opmærksom på de punkter, der fremgår af det, men de vidste også, at man ikke var »home free«, bare fordi man havde tjekket de nævnte punkter. Det blev indskærpet, at inden for EU var det afgørende at tjekke, at der var et gyldigt momsnummer. Efter år 2000 instruerede han ikke brokerne længere, fordi T var blevet leder af brokerafdelingen. De handler, der var omfattet af »Gul Feber« adskiller sig ikke fra deres andre handler. De var heller ikke ene om at handle med både telefoner og it-komponenter.

T, der var uddannet elektromekaniker, var ansat fra 1992-1996 som tekniker, men han fulgte med, da den tekniske del af virksomheden blev solgt fra. I 2000, da navneskiftet til Comitel blev markeret med en reception, var T med og udtrykte ønske om at deltage i udviklingen i virksomheden. T blev derefter ansat som forretningsudvikler, men han stod også for deres interne itinstallationer. T deltog i bestyrelsesmøderne, og det var ham, der foreslog at begynde brokerhandel med it-komponenter. Bestyrelsen var med på idéen, og de begyndte på det i 2003.

Strateginotatet dateret 25. oktober 2003 er lavet af ham til bestyrelsen. Visionen om kontrolleret vækst og en indtjeningsgrad over gennemsnittet var fremadpegende og optimistisk. »Kontrolleret vækst« betød, at de ikke måtte miste styringen. De skulle udnytte de hidtil opbyggede kompetencer inden for mobiltelefonområdet og ansætte nye folk med kompetencer inden for it. T, der var meget dygtig til it, stod for det. En indtjeningsgrad over gennemsnittet er altid drømmen, og med målsætningen om en omsætning på 2 mia. kr. senest i 2005 var der lagt op til en betydelig vækst, men det ville afhænge af markedsvilkårene, om væksten ville komme på mobiltelefoner eller it. Det var klart brokerafdelingen, der skulle løfte omsætningen. Han troede ikke selv på, at omsætningsmålsætningen kunne opfyldes, så det var overraskende, at det lod sig gøre. Der blev ikke lavet egentlige markedsundersøgelser forud for beslutningen om at gå ind i it-handlen, men brokerne og især T havde lyttet til den almindelige »markedssnak« og talt med speditører. Der blev ikke lagt op til handle med bestemte ting, men typisk med kernekomponenter af en vis værdi, f.eks. mikroprocessorer og RAM. Der blev ikke lavet en markedsstrategi, for det gjaldt om at udnytte muligheder i markedet, og det ville være utopi at tro, at man kunne forudse udviklingen.

Der var et samlet budget for brokerområdet, og det var et årsbudget, som blev divideret med 12, for det kunne ikke forudses mere præcist, og det budget, de lavede, blev både »undergået« og overgået.

**1902**

Strateginotatets afsnit om brokerområdet afspejlede situationen i 2003. Regnskabstal for 2002 viste, at de ikke havde så godt fat i markedet, som de troede. De havde hørt om de engelske myndigheders drastiske indgreben på mobiltelefonområdet, som havde alvorlige konsekvenser også for virksomheder, der ikke havde berøring med svigsforhold, men som alligevel fik indefrosset tilgodehavender. Der var dog ikke det samme i Danmark, og de regnede med, at brokermarkedet var på vej op igen.

De to navngivne personer, der omtales, Michael Simonsen og Sheng Tang, var brokere på telefonområdet. På it-brokerområdet ansatte de nye folk, som han ikke i dag husker navnene på. Han havde ikke forudsætninger for at finde folk med kompetencer inden for it og var derfor ikke med til at ansætte de nye. T fandt dem dels via sit netværk dels gennem bureauer. T blev gjort til direktør for at markere, at han reelt fungerede som sådan.

Før år 2000 havde de i virksomheden haft besøg af engelske myndigheder, der efterforskede momssvig. Virksomheden leverede kopier af fakturaer på handler og fik at vide, at de ikke havde gjort noget forkert. Han mener, at de baseret på deres erfaringer handlede tilstrækkeligt forsigtigt. I 2003 eller 2004, da der var omtale af momskaruseller igen, blev det drøftet i bestyrelsen, og konklusionen var, at de ikke ville forlade markedet, blot fordi der kom svindlere ind i branchen. De talte om nødvendige sikkerhedsforanstaltninger, herunder også om fremsendelse af lister med leverandører og kunder til SKAT, som de var begyndt på omkring 2000. Han havde fået lavet et it-program, så listerne over nye kunder og leverandører kunne genereres og skrives ud. Han udskrev selv listerne og sendte dem til SKAT. Hans indtryk var, at samarbejdet

med SKAT var godt, og af de e-mails, han fik tilbage fra SKAT, fik han også indtryk af, at listerne var af betydning. Det, at de indsendte listerne, havde ikke noget med brokernes kontrol af handler og varer at gøre. De havde et eksempel med et parti telefoner, som en broker besigtigede hos speditøren ude i lufthavnen, hvor emballagen var forkert, og det så ud til at være et parti, som var handlet mange gange. De afviste handlen og indberettede forholdet til SKAT. SKAT tog ud og kiggede på partiet kort tid efter. Af nysgerrighed spurgte han bagefter til sagen hos SKAT, som svarede, at de ikke kunne give ham oplysninger. Han er skuffet over, at SKAT ikke har givet ham den mindste advarsel. Når han i en artikel er citeret for at sige, at de 2-3 gange om året støtte på momskarruseller, var det eksemplevis sagen med et parti telefoner, han henviste til, men han oplevede også en ung mand, der kom fra et hollandsk firma og tilbød Nokia telefoner, som var 10 % billigere end hos Nokia. Den henvendelse orienterede han også SKAT om. Hans erfaring var, at firmaets rutiner og kontroller blev iagttaget. Det var brokernes ansvar at sikre sig, at varerne var som bestilt, og der var eksempler på, at de afviste leverancer. Efter år 2000, hvor T var blevet leder af brokerdelen, fortsatte de indarbejdede rutiner og kontrolforanstaltninger for at undgå at blive involveret i momssvig, men også for at undgå kommercielle risici. Han mente, at de havde en effektiv kontrol, men det viste sig jo at være forkert. Han kunne ikke gardere sig imod, at der var en »trojansk hest« i foretagendet.

Han frygtede momskarruseller og talte med T om det. Derfor er han meget skuffet over, hvad T gjorde. Bestyrelsen og han var enige om, at de skulle gøre alt for at holde sig væk fra det. Ud fra det, som var sket i England, vidste de, at der var en risiko for, at de kunne støde på det, men opfattelsen var, at det foregik ved handler inden for EU, og man skulle først og fremmest sørge for ikke at købe for billigt. Han vidste godt, at der kunne være tale om mange handelsled, for svigen blev realiseret, selv om man ikke dengang i 2003 brugte begreberne »missing trader« eller »skraldespandsselskab«. De havde besøg 2-3 gange af de engelske myndigheder, hvor de udleverede fakturaer til brug for efterforskningen i England, og SKAT bad også om oplysninger til andre udenlandske myndigheder.

Han fik idéen til CBB mobil i 1999, da man begyndte at kunne betale med dankort på internettet og på den måde springe forhandlerne af taletidskort over. Virksomheden SMS var primært T's idé. Den blev startet, fordi man vidste, der ville komme 3G, som muliggjorde udvikling af indholdstjenester. SMS solgte ringetoner og logoer. T deltog i udviklingen af begge selskaber, som blev solgt i 2004. T var hans højre hånd og en højt betroet medarbejder. T deltog også i »strategidøgnet«, hvor bestyrelsen drøftede virksomhedens udfordringer og trusler. T var blandt andet også ansvarlig for et projekt med E-taletid, som blev til firmaet hallo.dk, der blev solgt i 2011.

De etablerede den kundeopdelte organisation i Comitel i 2003. Han var administrerende direktør. I Consumerafdelingen var primært T's område med mobiltelefoni i Danmark. Businessafdelingen var forretningsområdet med mobile radioer til det professionelle marked. Brokerafdelingen stod T for, og endelig var der Eksportafdelingen, som tog sig af det oprindelige område med elektronik til hobbybrug, hvor der var eksport inden for Europa.

Virksomheden havde lokaler i en ejerlejlighed i hammershusgade 11, som han ejede og udlejede til virksomheden. Der var godt 30 ansatte på knap 1000 m$^2$. Han havde en hjørne og havde typisk åben dør. Tættest på hans kontor sad økonomi- og regnskabsfolkene samt en ansat, der tog sig af reklamer. Længere væk sad de 5 ansatte i Comitel International,

**1903**

hvor brokerhandlen foregik. Brokerne sad sammen og kunne høre hinanden tale i telefon. Christina Evers arbejdede dog hjemmefra noget af tiden. Ved siden af brokerafdelingen sad de 4 ansatte, der varetog salg til det danske marked, og i SMS sad 5 medarbejdere. CBB mobil havde lokaler et andet sted og havde ca. 60-70 ansatte, heraf en del deltidsansatte. I kontoret længst væk fra han sad chefen for Businessafdelingen, og i den ende af lejemålet sad også 2 mekanikere. Der var et lager på etagen, hvor der arbejdede 2 fuldtidslagerfolk og 3 gymnasieelever som deltidpakkere. På etagen nedenunder havde de også lejet lokaler fra en anden udlejer. Mange af medarbejderne var på deltid, og i alt havde han ca. 75 årsværk under sig. Han var der dagligt på arbejde fra kl. 8.30 til kl. 16.30.

I sit daglige arbejde færdedes han i lokalerne og talte med de ansatte, også i pauser og til frokost. Det var ikke en kæmpekoncern, så man mødte hinanden hele tiden, og brokerne fortalte glade om stolte om deres handler, men han var ikke nede i detaljerne i deres arbejde.

Det var T, der introducerede Solid Trading ApS som en mulig leverandør. Sagsøgte søgte oplysninger om direktøren, B, i Erhvervs- og Selskabsregisteret, men B var ung og havde kun været involveret i to selskaber. Der var ikke noget negativt at se, så han havde ikke noget at indvende. Han vidste, at T havde besøgt Solid Trading ApS på Skudehavnsvej, så han gik ud fra, at T havde undersøgt det nødvendige. Han husker ikke at have mødt B.

Han har ikke godkendt nogen handler, hverken dem, der er omfattet af »Gul Feber« eller andre. Han har attesteret bilag, når der ikke var andre til stede, men det var normalt T og en af økonomifolkene, der attesterede. Han fulgte løbende med i virksomhedens økonomi, og det var et fast punkt på bestyrelsesmøderne at gennemgå hovedtal. Med hensyn til hans attestation af et bilag med indkøb af lagkage, om SKAT har fremhævet, så var det ham selv, der i anledning af en medarbejders fødselsdag havde foretaget indkøbet på vejen, og derfor var det naturligt, at han påtegnede bilaget. Der var sådan, at bilag, der relaterede sig til mere privat forbrug, f.eks. telefonbilag, normalt skulle godkendes af en person over den pågældende. Derfor godkendte han også typisk T's telefon- og rejseregninger. De besluttede at få en lejlighed i England, fordi de havde meget rejseaktivitet dertil. Sagsøgte kunne disponere alene over bankkontoen. I andre tilfælde skulle der være to til at disponere, hvoraf den ene skulle være fra økonomiafdelingen. Det var nødvendigt, at der kunne frigives betaling uden hans tilstedeværelse, når et vareparti var kontrolleret. Han mener ikke, at T kunne disponere alene, selv da han blev direktør. T varetog ikke økonomiopgaver som sådan.

På et tidspunkt spurgte Sheng Tang, der var broker, ham til råds om en handel, men han svarede, at han ikke kunne rådgive om det, for det ville kræve, at han brugte megen tid på at sætte sig ind i markedet. Rådighedssummen for hele brokerafdelingen var den lånegrænse på 50 mio. kr., som var aftalt med banken for at kunne finansiere handlerne. Nogle gange måtte brokerafdelingen stoppe handlen, fordi der ikke var flere penge. Det kunne give anledning til lidt surhed hos de andre, hvis T selv havde handlet for hele beløbet. Kreditrammen blev aldrig overskredet. Det handlede om forholdet til banken. Han syntes ikke, det var mærkeligt, at nogle af »Gul Feber-handlerne« var på over 40 mio. kr., for bestyrelsen mente, at likviditetsrammen skulle udnyttes. Det er en forudsætning for at tjene mest muligt. Han havde ikke givet retningslinjer for, hvornår T skulle konsultere ham, men hvis firmaet ville investere i et helt andet marked, forventede han at blive konsulteret. T foreslog for eksempel handel med tøj, og det blev der sagt nej til.

Han kontrollerede ikke selv varer på lageret, men har set brokerne gøre det. Nogle gange stod varerne hos deres speditør Kuehne og Nagel i Brøndby, hvor brokeren kørte ud og kontrollerede. Andre gange overlod man det til speditøren at kontrollere på vegne af

Comitel. Når man havde handlet problemfrit med samme leverandør nogle gange, så skete kontrollen stikprøvevis. Det var afgørende, at brokerne kontrollerede varerne, før der skete betaling, for ikke at blive snydt. Plomberede it-komponenter mistede værdi, hvis man brød forseglingen. I forvejen var der kun en lille avance på dem, så man var nødt til stole på, at der var det indhold, som var anført på pakningen. Man funktionstestede kun telefoner i begrænset omfang, især for at tjekke, om de var låst til en bestemt udbyder. Man kunne ikke opstille en firkantet liste for kontrollen, den var varierende og op til brokeren. Han husker ikke eksempler på, at der opstod problemer som følge af en utilstrækkelig kontrol.

Den fremlagte checkliste vedrørende eksport af mobiltelefoner er formentlig lavet dengang, de kun handlede med mobiltelefoner, men den fremstår ikke som varespecifik, heller ikke i de felter, som konkret er afkrydset. Den blev brugt af brokerne til at huske relevante forhold. Brokerne arbejdede hårdt og kunne godt indgå handler på telefon, samtidig med at de var på vej ud til speditøren for at foretage varekontrol. Brokeren skulle ikke kontrollere hver enkel komponent, for det var umuligt. I forhold til handlerne i »Gul Feber« med 2,6 mio. komponenter må det have været en kontrol af antal enheder, fordi it-varer også var plomberede. Han havde ikke lavet retningslinjer for brokerne eller undervist dem, idet de vidste, hvad de skulle foretage sig. Det med ikke at bryde plomberingen havde de talt om i

**1904**

bestyrelsen, men han kan ikke sige noget nærmere om, hvad det indebærer i det konkrete tilfælde.

De havde ikke særlige redskaber, herunder jordspyd, på lageret, som de havde på værkstedet. Selv om it-varer er følsomme, og forseglingen ikke skulle brydes, så skulle de kunne transporteres på almindelig vis.

Han mener, han fik Code of Conduct på et møde i London. Han fik det i hvert fald ikke fra de danske myndigheder. Han brugte Code of Conduct som inspirationskilde, men der var ikke tale om en udtømmende liste, som brokeren bare kunne krydse af efter. Brokeren skulle være opmærksom på og tænke over alle relevante forhold, men det var helt grundlæggende, at momsnummeret inden for EU skulle valideres. Han mener, det var korrekt, når Comitel i høringssvaret af 31. januar 2005 skrev til SKAT, at virksomheden fulgte Code of Conduct, men her lå også, at den ikke blev brugt som en firkantet tjekliste. Code of Conduct blev implementeret ved, at han talte med T herom, og de var enige om at inddrage anvisningerne i deres kontrol. Det var op til T at sørge for det videre.

Momsnumre på handelspartnere i EU kan tjekkes via en internetside hos EU, det skulle den enkelte broker sørge for. Numrene skulle angives i indberetningen til SKAT.

T fortalte selv om den sag i England med Vaneypeco og Texmart, hvor deres betaling blev indefrosset på en konto. Det var i efteråret 2004. Handlen var ikke en del af »Gul Feber-handlerne«. Han var ikke selv klar over, at der var sket et brud med princippet om samtidighed, og han kunne heller ikke have opdaget det. Han og bestyrelsesformanden påtalte det over for T på et møde, for det var en alvorlig sag. De tog derefter kontakt til deres advokat i England.

Det eksempel med opsplitning af betalingen i 4 dele, som vedrører en handel i januar 2004 med Asia Time Technologies, har han ikke hørt om før i forbindelse med denne sag.

Han fulgte med i den månedsvise omsætning i hver enkelt afdeling, og hvis der var anledning til det, drøftede han det med afdelingen. Han holdt især øje med omkostningsafvigelser. Det er kendetegnende for brokerhandel, at omsætningen kan variere meget. Der var ikke unormalt med månedsvise udsving på mellem 10 og 100 mio. kr., så omsætningen i november måned 2003 var ikke noget særligt. I 2002 havde de haft en omsætning på over 2 mia. kr., så de store

beløb gav heller ikke anledning til særlige overvejelser. På verdensplan var it-markedet kæmpestort, og Comitel stod kun for en brøkdel heraf. Han var kun nede i de enkelte fakturaer, hvis de ikke blev betalt, og der var ingen af handlerne i »Gul Feber«, som ikke blev betalt.

Det var en fejl fra deres revisors side, at spaltningen af Comitel ikke skete i 2002, men først i december 2003, men i hele 2003 fungerede Comitel International som en selvstændig afdeling. Bestyrelsesformanden Ole Stangegaard fratrådte i 2003 på grund af alder, og Steen Erik Mønsted, der tidligere var kommet ind i bestyrelsen, blev derefter bestyrelsesformand. Lars Thinggaard og Torben Svanberg udtrådte medio 2004 efter salget af CBB. De ville gerne være med i holdingselskabets bestyrelse, men der ønskede han personer med indsigt i administration af værdipapirer. De skiltes i al fredsommelighed.

Han vidste godt, at varerne indkøbt fra Solid Trading ApS blev solgt til Fjernøsten, og det gjorde ham tryg, at varerne gik ud af EU, for han havde indtil da kun hørt om momskaruseller inden for EU. Han husker ikke, at T fortalte noget om, hvordan han fik kontakt til aftagere, men T havde været på flere rejser til Dubai og Østen, så det undrede ham ikke, at han havde disse kontakter. T var god til at skabe og vedligeholde netværk. Han og Steen Erik Mønsted var med på en rejse med T, hvor de mødtes med leverandøren.

Han drøftede ikke generelt priser på produkter med T, og at der skulle være betalt for høje priser for nogle Intel-produkter, har han først hørt i forbindelse med denne sag. Det er brokerens opgave at være opmærksom på priserne. I en opstartsfase med en ny leverandør var det naturligt at kontrollere mere.

Han har ikke kendskab til it-komponenter og til, i hvilket omfang de kan funktionstestes. Hvis det var muligt, var hans forventning, at T sørgede for det. Han satte ingen begrænsninger for, hvilke test brokerne kunne lave. Han hørte, at Solid Trading ApS var blevet snydt i forbindelse med en handel i Østen og gik konkurs. Det må være T, der fortalte ham det. Han har først i forbindelse med sagen hørt, at T fik anvist kunder i Fjernøsten af Solid Trading ApS. Han undrede sig ikke over, at det var T, der omsatte mest i brokerafdelingen.

Han var ikke orienteret om, at de begyndte at handle med Trademark International ApS og godkendte ikke handlerne i juni måned 2004. Det var han i forhold til Solid Trading ApS, at han havde undersøgt forholdene i Erhvervs- og Selskabsregisteret. Det var T's opgave at lave de nødvendige undersøgelser.

Han blev af T orienteret om og sagde ok for, at de begyndte på handlen med internet access-kortene til pornosider i august 2004. T var forretningsudvikler, så det var hans opgave at undersøge, om der var et marked for nye produkter. Han fandt ikke denne varetype så forskellig fra deres hidtidige salg af taletidskort. T sagde, at han havde testet kortene. Det var givetvis kun nogle få, der var testet, for et kort blev værdiløst, når kodefeltet var skrabet. Han kendte ikke til prissætningen på kortene, og han husker ikke at have fået oplysninger om aftagerne. Han så resultatet af aktiviteten i statistikkerne, men var ikke inde i detaljerne.

**1905**

De fik sjældent reklamationer, og det forekom typisk kun, hvis der manglede apparater i en leverance. Der var betydeligt færre indsigelser vedrørende it-komponenterne end vedrørende andre varer. Det undrede ham ikke, fordi it var dyrere varer og derfor varer af højere kvalitet.

Det var praktisk med bankkonti i andre lande, fordi pengeoverførslerne så gik hurtigere. Han husker ikke præcist, hvornår de begyndte med at have konti i udlandet. Han mener, at det ikke er unormalt at gennemføre handler til beløb større end egenkapitalen. Det var

Copyright © 2023 Karnov Group Denmark A/S

forudsætningen for vækst, og deres låneramme i banken var på 50 mio. kr.

De var normalt ikke en lagerførende brokervirksomhed. Det kunne forekomme, at en kunde løb fra en aftale, og så gjaldt det om at komme af med varerne så hurtigt som muligt, og salg i den situation medførte ofte tab.

På et tidspunkt fik de mulighed for at købe mobiltelefoner fra Samsungs afdeling i Stockholm, fordi Sheng Tang havde en god kontakt der, og det viste sig, at telefonerne bedst kunne sælges i Hongkong. De købte for flere hundrede millioner kr. Mobiltelefonerne endte vist i Kina. Han ved ikke, om de blev solgt til en broker. Han var tryg ved at sælge varer ud af EU, fordi der så ikke var noget problem med momssvig, troede han. Alt virkede normalt. Hvis der også er foregået svig med mobiltelefonerne, så har T svigtet i endnu større omfang end hidtil antaget.

Comitel Internationel stoppede brokerhandlen i 2006, efter at T var blevet sigtet. Han havde kendt T længe og havde stor tillid til ham. T var en højt placeret medarbejder, der i to omgange havde fået medarbejderaktier, men han viste sig at være en »trojansk hest«. Det var frygteligt at opdage, og hovedårsagen til, at han derefter fandt det for risikabelt at være på brokermarkedet. Da sigtelsen kom mod T, troede han og bestyrelsen ikke på den. Han kunne ikke se, at der havde været noget galt undervejs, og bagefter gennemgik han selv handlerne og kunne heller ikke konstatere, at noget var galt. Selv da tiltalen var rejst, havde han svært ved at tro på det, men da det risikerede at skade firmaets image at beholde T, blev han sagt op. Han har ikke set T, siden han selv afgav vidneforklaring i straffesagen. Det er ikke særlig behageligt at skulle se ham igen.

Det var uforståeligt for ham, at Distributørforeningen, der var et underudvalg i IT-Brancheforeningen, forsøgte at få ham ud af foreningen i 2007, fordi han havde haft en kriminel ansat. Det viste sig også, at det kun var Distributørforeningens medlem i hovedbestyrelsen, der støttede eksklusion, og hovedbestyrelsen reagerede på, at en del af Distributørforeningens grundlag for at forsøge at ekskludere ham var etiske regler, foreningen selv havde vedtaget, om, at parallelimport var forbudt. Hovedbestyrelsen mente, det kunne være i strid med konkurrencereglerne, så de regler blev hurtigt afskaffet.

Der opstod et »dårligt klima«, efter at han forsøgte at advare Jørn Rosenmeier mod en salgschef, han selv havde afskediget i slutningen af 90'erne, og hvor det efterfølgende viste sig, at den pågældende havde været indblandet i forkert fakturering af nogle B&O-højtalere. Den pågældende medarbejder blev ansat hos Jørn Rosenmeier og begyndte på brokerhandel, og det førte til, at han skrev et brev til Jørn Rosenmeier. Dertil kommer, at grundlæggende »hader« distributører brokerne, så han mener, at Jørn Rosenmeier har forsøgt at få ram på ham efterfølgende.

Han blev meget chokeret over at få stævningen i denne sag. Han havde ansvaret for at drive firmaet på betryggende måde, men mener ikke, han havde mulighed for at opdage momssvigen, som var meget professionelt og dygtigt iværksat. Det var heller ikke på grund af karakteren af de handler, Comitel International var involveret i, at Comitels rolle i momssvigen i »Gul Feber«-handlerne blev opdaget, men fordi man fandt oplysninger hos de andre involverede om blandt andet T.

Som direktør var hans egen arbejdsopgave overordnet at sørge for, at tingene fungerede, så de ansatte kunne løse deres opgaver. Det gjaldt for Comitel International som for resten af koncernen. Styring af økonomien var et væsentligt område for ham, men han delegerede meget til medarbejderne. Han har ikke haft bestyrelsesposter eller direktørposter uden for Comitel-koncernen, og han brugte det meste af tiden på Comitel International og Comitel, som havde til huse i lokalerne i hammershusgade. Han kan ikke sige,

hvor meget tid han brugte på den ene og den anden del af koncernen. I perioder brugte han den overvejende del af tiden på Comitel International, især med styring af økonomien og bankforhold, men det var på overordnet niveau, for det var umuligt at følge med på detailniveau. Han tjekkede hver dag, hvordan det så ud med bankkontoen, for det var store beløb, der røg ind og ud. Han overvågede bankkontoen på totalniveau, dvs. Han så posteringerne, men interesserede sig ikke for den enkelte postering.

Han forelagde omsætningstallene for bestyrelsen sammen med økonomichefen og udleverede en standardudskrift med totaltal, som var det, der interesserede bestyrelsen. Bag de enkelte tal kunne der være 100 forskellige konti, og de kunne udspecificeres, hvis der var ønske om det. Bestyrelsen havde fuld tillid til T.

Ud over økonomistyringen varetog sagsøgte mange forskellige ledelsesmæssige opgaver, som kan være svære at beskrive. Han talte blandt andet med personalet og tog sig af forhold vedrørende ejendommen og lejemålet, så tingene fungerede.

### 1906

han kan stadig ikke bagefter se, hvad han realistisk skulle have gjort for at opdage, at noget var galt med handlerne i »Gul Feber«. »Den trojanske hest«, de havde i virksomheden, sørgede for, at det så rigtigt ud.

De accepterede kun tredjepartsbetalinger, når der var en rimelig forklaring på det, for det kunne være tegn på, at noget var galt. En broker kunne godt være en privatperson, der handlede hjemme fra sit kælderrum, og i sådan en situation kunne de godt acceptere tredjepartsbetaling.

Han mener ikke at have set den vidneerklæring, som T afgav i slutningen af 2004 i Nottingham Crown Court i forbindelse med Vaneypeco/Texmart-sagen, hvori blandt andet angives, at tredjepartsbetalinger var normal praksis i branchen og forekom i 30 % af Comitels handler. Han mener, at 30 % er meget for højt sat. Han monitorerede ikke specifikt på virksomhedens tredjepartsbetalinger, men han og T talte om det.

SKAT udtrykte ønske om at få lister over Comitel Internationals kunder og leverandører, så han gik ud fra, at det var relevant for dem, hvilket den under sagen fremlagte mailkorrespondance også viser. Han mener ikke, det var den vigtigste kontrolforanstaltning, men han tog sig selv af det for at sikre, at listerne var korrekte. Listerne viste firmaer, der var oprettet i Comitels system. Det var kunder og leverandører, man havde handlet med eller påtænkte at handle med. Listerne gav ikke indblik i, hvor meget der var handlet. Han fik aldrig respons fra SKAT på indholdet af listerne. Han forventede, at SKAT ville sige til, hvis der konstateredes svigsforhold vedrørende nogle af de virksomheder, de handlede med, men det var ikke noget, SKAT udtrykkeligt havde stillet i udsigt.

