# Exhibit 31

**U.2014.3045Ø**
**FED2014.138**

*The Prison and Probation Service had violated Article 3 of the ECHR in 4 cases by unjustifiably placing detainees in secure detention.*
*by placing him in a security cell and restraining him there and in 8 cases by allowing a justified placement in a security cell and restraint to last longer than justified. 50,000 DKK in compensation. Question of limitation of claims for compensation for violation of Article 3 of the ECHR. Judicial review of such cases conducted in civil proceedings.*

*Non-contractual liability 3211.7 - Liability of public authorities 1.13 - Tort 3.3 - EU law/international issues - Other issues - Human rights 1.1 and 12.6 - Money*
*etc. 58.1 and 5.9 - Administration of justice 27.4 - Criminal law 3.7.*

♦ The case concerned a number of measures taken against A in the form of placement in a security cell, placement in an observation cell, transfer between institutions under the Danish Prison and Probation Service, exclusion from association and use of force by prison staff in the period from the time A was sentenced to detention on March 15, 1999 and until he was transferred to the Security Department at Nykøbing Sjælland Psychiatric Hospital on May 26, 2009. The allegations concerned whether the interventions carried out from and including his placement in a security cell on 10 August 2003 constituted a violation of Article 3 of the ECHR. After the nature and duration of the interventions that had taken place, including in particular the placements in a security cell using restraint and the placements in an observation cell, and the allegations of violation of Article 3 of the ECHR. 3, the High Court found that - regardless of the fact that it was a case conducted in the form of civil proceedings - it had to be examined whether the individual placements in security cells and observation cells could be assumed to violate Article 3, cf. the principle in section 471 of the Administration of Justice Act in conjunction with

**3046**

with Article 13 of the Convention. To the extent that placement in a security cell and restraint with hand and foot straps and a belly belt and possibly also gloves had been unjustified, the restraint was considered to cause such intense physical and mental suffering that the interference was covered by Article 3. The same applied in cases where the restraint in the security cell was considered justified, but where the interference had continued for longer than necessary. Prohibition of contact with other inmates based on security, protection or disciplinary considerations was not in itself found to be in violation of Article 3. Exclusion from general association for a certain length of time under conditions that were considered particularly stressful due to, among other things, lack of access to contact with other people, lack of or limited access to activities such as walks, television, books, etc. and poor physical conditions in the cell could constitute a violation of Article 3. When deciding whether exclusion from the general community fell under Article 3, considerable weight was given to the considerations behind the exclusion and how weighty they were. A had been extremely difficult to accommodate in the

prison system due to his peculiar personality structure and violently aggressive behavior in relation to both fellow inmates and staff. There was no basis for disregarding the Prison and Probation Service's assessment that it was necessary to establish a rotation scheme to enable the prisons and prison staff to accommodate A for the sake of both A and the prison staff. The rotation

Copyright © 2023 Karnov Group Denmark A/S    page 1

The scheme was thus to be considered a legitimate safeguarding of the interest in preventing violent assaults by A against staff and other inmates, which was provided for in section 26 of the Execution of Sentences Act or an analogy thereof, and did not violate Article 3. Based on A's personality characteristics, the overall course of imprisonment could not be considered contrary to Article 3. A argued that such limitation was contrary to the ECHR. The High Court stated that neither the Limitation Act nor its legislative history addressed the issue of limitation of claims for compensation for violation of Article 3 of the ECHR. According to the High Court's interpretation of case law from the ECHR, there was no basis for specifically considering limitation under Section 3(1) of the Limitation Act to be contrary to the requirement for effective remedies in Article 13 of the ECHR. As a result, claims for compensation for unjustified placements in security cells that had ended before a certain date had to be considered time-barred. The Prison and Probation Service had acted in violation of the prohibition against inhuman and degrading treatment or punishment in Article 3 of the ECHR by unjustifiably placing A in a security cell in 4 cases and restraining him to a couch and by allowing an otherwise justified placement in a security cell and restraint to continue for longer than justified in 8 cases. Some of the claims for compensation for these interventions were time-barred. The High Court found that the Prison and Probation Service, pursuant to section 26 of the Tort Liability Act in conjunction with ECHR articles 13 and 41 regarding the other unjustified or excessively long security cell confinements, should pay an estimated compensation of
DKK 50,000 for the suffering A had suffered.

**Ø.L.D. June 4, 2014 in case 11. afd. B-1871-11**
(Karsten Bo Knudsen, Katja Høegh, Julie Skat Rørdam (deputy)).

*A (adv. Hanne Mogensen Ziebe, Aarhus, trial)*
mod
*Directorate of Prisons and Probation (Km.adv. v/adv. Benedicte Galbo, Copenhagen).*

## Eastern High Court
*Grounds of action and claims*
  This case, brought before the Copenhagen City Court on January 3, 2011, was referred to the Eastern High Court by order of May 30, 2011, pursuant to Section 226(1) of the Danish Administration of Justice Act.
  A has claimed that:
  1) order the Department of Prisons and Probation to acknowledge that it has violated his rights under Article 3 of the European Convention on Human Rights; and
  2) Order the Department of Prisons and Probation to pay him compensation of DKK 120,000 plus interest from the institution of the case.
  The Department of Prisons and Probation ("the Department") has claimed rejection of A's claim 1, alternatively acquittal, and acquittal of A's claim 2.
  The case concerns a number of interventions against A in the form of placement in a security cell, placement in an observation cell, transfer between institutions under the Prison and Probation Service, exclusion from association and use of force by prison staff in the period from A was sentenced to detention by the Supreme Court's judgment of March 15, 1999

until he was transferred to the Security Department at the Psychiatric Hospital Nykøbing Sjælland on May 26, 2009. The case also concerns alleged inadequate investigation of the justification for the interference and a plea made during the main hearing regarding lack of right of access to the evidence.

the grounds for exclusion from association. During the main proceedings, A has stated that the allegations only concern the interventions carried out from and including the placement in a security cell on August 10, 2003.

At the beginning of the main hearing, it was stated that A had applied for legal aid. According to the information provided on May 26, 2014, a previously announced refusal has been referred back for reconsideration. Thus, has not yet made a decision in this regard.

**3047**

*Case presentation*
*Custodial sentence*

In the Eastern High Court's judgment of September 18, 1998, A was sentenced to custody for violation of sections 119(1), 260(1) and 288(1)(1) of the Penal Code.

The judgment states about the mental examination carried out at the Ministry of Justice's Forensic Psychiatric Clinic:

". . .

"The observer is therefore not insane, but on the basis of the present, an incipient insane development in recent years cannot be excluded with certainty. This is supported by the observer's degree of disconnectedness, his unrealistic, paranoid readiness to interpret events in the outside world, his primitive affect management and his violently uninhibited aggressive behavior, in which his reactions, in accordance with the results of the psychological test, are characterized by low frustration tolerance, outward projection with severe character deviations resulting in a chaotic, permanently disorganized mental state.

In connection with the alleged crime, the observer has been under the influence of alcohol, but there is no evidence to assume that a pathological state of intoxication has been present. He is normally gifted and does not suffer from epilepsy.

Diagnostically, there is probably an emotionally unstable personality structure of borderline type with occasional psychotic features. The diagnostic assessment has thus changed in relation to previous studies, even though the patient still appears to be highly dyssocial.

Due to his personality characteristics, the observer is covered by section 69(1) of the Danish Criminal Code. However, if he is found guilty, it is not possible to point to measures, cf.

§ Section 68, second sentence, as more appropriate than punishment to counter a presumably not insignificant risk of future similar crime. Taking into account the nature of the offense now charged, and taking into account his very severe personality disorder, it is more appropriate to

Thus, it cannot be denied that he poses such an imminent danger to the life, limb, health or liberty of others that the use of detention instead of imprisonment must be considered from a medical point of view. As the observer must be assumed to be in need of drug treatment as a result of his severe personality disorder, as well as the need for continuous psychiatric assessment for a longer period, imprisonment in Herstedve- ster Prison must be recommended".

In addition, the opinion of the Coroner's Council is stated:

". . . that A is not insane and cannot be assumed to have been so at the time of the alleged offense. He is normally gifted and does not suffer from epilepsy.

He was under the influence of alcohol at the time of the alleged offense, but there is no evidence to assume that an abnormal state of intoxication existed.

A has served a total of 8 years in prison. He does not present with definite symptoms of insanity, but he has previously had episodes of self-referral, possibly accompanied by hallucinatory experiences. His condition is characterized by poor contact ability, a sub-paranoid attitude (i.e. suspicious attitude bordering on the insane), and a very pronounced, and sometimes embarrassing, aggressive affect pressure with fear of losing self-control. He is also characterized by dyssocial traits in the form of a lack of consideration for his surroundings, a tendency to blame others and short-sighted, impulsive behavior.

In the opinion of the Council of Forensic Medicine, A suffers from a pseudopsychopathic schizotypal state (a borderline schizophrenic state without mental illness intensity). The possibility of a later development of true schizophrenia cannot be ruled out.

A is then covered by section 69(1) of the Danish Criminal Code, but the Council cannot, if he is found guilty, point to the sanctions mentioned in section 68(2) of the same Act as being more appropriate than an ordinary sanction.

The Council cannot reject the possibility that he continuously exposes the life, limb, health or freedom of others to such imminent danger that detention under section 70 of the Penal Code may be considered. In any case, A will need continued psychiatric observation and possible treatment, which is why possible detention can be recommended to be carried out at Herstedvester Prison." The verdict was upheld by the Supreme Court's judgment of March 15, 1999. *The course of imprisonment*

After the Eastern High Court's verdict, on January 15, 1999, A was placed in a closed prison at Anstalten ved Herstedvester.

The following overview of detention centers is presented:

| | |
|---|---|
| "15.01.99: | The offender is transferred from Copenhagen Prisons to the Institution at Herstedvester Transfer for the purpose of serving a sentence after sentencing. |
| 11.08.99: | The offender is transferred from Herstedvester Prison to Vridsløselille State Prison |
| | Assault on a fellow inmate and threatening behavior on the ward (see report on placement in observation cell dated 4 August 1999 and interrogation transcript dated 11 August 1999). |
| 13.09.99: | The person in question is transferred from the State Prison in Vridsløselille to Anstalten ved Her- stedvester |
| | According to the information in the case, this is a voluntary transfer |
| | **3048** |
| 23.08.00: | The offender is transferred from Herstedvester Prison to Vridsløselille State Prison |
| | Voluntary transfer |
| 10.07.03: | The person in question is transferred from Vridsløselille State Prison to Nyborg |

State
Prison
Reportedly
transferred
due to a
fight
during a
yard walk
(see here .
. .)

| 12.08.03: | Applicant transferred from Nvborg State Prison to Copenhagen Prisons |
| | The complainant threatens and tries to stab the staff with a knife (see here j.nr. . . .) |
| 19.08.03: | The offender is transferred from Copenhagen Prisons to the State Prison in Horsens Violent behavior (see j.nr. . . .). |
| 11.11.03: | The applicant is transferred from Horsens State Prison to Herstedvester Prison |
| | The applicant has reportedly agreed to the transfer. |
| 19.12.03: | The offender is transferred from Herstedvester Prison to Vridsløselille State Prison |
| | In the time prior to the transfer, the person in question has been placed in observation and security cells several times due to violent behavior (see here . . .) |
| 07.01.04: | The person in question is transferred from the State Prison in Vridsløselille to Anstalten ved Her- stedvester |
| | Verbal abuse including threats against staff, resulting in placement in an observation cell (see j.nr. . . .). Based on the incident, the offender is transferred to Herstedvester Prison for three days. |
| 10.01.04: | The offender is transferred from Herstedvester Prison to Vridsløselille State Prison |
| | Returned to the State Prison in Vridsløselille after a three-day stay in the prison at Herstedvester. |
| 30.04.04: | The person in question is transferred from the State Prison in Vridsløselille to Anstalten ved Her- stedvester |
| | Breach of contract and threats against staff. This is evident from the case presentation in j.nr. ... . |
| 16.09.04: | The offender is transferred from Herstedvester Prison to the State Prison in Horsens |
| | Prior to the transfer, the person in question had been placed in a security cell and observation cell for an extended period (see j.no. . ). It appears from the case that the facility finds, that the person's situation is "stuck" in the facility. |
| 27.01.05: | Transfer from Horsens State Prison to Nyborg  ................................State Prison Threatening and aggressive behavior towards fellow inmates (see j.no.)..................................................... |
| 15.04.05: | The offender is transferred from Nyborg State Prison to Politigården Prison |
| | The offender threatens the staff with shards from a broken mirror. Transferred to the Police Yard Prison on this basis (see also j.no.          ) |
| 27.04.05: | The offender is transferred from Politigårdens Fængsel to Nyborg State Prison Relaxation of prison conditions |
| 27.07.05: | Transfer from Nyborg State Prison to Herstedvester Prison Referral to the rotation scheme |
| 27.07.05: | Offenders are transferred from Herstedvester Prison to Politigården Prisons |
| | Violent and threatening behavior, including threats against staff (see also j.nr. . .). |
| 09.08.05: | The offender is transferred from Politigårdens Fængsel to Anstalten ved Herstedvester |
| | Violent behavior, including destruction of furniture and attempts to hit and bite prison officers in connection with transfer to a security cell (see also j.nr. . .). |
| 06.02.06: | Prior to this, the person in question has been shouting, and Politigårdens Fængsel has stated that they cannot house him when he is so loud. This is because his noisy behavior is a nuisance to, among other things, the judge on duty. |
| 21.03.06: | The offender is transferred from Herstedvester Prison to Vridsløselille State Prison |
| | Return after a mental examination at the secure facility. |
| 29.03.06: | The offender is transferred from Vridsløselille State Prison to Politigården Prison |

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

Strikes and attempts to bite staff during a search of an inmate's cell (see here)........................................

The offender is transferred from Politigårdens Fængsel to the State Prison in Horsens

Copyright © 2023 Karnov Group Denmark A/S

Relaxation of imprisonment conditions.

07.05.06:    The offender is transferred from Horsens State Prison to Copenhagen Prisons
Transferred due to court appearance.

09.05.06:    The offender is transferred from Copenhagen Prisons to the State Prison in
Horsens Returned after presentation in court

**3049**

05.07.06:    The offender is transferred from the State Prison in Horsens to Politigården Prison
The complainant hits a prison officer and makes threats against the other staff
when, due to shouting and screaming in the cell, he has to be placed in an
observation cell. (see also j.no. . . . .)

22.12.06:    The offender is transferred from Politigårdens Fængsel to Statsfængslet Østjylland
Relaxation of prison conditions and violent outburst against staff, shouting
and throwing cell furniture while threatening staff. When the staff wanted to
place him in an observation cell, he hit one prison officer and bit another in
the leg (see also j.no. . . . .).

10.05.07:    Transfer from East Jutland State Prison to Copenhagen Prisons
It has not been possible to find a more detailed reason for the transfer, so the
transfer was probably made with reference to the rotation scheme. On 12 June
2007, the person in question was disciplinary transferred from Vestre
Fængsel to Politi- gårdens Fængsel due to violent behavior, as he screamed,
kicked the cell door and threw the cell furniture (see j.nr. . . . .).

12.07.07:    The offender is transferred from Politigårdens Fængsel to Statsfængslet
Østjylland Relaxation of prison conditions.

04.07.08:    The offender is transferred from East Jutland State Prison to Politigården Prison
The complainant hit a prison officer several times in connection with a
reprimand given by the prison officer (see here j.nr. . . . .).

03.10.08:    The offender is transferred from Politigårdens Fængsel to Statsfængslet
Østjylland Relaxation of prison conditions.

22.01.09:    The offender is transferred from East Jutland State Prison to Politigården Prison
Together with a fellow inmate, the accused assaulted two prison officers in
connection with an interrogation (see j.no. . . . .).

05.03.09:    Transfer from Copenhagen Prisons to East Jutland State Prison Transfer for
presentation in the Court in Horsens

06.03.09:    The offender is transferred from East Jutland State Prison to Copenhagen
Prisons Return after presentation in the Court in Horsens

26.05.09:    The offender is transferred from Copenhagen Prisons to the Detention Center
The offender is transferred for the purpose of completing a mental
statement. When the mental statement has been completed, the person is
placed at the Security Institution pursuant to section 78 of the Execution of
Sentences Act."

It is agreed that transfers have been made as stated in the overview. In 2004, the Directorate's letter of September 13, 2004 to Herstedvester Prison and the State Prisons in Horsens, Nyborg and Vridsløselille decided on a so-called "rotation scheme", which would involve transfers at approximately 3-month intervals. The letter states, among other things:

"With reference to previous correspondence, it can be stated that the Directorate, based on an overall assessment of the circumstances of A's imprisonment, has decided to establish a rotation scheme so that the inmate is moved between the four closed prisons every three months.

Attached is a letter dated September 2, 2004 from Chief Physician G from Herstedvester Prison, which states that such an arrangement is deemed to be justifiable.

It has been agreed with the State Prison in Horsens that A will now be moved there by agreement between the prison at Herstedvester and

State Prison in Horsens. When he has served three months in the State Prison in Horsens, the inmate must be transferred to the State Prison in Nyborg and then to the State Prison in Vridsløselille. The Department assumes that the prisons themselves will agree the details of the practical transfer every three months."

In the letter of September 2, 2004 from consultant physician G, reference is made to, among other things:

"In accordance with a telephone agreement with chief physician [Name], it can be stated that A does not make use of the psychiatric treatment available at Herstedvester Prison. He does not want to receive the medical treatment that is proposed, and he refuses to talk to a psychiatrist.

From a psychiatric point of view, it is therefore assessed that A can just as well serve his sentence in a prison without the treatment available at Herstedvester Prison. As A has been assessed as not insane, it is also considered fully justifiable."

Copyright © 2023 Karnov Group Denmark A/S

The Directorate's memo of January 26, 2012 states the following about the rotation scheme:

"As stated in the attached letter of September 13, 2004 from the Directorate to Herstedvester Prison and the State Prisons in Nyborg, Vridsløselille and Horsens, it was decided in 2004 to establish a rotation scheme so that it was possible to move inmates between the four closed prisons every three months.

**3050**

It appears from the inmate's file that during his imprisonment there have been several episodes where he has behaved in a threatening and aggressive manner and many episodes where he has used violence against prison staff. There have been numerous reports of disciplinary action, exclusion from association, observation and solitary confinement, and the inmate has been reported to the police several times for threats and violence against staff.

Due to his aggressive and sometimes violent behavior, the inmate has been extremely difficult to accommodate in the Prison and Probation Service's institutions, and the fact that he has threatened and assaulted several employees in the institutions has affected the institutions' desire and ability to receive him.

Based on the above, it was agreed that inmates would be included in the above rotation scheme. The purpose of the rotation scheme was partly to try to prevent the inmates' imprisonment situation and imprisonment conditions from becoming further entrenched, and partly a well-founded consideration for the staff.

The special scheme has thus also been of a practical nature, as the intention was to avoid transfer cases having to be submitted to the Directorate as cases of disagreement, if it was not possible for the institution in which the person concerned was held to find a prison that would accept him.

It appears from the case that the scheme was mainly administered in such a way that when a serious incident necessitated the transfer of an inmate, he was typically moved to Politigårdens Fængsel, from where he was transferred after a period to one of the closed institutions. It also appears that, due to violence and threats against staff etc., it proved necessary on several occasions to transfer inmates within three months."

In the Directorate's letter of August 9, 2007 to the Director of Public Prosecutions, it is stated that A was serving his sentence together:

"A has been in general community service from October 30, 2002 to December 10, 2002 in Vridsløselille State Prison and from

September 16, 2004 to January 27, 2005 in the State Prison in Hor- sens."

*Interventions during imprisonment*

During the preparation of the case, the Department submitted a large number of documents in the form of reports, notes etc. on the use of force and interventions against A during the time he served in ordinary prison. The purpose of this was primarily to enable A's lawyer to clarify which of the interventions carried out during his imprisonment were covered by claims 1 and 2.

The following chronological overview of interventions against Mr. A has been prepared by the Attorney General representing the Directorate:
"

| DATE | What | Location | Justification | Attachment no. |
|---|---|---|---|---|
| 26.06.1997 at. 17.30 to 27.06.1997 12:35 p.m. | Safety cell | State Prison in Nyborg | To ward off threatened violence or overcome violent resistance. Assault against Prison official. | A |
| 01.04.1998 | Forensic psychiatric statement | | | 1 |
| 11.05.1999 | Transcript of the interrogation: The institution at the solitary confinement Herstedvester see | | Violence against fellow inmate, chika-AO-1-1-1 nizing behavior | |
| 09.07.1999 at 9:25 am to 12.07.1999 at 10.00 | Observation cell - ved le | Anstalten Herstedvester | Self-harm | AQ-1-1 |
| 19.07.1999 at. 19.55 to 26.07.1999 2:05 p.m. | Observation cell - ved le | Anstalten Herstedvester | Self-harm | AQ-1-2 |
| 04.08.1999 at. 13.25 to 11.08.1999 11:40 a.m. | Observation cell - ved le | Anstalten Herstedvester | Violence against fellow inmate | AQ-1-3 |
| 11.08.1999 | Transcript: Institution by fine for inappropriate language use - Herstedvester, transferred to the State Prison in Vridsløselille, Placement in a... rum | | Single room placement as A seems very agitated and aggressive | AO-1-2 |

| 15.09.1999 at. 10.20 to 15.09.1999 3 p.m. | Observation cell - ved le | Anstalten Herstedvester | Maintain peace and security in the institution | AQ-1-4 |
|---|---|---|---|---|

| | | |
|---|---|---|
| 15.09.1999 at 15 p.m. Security cell (supplement to annex Herstedvester 1-4) | Anstalten ved AQ- | To avert threatening violence, B overcome fierce r e s i s t a n c e **3051** and prevent suicide or self-harm |
| 15.09.1999 at 15 toSecurity cell AQ-1-4 28.09.1999 at 10.30 | The prison at Herstedvester to force | To prevent threatening violence, violent resistance and prevent suicide or self-harm |
| 28.09.1999 at 10.30 to 02.12.1999 on | Observation cell - Anstalten ved Herstedvester | Maintaining peace and security AQ-1-5 in the institution |
| 02.06.2000 Transcript of the hearing Possession of hash, one room san- Bringing | : Institution at Herstedvester | Possession of hashAO-1-3 |
| 14.06.2000 Transcript of the hearing fine, single- bringing, smoking Pipes are confiscated | : Anstalten ved Herstedvester | Threatening behavior towards AO-1-4 staff, manufactured smoking pipe, possession of a grate for hash-shuddering |
| 01.08.2000Interrogation transcript possession etc. of hashish and medicine, single-room confinement, etc. see | : Anstalten ved Herstedvester | Possession of hashish, etc., misconduct AO-1-7 thoughts of violence against fellow inmates set, prevent violent behavior |
| 01.08.2000 See | Solitary confinement - Anstalten ved Herstedvester | Suspicion of possession ofAO-1-5 and use of narcotics dust |
| 01.-18.08.2000 weekly memo regarding room placement and transfer | Personal record, Prison at Herstedvester | AO-1-6 |
| August 2000Interrogation transcript se, police notification For violence. | : Anstalten ved Herstedvester | Solitary confinement due to violence AO-1-8 against fellow inmate |
| 18.08.2000 Transcript of the hearing transfer to State Prison in Vridsløselille | : Institution at Herstedvester | AO-1-9 |
| 04.10.2002 at 15.10 to 08.10.2002 10:15 am | Exclusion from community | AO-1-9 |
| 09.12.2002 at 11.05 to 09.12.2002 on 1:35 p.m. | Observation cell - State Prison in Vridsløselille | Maintain peace and security AQ-1-6 in the institution (violence against co-inmate) |
| 09.12. | 2002Temporary exclusion from company | AO-1-10 |
| 10.07.2003 at 12.00 to 10.07.2003 12:48 (then transfer to the State Prison in Nyborg) | Exclusion from Community | AO-1-11 |
| 11.07.2003 at 13.45 to 21.07.2003 | Temporary out- closing from 11.00 a.m. Nyborg | State Prison in | AO-1-12 |
| 10.08.2003 at cellState prison in 16.45 to 12.08.2003 | Security Nyborg | To ward off threatening violence AP-1-1 (annex or overcome violentD) resistance |

9:12 a.m.

| 12.08.2003 at. 09.15 to 19.08.2003 1:10 p.m. | Exclusion from Community | State Prison in Nyborg | Prevent evasion, punishment and bar business or violence. as behavior - assault on prison official with knife | AO-1-13 |
|---|---|---|---|---|
| 16.08.2003 at. 03.48 to 16.08.2003 1:15 p.m. | Observation cell the | Copenhagen Prisons | Maintain calm and safety in the institution | AQ-1-7 |
| 16.08.2003 at. 13.50 to 16.08.2003 8:18 p.m. | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | AP-1-2 (Appendix E) |
| 18.08.2003 at. 02.20 to 19.08.2003 at 13:04 (hereafter transferred to Hor- meaning) | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | AP-1-3 (Appendix F) **3052** |
| 19.08.2003 at. 14.00 to 11.11.2003 9:30 a.m. | Exclusion from Community | | Prevent evasion, punishment and bar business or violence. as behavior - threatened persona light with knife, threatening behavior | AO-1-14 |
| 31.08.2003 at. 13.55 to 31.08.2003 4:47 p.m. | Safety cell | State Prison in Horsens | To ward off threatening violence or overcome violent resistance | AP-1-4 (Appendix G) |
| 31.08.2003 at. 16.47 to 31.08.2003 8:25 p.m. | Observation cell the | State Prison in Horsens | Need for special observation (after placement in security cell) | AQ-1-8 |
| 21.11.2003 at. 13.00 to 21.11.2003 1:58 p.m. | Observation cell the | The facility at Herstedvester | Need for special observation tion. | AQ-1-9 |
| 21.11.2003 at. 13.50 to 22.11.2003 10:55 a.m. | Safety cell | The facility at Herstedvester | To ward off threatening violence or overcome violent resistance | AP-1-5 (Appendix H) |
| 11/22/2003 at. 10.55 to 26.11.2003 17:45 | Observation cell the | The facility at Herstedvester | Need for special observation tion. Calmed down so much, that it is found justifiable to Remove A from the safety cell, and Place in observation cell. On 26.11.2003 placed in fuse cell again due to Fight with fellow inmate | AQ-1-10 |
| 26.11.2003 at. 17.45 to 27.11.2003 7:19 a.m. | Safety cell | The facility at Herstedvester | To ward off threatening violence or overcome violent resistance (violence against fellow citizens) sat) | AP-1-6 (Appendix J) |
| 11/27/2003 at. 07.15 to 09.12.2003 6:10 p.m. | Observation cell the | The facility at Herstedvester | Removed from security cell, an- brought to the observation cell. Then fuse cell again. Considerations of order and safety | AQ-1-11 |

Copyright © 2023 Karnov Group Denmark A/S

| | | | heat in the institution | |
|---|---|---|---|---|
| 09.12.2003 at. 18.10 to 10.12.2003 8:05 a.m. | Safety cell | The facility at Herstedvester | To prevent suicide or Other self-harm | AP-1-7 (Appendix K) |
| 10.12.2003 at. 08.05 to 19.12.2003 9:25 a.m. | Observation cell the | The facility at Herstedvester | Need for special observation tion. The removal of the fuse cell le, placed in an observation cell. the. | AQ-1-12 |
| 07.01.2004 at. 10.25 to 07.01.2004 1:50 p.m. | Observation cell the | State Prison in Vridsløselille | Considerations of order and safety heat in the institution | AQ-1-13 |

| | | | |
|---|---|---|---|
| 10.01.2004 at. 12.00 to 30.04.2004 12:20 p.m. | Exclusion from community | | Prevent evasion, criminal activity or violence AO-1-15 as behavior |
| 04/30/2004 at. 12.35 to 03.05.2004 10:23 a.m. | Safety cell | The institution at Herstedvester | To ward off threatening violence AP-1-8 (annex or overcome violentL ) resistance |
| 03.05.2004 at. 10.10 to 18.05.2004 3:49 a.m. | Observationscel- le | The institution at Herstedvester | Consideration of order and safety in the institution AQ-1-14 Afterwards Placed in solitary confinement |
| 18.05.2004 at. 03.40 to 18.05.2004 3:10 p.m. | Safety cell | The institution at Herstedvester | To ward off threatening violence AP-1-9 (annex or overcome violentM     ) resistance |
| 18.05.2004 at. 15.10 to 27.08.2004 11:45 am | Observationscel- le | The institution at Herstedvester | Need for special                             observati on. Then placed in a safe place. ring cell |
| 27.08.2004 at. 11.50 to 27.08.2004 5:30 p.m. | Safety cell | The institution at Herstedvester | To ward off threatening violence AP-1- 10(bi- or overcome violent   layer N)resistance |
| 27.08.2004 at. 17:30 to 16.09.2004 11:00 a.m. | Observationscel- le | The institution at Herstedvester | Need for special observation.     A is deemed so calm that  **3053** he is removed from the security cell. le and placed in an observation cell |
| 2004: 03.06.2004 | Letter from Chief Physician G regarding burning in the Security Department Nykø- bing Zealand | | AK |
| 17.06.2004 | Letter from the Ministry of Justice regarding transfer to the security department | | |
| 13.09.2004 | Letter from the Ministry of Justice to the prisons regarding Establishment of a rotation scheme | | |
| 02.09.2004 | Letter regarding resignation from Chief Physician G | | |
| 26.01.2005 at. 18.20 to 27.01.2005 11:30 am (then transfer to Nyborg State Prison) | Temporary exclusion from company | | Unbalanced, threatening to AO-1-16 fellow inmates |
| 13.04.2005 at. 22.10 to 15.04.2005 9:41 a.m. | Safety cell | State Prison in Nyborg | To avert threatening violence AP-1- 11(bi- or overcome violent   layer O)resistance |

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE                                                    U.2014.3045Ø - FED2014.138OE

| 15.04.2005 at. 11.00 to 15.04.2005 3:45 p.m. | Observationscel-le | Copenhagen Prisons | Need for special                        observati on-AQ-1-17 Placed in observation cell upon arrival from New Borg State Prison |
| Exclusion from community | Exclusion from community | | Prevent evasion, criminal activity or violence AO-1-17 as behavior |

| 27.04.2005 at. 18.00 to 27.07.2005 08:25 (then transfer to the facility at Herstedve- ster) | Exclusion from community | | Prevent evasion, criminal activity or violence AO-1-17 as behavior |

| | | | | |
|---|---|---|---|---|
| 27.07.2005 at. 08.45 to 27.07.2005 18:32 | Safety cell | The facility at Herstedvester | To ward off threatening violence or overcome violent resistance | AP-1-12 (bi-layer P) |
| 27.07.2005 at. 18.45 to 27.07.2005 7:30 p.m. | Observation cell the | Copenhagen Prisons | Need for special observation tion. Would have been fierce by transfer, would therefore take a look at A before he arrived in a regular cell | AQ-1-18 |
| 01.08.2005 at. 17.25 to 02.08.2005 2:26 pm. | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | Q |
| 02.08.2005 at. 14.24 to 02.08.2005 3:12 p.m. | Observation cell the | Copenhagen Prisons | Need for special observation After removing the fuse cell the | AQ-1-19 |
| 06.08.2005 at. 20.40 to 09.08.2005 8:24 a.m. | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | AP-1-13 (bi-layer R) |
| 09.08.2005 at. 09.00 to 19.08.2005 1:51 p.m. | Observation cell the | The facility at Herstedvester | Need for special observation tion. Then placed in the security ring cell | AQ-1-20 |
| 19.08.2005 at. 13.05 to 21.08.2005 1:05 p.m. | Safety cell | The facility at Herstedvester | To ward off threatening violence or overcome violent resistance | AP-1-14 (bi-Layer S and appendices 7) |
| 21.08.2005 at. 13.05 to 30.09.2005 1:50 p.m. | Observation cell the | The facility at Herstedvester | Considerations of order and safety heath in the institution. Removed of solitary confinement, placed in observation cell | AQ-1-21 |
| 24.08.2005 | Letter regarding implementation of mental examination else | | | AM |
| 30.09.2005 at. 13.40 to 05.10.2005 12:30 p.m. | Safety cell | The facility at Herstedvester | To ward off threatening violence or overcome violent resistance | AP-1-15 (bi-layer T) **3054** |
| 05.10.2005 at. 12.30 to 06.10.2005 8:18 a.m. | Observation cell the | The facility at Herstedvester | Considerations of order and safety heath in the institution. Removed of solitary confinement, placed in observation cell. After this to the Nykø- security center. bing Zealand | AQ-1-22 |
| 2005 | Mental examination | | | AL |
| 06.02.2006 at. 14.55 to 21.03.2006 at 16:09 | Exclusion from Community | | Prevent evasion, punishment and bar business or violence. as behavior. Exhibits gross | AO-1-18 |

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE                                                    U.2014.3045Ø - FED2014.138OE

| (hereinafter transfer to Copenhagen Port Prisons) | | | behavior | |
|---|---|---|---|---|
| 20.02.2006 | Response to complaint About the use of power safety and security. ring cell adjacent gelling | | | 10 |
| 03/20/2006 at. 18.45 to 21.03.2006 at 16.00 (hereafter transferred to the Police Department its prison) | Safety cell | State Prison in Vridsløselille | To ward off threatening violence or overcome violent resistance | AP-1-16 (bi- layer U) |

| | | | | |
|---|---|---|---|---|
| 21.03.2006 at<br><br>16.28 to 22.03.2006<br>10:04 a.m. | Safety cell | Copenhagen<br><br>Prisons | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-17 (bi-<br><br>layer V) |
| 29.03.2006 at<br>11.45 to 07.05.2006<br>2:15 p.m. | Exclusion from<br>Community | Kbh Prisons | Exhibits abusive behavior | AO-1-19 |
| 20.04.2006 at<br>11.25 to 20.04.2006 on<br>4:40 p.m. | Observation cell | State Prison in<br>Horsens | Need for special observation<br>tion. Observation cell for<br>To prevent self-harm<br>or violence against staff | AQ-1-23 |
| 09.05.2006 at<br><br>14.00 to 05.07.2006<br>2:15 p.m. | Exclusion from<br><br>community | Exhibiting abusive<br>behavior. Fore-<br>building evasion, punishable<br>business or violent<br>Behavior - violent<br>relationships<br>encounters with fellow<br>inmates and<br>staff | | AO-1-20 |
| 04.07.2006 at<br><br>18.05 to 05.07.2006<br>at 14:15 (hereafter<br>transferred to the Police Department<br>its prison) | Safety cell | State Prison in<br><br>Horsens | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-18 (bi-<br><br>layer X) |
| 05-07-2006 at<br><br>17.15 to 05.07.2006 on<br>8:25 p.m. | Observation cell | Copenhagen<br><br>Prisons | Considerations of order and<br>safety<br>heath in the institution.<br>Transferred<br>from Horsens, is aggressive | AQ-1-24 |
| 28.07.2006 at<br><br>19.55 to 30.07.2006<br>10:35 a.m. | Safety cell | Copenhagen<br><br>Prisons | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-19 (bi-<br><br>layer Y) |
| 30.07.2006 at<br><br>10.40 to 30.07.2006 le<br><br>5:05 p.m. | Observation cell | Copenhagen<br><br>Prisons | Need for special<br>observation.<br>tion. Accessed observation<br>cell<br>the link from the fuse box to<br>see if A is ready to<br>transition<br>to your own cell | AQ-1-25 |
| 03.08.2006 at<br>12.26 to 08.08.2006<br>end of the year<br>11:00 a.m. | Temporary out-<br>closure from the<br><br>Read more | Prevent violent behavior | | AO-1-21 |
| 11.09.2006 at<br><br>13.20 to 11.09.2006 on<br>2:50 p.m. | Observation cell | Copenhagen<br><br>Prisons | Considerations of order and<br>safety<br>visit the institution. Truen-<br>to the staff. Heref-<br>placed in solitary<br>confinement | AQ-1-26 |
| 11.09.2006 at<br><br>14.50 to 11.09.2006<br>17:13 | Safety cell | Copenhagen<br><br>Prisons | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-20 (bi-<br><br>layer Z)<br>**3055** |
| 20.12.2006 at<br><br>14.55 to 22.12.2006<br>at 09:40 (hereafter<br>transferred to Horsens<br>State Prison) | Safety cell | Copenhagen<br><br>Prisons | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-21 (bi-<br><br>layer Æ and<br>Appendix 9) |

Copyright © 2023 Karnov Group Denmark A/S

| 21.12.2006 at 15.36 to 22.12.2006 08:00 a.m. | Temporary out-closure from the end of the year Read more | Prevent violent behavior | AO-1-22 |
|---|---|---|---|
| 07.01.2007 at 17.00 to 12.01.2007 10:00 am | Exclusion from Community | Prevent evasion, punishment and bar business or violence. as behavior | AO-1-23 |
| 06.02.2007 | Interrogation rap port, violence and similar against someone in public service ste | | 4 |

| | | | | |
|---|---|---|---|---|
| 18.04.2007 at<br><br>10.00 to 25.04.2007<br>10:00 am | Exclusion from East Jutland<br>Community | | Prevent evasion, punishment and<br>bar business or violence.<br>as behavior (the staff's<br>Safety) | AO-1-24 |
| 10.05.2007 at<br>12.00 to 08.06.2007<br>1:10 p.m. | Exclusion from<br>Community | | Exhibits abusive behavior | AO-1-25 |
| 12.06.2007 at<br><br>13.15 to 13.06.2007<br>16:20 | Security cell | Copenhagen<br><br>Prisons | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-22 (bi-<br><br>layer Ø) |
| 13.06.2007 at<br>16.25 to 13.06.2007 le<br><br>5:38 p.m. | Observation cell- | Copenhagen<br>Prisons | Need for special observa-<br>tion. After placement in the<br>security<br>ring cell, A is placed in the<br>ob-<br>service cell. Hereafter<br>Security cell. | AQ-1-27 |
| 13.06.2007 at<br>17.25 to 14.06.2007<br>2:10 p.m. | Security cell | Copenhagen<br>Prisons | To prevent suicide or<br>Other self-harm | Å |
| 13.06.2007 at<br>15.54 to 15.06.2007<br>9:00 a.m. | Temporary out-<br>closure from the end of the year<br>Read more | | Prevent violent behavior | AO-1-26 |
| 14.06.2007 at<br>14.15 to 14.06.2007 le<br><br>8:14 p.m. | Observation cell- | Copenhagen<br>Prisons | Need for special observa-<br>tion. Has been in the security<br>cell<br>Smile. After observation cell<br>to<br>ordinary cell. | AQ-1-28 |
| 09.08.2007 | Serving time in a<br>shared locker | | | 6 |
| 05.12.2007 | Answering the ac-<br><br>Insight request.<br>ning<br><br> Overview of,<br>where A has the aforementioned<br>network and in which<br> periods (1999-<br>2007) | | | AT<br>(Appendix 5) |
| 25.02.2008 | Response    to    a<br>request        for<br>access          to<br>documents | | | AU |
| 16.04.2008 at<br><br>18.35 to 21.04.2008<br>12:11 p.m. | Security cell | State Prison<br><br>East Jutland | To ward off threatening<br>violence<br>or overcome violent<br>resistance | AP-1-23 (bi-<br><br>AA layer) |
| 21.04.2008 at<br><br>12.10 to 05.05.2008<br>1:45 p.m. | Exclusion from<br>Community | | Prevent evasion, punishment and<br>bar business or violence.<br>as behavior (threats to<br>staff) | AO-1-27 |
| 21.04.2008 at<br>12.19 to 21.04.2008 le<br><br>2:22 p.m. | Observation cell - | State Prison in<br>East Jutland | Need for special observa-<br>tion. Has been in the security<br>cell<br>Smile. After observation cell<br>to<br>ordinary cell. | AQ-1-29 |
| 07.05.<br>2008 | Letter from the Prime | | | AV |

| Minister | | |
|---|---|---|
| | East Jutland Prison land to the Reichsadvo- see attached note of April 28, 2008 prepared by psychiatric con- sulent | **3056** |

| 03.07.2008 at. 16.15 to 04.07.2008 at 07:25 (hereafter transferred to the Police Department the) | Safety cell | State Prison East Jutland | To ward off threatening violence or overcome violent resistance | AP-1-24 (bi-layer AB) |
|---|---|---|---|---|
| 04.07.2008 at. 10.30 to 03.10.2008 at 11:30 am (hereafter transfer to the State East Jutland Prison country) | Exclusion from Community | | Prevent evasion, punishment and bar business or violence. as behavior | AO-1-28 |
| 04.07.2008 at. 10.15 to 04.07.2008 11:35 a.m. | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | AP-1-25 (bi-AC layer) |
| 04.07.2008 at. 11.35 to 06.07.2008 19:03 | Observation cell the | Copenhagen Prisons | Need for special observation tion. Has been in the security cell Smile. After observation cell to ordinary cell. | AQ-1-30 |
| 30.07.2008 at. 11.45 to 30.07.2008 12:15 p.m. | Observation cell the | Copenhagen Prisons | Considerations of order and safety heat in the institution. Threatening to the staff. After this Placed in solitary confinement | AQ-1-31 |
| 30.07.2008 at. 12.15 to 31.07.2008 2:15 p.m. | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | AP-1-26 (bi-AD layer) |
| 31.07.2008 | Letter from the Director The Council for Crime nal care regarding § Section 78 placement | | | AW |
| 15.08.2008 at. 21.15 to 17.08.2008 10:11 p.m. | Safety cell | Copenhagen Prisons | To ward off threatening violence or overcome violent resistance | AP-1-27 (bi-AE layer) |
| 17.08.2008 at. 22.12 to 17.08.2008 11:05 p.m. | Observation cell the | Copenhagen Prisons | Need for special observation tion. From security cell to ob- servation cell. After this, the al- amicable cell. | AQ-1-32 |
| 19.08.2008 | Reporting of fuse cell an- Bringing from 15. 17.08.2008 | | | AY |
| 05.09.2008 | City of Copenhagen court order of September 5 2009 (mental survey) | | | AX |

| 08.09.2008 | Letter from the Director The Council for Crime nal care regarding § Section 78 placement and a letter from Consultant [Name] | | | AN |
|---|---|---|---|---|
| 08.12.2008 at. 11.05 to 08.12.2008 3:30 p.m. | Safety cell | State Prison East Jutland | To ward off threatening violence or overcome violent resistance | AP-1-28 (bi- AF layer) |
| 08.12.2008 at. 15.30 to 16.12.2008 10:30 a.m. | Exclusion from Community | | Prevent evasion, punishment and bar business or violence. as behavior. Exhibits gross behavior | AO-1-29 |

| | | | | |
|---|---|---|---|---|
| 22.01. | 2009Orientation regarding § Section 78 placement | | | AÆ |
| 22.01.2009 at 14.20 to 22.01.2009 16:50 (then transferred to the Police Yard) | Security cell | State Prison East Jutland | To ward off threatened violence or overcome violent resistance | AP-1-29 **3057** |
| 22.01.2009 at 19.30 to 24.01.2009 11:00 p.m. | Security cell | Copenhagen Prisons | To ward off threatened violence or overcome violent resistance | AP-1-30 (bi-law AG and Appendix 3) |
| 26.01.2009 | Exclusion reports see from community for the period 04.07.2008 to 03.10.2008 taken For your information | | | AZ |
| 23.02.2009 at 17.05 to 24.02.2009 2:40 p.m. | Security cell | Copenhagen Prisons | To ward off threatened violence or overcome violent resistance | AP-1-31 (bi-AH layer) |
| 04.03.2009 | Request for access to documents from A's lawyer | | | 8 |
| 04.03.2009 at 23.55 to 05.03.2009 8:25 a.m. | Security cell | State Prison East Jutland | To ward off threatened violence or overcome violent resistance | AP-1-32 (bi-AJ layer) |
| 13.04.2009 at 19.15 to 16.04.2009 10:05 a.m. | Observation cell-le | Copenhagen Prisons | Need for special observation. Violence against staff. Then to your own cell. | AQ-1-33 |
| 09.06.2009Direktoratet for Kriminalforsor-gen's response to complaints about use of force and fuse cell. Bringing | | | | AÅ |
| 30.09.2009 | Mental Observation Statement | | | 2 |
| 14.10. | 2009Decision regarding § 78 placement | | | BA |
| 19.11.2009Direktoratet for Kriminalforsor-gen's response to complaint about security cell placement | | | | BB |
| 04.05.2010Direktoratet for Kriminalforsor-gen's response to complaint about security cell placement | | | | BC |

| 19.08.2010 | Letter from the Security Department, Nykø- bing Zealand to the Ministry of Justice regarding application for access to the hospital grounds | BD |

Copyright © 2023 Karnov Group Denmark A/S

| 22.12.2010 | East Jutland State Prison, decision-making council meeting regarding exit to the hospital grounds | BE |
| 25.02.2011 | Copenhagen City Court, judgment | 11 |
| 25.01.2012 | Memo: account of transfers | AS |
| 26.01.2012 | Note on rotation scheme, established in 2004 | AR |

"

It is agreed that the information in the overview can be used as a basis. Reports concerning interventions prior to the security cell attack on August 10, 2003, and which are thus not covered by A's claims and pleas that

**3058**

these are clarified during the main hearing, are not included in the extract during the main hearing. In the overview above, the court has marked the reports etc. before August 10, 2003, which are not included in the extract in gray.

The extract does not contain reports on all the interventions listed in the overview. The reports, which are also marked in light gray above, are thus not included. A has not provided any explanation as to why the reports in question, which according to the annex numbering in the overview are included among the annexes submitted by the Directorate, have not been included in the extract.

In an auxiliary appendix, A has calculated the total exclusions from the general community to 9 years and 265 days. This also includes the period before August 10, 2003, which is not included in the case. In the statement of claim, the exclusions from the general community are calculated at 6 years and 35 days. This calculation concerns the period from December 10, 2002 to May 26, 2009 and thus also a period before August 10, 2003, which is not covered by the case.

A has totaled the placements in observation cells to 301 days, 14 hours and 51 minutes and has stated that there have been no less than 33 placements.

A has totaled the placements in security cells to a total of 37 with a total duration of 42 days, 8 hours and 37 minutes.

The statements concerning placements in observation and security cells concern the entire period of imprisonment and thus also include placements prior to the period from August 10, 2003, to which the case is limited. The statements on placements in observation and security cells also seem to include the interventions for which no reports are included in the extract.

The Department has not disputed the totals in the aforementioned statements, but has stated that, with regard to part of the exclusion from general community, there has been access to so-called one-to-one community.

Answers to similar questions from the Attorney General's Office to the prisons where A has served time show, among other things:

"1. *negatively strong inmate unit*
Has A been placed in the negative strength unit at any time during his sentence - and if so, in which periods and on what basis?"

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

The response from Nyborg State Prison shows that A has been placed in the prison's special security unit, which is for inmates who are assessed to be a personal danger. The unit is not categorized as a unit for negatively strong inmates.

The response from Copenhagen Prisons shows that during his time at Politigårdens Fængsel, A has mainly been placed in so-called category 1, which in the letter of 28 August 2006 from the Prison and Probation Service to Copenhagen Prisons is defined as

"Negatively strong inmates, including inmates from the strong wards in the closed prisons who behave in a seriously threatening and/or violent manner."

The response from Herstedvester Prison shows that the institution does not have a department for negatively strong inmates.

The response from East Jutland State Prison shows that A has not been placed in a ward for negatively strong inmates, neither in Horsens nor in East Jutland.

"2. *Access to TV, radio, newspaper and telephone*

Did A have access to TV, radio, newspaper and telephone during his sentence, including when he was excluded from association, placed in a security cell etc."

The response from Nyborg State Prison shows that A has had a TV and radio in his cell while serving his sentence, and that there is access to a telephone and newspaper on the ward. This also applies to inmates who are excluded from association, whereas A has not had access to this during placement in a security cell.

The response from Copenhagen Prisons shows that A has had access to TV, radio, newspaper and telephone during periods when he has been excluded from association. During a stay in an observation cell, inmates will normally not have access to TV and radio, but to newspapers and telephones, while inmates in a security cell will not have access to either.

The response from Herstedvester Prison shows that A has had access to a newspaper and telephone both during exclusion from association and during his stay in an observation cell, but not during his stay in a security cell. At the time of A's imprisonment, there was no TV installed in the observation cells, but he had access to TV during exclusion from association. There is no access to TV in the security cell. It should also be noted that a TV and playstation were installed in the cell (I6) in Ward I where A was held for a large part of the time. Cells I2 and I6 were not actual observation cells, but could be converted into such cells. A was placed here when his behavior and condition required frequent supervision. This was recorded in the same way as if he had been placed in an actual observation cell.

The response from East Jutland State Prison states that inmates have access to TV, radio, newspaper and telephone during exclusion from association. In practice, inmates will have access to newspapers and telephones,

Copyright © 2023 Karnov Group Denmark A/S

U.2014.3045Ø - FED2014.138OE

but not to TV and radio during placement in an observation cell. As an inmate in a security cell will normally be restrained, as he will otherwise be moved to an observation cell, the question of TV etc. is not relevant.

**3059**

"3. *Visit*

Has A had the opportunity for visits during his imprisonment - including when he was excluded from fellowship etc."

The response from Nyborg State Prison shows that A was placed in a ward with 6 places, to which 2 visiting rooms were attached. A has thus had the opportunity to receive visitors, even during periods when he was excluded from association.

The response from Copenhagen Prisons shows that A has had access to visits, even during periods when he was excluded from the common room.

The response from Herstedvester Prison shows that A has had access to visits during all sentences, including during his time in an observation cell. There is no access to visits during stays in security cells or if the inmate's behavior is specifically deemed to be dangerous.

The response from East Jutland State Prison shows that A has had access to visits, even during periods when he was excluded from the common room.

"4. *Contact with staff*

What contact has A had with staff during his imprisonment - including during the periods when he was excluded from association etc." The response from Nyborg State Prison shows that A has had contact with staff in the ward several times a day in connection with waking up, handing out meals and locking for the night. In addition, there has been contact to the extent that A has approached the staff or vice versa. The contact is stated to have been characterized by A's borderline and threatening behavior towards the staff, which culminated in an assault on the staff with a manufactured knife. The response from Copenhagen Prisons shows that the staff strive for extended contact with inmates who are excluded from association, just as contact with civilian staff groups is intensified to the extent deemed justifiable.

The response from Herstedvester Institution states, with reference to the extensive material in the form of observation and security cell reports and psychiatrist/psychologist records, that there has been close and frequent contact between A and the staff. Thus, the therapists have to a large extent offered conversations, and attempts have been made to accommodate his behavior and wishes on the ward, e.g. by letting him take hour-long baths and providing books, crossword puzzles and workbooks. It is stated that they have a large amount of material regarding the contact between A and the staff. The material shows that both the ward staff and the treatment staff have sought to understand, accommodate and help A to serve his sentence as tolerably as possible within the given framework and his behavior.

The response from East Jutland State Prison shows that staff are particularly attentive to inmates who are excluded from association and inmates who, like A, have been placed in the special security section. Contact with A has fluctuated, with some periods being good and others characterized by his delusions that staff were listening to him through the walls and poisoning his food/medication etc. A also had contact with the prison chaplain and the infirmary at times. In general, it was ensured that, as far as possible, the staff members who had the best contact with him were responsible for the contact.

"5. *Voluntary exclusion from fellowship*

Has A been voluntarily excluded from fellowship. If so, for what periods and on what basis? . . .".

All responses show that A has not been voluntarily excluded from fellowship.

Copyright © 2023 Karnov Group Denmark A/S

*The individual interventions*

A number of reports have been submitted on placements in solitary confinement, observation cells and exclusion from association.

With regard to the placements in security cells, unless otherwise stated below, according to the reports, A has been restrained with hand and foot straps and a lap belt throughout the placement. In some cases, it appears that gloves were also used in addition to wrist straps. The reports also show that A was searched and changed almost every time prior to the placement. According to the explanations given during the testimonies, the changing process normally consisted of removing A's own clothes and at least all clothes other than underwear, and A may have been dressed in prison underwear.

An undated interrogation transcript from Herstedvester Prison shows, among other things:

"On 31.07.2000 between 15.00 and 16.00, the detainee allegedly entered the cell of a fellow inmate and kicked/punched him in the face, causing the inmate to lose consciousness.

. . .

The detainee still denies having committed violence against the fellow inmate.

. . .

Despite the defendant's denial, the interrogator finds it proven that the defendant is the perpetrator of the violent incident on 31.07.2000.

. . .

It is also proven that the inmate, upon his confession, smoked hashish and illegally possessed prescribed medication, which he illegally collected instead of taking it upon delivery.

. . .

The detainee has therefore violated section 19 of the Executive Order on the treatment of persons placed in detention,

**3060**

paragraph 2, the Criminal Code on violence and on violation of the Act on narcotic drugs.

*It is therefore decided that the single-room restriction of 02.08.2000, which has already been implemented in accordance with section 2, paragraph 2, items 2 and 4 of the single-room circular, will continue to be maintained.*

This is partly due to prevent violent behavior and partly because the detention center is currently considered unsuitable for community.

*It is further stipulated that the institution shall file a police report against the detainee for having committed violence against a fellow inmate."*

There is no information in the written material in the case about what has come out of the police report referred to.

The security cell report from Nyborg State Prison on placement in the period August 10, 2003 at 16:45 - August 12, 2008 at 9:12 (a total of 1 day, 16 hours and 27 minutes) states:

" . . .

2 times on the second trip of the day, a loud bang is heard in the cell corridor Sdr. 3, without it being possible to localize where the sound is coming from. Around 16:30, a bang is heard from the inmate's cell, and the inmate activates the emergency call. When the door opens, the inmate comes rushing out of the cell with a knife in his hand, foaming at the mouth and in fear. The staff are forced to retreat to the office and sound the alarm via the portable radios. The inmate takes up position at the office, where he shouts and screams at the staff, kicks the door to the office, smashes various pieces of furniture in the corridor, stabs the window of the guard cage with the knife, and shows

increasing agitation. The undersigned arrives at Sdr. 3 via the elevator on the west side, the inmate is still in the corridor, armed with the knife, completely distraught. The undersigned attempts to get the inmate to put the knife down through conversation, the inmate remains calm, but suddenly jumps over the railing and attacks the undersigned with the knife. The undersigned is forced to, in self-defense,

to deliver a blow to the inmate's left upper arm with my bunch of keys on a chain, which stops the inmate temporarily. Meanwhile, staff arrive from the stairwell at the south end. The inmate storms towards the stairs with a raised knife, yours truly and F.f . . . jump over the railing and catch up with the inmate at the stairwell, where the undersigned gets into a fight with the inmate, during which the undersigned gives the inmate a kick to the body and also gets the inmate's legs kicked out from under him, as he tries to stab the undersigned with the knife. The inmate is then overpowered using a grip and a baton, handcuffed and transported to the security cell at SA, where he is hospitalized at 16:45 with restraints.

. . ."

The report also states that up until the afternoon of August 11, 2003, during several conversations, A appeared paranoid and, among other things, expressed that there was a plot to kill him. It also appears that he periodically lay down and shouted, and that during a conversation at 13:57 he was incredibly changeable in his state of mind and alternated between lying calmly and shouting and making threats. During questioning by a police officer at 15:01, he became agitated and expressed that the staff would forgive him. He calmed down after the police officer left. He then lay there shouting until 15:09. After being seen by a doctor at 15:55, he fell asleep and slept almost continuously until 8:34 on August 12, 2003. At that time he expressed during a conversation that he still believed that there was a plot against him. At 9:12 am on August 12, 2008, he was handcuffed and removed from the security cell for transfer to Copenhagen Prisons. According to the report, the last part of the placement in the security cell and restraint was due to A sleeping.

In the report from the Directorate on "Exclusion from Community", it is stated that on August 12, 2003 at 9:15 a.m. a decision was made on exclusion from community and that the exclusion ended on August 19, 2003 at 13:10. Furthermore, it states:

". . .

*Case development:*

On 12-08-03, the inmate was transferred as a UFF, due to assault on Ff with a knife. There is no basis for making an assessment today.

*Decision:*

Continued exclusion from community cf:

§ Section 63(1)(1) - to prevent evasion, criminal activity or violent behavior

No opportunity to socialize with fellow inmates.

*Justification:*

Nothing to note, August 14, 2003

. . .".

This appears from the report on his placement in a security cell in Copenhagen Prisons in the period August 18, 2003 at 2:20 am - August 19, 2003 at 1:04 pm (a total of 1 day, 10 hours and 44 minutes, of which he was restrained by a belt, hand strap and foot strap until 6:05 pm on August 18, 2003, when he was removed from restraint and moved to another cell):

". . .

*Description of the incident:*

On D. D. at 01:55, the inmate starts shouting loudly from the cell, while he punches and kicks the cell furniture. The inmate shouts that we can come and that he will not surrender without a fight. Security is called and attempts are made to open the door, but the inmate blocks the door and therefore 209 is called.

Then 209 decides that the inmates must be taken by force. At 02:12, the door is broken open with shields and inmates are

pacified under violent resistance. Inmates

**3061**

handcuffed and taken to SM02 inmates are still resisting. At 02:20 the inmate is restrained.

. . ."

It is further noted in the report at 2:25 am on August 18, 2003 that Mr. A was anxious and sure that the staff was going to kill him and was crying. From 2:40 a.m. he was calm, and when he was seen by a doctor at 3:40 a.m. it is also noted that he was calm. At 4:10 am, A. cried out. He also did so at 5:20, where he spat violently afterwards. Elsewhere, it appears from the notes that he was calm and asleep between 6:00 and 8:00. There is a new note that A shouted "a little in between" at 8:50, and that he shouted that the belt was tight (presumably) at about 9:10, which he repeated (without shouting) at 9:35 and at 10:00, when he asked if it could be loosened. In the entire period up to 11:30, there are only notes that A was lying calmly. At 11:30, he announced that he was ready to return to his own cell, but according to the notes, the prison officers assessed at this point that he was not "ready". Subsequently, there are notes that at 14:20, A shouted that he wanted to be released, and at 14:45 that he was lying down and shouting. Otherwise, there are only notes that he lay calmly until 18:05 on

August 18, 2003, where it appears that the restraint had been removed, and that he had been moved to SM12 and checked by a nurse and had been given food and milk at 18:15. The notes on the observations of A in the cell where he was held without restraint show that he was calm until 13:04 on August 19, 2003, when he was taken to Horsens State Prison.

The parties have indicated that they agree that this report, which is the only one from which more details about the course of the placement were documented during the presentation, is a typical report.

The report on exclusion from fellowship in the period August 19, 2003 at 14:00 to November 11, 2003 at 9:30 states, among other things:

*"WEEK NOTE created 26-08-2003 07:32 by [Name], supervisor*
*Case development:*

Inmate still exhibits a high degree of mental imbalance, talks to himself and non-existent persons. Talks a lot about assaults on his own person and on the staff.

The inmate continues to talk to himself, believes that listening devices are installed in his cell. On 31.08.03, the inmate was placed in a security cell after he had punched a prison official with his fist

Inmates continue to walk and talk to themselves. Doesn't talk to staff more than necessary and basically only answers yes or no. Has started to take advantage of the opportunity to go for a walk.

Inmate still seems mentally unbalanced, talks to himself, distrusts staff for putting something in his medicine. Inmate in recovery. Now talking to staff without delusions

test

[Name], Department Manager:

On 21.10.03. inmates have been excluded from fellowship with others due to unbalanced behavior from Copenhagen Prisons and Stf. in Nyborg.

Inmates are placed here by the Directorate until they are transferred to the institution at Herstedvester.

*Decision:*

Termination of exclusion from fellowship on 11-11-2003 09:30.

*Justification:*

Inmates are still considered a real threat to the people around them

Inmates are still considered a real threat to their surroundings

Inmates are still considered a real threat to their surroundings
Inmates are still considered a real threat to their surroundings
Inmates are still considered a real threat to their surroundings

CASE DEVELOPMENT. Inmate is in continued recovery. Promises during the interview that there will be no problems between . . . and the staff. The inmate is informed that the intention is that he will be transferred to the prison at Herstedvester as soon as possible. The inmate understands this and again expresses that he will have a problem-free sentence from now on.

*Justification.*

Inmates are still considered a real threat to their surroundings.

don't write

[Name], Department Manager:

Inmates are still considered a real threat to their surroundings.

[Name], Department Head:

The offender is transferred to continue serving his sentence at the prison at Her- stedvester."

The report on placement in a security cell in the State Prison in Horsens in the period August 31, 2003 at 13:55 - August 31, 2003 at 16:47 (a total of 2 hours and 52 minutes) states:

". . .

*Description of the incident:*

Inmate is in custody for 1 East, he has started hearing voices and believes that staff can talk to him through the wall, he also will not follow staff instructions and wants the door left open. The inmate is extremely aggressive and seems threatening, he wants a psychologist immediately. We decide to put him in the observation cell for closer observation and we offer him a doctor, which he refuses. Inmate leaves voluntarily

**3062**

He refuses to take off his necklace and says you have to do it, I take a step forward to loosen the necklace, the inmate quickly strikes out with his right fist, but does not hit me. The inmate is pacified and placed in the security cell.

. . ."

From the report on observation cell placement at Her- stedvester Institution in the period November 21, 2003 at 13:00 - 21:00.

November 2003 at 13:58 (total 58 minutes) appears:

". . .

*Description of the incident:*

For several days, the inmate has expressed being tormented by voices, e.g. that the staff are eavesdropping on him and have placed listening devices all over his cell. The inmate is assessed at a daily meeting with [Name], [Name], [Name], [Name] and the ward staff, where it is decided to move the inmate to an observation cell as soon as possible. This happens at 13.00 with the use of force.

. . ."

From a report on solitary confinement in Hersted-West Prison during the period November 21, 2003 at 13:50 - November 22 2003 at 10:55 am (a total of 21 hours and 5 minutes) is shown:

". . .

*Description of the incident:*

Since being placed in the observation cell, the inmate has become increasingly agitated and aggressive in the form of banging on the door and shouting. At 13:50, the staff opens the door to the inmate and informs him that he must stop his shouting and banging immediately, and if he does not comply with this, the consequence will be that the staff will be forced to place the inmate in a security cell, as the staff is aware from previous incidents that the inmate is extremely unbalanced. The inmate did not want to contribute to a calm solution, so the staff therefore felt compelled to place the inmate in a security cell.

. . ."

Report on the placement in a security cell at Hersted-West Institution during the period November 26, 2003 at 17:45 - November 27

2003 at 7:19 am (a total of 13 hours and 34 minutes) states, among other things:

"*Description of the incident:*

dd. at 5:45 p.m., the undersigned observes inmate A, assaulting fellow inmate [Name] . . . in the ward's living room. I see that inmate A is standing and hitting inmate, [Name] . . . in the head with both fists. I pull inmate A backwards onto the floor, and force is applied and the inmate is then placed in a security cell and restrained. Inmate [Name] defends himself by holding both hands up in front of his face. Inmate [Name] is inspected by the nurse, she notes that [Name] has many bruises on both forearms, otherwise nothing to note."

The notes in the report also show that after a period of spitting, using abusive language towards staff, shouting, whistling and trying to get out of the straps, A fell asleep around 00:00 - 00:15 on November 26-27, 2003. He then slept almost continuously until 7:15 am on November 27, 2003, when he was removed from the security cell.

Report on the placement in a security cell at Hersted-West Prison during the period December 9, 2003 at 18:10 - December 10

2003 at 8:05 am (a total of 13 hours and 55 minutes) states, among other things:

*"Description of the incident:*

Today, during the afternoon, in observation cell I6, the inmate has been extremely loud & threatening because he believes the staff will put poison in the food and terrorize him in every possible way. The staff repeatedly assured the inmate that this had nothing to do with anything and that he should remain calm. The inmate tries to command, threaten & kick the door. Due to this, the staff decides that the inmate is not suitable for visits later in the day, after which the inmate becomes directly threatening towards Ff. [Name] & Ff. [Name]. The staff then decides to place the inmate in observation cell I2, where there is no TV or other objects that could be used as weapons against the staff. The inmate asks for a conversation with the nurse, who tries to calm the inmate down, but without success. The inmate continues to kick the door, threaten, yell and throw food and food trays, Ff. [Name] observes through the observation glass that the inmate is sitting with a pointed & sharp object and rolled up sleeves. The staff then decides that the inmate should be transferred to security cell I7 to prevent self-harm or suicide. The inmate is then forcibly transferred to security cell I7."

According to the notes in the report, A threatened to take revenge and occasionally shouted and pulled on the straps until 19:25 on December 9, 2003. There are then no notes of aggressive behavior or anything else until the time when he was removed from the security cell at 8:05 am on 10 December 2003. At 19:35 on December 9, 2003, he had an arm strap loosened in order to pee in a flask and at 19:45 to smoke. At 20:05 his hand was fixed again. From this time and for the rest of the placement, the use of gloves ceased. At 22:45 the left arm was released, after which A fell asleep and slept until 5:40 on December 10, 2003, when he had a cigarette. At 6:00 a.m. his right hand was released, which occurred after his left hand had been restrained instead.

The report on exclusion from fellowship in the period January 10, 2004 at 12:00 - April 30, 2004 at 12:20 states, among other things:

*"WEEK NOTE created 19-03-2004 09:28 by [Name]*

. . .

**3063**

*Decision:*

Continued exclusion from community, cf:

To prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act.

No opportunity to socialize with fellow inmates.

*Justification:*

[Name], Prison officer:

The inmate's behavior has been very fluctuating. On the surface, things are going well, but the inmate has difficulty accepting changes, even though they are an attempt to ease his conditions.

The inmate has pronounced paranoid behavior and believes he hears voices that want to hurt him, the voices can be strangers or police officers.

*WEEK NOTE created 23-03-2004 13:53 by [Name], Prison Officer:*

. . .

*Decision:*

Continued exclusion from community cf:

To prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act

No opportunity to socialize with fellow inmates

*Justification:*

[Name], Prison officer:

At the one-room meeting today, the staff reported that the inmate is behaving more temperamentally at the moment. Nothing has been changed in the inmate's medication, but perhaps the inmate's mother's illness is affecting him a lot at the moment. Compared to the last memo, the following changes have been made to the inmate's conditions of confinement:

Inmates must be searched in their own living room or in the central room and NOT in the OBS cell. Inmates have [permission] for max 5 potted plants. Revised memo handed out to inmates.

. . .

*Decision:*

Continued exclusion from community cf:

To prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act

No opportunity to socialize with fellow inmates

*Justification:*

[Name], Prison officer:

Inmates are still excluded from the community with the possibility of a shared yard walk.

The inmate has been calm and in a better mood for the past 14 days. He has begun to participate in the common yard walk, he plays chess with his fellow inmates, and he says that they are nice people.

*Weekly note created on 21-04-2004 15:33 by [Name] Supervisor*

. . .

*Decision:*

Continued exclusion from community cf:

to prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act

No opportunity to socialize with fellow inmates

*Justification:*

[Name], Supervisor:

[Name], Head of

Department:

Change to the option of cell community is determined based on a positive course during the last period.

The change to cell sharing has been communicated to inmates verbally and in writing.

[Name], Supervisor:

Inmates are still excluded from fellowship with the possibility of a shared yard walk with other inmates on A1.

As of 27.04.2004, cell sharing with 03/288 has ceased.

From 27.04.2004, inmates have the option of cell sharing with 03/421.

*WEEK NOTE created 17-05-2004 10:30 by [Name], Prison Officer*

. . .

*Decision:*

Termination of exclusion from the community on 30-04-2004 12.20.

*Justification*

[Name] Prison officer:

Due to serious threats against staff, it is estimated that inmates must be transferred to Herstedvester Prison today."

Report on placement in a security cell at Hersted-West Institution in the period April 30, 2004 at 12:35 p.m. - May 3, 2004 at 12:35 p.m.

10:23 (a total of 2 days 21 hours and 48 minutes) is shown among other things:

*"Description of the incident:*

Inm. transferred here by staff from Stfg. Vridsløselille. The inmate had physically resisted the transfer and was still very violent on arrival even though he was handcuffed. Furthermore, the inmate had punched two prison officers from Vridsløselille prison in connection with the transfer.

. . .

*Doctor's notes/summary:*

[Name] Prison officer:

Dept. Physician: [Name]:

Acutely moved back from SV due to breach of contract and threats to staff. due to breach of contract and threats against staff. Shortly after arrival placed in a security cell.

Accessed at 13:35.

The inmate is annoyed and indifferent to supervision. He says "I don't care" to all questions.

**3064**

You can get your finger under all the straps, none seem to [tighten].

I bring the inmate's prescribed 12:00 Rivitril. When asked if he wants them, he replies: "I don't care". I repeat the question and he replies "I don't care".

I repeat the question and he replies, "I don't care, you can just pour them down my throat." He doesn't get them, as this can lead to mal-swallowing.

1.5.2004

Supervises inmates who are still restrained. The inmate has made serious threats to four different prison officers four times in the past 24 hours. In conversation with the undersigned, he remains tense and threatening. Otherwise, no physical discomfort from restraint is observed.

Inmates must continue to be fixed in security cells, and I have informed DFK, Deputy Director [Name].

Adm. Chief Physician [Name]"

The report also states that after periodically shouting and threatening, A was calm between 14:45 and 19:45 on April 30, 2004, when he again became agitated and spat on the wall, and at 20:00 and 20:10 he again shouted obscenities at staff and made threats. At 21:20 and again at 21:30 he became agitated and threatening again. There are then long periods where he slept until the afternoon of May 1, 2004, while during waking periods he regularly used abusive language, shouted or threatened, including threats to his life at 2:45 am and 2:50 am on May 1, 2004. According to a note at 7:05 am on May 1, 2004, the left arm was detached at this time. In the subsequent notes, it appears that the use of hand straps has completely ceased from this time. However, this is not consistent with later notes that wrists were loosened when A was given water. On May 1, 2004 at 12:00 noon it is noted that he did not want to talk to a nurse who was present to check him. Immediately afterwards it is again noted that he slept until 16:30, when he said to the consultant that "we should just get the hell out, otherwise he can

piss right in our faces". After this, there is again a longer period where he slept only interrupted by very short periods where he lay still. It is noted that on May 2, 2004 at 4:38 am, A asked a prison officer if he was bored and then lay still until 5:20 am, when he sat up, screamed and tore his belt.

Meaning. At 6:00 - 06:10 he shouted for water and became threatening and agitated, after which he was given a jug of water at 6:20. At 7:00 am he called a police officer an idiot. At 7:10 a.m. it is stated that he got/is getting his left wrist untied and his right wrist untied in connection with being given water. At 7:25, according to the notes, he spoke to the nurse, and at 7:40 he asked for something to read. 15 minutes later it is noted that he had fallen asleep. At 8:15 a.m. on May 2, 2004, he is again reported to be awake. Apart from notes that he shouted again at 10:45 and 11:00 on May 2, 2004, there are only notes that A lay still, slept, urinated in a flask, smoked, refused food, and that at 8:40 on May 3, 2004 he asked what time it was, and at 9:20

wanted to speak to a psychiatrist, which happened at 10:01. He was then removed from the security cell and restraint at 10:10 on May 3, 2004.

From the report on observation cell placement in the institution at Her- stedvester in the period May 18, 2004 at 15:10 - August 27, 2004 at 15:10

11:45 (a total of 100 days 20 hours and 35 minutes) is shown among other things:

  *"Description of the incident:*
  The inmate was taken out of the security cell at 15.10 and was then placed in observation cell I.6.
  . . .

| | | |
|---|---|---|
| 28-05-2004 18:15 | [Name] Prison officer | |

17.00 Inmate refuses to take his 17.00 medication (Risperdal). Cf. journal note from 27-05. The inmate has made an agreement with psych. G to continue with the prescribed medication for another week. Based on this, and from previous knowledge of the inmate's behavior, the undersigned decides to deny the inmate a walk. This will be maintained until the inmate takes ALL his medication again, or until there is a new written agreement with psych. G.

. . .

| | |
|---|---|
| 03-06-2004 11:25 | [Name] Prison officer |

10.00. It has been decided at the daily meeting that inmates should take the medication that psych. G recommends. If the inmate does not agree to this,
the staff decides that it is not possible to conduct a walk with the inmate, as the staff do not feel sufficiently comfortable with the situation. This is communicated to the inmate, who becomes extremely agitated and angry about this decision.

| | |
|---|---|
| 03-06-2004 11:31 | The respondent will subsequently call their lawyer. This will be done immediately after the department has acted in store. |

[Name] Prison officer

11.00. As agreed, the inmate is allowed to call his lawyer/mother/guardian where he explains the current situation - The inmate makes no secret of the fact that if there is no softening of the situation, the inmate will, according to his own statement, "go off" within 3 days. The staff should therefore treat the inmate with the utmost vigilance and caution.

. . .

| | |
|---|---|
| 04-06-2004 21:30 | **3065** |

[Name] Prison officer p.p.

18.25 Regarding telephone conversation with the counselor. The inmate states that he feels persecuted and that he is not being treated in accordance with the rules. The inmate says that he is afraid because he believes that the staff will use force against him because he has previously been violent towards
for the staff. The inmate also states that there is a lot of eavesdropping on the rooms the inmate is in. He knows this because the staff talk about the things he has said to his lawyer. Throughout the conversation, the inmate is very erratic in his thinking and he mixes everything up, which results in the counselor having to contact God and everyone else to make it visible that something is very wrong with the treatment of inmates.

. . .

| | |
|---|---|
| 27-08-2004 14:44 | [Name] Prison officer |

11.45 The inmate has a conversation with Psychiatrist G under staff supervision, when the inmate gradually shouts louder and his behavior also gradually intensifies, Psychiatrist G leaves the cell, the undersigned tries to calm the inmate down, but he jumps up threateningly from the bed and towards Ms. [Name]. The

.............................................................................................inmate is then passivated and placed in security cell I-7. ....................'

It also appears from the notes in the report that A was on farm trips, but not in a period from May 28, 2004 - June 24, 2004. It appears, cf. the above-mentioned notes, that the refusal of farm trips

was because A refused to take his medication. Against this background, the prison staff did not consider it safe to let him go for a walk. According to the report, he had access to

Copyright © 2023 Karnov Group Denmark A/S

go to the grocery store and shop on his own. However, this access was withdrawn on 22 July 2004 as a result of A's border-seeking behavior. He was then offered to order goods instead. It is noted that during his stay he was visited by the priest, psychiatrist G, his guardian and his mother and father, and that he had access to television and playstation as well as telephone calls. Throughout the process, there are notes of days when A was aggressive in his address to the prison staff and border-seekers. On 27 August 2004 at 11:45 am, A was transferred to a security cell as a result of paranoid and threatening behavior.

The report on the placement in a security cell at Hersted-West Institution in the period August 27, 2004 at 11:50 - August 27, 2004 at 17:30 (a total of 5 hours and 40 minutes) states, among other things:

*"Description of the incident:*

On this date at approximately 11:00 am, the inmate was allowed to call his lawyer and mother. The inmate seems paranoid, as even after several times he still doubted that he was talking to the right employees at the office. He expressed that there was someone pretending to be an employee at the law office. Immediately afterwards, he called his stepfather [Name] and asked [Name] to contact the law office because of his doubts. He then called his mother [Name] and spoke to her briefly, after which he hung up the phone to call back immediately, as he was in doubt that she was really his mother. When the inmate hung up, he was still convinced that he had not spoken to his mother & returned to the observation cell, shaken and tense.

Subsequently, staff were concerned about the inmate's state of mind and called Psychiatrist [Name], who arrived immediately afterwards. She spoke to the inmate in the cell, the inmate became progressively more agitated during the conversation. As the psychiatrist left the cell, the inmate shouted several times "it was not my mother I was talking to". The staff tried to calm the inmate during the conversation, but the inmate suddenly jumped up violently from the bed and, with clenched fists, made threatening gestures towards the staff."

The report also states that A calmed down relatively quickly, but at 15:20 he expressed an idea that the prison was diverting his calls so that he could not get in touch with his mother, even though he was calling the right number. At 16:00, A had his gloves and wrist straps loosened so he could smoke, and it was agreed that if he was still calm at 18:00, he would be taken out of the cell. He was taken out at 17:30.

The report on the placement in security cells in Copenhagen Prisons in the period August 6, 2005 at 20:40 - August 9, 2005 at 8:24 (a total of 2 days 11 hours and 44 minutes) states, among other things:

*"Description of the incident:*

2688 [Name] opens the door to the inmate's cell when he has rung the doorbell. Inmate kicks his trash out into the hallway and yells abuse at staff. 2688 [Name] kicks the inmate's trash back into the inmate's cell and closes the door, as the inmate is very agitated. Inmate then starts kicking the door violently and smashing his furniture (it sounds like glass is breaking). 20.40 staff are wearing response gear and open the door to inmate. The inmate is pacified under violent resistance and a baton is used on legs, arms and upper body. The inmate is then taken to the security cell, where he still resists violently.

**3066**

The inmate grabs 2679 [Name]'s upper arm hard on the way to the elevator and 2679 [Name] is forced to free himself by hitting the inmate's right shoulder with a fist.

Inmates are then taken to the safety cell and restrained.

. . .

*Doctor's notes/summary:*
[Name], Physician:

Copyright © 2023 Karnov Group Denmark A/S

Placed in the safety harness at approx. 21:40. Tightened in belt and straps. The belt and straps on the left hand and right foot are too tight, recommended. loosened. There are several abrasions and red marks in various places on the body and extremities.

No signs of serious bodily injury. Pt. is tense, angry and aggressive towards staff. No overt psych. Signs. [Name], Prison nurse:

Added. Has to urinate, but can't. Cries out about poor treatment and he wants to talk to the doctor again, who has just left."

The report also states in a concluding note that the restraint with lap belt, hand strap and foot straps was maintained throughout the placement, although according to the section on "Restraint" it appears that the restraint ended in the middle of the day on August 8, 2005. There are notes of threats to staff and attempts to get out of the restraint, as well as verbal abuse up to 23:45 on August 6, 2005. After this, there is a note that A gave a prison officer

"finger" at 01:15 on August 7, 2005. From 3:00 a.m. A shouted again, made threats at 3:30 a.m. and spat at the observation glass when a prison officer checked on him at 3:45 a.m. Apart from spitting at the observation window after being refused contact with a counselor at 9:40 a.m., according to the notes, A was then calm until 1:25 p.m. on 7 August 2005, when a prison officer had a conversation with him and asked if he had calmed down enough to be taken to an observation cell. According to the recorded

"A did not want to participate in our proposal, instead he made a number of counter demands. The staff agreed that lifting the inmate's fixation would not be the solution". A then shouted at 13:30 that if his demands were not met "we might as well pull the bars". At 13:40, A called and repeated his demands, which according to the notes were to make a phone call and get tobacco. He was informed that he would neither be allowed to make calls nor be offered cigarettes "as long as he is fixated and in such a negative mood". Immediately afterwards, there is a note of a conversation during which the prison officer informed A that he would not be given a telephone or cigarettes when he was returned to the observation cell, after which A announced that he "might as well stay in bed". Apart from a note about shouting and noise at 16:15 and a note at 19:45 about him shouting and calling an officer "a boy ass", there are no notes about aggressive behavior on A's part in the time thereafter. At 19:35 on August 7, 2005, after discussion with the medical staff at Vestre Fængsel, his request to be seen by a doctor was refused on the grounds that he would not state the purpose. At 21:30 and 23:30 he shouted for an officer. At 4:15 am on August 8, 2005, A again asked for a doctor, but was referred to speak to "[Name]". At 8:20 am he shouted in between. At 9:45 a.m., it is noted that the head watchman, who was called in at A's request, had spoken to him, and that A refused an offer of water. There are notes about attempts to urinate in a flask and about supervision by a nurse during the morning and in the middle of the day on August 8, and about supervision by a doctor and nurse at 13:50. At 14:06, he was given medication for pain and refused to be washed. At 14:25, after consultation with the nurse, this was again refused. The notes continue continuously until A was removed from the security cell on August 9, 2005 at 8:24 am.

The report on placement in a security cell at Hersted-West Institution in the period August 19, 2005 at 13:05 - August 21, 2005 at 13:05 (a total of 2 days) states, among other things:

"*Description of the incident:*

The inmate is today being interrogated by the Chief Officer [Name]. This is as a result of a report prepared by Ff. [Name] . . .

regarding threats, threatening behavior and racial slurs on his person. During this interrogation, the inmate is informed that such threats will result in the inmate being moved back to cell I.5.

these threats after the interrogation has been terminated and the staff has left the cell. The conclusion is that the inmate should be moved back to cell I.5, as he has not complied with the guidelines for living in cell I.6, and thus loses these privileges.

Response Team Leader Ff. B . . [witness in the case] who is currently on duty at Vk is then called to the department. HI. and familiarized with the situation. After consultation with the staff at dept. Hi, it is decided that gas will be used against the inmate if he does not comply with the staff's demand to move to cell I.5. quietly and calmly. This is due to knowledge of the inmate's dangerousness (see various reports).

The inmate is subsequently informed at 12:55 about the upcoming process if the inmate does not quietly follow along in cell I.5. You can just give me tear gas. You'll be reported to the police all tied up, this is torture"

It is then decided that gas will be used against the inmate. At 12:57, the inmate is warned that gas will now be used against inmate. This has no effect on the invader, and the first gas is then injected. The inmate is

**3067**

The inmate does not comply, and gas is again injected into the cell. As a lot of gas had been injected into the inmate without much effect, the undersigned (Officer B [witness in the case]) decided, due to the inmate's health, that it was not safe to inject further gas into the cell and then ordered the staff to enter the cell and remove the inmate for placement in a security cell. The inmate is then placed in security cell I.7.

. . .

*Doctor's notes/summary:*

[Name], Prison officer:

Department. Physician: [Name].

19.08.05 at 13.30: inspection due to safety cell placement after gas use.

The inmate is lying calmly on the bed, he is partially lying on his left side. This causes inappropriate pressure on the straps at the wrists. The inmate complains about this. Within seconds, the inmate becomes very agitated and becomes verbally threatening. He wants me to contact his guardian, lawyer etc. but I inform him that it is not my job. I am there to check if he has been harmed during the use of force/security cell placement. Then all the belts tighten and everything is wrong.

Objectively, the outer strap at the right wrist is tight and it loosens. At other straps, including the waist belt, there is plenty of room for my finger inside the strap.

The inmate's breathing and circulation are not believed to be affected by the use of gas. He can yell and scream as before. Speech is not slurred. The inmate's condition is not deemed suitable for further examination.

There are no fresh marks on the skin.

[Name], Prison officer:

Added d. 20/8-05 at 12.55. by doctor [Name]

The inmate is inspected in a security cell where he has been restrained with a belt, 2 gloves, hand and front straps.

Obj: Gloves, belt and straps are inspected and fully securely fastened. Inmates breathe naturally.

Psychologically, he is somewhat agitated and feels he has been treated unfairly. There are no signs of psychosis, but there is severe affect.

[Name], Prison officer:

Admitted 8/20/05 at 2030 due to abdominal pain.

He hasn't eaten or drunk for 24 hours and hasn't urinated despite being offered a flask.

Obj. hurts above the bladder, there is bladder attenuation to 1

finger below the navel. Inmate cannot urinate sitting down, but after he is

loosened and can stand up, he releases 800 ml of clear urine. The inmate eats and drinks afterwards.

Inmates should take a break from tbl.phenergan which can cause urinary retention.

Rivotril can be used.

Belt and 4 straps are reapplied and checked [Name], doctor"

The report also shows that until the morning of August 21, 2005, A regularly made aggressive statements and serious threats against the prison staff. At 7:30 am on August 21, 2005 he had his arm straps loosened. When he reported later that morning at 8:20 that he could not remember anything and that there was "no more trouble with him", he was told that whether he would be moved depended on his behavior during the morning. He was then removed from the holding cell at 13:05.

Attorney Claus Bonnez filed an administrative complaint with the Directorate on behalf of A about the intervention, including the use of gas. In a decision dated February 20, 2006, the Directorate announced that it considered the use of tear gas to be justified, that the placement in a security cell had not lasted longer than necessary, and that there was no claim for compensation.

Attorney Claus Bonnez then filed a complaint and request for compensation under the rules in sections 106-107 of the Execution of Sentences Act, cf. chapter 93a of the Administration of Justice Act, on behalf of A with the public prosecutor. The Attorney General's decision on the merits of 16 July 2007 upheld the Public Prosecutor's rejection of the complaint and rejection of compensation for placement in a security cell and use of gas. The decision states that, pursuant to section 1018 f(1) of the Danish Administration of Justice Act, the claimant may request that the case be brought before the court.

A then requested that the case be brought before the court pursuant to the provision in question. In Glostrup Court's judgment of March 22, 2013, the case was dismissed in accordance with the prosecution's claim on the following grounds:

"Claims for compensation for interference during the execution of a sentence are regulated in chapter 20 of the Execution of Sentences Act. Under sections 106-107 of the Execution of Sentences Act, an inmate is entitled to compensation for innocent interference under the rules of section 1018a of the Administration of Justice Act in a number of specified situations.

It is undisputed that the interventions at issue in the case are by their nature covered by sections 106-107 of the Execution of Sentences Act.

It follows from section 109 of the Execution of Sentences Act that decisions regarding claims for compensation for innocent interference during the execution of a sentence are made by the Ministry of Justice, Department of Prisons and Probation.

Under section 112 of the Execution of Sentences Act, certain specified final administrative decisions may be brought before the court for review. The provisions in sections 113-123 of the Execution of Sentences Act specify the procedure etc. in relation to the decisions that can be brought before the court pursuant to section 112.

**3068**

It is undisputed that the interference at issue in the case is not covered by the list in section 112 and that the list is exhaustive. The question is then whether the claims for compensation for interference during the execution of a sentence can be brought before the courts pursuant to Chapter 93a of the Danish Administration of Justice Act, including in particular the provisions in sections 1018 e-1018 f of the Act, or can only be brought before the courts pursuant to section 63 of the Constitution.

It appears from both the Public Prosecutor for North Zealand and Copenhagen Western Region's refusal of compensation of February 20, 2007 and the Director of Public Prosecutions' decision of July 16, 2007 that A's request to have his claim for compensation brought before the court pursuant to the rules in section 93a of the Danish Administration of Justice Act has been interpreted as a request to process the claim for compensation pursuant to section 1018h of the Danish Administration of Justice Act.

In this connection, reference was made to the fact that the legislative history of the Execution of Sentences Act provided that an inmate could demand that claims for damages relating to interference during the execution of the sentence, which were raised on the basis of the general rules on damages under Danish law, be processed according to the procedural rules in chapter 93a of the Administration of Justice Act, cf. section 1018h.

In connection with the consideration of Bill L 9 of November 9, 2011 to amend the Danish Criminal Enforcement Act and the Legal Fees Act (Revision of the Criminal Enforcement Act etc.), which was adopted as Act No. 113 of February 3, 2012, the Ministry of Justice stated the following on the issue of jurisdiction and access to judicial review, cf. the general comments section 3.11.2, among other things:

"It is the opinion of the Ministry of Justice that punishment § Section 112(9) finally settles which claims for damages as a result of interference during the execution of a sentence shall be subject to a particularly easy access to judicial review. Claims for damages that are not covered by section 112(9) can thus only be brought before the courts pursuant to section 63 of the Constitution. It is also the opinion of the Ministry of Justice that the administrative decision on questions of compensation for innocent interference during the execution of a sentence - regardless of whether the interference falls within or outside the scope of section 112(9) of the Execution of Sentences Act - must be decided by the Prison and Probation Service, cf. section 109 of the Execution of Sentences Act, and cannot also be decided by the Public Prosecution Service, cf. section 1018 e of the Administration of Justice Act.

(. . .)

In accordance with the above, it is assumed that claims for compensation for unjustified interference during the execution of a sentence cannot be processed under the rules in Chapter 93a of the Administration of Justice Act. The Ministry of Justice does not find that there is a need for special rules on easy access to judicial review for such claims. Claims that are not covered by section 112 of the Execution of Sentences Act may therefore only be brought before the courts pursuant to section 63 of the Constitution."

According to the wording of the provision in section 1018 h of the Administration of Justice Act, it is only "Claims for damages . . . in connection with criminal prosecution", which can be processed on request according to the rules in Chapter 93a of the Administration of Justice Act.

The claims for damages covered by this case cannot be considered to have been raised in connection with criminal prosecution, but are instead raised on the basis of interference during - the subsequent - execution of the sentence. Accordingly, and in view of the Ministry of Justice's comments to bill L 9 of November 9, 2011, the court finds that there is no authority in section 1018 h of the Danish Administration of Justice Act to process the claims for damages raised in the case according to the rules in chapter 93a of the Administration of Justice Act.

In this case, A has argued that it follows directly from the reference to section 1018a of the Administration of Justice Act in the

§§ Sections 106-107 that there is a legal basis for processing the claims for damages in accordance with the rules in Chapter 93a of the Danish Administration of Justice Act, regardless of whether or not they are based on the general rules on damages under Danish law.

The Court finds that the reference to the objective and substantive rule of law in section 1018a of the Danish Administration of Justice Act is not also a reference to the procedural rules in sections 1018e - 1018f of the Danish

Administration of Justice Act, as this would contradict the exhaustive list in section 112 of the Execution of Sentences Act of which decisions and measures can be brought before the courts according to the rules in sections 113-123 of the Execution of Sentences Act. In this connection, the Court notes that in the Execution of Sentences Act

§ Section 112(9) refers to compensation under section 106 in certain specific cases.

Furthermore, the Court finds no basis for assuming that access to judicial review of claims for damages such as those in this case solely on the basis of section 63 of the Constitution and not also according to chapter 93a of the Administration of Justice Act would be in violation of Article 3 of the ECHR."

Copyright © 2023 Karnov Group Denmark A/S

A appealed the judgment to the Eastern High Court. The appeal was withdrawn on February 19, 2014, cf. the court's court book of the same date.

Report on the placement in observation cells at Her- stedvester Prison in the period August 21, 2005 at 13:05 - September 30 2005 at 13:50 (a total of 40 days and 45 minutes) states, among other things:

*"Termination decision made by:* [Name]

*Description of the incident:*

The inmate was taken out of the security cell at 13.05 and placed in observation cell I.5."

The report also shows that A had access to farm tours. It also appears that he could call his guardian and others and had access to visits, including from the priest and his father. He could also order goods from the grocery store, watch TV and get magazines.

### 3069

The report on the placement in a security cell at Hersted-West Institution in the period September 30, 2005 at 13:40 - October 5, 2005 at 12:30 (a total of 4 days 22 hours and 50 minutes) states the following:

*"Description of the incident:*

The inmate is currently placed in a security cell. This happens after a conversation with Psych. [Name], where, at the end of the conversation, the inmate makes some particularly serious threats against Fr. [Name] and his family (see separate report by Mr. [Name] regarding threats).

The inmate is placed in observation cell I.6. with privileges. This means that the inmate has been given a TV, playstation, effects, etc. From the start of the inmate's stay, there have been very clear guidelines on how the inmate should serve his sentence in cell I.6. This includes, among other things, that the staff will not tolerate threats directed at the staff under any circumstances. As these guidelines have been clearly violated, the staff assess that the inmate must move to observation cell I.5, i.e. he will lose his privileges. The staff will inform the inmate of this when he has finished using the toilet (see observation note at 13.30.) The inmate is then told to go into observation cell I.5 as he has violated the rules for living in observation cell I.6. Under no circumstances will the inmate do this, so he will go into security cell I.7. The inmate then voluntarily goes down to the security cell and sits on the bed. The inmate intends to finish his cigarette. The inmate is told to lie down so that he can be restrained with all straps in accordance with applicable rules. The inmate refuses to do this, and the staff subsequently takes no chances due to the inmate's dangerousness and hatred towards the staff on duty, and the inmate is then restrained by force."

The report also states that A entered the security cell I7 himself and was then instructed by the staff to lie down "so that he can be restrained with all straps, cf. applicable rules." When A refused this, he was forcibly restrained because the staff did not take "any chances due to the inmate's dangerousness and hatred towards the staff on duty".

In the Community Exclusion Report from February 6, 2006 at 14:55 - March 21, 2006 at 16:09 it states, among other things:

*"3. Basis:*

Because the inmate exhibits serious or frequently repeated impermissible behavior that is manifestly incompatible with continued residence in association with other inmates, cf. section 63(1)(3) of the Execution of Sentences Act To prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act

No opportunity to socialize with fellow inmates

Inmates are informed about the rules of the placement.

. . .

*Case development:*

[Name], Prison official:

Inmate has been transferred

to K"

Weekly notes are not included in the extract.

The report on placement in a security cell in the State Prison in Vridslø- selille in the period March 20, 2006 at 18:45 - March 21, 2006 at 16:00 (a total of 21 hours and 15 minutes) states, among other things:

*"Description of the incident:*

On that day at 18:35, we went to the inmate to carry out the daily search of the inmate and his cell. The inmate did not want to participate in the search, and even though we made several attempts to persuade him, he insisted that he would not cooperate. The inmate began to complain loudly about the fact that ff. [Name] had walked behind the inmate while he was standing by the food cart and believed that he had gone that way to provoke the inmate. We tried to explain to the inmate that [Name] had only gone that way to cause as little inconvenience to the inmate as possible during the food delivery.

This did not impress the inmate at all, and he just got louder and louder. Suddenly, the inmate shouted that he needed to call his legal guardian right now. We explained to the inmate that we had to complete the search first, and if it went without further problems, he could call his legal guardian afterwards. The inmate continued to shout that he did not want to be searched. As it was obvious that the inmate would not cooperate with the search, I decided that we should leave the cell again to obtain permission from the warden's office to conduct a forced search. OVM [Name] gave permission for this and staff were called to the unit to conduct the search.

Together with the summoned staff, we went to the inmate and made another attempt to persuade him to cooperate with the search, but to no avail, and after a brief exchange of views, I gave the signal to take the inmate by force and conduct the search.

The inmate immediately resisted violently when staff grabbed him. He lashed out at me, yours truly, and tried to head-butt me, which failed as staff quickly grabbed him and pushed him down on the bed. I grabbed one of the inmate's hands and pressed it down on the bed right next to the inmate's head. The inmate tried to bite me, but only just managed to hit my hand with his teeth.

The inmate was then handcuffed and carried to the security cell where he was restrained. Throughout the process, the inmate shouted threats of death and destruction at the staff in general and at the undersigned and f.f. [Name] in particular.

Immediately after the inmate had been restrained, he managed to pull first one wrist strap and then the other. In connection with the replacement

**3070**

of the straps, the inmate tried to nod his head and grazed e.g. [Name] in the head, just as he lashed out violently at yours truly and hit me on the shoulder.

When the inmate continued to jerk violently on the straps and we feared that he would succeed in jerking them again, we obtained permission from OVM [Name] to handcuff the inmate's arms to the beds to prevent him from getting free again.

. . .

*Doctor's notes/resume:*

[Name], Prison officer:

Inspection 60 min after securing: Appears angry but awake and completely composed, BT 115/85, free resp. night. Colors.

Various excoriations but otherwise no signs of significant physical damage. Eyes night without bruising, neck without excoriations or pressure marks, neck moves freely.

St p e t c ia, abd soft unstitched.

On bg wrist excoriations, but not suspected fractures, are secured in handcuffs.

extremities otherwise without fractures.

Conclusion: No signs of significant physical damage."

The report further states that until approximately 23:00 on On March 20, 2006, he yelled, screamed and threatened. He slept almost continuously until 6:40 am on March 21, 2006, when he demanded to see a doctor, but was told that he had to wait until the nurses had time to see him. Thereafter, at 6:45 am, A kept shouting for a doctor and at the same time shouted abuse at a prison officer. From 8:00 a.m. A went back to sleep and then woke up at 8:45 a.m. and again at 9:00 a.m. and 9:15 a.m. and asked for a doctor at 9:30 a.m. Around 10:00 am he was seen by a nurse and it is noted that he was "slightly agitated" and shouted a lot. At 10:59 it is noted that he had calmed down. It is noted that at 13:15 he was refused to unbuckle his belt and to have a cigarette and was furious. At 16:03 on On March 21, 2006, the solitary confinement ended when A was transferred to Politigården Prison.

The report on the placement in security cells in Copenhagen Prisons in the period March 21, 2006 at 16:28 - March 22, 2006 at 10:04 (a total of 17 hours and 36 minutes) states, among other things:

*"Description of the incident:*

Inmates have arrived directly from fixation in the state prison, upon arrival at the police station the inmate is still threatening and aggressive, the inmate is placed in a security cell and restrained.

. . .

*Doctor's notes/summary:*

[Name], Physician:

Admitted at 17:35 on 21 03 2006 - very tense, in affect, angry, clear, collected and oriented, not psychotic. Complaints of pain - throughout the body - secondary to long term fixation in belts. On the wrists and ankles - redness and clear marks from handcuffs and belts, not thought to be signs of internal injuries.

Due to benzodiazepine use for several months - phenemal recommended - as prescribed - note - lack of medication can induce seizures - apply note, possibly new supervision if needed.

Clinical complaints are reassessed at a later stage when the pt has calmed down and loosened up."

The report also states that A was calm throughout the entire process. In the report on exclusion from fellowship from March 29, 2006 at 11:45 - May 7, 2006 at 14:15 is stated, among other things:

*"3. Basis:*

Because the inmate exhibits serious or frequently repeated impermissible behavior that is manifestly incompatible with continued residence in association with other inmates, cf. section 63(1)(3) of the Execution of Sentences Act Without the possibility of association with fellow inmates

Inmates are informed about the rules for placement."

Weekly notes are not included in the extract.

The report on observation cell placement in the State Prison in Horsens in the period April 20, 2006 at 11:25 - April 20, 2006 at 16:40 (a total of 5 hours and 15 minutes) states, among other things:

*"Description of the incident:*

In the last few days, the inmate has been very unbalanced and boundary-seeking. As a result, the inmate has had several small incidents where staff have been forced to reprimand the inmate. This has not gone down well with the inmate, who has not wanted to leave his cell since 17.04.2006. At the same time, the inmate has not wanted to take food or fluids and has not wanted to take the medication prescribed by his doctor. FF. [Name] and the undersigned stated on that day that the inmate had smashed the

Copyright © 2023 Karnov Group Denmark A/S

inner cell window, whereby there were large pieces of glass missing from the window. All things considered, the undersigned has determined that the inmate should be searched and placed in a holding cell to prevent self-harm or violence against staff."

In the report on exclusion from fellowship from May 9, 2006 at 14:00 - July 5, 2006 at 14:15 with the possibility of fellowship with inmates, it is stated, among other things:

*"8. Justification:*

Justification of why exclusion is necessary practice, deviation from practice if applicable):

The inmate has repeated violent clashes with both staff and fellow inmates, and he has a generally threatening behavior.

. . .

*WEEK NOTE created 18-05-2006 12:55 by [Name] Supervisor*

**3071**

*Case development:*

[Name], Supervisor

The inmate's behavior and mood swings have not changed since the time of placement, which is why the placement is extended. During the week, the inmate has had a longer conversation with both the prison priest and the nurse.

*Decision:*

Continued exclusion from community cf:

To prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act

Because the inmate exhibits serious or frequently repeated impermissible behavior that is manifestly incompatible with continued residence in association with other inmates, cf. section 63(1)(3) of the Execution of Sentences Act With the possibility of association with fellow inmates

*Justification:*

[Name], Supervisor

Please refer to the overall justification for the exclusion itself.

*WEEK NOTE created 23-05-2006 08:50 by [Name], Supervisor*

*Case development:*

*[Name]*, Supervisor

The inmate has weekly meetings with the prison chaplain and nurse, and at the same time the department staff take the time to talk to the inmate when he is out of his cell for various purposes. The inmate also goes on daily walks, and makes almost daily phone calls to his lawyer and guardian ad litem.

. . .

*Justification:*

[Name], Supervisor

It is still considered unjustifiable to let inmates have fellowship with fellow inmates, for the reasons stated in the grounds for exclusion.

*Case development:*

[Name], Supervisor

[Name], security department manager.

Inmates have been given an action plan. This action plan opens up, among other things, farm trips with other inmates and the opportunity to shop at the grocery store instead of ordering goods using grocery store slips.

Ward staff still have the time to talk to inmates.

The inmate still has regular contact with his lawyer and counselor.

. . .

*Justification:*

[Name], Supervisor

Inmates now have the opportunity to socialize with fellow inmates, under the conditions described in the inmate action plan.

*WEEK NOTE created 14-06-2006 13:44 by [Name], Supervisor*

*Case development:*

[Name], Supervisor

According to the action plan, the inmate can go on yard walks with other inmates and he has the opportunity to shop at the grocery store to order items using grocery coupons. Ward staff still take time to talk to inmates

The inmate is still in regular contact with his lawyer and legal guardian. The inmate has expressed a wish to be able to go to fitness training and attend church services, but the inmate has been told that this will not be possible for the time being.

Alternatively, it will be investigated whether it is possible to use the exercise bike for a few minutes every day. The inmate says that he is happy to be able to go for a walk with other inmates and that he has no problems with it.

. . .

*Justification:*

[Name], Supervisor

It is still considered inadvisable to let inmates serve their sentences together.

*WEEK NOTE created 23-06-2006 11:00 by [Name], Supervisor*

*Case development:*

[Name], Supervisor

Interview with inmate on 22/6 - 06. The inmate still wants to get out more among other inmates, he wants to go to church and to the fitness cellar. It is agreed with the inmate that he can be given the opportunity to bring the department's exercise bike into the cell. The inmate continues to go for walks with the other inmates in the isolation unit.

. . .

*Justification:*

[Name], Supervisor

It is still considered inadvisable to let inmates serve their sentence together with other inmates.

*WEEK NOTE created 04-07-2006 10:19 by [Name], Supervisor*

*Case development:*

[Name], Supervisor

Interview with inmate on June 30, 2006. The inmate is informed that in cooperation with, among others, the staff of the infirmary, an agreement folder has been made and that in the future a meeting will be held in connection with the interview that must already be conducted in accordance with the rules on "Exclusion from association", in order to ensure better case processing of inmates, he [is] also informed that he can expect to be transferred to the infirmary to one of the sick cells, this will happen on the same terms as before.

**3072**

. . .

*Justification:*

[Name], Supervisor

It is still considered too great a risk to allow inmates to serve their sentences in full community.

*[illegible in the weekly note extract] Case development:*

[Name], Supervisor

Inmate had [Name] . . . as an advisor.

A meeting was held today with inmates regarding the possibility of being moved to a larger cell with a sink in the infirmary, in order to improve the inmates' conditions, and at the same time, inmates were given a folder where all agreements with inmates are described.

A few days ago, the inmate had a fight with an employee on ward 1 West and the inmate couldn't let this incident go, so most of the conversation was about this incident.

The inmate didn't like the idea and didn't want to accept the offer to come to the infirmary He was asked to think about it overnight and give a final answer tomorrow.

. . .

*Justification:*

[Name], Supervisor

It is still not considered, and certainly not after today's incident, that inmates can serve their sentence together"

The report on the placement in a security cell in the State Prison in Horsens in the period July 4, 2006 at 18:05 - July 5, 2006 at 14:15 (a total of 20 hours and 10 minutes) states, among other things:

*"Description of the incident:*

On this date at 18.00, the undersigned hears the above inmate yelling and screaming inside his cell. The undersigned opens the door to hear what is wrong and at the same time tells the inmate to quiet down. The inmate sits on the chair with his back to the undersigned and shouts that the undersigned "just needs to piss off". The undersigned is also told by the inmate that this was the way they spoke here in Horsens. The undersigned then closes the door and, given the inmate's turbulent conditions of detention, the undersigned chooses to get more staff to bring the inmate to the observation cell. Ff. [Name], Ff [Name], Ovm. [Name] and the undersigned go to the inmate and tell him that due to his very aggressive behavior, the inmate must be transferred to the OBS cell. This results in the inmate becoming even more agitated and tells yours truly that the inmate is not going to the OBS and yours truly should just "piss off". Yours truly tells the inmate that he must get up from his chair and follow, or yours truly will have to use force. The inmate does not want this and the undersigned then grabs the inmate's left upper arm. The inmate pulls free and pushes the undersigned. The undersigned again gets hold of the inmate's left upper arm and ff. [Name] grabs the inmate's right upper arm. The inmate breaks free and lashes out at Ms. [Name] and the undersigned. [Name] and the undersigned. The inmate hits Sgt. [Name] in the head with a sale and also hits the undersigned on the arm/shoulder. The inmates are then placed on beds and Ff. [Name] holds the inmate's legs, Sgt. [Name] has a firm grip on the inmate's right arm, Ovm. [Name] has a firm grip on the inmate's upper body and the undersigned has a firm grip on the inmate's left arm. Ff. [Name] handcuffs the inmate, after which he is carried to the security cell, where he is restrained. During the restraint, the inmate shouts loudly to CO [Name] "[Name], I'm going to fucking kill you. There's nowhere for you to hide. I will come back here again". Likewise, Ff. [Name] is threatened with being killed. The undersigned is also told that the undersigned could just wait until he was released, then the undersigned would just have to watch. Finally, the inmate shouts to Ovm. [Name], Ff. [Name], Ff. [Name] and myself that "we should just wait. There will come a day when the inmate is released and then he will find us".

. . .

*Medical inspection performed* 04-07-2006 19:30

*Doctor's notes/summary:*

Supervision in connection with fixation.

Pt. Awake. Aggressive and threatening towards yours truly. Seems relevant but agitated in his address to the undersigned. No visible injuries.

The fixation is assessed and found acceptable. It is justifiable to maintain the fixation."

The report also shows that until 22:00 on July 4, 2006, A regularly made violent threats against the prison staff and a

doctor on duty who came to check on him. At 23:15 he fell asleep and slept almost continuously until 7:45 on July 5, 2006, when he again threatened the staff. He then lay calmly until 11:30 a.m., when he again made threats, which, along with shouting, were repeated regularly until 2:15 p.m. on

On July 5, 2006, he was removed from the security cell for transfer to Politigården Prison.

The report on placement in an observation cell in Copenhagen Prisons in the period 5 July 2006 at 17:15 - 5 July 2006 at 20:25 (a total of 3 hours and 10 minutes) states that the placement in the observation cell, which took place immediately after transfer from the State Prison in Horsens after the placement in a security cell in the period 4 July 2006 at 18:05 - 5 July 2006 at 14:15, was justified by essential considerations of order and security in the institution, cf. the Executive Order on exclusion from association section 15, paragraph 1, no. 2. The first note at 17:30 states that A was mad. Thereafter, until he was removed from the cell, it was noted that he was asleep.

Report on the placement in security cells in Copenhagen Prisons in the period July 28, 2006 at 19:55 - July 30

**3073**

2006 at 10:35 am (a total of 1 day, 14 hours and 40 minutes), among other things:

*"Description of the incident:*

Since 18:55, the inmate has been very agitated and has repeatedly kicked and punched the door and made verbal threats. At closing time, the inmate behaves very threatening and unbalanced, and will constantly discuss what has happened during the evening. We ask him to calm down and close the door, the inmate shouts through the door that he will kill the next person who opens the door for him, and we can just say that he does not fear us, and he will no longer put up with our way of treating him.

Inmates continue to kick the door and make verbal threats, and it is decided that the inmate is not fit to stay in their own cell and is forcibly moved.

. . .

*Doctor's notes/summary:*

Called on 28.07.06 at 20.40. Attended at 21.15 Pt has shouted and made verbal threats

Pt is seen in the security cell, where he is restrained and wearing underpants. Pt says that FF has strangled him and hit his head. No visible injuries to the neck or head. No signs of acute injuries elsewhere.

Conversation with pt that he is trying to calm down and become calm again so that he can talk to FF about getting out again. To this, pt answers if I believe it myself.

Pt offered medication does not want this and starts shouting again and says that as soon as he comes to Hersted vester again he will kill a guard. FF listens in the hallway

Doesn't want to talk to a psychiatrist either, asks how it would help - he has talked to one and she left so quickly again

Pt says that just because he shouts a little, they put him in the safety cell.

Pt responds as appropriate and is somatically unaffected. Not Psychotic. Not hallucinated. Not suicidal

Recommended to calm down and talk to FF

D 29.07.06

Called at 19.15 seen at 19.50 Pt wants to speak to a doctor

Pt states that he wants to get out of the security cell. Pt says that he will be quiet and calm, but is a little ambivalent in his statements, as the next moment he threatens to hit his head on the iron bar on the bed so he can become unconscious and get out of the cell while spitting on the wall.

I inform him that I agree with him that it is a good idea to be quiet and calm and not threaten to kill anyone, so that he can

talk to FF about possibly getting out of the cell

Pt also regrets that he raises his voice to the undersigned

No signs of injury on pt. Unaffected somatically except that he sweats a little in the summer heat

Not psychotic Not hallucinated. Not suicidal

The patient is recommended to drink plenty of fluids in the heat, up to 3 liters daily. It is recommended that the pt gets water/juice/milk, otherwise there may be a risk of dehydration of the body resulting in fainting and, in the worst case, death Does not want medication

Will talk to yours truly again at 20.30 regarding that he will probably be seen by psych.

Psych is ordered.

Pt wants to urinate and says he can't pee in a flask. Wants yours truly to place a catheter. Pt says that if he gets out of the safety cell and into his own cell, he can pee by standing up.

Refusal to lay cath"

The report also states that at 20:40, A shouted at a prison officer that he wanted to gouge his eyes out, and that at 21:30 after the doctor's inspection he was aggressive and shouted obscenities. The doctor noted about the inspection at 21:15 on July 28, 2006 that A stated that a prison officer had tried to strangle him and hit him on the head, and that there were no visible injuries to A's neck or head. It also appears that during the conversation, A became agitated and started shouting again and threatened to kill a guard when he comes to Herstedvester. At 22:10, there is another note in the report about threats on his life. In the notes up to and including 11:30 on July 29, 2006, it is noted that A was lying still or sleeping. At 11:40 he gave a prison official "The finger". At 11:55 he answered a question about whether he was calm, negative and agitated, after which it was decided to maintain the restraint. At 16:10 there was another conversation during which A stated that he would assault the staff if he was released. At 18:40, A shouted and screamed, and at 18:50, A was threatening the staff. At 19:10, he banged his head on the bed, shouting and threatening. At 19:25 he shouted for a doctor, which was discussed immediately afterwards. A refused the offer of water. At 20:05, he was seen by a doctor, and there were then several conversations between him and A until 20:30, when the doctor ordered a psychiatrist. According to the doctor's notes in the report, during the inspection at 19:50 on July 29, 2006, A said that he would be quiet and calm, but the next moment he threatened to hit his head on the iron bar in the bed to become unconscious and spat on the wall. It was discussed that it was a good idea for him to be quiet and calm to get out of the cell and about the risk of dehydration. At 20:40, A banged his head on the edge of the bed. Apart from notes about help to urinate using a flask and about placing a blanket to alleviate pain in A's knees, there are only notes that A slept or tried to sleep until 01:05 - 01:10 on

**3074**

July 30, 2006, when A was refused a request to smoke - and then at 1:20 am was very dissatisfied with this and expressed that it was an abuse of power. There are then notes that A regularly called and wanted tobacco. At 01:55, A wanted medicine, but did not want to take it because the prison officer would not untie him so he could see it. At 8:15 am he was offered medicine. According to the following notes, A lay calmly until 10:33 on July 30, 2006, when he was removed from the security cell after a conversation with a prison officer.

In a memo about the placement dated September 4, 2006, prepared by Head of Department F from Copenhagen Prisons in response to questions from the Directorate, it is stated:

". . .

*1. The question about the length of placement and fixation when*

*the inmate has been calm for a long time from the form.*

Copyright © 2023 Karnov Group Denmark A/S                                    page 50

I can state that 209 has been notified as prescribed and neither ut. nor ovm. [Name] has been notified/informed of the placement and as the placement is on a Friday at 19.55, both ut. and ovm. [Name] went home for the weekend, (it was ut. himself who had the back watch for PF that weekend). Therefore, ut. or ovm. [Name] cannot take a position or be involved in the question of when inmates should be taken out of the security cell and restraint. We did not know that inmates had been placed until Monday morning, when we arrive and are briefed. Therefore, I believe that the question must lie with the staff who were informed of the arrest. Ut. did not have any comments on the actual reason for the placement.

*2. You are asked what causes the placement to be terminated at that particular time and what has changed at that time.*

To the above question, I can say. can tell you that the inmate is very unbalanced and fluctuates incredibly much in his temperament within a very short period of time and is easily "flammable", therefore it is my assessment regarding the inmate that the staff have estimated that they have not been able to feel safe with the inmate and have therefore observed him for a long time, precisely because the inmate is very unbalanced. This must be the reason why the inmate was released from the restraints and taken out of the security cell at that time.

The inmate is an inmate who generally requires much more observation in everyday life than the average inmate and therefore the staff may have felt uncertain about the right time to take the inmate out of the security cell and fixation.

On 29/7-06 at 17:19, it is estimated by 209 that there is still no reason for inmate incapacitation.

On 29/7-06 at 19.29, the rear guard for KF is informed because the 24-hour time is approaching.

This means that those in charge have been able to ask questions about the length of the fixation.

*3. Questions are asked whether inmates are offered water during the placement period.*

From the notes, it is not possible to read whether inmates were offered water, and conversely, the notes do not state that inmates were refused water. However, according to the doctor's note, the doctor explains that it is very important that inmates have something to drink and I must therefore expect that staff have offered inmates water.

*4. Questions are asked about whether the inmate has been to the toilet.* The inmate is offered to pee in a flask, which the inmate initially refused, but later accepted the offer.

This means that inmates have not been released from restraints in order to go to the toilet.

*To the last question regarding DFK. believes that the form is fully completed.*

Ut. can see in the situation that the form is very inadequate, this may be because the staff who fill out the form do not have access to a PC until after they have been on duty on the inmate and then subsequently write the observation in the client "notes". As the manager at PF, we would very much like to continue working on a solution to this problem, so that we get much more comprehensive notes."

The Directorate's letter to Copenhagen Prisons of October 12, 2007, which is only presented in excerpts, states:

"The Ministry of Justice, Department of Prisons and Probation, has reviewed Copenhagen Prison's report of security placement and restraint for more than 24 hours concerning A, civil registration number ... .

The Department takes note of the report with the following comments:

*1. Food and drinks on offer*

The report should state when inmates have been offered food and drink. The Department notes that the doctor informs the inmate

Copyright © 2023 Karnov Group Denmark A/S

talked about the importance of drinking and assumes that they have been offered both food and drink at appropriate intervals.

*2. Observation report*

The Department finds that the report itself is inadequately completed, as it lacks both time and details of when the inmate was offered food and drink etc.

*3. Taking out a safety cell at an earlier stage*

It appears from Copenhagen Prison's statement of September 4, 2006, point 1, that the prison cannot answer why the person concerned was not transferred to an observation cell at an earlier stage when it appears that the person concerned is calm. It appears from the prison's response that this should have been answered by the persons who were informed of the placement.

**3075**

The observation report states that on July 30, 2006, at 01:55 a.m., the inmate is in a state of agitation. Subsequently, the other notes state that the inmate is lying on his right or left side, respectively. It appears at intervals that the inmate has his eyes closed.

Given that the specific placement took place more than a year ago, and it can therefore be very difficult to clarify whether the person concerned slept or was awake all night, the Department notes that it would be appropriate for the observation report to state whether the inmate is awake or asleep during the night hours. A solitary confinement should not be extended for longer than the purpose dictates. On the other hand, a sleeping inmate should not be awakened for the sole purpose of removing him or her from the security cell.

If the inmate has been awake and calm throughout the period from 01:55 on July 30, 2006 to 10:35 on the same day, the Department finds that the placement should have been terminated at an earlier time." The report on placement in an observation cell in Copenhagen Prisons in the period 30 July 2006 at 10:40 - 30 July 2006 at 17:05 (a total of 6 hours and 25 minutes) shows that the placement in the observation cell, which took place immediately after the removal of security cell at 10:15 on 30 July 2005, was done to observe A and see if he was ready to move to his own cell, and was justified by a need for special observation, cf. Executive Order on exclusion from association section 15, subsection 1, no. 3. The notes show that several times during the process, A expressed that he now wanted to go to his own cell and "deserved" to go to his own cell, which happened at 17:05.

A report on exclusion from association from 3 August 2006 at 12:26 - 8 August 2006 at 11:00 states that the decision on exclusion from association was made to prevent violent behaviour, cf. section 63(2) of the Execution of Sentences Act, cf. section 63(1), no. 1. September 2006 at 13:20 - 11 September 2006 at 14:50 (a total of 1 hour and 30 minutes) it appears that the placement was for reasons of order and security in the institution, cf. section 15(1)(2) of the Order on exclusion from association, as A was very angry and acted threateningly. The placement was replaced at 14:50 by a placement in a security cell, see below.

The report on the placement in security cells in Copenhagen Prisons in the period September 11, 2006 at 14:50 - September 11, 2006 at 17:13 (a total of 2 hours and 23 minutes) states, among other things:

*"Description of the incident*

The inmate had been placed in an observation cell earlier that day. Warden [Name] attempted to talk to the inmate in the observation cell, but the conversation was interrupted as the inmate was very agitated, threatening and shouting. After the conversation, the inmate began acting very violently in the observation cell, kicking the cell door and banging on the cell window. The inmate repeatedly shouts pigs and assholes at the staff. Warden [Name] tries to calm the inmate down, but the inmate calls Warden [Name] instead.

Master [Name] for a faggot and the other prison staff for scumbags and whores. Inmates behave in a very threatening manner and Warden [Name] decides that inmates must be placed in a security cell to prevent threatening violence. Warden [Name] approaches the inmates to get the inmates to voluntarily follow him. The inmate resists so strongly that [Name] grabs the inmate's right arm. The inmate tries to wriggle free and is therefore placed on the bed. The inmate kicks out with his right leg at [Name], who is hit in the stomach by the inmate's kick. The inmate is then carried from observation cell to security cell. The inmate resists strongly and tries to kick out at the staff. The inmate is restrained under violent resistance. Inmate tells supervisor [Name] that he will kill him and that he will kill [Name] as soon as he gets the chance. Inmate stands up in bed and tries to nod a head towards supervisor [Name], who is bent over inmate to control the restraint. [Name] manages to pull his head back so that the inmate does not hit him. Warden [Name] walks out of the holding cell while inmate continues to yell that he is going to kill [Name]. Inmate starts to spit at [Name], but misses.

. . .

11-09-2006 16:57 [Name] Fgsl.funk p.p.

At 15:15, 2956 took over the shift. The patient slept until the doctor arrived at 15:45. The inmate immediately became very aggressive and shouted to the doctor that he is very biased because he had spoken to the person before he went in to see him. The doctor asked him if the inmate had been injured, but the inmate didn't care and shouted that he hadn't done anything and that the officers are fat pigs who degrade and insult him. The doctor put a blanket on the inmate and told him that he would come back with medicine. The doctor left at 15:57."

In the report on placement in security cells in Copenhagen Prisons during the period December 20, 2006 at 14:55 - December 22, 2006 at 09:40 (a total of 1 day 18 hours and 45 minutes) it is stated that

". . .

*Description of the incident:*

At 14:30 on Tuesday, the inmate calls and wants to talk to the warden. When we don't immediately open the door, the inmate is "dismantling" his entire cell while shouting and screaming.

**3076**

The staff talk to the inmate and tell him that if he does not calm down immediately, we will have to take him to an OBS cell. The inmate shouts that he wants to make a phone call, that we are sitting in the office and slandering him, that he still wants to talk to us. This happens at the same time as he threatens all the staff present. Again, the staff tell him to calm down. The inmate only becomes more agitated. The inmate is told that we will be forced to take him by force if he does not voluntarily come to the observation cell. We take a step towards the inmate, who responds by lashing out at [Name] 2883 and hitting him in the face. Staff forcibly tries to pacify the inmate. The inmate fights back violently and tries to bite and kick the staff at every opportunity. It is very difficult to gain control over the inmate, and when this is initially unsuccessful, the inmate is given several blows with a stick. Inmate is handcuffed by [Name] 2819 and taken to a security cell. On his way out the door from his cell, inmate bites 2819's right leg. The inmate bites through and 2819 shouts loudly that he has now bitten his leg. [Name] 2883 then comes to 2819's rescue and the inmate releases the bite. Upon arrival at the security cell, the inmate is again threatened and messed up. After the inmate has been restrained and we are on our way out, the inmate spits at the staff.

During the doctor's supervision, the inmate looks very angrily at [Name] 2708 and says "I'm not done with you".

Management on PF's comments on the above.

Ut. tries to talk to the inmate shortly after the placement regarding § 31 tomorrow 21/12-06, the inmate is not at all responsive to what Ut. tries to explain to the inmate. The inmate shouts and screams at the ut. and surrounding staff. The inmate continues to make very serious and persistent threats against the staff and later against the victim. Among other things, the inmate shouts "I'm not finished with you, I'll get you, you're a bunch of scumbags and faggots". Ut. then leaves the security cell as attempts at further conversation are deemed hopeless at this point. During the above episode in the secure cell, the inmate sits down several times and screams at the same time as the inmate suggests that the inmate will spit at the officer, but does not do so.

Regarding the above episode, it was not possible to "only" place the inmate in an OBS cell due to the inmate's violent behavior. Ut. initially assessed that the inmate should be placed in an OBS cell, but during attempts at placement, this developed into the inmate being placed in a security cell."

In a report on exclusion from association from December 21, 2006 at 15:36 - December 21, 2006 at 08:00 it is stated that the decision on exclusion from association was made to prevent violent behavior, cf. section 63(2) of the Execution of Sentences Act, cf. section 63(1) no. 1.

In a report on exclusion from association from January 7, 2007 at 17:00 - January 12, 2007 at 10:00, it is stated that the decision on exclusion from association was made to prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act.

In a report on exclusion from association from April 18, 2007 at 10:00 am - April 25, 2007 at 10:00 am, it is stated that the decision on exclusion from association was made to prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act.

In a report on exclusion from association from 10 May 2007 at 12:00 - 8 June 2007 at 13:10 with the possibility of association with fellow inmates, it is stated that the decision to exclude the inmate from association was made because the inmate exhibits gross or frequently repeated impermissible behavior that is manifestly incompatible with continued association with other inmates, cf. section 63(1)(3) of the Execution of Sentences Act.

In the report on placement in a security cell in Copenhagen Prisons in the period June 12, 2007 at 13:15 - June 13, 2007 at 16:20 (a total of 1 day, 3 hours and 5 minutes) it is stated, among other things:

*"Description of the incident:*

Today at 13.10 inmates are received at PF, after transfer from VF.

Upon arrival, the employee is extremely agitated and puts up strong resistance when he has to get out of the car and be placed on the PF.

The staff present must therefore take the inmate to the door by force. The inmate becomes so violent that it becomes necessary to place the inmate in Security Cell PF-100 with restraints applied to the wrists, stomach and legs. This is on the orders of department head F.

Throughout the incident, inmates call staff members present various epithets. insults and also tries to spit at the staff. The inmate is restrained at 13.15.

Notes:

Ut. made the decision that the inmate should be placed in the security cell. The reason was that on arrival at PF the inmate was very agitated and offered strong resistance.

There was no way to reason with the inmate in the given situation.

Head of Department

F. Police Yard Prison

. . ."

Copyright © 2023 Karnov Group Denmark A/S

In the report, it is also initially noted at 13:15 on June 12, 2007, that restraint with wrist, stomach and foot straps was used. Nothing is noted about restraint in the remaining part of the process under the heading "Restraint".

A community exclusion report from June 13, 2007 at 15:54 - June 15, 2007 at 09:00 states that

**3077**

the decision on exclusion from association has been made to prevent violent behavior, cf. section 63(2) of the Execution of Sentences Act, cf.

§ Section 63(1)(1).

The report on placement in an observation cell in Copenhagen Prisons in the period 13 June 2007 at 16:25 - 13 June 2007 at 17:38 (a total of 1 hour and 13 minutes) shows that the placement in an observation cell, which took place immediately after removal from the security cell at 16:20 on 13 June 2007, was justified by the need for special observation after removal from the security cell, cf. Executive Order on exclusion from association section 15(1)(3). The imprisonment ended with A being placed in a security cell again.

In the report on renewed placement in a security cell in Copenhagen Prisons in the period June 13, 2007 at 17:25 - June 14, 2007 at 14:10 (a total of 20 hours and 45 minutes), which occurred after transfer from the observation cell stay from June 13, 2007 at 16:25 - June 13, 2007 at 17:38, it is stated, among other things:

*"Description of the incident:*

The inmate is placed in observation cell pf 99, he has rung the bell. The door is banged on and the staff on duty go to the cell to ask the inmate what he wants. The inmate hammers his head and hands against the cell door. I ask the inmate to step back and calm down. The inmate is angry and shouts for a doctor, further attempts at conversation seem futile in the situation. The inmate is taken from the observation cell to the security cell and is restrained, the inmate tries to wriggle free and puts up some resistance."

According to the notes immediately after his placement, A made threats against the prison staff, shouted and was very agitated. According to a note at 18:47 on June 13, 2007, during a long conversation with the supervising doctor and the prison officer, A used further abusive language. Until 6:50 the next morning, June 14, 2007, there are only notes that A remained calm. At this time he asked for F (warden F) and was given his medication on request. At 7:05, A complained about the treatment he had received and stated that he wanted to be seen by a doctor and psychiatrist. At 7:25, he asked again when F would come to work. At 8:30, A refused the offer of breakfast and to have one arm loosened in the meantime, as he did not want food if he was not completely loosened. At 9:50, F had a conversation with A, who made accusations against the staff and would not talk about the self-harm. Based on this, F assessed that there was still a risk of self-harm if A was given the opportunity. The admission and restraint were therefore maintained. Between 8:25 and 9:30, there was an exchange of words during which A stated that he was calm, that he wanted to be released and wanted to talk to F again. This happened at 9:50. According to F's note at 13:08, A quickly became aggressive and stated that he did not want to be moved "because it was only about giving him (inmate) more beatings". According to the note, F assessed that A continued to exhibit aggressive behavior with a risk of assaulting staff and therefore decided to maintain the restraint. At 10:25 and 10:45, A used various insults towards the prison officers. After a further

conversation with F, A was removed from the restraint and the security cell. During the conversation, A had indicated that he was now calm. He asked for a guarantee that he "would not be beaten up again" and was advised about the right to complain if he thought he had been treated unfairly.

Copyright © 2023 Karnov Group Denmark A/S

The report on placement in an observation cell in Copenhagen Prisons in the period 14 June 2007 at 14:15 - 14 June 2007 at 20:14 (a total of 5 hours and 59 minutes) states that the placement in an observation cell, which took place immediately after removal from the security cell at 14:10 on 14 June 2007, was justified by a need for special observation after removal from the security cell, cf. Executive Order on exclusion from association section 15(1)(3).

In the report on the placement in a security cell in the East Jutland State Prison in the period from April 16, 2008 at 18:35 - April 21, 12:11 (a total of 4 days, 17 hours and 36 minutes) it is stated, among other things:

*"Description of the incident:*

The inmate was restrained at 18:35 on this day due to the following:

The undersigned, together with FF. [Name] at 18:30 to the inmate to deliver a letter.

When the undersigned delivered the letter, the inmate started complaining about the inmate's medication.

The inmate had previously refused to take his evening medication as he did not think it should be crushed.

The inmates became more and more agitated during the conversation, and when the respondent wanted to end the conversation, he called me an asshole.

Yours truly told him to shut up and behave. This got the inmate more agitated.

The undersigned said that this behavior could not be allowed and due to the inmate's state of mind, the inmate was told that he was isolated for the rest of the day.

Yours truly closed the door and locked it, but the inmates started yelling and screaming at me.

I decided to move the inmates to the observation cell, so the other inmates on the ward were locked in there. The undersigned picked up the other officers in dept. E and then opened the inmate's cell door. The inmate was asked to follow me to the observation cell, but the inmate refused.

Inmates were again invited to come voluntarily, but refused.

FF. [Name] and UT. then grabbed each inmate's arms to lead him to the observation cell.

**3078**

The inmate now put up a defense as he jerked/flailed himself partially free.

The inmate is now being restrained on the floor by staff. During the restraint, the inmate bumps into his cell cabinet and breaks a small crack above his eyebrow.

The inmate was then handcuffed and transported to a security cell and restrained at 18:35."

The report also states that A was seen by the doctor several times while in solitary confinement, the first time on April 16, 2008 at 18:40.

The report on observation cell placement in East Jutland State Prison in the period 21 April 2008 at 12:19 - 21 April 2008 at 14:22 (a total of 2 hours and 3 minutes) states that the placement in observation cell, which took place immediately after removal from the security cell at 12:11 on 21 April 2008, was justified by a need for special observation after removal from the security cell, cf. section 15(1)(3) of the Executive Order on exclusion from association.

In the Directorate's decision of 19 November 2009 regarding A v/lawyer Claus Bonnez' complaint about the placement in a security cell on 16 April 2008 at 18:35, it was concluded that the use of force and subsequent placement in a security cell was justified. The Department found, however, that the placement

had lasted too long and as a result paid an estimated compensation of DKK 500. The compensation was calculated on the basis of the difference between compensation for involuntary detention in general and involuntary custody in particular.

Copyright © 2023 Karnov Group Denmark A/S

pre-trial detention in solitary confinement, cf. the Director of Public Prosecutions' communication no. 1/2008.

A Community Exclusion Report from April 21, 2008 at 12:10 pm - May 5, 2008 at 1:45 pm mentions among other things:

"At 17.30 the inmate is examined by prison doctor [Name] during the examination the inmate says: "I don't trust them (the staff), The voices inside my head say kill-kill. I'll slit their (the staff) throats as soon as I get free and the opportunity presents itself - it may not be the first one who opens, but maybe the second or third - "I promise you it will happen - I just need to get out of here

- No matter what I'll probably get you" ".

In the report on the placement in a security cell in the East Jutland State Prison in the period July 3, 2008 at 16:15 - July 4, 2008 at 7:25 (a total of 15 hours and 10 minutes) it is stated, among other things:

*"Description of the incident:*

Today's date is Ff. [Name], Ff. [Name] and the undersigned are on duty at dept. E - Special security. At 16:05, the above personnel are carrying items to the inmates.

Inmate [Name] and Inmate A are in the exercise yard. Inmate A is called into the ward.

When the inmate enters the ward, ut. tells A that he must wear a T-shirt and footwear.

The inmate is obviously very annoyed and agitated by the reprimand, but restrains himself.

Ff. [Name] and ut. are looking at the neighboring cell - belonging to [Name] where the door is open.

We are talking about damage that has occurred on the inmate's floor.

When inmate A goes past Ff. [Name] and out. the inmate shouts to [Name] who is still in the yard, "[Name] - Now they're fucking messing around in that cell"

Ff. [Name] states very firmly that inmates should stay out of the way and keep their voices down.

The inmate then rushes up and steps very threateningly towards Ff. [Name]

The inmate and Ff. [Name] are then face to face. Officer [Name] repeatedly tries to talk A down - but to no avail. [Name] repeatedly tries to talk A down - but without success.

Inmate shouts, to Ff. [Name]: "Shall we fix it somewhere else?". Officer [Name] asks inmate. [Name] asks inmate: "Should this be perceived as a threat?"

The inmate does not respond, but continues to shout: "Let's do it somewhere else" and gets more agitated if possible.

When Ff. [Name] now feels very threatened - he pushes the inmate away with a push in the chest. The inmate then strikes Sgt. [Name] in the forehead with a clenched fist, causing Sgt. [Name] loses his balance and retreats backwards, towards the yard area - the inmate follows and strikes Officer [Name] several more times with his fist. [Name]

Assault alarm is activated.

Ut. and Ff. [Name] run after the inmate. Ut. pacifies the inmate with a balance break from behind and then has the inmate restrained in a grip with arm on back.

However, the inmate still manages to kick out at Ff. [Name] and hits him with 2 kicks in the stomach and chest region.

Out. Still holds inmates in a lying position where the inmate is halfway lying/sitting with back to out. chest.

Assisting personnel arrive and Ff. [Name] takes inds. A's other arm and together with Ff. [Name] takes the inmate to the security cell.

Inmates are fixated."

~~The report also shows that A remained relatively calm after his~~

imprisonment. During a conversation at 18:00 on July 3, 2008, he expressed that he was very angry about the imprisonment, although he admitted to having hit a prison officer. However, he believed it was self-defense, as he felt insulted by the person in question. It is noted that he was very angry and agitated during the conversation. After yelling, screaming and spitting on the floor at 19:15 - 19:30

A calmed down and lay down to try to sleep, which after
Hand strap "test" and shouting and talking to yourself at 20:45

**3079**

- 21:00 happened at 21:30. After waking up at 6:45 am on July 4, 2008, A was taken out of the security cell at 7:25 am for transfer to Politigården Prison.

In a decision of May 4, 2010 regarding lawyer Claus Bonnez's complaint about the placement in a security cell in East Jutland State Prison from July 3, 2008 at 16:15, the Directorate concluded that the use of force and subsequent placement in a security cell was justified.

In the report on continued placement in security cells in Copenhagen Prisons in the period July 4, 2008 at 10:15 - July 4, 2008 at 11:35 (a total of 1 hour and 20 minutes) it is stated, among other things:

*"Description of the incident:*
Inmate transferred from Stf. Østjylland due to assault on a colleague. The inmate was handcuffed and had to be carried from the car, and is therefore placed in security cell PF100. The inmate has been moved directly from a security cell in East Jutland."

The report on placement in an observation cell in the period 4 July 2008 at 11:35 - 6 July 2008 at 19:03 (a total of 2 days, 7 hours and 28 minutes) immediately after removal from the security cell on 4 July 2008 at 11:35 from Copenhagen Prisons shows that A was placed in an observation cell as there was deemed to be a need for further observation. Reference is made to section 15(1)(3) of the Executive Order on exclusion from association. After a period where A was calm, it is noted that at 20:13 on 4 July 2008, under the supervision of the doctor, he became extremely agitated when he thought that the prison staff knocked on the wall next to him and said that it was a joy that his father was dead. It was then decided by the prison staff that he was not ready to be removed from the observation cell. The following notes show that A was calm, but did not want to accept offered food and drink and did not respond to requests until he called at 19:04 on July 6, 2008 and asked if he could come out. It was then decided to remove him from the cell, as the staff assessed that he was not a danger to himself and his surroundings, as his behavior had been unproblematic all day.

In a report on exclusion from association from 4 July 2008 at 10:30 - 3 October 2008 at 11:30 it is stated that the decisions on exclusion and continued exclusion from association were made to prevent evasion, criminal activity or violent behavior, cf. section 63(1)(1) of the Execution of Sentences Act. The weekly notes show that for long periods A behaved negatively, aggressively and boundary-seeking towards the prison staff. It also appears that he was regularly visited by a priest, doctor and nurse.

The report on placement in an observation cell in Copenhagen Prisons in the period 30 July 2008 at 11:45 - 30 July 2008 at 12:15 (a total of 30 minutes) states that the reason for the placement in the observation cell was that A, after taking a shower, became very upset that he could not immediately return to his own cell where his clogged sink was being repaired. When he shouted and continued to do so and became threatening, it was decided to take him to the observation cell, which was done by force as he would not leave voluntarily. The legal basis is stated to be the Executive Order on exclusion from association, section 15(1)(2). The stay ended with A being transferred to a security cell.

In the report on the subsequent security cell placement in Copenhagen Prisons in the period July 30, 2008 at 12:15 - July 31 2008 at 14:15 (a total of 1 day 2 hours and 0 minutes) it is stated

among other things:
*"Description of the incident:*
On that day, inmates were placed in observation cells.

In the observation cell, the inmate was very violent and screaming loudly. The undersigned tried to calm the inmate down, but the inmate continued to scream that he wanted out. When the undersigned told the inmate that he was not coming out of the observation cell immediately, the inmate became more violent and tried to tear open the cell door to get out.

The inmate was now so violent that the undersigned decided that the inmate should be placed in a security cell to control violent resistance. During the placement, the inmate resisted very violently.

. . .

*Doctor's notes/summary:*

Called on 30-07-08 at 22.45. Supervision at 23.00 by dept. doctor [Name] Pt. Transferred to security cell this morning. Became aggressive in connection with a craftsman entering his cell.

He attempted to be transferred to the observation cell at around 3 pm, but became violent again and has since been restrained in the security cell. He has subsequently not responded to charges and has not drunk or eaten. Pt. does not react to me entering the cell, he does not answer my questions, despite repeated requests.

Objective:

Lying completely still on your side. Breathing calmly. Warm and dry. Does not react to speech, except for discreet twitching around the eyes. It is clear to me that the patient is awake but does not want to talk to me. Straps controlled and sits with room for a finger. No immediate physical signs of distress.

Rating:

Not considered psychotic, but it is difficult to assess as pt. will not talk to me. Pt. Previously seen that our psychiatrists have diagnosed inmates as severely dys-social personality disordered and never psychotic. Inmates must continue to be offered food and drink. New inspection tomorrow afternoon if inmates are still in security cells.

**3080**

New audit 31-07-08 at 13.00 by [Name]

Still lying completely still. About once an hour he is asked if he wants to go back to the obs cell, but either ignores the request or shouts and screams that he is "not going in there". Hasn't eaten or drunk anything since yesterday at noon, i.e. 28 hours.

After a while he starts talking to me and only after FF steps out of the cell so that I am in a private room with inmates. Will under no circumstances in the obs cell, says he suffers from claustrophobia. He believes that he can walk calmly back to his own cell. Has no understanding that he has to convince FF that he can take it easy.

Objective:

Awake, alert, oriented. Does not seem somatically affected by fluid deficiency, but I do not examine him physically as his appearance is aggressive. However, his mattress is wet around his head and he has probably urinated in his pants.

Psychic is aggressive with a low frustration threshold, loud and only responds with either loud speech or shouting. One senses a certain receptiveness to good arguments. He is not considered psychotic/insane.

Plan:

Recommend that you try to take the inmate out of the restraints and either let him stay in the restraint cell or transfer him to his own cell. I would advise against placing him in the obs cell. He is not yet physically affected by lack of fluids, but this may occur already in the next 24 hours."

The report further states that at 14:15 on July 30, 2008, an attempt was made to move A, who had been calm until that time, back to the observation cell, but this was abandoned when he left

"verbally amok" and shouted "fucking whore" and other obscenities. He then lay quietly until 10:00 am on July 31, 2008, when it is

**3081**

noted that the area manager again tried to have a conversation with him with a view to returning him to the observation cell. However, this resulted in Mr. A starting to scream and shout that he did not want to be moved and that the prison staff "should go to hell". This was repeated during an attempted transfer interview at 11:05. After the doctor had examined A at 13:20, it was assessed at 14:15 that A could go back to his own cell. It is noted that when he was released, A was very conflict-seeking in relation to the staff, but did not make any outbursts.

In the report on placement in a security cell in Copenhagen Prisons in the period August 15, 2008 at 21:15 - August 17, 2008 at 22:11 (a total of 2 days and 56 minutes) it is stated, among other things:

*"Description of the incident:*

From 20:45 to 21:10, shouting and violent banging on walls and furniture was heard from inside the inmate's cell. At 21.10, the door was opened to the inmate and FF [Name] 2660 asked the inmate to stop. The inmate continues to shout at FF 2660 and will not calm down and is also very threatening. It is therefore decided that the inmate should go to the OBS cell, but the inmate will not follow voluntarily. The inmate resists when FF [Name] grabs the inmate's right arm. FF 2855, FF 2825, FF 2358 and FF [Name] then arrive and help to place arm restraints on the right and left arms respectively. The inmate is then led down to the elevator. Along the way, the inmate threatens that when he gets free in the OBS cell, he will kill us all. Therefore, it is decided that the inmate must be placed in a security cell to prevent violence against staff.

. . .

*Doctor called:* 15-08-2008 21.30 *Doctor recalled:*
*Medical inspection performed* 15-08-2008 22:15.
*Doctor's notes/summary:*

Is seen after he has been restrained in a security cell. He allegedly thought that the officers were banging on his door. They initially planned to move him to an observation cell, but he strongly resisted and was restrained for the safety of the staff. His imagined knocking on his cell has been going on for some time. I also gain insight into a diary-like stack of papers from which it appears that he believes the staff laugh loudly at him and knock on his cell. I spend 5 minutes in the cell, but get no feedback from the inmate. Asked about pain, need for medication etc.

. . .

Advised that he be moved back to his own cell as soon as possible, as the last time he was placed in a security cell, he lay there for over 24 hours without any educational effect being achieved.

His delusions are paranoid in nature, which is why psychiatric supervision is ordered as soon as possible."

The report also shows that after some initial threats and inappropriate language, A remained calm, although he completely refused to talk to the supervising doctor at 22:30 on August 15, 2008. At 8:43 am on August 16, 2008, it was assessed that A could not be taken back to his own cell as he had threatened to "tear the place apart" and uttered various insults. He remained calm until 13:57, when it is noted that he ignored an inquiry as to whether he was ready to move to his own cell. He ignored a similar inquiry at 19:13 on August 16, 2008 and did not respond to a request for water at 18:14. During a conversation with the supervising physician at 00:10 on August 17, 2008, he loudly stated that the officers were banging on the walls of his cell and, referring to one of the officers, that "the whore in the hallway is laughing at him". He also threatened to kill one of the officers if he got the chance. The doctor attempted a conversation, but A was very

shouting loudly. At 2:25 am, A tried to break free from the restraints while shouting death threats to a prison officer. At 2:40 am, it is noted that A was refused a flask to pee in because "he is far too violent and agitated for us to release the restraint". It appears that A was extremely threatening throughout the incident. At 2:55 am, he sat up and again threatened the life of a prison officer. After this, A remained calm and slept most of the time until 8:15 in the morning on August 17, 2008. According to the notes, he remained calm until 12:25 am, when he answered the prison staff's question as to whether he would be interested in going to the toilet and then to the observation cell and later in the evening back to his own cell: "I need to get out of this fucking shitty cell. You guys are fucking pigs. I'm going to smash everything", and showed a very hostile attitude towards the staff. Based on this, it was decided to let him stay in the security cell. At 14:14, A did not want to talk to the doctor who had arrived. At 14:30 he shouted and threatened with: "This will have consequences when I get out". At 15:45, A wanted to pee and 3 officers arrived to assist. He had in the meantime peed on the couch. There was a discussion about transfer to an observation cell with a view to later returning to his own cell when the watch commander arrived on Monday, but A wanted neither and refused to talk to the staff. After this, A remained calm again, but continued to refuse the offer of water. At 20:00 there was another conversation during which A complained about not being moved, but at the same time became increasingly angry and threatened the life of a prison officer. At 22:00, in connection with the removal from the security cell, it was noted that there had been a long and spacious dialog with A, which several prison officers had been involved in and helped to keep going. After using the toilet, A was transferred to an observation cell.

Report on observation cell placement immediately after the end of security cell placement from August 15, 2008 at 21:15 - August 17, 2008 at 22:11 in Copenhagen Prisons in the period August 17, 2008 at 22:12 - August 17, 2008 at 23:05 (a total of 53 minutes), it appears that A was placed in an observation cell as there was deemed to be a need for further observation. Reference is made to section 15(1)(3) of the Executive Order on exclusion from association.

In the report on the placement in a security cell in the East Jutland State Prison in the period December 8, 2008 at 11:05 - December 8, 2008 at 15:30 (a total of 4 hours and 25 minutes) it is stated, among other things:

*"Description of the incident:*

At 11:05 am today, inmates were restrained. This happened due to the following: Inmates who were temporarily placed in the visiting room due to visitation started shouting in the room. The undersigned, who was staying in the office, could hear the noise and rushed to the visitation area. Before I could get to the inmate visitation door, I could hear him kicking the door.

When ff. [Name], ff [Name], ff. [Name] and ff. [Name] had arrived, I opened the door. The inmate was clearly agitated. The inmate was yelling and did not want to be in the visitation room. He demanded some DVD movies and was very unhappy and agitated.

The undersigned explained to the inmate that we were very busy and he had to wait. This only agitated the inmate further. When the undersigned could not reason with the inmate, he was told to be calm and behave.

The door was then closed.

The inmate became more loud and threatening, shouting that things would go wrong and he would smash the room.

Considering the inmate's state of mind and previous behavioral pattern, I decided that the inmate should be placed in the observation cell.

Copyright © 2023 Karnov Group Denmark A/S

The door was opened again and the inmate was asked to come willingly to the observation cell, which he refused.

The undersigned now took hold of the inmate's left arm to lead him to the observation cell.

The inmate now lashed out at the undersigned. The inmate raised his arms with a clenched fist, but he was pacified on the floor.

The inmate was now handcuffed and transported to the holding cell where he was restrained.

Under notes, it is not completed under fixation to time and signature, which should be to 08.12.08 at 15.30."

The report also states that the intervention was terminated when A had remained calm for some time and had indicated that he would behave properly.

It appears from the East Jutland State Prison's statement of 5 February 2009 in connection with lawyer Claus Bonnez' complaint on behalf of A about the security cell placement, among other things, that the prison had found no basis for granting a request of 10 December 2008 from the lawyer to call in an external doctor, as the prison emphasized that the prison doctor is impartial in relation to the treatment of the inmates. Thus, complaints about medical treatment must be appealed to the Patient Complaints Board and not to the Directorate. The prison considered its duty to ensure medical supervision to be fulfilled by the supervision carried out by the prison doctor.

In the Directorate's decision of June 9, 2009 regarding attorney Claus Bonnez' complaint, the use of force and subsequent placement in a security cell was found justified.

**3082**

The report on exclusion from association shows that there has been exclusion from association with the possibility of association with fellow inmates in the period December 8, 2008 at 15:30 - December 16, 2008 at 10:30. Reference is made to section 63(1)(1) and (3) of the Execution of Sentences Act. The exclusion took place in continuation of the placement in a security cell in the period December 8, 2008 at 11:05 am - December 8, 2008 at 3:30 pm, see above.

In the report on the placement in a security cell in the East Jutland State Prison in the period January 22, 2009 at 14:20 - January 22, 16:50 (a total of 2 hours and 30 minutes) it is stated, among other things:

*"Description of the incident:*

Today afternoon, Ovm. [Name] will hold an interrogation of the inmate. During the interrogation, the inmate asks to be assisted by F. 211/08 A. During the interrogation, the inmate gets up from the bed and goes to the refrigerator to get some milk.

Then returns to his place on the bed. Briefly gets up again and walks towards the refrigerator again. Suddenly and very unexpectedly, the inmate turns around and strikes Ovm. [Name], who is sitting on a chair, twice in the face/head with a fist.

Also in the cell at the same time is ff. [Name]. In the above incident, ff. [Name] is also punched several times in the face and body. At the same time, A . . . jumps up from the bed. This happens very quickly and unexpectedly. [Unreadable] as if the incident has been agreed on conditions. The incident leads to a heavy scuffle.

In the hallway [illegible] and ff. [Name]. They immediately run into the cell, and ff. [Name] grabs [illegible]. A punches [illegible] several times in the face. [Name] several blows in the face. Likewise, [Name] manages to wriggle free and punches [Name] twice in the face. [Name] two blows to the face with a clenched fist. It is noted that [Name] is bleeding heavily from one eye, which is why he has difficulty restraining [Name].

All men are tumbling around on the floor and ff. [Name] restrains [Name] with body holds. In doing so, [Name] gives ff. [Name] a strong bite in the right chest. Ff. [Name] gets hold of A's right hand, which he tries to press into the eyes of ff. [Name]

The alarm is raised and the responding staff arrive and the two inmates are handcuffed. During this incident

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

Inmate [Name] resists very strongly and even four or five men have difficulty keeping the inmate on the floor. After the inmate is handcuffed, he is lifted/carried into the security cell. A is placed together in the security cell and straps are fitted in the holding cell. The fitting of the straps takes a few minutes and at the same time the helmet is examined by deputy inspector [Name] and security assistant manager [Name]. Throughout this process, the inmate continues to resist very strongly. As a result, the inmate managed to bite Deputy [Name]. [Name] in the left thigh.

The inmate then becomes tense and has difficulty breathing due to the commotion, which is why ward nurse [Name] is called. The inmate is subsequently given oxygen. The institution's doctor is called at the same time, see doctor's note."

The report also states that A repeatedly shouted, tore his clothes and threatened, most recently at 16:20, where he shouted threateningly about revenge, and that he was transferred to Copenhagen Prisons at 18:10. In the report on (continued) placement in a security cell in Copenhagen Prisons in the period 22 January 2009 at 19:30 - 24 January 23:00 (a total of 2 days, 3 hours and 30 minutes) it is stated, inter alia:

"*Description of the incident:*

inmates are placed in a security cell after transportation from East Jutland State Prison.

see report from East Jutland

the doctor is called at 19.45

management comments:

No comment on placement. See security cell report of January 22, 2009 from East Jutland where inmates roughly assaulted police officers in East Jutland. Stay: Inmates are restrained for 2 days, 3 hours and 30 minutes. The inmate is assessed by the supervisor on January 23, 2009 at 14:40 and is then released from the security cell on January 24, 2009 at 23:30. During this period, the inmate has been calm. In normal circumstances, this would be far too long. The inmate is known from previous placement at the police station, where the inmate is calm while he is restrained, but becomes violently agitated and is threatening during conversation. The inmate is paranoid and has difficulty with change, which is why they have waited for the inmate to talk to ensure that the inmate got out of the security cell and restraint as quickly as possible. The inmate is very special and extremely unfit to be in prison, which is why the long period in the security cell falls under the rules for fixation in the security cell." The report also states that upon arrival, A wanted to threaten the lives of the prison staff at Østjyllands Statsfængsel

"put on record" and that he seemed angry and obstinate, but also that he himself settled down. During the continued placement until 23:30 on January 24, 2009, when he was removed from the security cell and restraint, it is generally noted that A was calm/quiet. It appears that when staff attempted to contact him on January 23, 2009 at 12:50 and 14:40, he refused contact and asked the staff concerned

"fuck off" and that at 20:56 he signaled to the staff to have his blanket turned over, which was done. On January 24, 2009 at 17:40 he was offered food and drink, but did not want it. On the same day it is noted that at 19:30 he was offered water, but "refused it". At 22:50 he requested

**3083**

A asked for a urine flask, which he was given. He refused water and asked to go to his own cell. According to the notes, it was then assessed that he could go to his own cell, after which he was removed from the security cell on January 24 at 23:30.

In the report on the placement in security cells in Copenhagen Prisons in the period February 23, 2009 at 17:05 - February 24, 2009 at 14:40 (a total of 21 hours and 35 minutes) it is stated, among other things:

"*Description of the incident:*

The inmates have been getting more and more agitated throughout the day. Inmates have previously banged on the door due to a missing pen after

Copyright © 2023 Karnov Group Denmark A/S

conversation with the priest The inmate was told to stop this, which continued for some time. During the distribution of dinner, the inmate becomes agitated again, the staff arrives and tries to have a conversation. However, the door is kept closed tightly as the inmate tries to tear it open. It is assessed that there is a risk that the inmate will throw something out through the door, and the fact that he has just been given hot water is also considered. As we leave the cell, noise is heard from the cell and it is decided to go back to the cell. As there is a chain on the door, it is deemed too dangerous to stick your head in, so the chain is removed and the door is opened to assess the inmate's mental state. In the cell, the inmate's chair is broken on the floor and the inmate is violently agitated and threatened, and when the inmate is attempted to be removed by grabbing his arm, he becomes so violent that he is knocked down on the bed, with several officers above him. The inmate is restrained by force and handcuffed. The inmate is then taken to security cell 100 and restrained."

The report also states that shortly after being deployed, A refused to be seen by a doctor. At 19:45 on February 23, 2009, he sat up and shouted at the door "What are you looking at you idiot". He then lay still until 10:15 am on February 24, 2009, when, while being seen by a psychiatrist, he became very agitated and threatening in his behavior. At 12:45 he called and expressed that he wanted to return to his room. It is noted that he was agitated. At 14:40 he had a conversation with the area manager, who noted: "Inmate is reasonably calm, but feels unfairly treated and accuses staff of assaulting him. As the inmate has mostly been calm, he is removed and returned to his own cell." A was then removed from the security cell and restraint.

In the report on the placement in a security cell in the East Jutland State Prison in the period March 4, 2009 at 23:55 - March 5, 2009 at 8:25 (a total of 8 hours and 30 minutes) it is stated, among other things:

*"Description of the incident:*

On 4/3-909, the inmate was to be picked up from the police station and transported to East Jutland State Prison, because he was to appear in court in Horsens the next day.

We left East Jutland at 18:00 and arrived at the police station at 21:10. We had been told by the staff at the police station that inmates would not voluntarily come to East Jutland.

When the door to the cell was opened, the undersigned entered the cell, followed by [Name], [Name] and [Name]. The inmate was sitting on the bed and he was asked to come out of the cell voluntarily. the inmate refused and immediately became agitated. He was again asked to follow voluntarily. this further agitated the inmate and he refused to follow.

Yours truly wanted to grab the inmate's arm, but he tried to avoid me and was then pacified on the cell floor. [Name] and [Name] had arm restraints, [Name] did leg restraints and the undersigned did a body hold.

The inmate was handcuffed and transported to the car, where the inmate was now so violent that it was necessary to put him in the bottom of the car.

We left the police station at 21:35 and arrived in East Jutland at 23:50. The inmate was still very agitated and threatening, which is why it was necessary to restrain him in the security cell at 23:55."

The report also states that until 1:30 am on March 5, 2009, A continuously used abusive language towards the staff and the supervising doctor and challenged a prison officer to a fight. A then lay calmly and slept occasionally until he was removed from the security cell at 8:25 am on March 5, 2009.

The report on placement in an observation cell in Copenhagen Prisons in the period 13 April 2009 at 19:15 - 16 April 2009 at 10:05 (a total of 2 days, 14 hours and 50 minutes) states that A started threatening a prison officer when the officer told him not to talk to another inmate through the windows, and

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE    U.2014.3045Ø - FED2014.138OE

further threatened other prison officers when they tried to get him to calm down. It was then decided to bring him to the observation cell. In this connection, A lashed out at a prison officer and tried to headbutt him. A resisted violently and tried to hit the staff with punches and kicks. It became necessary to use batons to handcuff him and take him to the observation cell. The report refers to section 15(1)(3) of the Executive Order on exclusion from association. After being placed in the observation cell, he continued to shout threats and obscenities at staff and kicked the door. During the management's report, it was pointed out that notes were missing at several times on April 14 and April 15, 2009. The notes from 20:45 on April 13, 2009 show that A was calm, but during a conversation with supervisor C at 10:49 on April 14, 2009, he became agitated and ended up shouting and screaming. At 19:02 on

On April 14, 2009, he ran towards the door, punched

**3084**

on it and threatened the staff. He did not want any contact with the staff after that, but remained calm until April 15, 2009 at 11:45 am, when he stood up and shouted that the officers would be sorry and that they were "gay cops". At 16:45, it is noted that C again tried to have a conversation with A, but that he again became agitated, and it ended with C having to leave the cell, after which A shouted and screamed for 10 minutes. Later in the day at 17:21 there is a note about shouting and screaming and threats against the prison staff, at 21:00 about insults against a prison officer and at 22:10 about shouting and screaming. Throughout the process, A had refused offers of food and drink. On April 16 at 11:52 a.m., a note is made by the supervising doctor stating that A is very affect-labile, but not psychotic, and that the staff is observing with a view to continued protest eating. At 13:42 there is a longer note by C about A's refusal to eat and uncertainty as to whether he has drunk the water put in by staff or thrown it out. It is stated that the staff considered it essential that he returned to his own cell to perhaps improve his condition. A, who had thrown food scraps on the wall, was offered to return to his own cell if he could accept being handcuffed during transportation. He refused, but the staff then forcibly handcuffed him and took him back to his own cell without any resistance on his part.

On October 14, 2009, pursuant to section 78 of the Execution of Sentences Act, the Directorate decided to transfer A to the Security Department at the Psychiatric Hospital in Nykøbing Zealand to serve the remaining part of his prison sentence. Prior to this, A had been transferred to the Security Department on May 26, 2009, and he has not since been placed in ordinary prison.

*Criminal convictions etc. and measures for transfer to the Security Department*

In a letter dated June 3, 2004 to the Ministry of Justice from Chief Physician G, Herstedvester Prison, it is stated, among other things:

"It is hereby requested that a decision be made that the above-mentioned person be placed in the Security Department in Nykøbing Sjælland pursuant to section 40 of the Act on Deprivation of Liberty and Other Coercion in Psychiatry, as it is presumed that A is insane. It is also assessed that A is extremely dangerous to the life and limb of others.

. . .

*Conclusion:*

This is a 33-year-old man who has been sentenced to custody for violence. During his stay in prison he has regularly been very threatening and violent. Mental observation statements

were issued in 1988, 1991, 1994, 1998 and most recently in January 2003. Four of the statements - including the last one in January 2003 - were issued on an outpatient basis. In four of the statements it has been concluded that A is

Copyright © 2023 Karnov Group Denmark A/S

personality disordered, but not psychotic. In the statement from 1998 it was concluded that an incipient insane development in recent years could not be excluded with certainty. A can at times behave quite controlled, polite and friendly. Therefore, it was deemed that there was a need for thorough observation during a long-term hospitalization in a psychiatric ward with a view to a final diagnostic clarification. For a long time now, A has periodically expressed ideas that can be interpreted as insane. For a period of months in 1999, he has benefited from antipsychotic treatment. For safety reasons, A cannot be hospitalized in a forensic psychiatric ward.

It is therefore requested that the patient be placed in the Security Department in Nykøbing Zealand for the purpose of diagnostic clarification and initiation of relevant treatment."

The Ministry of Justice responded as follows by letter dated June 17, 2004:

". . .

After a review of the case, the Ministry of Justice hereby announces that the Ministry finds *no* basis for granting the request for a dangerousness decree, as the Ministry, after a concrete assessment, has not found that the conditions for detaining the person concerned in the Security Department are met.

In its decision, the Ministry of Justice has attached decisive importance to the opinion of the Forensic Medical Council that it is uncertain whether A is insane. The Ministry of Justice has also attached importance to the fact that the Council does not find that A currently poses such a persistent, serious and imminent danger to the life or body of others that the Council can recommend transfer to the Security Department, cf. section 40(1) of the Psychiatry Act." In a statement from Consultant G dated August 23, 2005, it is stated:

". . .

It is hereby requested that efforts be made to obtain a court order so that the above-mentioned can be mentally observed during hospitalization in the detention facility in Nykøbing Sjælland.

. . .

*Conclusion:*

A has a very severe personality disorder and clinically there has been a sharp deterioration in his condition within the last 1½ years. He is far more affectively labile than he has been previously. There have been several episodes of threats and violence (copy of reports attached). It is impossible to establish a contact with him that allows an exchange of information and views, one must almost describe him as autistic in his form of contact. He comes in a state of strong affect with no other trigger than his own ideas of revenge and violence.

**3085**

In the present case, it is assessed that A is in a state that can be equated with a psychotic state.

On August 22, 2005, the issue was discussed with the Prison and Probation Service's psychiatric consultant, consultant psychiatrist [Name]. He agrees with the institution's assessment and also recommends mental observation during hospitalization at the detention facility in Nykøbing Sjælland." On August 24, 2005, the Director of Public Prosecutions stated in a submission to the Public Prosecutor for Zealand:

"In the enclosed recommendation, the Herstedvester Prison has, after discussion with consultant physician [Name], Ministry of Justice, Psychiatric Clinic, recommended that A be mentally observed during hospitalization in the security ward at the Herstedvester Prison. It should be noted that the Chief of Police

in Glostrup has stated that the State Prosecutor has recently rejected a similar recommendation from the Chief of Police on a different basis. I shall request the Director of Public Prosecutions to make a decision on the matter, cf. Attorney General's announcement no. 5/2002.

. . ."

On March 15, 2005, an indictment was filed with the Court in Glostrup against A in connection with the knife attack that led to his placement in a security cell at Nyborg State Prison on August 10, 2004. In addition, charges were brought for the violence and threats against prison officers at Vridslø- selille State Prison on April 30, 2004, which gave rise to the transfer to and placement in a security cell at Herstedvester Prison on April 30, 2004 and for threats against the prison officers at Herstedvester Prison during the placement in the security cell in the afternoon and evening of April 30, 2004.

An undated mental statement obtained during the case pursuant to Glostrup Court's order of September 28, 2005, which was prepared by [Name], chief physician at the Security Department at the Psychiatric Hospital in Nykøbing Zealand, appears, among other things:

*"Conclusion*

The observer is therefore not insane, but must be considered to belong to the group of persons referred to in section 69(1) of the Penal Code. There are no circumstances indicating that measures pursuant to section 68(2) of the same Act would be more appropriate than punishment. Based on the current mental examination, no other sanction can be recommended than detention pursuant to section 70 of the Penal Code.

On the basis of the case file and the observer's wishes, it is recommended that the continued detention takes place in Vridsløselille State Prison, where there have reportedly been the fewest problems."

The statement states that the examination was prepared during hospitalization at the Security Department.

At Glostrup Court's judgment of August 31, 2006, A was sentenced to imprisonment for 8 months for violation of section 119(1) of the Danish Criminal Code, partly cf. section 245(1), cf. section 247(1). He was found guilty on count 1 of having assaulted a prison officer with a knife at Nyborg State Prison on August 10, 2003 at approximately 4:15 p.m. (the incident that gave rise to his placement in a security cell at Nyborg State Prison on August 10, 2003). In addition, he was found guilty of count 2 by having punched a prison officer in the face on April 30, 2004 at approximately 12 noon in Vrids løselille State Prison and by having threatened another prison officer with raping his wife and killing his children and by having threatened several prison officers during the afternoon and evening after transfer to Herstedvester Prison, i.e. while in the security cell, that they would be "killed", that he would

"smash" them and that he could "take a killing along the way". Case 2 concerns the violence and threats that led to the transfer to Herstedvester Prison, where A was placed in a security cell, cf. the relevant report. It appears from the judgment that the court based its decision on the notes about the threats in section 3 of the report on the placement in a security cell. A was acquitted on count 2 for biting a prison officer's finger and was also acquitted on count 4, which concerned a threat under section 119(1) of the Penal Code on July 31, 2004 against a prison officer. As far as can be seen, the latter case has no connection with the interventions that are the subject of this case.

In a letter dated October 5, 2006 from the Chief of Police in Glostrup to the Directorate, it is stated, among other things:

"The case raised in the indictment of March 15, 2005 has now been finally decided by judgment of August 31, 2006, which is attached for information. Regarding the handling of the case, it should be mentioned that the case was greatly enhanced by the defendant and his defense counsel's wish to use the courtroom

as a platform for more general criminal policy views.

The following pending cases remain to be decided, all provisionally gathered here at the office for assessment as a whole:

| litra | j.nr. | Date and time | Re. | institution |
|---|---|---|---|---|
| A | 3800-84110-00190-04 | 19-10-2004 | Possession of 0.3 g hash | Herstedvester |
| B | 2500-70311-00010-05 | 05-04-2005 | verbal death threats § 119 | Nyborg |
| C | 2500-70311-00011-05 | 13-04-2005 | attacks with knives by mirror glass | Nyborg |
| D | 2500-70311-00009-05 | 13-04-2005 | attacks with knives by mirror glass (same case) | Nyborg |
| E | 2500-70311-00008-05 | 13-04-2005 | Corporal assault in for evening meals (same case) | Nyborg **3086** |
| F | 0700-70311-00070-05 | 27-07-2005 | verbal death threats § 119 | Herstedvester |
| G | 0700-70311-00071-05 | 27-07-2005 | verbal death threats § 119 | Herstedvester |
| H | 0700-70311-00081-05 | 30-09-2005 | Several days of verbal Threats to personal safety The room at Anstalten at Herstedvester | Herstedvester |
| I | 0700-70311-00081-05 | 30-09-2005 | verbal death threats § 119 | Herstedvester |
| J | 3800-70311-00020-06 | 04-07-2006 | Verbal death threats and corporal assault § 119 | Horsens |
| K | 3800-70311-00022-06 | 05-07-2006 | verbal death threats § 119 | Horsens |
| L | 0700-70311-00072-05 | 16-08-2006 | verbal death threats § 119 | Herstedvester |
| M | 0700-70311-00073-05 | 19-08-2006 | verbal death threats § 119 | Herstedvester |

When reviewing the criminal register today, the list appears to be exhaustive for the number of pending cases."

By Svendborg Court's judgment of 21 August 2007, A was sentenced to imprisonment for 4 months for violation of section 119(1), cf. in part section 21, section 121, section 245(1), cf. section 247(1), cf. in part section 21, cf.

§ 89. Offenses 2 and 3 concerned qualified violence in cases of repetition and attempted violence as well as violation of section 119(1), cf. partly section 21, of the Danish Criminal Code committed on 13 April 2005 at Nyborg State Prison, where A threatened the lives of two prison officers with two pieces of mirror glass approximately 25 cm long made as knives and attempted to assault one of the prison officers with these mirror glasses, which he threw at the prison officer. These circumstances coincide in time with the placement in a security cell in Nyborg State Prison from April 13, 2005 at 22:10 to April 15, 2005 at 09:41, which is stated in the overview from the Attorney General's Office and which belongs to the placements where the report is not included in the extract. A was also found guilty of two counts (counts 4 and 5) concerning violation of section 119(1) of the Danish Criminal Code by having assaulted two prison officers on July 4, 2006 in Horsens State Prison with blows to the face and shoulder and by having threatened the lives of two other prison officers and by having threatened to kill a prison officer on July 5, 2006 in Horsens State Prison. The first of these circumstances is the incident which, according to the report on the placement in a security cell at Horsens State Prison in the period July 4, 2006 at 18:05 - July 5

Copyright © 2023 Karnov Group Denmark A/S

2006 at 14:15 gave rise to, among other things, placement in a security cell. According to the report, the threat on July 5, 2005 is the one made when A was removed from the security cell to be transferred to Politigården Prison. In relation 6, A was found guilty of violating section 119(1) of the Penal Code, cf. in part section 21, by having assaulted a prison officer at Politigården Prison on September 11, 2006 by kicking him in the stomach and attempting to headbutt and spit on him and threatening his life. In a report on security cell placement from Copenhagen Prisons in the period

September 11, 2006 at 14:50 - September 11, 2006 at 17:13 the conditions in question are mentioned.

In a letter dated July 31, 2008, the Directorate stated to A's lawyer, Attorney Claus Bonnez:

" . . .

The Ministry of Justice, Department of Prisons and Probation, can inform you that the Department intends to work towards Section 78 placement of your client in the Detention Center in Nykøbing Sjælland.

In this connection, the Department will ask whether your client still wishes to be placed in the Detention Facility in Nykøbing Sjælland. The Department can inform you that the case will be processed in accordance with the rules in section 78 of the Execution of Sentences Act and in accordance with the procedure mentioned in section 3(2) of Ministry of Justice Order no. 571 of July 5, 2002 on the placement of convicted persons in institutions etc. outside prison or remand home (the section 78 Order)."

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

On September 8, 2008, the Directorate wrote to the Detention Center, Psychiatric Hospital Nykøbing Zealand, among other things:

"The Ministry of Justice, Department of Prisons and Probation, shall request a statement regarding the placement of A in the Security Institution pursuant to section 78 of the Execution of Sentences Act.

If the institution objects, the Directorate intends to apply the procedure mentioned in section 3(2) of the Ministry of Justice's Order no. 571 of July 5, 2002 on the placement of convicted persons in institutions etc. outside prison or remand home."

In a letter dated September 11, 2008, Chief Physician [Name], Security Department at the psychiatric hospital Ny- købing Sjælland, stated:

". . .

I regret that we cannot receive the above under section 78 of the Execution of Sentences Act. Nor do I believe that it is possible for the Department of Prisons and Probation to apply the procedure mentioned in section 3(2) of the Ministry of Justice's Executive Order no. 571 of July 5, 2002 on the placement of convicted persons in institutions

etc. outside prisons or detention centers. I would like to refer to the Security Department's regulations, section 2, which states that "the department admits mentally ill persons who, by judgment, order or administrative resolution pursuant to section 40 of Act no. 331 of 24 May 1989 on deprivation of liberty and other coercion in psychiatry, it is determined that security measures should be taken against them." However, only persons who have been

**3087**

deemed suitable by the Ministry of Justice. In addition, remand prisoners are admitted to hospital mental observation pursuant to section 809(2) of the Danish Administration of Justice Act when they are considered by the prosecuting authority to be so personally dangerous or the risk of absconding is so great that observation in the Security Section is required. Otherwise, remand prisoners are only received in accordance with section 777 of the Administration of Justice Act.

. . ."

In the Directorate's letter of January 22, 2009 to the Director of Public Prosecutions, it is stated, among other things:

"The Department finds that the case should be resolved by applying to the Ministry of Justice for an exemption from the rules on confinement in the detention center.

On January 20, 2009, [Name], the chief medical officer at the detention facility in Nykøbing Zealand, informed the directorate by telephone that in connection with a pending case with the Copenhagen Police, A had requested a mental examination at the facility, where he is now on the waiting list.

The Department can inform that the Department intends to postpone the case concerning section 78 placement until the results of the mental health examination are available."

*The time after placement in the Secure Care Unit*

In a letter dated August 19, 2010 to the Ministry of Justice, Chief Physician [Name], Security Department at the psychiatric hospital Ny- købing Sjælland, stated, among other things:

"The patient started compulsory treatment at the beginning of October 2009 with tablet Zyprexa 10 mg daily.

The patient slowly responded to Zyprexa treatment.

On 13.10.2009, the patient stated that he would like to take Zyprexa voluntarily.

The patient has been treated with antipsychotic medicine tablet Zyprexa 20 mg since.

The patient has been friendly and sociable in the ward. The paranoid symptoms have faded completely. The patient has enjoyed socializing with fellow patients.

The patient has full communion in the ward since 30.7.2009. In connection with the compulsory treatment, it was thus possible to maintain full communion.

The patient has been seeing a psychologist since he arrived, as he has many experiences from his long time in prison that he needs to talk to a psychologist about."

On August 6, 2010, an indictment was received by the Copenhagen City Court charging A with violation of section 119(1) of the Danish Criminal Code in connection with the three above-mentioned security cell arrests in the period from December 20, 2006 at 2:55 pm at Copenhagen Prisons and from 14:55 at Copenhagen Prisons, in the period from June 12, 2007 at 13:15 at Copenhagen Prisons and in the period from January 22, 2009 at 14:20 at the State Prison in East Jutland and continued on January 22, 2009 at 19:30 at Copenhagen Prisons, as follows:

"1.

*Section 119(1) of the Penal Code,*

on December 20, 2006 at approximately 2:30 p.m. while serving time at Politi- gårdens Prison, Copenhagen V, the defendant assaulted prison officers [Name], [Name] and [Name] with violence or threat of violence by striking [Name] on the left cheek with a fist, biting [Name] on the right leg and repeatedly telling them all that he would "kill them and their mothers" or the like.

2.

*Section 119(1) of the Penal Code,*

On June 13, 2007 at approximately 10.20 am, while serving time in Politigården Prison, Copenhagen V, the defendant assaulted the prison officer on duty, F, with violence or threat of violence, by shouting at F: "I will smash you when I get out", "You are a dead man", "I will hang you when I get out", and "I will fucking kill you" or similar.

3.

*Section 119(1) of the Penal Code,*

on January 22, 2009 at approximately 2:10 p.m. while serving time in the East Jutland State Prison, Horsens, and as an assistant to a fellow inmate during his disciplinary hearing, assaulted the prison officer on duty, [Name], with violence or threat of violence, as the defendant gave [Name] several blows with his fist, including in the neck, jaw and throat."

At the request of the defense counsel at the court hearing on 5 September 2008, a mental observation statement dated 30 September 2009 had been prepared by consultant physician [Name], the Security Department at Nykøbing Zealand Psychiatric Hospital. The statement states, among other things:

*"Conclusion*

It is a 38-year-old man who has been charged with violence. He has previously been mentally examined 6 times without being found insane, but rather deviant in character with a paranoid personality disorder.

In the current mental examination, the observer was found to be normally gifted and does not suffer from epilepsy.

At the time of the alleged offense, he was not under the influence of drugs or euphoriant substances.

The observer was found to be insane during the examination and he is also considered to have been insane at the time of the alleged offense.

The psychological examination supports the diagnosis.

The observer is found to suffer from paranoid schizophrenia and is covered by section 16(1) of the Penal Code.

If the defendant is found guilty of the charges, in view of the defendant's mental illness and violent reaction pattern, a sentence of placement in a psychiatric hospital must be recommended."

On the basis of the mental statement, the prosecution requested that A be sentenced to indefinite placement in

**3088**

The security ward at the psychiatric hospital Nykøbing Sjælland.

In the premises of the Copenhagen City Court's judgment of February 25, 2011, it is stated:

*"Re relationship 1:*

All jurors and judges give their verdict:

The Court does not find it proven with sufficient certainty for conviction that the defendant has struck prison officer [Name] with a fist on the left cheek, or that the defendant has repeatedly stated to prison officers [Name], [Name] and [Name] that he would "kill them and their mothers" or similar. The court has emphasized that none of the witnesses in court have been able to explain this sufficiently clearly, not even after having read the police reports. The defendant is therefore acquitted of this part of the indictment. According to the statements of the witnesses [Name], [Name], [Name] and F, the court has found it proven that the defendant bit [Name] on the right leg at the junction between the boot shaft and the leg just below the knee.

According to the evidence, the court also found that the prison officers entered the defendant's cell with the intention of placing the defendant in a security cell if he would not stop screaming and shouting.

The Court finds that the use of force used by the prison staff to place the defendant in a security cell was in violation of section 66 of the Execution of Sentences Act, as the conditions for placement in a security cell under this provision were not met. The defendant's bite is therefore found not to be attributable to the § Section 119(1), but must be classified under Section 244 of the Penal Code.

The Court finds that the defendant's bite was triggered by the unreasonable use of force in which [Name] participated. Under these circumstances, the court finds that the defendant's act is not punishable under the Danish Criminal Code.

§ 13(1).

*Re relationship 2:*

4 jurors and 3 judges give their verdict:

After witness F's testimony compared to his memo of June 13, 2007, these voters find it proven that the defendant has made the threats stated in the indictment.

According to the evidence, these voters have also assumed that the defendant was placed in the security cell from the afternoon or evening of June 12, 2007. The prosecution has not proved that the duration of the placement in the security cell was proportional. These voters therefore find that the placement of the defendant in the security cell had been too long at the time of the crime, when F came to see the defendant.

It must therefore be assumed that the defendant was subjected to an excessive use of force, which is why the defendant's statements cannot be attributed to section 119(1) of the Danish Criminal Code, but must be attributed to section 266 of the Danish Criminal Code due to their nature.

Furthermore, these voters do not find that section 13 of the Penal Code applies.

2 jurors say:

We do not find it proven that the defendant has made the threats stated in the indictment.

*Re relationship 3:*

5 jurors and 3 judges give their verdict:

According to the statements of witnesses [Name] and [Name] in connection with the available police certificate, it must be assumed that the defendant struck [Name] twice in the head with his fist.

These voters do not find that the stated facts about the defendant's imprisonment over the years can lead to the acquittal of the defendant.

These voters find it proven to the extent stated that the

defendant is guilty of violating section 119(1) of the Danish Criminal Code.

1 juror states:

I find after the divergent explanations that it has not been proven that the defendant is guilty of the charge.

Copyright © 2023 Karnov Group Denmark A/S

The question of guilt shall be decided in accordance with section 891(4) of the Danish Administration of Justice Act.

*Thi is determined:*

In count 1, the defendant, A, is acquitted.

In count 2, the defendant is found guilty of violating the Criminal Code

§ 266.

In count 3, the defendant is found guilty of violating the Criminal Code

§ Section 119(1).

*Sanctions*

12 votes were cast in favor of the defendant being insane at the time of the crime due to insanity or a condition that can be equated with insanity.

The court has emphasized the Forensic Medical Council's statements compared with the other medical information about the defendant's personal circumstances, according to which the defendant at the time of the crime was insane due to mental illness or a condition that can be equated with mental illness.

The defendant is therefore not punished, cf. section 16(1) of the Danish Criminal Code.

12 votes were cast for the defendant to be sentenced to confinement in a psychiatric ward, cf. section 68 of the Danish Criminal Code.

The court has emphasized the nature of the offenses, the defendant's previous crime and the medical information and found that less intrusive measures are not sufficient, which is why it is necessary for the defendant to be placed in a psychiatric ward to prevent him from committing serious crime again.

Twelve votes were cast in favor of setting the length of the sentenced measure at 5 years, cf. section 68a(1) of the Danish Criminal Code.

**3089**

The Court has emphasized the information about the offence in case 2 compared with the fact that the defendant was subjected to excessive use of force at the time of the offence, and found that there are mitigating circumstances that may lead to a reduction in sentence under section 83(2) of the Danish Criminal Code. The Court has further found that in case 2 there is a reason for a reduction in sentence under section 82(13) of the Danish Criminal Code, cf. Article 6 of the Human Rights Convention, due to a long case processing time that cannot be attributed to the defendant. Against this background, the court found no basis for allowing the conviction for violation of section 266 of the Danish Criminal Code to lead to the non-determination of a maximum period under section 68a(2) of the Danish Criminal Code. Furthermore, the court has found that the violence in relation 3 cannot be considered a serious crime of violence as set out in section 68a(2) of the Danish Criminal Code.

. . ."

A was sentenced to placement in a psychiatric ward for a maximum period of 5 years. In addition, it was decided that the Supreme Court's judgment of March 15, 1999, Glostrup Court's judgment of August 31, 2006 and Svendborg Court's judgment of August 21, 2007 lapsed.

*Explanations*

Statements have been given by A, area manager B, chief warden C, prison officer D, deputy prison warden E, area manager F, consultant G and doctor H.

*A* has explained, among other things, that during his imprisonment at Herstedvester Prison, he initially served his sentence in reception ward C. It was an ordinary cell with a TV, playstation etc. It was an ordinary cell with TV and playstation etc. He was there most of the time, except for stays in observation and security cells from 1999-2000. He was in the general community and worked at the production school. In 1999 he met a girl, [Name], with whom he fell in love. Due to an episode of violence, he was placed in Vridsløselille for about a month in 1999. [Name] hanged himself while he was in Vridsløselille. He came back to Hersted-West. He hoped that the psychologists and psychiatrists at Herstedvester could get to his heart. He came back to ward C. He had been given a large dose of a stesolid-like drug while he was in Vridsløselille. The dose was heavily

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

set up at Herstedvester. He pointed this out on the first night. He was scolded by a guard. It happened again the following evening. He was then moved to Ward I, which is the isolation ward. He was not given any explanation. He was put in an empty observation cell. As was usual for observation cells, it was equipped with a bolted bed with a rubber mattress and bolted table and chair. He tried to hang himself twice and tried to cut his arm open on himself with some wire. Staff attended and he tried to cut his arm again. He hit one of the guards with the wire and was accused of trying to take out the guard's eye. He was put in a holding cell and restrained. There were two more ordinary cells in Ward I with normal chairs, beds etc. There was a piece of cardboard covering the window to these cells, so the guards could not look in the same way as in the others. He was allowed to live in one of these cells for a few months. He did not have access to his own things during the time he was in Ward I, except for the period when he was in the normal cell. He was eventually allowed to move to Ward K, where he went to work without any problems and had normal fellowship.

Security cells are furnished with a bed in the middle of the floor with a rubber mattress, abdominal belt and hand and foot straps. There is a small room attached from which staff can look in, while the inmate cannot look out. It is fully lit around the clock. When he was in a security cell, the heat was not regulated as he wished. If he was lucky, he had a blanket put over him. Sometimes he was naked. Other times he wore underpants and a t-shirt. He couldn't take water for himself. When he had to eat, he sometimes had an arm untied. He has also been fed. Being in a security cell quickly makes you feel strange. The staff thought it was "hilarious" to see how far they could push him.

At Vridsløselille in 2000-2002, he had general fellowship. When he returned to Herstedvester in August 2005, he was told that there was only one officer he could approach. During a walk, another officer approached him and was threatening. A few days later, he was called in for questioning by the warden [Name]. The prison officers had "turned it around", so he was the one who had been threatening the officer. He tried to explain himself. Another officer said that after the interrogation he would be moved to an observation cell, which was without television and playstation and where he was not allowed to smoke. The guard assured him that he would not be moved. The guard did not believe his explanation that it was the officer who had threatened him. He said that he would have to take action himself. He went back to his normal cell. The officer came back and told him to move. He refused. The officer said they wouldn't carry him, they would gas him instead. He said they would just have to do that. They emptied a full cartridge of tear gas into him and then another cartridge. He weighed only 64-65 kg at the time, and they could easily have carried him. He landed in a way that he doesn't remember on the floor. He heard someone shouting:
"Get him out of here," and that it had to be now. He fainted again and woke up while being carried to the holding cell. He was there for 5 days without being washed, given water, etc. The report says it was for 2 days, but it was 5 days. He was given a shower and clean clothes before he was taken to the

**3090**

The security ward at Nykøbing Zealand. It was stupid of him to accept the offer of a shower etc. because the staff up there could not see how dirty and miserable he was after lying in his own urine in the clothes he was wearing when he was restrained. He had to pee out of the bed, but it partially ran back. The urine on the floor was also not wiped up, so he was lying in an ammonia vapor. At the police station, he was first placed in cell 20, which

was a normal cell. Otherwise, he has always been in cell 17, which was

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

with a bolted bed, a clogged sink and peeling paint. Each time he got the same duvet with no filling. It was a lie when they said they had no other duvets. For a good word, he was thrown into the security cell. They beat him on the way there, in the elevator and in the cell. Once, he was swung into the wall on the way into the security cell and got a concussion. He was put in a holding cell when he talked back or shouted out. They banged spoons and forks and keys on the cell door and walls. He was always handcuffed when he had to go to the toilet, even if he was quiet and calm. They were fastened so tightly that they were hard to get off. Sometimes he was left in the toilet for 1 - 1½ hours. He could hear them talking about how fun it was to bang on the walls. He hardly spoke to the staff at Copenhagen Prisons, who were "fucking pigs" in relation to him.

In 2001, he spent a short period of time in voluntary isolation at Vridsløselille to get out of heroin addiction. He was respected by the other inmates in the prison for getting out of his addiction in this way. During the 6 years of isolation/rotation scheme from 2003-2009, he had virtually no contact with other inmates. However, he did socialize with other prisoners for a very short period at Nyborg. The first time he was in Vridsløselille after the rotation scheme was introduced, he also had fellowship with the gang leader and with the others in solitary confinement for a period of about 1½ months. It is the prison chaplains who have kept him alive. He either visited them in their office or they came to his cell. He was not allowed to attend church services during his isolation. At Vridsløselille, the inspector made a special arrangement about the number of pieces of clothing and other private belongings he was allowed to have. In the other places, there were no such written rules. In Ward I at Herstedvester, he was not allowed to keep his clothes in the observation cell, which was set up "normally", but he was allowed his playstation and cigarettes. When he needed clean clothes, he had to ask for them.

In East Jutland, the cells were nicely decorated so they didn't look like prison cells, and each cell had its own shower. He spent most of his time in the

E. There was a group of prison guards trying to create better conditions and then a group of "sadists". At one point, someone had seen him on camera with a cigarette in the workshop and asked him to put it out. He subsequently gave the camera a fuck finger. Just after work, a police officer informed him that all his privileges (food money, access to work, etc.) had been withdrawn. At the end of his sentence at East Jutland, he was to attend an interrogation with a good friend [Name], with whom he was often together when he had fellowship. [Name] had tried to escape. Two guards came with grins on their faces and took him to [Name]'s cell. They had already started the interrogation, even though he should have been present from the start as an advisor. He interrupted and asked the guard to start over. The guard ignored this. [Name] looked sleepy because he was on strong psychotropic medication. [Name] went to grab something from the fridge. He saw nothing but the guards grabbing [Name]. He didn't see anything to suggest that [Name] had struck out at one of them. He got up himself, but was thrown to the floor. He heard one of the guards shout: "Just kill [Name]". Both he and [Name] were carried to separate holding cells. He heard a nurse call out and understood that they had to resuscitate [Name]. He had sensed from the start that something was planned to happen inside [Name]'s cell. He was moved to the police station and was beaten up like never before.

After 4 months in Horsens, where he had full fellowship with the inmates in the infirmary and with everyone during the

walks, he was moved to Nyborg. In Horsens, he had been physically unwell for a few days. A lot of guards came in and said that he should be moved to Nyborg. He voluntarily agreed and was placed in Nyborg in a specially secured cell with iron brackets on

Copyright © 2023 Karnov Group Denmark A/S

The door. He was handed a dirty thermos and when he asked for cleaning products, he was given a dirty dishwashing brush. One day when he was washing clothes, he was not allowed to pick them up from the washing machine. In the end, his wet clothes were thrown somewhere else. After a while, he became so afraid of the guards that he didn't dare go out into the hallway.

Among other things, *B* has explained that he is employed by Copenhagen Prisons as an area manager at Vestre Prison. He has previously been a prison officer at Herstedvester Prison from 1989 to 2006. He was a permanent member of Ward I and also worked as a guard in VK1. He met A in prison. His general impression was that A did not like the uniformed staff and felt unfairly treated.

Presented with a report on the security cell from August 19, 2005 at 13:05 on the use of gas, the witness explained that cell I5 is an observation cell. It is furnished with a fixed bed, table etc. Cell I6 was a cell that was furnished more normally with television, playstation etc. It was agreed with A that he could live in the latter cell when he complied with

**3091**

the prison stay. There was a cupboard on the other side of the corridor where he could keep his other belongings. An agreement, approved by the management/psychiatrists, had been made with A about what he had to comply with in order to stay at I6, including behavior in relation to staff, medication, hygiene, etc. The rule was that if he did not comply with these rules, he would be placed in an observation cell (cell I5). All observation cells have a window so you can see into the cell. Both cells were set up in this way. Cell I7 is a security cell where, in accordance with legal regulations, violent prisoners are placed. There is a linoleum floor, a bed in the middle of the floor and a belly belt, foot straps, hand straps and gloves. In Copenhagen Prisons, for example, you can be placed in a security cell without being restrained. This has also happened in security cell I7 at Hersted-West. He was the incident commander on August 19, 2005, and the only one who had to gas himself. At the time, he was a prison officer and not an area leader. The reason he is listed as an area manager in the holding cell report is that the system automatically inserts the current title. He became involved because he was on duty that day. He was called by the staff, who informed him that they had to move A because he had threatened one of the guards. They might need gas. He said that it depended on a specific assessment whether he could allow the use of gas. It appears from the report what happened. He came up to the ward. He said that he would not use gas if A could be persuaded to voluntarily move cell. There was a dialog with A, where reference was made to the agreement on the framework for his imprisonment and said that A should move from I6 to I5 because of the threat. A did not want to move. It was suggested that if A wanted to move voluntarily, it would be good, and if not, they would use force. He told A that if he would not move willingly, they would use gas. A announced that he "didn't give a shit" and that they would be reported to the police. Then they used gas. A sat quietly on his bed. He seemed to be focusing on not breathing too deeply. He was very unresponsive to the gas. Additional gas was added quite soon after the first cartridge (a few minutes). In the end, he decided that it was not safe to add more gas, also because A was possibly psychotic and in any case not responding to the gas. He decided that they had to take him out by other means instead. They took emergency equipment, including gas masks, because they could easily feel the gas themselves. A was sitting on the bed coughing and spitting, so he could feel it too. Presumably his resistance was also reduced. It's not true that A had fainted. He

didn't at any point. They went in with shields etc. A was placed

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

in the security cell, because you were now at a level of use of force where you would normally use a security cell. Of course, an individual assessment is made each time. The decision to place A in a security cell was based on the seriousness of the situation and the general knowledge of A, who had often been threatening and violent in the past and who had been placed in a security cell many times before, even in cases where the situation had been less serious. He believes that he left when A was restrained. The gas used was tear gas, which is also used by the defense and by the police for large demonstrations. This is the only time he has been involved in using gas in the time he has been at Herstedvester. "You use it to counteract a threatening situation. They didn't just go in and take A by force because they assessed that it was less invasive for both A and the staff than the alternative, which, based on their experiences with A, would have been to bring in 4-6 men with batons. Using physical force to get him out of the cell would thus have been more intrusive.

*Chief Warden C* has explained, among other things, that he was employed as deputy head of the area manager at Copenhagen Prisons when A was placed in a security cell at Copenhagen Prisons on January 22, 2009 at 19:30, cf. the submitted report. Fixation can be used in a security cell, but it can also be omitted. He was not physically present while A was restrained. His task was to make a managerial assessment of the justification for the intervention. He has added the managerial comments in the report. As it appears from the report, this was not done until May 28, 2009. The comments were added on the basis of the notes in the case about the reason for the intervention, the observations during the stay, etc. He was not physically present when A came to the prison or in connection with the placement in a security cell. If it can be defended that the intervention had a duration which, as stated in his comments, would have been "far too long" under normal circumstances, this is related to the prior knowledge of A. A was "difficult to read". It was known from many situations that he was violent, that it came very spontaneously, and that he could be in a violent and acting out state for a very long time. Normally, most people calm down after a few hours, but the experience was that it took much longer with A, and that it required you to come in and have a dialog with him. You had to be able to talk to him before you could let him out. The basis for the deployment was a very violent incident in East Jutland, and it illustrates very well that the situations with A typically lasted a very long time.

His attitude throughout the process has been that A would benefit from some medical help. It's good that this has apparently happened and that it helps.

*Prison officer D* has explained, among other things, that he is employed at Copenhagen Prisons and serves at

**3092**

Police Station Prison. He did the same in 2007. He remembers A well, even though it has been many years since he last saw him. A was usually in cell I7 at the Police Station Prison. At the time, it was furnished like the other cells with a bed, table, cupboard, fridge, shelf and sink. He is in doubt, but remembers that there was no community between A and other inmates. It is possible to go for a walk and visit the prison. Books can be ordered from the library at Vestre Prison. There are no other opportunities for activities. He has had contact with A, especially to get him to stop shouting and kicking the doors. Occasionally, A ended up in an observation cell or security cell. He no longer remembers the specific incidents. It was usually caused by outbursts in the form of pushing the staff. He does not

remember being involved in placing A in a punishment cell.

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

When an inmate is placed in an observation cell, they strip off their own clothes and put on special clothes. In a security cell, you are generally allowed to keep your own underwear. A blanket is placed over the inmate if they wish.

Presented with a report on placement in a security cell from August 15, 2008 at 21:15, where it appears that he made the decision to place an inmate in a security cell, the witness explained that he cannot remember the process today. "It is a joint decision to put an inmate in a security cell. When he is listed as the decision-maker, it is because he wrote the report. He has been involved in making the decision and implementing the procedure. If an inmate shouts out, it can lead to a placement in an observation cell. This is due to the need to ensure peace and order in the prison. Placement in an observation cell is done to prevent the situation from escalating by others joining in the shouting etc. When an inmate like A threatens or resists, it can, as happened here, lead to placement in a security cell where there is constant supervision. In an observation cell, there is only supervision every half hour.

In his personal opinion, and with the caveat that he is not a doctor, A was not fit to be in a regular prison. He was paranoid and heard voices. He was very flammable and started shouting, for example, because he thought the prison officers were laughing at him and talking about him in the guardroom.

When placed in a security cell, a plastic flask is sometimes used if the inmate needs to urinate. The inmate's hand is untied. If the inmate is rebellious and there is a risk of violence, the flask may be denied. If the inmate needs to make "big", you will sometimes be able to take the inmate to the toilet, as most people remain calm in that situation. Toilet visits often take place in connection with the inmate being released. In observation cells, the inmate can go to the toilet. During security cell placement, the general manager will usually come down and talk to the inmate about how things are going. Prison staff can make their own decisions about placement in and removal from a security cell. A briefing must be given to a superior. The report on the placement in a security cell on August 15, 2008 at 21:15 shows that "Use of force" stated, among other things: "Held head so inmate did not hit head ... . .". This is probably because they wanted to prevent A from hitting his head against the wall. The fact that A, as the report also states, spat and bit the staff was very common behavior on A's part.

*Deputy Prison Superintendent E* has explained, among other things, that he was Deputy Prison Superintendent from 1993 at Horsens State Prison and subsequently at Østjyllands State Prison. They are two deputy prison inspectors. He is responsible for legal matters, including legality control of compliance with the Execution of Sentences Act and associated regulations, and has overall responsibility for the inmates. He has written the answer from Østjyllands Fængsel dated February 21, 2014 to the Attorney General's questions.

Section E in Østjyllands Fængsel and formerly Horsens Statsfængsel is a secure section. There are 36 places for "negative strong prisoners" and 12 additional places in a special security section. The special security section houses a very mixed group of particularly escape-prone or particularly violent inmates and inmates with special protection needs. There is a high degree of security with intensive surveillance. There are 12 places divided into 2 sections with 6 places in each. A was in this section because he was at times very violent and very difficult for the staff to handle. There was a need for a fixed and secure environment.

Action plans must be drawn up for all inmates, describing how the sentence is to be served and what the plans are for the person concerned, cf. section 31 of the Execution of Sentences Act. They are drawn up with the participation of the inmate and the staff involved with the inmate,

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

including social worker, nurses, etc. A plan was also made for A's imprisonment, and it was regularly reviewed as required by law. It was difficult to make action plans for A. Due to his rather turbulent sentence, it was difficult to handle anything other than "right here and now". The plans were mostly about organizing a sensible daily life for him, including how much he could be taken out of his cell, which of the other inmates he could be with, etc.

He has not had personal contact with A, but has attended, among other things, joint meetings about the detainees with the directorate. His overall impression was that A was very volatile. There could be periods when things worked very well, and then he could suddenly explode. When that happened, he had to be moved to a

**3093**

another section, in a security cell or to another prison. A was at Østjyllands Statsfængsel for approx. 1 year from 2007. The reason for the rotation scheme was that no one wanted to keep him there. In both Horsens and East Jutland, he was kept for longer periods than the three months required by the rotation scheme. If things went well, they let him stay in place. However, it usually ended with an outbreak of violence that meant he had to be moved. Most of the transfers were based on specific violent incidents and not on the rotation scheme. In the Prison and Probation Service, there is a completely established practice that an inmate who commits a violent act of a certain severity against staff must be moved to another prison. This practice is partly out of consideration for the staff who have been assaulted and who do not have to meet the perpetrator immediately after the assault, and partly out of consideration for the inmate. The move avoids the risk of myths and suspicions of revenge among staff. He has not previously experienced similar formalized rotation arrangements. He does not know whether A has been informed that the rotation scheme was not followed. There has not been any particularly formalized decision. They looked at each other and said: "It's going very well", and then not moving him.

In the cases where A was transferred from a security cell in Østjyllands Statsfængsel to another prison, the transfer was typically to Poli- tigårdens Fængsel, which, like Østjyllands Statsfængsel, has a particularly high level of security.

During his imprisonment, cf. point 4 in his response to the Chamber's questions, the staff paid particular attention to A and tried to maintain contact with him to the extent possible. This is also how they normally act in relation to the other employees in the special section. To a certain extent, A had fellowship with other inmates in the 12-man section in question. The starting point is that the 12 inmates in the special security section have fellowship. However, the prerequisite for fellowship is that one of the other inmates wants it. He experienced on a number of occasions that the other inmates declined contact with A.

There are approximately 30 employees attached to the secure ward E. What he described in his response to the Attorney General about a special system for A came about after the staff had been on a study visit to the secure ward in Nykøbing Zealand. They were inspired to establish a system that ensured that all employees were aware of what had been said to and agreed with A and decided about him by other employees. For example, it could be agreed with him that if he respected an agreed framework, he could be given additional freedom. In A's case, as is generally the case, his case was reviewed at a meeting once a week by the staff on the ward. The purpose of the review is to assess whether there is a basis for loosening or tightening the

person's conditions of imprisonment. In addition to the staff in the unit, a social worker and a lawyer, typically a prison officer, will also participate.

Copyright © 2023 Karnov Group Denmark A/S

In the maximum security section, you can watch TV. By agreement with the staff, it is possible to use a special gym, for example, so that two inmates can play ball. There is also access to newspapers, borrowing books and the possibility to go for a walk. The inmates in the section have the opportunity to do gangman work (cleaning etc.) and assembly work (typically packing work for external companies). A was only employed for a short time and only part-time. It was mostly in the nature of therapy. A's contact with the other inmates has been sporadic and fluctuating and, as mentioned, has depended on the other inmates. The experience has been that some have said no or backed out after a while. As with all inmates in the section, it has been one-to-one fellowship. There is no general fellowship in the section.

When presented with the report on placement in a security cell on April 16, 2008 at 18:35, the witness explained that when an inmate, as was the case here, suffers an injury during restraint, he normally reads through the material in the case and talks to the staff. He believes he has done that in this case as well. He does not believe that he has spoken to A about the specific placement. There is no fixed procedure whereby an inmate who has been injured in connection with placement in a security cell is consulted. The person in question will always be seen by a doctor in connection with their placement in a security cell. In addition, there is always a subsequent discussion with the inmate about the incident in the ward. If there is a complaint about the intervention from the inmate, they will be heard in this connection. If an interrogation is held in connection with possible sanctions against the inmate, he or she is also always heard.

When a report on exclusion from the Community in the period from
21 April 2008 at 12:10 p.m. and the report on placement in a security cell on 16 April 2008 at 6:35 p.m. is a note about the removal of a blanket from A's face, this is due to the fact that when placed in a security cell, it is always required to be able to see the inmate's face. The officers must therefore be able to see if the person is breathing. In extreme cases, this can result in the blanket having to be removed from the inmate. However, he has never heard of any cases where this has happened. "They will usually dim the lights at night. There may be cases where, due to the situation, you have to have more light on. Like fines and warnings, a punishment cell is a sanction, whereas placement in an observation cell or security cell is a preventive measure for security reasons.

**3094**

*F* has explained, among other things, that he is an area manager at Copenhagen Prisons in a different area than in 2006-2007. At that time, he was at Politigårdens Fængsel, first as acting and then as appointed head of department. He changed his place of employment in March 2008. As head of department, he has had overall responsibility for A when he has been at Politigården Prison and has had a number of conversations with him. During several of the periods he has been at the prison, A has been in category 1 "negative strong inmate". Politi- gårdens Fængsel is intended for inmates who have "crossed the line" at other prisons. The categorization often lies in the reception received from the transferring prison and the background of the transfer. Politigården Prison was reopened to house strong, unmanageable prisoners from all institutions in the country. Both remand prisoners and prisoners serving time are placed at the Police Station Prison.

A undoubtedly sat on the 4th floor, which is for the "heaviest" inmates who have to sit close to the staff, but he does not remember specifically where A was placed. He does not remember whether A had fellowship with the other inmates. It depends on whether you can find a "community buddy". The starting point is that you have fellowship in pairs. It may happen that you cannot find a partner, including someone who is willing to have fellowship with the person you are looking for a partner for. There are

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

It can take 1-2 weeks to find a solution when transferring a new inmate.

A was very unbalanced. In his opinion, A was "insanely unstable". He is one of the few inmates where the witness has been fundamentally unsure of what the inmate would do next. He has never experienced an inmate who has threatened to kill him so many times. A has been placed in observation cells and security cells due to violence and threats. When such placements occurred, he had to talk to A. He has often been scolded and threatened both during such placements and when A has been in his own cell. Presented report on placement in a security cell from the

On July 28, 2006 at 19:55, the witness explained that this is a typical example of placing A in a security cell. When a security cell is chosen, it is a security-related measure to ensure that the "end a situation". He can't say whether he has also been sentenced to solitary confinement afterwards. You can't overhear such serious threats, especially not from an inmate with A's history. As a starting point, you try the mildest placement - that is, observation cell. In A's case, it often ended up with a security cell instead of an observation cell, because he almost inevitably went completely crazy when he was asked to move from A to B.

According to the current general guidelines, every prisoner placed in a security cell must be searched. This is done in particular to avoid the possibility of self-harm with, for example, a razor blade. When searches are not carried out in individual cases, it is based on a specific assessment that a search would further escalate an already very tense situation. All inmates at Copenhagen Prisons are regularly searched - approximately 1-2 times a month. Visitation occurs somewhat more frequently at Politigårdens Fængsel, perhaps an additional 1-2 times per month. Normally, the inmate is stripped of their own clothes and lies naked with a blanket over them in the security cell. They may be given some of the prison's underwear to wear, but often the prisoner will be too violent to attempt to put underwear on. A solitary confinement such as the one that took place from July 28, 2006 at 19:55 in 1 day, 14 hours and 40 minutes is long compared to the average duration. It is not his professional opinion that A has had longer placements than necessary. Although A was able to lie down and sleep, as shown in this report, the history meant that it was necessary to leave him in the security cell for longer. This ties in with what he previously said about A being "highly unpredictable". He could go from being completely calm to being wildly threatening in a split second. You were simply afraid that he would use violence. The fact that A was calm for half an hour was not enough to be sure that he had calmed down. In his opinion, you needed to have a conversation where there were no threats from A before you could let him out of the security cell. Given the situation with the security cell and fixation etc. he would not require A to be "completely down" during such a conversation, but he should not threaten. If possible, the responsible manager (the witness) should be contacted by the prison officers before being placed in a security cell. However, this will often not be possible in the situation, but the person in question should be contacted as soon as possible after the placement. It will typically also be the superior who - possibly after telephone contact - decides that the inmate should be removed from the security cell. Normally, he will be present in the security cell himself to assess the inmate.

When presented with a report on the placement in a security cell on July 4, 2008 from 10:15 a.m., the witness explained that he was not present himself, but had heard about the case in question, where there had been a violent assault on a prison

officer in the East Jutland State Prison. There was no doubt that A had to be moved after such an assault. The transportation must have taken place in such a way that it was deemed that he should be placed

in solitary confinement upon arrival at Police Headquarters Prison. You can see from the report that he was carried in from the car.

Presented with a report on the placement in security cells on December 20, 2006 from 14:55, the witness explained that with the current layout of the prison, it was possible to break windows in the cells.

**3095**

*Consultant G* has explained, among other things, that she graduated as a psychiatrist in 1992. She was employed at Anstalten ved Hersted- vester as a consultant on April 1, 2004 in a department for the most mentally ill inmates and in the women's department. During her time there, there have been 5 psychiatrists and around 10 psychologists. The inmates in the ward for the mentally ill are inmates with special problems who find it difficult to be in a normal ward. There have also been inmates in the ward who are actually insane. She never visits an inmate in the ward in question, where A was also held, without officers standing outside the door. The ward is divided in two. In one section, there is free access between cells during the day. In the other section, the inmates are placed in observation cells (solitary cells). Unlike other prisons, observation cells are used so that the inmates can be out with other inmates for a few hours each day.

A would not talk to her or her colleagues. The prison officers couldn't talk to him either and were very afraid of him because he was so threatening and violent. It was clear that A was not feeling well. He also expressed this, but it was not possible to talk to him. The symptoms A had in the form of hearing voices etc. gave rise to a number of considerations for her. She wasn't sure of the diagnosis, but something had to be done. They offered antipsychotic medication as the most obvious option. He refused it. In theory, it is possible to use forced medication at Herstedvester. In practice, it is not possible because the rules require that there must be a round-the-clock staffing of doctors in order to forcibly medicate. A could not be placed in an ordinary closed forensic psychiatric ward where forced medication would be possible because he was so dangerous. It was not possible to do anything about the very deadlocked situation. This led to her request of June 3, 2004 to the Ministry of Justice for him to be placed in the secure ward in Nykøbing Zealand pursuant to a dangerousness decree under section 40 of the Psychiatry Act.

When shown the report on placement in observation cell from May 18, 2004 at 15:10 to August 27, 2004 at 11:45, the witness explained that she was regularly down to check on A during the approximately 3 months of placement. She was not involved in the decision to place and extend the placement. He continued to be threatening and therefore it was not possible to get him out of the cell. Regarding the note on August 27 at 17:44 that during a visit by her he became more and more loud, after which she "backed out", the witness explained that she had to go out as it was not possible to make any contact with him. Her request to the Ministry of Justice and the Director of Public Prosecutions of August 23, 2005 for renewed mental observation of A was, as stated in the letter, justified by a significant deterioration in A's condition. There was also a new criminal case in progress. She wanted to help A, but they could not help him in the prison system. A needed a completely different kind of care for A than what could be provided in prison. There are not at all the same staffing levels at Anstalten ved Her- stedvester as in a psychiatric ward. Furthermore, it would be possible to use forced medication in a psychiatric ward. She believed that he should be in the Security Department. The purpose of the new request was to obtain a new

mental statement. The reason why it should be carried out at the Security Department was that A was extremely dangerous. He could not be examined at a general psychiatric ward in 2004 or 2005. A did not have the usual symptoms of insanity, but he had such unusual behavior that she believed,

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

that there were grounds for a thorough observation in order to determine whether he was now insane.

*Doctor H* has explained, among other things, that today he has his own medical practice. In 2007, he was employed by Copenhagen Prisons. This meant that he supervised inmates in all the prisons in Copenhagen. He doesn't remember seeing A, but he recognizes his face. When an inmate was placed in a security cell, he was informed of the placement by the staff and then had to carry out supervision. When during his shift this happened depended on whether he was informed of acute conditions that made it necessary to carry out the supervision immediately. Thus, supervision had to be carried out immediately if there was any indication that the inmate was psychotic or there was information about a need for treatment. As a rule, he not only received an oral briefing, but also a report on the background to the intervention. He would first read the report and then talk to the staff before going in to see the detainee. He usually preferred to go in alone, but if there was danger involved, he had a prison officer with him. He primarily checked the inmate's physical condition. First and foremost, he looked to see if the inmate was overly restrained or dehydrated, and if the inmate was in an insane state. If the inmate complained of pain, or if there was a basis for this according to the information he had received, he looked for injuries.

Presented with a report on placement in a security cell from July 30, 2008 at 12:15 p.m. with notes on supervision carried out by him on July 30 at 11:00 p.m. and July 31, 2008 at 1:00 p.m., the witness explained that he does not remember the supervision. It depended on the specific situation when an inmate who refused to take fluids is dehydrated. If, on the third day, an inmate who refused to drink seemed lethargic, it was his and the consultant's opinion that you had to try to accommodate some of the inmate's wishes to get them to drink. He did not have the authority to say that the inmate should leave the security cell, but he could advise on this. He could admit an inmate whom he deemed insane.

**3096**

Presented with a report on placement in a security cell from August 15, 2008 at 21:15 with notes on supervision carried out by him on August 15, 2008 at 21:30, the witness explained that his recommendation to move A back due to lack of "educational effect" was due to the fact that after a previous placement in a security cell he had spoken to the chief physician that the easiest way to get A to drink etc. would be to get him back to his own cell. His and the chief physician's instructions were purely medical. It was up to the prison officers and prison management whether to follow the medical recommendations. *The procedure*

Mr. *A* has proceeded in accordance with the general grounds set out in his statement of claim of 14 March 2014, according to which

". . . that the applicant has been subjected to :
- unauthorized transfers between institutions under the criminal justice system,
- unjustified use of exclusion from the community,
- unjustified use of observation cell placement,
- unjustified use of solitary confinement,
- . . .
- unjustified use of force by prison staff
- and that the defendant's investigations of the plaintiff's complaints about the above-mentioned interference do not comply with the procedural part of Article 3 of the ECHR. *Transfers between institutions under the Prison and Probation Service*

It is alleged that the 22 involuntary transfers between different prisons in the period from July 10, 2003 to July 12, 2007, either independently or in conjunction with the other interventions that

Copyright © 2023 Karnov Group Denmark A/S

the plaintiff has been subjected to during his imprisonment violates the plaintiff's rights under Article 3 of the ECHR.

Plaintiff argues that the burden is on the defendant to prove that each of the 22 involuntary transfers was justified.

It is the Claimant's view that the Defendant has failed to prove that any of the 22 involuntary transfers were justified.

With reference to court records of January 7 and May 22, 2013, it can be stated that it is the plaintiff's opinion that the parties agree that there have been 22 involuntary transfers between different prisons of the plaintiff during the period in question. *Exclusion from association*

The applicant claims that from December 10, 2002 until May 26, 2009 he was excluded from association for a period of 6 years and 35 days.

In support of the plaintiff's claim, the documents in the case are submitted . . . in which the defendant Ministry of Justice, Department of Prisons and Probation, states that in the period from December 10, 2002 to October 30, 2006, the plaintiff has only had ordinary fellowship for approximately 4 months and 20 days. During this period, he was thus excluded from association for a total of approximately 3 years and 6 months. As regards the period from October 2006 to May 26, 2009, it is claimed that the plaintiff has constantly circulated between specially secured sections in Vridsløselille State Prison, Østjylland State Prison and Nyborg State Prison, where in none of the cases has he had ordinary association with other inmates.

It is submitted that the exclusions from association do not meet the conditions of either section 33a or section 63 of the Execution of Sentences Act. Furthermore, it is claimed that the exclusions, either independently or in conjunction with the other measures to which the applicant has been subjected while serving his sentence, violate the applicant's rights under Article 3 of the ECHR.

The applicant submits that the defendant has the burden of proving that in each case where the applicant has been excluded from the community the exclusion from the community has been justified and that the length of the exclusion from the community has been justified. The applicant also submits that it has not discharged the burden of proving that some of the exclusions from communion were justified either as regards the grounds for the exclusions from communion or as regards the temporal extent of the individual exclusions from communion.

With reference to the court books of January 7 and May 22, 2013, it can be stated that it is the plaintiff's opinion that there is a disagreement between the parties as to the extent of the exclusion from the community, as the defendant, as the plaintiff understands it, claims that the plaintiff has only been excluded from the community to the extent described in Annex AO-1-1 to Annex AO-1-29.

*Placement in observation cell*

The plaintiff has been placed in an observation cell no less than 33 times. The total duration of the stays was 301 days, 14 hours and 51 minutes.

It is submitted that the 33 stays in observation cells do not meet the conditions for this under national law. Furthermore, it is claimed that the placements, either independently or in conjunction with the other measures to which the applicant has been subjected during the detention, violate the applicant's rights under Article 3 of the ECHR. The plaintiff claims that it is the defendant who must prove that each of the 33 stays in observation cells was justified both in terms of the grounds for placement and in terms of the duration of the stays.

In the Plaintiff's view, the Defendant has failed to prove that any of the interferences were justified either in terms of the grounds for placement or the temporal scope.

Copyright © 2023 Karnov Group Denmark A/S

With reference to court books dated January 7 and May 22, 2013, it can be stated that it is the plaintiff's opinion that there is agreement between the parties that there has been

**3097**

33 stays in observation cells and that the total length of the stays is as stated above.

*Placement in a security cell*

The plaintiff has been placed in a security cell 37 times. The plaintiff has calculated the total duration of the stays to 42 days, 8 hours and 37 minutes.

It is claimed that the 37 stays in security cells do not meet the conditions in section 66 of the Execution of Sentences Act. Furthermore, it is claimed that the placements, either independently or in conjunction with the other measures to which the applicant has been subjected while serving his sentence, violate the applicant's rights under Article 3 of the ECHR.

The plaintiff submits that it is for the defendant to prove that each of the 37 stays in the security cell was justified both in terms of the grounds for placement and in terms of the duration of the stays.

In the Plaintiff's view, the Defendant has failed to prove that any of the interferences were justified either in terms of the grounds for placement or the temporal scope.

With reference to court records dated January 7 and May 22, 2013, it can be stated that it is the plaintiff's opinion that the parties agree that there have been 37 stays in security cells and that the stays together have the length stated above.

. . .

*Unjustified use of force*

It is claimed that the plaintiff has been subjected to unjustified use of force, including the use of gas, while he was in a prison cell sitting calmly on his bed. In addition, he has on several occasions been beaten with a baton and been subjected to rough handling, etc. It is claimed that the use of force, either independently or in conjunction with the other measures to which the applicant has been subjected during his imprisonment, violates the applicant's rights under Article 3 of the ECHR. It is also claimed that it is the defendant who has the burden of proof that the use of force has been justified and that the defendant has not met the burden of proof.

*Inadequate investigation into the justification of the interventions*

The Plaintiff claims that the Defendant has either completely failed to investigate or has conducted an inadequate investigation of the Plaintiff's complaints about the above-mentioned interferences and that the Defendant has also for this reason violated the Plaintiff's rights under Article 3 ECHR.

*About statute of limitations*

In relation to the defendant's objections that certain of the facts on which the application is based are time-barred, this is disputed. It is argued that any limitation period only runs from the time when the plaintiff is released. Finally, it is submitted that claims arising from violations of Article 3 ECHR are not time-barred.

*Regarding the calculation of the compensation claim.*

. . .

The ECtHR [has] under Article 41 ECHR . . . awarded compensation for similar interference.

Article 41 of the ECHR is only a jurisdictional rule for the ECtHR, which is why the amounts of compensation that appear in the ECtHR's decisions are not easily comparable with the compensation to be measured by the national courts for similar violations. The national courts assess the compensation on the basis of Article 13 of the ECHR and for Denmark also on the basis of the EAL

§ In this regard, the plaintiff may refer to page 959 of "The

European Convention on Human Rights, Art. 10-59 and the additional protocols", 3rd edition, by Peer Lorenzen and others, published in 2011 by DJØF. Among other things, it states the following:

. . .

It is the plaintiff's opinion that the ECtHR will award a complainant compensation of approximately DKK 240,000 for infringements of the nature and extent of the infringement at issue in the present case. Based on the above considerations, the plaintiff is of the opinion that the national courts will arrive at a compensation amounting to approximately half of this, provided that an infringement is established to the extent alleged. It is on this basis that the claim for compensation is set at DKK 120,000."

During the main hearing, it was also claimed that Article 3 of the Human Rights Convention had been violated as a result of the lack of right of access to and reasons for exclusion from the community, which is a consequence of the exception in section 9(4) of the Administration Act.

During the main hearing, A waived a plea that he had been subjected to unwarranted body searches.

As far as the placements in observation cells are concerned, the placements at Herstedvester Prison on May 18, 2004 at 3:10 p.m. August 27, 2004 at 11:45 am (total 100 days 20 hours and 35 minutes)

and August 21, 2005 at 13:05 - September 30, 2005 at 13:50 (a total of 40 days and 45 minutes) particularly highlighted during the proceedings. *The Department of Prisons and Probation* has proceeded in accordance with the general pleas set out in the Department's summary pleading of March 24, 2014, according to which:

*"Re Plaintiff's Claim 1*:

In support of the motion to dismiss, it is submitted that the applicant's claim 1 is a plea in support of the applicant's claim 2, as the claim for damages raised in the applicant's claim 2 is based precisely on the applicant's claim 1 and the related pleas, namely that during his imprisonment in the period 1997 - 2009 the applicant was treated in a manner which is disproportionate and thus contrary to Article 3 ECHR.

The claim for acquittal is based on the same pleas as those put forward against the applicant's claim 2.

**3098**

*Re Plaintiff's claim 2*:

In support of the claim for acquittal, it is argued that the use of force to which the applicant was subjected during his imprisonment did not exceed the limits of what was absolutely necessary in the specific situations, taking into account the applicant's behavior, and that it was necessary to establish a rotation order because the applicant represented such a significant burden on the resources of the individual prisons.

Emphasis is placed on the fact that the applicant was so strongly mentally deviant, violent and paranoid, and that this - as evidenced by the many convictions - meant that he was regularly exceptionally violent, or threatened to be, towards both fellow inmates and prison staff.

It is also emphasized that consideration for both fellow inmates and staff just as frequently made it absolutely necessary to use force against the applicant in the manner provided for in the Criminal Penalties Act.

Finally, it is emphasized that resource considerations in the prisons necessitated the rotation scheme established between the prisons, which was only implemented to the extent necessary.

It is thus claimed that the measures taken against the applicant

have a legal basis in the Execution of Sentences Act and have not been contrary to the principle of proportionality as it applies under Danish law.

Copyright © 2023 Karnov Group Denmark A/S

In particular, as regards the claim for damages based on the use of tear gas against the applicant on August 19, 2005, it is submitted that the defendants are not the proper defendants, as the final administrative decision to deny the applicant compensation was made by the Director of Public Prosecutions.

It is disputed that the applicant's conditions of imprisonment and the measures taken against him constituted a violation of Article 3 of the ECHR. Also in this context, it is maintained that the principle of proportionality has been observed and that the measures etc. have been necessary.

With regard to the ECHR, it should be noted that a violation of Article 3 does not entail strict liability. It follows from case law that any violation must be assessed according to Danish law's general rule on damages, the culpa rule, and that damages, if any, are awarded pursuant to section 26 of the Tort Liability Act.

Article 13 ECHR does not provide a legal basis for Danish courts to award compensation directly on the basis of the provision, which only contains a requirement that an individual whose rights and freedoms under the Convention have been violated must have access to effective remedies before the national courts. The provision thus does not regulate the conditions under which compensation may be awarded. The details of the national remedies are left to the discretion of the Member States.

It follows from the wording of Article 41 of the ECHR that the provision is a rule of jurisdiction for the European Court of Human Rights, according to which the Court may award compensation in cases where the Court finds the ECHR violated.

Article 41 does not contain a legal basis for Danish courts to award damages.

Finally, it is submitted that claims for damages based on the use of force against the applicant prior to December 30, 2005 are time-barred under both the 1908 Act and the 2007 Act, as the claim for damages was first brought by the applicant on December 30, 2010 dated summons.

The fact that the claim is based on the ECHR does not change this. The burden of proof that the individual measures were unjustified or disproportionate, and thus damages-inducing in each case, lies with the applicant.

This is in accordance with the general principle of civil procedure that the plaintiff bears the burden of proving the truth of the allegations and pleas put forward by him."

After having become aware during the main hearing that the case had been filed on January 3, 2011, the Directorate has made a procedural declaration that the Directorate will not claim limitation with regard to claims that would not have been time-barred according to the transitional rule in section 30(1) of the Limitation Act, cf. the 1908 Act, if the case had been filed on December 30, 2010 as previously assumed by the Directorate.

With regard to the placement in a security cell at Herstedvester Prison in the period 19 August 2005 at 13:05 - 21 August 2005 at 13:05 and the use of tear gas prior to this, the Department has argued that Glostrup Court's judgment of 22 March 2013 rejecting the claim for damages has taken a legally binding position on the justification for the intervention and the associated claim for damages. Therefore, this interference and the associated claim for damages cannot be considered in this case. If the Directorate's plea that the objections and claims for damages concerning the interference must be rejected is not upheld, the Directorate's objection on limitation does not cover this interference.

As regards the issue of lack of due processing of A's complaints, the Directorate has argued that already because it is not stated which complaints are alleged not to have been processed correctly, the plea cannot be upheld.

Copyright © 2023 Karnov Group Denmark A/S

With regard to A's new plea concerning the lack of access to documents and reasons, the Directorate argued that the plea was submitted too late and should therefore not be considered.

**The Court's reasoning and result**

*Re claim 1*

The Court finds that A's claim 1 is so generally formulated that it is not suitable for adjudication as

**3099**

independent claim. It is thus not stated in any way when, where and how Article 3 of the European Convention on Human Rights is alleged to have been violated. Consequently, the claim is rejected. It is noted that the recognition claim will be tried as a plea in support of claim 2.

*Re claim 2*

*Article 3 of the European Convention on Human Rights and the Execution of Sentences Act*

Article 3 of the European Convention on Human Rights prohibits torture and inhuman and degrading treatment and punishment. In its judgment of September 29, 2005 in case 24919/03, Mathew, the European Court of Human Rights stated the following about the general principles that apply to the Court's assessment under Article 3, including in relation to prisoners:

175. The Court has stated the applicable principles as follows (see, for example, Kalashnikov v. Russia, no. 47095/99, § 95, ECHR 2002-VI, case-law references omitted):

"The Court reiterates that Article 3 of the Convention enshrines one of the most fundamental values of democratic society. It prohibits in absolute terms torture or inhuman or degrading treatment or punishment, irrespective of the circumstances and the victim's behavior . .

The Court further reiterates that, according to its case-law, ill-treatment must attain a minimum level of severity if it is to fall within the scope of Article 3. The Assessment of this minimum is relative; it depends on all the circumstances of the case, such as the duration of the treatment, its physical and mental effects and, in some cases, the sex, age and state of health of the victim . . .

The Court has considered treatment to be "inhuman" because, inter alia, it was premeditated, was applied for hours at a stretch and caused either actual bodily injury or intense physical and mental suffering. It has deemed treatment to be "degrading" because it was such As to arouse in the victims feeling of fear, anguish and inferiority capable of humiliating and debasing them . . In considering whether a particular form of treatment is "degrading" within the meaning of Article 3, the Court will have regard to whether its object is to humiliate and debase the person concerned and whether, as far as the consequences are concerned, it adversely affected his or her personality in a manner incompatible with Article 3. . . However, the absence of any such purpose cannot conclu- sively rule out a finding of a violation of Article 3 . . The suffering and humiliation involved must in any event go beyond that inevi- table element of suffering or humiliation connected with a given form of legitimate treatment or punishment.

Measures depriving a person of his liberty may often involve such an element. Yet it cannot be said that detention on remand in itself raises an issue under Article 3 of the Convention. Nor can that Ar- ticle be interpreted as laying down a general obligation to release a detainee on health grounds or to place him in a civil hospital to enable him to obtain specific medical treatment.

Nevertheless, under this provision the State must ensure that a person is detained in conditions which are compatible with

respect for his human dignity, that the manner and method of the execution

of the measure do not subject him to distress or hardship of an in- tensity exceeding the unavoidable level of suffering inherent in detention and that, given the practical demands of imprisonment, his health and well-being are adequately secured

. . .

2. Use of physical force and instruments of restraint against the applicant

(a) Physical force

. . .

177. In respect of a person deprived of his liberty, recourse to physical force which has not been made strictly necessary by his own conduct diminishes human dignity and is in principle an infrin- gement of the right set forth in Article 3 (see Ribitsch v. Austria, judgment of 4 December 1995, Series A no. 336, p. 26, § 38, and Keenan v. the United Kingdom, no. 27229/95, § 113, ECHR 2001- III)."

The current Act no. 432 of May 31, 2000 on the Execution of Sentences etc. states, among other things:

"*Section 22.* Execution of punishment in prison shall normally take place in open prison. Stk. 2. However, the sentence shall be served in a closed prison when the sentence is 5 years or more. In this case, however, the sentence must also be executed in an open prison if it is not considered unreasonable in light of the other information about the convicted person.

. . .

Subsection 5. Execution of a sentence in prison may also take place in a closed prison if

1) . . .

2) According to the medical information, the convicted person should be placed in the institution at Herstedvester.

. . .

*§ A* prison sentence shall, as far as practicable, be served in the vicinity of the convicted person's place of residence. In deciding in which open or closed prison or remand prison the sentenced person is to be placed, account shall also be taken of the sentenced person's own wishes, particularly with regard to work, education, family or health matters.

Paragraph 2. The rules in paragraph 1, 1st sentence, can be deviated from

. . .

5) to prevent abuse of fellow inmates, staff or others in the institution,

. . .

**3100**

§ An inmate may be transferred between open prisons, between closed prisons or between remand prisons

. . .

4) to prevent abuse of fellow inmates, staff or others in the institution,

5) if there are specific reasons to believe that the inmate has abused fellow inmates, staff or others in the institution,

. . .

*§ 33.* An inmate shall as far as possible have access to fellowship with other inmates.

Subsection 2. If the inmate so wishes and the conditions allow, the prison sentence shall be served without or with restricted association. Stk. 3. If the inmate so wishes and conditions permit, a prison sentence shall be served without association with inmates of the opposite sex, except for association during working hours.

Paragraph 4. Otherwise, imprisonment may only be enforced without community in accordance with the rules in sections 63 and 64.

. . .

*§ 35.* An inmate has the right to participate in religious services held in the institution. If for reasons of order or security

however, the head of the institution or his/her designee may deny an inmate access to participate in religious services.

. . .

*§ 62.* The institution may use force against an inmate if it is necessary

1) to avert threatened violence, overcome violent resistance or to prevent suicide or other self-harm,

2) to prevent evasion or to stop escapees or

3) to enforce an ordered measure when immediate implementation is necessary and the inmate refuses or fails to comply with staff instructions.

Paragraph 2. Force may be used by grip, shield, baton and tear gas. Stk. 3. Force may not be used if it would be disproportionate in relation to the purpose of the intervention and the violation and discomfort that the intervention is likely to cause. Subsection 4. The use of force must be carried out as gently as the circumstances allow. A medical examination must be carried out after the use of force if there is a suspicion of illness, including injury, in the inmate in connection with the use of force, or if the inmate himself requests medical assistance.

Subsection 5. The Minister of Justice shall lay down rules on the use of force against prisoners.

*§ 63.* The head of the institution or a person authorized to do so may exclude an inmate from association with other inmates if it is necessary

1) to prevent evasion, criminal activity or violent behavior,

2) to carry out measures that are necessary for safety reasons or required to carry out a general health check or to prevent the risk of infection; or

3) because the inmate exhibits serious or frequently repeated inappropriate behavior that is clearly incompatible with continued stay in the company of other inmates.

Subsection 2. If there is reason to assume that the conditions in subsection (1) for exclusion from association have been met, the institution may temporarily exclude the inmate from association with other inmates while the question of exclusion is being considered. If there is reason to assume that the conditions in section 25 for transfer to a closed prison or in section 26 for transfer between uniform closed penal institutions or in section 28 for transfer to a remand prison are met, the institution may also temporarily exclude the inmate from association with other inmates while the question of transfer is considered.

Stk. 3. An inmate who is excluded from association shall be isolated in a living room in a special ward, in his own living room or in a detention center.

. . .

Stk. 5. Exclusion from fellowship may not be made if the exclusion would be a disproportionate interference according to the purpose of the interference and the violation and discomfort that the interference is likely to cause.

Paragraph 6. Exclusion from fellowship shall be carried out as gently as circumstances permit.

Paragraph 7. Exclusion from fellowship shall be terminated immediately when the conditions for exclusion are no longer met. The institution shall at least once a week consider the question of terminating the exclusion from fellowship in whole or in part.

Subsection 8. The Minister of Justice shall lay down rules on the exclusion of inmates from association with other inmates.

. . .

*§ 66.* At the discretion of the head of the institution or the person authorized to do so, an inmate may be placed in a security cell, including forced restraint using a belt, hand and foot straps

and gloves, if necessary

1) to avert threatened violence or overcome violent resistance; or

2) to prevent suicide or other self-harm.

Subsection 2. Placement in a security cell and forced restraint may not be carried out if it would be a disproportionate interference according to the purpose of the intervention and the violation and discomfort that the intervention is likely to cause.

Paragraph 3. Placement in a security cell and forced restraint shall be carried out as gently as the circumstances allow.

Paragraph 4. An inmate who has been forcibly restrained must have a permanent guard.

**3101**

Subsection 5. In the event of forced fixation of an inmate in a security cell, the institution shall immediately request a doctor to supervise the inmate. The doctor shall supervise the person in question unless the doctor deems such supervision manifestly unnecessary.

Subsection 6. If the inmate is placed in a security cell without forced restraint, a doctor must be called if there is suspicion of illness, including injury, in the inmate, or if the inmate himself requests medical assistance.

Subsection 7. The Minister of Justice shall lay down rules on the approval of security cells and on the use of security cells and forced restraint, including medical supervision and other supervision."

Act no. 367 of May 24, 2005 added a new paragraph 2 to section 33, according to which:

"The Minister of Justice or whoever is authorized to do so may decide that community in prison wards or detention facilities designated for the placement of inmates whose presence creates a particular risk of abuse of fellow inmates, staff or others in the institution shall be implemented as cell sharing with another inmate in their own living room as determined by the Prison and Probation Service." The above rules have not been changed during the period to which the case relates.

A number of administrative regulations have been issued in connection with the Execution of Sentences Act, of which the current Executive Order no. 348 of May 17, 2001 on security measures in prisons and detention facilities and Executive Order no. 673 of July 9, 2003 and the subsequent Executive Order no. 440 of May 30, 2008 on exclusion from association are of particular importance in this case.

Executive Order no. 348 of May 17, 2001 on means of security in prisons states, among other things:

"§ 8

Forced restraint can only exceptionally be used for more than 24 hours.

. . .

§ 13

The institution must as soon as possible prepare a report on the use of handcuffs, security cells, including forced restraint, and other security measures. The report must contain information about the reason for the use, the date and time when the use of the means of restraint ceased, and that the inmate has been informed of the possibility to complain to the Minister of Justice and when the deadline for filing a complaint expires, cf. section 111(2) of the Execution of Sentences Act. The report must also contain information about the institution's considerations regarding medical supervision and about notification under this Executive Order.

Subsection 2. On request, the prisoner shall be given a copy of the report drawn up in accordance with subsection (1)."

*Burden of proof and judicial review*

In a civil case such as this, the plaintiff, A, has, as a starting point, the burden of proving that there has been a use of force and interference that can justify a claim for compensation as alleged.

However, as the administrative authority, the Directorate is responsible for the use of force and interventions such as placement in security cells, etc. that go beyond the deprivation of liberty that is a consequence of the regulations.

Copyright © 2023 Karnov Group Denmark A/S

U.2014.3045Ø - FED2014.138OE

judgment, and must thereby be able to prove that the conditions for the use of force, placement in a security cell etc. in the Execution of Sentences Act and related administrative regulations have been met, and that the extent of the individual interventions has been justified. As the case is presented, it is unclear whether and, if so, to what extent A claims that each individual intervention and/or the extent of these, considered in isolation, constitute violations of Article 3 of the European Convention on Human Rights. Thus, only in very few cases have detailed claims been made during the referral and the procedure that specific interventions should be considered unjustified or too prolonged and why this is the case. It is also far from all reports of placement in security and observation cells in the extract that have been documented or referred to during the main hearing.

The placement in a security cell at Copenhagen Prisons in the period August 18, 2003 at 2:20 am - August 19, 2003 at 1:04 pm, which according to the parties is a typical example of the course of a placement in a security cell, and where detailed documentation has been made of the prison staff's notes on the course of the placement, also differs from all other placements in security cells in that the fixation in the form of hand and foot straps and belly belt was completely removed after almost 16 hours at 6:05 pm. 18:05 on August 18, 2003, after which the security cell placement continued without restraint in another cell. In virtually all other cases, the restraint was maintained in full until A was removed from the security cell.

After the nature and duration of the interventions that have taken place, including in particular the detention in security cells with the use of restraints and the detention in observation cells, and the allegations of violation of Article 3 of the European Convention on Human Rights, the Court finds that - regardless of the fact that this is a case conducted in the form of civil proceedings and regardless of the ambiguities mentioned - an examination must be made of whether the individual detentions in security cells and observation cells can be assumed to violate Article 3 of the Convention, cf. the principle in section 471 of the Danish Administration of Justice Act in conjunction with Article 13 of the Convention. All the security and observation cell reports included in the extract are therefore reviewed below in order to assess whether Article 3 is violated in relation to the individual placement.

**3102**

A's other claims of violation of Article 3 of the European Convention on Human Rights as a result of the exclusion from association, the rotation scheme, lack of or inadequate investigation of his complaints, the use of force in general and lack of access to documents and reasons, as well as whether the prison conditions as a whole entail a violation of Article 3 of the Convention, will now be considered.

*Evidence in and delimitation of the case*

The Danish Execution of Sentences Act and related administrative regulations contain detailed rules on continuous observation of the person subjected to an intervention, medical supervision and documentation of observations etc. for certain types of interventions, cf. in particular the current Executive Order no. 348 of May 17, 2001 on means of security in prisons and detention facilities and Executive Order no. 673 of July 9, 2003 and the subsequent Executive Order no. 440 of May 30, 2008 on exclusion from association. The purpose of these rules is to ensure proof of the justification for the use of force and the use of special measures such as the use of security cells etc. during the execution of a sentence, and also to ensure that the scope and extent of such measures are not extended beyond what is necessary.

The written material in the case contains extensive and detailed reports on, in particular, the placements in security cells and observation cells. The evidence regarding the individual interventions consists to a large extent only of such reports and decisions,

memos etc. prepared by the Directorate and subordinate institutions concerning A.

With regard to specific interventions, testimony has thus only been given about the prelude to the placement in a security cell on August 27, 2004 at 11:50 (by Consultant G), about the placement in a security cell at Herstedvester Prison in the period August 19, 2005 at 13:05 - August 21, 2005 at 13:05, including about the prior use of tear gas 13:05, including the prior use of tear gas (by B and A) and about the placement in a security cell at Copenhagen Prisons on January 22, 2009 from 19:30, which is a continuation of a placement in a security cell at Østjyllands Statsfængsel from January 22, 2009 at 14:20 (by C and A). In addition, A has testified about a not precisely timed placement in an observation cell and subsequent placement in a security cell in 1999 at Anstalten ved Herstedvester, which predates the period to which the case is limited. Other explanations concern more general information about the imprisonment, the conditions of placement in a security cell and about A.

Apart from the deficiencies in the reporting from Copenhagen Prisons on the placement in a security cell on 28 July 2006, which were acknowledged in a memo dated 4 September 2006 by Head of Department F from Copenhagen Prisons and which were pointed out in the Directorate's letter to Copenhagen Prisons dated

October 12, 2007, and what is mentioned below about deficiencies in the notes on fixation in the reports on the placements in security cells from April 30, 2004, at 12:35 at Herstedvester Prison and from June 12, 2007, at 12:15 at Copenhagen Prisons, as well as management's criticism of a few missing notes in the report on placement in observation cells from April 13, 2009, at 19:15. 13:15 at Copenhagen Prisons and the management's reprimand of a few missing notes in the report on observation cell placement from April 13, 2009 at 19:15, there is no basis for assuming that the rules on continuous observation and documentation thereof and on medical supervision etc. have not been complied with. On behalf of A, lawyer Claus Bonnez has complained to the Directorate about the placement in a security cell at Herstedvester Prison from 19 August 2005 at 13:05 - 21 August 2005 at 13:05, including the use of tear gas, cf. the Directorate's decision of 20 February 2006, whereby the use of tear gas and the placement in the security cell and its duration were deemed justified. Complaints have also been lodged about the placement in a security cell at the East Jutland State Prison from April 16, 2008 at 18:35, from July 3, 2008

16:15 and from December 8, 2008 at 11:05, cf. the Directorate decisions of November 19, 2009, May 4, 2010 and June 9, 2009. In the three decisions, the use of force and the placement in a security cell were found to be justified. In the decision of November 19, 2009, it was also determined that the placement in a security cell from April 16, 2008 at 18:35 was too long, and A was awarded compensation of DKK 500 for this.

No other administrative complaints have been lodged under the rules of the Execution of Sentences Act or complained to the Parliamentary Ombudsman. A has attempted to have the placement in a security cell on 19 August 2005 at 13:05 and the prior use of tear gas at Herstedvester Prison brought before the courts under the rules in Chapter 93a of the Administration of Justice Act.

March 22, 2013. Apart from this, it is only in this case, which was brought on January 3, 2011, that the interventions carried out in the period from August 10, 2003 to A's transfer to the Security Department on

May 26, 2009, has been brought before the courts.

Against this background, the Court finds that the reports prepared on placement in security cells and observation cells as well as what is stated in the Directorate's and subordinate institutions' memos etc. on the grounds for the measures taken must be applied to the extent that no concrete evidence to the contrary has been produced in this case, or no decision has been made on the justification of the applicable measure in previous decisions which must be applied in this case.

During the preparation of the case, A has received from the Directorate the reports, memoranda etc. that have been prepared on the use of force and interventions while serving time in ordinary prison. During the main hearing, A has limited his claim to the time from the placement in a security cell from August 10, 2003 at 16:45 at the State Prison in Nyborg and has stated that the extract therefore does not include

**3103**

included reports concerning previous interventions etc. that appear from the overview prepared by the Attorney General's Office. The extract also does not include reports concerning a number of placements in observation or security cells after August 10, 2003, but before May 26, 2009. No explanation for this has been given by A. Nor have any explanations been given about the placements in question. Against this background, the Court must understand the lack of inclusion of the reports to mean that the placements in question, considered in isolation, are not covered by the case. Therefore, the justification for the interventions in question will not be considered in the following. These interventions are thus only included in the assessment of whether the conditions of imprisonment in the period from August 10, 2003 to May 26, 2009 as a whole, and regardless of whether the individual interventions in isolation must be considered justified, entail a violation of Article 3 of the European Convention on Human Rights.

*A's personality and behavior while serving his sentence*

Prior to the custodial sentence, A had been convicted several times of personally dangerous crimes. Against this background and according to the mental health certificate and the statement from the Forensic Medical Council obtained prior to the custody sentence, there is no doubt that A, due to his peculiar personality and the state he was in, could be extremely dangerous to his surroundings.

In Glostrup Court's judgment of 31 August 2006 and Svendborg Court's judgment of 21 August 2007, A was found guilty of several violations of sections 119(1) and 245(1) of the Danish Criminal Code by threatening or using serious violence against prison staff while serving his sentence. In Copenhagen City Court's judgment of February 11, 2011, he was also found guilty of violating section 266 of the Penal Code by threatening a prison official and of violating section 119(1) of the Penal Code by assaulting a prison official. According to the overview of interventions and the reports presented, a significant proportion of the placements in security cells were based on violence or threats of violence against prison staff or fellow inmates or threats of suicide or attempted self-harm. The specific decisions on exclusion from association and placement in observation cells have also been based on the risk of assault on others and threatening or aggressive behavior or the risk of self-harm.

Against this background and after the witness statements from B, C, D, E and G, there is no doubt that A has been very difficult to have in the prison system as a result of a very often very aggressive and paranoid behavior with a tendency to react violently to other people's behavior and events in the outside world. In addition, there were threats of suicide and attempts at self-harm.

*The lockdowns in solitary confinement*

To the extent that the placement in a security cell and restraint with hand and foot straps as well as a waist belt and possibly also gloves has been unjustified, the restraint in particular must be considered to cause such intense physical and mental suffering that the intervention is covered by Article 3 of the European Convention on Human Rights, cf. See, inter alia, the European

Court of Human Rights' judgment of 29 May 2012 in cases 16563/08, 40841/09, 8192/10 and 18656/10, Julin, paragraph 127. The same applies in cases where the restraint in the security cell must be considered justified, but where the interference has continued for longer than necessary.

Regarding the assessment of the extent of the individual placements, it should be noted that C and F have explained that it was their experience that A, unlike most other inmates, did not come out of the aggressive state that justified the individual security cell placements within a few hours. It was only when a dialog could be established with A that he could be removed from the restraint and the security cell. The Court finds that there is no reason to doubt this experience, which is also reflected in what C stated in Copenhagen Prison's report on the continued placement in a security cell and fixation upon arrival at the prison on 22 January 2009 at 22:18. This experience also seems to be reflected in the course of events after the placement in a security cell from 12 June 2007 at 13:15 to 13 June 2007 at 16:20, which in Copenhagen City Court's judgment of 25 February 2011 is considered to have been too long. The subsequent placement in the observation cell was thus interrupted and replaced by a new placement in a security cell, because after the transfer to the observation cell, A banged his head and hands against the cell door, was angry and could not be spoken to. However, it should also be noted that the reports on interventions from August 10, 2003 onwards do not contain any examples of prison staff loosening the foot strap, hand strap and waist belt and then experiencing a violent reaction that made it necessary to restrain A again. Even though the experience with A may have justified a longer duration of intervention than usual, in the court's opinion, it can only be a matter of a certain extended observation period and time to attempt a dialog in order to assess whether he had calmed down enough to be removed from the restraint and the security cell.

*Decisions that are important in the assessment of the individual security cell placements:*

Glostrup Court's judgment of August 31, 2006 established that A committed the knife attack that led to him being placed in a security cell from August 10, 2003 at 16:45 to August 12, 2008 at 9:12 for a total of 1 day, 16 hours and 27 minutes. Based on the knife attack and the other information in the security cell report about A's smashing of furniture, shouting and screaming etc. the placement in a security cell must be considered justified. The report states that up until the afternoon of August 11, 2003, A appeared paranoid during several conversations and, among other things, expressed that there was a plot to kill him. It also appears that he

**3104**

periodically lay down and shouted, and that during a conversation at 13:57, his mood was unstable and alternated between lying calmly and shouting and making threats. During questioning by a police officer at 15:01, he became agitated and expressed that the staff would forgive him. He calmed down after the police officer left. He then lay there shouting until 15:09. After being seen by a doctor at 15:55, he fell asleep and slept almost continuously until 8:34 on August 12, 2003. At that time he expressed during a conversation that he still believed that there was a plot against him. At 9:12 am on August 12, 2008, he was handcuffed and removed from the security cell for transfer to Copenhagen Prisons. According to the report, the last part of the placement in the security cell and fixation was due to A sleeping. The Court finds that there is no basis for requiring the prison staff to wake A to assess whether he had calmed down enough to be removed from the restraint and security cell. Due to A's considerable dangerousness, it must also be considered justified that there was a certain period of observation and time for attempted dialog from the time he woke up until the restraint ended and he was removed from the security cell. In view of this

and the background to the placement in the security cell and the restraint, as well as the violent paranoia and periodic shouting, screaming and making threats,

Copyright © 2023 Karnov Group Denmark A/S

that characterized A during the waking periods, the Court finds that there is no basis for considering the extent of the intervention or the circumstance that the hand and foot straps and lap belt were not loosened while he was sleeping to be unjustified. The circumstances were such that the forced fixation could exceptionally have been maintained for more than 24 hours, cf. section 8 of the current Security Cell Order.

In the judgment of August 31, 2006 from Glostrup Court, A was also found guilty of violating section 119(1), cf. section 247(1), of the Danish Criminal Code by having punched a prison officer in the face and threatened another prison officer that he would rape his wife and kill his children in the State Prison in Vridsløselille on April 30, 2004 at approximately 12 noon. It was thus established that he had committed the offenses that gave rise to a transfer from Vridsløselille State Prison to Herstedvester Prison, cf. the report on placement in a security cell at Herstedvester Prison in the period from 30 April 2004 at 12:35. In the judgment, A was also found guilty of violating section 119(1) of the Danish Criminal Code by threatening several prison officers in the afternoon and evening after his transfer to Herstedvester Prison, i.e. during his placement in the security cell, that they would be "whacked", that he would "smash" them and that he could "take a murder with him on the road". It appears from the judgment that the district court based its decision on the notes about the threats in question in the security cell placement report.

According to the report on the placement in a security cell, A was also very violent on arrival at Herstedvester and had also physically resisted the transport. In view of this and the violent episode that had immediately preceded it in Vridsløselille, the court found the placement in a security cell and the restraint justified. The judgment also established that A had made threats after being placed in a security cell on April 30, 2004. The report also states that the placement and restraint ended on May 3, 2004 at 10:23 a.m. and thus lasted a total of 2 days 21 hours and 48 minutes. It is stated that after periodically shouting and threatening, A was calm between 14:45 and 19:45 on April 30, 2004, when he again lay restlessly and spat on the wall and at 20:00 and 20:10 he again shouted obscenities at the staff and made threats. At 21:20 and again at 21:30 he became agitated and threatening again. There are then long periods where he slept until the afternoon of May 1, 2004, while during waking periods he regularly used abusive language, shouted or threatened, including threats to his life at 2:45 and 2:50 am on May 1, 2004. According to a note at 7:05 am on May 1, 2004, the left arm was loosened at this time. In the subsequent notes, it appears that the use of hand straps has completely ceased from this time. However, this is not consistent with later notes that wrists were loosened when A was given water. The court therefore assumes that the wrist straps were only removed briefly. On May 1, 2004 at 12:00 noon it is noted that he did not want to talk to a nurse who was present to check him. Immediately afterwards it is again noted that he slept until 16:30, when he said to the consultant that "we should just get the fuck out or he can piss in our face". After this, there is again a longer period where he slept only interrupted by very short periods where he lay still. It is noted that on May 2, 2004 at 4:38 am A asked a prison officer if he was bored and then lay still until 5:20 am, when he sat up, screamed and tore at his straps. At 6:00-6:10 he shouted for water and became threatening and agitated, after which he was given a jug of water at 6:20. At 7:00 am he called a police officer an idiot. At 7:10 a.m. it is stated that he got/is getting his left wrist untied and loosened his right wrist in connection with being given water. At 7:25, according to the notes, he spoke to the nurse,

and at 7:40 he asked for something to read. 15 minutes later it is noted that he had fallen asleep. At 8:15 a.m. on May 2, 2004, he is stated

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

to be awake again. Apart from notes that he shouted again on May 2, 2004 at 10:45 and 11 am, there are only notes that A lay still, slept, urinated in a flask, smoked, refused food, and that at 8:40 am on May 3, 2004 he asked what time it was and at 9:20 am wanted to speak to a psychiatrist, which happened at 10:01 am. He was then removed from the holding cell and restraint at 10:10 am on May 3, 2004. According to the notes in the report

**3105**

the Court finds that the placement and restraint in the period from the morning/afternoon of May 2, 2004 until the end of the placement and restraint on May 3, 2004 at 10:10 am must be considered unjustified, as A's most recent aggressive outburst was the threats and anger at 6 am and the statement at 7 am on May 2, 2004 that a police officer was an idiot. The placement and restraint in the period prior to this must, however, be considered justified in view of the threats and the aggressive behavior on A's part. This also applies to the maintenance of the restraint during the periods when he slept and the fact that the restraint was extended beyond 24 hours, cf. section 8 of the current Security Cell Order.

  By Svendborg Court's judgment of 21 August 2007, A was found guilty of two counts (counts 4 and 5) concerning violation of section 119(1) of the Penal Code by having assaulted two prison officers on 4 July 2006 at Horsens State Prison with blows to the face and shoulder, by having threatened the lives of two other prison officers and by having threatened to kill a prison officer on 5 July 2006 at Horsens State Prison. In view of the violence and threats on 4 July 2006 and the other information in the report on the placement in a security cell at Horsens State Prison in the period 4 July 2006 at 18:05 - 5 July 2006 at 14:15 (a total of 20 hours and 10 minutes), the decision to place and fix A in a security cell must be considered justified. According to the report, until 22:00 on July 4, 2006, A regularly made threats of violence against the prison staff and a doctor on duty who came to check on him. At 23:15 he fell asleep and slept almost continuously until 7:45 on July 5, 2006, when he again threatened the staff. He then lay calmly until 11:30 am, when he again made threats, which, together with shouting, were repeated regularly until he was removed from the security cell at 2:15 pm on July 5, 2006 for transfer to the Police Station Prison. The threat to his life, for which A was convicted by Svendborg Court, appeared at this time. After the information provided about the countless threats that A made throughout his placement in the security cell and the restraint, the court finds that there is no basis for considering the intervention to have been extended for longer than necessary or that the restraint should have been loosened during the periods when he slept.

  In Svendborg Court's judgment of 21 August 2007, A was also found guilty on count 6 of violating section 119(1) of the Danish Criminal Code, cf. in part section 21, by having assaulted a prison officer at Politigården Prison on 11 September 2006 by kicking him in the stomach and attempting to headbutt and spit on him as well as threatening his life as described in the report on placement in security cells from Copenhagen Prisons in the period September 11, 2006 at 14:50 - September 11, 2006 at 17:13. Against this background and according to what is otherwise stated in the report about the reasons for the placement in a security cell and the restraint, the court finds the interventions justified. According to the report, A slept until a doctor arrived at 15:45. He was reportedly aggressive towards the doctor and shouted at 16:18 that he wanted to cut the staff member's throat. He was removed from the security cell at 17:14. There is no

basis for considering the extent of the intervention to be longer than justified. Nor is there any basis to consider the restraint during the period when A was sleeping to be unjustified.

Copyright © 2023 Karnov Group Denmark A/S

The Directorate's acknowledgement in the decision of November 19, 2009 that the placement in a security cell in the East Jutland State Prison from April 16, 2008 at 18:35 to April 21, 2008 at 12:11 was too long is applied in this case. The report states that during a conversation about handing over a letter and medication, A became increasingly agitated, after which he started shouting and screaming when the prison officer left the cell. When they wanted to move him to an observation cell, he refused and physically resisted when they tried to take him away. He jerked/flailed free and was pinned to the floor by staff. In the process, he hit a cell cabinet and got a small crack above his eyebrow. He was then handcuffed and transported to a security cell and restrained. The report shows that he was seen by a doctor several times, the first time on April 16, 2008 at 19:35. The Court finds that there is no basis for setting aside the prison staff's decision that A should be moved to an observation cell as a result of his shouting and screaming. Furthermore, given the physical resistance he offered against the transfer, it must be considered justified that he was placed in a security cell and restrained. There is no basis for assuming that the injury above the eye was caused in any other way than stated in the report. As mentioned, it follows from the Directorate's decision that the placement, which lasted 4 days, 17 hours and 36 minutes, was too long.

The Copenhagen City Court's judgment of February 11, 2011, which is unappealed, ruled on the justification for placing A in a security cell in Copenhagen Prisons from December 20, 2006 at 14:55 and from June 12, 2007 at 13:15. The jury in the City Court found that the conditions in section 66 of the Execution of Sentences Act for placing A in a security cell on December 20, 2006 at 14:55 were not met. Furthermore, it was not found proven that the length of A's stay in the security cell after the placement on June 12, 2007 at 13:15 was proportional. The total stay of 1 day, 3 hours and 5 minutes was thus found to be too long. A was then acquitted on the first count and only convicted of violation of section 266 of the Penal Code in the second count, as section 119(1) of the Penal Code could not be applied in the opinion of the District Court. In view of the extensive evidence that has been presented in the District Court on these two counts, and regardless of the different

**3106**

burden of proof rules that apply in a civil case such as this, the Court finds that there is no basis for reaching a different assessment than the District Court of the justification of the two placements in security cells at Copenhagen Prisons. The Court thus finds that the placement in a security cell from December 20, 2006 at 14:55 did not meet the conditions in section 66 of the Execution of Sentences Act and that the placement in a security cell from June 12, 2007 was too long. In the report on the latter intervention, it is initially noted at 13:15 on June 12, 2007 that wrist, stomach and foot restraints were used. Nothing is noted about restraint in the remaining part of the process under the heading "Restraint", which must be assumed to be due to an error. Against this background, and as there is no note that the restraint has been removed, the Court assumes that A has been restrained with wrist, stomach and foot straps throughout the entire process. With regard to the justification of the placement in a security cell on June 12, 2007, it is stated in Copenhagen Prison's report on the placement that A, who arrived after transfer from Vestre Fængsel, was extremely agitated and resisted so strongly when he was getting out of the car that he had to be taken to Politigården Prison by force and that he became so violent that it was necessary to place him in a security cell. The

Court finds the above to be true. The conditions in section 66 of the Execution of Sentences Act for placing A in a security cell and restraining him must then be considered fulfilled.

In the Copenhagen City Court's judgment of February 11, 2011, A was found guilty of violating section 119(1) of the Danish Criminal Code, corresponding to what is stated in the East Jutland State Prison's report on the security cell placement on January 22, 2009 at 14:20, by having assaulted a prison officer and punched him in the face while acting as counsel for a fellow inmate. The criminal conviction thus established that A had committed violence as stated in the report on the security cell placement. In view of the violence and the other information in the report from Østjyllands Fængsler about the placement in a security cell, the conditions for placement in a security cell and restraint in section 66 of the Execution of Sentences Act were met. As regards the length of the placement, which lasted a total of 2 hours and 30 minutes, the report states that A repeatedly shouted, tore his clothes and threatened, most recently at 16:20, when he shouted threateningly about revenge, and that he was transferred to Copenhagen Prisons at 18:10. Based on the information in the report about A's threatening behavior, there is no basis for considering the extent of the placement and restraint to be unjustified. Copenhagen Prisons' report on the continued placement in a security cell and restraint on arrival at the prison on January 22, 2009 at 7:50 pm does not state that A, who was handcuffed, resisted or made threatening remarks against the staff at Copenhagen Prisons. It is stated that he wanted to threaten the lives of prison staff at Østjyllands Statsfængsel

"taken down to protocol" and that he seemed angry and obstinate, but also that he himself settled down. During the continued placement until January 24, 2009 at 23:30, when he was removed from the security cell and restraint, it is generally noted that A was calm/quiet. It appears that when staff attempted to contact him on January 23, 2009 at 12:50 and 14:40, he refused contact and asked the staff concerned

"fuck off" and that at 20:56 he signaled to the staff to have his blanket turned over, which was done. On January 24, 2009 at 17:40 he was offered food and drink, but did not want it. On the same day it is noted that at 19:30 he was offered water, but "refused it". At 22:50, Mr. A requested a urine flask, which he was given. He declined the water and asked to go to his own cell. According to the notes, it was then assessed that he could go to his own cell, after which he was removed from the security cell on January 24, 23:30 after a total of 2 days, 3 hours and 30 minutes. According to the content of the report, there was no actual basis for the intervention in the form of specific threatening behavior or violence towards the prison staff in Copenhagen Prisons. The threat to prison staff at Østjyllands Statsfængsel is not in itself considered to justify placement in a security cell using restraint with a belt, hand strap and foot strap after 4 hours of transportation. In addition, during the placement, no threats were made or other behavior was exhibited that could justify the very prolonged intervention. On this basis, the Court finds that the placement and fixation in a security cell at Copenhagen Prisons was unjustified.

A has previously applied for compensation under the rules of the Administration of Justice Act

§§ 106-107, cf. Chapter 93a, for the placement in a security cell at Herstedvester Prison from August 19, 2005 at 13:05 to August 21, 2005 at 13:05 in 2 days. The case was dismissed from the courts by Glostrup Court's judgment of March 22, 2013 with reference to the lack of legal authority to process the claim for compensation for conditions during the execution of the sentence according to the rules in Chapter 93a of the Danish Administration of Justice Act. As no substantive decision has been made on the claim for compensation for the use of gas and the placement in a security cell on

August 19, 2005, A is not precluded from raising the claim in this case. Based on the content of the report from the Herstedvester Institution on the intervention and the statement from B and partly A's statement, it is assumed that the prison had decided to transfer A to an ordinary observation cell as a result of threats made against

for a prison officer. There is no basis for considering the prison's decision to do so unjustified. It is furthermore assumed that A refused to cooperate and that, based on the prison's knowledge of A's generally violent reaction pattern, it was then decided to use tear gas to force him to cooperate. Tear gas is mentioned in

**3107**

Section 62(2) of the Execution of Sentences Act as a means of force that can be used. Before the tear gas was used, a warning was given as required by section 6 of the current Executive Order no. 382 of 17 May 2001 on the use of force. B has explained that the use of tear gas was considered more lenient for both A and the staff, as the alternative was assumed from experience to be a significant use of force by several officers using batons. The Court finds that there is no basis for disregarding the prison staff's assessment, which was based on their prior knowledge of A and his usual reaction patterns, that the use of tear gas would be more lenient in the situation and was therefore the means of force to be used, cf. section 33(4) of the Execution of Sentences Act. The fact that the tear gas did not work on A, and that it was then necessary to use other significant force to get him out of the cell, cannot lead to a different result. According to the report, it is assumed that A put up considerable resistance and that it was therefore deemed necessary to use a security cell. There is no basis for assuming that the conditions for the use of a security cell were not met. It appears from the security cell report that until the morning of August 21, 2005, A regularly made aggressive statements and serious threats against the prison staff. At 7:30 on August 21, 2005 he had his arm straps loosened. When he reported later that morning at 8:20 that he could not remember anything and that there was "no more trouble with him", he was told that whether he would be moved depended on his behavior during the morning. He was then removed from the security cell at 13:05. The Court finds that, according to the information provided about the course of the placement, there is no basis for considering the placement to be longer than necessary. The circumstances were such that it was exceptionally possible to maintain the forced confinement for more than 24 hours, cf. section 8 of the current Security Cell Order.

*Other placements in security cells:*

With regard to his placement in a security cell at Copenhagen Prisons in the period 18 August 2003 at 2:20 am - 19 August 2003 at 1:04 pm for a total of 1 day, 10 hours and 44 minutes, it appears from the report that A shouted, hit and kicked the cell furniture and announced that he would not surrender without a fight. When the prison staff tried to open the door to the cell, A had blocked it. It was decided to "take him by force" and this was done with the use of shields under violent resistance from A. According to the report, he continued to resist while being taken to the security cell. At 2:25 a.m., it is noted that A was afraid and certain that the staff would kill him and was crying. From 2:40 a.m. he was calm, and when he was seen by a doctor at 3:40 a.m., it is also noted that he was calm. At 4:10 am, A. cried out. He also did so at 5:20, where he spat violently afterwards. Otherwise, it appears from the notes that he was calm and asleep in the period 6:00 - 8:00. There is a new note that A shouted "a little in between" at 8:50, and that he shouted that the belt was tight (presumably) at about 9:10, which he repeated (without shouting) at 9:35, and at 10:00, when he asked if it could be loosened. In the entire period up to 11:30, there are only notes that A was lying calmly. At 11:30, he announced that he was ready to return to his own cell, but according to the notes, the prison officers assessed at this point that he was not "ready". Subsequently, there are notes that at 14:20, A shouted that he

wanted to be released, and at 14:45 that he was lying down and shouting. Otherwise, there are only notes that he lay calmly until

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

At 18:05 on August 18, 2003, it appears that the restraint had been removed and that he had been moved to SM12 and seen by a nurse and had been given food and milk at 18:15. The notes on the observations of A in the cell where he was held without restraint show that he was calm until 13:04 on August 19, 2003, when he was taken to Horsens State Prison. After the described reasons for the placement in a security cell, the court finds the placement and restraint to be justified. However, the extent of the placement and restraint is found to have exceeded what was necessary from the morning of August 18, 2003, when, according to the report, A had been lying quietly and sleeping from 6:00-8:00 am for a considerable number of hours. As regards the period from the morning of August 18, 2003 until the removal of the restraint and the transfer to another cell at 18:05 on August 18, 2003, Article 3 of the European Convention on Human Rights was violated. After the time when the restraint was removed, there is no evidence that A was subjected to such significant physical and mental suffering that the provision can apply, also considering that the placement ended on August 19, 2003 at 13:04.

According to the report on the placement in a security cell at Horsens State Prison in the period 31 August 2003 at 13:55 - 31 August 2003 at 16:47, the reason for the placement was a decision that A, who heard voices and was extremely aggressive, should be transferred to a holding cell. During the transfer, he lashed out at a prison officer. The decision to transfer him to an observation cell, as well as the placement in a security cell and the restraint are found to be justified. The extension of the intervention, which ended after almost 3 hours, cannot be considered unjustified.

In the report on the placement in a security cell at Hersted-West Institution in the period 21 November 2003 at 13:50 - 22 November 2003 at 10:55 for a total of 21 hours and 5 minutes, the decision to place A in a security cell and restrain him was based on the fact that he became increasingly agitated and aggressive in the observation cell where he was placed. He was shouting and banging on the doors and did not stop when the staff announced at 13:50 that if he did not stop, he would be placed in a

**3108**

solitary confinement. In the first note on the placement, it is stated that A was placed in a security cell because he would not cooperate with the staff's instructions and exhibited threatening behavior. Regardless of whether the placement in a security cell can be considered justified, the use of restraint with a belt, hand strap, foot strap and gloves cannot be considered necessary based on what is noted about the reason for the transfer. In any case, the restraint must on that basis be considered unjustified.

From the report on solitary confinement at Her- stedvester Institution in the period November 26, 2003 at 17:45 - 27. November 2003 at 7:19 am for a total of 13 hours and 34 minutes, it appears that the intervention occurred as a result of A's violent assault on a fellow inmate in the ward's living room. The restraint and fixation with the use of a waist belt, hand and foot straps and gloves is therefore found to be justified. After a period of occasional spitting, using abusive language towards the staff, shouting and whistling and trying to get out of the restraints, A fell asleep around 00:00 - 00:15 on November 26-27, 2003, according to the notes. He then slept almost continuously until 7:15 am on November 27, 2003, when he was removed from the security cell. The extent of the placement while A was asleep cannot be considered unjustified. Nor can it be considered unjustified that the prison staff allowed him to sleep during the continued use of restraint rather than waking him up to assess whether he had calmed down enough to be removed from restraint and the security cell.

Copyright © 2023 Karnov Group Denmark A/S

It appears from the report on placement in a security cell at Herstedvester Prison in the period December 9, 2003 at 18:10 - December 10, 2003 at 08:05. 8:05 am for a total of 13 hours and 55 minutes, that the placement in a security cell and the restraint with a stomach belt, hand and foot straps and gloves was done to prevent self-harm or suicide, as A, who had been moved to an observation cell due to paranoid and threatening aggressive behavior, was seen sitting with a pointed and sharp object and rolled up sleeves. He was then forcibly transferred to the security cell. Against this background, there is no basis for considering the placement in the security cell and the restraint to be unjustified. According to the notes, A threatened to take revenge and was occasionally shouting and pulling on the straps until 19:25 on December 9, 2003. There are then no notes of aggressive behavior or anything else up to the time when he was removed from the security cell at 8:05 am on 10 December 2003. At 19:35 on December 9, 2003, he had an arm strap loosened in order to pee in a flask and at 19:45 to smoke. At 20:05 his hand was fixed again. From this time and for the rest of the placement, the use of gloves ceased. At 22:45 the left arm was released, after which A fell asleep and slept until 5:40 on December 10, 2003, when he had a cigarette. At 6:00 a.m. his right hand was released, which happened after his left hand had been restrained instead. The suspicion of attempted suicide or self-harm could justify a period of observation in a security cell without access to remedies with which A could harm himself corresponding to the total time A spent in the security cell. His initially aggressive behavior and threats also justified the use of restraint, including for some time after he had calmed down. However, the maintenance of the restraint after the time at 19:25 on December 9, 2003, when A last threatened and shouted etc. and then remained calm for several hours thereafter, must be considered unjustified.

The placement in a security cell at Anstalten ved Herstedvester in the period 27 August 2004 at 11.50 - 27 August 2004 at 17.30 (a total of 5 hours and 40 minutes) is the end of a placement in observation cell I6 at Herstedvester for 100 days, 20 hours and 35 minutes, see below about this placement. It appears from the report on the placement in the security cell and the previous report on the placement in the observation cell that on the morning of 27 August 2004, A exhibited increasingly paranoid behavior, including hearing voices. During a conversation with psychiatrist G, who had been called in by the prison staff, he gradually became more and more aggressive and, when she had left the cell, he jumped up from his bed in a threatening manner and lashed out at a prison official with clenched fists. He was then placed in a security cell without major problems, where he was initially loud and agitated and tried to wriggle free of the restraints. Based on the information about A's paranoid behavior and threatening outbursts against a prison officer, the placement in a security cell and the restraint with a belly belt, hand and foot straps and gloves is justified. According to the notes, he calmed down relatively quickly, but at 15:20 he expressed an idea that the prison was diverting his calls so that he could not get in touch with his mother, even though he called the right number. At 16:00, A had his gloves and wrist straps loosened so he could smoke, and it was agreed that if he was still calm at 18:00, he would be taken out of the cell. He was taken out at 17:30. Considering the paranoid delusions A continued to express at 15:20 and the need for a certain observation period before the insertion and fixation ceased completely, the intervention cannot be considered more prolonged than necessary.

According to the report on placement in a security cell from Copenhagen Prisons in the period 6 August 2005 at 20:40 - 9 August 2005 at 8:24 for a total of 2 days 11 hours and 44 minutes, the intervention was due to A's violently aggressive behavior, which was in the process of smashing

the furniture in his cell. He resisted vigorously when the prison officers, using intervention equipment and batons, entered to pacify him and was then placed in the security cell with continued violent resistance and

**3109**

fixed. Against this background, the intervention is found to be justified. It appears from a concluding note that the restraint with lap belt, hand strap and foot straps was maintained throughout the placement, even though it appears from the section on "Restraint" that the restraint ended in the middle of the day on August 8, 2005. There are notes about threats against the staff and attempts to get out of the restraint as well as verbal abuse until 23:45 on August 6, 2005. Then there is a note that A gave a prison officer "the finger" at 01:15 on August 7, 2005. From 3:00 am, A shouted again, made threats at 3:30 am and spat at the observation glass when a prison officer checked on him at 3:45 am. Apart from spitting at the observation glass after being refused contact with a counselor at 9:40 a.m., A lay calmly until 1:25 p.m. on August 7, 2005, when a prison officer had a conversation with him and asked if he had calmed down enough to be taken to an observation cell. According to the notes, "Mr. A did not want to participate in our proposal, instead he made a number of counter demands. The staff agreed that it would not be the solution to remove the inmate's fixation". A then shouted at 13:30 that if his demands were not met

"we might as well pull the sticks". At 13:40, A called and repeated his demands, which according to the notes were to make phone calls and get tobacco. He was informed that he would neither be allowed to make calls nor be offered cigarettes "as long as he is fixated and in such a negative mood". Immediately afterwards, there is a note of a conversation during which the prison officer informed A that he would not be given a telephone or cigarettes when he was returned to the observation cell, after which A announced that he "might as well stay lying down". Apart from a note about shouting and noise at 16:15 and a note at 19:45 about him shouting and calling an officer "a boy ass", there are no notes about aggressive behavior on A's part in the time thereafter. At 19:35 on August 7, 2005, after discussion with the medical staff at Vestre Prison, his request to be seen by a doctor was refused on the grounds that he would not state what the purpose was. At 21:30 and 23:30 he shouted for an officer. At 4:15 am on August 8, 2005, A again asked for a doctor, but was referred to speak to a named employee. At 8:20 a.m. he shouted occasionally. At 9:45 a.m., it is noted that the supervisor, who was called in at A's request, had spoken to him, and that A refused an offer of water. There are notes about attempts to urinate in a flask and about supervision by a nurse during the morning and in the middle of the day on August 8, and about supervision by a doctor and nurse at 13:50. At 14:06, he was given medication for pain and refused to be washed. At 14:25, after consultation with the nurse, this was again refused. The notes continued until A was removed from the security cell on August 9, 2005 at 8:24 a.m. According to the notes in the report, A had calmed down on the morning of August 7, 2005. The subsequent continued placement in the security cell and restraint appears to have been mainly due to the fact that A made various demands during a conversation at 13:25 on August 7, 2005 to be allowed to smoke and use the telephone when he was transferred to the observation cell. Regardless of whether these demands could not be met, the maintenance of the placement in the security cell during continued fixation after the time in the morning of August 7, 2005, when A had been calm for a certain observation period,

must be considered unjustified.

 The placement in a security cell at Anstalten ved Herstedvester in the period September 30, 2005 at 13:40 - October 5, 2005 at 12:30 (a total of 4 days 22 hours and 50 minutes) took place in immediate continuation of

Copyright © 2023 Karnov Group Denmark A/S

the placement in observation cell I5 from August 21, 2005 at 13:05 - September 30, 2005 at 13:50, see about this placement below. According to the two reports, A was placed in a security cell because, after a visit to the toilet, he announced that he would rather go to the security cell (I7) than to observation cell I5, to which he was to be moved. According to the reports, the reason he was to be moved to observation cell I5 was that he had made serious threats against a prison officer and therefore, in accordance with the applicable "clear guidelines" on, among other things, not tolerating threats against staff, he should not have access to the special privileges in the form of TV, playstation etc. that he had in observation cell I6, which was set up as a normal cell. The report states that he entered the security cell I7 himself and was then instructed by the staff to lie down "so that he can be restrained with all straps, cf. applicable rules." When A refused to do so, he was forcibly restrained because the staff did not take "any chances due to the inmate's dangerousness and hatred towards the staff on duty". After the course of events described, there was no basis for restraining A. The restraint and the continued placement in a security cell must therefore be considered unjustified. The fact that A subsequently threatened the prison officers and at a time when he had managed to free himself from the straps, had to be held with a shield and then restrained with handcuffs between the wrist strap and the bed cannot lead to a different result.

It appears from the report on placement in a security cell in Vridsløselille State Prison in the period 20 March 2006 at 18:45 - 21 March 2006 at 16:00 for a total of 21 hours and 15 minutes that A resisted a routine search, which was then sought to be carried out by force. When A resisted violently and attempted to hit the prison officers and nod his head, he was brought to a security cell and restrained during continued violent resistance and further attempts to nod his head. Against this background, the placement in a security cell and the restraint were found to be justified. Regarding the course of events, it appears that A until

### 3110

At approximately 11:00 p.m. on March 20, 2006, he was yelling, screaming and threatening. He slept almost continuously until 6:40 am on March 21, 2006, when he demanded to see a doctor, but was told that he had to wait until the nurses had time to see him. Thereafter, at 6:45 am, A kept shouting for a doctor and at the same time shouted abuse at a prison officer. From 8:00 am, A went back to sleep and from the time he woke up at 8:45 am, he shouted again at 9:00 am and 9:15 am and asked for a doctor at 9:30 am. Around 10:00 am, he was seen by a nurse and it is noted that he was "slightly agitated" and shouted a lot. At 10:59 it is noted that he had calmed down. It is noted that at 13:15 he was refused to loosen his belt and get a cigarette and was furious. At 16:03 on March 21, 2006, the placement in the security cell ended when A was transferred to Politigården Prison. According to the information about A's regular aggressive outbursts and rage during the process, there is no basis for considering the placement and restraint to be too long.

According to the report on the continued placement in a security cell in Copenhagen Prisons in the period March 21, 2006 at 16:28 - March 22, 2006 at 10:04 for a total of 17 hours and 36 minutes, the placement in a security cell and the restraint was justified by the fact that A was still threatening and aggressive. Although it would have been desirable if it had been elaborated further, the court finds that there is no basis for deeming the decision to place A in a security cell while using restraint to be unjustified. However, it appears from the report that A was calm throughout the process. The vast majority of the intervention,

which lasted 17 hours and 36 minutes, must therefore be considered unjustified.

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

The report on the placement in a security cell in Copenhagen Prisons in the period 28 July 2006 at 19:55 - 30 July 2006 at 10:35 for a total of 1 day, 14 hours and 40 minutes states that A was placed in a security cell because he was very agitated and threatening, kicked and banged on the door of his own cell and could not be made to remain calm. In light of the death threats he also made to the staff, it was decided to move him from his own cell. He resisted this and was then forcibly moved to the security cell, where he was restrained. After the course of events described, the court finds that the placement in the security cell and the restraint were justified. It appears that at 20:40, A shouted at a prison officer that he wanted to poke his eyes out, and that at 21:30, after the doctor's supervision, he was aggressive and shouted obscenities. The doctor noted about the inspection at 21:15 on July 28, 2006 that A stated that a prison officer had tried to strangle him and hit him on the head, and that there were no visible injuries to A's neck or head. It also appears that during the conversation, A became agitated and started shouting again and threatened to kill a guard when he comes to Herstedvester. At 22:10, there is another note in the report about threats on his life. In the notes up to and including 11:30 on July 29, 2006, it is noted that A was lying still or sleeping. At 11:40 he gave a prison officer "the finger". At 11:55 he answered a question about whether he was calm, negative and agitated, after which it was decided to maintain the restraint. At 16:10 there was another conversation during which A stated that he would assault the staff if he was released. At 18:40 A shouted and screamed, and at 18:50 A was threatening towards the staff. At 19:10, he slammed his head into the bed, shouting and threatening. At 19:25 he shouted for a doctor, which was discussed immediately afterwards. A refused the offer of water. At 20:05, he was seen by a doctor, and there were then several conversations between him and A until 20:30, when the doctor ordered a psychiatrist. According to the doctor's notes in the report, during the inspection at 19:50 on July 29, 2006, A said that he would be quiet and calm, but the next moment he threatened to hit his head on the iron bar in the bed in order to become unconscious, and at the same time spat on the wall. It was discussed that it was a good idea for him to be quiet and calm to get out of the cell and the risk of dehydration. At 20:40, A banged his head on the edge of the bed. Apart from notes about help to urinate using a flask and about placing a blanket to relieve pain in A's knees, there are then only notes about A sleeping or trying to sleep until 01:05 - 01:10 on July 30, 2006, when A was refused a wish to smoke - and then at 1:20 was very dissatisfied with this and expressed that it was an abuse of power. Subsequently, there are notes that A regularly called and wanted tobacco. At 01:55, A wanted medicine, but did not want to take it because the prison officer would not untie him so he could see it. At 8:15 am he was offered medication. According to the following notes, A lay calmly until 10:33 on July 30, 2006, when he was removed from the security cell after a conversation with a prison officer. After the information about the violent threats directed at the prison officers, which A made repeatedly during the process towards both the prison officers and the supervising doctor, as well as his self-harming behavior by hitting his head against the bed, the court finds that until the time in the morning of 30 July 2006 at 8:15 am, when A did not react with aggression to the offer of medicine, there was a necessary basis for maintaining the placement in the security cell and the fixation. The continued fixation after 8:15 am on July 30, 2006, on the other hand, must be considered unjustified.

As previously mentioned, after being placed in a security cell

between June 12, 2007 at 13:15 and June 13, 2007 at 16:20, A was found guilty by the Copenhagen City Court judgment of February 11, 2011 of

Copyright © 2023 Karnov Group Denmark A/S

long-term, placed in an observation cell from June 13, 2007 at 16:25 - June 13, 2007 at 17:38, cf. the justification for this placement below. The observation cell placement was according to the report on the observation cell placement and the report on

**3111**

The placement in a security cell from June 13, 2007 at 17:25 - June 14 at 14:10 (a total of 20 hours and 45 minutes) was replaced by a placement in a security cell under restraint because A in the observation cell, after having first called, banged on the door and banged his head and hands against the cell door and, when the prison staff tried to calm him down, he was still agitated and could not be brought to have a conversation. Taking into account in particular A's attempt to self-harm by banging his head and hands against the cell door, the placement in a security cell and the restraint are considered justified. According to the notes immediately after the placement, A made threats against the prison staff, shouted and was very agitated. According to a note at 18:47 on June 13, 2007, during a long conversation with the supervising doctor and the prison officer, A used further abusive language. Until 6:50 the next morning, June 14, 2007, there are only notes that A remained calm. At this time he asked for F (warden F) and was given his medication on request. At 7:05, A complained about the treatment he had received and stated that he wanted to be seen by a doctor and psychiatrist. At 7:25, he asked again when F would come to work. At 8:30, A refused the offer of breakfast and having one arm loosened in the meantime, as he did not want food if he was not completely loosened. At 9:50, F had a conversation with A, who made accusations against the staff and would not talk about the self-harm. Based on this, F assessed that there was still a risk of self-harm if A was given the opportunity to do so. The detention and restraint were therefore maintained. Between 8:25 and 9:30, there was an exchange of words during which A stated that he was calm, that he wanted to be released and would like to talk to F again. This happened at 9:50. According to F's note at 13:08, A quickly became aggressive and stated that he did not want to be moved, "because it was only about giving him (ins.) more beatings". According to the note, F assessed that A continued to exhibit aggressive behavior with a risk of assaulting staff and therefore decided to maintain the restraint. At 10:25 and 10:45, A used various insults towards the prison officers. After a further conversation with F, A was removed from the restraint and the security cell. During the conversation, A had indicated that he was now calm. He asked for a guarantee that he "will not be beaten up again" and was advised about the right to complain if he thought he had been treated unfairly. Based on the information in the report about the threats etc. that A made to the prison staff, as well as Chief Warder F's conversations with A and F's assessment that there was still a risk of self-harm or assault on the prison staff, there is no basis for considering the extent of the placement in a security cell and the restraint to be unjustified.

 According to the report, the reason for the placement in a security cell in the East Jutland State Prison from 3 July 2008 at 16:15 - 4 July 2008 at 7:25 for a total of 15 hours and 10 minutes was that, during a process that began with A being told to wear a t-shirt and footwear, A became increasingly agitated and ended up first threatening a prison officer and then, when the officer felt threatened and pushed him away, hit the prison officer in the forehead with his fist. When the prison officer fell down, A followed and continued to punch and kick the officer, even after being grabbed from behind by another prison officer. Against this background, the placement in a security cell and the restraint must be considered justified. After his imprisonment, A behaved

relatively calmly. During a conversation at 18:00 on July 3, 2008, he expressed that he was very angry about the imprisonment, although he admitted that he had hit a

Copyright © 2023 Karnov Group Denmark A/S

prison official. However, he believed it was self-defense, as he felt offended by the person in question. It is noted that he was very angry and agitated during the conversation. After shouting, screaming and spitting on the floor at 19:15 - 19:30, A calmed down and lay down to try to sleep, which after "testing" the hand strap and shouting and talking to himself at 20:45 - 21:00 happened at 21:30. After waking up at 6:45 am on July 4, 2008, A was taken out of the security cell at 7:25 am for transfer to the Police Station Prison. According to the course of events described, the placement and restraint did not last longer than justified. In this connection, reference is made to what was previously stated about maintaining restraint during sleep.

According to the report on the continued solitary confinement from the

4 July 2008 at 10:15 - 4 July 2008 at 11:35, which took place at Copenhagen Prisons immediately after the transfer of A from the security cell in East Jutland, A was handcuffed on arrival and had to be carried from the car. Against this background and given the background for the transfer, the short-term placement in a security cell under restraint of 1 hour and 20 minutes that took place must be considered justified.

Placement in a security cell in Copenhagen Prisons from 12:15 pm on July 30, 2008 to 2:15 pm on July 31, 2008 for a total of 1 day and 2 hours took place after the observation cell placement in Copenhagen Prisons from 11:45 am on July 30, 2008 to 12:15 pm on July 30, 2008, cf. the justification for this placement below. According to the reports, A was placed in a security cell in order to "force violent resistance", as A was very violent in the observation cell and screamed loudly and, when a prison officer tried to calm him down, became even more violent and tried to tear open the cell door. Based on this and the information about the violent physical resistance that A offered during the transfer, the placement in a security cell and the restraint are found to be justified. Regarding the course of events, the report states that at 14:15 on July 30, 2008, an attempt was made to move A, who had been calm until that time, back to the observation cell, but this was abandoned when he left.

**3112**

"verbally amok" and shouted "damn whore" and other obscenities. He was then calm until 10:00 am on July 31, 2008, when it is noted that the area manager again tried to have a conversation with him with a view to returning him to the observation cell. However, this resulted in Mr. A starting to scream and shout that he did not want to be moved and that the prison staff "should go to hell". This was repeated during an attempted transfer interview at 11:05. After a doctor had examined A at 13:20, it was assessed at 14:15 that A could go back to his own cell. It is noted that when he was released, A was very conflict-seeking in relation to the staff, but did not make any outbursts. After the course of events described, A, every time the area manager tried to have a conversation with him with a view to removing him from the security cell and the restraint, went verbally "crazy" and became very aggressive, the extent of the stay in the security cell and the restraint cannot be considered unjustified. The circumstances were such that the restraint could exceptionally have been maintained for more than 24 hours, cf. section 8 of the current Security Cell Order.

According to the report on the placement in a security cell in Copenhagen Prisons from August 15, 2008 at 21:15 to August 17, 2008 at 22:11 for a total of 2 days and 56 minutes, the placement and fixing took place after a process where A had initially shouted and banged violently on the furniture in his cell.

A recommendation to stop did not help, and A was very threatening towards the prison officer. It was then decided to transfer him to an observation cell, but A would not follow voluntarily and therefore had to be taken by force. Against this background, and as A made threats on his life

Copyright © 2023 Karnov Group Denmark A/S

against the prison officers, a decision was made to place them in a security cell and to restrain them. After the above-mentioned course of events, the placement and restraint cannot be considered unjustified. The report shows that after some initial threats and insults, A remained calm, although he completely refused to talk to a supervising doctor at 22:30 on August 15, 2008. At 8:43 am on August 16, 2008, it was assessed that A could not be taken back to his own cell as he had threatened to "tear the whole place apart" and uttered various insults. He remained calm until 13:57, when it is noted that he ignored an inquiry as to whether he was ready to move to his own cell. He ignored a similar inquiry at 19:13 on 16 August 2008 and did not respond to a request for water at 18:14. During a conversation with the supervising doctor at 00:10 on 17 August 2008, he loudly stated that the officers were banging on the walls of his cell and, referring to one of the officers, that "the whore in the hallway is laughing at him". He also threatened to kill one of the officers if he got the chance. The doctor attempted a conversation, but A was very loud. At 2:25 am, A tried to get out of the restraints while shouting death threats to a prison official. At 2:40 am, it is noted that A was refused a flask to pee in because "he is far too violent and agitated for us to release the restraint". It appears that A was extremely threatening throughout the incident. At 2:55 am, he sat up and again threatened the life of a prison officer. After this, A remained calm and slept most of the time until 8:15 in the morning on August 17, 2008. According to the notes, he remained calm until 12:25 p.m., when he answered the prison staff's question as to whether he would be interested in going to the toilet and then to the observation cell and later in the evening back to his own cell: "I need to get out of this fucking shitty cell. You guys are fucking pigs. I have to smash everything" and showed a very hostile attitude towards the staff. Based on this, it was decided to let him stay in the security cell. At 14:14, A did not want to talk to the doctor who had arrived. At 14:30 he shouted and threatened with: "This will have consequences when I get out". At 15:45, A wanted to urinate and 3 officers arrived to assist. He had in the meantime peed on the couch. There was a discussion about transfer to the observation cell with a view to returning to his own cell when the watch commander arrived on Monday, but A wanted neither and refused to talk to the staff. After this, A remained calm, but continued to refuse the offer of water. At 20:00 there was another conversation during which A complained about not being moved, but at the same time became increasingly angry and threatened the life of a prison officer. At 22:00, in connection with the removal from the security cell, it was noted that there had been a long and spacious dialog with A, which several prison officers had been involved in and helped to keep going. After using the toilet, A was transferred to a holding cell, cf. the justification for this placement below. According to the information provided about the course of events, where A, when the prison staff sought a dialog in order to get him transferred to an observation cell and then to his own cell, stood up and became very aggressive and threatening, there is no basis for considering the extent of the security cell placement to be unjustified. Furthermore, the circumstances have been such that the forced confinement could exceptionally be maintained for more than 24 hours, cf. section 8 of the current Security Cell Order. This applies regardless of the very long periods when A, when he was not in contact with the staff, remained calm, and regardless of the total placement and restraint lasting more than two days. There is no basis for assuming that the dialog that eventually led to A being removed from the security cell could have been carried out at an earlier time.

According to the report on the security cell placement in East Jutland State Prison from December 8, 2008 at 11:05 am

**3113**

Until December 8, 2008 at 15:30 for a total of 4 hours and 25 minutes, A was temporarily placed in the visiting room, where he started shouting and kicking the door. When the prison officers arrived, he was clearly agitated and then became even more agitated and threatened, among other things, to smash the entire room. It was then decided to place him in an observation cell. When A refused to comply and lashed out at a prison officer with his fist, he was pacified and taken to a security cell where he was restrained. Against this background, the placement and restraint must be considered justified. The intervention, which lasted 4 hours and 25 minutes, was terminated when A had remained calm for some time and had indicated that he would behave properly. There is no basis for considering the stretching to be unjustified.

According to the report, A was placed in a security cell in Copenhagen Prisons from February 23, 2009 at 17:05 to February 24, 2009 at 14:40 for a total of 21 hours and 35 minutes because he became increasingly agitated during the day and, among other things, had knocked on the door. When he had smashed his chair in the afternoon and continued to be highly agitated and threatening, an attempt was made to remove him by grabbing him by the arm, but he became so violent that he had to be knocked down on the bed and held by several officers. He was then forcibly taken to the security cell and restrained. According to the information about the background to the intervention, this was justified. According to the report, shortly after being taken into custody, A refused to be seen by a doctor. At 19:45 on February 23, 2009, he sat up and shouted at the door "What are you looking at you idiot". He then lay still until 10:15 am on February 24, 2009, when, while being seen by a psychiatrist, he became very agitated and threatening in his behavior. At 12:45 he called and expressed that he wanted to return to his room. It is noted that he was agitated. At 14:40, he had a conversation with the area manager, who took notes:

"The inmate is reasonably calm, but feels unfairly treated and accuses staff of assaulting him. As the inmate has mostly remained calm, he is removed and returned to his own cell." A was then removed from the security cell and restraint. After the information about how A became agitated when the psychiatrist attempted to contact him at 10:15 on 24 February 2009 and became agitated at 12:45 the same day, and in view of the need to have a certain observation period thereafter, the extent of the placement and restraint, which lasted less than 24 hours, cannot be considered unjustified.

It appears from the report on the placement in a security cell in the East Jutland State Prison from March 4, 2009 at 23:55 to March 5, 2009 at 8:25 for a total of 8 hours and 30 minutes that A was picked up by staff from the East Jutland State Prison in Politigårdens Fængsel, as he was to be presented at the Court in Horsens. As A did not want to come voluntarily, he had to be handcuffed and transported to the car by force. It was also necessary to put him in the bottom of the car during transportation because he was so violent. On arrival at East Jutland State Prison, A was still extremely agitated and threatening. It was therefore deemed necessary to place him in a security cell and restrain him. According to the information in the report about A's violent and threatening behavior, the placement and restraint must be considered justified. Until 1:30 a.m. on March 5, 2009, A continuously used abusive language towards the staff and the supervising doctor and challenged a prison officer to a fight. A then lay quietly and slept in between until he

was removed from the security cell at 8:25 am on March 5, 2009. There is no basis for considering the extent of the intervention unjustified.

*Observation cell admissions*

Prohibitions on contact with other inmates that are justified for security, protection or disciplinary reasons are

not in itself contrary to Article 3 of the European Convention on Human Rights, see, inter alia, judgment of 12 May 2005 in case 46221/99 Öcalan, paragraph 191. Exclusion from general association for a certain length of time under conditions that must be considered particularly harsh due to, among other things, lack of access to contact with other people, lack of or limited access to activities such as walks, television, books, etc. and poor physical conditions in the cell, may constitute a violation of Article 3, see, inter alia, judgment of September 29, 2005 in case 24919/03, Mathew, paragraphs 197-205, judgment of April 7, 2005 in case 24407/04, Onoufriou, paragraphs 71-81, and judgment of July 4, 2013 in case 4242/07 Rzakhanov. In determining whether exclusion from the general community falls under Article 3, considerable weight is given to the reasons for the exclusion and how weighty they are, see, inter alia, the Mathew judgment, paragraph 201.

According to the report, the reason for placing A in an observation cell at Anstalten ved Herstedvester in the period 21 November 2003 at 13:00 - 21 November 2003 at 13:58 was that A was distressed by hearing voices, which is why they wanted to monitor him more closely. Against this background, the intervention must be considered justified, cf. section 64(1)(1) of the Execution of Sentences Act, and was so limited in time that it cannot fall under Article 3 of the European Convention on Human Rights. The placement must be included in the overall assessment of A's conditions of imprisonment from the August 10, 2003.

The very long stay in an observation cell at Herstedvester Prison for a total of 100 days, 20 hours and 35 minutes from May 18, 2004 is not further explained in the report, which merely states that A was removed from the security cell and then placed in observation cell I6. It appears from the notes in the report that during his stay in cell I6, A went on farm trips, but not during a period from May 28, 2004 - June 24, 2004. It appears from the notes that the refusal to go for walks was due to the fact that

**3114**

A refused to take his medication. On this basis, the prison staff did not consider it safe to let him go for a walk. According to the report, he had access to go to the grocery store and shop on his own. However, this access was withdrawn on 22 July 2004 as a result of A's border-seeking behavior. He was then offered to order goods instead. It is noted that during his stay he was visited by the priest, psychiatrist G, his guardian and his mother and father, and that he had access to television and playstation as well as telephone calls. Throughout the process, there are notes of days when A was aggressive in his speech to the prison staff and boundary-seeking. On 27 August 2004 at 11:45 am, A was transferred to a security cell as a result of paranoid and threatening behavior, cf. above about this placement. According to point "Re 2" in the response from Herstedvester Prison to the Attorney General's questions, B's and A's statements and the information provided in some of the reports on placement in a security cell or observation cell, cell I6 was a cell in the section with observation and security cells, which was furnished more normally with television, playstation etc. where it had been agreed with A that he could stay if he complied with the framework for his stay in prison. The answer to the Attorney General's question also shows that A was observed while he was in this cell because his behavior and mental state made frequent supervision necessary. Notes were therefore also kept as if he had been placed in an actual observation cell. On this basis and according to the information in the report on the placement from 18 May 2004 about walks in the yard, access to visitors, access to a playstation, television and to a

certain extent to shop in the prison's grocery store, there did not appear to have been placement in an actual observation cell, cf. section 64(1)(1) of the Execution of Sentences Act.

Copyright © 2023 Karnov Group Denmark A/S

A's placement in a normally furnished cell and a simultaneous exclusion from general association, cf. section 63 of the Act. According to the available information, the stay did not involve such a long-term restriction of A's access to contact with others or restrictions in general which could lead to it being considered covered by Article 3 of the European Convention on Human Rights when considered in isolation. However, the stay in observation cell I6 of approximately 101 days must be included in the overall assessment of the exclusion from general association that has taken place and in the overall assessment of A's conditions of imprisonment.

The placement in an observation cell at Herstedvester Prison from 21 August 2005 at 13:05 - 30 September 2005 at 13:50 is immediately after the placement in a security cell at Herstedvester Prison from 19 August 2005 at 13:05 - 21 August 2005 at 13:05 and before the placement in a security cell at Herstedvester Prison from 30 September 2005 at 13:40 - 5 October 2005 at 12:30, see above regarding these two placements. As previously mentioned, the placement in a security cell on August 19, 2005 stemmed from A's refusal to move from cell I6, which was designed as a normal cell to an actual observation cell. The placement in an observation cell on 21 August 2005 is, as far as can be seen, an implementation of the earlier decision that A was to be moved from the observation cell.

"normal" cell I6 to the actual observation cell I5 as a result of threats made to a prison officer. The decision must be seen in light of the special guidelines at Herstedvester Prison according to the statements, which meant that if A was violent or threatened prison staff, he was deprived of the privilege of living in the "normal" observation cell I6 and was moved to an ordinary observation cell. According to the report on the observation cell placement, A had access to walks. It also states that he could call his guardian and others and had access to visits, including from the priest and his father. He could also order goods from the grocery store, watch TV and get magazines. Against this background and considering that the stay in the observation cell was limited to approximately 40 days, the placement cannot be assumed to have caused A such mental and physical suffering that the intervention, considered in isolation, can be considered covered by Article 3 of the European Convention on Human Rights. The placement must be included in the overall assessment of the exclusion from ordinary society that has taken place and in the overall assessment of A's conditions of imprisonment.

Observation cell placement in the State Prison in Horsens in the period

April 20, 2006 at 11:25 am - April 20, 2006 at 4:40 pm for a total of 5 hours and 15 minutes has had a character and been of such limited duration that it cannot fall under Article 3 of the European Convention on Human Rights. The placement, which according to the information about A's unbalanced state of mind and the suspicion of a t t e m p t e d  self-harm with glass from a broken window in his cell must be considered justified, cf. section 64(1)(1) of the Execution of Sentences Act, must be included in the overall assessment of A's imprisonment. The observation cell placement at Copenhagen Prisons in the period 13 April 2009 at 19:15 and the force used in this connection must be considered justified in light of the threats A made to the prison officers and his attempt to headbutt an officer and other violent resistance. According to the information in the report about his threats, shouting etc. every time the staff tried to contact him, the extent of the arrest cannot be considered unjustified either. In this connection, it should be noted that the placement was terminated when A's continued refusal to

consume food and drink was assessed to affect his condition.

**3115**

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

With the exception of one, all the other observation cell placements are of shorter duration - between 1/2 and approx. 6½ hours. In most cases, the placements were made immediately after placement in a security cell and were justified by a need for special observation, cf. section 15(1)(3) of the Executive Order on exclusion from association before transferring A to his ordinary cell, or by decisive considerations of order and security in the institution, cf. section 15(1)(2) of the Executive Order on exclusion from association. The placements must be considered justified and, moreover, they have not been of an extent and nature that would make them fall under Article 3 of the European Convention on Human Rights. With regard to the somewhat longer observation cell placement of 2 days 7 hours and 28 minutes in the period 4 July 2008 at 11:35 am - 6 July 2008 at 7:03 pm at Copenhagen Prisons immediately after the previous placement in a security cell, the Court notes that the longer observation period must be assumed to be due to the fact that A, cf. note at 20:13 on July 4, 2008, during the doctor's supervision, A expressed para- noid ideas that the prison staff knocked on the wall next to him and said that it was a joy that his father was dead. Against this background, the stretching cannot be considered unjustified.

The most recently mentioned placements must also be included in the overall assessment of A's imprisonment.

*The exclusion from community*

As already mentioned, it follows from the case law of the European Court of Human Rights that exclusion from the general community in prison may under certain circumstances violate Article 3 of the European Convention on Human Rights.

In the statement of claim, A's lawyer has calculated the total period during which A has been excluded from ordinary fellowship to 6 years and 35 days. The calculation in question concerns the period from December 10, 2002 to May 26, 2009 and thus also a period before August 10, 2003, which is not covered by the case. According to the other information provided, it must be assumed, irrespective of the uncertainty about the exact calculation of time, that A has been excluded from ordinary fellowship for all or the vast majority of the period from August 10, 2003 to May 26, 2009, which the case concerns.

Some of the exclusions from association are due to placement in an observation cell or security cell, which, cf. the above, has been found justified. In these cases, the exclusion from association is a consequence of the intervention and should therefore not be included when assessing whether the exclusion from association is otherwise justified. In addition, in the following cases, a decision has been made on complete exclusion from association, cf. section 63(1)(1) of the Execution of Sentences Act, cf. the Directorate's notes on exclusion:

- from August 12, 2003 at 9:15 am to August 19, 2003 at 13:10 pm,
- from August 19, 2003 at 14:00 to November 11, 2003 at 14:00 9:30,
- from January 10, 2004 at 12:00 to April 30, 2004 at 12:20,
- from February 6, 2006 at 14:55 until March 21, 2006 at 16:09,
- from March 29, 2006 at 11:45 to May 7, 2006 at 14:15,
- from August 3, 2006, 12:26 pm to August 8, 2006, 11:00 am,
- from December 21, 2006, 15:36 to December 22, 2006 8:00 am
- from January 7, 2007 at 17:00 until January 12, 2007 at 10:00,
- from April 18, 2007 at 10:00 am to April 25, 2007 at 10:00 am,
- from June 13, 2007 at 15:54 to June 15, 2007 at 9:00,
- from April 21, 2008 at 12:10 pm to May 5, 2008 at 1:45 pm and
- from July 4, 2008 at 10:30 am to October 3, 2008 at 11:30 am

According to the three decisions as stated in the Directorate's notes on exclusion from visitation from May 9, 2006 at 14:00 to July 5, 2006 at 14:15, from May 10, 2007 at 12:00 to June 8 2007 at 13:10 and December 8, 2008 at 15:30 to December 16, 2008 at 10:30 on the exclusion from access decided pursuant to

Copyright © 2023 Karnov Group Denmark A/S

of section 63(1)(1) and (3) of the Execution of Sentences Act, it has been possible to spend time with others.

According to the available notes, reports and other information, the exclusion from general association that has taken place and the placement in specially secured sections, including the placement in cell I6 at Herstedvester Prison, is justified in order to prevent further violence and threats against other inmates, cf. Section 63(1)(1)(1) and (3) of the Execution of Sentences Act and the detailed rules on such exclusion in Executive Order No. 572 of July 5, 2002, subsequent Executive Order No. 1072 of November 3, 2005 and then Executive Order No. 28 of January 22, 2009 (the Transfer Order and most recently the Placement and Transfer Order).

There are reports and other information about violence against inmates. Against this background and in light of the other information in the mental observation statements about A's considerable dangerousness and peculiar personality structure and what appears from the convictions from Glostrup Court, Svendborg Court and Copenhagen City Court about threats and violence against prison staff during his sentence, it must be assumed that there has been a considerable need to protect other inmates from A. There is no basis for setting aside the assessments of the Directorate and the underlying institutions, according to which

**3116**

It has not been possible to meet this consideration in a responsible manner while serving time in general association in the normal wards in the prisons. Nor is there any basis for disregarding the assessments of the Directorate and the underlying institutions, according to which there has been a need to completely exclude association with other inmates during the periods stated in the above-mentioned memoranda.

According to the available information, during the periods in which he was excluded from general association, A has to a certain extent had one-on-one association with other inmates. According to the statements from E and F, the reason why this one-on-one fellowship has been limited is that it was quite often not possible to find other suitable inmates in the special sections where A was serving time who were willing to spend time with him.

According to the information provided, the prison staff made efforts throughout his imprisonment to compensate for the lack of fellowship with other inmates, including ensuring as far as possible that A was in contact with staff with whom he could work, and that staff were available for conversations if A so desired. A has also had access to visit and be visited by the prison chaplains and for visits in general. He has also had access to television, radio, books, newspapers and his playstation, as well as to telephone calls. Furthermore, according to the report on his stay in cell I6 at Herstedvester Prison and the answers from the prisons to the Attorney General's questions, A has had access to socializing with others during walks and to a certain extent during shopping. The aforementioned opportunities have been limited to the extent that this has been a consequence of placement in a security cell or actual observation cell or a decision on complete exclusion from socializing.

The Court finds that, according to the available information, there is no basis for considering the exclusions from general association and the more limited temporal exclusions from any contact with other prisoners to be unjustified or disproportionate. The exclusion from general association and the periodic exclusions from any contact with other inmates cannot therefore be considered contrary to Article 3 of the

European Convention on Human Rights.

*The rotation scheme*

A has been extremely difficult to accommodate in the prison system due to his peculiar personality structure and violently aggressive behavior in relation to both fellow inmates and staff.

There is no basis for disregarding the Directorate's assessment that it was necessary to establish a rotation scheme in September 2004 for the sake of both A and the prison staff in order to make it possible for the prisons and prison staff to accommodate A. The rotation scheme must thus be regarded as a justified safeguarding of the interest in preventing violent assaults by A against staff and other inmates, as laid down in the Danish Execution of Sentences Act.

§ Section 26 or an analogy thereof, and does not violate Article 3 of the European Convention on Human Rights.

In addition, according to the presented overview of transfers, it must be assumed that no more than two transfers during the serving of the sentence are justified by the rotation scheme. According to the overview, the other transfers are for a significant part justified by violent assaults on prison staff committed by A. In these cases, the transfers are directly authorized by section 26(1)(5) of the Execution of Sentences Act. The considerations described by E, to ensure that prison staff who have been subjected to violent assaults do not have to meet the perpetrator immediately afterwards and to avoid the risk of or suspicion of harassment of the perpetrator by the prison staff, imply in relation to both the Execution of Sentences Act and Article 3 of the European Convention on Human Rights that the transfers must be considered justified. In addition, in a number of cases, the transfers are based on court appearances in connection with the criminal proceedings that have taken place during the serving of the sentence, as well as hospitalization for mental observation. Insofar as the latter transfers are covered by A's plea of unjustified transfers at all, the transfers in question are manifestly justified.

*Missing or inadequate investigation of A's complaints*

The European Court of Human Rights has in its judgment of November 2, 2004 in case 32446/96, Abdülsamet Yaman, paragraph 53, established that the requirement for effective remedies in Article 13 of the Convention means that victims of torture or torture-like treatment, cf. Article 3 of the Convention, are entitled to:

". . . a thorough and effective investigation capable of leading to the identification and punishment of those responsible, including effective access for the complainant to the investigatory procedure (see the above-cited Aksoy judgment, § 98)."

In this case, there is no information that A has reported or attempted to report individuals to the police.

In the statement of claim or during the main hearing, Mr. A has not stated which complaints he believes have not been properly investigated. For this reason alone, there is no basis for accepting the plea of lack of or insufficient investigation of his complaints.

*Use of force*

There is no evidential basis for the fact that A, as explained by him, has been beaten up by prison staff on a number of occasions. The use of tear gas prior to the placement in a security cell on August 19, 2005 at Anstalten på Herstedve- ster has been considered above. According to the available information, A's aggressive and violent behavior has also made it necessary to use force in a number of other cases.

**3117**

To the extent that placements in security cells have been found unjustified, there is no need to separately consider the use of force that is part of the overall intervention.

There is therefore no basis for considering the use of force that

otherwise took place during the serving of the sentence to be contrary to the Penal Code.

Copyright © 2023 Karnov Group Denmark A/S

Section 62 of the Enforcement Act or against Article 3 of the European Convention on Human Rights.

*Access to documents and justification*

A's plea that Article 3 of the European Convention on Human Rights has been violated as a result of the lack of a requirement for access to and reasons for exclusion from the case, which is a consequence of the exception in section 9(4) (now section 11(2)) of the previously applicable Public Administration Act, was first raised during the main hearing.

The Court finds that there are no circumstances that can justify that the plea - which is in no way substantiated - against the Directorate's protest should be allowed to be raised at this late stage, and therefore does not take it under appeal, cf. the Administration of Justice Act § 363, paragraph 1 and paragraph 4.

*Overall assessment of the prison conditions*

There is no doubt that A has been very difficult to accommodate in the Prison and Probation Service's institutions due to his personality characteristics, paranoid traits and considerable aggressiveness. It is also evident that A's imprisonment has been characterized by very violent interventions and by his experience of being persecuted by the prison staff, and that he - as expressed in several of the reports presented and the statements from F and D - could appear misplaced in the prison system.

The Prison and Probation Service has been aware, at least since June 3, 2004, when Chief Physician G, Herstedvester Prison, contacted the Directorate about the possibility of transferring A to the Security Department under section 40 of the Psychiatry Act, that A had difficult and inappropriate prison conditions in the institutions of the Prison and Probation Service. They were also aware that, in all probability, it would provide better opportunities to take care of A and alleviate the paranoid ideas that characterized him if they could get him transferred to the Security Department. From the summer of 2004 until the transfer to the Secure Unit on 26 May 2009, the directorate has also been working continuously to achieve a transfer.

Based on the information about A's aggressive and violent behavior and considerable dangerousness, it must be assumed that the only safely acceptable alternative to imprisonment in the special security sections of the closed prisons was placement in the security section.

However, the prerequisite for a transfer to the Security Department was - as far as is undisputed - that A had to be considered insane. The Security Department, which is part of the psychiatric hospital Nykøbing Sjælland, is thus a treatment facility for mentally ill persons, and not a place of detention for persons sentenced to custody who, like A, are covered by section 69 of the Danish Criminal Code.

A has been subjected to a total of 7 mental observations of A. He was not found insane until the seventh statement, which was drawn up during the observation that took place at the Security Department from May 26, 2009. This has not been claimed and, as the case is stated, there is no basis for assuming that it is an error that A was not found insane in the previously made mental observation statements. There is thus no basis for assuming that A could and should have been transferred to the Security Department at an earlier date.

Against this background, the overall course of imprisonment cannot be considered contrary to Article 3 of the European Convention on Human Rights.

*Statute of limitations*

The case was filed on January 3, 2011, and the transitional rule in section 30(1) of the Parentage Act is therefore not applicable.

Claims for compensation for interference of the nature that A has been subjected to are in the nature of tort compensation, cf. section 26 of the Tort Liability Act, and are thus time-barred under section 3(1) of the Limitation Act.

Copyright © 2023 Karnov Group Denmark A/S

It follows from section 3(2) that the limitation period in subsection 1 is suspended in the event of ignorance of the claim, so that it is only calculated from the day when the creditor became or should have become aware of the claim.

The High Court understands the Directorate's procedural declaration not to assert limitation with respect to claims that would not have been time-barred under the transitional rule in section 30(1) of the Limitation Act, cf. the 1908 Act, if the case had been brought on December 30, 2010, to mean that limitation is not asserted with respect to any tortious acts committed on or after December 30, 2005. The High Court assumes that this also means that the limitation period will not apply in cases where the time limit has been suspended, cf. section 3(2) of the Limitation Act, until

December 30, 2005 or later.

With regard to the question of suspension, it is noted that A has not claimed to have been unaware of the harmful acts (the placements in security cells using restraint) on which the claim for compensation regarding the individual unjustified interventions is based. Nor are there any circumstances to support that the limitation period has been suspended with regard to the claim for compensation for the placements in security cells that ended before

December 30, 2005, cf. section 3(2) of the Limitation Act. In this connection, it should be noted that, according to the reports on the security cell incidents, a complaint guidance was given, and that A, according to the notes in the

### 3118

Various reports have been in contact with both the lawyer and the guardian ad litem during the course of the detention. Complaints have also been filed by lawyer Claus Bonnez regarding some of the security cell incidents before this case was filed.

It follows that claims for compensation for the unjustified placements in security cells that ended before December 30, 2005 are time-barred.

However, A has argued that such limitation is contrary to the European Convention on Human Rights.

The Limitation Act or its preparatory works, cf. bill no. 165 of February 28, 2007 and report no. 1460/2005, do not address the issue of limitation of claims for compensation for violation of Article 3 of the European Convention on Human Rights.

It follows from the case law of the European Court of Human Rights on the requirement for effective remedies in Article 13 that it must be possible to establish that rights under the Convention have been violated and in "appropriate cases" to be awarded damages, see, among other things, judgment of 10 May 2001 in case 28945/95, T. P. and K.M., paragraph 107. The Court has found that the lack of access for a reviewing body to award damages may mean that there is no effective remedy available, cf. judgment of 28 January 2003 in case 44647/98, Peck, paragraphs 108-109. In the judgment of November 2, 2004 in case 32446/96, Abdülsamet Yaman, paragraph 53, the Court stated regarding claims for compensation for violation of Article 3, :

"The Court reiterates that the nature of the right safeguarded under Article 3 has implications for Article 13. Where an individual has an arguable claim that he has been tortured or subjected to serious ill-treatment by agents of the State, the notion of an "effective re- medy" entails, in addition to the payment of compensation where appropriate, a thorough and effective investigation . . .".

The requirement for effective remedies in Article 13 of the European Convention on Human Rights means that limitation periods cannot be invoked in relation to criminal prosecution of violations of the prohibition in Article 3, see judgment of October 17, 2006 in case 52067/99, Okkali, paragraph 76, where it is stated:

"The Court reaffirms that, when an agent of the State is accused of crimes that violate Article 3, the criminal proceedings and sen-

tencing must not be time-barred and the granting of an amnesty or pardon should not be permissible (see, mutatis mutandis, Abdülsamet Yaman v. Turkey, no. 32446/96, § 55, 2 November 2004; compare Dujardin and Others v. France, no. 16734/90, Commission decision of 2 September 1991, Decisions and Reports 72, p. 236)." and judgment of 2 November 2004 in case 32446/96, Abdülsamet Yaman, paragraph 55, which states

"The Court further points out that where a State agent has been charged with crimes involving torture or ill-treatment, it is of the utmost importance for the purposes of an "effective remedy" that criminal proceedings and sentencing are not time-barred and that the granting of an amnesty or pardon should not be permissible. The Court also underlines the importance of the suspension from duty of the agent under investigation or on trial as well as his dis- missal if he is convicted (see Conclusions and Recommendations of the United Nations Committee against Torture: Turkey, 27 May 2003, CAT/C/CR/30/5)."

However, in the Commission decision, Dujardin, mentioned in paragraph 76 of the Okkali judgment, the Commission assumed that a general amnesty scheme as part of a national reconciliation process was not contrary to the Convention, even though criminal prosecution of violations of Article 3 was thereby barred.

The Court has not directly addressed whether limitation of the State's civil liability for violations of Article 3 may be contrary to Article 13. However, the case law on Article 6 of the Convention shows that limitation rules are not in themselves contrary to the Convention. In the judgment of July 7, 2009 in case 1062/07, Stagno, the Court has stated the following:

"The Court has already held that limitation periods serve several important purposes, namely to guarantee legal certainty by putting an end to actions, to protect potential defendants from late claims which may be difficult to counter, and to prevent the injustice which might occur if the courts were called upon to rule on events which occurred far in the past on the basis of evidence which could no longer be relied on and which would be incomplete because of the passage of time (Stubbings and Others v. United Kingdom, judgment of 24 September 1996, Reports of Judgments and Decisions 1996-IV, pp. 1502-1503, § 51; Vo v. France [GC], no. 53924/00, § 92, ECHR 2004-VIII).

27 It follows that the existence of a limitation period is not in itself incompatible with the Convention. It is for the Court to ascertain in each individual case whether the nature of the limitation period in question or the manner in which it has been applied is compatible with the Convention (Phinikaridou v. Cyprus, no. 23890/02, § 52, 20 December 2007).

28 A limitation period may affect the substance of the right of access to a court if it prevents the litigant from availing himself of an available remedy (Mizzi v. Malta, no. 26111/02, § 89, January 12, 2006)."

According to the court, limitation rules thus fulfill essential objectives of legal certainty to ensure that defendants are not faced with claims that are difficult to meet due to the passage of time and to avoid the courts having to rule on matters that are far back in time, where the evidence is not credible and is incomplete due to the passage of time. The

**3119**

However, the concrete application of national limitation rules may constitute a violation of the Convention.

It does not seem clear that the existing case law on the inapplicability of national rules on limitation of criminal liability in relation to persons who have committed torture or treatment similar to torture should be understood as meaning that civil

claims for compensation for violations of Article 3 cannot be time-barred. Where

the victim of a violation of Article 3 can bring a claim for compensation in a civil action and is thus able to ensure that the limitation period is interrupted, criminal prosecution of individuals for torture and torture-like treatment requires not only a report from the victim, but also that the state initiates an investigation and criminal prosecution of those responsible. In the latter case, the consideration of ensuring that the state does not, by a lack of or slow processing of the victim's report, achieve that the criminal liability is time-barred, argues for the criminal liability not to be time-barred, cf. the two above-mentioned judgments. The same considerations do not seem to exist when it comes to civil limitation of the victim's claim for compensation. As far as civil claims for compensation are concerned, it is basically up to the victim alone whether a claim for compensation is raised in time. In addition, civil limitation legislation typically contains provisions on the suspension of limitation periods in, among other things, cases where the claimant has not had a real opportunity to raise the claim, cf. the Danish Limitation Act.

§ Sections 3(2) and 9, cf. also Section 13 on the right to bring a claim for damages or compensation against a defendant for the criminal offense after the expiry of the general limitation period in criminal proceedings. With regard to civil claims for compensation, it must therefore be assumed that it is compatible with the requirement for effective remedies in Article 13 of the Convention that the claim must be brought within the time limits set out in generally applicable limitation legislation. In this case, there is no basis for specifically considering limitation under section 3(1) of the Limitation Act, with the further limitation of which claims can be considered time-barred, which follows from the Directorate's procedural statement, to be contrary to the requirement for effective remedies in Article 13 of the European Convention on Human Rights. Consequently, claims for compensation for the unjustified placements in security cells completed before December 30, 2005 must be considered time-barred.

*Reimbursement*

The Directorate has acted in violation of the prohibition against inhuman and degrading treatment or punishment in Article 3 of the European Convention on Human Rights by unjustifiably placing A in a security cell and restraining him to a couch in four cases and by allowing an otherwise justified placement in a security cell and restraint to continue for longer than justified in eight cases.

Claims for compensation for the excessive length of time spent in solitary confinement with the use of restraints that occurred in connection with the arrests from April 30, 2004 at 12:35 p.m. to May 3, 2003 at 12:35 p.m.

10:23 am, from August 18, 2003 at 2:20 am to August 18, 2003 at 6:05 pm (when the fixation was removed), from November 21, 2003 at 1:50 pm to November 22, 2003 at 10:55 am, from December 9

2003 at 18:10 until December 10, 2003 at 8:05 and from December 6.

However, for the unjustified placement and fixation from August 30, 2005 at 20:40 to August 9, 2005 at 8:24 and from September 30, 2005 at 13:40 to October 5, 2005 at 12:30, respectively, are outdated.

The Court finds that, pursuant to section 26 of the Tort Liability Act in conjunction with Articles 13 and 41 of the European Convention on Human Rights concerning the other unjustified or excessively prolonged placements in security cells, the Directorate must pay an estimated compensation of DKK 50,000 to A for the suffering he has incurred.

*Legal costs*

A's claim 1 was rejected, and he only succeeded in a limited part of claim 2 and the related claims for violation of Article 3 of the European Convention on Human Rights. In this connection, a significant part of the claim for compensation was time-barred when the case was brought. However, it has been necessary to bring the case in order to obtain compensation. The Department of Prisons and Probation must therefore pay partial legal costs to A with a total of DKK 50,500

Copyright © 2023 Karnov Group Denmark A/S

DKK. The amount includes DKK 500 for proportionate court fees and DKK 50,000 for legal fees including VAT. When determining the amount to cover the costs of legal assistance, in addition to the amount won, the scope, duration and fundamental nature of the case have been taken into account. On the other hand, it has been taken into account that the main hearing, which should have been held in January 2013, had to be rescheduled as it turned out at the beginning of the main hearing that A could not be present because his lawyer had not made the Security Department aware of the need for transportation and accompaniment of him in time. The additional work incurred by the Department as a result of A's imprecise claim 1 and unclear pleas in support of claim 2 is also considered significant.

## For it is recognized as right

*A's claim 1 is rejected.*

  *The Department of Prisons and Probation must pay A DKK 50,000 plus procedural interest from January 3, 2011.*

  *The Department of Prisons and Probation shall pay DKK 50,500 in legal costs to A.*

  *The judgment must be paid within 14 days of the date of this judgment. The legal costs shall bear interest in accordance with section 8a of the Interest Act.*

**U.2014.3045Ø**
**FED2014.138**

*Kriminalforsorgen havde overtrådt EMRK art. 3 ved i 4 tilfælde uberettiget at have anbragt forvaringsdømt i sikringscelle og dér fiksere ham samt ved i 8 tilfælde at lade en berettiget anbringelse i sikringscelle og fiksering vare længere end berettiget. 50.000 kr. i godtgørelse. Spørgsmål om forældelse af krav om godtgørelse for overtrædelse af EMRK art. 3. Domstolsprøvelse af sådanne sager, som føres i civilprocessens former.*

Erstatning uden for kontraktforhold 3211.7 - Offentlige myndigheders ansvar 1.13 - Tort 3.3 - EU-ret/internationale spørgsmål - Øvrige spørgsmål - Menneskerettigheder 1.1 og 12.6 - Pengevæsen m.v. 58.1 og 5.9 - Retspleje 27.4 - Strafferet 3.7.

♦ Sagen vedrørte en række indgreb mod A i form af indsættelse i sikringscelle, indsættelse i observationscelle, overførsel mellem institutioner under Kriminalforsorgen, udelukkelse fra fællesskab og magtanvendelse fra fængselspersonalet i tiden fra A ved dom af 15. marts 1999 blev idømt forvaring, og til han den 26. maj 2009 blev overført til Sikringsafdelingen på Psykiatrihospitalet Nykøbing Sjælland. Påstandene vedrørte, om indgreb, der var foretaget fra og med en indsættelse i sikringscelle den 10. august 2003, udgjorde en krænkelse af EMRK art. 3. Efter karakteren og varigheden af de indgreb, der var foregået, herunder navnlig indsættelserne i sikringscelle under brug af fiksering samt indsættelserne i observationscelle, og de anbringender, der var anført om krænkelse af EMRK art. 3, fandt landsretten, at der - uanset at der var tale om en sag, der førtes i civilprocessens former - måtte foretages en prøvelse af, om de enkelte indsættelser i sikringscelle og observationscelle kunne antages at stride mod art. 3, jf. herved princippet i retsplejelovens § 471 sammenholdt

**3046**

med konventionens art. 13. I det omfang indsættelse i sikringscelle og fiksering med hånd- og fodremme samt mavebælte og eventuelt tillige handsker havde været uberettiget, måtte navnlig fikseringen anses for at medføre en så intens fysisk og psykisk lidelse, at indgrebet omfattedes af art. 3. Det samme gjaldt i de tilfælde, hvor fikseringen i sikringscellen måtte anses for berettiget, men hvor indgrebet var fortsat i længere tid end nødvendigt. Forbud mod kontakt med andre indsatte, som er begrundet i sikkerheds- eller beskyttelsesmæssige eller disciplinære hensyn, fandtes ikke i sig selv i strid med art. 3. Udelukkelse fra almindeligt fællesskab af en vis længde under forhold, der måtte anses for særligt belastende som følge af blandt andet manglende adgang til kontakt med andre mennesker, manglende eller begrænset adgang til aktiviteter i form af gårdture, fjernsyn, bøger mv. og ringe fysiske forhold i cellen, kunne udgøre en krænkelse af art. 3. Ved afgørelsen af, om udelukkelse fra almindelig fællesskab faldt under art. 3, indgik det med betydelig vægt, hvilke hensyn der lå bag udelukkelsen, og hvor vægtige disse var. A havde været særdeles vanskelig at rumme i fængselsvæsnet som følge af sin egenartede personlighedsstruktur og voldsomt aggressive adfærd i forhold til såvel medindsatte som personale. Der var ikke er grundlag for at tilsidesætte Kriminalforsorgens vurdering, hvorefter det af hensyn til såvel A som fængselspersonalet var nødvendigt at etablere en rotationsordning for at gøre det muligt for fængslerne og fængselspersonalet at rumme A. Rotations-

ordningen måtte således anses for en berettiget varetagelse af hensynet til at forebygge voldelige overgreb fra A over for personale og andre indsatte, der var hjemlet i straffuldbyrdelseslovens § 26 eller en analogi heraf, og stred ikke mod art. 3. Det samlede afsoningsforløb kunne på baggrund af A's personlighedsmæssige egenart ikke anses for stridende mod art. 3. Kriminalforsorgen gjorde gældende, at dele af A's krav var forældet. A gjorde heroverfor gældende, at sådan forældelse stred mod EMRK. Landsretten udtalte, at der ikke i forældelsesloven eller forarbejderne hertil er taget stilling til spørgsmålet om forældelse af krav på godtgørelse for overtrædelse af EMRK art. 3. Efter den fortolkning, landsretten foretog af praksis fra EMD, var der ikke grundlag for konkret at anse forældelse efter forældelseslovens § 3, stk. 1, for stridende mod kravet om effektive retsmidler i EMRK art. 13. Som følge heraf måtte godtgørelseskrav vedrørende uberettigede sikringscelleanbringelser, der var afsluttet før et bestemt tidspunkt, anses for forældede. Kriminalforsorgen havde handlet i strid med forbuddet mod umenneskelig og nedværdigende behandling eller straf i EMRK art. 3 ved i 4 tilfælde uberettiget at have anbragt A i sikringscelle og dér fiksere ham til en briks samt ved i 8 tilfælde at lade en i øvrigt berettiget anbringelse i sikringscelle og fiksering vare ved i længere tid end berettiget. En del af godtgørelseskravene for disse indgreb var forældede. Landsretten fandt, at Kriminalforsorgen efter erstatningsansvarslovens § 26 sammenholdt med EMRK art. 13 og 41 vedrørende de øvrige uberettigede eller for langvarige sikringscelleanbringelser skulle betale en skønsmæssigt fastsat godtgørelse på 50.000 kr. for den lidelse, A var blevet påført.

**Ø.L.D. 4. juni 2014 i sag 11. afd. B-1871-11**
(Karsten Bo Knudsen, Katja Høegh, Julie Skat Rørdam (kst.)).

*A (adv. Hanne Mogensen Ziebe, Aarhus, prøve)*
mod
*Direktoratet for Kriminalforsorgen (Km.adv. v/adv. Benedicte Galbo, Kbh.).*

## Østre Landsret

*Sagens anlæg og påstande*

Denne sag, der er anlagt ved Københavns Byret den 3. januar 2011, er ved kendelse af 30. maj 2011 henvist til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

A har nedlagt påstand om:

1) Direktoratet for Kriminalforsorgen tilpligtes at anerkende, at have krænket hans rettigheder efter Den Europæiske Menneskerettighedskonventions artikel 3, og

2) Direktoratet for Kriminalforsorgen tilpligtes til at betale ham en godtgørelse på 120.000 kr. med tillæg af procesrente fra sagens anlæg.

Direktoratet for Kriminalforsorgen (»direktoratet«) har påstået afvisning af A's påstand 1, subsidiært frifindelse, og frifindelse over for A's påstand 2.

Sagen vedrører en række indgreb mod A i form af indsættelse i sikringscelle, indsættelse i observationscelle, overførsel mellem institutioner under kriminalforsorgen, udelukkelse fra fællesskab og magtanvendelse fra fængselspersonalet i tiden fra A ved dom af 15. marts 1999 blev idømt forvaring, og til han den 26. maj 2009 blev overført til Sikringsafdelingen på Psykiatrihospitalet Nykøbing Sjælland. Sagen vedrører herudover påstået mangelfuld efterforskning af indgrebenes berettigelse og ti under hovedforhandlingen fremsat anbringende om manglende krav på aktindsigt i be-

Copyright © 2023 Karnov Group Denmark A/S                                    side 1

grundelserne for udelukkelse fra fællesskab. A har under hovedforhandlingen meddelt, at påstandene alene vedrører de indgreb, der er foretaget fra og med indsættelsen i sikringscelle den 10. august 2003.

Det er ved indledningen af hovedforhandlingen oplyst, at A har søgt fri proces. Efter det den 26. maj 2014 oplyste er et tidligere meddelt afslag hjemvist til fornyet behandling. Der er således endnu ikke truffet afgørelse herom.

**3047**

*Sagsfremstilling*

*Forvaringsdommen*

Ved Østre Landsrets dom af 18. september 1998 blev A idømt forvaring for overtrædelse af straffelovens § 119, stk. 1, § 260, nr. 1, og § 288, stk. 1, nr. 1.

Af dommen fremgår om den foretagne mentalundersøgelse på Justitsministeriets Retspsykiatriske Klinik:

».. .

»Observanden er herefter ikke sindssyg, men på det foreliggende kan en begyndende sindssygelig udvikling gennem de senere år ikke med sikkerhed udelukkes. Herfor taler observandens grad af kontaktafflukkethed, hans urealistiske, paranoide fortolkningsberedskab overfor begivenheder i omverdenen, hans primitive affektforvaltning og hans voldsomt uhæmmede aggressive adfærd, hvor hans reaktioner i overensstemmelse med resultatet af den psykologiske test er præget af lav frustrationstolerance, udadprojiceren med svære karakterafvigende træk til følge med udgangspunkt i en kaotisk, permanent usamlet psykisk tilstand.

Observanden har i forbindelse med den påsigtede kriminalitet været påvirket af alkohol, uden at der er holdepunkter for at antage, at en patologisk rustilstand har foreligget. Han er normalt begavet og lider ikke af epilepsi.

Diagnostisk foreligger der formentlig en emotionelt ustabil personlighedsstruktur af borderline type med tidvis psykosenært sygdomspræg. Den diagnostiske vurdering har således ændret sig i forhold til tidligere undersøgelser, uanset at observanden fortsat fremtræder svært dyssocial.

Observanden er som følge af sin personlighedsmæssige egenart omfattet af straffelovens § 69, stk. 1. Imidlertid kan man ikke, såfremt han findes skyldig, pege på foranstaltninger, jf. straffelovens § 68, 2. pkt., som mere formålstjenlige end straf til imødegåelse af en formentlig ikke ubetydelig risiko for fremtidig ligeartet kriminalitet. Under hensyntagen til karakteren af det nu påsigtede forhold, samt under hensyntagen til hans meget svære personlighedsforstyr-

relse, hvor der ikke synes at være sket en gunstig ændring fra tidligere undersøgelser, kan det således ikke afvises, at han frembyder en sådan nærliggende fare for andres liv, legeme, helbred eller frihed, at anvendelse af forvaring i stedet for fængsel ud fra lægelig betragtning må overvejes. Da observanden må antages at have behov for medikamentel behandling som følge af hans svære personlighedsforstyrrelse, samt behov for vedvarende psykiatrisk vurdering i en længere periode, skal afsoning i Anstalten ved Herstedvester anbefales«.

Desuden fremgår om Retslægerådets udtalelse:

». . . at, A ikke er sindssyg og ikke kan antages at have været det på tidspunktet for det påsigtede. Han er normalt begavet og lider ikke af epilepsi.

Han var på tidspunktet for det påsigtede påvirket af alkohol, men der er ingen holdepunkter for at antage, at en såkaldt abnorm rustilstand har foreligget.

A har i alt afsonet 8 år i fængslerne. Han frembyder ikke sikre sindssygelige symptomer, men han har tidligere haft episoder af selvhenførende art, muligvis ledsaget af hallucinatoriske oplevelser. Hans tilstand er præget af ringe kontaktevne, sub-paranoid holdning (d.v.s. mistroisk holdning grænsende til det sindssygelige), samt et meget udtalt, og til tider pinagtigt, aggressivt affektpres med frygt for at miste selvkontrol. Han er tillige præget af dyssociale træk i form af manglende hensyn til omgivelserne, tilbøjelighed til at lægge skyld på andre og kortsynet, impulsiv adfærd.

Efter Retslægerådets opfattelse lider A af en pseudopsykopatisk skizotypisk tilstand (en skizofreniform grænsetilstand uden sindssygelig intensitet). Muligheden for en senere udvikling af egentlig skizofreni kan ikke udelukkes.

A er herefter omfattet af straffelovens § 69, stk. 1, men rådet kan ikke, såfremt han findes skyldig, pege på sanktioner nævnt i samme lovs § 68, 2. pkt., som værende mere formålstjenlige end almindelig sanktion.

Rådet kan ikke afvise muligheden for, at han vedvarende udsætter andres liv, legeme, helbred eller frihed for en så nærliggende fare, at anvendelse af forvaring efter straffelovens § 70 kan komme på tale. Under alle omstændigheder vil A have behov for fortsat psykiatrisk observation og eventuel behandling, hvorfor eventuel afsoning kan anbefales gennemført i Anstalten ved Herstedvester.«

Dommen blev stadfæstet ved Højesterets dom af 15. marts 1999.

*Afsoningsforløbet*

Efter Østre Landsrets dom blev A den 15. januar 1999 indsat i lukket fængsel på Anstalten ved Herstedvester.

Der er en fremlagt følgende oversigt over afsoningssteder:

| | |
|---|---|
| »15.01.99: | Pågældende overføres fra Københavns Fængsler til Anstalten ved Herstedvester |
| | Overførsel med henblik på strafafsoning efter domsafsigelse. |
| 11.08.99: | Pågældende overføres fra Anstalten ved Herstedvester til Statsfængslet i Vridsløselille |
| | Overfald på medindsat samt truende adfærd på afdelingen (se hertil rapport vedrørende anbringelse i observationscelle af 4. august 1999 samt forhørsudskrift af 11. august 1999). |
| 13.09.99: | Pågældende overføres fra Statsfængslet i Vridsløselille til Anstalten ved Herstedvester |
| | Efter det i sagen oplyste er der tale om en frivillig overførsel |
| | **3048** |
| 23.08.00: | Pågældende overføres fra Anstalten ved Herstedvester til Statsfængslet i Vridsløselille |
| | Frivillig overførsel |
| 10.07.03: | Pågældende overføres fra Statsfængslet i Vridsløselille til Statsfængslet i Nyborg |
| | Efter det oplyste overført på grund af et slagsmål på en gårdtur (se hertil . . .) |

Copyright © 2023 Karnov Group Denmark A/S

12.08.03: Pågældende overføres fra Statsfængslet i Nvborg til Københavns Fængsler

Pågældende truer og forsøger at stikke personalet med en kniv (se hertil j.nr. . . .)

19.08.03: Pågældende overføres fra Københavns Fængsler til Statsfængslet i Horsens

Voldsom adfærd (se hertil j.nr. . . .).

11.11.03: Pågældende overføres fra Statsfængslet i Horsens til Anstalten ved Herstedvester

Pågældende er efter det oplyste indforstået med overførslen.

19.12.03: Pågældende overføres fra Anstalten ved Herstedvester til Statsfængslet i Vridsløselille

Pågældende har i tiden forud for overførslen flere gange været indsat i observations- og sikringscelle grundet voldsom adfærd (se hertil . . .)

07.01.04: Pågældende overføres fra Statsfængslet i Vridsløselille til Anstalten ved Herstedvester

Verbalt udfald indeholdende trusler mod personalet, der medfører anbringelse i observationscelle (se hertil j.nr. . . .). Pågældende overføres på baggrund af episoden til Anstalten ved Herstedvester i tre dage.

10.01.04: Pågældende overføres fra Anstalten ved Herstedvester til Statsfængslet i Vridsløselille

Tilbageføres til Statsfængslet i Vridsløselille efter tre dages ophold i Anstalten ved Herstedvester.

30.04.04: Pågældende overføres fra Statsfængslet i Vridsløselille til Anstalten ved Herstedvester

Kontraktbrud og trusler mod personalet. Dette fremgår af sagsfremstillingen i j.nr. . . .

16.09.04: Pågældende overføres fra Anstalten ved Herstedvester til Statsfængslet i Horsens

Pågældende var forud for overførslen sikringscelle- og observationscelleanbragt i en længere periode (se hertil j.nr. . . .). Det fremgår af sagen, at anstalten finder, at pågældendes situation er »fastlåst« i anstalten.

27.01.05: Pågældende overføres fra Statsfængslet i Horsens til Statsfængslet i Nyborg

Truende og aggressiv adfærd over for medindsatte (se hertil j.nr. . . .).

15.04.05: Pågældende overføres fra Statsfængslet i Nyborg til Politigårdens Fængsel

Pågældende truer personalet med skårene fra et knust spejl. Overføres på baggrund heraf til Politigårdens Fængsel (se hertil j.nr. . . .)

27.04.05: Pågældende overføres fra Politigårdens Fængsel til Statsfængslet i Nyborg

Lempelse af afsoningsforhold

27.07.05: Pågældende overføres fra Statsfængslet i Nyborg til Anstalten ved Herstedvester

Henvisning til rotationsordningen

27.07.05: Pågældende overføres fra Anstalten ved Herstedvester til Politigårdens Fængsel

Voldelig og truende adfærd, herunder trusler mod personalet (se hertil j.nr. . . .).

09.08.05: Pågældende overføres fra Politigårdens Fængsel til Anstalten ved Herstedvester

Voldsom adfærd, herunder ødelæggelse af inventar samt forsøg på at slå og bide fængselsbetjente i forbindelse med overførsel til sikringscelle (se hertil j.nr. . . .).

Forud herfor har pågældende været råbende, og Politigårdens Fængsel har i den forbindelse oplyst, at de ikke kan huse ham, når han er så højtråbende. Dette henset til at pågældendes støjende adfærd er til gene for bl.a. dommervagten.

06.02.06: Pågældende overføres fra Anstalten ved Herstedvester til Statsfængslet i Vridsløselille

Retur efter mentalundersøgelse på Sikringsanstalten.

21.03.06: Pågældende overføres fra Statsfængslet i Vridsløselille til Politigårdens Fængsel

Slår ud efter og forsøger at bide personalet i forbindelse med en visitation af indsattes celle (se hertil . . .).

29.03.06: Pågældende overføres fra Politigårdens Fængsel til Statsfængslet i Horsens

Lempelse af afsoningsforhold.

| | |
|---|---|
| 07.05.06: | Pågældende overføres fra Statsfængslet i Horsens til Københavns Fængsler |
| | Overføres på grund af fremstilling i retten. |
| 09.05.06: | Pågældende overføres fra Københavns Fængsler til Statsfængslet i Horsens |
| | Tilbageføres efter endt fremstilling i retten |
| | **3049** |
| 05.07.06: | Pågældende overføres fra Statsfængslet i Horsens til Politigårdens Fængsel |
| | Pågældende slår en fængselsbetjent og ytrer trusler mod det øvrige personale, idet pågældende, på grund af råben og skrigen på cellen, skal anbringes i observationscelle. (se hertil j.nr. . . .) |
| 22.12.06: | Pågældende overføres fra Politigårdens Fængsel til Statsfængslet Østjylland |
| | Lempelse af afsoningsforhold og voldeligt udfald mod personalet, idet pågældende råber og smider med celleinventaret samtidig med, at han truer personalet. Da personalet vil anbringe ham i observationscelle, slår han én fængselsbetjent og bider en anden i benet (se hertil j.nr. . . .). |
| 10.05.07: | Pågældende overføres fra Statsfængslet Østjylland til Københavns Fængsler |
| | Det har ikke været muligt at finde en nærmere begrundelse for overførslen, så overførslen er formentligt sket med henvisning til rotationsordningen. Pågældende blev den 12. juni 2007 disciplinært overført fra Vestre Fængsel til Politigårdens Fængsel på grund af voldsom adfærd, idet pågældende skriger, sparker på celledøren og smider med celleinventaret (se hertil j.nr. . . .). |
| 12.07.07: | Pågældende overføres fra Politigårdens Fængsel til Statsfængslet Østjylland |
| | Lempelse af afsoningsforhold. |
| 04.07.08: | Pågældende overføres fra Statsfængslet Østjylland til Politigårdens Fængsel |
| | Pågældende slår en fængselsbetjent flere gange i forbindelse med en påtale givet af fængselsbetjenten (se hertil j.nr. . . .). |
| 03.10.08: | Pågældende overføres fra Politigårdens Fængsel til Statsfængslet Østjylland |
| | Lempelse af afsoningsforhold. |
| 22.01.09: | Pågældende overføres fra Statsfængslet Østjylland til Politigårdens Fængsel |
| | Pågældende overfalder sammen med en medindsat to fængselsbetjente i forbindelse med afholdelse af forhør (se hertil j.nr. . . .). |
| 05.03.09: | Pågældende overføres fra Københavns Fængsler til Statsfængslet Østjylland |
| | Overførsel med henblik på fremstilling i Retten i Horsens |
| 06.03.09: | Pågældende overføres fra Statsfængslet Østjylland til Københavns Fængsler |
| | Retur efter fremstilling i Retten i Horsens |
| 26.05.09: | Pågældende overføres fra Københavns Fængsler til Sikringsanstalten |
| | Pågældende overføres med henblik på udfærdigelse af mentalerklæring. Da mentalerklæringen er afsluttet, anbringes pågældende på Sikringsanstalten i medfør af straffuldbyrdelseslovens § 78.« |

Der er enighed om, at der er sket overførsler som anført i oversigten.

I 2004 blev der ved direktoratets brev af 13. september 2004 til Anstalten ved Herstedvester samt Statsfængslerne i Horsens, Nyborg og Vridsløselille truffet beslutning om en såkaldt »rotationsordning«, der skulle indebære flytning med ca. 3 måneders mellemrum. Af brevet fremgår blandt andet:

»Under henvisning til tidligere korrespondance kan det oplyses, at direktoratet udfra en samlet vurdering af omstændighederne vedrørende A's afsoningsforhold har besluttet, at der etableres en rotationsordning, således at den indsatte flyttes mellem de 4 lukkede fængsler hver tredje måned.

Der vedlægges i sagens anledning skrivelse af 2. september 2004 fra overlæge G fra Anstalten ved Herstedvester, hvoraf det fremgår, at en sådan ordning skønnes at være forsvarlig.

Det er aftalt med Statsfængslet i Horsens, at A nu flyttes dertil efter nærmere aftale mellem Anstalten ved Herstedvester og Statsfængslet i Horsens. Når han har afsonet 3 måneder i Statsfængslet i Horsens skal den indsatte flyttes til Statsfængslet i Nyborg og derefter til Statsfængslet i Vridsløselille. Direktoratet går ud fra, at fængslerne selv aftaler det nærmere vedrørende den praktiske overførsel hver tredje måned.«

I det brev af 2. september 2004 fra overlæge G, der henvises til, er blandt andet anført:

»I henhold til telefonisk aftale med administrerende overlæge [Navn] kan det oplyses, at A ikke gør brug af det psykiatriske behandlingstilbud, der findes på Anstalten ved Herstedvester. Han ønsker ikke at modtage den medicinske behandling, som er foreslået, og han afviser at tale med psykiater.

Ud fra et psykiatrisk synspunkt vurderes det derfor, at A lige så godt kan afsone i et fængsel uden det behandlingstilbud, som findes i Anstalten ved Herstedvester. Da A er vurderet som ikke sindssyg, skønnes det også fuldt forsvarligt.«

Copyright © 2023 Karnov Group Denmark A/S

I direktoratets notat af 26. januar 2012 anføres det om rotations-ordningen:

»Som det fremgår af den vedlagte skrivelse af 13. september 2004 fra direktoratet til Anstalten ved Herstedvester samt til Statsfængslerne i Nyborg, Vridsløselille samt Horsens, blev det i 2004 besluttet at etablere en rotationsordning, således at der var mulighed for at flytte indsatte mellem de fire lukkede fængsler hver tredje måned.

**3050**

Det fremgår af indsattes sag, at der under hans afsoning har været adskillige episoder, hvor han har optrådt truende og aggressivt samt mange episoder, hvor han har udøvet vold mod fængselspersonalet. Der foreligger utallige indberetninger af disciplinær art, udelukkelse fra fællesskab, observations- og sikringscellenbringelse, ligesom indsatte flere gange er blevet politianmeldt for trusler og vold mod personalet.

På grund af sin aggressive og til tider voldelige adfærd har indsatte været særdeles vanskelig at rumme i Kriminalforsorgens institutioner, ligesom det forhold at han har truet og overfaldet adskillige medarbejdere i institutionerne, har påvirket institutionernes lyst og evne til at modtage ham.

På baggrund af ovenstående blev det aftalt, at indsatte skulle indgå i den ovennævnte rotationsordning. Formålet med rotationsordningen var dels at søge at hindre, at indsattes afsoningssituation og afsoningsforhold blev yderligere fastlåst, dels et velbegrundet hensyn til personalet.

Særordningen har således ligeledes været af praktisk karakter, idet hensigten var at undgå, at overførselssager skulle forelægges direktoratet som uenighedssager, såfremt det ikke var muligt for den institution, hvori pågældende opholdt sig, at finde et fængsle, der ville modtage ham.

Det fremgår af sagen, at ordningen navnlig blev administreret på den måde, at når en alvorlig episode nødvendiggjorde en overførsel af indsatte, så blev han typisk flyttet til Politigårdens Fængsel, hvorfra han efter en periode blev overført til en af de lukkede institutioner. Det fremgår videre, at det, grundet vold og trusler mod personalet m.v., flere gange viste sig nødvendigt at overføre indsatte inden tre måneder.«

I direktoratets brev af 9. august 2007 til Rigsadvokaten oplyses det om A's afsoning i fællesskab:

»A har siddet i almindelig[t] fællesskab fra den 30. oktober 2002 til den 10. december 2002 i statsfængslet Vridsløselille og fra den 16. september 2004 til den 27. januar 2005 i Statsfængslet i Horsens.«

*Indgreb under afsoning*

Under sagens forberedelse har direktoratet fremlagt et stort antal bilag i form af rapporter, notater mv. om magtanvendelse og indgreb over for A i den tid, han har afsonet i almindeligt fængsel. Formålet hermed har navnlig været at gøre det muligt for A's advokat at præcisere, hvilke af de indgreb der er foretaget under afsoningen, som omfattes af påstand 1 og 2.

Der er af Kammeradvokaten, som repræsenterer direktoratet, udarbejdet følgende kronologiske oversigt over indgreb over for A:
»

| DATO | Hvad | Sted | Begrundelse | Bilagsnr. |
|---|---|---|---|---|
| 26.06.1997 kl. 17.30 til 27.06.1997 kl. 12.35 | Sikringscelle | Statsfængslet i Nyborg | For at afværge truende vold eller overvinde voldsom modstand. Overfald mod fængselsfunktionær. | A |
| 01.04.1998 | Retspsykiatrisk erklæring | | | 1 |
| 11.05.1999 | Forhørsudskrift: enrumsanbringel-se | Anstalten ved Herstedvester | Vold mod medindsat, chikanerende adfærd | AO-1-1 |
| 09.07.1999 kl. 9.25 til 12.07.1999 kl. 10.00 | Observationscel-le | Anstalten ved Herstedvester | Selvbeskadigelse | AQ-1-1 |
| 19.07.1999 kl. 19.55 til 26.07.1999 kl. 14.05 | Observationscel-le | Anstalten ved Herstedvester | Selvbeskadigelse | AQ-1-2 |
| 04.08.1999 kl. 13.25 til 11.08.1999 kl. 11.40 | Observationscel-le | Anstalten ved Herstedvester | Vold mod medindsat | AQ-1-3 |
| 11.08.1999 | Forhørsudskrift: bøde for upassende sprogbrug, overføres til Statsfængslet i Vridsløselille, anbringelse i en-rum | Anstalten ved Herstedvester | Enrumsanbringelse, da A virker meget ophidset og ag-gressiv | AO-1-2 |
| 15.09.1999 kl. 10.20 til 15.09.1999 kl. 15 | Observationscel-le | Anstalten ved Herstedvester | Opretholde ro og sikkerhed i institutionen | AQ-1-4 |

UfR ONLINE    U.2014.3045Ø - FED2014.138OE

| 15.09.1999 kl. 15 (tillæg til bilag AQ-1-4) | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold, betvinge voldsom modstand og hindre selvmord eller selvbeskadigelse | B 3051 |
| 15.09.1999 kl. 15 til 28.09.1999 kl. 10.30 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold, betvinge voldsom modstand og hindre selvmord eller selvbeskadigelse | AQ-1-4 |
| 28.09.1999 kl. 10.30 til 02.12.1999 | Observationscelle | Anstalten ved Herstedvester | Opretholde ro og sikkerhed i institutionen | AQ-1-5 |
| 02.06.2000 | Forhørsudskrift: besiddelse af hash, enrumsanbringelse | Anstalten ved Herstedvester | Besiddelse af hash | AO-1-3 |
| 14.06.2000 | Forhørsudskrift: bøde, enrumsanbringelse, ryge-rør konfiskeres | Anstalten ved Herstedvester | Truende adfærd over for personalet, fremstillet ryge-rør, besiddelse af rist til has-hrygning | AO-1-4 |
| 01.08.2000 | Forhørsudskrift: besiddelse mv. af hash og medicin, enrumsanbringelse | Anstalten ved Herstedvester | Besiddelse af hash mv., mis-tanke om vold mod medind-sat, forebygge voldsom ad-færd | AO-1-7 |
| 01.08.2000 | Enrumsanbringelse | Anstalten ved Herstedvester | Mistanke om besiddelse samt brug af euforiserende stoffer | AO-1-5 |
| 01.-18.08.2000 | Personjournal, ugenotat ang. en-rumsanbringelse og overførsel | Anstalten ved Herstedvester | | AO-1-6 |
| August 2000 | Forhørsudskrift: enrumsanbringel-se, politianmel-des for vold | Anstalten ved Herstedvester | Enrumsanbringelse pga. vold mod medindsat | AO-1-8 |
| 18.08.2000 | Forhørsudskrift: overførsel til Statsfængslet i Vridsløselille | Anstalten ved Herstedvester | | AO-1-9 |
| 04.10.2002 kl. 15.10 til 08.10.2002 kl. 10.15 | Udelukkelse fra fællesskab | | | AO-1-9 |
| 09.12.2002 kl. 11.05 til 09.12.2002 kl. 13.35 | Observationscelle | Statsfængslet i Vridsløselille | Opretholde ro og sikkerhed i institutionen (vold mod medindsat) | AQ-1-6 |
| 09.12.2002 | Midlertidig ude-lukkelse fra fæl-lesskab | | | AO-1-10 |
| 10.07.2003 kl. 12.00 til 10.07.2003 kl. 12.48 (herefter overførsel til Stats-fængslet i Nyborg) | Udelukkelse fra fællesskab | | | AO-1-11 |
| 11.07.2003 kl. 13.45 til 21.07.2003 kl. 11.00 | Midlertidig ude-lukkelse fra fæl-lesskab | Statsfængslet i Nyborg | | AO-1-12 |
| 10.08.2003 kl. 16.45 til 12.08.2003 kl. 09.12 | Sikringscelle | Statsfængslet i Nyborg | For at afværge truende vold eller overvinde voldsom modstand | AP-1-1 (bilag D) |

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE                                                                                      U.2014.3045Ø - FED2014.138OE

| | | | | |
|---|---|---|---|---|
| 12.08.2003 kl. 09.15 til 19.08.2003 kl. 13.10 | Udelukkelse fra fællesskab | Statsfængslet i Nyborg | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd - overfald på fængselsfunktionær med kniv | AO-1-13 |
| 16.08.2003 kl. 03.48 til 16.08.2003 kl. 13.15 | Observationscelle | Københavns Fængsler | Opretholde ro og sikkerhed i institution | AQ-1-7 |
| 16.08.2003 kl. 13.50 til 16.08.2003 kl. 20.18 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-2 (Bilag E) |
| 18.08.2003 kl. 02.20 til 19.08.2003 kl. 13.04 (herefter overført til Horsens) | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-3 (Bilag F)<br>**3052** |
| 19.08.2003 kl. 14.00 til 11.11.2003 kl. 09.30 | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd - truet personalet med kniv, truende adfærd | AO-1-14 |
| 31.08.2003 kl. 13.55 til 31.08.2003 kl. 16.47 | Sikringscelle | Statsfængslet i Horsens | For at afværge truende vold eller overvinde voldsom modstand | AP-1-4 (bilag G) |
| 31.08.2003 kl. 16.47 til 31.08.2003 kl. 20.25 | Observationscelle | Statsfængslet i Horsens | Behov for særlig observation (efter anbringelse i sikringscelle) | AQ-1-8 |
| 21.11.2003 kl. 13.00 til 21.11.2003 kl. 13.58 | Observationscelle | Anstalten ved Herstedvester | Behov for særlig observation. | AQ-1-9 |
| 21.11.2003 kl. 13.50 til 22.11.2003 kl. 10.55 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-5 (bilag H) |
| 22.11.2003 kl. 10.55 til 26.11.2003 kl. 17.45 | Observationscelle | Anstalten ved Herstedvester | Behov for særlig observation. Faldet så meget til ro, at det findes forsvarligt at udtage A af sikringscelle, og anbringe i observationscelle. Den 26.11.2003 anbragt i sikringscelle igen pga. slagsmål med medindsat | AQ-1-10 |
| 26.11.2003 kl. 17.45 til 27.11.2003 kl. 07.19 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand (vold mod medindsat) | AP-1-6 (bilag J) |
| 27.11.2003 kl. 07.15 til 09.12.2003 kl. 18.10 | Observationscelle | Anstalten ved Herstedvester | Udtaget af sikringscelle, anbragt i observationscelle. Herefter sikringscelle igen. Hensyn til orden og sikkerhed i institution | AQ-1-11 |
| 09.12.2003 kl. 18.10 til 10.12.2003 kl. 08.05 | Sikringscelle | Anstalten ved Herstedvester | For at hindre selvmord eller anden selvbeskadigelse | AP-1-7 (bilag K) |
| 10.12.2003 kl. 08.05 til 19.12.2003 kl. 09.25 | Observationscelle | Anstalten ved Herstedvester | Behov for særlig observation. Udtaget af sikringscelle, anbragt i observationscelle. | AQ-1-12 |
| 07.01.2004 kl. 10.25 til 07.01.2004 kl. 13.50 | Observationscelle | Statsfængslet i Vridsløselille | Hensyn til orden og sikkerhed i institution | AQ-1-13 |

Copyright © 2023 Karnov Group Denmark A/S

| | | | | |
|---|---|---|---|---|
| 10.01.2004 kl. 12.00 til 30.04.2004 kl. 12.20 | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd | AO-1-15 |
| 30.04.2004 kl. 12.35 til 03.05.2004 kl. 10.23 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-8 (bilag L) |
| 03.05.2004 kl. 10.10 til 18.05.2004 kl. 03.49 | Observationscelle | Anstalten ved Herstedvester | Hensyn til orden og sikkerhed i institutionen Herefter anbragt i sikringscelle | AQ-1-14 |
| 18.05.2004 kl. 03.40 til 18.05.2004 kl. 15.10 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-9 (bilag M) |
| 18.05.2004 kl. 15.10 til 27.08.2004 kl. 11.45 | Observationscelle | Anstalten ved Herstedvester | Behov for særlig observation. Herefter anbragt i sikringscelle | AQ-1-15 |
| 27.08.2004 kl. 11.50 til 27.08.2004 kl. 17.30 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-10 (bilag N) |
| 27.08.2004 kl. 17.30 til 16.09.2004 kl. 11.00 | Observationscelle | Anstalten ved Herstedvester | Behov for særlig observation. A skønnes så rolig, at han er udtaget af sikringscelle og indsat i observationscelle | AQ-1-16 **3053** |
| 2004: 03.06.2004 | Brev fra overlæge G ang. anbringelse i Sikringsafdelingen Nykøbing Sjælland | | | AK |
| 17.06.2004 | Brev fra Justitsministeriet ang. overførsel til sikringsafdelingen | | | |
| 13.09.2004 | Brev fra Justitsministeriet til fængslerne ang. etablering af rotationsordning | | | |
| 02.09.2004 | Brev ang. afsoning fra overlæge G | | | |
| 26.01.2005 kl. 18.20 til 27.01.2005 kl. 11.30 (herefter overførsel til Nyborg Statsfængsel) | Midlertidig udelukkelse fra fællesskab | | Uligevægtig, truende overfor medindsatte | AO-1-16 |
| 13.04.2005 kl. 22.10 til 15.04.2005 kl. 09.41 | Sikringscelle | Statsfængslet i Nyborg | For at afværge truende vold eller overvinde voldsom modstand | AP-1-11 (bilag O) |
| 15.04.2005 kl. 11.00 til 15.04.2005 kl. 15.45 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Anbragt i observationscelle ved ankomsten fra Nyborg Statsfængsel | AQ-1-17 |
| 27.04.2005 kl. 18.00 til 27.07.2005 kl. 08.25 (herefter overførsel til Anstalten ved Herstedvester) | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd | AO-1-17 |

| 27.07.2005 kl. 08.45 til 27.07.2005 kl. 18.32 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-12 (bilag P) |
| 27.07.2005 kl. 18.45 til 27.07.2005 kl. 19.30 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Havde været voldsom ved overførsel, ville derfor se A lidt an, inden han kom i almindelig celle | AQ-1-18 |
| 01.08.2005 kl. 17.25 til 02.08.2005 kl. 14.26 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | Q |
| 02.08.2005 kl. 14.24 til 02.08.2005 kl. 15.12 | Observationscelle | Københavns Fængsler | Behov for særlig observation efter udtagning af sikringscelle | AQ-1-19 |
| 06.08.2005 kl. 20.40 til 09.08.2005 kl. 08.24 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-13 (bilag R) |
| 09.08.2005 kl. 09.00 til 19.08.2005 kl. 13.51 | Observationscelle | Anstalten ved Herstedvester | Behov for særlig observation. Herefter anbragt i sikringscelle | AQ-1-20 |
| 19.08.2005 kl. 13.05 til 21.08.2005 kl. 13.05 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-14 (bilag S og bilag 7) |
| 21.08.2005 kl. 13.05 til 30.09.2005 kl. 13.50 | Observationscelle | Anstalten ved Herstedvester | Hensyn til orden og sikkerhed i institutionen. Udtaget af sikringscelle, anbragt i observationscelle | AQ-1-21 |
| 24.08.2005 | Brev angående iværksættelse af mentalundersøgelse | | | AM |
| 30.09.2005 kl. 13.40 til 05.10.2005 kl. 12.30 | Sikringscelle | Anstalten ved Herstedvester | For at afværge truende vold eller overvinde voldsom modstand | AP-1-15 (bilag T) **3054** |
| 05.10.2005 kl. 12.30 til 06.10.2005 kl. 08.18 | Observationscelle | Anstalten ved Herstedvester | Hensyn til orden og sikkerhed i institutionen. Udtaget af sikringscelle, anbragt i observationscelle. Herefter til sikringsanstalten Nykøbing Sjælland | AQ-1-22 |
| 2005 | Mentalundersøgelse | | | AL |
| 06.02.2006 kl. 14.55 til 21.03.2006 kl. 16.09 (herefter overførsel til Københavns Fængsler) | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd. Udviser grov adfærd | AO-1-18 |
| 20.02.2006 | Svar på klage over magtanvendelse samt sikringscelleanbringelse | | | 10 |
| 20.03.2006 kl. 18.45 til 21.03.2006 kl. 16.00 (herefter overført til Politigårdens fængsel) | Sikringscelle | Statsfængslet i Vridsløselille | For at afværge truende vold eller overvinde voldsom modstand | AP-1-16 (bilag U) |

| 21.03.2006 kl. 16.28 til 22.03.2006 kl. 10.04 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-17 (bilag V) |
| 29.03.2006 kl. 11.45 til 07.05.2006 kl. 14.15 | Udelukkelse fra fællesskab | Kbh Fængsler | Udviser grov adfærd | AO-1-19 |
| 20.04.2006 kl. 11.25 til 20.04.2006 kl. 16.40 | Observationscelle | Statsfængslet i Horsens | Behov for særlig observation. Observationscelle for at forhindre selvbeskadigelse eller vold mod personalet | AQ-1-23 |
| 09.05.2006 kl. 14.00 til 05.07.2006 kl. 14.15 | Udelukkelse fra fællesskab | | Udviser grov adfærd. Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd - voldelige sammenstød med medindsatte og personale | AO-1-20 |
| 04.07.2006 kl. 18.05 til 05.07.2006 kl. 14.15 (herefter overført til Politigårdens fængsel) | Sikringscelle | Statsfængslet i Horsens | For at afværge truende vold eller overvinde voldsom modstand | AP-1-18 (bilag X) |
| 05-07-2006 kl. 17.15 til 05.07.2006 kl. 20.25 | Observationscelle | Københavns Fængsler | Hensyn til orden og sikkerhed i institutionen. Overført fra Horsens, er aggressiv | AQ-1-24 |
| 28.07.2006 kl. 19.55 til 30.07.2006 kl. 10.35 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-19 (bilag Y) |
| 30.07.2006 kl. 10.40 til 30.07.2006 kl. 17.05 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Tilgået observationscellen fra sikringscellen for at se, om A er klar til at overgå til egen celle | AQ-1-25 |
| 03.08.2006 kl. 12.26 til 08.08.2006 kl. 11.00 | Midlertidig udelukkelse fra fællesskab | | Forebygge voldsom adfærd | AO-1-21 |
| 11.09.2006 kl. 13.20 til 11.09.2006 kl. 14.50 | Observationscelle | Københavns Fængsler | Hensyn til orden og sikkerhed på institutionen. Truende over for personalet. Herefter anbragt i sikringscelle | AQ-1-26 |
| 11.09.2006 kl. 14.50 til 11.09.2006 kl. 17.13 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-20 (bilag Z) **3055** |
| 20.12.2006 kl. 14.55 til 22.12.2006 kl. 09.40 (herefter overført til Horsens Statsfængsel) | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-21 (bilag Æ samt bilag 9) |
| 21.12.2006 kl. 15.36 til 22.12.2006 kl. 08.00 | Midlertidig udelukkelse fra fællesskab | | Forebygge voldsom adfærd | AO-1-22 |
| 07.01.2007 kl. 17.00 til 12.01.2007 kl. 10.00 | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd | AO-1-23 |
| 06.02.2007 | Afhøringsrapport, vold og lign. mod nogen i offentlig tjeneste | | | 4 |

| 18.04.2007 kl. 10.00 til 25.04.2007 kl. 10.00 | Udelukkelse fra fællesskab | Østjylland | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd (personalets sikkerhed) | AO-1-24 |
|---|---|---|---|---|
| 10.05.2007 kl. 12.00 til 08.06.2007 kl. 13.10 | Udelukkelse fra fællesskab | | Udviser grov adfærd | AO-1-25 |
| 12.06.2007 kl. 13.15 til 13.06.2007 kl. 16.20 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-22 (bilag Ø) |
| 13.06.2007 kl. 16.25 til 13.06.2007 kl. 17.38 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Efter anbringelse i sikringscelle, anbringes A i observationscelle. Herefter sikringscelle. | AQ-1-27 |
| 13.06.2007 kl. 17.25 til 14.06.2007 kl. 14.10 | Sikringscelle | Københavns Fængsler | For at hindre selvmord eller anden selvbeskadigelse | Å |
| 13.06.2007 kl. 15.54 til 15.06.2007 kl. 09.00 | Midlertidig udelukkelse fra fællesskab | | Forebygge voldsom adfærd | AO-1-26 |
| 14.06.2007 kl. 14.15 til 14.06.2007 kl. 20.14 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Har været i sikringscelle. Efter observationscelle til almindelig celle. | AQ-1-28 |
| 09.08.2007 | afsoning i fællesskab | | | 6 |
| 05.12.2007 | Besvarelse af aktindsigtsanmodning _____ Oversigt over, hvor A har afsonet og i hvilke perioder (1999-2007) | | | AT (bilag 5) |
| 25.02.2008 | Besvarelse af aktindsigtsanmodning | | | AU |
| 16.04.2008 kl. 18.35 til 21.04.2008 kl. 12.11 | Sikringscelle | Statsfængslet Østjylland | For at afværge truende vold eller overvinde voldsom modstand | AP-1-23 (bilag AA) |
| 21.04.2008 kl. 12.10 til 05.05.2008 kl. 13.45 | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd (trusler mod personalet) | AO-1-27 |
| 21.04.2008 kl. 12.19 til 21.04.2008 kl. 14.22 | Observationscelle | Statsfængslet i Østjylland | Behov for særlig observation. Har været i sikringscelle. Efter observationscelle til almindelig celle. | AQ-1-29 |
| 07.05.2008 | Brev fra Statsfængslet Østjylland til Rigsadvokaten bilagt notat af 28. april 2008 udarbejdet af psykiatrisk konsulent | | | AV<br>**3056** |

| 03.07.2008 kl. 16.15 til 04.07.2008 kl. 07.25 (herefter overført til Politigården) | Sikringscelle | Statsfængslet Østjylland | For at afværge truende vold eller overvinde voldsom modstand | AP-1-24 (bilag AB) |
|---|---|---|---|---|
| 04.07.2008 kl. 10.30 til 03.10.2008 kl. 11.30 (herefter overførsel til Statsfængslet Østjylland) | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd | AO-1-28 |
| 04.07.2008 kl. 10.15 til 04.07.2008 kl. 11.35 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-25 (bilag AC) |
| 04.07.2008 kl. 11.35 til 06.07.2008 kl. 19.03 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Har været i sikringscelle. Efter observationscelle til almindelig celle. | AQ-1-30 |
| 30.07.2008 kl. 11.45 til 30.07.2008 kl. 12.15 | Observationscelle | Københavns Fængsler | Hensyn til orden og sikkerhed i institutionen. Truende over for personalet. Herefter anbragt i sikringscelle | AQ-1-31 |
| 30.07.2008 kl. 12.15 til 31.07.2008 kl. 14.15 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-26 (bilag AD) |
| 31.07.2008 | Brev fra Direktoratet for Kriminalforsorgen ang. § 78- anbringelse | | | AW |
| 15.08.2008 kl. 21.15 til 17.08.2008 kl. 22.11 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-27 (bilag AE) |
| 17.08.2008 kl. 22.12 til 17.08.2008 kl. 23.05 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Fra sikringscelle til observationscelle. Herefter almindelig celle. | AQ-1-32 |
| 19.08.2008 | Indberetning af sikringscelleanbringelse fra 15.-17.08.2008 | | | AY |
| 05.09.2008 | Københavns Byrets kendelse af 5. september 2009 (mentalundersøgelse) | | | AX |
| 08.09.2008 | Brev fra Direktoratet for Kriminalforsorgen ang. § 78 anbringelse samt brev fra overlæge [Navn] | | | AN |
| 08.12.2008 kl. 11.05 til 08.12.2008 kl. 15.30 | Sikringscelle | Statsfængslet Østjylland | For at afværge truende vold eller overvinde voldsom modstand | AP-1-28 (bilag AF) |
| 08.12.2008 kl. 15.30 til 16.12.2008 kl. 10.30 | Udelukkelse fra fællesskab | | Forebygge undvigelse, strafbar virksomhed eller voldsom adfærd. Udviser grov adfærd | AO-1-29 |

UfR ONLINE

U.2014.3045Ø - FED2014.138OE

| 22.01.2009 | Orientering ang. § 78 anbringelse | | | AÆ |
|---|---|---|---|---|
| 22.01.2009 kl. 14.20 til 22.01.2009 kl. 16.50 (herefter overført til Politigården) | Sikringscelle | Statsfængslet Østjylland | For at afværge truende vold eller overvinde voldsom modstand | AP-1-29 **3057** |
| 22.01.2009 kl. 19.30 til 24.01.2009 kl. 23.00 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-30 (bilag AG samt bilag 3) |
| 26.01.2009 | Indberetninger vedr. udelukkelse fra fællesskab for perioden 04.07.2008 til 03.10.2008 taget til efterretning | | | AZ |
| 23.02.2009 kl. 17.05 til 24.02.2009 kl. 14.40 | Sikringscelle | Københavns Fængsler | For at afværge truende vold eller overvinde voldsom modstand | AP-1-31 (bilag AH) |
| 04.03.2009 | Aktindsigtsanmodning fra A's advokat | | | 8 |
| 04.03.2009 kl. 23.55 til 05.03.2009 kl. 08.25 | Sikringscelle | Statsfængslet Østjylland | For at afværge truende vold eller overvinde voldsom modstand | AP-1-32 (bilag AJ) |
| 13.04.2009 kl. 19.15 til 16.04.2009 kl. 10.05 | Observationscelle | Københavns Fængsler | Behov for særlig observation. Vold mod personalet. Herefter til egen celle. | AQ-1-33 |
| 09.06.2009 | Direktoratet for Kriminalforsorgens svar på klage over magtanvendelse samt sikringscellebringelse | | | AÅ |
| 30.09.2009 | Mentalobservationserklæring | | | 2 |
| 14.10.2009 | Afgørelse ang. § 78 anbringelse | | | BA |
| 19.11.2009 | Direktoratet for Kriminalforsorgens svar på klage over sikringscelleanbringelse | | | BB |
| 04.05.2010 | Direktoratet for Kriminalforsorgens svar på klage over sikringscelleanbringelse | | | BC |
| 19.08.2010 | Brev fra Sikringsafdelingen, Nykøbing Sjælland til Justitsministeriet vedr. ansøgning om udgang til hospitalets terræn | | | BD |

| 22.12.2010 | Statsfængslet Østjylland, afde-lingsrådsmøde ang. udgang til hospitalets ter-ræn | BE |
| 25.02.2011 | Københavns By-ret, dom | 11 |
| 25.01.2012 | Notat: redegørel-se over overførs-ler | AS |
| 26.01.2012 | Notat om rota-tionsordning, etableret i 2004 | AR |

«

Der er enighed om, at det i oversigten oplyste kan lægges til grund. Rapporter vedrørende indgreb, der ligger før sikringscelleanbringelsen den 10. august 2003, og som dermed ikke er omfattet af A's påstand og anbringender, som

**3058**

disse er præciseret under hovedforhandlingen, er ikke er medtaget i ekstrakten under hovedforhandlingen. I oversigten ovenfor har retten markeret de rapporter mv. før 10. august 2003, som ikke er medtaget i ekstrakten, med gråt.

Ekstrakten indeholder ikke rapporter om alle de indgreb, som fremgår af oversigten. De rapporter, som ligeledes er markeret med lysegrå ovenfor, er således ikke med. Der er ikke af A givet nogen forklaring på, hvorfor de pågældende rapporter, der ifølge bilagsnummereringen i oversigten indgår blandt de bilag, som er fremlagt af direktoratet, ikke er medtaget i ekstrakten.

A har i et hjælpebilag samlet opgjort udelukkelserne fra almindeligt fællesskab til 9 år og 265 dage. Heri indgår også perioden før 10. august 2003, som ikke er omfattet af sagen. I påstandsdokumentet er udelukkelserne fra almindeligt fællesskab opgjort til 6 år og 35 dage. Denne opgørelse vedrører tiden fra den 10. december 2002 til den 26. maj 2009 og dermed også en periode før den 10. august 2003, som ikke er omfattet af sagen.

A har samlet opgjort anbringelserne i observationscelle til 301 dage 14 timer og 51 minutter og har angivet, at der har været tale om ikke under 333 anbringelser.

A har samlet opgjort anbringelserne i sikringscelle til i alt 37 med en samlet tidsmæssig udstrækning på 42 døgn, 8 timer og 37 minutter.

Opgørelserne vedrørende anbringelser i observations- og sikringscelle vedrører hele afsoningsperioden, og omfatter dermed også anbringelser, der ligger før den periode fra den 10. august 2003, som sagen er begrænset til at vedrøre. Opgørelserne over anbringelser i observations- og sikringscelle synes også at omfatte de indgreb, hvorom der ikke er medtaget rapporter i ekstrakten.

Direktoratet har nærmere bestridt sammentællingen i de nævnte opgørelser, men har anført, at der for så vidt angår en del af udelukkelsen fra almindeligt fællesskab har været adgang til såkaldt én-til-én-fællesskab.

Af besvarelser af enslydende spørgsmål fra Kammeradvokaten til de fængsler, hvor A har afsonet, fremgår blandt andet:

*»1. Afdelingen for negativt stærke indsatte*

Har A på noget tidspunkt under afsoningen været placeret på afdelingen for negativt stærke indsatte - og i givet fald, i hvilke perioder og på hvilket grundlag?«

Af besvarelsen fra Statsfængslet i Nyborg fremgår, at A har været placeret på fængslets særligt sikrede afdeling, som blandt andet er til indsatte, der er vurderet personfarlige. Afdelingen er ikke kategoriseret som en afdeling for negativt stærke indsatte.

Af besvarelsen fra Københavns Fængsler fremgår, at A under afsoningsperioderne på Politigårdens Fængsel hovedsagligt har været placeret som såkaldt kategori 1, som i brev af 28. august 2006 fra Kriminalforsorgen til Københavns Fængsler er defineret som »Negativt stærke indsatte, herunder indsatte fra stærkeafdelingerne i de lukkede fængsler, som optræder alvorligt truende og/eller voldeligt.«

Af besvarelsen fra Anstalten ved Herstedvester fremgår, at anstalten ikke har en afdeling for negativt stærke indsatte.

Af besvarelsen fra Statsfængslet Østjylland fremgår, at A ikke har været placeret på afdeling for negativt stærkt styrende indsatte, hverken i Horsens eller i Østjylland.

*»2. Adgang til TV, radio, avis og telefon*

Har A under afsoningen haft adgang til TV, radio, avis og telefon, herunder da han var udelukket fra fællesskab, placeret i sikringscelle mv.?«

Af besvarelsen fra Statsfængslet i Nyborg fremgår, at A under afsoning har haft TV og radio i cellen, og at der er adgang til telefon og avis på afdelingen. Dette gælder også for indsatte, der er udelukket fra fællesskab, hvorimod A ikke har haft adgang hertil under placering i sikringscelle.

Af besvarelsen fra Københavns Fængsler fremgår, at A i perioder, hvor han har været udelukket fra fællesskab har haft adgang til TV, radio, avis samt telefon. Under ophold i observationscelle vil indsatte normalt ikke have adgang til TV og radio, men til avis og telefonering, medens indsatte under ophold i sikringscelle ikke har adgang til nogen af delene.

Af besvarelsen fra Anstalten ved Herstedvester fremgår, at A har haft adgang til avis og telefon både under udelukkelse fra fællesskab og under ophold i observationscelle, men ikke under ophold i sikringscelle. Der var på tidspunktet for A's afsoning endnu ikke installeret TV i observationscellerne, men han havde adgang til TV under udelukkelse fra fællesskab. Der er ikke adgang til TV i sikringscelle. Det bemærkes endvidere, at der blev installeret TV og playstation i den celle (I6) på afdeling I, hvor A var indsat en stor del af tiden. Cellerne I2 og I6 var ikke egentlige observationsceller, men kunne ombannes til sådanne. A var anbragt her, når hans adfærd og tilstand krævede hyppige tilsyn. Der er gjort notat herom på lige fod, som hvis han havde været anbragt i en egentlig observationscelle.

Af besvarelsen fra Statsfængslet Østjylland fremgår, at indsatte har adgang til TV, radio, avis og telefon under udelukkelse fra fællesskab. I praksis vil indsatte have adgang til avis og telefon,

Copyright © 2023 Karnov Group Denmark A/S

men ikke til TV og radio under indsættelse i observationscelle. Da en indsat i sikringscelle normalt vil være fastspændt, idet han ellers flyttes til observationscelle, er spørgsmålet om TV mv. ikke aktuelt.

**3059**

»3. Besøg

Har A haft mulighed for besøg under afsoningen? - herunder, da han var udelukket fra fællesskab m.v.?«

Af besvarelsen fra Statsfængslet i Nyborg fremgår, at A var placeret på en afdeling med 6 pladser, hvortil der var knyttet 2 besøgsrum. A har således haft mulighed for at modtage besøg, også i perioder hvor han var udelukket fra fællesskab.

Af besvarelsen fra Københavns Fængsler fremgår, at A har haft adgang til besøg, også i perioder hvor han var udelukket fra fællesskab.

Af besvarelsen fra Anstalten ved Herstedvester fremgår, at A har haft adgang til besøg under alle afsoninger, herunder under anbringelse i observationscelle. Der er ikke adgang til besøg under ophold i sikringscelle, eller hvis indsattes adfærd konkret skønnes at være faretruende.

Af besvarelsen fra Statsfængslet Østjylland fremgår, at A har haft adgang til besøg, også i perioder hvor han var udelukket fra fællesskab.

»4. Kontakt med personalet

Hvilken kontakt har A haft med personalet under afsoningen - herunder i de perioder, hvor han var udelukket fra fællesskab mv.?«

Af besvarelsen fra Statsfængslet i Nyborg fremgår, at A har haft kontakt med personalet på afdelingen flere gange dagligt i forbindelse med vækning, udlevering af måltider og aflåsning til nat. Derudover har der været kontakt, i det omfang A har henvendt sig til personalet eller omvendt. Kontakten angives at have været præget af A's grænsesøgende og truende adfærd over for personalet, der bl.a. udmunder i et overfald på personalet med en tilvirket kniv.

Af besvarelsen fra Københavns Fængsler fremgår, at personalet bestræber sig på udvidet kontakt med de indsatte, der er udelukket fra fællesskab, ligesom kontakten med civile personalegrupper intensiveres i det omfang, det skønnes forsvarligt.

Af besvarelsen fra Anstalten ved Herstedvester fremgår under henvisning til det omfattende materiale i form af observations- og sikringscellerapporter samt psykiater-/psykologjournaler, at der har været en tæt og hyppig kontakt mellem A og personalet. Således har behandlerne i vidt omfang tilbudt samtaler, og man har forsøgt at rumme hans adfærd og ønsker på afdelingen bl.a. ved at lade ham tage timelange bade samt fremskaffe bøger, kryds og tværs og opgavehæfter. Det angives, at man har en stor mængde materiale vedrørende kontakten mellem A og personalet. Materialet vidner om, at både afdelingernes personale og behandlerpersonalet har søgt at forstå, rumme og hjælpe A til en så tålelig afsoning som muligt under de givne rammer og hans adfærd.

Af besvarelsen fra Statsfængslet Østjylland fremgår, at personalet er særligt opmærksom på indsatte, der er udelukket fra fællesskab, og indsatte, der som A har været det, er anbragt på det særligt sikrede afsnit. Kontakten med A har været svingende, idet den i nogle perioder var god og i andre perioder præget af hans vrangforestillinger om, at personalet aflyttede ham gennem væggene og forgiftede hans mad/medicin mv. A havde ligeledes i perioder kontakt med fængselspræsten og sygeafdelingen. Man var generelt opmærksom på så vidt muligt at lade de personalemedlemmer, der havde bedst kontakt med ham, stå for kontakten.

»5. Frivillig udelukkelse fra fællesskab

Har A været frivilligt udelukket fra fællesskab. I givet fald, i hvilke perioder og på hvilket grundlag? . . .«.

Af samtlige besvarelser fremgår, at A ikke har været frivilligt udelukket fra fællesskab.

*De enkelte indgreb*

Der er fremlagt en række rapporter om anbringelser i sikringscelle og observationscelle samt om udelukkelse fra fællesskab.

For så vidt angår anbringelserne i sikringscelle har A, medmindre andet er anført nedenfor, ifølge rapporterne været fikseret med hånd- og fodremme samt mavebælte under hele anbringelsen. I visse tilfælde fremgår det, at der ud over håndledsremme også er anvendt handsker. Af rapporterne fremgår tillige, at der forud for indsættelsen næsten hver gang er sket visitation af A og omklædning. Omklædningen har efter den under forklaringerne oplyste normalt bestået i, at eget tøj og i hvert fald alt andet tøj end undertøj aftages, og A eventuelt er blevet iført fængselsundertøj.

Af udateret forhørsudskrift fra Anstalten ved Herstedvester fremgår blandt andet:

»Forvarede skulle den 31.07.2000 mellem kl. 15.00 og 16.00 have gået ind i en medindsattes celle og sparket/slået denne i ansigtet, hvorved den medindsatte mistede bevidstheden.

. . .

Forvarede nægter fortsat at have udøvet vold mod den medindsatte.

. . .

På trods af forvaredes benægtelse finder forhørslederen det for bevist/godtgjort, at forvarede er gerningsmanden til voldsepisoden den 31.07.2000.

. . .

Det findes ligeledes bevist, at indsatte ved sin erkendelse har røget hash samt illegalt været i besiddelse af lægeordineret medicin, som han illegalt har samlet sammen istedet for at indtage denne ved udlevering.

. . .

Forvarede har derfor overtrådt bekendtgørelsen om behandling af personer, der er anbragt i forvaring § 19,

**3060**

stk. 2, straffelovgivningen om vold og om overtrædelse af lov om euforiserende stoffer.

*Det bestemmes derfor, at den allerede iværksatte enrumsanbringelse af 02.08.2000 i medfør af enrumscirkulærets § 2, stk. 2, pkt. 2 og 4, fortsat opretholdes.*

Dette dels for at forebygge voldsom adfærd og dels da forvarede for tiden findes uegnet til fællesskab.

*Det bestemmes endvidere, at anstalten indgiver politianmeldelse mod forvarede for at have begået vold mod en medindsat.«*

Der er ikke oplysninger i det skriftlige materiale i sagen om, hvad der er kommet ud af den politianmeldelse, der omtales.

Af sikringscellerapport fra Statsfængslet i Nyborg om anbringelse i perioden den 10. august 2003 kl. 16:45 - 12. august 2008 kl. 9:12 (i alt 1 døgn, 16 timer og 27 minutter) fremgår:

». . .

2 gange på dagens 2 tur høres der et højt brag på cellegangen Sdr. 3, uden at det kan lokaliseres hvorfra lyden kommer. Ca. 16.30 høres der et brag fra indsattes celle, og indsatte aktiverer nødopkaldet. Da døren åbnes til indsatte kommer denne farende ud af cellen med en kniv i hånden, med fråde om munden og i affekt. Personalet ser sig nødsaget til at trække sig tilbage til kontoret, og slå alarm via de bærbare radioer. Indsatte tager opstilling ved kontoret, hvor han råber og skriger efter personalet, sparker på døren til kontoret, smadrer diverse møblement på gangen, stikker med kniven i ruden til vagtburet, og viser tiltagende ophidselse. Undertegnede ankommer til Sdr. 3 via elevatoren på vestsiden, indsatte opholder sig stadig på gangen, bevæbnet med kniven, fuldstændig i affekt. Undertegnede forsøger ved samtale, at få indsatte til at lægge kniven fra sig, indsatte forholder sig herunder i ro, men springer pludselig op ved gelænderet og angriber undertegnede med kniven. Undertegnede ser sig nødsaget til, i nødværge,

at tildele indsatte et slag på venstre overarm med mit nøglebundt i en kæde, hvilket stopper indsatte midlertidigt. I mellemtiden kommer de personale til fra trappeløbet i sydenden. Indsatte stormer mod trappen med hævet kniv, undertegnede og F.f . . . hopper over gelænderet og indhenter indsatte ved trappeløbet, hvor undertegnede kommer i slagsmål med indsatte, hvorunder undertegnede tildeler indsatte et spark på kroppen og endvidere får sparket benene væk under indsatte, idet denne forsøger at stikke undertegnede med kniven. Indsatte overmandes herefter med anvendelse af greb og stav, ilægges håndjern og transporteres til sikringscellen for SA hvor han kl. 16.45 indlægges med fiksering.

. . .«

Af rapporten fremgår endvidere, at A frem til om eftermiddagen den 11. august 2003 under flere samtaler fremstod paranoid og blandt andet gav udtryk for, at der var tale om et komplot, der gik ud på at slå ham ihjel. Desuden fremgår det, at han periodevis lå og råbte, og at han under en samtale kl. 13:57 var utroligt skiftende i sin sindsstemning og vekslede mellem at ligge roligt og råbe op og komme med trusler. Under en afhøring foretaget af en politibetjent kl. 15:01 blev han ophidset og gav udtryk for, at personale ville forgive ham. Han faldt til ro, da politibetjenten var gået. Han lå derefter og råbte frem til kl. 15:09. Efter at være blevet tilset af en læge kl. 15:55 faldt han i søvn og sov herefter stort set uafbrudt frem til den 12. august 2003 kl. 8:34. På det tidspunkt gav han under en samtale udtryk for, at han fortsat mente, at det var et komplot mod ham. Kl. 9:12 den 12. august 2008 blev han ført håndjern og udtaget af sikringscellen med henblik på overførsel til Københavns Fængsler. Den sidste del af anbringelsen i sikringscelle og fiksering skyldtes ifølge rapporten, at A sov.

I rapport fra direktoratet om »Udelukkelse fra fællesskab«, angives det, at der den 12. august 2003 kl. 9:15 er truffet beslutning om udelukkelse fra fællesskab, og at udelukkelsen ophørte den 19. august 2003 kl. 13:10. Desuden fremgår det:

». . .

*Sagens udvikling:*

Indsatte blev den 12-08-03 overført som UFF, på af overfald på Ff med kniv. Der findes ikke grundlag for at foretage vurdering i dag.

*Beslutning:*

Fortsat udelukkelse fra fællesskab jf.:

§ 63, stk. 1, nr. 1 - for at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd

Uden mulighed for samvær med medindsatte.

*Begrundelse:*

Intet at bemærke, 14. august 2003

. . .«.

Det fremgår af rapport om sikringscelleanbringelse i Københavns Fængsler i perioden den 18. august 2003 kl. 2:20 - 19. august 2003 13:04 (i alt 1 døgn 10 timer og 44 minutter, heraf fikseret i bælte, håndrem og fodrem frem til kl. 18.05 den 18. august 2003, hvor han blev udtaget af fiksering og flyttet i en anden celle):

». . .

*Beskrivelse af episoden:*

D. d. kl. 01.55 begynder indsatte at råbe højlydt fra cellen, samtidig med at han slår og sparker på celleinventaret. Indsatte råber at vi bare kan komme, og at han ikke overgiver sig uden kamp. Assistance tilkaldes, og der gøres forsøg på at åbne døren, indsatte blokerer imidlertid døren, og derfor tilkaldes 209.

Herefter beslutter 209, at indsatte skal tages med magt. Kl. 02.12 brydes døren op med skjolde, og indsatte pasificeres under voldsom modstand. Indsatte

pålægges håndjern og føres over i SM02 indsatte er stadigvæk modstand. Kl. 02.20 er indsatte spændt.

. . .«

Det er endvidere i rapporten kl. 2:25 den 18. august 2003 noteret, at A var angst og sikker på, at personalet ville slå ham ihjel og græd. Fra kl. 2:40 lå han roligt, og da han blev tilset af læge kl. 3:40, er det også noteret, at han var rolig. Kl. 4:10 råbte A. Det gjorde han også kl. 5:20, hvor han spyttede voldsomt bagefter. Ellers fremgår det af notaterne, at han lå roligt og sov i tidsrummet kl. 6:00 - 8:00. Der er på ny notat om, at A råbte »lidt ind i mellem« kl. 8:50, og om, at han råbte, at bæltet var stramt (formentlig) ca. kl. 9:10, hvilket han gentog (uden råben) kl. 9:35 og kl. 10:00, hvor han spurgte, om det kunne blive løsnet. I hele perioden frem til kl. 11:30 er der i øvrigt kun noteringer om, at A lå roligt. Kl. 11:30 meddelte han at være klar til at returnere til egen celle, men fængselsfunktionærerne vurderede ifølge notatet på dette tidspunkt, at han ikke var »klar«. I tiden herefter er der notater om, at A kl. 14:20 råbte, at han ville slippes fri, og kl. 14:45, at han lå og råbte. I øvrigt er der kun notater om, at han lå roligt frem til kl. 18:05 den 18. august 2003, hvor det fremgår, at fikseringen var aftaget, og at han var roligt til SM12 samt tilset af en sygeplejerske og havde fået mad og mælk kl. 18:15. Af notaterne om observationerne af A i den celle, hvor han blev indsat uden fiksering, fremgår, at han var rolig frem til kl. 13:04 den 19. august 2003, hvor han blev afhentet til Horsens Statsfængsel.

Parterne har angivet at være enige om, at denne rapport, som er den eneste, hvorfra der under forelæggelsen er dokumenteret nærmere om forløbet af anbringelsen, er en typisk rapport.

Af rapport om udelukkelse fra fællesskab i perioden den 19. august 2003 kl. 14:00 til 11. november 2003 kl. 9:30 fremgår blandt andet:

*»UGE NOTAT oprettet 26-08-2003 07:32 af [Navn], overvagtmester*

*Sagens udvikling:*

Indsatte udviser stadig in stor grad af psykisk ubalance, taler med sig selv og ikke eksisterene personer. Taler meget om overfald dels på hans egen person dels på personalet.

Indsatte fortsætter med at tale med sig selv, mener at der er installeret aflytningsudstyr på hans celle. Indsatte blev den 31.08.03 sikringcelle anbragt efter at han havde slået ud efter en fængselsfunktionær med knytnæve

Indsatte fortsætter med at gå og småtale med sig selv. Taler ikke mere end nødvendigt med personalet og svarer stort set kun med ja eller nej. Er begyndt at benytte muligheden for gårdtur.

Indsatte virker stadigvæk psykisk ude af balance, taler med sig selv, mistror personalet for at puttet noget i hans medicin. Indsatte i bedring. Taler nu med personalet uden vragnforestillinger

test

[Navn], Afdelingsleder:

Den 21.10.03. har indsatte været udelukket fra fællesskab med andre, grundet uligevægtig adfærd bla. fra Københavns fængsler og Stf. i Nyborg.

Indsatte er anbragt her af direktoratet indtil overflytning til Anstalten ved Herstedvester.

*Beslutning:*

Ophør af udelukkelse fra fællesskab d. 11-11-2003 09:30.

*Begrundelse:*

Indsatte betragtes stadig som en reel trussel mod de personer som omgås ham

Indsatte betragtes stadig som en reel trussel mod sin omgivelse

Indsatte betragtes stadig som en reel trussel mod sine omgivelser

Indsatte betragtes stadig som en reel trussel mod sine omgivelser.

Indsatte betragtes stadig som en reel trussel mod sine omgivelser

**3061**

Copyright © 2023 Karnov Group Denmark A/S

SAGENS UDVIKLING. Indsatte er i fortsat bedring. Lover under samtalen at der ikke bliver nogen problemer mellem . . . og personalet. Indsatte orienteres om, at det er hensigten, at han skal overflyttes til anstalten ved Herstedvester hurtigst muligt. Indsatte er indeforstået med dette og giver igen udtryk for, at han vil have en problemfri afsoning fra nu af.

*Begrundelse.*

Indsatte betragtes stadig som en reel trussel mod sine omgivelser.

ej skrive

[Navn], Afdelingsleder:

Indsatte betraktes stadig som en reel trussel mod sine omgivelser.

[Navn], Afdelingsleder:

Pågældende overflyttes til fortsat afsoning Anstalten ved Herstedvester.«

Af rapport om sikringscellebringelse i Statsfængslet i Horsens i perioden den 31. august 2003 kl. 13:55 - 31. august 2003 kl. 16:47 (i alt 2 timer og 52 minutter) fremgår:

».. «

*Beskrivelse af episoden:*

Indsatte er anbragt i forvaring i 1 Øst, han er begyndt at høre stemmer og mener, at personalet kan snakke til ham gennem vægen, han vil desuden ikke følge personalets anvisninger, og vil have døren til at stå åben. Indsatte er yderst aggressiv og virker truende, han vil have en psykolog øjeblikkelig. Vi beslutter at anbringe ham i obs. cellen til nærmere observation og vi tilbyder ham en læge, hvilket han afslår. Indsatte går frivillig

**3062**

med over til obs. cellen, her nægter han, at tage sin halskæde af og siger, så må i gøre det, jeg går et skridt frem for at løsne halskæden, indsatte slår hurtigt ud med sin højre knyttede hånd, men rammer mig ikke. Indsatte bliver pacificeret og anbragt i sikringscellen.

. . .«

Af rapport om observationscellebringelse i Anstalten ved Herstedvester i perioden den 21. november 2003 kl. 13:00 - 21. november 2003 kl. 13:58 (i alt 58 minutter) fremgår:

».. «

*Beskrivelse af episoden:*

Inds. har i flere dage givet udtryk for at være forpint af stemmer, bl.a. at personalet aflytter ham, og har placeret aflytningsudstyr overalt i hans celle. Inds. bliver vurderet til daglig møde med bl.a. [Navn], [Navn], [Navn] og afdelingspersonalet, hvor det bliver besluttet at flytte inds. til observationscelle snarest muligt. Dette sker kl. 13.00 med brug af magt.

. . .«

Af en rapport om sikringscellebringelse i Anstalten ved Herstedvester i perioden den 21. november 2003 kl. 13:50 - 22. november 2003 kl. 10:55 (i alt 21 timer og 5 minutter) fremgår:

».. .

*Beskrivelse af episoden:*

Inds. er dd. siden observationscellen anbringelsen blevet tiltagende urolig og aggressiv i form af banken på døren på vrben. Kl. 13.50 åbner personalet ind til inds. og meddeler at han skal stoppe sit råberi og banken øjeblikkeligt, og hvis ikke han retter sig efter dette, så vil konsekvensen blive at personalet ser sig nødsaget til at anbringe inds. i sikringscelle, da personalet fra tidligere episoder er bekendt med at medvirke til en rolig løsning, så personalet så sig derfor nødsaget til at anbringe inds. i sikringscelle.

. . .«

Af rapport om sikringscellebringelse i Anstalten ved Herstedvester i perioden den 26. november 2003 kl. 17:45 - 27. november 2003 kl. 7:19 (i alt 13 timer og 34 minutter) fremgår blandt andet: »*Beskrivelse af episoden:*

dd. kl. 17.45 observerer undertegnede, at indsatte A, overfalder en medindsat [Navn] . . ., i afdelingens opholdsstue. jeg ser at, indsatte A, står og slår indsatte, [Navn] . . . i hovedet med begge knyttede næver. Jeg hiver A, baglæns ned til gulvet, og magtanvendelse bliver strakt anvendt. og indsatte bliver herefter anbragt i sikringscelle og fastspændt. Indsatte [Navn], forsvarer sig ved at holde begge hænder op foran ansigtet. Indsatte [Navn] tilses af sygeplejersken, hun konstaterer, at [Navn] har mange slagmærker på begge underarme, ellers intet at bemærke.«

Af noteringerne i rapporten fremgår i øvrigt, at A efter i en periode ind i mellem at have spyttet, være kommet med ukvemsord over for personalet, at have råbt, piftet og forsøgt at komme fri af remmene faldt i søvn omkring kl. 00:00 - 00:15 den 26. - 27. november 2003. Han var herefter stort set uafbrudt indtil kl. 7:15 den 27. november 2003, hvor han blev udtaget af sikringscellen.

Af rapport om sikringscellebringelse i Anstalten ved Herstedvester i perioden den 9. december 2003 kl. 18:10 - 10. december 2003 kl. 8:05 (i alt 13 timer og 55 minutter) fremgår blandt andet: »*Beskrivelse af episoden:*

Dags dato i løbet af eftermiddagen, i observationscelle I6, har indsatte været særdeles højtråbende & truende pga. at han mener personalet vil putte gift i maden samt terrorisere ham på alle tænkelige måder. Personalet forsikrede gentagende gange indsatte om, at dette ikke havde noget på sig & at han skulle forholde sig roligt. Indsatte forsøger med at kommandere, true & sparke på døren. Grundet dette beslutter personalet at indsatte ikke er egnet til besøg senere på dagen, hvorefter indsatte bliver direkte truende overfor Ff. [Navn] & Ff. [Navn]. Personalet beslutter herefter at anbringe indsatte i observationscelle I2, hvor der ikke forefindes tv samt andre genstande som kunne benyttes som våben mod personalet. Indsatte beder efter en samtale med sygeplejersken, som forsøger at tale indsatte til ro, men uden held. Indsatte fortsætter løbende med at sparke på døren, true, råbe & kaste med mad samt madbakke, Ff. [Navn] observere gennem observation glasset at indsatte sidder med en spids & skarp genstand samt oprullede ærmer. Personalet beslutter da at indsatte skal overføres til sikringscelle I7, for at hindre selvbeskadigelse eller selvmord. Herefter bliver indsatte med magt overført til sikringscelle I7.«

Ifølge noteringerne i rapporten truede A med hævn og lå ind imellem og råbte og hev i remmene frem til kl. 19:25 den 9. december 2003. Der er herefter ikke noteringer om aggressiv adfærd eller andet frem til det tidspunkt, hvor han blev udtaget af sikringscellen kl. 8:05 den 10. december 2003. Kl. 19:35 den 9. december 2003 fik han løsnet en armrem for at kunne tisse i en kolbe henholdsvis kl. 19:45 for at ryge. Kl. 20:05 fikseredes hånden igen. Fra dette tidspunkt og resten af anbringelsen ophørte brugen af handsker. Kl. 22:45 løsnedes venstre arm, hvorefter A faldt i søvn og sov frem til kl. 5:40 den 10. december 2003, hvor han fik en cigaret. Kl. 6:00 løsnedes hans højre hånd, hvilket skete, efter at venstre hånd i stedet var blevet spændt fast.

Af rapport om udelukkelse fra fællesskab i perioden den 10. januar 2004 kl. 12 - 30. april 2004 kl. 12:20 fremgår blandt andet: »*UGE NOTAT oprettet 19-03-2004 09:28 af [Navn]*

. . . «

**3063**

*Beslutning:*

Fortsat udelukkelse fra fællesskab, jf.:

For at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1.

Uden mulighed for samvær med medindsatte.

*Begrundelse:*

[Navn], Fængselsfunktionær-

Indsattes adfærd har været meget svingende. Umiddelbart går det godt, men indsatte har svært ved at rumme forandringer uagtet de er et forsøg på at lempe hans forhold.

Indsatte har udtalt paranoid adfærd og mener at høre stemmer der vil gøre ham fortræd, stemmerne kan både være fremmede eller betjente.

*UGE NOTAT oprettet 23-03-2004 13:53 af [Navn], Fængselsfunktionær:*

. . .

*Beslutning:*

Fortsat udelukkelse fra fællesskab jf.:

For at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1

Uden mulighed for samvær med medindsatte

*Begrundelse:*

[Navn], Fængselsfunktionær:

På enrumsmøde d.d. orienterede personalet om at indsatte opfører sig mere temperamentsfuldt for tiden. Der er ikke ændret noget ved indsattes medicin, men måske påvirker inds. moders sygdom ham meget for tiden. I forhold til sidste notat er der ændret følgende i indsattes afsoningsforhold:

Indsatte skal visiteres i eget opholdsrum eller i centralens rum og IKKE i OBS-cellen. Indsatte har [tilladelse] til max 5 potteplanter. Revideret notat udleveret til indsatte.

. . .

*Beslutning:*

Fortsat udelukkelse fra fællesskab jf.:

For at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1

Uden mulighed for samvær med medindsatte

*Begrundelse:*

[Navn], Fængselsfunktionær:

Indsatte er fortsat udelukket fra fællesskab med mulighed for fælles gårdtur.

Indsatte har i de seneste 14 dage været rolig og i bedre humør. Han er så småt begyndt at deltage i den fælles gårdtur, han bl.a. spiller skak med sine medindsatte, og han udtaler at de er flinke mennesker.

*Uge notat oprettet den 21-04-2004 15: 33 af [Navn] Overvagtmester*

. . .

*Beslutning:*

Fortsat udelukkelse fra fællesskab jf.:

for at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1

Uden mulighed for samvær med medindsatte

*Begrundelse:*

[Navn], Overvagtmester:

[Navn],afdelingsleder:

Ændring til mulighed for cellefællesskab er bestemt på baggrund af et positivt forløb igennem den sidste periode.

Ændringen om cellefællesskab er meddelt indsatte mundtligt og skriftligt.

[Navn], Overvagtmester:

Indsatte er fortsat udelukket fra fællesskab med mulighed for fælles gårdtur med øvrige indsatte på A1.

Fra d. 27.04.2004 er cellefællesskab med 03/288 ophørt.

Fra d. 27.04.2004 har indsatte mulighed for cellefællesskab med 03/421.

*UGE NOTAT oprettet 17-05-2004 10:30 af [Navn], Fængselsfunktionær*

. . .

*Beslutning:*

Ophør af udelukkelse fra fællesskab d. 30-04-2004 12.20.

*Begrundelse*

[Navn] Fængselsfunktionær:

P.g.a. alvorlige trusler mod personalet, skønnes det at indsatte skal overføres til Anstalten v. Herstedvester d.d.«

Af rapport om sikringscelleanbringelse i Anstalten ved Herstedvester i perioden den 30. april 2004 kl. 12:35 - 3. maj 2004 kl. 10:23 (i alt 2 døgn 21 timer og 48 minutter) fremgår blandt andet:

»*Beskrivelse af episoden:*

Inds. overført hertil af personale fra stfg. Vridsløselille. Indsatte havde fysisk modsat sig overførslen og var ved ankomsten stadig meget voldsom selv om han var belagt med håndjern. Yderligere havde indsatte slået to fængselsfunktionærer fra Vridsløselille stfg. i forbindelse med transporten hertil.

. . .

*Lægens bemærkninger/resume:*

[Navn] Fængselsfunktionær:

Afd. læge: [Navn]:

Tilbageflyttet akut fra SV ang. pga kontraktbrud og trusler mod personale. Kort efter ankomsten anbragt i sikringscelle.

Tilses kl. 13:35.

Indsatte er irriteret og ligeglad med tilsynet. Han siger til sine spørgsmål »Jeg er ligeglad«.

**3064**

Man kan få en finger ind under alle remme, ingen ser ud til at [stramme].

Jeg har indsattes ordinerede kl. 12:00 Rivitril med. På forespørgsel om han vil ahve dem, svarer han: »Jeg er ligeglad«. Jeg gentager spm.., og han svarer »Jeg er ligeglad«.

Jeg gentager spm., og han svarer: »Jeg er ligeglad, du kan jo bare hælde dem i halsen på mig.« Han får dem ikke, da der på den måde kan opstå fejlsynkning.

1.5.2004

Tilser indsatte som fortsat er fikseret. Indsatte har 4 gange inden fore det forløbne døgn fremkommet med alvorlige trusler over for 4 forskellige fængselsfunktionærer. Ved samtale med undertegnede, er han fortsat anspændt og truende. I øvrigt observeres ingen fysiske gener fra fastspænding.

Indsatte må fortsat være fixeret i sikringscelle, og jeg har underrettet DFK, vicedirektør [Navn].

Adm. overlæge [Navn]«

Det er endvidere i rapporten anført, at A efter periodevist at have råbt op og truet, lå roligt mellem kl. 14:45 og kl. 19:45 den 30. april 2004, hvor han på ny lå uroligt og spyttede på væggen og kl. 20:00 og kl. 20:10 på ny råbte ukvemsord mod personalet og fremkom med trusler. Kl. 21:20 og igen kl. 21:30 blev han på ny ophidset og truende. Der er herefter lange perioder, hvor han sov frem til den 1. maj 2004 om eftermiddagen, medens han i vågne perioder jævnligt kom med skældsord, råbte eller truede, og herunder fremkom med trusler på livet kl. 2:45 og kl. 2:50 den 1. maj 2004. Ifølge et notat kl. 7:05 den 1. maj 2004 blev venstre arm på dette tidspunkt løsnet. I de efterfølgende noteringer ser det ud, som brug af håndremme helt er ophørt fra dette tidspunkt. Dette stemmer dog ikke overens med senere noteringer om, at håndled blev løsnet, da A fik vand. Det er den 1. maj 2004 kl. 12:00 noteret, at han ikke ønskede at tale med en sygeplejerske, som var til stede for at tilse ham. Umiddelbart efter er det på ny noteret, at han sov frem til kl. 16:30, hvor han til overlægen sagde, at »vi skal bare skride ud, ellers kan han pisse os lige i fjæset«. Herefter er der igen en længere periode, hvor han sov kun afbrudt af ganske korte perioder, hvor han lå stille. Det er noteret, at A den 2. maj 2004 kl. 4:38 spurgte en fængselsbetjent, om den pågældende kedede sig og herefter lå stille frem til kl. 5:20, hvor han satte sig op, skreg og flåede i rem-

mene. Kl. 6:00 - 06:10 råbte han på vand og blev truende og hidsig, hvorefter han kl. 6:20 fik en kande vand. Kl. 7:00 kaldte han en betjent for en idiot. Kl. 7:10 er det angivet, at han fået/får spændt venstre håndled fri og løsnet højre, i forbindelse med at han har fået vand. Kl. 7:25 talte han ifølge noteringerne med sygeplejersken, og kl. 7:40 bad han om noget at læse i. 15 minutter efter er det noteret, at han var faldet i søvn. Kl. 8:15 den 2. maj 2004 angives han på ny at være vågen. Bortset fra notater om, at han den 2. maj 2004 kl. 10:45 og kl. 11:00 igen råbte, er der herefter alene notater om, at A lå stille, sov, urinerede i en kolbe, røg, afslog mad, samt at han kl. 8:40 den 3. maj 2004 spurgte, hvad klokken var, og kl. 9:20

ønskede at tale med en psykiater, hvilket skete kl. 10:01. Herefter blev han udtaget af sikringscellen og fikseringen kl. 10:10 den 3. maj 2004.

Af rapport om observationscelleanbringelse i Anstalten ved Herstedvester i perioden 18. maj 2004 kl. 15:10 - 27. august 2004 kl. 11:45 (i alt 100 døgn 20 timer og 35 minutter) fremgår blandt andet:

»*Beskrivelse af episoden:*

Inds. er d.d. kl. 15.10 udtaget af sikringscellen og bliver derefter anbragt i observationscelle I.6.

. . .

|  |  |
|---|---|
| 28-05-2004 18:15 | [Navn] Fængselsfunktionær |

17.00 Inds. nægter d.d. at tage sin kl. 17.00 medicin (Risperdal). Jf. journalnotat fra d. 27-05. Har inds. lavet en aftale med psyk. G om at fortsætte med den ordinerede medicin endnu en uge. På baggrund af dette, og fra tidligere kendskab til inds. adfærd, beslutter undertegnede at nægte inds gårdtur. Dette vil blive opretholdt indtil inds. igen tager AL sin medicin, eller til der foreligger en ny skriftlig aftale med psyk. G.

. . .

|  |  |
|---|---|
| 03-06-2004 11:25 | [Navn] Fængselsfunktionær |

10.00. Det er d.d. på dagligt møde blevet besluttet at inds. skal tage den medicin som psyk. G anbefaler. Hvis ikke inds. indvilliger i dette, skønner personalet at der ikke kan afvikles gårdtur med inds, da personalet ikke føler sig tilstrækkeligt trygge ved situationen. Dette meddeles inds, som bliver særdeles opfarende og vred over denne beslutning. Inds. vil efterfølgende ringe til sin advokat. Dette vil blive gjort umiddelbart efter afdelingen har handlet i butik.

|  |  |
|---|---|
| 03-06-2004 11:31 | [Navn] Fængselsfunktionær |

11.00. Inds. får som aftalt lov til at ringe til sin advokat/moder/bistandsværge hvor han redegør for den nuværende situation - Inds. lægger ikke skjul på at hvis der ikke kommer en opblødning på situationen, så vil inds. efter eget udsagn »tænde af« inden 3 dage. Personalet bør derfor omgås inds. med største agtpågivenhed og forsigtighed.

**3065**

. . .

|  |  |
|---|---|
| 04-06-2004 21:30 | [Navn] Fængselsfunktionær p.p. |

18.25 Vedr. telefonsamtale med bistandsværgen. Indsatte udtaler at han føler sig forfulgt og at han ikke bliver behandlet i overensstemmelse med reglerne. Inds. siger at han er bange da han tror at personalet vil udøve magt over for ham, fordi han tidligere har været voldelig over for personalet. Indsatte udtaler også at der foregår en del aflytning af de rum som inds. opholder sig i. det ved han fordi personalet snakker om de ting som han har udtalt sig om til sin advokat. Under hele samtalen er indsatte meget springende i sin tankegang og han roder alle ting sammen hvilket giver udslag i at bistandsværgen skal kontakte gud og hver mand for at gøre det synligt at den er helt galt med behandlingen af indsatte.

. . .

|  |  |
|---|---|
| 27-08-2004 14:44 | [Navn] Fængselsfunktionær |

11.45 Indsatte har samtale med Psykiater G under opsyn af personale, da indsatte gradvis råber højere og hans adfærd også gradvis intensiveres, går Psykiater G ud af cellen, undertegnede forsøger at tale indsatte til ro, men han springer truende op fra sengen og hen imod Ff. [Navn]. Herefter bliver indsatte passificeret og anbragt i sikringscelle I-7. . . .«

Det fremgår endvidere af noteringerne i rapporten, at A var på gårdture, dog ikke i en periode fra den 28. maj 2004 - 24. juni 2004. Det fremgår, jf. ovennævnte notater, at nægtelsen af gårdture

skyldtes, at A nægtede at indtage sin medicin. Fængselspersonalet fandt det på den baggrund ikke sikkerhedsmæssigt forsvarligt at lade ham gå på gårdtur. Ifølge rapporten havde han adgang til at

gå til købmanden og handle på egen hånd. Adgangen hertil blev imidlertid inddraget den 22. juli 2004 som følge af A's grænsesøgende adfærd. Herefter blev han i stedet tilbudt at bestille varer. Det er noteret, at han under opholdet havde besøg af præsten, psykiater G, sin bistandsværge samt sin mor og far, og at han havde adgang til fjernsyn og playstation samt til at telefonere. Der er i hele forløbet noteringer om dage, hvor A var aggressiv i sin tiltale til fængselspersonalet og grænsesøgende. Den 27. august 2004 kl. 11:45 blev A, jf. ovennævnte notat, overført til sikringscelle som følge af paranoid og truende adfærd.

Af rapport om sikringscelleanbringelse i Anstalten ved Herstedvester i perioden 27. august 2004 kl. 11.50 - 27. august 2004 kl. 17:30 (i alt 5 timer og 40 minutter) fremgår blandt andet:

»Beskrivelse af episoden:

Dags dato ca. kl. 11.00, fik indsatte lov til at ringe til sin advokat samt moder. Indsatte virker paranoid, da han selv efter flere gange fortsat var i tvivl om, at han talte med de rigtige ansatte på kontoret. Han gav udtryk for at der var nogen som udgav sig for at være ansat på advokatkontoret. Umiddelbart efter ringede han til sin stedfader [Navn] og bad [Navn] om at kontakte advokatkontoret, pga. af sin tvivl. Derefter ringede han til sin Moder [Navn] og talte kort med hende, hvorefter han lagde røret på, for at ringe op igen med det samme, da han var i tvivl om at hun virkeligt var hans Moder. Da indsatte lagde røret på, var han stadig overbevist om at han ikke har talt med sin Moder & gik røset samt anspændt retur til observationscellen.

Efterfølgende var personalet bekymret for indsattes sindstilstand og tilkaldte Psykiater [Navn], som ankom umiddelbart efter. Hun talte med indsatte på cellen, indsatte blev gradvist mere ophidset under samtalen. I det Psykiateren fortrak sig fra cellen, råbte indsatte flere gange »det var ikke min Mor, jeg talte med«. Personalet forsøgte ved samtale at berolige indsatte, men indsatte sprang pludseligt voldsomt op fra sengen og gjorde med knyttede næver, truende udfald mod personalet.«

Af rapporten fremgår endvidere, at A faldt relativt hurtigt til ro, men kl. 15:20 gav udtryk for en forestilling om, at fængslet omstillede hans samtaler, så han ikke kunne komme i kontakt med sin mor, selvom han ringede til det rigtige nummer. Kl. 16:00 fik A løsnet handsker og håndledsremme, så han kunne ryge, og det blev aftalt, at man, hvis han stadig var rolig ved 18-tiden, ville tage ham ud af cellen. Han blev udtaget kl. 17:30.

Af rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 6. august 2005 kl. 20:40 - 9. august 2005 kl. 8:24 (i alt 2 døgn 11 timer og 44 minutter) fremgår blandt andet:

»Beskrivelse af episoden:

D.d. kl. 20.30 2688 [Navn] åbner døren til indsattes celle da han har ringet på. Indsatte sparker sit affald ud på gangen og råber skældsord af personalet. 2688 [Navn] sparker indsattes affald tilbage på indsattes celle og lukker døren, da indsatte er meget ophidset. Indsatte begynder herefter at sparke voldsomt på døren og smadre sit inventar (det lyder som om der er glas der bliver knust). 20.40 personalet er iført indsats udstyr og åbner døren til indsatte. Indsatte bliver pacificeret under voldsom modstand der bliver brugt stav på ben, arme samt overkrop. Indsatte bliver herefter ført til sikringscellen, hvor han stadig gør voldsom modstand.

**3066**
Indsatte får hårdt fat i 2679 [Navn] s overarm på vej mod elevatoren og 2679 [Navn] bliver nød til at frigøre sig ved brug af slag med knytnæve på indsattes højre skulder.

Indsatte bliver herefter ført til sikringscellen og spændt.

. . .

Lægens bemærkninger/resume:
[Navn], Læge:

Tilset i sikringsselle kl. ca. 21.40. Ligger spændt i bælte og remme. Bæltet samt remme på vé. hånd og hø. fod ligge for stramt, anbef. løsnet. Der ses adskillige hudafskrabninger samt røde mærker forskellige steder på kroppen og ekstremiteter.

Ingen tegn til alvorlig kropsskade. Pt. er anspændt, vredladende og aggressiv over for personale. Ingen manifeste psyk. tegn.

[Navn], Fængselssygepl.:

Tilset. Skal lade vandet, men kan ikke. Råber op om dårlig behandling og han vil tale med ovm og læge igen, som lige er gået.«

Af rapporten fremgår endvidere af et afsluttende notat, at fikseringen med mavebælte, håndrem og fodremme er opretholdt under hele anbringelsen, selvom det efter rubrikken om »Fiksering« ser ud, som om fikseringen er ophørt midt på dagen den 8. august 2005. Der er noteringer om trusler mod personalet og forsøg på at komme fri af fikseringen samt skældsord frem til kl. 23:45 den 6. august 2005. Herefter er der et notat om, at A gav en fængselsbetjent »fingeren« kl. 01:15 den 7. august 2005. Fra kl. 3:00 råbte A på ny op, kom med trusler kl. 3:30 og spyttede efter observationsglasset, da en fængselsbetjent så til ham kl. 3:45. A lå, bortset fra spytten mod observationsruden efter at have fået afslag på kontakt til bistandsværge kl. 9:40, ifølge noteringerne herefter roligt frem til kl. 13:25 den 7. august 2005, hvor en fængselsfunktionær havde en samtale med ham og spurgte, om han var faldet så meget til ro, at han kunne føres til en observationscelle. Ifølge det noterede »ønskede A ikke at deltage i vores forslag, han stillede derimod en række modkrav. Personalet enedes om, at det ikke ville være løsningen at ophæve indsattes fiksering«. A råbte herefter kl. 13:30, at hvis hans krav ikke blev imødekommet »kan vi ligeså godt trække stavene«. Kl. 13:40 ringede A og gentog sine krav, som efter det noterede var at telefonere og få tobak. Han blev oplyst om, at han hverken ville få lov at telefonere eller få tilbudt cigaretter, »så længe han er fikseret og i så negativt humør«. Der er umiddelbart herefter et notat om en samtale, hvorunder fængselsbetjenten meddelte A, at han hverken ville få telefon eller cigaretter ved tilbageførsel til observationscellen, hvorefter A meddelte, at så kunne han »jo ligeså godt blive liggende«. Der er, bortset fra et notat om råben og støj kl. 16:15 og et notat kl. 19:45 om, at han råbte og kaldte en betjent for »en drengerøv«, ingen noteringer om aggressiv adfærd fra A's side i tiden herefter. Kl. 19:35 den 7. august 2005 blev hans anmodning om at blive tilset af en læge efter drøftelse med det lægefaglige personale på Vestre Fængsel afslået under henvisning til, at han ikke ville oplyse, hvad formålet var. Kl. 21:30 og kl. 23:30 råbte han efter en betjent. Kl. 4:15 den 8. august 2005 spurgte A igen efter en læge, men henvistes til at tale med »[Navn]«. Kl. 8:20 råbte han ind i mellem. Kl. 9:45 er der notat om, at overvagtmesteren, som var tilkaldt efter anmodning fra A, havde talt med denne, samt at A afslog et tilbud om vand. Der er noteringer om forsøg på at tisse i en kolbe samt om tilsyn af sygeplejerske i løbet af formiddagen og midt på dagen den 8. august 2005 om tilsyn af læge og sygeplejerske kl. 13:50. Kl. 14:06 fik han medicin mod smerter og afslag på at blive vasket. Kl. 14:25 blev der efter konsultation med sygeplejersken på ny givet afslag herpå. Noteringerne fortsætter løbende frem til A blev udtaget af sikringscellen den 9. august 2005 kl. 8:24.

Af rapport om sikringscelleanbringelse i Anstalten ved Herstedvester i perioden 19. august 2005 kl. 13:05 - 21. august 2005 kl. 13:05 (i alt 2 døgn) fremgår blandt andet:

»Beskrivelse af episoden:

Inds. er d.d. i forhør v/Overvagtmester [Navn]. Dette er som følge af en rapport udfærdiget af Ff. [Navn] . . . vedr. trusler, truende adfærd og racistiske tilråb på hans person. Under dette forhør bliver inds informeret om at den slags trusler fremover vil resultere i at inds. vil blive flyttet retur til celle I.5. På trods af dette fortsætter

disse trusler efter at forhører er bragt til ophør, og personalet har forladt cellen. Konklusionen bliver herefter at inds. skal flyttes tilbage til celle I.5, da han ikke har efterkommet retningslinierne for at bo på celle I.6, og dermed mister disse privilegier.

Indsatsleder Ff. B . . .[vidne i sagen] som d.d. forretter tjeneste på Vk bliver herefter kaldt op på afd. HI. og tal ind i situationen.

Efter samråd med personalet på afd. Hi bliver det besluttet at der vil blive anvendt gas mod inds. hvis ikke han efterkommer personalets krav om at flytte på celle I.5. stille og roligt. Dette sker som følge af kendskab til inds. farlighed (se diverse rapporter).

Inds. bliver efterfølgende kl. 12.55 informeret om det kommende forløb hvis ikke inds. stille og roligt følger med på celle I.5. svaret på det bliver at »jeg skal ikke en skid. I kan bare give mig tåregas. I bliver politianmeldt hele bundet, dette er tortur«

Det bliver herefter besluttet at der vil blive brugt gas mod inds.

Inds. bliver kl. 12.57. advaret om at nu vil der blive brugt gas mod inds. Dette har ingen effekt mod inds, og første gang gas bliver herefter sprøjtet ind. Inds. bliver

**3067**

herefter beordret til at lægge sig ned. dette efterkommer inds. ikke, og der bliver på ny lagt gas ind på cellen. Da der efterhånden er blevet sprøjtet meget gas ind til inds uden den helt store effekt, beslutter undertegnede (Ff. B [vidne i sagen)) pga. inds. helbred, at det ikke findes forsvarligt at sprøjte yderligere gas ind på cellen og beordrer derefter personalet til at trænge ind på cellen og udtage inds. med henblik på sikringscelleanbringelse. Inds. bliver herefter anbragt i sikringscelle I.7.

. . .

*Lægens bemærkninger/resume:*

[Navn], Fængselsfunktionær:

Afd. Læge: [Navn]

19.08.05 kl. 13:30: tilsyn pga. sikringscelleanbringelse efter gasanvendelse.

Indsatte ligger roligt på lejet, han ligger delvist på ve. side. Det forårsager et uhensigtsmæssigt tryk af remme ved ve. håndled. Dette klager indsatte over. I løbet af sekunder hidser indsatte sig voldsomt op og bliver verbalt truende. Han vil have, at jeg kontakter hans bistandsværge, advokat m.v., men jeg oplyser ham om, at det ikke er min opgave. Jeg er der for at undersøge, om han er kommet noget til under magtanvendelsen/sikringscelleanbringelsen. Herefter snærer alle remme, og alt er galt.

Objektivt er yderste rem ved hø. håndled stram, og den løsnes. Ved øvrige remme incl. mavebæltet er der god plads til min finger indenfor remmen.

Indsattes åndedræt og kredsløb skønnes ikke at være påvirket af gasanvendelsen. Han kan råbe og skrige som tidligere. Talen er ikke sløret. Indsattes tilstand skønnes ikke velegnet til nærmere undersøgelse.

Der ses ingen friske mærker på huden.

[Navn], Fængselsfunktionær:

Tilset d. 20/8-05 kl. 12.55. af læge [Navn]

Indsatte tilses i sikringscelle hvor han har været fikseret med bælte, 2 handsker, hånd og fordremme.

Obj: handsker, bælte og remme efterses og er anlagt fuldt forsvarligt. Indsatte trækker vejret naturlig.

Psykisk er han noget opkørt, mener sig uretfærdigt behandlet. Der ses ikke tegn af psykose, men altså svær affekt.

[Navn], Fængselsfunktionær:

Tilses 20/8-05 kl. 2030 pga. mavesmerter.

Har han spist og drukket i et døgn ej heller ladet vandet selvom han er tilbudt kolbe.

Obj. ondt over urinblæren, der er blæredæmpning til 1 finger under navlen. Indsatte kan ikke lade vandet siddende, men efter han er

løsnet og kan stå op kvitterer han 800 ml klar urin. Indsatte spiser og drikker efterfølgende.

Indsatte skal holde pause med tbl.phenergan som kan give urinretention.

Rivotril kan anvendes.

Bælte og 4 remme genanlægges og kontrolleres

[Navn], læge«

Af rapporten fremgår endvidere, at A frem til den 21. august 2005 om morgenen med jævne mellemrum fremkom med aggressive udtalelser og alvorlige trusler mod fængselspersonalet. Kl. 7:30 den 21. august 2005 fik han løsnet armremmene. Da han senere om morgenen kl. 8:20 meddelte, at han intet kunne huske, og at der ikke var »mere ballade med ham«, fik han at vide, at det afhang af hans adfærd i løbet af morgenen, om han ville blive flyttet. Han blev herefter udtaget af sikringscellen kl. 13:05.

Advokat Claus Bonnez indgav på vegne A administrativ klage til direktoratet over indgrebet, herunder anvendelsen af gas. Direktoratet meddelte i en afgørelse af 20. februar 2006, at man anså anvendelsen af tåregas for berettiget, at sikringscelleanbringelsen ikke havde varet længere end nødvendigt, og at der ikke var krav på erstatning.

Advokat Claus Bonnez indgav herefter på vegne A klage og anmodning om erstatning efter reglerne i straffuldbyrdelseslovens §§ 106-107, jf. retsplejelovens kapitel 93 a, til anklagemyndigheden. Ved Rigsadvokatens realitetsafgørelse af 16. juli 2007 blev statsadvokatens afslag på klage over og afslag på erstatning for indsættelse i sikringscelle og brug af gas stadfæstet. Af afgørelsen fremgår, at erstatningssøgende i medfør af retsplejelovens § 1018 f, stk. 1, kan begære sagen indbragt for retten.

A anmodede herefter om, at sagen blev indbragt for retten i medfør af den pågældende bestemmelse. Ved Glostrup Rets dom af 22. marts 2013 blev sagen i overensstemmelse med anklagemyndighedens påstand afvist med følgende begrundelse:

»Krav om erstatning i anledning af indgreb under fuldbyrdelse af straf er reguleret i straffuldbyrdelseslovens kapitel 20. Efter straffuldbyrdelseslovens §§ 106 -107 har en indsat ret til erstatning for uforskyldte indgreb efter reglerne i retsplejelovens § 1018 a i en række nærmere angivne situationer.

Det er ubestridt, at de under sagen omhandlede indgreb efter deres art er omfattet af straffuldbyrdelseslovens §§ 106-107.

Det følger af straffuldbyrdelseslovens § 109, at afgørelse vedrørende krav om erstatning for uforskyldte indgreb under fuldbyrdelse af straf træffes af Justitsministeriet, Direktoratet for Kriminalforsorgen.

Efter straffuldbyrdelseslovens § 112 kan visse nærmere opregnede endelige administrative afgørelser kræves indbragt til prøvelse for retten. Bestemmelserne i straffuldbyrdelseslovens §§ 113-123 regulerer nærmere procesmåden m.v. i forhold til de afgørelser, der i medfør af § 112 kan kræves indbragt for retten.

**3068**

Det er ubestridt, at de under sagen omhandlede indgreb ikke er omfattet af opregningen i § 112, og at opregningen er udtømmende.

Spørgsmålet er herefter, om de rejste krav om erstatning for indgreb under fuldbyrdelse af straf kan indbringes for domstolene i medfør af retsplejelovens kapitel 93 a, herunder navnlig bestemmelserne i retsplejelovens §§ 1018 e-1018 f, eller alene kan indbringes for domstolene i medfør af grundlovens § 63.

Det fremgår både at Statsadvokaten for Nordsjælland og Københavns Vestegns afslag på erstatning af 20. februar 2007 og af Rigsadvokatens afgørelse af 16. juli 2007, at man har opfattet A's anmodning om at få sine krav om erstatning indbragt for retten i medfør af reglerne i retsplejelovens § 93 a som en begæring om at behandle erstatningskravet i medfør af retsplejelovens § 1018 h.

Der blev i den forbindelse henvist til, at det i forarbejderne til straffuldbyrdelsesloven var forudsat, at en indsat kunne forlange erstatningskrav vedrørende indgreb under straffuldbyrdelsen, der blev rejst på grundlag af dansk rets almindelige erstatningsregler, behandlet efter de processuelle regler i retsplejelovens kapitel 93 a, jf. § 1018 h.

I forbindelse med behandlingen af lovforslag L 9 af 9. november 2011 til lov om ændring af straffuldbyrdelsesloven og retsafgiftsloven (Revision af straffuldbyrdelsesloven mv.), der blev vedtaget som lov nr. 113 af 3. februar 2012, anførte Justitsministeriet om kompetencespørgsmålet og adgang til domstolsprøvelse, jf. de almindelige bemærkninger pkt. 3.11,2, blandt andet følgende:

»Det er Justitsministeriets opfattelse, at straffuldbyrdelseslovens § 112, nr. 9, endeligt gør op med, hvilke erstatningskrav som følge af indgreb under straffuldbyrdelsen der skal være genstand for en særlig let adgang til domstolsprøvelse. De erstatningskrav, der ikke er omfattet af § 112, nr. 9, kan således alene indbringes for domstolene i medfør af grundlovens § 63. Det er desuden Justitsministeriets opfattelse, at den administrative afgørelse af spørgsmål om erstatning for uforskyldte indgreb under straffuldbyrdelsen - uanset om indgrebet alder inden for eller uden for straffuldbyrdelseslovens § 112, nr. 9 - skal afgøres af kriminalforsorgen, jf. straffuldbyrdelseslovens § 109, og ikke tillige kan afgøres af anklagemyndigheden, jf. retsplejelovens § 1018 e.

( . . .)

I overensstemmelse hermed forudsættes det med det ovenfor anførte, at krav om erstatning for uberettigede indgreb under straffuldbyrdelsen ikke kan behandles efter reglerne i retsplejelovens kapitel 93 a. Justitsministeriet finder ikke, at der er behov for særlige regler om let adgang til domstolsprøvelse for sådanne krav. Krav, der ikke er omfattet af straffuldbyrdelseslovens § 112, vil derfor alene kunne indbringes for domstolene i medfør af grundlovens § 63.«

Efter ordlyden af bestemmelsen i retsplejelovens § 1018 h er det alene »Erstatningskrav . . . i anledning af strafferetlig forfølgning«, der på begæring kan behandles efter reglerne i retsplejelovens kapitel 93 a.

De af denne sag omfattede erstatningskrav kan ikke anses for rejst i anledning af strafferetlig forfølgning, men er derimod rejst på grundlag af indgreb under - den efterfølgende - straffuldbyrdelse. Herefter og henset til Justitsministeriets bemærkninger til lovforslag L 9 af 9. november 2011 finder retten, at der ikke er i retsplejelovens § 1018 h hjemmel til at behandle de under sagen rejste erstatningskrav efter reglerne i retsplejelovens kapitel 93 a.

A har under denne sag gjort gældende, at det følger direkte af henvisningen i retsplejelovens § 1018 a i straffuldbyrdelseslovens §§ 106-107, at der er hjemmel til at behandle de rejste erstatningskrav efter reglerne i retsplejelovens kapitel 93 a, uanset om de støttes på dansk rets almindelige erstatningsregler eller ej.

Retten finder, at henvisningen til den objektive og materielle erstatningsregel i retsplejelovens § 1018 a ikke samtidig er en henvisning til de processuelle regler i retsplejelovens §§ 1018 e - 1018 f, da dette i givet fald ville være i modstrid med den udtømmende oprensning i straffuldbyrdelseslovens § 112 af, hvilke afgørelser og indgreb, der efter straffuldbyrdelsesloven kan indbringes for domstolene efter reglerne i straffuldbyrdelseslovens §§ 113-123. Retten bemærker i den forbindelse, at der i straffuldbyrdelseslovens § 112, nr. 9, henvises til erstatning efter § 106 i visse specifikt anførte tilfælde.

Retten finder endvidere ikke grundlag for at antage, at en adgang til domstolsprøvelse af erstatningskrav som de i sagen foreliggende alene på grundlag af grundlovens § 63 og ikke tillige efter retsplejelovens kapitel 93 a, vil være i strid med EMRK artikel 3.«

A ankede dommen til Østre Landsret. Anken blev hævet den 19. februar 2014, jf. rettens retsbog af samme dato.

Af rapport om observationscelleanbringelse i Anstalten ved Herstedvester i perioden 21. august 2005 kl. 13:05 - 30. september 2005 kl. 13:50 (i alt 40 døgn og 45 minutter) fremgår blandt andet:

»Beslutning om ophør truffet af: [Navn]
Beskrivelse af episoden:

Inds. er d.d. kl. 13.05 udtaget af sikringscelle, og anbragt i observationscelle I.5.«

Af rapporten fremgår endvidere, at A havde adgang til gårdture. Det fremgår endvidere, at han kunne ringe til sin bistandsværge m.fl. og havde adgang til besøg, herunder af præsten og sin far. Han kunne endvidere bestille varer hos købmanden, se fjernsyn og få blade.

**3069**

Af rapport om sikringscelleanbringelse i Anstalten ved Herstedvester i perioden 30. september 2005 kl. 13:40 - 5. oktober 2005 kl. 12:30 (i alt 4 døgn 22 timer og 50 minutter) fremgår blandt andet:

»Beskrivelse af episoden:

Inds. er d.d. sikringscelleanbragt. Dette sker efter samtale med Psyk. [Navn], hvor inds til sidst i samtalen fremkommer med særdeles alvorlige trusler imod ff. [Navn] og hans familie (se særskildt rapport af Ff. [Navn] vedr. trusler.)

Inds. er placeret i observationscelle I.6. med privilegier. Dvs: inds. har udleveret Tv, playstation, effekter osv. Der har fra starten af inds. ophold været helt klare retningslinier om hvorledes inds. skal afsone i celle I.6. Dette inkluderer bla. at personalet ikke under nogle omstændigheder tolererer trusler rettet mod personalet. Da disse retningslinier er blevet klart overtrådt vurderer personalet, at inds. skal flytte observationscelle I.5. dvs. han mister sine privilegier. Personalet vil meddele dette til inds. når han har forettet sit toiletærinde færdigt (se obsnotat kl. 13.30.) Inds. får herefter besked på at gå ind i observationscelle I.5. da han har overtrådt regningslinierne for at bo i observationscelle I.6. Dette vil inds. under ingen omstændigheder, så heller ind i sikringscelle I.7. Inds. går herefter frivilligt ned i sikringscellen og sætter sig på sengen. Inds. har her til hensigt at ryge sin cigaret færdig. Inds. for besked på at lægge sig ned så han kan blive fikseret med samtlige remme jf. gældende regler. Dette nægter inds, og personalet tager derfor efterfølgende ingen chancer pga. inds. farlighed og had overfor det tjenestegørende personale, og inds. bliver derefter fikseret med magt.«

Af rapporten fremgår endvidere, at A selv gik ind i sikringscellen I7 og herefter af personalet blev instrueret om at lægge sig ned, »så han kan blive fikseret med samtlige remme, jf. gældende regler.« Da A nægtede dette, blev han, fordi personalet ikke tog »nogen chancer pga. inds. farlighed og had overfor det tjenestegørende personale«, fikseret med magt.

I rapport om udelukkelse fra fællesskab fra den 6. februar 2006 kl. 14:55 - 21. marts 2006 kl. 16:09 angives det blandt andet:

»3. Grundlag:

Fordi den indsatte udviser en grov eller oftere gentagen utilladelig adfærd, som er åbenbart uforenelig med fortsat ophold i fællesskab med andre indsatte, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 3

For at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1

Uden mulighed for samvær med medindsatte
Indsatte er orienteret om regler for anbringelsen.

. . .

Sagens udvikling:

[Navn], Fængselsfunktionær:
Indsatte er overført til K«
Ugenotater indgår ikke i ekstrakten.

Af rapport om sikringscelleanbringelse i Statsfængslet i Vridsløselille i perioden 20. marts 2006 kl. 18:45 - 21. marts 2006 kl. 16:00 (i alt 21 timer og 15 minutter) fremgår blandt andet:

»Beskrivelse af episoden:

D.d. kl. 18.35 gik vi ind til indsatte for at gennemføre den daglige visitation af indsatte og hans celle. Indsatte ønskede ikke at medvirke til visitationen, og selv om vi gjorde flere forsøg at overtale ham, fastholdt han, at han ikke ville medvirke. Indsatte begyndte at brokke sig højlydt over, at ff. [Navn] var gået bagom indsatte mens han stod ved madvognen, og mente at han var gået den vej for at provokere indsatte. Vi forsøgte at forklare indsatte, at [Navn] blot var gået den vej for at genere indsatte mindst muligt under madudleveringen.

Dette gjorge overhovedet ikke indtryk på indsatte, og han blev blot mere og mere højtråbende. Pludselig råbte indsatte, at han skulle ringe til sin bistandsværge her og nu. Vi forklarede indsatte, at nu skulle vi først have gennemført visitationen, og hvis den så forløb uden yderligere problemer, så kunne han ringe til sin bistandsværge bagefter. Indsatte fortsatte med at råbe, at han ikke ville visitares. Da det var åbenlyst, at indsatte ikke ville medvirke til visitationen, valgte jeg at vi trak os ud af cellen igen for at opnå vagtmesterkontorets tilladelse til at gennemføre en tvangsvisitation. OVM [Navn] gav tilladelse til dette, og der blev tilkaldt personale til afdelingen for at gennemføre visitationen.

Sammen med det tilkaldte personale gik vi ind til indsatte, og gjorde endnu et forsøg på at overtale ham til at medvirke med visitationen, men dog uden held, og efter en kort meningsudveksling gav jeg signal til at vi skulle tage indsatte med magt og gennemføre visitationen.

Indsatte gjorde straks voldsom modstand, da personalet tog fat i ham. Han slog ud efter mig undertegnede samt forsøgte at nikke mig en skalle, hvilket mislykkedes da personalet hurtigt fik fat i ham og pressede ham ned på sengen. Jeg havde fat i indsatte ene hånd og pressede den ned på sengen lige ud for indsatte hoved. Indsatte forsøgte at komme til at bide mig, men nåede kun lige at ramme min hånd med sine tænder.

Indsatte blev herefter belagt med håndjern og båret til sikringscellen, hvor han blev fikseret. Under hele forløbet råbte indsatte trusler om død og ødelæggelse ud mod personalet i almindelighed og undertegnede og f.f. [Navn] i særdeleshed.

Umiddelbart efter at indsatte var blevet fikseret lykkedes det ham at rykke først den ene håndledsrem og der næst den anden over . I forbindelse med udskiftning

**3070**

af remmene forsøgte indsatte at nikke skaller og strejfede f.f. [Navn] i hovedet, ligesom han slog voldsomt ud efter undertegnede og ramte mig på skulderen.

Da indsatte fortsatte med at rykke voldsomt i remmene og vi frygtede, at det ville lykkes for ham at rykke dem over igen, indhentede vi tilladelse fra OVM [Navn] til at lænke indsattes arme til senge ved hjælp af håndjern, for at forhindre ham i at komme fri igen.

. . .

Lægens bemærkninger/reesume:

[Navn], Fængselsfunktionær:

Tilsyn 60 min efter sikring: Fremtræder vred men vågen og helt samlet, BT 115/85, fri resp. nat. farver.

Diverse ekscoriationer men iøvrigt ikke tegn på væsentlig fysisk skade. Øjne nat uden blodudtrædninger, hals uden excoriationer eller trykmærker, nakken bevæger frit.

St p et c ia, abd blødt uømt.

På bg håndled excoriationer, men ikke mistanke om frakturer, er sikret i håndjern.

ekstremiteter iøvr. uden frakturer.

Konkl.: Ingen tegn på væsentlige fysiske skader.«

Af rapporten fremgår endvidere, at A frem til ca. kl. 23:00 den 20. marts 2006 råbte, skreg og truede. Han sov stort set uafbrudt frem til kl. 6:40 den 21. marts 2006, hvor han forlangte at se en læge, men fik at vide, at han måtte vente på, at sygeplejerskerne havde tid til at se ham. Herefter råbte A kl. 6:45 hele tiden efter en læge og råbte samtidig skældsord efter en fængselsbetjent. Fra kl. 8:00 sov A på ny og råbte herefter fra han vågnede kl. 8:45 igen op kl. 9:00 og kl. 9:15 og spurgte efter en læge kl. 9:30. Omkring kl.10:00 blev han tilset af en sygeplejerske, og det er noteret, at han var »lettere opkørt« og råbte en del. Kl. 10:59 er det noteret, at han var blevet rolig. Det er noteret, at han kl. 13:15 fik afslag på at få løsnet bæltet og at få en cigaret og var rasende. Kl. 16:03 den 21. marts 2006 ophørte sikringscelleanbringelsen, da A blev overført til Politigårdens Fængsel.

Af rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 21. marts 2006 kl. 16:28 - 22. marts 2006 kl. 10:04 (i alt 17 timer og 36 minutter) fremgår blandt andet:

»Beskrivelse af episoden:

Indsatte er ankommet direkte fra fiksering i vridsløse statsfængsel, ved ankomst til politigården er indsatte stadig truende og aggressiv, indsatte bliver anbragt i sikringscelle og fikseret.

. . .

Lægens bemærkninger/resume:

[Navn] , Læge:

Tilset kl. 17 35 d 21 03 2006 - meget anspænt, i affekt, vredladen, klar, samlet og orienteret ikke psykotisk. Klager over smerter - i hele kroppen - ang. sekundær til langv. fixering i bælter. På bg håndled og ankler - rødme og tydelige mærker efter håndjern og bælter, skønnes ikke tegn på indre læsioner.

Gr. benzodiasepinbrug gn fl måneder - anbefales phenemal, - som ordineret- obs -manglende medicinering kan fremkalder krampe anfald - anb obs, evt ny tilsyn ved behov.

Kliniske klager bliver revurderet på et senere tidspunkt når pt er faldet i ro og løsnet.«

Af rapporten fremgår endvidere, at A under hele forløbet lå roligt. I rapport om udelukkelse fra fællesskab fra den 29. marts 2006 kl. 11:45 - 7. maj 2006 kl. 14:15 angives det blandt andet:

»3. Grundlag:

Fordi den indsatte udviser en grov eller oftere gentagen utilladelig adfærd, som er åbenbart uforenelig med fortsat ophold i fællesskab med andre indsatte, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 3

Uden mulighed for samvær med medindsatte

Indsatte er orienteret om regler for anbringelsen.«

Ugenoatater indgår ikke i ekstrakten.

Af rapport om observationscelleanbringelse i Statsfængslet i Horsens i perioden 20. april 2006 kl. 11:25 - 20. april 2006 kl. 16:40 (i alt 5 timer og 15 minutter) fremgår blandt andet:

»Beskrivelse af episoden:

Indsatte har i de sidste par dage været meget uligevægtig og grænsesøgende. Indsatte har i den anledning haft flere små episoder hvor personalet har været tvunget til at irettesætte indsatte. Dette er ikke faldet i god jord hos indsatte, der siden den 17.04.2006 ikke har ønsket at forlade hans celle. Indsatte har samtidig ikke ønsket at indtage føde eller væske, og har samtidig ikke ønsket at modtage den lægeordinerede medicin. FF. [Navn] samt undertegnede, konstaterede d.d at indsatte havde smadret det indvendige cellevindue, hvorved der var store stykker glas der manglede i vinduet. Alt taget i betragtning, har undertegnede bestem at indsatte skal visiteres og anbringes i obs.celle for at forhindre selvbeskadigelse eller vold mod personalet.«

Copyright © 2023 Karnov Group Denmark A/S

I rapport om udelukkelse fra fællesskab fra den 9. maj 2006 kl. 14:00 - 5. juli 2006 kl. 14:15 med mulighed for samvær med medindsatte angives det blandt andet:

*»8. Begrundelse:*

Begrundelse for hvorfor udelukkelse er nødvendig praksis, evt. fravigelse fra praksis):

Indsatte har gentagne voldelige sammenstød med både personale og medindsatte, ligesom han har en generel truende adfærd.

. . .

*UGE NOTAT oprettet 18-05-2006 12:55 af [Navn] Overvagtmester*

**3071**

*Sagens udvikling:*

[Navn], Overvagtmester

Indsattes adfærd og humørsvingninger har ikke ændret sig siden anbringelsestidspunktet hvorfor anbringelsen forlænges. Indsatte har i ugen forløb, haft en længere samtale både med fængselspræsten samt sygeplejersken.

*Beslutning:*

Fortsat udelukkelse fra fællesskab jf.:

For at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1

Fordi den indsatte udviser en grov eller oftere gentagen utilladelig adfærd, som er åbenbart uforenelig med fortsat ophold i fællesskab med andre indsatte, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 3 Med mulighed for samvær med medindsatte

*Begrundelse:*

Henvises til den overordnede begrundelse for selve udelukkelsen.

*UGE NOTAT oprettet 23-05-2006 08:50 af [Navn], Overvagtmester*

*Sagens udvikling:*

*[Navn]*, Overvagtmester

Indsatte har ugentlige udvigede samtaler med fængselspræst, sygeplejerske, og samtidig tager afdelingspersonalet sig tid til, at snakke med indsatte når han er ude af hans celle i forskellige gøremål. Indsatte er ligeledes på daglig gårdtur, og telefonerer stort set dagligt med advokat og bistandsværge.

. . .

*Begrundelse:*

[Navn], Overvagtmester

Det findes fortsat uforsvarligt at lade indsatte have fællesskab med medindsatte, af de årsager som er opgivet i udelukkelsesgrunden.

*Sagens udvikling:*

[Navn], Overvagtmester

[Navn], sikkerhedsafdelingsleder.

Indsatte har fået udarbejdet en handleplan. denne handleplan åbner bl.a. op for gårdture med andre indsatte samt mulighed for købmandshandel hos købmanden frem for at bestille vare ved hjælp af købmandssedler.

Afdelingspersonalet tager sig stadig god tid til at snakke med indsatte.

Indsatte har stadig jævnligt kontakt med sin advokat og bistansværge.

. . .

*Begrundelse:*

[Navn], Overvagtmester

Indsatte har nu mulighed for samvær med medindsatte, under forudsætninger som er beskrevet i indsattes handleplan.

*UGE NOTAT oprettet 14-06-2006 13:44 af [Navn], Overvagtmester*

*Sagens udvikling:*

[Navn], Overvagtmester

Ifølge handleplan kan indsatte gå på gårdtur med andre indsatte og han har mulighed for at handle hos købmanden f[rem]for at bestille vare ved hjælp af købmandssedler. Afdelingspersonalet tager sig stadig god tid til at snakke med indsatte

Indsatte har stadig jævnligt kontakt med sin advokat og bistandsværge. Indsatte har udtrykt ønske om at kunne gå til konditræning og at deltage i gudstjenesten, men indsatte har fået at vide, at det ikke blive aktuelt foreløbig.

Alternativt vil man undesøge om der er mulighed for at benytte kondicyklen nogle minutter hver dag. Indsatte udtaler at han er godt tilfreds med at kunne komme på gårdtur med andre indsatte og at han ingen problemer har med det.

. . .

*Begrundelse:*

[Navn], Overvagtmester

Det skønnes fortsat at være utilrådeligt at lade indsatte afsone i fællesskab.

*UGE NOTAT oprettet 23-06-2006 11:00 af [Navn], Overvagtmester*

*Sagens udvikling:*

[Navn], Overvagtmester

Samtale med indsatte den 22/6 - 06. Indsatte har forsat ønske om at komme lidt mere ud blandt andre indsatte, han har et ønske om at komme i kirke og at komme i kondikælderen. Det aftales med indsatte at han kan få mulighed for at få afdelingens kondicykel ind på cellen. Indsatte går fortsat på gårdtur med de andre indsatte på isolationsafdelingen.

. . .

*Begrundelse:*

[Navn], Overvagtmester

Det skønnes fortsat at være utilrådeligt at lade indsatte afsone i fællesskab med andre indsatte.

*UGE NOTAT oprettet 04-07-2006 10:19 af [Navn], Overvagtmester*

*Sagens udvikling:*

[Navn], Overvagtmester

Samtale med indsatte d. 30/6 2006. Indsatte informeres om at man i samarbejde med bla. sygeafdelingens personale har lavet en aftalemappe og at man i fremtiden vil afholde et møde i forbindelse med den samtale der i forvejen skal foretages i henhold til reglerne om »Udelukkelse fra fællesskab«, dette for at sikre en bedre sagsbehandling omkring indsatte, han [er] ligeledes informeret om at han kan påregne at blive overført til sygeafdelingen til en af sygecellerne, dette vil ske på samme vilkår som hidtil.

**3072**

. . .

*Begrundelse:*

[Navn], Overvagtmester

Det skønnes stadig at være for stor risiko ved at lade indsatte afsone i fuld fællesskab.

*[Ulæseligt i ekstrakten om ugenotat]*

*Sagens udvikling:*

[Navn], Overvagtmester

Indsatte havde [Navn] . . . med som bisidder.

Der blev d.d. afholdt samtale med indsatte, vedr. muligheden for at blive flyttet til en større celle med håndvask på sygeafdelingen, dette for at bedre indsattes forhold, samtidig fik inds. udleveret en samtalemappe, hvor alle aftaler med indsatte er beskrevet.

Indsatte havde for et par dage siden en bataljle med en ansat på afdeling 1. vest og denne episode kunne indsatte ikke slippe så derfor kom det meste af samtalen til at handle om denne episode.

Indsatte syntes ikke ideen var god og han ville ikke tage imod tilbuddet om at komme på sygeafdelingen Han blev bedt om at tænke over det natten over og så give et endeligt svar i morgen.

. . .

*Begrundelse:*

[Navn], Overvagtmester

Det skønnes stadig ikke, og slet ikke efter dags datos episode, at indsatte kan afsone i fællesskab«

Af rapport om sikringscelleanbringelse i Statsfængslet i Horsens i perioden 4. juli 2006 kl. 18:05 - 5. juli 2006 kl. 14:15 (i alt 20 timer og 10 minutter) fremgår blandt andet:

»*Beskrivelse af episoden:*

Dags dato kl. 18.00 hører undertegnede ovenstående indsatte råbe og skrige inde på sin celle. Undertegnede åbner døren for at høre hvad der er galt og samtidig fortælle indsatte, at han skal dæmpe sig. Indsatte sidder på stolen med ryggen til undertegnede og råber at undertegnede »bare skal pisse af«. Ligeledes får undertegnede af vide af indsatte, at den nye måden man talte på her i Horsens. Undertegnede lukker herefter døren og taget i betragtning af indsattes turbulente afsoningsforhold, vælger undertegnede at skaffe mere personale for at få indsatte bragt til obs.cellen. Ff. [Navn], Ff [Navn], Ovm. [Navn]samt undertegnede går ind til indsatte og fortæller ham, at grundet i han meget aggressive opførsel, skal indsatte overføres til OBS-cellen. Dette resulterer i at indsatte bliver endnu mere ophidset og fortæller undertegnede, at indsatte ikke skal i OBS'en og undertegnede bare skal »pisse af«. Undertegnede fortæller indsatte at han skal rejse sig fra sin stol og følge med, eller er undertegnede nødsaget til at anvende magt. Dette vil indsatte ikke og undertegnede tager herefter fast i indsattes venstre overarm. Indsatte river sig løs og skubber til undertegnede. Undertegnede får igen fast i indsattes venstreoverarm og ff. [Navn] tager fast i indsattes højre overarm. Indsatte får sig revet løs og slår ud efter Ff. [Navn] undertegnede. Indsatte rammer Ff. [Navn] i hovedet med et salg og rammer også undertegnede på armen/skulderen. Herefter bliver indsatte lagt på senge og Ff. [Navn] holder indsatte ben, Ff. [Navn] har fast greb i indsattes højre arm, Ovm. [Navn] har fat i indsatte overkrop samt undertegnede der har et fast greb i indsattes venstre arm. Ff. [Navn] sætter håndkjern på indsatte, hvorefter han bliver båret til sikringscellen, hvor han bliver fikseret. Under fikseringen råber indsatte højt til Ovm [Navn] »[Navn], jeg slår dig krafdeme ihjel. Der er ingen steder hvor du kan gemme dig. Jeg kommer tilbage hertil igen«. Ligeledes bliver Ff. [Navn] truet med at blive slået ihjel. Undertegnede får også at vide, at undertegnede bare kunne vente til han blev løsnet, så skulle undertegnede bare se. Til slut råber indsatte til Ovm. [Navn], Ff. [Navn], Ff. [Navn] samt undertegnede, at »vi bare skulle vente. Der kommer en dag hvor indsatte bliver løsladt og så skulle han nok finde os«.

. . .

*Lægetilsyn foretaget* 04-07-2006 19:30

*Lægens bemærkninger/resume:*

Tilsyn i forbindelse med fiksering.

Pt. vågen. Aggressiv og truende overfor undertegnede.

Virker relevant men opkørt i sin tiltale til undertegnede.

Ingen synlige skader.

Fikseringen vurderes, og findes acceptabel.

Det er forsvarligt at opretholde fikseringen.«

Af rapporten fremgår endvidere, at A frem til kl. 22:00 den 4. juli 2006 jævnligt fremkom med voldsomme trusler mod fængselspersonalet og en vagtlæge, der kom til stede for at tilse ham. Kl 23:15 faldt han i søvn og sov stort set uafbrudt frem til kl. 7:45 den 5. juli 2006, hvor han på ny truede personalet. Han lå herefter roligt frem til kl. 11:30, hvor han på ny fremkom med trusler, hvilket sammen med råben gentog sig jævnligt frem til han kl. 14:15 den

5. juli 2006 blev udtaget af sikringscellen med henblik på overførsel til Politigårdens Fængsel.

Af rapport om observationscelleanbringelse i Københavns Fængsler i perioden 5. juli 2006 kl. 17:15 - 5. juli 2006 kl. 20:25 (i alt 3 timer og 10 minutter) fremgår, at indsættelsen i observationscelle, som ikke umiddelbart efter overførsel fra Statsfængslet i Horsens efter sikringscelleanbringelsen i perioden 4. juli 2006 kl. 18:05 - 5. juli 2006 kl. 14:15 var begrundet i afgørende hensyn til orden og sikkerhed i institutionen, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 2. Det første notat kl. 17:30 angiver, at A var gal. Herefter er det frem til, han blev udtaget af cellen, noteret, at han sov.

Af rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 28. juli 2006 kl. 19:55 - 30. juli

**3073**

2006 kl. 10:35 (i alt 1 døgn 14 timer og 40 minutter) fremgår blandt andet:

»*Beskrivelse af episoden:*

Indsatte har siden kl. 18.55 været meget opfarende og gentagende gange sparket og slået ð døren, samt kommet med verbale trusler.

Ved aftenlukning opfore indsatte sig meget truende og uligevægtig, og vil hele tiden diskutere det der er sket i løbet af aften. Vi beder ham falde ned og lukker døren indsatte råber igennem døren at han vil slå den næste ihjel der åbner til ham, og vi kan bare omme, han frygter os ikke, og han finder sig ikke mere i vores måde at behandle ham på.

Indsatte fortsætter med at sparke på døren og komme med verbale trusler. og det besluttes at indsatte ikke er egnet til ophold i egen celle, og flyttes med magt.

. . .

*Lægens bemærkninger/resume:*

Tilkaldt d 28.07.06 kl. 20.40. Tilset kl. 21.15

Pt har råbt og kommet med verbale trusler

Pt tilses på sikringscellen, hvor han er spændt og iført underbukser.

Pt siger at FF har taget kvælertag på ham og slået hovedet. Ingen synlige skader på halsen el hoved. Ingen tegn på akutte skader andre steder.

Samtale men pt om at han prøver at falde ned og blive rolig igen, således at han kan tale med FF om at komme ud igen. Til dette svarer pt om jeg selv tror på det.

Pt tilbydes medicin vil ikke have dette og begynder at råbe igen og sige at så snart han kommer til Hersted vester igen vil han slå en vagt ihjel. FF hører med på gangen

Vil heller ikke tale med psykiater, spørger om hvad det skulle hjælpe - han har jo talt med en og hun gik så hurtigt igen

Pt siger at bare fordi han råber lidt kommer de ham i Sikringscellen.

Pt svarer iøv relevant og er somatisk upåvirket. Ikke Psykotisk. Ikke hallucineret. Ikke suicidal

Anbefales dog at falde ned og få talt med FF

D 29.07.06

Tilkaldt kl. 19.15 tilset kl. 19.50

Pt ønsker at tale med en læge

Pt oplyser at han gerne vil ud af sikringscellen. Pt siger selv at han nok skal være stille og rolig, men er lidt ambivalent i sine udtalelser, idet han det næste øjeblik truer med at slå sit hoved ned i jernstangen på lejet så han kan blive bevidstløs og komme ud af cellen alt i medens han spytter på væggen.

Jeg oplyser pt om at jeg er enig med ham i at, det er en god ide at være stille og rolig og ikke true med at slå nogen ihjel, således at han kan tale med FF om evt at komme ud af cellen

Pt beklager da også at han hæver stemmeføringen overfor undertegnede

Ingen tegn på skade på pt. Upåvirket somatisk bortset fra at han sveder lidt i sommervarmen

Ikke psykotisk Ikke hallucineret. Ikke suicidal

Pt. anbefales at drikke rigeligt i varmen op til 3 liter dagligt. Det anbefales at pt får vand/saft/mælk, idet der ellers kan risikerer afvanding af kroppen med besvimelse til følge og i værste fald død

Vil ikke have medicin

Vil han med undertegnede igen kl. 20.30 ang at han allige vel vil tilses af psyk.

Der bestilles psyk.

Pt vil lade vandet og siger at han ikke kan tisse i en kolbe. Vil have at undertegnede lægger katheter. Pt siger at hvis ahn kommer ud af sikringscellen og op på egen celle så kan han tisse ved at stå op.

Afslag på at der lægges kath«

Af rapporten fremgår endvidere, at A kl. 20:40 råbte til en fængselsfunktionær, at han ville prikke øjnene ud på ham, og at han kl. 21:30 efter lægens tilsyn var aggressiv og råbte ukvemsord. Lægen har om tilsynet kl. 21:15 den 28. juli 2006 blandt andet noteret, at A angav, at en fængselsfunktionær havde forsøgt at tage kvælertag på ham og slået ham i hovedet, og at der ikke var synlige skader på A's hals eller hoved. Desuden fremgår det, at A under samtalen hidsede sig op og begyndte at råbe igen og truede med at slå en vagt ihjel, når han kommer til Herstedvester. Kl. 22:10 er der igen i rapporten et notat om trusler på livet. I noterne frem til og med kl. 11:30 den 29. juli 2006 er det noteret, at A lå stille henholdsvis, at han sov. Kl. 11:40 gav han en fængselsfunktionær »fingeren«. Kl. 11:55 besvarede han et spørgsmål om, hvorvidt han var rolig negativt og opfarende, hvorefter det blev besluttet at bibeholde fikseringen. Kl. 16:10 var der på ny en samtale, hvorunder A udtalte, at han ville overfalde personalet, hvis han blev løsnet. Kl. 18:40 råbte og skreg A, og kl. 18:50 var A truende over for personalet. Kl. 19:10 hamrede han sit hoved ind i sengen og råbte og truede. Kl. 19:25 råbte han på en læge, hvilket der var en samtale om umiddelbart efter. A afslog tilbud om vand. Kl. 20:05 blev han tilset af en læge, og der var herefter flere samtaler mellem denne og A frem til kl. 20:30, hvor lægen bestilte en psykiater. Ifølge lægens notater i rapporten sagde A under tilsynet kl. 19:50 den 29. juli 2006, at han nok skulle være stille og rolig, men truede i næste øjeblik med at slå sit hoved ind i jernstangen i lejet for at blive bevidstløs og spyttede samtidig på væggen. Der blev talt om, at det var en god idé, at han skulle være stille og rolig for at komme ud af cellen samt om risikoen for dehydrering. Kl. 20:40 hamrede A hovedet ind i sengekanten. Bortset fra notater om hjælp til at tisse ved hjælp af en kolbe og om placering af et tæppe for at afhjælpe smerter i A's knæ er der alene notater om, at A sov eller prøvede at sove frem til kl. 01:05 - 01:10 den

**3074**

30. juli 2006, hvor A fik afslag på et ønske om at ryge - og herefter kl. 1:20 var meget utilfreds hermed og gav udtryk for, at der var tale om magtmisbrug. Der er herefter notater om, at A med jævne mellemrum ringede og ville have tobak. Kl. 01:55 ønskede A medicin, men ønskede ikke at indtage den, fordi fængselsfunktionæren ikke ville løsne ham, så han kunne se den. Kl. 8:15 fik han tilbudt medicin. Ifølge de følgende notater lå A roligt frem til kl. 10:33 den 30. juli 2006, hvor han efter en samtale med en fængselsfunktionær blev udtaget af sikringscellen.

I et notat om anbringelsen af 4. september 2006 udarbejdet af afdelingsleder F fra Københavns Fængsler med svar på spørgsmål fra direktoratet angives det:

». . .

*1. Spørgsmålet omkring længden af anbringelsen og fikseringen, når indsatte har været rolig i lang tid ud fra skemaet.*

Jeg kan udtale at 209 er blevet underrettet som forskrevet og hverken ut. eller ovm. [Navn] er blevet underrettet/orienteret om anbringelsen og da anbringelsen sker en fredag kl. 19.55 er både ut. og ovm. [Navn] gået hjem til weekend, ( det var ut. selv der havde bagvagten for PF pågældende weekend ). Derfor kan ut. eller ovm. [Navn] ikke tage stilling eller være inde i spørgsmålet om, hvornår indsatte evt. skulle tages ud af sikringscelle og fiksering. Vi viste ikke, at indsatte var blevet anbragt før mandag morgen, hvor vi møder ind og får orientering. Derfor mener jeg, at det spørgsmål må ligge hos de personaler der var underrettet om anbringelsen. Ut. havde i øvrigt ikke nogen bemærkninger til selve årsagen til anbringelsen.

*2. Der spørges om hvad der gør, at anbringelse ophæves på netop det tidspunkt og hvad der har ændret sig på dette tidspunkt.*

Til ovenstående spørgsmål, kan ut. fortælle, at indsatte er meget uligevægtig og svinger utroligt meget i sit temperament inden for meget kort tid og er let »antændelig«, derfor er det min vurdering vedr. indsatte, at personalet har skønnet, at de ikke har kunnet føle sig sikre på indsatte og derfor har observerede ham i længere tid, netop pga. indsatte er meget uligevægtig. Dette må være årsagen til, at man netop løsner indsatte fra fikseringen og udtager ham af sikringscellen på det tidspunkt.

Indsatte er en indsat der generelt i hverdagen kræver meget mere observation en gennemsnittet af indsatte og derfor har personalet, måske følt en usikkerhed vedr. det rette tidspunkt for, at tage indsatte ud af sikringscellen og fikseringen.

Den 29/7-06 kl. 17.19, skønnes det af 209, at der fortsat ikke er grund til affiksering af indsatte.

Den 29/7-06 kl. 19.29 er bagvagt for KF orienteret pga. 24 timers tidspunktet nærmer sig.

Dvs. at de ansvarshavende har kunnet stille spørgsmål til den længde fikseringen var ved at få.

*3. Der bliver stillet spørgsmål til om indsatte er tilbudt vand i perioden for anbringelsen.*

Ud fra notaterne kan man ikke læse om indsatte er tilbudt vand, omvendt står der heller ikke i notaterne, at indsatte er nægtet at få vand. Men iflg. lægens notat forklarer lægen, at det er meget vigtigt, at indsatte for noget at drikke og må derfor må jeg forvente, at personalet har tilbudt indsatte vand.

*4. Der bliver stillet spørgsmål til om indsatte har været på toilettet.*

Indsatte er tilbudt at tisse i en kolbe, hvilket indsatte i første omgang afslog, dog for senere at modtage tilbudet.

Dvs. at indsatte har ikke været løsnet fra fikseringen for at kunne gå på toilettet.

*Til det sidste spørgsmål vedr. at DFK. mener at skemaet er mangelfuldt udfyldt.*

Ut. kan i situationen godt se at skemaet er meget mangelfuldt, dette kan skyldes at det personale der udfylder skemaet ikke har adgang til en PCér før efter de har siddet vagt på indsatte og så efterfølgende skriver observationen ind i klienten »notater«. Denne problematik vil vi som ledelsen på PF. meget gerne arbejde videre med en løsning, således at vi får nogle meget mere fyldestgørende notater.«

I direktoratets brev til Københavns Fængsler af 12. oktober 2007, som kun er fremlagt i uddrag, anføres det:

»Justitsministeriet, Direktoratet for Kriminalforsorgen, har gennemgået Københavns Fængslers indberetning af sikringsanbringelse og fiksering i mere end 24 timer vedrørende A, cpr.nr. . . .

Direktoratet tager indberetningen til efterretning med følgende bemærkninger:

*1. Tilbudt mad og drikke*

Det bør fremgå af rapporten, hvornår indsatte er blevet tilbudt mad og drikke. Direktoratet konstaterer, at lægen oplyser den ind-

satte om vigtigheden af at drikke, og går ud fra, at pågældende er blevet tilbudt både mad og drikke med passende mellemrum.

*2. Observationsrapporten*

Direktoratet finder, at selve rapporten er mangelfuldt udfyldt, idet der mangler såvel klokkeslæt og angivelser af, hvornår den indsatte er tilbudt mad og drikke mv.

*3. Udtagelse af sikringscelle på et tidligere tidspunkt*

Det fremgår af Københavns Fængslers udtalelse af 4. september 2006, 1. pkt., at fængslet ikke kan svare på, hvorfor pågældende ikke overføres til observationscelle på et tidligere tidspunkt, når det ser ud som om, at pågældende er rolig. Det fremgår af fængslets svar, at besvarelsen af dette burde være foretaget af de personer, der var underrettet om anbringelsen.

**3075**

Det fremgår af observationsrapporten, at indsatte den 30. juli 2006, kl. 01.55 er opførende. Herefter fremgår det i de øvrige noter, at pågældende ligger på henholdsvis højre eller venstre side. Det fremgår med mellemrum, at pågældende har lukkede øjne.

Henset til, at den konkrete anbringelse fandt sted for over et år siden, og det dermed kan være meget svært at få afklaret, om den pågældende sov eller var vågen hele natten, skal direktoratet bemærke, at det vil være hensigtsmæssigt, at det anførtes i observationsrapporten i nattetimerne - om den indsatte er vågen eller sover.

En sikringscelleanbringelse bør ikke udstrækkes i længere tid, end formålet tilsiger det. På den anden side, bør man ikke vække en sovende indsat alene med det formål at udtage pågældende af sikringscelle.

Såfremt den indsatte har været vågen og rolig i hele perioden fra de 30. juli 2006 kl. 01.55 til samme dag kl. 10.35 finder direktoratet, at anbringelsen burde have været ophørt på et tidligere tidspunkt.«

Af rapport om observationscelleanbringelse i Københavns Fængsler i perioden 30. juli 2006 kl. 10.40 - 30. juli 2006 kl. 17.05 (i alt 6 timer og 25 minutter) fremgår, at indsættelsen i observationscelle, som skete umiddelbart efter udtagelsen af sikringscelle kl. 10.15 den 30. juli 2005, skete for at observere A og se, om han var klar til at overgå til egen celle, og var begrundet i behov for særlig observation, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3. Af notaterne fremgår, at A flere gange i forløbet gav udtryk for, at han nu ville i egen celle og »fortjente« at komme i egen celle, hvilket skete kl. 17.05.

I en rapport om udelukkelse fra fællesskab fra den 3. august 2006 kl. 12.26 - 8. august 2006 kl. 11.00 anføres, at beslutningen om udelukkelse fra fællesskab er truffet for at forebygge voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 2, jf. § 63, stk. 1, nr. 1.

Af rapport om observationscelleanbringelse i Københavns Fængsler den 11. september 2006 kl. 13.20 - 11. september 2006 kl. 14.50 (i alt 1 time og 30 minutter) fremgår, at anbringelsen skete af hensyn til orden og sikkerhed i institutionen, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 2, idet A var meget vred og optrådte truende. Anbringelsen afløstes kl. 14.50 af en anbringelse i sikringscelle, se herom nedenfor.

Af rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 11. september 2006 kl. 14.50 - 11. september 2006 kl. 17.13 (i alt 2 timer og 23 minutter) fremgår blandt andet:

»*Beskrivelse af episoden*

Indsatte var d.d. tidligere på dagen, blevet anbragt i observationscelle. Overvagtmester [Navn] har forsøgt samtale med indsatte i observationscellen, men samtalen blev afbrudt, da indsatte var meget hidsig, truende og råbende. Efter samtalen begynder indsatte at optræde meget voldsomt i observationscellen, hvor han sparker på celledøren og banker på cellevinduet. Indsatte råber gentagende gange svin og røvhuller efter personalet. Overvagtmester [Navn] forsøger at tale indsatte til ro, men indsatte kalder i stedet overvagt-

mester [Navn] for en bøsserøv og det øvrige fængselspersonale for møgsvin og møgludere. Indsatte optræder særdeles truende og overvagtmester [Navn] beslutter, at indsatte skal anbringes i sikringscelle for at afværge truende vold. Overvagtmester [Navn] går frem mod indsatte, for at få indsatte til frivilligt at følge med. Indsatte sætter sig så kraftigt til modværge, at [Navn] griber fat i indsattes højre arm. Indsatte prøver at vriste sig fri og bliver derfor lagt på sengen. Indsatte sparker med højre ben ud efter [Navn], som bliver ramt i maven af indsattes spark. Indsatte bliver herefter båret fra observationscelle til sikringscelle. Indsatte gør kraftigt modstand og forsøger at sparke ud efter personalet. Indsatte bliver fikseret under voldsom modstand. Indsatte udtaler til overvagtmester [Navn] at han vil slå ham ihjel og at han vil dræbe [Navn] så snart han få chancen. Indsatte rejser sig op i sengen og prøver at nikke en skalde mod overvagtmester [Navn], som står bøjet over indsatte for at kontrollere fikseringen. [Navn] når at trække hovedet til sig, så indsatte ikke rammer. Overvagtmester [Navn] går ud af sikringscellen, mens indsatte fortsætter med at råbe, at han vil slå [Navn] ihjel. Indsatte begynder at spytte efter [Navn], men rammer ikke.

. . .

11-09-2006 16:57 [Navn] Fgsl.funk p.p.

Kl. 15.15 overtog 2956 vagten. Inds. sov lige indtil lægen ankom kl. 15.45. Inds. blev med det samme meget aggressiv og råbte til lægen, at han er meget forudindtaget pga. han har talt med personalet inden han gik ind til ham. Lægen udspurgte ham, om inds. var kommet til skade, men inds. var ligeglad og råbte at han ikke havde gjort noget og de betjente er nogle fede svin, og de nedværdiger og krænker ham. Lægen gav inds. et tæppe på og fortalte inds. at han ville komme tilbage med medicin. Lægen derfra kl. 15.57.«

I rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 20. december 2006 kl. 14:55 - 22. december 2006 kl. 09:40 (i alt 1 døgn 18 timer og 45 minutter) angives det blandt andet:

». . .

*Beskrivelse af episoden:*

D.d kl. 14.30 ringer indsatte på og ønsker at snakke med ovm.

Da vi ikke med det samme åbner døren, er indsatte ved at »skille« hele sin celle ad, samtidig med han råber og skriger.

**3076**

Personalet tager en snak med indsatte, og fortæller ham, at hvis han ikke omgående falder til ro, må vi se os nødsaget til at bringe ham til en OBS celle. Indsatte råber at han vil telefonere, at vi sidder på kontoret og bagtaler ham, at han stadig ønsker at tale med ovm. Dette sker samtidig med at han truer alt det tilstedeværende personale. Igen siger personalet at han skal falde til ro. Indsatte bliver blot mere ophidset. Indsatte får at vide at vi ser os nødsaget til at tage ham med magt, hvis han ikke frivilligt følger med til OBScellen. Vi tager et skridt frem mod indsatte, som svarer med at slå ud efter [Navn] 2883 og rammer ham i ansigtet. Personalet prøver med magt at få pacificeret indsatte. Indsatte kæmper voldsomt imod og prøver ved enhver given lejlighed at bide og sparke personalet. Det er meget svært at få kontrol over indsatte, da dette i første omgang ikke lykkes, tildeles indsatte flere slag med stav. Indsatte bliver af [Navn] 2819 ilagt håndjern og ført til sikringscelle. På vej ud af døren fra sin celle, bide indsatte på 2819's højre ben. Indsatte bider igennem og 2819 råber højt at, han nu har fået bidt sig fat i hans ben. [Navn] 2883 kommer efterfølgende 2819 til undsætning og indsatte slipper bidet. Ved ankomst til sikringscelle bliver personalet igen truet, og svinet til. Efter indsatte er blevet spændt og vi er på vej ud, spytter indsatte efter personalet.

Under lægens tilsyn ser indsatte meget vredt på [Navn] 2708 og siger »dig er jeg ikke færdig med«.

Ledelsen på PF's bemærkninger til ovenstående.

Ut. forsøger at tale med inds. kort efter anbringelsen vedr. § 31 udg. i morgen den 21/12-06, inds. er overhoved ikke lydhør overfor hvad ut forsøger at forklarer inds. Inds. råber og skriger af ut. og omkringstående personale. Inds. forsætter med at komme med meget grove vedvarende trusler mod personalet og senere mod ut. Bla. råber inds. jeg er ikke færdig med jer, jeg skal nok få ram på jer, i er nogle møgsvind og bøsserøve. Ut. forlader herefter sik.celle da forsøg på videre samtale skønnes håbløs på nuværende tidspunkt. Under ovenstående episode i sik.celle, sætter inds. sig flere gange og og skriger samtidig med at inds. lægger an til at inds. vil spytte efter ut., men gør dog ikke dette.

Der var vedr. ovenstående episode ikke mulighed for »kun« at anbringe inds. i OBS-celle, pga. inds. volsomme adfærd. Ut. vurdere i første omgang, at inds. skulle placeres i OBS-celle, dette udviklede sig under forsøg på anbringelsen til, at inds. blev placeret i sik.celle.«

I en rapport om udelukkelse fra fællesskab fra den 21. december 2006 kl. 15:36 - 21. december 2006 kl. 08:00 anføres, at beslutningen om udelukkelse fra fællesskab er truffet for at forebygge voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 2, jf. § 63, stk. 1, nr. 1.

I en rapport om udelukkelse fra fællesskab fra den 7. januar 2007 kl. 17:00 - 12. januar 2007 kl. 10:00 anføres, at beslutningen om udelukkelse fra fællesskab er truffet for at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelsesloven § 63, stk. 1, nr. 1.

I en rapport om udelukkelse fra fællesskab fra den 18. april 2007 kl. 10:00 - 25. april 2007 kl. 10:00 anføres, at beslutningen om udelukkelse fra fællesskab er truffet for at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelsesloven § 63, stk. 1, nr. 1.

I en rapport om udelukkelse fra fællesskab fra den 10. maj 2007 kl. 12:00 - 8. juni 2007 kl. 13:10 med mulighed for samvær med medindsatte anføres, at beslutningen om udelukkelse fra fællesskab er truffet, fordi den indsatte udviser en grov eller oftere gentagen utilladelig adfærd, som er åbenbart uforenelig med fortsat ophold i fællesskab med andre indsatte, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 3.

I rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 12. juni 2007 kl. 13:15 - 13. juni 2007 kl. 16:20 (i alt 1 døgn 3 timer og 5 minutter) anføres det blandt andet:

»Beskrivelse af episoden:

D.d kl. 13.10 bliver indsatte modtaget på PF, efter overførsel fra VF.

Inds er ved ankomst særdeles ophidset og yder kraftig modstand da denne skal ud af bilen og indsættes på PF.

Tilstedeværende personale må derfor føre indsatte til døren med magt. Indsatte bliver her så voldsom, at det bliver nødvendigt at anbringe inds i Sikringscelle PF-100 med fiksering pålagt på håndled, mave-, og ben. Dette efter ordre fra afd.leder F.

Under hele episoden kalder indsatte tilstedeværende personale for div. ukvemsord og prøver endvidere at spytte efter personalet.

Inds. er fikseret d.d. kl. 13.15.

Bemærkning:

Ut. tog beslutningen om at inds. skulle anbringes i sik.-cellen.

Årsagen var at inds. ved ankomsten til PF var meget ophidset og ydede kraftig modstand.

Der var ikke mulighed for at tale inds. til fornuft i den givne situation.

Afd.leder F.

Politigårdens Fængsel

. . .«.

I rapporten er det endvidere indledningsvis noteret kl. 13:15 den 12. juni 2007, at der er sket fiksering med håndleds-, mave- og fodremme. Der er intet noteret om fiksering i den resterende del af forløbet under rubrikken om »Fiksering«.

I en rapport om udelukkelse fra fællesskab fra den 13. juni 2007 kl. 15:54 - 15. juni 2007 kl. 09:00 anføres, at

**3077**

beslutningen om udelukkelse fra fællesskab er truffet for at forebygge voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 2, jf. § 63, stk. 1, nr. 1.

Af rapport om observationscelleanbringelse i Københavns Fængsler i perioden 13. juni 2007 kl. 16:25 - 13. juni 2007 kl. 17:38 (i alt 1 timer og 13 minutter) fremgår, at indsættelsen i observationscelle, som skete umiddelbart efter udtagelsen af sikringscelle kl. 16:20 den 13. juni 2007, var begrundet i behov for særlig observation efter udtagelsen fra sikringscelle, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3. Indsættelsen blev sluttet med, at A på ny blev anbragt i sikringscelle.

I rapport om fornyet sikringscelleanbringelse i Københavns Fængsler i perioden 13. juni 2007 kl. 17:25 - 14. juni 2007 kl. 14:10 (i alt 20 timer og 45 minutter), som skete efter overførsel fra observationscelleopholdet fra den 13. juni 2007 kl. 16:25 - 13. juni 2007 kl. 17:38 anføres det blandt andet:

»Beskrivelse af episoden:

Indsatte er placeret i observationscelle pf 99, han har ringet på. Der bliver hamret på døren og det tjenestegørende personale går til cellen for at høre indsatte hvad han vil. Indsatte hamrer renholdsvis sit hoved samt sine hænder mod celledøren. Jeg beder indsatte om at træde tilbage og tage den med ro. Indsatte er ilter og råber på læge, yderligere forsøg på samtale virker formålsløst i situationen. Indsatte bliver ført fra observationscelle til sikringscelle og fikseres, indsatte forsøger at vriste sig fri og gør herunder en del modstand.«

Ifølge notaterne umiddelbart efter anbringelsen fremkom A med trusler mod fængselspersonalet, ligesom han råbte op og var meget opfarende. Ifølge et notat kl. 18:47 den 13. juni 2007 fremkom A under en længere samtale med den tilsynsførende læge og fængselsfunktionæren med yderligere skældsord. Frem til kl. 6:50 næste morgen den 14. juni 2007 er der kun notater om, at A forholdt sig roligt. På dette tidspunkt spurgte han efter F (overvagtmester F) og fik på anmodning sin medicin udleveret. Kl. 7:05 klagede A over den behandling, han havde fået, og angav, at han ville tilses af læge og psykiater. Kl. 7:25 spurgte han igen efter, hvornår F ville møde på arbejde. Kl. 8:30 afslog A tilbud om morgenmad og om at få den ene arm løsnet imedens, idet han ikke ville have mad, hvis han ikke blev løsnet helt. Kl. 9:50 havde F en samtale med A, som fremkom med beskyldninger mod personalet og ikke ville tale om selvbeskadigelsen. F vurderede på den baggrund, at der fortsat var risiko for selvbeskadigelse, hvis A fik mulighed herfor. Indsættelsen og fikseringen blev derfor opretholdt. Der var i tidsrummet kl. 8:25 - 9:30 ordvekslinger, hvorunder A oplyste at være rolig, at han gerne ville løsnes og gerne ville tale med F igen. Det skete kl. 9:50. Ifølge F's notering kl. 13:08 blev A hurtigt aggressiv og udtalte, at han ikke ville flyttes, »for det gik jo kun ud på give ham (inds.) flere bank«. Ifølge notatet vurderede F, at A fortsat udviste aggressiv adfærd med risiko for overgreb mod personalet og besluttede derfor at opretholde fikseringen. Kl. 10:25 og 10:45 fremkom A med forskellige skældsord over for fængselsfunktionærerne. Efter en yderligere samtale med F blev A udtaget af fikseringen og sikringscellen. Under samtalen havde A angivet nu at være rolig. Han bad om garanti for, at han »ikke får bank igen«, og blev vejledt om adgangen til at klage, hvis han mente, at han var blevet behandlet uretmæssigt.

Af rapport om observationscelleanbringelse i Københavns Fængsler i perioden 14. juni 2007 kl. 14:15 - 14. juni. 2007 kl. 20:14 (i alt 5 timer og 59 minutter) fremgår, at indsættelsen i observationscelle, som skete umiddelbart efter udtagelsen af sikringscelle kl. 14:10 den 14. juni 2007, var begrundet i behov for særlig observation efter udtagelsen fra sikringscelle, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3.

I rapport om sikringscelleanbringelse i Statsfængslet i Østjylland i perioden fra den 16. april 2008 kl. 18:35 - 21. april 12:11 (i alt 4 døgn 17 timer og 36 minutter) anføres det blandt andet:

»*Beskrivelse af episoden:*

Indsatte blev d.d. kl. 18.35 fikseret p.g.a. følgende:

Undertegnede skulle sammen med FF. [Navn] kl. 18.30 ned til indsatte for at udlevere et brev.

Da undertegnede afleverede brevet, begyndte indsatte at brokke sig vedr. indsattes medicin.

Indsatte havde tidligere nægtet at indtage sin aftenmedicin, da han ikke mente at den skulle knuses/opstemmes.

Indsatte blev mere og mere ophidste under samtalen, og da undertegnede ville slutte samtalen kaldte ham mig for et røvhul.

Undertegnede sagde at han skulle klappe i og opføre sig ordentligt. Dette blev indsatte mere ophidset over.

Undertegnede sagde at denne opførsel ikke kunne tillades og p.g.a. indsattes sindstilstand, fik indsatte at vide at han var isoleret resten af dagen.

Undertegnede lukkede døren og låste, men indsatte begyndte at råbe og skrige mod undertegnede.

Jeg besluttede at ville flytte indsatte til observationscellen, så der for blev de øvrige indsatte på afdelingen låst inde. Undertegnede hentede de øvrige funktionære på afd. E og åbnede derefter indsattes celledør. Indsatte blev bedt om at følge med til observationscellen, men dette nægtede indsatte.

Indsatte blev igen opfordret tl at følge frivilligt med, men nægtede. FF. [Navn] og UT. tog herefter nu fat i hver af indsattes arme for at føre ham til observationscellen.

**3078**
Indsatte satte sig nu til modværge, da han rykker/flår sig delvis fri.

Indsatte bliver nu fikreret på gulvet af personalet. Under fikseringen rammer indsatte ind i sit celleskab og slår en lille revne over øjenbrynet.

Herefter blev indsatte ilagt håndjern og transporteret til sikringscelle og fikseret kl. 18.35.«

Af rapporten fremgår endvidere, at A blev tilset af lægen flere gange under sikringscelleanbringelsen, første gang den 16. april 2008 kl. 18:40.

Af rapport om observationscelleanbringelse i Statsfængslet Østjylland i perioden 21. april 2008 kl. 12:19 - 21. april 2008 kl. 14:22 (i alt 2 timer og 3 minutter) fremgår, at indsættelsen i observationscelle, som skete umiddelbart efter udtagelsen af sikringscelle kl. 12:11 den 21. april 2008, var begrundet i behov for særlig observation efter udtagelsen fra sikringscelle, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3.

I direktoratets afgørelse af 19. november 2009 vedrørende A v/advokat Claus Bonnez' klage over sikringscelleanbringelsen fra den 16. april 2008 kl. 18:35 konkluderes det, at den anvendte magtanvendelse samt efterfølgende anbringelse i sikringscelle var berettiget. Direktoratet fandt derimod, at anbringelsen havde haft en for lang tidsmæssig udstrækning, og udbetalte som følge heraf en skønsmæssigt udmålt erstatning på 500 kr. Erstatningen blev beregnet med udgangspunkt i differencen mellem erstatning for uforskyldt varetægtsfængsling i almindelighed og uforskyldt vare-

tægtsfængsling i isolation, jf. Rigsadvokatens meddelelse nr. 1/2008.

I en rapport om udelukkelse fra fællesskab fra den 21. april 2008 kl. 12:10 - 5. maj 2008 kl. 13:45 nævnes blandt andet:

»Kl. 17.30 tilses indsatte af fængselslæge [Navn] under undersøgelsen udtaler indsatte: »Jeg stoler ikke på dem (personalet), Stemmerne inde i mit hoved siger dræb-dræb. Jeg skærer halsen over på dem (personalet) og snart jeg kommer fri og lejligheden byder sig - det er ikke sikkert det er den første der åbner, men maske anden eller treide - »Jeg lover jer det sker - jeg skal bare væk herfra - uanset hvad jeg nok få jer« «.

I rapport om sikringscelleanbringelse i Statsfængslet i Østjylland i perioden den 3. juli 2008 kl. 16:15 - 4. juli 2008 kl. 7:25 (i alt 15 timer og 10 minutter) anføres det blandt andet:

»*Beskrivelse af episoden:*

Dags dato er Ff. [Navn], Ff. [Navn] og undertegnede tjenestegørende på afd. E - Særlig sikret. Kl. 16.05 er ovenstående personaler rundt med effekter til de indsatte.

Indsatte [Navn] og indsatte A opholder sig på gårdtursarealet.

Indsatte A kaldes ind på afdelingen.

Da indsatte kommer ind på afdelingen påtaler ut. overfor A at han skal iføre sig en T-shirt samt fodtøj.

Indsatte bliver tydeligvis meget irriteret og ophidset over påtalen, men behersker sig dog.

Ff. [Navn] og ut. står og kigger på nabocellen - tilhørende [Navn] hvor døren er åben.

Vi taler om en skade der er opstået på indsattes gulv.

Da indsatte A går forbi Ff. [Navn] og ut. råber indsatte til [Navn] der stadig opholder sig i gården, »[Navn] - Nu står de kraftedme og roder i den celle«

Ff. [Navn] påtaler, meget bestemt, at indsatte skal blande sig udenom og dæmpe sig.

Indsatte farer herefter op og træder meget truende frem mod Ff. [Navn]

Indsatte og Ff. [Navn] står herefter ansigt til ansigt. Ff. [Navn] prøver gentagne gange at tale A ned - dog uden resultat.

Indsatte råber, til Ff. [Navn]: »Skal vi ordne det et andet sted?«. Ff. [Navn] spørger indsatte: »Skal det opfattes som en trussel«

Indsatte svarer ikke, men fortsætter med at råbe: »Skal vi ordne det et andet sted« og hidser sig om muligt mere op.

Da Ff. [Navn] nu følger sig meget truet - skubber han indsatte væk, med et skub i brystkassen. Indsatte slår herefter Ff. [Navn] i panden med knyttet hånd, hvorved Ff. [Navn] kommer ud af balance og trækker sig bagud, mod gårdturs arealet - indsatte følger efter og slår stadig flere gange med Ff. [Navn]

Overfaldsalarm aktiveres.

Ut. og Ff. [Navn] løber efter indsatte. Ut. får indsatte pacificeret med en balancebrydning bagfra og får herefter indsatte fastholdt i et greb med arm på ryg.

Indsatte formår dog stadig at sparke ud efter Ff. [Navn] og rammer han med 2 spark i mave og brystregion.

Ut. Fastholder stadig indsatte i en liggende position, hvor indsatte halvvejs ligger/sidder med ryg mod ut. bryst.

Tililende personale kommer til og Ff. [Navn] tager inds. A anden arm og sammen med Ff. [Navn] føres indsatte til sikringscelle.

Indsatte fikseres.«

Af rapporten fremgår endvidere, at A efter indsættelsen forholdt sig relativt roligt. Han gav under en samtale kl. 18:00 den 3. juli 2008 udtryk for at være meget forbitret over indsættelsen, idet han dog erkendte at have slået en fængselsfunktionær. Han mente imidlertid, at det var selvforsvar, da han følte sig forulempet af den pågældende. Det er noteret, at han var meget vred og ophidset under samtalen. Efter råben, skrigen og spytten på gulvet kl. 19:15 - 19:30

Copyright © 2023 Karnov Group Denmark A/S

faldt A til ro og lagde sig for at forsøge på at sove, hvilket efter »test« af håndrem samt råben og snakken med sig selv kl. 20:45

**3079**

- 21:00 skete kl. 21:30. Efter at være vågnet kl. 6:45 den 4. juli 2008 blev A kl. 7:25 udtaget af sikringscellen med henblik på overførsel til Politigårdens Fængsel.

I en afgørelse af 4. maj 2010 vedrørende advokat Claus Bonnez' klage over sikringscelleanbringelsen i Statsfængslet i Østjylland fra den 3. juli 2008 kl. 16:15 har direktoratet konkluderet, at den anvendte magtanvendelse og efterfølgende anbringelse i sikringscelle var berettiget.

I rapport om fortsat sikringscelleanbringelse i Københavns Fængsler i perioden den 4. juli 2008 kl. 10:15 - 4. juli 2008 kl. 11:35 (i alt 1 time og 20 minutter) anføres det blandt andet:

»*Beskrivelse af episoden:*

Indsatte er overført fra Stf. Østjylland pga. overfald på en kollega. Indsatte var iført håndjern og måtte bæres fra bilen, og er derfor anbragt i sikringscelle PF100. Indsatte er flyttet direkte fra sikringscelleanbringelse i Østjylland.«

Af rapport om observationscelleanbringelse i perioden den 4. juli 2008 kl. 11:35 - 6. juli 2008 kl. 19:03 (i alt 2 døgn 7 timer og 28 minutter) umiddelbart efter udtagelsen af sikringscellen den 4. juli 2008 kl. 11:35 fra Københavns Fængsler fremgår, at A blev anbragt i observationscelle, da der skønnedes at være behov for yderligere observation. Der henvises til bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3. Efter en periode, hvor A var rolig, er det kl. 20:13 den 4. juli 2008 noteret, at han under tilsyn af tjagen hidsede sig gevaldigt op, da han mente, at fængselspersonalet bankede på væggen ind til ham og sagde, at det var en fryd, at hans far var død. Det blev herefter besluttet at fængselspersonalet, at han ikke var klar til at blive udtaget af observationscellen. Af de følgende notater fremgår, at A var rolig, men ikke ønskede at tage imod tilbudt mad og drikke og ikke svarede på henvendelser, før han kl. 19:04 den 6. juli 2008 ringede og spurgte, om han kunne komme ud. Det blev herefter besluttet at udtage ham af cellen, idet personalet vurderede, at han ikke var til fare for sig selv og sine omgivelser, eftersom hans adfærd havde været uproblematisk hele dagen.

I en rapport om udelukkelse fra fællesskab fra den 4. juli 2008 kl. 10:30 - 3. oktober 2008 kl. 11:30 anføres, at beslutningerne om udelukkelse og fortsat udelukkelse fra fællesskab er truffet for at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1. Af ugenotaterne fremgår, at A i lange perioder optrådte negativt, aggressivt og grænsesøgende over for fængselspersonalet. Det fremgår endvidere, at han jævnligt havde besøg af præst, læge og sygeplejerske.

Af rapport om observationscelleanbringelse i Københavns Fængsler i perioden 30. juli 2008 kl. 11:45 - 30. juli 2008 kl. 12:15 (i alt 30 minutter) fremgår, at baggrunden for anbringelse i observationscellen var, at A efter at have været i bad blev stærkt ophidset over, at han ikke straks kunne komme tilbage sin egen celle, hvor man var ved at reparere hans tilstoppede vask. Da han råbte op og fortsatte hermed og blev truende, blev det besluttet at føre ham til observationscellen, hvilket skete med magt, da han ikke ville gå frivilligt. Hjemlen angives at være bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 2. Opholdet blev afsluttet med, at A blev overført til sikringscelle.

I rapporten om den herefter iværksatte sikringscelleanbringelse i Københavns Fængsler i perioden 30. juli 2008 kl. 12:15 - 31. juli 2008 kl. 14:15 (i alt 1 døgn 2 timer og 0 minutter) anføres det blandt andet:

»*Beskrivelse af episoden:*

D.d. var indsatte anbragt i observationscelle.

I observationscellen var indsatte meget voldsom og skreg højlydt. Undertegnede forsøgte at tale indsatte til ro, men indsatte skreg fortsat, at han ville ud. Da undertegnede gav indsatte besked om at han ikke kom ud af observationscellen med det samme, blev indsatte mere voldsom og forsøgte at rive celledøren op for at komme ud.

Indsatte var nu så voldsom at undertegnede besluttede at indsatte skulle anbringes i sikringscelle for at betvinge voldsom modstand. Under anbringelsen gjorde indsatte meget voldsom modstand.

. . .

*Lægens bemærkninger/resume:*

Tilkaldt 30-07-08 kl. 22.45. Tilsyn kl. 23.00 af afd. læge [Navn]
Pt. overført til sikringscelle i formiddags. Blev aggressiv ifm. at håndværker skulle ind på hans celle.

Er forsøgt overført til obs.cellen ved 15-tiden, men blev igen voldsom og har siden været fastspændt i sikringscellen. Han har efterfølgende ikke svaret på tiltale og har ikke drukket eller spist.

Pt. reagerer ikke på at jeg træder ind i cellen, hans svarer ikke på mine spørgsmål, trods gentagne opfordringer.

Objektivt:

Ligger helt stille på siden. Roligt åndedræt. Varm og tør. Reagerer ikke på tiltale, udover diskrete trækninger omkring øjnene. Det er klart min fornemmelse at pt. er vågen, men ikke ønsker at tale med mig. Remme kontrolleret og sidder med plads til en finger. Ingen umiddelbare fysiske tegn på overlast.

Vurdering:

Vurderes ikke psykotisk, men det er svært at vurdere da pt. ikke vil tale med mig. Pt. tidl. set at vores psykiatere som har diagnosticeret indsatte som svært dysocialt personlighedsforstyrret og aldrig psykotisk. Indsatte skal fortsat tilbydes mad og drikke. Nyt tilsyn i morgen eftermiddag, hvis indsatte stadig er i sikringscelle.

**3080**

Nyt tilsyn 31-07-08 kl. 13.00 af [Navn]

Ligger fortsat helt stille. Bliver ca. 1 gang i timen spurgt om han vil tilbage til obs-celle, men ignorer enten forespørgselen eller begynde at råbe og skirge at han »fanme ikke skal derind«. Har intet drukket eller spist siden i går ved 12-tiden, altså 24 timer.

Efter et stykke tid begynder han at tale til mig og først efter FF træder ud af cellen, således at jeg er i enerum med indsatte. Vil under ingen omstændigheder i obs-cellen, siger han lider af klaustrofobi. Mener godt selv at han kan gå roligt tilbage til hans egen celle. Har ingen forståelse for at han bliver nødt til at overbevise FF om at han kan tage den med ro.

Objektivt:

Vågen, klar, orienteret. Virker ikke somatisk påvirket af væskemangel, men jeg undersøger ham ikke fysisk idet hans fremtræden er aggressiv. Han madras er dog våd omkring hovedet og han har formentlig urineret i bukserne.

Psykisk er på aggressiv med lav fustrationstærskel, højtråbende og svarer kun med enten høj tale eller råb. Man aner en hvis modtagelighed for gode argumenter. Han vurderes ikke psykotisk/sindssyg.

Plan:

Anbefaler at man forsøger at tage indsatte ud af sikringsremme og enten lader ham blive i sikringscelle eller forflytter ham til egen celle. Jeg vil fraråde at han placeres i obs-cellen. Vurderes endnu ikke fysisk påvirket af væskemangel, men dette kan dog indtræde allerede næste døgn.«

Af rapporten fremgår endvidere, at man kl. 14:15 den 30. juli 2008 forsøgte at flytte A, som indtil dette tidspunkt havde ligget roligt, tilbage til observationscellen, men opgav det, da han gik »verbalt amok« og råbte »forbandede luder« mfl. ukvemsord. Han lå herefter roligt frem til kl. 10:00 den 31. juli 2008, hvor det er

Copyright © 2023 Karnov Group Denmark A/S

noteret, at områdelederen igen forsøgte at føre en samtale med ham med henblik på tilbageførsel til observationscellen. Dette resulterede imidlertid i, at A begyndte at skrige og råbe, at han ikke ville flyttes, og at fængselspersonalet »skulle skride ad helvede til«. Dette gentog sig under et forsøg på samtale om overførsel kl. 11.05. Efter at lægen kl. 13.20 havde tilset A, blev det kl. 14:15 vurderet, at A kunne gå tilbage til sin egen celle. Det er noteret, at A han blev løsnet, var meget konfliktsøgende i forhold til personalet, men dog ikke gjorde udfald.

I rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 15. august 2008 kl. 21:15 - 17. august 2008 kl. 22:11 (i alt 2 døgn, og 56 minutter) anføres det blandt andet:

»Beskrivelse af episoden:

D.d. fra kl. 20.45 til 21.10 bliver der råbt og banket voldsomt på vægge og inventar inde fra indsattes celle. Kl. 21.10 bliver der åbnet til indsatte og FF [Navn] 2660 beder indsatte om at stoppe. Indsatte bliver ved med at råbe, at FF 2660 og vil ikke dæmpe sig og er desuden meget truende. Det bliver derfor besluttet at indsatte skal i OBS-cellen, men indsatte vil ikke følge med frivilligt. Indsatte gør modstand da FF [Navn] tager om indsattes højre arm. Herefter kommer FF 2855, FF 2825, FF 2358 og ut til og hjælper med at ligge armsmogningsgreb på henholdsvis højre og venstre arm. Indsatte bliver herefter ført ned til elevatoren. Undervejs truer indsatte med, at når han kommer fri i OBS-cellen, vil han slå os alle ihjel. Derfor bliver det besluttet, at indsatte skal i sikringscelle for at afværge vold mod personale.

. . .

Lægen tilkaldt: 15-08-2008 21.30 Lægen genkaldt:
Lægetilsyn foretaget 15-08-2008 22:15.

Lægens bemærkninger/resume:

Tilses efter han er blevet fastspændt i Sikringscelle. Har angiveligt ment at betjentene hamrede på hans dør. Man planlagde først at flytte ham til obs-celle, men han modsatte sig kraftigt og af hensyn til personalets sikkerhed blev han fikseret. Hans forestillinger om at der bliver banket på hans celle, har stået på gennem længere tid. Jeg får også indblik i en dagbogslignende stak papirer, hvoraf det fremgår at han mener personalet griner højlydt af ham og banker ind til hans celle. Jeg bruger 5 minutter i cellen, men for intet respons fra indsatte. Adspørges om smerter, behov for medicin etc.

. . .

Tilrådes at han tilbageflyttes hurtigst muligt til egen celle, idet han ved sidste sikringscelleanbringelse lå i over 24 timer, uden man opnåede nogen pædagogisk effekt.

Hans forestillinger har paranoid karakter, hvorfor der bestilles psykiatrisk tilsyn snarest.«

Af rapporten fremgår endvidere, at A efter nogle indledende trusler og ukvemsord forholdt sig roligt, idet han dog fuldstændig nægtede at tale med den tilsynsførende læge kl. 22:30 den 15. august 2008. Kl. 8:43 den 16. august 2008 blev det vurderet, at A ikke kunne føres tilbage til sin egen celle, da han havde truet med at »splitte hele lortet ad« og udtalt forskellige ukvemsord. Han forholdt sig fortsat roligt frem til kl. 13:57, hvor det er noteret, at han ignorerede en forespørgsel om, hvorvidt han var klar til at rykke op på egen celle. Han ignorerede en tilsvarende forespørgsel kl. 19:13 den 16. august 2008 og svarede heller ikke på en henvendelse om vand kl. 18:14. Under en samtale med den tilsynsførende læge kl. 00:10 den 17. august 2008 gav han højtråbende udtryk for, at betjentene bankede på væggene til hans celle, og møntet på en af betjentene, at »luderen på gangen griner af ham«. Desuden truede han med at slå en af betjentene ihjel, hvis han kunne komme til det. Lægen forsøgte en samtale, men A var meget

**3081**

højtråbende. Kl. 2:25 forsøgte A at komme fri af fikseringen samtidig med, at han råbte dødstrusler til en fængselsfunktionær. Kl. 2:40 er det noteret, at A fik afslag på at få en kolbe til at tisse i, fordi »han er alt for voldsom og ophidset til, at vi kan løse fikseringen«. Det fremgår, at A under hele episoden var ekstremt truende. Kl. 2:55 satte han sig op og truede på ny en fængselsfunktionær på livet. Herefter forholdt A sig roligt og sov det meste af tiden frem til kl. 8:15 om morgenen den 17. august 2008. Også herefter lå han ifølge notaterne roligt frem til kl. 12:25, hvor han på fængselspersonalets forespørgsel om, hvorvidt han ville være interesseret i at komme på toilet og derefter i observationscelle samt senere på aftenen tilbage til egen celle, svarede: »Jeg skal ud af den her fucking lorte celle. I er nogle fucking svin. Jeg skal smadre alt«, og udviste en meget fjendtlig holdning over for personalet. Det blev den baggrund besluttet at lade ham blive i sikringscellen. Kl. 14:14 ønskede A ikke at tale med lægen, som var kommet til stede. Kl. 14:30 råbte han og truede med: »Det her får konsekvenser, når jeg kommer ud«. Kl. 15:45 ønskede A at tisse og 3 betjente kom til stede for at bistå. Han havde i mellemtiden tisset på briksen. Der var en dialog om overførsel til observationscelle med henblik på senere at komme tilbage til egen celle, når overvagtmesteren mødte mandag, men A ønskede ingen af delene og nægtede at tale med personalet. Herefter forholdt A sig igen roligt, men afslog fortsat tilbud om vand. Kl. 20:00 var der på ny en samtale, hvorunder A klagede over ikke at blive flyttet, men samtidig blev mere og mere vred og truede en fængselsfunktionær på livet. Kl. 22:00 er det i forbindelse med udtagelsen fra sikringscellen noteret, at der har været en lang og rummelig dialog med A, som flere fængselsbetjente har været inde over og medvirket til at holde i gang. A blev efter at have været på toilettet overført til observationscelle.

Af rapport om observationscelleanbringelse umiddelbart efter afslutningen af sikringscelleanbringelsen fra den 15. august 2008 kl. 21:15 - 17. august 2008 kl. 22:11 i Københavns Fængsler i perioden 17. august 2008 kl. 22:12 - 17. august 2008 kl. 23:05 (i alt 53 minutter) fremgår, at A blev anbragt i observationscelle, da der skønnedes at være behov for yderligere observation. Der henvises til bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3.

I rapport om sikringscelleanbringelse i Statsfængsel i Østjylland i perioden 8. december 2008 kl. 11:05 - 8. december 2008 kl. 15:30 (i alt 4 timer og 25 minutter) anføres det blandt andet:

»Beskrivelse af episoden:

D.d. kl. 11.05 blev indsatte fikseret. Dette skete pga. følgende:

Indsatte der midlertidig var placeret i besøgslokalet pga. visitation, begyndte at råbe i lokalet. Undertegnede der opholdte sig på kontoret kunne høre larmen, og skyndte mig til besøgsafdelingen.

Inden undertegnede var nået hen til besøgsdøren til indsatte, kunne jeg høre at han sparkede på døren.

Da ff. [Navn], ff [Navn], ff. [Navn] og ff. [Navn] var ankommet, åbnede jeg døren. Indsatte var tydelig ophidset. Indsatte råbte op og ville ikke være i besøgsrummet. Han krævede nogle dvd-film og var meget utilfreds og ophidset.

Undertegnede forklarede indsatte at, vi havde meget travlt og han måtte vente. Dette ophidsede blot indsatte yderligere. Da undertegnede ikke kunne tale indsatte til fornuft, fik han at vide at han skulle være rolig og opføre sig ordentligt.

Herefter blev døren lukket.

Indsatte blev nu mere højt råbende og truende, og råbte bla. at det ville gå helt galt og han ville smadre lokalet. Indsattes sindstilstand og tidligere adfærds mønster taget i betragtning, besluttede jeg at indsatte skulle anbringes i observationscellen.

Døren blev igen åbnet og indsatte blev bedt om at følge med frivilligt med til observationscellen, hvilke han nægtede.

Undertegnede tog nu fat i indsattes venstre arm for at føre ham til observationscellen.

Indsatte gjorde nu udfald mod undertegnede. Indsatte løftede armen med knyttet hånd, men blev han pacificeret på gulvet.

Indsatte blev nu ilagt håndjern og transporteret til sikringscellen, hvor han blev fikseret.

Under notater er der ikke afsluttet under fiksering til kl. og underskrift, hvilket skal være til den 08.12.08 kl. 15.30.«

Af rapporten fremgår endvidere, at indgrebet blev bragt til ophør, da A i nogen tid havde forholdt sig roligt og havde tilkendegivet, at han ville opføre sig ordentligt.

Af Statsfængslet i Østjyllands udtalelse af 5. februar 2009 i anledning af advokat Claus Bonnez' klage på vegne A over sikringscelleanbringelsen fremgår blandt andet, at fængslet ikke havde fundet grundlag for at imødekomme en anmodning af 10. december 2008 fra advokaten om at tilkalde en læge udefra, idet fængslet lagde vægt på, at fængslets læge er uvildig i forhold til behandlingen af de indsatte. Således skal klager over den lægelige behandling påklages til Patientklagenævnet og ikke til direktoratet. Fængslets læge havde ved sin pligt til at sikre lægetilsyn for opfyldt ved det tilsyn fængslets læge havde foretaget.

Ved direktoratets afgørelse af 9. juni 2009 vedrørende advokat Claus Bonnez' klage blev den anvendte magtanvendelse og efterfølgende anbringelse i sikringscelle fundet berettiget.

**3082**

Af rapport om udelukkelse fra fællesskab fremgår, at der har været udelukkelse fra fællesskab med mulighed for samvær med mindsatte i perioden den 8. december 2008 kl. 15:30 - 16. december 2008 kl. 10:30. Der henvises til straffuldbyrdelseslovens § 63, stk. 1, nr. 1 og nr. 3. Udelukkelsen fandt sted i fortsættelse af sikringscelleanbringelsen i perioden 8. december 2008 kl. 11:05 - 8. december 2008 kl. 15:30, se herom ovenfor.

I rapport om sikringscelleanbringelse i Statsfængslet i Østjylland i perioden 22. januar 2009 kl. 14:20 - 22. januar 16:50 (i alt 2 timer og 30 minutter) anføres det blandt andet:

*»Beskrivelse af episoden:*

Dags eftermiddag skal Ovm. [Navn] afholde forhør over indsatte. Under forhøret beder indsatte om at få F. 211/08 A som bisidder. Under forhøret rejser indsatte sig op fra sengen og går over til køleskabet og henter noget mælk.

Går herefter retur til sin plads på sengen. Rejser sig kortvarigt herefter igen, og går på ny over mod køleskabet. Pludselig og meget uventet drejer indsatte sig rundt og slår Ovm. [Navn], der sidder på en stol, to gange i ansigtet/hovedet med knyttet hånd.

På cellen befinder sig også samtidig ff. [Navn]. Ved ovenstående hændelse bliver ff. [Navn] også tildelt flere knytnæveslag i ansigtet og på kroppen. Samtidig springer A . . . op fra sengen. Dette sker meget hurtigt og uventet. [Ulæseligt] som om, at episoden har været aftalt på forhold. Hændelse medfører kraftig håndgemæng.

På gangen [ulæseligt] og ff. [Navn]. De springer med det samme ind på cellen, og ff. [Navn] får fat i [ulæseligt]. A tildeler ff. [Navn] adskillige slag i ansigtet. Ligeledes får [Navn] vristet sig fri, og tildeler ff. [Navn] to slag i ansigtet med knyttet hånd. Det bemærkes, at [Navn] bløder kraftigt fra det ene øje, hvorfor han har vanskeligt ved at fastholde [Navn].

Alle mand vælter rundt på gulvet, og ff. [Navn] fastholder [Navn] med kropsgreb. [Navn] tildeler herved ff. [Navn] et kraftigt bid i højre bryst. Ff. [Navn] får fat i A's højre hånd, som denne forsøger, at presse ind i øjnene på ff. [Navn]

Alarmen er slået, og det tililende personale kommer til stede, og de to indsatte bliver belagt med håndjern. Ved denne hændelse gør

indsatte [Navn] meget kraftig modstand og selv fire - fem mand har vanskeligt ved og holde indsatte på gulvet. Efter indsatte bliver belagt med håndjern bliver han løftet/båret ind til sikringscellerne.

A placeres med det sammen i sikringscellen, og der monteres remtøj i obs cellen. Monteringen af remtøj tager et par minutter og samtidig bliver der undersøgt hjelm hertil via viceinspektør [Navn] og sikkerhedssouschef [Navn]. Under hele dette forløb gør indsatte fortsat meget kraftig modstand. Herved lykkedes det for indsatte og bide ff. [Navn] i venstre lår.

Indsatte bliver herefter spændt og har svært ved at trække vejret pga. den megen tumult, hvorfor afdelingssygeplejeske [Navn] hidkaldes. Indsatte får efterfølgende ilt. Anstaltens læge hidkaldes samtidig se evt. lægenotat.«

Af rapporten fremgår endvidere, at A gentagne gange råbte op, rev i remtøj og truede, senest kl. 16:20, hvor han råbte truende om hævn, samt at overførsel til Københavns Fængsler skete kl. 18:10.

I rapport om (fortsat) sikringscelleanbringelse i Københavns Fængsler i perioden 22. januar 2009 kl. 19:30 - 24. januar 23:00 (i alt 2 døgn 3 timer og 30 minutter) angives det blandt andet:

*»Beskrivelse af episoden:*

indsatte er anbragt i sikringscelle efter transport fra Statsfængslet Østjylland.

se rapport fra Østjylland

lægen er tilkaldt kl. 19.45

ledelsens bemærkninger:

Ingen kommentar til anbringelse. Se sikringscellerapport af 22/1-09 fra østjylland hvor indsatte groft overfalder betjente i østjylland.

Ophold: Indsatte er fikseret i 2 døgn 3 timer og 30 minutter. Indsatte bliver vurderet af overvagtmester d. 23/1-09 kl. 14.40 og kommer derefter ud af sikringscellen d. 24/1-09 kl. 23.30. Indsatte har i denne periode været rolig. I normale omstændigheder ville dette være alt for lang tid. Indsatte er kendt fra tidligere anbringelse på politigården, hvor indsatte er rolig mens han er fikseret, men hidser sig voldsomt op og er truende ved samtale. Indsatte er parnoid og har svært ved forandringer, hvorfor man har ventet på, at indsatte ville tale for derved at sikre at indsatte kom hurtigst muligt ud af sikringscellen og fikseringen. Indsatte er meget speciel og særdeles uegnet til at sidde i fængsel, hvorfor det lange forløb i sikringscellen falder ind under regler for fiksering i sikringscellen.«

Af rapporten fremgår endvidere, at A ved ankomsten ønskede en trussel på livet mod fængselspersonalet i Østjyllands Statsfængsel »ført til protokols«, og at han virkede vred og indædt, men også at han selv lagde sig til rette. Under den fortsatte anbringelse frem til den 24. januar 2009 kl. 23:30, hvor han blev udtaget af sikringscellen og fikseringen, er det generelt noteret, at A lå roligt/stille. Det fremgår, at han ved kontaktforsøg fra personalets side den 23. januar 2009 kl. 12:50 og kl. 14:40 afviste kontakt og bad de pågældende »fucke af«, og at han kl. 20:56 gjorde tegn til personalet om at få sit tæppe vendt, hvilket skete. Den 24. januar 2009 kl. 17:40 blev han tilbudt mad og drikke, men ønskede det ikke. Samme dag er det noteret, at han kl. 19:30 blev tilbudt vand, men »takker surt nej«. Kl. 22:50 anmodede

**3083**

A om en urinkolbe, hvilket han fik. Han sagde nej til vand og bad om at komme op på egen celle. Det vurderedes ifølge noteringen herefter, at han kunne komme til egen celle, hvorefter han blev udtaget af sikringscellen den 24. januar kl. 23:30.

I rapport om sikringscelleanbringelse i Københavns Fængsler i perioden 23. februar 2009 kl. 17:05 - 24. februar 2009 kl. 14:40 (i alt 21 timer og 35 minutter) anføres det blandt andet:

*»Beskrivelse af episoden:*

Indsatte har dagen igennem hidset sig mere og mere op. Indsatte har tidligere banket løs på døren grundet manglende kuglepen efter

samtale med præsten Indsatte fik at vide at han skulle stoppe dette, hvilket dog fortsatte noget tid. Under uddeling af aftensmad hidser indsatte sig igen op, personalet kommer tilstede og prøver at fører en samtale. Døren holdes dog lukket tæt i det indsatte prøver og rive den op. Det vurderes at der er risiko for at indsatte vil kaste noget ud gennem døren, og med i den overvejelse er at han ligger har fået varmt vand. Da vi går fra cellen høres der larm fra cellen, og det besluttes at gå tilbage til cellen. Da der er kæde på døren vurderes det for farligt at stikke hovedet ind, derfor tages kæden af og døren åbnes for at vurdere indsatte psykiske tilstand. På cellen ligger indsatte stol itu på gulvet og indsatte er voldsom ophidset og truende, og da indsatte forsøges fjernet med greb i arm, bliver han nu så voldsom at han væltes ned på sengen, med flere betjente over sig. Indsatte fastholdes med magt og påsættes håndjern. Herefter føres indsatte til sikringscelle på 100 og fikseres.«

Af rapporten fremgår endvidere, at A kort efter indsættelsen afviste tilsyn af en læge. Kl. 19:45 den 23. februar 2009 satte han sig op og råbte mod døren »Hvad glor du på din idiot«. Han lå herefter stille frem til kl. 10:15 den 24. februar 2009, hvor han, da han blev tilset af en psykiater, blev meget hidsig og truende i sin adfærd. Kl. 12:45 ringede han og gav udtryk for, at han gerne ville tilbage til sit opholdsrum. Det er noteret, at han var hidsig. Kl. 14:40 havde han en samtale med områdelederen, som noterede: »Indsatte er rimelig rolig, men føler sig uretfærdigt behandlet og anklager personalet for at overfalde ham. Da indsatte for det meste har ligget roligt, udtages han og tilbageføres til egen celle.« A blev herefter udtaget af sikringscellen og fikseringen.

I rapport om sikringscelleanbringelse i Statsfængslet i Østjylland i perioden 4. marts 2009 kl. 23:55 - 5. marts 2009 kl. 8:25 (i alt 8 timer og 30 minutter) anføres det blandt andet:

»Beskrivelse af episoden:

D 4/3-909 skulle indsatte afhentes fra politigården og transporteres til statsfængslet Østjylland, fordi han dagen efter skal fremstilles i retten i Horsens.

Vi forlod Østjylland kl. 18.00 og ankom til politigården kl. 21.10. Vi havde af personalet på politigården fået at vide at indsatte ikke frivilig ville med til Østjylland.

Da døren til cellen blev åbnet, gik undertegnede ind på cellen, efterfulgt af [Navn], [Navn] og [Navn]. Indsatte sad på sengen og han blev bedt om at følge frivilligt med ud af cellen. dette nægtede indsatte og hidsede sig straks op. Han blev igen bedt om at følge frivilig med. dette ophidsede indsatte yderligere, og han nægtede at følge med.

Undertegnede ville tage fat i indsattes arm, men han forsøgte at undvige mig, og blev herefter pacifiseret på cellegulvet. [Navn] og [Navn] havde armsnoningsgreb, [Navn] lavede benbengreb og undertegnede tog et kropsgreb.

Indsatte blev ilagt håndjern og transporteret til bilen, hvor indsatte nu var så voldsom at det var nødvendig at lægge ham i bunden af bilen.

Vi forlod politigården kl. 21.35 og ankom til Østjylland kl. 23.50. Indsatte var stadig voldsom ophidset samt truende, hvorfor det var nødvendig at fiksere ham i sikringscellen kl. 23.55.«

Af rapporten fremgår endvidere, at A frem til kl. 1:30 den 5. marts 2009 løbende kom med ukvemsord mod personalet og den tilsynsførende læge og udfordrede en fængselsfunktionær til slåskamp. A lå herefter roligt og sov ind imellem, indtil han kl. 8:25 den 5. marts 2009 blev udtaget af sikringscellen.

Af rapport om observationscelleanbringelse i Københavns Fængsler i perioden 13. april 2009 kl. 19:15 - 16. april 2009 kl. 10:05 (i alt 2 døgn, 14 timer og 50 minutter) fremgår, at A begyndte at true en fængselsbetjent, da denne indskærpede over for ham, at han ikke skulle tale med en anden indsat gennem vinduerne, og

yderligere truede andre fængselsbetjente, da man forsøgte at få ham til at dæmpe sig. Man besluttede herefter at bringe ham til observationscellen. I den forbindelse gjorde A udfald mod en fængselsfunktionær og forsøgte at nikke denne en skalle. A gjorde voldsom modstand og forsøgte at ramme personalet med slag og spark. Det blev nødvendigt at bruge stave for at kunne påføre ham håndjern og føre ham til observationscellen. Der henvises i rapporten til bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3. Efter at være blevet anbragt i observationscellen fortsatte han med at råbe trusler og ukvemsord efter personalet samt sparke på døren. Det er under ledelsens påtegning påtalt, at der mangler notater på flere tidspunkter den 14. april og 15. april 2009. Notaterne fra kl. 20:45 den 13. april 2009 viser, at A forholdt sig roligt, men under en samtale med overvagtmester C kl. 10:49 den 14. april 2009 hidsede han sig op og endte med at råbe og skrige. Kl. 19:02 den 14. april 2009 løb han hen mod døren, slog

**3084**

på den og truede personalet. Han ønskede i tiden herefter ikke kontakt med personalet, men forholdt sig roligt indtil den 15. april 2009 kl. 11:45, hvor han for op og råbte op om, at betjentene ville komme til at fortryde, og at de var »bøssebetjente«. Kl. 16:45 er der notat om, at C på ny forsøgte en samtale med A, men at han igen hidsede sig op, og det endte med, at C måtte forlade cellen, hvorefter A råbte og skreg i 10 minutter. Senere på dagen kl. 17:21 er der notat om råben og skrigen samt trusler mod fængselspersonalet, kl. 21:00 om ukvemsord mod en fængselsbetjent og kl. 22:10 om råben og skrigen. A havde under hele forløbet afslået tilbud om mad og drikke. Den 16. april kl. 11:52 er der notat af den tilsynsførende læge om, at A er meget affektlabil, men ikke psykotisk, og at personalet observerer med henblik på fortsat protestspisevægring. Kl. 13:42 er der et længere notat af C om A's nægtelse af at spise og usikkerhed om, hvorvidt han har drukket det vand, personalet har sat ind, eller smidt det ud. Det angives, at personalet anså det for væsentligt, at han kom tilbage til egen celle for måske derved at forbedre hans tilstand. A, som havde kastet madrester på væggen, blev tilbudt at komme tilbage til egen celle, hvis han kunne affinde sig med at blive iført håndjern under transporten. Det nægtede han, men personalet iførte ham herefter med magt håndjern og førte ham tilbage til egen celle uden modstand fra hans side.

Den 14. oktober 2009 traf direktoratet i medfør af straffuldbyrdelseslovens § 78 afgørelse om at overføre A til Sikringsafdelingen på Psykiatrihospitalet i Nykøbing Sjælland for der at udstå den resterende del af fængselsstraffen. Forud herfor var A den 26. maj 2009 overført til Sikringsafdelingen, og han har ikke siden været anbragt i almindeligt fængsel.

*Straffedomme mv. og tiltag med henblik på overførsel til Sikringsafdelingen*

I et brev af 3. juni 2004 til Justitsministeriet fra overlæge G, Anstalten ved Herstedvester, angives det blandt andet:

»Man skal hermed anmode om, at der træffes bestemmelse om, at ovennævnte i henhold til § 40 i bekendtgørelse af lov om frihedsberøvelse og anden tvang i psykiatrien anbringes i Sikringsafdelingen i Nykøbing Sjælland, idet der er formodning om, at A er sindssyg. Man vurderer samtidig, at A er overordentlig farlig for andres liv og legeme.

. . .

*Konklusion:*

Det drejer sig om en 33-årig mand, som er idømt forvaring på grund af vold. Han har under ophold i fængslet jævnligt været meget truende og voldelig. Der er udfærdiget mentalobservationserklæringer i 1988, 1991, 1994 1998 og senest i januar 2003. Fire af erklæringerne - herunder den sidste i januar 2003 - er udfærdiget ambulant. I fire af erklæringerne har man konkluderet, at A er

personlighedsforstyrret, men ikke psykotisk. I erklæringen fra 1998 konkluderedes det, at en begyndende sindssygelig udvikling gennem de senere år ikke med sikkerhed kunne udelukkes. A kan i perioder optræde ganske kontrolleret, høfligt og venligt. Derfor skønnes der at være behov for en grundig observation under en længerevarende indlæggelse på en psykiatrisk afdeling med henblik på en endelig diagnostisk afklaring. A har nu igennem lang tid i perioder givet udtryk for forestillinger, der kan tolkes som sindssygelige. Han har i en periode af måneders varighed i 1999 haft gavn af antipsykotisk behandling. Af sikkerhedsmæssige grunde kan A ikke være indlagt på en retspsykiatrisk afdeling.

Der anmodes derfor om anbringelse i Sikringsafdelingen i Nykøbing Sjælland med henblik på diagnostisk afklaring og iværksættelse af relevant behandling.«

Justitsministeriet svarede som følger ved brev af 17. juni 2004:

». . .

Efter en gennemgang af sagen skal Justitsministeriet herved meddele, at ministeriet *ikke* finder grundlag for at imødekomme anmodningen om afsigelse af farlighedsdekret, idet ministeriet efter en konkret vurdering ikke har fundet, at betingelserne for at anbringe den pågældende i Sikringsafdelingen er opfyldt.

Justitsministeriet har ved afgørelsen lagt afgørende vægt på Retslægerådets udtalelse om, at det er usikkert, om A er sindssyg. Justitsministeriet har desuden tillagt det betydning, at rådet ikke finder, at A aktuelt udgør en sådan vedvarende, alvorlig og overhængende fare for andres liv eller legeme, at rådet kan anbefale overførsel til Sikringsafdelingen, jf. psykiatrilovens § 40, stk. 1.«

I en udtalelse fra overlæge G af 23. august 2005 er det anført:

». . .

Man skal herved anmode om, at der arbejdes på en retskendelse, således at ovennævnte kan blive mentalobserveret under indlæggelse i Sikringsanstalten i Nykøbing Sjælland.

. . .

*Konklusion:*

A er meget svært personlighedsforstyrret og klinisk er der indtrådt en kraftig forværring i tilstanden inden for det sidste 1½ år. Han er langt mere affektlabil, end han har været tidligere. Der har været flere episoder med trusler og vold (kopi af rapporter vedlægges). Det er umuligt at etablere en kontakt med ham, som muliggør en udveksling af oplysninger og synspunkter, man må nærmest betegne ham som autistisk i sin kontaktform. Han kommer i kraftig affekt uden anden udløsende faktor end egne forestillinger om hævn og vold.

**3085**

På det foreliggende vurderes det, at A er i en tilstand, der må ligestilles med en psykotisk tilstand.

Problemstillingen har den 22. august 2005 været drøftet med Kriminalforsorgens psykiatriske konsulent overlæge [Navn]. Han som er enig i anstaltens vurdering og tilråder også mentalobservation under indlæggelse på Sikringsanstalten i Nykøbing Sjælland.«

Den 24. august 2005 anførte Rigsadvokaten i en oversendelse til Statsadvokaten for Sjælland:

»Anstalten ved Herstedvester har i vedlagte indstilling efter drøftelse med overlæge [Navn], Justitsministeriet, Psykiatrisk Klinik, anbefalet, at A mentalobserveres under indlæggelse på Sikringsafdelingen ved Anstalten ved Herstedvester. Det bemærkes, at Politimesteren i Glostrup har oplyst, at statsadvokaten for nylig på et andet grundlag har afslået en lignende indstilling fra politimesteren.

Jeg skal anmode statsadvokaten om at træffe afgørelse vedrørende spørgsmålet, jf. rigsadvokatmeddelelse nr. 5/2002.

. . .«

Der blev ved anklageskrift modtaget i Retten i Glostrup den 15. marts 2005 rejst tiltale mod A i anledning af det knivoverfald, som gav anledning til anbringelse i sikringscelle på Nyborg Statsfængsel den 10. august 2004. Derudover blev der rejst tiltale for den vold og de trusler mod fængselsfunktionærer i Statsfængslet i Vridsløselille den 30. april 2004, der gav anledning til overførslen til og sikringscelleanbringelsen på Anstalten ved Herstedvester den 30. april 2004 og for trusler mod fængselsfunktionærerne på Anstalten ved Herstedvester under anbringelsen i sikringscellen om eftermiddagen og aftenen den 30. april 2004.

Af en i henhold til Glostrup Rets kendelse af 28. september 2005 under sagen indhentet udateret mentalerklæring, som er udarbejdet af administrerende overlæge på Sikringsafdelingen på Psykiatrihospitalet i Nykøbing Sjælland, [Navn], fremgår blandt andet:

*»Konklusion*

Observanden er herefter ikke sindssyg, men må anses for at tilhøre i straffelovens § 69 stk. 1 omhandlede personkreds. Der er ikke forhold der peget på, at foranstaltninger i medfør af samme lovs § 68, 2. pkt., vil være mere formålstjenlige end straf. Med baggrund i den aktuelle mentalundersøgelse kan der ikke anbefales anden sanktion end forvaring i medfør af straffelovens § 70.

På baggrund af sagsakterne og observandens ønske skal det anbefales, at den fortsatte forvaring sker i Statsfængslet Vridsløselille, hvor der angiveligt har været de færreste problemer.«

Af erklæringen fremgår, at undersøgelsen er udarbejdet under indlæggelse på Sikringsafdelingen.

Ved Glostrup Rets dom af 31. august 2006 blev A idømt fængsel i 8 måneder for overtrædelse af straffelovens § 119, stk. 1, til dels jf. § 245, stk. 1, jf. § 247, stk. 1. Han blev herved i forhold 1 fundet skyldig i den 10. august 2003 ca. kl. 16:15 i Nyborg Statsfængsel at have overfaldet en fængselsfunktionær med en kniv (det forhold som gav anledning til sikringscelleanbringelsen på Nyborg Statsfængsel den 10. august 2003). Desuden blev han fundet skyldig i forhold 2 ved den 30. april 2004 ca. kl. 12 i Statsfængslet i Vridsløselille at have tildelt en fængselsfunktionær et knytnæveslag i ansigtet og ved at have truet en anden fængselsfunktionær med at voldtage hans kone og slå hans børn ihjel samt ved om eftermiddagen og aftenen efter overførslen til Anstalten ved Herstedvester, det vil sige under anbringelsen i sikringscellen, at have truet flere fængselsfunktionærer med, at de ville blive »nakket«, at han ville »smadre« dem, og at han kunne »tage et drab med på vejen«. Forhold 2 vedrører den vold og de trusler, der førte til overførslen til Anstalten ved Herstedvester, hvor A blev anbragt i sikringscelle, jf. rapporten herom. Det fremgår af dommen, at retten lægger noterne om truslerne i forhold 3 i rapporten om sikringscelleanbringelsen til grund. A blev i forhold 2 frifundet for at have bidt en fængselsfunktionær i fingeren og blev også frifundet i forhold 4, som drejede sig om trussel efter straffelovens § 119, stk. 1, den 31. juli 2004 over for en fængselsfunktionær. Det sidste forhold har så vidt ses ingen sammenhæng med de indgreb, som denne sag vedrører.

I et brev af 5. oktober 2006 fra Politimesteren i Glostrup til direktoratet er det blandt andet anført:

»Den ved anklageskrift af 15. marts 2005 rejste sag er nu endelig afgjort ved dom af 31. august 2006, der vedlægges til orientering. Om sagens behandling skal nævnes, at sagen i høj grad blev vidtløftiggjort af tiltalte og hans forsvarers ønske om at bruge retssalen som talerstol for mere generelle kriminalpolitiske synspunkter.

Der tilbagestår herefter følgende verserende sager til afgørelse, alle foreløbig samlet her ved embedet til vurdering under eet:

| litra | j.nr. | Dato | vedr. | anstalt |
|---|---|---|---|---|
| A | 3800-84110-00190-04 | 19-10-2004 | besiddelse af 0,3 g hash | Herstedvester |
| B | 2500-70311-00010-05 | 05-04-2005 | verbale dødstrusler § 119 | Nyborg |
| C | 2500-70311-00011-05 | 13-04-2005 | angreb med knive af spejlglas | Nyborg |
| D | 2500-70311-00009-05 | 13-04-2005 | angreb med knive af spejlglas (samme sag) | Nyborg |
| E | 2500-70311-00008-05 | 13-04-2005 | korporligt angreb i forbindelse med aftensmad (samme sag) | Nyborg **3086** |
| F | 0700-70311-00070-05 | 27-07-2005 | verbale dødstrusler § 119 | Herstedvester |
| G | 0700-70311-00071-05 | 27-07-2005 | verbale dødstrusler § 119 | Herstedvester |
| H | 0700-70311-00081-05 | 30-09-2005 | flere dages verbale trusler overfor personalet på Anstalten ved Herstedvester | Herstedvester |
| I | 0700-70311-00081-05 | 30-09-2005 | verbale dødstrusler § 119 | Herstedvester |
| J | 3800-70311-00020-06 | 04-07-2006 | Verbale dødstrusler og korporligt angreb § 119 | Horsens |
| K | 3800-70311-00022-06 | 05-07-2006 | verbale dødstrusler § 119 | Horsens |
| L | 0700-70311-00072-05 | 16-08-2006 | verbale dødstrusler § 119 | Herstedvester |
| M | 0700-70311-00073-05 | 19-08-2006 | verbale dødstrusler § 119 | Herstedvester |

Ved gennemsyn af kriminalregisteret d.d. fremstår listen som udtømmende for antallet af verserende sager.«

Ved Svendborg Rets dom af 21. august 2007 blev A idømt fængsel i 4 måneder for overtrædelse af straffelovens § 119, stk. 1, jf. til dels § 21, § 121, § 245, stk. 1, jf. § 247, stk. 1, jf. til dels § 21, jf. § 89. Forhold 2 og 3 vedrørte kvalificeret vold i gentagelsestilfælde og forsøg herpå samt overtrædelse af straffelovens § 119, stk. 1, jf. til dels § 21, begået den 13. april 2005 på Nyborg Statsfængsel, hvor A truede to fængselsfunktionærer på livet med to stykker spejlglas på ca. 25 cm længde tilvirket som knive og forsøgte at overfalde den ene af fængselsfunktionærerne med disse spejlglasknive, som han kastede efter fængselsfunktionæren. Disse forhold falder tidsmæssigt sammen med den sikringscelleanbringelse i Statsfængslet i Nyborg fra den 13. april 2005 kl. 22:10 til den 15. april 2005 kl. 09:41, der er oplyst om i Kammeradvokatens oversigt, og som hører til de anbringelser, hvor rapporten ikke er medtaget i ekstrakten. A blev desuden fundet skyldig i to forhold (forhold 4 og 5) vedrørende overtrædelse af straffelovens § 119, stk. 1, ved den 4. juli 2006 i Horsens Statsfængsel at have overfaldet to fængselsfunktionærer med slag i ansigtet henholdsvis på skulderen samt ved at have truet to andre fængselsfunktionærer på livet samt ved den 5. juli 2006 i Horsens Statsfængsel at have truet en fængselsfunktionær med at slå ham ihjel. Det første af disse forhold er den episode, som ifølge rapport om sikringscelleanbringelse fra Statsfængslet i Horsens i perioden 4. juli 2006 kl. 18:05 - 5. juli

2006 kl. 14:15 blandt andet gav anledning til anbringelse i sikringscelle. Truslen den 5. juli 2006 er den, der ifølge rapporten blev fremsat, da A blev udtaget af sikringscellen for at blive overført til Politigårdens Fængsel. A blev i forhold 6 fundet skyldig i overtrædelse af straffelovens § 119, stk. 1, jf. til dels § 21, ved den 11. september 2006 i Politigårdens Fængsel at have overfaldet en fængselsfunktionær med spark i maven og forsøg på at tildele en fængselsfunktionær med spark i maven og forsøg på at tildele en fængselsfunktionær slag i ansigtet og skulle og spytte på den pågældende samt trusler på livet. I rapport om sikringscelleanbringelse fra Københavns Fængsler i perioden 11. september 2006 kl. 14:50 - 11. september 2006 kl. 17:13 er de pågældende forhold nævnt.

Direktoratet anførte i et brev af 31. juli 2008 til A's advokat, advokat Claus Bonnez:

». . .

Justitsministeriet, Direktoratet for Kriminalforsorgen, kan oplyse, at direktoratet påtænker at arbejde hen imod § 78 anbringelse af Deres klient i Sikringsanstalten i Nykøbing Sjælland.

Direktoratet skal i den forbindelse forespørge, om Deres klient fortsat ønsker anbringelse i Sikringsanstalten i Nykøbing Sjælland.

Direktoratet kan oplyse, at sagen vil blive behandlet efter reglerne i straffuldbyrdelseslovens § 78 og efter proceduren nævnt i § 3, stk. 2, i Justitsministeriets bekendtgørelse nr. 571 af 5. juli 2002 om anbringelse af dømte i institution m.v. uden for fængsel eller arresthus (§ 78 bekendtgørelsen).«

Den 8. september 2008 skrev direktoratet til Sikringsanstalten, psykiatrisk hospital Nykøbing Sjælland blandt andet:

»Justitsministeriet, Direktoratet for Kriminalforsorgen, skal anmode om en udtalelse vedrørende anbringelse af A i Sikringsanstalten i medfør af straffuldbyrdelseslovens § 78.

Såfremt anstalten udtaler sig herimod påtænker direktoratet at anvende proceduren nævnt i § 3, stk. 2, i Justitsministeriets bekendtgørelse nr. 571 af 5. juli 2002 om anbringelse af den dømte i institution m.v. udenfor fængsel eller arresthus.«

Overlæge [Navn], Sikringsafdelingen på psykiatrisk hospital Nykøbing Sjælland, udtalte i et brev af 11. september 2008:

». . .

Jeg skal beklage, at vi ikke kan modtage ovenstående i henhold til straffuldbyrdelseslovens § 78. Jeg mener heller ikke at der er mulighed for, at Direktoratet for Kriminalforsorgen kan anvende proceduren nævnt i § 3, stk. 2 i Justitsministeriets bekendtgørelse nr. 571 af 5. juli 2002 om anbringelse af den dømte i institution m.v. udenfor fængsler eller arresthuse. Jeg skal venligst henvise til Sikringsafdelingens regulativ pkt. 2, hvoraf det fremgår, at »afdelingen optager sindssyge personer om hvem det ved dom, kendelse eller administrativ resolution i medfør af § 40 i lov nr. 331 af 24. maj 1989 om frihedsberøvelse og anden tvang i psykiatrien, bestemmes at der bør træffes sikkerhedsforanstaltninger overfor dem.« Det optages dog kun personer som af

**3087**

justitsministeriet skønnes egnede dertil. Desuden modtages varetægtsfængslede efter kendelse til hospitalsmæssig mentalobservation, i henhold til retsplejelovens § 809 stk. 2, når de af anklagemyndigheden ansøges for så personfarlige eller risikoen for udvigelse er så stor, at observation i Sikringsafdelingen er påkrævet. Varetægtsfængslede herudover modtages alene i henhold til retsplejelovens § 777.

. . .«

I direktoratets brev af 22. januar 2009 til Rigsadvokaten anføres det blandt andet:

»Direktoratet finder, at sagen i givet fald skulle løses ved ansøgning til Justitsministeriet om dispensation fra reglerne om anbringelse i Sikringsanstalten.

Ledende overlæge ved Sikringsanstalten i Nykøbing Sjælland, [Navn], har telefonisk den 20. januar 2009 oplyst overfor direktoratet, at A i forbindelse med en verserende sag hos Københavns Politi er begæret mentalundersøgt på Sikringsanstalten, hvor han således nu står på venteliste.

Direktoratet kan oplyse, at direktoratet påtænker at henlægge sagen vedrørende § 78-anbringelse, indtil resultatet fra mentalundersøgelsen foreligger.«

*Tiden efter anbringelsen på Sikringsafdelingen*

Overlæge [Navn], Sikringsafdelingen på psykiatrisk hospital Nykøbing Sjælland, oplyste i et brev af 19. august 2010 til Justitsministeriet blandt andet:

»Patienten påbegyndte tvangsbehandling primo oktober 2009 med tablet Zyprexa 10 mg dagligt.

Patienten fik langsomt effekt af Zyprexabehandlingen.

D. 13.10.2009 meddelte patienten, at han gerne ville tage Zyprexa frivilligt.

Patienten har været i behandling med antipsykotisk medicin tablet Zyprexa 20 mg siden.

Patienten har været venlig og omgængelig i afdelingen. De paranoide symptomer er bleget helt af. Patienten har nydt samvær med medpatienter.

Patienten har fuldt fællesskab i afdelingen siden den 30.7.2009. I forbindelse med tvangsbehandlingen var det således muligt at opretholde fuldt fællesskab.

Patienten har talt med psykolog, siden han kom, idet han har mange oplevelser fra sin lange tid i fængselsvæsnet, som han har behov for at tale med psykolog om.«

Der blev ved anklageskrift modtaget i Københavns Byret den 6. august 2010 rejst tiltale mod A for overtrædelse af straffelovens § 119, stk. 1, i forbindelse med de tre ovennævnte sikringscelleanbringelser i perioden fra den 20. december 2006 kl. 14:55 på Københavns Fængsler, i perioden fra den 12. juni 2007 kl. 13:15 på Københavns Fængsler i perioden fra den 22. januar 2009 kl. 14:20 på Statsfængslet i Østjylland og fortsat den 22. januar 2009 kl. 19:30 på Københavns Fængsler, som følger:

»1.

*straffelovens § 119, stk. 1,*

ved den 20. december 2006 ca. kl. 14.30 under afsoning i Politigårdens fængsel, København V, med vold eller trussel om vold at have overfaldet de tjenestegørende fængselsfunktionærer [Navn], [Navn] og [Navn], idet tiltalte tildelte [Navn] et slag med knyttet hånd på venstre kind, bed [Navn] i højre ben og flere gange udtalte til dem alle, at han ville »slå dem og deres mødre ihjel« eller lignende.

2.

*straffelovens § 119, stk. 1,*

ved den 13. juni 2007 ca. kl. 10.20 under afsoning i Politigårdens fængsel, København V, med vold eller trussel om vold at have overfaldet den tjenestegørende fængselsfunktionær F, idet tiltalte råbte til F: »Jeg smadrer dig, når jeg kommer fri«, »Du er en død mand«, »Jeg skal hænge dig, når jeg engang kommer ud«, og »Jeg nakker dig fandme« eller lignende.

3.

*straffelovens § 119, stk. 1,*

ved den 22. januar 2009 ca. kl. 14.10 under afsoning i Statsfængslet Østjylland, Horsens, og som bisidder for en medindsat under dennes disciplinære forhør, med vold eller trussel om vold at have overfaldet den tjenestegørende fængselsfunktionær [Navn], idet tiltalte tildelte [Navn] flere slag med knyttet hånd, herunder i nakken, på kæben og på halsen.«

Der var på forsvarerens begæring i retsmøde den 5. september 2008 udarbejdet mentalobservationserklæring af 30. september 2009 af overlæge [Navn], Sikringsafdelingen på psykiatrisk hospital Nykøbing Sjælland. I erklæringen anføres det blandt andet:

»*Konklusion*

Det drejer sig om en 38-årig mand, der er tiltalt for vold. Han er tidligere mentalundersøgt 6 gange uden at være fundet sindssyg, men derimod karakterafvigende med en paranoid personlighedsforstyrrelse.

Ved den aktuelle mentalundersøgelse er observanden fundet normalt begavet og han lider ikke af epilepsi.

Han var ikke på tidspunktet for det påsigtede været påvirket af hverken medicin eller euforiserende stoffer.

Observanden er ved den foretagne undersøgelse fundet sindssyg og han anses også for at have været sindssyg på tidspunktet for det påsigtede.

Den psykologiske undersøgelse støtter diagnosen.

Observanden findes lidende af paranoid skizofreni og omfattet af straffelovens § 16, stk. 1.

Såfremt observanden findes skyldig i det påsigtede, skal der, i henseende til observandens sindssygdom og voldsomme reaktionsmønster, anbefales dom til anbringelse på psykiatrisk hospital.«

På baggrund af mentalerklæringen påstod anklagemyndigheden A dømt til tidsubestemt anbringelse på

**3088**

Sikringsafdelingen på psykiatrisk hospital Nykøbing Sjælland.

Copyright © 2023 Karnov Group Denmark A/S

I præmisserne i Københavns Byrets dom af 25. februar 2011 anføres det:

»Ad forhold 1:

Alle nævninger og dommere udtaler:

Retten finder det ikke med den til domfældelse tilstrækkelige sikkerhed bevist, at tiltalte har tildelt fængselsfunktionær [Navn] et slag med knyttet hånd på venstre kind, eller at tiltalte til fængselsfunktionærerne [Navn], [Navn] og [Navn] flere gange har udtalt, at han ville »slå dem og deres mødre ihjel« eller lignende. Retten har herved lagt vægt på, at ingen af vidnerne i retten tilstrækkeligt klart har kunnet forklare herom, heller ikke efter forehold af politirapporter. Tiltalte frifindes derfor for denne del af tiltalen.

Retten har efter vidnerne [Navn]s, [Navn]s, [Navn]s og Fs forklaringer fundet det bevist, at tiltalte bed [Navn]i højre ben ved overgangen mellem støvleskaftet og benet lidt under knæet.

Retten har endvidere efter bevisførelsen lagt til grund, at fængselsfunktionærerne gik ind i tiltaltes celle med henblik på at anbringe tiltalte i sikringscelle, såfremt han ikke ville ophøre med at skrige og råbe.

Retten finder, at den magtanvendelse, som fængselspersonalet anvendte med henblik på anbringelsen af tiltalte i sikringscelle var i strid med straffuldbyrdelsesloven § 66, idet betingelserne for anbringelse i sikringscelle efter denne bestemmelse ikke var opfyldt. Tiltaltes bid findes derfor ikke at kunne henføres under straffelovens § 119, stk. 1, men må henføres under straffelovens § 244.

Retten lægger til grund, at tiltaltes bid var udløst af den uretmæssige magtanvendelse, som [Navn] deltog i. Under disse omstændigheder finder retten, at tiltaltes handling er straffri efter straffelovens § 13, stk. 1.

*Ad forhold 2:*

4 nævninger og 3 dommere udtaler:

Efter vidnet Fs forklaring sammenholdt med hans notat af 13. juni 2007 finder disse voterende det godtgjort, at tiltalte har udtalt de i tiltalen anførte trusler.

Disse voterende har efter bevisførelsen endvidere lagt til grund, at tiltalte var anbragt i sikringscellen fra om eftermiddagen eller aftenen den 12. juni 2007. Anklagemyndigheden har ikke ført bevis for, at varigheden af anbringelsen i sikringscellen har været proportional. Disse voterende finder herefter, at anbringelsen af tiltalte i sikringscelle havde været for langvarig på gerningstidspunktet, hvor F kom for at tilse tiltalte.

Det må derfor lægges til grund, at tiltalte var udsat for en for vidtgående magtanvendelse, hvorfor tiltaltes udtalelser ikke findes at kunne henføres under straffelovens § 119, stk. 1, men må efter deres karakter henføres under straffelovens § 266.

Disse voterende finder endvidere ikke, at straffelovens § 13 finder anvendelse.

2 nævninger udtaler:

Vi finder det ikke bevist, at tiltalte har udtalt de i tiltalen anførte trusler.

*Ad forhold 3:*

5 nævninger og 3 dommere udtaler:

Efter vidnerne [Navn]s og [Navn]s forklaringer sammenholdt med den foreliggende politiattest må det lægges til grund, at tiltalte har slået [Navn] to gange med knyttet hånd i hovedet.

Disse voterende finder ikke, at det anførte om tiltaltes afsoningsforhold gennem årene kan føre til frifindelse af tiltalte.

Disse voterende finder det i det anførte omfang bevist, at tiltalte er skyldig i overtrædelse af straffelovens § 119, stk. 1.

1 nævning udtaler:

Jeg finder efter de divergerende forklaringer, at det ikke er bevist, at tiltalte er skyldig i tiltalen.

Skyldsspørgsmålet afgøres i det hele i overensstemmelse med retsplejelovens § 891, stk. 4.

*Thi bestemmes:*

I forhold 1 frifindes tiltalte, A.

I forhold 2 findes tiltalte skyldig i overtrædelse af straffelovens § 266.

I forhold 3 findes tiltalte skyldig i overtrædelse af straffelovens § 119, stk. 1.

*Sanktion*

Der er afgivet 12 stemmer for, at tiltalte på gerningstidspunktet har været utilregnelig på grund af sindssygdom eller en tilstand, der må sidestilles med sindssygdom.

Retten har lagt vægt på Retslægerådets erklæringer sammenholdt med de øvrige lægelige oplysninger om tiltaltes personlige forhold, hvorefter tiltalte på gerningstidspunktet har været utilregnelig på grund af sindssygdom eller en tilstand, der må ligestilles med sindssygdom.

Tiltalte straffes derfor ikke, jf. straffelovens § 16, stk. 1.

Der er afgivet 12 stemmer for, at tiltalte skal dømmes til anbringelse på psykiatrisk afdeling, jf. straffelovens § 68.

Retten har lagt vægt på lovovertrædelsernes karakter, tiltaltes tidligere kriminalitet og de lægelige oplysninger og fundet, at mindre indgribende foranstaltninger ikke findes tilstrækkelige, hvorfor det er nødvendigt, at tiltalte anbringes i psykiatrisk afdeling for at imødegå, at han på ny begår alvorlig kriminalitet.

Der er afgivet 12 stemmer for at fastsætte længstetiden for den idømte foranstaltning til 5 år, jf. straffelovens § 68 a, stk. 1.

**3089**

Retten har lagt vægt på oplysningerne om gerningen i forhold 2 sammenholdt med, at tiltalte på gerningstidspunktet var udsat for en for vidtgående magtanvendelse, og fundet, at der foreligger formildende omstændigheder, som kan føre til strafbortfald efter straffelovens § 83, 2. pkt. Retten har videre fundet, at der i forhold 2 foreligger en strafnedsættelsesgrund efter straffelovens § 82, nr. 13, jf. menneskerettighedskonventionens artikel 6, som følge af lang sagsbehandlingstid, der ikke kan tilskrives tiltalte. På denne baggrund har retten ikke fundet grundlag for at lade domfældelsen for overtrædelse af straffelovens § 266 føre til, at der ikke fastsættes en længstetid efter straffelovens § 68 a, stk. 2. Endvidere har retten fundet, at voldsudøvelsen i forhold 3 ikke kan anses for en alvorlig voldsforbrydelse som anført i straffelovens § 68 a, stk. 2.

. . .«

A blev dømt til anbringelse i psykiatrisk afdeling med en længstetid på 5 år. Desuden blev det bestemt, at Højesterets dom af 15. marts 1999, Glostrup Rets dom af 31. august 2006 og Svendborg Rets dom af 21. august 2007 bortfaldt.

*Forklaringer*

Der er afgivet forklaringer af A, områdeleder B, overvagtmester C, fængselsbetjent D, vicefængselsinspektør E, områdeleder F, overlæge G og læge H.

*A* har forklaret blandt andet, at han under indsættelserne på Anstalten på Herstedvester indledningsvis afsonede på modtagelsesafdeling C. Det var en almindelig celle med TV og playstation mv. Der sad han det meste af tiden, bortset fra ophold i observations- og sikringscelle fra 1999-2000. Han var i almindeligt fællesskab og arbejdede på produktionsskolen. I 1999 mødte han en pige, [Navn], som han blev forelsket i. På grund af en voldsepisode blev han anbragt på Vridsløselille i ca. 1 måned i 1999. [Navn] hængte sig, medens han var på Vridsløselille. Han kom tilbage på Herstedvester. Han havde et håb om, at psykologerne og psykiaterne på Herstedvester kunne trænge ind til hans hjerte. Han kom igen på afdeling C. Han havde fået en stor dosis af et stesolidlignende præparat, medens han var på Vridsløselille. Dosis blev kraftigt

nedsat på Herstedvester. Det gjorde han opmærksom på den første aften. Han blev skældt ud af en vagt. Det skete igen aftenen efter. Herefter blev han flyttet op på afdeling I, som er isolationsafdelingen. Han fik ikke nogen forklaring. Han kom i en tom observationscelle. Den var, som det var sædvanligt for observationsceller, udstyret med en fastboltet seng med en gummimadras og fastboltet bord og stol. Han forsøgte at hænge sig selv to gange og forsøgte at skære armen op på sig selv med noget ståltråd. Personalet kom til stede, hvorefter han forsøgte at skære i armen igen. Han ramte en af vagterne med ståltråden og blev beskyldt for at forsøge at slå øjet ud på vagten. Han kom i sikringscelle og blev fikseret. Der var to mere almindelige celler på afdeling I med normale stole, senge mv. Der var et papstykke for ruden ind til disse celler, så vagterne ikke på samme måde som i de øvrige kunne kigge ind. Han fik lov at bo i en af disse celler i nogle måneder. Han havde ikke adgang til sine egne ting i den periode, hvor han var på afdeling I, bortset fra den periode, hvor han var i den normale celle. Han fik på et tidspunkt lov til at flytte på afdeling K, hvor han gik på arbejde uden problemer og havde almindeligt fællesskab.

Sikringsceller er indrettet med en seng på midten af gulvet med en gummimadras, mavebælte samt hånd- og fodremme. Der er et lille lokale tilknyttet, hvorfra personalet kan kigge ind fra, medens den indsatte ikke kan kigge ud. Der er fuldt belyst døgnet rundt. Når han var i sikringscelle blev varmen ikke reguleret som ønsket af ham. Han fik, hvis han var heldig, et tæppe lagt over sig. Nogle gange var han nøgen. Andre gange havde han underbukser og en t-shirt på. Han kunne ikke selv tage vand. Når han skulle spise, fik han nogle gange løsnet en arm. Han er også blevet madet. Han får det hurtigt mærkeligt af at være i en sikringscelle. Personalet syntes, det var »herre sjovt« at se, hvor langt de kunne presse ham.

På Vridsløselille havde han i 2000-2002 almindeligt fællesskab.

Da han kom retur til Herstedvester i august 2005 fik han at vide, at der kun var én betjent, han måtte henvende sig til. På en gårdtur var der en anden betjent, der henvendte sig til ham og var truende. Nogle dage efter blev han kaldt til forhør hos vagtmesteren [Navn]. Fængselsbetjentene havde »vendt den«, så det var ham, der havde været truende over for betjenten. Han forsøgte at forklare sig. En anden betjent sagde, at han efter forhøret skulle flytte til en observationscelle, som var uden fjernsyn og playstation, og hvor han ikke måtte ryge. Vagtmesteren forsikrede ham om, at han ikke ville blive flyttet. Vagtmesteren troede ikke på hans forklaring om, at det var betjenten, som havde truet. Han sagde, at han så selv måtte tage affære. Han kom ind på sin normale celle. Betjenten kom igen og sagde, at han skulle flytte. Det nægtede han. Betjenten sagde, at de ikke ville bære ham, men i stedet gasse ham. Han sagde, at det måtte de bare gøre. De tømte en hel patron tåregas ind til ham og herefter endnu en patron. Han vejede dengang kun 64-65 kg, og de kunne sagtens have båret ham. Han kom på en måde, som han ikke husker, ned på gulvet. Han hørte nogen råbe: »Få ham ud herfra,« og at det skulle være nu. Han besvimede igen og vågnede, medens han blev båret hen i sikringscellen. Han var der i 5 døgn, uden at blive vasket, få vand mv. Der står i rapporten, at der var i 2 døgn, men det var 5 døgn. Han fik bad og fik rent tøj, inden han kom op på

**3090**

Sikringsafdelingen på Nykøbing Sjælland. Det var dumt af ham at tage imod tilbuddet om bad mv., for personalet deroppe kunne dermed ikke se, hvor beskidt og sølle han var, efter at have ligget i sin egen urin i det tøj, han havde på, da han blev fikseret. Han måtte tisse ud af sengen, men det løb delvist tilbage. Urinen på gulvet blev heller ikke tørret op, så han lå i en ammoniakdunst.

På Politigården blev han første gang placeret i celle 20, som var en normal celle. Ellers har han alle gange siddet i celle 17, som var

med fastboltet seng, tilstoppet håndvask, og hvor malingen skallede af. Hver gang fik han samme dyne uden fyld. Det var løgn, når de sagde, at de ikke havde andre dyner. Han blev for et godt ord smidt i sikringscellen. De tævede ham på vejen derhen, i elevatoren og i cellen. En gang blev han blandt andet svinget ind i væggen på vej ind i sikringscellen og fik hjernerystelse. Han kom i sikringscelle, når han svarede igen eller råbte op. De bankede med skeer og gafler på celledøren og væggene. Han fik altid håndjern på, når han skulle på toilettet, selv om han var stille og rolig. De blev spændt så hårdt, at de var svære at få af. Nogle gange blev han efterladt i 1 - 1½ time på toilettet. Han kunne høre dem tale om, at det var sjovt at banke på væggene. Han talte stort set ikke med personalet på Københavns Fængsler, som var nogle »forbandede svin« i forhold til ham.

På Vridsløselille var han i 2001 i en kort periode i frivillig isolation for at komme ud af et heroinmisbrug. Han blev respekteret af de andre i fængslet for på denne måde selv at komme ud af misbruget. I de 6 år isolationen/rotationsordningen varede fra 2003-2009 havde han stort set ikke kontakt med andre indsatte. Dog havde han fællesskab med øvrige fanger i en ganske kort periode på Nyborg. Første gang han var på Vridsløselille efter rotationsordningen blev indført, havde han også fællesskab med gangmanden og med de andre, der var i isolation, i en periode på ca. 1½ måned. Det er fængselspræsterne, som har holdt ham i live. Han har enten besøgt dem på deres kontor, eller de er kommet i hans celle. Han fik ikke lov til at gå til gudstjeneste under isolationen. På Vridsløselille lavede inspektøren en særordning om antal egne stykker tøj m.fl. private ejendele, som han måtte have. De andre steder var der ikke den slags skriftlige regler. På afdeling I på Herstedvester måtte han heller ikke have sit tøj i den observationscelle, som var »normalt« indrettet, men derimod godt sin playstation og cigaretter. Når han skulle have rent tøj, måtte han bede om det.

I Østjylland var cellerne fint indrettet, så de ikke ligner fængselsceller, og der var eget bad til hver celle. Han var mest på afdeling E. Der var en gruppe fængselsbetjente, som forsøgte at skabe bedre forhold, og så en gruppe af »sadister«. På et tidspunkt var der én, der på et kamera havde set ham med en cigaret på værkstedet, og bad ham slukke den. Han gav efterfølgende en fuckfinger op til kameraet. Lige efter fyraften meddelte en betjent, at alle hans privilegier (kostpenge, adgang til arbejde mv.) var inddraget. I slutningen af afsoningen på Østjylland skulle han med som bisidder til et forhør med en god ven [Navn], som han tit var sammen med, når han havde fællesskab. [Navn] havde forsøgt at flygte. Der kom to vagtmestre med smørrede grin og hentede ham ind på [Navn]s celle. De var allerede gået i gang med forhøret, selvom han som bisidder skulle have været med fra starten. Han afbrød og bad vagtmesteren starte forfra. Det ignorerede vagtmesteren. [Navn] så søvnig ud, fordi han fik stærk psykofarmaka. [Navn] gik hen for at tage noget i køleskabet. Han så ikke andet, end at vagterne greb fat i [Navn]. Han så ikke noget til, at [Navn] skulle have slået ud efter en af dem. Han for selv op, men blev kastet omkuld på gulvet. Han hørte en af vagterne råbe: »Så do dog [Navn]«. Både han og [Navn] blev båret hen i hver sin sikringscelle. Han hørte en sygeplejerske råbe op og forstod, at de måtte genoplive [Navn]. Han havde fra starten fornemmet, at det var planlagt, at der skulle ske noget inde i [Navn]s celle. Han blev flyttet til Politigården og fik så mange bank på vejen, som aldrig før.

Efter at have været 4 måneder på Horsens, hvor han havde fuldt fællesskab med de indsatte på sygeafdelingen og med alle under gårdturene, blev han flyttet til Nyborg. Han havde i Horsens haft det fysisk dårligt nogle dage. Der kom en masse vagter ind og sagde, at han skulle flyttes til Nyborg. Han fulgte frivilligt med og blev i Nyborg anbragt i en særligt sikret celle med jernbeslag på

døren. Han fik udleveret en beskidt termokande og fik, da han bad om rengøringsmidler, en beskidt opvaskebørste. En dag, hvor han vaskede tøj, kunne han ikke få lov at hente tøjet i vaskemaskinen. Det endte med, at hans våde tøj blev smidt et andet sted hen. Han blev efter et stykke tid så bange for vagterne, at han ikke turde gå ud på gangen.

*B* har forklaret blandt andet, at han er ansat i Københavns Fængsler som områdeleder på Vestre Fængsel. Han har tidligere været fængselsbetjent på Anstalten ved Herstedvester fra 1989-2006. Han var fast på afdeling I og fungerede desuden som vagthavende VK1. Han mødte A i fængslet. Hans generelle indtryk var, at A ikke brød sig om det uniformerede personale og følte sig uretfærdigt behandlet.

Forevist rapport om sikringscelle fra den 19. august 2005 kl. 13:05 om blandt andet brug af gas forklarede vidnet, at celle I5 er en observationscelle. Den er indrettet med fastmonteret seng, bord m.v. Celle I6 var en celle, som var indrettet mere normalt med fjernsyn, playstation mv. Det var aftalt med A, at han kunne bo i den sidstnævnte celle, når han overholdt rammerne for

**3091**

fængselsopholdet. Der var et skab på den anden side af gangen, hvor han kunne have sine øvrige ting. Der var indgået en aftale, som var godkendt af ledelsen/psykiaterne, med A om, hvad han skulle overholde for at kunne bo på I6, blandt andet om opførsel i forhold til personalet, medicinindtag, hygiejne mv. Reglen var, at hvis han ikke overholdt disse rammer, ville han komme i egentlig observationscelle (celle I5). I alle observationsceller er der vindue, så man kan se ind i cellen. Begge celler var indrettet på denne måde. Celle I7 er en sikringscelle, hvor man i overensstemmelse med lovgivningens regler placerer voldsomme udadreagerende fanger. Der er linoleumsgulv, en seng midt på gulvet samt mavebælte, fodremme, håndremme og handsker. På blandt andet Københavns Fængsler kan man godt blive placeret i en sikringscelle uden at være fikseret. Det er også forekommet i sikringscelle I7 på Herstedvester. Det var ham, der var indsatsleder den 19. august 2005, og som den eneste måtte lægge gas ind. Han var dengang fængselsbetjent og ikke områdeleder. Når han optræder som områdeleder i sikringscellerapporten, skyldes det, at systemet automatisk indsætter den nuværende titel. Han blev involveret, fordi han var vagthavende den dag. Han blev ringet op af personalet, som oplyste, at de skulle flytte A, fordi han havde truet en af vagterne. De skulle muligvis bruge gas. Han sagde, at det kom an på en konkret vurdering, om han kunne tillade brug af gas. Det fremgår af rapporten, hvad der skete. Han kom op på afdelingen. Han sagde, at han ikke ville bruge gas, hvis A kunne overtales til frivilligt at flytte celle. Der var en dialog med A, hvor der blev henvist til aftalen om rammerne for hans afsoning og sagt, at A skulle flytte fra I6 til I5 på grund af truslen. A ville ikke flytte. Der blev lagt op til, at hvis A ville flytte frivilligt, ville det være godt, og hvis ikke, ville de bruge magt. Han sagde til A, at hvis ikke han ville flytte godvilligt, ville de bruge gas. A meddelte, at det ville han »skide på«, og at de ville blive meldt til politiet. Så brugte de gas. A sad stille og roligt på sin seng. Han fokuserede vist på ikke at trække vejret for dybt. Han var meget labil modtagelig for gassen. Der blev lagt yderligere gas ind ret kort tid efter den første patron (ét par minutter). Til sidst vurderede han, at det ikke var forsvarligt at lægge mere gas ind, også fordi A muligvis var psykotisk, og i hvert fald ikke reagerede på gassen. Han besluttede, at de i stedet måtte tage ham ud på anden vis. De tog indsatsudstyr med bl.a. gasmasker, for de kunne sagtens selv mærke gassen. A sad på sengen og hostede og spyttede, så han kunne også godt mærke det. Formentlig var hans modstandskraft også nedsat. Det er ikke rigtigt, at A var besvimet. Det gjorde han ikke på noget tidspunkt. De gik ind med skjolde mv. A blev anbragt

i sikringscellen, fordi man nu var oppe i et niveau af magtanvendelse, hvor man normalt ville benytte sikringscelle. Der foretages selvfølgelig hver gang en individuel vurdering. Beslutningen om sikringscelleanbringelse var begrundet i situationens alvor og det almindelige kendskab til A, som ofte før havde været truende og voldelig, og som havde haft mange tidligere sikringscelleanbringelser, også i tilfælde hvor situationen havde været mindre alvorlig. Han mener, at han forlod stedet, da A var fikseret. Den gas, der blev brugt, var tåregas, som også bruges af forsvaret og af politiet til store demonstrationer. Det er den eneste gang, han har været med til at bruge gas, i den tid han var fæstet på Herstedvester. Man bruger det for at modvirke en truende situation. De gik ikke bare ind og tog A med magt, fordi de vurderede, at det var mindre indgribende for både A og personalet end alternativet, som efter erfaringerne med A efter alt at dømme ville være, at der skulle 4-6 mand ind med stave. Det ville således have været mere indgribende at bruge fysisk magt for at få ham ud af cellen.

*Overvagtmester C* har forklaret blandt andet, at han var ansat som souschef for områdelederen på Københavns Fængsler, da A blev anbragt i sikringscelle på Københavns Fængsler den 22. januar 2009 kl. 19:30, jf. den fremlagte rapport. Der kan i en sikringscelle anvendes fiksering, men det kan også undlades. Han var ikke fysisk til stede, medens A var fikseret. Hans opgave var at foretage en ledelsesmæssig vurdering af berettigelsen af indgrebet. Han har tilføjet de ledelsesmæssige bemærkninger i rapporten. Det er, som det fremgår af rapporten, først sket den 28. maj 2009. Bemærkningerne er tilføjet på grundlag af de notater, der var i sagen, om baggrunden for indgrebet, dokumenteret uden opholdet mv. Han var ikke fysisk til stede, da A kom til fængslet eller i forbindelse med sikringscelleanbringelsen. Når det kan forsvares, at indgrebet havde en varighed, der som anført i hans bemærkninger under normale omstændigheder ville have været »alt for lang«, hænger det sammen med det forudgående kendskab til A. A var »svær at læse«. Det var erfaret fra mange situationer, at han var voldelig, at det kom meget spontant, og at han kunne være i en voldsom og udadreagerende tilstand i meget lang tid. Normalt falder de fleste ned efter et par timer, men erfaringen var, at det tog meget længere tid med A, og at det krævede, at man kom ind og fik en dialog med ham. Man skulle kunne tale med ham, før man kunne lukke ham ud. Grundlaget for indsættelsen var en meget voldsom episode i Østjylland, og den illustrerer udmærket, at situationerne med A typisk varede ved meget længe.

Hans holdning har hele forløbet igennem været, at A ville have glæde af noget medicinsk hjælp. Det er godt, at det øjensynlig er sket, og at det hjælper.

*Fængselsbetjent D* har forklaret blandt andet, at han er ansat ved Københavns Fængsler og gør tjeneste på

**3092**

Politigårdens Fængsel. Det gjorde han også i 2007. Han kan godt huske A, selvom det er mange år siden, han sidst har set ham. A sad som regel i celle I7 på Politigårdens Fængsel. Dengang var den indrettet som de øvrige celler med seng, bord, skab, køleskab og en hylde samt håndvask. Han er i tvivl, men husker det sådan, at der ikke var fællesskab mellem A og øvrige indsatte. Der er mulighed for gårdtur og besøg på fængslet. Der kan bestilles bøger fra biblioteket på Vestre Fængsel. Der er ikke andre muligheder for aktiviteter. Han har haft kontakt til A, navnlig om at få ham til at lade være med at råbe og sparke på dørene. Indimellem endte det med, at A kom i observationscelle eller sikringscelle. Han husker ikke de specifikke episoder længere. Det var i reglen forårsaget af udfald i form af skub mod personalet. Han mindes ikke at have været med til at placere A i strafcelle.

Copyright © 2023 Karnov Group Denmark A/S

Når en indsat skal i observationscelle afklædes de deres eget tøj og iklædes særligt tøj. I sikringscelle får man som hovedregel lov at beholde sit eget undertøj. Den indsatte får et tæppe over sig, hvis den pågældende ønsker det.

Forevist rapport om sikringscellenbringelse fra den 15. august 2008 kl. 21:15, forklarede det fremgår, at han har truffet afgørelsen om indsættelse i sikringscelle, forklarede vidnet, at han ikke i dag kan huske forløbet. Det er en fælles beslutning at sætte en indsat i sikringscelle. Når han står som beslutningstager, skyldes det, at han har skrevet rapporten. Han har været med til at træffe beslutningen og til gennemførelse af indgrebet. Hvis en indsat råber op, kan det føre til en indsættelse i observationscelle. Det skyldes hensynet til at sikre ro og orden i fængslet. Indsættelsen i observationscelle sker for at undgå, at situationen eskalerer ved, at andre tilslutter sig råberiet mv. Når en indsat som A truer eller gør voldelig modstand, kan det, som det skete her, føre til en placering i sikringscelle, hvor der er konstant opsyn. I en observationscelle er der kun tilsyn hver halve time.

Efter hans personlige opfattelse og med det forbehold, at han ikke er læge, var A ikke egnet til at sidde i almindeligt fængsel. Han var paranoid og hørte stemmer. Han var meget letantændelig og begyndte for eksempel at råbe op, fordi han mente, at fængselsbetjentene grinede af ham og talte om ham inde på vagtstuen.

Ved indsættelse i sikringscelle bruger man nogle gange en plastikkolbe, hvis den indsatte skal tisse. Den pågældende får hånden løsnet. Hvis den indsatte er opførende, og der er risiko for vold, kan man nægte den pågældende kolben. Hvis den indsatte skal lave »stort«, vil man nogle gange kunne tage den indsatte på toilettet, da de fleste forholder sig roligt i den situation. Ofte foregår toiletbesøg i forbindelse med, at den indsatte bliver løsnet. I observationsceller kan den indsatte komme på toilettet. Under sikringscellenbringelse vil den daglige leder normalt komme ned og tale med den indsatte om, hvordan det går. Fængselspersonalet kan selv træffe afgørelse om indsættelse og udtagelse af sikringscelle. Der skal gives en orientering til en overordnet. Af rapporten om sikringscellenbringelse den 15. august 2008 kl. 21:15 er under »magtanvendelse« blandt andet anført: »Holdt hoved så indsatte ikke slog hoved . . .«. Dette drejer sig formentlig om, at man har villet undgå, at A slog hovedet ind i væggen. At A, som det også fremgår af rapporten, spyttede og bed personalet, var en meget sædvanlig adfærd fra A's side.

*Vicefængselsinspektør E* har forklaret blandt andet, at han været vicefængselsinspektør fra 1993 på Horsens Statsfængsel og efterfølgende på Østjyllands Statsfængsel. De er to vicefængselsinspektører. Han har ansvar for juridiske forhold, herunder legalitetskontrol med overholdelsen af straffuldbyrdelsesloven og tilhørende forskrifter, og har det overordnede ansvar for de indsatte. Han har skrevet svaret fra Østjyllands Fængsel af 21. februar 2014 på Kammeradvokatens spørgsmål.

Afdeling E i Østjyllands Fængsel og tidligere Horsens Statsfængsel er en sikret afdeling. Der er 36 pladser til »negative stærke fanger« og 12 yderligere pladser på et særligt sikret afsnit. Det særligt sikrede afsnit rummer en meget blandet gruppe af særligt flugttruede eller særligt voldelige indsatte og indsatte, som har et særligt beskyttelsesbehov. Der er en høj grad af sikkerhed med intensiv overvågning. Der er 12 pladser fordelt på 2 sektioner med 6 pladser på hver. A sad på dette afsnit, fordi han i perioder var meget voldelig og meget svær at håndtere for personalet. Der var behov for faste og sikre rammer.

Der skal for alle indsatte laves handleplaner, der beskriver, hvordan afsoningen skal ske, og hvad planerne er for den pågældende, jf. straffuldbyrdelseslovens § 31. De udarbejdes under medvirken af den indsatte og det personale, der har med den indsatte at gøre,

herunder socialrådgiver, sygeplejersker mv. Der var også lavet en plan for A's afsoning, og den blev som krævet i loven jævnligt revideret. Det var svært at lave handleplaner for A. På grund af hans temmeligt turbulente afsoning var det vanskeligt at håndtere andet end »lige her og nu«. Planerne drejede sig mest om at tilrettelægge en fornuftig dagligdag for ham, blandt andet om, hvor meget man kunne tage ham ud af cellen, og hvem af de øvrige indsatte han kunne være sammen med o.lign.

Han har ikke haft personlig kontakt med A, men har været med til blandt andet fælles møder om de forvaringsdømte med direktoratet. Hans samlede indtryk var, at A var meget svingende. Der kunne være perioder, hvor det fungerede meget godt, og så kunne han pludselig eksplodere. Når det skete, måtte han flyttes til et

**3093**

andet afsnit, i sikringscelle eller til et andet fængsel. A var på Østjyllands Statsfængsel i ca. 1 år fra 2007. Baggrunden for rotationsordningen var, at der ikke var nogen, som ønskede at have ham siddende. Både i Horsens og Østjylland havde man ham siddende i længere perioder end de 3 måneder, der fulgte af rotationsordningen. Hvis det gik godt, lod de ham blive siddende. Det endte dog i reglen med, at der kom en voldsudbrud, der gjorde, at han måtte flyttes. De fleste flytninger var begrundet i konkrete voldsepisoder og ikke i rotationsordningen. Der er i kriminalforsorgen fuldstændig fast praksis for, at en indsat, som begår et voldsforhold af en vis grovhed over for personalet, skal flyttes til et andet fængsel. Denne praksis er dels begrundet i et hensyn til personalet, der er blevet overfaldet, og som ikke skal møde gerningsmanden straks efter overfaldet, dels i hensyn til den indsatte. Med flytningen undgås risikoen for myter om og mistanke om hævnønsker hos personalet. Han har ikke tidligere oplevet tilsvarende formaliserede rotationsordninger. Han ved ikke, om A er blevet oplyst om, at rotationsordningen ikke blev fulgt. Der har ikke været tale om nogen særligt formaliseret beslutning. Man har kigget på hinanden og sagt: »Det går meget godt«, og så undladt at flytte ham.

I de tilfælde, hvor A er overført fra en sikringscelle i Østjyllands Statsfængsel til et andet fængsel, er overførslen typisk sket til Politigårdens Fængsel, hvor man på samme måde som Østjyllands Statsfængsel har en særlig høj grad af sikkerhed.

Under afsoningen har man, jf. punkt 4 i hans svar på Kammeradvokatens spørgsmål, fra personalets side været særligt opmærksomme på A og prøvet at holde en kontakt med ham i det omfang, det har været muligt. Det er også sådan, man normalt agerer i forhold til de øvrige ansatte på det særlige afsnit. A havde i et vist omfang fællesskab med andre indsatte på det pågældende 12-mandsafsnit. Udgangspunktet er, at de 12 indsatte på det særligt sikrede afsnit har fællesskab. Forudsætningen for fællesskab er imidlertid, at én af de øvrige indsatte ønsker det. Han oplevede en del gange, at de andre indsatte meldte fra i forhold til kontakt med A.

Der er ca. 30 medarbejdere knyttet til den sikrede afdeling E.

Det, som han i svaret til Kammeradvokaten har beskrevet om et særligt system for A, kom i stand, efter personalet havde været på et studiebesøg på Sikringsafdelingen i Nykøbing Sjælland. De blev der inspireret til at etablere en ordning, der sikrede, at alle medarbejdere var klar over, hvad der var sagt til og aftalt med A og besluttet vedrørende ham af andre medarbejdere. Man kunne for eksempel aftale med ham, at hvis han respekterede nærmere aftalte rammer, kunne han få yderligere frihed. I A's tilfælde blev der - som det generelt gælder - på et møde en gang om ugen foretaget en gennemgang af hans sag af personalet på afsnittet. Gennemgangen sker med henblik på at vurdere, om der er grundlag for at løsne eller stramme på den pågældendes afsoningsforhold. Der vil ud over personalet på afdelingen typisk også deltage en socialrådgiver og en jurist, typisk en fængselsfuldmægtig.

På det særligt sikrede afsnit kan man se fjernsyn. Der er mulighed for efter aftale med personalet at benytte en særlig gymnastiksal, f.eks. sådan at to indsatte kan spille bold. Der er desuden adgang til aviser, lån af bøger og mulighed for gårdtur. De indsatte på afsnittet har mulighed for at udføre gangmandsarbejde (rengøring mv.) og montagearbejde (typisk pakkearbejde for eksterne firmaer). A var kun kortvarigt i arbejde og udelukkende ad deltid. Det havde mest karakter af terapi. A's kontakt med de andre indsatte har været sporadisk og svingende og har som nævnt beroet på de øvrige indsatte. Erfaringen har været, at en del har sagt nej eller er bakket ud af det efter et stykke tid. Det har, som det gælder alle indsatte på afsnittet, været én til én fællesskab. Der er ikke almindeligt fællesskab på afsnittet.

Forevist rapport om sikringscelleanbringelse den 16. april 2008 kl. 18:35 forklarede vidnet, at når en indsat, som tilfældet var her, får en skade under fikseringen, gennemlæser han normalt materialet i sagen og taler med personalet. Det mener han også, at han har gjort i denne sag. Han mener ikke, at han har talt med A om den konkrete anbringelse. Der er ikke en fast procedure, hvorefter en indsat, der er kommet til skade i forbindelse med indsættelse i sikringscelle, høres. Den pågældende vil altid i forbindelse med indsættelsen i sikringscelle blive tilset af en læge. Desuden er der altid på afdelingen en efterfølgende snak med den indsatte om episoden. Hvis der kommer en klage over indgrebet fra den indsatte, høres den pågældende i den forbindelse. Hvis der afholdes forhør i anledning af mulige sanktioner over for den indsatte, bliver den pågældende også altid hørt.

Når der i rapport om udelukkelse fra fællesskab i perioden fra den 21. april 2008 kl. 12:10 samt rapport om sikringscelleanbringelse den 16. april 2008 kl. 18:35 er et notat om fjernelse af et tæppe fra A's ansigt, hænger det sammen med, at man ved indsættelse i sikringscelle altid vil forlange at kunne se den indsattes ansigt. Betjentene skal således kunne se, om den pågældende trækker vejret. I yderste konsekvens kan det ende med, at man må tage tæppet fra den indsatte. Han har dog aldrig hørt om tilfælde, hvor det er sket. Man vil normalt dæmpe lyset om natten. Der kan være tilfælde, hvor man på grund af situationen er nødt til at have mere lys på.

Strafcelle er ligesom bøde og advarsel en sanktion, hvorimod anbringelse i observationscelle og sikringscelle er en sikkerhedsmæssigt begrundet forebyggende foranstaltning.

**3094**

*F* har forklaret blandt andet, at han er områdeleder på Københavns Fængsler på et andet område end i 2006-2007. Dengang var han på Politigårdens Fængsel først som konstitueret og siden som udnævnt afdelingsleder. Han skiftede ansættelsessted i marts 2008. Han har som afdelingsleder været overordnet ansvarlig for A, når han har været på Politigårdens Fængsel, og har herunder haft en del samtaler med ham. A har i flere af de perioder, hvor han har været på fængslet, været i kategori 1 »negativ stærk indsat«. Politigårdens Fængsel er beregnet til de indsatte, som er »gået langt over stregen« på andre fængsler. Kategoriseringen ligger ofte i den anmodning, man får fra det overflyttende fængsel, og i baggrunden for overførslen. Politigårdens Fængsel blev genåbnet med henblik på at placere stærke, uhåndterbare fanger fra alle landets institutioner. Der placeres både varetægtsarrestanter og afsonere på Politigårdens Fængsel.

A har utvivlsomt siddet på 4. sal, som er for »de tungeste« indsatte, der skal sidde tæt på personalet, men han husker ikke konkret, hvor A var placeret. Han husker ikke, om A havde fællesskab med de øvrige indsatte. Det beror på, om man kan finde en »fællesskabsmakker«. Udgangspunktet er, at man har parvist fællesskab. Det kan forekomme, at man ikke kan finde en makker, herunder én som er villig til at have fællesskab med den, der søges makker til. Der

kan godt gå 1-2 uger før, man får fundet en løsning, når der overføres en ny indsat.

A var meget uligevægtig. Efter hans opfattelse var A »sindsygt utilregnelig«. Han er en af de få indsatte, hvor vidnet har været grundlæggende usikker på, hvad den indsatte ville gøre i næste øjeblik. Han har aldrig oplevet en indsat, som har truet ham så mange gange med at slå ham ihjel. A er blevet sat i observationscelle og sikringscelle på grund af vold og trusler. Når der skete sådanne anbringelser, skulle han tale med A. Han er ofte blevet skældt ud og truet både under sådanne indsættelser, og når A har været i sin egen celle. Forevist rapport om sikringscelleanbringelse fra den 28. juli 2006 kl. 19:55 forklarede vidnet, at dette er et typisk eksempel på en anbringelse af A i sikringscelle. Når der vælges sikringscelle, er det en sikkerhedsmæssigt begrundet foranstaltning for at »slutte en situation«. Om der derudover er idømt strafcelle efterfølgende, kan han ikke sige. Man kan ikke overhøre så alvorlige trusler og navnlig ikke fra en indsat med A's historik. Man prøver som udgangspunkt den mildeste placering - det vil sige observationscelle. I A's tilfælde endte det ofte med en sikringscelleanbringelse i stedet for observationscelle, fordi han nærmest uundgåeligt gik helt amok, når man bad ham om at gå fra A til B.

Ifølge de gældende generelle retningslinjer skal enhver fange, som indsættes i sikringscelle, visiteres. Det sker navnlig for at undgå mulighed for selvbeskadigelse med f.eks. et medbragt barberblad. Når man i enkelte tilfælde undlader visitation, sker det ud fra en konkret vurdering om, at visitation vil eskalere en i forvejen meget opkørt situation yderligere. Alle indsatte på Københavns Fængsler bliver jævnligt visiteret - ca. 1-2 gange om måneden. Visitation forekommer noget hyppigere på Politigårdens Fængsel måske 1-2 gange yderligere pr. måned. Normalt fratages den indsatte sit eget tøj og ligger nøgen med et tæppe over sig i sikringscellen. Eventuelt kan den pågældende få noget af fængslets undertøj på, men ofte vil fangen være for voldsom til, at man forsøger at give den pågældende undertøj på. En sikringscelleanbringelse som den, der skete fra den 28. juli 2006 kl. 19:55 på 1 døgn, 14 timer og 40 minutter, er lang set i forhold til den gennemsnitlige varighed. Det er ikke hans professionelle opfattelse, at A har haft længere anbringelser end nødvendigt. Selvom A kunne ligge roligt og sove, således som det også ses i denne rapport, betød historikken, at man var nødt til at lade ham blive længere i sikringscellen. Det hænger sammen med det, han tidligere har sagt om, at A var »stærkt utilregnelig«. Han kunne gå fra at være helt rolig til inden for et splitsekund at være vildt truende. Man var simpelthen bange for, at han ville udøve vold. Det at A lå roligt en halv time, var således ikke nok til at vide sig sikker på, at han var faldet til ro. Efter hans opfattelse skulle man have en samtale, hvor der ikke var trusler fra A's side, før man kunne lukke ham ud af sikringscellen. Han ville henset til situationen med sikringscelle og fiksering mv. ikke kræve, at A var »helt nede« under en sådan samtale, men han skulle ikke true. Den ansvarlige leder (vidnet) skal om muligt kontaktes af fængselsbetjentene, før der sker indsættelse i sikringscelle. Det vil dog ofte ikke være muligt i situationen, men så skal den pågældende kontaktes snarest muligt efter anbringelsen. Det vil typisk også være den overordnede, som - eventuelt efter telefonisk kontakt - beslutter, at den indsatte skal udtages af sikringscellen. Normalt vil han selv komme til stede i sikringscellen for at vurdere den indsatte.

Forevist rapport om sikringscelleanbringelse den 4. juli 2008 fra kl. 10:15 forklarede vidnet, at han ikke selv var til stede, men har hørt om den pågældende sag, hvor der var sket et voldsomt overfald på en fængselsbetjent i Statsfængslet i Østjylland. Der var ikke tvivl om, at A skulle flyttes efter et sådant overfald. Transporten må have forløbet sådan, at man skønnede, at han skulle anbringes

i sikringscelle ved ankomsten til Politigårdens Fængsel. Man kan se af rapporten, at han blev båret ind fra bilen.

Forevist rapport om sikringscelleanbringelse den 20. december 2006 fra kl. 14:55 forklarede vidnet, at der med den dagældende indretning på fængslet godt kunne smadres vinduer i cellerne.

### 3095

*Overlæge G* har forklaret blandet andet, at hun blev færdiguddannet som psykiater i 1992. Hun blev ansat på Anstalten ved Herstedvester som overlæge den 1. april 2004 på en afdeling for de mest psykisk syge indsatte og på kvindeafdelingen. I den tid, hun har været der, har de været 5 psykiatere og ca. 10 psykologer. De indsatte på afdelingen for psykisk syge er indsatte med særlige problemer, der har svært ved at være på en normal afdeling. På afdelingen har der også været indsatte, som er egentligt sindssyge. Hun går aldrig ind til en indsat på den pågældende afdeling, hvor A også sad, uden at der står betjente uden for døren. Afdelingen er delt i to. På det ene afsnit er fri adgang mellem cellerne i dagtimerne. På det andet afsnit er de indsatte placeret i observationsceller (enceller). I modsætning til andre fængsler anvendes observationsceller sådan, at den indsatte kan være ude i fællesskab med andre indsatte nogle timer hver dag.

A ville ikke tale med hende eller hendes kolleger. Fængselsbetjentene kunne heller ikke tale med ham og var meget bange for ham, fordi han var så truende og voldelig. Det var klart, at A ikke havde det godt. Det gav hun også udtryk for, men det var ikke muligt at tale med ham. De symptomer, som A havde i form af at høre stemmer mv., gav anledning til en række overvejelser hos hende. Hun var ikke sikker på diagnosen, men noget skulle gøres. De tilbød antipsykotisk medicin som det mest nærliggende. Det afslog han. I teorien kan man tvangsmedicinere på Herstedvester. I praksis kan det ikke lade sig gøre, fordi regelsættet kræver, at der skal være en døgnbemanding af læger for at tvangsmedicinere. A kunne ikke placeres på en almindelig lukket retspsykiatrisk afdeling, hvor tvangsmedicinering ville være mulig, fordi han var så farlig. Det var ikke muligt at gøre noget ved den meget fastlåste situation. Det førte til hendes anmodning af 3. juni 2004 til Justitsministeriet om anbringelse af ham på Sikringsafdelingen i Nykøbing Sjælland i henhold til et farlighedsdekret efter psykiatrilovens § 40.

Forevist rapport om anbringelse i observationscelle fra den 18. maj 2004 kl. 15:10 til 27. august 2004 kl. 11:45 forklarede vidnet, at hun jævnligt var nede og se til A under de ca. 3 måneders anbringelse. Hun var ikke involveret i beslutningen om at anbringelsen og udstrækningen. Han blev ved med at være truende, og derfor var det ikke muligt at få ham ud af cellen. Om notatet den 27. august kl. 17:44 om, at han under et besøg af hende blev mere og mere højtråbende, hvorefter hun »bakkede ud«, forklarede vidnet, at hun måtte gå ud, da det ikke var muligt at få nogen kontakt med ham.

Hendes anmodning til Justitsministeriet og Rigsadvokaten af 23. august 2005 om fornyet mentalobservation af A var, som det fremgår af brevet, begrundet i en betydelig forværring af A's tilstand. Der var også en ny straffesag i gang. Hun ville gerne hjælpe A, men de kunne ikke hjælpe ham i fængselsvæsenet. Der var behov for en helt anden omsorg for A end den, der kunne gives i et fængsel. Der er slet ikke samme normering på Anstalten ved Herstedvester som på en psykiatrisk afdeling. Desuden ville man kunne tvangsmedicinere på en psykiatrisk afdeling. Hun mente, at han skulle på Sikringsafdelingen. Formålet med den nye henvendelse var at få en ny mentalerklæring tilvejebragt. Når burde den udfærdiges på Sikringsafdelingen, var årsagen, at A var overordentlig farlig. Han kunne hverken i 2004 eller 2005 undersøges på en almindelig psykiatrisk afdeling. A havde ikke sædvanlige sindssygelige symptomer, men han havde en så aparte adfærd, at hun mente,

at der var grundlag for at foretage en grundig observation med henblik på at fastslå, om han nu var sindssyg.

*Læge H* har forklaret blandet andet, at han i dag har sin egen lægepraksis. I 2007 var han ansat i Københavns Fængsler. Det betød, at han havde tilsyn med indsatte i alle fængslerne i København. Han var ikke huske, at han har tilset A, men kan genkende hans ansigt. Når der skete en sikringscelleanbringelse, fik han en oplysning om anbringelsen af personalet og skulle herefter foretage tilsyn. Hvornår under hans vagt, det skete, afhang af, om der blev oplyst om akutte forhold, der gjorde det nødvendigt at foretage tilsynet straks. Tilsynet skulle således foretages med det samme, hvis noget tydede på, at den indsatte var psykotisk, eller der var oplysning om et behandlingsbehov. I reglen fik han ikke blot en mundtlig orientering, men også en rapport om baggrunden for indgrebet. Han plejede først at læse rapporten og herefter tale med personalet, før han gik ind til den anbragte. Han foretrak normalt at gå ind alene, men hvis der var fare forbundet hermed, havde han en fængselsbetjent med. Han undersøgte primært den indsattes fysiske tilstand. Først og fremmest så han efter, om den pågældende var spændt for hårdt fast eller dehydreret, og om den pågældende var i en sindssygelig tilstand. Hvis den indsatte klagede over smerter, eller der efter de oplysninger, han havde fået, var grundlag herfor, så han efter skader.

Forevist rapport om anbringelse i sikringscelle fra den 30. juli 2008 kl. 12:15 med notater om tilsyn foretaget af ham den 30. kl. 23:00 og 31. juli 2008 kl. 13:00 forklarede vidnet, at han ikke husker tilsynet. Det afhang af den konkrete situation, hvornår en indsat, som nægtede at indtage væske, er dehydreret. Hvis en indsat, som nægtede at indtage væske, på tredjedagen virkede sløv, var det hans og overlægens holdning, at man måtte forsøge at imødekomme nogle af den indsattes ønsker for at få vedkommende til at drikke. Han havde ikke kompetence til at sige, at den indsatte skulle ud af sikringscellen, men kunne rådgive herom. Han kunne indlægge en indsat, som han skønnede sindssyg.

### 3096

Forevist rapport om anbringelse i sikringscelle fra den 15. august 2008 kl. 21:15 med notater om tilsyn foretaget af ham den 15. august 2008 kl. 21:30 forklarede vidnet, at hans anbefaling om tilbageflytning af A som følge af manglende »pædagogisk effekt« skyldtes, at han efter en tidligere sikringscelleanbringelse havde talt med overlægen om, at den enkleste måde at få A til at drikke mv., ville være at få ham tilbage til hans egen celle. Hans og overlægens anbefalinger var rent lægelige. Det var op til fængselsfunktionærerne og ledelsen i fængslet, om de lægelige anbefalinger skulle følges.

*Procedure*

A har procederet i overensstemmelse med de overordnede anbringender, der fremgår af hans påstandsdokument af 14. marts 2014, hvorefter det gøres gældende:

». . . at sagsøgeren har været udsat for:

- uberettigede overførsler mellem institutioner under kriminalforsorgen,

- uberettiget brug af udelukkelse fra fællesskabet,

- uberettiget brug af anbringelse i observationsceller,

- uberettiget brug af anbringelse i sikringsceller,

- . . .

- uberettiget magtanvendelse fra fængselspersonalet

- og at sagsøgtes undersøgelser af sagsøgers klager over ovennævnte indgreb ikke opfylder den processuelle del af EMRK artikel 3.

*Overførsler mellem institutioner under kriminalforsorgen*

Det gøres gældende, at de 22 ufrivillige overførsler mellem forskellige fængsler i perioden fra 10. juli 2003 til 12. juli 2007 enten selvstændigt eller sammenholdt med de øvrige indgreb, som

sagsøgeren har været udsat for under afsoningen, strider mod sagsøgers rettigheder efter EMRK artikel 3.

Sagsøger gør gældende, at det er sagsøgte, som skal bevise, at hver enkelt af de 22 ufrivillige overførsler har været berettiget.

Det er sagsøgers opfattelse, at sagsøgte ikke har ført bevis for, at nogen af de 22 ufrivillige overførsler har været berettiget.

Under henvisning til retsbøger af 7. januar og 22. maj 2013 kan det oplyses, at det er sagsøgers opfattelse, at der er enighed mellem parterne om, at der har været tale om 22 ufrivillige overførsler mellem forskellige fængsler af sagsøger i den omhandlede periode.

*Udelukkelse fra fællesskab*

Sagsøger gør gældende, at han i perioden fra 10. december 2002 og frem til 26. maj 2009 har været udelukket fra fællesskab i en periode på 6 år og 35 dage.

Til støtte for sagsøgers påstand er fremlagt sagens bilag . . ., hvor sagsøgte Justitsministeriet, Direktoratet for Kriminalforsorgen, oplyser, at sagsøger i tiden fra 10. december 2002 til 30. oktober 2006 kun har haft almindeligt fællesskab i cirka 4 måneder og 20 dage. I denne periode er der således tale om udelukkelse fra fællesskab sammenlagt i cirka 3 år og 6 måneder. For så vidt angår perioden fra oktober 2006 til den 26. maj 2009 gøres det gældende, at sagsøger konstant har cirkuleret mellem særligt sikrede afdelinger henholdsvis i Statsfængslet Vridsløselille, Statsfængslet Østjylland og Statsfængslet Nyborg, hvor han i ingen af tilfældene har haft almindeligt fællesskab med andre indsatte.

Det gøres gældende, at udelukkelserne fra fællesskab hverken opfylder betingelserne i § 33a eller § 63 i straffuldbyrdelsesloven. Endvidere gøres det gældende, at udelukkelserne enten selvstændigt eller sammenholdt med de øvrige indgreb, som sagsøgeren har været udsat for under afsoningen, strider mod sagsøgers rettigheder efter EMRK artikel 3.

Sagsøger gør gældende, at sagsøgte har bevisbyrden for, at det i hvert enkelt tilfælde, hvor sagsøger har været udelukket fra fællesskab, har været berettiget at udelukke denne fra fællesskab, og at længden af udelukkelsen fra fællesskab har været berettiget. Sagsøger gør også gældende, at sagsøgte har løftet bevisbyrden for, at nogle af udelukkelserne fra fællesskab har været berettiget hverken med hensyn til grundlaget for udelukkelserne fra fællesskab eller med hensyn til den tidsmæssige udstrækning af de enkelte udelukkelser fra fællesskab.

Under henvisning til retsbøger af 7. januar og 22. maj 2013 kan det oplyses, at det er sagsøgers opfattelse, at der er uenighed mellem parterne med hensyn til omfanget af udelukkelse fra fællesskab, idet sagsøgte, således som sagsøger forstår det, gør gældende, at sagsøger alene har været udelukket fra fællesskabet i det omfang, som er beskrevet i bilag AO-1-1 til bilag AO-1-29.

*Anbringelse i observationscelle*

Sagsøger har været anbragt i observationscelle ikke under 33 gange. Opholdenes samlede varighed har sagsøger opgjort til 301 dage, 14 timer og 51 minutter.

Det gøres gældende, at de 33 ophold i observationscelle ikke opfylder betingelserne herfor i national ret. Endvidere gøres det gældende, at anbringelserne enten selvstændigt eller sammenholdt med de øvrige indgreb, som sagsøgeren har været udsat for under afsoningen, strider mod sagsøgers rettigheder efter EMRK artikel 3.

Sagsøger gør gældende, at det er sagsøgte, som skal bevise, at hver enkelt af de 33 ophold i observationscelle har været berettiget både med hensyn til anbringelsesgrundlaget og med hensyn til opholdenes tidsmæssige udstrækning.

Det er sagsøgers opfattelse, at sagsøgte ikke har ført bevis for, at nogen af indgrebene har været berettiget hverken med hensyn til anbringelsesgrundlaget eller den tidsmæssige udstrækning.

Under henvisning til retsbøger af 7. januar og 22. maj 2013 kan det oplyses, at det er sagsøgers opfattelse, at der er enighed mellem parterne om, at der har været

**3097**

tale om 33 ophold i observationscelle, og at opholdene til sammen har den længde, som er anført ovenfor.

*Anbringelse i sikringscelle*

Sagsøger har været anbragt i sikringscelle 37 gange. Opholdenes samlede varighed har sagsøger opgjort til 42 døgn, 8 timer og 37 minutter.

Det gøres gældende, at de 37 ophold i sikringscelle ikke opfylder betingelserne i straffuldbyrdelseslovens § 66. Endvidere gøres det gældende, at anbringelserne enten selvstændigt eller sammenholdt med de øvrige indgreb, som sagsøgeren har været udsat for under afsoningen, strider mod sagsøgers rettigheder efter EMRK artikel 3.

Sagsøger gør gældende, at det er sagsøgte, som skal bevise, at hver enkelt af de 37 ophold i sikringscelle har været berettiget både med hensyn til anbringelsesgrundlaget og med hensyn til opholdenes tidsmæssige udstrækning.

Det er sagsøgers opfattelse, at sagsøgte ikke har ført bevis for, at nogen af indgrebene har været berettiget hverken med hensyn til anbringelsesgrundlaget eller den tidsmæssige udstrækning.

Under henvisning til retsbøger af 7. januar og 22. maj 2013 kan det oplyses, at det er sagsøgers opfattelse, at der er enighed mellem parterne om, at der har været tale om 37 ophold i sikringscelle, og at opholdene til sammen har den længde, som er anført ovenfor.

. . .

*Uberettiget magtanvendelse*

Det gøres gældende, at sagsøger har været udsat for uberettiget magtanvendelse herunder blandt andet brug af gas, medens han befandt sig i en fængselscelle siddende roligt på sin seng. Derudover har han ved flere lejligheder fået tildelt slag af stav og været udsat for hårdhændede indgreb mv. Det gøres gældende at magtanvendelsen enten selvstændigt eller sammenholdt med de øvrige indgreb, som sagsøgeren har været udsat for under afsoningen, strider mod sagsøgers rettigheder efter EMRK artikel 3. Det gøres også gældende, at det er sagsøgte, som har bevisbyrden for, at magtanvendelsen har været berettiget, og at sagsøgte ikke har løftet bevisbyrden herfor.

*Mangelfuld efterforskning af indgrebenes berettigelse*

Sagsøger gør gældende, at sagsøgte enten helt har undladt at efterforske eller har foretaget en mangelfuld efterforskning af sagsøgers klager over de ovennævnte indgreb, og at sagsøgte også af denne grund har krænket sagsøgers rettigheder efter EMRK artikel 3.

*Vedrørende forældelse*

I forhold sagsøgtes indsigelser om, at visse af de forhold, der ligger til grund for stævningen, er forældede, bestrides dette. Det gøres gældende, at en eventuel forældelsesfrist først løber fra tidspunktet, hvor sagsøger bliver løsladt. Endelig gøres det gældende, at krav, der opstår som følge af krænkelser af EMRK artikel 3, ikke forældes.

*Vedrørende godtgørelseskravets beregning.*

. . .

EMD [har] efter EMRK artikel 41 . . . udmålt godtgørelser for lignende indgreb.

EMRK artikel 41 er alene en kompetenceregel for EMD, hvorfor de godtgørelsesstørrelser, som forekommer i EMDs afgørelser, ikke uden videre er sammenlignelige med de godtgørelser, der skal udmåles af de nationale domstole for tilsvarende krænkelser. De nationale domstole udmåler godtgørelsen med hjemmel i EMRK artikel 13 og for Danmarks vedkommende også med hjemmel i EAL § 26. Herom kan sagsøger nærmere henvise til side 959 i »Den

Copyright © 2023 Karnov Group Denmark A/S

Europæiske Menneskerettighedskonvention, Art. 10-59 samt tillægsprotokollerne«, 3. udgave, af Peer Lorenzen m.fl., udgivet i 2011 på DJØFs forlag. Heraf fremgår blandt andet følgende:

. . .

Det er sagsøgers opfattelse at EMD vil tillægge en klager en godtgørelse på cirka 240.000 kr. for krænkelser af den art og det omfang, som der er tale om i den aktuelle sag. Ud fra ovennævnte betragtninger er det sagsøgers opfattelse, at de nationale domstole vil nå frem til en godtgørelse, der udgør cirka det halve heraf, såfremt der statueres krænkelse i det påståede omfang. Det er på dette grundlag, at godtgørelseskravet er fastsat til kr. 120.000.«

Under hovedforhandlingen er det tillige gjort gældende, at der er sket krænkelse af menneskerettighedskonventionens artikel 3 som følge af det manglende krav på aktindsigt i og begrundelse for udelukkelse fra fællesskab, der er en følge af undtagelse i forvaltningslovens § 9, stk. 4.

A har under hovedforhandlingen frafaldet et anbringende om at have været udsat for uberettigede kropsvisitationer.

For så vidt angår anbringelserne i observationscelle er anbringelserne i Anstalten ved Herstedvester den 18. maj 2004 kl. 15:10 - 27. august 2004 kl. 11:45 (i alt 100 døgn 20 timer og 35 minutter) og den 21. august 2005 kl. 13:05 - 30. september 2005 kl. 13:50 (i alt 40 døge og 45 minutter) særligt fremhævet under proceduren.

*Direktoratet for Kriminalforsorgen* har procederet i overensstemmelse med de overordnede anbringender, der fremgår af direktoratets sammenfattende processkrift af 24. marts 2014, hvorefter:

»*Ad sagsøgers påstand 1:*

Til støtte for påstanden om afvisning gøres det gældende, at sagsøgerens påstand 1 er et anbringende til støtte for sagsøgerens påstand 2, idet det med sagsøgerens påstand 2 rejste erstatningskrav netop støttes på sagsøgerens påstand 1 og de i tilknytning hertil fremførte anbringender nemlig, at sagsøgeren sin afsoning i perioden 1997 - 2009 har været behandlet på en måde, som er uproportional og dermed i strid med EMRK artikel 3.

Frifindelsespåstanden støttes på samme anbringender, som gøres gældende over for sagsøgerens påstand 2.

**3098**

*Ad sagsøgers påstand 2:*

Til støtte for frifindelsespåstanden gøres det gældende, at den magtanvendelse, som sagsøgeren har været udsat for under sin afsoning, ikke har overskredet grænserne for, hvad der i de konkrete situationer under hensyntagen til sagsøgerens adfærd var absolut nødvendigt, samt at det var nødvendigt at etablere en rotationsordning, fordi sagsøgeren udgjorde en så betydelig belastning af de enkelte fængslers ressourcer.

Der lægges herved vægt på, at sagsøgeren var så stærkt psykisk afvigende, voldelig og paranoid, og at dette - som det fremgår af de mange domme - medførte, at han jævnligt var helt usædvanlig voldelig, eller truede med at være det, over for såvel medindsatte som over for fængselspersonalet.

Der lægges endvidere vægt på, at hensynet til både medindsatte og personale ligeså hyppigt gjorde det absolut påkrævet at anvende magt over for sagsøgeren på den måde, dette var hjemlet i straffuldbyrdelsesloven.

Der lægges endelig vægt på, at hensynet til de ressourcemæssige forhold i fængslerne nødvendiggjorde den mellem fængslerne etablerede rotationsordning, som i øvrigt kun blev effektueret i det omfang, der var behov for det.

Det gøres således gældende, at de over for sagsøgeren foretagne indgreb har hjemmel i straffuldbyrdelsesloven og ikke har været i strid med proportionalitetsprincippet, således som det gælder efter dansk ret.

Særligt om det erstatningskrav, som støttes på anvendelse af tåregas over for sagsøgeren den 19. august 2005, gøres det gældende, at de sagsøgte ikke er rette sagsøgte, idet den endelige administrative afgørelse om i den anledning at meddele sagsøgeren afslag på erstatning blev truffet af Rigsadvokaten.

Det bestrides, at sagsøgerens afsoningsforhold og de over for ham foretagne indgreb har udgjort en krænkelse af EMRK artikel 3. Også i denne sammenhæng fastholdes det, at proportionalitetsprincippet er iagttaget, og at de iværksatte indgreb m.v. har været nødvendige.

Om EMRK bemærkes særligt, at en krænkelse af art. 3 ikke medfører et objektivt ansvar. Det følger af retspraksis, at en eventuel krænkelse skal bedømmes efter dansk rets almindelige erstatningsregel, culpa-reglen, og at erstatning i givet fald tilkendes i medfør af erstatningsansvarslovens § 26.

EMRK art. 13 indeholder ikke hjemmel for danske domstole til at udmåle erstatning direkte på grundlag af bestemmelsen, som alene indeholder et krav om, at et individ, hvis rettigheder og friheder efter konventionen er blevet krænket, skal have adgang til effektive retsmidler ved de nationale domstole. Bestemmelsen regulerer således ikke, under hvilke betingelser erstatning kan tilkendes.

Den nærmere udformning af de nationale retsmidler er henlagt til medlemsstaternes skøn.

Det følger af ordlyden af EMRK art. 41, at bestemmelsen er en kompetenceregel for Menneskerettighedsdomstolen, hvorefter Domstolen kan tilkende erstatning i sager, hvori Domstolen finder EMRK krænket.

Heller ikke art. 41 indeholder således en hjemmel for danske domstole til at tilkende erstatning.

Det gøres endelig gældende, at erstatningskrav, som er begrundet i magtanvendelse over for sagsøgeren forud for den 30. december 2005, er forældet i medfør af såvel 1908-loven som 2007-loven, idet kravet om erstatning først blev rejst ved den af sagsøgeren den 30. december 2010 daterede stævning.

Det forhold, at kravet støttes på EMRK, ændrer ikke herved.

Bevisbyrden for, at de enkelte foranstaltninger var uberettigede eller uproportionale og dermed erstatningspådragende i hvert enkelt tilfælde, påhviler sagsøgeren.

Dette er i overensstemmelse med det almindelige princip i den civile retspleje om, at sagsøgeren har bevisbyrden for rigtigheden af de påstande og anbringender, vedkommende gør gældende.«

Efter under hovedforhandlingen at være blevet opmærksom på, at sagen er anlagt den 3. januar 2011, har direktoratet afgivet en processuel erklæring om, at direktoratet ikke vil gøre forældelse gældende for så vidt angår krav, som ikke ville have været forældet efter overgangsreglen i forældelseslovens § 30, stk. 1, jf. 1908-loven, hvis sagen som hidtil antaget af direktoratet havde været anlagt den 30. december 2010.

Direktoratet har vedrørende sikringscelleanbringelsen på Anstalten ved Herstedvester i perioden 19. august 2005 kl. 13:05 - 21. august 2005 kl. 13:05 og brugen af tåregas forud herfor nærmere gjort gældende, at der ved Glostrup Rets afvisningsdom af 22. marts 2013 retskraftigt er taget stilling til berettigelsen af indgrebet og det hertil knyttede erstatningskrav. Der kan derfor ikke tages stilling til dette indgreb og det tilhørende erstatningskrav under denne sag. Hvis direktoratets anbringende om, at indsigelser og erstatningskrav vedrørende indgrebet skal afvises, ikke tages til følge, omfatter direktoratets indsigelse om forældelse ikke dette indgreb.

For så vidt angår spørgsmålet om manglende behørig behandling af A's klager har direktoratet gjort gældende, at allerede fordi det ikke er anført, hvilke klager der hævdes ikke at være blevet behandlet korrekt, kan anbringendet herom ikke tages til følge.

Med hensyn til A's nye anbringende om den manglende adgang til aktindsigt og begrundelse har direktoratet gjort gældende, at anbringendet er for sent fremsat og derfor ikke bør tages under påkendelse.

**Rettens begrundelse og resultat**

*Ad påstand 1*

Retten finder, at A's påstand 1 er så generelt formuleret, at den er uegnet til at tage under pådømmelse som

**3099**

selvstændig påstand. Det er således ikke på nogen måde angivet, hvornår, hvor og hvordan Den Europæiske Menneskerettighedskonventions artikel 3 påstås at være krænket. Påstanden afvises som følge heraf. Det bemærkes, at anerkendelsespåstanden vil blive prøvet som et anbringende til støtte for påstand 2.

*Ad påstand 2*

*Den Europæiske Menneskerettighedskonventions artikel 3 og straffuldbyrdelsesloven*

Artikel 3 i Den Europæiske Menneskerettighedskonvention forbyder tortur og umenneskelig og nedværdigende behandling og straf.

I blandt andet dom af 29. september 2005 i sag 24919/03, Mathew, har Den Europæiske Menneskerettighedsdomstol udtalt følgende om de generelle principper, der gælder ved domstolens bedømmelse efter artikel 3 og herunder i relation til strafafsonere:

175. The Court has stated the applicable principles as follows (see, for example, Kalashnikov v. Russia, no. 47095/99, § 95, ECHR 2002-VI, case-law references omitted):

»The Court reiterates that Article 3 of the Convention enshrines one of the most fundamental values of democratic society. It prohibits in absolute terms torture or inhuman or degrading treatment or punishment, irrespective of the circumstances and the victim's behaviour . . .

The Court further reiterates that, according to its case-law, ill-treatment must attain a minimum level of severity if it is to fall within the scope of Article 3. The Assessment of this minimum is relative; it depends on all the circumstances of the case, such as the duration of the treatment, its physical and mental effects and, in some cases, the sex, age and state of health of the victim . . .

The Court has considered treatment to be »inhuman« because, inter alia, it was premeditated, was applied for hours at a stretch and caused either actual bodily injury or intense physical and mental suffering. It has deemed treatment to be »degrading« because it was such As to arouse in the victims feeling of fear, anguish and inferiority capable of humiliating and debasing them . . . In considering whether a particular form of treatment is »degrading« within the meaning of Article 3, the Court will have regard to whether its object is to humiliate and debase the person concerned and whether, as far as the consequences are concerned, it adversely affected his or her personality in a manner incompatible with Article 3 . . . However, the absence of any such purpose cannot conclusively rule out a finding of a violation of Article 3 . . . The suffering and humiliation involved must in any event go beyond that inevitable element of suffering or humiliation connected with a given form of legitimate treatment or punishment.

Measures depriving a person of his liberty may often involve such an element. Yet it cannot be said that detention on remand in itself raises an issue under Article 3 of the Convention. Nor can that Article be interpreted as laying down a general obligation to release a detainee on health grounds or to place him in a civil hospital to enable him to obtain specific medical treatment.

Nevertheless, under this provision the State must ensure that a person is detained in conditions which are compatible with respect for his human dignity, that the manner and method of the execution

of the measure do not subject him to distress or hardship of an intensity exceeding the unavoidable level of suffering inherent in detention and that, given the practical demands of imprisonment, his health and well-being are adequately secured . . .

2. Use of physical force and instruments of restraint against the applicant

(a) Physical force

177. In respect of a person deprived of his liberty, recourse to physical force which has not been made strictly necessary by his own conduct diminishes human dignity and is in principle an infringement of the right set forth in Article 3 (see Ribitsch v. Austria, judgment of 4 December 1995, Series A no. 336, p. 26, § 38, and Keenan v. the United Kingdom, no. 27229/95, § 113, ECHR 2001-III).«

Af den dagældende lov nr. 432 af 31. maj 2000 om fuldbyrdelse af straf mv. fremgår blandt andet:

*»§ 22.* Fuldbyrdelse af straf i fængsel sker normalt i åbent fængsel.

Stk. 2. Fuldbyrdelse af straffen skal dog ske i lukket fængsel, når straffen er på 5 år eller mere. Fuldbyrdelsen af straffen skal imidlertid også i dette tilfælde ske i åbent fængsel, hvis det ikke findes betænkeligt efter det i øvrigt oplyste om den dømte.

. . .

Stk. 5. Fuldbyrdelse af straf i fængsel kan endvidere ske i lukket fængsel, hvis

1) . . .

2) den dømte efter de lægelige oplysninger bør anbringes i Anstalten ved Herstedvester.

. . .

*§ 23.* Fængselsstraf skal, så vidt det er praktisk muligt, fuldbyrdes i nærheden af den dømtes hjemsted. Ved afgørelsen af, i hvilket åbent eller lukket fængsel eller i hvilket arresthus den dømte skal anbringes, skal der endvidere tages hensyn til den dømtes egne ønsker, navnlig vedrørende arbejds-, uddannelses-, familie- eller helbredsmæssige forhold.

Stk. 2. Reglerne i stk. 1, 1. pkt., kan fraviges

. . .

5) for at forebygge overgreb på medindsatte, personale eller andre i institutionen,

. . .

**3100**

*§ 26.* En indsat kan overføres mellem åbne fængsler, mellem lukkede fængsler eller mellem arresthuse

. . .

4) for at forebygge overgreb på medindsatte, personale eller andre i institutionen,

5) hvis der er bestemte grunde til at antage, at den indsatte har udøvet overgreb på medindsatte, personale eller andre i institutionen,

. . .

*§ 33.* En indsat skal så vidt muligt have adgang til fællesskab med andre indsatte.

Stk. 2. Såfremt den indsatte selv ønsker det og forholdene tillader det, fuldbyrdes fængselsstraf uden eller med begrænset fællesskab.

Stk. 3. Såfremt den indsatte selv ønsker det og forholdene tillader det, fuldbyrdes fængselsstraf uden fællesskab med indsatte af modsat køn, bortset fra fællesskab i arbejdstiden.

Stk. 4. I øvrigt kan fængselsstraf kun fuldbyrdes uden fællesskab efter reglerne i §§ 63 og 64.

. . .

*§ 35.* En indsat har ret til at deltage i gudstjenester, der afholdes i institutionen. Såfremt ordens- eller sikkerhedsmæssige hensyn

gør det påkrævet, kan institutionens leder eller den, der bemyndiges hertil, dog nægte en indsat adgang til at deltage i gudstjenester.

. . .

§ 62. Institutionen kan anvende magt over for en indsat, hvis det er nødvendigt

1) for at afværge truende vold, overvinde voldsom modstand eller for at hindre selvmord eller anden selvbeskadigelse,

2) for at hindre undvigelse eller standse undvegne eller

3) for at gennemtvinge en påbudt foranstaltning, når øjeblikkelig gennemførelse af denne er nødvendig og den indsatte afviser eller undlader at følge personalets anvisninger herom.

Stk. 2. Magtanvendelse kan ske ved greb, skjold, stav og tåregas.

Stk. 3. Magtanvendelse må ikke gennemføres, såfremt det efter indgrebets formål og den krænkelse og det ubehag, som indgrebet må antages at forvolde, ville være et uforholdsmæssigt indgreb.

Stk. 4. Magtanvendelse skal foretages så skånsomt, som omstændighederne tillader. Der skal gennemføres lægetilsyn efter magtanvendelse, hvis der er mistanke om sygdom, herunder om tilskadekomst, hos den indsatte i forbindelse med anvendelsen af magt, eller hvis den indsatte selv anmoder om lægehjælp.

Stk. 5. Justitsministeren fastsætter regler om anvendelse af magt over for indsatte.

§ 63. Institutionens leder eller den, der bemyndiges dertil, kan udelukke en indsat fra fællesskab med andre indsatte, hvis det er nødvendigt

1) for at forebygge undvigelse, strafbar virksomhed eller voldsom adfærd,

2) for at gennemføre foranstaltninger, der er nødvendige af sikkerhedshensyn eller påkrævet for at gennemføre en almindelig sundhedskontrol eller forebygge smittefare, eller

3) fordi den indsatte udviser en grov eller oftere gentagen utilladelig adfærd, som er åbenbart uforenelig med fortsat ophold i fællesskab med andre indsatte.

Stk. 2. Såfremt der er grund til at antage, at betingelserne i stk. 1 for udelukkelse fra fællesskab er opfyldt, kan institutionen midlertidigt udelukke den indsatte fra fællesskab med andre indsatte, mens spørgsmålet om udelukkelse behandles. Er der grund til at antage, at betingelserne i § 25 for overførsel til lukket fængsel eller i § 26 for overførsel mellem ensartede lukkede afsoningsinstitutioner eller i § 28 for overførsel til arresthus er opfyldt, kan institutionen også midlertidigt udelukke den indsatte fra fællesskab med andre indsatte, mens spørgsmålet om overførsel behandles.

Stk. 3. En indsat, der udelukkes fra fællesskab, isoleres i opholdsrum på særlig afdeling, i eget opholdsrum eller i et arresthus.

. . .

Stk. 5. Udelukkelse fra fællesskab må ikke foretages, hvis udelukkelsen efter indgrebets formål og den krænkelse og det ubehag, som indgrebet må antages at forvolde, ville være et uforholdsmæssigt indgreb.

Stk. 6. Udelukkelse fra fællesskab skal gennemføres så skånsomt, som omstændighederne tillader.

Stk. 7. Udelukkelse fra fællesskab skal straks bringes til ophør, når betingelserne herfor ikke længere er opfyldt. Institutionen skal mindst én gang om ugen overveje spørgsmålet om helt eller delvis at bringe udelukkelsen fra fællesskab til ophør.

Stk. 8. Justitsministeren fastsætter regler om udelukkelse af indsatte fra fællesskab med andre indsatte.

. . .

§ 66. Efter bestemmelse af institutionens leder eller den, der bemyndiges dertil, kan en indsat anbringes i sikringscelle og herunder tvangsfikseres ved anvendelse af bælte, hånd- og fodremme samt handsker, hvis det er nødvendigt

1) for at afværge truende vold eller overvinde voldsom modstand eller

2) for at hindre selvmord eller anden selvbeskadigelse.

Stk. 2. Anbringelse i sikringscelle og tvangsfiksering må dog ikke foretages, såfremt det efter indgrebets formål og den krænkelse og det ubehag, som indgrebet må antages at forvolde, ville være et uforholdsmæssigt indgreb.

Stk. 3. Anbringelse i sikringscelle og tvangsfiksering skal foretages så skånsomt, som omstændighederne tillader.

Stk. 4. En indsat, der er tvangsfikseret, skal have fast vagt.

**3101**

Stk. 5. Ved tvangsfiksering af en indsat i sikringscelle skal institutionen straks anmode en læge om at foretage tilsyn med den indsatte. Lægen skal tilse den pågældende, medmindre lægen skønner sådant tilsyn åbenbart unødvendigt.

Stk. 6. Ved anbringelse i sikringscelle uden tvangsfiksering skal der tilkaldes læge, hvis der er mistanke om sygdom, herunder om tilskadekomst, hos den indsatte, eller hvis den indsatte selv anmoder om lægehjælp.

Stk. 7. Justitsministeren fastsætter regler om godkendelse af sikringsceller og om anvendelsen af sikringsceller og tvangsfiksering, herunder om lægetilsyn og andet tilsyn.«

Ved lov nr. 367 af 24. maj 2005 blev der indføjet et nyt stykke 2 i § 33, hvorefter:

»Justitsministeren eller den, der bemyndiges dertil, kan bestemme, at fællesskab i fængselsafdelinger eller arresthuse, som er udpeget til anbringelse af indsatte, hvis tilstedeværelse skaber en særlig risiko for overgreb på medindsatte, personale eller andre i institutionen, skal gennemføres som cellefællesskab med en anden indsat i eget opholdsrum efter kriminalforsorgens nærmere bestemmelse.«

Ovennævnte regler er i øvrigt ikke ændret i den periode, som sagen vedrører.

Der er udstedt en række administrative forskrifter i tilknytning til straffuldbyrdelsesloven, hvoraf særligt dagældende bekendtgørelse nr. 348 af 17. maj 2001 om sikringsmidler i fængsel og arresthuse og bekendtgørelse nr. 673 af 9. juli 2003 og den efterfølgende bekendtgørelse nr. 440 af 30. maj 2008 om udelukkelse fra fællesskab er af betydning i denne sag.

Af bekendtgørelse nr. 348 af 17. maj 2001 om sikringsmidler i fængsel fremgår blandt andet:

»§ 8

Tvangsfiksering kan kun helt undtagelsesvis ske i over ét døgn.

. . .

§ 13

Institutionen skal så hurtigt som muligt udarbejde rapport om anvendelse af håndjern, sikringscelle, herunder tvangsfiksering, samt andre sikringsmidler. Rapporten skal indeholde oplysning om begrundelsen for anvendelsen, om dato og klokkeslæt for, hvornår anvendelsen af sikringsmidlet er ophørt, samt om, at den indsatte er orienteret om muligheden for at klage til justitsministeren og om, hvornår fristen for at indgive klage udløber, jf. straffuldbyrdelseslovens § 111, stk. 2. Rapporten skal endvidere indeholde oplysning om institutionens overvejelser vedrørende lægetilsyn, samt om underretning efter denne bekendtgørelse.

Stk. 2. Den indsatte skal efter anmodning have udleveret kopi af den rapport, som er udfærdiget i henhold til stk. 1.«

*Bevisbyrde og rettens prøvelse*

Sagsøgeren, A, har under en civil sag som denne som udgangspunkt bevisbyrden for, at der er sket magtanvendelse og indgreb, der kan begrunde et krav om godtgørelse som påstået.

Direktoratet er imidlertid som forvaltningsmyndighed ansvarlig for magtanvendelse og indgreb som anbringelse i sikringscelle m.v., som ligger ud over den frihedsberøvelse, der er en følge af forva-

ringsdommen, og skal herved kunne godtgøre, at betingelserne for magtanvendelse, sikringscelleanbringelse mv. i straffuldbyrdelsesloven og hertil knyttede administrative forskrifter har været opfyldt, samt at udstrækningen af de enkelte indgreb har været berettiget.

Som sagen er forelagt, er det uklart, om og i givet fald i hvilket omfang A gør gældende, at hvert enkelt indgreb og/eller udstrækningen af disse isoleret betragtet udgør krænkelser af Den Europæiske Menneskerettighedskonventions artikel 3. Der er således kun i ret få tilfælde under foreliggelsen og proceduren anført nærmere anbringender om, at konkrete indgreb skal anses for uberettigede eller for langvarige, og hvorfor det er tilfældet. Det er også langt fra alle rapporter om anbringelse i sikringscelle- og observationscelle i ekstrakten, som der er blevet dokumenteret fra eller henvist til under hovedforhandlingen.

Den indsættelse i sikringscelle på Københavns Fængsler i perioden den 18. august 2003 kl. 2:20 - 19. august 2003 13:04, som ifølge parterne er et typisk eksempel på forløbet af en indsættelse i sikringscelle, og hvor der er foretaget en nærmere dokumentation af fængselspersonalets noteringer om forløbet under anbringelsen, adskiller sig endvidere fra alle andre sikringscelleindsættelser, derved at fikseringen i form af hånd- og fodremme samt mavebælte blev fuldstændig aftaget efter knap 16 timer kl. 18:05 den 18. august 2003, hvorefter sikringscelleanbringelsen fortsatte uden fiksering i en anden celle. I stort set alle andre tilfælde er fikseringen opretholdt i fuldt omfang, indtil A blev udtaget af sikringscellen.

Efter karakteren og varigheden af de indgreb, der er foregået, herunder navnlig indsættelserne i sikringscelle under brug af fiksering samt indsættelserne i observationscelle, og de anbringender, der er anført om krænkelse af Den Europæiske Menneskerettighedskonventions artikel 3, finder retten, at der - uanset at der er tale om en sag, der føres i civilprocessens former, og uanset de mange uklarheder - må foretages en prøvelse af, om de enkelte indsættelser i sikringscelle og observationscelle kan antages at stride mod konventionens artikel 3, jf. herved princippet i retsplejelovens § 471 sammenholdt med konventionens artikel 13. Alle de sikringscelle- og observationscellerapporter, som er medtaget i ekstrakten, gennemgås derfor i det følgende med henblik på at vurdere, om artikel 3 er krænket i relation til den enkelte anbringelse.

**3102**

Der tages herefter stilling til A's øvrige anbringender om krænkelse af Den Europæiske Menneskerettighedskonventions artikel 3 som følge af udelukkelsen fra fællesskab, rotationsordningen, manglende eller mangelfuld efterforskning af hans klager, magtanvendelsen i øvrigt og manglende adgang til aktindsigt og begrundelse, samt til om afsoningsforholdene samlet set indebærer en krænkelse af konventionens artikel 3.

*Beviser i og afgrænsning af sagen*

Der er i straffuldbyrdelsesloven og hertil hørende administrative forskrifter fastsat detaljerede regler om løbende observation af den, der er udsat for et indgreb, lægeligt tilsyn og dokumentation for observationer mv. ved visse typer af indgreb, jf. navnlig dagældende bekendtgørelse nr. 348 af 17. maj 2001 om sikringsmidler i fængsel og arresthuse og bekendtgørelse nr. 673 af 9. juli 2003 og efterfølgende bekendtgørelse nr. 440 af 30. maj 2008 om udelukkelse fra fællesskab. De pågældende regler har til formål at sikre bevis for berettigelsen af magtanvendelse og anvendelse af særlige indgreb som brug af sikringscelle mv. under straffuldbyrdelsen og herunder også for, at omfanget og udstrækningen af sådanne indgreb ikke udstrækkes ud over det nødvendige.

Det skriftlige materiale i sagen indeholder omfattende og detaljerede rapporter om navnlig de foretagne indsættelser i sikringscelle og i observationscelle. Beviserne vedrørende de enkelte indgreb består i vidt omfang alene af sådanne rapporter samt afgørelser,

notater mv., der er udarbejdet af direktoratet og underliggende institutioner vedrørende A.

Vedrørende konkrete indgreb er der således kun afgivet forklaring om optakten til sikringscelleanbringelsen den 27. august 2004 kl. 11:50 (af overlæge G), om sikringscelleanbringelsen i Anstalten ved Herstedvester i perioden 19. august 2005 kl. 13:05 - 21. august 2005 kl. 13:05, herunder om den forudgående anvendelse af tåregas (af B og A) og om sikringscelleanbringelsen i Københavns Fængsler den 22. januar 2009 fra kl. 19:30, der er en fortsættelse af en anbringelse i sikringscelle på Østjyllands Statsfængsel fra den 22. januar 2009 kl. 14:20 (af C og A). A har herudover forklaret om en ikke præcist tidsfæstet anbringelse i observationscelle og efterfølgende anbringelse i sikringscelle i 1999 på Anstalten ved Herstedvester, som ligger før den periode, som sagen er begrænset til at vedrøre. Øvrige forklaringer vedrører mere generelle oplysninger om afsoningen, vilkårene ved indsættelse i sikringscelle og om A.

Bortset fra de mangler i rapporteringen fra Københavns Fængsler om sikringscelleanbringelse den 28. juli 2006, der er erkendt i notat af 4. september 2006 af afdelingsleder F fra Københavns Fængsler, og som er påtalt i direktoratets brev til Københavns Fængsler af 12. oktober 2007, og det som nævnes nedenfor om mangler i noterne om fiksering i rapporterne om sikringscelleanbringelserne fra den 30. april 2004, kl. 12:35 på Anstalten ved Herstedvester og fra den 12. juni 2007 kl. 13:15 på Københavns Fængsler samt påtalen fra ledelsens side af enkelte manglende notater i rapport om observationscelleanbringelse fra den 13. april 2009 kl. 19:15, er der ikke grundlag for at antage, at reglerne om løbende observation og dokumentation heraf samt om lægeligt tilsyn mv. ikke er overholdt.

Advokat Claus Bonnez har på vegne A klaget til direktoratet over sikringscelleanbringelsen på Anstalten ved Herstedvester fra den 19. august 2005 kl. 13:05 - 21. august 2005 kl. 13:05, herunder anvendelsen af tåregas, jf. direktoratets afgørelse af 20. februar 2006, hvorved benyttelsen af tåregas samt anbringelsen i sikringscellen og varigheden af denne blev anset for berettiget. Der er desuden klaget over sikringscelleanbringelserne på Statsfængslet i Østjylland fra den 16. april 2008 kl. 18:35, fra den 3. juli 2008 kl. 16:15 og fra den 8. december 2008 kl. 11:05, jf. direktoratets afgørelser af 19. november 2009, 4. maj 2010 og 9. juni 2009. I de tre afgørelser er den anvendte magtudøvelse og sikringscelleanbringelsen fundet berettiget. Ved afgørelsen af 19. november 2009 er det endvidere fastslået, at sikringscelleanbringelsen fra den 16. april 2008 kl. 18:35 var for langvarig, og der er tillagt A en godtgørelse herfor på 500 kr.

Der er ikke i øvrigt indgivet administrativ klage efter reglerne i straffuldbyrdelsesloven eller klaget til Folketingets Ombudsmand.

A har forsøgt at få sikringscelleanbringelsen fra den 19. august 2005 kl. 13:05 og den forudgående brug af tåregas på Anstalten ved Herstedvester indbragt for domstolene efter reglerne i retsplejelovens kapitel 93 a. Sagen blev afvist ved Glostrup Rets dom af 22. marts 2013. Bortset herfra er der først ved denne sag, som er anlagt den 3. januar 2011, at de indgreb, som er foretaget i perioden fra den 10. august 2003 til A's overførsel til Sikringsafdelingen den 26. maj 2009, er søgt indbragt for domstolene.

Retten finder på den nævnte baggrund, at de udfærdigede rapporter om anbringelse i sikringscelle og observationscelle samt det i direktoratets og underliggende institutioners notater mv. anførte om begrundelsen for iværksatte indgreb må lægges til grund, i det omfang der ikke under denne sag er ført konkret bevis for andet, eller der ikke ved tidligere trufne afgørelser, som må lægges til grund i denne sag, er truffet afgørelse vedrørende berettigelsen af det pågældende indgreb.

Under sagens forberedelse har A fra direktoratet modtaget de rapporter, notater mv., der er udfærdiget om magtanvendelse og indgreb under afsoningen i almindeligt fængsel. A har under hovedforhandlingen begrænset sit krav til at vedrøre tiden fra sikringscelleanbringelsen fra den 10. august 2003 kl. 16:45 på Statsfængslet i Nyborg og har oplyst, at der derfor ikke in ekstrakten er

**3103**

medtaget rapporter vedrørende tidligere foretagne indgreb mv., der fremgår af den oversigt, som Kammeradvokaten har udarbejdet. I ekstrakten er der heller ikke medtaget rapporter vedrørende en række anbringelser i observations- eller sikringscelle efter den 10. august 2003, men før den 26. maj 2009. Der er ikke fra A's side givet nogen forklaring herpå. Der er heller ikke afgivet forklaringer om de pågældende anbringelser. Retten må på den baggrund forstå den manglende medtagelse af rapporterne således, at de pågældende anbringelser ikke isoleret betragtet er omfattet af sagen. Der tages derfor ikke stilling til berettigelsen af de pågældende indgreb i det følgende. Disse indgreb indgår således alene ved vurderingen af, om afsoningsforholdene i tiden fra den 10. august 2003 til den 26. maj 2009 samlet set, og uanset om de enkelte indgreb isoleret betragtet må anses for berettigede, indebærer en krænkelse af Den Europæiske Menneskerettighedskonventions artikel 3.

*A's personlighed og adfærd under afsoningen*

A var forud for forvaringsdommen adskillige gange dømt for personfarlig kriminalitet. På den baggrund og efter den mentalobservationserklæring og den erklæring fra Retslægerådet, der blev indhentet forud for forvaringsdommen, er der ingen tvivl om, at A, som følge af sin særegne personlighed og den tilstand han var i, kunne være overordentlig farlig for sine omgivelser.

A er ved Glostrup Rets dom af 31. august 2006 og Svendborg Rets dom af 21. august 2007 fundet skyldig i flere tilfælde af overtrædelse af straffelovens § 119, stk. 1, og § 245, stk. 1, ved at have truet eller udøvet alvorlig vold mod fængselspersonalet under afsoningen. Ved Københavns Byrets dom af 11. februar 2011 er han ligeledes fundet skyldig i at have overtrådt straffelovens § 266 ved at true en fængselsfunktionær samt i overtrædelse af straffelovens § 119, stk. 1, ved at overfalde en fængselsfunktionær. En betydelig del af sikringscelleanbringelserne har ifølge oversigten over indgreb og de fremlagte rapporter været begrundet i vold eller trussel om vold mod fængselspersonale eller medindsatte eller i trusler om selvmord eller forsøg på selvbeskadigelse. De konkrete afgørelser om udelukkelse fra fællesskab og indsættelserne i observationscelle har ligeledes været begrundet i risikoen for overgreb på andre og i truende eller aggressiv adfærd eller i risiko for selvbeskadigelse.

Der er på den baggrund og efter vidneforklaringerne fra B, C, D, E og G ikke tvivl om, at A har været meget vanskelig at have i fængselsvæsnet som følge af en meget ofte voldsomt aggressiv og paranoid adfærd med tilbøjelighed til at reagere voldeligt på andre personers adfærd og begivenheder i omverdenen. Hertil kom trusler om selvmord og forsøg på selvbeskadigelse.

*Indsættelserne i sikringscelle*

I det omfang indsættelse i sikringscelle og fiksering med håndog fodremme samt mavebælte og eventuelt tillige handsker har været uberettiget, må navnlig fikseringen anses for at medføre en så intens fysisk og psykisk lidelse, at indgrebet omfattes af Den Europæiske Menneskerettighedskonventions artikel 3, jf. blandt andet Den Europæiske Menneskerettighedsdomstols dom af 29. maj 2012 i sagerne 16563/08, 40841/09, 8192/10 og 18656/10, Julin, præmis 127. Det samme gælder i de tilfælde, hvor fikseringen i sikringscellen må anses for berettiget, men hvor indgrebet er fortsat i længere tid end nødvendigt.

Om vurderingen af udstrækningen af de enkelte anbringelser bemærkes, at C og F har forklaret, at det var erfaringen, at A i modsætning til de fleste andre indsatte ikke kom ud af den aggressive tilstand, der begrundede de enkelte sikringscelleanbringelser, inden for et par timer. Det var først, når man kunne få en dialog med A, at han kunne udtages af fikseringen og sikringscellen. Retten finder, at der ikke er grundlag for at betvivle denne erfaring, som også kommer til udtryk i det af C anførte i Københavns Fængslers rapport om den fortsatte sikringscelleanbringelse og fiksering ved ankomsten til fængslet den 22. januar 2009 kl. 22:18. Den pågældende erfaring synes også afspejlet i forløbet efter den sikringscelleanbringelse fra den 12. juni 2007 kl. 13:15 til den 13. juni 2007 kl. 16:20, som i Københavns Byrets dom af 25. februar 2011 er anset for at have været for langvarig. Den efterfølgende observationscelleanbringelse blev således afbrudt og afløst af en ny sikringscelleanbringelse, fordi A efter overførslen til observationscellen hamrede hoved og hænder mod celledøren, var ilter og ikke til at tale med. Det bemærkes dog samtidig, at der ikke i de fremlagte rapporter om indgreb fra den 10. august 2003 og frem er eksempler på, at fængselspersonalet har løsnet fodrem, håndrem og mavebælte og herefter oplevet en voldelig reaktion, der har gjort det nødvendigt på ny at fiksere A. Selvom erfaringen med A har kunnet begrunde en langvarere varighed af indgreb end vanligt, kan der efter rettens opfattelse alene være tale om en vis forlænget observationsperiode og tid til at forsøge en dialog med henblik på at vurdere, om han var faldet så meget til ro, at han kunne udtages af fikseringen og sikringscellen.

*Afgørelser som har betydning ved vurderingen af de enkelte sikringscelleanbringelser:*

Ved Glostrup Rets dom af 31. august 2006 er det fastslået, at A har begået det overfald med kniv, der førte til en sikringscelleanbringelse fra den 10. august 2003 kl. 16:45 til den 12. august 2008 kl. 9:12 på i alt 1 døgn, 16 timer og 27 minutter. På baggrund af knivoverfaldet og efter det i øvrigt oplyste i sikringscelleanbringelsesrapporten om A's smadring af møbler, råben og skrigen mv. må anbringelsen i sikringscelle anses for berettiget. Af rapporten fremgår, at A frem til om eftermiddagen den 11. august 2003 under flere samtaler fremstod paranoid og blandt andet gav udtryk for, at der var tale om et komplot, der gik ud på at slå ham ihjel. Desuden fremgår det, at han

**3104**

periodevis lå og råbte, og at han under en samtale kl. 13:57 var urolig skiftende i sin sindsstemning og vekslede mellem at ligge roligt og råbe op og komme med trusler. Under en afhøring foretaget af en politibetjent kl. 15:01 blev han ophidset og gav udtryk for, at personalet ville forgive ham. Han faldt til ro, da politibetjenten var gået. Han lå derefter og råbte frem til kl. 15:09. Efter at være blevet tilset af en læge kl. 15:55 faldt han i søvn og sov herefter stort set uafbrudt frem til den 12. august 2003 kl. 8:34. På det tidspunkt gav han under en samtale udtryk for, at han fortsat mente, at det var et komplot mod ham. Kl. 9:12 den 12. august 2008 blev han iført håndjern og udtaget af sikringscellen med henblik på overførsel til Københavns Fængsler. Den sidste del af anbringelsen i sikringscelle og fiksering skyldtes ifølge rapporten, at A sov. Retten finder, at der ikke er grundlag for at kræve, at fængselspersonalet skulle vække A for at vurdere, om han var faldet så meget til ro, at han kunne udtages af fikseringen og sikringscellen. Som følge af A's betydelige farlighed må indgrebet anses for berettiget, at der har været en vis observationsperiode og tid til forsøg på dialog, fra han vågnede, og til fikseringen ophørte, og han blev taget ud af sikringscellen. Henset hertil og til baggrunden for anbringelsen i sikringscelle og fikseringen samt til den voldsomme paranoia og periodevise råben, skrigen og fremsættelse af trusler,

der prægede A i de vågne perioder, finder retten, at der ikke er grundlag for at anse udstrækningen af indgrebet eller den omstændighed, at hånd- og fodremme samt mavebælte ikke blev løst, medens han sov, for uberettiget. Der har herved foreligget sådanne omstændigheder, at tvangsfikseringen undtagelsesvis har kunnet opretholdes i over ét døgn, jf. § 8 i den dagældende sikringscellebekendtgørelse.

I dommen af 31. august 2006 fra Glostrup Ret er A tillige fundet skyldig i overtrædelse af straffelovens § 119, stk. 1, jf. § 247, stk. 1, ved i Statsfængslet i Vridsløselille den 30. april 2004 ca. kl. 12 at have tildelt en fængselsfunktionær et knytnæveslag i ansigtet og have truet en anden fængselsfunktionær med at ville voldtage hans kone og slå hans børn ihjel. Det er dermed fastslået, at han har begået de forhold, der gav anledning til en overførsel fra Statsfængslet i Vridsløselille til Anstalten ved Herstedvester, jf. rapport om sikringscelleanbringelse på Anstalten ved Herstedvester i perioden fra den 30. april 2004 kl. 12:35. Ved dommen er A tillige fundet skyldig i overtrædelse af straffelovens § 119, stk. 1, ved om eftermiddagen og aftenen efter overførslen til Anstalten ved Herstedvester, det vil sige under anbringelsen i sikringscellen, at have truet flere fængselsfunktionærer med, at de ville blive »nakket«, at han ville »smadre« dem, og at han kunne »tage et drab med på vejen«. Det fremgår af dommen, at byretten lægger notaterne om de pågældende trusler i rapporten om sikringscelleanbringelsen til grund.

Ifølge rapporten om sikringscelleanbringelsen var A ved ankomsten til Herstedvester stadig meget voldsom og havde også fysisk modsat sig transporten. Henset hertil og til den voldsepisode, der umiddelbart forud herfor havde fundet sted i Vridsløselille, finder retten anbringelsen i sikringscelle og fikseringen berettiget. Ved dommen er det tillige fastslået, at A er fremkommet med trusler efter anbringelsen i sikringscelle den 30. april 2004. Af rapporten fremgår i øvrigt, at anbringelsen og fikseringen ophørte den 3. maj 2004 kl. 10:23 og dermed varede i alt 2 døgn 21 timer og 48 minutter. Det er anført, at A efter periodevist at have råbt op og truet, lå roligt mellem kl. 14:45 og kl. 19:45 den 30. april 2004, hvor han på ny lå uroligt og spyttede på væggen og kl. 20:00 og kl. 20:10 på ny råbte ukvemsord mod personalet og fremkom med trusler. Kl. 21:20 og igen kl. 21:30 blev han på ny ophidset og truende. Der er herefter lange perioder, hvor han sov frem til den 1. maj 2004 om eftermiddagen, medens han i vågne perioder jævnligt kom med skældsord, råbte eller truede og herunder fremkom med trusler på livet kl. 2:45 og kl. 2:50 den 1. maj 2004. Ifølge et notat kl. 7:05 den 1. maj 2004 blev venstre arm på dette tidspunkt løsnet. I de efterfølgende noteringer ser det ud som brug af håndremme helt er ophørt fra dette tidspunkt. Dette stemmer dog ikke overens med senere noteringer om, at håndled blev løsnet, da A fik vand. Retten lægger derfor til grund, at håndledsremmene kun er blevet fjernet kortvarigt. Der er den 1. maj 2004 kl. 12:00 noteret, at han ikke ønskede at tale med en sygeplejerske, som var til stede for at tilse ham. Umiddelbart efter er det på ny noteret, at han sov frem til kl. 16:30, hvor han til overlægen sagde, at »vi skal bare skride ud, eller kan han pisse os lige i fjæset«. Herefter er der igen en længere periode, hvor han sov kun afbrudt af ganske korte perioder, hvor han lå stille. Der er noteret, at A den 2. maj 2004 kl. 4:38 spurgte en fængselsbetjent, om den pågældende kedede sig og herefter lå stille frem til kl. 5:20, hvor han satte sig op, skreg og flåede i remmene. Kl. 6:00-06:10 råbte han på vand og blev truende og hidsig, hvorefter han kl. 6:20 fik en kande vand. Kl. 7:00 kaldte han en betjent for en idiot. Kl. 7:10 er det angivet, at har fået/får spændt venstre håndled fri og løsnet højre i forbindelse med, at han har fået vand. Kl. 7:25 talte han ifølge noteringerne med sygeplejersken, og kl. 7:40 bad han om noget at læse i. 15 minutter efter er det noteret, at han var faldet i søvn. Kl. 8:15 den 2. maj 2004 angives han

på ny at være vågen. Bortset fra notater om, at han den 2. maj 2004 kl. 10:45 og kl. 11 igen råbte, er der herefter alene notater om, at A lå stille, sov, urinerede i en kolbe, røg, afslog mad, samt at han kl. 8:40 den 3. maj 2004 spurgte, hvad klokken var, og kl. 9:20 ønskede at tale med en psykiater, hvilket skete kl. 10:01. Herefter blev han udtaget af sikringscellen og fikseringen kl. 10:10 den 3. maj 2004. Efter noteringerne i rapporten

**3105**

finder retten, at anbringelsen og fikseringen i tidsrummet fra om morgenen/formiddagen den 2. maj 2004 frem til ophøret af anbringelse og fiksering den 3. maj 2004 kl. 10:10 må anses for uberettiget, idet A seneste aggressive udfald var truslerne og hidsigheden ved 6-tiden og udsagnet kl. 7 om morgenen den 2. maj 2004 om, at en betjent var en idiot. Anbringelsen og fikseringen i tidsrummet forud herfor må derimod anses for berettiget henset til truslerne og den aggressive adfærd fra A's side. Det gælder også opretholdelsen af fikseringen i de perioder, hvor han sov og den omstændighed, at fikseringen blev udstrakt ud over 1 døgn, jf. § 8 i den dagældende sikringscellebekendtgørelse.

Ved Svendborg Rets dom af 21. august 2007 blev A fundet skyldig i to forhold (forhold 4 og 5) vedrørende overtrædelse af straffelovens § 119, stk. 1, ved den 4. juli 2006 i Horsens Statsfængsel at have overfaldet to fængselsfunktionærer med slag i ansigtet henholdsvis på skulderen, ved at have truet to andre fængselsfunktionærer på livet samt ved den 5. juli 2006 i Horsens Statsfængsel at have truet en fængselsfunktionær med at slå ham ihjel. Henset til den udøvede vold og truslerne den 4. juli 2006 og det i øvrigt oplyste i rapporten om sikringscelleanbringelse fra Statsfængslet i Horsens i perioden 4. juli 2006 kl. 18:05 - 5. juli 2006 kl. 14:15 (i alt 20 timer og 10 minutter) må beslutningen om anbringelse og fiksering af A i sikringscelle anses for berettiget. Ifølge rapporten fremkom A frem til kl. 22:00 den 4. juli 2006 jævnligt med voldsomme trusler mod fængselspersonalet og en vagtlæge, der kom til stede for at tilse ham. Kl. 23:15 faldt han i søvn og sov stort set uafbrudt frem til kl. 7:45 den 5. juli 2006, hvor han på ny truede personalet. Han lå herefter roligt frem til kl. 11:30, hvor han på ny fremkom med trusler, hvilket sammen med råben gentog sig jævnligt, frem til han kl. 14:15 den 5. juli 2006 blev udtaget af sikringscellen med henblik på overførsel til Politigårdens Fængsel. Den trussel på livet, som A blev dømt for ved Svendborg Rets dom, fremkom på dette tidspunkt. Uanset det oplyste om de utallige trusler, som A kom med under hele anbringelsen i sikringscellen og fikseringen, finder retten, at der ikke er grundlag for at anse indgrebet for at være udstrakt i længere tid end nødvendigt eller for at fikseringen skulle have været løsnet i de perioder, hvor han sov.

A blev ved Svendborg Rets dom af 21. august 2007 endvidere i forhold 6 fundet skyldig i overtrædelse af straffelovens § 119, stk. 1, jf. til dels § 21, ved den 11. september 2006 i Politigårdens Fængsel at have overfaldet en fængselsfunktionær med spark i maven og forsøg på at tildele en skalle og spytte på den pågældende samt trusler på livet svarende til, hvad der er beskrevet i rapport om sikringscelleanbringelse fra Københavns Fængsler i perioden 11. september 2006 kl. 14:50 - 11. september 2006 kl. 17:13. På den baggrund og efter det i øvrigt anførte i rapporten om begrundelsen for anbringelsen i sikringscelle og fikseringen finder retten indgrebene berettigede. Ifølge rapporten sov A, indtil der kom en læge til stede kl. kl. 15:45. Han var efter det oplyste aggressiv over for lægen og råbte kl. 16:18, at han ville skære halsen over på personalet. Han blev udtaget af sikringscellen kl. 17:14. Der er ikke grundlag for at anse indgrebets udstrækning for længere end berettiget. Der er heller ikke grundlag for at anse fikseringen i den periode, hvor A sov, for uberettiget.

Direktoratets anerkendelse i afgørelsen af 19. november 2009 om, at sikringscellebringelsen i Statsfængslet i Østjylland fra den 16. april 2008 kl. 18:35 til den 21. april 2008 kl. 12:11 var for langvarig, lægges til grund i denne sag. Om begrundelsen for indgrebet fremgår det af rapporten, at A under en samtale om udlevering af et brev og om medicin blev mere og mere ophidset, hvorefter han, da fængselsbetjenten forlod cellen, begyndte at råbe og skrige. Da man herefter ville flytte ham til en observationscelle, nægtede han dette og satte sig fysisk til modværge, da man forsøgte at føre ham. Han rykkede/flåede sig fri og blev fikseret på gulvet af personale. I den forbindelse ramte han et celleskab og fik en lille revne over øjenbrynet. Han blev herefter ilagt håndjern og transporteret til sikringscelle og fikseret. Af rapporten fremgår, at han flere gange og første gang den 16. april 2008 kl. 19:35 blev tilset af en læge. Retten finder, at der ikke er grundlag for at tilsidesætte fængselspersonalets afgørelse om, at A skulle flyttes til en observationscelle som følge af hans råben og skrigen. Det må endvidere henset til den fysiske modstand, han ydede mod flytningen, anses for berettiget, at han blev anbragt i en sikringscelle og fikseret. Der er ikke grundlag for at antage, at skaden over øjet er fremkommet på anden måde end angivet i rapporten. Som nævnt følger det af direktoratets afgørelse at anbringelsen, der varede 4 døgn, 17 timer og 36 minutter, var for langvarig.

Ved Københavns Byrets dom af 11. februar 2011, der er upåanket, er der taget stilling til berettigelsen af sikringscellebringelser i Københavns Fængsler fra den 20. december 2006 kl. 14:55 og fra den 12. juni 2007 kl. 13:15. Nævningetinget i byretten fandt, at betingelserne i straffuldbyrdelseslovens § 66 for at anbringe A i sikringscelle den 20. december 2006 kl. 14:55 ikke var opfyldt. Det blev endvidere ikke fundet bevist, at længden af A's ophold i sikringscelle efter anbringelsen den 12. juni 2007 kl. 13:15 var proportional. Opholdet på i alt 1 døgn 3 timer og 5 minutter blev således fundet for langvarigt. A blev herefter frifundet i det første forhold og alene dømt for overtrædelse af straffelovens § 266 i det andet forhold, idet straffelovens § 119, stk. 1, efter byrettens opfattelse ikke kunne bringes i anvendelse. Henset til den omfattende bevisførelse, der har været i byretten, om disse to forhold, og uanset de anderledes

**3106**

bevisbyrderegler, der gælder i en civil sag som nærværende, finder retten, at der ikke er grundlag for at nå til en anden vurdering end byretten af berettigelsen af de to sikringscellebringelser på Københavns Fængsler. Retten lægger således til grund, at sikringscellebringelsen fra den 20. december 2006 kl. 14:55 ikke opfyldte betingelserne i straffuldbyrdelseslovens § 66, og at sikringscellebringelsen fra den 12. juni 2007 var for langvarig. I rapporten om sidstnævnte indgreb er det indledningsvis noteret kl. 13:15 den 12. juni 2007, at der er sket fiksering med håndleds-, mave- og fodremme. Der er intet noteret om fiksering i den resterende del af forløbet under rubrikken om »Fiksering«, hvilket må antages at bero på en fejl. Retten går på den baggrund, og da der intet er noteret om, at fikseringen er aftaget, ud fra, at A har været fikseret med håndleds-, mave- og fodremme under hele forløbet. For så vidt angår berettigelsen af anbringelsen i sikringscelle den 12. juni 2007 er det i Københavns Fængslers rapport om anbringelsen angivet, at A, der ankom efter overførsel fra Vestre Fængsel, var særdeles ophidset og ydede så kraftig modstand, han skulle ud af bilen, at man måtte føre ham ind på Politigårdens Fængsel med magt samt at han her blev så voldsom, at det var nødvendigt at anbringe ham i sikringscelle. Retten lægger det anførte til grund. Betingelserne i straffuldbyrdelseslovens § 66 for at anbringe A i sikringscelle og fiksere ham må herefter anses for opfyldt.

Ved Københavns Byrets dom af 11. februar 2011 blev A fundet skyldig i overtrædelse af straffelovens § 119, stk. 1, svarende til det, som er angivet i Statsfængslet i Østjyllands rapport om sikringscellebringelsen den 22. januar 2009 kl. 14:20, ved som bisidder for en medindsat om at have overfaldet en fængselsfunktionær og tildelt denne slag i ansigtet. Ved straffedommen er det dermed fastslået, at A har begået vold som angivet i rapporten om sikringscellebringelsen. Henset til den udøvede vold og det i øvrigt oplyste i rapporten fra Østjyllands Fængsler om anbringelsen i sikringscelle var betingelserne for sikringscellebringelse og fiksering i straffuldbyrdelseslovens § 66 opfyldt. For så vidt angår længden af anbringelsen, som varede i alt 2 timer og 30 minutter, fremgår det af rapporten, at A gentagne gange råbte op, rev i remtøj og truede, senest kl. 16:20, hvor han råbte truende om hævn, samt at overførsel til Københavns Fængsler skete kl. 18:10. Der er efter det i rapporten anførte om A's truende adfærd ikke grundlag for at anse udstrækningen af anbringelsen og fikseringen for uberettiget.

Af Københavns Fængslers rapport om den fortsatte sikringscellebringelse og fiksering ved ankomsten til fængslet den 22. januar 2009 kl. 19:50 er der intet noteret om, at A, som blev modtaget i håndjern, skulle have ydet modstand eller udtalt sig truende imod personalet i Københavns Fængsler. Det er angivet, at han ønskede en trussel på livet mod fængselspersonalet i Østjyllands Statsfængsel »først til protokols«, og at han virkede vred og indædt, men også, at han selv lagde sig til rette. Under den fortsatte anbringelse frem til 24. januar 2009 kl. 23:30, hvor han blev udtaget af sikringscellen og fikseringen, er det generelt noteret, at A lå roligt/stille. Det fremgår, at han ved kontaktforsøg fra personalets side den 23. januar 2009 kl. 12:50 og kl. 14:40 afviste kontakt og bad de pågældende »fucke af«, og at han kl. 20:56 gjorde tegn til personalet om at få sit tæppe vendt, hvilket skete. Den 24. januar 2009 kl. 17:40 blev han tilbudt mad og drikke, men ønskede det ikke. Samme dag er det noteret, at han kl. 19:30 blev tilbudt vand, men »takker surt nej«. Kl. 22:50 anmodede A om en urinkolbe, hvilket han fik. Han sagde nej til vand og bad om at komme op på egen celle. Det vurderedes ifølge noteringen herefter, at han kunne komme til egen celle, hvorefter han blev udtaget af sikringscellen den 24. januar 23:30 efter i alt 2 døgn 3 timer og 30 minutter. Efter indholdet af rapporten har der ikke været noget egentligt grundlag for indgrebet i form af konkret truende adfærd eller voldsudøvelse over for fængselspersonalet i Københavns Fængsler. Truslen over for fængselspersonale i Østjyllands Statsfængsel findes ikke i sig selv at kunne begrunde en anbringelse i sikringscelle under anvendelse af fiksering med bælte, håndrem og fodrem efter 4 timers transport. Hertil kommer, at der heller ikke under anbringelsen er fremsat nogen form for trusler eller udvist anden form for adfærd, der kunne begrunde det meget langvarige indgreb. Retten finder på den baggrund anbringelsen og fikseringen i sikringscelle på Københavns Fængsler uberettiget.

A har tidligere søgt om erstatning efter reglerne i retsplejelovens §§ 106-107, jf. kapitel 93 a, for sikringscellebringelsen på Anstalten ved Herstedvester fra den 19. august 2005 kl. 13:05 til den 21. august 2005 kl. 13:05 på 2 døgn. Sagen blev afvist fra domstolene ved Glostrup Rets dom af 22. marts 2013 under henvisning til manglende hjemmel til at behandle det rejste erstatningskrav for forhold under straffuldbyrdelsen efter reglerne i retsplejelovens kapitel 93 a. Da der ikke er truffet en realitetsafgørelse om erstatningskravet for benyttelsen af gas og sikringscellebringelsen den 19. august 2005, er A ikke afskåret fra at rejse kravet under denne sag. Efter indholdet af rapporten fra Anstalten ved Herstedvester om indgrebet samt forklaringen fra B og til dels A's forklaring lægges det til grund, at fængslet havde besluttet at overføre A til en almindelig observationscelle som følge af trusler fremsat over

for en fængselsbetjent. Der er ikke grundlag for at anse fængslets beslutning herom for uberettiget. Det lægges endvidere til grund, at A nægtede at medvirke hertil, og at man herefter på baggrund af fængslets kendskab til A's generelt voldelige reaktionsmønster besluttede at anvende tåregas for at tvinge ham til at medvirke. Tåregas er nævnt i

**3107**

straffuldbyrdelseslovens § 62, stk. 2, som et magtmiddel, der kan anvendes. Der blev, før tåregassen blev taget i brug, advaret herom som krævet i dagældende bekendtgørelse nr. 382 af 17. maj 2001 om magtanvendelse § 6. B har forklaret, at brug af tåregas blev anset for mere lempeligt for både A og personalet, idet alternativet erfaringsmæssigt måtte antages at være en betydelig magtudøvelse fra flere betjente med brug af stave. Retten finder, at der ikke er grundlag for at tilsidesætte fængselspersonalets vurdering, der var baseret på deres forudgående kendskab til A og hans sædvanlige reaktionsmønstre, om at anvendelse af tåregas ville være mere lempeligt i situationen, og derfor var det magtmiddel, der skulle tages i brug, jf. straffuldbyrdelseslovens § 33, stk. 4. Den omstændighed, at tåregassen ikke virkede på A, og at det herefter blev nødvendigt at anvende anden betydelig magt for at få ham ud af cellen, kan ikke føre til et andet resultat. Det lægges efter rapporten til grund, at A gjorde betydelig modstand, og det derfor blev anset for nødvendigt at anvende sikringscelle. Der er ikke grundlag for at antage, at betingelserne for brug af sikringscelle ikke var opfyldt. Det fremgår af sikringscellerapporten, at A frem til den 21. august 2005 om morgenen med jævne mellemrum fremkom med aggressive udtalelser og alvorlige trusler mod fængselspersonalet. Kl. 7:30 den 21. august 2005 fik han løsnet armremmene. Da han senere om morgenen kl. 8:20 meddelte, at han intet kunne huske, og at der ikke var »mere ballade med ham«, fik han at vide, at det afhang af hans adfærd i løbet af morgenen, om han ville blive flyttet. Han blev herefter udtaget af sikringscellen kl. 13:05. Retten finder, at der efter det oplyste om forløbet af anbringelsen ikke er grundlag for at anse anbringelsen for mere langvarig end nødvendigt. Der har herved foreligget sådanne omstændigheder, at tvangsfikseringen undtagelsesvis har kunnet opretholdes i over ét døgn, jf. § 8 i den dagældende sikringscellebekendtgørelse.

*Øvrige anbringelser i sikringscelle:*

For så vidt angår sikringscelleanbringelse på Københavns Fængsler i perioden den 18. august 2003 kl. 2:20 - 19. august 2003 kl. 13:04 på i alt 1 døgn 10 timer og 44 minutter, fremgår det af rapporten, at A råbte, slog og sparkede på celleinventaret og meddelte, at han ikke ville overgive sig uden kamp. Da fængselspersonalet forsøgte at åbne døren til cellen, havde A blokeret den. Det blev besluttet at »tage ham med magt« og dette sket under brug af skjolde under voldsom modstand fra A's side. Medens han blev ført til sikringscellen gjorde han ifølge rapporten fortsat modstand. Kl. 2:25 er det noteret, at A var angst og sikker på, at personalet ville slå ham ihjel og græd. Fra kl. 2:40 lå han roligt, og da han blev tilset af læge kl. 3:40, er det også noteret, at han var rolig. Kl. 4:10 råbte A. Det gjorde han også kl. 5:20, hvor han spyttede voldsomt bagefter. Ellers fremgår det af notaterne, at han lå roligt og sov i tidsrummet 6:00 - 8:00. Der er på ny notat om, at A råbte »lidt ind i mellem« kl. 8:50, og om, at han råbte, at bæltet var stramt (formentlig) ca. kl. 9:10, hvilket han gentog (uden råben) kl. 9:35, og kl. 10:00, hvor han spurgte, om det kunne blive løsnet. I hele perioden frem til kl. 11:30 er der i øvrigt kun noteringer om, at A lå roligt. Kl. 11:30 meddelte han at være klar til at returnere til egen celle, men fængselsfunktionærerne vurderede ifølge notatet på dette tidspunkt, at han ikke var »klar«. I tiden herefter er der notater om, at A kl. 14:20 råbte, at han ville slippes fri, og kl. 14:45, at han lå og råbte. I øvrigt er der kun notater om, at han lå roligt frem til

kl. 18:05 den 18. august 2003, hvor det fremgår, at fikseringen var aftaget, og at han var flyttet til SM12 samt tilset af en sygeplejerske og havde fået mad og mælk kl. 18:15. Af notaterne om observationerne af A i den celle, hvor han blev indsat uden fiksering, fremgår, at han var rolig frem til kl. 13:04 den 19. august 2003, hvor han blev afhentet til Horsens Statsfængsel. Efter det beskrevne om optakten til sikringscelleanbringelsen finder retten anbringelsen og fikseringen berettiget. Udstrækningen af anbringelsen og fikseringen findes imidlertid at have overskredet det fornødne fra om morgenen den 18. august 2003, hvor A ifølge rapporten havde ligget roligt og herunder sovet fra kl. 6:00-8:00 i et betydeligt antal timer. For så vidt angår tidsrummet fra om morgen den 18. august 2003 til aftagelsen af fikseringen og overflytningen til en anden celle kl. 18:05 den 18. august 2003 er artikel 3 i den Europæiske Menneskerettighedskonvention tilsidesat. Efter det tidspunkt, hvor fikseringen blev aftaget, er der ikke holdepunkter for, at A var udsat for en så betydelig fysisk og psykisk lidelse, at bestemmelsen kan finde anvendelse, herunder også henset til at anbringelsen ophørte den 19. august 2003 kl. 13:04.

Ifølge rapporten om sikringscelleanbringelse fra Statsfængslet i Horsens i perioden den 31. august 2003 kl. 13:55 - 31. august 2003 kl. 16:47 var anbringelsen begrundet i en beslutning om, at A, der hørte stemmer og var yderst aggressiv, skulle overføres til en observationscelle. Under overførslen slog han ud efter en fængselsfunktionær. Beslutningen om overførsel til observationscelle samt indsættelsen i sikringscelle og fikseringen findes berettiget. Udstrækningen af indgrebet, der ophørte efter knap 3 timer, kan ikke anses for uberettiget.

I rapporten om sikringscelleanbringelse fra Anstalten ved Herstedvester i perioden den 21. november 2003 kl. 13:50 - 22. november 2003 kl. 10:55 på i alt 21 timer og 5 minutter er beslutningen om at indsætte A i sikringscelle og fiksere ham begrundet med, at han blev tiltagende urolig og aggressiv i den observationscelle, hvor han var anbragt. Han råbte og bankede på dørene og ophørte ikke hermed, da personalet kl. 13:50 meddelte, at han, hvis han ikke stoppede, ville blive anbragt i en

**3108**

sikringscelle. I det første notat om anbringelsen er det anført, at A blev anbragt i sikringscelle, fordi han ikke ville medvirke til at følge personalets anvisninger og udviste truende adfærd. Uanset om selve anbringelsen i sikringscelle kan anses for berettiget, kan anvendelsen af fiksering med bælte, håndrem, fodrem og handsker ikke anses for nødvendig ud fra det, der er noteret om begrundelsen for overførslen. I hvert fald fiksering må på den baggrund anses for uberettiget.

Af rapporten om sikringscelleanbringelse fra Anstalten ved Herstedvester i perioden den 26. november 2003 kl. 17:45 - 27. november 2003 kl. 7:19 på i alt 13 timer og 34 minutter fremgår, at indgrebet skete som følge af A's voldelige overfald på en medindsat på afdelingens opholdsstue. Indsættelsen og fikseringen med brug af mavebælte, hånd- og fodremme samt handsker findes på den baggrund berettiget. Efter i en periode ind i mellem at have spyttet, være kommet med ukvemsord over for personalet og have råbt og piftet, forsøgt at komme fri af remmene, faldt A ifølge noteringerne i søvn omkring kl. 00:00 - 00:15 den 26. - 27. november 2003. Han sov herefter stort set uafbrudt indtil kl. 7:15 den 27. november 2003, hvor han blev udtaget af sikringscellen. Udstrækningen af anbringelsen, medens A sov, kan ikke anses for uberettiget. Det kan heller ikke anses for uberettiget, at fængselspersonalet lod ham sove under fortsat brug af fiksering fremfor at vække ham for at vurdere, om han var faldet så meget til ro, at han kunne udtages af fikseringen og sikringscellen.

Copyright © 2023 Karnov Group Denmark A/S

Det fremgår af rapporten om sikringscelleanbringelse fra Anstalten ved Herstedvester i perioden den 9. december 2003 kl. 18:10 - 10. december 2003 kl. 8:05 på i alt 13 timer og 55 minutter, at indsættelsen i sikringscelle og fikseringen med mavebælte, hånd- og fodremme samt handsker skete for at hindre selvbeskadigelse eller selvmord, idet A, som på grund af paranoid og truende aggressiv adfærd var flyttet til en observationscelle, blev set sidde med en spids og skarp genstand og oprullede ærmer. Han blev herefter med magt overført til sikringscellen. Der er på den nævnte baggrund ikke grundlag for at anse anbringelsen i sikringscelle og fikseringen for uberettiget. Ifølge noteringerne truede A med hævn og lå ind imellem og råbte og hev i remmene frem til kl. 19:25 den 9. december 2003. Der er herefter ikke noteringer om aggressiv adfærd eller andet frem til det tidspunkt, hvor han blev udtaget af sikringscellen kl. 8:05 den 10. december 2003. Kl. 19:35 den 9. december 2003 fik han løsnet en armrem for at kunne tisse i en kolbe henholdsvis kl. 19:45 for at ryge. Kl. 20:05 fikseredes hånden igen. Fra dette tidspunkt og resten af anbringelsen ophørte brugen af handsker. Kl. 22:45 løsnedes venstre arm, hvorefter A faldt i søvn og sov frem til kl. 5:40 den 10. december 2003, hvor han fik en cigaret. Kl. 6:00 løsnedes hans højre hånd, hvilket skete, efter at venstre hånd i stedet var blevet spændt fast. Mistanken om forsøg på selvmord eller selvbeskadigelse kunne begrunde en observationsperiode i en sikringscelle uden adgang til remedier, hvormed A kunne skade sig selv svarende til den tid, hvor A samlet opholdt sig i sikringscellen. Hans indledningsvis aggressive adfærd og trusler berettigede endvidere brug af fiksering, herunder også i en vis tid efter det tidspunkt, hvor han var faldet til ro. Opretholdelsen af fikseringen efter det tidspunkt kl. 19:25 den 9. december 2003, hvor A senest truede og råbte mv. og herefter havde været rolig i flere timer herefter, må imidlertid anses for uberettiget.

Sikringscelleanbringelsen på Anstalten ved Herstedvester i perioden 27. august 2004 kl. 11.50 - 27. august 2004 kl. 17:30 (i alt 5 timer og 40 minutter) er afslutningen på en anbringelse i observationscelle I6 på Herstedvester i 100 døgn, 20 timer og 35 minutter, jf. om denne anbringelse nedenfor. Det fremgår af rapporten om sikringscelleanbringelsen og den forudgående rapport om anbringelsen i observationscelle, at A om formiddagen den 27. august 2004 udviste en stedse mere paranoid adfærd, og herunder hørte stemmer. Under en samtale med psykiater G, som var blevet tilkaldt af fængselspersonalet, blev han gradvist mere og mere aggressiv og sprang, da hun havde forladt cellen, truende op fra sin seng og gjorde med knyttede næver udfald mod en fængselsfunktionær. Han blev herefter uden større problemer anbragt i sikringscelle, hvor han indledningsvis var højtråbende og urolig samt forsøgte at vriste sig fri af remmene. Efter det oplyste om A's paranoide adfærd og truende udfald mod en fængselsfunktionær findes anbringelsen i sikringscelle og fikseringen med mavebælte, hånd- og fodremme samt handsker berettiget. Ifølge noteringerne faldt han relativt hurtigt til ro, men gav kl. 15:20 udtryk for en forestilling om, at fængslet omstillede hans samtaler, så han kunne komme i kontakt med sin mor, selvom han ringede til det rigtige nummer. Kl. 16:00 fik A løsnet handsker og håndledsremme, så han kunne ryge, og det blev aftalt, at man, hvis han stadig var rolig ved 18-tiden, ville tage ham ud af cellen. Han blev udtaget kl. 17:30. Henset til den paranoide forestilling, A fortsat gav udtryk for kl. 15:20, og behovet for en vis observationsperiode inden indsættelsen og fikseringen helt ophørte, kan indgrebet ikke anses for mere langvarigt end nødvendigt.

Ifølge rapporten om sikringscelleanbringelse fra Københavns Fængsler i perioden 6. august 2005 kl. 20:40 - 9. august 2005 kl. 8:24 på i alt 2 døgn 11 timer og 44 minutter var indgrebet begrundet i en voldsomt aggressiv adfærd hos A, der var i færd med at smadre inventaret i sin celle. Han gjorde kraftig modstand, da fængselsfunktionærerne under brug af indsatsudstyr og stave trængte ind for at pacificere ham og blev herefter under fortsat voldsom modstand anbragt i sikringscellen og

**3109**

fikseret. På den nævnte baggrund findes indgrebet berettiget. Det fremgår af et afsluttende notat, at fikseringen med mavebælte, håndrem og fodremme er opretholdt under hele anbringelsen, selvom det efter rubrikken om »Fiksering« ser ud, som om fikseringen er ophørt midt på dagen den 8. august 2005. Der er noteringer om trusler mod personalet og forsøg på at komme fri af fikseringen samt skældsord frem til kl. 23:45 den 6. august 2005. Herefter er der et notat om, at A gav en fængselsbetjent »fingeren« kl. 01:15 den 7. august 2005. Fra kl. 3:00 råbte A på ny op, kom med trusler kl. 3:30 og spyttede efter observationsglasset, da en fængselsbetjent så til ham kl. 3:45. A lå, bortset fra spytten mod observationsruden efter at have fået afslag på kontakt til bistandsværge kl. 9:40, ifølge noteringerne herefter roligt frem til kl. 13:25 den 7. august 2005, hvor en fængselsfunktionær havde en samtale med ham og spurgte, om han var faldet så meget til ro, at han kunne føres til en observationscelle. Ifølge det noterede »ønskede A ikke at deltage i vores forslag, han stillede derimod en række modkrav. Personalet enedes om, at det ikke ville være løsningen at ophæve indsattes fiksering«. A råbte herefter kl. 13:30, at hvis hans krav ikke blev imødekommet »kan vi ligeså godt trække stavene«. Kl. 13:40 ringede A og gentog sine krav, som efter det noterede var at telefonere og få tobak. Han blev oplyst om, at han hverken ville få lov at telefonere eller få tilbudt cigaretter, »så længe han er fikseret og i så negativt humør«. Der er umiddelbart herefter et notat om en samtale, hvorunder fængselsbetjenten meddelte A, at han hverken ville få telefon eller cigaretter ved tilbageførsel til observationscellen, hvorefter A meddelte, at så kunne han »jo ligeså godt blive liggende«. Der er, bortset fra et notat om råben og støj kl. 16:15 og et notat kl. 19:45 om, at han råbte og kaldte en betjent for »en drengerøv«, ingen noteringer om aggressiv adfærd fra A's side i tiden herefter. Kl. 19:35 den 7. august 2005 blev hans anmodning om at blive tilset af en læge efter drøftelse med det lægefaglige personale på Vestre Fængsel afslået, under henvisning til at han ikke ville oplyse, hvad formålet var. Kl. 21:30 og kl. 23:30 råbte han efter en betjent. Kl. 4:15 den 8. august 2005 spurgte A igen efter en læge, men henvistes til at tale med en navngiven medarbejder. Kl. 8:20 råbte han ind imellem. Kl. 9:45 er der notat om, at overvagtmesteren, som var tilkaldt efter anmodning fra A, havde talt med denne, samt at A afslog et tilbud om vand. Der er noteringer om forsøg på at tisse i en kolbe samt om tilsyn af sygeplejerske i løbet af formiddagen og midt på dagen den 8. august samt om tilsyn af læge og sygeplejerske kl. 13:50. Kl. 14:06 fik han medicin mod smerter og afslag på at blive vasket. Kl. 14:25 blev der efter konsultation med sygeplejersken på ny givet afslag herpå. Noteringerne fortsætter løbende frem til A blev udtaget af sikringscellen den 9. august 2005 kl. 8:24. Ifølge noteringerne i rapporten var A faldet til ro om formiddagen den 7. august 2005. Den herefter fortsatte anbringelse i sikringscelle og fiksering synes væsentligst at have været begrundet i, at A fremsatte forskellige krav under en samtale kl. 13:25 den 7. august 2005 om at få lov til at ryge og telefonere, når han blev overført til observationscellen. Uanset om disse krav ikke kunne imødekommes, må opretholdelsen af anbringelsen i sikringscelle under fortsat fiksering efter det tidspunkt om formiddagen den 7. august 2005, hvor A havde været rolig i en vis observationsperiode, anses for uberettiget.

Sikringscelleanbringelsen på Anstalten ved Herstedvester i perioden 30. september 2005 kl. 13:40 - 5. oktober 2005 kl. 12:30 (i alt 4 døgn 22 timer og 50 minutter) skete i umiddelbar forlængelse af

indsættelsen i observationscelle I5 fra den 21. august 2005, kl. 13:05 - 30. september 2005 kl. 13:50, jf. om denne anbringelse nedenfor. Ifølge de to rapporter skete anbringelsen i observationscelle, fordi A efter et toiletbesøg meddelte, at han hellere ville gå i sikringscellen (I7) frem for at gå til observationscelle I5, hvortil han skulle flyttes. Årsagen til, at han skulle flyttes til observationscelle I5, var ifølge rapporterne, at han var fremkommet med alvorlige trusler mod en fængselsfunktionær og derfor i henhold til de gældende »klare retningslinjer« om blandt andet ikke at tolerere trusler mod personalet ikke skulle have adgang til de særlige privilegier i form af tv, playstation mv., som han havde i den observationscelle I6, der var indrettet som en normal celle. Af rapporten fremgår, at han selv gik ind i sikringscellen I7 og herefter af personalet blev instrueret om at lægge sig ned, »så han kan blive fikseret med samtlige remme, jf. gældende regler.« Da A nægtede dette, blev han, fordi personalet ikke tog »nogen chancer pga. inds. farlighed og had over for det tjenestegørende personale«, fikseret med magt. Efter det beskrevne forløb var der ikke grundlag for at fiksere A. Fikseringen og opretholdelsen af indsættelsen i sikringscelle må herefter anses for uberettiget. Den omstændighed, at A efterfølgende truede fængselsfunktionærerne og på et tidspunkt, hvor det var lykkedes ham at frigøre sig fra remmene, måtte holdes med brug af skjold og herefter fikseres med brug af håndjern mellem håndledsrem og seng, kan ikke føre til et andet resultat.

Det fremgår af rapporten om sikringscelleanbringelse i Statsfængslet i Vridsløselille i perioden 20. marts 2006 kl. 18:45 - 21. marts 2006 kl. 16:00 på i alt 21 timer og 15 minutter, at A modsatte sig en rutinemæssig visitation, som herefter blev søgt gennemført tvangsmæssigt. Da A gjorde voldsom modstand og herunder forsøgte at slå fængselsbetjentene og nikke skaller, blev han under fortsat voldsom modstand og yderligere forsøg på at nikke skaller bragt til en sikringscelle og fikseret. På den nævnte baggrund findes anbringelsen i sikringscelle og fikseringen berettiget. Om forløbet fremgår det, at A frem til

**3110**

kl. ca. 23:00 den 20. marts 2006 råbte, skreg og truede. Han sov stort set uafbrudt frem til kl. 6:40 den 21. marts 2006, hvor han forlangte at se en læge, men fik at vide, at han måtte vente på, at sygeplejerskerne havde tid til at se ham. Herefter råbte A kl. 6:45 hele tiden efter en læge og råbte samtidig skældsord efter en fængselsbetjent. Fra kl. 8:00 sov A på ny og råbte herefter fra han vågnede kl. 8:45 igen og kl. 9:00 og 9:15 og spurgte efter en læge kl. 9:30. Omkring kl. 10:00 blev han tilset af en sygeplejerske, og det er noteret, at han var »lettere opkørt« og råbte en del. Kl. 10:59 er det noteret, at han var blevet rolig. Det er noteret, at han kl. 13:15 fik afslag på at få løsnet bæltet og at få en cigaret og var rasende. Kl. 16:03 den 21. marts 2006 ophørte sikringscelleanbringelsen, da A blev overført til Politigårdens Fængsel. Efter det oplyste om jævnlige aggressive udfald og raseri hos A under forløbet er der ikke grundlag for at anse anbringelsen og fikseringen for at være for langvarig.

Ifølge rapport om den fortsatte sikringscelleanbringelse i Københavns Fængsler i perioden 21. marts 2006 kl. 16:28 - 22. marts 2006 kl. 10:04 på i alt 17 timer og 36 minutter var anbringelsen i sikringscelle og fikseringen begrundet med, at A stadig var truende og aggressiv. Selvom det havde været ønskeligt, om det havde været uddybet nærmere, finder retten, at der ikke er grundlag for at anse beslutningen om at anbringe A i sikringscelle under brug af fiksering for uberettiget. Det fremgår imidlertid af rapporten, at A under hele forløbet lå roligt. Langt hovedparten af indgrebet, som varede 17 timer og 36 minutter, må på den baggrund anses for uberettiget.

Af rapporten om sikringscelleanbringelsen i Københavns Fængsler i perioden den 28. juli 2006 kl. 19:55 - 30. juli 2006 kl. 10:35 på i alt 1 døgn 14 timer og 40 minutter fremgår, at anbringelsen og fikseringen skete, fordi A var meget opfarende og truende samt sparkede og slog på døren i sin egen celle og ikke kunne formås til at forholde sig roligt. Det blev i lyset af de trusler på livet, han tillige fremkom med over for personalet, besluttet at flytte ham fra egen celle. Han modsatte sig dette og blev herefter flyttet med magt til sikringscellen, hvor han blev fikseret. Efter det beskrevne forløb finder retten anbringelsen i sikringscelle og fikseringen berettiget. Om forløbet fremgår det, at A kl. 20:40 råbte til en fængselsfunktionær, at han ville prikke øjenene ud på ham, og at han kl. 21:30 efter lægens tilsyn var aggressiv og råbte ukvemsord. Lægen har om tilsynet kl. 21:15 den 28. juli 2006 blandt andet noteret, at A angav, at en fængselsfunktionær havde forsøgt at tage kvælertag på ham og slået ham i hovedet, men at lægen ikke var synlige skader på A's hals eller hoved. Desuden fremgår det, at A under samtalen tilsidst sig op og begyndte at trampe og truede med at slå en vagt ihjel, når han kommer til Herstedvester. Kl. 22:10 er der igen i rapporten et notat om trusler på livet. I notaterne frem til og med kl. 11:30 den 29. juli 2006 er det noteret, at A lå stille henholdsvis, at han sov. Kl. 11:40 gav han en fængselsfunktionær »fingeren«. Kl. 11:55 besvarede han et spørgsmål om, hvorvidt han var rolig negativt og opfarende, hvorefter det blev besluttet at bibeholde fikseringen. Kl. 16:10 var der på ny en samtale, hvorunder A udtalte, at han ville overfalde personalet, hvis han blev løsnet. Kl. 18:40 råbte og skreg A, og kl. 18:50 var A truende over for personalet. Kl. 19:10 hamrede han sit hoved ind i sengen og råbte og truede. Kl. 19:25 råbte han på en læge, hvilket der var en samtale om umiddelbart efter. A afslog tilbud om vand. Kl. 20:05 blev han tilset af en læge, og der var herefter flere samtaler mellem denne og A frem til kl. 20:30, hvor lægen bestilte en psykiater. Ifølge lægens notater i rapporten sagde A under tilsynet kl. 19:50 den 29. juli 2006, at han nok skulle være stille og rolig, men truede i næste øjeblik med at slå sit hoved ned i jernstangen i lejet for at blive bevidstløs, og spyttede samtidig på væggen. Der blev talt om, at det var en god idé, at han skulle være stille og rolig for at komme ud af cellen samt om risikoen for dehydrering. Kl. 20:40 hamrede A hovedet ind i sengekanten. Bortset fra notater om hjælp til at tisse ved hjælp af en kolbe og om placering af et tæppe for at afhjælpe smerter i A's knæ er der derefter alene notater om, at A sov eller prøvede at sove frem til kl. 01:05 - 01:10 den 30. juli 2006, hvor A fik afslag på et ønske om at ryge - og herefter kl. 1:20 var meget utilfreds hermed og gav udtryk for, at der var tale om magtmisbrug. Der er herefter notater om, at A med jævne mellemrum ringede og ville have tobak. Kl. 01:55 ønskede A medicin, men ønskede ikke at indtage den, fordi fængselsfunktionæren ikke ville løsne ham, så han kunne se den. Kl. 8:15 fik han tilbudt medicin. Ifølge de følgende notater lå A roligt frem til kl. 10:33 den 30. juli 2006, hvor han efter en samtale med en fængselsfunktionær blev udtaget af sikringscellen. Efter det oplyste om de voldsomme trusler rettet mod fængselsfunktionærerne, som A fremkom med gentagne gange under forløbet over for så vel fængselsfunktionærerne som den tilsynsførende læge, samt hans selvbeskadigende adfærd med at slå hovedet mod sengen, finder retten, at der frem det tidspunkt om morgenen den 30. juli 2006 kl. 8:15, hvor A ikke reagerede med aggression på tilbuddet om medicin, har været fornødent grundlag for at opholde sikringscelleanbringelsen og fikseringen. Den fortsatte fiksering efter kl. 8:15 den 30. juli 2006 må derimod anses for uberettiget.

Som tidligere nævnt blev A efter den sikringscelleanbringelse i perioden den 12. juni 2007 kl. 13:15 - 13. juni 2007 kl. 16:20 som ved Københavns Byrets dom af 11. februar 2011 er fundet for

langvarig, placeret i observationscelle fra den 13. juni 2007 kl. 16:25 - 13. juni. 2007 kl. 17:38, jf. om berettigelsen af denne anbringelse nedenfor. Observationscelleanbringelsen blev ifølge rapporten om observationscelleanbringelsen og rapport om

**3111**

sikringscelleanbringelse fra den 13. juni 2007 kl. 17:25 - 14. juni kl. 14:10 (i alt 20 timer og 45 minutter) erstattet af en anbringelse i sikringscelle under fiksering, fordi A i observationscellen efter først at have ringet hamrede på døren og hamrede sit hoved og sine hænder mod celledøren og, da fængselspersonalet søgte at tale ham til ro, fortsat var ilter og ikke kunne bringes til at føre en samtale. Under hensyn til navnlig A's forsøg på selvbeskadigelse ved at hamre hoved og hænder mod celledøren, findes anbringelsen i sikringscelle og fikseringen berettiget. Ifølge notaterne umiddelbart efter anbringelsen fremkom A med trusler mod fængselspersonalet, ligesom han råbte op og var meget opfarende. Ifølge et notat kl. 18:47 den 13. juni 2007 fremkom A under en længere samtale med den tilsynsførende læge og fængselsfunktionæren med yderligere skældsord. Frem til kl. 6:50 næste morgen den 14. juni 2007 er der kun notater om, at A forholdt sig roligt. På dette tidspunkt spurgte han efter F (overvagtmester F) og fik på anmodning sin medicin udleveret. Kl. 7:05 klagede A over den behandling, han havde fået, og angav, at han ville tilses af læge og psykiater. Kl. 7:25 spurgte han igen efter, hvornår F ville møde på arbejde. Kl. 8:30 afslog A tilbud om morgenmad og få den ene arm løsnet imedens, idet han ikke ville have mad, hvis han ikke blev løsnet helt. Kl. 9:50 havde F en samtale med A, som fremkom med beskyldninger mod personalet og ikke ville tale om selvbeskadigelsen. F vurderede på den baggrund, at der fortsat var risiko for selvbeskadigelse, hvis A fik mulighed herfor. Indsættelsen og fikseringen blev derfor opretholdt. Der var i tidsrummet kl. 8:25 - 9:30 ordvekslinger, hvorunder A oplyste at være rolig, at han gerne ville løsnes og gerne ville tale med F igen. Det skete kl. 9:50. Ifølge F's notering kl. 13:08 blev A hurtigt aggressiv og udtalte, at han ikke ville flyttes, »for det gik jo kun ud på give ham (inds.) flere bank«. Ifølge notatet vurderede F, at A fortsat udviste aggressiv adfærd med risiko for overgreb mod personalet og besluttede derfor at opretholde fikseringen. Kl. 10:25 og 10:45 fremkom A med forskellige skældsord over for fængselsfunktionærerne. Efter en yderligere samtale med F blev A udtaget af fikseringen og sikringscellen. Under samtalen havde A angivet nu at være rolig. Han bad om garanti for, at han »ikke får bank igen«, og blev vejledt om adgangen til at klage, hvis han mente, at han var blevet behandlet uretmæssigt. Efter det i rapporten angivne om de trusler mv., A fremkom med over for fængselspersonalet, samt om overvagtmester F's samtaler med A og F's vurdering af, at der fortsat var risiko for selvbeskadigelse henholdsvis overgreb på fængselspersonalet, er der ikke grundlag for at anse udstrækningen af sikringscelleanbringelsen og fikseringen for uberettiget.

Sikringscelleanbringelsen i Statsfængslet i Østjylland fra den 3. juli 2008 kl. 16:15 - 4. juli 2008 kl. 7: 25 på i alt 15 timer og 10 minutter var ifølge rapporten begrundet i, at A under et forløb, der blev indledt med, at A fik besked på at iføre sig t-shirt og fodtøj, hidsede sig mere og mere op og endte med først at true en fængselsfunktionær og herefter, da denne følte sig truet og skubbede ham væk, slog fængselsfunktionæren i panden med knyttet hånd. Da fængselsfunktionæren faldt om, fulgte A efter og fortsatte med at slå ud og sparke efter den pågældende, selv efter at være blevet grebet bagfra af en anden fængselsfunktionær. På den baggrund må sikringscelleanbringelsen og fikseringen anses for berettiget. Efter indsættelsen forholdt A sig relativt roligt. Han gav under en samtale kl. 18:00 den 3. juli 2008 udtryk for at være meget forbitret over indsættelsen, idet han dog erkendte at have slået en

fængselsfunktionær. Han mente imidlertid, at det var selvforsvar, da han følte sig forulempet af den pågældende. Det er noteret, at han var meget vred og ophidset under samtalen. Efter råben, skrigen og spytten på gulvet kl. 19:15 - 19:30 faldt A til ro og lagde sig for at forsøge på at sove, hvilket efter »test« af håndrem samt råben og snakken med sig selv kl. 20:45 - 21:00 skete kl. 21:30. Efter at være vågnet kl. 6:45 den 4. juli 2008 blev A kl. 7:25 udtaget af sikringscellen med henblik på overførsel til Politigårdens Fængsel. Efter det beskrevne forløb har anbringelsen og fikseringen ikke haft en længere udstrækning end berettiget. Der henvises i den forbindelse til det tidligere anførte om opretholdelse af fiksering under søvn.

Ifølge rapporten om den fortsatte sikringscelleanbringelse fra den 4. juli 2008 kl. 10:15 - 4. juli 2008 kl. 11:35, der skete på Københavns Fængsler umiddelbart efter overførslen af A fra sikringscelleanbringelsen i Østjylland, var A iført håndjern ved ankomsten og måtte bæres fra bilen. På den baggrund og henset til baggrunden for overførslen må den kortvarige anbringelse i sikringscelle under fiksering på 1 time og 20 minutter, der fandt sted, anses for berettiget.

Sikringscelleanbringelse i Københavns Fængsler fra den 30. juli 2008 kl. 12:15 - 31. juli 2008 kl. 14:15 på i alt 2 døgn 2 timer fandt sted efter observationscelleanbringelsen i Københavns Fængsler fra den 30. juli 2008 kl. 11:45 - 30. juli 2008 kl. 12:15, jf. om berettigelsen af denne anbringelse nedenfor. Ifølge rapporterne skete anbringelsen i sikringscelle for at »betvinge voldsom modstand«, idet A i observationscellen var meget voldsom og skreg højlydt, og, da en fængselsfunktionær forsøgte at tale ham til ro, blev endnu mere voldsom og forsøgte at rive celledøren op. Herefter og efter det oplyste om den voldsomme fysiske modstand, A ydede under overførelsen, findes anbringelsen i sikringscelle og fikseringen berettiget. Vedrørende forløbet fremgår det af rapporten, at man kl. 14:15 den 30. juli 2008 forsøgte at flytte A, som indtil dette tidspunkt havde ligget roligt, tilbage til observationscellen, men opgav det, da han gik

**3112**

»verbalt amok« og råbte »forbandede luder« m.fl. ukvemsord. Han lå herefter rolig frem til kl. 10:00 den 31. juli 2008, hvor det er noteret, at områdelederen igen forsøgte at føre en samtale med ham med henblik på tilbageførsel til observationscellen. Dette resulterede imidlertid i, at A begyndte at skrige og råbe, at han ikke ville flyttes, og at fængselspersonalet »skulle skride ad helvede til«. Dette gentog sig under et forsøg på samtale om overførsel kl. 11:05. Efter en læge kl. 13:20 havde tilset A, blev det kl. 14:15 vurderet, at A kunne gå tilbage til sin egen celle. Det er noteret, at A, da han blev løsnet, var meget konfliktsøgende i forhold til personalet, men dog ikke gjorde udfald. Efter det beskrevne forløb, hvor A, hver gang områdelederen forsøgte at få en samtale med ham med henblik på udtagelse af sikringscellen og fikseringen, gik verbalt »amok« og blev stærkt aggressiv, kan udstrækningen af opholdet i sikringscelle og fikseringen ikke anses for uberettiget. Der her herved foreligget sådanne omstændigheder, at tvangsfikseringen undtagelsesvis har kunnet opretholdes i over ét døgn, jf. § 8 i den dagældende sikringscellebekendtgørelse.

Ifølge rapporten om sikringscelleanbringelsen i Københavns Fængsler fra den 15. august 2008 kl. 21:15 til den 17. august 2008 kl. 22:11 på i alt 2 døgn, og 56 minutter skete anbringelsen og fikseringen efter et forløb, hvor A indledningsvis havde råbt og banket voldsomt på inventaret i sin celle. En henstilling om at holde op hjalp ikke, og A var meget truende over for fængselsfunktionæren. Det blev herefter besluttet at overføre ham til en observationscelle, men A ville ikke følge med frivilligt og måtte derfor føres med magt. På den baggrund, og idet A fremkom med trusler på livet

mod fængselsfunktionærerne, blev der truffet beslutning om anbringelse i sikringscelle og om fiksering. Efter det nævnte forløb kan anbringelsen og fikseringen ikke anses for uberettiget. Af rapporten fremgår, at A efter nogle indledende trusler og ukvemsord forholdt sig roligt, idet han dog fuldstændig nægtede at tale med en tilsynsførende læge kl. 22:30 den 15. august 2008. Kl. 8:43 den 16. august 2008 blev det vurderet, at A ikke kunne føres tilbage til sin egen celle, da han havde truet med at »splitte hele lortet ad« og udtalt forskellige ukvemsord. Han forholdt sig fortsat roligt frem til kl. 13:57, hvor der er noteret, at han ignorerede en forespørgsel om, hvorvidt han var klar til at rykke op på egen celle. Han ignorerede en tilsvarende forespørgsel kl. 19:13 den 16. august 2008 og svarede heller ikke på en henvendelse om vand kl. 18:14. Under en samtale med den tilsynsførende læge kl. 00:10 den 17. august 2008 gav han højtråbende udtryk for, at betjentene bankede på væggene til hans celle, og møntet på en af betjentene, at »luderen på gangen griner af ham«. Desuden truede han med, at slå en af betjentene ihjel, hvis han kunne komme til det. Lægen forsøgte en samtale, men A var meget højtråbende. Kl. 2:25 forsøgte A at komme fri af fikseringen, samtidig med at han råbte dødstrusler til en fængselsfunktionær. Kl. 2:40 er det noteret, at A fik afslag på at få en kolbe til at tisse i, fordi »han er alt for voldsom og ophidset til, at vi kan løse fikseringen«. Det fremgår, at A under hele episoden var ekstremt truende. Kl. 2:55 satte han sig op og truede på ny en fængselsfunktionær på livet. Herefter forholdt A sig roligt og sov det meste af tiden frem til kl 8:15 om morgenen den 17. august 2008. Også herefter lå han ifølge notaterne roligt frem til kl. 12:25, hvor han på fængselspersonalets forespørgsel om, hvorvidt han ville være interesseret i at komme på toilet og derefter i observationscelle samt senere på aftenen tilbage til egen celle, svarede: »Jeg skal ud af den her fucking lorte celle. I er nogle fucking svin. Jeg skal smadre alt«, og udviste en meget fjendtlig holdning over for personalet. Det blev på den baggrund besluttet at lade ham blive i sikringscellen. Kl. 14:14 ønskede A ikke at tale med lægen, som var kommet til stede. Kl. 14:30 råbte han og truede med: »Det her får konsekvenser, når jeg kommer ud«. Kl. 15:45 ønskede A at tisse, og 3 betjente kom til stede for at bistå. Han havde i mellemtiden tisset på briksen. Der var en dialog om overførsel til observationscelle med henblik på senere at komme tilbage til egen celle, når overvagtmesteren mødte mandag, men A ønskede ingen af delene og nægtede at tale med personalet. Herefter forholdt A sig igen roligt, men afslog fortsat tilbud om vand. Kl. 20:00 var der på ny en samtale, hvorunder A klagede over ikke at blive flyttet, men samtidig blev mere og mere vred og truede en fængselsfunktionær på livet. Kl. 22:00 er det i forbindelse med udtagelsen fra sikringscellen noteret, at der har været en lang og rummelig dialog med A, som flere fængselsbetjente har været inde over og medvirket til at holde i gang. A blev efter at have været på toilettet overført til observationscelle, jf. om berettigelsen af denne anbringelse nedenfor. Efter det oplyste om forløbet, hvor A, når fængselspersonalet forsøgte en dialog med henblik på at få ham overført til observationscelle og herefter til egen celle, for op og blev stærkt aggressiv og truende, er der ikke grundlag for at anse udstrækningen af sikringscelleanbringelsen for uberettiget. Der har endvidere foreligget sådanne omstændigheder, at tvangsfikseringen undtagelsesvis har kunnet opretholdes i over et døgn, jf. § 8 i den pågældende sikringscellebekendtgørelse. Det gælder uanset de ganske lange perioder, hvor A, når han ikke var i kontakt med personalet, lå roligt, og uanset den samlede anbringelse og fiksering var på over 2 døgn. Der er herved ikke grundlag for at antage, at den dialog, der til slut førte til, at A kunne udtages af sikringscellen, kunne have været gennemført på et tidligere tidspunkt.

Ifølge rapporten om sikringscelleanbringelsen i Statsfængslet i Østjylland fra den 8. december 2008 kl. 11:05

**3113**

til den 8. december 2008 kl. 15:30 på i alt 4 timer og 25 minutter var A midlertidigt placeret i besøgslokalet, hvor han begyndte at råbe og sparke på døren. Da fængselsbetjentene kom til stede, var han tydeligt ophidset og hidsede sig herefter endnu mere op og truede blandt andet med at smadre hele lokalet. Det blev herefter besluttet at anbringe ham i observationscelle. Da A nægtede at følge med og gjorde udfald mod en fængselsbetjent med knyttet hånd, blev han pacificeret og bragt til en sikringscelle, hvor han blev fikseret. På den nævnte baggrund må anbringelsen og fikseringen anses for berettiget. Indgrebet, som varede 4 timer og 25 minutter, blev bragt til ophør, da A i nogen tid havde forholdt sig roligt og havde tilkendegivet, at han ville opføre sig ordentligt. Der er ikke grundlag for at anse udstrækningen for uberettiget.

Sikringscelleanbringelsen i Københavns Fængsler fra den 23. februar 2009 kl. 17:05 til den 24. februar 2009 kl. 14:40 på i alt 21 timer og 35 minutter skyldtes ifølge rapporten, at A i løbet af dagen hidsede sig mere og mere op og blandt andet havde banket på døren. Da han ud på eftermiddagen havde smadret sin stol og fortsat var stærkt ophidset og truende, blev han søgt fjernet med et greb i armen, men blev så voldsom, at han måtte væltes omkuld på sengen og holdes af flere betjente. Han blev herefter med magt ført til sikringscellen og fikseret. Efter oplysningerne om baggrunden for indgrebet findes dette berettiget. Ifølge rapporten afviste A kort efter indsættelsen tilsyn af en læge. Kl. 19:45 den 23. februar 2009 satte han sig op og råbte mod døren »Hvad glor du på din idiot«. Han lå herefter stille frem til kl. 10:15 den 24. februar 2009, hvor han, da han blev tilset af en psykiater, blev meget hidsig og truende i sin adfærd. Kl. 12:45 ringede han og gav udtryk for, at han gerne ville tilbage til sit opholdsrum. Det er noteret, at han var hidsig. Kl. 14:40 havde han en samtale med områdelederen, som noterede: »Indsatte er rimelig rolig, men føler sig uretfærdigt behandlet og anklager personalet for at overfalde ham. Da indsatte for det meste har ligget roligt, udtages han og tilbageføres til egen celle.« A blev herefter udtaget af sikringscellen og fikseringen. Efter det oplyste om, hvordan A hidsede sig op ved psykiaterens kontaktforsøg kl. 10:15 den 24. februar 2009 og hidsighed kl. 12:45 samme dag, og henset til behovet for at have en vis observationsperiode herefter, kan udstrækningen af anbringelsen og fikseringen, som var på mindre end 1 døgn, ikke anses for uberettiget.

Det fremgår af rapporten om sikringscelleanbringelsen i Statsfængslet i Østjylland fra den 4. marts 2009 kl. 23:55 til den 5. marts 2009 kl. 8:25 på i alt 8 timer og 30 minutter, at A blev afhentet af personale fra Statsfængslet i Østjylland i Politigårdens Fængsel, idet han skulle fremstilles i Retten i Horsens. Da A ikke frivilligt ville følge med, måtte han lægges i håndjern og transporteres ud i bilen med magt. Det var endvidere nødvendigt at lægge ham i bunden af bilen under transporten, fordi han var så voldsom. Ved ankomsten til Statsfængslet i Østjylland var A fortsat voldsomt ophidset og truende. Det blev derfor anset for nødvendigt at anbringe ham i sikringscelle og fiksere ham. Efter oplysningerne i rapporten om A's voldsomme og truende adfærd må anbringelsen og fikseringen anses for berettiget. Frem til kl. 1:30 den 5. marts 2009 kom A løbende med ukvemsord mod personalet og den tilsynsførende læge og udfordrede en fængselsfunktionær til slåskamp. A lå herefter roligt og sov ind i mellem, indtil han kl. 8:25 den 5. marts 2009 blev udtaget af sikringscellen. Der er ikke grundlag for at anse udstrækningen af indgrebet for uberettiget.

*Indsættelserne i observationscelle*

Forbud mod kontakt med andre indsatte, som er begrundet i sikkerheds- eller beskyttelsesmæssige eller disciplinære hensyn, er

Copyright © 2023 Karnov Group Denmark A/S

ikke i sig selv i strid med Den Europæiske Menneskerettighedskonventions artikel 3, jf. blandt andet dom af 12. maj 2005 i sag 46221/99 Öcalan, præmis 191. Udelukkelse fra almindeligt fællesskab af en vis længde under forhold, der må anses for særligt belastende som følge af blandt andet manglende adgang til kontakt med andre mennesker, manglende eller begrænset adgang til aktiviteter i form af gårdture, fjernsyn, bøger mv. og ringe fysiske forhold i cellen, kan udgøre en krænkelse af artikel 3, jf. blandt andet dom af 29. september 2005 i sag 24919/03, Mathew, præmis 197-205, dom af 7. april 2005 i sag 24407/04, Onoufriou, præmis 71-81, og dom af 4. juli 2013 i sag 4242/07 Rzakhanov. Ved afgørelsen af, om udelukkelse fra almindelig fællesskab falder under artikel 3, indgår det med betydelig vægt, hvilke hensyn, der ligger bag udelukkelsen, og hvor vægtige disse er, jf. blandt andet Mathewdommen præmis 201.

Indsættelsen i observationscelle på Anstalten ved Herstedvester i perioden den 21. november 2003 kl. 13:00 - 21. november 2003 kl. 13:58 var ifølge rapporten begrundet i, at A var forpint af at høre stemmer, hvorfor man ønskede at overvåge ham nærmere. Indgrebet må på den baggrund anses for berettiget, jf. straffuldbyrdelseslovens § 64, stk. 1, nr. 1, og har i øvrigt haft en så begrænset tidsmæssig udstrækning, at det ikke kan falde under Den Europæiske Menneskerettighedskonventions artikel 3. Anbringelsen må indgå i den samlede bedømmelse af A's afsoningsforhold fra den 10. august 2003.

Den meget langvarige indsættelse i observationscelle på Anstalten ved Herstedvester på i alt 100 døgn, 20 timer og 35 minutter fra den 18. maj 2004 er ikke nærmere begrundet i rapporten, hvori det blot oplyses, at A er udtaget af sikringscelle og herefter anbragt i observationscelle I6. Det fremgår af noteringerne i rapporten, at A under opholdet i celle I6 var på gårdture, dog ikke i en periode fra den 28. maj 2004 - 24. juni 2004. Af noteringerne fremgår, at nægtelsen af gårdture skyldtes, at

**3114**

A nægtede at indtage sin medicin. Fængselspersonalet fandt det på den baggrund ikke sikkerhedsmæssigt forsvarligt at lade ham gå på gårdtur. Ifølge rapporten havde han adgang til at gå til købmanden og handle på egen hånd. Adgangen hertil blev imidlertid inddraget den 22. juli 2004 som følge af A's grænsesøgende adfærd. Herefter blev han i stedet tilbudt at bestille varer. Det er noteret, at han under opholdet havde besøg af præsten, psykiater G, sin bistandsværge samt sin mor og far, og at han havde adgang til fjernsyn og playstation samt til at telefonere. Der er i hele forløbet noteringer om dage, hvor A var aggressiv i sin tiltale til fængselspersonalet og grænsesøgende. Den 27. august 2004 kl. 11:45 blev A overført til sikringscelle som følge af paranoid og truende adfærd, jf. ovenfor om denne anbringelse. Ifølge punktet »Ad 2« i besvarelsen fra Anstalten ved Herstedvester af Kammeradvokatens spørgsmål, B's og A's forklaringer og det i øvrigt i visse af rapporterne om sikringscelle- eller observationsanbringelse oplyste var celle I6 en celle på afsnittet med observations- og sikringsceller, som var indrettet mere normalt med fjernsyn, playstation mv., hvor det var aftalt med A, at han kunne bo, hvis han overholdt rammerne for fængselsopholdet. Af besvarelsen af Kammeradvokatens spørgsmål fremgår endvidere, at der blev foretaget observation af A, medens han sad i denne celle, fordi hans adfærd og psykiske tilstand gjorde hyppige tilsyn nødvendige. Man førte derfor også notater, som var der tale om placering i en egentlig observationscelle. På den baggrund og efter det i rapporten om anbringelsen fra den 18. maj 2004 oplyste om gårdture, besøgsadgang, adgang til playstation, fjernsyn og til i et vist omfang at handle i fængslets købmand syntes der reelt ikke at have været tale om anbringelse i en egentlig observationscelle, jf. straffuldbyrdelseslovens § 64, stk. 1, nr. 1, men sna-

rere om anbringelse i en normalt indrettet celle og en samtidig udelukkelse fra almindeligt fællesskab, jf. lovens § 63. Opholdet har efter de foreliggende oplysninger ikke indebåret en sådan længerevarende indskrænkning af A's adgang til samvær med andre eller restriktioner i øvrigt, som kan føre til, at det isoleret betragtet kan anses for omfattet af Den Europæiske Menneskerettighedskonventions artikel 3. Opholdet i observationscelle I6 på ca. 101 døgn må imidlertid indgå i den samlede bedømmelse af den udelukkelse fra almindeligt fællesskab, der har fundet sted og i den samlede vurdering af A's afsoningsforhold.

Observationscelleanbringelsen på Anstalten ved Herstedvester i perioden 21. august 2005 kl. 13:05 - 30. september 2005 kl. 13:50 ligger umiddelbart efter sikringscelleanbringelsen på Anstalten ved Herstedvester fra den 19. august 2005 kl. 13:05 - 21. august 2005 kl. 13:05 og før anbringelsen i sikringscelle på Anstalten ved Herstedvester i perioden 30. september 2005 kl. 13:40 - 5. oktober 2005 kl. 12:30, jf. om disse anbringelser ovenfor. Som tidligere nævnt udsprang sikringscelleanbringelsen den 19. august 2005 af A's nægtelse af at flytte sig fra celle I6, der var indrettet som en normal celle til en egentlig observationscelle. Anbringelsen i observationscelle den 21. august 2005 er så vidt ses en gennemførelse af den tidligere trufne beslutning om, at A skulle flytte fra den »normale« celle I6 til den egentlige observationscelle I5 som følge af fremsatte trusler over for en fængselsfunktionær. Beslutningen må ses i lyset af de særlige retningslinjer, man ifølge forklaringerne havde på Anstalten ved Herstedvester, som indebar, at A, hvis han var voldelig eller truede fængselspersonalet, blev frataget det privilegium, det var, at bo i den »normale« observationscelle I6 og blev flyttet til en almindelig observationscelle. Ifølge rapporten om observationscelleanbringelsen havde A adgang til gårdture. Det fremgår endvidere, at han kunne ringe til sin bistandsværge m.fl. og havde adgang til besøg, herunder af præsten og sin far. Han kunne endvidere bestille varer hos købmanden, se fjernsyn og få blade. På den baggrund og henset til, at opholdet i observationscelle var begrænset til ca. 40 døgn, kan anbringelsen ikke antages at have påført A en sådan psykisk og fysisk lidelse, at indgrebet isoleret betragtet kan anses for omfattet af artikel 3 i Den Europæiske Menneskerettighedskonvention. Anbringelsen må indgå i den samlede bedømmelse af den udelukkelse fra almindeligt fællesskab, der har fundet sted, og i den samlede vurdering af A's afsoningsforhold.

Observationscelleanbringelsen i Statsfængslet i Horsens i perioden 20. april 2006 kl. 11:25 - 20. april 2006 kl. 16:40 på i alt 5 timer og 15 minutter har haft en karakter og været af så begrænset varighed, at den ikke kan falde under artikel 3 i Den Europæiske Menneskerettighedskonvention. Anbringelsen, som efter det oplyste om A's uligevægtige sindstilstand og mistanken om forsøg på selvbeskadigelse med glas fra en smadret rude i hans celle i øvrigt må anses for berettiget, jf. straffuldbyrdelseslovens § 64, stk. 1, nr. 1, må indgå i den samlede bedømmelse af A's afsoningsforhold.

Observationscelleanbringelsen på Københavns Fængsler i perioden 13. april 2009 kl. 19:15 og den i den forbindelse anvendte magt må anses for berettiget i lyset af de trusler, som A fremkom med over for fængselsbetjentene, og hans forsøg på at nikke en betjent en skalle samt øvrige voldsomme modstand. Efter det i rapporten oplyste om hans trusler, råben mv., hvor eneste gang personalet forsøgte at komme i kontakt med ham, kan udstrækningen af anbringelsen heller ikke anses for uberettiget. Det bemærkes i den forbindelse, at anbringelsen blev bragt til ophør, da A's fortsatte vægren sig mod at indtage mad og drikke blev vurderet at påvirke hans tilstand.

**3115**

U.2014.3045Ø – FED2014.138OE

På nær én er alle de øvrige observationscelleanbringelser af kortere varighed - mellem 1/2 og ca. 6½ timer. Der er i de fleste tilfælde tale om anbringelser, der er sket umiddelbart efter sikringscelleanbringelser, og som begrundes i behov for særlig observation, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 3, inden overførsel af A til hans almindelige celle, eller i afgørende hensyn til orden og sikkerhed i institutionen, jf. bekendtgørelse om udelukkelse fra fællesskab § 15, stk. 1, nr. 2. Anbringelserne må anses for berettigede, og har desuden ikke haft en udstrækning og karakter, som gør, at de kan falde under artikel i den Europæiske Menneskerettighedskonventions artikel 3. For så vidt angår den noget længere observationscelleanbringelse på alt 2 døgn 7 timer og 28 minutter i perioden den 4. juli 2008 kl. 11:35 - 6. juli 2008 kl. 19:03 på Københavns Fængsler umiddelbart efter den forudgående sikringscelleanbringelse, bemærker retten, at den længerevarende observationsperiode må antages at skyldes, at A, jf. notatet kl. 20:13 den 4. juli 2008, under lægens tilsyn gav udtryk for paranoide forestillinger om, at fængselspersonalet bankede på væggen ind til ham og sagde, at det var en fryd, at hans far var død. Udstrækningen kan på den baggrund ikke anses for uberettiget.

Også de senest nævnte anbringelser må indgå ved den samlede bedømmelse af A's afsoningsforhold.

*Udelukkelsen fra fællesskab*

Som allerede nævnt følger det af praksis fra Den Europæiske Menneskerettighedsdomstol, at udelukkelse fra almindeligt fællesskab i fængslet under visse omstændigheder kan være i strid med artikel 3 i Den Europæiske Menneskerettighedskonvention.

A's advokat har i påstandsdokumentet samlet opgjort den periode, hvor A har været udelukket fra almindeligt fællesskab til 6 år og 35 dage. Den pågældende opgørelse vedrører tiden fra den 10. december 2002 til den 26. maj 2009 og dermed også en periode før den 10. august 2003, som ikke er omfattet af sagen. Efter det i øvrigt oplyste, må det uanset usikkerheden om den præcise tidsmæssige opgørelse lægges til grund, at A i hele eller langt hovedparten af den periode fra 10. august 2003 til den 26. maj 2009, som sagen vedrører, har været udelukket fra almindeligt fællesskab.

En del af udelukkelserne fra fællesskab skyldes indsættelser i observationscelle- eller sikringscelle, der, jf. det ovenfor anførte, er fundet berettiget. Udelukkelsen fra fællesskab er i disse tilfælde en følge af indgrebet og skal dermed ikke indgå ved vurderingen af, om udelukkelsen fra fællesskab i øvrigt er berettiget. Herudover er i følgende tilfælde truffet afgørelse om fuldstændig udelukkelse fra fællesskab, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1, jf. direktoratets notater om udelukkelse:

- fra den 12. august 2003 kl. 9:15 til den 19. august 2003 kl. 13:10,
- fra den 19. august 2003 kl. 14:00 til den 11. november 2003, kl. 9:30,
- fra den 10. januar 2004 kl. 12:00 til den 30. april 2004 kl. 12:20,
- fra den 6. februar 2006 kl. 14:55 til den 21. marts 2006 kl. 16:09,
- fra den 29. marts 2006 kl. 11:45 til den 7. maj 2006 kl. 14:15,
- fra den 3. august 2006, kl. 12:26 til den 8. august 2006 kl. 11:00,
- fra den 21. december 2006, kl. 15:36 til den 22. december 2006 kl. 8:00
- fra den 7. januar 2007 kl. 17:00 til den 12. januar 2007 kl. 10:00,
- fra den 18. april 2007 kl. 10:00 til den 25. april 2007 kl. 10:00,
- fra den 13. juni 2007 kl. 15:54 til den 15. juni 2007 kl. 9:00,
- fra den 21. april 2008 kl. 12:10 til den 5. maj 2008 kl. 13:45 og
- fra den 4. juli 2008 kl. 10:30 til den 3. oktober 2008 kl. 11:30

I henhold til de tre afgørelser som fremgår af direktoratets notater om udelukkelse for samvær fra den 9. maj 2006 kl. 14:00 til den 5. juli 2006 kl. 14:15, fra den 10. maj 2007 kl. 12:00 til den 8. juni 2007 kl. 13:10 og den 8. december 2008 kl. 15:30 til den 16. december 2008 kl. 10:30 om udelukkelse for samvær truffet i medfør

af straffuldbyrdelseslovens § 63, stk. 1, nr. 1 og nr. 3, har der derimod været mulighed for samvær med andre.

Den udelukkelse fra almindeligt fællesskab, der er foregået, og den anbringelse, som samtidig er sket på særligt sikrede afsnit, og herunder anbringelsen i celle I6 på Anstalten ved Herstedvester, er ifølge de foreliggende notater, rapporter og øvrige oplysninger begrundet i hensyn til at forebygge yderligere vold og trusler mod andre indsatte, jf. straffuldbyrdelseslovens § 63, stk. 1, nr. 1 og 3, og de nærmere regler om sådan udelukkelse i bekendtgørelse nr. 572 af 5. juli 2002, efterfølgende bekendtgørelse nr. 1072 af 3. november 2005 og herefter bekendtgørelse nr. 28 af 22. januar 2009 (overførselsbekendtgørelsen og senest anbringelses- og overførselsbekendtgørelsen).

Der foreligger rapporter og andre oplysninger om vold mod medindsatte. På den baggrund og efter de øvrige oplysninger i navnlig mentalobservationserklæringerne om A's betydelige farlighed og særegne personlighedsstruktur og det, som fremgår af blandt andet straffedommene fra Glostrup Ret, Svendborg Ret og Københavns Byret om trusler og vold mod fængselspersonale under afsoningen, må det lægges til grund, at der har været et betydeligt behov for at beskytte andre indsatte mod A. Der er ikke grundlag for at tilsidesætte direktoratets og de underliggende institutioners vurderinger, hvorefter

**3116**

dette hensyn ikke har kunnet tilgodeses på forsvarlig vis under afsoning i almindeligt fællesskab på de normale afdelinger i fængslerne. Der er heller ikke grundlag for at tilsidesætte direktoratets og de underliggende institutioners vurderinger, hvorefter der i de perioder, som fremgår af ovennævnte notater, har været behov for helt at udelukke fællesskab med andre indsatte.

Efter de foreliggende oplysninger har A i de perioder, hvor han har været udelukket fra almindeligt fællesskab, i vist omfang haft én-til-én-fællesskab med andre indsatte. At dette én-til-én-fællesskab har været begrænset, skyldes ifølge forklaringerne fra E og F, at det ganske ofte ikke var muligt at finde andre egnede indsatte på de særlige afsnit, hvor A afsonede, som var villige til at have samvær med ham.

Efter det oplyste har der under hele afsoningen været gjort en indsats fra fængselspersonalets side for at kompensere for det manglende fællesskab med andre indsatte, herunder således at man så vidt muligt sikrede, at A var i kontakt med personale, som han kunne fungere med, og at der i det omfang A ønskede det, var personale til rådighed for samtaler. A har endvidere haft adgang til at besøge og have besøg af fængselspræsterne og til besøg i øvrigt. Han har også haft adgang til fjernsyn, radio, bøger, aviser og til sin playstation samt til at telefonere. Desuden har A ifølge rapporten om opholdet i celle I6 på Anstalten ved Herstedvester samt besvarelserne fra fængslerne på Kammeradvokatens spørgsmål haft adgang til samvær med andre under gårdture samt i et vist omfang under indkøb. De nævnte muligheder har været begrænset, i det omfang det har været en følge af sikringscelle- eller egentlige observationscelleanbringelser eller en afgørelse om fuldstændig udelukkelse fra samvær.

Retten finder, at der efter de foreliggende oplysninger ikke er grundlag for at anse udelukkelserne fra almindeligt fællesskab og de tidsmæssigt mere begrænsede udelukkelser af ethvert samvær med andre indsatte for uberettigede eller uproportionale. Udelukkelsen fra almindeligt fællesskab og de periodevise udelukkelser af ethvert samvær med andre indsatte kan herefter ikke anses stridende mod Den Europæiske Menneskerettighedskonventions artikel 3.

*Rotationsordningen*

A har været særdeles vanskelig at rumme i fængselsvæsnet, som følge af sin egenartede personlighedsstruktur og voldsomt aggressive adfærd i forhold til såvel medindsatte som personale.

Der er ikke er grundlag for at tilsidesætte direktoratets vurdering, hvorefter det af hensyn til såvel A som fængselspersonalet i september 2004 var nødvendigt at etablere en rotationsordning for at gøre det muligt for fængslerne og fængselspersonalet at rumme A.

Rotationsordningen må således anses for en berettiget varetagelse af hensynet til at forebygge voldelige overgreb fra A over for personale og andre indsatte, der er hjemlet i straffuldbyrdelseslovens § 26 eller en analogi heraf, og strider ikke imod mod Den Europæiske Menneskerettighedskonventions artikel 3.

Hertil kommer, at det efter den fremlagte oversigt over overførsler må lægges til grund, at højest to overførsler under afsoningen er begrundet i rotationsordningen. De øvrige overførsler er ifølge oversigten for en betydelig dels vedkommende begrundet i voldelige overfald på fængselspersonale begået af A. I disse tilfælde er overførslerne direkte hjemlet i straffuldbyrdelseslovens § 26, stk. 1, nr. 5. De hensyn, som er beskrevet af E, til at sikre, at fængselspersonale, der har været udsat for voldelige overfald, ikke skal møde gerningsmanden umiddelbart herefter og til at undgå risiko for eller mistanke om chikane fra fængselspersonalets side over for gerningsmanden, indebærer i relation til såvel straffuldbyrdelsesloven som Den Europæiske Menneskerettighedskonventions artikel 3, at overførslerne må anses for berettigede. Herudover er der i et del tilfælde tale om overførsler, som er begrundet i fremstillinger i retten i forbindelse med de straffesager, der har været under afsoningen, samt i indlæggelse til mentalobservation. For så vidt som de sidstnævnte overførsler overhovedet er omfattet af A's anbringende om uberettigede overførsler, er de pågældende overførsler åbenbart berettigede.

*Manglende eller mangelfuld efterforskning af A's klager*

Den Europæiske Menneskerettighedsdomstol har i blandt andet dom af 2. november 2004 i sag 32446/96, Abdülsamet Yaman, præmis 53, fastslået, at kravet om effektive retsmidler i konventionens artikel 13 indebærer, at ofre for tortur eller torturlignende behandling, jf. konventionens artikel 3, har krav på:

».. . a thorough and effective investigation capable of leading to the identification and punishment of those responsible, including effective access for the complainant to the investigatory procedure (see the above-cited Aksoy judgment, § 98).«

I denne sag er der ingen oplysninger om, at A har anmeldt eller forsøgt at anmelde enkeltpersoner til politiet.

A har ikke i påstandsdokumentet eller under hovedforhandlingen anført, hvilke klager han mener ikke er behørigt efterforsket. Allerede af denne grund er der ikke grundlag for at tage anbringendet om manglende eller mangelfuld efterforskning af hans klager under påkendelse.

*Magtanvendelse*

Der er intet bevismæssigt grundlag for, at A, som forklaret for ham, i en række tilfælde er blevet gennembanket af fængselspersonalet.

Der er ovenfor taget stilling til brugen af tåregas forud for sikringscelleanbringelsen den 19. august 2005 på Anstalten ved Herstedvester. Efter de foreliggende oplysninger har A's aggressive og voldelige adfærd tillige gjort det nødvendigt at anvende magt i en række andre tilfælde.

**3117**

I det omfang indsættelser i sikringscelle er fundet uberettigede, er der ikke behov for særskilt at tage stilling til den magtanvendelse, der er en del af det samlede indgreb.

Der er herefter intet grundlag for at anse den magtanvendelse, der i øvrigt har fundet sted under afsoningen, for stridende mod straf-

fuldbyrdelseslovens § 62 eller mod Den Europæiske Menneskerettighedskonventions artikel 3.

*Aktindsigt og begrundelse*

A's anbringende om, at der er sket krænkelse af Den Europæiske Menneskerettighedskonventions artikel 3 som følge af det manglende krav på aktindsigt i og begrundelse for udelukkelse fra fællesskab, der er en følge af undtagelsen i den tidligere gældende forvaltningslovs § 9, stk. 4 (nu § 11, stk. 2), er først fremsat under hovedforhandlingen.

Retten finder, at der ikke foreligger omstændigheder, som kan begrunde, at anbringendet - som på ingen måde er konkretiseret - mod direktoratets protest skal tillades fremsat på dette sene tidspunkt, og tager der derfor ikke under påkendelse, jf. retsplejelovens § 363, stk. 1 og stk. 4.

*Samlet bedømmelse af afsoningsforholdene*

Der er ingen tvivl om, at A som følge af sin personlighedsmæssige egenart, paranoide træk og betydelige aggressivitet har været meget vanskelig at rumme i Kriminalforsorgens institutioner. Det er også åbenbart, at A har haft et afsoningsforløb, der har været præget af meget voldsomme indgreb og af hans oplevelse af at være forfulgt af fængselspersonalet, samt at han - som det er kommet til udtryk i flere af de fremlagte rapporter og forklaringerne fra F og D - kunne forekomme fejlanbragt i fængselsvæsnet.

I Kriminalforsorgen har man i hvert fald fra den 3. juni 2004, hvor overlæge G, Anstalten ved Herstedvester, rettede henvendelse til direktoratet om muligheden for at opnå en overførsel af A til Sikringsafdelingen efter psykiatrilovens § 40, været klar over, at A havde vanskelige og uhensigtsmæssige afsoningsforhold i Kriminalforsorgens institutioner. Man har endvidere været bevidst om, at det efter alt at dømme ville give bedre muligheder for at tage vare på A og afhjælpe de paranoide forestillinger, der prægede ham, hvis man kunne få ham overført til Sikringsafdelingen. Fra sommeren 2004 og frem til overførslen til Sikringsafdelingen den 26. maj 2009 har der da også fra direktoratets side løbende været arbejdet på at opnå en overførsel.

Efter oplysningerne om A's aggressive og voldelige adfærd og betydelige farlighed må det lægges til grund, at det eneste sikkerhedsmæssigt acceptable alternativ til afsoning på de særligt sikrede afsnit i de lukkede fængsler var en anbringelse på Sikringsafdelingen.

Forudsætningen for en overførsel til Sikringsafdelingen var imidlertid - så vidt ses ubestridt - at A måtte anses for sindssyg. Sikringsafdelingen, som indgår i det psykiatriske hospital Nykøbing Sjælland, er således et behandlingssted for sindssyge personer, og ikke et anbringelsessted for forvaringsdømte personer, der, som A var, er omfattet af straffelovens § 69.

Der er i alt foretaget 7 mentalobservationer af A. Først ved den syvende erklæring, der blev udarbejdet under den observation, som fandt sted på Sikringsafdelingen fra den 26. maj 2009, er han fundet sindssyg. Det er ikke gjort gældende, og der er, som sagen er oplyst, ikke grundlag for at antage, at det er en fejl, at A ikke er fundet sindssyg i de tidligere foretagne mentalobservationserklæringer. Der er dermed intet grundlag for, at A kunne og skulle have været overført til Sikringsafdelingen på et tidligere tidspunkt.

Det samlede afsoningsforløb kan på den baggrund ikke anses for stridende mod Den Europæiske Menneskerettighedskonventions artikel 3.

*Forældelse*

Sagen er anlagt den 3. januar 2011, og overgangsreglen i forældelseslovens § 30, stk. 1, finder derfor ikke anvendelse.

Krav på godtgørelse for indgreb af den karakter, som A har været udsat for, har karakter af tortgodtgørelse, jf. erstatningsansvarslovens § 26, og forældes dermed efter forældelseslovens § 3, stk. 1.

Det følger af § 3, stk. 2, at forældelsesfristen i stk. 1 suspenderes ved ukendskab til fordringen, således at den først regnes fra den dag, da fordringshaveren fik eller burde have fået kendskab til fordringen.

Landsretten forstår direktoratets proceserklæring om ikke at gøre forældelse gældende for så vidt angår krav, som ikke ville have været forældet efter overgangsreglen i forældelseslovens § 30, stk. 1, jf. 1908-loven, hvis sagen havde været anlagt den 30. december 2010, sådan, at der ikke gøres forældelse gældende med hensyn til eventuelle ansvarspådragende handlinger, der er foretaget den 30. december 2005 eller senere. Landsretten går ud fra, at dette tillige indebærer, at forældelse ikke gøres gældende i tilfælde, hvor fristen har været suspenderet, jf. forældelseslovens § 3, stk. 2, frem til den 30. december 2005 eller senere.

For så vidt angår spørgsmålet om suspension bemærkes, at A ikke har gjort gældende at have været ubekendt med de skadegørende handlinger (sikringscelleanbringelserne under brug af fiksering), hvorpå godtgørelseskravet vedrørende de enkelte uberettigede indgreb støttes. Der er heller ikke omstændigheder, der støtter, at forældelsesfristen har været suspenderet for så vidt angår krav på godtgørelse for de sikringscelleanbringelser, der er ophørt før den 30. december 2005, jf. forældelseslovens § 3, stk. 2. Det bemærkes i den forbindelse, at der ifølge rapporterne om sikringscelleanbringelser er givet klagevejledning, og at A ifølge noteringerne i de

**3118**

forskellige rapporter har været i kontakt med både advokat og bistandsværge under afsoningsforløbet. Der er også indgivet klager af advokat Claus Bonnez vedrørende visse af sikringscelleanbringelserne for anlægget af denne sag.

Heraf følger, at godtgørelseskrav vedrørende de uberettigede sikringscelleanbringelser, som er ophørt før den 30. december 2005, er forældede.

A har imidlertid gjort gældende, at sådan forældelse strider mod Den Europæiske Menneskerettighedskonvention.

Der er ikke i forældelsesloven eller forarbejderne hertil, jf. lov forslag nr. 165 af 28. februar 2007 og betænkning nr. 1460/2005, taget stilling til spørgsmålet om forældelse af krav på godtgørelse for overtrædelse af Den Europæiske Menneskerettighedskonventions artikel 3.

Af Den Europæiske Menneskerettighedsdomstols praksis om kravet om effektive retsmidler i artikel 13 følger blandt andet, at der skal være adgang til at få fastslået, at rettigheder efter konventionen er krænket samt i »appropriate cases« få tilkendt erstatning, jf. blandt andet dom af 10. maj 2001 i sag 28945/95, T. P. og K.M., præmis 107. Domstolen har fundet, at manglende adgang for et prøvelsesorgan til at tilkende erstatning kan indebære, at der ikke er et effektivt retsmiddel til rådighed, jf. dom af 28. januar 2003 i sag 44647/98, Peck, præmis 108-109. I dom af 2. november 2004 i sag 32446/96, Abdülsamet Yaman, præmis 53, har domstolen vedrørende krav på godtgørelse for overtrædelse af artikel 3, udtalt:

»The Court reiterates that the nature of the right safeguarded under Article 3 has implications for Article 13. Where an individual has an arguable claim that he has been tortured or subjected to serious ill-treatment by agents of the State, the notion of an »effective remedy« entails, in addition to the payment of compensation where appropriate, a thorough and effective investigation . . .«.

Kravet om effektive retsmidler i Den Europæiske Menneskerettighedskonventions artikel 13 indebærer, at forældelsesfrister ikke kan gøres gældende i relation til strafferetlig forfølgning af overtrædelser af forbuddet i artikel 3, jf. dom af 17. oktober 2006 i sag 52067/99, Okkali, præmis 76, hvor det udtales:

»The Court reaffirms that, when an agent of the State is accused of crimes that violate Article 3, the criminal proceedings and sen-

tencing must not be time-barred and the granting of an amnesty or pardon should not be permissible (see, mutatis mutandis, Abdülsamet Yaman v. Turkey, no. 32446/96, § 55, 2 November 2004; compare Dujardin and Others v. France, no. 16734/90, Commission decision of 2 September 1991, Decisions and Reports 72, p. 236).«

og dom af 2. november 2004 i sag 32446/96, Abdülsamet Yaman, præmis 55, hvorefter:

»The Court further points out that where a State agent has been charged with crimes involving torture or ill-treatment, it is of the utmost importance for the purposes of an »effective remedy« that criminal proceedings and sentencing are not time-barred and that the granting of an amnesty or pardon should not be permissible. The Court also underlines the importance of the suspension from duty of the agent under investigation or on trial as well as his dismissal if he is convicted (see Conclusions and Recommendations of the United Nations Committee against Torture: Turkey, 27 May 2003, CAT/C/CR/30/5).«

I kommissionsafgørelsen, Dujardin, som nævnes i præmis 76 i Okkali-dommen, antog Kommissionen dog, at en generel amnestiordning som led i en national forsoningsproces ikke var konventionsstridig, selvom strafferetlig forfølgning af krænkelser af artikel 3 dermed blev afskåret.

Domstolen har ikke direkte forholdt sig til, om forældelse af statens civilretlige erstatningsansvar for krænkelser af artikel 3 kan være i strid med artikel 13. Af retspraksis om konventionens artikel 6 fremgår imidlertid, at forældelsesregler ikke i sig selv strider mod konventionen. I dom af 7. juli 2009 i sag 1062/07, Stagno, har domstolen herved udtalt:

»26. La Cour a déjà jugé que les délais de prescription ont plusieurs finalités importantes, à savoir garantir la sécurité juridique en fixant un terme aux actions, mettre les défendeurs potentiels à l'abri de plaintes tardives peut-être difficiles à contrer, et empêcher l'injustice qui pourrait se produire si les tribunaux étaient appelés à se prononcer sur des événements survenus loin dans le passé à partir d'éléments de preuve auxquels on ne pourrait plus ajouter foi et qui seraient incomplets en raison du temps écoulé (Stubbings et autres c. Royaume-Uni, arrêt du 24 septembre 1996, Recueil des arrêts et décisions 1996-IV, pp. 1502-1503, § 51 ; Vo c. France [GC], no 53924/00, § 92, CEDH 2004-VIII).

27. Il s'ensuit que l'existence d'un délai de prescription n'est pas en soi incompatible avec la Convention. Il incombe à la Cour de vérifier dans chaque cas d'espèce si la nature du délai de prescription en cause ou la manière dont il a été appliqué est compatible avec la Convention (Phinikaridou c. Chypre, no 23890/02, § 52, 20 décembre 2007).

28. Un délai de prescription peut atteindre le droit d'accès à un tribunal dans sa substance s'il empêche le justiciable de se prévaloir d'un recours disponible (Mizzi c. Malte, no 26111/02, § 89, 12 janvier 2006).«

Ifølge domstolen opfylder forældelsesregler således væsentlige retssikkerhedsmæssige formål om at sikre, at sagsøgte ikke mødes med krav af den, som følge af den forløbne tid er vanskelige at imødegå, og om at undgå, at domstolene skal udtale sig om forhold, der ligger langt tilbage i tid, hvor beviserne ikke er troværdige og er ufuldstændige som følge af den forløbne tid. Den

**3119**

konkrete anvendelse af nationale forældelsesregler kan imidlertid indebære en konventionskrænkelse.

Det forekommer ikke åbenbart, at den foreliggende retspraksis om manglende adgang til at anvende nationale regler om forældelse af strafansvar i relation til personer, som har foretaget tortur eller torturlignende behandling, skal forstås sådan, at civilretlige krav om godtgørelse for krænkelser af artikel 3 ikke kan forældes. Hvor

ofret for en krænkelse af artikel 3 kan rejse godtgørelseskrav ved civilt sagsanlæg og dermed er rådig over at sikre afbrydelse af forældelse, forudsætter strafferetlig forfølgning af enkeltindivider for tortur og torturlignende behandling ikke blot en anmeldelse fra ofret, men også at staten iværksætter efterforskning og strafferetlig tiltale mod de ansvarlige. Hensynet til at sikre, at staten ikke ved en manglende eller langsommelig behandling af ofrets anmeldelse opnår, at det strafferetlige ansvar forældes, taler i sidstnævnte tilfælde for, at det strafferetlige ansvar ikke skal kunne forældes, jf. de to ovennævnte domme. Samme hensyn synes ikke at foreligge, når det kommer til civilretlig forældelse af ofrets krav på godtgørelse. For så vidt angår civile godtgørelseskrav beror det således som udgangspunkt alene på ofret, om der i tide rejses krav om godtgørelse. Hertil kommer, at civilretlig forældelseslovgivning typisk indeholder bestemmelser om suspension af forældelsesfrister i blandt andet tilfælde, hvor den kravet tilkommer ikke har haft reel mulighed for at rejse kravet, jf. i dansk ret forældelseslovens § 3, stk. 2, og § 9, jf. tillige § 13 om adgangen til efter udløbet af den almindelige forældelsesfrist under en straffesag at rejse krav om erstatning eller godtgørelse over for en tiltalt i anledning af det strafbare forhold. Med hensyn til civile godtgørelseskrav må det derfor antages, at det er foreneligt med kravet om effektive retsmidler i konventionens artikel 13, at kravet skal rejses inden for de frister, der følger af almindeligt gældende forældelseslovgivning.

Der er ikke i denne sag grundlag for konkret at anse forældelse efter forældelseslovens § 3, stk. 1, med den yderligere begrænsning af, hvilke krav der kan anses for forældet, der følger af direktoratets proceserklæring, for stridende mod kravet om effektive retsmidler i Den Europæiske Menneskerettighedskonventions artikel 13. Som følge heraf må godtgørelseskrav vedrørende de uberettigede sikringscelleanbringelser, der er afsluttet før den 30. december 2005, anses for forældede.

*Godtgørelse*

Direktoratet har handlet i strid med forbuddet mod umenneskelig og nedværdigende behandling eller straf i Den Europæiske Menneskerettighedskonventions artikel 3 ved i 4 tilfælde uberettiget at have anbragt A i sikringscelle og der fikseret ham til en briks samt ved i 8 tilfælde at lade en i øvrigt berettiget anbringelse i sikringscelle og fiksering vare ved i længere tid end berettiget.

Godtgørelseskrav vedrørende de for langvarige sikringscelleanbringelser samt brug af fiksering, der skete i forbindelse med anbringelserne fra den 30. april 2004 kl. 12:35 til den 3. maj 2003 kl. 10:23, fra den 18. august 2003 kl. 2:20 til den 18. august 2003 kl. 18:05 (hvor fikseringen blev aftaget), fra den 21. november 2003 kl. 13:50 til den 22. november 2003 kl. 10:55, fra den 9. december 2003 kl. 18:10 til den 10. december 2003 kl. 8:05 og fra den 6. august 2005 kl. 20:40 til den 9. august 2005 kl. 8:24 henholdsvis for den uberettigede anbringelse og fiksering fra den 30. september 2005 kl. 13:40 til den 5. oktober 2005 kl. 12:30 er imidlertid forældede.

Retten finder, at direktoratet efter erstatningsansvarslovens § 26 sammenholdt med Den Europæiske Menneskerettighedskonventions artikel 13 og 41 vedrørende de øvrige uberettigede eller for langvarige sikringscelleanbringelser skal betale en skønsmæssigt fastsat godtgørelse på 50.000 kr. til A for den lidelse, han er påført.

*Sagsomkostninger*

A's påstand 1 er afvist, og han har kun fået medhold i en begrænset del af påstand 2 og de hertil knyttede anbringender om krænkelse af Den Europæiske Menneskerettighedskonventions artikel 3. En betydelig del af godtgørelseskravet var i den forbindelse forældet ved sagens anlæg. Det har imidlertid været nødvendigt at anlægge sagen for at opnå erstatning. Direktoratet for Kriminalforsorgen skal derfor betale delvise sagsomkostninger til A med i alt 50.500

kr. Beløbet omfatter 500 kr. til forholdsmæssig retsafgift og 50.000 kr. til udgifter til advokatbistand inkl. moms. Ved fastsættelsen af beløbet til dækning af udgifterne til advokatbistand er der ud over det vundne beløb taget hensyn til sagens omfang, varighed og principielle karakter. Det er i modgående retning taget i betragtning, at hovedforhandlingen, som skulle være gennemført i januar 2013, måtte omberammes, da det ved hovedforhandlingens begyndelse viste sig, at A ikke kunne komme til stede, fordi hans advokat ikke rettidigt havde gjort Sikringsafdelingen opmærksom på behovet for transport og ledsagelse af ham. Det merarbejde, direktoratet er påført, som følge af A's upræcise påstand 1 og uklare anbringender til støtte for påstand 2 er tillige tillagt betydning.

## Thi kendes for ret

*A's påstand 1 afvises.*

*Direktoratet for Kriminalforsorgen skal til A betale 50.000 kr. med tillæg af procesrente fra den 3. januar 2011.*

*I sagsomkostninger for retten skal Direktoratet for Kriminalforsorgen betale 50.500 kr. til A.*

*Det idømte skal betales inden 14 dage efter denne doms afsigelse.*

*Sagsomkostningerne forrentes efter rentelovens § 8 a.*