# Exhibit 32, Part 1 of 3

U.2020.2851
U.2020.2851

**The Danish Courts Administration was not liable for long case processing time in connection with the introduction of digital land registration.**

*Non-contractual compensation 111.2 and Registration 1.8.*

The association Gruppesøgsmål.nu, G, on behalf of a number of private homeowners brought an action for damages against the Danish Courts Agency, D, on the grounds that the homeowners in connection with the introduction of the digital land registration in 2009 were exposed to long processing times for land registration expeditions. Like the High Court, the Supreme Court found that there was no basis for applying stricter liability rules in the form of strict liability (risk liability),[1] and that enrichment considerations could not lead to imposing liability in damages on D.[2] The Supreme Court noted that the fact that the case processing time exceeds the 10-day deadline in the Land Registration Act does not in itself give rise to liability. § Section 16(4),[3] and that this does not provide a basis for reversing the burden of proof. The decision on liability was then to be made on the basis of the fault rule, where it was incumbent on G to prove that D had acted in a way that gave rise to liability in connection with the introduction of digital registration. The Supreme Court stated that the introduction of digital registration had to take place within specific framework conditions laid down by law and in documents approved by the Finance Committee of the Danish Parliament. The Supreme Court found that there were no very special circumstances such that D's failure to seek to change the framework conditions was a liability. The question was then whether D had acted responsibly within the framework conditions. The Supreme Court noted that developing and implementing an IT system such as the digital land registration system is an extremely complicated task. Even with careful planning and implementation, problems of a technical, administrative, organizational or other nature may arise that lead to extended case processing times. Taking this into account, the Supreme Court found that compensation under the fault rule for extended case processing times resulting from the transition to digital registration had to presuppose that there was a significant delay and that this delay was due to significant and clear errors or omissions. The Supreme Court found that G had not demonstrated significant and clear errors or omissions. There was therefore no basis for imposing liability on D.[4]

**H.D. June 15, 2020 *in case 94/2019 (1. afd.)***

(Thomas Rørdam, Jon Stokholm, Vibeke Rønne, Henrik Waaben, Michael Rekling, Oliver Talevski and Kristian Korfits Nielsen).

*Gruppesøgsmål.nu (adv. Morten Samuelsson, Kbh., besk.) Co-interveners in support of Gruppesøgsmål.nu: Poul Due, Ejendomsselskabet Otto ApS (former Kanalhuset ApS), Soeborg Ejendomme ApS, Frank Lyngholm Andersen, Gartneriet Blomstergården, Jens Jørgen Bonde and David Holm (adv. Jens Rostock-Jensen, Copenhagen, and adv. Jes Anker Mikkelsen, Copenhagen, for all) against*
*The Danish Courts Administration (adv. Sune Fugleholm and adv. Kasper Mortensen, both Copenhagen)*

## Eastern High Court's judgment of May 27, 2019 (4th department), B-3159-11

(John Lundum, Henrik Twilhøj and Erik P. Bentzen) in 1st instance case

### Introduction

This case is treated as a class action.

The issue in the case is whether the Danish Courts Administration has incurred liability for damages to private homeowners who, after the introduction of digital land registration, were exposed to long case processing times with land registration expeditions that would not have occurred in the previous land registration system.

The case is brought against the Danish Courts Agency, but the parties have agreed that it also covers errors, negligence or other actions that can be attributed to any public authority that has been involved in organizing or deciding on the introduction of digital registration.

The case was filed on August 12, 2011 at the Copenhagen City Court, which by order of October 6, 2011 has referred the case to the Eastern High Court. *The framework for the class action*

By order of September 26, 2013, the High Court established the following framework for the class action:

"Who can participate in the class action? Persons (including estates etc.) who

1. as a buyer, seller or owner of single-family homes, condominiums or vacation homes in the period from

   2852

   September 8, 2009 to December 31, 2010 registered or had registered deeds, mortgages or other documents for registration or cancellation, including for the purpose of prioritization,

2. obtained registration or cancellation or rejection of the document later than 10 working days after the notification of the document in the digital registration system without the registration or cancellation after the notification being based on anything other than the District Court's own case processing solely on the basis of the document that was notified for registration or cancellation, and

3. at the time of registration or no later than 4 weeks after the expiry of the registration deadline, submits evidence satisfactory to the court of law of the fulfillment of the conditions set out above ,

can join the class action.

---

1    Bernhard Gomard: Moderne Erstatningsret (2002), pp. 73-77, Bo von Eyben and Helle Isager: Lærebog i erstatningsret, 8th edition (2015), pp. 191-99, and Mogens Hornslet in U 1987B.288.

2    Henry Ussing: Erstatningsret (1947), pp. 229-32, and Torsten Iversen et al: Formueretlige emner, 9th edition (2019), pp. 385-89.

3    Bet. no. 1461/2005, p. 25, U 1953.567 V, U 1995.224 Ø, and Peter Mortensen: Tinglysning, 3rd edition (2001), p. 361 f.

**4**    U 2001.956 Ø, Vibe Ulfbeck in Carsten Henrichsen et al (eds.): Forvaltningsretlige perspektiver (2006), pp. 273 f., 279-81 and 288-91, Orla Friis Jensen and Søren Højgaard Mørup in Karsten Revsbech et al: Forvaltningsret - Almindelige emner, 6th edition (2016), pp. 573 f., Helle Bødker Madsen and Søren Højgaard Mørup in Børge Dahl et al (eds): Festskrift til Jens Peter Christensen (2016), pp. 433-53, Søren Højgaard Mørup in Peter Pagh et al: Offentlige myndigheders erstatningsansvar (2017), pp. 81-89, Niels Fenger (ed.): Forvaltningsret (2018), p. 954, and Bernhard Gomard in U 2004B.383.

U.2020.2851H

An estate is also considered to meet the conditions if the deceased met one or more of the conditions and the estate meets the others. Which claims are covered by the class action?

The participants' demand that the Danish National Courts Administration recognizes that it was a liability that the document mentioned in points 1-2 was registered or cancelled later than 10 working days after the notification of the document."

The High Court then approved that the conditions for handling the case according to the rules on class actions were met, and the association Gruppesøgsmål.nu was appointed as class representative, cf. section 254 e(1) of the Danish Administration of Justice Act.

In the court book of March 24, 2014, the High Court accepted the class representative's proposal as to the newspapers in which the announcement regarding the possibility of joining the class action should be made, and the High Court approved the class representative's opening notification to the persons whose claims would fall within the scope of the class action about the legal effect of joining the class action, cf. Section 254e(9) of the Danish Administration of Justice Act and of the matters mentioned in Section 254e(1)-(7) of the Danish Administration of Justice Act. The registration should be made electronically to Forenin- gen Gruppesøgsmål.nu, alternatively by completing the registration form in writing.

The deadline for joining the class action was set to expire on June 30, 2014.

The association Gruppesøgsmål.nu (hereinafter the Association) has had free legal representation in the case.

*Group members*

A list sent by the class representative to the High Court shows that there are a total of 422 persons or co-owners registered who fulfilled the conditions of the class action framework and are therefore members of the class.

*Biintervention*

In addition to the class action, a number of traders who do not meet the conditions of the class action framework have brought an action against the National Courts Board and eight test cases have been selected.

On September 5, 2018, the High Court allowed the plaintiffs in the eight test cases, Poul Due, Kanalhuset ApS, Soeborg Ejendomme ApS, Gårdejer Frank Lynghold Andersen, Gartneriet Blomster gården A/S, Jens Jørgen Bonde, David Holm and Ejendomsselskabet Bjør- nbaksvej 8 ApS, to join the class action as co-interveners, cf. section 252 of the Danish Administration of Justice Act.

## Claims

*The association* submits the following claims:

*Claim 1*

Order the defendant, Domstolsstyrelsen, to recognize a duty to compensate any seller of a single-family house, a condominium or a recreational property

a.    who are enrolled in the class action,

b.    who in the period September 8, 2009 to December 31, 2010 have registered or had registered deeds, mortgages or other documents for registration or cancellation,

c.    proving that the documents referred to in point (b) were not registered or canceled within 10 working days of the date of registration, or such other period as the court may deem sufficient to establish liability,

d.    for that class member's additional costs for interest, commissions and other expenses that would not have been ~~incurred by timely registration or cancellation, from the~~

time when registration or cancellation should have occurred until the time when registration or cancellation actually occurred,

**2853**

e.    with the addition of usual procedural interest from the filing of the case until the decision is made.

Copyright © 2023 Karnov Group Denmark A/S

*Claim 2*

Order the National Court of Justice to recognize liability for damages against any buyer of a single-family house, a condominium or a holiday home,

a.  who are enrolled in the class action,
b.  who in the period September 8, 2009 to December 31, 2010 have registered or had registered deeds, mortgages or other documents for registration or cancellation,
c.  proving that the documents referred to in point (b) were not registered or canceled within 10 working days of the date of registration, or such other period as the court may deem to be sufficient to establish liability,
d.  for that class member's additional costs for interest, commissions and other expenses that would not have been incurred by timely registration or cancellation, from the time when registration or cancellation should have occurred until the time when registration or cancellation actually occurred,
e.  with the addition of usual procedural interest from the filing of the case until the decision is made.

*Claim 3*

Order the National Court of Justice to recognize liability for damages against any owner of a single-family house, a condominium, or a holiday home,

a.  who are enrolled in the class action,
b.  who in the period September 8, 2009 to December 31, 2010 have registered or had registered deeds, mortgages or other documents for registration or cancellation for the purpose of reprioritization,
c.  proving that the documents referred to in point (b) were not registered or canceled within 10 business days of the date of registration, or such other period as the court may deem to be sufficient to establish liability,
d.  for the group member's additional costs for interest, commissions and other expenses that would not have been incurred by timely registration or cancellation, from the time when registration or cancellation should have occurred until the time when registration or cancellation actually occurred,
e.  with the addition of usual procedural interest from the filing of the case until the decision is made.

