# Exhibit 32, Part 2 of 3

U.2020.2851H

The Danish Courts Administration's mention of the 200,000 mortgage deeds that should have been submitted to the Land Registration Court in violation of a recommendation to the contrary gives us great cause for wonder.

Already prior to the implementation of the digital land registration, there had been a dialogue between the financial organizations and the Danish Courts Administration that the financial companies should not submit mortgages for pure digitization in the start-up phase. Mortgage deeds should thus only be submitted where digitization was necessary as a prerequisite for the completion of a land registration expedition. This practice was communicated to the financial institutions, and the feedback has been unanimous that the recommendations have been fully complied with.

When it became clear how big the challenges of the Land Registry were, the financial sector repeatedly offered - most recently by letter of

December 15, 2009 to the Ministry of Justice and the Ministry of Economic and Business Affairs - to make a significant number of employees available free of charge to work for the Land Registration Court during its in- struction. During a meeting in late December 2009, it was discussed to lend 50-60 employees to the Land Registration Court. This offer was subsequently declined.

Later, as you know, an agreement was made that the financial companies would relieve the Land Registration Court by taking over the majority of the task of digitizing the many mortgage deeds.

It must therefore be stated that the financial sector has throughout the process sought to assist the Land Registration Court in meeting the major challenges.

..."

The chairman of the board of the National Courts Administration responded to the financial sector's inquiry by letter dated August 20, 2010:

"...

In the letter, the financial sector confirms the Danish Courts Administration's information that the Land Registration Court could reasonably expect that no mortgages would be submitted for digitization (mass conversion) in the autumn, unless in the specific cases it was a necessary prerequisite for the implementation of a current land registration expedition.

...

**2869**

The Land Registration Court has informed the agency that the court estimates that it has received approximately 200,000 mortgages for digitization - almost all in the period from early October to mid-December. This should be seen in relation to a level for land registration expeditions regarding endorsements etc. before digitization of approx. 15,000 per month. The Land Registration Court had expected that the majority of these approx. 15,000 mortgages per month would be digitized by the sector itself, cf. that a legislative amendment in June 2009 in section 15, paragraphs 14 and 15, at the initiative of the financial sector had given legal authority for tax exemption in order for the financial sector to carry out conversion itself.

The Land Registration Court has also stated that a significant part of the approximately 200,000 mortgage deeds were received in large overall deliveries from individual institutions, often in moving boxes and often in alphabetical order without accompanying lists, which indicates that larger quantities were sent from the archive. In a number of cases, covering letters were sent with no indication of the topicality or urgency of the

cases, while in parallel, other cases were received individually, where the urgency was emphasized. The latter were continuously processed by the Land Registration Court, while it was not possible - despite significant resource consumption - to keep up with the total amount of mortgages for digitization.

...

U.2020.2851H

However, the decisive factor in connection with Rigsrevisionen's report has been whether it could have been predicted that the Land Registration Court would receive moving boxes with such a large number of documents for digitization during the start-up period. It is still the Danish Courts Administration's assessment that, in light of the clear expectations, which are also confirmed in the sector's letter of August 19, it came as a surprise to everyone - including the financial sector's representatives in the cooperation - that this was the case. I would like to take this opportunity to once again thank the Danish Finance Council, the Danish Mortgage Credit Council and the Danish Mortgage Credit Association for the good cooperation in solving the major challenges during the start-up period, including the sector's assistance in digitizing the remaining approx. 50,000 mortgage deeds in spring 2010.

..."

At the request of the Danish Courts Agency, the Attorney General's Office conducted a "study of delays in connection with the digital land registration project". The Attorney General submitted his opinion on September 14, 2010.

During the preparation of the case before the High Court, an expert opinion was made by Klaus Kvorning Hansen. The appraiser has submitted a statement of estimate dated June 19, 2016 and a supplementary statement of estimate dated August 6, 2017. The appraisal statement of June 19, 2016 states:

"...

2.1 Question 1

*When organizing and implementing the digital land registration system, could it have been foreseen that the problems with the use of the system described in the parties' pleadings and appendices, including:*

a.  *Backlog of cases that were reported for registration, including powers of attorney.*

b.  *Lack of confirmation from the land registry about receipt of notifications and lack of information about the status of notified cases and powers of attorney submitted for registration, including information about the background for manual removal of notifications and information about transactions that were placed in the error queue.*

c.  *Lack of availability and stability, including operational stability.*

d.  *Lack of functionality in the land registration system, which meant that housing association cases, administrative cases, releases, etc. could not be reported for land registration, and there were also challenges with certain other forms of processing.*

e.  *Missing or non-existent support for e.g. missing or incomplete registrations in the digital land register.*

f.  *Lack of usability in terms of guidance, advice etc. for use of the digital land registration system, including the signature folder, notifications and the completion and registration of powers of attorney as well as defective and erroneous written instructions for use in notifications and submission of powers of attorney.*

g.  *Technical issues that meant it was not possible to report.*

h.  *Long response times to inquiries - including the Land Registry Hotline and written inquiries by email and post - submitted powers of attorney, notifications, etc.*

i.  *Lack of quality of responses received from the Land Registration Court, including the Hotline and inquiries in general, as well as inadequate and unclear land registration responses, including with regard to test registrations.*

j.  *Large number of manual processing of notifications and powers of attorney.*

k.  *Errors when scanning proxies, rejecting notifications, etc.*

U.2020.2851H

l.    *Automatic removal of the notification after 30 days if it was not finalized, requiring re-notification.*

m.    *Failure to digitize mortgages before the digital land registration system went live .*

**2870**

2.1.1 Answer.

In my opinion, it could have been foreseen when planning and implementing the digital land registration system that problems would arise in several of the areas mentioned.

The answer is given in relation to items a.-m. of the question as the reason for the answer typically covers several of the items in the combination.

2.1.2 Justification

The answer to this question must be seen in the context of the answers to the defendant's questions related to the risk analyses (section 3.3-3.5, page 23ff). Under normal circumstances, the ability to foresee problems in given areas is closely related to whether the areas in question have been identified and covered in the risk analyses and whether the probability of the risk materializing has been correctly assessed. It also requires that the risk analysis is followed up regularly and that the project's internal risk log is updated as the project progresses and new risks are identified. Thus, a number of the problems highlighted in the plaintiff's question already appear in an early version of the risk analysis [...], and they have been given a weight in the analysis that has not been sufficiently reduced or completely removed during the implementation of the project. In other words, several of the conditions were actually foreseen, but for various reasons they were not acted upon to such an extent that the possible negative consequences were eliminated or immediate mitigation measures were implemented.

For example, the multiple stakeholders are identified as a level 4 risk [...] that is assumed to be minimized by involvement. The subsequent lack of interest in developing system-to-system integrations from e.g. the housing lawyers, combined with the limited uptake and flexibility in the use of digital signatures (at that time the OCES signature provided by TDC) would normally have led to specific adaptations of the project and possibly special efforts (points a, e, f, j, k above) in terms of staffing and technical preparedness.

In the same context, it could have been foreseen that the lack of development of system-to-system integrations for significant professional user groups [...], which was identified during the project, would lead to a much greater dependence on a well-functioning solution and process associated with the user portal and the submission of authorizations. This would normally have led to a stronger and more extensive preparedness in relation to proxy processing and the processing of manual cases, the load on the service desk (hotline) and a stronger focus on the user-friendliness of the user portal. Based on the information provided, it seems that the risk associated with a lack of user-friendliness in the external portal was recognized, but nevertheless it was decided to maintain the decision not to conduct an actual user-friendliness test [...], as had been decided in connection with the contract with CSC.

The pressure on the hotline could also have been foreseen (points h, l above) when dealing with such a varied user group as was the case, combined with the great importance of land registration for the ordinary citizen and consequently also for the professional actors.

Under normal circumstances, there will also be great attention to the relationship between the need for support and a reduced

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

focus on user-friendliness in the user interfaces (points f, h, l above), so that the requirement in this project for a high degree of legal precision in help texts and instructions [...] would have led to a strengthening of support, written instructions, integrated help texts and, in general, the level of information for end users, and in particular for user groups that are not particularly familiar with land registration.

At a late stage in the project it was decided to disregard a performance and stress test of the system in the operational environment [...], which would have increased the risk of problems with response times (points c, g above), which would have further increased the pressure on the hotline. This could have been recognized and would also generally have led to increased attention to compensatory measures, e.g. in the form of targeted error messages to users or the establishment of queuing systems. However, the decision was taken so late that it effectively precluded the implementation of such measures. As for the quality of the responses from the Land Registration Court (point i above), it is obviously related to the competencies of the employees in question, and it could have been foreseen that during a start-up period, where knowledge of a new system and changed processes must be built up, it will be difficult to provide answers and help to the same extent and of the same quality as in a normal operating situation. In such circumstances, it will be common to try to limit the number of inquiries by carrying out a more gradual implementation and, especially where a gradual implementation is excluded, to strengthen the training of both support staff and users and to prepare comprehensive and targeted guidance material.

The strictly technical problems with the proxy scanners could possibly not have been foreseen, but would probably have been uncovered in a more careful and timely test including a load test. The many errors in the proxies due to misunderstandings by users could also have been avoided to some extent if the completion of the forms had been tested under similar operating conditions (point j above) and by users other than the professionals [...].

**2871**

This would have eased the pressure on the Land Registration Court in the first phase of implementation and alleviated a number of other problems caused by lack of resources for manual tasks.

2.1.2.1 Specific to the proxy and scanner solution

Specifically regarding the procurement and testing of both scanners and the associated customized software, I believe that the task has been underestimated. It was clear very early in the project that the use and quantity of proxies would be critical, and it is therefore not obvious why the testing of equipment and software was not initiated until very late (in August 2009). It is also remarkable that the test of the standardized proxy form did not include a larger and more diverse group of users, when it should have been known that practice and routine would vary greatly between the different (potential) users of the proxy. See answers and justifications in sections 3.18-3.22.

2.2 Question 2

*When designing and implementing the digital land registration system, could measures have been taken that would have reduced, prevented or eliminated the risk of problems as mentioned in question 1?*

2.2.1 Answer.

Yes, in my opinion, measures could have been taken in a number of areas that would have prevented the problems mentioned from occurring or mitigated their main negative effects.

2.2.2 Justification

Most of these measures are mentioned in the answers to questions 1, 3 and 8, but it should be added that it is common practice in the implementation of IT projects that identified (foreseen) risks are assessed in terms of their likelihood and impact, and that the implementation of preventive or mitigating measures reflects this assessment in relation to the costs associated with the relevant measures. Therefore, the decisions in any project will be able to infer a risk appetite that only expresses a business and not a project-technical or IT professional assessment.

With the reservation that the risk appetite at the Danish Courts Agency may have been high, it is my assessment that in a number of areas, measures have been chosen that would usually, at least for the majority, have been implemented in projects of a similar nature as the digital land registration system. They are mentioned in the answer to the plaintiff's question 3 below.

My answer is also based on my assessment that more thorough work on the project's risk analysis and operational risk logs, in addition to closer involvement of the project's main stakeholders and users, could have remedied most of the problems mentioned in the plaintiff's question 1. Even without necessarily changing the overall implementation strategy of the project.

2.3 Question 3

*What measures could have been taken?*

2.3.1 Answer.

Overall, it is my estimate that the causes of virtually all the problems that arose in the first few months after the digital land registration system went live would have been identified through a phased implementation, and therefore would not have had [quite] as great consequences as they did.

Secondly, a closer involvement of the future users of the digital land registration system and the Danish Land Registry's partners would have uncovered both potential problems and possible solutions to them.

See also section 2.1.2.1 and the answer to the defendant's question 5 in section 3.11.

2.3.1.1 Step-by-step implementation

When implementing systems as large and complex as the digital land registration system, there will always be errors and inadequacies, and a degraded user experience and reduced service will be common during a transition period.

The measures taken to reduce these phenomena depend on several factors. Partly, of course, on the ability to accurately predict where the problems will occur and whether they will occur, but also on the options and means available to prevent their occurrence and mitigate their effects.

My estimate is based on the fact that it is common for a comprehensive conversion of critical manual processes to automated processes to happen in stages. This can be done by automating parts of the process first, by implementing the fully automated process over time and in sub-areas, by keeping the manual process available in parallel with the automated solution for a period of time, or through a combination of these approaches.

The intention of such a phased implementation is to limit the detrimental effects of any errors in the automated process and to gain time to detect, analyze and correct them, but also often to enable a smoother transition for users who have to get used to new tools, changed processes or new requirements.

The greatest benefits of a phased implementation are achieved in cases where there are many different stakeholders involved,

Copyright © 2023 Karnov Group Denmark A/S

where the processes covered are particularly business critical, or where needs and

**2872**

stakeholder and user preconceptions are highly variable or only partially uncovered.

The project's framework conditions were established early on and were decisive in determining the chosen implementation strategy (see section 2.5.2), but this does not change the fact that a step-by-step implementation could have been chosen and would also generally have been the preferred one - all else being equal. In this context, I would consider the decision to implement the commissioning as a "big bang" as part of the organization of the digital land registration system, regardless of the fact that the decision was made before the actual development project was established.

In my opinion, phased implementation, possibly supplemented with an actual pilot operation (parallel operation) of the digital land registration system would, most importantly, have uncovered the majority of the problems that arose before full implementation, and would have reduced the harmful effects to the subset of users and citizens who would be included in the first steps. In other words, the last users and citizens in the phased implementation would not have experienced the problems and errors that the users and citizens in the first steps experienced. In addition, during the phased implementation, the Land Registration Court would have been able to implement the majority of the measures taken to reduce the harmful effects of the problems in an orderly manner and as the problems were identified and experience with operation and support was gained [...]. Overall, this would have resulted in a better user experience, fewer delays in land registration and less strain on the employees of the Land Registration Court.

The same would apply to the problem of converting mortgage deeds submitted by professional users (banks and mortgage companies) if, for example, the step-by-step implementation had been divided by institution, industry or jurisdiction. The later agreement with the financial sector could therefore have been concluded and implemented at an earlier stage, resulting in a reduced workload for the employees of the Land Registry.

2.3.1.2 Involving users and partners

A number of the problems that arose following the implementation were caused by behavior among users and the court's collaborators that had not been anticipated and thus not taken into account. A closer and more intensive involvement of the various user groups and parties during the project could, in my opinion, have helped to identify how users would react and act in connection with the implementation, and the necessary project-related precautions could have been taken. This applies, for example, to very specific issues such as

- The use of proxies and their quality
- The use of the external portal and its usability
- Expanded use of the external user portal by professional users rather than proprietary system-to-system solutions
- the financial sector's expectations regarding the conversion of mortgages.

If users and partners had been involved to a greater extent, for example in connection with requirements, design of solutions, risk assessments and testing, it is my assessment that several of the problems mentioned in the plaintiff's question 1 would not have occurred or would not have had the consequences they had.

In this connection, it should be added that, in general, it is my assessment that, in terms of governance, the project has predominantly been oriented towards the development of the

technical solution, and that the challenges associated with reorganized and new business processes, new or-

U.2020.2851H

ganizational conditions, new competencies among key employees, user behavior (also among the professional actors) and the level of competence among users have not received the attention that such significant issues would normally receive.

2.4 Question 4

*What costs would such measures have entailed?*

2.4.1 Answer.

It is certain that a step-by-step implementation and closer involvement of users and partners would have prolonged the project and also increased the direct costs. However, the increased costs should be compared with the costs incurred by users and partners in connection with the problems that arose, in addition, of course, to the loss of prestige suffered by the Land Registration Court and the Danish Courts Agency. See the answer to the plaintiff's question 3 in section 2.3 above.

A phased implementation was considered at an early stage of the process and was rejected primarily due to objections from the financial sector, especially regarding the costs of duplication of manual and digital processes, and because the organizational adaptation with a central Land Registration Court would be difficult to coordinate with a gradual transition to digital registration [...].

The objections and difficulties in question do not in principle preclude a step-by-step implementation, and I do not consider it part of the exercise of discretion to assess whether they were weighty enough to preclude it on other grounds. However, it is my opinion that the difficulties for the financial sector would be manageable, as there would be no double operation in the same jurisdictions or geographical areas, but only a distinction between traditional operation and operation with the digital land registration system. Similarly, it would be possible to make a gradual transition without fundamental obstacles, for example

**2873**

jurisdiction by jurisdiction to digital land registration at Tinglysningsretten Hobro. See also section 2.5.2 below.

It is difficult to calculate the costs of a step-by-step implementation exactly, as it requires a careful estimate of the resources that should have been deployed, an assessment of the costs associated with activities that would have been tendered for, and knowledge of the price of given services at the time. An accurate calculation will therefore require extensive work to obtain information and reconstruct conditions that existed at the time of the introduction of the digital land registration system, which falls outside the scope of this estimate.

In the section below, despite this and based on an experience-based assessment and information on prices of CSC services obtained from Kammeradvokaten, I have made an estimate of the costs associated with a phased implementation and a more extensive involvement of users and partners. As stated, my estimate will be associated with great uncertainty, but it is nonetheless sufficiently substantiated to be able to illustrate the costs of the measures described in section 2.3.1.

...

2.4.3.2 Estimated costs of a phased implementation As shown in Table 1 below, by far the largest cost of a phased implementation will be the further postponed repatriation of the efficiency gains (DKK 28.4 million) and employee retention costs (DKK 6.8 million).

The total costs associated with a phased implementation of DKK 41.1 million should be compared to the total budgeted project costs of DKK 621 million. [...]. In other words, there are

Copyright © 2023 Karnov Group Denmark A/S

In other words, based on my very rough estimate, a phased implementation would have resulted in a cost increase of almost 7 %.

It must be emphasized again that especially the estimates for specification, development and testing of validation as well as development and testing of guides are associated with a large uncertainty[.]

| Activity | Number of | Price | Amount of money |
|---|---|---|---|
| *Deferred savings* | | | |
| 80% for 3 months | | | 18.920.000 |
| 40% for 3 months | | | 9.460.000 |
| | | | |
| *Specification and development of input validation (geographical criteria)* | | | |
| Developer | 1.000 | 1.174 | 1.174.000 |
| Architect | 200 | 1.174 | 234.800 |
| Analysts | 200 | 1.174 | 234.800 |
| Project Manager 6 months (CSC) | 600 | 1.342 | 805.200 |
| Requirements etc. DSS | 200 | 403 | 80.645 |
| Requirements etc. external stakeholders | 200 | 500 | 100.000 |
| *Testing input validation (geographical criteria)* | | | |
| User testing (DSS) | 200 | 351 | 70.175 |
| External stakeholders | 200 | 500 | 100.000 |
| Test management | 200 | 1.342 | 268.400 |
| *How-to guides* | | | |
| Guide development (CSC) | 100 | 1.174 | 117.400 |
| Guide development (DSS) | 200 | 403 | 80.645 |
| Testing guides (DSS) | 100 | 351 | 35.087 |
| *Education and training* | | | |
| User course 19 classes | 19 | 80.000 | 1.520.000 |
| Superuser course 2 classes | 2 | 80.000 | 160.000 |
| User course 150 participants in 15 hours | 2.250 | 351 | 789.469 |
| Superuser course 16 participants in 37 hours | 592 | 351 | 207.718 |
| *Employee retention* | | | |
| Add-ons | 6 | 1.125.000 | 6.750.000 |
| | | | ——————— |
| | | | 41.108.338 |
| *Total* | | | **2874** |

## 2.5 Question 5

*Was it necessary to implement the digital land registration system as a so-called "big bang" so that from the moment the digital land registration was introduced, it would no longer be possible to register paper documents for registration?*

### 2.5.1 Answer.

No, in my opinion, it was not necessary to carry out the implementation as a "big bang" from a purely IT or project professional point of view.

### 2.5.2 Justification

Decisions on how an implementation should be carried out rarely depend on the functional content of the developed system as such, but much more on the processes and the organization that the IT system in question is to support or, in the case of processes, perhaps replace.

Based on the available material and an IT professional assessment, I do not believe that there were project or IT-related conditions that would necessitate a "big bang".

On the other hand, it is clear that financial and personnel-related decisions were made that effectively ruled out a more successful implementation. However, these decisions were not based on IT-related matters, but solely on business and personnel policy considerations and were made at a very early stage, so that the project's framework conditions made it difficult or completely excluded considerations towards a more successive implementation [...].

In other words, in my opinion, the framework conditions given to the project precluded a more sober and project-related organization of the project's implementation. This is also a main element in my assessment when answering the plaintiff's questions 1-3, just as it is a recurring theme in the Auditor General's criticism of the project process [...]. As stated in section 2.3.1.1.1 above, an overall assessment of the project process must also include the decision, which preceded the actual establishment of the project, to undertake the commissioning as a "big bang".

### 2.6 Question 6

U.2020.2851H

*Could the implementation have been carried out in such a way that the digital land registration system was primarily tested either by a limited group of users (bank, lawyers, brokers or similar) and/or in a limited geographical area?*

2.6.1 Answer.

Yes, the implementation could have been carried out as a successive implementation, where the new system would have been taken into use step by step in defined areas of use or distributed over time across geographical areas such as the judicial districts.

2.6.2 Justification

The costs associated with having two parallel systems and/or business processes running will typically be considered when deciding on the form of implementation. The more relaxed and less risky step-by-step implementation will usually be more costly if you look closely at project costs and the consequences for the temporal transition to full operation and thus the realization of benefits, but the additional costs will usually be compared with the risk of derived costs associated with unforeseen errors, user dissatisfaction, etc. See section 2.4 above.

In the case of the digital land registration, there would have been good reason to consider a more gradual implementation in light of the existing risks and the problematic project process. Admittedly, the decision should have been made at a relatively early stage in the project process, but it is my assessment that so many and significant risks associated with the system implementation, the transition to automated processes and the organizational adaptations, including the resource conditions [...] were identified very early on that it should have led to a revision of the implementation strategy when only a project and IT professional perspective is taken and user experience, citizens' expectations and case processing time (degree and effect of automation) are primarily considered.

In my assessment, I take into account the previously stated that the decision to carry out the commissioning as a "big bang" under normal circumstances could have been challenged by the project when the course of the project and the identified risks were taken into account.

2.7 Question 7

*Could the implementation have been carried out in such a way that, during a test period, registrations were made in parallel in the former paper system at the land registration courts and in the digital land registration system?*

2.7.1 Answer.

Yes, such an extended test could have been carried out. However, it is extremely rare that such a test methodology is chosen, and I am not aware that this has been done for systems of the scope and complexity of the digital land registration. It is my estimate that conducting such a test would have been disproportionately expensive and that the benefits would not have been commensurate with the costs.

...

2.8 Question 8

*Based on the experience gained during the test period, could you during this test period have developed*

- *user guides*
- *a support section for user calls, and*
- *A monitoring system that would alert the moment a case had been pending for longer than a predefined period?*

**2875**

2.8.1 Answer.

Yes, based on the information provided, there was nothing in principle that prevented user guides from being prepared during

the test period, established

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

a support department or developed a feature to notify you of cases that exceeded a certain time limit.

### 2.8.2 Justification

Considering only the information available and the project technical possibilities given, the project management could have decided to implement the measures listed. It would not have hindered the project's main product or changed the risk picture in anything other than a positive (risk-minimizing) direction. In addition, all three measures would have been relevant to consider in light of the experience that would have been gained during the test period.

An extraordinary contingency (fire watch) during a ramp-up period is common and is usually based on an assessment of how much productivity loss and faulty processing a new system will cause. This contingency will usually include a hotline function as well as case managers and developers, but also extended monitoring of system performance and usage patterns.

Decisions on the implementation of mitigation measures such as those mentioned will generally be based on an assessment of the financial and time-related costs, and it is therefore quite possible that relevant and risk-minimizing measures are rejected because of the price or consequences for a project's schedule. Based on the material presented, it is not possible to accurately assess whether the measures mentioned would have been so costly that they - in connection with a test phase or successive implementation - would have been rejected. However, it is not my assessment that this would have been the case (cf. the answers to the plaintiff's questions 3 and 4 above).

It also turned out that the preparation of better user guides and an increased effort in the Land Registration Court's hotline relatively quickly proved to be necessary, and that both were implemented with a noticeable resource effort in the hotline as a result [...].

### 2.9 Question 9

*Would the implementation of the digital land registration system during a test period, as mentioned in questions 6, 7 and 8, have reduced, prevented or eliminated the risk of the problems mentioned in question 1?*

### 2.9.1 Answer.

Yes, under certain conditions, a trial period would have reduced or completely mitigated risks like those that created the problems mentioned in question 1.

### 2.9.2 Prerequisites

My answer is based on the answers and justifications in questions 6, 7 and 8.

It should be noted that I am not referring to test periods in the true sense of the word, which are periods where the digital land registration system has not yet been commissioned, but is being tested for commissioning.

Instead, my assessment applies to periods where the digital land registration system is not widely used by all users or covers all types of land registration and can therefore be used to find and correct errors and inadequacies in the system as well as in the supporting organization and case processing. In this sense, it is rather a matter of periods of pilot operation.

However, it is my estimate, as shown in sections 3.3-3.5 in particular, that a number of the issues that a test period defined in this way would have uncovered could have been identified through increased stakeholder and user involvement and through more careful follow-up on risk analyses and logs. This also means that organizing a period of pilot operation is not the only prerequisite that should have been met, as a successful utilization of the period, especially in relation to the risk

mitigation measures implemented, would require a critical assessment of the problems found compared to the more general objectives of the project.

and scope. In other words, a pilot operation, guided by the risk analysis, should help identify general solutions and risk mitigation measures, but this would require that the project organization and project management during the pilot operation period pay full attention to identifying and addressing the main risks and problems.

### 2.10 Question 10

*Would the use of an already known methodology, thus matching already used methods - rather than developing a new methodology - have reduced, prevented or eliminated the risk of the problems mentioned in question 1?*

2.10.1 Answer.

No, the requirement to use a service oriented architecture (SOA) is not considered to have increased the risks associated with the issues mentioned in plaintiff's question 1.

...

### 3 Defendant's question

Question K1 related to the organization

### 3.1 Question K1.1

*Please explain whether the organization of the project, where CSC was the supplier of the IT system and Devoteam was the advisor to the Danish Courts Administration, was customary at the time when acquiring IT systems of a size and complexity corresponding to the digital land registration system.*

3.1.1 Answer.

There was nothing unusual in the chosen organization of the project in general, nor specifically in the choice of CSC as an external supplier to handle

**2876**

development task and Devoteam as advisor to the Danish Courts Administration. Furthermore, it does not appear that the project's internal organization deviates from what is common for projects of a type such as the digital land registration system.

3.1.2 Justification

...

### 3.2 Question K1.2

*If the expert finds that the organization or choice of a company such as CSC or Devoteam was not customary at the time, the expert is asked to explain what information and other circumstances that were generally known at the time that made the organization or choice unusual.*

3.2.1 Answer.

The question is not answered as I have not found the organization and choice of suppliers to be unusual.

However, as stated in section 2.3.1.2, it is my assessment that the involvement of users and partners in the project - and thus also as reflected in the project organization - has not been sufficient. The risk analyses carried out at an early stage in the process should have resulted in the professional users in particular being involved and committed more than they were.

Question K2 related to the risk analyses

### 3.3 Question K2.1

*At a general level, please describe which elements were at that time usually included in a risk analysis when acquiring IT systems of a size and complexity corresponding to the digital land registration system.*

3.3.1 Answer.

Risk analysis for IT projects is rarely conducted using the same methodology or to the same extent from project to project. The scope and depth of the analysis typically reflects an overall prior assessment (explicit or implicit) of the business criticality of the project and how innovative or disruptive it is considered to be. This means that projects that, for example, introduce a stan-

standard system in an area where processes are already automated is unlikely to be risk assessed at the same level and with the same care as projects that introduce proprietary or custom-developed systems in areas that have previously been manually operated.

...

The risk analysis will usually include project-internal factors such as project organization, the number of suppliers, the nature of the skills of the people involved, the geographical spread of project participants, the physical environment provided, technical and IT architecture requirements, and project-external factors such as the financial framework, external stakeholders' expectations and requirements, market conditions, legal and other regulatory requirements.

...

### 3.4 Question K2.2

*Please inform us whether the risk analyses of March 20 and 21 November 2006, which Devoteam prepared in cooperation with the Danish Courts Administration, contained the elements that were usually included in a risk analysis, cf. the assessor's answer to question 2.1.*

3.4.1 Answer.

Yes, the risk analyses of March 20 and November 21, 2006 are deemed to contain the elements that would normally be included in a risk analysis of IT projects.

This estimate does not include an assessment of the compliance of the risk logs listed below (section 3.4.2.1) with good practice or their completeness in relation to the actual risks of the project.

...

3.4.2.1 Risk logic

It should be noted that the ongoing risk analysis, which is part of the operational project implementation, consists of completely different and more detailed risk assessments and proposals for mitigating risks for individual elements of the project. This ongoing risk analysis has been documented and updated in a so-called risk log [...].

...

In this context, it is noteworthy that the project's risk log [...] is not linked to the structure and themes of the risk analysis, which is why there is an increased likelihood that the ongoing risk management in the project, as expressed in the log, does not address all elements of the risk analysis, and conversely that the ongoing updating of the risk log does not immediately inspire a revision of the assessment of the risk analysis themes.

...

### 3.5 Question K2.3

*Please state whether the risk analyses contain assessments of risks which, based on the information available at the time, appear to be significant underestimates or misjudgments. If so, please state what information was generally known at the time, which implies that Devoteam and the Danish Courts Administration should have made a significantly different risk assessment of the applicable circumstances.*

3.5.1 Answer.

It is my assessment that significant risks have been overlooked and underestimated. It appears that the project was hit by unforeseen or insufficiently risk-assessed problems in connection with the commissioning, especially regarding the processing of powers of attorney, pressure on the hotline, resource-intensive manual checks and conversion of mortgage letters.

**2877**

It is also noteworthy that it was not until the very end of the project process [...], with the exception of the regulation after the

U.2020.2851H

supplier selection in 2006, that the measures implemented succeeded in reducing the actually identified risks. The measures must be considered to

Copyright © 2023 Karnov Group Denmark A/S

may have been insufficient, which in itself may indicate an underestimation of all the risks in question.

Although it is not unusual that risks are overlooked or underestimated in projects of the size and complexity of the digital land registration system, it is nevertheless my assessment that in terms of risk analyses, the project is somewhat outside what is normal in terms of the completeness and quality of risk analyses.

In my answer, I start from the premise that the risk analysis should not only have been based on "information that was generally known at the time", but should also, in accordance with good practice, have included an active, in-depth investigation of the circumstances and interests that had been identified in the analysis.

...

Question K3 related to the requirements specification

3.6 Question K3.1

*Please describe at a general level how, at that time, a requirement specification was usually drawn up when acquiring IT systems of a size and complexity corresponding to the digital land registration system.*

3.6.1 Answer.

Requirements specifications are specific to the project model - and to some extent also the development model - being worked under. This means that requirements specifications developed under a waterfall model will differ considerably from requirements specifications - or the equivalent - developed under agile project models. My answer is based on the fact that a waterfall project model has been chosen for the digital land registration system (cf. my answer to question K4.3 above).

...

3.7 Question K3.2

*Please state whether the specification of requirements of June 26, 2006 is set out in a way that corresponds to usual practice, cf. the appraiser's answer to question 3.1.*

3.7.1 Answer.

In my opinion, the requirements specification [...] has been drawn up in good accordance with common practice for projects implemented according to an (adapted) waterfall model (see my answer to question K4.1).

...

Question K4 related to the development model

3.8 Question K4.1

*The assessor is asked to describe at a general level the "waterfall model" for the development of IT systems.*

3.8.1 Answer.

The waterfall model is actually a collective term for the project models that are based on a project comprising distinct phases in a sequential process. Typically, these phases include idea, analysis, requirements specification, design, construction, testing and commissioning.

...

3.9 Question K4.2

*Please state whether it was customary at the time to use the "waterfall model" when developing IT systems of a size and complexity similar to the digital land registration system.*

3.9.1 Answer.

It was quite common - and still is to a large extent - to use the waterfall model in projects similar to the digital land registration system.

...

3.10 Question K4.3

*Please state whether the development model agreed in the contract for the digital land registration system corresponds to a "waterfall model", as the model was used at the time.*

3.10.1 Answer.

Yes, the development model proposed in the contract is a waterfall model.

...

Question K5 related to the testing program

3.11 Question K5.1

*Please describe at a general level which elements are typically included in a test program and test procedures when acquiring an IT system with a size and complexity corresponding to the digital land registration system.*

3.11.1 Answer.

Testing a system such as the digital land registration system will typically include an actual system test of the functional and non-functional requirements, as well as a test of the system's user interface, associated user manuals and any associated tool plans.

...

In general, system testing will never be complete, as production conditions will by definition differ from the conditions that can be simulated for testing purposes. This means that there will hardly ever be a situation where a system with even a minimum of complexity and functional breadth can be put into production without errors.

...

3.12 Question K5.2

*Please advise whether the testing program established for the IT system in this case contains the elements that, at that time*

**2878**

*would normally be expected from a test program when acquiring such an IT system.*

3.12.1 Answer.

Yes, the established test program contained the elements that would normally be required in such a program. However, regarding the testing of the scanner equipment, see section 3.20 below, which states that the testing of this part of the delivery cannot be considered to have been based on what is considered to be good practice.

It is also noted that testing of instructions is absent [...], although the contract can actually be read in such a way that both documentation and instructions must be tested [...].

...

3.13 Question K5.3

*Please state whether it was unusual for an IT system such as the one in question to detect errors in connection with the completion of the acceptance test.*

3.13.1 Answer.

It is not at all unusual for defects to be found in the delivered goods during an acceptance test. This is also taken into account in the contract [...].

...

3.15 Question K5.5

*When the National Courts Administration took over the IT system, 17 errors were identified. Please state whether, with the knowledge available at the time, the 17 errors appeared to be so problematic that they should have prevented the takeover and commissioning of the IT system. If so, please state which of the 17 errors were of such a problematic nature and whether they were the cause of some of the problems that arose after the commissioning of the system, e.g. problems with scanners.*

Copyright © 2023 Karnov Group Denmark A/S

3.15.1 Answer.

None of the 17 errors found during the commissioning were, in my opinion, so problematic that they should have prevented the takeover and commissioning of the digital land registration system. In other words, the Danish Courts Administration did not take any major known risks during commissioning.

...

Question K6 related to the usability of the system

3.16 Question K6.1

*On May 3, 2013, Rigsrevisionen conducted a usability test of the digital land registration system's self-service solution. The assessor is asked to state whether he agrees with the assessments and the conclusion that appear from the usability test. If not, please state on which points he disagrees.*

3.16.1 Answer.

I agree with the assessment and conclusions of Rigsrevisionen's usability test.

...

Question K7 related to proxy scanners

3.18 Question K7.1

*The purchase of the scanner equipment to be used for scanning the power of attorney forms was made in collaboration between the Danish Courts Administration, Devoteam and CSC. Please state whether the purchase was made on the basis of the investigations and assessments that can usually be expected when purchasing technical equipment. If not, please state what further steps should have been taken.*

3.18.1 Answer.

Based on the information provided, it is my assessment that the assessments and investigations that would normally be carried out in connection with such acquisitions were carried out prior to the acquisition of the equipment for scanning proxy forms.

...

3.19 Question K7.2

*Please state whether the testing of the scanner equipment met the requirements usually required when purchasing technical equipment. If not, please state which additional tests should have been carried out.*

3.19.1 Answer.

It is unclear what types of tests were performed on the technical equipment. However, based on the information provided, it does not appear that sufficiently comprehensive functional testing of the equipment in realistic use situations and at a sufficiently early stage in the project process has been carried out.

...

However, it appears from the case file that only a limited number of proxies from selected actors have been tested [...]. This must be considered an incomplete test, as the completion and printing of the power of attorney form could be done by many different actors, and the basis for scanning would consequently be very varied.

...

3.20 Question K7.3

*After commissioning, errors were found in the scanning software that controlled the scanning of the proxies. Please advise whether the errors should have been detected during the testing that took place prior to commissioning.*

3.20.1 Answer.

In my opinion, the testing of the scanning software should have been organized and conducted in such a timely manner and with such care that the errors would have been detected before commissioning.

**2879**

However, it cannot be conclusively assessed whether the test performed was simply poorly executed and whether, in other words, it was actually designed in such a way that, properly executed, it would have provided coverage.

...

Question K8 related to the size of the IT development part of the project

3.23 Question K8.1

*Based on the requirements specification and the contract between the Danish Courts Administration and CSC, the assessor is asked to state whether the development of the IT system itself in the digital property information system was a more complex task than the development of other IT systems of the same size that the state buys in order to digitize the authorities' case processing, for example in SKAT's area.*

3.23.1 Answer.

It is not my assessment that the development of the digital land registration system was a more complex task than the development of other public IT systems of similar size.

..."

In the supplementary statement of estimate of August 6, 2017, the appraiser has answered additional questions from the Danish Courts Administration:

"...

9. Questions related to the scanners

...

Please use the following assumptions when answering the questions below:

- That (9.1) testing of the scanners began in May 2009 and that testing of the scanners was carried out until just before commissioning.
- That (9.2) the testing of the scanners was carried out according to plan and with satisfactory results and that at the time of commissioning the scanners showed no problems.
- That (9.3) after the commissioning of the land registration system it turned out that there were problems with the scanner software itself and that the problems consisted in the OCR reading of the scanned powers of attorney not being sufficiently accurate.
- That (9.4) the errors found in the scanner software were not very extensive and that fixing the errors required only a minor adjustment of the scanner software.

...

9.1 Please state whether, based on the stated assumptions (9.1) - (9.4) regarding the testing of the scanners and the errors found, there is reason for the assessor to change or elaborate on the answer to question 2 and questions K7.2 and K7.3.

9.2 If question 9.1 is answered in the negative, please explain what other specific measures the assessor believes the Danish Courts Administration should have taken to counter the risk of the problems with the scanner software described in the above-mentioned condition (9.4).

Answer to question 9:

Re 9.1:

I do not find that there is any reason to substantially change the answer to the stated questions, but I must elaborate on the answer with the following:

...

Re 9.2:

If question 9 relates to the scanner software issue in isolation, it is my opinion that a more extensive test (several so-called test cases) would probably have revealed the error.