Comitel indsendte hver måned rutinemæssigt salgsfakturaer til SKAT, fordi de så hurtigere fik eksportmomsen. Købsfakturaer blev indsendt, når SKAT bad om det.

Da Comitel Internatonal gik konkurs, blev virksomhedens dokumenter afleveret til kurator. Der kan også have været relevante dokumenter vedrørende Comitel International hos speditører og i Comitel-koncernen, hvorfra der blev købt ydelser.

En checkliste som den, der er fremlagt vedrørende ordrenummer 743 og 774 og indkøb nummer 729 den 12. november 2004 af internet access-kort vedrører den enkelte handel på ordreniveau. Den vedrører ikke kunden eller markedet. Code of Conduct var første gang han så en opstilling med opmærksomhedspunkter, som kom fra en offentlig myndighed. Han havde forsøgt at få en liste fra SKAT tidligere. Det var formentlig i 1998 som brancheforeningsformand på mødet med SKAT. Fysisk test og kontrol var ikke noget, han vidste noget om på det tidspunkt. Han har ikke set mange af deres varer, men den han så, var plomberede, og det var ikke muligt

at tage noget ud uden at bryde forseglingen. Han ved også, at nogle it-komponenter kan tage skade ved den blotte berøring.

Brokerne havde en fast løn og var derudover på provision. Han mener, at grundlønnen var 25.000 kr. månedligt, men de kunne tjene store beløb. Typisk havde de hver deres kunder og handlede ikke med de samme, men de kunne afhænge af personlige relationer. De andre brokere har nok set varer fra T's handler på lageret, men tilsyneladende var der ikke noget anderledes ved disse handler. Hverken internt eller eksternt antydede nogen, at noget var galt. Det var også SKATs vurdering, at svindlen var lavet på en anden måde end hidtil kendt. Det er trist, at staten har haft et så stort tab. T var ikke provisionslønnet, og det var en medvirkende årsag til, at han fik en aktiepost og 1 mio. kr., da han blev direktør. Han havde kendt T længe - fra denne var 23 år - og syntes derfor, at han vidste meget om ham. Han og hans kone har været hjemme hos T 2-3 gange, men de omgik ellers ikke hinanden privat.

*T* har forklaret, at han begyndte at arbejde i virksomheden i 1992 på værkstedet, hvor han reparerede kommunikationsradioer og walkie-talkies. Han er certificeret Novell-administrator og har en uddannelse som PhP-programmør. Dengang var han meget interesseret i og meget kyndig i it. Han fik en god kontakt til Nokia, og det lykkedes at få en aftale om garantireparationer på Nokia-telefoner. Han blev leder af værkstedet. På et tidspunkt startede han sammen med en kollega i branchen virksomheden Teleservice, som lavede reparationer uden salg. Derfor forlod han Danitas. Efter at der var påstået uenighed, trak han sig fra Teleservice, som også endte med at blive solgt. Peer Kølendorf, som han havde haft jævnlig kontakt med, tilbød ham at vende tilbage til Danitas/Comitel, og han blev ansat som forretningsudvikler i Comitel den 7. august 2000. Han skulle se på nye idéer og på, om forretningen kunne optimeres. Der var allerede brokerhandel med mobiltelefoner i virksomheden. I første omgang var han ikke selv broker, men foretog en vurdering af aktiviteterne med henblik på forretningsudvikling. Det var før 2003. Han kunne se, at der var en verden af muligheder, som han mente kunne udnyttes bedre, end den daværende brokerafdeling gjorde. Han forsøgte derfor selv at sætte gang i udviklingen og prøvede sammen med de daværende brokere at få nye kunder og leverandører.

Han vendte dagligt overordnede ting med Peer Kølendorf, og det handlede ikke kun om brokermarkedet. De drøftede også kunder og leverandører, hvis der var et eller andet specielt. Det kunne for eksempel være, hvis kontakten til en leverandør blev genoptaget, som det skete med personer i Hongkong, som Peer Kølendorf havde kendt gennem mange år. De gamle kontakter i blandt andet Hongkong blev brugt til at etablere nye

**1907**

kontakter. Han fik mere og mere med brokeraktiviteten at gøre. Det var op til ham at udstikke retningslinjer. Peer Kølendorfs rolle på brokerområdet var på informationsniveau. Peer Kølendorf efterspurgte ikke information om hverken leverandører eller kunder, men afhængig af situationen orienterede han nogle gange Peer Kølendorf om nye kunder. Det skete mundtligt. Peer Kølendorf holdt øje med statistikken for omsætning og tog sig af indrapportering til SKAT af kunder og leverandører på cvr-numre.

De varer, der handlede med, skulle være inden for teknologi-området, dvs. mobiltelefoner og it. Han husker ikke præcist, hvornår beslutningen om at handle med it-komponenter blev truffet. Det var nok ham, der foreslog, at de skulle gå ind i brokerhandel med it-komponenter, fordi han havde en forkærlighed for it. Han mener, at de første handler med it-komponenter gik fra holland til England, men i starten blev der ikke handlet så meget. Han blev introduceret til Solid Trading ApS af en medarbejder i Comitel International, der tidligere havde arbejdet sammen med personen hos Solid Tra-

ding ApS. Kunderne kom han i kontakt med på elektronikmesser, blandt andet i Hongkong, på brokersites på internettet og via telefonen. Det gjorde sig også gældende ved »Gul feber«-handlerne. De andre brokere var også i kontakt med Solid Trading ApS, men i forbindelse med »Gul feber«-handlerne var det primært ham, der havde kontakten. Det var også primært ham, der havde kontakten til aftagerne i Hongkong, men når han var på rejse, tog de andre brokere over.

Han husker, han havde kontakt til firmaet Asia Time Technologies Ltd. i Hongkong, men husker ikke, hvem der oprindelig fik firmaet ind som kunde hos Comitel International.

Han interesserede sig ikke for, hvordan Asia Time Technologies Ltd. Havde fundet frem til Comitel. På et tidspunkt besøgte tre Hongkong-baserede firmaer kontoret, men han husker ikke hvilke. Han genkender også de øvrige navne på udenlandske selskaber i »Gul Feber«-handlerne, som fremgår af oversigten på side 10 i Københavns Byrets dom af 4. oktober 2007, herunder Aspen Group Ltd. og Fusion R, men husker ikke detaljer om dem, eller om, hvordan kontakten til dem blev etableret. Det var ikke Peer Kølendorf, der stod for kontakten til selskaberne.

Han husker ikke, om han sagde direkte til Peer Kølendorf, at Solid Trading ApS kunne levere it-komponenter, men de har nok talt om, at de kunne få en forretning op at køre. De talte løbende sammen i det daglige, og han var den, der informerede Peer Kølendorf. Peer Kølendorf havde ikke kontakt til Solid Trading ApS. Han orienterede ikke Peer Kølendorf, selv om de lavede en stor handel som for eksempel den med Asia Time Technologies Ltd. Peer Kølendorf kan være blevet bekendt med den fra statistikken eller ved, at brokerne havde »armene over hovedet« efter en stor handel. Han husker ikke, at Peer Kølendorf har spurgt til priser.

Da han kom, var der etableret kontrolrutiner i brokerafdelingen i forhold til varer, leverandører og kunder. Han vedstår det, han sagde under straffesagen om kontrol af blandt andet momsnummer og varer. Han mener, de forsøgte at følge retningslinjerne i det engelske Code of Conduct, som blev omtalt på møder i FTI, der var den engelske organisation for brokere. Han og Peer Kølendorf var helt enige om, at de skulle undgå momskaruseller. Peer Kølendorf kom også med artikler fra SKAT og andre om emnet.

Peer Kølendorf spurgte tit til, om de havde foretaget vareoptælling og kontrol. It-komponenterne kom ind på deres eget lager, mens mobiltelefoner typisk lå ude hos speditøren. Alle i brokerafdelingen deltog i kontrol og optælling også i »Gul Feber«-handlerne. Han deltog selv i kontrollen og påså, at de andre brokere lavede kontrol. Hvis kasserne var åbne, så tjekkede de indholdet og tog stikprøver ud til kontrol. It-komponenter lå pakket i gennemsigtige poser. Hvis kasserne var lukkede og forseglede, så talte de kasserne, tjekkede labels, og at forseglingen var i orden hele vejen rundt, dvs. at der var brugt den rigtige type tape. Varer tabte værdi, hvis forseglingen blev brudt. Man talte på markedet om »open box« og »sealed box«, og prisen på de to typer var ikke den samme. Det fremgik hverken af »purchase order« eller fakturaen, om det var åbne eller lukkede kasser, men det var aftalt over telefonen. Man vidste som broker, hvad der kom, og så kontrollerede man, om den modtagne vare var som aftalt. På fakturaen stod eksempelvis »RAM klodser«, men mundtligt eller i en MSN-besked var der aftalt RAM-klodser på 1 gigabyte. Man havde ikke et dokumentationsspor. Hvis varerne ikke var som aftalt, måtte kunden sige ja eller nej til det, som kunne leveres. Man kunne også kontakte leverandøren. Han havde en kunde, før han indkøbte varer. Hver handel havde et kontrolskema med afkrydsningsmuligheder, men han husker ikke, om de udfyldte skemaet ved handel med it-komponenter. Det var et kontrolskema fra tidligere tider. Han mindes ikke, at der var

Copyright © 2023 Karnov Group Denmark A/S

problemer med, at der ikke kom de aftalte varer, også selv om man ikke kendte hinanden så godt.

Der blev ikke solgt med garanti eller reklamationsret, så der kom ikke reklamationer. Når en telefon havde navnet Nokia stemplet på, og Nokia kunne se de relevante data i selve apparatet, ville Nokia behandle reklamationen. Hvis det var it-komponenter, der ikke virkede, så ville han kontakte leverandøren og forsøge at gøre noget ved det, men det var ikke noget, han var retligt forpligtet til.

Comitel International markedsførte sig på messer og brokermøder samt på brokersites på internettet.

**1908**

Han og de andre brokere havde løbende dialog om, hvor der kunne tjenes flest penge. Han husker ikke, at der var uenighed om udnyttelse af rammen på 50 mio. kr., selv om han eksempelvis brugte 40 mio. kr. på en handel med Asia Time Technologies Ltd. Det var helt sædvanligt at handle for store beløb. Det var heller ikke noget, han drøftede med Peer Kølendorf. Han var ikke provisionslønnet.

Det var kun betalinger af varer, som krævede godkendelse. Han kunne ikke selv godkende betalinger, men lagde det til bogholderiet og fik besked tilbage, når der var betalt. Han husker ikke, hvilke papirer han skulle udfylde i den forbindelse, men der var givetvis nogle.

Det kan godt passe, at det var på hans initiativ, at de begyndte på handel med internet access-kort til pornosider i efteråret 2004. Det lignede taletidskort, som de allerede handlede med, og han havde set kortene i Hongkong, hvor de lå i butikkerne, og han vurderede, at der var et marked. Han lavede ikke en formaliseret undersøgelse af kortene. Han husker ikke, om Peer Kølendorf spurgte til handlerne med kortene. Han husker ikke korrespondancen med aftagerne i forbindelse med handlen med kortene.

Han var ansat som forretningsudvikler, indtil han blev direktør, men det medførte ingen ændring i hans hverdag. Han var ikke med til bestyrelsesmøder, men kom nogle gange ind og besvarede spørgsmål. Peer Kølendorf orienterede ham i øvrigt om, hvad de talte om. Han var med på strategidøgnet.

Der var ikke forskel på »Gul Feber«-handlerne og andre handler før og efter denne periode. Det var også de samme medarbejdere, der stod for dem. Han husker, at de ikke ville have tredjepartsbetalinger, fordi det kunne »lugte af noget mistænkeligt«. Han husker ikke den vinдеrklæring, som han skulle afgive for Nottingham Crown Court i forbindelse med Vaneypeco/Texmart-sagen, og som foreligger i udkast i sagen.

Han var meget med i driften af CBB Mobil på den tekniske side, men var ikke i salgsprocessen. Det interesserede ham ikke. I forhold til SMS var det også det tekniske og personalemæssige, han tog sig af, indtil det blev solgt fra.

Han brugte efterhånden mere og mere tid på brokeraktiviteter og arbejdede samtidig på CBB Mobil og SMS, så han tog også aftener i brug.

*Ole Stangegaard* har forklaret, at han var formand for bestyrelsen i Danitas, senere Comitel, fra den 6. november 1998 til juni 2003. Han er uddannet som linjeofficer og var i 1960 med til at starte Datacentralen, hvor han blev vicedirektør. Han arbejdede herefter med it i både ØK og i konsulentvirksomheden Price Waterhouse, hvor han var partner gennem 9 år. Herefter var han indtil for 2 år siden bestyrelsesformand for flere selskaber inden for it-området, blandt andet i virksomheden Milestone.

Peer Kølendorf ønskede en professionel bestyrelse, og han fik tilbud om at blive formand. De to andre medlemmer af bestyrelsen blev Torben Svanberg, der havde en baggrund i mobiltelefonbranchen, og Lars Thinggaard, der er revisoruddannet og nu er direktør

i Milestone. Han havde personligt ingen erfaring med brokerområdet.

Hans indtryk af virksomheden var fra begyndelsen meget positivt. Den havde et solidt økonomisk grundlag og virkede veldrevet. Peer Kølendorfs adfærd i forhold til bestyrelsen var tillidvækkende. Tingene var i orden med den fornødne funktionsadskillelse, og der var nedskrevne regler og procedurer for de ansatte i en personalehåndbog. Når bestyrelsen stillede spørgsmål, fik han den prompte svar, hvilket var tegn på en veldrevet organisation.

De holdt bestyrelsesmøde hver 2.-3. måned, og han kom i virksomheden mindst en gang om måneden for at mødes med Peer Kølendorf. Han oplevede en god stemning i virksomheden og blandt personalet.

Han og Peer Kølendorf havde hvert halve år møde med virksomhedens bank, og tilbagemeldingen fra banken var, at alt var i orden. Der blev holdt til tiden, og aftaler blev overholdt. Én gang om året var der også et møde om virksomhedens forsikringsforhold.

Bestyrelsen fik løbende rapportering på det overordnede plan om omsætning, omkostninger og resultat. De drøftede de enkelte afdelinger, hvis der var anledning til det, men det var ikke bestyrelsens opgave at kontrollere forholdene på afdelingsniveau, når direktøren, som det var tilfældet med Comitel, sørgede for at give de nødvendige oplysninger. Der var diskussioner i bestyrelsen, men man nåede altid til enighed uden afstemning, og Peer Kølendorf implementerede beslutningerne loyalt. Én gang om året afholdt man et strategimøde. Peer Kølendorf levede i høj grad op til hans forventninger - både som forretningsmand og i menneskelig adfærd og retskaffenhed. Som administrerende direktør i en organisation af Comitels størrelse var det Peer Kølendorfs ansvar at udstikke retningslinjer, lave resultatkontrol og sørge for, at organisationen fungerede, men han skulle ikke selv være nede i detaljer i den daglige drift eller bogholderifunktioner. Bestyrelsen var tilfreds med den måde, Peer Kølendorf udfyldte rollen på.

Han havde et møde med T, da Peer Kølendorf udtrykte ønske om at ansætte ham som forretningsudvikler. Han fattede tillid til T, der fremstod som en faglig kompetent og initiativrig person, så han støttede ansættelsen. Der var et godt personligt forhold mellem Peer Kølendorf og T, som var en del af den daglige ledelse. Han oplevede ikke tillidsbrud fra T's side i sin formandstid.

T deltog lejlighedsvis i bestyrelsesmøder og præsenterede interessante forslag baseret på sit kendskab til faget og markedsforhold. T's forslag om at udvide

**1909**

brokervirksomheden til at omfatte it-komponenter fandt bestyrelsen interessant, fordi det er usundt for en virksomhed kun »at stå på et ben«. Samtidig kunne udvidelsen ske på grundlag af den eksisterende organisation og de støttefunktioner, f.eks. bogholderiet, som allerede var til stede, så det virkede fornuftigt. Der var ikke lavet en strategiplan, men bestyrelsen havde sat ambitiøse vækstmål for virksomheden, og udvidelsen på brokerområdet kunne bidrage til opfyldelse heraf. Det var lige i slutningen af hans formandsperiode, at bestyrelsen vedtog at følge forslaget, og det var T, der skulle gennemføre det. Det var unødvendigt med en forretningsplan, fordi Peer Kølendorf og T kendte området så godt, og det var kun et spørgsmål om at tage en ny varegruppe ind og ansætte få yderligere folk.

Bestyrelsen lagde vægt på, at forholdet til myndighederne, herunder SKAT, skulle være i orden, og hvert bestyrelsesmøde blev indledt med, at kvitteringer for indbetalt A-skat og moms blev omdelt. Bestyrelsen kendte godt begrebet momskarruseller, og det blev omtalt med stor afsky, men det var ikke noget, de drøftede indgående. Han vidste, at Peer Kølendorf indsendte lister over kunder og leverandører til SKAT og kendte navngivne medarbej-

dere i SKAT, og bestyrelsen fik også forelagt sådanne lister ved en lejlighed. Han husker ikke, at ordet momskarrusel har været anvendt i forbindelse med listerne. De blev indsendt med henblik på korrekt afregning i forhold til SKAT.

Han vidste, at Peer Kølendorf havde skærpet opmærksomhed omkring momsforhold, og han hørte ikke noget om, at virksomheden skulle have været i nærheden af en momskarrusel. Det ville absolut have fået bestyrelsen til at reagere. Han erindrer ikke specifikke artikler, hvor Peer Kølendorf har udtalt sig om momskarruseller, men det kan godt være noget, de har talt om.

Han husker ikke, at der blev omtalt et Code of Conduct, men bestyrelsen vidste, at varer blev undersøgt stikprøvevis. Det var god forretningsskik, så det var der ikke brug for at skrive ned. Bestyrelsen hørte ikke noget om manglende betalinger, og han vidste fra møderne med banken, at der var styr på de store betalingsstrømme. Han husker ikke konkrete navne på samhandelspartnere. Bestyrelsen gik ikke ned i detaljer med det.

Han husker ikke, at der lå nogen speciel overvejelse bag formuleringen om »særlige risici« i ledelsesberetningen i årsrapporten fra 2002, som han er medunderskriver af. Ledelsen skal altid tilstræbe seriøsitet i forretningsførelsen, og de væsentlige risici er ukurante varer, useriøse samhandelspartnere og manglende betalingsevne. Han havde tillid til, at Peer Kølendorf havde organisationen på plads, således at forretningen blev afviklet på forsvarlig vis.

Da han i 2007 så omtalt i Computerworld, at Distributørforeningen forsøgte at få Peer Kølendorf ekskluderet af brancheforeningen, blev han meget forarget. Han fandt det uretfærdigt og ukollegialt og tilbød Peer Kølendorf sin assistance. Han og Peer Kølendorf havde et møde med IT-brancheforeningens formand og direktør, hvor han sagde sin mening om det, han opfattede som en personlig vendetta mod Peer Kølendorf.

*Steen Erik Mønsted* har forklaret, at han blev medlem af bestyrelsen i februar 2003 og siden juni 2003 har han været bestyrelsesformand. Han startede oprindelig som managementkonsulent i T. Bak-Jensen og AIM. Derefter kom han ind i dagligvarebranchen og var først direktør i Frellsen og siden i BS Supermarkeder, der i hans tid blev til Fakta-kæden for at tage konkurrencen op på discountmarkedet. Da han kom hjem efter et 3-årigt ophold i udlandet, hvor han var direktør i Gate Gourmet i England og Irland med ledelsesansvar for 2.000 ansatte, tilbød Peer Kølendorf ham at indtræde i Comitels bestyrelse. Han har kendt Peer Kølendorf i 25 år, hvor de har siddet i en VL-gruppe sammen. Han kender til brokerhandel på dagligvareområdet. Han havde ingen viden om it, og han skulle være generalist. Der var andre i bestyrelsen med teknisk indsigt.

Han har ikke før mødt et selskab, hvor der var så godt styr på tingene som i Comitel. Bestyrelsen fungerede godt og kunne til fulde følge med i den overordnede drift og få de oplysninger, den ønskede. Der var en fast skabelon for bestyrelsesmøderne med oplæg og afrapportering, og Peer Kølendorf er en yderst professionel leder, der uddelegerede og organiserede virksomheden på en hensigtmæssig måde, men samtidig var på hele tiden og udviste en høj grad af rettidig omhu i forhold til afrapporteringer og dokumentation. Han ser Peer Kølendorf som en retskaffen, venlig, social og meget flittig person, der fuldt ud har levet op til hans forventninger.

Der var kvartalsvise bestyrelsesmøder, og herudover mødtes han med Peer Kølendorf 2-3 gange om måneden.

På bestyrelsesmøderne var der afrapportering vedrørende budget og likviditet. Hvis der var brug for information om markedsforhold, var det T, der redegjorde mundtligt herfor. Til møderne forelå en standardrapport, som også indeholdt resultatopgørelse, og herudover kunne der være afrapporteringer vedrørende personaleudskiftninger og lønforhold samt de oplysninger, der blev sendt til SKAT.

Han kan ikke sige, hvorfor it-komponenter ikke står nævnt på den standardrapport, der forelå til bestyrelsesmødet den 2. september 2004, men det kom til at stå senere. Han erindrer at have set debitor- og kreditorlister, men de var ikke altid vedlagt regnskabstallene til bestyrelsesmøderne.

T var en nøgleperson i virksomheden, og derfor blev han udnævnt til direktør for brokerafdelingen. I februar 2003 var T forretningsudvikler og virkede meget

**1910**

kompetent inden for it og telefoni. T havde stor viden, var praktisk orienteret og havde et stort netværk. Han vidste, at Peer Kølendorf havde stor tillid til T, og det havde han også selv. Han havde ikke oplevet tillidsbrud fra T's side før sagen med Vaneypeco/Texmart i England. Han og Peer Kølendorf gjorde det helt klart, at det var utilstedeligt, at T havde frigivet varer, før der var sket betaling.

Han husker, at T kom med forslaget om at udvide brokerhandlen med it-komponenter, fordi han havde fået forespørgsler på blandt andet RAM. Bestyrelsen afviste det først, men det kom op igen, og det lå i naturlig forlængelse af, at virksomheden allerede havde en velfungerende brokerafdeling og tilhørende støttefunktioner med eksempelvis bankflow og en kompetent speditør. På et tidspunkt kom der et forslag om at udvide til handel med tøj, men de besluttede at begrænse området til det, som T havde viden om, så det blev it og mobiltelefoner.

Der forelå ikke et skriftligt oplæg for bestyrelsens beslutning om brokerhandel med it-komponenter. Bestyrelsen fandt, at T's mundtlige redegørelse om markedsforholdene var et tilstrækkeligt og godt grundlag. Comitel var en lille spiller, men hvis virksomheden kunne få bare en lille markedsandel, ville det give et fint resultat. Beslutningen gik ud på, at T skulle ansætte folk, men i øvrigt bruge det eksisterende apparat i virksomheden og udnytte sin egen ekspertise og netværk.

De drøftede spørgsmålet om momskarruseller i bestyrelsen. Bestyrelsen var interesseret i at dække sig ind, og de kendte til Peer Kølendorfs samarbejde med SKAT og havde set de lister over samhandelspartnere, som blev indsendt. Han fandt det betryggende, at SKAT - i modsætning til Comitel selv - kunne se forudgående og efterfølgende handelsled, og han regnede med, at de ville besked, hvis noget var galt. Rutinen med indsendelse af lister var allerede indarbejdet, da han kom ind i bestyrelsen. Bestyrelsens holdning var, at de ikke kunne være politibetjente, men »herre i eget hus«.

De talte om Code of Conduct, og det var T's opgave at være opmærksom på, at disse retningslinjer blev overholdt. Han husker, at der var et eksempel med en virksomhed uden momsnummer, som Comitel afviste at handle med. Han mener, de gjorde, hvad der var muligt for at undgå momskarruseller, og Comitel fik heller ikke oplysninger om, at de var involveret i noget sådant.

Derfra hvor han sad, oplevede han ingen forskel på »Gul Feber«-handlerne og andre handler. Det er en opdeling, der først er sket efterfølgende. Han fik løbende rapportering om omsætningstallene og glædede sig over den positive udvikling, men Comitels handler var små i forhold til markedet som helhed, og det var normalt med store udsving, så der var ingen alarmklokker, der ringede. En handel på 40 mio. kr. var en »pæn« handel, men ikke hverken lille eller stor ud over det sædvanlige. Han vidste, at andre selskaber omsatte for samme beløb. Så vidt han ved, er forsøg på at kortlægge brokermarkedets størrelse ikke lykkedes.

Bestyrelsen bad om at se den varekontrol, der blev foretaget, og fik i foråret 2003 en demonstration på deres eget lager af T. Speditøren foretog en tilsvarende kontrol af de varer, som Comitel ikke selv havde på lager eller kontrollerede hos speditøren. Bestyrelsen kontrollerede ikke efterfølgende, at der blev foretaget kontrol,

hvilket han hverken anså for nødvendigt eller for bestyrelsens op-gave. Bestyrelsen havde tillid til, at der blev foretaget varekontrol, som det sker i alle forretningsforhold, og der har heller ikke været anledning til at tro andet.

Han havde hørt om selskabet Solid Trading ApS og vidste, at Comitel startede handel med it-komponenter med selskabet i november 2003. T fortalte om sit besøg hos Solid Trading ApS og nævnte, at det så fint ud, og selskabet var momsregistreret.

Han opfatter bemærkningerne om særlige risici i ledelsesberetnin-gen i årsrapporten for 2003 som standardrevisorbemærkninger. Man skal handle med seriøse købere, og det indebærer, at man er opmærksom og bruger sine sunde fornuft samt tjekker momsnum-mer.

Det »lå i blodet« i Comitel og krævede ikke et særligt system. Bemærkningerne i årsrapporten 2003 om nedgang på det engelske marked skyldtes de engelske myndigheders indgriben over for »brodne kar i branchen«. Bemærkningen samme sted om fokus på salgsarbejde i Asien skal ses på baggrund af, at de overvejede, om virksomheden kunne starte noget op i Dubai, men det blev opgivet, efter at T havde undersøgt forholdene.

Det forhold, at T blev udnævnt til direktør for brokerafdelingen i april 2004, førte ikke til ændringer i Peer Kølendorfs rolle i virk-somheden, og det havde han heller ikke in forventning om. Peer Kølendorf var fortsat overordnet ansvarlig for virksomhedens drift og tog sig af de økonomiske og likviditetsmæssige forhold, herunder afrapporteringer til bestyrelsen, men Peer Kølendorf var ikke eks-pert på brokerområdet og havde ikke T's netværk og tekniske ind-sigt. Når det handlede om brokerområdet, rettede bestyrelsen sig mod T, og han oplevede det som en styrkelse af den del af virksom-heden, at T fik det fulde ansvar.

Så vidt han husker, fik han først efterfølgende at vide, at Comitel handlede med internet access-kort, men det lå inden for de vedtagne rammer, og når markedet var der, var det i orden.

Han blev bestyrtet over SKATs brev af 6. december 2004 om nægtelse af fradrag for moms, og det blev drøftet i bestyrelsen. Peer Kølendorf og T tog sig af det efterfølgende forløb. Det gav ikke anledning til ændringer i virksomhedens procedurer eller

**1911**

kontrolforanstaltninger i forhold til T, og på dette tidspunkt heller ikke til en overvejelse om at trække sig ud af brokerhandlen. Han havde en tyrkertro på, at det, de lavede, var i orden.