The National Courts Administration has claimed that the case should be dismissed.

## Case presentation

*The legal basis for the digital land registration project*

In 2003, the Ministry of Justice set up a committee ("Tinglysningsudval- get"), which was tasked with making proposals for an overall modernization and streamlining of land registration. The committee included representatives from a number of ministries, the courts, the Danish Finance Council, the Danish Mortgage Credit Council, the Danish Bar and Law Society, the Danish Association of Real Estate Agents, land surveyor associations, the Consumer Council, the National Association of Local Authorities and the Association of County Councils.

On February 21, 2005, at the request of the Ministry of Justice, the consulting firm Deloitte Consulting A/S (hereinafter Deloitte) submitted an overall analysis of the Danish courts. One of the conclusions in Deloitte's report was that a full digitization of land registration was possible. It was Deloitte's assessment that a completely new IT system should be developed for digital land registration. The analysis described

the necessary IT support and the task of transforming the case processes and legal reviews in the paper-based land registration into an IT system, including the necessary integration with a number of other public registers.

U.2020.2851H

Deloitte also estimated the efficiency gains and socio-economic consequences of a digital land registration system as well as the establishment and operating costs. It was estimated that approximately 69% of land registration tasks could be automated. With the centralization of land registration in one center, the number of FTEs could be reduced from approx. 357 to approx. 91. This corresponded to annual operational savings of approximately DKK 83.2 million compared to the then existing costs of approximately DKK 145.3 million. At the same time, the professional players would be able to save DKK 200-300 million annually and the citizens approximately DKK 100 million.

For use in the work of the Land Registration Committee, the Danish Courts Administration prepared a memorandum on the financial/personnel consequences of a changed organization of land registration. The memo states, among other things, that until the time when a future land registration system functioned 100% efficiently, it had to be assumed that there would be a transition period where a larger part of the documents would have to be processed manually. In a start-up phase, the system would probably find it difficult to handle the electronic notifications, which were otherwise generally suitable for being processed by machine.

On April 7, 2005, the Danish Courts Administration wrote to the Ministry of Finance about the personnel consequences of a land registration reform. The Danish Courts Administration had made some calculations, which were, however, associated with a number of uncertainties with regard to, among other things, the size of age-related departures and the detailed design and impact of the impending judicial district reform on the number of resignations in the following years. It was assessed that it was probably unrealistic that the new system would be able to register 70% of the documents automatically from day one with the necessary certainty. If it was assumed that approx. 35% of the documents could be registered automatically, there would be a need for a staff in the land registry of approx. 200 work years. The Agency pointed to the societal importance of land registration, which should lead to considerable caution and care being exercised in connection with the implementation of a land registration reform, not least in the period following the introduction of a new IT system. There would be a need to retain land registration staff in the time leading up to the implementation of the new system, and this would make it necessary to be able to offer staff a combination of favorable resignation terms and employment offers in other positions at the courts.

In June 2005, the Land Registration Committee issued sub-report 1461 on the handling of the land registration task. The Land Registration Committee recommended that a future paperless land registration should be gathered in a central land registration unit. This would ensure the best use of staff, the best professional environment, the most uniform case processing, the best opportunities for further rationalization and further development of the IT system and the greatest savings potential.

In February 2006, the Land Registration Committee submitted report no. 1471 on digital land registration. In this report, the committee dealt with the legal, practical and technical issues raised by the implementation of digital registration.

**2854**

The report contained a draft of the legislative amendments necessary for the introduction of digital land registration. The Land Registration Committee assessed that a fundamental prerequisite for the introduction of digital land registration was the abolition of the previous paper-based land registration and the introduction of a new paperless land registration with automatic and digital procedures based on digital signature, digital documents and digital communication between users and the system. The committee thus proposed a fundamental change to the land registration process, but not to the basic conditions for land registration and its legal effects.

The Land Registration Court was established by Act no. 538 of 8 June 2006 amending the Administration of Justice Act and various other acts (Police and Court Reform), and the centralization of the land registration task was

U.2020.2851H

an integral part of the court reform. The Land Registration Court was placed in Hobro. The court reform entailed major changes in court personnel, tasks and buildings, among other things. The Police and Court Reform Act came into force on January 1, 2007, but the work to implement the reform continued afterwards, in parallel with the digital land registration project.

The Land Registration Act was amended by Act no. 539 of June 8, 2006 amending the Land Registration Act and various other acts (Digital Land Registration).

*The grant for the land registration project*

In a letter dated 15 June 2005 to the Ministry of Justice, the Danish Courts Administration presented its proposal for an organizational transition scheme for a new digitalized land registration system. In this connection, the Agency pointed out the critical factors for an efficient and safe performance of the land registration task in connection with the development and implementation of a new digital land registration system. These included the risk of staff turnover in the time leading up to the implementation of the new system, too high expectations for the degree of automation and problems with the new system. The agency recommended a model with a centralized land registration, which in a transitional period of 2-3 years was supplemented with a preparedness of approx. 100-110 annual works.

The Ministry of Justice submitted the proposal of the National Courts Administration to the Ministry of Finance, which could not agree with the proposed solution.

During 2005, negotiations were held between the Ministry of Finance and the Ministry of Justice on the financial framework for the courts' activities and the implementation of the court and land registration reforms. In November 2005, the result of the negotiations on the budget for the Land Registration Court was that the assumed efficiency gains from the digital land registration of approximately DKK 86 million annually (2006 prices), which Deloitte had calculated at DKK 83.2 million in 2005, would not be realized until 6 months after commissioning, which was assumed to take place on 1 January 2008. Thus, there would be no change in the appropriation in the first half of 2008.

The funding basis for the development of the digital land registration system was provided by document no. 38 of November 21, 2006. The act was based on the assumption that the new digital land registration system would go live on April 1, 2008. Postponement from January to April 2008 meant that the period in which the efficiency gains would not be realized was reduced from 6 to 3 months. However, subsequent postponements of the commissioning meant that the period during which the efficiency gains were not to be realized disappeared completely.

*The framework conditions for the project*

The adopted laws and acts regarding digital land registration meant that the following essential framework conditions were established for the project:

- The registration task was to be centralized for the entire country by a registration court, which was to be located in Hobro.
- The financial framework of the project - the expected savings should be realized at the time of commissioning.
- Commissioning was to take place as a "big bang", i.e. simultaneously for the entire country and without pilot operation.

*Organization and project management*

In a memo dated 3 May 2005 from the Administrative Office of the Danish Courts Agency to the Agency's Board of Directors on the organization of the land registration reform, it was proposed that the land registration project be organized by setting up an internal steering group, a contact group, a project group (also called user group) and a project secretariat. The internal steering group consisted of the Director of the Danish Courts Agency, the agency's IT manager and the project management (Judge Søren Sørup Hansen). The user group was an external monitoring group with the participation of the Director of the National Courts Administration, the project management and representatives from

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

all significant interests in land registration, including the Danish Bankers Association, the Danish Mortgage Credit Council, the Danish Bar and Law Society, the Danish Association of Real Estate Agents, the Danish Association of Land Surveyors, the Danish Association of Local Authorities and a number of ministries, including the Ministry of Justice. The purpose of the user group was to ensure that all key stakeholders had the opportunity to provide input on how the digital land registration system should be designed and that the right interfaces were created with the other stakeholders.

Additional external and internal working groups were set up during the course of the project.

The Danish Courts Administration made ongoing management decisions based on input from the Danish Court of Registration, Devoteam Consulting A/S (hereinafter Devoteam), the supplier (CSC) and external actors. Devoteam was a consultancy firm that provided advice to the Danish National Court Administration on IT system design and requirements specification as well as supplier management.

**2855**

The overall management in relation to the supplier took place through the supplier steering group for the digital land registration project with the participation of the Danish Courts Administration, the Land Registration Court (Søren Sørup Hansen), Devoteam and CSC.

*Risk management*

Risk management and risk assessments were carried out on an ongoing basis. The risk assessments were divided into four main areas: organization, technical solution, supplier and stakeholders, and an overall risk assessment was performed for all four areas.

The risk assessment of the four areas and the overall assessment was made on a scale of 1-5, where 1 was the lowest and 5 the highest risk. Both the project management and the contractor kept so-called risk logs. These risk logs were updated regularly and were used to assess the progress of the project and to focus on future activities in the project. It was a form where the probability of the risk occurring and the consequences of the risk occurring were assessed by entering numbers. Based on the numbers, the risks were colored red, yellow or green depending on the severity of each risk. The risk logs were continuously updated and individual risks were "closed" as they were addressed. The risk logs were reviewed at meetings of both the internal steering group and the supplier steering group.

The first risk analysis of the project was presented by Devoteam to the National Courts Administration on March 20, 2006. As previously stated, the risk analysis was divided into four main areas: organization, technical solution, supplier and stakeholders. The division into the four main areas was maintained in later risk analyses, and in a risk analysis of 21 November 2006, the risk for the main area "organization" was assessed at level 4. It was stated that the organizational conditions were generally assessed at a risk below medium, but with the choice of Hobro as the home of the Land Registration Court, there was assessed to be a not insignificant risk of a lack of qualified manpower during the implementation of the digital land registration system. It was also important that the commissioning of the digital land registration system was to take place as a "big bang", after which it would no longer be possible to register paper documents for land registration, but could only use electronic documents equipped with a digital signature.