Copyright © 2023 Karnov Group Denmark A/S

However, as mentioned, the key point in relation to the risk element is not the isolated functionality of the scanning equipment, but the full functionality and overall process in terms of

U.2020.2851H

scanning of the proxies. This consideration is evident from section 3.21.2 of the assessment report [...]:

...

10. Questions related to stakeholder engagement

...

Please use the following assumptions when answering the questions below:

- That (10.1) all significant users were represented in the Land Registration Committee and thus had influence on the proposal for the future land registration model, including in the preparation of reports on the digital land registration.
- That (10.2) in the fall/winter of 2005/2006, two meetings were held with the Danish Bar and Law Society, two meetings with the Danish Association of Real Estate Agents, two meetings with the land surveyor associations, three meetings with the Danish Finance and Mortgage Credit Council and one meeting with interested public authorities where the participants were given the opportunity to present their wishes and proposals for the future land registration solution.
- That (10.3) draft requirements specification was prepared based on the reports and meetings of the Registration Committee and that the draft was sent for consultation with users and any suppliers.
- That (10.4) remarks, suggestions and comments from users were incorporated into the final requirements specification that formed the basis for the tender process over the summer of 2006
- That (10.5) a monitoring group was established to follow and assist in connection with the land registration project, and that the monitoring group met 3-4 times a year and discussed progress and specific challenges, and the monitoring group was shown screenshots etc.
- That (10.6) the advisory group had representation from lawyers, real estate agents, surveyors, the

**2880**

financial sector and a number of public authorities.
- That (10.7) the monitoring group discussed a number of practical issues to be resolved in connection with commissioning, including the conversion of mortgages.
- That (10.8) on the basis of the discussions, a "Transition memo", which sought to address the practical challenges, such as guidelines for the conversion of the large number of mortgages, which should only be done by prior agreement with the Land Registration Court.
- That (10.9) a technical group was also established that met monthly to discuss technical solutions and challenges.
- That (10.10) the technical group ended up being a technical collaboration forum for the financial sector
- That (10.11) an OIO working group was set up - with the same participants as the monitoring group - where standardization was discussed.
- That (10.12) a couple of multi-day workshops were held under the auspices of the technical group where the Digital Land Registry was discussed.
- That (10.13) a mortgage tracking group and a mortgage preparation group were set up during 2008, meeting weekly in turn
- That (10.14) the mortgage group had representation from Fi- nans- and Realkreditrådet as well as e-nettet and Domstolsstyrelsen
- That (10.15) the mortgage group in the last part of the project functioned almost as an actual steering group in

relation to the system solution and that it was this group that gave final approval for the system to go live.

U.2020.2851H

- That (10.16) during 2008 a physical test scene was established at the supplier CSC where interested users could test the system.
- That (10.17) the test center existed until the system was deployed and that in the test center it was possible to discuss issues directly with CSC and Devoteam.
- That (10.18) a special "sandbox solution" - a model of the final solution - was developed in the spring of 2009 and made freely available on the Internet, where users could practice using the solution
- That (10.19) The Director General of the Danish Courts Administration and the project manager held meetings with the representatives of the Danish Bar Association and the Danish Association of Real Estate Agents in the monitoring group in the period from winter 2008/2009 to commissioning.
- That (10.20) the financial sector was more involved in the development than the others, because the financial sector developed a system solution itself and the financial sector is by far the largest user of land registration.
- That (10.21) the approximately 2 million documents reported in 2015 are distributed as follows:
  79.3% from banks and mortgage banks
  7.2% from lawyers
  5.8% from state and
  municipalities 2.4% from
  real estate agents
  1.8% from financial institutions
  1.1% from surveyors
  0.3% from auditors
  1.5% from other businesses
  0.6% from citizens
- That (10.22) the testing of the proxy scheme was carried out in August 2009 when the relevant forms were available in final form.
- That (10.23) the test was conducted with proxies completed by CSC, Devoteam, Danske Bank, Realkredit Danmark, BEC, BRF and e-nettet.
- That (10.24) financial institutions were able to send as many proxies as they wanted and that examples of proxy forms from Unikt System Design A/S, which makes solutions for lawyers, were tested

10.1 Please state whether, based on the assumptions (10.1) - (10.24) above regarding the involvement of stakeholders, there is reason for the assessor to change or elaborate on the answer to question 2.

10.2 If question 10.1 is answered in the negative, the assessor is asked to explain which additional specific measures the assessor believes the Danish Courts Administration should have taken in relation to stakeholder involvement before the implementation of the digital land registration.

Answer to question

10 Re 10.1:

It is correct, as the stated assumptions illustrate, that the digital land registration system has been developed with very broad stakeholder involvement, and that the stakeholders have had good opportunities to influence requirements as well as development and testing. This is also acknowledged in section 3.1 of the assessment report on the project organization. However, the decisive factor for my assessment has been the fact mentioned in section 2.3.1.2 of the report, among other things:

...

It should therefore have been made clear in the description of the stakeholder involvement that my assessment is based on the fact that a stronger involvement of the users - especially in the testing process - could have identified several of the challenges and difficulties that arose in time. The associated estimate is based on - what should also have been

U.2020.2851H

stated with greater emphasis - that it appeared that user behavior in the broadest sense contributed to the occurrence of the conditions highlighted in the quoted paragraph with a negative effect on the operational situation.

**2881**

My answer to question 2 of the assessment report must therefore be supplemented by the fact that the stakeholder representatives who were actually involved and could gain significant influence on the project have not had sufficient insight into or overview of user behavior to be able to set the right requirements or provide information about the expected user behavior.

Re 10.2:

It falls a little outside the scope of the assessment topics, but in continuation of the above, one could ask the question - which I do not do in the assessment report - whether the appointed and involved representatives of the stakeholders have been motivated to take a real joint responsibility for the functionality of the commissioned solution in the broadest and non-technical sense.

A number of the issues mentioned in section 2.3.1.2 of the report are largely related to the behavior of stakeholders and users, as it unfolded after commissioning, and are therefore not related to the systemic implementation of the executive order's requirements. At least in theory, stakeholders could have contributed to (parts of) the behavior that was problematic for operability being corrected or notified at an earlier point in time, and it is an open question whether it should be the responsibility of a project's management to ensure that stakeholders participate in such a way, also in accordance with project practice.

In other words, it is not certain that the Danish Courts Administration would have been able to organize the stakeholder involvement in such a way that the necessary information would have been created and flowed into the project.

However, this does not change the fact that, based on the material presented (cf. the answer to question 11 below), I cannot see that there has been sufficient - if any - focus on end-user behavior overall. This could, for example, have been done in the form of test cases based on unassisted completion of the power of attorney form and entering into an agreement on the scope of mortgage conversion.

11. Questions related to risk management

...

Please use the following assumptions when answering the questions below:

- That (11.1) an overall risk analysis for the overall project was originally prepared in the spring, and that this was done in connection with the Danish Courts Administration's application to the Finance Committee for a grant for the project.
- That (11.2) this risk analysis was replaced by an actual - and much more detailed - risk log at the start of the project, and that the risk log was kept and maintained continuously throughout the project.
- That (11.3) the risk log conducted by the consultancy Devoteam was reviewed and discussed at the weekly project meetings (Monday) and at the project steering committee meetings
- That (11.4) the risk log showed which risks were currently located, what the consequences were and what could and should be done to mitigate them, and that the individual risks were colored red, yellow and green based on a point system.
- That (11.5) the conclusions of the original risk analysis

were translated into a schematic risk profile - according to the Ministry of Finance guidelines - in connection with the Danish Courts Administration's application to the Finance Committee

U.2020.2851H

- That (11.6) it is this risk profile that appears both in the application to the Finance Committee and in the subsequent semi-annual reports on the progress of the project.
- That (11.7) the risk profile was intended to form the basis for reporting to the Finance Committee and that the risk profile was therefore not part of the ongoing risk management in the land registration project
- That (11.8) the risk profile only contains some general conditions and some specific comments on the individual conditions.
- That (11.9) the risk profile was continuously adjusted based on the current risk log.
- That (11.10) there will often not be major changes in the overall risk profile, even if the individual items in the risk log are continuously addressed, and that this is because risks that were addressed were often "replaced" by new risks, and thus the overall risk picture is unchanged
- That (11.11) changes should be read from the comments attached to the risk profile.

11.1 The appraiser is asked to state whether the approach to risk management described in the above assumptions (11.1) - (11.11), where the risk log is the ongoing working tool, is usual for the development of IT systems with a size and complexity corresponding to the digital land registration system

11.2 Please state whether the assumptions (11.1) - (11.11) above about the risk analyses provide guidance for the assessor to change the answer to question K2.3.

11.3 If question 11.1 is answered in the negative, please explain how the Danish Courts Administration should have organized and implemented the risk management instead.

Answer to question

11 Re 11.1:

As stated in section 3.4.2.1 of the appraisal report [...], the described procedure is assessed as completely customary, and most of the assumptions (11.1) - (11.11) were included in this assessment.

**2882**

However, it should be noted in particular that the assumption (11.10) that the overall risk profile will not change during the course of a project because the sum of risks is constant, so to speak, does not seem well founded. In fact, the risk profile was adjusted during the project, and it will be common and even desirable that the overall risk is reduced during a project as the ongoing risk management (as expressed in the risk log) also handles the risks addressed by the risk analysis. So the fact that the project was still a high-risk project at implementation based on the risk profile is neither a given nor appropriate.

...

Re 11.2:

I do not find that the stated assumptions give reason to substantially change my answer to question K2.3.

...

Re 11.3:

With the proviso that activities aimed at stakeholders may have been carried out without it appearing from the submitted material, it would have been beneficial for the Danish Courts Administration to have strengthened the involvement of the actual end users in risk management. Partly to identify risks associated with the fact that the digital land registration system basically required significant changes and a high degree of precision in user behaviour, and partly to minimize and mitigate the risks in question through, for example, training and general information.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

..."                                                                                  "

*Additional statistics*

The Danish Courts Administration has presented an overview of the average case processing time for land registration in the period from November 2002 to November 2018 (measured in weekdays):

"



Kilde: Danmarks Domstole http://www.tinglysningsretten.dk/tinglysning/talogfakta/statistik/Pages/default.aspx (den 17. december 2018)

"

The Danish Courts Agency has also prepared a case overview for for the period September 8, 2009 - June 28, 2010, which shows, among other things, how many cases the Land Registration Court has processed during this period:

"

| | Alle andre sager end matrikulære ændringer (både manuelle og automatiske) | Matrikulære ændringer |
|---|---|---|
| Antal modtagne sager i hele perioden | 1.045.880 | 12.801 |
| - afsluttede pr. 28/6-10 | 1.017.383 | 12.526 |
| - uafsluttede pr. 28/6-10 | 28.497 | 275 |

"

The overview also shows that the closed cases were processed within the following number of days:

"

| Afsluttet i løbet af (kalenderdage): | Alle andre sager end matrikulære ændringer (både manuelle og automatiske) | | Matrikulære ændringer | |
|---|---|---|---|---|
| | Antal | % (af 1.017.383) | Antal | % (af 12.526) |
| 0 dage | 653.688 | 64,25 | 1.253 | 10,00 |
| 1-14 dage | 142.853 | 14,04 | 1.556 | 12,42 |
| 15-28 dage | 104.495 | 10,27 | 562 | 4,49 |
| 29-40 dage | 39.386 | 3,87 | 623 | 4,97 |
| 41-50 dage | 19.401 | 1,91 | 595 | 4,75 |
| 51-60 dage | 22.370 | 2,20 | 464 | 3,70 |
| 61-90 dage | 32.765 | 3,22 | 1.470 | 11,74 |
| 91-120 dage | 1.561 | 0,16 | 2.069 | 16,52 |
| 121-150 dage | 695 | 0,07 | 2.828 | 22,58 |
| 151-180 dage | 140 | 0,01 | 1.071 | 8,55 |
| 181-210 dage | 23 | <0,01 | 31 | 0,25 |
| 211-224 dage | 6 | <0,01 | 4 | 0,03 |
| I alt | 1.017.383 | 100,00 | 12.526 | 100,00 |

"

The overview also shows that the cases that were not yet closed on June 28, 2010 had been pending for the following number of days ("waiting time") at that time:

Copyright © 2023 Karnov Group Denmark A/S

| Under behandling i: (kalenderdage) | Alle andre sager end matrikulære ændringer (både manuelle og automatiske) | | Matrikulære ændringer | |
|---|---|---|---|---|
| | Antal | % (af 28.497) | Antal | % (af 275) |
| 0-14 dage | 19.645 | 68,94 | 158 | 57,45 |
| 15 dage - 1 måned | 7.412 | 26,01 | 37 | 13,45 |
| 1-2 måneder | 1.028 | 3,61 | 34 | 12,36 |
| 2-3 måneder | 253 | 0,89 | 11 | 4,00 |
| 3-4 måneder | 121 | 0,41 | 14 | 5,10 |
| 4-5 måneder | 30 | 0,11 | 10 | 3,64 |
| 5-6 måneder | 1 | <0,01 | 6 | 2,18 |
| 6-7 måneder | 2 | 0,01 | 5 | 1,82 |
| 7-8 måneder | 3 | 0,01 | 0 | 0,00 |
| 8-9 måneder | 2 | 0,01 | 0 | 0,00 |
| I alt | 28.497 | 100,00 | 275 | 100,00 |

"

*Loss statements*

The case concerns the Danish Courts Administration's potential liability for damages to private homeowners, and the case thus does not include the calculation of any loss for the individual homeowner. However, the association has presented

**2883**

loss statements for some of the members in the class action. The Danish Courts Administration has predominantly disputed the presented loss statements and has itself prepared typical examples which, in the opinion of the Board, show the extent of the loss that the citizen may have suffered in connection with the commissioning of the digital land registration.

**Explanations**

Jørn Knudsen, A, B, Michael Nygaard, Jan Schøtt-Petersen, Henrik Høpner, Steen Hermansen, Lars Mathiesen, Peter Vilsøe, Carsten Holmgaard, C, Leif Ekdahl, Søren Sørup Hansen and Adam Wolf have given evidence to the High Court.

*Jørn Knudsen* has explained that he is the CEO of e-nettet and has been for 20 years. E-nettet was originally called Realkredit-nettet and was owned by the mortgage banks. Now it is owned by the financial sector, including the banks, and performs digital infrastructure for the sector. The company employs mainly IT staff, which for the sake of convenience he will refer to by its current name, e-nettet. He himself holds a degree in cand.scient.pol.

On behalf of the mortgage banks, e-nettet handled the task of digital land registration, and e-nettet was hired by the banks to handle digital land registration. It was an obvious task for e-nettet to take on, as the company had the necessary competencies. A steering group was established internally with managers from the financial sector.

It was important for the financial sector to digitize land registration as it was the last "bastion" of a real estate transaction that was still on paper. Everything related to borrowing, loan repayment

etc. was digitized. The financial sector has many land registration transactions that are standardized, and land registration using a system-to-system solution would be optimal. A possible conversion wave could be carried out more efficiently, and it would be more customer-friendly and save the sector employee resources.

E-nettet was responsible for the operational part of the work and, as mentioned, a steering group was established with representatives from the financial sector. The industry organizations that were responsible for the political part did not participate in the steering group.

In the beginning, there was occasional access to ask questions

about the land registration project, but until 2008 the involvement was very sporadic and not entirely satisfactory. Collaboration became closer when it became clear that the project could not reach its goal in

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

2008. It became more coordinated and the National Courts Board recognized that closer cooperation was necessary. They saw an increasing degree of cooperation, and it was also necessary. In the end, there was close cooperation between the parties. Devoteam also worked for the e-Net, but they were different employees and things were kept separate.

CSC and the underlying tender underestimated the project. The National Courts Administration also underestimated the readiness to answer questions from external stakeholders.

The e-net had an employee in the established user group at the National Courts Administration. The interest from e-nettet was greatest in relation to the IT project in the financial sector, and that part had nothing to do with the user group. He did not participate in the user group himself and does not know the nature of the information in the group.

The Mortgage Succession Group was set up when the first go-live for digital registration was postponed.

Thomas Nørby Dahl, who was head of office at the Danish Bankers Association, attended the user group meetings, and e-nettet worked closely with him. E-nettet did not otherwise collaborate with other industries, including lawyers and real estate agents, outside of the user group meetings. Contact with these industries has been sporadic, and there was no discussion about e-nettet developing anything for other industries.

He knows the framework conditions for the land registration project. A "go-live" date was thus set, and it was to be done at a "big bang". He doesn't know where the framework conditions came from and he hasn't explored them further.

As he recalls, e-nettet was made aware of the risk assessments, but the company did not engage in a dialog about it.

The system-to-system solution is about defining an interface between two systems so that they can talk to each other. In this way, an employee in the financial sector can register a title deed in the blink of an eye, with no waiting time for the customer. Data can be reused in the system and there is no need to perform any part of the process on paper. It would delay the processing of a real estate transaction in the financial sector if the sector had to use the land registration portal. Using the portal was not considered and would require too many employee resources in the sector.

It builds on the tradition that the entire financial sector was behind a system-to-system solution and not, for example, the big banks going it alone. This is unique to Denmark.

In 2008-2009, the digital signature was available and the prerequisites for using it in land registration were therefore in place. The financial sector was comfortable using the digital signature.

According to his recollection, the fact that key employees at CSC were dismissed in August 2007 did not have a major impact on the project. CSC had not succeeded with the part of the project that had been initiated. There was not the necessary and expected progress, and the project was failing.

There was close cooperation between the operational part of the project in the financial sector, which the e-Net was responsible for,

**2884**

and the industry policy. He was thus involved in the correspondence with the Danish Courts Administration, such as the letter of October 5, 2007 from Finansrådet and Realkreditrådet, extract page 619, but he was not a "pen driver".

There was no collaboration between e-nettet and CSC. E-nettet worked based on the specifications of the land registration system. In addition, "question meetings" were held. E-nettet was

not involved in the user-facing part of the project, and the company was not involved in the user side of the individual banks or their branches. The specifications were continuously changed, and as a result, there was less and less time for testing, among other things. Dissatisfaction with the timetable was expressed to the Danish Courts Administration. The e-network

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

had the perception that CSC was not "performing". It was costing the e-grid a lot of money that the specifications changed and the tone from the financial sector intensified. The sector set preconditions for the project to reach its goal. It was not the e-network that caused the schedule to be missed, and the e-network had nothing to do with extending the requirements for the project, as mentioned in the minutes of the meeting of the supplier steering group on June 9, 2008, extract page 758.

When he wrote an email to Adam Wolf on June 11, 2009, extract page 1101, the project was in a critical phase. He doesn't remember who failed in the project, but specifically, it was a problem that changes were made to the project late in the process and that the test system was not in place. The employees at e-nettet had their summer vacation taken away and contingency plans were discussed. The user test, which was the last part of the test, had to be done on something similar to the finished system. The test subjects were from different parts of the financial sector. The National Courts Administration had no influence on who the test subjects were. E-nettet was responsible for coordinating the test activities/test cases. There was not much testing of the portal, but more system-to-system testing via the gateway. These were complicated tests. It was unusual to work towards a goal in the form of a "big bang".

E-nettet was concerned that manual processing of land registration reports could become a problem, but he doesn't remember if manual processing was seen as a risk.

He does not remember that much time was spent on the issue of converting paper mortgages in the mortgage follow-up group. So he does not have the impression that it was discussed and that there was disagreement. The e-net had nothing to do with the financial sector's request for the conversion of mortgages. Apparently in November 2009, the e-Net was involved in the Danish Land Registry's challenge with the conversion of mortgages. Although the level of automation in the registration of documents was increasing, turnaround times were getting longer and longer, and that curve needed to be broken. The e-network relayed the financial sector's offer to provide manpower and coordinate the return of the mortgages to the banks. However, the lending of employees did not materialize, as the employment law issues were too complicated.

He was involved in drawing up the agreement of October 30, 2008 between the Danish Courts Administration, CSC, Realkreditrådet and Finansrådet, extract page 853. He thus provided input on what e-nettet thought was necessary to achieve the goal of the project. Among other things, he gave input on the timetable. CSC had to perform its test, which was a prerequisite for the others' tests. Possible errors had to be reported to the Danish Courts Administration/Sørup Hansen. E-nettet was satisfied with this part of the process as opposed to the first part, i.e. before the agreement of

October 30, 2008, where there were some problems with communication. He drafted the agreement's Appendix 2, "Project space and collaboration". It was important that the relevant people were in the same place at the same time. These were employees from CSC and probably 8-10 employees from e-nettet. There were also employees from Devoteam. However, the developers were not included. You would probably do that today There was a heightened state of alert when the system went live, but the system was stable and "the picture was green".

*A* has explained that he has a degree in IT and has worked with large IT systems since 1999. He and his spouse sold their apartment in Bredgade in Copenhagen in 2009 because they wanted to work abroad. They have now lived and worked in Switzerland for 8 years.

They put the apartment up for sale in April 2009. He did not have any advisors in connection with the sale other than the real estate agent. At some point, the real estate agent informed them about the upcoming digital registration and that their case would be one of the first cases that

Copyright © 2023 Karnov Group Denmark A/S

had to be run through the system. He does not remember any media coverage about the use of the digital land registration system. He did not seek out information about the system himself. He and his spouse had a digital signature and knew about its use. He does not know why the buyer, who was a psychologist or psychiatrist, did not use a lawyer in connection with the transaction. He only spoke to the buyer once, and that was after the transaction was completed. The real estate agent did not tell them anything about the buyer's experience with real estate or IT.

He did not perceive it as a problem to use the land registration system. He was used to working with IT systems and does not remember it being difficult. He does not remember what the screen with the digital signature looked like. There was nothing new or unusual about the system in terms of IT. He does not believe that he

**2885**

received a receipt by email or similar that their deed had been reported for registration, but the system came up with a screen that the registration was completed after they had used their digital signature. He did not receive any notification about it, as the buyer did on the system.

In December 2009 and January 2010, he spoke regularly with the real estate agent, called the Land Registry and sent emails to the Land Registry to find out what was happening with their deed. He had expected the registration process to take a week, but didn't realize that the registration time was a problem in terms of getting the deal closed and the finances in place. When he called the Land Registration Court, he was put on hold and then transferred several times, after which the phone was often disconnected. Then he could start all over again. At one point, he got through to an employee who informed him that no notification had been registered regarding their deed. The employee didn't seem particularly interested in helping, but tired of all the user inquiries. He does not remember today when the conversation took place, but probably at the end of January 2010.

He subsequently wrote several emails to Sørup Hansen to clarify what had happened to their deed. He knew that a IT system has a log from which you can trace what happened to the individual transactions. He was therefore persistent with Sørup Hansen. In the end, the buyer reported the deed for registration again, after which the registration was completed the same day.

If, in November 2009, he had received a receipt from the Land Registration Court stating that only the fee had been paid, but that a document had not been registered for registration, he would have acted differently. He would also have done so if the Land Registration Court had already informed him when he phoned in December 2009 that no notification had been made. He was aware that he had to pay interest on mortgage and bank loans during the period when the deed was not registered. The bank would not contribute to an arrangement that could reduce his interest expense. He cannot remember whether it was he himself or the real estate agent who made the loss statement that he attached to his class action complaint.

*B* has explained that she is a trained graphic designer. She has been self-employed since 2008. Her husband, ..., is a trained aircraft mechanic. Neither of them has legal and financial knowledge. In 2008, her husband lost his job when the airline Sterling went bankrupt. This was at the same time she started her own business and they were struggling financially. They decided to sell their apartment and it was put up for sale in July 2009. They were not informed about the digital registration when the apartment was put up for sale, but they knew about it when the apartment was sold on October 15, 2009. It was possibly D or E

who had informed them about it. They knew that there would be financial consequences if the registration was delayed. She was

doesn't recall being informed of what was required of her and ... that the registration was digital. They both had a digital signature. She doesn't remember when she got hers, but it was probably when she became self-employed. It wasn't because of the digital land registration. They were both used to using digital signatures and they didn't need to authorize others to complete the registration on their behalf.

It was D who contacted them when they had to sign the registration documents. She and ... were not together when they each signed the documents digitally. She doesn't remember in detail how it went, but the signature went through. The same thing, ... has said, happened to him. They notified D that the documents had been signed.

In the period December 2, 2009 - February 2010, they waited for the registration. She tried to call the Land Registration Court several times, but gave up because of the waiting time. However, she did get through to a person once. She thinks that E also tried to call the Land Registration Court, but D did not.

They were finally notified that ... digital signature was not valid. It is their understanding that his signature expired during the waiting period because you cannot sign with a signature that is not valid.

... renewed her signature immediately. She called the Land Registry Court, where she was informed that it would then take another 5-6 weeks for the documents to be registered. It was frustrating as they were under a lot of financial pressure. The bank was not prepared to contribute to a solution.

On Facebook, there was a group called "Digital land registration, scandal". She joined it. TV2 contacted her and asked if she would participate in a program about the digital land registration. She agreed to do so. Two days after the program had been on TV, the documents were registered.

The statement of their losses was prepared by their bank and by D. She is not aware that there was an error in the notification to the land registry and that it was an error that not all documents were submitted for registration at the same time. If they had been informed immediately that there was something wrong with ... digital signature, they would have reacted immediately. *Michael Nygaard* has explained that he works as a project manager in the EDC chain's IT department. He is originally trained as a real estate agent. He has no IT technical training. EDC has a development department,

**2886**

where 40 employees are employed. EDC is not owned by a financial player, but owned by the individual brokers via a limited company.

He was a member of the user group for the digital land registration as a representative of EDC. He attended one of the first meetings together with one of their developers. He did not know the other participants, apart from Jens Baunbæk. The meeting took about an hour and a half. They were interested in how the land registration system could affect the real estate agents' work, including whether they needed to adapt their IT system to the land registration system. The meeting was of an informational nature. It was essentially Sørup Hansen who had the floor at the meeting. The Danish Courts Administration had already decided how the system should be, and they were not immediately invited to make amendments. After the meeting, EDC concluded that they did not need a system-to-system solution. They would wait and see, but they have not subsequently chosen such a solution. EDC has 1,100 users of the chain's IT system across 235 locations.

Real estate agents use the land registration system when a customer asks them to handle a real estate transaction. The problems with the land registration system did not affect the real estate agents' work, but had an impact on their customers. He did not consistently attend the user group meetings, but did attend one meeting,

U.2020.2851H

when it became clear that the project would be delayed. At the meeting it was stated what volume of documents was expected to be taken for manual registration, but he no longer remembers the number of documents.

At the time, the use of digital signatures was entering the real estate industry, but it was not yet an integrated part of their IT system. The real estate agents who needed to register property had set up digital signatures. It was probably 60-70 percent of the stores.

The Danish Association of Estate Agents had planned 10-15 courses on the land registration system in 2008. They referred their brokers to the courses, and the interest among brokers was high. In his opinion, it was not in the brokers' interest to encourage customers to create a digital signature. The provider of the land registration system had to take care of that. He did not attend user group meetings after the land registration system went live.

*Jan Schøtt-Petersen* has explained that he is a lawyer, chairman of Danske Boligadvokater and chairman of the group representative. His law firm is located in Helsingør. The office has a relatively large proportion of real estate transactions. For a period in 1995, he was employed by Nykredit, where Lars Mathiesen was his boss.

In 1999, he was elected to the Danish Bar and Law Society, and around 2000 he co-founded Danske Boligadvokater, where he was a member of the board until 2005. In 2010, he was elected to the board again and became chairman.

He followed the work on digital land registration and was regularly informed about the work through the lawyer organizations. He had employees in his office who only worked with real estate transactions. They were professionally strong and had IT skills, and they kept up to date on the progress of the digital land registration. One of the employees attended a course on digital land registration at either the local lawyers' association or under the auspices of Advo- katernes Serviceselskab. He doesn't remember any "hands on" courses leading up to the introduction of digital land registration, but he believes that one of his employees had some screen prints from the system. Digital signature was in its infancy, but the office had it and was used to using it. The clinics were briefed and recommended to get digital signatures. They were trying to reduce the backlog of real estate transactions up until the digital land registry went live. He doesn't have much to do with real estate agents, but it was his feeling that they were prepared for the new system. The Danish Association of Estate Agents adapted the purchase agreement in relation to, for example, obtaining a digital signature. The real estate agents were thus prepared for customers to be advised to obtain a digital signature.

In the office, they had daily meetings about the use of the land registration system, including how the workflows should be handled. He did not work in the system himself. There were pending cases at the time of the transition to digital registration, and new cases were being added. A large number of clients wanted a power of attorney solution rather than using a digital signature, which some were "fumbling" with. At the office, they saw it as their job to help the client through to the end. This did not mean extra income for the law firm. The price of a real estate transaction is "flat".

The seller in a real estate transaction is represented by the real estate agent, and the witness therefore did not do anything to promote the use of digital signatures among the sellers. The real estate agents could also get registered authorization to sign digitally for the sellers. The incorporated business processes in a real estate transaction were unchanged by the digital registration.

When the digital land registry went live, the office was very aware of it. Those were chaotic days and there was immediate frustration at the lack of guidance. There were times,

U.2020.2851H

where the system was "down", where it was not possible for employees to get through on the phone to the Land Registration Court, and where there was no response to inquiries to the Land Registration Court in general. The expectation was that it would be resolved quickly. Everything had to be tested, including the clients' use of

**2887**

Digital signature and registration of proxies. Powers of attorney had to be sent by regular mail, and time was lost because they were not registered. There were postal delays and delayed expeditions, so it took a long time before a power of attorney was either registered or rejected. The proxies sometimes had to be sent multiple times. There was frustration in the office about the long case processing times and "hello man axe handle" responses from the Land Registration Court.

In September-October 2009, some of the proxies were rejected if, for example, the signature was not within the frame on the form or there were typing errors. It was as if a password was required. These were trivial issues that led to rejection. Once they identified the reasons for the rejections, they tried to instruct the clients to avoid mistakes. There were no adequate answers to the challenges with proxies in the existing guides. It often happened that the power of attorney was not registered when a document was filed for registration and the document was registered with a deadline of 5 days. If the power of attorney was not registered within the deadline, the document was rejected and you had to start over, and the registration fee was lost.

The time it took for a document to be registered varied greatly. It could be days, weeks or months. There were cases that were registered immediately and did not cause any problems, while others were rejected due to system handling, such as employee signature deficiencies. This prevented the registration of the documents and led to a documentation phase. These were not material rejections, but system-based rejections that were sometimes incomprehensible. The long processing times had financial consequences for the clients. A client was often a buyer in one transaction and a seller in another. For clients who faced financial challenges, banks were often sympathetic to letting the interest on the loans go out with the interest on the deposited purchase price. He had very competent employees, and it was his experience that the problems with the land registration process subsided after about a year, but it probably took up to two years before land registration was not considered a challenge.

The reason for rejection: "Delay due to documents relating to the property not being notified at the same time" is not relevant. In an ideal world, all documents are notified at the same time, but this does not happen in the real world. It is not possible to carry out all land registration expeditions at the same time.

In January 2010, he was invited to join the board of Danske Boligadvokater. He was thrown into the challenges of digital land registration, and the most pressing issue was how Danish housing lawyers should handle the challenges of digital land registration. It was the industry's view that there were still problems. There was close cooperation between IT experts in the Danish Bar and Law Society, the financial sector and real estate agents, and there was a series of meetings with the Minister of Justice and the Danish Courts Administration. There was no doubt that the National Courts Administration was committed to solving the problems, but it was slow going. The system had inherent difficulties that needed to be resolved. The assessments have confirmed a number of inadequacies both in the way the system is structured and in the roll-out of the system.

Danske Boligadvokater initiated the class action because they have clients who have suffered losses. There is also a need to establish responsibility and a precedent is needed for future digitization processes.

U.2020.2851H

*Henrik Høpner* has explained that he is a lawyer and has been a member of the Danish Bar and Law Society and chairman of Danske Boligadvokater. He was a member of the Land Registration Committee and a member of the Danish Courts' user group in connection with the development of the digital land registration system.

The Land Registration Committee should probably have recommended a trial period or a trial office prior to the launch of digital registration. This was discussed during the committee's work, and Bornholm was mentioned as a possibility. However, this was not reflected in the report.

The Land Registration Committee's considerations were subject to the fact that the land registration system was to be introduced in connection with the court district reform. As a lawyer representative on the committee, he agreed that land registration could be centralized and placed in one place in the country. The committee was probably of the opinion that the Land Registration Court should be located in Aarhus, where it would be possible to recruit and retain the necessary land registration staff. He later heard from a participant at a dinner attended by the Minister of Justice, among others, that Hobro was chosen as the home of the Land Registration Court because it was a wish from a member of parliament from the Danish People's Party.

The board of Danske Boligadvokaters had in-depth discussions about how the commissioning of the land registration system should be handled. In 2008 and 2009, he and his colleagues held many courses around Denmark on how to use the land registration system. There was a huge interest among members in these courses. This was partly due to the fact that digital land registration would lead to increased competition from real estate agents, which they were very aware of.

The Danish Courts Administration's user group did not have the opportunity to make suggestions for the development of the land registration system. The financial sector and the National Courts Administration ran their own race with a system-to-system solution. It would be far too expensive for the lawyers to develop such a system. The lawyers' land registrations are more complex. He considered the user group as a

**2888**

orientation forum and does not recall that it was possible to influence the design of the system. It was purely an information forum, where much of the information concerned the many postponements of the commissioning of the system. The lawyers were not invited to carry out tests or similar of the system before it went live.

The lawyers did not receive material for courses until they themselves became aware that such material was used on courses taught by Anja Olsen from the Danish Courts Administration and Brian Pedersen from the District Court. According to his recollection, the lawyers were not involved in the work with information material and the like, but during the user group meetings he made several suggestions on how communication about the system should be conveyed to the users.

The legal profession had no problems using digital signatures. The lawyers were already using it when setting up companies etc. with the Danish Commerce and Companies Agency. It is nonsense that lawyers' use of powers of attorney instead of clients' use of digital signatures was the cause of problems with digital land registration. It was assumed in the Land Registration Committee that all professional users should also be able to use proxies. In his office, they went to great lengths to ensure that the powers of attorney were in order before they were sent for registration in the Land Registry Court. Lawyers typically only

get involved in a real estate transaction when the clients are ready to act, and then there is no time for the client to obtain a digital signature. Therefore, it was necessary to use proxies.

It was no longer possible to get guidance from the registrar when a document was rejected from registration, as it was

had been to the old land registry offices. It was frustrating, and sometimes they would resend a rejected power of attorney and it would be registered without any changes having been made to it. For example, documents were not allowed to be stapled together with staples, so they were rejected and his staff had to remove the staples from the documents and return them to the Land Registry. He doesn't understand why the Land Registry staff couldn't do that instead of rejecting the documents.

During the user group meetings in the fall of 2009, there was a realization that things were not going as fast as expected. It was mentioned that there were problems with the scanners. It has always been his opinion that two scanners for the entire project was too few and that it was to be expected that there would be a need to scan a large number of proxies for a number of years.

During a user group meeting, it was mentioned that a bank had sent a "truckload" of mortgages for digitization in the autumn of 2009, and that this had contributed to delays in the registration process. During the meeting, he suggested that the mortgages should be returned with the message that the bank had a five-year period to have them digitized, and that they had to specify if some of the mortgages had to be digitized here and now, for example because specific properties were traded. It was crazy at that time to start a total digitization of owner mortgages.

He does not agree with Devoteam's statement in the email of October 2, 2009 to Adam Wolf and others, extract page 1361. It is nonsense to say this about the lawyers' relationship with digital signatures. As he has previously explained, lawyers already had digital signatures and used them for company registrations. At the time, the legal profession was one of the most advanced industries in the use of digital signatures. In his opinion, Devoteam consisted of a bunch of loudmouth consultants who didn't know anything. They were very arrogant during the user group meetings. He also doesn't recognize the statement that the lawyers had not registered their digital signature with the Land Registry. This is not a problem that he has heard of before, but it would be easy for the Land Registration Court to contact, for example, Danske Bo-ligadvokater and get them to inform the lawyers if there was a problem.

The Land Registration Committee was very aware of the trade-off between resources and the need for digitization of e.g. owner mortgages. This is the background to the committee's proposal for a period of 5 years in which owner mortgages would retain their priority position regardless of digitization. With this arrangement, the intention was that the financial sector would hold back on digitizing mortgages. This was the case, with the exception of a few banks.

He did not participate in the National Courts Administration's test and technology group. It was an internal group within the agency that worked with the financial sector. He believes that no other lawyers participated in that group either.

The lawyers did not consider participating in the test mentioned in the minutes of the User Group meeting of April 20, 2009, extract page 1046. The test concerned the financial sector's system-to-system solution. The lawyers wanted to use the portal and there was no test of that solution. He does not recall having seen the email of June 24, 2009 from Emil Melchior to Danske Advokater, extract page 1149, regarding communication about digital registration, but he has at some point seen the attached messages or something similar.

He has not previously seen the section on the division of responsibilities regarding the trade organizations' responsibility for communication to their own backgrounds, which is contained in the Danish Courts Administration's communication package from June 2009, extract page 1177, but the legal profession

**2889**

U.2020.2851H

did what it could to communicate knowledge about the land registration system. It was continuously discussed that the organizations should make sure to keep their members informed about the land registration project.

In the spring of 2009, he was a frequent guest at the Danish Courts Administration in Adam Wolf's office, where discussions took place between him, Adam Wolf and Sørup Hansen. The meetings did not concern "technology", but problems related to the many delays of the project.

As he recalls, the "sandbox" mentioned in the minutes of the user group meeting on June 25, 2009, extract page 1205, was a rough example of how to go from screen to screen when registering a deed. He cannot remember specifically how they informed their members about

"sandbox", but it would be unusual if this had not happened. There were also some videos, but in his opinion they were aimed at "Mr. and Mrs. Denmark". He has previously seen the Danish Court of Justice's "Guidance - power of attorney (real estate)", extract page 1281, or a similar guidance, but he does not remember whether he has commented on the guidance.

*Steen Hermansen* has explained that he works in the Danish Bar and Law Society as Head of Digitization. He is not a lawyer himself, but helps law firms with IT solutions. He was originally employed by Advokaternes Serviceselskab, which was acquired by Danske Advokater after that organization was established in 2008.