Brokeraktiviteten blev lukket ned i 2006, dels på grund af at T, der var krumtappen i den del af virksomheden, var væk, dels på grund af lovændringen om solidarisk hæftelse. Hverken Peer Kø-lendorf eller andre havde ekspertise til at drive brokerhandlen vide-re, og virksomheden satser fremadrettet hovedsagligt på en ejen-domsportefølje.

*Flemming Lind Johansen* har forklaret, at han er uddannet i rig og har arbejdet en årrække i toldvæsenet, herunder med kontrol af brokerbranchen i 1994. Fra 2001 indtil 2012, hvor han startede egen rådgivningsvirksomhed, var han partner i henholdsvis KPMG og Ernst & Young, hvor han rådgav om moms. Han er forfatter til flere bøger om moms og er ekstern lektor i momsret på CBS.

Han bistod Comitel i 2004 og 2005 som rådgiver, fordi Peer Kø-lendorf og på baggrund af OB Invest-sagen, hvor Comitel havde solgt til Norge, der ikke var medlem af EU, havde bedt ham tjekke Co-mitels procedurer og brokernes kendskab til momsreglen inden for EU.

Da SKATs første udkast til afgørelse vedrørende »Gul Feber«-handlerne kom i december 2004, foretog han som rådgiver for Comitel en gennemgang af handlerne og var også involveret i det høringssvar, som Comitel afgav den 31. januar 2005.

Han gennemgik regnskabsmaterialet, herunder kontoudtog vedrø-rende handlerne, og fandt intet påfaldende. Der var ikke tale om urealistiske beløb sammenholdt med Comitels handel i øvrigt. Han kontrollerede leverandørerne, dvs. Trademark International ApS og Solid Trading ApS, og fandt ikke noget påfaldende. Begge sel-skaber havde afgivet årsregnskab og havde revisor tilknyttet. Det eneste, han undrede sig over, var, at Solid Trading ApS havde været tilmeldt en adresse i et fritidshus, men senere var selskabets adresse blevet ændret til Skudehavnsvej. Det var vanskeligt at undersøge kunderne, da det var selskaber i Fjernøsten, men han mente, at svindel i det led ville være svært på grund af toldkontrol ud af EU og importkontrol i det pågældende land i Fjernøsten. Han er dog opmærksom på, at eksportkontrol ikke er noget, der sker konse-kvent.

Han påså ikke, om der var gennemført varekontrol i hver enkelt handel. Han havde tillid til, at hvis der blev, om der var blevet betalinger til tredjepart eller givet kredit. Han forholdt sig til produktangivel-serne på varerne, som de var angivet i papirerne, og studsede ikke over noget i den forbindelse, herunder angivelserne »Infineon TS-OP« eller »Samsung Branded Dice«. Han mener, at han blandt andet på baggrund af sit arbejde i toldvæsenet havde tilstrækkeligt kendskab til at kunne vurdere produktbeskrivelserne, selv om det er et marked i konstant udvikling.

Han var tilfældigt til stede i Comitel, da T's arbejdsplads blev ransaget. Det var en alvorlig situation, som førte til yderligere undersøgelser, blandt andet anmodede virksomheden om aktindsigt i SKATs oplysninger om Solid Trading ApS, men SKAT mente ikke, at der kunne findes noget relevant deri. Først senere havde han lejlighed til at gennemgå oplysninger om Solid Trading ApS, hvor han blandt andet hæftede sig ved, at selskabet havde betalt både vagtselskab og forsikringsselskab, hvilket tydede på reel handel i virksomheden. Han spurgte også T, om han havde kendskab til en person, der var omtalt i SKATs første udkast til afgørelse. T svarede, at han ikke kendte den pågældende person, som heller ikke var kendt i brokerkredse.

Han mener, at SKAT ikke havde været tilstrækkelig omhyggelig i sine undersøgelser af Comitels eksportangivelser, idet hans under-søgelse blandt andet viste, at der var foretaget eksportangivelse fra Comitels speditør, men angivelse var sket under et såkaldt »dummy nummer«, som alle kan bruge hos SKAT.

Han mener, at der består en væsentlig risiko for brokere for ikke at få penge for de varer, der sælges, så det er sædvanligt at sælge »on hold«, dvs. brokeren udleverer ikke varer, før de er betalt. Samtidig er det væsentligt ikke at betale sin leverandør, før man som broker har foretaget varekontrol, hvilket er svært ved it-kom-ponenter, fordi værdien forringes, hvis man åbner indpakkede varer. Betaling til tredjepart kan være tegn på noget mistænkeligt, men kan også forekomme i helt reelle handler. Efter hans opfattelse er det et karakteristika ved brokerbranchen at »spille med lukkede kort«, da brokeren ellers overflødiggør sig selv som mellemhandler.

Han mener, at indsendelse af lister over leverandører og kunder til SKAT er en almindelig kendt forholdsregel, fordi SKAT dermed får overblik over handelsmønstret og kan se, hvem der handler på markedet.

*Kenn Hoffmann Jensen* har forklaret, at han også i dag arbejder som specialkonsulent i SKAT i Afdelingen for særlig kontrol og beskæftiger sig med sager om tungere økonomisk kriminalitet, men det er nu en landsdækkende afdeling. På tidspunktet for »Gul Feber-handlerne« sad han i Region Nordsjælland-Bornholm.

Han havde bl.a. kontrolbeføjelse over for Solid Trading ApS, som tidligere hed Nemesis ApS. Første gang han stødte på virksomheden var i forbindelse med en såkaldt verifikationsanmodning fra de engelske myndigheder i september 2002. Hans kollega Jørgen Eg-

gert var ude i virksomheden for at få oplysninger om en handel vedrørende to engelske selskaber, som de engelske myndigheder havde bedt om. Primo 2003 kom der igen en verifikationsanmodning fra de engelsk

**1912**

myndigheder, og han havde da selv kontakt med virksomheden. Der kom flere anmodninger vedrørende Solid Trading ApS vedrørende indkøb hos engelske virksomheder og videresalg til en italiensk virksomhed. De fik ingen reaktion fra de engelske myndigheder på de oplysninger, de sendte til dem, men bad heller ikke herom. De sendte en anmodning til de italienske myndigheder om oplysninger, men fik ikke svar tilbage.

I oktober måned 2003 var han sammen Jørgen Eggert på kontrolbesøg hos Solid Trading, der havde anmodet om udbetaling af eksportmoms på knap 4 mio. kr. De fandt intet til hinder for udbetaling, men bad den centrale enhed i SKAT om at tage kontakt til de engelske myndigheder, fordi de mente, at Solid Trading ApS indgik i en momskarrusel. I december 2003 fik de besøg af to engelske politifolk, der fik materiale med hjem. Han ringede medio januar 2004 til det engelske politi og fik at vide, at sagen var under efterforskning, men hørte herefter ikke meget.

I februar 2004 fik de en henvendelse fra Region Køge om firmaet Network Trading ApS, der havde oparbejdet et beløb på 90 mio. kr. i skyldig moms for 3. kvartal 2003 og januar 2004. Network Trading ApS havde videresolgt varer indkøbt i Hongkong til Trademark International ApS i Vejle, der havde videresolgt varerne til Solid Trading ApS, som igen havde videresolgt til Comitel, der havde solgt varerne tilbage til Hongkong. Betalingerne skete som regel ved, at Trademark International ApS betalte direkte til Network Trading ApS' leverandør i Hongkong, men ved en handel i januar 2004 blev den rutine fraveget, og Network Trading ApS forudbetalte 90 mio. kr. til leverandøren Quantum i Hongkong, som viste sig ikke at levere og heller ikke efterfølgende tilbagebetalte beløbet. Det førte til Network Trading ApS' manglende momsindbetaling på ca. 90 mio. kr. og til, at selskabet efterfølgende gik konkurs. Det var Region Køge, der behandlede sagen vedrørende Network Trading ApS, og han foretog sig ikke noget på dette tidspunkt og havde ikke kontakt til sagsbehandleren vedrørende Trademark International ApS i Region Vejle.

Han deltog i mødet den 16. marts 2004 med repræsentanter for tre skatteregioner, Kammeradvokaten, SØK og Told- og Skattestyrelsen, hvor der blandt andet blev besluttet at nedsætte en styregruppe om aktion »Gul Feber«. Det var ledelsen i hans region, der tog initiativ til mødet for at få fælles fodslag, så de kunne få luket momssvigskæden. Det var nok han, der havde inviteret SØK med. På mødet blev det blandt andet besluttet at sætte toldspærre på de relevante virksomheder, og det skete også i forhold til Solid Trading ApS. Det medførte, at indkøbte varer fra Fjernøsten blev åbnet af tolderne for at verificere indholdet. Det er ikke sædvanligt at gøre, men Solid Trading ApS var gået fra at handle inden for EU og i Danmark til at importere fra et tredjeland, så det var et forsøg på at sikre sig mod fremtidige begivenheder. To dage efter blev et forudbetalt vareparti fra Hongkong til Solid Trading ApS stoppet i lufthavnen som beskrevet i ToldSkats fremlagte notat af 2. april 2004, som han kan vedstå. Det førte til, at Solid Trading ApS ikke kunne betale momstilsvar på 11 mio. kr. for februar måned og 17 mio. kr. for marts måned 2004, og virksomheden gik derefter konkurs. Varepartiet viste sig at være attrapper og ikke varemærkeforfalsket som anført i notatet.

Han erindrer ikke, at de havde fået en tip vedrørende Solid Trading ApS udefra. Det må være på baggrund af de gennemførte kontrolbesøg, at de fik viden om virksomhedens handel med Fjernøsten. Han husker ikke, hvor mange kontrolbesøg de foretog i efteråret

2003, men de så aldrig de indfortoldede varer på lageret. En toldprofil eller toldspærre kan gradueres ud fra tilgængelige oplysninger og kan godt sættes på en specifik vare. Primo 2004 havde han kun teser at arbejde ud fra. Da der skete tredjepartsforudbetaling, fik han mistanke om, at der var tale om kædesvig.

Det er ikke blevet nemmere at afsløre momskarruseller, selv om SKAT har indført en enhedsorganisation, fordi handelskæden er blevet længere, og varerne går ind og ud af EU. Kommunikationen i SKAT er bedre, men sagerne er sværere. Det påtænkte »Early Warning-system«, som er beskrevet i en artikel i deres fagforeningsblad, blev ikke til noget. Det system, de fik i stedet, er ikke lige så godt.

Han har i et notat af 2. februar 2004 omtalt en samtale med en kollega, Charlotte Vindelev, fra Region København, der stod for at skulle udbetale negativ moms til Comitel. Som det fremgår af notatet, havde hun på kontrolbesøget bedt Comitel om fakturaer og betalingsdokumentation vedrørende køb hos Solid Trading ApS. Charlotte Vindelev havde forud herfor kontaktet ham for at få noget at vide om Solid Trading ApS. De drøftede ikke risikoen for momssvig før hendes besøg.

Når der skal ske udbetaling af negativt momstilsvar, foretages en graduering af, hvilken kontrol der skal gennemføres. Der er 7 kategorier og jo højere kategori, jo bedre dokumentation kræves der, før der sker udbetaling. Hvis man ender i en kategori 5, 6 eller 7, vil kontrollen typisk indebære et besøg i virksomheden.

*Mia B. E. Hansen* har forklaret, at hun i dag er specialkonsulent i SKATs afdeling for særlig kontrol, hvor hun arbejder med momssvig. I 2000-2003 arbejdede hun i Region København i en revisionsgruppe, hvor hun bl.a. besvarede verifikationsanmodninger fra udenlandske myndigheder. Hun har en 4-årig uddannelse som fuldmægtig inden for Toldskat og har derudover en »spydspidsuddannelse« inden for moms.

Hun begyndte at have noget med Comitel at gøre i 2000, fordi SKAT fik mange verifikationsanmodninger

**1913**

fra udlandet vedrørende virksomhedens handler. De var tre sagsbehandlere, der tog sig af dem. Det var en medarbejder i afdelingen »Store selskaber«, der stod for udbetaling af negativ moms til Comitel. Hun kan ikke sige præcist, hvor mange verifikationsanmodninger, SKAT fik vedrørende Comitel. Proceduren var, at hun skrev til virksomheden og bad om oplysninger om handlerne, og det gik meget stringent med Comitel, hvor Poul Elmelund svarede hurtigt. De fik ikke tilbagemeldinger på de oplysninger, som SKAT sendte til de udenlandske myndigheder. Hun havde også ansvar for et par andre brokervirksomheder, hvoraf en var lige så stor som Comitel.

Hun husker, at Peer Kølendorf indsendte lister over leverandører og kunder, men kan ikke sige præcist, hvornår han begyndte på det. På det tidspunkt var der ikke en struktureret overvågning af momskarruseller, og tanken var, at hvis SKAT fik oplysninger ind fra de store brokere, så gav det et overblik, og oplysningerne kunne formidles til den relevante skatteregion til undersøgelse. Hun husker ikke, hvem der initierede ordningen. Hun fik og gennemgik listerne fra Peer Kølendorf i 2002 og 2003. Hvis der var nye danske virksomheder på listen, sendte hun oplysning herom til den relevante skatteregion, der så selv vurderede, om noget skulle undersøges i den anledning. Listerne angav ikke størrelsen på samhandlen, og hun husker ikke at have bedt om oplysninger herom.

Peer Kølendorf fik ikke tilbagemeldinger om virksomhederne på de indsendte lister over kunder og leverandører, og hun ville også have brudt sin tavshedspligt, hvis hun gjorde noget sådant. Hun har én gang i 2001 fået en anmeldelse om en virksomhed fra Comitel, og heller ikke der gav hun en tilbagemelding til Peer Kølendorf om, hvad anmeldelsen førte til.

**1914**

Listerne fra Peer Kølendorf har hun ikke kunnet finde i arkivet, hvilket kan skyldes, at arkivet har flyttet fysisk adresse flere gange, ligesom SKAT er gået fra manuel til fuldelektronisk sagsbehandling.

Hun husker ikke at være blevet spurgt af Peer Kølendorf om, hvorvidt handel med Solid Trading var en god idé. Hun ville ogkså kun have kunnet oplyse, hvorvidt virksomheden var momsregistreret. SKAT kan kun udlevere oplysninger om andre virksomheder, hvis det sker som led i en begrundelse af en afgørelse.

Indtil mødet i styregruppen om »Gul Feber« den 16. marts 2004 havde hun ikke kendskab til, at der havde været anledning til kontrol af Comitel ud over det sædvanlige. Hun ville forvente at have hørt det, hvis der var særlige forhold vedrørende virksomheden. De drøftelser om Comitel, som Charlotte Vindelev, der arbejdede i en anden afdeling i Region København, havde med Kenn Hoffmann Jensen fra Region Nordsjælland, og som fremgår af et notat af 2. februar 2004, kender hun ikke til.

Hun ved ikke, hvornår hun fik indkaldelsen til mødet i styregruppen den 16. marts 2004. SØK var med for at diskutere teorier om momskarrusel. På mødet blev Comitel nævnt som aftager i handelskæden, men der forelå ikke noget faktuel dokumentation om virksomheden på mødet, og man drøftede ikke konkrete navne, eller om virksomheden foretog sig noget kriminelt. På mødet talte de mest om transaktionskæde og forløb og de teser, det gav anledning til.

Skemaet til brug ved kortperiodisk kontrol bruges ved udbetalingskontrol, men hun kender ikke baggrunden for kontrollen hos Comitel, der førte til et skema underskrevet den 25. marts 2004. Hun hørte om det på et af møderne i styregruppen. Det var formentlig ikke på mødet den 16. marts 2004.

SKAT overvejede, om der var grundlag for at tilbageholde negativ moms i forhold til Comitel, men fandt først grundlag herfor vedrørende momsen for december 2004. I marts 2004 var handelsforløbet ikke afdækket. Det skete først senere i 2004. Hele handelskæden skulle afdækkes, og der skulle være overblik over faktureringerne, før det var forsvarligt at tilbageholde negativ moms. Der er en alvorlig sag at nægte udbetaling, fordi virksomheden risikerer at gå konkurs, så de skulle være helt sikre på grundlaget.

Det var først i juni måned 2004, at SKAT begyndte afdækningen af handelskæden i »Gul Feber«- handlerne. Fra marts til juni var et mellemspil, hvor SKAT var i tvivl, om der var grundlag for fradragsnægtelse og blandt andet bad om bistand fra Kammeradvokaten. Hun indkaldte materiale om »Gul Feber«-handlerne fra Comitel den 29. juni 2004 og fik noget af det den 16. juli 2004. Det sidste modtog hun i september 2004. Hen over sommeren indhentede hun også materiale fra de andre skatteregioner. Når SKAT bad Comitel om at få materiale, så fik SKAT det uden unødig forsinkelse.

Efter SKATs forslag til afgørelse af 6. december 2004 deltog hun i et møde med Comitel den 27. januar 2005, hvorefter Comitel afgav høringssvar den 31. januar 2005. I mødet deltog Peer Kølendorf, T og selskabets advokat. Hun husker ikke, at der var afgivelser i høringssvaret i forhold til drøftelserne på mødet.

I marts 2005 fik de Generaladvokatens indstilling i Bond-housesagen [Forenede sager C-354/03, C-355/03 og C-484/03], og det gav anledning til overvejelse om, hvorvidt sagen vedrørende Comitel var tilstrækkeligt dokumenteret. Derfor besluttede de at bede myndigheder i Europa om oplysninger om, hvorvidt nogle af Comitels handelspartnere kunne karakteriseres som »missing trader«. De skrev ud i juni måned 2005. Hun var på barsel fra september 2005 til maj/juni 2006 og var derfor ikke med til at skrive den endelige afgørelse, men SKATs konklusion i afgørelsen af 20. juli 2006 om, at den overvejende del af Comitels internationale salg

var momskarruselrelateret, er baseret på de svar, som blev modtaget fra de udenlandske myndigheder.

De luxembourgske myndigheder oplyste eksempelvis i et svar af 9. juli 2005, der ligger som akt 68 i sagen, at selskabet Vaneypeco var et skraldespandsselskab.

For så vidt angår selskaberne NU Communications Ltd. og Ocean 3 Ltd. beror SKATs konklusion på en vurdering af de oplysninger, som de engelske myndigheder har givet om selskaberne. Det er oplysninger om, at selskaberne har haft hyppige ledelsesskift og stor udskiftning af sekretærer samt skift i handelsmønster og derefter afmelding af selskabet, kort tid efter at der er handlet for store beløb med Comitel, der har ført til denne konklusion.

Hun husker ikke at have haft drøftelser om Comitel med udenlandske myndigheder. SKATs analyse er baseret på de udenlandske myndigheders skriftlige svar.

I 2003 og 2004 var der kun beskeden toldkontrol ved eksport, og fysisk kontrol var en sjældenhed.

SKAT havde overhovedet ikke haft dårlige erfaringer med Comitel tidligere. Frister for levering af materiale blev overholdt, og der blev ringet fra virksomheden og lavet aftaler, hvis der var brug for tid til at fremfinde det ønskede materiale.

Hun har udstedt notifikation til virksomheden et par gange, efter at det blev muligt i 2006. Notifikationen indebærer, at SKAT forelægger virksomheden oplysninger om momssvig og gør opmærksom på, hvordan virksomheden kan sikre sig herimod fremadrettet. Der var ikke noget vejledningsmateriale til brokere i 2003-2004. Først med reglen om notifikation kom der også en checkliste, som vedlægges notifikationen.

Den del af sagen vedrørende Comitel, som angår salg til det norske selskab, OB Invest, men hvor levering skete til England, verserer stadigvæk. SKAT fik oplysninger fra Norge den 19. maj 2004 og kunne se, at der var andre forhold vedrørende Comitel, der skulle undersøges.

*Reino Nielsen* har forklaret, at han i dag er chefkonsulent i SKATs afdeling for særlig kontrol. I 2003 og 2004 arbejdede han i ToldSkats planlægningskontor og havde til opgave at koordinere regionernes arbejde med momskarruseller og stå for den internationale kontakt på dette område. I 2003 havde han arbejdet med området nogle år.

Han hørte første gang om »Gul Feber«-handler i begyndelsen af 2004, enten i januar eller februar måned. Han blev kontaktet af en sagsbehandler, der syntes, at noget så mærkeligt ud, hvorefter der blev indkaldt til mødet den 16. marts 2004. Han husker ikke i dag, om henvendelsen fra sagsbehandleren vedrørte Network Trading ApS eller Solid Trading ApS. Det var planlægningskontoret, der tog initiativ til styregruppen, fordi selskaber i flere regioner var indblandet, og der også var grænseoverskridende handler. Det kan have været han selv, der indkaldte til mødet. Han husker ikke, med hvilket varsel indkaldelsen skete, eller om det var telefonisk eller ved e-mail. Han mener, det var efter, Network Trading ApS var gået konkurs.

Det nye i »Gul Feber«-handlerne var, at der var handlet ud af EU, hvilket gjorde det vanskeligt at få oplysninger om de involverede selskaber, fordi der ikke på globalt plan er et system som i EU, der gør det muligt at udveksle oplysninger. Man kunne ikke bare indhente oplysninger fra Hongkong og Singapore. Det andet var, at »skraldspandsselskabet« i de hidtil kendte kædehandler normalt undlod at angive og betale moms. I »Gul Feber« havde »skraldespandsselskabet«, angivet moms, men så skete et eller andet udfordset med aktiverne, hvorefter momsen ikke kunne indbetales, og selskabet gik konkurs.

Copyright © 2023 Karnov Group Denmark A/S

Hans rolle i styregruppen var at bringe parter sammen, og han inddrog Kammeradvokaten, fordi der kunne opstå behov for at sikre aktiver ved arrest eller på anden måde. Det var normal praksis. Han inddrog også SØK, fordi det i forhold til »skraldespandsselskabet« - i dette tilfælde Network Trading ApS - var relevant at overveje, om der var begået et strafbart forhold, og politiets efterforskning kunne også afdække strafbare forhold i senere led i handelskæden. Anklagemyndigheden trak sig hurtigt ud af sagen igen, fordi der var angivet moms i »skraldespandsselskabet«, og der derfor ikke vurderedes at være et strafferetligt grundlag. Politiet indledte først en efterforskning, da Roxy World i sommeren 2004 blev udsat for røveri, der viste sig at være fingeret. Det var Politiet i Roskilde, der efterforskede og fandt frem til, at der var tale om skyldnersvig og ikke som normalt groft skattesvig efter straffelovens § 289. I styregruppen arbejdede de med teser, men det indgik ikke i tesen, at Comitel skulle være en del af et kriminelt netværk. Det viste sig først senere, at Comitel kunne ses som fællesnævner for de involverede selskaber, og det var tidligst i efteråret 2004, at Comitel kom i søgelyset i forbindelse med kriminelt.

Efter henvendelse fra nogle statsautoriserede revisorer skrev han i 2003 en artikel i deres forenings blad om, hvordan man kunne sikre sig mod uforvarende at blive en medspiller i en ulovlig momskarrusel. De efterspurgte rådgivning til virksomhederne. Artiklen var inspireret af det engelske Code of Conduct. I artiklen er der meget fokus på for lave priser, fordi det var et kendetegn fra de hidtil kendte momskarruseller, hvor varerne var bestemt til slutbrugere. I dag må rådet være, at man skal være opmærksom på prisafvigelser, og de kan være i både op- og nedadgående retning.

I artiklen omtales også ordningen med at rette henvendelse til SKAT som en måde at sikre sig på, men problemet hermed var, at SKAT ikke på daværende tidspunkt kunne udlevere oplysninger til den virksomhed,

**1915**

som foretog en indrapportering, om resultatet af en eventuel undersøgelse. SKAT kunne dog bruge oplysningerne til at afdække en handelskæde og bruge oplysningerne her i landet, eller orientere udenlandske myndigheder om involverede udenlandske selskaber. Ordningen var ikke oprindelig tænkt til momskarruselområdet, men var indført som led i indsats mod sort arbejde, således at myndighederne hurtigere kunne foretage kontrol, og den anmeldende virksomhed til gengæld kunne slippe for strafansvar.

Varekontrol omtales ikke i artiklen, fordi SKAT ikke havde set de »lukkede kredsløb« i de tidligere momskarruseller, og det forekom i øvrigt oplagt at foretage varekontrol, men i dag ville han have skrevet det anderledes.

»Gul Feber«-sagen var en medvirkende årsag til, at SKAT fik en enhedsorganisation.

Der er ingen toldkontrol, når varer forlader EU. Der afleveres en eksporterklæring. Toldkontrol ved import fra tredjelande sker ud fra en risikovurdering og er stikprøvebaseret. Der er mulighed for kontrol, hvilket der ikke er mellem EU-lande. Da det blev besluttet at sætte en toldprofil på Solid Trading ApS i marts 2004, var det resultatet af en risikovurdering.

Han har haft et møde med IT-brancheforeningen i 2005 i kølvandet på afgørelsen i Bond-house-sagen [Forenede sager C-354/03, C-355/03 og C-484/03]. Så vidt han husker, var det SKAT, der tog initiativ til mødet, med henblik på at drøfte om SKAT og branchen i fællesskab kunne gøre noget for at forhindre momskarruseller.

*Jørn Rosenmeier* har forklaret, at han er uddannet cand.merc og begyndte med import og eksport af it-dele i regi af et firma, der oprindeligt handlede med radioer. Det udviklede sig fra starten af 1980'erne, og indtil firmaet, der havde omkring 100 ansatte, i 2010 blev opkøbt af et amerikansk firma, hvori han blev ansat som direk-

tør. Firmaet importerede mærkevarer inden for it, men også CPU'er og RAM, fra hele verden og var distributør i Danmark og Norge. I 2000 havde han bygget nyt domicil med et stort lager og var samtidig et perspektiv i, at radio- og it-forhandlere kunne overtage handel med mobiltelefoner, og han ville derfor forsøge sig på dette marked.

Han ansatte K, der tidligere havde været medarbejder hos Comitel, med henblik på at opbygge et agentur. I den forbindelse fik han et brev fra Peer Kølendorf, der gjorde opmærksom på markedsføringslovens bestemmelse om erhvervshemmeligheder på grund af K's kendskab til mobiltelefonområdet. Virksomheden handlede med tilbehør til telefoner, og K, sagde, at man ved at handle på brokermarkedet kunne »udnytte imperfektioner i markedet« ved vekslende udbud og efterspørgsel at bestemte varer. Han ansatte senere to yderligere medarbejdere, Torben Nielsen og Henrik Johansen, der også begge havde været ansat hos Comitel og havde fungeret som et makkerpar. Henrik Johansen lavede handlerne, og Torben Nielsen lavede papirarbejdet og inspicerede varerne. Han afskedigede K efter nogen tid, men ansatte yderligere et par medarbejdere til brokerhandel med mobiltelefoner.