In the risk analysis, the risk for the main area "technical solution" was assessed at level 3. The analysis pointed out that in order to enable the automated processing of land registration transactions,

it was necessary to use a digital signature that could be checked automatically, but that this risked, among other things, that citizens could not or would not register land registrations due to the lack of a signature or lack of knowledge of it. It was stated that a possible solution could be a power of attorney scheme, which would allow

for mortgage institutions or advisors to complete the digital land registration on behalf of a citizen.

The risk for the main area "supplier" was assessed at level 3, mainly due to a very tight schedule. It was stated that the timetable was set politically based on the desire to provide a digitized land registry at the same time as the implementation of a number of other reforms. The tight schedule meant that very tight project management and prioritization was required.

For the main area "Stakeholders", the Danish Courts Administration assessed the overall risk at level 3. The fact that the project was to be developed in collaboration with many stakeholders was independently assessed to have a high risk, because the stakeholders were very different from the largest financial institutions, land surveyors and public institutions to smaller car financing, lawyers and real estate agents. However, the risk was seen to be reduced by the fact that the financial sector had come together and agreed on the need for a common solution. However, this increased the requirement for the Danish Courts Agency to ensure that all stakeholders would be consulted. The overall risk assessment for all main areas was set at 3. As mentioned, the risk logs were continuously updated and new risk analyses were continuously performed.

*Main lines in the process leading up to the closing period*

Until the launch of digital land registration on September 8, 2009, the planned launch date was postponed three times. The first postponement from March 26, 2008 to November 21, 2008 was decided in the fall of 2007, when CSC announced that it was not possible to meet the deadline of March 25, 2008. As a result of increased risk on the supplier side and in relation to stakeholders, the Danish Courts Administration assessed that the development of the digital land registration system had changed from risk level 3 to risk level 4. The risk assessment of the organizational conditions was still relatively high.

The second postponement of the implementation from November 21, 2008 to January 12, 2009 was decided in June 2008. In a memorandum dated September 15, 2008, it was stated that the Danish Courts Administration, in cooperation with the financial sector and the supplier, had prepared a detailed implementation plan for the actual transition to digital land registration. The plan, which was intended to ensure a successful transition to the new system, meant that the test period was extended up to and including Tuesday, December 23, 2008, that all real estate registration would then be closed for 10 working days while data conversion and conversion took place, that the digital registration would open on Monday, January 12, 2009, and that banks and mortgage credit institutions would have their IT systems connected to the new system.

**2856**

digital land registration at the end of January 2009. The risk assessment was unchanged compared to the first postponement of the project.

The period during which the efficiency gains were not to be realized, which had been set at three months in document no. 38 of 21 November 2006, was reduced in the first postponement of commissioning and lapsed completely in the second postponement.

The third postponement from January 12, 2009 to September 8, 2009 was decided in October 2008. A memo dated October 28, 2008 from the Danish Courts Administration states that the agency, the Danish Bankers Association, the Danish Mortgage Credit Council, CSC and Devoteam had confidence in the direction of the project and the design of the system, and there was also

agreement that the schedule at the time contained a significant risk of errors and teething problems. To allow time for thorough testing of the system, including the system-to-system solution with the financial sector, and thus reduce the risk of teething problems during commissioning, it was agreed to draw up a revised timetable that postponed the commissioning of the digital land registration from January 12, 2009 to early September 2009. It was stated in the memo that in a

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

Postponement of the time of implementation of the system would be crucial for the handling of the land registration task during the transition period, so that the Danish Courts Administration could retain all the existing employees in the land registration departments, so that the task was solved in a reassuring manner. It would be critical for the safe operation of land registration in the period leading up to digital land registration if several employees did not wish to continue their employment. In order to retain employees in the land registration departments at the city courts, some of whom had already planned their departure from the courts, and some had already been extended several times, it would be necessary to provide a retention bonus to the individual. The memorandum included calculations of the costs of delaying deployment.

The construction of the Land Registration Court's premises in Hobro began in March 2008 as a PPP project and was completed in March 2009. *The delivered IT system*

The IT system was developed by CSC, which was selected as one of three bidders to develop the system.

The requirement specification called for usability testing of the external portal, but this was not included as CSC instead offered to provide a usability expert for the project. At the beginning of the project, it was expected that the professional users would develop industry-specific system-to-system solutions, while the external portal would only be used by certain smaller companies and private individuals. However, it later turned out that a number of professional users would not develop their own system solutions after all. This was the case for lawyers, real estate agents and land surveyors, for example, while the financial sector established system-to-system solutions.

In August 2009, the opportunity was established to test and comment on the external portal in a so-called "sandbox" solution.

A user guide for using the digital land registration system was prepared, and a hotline was established in the Land Registration Court that users could call for assistance, advice and guidance in using the system.

*Special about the power of attorney scheme*

In report no. 1471/2006, the Land Registration Committee assumed that the abolition of the previous paper-based land registration and the introduction of a new paperless land registration with automatic and digital case procedures was based on digital signatures, digital documents and digital communication between users and the system. Due to the relatively limited use of digital signatures, the Land Registration Committee recommended that a proxy system should also be established so that lawyers and others could make notifications on behalf of their clients.

Executive Order no. 763 of July 20, 2009 on access to the land registration system and the method of registration laid down rules on the form and content of powers of attorney for use in land registration. Among other things, it was stipulated that the power of attorney must be given on a form included as Appendix 1 to the Executive Order.

The power of attorney had to be filled in by machine and be dated and signed by the person who disposed of the registered document. When the power of attorney was received at the Land Registration Court, it was checked, among other things, whether it was filled in correctly, and it was then scanned in. After scanning, the powers of attorney were OCR-read so that it was later possible to find specific data in the individual power of attorney by machine. This functionality required that the data always appeared in a predetermined place in the power of attorney, which is why there was a form requirement.

During the case, it was stated that the Danish Courts Administration estimated that the Land Registration Court could risk receiving up to 8,000-10,000 powers of attorney daily. The system was therefore developed so that it had a capacity of up to 10,000 powers of attorney daily. After going live

of the digital land register, the Land Registration Court received approximately 4,000 powers of attorney per day.

The proxy system was developed and ready to go live on September 8, 2009.

*Specifically on the conversion of existing mortgages* The Land Registration Committee's report no. 1471/2006 contained proposals for transitional rules to help ensure a smooth transition process with ongoing conversion of paper mortgages, as a requirement for conversion (digitization) of all existing paper-based mortgages in immediate connection with

**2857**

the introduction of digital registration would be associated with a large workload for the Land Registration Court during the start-up period.

Act no. 504 of June 12, 2009 introduced a possibility for the financial sector to largely handle the conversion itself. The scheme included authorized notifiers under the Land Registration Act. The conversion was tax-free if, in connection with the cancellation of the mortgage, a corresponding digital mortgage was registered, and the tax exemption required that the new mortgage was reported for registration no later than the cancellation of the previous mortgage and no later than 5 years after the law came into force.

Act no. 539 of June 8, 2006 also introduced a transitional scheme for registered owner mortgages, according to which rights over these had to be registered no later than 5 years after the entry into force of the Act [commissioning of digital registration] in order to maintain protection against agreements and prosecution.

In connection with a user group meeting on June 25, 2009, the handling of various situations during the transition to digital registration was discussed. One of the points was the conversion of mortgages. A memo prepared for the discussions states: "Requests for conversion of a large number of (owner) mortgages, without this taking place in connection with the registration of changes to these, must be agreed in detail with the Registration Court".

During the case, it has been stated that the Danish Courts Administration had an expectation that approximately 15,000 mortgages per month would be converted (calculated on the basis of the number of registered endorsements in the preceding years), and that the vast majority (approximately 80%) of these conversions would take place via authorized notifiers and would therefore not burden the Land Registration Court. It was also expected that this number would decrease slightly, as it was often the same documents that were endorsed several times, and that the Registration Court would therefore receive approximately 3,000 mortgages per month for conversion, corresponding to a total of approximately 12,000 mortgages until the turn of the year 2009/2010.

*Specifically on expected employee productivity, staffing and staff training*

As mentioned, Deloitte estimated that the approximately 357 FTEs used in the existing paper-based land registration system could be reduced to approximately 91 FTEs by introducing a centralized digital land registration system. Deloitte also estimated that an automation rate of 69% could be achieved. Deloitte's analysis was the starting point for the funding basis for the land registration project.

From 2008, the Land Registration Court was allocated a basic allocation of 115 FTEs, which was later upgraded. In January 2009, the Court of Registration assessed that after moving to new premises in April 2009, the court would need to fully utilize the

original standard of 122 FTEs.

As a result of the centralization and location of the Land Registration Court in Hobro, it was difficult to recruit staff with land registration experience. However, it was possible to recruit a sufficient number of otherwise competent employees, who had to be trained for the land registration task.

U.2020.2851H

After the establishment of the court on 1 January 2007, the Land Registration Court took over the land registration task from a number of district courts, and three training centers were established in Aalborg, Randers and Aarhus, where a total of approximately 60 employees were to be trained in the paper-based land registration system. Over the course of 9 months, the employees were to be trained by experienced land registry employees in land registration.

In May 2009, the Land Registration Court entered into an agreement with surrounding judicial districts on the loan and training of employees if the case processing time at the Land Registration Court should become unacceptably long. This established an additional contingency of 20 experienced land registry employees. Prior to commissioning, these employees received the same courses in the use of the new system as the Land Registration Court's own employees.

The Danish Courts Administration has stated that in June 2009, a general introduction was held for all employees in the use of the digital land registration system. In addition, CSC trained 16 super users who trained the other employees between August 20 and September 7, 2009. During the training, the employees could, among other things, practice on test cases.