There was an introductory meeting at the Danish Bar and Law Society, where Sørup Hansen came and informed about the land registration project. The witness, Secretary General Henrik Rothe and lawyer Henrik Høpner participated in the meeting with Sørup Hansen. The lawyers were interested in participating in the process of digital land registration. He thought the idea of commissioning digitization with a "big bang" was "fresh". However, at the time, the plan was to digitize the vehicle register first, and it was therefore assumed that any teething problems in the system would be solved before the digitization of the land register. He expressed that the "big bang" was bold. It was his opinion from the beginning that a system-to-system solution was not relevant for lawyers.

He was appointed by the Danish Bar and Law Society to participate in the user group at the Danish Courts Agency. A project like the digital land registration was not unique compared to what Advokaternes Serviceselskab was doing.

The industry organizations participated in the user group. He didn't know in advance who would be in the user group, but the financial sector showed up in large numbers, and the lawyers, surveyors and real estate agents were the "little guys" in the user group. It was a technically based kick-off meeting and it was clear that this was a complex and large system. He was confirmed that the lawyers should not develop a system-to-system solution, and no lawyers have established such a solution today. The reason is that the lawyers have very different land registration cases and types of processing. The legal sector had its own meetings with the Danish Courts Agency about their land registration solution.

In 2006, he began to gain insight into what the system would look like. He toured various law firms in Denmark with Henrik Høpner and Henrik Øe, who was head of office at the Ministry of Justice. They showed some screenshots from the system so that the students could get an impression of it. They asked for an actual demo model of the system, as they had an interest in giving a realistic picture of what it would look like. In August 2009, a "sandbox" was set up, but it was not until the digital land

registration system went live in September 2009 that it was actually possible to see what the system looked like. The project was postponed several times, but this did not affect the advisors.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

The legal profession was used to using digital signatures, but with the land registration system, a personal ID number had to be linked to the signature for the employees who would work with the land registration track. Problems arose with sending the right files with the certificates for the digital signature to the Land Registration Court, and there were challenges with communication from the Land Registration Court to the law firms in this connection.

It was not discussed at the user group meetings that the lawyers' clients should have a digital signature. The clients were not comfortable with digital signatures, and a proxy system was used instead. He told the lawyers about the digital signature, but he knew that the power of attorney would be used. If there was an error in the land registration process, the lawyer with the power of attorney would be able to try again without having to ask the client to sign again with a digital signature. He was informed that many powers of attorney were sent to the Land Registration Court for registration after the system went live. It could seem a bit random whether a power of attorney was registered, and he received many inquiries from members. Many tried to contact the Land Registration Court, but the problems were not solved that way. The support at the Land Registration Court was not able to answer questions or provide qualified help.

He and the CEO of Danish Lawyers, Paul Mollerup, met with Adam Wolf and Sørup Hansen at the end of September 2009 to discuss the challenges of digital land registration at that time. Adam Wolf and Sørup Hansen did not fully agree on the extent of the challenges. Several meetings were held. He doesn't remember if Adam Wolf and Sørup Hansen said why the digital land registration was not working. It was not said that there were challenges,

**2890**

because the digital signature was not being used. At a user group meeting in December 2009, he asked for instructions for the system. Before the system went live, they had been told that the system was intuitive and therefore no manuals were needed, but it turned out that they were.

After the system went live, there were initially problems with users losing information they had entered, among other things. It was stated that the reason could be that the user had other systems open when they went to tinglysning.dk, but this was not correct. However, the system improved as users became better at using it and communication with the Land Registration Court improved. Today, land registration is a success. However, there are still challenges with the large land registration cases. Lawyers were never invited to participate in testing the system before it went live, so they have not declined to participate.

The test and technical group mentioned in the minutes of the user group meeting on April 28, 2008, extract page 732) dealt with the system-to-system solution. He did not participate in the group himself. The suppliers of IT solutions for the legal profession were invited to participate, but they doubted that the system-to-system solution would be chosen by the lawyers. Therefore, their participation did not materialize.

He does not remember a live demonstration of the system at the user group meeting on April 20, 2009, as stated in the minutes of the meeting, extract page 1046. The "sandbox" was added later. The test referred to in the minutes is a test of the system-to-system solution. He did not have access to the system himself. It later emerged that the financial sector was also testing the portal solution.

With the "sandbox" a small test environment was established, but it only became available in August 2009. He took the sandbox

with him on his trips around the country, visiting two law firms per day. "The sandbox wasn't super useful, but he doesn't remember,

Copyright © 2023 Karnov Group Denmark A/S

that the National Courts Administration received feedback that it was not applicable.

*Lars Mathiesen* has explained that he runs a consultancy business, among other things. He has previously been CEO of Nykredit and chairman of the financial sector's steering group on digital land registration, as well as being a member of the e-nette board. He has significant experience in governance and handling large projects. Mortgage lending is a core service for mortgage lenders. Digital land registration could make the sector more efficient and they went into the land registration project with an open mind. The financial sector has 80 percent of the volume of total land registration in Denmark.

The financial sector has considerable experience in developing large systems. The sector's system was implemented as planned, but it was delayed because it had to wait for the land registration system, which cost the sector money.

The land registration project had three main phases. The court administration and the financial sector had to develop new systems. There was no already developed and usable system. The system had to be tested. The financial sector has a tradition of extensive testing of new systems, and they did not dare to launch the land registration system without such tests. Finally, the land registration system had to be launched. The National Courts Administration listened to their objections in connection with the project development. They had a good dialog with the agency, but in the first part of the project's lifetime, the agency's supplier failed. The final stage in the development of the system-to-system solution was the integration test to ensure that the two systems can talk to each other. The financial sector took care of the training of staff in the use of the new system. This was essential and the sector has experience of this from other major system changes.

After the launch of the land registration system, the sector's steering group received reports from the individual departments that "the piles were growing". This led to meetings with, among others, the Minister of Justice and the board about the problems with processing times. During the meetings, solutions were discussed and not who was to blame for what. The secretary was very willing to help find solutions. Jørn Knudsen from e-nettet was given the task of drafting what was agreed at the meeting with the agency and the minister.

The main reasons for the problems were the surprisingly low level of automation in the beginning and the fact that the Land Registry received a large number of powers of attorney from lawyers and mortgage deeds to be digitized. The digitization of owner mortgages was not time-critical unless you needed new loans. Nordea sent a "moving van" of owner mortgages for digitization in autumn 2009. He does not know how the mortgages were sent, including whether it was clear which mortgages were time-critical. The agreement with the financial sector not to send the mortgages for digitization was only made after that time. Thus, it was not a case of Nordea breaking an agreement by sending the mortgages to the Land Registration Court.

*Peter Vilsøe* has explained that he is a lawyer, and his law firm mainly deals with real estate transactions.

Courses on digital land registration were offered for both lawyers and secretaries before the system went live. It was not difficult to find courses offered by Danish Lawyers. That's why Brian Pedersen from the Land Registration Court held courses. The law firm was in contact with its IT supplier to ensure that the

**2891**

the office's IT was prepared for digital land registration. He himself was looking forward to digital land registration, as the

company had an annual cost of DKK 500,000 for postage when sending land registration documents. Today, there is great satisfaction with digital land registration.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

After the digital land registration went live, there was a tough transition period where things took a long time. There was a lack of guidance for the system and from the Land Registry, and the guidelines changed almost daily. The secretaries found that the system "crashed". They had an extra secretary in the office to prepare for the new situation, and despite the challenges, the atmosphere was good. It was probably mainly the property sellers who had problems, because the purchase price could not be released until the deed was registered. He sometimes got involved in the challenges, and he sometimes wrote to either the case officer at the Land Registration Court or Sørup Hansen. It was especially when he wrote to Sørup Hansen that something happened.

He doesn't remember the powers of attorney causing the office any problems, apart from the fact that it took a long time to register them. For the ordinary cases, it took ½-1 year before things got better and the registration went without delay, while it took longer for the more difficult cases. They made sure to send the power of attorney for registration in good time before the deed was reported for registration. It was not appropriate to send the deed for registration and then the power of attorney for registration, as a rejection of the power of attorney would then also mean that the deed was rejected.

*Carsten Holmgaard* has explained that he is a partner in the law firm Kirk Larsen & Ascanius in Esbjerg. In 2009, the office had approximately 65 employees. For many years, the office has had a good base with the purchase and sale of real estate, and in 2009, in addition to himself, there was one assistant attorney and five legal assistants in the real estate department, of which he was head.

They were well aware well in advance that the land registration would go digital. The department's employees attended a course with Brian Pedersen from the Land Registration Court even before the first announced start-up date. There were employees on a course again prior to the second announced commissioning date, and he was also on a course prior to the actual commissioning. They made a great effort to complete their cases in the manual system before the transition to digital registration in September 2009. The Land Registry in Esbjerg was prepared for this, and as he recalls, the lawyers were also encouraged to tidy up before the transition to the new system.

All employees in the office who needed it had their own digital signature, but they had deliberately not encouraged their clients to use digital signatures for land registration. They wanted to wait and see and get to know the system themselves, and they had heard on the courses that everyone, including professionals, could use powers of attorney. Moreover, several of his clients would have "run away screaming" if he had suggested that they use a digital signature themselves.

After going live, they immediately started filing proxies for their real estate transactions, but it was probably 4 weeks before they filed their first deed for clearing. It soon became apparent that many of their powers of attorney were rejected due to errors.

They usually managed to "sniff out" most of the errors in the powers of attorney before they had to register the deeds, but this was only because they had sent in the powers of attorney well in advance. In some cases, it was their own mistakes that caused the rejection of the powers of attorney. It could be a wrong date or a wrong city name or witnesses who hadn't written the last 4 digits of their social security number on the power of attorney. They resubmitted the corrected powers of attorney, but registration could take a long time and it was difficult to get in touch with the Land Registry to get information.

The rejected proxies often came with an explanation, but it was in a very convoluted language. It was very frustrating. The system used new terms and was not at all similar to the paper-based

U.2020.2851H

system. Everything had been renamed and the system could not handle æ and ø, for example.

He was continuously involved in the problems because his secretaries were sitting right outside his door, coming in to help solve the problems. A lot of hours were spent. For example, they had weekly meetings where they shared their knowledge. They also exchanged experiences with local colleagues.

As part of his testimony, he has asked the office's IT manager to find all emails between the office and the Land Registration Court for a period of 6 months after the system went live. There are 2,400 emails in total, of which approximately 140 emails were sent from their office with questions about how to use the system. The other emails from the Land Registration Court concern rejections, clearances with deadlines and the like.

Contact with the Land Registry hotline varied greatly. Sometimes they got a quick answer, but often they couldn't use the answers for anything. Nothing worked properly. Even drafts that they had saved in the system for processing often disappeared. They have also experienced the system shutting down, so they lost all the workflows they were working on. He hasn't worked in the system himself, but heard about it from his coworkers.

Initially, there were also problems with the land registry certificates. In some certificates, the correct title holder was not indicated. It just said "yes" in the relevant box, and that

**2892**

took a long time to get it fixed. He didn't feel that real estate agents were very well prepared for digital land registration. The real estate agents had the same problems with getting powers of attorney registered.

The turnaround rate at the office was not significantly affected by the problems, but this was solely due to his very experienced employees. The process with the many errors caused insecurity, and they had to tell clients and banks etc. why registration did not happen as expected. If their clients had used digital signatures instead of powers of attorney, they would have had to contact the clients many times to ask them to sign again. It was many years before they left it up to their clients to sign. Even today, they usually use a digital power of attorney for real estate transactions. It would have been nice if the power of attorney had been digital back then and not had to be filled out manually. For example, they didn't even have an old-fashioned typewriter in the office at the time. Typewriters didn't contain an "@ sign", so it had to be written on with a ballpoint pen anyway.

Land registration could take months when a document was selected for manual processing. They were notified of this, but not why the document was selected or how long it would take. This often happened with particularly difficult registrations involving companies and the like. They didn't know from the start that manual processing would take so long. They only informed their clients about the processing time if they could see that it would take a long time. In general, they did not explain the reason in detail to their clients, except that it was the digital land registration that was the cause.

The consequence for the buyers was that they could not register their change of ownership loan. They therefore had a home loan in the bank at a more expensive interest rate, which was just waiting for the deed to be cleared so that the financing could fall into place.

They never submitted all documents for registration at the same time. This has never been done, and no one had informed them that they needed to change the process. Such a procedure only exists in the ideal world. In his opinion, the difference in the total

registration time is almost neutral if you

in the office will do the other expeditions as soon as the deed is ready.

He did not consider appealing some of the many rejections. He is not in the habit of burdening the courts with such matters. In the old system, you would get a call from the local land registry office and the problem would be resolved in a dialog. It was a big change that the personal element disappeared from the land registry.

There were many reasons for rejection that frustrated staff. For example, there was no guidance on powers of attorney for companies with multiple signatories, but it turned out that you had to write multiple names in the same field. You also had to clarify the signatory's name in block letters under the signature. It was "learning by doing". Another example is a resort where 90 condominiums were to be sold. They carefully drafted 90 powers of attorney and only later learned that it could have been done with an appendix to one power of attorney.

They would have gladly spent the time and money to participate in a pre-launch test period if that had been an option. I think that was the original plan, but it ended up that they "skated" over this. At the request of Brian Pedersen from the Land Registry Court, the office has subsequently participated in a test regarding the clearing of forced sale deeds, and it was a great success.

Today, they are very happy with the digital land registration system, and 99 percent of their registrations work. They also get a nice treatment from the Land Registry staff.

*Mr. C* has explained that he graduated with a Master of Laws in 2003. In 2009 he was a project development manager, but today he is a lawyer.

He and his spouse sold their apartment on September 9, 2009. They weren't particularly prepared for digital land registration, but they knew it was coming. They moved into temporary accommodation until they had bought and could take possession of their new home. He and his spouse already had digital signatures, and they used them. He doesn't know if the buyer had challenges signing the deed. The takeover was agreed for October 28, 2009. The registration took a long time, and he was aware that it cost interest on the loans, which could not be repaid. He tried several times to call the hotline at the Land Registration Court, but he never got through to anyone before he was "kicked off". He became very frustrated with the process. The deed was not registered until January 22, 2010. It was his experience that there were teething problems in the system. When he bought a property not long after and had to rectify the transaction himself, everything went smoothly.

He wrote to the Danish Courts Administration claiming compensation for the increased interest expenses they had incurred. The Danish Courts Administration acknowledged that there had been no error on his part, but still refused to pay compensation, stating that the processing time had not differed from the processing time for registration of other documents. Therefore, the agency did not find that any errors had been made that could lead to compensation. At the time, he chose not to take any further action, but when he was later contacted about the class action, he chose to sign up.

When the registration process dragged on, he talked to their bank advisor about limiting the loss of interest. From the 1st.

**2893**

January 2010, the bank lowered the interest rate on their loan to a rate equal to the interest rate on the escrow account. It is his impression that this was the bank's general policy at the time, because the bank did not want to make money on customers'

problems with the land registry. It is Danske Bank that has calculated their losses.

*Leif Ekdahl* has explained that he is employed by CSC. He has been since December 1, 2007. He was program manager for the land registration project until January 1, 2009, when he became account manager in

U.2020.2851H

relationship with the Danish Courts Agency. Originally trained as a civil engineer, he has been employed by several large Danish companies, including in the financial sector, where he has worked with large distressed IT projects.

The original schedule for the land registration project had already been exceeded and the project had been restructured when he became Program Manager in 2007. His first task was to draw up a new schedule. It was necessary to cut down on testing time in order to make it work. The job had to be done and CSC was prepared to provide significant resources, even if it meant going over budget. When he took over, there were only five people left in the project due to organizational problems, but this was quickly increased to 80 people. There had been a dispute between the two development teams located in Aarhus and Copenhagen, and CSC had probably overestimated the importance of having developed the first land registration project. The fact that the financial sector, which was a significant stakeholder, continuously had new requests for the system's functionality delayed the process. Overall, however, the collaboration between CSC, the financial sector and the National Courts Administration went well.

CSC would only deliver the system itself, including the infrastructure. The organizational part belonged under the Danish Courts Agency.

He believes that CSC had insight into Devoteam's risk analyses, extract pages 521, 545 and 571, but he does not know if CSC was directly involved in them. CSC did not as such have considerations regarding the risk of launching the system as a "big bang". CSC did not consider that concept as a particular risk. No organizational issues were involved in this assessment. They had discussions with Sørup Hansen about the degree of automation. This had an impact on the number of checks in the system, and thus on the number of cases that had to be processed manually. The location of the Land Registration Court in Hobro did not affect CSC's work. From a technical point of view, CSC was not concerned about the use of the digital signature.

Devoteam prepared the "pressure test" of CSC's delivery, extract page 601. One of Devoteam's tasks was to ensure that CSC delivered in relation to what had been agreed. CSC's risk log was a document to ensure that they got through all stages. The log was regularly updated.

Due to the delays in the project, it became necessary to develop the large real estate part of the project first and wait with the smaller car book part. This made the system more robust when starting to develop the real estate part. If the car book had been developed first as originally planned, it would have been necessary to make changes to the core of the system because real estate is much more complex.

The contingency plan of April 4, 2008, extract page 721, was prepared by CSC. It is based solely on the IT technical part of the project. He attended the user group meetings of the National Courts Administration to see what was happening, but he had no real influence on the meetings. He attended as an observer and to show CSC's presence. He probably attended 2-3 meetings.

He is aware of the discussions regarding the financial sector's attempts to expand scope and functionality, as stated in the minutes of the meeting of the supplier steering group on June 9, 2008, extract page 757. It was CSC's opinion that the financial sector was continuously trying to get more functions in the system, and there was an ongoing battle between the financial sector and Sørup Hansen about what were bug fixes and what were new requests. More requests would have an impact on the schedule. The financial sector got a lot of new things. The sector

had a strong backing that could push the right buttons.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

He believes that CSC created the risk log that is included in the extract on page 761. The log was continuously changed, among other things, some graphic illustrations were added, e.g. some arrows and colors to illustrate the development. The log was a joint input. On page 1, point 4 of the log, it is stated that short test runs would mean increased risk because it would increase the risk of errors only being discovered when the system is put into operation. However, the test runs ended up being relatively long, and changes were made to the system right up until go-live. Item 18 is a check of the degree of automation and has been added at the request of the Danish Courts Administration. He believes that item 27 about deficiencies in the Danish Courts Administration's project organization must have been included at the request of Devoteam. The agency was subsequently "manned up" by bringing in more employees from Devoteam.

He has previously seen a draft of the memorandum of June 24, 2008 regarding project assumptions agreed between the Danish Courts Administration, the Danish Business Council and the Danish Mortgage Credit Council, extract page 769, and has participated in some of the previous meetings. They had to agree on the conditions for changing the schedule. It was completely undramatic.

Devoteam's contingency plan, extract page 773, was an old document with a new date that CSC had no

**2894**

had to deal with. The document was historical and could not be used for anything at the time.

In January 2009, Ulla Tonne took over his position. He was then part of CSC's internal project group and reported regularly to CSC in the US, which showed increased interest due to the project's development and economy.

The arrow under point 18 in the risk log, extract page 940, shows a reduced risk because at that time it was more possible to estimate the need for manual handling staff.

In the risk log, extract page 996, three new overall risk scenarios were defined. Partly that the digital land registration was not ready due to technical errors, partly that the Land Registration Court did not have time to complete all old cases before going live, and partly that the Land Registration Court could not process incoming cases due to staff shortages or many cases for manual processing due to poor data quality. He does not remember it being particularly critical.

Jørn Knudsen's email of June 11, 2009 to Adam Wolf, extract page 1101, should be seen in light of the fact that the financial sector at the time was still trying to implement changes and that it was necessary for e-Net employees to work during the summer holidays. At the time, bankers were testing their own systems against the land registration system. The lawyers were not interested in the system to system solution, but there was a test environment for users of the portal, and he would be surprised if there was no access for lawyers and real estate agents.

During September, there were performance problems, but he now knows that in many cases it was due to user conditions, including the users' browsers. CSC had made a "short list" for users to use. "It sounds very strange if it would affect the functionality of the land registration system if users had Advosys programs open on their PC. It is a well-known principle to limit user access to a system to avoid overload. Skat uses this every year when they open the previous tax year's annual statements. In the summer of 2009, they chose to increase capacity with new hardware to ensure good performance at start-up.

In early 2009, the Danish Courts Administration ordered a special scanning system that would work with the land registration system. CSC delivered three identical scanners, but only one of them worked. They spent months trying to find the reason why the two scanners

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

did not work. Tests had been run on one scanner before go-live, and that was the one that worked. If they had run tests on all three scanners, they would probably have discovered the errors before going live. The technical part of the land registration system worked except for the scanners, which CSC had some responsibility for. It is his opinion that a large part of the problems after the start of operations are due to poor communication. "It's naive to think that such a complex system can run optimally from day one. It could have been communicated better. The extra mortgages also took resources away from manual registration. It will never be possible to automatically register all documents. There are a number of checks in the system, and the more checks you add, the higher the level of automation you will achieve. If the checks do not cover an incoming document, the document will be removed for manual processing.

The number of checks was determined in January 2009, and it was at that time that it was known how many staff would be needed for manual registration. However, the number of employees will always be a 'shot in the dark'. The best person to make this estimate was Sørup Hansen.

*Søren Sørup Hansen* has explained that he is the head of the Land Registry Court in Hobro. Apart from a period of five years as a lawyer, he has been employed by the courts since 1973 and has been particularly involved in land registration, including land registration projects such as the conversion of land registers to computerization and the creation of the Car and Person Book.

In 2000, the financial sector expressed a desire for greater uniformity in case processing at the land registry offices. The sector employed people with special knowledge of how to register land registrations at each of the 82 land registry offices around the country. The Ministry of Justice set up a land registration committee to look at the future of land registration. He was a member of the committee. The committee submitted a partial report in 2005, and the recommendation was that land registration should continue to be a public matter and that uniform case processing could be ensured by centralizing land registration or some form of automation of the land registration process. A report was submitted by the Land Registration Committee in 2006, which recommended that land registration should be both centralized and automated. However, the government had already decided in 2005 that land registration should be digitized.

It was decided that the 82 land registry offices should be reorganized into one Land Registration Court. There were discussions about the location, and it was politically decided to locate the Land Registration Court in Hobro. The centralization meant that a construction project had to be carried out. At the same time, a court reform was to be implemented, which made it more difficult in terms of staffing to carry out the land registration task at a number of offices. Therefore, in 2007 and 2008, there were some rotations, which meant, among other things, that land registration was not carried out throughout the country in the judicial district where the property was located. From 2007, paper registration for 25 of the old legal districts was carried out in a shanty town in Hobro.

**2895**

The organization of the land registration project was traditional. An internal steering group was established with responsibility for the overall organization. There was also a user group, also known as the contact group or support group, with the participation of various stakeholders. In reality, it was a group made up of the same stakeholders who participated in the Land Registration Committee.

The letter of June 15, 2005 from the Danish Courts Agency to the Ministry of Justice, extract page 507, was prepared by him and the then director of the Danish Courts Agency, Bent Carlsen, and it mentions, among other things, their expectation of staff turnover among the land registry staff in the time leading up to the introduction of the land registration system. At the time, they knew

he said that the plan was to centralize the land registry, but no one knew where. They had to consider whether the staff would move with them, and they had to anticipate that some would move to work outside the courts. The letter was sent about a year before the Land Registry Committee issued its report, and it was a negotiation proposal to the Ministry of Justice. The National Courts Administration wanted more resources. A degree of automation at the start of the system of 35% was a conservative estimate. It was uncertain what the transitional arrangement would be like, but the Board estimated that in addition to the expected 90 employee FTEs at the Land Registration Court as a transitional solution, there should temporarily be a land registration preparedness of approx. 100 FTEs until the degree of automation had reached the expected level.

At the time of the Ministry of Justice's document no. 38 of November 21, 2006 to the Finance Committee, material collection page 101, a requirements specification for the land registration system had been prepared, a tender had been held, and offers had been received for the development and operation task. The desire for the digital land registration system to go live with a "big bang" came from the Land Registration Committee, and it was based, among other things, on experience from the previous land registration project with the conversion of the land registers to computerization, which took 12 years. At a "big bang" would achieve the benefits of digitalization from day one. It was clear that "big bang" was the solution, and this was included in the bill. To counter the risk of the system not working satisfactorily from the start in the event of a "big bang", a number of employees had to be trained in manual land registration for employment in Hobro, and the employees had to be trained to operate the new system. Training centers were established for this purpose in Aalborg, Randers and Aarhus, where 60 new employees were trained during 2007 and early 2008.

Risk logs were used in the development of the system, and the so-called risk analyses contained a summary presentation of the risk logs. CSC had to keep a risk log that contained what CSC saw as risks in the system and what CSC believed should be done to minimize the risks. The National Courts Administration also kept a risk log, which contained what the agency saw as risks, including in relation to business conditions or conditions at the supplier, CSC. Finally, the financial sector kept a risk log.

When an item in a risk log has the status "Open", for example item 23 in the risk log from September 2007, page 607 of the extract, it shows that the item would be a potential risk until the system went live. It was then necessary to consider what would be done to mitigate the risk and how likely it was to occur. Item 23 is also included in the risk log from January 2008, extract page 658. The status is still "Open", but the text has been changed, which shows that the risk was processed.

The minutes from the supplier steering committee meeting on June 9, 2008, extract page 757, show that CSC's risk log was reviewed, and it was CSC that proposed solutions. Item 18 in the risk log, extract page 762, concerned the extent of manual review of claims in relation to the number of employees, and CSC suggested the use of user forms to increase the degree of automation.

In a letter from the National Courts Administration dated October 10, 2008, extract page 837, it was announced that the entry into force of the land registration system would be postponed. At that time, there had already been a previous postponement. The employees who were still at the existing land registry offices at the time began to "leak", and retired

employees wanted to leave. There was a lot of pressure. The grant that had been used to retain employees during the development of the system expired at the end of 2008. The major district court reform was well underway. The district courts were under pressure and wanted to use their own employees, which meant that it was not easy to attract

U.2020.2851H

employees for the land registration task. Another postponement was therefore quite critical in terms of staffing.

In the fall of 2008, when it became clear that another postponement was needed, the National Courts Administration, in collaboration with CSC, Realkreditrådet and Finansrådet, drew up a new plan for implementing the digital land register, extract page 853. The parties agreed that the digital land register should be implemented as quickly and as securely as possible, including that the necessary time should be allocated for testing. The financial sector was the dominant player in relation to the registration of documents, and the sector wanted more time for testing, among other things. It was agreed that there should be closer cooperation at management level between the Danish Courts Administration and the financial sector. The mortgage follow-up group, which was really only an orientation group, was upgraded. Jørn Knudsen from e-nettet was further involved. Jørn Knudsen came up with a draft description of a common project space and the

**2896**

future cooperation, extract page 856. The financial sector's interest in the work was mainly to secure the investment that the sector had already made in developing a system-to-system solution. It was reasonable that the sector should be more closely associated with the project.

A project room was established at CSC. Many things could be solved much more easily because employees from the National Courts Administration, the finance department and CSC were in the project room. They conducted tests on both the case management portal and the system-to-system solution. He came to the project room himself, but not to solve actual tasks. The CFO was very enthusiastic about the project room and it was open to everyone.

On January 13, 2009, he sent a letter to the National Courts Board, extract page 915. He was angry because he had received a notification from the National Courts Board on December 12, 2008 about

"Staffing for the Land Registration Court 2009", which stated that the total staffing was 115 FTEs, including the head of administration and president. When the property in Hobro was built, everyone agreed that the number of FTEs should be 122, and the property was built for 150 employees. He had thus counted on 122 FTEs. In the letter, he referred to the previous agreement. It ended up with an additional 10 FTEs, so the Land Registration Court was standardized with a total of 125 FTEs.

As one of the elements of a contingency plan for the implementation of digital land registration, he wrote on 13 May 2009, extract page 1195, to five district courts about "neighborly help". The plan was that the Land Registration Court would be able to draw on 4-5 employees with land registration experience from each of the courts in Hjørring, Aalborg, Holstebro, Viborg and Herning. The scheme was limited to the five courts, as it would only be possible to register in the Danish Land Registration Court's premises, and therefore the travel time for the employees in question had to be taken into account. There were 20 employees who signed up. The assessment of how many employees should be included in the neighborly help was an estimate, and it was estimated that 20 employees were sufficient. This later turned out not to be enough, but at the time it was deemed that 20 employees was "solid". The number of full-time equivalents at the Land Registration Court had increased to 125. The estimate of the number of employees was discussed "across the table". It didn't make sense to put numbers on individual parts, and the numbers were not put into a spreadsheet. The

estimate would be the same in any case. In June 2009, the National Courts Administration prepared a communication package, extract page 1069, in collaboration with the financial sector, agents and real estate agents. The industry organizations were responsible for communicating with their own backgrounds, i.e. local banks, mortgage banks etc. The financial sector and lawyers would inform their users themselves. The Danish Courts Administration only had to inform others than its own employees to a limited extent, and this included

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

This is also why the mortgage successor group was set up. A meeting was held "Go-home meetings" attended by Henrik Høpner and others, where Henrik Høpner asked about the things he wanted more information about. Afterwards, he would have liked the communication part to have been carried out in a different way than the financial sector and the lawyers themselves being responsible for informing their own backgrounds. The use of digital signatures is an example of how the communication was not coherent. The lawyers believed that digital signatures were not a problem because they were already used to a certain extent in relation to the Danish Tax Agency and the Danish Commerce and Companies Agency. However, the digital signature used there was not "broad" enough in relation to the signature to be used in the land registration system. In the land registration system, you make a commitment, and it should therefore be possible from the digital signature to see who actually signed. The signature had to be linked to a specific employee with a social security number, which was new. It also caused many problems that, for example, there could not be a hyphen between date and name in the digital signature, and lawyers and real estate agents were not aware of which signature to use.

Conversion of mortgages was discussed in the Registration Committee, and a legal basis for the financial sector to convert mortgages themselves was added to the law. In addition, a transitional period of 5 years was introduced to convert rights in owner mortgages. In the start-up phase, the Land Registration Court was not equipped to convert many mortgages. In his opinion, there was an agreement with the financial sector not to submit mortgages for conversion unless they were mortgages in specific real estate transactions. He also assumed that the financial sector would to a large extent convert mortgages themselves. It was the financial sector that had wanted this option.

At the meeting of the user group on June 25, 2009, extract page 1199, he gave a status on the land registration system, including testing and joint testing. CSC was to test the system first and then the Court Administration/The Land Registration Court. Finally, there would be a test for everyone, including the involvement of the financial sector and land inspectors. The portal solution was tested by CSC and by the Land Registration Court. However, it was also tested by the financial sector, as smaller institutions wanted to use the portal. The project room was open to everyone for testing. As soon as the supplier contract was signed with CSC, a usability expert was assigned to the project. This person was responsible for ensuring that user-friendly screens were developed and that disabled users were taken into account. As a result of the Auditor General's criticism of the system's user-friendliness

**2897**

In later changes to the system, there have been tests for users in the form of "Mr. and Mrs. Hansen". These tests have always failed because land registration is a complicated legal discipline. It is not possible to conduct tests in the way that Rigsrevisionen and the appraiser are calling for. There is a difference between professional users of the system and ordinary citizens, and the use of legal jargon is unavoidable. The "sandbox", which was established in August 2009, contained simple expedition types, where you could, for example, try to report a deed for registration. It was similar to the final system, which is similar to the system today. There was some feedback on the "sandbox", but not much, and it was not possible to make any fundamental changes to the system at that time.

A proxy form was added as an appendix to the executive order on access to the land registration system and the method of registration. The form was developed after a series of meetings in the user group, and all stakeholders have therefore been able to influence the process. Once the notice was published, the proxy form was

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

posted on tinglysning.dk. Anyone could use the form, but a number of professional users created their own, which had the same content but a different layout. This caused problems when scanning. When the Car and Person Book was later digitized, it was decided that only the executive order's power of attorney form could be used.

The closing period leading up to the launch of the land registration system was turbulent. 25 jurisdictions had to be finalized and all employees were trained in the new system.

In the months leading up to the launch of the land registration system, many errors were made in the paper registration, and from the start, many resources were therefore used in the digital land registration to correct these errors. These errors could be errors in the form of incorrect names of title holders and creditors, incorrect amounts, division of a parce- lejendom into condominiums, etc. Digitization also made it possible for users to look back at previous land registrations, and in this connection they could become aware of errors. In September 2009, not many documents were submitted for registration, so there were resources available to correct errors. Up to half of the employees were used to correct errors. Today, errors still need to be corrected, and three employees are working on this.

There were never any problems with the physical scanners, which were only meant to scan documents. However, there were problems with the software for OCR reading of scanned documents. OCR reading requires data to be clear and in specific locations in the document. The OCR program was tested on a scanner before the land registration system was put into operation, and everything was fine. A total of four scanners were used and the scanner used for the test was fine, but the other three scanners did not work, which caused challenges. He pressed CSC to solve the problem, but CSC did not act quickly enough. He therefore called in external help, which solved the problem.

The biggest problem with the scanning was the quality of the completed powers of attorney. The quality was poor, and for a period of time, the Court of Registration had to return up to half of all powers of attorney received. The Land Registration Court received up to 5,000 powers of attorney per day. It was surprising that the quality was so poor, and a lot of relatively elementary errors were made. For example, data was written outside the fields where the text should be inserted. There is a field for the signature, but there are no special rules about keeping it within the field. If several people need to sign a document, you can sign further down the form. The form on the extract on page 2788 was used when the power of attorney had to be returned after rejection. The presence of clips or staples in the power of attorney was not a reason for rejection, but a friendly recommendation was given to the applicant to return the power of attorney without clips.

In the old land registration system, you could call the land registry office and have an employee read out the land register. This option was abolished with the digital land registration system. Instead, a hotline was established, and based on some simple calculations, it was estimated how many employees the hotline would need. It is possible that the expected number of inquiries was underestimated, and the number of hotline staff was increased. There were many low-level questions, which led to the hiring of 6 temporary employees in late October 2009 to screen the hotline inquiries. There were many legal questions, and it was somewhat bluntly pointed out that the Land Registration Court was a court that could not provide legal advice. The waiting times in the hotline were long. The temps were employed until the end of 2010, when they were also employed by the Land Registration Court.

Rigsrevisionen's report contains on page 46, extract page 1937, a graph of the degree of automation. Deloitte had estimated the degree of automation. It was taken into account that

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

were tasks that could fall away. For example, the cancellation of judicial remarks was automated in such a way that the reviewer simply received an email stating that a judicial remark had been deleted if the conditions for this were met, without the need to re-review the document. This accounts for the 8% difference shown in the figure with the graph in Rigsrevisionen's report. The drop at the beginning of the graph was due to the many errors from the old registration system, while the development of the graph otherwise matched the expected. CSC suggested that more user forms were used, and this contributed to the

**2898**

to increase the level of automation. A lot of documents came in for the annulment of legal notices on property transactions that had been completed before the transition to the digital land registration system, and this took a lot of resources, although he can't say exactly how many resources. Every day, it was assessed where the resources should be deployed, and this was not recorded in detail. More mortgages came in for conversion than expected. In November 2009, over 100,000 mortgages were received. On November 15, 2009, he wrote an email to Jørn Knudsen, extract page 1465, as Jørn Knudsen represented the financial sector. Among other things, he urged the financial sector to make greater use of the legal authority given to the sector by law to convert mortgages themselves. Tho- mas Nørby Dahl from the Danish Bankers Association wrote on November 17, 2009, extract page 1467, that the Danish Bankers Association would investigate the possibility of recommending banks to convert mortgages to a greater extent by using the reporting system. The inquiry showed that the intentions of the financial sector were good enough. However, it took until mid-December 2009 before the financial sector recognized that the approach of sending so many mortgages for conversion without any connection to a specific property transaction was not "good enough". In practical terms, the Land Registration Court sorted the mortgages received. If there were specific real estate transactions, the mortgages had to be digitized, but all other mortgages were archived. When there was later a specific real estate transaction, the Land Registration Court should be able to find the relevant mortgage in the archive. The forwarding of the many mortgages was in violation of the agreement with the financial sector, but he had no legal or regulatory authority to return the mortgages. It is possible that there was no actual agreement with the financial sector, but there was an understanding between the Danish Courts Administration and the financial sector that the financial sector should not send mortgages for conversion without there being concrete transactions. A lot of resources went into the conversion and archiving task. The Land Registration Court received 15-18,000 letters every day, and just handling the mail required significant resources. Up to 30 employees worked on the conversion of mortgage deeds.

In mid-December 2009, the Danish Courts Administration prepared a 10-point action plan for stable operation of the digital land registration, extract page 1545. At that time, it could be established that the technical solution worked as intended. The system was working, but a pile of land registration cases had accumulated that was larger than anticipated due to the circumstances he has explained. It would not be possible to get rid of the pile before the end of the year, so an initiative was taken to specialize the employees, even though the original assumption was that they would be generalists. There was a meeting of the user group on December 14, 2009, extract page 1551, and he proposed that the financial sector itself should convert mortgages, as was possible under the law.

He participated in a meeting at the Ministry of Justice on December 17, 2009, extract page 1573, about the possibility of posting employees from the financial sector to the Land Registration Court in Hobro. It was the financial sector's offer, which, however, in his opinion was not a real offer.

U.2020.2851H

offer, as it would be like "letting the fox guard the geese". There were also many unresolved employment law issues in the offer. He told the meeting that the big problem was that the financial sector had submitted far too many mortgages for conversion without it being part of actual real estate transactions.

On January 13, 2010, the National Courts Administration prepared an action plan, extract page 1587, which was based on the action plan from mid-December 2009. It was necessary to set specific targets for processing times. The proposal to add 25 additional case officers to the Land Registration Court did not materialize, as he assessed that the resources to train new employees were better spent on other tasks. However, an operations manager was hired. An agreement was reached with the financial sector on the conversion of mortgage deeds, and the Land Registration Court therefore stopped doing that part.

At the end of March 2010, we succeeded in reducing the average registration time for all processed cases to 10 days. This was partly due to technical solutions, partly due to a great deal of effort on the part of employees, and partly because the notifications that entered the land registration system were better prepared.