Brokerne gjorde det klart, at de var vant til at have en ramme på 10 mio. kr. eller mere at handle for, men et så stort beløb havde han ikke til rådighed i virksomheden, så han fastsatte en ramme på 3 mio. kr., således at han ved handler op til 3 mio. kr. skulle orienteres efterfølgende, mens handler derover krævede forudgående godkendelse. Brokerne forklarede også om princippet »ship on hold«, og at alting skulle gå meget hurtigt på brokermarkedet med store handler. Brokerne var ikke tilfredse med rammen, som de fandt alt for lille. Han bemærkede, at der ofte var handel med nye kunder og med ham ukendte firmaer, og efter ca. 6 måneder blev han så mistænksom, at han bad sin økonomichef kontakte SKAT i Ålborg, også fordi han havde set artikler om momssvig. SKAT bad om en liste over kunder i England og skrev derefter tilbage, at der ikke umiddelbart var faresignaler. Efter ca. 1 år skrev SKAT, at en af kunderne var gået konkurs med en stor momsgæld. Det var i 2001. De aftalte derfor at fremsende alle papirer på fremtidige handler til SKAT. Efter et par måneder oplyste SKAT, at flere af firmaets kunder efterfølgende var gået konkurs. Han foreholdt de to medarbejdere oplysningerne, og de erkendte, at brokere mødtes på den årlige CeBit-messe i hannover og aftalte momskarruseller, herunder hvilke selskaber der skulle ende som skraldespandsselskaber. De oplyste, at det var noget, de også havde gjort i deres tid i Comitel, og SKAT i Danmark var ligeglad, fordi det ikke medførte tab af offentlige danske midler.

Herefter ophørte han øjeblikkeligt med brokerhandlen. Han troede oprindelig på »imperfektioner i markedet«, men mener i dag, at det er »svindel og humbug«. Efter han havde lukket ned, fik han besøg af de engelske myndigheder, der brugte en uge på at undersøge materiale om handlerne, og han ved, at de ved hjælp heraf stoppede flere momskarruseller.

Da han reagerede på sin begyndende mistanke, var det ikke på grund af mangler ved dokumenter og fakturaer, for de så ok ud, bortset fra at der var tale om ikke kendte leverandører og kunder. Samlet set virkede det bare for godt til at være sandt. Brokerhandlen med mobiltelefoner foregik fra primo 2001 til slutningen af 2001.

Virksomhedens handel med CPU'er og RAM var anderledes, fordi der blev købt ind til lager, og man kendte kunderne. Han har også købt og solgt it-komponenter på brokermarkedet, og det er hans opfattelse, at

**1916**

man ikke kan være i tvivl om, hvornår der foregår rigtig brokerhandel. Det er kendetegnende, at der vil være en masse små handler til forskellige købere for at komme af med et stort parti. Der vil

være flere kunder, som tager kontakt, og man vil vide, hvem der er slutkunden. Det rette brokermarked er efter hans opfattelse ikke kendetegnet af store handler.

Man kan godt kontrollere it-varer visuelt uden at åbne pakkerne. Hvis man skal åbne pakkerne, kræver det særligt udstyr, for CPU'er er følsomme over for statisk elektricitet og forsendes derfor i særlige poser.

Han var med til at stifte Distributørudvalget i 2003 og var medlem heraf indtil 2008. Distributørudvalget fastsatte etiske retningslinjer for sikre en ordentlig branchestandard og forhindre momssvig og handel med stjålne varer. Et af punkterne var, at man skal kende varernes oprindelse. Distributørudvalget fik SKAT til at holde foredrag om momskarruseller, og han fortalte en journalist på Computerworld om sin erfaring fra brokerhandlen i 2001. Distributørudvalget fandt det uholdbart, at Peer Kølendorf sad i IT-Brancheforeningens hovedbestyrelse, når Comitel var en af de bedst sælgende virksomheder på brokermarkedet. Comitel havde en enorm omsætning på ganske få medarbejdere, og han er af den opfattelse, at der ikke var tale om reel handel, for it marked af den karakter eksisterede ikke i virkeligheden. Han drøftede situationen uformelt med IT-Brancheforeningens direktør og fik tilsagn om, at Peer Kølendorf ikke blev genopstillet til hovedbestyrelsen, men det skete alligevel. Han fik en reprimande for at komme med offentlig kritik af medlemmer af brancheforeningen, og det førte til, at han meldte sig ud i 2008.

*Ole Eklund* har forklaret, at han er administrerende direktør i Also A/S, der er en stor europæisk grossist og distributør inden for it- og forbrugerelektronik. Also A/S køber varer fra alle de store producenter, hP, Lenovo, Microsoft, IBM, Intel m.fl., og aftagerne er store detailkæder som Fona samt professionelle selskaber som eksempelvis Atea. Han har været inden for distributørbranchen siden 1990 og har tidligere været ansat i Ingram Mikro A/S og Magirus Nordic A/S.

Han har været medlem af hovedbestyrelsen i IT-Brancheforeningen siden 2003, da Magirus Nordic A/S meldte sig ind, og Distributørudvalget blev etableret. Han blev formand for Distributørudvalget fra starten. Formålet med udvalget var at »få ryddet op«, fordi it-distributører stod i et dårligt lys efter sager med dårlige og falske varer. Han mødte momskarruseller første gang i 2001-02, og det blev et stort emne i 2003 og 2004, hvor også SKAT var kommet mere på banen. Distributørudvalget ville blandt andet lave etiske retningslinjer for branchen og få budskabet ud om, at et tremandsfirma, der omsætter for en milliard ved »bare at flytte bokse«, ikke kan sammenlignes med rigtige distributører, der tilføjer en reel værdi i handelskæden i form af blandt andet logistik, lagerbeholdninger og teknisk personale, der kan uddanne kunderne. Han repræsenterede IT-Brancheforeningen i det samarbejde, som SKAT tog initiativ til i 2005. Det var Reino Nielsen, der deltog fra SKAT.

Distributørudvalget blev nedlagt igen i foråret 2008, umiddelbart efter at sagen med Peer Kølendorf havde været behandlet. På det tidspunkt gav det heller ikke længere mening i forhold til markedet at bibeholde udvalget. Distributørudvalgets »etiske charter« blev fjernet i 2008, da IT-Brancheforeningen lavede en tværgående revision af alle udvalgenes retningslinjer.

Han har ikke tabt handler i konkurrence med Comitel, og Comitel har ikke leveret til hans kunder. Der har altid været firmaer, som lever af at skaffe varer, som ikke er tilgængelige, men efter hans opfattelse er der imidlertid ikke et reelt marked for en dansk virksomhed for at købe i udlandet og sælge i udlandet. Distributører sælger kun nationalt, så rent forretningsmæssigt mener han, at der kun er marginal konkurrence mellem distributører og brokere. Den største konkurrence for distributører og andre distributører, så det

er ikke brødnid, der er baggrund for hans indstilling til brokerbranchen.

Han mener ikke, at han var initiativtager til sagen om eksklusion af Peer Kølendorf, men han var formand for Distributørudvalget, og det lå udvalgets medlemmer på sinde. Da sagen kom op i 2007 i forlængelse af »Gul Feber«-handlerne, var det bare dråben, der fik bægeret til at flyde over, fordi der havde været diskussioner siden 2002 og 2003 og omtale i medierne, hvor der var blevet advaret om, at brokermarkedet var »højfyldt farvand«. Efter at det var kommet frem, at T var indblandet, ønskede et enigt Distributørudvalg at få IT-Brancheforeningen på banen og markere, at selv om Peer Kølendorf ikke havde et juridisk ansvar, så var der et etisk ansvar hos ledelsen for det, der var foregået. I hovedbestyrelsen var der uenighed, og sagen endte i en afstemning, der ikke støttede eksklusion af Peer Kølendorf. Han mener fortsat, at det var rigtigt at indstille til eksklusion om ikke andet så ud fra et etisk og moralsk synspunkt.

Når der i Distributørudvalgets indstilling af 24. januar 2008 om eksklusion af Peer Kølendorf nævnes, at Comitel har været medvirkende til »at levere brændstof til momskarrusellerne«, så var det på baggrund af oplysninger fra SKAT om, at der var 10 % svig på brokermarkedet, og derfor leverede man brændstof, når man som virksomhed agerede på det marked. Han var ikke bekendt med, om Comitels handler konkret havde ført til tab for SKAT. Han husker ikke, om han havde en indsatsplan fra SKAT i forbindelse med udfærdigelsen af indstillingen.

Han husker dialogen med Martin Vollmer i SKAT, som fremgår af en e-mail af 28. marts 2005. Hans svar

**1917**

om almindelig praksis for køb og salg af it-komponenter er baseret på hans eget branchekendskab. Han mener, at det er normalt at få reklamationer på it-produkter i størrelsesordenen 0-5 %, fordi det er skrøbelige varer. Prisudviklingen på it-komponenter er svingende, men han mener, at der i efteråret 2003 var en periode med faldende priser.

*Kim Østrup* har forklaret, at han er uddannet cand.polit i 1971 og har arbejdet 45 år i IBM, hvor han fra 1992 til 1. januar 2013 var vicedirektør og med i IBM's ledergruppe. Han har repræsenteret IBM i blandt andet IT-Brancheforeningens bestyrelse, hvor han også var formand i en 4-årig periode. Han har endvidere siddet i en række andre bestyrelser.

Han lærte Peer Kølendorf at kende, da Leverandørforeningen for Radio og Telekommunikation indledte et samarbejde med IT-Brancheforeningen i 1998, mens han var formand. Peer Kølendorf blev medlem af hovedbestyrelsen, og det gav ikke anledning til overvejelser, at Peer Kølendorf var direktør i en brokervirksomhed.

Han var bekendt med brokermarkedet fra IBM. Hvis der var fyldte lagre, så sendte man varer ud på markedet, og det gjaldt både store og små komponenter. Prissætningen kunne afhænge af valutakursændringer, og så flyttede brokere rundt på varerne. IBM brød sig ikke om det, og det var et marked, ledelsen var opmærksom på. Han har ikke selv beskæftiget sig med brokerhandel. Ham bekendt var der ingen andre medlemmer af IT-Brancheforeningens hovedbestyrelse, der drev brokerforretning, men eksempelvis hP og Microsoft har givet været bekendt med det. Ham bekendt var der ikke en forening for brokere.

Han havde indtryk af, at Comitel var en veldrevet forretning, der havde »flere ben at stå på« og havde opnået gode resultater, og at Peer Kølendorf var en professionel forretningsmand. Han har ikke haft noget forretningsmæssigt forhold til Comitel eller Peer Kølendorf.

Han var bekendt med omsætningsstørrelserne i »Gul Feber«-handlerne, og det virkede ikke urealistisk på ham eller de andre i IT-Brancheforeningen.

Distributørudvalget blev etableret i november 2003 for også at få det segment med i IT-Brancheforeningen. Der er ingen tvivl om, at brokere og distributører har vidt forskellige forretningsmodeller og konkurrerer med hinanden.

Han blev i starten af 2007 opmærksom på Distributørudvalgets etiske retningslinjer fra 2004, som ikke var godkendt i hovedbestyrelsen. De indeholdt bl.a. et forbud mod at købe kopiprodukter, hvilket han vurderede var uholdbart i forhold til EU-reglerne. Det var disse etiske retningslinjer, som Distributørudvalget i forsommeren 2007 i tiltræde omgang angav som grundlag for at ekskludere Peer Kølendorf, hvilket blev blankt afvist af hovedbestyrelsen. Det skete mundtligt.

Senere i 2007, efter T var blevet dømt, kom Distributørudvalgets indstilling om eksklusion, under henvisning til at Peer Kølendorf ved at drive virksomhed på brokermarkedet havde tilsidesat IT-Brancheforeningens generelle retningslinje om at agere i overensstemmelse med god brancheskik. Det blev anført, at SKAT gentagne gange skulle have advaret mod at være på dette marked, hvilket Distributørudvalgets formand, Ole Eklund, ikke kunne dokumentere, da forretningsudvalget spurgte hertil.

Forretningsudvalget indstillede derfor til hovedbestyrelsen, at der ikke skulle ske eksklusion, fordi det var legitimt at være på brokermarkedet, og hverken Comitel eller Peer Kølendorf var sigtet eller dømt. På hovedbestyrelsesmødet den 28. februar 2008 blev Distributørudvalgets indstilling afvist med alle stemmer bortset fra Distributørudvalgets medlems.

Han husker, at forretningsudvalget og sekretariatet var dybt nede i sagen og fandt indstillingen ubegrundet, og adspurgt på hovedbestyrelsesmødet fremkom Distributørudvalgets formand, Ole Eklund, ikke med et eneste argument for, at der var handlet i strid med god brancheskik.

*Procedure*

*SKAT* har i det væsentlige procederet i overensstemmelse med sit sammenfattende processkrift af 29. september 2014, hvori der hedder:

*»SKATs hovedanbringender*

Bestyrelsen og direktionen forestår i fællesskab ledelsen af selskabets anliggender, jf. den dagældende aktieselskabslovs § 54, stk. 1, og tilsvarende den nugældende selskabslovs §§ 115 og 117.

Det er bestyrelsens overordnede ansvar at sørge for en forsvarlig organisation af selskabets virksomhed, jf. aktieselskabslovens § 54, stk. 1. Direktionen skal derimod varetage den daglige ledelse af selskabet, jf. aktieselskabslovens § 54, stk. 2.

Direktionens rolle i denne forbindelse adskiller sig således afgørende fra bestyrelsens rolle, der er af mere overordnet karakter, hvorimod direktionens rolle i forbindelse med driften af virksomheden er at lede selskabet i dagligdagen, dvs. varetage den daglige drift af virksomheden. Direktionen må således i langt højere grad end bestyrelsen formodes at kende alle selskabets transaktioner og økonomiske stilling, og direktionen vil derfor langt lettere kunne siges at have handlet culpøst, hvis der påføres andre tab, jf. Jørgen Boe: Bestyrelsesmedlemmers og direktørers ansvar, UfR 1984B, side 395[U 1984B.385].

Peer Kølendorf var i perioden fra den 1. november 2003 til den 1. december 2004 direktør og/eller bestyrelsesmedlem i samt den ultimative ejer af Comitel International A/S'. I den samme periode var Comitel International A/S en aktiv deltager i - og en nødvendig

**1918**

og dermed afgørende forudsætning for gennemførelsen af - de handler, der samlet udgjorde Gul Feber-komplekset og Danmarks-historiens største momskarrusel.

Comitel International A/S var vidende om handlernes reelle karakter og formål.

Der må efter SKATs opfattelse anlægges den samme ansvarsbedømmelse for hele perioden, idet Peer Kølendorfs udtræden som direktør den 16. april 2004 ikke ændrede de faktiske ledelsesforhold i virksomheden, og idet Peer Kølendorf ved sin udtræden var bekendt med den manglende kontrol med selskabets brokerhandler.

Peer Kølendorf var branchekyndig og kendte til momskarruseller samt disses karakteristika. Peer Kølendorf vidste endvidere, hvordan man kunne undgå at medvirke til handler, der indgik i momskarruseller, og Peer Kølendorf var vidende om, at handlen med IT-komponenter var et nyt område for Comitel International A/S og et område, der var udsat for momskarruseller og falske varer. Peer Kølendorf anslog således selv, at 10-20 % af handlerne på markedet var del af momskarruselsvig.

På trods heraf gav han sine brokere en bemyndigelse til at indgå handler for kr. 50 mio. og lod dem herefter handle uden nogen form for indblanding eller kontrol fra selskabets daglige ledelse.

Det er fast antaget i retspraksis og den juridiske litteratur, at jo mere et bestyrelsesmedlem distancerer sig fra et detailansvar, desto større kontrolansvar må bestyrelsesmedlemmet pålægges. Det er således ikke ansvarsfrit for bestyrelsen at distancere sig fra detailviden om aktiviteten i selskabet, idet der blot bliver tale om, at ansvarsnormen ændrer sig til et kontrolansvar, jf. f.eks. UfR 1962, side 151 H og UfR 1962, side 452 h. Tilsvarende gør sig gældende for direktionen, der dog fra lovgivers side også forudsættes at have et detaljeret kendskab til driften med henblik på at forestå ledelsen af den daglige drift.

Peer Kølendorf deltog ikke i afviklingen af brokerhandlerne og havde ikke konkret viden om handlerne. Peer Kølendorf havde derfor som bestyrelsesmedlem så meget desto mere pligt til at føre aktiv kontrol med brokeraktiviteten, herunder implementere konkrete og relevante retningslinjer for brokerne og sikre efterlevelse heraf.

Som direktør havde Peer Kølendorf derudover en aktiv handlepligt til at være involveret i driften, have detailviden om selskabets aktiviteter og føre en mere indgående kontrol med selskabets forretningsområde, selskabets forretninger og de ansatte.

I stedet afstod Peer Kølendorf efter sit eget udsagn fra at føre aktiv kontrol med brokeraktiviteten, herunder med handlerne med IT-komponenter og pornokort, hvilken handelsaktivitet han fuldstændigt overlod ansvaret for til sin salgschef, senere direktør, T.

Det forhold, at Peer Kølendorf undlod at udføre sin direktionsfunktion i relevant omfang, kan ikke fritage ham for sit ansvar. En delegation af arbejdsopgaver fritager således ikke direktionen for ansvar i forhold til tredjemand.

Peer Kølendorf var vidende om og accepterede de handler, som T på vegne af selskabet indgik i perioden fra den 10. november 2003 og indtil udgangen af november 2004, og Peer Kølendorf trådte ind på dette marked uden på nogen relevant måde at søge at værge sig mod at deltage i momskarruselrelaterede handler.

Tværtimod accepterede Peer Kølendorf, at Comitel International A/S deltog i handler, hvor volumen både i handlede enheder og pris, fakturamateriel, manglende reel varekontrol, undladelse af sædvanlige kontrolmekanismer såsom f.eks. registrering af batchnumre/serienumre mv., indebar så store risici, at det ikke gav mening for en branchekyndig, medmindre Peer Kølendorf havde nærmere indsigt i sammenhængen mellem Comitel International A/S' leverandør og kunder og handlernes formål.

Det er derfor SKATs opfattelse, at der var både generelle og konkrete problemindikatorer, herunder både vedrørende brokermarkedet og de specifikke handler, der gav Peer Kølendorf anledning til at tilvejebringe information med henblik på at afdække eventuelle svigagtige forhold, jf. i denne forbindelse Thorbjørn Sofsrud: Bestyrelsesansvaret, 1999, side 442. Peer Kølendorf undlod imidlertid at reagere på disse problemindikatorer, på trods af at han havde rimelig anledning hertil, og han forsømte derfor at foretage en oplagt vurdering af, hvorvidt selskabet burde afstå fra Gul Feber-handlerne.

Dette må efter SKATs opfattelse være udtryk for, at Peer Kølendorf på grov uagtsom vis undlod at tilrette[lægge] ledelsen af sin virksomhed på forsvarlig vis og undlod at forholde sig til de konkrete og generelle risici, som Gul Feber-handlerne indebar for Comitel International A/S.

Der skal også i ansvarsvurderingen tages højde for organisationens størrelse, jf. bl.a. Morten Samuelsson og Kjeld Søgaard: Bestyrelsesansvaret, 1997, side 181. Der må derfor stilles langt højere krav til ledelsens detailviden om driften i mindre virksomheder. Særligt hvis et mindre selskabs eneejer og direktør på egen hånd varetager driften, og denne gennem retsbrud mv. påfører tredjemand tab, vil skillelinjen mellem håndtelse og erstatningsansvar være tynd, og der skal ikke meget til for at statuere ansvar, jf. Erik Werlauff: Selskabsret, 9. udgave, 2013, side 580.

Det bør således føre til en skærpende ansvarsbedømmelse, at Comitel International A/S var en mindre virksomhed med kun 5-6 ansatte, at Peer Kølendorf ved handlens opstart var medlem af både direktion og bestyrelsen, samt at han havde bestemmende indflydelse

**1919**

over selskabet, idet han var den ultimative hovedaktionær.

Ledelsen har pligt til at føre kontrol med, at der er økonomisk realitet bag selskabets dispositioner, jf. UfR 2005, side 918 h, hvor Højesteret pålagde et bestyrelsesmedlem i et canadisk selskab ansvar over for en deltager i et cirkulært investeringsprojekt, idet bestyrelsesmedlemmet burde have indset, at projektet kunne være uden økonomisk realitet. Denne pligt gælder for alle medlemmer af ledelsen, men må være særligt nærliggende for direktionen, der i modsætning til bestyrelsen har detaljeret indsigt i den daglige drift.

Som direktør og bestyrelsesmedlem havde Peer Kølendorf pligt til at sikre tilrettelæggelse og efterlevelse af relevante kontrolforanstaltninger, som var egnede til at forhindre Comitel International A/S i at blive inddraget i fiktive handler, der kunne indebære tab for SKAT.

Dette skete ikke.

Der anlægges en strengere bedømmelse, hvor ledelsens handlinger eller undladelser, som påfører en kreditor tab, har haft til formål at bibringe ledelsen personlig fordel. Det bør således føre til en skærpet bedømmelse, at Peer Kølendorf var den ultimative ejer af Comitel International A/S og den koncern, som selskabet indgik i, hvorfor han havde en personlig økonomisk interesse i overskuddet, som Gul Feber-handlerne genererede for selskabet.

Det gøres i konsekvens af det netop anførte sammenfattende gældende, at Peer Kølendorf i sin egenskab af direktør, bestyrelsesmedlem og ultimativ hovedaktionær i Comitel International A/S har handlet erstatningsansvarspådragende over for SKAT ved tilrettelæggelsen af og den manglende kontrol med driften i sin virksomhed.

Det kan i forlængelse af ovenstående lægges til grund, at Peer Kølendorf kendte til, at der bestod en nærliggende risiko for at SKAT led tab i konsekvens af de omfattende problemer med svigsrelaterede handler på markedet for mobiltelefoner og IT-

komponenter. Dette forhold må føre til en skærpet ansvarsbedømmelse.

I forbindelse med ovenstående gøres det nærmere gældende, at Peer Kølendorf gennem sin mangeårige erfaring med handel inden for mobiltelefon- og IT-branchen samt sit arbejde i brancheforeningen LRK (senere IT-Branchen) var fuldt bekendt med branchens problemer med momskarruselsvig,

at Peer Kølendorf var bekendt med de almindelige kommercielle risici for brokerhandler samt den for brokermarkedet særligt nærliggende risiko for at blive inddraget i handler uden økonomisk realitet med deraf følgende retsbrud og tab for SKAT,

at opstarten med handel af IT-komponenter i Gul Feber-handlerne var et nyt markedsområde for Comitel-koncernen,

at der både var tale om helt nye kunder og leverandører i disse handler, som ikke udsprang af hverken Peer Kølendorfs eller Comitel-koncernens eksisterende netværk,

at Comitel International A/S i handlerne med disse nye kunder, leverandører og varesortiment genererede en øjeblikkelig og eksplosivt stigende omsætning til et trecifret millionbeløb,

at den høje omsætning opstod på trods af, at selskabet undlod på nogen måde at markedsføre sig som broker via sædvanlige medier, herunder ved ikke at have nogen hjemmeside,

at dette marked således reelt blev opdyrket fra den ene dag til den anden, samtidig med at der fra første handel var tale om lukrative handler med meget store varepartier, som i alle tilfælde udelukkende blev købt fra og solgt til andre brokere,

at omsætningen pr. medarbejder i Comitel International A/S langt oversteg sammenlignelige virksomheder på markedet, hvilket Peer Kølendorf utvivlsomt var bekendt med,

at de ansatte brokere havde en uforholdsmæssig høj bemyndigelse til at indgå handler på kr. 50 mio., som ikke var sædvanlig[t] i branchen og henset til selskabets beskedne kapitalgrundlag i sig selv var uforsvarlig[t],

at blot en fejlslagen handel således kunne føre til tab af selskabets fulde kapitalgrundlag uden ledelsens involvering eller godkendelse,

at den virksomhed, som Peer Kølendorf var ansvarlig for driften af, ikke reelt havde nogen form for kontrol eller procedurer, som var egnede til at afdække handler med potentielle tabsrisici for Comitel International A/S eller SKAT,

at Comitel International A/S ikke efterlevede relevante anbefalinger, herunder den engelske Code of Conduct, som Peer Kølendorf selv har fremhævet over for SKAT,

at det er udokumenteret og - henset til Bs forklaring under straffesagen, antallet af handlede enheder og den ofte mangelfulde varebeskrivelse på købs- og salgsfakturaer - usandsynligt, at der blev foretaget nogen reel varekontrol i Gul Feber-handlerne,

at der ikke blev foretaget registrering af serie- eller batchnumre på trods af, at dette var en relevant og sædvanlig kontrolforanstaltning for at undgå momskarruselsvig og i øvrigt varetage sig mod sædvanlige kommercielle risici,

at det efter forklaringerne afgivet under straffesagerne og vurderingsrapporten af det vareparti, der blev stoppet i Københavns Lufthavn, kan lægges til grund, at varerne i handlerne med IT-komponenter i meget stort omfang var attrapper, dummies eller varemærkeforfalskede, og at de samme varer passerede Comitel International A/S' varelager flere gange,

**1920**

at Comitel International A/S i adskillige af handlerne indkøbte og videresolgte varer til priser, der væsentligt afveg fra markedsprisen,

at det for Peer Kølendorf burde have fremstået særdeles usandsynligt, at Comitel International A/S' kunder ville aftage varer fra Comitel International A/S til en pris, der langt oversteg priserne på det autoriserede marked,

Copyright © 2023 Karnov Group Denmark A/S

at det fakturamateriale - der var det eneste skriftlige grundlag for handlerne og var fuldt tilgængeligt for Peer Kølendorf - i flere tilfælde indeholdt mangelfulde eller meningsløse varebetegnelser, hvilket særligt gjorde sig gældende i de største handler,

at de meningsløse varebetegnelser umuliggjorde en kontrol af, om de leverede varer svarede til dels det, som Comitel International A/S havde bestilt hos sin leverandør samt dels det, som Comitel International A/S havde modtaget købsordre på fra sin kunde,

at de meningsløse varebetegnelser ville have foranlediget en branchekyndig direktør til at foretage nærmere undersøgelser af handlerne,

at Solid Trading ApS, Trademark International ApS og J Corp ApS i tilnærmelsesvis alle Gul Feber-handlerne med meget kort varsel kunne levere præcis det antal IT-komponenter/pornokort, som Comitel International A/S' kunder i Fjernøsten efterspurgte, hvilket henset til ordrernes meget store volumen må have fremstået særdeles usandsynligt for en branchekyndig direktør,

at volumen i de enkelte Gul Feber-handler var langt større end sædvanlige handler på brokermarkedet for IT-komponenter, herunder også for Comitel International A/S' øvrige handler,

at det henset til varernes følsomme karakter ville have ansporet en branchekyndig direktør til at stille spørgsmålstegn ved handlernes realitet, at der ikke i en eneste af Gul Feber-handlerne blev modtaget reklamationer vedrørende varerne,

at Comitel International A/S i en specifik handel ydede kredit på kr. 20 mio. til et helt nystiftet selskab i Hongkong, som Comitel International A/S ikke tidligere havde handlet med, uden at Peer Kølendorf herefter fandt anledning til at sanktionere dette eller skærpe kontrollen med T,

at en meget betydelig del af Comitel International A/S' omsætning med EU-handler i samme periode også må antages at være momskarruselsvigsrelateret, hvilket Comitel International A/S burde havde indset henset til det store antal verifikationsanmodninger fra andre europæiske afgiftsmyndigheder vedrørende Comitel International A/S' samhandelsparter,

at det kan lægges til grund, at i hvert fald 30 pct. af betalingerne til Comitel International A/S - uden for Gul Feber-handlerne - i den for sagen relevante periode var tredjepartsbetalinger, hvilket er et typisk kendetegn for momskarruselrelaterede handler,

at Peer Kølendorf, såfremt han havde overvåget Comitel International A/S' ind- og udbetalinger meget let kunne have opnået kendskab til modtagelsen af tredjepartsbetalinger samt til, at Comitel International A/S uden forretningsmæssig begrundelse foretog opsplitning af betalinger og modtog opsplittede betalinger i en række Gul Feber-handler,

at opstarten af handlerne med pornokort også udgjorde et nyt - og i forhold til Comitel International A/S' tidligere aktivitet - markant anderledes markedsområde med helt nye kunder og leverandører,

at Peer Kølendorf undlod at interessere sig nærmere for, hvem disse nye kunder og leverandører var,

at der ikke bestod et reelt brokermarked for handel med pornokort, og at Peer Kølendorf ikke berettiget kunne være af en anden opfattelse,

at der også i fakturamaterialet i handlerne med pornokort var tale om unøjagtige varebetegnelser og en prisfastsættelse, der ikke tillod nævneværdige avancer i senere omsætningsled,

at pornokortene var af så ringe kvalitet, at de reelt måtte betegnes som ukurante,

at Peer Kølendorf ikke førte nogen form for kontrol med T, der ene mand gennemførte Gul Feber-handlerne og efter Peer Kølendorfs udsagn også mere eller mindre egenhændigt foretog varekontrollen i handlerne med 2,6 mio. IT-komponenter og 288.500 stk. pornokort,

at Peer Kølendorf på den baggrund ikke kunne være i god tro om, at der blev gennemført en reel og tilstrækkelig varekontrol,

at summen af de mange usædvanlige forhold, der har været forbundet med driften af Comitel International A/S generelt og konkret Gul Feber-handlerne, burde have givet Peer Kølendorf anledning til at foretage en nærmere undersøgelse af aktiviteterne i selskabet,

at Peer Kølendorf, såfremt han havde foretaget sådanne nærmere undersøgelser, burde være blevet bekendt med sit selskabs deltagelse i det omfattende momskarruselsvigsarrangement og dermed have afstået fra at gennemføre de pågældende handler og derudover drage de nødvendige konsekvenser fremadrettet,

at Peer Kølendorf havde oplagt anledning til og mulighed for at identificere de usædvanlige og risikable forhold omkring de fiktive handler, men ikke handlede på et eneste af forholdene i sin virksomhed, idet Peer Kølendorf uden nogen form for tilsyn eller kontrol overlod ledelsen af den daglige drift til T,

at de af Peer Kølendorf hævdede kontrolforanstaltninger, hvis eksistens Peer Kølendorf må bære bevisbyrden for, er udokumenterede,

at Peer Kølendorfs ansvar skal vurderes i lyset af, at Comitel International A/S var en lille virksomhed med få ansatte, og at Peer Kølendorf i hele perioden var ledelsesmedlem og hovedaktionær i selskabet,

**1921**

at ansvaret yderligere skal vurderes i lyset af den opmærksomhed, som Peer Kølendorf burde have givet brokerforretningen grundet omsætningens størrelse og de erkendte risici ved aktiviteten,

at Peer Kølendorfs ledelsesposter i de øvrige dele af Comitel-koncernen ikke ændrer herpå,

at de ovenfor anførte undladelser både isoleret og samlet set var egnede til at forårsage afgiftstab for SKAT, hvilket var kendeligt for Peer Kølendorf,

at undladelserne påførte SKAT et tab for uberettiget afløftet moms i størrelsesordenen kr. 144.080.700, som udgør SKATs erstatningskrav i nærværende sag,

at SKATs sagsbehandling ikke kan indebære nedsættelse eller bortfald af erstatningskravet, ligesom kravet hverken er helt eller delvist forældet, og

at der under hensyn til skyldgraden ikke bør ske lempelse af Peer Kølendorfs erstatningsansvar i medfør af selskabslovgivningen eller erstatningsansvarsloven.