*The shutdown period and commissioning of the system*

IT system acceptance tests were held on July 8 and August 20, 2009. However, the IT system was not immediately approved, and Devoteam later assessed the takeover test of August 20, 2009 and recommended to the Danish Courts Administration that if the agency chose to let CSC pass the takeover test, this should be subject to the correction of a number of errors and omissions. It is stated that the system was finally approved in November 2009.

The postponements of the commissioning date had led to challenges for the district court presidents in maintaining the necessary staff to maintain the paper-based land registration at the courts' land registration departments. It was assessed that a further postponement would have significantly worsened the situation.

In a draft briefing document to the Finance Committee , the Danish Agency for the Judiciary stated that it was still the Agency's plan for the system to go live on September 8, 2009, and together with the supplier and users - especially in the financial sector - the Agency had prepared production preparation plans, but also contingency plans in the event of a disruption of the system.

**2858**

unforeseen problems might arise. The Danish Courts Administration expected that - despite the thorough testing of the system - minor operational disruptions could be expected in the period immediately after implementation, just as a running-in period with longer case processing times had to be expected until the turn of the year. There was still a risk assessment of 4.

On August 28, 2009, the Danish Land Registry's "Emergency plan for e-TL" prepared by Devoteam was available. The plan contained, among other things, detailed checklists and lists of tools.

At a supplier steering committee meeting on August 31, 2009, the Danish Courts Administration expressed concern about whether production preparations and performance tests were documented and ready for the land registration system to go live on September 8, 2009. CSC confirmed that the performance test had been completed in the test environment.

The National Courts Administration decided to put the digital land registration system into operation on September 8, 2009. In

the months leading up to the launch, the financial sector had expressed concern about whether there was sufficient time for quality assurance of the system and whether there were adequate contingency plans. A dialog with the Ministry of Justice and the Danish Courts Agency about contingency plans and testing of the system in July and August 2009 led to the financial sector agreeing to commission the digital land registration system on 8 September 2009.

During the period from August 20, 2009 to commissioning on September 8, 2009, land registration was closed. During the closure period, all paper cases had to be finalized in the old system so that the content of the land register could be transferred to the new system by data conversion in the first week of September 2009.

In general, the paper-based land registration system had relatively low average processing times, especially in recent years prior to the implementation of the digital system. On average, the vast majority of courts were able to process incoming documents in 10 working days or less. However, the figures showed large variations between the individual court districts.

On September 8, 2009, the Danish Courts Administration issued a press release about the commissioning of the digital land registration. The press release pointed out that there would be a running-in period until New Year. The start-up period was due, among other things, to the fact that the Land Registration Court would initially have to solve more tasks manually, partly because users were expected to have to get used to the new system, just as a backlog of cases had arisen as a result of the temporary closure period.

The Danish Courts Administration has drawn statistics on case processing times and the degree of automation for completed and received cases in the period from September 2009 - December 2010. The statistics show the following:

"...

**Sagstal, målopfyldelse og gennemsnitlig sagsbehandlingstid for tinglysningen i perioden september 2009 til december 2010 for hhv. de manuelt behandlede og alle tinglysningssager**

| | Manuelt behandlede sager | Mål-opfyldelse | Gennemsnitlig sags-behandlingstid | Gennemsnitlig behandlingstid | | Alle behandlede sager | Mål-opfyldelse | Gennemsnitlig sagsbehandlingstid | Gennemsnitlig behandlingstid |
|---|---|---|---|---|---|---|---|---|---|
| | Baseret på afsluttede sager i måneden | | (ugedage) | (hverdage 5/7) | | Baseret på afsluttede sager i måneden | | (ugedage) | (hverdage 5/7) |
| **2009** | | | | | **2009** | | | | |
| September | 8.436 | 99,5 | 4,4 | 3,1 | September | 17.700 | 99,7 | 2,2 | 1,6 |
| Oktober | 12.995 | 47,3 | 16,6 | 11,8 | Oktober | 37.852 | 81,3 | 5,9 | 4,2 |
| November | 14.086 | 36,8 | 25,1 | 17,9 | November | 63.910 | 74,2 | 8,8 | 6,3 |
| December | 23.862 | 18,4 | 38,6 | 27,5 | December | 79.477 | 65,5 | 15,6 | 11,1 |
| **2010** | | | | | **2010** | | | | |
| Januar | 47.979 | 16,9 | 48,2 | 34,4 | Januar | 116.768 | 59,9 | 22,7 | 16,2 |
| Februar | 51.453 | 27,8 | 31,2 | 22,3 | Februar | 121.019 | 66,3 | 14,4 | 10,5 |
| Marts | 58.719 | 44,3 | 19,9 | 14,2 | Marts | 140.355 | 75,4 | 8,9 | 6,4 |
| April | 38.506 | 64,0 | 17,4 | 12,4 | April | 120.546 | 87,9 | 6,0 | 4,3 |
| Maj | 47.405 | 53,6 | 20,7 | 14,8 | Maj | 163.948 | 84,8 | 6,9 | 4,9 |
| Juni | 54.373 | 66,6 | 13,4 | 9,5 | Juni | 193.672 | 89,5 | 4,3 | 3,1 |
| Juli | 52.819 | 62,9 | 13,6 | 9,7 | Juli | 162.378 | 86,4 | 5,1 | 3,6 |
| August | 49.893 | 61,5 | 14,4 | 10,3 | August | 155.912 | 86,2 | 5,2 | 3,7 |
| September | 55.527 | 62,7 | 14,2 | 10,2 | September | 180.171 | 87,2 | 4,9 | 3,5 |
| Oktober | 55.984 | 69,9 | 10,5 | 7,5 | Oktober | 170.820 | 89,4 | 3,8 | 2,7 |
| November | 56.967 | 66,1 | 11,3 | 8,0 | November | 188.440 | 88,8 | 3,9 | 2,8 |
| December | 59.250 | 64,2 | 11,7 | 8,3 | December | 177.700 | 87,0 | 4,3 | 3,1 |

Note: Der anvendes 14 kalenderdage for at finde målopfyldelsen inden for 10 hverdage. I perioder med skæve helligdage vil målopfyldelsen derfor være undervurderet. Når afgørelsestiden findes, ganges vi på tilsvarende vis afgørelsestiden i kalenderdage med 5/7 for at findes afgørelsestiden målt i hverdage. I perioder med skæve helligdage vil afgørelsestiden således blive målt længere, end den er.

**Sagstal, målopfyldelse og gennemsnitlig sagsbehandlingstid for tinglysningen i perioden september 2009 til december 2010 for hhv. de manuelt behandlede og alle tinglysningssager**

| | Manuelt behandlede sager | Mål-opfyldelse | Gennemsnitlig sags-behandlingstid | Gennemsnitlig behandlingstid | | Alle behandlede sager | Mål-opfyldelse | Gennemsnitlig sagsbehandlingstid | Gennemsnitlig behandlingstid |
|---|---|---|---|---|---|---|---|---|---|
| | Baseret på afsendte sager i måneden | | (ugedage) | (hverdage 5/7) | | Baseret på modtagne sager i måneden | | (ugedage) | (hverdage 5/7) |
| **2009** | | | | | **2009** | | | | |
| September | 18.200 | 51,1 | 18,6 | 11,3 | September | 28.246 | 66,0 | 12,9 | 9,2 |
| Oktober | 30.614 | 18,9 | 53,9 | 38,5 | Oktober | 65.698 | 46,9 | 30,7 | 21,9 |
| November | 37.807 | 13,7 | 51,2 | 36,6 | November | 87.444 | 53,8 | 25,9 | 18,5 |
| December | 31.066 | 13,8 | 42,8 | 30,6 | December | 83.847 | 61,8 | 18,8 | 13,4 |
| **2010** | | | | | **2010** | | | | |
| Januar | 34.515 | 26,8 | 28,0 | 20,0 | Januar | 99.877 | 71,6 | 10,8 | 7,7 |
| Februar | 37.828 | 40,5 | 20,4 | 14,5 | Februar | 105.480 | 77,2 | 7,9 | 5,7 |
| Marts | 48.424 | 56,2 | 13,7 | 9,8 | Marts | 129.430 | 82,5 | 5,7 | 4,0 |
| April | 40.467 | 67,9 | 12,5 | 8,9 | April | 124.186 | 88,3 | 4,7 | 3,3 |
| Maj | 47.435 | 55,4 | 13,7 | 9,8 | Maj | 164.064 | 85,5 | 4,6 | 3,3 |
| Juni | 56.696 | 67,1 | 14,2 | 10,1 | Juni | 195.932 | 89,2 | 4,7 | 3,3 |
| Juli | 50.741 | 54,5 | 15,5 | 11,1 | Juli | 160.093 | 84,0 | 5,5 | 4,0 |
| August | 47.833 | 66,1 | 12,1 | 8,6 | August | 152.765 | 88,9 | 4,2 | 3,0 |
| September | 56.637 | 68,0 | 10,8 | 7,7 | September | 180.737 | 89,1 | 3,7 | 2,7 |
| Oktober | 54.811 | 66,5 | 11,6 | 8,3 | Oktober | 170.497 | 88,1 | 4,2 | 3,0 |
| November | 61.245 | 60,2 | 12,6 | 9,0 | November | 192.231 | 86,2 | 4,5 | 3,2 |
| December | 58.436 | 60,4 | 14,0 | 10,0 | December | 177.210 | 85,7 | 5,1 | 3,6 |

Note: Der anvendes 14 kalenderdage for at finde målopfyldelsen inden for 10 hverdage. I perioder med skæve helligdage vil målopfyldelsen derfor være undervurderet. Når afgørelsestiden findes, ganges vi på tilsvarende vis afgørelsestiden i kalenderdage med 5/7 for at findes afgørelsestiden målt i hverdage. I perioder med skæve helligdage vil afgørelsestiden således blive målt længere, end den er.

..."