It is not true, as Rigsrevisionen writes in its report on page 3, extract page 1894, that there were no prior calculations of resources and dimensioning of the tasks. There is no spreadsheet, but there were calculations and everything was taken into account, just not that it all happened at once. Expectations for employee efficiency were higher than they could meet. This was due to the fact that when introducing new processes, employees forget what they otherwise know. The proxies had been tested after the form was introduced in June 2009, and a more thorough test would not have revealed the challenges that arose. It was only when the proxy form was used in "real life" that the real problems became apparent. CSC had prepared a comprehensive guide for the system, but it was not appropriate. In the fall of 2009, shorter guides were therefore created on specific points. Today, so-called navigation slips are used. The hotline was actually prepared for the task, but the pressure was greater than anticipated. Overall, he agrees very much with the assessor's statements, but certain parts of the statements show that

**2899**

The assessor does not know enough about land registration, and some of the assessor's proposals for commissioning are not realistic. This applies, for example, to his proposals for commissioning for individual user groups and for individual document types. He also disagrees that the risk management was not in order. Additional risk management would have been prohibitive. There was extensive user involvement. Meetings were held with all user groups from the start and before the requirements specification was drafted, and both separate and joint meetings were held with the financial sector, lawyers and others. The usability test conducted by Rigsrevisionen on 3 May 2013, and which the assessor is asked about in question K6 (section 3.16), the extract on page 3602, is reasonably positive, but it says something about the legal language.

It was not a requirement that all documents were reported for registration at the same time, and therefore no rejection was made on this ground, but it was appropriate that the applicant did not wait for e.g. registration of the deed before submitting mortgage deeds for registration. If the deed for a property was taken for manual processing, documents submitted later were also taken for manual processing. It therefore shortened the waiting time if later documents, such as mortgages, were submitted when they were available, as they would then be included in an overall manual processing. Since a change in the

law in 2000, the registration fee is not due until final registration, so there was no risk of a paid registration fee being lost. The sale of part of a real estate property has, in particular

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

in Eastern Denmark, presented challenges. The seller must state how much is being sold, while the buyer must state how much is being bought. If the seller owns 1/2 of the property and is selling his entire share, he must declare this as 1/1.

C's trade was selected for manual processing. There were no problems with the notified deed, but it was automatically selected for manual processing as part of a random check that the system was working properly.

*Adam Wolf* has explained that he holds a Master of Science in Political Science and has been CEO of Danish Regions since 2012. Before that, he was Director of the Danish Courts Agency, where he was employed on November 1, 2005. This was one month before the publication of the draft law regarding the court reform. At that time, the land registration reform was already underway.

The Ministry of Justice's document no. 38 from 2006, page 101, formed the basis for the establishment of the digital land registration project. Both the financial and organizational conditions for the project were described quite exhaustively in the document, and it was in every way a complicated puzzle, because the court reform and the IT project had to work together. The Danish Courts Administration could not change the terms that had already been discussed in the Land Registration Committee. The centralization of land registration had already been decided, and the location of the Land Registration Court was decided shortly after he took over as director. The location in Hobro was not the board's first choice. It was a very politically driven process.

All stakeholders who had participated in the Land Registration Committee had nodded yes to a commissioning of the future digital system as a "big bang", and that solution was subsequently approved by the Finance Committee. At no point were questions raised about a "big bang". The solution was a given and was not problematized along the way. A possible commissioning of a few jurisdictions would not have been risk-free and would probably have caused difficulties for the major players on the other side of the table, especially the financial sector, which made significant investments in developing their own systems so that they could work with the digital land registration. It is also not certain that a pilot project would have provided a picture of the actual load on the system. This would require getting all the players to act realistically in the pilot process, which is difficult to imagine. For example, the problem of mass conversion immediately after commissioning would not have arisen in a pilot project. Moreover, there has never been a description of a pilot project, so such a process is entirely hypothetical.

The appraiser's estimated additional costs of a phased implementation of the digital land registration are set at approximately DKK 40 million, extract page 3575 ff. This amount should be compared with the total contract sum of approximately DKK 48 million, extract page 5012. Staged commissioning would thus have doubled the costs, and it would be difficult to ask the Finance Committee for the amount when significant rationalization gains had already been included as a precondition for the project. No one actually asked for a pilot project.

The location of the Land Registration Court in Hobro entailed an increased risk for the organizational part of the project. The Danish Courts Administration would have preferred Aarhus, Roskilde or Ringsted, for example, where it would be more realistic to recruit qualified registry staff. During this period, the Danish Courts Administration calculated a lot of mileage for the

existing staff at the land registry offices. The project's financial assumptions are clearly stated in document no. 38, item b, including table 1. The Danish Courts Administration had argued for a gradual phasing out of the excess number of land registry employees so that they could assist during a start-up period. This was an unusu-

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

situation of trying to retain 200 employees right up until the rollout of the digital

**2900**

registration, after which they would no longer be employed. His predecessor had proposed to the Ministry of Justice that the employees be retained for a 3-year transition period. The Ministry of Justice had reported back that it had submitted the agency's proposal to the Ministry of Finance, but the Ministry of Finance had rejected it without further negotiation. This suggests that the proposal had

"completely missed the mark".

His email of 16 November 2005 to Head of Department Thorkild Fogde in the Ministry of Justice, extract page 515, is an expression of how the Danish Courts Administration had to fight to retain just some employees in a transitional scheme and fight against the full rationalization gain being realized at "big bang".

The postponement of the planned implementation of the digital land registration on March 25, 2008, which was approved by the Finance Committee in document no. 11, extract page 643, meant that the Danish Courts Administration lost the expected buffer. The rationalization gains were to be realized as expected. Against this background, the Danish Courts Administration was very concerned about whether it would be possible to retain the necessary staff to keep the paper certification running until the "big bang". On the other hand, the postponement meant that the Land Registration Court's new building was completed before the "big bang" and that there was more time to train new local employees in land registration. For some issues, the risk was thus reduced by the postponement, and for other issues the risk was increased.

The Danish Courts Agency had a well-functioning project ganization both internally and in relation to the supplier. During the same period, the agency was the project organization for the entire judicial district reform and was thus already geared up for the project work with the digital registration. Things were connected, and this is not at all clear from the Auditor General's report. He and Sørup Hansen worked closely together, with Sørup taking care of the ongoing project work, while he took care of "big politics". There was a natural division of labor in the process. He sat in the steering group with the supplier, in the internal steering group and in the user group. The user group was important throughout the process, both before and after commissioning. The digital land registration is the most integrated public/private IT project ever undertaken in Denmark. There was close collaboration with the financial sector, who were the only ones to create a system-to-system solution. This also meant that there were ongoing requests for changes to the system from the financial sector, which were met. The mortgage follow-up group was a natural part of the collaboration.

In the beginning, the collaboration with CSC was terrible because it turned out that CSC had misled the agency. In reality, CSC had not produced anything for the first six months because a number of core employees had left the company. Throughout the course of the project, there were five different project managers that the agency had to work with. That was also a challenge.

The Danish Agency for the Judiciary had an open approach to the stakeholders, and everyone in the circle of stakeholders had prior knowledge of Sørup Hansen. From the start, the Board was prepared to listen to the stakeholders and their wishes. He had separate meetings with representatives of the lawyers and real estate agents. It was part of the open dialog. The dialog was constructive and he had a good relationship with Henrik Høpner, but they could both be tough if need be. It's important to

understand that all stakeholders had a constituency that they had to represent. Some of the letters from the Finance Council are an expression of this and part of a power and stakeholder game. He knew about these issues from his time in the Ministry of Finance, among others.

U.2020.2851H

In the user group, he had a dialog with Henrik Høpner about training and communication in connection with the implementation of the digital land registration. The lawyers were very clear that the Danish Courts Administration should not "interfere" with their backgrounds regarding these matters. The lawyers wanted to be responsible for training and communication themselves, and in 2006 they already had a large business in holding courses on digital land registration. The lawyers would also distribute the Danish Courts Administration's communication package themselves. He finds it difficult to see how the agency could have allowed itself to do things differently in relation to the lawyers. The adjudicator's criticism regarding communication with the stakeholders does not correspond well with his experience. Communication took place through the user group, who had to communicate with their backgrounds themselves. They strongly encouraged everyone to participate in CSC's test site, including the "sandbox", but they didn't really get feedback from anyone. Some of their instructions could perhaps have been better designed, but it's not something that had a significant impact on the process at all.

He finds it difficult to understand Rigsrevisionen's criticism of the division of roles and responsibilities in the project. In reality, the collaboration was excellent and the division of roles and responsibilities was very clear, also in relation to the supplier and stakeholders. Nor does he understand the criticism regarding milestone management. Time was set for the milestones, and the Auditor General overlooks the fact that the land registration project was only one part of the entire court reform.

Throughout the project, there was a realization that the financial sector was creating a comprehensive technical and expensive solution that was deeply integrated into the digital land registration. Therefore, it was also sensible and natural for the parties to work more closely together in the final phase. This is reflected in the agreement of October 30, 2008 between

**2901**

The Danish Courts Administration, Realkreditrådet, Finansrådet and CSC, extract page 853. It was an advantage that Devoteam advised both the financial sector and the National Courts Administration, because this way knowledge could be tied together in the overall project. Everyone recognized the mutual dependency. It was clear that during that period, CSC had offered more than they could handle. He spoke to colleagues in both the police and the tax authorities who felt that it was the same skilled CSC employees who were moved around between customers.

Risk logs were a daily tool for him. He mostly focused on what was flashing red or yellow in a log. "It's not true that risks were not continuously 'closed'. They did nothing more than change the risk picture. Some risks were downplayed and therefore lay dormant, while other risks were added and work was done to reduce them. The risk assessment in document no. 38 to the Finance Committee was based on an estimate. It was not possible to make an actual calculation. He is not known for taking risks, and neither is the Danish Courts Administration as an organization. The appraiser's designation

"Risk appetite" is therefore completely incomprehensible to him in this context. There may be things that could have been done differently in such a large project, but he finds it hard to see that there are things about working with their risk logs that should have been done differently.

In the spring of 2009, one of the major challenges was to maintain the staffing of the paper registry until the digital registry went live in September. It was clear that a lower level of automation was to be expected in the beginning. They had therefore planned a contingency plan that could step in and register manually. It was agreed that they could draw on employees from neighboring courts, and funds were set aside for an additional 10 FTEs. The contingency was planned on the basis of an estimate. He doesn't think it would be possible to make an actual calculation. Having Sørup Hansen, who had devised the system and who had worked for many years with land registration, was unique. Sørup Hansen and Devoteam

was the perfect team to estimate the need for resources during the ramp-up period.

Immediately prior to going live on September 8, 2009, everyone was relieved that the end of paper-based land registration was complete and that the data conversion had gone well. The known bugs in the land registration system were manageable, and there were no stakeholders or contract partners who thought that the system should not go live as planned. The big challenge was the performance of the system when it went live.

Upon commissioning, the system worked and the first reactions were very positive. He received many congratulations in the first weeks. By the end of September, there were concerns, but also a strong belief that the problems could be solved during the commissioning period until the end of the year. During October, things became more critical and users became very clear that things were not working. The conversion of mortgages also became a problem. He was in Hobro and saw all the boxes of mortgages for conversion. It wasn't until November that they realized that an actual action plan was needed to get rid of the piles. It was the piles that were the problem, because the operation itself was fine. The employees needed to process more cases and not spend so much time on other things. You had to prioritize case processing. In December, there was a system change that reduced the pile by 10,000 documents. That should not be ignored.

He was confident that Sørup Hansen and the financial sector could solve the problems with the many mortgages, but it turned out that there were problems in the financial sector's backyard. It was therefore very surprising that the financial sector did not use the authority to convert the mortgages themselves. The financial sector's letter of 15 December 2009 to the Permanent Secretaries of the Ministry of Economic and Business Affairs and the Ministry of Justice, extract page 1561, he saw as something that the sector needed in relation to its hinterland, and that was completely fair. In reality, the letter led to them nailing the finance secretary to his responsibility for the success of the project. In this connection, it was crucial that the Land Registration Court stopped converting mortgages. This freed up resources for day-to-day operations and for combating piles. The 25 extra FTEs were a political signal. In the fall, they had not lacked financial resources, but possibly competent employees, which, however, were not available. The development in operations from December 2009 onwards was the development they had expected from September 8 and onwards. One could say that they were delayed for 3 months due to the aforementioned circumstances. In his opinion, they were in stable operation from summer 2010. There was a flow, and the cases that were sent to the Land Registration Court were continuously processed. At that time, it was only the very special cases that were at a standstill.

## How to proceed

*The association* has claimed that the Danish Courts Administration is liable to pay compensation to any of the registered parties who have suffered losses due to delays in registration during the period stated in the claim, as such delays are due to actions taken by Tinglysningsretten, the Danish Courts Administration, the Ministry of Justice or other public authorities in connection with the introduction of digital registration.

The responsibility of the National Courts Administration is primarily based on the fault rule. Both Rigsrevisionens's investigation and the discretionary statements show that errors were made and

**2902**

Negligence that has caused delays that could and should have been foreseen and thus avoided.

The responsibility of the National Courts Administration is also based on general rules on risk liability. The National Courts Administration has solely and deliberately taken

decisions that have increased the risk of delays that could cause and have caused losses for the users of the land registration system. The risk in question could have been eliminated or reduced if the Danish Courts Administration had acted differently. When assessing the Danish Courts Administration's risk responsibility, it must be taken into account that the agency has given itself the exclusive right to register land registrations and has decided not to privatize this business area. The Danish Courts Administration achieves a financial profit from the operation of land registration that far exceeds the costs. If a private company had been responsible for land registration, a similar profit would be considered exorbitant and unreasonable. For a private operator, a similar monopolistic approach would lead to competition law interventions to protect consumers. The digital land registration has resulted in significant operational savings, and the Danish Courts Administration has decided to retain the savings achieved, as the agency has not passed on the savings to the users by reducing user fees. In making its decisions, the Danish Courts Administration was driven by a desire to "harvest" savings as quickly as possible. The Danish Courts Administration could not settle for future savings that could optimize profits, but chose to accelerate the project and implement it in a way that entailed the risk of extensive negative consequences for users of the Land Registry. The motive for this was partly to save on the actual costs of introducing digital land registration and partly to "reap" the benefits as quickly as possible. Under these circumstances, the Danish Courts Agency is liable for the risk that the Agency's actions have caused the users of the land registration - even if the High Court finds that there is no evidence of specific errors or omissions that can be attributed to the Agency as culpable.

Finally, the responsibility of the Danish Courts Administration is based on the general principle of enrichment. The Danish Courts Administration's actions in connection with the introduction of digital land registration took place in a way where considerations of saving costs and realizing savings as early as possible led to a hastening of the implementation, and where the Danish Courts Administration failed to take a number of necessary measures because these would lead to increased costs that the administration did not want to incur.

The Danish Courts Administration has thus made transactions that have enriched the state at the expense of financial losses for the registrants, who in the period after the implementation of the system became victims of the choices made by the agency. The Danish Courts Administration has been enriched at the expense of losses that were passed on to the enrollees and must therefore reasonably be ordered to pay compensation to the enrollees, as they have suffered financial losses that are inextricably linked to the enrichment that the Danish Courts Administration has achieved.

The Danish Courts Administration's calculations of the enrollees' losses are theoretical and do not correspond to the actual circumstances. However, it is true that, even if the calculation is correct, the financial losses incurred by the registrants are less than the considerable profit that the Danish Courts Administration has made by introducing the system without taking into account the financial losses that it has caused to the registrants through unilateral decisions. This supports that the Danish Courts Administration, based on a fundamental principle of enrichment, must compensate the enrollees. Compensation to the victims of the Danish Courts Administration's actions will only mean that the agency's profit will not be quite as large as desired and hoped, but the agency will still have a financial advantage. It does not change the

Danish Courts Administration's liability if the enrollees' losses are caused by errors committed by CSC, Devoteam or others who were hired by the Danish Courts Administration to assist with the implementation of the project. The Danish Courts Administration is liable in relation to the registrants for such errors.

The private homeowners have been completely without influence on how the Danish Courts Administration in relation to lawyers, banks and other

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

major users of the system have prepared themselves with a view to ensuring appropriate use of the system. It was incumbent on the Danish Courts Administration to safeguard against the alleged inappropriate use of the system by means of agreements with the major users involved or by a different design of the system. The Danish Courts Administration's own case presentation shows that it was due to decisions made by the Land Registration Court when allocating the available resources that the effects of the alleged inappropriate use of the system were not remedied in time.

The private homeowners were unfortunate victims of the fact that, prior to the introduction of digital land registration, the state had not taken sufficient precautions against inappropriate behavior on the part of, for example, financial institutions, and that after the introduction of the system, the state prioritized its tasks incorrectly to the detriment of private homeowners.

This does not change the responsibility of the Danish Courts Administration if the financial sector, lawyers or other professional users of the digital land registration system have used the system in an inappropriate way and thereby contributed to causing delays. It was the National Courts Administration that decided how the system should be designed. If it was designed in a way that created a risk of professional users using the system inappropriately and thereby causing delays, then it is the response of the Danish Courts Administration. It is

**2903**

The Danish Courts Administration, which has failed to ensure through agreements with or proper guidance to the professional users that their use of the functionality built into the system did not lead to delays. In addition, by failing to take timely action when the potentially inappropriate use became apparent, the Danish Courts Administration has thereby independently committed an actionable negligence. As it appears from the conclusions of both Rigsrevisionen and the assessor, the user-friendliness, the instructions and the possibilities for help via the hotline of the Land Registry Court were criticizable. Against this background, it must be rejected that the Danish Courts Administration can be acquitted in this case with reference to the fact that lawyers, real estate agents and other professional users used the system inappropriately. The same applies if you want to apologize that lawyers and other professionals by using the power of attorney system have unnecessarily burdened the Land Registration Court, or you want to apologize that the financial sector by converting mortgages has unnecessarily burdened the Land Registration Court.

The Danish Courts Administration chose to dispose of certain functions and options in the digital land registration system. The users of the system - including lawyers, real estate agents and the financial sector - must then be entitled to use the functions that were made available in the digital land registration system. If the system and the resources allocated to serve the users were not suitable for this use, then the responsibility lies with the Danish Courts Administration, which had made the decision to launch the system with a functionality and possibilities that the system apparently could not handle.

The fact that the decision-makers behind the system had not dimensioned the system appropriately, had underestimated the interest in using the functions offered and had misjudged the consequences of the system's users using the procedures that were made possible cannot be invoked as grounds for not being liable.

If it is assumed that professional users have intentionally or negligently caused delays and losses for the registrants through their use of the system, this does not change the fact that the Danish

Courts Administration has incurred a liability for damages by designing the system in a way that created this risk, and the Association is free to

in relation to several possible tortfeasors to choose to raise their claim for compensation with the Danish Courts Administration.

The statistics clearly show that the registrants would have been significantly better off in the old system compared to what they were exposed to in the new system. In the old system, registrants would not have been exposed to loss-causing delays. Even in the new system, after the errors and deficiencies that existed after the system was introduced have been rectified, there is no risk of such significant delays that were experienced by the unfortunate users who had to "put their backs" to the system in the early days. In these circumstances, it is irrelevant whether the legislation gives users a legal right to registration within certain time limits.

Any uncertainty as to whether some of the registered parties may be located in a jurisdiction that happened to have case processing times that exceeded the case processing time for cases for manual processing under the new system for a shorter or longer period of time must be to the detriment of the Danish Courts Administration. This would be in line with the general principle of constitutional law that if a basis for liability has been proven for a tortfeasor, it is the tortfeasor who has the burden of proof if the tortfeasor wants to claim that, despite the basis for liability, compensation should not be paid for one reason or another.

Moreover, the statistics show that in most jurisdictions in the years prior to the introduction of the digital land registration system, land registration was generally completed within 10 days. This supports the view stated above that it should not be taken into account whether there may have been a longer processing time in individual jurisdictions for shorter or longer periods.

The 10-day deadline in section 16(4) of the Land Registration Act is a reasonable measuring point in relation to the processing time that must trigger registration in the present case. It can be proved that the parties to the class action would in all probability have obtained registration within 10 days in the old land registration system.

Actually, the deduction of 10 days should not be made in the later calculation of the registered claim for compensation, but it should be determined on the basis of the registration times that have been achieved after the defects that the Danish Courts Administration had inflicted on the system in its early days have been remedied. It could have been possible to introduce digital registration in a way that would not have impaired the ability to achieve registration in far less than 10 days. The evidence for this consists partly in the Danish Courts Administration's own information about the registration times that now apply, and partly in the conclusions of the expert opinion, which show that such registration times could have been achieved by a more appropriate organization The Danish Courts Administration has acknowledged that there were problems in connection with the introduction of digital registration and that these problems led to extended case processing times, but has claimed that these problems were due to extraordinary circumstances that did not

**2904**

could have been foreseen. Extraordinary circumstances, which meant that the employees of the Land Registration Court were forced to take care of other things than the handling of the cases that required manual processing, without the Danish Courts Administration being to blame.

However, it appears from the documents submitted by the Danish Courts Agency, the Auditor General's statement and the expert opinions obtained that the problems were not due to extraordinary circumstances that could not be foreseen by the

Danish Courts Agency.

The information in the case, including the findings of Rigsrevisionen and the assessor, supports that the National Courts Board was aware that there was a risk that many citizens would be exposed to

delayed land registration expeditions with resulting losses. In this context, it is irrelevant whether it is due to pressure from the Ministry of Finance or others in order to "reap" savings.

The National Courts Administration claims that land registration is not an "economic activity", apparently meaning that the state in a compensation case for damage it causes to its citizens should be judged by different and more lenient standards than those that apply to others who cause loss or damage. This is not a view that has a legal basis or is reasonable.

The National Courts Administration has admitted that the introduction of the system was characterized by errors and inadequacies. At the same time, it can be seen from the case documents that the Danish Courts Administration chose not to better secure the project because it was more important to "reap" savings for the state. It could not be clearer that the actions of the Danish Courts Administration were very much the result of economic considerations that are fully comparable to a private company's motives to achieve the greatest possible profit. Had private companies made deliberate decisions that put users at risk of loss-causing delays in order to save money and thus achieve an improved financial result for themselves (in governmental language:

"realize savings"), there would have been no doubt about the liability of the companies in question.

There is no legal basis for the Danish Courts Administration to be judged by other and more lenient standards. On the contrary, the Danish Courts Administration should be judged by a strict yardstick, partly because the Danish Courts Administration has a monopoly position, which means that users of the system do not have the freedom to choose a supplier who is better able to deliver a flawless service without delays.

The Danish Courts Administration imposed a premature and uncertain introduction of the digital land registration system on citizens, knowing that it was associated with the risk of serious delays for users' registrations. Users have had no choice. There is only one land registration system. The Danish Courts Administration has thus forced a risk of loss and costs on the users, which became a reality. The risk could have been avoided by a different and more appropriate organization. This was opted out in order to achieve financial benefits. This means that all the conditions for imposing liability for damages on the Danish Courts Administration are met, which becomes particularly clear when you remember that the Danish Courts Administration thereby - at the expense of the users - secured financial benefits that far exceed the costs that better security would have cost and that far exceed the losses incurred by the citizens.

The Danish Courts Administration must compensate citizens' losses, also because the state has not provided the service that citizens have paid for through the land registration fee paid. The state's considerations about privatization show that this area is a revenue-generating area where the state provides services against payment that could just as well have been provided by private companies (e.g. car inspection). Private companies could not provide a degraded and loss-making service and then claim to be exempt from liability with arguments about doing something good for the public good, not conducting "economic activity" or similar.

It is not true, as claimed by the Danish Courts Administration, that there were extraordinary circumstances. In addition, the triggering circumstances should not be judged as isolated problems. In that case, anyone who undertakes to implement a major project that affects the welfare and economy of many people would always be able to claim to be free from liability if only the

losses caused by the project to innocent users can be explained away as isolated extraordinary circumstances.

Implementing a project like this requires decision-makers to take into account that there are many factors that

Copyright © 2023 Karnov Group Denmark A/S

must interact with each other and that if the risks posed by each factor are not adequately safeguarded, the interaction of these factors could lead to serious functional deficiencies in the overall project.

If it is true that it was a combination of individual causes that triggered the major delays, these individual causes could have been solved in isolation. Therefore, the Danish Courts Administration bears responsibility for not having foreseen how the various causes could collectively trigger delays, and responsibility for not having effectively resolved these individual causes as they arose.

To that extent, the Board has acknowledged its responsibility in admitting that the problems of delay were due to isolated causes which could have been resolved individually, recognizing that more effective measures - after it was finally known

**2905**

the problems they had caused - could have prevented the long period of registration delays. Such more effective measures were apparently not taken.

The findings of the National Audit Office and the conclusions of the adjudicator document that the case processing times that the Danish Courts Administration subjected citizens to could and should have been significantly reduced by a different and more appropriate organization. For this reason alone, the view that citizens must accept longer case processing times when the state chooses to make changes is irrelevant, even if such extended case processing times were announced. The National Courts Administration deliberately made decisions during planning to ignore known risks and thereby increase the risk of negative effects. When such negative effects could have been avoided by different and more appropriate planning

- to excess in order to "reap" savings for themselves - there is a liability for damages. In this context, it must be taken into account that the users had no choice because the state has assumed the exclusive right to provide land registration services.

The framework conditions and the financial framework were set by the government. The framework was known in advance and the task was to create a sound and safe project within this framework. If a sound system could not be implemented within the framework that had been set, the framework should have been changed. The only one who could make such a change was the state. The framework and the financial framework cannot be used as an excuse for why the system was designed and implemented as it was. It was the state that set the framework, and it is therefore the state that must be held responsible for the fact that a defensible system was not designed within the framework that was set or that the framework was not changed in such a way that the system could be implemented in a responsible manner.

The defendants' losses are claimed to be compounded with interest, even though no enforcement claim has been made, cf. section 3(5) of the Interest Act. It is expressly claimed that the Court must recognize that interest must be paid. The case consists of a number of individual claims which - if they had been brought individually - would trigger a large number of legal proceedings, during which enforcement and interest claims could be brought on the individual claims. When the Interest Act as a starting point requires that a demand is issued on the basis of a claim for damages, it is due to a consideration that the person who must pay can release himself from future interest by paying. This consideration is not present in the present case, where the Danish Courts Administration has refused to be liable for the defendants' losses and has thus made it clear in advance that it

will not pay - even if individual and specifically calculated claims for compensation were made.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

*The Danish Courts Administration* has generally argued that the introduction of the digital land registration system has achieved a significant streamlining and improvement of the land registration process for the benefit of citizens and businesses in Denmark. Digital land registration is faster, better and more efficient than the old land registration system. Before land registration was digitized in 2009, the average processing time was 6.7 days (the period January-August 2009), but with large variations in the processing time at the different courts. The implementation of digital land registration led to an increase in case processing times for a period of time. The case processing time was longest in the period immediately after the implementation of the digital land registration (September-December 2009), where the average case processing time was 8.1 days. The digital land registration project has been a success and has met the prerequisites and framework conditions prescribed by the legislature for the preparation, commissioning and operation of the digital land registration system.

The assessment of liability in relation to the Danish Courts Administration must be based on the general rule of fault under Danish law. Outside areas where a different liability standard has been established by law or case law, the liability standard for public authorities is the general fault rule. Neither legislation nor case law provides a basis for imposing strict liability for the losses to which the case relates. Liability for the National Courts Administration therefore presupposes that clear errors have been made in relation to the due diligence that society can reasonably expect from the responsible authorities in a situation such as the present one, which involves the reorganization within the framework established by the Danish Parliament of a function critical to society and important to a large part of the population.

The overall preparation and implementation of the digital registration project within the framework established by the Danish Parliament meets the requirements for due diligence that can reasonably be expected of such a large and complex development and change project in a situation like this.

The extended processing time was due to an unforeseeable confluence of extraordinary circumstances. Effective measures were quickly taken to address the extraordinary circumstances and to reduce the processing time. There is no basis to conclude that there should have been a significantly faster or more effective response to the extraordinary circumstances and to the increased case handling time.

As part of the digital land registration project, a number of decisions had to be made and a number of

**2906**

estimates. Some of these estimates and decisions have subsequently turned out not to be valid or to be wrong. This is inevitable in a development and change project as complex and long-lasting as the digital land registration project. None of the errors of judgment and wrong decisions in question were due to a lack of diligence, competence or respect for the task, and they cannot therefore incur liability. According to theory and case law, the expedition deadline of 10 days in section 16(4) of the Land Registration Act is an internal regulation, the violation of which does not in itself justify liability for damages to notifiers. The assessment must be made according to the general fault rule as it has been developed in relation to the performance of public authority tasks. Liability for damages presupposes that the authority has committed clear errors in relation to the care that society can reasonably demand in a situation such as this. The requirements for an authority's due diligence depend on a specific assessment. The assessment includes, among other things, the

importance of the authority's area for the citizens, how close the possibility of loss is, the typical size of the loss and whether only a few or everyone in the same situation is affected. The courts examine the authority's preparation and organization of the task as well as the prioritization of the authority's resources.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

However, the review is restrained, and there are no examples of inadequate organization of the task or incorrect resource prioritization in itself having triggered liability for long case processing time. The courts are particularly reluctant in their review and possible adjudication of errors where the situation is due to a lack of resources available to the authority, cf. the Supreme Court's judgment printed in UfR 1985, page 368 (Odder Hospital case). This is because it is not primarily a legal, but rather a political-economic question which resources should be made available to the authority, and that this is part of the general questions about the overall public resource consumption and the distribution of available resources between the different sectors and among institutions etc. within the sector in question. The Supreme Court has confirmed the line taken in the Odder Hospital case in the judgments printed in UfR 2000, page 1196 (marriage transplantation for involuntarily childless people), in UfR 2008, page 2813 (emergency aid during the weekend for surgery of retinal detachment) and in UfR 2010, page 1394 (the dyslexia case). This case law is an expression of the fact that decisions involving even fairly fundamental trade-offs in society should be made by politicians rather than judges.

The digital land registration project was launched on the basis of an analysis of the Danish courts conducted by the consulting firm Deloitte in 2005 and the Land Registration Committee's report no. 1471/2006 on digital land registration. The Land Registration Court was established by Act no. 538 of June 8, 2006, which came into force on January 1, 2007. The project was subject to budget negotiations as part of the negotiations on the financial framework for the court and land registration reform. The negotiations assumed an efficiency gain of approximately DKK 86 million annually (2006 prices), which was to be realized six months after commissioning, which was assumed to take place on 1 January 2008. The budgetary basis for the development of the digital land registration system was provided by Act no. 38 of November 21, 2006. Here, commissioning was scheduled for 1 April 2008, which meant that the efficiency gains should now be realized after 3 months. Later, commissioning was postponed, which meant that the efficiency gains were to be realized upon commissioning. This is also stated in document no. 151 of May 26, 2009.

When assessing the responsibility for the increased case processing time, considerable emphasis must be placed on the fact that the Danish Courts Administration did not have any freedom of choice in relation to how the implementation and commissioning of the digital land registration should take place. The digital land registration project was thus subject to a number of framework conditions that had to be met. For example, the land registration task was to be centralized for the entire country at one land registration court, which was to be located in Hobro, and the financial framework for the project, including that the expected savings were to be realized at the time of commissioning. Commissioning was to take place simultaneously for the entire country and without pilot operation.

The framework conditions were adopted by a majority in the Danish Parliament, and they are an expression of the legislature's prioritization of resources. The framework conditions constituted the space within which the Danish Courts Administration, the Danish Land Registration Court and the Ministry of Justice could act in the preparation and implementation of the digital land registration project. Among other things, the framework meant that a number of prioritizations of resources had to be made. It cannot be claimed that the project should have been prepared and implemented in a way that the framework did not allow, e.g. by exceeding the financial framework or by implementing pilot operation of the new land registration system. The courts' review of the way in which the project was prepared and implemented within the given framework, and

whether mistakes were made in this regard, should be cautious in this context.

The assessor has criticized the fact that the commissioning of the digital land registration was to take place as a "big bang". This is the appraiser's main point of criticism, and he believes that a number of the errors that were subsequently identified could have been avoided if a phased commissioning had been carried out instead. However, as a result of the framework conditions, it was not possible for the National Courts Administration to choose a phased deployment, and the

**2907**

The lack of phased commissioning is for that reason alone irrelevant to the assessment of liability. If the legislature could be held liable for the prioritization of resources, this would have incalculable consequences for the legislature's ability to make the necessary allocation and prioritization of resources. The legislature is solely responsible for compliance with the Basic Law.

The overall preparation and implementation of the digital registration project within the given framework meets the requirements for due diligence that can reasonably be expected of such a large and complex development and change project in a situation like the present. In this context, it must be considered that this is a reorganization and development of an entire case area, which will inevitably cause inconvenience to a wider and already unknown group of citizens for a period of time, as was announced in advance. In addition, there is only a loss of wealth and the damage is likely to be relatively limited in size.

Prior to the commissioning of the digital land registration, it was assessed that the Land Registration Court was dimensioned and prepared for the task, and that sufficient allowance had been made for a run-in period with lower productivity and a number of one-off tasks. The dimensioning and preparation for the task, including the training of employees, was based on the Deloitte analysis and on assessments made by the president of the Land Registration Court, who had the best insight into both the digital land registration system and the capacity and competencies of the Land Registration Court's employees. All relevant information was included in the assessments.

Originally, the digital land registration was scheduled to go live on March 26, 2008. However, the launch was postponed three times. From the second postponement, difficulties arose in retaining employees in the existing land registry departments, and by the third postponement it was necessary to enter into special bonus and retention agreements with the employees. Due to the staffing situation in the existing land registration departments at the individual district courts, a further postponement of the commissioning would have been critical.

It is common and widely accepted that major restructuring in the public sector leads to longer case processing times and reduced productivity for a period of time, to the detriment of users, without this giving users a claim for compensation. This has also been the consequence of many other key reforms in Denmark, including the implementation of the 2007 local government reform, the 2007 police and court reform and a new structure for the state administration in 2012. It was inevitable that the digitization of the more than 100-year-old land registry system would have negative consequences for users for a period of time, but this does not mean that these citizens are entitled to compensation.

The extended case processing time in the Land Registration Court is due to the coincidence of a number of extraordinary circumstances leading up to and after the commissioning, which made it necessary for the Land Registration Court to take care of other tasks than anticipated. The consequence of this was, firstly, that there were significantly fewer resources available for processing cases selected for manual processing, and

U.2020.2851H

Secondly, the employees did not achieve the required routine in using the new system. For a period of time, the employees could not keep up with the influx of cases, which led to extended case processing times for manually processed cases.

The extraordinary circumstances were in particular *that* the financial sector sent a very large number of paper mortgages for conversion, despite the fact that there was no current need for conversion and that there was an understanding between the sector and the court that such applications would only be submitted to a very limited extent, *that* problems arose with the power of attorney scheme, *that* up to the closing period there were significantly more notifications than expected, *that* after the commissioning an unexpectedly large number of errors made in the paper-based land registration system had to be corrected, *and that* the Land Registration Court had to cancel court remarks to an unexpectedly large extent during the start-up period. The coincidence of these extraordinary circumstances was not foreseeable, and the Land Registration Court could - with the exception of the conversion cases - have handled the extraordinary circumstances without this having a significant impact on the case processing time. Effective measures were quickly put in place to deal with the extraordinary circumstances.

The most significant unforeseen event was some banks' requests for mass conversions in the fall of 2009. This happened despite a clear understanding between the financial sector and the Land Registration Court that this type of request would only occur to a limited extent, and that it would only take place after prior agreement with the Land Registration Court. The financial secretary has subsequently confirmed this. It was thus unforeseen that during the fall, the financial sector sent a very large number of mortgage deeds - around 200,000 - to the Land Registration Court with a request for conversion. In addition, the Danish Courts Agency had a justified expectation that the financial sector would make use of the possibility to convert owner mortgages themselves pursuant to section 15(14) of the transitional rules, as the financial sector itself had contributed to the insertion of this provision in the Land Registration Act prior to the commissioning of the electronic land registration. At times, up to 30 employees were used for the task, and the conversion of the mortgages was the

**2908**

single factor that had the greatest impact on case processing time after the implementation of digital land registration. In December 2009, it became clear that the Land Registration Court would find it difficult to process so many conversion cases and at the same time reduce the backlog. At the turn of the year 2009/2010, an agreement was therefore reached with the financial sector that the sector would take over the task of converting mortgages. After this, the processing time was quickly reduced.

The unforeseen events with the power of attorney system occurred in September 2009 and required a great deal of effort until the processing time for processing powers of attorney was normalized by the end of November 2009. Firstly, the Land Registration Court received more powers of attorney than anticipated. The Land Registration Court received 4,000 powers of attorney per day, which was more than the daily number of notifications of documents for registration. This was surprising, as the representatives of the professional users had announced during the development process that they would work to get their customers to use digital signatures instead of the power of attorney system.

After commissioning, problems also arose with the software used by the power of attorney scanners. The Land Registration Court immediately requested help to solve the software problems, which resulted in two of the three scanners being out of operation, and the problems were solved by the end of September/beginning of October

U.2020.2851H

2009. It is disputed that the prior testing of the scanners had been deficient.

In addition, there were many so-called "beginner's mistakes" where users filled out the proxies in violation of the instructions. This also applied to the professional users, even though the requirements for the power of attorney were laid down by the Ministry of Justice in an executive order after discussions and meetings with the users. For a period of time, the Land Registration Court had to return up to half of the authorizations daily due to errors, which was very resource-intensive. It is disputed that this can be attributed to insufficient user involvement.

In order to reduce the pile of proxies, staffing levels were increased and a special team of employees was established to work exclusively on creating proxies. The team worked around the clock in three shifts to maximize scanner capacity and reduce the pile of powers of attorney. To the extent possible, the Land Registration Court used staff other than the professional land registration employees to handle the work with the powers of attorney. At the same time, the Danish Courts Administration reacted to the many errors in the powers of attorney. The Danish Courts Administration thus introduced a completely new power of attorney system (in January 2011), where data is entered directly into the land registration system. The fact that the Danish Courts Administration chose to introduce a completely new power of attorney system should also be seen in light of the development in general technological maturity from 2009 to 2011.