I forhold til den hævdede egen skyld, som SKAT ifølge Peer Kølendorf skulle have udvist, gøres det nærmere gældende, at SKAT - i modsætning til Peer Kølendorf - ikke havde sin daglige gang i Comitel International A/S og som oppebørselsmyndighed for skatter og afgifter ikke havde samme adgang til at føre kontrol med de ansatte brokere og virksomhedens handler som selskabets ledelse.

Det er således selvmodsigende, når Peer Kølendorf under nærværende sag på den ene side hævder, at han som branchekyndig direktør, bestyrelsesmedlem og ultimativ hovedaktionær i Comitel International A/S hverken kunne eller burde have opdaget, at selskabet i meget vidt omfang indgik handler uden økonomisk realitet og med ukurante varer, mens SKAT efter Peer Kølendorfs opfattelse på den anden side burde have stoppet de involverede i Gul Feber-komplekset på et langt tidligere tidspunkt.

Endvidere skal det fremhæves, at SKAT både i kontrol- og inddrivelsesmæssig henseende reagerede omgående på det tidspunkt, hvor der var indikationer på svig og tabsrisiko, og at SKAT i øvrigt har udfoldet meget betydelige bestræbelser, herunder i forbindelse med finansiering af arrestforretning, SKATs konkursbegæring samt

sikkerhedsstillelse i forhold til bobehandlingsomkostninger for de involverede danske konkursboer med henblik på at stoppe den pågældende aktivitet og begrænse SKATs tab.

SKAT inddragede også straks Statsadvokaten for Særlig Økonomisk Kriminalitet (SØK - nu SØIK) i sagen, da tabsrisikoen viste sig i Network Trading ApS i marts 2004.

Når SKAT ikke tilbageholdt Comitel International A/S' moms med hjemmel i opkrævningslovens § 12, stk. 3, skyldtes dette, at SKAT ikke på udbetalingstidspunkterne havde den fornødne konkrete viden om handlernes svigagtige karakter samt Comitel International A/S' viden herom, og at betingelserne for at tilbageholde moms dermed ikke på daværende tidspunkt var opfyldt.

SKAT havde således ikke på tidspunktet for den sidste udbetaling af negativ moms vedrørende samhandlen med Solid Trading ApS grundlag for at antage, at handlerne var en del af et organiseret set-up, der havde til formål forsætligt at unddrage moms, eller at Comitel International A/S var en aktiv del af dette set-up.

Først i december 2004 var SKAT kommet så langt i indsamlingen af information og analysen af den indsamlede information, at SKAT - på rent objektivt grundlag - fandt, at der kunne fremsendes et forslag til afgørelse om nægtelse af fradrag i høring til Comitel International A/S.

Hvis SKAT desuagtet havde tilbageholdt Comitel International A/S' moms, ville der således have været tale om uberettiget myndighedsudøvelse, som ville kunne begrunde et ansvarsgrundlag for SKAT.

Selv hvis SKAT allerede i marts 2004 havde haft begrundede antagelser om, at Solid Trading ApS bevidst ikke havde til hensigt at afregne sit momstilsvar, bemærkes det, at SKAT ikke på daværende tidspunkt havde den fornødne hjemmel til at underrette Comitel International A/S om en sådan mistanke.

Det gøres endeligt gældende, at SKATs tab fuldt ud er dokumenteret.

Tilbageholdelsen af Comitel International A/S' negative momstilsvar for november måned 2004, som forfaldt til udbetaling den 20. december 2004, førte efter protester fra Peer Kølendorfs side om, at tilbageholdelsen skete på et uberettiget grundlag til, at Comitel International A/S samtidig blev meddelt henstand med betaling af et positivt momstilsvar angivet på Comitel International A/S hovedregistrering. Tilbageholdelsen af Comitel International A/S' negative momstilsvar for november måned 2004 indebar derfor reelt kun en nettotilbageholdelse på kr. 2 mio.

Henstanden blev - efter anmodning fra Peer Kølendorf - alene ydet som konsekvens af, at Comitel International A/S efter tilbageholdelsen af det negative momstilsvar ikke var i stand til at betale sit forfaldne positive momstilsvar, og SKAT accepterede således at meddele henstand for at udligne likviditetsbelastningen for Comitel International A/S. Tilbageholdelsen af den negative moms for november måned 2004 og den efterfølgende meddelelse af henstand med betaling af det forfaldne positive momstilsvar skal således i relation til tabsopgørelses ses samlet. Dette fører til, at SKATs tab alene skal reduceres med nettotilbageholdelsen på kr. 2 mio.«

Vedrørende opgørelsen af tabet har SKAT yderligere anført, at der ikke er grundlag for at afkorte kravet med

**1922**

dividenderne i de konkursramte selskaber involveret i »Gul Feber«-komplekset, idet konkursboerne i udgangspunktet må anses for tomme. SKAT har imidlertid afgivet en bindende proceserklæring om at transportere retten til dividenderne til Peer Kølendorf, hvis denne dømmes i overensstemmelse med SKATs påstand og betaler det fulde beløb til SKAT, inden de udestående dividendebeløb endeligt afregnes.

SKAT har endvidere vedrørende spørgsmålet om egen skyld anført, at Peer Kølendorfs indsendelse af kunde- og leverandørlister til SKAT ikke kan tillægges selvstændig betydning, allerede fordi listerne indeholdt meget få oplysninger - også færre end SKAT selv ville kunne hente fra det fælles EU-momssystem (VIES-systemet) - og SKAT ville derfor alene på grundlag af disse kunne forholde sig til aktiviteterne, hvilket Peer Kølendorft heller ikke har fået stillet i udsigt eller kan have haft en berettiget forventning om.

SKAT har endelig bestridt, at kravet mod Peer Kølendorf er helt eller delvist forældet og har principalt anført, at der gælder en 20-årig forældelsesfrist, idet SKATs tab er opstået som direkte konsekvens af en forbrydelse, for hvilken der under en offentlig straffesag er pålagt straf, jf. 1908-forældelseslovens § 1, stk. 1, nr. 5, in fine, jf. DL 5-14-4. Subsidiært er det gjort gældende, at kravet er omfattet af den dagældende 5-årige forældelsesfrist, og at forældelsesfristen har været suspenderet i hvert fald frem til SKATs første forslag til afgørelse den 6. december 2004, hvorfor forældelse ikke var indtrådt ved sagens anlæg.

*Peer Kølendorf* har i det væsentlige procederet i overensstemmelse med sit sammenfattende processkrift af 29. september 2014, hvori det blandt andet hedder:

»*1 Sagens problemstilling*

1.1 *Momssystemet*

• I momssystemet opkræver sælgeren af en vare moms af salget fra køberen på vegne af SKAT, og sælgeren viderebetaler herefter momsen til SKAT. SKAT bærer risikoen for, at sælgeren indbetaler momsen til SKAT, og køberen har derfor krav på at få momsen tilbagebetalt fra SKAT (momsfradrag), uanset om sælgeren ikke indbetaler momsen til SKAT. Momssystemets iboende risiko for sælgerens - eller et tidligere leds - manglende indbetaling af momsen påhviler således SKAT.

• Som undtagelse hertil er det fastslået i Kittel-dommen fra juli 2006 (MS 2, s. 297) [sag C-439/04], at hvis køber vidste eller burde have vidst, at »transaktionen var led i momssvig« - og at momsen, som køberen betaler til sælgeren, derfor ikke vil blive viderebetalt til SKAT - så kan køberen blive nægtet tilbagebetaling af momsen. Det afgørende er købers viden eller burde viden *ved betalingen af købesummen inklusive moms til sælgeren*. Hvis køberen *efter* betalingen til sælgeren erfarer, at sælgeren svigagtigt ikke har til hensigt at indbetale momsen, har dette ikke betydning for køberens krav på tilbagebetaling af momsen.

1.2 *SKATs overordnede anbringender*

• SKAT har overordnet gjort gældende, at Peer Kølendorf har handlet ansvarspådragende ved at foranledige, at Comitel fra SKAT fik tilbagebetalt moms, som et forudgående led efterfølgende svigagtigt unddrog SKAT ved skyldnersvig.

• Den *handling,* som Peer Kølendorf bebrejdes, er således, at han har foranlediget tilbagebetaling af momsen til Comitel. Handlingen er ifølge ministeriet *retsstridig,* fordi Peer Kølendorf på tidspunktet for tilbagebetalingen burde have vidst, at et forudgående led svigagtigt ville undlade at indbetale momsen til SKAT, og at en tilbagebetaling af momsen til Comitel dermed var uberettiget.

1.3 *Peer Kølendorfs overordnede anbringender*

• Peer Kølendorf gør overordnet gældende, at han ikke burde have vidst, at tilbagebetalingen af momsen ville vise sig uberettiget på grund af den efterfølgende svig i andre selskaber. Momsen var betalt for varer, der efter en bestyrelsesbeslutning indgik i Comitels varesortiment, og som blev købt og videresolgt som et led i selskabets almindelige handelsvirksomhed.

• Der er ikke før i dansk ret rejst et erstatningskrav i en situation som denne. Skatteministeriet kræver erstatning af Peer Kølendorf i en situation, *hvor* det selskab, som han var hovedaktionær og

medlem af ledelsen i, af en højtplaceret og betroet medarbejder i forening med personer uden for selskabet svigagtigt blev anvendt som et redskab til at udøve skyldnersvig i *andre* selskaber, *hvor* selskabets involvering bestod i at gennemføre handelstransaktioner med handelsvarer som led i selskabets almindelige drift, og *hvor* Peer Kølendorf ikke har opnået vinding ved handlerne eller den udøvede svig, tværtimod.

*2 Kort om Comitel*

2.1 *Selskabets ledelse og struktur*

• T blev ansat i 1992 og var i firmaet indtil 1996. I denne periode udviklede han virksomhedens værksted fra at være reparationsværksted for egne produkter med 3-4 ansatte til at være serviceværksted for bl.a. Nokia-telefoner med 10 ansatte. Han forlod selskabet for at starte virksomheden TeleService op. Den blev senere solgt til Fleggaard/Dangaardkoncernen.

• I 1998 fik selskabet en professionel bestyrelse. Ole Stangegaard, som bl.a. havde været med til at etablere *Statens Datacentral* og *ØK Data*, indtrådte som formand, og efterfølgende indtrådte som Torben Svanberg, som havde været direktør i *Sonofon*, der havde indgået aftaler med Comitel som broker af mobiltelefoner, samt Lars Thinggaard, der var revisoruddannet og havde været i it-branchen siden 1994. Bestyrelsen

**1923**

bestod indtil juni 2003 herefter af de tre og Peer Kølendorf.

• I 2000 blev T atter ansat i selskabet, og denne gang indgik han i selskabets daglige ledelse og refererede direkte til Peer Kølendorf. Han havde titel af forretningsudvikler og overtog ansvaret for brokerafdelingen.

• I juni 2003 udtrådte Ole Stangegaard af bestyrelsen, og Steen E. Mønsted indtrådte som ny formand for bestyrelsen. Han havde betydelig erfaring fra handelsvirksomheder og havde bl.a. været med til at stifte Fakta-kæden.

• Ved sagsperiodens opstart i efteråret 2003 var selskabet organiseret med Peer Kølendorf som administrerende direktør, og med stabsfunktioner i form af *forretningsudvikling, it, finans/logistik* og *teknik/udvikling*.

• Selskabet havde 4 kundeopdelte forretningsområder (afdelinger): *Consumer, Business, Broker* og *Eksport*. Til support af driften af disse kundeorienterede afdelinger var der en enhed med ansvar for *internet* og *marketing* og en enhed med ansvar for ekspedition af *salg* og *indkøb*, ligesom en enhed håndterede selskabets *lager* ...

• Selskabet var i 2003 distributør for en række førende internationale producenter af *telekommunikationsudstyr* herunder *Nokia, Motorola, Ericsson, Siemens* samt *NEC, Samsung og Mitsubishi*, hvor forhandlerne var selskabets primære kunder ...

• Comitel havde desuden distribution af *landmobile radioer* fra de største producenter.

• Selskabet solgte også *privatradioer*, og dette skete under selskabets eget varemærke *Danita*. Privatradio havde været selskabets hovedområde siden 1966, og produkterne blev udviklet og designet i Danmark og produceret på fabrikker i Fjernøsten. Selskabets andel af privatradiomarkedet var på daværende tidspunkt 85 %.

• Selskabet forhandlede i tillæg hertil *hobbyradioer* fra bl.a. Cobra og *Panasonic* og *PMR-systemer* og udstyr fra *Simoco, Maxon, Kenwood* samt *Motorola* ...

• I 2003 indgik in koncernen også datterselskabet *SMS A/S,* der havde aktiviteter med takserede ringetoner til logoer til mobiltelefoner. Comitel A/S ejede desuden 50 % af CBB Mobil A/S, hvori Peer Kølendorf på dette tidspunkt var bestyrelsesformand.

• I 2003 var der gennemsnitligt 30-35 personer i selskabets kontor på Østerbro, hvilke kontorer Comitel A/S delte med det helejede datterselskab SMS A/S.

2.2 *Brokerafdelingen*

• I midten af 1990'erne opstartede selskabet gradvist *brokerhandel* med mobiltelefoner. I 1995 var omsætningen på 70 mio. kr., og den voksede til over 1 mia. kr. i 2002. Avancen ved handelen var beskeden, og omsætningen bidrog således kun minimalt til resultatet. Siden opstarten af brokerhandelen i midten af halvfemserne og efter indsættelsen af en professionel bestyrelse var brokervirksomheden løbende blevet sat i fastere rammer.

• Fra ultimo 2003 til ultimo 2004 handlede Comitel med 1.221 forskellige varenumre på mobiltelefon- og it-brokermarkederne.

• Comitel gennemførte i 2004 lidt over 1.200 brokerhandler.

• Peer Kølendorf var ikke selv broker, og han medvirkede ikke til de konkrete handler, men han havde sin daglige gang på koncernens kontor, og han havde adgang til alle oplysninger om koncernens aktiviteter, også brokerhandler.

*3 Ansvarsgrundlaget*

3.1 *Selskabet var forsvarligt organiseret og kapitaliseret*

• Selskabet havde de kompetencer til stede, som var nødvendige for at drive selskabets forretningsområder (afdelinger) på en forsvarlig og hensigtsmæssig måde, herunder inden for ledelse, finans og økonomi (regnskab, bogholderi, ind- og udbetalinger), lager (modtagelse, opbevaring og afsendelse af varer), logistik (transport af varer til og fra selskabet og forsikring af varerne), indkøb, salg, marketing, værksted og produktudvikling samt it og forretningsudvikling.

• Selskabet havde den kapital, der var nødvendig til den løbende drift.

3.2 *Selskabets daglige drift var forsvarligt tilrettelagt og overvåget*

• Den daglige drift var tilrettelagt med hensigtsmæssige rutiner og forretningsgange og med en personel adskillelse mellem de relevante funktioner i selskabet. Virksomheden havde eksisteret i 37 år på det tidspunkt, da de første handler i sagen blev gennemført, og Peer Kølendorf havde i alle årene haft ansvaret for og ført tilsyn med, at den daglige drift af selskabet var forsvarlig.

• Som administrerende direktør udstedte han instrukser og retningslinjer, og han påså, at disse blev implementeret ved forsvarlige rutiner og forretningsgange.

• Han havde desuden ansvaret for at implementere den strategi, som bestyrelsen havde fastsat inden for selskabets enkelte forretningsområder.

• Peer Kølendorf førte tilsyn ved dagligt at være stede på kontoret og følge med i de enkelte forretningsområder og ved at være tilgængelig for alle medarbejdere for sparring og for bistand, hvis der opstod spørgsmål eller problemer, og han drøftede løbende stort og småt med medarbejderne. Han havde ikke detailindsigt i de tusindvis af transaktioner, som selskabet indgik hvert år, og han delegerede selve driften af forretningsområderne til lederne af disse.

• Ledelsen af personalet og personalemæssige forhold i øvrigt blev også i vidt omfang håndteret af Peer Kølendorf på daværende tidspunkt.

• Peer Kølendorf havde som administrerende direktør ansvaret for selskabets økonomi og førte løbende tilsyn

**1924**

med økonomien, herunder udviklingen i de enkelte afdelingers omsætning og omkostninger, og han sørgede for budgetopfølgning over for afdelingslederne, herunder T.

• Peer Kølendorf varetog som administrerende direktør og bestyrelsesmedlem i Comitel A/S og Comitel International A/S og senere som bestyrelsesmedlem i Comitel International A/S sine ledelsespligter på fuldt tilstrækkelig vis.

3.3 *Selskabet havde en dyb og langvarig erfaring med det internationale brokermarked*

• International brokerhandel er en lovlig - og samfundsnyttig - aktivitet, som konkurrencereglerne og konkurrencemyndighederne værner om.

• Selskabet havde siden midten af halvfemserne opbygget en betydelig brokervirksomhed på det internationale brokermarked for mobiltelefoner.

• De særlige kompetencer, der er nødvendige ved drift af international brokervirksomhed, var gradvist blevet opbygget, og de rutiner og forretningsgange, der var nødvendige, herunder i forhold til kontrol af varer, leverandører og kunder, var fuldt ud indarbejdet, da sagens handler begynder i 2003.

3.4 *Selskabet var opmærksom på og garderede sig mod momssvig ved brokerhandel*

• Selskabet havde et tæt samarbejde med told- og skattemyndighederne:

• Selskabet blev på et møde i Told- og Skattestyrelsen i 1998 gjort opmærksom på, at selskabet havde solgt mobiltelefoner til selskaber, som efterfølgende havde vist sig at være *missing traders*. Ifølge styrelsens mødereferat havde Peer Kølendorf været interesseret i at høre, hvordan momskarruseller kunne undgås, og det blev aftalt, at han skulle fremsende leverandør- og kundekartoteket til styrelsen.

• Peer Kølendorf fremsendte herefter oplysninger om brokervirksomhedens nye påtænkte leverandører og kunder til styrelsen hver måned frem til 2002. Selskabet undgik i denne periode handler, hvor en leverandør eller kunde var involveret i momskarruseller (selskabet fik på intet tidspunkt i tiden frem til 2002 på ny oplysning fra styrelsen om, at en leverandør eller kunde havde været involveret i momssvig).

• I *2000* deltog Peer Kølendorf i møder med Skatteministeriets departement, hvor departementet bl.a. præsenterede et lovforslag, som indebar, at et selskab kunne frigøre sig fra hæftelse, hvis selskabet indberettede handlerne med den anden virksomhed til told- og skattemyndighederne. I 1999 havde myndighederne tilsvarende udstedt et cirkulære (nr. 123/1999), hvorefter dette var strafferetligt ansvarsfrigørende. Dette bekræftede, at en afgørende forholdsregel mod momskarruseller bestod i at stille relevante oplysninger til rådighed for myndighederne.

• I 2002 bad Told- og Skattestyrelsen Peer Kølendorf fremover sende oplysninger om nye leverandører og kunder til Mia E.B. Hansen i Told-Skat København. Peer Kølendorf fortsatte med at fremsende oplysningerne hver måned, og heller ikke i tiden fra 2002 og frem til sagsperiodens afslutning i *november 2004* modtog selskabet oplysning om, at en leverandør eller kunde var involveret i momskarruselsvig. Peer Kølendorf opfattede dette således, at selskabet ikke i perioden havde købt fra eller solgt til en virksomhed, som efterfølgende viste sig at være *missing trader* eller på anden måde relateret til momssvig.

• Selskabet var inden sagsperioden jævnligt blevet anmodet om dokumentation til brug for ToldSkat Københavns besvarelse af såkaldte *verifikationsanmodninger* fra udenlandske myndigheder. Heller ikke dette afstedkom oplysning til Comitel eller Peer Kølendorf om, at Comitel på noget tidspunkt have handlet med svigsrelaterede selskaber.

• Selskabet fremsendte hver måned købs- og salgsfakturaer til ToldSkat Københavns udbetalingskontrol (Charlotte Vindelev og Kurt Enok) i forbindelse med anmodninger om tilbagebetaling af købsmoms til selskabet. Regionen havde dermed et fuldstændigt grundlag for at vurdere selskabets krav om tilbagebetaling af momsen. Fra januar 2004 sendte Peer Kølendorf efter anmodning fra Charlotte Vindelev *også* oplysningerne om nye leverandører og kunder direkte til hende.

• Peer Kølendorf sørgede således for, at SKAT i hele sagsperioden havde oplysninger om alle brokerafdelingens handler, leverandører og kunder.

• Peer Kølendorf sørgede også for, at brokerafdelingen internt traf relevante *forholdsregler* mod momskarruseller, og han orienterede aktivt om momskarruseller og om faresignalerne både internt og i brancheblade og dagspressen i perioden fra 1998 til 2001.

• England var særligt plaget af momskarruseller, og Peer Kølendorf havde fra de engelske told- og afgiftsmyndigheder fået udleveret en vejledning (Code of Conduct) med faresignaler og forholdsregler, som han instruerede T og brokerne i at gøre sig bekendt med, således at brokerne kunne være opmærksomme på disse. Dette bekræftede T i sin forklaring i straffesagen, ligesom han oplyste, at Peer Kølendorf runddelte artikler om momskarruseller i brokerafdelingen …

• *Sammenfattende var rutiner, forretningsgange og kontrolforanstaltninger* løbende blevet udviklet og indarbejdet i brokerafdelingen i årene forud for sagsperioden, og foranstaltningerne fremstod for Peer Kølendorf *effektive* i forhold til at undgå momskarruseller. Selskabet fik efter mødet i Told- og Skattestyrelsen i 1998 *på intet tidspunkt* oplysning om, at samhandelspartnere havde været involveret i momssvig.

**1925**

3.5 *Bestyrelsen besluttede at udvide varesortimentet*

• Bestyrelsen ønskede, at selskabet skulle udvide varesortimentet i brokerafdelingen, således at denne ikke alene var baseret på handel med mobiltelefoner.

• Lederen af brokerafdelingen, T, stillede herefter i begyndelsen af 2003 forslag om udvidelsen af varesortimentet til it-komponenter.

• På et strategiseminar i februar 2003 og efterfølgende på et bestyrelsesmøde motiverede T nærmere sit forslag, og bestyrelsen besluttede herefter, at T kunne udvide varesortimentet til it-komponenter. Det blev drøftet, om han kunne udvide varesortimentet til andet end mobiltelefoner og it-komponenter, og det blev vedtaget, at andre varer i givet fald skulle have relation til den eksisterende forretning, således at varesortimentet ikke kunne udvides til eksempelvis tøj (habitter eller andet).

• Bestyrelsen havde tillid til T's analyse af og oplysninger om bl.a., at der var et internationalt brokermarked for disse it-varer, *at* det var et meget stort og hastigt voksende marked, *at* hans forslag om it-komponenter var motiveret af en efterspørgsel fra eksisterende kunder, og *at* han kunne nyttiggøre *brokerplatformen* og det eksisterende netværk til disse varer.

• Bestyrelsens og Peer Kølendorfs tillid til T var bl.a. baseret på T's hidtidige adfærd og præstationer i selskabet, herunder ikke mindst i forhold til etableringen og udviklingen af CBB Mobil og SMS A/S. Han havde været ansat i selskabet fra *1992 til 1996* og igen fra *2000*, og han havde på intet tidspunkt forud for sagsperioden svigtet den tillid, som bestyrelsen og Peer Kølendorf havde vist ham, ligesom han havde løst de opgaver, som han var blevet betroet, på en dygtig, pligtopfyldende og omhyggelig måde.

• Bestyrelsens beslutning om at imødekomme T's forslag om at udvide varesortimentet hvilede således på et forsvarligt grundlag.

3.6 *T eksekverede bestyrelsens beslutning*

• Bestyrelsens beslutning kunne eksekveres umiddelbart af T i dennes egenskab af leder af brokerafdelingen, da der blot var tale om en udvidelse af det eksisterende varesortiment, således at de rutiner, forretningsgange og kontrolforanstaltninger, der var indarbejdet, også kunne og skulle anvendes på de nye varetyper, som bestyrelsen havde tilladt en udvidelse til.