After the first week of digital land registration, case processing time increased, and on October 7, 2009, the financial sector contacted the Danish Courts Administration and expressed concern about the increased

processing time, especially in the preceding two weeks. The financial sector experienced, among other things, an increasing accumulation of cases that were reported for registration, but where there was no information about when the case was expected to be processed, lack of availability and stability with long response times from the land registration system with the effect that production in the financial sector actually stopped in the middle of the day from 11:00 to 15:00, and lack of functionality in the land registration system that made it impossible for the financial sector to report a number of cases for registration, including housing association cases, trust cases, releases, etc.

By email dated October 29, 2009, the Association of Danish Lawyers forwarded to the Danish Courts Agency an inquiry dated October 16, 2009 from attorney Lars Lindencrone Petersen about, among other things, a number of practical problems with the digital

**2859**

land registration system. Among other things, he stated that "several functions in the new system do not work/have not worked, including the draft function, the possibility of test registration of documents and the function whereby others than the applicant are notified by e-mail that a document has been registered", and that it thus "has not been possible to register the clients' rights correctly and release purchase amounts within a reasonable time etc."

Attorney Lars Lindencrone Petersen also stated that there "there are still long periods where it is not possible to light documents due to "technical problems", as the system is "out of order", sends an "error message" or simply states that there is a "technical error". We have experienced on several occasions that we have been ready to register a document, but for several days have been met with technical problems that prevent the actual registration". He also stated that there were very long "response times" when users had to move through the various screens. Finally, attorney Lars Lindencrone Petersen stated that "when legislation allows for the use of the power of attorney scheme, and when the individual client often feels more comfortable with the lawyer carrying out the entire digital registration expedition on behalf of the client, then it is the primary task of the Land Registration Court to ensure that the registration is not delayed and can be completed within a reasonable time after sending the power of attorney for registration".

At a user group meeting on October 19, 2009, the Director of the Danish Courts Administration gave a briefing on the transition from the old land registration system to digital land registration. He stated that after the first week there had been more pressure on the system, and handling problems had been identified in relation to powers of attorney, among other things. The other problems found were minor errors and inadequacies that could be corrected and were to be expected during a start-up period. He also noted that the Land Registration Court's hotline had been overloaded. The Bar Council's representative in the user group expressed dissatisfaction with the system on a number of points.

On October 21, 2009, Devoteam submitted a memo about the situation in the Land Registration Court. Among other things, it was stated that there were long waiting times in the telephone service, that there were many inquiries via e-mail and that employees were stressed by case backlogs.

At a meeting of the board of the Danish Courts Administration on October 26, 2009, one of the items on the agenda was information on the status of the IT projects. "Status on digital land registration" was prepared as an appendix to the item, which states:

"... The running-in period

...

The status as of October 21, 2009 is that 67,664 notifications have been received. Of these, approximately 1/3 are still being processed, while 2/3 have been finalized. Of the completed notifications, around two thirds are

thirds registered within one day. On average, the processing time for completed cases is approximately 5 days. A total of 519,614 queries have been made in the system.

The number of reports is divided into approximately 1/3 on the external portal (www.tinglysning.dk), which lawyers and estate agents use, and 2/3 on the system-to-system solution used by banks and mortgage lenders.

The Danish Courts Administration has already prepared users of the digital land registration before September 8th for a start-up period until the end of the year. ...

Since the system came into force, a number of transitional difficulties have emerged. This has caused frustration for employees and users, who have also voiced their criticism of the system in the press.

Below are some of the teething problems that have arisen after the implementation.

1. High pressure on paper powers of attorney

One of the practical issues during the start-up period has proven to be the use of paper-based powers of attorney. According to the legal basis for digital land registration, the use of digital signatures by buyers and sellers is now the primary way to sign a deed, for example. As a secondary option for users who, for various reasons, may not have a digital signature, a so-called power of attorney scheme was introduced, where the buyer and seller can give power of attorney to a professional advisor, who can then sign digitally on behalf of the property manager.

In practice, the paper-based power of attorney system has proved to cause more problems because the use of powers of attorney has been significantly more widespread than expected. This has led to capacity problems in the Land Registration Court, and at times there have been significant technical difficulties in setting up the necessary scanning equipment.

Unfortunately, the pressure on the power of attorney system has meant that several professional users have had to wait up to several weeks to confirm that the submitted powers of attorney are in order and can form the basis for registration. In this connection, the Danish Land Registration Court has pointed out that professional advisors - in accordance with the intention of the law - can recommend their clients to sign with a digital signature instead of filling out a power of attorney or registering the expected power of attorney.

To reduce the backlog of powers of attorney, the Land Registration Court has hired an additional 4 employees and established a special team of employees who work exclusively with creating powers of attorney. The team has periodically worked around the clock in 3 shifts, and

**2860**

The efforts have meant that the pile is expected to be reduced so that by the end of week 43, the court will scan the new powers of attorney continuously.

2. Lack of functionality.

In order not to risk problems in connection with the commissioning on September 8, some minor fixes - especially the functionality that ensures automated land registration - were postponed and were only put into production on September 29. This resulted in a backlog of cases for manual processing, which is only now being resolved. Similarly, there are still a number of corrections that are not expected to be put into production until the end of October.

3. Draft function did not work

The draft function www.tinglysning.dk is another element that has caused difficulties for several users during the start-up period. In the first few weeks, users could not save the draft of a deed, but the function has since been fixed and now works as intended.

4. Periods with long response times

In the early days of digital land registration, there were periodic problems with the system's response times, i.e. the time the user waits to get to a new screen. However, a recent upgrade of the system has led to a significant improvement in response times, which are now at a satisfactory level. However, changes in usage patterns can still trigger the need for fine-tuning of the system, which is why the supplier CSC and the National Courts Administration have established a close monitoring of response times.

5. Long waiting time in the Land Registry hotline

There has been, and still is, a lot of pressure on the Land Registry hotline. Unfortunately, this has resulted in a significant waiting time for users. At times, many inquiries have concerned basic questions such as digital signatures and basic information and guidance on how the system works. It has not proved possible in the short term to increase the number of employees who have sufficient knowledge of the system to answer users' questions in a quality manner.

In order to channel users around the hotline, the Danish Land Registration Court and the Danish Courts Agency have strengthened the information on the Danish Land Registration Court's website. At the same time, assistance has been hired to target existing guides to the system in relation to users' current questions.

The extraordinary load on the hotline has meant that more employees than expected are answering phones and emails. Conversely, this means fewer employees to handle the cases that require manual processing. Therefore, during the start-up period, a longer than normal case processing time must be expected for manual handling.

6. Criticism of the system's functionality

In the first few weeks of digital land registration, there has been criticism of parts of the system's functionality. The criticism has been directed partly at minor errors and shortcomings, and partly at issues that could improve the users' experience of the system. Some of the criticism is related to the adaptation to a new system, which means changed procedures for professional users, among others. Another - and quite sensible - part is related to the fact that the professional user groups often have different needs - and different needs than the ordinary citizen. However, the new land registration portal must cover all needs and, in particular, ensure that citizens can continue to carry out land registration expeditions themselves in an understandable and secure way. ...

...

Both in the committee work and in the preparatory years leading up to the transition to digital land registration, there has been broad involvement of user groups. In the subsequent start-up period, there has also been a close dialog with key user groups to gather experience with the new system. The Danish Land Registration Court and the Danish Courts Agency will continue the dialog with the users of the system in order to continuously improve the users' experience and use of the system.

..."

On November 9, 2009, the Land Registration Court sent a graph prepared by the financial sector of the development in the ratio between reported cases and cases for manual processing for the period September 8 - November 5, 2009, to the Danish Courts Administration. The graph looked as follows:



At the end of September 2009 and especially during October 2009, the District Court started receiving a large number of mortgages for conversion. The many conversion requests all came from financial institutions. In a number of cases, cover letters were enclosed that did not indicate anything about the timeliness or urgency of the cases, while at the same time other cases were received individually from the same financial institution, where the urgency was emphasized. The submission of the

**2861**

very large number of mortgages had not been agreed in advance with the District Court.

The National Courts Administration has stated that in October 2009, the requests for conversion of mortgages began to take many resources from the case processing. All requests for conversion of mortgages were received in the court's mail department. Here, the requests were sorted by date of receipt and subdivided in alphabetical filing order for each day of receipt, after which they were placed on a shelf marked with the respective date of receipt. All conversion requests from the financial sector were considered to be mass conversion requests, unless the forwarding letter stated that the request was urgent or it was otherwise clear that the request was related to another current land registration process. This applied regardless of whether it was a mass request or a single request. However, when the court only received a single mortgage for conversion from a bank or similar, this mortgage was processed as a matter of urgency for practical reasons. The mortgages that were marked as urgent were removed and converted immediately, but otherwise the mortgages that were received were converted after the date of receipt. Thus, both urgent mortgages and mortgages from the "pile" were converted every day.

The number of conversion requests continued to grow in November 2009, and at that time it was mainly the conversion of mortgages that took resources away from case processing. It has been reported that at times up to 30 employees were used on the conversion task.

By email dated November 15, 2009, the Land Registration Court responded to a commitment from the financial sector for possible assistance:

"...

Where we could see a real help is in the conversion of old mortgages. Converting a mortgage takes

- on average - as long as the registration of 4-5 mortgages selected for manual processing, and is thus very burdensome for the Land Registration Court, which at present has just rounded 50,000 converted mortgages.

It would therefore be a great help if banks were to make greater use of the authority granted to them in the amendment to the Land Registration Act to convert mortgages themselves (applies to all

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

authorized notifiers). This would also save the relevant costs.

U.2020.2851H

The cost of shipping and handling paper documents both when they are sent and when they are returned.

..."