It was also an unforeseen extraordinary circumstance that in the run-up to the closing period prior to the launch of digital land registration, a significant number of notifications had to be processed before the system could go live. This meant that there was less time for training and education than anticipated, as the employees were busy processing the many notifications. In addition, after commissioning, a large number of errors were found in cases that had been registered in the paper-based land registration system, which had to be corrected the first time the faulty case was processed after commissioning. The extent of the errors was unexpected. Finally, during the start-up period, the Land Registration Court had to cancel court annotations to an unexpected extent. After commissioning, there were still many paper documents with annotations, and these could be sent to the Land Registration Court with a request for annulment. However, it was expected that only very few applicants would use this option, but most applicants chose to send the documents for the annulment of court annotations, and the number of documents involved was quite significant.

After commissioning, a number of measures were implemented to reduce case processing time. Among other things, measures were taken to improve employee productivity, including the establishment of specialized teams. In addition, contingencies were drawn on from the surrounding courts and additional work was carried out. It was also continuously considered to deploy more caseworkers, but this was not possible during the start-up period because the training of new caseworkers would have taken time away from the processing of cases that had been selected for manual processing. As it was assessed that it was professionally justifiable to add additional caseworkers, this was done. During the fall, winter and spring of 2009/2010, it was also considered whether there were tasks that did not necessarily need to be solved by the Land Registration Court's trained employees, and which could therefore be solved by others. There was also ongoing work to correct errors in and improve the IT system. Targeted efforts were made to improve the system's degree of

automation, as this had a major impact on the number of cases to be processed monthly, and thus on the case processing time. As a result of this work, the case backlog was reduced by approximately 10,000 cases in mid-December as a result of updates to the system.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

It must be included in the assessment of responsibility that the most critical element in the reorganization of land registration, namely the IT system, functioned satisfactorily from the turn of the year 2009/2010, and that the degree of automation at the turn of the year, as expected during the development of the system, was approximately 69%.

**2909**

Overall, there is no basis for concluding that the extraordinary circumstances that arose in connection with the commissioning and the increasing processing time should have been responded to significantly faster or more effectively. The problem with the case processing time was a resource problem, as the extraordinary and unpredictable circumstances mentioned above meant that there were significantly fewer resources available for manual non-automated case processing than anticipated. As previously stated, during the preparation and implementation of the digital land registration project, including after the system went live, a number of decisions and estimates had to be made. Some of these estimates have subsequently proved to be wrong, just as some of the decisions with the knowledge available today have proved to be wrong. This is inevitable in a development and change project as complex and long-lasting as the digital land registration project. None of the errors of judgment and wrong decisions in question were due to a lack of diligence, competence or respect for the task, and they cannot therefore incur liability. The estimate of the expected resource requirements was made by the persons (Sørup Hansen and Devoteam) who were most qualified to do so and who had the best insight into the land registration project and the best factual basis for it. If their best judgment based on the best available factual basis should be culpable, then there is in fact liability on an objective basis. Overall, the Danish Courts Administration has not committed clear or inexcusable errors in connection with the implementation and commissioning of the digital land registration, and the Danish Courts Administration has not acted culpably.

Rigsrevisionen's investigation of the digital land registration project was carried out with a different purpose than an assessment of liability. It is explicitly stated in the report that liability issues were not included in Rigsrevisionen's investigation, and that Rigsrevisionen has not addressed issues of liability. The criticism raised by Rigsrevisionen is therefore not an expression of any position on the part of Rigsrevisionen as to whether there may be liability for damages in this connection.

It is disputed that the 10-day deadline in section 16(4) of the Land Registration Act can be used as a yardstick for the processing time. This is an internal regulation, and exceeding the deadline in the paper-based land registration system could not in itself justify liability for damages against notifiers. There is no evidence that this would be different after the introduction of digital registration, and therefore the deadline cannot be used as a reasonable measuring point for what triggers compensation in this case. If the liability is to be assessed by comparison with how a notification in the paper-based system would have been processed, the Association must demonstrate what such a notification would have led to, which will be different depending on where the notification was submitted and when. It is also disputed that the State is liable for any errors committed by CSC, Devoteam or other independently acting third parties.

The introduction of the digital land registration is not a project comparable to major construction works and the like, where strict liability is imposed based on risk considerations. The case differs in crucial respects from the cases concerning construction works and utilities where strict liability has been established in case law, and there is no basis for an expansive interpretation of this case law. The imposition of strict liability (strict

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

responsibility) for the implementation of public IT projects and other major public change projects must require legal authority.

The objective risk liability based on case law is limited to injuries caused by construction work and breaks in supply lines. With the exception of the judgment printed in UfR 1983, page 895, where personal injury occurred as a result of a rupture of a main gas pipeline, all Supreme Court judgments involved damage to neighboring properties. It was serious damage caused to individual injured parties' properties as a result of their close proximity, and the damage could be directly attributed to the construction work or the pipeline rupture. This was an economic activity, and the Supreme Court emphasized that the developer or the owner of the supply network had the opportunity to take into account the risk of such not unforeseeable damage occurring in its technical and financial planning of the work or operation. The Supreme Court's case law shows that strict liability must either require a statutory basis or at least have very strong grounds for it.

In this case, there are not the strong reasons that must be present to deviate from the general liability rule of Danish law and impose strict liability without legal authority. The case does not concern economic activity. Furthermore, the digital land registration project cannot be compared to construction work or utilities, and the case does not concern the choice between an economically advantageous solution that entailed a significant, concrete and foreseeable economic risk for a small, identifiable group of people directly and involuntarily affected and a more expensive solution that would reduce the economic value of the project. In other words, there was no question of imposing a significant economic risk on "neighbors" for their own benefit, which they had no possibility to protect themselves against. In this connection, it is of significant importance that the digital land registration project was to a very large extent determined by the previously mentioned framework provisions decided by the Danish Parliament. The case concerns losses for

**2910**

a previously unknown and random group of people, and any citizen could have been included in the group. This is purely property damage, and the size of the losses that may have been suffered as a result of the extended case processing time must be assumed to be relatively smaller than the losses caused by the damage to neighboring property in the cases of construction work and water main breaks. Furthermore, the cause of the losses incurred by the claimants is not as unambiguous as in the Supreme Court's judgments concerning construction work and water main breaks.

It should always be taken into account that extended processing times can occur during the start-up period of a completely new system and after major organizational changes. In other words, longer processing times are always a foreseeable consequence of the commissioning of such systems. The court reform is also an example of this. The possibility of extended case processing times for a certain period of time after the implementation of digital land registration was also recognized and communicated to users. The consequences of strict liability for losses consisting of pure property damage to a previously unknown and random group of citizens and companies in connection with major societal changes such as the digitization of land registration will be far-reaching and unmanageable for future projects implemented for the benefit of society. It must therefore be rejected on the basis of risk considerations to make the Danish Courts Administration liable for damages for the losses that may have been suffered by extended case processing time in the Land Registration Court in the initial period after commissioning.

It is the opinion of the Danish Courts Administration that it is a prerequisite for assessing the Danish Courts Administration's potential liability for damages that there is knowledge of the losses suffered by the parties to the class action. Since the Association has refused to present thorough and documented information during the preparation of the case, the

In view of the fact that the Danish Courts Agency has been forced to prepare sample examples that, in the opinion of the Danish Courts Agency, show the extent of the loss that the citizen may have suffered in connection with the commissioning of the digital land registration. The examples presented are based on a total purchase price/loan amount of DKK 1,000,000 and show *that* the seller of a property will typically have an additional cost of DKK 97 per day in case of delayed registration, *that* the buyer of a property will typically have an additional cost of DKK 86 per day in case of delayed registration *The* homeowner who takes out an additional loan will typically have an additional cost of DKK 115 per day if registration is delayed, *and the* homeowner *who* re-prioritizes a loan will typically have an additional cost of DKK 138 per day if registration is delayed. The typical examples show the financial burden that the Association's members could be exposed to during the litigation period.

It is also a given that it is not the entire case processing time that could give rise to liability. For example, it can be assumed that the first 10 days of the case processing time cannot be claimed compensation from the Danish Courts Administration. In addition, exchange rate or interest gains must be included in the loss calculation. In this connection, it may be important whether the claimant has acted as a buyer or seller of a property, already because price and interest rate developments will usually affect the costs of repossession and repayment of mortgage loans differently. Furthermore, not every delay in repayment of a mortgage loan necessarily triggers a loss. On the contrary, in some situations, a delay will result in an economic gain for the borrower. This may occur if the price of the bond rises or a variable interest rate falls in the time leading up to repossession and no hedging has been done. In these cases, the borrower (e.g. a property buyer) will, in the event of an increase in the price, receive a higher proceeds or, in the event of a decrease in the variable interest rate, have a lower future payment on their loan than an earlier registration would have resulted in. For bond loans, a price increase will affect the proceeds, both when the bond loan has a fixed interest rate and when the loan has a variable interest rate. In general, an increase in the price will mean that the interest rate will fall. As regards the period covered by the lawsuit (September 8, 2009 to December 31, 2010), a price and interest gain will, as a starting point, have been achieved for bond loans without hedging, as the bond interest rate has generally been declining during the period.

In support of the Association's claims, *the co-interveners* have argued that the Danish National Audit Office's report to the State Auditors on the digital land registration project, the Attorney General's investigation of the delays in connection with the digital land registration project and the discretionary statements all basically support that the Danish Courts Administration has acted irresponsibly in connection with the planning and implementation of the digital land registration.

The Danish Courts Administration has thus committed culpable errors and shown culpable negligence in connection with the establishment and launch of the digital land registration. In particular, the Danish Courts Administration's organizational preparation prior to the implementation of the digital land registration was deficient. The Danish Courts Administration underestimated the scope and complexity of the tasks to be solved and therefore had a completely unrealistic expectation of employee productivity. Similarly, the Danish Agency for the Judiciary had not adequately prepared the handling of powers of attorney, which was a crucial prerequisite for the system to function satisfactorily, and the agency had not set aside

**2911**

sufficient resources for this. In addition, the instructions on how to use the system were inadequate and difficult to understand, and the hotline set up was under-resourced and at times

U.2020.2851H

staffed by temporary workers without sufficient knowledge of the land registration system. This should be seen in the context of the fact that the Danish Courts Agency chose not to perform the planned - and by CSC assumed - user-friendliness test, and the agency had therefore not tested the system sufficiently in relation to user-friendliness prior to the implementation.

The Danish Courts Administration had not sufficiently planned or allocated resources to handle the required conversion of paper-based mortgages to digital mortgages and had also significantly underestimated the need for resources. There was no agreement with the financial sector that the banks would handle the conversion themselves to a certain extent. Such an agreement was not entered into with binding effect until February 11, 2010. Against this background, it is argued that the Danish Courts Administration cannot disclaim responsibility towards the users by referring to an agreement with the financial sector when this agreement did not exist de facto until long after commissioning. It is also argued that any agreements with the financial sector or other professional actors are irrelevant in relation to the Danish Courts Administration's responsibility towards the users of the system. The Danish Courts Administration is thus more likely to bear the responsibility and risk of loss as a result of delays and defects in the system than the users, regardless of the role the financial sector or other third parties may have played.

Fundamentally, the above problems were largely rooted in the fact that the Danish Courts Administration chose to reap the efficiency gains from the digitization of land registration too quickly. Instead of waiting until the system had been in operation for 3 months as originally planned according to document no. 38 of November 21, 2006, the Danish Courts Administration chose to reap the benefits and thus save 200 FTEs even before the system was implemented. As a result, there were too few case officers to process the many complaints, especially those cases that had to be processed manually due to their complexity or errors and omissions in the system, and too few employees to answer users' questions and inquiries. This should again be seen in the context of the fact that the system did not contain all the functionalities that were planned when it went live, which meant that more cases had to be selected for manual processing, which in turn led to greater resource requirements and delays.

The problems became particularly critical when the National Courts Administration had chosen to launch the digital land registration as a so-called "big bang" project rather than implementing it gradually over a longer period. This placed great demands on the system to work from the start, which was not the case.

The Danish Courts Administration has therefore incurred liability for damages in this case. It is further argued that the Danish Courts Administration's violation of the 10-day deadline in section 16(4) of the Danish Land Registration Act in itself gives rise to liability. The deadline is mandatory and follows directly from the Land Registration Act, and there is no basis for claiming that the deadline should only have the character of an internal regulation. In that case, the deadline would have been stated in a circular or internal guidance and not in a law that citizens can rely on. If the court finds that exceeding the 10-day deadline is not in itself liable, the statutory deadline must at least lead to the Danish Courts Administration being subject to a presumption of liability, so that the administration must prove that the exceeding of the deadline is not due to circumstances that give rise to liability. This burden of proof has not been lifted and cannot be lifted.

The 10-day deadline constitutes a reasonable fixed point in

relation to the assessment of the Danish Courts Agency's responsibility, as the agency's extended case handling as a result of the establishment and launch of the digital

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

registration resulted in a clear deterioration of the previously applicable possibility of obtaining registration within 10 days.

Furthermore, the Danish Courts Administration bears a risk responsibility for the establishment and launch of the digital land registration system, as the Danish Courts Administration planned and implemented the digitization of the land registration system in a way that significantly increased the risk of incurring losses for the users of the land registration system. In this connection, it is disputed that the financial and temporal framework for the digitization of the land registration system did not allow the Danish Courts Administration to act differently, including in relation to commissioning the digital land registration system at a "big bang".

As stated in Rigsrevisionen's report, when the budget for the digital land registration system was established by Act no. 38 of 21 November 2006, it was assumed that the operational savings would only be realized after the system had been in operation for approximately 3 months. The original framework conditions thus allowed for a gradual roll-out of the system adapted to the actual capacity. The commissioning of the digital land registration system in a "big bang" was only necessitated by delays in the implementation of the digital land register, for which the Danish Courts Administration is responsible.

The extraordinary circumstances pointed out by the Danish Courts Administration were neither unforeseeable nor extraordinary, but rather foreseen and pointed out even before the commissioning. Thus, the delays were due to the fact that, despite the known risks, the Danish Courts Administration underestimated the extent of the problems and did not plan sufficient resources to deal with them.

**2912**

On the issue of mortgage conversion, it was not until February 2011, six months after the system went live, that the National Courts Administration ensured that a clear agreement was reached with the financial sector to assist with the conversion.

By allocating the necessary resources to address the problems that would most likely arise, including by not realizing the efficiency gains already before commissioning, the Danish Courts Administration could have mitigated the negative consequences of its erroneous assessment. Regardless of how complex and extensive the digital land registration project was, the negative consequences of the errors and deficiencies identified could have been considerably reduced if the Danish Courts Administration had planned a realistic and sufficient preparedness to deal with the problems. It is emphasized that the agency had the opportunity to phase in the digital land registration gradually rather than as a "big bang" project, cf. the Land Registration Committee's report, and that the Danish Courts Administration could have waited to reap the efficiency gains until a time when the system actually created these gains.

These opportunities existed precisely to minimize the problems associated with the implementation of digital land registration and not least the consequences of this. Thus, it was not inevitable that the massive delays and other problems occurred. Rather, they were a consequence of the choices the Danish Courts Administration had made with regard to the implementation process. In this context, it makes no difference that the Danish Bankers Association and the Danish Mortgage Credit Council were not in favor of pilot operation, as it was the Danish Courts Administration that was responsible for the commissioning, which made the final decision on commissioning at a "big bang", and which therefore also bears the responsibility in relation to the users.

The land registration system is a fundamental and monopolistic system in Danish administration of justice, and users therefore had no alternative to the digital land registration after its implementation. The Danish Courts Administration was aware of the significant consequences that any errors and deficiencies in the system and the commissioning would

U.2020.2851H

for the users, and the Danish Courts Administration was the only actor that could counteract these risks. Under these circumstances, the Danish Courts Administration must be more likely to bear the responsibility and risk for the inconvenience caused than the users, and must therefore also be liable to compensate their losses.

## The High Court's reasoning and result

*The responsibility standard*

Section 16(4) of the Land Registration Act states, among other things, that the examination and final or provisional registration of a document that has been reported for registration must take place as soon as possible and no later than 10 days after the document has been reported to the land register.

Prior to the establishment of the Land Registration Court in Hobro in 2007, land registration took place in land registration departments at the then 82 district courts in Denmark. The turnaround time for the introduction of documents reported for registration has varied over the years and from district court to district court. There have been periods where the average processing time in some jurisdictions has exceeded 10 days. However, the association has not demonstrated that compensation has been paid solely as a result of exceeding the 10-day deadline in the Land Registration Act.

§ 16(4).

The High Court finds that the deadline of 10 days in section 16(4) of the Land Registration Act does not give a notifier a legal claim to registration within the deadline, so that exceeding the deadline in itself gives rise to liability, but that it is a regulatory requirement. Therefore, the fact that the case processing time has been longer than 10 days after the introduction of digital land registration does not in itself constitute a liability-inducing circumstance. Furthermore, there is no basis for reversing the burden of proof so that the Danish Courts Administration is required to prove that a case processing time that has exceeded 10 days is not due to irresponsible circumstances on the part of the administration.

The introduction of digital land registration was introduced by law and involved a transition from a paper-based and decentralized land registration, which was handled by the land registration departments at the then district courts, to a digital and centralized land registration, which was handled by the Danish Land Registration Court. The introduction of a centralized digital land registration process was a change that affected all natural and legal persons in Denmark and did not impose a particular risk of loss or disadvantage to certain groups or individuals.

Against this background, there is no basis for applying stricter liability rules such as strict liability or risk liability when assessing whether the Danish Courts Administration has incurred liability in connection with the introduction of digital registration.

The legislature has decided that land registration in Denmark is a task that is handled by a public authority. Over the years, the land registration area has constantly been a profit-making business, so that the income in the form of land registration fees exceeds the cost of running the land registry. The legislative power has not changed this over the years. One of the assumptions in connection with the decision to introduce digital land registration was that staff costs could be greatly reduced. This has proven to be true. The introduction of digital land registration has thus led to an increase in profits for the public sector when handling the land registration task. At the same time, the costs for professional users of the land registration system have fallen. The legislature was aware of the expected savings

for the public sector

**2913**

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

the introduction of digital land registration, and this did not lead to the legislature reducing the registration fee in connection with the introduction of digital land registration.

Against this background, there is no basis for applying enrichment views when assessing whether the Danish Courts Administration has incurred liability in connection with the introduction of digital registration. It is thus the general fault rule that applies to the decision of this case, and it is thus a prerequisite for the Association to be fully or partially successful in its claims that the Association proves that the Danish Courts Administration has committed errors that give rise to liability in connection with the introduction of the digital land registration.

*Has the National Courts Administration acted irresponsibly?*

The overall framework for the introduction of digital land registration was set by the legislature and included, among other things, *that the* land registration task should be centralized at one office, the Land Registration Court, *that* this should be located in Hobro, *that* the commissioning should take place simultaneously for the whole country ("big bang"), and *that* the expected savings should be implemented at the time of commissioning.

However, this does not imply that the Danish Courts Administration is free from liability for unacceptably extended case processing times after the introduction of digital registration if it should have been clear to the Danish Courts Administration that such unacceptably extended case processing times were likely to occur under the established framework, but failed to inform the legislature thereof.

The Danish Courts Administration may also be liable for damages if unacceptably extended case processing times were due to errors and omissions in the planning and organization of the introduction of digital registration, in the decision to implement digital registration and not postpone the implementation again or in the handling of problems that arose after digital registration had been implemented.

The Danish Courts Administration's choice of CSC as supplier was made after a tendering round and cannot be considered a liability for the Danish Courts Administration. Admittedly, there were some delays in the initial phases, which, according to the information provided, must at least partly be attributable to CSC, but as the implementation of the digital land registration was postponed from March 26, 2008 to September 8, 2009 as a result of the delays, the delays had no impact on the extended case processing times after the introduction of the digital land registration.

In connection with the preparation and planning of the introduction of digital land registration, the Danish Courts Agency established an internal steering group, an external monitoring group (user group) with representatives of all important users of land registration and a project secretariat. The Danish Courts Agency also hired Devoteam as an external consultant. Devoteam provided advice on the design and specification of requirements for the digital land registration system and on supplier management. Risk assessments were prepared throughout the process leading up to the commissioning of the digital land registration system, with risk assessments divided into four main areas (organization, technical solution, supplier and stakeholders) and an overall risk assessment for all four areas. At the same time, through the external monitoring group/user group, contact was maintained with the future users of the digital land registration, who were given the opportunity to present their wishes for the system and their assessments of the proposed solutions.

It is the High Court's assessment that the risk assessments rested on a sufficient basis, that known risks were followed up on to a sufficient extent and that there had been the necessary opportunity for the future users of the digital land registration to gain knowledge about and influence the project.

Copyright © 2023 Karnov Group Denmark A/S

In terms of user involvement, the situation was also that the group of users of the digital land registration system was organized in very different ways, and that they had different wishes for the design of the system and different opportunities for or interest in being involved in detail in the process prior to the introduction of the digital land registration system. The financial sector (mortgage credit institutions and banks), which constituted the largest group of users of the land registration system, was thus characterized by mainly consisting of large entities with specialized workflows. As a result, the financial sector had a great interest in developing a land registration system that could lead to savings in a large organization (system-to-system solution), and the financial sector therefore had a significant interest in actively participating in the preparations for the introduction of digital land registration. Other user groups such as lawyers, real estate agents and surveyors were more organized in smaller units and did not have the same interest in a system-to-system solution. For lawyers and real estate agents in particular, it was considered important that it would be possible to use a power of attorney scheme alongside digital signatures.

The Association has not demonstrated that any of the users, in connection with the user group meetings or otherwise, have pointed out issues, including those that later gave rise to problems that should have been addressed but were not.

Thus, there is no evidence of irresponsibility on the part of the Danish Courts Administration in the process leading up to the decision to implement digital land registration on September 8, 2009.

The introduction of digital land registration simultaneously for the whole country ("big bang") was, as mentioned above, determined by

**2914**

Legislative power. The court reform came into force on 1 January 2007, and as a result, 82 district courts were centralized into 24 district courts and 1 nationwide Land Registration Court. The employees in the land registration departments at the individual district courts were thus aware that the land registration task would shortly be transferred to the Land Registration Court in Hobro. This meant that experienced and skilled employees who were not close to retirement age or for other reasons wished to leave the judiciary had a strong incentive to move away from the still existing land registration departments to other parts of the district court, which remained where they were, unless they were interested in being employed in the Land Registration Court in Hobro. This had already in 2007 and 2008 led to problems with staffing in some land registration departments, and as a result, it had proved necessary to make some adjustments, which meant that land registration was not carried out throughout the country in the judicial district where the property in question was located. From 2007, paper registration for 25 of the old legal districts took place in a shanty town in Hobro.

Thus, in the opinion of the High Court, it was clear well before September 2009 that it would not be possible to change the commissioning of the digital land registration from a "big bang" model to a model with pilot operation and gradual roll-out. Against this background, the Danish National Courts Administration has not committed any errors of responsibility by not, in the time leading up to the introduction of the digital land registration, attempting to change the established framework condition of simultaneous commissioning of the digital land registration for the entire country to a scheme with pilot operation and/or phased introduction of the digital land registration. It must

be assumed that the errors found during the acceptance test before the commissioning of the digital land registration were not of a nature or extent that should have resulted in the digital land registration not being put into operation on September 8, 2009. It should also be noted that the problems that led to extended case processing times after going live were largely not related to the land registration system itself, but were due to other factors.

U.2020.2851H

Thus, the Danish Courts Administration has not been found to be responsible in connection with the decision to implement digital land registration on September 8, 2009.

In report no. 1471/2006 on digital land registration, the Land Registration Committee had recommended that it should be possible to use a power of attorney scheme alongside access to digital land registration via digital signature. Such a power of attorney scheme was implemented by Executive Order no. 763 of July 20, 2009, which contained a form on which such a power of attorney should be given.

To handle the powers of attorney in the digital land registration system, the Land Registration Court acquired a number of scanners. When the digital land registration was implemented, and the Land Registration Court received a large number of powers of attorney, it turned out that there were problems with the software that CSC had delivered for OCR reading of the scanned documents. It is the High Court's assessment that this circumstance does not in itself give rise to liability for the Danish Courts Administration. In this connection, the High Court also attached importance to the fact that the problems with the defective software were remedied within a relatively short time.

Regarding the preparedness of the Land Registration Court in the initial phase, Deloitte had estimated in the report from 2005, which formed the basis for the further process of digital registration, that approximately 69% of the registration tasks could be automated, and that this in combination with a centralization of registration at one center could lead to a reduction in the number of FTEs from approximately 357 to approximately 91. When the digital land registration system came into force on September 8, 2009, the Land Registration Court was staffed with 125 FTEs. According to Sørup Hansen's explanation, it must be assumed that, in addition, agreements had been made with the neighboring authorities to the Land Registration Court in Hobro about

"neighborly help" to the extent of 20 employees.

It is the High Court's assessment that the Danish Land Registration Court's and the Danish Courts Agency's assessment of the extent of the necessary staff resources in the transition to digital land registration was made with the necessary care and with the involvement of the knowledge possessed by the Danish Land Registration Court and the Danish Courts Agency.

After the introduction of digital land registration on September 8, 2009, a number of problems quickly arose, which meant that many transactions were not processed quickly enough.

It must be assumed that the digital land registration system itself generally functioned as intended. There were a number of technical problems in the initial phase, but these were not greater than expected and acceptable for such a comprehensive change of a technically and legally complex system, and the technical problems were solved quickly enough. At the end of 2009, the system had achieved the 69% degree of automation originally estimated by Deloitte.

It must be considered proven that the problems that led to prolonged processing times for a period of time were mainly due to the following factors:

- There were problems with the proxy system.
- The financial sector sent a very large number of mortgages to the Land Registry for conversion.
- There had been a significant number of complaints in the period leading up to the closure of the land registry for 14 days before going live.

- After going live, an unexpectedly large number of errors made in the paper-based land registration system had to be fixed.
- The hotline was overloaded.

From these factors, it must be assumed that the very large number of mortgages submitted for conversion by banks and credit associations was by far the most important factor for the extended conversion times.

**2915**

processing times. It must therefore be assumed that in the initial phase of digital land registration, the Land Registration Court received up to

200,000 mortgages for conversion, and that the work with registration, conversion and return of the mortgages required a large number of employees, up to 30 FTEs out of 125. The question is whether the Danish Courts Administration can be blamed for the fact that far more mortgages were submitted for conversion to digital mortgages in the months immediately following the implementation of digital registration than expected.

Sørup Hansen has explained that the Land Registration Court was initially not standardized to convert many mortgages, and that it was his understanding that there was an agreement with the financial sector not to submit mortgages for conversion unless they were mortgages in a specific property transaction. The perception that there was such an agreement is supported by the content of the financial sector's letter of August 19, 2010 to the Chairman of the Board of the Danish Courts of Justice, which states, among other things it is stated *that* even before the digital land registration was put into operation, there had been a dialogue between the financial organizations and the Danish Courts Administration stating that the financial companies should not submit mortgage deeds for pure digitization, *that* this practice was communicated to the financial companies, and *that* the feedback was unanimous that the recommendation was fully complied with.

Against this background, it is assumed that well in advance of the commissioning of the digital land registration system, the Danish Courts Administration and the financial sector had reached a common understanding that mortgages should not be sent in for pure digitization. Therefore, the Danish Courts Administration cannot be blamed for not having foreseen that mortgages would be submitted for conversion to the very large extent that they actually were.

As regards the other factors listed above, the High Court finds that they can only be assumed to have contributed to an extension of the case processing times to a minor extent, and that these are factors that could have been handled with the number of staff available in the initial phase if the problem with the very large number of mortgage deeds for conversion had not occurred. Thus, the Danish Courts Administration has not been found to be responsible in connection with the handling of the problems that arose after the commissioning of the digital land registration.

The High Court then upholds the Danish Courts of Justice's motion for acquittal.

*Legal costs*

After the outcome of the case compared to the parties' claims, the Danish Treasury must, because the Association has legal aid, pay a total of DKK 3,259,125 in legal costs to the Danish Courts Agency.

The amount includes DKK 259,125 including VAT for inspection and estimate and

DKK 3,000,000 including VAT for legal fees. The amount for legal assistance has been estimated based on an overall assessment of the scope and nature of the case and the extent of the work involved in conducting the case.

The co-interveners, who also have legal aid, have essentially only repeated or elaborated on the Association's pleas and have not otherwise, through their participation in the case, incurred special costs in the class action. Accordingly, and after an overall assessment, the High Court finds that there are no special reasons that can lead to the Treasury having to pay costs to the Danish Courts Administration in relation to the co-interveners, cf. the

Administration of Justice Act.
§ Section 252(4), 2nd sentence.

## For it is recognized as right

The case is dismissed.

The Danish Treasury must pay the costs of the case to the Danish Courts Agency in the amount of DKK 3,259,125.

U.2020.2851H

The ordered legal costs must be paid within 14 days and are subject to interest in accordance with section 8a of the Interest Act.

## Supreme Court ruling

Co-Intervenors in support of Class Action.nu:

Poul Due, Ejendomsselskabet Otto ApS (formerly Kanalhuset ApS), Soeborg Ejendomme ApS, Frank Lyngholm Andersen, Gartneriet Blomstergården, Jens Jørgen Bonde and David Holm (all represented by attorney Jens Rostock-Jensen (appointed) and attorney Jes Anker Mikkelsen)

In a previous instance, judgment was handed down by the 4th division of the Eastern High Court on

May 27, 2019 (B-3159-11).

Seven judges participated in the adjudication: Thomas Rørdam, Jon Stokholm, Vibeke Rønne, Henrik Waaben, Michael Rekling, Oliver Talevski and Kristian Korfits Nielsen.

## Claims

The parties have repeated their claims.

## Explanations

For the benefit of the Supreme Court, testimony has been given by Klaus Kvorning Hansen and by Merete Steen and Jette Sjælland.

*Estimator Klaus Kvorning Hansen* has explained, among other things, that he answered the question based on what is

**2916**

good practice and customary in the IT industry. He is employed at the University of Copenhagen. He has no personal experience in developing and implementing government IT projects.

There are elements in every project process that are specific to the project in question, so you can't just refer to what you usually do. In the assessment statements, he has expanded his assessment with more specific considerations based on his personal experience, as he could not answer the questions asked based on customary practice alone.

The statement about proxy scanners in the statement of estimate is not an expression of his own personal estimate, but is an expression of custom and good practice. Where in the report he has written "ordinary" or

"Generally" is most often a reference to common industry practice. To his knowledge, there is no document that expresses the standard of practice in general, but there are standards of practice in a number of specific areas, such as usability testing. There is always judgment involved, but the majority in his position would probably answer the questions in a similar way.

When you look at the evolution of best practice from 2003 to today, agile development methods for project management and project engineering have emerged. It's a different way of approaching projects. It was a good decision not to switch from the waterfall model to an agile model during the land registration project. The waterfall model is still widely used and he still uses it in some projects. The choice of project model is based on the nature of the project. There has been development in the waterfall model as well. It has gradually become common to build agile processes into the waterfall model. When you approach the implementation phase, you run "sprints". Good practice in this area has not generally evolved since 2006. However, the understanding of IT is much greater today. This also applies to the management of user behavior. Today, for example, you would insist that usability tests are carried out.

With the phrase "user behavior in the broadest sense" in the supplementary statement of opinion, he has in mind the behavior of users of the system in the broadest sense, including,

among others, legal secretaries and employees at the Land Registration Court. The users' realistic approach to the system could have been involved in greater

U.2020.2851H

and if they had been involved earlier in the process, some of the challenges might have been discovered earlier.

The answer to question 10.2 is based on his experience that it can be difficult for a project management team to get individual members of management motivated for the project. This may be because the person or persons concerned have a reservation towards the project owners. He had no insight into whether this was the case in this project. It is an open question whether it would have been possible to get stakeholders involved in user testing. The consideration is purely theoretical. If someone had such reservations, you would normally escalate the issue to the "sponsor group" who would make the necessary decisions and ensure that those who needed to be involved were involved. The sponsor group or project sponsor is just another name for the project owner. The National Courts Administration had the project ownership. The project management should have had the opportunity to escalate the issue to the Danish Courts Administration, especially as it was external project management. The Danish Courts Administration had the project ownership and should perhaps have supported the project to a greater extent. This is just his assumption.

He agrees with Rigsrevisionen's assessment that it was less appropriate to opt out of conducting usability tests. He has addressed this in the supplementary assessment report. When you are dependent on the use of the system, it is crucial that users are also able to use the system and that there are no delays or obstacles resulting from not knowing how to use the system. If you had done broad usability tests, you would have known in advance what challenges there were in the system, including, for example, in the user interface. A broad user base also includes self-service users. The practice for usability testing is that it must be real users who have not been involved in the project, and the test must be conducted in a controlled manner so that you can determine without interference if there is something that cannot be done. Users are often asked to speak aloud during use to record where things go wrong along the way. In many projects, however, this is something that is avoided because it is relatively convenient and can be technically difficult. It's not a functionality test as such. It's a test of whether users can interact with the system. Ideally, testing systems should also include testing user guides.

There can be sessions that take days, but it can also take an hour, depending on what you want to test. You create usability test scripts and ask the user to go through their tasks and then let them get frustrated if something is not working optimally. There are specialists in the field who can be hired to design user interfaces and other things, but most often it will be project employees who witness the test. The test can, for example, lead to a revision of the user guide. You may also discover, for example, that "prompts" are needed along the way in the system.

Usability testing should have been carried out at the point when the system had become functional, i.e. late in the process. Unfortunately, there is often no time for this at that point, so you cut it short, even if it doesn't

**2917**

is appropriate. He has not commented on the reason why they chose not to conduct usability tests.

Some of the issues with the proxies could perhaps have been resolved by prior usability testing. For example, if citizens had been asked to fill out proxies and scan them afterwards. He felt that this should have been done. When he states that "should have been done", it is with reservation for what was possible under the framework conditions given for the project.

For example, a user expert can be someone who has expertise in how a user interface should be designed to work optimally for users. A user expert can be very useful, but cannot replace an actual usability test.

He has not seen the "sandbox" that was used in relation to users, but it is described in the case material. The sandbox could not replace usability testing. Usability testing should be done on the system you are about to launch and as close to launch as possible. As he understood it, the sandbox was a test environment and was therefore not a realistic situation. Nor did he understand that ordinary users were let into the sandbox. It is absolutely relevant to have a test environment like the sandbox to test the functionality of the system, but it cannot replace a usability test.

A hotline cannot fix the lack of usability testing, but it is common to provide extraordinary staffing of such a hotline - and of the internal technical response to correct errors - in the initial phase after deployment. This is known as "hyper-care" or "fire watch". A lack of user-friendliness in the system is often experienced as pressure on such a hotline.

He does not believe that a beta version of the system should have been deployed. He has only considered that the test system could have been run in parallel with the manual system to test whether it worked. Manual processing was stopped at the time when the system went live. He hasn't considered it, but you could have developed a pilot with a beta version of the system at a time when the system was not fully developed, to test the system in operation with some users and then have time to correct the errors. However, he would never recommend a beta version as a "big bang".

His comment in the supplemental opinion that the conditions are by no means "unusual or unlikely" suggests that the risk of the problems occurring should have been taken into account. That's what a risk analysis is all about. With the answer, he is referring to going directly from a very manual-based system to a digital system. In such a transformation, it is important that what users do is included. The risk factor concerns whether the system's way of handling cases reflects the practices that have been incorporated when the tasks were done manually. Often a system is based on doing things in the same way as in a manual process, but there can be very different processes. Making that transformation is a risk in itself because the systems don't reflect what you do in the manual process. In a manual process, users have different approaches to the process, which cannot be reflected in a digital system. This was also reflected in algorithms that selected certain cases for manual processing because the system could not handle deviations. The idea of user testing is to cover yourself for things you could not have foreseen.

With a little better project management, stakeholders would probably have been brought to the table. Stakeholder analysis should be done in all projects. It is not clear from the material how management actually handled the issue, nor has it been part of his assessment. If the stakeholders purely refused to participate in usability tests, it would have been an obstacle to conducting them, but he has never experienced this in practice.

The term "risk appetite" in the estimate statement is about assessing the risks you are willing to take in relation to the rewards you can achieve. It is purely a business judgment. It is the project owner or project sponsor who makes that assessment. For example, project owners took the risk of skipping the usability test. He often sees that cuts are made - either in terms of time or finances. "It's normal to look at whether to cut functionality, usability or other things when time is a parameter.

Copyright © 2023 Karnov Group Denmark A/S

There may be framework conditions for a project that cannot be changed. For example, the requirements and implementation deadline of the General Data Protection Regulation, but it can also be, for example, a specific deadline or budget and not necessarily legislative framework conditions. It is the set of framework conditions that will greatly influence the project and have a significant impact on the room for maneuver that a project manager has.

Based on the framework conditions, you weigh up the risks to assess where to take action. It will be impossible to create systems that exclude risks. It is the project management's task to continuously analyze the consequences of the framework conditions on which the project is based, and then speak up to management if there are challenges with the framework. If the National Courts Administration could see that the framework entailed risks that could be questionable, they should have told the client that the framework conditions were too strict or not appropriate. This is a completely normal process and has also happened in this project, as the project has been extended several times. It's completely normal because you can't predict

**2918**

everything in advance. He does not know what dialog there has been between the parties. His assumptions about this are hypothetical.

It is common to cut the project on an ongoing basis or challenge the framework conditions. It is common to cut back on activities at the end of a project, such as usability tests. He has not had the opportunity to verify whether it was a bad idea to opt out of usability testing, but given the nature of the project, he believes it was a bad idea. Based on a professional assessment, usability tests should not have been omitted. He has not been able to find a recommendation on the opt-out in the case. As far as he can see, the reason for opting out is that they had a user expert, but it would have been better to challenge the framework conditions. The National Courts Administration should have gone to the Danish Parliament with their concerns. His assessment is about what should have been done in terms of the project.

At management level, there has been a very broad involvement of stakeholders in the forums that were established. As far as he can see, no consideration has been given to involving the end users, i.e. those who use the system.

After a system has gone live, you need to have a sufficiently large group of hotline and technical staff who can act as an emergency response team and assess which errors are critical and which are less critical and can do something about the system's performance. He has personally experienced that during a hypercare period, a system had to be rolled all the way back to the old system. "It must have been a relatively good system that was put into operation in the land registration project, as it is admirable how quickly the problems were corrected. The system became stable in operation relatively quickly. It is his assumption that the land registration system today is a success both nationally and internationally.