• I forlængelse af bestyrelsens beslutning blev der ansat brokere, der havde erfaring med international brokerhandel med it-kompo-

nenter, og som leder af brokerafdelingen var det T, der sørgede herfor.

• Det var ikke nødvendigt, at Peer Kølendorf som administrerende direktør skulle medvirke ved T's eksekvering af bestyrelsens beslutning om udvidelsen af varesortimentet, og bestyrelsen forventede heller ikke dette.

### 3.7 T stod for køb og videresalg af varer fra Solid Trading ApS

• Sagens handler med varer købt hos Solid Trading er en eksekvering af bestyrelsens beslutning om udvidelse af varesortimentet. T anmodede Peer Kølendorf om at gennemgå offentligt tilgængelige registreringer om selskabet og personerne bag dette. Peer Kølendorf konstaterede, at der ikke var registreret noget belastende om selskabet eller direktøren. I øvrigt var han ikke involveret i etableringen af samhandelen med Solid Trading og de øvrige overvejelser og undersøgelser, som blev gennemført.

• T skulle som broker forholde sig kritisk til en handels samlede omstændigheder, herunder til priser, leverandører, kunder og de varer, som blev handlet, og Peer Kølendorf havde ingen grund til at tro, at han ikke gjorde dette og i øvrigt var opmærksom på da kendte faresignaler.

• Brokerne havde en likviditet på 50 mio. kr., som de til sammen kunne disponere inden for. Som leder af brokerafdelingen skulle T fordele likviditeten, hvis der ikke var tilstrækkelig likviditet til alle handler.

• En broker kunne ikke selv foretage betalingen for varerne, og normalt var det økonomiafdelingen, der sørgede for betalinger, men Peer Kølendorf godkendte fra tid til anden en betaling, hvis der var et praktisk behov herfor, eksempelvis i en ferieperiode. Transport og forsikring af varerne sørgede enten selskabets ansatte speditør eller et speditionsfirma for at arrangere. Hvis et speditionsfirma blev anvendt, foretog dette ofte varekontrollen. Hvis varerne passerede Comitels lager, sørgede en broker normalt for varekontrollen, eller flere brokere, hvis vareantallet nødvendiggjorde dette. Frigivelsen af varerne til køberne stod sælgerne for, når selskabet havde modtaget betaling for varerne. Det var ikke tilladt at sælge på kredit eller at frigive varerne uden at have modtaget betaling. Lagerpersonalet registrerede til- og afgang af varer på lageret.

• Handler inden for den beløbsmæssige ramme skulle Peer Kølendorf ikke godkende, og han har ikke godkendt sagens handler eller vilkårene for disse.

• ToldSkat København (Mia E.B. Hansen) blev i oktober 2003 orienteret om, at Solid Trading ApS var ny leverandør, og regionen (Charlotte Vindelev) fik kopi af alle købsfakturaer fra Solid Trading til brug for vurderingen af tilbagebetalingen af købsmoms til Comitel. Tilsvarende modtog regionen (Charlotte Vindelev) salgsfakturaerne til køberne af varerne, også af hensyn til udbetaling af momsen. Regionen havde således alle oplysninger om handlerne som grundlag for regionens vurdering af Comitels krav på udbetaling af momsen.

• De enkelte handler, der herefter over de næste 5 måneder løbende blev indgået med Solid Trading ApS, lå inden for den beløbsmæssige ramme, som var udstukket

**1926**

for brokerne, og handlerne fremstod for Peer Kølendorf som normale brokerhandler. Han var bekendt med, at der blev indgået handler, og at varerne blev solgt til købere i Fjernøsten, hvor T havde opbygget et netværk, til dels baseret på Comitels eksisterende netværk. Bestyrelsen havde ud fra T's oplysninger om markedspotentialet forventet en stor omsætning, og den løbende omsætning afveg ikke fra det forventede eller i øvrigt fra den omsætning, som selskabet havde haft på månedsbasis i 2002, hvor omsætningen var på ca. 1,2 mia. kr.

• Samhandelen med Solid Trading ApS ophørte på grund af dennes konkurs. Konkursen blev forklaret med, at selskabet var blevet svigtet af en leverandør.

• Peer Kølendorf har ikke handlet ansvarspådragende i forhold til disse handler.

### 3.8 Køb og videresalg af varer fra Trademark International ApS

• Handlerne foregik i perioden 16. - 24. juni 2004. Peer Kølendorf var ikke orienteret om handlerne forud for handlernes gennemførelse.

• Som ved samhandelen med Solid Trading blev SKAT orienteret fuldt ud.

• Peer Kølendorf har ikke handlet ansvarspådragende i forhold til disse handler.

### 3.9 Køb og videresalg af varer fra J Corp ApS

• Handlerne foregik i to adskilte tidsforløb. Peer Kølendorf var inden handlerne blevet orienteret af T om, at der var et marked for såkaldte internet access cards, der giver adgang til hjemmesider med pornografisk materiale, og at han ville undersøge mulighederne for at påbegynde handel med disse. Comitel forhandlede på dette tidspunkt andre værdibærende kort.

• Peer Kølendorf blev ikke orienteret om de enkelte handler, da de lå inden for den beløbsmæssige ramme for brokerne. Handlerne fandt sted over to perioder. Den første løb over den 13. - 26. august 2004. Den anden løb over den 10. - 12. november 2004. Selskabet har dog aldrig fået momsen tilbagebetalt vedrørende novemberhandlerne, da SKAT valgte at tilbageholde momsen. SKAT har derfor ikke krav på tilbagebetaling af momsen af disse handler.

• Som ved samhandelen med Solid Trading blev SKAT orienteret fuldt ud.

• Peer Kølendorf har ikke handlet ansvarspådragende i forhold til disse handler.

### 3.10 Afdækningen af svigen og T's medvirken til denne

• Ovenstående er sådan, som omstændighederne fremstod for Peer Kølendorf, da handlerne blev gennemført i 2003 og 2004.

• I de 10 år, der er gået siden sagens sidste handler, har SKAT, Kammeradvokaten, politiet, Comitel og Peer Kølendorf anvendt betydelige ressourcer på at kortlægge enhver detalje om de involverede selskaber, personer og transaktioner. En betydelig del af de oplysninger, som nu kan præsenteres om sagskomplekset, hverken kunne eller skulle Peer Kølendorf have haft kendskab til.

• Svigen i sagen blev udøvet på en måde, som ikke hidtil var set. Der var tale om et lukket kredsløb, hvor personerne bag svigen havde infiltreret alle led i handelskæden. I Comitel var det en højtplaceret og betroet medarbejder, T, som misbrugte sin stilling til at indgå handlerne.

• I modsætning til tidligere var der ikke i kæderne »missing traders«. De tomte selskaber var alle momsregistreret og angav korrekt den skyldige moms, men på grund af ekstraordinære omstændigheder, herunder et fingeret røveri, kunne de ikke indbetale momsen til SKAT, og selskaberne gik derfor konkurs.

• Varerne blev desuden solgt og forsendt til et tredjeland, hvor varerne ikke umiddelbart kunne anvendes til momssvig igen, men skulle gennem potentielt 4 toldkontroller (udførsel fra Danmark, indførsel i tredjelandet, udførsel fra tredjelandet og indførsel til Danmark igen) for atter at kunne anvendes til momssvig.

• Uanset Network Tradings og Solid Tradings konkurser i begyndelsen af 2004 blev Comitel og Peer Kølendorf først efter alle sagens handler oplyst af SKAT om, at selskabernes konkurs kunne have forbindelse med momssvig.

### 3.11 Efterfølgende konstateringer

• Efter sagens handler har særligt it-distributørerne Jørn Rosenmeier og Ole Eklund samt Reino Nielsen fra SKAT givet anledning til en række artikler om momskaruseller i avisen Computerworld,

ligesom de har udtalt sig om momskarruseller i disse. Gul Feber-sagen gav anledning til, at momskarruseller - som ellers var blevet anset for nærmest »udryddet« - atter blev et emne, der blev taget op af SKAT og avisen. Branchen og SKAT er blevet klogere efter Gul Feber-sagen, og der har ikke siden været en karrusel som denne.

• I nærværende sag, hvor SKAT har gjort erstatningsansvar gældende over for Peer Kølendorf personligt, er det afgørende, hvorledes de relevante forhold fremstod for ham på tidspunkterne for de handler, der er omhandlet i sagen, og den viden og erfaring, der på daværende tidspunkter var om momskarruseller. Det relevante er ikke den viden og de oplysninger, som kun en omfattende, mangeårig politimæssig efterforskning efterfølgende har kunnet afdække.

• SKAT har fremdraget visse forhold, som ifølge SKAT er svigsindikatorer. Det er imidlertid forhold, som Peer Kølendorf enten ikke i sagsperioden kunne have viden om eller ikke burde have viden om, og i vidt omfang har Peer Kølendorf først kunnet forholde sig til de fremhævede forhold længe efter sagsperioden.

**1927**

• I løbet af de 10 år, som er forløbet siden sagens sidste handel, har SKAT løbende identificeret nye »faresignaler« eller »usædvanlige forhold«, som Peer Kølendorf *i sagsperioden* burde have været opmærksom på. En række af disse er frafaldet igen. I det følgende kommenteres en række af de forhold, som SKAT fastholder, at Peer Kølendorf burde have været opmærksom på i sagsperioden:

• *Upræcise varebenævnelser i fakturaer*. Der er i givet fald tale om enkeltstående eksempler, som først ses at optræde, efter at en række handler var gennemført med Solid Trading, og samhandelsforholdet således var vel etableret. Det var T's opgave som broker at sikre en tilstrækkelig dokumentation for køb og salg, enten i selve fakturaen eller i andet skriftligt materiale. Peer Kølendorf havde ingen grund til at tro, at T ikke rutinemæssigt sikrede sig dette.

• *Varekontrol*. Som i enhver anden handelsvirksomhed skulle der foretages en relevant og effektiv varekontrol inden betaling for varerne. Peer Kølendorf blev ikke inddraget i kontrollen af varerne, som T som broker havde ansvaret for. Peer Kølendorf havde ingen grund til at tro, at T ikke foretog den relevante og effektive varekontrol, som alle brokere skulle foretage.

• *Kontrol af leverandører og kunder*. Alle brokere skulle kontrollere og forholde sig kritisk til leverandører og kunder. Peer Kølendorf havde ingen grund til at tro, at T som den ansvarlige broker ikke gjorde dette i forhold til leverandører og kunder i sagens handler.

…

• *Omsætningens udvikling og størrelse*. Som broker og som leder af brokerafdelingen skulle T forholde sig kritisk til leverandører, kunder og markedspotentialet for et produkt, og Peer Kølendorf havde ingen grund til at tro, at T's oplysninger herom til bestyrelsen ikke var korrekte. Rapporter fra hP Labs og KPMG har bekræftet, at der var et betydeligt internationalt brokermarked for it-komponenter. Bestyrelsens og Peer Kølendorfs forventning var, at der ville kunne genereres en betydelig omsætning med de nye varetyper ved brug af den eksisterende brokerafdelings *platform*.

• *Brokermarkedet var inficeret med momssvig*. I Danmark var der i årene op til sagens handler kun få momskarruseller, og ingen der havde en størrelse, som gav anledning til medieomtale. Ifølge SKAT var det lykkedes at »udrydde« momskarrusellerne i Danmark, og det var da også forståelsen hos aktørerne, at SKAT i Danmark effektivt - i samarbejde med markedsaktørerne - formåede at undgå momskarruseller. Comitel og Peer Kølendorf var meget opmærksomme på momskarruseller og gennemførte relevante og effektive forholdsregler mod sådanne.

• *Frigivelse af varer uden betaling*. En broker måtte ikke frigive varer uden samtidig betaling. Peer Kølendorf havde ikke viden om, at det tilsyneladende var sket i ét tilfælde i sagsperioden. Frigivelsen fremgik ikke af sagens dokumenter, og betalingen indløb i løbet af kort tid.

• *Salg på kredit*. En broker måtte ikke sælge på vilkår om kredit, og det skete heller ikke i nogen af sagens handler.

• *Comitel fik anvist kunder af Solid Trading*. Hvis dette er tilfældet, er det ikke noget, som Peer Kølendorf havde eller kunne have viden om. Dette ville kun T kunne have viden om. Anvisning af kunder ville være et faresignal, som en broker skulle reagere på.

• *Comitel opdelte betalinger*. Peer Kølendorf havde ingen oplysninger modtaget om, at betalinger blev opdelt, heller ikke fra selskabets økonomiafdeling. SKAT har anført, at opdelingerne kunne være for at besvige forsikringen, men det giver ingen mening og er da heller ikke underbygget. Det mest sandsynlige er, at en ordre er forsendt successivt, netop for at minimere transportrisikoen, og at betalingen derfor er opdelt, således at betalingen er gennemført ved hver delfrigivelse. Forsikringsdækningen var relateret til *forsendelser* og ikke *ordrer/fakturaer*.

• *Prissætning af varer*. Det siger sig selv, at brokerne skulle forholde sig kritisk til prisen for en vare. Det var almindeligt kendt, at for *lave* priser indikerede en momskarrusel. En broker skulle selvsagt også forholde sig til, om prisen var for høj. Hvis T har fået tilbudt varer til en for høj pris, skulle han have reageret på dette, og tilsvarende gælder, hvis prisen af andre grunde ikke gav mening. Peer Kølendorf havde ingen grund til at tro, at denne rutinemæssige og i øvrigt også kommercielt begrundede forholdsregel ikke blev iagttaget. I de få tilfælde, hvor der ifølge SKAT var priser, som burde have givet anledning til yderligere undersøgelser, bestrides det, at priserne afveg fra markedsprisen. SKAT har ikke dokumenteret, at dette skulle være tilfældet.

• *IMEI, serie- og batchnumre*. Der er kun IMEI-numre på mobiltelefoner. (Selv for mobiltelefoner viste det sig hurtigt, at det ikke var praktisk muligt at gennemføre en registrering af IMEI-numre. Det var heller ikke noget, som SKAT i Danmark udtrykte en forventning om). Hvis det var praktisk muligt at registrere serie- eller batchnumre, som SKAT umiddelbart inden hovedforhandlingen i denne sag har foreslået, så kunne dette selvsagt være sket. Peer Kølendorf har ikke godkendt, at der ikke skete en registrering, og Peer Kølendorf havde ingen grund til at tro, at T ikke tog de forholdsregler, der var mulige.

• *Comitel modtog ikke reklamationer*. Mindre reklamationer skulle ikke indberettes til Peer Kølendorf som administrerende direktør, og Peer Kølendorf har derfor ikke i sagsperioden forholdt sig til, om der var reklamationer i relation til handlerne. Efter sagsperioden har det

**1928**

kunnet konstateres, at der ikke var reklamationer vedrørende selve varepartierne. Reklamationer vedrørende enkelte varer er først indgået nogle måneder efter salget, når varerne var nået til slutbrugeren og blev testet af denne.

…

3.12 *SKAT og politiet*

• SKAT modtog løbende alle oplysninger om handlerne, herunder leverandører, kunder og omsætningens størrelse, via oplysninger fra Comitel. SKAT kunne dermed have gennemført en kæderevision allerede primo december 2003 og dermed inden udbetaling af momsen af de første handler til Comitel.

• Ifølge SKATs interne notater havde SKAT senest i februar 2004 et overblik over den samlede handelskæde og dermed flere oplysninger tilgængelig end dem, der var tilgængelige i Comitel og dermed - potentielt - for Peer Kølendorf.

Copyright © 2023 Karnov Group Denmark A/S

• SKAT havde desuden i marts 2004 foretaget en varekontrol og en funktionstest af varer, der var stoppet i tolden, og som skulle have været leveret til Comitel, men som altså aldrig blev leveret. Disse varer viste sig at være attrapper.

• SKAT havde fundet et diagram over handelskæderne på en computer tilhørende B, herunder kæden, som først blev afviklet i juni 2004. B burde kun have kendt Solid Tradings leverandør og kunde.

• Uanset adgangen til dette materiale og dermed til væsentlig mere information, end Peer Kølendorf kunne få adgang til både før og efter sagsforløbet, mente SKAT først i *december 2004* at have grundlag for at nægte Comitel fradragsret for købsmomsen at handlerne med Solid Trading et år tidligere. SKATs forslag til afgørelse fra december 2004 om fradragsnægtelse var tilmed begrundet i en »objektiv model«, som dengang blev anset for gangbar, da der selv på dette tidspunkt ikke hos SKAT var grundlag for at antage, at nogen hos Comitel *havde deltaget i svigen eller burde have haft viden om svigen.* Politiet afviste helt indtil *primo 2005* at indlede efterforskning, uanset at politiet havde deltaget i møder med SKAT om sagen, og ligesom SKAT havde flere oplysninger at basere sin vurdering på, end Peer Kølendorf havde.

• Det er en betingelse for, at tilbagebetalingen af momsen til Comitel var uberettiget - og dermed for, at Peer Kølendorf overhovedet *kan* have handlet retsstridigt - at et forudgående led som følge af *svig* ikke ville indbetale momsen. Men hvordan kan SKAT gøre gældende, at Peer Kølendorf *i sagsperioden* burde have vidst, at et forudgående led svigagtigt ville undlade at indbetale momsen - dvs. burde have vidst, at SKAT ud fra den da gældende objektive model havde grundlag for at nægte fradraget - når SKAT og politiet på et mere fuldstændigt grundlag ikke havde en mistanke om momssvig, før nogen begrunde nægtelse af fradraget, før op til *et år senere*? hvordan kunne Peer Kølendorf have vidst det i december 2003, da købsmomsen af de første handler blev tilbagebetalt?

• SKATs anbringender i sagen er baseret på efterrationaliseringer.

• I straffesagen forklarede Peer Kølendorf bl.a., at »*Broker-markedet har en sådan karakter, at det, der udefra kan se usædvanligt ud, er sædvanligt, og kriminelle elementer kan gemme sig i mængden.*« ...

3.13 *It-brancheforeningen*

• Efter straffedommen over T i 2007 rejste Distributørudvalget ultimo 2007 en sag om eksklusion af Peer Kølendorf fra it-brancheforeningen. Distributørudvalgets formand Ole Eklund gjorde på udvalgets vegne gældende, at Comitel og Peer Kølendorf havde handlet i strid med god brancheskik.

• It-brancheforeningens forretningsudvalg og hovedbestyrelse har primo 2008 fastslået, at Comitel og Peer Kølendorf ikke som følge af T's involvering af selskabet i Gul Feber-handlerne har handlet i strid med god brancheskik, og i særdeleshed har de fastslået, at selve dette at agere på it-brokermarkedet, som Comitel havde gjort det, ikke var i strid med god brancheskik. Det var bl.a. repræsentanter for IBM, hP og Microsoft, der deltog i afgørelsen af dette spørgsmål, hvor distributørudvalgets indstilling om eksklusion af Peer Kølendorf således blev afvist. Disse selskaber har alle it-broker-markedet tæt inde på livet og har dermed et grundigt kendskab til dette.

• SKATs anbringende om, at det var ansvarspådragende at udvide varesortimentet til it-komponenter, er således i modstrid med den afgørelse, som forretningsudvalget og hovedbestyrelsen i it-brancheforeningen har truffet.

4 *Årsagsforbindelse og adækvans*
4.1 *Årsagsforbindelse*
• Det er en betingelse for, at en person kan ifalde erstatningsansvar i forbindelse med culpøs adfærd, at den culpøse adfærd også *faktisk*

*har forårsaget* skaden. Ved vurderingen heraf må man grundlæggende spørge, om skaden ville være sket uanset den culpøse adfærd. I UfR 2011.354 Ø (Danica White) var et skib blevet kapret af somaliske pirater. Besætningsmedlemmerne krævede i den forbindelse erstatning, og landsretten fastslog, at kaptajnen havde handlet culpøst ved ikke at etablere tilstrækkelige kontrolforanstaltninger. Desuagtet frifandt landsretten rederiet, da yderligere kontrolforanstaltninger ikke ville have forhindret kapringen og dermed skaden.

• Højesteret har endvidere fastslået, at disse principper også gælder vedrørende undersøgelsespligter og deres betydning. UfR 2006.145 H (Procuritas) vedrørte et erstatningsopgør i forbindelse med en

**1929**

selskabstømmersag. Her blev sælgersiden frifundet med henvisning til manglende årsagssammenhæng, idet iagttagelse af deres undersøgelsespligt ikke ville have forhindret, at selskabet blev tømt, og at statskassen derved led et tab.

• SKAT har i øvrigt ikke redegjort for, hvad andre kontrolforanstaltninger potentielt ville have afdækket, herunder godtgjort, at de ville have hindret tabet.

• Eftersom T deltog i svigen, kan andre eller yderligere kontrolforanstaltninger ikke forventes at have afdækket for Comitel eller Peer Kølendorf, at handlerne blev indgået med hensigt om skyldnersvig i andre selskaber.

• Peer Kølendorf gør gældende, at kausalitetsbetingelsen ikke er opfyldt, og at SKAT i øvrigt har bevisbyrden for, at denne betingelse er opfyldt.

4.2 *Adækvans*
• Ved vurderingen af *adækvansen* må der tages hensyn til, at egentlig kriminalitet begået af en betroet medarbejder og et ledelsesmedlem i ledtog med tredjemand normalt er upåregnelig, og i hvert fald er mere upåregnelig end eksempelvis almindelig sløsethed og sjusk. Sidstnævnte forekommer nu og da i en nok så velmenende og lovlydig medarbejderstab, hvorimod man som hovedregel må gå ud fra, at der ikke begås kriminalitet.

• Peer Kølendorf og Comitel havde intet grundlag for eller anledning til at mistænke, at T pludselig havde kastet sig ud i kriminalitet. Eftersom kriminaliteten manifesterede sig i andre virksomheder end Comitel, havde Peer Kølendorf heller ingen mulighed for at opdage dette.

• Peer Kølendorf gør gældende, at adækvansbetingelsen ikke er opfyldt, og at SKAT i øvrigt har bevisbyrden [for], at adækvansbetingelsen er opfyldt.

5 *Egen skyld og tabsbegrænsning*
• Hvis Peer Kølendorf burde have vidst, at der var svigshensigt i et forudgående led, så gælder dette så meget desto mere for SKAT.

• SKAT kan udsætte tilbagebetaling af moms, hvis grundlaget for kravet ikke er dokumenteret af den afgiftspligtige, eller hvis der er nærliggende risiko for tab ved udbetaling af momsen til selskabet, jf. opkrævningslovens § 12.

• SKAT havde i næsten et år, inden Solid Tradings samhandel med Comitel blev opstartet, overvåget Solid Trading og konstateret, at selskabets handler var relateret til momskarruseller. SKAT fik oplysning om Comitels påtænkte samhandel med Solid Trading i oktober 2003, og til brug for udbetaling af moms til Comitel fik SKAT alle købsfakturaer fra Solid Trading og salgsfakturaer til selskaberne i Fjernøsten. Ud fra den standard, som SKAT gør gældende i nærværende sag over for Comitel, burde SKAT på grundlag af disse oplysninger have foretaget en kæderevision inden udbetaling til Comitel, og dermed ville alle led i omsætningskæden og de tilhørende fakturaer være afdækket. Hvis SKAT havde etableret dette grundlag, ville SKAT have konkluderet inden første udbetaling til Comitel, at der ikke skulle udbetales moms til Comitel, før grundlaget for udbetalingen var dokumenteret af selskabet.

Tilbageholdelse af moms er et foreløbigt retsmiddel, der ikke kræver samme mistankegrundlag som en endelig afgørelse om nægtelse af fradragsret.

• Det er udtryk for en uforsvarlig organisation og en uforsvarlig tilrettelæggelse af kontrolarbejdet i SKAT, hvis de oplysninger, som Comitel løbende fremsendte til SKAT, ikke blev udvekslet med den region, som Solid Trading hørte under. Peer Kølendorf har under alle omstændigheder været berettiget til at antage, at SKAT var organiseret på en sådan måde og havde tilrettelagt kontrolarbejdet på en sådan måde, at relevante oplysninger blev udvekslet rettidigt mellem de relevante dele af SKAT. Hvis ikke dette har været tilfældet, er det udtryk for egen skyld og accept af risiko i en sådan grad, at kravet mod Peer Kølendorf i det hele bortfalder eller i hvert fald skal nedsættes væsentligt.

• Hvis SKATs bemærkninger i sagen om SKATs kontrolarbejde skal forstås således, at end ikke de enkelte personer i ToldSkat København koordinerede deres kontrolaktiviteter vedrørende en »risikovirksomhed« som Comitel, der siden 1998 havde indsendt oplysninger om leverandører, kunder og fakturaer fra og til disse til SKAT, så er dette udtryk for en så uforsvarlig måde at organisere sig på og en så uforsvarlig måde at tilrettelægge kontrollen på, at SKAT også af denne grund selv må bære det hævdede tab.

• I sagen har SKAT først benægtet, at Comitel fremsendte oplysninger om nye leverandører og kunder til SKAT månedligt, og da Comitel så dokumenterede fremsendelsen af oplysningerne for én måned, benægtede SKAT fortsat dette, hvorefter SKAT benægtede, at der var fremsendt oplysninger for mere end denne ene måned. Først da Comitel dokumenterede, at der også var indsendt for andre måneder, anerkendte SKAT at have modtaget oplysningerne, men hævdede så, at oplysningerne dels var ufuldstændige, dels alene blev anvendt til den »almindelige ligning« af selskabet. SKAT har endelig overgivet sig, da Peer Kølendorf kunne dokumentere, at det oprindeligt var Told- og Skattestyrelsen, der havde anmodet om og fået oplysningerne om leverandører og kunder, og at samarbejdet med SKAT kunne dateres tilbage til 1998.

• SKAT har anlyst, at de konsekvente og gentagne urigtige benægtelser af at have modtaget oplysninger fra Peer Kølendorf skyldes en »fejlarkivering« hos en medarbejder hos SKAT. Det er helt utroværdigt. Siden 1998 er oplysningerne fremsendt hver måned til først en person i Told- og Skattestyrelsen og så fra 2002 og

**1930**

fremefter til Mia E.B. Hansen, samt fra januar 2004 også til Charlotte Vindelev i ToldSkat Københavns udbetalingskontrol. Hvis *alle* disse personer har fejlarkiveret det materiale, som Comitel og Peer Kølendorf indsendte hver måned fra 1998 til 2004, så har forretningsgangene og kontrolprocedurerne hos SKAT været så uforsvarlige, at SKATs oplysninger om sagen i øvrigt heller ikke kan tillægges nogen vægt. Og selv den angivelige fejlarkivering forklarer på ingen måde SKATs benægtelser af overhovedet at have modtaget oplysningerne, eftersom SKATs medarbejder (Mia hansen) har forklaret, at hun godt kunne huske at have modtaget oplysningerne og deres formål, men blot ikke kunne finde dem.

• Når SKAT har været så ked af, at Comitels og Peer Kølendorfs samarbejde med SKAT blev dokumenteret, så beror det givetvis på to forhold: *For det første* viser samarbejdet, at Peer Kølendorf på en aktiv og relevant måde har værnet om SKATs og Comitels interesser. *For det andet* viser samarbejdet, at SKAT totalt har svigtet Comitel og Peer Kølendorf og for så vidt også sig selv.

• Det fremgår af sagens materiale, at firmaet Rosenmeier, der var blevet anmodet om at fremsende oplysninger om kunder til told- og skatteregion Aalborg, fra denne region fik oplysning om, at en kunde var gået konkurs og formentlig havde været en missing trader. Regionen henvendte sig om det samme nogle måneder senere.