The financial sector responded to the Land Registration Court by email dated November 17, 2009:

"...

Based on your proposal, the Danish Bankers Association is currently investigating the implications of and the possibility of recommending that banks make greater use of the possibility in section 49(4) of the Danish Land Registry Act to convert mortgages via the reporting system. I will return with an answer to this shortly. However, I would like to hear whether the Finance Council/the sector could be of assistance to the Land Registration Court in other areas where there is no shift of responsibility from the Land Registration Court to the financial sector.

..."

On December 10, 2009, the board of the Danish Courts Administration received a memo entitled "Status of digital land registration", which stated, among other things:

"...

This memo describes the development since the last briefing and the planned further development of the project.

Until the turn of the year, digital land registration is in a purchasing period. Experience from the first three months of using digital land registration has confirmed the agency's expectation that such a complex IT solution presents many challenges of a legal, technical and practical nature. However, it has also turned out that users are experiencing somewhat greater inconvenience than the agency had previously anticipated.

We are working hard to solve the identified problems, and we believe that things are moving in the right direction. The Board remains confident in the design and functionality of the system, and it is our assessment that the commissioning period can be considered completed as of December 31, 2009.

Statistical information

As of December 9, 2009, 206,573 documents have been reported for registration. Of these, 136,719 have been registered, and of these, 91,624 notifications have been registered automatically.

During the same period, 1,027,076 queries were made. The degree of automation is currently approx. 50%, to which should be added approx. 8% from documents that are no longer reported for registration, as some procedures are now fully automated.

..."

In order to stabilize case processing times in manual cases and otherwise create a stable operation of the digital land registration, The National Courts Administration and the Land Registration Court prepared a 10-point action plan dated 14 December 2009: The action plan states, among other things:

"...

Overall, it is the assessment of the Danish Courts Administration and the Danish Land Registration Office that the work of adjusting and adapting the digital land registration system has come so far

**2862**

now that we can say that the IT solution itself is stable. There is certainly room and need for improvement, especially in terms of meeting the wishes expressed by users for changed/improved functionality, but overall we believe that the IT solution is stable.

The Land Registration Court is now looking to stabilize the operation of the Land Registration Court in all other areas, including a special focus on the cases that are selected for

manual processing.

Focus on manual cases

The National Courts Administration and the Land Registration Court have decided to focus their efforts first and foremost on stabilizing case processing.

Copyright © 2023 Karnov Group Denmark A/S

The processing times for the cases that are selected for manual processing in the Land Registration Court. ...

...

Below is a description of the initiatives that have been implemented or planned in order to stabilize case processing times in manual cases, as well as the many other initiatives that have been implemented to ensure stable operations in the digital land registration after New Year.

...

The individual initiatives

The many initiatives described below aim to ensure a stable operation of the digital land registration from New Year. Some of the initiatives have already been launched or implemented, while others are in the process of being implemented. The status of each initiative is listed below.

1. Changed organization and strengthening of staffing in the Land Registry Court

...

2. Increased focus on manual case handling

...

3. Improving the Hotline

...

4. Emails

...

5. Improved guides

...

6. Help texts on tinglysning.dk

...

7. Restructuring of FAQ on Tinglysningsretten.dk

...

8. Continuous system improvements and update of the land registration system on December 16, 2009

...

9. Clarification of legal issues regarding housing associations etc. and questions regarding the Land Registration Order etc.

...

10. Communication

..."

At a meeting of the user group on December 14, 2009, the director of the Danish Courts Administration informed that the agency and the Land Registration Court had focused on the long processing times for the cases selected for manual processing and that a 10-point action plan had been prepared. The financial sector agreed with the agency's assessment that the primary focus should be on the long case processing time, which was critical. It was stated that due to the long processing time, several parts of the financial sector were considering introducing an administrative stop for loans because it was too uncertain whether it was possible to obtain security in real estate.

The president of the Land Registry mentioned at the meeting that it would facilitate the Land Registry if the financial sector would take it upon itself to convert the mortgages, as the sector itself had requested in connection with the preparation of the legal basis for the digital system. The representative of the financial sector stated that "he would take the proposal back".

In a letter dated December 15, 2009, the financial sector wrote the following to the Permanent Secretaries of the Ministry of Justice and the Ministry of Economic and Business Affairs:

"The financial sector can currently state:

That the number of reports with missing land registry responses is increasing. Currently, 75,000 cases are missing responses, including 38,000 mortgage notifications, of which

there are approximately 1,000 cases where the registration status is unknown, and

That the case processing times at the Land Registration Court are still on the rise. Currently, the average case processing time is over 60 days for cases where there is actual case processing.

This situation, in the context of a very low level of activity in the real estate market, including a low number of conversions, is very worrying and not acceptable for the financial sector and its customers.

Already at this stage, the long processing time of the Land Registry Court has consequences for lending. Costs in connection with the derived interim financing guarantees have increased. Among other things, this has meant that some companies have chosen to postpone taking out loans until the processing times at the Land Registry Court have been reduced. In addition, the financial sector's guarantee position - and thus capital tied up - has doubled since the implementation of the Digital Land Registry. A continued increase could have a negative impact on lending activity. It is thus the financial sector's assessment that there will be social consequences if the case processing time at the Land Registration Court is not reduced as soon as possible."

The Danish Courts Administration received inquiries from the industry organizations Landbrug & Fødevarer and Dansk

**2863**

Ejendomsmæglerforening with criticism of, among other things, the long case processing times and the missing or inadequate guidelines.

The financial sector and the National Courts Administration held a meeting at the Ministry of Justice on December 17, 2009. At the meeting it was agreed, according to a memo of the same date prepared by the National Courts Board:

"...

1. Secondment of employees from the financial sector to the District Court in Hobro.

If employees from the financial sector are to be seconded, the Danish Courts Administration and the Land Registration Court must describe as soon as possible - and before Christmas:

a)   tasks - what tasks can the employees expect to have to solve in Hobro. In addition to conversion, Sørup must carefully consider what other tasks they can solve, including, for example, canceling court notes on paper documents from the old system.

b)   Working conditions/location - where will the employees work, how long are the working days etc., will the employees be hired in Hobro or are they employed in the financial sector etc.

It must be clarified with the financial sector how the costs of the posting, including salary, hotel and other related expenses, will be covered.

2. Possible non-posting of employees

Sørup must consider - if there can be no posting of employees from the financial sector - whether it can in any way give the Land Registration Court a relief if The financial sector is responsible for "preparing" the conversion of the mortgages, and the Land Registration Court subsequently "approves" these, so that the Land Registration Court is responsible for the conversion.

The Danish Bankers Association would also recommend that members reconsider the possibility of converting mortgages themselves - and also follow up on the fact that several have not followed the recommendation not to send mortgages into moving boxes for conversion.

..."

On December 29, 2009, the Land Registration Court sent a memo to the financial sector about the sector's possibilities to help the Land Registration Court. The conclusion of the memo states:

"...

In the opinion of the Land Registration Court, the financial sector will primarily be able to relieve the Land Registration Court by taking over the

U.2020.2851H

gifts with the conversion of mortgages and cancellations of legal notices.

Alternatively, from January 1, 2010, the Land Registration Court will be able to receive 12 employees who can perform these tasks from the Land Registration Court's premises in Hobro. However, before this can be implemented, agreements must be made on the employment status of the persons in question - including responsibility for the tasks they perform.

..."

In early 2010, an understanding was reached with the financial sector that the sector would take over the task of converting mortgages, and the Land Registration Court then ceased to convert mortgages from the pile. By agreement of April 6, 2010, the Land Registration Court and the financial sector agreed on a procedure for returning the paper mortgages sent to the Land Registration Court for mass conversion to the individual banks.

In a memo dated January 13, 2010 from the National Courts Administration with an action plan for reducing case piles, it appears that 60% of cases received were processed immediately. The memo also set the goal that the Land Registration Court during the spring of 2010 should reduce the processing time in all types of cases so that 95% of all documents were registered within 10 days from April 6, 2010.

In a memo dated January 15, 2010 on "Status of digital land registration", the Danish Courts Administration has described the main reasons for the backlog of cases in the Land Registration Court during the fall of 2009. The memo states, among other things, the following:

"After four months of operation, the status is that the significant errors and deficiencies in the IT system have been corrected and that the basic functionality is in place, but there have been major inconveniences for users throughout the start-up period, and the case processing time has been unacceptably long in about half of the cases.

...

Status at the end of the commissioning period

a. How the IT system works

The status at the end of the commissioning period is that significant errors and deficiencies in the IT system and in the data conversion have been corrected. There are no longer any problems with the IT technical handling of proxies or drafts, which caused major problems for users during the commissioning period.

At the end of the start-up period, the system's degree of automation is satisfactory, as approximately 60% of all cases are handled automatically, i.e. typically within a few minutes. To this must be added approximately 8%, which corresponds to the cases in the previous system that have been completely eliminated by digitization. The degree of automation is therefore now very close to the expected 69% of cases in the previous land registration system. It is expected that the level of automation can be further increased by a few percentage points in the long term.

...

b. Case processing time and the causes of the backlog

...

The long case processing time for cases selected for manual processing is primarily due to the fact that due to start-up problems, unexpectedly many paper cases, as well as habituation and lack of routine among the employees at the Land Registration Court, fewer cases have been processed.

**2864**

cases than expected, even though cases were processed 6 days per

week throughout the start-up period.

...