The automation rate ended up at 69-70% at the end of the year, but the automation rate was lower than expected in the first period after commissioning. If you had done usability tests, you could have predicted a lower level of automation in the first period after commissioning, and then you could have staffed it afterwards. He doesn't remember the exact date when they caught up, but they quickly got automation under control.

The themes in the risk analysis were not transferred one-to-one to the themes in the risk log. For example, when the likelihood of a certain risk occurring changes, this should be reflected in the risk

analysis. The risk log is not directly linked to the risk themes in the risk analysis. It is surprising that the risk analysis hardly changes during the entire period. All risks should have been addressed, and you should have

U.2020.2851H

minimized them, but the project remained a high-risk project throughout the project period. As a result, the risk was not managed well enough. It is often a neglected area in project management that risk logic is not used sufficiently. This may be a reflection of high risk appetite in project management in general, but it can also be unreflective. Not relating to the risk analysis is a meta-risk. When the risk log is discussed in daily project management meetings, it is strange that the risk analysis that is presented to management is not re-evaluated. The risk assessment of the topics in the risk analysis does not change, even if the risk picture in the risk log changes. He understands the risk analysis as an isolated product with no connection to the risk log. Project management, including managing the risk analysis, is about minimizing risks. He questions whether those who received the risk analysis responded to it. He bases this on the fact that the risk analysis did not change over time. He has no insight into the background to this, but he has wondered about it.

The project owner, i.e. the National Courts Board, should have reported risks to the recruiter. Especially as the risk assessment remained high. For example, the fact that there were problems with the proxies posed a risk. It is the user behavior that poses the risks, but also, for example, the problems with the scanners. Functional and load tests should have been performed on the scanners. How many cases were taken out for manual processing due to incorrect input data was also a risk that materialized. He has mentioned the risks in the estimate report.

*Jette Sjælland* has explained that in 2009 she worked at Ret & Råd in Ballerup. She was primarily responsible for real estate transactions and buyer advice. She was the only person in charge of real estate transactions, buyer advice and land registration at Ret & Råd, Ballerup. Steen Hermansen from Danske Advokater referred lawyer Morten Samuelsson to her because she was one of the people who complained most about the land registration system in 2009.

Ret & Råd was not very well prepared for the digital land registration system. However, in the spring of 2009, she attended a course with Henrik Høpner, where the participants received a general briefing on the system. They did not have the opportunity to be better prepared via Danske Advokater. She tried to clean up the paperwork before the system went live, so she was ready for it.

She experienced the digital land registration system as something new and exciting, but she was also aware of her responsibility to ensure that what she did in the land registration system was correct. Before, the court did it for you. The system stopped her from trying to do it correctly because she was often kicked out without the system having saved what she had done. You almost had to save after every page, so you knew you at least had something before you were kicked out. There were

**2919**

frustrations in the start-up phase, so she asked for help from the Association of Danish Lawyers. She was subsequently enrolled in a user group under the Association of Danish Lawyers. Merete Steen was also part of that group.

There were no instructions for users, only general instructions on how the various reviews worked and what types of reviews could be made in the system. The users who had to make the reviews lacked user guides. They couldn't read if what they were doing was correct. They had the option of calling the Danish Land Registry's hotline, which they often called "notline" because they didn't get the answers they needed. In the user group, they helped each other answer questions about the system. This was a great help, especially when she was alone with the land

registration. Many law offices requested user guides, so Steen Hermansen contacted the user group to ask if they would

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

Write a guide. The user group began to write a guide by dividing the types of notifications between them and creating guides on what to do with each individual screen. They got very far with the guide, but just before Christmas in 2009, Tinglysningsretten published its user guides, which replaced the ones the user group was in the process of creating. "The user guides were ok, but they could have been better. They have improved a lot, and now there are guides for everything. She attended a workshop at the Danish Courts Administration together with other users, including land surveyors, lawyers, etc. She does not remember if Adam Wolf was present.

In the beginning, she didn't see customers wanting to use digital signatures. It was too new for customers, and many did not yet have online banking etc. Most chose to give the office a power of attorney. Throughout the first six months after going live, they mostly used proxies. She found that it was difficult to persuade customers to do something new, especially older customers. They benefited from having a registration power of attorney because they didn't have to contact customers if changes were needed along the way. It was a labor advantage.

She found it difficult to understand why some information was rejected. For example, it was rejected if you wrote outside the signature box on the power of attorney. Failure to fill in the "country of origin code" was also a reason for rejection at first. She had never heard that word before. If the power of attorney was clipped together, it was also initially rejected because you had to be able to scan it in quickly. They subsequently changed that. She doesn't recognize Søren Sørup Hansen's explanation that the Land Registration Court didn't reject powers of attorney because of clips.

When she contacted the hotline, she was often told that they could not help as they were not allowed to give legal advice - even if she simply asked which box she should use to state this or that. Later, they were given a contact form where you could better explain your way through the question. It got better along the way and it works really well now.

She has rarely experienced that you have to submit the deed and the banks' mortgages at the same time. Back then, she registered the deed and when she got it back with remarks, she informed the banks that they could start registering a new loan and cancel the old loan and so on, which they did. She still does that today.

*Merete Steen* has explained, among other things, that she was a member of the user group under Danish Lawyers together with Jette Sjælland. She has been with Winsløw Law Firm since 2007. She was on maternity leave in 2009 and returned from maternity leave in August 2009. She was responsible for real estate transactions and land registration. She had colleagues who were responsible for simple land registration, while she was responsible for the more advanced land registration. She was prepared for the new land registration system by attending a course in the fall of 2008, taught by Adam Wolf and Henrik Høpner. She didn't attend any other courses, but received regular briefings from Steen Hermansen from the Association of Danish Lawyers. They put a lot of effort into submitting and processing all their paper cases before the digital land registration system came into force. It was only if something was delayed, for example in the post, that it had to wait. Otherwise, they cleaned up all paper files before the system went live because the office was unsure of what to expect with the new system.

They were prepared in terms of digital signature. Some customers were easy to convince to use digital signatures, but it was mostly business customers. Private customers were harder to convince, especially in the first six months when the system was criticized in the press. There were cases where they thought it would be easier with a registration power of attorney, but they were willing to try anything

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

new, so she tried to convince customers to use digital signatures. When the system went live, it was not very intuitive. It wasn't difficult to register a deed from Mr. Hansen to Mrs. Jensen. Hansen to Mrs. Jensen, but there were problems along the way. One of the first things she had to register was a condominium division and a deed with a probate certificate. She was used to taking the deed and the probate certificate, putting both in an envelope and sending it to the court. In the new system, she had her application rejected because she first had to register the probate certificate, and the probate certificate could not contain CPR numbers. She was not used to that. There were a few instructions available. She doesn't remember exactly how many, but there were probably less than 10 instructions for the system. One of them was on how to create simple deeds, but there were no instructions on, for example, registering a probate certificate.

**2920**

She joined the user group under Danish Lawyers. The user group tried to compensate for the lack of guidance. By virtue of her role in the user group, she attended a workshop at the National Courts Administration in February 2010, where Adam Wolf was present. There she said that they lacked guidance for the system. There were 58 notification types, so she said that 58 guides were needed. Adam Wolf replied that "we'll have to look into that". The user guides started coming from the Land Registration Court in November and December 2009, but the full scope did not come until much later.

In relation to the powers of attorney, there was suddenly something called "land-ownership code", which had to be entered if they were to be approved. She didn't know what that was, even though the Land Registry said it was nothing new. If something was written in pen in the power of attorney before the signature section, it was rejected. They found this out later when the application was returned as rejected. There wasn't always a reason when something was returned as rejected. She felt that some of the employees at the Land Registry Court had a desire to reject the reports out of hand. If she had known in advance that a power of attorney would be rejected if it was written in pen, she would not have sent it off. When they were rejected, it took time to make a new one and submit it. She doesn't remember if one of the reasons for rejection was that the proxies were clipped together. The office does not clip them together today, but she does not remember what the reason for that is. She assumed it was based on experience.

At one point, she called the hotline and was on hold for almost two hours, after which she was disconnected. By then she was second in line. The vast majority of the hotline staff quickly replied that her questions were legal and that they were not allowed to answer legal questions. She didn't know if that meant they couldn't answer. It was difficult to get a clear answer. After six months, the employees at the Land Registration Court gained more insight and things calmed down. She also used her user group and network a lot to answer questions about the system.

When submitting a condominium subdivision request to go from 144 to 157 apartments, the system froze after number 95 and she had to start over. She got through to the hotline, who recommended splitting the review. It was a corner property, so she subsequently tried to split the review into three. She was told to type it out in one without saving the draft. She entered the report one evening between 8pm and midnight because the system was more stable at that time. There were several errors in the middle of the day. The report went through in three pieces, but was then rejected by the system because it was not reported on the entire

property. The Land Registry managed to reject one of the applications, but then she called to stop the rejection of the other two and was told that they would look at it together. It was processed manually.

She estimated that she probably spent 50-75% more time on land registration between September 2009 and the end of 2009 than she did before. On the specific case of condominium division, she probably spent 600-700% more time on the case than she would have spent in the old system.

On the whole, the system works well today. However, it still struggles with the more complicated cases about relocations, land transfers, etc. They also still experience uneven case processing in completely similar cases. Today, she knows who to write to for help, and she herself has become more familiar with the system.

## The Supreme Court's reasoning and result

### Case background and problem statement

In 2006, it was decided to introduce paperless (digital) land registration in Denmark. The chosen system meant that the task of registering rights over real estate etc. would no longer be handled in the individual district courts, but would be gathered at a nationwide specialized court, Tinglysningsretten, which was located in Hobro. The original plan was for the digital land registration system to be put into operation on April 1, 2008, but the commissioning had to be postponed so that the system ended up being put into operation on September 8, 2009. The case concerns whether the Danish Courts Agency, which was responsible for the development and implementation of the digital land registration system, is liable for the long processing time for land registration ex-petitions for the 422 private homeowners who are registered in the group action.

The only question is whether there is the necessary basis for liability. The parties agree that this question also includes the conduct of other state authorities involved in the introduction of the digital land registration system. The Supreme Court shall not decide whether the individual class member is entitled to compensation, including whether there is a causal link, whether there is a loss and whether there is fault.

### The responsibility standard

The Supreme Court agrees that there is no basis for applying stricter liability rules in the form of strict liability (risk liability) when assessing whether the Danish Courts Administration has incurred liability for long case processing time.

The Supreme Court also agrees that enrichment considerations cannot lead to ordering the Danish Courts Administration to cover the private homeowners' losses.

In addition, the Supreme Court finds reason to note that it does not in itself give rise to liability that

**2921**

the processing time exceeds the deadline of 10 days stipulated in section 16(4) of the Land Registration Act. The provision does not give a notifier a legal claim to registration within 10 days, but must, in accordance with long-standing case law, be considered to be an internal regulation. Nor is there any basis for reversing the burden of proof so that the Danish Courts Administration is required to prove that a case processing time that has exceeded the 10-day deadline in section 16(4) is not due to culpable circumstances.

The Supreme Court then agrees that it is the general liability standard of Danish tort law - the fault rule - which applies to the case decision. It is therefore a condition for the association Gruppesøgsmål.nu to succeed in its claims that the association proves that the Danish Courts Agency (the governmental authorities involved) has made liability-inducing transactions in connection with the introduction of the digital land registration.

The introduction of digital land registration was to take place within specific framework conditions, which meant *that* the land registration task

U.2020.2851H

should be centralized at one office (the Land Registration Court), which was located in Hobro, *that* the commissioning should take place simultaneously for the whole country ("big bang") without prior pilot operation, and *that* the expected staff savings should be achieved already from the time of commissioning.

This is the basic framework for the digital land registration system, which is laid down by law and in documents approved by the Danish Parliament's Finance Committee. The Supreme Court finds that there are no very special circumstances such that it was a breach of responsibility that the Danish Courts Administration did not seek to change the framework conditions.

The question is then whether the Danish Courts Administration - within the established framework conditions - has acted irresponsibly in connection with the introduction of the digital land registration system.

Developing and implementing an IT system such as the digital land registration system is an extremely complicated task. Even with careful planning and implementation, problems of a technical, administrative, organizational or other nature may arise that lead to extended case processing times. Taking this into account, the Supreme Court finds that compensation under the fault rule for extended case processing times resulting from the transition to digital registration must presuppose that there is a significant delay and that this delay is due to significant and clear errors or omissions.

Rigsrevisionen's assessments in the report on the digital land registration project have been made as part of an ordinary performance audit and do not constitute an assessment under tort law. Estimator Klaus Kvorning Hansen's answers to the questions asked are based on how, from an IT professional or project methodological point of view, one would generally and normally have acted. Therefore, Rigsrevisionen's assessments and the assessor's statements cannot be given decisive importance for the assessment that the Supreme Court must make according to the aforementioned relatively mild response standard. Moreover, the Auditor General's report and the expert's statements largely concern the framework conditions for the digital land registration system, and as mentioned, this cannot justify liability for damages for the Danish Courts Administration.

## Significant and obvious errors or omissions

The decision to go live with the digital land registration system on September 8, 2009 was made after the system had been tested and on the basis of advice from the consulting firm Devoteam. The errors and deficiencies in the IT system that caused problems were corrected at the end of the run-in phase on December 31, 2009, and the proportion of land registration transactions that could be carried out automatically was at that time as expected.

In the time after the system went live, the processing time for the land registration expeditions that had to be done manually increased. The processing time was particularly long in the period from September 2009 through February 2010. When it became clear in November/December 2009 that the processing time could not be reduced to less than 10 days at the end of the introductory phase, measures were taken, which meant that the processing time began to decrease significantly. As stated by the High Court, it must be assumed that it was the processing of mortgage deeds, which required up to 30 FTEs out of 125, which was by far the most significant factor in the extended case processing times. Like the High Court, the Supreme Court found that prior to the commissioning of the digital land registration system, a common understanding had been reached

between the Danish Courts Administration and the financial sector that a large number of mortgage deeds should not be sent in solely for the purpose of digitization without further agreement with the Land Registration Court. Against this background, the submission of mortgage deeds by banks and mortgage credit institutions for mass conversion constituted an extraordinary circumstance that the

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

the agency could not have foreseen. According to the information in the case, it must be assumed that the Registration Court at least reacted to the conversion problem in mid-November 2009, and that the problem was handled in early 2010 in such a way that the Registration Court ceased to mass convert mortgages. Later, the financial sector took over this task.

The Land Registration Court received a large number of powers of attorney after the digital land registration system went live, because the digital signature was only used to a limited extent at that time. It turned out that there were problems with scanners supplied by CSC. There were

**2922**

There were also other problems with the power of attorney system, including incorrectly completed power of attorney forms. Initiatives were taken to solve these problems, e.g. by correcting the error in the scanners and by allocating more employees to the task, and during the second half of October 2009, the Registration Court was able to continuously scan new powers of attorney received.

Based on the above, the Supreme Court finds that the association Gruppesøgsmål.nu has not demonstrated significant and clear errors or negligence on the part of the Danish Courts Agency in the commissioning of the digital land registration system or in dealing with the problems that arose after the commissioning. In relation to the other matters invoked by the association Gruppesøgsmål.nu, no significant and clear errors or omissions have been demonstrated either.

There is therefore no basis for imposing liability for damages on the Danish Courts Administration towards the homeowners who have joined the class action.

## Conclusion and legal costs

The Supreme Court upholds the High Court's judgment.

The State Treasury must pay the Supreme Court's legal costs DKK 1,000,000 to the Danish Courts Agency. Emphasis has been placed on the nature and scope of the case and the work performed.

## For it is recognized as right

The judgment of the High Court is upheld.

The Danish Treasury must pay DKK 1,000,000 in legal costs before the Supreme Court to the Danish Courts Administration.

The ordered costs must be paid within 14 days of the date of this Supreme Court judgment and shall bear interest in accordance with section 8a of the Interest Act.

U.2020.2851H

**U.2020.2851**
**U.2020.2851**

***Domstolsstyrelsen var ikke erstatningsansvarlig for lang sagsbehandlingstid i forbindelse med indførelse af digital tinglysning.***

*Erstatning uden for kontraktforhold 111.2 og Tinglysning 1.8.*

Foreningen Gruppesøgsmål.nu, G, anlagde på vegne en række private boligejere erstatningssag mod Domstolsstyrelsen, D, i anledning af, at boligejerne i forbindelse med indførelsen af den digitale tinglysning i 2009 blev udsat for lang sagsbehandlingstid ved tinglysningsekspeditioner. Højesteret fandt som landsretten, at der ikke var grundlag for at anvende skærpede ansvarsregler i form af objektivt ansvar (risikoansvar),[1] og at berigelsessynspunkter ikke kunne føre til at pålægge D erstatningsansvar.[2] Højesteret bemærkede, at det ikke i sig selv er ansvarspådragende, at sagsbehandlingstiden overskrider 10-dagesfristen i tinglysningslovens § 16, stk. 4,[3] og at dette heller ikke giver grundlag for at vende bevisbyrden. Afgørelsen af ansvarsspørgsmålet skulle herefter træffes på grundlag af culpareglen, hvor det påhvilede G at godtgøre, at D havde foretaget ansvarspådragende dispositioner i forbindelse med indførelsen af den digitale tinglysning. Højesteret anførte, at indførelsen af digital tinglysning skulle ske inden for nærmere angivne rammebetingelser, som var fastsat ved lov og i aktstykker tiltrådt af Folketingets Finansudvalg. Højesteret fandt, at der ikke forelå sådanne helt særlige omstændigheder, at det var ansvarspådragende, at D ikke søgte rammebetingelserne ændret. Spørgsmålet var herefter, om D inden for de fastsatte rammebetingelser havde handlet ansvarspådragende. Højesteret bemærkede, at det er en særdeles kompliceret opgave at udvikle og gennemføre et it-system som det digitale tinglysningssystem. Selv med en omhyggelig planlægning og gennemførelse kan der vise sig problemer af teknisk, administrativ, organisatorisk eller anden art, som fører til forlængede sagsbehandlingstider. Under hensyn hertil fandt Højesteret, at erstatning efter culpareglen for forlængede sagsbehandlingstider, som var en følge af overgangen til den digitale tinglysning, måtte forudsætte, at der var tale om en betydelig forsinkelse, og at denne forsinkelse skyldtes væsentlige og klare fejl eller forsømmelser. Højesteret fandt, at G ikke havde påvist væsentlige og klare fejl eller forsømmelser. Der var herefter ikke grundlag for at pålægge D erstatningsansvar.[4]

**H.D. 15. juni 2020** *i sag 94/2019 (1. afd.)*

(Thomas Rørdam, Jon Stokholm, Vibeke Rønne, Henrik Waaben, Michael Rekling, Oliver Talevski og Kristian Korfits Nielsen).

*Gruppesøgsmål.nu (adv. Morten Samuelsson, Kbh., besk.)*
*Biintervenienter til støtte for Gruppesøgsmål.nu: Poul Due, Ejendomsselskabet Otto ApS (tidligere Kanalhuset ApS), Soeborg Ejendomme ApS, Frank Lyngholm Andersen, Gartneriet Blomstergården, Jens Jørgen Bonde og David Holm (adv. Jens Rostock-Jensen, Kbh., besk., og adv. Jes Anker Mikkelsen, Kbh., for alle)*
mod
*Domstolsstyrelsen (adv. Sune Fugleholm og adv. Kasper Mortensen, begge Kbh.)*

## Østre Landsrets dom 27. maj 2019 (4. afd.), B-3159-11

(John Lundum, Henrik Twilhøj og Erik P. Bentzen) i 1. instans

### Indledning

Denne sag er behandlet som et gruppesøgsmål.

Problemstillingen i sagen er, om Domstolsstyrelsen har pådraget sig et erstatningsansvar over for private boligejere, der efter indførelse af digital tinglysning blev udsat for lang sagsbehandlingstid med tinglysningsekspeditioner, som ikke ville være indtrådt i det tidligere tinglysningssystem.

Sagen er anlagt mod Domstolsstyrelsen, men parterne har været enige om, at den også omfatter fejl, forsømmelser eller erstatningspådragende dispositioner i øvrigt, som kan tilregnes enhver offentlig myndighed, der har været involveret i tilrettelæggelse af eller beslutninger om indførelse af digital tinglysning.

Sagen er anlagt den 12. august 2011 ved Københavns Byret, der ved kendelse af 6. oktober 2011 har henvist sagen til Østre Landsret.

*Rammen for gruppesøgsmålet*

Ved kendelse af 26. september 2013 fastlagde landsretten følgende ramme for gruppesøgsmålet:

»Hvem kan deltage i gruppesøgsmålet?

Personer (herunder dødsboer m.v.), der

1. som køber, sælger eller ejer af enfamiliehuse, ejerlejligheder eller fritidsejendomme i perioden fra

    **2852**

    den 8. september 2009 til den 31. december 2010 anmeldte eller lod anmelde skøder, pantebreve eller andre dokumenter til tinglysning eller aflysning, herunder med henblik på omprioritering,
2. opnåede tinglysning eller aflysning eller afvisning af dokumentet senere end 10 hverdage efter anmeldelsen af dokumentet i det digitale tinglysningssystem, uden at tinglysningen eller aflysningen efter anmeldelsen beroede på andet end Tinglysningsrettens egen sagsbehandling alene på grundlag af det dokument, der var anmeldt til tinglysning eller aflysning, og
3. ved tilmeldingen eller senest 4 uger efter udløbet af tilmeldingsfristen fremsender en efter rettens skøn tilfredsstillende dokumentation for opfyldelsen af de ovenfor anførte betingelser,

    kan tilmelde sig gruppesøgsmålet.

---

1   Bernhard Gomard: Moderne Erstatningsret (2002), s. 73-77, Bo von Eyben og Helle Isager: Lærebog i erstatningsret, 8. udg. (2015), s. 191-99, og Mogens Hornslet i U 1987B.288.

2   Henry Ussing: Erstatningsret (1947), s. 229-32, og Torsten Iversen m.fl. (red.): Formueretlige emner, 9. udg. (2019), s. 385-89.

3   Bet. nr. 1461/2005, s. 25, U 1953.567 V, U 1994.224 H, og Peter Mortensen: Tinglysning, 3. udg. (2001), s. 361 f.

4   U 2001.956 Ø, Vibe Ulfbeck i Carsten Henrichsen m.fl. (red.): Forvaltningsretlige perspektiver (2006), s. 273 f., 279-81 og 288-91, Orla Friis Jensen og Søren Højgaard Mørup i Karsten Revsbech m.fl.: Forvaltningsret – Almindelige emner, 6. udg. (2016), s. 573 f., Helle Bødker Madsen og Søren Højgaard Mørup i Børge Dahl m.fl. (red.): Festskrift til Jens Peter Christensen (2016), s. 433-53, Søren Højgaard Mørup i Peter Pagh m.fl. (red.): Offentlige myndigheders erstatningsansvar (2017), s. 81-89, Niels Fenger (red.): Forvaltningsret (2018), s. 954, og Bernhard Gomard i U 2004B.383.

Et dødsbo anses også for at opfylde betingelserne, hvis afdøde opfyldte én eller flere af betingelserne, og boet opfylder de øvrige. Hvilke krav er omfattet af gruppesøgsmålet?

Deltagernes krav om, at Domstolsstyrelsen anerkender, at det var ansvarspådragende, at det dokument, der er nævnt under pkt. 1-2, blev tinglyst eller aflyst senere end 10 hverdage efter anmeldelsen af dokumentet.«

Landsretten godkendte herefter, at betingelserne for at behandle sagen efter reglerne om gruppesøgsmål var opfyldt, og Foreningen Gruppesøgsmål.nu blev udpeget som grupperepræsentant, jf. retsplejelovens § 254 e, stk. 1.

I retsbog af 24. marts 2014 tiltrådte landsretten grupperepræsentantens forslag til, i hvilke aviser annoncering vedrørende muligheden for at tilmelde sig gruppesøgsmålet skulle ske, og landsretten godkendte grupperepræsentantens åbningsunderretning til de personer, hvis krav ville falde inden for rammen for gruppesøgsmålet, om retsvirkningen ved at tilmelde sig gruppesøgsmålet, jf. retsplejelovens § 254 e, stk. 9, og om de i retsplejelovens § 254 e, stk. 1-7, nævnte forhold. Tilmeldingen skulle ske elektronisk til Foreningen Gruppesøgsmål.nu, alternativt ved skriftlig udfyldelse af tilmeldelsesblanketten.

Fristen for at tilmelde sig gruppesøgsmålet blev fastsat til udløb den 30. juni 2014.

Foreningen Gruppesøgsmål.nu (i det følgende Foreningen) har haft fri proces under sagen.

*Gruppemedlemmer*

Af en liste, som grupperepræsentanten har sendt til landsretten, fremgår, at der er tilmeldt i alt 422 personer eller samejere, som opfyldte betingelserne i rammen for gruppesøgsmålet, og som derfor er medlemmer af gruppen.

*Biintervention*

Foruden gruppesøgsmålet har en række erhvervsdrivende, som ikke opfylder betingelserne i rammen for gruppesøgsmålet, anlagt sag mod Domstolsstyrelsen, og der er udtaget otte prøvesager.

Landsretten tillod den 5. september 2018, at sagsøgerne i de otte prøvesager, Poul Due, Kanalhuset ApS, Soeborg Ejendomme ApS, Gårdejer Frank Lynghold Andersen, Gartneriet Blomstergården A/S, Jens Jørgen Bonde, David Holm og Ejendomsselskabet Bjørnbaksvej 8 ApS, indtrådte i gruppesøgsmålet som biintervenienter, jf. retsplejelovens § 252.

## Påstande

*Foreningen* har nedlagt følgende påstande:

*Påstand 1*

Sagsøgte, Domstolsstyrelsen, tilpligtes at anerkende erstatningspligt over for enhver sælger af et enfamiliehus, en ejerlejlighed eller en fritidsejendom

a.  som er tilmeldt gruppesøgsmålet,

b.  som i perioden 8. september 2009 til den 31. december 2010 har anmeldt eller ladet anmelde skøder, pantebreve eller andre dokumenter til tinglysning eller aflysning,

c.  som godtgør, at de under litra b) nævnte dokumenter ikke forelå tinglyst eller aflyst inden for 10 hverdage efter anmeldelse til tinglysning, subsidiært en sådan periode, der efter rettens skøn anses for ansvarspådragende,

d.  for det pågældende gruppemedlems merudgifter til rente, provisioner og andre udgifter, som ikke ville være påløbet ved rettidig tinglysning eller aflysning, fra det tidspunkt, hvor tinglysning eller aflysning burde være sket, indtil det tidspunkt, hvor tinglysning eller aflysning faktisk skete,

**2853**

e.  med tillæg af sædvanlig procesrente fra sagens anlæg til betaling sker.

*Påstand 2*

Domstolsstyrelsen tilpligtes at anerkende erstatningspligt over for enhver køber af et enfamiliehus, en ejerlejlighed eller en fritidsejendom,

a.  som er tilmeldt gruppesøgsmålet,

b.  som i perioden 8. september 2009 til 31. december 2010 har anmeldt eller ladet anmelde skøder, pantebreve eller andre dokumenter til tinglysning eller aflysning,

c.  som godtgør, at de under litra b) nævnte dokumenter ikke forelå tinglyst eller aflyst inden for 10 hverdage efter anmeldelse til tinglysning, subsidiært en sådan periode, der efter rettens skøn anses for ansvarspådragende,

d.  for det pågældende gruppemedlems merudgifter til rente, provisioner og andre udgifter, som ikke ville være påløbet ved rettidig tinglysning eller aflysning, fra det tidspunkt, hvor tinglysning eller aflysning burde være sket, indtil det tidspunkt, hvor tinglysning eller aflysning faktisk skete,

e.  med tillæg af sædvanlig procesrente fra sagens anlæg til betaling sker.

*Påstand 3*

Domstolsstyrelsen tilpligtes at anerkende erstatningspligt over for enhver ejer af et enfamiliehus, en ejerlejlighed, eller en fritidsejendom,

a.  som er tilmeldt gruppesøgsmålet,

b.  som i perioden 8. september 2009 til 31. december 2010 med henblik på omprioritering har anmeldt eller ladet anmelde skøder, pantebreve eller andre dokumenter til tinglysning eller aflysning,

c.  som godtgør, at de under litra b) nævnte dokumenter ikke forelå tinglyst eller aflyst inden for 10 hverdage efter anmeldelse til tinglysning, subsidiært en sådan periode, der efter rettens skøn anses for ansvarspådragende,

d.  for det pågældende gruppemedlems merudgifter til rente, provisioner og andet, som ikke ville være påløbet ved rettidig tinglysning eller aflysning, fra det tidspunkt, hvor tinglysning eller aflysning burde være sket, indtil det tidspunkt, hvor tinglysning eller aflysning faktisk skete,

e.  med tillæg af sædvanlig procesrente fra sagens anlæg til betaling sker.

Domstolsstyrelsen har nedlagt påstand om frifindelse.

## Sagsfremstilling

*Det lovgivningsmæssige grundlag for det digitale tinglysningsprojekt*

Justitsministeriet nedsatte i 2003 et udvalg (»Tinglysningsudvalget«), der havde til opgave at komme med forslag til en samlet modernisering og effektivisering af tinglysningen. Der var i udvalget repræsentanter for en række ministerier, domstolene, Finansrådet, Realkreditrådet, Advokatrådet, Dansk Ejendomsmæglerforening, landinspektørforeningen, Forbrugerrådet, Kommunernes Landsforening og Amtsrådsforeningen.

På Justitsministeriet foranledning afgav rådgivningsfirmaet Deloitte Consulting A/S (herefter Deloitte) den 21. februar 2005 en samlet analyse af de danske domstole. En af konklusionerne i Deloittes rapport var, at en fuld digitalisering af tinglysningen var mulig. Det var Deloittes vurdering, at der burde udvikles et helt nyt it-system til digital tinglysning. Analysen beskrev den nødvendige it-understøttelse og opgaven med at omdanne sagsgangene og de juridiske prøvelser i den papirbaserede tinglysning til et it-system, herunder den nødvendige integration med en række andre offentlige registre.

U.2020.2851H

Deloitte foretog desuden et skøn over effektiviseringsgevinster og samfundsøkonomiske konsekvenser ved et digitalt tinglysningssystem samt over etablerings- og driftsomkostninger. Det blev vurderet, at ca. 69 % af tinglysningsopgaverne kunne automatiseres. Med centralisering af tinglysningen i ét center kunne antallet af årsværk ved en digitalisering nedbringes fra ca. 357 til ca. 91. Dette svarede til en driftsøkonomisk besparelse årligt på ca. 83,2 mio. kr. set i forhold til de eksisterende udgifter på ca. 145,3 mio. kr. Samtidig ville de professionelle aktører årligt kunne spare 200-300 mio. kr. og borgerne ca. 100 mio. kr.

Til brug for Tinglysningsudvalgets arbejde udarbejdede Domstolsstyrelsen et notat om de økonomiske/personalemæssige konsekvenser af en ændret organisering af tinglysningen. Af notatet fremgår bl.a., at der frem til det tidspunkt, hvor et fremtidigt tinglysningssystem fungerede 100 % effektivt, måtte antages at være en overgangsperiode, hvor en større del af dokumenterne skulle behandles manuelt. Systemet ville formentlig i en indkøringsfase have vanskeligt ved at håndtere de elektroniske anmeldelser, som ellers som udgangspunkt var egnet til at blive behandlet maskinelt.

Den 7. april 2005 skrev Domstolsstyrelsen til Finansministeriet om de personalemæssige konsekvenser af en tinglysningsreform. Domstolsstyrelsen havde foretaget nogle beregninger, som dog var forbundet med en række usikkerheder med hensyn til bl.a. størrelsen af aldersbetinget afgang og den forestående retskredsreforms nærmere udformning og indvirkning på antallet af fratrædelser i de følgende år. Det blev vurderet, at det formentlig var urealistisk, at det nye system med den fornødne sikkerhed ville kunne tinglyse 70 % af dokumenterne automatisk fra den første dag. Hvis det antoges, at ca. 35 % af dokumenterne kunne lyses automatisk, ville der være et behov for et personale i tinglysningen på ca. 200 årsværk. Styrelsen pegede på tinglysningens samfundsmæssige betydning, som burde medføre, at der blev udvist betydelig forsigtighed og omhu i forbindelse med gennemførelsen af en tinglysningsreform ikke mindst i tiden efter et nyt it-systems ibrugtagning. Der ville være et behov for at fastholde tinglysningspersonale i tiden op til det ny systems ibrugtagning, og det ville gøre det nødvendigt at kunne tilbyde personalet en kombination af gunstige fratrædelsesvilkår og ansættelsestilbud i andre stillinger ved retterne.

Tinglysningsudvalget afgav delbetænkning 1461 i juni 2005 om varetagelsen af tinglysningsopgaven. Tinglysningsudvalget anbefalede, at en fremtidig papirløs tinglysning blev samlet i en central tinglysningsenhed. Dette ville sikre den bedste udnyttelse af personalet, det bedste faglige miljø, den mest ensartede sagsbehandling, de bedste muligheder for yderligere rationaliseringer og videreudvikling af it-systemet og det største besparelsespotentiale.

I februar 2006 afgav Tinglysningsudvalget betænkning nr. 1471 om digital tinglysning. Heri behandlede udvalget de spørgsmål af retlig, praktisk og teknisk karakter, som gennemførelsen af digital tinglysning gav

**2854**

anledning til, og betænkningen indeholdt et udkast til de lovændringer, som var nødvendige for indførelsen af digital tinglysning. Tinglysningsudvalget vurderede, at en grundlæggende forudsætning for indførelse af digital tinglysning var en afskaffelse af den hidtidige papirbaserede tinglysning og indførelse af en ny papirløs tinglysning med automatiske og digitale sagsgange baseret på digital signatur, digitale dokumenter og digital kommunikation mellem brugerne og systemet. Udvalget foreslog dermed en gennemgribende ændring af tinglysningsprocessen, men ikke af de grundlæggende betingelser for tinglysningen og retsvirkningerne heraf.

Tinglysningsretten blev oprettet ved lov nr. 538 af 8. juni 2006 om ændring af retsplejeloven og forskellige andre love (Politi- og domstolsreform), og centraliseringen af tinglysningsopgaven var

en integreret del af domstolsreformen. Tinglysningsretten blev placeret i Hobro. Domstolsreformen indebar store ændringer i bl.a. retternes personale, opgaverne og de bygningsmæssige forhold. Loven om politi- og domstolsreform trådte i kraft den 1. januar 2007, men arbejdet med at gennemføre reformen fortsatte i tiden efter og altså sideløbende med det digitale tinglysningsprojekt.

Tinglysningsloven blev ændret med lov nr. 539 af 8. juni 2006 om ændring af lov om tinglysning og forskellige andre love (Digital tinglysning).

*Bevillingen til tinglysningsprojektet*

Ved brev af 15. juni 2005 til Justitsministeriet kom Domstolsstyrelsen med sit forslag til en organisatorisk overgangsordning for et nyt digitaliseret tinglysningssystem. Styrelsen pegede i den forbindelse på de kritiske faktorer for en effektiv og betryggende udførelse af tinglysningsopgaven i forbindelse med udviklingen og implementeringen af et nyt digitalt tinglysningssystem. Det drejede sig om risikoen for personaleflugt i tiden frem til, at det nye system blev taget i brug, for høje forventninger til automatiseringsgraden og problemer med det nye system. Styrelsen anbefalede en model med en centraliseret tinglysning, der i en overgangsperiode på 2-3 år blev suppleret med et beredskab på ca. 100-110 årsværk.

Justitsministeriet forelagde Domstolsstyrelsens forslag for Finansministeriet, der ikke kunne tilslutte sig løsningsforslaget.

I løbet af 2005 blev der ført forhandlinger mellem Finansministeriet og Justitsministeriet om de økonomiske rammer for domstolenes virksomhed og gennemførelsen af domstols- og tinglysningsreformen. I november 2005 blev resultatet af forhandlingerne om økonomien for Tinglysningsretten, at den forudsatte effektiviseringsgevinst ved den digitale tinglysning på ca. 86 mio. kr. årligt (2006-priser), som Deloitte havde beregnet til 83,2 mio. kr. i 2005, først skulle realiseres 6 måneder efter idriftsættelsen, som blev forudsat at kunne finde sted den 1. januar 2008. Der ville således være uændret bevilling i første halvår af 2008.

Det bevillingsmæssige grundlag for udviklingen af det digitale tinglysningssystem blev tilvejebragt ved aktstykke nr. 38 af 21. november 2006. Aktstykket hvilede på den forudsætning, at det nye digitale tinglysningssystem blev sat i drift den 1. januar 2008. Udsættelse fra januar til april 2008 medførte, at den periode, hvor effektiviseringsgevinsten ikke skulle realiseres, blev reduceret fra 6 til 3 måneder. Senere udsættelser af idriftsættelsen medførte dog, at den periode, hvor effektivitetsgevinsten ikke skulle realiseres, helt forsvandt.

*Rammebetingelserne for projektet*

De vedtagne love og aktstykker vedrørende den digitale tinglysning indebar, at der var fastsat følgende væsentlige rammebetingelser for projektet:

- Tinglysningsopgaven skulle centraliseres for hele landet ved en tinglysningsret, som skulle placeres i Hobro.
- Den økonomiske ramme for projektet - den forventede besparelse skulle realiseres på idriftsættelsestidspunktet.
- Idriftsættelse skulle ske som »big bang«, dvs. samtidig for hele landet og uden pilotdrift.

*Organisation og projektstyring*

I et notat af 3. maj 2005 fra Domstolsstyrelsens administrationskontor til styrelsens bestyrelse om organisering af tinglysningsreformen blev det foreslået, at tinglysningsprojektet blev organiseret ved, at der blev nedsat en intern styregruppe, en kontaktgruppe, en projektgruppe (også kaldet brugergruppe) og projektsekretariat.

Den interne styregruppe bestod af Domstolsstyrelsens direktør, styrelsens it-chef og projektledelsen (dommer Søren Sørup Hansen). Brugergruppen var en ekstern følgegruppe med deltagelse af Domstolsstyrelsens direktør, projektledelsen og repræsentanter fra

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

alle væsentlige interesser i tinglysningen, herunder Finansrådet, Realkreditrådet, Advokatrådet, Dansk Ejendomsmæglerforening, Landinspektørforeningen, Kommunernes Landsforening og en række ministerier, herunder Justitsministeriet. Formålet med brugergruppen var at sikre, at alle væsentlige interessenter fik mulighed for at give input til, hvordan det digitale tinglysningssystem skulle udformes, og at der blev skabt de rigtige grænseflader til de øvrige interessenter.