Regionens handling er ikke mere, end hvad en virksomhed, der bruger ressourcer på at indsamle og fremsende oplysninger til SKAT, er berettiget til at forvente af SKAT. ToldSkat København gjorde imidlertid intet over for Comitel; end ikke da Solid Trading var gået konkurs i marts 2004, fik Peer Kølendorf brugbare informationer af SKAT.

• I februar 2004 går leverandøren til Solid Trading konkurs, og fra dette tidspunkt burde det have stået endnu mere klart for SKAT ud fra den standard, som SKAT gør gældende i nærværende sag over for Comitel, at SKAT ikke skulle have tilbagebetalt moms til Comitel. Udbetalingen af moms i marts 2004 sker endog på et tidspunkt, hvor 13 personer hos SKAT, SØIK og Kammeradvokaten er indkaldt til det første møde i Gul Feber-sagen. Risikoen for tilbagebetalingen til Comitel - og dermed risikoen for, om Comitel senere kan refundere momsen - påhviler i forholdet mellem SKAT og Peer Kølendorf fuldt ud SKAT. SKAT indså risikoen, som det fremgår af mødenotaterne, men valgte at løbe risikoen, da SKAT ikke ville risikere et erstatningskrav fra Comitel, hvis tilbageholdelsen viste sig uberettiget. SKAT har altså bevidst undgået risikoen for et erstatningskrav, og SKAT har dermed bevidst påført Peer Kølendorf risikoen for efterfølgende at blive mødt med et erstatningskrav fra SKAT. (I øvrigt er det ikke rigtigt, at SKAT risikerede et erstatningskrav. Ifølge opkrævningsloven kompenseres en uberettiget tilbageholdelse af moms med *renter*).

• De yderligere oplysninger, der kommer frem i løbet af foråret og sommeren 2004, gør det endnu mere klart, at SKAT skulle tilbageholde momsen.

*6 Tabsopgørelsen*

• Tabsopgørelsen bestrides som udokumenteret.

• Peer Kølendorf kan kun være erstatningsansvarlig for den del af tabet, der stammer fra handler, som han måtte have udvist ansvarspådragende adfærd i forhold til. SKAT har imidlertid ikke gjort noget gældende om, hvorfor Peer Kølendorf skulle være erstatningsansvarlig i forbindelse med hver enkelt konkret handel. SKAT har i det hele undladt at henføre påstandsbeløbet til Peer Kølendorfs konkrete ansvar for nogen af sagens handler. Kun hvis landsretten måtte finde, at selve udvidelsen af varesortimentet var ansvarspådragende, kan landsretten dermed give SKAT medhold i den nedlagte påstand.

• Beløb, der indvindes til staten, herunder til konkursboerne efter svigsselskaberne og konkursboet efter Comitel International A/S, skal fragå i kravet mod Peer Kølendorf. Comitel havde tegnet en kriminalitetsforsikring, og forsikringssummen vil blive udbetalt til konkursboet efter Comitel International A/S.

• Det momsbeløb, der vedrører handlerne i november 2004, skal i det hele fragå tabsopgørelsen. Peer Kølendorf har ikke pådraget sig et erstatningsansvar, allerede fordi momsen aldrig er blevet udbetalt til Comitel af SKAT. Det retsstridige forhold, som Peer Kølendorf bebrejdes, består i opnåelsen af en - ifølge SKAT - uberettiget udbetaling af moms, og Peer Kølendorf kan selvsagt ikke blive erstatningsansvarlig for et *forgæves forsøg* på at få momsen udbetalt. Hvis ikke hele beløbet fragår, vil en del af påstandsbeløbet ikke kunne henføres til noget tab.

*7 Lempelse af erstatningsansvaret*

• Såfremt landsretten måtte finde, at Peer Kølendorf er erstatningsansvarlig, gør sagsøgte gældende, at ansvaret bør lempes, jf. erstatningsansvarslovens § 24, stk. 1, og aktieselskabslovens § 143, stk. 1 (nu selskabslovens § 363, stk. 1).

• Som et eksempel, hvor lempelse er kommet på tale, kan nævnes UfR 2010.3203 H (Tivoli Night), hvor ansvaret blev lempet for en direktør, på trods af at der var tale om en (varemærke) krænkelse, der var begået groft uagtsomt og siden hen endda forsætligt. Sø- og handelsretten lagde i sin dom, der blev stadfæstet af Højesteret,

vægt på, at direktøren ikke havde haft en personlig fortjeneste ved krænkelsen, og at han indirekte blev ramt af de sanktioner, der blev pålagt virksomheden. På tilsvarende grundlag må der ske lempelse af et eventuelt erstatningsansvar, som Peer Kølendorf måtte ifalde i denne sag. Peer Kølendorf har intet tjent i forbindelse

**1931**

med sagens handler. For regnskabsårene i sagsperioden og frem til Comitel International A/S' konkurs er der ikke blevet udbetalt udbytte fra selskabet. Peer Kølendorf har tværtimod lidt et betydeligt tab, i forbindelse med at selskabet gik konkurs.

• Samtidig har Peer Kølendorf - foranlediget og understøttet af SKAT selv - haft en fast tro på, at de forholdsregler, der blev taget, var effektive. Hvis landsretten måtte finde, at denne tro ikke har været berettiget, er det fremsatte krav efter sagsøgtes opfattelse eksorbitant og urimeligt tyngende.

• Der foreligger i givet fald også ganske særlige omstændigheder, i lyset af at der i tilfælde af erstatningsansvar er tale om, at Peer Kølendorf blev svigtet *dels* af en mangeårig betroet og højtstående medarbejder og i en del af perioden også ledelsesmedlem i selskabet, som i et personligt og professionelt tillidsbrud deltog i svindelen, *dels* af skadelidte (SKAT) selv.

• Det påståede erstatningskrav overstiger i betydelig grad de midler, som Peer Kølendorf har til rådighed for betaling af et erstatningsbeløb, selv med bidrag fra tredjemand.

*8 Afsluttende bemærkninger*

• Erstatningsansvar for Peer Kølendorf i denne sag vil føre uoverskuelige konsekvenser med sig, idet en helt normal og almindelig organisering af en virksomhed så ikke længere vil kunne lade sig gøre uden risiko for at ifalde et erstatningsansvar. En betroet medarbejders svigagtige adfærd i relation til helt normale, forretningsmæssige dispositioner bør ikke udløse et ansvar. En sådan retstilstand vil føre til en lammende retsusikkerhed.«

Vedrørende de af SKAT fremhævede eksempler på handler med upræcise varebenævnelser i fakturaer har Peer Kølendorf yderligere anført, at for så vidt angår betegnelserne »Infineon TSOP« og »Samsung Branded Dice Programme« fremgår den præcise varespecifikation på de omhandlede varer af fremlagte købsordrer, og i Samsungs produktoversigter kan varetyperne genfindes, hvorfor det betrides, at der skulle være tale om ikke eksisterende produkter.

Peer Kølendorf har endvidere anført, at det er korrekt som påpeget af SKAT, at der ikke eksisterer CPU-enheder af typen »Intel Pentium 4 3.0 Ghz, 533 Mhz«, hvorfor der i en konkret handel er en unøjagtighed. Imidlertid fremgår den korrekte varebetegnelse på den eksisterende komponent, nemlig »Pentium 4 3.0 Ghz 800 Mhz«, af et andet dokumenteret handelsforløb, hvor der er gennemført varekontrol.

Peer Kølendorf har endvidere gjort gældende, at SKATs krav er delvist forældet, idet der gælder en 5-årig forældelse, som løb fra tidspunktet for kravets opståen, hvilket i det konkrete tilfælde må være principalt tidspunktet for angivelsen af moms, subsidiært tidspunktet for udbetaling af momsfradragene for november og december 2003, hvorfor principalt 100,4 mio. kr., subsidiært 77,4 mio. kr., af kravet var forældet på tidspunktet for sagens anlæg.

Peer Kølendorf har endelig anført, at imødekommelse af et erstatningskrav fra SKAT på mere end 30-40 mio. kr. vil være ruinerende for ham.

**Landsrettens begrundelse og resultat**

Peer Kølendorf har siden 1966 drevet egen virksomhed inden for radio- og telekommunikationsbranchen. Virksomheden, der i midten af 1990'erne var begyndt at handle på brokermarkedet for mobiltelefoner, fik i 1999 en professionel bestyrelse og ændrede i 2000 navn til Comitel. Ved opspaltningen i tre selskaber med virkning

fra 1. januar 2003 blev brokeraktiviteten henlagt til Comitel International A/S, hvor Peer Kølendorf var ultimativt hovedaktionær og bestyrelsesmedlem samt tillige administrerende direktør i perioden indtil 16. april 2004.

Denne sag drejer sig om, hvorvidt Peer Kølendorf har pådraget sig et personligt erstatningsansvar for det tab, SKAT har lidt som følge af ikke afregnet salgsmoms fra brokerhandler gennemført fra november 2003 til november 2004, der indgik i planlagt momskarruselsvig. Lederen af Comitel International A/S' brokerafdeling, T, blev idømt 5 års fængsel for sin deltagelse heri.

Det lægges til grund, at Peer Kølendorf ikke vidste, at de pågældende handler, der omfattede it-komponenter og internet accesskort, indgik i momskarruselsvig, men at han var bekendt med, at der forud for handlerne i denne sag havde været problemer med momssvig ved brokerhandler inden for EU med blandt andet mobiltelefoner og it-komponenter.

Det gøres ikke af SKAT gældende, at det at handle på brokermarkedet for it-komponenter i sig selv var ansvarspådragende, hvorfor spørgsmålet for landsretten er, om Peer Kølendorf har handlet ansvarspådragende ved sin ledelse og drift af Comitel International A/S i perioden november 2003 til november 2004.

På grundlag af de afgivne forklaringer lægges det til grund, at Peer Kølendorfs ledelsesmæssige opgaver vedrørende den samlede koncern med ca. 75 årsværk, herunder Comitel International A/S, var uændrede i den periode, sagen omhandler, og at han med bestyrelsens indforståelse havde som sin væsentligste opgave at sikre de overordnede organisatoriske og økonomiske rammer, hvilket blandt andet indebar dagligt tjek af bankposteringerne på totalniveau herunder for at sikre, at den med banken aftalte likviditetsramme på 50 mio. kr. ikke blev overskredet, kontrol af de månedsvise omsætnings-, omkostnings- og resultattal samt budgetopfølgning.

**1932**

T, der havde været ansat i virksomheden fra 1992-96 som elektromekaniker og senere leder af værkstedet, blev i august 2000 ansat nu som forretningsudvikler med fast løn og en aktieoptionsordning, og han blev den 16. april 2004 udnævnt til administrerende direktør i Comitel International A/S og indtrådte i bestyrelsen den 1. juni 2004. Fra sin ansættelse i august 2000 og frem til juli 2006, hvor han blev afskediget, havde T ansvaret for virksomhedens brokerhandel.

Peer Kølendorf, Ole Stangegaard og Steen Erik Mønsted har samstemmende forklaret, at T var en nøgleperson i virksomheden på grund af sin faglige kompetence inden for it og mobiltelefoni og sit personlige netværk, og at han nød en meget høj grad af tillid fra direktion og bestyrelse, hvilket også var baggrunden for hans udnævnelse til direktør.

Efter bevisførelsen lægges det til grund, at brokerhandlen med mobiltelefoner ikke havde givet anledning til problemer under T's ledelse i 2000-2003, og at forudsætningen for bestyrelsens beslutning i 2003 om at udvide brokeraktiviteterne til at omfatte handel med it-komponenter var T's kompetence og den omstændighed, at virksomheden allerede havde de herfor nødvendige indarbejdede procedurer vedrørende håndtering af varer, kunder og leverandører og etablerede organisatoriske rammer med bogholderifunktion, speditør og lager.

Af bestyrelsesreferaterne fremgår, at bestyrelsen løbende fik afrapportering vedrørende virksomhedens økonomiske, markedsmæssige og organisatoriske forhold, ligesom der fremlagdes kvitteringer for indbetalte skatter og afgifter. Det lægges endvidere til grund, at bestyrelsesformanden og Peer Kølendorf havde regelmæssige møder med banken og forsikringsselskabet, og at bestyrelsen i foråret 2003 fik demonstreret en varekontrol på virksomhedens lager.

**1933**

Under de anførte omstændigheder, herunder navnlig T's mange-årige, centrale rolle i virksomheden, og henset til at der ikke foreligger oplysninger om, at de driftsmæssige og organisatoriske rammer i Comitel International A/S var usædvanlige for brokervirksomheder, findes det ikke godtgjort, at Peer Kølendorf har handlet ansvarspådragende ved at lade T forestå den daglige drift af brokeraktiviteterne som sket.

Efter aftale med SKAT havde Peer Kølendorf igennem flere år forud for sagens opståen selv forestået månedlig indsendelse af lister til SKAT over virksomhedens nye kunder og leverandører, hvilket af SKAT var anvist som en måde at sikre sig mod at blive involveret i momssvig. Salgsfakturaer blev indsendt månedsvis med henblik på refusion af moms, og købsfakturaer blev indsendt efter anmodning fra SKAT. Virksomheden havde endvidere i flere tilfælde givet SKAT oplysninger om sine handler til brug for besvarelsen af udenlandske myndigheders verifikationsanmodninger i forbindelse med afdækning af mulige svigsforhold. SKAT har i en udbetalingskontrol i virksomheden i foråret 2004 vedrørende perioden august - december 2003 blandt andet anført, at alt var ok vedrørende negativ moms, og der var ingen alvorlige bemærkninger i forbindelse med tidligere kontroller. Under kontrollen foretog SKAT tillige besigtigelse af varelageret. For så vidt angår udbetalingskontrollen for januar til marts 2004 var der ingen bemærkninger vedrørende virksomhedens eksterne handler, og SKAT frigav den 5. maj 2004 negativ moms for april 2004 med bemærkningen »mindre risiko«.

Det lægges derfor til grund, at der i perioden 2002 og frem til SKATs forslag til afgørelse i december 2004 ikke ved SKATs kontakt til virksomheden fremkom oplysninger, som gav Peer Kølendorf anledning til at iværksætte nærmere undersøgelser af virksomhedens brokeraktiviteter.

Efter de foreliggende oplysninger, herunder Reino Nielsens forklaring, blev momssvigen i »Gul Feber«-handlerne gennemført på en ny måde, blandt andet ved at varerne blev handlet ud af EU. Peer Kølendorf har forklaret, at han fandt det betryggende, at Comitel International A/S solgte varer ud af EU, fordi han kun havde hørt om momssvig inden for EU.

Virksomheden var gennem mange år haft samhandel med Fjernøsten, og T, der forestod handlerne, var erfaren og velanskreven. På denne baggrund findes Peer Kølendorf ikke at have handlet ansvarspådragende ved ikke at kontrollere de nye kunder i Fjernøsten, som T oplyste at have indgået samarbejde med.

Efter bevisførelsen findes der endvidere ikke grundlag for at tilsidesætte de samstemmende forklaringer fra Peer Kølendorf, Steen Erik Mønsted og T om, at varekontrol var et normalt led i brokerhandlen for at imødegå den kommercielle risiko, og at det var T's ansvar at instruere og påse brokernes overholdelse af virksomhedens procedurer for handlen.

Landsretten må derfor lægge til grund, at Peer Kølendorf havde en berettiget forventning om, at sædvanlig varekontrol blev foretaget.

Comitel A/S havde i 2002 en omsætning på 1,2 mia. kr. Omsætningen i Comitel International A/S var i 2003 på 724 mio. kr., i 2004 2,2 mia. kr. og i 2005 2,3 mia. kr.

Sagen omfatter 30 indkøb i november og december måned 2003 fra Solid Trading ApS til et samlet beløb på 268 mio. kr. For så vidt angår 2004 omfatter sagen i alt 39 indkøb fra Solid Trading ApS, Trademark International ApS og J Corp ApS til et samlet beløb i størrelsesordenen ca. 300 mio. kr. Indkøbene i 2004 er fordelt med 5 i januar måned, 3 i februar måned, 8 i marts måned, 4 i juni måned, 15 i august måned og 4 i november måned. I 2004 gennemførte Comitel International A/S lidt over 1.200 brokerhandler.

Virksomhedens resultater for årene 2003-2005 var omtrentligt på 1,5 mio. kr., 8,4 mio. kr. og 6,6 mio kr. Der blev ikke udbetalt udbytte for årene 2003 og frem til virksomhedens konkurs.

Det lægges endvidere til grund, at der i forbindelse med »Gul Feber«-handlerne ikke skete overskridelse af likviditetsrammen eller forekom manglende betalinger.

Efter en samlet bedømmelse af oplysningerne om Comitel International A/S' handel med it-komponenter er der herefter ikke grundlag for at antage, at Peer Kølendorf ud fra omfanget og fortjenesten ved de brokerhandler, som T gennemførte som led i »Gul Feber«-komplekset, havde en sådan anledning til nærmere at kontrollere disse handler, at han ved at undlade dette, har handlet ansvarspådragende.

Som anført findes Peer Kølendorf ikke have handlet ansvarspådragende ved at overlade den daglige drift af brokeraktiviteterne til T, og landsretten lægger til grund, at det hverken var et sædvanligt led i Peer Kølendorfs arbejde som direktør eller bestyrelsesmedlem at påse varebetegnelser og prissætning, hvilket efter det oplyste også ville kræve indgående kendskab til de aktuelle markedsforhold. På denne baggrund findes det af SKAT anførte om upræcise varebetegnelser og uforklarlige afvigelser fra markedsprisen ikke at kunne føre til et andet resultat.

Særligt for så vidt angår handlerne i august og november 2004 med internet access-kort lægges det efter bevisførelsen til grund, at Peer Kølendorf godkendte et forslag fra T om at påbegynde denne handel, at grundlaget herfor var T's oplysninger om, at der var et marked herfor i Fjernøsten, og at virksomheden handlede med andre værdibærende kort. På den baggrund findes det heller ikke godtgjort, at Peer Kølendorf i denne forbindelse har handlet ansvarspådragende ved ikke at foretage yderligere undersøgelser vedrørende de pågældende handler.

Landsretten frifinder herefter Peer Kølendorf.

SKAT skal betale sagsomkostninger til Peer Kølendorf med i alt 5.000.000 kr. inkl. moms til dækning af udgifter til advokatbistand. Ved fastsættelsen af beløbet er der ud over sagens værdi taget hensyn til sagens omfang, varighed og betydning.

- - -

## Højesteret

### Højesterets dom

I tidligere instans er afsagt dom af Østre Landsrets 15. afdeling den 31. oktober 2014.

I pådømmelsen har deltaget fem dommere: Jytte Scharling, Jon Stokholm, Henrik Waaben, Oliver Talevski og Jan Schans Christensen.

*Påstande*

Parterne har gentaget deres påstande.

*Anbringender*

*Skatteministeriet* har i det væsentlige gentaget sine anbringender og supplerende anført bl.a., at der ikke ved vurderingen af Peer Kølendorfs ansvar som direktør i Comitel International A/S skal tages hensyn til hans øvrige arbejdsopgaver i andre selskaber i koncernen. Ansvarsvurderingen i relation til den dagældende aktieselskabslovs § 54, stk. 2, skal alene foretages i forhold til det selskab, hvori ledelsesmedlemmet har varetaget direktionshvervet og dermed haft ansvaret for den daglige drift. Det kan endvidere ikke tillægges betydning for Peer Kølendorfs ansvar i forhold til tredjemand, at han havde opnået bestyrelsens accept af, at han som direktør havde en begrænset involvering i den daglige drift af Comitel International, og at han alene havde et formelt ansvar for at etablere de overordnede organisatoriske og økonomiske rammer. Dette

Copyright © 2023 Karnov Group Denmark A/S

gælder navnlig i en situation, hvor selskabet alene havde én aktivitet og 5-6 ansatte. Under sådanne omstændigheder er der ikke mulighed eller behov for delegation uden kontrol fra direktøren i det omfang, som det skete i Comitel International. Peer Kølendorfs manglende involvering i den daglige drift er i en situation som den foreliggende et skærpende moment.

Det er Skatteministeriets opfattelse, at Comitel International i perioden fra begyndelsen af november 2003 og i hele 2004 kun i meget begrænset omfang handlede med leverandører og kunder, der ikke var involveret i momssvig. Ud fra svar, som ministeriet har modtaget fra myndigheder i andre EU-lande om Comitel Internationals samhandelspartnere i 2003 og 2004, må det lægges til grund, at aktiviteten i Comitel International inklusive »Gul Feber«-handlerne fra udspaltningen af brokeraktiviteten og frem til slutningen af 2004 i meget betydeligt omfang - mindst 80 % - skete ved samhandel med selskaber, der formodningsvis var involveret i momssvig, herunder som »missing traders«.

SKAT har ikke ved modtagelse af kundelister og foretagelse af udbetalingskontroller i Comitel International skabt en berettiget forventning hos Peer Kølendorf om, at selskabets brokerhandel ikke var momssvigrelateret. I forbindelse med en udbetalingskontrol i medfør af momslovens § 74, stk. 1, foretager SKAT ikke en egentlig prøvelse af de omhandlede aktiviteter eller anden godkendelse af virksomhedens regnskab. En udbetalingskontrol kan derfor ikke sidestilles med en egentlig afgiftskontrol.

*Peer Kølendorf* har i det væsentlige gentaget sine anbringender og supplerende anført bl.a., at det bestrides, at varer, som Comitel International solgte til EU-samhandelspartnere, blev anvendt til at begå momssvindel. Svarene fra myndigheder i øvrige EU-lande om Comitel Internationals samhandelspartnere i 2003 og 2004 udgør ikke dokumentation herfor. Der er under alle

**1934**

omstændigheder tale om forhold, som han ikke kendte eller burde kende til. Hverken SKAT eller udenlandske myndigheder tilkendegav - uanset løbende kontakt - at Comitel International havde handlet med »missing traders«, hvilket betryggede ham i, at selskabets forholdsregler var effektive.

Det påvirker vurderingen af en borgers ansvar over for SKAT, hvad SKAT har instrueret borgeren i at gøre, særligt når borgeren herefter har iagttaget disse instruktioner i en årrække og ikke på noget tidspunkt i perioden op til sagens handler fik oplyst af SKAT, at selskabet havde gjort noget forkert, eller at selskabet havde været involveret i en handel, der havde ført til et momstab for Danmark eller et andet land.

*Supplerende sagsfremstilling*

Af den for Højesteret fremlagte materiale vedrørende Comitel Internationals samhandelspartnere i andre EU-lande i perioden 2003-2004, herunder oplysninger fra det britiske og det spanske virksomhedsregister, fremgår bl.a., at en del af de virksomheder, som Comitel International havde samhandel med i perioden, er afregistreret, medens andre fortsat er registreret.

*Forklaringer*

Til brug for Højesteret er der afgivet forklaring af Sheng Tang og Stina Grøndahl (tidligere Christina Evers) og supplerende forklaring af Peer Kølendorf.

*Sheng Tang* har forklaret bl.a., at han er uddannet i Kina, hvorfra han har, hvad der svarer til en cand.merc. Han kom til Danmark i 1991, men har ikke studeret her i landet. Han har haft mange forskellige jobs, inden han blev ansat i Comitel, bl.a. i telecom software virksomheden Build Systems. Han har også arbejdet i en eksportvirksomhed i seks år, hvor han var eksportmanager. Arbejdet i eksportvirksomheden bestod i eksport af danske højtalere til Kina og resten af Fjernøsten. Han mener, det var i 2001, han blev ansat

i Comitel. Hos Comitel fik han ansvar for handlen med mobiltelefoner med de asiatiske lande, der var i boom på det tidspunkt. Da han blev ansat hos Comitel, var han til ansættelsessamtale hos Peer Kølendorf. Han blev ansat i brokerafdelingen. I starten handlede han udelukkende med mobiltelefoner. De første fem måneder var der ikke noget af lave. Det var svært, fordi brokervirksomhed handler om kontakter og relationer, og i starten har man ingen. Efter fem måneder fik han fat i Samsung i Stockholm, og derfra gik det godt. Der blev f.eks. fra Samsung solgt restpartier til Hongkong og andre asiatiske lande. Han har aldrig handlet med CPU'er og it-komponenter.

Han mener, at de var fire brokere, da han blev ansat. De andre brokere solgte også udelukkende mobiltelefoner. T, der i begyndelsen ikke arbejdede med brokervirksomhed, var også i Comitel på det tidspunkt. Der var forskel på de kunder, brokerne håndterede. Man havde sine egne kunder. F.eks. var det kun ham, der havde en kunderelation til Samsung.

Da han blev ansat, var hans chef - - - , som var gruppeleder. Peer Kølendorf var slet ikke involveret i brokerhandel. Så vidt han ved, havde ingen af brokerne kontakt med Peer Kølendorf. Peer Kølendorf var til tiede i virksomheden dagligt, men var slet ikke indblandet i hans arbejde. Peer Kølendorf var ikke nede i detaljerne med brokervirksomheden. Han mener ikke, at Peer Kølendorf havde indsigt i detaljer i brokermarkedet, og han havde ikke daglig sparring med Peer Kølendorf.

Hans bemyndigelse til at handle var ubegrænset, forudsat han havde en køber og en sælger. Han kunne f.eks. købe 3-5.000 mobiltelefoner til en stk. pris på 1.500 kr. En sådan handel kunne han foretage uden at spørge. Der var ikke tilfælde, hvor hans handler skulle godkendes. Han har f.eks. købt 20.000 og 30.000 mobiltelefoner fra Samsung, uden at der skulle spørges. Han mener ikke, at han først skulle tjekke, om der f.eks. var likviditet til at foretage handlen. Når kunder købte, var det kontant, og der blev ikke handlet på kredit.

Det var Michael Simonsen, der fortalte ham, hvordan de praktiske ting, f.eks. kundetjek og momsforhold mv., skulle håndteres. Senere blev det T, han refererede til. Han kan ikke tidsfæste, præcis hvornår han begyndte at referere til T. Han kan heller ikke huske, om der blev lavet budgetter i forhold til, hvor meget brokerne skulle omsætte for. Han fik fast løn og provision. Provisionen var meget lav i starten. Der var tale om promiller. Provisionen steg et par år efter hans ansættelse.

Kunder til hans leverandører, f.eks. Samsung, kunne være baseret i eksempelvis Holland eller Hongkong. Kunderne var forskellige. Vedrørende opstillingen, der viser hans kunder, leverandører og omsætningstal i 2004-2006, kan det godt passe, at hans kunder primært var europæiske virksomheder, men der var også større handler med virksomheder i Hongkong, f.eks. Starup Trading Company og HCT holding Ltd. Det er de virksomheder, der står »hK« ud for i opstillingen. Det må have været muligt at opnå højere priser fra de europæiske kunder.

Hans kunder i Fjernøsten var brokere. Det var relationer, han havde opbygget, og til dels kunder, han havde overtaget. Brokermarkedet handler om relationer. Relationen kan være både kort og lang. Der kan være tale om, at en kunde ringer ind og siger, at de har brug for noget, og så handles der. En sådan relation er typisk kort. Relationen til Samsung var lang. De brokervirksomheder, han handlede med, havde eksisteret i mange år, men der var også nogle, der var helt nye. Fra opstillingen over hans kunder, leverandører og omsætningstal i 2004 husker han hverken Vaneypeco Consulting eller Osseni Telecomunication LDA. Han mener ikke, der var eksempler på, at man delte kunder. Han ved ikke,

**1935**

hvordan kunderne blev fordelt, når en broker stoppede. Der var ingen fordelingsnøgle.