A number of unforeseen teething problems put an extraordinary strain on the Land Registration Court's employees, who did not have enough time to process the ongoing cases and gain routine in the new system. The biggest problems during the start-up period were as follows:

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

- An error in the scanning of paper powers of attorney and many initial errors in the submitted powers of attorney meant that the powers of attorney had to be checked manually. The instructions for the power of attorney and the design of the power of attorney form were part of the reason for the many user errors. The scanning error was fixed by the end of September, but the huge number of proxies (around 4,000 per day) and the limited use of digital signing meant that a number of employees had to work in 3 shifts (around the clock) to maximize the scanning capacity and reduce the pile. The backlog was reduced around November 1, after which the processing time for proxies has been the expected 2-3 days.

- A number of errors and deficiencies in the land registration system and in the data conversion meant that certain cases caused problems and that a number of case processes were heavier than expected. For example, a check to ensure automatic processing of mortgages had to be postponed shortly before the start of production, which is why far more mortgages than expected were selected for manual processing during the first three weeks. It was not unexpected that, despite extensive testing, there would be a number of errors and omissions during the purchasing period, but the nature of the specific errors was not known in advance. Significant errors and deficiencies have been continuously corrected during the running-in period.

- In addition to the approximately 4,000 paper powers of attorney that the Land Registration Court receives every day, there were unexpectedly many other paper requests, as a number of cases completed up to the closure of the old system had to be corrected on paper. In addition, over the fall, the Land Registration Court received an unexpectedly large number of paper cases, including cases on the conversion of mortgages, which was made possible in the legislation and which it was assumed in the planning of the Land Registration Court would be handled by the professional users.

- Finally, questions from users via email and telephone have placed a very heavy burden on the Land Registration Court. This meant that more employees than expected had to spend their time answering questions in the hotline or by email. To a certain extent, the large number of user inquiries can be attributed to the expected familiarization with the system, but questions about acquiring a digital signature, local browser setup, etc. were more extensive than expected. The load on both the telephone hotline and the volume of incoming emails pulled a significant number of employees away from the actual case handling. At the same time, the many questions came at a time when no routines had been established for handling customer inquiries that ensured sufficiently fast, consistent and correct answers.

  However, the extraordinarily high number of inquiries was also a consequence of the fact that the guides available to users were not good enough. Since then, a number of better and more easily understandable guides have been produced for the land registration system.

  ...

  From the start of operations in September 2009, digital land registration will save the state almost DKK 100 million annually, and users will - once the case backlog has been reduced - save time and money on faster land registration in ordinary cases of trade and mortgaging of real estate."

According to the minutes of February 26, 2010 from a meeting of the user group on

On February 1, 2010, the Director of the National Courts Administration informed the meeting that the action plan had a good effect on the manual cases. Overall, there was no cause for concern in relation to reaching the goal, although there would be certain challenges with regard to the cadastral cases. The Land Registration Court was still processing cadastral cases as of October 2, 2010, but the number was

Copyright © 2023 Karnov Group Denmark A/S

this pile decreased a lot. In terms of deeds, more resources had been shifted to this area, so there was still reason for optimism. The automation rate was just over 60%.

At a meeting of the board of the Danish Courts Administration on February 10, 2010, the director of the Danish Courts Administration stated that many factors had contributed to creating the piles. A lack of user testing had created extra pressure on the Land Registration Court's hotline. There had been an image in the media that there would have been no problems if the lawyers had participated in a user test, but this was not true. The main problems were the many powers of attorney and related problems with scanners and the 100,000 extra cases coming from the financial sector.

In a memo dated March 9, 2010, the Board of the Danish Courts of Justice was informed about the status of digital land registration, and it was stated that since the commissioning of digital land registration and until the end of week 9 in 2010, the Land Registration Court had received a total of 497,429 applications. 93.8% had been completed, 4.8% were for manual processing and 1.4% were in the property queue. The automation rate remained around 60%. In relation to the action plan, on March 8, 2010, the Land Registry Court had achieved the interim target of

**2865**

all points, except for the case type cadastral changes, but also for these cases it went the right way.

*Rigsrevisionen's report*

In August 2010, Rigsrevisionen submitted a report to the State Auditors on the digital land registration project. The report was submitted on the basis of a request from the State Auditors, as the Danish Courts Administration's land registration project had been selected to be included in report no. 2/2008 on the management of government digitization projects, but as the administration could not allocate resources to be included in Rigsrevisionen's investigation, the digital land registration system was excluded from the investigation. As the commissioning of the digital land register was postponed several times, the State Auditors wanted Rigsrevisionen to investigate the digitization project. Based on the State Auditors' request, Rigsrevisionen formulated the following questions for the investigation:

"...

- Was the Danish Courts Administration's decision-making basis for the implementation of the digital land registration system adequate?
- Was the National Courts Administration's project management satisfactory?
- Was the financial management of the digital land registration project satisfactory?
- Is the system working satisfactorily?
- Was the organizational preparation satisfactory?

Rigsrevisionen's report contains the following about the results of the investigation:

"The digital land registration project was approved by the Finance Committee

in 2006, and the system was scheduled to go live in early 2008. However, the implementation of the digital land register (rights over real estate) was delayed for almost 1½ years, while the remaining 3 books have not yet gone live. The delay of the digital land register was due to delayed deliveries from the supplier and the need for additional time to test the system. The original development budget for the digital land registration system has been increased by approximately DKK 67 million. In addition,

as a result of the delay, there have been additional costs for the state of approximately DKK 124 million, mainly because the planned operational savings have been postponed. The Danish Courts Administration has not ensured a correct accounting organization of the digital land registration project. There has not been a complete overview of costs related to the project.

When the project was approved by the Finance Committee in November 2006, it was a prerequisite in the document that a planned staff reduction

U.2020.2851H

of 200 FTEs was to be realized 3 months after the system went live. Due to the delays of the system, this assumption was changed so that the staff savings of 200 FTEs would instead take place at the time of commissioning. According to the Registration Committee, the intention was for the system to be commissioned as a big-bang project, i.e. commissioning the system simultaneously for the whole country and without pilot operation Furthermore, it was decided by law that the land registration task should be centralized and placed in the Land Registration Court in Hobro.

There were thus 3 essential framework conditions for the implementation of the digital land registration system: saving 200 FTEs for the land registration task at the time of commissioning, commissioning the system as a big-bang project and centralizing the land registration task by establishing the Land Registration Court in Hobro. The Danish Courts Administration has commissioned the digital land register accordingly.

At the end of 2009, according to the National Courts Administration, the system was essentially working satisfactorily. However, in 2010 there are still problems with user-friendliness. From the turn of the year 2009/10, approximately 70% of the registrations were completely automatic and typically within a few minutes, which corresponded to the goal of the system. After the commissioning of the digital land register during the start-up period, there have been a number of significant errors and deficiencies in the system, which the Danish Courts Administration has taken the initiative to rectify. The Danish Courts Administration has also continuously improved the system The *organizational* preparation prior to the implementation of the digital land register was inadequate and was not based on thorough calculations of resources and dimensioning of the tasks. The Danish Courts Administration's expectations for employee productivity were unrealistically high, the handling of powers of attorney was not sufficiently prepared, and the deselected usability test placed greater demands on the quality of the instructions being in order and that the Land Registration Court's hotline was well-functioning. However, the Danish Courts Administration underestimated these conditions, which led to a backlog of cases and thus a very long case processing time, which had major consequences for citizens and businesses in connection with the purchase, sale and mortgaging of real estate. Since January 2010, however, the Land Registry Court has reduced the number of unprocessed cases.

Overall, Rigsrevisionen's investigation shows that the three framework conditions for the digital land registration project meant that the project was a high-risk project. In particular, the framework condition that the Danish Courts Administration had to reserve 200 FTEs for the land registration task already at the time of the commissioning of the digital land register, and the framework condition of commissioning the system as a big-bang project placed great demands on the digital land register to function optimally from the start. In principle, Rigsrevisionen believes that efficiency gains resulting from the implementation of a new IT system should be reaped as errors and deficiencies in the system are dealt with, as employees gain routine, and as

**2866**

Rigsrevisionen finds that the Ministry of Justice reaped the efficiency gains too early. The Ministry of Justice has stated that the ministry agrees with the fundamental view that efficiency gains in connection with IT projects should generally be reaped as they arise. The Ministry of Justice does not share Rigsrevisionen's view in the specific case and does not find that the efficiency gains were reaped too early. According to the

Ministry, a gradual harvesting of the efficiency gains would not have been possible in this case, as the employees were located around the district courts and therefore could not be employed in the Land Registration Court in Hobro after the implementation of the digital land register. Rigsrevisionen finds that the Ministry of Justice could have secured additional resources in cooperation with the Danish Courts Agency

U.2020.2851H

to the Land Registration Court in Hobro by making agreements to retain some of the 200 FTEs during a transition period.

This overall assessment is based on the following: The Danish Courts Administration's decision-making basis for implementing the digital land registration system was adequate within the given framework. Prior to the commissioning of the system, a number of significant risks to the project were identified. Based on the risk analysis and the established framework conditions, the Auditor General assesses that the project was a high-risk project. This was partly due to risks in relation to the technical solution and stakeholders.

• The framework conditions for the project were, among other things, that the full staff savings were to be harvested already at the time of commissioning the digital land registry, that the digital land registration system was to be commissioned as a big-bang project, which meant commissioning simultaneously for the whole country and without pilot operation, and that the geographical location of the Land Registration Court in Hobro was determined by law.

• The Danish Courts Administration has prepared a detailed risk analysis, and the agency's original assessment was that the digitization of land registration was a medium-risk project. However, after a closer review of the risk analysis, Rigsrevisio n's assessment is that the digitization of land registration was a high-risk project. This is due, among other things, to the fact that the timetable was very tight, that a very complex system had to be developed based on an untested technology, that the project had to be developed in collaboration with many stakeholders, and that the framework conditions presented many organizational challenges.