Der blev nedsat yderligere eksterne og interne arbejdsgrupper i projektforløbet.

Domstolsstyrelsen traf løbende ledelsesmæssige beslutninger på grundlag af input fra Tinglysningsretten, Devoteam Consulting A/S (herefter Devoteam), leverandøren (CSC) og eksterne aktører. Devoteam var et konsulentfirma, som leverede rådgivning til Domstolsstyrelsen om it-systemets design og kravspecifikation samt til leverandørstyring.

**2855**

Styringen i forhold til leverandøren foregik overordnet gennem leverandørstyregruppen for det digitale tinglysningsprojekt med deltagelse af Domstolsstyrelsen, Tinglysningsretten (Søren Sørup Hansen), Devoteam og CSC.

*Risikostyring*

Der blev løbende foretaget risikostyring og udarbejdet risikovurderinger. Risikovurderingerne var opdelt i fire hovedområder: organisation, teknisk løsning, leverandør og interessenter, og der blev foretaget en samlet risikovurdering for alle fire områder.

Risikovurderingen af de fire områder og den samlede vurdering blev foretaget på en skala fra 1-5, hvor 1 var den laveste og 5 den højeste risiko. Både projektledelsen og leverandøren førte såkaldte risikologs. Disse risikologs blev opdateret løbende og blev brugt til at vurdere projektets fremdrift og til at sætte fokus på fremtidige aktiviteter i projektet. Der var tale om et skema, hvor sandsynligheden for risikoens indtræden og konsekvensen af risikoens indtræden blev vurderet ved angivelse af tal. Ud fra tallene blev risicierne inddelt i farverne rød, gul eller grøn afhængig af den enkelte risikos alvor. Risikologgene blev løbende opdateret og de enkelte risici blev »lukket«, efterhånden som der blev taget hånd om dem. Risikologgene blev gennemgået på møderne i både den interne styregruppe og i leverandørstyregruppen.

Den første risikoanalyse af projektet blev præsenteret for Devoteam for Domstolsstyrelsen den 20. marts 2006. Risikoanalysen var som tidligere anført opdelt i fire hovedområder: organisation, teknisk løsning, leverandør og interessenter. Opdelingen i de fire hovedområder blev opretholdt i senere risikoanalyser, og i en risikoanalyse af 21. november 2006 blev risikoen for hovedområdet »organisation« vurderet til niveau 4. Det blev anført, at de organisatoriske forhold generelt blev vurderet til en risiko under middel, men bl.a. med valget af Hobro som hjemsted for Tinglysningsretten vurderedes der at være en ikke ubetydelig risiko for mangel på kvalificeret arbejdskraft ved implementeringen af det digitale tinglysningssystem. Desuden havde det betydning, at idriftsættelse af den digitale tinglysning skulle ske som et »big-bang«, hvorefter man ikke længere havde mulighed for at anmelde papirdokumenter til tinglysning, men udelukkende kunne anvende elektroniske dokumenter forsynet med digital signatur.

I risikoanalysen havde risikoen for hovedområdet »teknisk løsning« vurderet til niveau 3. I analysen blev der peget på, at det for at muliggøre den automatiserede behandling af tinglysningsekspeditioner var nødvendigt at anvende en digital signatur, der kunne kontrolleres automatisk, men at dette bl.a. risikerede at indebære, at borgere ikke kunne eller ikke ville tinglyse på grund af manglende signatur eller manglende kendskab til denne. Det blev anført, at en mulig løsning kunne være en fuldmagtsordning, som gav mulig-

hed for, at kreditinstitutioner eller rådgivere kunne gennemføre den digitale tinglysning på vegne af en borger.

Risikoen for hovedområdet »leverandør« blev vurderet til niveau 3 som følge hovedsageligt af en meget stram tidsplan. Det blev anført, at tidsplanen var fastlagt politisk ud fra ønsket om at få tilvejebragt en digitaliseret tinglysning samtidig med gennemførelsen af en række andre reformer. Den stramme tidsplan betød, at der skulle foretages en meget stram projektstyring og prioritering.

For hovedområdet »interessenter« vurderede Domstolsstyrelsen samlet risikoen på niveau 3. Det forhold, at projektet skulle udvikles i samarbejde med mange interessenter, blev selvstændigt vurderet til at have en høj risiko, fordi interessenterne var meget forskellige fra de største finansielle institutioner, over landinspektører og offentlige institutioner til mindre bilfinansiering, advokater og ejendomsmæglere. Risikoen blev dog anset for reduceret af, at finanssektoren havde fundet sammen, og at der her var skabt enighed om behovet for en fælles løsning. Dette øgede dog kravet til Domstolsstyrelsen om, at alle interessenter ville blive hørt. Den samlede risikovurdering for alle hovedområder blev anført til 3. Som nævnt blev risikologgene løbende opdateret, og der blev løbende foretaget nye risikoanalyser.

*Hovedlinjer i forløbet frem til lukkeperioden*

Frem til idriftsættelsen af den digitale tinglysning den 8. september 2009 blev den planlagte dato for idriftsættelse udskudt tre gange. Den første udskydelse af idriftsættelsen fra den 26. marts 2008 til den 21. november 2008 blev besluttet i efteråret 2007, da CSC meddelte, at det ikke var muligt at overholde fristen den 25. marts 2008. Som følge af øget risiko på leverandørsiden og i forhold til interessenterne vurderede Domstolsstyrelsen, at udviklingen af det digitale tinglysningssystem havde ændret sig fra risikoniveau 3 til risikoniveau 4. Risikovurderingen ved de organisatoriske forhold var stadig relativ høj.

Den anden udskydelse af idriftsættelsen fra den 21. november 2008 til den 12. januar 2009 blev besluttet i juni 2008. Ved aktstykke af 15. september 2008 blev det oplyst, at Domstolsstyrelsen i samarbejde med finanssektoren og leverandøren havde udarbejdet en detaljeret implementeringsplan for selve overgangen til digital tinglysning. Planen, som skulle sikre en vellykket overgang til det nye system, indebar, at testperioden blev forlænget til og med tirsdag den 23. december 2008, at al tinglysning vedrørende fast ejendom herefter ville lukke i 10 arbejdsdage, mens datakonvertering og omstilling foregik, at den digitale tinglysning ville åbne mandag den 12. januar 2009, og at banker og realkreditinstitutter ville få koblet deres it-systemer til den

**2856**

digitale tinglysning i slutningen af januar 2009. Risikovurderingen var uændret i forhold til den første udsættelse af projektet.

Den periode, hvor effektiviseringsgevinsten ikke skulle realiseres, som ved aktstykke nr. 38 af 21. november 2006 var blevet fastsat til 3 måneder, blev ved den første udskydelse af idriftsættelsen reduceret og bortfaldt helt ved den anden udskydelse.

Den tredje udskydelse fra den 12. januar 2009 den 8. september 2009 blev besluttet i oktober 2008. Af et notat af 28. oktober 2008 fra Domstolsstyrelsen fremgår, at der mellem styrelsen, Finansrådet, Realkreditrådet, CSC og Devoteam var tillid til projektets retning og systemets design, og der var samtidig enighed om, at den daværende tidsplan indeholdt væsentlig risiko for fejl og startvanskeligheder. For at skabe tid til en grundig gennemtestning af systemet, herunder af system til system-løsningen med finanssektoren, og dermed reducere risikoen for startvanskeligheder ved idriftsættelsen, var der enighed om at opstille en revideret tidsplan, der udskød idriftsættelsen af den digitale tinglysning fra den 12. januar 2009 til primo september 2009. Det blev anført i notatet, at det ved en

Copyright © 2023 Karnov Group Denmark A/S                                                                                          side 4

U.2020.2851H

udskydelse af tidspunktet for ibrugtagen af systemet vil være af afgørende betydning for tinglysningsopgavens varetagelse i overgangsperioden, at Domstolsstyrelsen kunne fastholde alle de daværende medarbejdere i tinglysningsafdelingerne, så opgaven blev løst på betryggende vis. Det ville være kritisk for en sikker drift af tinglysningen i perioden frem til den digitale tinglysning, hvis flere medarbejdere ikke ønskede at fortsætte deres ansættelse. For at kunne fastholde medarbejderne i tinglysningsafdelingerne ved byretterne, hvoraf nogle allerede havde planlagt deres afsked fra domstolene, og nogle allerede tidligere var blevet forlænget flere gange, ville der være behov for at yde en fastholdelsesbonus til den enkelte. Notatet indeholdt beregninger af udgifterne ved at udskyde idriftsættelsen.

Byggeriet af Tinglysningsrettens lokaler i Hobro blev påbegyndt i marts 2008 som et OPP-projekt, og det var færdigt i marts 2009.

### Det leverede it-system

It-systemet blev udviklet af CSC, der blev valgt som en ud af tre tilbudsgivere på udviklingen af systemet.

Kravspecifikationen indeholdt krav om brugervenlighedstest af den eksterne portal, men den blev fravalgt, idet CSC i stedet tilbød at stille en brugervenlighedsekspert til rådighed for projektet. Det var i begyndelsen af projektet forventningen, at de professionelle brugere ville udvikle branchespecifikke systemtil system-løsninger, mens den eksterne portal kun ville blive brugt af visse mindre virksomheder og privatpersoner. Det viste sig dog senere, at en række professionelle brugere alligevel ikke ville udvikle egne systemløsninger. Dette var således tilfældet for bl.a. advokaterne, ejendomsmæglerne og landinspektørerne, mens finanssektoren etablerede system til system-løsninger.

I august 2009 blev der etableret mulighed for at afprøve og kommentere den eksterne portal i en såkaldt »sandkasse« løsning.

Der blev udarbejdet en brugervejledning i anvendelse af det digitale tinglysningssystem, ligesom der blev etableret en hotline i Tinglysningsretten, som brugerne kunne ringe til for at få assistance, råd og vejledning i at anvende systemet.

### Særligt om fuldmagtsordningen

Tinglysningsudvalget forudsatte i betænkning nr. 1471/2006, at en afskaffelse af den hidtidige papirbaserede tinglysning og indførelse af en ny papirløs tinglysning med automatiske og digitale sagsgange var baseret på digital signatur, digitale dokumenter og digital kommunikation mellem brugerne og systemet. På grund af den relativt begrænsede udbredelse af digitale signaturer anbefalede Tinglysningsudvalget, at der også blev etableret en fuldmagtsordning, så advokater m.fl. kunne foretage anmeldelser på deres klienters vegne.

Ved bekendtgørelse nr. 763 af 20. juli 2009 om adgang til tinglysningssystemet og om tinglysningsmåden blev der fastsat regler om udformningen og indholdet af fuldmagter til brug for tinglysning. Det blev bl.a. bestemt, at fuldmagten skulle gives på en blanket, der var optaget som bilag 1 til bekendtgørelsen.

Fuldmagten skulle udfyldes maskinelt og var dateret og underskrevet af den, der disponerede i henhold til det anmeldte dokument. Når fuldmagten var modtaget i Tinglysningsretten, blev det bl.a. undersøgt, om den var udfyldt korrekt, og den blev herefter scannet ind. Efter scanningen blev fuldmagterne OCR-læst, så det blev muligt senere maskinelt at finde bestemte data i den enkelte fuldmagt. Denne funktionalitet krævede, at data altid stod på et forud fastsat sted i fuldmagterne, og derfor var der formularartvang.

Det er under sagen oplyst, at Domstolsstyrelsen skønnede, at Tinglysningsretten kunne risikere at modtage op mod 8.000-10.000 fuldmagter dagligt. Systemet blev derfor udviklet, så det havde en kapacitet på op til 10.000 fuldmagter dagligt. Efter idriftsættelsen

af den digitale tingbog modtog Tinglysningsretten ca. 4.000 fuldmagter om dagen.

Systemet til fuldmagtsordningen var udviklet og klar til idriftsættelse den 8. september 2009.

### Særligt om konvertering af eksisterende pantebreve

Tinglysningsudvalgets betænkning nr. 1471/2006 indeholdt forslag til overgangsregler, der skulle medvirke til at sikre en smidig overgangsproces med løbende konvertering af papirpantebreve, idet et krav om konvertering (digitalisering) af samtlige eksisterende papirbaserede pantebreve i umiddelbar tilknytning til

**2857**

indførelsen af digital tinglysning ville være forbundet med en stor arbejdsbyrde for Tinglysningsretten i indkøringsperioden.

Ved lov nr. 504 af 12. juni 2009 blev der indført en mulighed for, at finanssektoren i vidt omfang selv kunne forestå konverteringen. Ordningen omfattede autoriserede anmeldere efter tinglysningsloven. Konverteringen var afgiftsfri, hvis der i forbindelse med aflysningen af pantebrevet skete tinglysning af et tilsvarende digitalt pantebrev, og afgiftsfriheden forudsatte, at det nye pantebrev blev anmeldt til tinglysning senest samtidig med aflysning af det tidligere pantebrev og senest 5 år efter lovens ikrafttræden.

Der var desuden ved lov nr. 539 af 8. juni 2006 indført en overgangsordning for tinglyste ejerpantebreve, hvorefter rettigheder over disse senest 5 år efter lovens ikrafttræden [idriftsættelse af den digitale tinglysning] skulle tinglyses for at bevare beskyttelse mod aftaler og retsforfølgning.

I forbindelse med et brugergruppemøde den 25. juni 2009 blev håndtering af forskellige situationer ved overgangen til digital tinglysning drøftet. Et af punkterne var konvertering af pantebreve. Af et notat udarbejdet til brug for drøftelserne fremgår: »Anmodning om konvertering af et større antal (ejer)pantebreve, uden at dette sker i forbindelse med tinglysning af ændringer til disse, skal aftales nærmere med Tinglysningsretten«.

Det er under sagen oplyst, at Domstolsstyrelsen havde en forventning om, at der skulle konverteres ca. 15.000 pantebreve om måneden (beregnet på grundlag af antallet af tinglyste pantegninger i de forudgående år), og at langt størstedelen (ca. 80 %) af disse konverteringer ville ske via autoriserede anmeldere og derfor ikke ville belaste Tinglysningsretten. Det var desuden forventningen, at dette tal ville være svagt faldende, idet det ofte var de samme dokumenter, der blev påtegnet flere gange, og at Tinglysningsretten derfor ville modtage ca. 3.000 pantebreve om måneden til konvertering, svarende til i alt ca. 12.000 pantebreve frem til årsskiftet 2009/2010.

### Særligt om medarbejdernes forventede produktivitet, personalenormeringen og uddannelsen af personalet

Deloitte vurderede som nævnt, at de ca. 357 årsværk, der blev anvendt i det eksisterende papirbaserede tinglysningssystem, ved indførelse af et centraliseret digitalt tinglysningssystem kunne reduceres til ca. 91 årsværk. Deloitte vurderede også, at man kunne opnå en automatiseringsgrad på 69 %. Deloittes analyse var udgangspunktet for det bevillingsmæssige grundlag for tinglysningsprojektet.

Tinglysningsretten blev fra 2008 tildelt en grundbevilling på 115 årsværk, der dog senere blev opnormeret. Tinglysningsretten vurderede således i januar 2009, at retten efter flytningen til nye lokaler i april 2009 ville have behov for at udnytte den oprindelige normering på 122 årsværk fuldt ud.

Som følge af centraliseringen og placeringen af Tinglysningsretten i Hobro var det vanskeligt at rekruttere personale med tinglysningserfaring. Det var derimod muligt at rekruttere et tilstrækkeligt antal i øvrigt kompetente medarbejdere, der dog skulle uddannes til tinglysningsopgaven.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

Tinglysningsretten overtog efter etableringen af retten den 1. januar 2007 tinglysningsopgaven fra et antal byretter, og der blev etableret 3 uddannelsescentre placeret i Aalborg, Randers og Aarhus, hvor i alt ca. 60 medarbejdere skulle uddannes i det papirbaserede tinglysningssystem. Medarbejderne skulle i løbet af 9 måneder oplæres af erfarne Tinglysningsmedarbejdere i at tinglyse.

I maj 2009 indgik Tinglysningsretten aftale med omkringliggende retskredse om udlån og oplæring af medarbejdere, hvis sagsbehandlingstiden ved Tinglysningsretten måtte blive uacceptabel lang. Der blev derved etableret et yderligere beredskab på 20 erfarne tinglysningsmedarbejdere. De pågældende medarbejdere fik forud for idriftsættelsen samme kurser i brugen af det nye system som Tinglysningsrettens egne medarbejdere.

Domstolsstyrelsen har oplyst, at der i juni 2009 blev afholdt en generel introduktion for alle medarbejdere i brugen af det digitale tinglysningssystem. Desuden uddannede CSC 16 superbrugere, der i perioden 20. august - 7. september 2009 uddannede de øvrige medarbejdere. Medarbejderne kunne under uddannelsen bl.a. øve sig på prøvesager.

*Lukkeperioden og idriftsættelsen af systemet*

Der blev afholdt overtagelsesprøver af it-systemet den 8. juli og 20. august 2009. It-systemet blev imidlertid ikke umiddelbart godkendt, og Devoteam foretog senere en vurdering af overtagelsesprøven af 20. august 2009 og indstillede til Domstolsstyrelsen, at hvis styrelsen valgte at lade CSC bestå overtagelsesprøven, burde dette ske forbehold for afhjælpning af en række fejl og mangler. Det er oplyst, at systemet blev endeligt godkendt i november 2009.

Udskydelserne af idriftsættelsestidspunktet havde medført udfordringer for byretspræsidenterne med at fastholde det nødvendige personale til at opretholde den papirbaserede tinglysning ved retternes tinglysningsafdelinger. Det var vurderingen, at en yderligere udskydelse ville have forværret situationen betydeligt.

I et udkast til orienterende aktstykke til Finansudvalget gav Domstolsstyrelsen udtryk for, at det fortsat var styrelsens plan, at systemet skulle sættes i drift den 8. september 2009, og Domstolsstyrelsen havde sammen med leverandøren og brugerne - særligt i den finansielle sektor - udarbejdet produktionsforberedelsesplaner, men også beredskabsplaner for det tilfælde, at der

**2858**

måtte opstå uforudsete problemer. Det var Domstolsstyrelsens forventning, at der - uanset den grundige test af systemet - måtte forventes mindre driftsforstyrrelser i perioden umiddelbart efter implementeringen, ligesom der måtte påregnes en indkøringsperiode med længere sagsbehandlingstider frem til årsskiftet. Der var fortsat en risikovurdering på 4.

Den 28. august 2009 forelå Tinglysningsrettens »Beredskabsplan for e-TL« udarbejdet af Devoteam. Planen indeholdt bl.a. detaljerede tjeklister og hjælpemiddeloversigter.

På et leverandørstyregruppemøde den 31. august 2009 udtrykte Domstolsstyrelsen bekymring for, om produktionsforberedelser og performancetest var dokumenteret og klar til, at tinglysningssystemet kunne idriftsættes den 8. september 2009. CSC bekræftede, at performancetesten var gennemført i testmiljøet.

Domstolsstyrelsen besluttede at sætte det digitale tinglysningssystem i drift den 8. september 2009. Finanssektoren havde i månederne op til idriftsættelsen udtrykt bekymring for, om der var tilstrækkelig til kvalitetssikring af systemet, og om der var tilstrækkelige beredskabsplaner. En dialog med Justitsministeriet og Domstolsstyrelsen om beredskabsplaner og test af systemet i juli og august 2009 førte til, at finanssektoren var enig i idriftsættelse af det digitale tinglysningssystem den 8. september 2009.

I perioden fra den 20. august 2009 til idriftsættelsen den 8. september 2009 var der lukket for tinglysning. I lukkeperioden skulle bl.a. alle papirsager færdigbehandles i det gamle system, så tingbogens indhold kunne blive overført til det nye system ved datakonvertering i første uge af september 2009.

*Den forlængede sagsbehandlingstid og indsatsen mod den*

Generelt havde det papirbaserede tinglysningssystem, særligt i de seneste år forud for idriftsættelsen af det digitale system, relativt lave gennemsnitlige ekspeditionstider. Langt hovedparten af retterne kunne ud fra en gennemsnitsbetragtning behandle de indkomne dokumenter på 10 hverdage eller derunder. Tallene gemte dog på store variationer mellem de enkelte retskredse.

Den 8. september 2009 udsendte Domstolsstyrelsen en pressemeddelelse om idriftsættelsen af den digitale tinglysning. Det blev i pressemeddelelsen pointeret, at der ville være en indkøringsperiode frem til nytår. Indkøringsperioden skyldtes bl.a., at Tinglysningsretten i begyndelsen ville komme til at løse flere opgaver manuelt, bl.a. fordi brugerne forventedes at skulle vænne sig til det nye system, ligesom der var opstået en ophobning af sager som følge af den midlertidige lukkeperiode.

Domstolsstyrelsen har trukket statistik på sagsbehandlingstiderne og automatiseringsgraden for afsluttede og modtagne sager i perioden fra september 2009 - december 2010. Følgende fremgår af statistikkerne:

»...

Sagstal, målopfyldelse og gennemsnitlig sagsbehandlingstid for tinglysningen i perioden september 2009 til december 2010 for hhv. de manuelt behandlede og alle tinglysningssager

| | Manuelt behandlede sager | Mål-opfyldelse | Gennemsnitlig sags-behandlingstid | Gennemsnitlig behandlingstid | | Alle behandlede sager | Mål-opfyldelse | Gennemsnitlig sags-behandlingstid | Gennemsnitlig behandlingstid |
|---|---|---|---|---|---|---|---|---|---|
| | Baseret på afsluttede sager i måneden | | | | | Baseret på afsluttede sager i måneden | | | |
| | | | (ugedage) | (hverdage 5/7) | | | | (ugedage) | (hverdage 5/7) |
| 2009 | | | | | 2009 | | | | |
| September | 8.436 | 99,5 | 4,4 | 3,1 | September | 17.700 | 99,7 | 2,2 | 1,6 |
| Oktober | 12.995 | 47,3 | 16,6 | 11,8 | Oktober | 37.852 | 81,3 | 5,9 | 4,2 |
| November | 14.086 | 36,8 | 25,1 | 17,9 | November | 63.910 | 74,2 | 8,8 | 6,3 |
| December | 23.862 | 18,4 | 38,6 | 27,5 | December | 79.477 | 65,5 | 15,6 | 11,1 |
| 2010 | | | | | 2010 | | | | |
| Januar | 47.979 | 16,9 | 48,2 | 34,4 | Januar | 116.768 | 59,9 | 22,7 | 16,2 |
| Februar | 51.453 | 27,8 | 31,2 | 22,3 | Februar | 121.019 | 66,3 | 14,4 | 10,3 |
| Marts | 58.719 | 44,3 | 19,9 | 14,2 | Marts | 140.355 | 75,4 | 8,9 | 6,4 |
| April | 38.506 | 64,0 | 17,4 | 12,4 | April | 120.546 | 87,9 | 6,0 | 4,3 |
| Maj | 47.405 | 53,6 | 20,7 | 14,8 | Maj | 163.948 | 84,8 | 6,9 | 4,9 |
| Juni | 54.373 | 66,6 | 13,4 | 9,5 | Juni | 193.872 | 89,5 | 4,3 | 3,1 |
| Juli | 52.819 | 62,9 | 13,6 | 9,7 | Juli | 162.378 | 86,4 | 5,1 | 3,6 |
| August | 49.899 | 61,5 | 14,4 | 10,3 | August | 151.052 | 86,2 | 5,2 | 3,7 |
| September | 55.927 | 62,7 | 14,2 | 10,2 | September | 180.171 | 87,2 | 4,9 | 3,5 |
| Oktober | 55.694 | 69,9 | 10,5 | 7,5 | Oktober | 170.820 | 90,3 | 3,6 | 2,6 |
| November | 56.567 | 66,1 | 11,8 | 8,0 | November | 188.440 | 88,8 | 3,9 | 2,8 |
| December | 59.250 | 64,2 | 11,7 | 8,3 | December | 177.700 | 87,0 | 4,3 | 3,1 |

Note: Der anvendes 14 kalenderdage for at finde målopfyldelsen inden for 10 hverdage. I perioder med skæve helligdage vil målopfyldelsen derfor være undervurderet. Når afgørelsestiden findes, ganger vi på tilsvarende vis afgørelsestiden i kalenderdage med 5/7 for at findes afgørelsestiden målt i hverdage. I perioder med skæve helligdage vil afgørelsestiden således blive målt langere, end den er.

Sagstal, målopfyldelse og gennemsnitlig sagsbehandlingstid for tinglysningen i perioden september 2009 til december 2010 for hhv. de manuelt behandlede og alle tinglysningssager

| | Manuelt behandlede sager | Mål-opfyldelse | Gennemsnitlig sags-behandlingstid | Gennemsnitlig behandlingstid | | Alle behandlede sager | Mål-opfyldelse | Gennemsnitlig sags-behandlingstid | Gennemsnitlig behandlingstid |
|---|---|---|---|---|---|---|---|---|---|
| | Baseret på modtagne sager i måneden | | | | | Baseret på modtagne sager i måneden | | | |
| | | | (ugedage) | (hverdage 5/7) | | | | (ugedage) | (hverdage 5/7) |
| 2009 | | | | | 2009 | | | | |
| September | 18.200 | 51,1 | 18,6 | 13,3 | September | 26.246 | 66,0 | 12,9 | 9,2 |
| Oktober | 17.334 | 53,9 | 16,9 | 12,1 | Oktober | 65.698 | 46,9 | 30,7 | 21,9 |
| November | 37.807 | 13,7 | 51,2 | 36,6 | November | 87.444 | 53,8 | 25,9 | 18,5 |
| December | 31.066 | 13,8 | 42,8 | 30,6 | December | 83.847 | 61,8 | 18,8 | 13,4 |
| 2010 | | | | | 2010 | | | | |
| Januar | 34.515 | 26,8 | 28,0 | 20,0 | Januar | 99.877 | 71,6 | 10,8 | 7,7 |
| Februar | 37.828 | 40,5 | 20,4 | 14,5 | Februar | 105.480 | 77,2 | 7,9 | 5,7 |
| Marts | 48.424 | 56,2 | 13,7 | 9,8 | Marts | 129.430 | 82,5 | 5,7 | 4,0 |
| April | 40.467 | 67,9 | 12,5 | 8,9 | April | 124.186 | 88,3 | 4,7 | 3,3 |
| Maj | 47.435 | 55,4 | 13,7 | 9,8 | Maj | 164.064 | 85,5 | 4,6 | 3,3 |
| Juni | 56.696 | 67,1 | 14,2 | 10,1 | Juni | 195.932 | 89,2 | 4,7 | 3,3 |
| Juli | 50.741 | 54,5 | 15,5 | 11,1 | Juli | 160.093 | 84,0 | 5,5 | 4,0 |
| August | 47.835 | 68,1 | 12,1 | 8,6 | August | 152.765 | 88,9 | 4,2 | 3,0 |
| September | 56.637 | 68,0 | 10,8 | 7,7 | September | 180.737 | 89,1 | 3,7 | 2,7 |
| Oktober | 54.811 | 66,3 | 11,6 | 8,3 | Oktober | 170.497 | 88,1 | 4,2 | 3,0 |
| November | 61.245 | 60,2 | 12,6 | 9,0 | November | 192.231 | 86,2 | 4,5 | 3,2 |
| December | 58.436 | 60,4 | 14,0 | 10,0 | December | 177.210 | 85,7 | 5,1 | 3,6 |

Note: Der anvendes 14 kalenderdage for at finde målopfyldelsen inden for 10 hverdage. I perioder med skæve helligdage vil målopfyldelsen derfor være undervurderet. Når afgørelsestiden findes, ganger vi på tilsvarende vis afgørelsestiden i kalenderdage med 5/7 for at findes afgørelsestiden målt i hverdage. I perioder med skæve helligdage vil afgørelsestiden således blive målt langere, end den er.

...«

Efter den første uge med digital tinglysning steg sagsbehandlingstiden, og finanssektoren rettede den 7. oktober 2009 henvendelse til Domstolsstyrelsen og udtrykte bekymring for den forøgede

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

sagsbehandlingstid, navnlig i de forudgående to uger. Finanssektoren oplevede bl.a. en stigende ophobning af sager, der var anmeldt til tinglysning, men hvor der ikke forelå information om, hvornår sagen forventedes behandlet, manglende tilgængelighed og stabilitet med lange svar tider fra tinglysningssystemet med den virkning, at produktionen i finanssektoren reelt stoppede midt på dagen fra kl. 11.00 til 15.00, og manglende funktionalitet i tinglysningssystemet, der gjorde det umuligt for finanssektoren at anmelde en række sager til tinglysning, herunder boligforeningssager, forvaltningssager, relaksationer mv.

Ved mail af 29. oktober 2009 videresendte Danske Advokater til Domstolsstyrelsen en henvendelse af 16. oktober 2009 fra advokat Lars Lindencrone Petersen om bl.a. en række praktiske problemer med det digitale

**2859**

tinglysningssystem. Han anførte bl.a., at »flere funktioner i det nye system ikke fungerer/har fungeret, herunder kladdefunktionen, muligheden for at prøvetinglyse dokumenter samt funktionen, hvorved ende end anmelder via e-mail gives meddelelse om, at et dokument er tinglyst«, og at det således bl.a. »ikke [har] været muligt i fornødent omfang at tinglyse klienternes rettigheder rettidigt og frigive købesummer inden for rimelig tid mv.«

Advokat Lars Lindencrone Petersen anførte endvidere, at der »fortsat [er] lange perioder, hvor det ikke er muligt at lyse dokumenter på grund af »tekniske problemer«, idet systemet »er ude af drift«, sender en »fejlmeddelelse« eller blot oplyser, at der en »teknisk fejl«. Vi har således ved flere lejligheder oplevet, at vi har været klar til at tinglyse et dokument, men gennem flere dage er blevet mødt med tekniske problemer, der hindrer selve tinglysningen«. Desuden anførte han, at der var meget lange »svar tider«, når man som bruger skulle bevæge sig igennem de forskellige skærmbilleder. Endelig anførte advokat Lars Lindencrone Petersen, at »når lovgivningen giver mulighed for anvendelse af fuldmagtsordningen, og når den enkelte klient ofte føler sig mere tryg ved, at advokaten foretager hele den digitale tinglysningsekspedition på vegne af klienten, så er det Tinglysningsrettens fornemste opgave at sikre, at tinglysningen ikke forsinkes og kan gennemføres inden for rimelig tid efter afsendelsen af omhandlede fuldmagt til registrering«.

På et brugergruppemøde den 19. oktober 2009 orienterede Domstolsstyrelsens direktør om overgangen fra det gamle tinglysningssystem til digital tinglysning. Han oplyste, at der efter den første uge var kommet mere pres på systemet, og der var bl.a. konstateret håndteringsproblemer i forhold til fuldmagter. De øvrige problemer, der var konstateret, var småfejl og uhensigtsmæssigheder, der kunne rettes, og som man måtte forvente i en indkøringsperiode. Han bemærkede i øvrigt, at Tinglysningsrettens hotline have været overbelastet. Advokatrådets repræsentant i brugergruppen udtrykte utilfredshed med systemet på en række punkter.

Devoteam afgav den 21. oktober 2009 et notat om situationen i Tinglysningsretten. Det blev bl.a. anført, at der var lange ventetider i telefonbetjeningen, at der var mange henvendelser via e-post, og at medarbejderne blev stressede af sagspukler.

På et møde i Domstolsstyrelsens bestyrelse den 26. oktober 2009 var et af punkterne på dagsordenen orientering om status på it-projekterne. Som bilag til punktet var udarbejdet »Status på digital tinglysning«, hvoraf fremgår:

»…

Indkøringsperioden

…

Status er pr. 21. oktober 2009, at der er modtaget 67.664 anmeldelser. Heraf er ca. 1/3 stadig under behandling, mens 2/3 er færdigbehandlet. Af de færdigbehandlede anmeldelser er omkring to tredjedele tinglyst inden for én dag. I gennemsnit er sagsbehandlingstiden på de færdigbehandlede sager ca. 5 dage. Der er samlet blevet foretaget 519.614 forespørgsler i systemet.

Antallet af anmeldelser fordeler sig med ca. 1/3 på den eksterne portal (www.tinglysning.dk), som blandt andet advokater og ejendomsmæglere benytter, og 2/3 på system til system-løsningen, som banker og realkreditinstitutter gør brug af.

Domstolsstyrelsen har allerede inden den 8. september forberedt brugerne af den digitale tinglysning på en indkøringsperiode frem til årsskiftet. …

Efter systemet trådte i kraft har der da også vist sig en række overgangsvanskeligheder. Det har skabt frustration for medarbejdere og brugere, der også har fremført deres kritik af systemet i pressen.

Nedenfor følger nogle af de indkøringsvanskeligheder, der har vist sig efter ikrafttrædelsen.

1. Stort pres på papirfuldmagter

En af de praktiske problemstillinger i indkøringsperioden har vist sig at være brugen af papirbaserede fuldmagter. I følge lovgrundlaget om digital tinglysning er købers og sælgers brug af digital signatur fremover den primære måde at underskrive for eksempel et skøde på. Som en sekundær mulighed for de brugere, der af forskellige årsager ikke måtte have en digital signatur, blev der indført en såkaldt fuldmagtsordning, hvor køber og sælger kan give fuldmagt til en professionel rådgiver, der på den baggrund kan signere digitalt på vegne af disponenten.

I praksis har den papirbaserede fuldmagtsordning vist sig at medføre flere problemer, fordi brugen af fuldmagter har været væsentlig mere udbredt end forventet. Det har medført kapacitetsproblemer i Tinglysningsretten, ligesom der i perioder har været betydelige tekniske vanskeligheder omkring opsætningen af det nødvendige skanningsudstyr.

Presset på fuldmagtsordningen har desværre betydet, at flere professionelle brugere har måttet vente op til flere, uger på at få bekræftet, at de fremsendte fuldmagter er i orden, og kan danne grundlag for tinglysning. Tinglysningsretten har i den forbindelse pointeret, at professionelle rådgivere - i overensstemmelse med lovens hensigt - kan anbefale deres klienter at skrive under med en digital signatur i stedet for at udfylde en fuldmagt, eller tinglyse på forventet fuldmagt.

For at nedbringe bunken af fuldmagter har Tinglysningsretten ansat yderligere 4 medarbejdere og etableret et særligt hold af medarbejdere, der udelukkende beskæftiger sig med at oprette fuldmagter. Holdet har i perioder arbejdet døgnet rundt i 3-holdsskift, og

**2860**

indsatsen har betydet, at bunken forventes nedbragt, således at retten med udgangen af uge 43 skanner de nye fuldmagter løbende.

2. Manglende funktionalitet.

For ikke at risikere problemer i forbindelse med idriftsætningen den 8. september, blev en del mindre rettelser - især af den funktionalitet, der sikrer automatiseret tinglysning - udskudt, og blev først lagt i produktion den 29. september. Dette betød en ophobning af sager til manuel behandling, som førest nu er at være afviklet. Tilsvarende udestår der fortsat en del rettelser, der først forventes lagt i produktion med udgangen af oktober måned.

3. Kladdefunktionen virkede ikke

Kladdefunktionen www.tinglysning.dk er et andet element, der i indkøringsperioden har skabt vanskeligheder for flere brugere. I de første uger kunne brugere således ikke gemme kladden til et skøde, men funktionen er efterfølgende blevet rettet og fungerer nu efter hensigten.

4. Perioder med lange svartider

Copyright © 2023 Karnov Group Denmark A/S

side 7

U.2020.2851H

I den første tid med digital tinglysning har der periodevis været problemer med systemets svartider; det vil sige den tid, brugeren venter på at komme frem til et nyt skærmbillede. En nylig optimering af systemet har dog betydet en væsentlig forbedring af svartiderne, som nu er på et tilfredsstillende niveau. Ændringer i forbrugsmønstret kan dog fortsat udløse behov for finjustering af svartider, hvorfor leverandøren CSC og Domstolsstyrelsen har etableret en tæt overvågning af svartiderne.

5. Lang ventetid i Tinglysningsrettens hotline

Der har været og er fortsat et meget stort pres på Tinglysningsrettens hotline. Det har desværre resulteret i en betydelig ventetid for brugerne. I perioder har mange henvendelser omhandlet basale spørgsmål som digital signatur og grundlæggende information og vejledning om systemets funktion. Det har ikke på kort sigt vist sig muligt at forøge antallet af medarbejdere, der har tilstrækkelig viden om systemet til at besvare brugernes spørgsmål på en kvalificeret måde.

For at kanalisere brugerne uden om hotline har Tinglysningsretten og Domstolsstyrelsen styrket informationen på Tinglysningsrettens hjemmeside. Samtidig er der hyret bistand til at målrette eksisterende vejledninger til systemet i forhold til brugernes aktuelle spørgsmål.

Den ekstraordinære belastning af hotline har betydet, at flere medarbejdere end forventet svarer på telefoner og mails Det betyder omvendt færre medarbejdere til at ekspedere de sager, som kræver manuel behandling. Der må derfor i indkøringsperioden forventes en længere sagsbehandlingstid end normalt på manuelle ekspeditioner.

6. Kritik af systemets funktionalitet

Der har i de første uger med digital tinglysning været fremført kritik af dele af systemets funktionalitet. Kritikken har rettet sig imod mindre fejl og mangler, dels imod forhold, som kunne forbedre brugernes oplevelse af systemet. En del af kritikken hænger sammen med tilvænningen til et nyt system, der betyder ændrede procedurer hos blandt andet de professionelle brugere. En anden - og ganske væsentlig del - del hænger sammen med det forhold, at de professionelle brugergrupper ofte har forskellige behov - og andre behov end den almindelige borger. Den nye tinglysningsportal skal imidlertid dække alle behov, og skal især sikre, at borgeren fortsat selv kan foretage tinglysningsekspeditioner på en forståelig og sikker måde. …

…

Både i udvalgsarbejdet og i de forberedende år op til overgangen til digital tinglysning har der været bred inddragelse af brugergrupperne. I den efterfølgende indkøringsperiode har der desuden været en tæt dialog med centrale brugergrupper for at samle erfaringerne med det nye system. Tinglysningsretten og Domstolsstyrelsen vil fortsætte dialogen med brugerne af systemet med henblik på løbende at forbedre brugernes oplevelse og anvendelse af systemet.