De eneste instrukser, han var underlagt, var, at han skulle udfylde et skema. Skemaet var et stykke papir, hvor man bl.a. skulle tjekke et firmas eksistens, dets leverandører og kunder. Man skulle tjekke, om firmaet var »ok«. Han kan ikke huske, hvad man i øvrigt skulle undersøge omkring kunden. Hvis det var en dansk virksomhed, kunne man ringe til Told og Skat. Hvis der skulle laves et tjek på en kunde eller en leverandør, var det ham selv, der ringede. Han kan ikke huske, om der ud over skemaet var skriftlige retningslinjer. Der var månedlige møder, hvor brokerne bl.a. fik instrukser om, at man skulle passe på, hvis ikke man vidste, hvor varerne kom fra. Brokerne fik ikke besked på, at de ikke måtte handle, men blot at de skulle passe på. Han kan ikke huske, om han har set et Code of Conduct fra England.

Det var speditøren, som foretog varekontrol. Nogle gange, hvis varerne var i Danmark, foretog brokerne selv kontrollen. I de fleste handler han var med i, var det speditøren, der foretog varekontrollen. Det skete meget sjældent, at de fik varer ind til kontrol. Han har nogle gange været ude hos speditøren og foretage kontrol, men brokere tjekker normalt ikke lageret. Når der var tale om »trekanthandel«, dvs. når varen ikke kom til Danmark, var der altid speditøren, der foretog kontrol. Her blev varerne sendt direkte fra f.eks. Sverige til Hongkong og passerede ikke en dansk speditør.

Han fik ikke reklamationer. Det får man ikke på brokermarkedet. Det sker måske, men han har aldrig selv oplevet det. Han kendte ikke til begrebet »momskarrusel« i 2001-2003, men han blev senere bekendt med begrebet.

Forholdet til T, der var sød og rar, var godt. T havde til daglig mere at sige end Peer Kølendorf. T var leder af brokerafdelingen, men han havde gang i mange ting. T havde med »Business Development« at gøre. Han kendte ikke T's kunder og leverandører, og der var ikke konkurrence mellem T og ham.

*Stina Grøndahl* har forklaret bl.a., at hun er handelsuddannet. Inden hun blev ansat i Comitel, var hun bl.a. ansat i Santec International, også som broker, og i KISS Technology, der ejes af Sisco Systems. Senere flyttede hun til Fyn og startede som selvstændig med eget firma. I sit eget firma var hun beskæftiget med brokervirksomhed som tidligere. Hun opsøgte kunder og solgte varer. Det på tidspunkt blev hun træt af brokerbranchen. Hun blev restauratør, men det gik ikke, som det skulle. I en kort periode herefter var hun ansat som salgskonsulent på Fyns Amtsavis. Hun så Comitels opslag i sommeren 2003, søgte jobbet og fik det. Hun var i Comitel fra oktober 2003.

Hun var til samtale hos T og mødte ikke i den forbindelse Peer Kølendorf. Hun blev ansat hos Comitel med henblik på at få Comitel ind på markedet for it-komponenter, som Comitel gerne ville tilføje til varesortimentet. Det var også it-komponenter, hun tidligere havde arbejdet med. I hendes tidligere ansættelse købte og solgte hun til kunder over hele verden. Det kunne f.eks. være »broker til broker«-handler og handler med leverandører, distributører og fabrikanter. Det skulle blot være reelle og valide virksomheder, man handlede med.

Da hun blev ansat hos Comitel, skulle hun referere til T. Første gang, hun mødte Peer Kølendorf, var på hendes første arbejdsdag. Generelt havde hun ikke noget at gøre med Peer Kølendorf. Han var til stede i virksomheden, når hun var der, men hun havde hjemmearbejdsplads, så hun var ikke selv ret meget i virksomhedens bygning.

Peer Kølendorf havde intet at gøre med brokeraktiviteten, herunder med kunder, leverandører og produkter. Det havde T. Peer Kølendorf fulgte selvfølgelig tallene, om det gik godt eller dårligt, men

Peer Kølendorf havde i øvrigt ikke noget med brokerdelen af virksomheden at gøre.

Da hun blev ansat i Comitel i 2003, var der en ung mand, der hed A. Han var også fra brokerbranchen, og de skulle køre parløb og sammen opbygge et marked for it-komponenter.

T skulle godkende hendes handler, idet der jo skulle være likviditet til rådighed. Handlerne foregik som et tværfagligt samarbejde. Det var store handler, og der var flere, der skulle bruge likviditet. Hvis der skulle være store handler, kunne man ikke nødvendigvis gennemføre dem alle. Det forhold, at der ikke var ubegrænsede midler, skabte ikke de store gnidninger.

Hun handlede med alle slags it-komponenter, f.eks. CD-rom-drev, DVD-drev, CPU'er og RAM-klodser. Hun havde ikke sine egne kunder som sådan. Kunderne var Comitels, men hun fandt dem og havde relationen til kunden. Kunden handlede med hende, men fordi hun var ansat hos et velrenommeret firma.

Der var kun den skriftlige retningslinje, at man ikke måtte ryge, heller ikke i pauserne. Der var ikke retningslinjer om, at man ikke måtte handle med bestemte kunder. Det var »cash on delivery«, så Comitel skulle blot have pengene, før de frigav varer. Heller ikke på leverandørsiden var der skriftlige retningslinjer.

Hun handlede til momskarruseller, da hun blev ansat. Det var noget, de drøftede og var meget opmærksomme på. Told og Skat var også inde flere gange og drøfte momskarruseller, men Told og Skat kunne heller ikke lave en klar retningslinje til dem. Man havde ingen retningslinjer for, hvordan man skulle undgå momskarruseller, men man var opmærksom på, hvor varerne kom fra. Det var en jungle, så de var påpasselige. Hun kan

**1936**

ikke sige noget nærmere om, hvordan denne påpasselighed kom til udtryk. Hun var dog meget opmærksom på, at der var tale om en proper handel. Hun rådførte sig f.eks. med T og kunne finde på at tage referencer på kunden eller leverandøren. Hun mener ikke, at hun er blevet præsenteret for et Code of Conduct. Hun ved ikke, hvad det betyder.

Varerne, de købte, gik igennem en speditør, så der var ikke kontrol på lageret. De havde et returvarelager, men det havde en meget begrænset størrelse. Hun »handlede med papkasser«, som hun ikke så indholdet af. Det var speditøren, der foretog varekontrollen. Kontrollen beroede på en konkret aftale med speditøren. Kasserne blev åbnet af speditøren, inden der blev betalt. Det var, fordi der var meget svindel, og det var en sikkerhed for kunden og for Comitel.

Hun var i Comitel godt halvandet år. Hun sagde op, fordi hun fik et bedre tilbud. Med hensyn til opstillingen over hendes kunder, leverandører og omsætningstal i 2004-2005 kan hun bekræfte, at hendes kunder og leverandører hovedsageligt var fra Europa. Der var slet ikke i marked i Østen. De kæmpede for at komme ind på markedet i Østen, men det var ikke muligt. At mange handler med virksomheder i Østen ikke blev til noget skyldtes f.eks. udsving i valutakurs, at fragtomkostningerne var større, og tidsfaktoren. De kunne slet ikke matche markedet. Det var ikke, fordi markedet var for farligt, men fordi de ikke kunne matche det. Markedet i Østen var desuden ikke hendes styrke.

Hun mindes ikke, at der var et skema, hun skulle udfylde, når hun fik en ny kunde eller leverandør. Med hensyn til Sheng Tangs forklaring om, at der var et skema vedrørende nye kunder og leverandører, der skulle udfyldes, arbejdede hun og Sheng på vidt forskellige markeder. Der var meget mere kontrol med mobiltelefonmarkedet, hvor omsættligheden og handlerne er større. Det er nemmere at omsætte mobiltelefoner, som alle kan bruge, end it-komponenter.

*Peer Kølendorf* har supplerende forklaret bl.a., at rollefordelingen mellem T og ham var, at han udstak retningslinjer for og delegerede

Copyright © 2023 Karnov Group Denmark A/S

opgaver til T. Ansvar handler om at påtage sig en forpligtelse. Han delegerede opgaver til T, når det handlede om brokerdelen af Comitels virksomhed, og T påtog sig denne forpligtelse. T og han gik op ad hinanden hver dag. Døren var altid åben, og der var løbende dialog imellem dem.

Han kontrollerede, hvad der skete i virksomheden, ved at se i it-systemet. Der kunne han se, hvilke kunder og leverandører virksomheden havde, men han gik ikke i detaljer og kontrollerede ikke, hvilke virksomheder der var tale om. Kontrollen skete mindst en gang hver måned, nogle gange på ugebasis.

Han sendte oplysninger til Told og Skat en gang om måneden. Der var bestemte rutiner for, hvad der skulle gøres. Told og Skat fik oplysningerne om alle nye kunder og leverandører råt for usødet.

Det var økonomiafdelingen, der havde back office-funktionen, herunder bogholderi, ansvaret for ind- og udbetalinger og for registrering af nye varenumre, kunder og leverandører mv. Det var T som sælger ikke inde i. Ingen af brokerne havde bemyndigelse til at foretage udgående betalinger, som der normalt skulle være to til at foretage. Ingen af brokerne var på listen over mennesker, der var beføjet til at godkende udgående betalinger. Brokerne havde dog adgang til it-systemet og kunne se, når og om der var kommet penge ind, hvilket indebar, at der kunne frigives varer til kunden. T kunne f.eks. ikke udstede en kreditnota til kunden. At udstede en kreditnota var med hans revisors ord det samme som at udstede en check, hvilket skulle igennem økonomiafdelingen. Han betragtede denne funktionsopdeling som en relevant og tilstrækkelig opdeling. Det var, hvad han kunne gøre. Han kunne ikke være med i selve brokeraktiviteten, der foregik over telefonen og blev håndteret af sælgerne.

I forhold til de retningslinjer, han udstak for T, mener han, at man skal passe på med at være for firkantet, så en egentlig liste var der ikke. Ledelsen og T kiggede på Code of Conduct fra England, som de var inspireret af. Told og Skat kunne heller ikke formulere retningslinjer. Ud over at sørge for at man ikke handlede med de forkerte, handlede det i høj grad om fornemmelse og om at spørge sine øvrige samhandelspartnere.

I 2003 blev brokervirksomheden i Comitel A/S udspaltet til Comitel International A/S. I Comitel International A/S var der kun brokere. De øvrige funktioner ud over køb og salg, f.eks. telefon, reception, lager og økonomi, herunder ind- og udbetalinger, lå stadig i Comitel A/S. Comitel International A/S betalte hver måned for de ydelser, som Comitel A/S udførte. Comitel International A/S kunne ikke fungere uden Comitel A/S.

Da han i forbindelse med udspaltningen blev direktør for moderselskabet, Comitel A/S, blev T operativ chef for Comitel International A/S. Der var ingen større forskel i måden, han og T arbejdede på. Det forhold, at T blev udnævnt til direktør i april 2004, gjorde således i praksis ingen forskel. Også efter udspaltningen var det ham og ikke T, der havde samarbejdet med Told og Skat.

Udsagnet i hans forklaring for landsretten om, at T blev udnævnt som direktør, fordi »han reelt fungerede som sådan«, er udtryk for, at man i ledelsen syntes, at det var rimeligt, at T fik titlen som direktør i brokervirksomheden. Som driftsleder fungerede T reelt som direktør, men det overordnede tilsyn, som han forestod, var det samme efter udnævnelsen.

Med hensyn til hans forklaring for landsretten - som ikke fremgår af landsrettens dom - om, at en

**1937**

medarbejder »selv må stå til ansvar for det, han laver«, ligger heri, at han havde pålagt T som ansat et ansvar og en forpligtelse. Hvis ikke man som ansat påtager sig den forpligtelse eller det ansvar, man bliver pålagt, bliver man irettesat og i værste fald fyret. Han

har ikke med sin formulering tænkt på det juridiske ansvar, han som direktør fortsat var underlagt.

T blev ansat som forretningsudvikler og tog sig af nye ting. Det var T, der havde ansvaret for brokeraktiviteten, og det undrede ham ikke, at T fik gang i denne aktivitet. T havde også tidligere fået gang i andre nye ting, såsom CBB Mobil A/S og SMS A/S, der var store succeser. Det var desuden ikke kun T, der stod for it-brokerdelen. Der var også ansat andre it-brokere.

En »seriøs køber« er en køber, der holder ord. Når en køber har indgået en aftale, der typisk vil blive fulgt op af en fax - i dag en mail - er det vigtigt, at køberen overholder sin forpligtelse og betaler. Den »useriøse køber« er den, der f.eks. springer fra, fordi prisen på varen har ændret sig, når varen er på vej, og handlen ikke længere er lukrativ. Dem vil man ikke handle med igen. Problemet opstår, når man så står med et parti, man ikke har solgt endeligt. På brokermarkedet nytter det ikke noget at forfølge samhandelspartnere med sagsanlæg, der kan tage flere år. Det er bedre at tage et tab og komme videre.

Overordnet har han faglig indsigt i brokermarkedet, men hvis en produktbetegnelse bliver nævnt for ham, kan han ikke nødvendigvis sige, hvad det er. Han har været i branchen i 50 år, men han kender ikke tekniske betegnelser, for det er han ikke uddannet til. Derfor har han ansat folk, som har teknisk indsigt. For ham var det handelsvarer, Comitel solgte. Han mener ikke, at man skal være teknisk uddannet for at drive handelsmæssig virksomhed. Det væsentlige i brokermarkedet er selvfølgelig prisen, men det allervigtigste er leveringsevnen. Det kan godt være, at man kan købe komponenter billigere hos en fabrik, men hvis fabrikken ikke kan levere, er det uden betydning. Det gælder både for it-komponenter og mobiltelefoner.

Han har »prisindsigt« forstået på den måde, at han godt ved, hvordan priser på brokermarkedet skabes, men han kendte ikke prisen på de enkelte varer. Han så navnene på virksomhedens kunder, så han vidste, hvad de hed, men han kendte dem ikke specifikt, for han deltog ikke i selve brokeraktiviteten.

Han har ikke før denne sag hørt om en såkaldt »trojansk hest«, hvor en ledende medarbejder i et firma er medvirkende i svindlen, og hvor det således ikke kun er samhandelspartnere, der begår svindlen.

Bemærkningen i ledelsesberetningen i Comitel International A/S' årsrapport for 2006 om, at grunden til, at virksomheden ophørte med brokeraktivitet, var, at der blev indført hæftelse for moms, der ikke blev betalt i tidligere led i omsætningskæden, er ikke dækkende. Uddybende kan det siges, at det er meget vanskeligt at vide, hvad en samhandelspartner langt ude i kæden foretager sig. Det var også en medvirkende årsag, at T, der var leder af brokerafdelingen, ophørte i virksomheden. Da han blev opmærksom på, at noget var galt, forsøgte han at gå tilbage for at se, om han kunne have opdaget det. Det kunne han ikke. Dette forhold var nok til at sige, at han ikke kunne fortsætte brokervirksomheden. Det var også et medvirkende forhold, at han havde rapporteret løbende over for Told og Skat, hvilket heller ikke før var sent førte til, at svindlen blev afdækket. Det var en ny form for svindel, man ikke havde kendt til udfø re.

Han gik ud fra, at hvis Told og Skat lå inde med oplysninger, der gav anledning til mistanke om momskarruselsvig, havde han fået dem. Når Comitel så noget, der så mystisk ud, anmeldte de det. Det kunne f.eks. være papkasser, der så forkerte ud. Told og Skat tog så ud til spediøren. Efterfølgende hørte han ikke et meget andet end, at der måske blev sagt tak for tippet. Han har også oplevet, at han tilbudt Nokia-telefoner meget billigere, end de kunne købes for fra fabrikken. Det anmeldte de også og blev takket. I forhold til de lister, han sendte til Told og Skat med nye kunder

og leverandører, ville han have forventet at få et præj, hvis der var en mistanke om, at der var en ny form for momskarruseller, han ikke var bekendt med, men han fik ingen advarsler.

Problemerne i forhold til det engelske marked, som er omtalt i landsrettens dom, kan han ikke tidsfæste præcist. Det handler formentlig om, at det engelske toldvæsen var begyndt at skride ind over for momskarruseller, hvilket der ikke var noget af i Danmark på det tidspunkt. I England gik man ind og standsede udbetalingen af negativ moms, og det standsede hele det engelske brokermarked. Det gik i et tilfælde ud over et dansk selskab, og det påvirkede også det marked, Comitel International A/S handlede i.

I forhold til det omsætningsmål, der blev formuleret ultimo 2003 på 2 mia. kr., er et sådant mål på brokermarkedet udtryk for et håb og et gæt. Man kan ikke sige, hvordan markedet udvikler sig. Det kræver, at der er varer, som nogen mangler. I givet fald tyer man til brokermarkedet, fordi man ikke kan få varerne fra fabrikkerne. Hvis fabrikkerne i stedet havde produceret mere, end de kunne bruge, var målet ikke blevet indfriet. De 2 mia. kr. er formentlig udtryk for, at virksomheden havde en ambitiøs bestyrelse. Målet viste sig at blive indfriet, men det kunne lige så godt være gået den anden vej. Det var f.eks. relationen til gode kunder som Samsung, der gjorde, at målet kunne nås.

Omsætningsmålet skulle T og hans ansatte realisere. Det foregik ikke sådan, at bestyrelsen blot satte et mål.

**1938**

Målet blev fastlagt sammen med T, og han mener ikke, det var et mål, som T og hans ansatte blev presset til. Der var ledelsesmæssig opbakning til at nå målet f.eks. i kraft af at sørge for, at der var likviditet til rådighed. Han var ikke selv med til at finde kunder, leverandører og produkter.

I forhold til Stina Grøndahls forklaring om, at der var problemer vedrørende handlen med Fjernøsten, har han ikke hørt om sådanne problemer tidligere. Spørgsmålet er, hvor meget Stina Grøndahl vidste om det, da hun selv primært handlede med europæiske virksomheder.

Han havde en løbende dialog med T. Instrukser om tiltag over for momskarruselsvig blev f.eks. givet på basis af, hvad man havde hørt og læst. På den måde var man advaret om, hvad det var for nogle momskarruseller, som blev benyttet. F.eks. var det et faretegn, at den pris, der blev tilbudt, var lavere end markedsprisen, men det var ikke noget, der kunne fastsættes entydige retningslinjer for. Et andet faretegn kunne som nævnt være en »useriøs køber«.

For at undgå at handle med selskaber, der drev momskarruselsvig, forhørte man sig i branchen og tog referencer, når man fik nye samhandelspartnere. Det var noget, sælgerne selv skulle dyrke, og han tog typisk ikke selv referencer. Han tog selv referencer i forbindelse med opstarten af samhandlen med Solid Trading ApS, der var en dansk virksomhed. Han havde ikke kontakt med folk i brokermarkedet og kunne kun selv undersøge i Danmark.

Han kan ikke sige noget om, at en bestemt procentdel af en brokervirksomheds omsætning vil være relateret til momskarruselsvig, men de kendte til momskarruselsvig fra artikler. Ifølge artiklerne var der ikke problemer i Danmark.

Han var vidende om, at man i 2003 havde ændret momsreglerne, sådan at reglerne var de samme i relation til samhandel med selskaber i Europa og tredjelande, herunder Hongkong, men toldkontrollen var ikke den samme. Her var der vidt forskellige regler. I forhold til handel med tredjelande var momskarruselsvig ikke oplagt, da der var store omkostninger forbundet med at sende varer til f.eks. Hongkong.

Han fik ikke noget tilsagn fra Told og Skat om, at han ville blive underrettet, hvis Told og Skat havde mistanke om momskarruselsvig, men han forventede at få oplysninger om en eventuel mis-

tanke, fordi han sendte lister til Told og Skat og blev rykket, hvis listerne ikke kom. Derfor forventede han, at listerne blev brugt til noget. Han vidste ikke, hvad listerne blev brugt til, men gik ud fra, at de blev brugt til at følge varerne, f.eks. til Hongkong. Ingen fra Told og Skat har fortalt ham, at varerne kunne følges til Hongkong, men han mener at Told og Skat har den mulighed.

De interne dokumenter fra Told og Skat, som viser, at der har været møder allerede i 2003 vedrørende bl.a. mistanke om momskarruselsvig, blev han ikke gjort bekendt med før denne sag.

Han og hans virksomheder er ikke i dag i besiddelse af bogførings- og regnskabsmateriale vedrørende Comitel International A/S. Der er en vis elektronisk bogføring, men den er sammenlagt, og man kan ikke se ret meget. Man kan f.eks. ikke periodedele en omsætning.

Han kender ikke specifikke produktbetegnelser og ved f.eks. ikke, at »Infineon TSOP« er en microprocessor, og hvad »Samsung Branded Dice« dækker over. Han har importeret elektronik i 50 år og mener ikke, at det er nødvendig viden for at drive en handelsvirksomhed.

Han mener, at T spurgte ham, i forbindelse med at Comitel gik ind i handlen med pornokort. Han ved ikke, hvorfor Comitel forlod markedet.

## Højesterets begrundelse og resultat

### Sagens baggrund og hovedproblem

Sagen angår, om Peer Kølendorf er erstatningsansvarlig for det tab på 144.080.700 kr., som Skatteministeriet har lidt ved, at Comitel International A/S fik tilbagebetalt moms vedrørende perioden november 2003 til november 2004, som forudgående handelsled svigagtigt unddrog SKAT. Lederen af Comitel Internationals brokervirksomhed, T, er idømt 5 års fængsel for skyldnersvig i form af deltagelse i momskarruselsvig som led i det såkaldte »Gul Feber«-sagskompleks.

Skatteministeriets hovedsynspunkt er, at Peer Kølendorf som ultimativ hovedaktionær og bestyrelsesmedlem samt daglig leder af Comitel International - i perioden frem til den 16. april 2004 tillige som registreret direktør - har handlet ansvarspådragende ved ikke at sikre en forsvarlig organisering af og et tilstrækkeligt tilsyn med selskabets brokervirksomhed.

### Ansvarsbedømmelsen

Spørgsmålet om Peer Kølendorfs erstatningsansvar skal bedømmes efter dansk rets almindelige erstatningsregel (culpareglen), hvorefter det afgørende er, om Peer Kølendorf har forvoldt SKATs tab forsætligt eller uagtsomt (uforsvarligt), jf. dagældende aktieselskabslovs § 140, nugældende selskabslovs § 361.

Som anført af landsretten må det lægges til grund, at Peer Kølendorf ikke vidste, at de pågældende handler med it-komponenter og internet access-kort indgik i momskarruselsvig. Peer Kølendorf kan derfor kun blive erstatningsansvarlig, hvis Skatteministeriet godtgør, at han har udvist en uforsvarlig adfærd i forbindelse med organiseringen af eller tilsynet med selskabets brokervirksomhed.

Peer Kølendorf havde fra sit virke i branchen kendskab til tidligere anvendte momskarruseller på

**1939**

brokermarkedet og til de risici for svig, der var forbundet hermed.

Uanset dette og uanset den generelle risiko for momssvig på brokermarkedet kan det efter Højesterets opfattelse ikke i sig selv anses for ansvarspådragende for Peer Kølendorf, at selskabet gik ind i brokermarkedet for it-komponenter mv., hvilket Skatteministeriet da heller ikke har gjort gældende.

Det kan endvidere ikke i sig selv anses for ansvarspådragende, at selskabets brokervirksomhed ikke var indrettet således, at selskabet alene benyttede sig af retten til momsfradrag, efter at selskabet

Copyright © 2023 Karnov Group Denmark A/S

havde kontrolleret, at de tidligere handelsled havde angivet og betalt momsen.

Om Peer Kølendorf ved organiseringen af eller tilsynet med selskabets brokervirksomhed udviste en uforsvarlig adfærd, beror herefter på de konkrete omstændigheder i sagen, herunder om han undlod at tilrettelægge selskabets virksomhed således, at selskabet afstod fra at handle i tilfælde, hvor omstændighederne gav anledning til mistanke om svig eller uregelmæssigheder i tidligere handelsled.

Brokervirksomheden, som oprindelig var en afdeling i Comitel A/S og omfattede handel med radiokommunikationsudstyr og mobiltelefoner, blev som led i ophørsspaltningen af selskabet i 2003 overført til Comitel International. T havde været ansat i Comitel fra 1992-96 som elektromekaniker og senere leder af værkstedet. I august 2000 blev han ansat som forretningsudvikler og ansvarlig for brokerhandlen med mobiltelefoner i Comitel, og som led i omstruktureringen blev han overført til Comitel International. I 2003 besluttede bestyrelsen på T's initiativ at udvide brokerforretningen til også at omfatte handel med it-komponenter.

Som anført af landsretten var T en nøgleperson i virksomheden på grund af sin faglige kompetence inden for it og mobiltelefoni og sit personlige netværk. Brokerhandlen med mobiltelefoner havde ikke givet anledning til problemer under hans ledelse i 2000-2003, og han nød en høj grad af tillid fra direktion og bestyrelse. T blev ansat som daglig leder af brokerforretningen, fordi bestyrelsen og direktionen ønskede at anvende hans ekspertise og netværk til at udvikle denne forretning.

Efter bevisførelsen, herunder de afgivne forklaringer, lægger Højesteret til grund, at Peer Kølendorf, der betragtede T som sin højre hånd, instruerede ham om at sørge for, at brokerne traf forholdsregler for at undgå, at Comitel International blev involveret i momskarruselsvig.

Peer Kølendorf, der havde kontor i de samme lokaler som de få øvrige medarbejdere i Comitel International, havde dagligt kontakt med T og de øvrige brokere og fulgte løbende op på udviklingen i selskabets økonomi, herunder omsætning, omkostninger, resultat og budget, ligesom han dagligt fulgte bevægelserne på selskabets bankkonti. Bevisførelsen giver ikke grundlag for at fastslå, at Peer Kølendorf gennem sin kontakt med T og de øvrige brokere eller gennem sin kontrol af selskabets økonomi mv. burde have fået mistanke om, at tidligere handelsled var involveret i momskarruselsvig. De oplysninger, som Skatteministeriet har modtaget fra myndigheder i andre EU-lande om Comitel Internationals EU-samhandelspartnere i 2003 og 2004, kan ikke føre til en anden vurdering.

Ud over den nævnte kontrol med selskabets økonomi mv. sendte Peer Kølendorf efter aftale med SKAT i flere år månedlige lister over selskabets nye kunder og leverandører til SKAT. Dette må antages at have medvirket til at styrke Peer Kølendorf i opfattelsen af, at selskabet havde truffet de fornødne forholdsregler for at undgå at blive involveret i momskarruselsvig.

På den anførte baggrund finder Højesteret det ikke godtgjort, at Peer Kølendorf ved den opgavefordeling, der blev gennemført mellem ham og T, eller som følge af manglende tilsyn eller kontrol med brokervirksomheden har udvist uforsvarlig adfærd.

Peer Kølendorf er herefter ikke erstatningsansvarlig for SKATs tab.

*Konklusion*

Højesteret stadfæster dommen.

## Thi kendes for ret

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for Højesteret skal Skatteministeriet betale 3.750.000 kr. til Peer Kølendorf.*

*De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne Højesteretsdoms afsigelse og forrentes efter rentelovens § 8 a.*

Copyright © 2023 Karnov Group Denmark A/S