• The Danish Courts Administration has involved stakeholders in relation to the digital land registration project in the preparation of the requirements specification. The Danish Courts Administration has also established a user group, a test and technical group and a mortgage tracking group consisting of selected stakeholders. Finally, the Danish Courts Agency has conducted a thorough analysis of the supplier before entering into the contract.

The commissioning of the digital land register was postponed for almost a year and a half, and the other 3 books have not yet been commissioned. The main reasons for the postponement were delayed deliveries from the supplier and the need for additional time to test the system. The National Courts Administration's project management has not been fully satisfactory. The Danish Courts Administration has generally established standards for monitoring and reporting, and the goals for the project were clear. However, two essential management tools, which are part of good project management, were not fully applied. Firstly, the planning of the project only included milestones for the system development and not milestones for e.g. training of employees, preparation of guides and recruitment of employees to the Land Registration Court. Secondly, the internal division of roles and responsibilities in relation to the implementation of the digital land registration system was not sufficiently clarified and described. Project management was strengthened at the end of 2007, including the appointment of an external supplier management consultant. However, the Danish Courts Administration now assesses that project management could have been strengthened at the start of the project.

...

At the end of 2009, according to the National Courts Administration, the system was essentially functioning satisfactorily. However, there were still problems with user-friendliness. At the turn of the year 2009/10, 70% of all reports were processed automatically as planned. However, during the start-up period - from September 2009 through December 2009 - the system was characterized by a number of significant errors and deficiencies, which the Danish Courts Administration has taken the initiative to correct. It is the National Audit Office's assessment that a prior pilot operation, e.g. in a few court districts, could have identified errors and deficiencies in the system.

U.2020.2851H

The system was implemented throughout the country, and the user-friendliness test that was not chosen could have demonstrated the problems with the system's lack of user-friendliness.

...

The organizational preparation prior to the implementation of the digital land register was inadequate. The preparation was not based on thorough calculations of resources and dimensioning of tasks, which is why the Danish Courts Administration and the Land Registration Court underestimated the scope and complexity of the tasks to be solved when the system went live. Firstly, the Danish Courts Agency and the Danish Court of Registration had an unrealistic expectation of employee productivity, which meant that the agency and the court did not have adequate staff preparedness. Secondly, the the Danish Courts and Registration Office did not prepare for the handling of powers of attorney, including dimensioning the need for resources

**2867**

to do so. Thirdly, the instructions on how to use the system were inadequate, and the Land Registry Court's hotline function did not have sufficient resources and skills to handle the many user inquiries. In Rigsrevisionen's assessment, the Ministry of Justice reaped the efficiency gains from the system too early, and not as errors and deficiencies in the system were handled, the employees gained the necessary routine, and the system was well anchored throughout the organization. This led to very long case processing times in manual case processing, which has had major consequences for citizens and businesses. In January 2010, the Danish Courts Administration launched initiatives that have reduced case processing times.

...

*The commissioning of the digital land register*

- According to the National Courts Administration, the main reasons for the long case processing time in the fall of 2009 were *many error corrections of paper cases* from the old land registration system, *problems with power of attorney scanners and initial errors in the submitted powers of attorney*, *conversion of mortgages* and *lack of routine among employees*, which caused a lower productivity than expected among the Land Registry employees after the implementation of the digital land register.

  ...

- *Conversion of mortgages:* Domstolsstyrelsen assumed that there was a clear agreement with the financial sector and the other users that no mortgages should be submitted to the Land Registration Court for conversion unless a mortgage was to be endorsed or there was a specific agreement with the Land Registration Court. However, the Land Registration Court received

  - reportedly - 200,000 mortgages for conversion *in the period up to the end of 2009* and used considerable resources

  - According to reports, at times up to 30 employees were involved in handling this task. The National Audit Office can establish that no written agreement with the financial sector on the conversion of mortgages had been entered into before February 2010. The National Audit Office finds that the Land Registration Court should have entered into a written agreement with the financial sector at an earlier point in time rather than starting the conversion of the large number of submitted mortgages, which is considered to be an inappropriate allocation of resources.

  ..."

Section VI of the report on "System functionality" states:

126. the digital land register went live on September 8, 2009 with a number of errors. The Danish Courts Administration was aware of the errors before the system went live, but assessed that the errors were of no significance to the operation of the system. Rigsrevisionen agrees with this. The system was not finally approved by the National Courts Administration until November 2009.

...

B. Digitalization and automation

...



Figur 3. Andelen af modtagne anmeldelser behandlet automatisk samme dag i perioden 8. september 2009 - 28. maj 2010 (uge 37 i 2009 og uge 21 i 2010)

Note: September 2009: uge 37-40, oktober 2009: uge 40-44, november 2009: uge 45-49, december 2009: uge 49-53, januar 2010: uge 1-4, februar 2010: uge 5-8, marts 2010: uge 9-13, april 2010: uge 14-17 og maj 2010: uge 18-21.

Det bemærkes, at de dokumenter, der ikke længere anmeldes til tinglysning, idet systemet automatisk håndterer en lang række informationer, som tidligere blev påført papirdokumenterne, skal tillægges automatiseringsgraden (behandling af retsanmærkninger).

Kilde: Data modtaget fra Domstolsstyrelsen.

Figure 3 shows that the proportion of documents received that are registered on the same day and without any form of manual processing has been increasing in the period from the launch of the digital land register on September 8, 2009 (week 37) to the end of December 2009 (week 53), after which it has been fairly stable. When 8% is added, which corresponds to the number of court remarks that are processed automatically in the digital land registration system, the figure shows that around the turn of the year 2009/10, the Danish Courts Administration has reached the goal of 70% of all documents reported for land registration being processed automatically. It is not the goal that all notifications should be registered automatically. However, the Danish Courts Administration expects that the degree of automation will increase further over time."

Section VII of the report on "The organizational preparation and commissioning of the digital land register" includes the following figure and table:

**2868**

"...

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

"...

A. Testing the system

...

Assessme

nt

U.2020.2851H



Figur 4. Modtagne, afsluttede og ubehandlede anmeldelser (sager) fra 8. september 2009 til 28. maj 2010 (Antal)

Note: September 2009: uge 37-40, oktober 2009: uge 40-44, november 2009: uge 45-49, december 2009: uge 49-53, januar 2010: uge 1-4, februar 2010: uge 5-8, marts 2010: uge 9-13, april 2010: uge 14-17 og maj 2010: uge 18-21.

Figure 4 shows that there is a gradual increase in the number of notifications received over the period, although with some fluctuations. It can also be seen that the number of closed cases up to week 51 is somewhat lower than the number of notifications received, which results in a steady backlog of cases up to week 51, where the number of unprocessed cases is just over

70.000. Since the turn of the year, the case backlog has been decreasing, and at the end of May 2010 (week 21) it was just over 27,000.

...

Tabel 8. Delmål for og realiserede sagsbehandlingsdage frem til den 6. april for 95 % af anmeldelse   e, fordelt på 17 sagstyper (Antal)

| Sagstype | 11. januar 2010 Faktisk sage- behandlingstid | 8. februar 2010 | | 8. marts 2010 | | 6. april 2010 | |
|---|---|---|---|---|---|---|---|
| | | Delmål | Realiseret | Delmål | Realiseret | Delmål | Realiseret |
| Administrative sager | 10 | 10 | 0 | 10 | 0 | 10 | 0 |
| Aflysninger | 62 | 20 | 18 | 10 | 10 | 10 | 10 |
| Bodelinger | 60 | 20 | 19 | 15 | 14 | 10 | 2 |
| Ejerpantebreve | 60 | 40 | 34 | 20 | 19 | 10 | 5 |
| Matrikulære sager | 100 | 90 | 128 | 70 | 145 | 40 | 149 |
| Meddelelser | 60 | 25 | 17 | 20 | 3 | 10 | 2 |
| Pantebreve i øvrigt | 60 | 40 | 32 | 25 | 12 | 10 | 8 |
| Pantebrevsvilkår | 60 | 40 | 73 | 25 | 24 | 10 | 9 |
| Realkreditpantebreve | 38 | 45 | 16 | 35 | 27 | 10 | 10 |
| Respekter | 60 | 40 | 34 | 25 | 14 | 10 | 8 |
| SDRO-pantebreve | 81 | 55 | 48 | 35 | 21 | 10 | 8 |
| Servitutter | 69 | 40 | 34 | 25 | 24 | 10 | 9 |
| Skadesløsbreve | 10 | 10 | 0 | 10 | 0 | 10 | 0 |
| Skifteretsattester | 60 | 50 | 48 | 25 | 20 | 10 | 9 |
| Skøder | 68 | 50 | 48 | 30 | 28 | 10 | 10 |
| Udlæg | 60 | 40 | 33 | 20 | 3 | 10 | 1 |
| Underpant | 60 | 40 | 20 | 20 | 3 | 10 | 1 |
| Totalt antal sagstyper, som overholder delmål | | | 15 | | 16 | | 16 |

Table 8 shows that in February 2010 the National Courts Administration had achieved the interim targets for 15 out of 17 case types. In April 2010, the agency had reached the interim targets for all case types with the exception of cadastral cases. The case processing time for this case type has increased from 128 days in February to 149 days (almost 5 months) in April 2010.

..."

After the National Audit Office had submitted its report, the financial sector contacted the chairman of the board of the National Courts Administration by letter dated August 19, 2010:

"...

In continuation of the National Audit Office's publication of "Report to the State Auditors on the digital land registration project", it has been pointed out by the Danish Courts Administration that a number of unforeseen tasks contributed to the long case processing times. In the Danish Courts Administration's response to the National Audit Office's report, it is mentioned as a significant, unforeseen task that "... conversion of 200,000 old paper mortgages had to be carried out despite the recommendation to wait until after the start-up".

Copyright © 2023 Karnov Group Denmark A/S