…«

Tinglysningsretten sendte den 9. november 2009 en graf udarbejdet af finanssektoren over udviklingen i forholdet mellem anmeldte sager og sager, der lå til manuel behandling, for perioden 8. september - 5. november 2009, til Domstolsstyrelsen. Grafen så således ud:



I slutningen af september 2009 og navnlig i løbet af oktober 2009 begyndte Tinglysningsretten at modtage et stort antal pantebreve til konvertering. De mange konverteringsanmodninger kom alle fra finansielle institutter. Der blev i en række tilfælde medsendt følgebreve, der ikke angav noget om sagernes aktualitet eller hastende karakter, mens der samtidig fra samme pengeinstitut blev modtaget andre sager enkeltvis, hvor den hastende karakter var fremhævet. Indsendelsen af det

**2861**

meget store antal pantebreve var ikke aftalt på forhånd med Tinglysningsretten.

Domstolsstyrelsen har oplyst, at anmodningerne om pantebrevskonvertering i oktober måned 2009 begyndte at tage mange ressourcer fra sagsbehandlingen. Alle anmodninger om konvertering af pantebreve blev modtaget i rettens postafdeling. Her blev anmodningerne sorteret efter modtagelsesdato og underopdelt i alfabetisk anmelderorden for hver modtagelsesdag, hvorefter de blev placeret på en reol mærket med den pågældende modtagelsesdato. Alle konverteringsanmodninger fra finanssektoren blev betragtet som anmodninger om massekonvertering, medmindre det af fremsendelsesbrevet fremgik, at anmodningen var hastende, eller det i øvrigt fremgik, at anmodningen havde forbindelse til en anden aktuel tinglysningsmæssig ekspedition. Dette gjaldt, uanset om der var tale om masseanmodninger eller en enkeltstående anmodninger. Når retten kun modtog et enkelt pantebrev til konvertering fra et pengeinstitut eller lignende, blev dette pantebrev dog af praktiske grunde hastebehandlet. De pantebreve, der var markeret som hastende, blev udtaget og konverteret straks, men i øvrigt blev de pantebreve, der blev modtaget, konverteret efter modtagelsesdato. Der blev således konverteret både hastende pantebreve og pantebreve fra »bunken« hver dag.

Tilgangen af konverteringsanmodninger fortsatte med at vokse i november 2009, og det var på det tidspunkt især konvertering af pantebreve, der trak ressourcer fra sagsbehandlingen. Det er oplyst, at der i perioder blev anvendt op til 30 medarbejdere på konverteringsopgaven.

Ved mail af 15. november 2009 svarede Tinglysningsretten på et tilsagn fra finanssektoren om mulig hjælp:

»…

Der hvor vi kunne se en virkelig hjælp, er i forbindelse med konverteringen af gamle pantebreve. Konvertering af et pantebrev tager - i gennemsnit - lige så lang tid, som tinglysning af 4-5 pantebreve udtaget til manuel behandling, og er dermed meget belastende for Tinglysningsretten, der på nuværende tidspunkt netop har rundet 50.000 konverterede pantebreve.

Det ville derfor være en meget stor hjælp, hvis pengeinstitutterne i højere grad ville udnytte den hjemmel, de har fået i ændringsloven til tinglysningsloven, til selv at konvertere pantebreve (gælder for alle autoriserede anmeldere). Dette ville samtidig spare de pågæl-

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

dende for udgifter til forsendelse og håndtering af papirdokumenterne både når de skal afsendes, og når de kommer retur.

…«

Finanssektoren svarede Tinglysningsretten ved mail af 17. november 2009:

»…

På baggrund af jeres forslag er Finansrådet p.t. ved at undersøge implikationerne af og mulighederne for at anbefale pengeinstitutterne i videre omfang benytte den mulighed, der er i Tingbogsbekendtgørelsens § 49, stk. 4 for at konvertere pantebreve via brug af anmelderordningen. Jeg vender tilbage med et svar herpå snarest.

Jeg hører imidlertid gerne om Finansrådet/sektoren kunne være Tinglysningsretten behjælpelig på andre områder, hvor der ikke dermed sker en ansvarsforskydning fra Tinglysningsretten til finanssektoren.

…«

Den 10. december 2009 modtog Domstolsstyrelsens bestyrelse et notat med overskriften »Status på digital tinglysning«, hvori der bl.a. stod:

»…

I dette notat redegøres for udviklingen siden seneste orientering og for den planlagte videreudvikling af projektet.

Den digitale tinglysning befinder sig frem til årsskiftet i en indkøringsperiode. Erfaringerne fra de første 3 måneder, hvor digital tinglysning har været i brug, har bekræftet styrelsens forventning om, at en så kompleks IT-løsning giver mange udfordringer af juridisk, teknisk og praktisk karakter. Det har dog også vist sig, at brugerne har noget større gener, end styrelsen på forhånd havde forventet.

Der arbejdes på højtryk på at løse de identificerede problemer, og det er styrelsens vurdering, at tingene går i den rigtige retning. Styrelsen har således fortsat tiltro til systemets konstruktion og funktionalitet, og det er vores vurdering, at indkøringsperioden kan betragtes som afsluttet pr. 31. december 2009.

Statistiske oplysninger

Der er indtil den 9. december 2009 anmeldt 206.573 dokumenter til tinglysning. Heraf er de 136.719 tinglyst, og af disse er 91.624 anmeldelser tinglyst automatisk.

Der er i samme periode foretaget 1.027.076 forespørgsler.

Automatiseringsgraden er prt. ca. 50%, hvortil dog skal lægges ca. 8% hidrørende fra dokumenter, der ikke længere anmeldes til tinglysning, idet en del procedurer nu er helt automatiseret.

…«

For at stabilisere sagsbehandlingstiderne i de manuelle sager og i øvrigt skabe en stabil drift af den digitale tinglysning udarbejdede Domstolsstyrelsen og Tinglysningsretten en 10 punkts handlingsplan dateret 14. december 2009: Af handleplanen fremgår bl.a.:

»…

Det er overordnet set Domstolsstyrelsens og Tinglysningsrettens vurdering, at arbejdet med at justere og tilpasse det digitale tinglysningssystem er nået så langt

**2862**

nu, at vi kan sige, at selve it-løsningen fungerer stabilt. Der er bestemt plads til og behov for forbedringer, herunder navnlig med hensyn til at imødekomme de ønsker, der er fremsat af brugerne til ændret/forbedret funktionalitet, men overordnet set vurderer vi, at it-løsningen fungerer stabilt.

Tinglysningsretten ser nu derfor på at få stabiliseret driften af Tinglysningsretten på alle andre områder, herunder med særligt fokus på de sager, der udtages til manuel behandling.

Fokus på manuelle sager

Domstolsstyrelsens og Tinglysningsretten har besluttet at sætte kræfterne ind for først og fremmest at få stabiliseret sagsbehand-

lingstiderne for de sager, der bliver udtaget til manuel behandling i Tinglysningsretten. …

Nedenfor er beskrevet de initiativer, der er gennemført eller planlagt gennemført med henblik på at stabilisere sagsbehandlingstiderne i de manuelle sager, samt de mange andre initiativer, der er sat i værk for i øvrigt at sikre stabil drift i den digitale tinglysning efter nytår.

De enkelte initiativer

De mange initiativer, der er beskrevet i det følgende, har til formål at sikre en stabil drift af den digitale tinglysning fra nytår. En del af initiativerne er allerede iværksat eller gennemført, mens en række andre er ved at blive implementeret. Status for hvert enkelt initiativ er anført nedenfor.

1. Ændret organisering og styrkelse af bemandingen i Tinglysningsretten

…

2. Øget fokus på manuel sagsbehandling

…

3. Forbedring af Hotline

…

4. E-mails

…

5. Forbedrede vejledninger

…

6. Hjælpetekster på tinglysning.dk

…

7. Omstrukturering af FAQ på Tinglysningsretten.dk

…

8. Løbende forbedringer af systemet og opdatering af tinglysningssystemet den 16. december 2009

…

9. Afklaring af juridiske problemer vedr. boligforeninger mv. og spørgsmål vedr. tinglysningsbekendtgørelsen mv.

…

10. Kommunikation

…«

På et møde i brugergruppen den 14. december 2009 orienterede Domstolsstyrelsens direktør om, at styrelsen og Tinglysningsretten havde rettet fokus mod de lange sagsbehandlingstider for de sager, der blev udtaget til manuel sagsbehandling, og at der var udarbejdet en 10 punkts handlingsplan. Finanssektoren var enig i styrelsens vurdering, hvorefter det primære fokus måtte være rettet mod den lange sagsbehandlingstid, der var kritisk. Det blev oplyst, at der på grund af den lange sagsbehandlingstid flere steder i den finansielle sektor var overvejelser om at indføre et administrativt stop for udlån, fordi det var for usikkert, om man kunne opnå sikkerhed i fast ejendom.

Tinglysningsrettens præsident nævnte på mødet, at det ville lette Tinglysningsretten, hvis finanssektoren ville påtage sig selv at konvertere pantebrevene, sådan som sektoren selv havde bedt om i forbindelse med forberedelserne af lovgrundlaget for det digitale system. Finanssektorens repræsentant oplyste, at »han ville tage forslaget med tilbage«.

Ved brev af 15. december 2009 skrev finanssektoren bl.a. følgende til departementscheferne i Justitsministeriet og Økonomi- og Erhvervsministeriet:

»Finanssektoren kan på nuværende tidspunkt konstatere:

At antallet af anmeldelser, hvor der mangler tinglysningssvar, er stigende. P.t. mangler der svar på 75.000 sager, herunder 38.000 pantebrevsanmeldelser, hvoraf der er cirka 1.000 sager, hvor tinglysningsstatus er ukendt, og

At sagsbehandlingstiderne hos Tinglysningsretten fortsat er for opadgående. P.t. er den gennemsnitlige sagsbehandlingstid over 60 dage for de sager, hvor der er egentlig sagsbehandling.

Denne situation, som skal ses i lyset af et meget lavt aktivitetsniveau på ejendomsmarkedet, herunder et lavt antal konverteringer, er stærkt bekymrende og ikke acceptabel for finanssektoren og dens kunder.

Allerede på nuværende tidspunkt har Tinglysningsrettens lange sagsbehandlingstid konsekvenser for långivningen. Omkostninger i forbindelse med de afledte mellemfinansieringsgarantier er steget. Det har blandt andet betydet, at nogle erhvervsvirksomheder har valgt at udsætte lånoptagningen indtil, sagsbehandlingstiderne hos Tinglysningsretten er nedbragt. I tillæg er finanssektorens garantistillelse - og dermed kapitalbinding - siden idriftsættelsen af Den Digitale Tingbog fordoblet. En fortsat stigning vil kunne ramme udlånsaktiviteten negativt. Det er således finanssektorens vurdering, at det vil få samfundsmæssige følger, hvis ikke sagsbehandlingstiden hos Tinglysningsretten snarest nedbringes.«

Domstolsstyrelsen modtog henvendelser fra brancheorganisationerne Landbrug & Fødevarer og Dansk

**2863**

Ejendomsmæglerforening med kritik af bl.a. de lange sagsbehandlingstider og de manglende eller mangelfulde vejledninger.

Finanssektoren og Domstolsstyrelsen afholdt et møde i Justitsministeriet den 17. december 2009. På mødet blev der ifølge et notat af samme dato udarbejdet af Domstolsstyrelsen aftalt:

»…

1. Udstationering af medarbejdere fra finanssektoren i Tinglysningsretten i Hobro.

Skal der ske udstationering af medarbejdere fra finanssektoren, skal Domstolsstyrelsen og Tinglysningsretten snarest - og inden jul - beskrive:

a)  arbejdsopgaver - hvilke opgaver kan medarbejderne forvente at skulle løse i Hobro. Udover konvertering må Sørup nøje overveje, hvilke andre opgaver de kan løse, herunder f.eks. annullation af retsanmærkninger på papirdokumenter fra det gamle system.

b)  arbejdsvilkår/sted - hvor skal medarbejderne arbejde, hvor lange arbejdsdage mv., skal medarbejderne ansættes i Hobro eller er de ansat i finanssektoren etc.

Det skal nærmere afklares med finanssektoren, hvordan udgifterne til udstationeringen, herunder løn, hotel og andre udgifter i øvrigt hertil, skal afholdes.

2. Evt. ikke udstationering af medarbejdere

Sørup skal overveje - hvis der ikke kan blive tale om udstationering af medarbejdere fra finanssektoren - om det på nogen måde kan give Tinglysningsretten en lettelse, hvis Finanssektoren står for at »forberede« konverteringen af pantebrevene, og Tinglysningsretten efterfølgende »godkender« disse, således at Tinglysningsretten har ansvaret for konverteringen.

I øvrigt vil Finansrådet anbefale medlemmerne at genoverveje muligheden for at konvertere pantebreve selv - og i øvrigt følge op på, at der er flere, der ikke har fulgt anbefalingen om, at man ikke sender pantebreve ind i flyttekasser til konvertering.

…«

Tinglysningsretten sendte den 29. december 2009 et notat til finanssektoren om sektorens muligheder for at hjælpe Tinglysningsretten. Af konklusionen i notatet fremgår:

»…

Den finansielle sektor vil efter Tinglysningsrettens opfattelse primært kunne aflaste Tinglysningsretten ved selv at overtage op-

gaverne med konvertering af pantebreve og annulationer af retsanmærkninger.

Alternativt vil Tinglysningsretten fra 1. januar 2010 kunne modtage 12 medarbejdere, der kan udføre disse opgaver fra Tinglysningsrettens lokaler i Hobro. Inden dette vil kunne sættes i værk skal der dog indgås aftaler om de pågældende personers ansættelsesretlige stilling - herunder om ansvaret for de opgaver de udfører.

…«

I begyndelsen af 2010 blev der opnået en forståelse med finanssektoren om, at sektoren overtog opgaven med at konvertere pantebreve, og Tinglysningsretten ophørte herefter med at konvertere pantebreve fra bunken. Ved aftale af 6. april 2010 blev Tinglysningsretten og finanssektoren enige om en procedure for at returnere de papirpantebreve, som var sendt til Tinglysningsretten til massekonvertering, til de enkelte pengeinstitutter.

I et notat af 13. januar 2010 fra Domstolsstyrelsen med en handlingsplan for nedbringelse af sagsbunker fremgår, at 60 % af modtagne sager blev behandlet omgående. Notatet satte yderligere det mål, at Tinglysningsretten i løbet af foråret 2010 skulle nedbringe sagsbehandlingstiden i alle sagstyper, så 95 % af alle dokumenter blev tinglyst inden for 10 dage fra den 6. april 2010.

I et notat af 15. januar 2010 om »Status for digital tinglysning« har Domstolsstyrelsen bl.a. beskrevet hovedårsagerne til sagsophobningen i Tinglysningsretten i løbet af efteråret 2009. Af notatet fremgår bl.a. følgende:

»Status efter fire måneders drift er, at de væsentlige fejl og mangler i it-systemet er rettet, og at den grundlæggende funktionalitet er på plads, men der har i hele indkøringsperioden været store gener for brugerne, og sagsbehandlingstiden har i ca. halvdelen af sagerne været uacceptabelt lang.

…

Status ved indkøringsperiodens afslutning

a. It-systemets funktion

Status ved indkøringsperiodens afslutning er, at væsentlige fejl og mangler i it-systemet og i datakonverteringen er rettet. Der er således ikke længere problemer med den it-tekniske håndtering af fuldmagter eller kladder, som gav store problemer for brugerne i løbet af indkøringsperioden.

Systemets automatiseringsgrad er ved indkøringsperiodens afslutning tilfredsstillende, idet ca. 60 % af alle sager håndteres automatisk, dvs. typisk på få minutter. Dertil skal lægges ca. 8 %, som svarer til de sager i det tidligere system, som helt er bortfaldet ved digitaliseringen. Automatiseringsgraden er altså nu meget tæt på de forventede 69 % af sagerne i det tidligere tinglysningssystem. Det er forventningen, at automatiseringsgraden kan øges yderligere med nogle få procentpoint på sigt.

…

b. Sagsbehandlingstiden og årsagerne til sagsbunken

…

Den lange sagsbehandlingstid for sager udtaget til manuel behandling skyldes først og fremmest, at der på grund af indkøringsproblemer, uventet mange papirsager samt tilvænning og manglende rutine hos medarbejderne ved Tinglysningsretten er behandlet færre

**2864**

sager end forventet, selvom der er sagsbehandlet 6 dage pr. uge i hele indkøringsperioden.

…

En række uforudsete startvanskeligheder gav en ekstraordinær belastning af Tinglysningsrettens medarbejdere, som dermed ikke havde tilstrækkelig tid til at behandle de løbende sager og opnå rutine i det nye system. De største problemer i indkøringsperioden var følgende:

- En fejl i skanningen af papirfuldmagter og mange begynder-fejl i de indsendte fuldmagter betød, at fuldmagterne skulle kontrolleres manuelt. Vejledningen omkring fuldmagterne og fuldmagtsformularens udformning var en del af årsagen til de mange brugerfejl. Fejlen i skanningen blev rettet med udgangen af september, men det voldsomme antal fuldmagter (ca. 4.000 om dagen) og den begrænsede brug af digital signatur betød, at et antal medarbejdere måtte arbejde i 3-holdsskift (døgnet rundt) for at udnytte skanningskapaciteten maksimalt og bringe bunken ned. Bunken blev nedbragt omkring 1. november, hvorefter sagsbehandlingstiden for fuldmagter har været på de forventede 2-3 dage.
- En række fejl og mangler i tinglysningssystemet og i data-konverteringen betød, at visse sager voldte problemer, og at en række sagsgange var tungere end forventet. Eksempelvis måtte en kontrol, der skulle sikre automatisk behandling af pantebreve, udskydes kort før produktionsstart, hvorfor langt flere pantebreve end forventet er blevet udtaget til manuel behandling de første 3 uger. Det var ikke uventet, at der trods omfattende tests ville være et antal fejl og mangler i indkø-ringsperioden, men karakteren af de konkrete fejl var ikke kendt på forhånd. Væsentlige fejl og mangler er løbende blevet rettet i indkøringsperioden.
- Udover de ca. 4.000 papirfuldmagter, som Tinglysningsretten modtager hver dag, kom der uventet mange andre papireks-peditioner, idet en række sager afsluttet op til lukningen af det gamle system skulle fejlrettes på papir. Desuden modtog Tinglysningsretten over efteråret et uventet stort antal papir-sager, herunder sager om konvertering af pantebreve, som der var åbnet mulighed for i lovgivningen, og som det var forudsat i Tinglysningsrettens planlægning, ville blive håndteret af de professionelle brugere.
- Endelig har spørgsmål fra brugerne via mail og telefon ud-gjort en meget stor belastning af Tinglysningsretten. Det betød, at flere medarbejdere end forventet skulle bruge deres tid på at svare på spørgsmål i hotline eller på mail. Det store antal brugerhenvendelser må i et vist omfang tilskrives den forventede tilvænning til systemet, men spørgsmål til anskaf-felse af digital signatur, lokal browser-opsætning m.v. havde et større omfang end forventet. Belastningen af både den te-lefoniske hotline og fra mængden af indkomne mails trak et betydeligt antal medarbejdere væk fra den egentlige sagsbe-handling. Samtidig kom de mange spørgsmål på et tidspunkt, hvor der ikke var oparbejdet rutiner i håndtering af kunde-henvendelser, der sikrede tilstrækkeligt hurtige, ensartede og korrekte svar.

De ekstraordinært mange henvendelser var dog også en konsekvens af, at de vejledninger, som var tilgængelige for brugerne, ikke var gode nok. Der er siden udarbejdet en række bedre og mere let forståelige vejledninger til tinglys-ningssystemet.

…

Digital tinglysning sparer fra driftsstarten i september 2009 staten for knap 100 mio. kr. årligt, og brugerne vil - når sagsbunken er nedbragt - spare tid og penge på hurtigere tinglysning i almindelige sager om handel og belåning af fast ejendom.«

Ifølge referat af 26. februar 2010 fra et møde i brugergruppen den 1. februar 2010 orienterede Domstolsstyrelsens direktør under mødet om, at handlingsplanen havde god effekt på de manuelle sager. Der var overordnet set ikke grund til bekymring i forhold til at komme i mål, idet der dog ville være visse udfordringer med hensyn til de matrikulære sager. Tinglysningsretten behandlede stadig matrikulære sager fra den 2. oktober 2010, men i antal var

denne bunke faldet meget. Med hensyn til skøder var der flyttet flere ressourcer til dette område, og der var derfor stadig grund til optimisme. Automatiseringsgraden var oppe på lidt over 60 %.

På et møde i Domstolsstyrelsens bestyrelse den 10. februar 2010 oplyste Domstolsstyrelsens direktør, at der var mange faktorer, der havde været medvirkende til at skabe brugerne. Manglende bruger-test havde skabt ekstra pres på tinglysningsrettens hotline. Der havde i medierne været et billede af, at der havde fra sikre have været problemer, hvis advokaterne havde været med i en brugertest, men det var ikke rigtigt. De primære problemer var de mange fuldmagter og i den forbindelse problemer med scannere og de 100.000 ekstra sager, der kom fra finanssektoren.

I et notat af 9. marts 2010 blev Domstolsstyrelsens bestyrelse orienteret om status på digital tinglysning, og det blev oplyst, at Tinglysningsretten siden idriftsættelsen af digital tinglysning og indtil udgangen af uge 9 i 2010 havde modtaget i alt 497.429 an-meldelser. 93,8 % var afsluttet, 4,8 % var til manuel behandling og 1,4 % lå i ejendomskøen. Automatiseringsgraden var fortsat omkring 60 %. I forhold til handlingsplanen havde Tinglysnings-retten den 8. marts 2010 nået delmålet på

**2865**

alle punkter, bortset fra sagstypen matrikulære ændringer, men også for disse sager gik det den rigtige vej.

*Rigsrevisionens beretning*

Rigsrevisionen afgav i august 2010 beretning til Statsrevisorerne om det digitale tinglysningsprojekt. Beretningen blev afgivet på baggrund af en anmodning fra Statsrevisorerne, idet Domstolssty-relsens tinglysningsprojekt var udvalgt til at indgå i beretning nr. 2/2008 om styring af statslige digitaliseringsprojekter, men da sty-relsen ikke kunne afse ressourcer til at indgå i Rigsrevisionens un-dersøgelse, blev det digitale tinglysningssystem udtaget af under-søgelsen. Da idriftsættelsen af den digitale tingbog blev udskudt flere gange, ønskede Statsrevisorerne, at Rigsrevisionen undersøgte digitaliseringsprojektet. På baggrund af Statsrevisorernes anmod-ning formulerede Rigsrevisionen følgende spørgsmål for undersø-gelsen:

»…

- Var Domstolsstyrelsens beslutningsgrundlag for implemen-tering af det digitale tinglysningssystem fyldestgørende?
- Var Domstolsstyrelsens projektstyring tilfredsstillende?
- Var den økonomiske styring af det digitale tinglysningspro-jekt tilfredsstillende?
- Fungerer systemet tilfredsstillende?
- Var den organisatoriske forberedelse tilfredsstillende?

Rigsrevisionens beretning indeholder følgende om undersøgelsens resultater:

»Det digitale tinglysningsprojekt blev tiltrådt af Finansudvalget i 2006, og systemet skulle efter planen have været idriftsat primo 2008. Imidlertid blev implementeringen af den digitale tingbog (rettigheder over fast ejendom) forsinket næsten 1½ år, mens de resterende 3 bøger endnu ikke er idriftsat. Forsinkelsen af den digi-tale tingbog skyldtes bl.a. forsinkede leverancer fra leverandøren og behov for yderligere tid til test af systemet. Det oprindelige ud-viklingsbudget for det digitale tinglysningssystem er udvidet med ca. 67 mio. kr. Hertil kommer, at der som følge af forsinkelsen har været ekstra udgifter for staten på ca. 124 mio. kr., hovedsageligt fordi de planlagte driftsbesparelser er udskudt. Domstolsstyrelsen har ikke sikret en korrekt regnskabsmæssig tilrettelæggelse af det digitale tinglysningsprojekt. Der har ikke været et fuldstændigt overblik over omkostninger relateret til projektet.

Da projektet blev tiltrådt af Finansudvalget i november 2006, var det i aktstykket en forudsætning, at en planlagt personalebesparelse

Copyright © 2023 Karnov Group Denmark A/S

på 200 årsværk skulle realiseres 3 måneder efter idriftsættelsen af systemet. Grundet forsinkelserne af systemet blev denne fonudsætning ændret, så personalebesparelsen på 200 årsværk i stedet skulle ske på tidspunktet for idriftsættelsen, Det var ifølge Tinglysningsudvalget hensigten, at systemet skulle idriftsættes som et big-bang-projekt, dvs. idriftsættelse af systemet samtidig for hele landet og uden pilotdrift Endvidere blev det ved lov besluttet, at tinglysningsopgaven skulle centraliseres og placeres i Tinglysningsretten i Hobro.

Der var således 3 væsentlige rammebetingelser for implementeringen af det digitale tinglysningssystem: besparelse af 200 årsværk til tinglysningsopgaven på idriftsættelsestidspunktet, idriftsættelse af systemet som et big-bang-projekt og centralisering af tinglysningsopgaven ved at etablere Tinglysningsretten i Hobro. Domstolsstyrelsen har idriftsat den digitale tingbog i overensstemmelse hermed.

Ved udgangen af 2009 fungerede systemet ifølge Domstolsstyrelsen i al væsentlighed tilfredsstillende. Dog er der i 2010 stadig problemer med brugervenligheden. Tinglysning foregik fra årsskiftet 2009/10 for ca. 70 % af anmeldelsernes vedkommende helt automatisk, og typisk inden for få minutter, hvilket svarede til målet for systemet. Der har efter idriftsættelsen af den digitale tingbog i indkøringsperioden været en række væsentlige fejl og mangler ved systemet, som Domstolsstyrelsen har taget initiativ til at rette op på. Domstolsstyrelsen har i øvrigt løbende forbedret systemet

Den *organisatoriske* forberedelse forud for idriftsættelsen af den digitale tingbog var mangelfuld og var ikke baseret på grundige beregninger af resurser og dimensionering af opgaverne. Domstolsstyrelsens forventning til medarbejderproduktiviteten var urealistisk høj, håndteringen af fuldmagter var ikke tilstrækkeligt forberedt, og den fravalgte brugervenlighedstest stillede større krav til, at kvaliteten af vejledningerne var i orden, og at Tinglysningsrettens hotline var velfungerende. Domstolsstyrelsen undervurderede imidlertid disse forhold, hvilket medførte en ophobning af sager og dermed en meget lang sagsbehandlingstid, som havde store konsekvenser for borgere og virksomheder i forbindelse med køb, salg og belåning af fast ejendom. Siden januar 2010 har Tinglysningsretten imidlertid reduceret antallet af ubehandlede sager.

Samlet viser Rigsrevisionens undersøgelse, at de 3 rammebetingelser for det digitale tinglysningsprojekt indebar, at projektet var et højrisikoprojekt. Særligt rammebetingelsen om, at Domstolsstyrelsen skulle bespare 200 årsværk til tinglysningsopgaven allerede på tidspunktet for idriftsættelsen af den digitale tingbog, og rammebetingelsen om at idriftsætte systemet som et big-bang-projekt stillede store krav til, at den digitale tingbog skulle fungere optimalt fra start. Principielt er det Rigsrevisionens opfattelse, at en effektiviseringsgevinst som følge af implementeringen af et nyt it-system bør høstes, i takt med at fejl og mangler i systemet bliver håndteret, at medarbejderne opnår rutine, og at

**2866**

systemet bliver godt forankret i hele organisationen, Rigsrevisionen finder, at Justitsministeriet høstede effektiviseringsgevinsten for tidligt. Justitsministeriet har oplyst, at ministeriet er enig i det principielle synspunkt om, at man generelt skal høste effektiviseringsgevinster i forbindelse med it-projekter, i takt med at de opstår. Justitsministeriet deler ikke Rigsrevisionens opfattelse i den konkrete sag og finder ikke, at effektiviseringsgevinsten blev høstet for tidligt. En trinvis indhøstning af effektiviseringsgevinsten ville i denne sag ifølge ministeriet ikke have været mulig, da medarbejderne var placeret rundt om i byretterne og derfor ikke kunne anvendes i Tinglysningsretten i Hobro efter idriftsættelsen af den digitale tingbog. Rigsrevisionen finder, at Justitsministeriet i samarbejde med Domstolsstyrelsen kunne have sikret yderligere resurser

til Tinglysningsretten i Hobro ved at have indgået aftaler om at fastholde nogle af de 200 årsværk i en overgangsperiode.

Denne samlede vurdering er baseret på følgende:

Domstolsstyrelsens beslutningsgrundlag for implementering af det digitale tinglysningssystem var inden for de givne rammebetingelser fyldestgørende. Forud for idriftsættelsen af systemet blev der identificeret en række væsentlige risici ved projektet. Rigsrevisionen vurderer ud fra risikoanalysen og de fastsatte rammebetingelser, at projektet var et højrisikoprojekt. Dette bl.a. grundet risici i relation til den tekniske løsning og interessenter.

- Rammebetingelserne for projektet var bl.a., at den fulde personalebesparelse skulle høstes allerede på tidspunktet for idriftsættelse af den digitale tingbog, at det digitale tinglysningssystem skulle idriftsættes som et big-bang-projekt, hvilket indebar idriftsættelse samtidig for hele landet og uden pilotdrift, og at den geografiske placering af Tinglysningsretten i Hobro var fastsat ved lov.

- Domstolsstyrelsen har udarbejdet en udførlig risikoanalyse, og styrelsens oprindelige vurdering var, at digitaliseringen af tinglysningen var et middelrisikoprojekt. Efter en nærmere gennemgang af risikoanalysen er det imidlertid Rigsrevisionens vurdering, at digitaliseringen af tinglysningen var et højrisikoprojekt. Dette skyldes bl.a., at tidsplanen var meget stram, at der skulle udvikles et meget komplekst system baseret på en uprøvet teknologi, at projektet skulle udvikles i samarbejde med mange interessenter, og at rammebetingelserne gav mange organisatoriske udfordringer.

- Domstolsstyrelsen har inddraget interessenter i relation til det digitale tinglysningsprojekt ved udarbejdelsen af kravspecifikationen. Ligeledes har Domstolsstyrelsen etableret en brugergruppe, en test- og teknikgruppe og en pantebrevsfølgegruppe bestående af udvalgte interessenter. Endelig har Domstolsstyrelsen foretaget en grundig analyse af leverandøren inden kontraktindgåelse.

Idriftsættelsen af den digitale tingbog blev udskudt næsten 1½ år, og de øvrige 3 bøger er endnu ikke idriftsat. De primære årsager til udskydelsen var forsinkede leverancer fra leverandøren og behov for yderligere tid til test af systemet. Domstolsstyrelsens projektstyring har ikke været fuldt ud tilfredsstillende. Domstolsstyrelsen har generelt etableret standarder for monitorering og afrapportering, og målene for projektet var klare. Imidlertid er 2 væsentlige styringsredskaber, som indgår i god projektstyring, ikke anvendt i fuldt omfang. For det første omfattede Domstolsstyrelsens og Tinglysningsrettens planlægning af projektet alene milepæle for systemudviklingen og ikke milepæle for fx uddannelse af medarbejdere, udarbejdelse af vejledninger og rekruttering af medarbejdere til Tinglysningsretten. For det andet var den interne rolle- og ansvarsfordeling i relation til implementeringen af det digitale tinglysningssystem ikke i tilstrækkelig grad klarlagt og beskrevet. Projektstyringen blev styrket ultimo 2007, bl.a. med ansættelse af en ekstern leverandørstyringskonsulent. Domstolsstyrelsen vurderer imidlertid nu, at projektledelsen kunne have været styrket ved projektets påbegyndelse.

…

Ved udgangen af 2009 fungerede systemet ifølge Domstolsstyrelsen i al væsentlighed tilfredsstillende. Dog var der fortsat problemer med brugervenligheden. Ved årsskiftet 2009/10 blev 70 % af alle anmeldelser som planlagt behandlet automatisk. Systemet har dog i indkøringsperioden - fra september 2009 til og med december 2009 - været præget af en række væsentlige fejl og mangler, som Domstolsstyrelsen har taget initiativ til at rette op på. Det er Rigsrevisionens vurdering, at en forudgående pilotdrift, fx. i enkelte retskredse, kunne have identificeret fejl og mangler i systemet, in-

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

den systemet blev implementeret i hele landet, ligesom den fravalgte brugervenlighedstest kunne have påvist problemerne med systemets manglende brugervenlighed.

…

Den organisatoriske forberedelse forud for idriftsættelsen af den digitale tingbog var mangelfuld. Forberedelsen var ikke baseret på grundige beregninger af resurser og dimensionering af opgaver, hvorfor Domstolsstyrelsen og Tinglysningsretten undervurderede omfang og kompleksitet af de opgaver, der skulle løses ved idriftsættelsen af systemet. For det første havde Domstolsstyrelsen og Tinglysningsretten en urealistisk forventning til medarbejderproduktiviteten, og det betød, at styrelsen og retten ikke havde et tilstrækkeligt personaleberedskab. For det andet forberedte Domstolsstyrelsen og Tinglysningsretten ikke håndteringen af fuldmagter, herunder dimensionerede behovet for resurser

**2867**

hertil. For det tredje var vejledningerne i brugen af systemet mangelfulde, ligesom Tinglysningsrettens hotlinefunktion ikke havde tilstrækkelige resurser og kompetencer til at håndtere de mange brugerhenvendelser. Justitsministeriet høstede efter Rigsrevisionens vurdering effektiviseringsgevinsten ved systemet for tidligt, og ikke i takt med at fejl og mangler i systemet blev håndteret, at medarbejderne opnåede den fornødne rutine, og at systemet blev godt forankret i hele organisationen. Det førte til meget lange sagsbehandlingstider i den manuelle sagsbehandling, hvilket har haft store konsekvenser for borgere og virksomheder. Domstolsstyrelsen har i januar 2010 igangsat initiativer, der har nedbragt sagsbehandlingstiden.

…

*Idriftsættelsen af den digitale tingbog*

• Ifølge Domstolsstyrelsen var de væsentligste årsager til de lange sagsbehandlingstid i efteråret 2009 *mange fejlrettelser af papirsager* fra det gamle tinglysningssystem, *problemer med fuldmagtsskannere og begynderfejl i de fremsendte fuldmagter, konvertering af pantebreve* og *manglende rutine hos medarbejderne,* hvilket forårsagede en lavere produktivitet end forventet hos Tinglysningsrettens medarbejdere efter idriftsættelsen af den digitale tingbog.

…

• *Konvertering af pantebreve:* Domstolsstyrelsen forudsatte, at der var en klar aftale med den finansielle sektor og de øvrige brugere om, at der ikke skulle indsendes pantebreve til Tinglysningsretten til konvertering, medmindre et pantebrev skulle påtegnes, eller der forelå en konkret aftale med Tinglysningsretten herom. Tinglysningsretten modtog imidlertid - efter det oplyste - 200.000 pantebreve til konvertering *i perioden frem til ultimo 2009* og anvendte betydelige resurser - efter det oplyste i perioder op mod 30 medarbejdere - på at håndtere denne opgave. Rigsrevisionen kan konstatere, at der ikke før februar 2010 var indgået en skriftlig aftale med den finansielle sektor om konvertering af pantebreve. Rigsrevisionen finder, at Tinglysningsretten på et tidligere tidspunkt burde have indgået en skriftlig aftale med den finansielle sektor frem for at påbegynde konverteringen af den store mængde indsendte pantebreve, hvilket vurderes at være en uhensigtsmæssig disponering af resurserne.

…«

I beretningens afsnit VI om »Systemets funktionalitet« fremgår: »…

A. Test af systemet

…

Vurdering

126. Den digitale tingbog blev idriftsat den 8. september 2009 med en række fejl. Domstolsstyrelsen kendte til fejlene inden idriftsættelsen, men vurderede, at fejlene var uden betydning for driften af systemet. Rigsrevisionen er enig heri. Systemet blev først endeligt godkendt af Domstolsstyrelsen i november 2009.

…

B. Digitalisering og automatisering

…



Figur 3. Andelen af modtagne anmeldelser behandlet automatisk samme dag i perioden 8. september 2009 - 28. maj 2010 (uge 37 i 2009 og uge 21 i 2010)

Note: September 2009: uge 37-40, oktober 2009: uge 40-44, november 2009: uge 45-49, december 2009: uge 49-53, januar 2010: uge 1-4, februar 2010: uge 5-8, marts 2010: uge 9-13, april 2010: uge 14-17 og maj 2010: uge 18-21.

Det bemærkes, at i de dokumenter, der ikke længere anmeldes til tinglysning, idet systemet automatisk håndterer en lang række informationer, som tidligere blev påført papirdokumentet, skal tillægges automatiseringsgraden (behandling af retsanmærkninger)

Kilde: Data modtaget fra Domstolsstyrelsen.

Figur 3 viser, at andelen af modtagne dokumenter, som tinglyses samme dag og uden nogen form for manuel sagsbehandling, har været stigende i perioden fra idriftsættelsen af den digitale tingbog den 8. september 2009 (uge 37) til ultimo december 2009 (uge 53), hvorefter den har været nogenlunde stabil. Når hertil lægges 8 %, der svarer til antallet af retsanmærkninger, som i det digitale tinglysningssystem behandles automatisk, viser figuren, at Domstolsstyrelsen omkring årsskiftet 2009/10 har nået målet om, at 70 % af alle dokumenter, der anmeldes til tinglysning, behandles automatisk. Det er ikke målet, at alle anmeldelser skal kunne tinglyses automatisk. Domstolsstyrelsen forventer dog, at automatiseringsgraden vil øges yderligere over tid.«

I beretningens afsnit VII om »Den organisatoriske forberedelse og idriftsættelse af den digitale tingbog« indgår følgende figur og tabel:

**2868**

»…