# Exhibit 32, Part 3 of 3



Figur 4. Modtagne, afsluttede og ubehandlede anmeldelser (sager) fra 8. september 2009 til 28. maj 2010 (Antal)

Legend:
— Modtagne anmeldelser
— Afsluttede anmeldelser
— Ubehandlede anmeldelser

Note: September 2009: uge 37-40, oktober 2009: uge 40-44, november 2009: uge 45-49, december 2009: uge 49-53, januar 2010: uge 1-4, februar 2010: uge 5-8, marts 2010: uge 9-13, april 2010: uge 14-17 og maj 2010: uge 18-21.

Det ses af figur 4 at der sker gradvis stigning i antal modtagne anmeldelser over perioden, dog med visse udsving. Det ses videre, at antal afsluttede sager frem til uge 51 ligger noget under antal modtagne anmeldelser, hvilket bevirker en jævn sagsophobning frem til uge 51, hvor antallet af ubehandlede sager er på godt 70.000. Siden årsskiftet har sagsbunken været faldende, og den lå ultimo maj 2010 (uge 21) på godt 27.000.

…

Tabel 8. Delmål for og realiserede sagsbehandlingsdage fra til den 6. april for 95 % af anmeldelser e, fordelt på 17 sagstyper (Antal)

| Sagstype | 11. januar 2010 Faktisk sagsbehandlingstid | 8. februar 2010 Delmål | Realiseret | 8. marts 2010 Delmål | Realiseret | 6. april 2010 Delmål | Realiseret |
|---|---|---|---|---|---|---|---|
| Administrative sager | 10 | 10 | 0 | 10 | 0 | 10 | 0 |
| Aflysninger | 62 | 20 | 18 | 10 | 10 | 10 | 0 |
| Bodelinger | 60 | 20 | 19 | 15 | 6 | 10 | 0 |
| Ejerpantebreve | 60 | 40 | 34 | 20 | 19 | 10 | 6 |
| Matrikulære sager | 100 | 90 | 128 | 70 | 145 | 40 | 149 |
| Meddelelser | 60 | 25 | 17 | 20 | 3 | 10 | 2 |
| Pantebreve i øvrigt | 60 | 40 | 32 | 25 | 12 | 10 | 8 |
| Pantebrevsvilkår | 60 | 40 | 73 | 25 | 24 | 10 | 9 |
| Realkreditpantebreve | 38 | 45 | 16 | 35 | 27 | 10 | 10 |
| Respekter | 60 | 40 | 34 | 25 | 14 | 10 | 8 |
| SDRO-pantebreve | 81 | 55 | 46 | 40 | 30 | 10 | 9 |
| Servitutter | 69 | 40 | 34 | 25 | 24 | 10 | 9 |
| Skadesløsbreve | 10 | 10 | 0 | 10 | 0 | 10 | 0 |
| Skifteretsattester | 60 | 50 | 48 | 25 | 20 | 10 | 5 |
| Skøder | 68 | 50 | 48 | 30 | 28 | 10 | 10 |
| Udlæg | 60 | 40 | 30 | 15 | 10 | 10 | 1 |
| Underpant | 60 | 40 | 20 | 20 | 3 | 10 | 4 |
| Totalt antal sagstyper, som overholder delmål | | | 15 | | 16 | | 16 |

Det ses af tabel 8, at Domstolsstyrelsen i februar 2010 havde nået delmålene for 15 ud af 17 sagstyper. I april 2010 havde styrelsen nået delmålene for alle sagstyper med undtagelse af de matrikulære sager. Sagsbehandlingstiden for denne sagstype er steget fra 128 dage i februar måned til 149 dage (knap 5 måneder) i april 2010.

…«

Efter Rigsrevisionen havde afgivet sin beretning, henvendte finanssektoren sig til formanden for Domstolsstyrelsens bestyrelse ved brev af 19. august 2010:

»…

I forlængelse af Rigsrevisionens offentliggørelse af »Beretning til Statsrevisorerne om det digitale tinglysningsprojekt« er det fra Domstolsstyrelsens side blevet påpeget, at en række uforudsete opgaver var medvirkende årsag til de lange sagsbehandlingstider. I Domstolsstyrelsens svar til Rigsrevisionens beretning nævnes det som en betydelig, uforudset opgave, at der skulle foretages »… konvertering af 200.000 gamle papirpantebreve trods henstilling om at vente til efter indkøringen«.

Domstolsstyrelsens omtale af de 200.000 pantebreve, som skulle være indsendt til Tinglysningsretten i strid med en henstilling om det modsatte, giver anledning til stor undren hos os.

Allerede forud for idriftsættelsen af den digitale tinglysning havde der været dialog mellem de finansielle organisationer og Domstolsstyrelsen om, at de finansielle virksomheder ikke skulle indsende pantebreve til ren digitalisering i opstartsfasen. Pantebreve skulle således alene indsendes, hvor en digitalisering var nødvendig som en forudsætning for gennemførelsen af en tinglysningsekspedition.

Denne praksis blev meldt ud til de finansielle virksomheder, og tilbagemeldingerne har samstemmende lydt, at henstillingerne fuldt ud er blevet efterlevet.

Da det stod klart, hvor store Tinglysningsrettens udfordringer var, tilbød den finansielle sektor gentagne gange - senest ved brev af 15. december 2009 til Justitsministeriet og Økonomi- og Erhvervsministeriet - at betydeligt antal medarbejdere til rådighed vederlagsfrit til at arbejde for Tinglysningsretten under dennes instruktion. Under et møde sidst i december 2009 blev det drøftet at udlåne 50-60 medarbejdere til Tinglysningsretten. Dette tilbud blev der efterfølgende takket nej til.

Senere blev der som bekendt indgået en aftale om, at de finansielle virksomheder skulle aflaste Tinglysningsretten ved at overtage den overvejende del af opgaven med at digitalisere de mange pantebreve.

Det må derfor slås fast, at den finansielle sektor gennem hele forløbet har søgt at bistå Tinglysningsretten med at klare de store udfordringer.

…«

Formanden for Domstolsstyrelsens bestyrelse svarede på finanssektorens henvendelse ved brev af 20. august 2010:

»…

I brevet bekræfter finanssektoren Domstolsstyrelsens oplysninger om, at Tinglysningsretten med god grund kunne forvente, at der ikke i efteråret ville blive indsendt pantebreve til digitalisering (massekonvertering), hvis ikke der i de konkrete tilfælde var tale om en nødvendig forudsætning for gennemførelsen af en aktuel tinglysningsekspedition.

…

**2869**

Tinglysningsretten har over for styrelsen oplyst, at retten skønner at have modtaget ca. 200.000 pantebreve til digitalisering - stort set alle i perioden primo oktober til medio december. Det skal ses i forhold til et niveau for tinglysningsekspeditioner vedrørende påtegninger m.v. før digitaliseringen på ca. 15.000 pr. måned. Tinglysningsretten havde i øvrigt forventet, at den overvejende del af disse ca. 15.000 pantebreve pr. måned ville blive digitaliseret af sektoren selv, jf. at der ved lovændring i juni 2009 i § 15, stk. 14 og 15, på finanssektorens initiativ var givet hjemmel til afgiftsfritagelse med henblik på, at finanssektoren selv gennemførte konvertering.

Tinglysningsretten har desuden oplyst, at en betydelig del af de ca. 200.000 pantebreve blev modtaget i store samlede leverancer fra enkelte institutter, herunder ofte i flyttekasser og ofte i alfabetisk orden uden medfølgende lister, hvilket tyder på, at der blev fremsendt større mængder fra arkivet. Der var i en række tilfælde medsendt følgebreve, der ikke angav noget om sagernes aktualitet eller hastende karakter, mens der parallelt blev modtaget andre sager enkeltvis, hvor den hastende karakter var fremhævet. Sidstnævnte blev løbende ekspederet af Tinglysningsretten, mens det ikke var muligt - trods det betydeligt ressourceforbrug - at holde trit med den samlede mængde pantebreve til digitalisering.

…

Det afgørende i forbindelse med Rigsrevisionens beretning har imidlertid været, om det kunne forudses, at Tinglysningsretten i indkøringsperioden ville modtage flyttekasser med så stort antal dokumenter til digitalisering. Det er fortsat Domstolsstyrelsens vurdering, at det i lyset af de klare forventninger, som også bekræftes i sektorens brev af 19. august, kom bag på alle - også den finansielle sektors repræsentanter i samarbejdet - at dette var tilfældet.

Jeg vil gerne benytte lejligheden til endnu en gang at takke Finansrådet, Realkreditrådet og Realkreditforeningen for det gode samarbejde om at løse de store udfordringer i indkøringsperioden, herunder sektorens bistand til at digitalisere de resterende ca. 50.000 pantebreve i foråret 2010.

…«

På foranledning af Domstolsstyrelsen gennemførte Kammeradvokaten en »[e]rstatningsretlig undersøgelse af forsinkelser i forbindelse med det digitale tinglysningsprojekt«. Kammeradvokaten afgav sin udtalelse den 14. september 2010.

Der er under forberedelsen af sagen for landsretten foretaget syn og skøn ved skønsmand Klaus Kvorning Hansen. Skønsmanden har afgivet skønserklæring af 19. juni 2016 og supplerende skønserklæring af 6. august 2017. Af skønserklæringen af 19. juni 2016 fremgår:

»…

2.1 Spørgsmål 1

*Kunne det ved tilrettelæggelsen og implementeringen af det digitale tinglysningssystem være forudset, at der ville opstå de problemer med brug af systemet, der er beskrevet i parternes processkrifter med tilhørende bilag, herunder:*

a. *Ophobning af sager, der var anmeldt til tinglysning, herunder fuldmagter.*

b. *Manglende bekræftelse fra tinglysningen om modtagelse af anmeldelser samt manglende oplysning om status på anmeldte sager og indsendte fuldmagter til registrering, herunder oplysning om baggrund for manuel udtagelse af anmeldelser samt oplysninger om ekspeditioner, der blev placeret i fejlkø.*

c. *Manglende tilgængelighed og stabilitet, herunder driftsstabilitet.*

d. *Manglende funktionalitet i tinglysningssystemet, der gjorde, at boligforeningssager, forvaltningssager, relaksationer m.v. ikke kunne anmeldes til tinglysning, og der i øvrigt var udfordringer med visse øvrige ekspeditionsformer.*

e. *Manglende eller ikke eksisterende support til f.eks. manglende eller mangelfulde registreringer i den digitale tingbog.*

f. *Manglende brugervenlighed i form af vejledning, rådgivning m.v. til brug af det digitale tinglysningssystem, herunder underskriftsmappen, anmeldelser og udfyldning og registrering af fuldmagter samt mangelfulde og fejlbehæftede skriftlige vejledninger til brug for anmeldelse og indsendelse af fuldmagter.*

g. *Tekniske problemer der medførte, at det ikke var muligt at anmelde.*

h. *Lange svartider på henvendelser - herunder Tinglysningsrettens Hotline og skriftlige henvendelser pr. mail og post - indsendte fuldmagter m.v.*

i. *Manglende kvalitet af svar modtaget fra Tinglysningsretten, herunder Hotlinen og henvendelser i øvrigt samt mangelfulde og uklare tinglysningssvar, herunder også med hensyn til prøvetinglysningerne.*

j. *Stort antal manuelle behandlinger af anmeldelser og fuldmagter.*

k. *Fejl i forbindelse med scanning af fuldmagter, afvisning af anmeldelser m.v.*

l. *Automatisk fjernelse af anmeldelse efter 30 dage, såfremt denne ikke var færdigbehandlet, hvilket krævede genanmeldelse.*

m. *Manglende digitalisering af pantebreve inden idriftsættelsen af det digitale tinglysningssystem.*

**2870**

### 2.1.1 Svar

Det kunne efter mit skøn ved tilrettelæggelsen og implementeringen af det digitale tinglysningssystem være forudset, at der ville opstå problemer på flere af de nævnte områder.

Svaret gives under ét i forhold til spørgsmålets punkter a.-m., da begrundelsen for svaret typisk dækker flere af punkterne i kombination.

### 2.1.2 Begrundelse

Besvarelsen af dette spørgsmål skal ses i sammenhæng med besvarelserne af sagsøgtes spørgsmål relateret til risikoanalyserne (afsnit 3.3-3.5, side 23ff). Muligheden for at forudse problemer på givne områder hænger under normale omstændigheder nøje sammen med, om de pågældende områder er identificeret og afdækket i risikoanalyserne, og om sandsynligheden for risikoens realisering er korrekt bedømt. Det forudsætter også, at der følges løbende op på risikoanalysen, og at projektets interne risikolog ajourføres i takt med at projektet skrider frem, og at nye risici identificeres.

Det gælder således, at en række af de i sagsøgers spørgsmål fremhævede problemer allerede optræder i en tidlig version af risikoanalysen […], og de er i analysen tildelt en vægt, der ikke i tilstrækkeligt omfang i løbet af projektets gennemførelse er blevet bragt ned eller helt fjernet. Sagt på en anden måde, så var flere af forholdene faktisk forudset, men det blev af forskellige grunde ikke handlet på dem i et sådant omfang, at de mulige negative konsekvenser blev elimineret eller foranstaltninger til umiddelbar afbødning blev iværksat.

F.eks. påpeges de mange interessenter som en risiko på niveau 4 […], der antages at kunne minimeres ved involvering. Den efterfølgende manglende interesse for at udvikle system-til-system integrationer fra f.eks. boligadvokaterne kombineret med den begrænsede udbredelse af og fleksibilitet i anvendelsen af digital signatur (på daværende tidspunkt OCES-signaturen leveret af TDC) ville følgelig almindeligvis have ført til specifikke tilpasninger af projektet og eventuelt særlige indsatser (punkterne a, e, f, j, k ovenfor) i form af et bemandingsmæssigt og teknisk beredskab.

I samme forbindelse kunne det have været forudset, at manglende udvikling af system-til-system-integrationer for væsentlige professionelle brugergrupper […], som blev konstateret i løbet af projektet, ville medføre en langt større afhængighed af en velfungerende løsning og proces forbundet med brugerportalen og afgivelse af fuldmagter. Dette ville normalt have ført til et stærkere og mere udbygget beredskab i forhold til fuldmagtsbehandlingen og behandlingen af manuelle sager, belastningen af servicedesk (hotline) samt til et mere markant fokus på brugervenligheden af brugerportalen. Det virker, ud fra det oplyste, som om risikoen forbundet med manglende brugervenlighed i den eksterne portal var erkendt, men ikke desto mindre blev det besluttet at fastholde at undlade en egentlig brugervenlighedstest […], sådan som det ellers var blevet besluttet i forbindelse med kontraktindgåelsen med CSC.

Presset på hotline kunne ligeledes have været forudset (punkt h, l ovenfor), når der var tale om en så broget brugerskare, som tilfældet var, kombineret med den store betydning, tinglysning har for den almindelige borger og følgelig også for de professionelle aktører.

Der vil tillige under normale omstændigheder være stor opmærksomhed på forholdet mellem behovet for support og et reduceret

U.2020.2851H

fokus på brugervenlighed i brugergrænsefladerne (punkterne f, h, l ovenfor), således at kravet i dette projekt om en høj grad af juridisk præcision i hjælpetekster og vejledninger […] ville have medført en styrkelse af supporten, den skriftlige vejledning, integrerede hjælpetekster og helt generelt informationsniveauet overfor slutbrugerne, og i særlig grad overfor de brugergrupper der ikke er specielt fortrolige med tinglysning.

På et sent tidspunkt i projektforløbet blev det besluttet at se bort fra en performance- og stresstest af systemet i driftsmiljøet […], hvorfor der ville være en forhøjet risiko for problemer med svartider (punkterne c, g ovenfor), som i givet fald også ville øge presset yderligere på hotline. Dette kunne have været erkendt og ville også almindeligvis have været fra en øget opmærksomhed på kompenserende foranstaltninger f.eks. i form af målrettede fejlmeldinger til brugerne eller etablering af kø-systemer. Beslutningen blev dog truffet så sent, at den reelt udelukkede iværksættelse af sådanne.

Hvad angår kvaliteten af svarene fra Tinglysningsretten (punktet i ovenfor), hænger det selvklart sammen med kompetencerne hos de pågældende medarbejdere, og det kunne være forudset, at det i en indkøringsperiode, hvor der skal opbygges kendskab til et nyt system og ændrede processer, vil være vanskeligt at give svar og hjælp i samme omfang og af samme kvalitet som i en normal driftssituation. Under sådanne omstændigheder vil det være almindeligt at søge at begrænse antallet af henvendelser ved at foretage en mere successiv implementering, og, især hvor en successiv implementering er udelukket, at styrke uddannelsen af såvel supportmedarbejdere som brugere og at udarbejde omfattende og målrettet vejledningsmateriale.

De strengt tekniske problemer med fuldmagts-scannerne kunne muligvis ikke have været forudset, men ville formentlig være blevet afdækket i en mere omhyggelig og rettidig test inkl. en belastningstest. De mange fejl i fuldmagterne, der skyldtes misforståelser hos brugerne, kunne i en vis udstrækning også have været undgået, hvis udfyldelse af formularerne var blevet testet under driftsligende omstændigheder (punkt j ovenfor) og af andre brugere end de professionelle […].

**2871**

Dette ville have mindsket presset på Tinglysningsretten i den første fase af idriftsættelsen og have afhjulpet en række af de øvrige problemer, der skyldtes manglende ressourcer til manuelle opgaver.

### 2.1.2.1 Særligt vedr. fuldmagts- og scanner-løsningen

Det gælder specifikt vedr. anskaffelse og test af såvel scannere som den tilhørende specialudviklede software, at opgaven efter mit skøn har været undervurderet. Det var meget tidligt i projektforløbet klart, at brugen og mængden af fuldmagter ville være kritisk, og det virker derfor ikke indlysende, hvorfor der først meget sent iværksættes test af udstyr og programmel (i august måned 2009).

Det er desuden bemærkelsesværdigt, at testen af den standardiserede fuldmagts-formular som nævnt ikke omfatter en større og bredere sammensat brugergruppe, når det burde have været kendt, at praksis og rutine ville variere stærkt mellem de forskellige (potentielle) anvendere af fuldmagten. Jf. svar og begrundelser i afsnit 3.18-3.22.

### 2.2 Spørgsmål 2

*Kunne der ved tilrettelæggelsen og implementeringen af det digitale tinglysningssystem være truffet foranstaltninger, der havde reduceret, hindret eller fjernet risikoen for problemer som nævnt i spørgsmål 1?*

#### 2.2.1 Svar

Ja, der kunne efter mit skøn på en række områder have været truffet foranstaltninger, der ville have hindret de nævnte problemer i at opstå eller have afbødet de væsentligste negative virkninger af dem.

#### 2.2.2 Begrundelse

Hovedparten af disse foranstaltninger er nævnt under besvarelsen af spørgsmålene 1, 3 og 8, men det skal tilføjes, at det er almindelig praksis i forbindelse med gennemførelsen af it-projekter, at identificerede (forudsete) risici bedømmes i forhold til deres sandsynlighed og konsekvens, og at iværksættelsen af hindrende eller afbødende foranstaltninger afspejler denne bedømmelse sammenholdt med omkostningerne forbundet med de relevante foranstaltninger. Der vil derfor af beslutningerne i et hvilket som helst projekt kunne udledes en risiko-appetit, som alene udtrykker en forretningsmæssig og ikke en projekt-teknisk eller it-faglig vurdering.

Med det forbehold, at risikoappetitten hos Domstolsstyrelsen kan have været høj, er det mit skøn, at det på en række områder er foretaget fravalg af foranstaltninger, der sædvanligvis, i det mindste for et flertals vedkommende, ville være blevet gennemført i projekter af en tilsvarende karakter som det digitale tinglysningssystem. De er nævnt i besvarelsen af sagsøgers spørgsmål 3 herunder.

Mit svar baserer sig også på, at det er min vurdering, at et mere gennemført arbejde med projektets risikoanalyse og de operationelle risikologs foruden en tættere involvering af projektets hovedinteressenter og brugere ville have kunnet afhjulpet hovedparten af de problemer, der er nævnt i sagsøgers spørgsmål 1. Også uden at der nødvendigvis skulle have været ændret i projektets overordnede implementeringsstrategi.

### 2.3 Spørgsmål 3

*Hvilke foranstaltninger kunne være truffet?*

#### 2.3.1 Svar

Det er helt overordnet mit skøn, at årsagerne til stort set alle de problemer, der opstod i de første måneder efter idriftsættelsen af det digitale tinglysningssystem, ville være blevet afdækket gennem en trivis implementering, og derfor ikke ville have haft [helt] så store konsekvenser, som de fik.

I anden række vil en tættere involvering af de kommende brugere af det digitale tinglysningssystem og Tinglysningsrettens samarbejdsparter have afdækket såvel potentielle problemer som mulige løsninger af dem.

Jf. i øvrigt afsnit 2.1.2.1 og besvarelsen af sagsøgtes spørgsmål 5 i afsnit 3.11.

##### 2.3.1.1 Trinvis implementering

Der vil almindeligvis altid i forbindelse med implementering af systemer med en størrelse og kompleksitet som det digitale tinglysningssystem forekomme fejl og uhensigtsmæssigheder, ligesom en forringet brugeroplevelse og reduceret service vil være almindeligt forekommende i en overgangsperiode.

Hvilke foranstaltninger, der træffes til reduktion af disse fænomener, afhænger af flere faktorer. Dels selvfølgelig af evnen til præcis at forudse, hvor problemerne vil opstå, og om de vil opstå, men også af de muligheder og midler der er til rådighed for at forebygge deres opståen og afbøde deres virkning.

Mit skøn baserer sig på, at det er almindeligt, at en omfattende omlægning af kritiske manuelle processer til automatiserede processer sker i tempi. Det kan ske ved at automatisere dele af processen først, ved at implementere den fuldt automatiserede proces over tid og fordelt på delområder, ved fortsat at lade den manuelle proces være tilgængelig parallelt med den automatiserede løsning i en periode eller gennem en kombination af disse tilgange.

Hensigten med en sådan successiv implementering er at begrænse skadevirkningerne af eventuelle fejl i den automatiserede proces og at vinde tid til at konstatere, analysere og rette disse, men også ofte at muliggøre en blidere overgang for brugere, der skal vænne sig til nye værktøjer, ændrede processer eller nye krav.

De største fordele ved en successiv implementering opnås i de tilfælde, hvor der er mange forskellige interessenter involveret,

Copyright © 2023 Karnov Group Denmark A/S

hvor de omfattede processer er særligt forretningsmæssigt kritiske, eller hvor behov og

**2872**

forudsætninger hos interessenter og brugere er stærkt varierende eller kun delvist afdækket.

Projektets rammebetingelser blev tidligt fastlagt og var afgørende bestemmende for den valgte implementeringsstrategi (jf. afsnit 2.5.2), men det ændrer ikke ved, at en trinvis implementering kunne have været valgt og også almindeligvis ville have været den foretrukne - alt andet lige. I den forbindelse vil jeg betragte beslutningen om at gennemføre idriftsættelsen som et »big bang« som en del af tilrettelæggelsen af det digitale tinglysningssystem, uagtet at beslutningen blev truffet, før det egentlige udviklingsprojekt var etableret.

Trinvis implementering evt. suppleret med en egentlig pilotdrift (parallel drift) af det digitale tinglysningssystem ville efter mit skøn dels, som det vigtigste, have afdækket flertallet af de opståede problemer inden fuld idriftsættelse, dels have reduceret skadevirkningerne til den delmængde af brugere og borgere, der ville indgå i de første trin. Sagt på en anden måde så ville de sidste brugere og borgere i den trinvise implementering ikke have oplevet de problemer og fejl, som brugerne og borgerne i de første trin oplevede.

Derudover ville Tinglysningsretten under den trinvise implementering kunne have gennemført hovedparten af de tiltag, der blev gjort for at reducere skadevirkningen af problemerne, i god ro og orden og i takt med, at problemerne blev konstateret og erfaringer med drift og support indvundet […]. Samlet set ville det have medført en bedre brugeroplevelse, færre forsinkelser i tinglysningen og mindre belastning af Tinglysningsrettens medarbejdere.

Tilsvarende ville gælde problemet med konverteringen af pantebreve indsendt fra de professionelle bruger (banker og realkreditinstitutter), hvis den trinvise implementering f.eks. var blevet opdelt efter institutioner, brancher eller retskredse. Den senere indgåede aftale med finanssektoren ville følgelig have kunnet være indgået og effektueret på et tidligere tidspunkt med en reduceret belastning af Tinglysningsrettens medarbejdere som resultat.

2.3.1.2 Involvering af brugere og samarbejdsparter

En række af de problemer, der opstod i forlængelse af idriftsættelsen, var forårsaget af en adfærd hos brugerne og rettens samarbejdsparter, der ikke var forudset og dermed ikke taget højde for. En tættere og mere intensiv involvering af de forskellige brugergrupper og parter undervejs i projektet kunne efter mit skøn have medvirket til at afdække, hvordan brugerne ville reagere og agere i forbindelse med implementeringen, og der ville kunne have været taget de nødvendige projektmæssige forholdsregler. Det gælder f.eks. helt konkrete forhold som

- brugen af fuldmagter og deres kvalitet
- brugen af den eksterne portal og dens brugervenlighed
- professionelle brugeres udvidede anvendelse af den eksterne brugerportal frem for egenudviklede system-til-system-løsninger
- den finansielle sektors forventninger med hensyn til konvertering af pantebreve.

Var brugere og samarbejdsparter blevet involveret i større udstrækning f.eks. i forbindelse med kravstillelse, design af løsninger, risikovurderinger og test, er det således min vurdering, at flere af problemerne, der er nævnt i sagsøgers spørgsmål 3, ikke ville være opstået eller ikke ville have fået de konsekvenser, de fik.

Det bør i den forbindelse tilføjes, at det helt generelt er min vurdering, at projektet styringsmæssigt i overvejende grad har været orienteret mod udviklingen af den tekniske løsning, og at udfordringerne forbundet med omlagte og nye forretningsprocesser, nye or-

ganisatoriske forhold, nye kompetencer hos centrale medarbejdere, brugeradfærd (også blandt de professionelle aktører) og kompetenceniveauet blandt brugerne ikke har fået den opmærksomhed, som så betydende forhold almindeligvis vil få.

2.4 Spørgsmål 4

*Hvilke omkostninger havde sådanne foranstaltninger medført?*

2.4.1 Svar

Det er givet, at en trinvis implementering og tættere involvering af brugere og samarbejdsparter ville have forlænget projektet og også øget de direkte omkostninger. De forøgede omkostninger bør imidlertid sammenholdes med de omkostninger, der blev påført brugere og samarbejdsparter i forbindelse med de opståede problemer foruden selvfølgelig det prestigetab, Tinglysningsretten og Domstolsstyrelsen led. Jf. svaret på sagsøgers spørgsmål 3 i afsnit 2.3 ovenfor.

En trinvis implementering blev bragt til overvejelse på et tidligt tidspunkt i forløbet, og den blev fravalgt primært på baggrund af indvendinger fra den finansielle sektor, der især angik omkostningerne ved dobbeltdrift af manuelle og digitale processer, og fordi den organisatoriske tilpasning med en central Tinglysningsret kun vanskeligt ville kunne koordineres med en successiv overgang til digital tinglysning […].

De pågældende indvendinger og vanskeligheder udelukker ikke principielt en trinvis implementering, og jeg anser det ikke for at være en del af skønsforretningen at vurdere, om de var tungtvejende nok til at udelukke den af andre grunde. Det er imidlertid min opfattelse, at vanskelighederne for den finansielle sektor ville være til at overskue, da der ikke ville være tale om dobbeltdrift i de samme retskredse eller geografiske områder, men alene om at kunne skelne mellem, hvor der ville være traditionel drift henholdsvis drift med det digitale tinglysningssystem. Tilsvarende ville der uden principielle hindringer kunne foretages en trinvis overgang fx

**2873**

retskreds for retskreds til digital tinglysning ved Tinglysningsretten Hobro. Se i øvrigt afsnit 2.5.2 nedenfor.

Det er vanskeligt at opgøre omkostningerne ved en trinvis implementering eksakt, da det forudsætter en nøje estimering af de ressourcer, der skulle have været sat ind, en vurdering af udgifterne forbundet med aktiviteter, der ville have været indhentet tilbud på, og et kendskab til prisen på givne ydelser på daværende tidspunkt. En præcis opgørelse vil derfor forudsætte et omfattende arbejde med at indhente oplysninger og rekonstruere forhold, der herskede på tidspunktet for indførelse af det digitale tinglysningssystem, hvilket falder uden for denne skønsforretning.

I afsnittet herunder har jeg på trods af dette og på baggrund af en erfaringsbaseret vurdering samt oplysninger om priser på CSC-ydelser indhentet fra Kammeradvokaten foretaget et skøn over omkostninger forbundet med en trinvis implementering og en mere omfattende involvering af brugere og samarbejdsparter. Mit skøn vil, som anført, være forbundet med stor usikkerhed, men det er ikke desto mindre tilstrækkeligt underbygget til at kunne anskueliggøre omkostningerne ved de i afsnit 2.3.1 beskrevne foranstaltninger.

…

2.4.3.2 Estimerede omkostninger ved en trinvis implementering

Som det ses af Tabel 1 nedenfor vil langt den største omkostning ved en trinvis implementering være den yderligt udskudte hjemtagelse af effektiviseringsgevinsten (28,4 mio. kr.) og udgifter til fastholdelse af medarbejdere (6,8 mio. kr.).

De samlede omkostninger forbundet med en trinvis implementering på 41,1 mio. kr. skal sammenholdes med de samlede budgetterede projektomkostninger på 621 mio. kr. […]. Der er med andre

ord tale om, at en trinvis implementering ud fra mit meget grove skøn ville have medført en stigning i omkostningerne på knap 7 %.

Det skal atter understreges, at især estimaterne vedr. specifikation, udvikling og test af validering samt udvikling og test af vejledninger er forbundet med en stor usikkerhed[.]

| Aktivitet | Antal | Pris | Beløb |
|---|---|---|---|
| *Udskudte besparelser* | | | |
| 80% i 3 måneder | | | 18.920.000 |
| 40% i 3 måneder | | | 9.460.000 |
| *Specifikation og udvikling af validering af input (geografiske kriterier)* | | | |
| Udvikler | 1.000 | 1.174 | 1.174.000 |
| Arkitekt | 200 | 1.174 | 234.800 |
| Analytiker | 200 | 1.174 | 234.800 |
| Projektchef 6 måneder (CSC) | 600 | 1.342 | 805.200 |
| Krav m.v. DSS | 200 | 403 | 80.645 |
| Krav m.v. eksterne interessenter | 200 | 500 | 100.000 |
| *Test af validering af input (geografiske kriterier)* | | | |
| Brugertest (DSS) | 200 | 351 | 70.175 |
| Eksterne interessenter | 200 | 500 | 100.000 |
| Testledelse | 200 | 1.342 | 268.400 |
| *Vejledninger* | | | |
| Udvikling af vejledninger (CSC) | 100 | 1.174 | 117.400 |
| Udvikling af vejledninger (DSS) | 200 | 403 | 80.645 |
| Test af vejledninger (DSS) | 100 | 351 | 35.087 |
| *Uddannelse* | | | |
| Brugerkursus 19 hold | 19 | 80.000 | 1.520.000 |
| Superbrugerkursus 2 hold | 2 | 80.000 | 160.000 |
| Brugerkursus 150 deltagere á 15 timer | 2.250 | 351 | 789.469 |
| Superbrugerkursus 16 deltager á 37 timer | 592 | 351 | 207.718 |
| *Fastholdelse af medarbejdere* | | | |
| Tillæg | 6 | 1.125.000 | 6.750.000 |
| | | | 41.108.338 |
| *Total* | | **2874** | |

## 2.5 Spørgsmål 5

*Var det nødvendigt at gennemføre implementeringen af det digitale tinglysningssystem som et såkaldt »big bang«, således at der fra det øjeblik, hvor den digitale tinglysning var indført, ikke længere ville være mulighed for at anmelde papirdokumenter til tinglysning?*

### 2.5.1 Svar

Nej, det var efter mit skøn ikke nødvendigt at gennemføre implementeringen som et »big bang« ud fra en rent it- eller projekt-faglig vurdering.

### 2.5.2 Begrundelse

Beslutninger om, hvordan en implementering skal foretages, afhænger sjældent af det udviklede systems funktionelle indhold som sådan, men i langt højere grad af de processer og den organisation, som det pågældende it-system skal understøtte eller for processernes vedkommende måske erstatte.

Ud fra det foreliggende materiale og en it-faglig vurdering skønner jeg ikke, at der forelå projekt- eller it-faglige forhold, der skulle nødvendiggøre et »big bang«.

Derimod er det åbenlyst, at der har været truffet økonomiske og personalemæssige dispositioner, der reelt har udelukket en mere successiv implementering. Disse dispositioner er imidlertid ikke begrundet i it-faglige forhold, men alene i forretningsmæssige og personalepolitiske overvejelser og blev foretaget på et meget tidligt tidspunkt, sådan at projektets rammebetingelser vanskeliggjorde eller helt udelukkede overvejelser i retning af en mere successiv implementering […].

Med andre ord udelukkede de rammebetingelser, der blev givet projektet, efter min vurdering en mere nøgtern og projektfaglig begrundet tilrettelæggelse af projektets implementering. Dette er også et hovedelement i mit skøn under besvarelsen af sagsøgers spørgsmål 1-3, ligesom det er et gennemgående tema i Rigsrevisionens kritik af projektforløbet […]. Som anført i afsnit 2.3.1.1 ovenfor så må en samlet vurdering af projektforløbet også omfatte beslutningen, der gik forud for selve projektets etablering, at foretage idriftsættelsen som et »big bang«.

## 2.6 Spørgsmål 6

Copyright © 2023 Karnov Group Denmark A/S

*Kunne man have gennemført implementeringen således, at det digitale tinglysningssystem i første række blev testet enten af en afgrænset kreds af brugere (bank, advokatkreds/kæde, mæglerkæde eller lignende) og/eller i et afgrænset geografisk område?*

2.6.1 Svar

Ja, implementeringen ville kunne have været gennemført som en successiv implementering, hvor det nye system ville være blevet taget i brug trinvist på afgrænsede brugsområder eller fordelt tidsmæssigt over geografiske områder som f.eks. retskredsene.

2.6.2 Begrundelse

Det vil typisk indgå i overvejelserne over implementeringsform, hvilke omkostninger der vil være forbundet med at have to parallelle systemer og/eller forretningsprocesser kørende. Den mere lempelige og mindre risikobetonede trinvise implementering vil normalt være mere bekostelig, hvis der ses snævert på projektomkostninger og konsekvenser for den tidsmæssige overgang til fuld drift og dermed hjemtagelse af gevinster, men de pågældende meromkostninger vil normalt blive sammenholdt med risikoen for afledte omkostninger forbundet med uforudsete fejl, brugerutilfredshed osv. Jf. afsnit 2.4 ovenfor.

For den digitale tinglysning ville der skønsmæssigt i lyset af de foreliggende risici og med det problemfyldte projektforløb have været god grund til at overveje en mere trinvis implementering.

Ganske vist skulle beslutningen have været truffet på et relativt tidligt tidspunkt i projektforløbet, men det er min vurdering, at der meget tidligt på projektet så mange og betydelige risici forbundet med den systemmæssige implementering, overgangen til automatiserede processer og de organisatoriske tilpasninger herunder ressourceforholdene […], at det burde have ført til en revision af implementeringsstrategien, når der alene anlægges en projekt- og itfaglig synsvinkel og fortrinsvis tages hensyn til brugeroplevelse, borgernes forventninger og sagsbehandlingstiden (grad og effekt af automatisering).

Jeg tager i min vurdering det tidligere anførte til indtægt, at beslutningen om at gennemføre idriftsættelsen som et »big bang« under normale omstændigheder ville kunne være blevet udfordret af projektet, når forløbet af projektet og de identificerede risici blev taget i betragtning.

2.7 Spørgsmål 7

*Kunne man have gennemført implementeringen således, at der i en testperiode parallelt blev fortaget tinglysninger i det tidligere papirsystem ved tinglysningsretterne og i det digitale tinglysningssystem?*

2.7.1 Svar

Ja, en sådan udvidet test ville kunne have været gennemført. Det er dog yderst sjældent, at man vælger en sådan testmetodik, da jeg har ikke kendskab til, at det er sket for systemer af et omfang og en kompleksitet som den digitale tinglysning. Det er mit skøn, at gennemførslen af en sådan test ville have været uforholdsmæssig dyr, og at udbyttet ikke ville have stået mål med omkostningerne.

…

2.8 Spørgsmål 8

*Kunne man i denne testperiode, ud fra de erfaringer man gjorde sig undervejs i testperioden, have udfærdiget*

- *brugervejledninger*
- *en supportafdeling til brugeropkald, og*
- *et overvågningssystem, som ville advisere i det øjeblik, en sag havde ligget længere end en foruddefineret periode?*

**2875**

2.8.1 Svar

Ja, der var principielt intet der, ud fra det oplyste, hindrede, at der i testperioden kunne være udarbejdet brugervejledninger, etableret en supportafdeling eller udviklet en funktion til advisering om sager, hvis liggetid overskred en given frist.

2.8.2 Begrundelse

Når der alene ses på de oplysninger, der forelå, og de projekttekniske muligheder, der var givet, så kunne projektets ledelse have besluttet at gennemføre de anførte tiltag. Det ville ikke have langt hindringer i vejen for projektets hovedprodukt eller have ændret risikobilledet i andet end en positiv (risikominimerende) retning. Alle tre tiltag ville derudover have været relevante at overveje i lyset af de erfaringer, der efter alt at dømme ville være blevet gjort i testperioden.

Et ekstraordinært beredskab (brandvagt) i en indkøringsperiode er almindeligt og baseres normalt på en vurdering af, hvor store produktivitetstab og fejlbehæftede behandlinger et nyt system vil medføre. Beredskabet vil normalt omfatte såvel hotline-funktion som sagsbehandlere og udviklere, men også en udvidet overvågning af systemperformance og brugsmønstre.

Beslutning om gennemførelse af afbødende handlinger som de nævnte vil almindeligvis basere sig på en vurdering af de økonomiske og tidsmæssige omkostninger, og det kan derfor sagtens forekomme, at relevante og risikominimerende tiltag afvises på grund af prisen eller konsekvenser for et projekts tidsplan. Det er ikke ud fra det forelagte materiale muligt præcist at vurdere, om de nævnte tiltag ville have været så omkostningskrævende, at de - i forbindelse med en testfase eller successiv implementering - ville være blevet afvist. Men det er ikke min vurdering, at det ville være tilfældet (jf. svarene på sagsøgers spørgsmål 3 og 4 ovenfor).

Det viste sig i øvrigt, at udarbejdelsen af bedre brugervejledninger og en forøget indsats i Tinglysningsrettens hotline relativt hurtigt viste sig at være nødvendig, og at begge dele blev iværksat med en markant ressourcemæssig indsats i hotlinen til følge […].

2.9 Spørgsmål 9

*Ville implementeringen af det digitale tinglysningssystem i en testperiode, som nævnt i spørgsmål 6, 7 og 8, have reduceret, hindret eller fjernet risikoen for problemerne som nævnt i spørgsmål 1?*

2.9.1 Svar

Ja, en testperiode ville under visse forudsætninger have reduceret eller helt afbødet risici som dem, der skabte problemerne nævnt i spørgsmål 1.

2.9.2 Forudsætninger

Mit svar baserer sig på svarene og begrundelserne i spørgsmål 6, 7 og 8.

Det skal bemærkes, at jeg ikke forholder mig til testperioder i den egentlige forstand af ordet, hvor der er tale om perioder, hvor det digitale tinglysningssystem ikke er idriftsat endnu, men afprøves med henblik på idriftsættelse.

Min vurdering gælder i stedet perioder, hvor det digitale tinglysningssystem er udbredt til alle brugere eller omfatter alle typer af tinglysning og derfor kan benyttes til at finde og rette fejl og uhensigtsmæssigheder såvel i systemet som i den understøttende organisation og sagsbehandling. Således forstået er der snarere tale om perioder med pilotdrift.

Det er imidlertid mit skøn, som det fremgår af især afsnit 3.3-3.5, at en række af de forhold, som en således defineret testperiode ville have afdækket, også ville kunne have været identificeret gennem en øget inddragelse af interessenter og brugere samt gennem en mere omhyggelig opfølgning på risikoanalyser og -logs. Det betyder også, at tilrettelæggelse af en periode med pilotdrift ikke er den eneste forudsætning, der skulle have været opfyldt, da en succesfuld undnyttelse af perioden, især i forhold til de iværksatte risikoafbødende tiltag, ville kræve en kritisk vurdering af de fundne problemer sammenholdt med projektets mere generelle målsætnin-

Copyright © 2023 Karnov Group Denmark A/S

ger og omfang. Sagt på en anden måde så skal en pilotdrift, bl.a. styret af risikoanalysen, hjælpe med at udpege generelle løsninger og risikominimerende tiltag, men det ville forudsætte at projektorganisationen og projektets ledelse i perioden med pilotdrift havde fuld opmærksomhed på at identificere og imødegå de væsentligste risici og problemer.

2.10 Spørgsmål 10

*Ville anvendelsen af en allerede kendt metodik, som dermed matchede allerede anvendte metoder - frem for at udvikle en ny metode - have reduceret, hindret eller fjernet risikoen for problemerne som nævnt i spørgsmål 1?*

2.10.1 Svar

Nej, kravet om anvendelse af en service orienteret arkitektur (SOA) skønnes ikke at have øget risicerne forbundet med problemerne nævnt i sagsøgers spørgsmål 1.

…

3 Sagsøgtes spørgsmål

Spørgsmål K1 relateret til organiseringen

3.1 Spørgsmål K1.1

*Skønsmanden bedes redegøre for, om organiseringen af projektet, hvor CSC var leverandør af IT-systemet, og Devoteam var Domstolsstyrelsens rådgiver, var sædvanlig på daværende tidspunkt ved anskaffelse af IT-systemer med en størrelse og kompleksitet svarende til det digitale tinglysningssystem.*

3.1.1 Svar

Der var intet usædvanligt i den valgte organisering af projektet generelt set og heller ikke specifikt i valget af CSC som ekstern leverandør til varetagelse af

**2876**

udviklingsopgaven og Devoteam som Domstolsstyrelsens rådgiver. Endvidere ses det ikke, at projektets interne organisation afviger fra, hvad der er almindeligt for projekter af en type som det digitale tinglysningssystem.

3.1.2 Begrundelse

…

3.2 Spørgsmål K1.2

*Hvis skønsmanden finder, at organiseringen eller valget af en virksomhed som CSC eller Devoteam ikke var sædvanlig på daværende tidspunkt, bedes skønsmanden redegøre for, hvilke oplysninger og andre forhold, som var almindeligt kendt på daværende tidspunkt, der gjorde organiseringen eller valgene usædvanlige.*

3.2.1 Svar

Spørgsmålet besvares ikke, da jeg ikke har fundet, at organisering og valget af leverandører var usædvanligt.

Det er dog min vurdering, som anført i afsnit 2.3.1.2, at involveringen af brugere og samarbejdsparter i projektet - og dermed også som den afspejler sig i projektorganiseringen - ikke har været tilstrækkelig. På et tidligt tidspunkt i forløbet gennemførte risikoanalyser burde have medført, at især de professionelle brugere blev involveret og forpligtet mere, end det skete.

Spørgsmål K2 relateret til risikoanalyserne

3.3 Spørgsmål K2.1

*Skønsmanden bedes på et overordnet plan beskrive, hvilke elementer der på daværende tidspunkt sædvanligvis indgik i en risikoanalyse ved anskaffelse af IT-systemer med en størrelse og kompleksitet svarende til det digitale tinglysningssystem.*

3.3.1 Svar

Risikoanalyser i forbindelse med it-projekter gennemføres sjældent efter samme metodik eller i samme omfang fra projekt til projekt. Omfang af og dybde i analysen afspejler typisk en samlet forudgående vurdering (eksplicit eller implicit) af projektets forretningsmæssige kritikalitet, og hvor nyskabende eller indgribende det anses for at være. Det vil sige, at projekter, der f.eks. indfører et stan-

dardsystem på et område, hvor processerne allerede er automatiserede, næppe vil blive risikovurderede på samme niveau og med samme omhu, som projekter der indfører egen- eller specialudviklede systemer på områder, der hidtil har været manuelt betjent.

…

Der vil almindeligvis være tale om, at risikoanalysen omfatter dels projekt-interne forhold som f.eks. projektets organisering, antallet af leverandører, karakteren af de tilknyttede personers kompetencer, geografisk spredning af projektdeltagere, de fysiske rammer der stilles til rådighed, krav til teknik og it-arkitektur, dels projekt-eksterne forhold som f.eks. de økonomiske rammer, eksterne interessenters forventninger og krav, markedsforhold, juridiske og øvrige regulatoriske krav.

3.4 Spørgsmål K2.2

*Skønsmanden bedes oplyse, om risikoanalyserne af 20. marts og 21. november 2006, som Devoteam udarbejdede i samarbejde med Domstolsstyrelsen, indeholdt de elementer, som sædvanligvis indgik i en risikoanalyse, jf. skønsmandens besvarelse af spørgsmål 2.1.*

3.4.1 Svar

Ja, risikoanalyserne af 20. marts og 21. november 2006 skønnes at indeholde de elementer, der almindeligvis vil indgå i en risikoanalyse af it-projekter.

I dette skøn indgår ikke et skøn over nedennævnte (afsnit 3.4.2.1) risikologs overensstemmelse med god skik og kutyme eller deres fuldstændighed i forhold til projektets faktiske risici.

…

3.4.2.1 Risikologgen

Det skal bemærkes, at den løbende risikoanalyse, som indgår i den operationelle projektgennemførelse, består af helt andre og mere detaljerede risikovurderinger og forslag til imødegåelse af risici vedr. enkelte elementer i projektet. Denne løbende risikoanalyse er blevet dokumenteret og ajourført i en såkaldt risikolog […].

…

Det er i den forbindelse bemærkelsesværdigt, at projektets risikolog […] ikke knytter an til struktur og temaer i risikoanalysen, hvorfor der er en øget sandsynlighed for, at den løbende risikohåndtering i projektet, som udtrykkes i loggen, ikke adresserer alle risikoanalysens elementer, og omvendt at den løbende ajourføring af risikologgen ikke umiddelbart inspirerer til en revision af vurderingen af risikoanalysens temaer.

…

3.5 Spørgsmål K2.3

*Skønsmanden bedes oplyse, om risikoanalyserne indeholder vurderinger af risici, som ud fra de oplysninger der på daværende tidspunkt var til stede, fremstår som væsentlige undervurderinger eller fejlvurderinger. I bekræftende fald bedes skønsmanden oplyse, hvilke oplysninger der var almindeligt kendt på daværende tidspunkt, som indebærer, at Devoteam og Domstolsstyrelsen burde have foretaget en væsentligt anderledes risikovurdering af det pågældende forhold.*

3.5.1 Svar

Det er min vurdering, at der er overset og undervurderet væsentlige risici. Det fremgår af, at projektet i forbindelse med idriftsættelsen blev ramt af uforudsete eller ikke tilstrækkeligt risikovurderede problemer vedr. især behandlingen af fuldmagter, presset på hotline, ressourcekrævende manuelle kontroller og konvertering af pantebreve.

**2877**

Det er desuden bemærkelsesværdigt, at det ikke før til allersidst i projektforløbet […], når undtages reguleringen efter leverandørvalget i 2006, er lykkedes at nedbringe de faktisk identificerede risici ved hjælp af de iværksatte tiltag. Tiltagene må anses for at

Copyright © 2023 Karnov Group Denmark A/S

have været utilstrækkelige, og det kan derfor i sig selv pege på, at der har været tale om en undervurdering af samtlige de pågældende risici.

Det er ganske vist ikke usædvanligt, at der i projekter af en størrelse og kompleksitet som det digitale tinglysningssystem overses risici, eller at de undervurderes, men det er ikke desto mindre min vurdering, at projektet i forhold til risikoanalyserne ligger noget uden for, hvad der er normalt forekommende med hensyn til risikoanalysers fuldstændighed og kvalitet.

Jeg tager i mit svar udgangspunkt i, at risikoanalysen ikke alene burde have beroet på »oplysninger, der var almindelig kendt på daværende tidspunkt«, men også efter god skik burde have omfattet en aktiv uddybende undersøgelse af de forhold og interesser, der var blevet udpeget i analysen.

…

Spørgsmål K3 relateret til kravspecifikationen

3.6 Spørgsmål K3.1

*Skønsmanden bedes på et overordnet plan beskrive, hvordan man på daværende tidspunkt sædvanligvis opstillede en kravspecifikation ved anskaffelse af IT-systemer med en størrelse og kompleksitet svarende til det digitale tinglysningssystem.*

3.6.1 Svar

Kravspecifikationer er specifikke for den projektmodel - og i en vis udstrækning også den udviklingsmodel - der arbejdes efter. Det vil sige, at kravspecifikationer udarbejdet under en vandfaldsmodel vil adskille sig betragteligt fra kravspecifikationer - eller hvad der svarer dertil - udarbejdet under agile projektmodeller. Mit svar baserer sig på, at der til det digitale tinglysningssystem er valgt en vandfalds-projektmodel (jf. min besvarelse af spørgsmål K4.3 nedenfor).

…

3.7 Spørgsmål K3.2

*Skønsmanden bedes oplyse, om kravsspecifikationen af 26. juni 2006 er opstillet på en måde, der svarer til sædvanlig praksis, jf. skønsmandens besvarelse af spørgsmål 3.1.*

3.7.1 Svar

Kravspecifikationen […] er efter mit skøn opstillet i god overensstemmelse med almindelig praksis for projekter, der gennemføres efter en (tillempet) vandfaldsmodel (jf. mit svar på spørgsmål K4.1).

…

Spørgsmål K4 relateret til udviklingsmodellen

3.8 Spørgsmål K4.1

*Skønsmanden bedes på et overordnet plan beskrive »vandfaldsmodellen« for udvikling af IT-systemer.*

3.8.1 Svar

Vandfaldsmodellen er reelt en samlebetegnelse for de projektmodeller, der tager udgangspunkt i, at et projekt omfatter distinkte faser i et sekventielt forløb. Typisk drejer det sig om faser som ide, analyse, kravspecifikation, design, konstruktion, test og idriftsættelse.

…

3.9 Spørgsmål K4.2

*Skønsmanden bedes oplyse, om det på daværende tidspunkt var sædvanligt at anvende »vandfaldsmodellen« ved udvikling af IT-systemer med en størrelse og kompleksitet svarende til det digitale tinglysningssystem.*

3.9.1 Svar

Det var helt sædvanligt - og er det i stor udstrækning stadig - at anvende vandfaldsmodellen i projekter lig det digitale tinglysningssystem.

…

3.10 Spørgsmål K4.3

*Skønsmanden bedes oplyse, om den udviklingsmodel, der er aftalt i kontrakten vedrørende det digitale tinglysningssystem, svarer til en »vandfaldsmodel«, sådan som modellen blev anvendt på daværende tidspunkt.*

3.10.1 Svar

Ja, den udviklingsmodel der lægges op til i kontrakten er en vandfaldsmodel.

…

Spørgsmål K5 relateret til afprøvningsprogrammet

3.11 Spørgsmål K5.1

*Skønsmanden bedes på et overordnet plan beskrive, hvilke elementer der typisk indgår i et afprøvningsprogram og testprocedurer ved anskaffelse af et IT-system med en størrelse og kompleksitet svarende til det digitale tinglysningssystem.*

3.11.1 Svar

Afprøvning og test af et system som det digitale tinglysningssystem vil typisk omfatte en egentlig systemtest af de funktionelle og de ikke funktionelle krav, samt en test af systemets brugergrænseflade, tilhørende brugervejledninger og eventuelt tilhørende beredskabsplaner.

…

Det gælder generelt, at afprøvning af systemer aldrig vil kunne blive komplet, da produktionsforholdene pr. definition vil adskille sig fra de forhold, der kan simuleres i testøjemed. Det betyder, at der næppe vil forekomme en situation, hvor et system med bare et minimum af kompleksitet og funktionel bredde, kan sættes i produktion uden fejl.

…

3.12 Spørgsmål K5.2

*Skønsmanden bedes oplyse, om det afprøvningsprogram, som var fastsat for IT-systemet i denne sag, indeholder de elementer, der på daværende tidspunkt*

**2878**

*sædvanligvis måtte forventes af et afprøvningsprogram ved anskaffelse af et sådant IT-system.*

3.12.1 Svar

Ja, det fastsatte afprøvningsprogram indeholdt de elementer, man almindeligvis vil forudsætte i et sådant program. Hvad angår test af scannerudstyret henvises dog til afsnit 3.20 nedenfor, hvoraf det fremgår, at testen af denne del af leverancen ikke kan anses for at være sket ud fra, hvad der må anses for at være god praksis.

Det bemærkes ligeledes, at afprøvning (test) af vejledninger er fraværende […], selv om kontrakten faktisk godt kan læses sådan, at såvel dokumentation som vejledninger skal afprøves […].

…

3.13 Spørgsmål K5.3

*Skønsmanden bedes oplyse, om det var usædvanligt, at der i et IT-system som det foreliggende blev konstateret fejl i forbindelse med gennemførelsen af overtagelsesprøven.*

3.13.1 Svar

Det er slet ikke usædvanligt, at der i forbindelse med en overtagelsesprøve konstateres fejl i det leverede. Dette er da også taget højde for i kontrakten […].

…

3.15 Spørgsmål K5.5

*Ved Domstolsstyrelsens overtagelse af IT-systemet var der 17 konstaterede fejl. Skønsmanden bedes oplyse, om de 17 fejl med den viden, som man havde på daværende tidspunkt, fremtrådte som så problematiske, at de burde have hindret overtagelse og idriftsættelse af IT-systemet. I bekræftende fald bedes skønsmanden oplyse, hvilke af de 17 fejl, der havde en sådan problematisk karakter, og om de var årsagen til nogle af de problemer, som opstod efter idriftsættelsen af systemet, f.eks. problemer med scannere.*

3.15.1 Svar

Der er ingen af de 17 konstaterede fejl ved idriftsættelsen, der efter min vurdering var så problematiske, at de skulle have forhindret overtagelse og idriftsættelse af det digitale tinglysningssystem. Med andre ord tog Domstolsstyrelsen ikke nogen større kendt risiko ved idriftsættelsen.

…

Spørgsmål K6 relateret til systemets brugervenlighed

3.16 Spørgsmål K6.1

*Rigsrevisionen har den 3. maj 2013 fået foretaget en brugervenlighedstest af det digitale tinglysningssystems selvbetjeningsløsning. Skønsmanden bedes oplyse, om han er enig i de vurderinger og den konklusion, som fremgår af brugervenlighedstesten. I benægtende fald bedes skønsmanden oplyse, på hvilke punkter han er uenig.*

3.16.1 Svar

Jeg er enig i vurderingen og konklusionerne i Rigsrevisionens brugervenlighedstest.

…

Spørgsmål K7 relateret til fuldmagtsscannere

3.18 Spørgsmål K7.1

*Indkøbet af det scannerudstyr, som skulle bruges ved indscanning af fuldmagtsblanketter, foregik i et samarbejde mellem Domstolsstyrelsen, Devoteam og CSC. Skønsmanden bedes oplyse, om indkøbet skete på grundlag af de undersøgelser og vurderinger, der sædvanligvis må forventes ved indkøb af teknisk udstyr. I benægtende fald bedes skønsmanden oplyse, hvilke yderligere skridt der burde have været foretaget.*

3.18.1 Svar

Ud fra det oplyste er det mit skøn, at der forud for anskaffelsen af udstyret til indscanning af fuldmagtsblanketter er foretaget de vurderinger og undersøgelser, der normalt vil blive foretaget ved sådanne anskaffelser.

…

3.19 Spørgsmål K7.2

*Skønsmanden bedes oplyse, om testningen af scannerudstyret opfyldte de krav, der sædvanligvis må stilles ved indkøb af teknisk udstyr. I benægtende fald bedes skønsmanden oplyse, hvilke yderligere tests der burde have været gennemført.*

3.19.1 Svar

Det er uklart hvilke typer af test, der er foretaget af det tekniske udstyr. Men ud fra det oplyste synes det ikke som om, der er foretaget en tilstrækkeligt omfattende funktionel test af udstyret i realistiske brugssituationer og på et tilstrækkeligt tidligt tidspunkt i projektforløbet.

…

Det fremgår imidlertid af sagens akter, at der udelukkende er foretaget test af et begrænset antal fuldmagter fra udvalgte aktører […]. Det må anses for at være en ufuldstændig test, da udfyldelse og udskrift af fuldmagtsformularen vil kunne ske hos mange forskellige aktører, og at grundlaget for indscanning følgelig ville være meget varieret.

…

3.20 Spørgsmål K7.3

*Efter idriftsættelsen blev der konstateret fejl i den scanningssoftware, som styrede scanningen af fuldmagterne. Skønsmanden bedes oplyse, om fejlene burde have været konstateret ved den testning, der fandt sted forud for idriftsættelsen.*

3.20.1 Svar

Det er min vurdering, at testen af scanningssoftwaren burde have været indrettet sådan samt afviklet så betids og med så stor omhu, at fejlene ville være blevet afsløret inden idriftsættelsen.

Det kan imidlertid ikke entydigt vurderes, om den foretagne test blot har været dårligt udført, og om den med andre ord faktisk har været designet sådan, at den korrekt udført ville have været dækkende.

…

Spørgsmål K8 relateret til størrelsen af it-udviklingsdelen i projektet

3.23 Spørgsmål K8.1

*På baggrund af kravsspecifikationen og kontrakten mellem Domstolsstyrelsen og CSC bedes skønsmanden oplyse, om udviklingen af selve it-systemet i det digitale tinglysningssystem var en mere kompleks opgave end udviklingen af andre it-systemer af samme størrelse, som staten køber med henblik på digitalisering af myndighedernes sagsbehandling, f.eks. på SKAT's område.*

3.23.1 Svar

Det er ikke min vurdering, at udviklingen af det digitale tinglysningssystem var en mere kompleks opgave end udviklingen af andre offentlige it-systemer af samme størrelse.

…«

Skønsmanden har ved den supplerende skønserklæring af 6. august 2017 besvaret supplerende spørgsmål fra Domstolsstyrelsen:

»…

9. Spørgsmål relateret til scannere

Skønsmanden bedes lægge følgende forudsætninger til grund ved besvarelsen af nedenstående spørgsmål:

- At (9.1) testen af scannerne blev påbegyndt i maj 2009, og at der helt frem til umiddelbart før idriftsættelsen blev foretaget test af scannerne.

- At (9.2) testen af scannerne blev gennemført planmæssigt og med et tilfredsstillende resultat, og at scannerne på tidspunktet for idriftsættelsen ikke viste problemer.

- At (9.3) det efter idriftsættelsen af tinglysningssystemet viste sig, at der var problemer med selve scannersoftwaren, og at problemerne bestod i, at OCR-læsningen af de scannede fuldmagter ikke var tilstrækkelig præcis.

- At (9.4) de konstaterede fejl ved scannersoftwaren ikke var særlig omfattende, og at udbedring af fejlene krævede kun en mindre justering af scannersoftwaren.

…

9.1 Skønsmanden bedes oplyse, om der på grundlag af de anførte forudsætninger (9.1) - (9.4) vedrørende test af scannerne og de konstaterede fejl er anledning for skønsmanden til at ændre eller uddybe besvarelsen af spørgsmål 2 samt spørgsmål K7.2 og K7.3.

9.2 Såfremt spørgsmål 9.1 besvares benægtende, bedes skønsmanden redegøre for hvilke andre konkrete tiltag, skønsmanden mener, Domstolsstyrelsen burde have iværksat for at imødegå risikoen for de problemer med scannersoftwaren, der er beskrevet i den ovenfor anførte forudsætning (9.4).

Svar på spørgsmål 9:

Ad 9.1:

Jeg finder ikke, at der er anledning til substantielt at ændre besvarelsen af de anførte spørgsmål, men jeg skal uddybe besvarelsen med følgende:

…

Ad 9.2:

Hvis spørgsmål 9 isoleret set angår problemet med scannersoftwaren, er det min opfattelse, at en mere omfattende test (flere såkaldte test-cases) formentlig ville have afsløret fejlen.

Men det springende punkt i forhold til risikoelementet er som nævnt ikke den isolerede funktionsdygtighed af scanningsudstyret, men den fulde funktionalitet og den samlede proces hvad angår

**2879**

indscanning af fuldmagterne. Denne overvejelse fremgår bl.a. af skønsrapportens afsnit 3.21.2 […]:

…

10. Spørgsmål relateret til inddragelse af interessenter

…

Skønsmanden bedes lægge følgende forudsætninger til grund ved besvarelsen af nedenstående spørgsmål:

- At (10.1) alle væsentlige brugere var repræsenteret i Tinglysningsudvalget og således havde indflydelse på forslaget til den fremtidige tinglysningsmodel, herunder ved udarbejdelsen af betænkningen om den digitale tinglysning.
- At (10.2) der i efteråret/vinteren 2005/2006 blev afholdt to møder med Advokatrådet, to møder med Dansk Ejendomsmæglerforening, to møder med landinspektørforeningerne, tre møder med Finans- og Realkreditrådet samt ét møde med interesserede offentlige myndigheder, hvor deltagerne fik mulighed for at fremkomme med ønsker og forslag til den fremtidige tinglysningsløsning.
- At (10.3) udkast til kravspecifikation blev udarbejdet på baggrund af Tinglysningsudvalgets betænkninger og møderne, og at udkastet blev sendt i høring hos brugerne og eventuelle leverandører.
- At (10.4) bemærkninger, forslag og kommentarer fra brugerne blev indarbejdet i den endelige kravspecifikation, der dannede grundlag for udbudsforretningen over sommeren 2006
- At (10.5) der blev nedsat en følgegruppe, der skulle følge og bistå i forbindelse med tinglysningsprojektet, og at følgegruppen mødtes 3-4 gange årligt og drøftede fremdriften samt konkrete udfordringer, ligesom følgegruppen fik forevist skærmbilleder mv.
- At (10.6) følgegruppen havde repræsentation fra advokater, ejendomsmæglere, landinspektører, den

  **2880**

  finansielle sektor samt en række offentlige myndigheder.
- At (10.7) følgegruppen drøftede en række praktiske problemer, der skulle afklares i forbindelse med idriftsættelsen, herunder konvertering af pantebreve.
- At (10.8) der på baggrund af drøftelserne blev udarbejdet et »Overgangsnotat«, hvor der blev søgt taget hånd om de praktiske udfordringer, f.eks. ved retningslinjer for konvertering af det store antal pantebreve, der kun skulle ske ved forudgående aftale med Tinglysningsretten.
- At (10.9) der også blev nedsat en teknikgruppe, der mødtes månedligt og drøftede tekniske løsninger og udfordringer.
- At (10.10) teknikgruppen endte med at være et teknisk samarbejdsforum for den finansielle Sektor
- At (10.11) der blev nedsat en OIO-arbejdsgruppe - med samme deltagerkreds som følgegruppen - hvor standardisering blev drøftet.
- At (10.12) der i regi af teknikgruppen blev afholdt et par flerdages workshops, hvor Den Digitale Tingbog blev drøftet.
- At (10.13) der i løbet af 2008 blev nedsat en pantebrevsfølgegruppe og en pantebrevsforberedelsesgruppe, der på skift mødtes ugentligt
- At (10.14) pantebrevsgruppen havde repræsentation fra Finans- og Realkreditrådet samt e-nettet og Domstolsstyrelsen
- At (10.15) pantebrevsgruppen i den sidste del af projektet nærmest fungerede som en egentlig styregruppe i forhold til systemløsningen, og at det var denne gruppe, der endeligt godkendte, at systemet blev sat i drift.

- At (10.16) der i løbet af 2008 blev etableret et fysisk testcenter hos leverandøren CSC, hvor de brugere, der måtte være interesseret, kunne teste systemet.
- At (10.17) testcenteret bestod, indtil systemet blev idriftsat, og at det i testcenteret var muligt at drøfte spørgsmål direkte med CSC og Devoteam.
- At (10.18) der i foråret 2009 blev udviklet en særlig »sandkasseløsning« - en model af den endelig løsning - der blev lagt frit tilgængeligt på internettet, og hvor brugerne kunne øve sig i at benytte løsningen
- At (10.19) Domstolsstyrelsen direktør og projektlederen i perioden fra vinteren 2008/2009 til idriftsættelsen holdt møder med Advokatrådets og Dansk Ejendomsmæglerforenings repræsentanter i følgegruppen.
- At (10.20) den finansielle sektor i højere grad blev inddraget i udviklingen end de øvrige, fordi den finansielle sektor selv udviklede en systemløsning, og at den finansielle sektor er langt den største bruger af tinglysningen.
- At (10.21) der i 2015 anmeldte ca. 2 mio. dokumenter fordeler sig således:

  79,3 % fra penge- og realkreditinstitutter
  7,2 % fra advokater
  5,8 % fra stat og kommuner
  2,4 % fra ejendomsmæglere
  1,8 % fra finansieringsinstitutter
  1,1 % fra landinspektører
  0,3 % fra revisorer
  1,5 % fra andre virksomheder
  0,6 % fra borgere
- At (10.22) testen af fuldmagtsordningen blev gennemført i august 2009, hvor de relevante formularer forelå i endelig form.
- At (10.23) testen blev gennemført med fuldmagter udfyldt af CSC, Devoteam, Danske Bank, Realkredit Danmark, BEC, BRF og e-nettet.
- At (10.24) finansinstitutionerne havde mulighed for at sende så mange fuldmagter, som de ville, og at der blev testet eksempler på fuldmagtformularer fra Unikt System Design A/S, der laver løsninger til advokater

10.1 Skønsmanden bedes oplyse, om der på grundlag af de ovenfor anførte forudsætninger (10.1) - (10.24) om inddragelse af interessenterne er anledning for skønsmanden til at ændre eller uddybe besvarelsen af spørgsmål 2.

10.2 Såfremt spørgsmål 10.1 besvares benægtende, bedes skønsmanden redegøre for, hvilke yderligere konkrete tiltag, som skønsmanden mener, Domstolsstyrelsens burde have iværksat i forhold til inddragelse af interessenter inden idriftsættelsen af den digitale tinglysning.

Svar på spørgsmål 10
Ad 10.1:

Det er korrekt, som de anførte forudsætninger illustrerer, at det digitale tinglysningssystem er udviklet under meget bred inddragelse af interessenter, og at interessenterne har haft gode muligheder for at påvirke såvel krav som udvikling og test. Det er også anerkendt i skønsrapportens afsnit 3.1 om projektets organisering. Afgørende for mit skøn har imidlertid været det forhold, der bl.a. er omtalt i rapportens afsnit 2.3.1.2:

…

Det skulle derfor have været præciseret i omtalen af interessentinvolveringen, at min vurdering er baseret på, at en styrket involvering af brugerne - især i testforløbet - i tide ville kunne have identificeret flere af de opståede udfordringer og vanskeligheder. Det dermed forbundne skøn baserer sig på - hvad der også burde have været

U.2020.2851H

anført med større vægt - at det viste sig, at brugeradfærden i bredeste forstand medvirkede til, at de i det citerede afsnit fremhævede forhold med negativ effekt på driftssituationen opstod.

**2881**

Min besvarelse af spørgsmål 2 i skønsrapporten skal derfor suppleres med, at de repræsentanter for interessenterne, som rent faktisk blev involveret og kunne vinde betydelig indflydelse på projektet, ikke har haft tilstrækkelig indsigt i eller overblik over brugeradfærden til at kunne stille de rette krav eller oplyse om den forventede brugeradfærd.

Ad 10.2:

Det falder lidt uden for skønstemaerne, men man kunne i forlængelse af ovenstående stille spørgsmålet - hvad jeg ikke gør i skønsrapporten - om de udpegede og involverede repræsentanter for interessenterne har været motiverede for at tage e egentlig medansvar for funktionsdygtigheden af den idriftsatte løsning i bredeste og ikke-tekniske forstand.

En række af de i rapportens afsnit 2.3.1.2 nævnte forhold har i vid udstrækning at gøre med interessenternes og brugernes adfærd, sådan som den udfoldede sig efter idriftsættelsen, og har altså ikke at gøre med den systemmæssige implementering af bekendtgørelsens krav. Interessenterne ville i hvert fald i teorien kunne have medvirket til, at (dele af) den for funktionsdueligheden problematiske adfærd var blevet korrigeret eller varslet på et tidligere tidspunkt, og det er et åbent spørgsmål, om det, også efter sædvane i projekter, skal påhvile et projekts ledelse at sikre, at interessenter medvirker på sådan vis.

Sagt på en anden måde, så er det ikke givet, at Domstolsstyrelsen ville kunne have tilrettelagt interessentinvolveringen sådan, at den nødvendige information var blevet skabt og tilflydt projektet.

Dette ændrer imidlertid ikke ved, at jeg, ud fra det forelagte materiale (jf. svaret på spørgsmål 11 nedenfor), ikke kan se, at der samlet set har været tilstrækkeligt - om noget - fokus på slutbrugeres adfærd. Det kunne f.eks. være sket i form af testcases baseret på uhjulpen udfyldelse af fuldmagtsformularen og indgåelse af en aftale om omfanget af pantebrevskonvertering.

11. Spørgsmål relateret til risikostyring

…

Skønsmanden bedes lægge følgende forudsætninger til grund ved besvarelsen af nedenstående spørgsmål:

-   At (11.1) der oprindeligt i foråret blev udarbejdet en overordnet risikoanalyse for det samlede projekt, og at dette skete i forbindelse med Domstolsstyrelsens ansøgning til Finansudvalget om bevilling til projektet.

-   At (11.2) denne risikoanalyse blev erstattet af en egentlig - og langt mere detaljeret - risikolog ved projektets start, og at risikologgen blev ført og vedligeholdt løbende gennem hele projektet.

-   At (11.3) risikologgen, der blev ført af konsulentfirmaet Devoteam, blev gennemgået og drøftet på de ugentlige projektmøder (mandag) samt på møderne i projektets styregruppe

-   At (11.4) det fremgik af risikologgen, hvilke risici, der aktuelt var lokaliseret, hvad konsekvensen var, samt hvad der kunne og skulle gøres for at imødegå dem, og at de enkelte risici fremstod med farverne rød, gul og grøn på grundlag af et pointsystem.

-   At (11.5) den oprindelige risikoanalyses konklusioner blev omsat til en skematisk risikoprofil - efter Finansministeriet retningslinjer herfor - i forbindelse med Domstolsstyrelsens ansøgning til Finansudvalget

-   At (11.6) det er denne risikoprofil, der fremgår dels af ansøgningen til Finansudvalget, dels af de efterfølgende halvårlige redegørelser for projektets fremdrift.

-   At (11.7) risikoprofilen havde til formål at danne grundlag for afrapportering til Finansudvalget, og at risikoprofilen derfor ikke var en del af den løbende risikohåndtering i tinglysningsprojektet

-   At (11.8) risikoprofilen alene indeholder nogle overordnede forhold samt nogle konkrete bemærkninger til de enkelte forhold.

-   At (11.9) risikoprofilen løbende blev tilrettet på grundlag af den aktuelle risikolog.

-   At (11.10) der ofte ikke vil ske store ændringer i den overordnede risikoprofil, selv om de enkelte punkter i risikologgen løbende håndteres, og at det skyldes, at risici, som blev håndteret, ofte blev »erstattet« af nye risici, og dermed er det samlede risikobillede uændret

-   At (11.11) ændringerne skal læses ud af de til risikoprofilen knyttede bemærkninger.

11.1 Skønsmanden bedes oplyse, om den i de ovenstående forudsætninger (11.1) - (11.11) beskrevne fremgangsmåde for risikohåndtering, hvor risikologgen udgør det løbende arbejdsredskab, er sædvanlig for udvikling af IT-systemer med en størrelse og kompleksitet, svarende til det digitale tinglysningssystem

11.2 Skønsmanden bedes oplyse, om der på grundlag af de ovenfor anførte forudsætninger (11.1) - (11.11) om risikoanalyserne er anledning for skønsmanden til at ændre besvarelsen af spørgsmål K2.3.

11.3 Såfremt spørgsmål 11.1 besvares benægtende, bedes skønsmanden redegøre for, hvordan Domstolsstyrelsen i stedet burde have tilrettelagt og gennemført risikohåndteringen.

Svar på spørgsmål 11

Ad 11.1:

Som bl.a. anført i skønsrapportens afsnit 3.4.2.1 […] vurderes den beskrevne fremgangsmåde som helt sædvanemæssig, og hovedparten af forudsætningerne (11.1) - (11.11) indgik i denne vurdering.

**2882**

Det skal dog specielt bemærkes, at antagelsen (11.10), at den overordnede risikoprofil ikke vil ændre sig under et projektforløb, fordi summen af risici så at sige er konstant, ikke forekommer velbegrundet. Rent faktisk blev risikoprofilen justeret undervejs i projektet, og det vil være ofte forekommende og oven i købet ønskværdigt, at den samlede risiko reduceres i løbet af et projekt, i takt med at den løbende risikohåndtering (som udtrykt i risikologgen) også håndterer de risici, risikoanalysen adresserer. Så at projektet ud fra risikoprofilen stadig var et højrisiko-projekt ved implementeringen, er hverken givet eller hensigtsmæssigt.

…

Ad 11.2:

Jeg finder ikke, at de anførte forudsætninger giver anledning til at ændre substantielt i min besvarelse af spørgsmål K2.3.

…

Ad 11.3:

Med det forbehold, at aktiviteter rettet mod interessenterne kan have været gennemført, uden at det fremgår af det forelagte materiale, så kunne Domstolsstyrelsen i risikohåndteringen med fordel have styrket involveringen af de egentlige slutbrugere. Dels for at afdække risici forbundet med, at det digitale tinglysningssystem grundlæggende forudsatte væsentlige ændringer og en høj grad af præcision i brugernes adfærd, dels for at minimere og afbøde de pågældende risici gennem f.eks. uddannelse og generel oplysning.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

…«

*Yderligere statistik*

Domstolsstyrelsen har under sagen fremlagt en oversigt over den gennemsnitlige sagsbehandlingstid for tinglysning i perioden fra november 2002 til november 2018 (målt i ugedage):

»



Kilde: Danmarks Domstole http://www.tinglysningsretten.dk/tinglysning/talogfakta/statistik/Pages/default.aspx (set den 17. december 2018)

«

Domstolsstyrelsen har desuden udarbejdet sagsoversigt for perioden 8. september 2009 - 28. juni 2010, hvoraf det bl.a. fremgår, hvor mange sager Tinglysningsretten har behandlet i denne periode:

»

| | Alle andre sager end matrikulære ændringer (både manuelle og automatiske) | Matrikulære ændringer |
|---|---|---|
| Antal modtagne sager i hele perioden | 1.045.880 | 12.801 |
| - afsluttede pr. 28/6-10 | 1.017.383 | 12.526 |
| - uafsluttede pr. 28/6-10 | 28.497 | 275 |

«

Af oversigten fremgår det endvidere, at de afsluttede sager var blevet behandlet i løbet af følgende antal dage:

»

| Afsluttet i løbet af (kalenderdage) | Alle andre sager end matrikulære ændringer (både manuelle og automatiske) | | Matrikulære ændringer | |
|---|---|---|---|---|
| | Antal | % | Antal | % |
| | | (af 1.017.383) | | (af 12.526) |
| 0 dage | 653.688 | 64,25 | 1.253 | 10,00 |
| 1-14 dage | 142.853 | 14,04 | 1.556 | 12,42 |
| 15-28 dage | 104.495 | 10,27 | 562 | 4,49 |
| 29-40 dage | 39.386 | 3,87 | 623 | 4,97 |
| 41-50 dage | 19.401 | 1,91 | 595 | 4,75 |
| 51-60 dage | 22.370 | 2,20 | 464 | 3,70 |
| 61-90 dage | 32.765 | 3,22 | 1.470 | 11,74 |
| 91-120 dage | 1.561 | 0,16 | 2.069 | 16,52 |
| 121-150 dage | 695 | 0,07 | 2.828 | 22,58 |
| 151-180 dage | 140 | 0,01 | 1.071 | 8,55 |
| 181-210 dage | 23 | <0,01 | 31 | 0,25 |
| 211-224 dage | 6 | <0,01 | 4 | 0,03 |
| I alt | 1.017.383 | 100,00 | 12.526 | 100,00 |

«

Desuden fremgår det af oversigten, at de sager, der endnu ikke var afsluttede den 28. juni 2010, på dette tidspunkt havde været under behandling i følgende antal dage (»liggetid«):

»

| Under behandling i: (kalenderdage) | Alle andre sager end matrikulære ændringer (både manuelle og automatiske) | | Matrikulære ændringer | |
|---|---|---|---|---|
| | Antal | % | Antal | % |
| | | (af 28.497) | | (af 275) |
| 0-14 dage | 19.645 | 68,94 | 158 | 57,45 |
| 15 dage - 1 måned | 7.412 | 26,01 | 37 | 13,45 |
| 1-2 måneder | 1.028 | 3,61 | 34 | 12,36 |
| 2-3 måneder | 253 | 0,89 | 11 | 4,00 |
| 3-4 måneder | 121 | 0,41 | 14 | 5,10 |
| 4-5 måneder | 30 | 0,11 | 10 | 3,64 |
| 5-6 måneder | 1 | <0,01 | 6 | 2,18 |
| 6-7 måneder | 2 | 0,01 | 5 | 1,82 |
| 7-8 måneder | 3 | 0,01 | 0 | 0,00 |
| 8-9 måneder | 2 | 0,01 | 0 | 0,00 |
| I alt | 28.497 | 100,00 | 275 | 100,00 |

«

*Tabsopgørelser*

Sagen drejer sig om Domstolsstyrelsens eventuelle erstatningsansvar over for private boligejere, og sagen omfatter således ikke opgørelsen af et eventuelt tab for den enkelte boligejer. Foreningen har dog fremlagt

**2883**

tabsopgørelser for enkelte af medlemmerne i gruppesøgsmålet.

Domstolsstyrelsen har overvejende bestridt de fremlagte tabsopgørelser og har selv udarbejdet typeeksempler, der efter styrelsens opfattelse viser omfanget af det tab, som borgeren kan have lidt i forbindelse med idriftsættelsen af den digitale tinglysning.

## Forklaringer

Jørn Knudsen, A, B, Michael Nygaard, Jan Schøtt-Petersen, Henrik Høpner, Steen Hermansen, Lars Mathiesen, Peter Vilsøe, Carsten Holmgaard, C, Leif Ekdahl, Søren Sørup Hansen og Adam Wolf har afgivet forklaring for landsretten.

*Jørn Knudsen* har forklaret, at han er administrerende direktør i e-nettet og har været det i 20 år. E-nettet hed oprindelig Realkreditnettet og var ejet af realkreditinstitutterne. Nu er det ejet af finanssektoren, dvs. også bankerne, og udfører digital infrastruktur for sektoren. Der er primært it-medarbejdere i virksomheden, som han for nemheds skyld vil betegne med dens nuværende navn e-nettet. Han er selv uddannet cand.scient.pol.

E-nettet varetog på vegne af realkreditinstitutterne opgaven med den digitale tinglysning, og e-nettet blev antaget af bankerne til at håndtere den digitale tinglysning. Det var en oplagt opgave for e-nettet at indgå i, da virksomheden havde de nødvendige kompetencer. Der blev internt etableret en styregruppe med ledelsespersoner fra finanssektoren.

Det var vigtigt for finanssektoren, at tinglysningen blev digitaliseret, da det var den sidste »bastion« ved en ejendomshandel, der endnu var på papir. Alt vedrørende lånoptagelse, låneindfrielse m.v. var digitaliseret. Finanssektoren har mange tinglysningstransaktioner, som er standardiserede, og tinglysning ved en system til system-løsning ville være optimal. En eventuel konverteringsbølge ville kunne gennemføres mere effektivt, og det ville være mere kundevenligt og medføre, at sektoren kunne spare medarbejderressourcer.

E-nettet stod for den operationelle del af arbejdet, og der blev som nævnt etableret en styregruppe med repræsentanter fra finanssektoren. Brancheorganisationerne, der stod for den politiske del, deltog ikke i styregruppen.

Der var i begyndelsen lejlighedsvis adgang til at stille spørgsmål til tinglysningsprojektet, men frem til 2008 var inddragelsen meget sporadisk, og det var ikke helt tilfredsstillende. Samarbejdet blev tættere, da det viste sig, at projektet ikke kunne komme i mål i

2008. Det blev mere koordineret, og Domstolsstyrelsen erkendte, at det var nødvendigt med et tættere samarbejde. De oplevede således en stigende grad af samarbejde, og det var også nødvendigt. Det endte med, at der var et tæt samarbejde mellem parterne. Devoteam arbejdede også for e-nettet, men det var nogle andre medarbejdere, og tingene blev holdt adskilt.

CSC og det underliggende udbud undervurderede projektet. Domstolsstyrelsen undervurderede også beredskabet i forhold til at besvare spørgsmål fra eksterne interessenter.

E-nettet havde en medarbejder i den etablerede brugergruppe i Domstolsstyrelsen. Interessen fra e-nettet var størst i relation til it-projektet i finanssektoren, og den del havde ikke noget med brugergruppen at gøre. Han deltog ikke selv i brugergruppen og kender ikke karakteren af informationerne i gruppen.

Pantebrevsfølgegruppen blev nedsat, da den første »go-live« for den digitale tinglysning blev udskudt.

Thomas Nørby Dahl, der var kontorchef i Finansrådet, deltog i brugergruppemøderne, og e-nettet arbejdede tæt sammen med ham. E-nettet havde ellers ikke samarbejde med andre brancher, herunder advokaterne og ejendomsmæglerne, uden for brugergruppemøderne. Kontakten til de brancher har været sporadisk, og det blev ikke drøftet, at e-nettet skulle udvikle noget for andre brancher.

Han kender til rammebetingelserne for tinglysningsprojektet. Der blev således fastsat en dato for »go-live«, og det skulle ske ved et »big bang«. Han ved ikke, hvor rammebetingelserne stammede fra, og han har ikke dyrket dem nærmere.

Som han husker det, fik e-nettet kendskab til risikovurderingerne, men virksomheden indgik ikke i en dialog herom.

System til system-løsningen går ud på at definere en grænseflade mellem to systemer, så de kan tale sammen. En medarbejder i finanssektoren kan på den måde tinglyse på et kort øjeblik uden ventetid for kunden. Data kan genbruges i systemet, og det er ikke nødvendigt at udføre nogen del af processen på papir. Det vifle forsinke ekspeditionen af en ejendomshandel i finanssektoren, hvis sektoren skulle bruge tinglysningsportalen. Det blev ikke overvejet at bruge portalen, og det ville kræve for mange medarbejderressourcer i sektoren.

Det bygger på tradition, at det var hele finanssektoren, der stod bag en løsning med system til system, og ikke f.eks. de store banker, der gik alene. Dette er unikt for Danmark.

I 2008-2009 var den digitale signatur tilgængelig, og forudsætningen for at anvende den ved tinglysning var derfor til stede. Finanssektoren var tryg ved at bruge den digitale signatur.

Det havde efter hans erindring ikke den store betydning for projektet, at centrale medarbejdere i CSC blev opsagt i august 2007. CSC var ikke lykkedes med den del af projektet, der var sat i gang. Der var ikke den nødvendige og forventede fremdrift, og projektet skrantede.

Der var et tæt samarbejde mellem den operationelle del af projektet i finanssektoren, som e-nettet stod for,

**2884**

og den branchepolitiske. Han var således involveret i korrespondancen med Domstolsstyrelsen, som f.eks. brevet af 5. oktober 2007 fra Finansrådet og Realkreditrådet, ekstrakten side 619, men han var ikke »pennefører«.

Der var ikke noget samarbejde mellem e-nettet og CSC. E-nettet arbejdede ud fra specifikationerne for tinglysningssystemet. Der blev desuden afholdt »spørgemøder«. E-nettet var ikke involveret i den brugervendte del af projektet, og virksomheden var ikke ude over brugersiden i de enkelte pengeinstitutter eller deres filialer.

Der skete løbende ændringer af specifikationerne, og der blev som følger heraf bl.a. mindre og mindre tid til tests. Der blev over for Domstolsstyrelsen udtrykt utilfredshed med tidsplanen. E-nettet

havde oplevelsen af, at CSC ikke »performede«. Det kostede e-nettet mange penge, at specifikationerne ændrede sig, og tonen fra finanssektoren blev skærpet. Sektoren opstillede forudsætninger for, at projektet kom i mål. Det var ikke e-nettet, der var årsagen til, at tidsplanen ikke holdt, og e-nettet havde ikke noget at gøre med udvidelse af kravene til projektet, som omtales i referatet fra mødet i leverandørstyregruppen den 9. juni 2008, ekstrakten side 758.

Da han skrev en mail til Adam Wolf den 11. juni 2009, ekstrakten side 1101, var projektet inde i en kritisk fase. Han husker ikke, hvem der svigtede i projektet, men konkret var det et problem, at der kom ændringer til projektet sent i forløbet, og at testsystemet ikke var på plads. Medarbejderne hos e-nettet fik inddraget deres sommerferie, og der blev talt om beredskabsplaner. Brugertesten, der var den sidste del af testen, skulle foretages på noget, der mindede om det færdige system. Testpersonerne sad i forskellige dele af finanssektoren. Domstolsstyrelsen havde ikke indflydelse på, hvem der var testpersoner. E-nettet stod for koordineringen af testaktiviteterne/testcasene. Der var ikke meget test af portalen, men mere test af system til system via gatewayen. Det var komplicerede tests. Det var usædvanligt, at der blev arbejdet frem mod et mål i form af et »big bang«.

E-nettet var optaget af, at manuel behandling af tinglysningsanmeldelser kunne blive et problem, men han husker ikke, om manuel behandling blev set som en risiko.

Han husker ikke, at der i pantebrevsfølgegruppen blev brugt meget tid på spørgsmålet om konvertering af papirpantebreve. Han har således ikke et billede af, at det blev diskuteret, og at der var uenighed. E-nettet havde ikke noget at gøre med finanssektorens anmodning om konvertering af pantebreve. Vistnok i november 2009 blev e-nettet inddraget i Tinglysningsrettens udfordring med konvertering af pantebreve. Selv om automatiseringsgraden ved tinglysning af dokumenter steg, blev ekspeditionstiderne længere og længere, og den kurve skulle knækkes. E-nettet videreformidlede finanssektorens tilbud om at stille mandskab til rådighed og om at koordinere returneringen af pantebrevene til bankerne. Det blev dog ikke til noget med udlån af medarbejdere, da de ansættelsesretslige forhold var for komplicerede.

Han har været med til at udarbejde aftalen af 30. oktober 2008 mellem Domstolsstyrelsen, CSC, Realkreditrådet og Finansrådet, ekstrakten side 853. Han kom således med input om, hvad e-nettet mente var nødvendigt for at komme i mål med projektet. Han gav bl.a. input til tidsplanen. CSC skulle udføre sin test, og det var en forudsætning for de andres tests. Mulige fejl skulle indrapporteres til Domstolsstyrelsen/Sørup Hansen. E-nettet var tilfreds med denne del af processen modsat den første del, dvs. før aftalen af 30. oktober 2008, hvor der var en del problemer med kommunikationen. Han har udarbejdet aftalens bilag 2, »Projektrum og samarbejde«. Det var vigtigt, at de relevante folk var samme sted på samme tid. Det drejede sig om medarbejdere fra CSC og nok 8-10 medarbejdere fra e-nettet. Der var også medarbejdere fra Devoteam. Udviklerne var dog ikke tænkt med. Det ville man nok gøre i dag.

Der var forhøjet beredskab, da systemet blev sat i drift, men systemet var stabilt, og »billedet var grønt«.

*A* har forklaret, at han er uddannet inden for it-området, og han har arbejdet med store it-systemer siden 1999. Han og hans ægtefælle solgte deres lejlighed i Bredgade i København i 2009, fordi de gerne ville arbejde i udlandet. De har nu boet og arbejdet i Schweiz i 8 år.

De satte lejligheden til salg i april 2009. Han havde i forbindelse med salget rådgivene ud over ejendomsmægleren. På et tidspunkt orienterede ejendomsmægleren om den kommende digitale tinglysning, og at deres sag ville være en af de første sager, som

skulle køres igennem systemet. Han husker ikke, at der blev informeret i medierne om brugen af den digitale tinglysning. Han opsøgte ikke selv information om systemet. Han og hans ægtefælle havde digital signatur og kendte til brugen af den. Han ved ikke, hvorfor køberen, der var psykolog eller psykiater, ikke anvendte advokat i forbindelse med handlen. Han har alene talt med køberen en gang, og det var, efter handlen var gennemført. Ejendomsmægleren fortalte dem ikke noget om køberens erfaringer med ejendomshandel eller it.

Han opfattede det ikke som et problem at anvende tinglysningssystemet. Han var vant til at arbejde med it-systemer og husker det ikke som besværligt. Han husker ikke nærmere, hvordan skærmbilledet med den digitale signatur så ud. Der var it-mæssigt ikke noget nyt eller usædvanligt ved systemet. Han mener ikke, at han

**2885**

modtog en kvittering pr. mail eller lignende på, at deres skøde var anmeldt til tinglysning, men systemet kom med et skærmbillede om, at tinglysningen var gennemført, efter de havde brugt deres digitale signatur. Han modtog ingen besked om det, som køberen gjorde på systemet.

I december 2009 og januar 2010 talte han løbende med ejendomsmægleren og ringede til Tinglysningsretten, ligesom han sendte mails til Tinglysningsretten for at høre, hvad der skete med deres skøde. Han havde regnet med, at tinglysningen ville tage en uges tid, men tænkte ikke nærmere over, at tinglysningstiden var et problem i forhold til at få handlen afsluttet og økonomien på plads.

Når han ringede til Tinglysningsretten, kom han i kø og blev flere gange efterfølgende stillet om, hvorefter telefonen ofte blev afbrudt. Så kunne han starte forfra. På et tidspunkt kom han igennem til en medarbejder, der oplyste, at der ikke var registreret en anmeldelse vedrørende deres skøde. Medarbejderen virkede ikke særligt interesseret i at hjælpe, men træt af alle de brugerhenvendelser. Han husker ikke i dag, hvornår samtalen fandt sted, men formentlig i slutningen af januar 2010.

Han skrev efterfølgende flere mails til Sørup Hansen for at få afklaret, hvad der var sket med deres skøde. Han vidste, at et it-system har en log, hvorfra man kan spore, hvad der er sket med de enkelte transaktioner. Han var derfor vedholdende over for Sørup Hansen. Det endte med, at køberen anmeldte skødet til tinglysning på ny, hvorefter tinglysningen blev gennemført samme dag.

Hvis han i november 2009 havde modtaget en kvittering fra Tinglysningsretten, hvoraf det fremgik, at der alene var betalt afgift, men ikke anmeldt et dokument til tinglysning, ville han have handlet anderledes. Det ville han også have gjort, hvis Tinglysningsretten allerede ved hans telefoniske henvendelse i december 2009 havde oplyst, at der ikke var sket anmeldelse. Han var opmærksom på, at han skulle betale renter på realkredit- og banklån i den periode, hvor der ikke skete tinglysning af skødet. Banken ville ikke medvirke til en ordning, der kunne formindske hans renteudgift. Han kan ikke huske, om det var ham selv eller ejendomsmægleren, der lavede den tabsopgørelse, som han vedlagde sin anmeldelse til gruppesøgsmålet.

*B* har forklaret, at hun er uddannet grafisk designer. Hun har været selvstændig siden 2008. Hendes mand, …, er uddannet flymekaniker. Ingen af dem har juridisk og økonomisk indsigt. I 2008 blev hendes mand arbejdsløs, da flyselskabet Sterling gik konkurs. Det var samtidig med, at hun begyndte selvstændig virksomhed, og de var derfor trængt økonomisk. De besluttede at sælge deres lejlighed, og den blev sat til salg i juli 2009. De blev ikke oplyst om den digitale tinglysning, da lejligheden blev sat til salg, men de kendte til den, da lejligheden blev solgt den 15. oktober 2009. Det var muligvis D eller E, der havde oplyst om den. De vidste, at det havde økonomiske konsekvenser, hvis tinglysningen trak ud. Hun

husker ikke, at de blev oplyst om, hvad det krævede af hende og …, at tinglysningen var digital. De havde begge en digital signatur. Hun husker ikke, hvornår hun fik sin, men det var vist i forbindelse med, at hun blev selvstændig. Det var ikke på grund af den digitale tinglysning. De var begge vant til at bruge digital signatur, og de havde ikke brug for at give andre fuldmagt til at gennemføre tinglysningen på deres vegne.

Det var D, der kontaktede dem, da de skulle underskrive tinglysningsdokumenterne. Hun og … var ikke sammen, da de hver underskrev dokumenterne digitalt. Hun husker ikke i detaljer, hvordan det forløb, men underskriften gik igennem. Det samme, har … fortalt, skete for ham. De gav D besked om, at dokumenterne var underskrevet.

I perioden 2. december 2009 - februar 2010 afventede de tinglysningen. Hun forsøgte flere gange at ringe til Tinglysningsretten, men opgav på grund af ventetiden. Hun kom dog igennem til en person en gang. Hun tror, at E også forsøgte at ringe til Tinglysningsretten, men det gjorde D ikke.

De fik langt om længe meddelelse om, at … digitale signatur ikke var valid. Det er deres opfattelse, at hans signatur udløb i ventetiden, for man kan ikke underskrive med en signatur, der ikke er gyldig. … fornyede sin signatur med det samme. Hun ringede til Tinglysningsretten, hvor hun fik oplyst, at der herefter ville forløbe yderligere 5-6 uger, før dokumenterne blev tinglyst. Det var frustrerende, da de var meget pressede økonomisk. Banken var ikke indstillet på at bidrage til en løsning.

På Facebook var der en gruppe, der hed »Digital tinglysning, skandale«. Den meldte hun sig ind i. TV2 rettede henvendelse til hende og spurgte, om hun ville medvirke i en udsendelse om den digitale tinglysning. Det indvilgede hun i. To dage efter, at udsendelsen havde været på tv, blev dokumenterne tinglyst.

Opgørelsen af deres tab er udarbejdet af deres bank og af D. Hun kender ikke til, at der var fejl i anmeldelsen til tinglysningen, og at det var en fejl, at ikke alle dokumenter blev indleveret til tinglysning samtidig. Hvis de straks havde fået oplyst, at der var noget galt med … digitale signatur, ville de have reageret med det samme.

*Michael Nygaard* har forklaret, at han arbejder som projektleder i EDC-kædens it-afdeling. Han er oprindelig uddannet som ejendomsmægler. Han har ingen it-teknisk uddannelse. EDC har en udviklingsafdeling,

**2886**

hvor der er ansat 40 medarbejdere. EDC er ikke ejet af en finansiel aktør, men ejet af de enkelte mæglere via et aktieselskab.

Han var medlem af brugergruppen for den digitale tinglysning som repræsentant for EDC. Han deltog på et af de første møder sammen med en af deres udviklere. Han kendte ikke de andre deltagere, bortset fra Jens Baunbæk. Mødet tog ca. halvanden time. De var interesseret i, hvordan tinglysningssystemet kunne påvirke ejendomsmæglernes arbejde, herunder om der var behov for, at de skulle tilpasse deres it-system til tinglysningssystemet. Mødet havde orienterende karakter. Det var i det væsentlige Sørup Hansen, der havde ordet på mødet. Domstolsstyrelsen havde allerede besluttet, hvordan systemet skulle være, og de blev ikke umiddelbart inviteret til at komme med ændringsforslag. Efter mødet konkluderede de i EDC, at de ikke havde behov for en system til system-løsning. De ville se tiden an, hvor han heller ikke efterfølgende valgt en sådan løsning. I EDC er der 1100 brugere af kædens it-system fordelt på 235 lokationer.

Ejendomsmægleren anvender tinglysningssystemet i de tilfælde, hvor en kunde beder dem om at forestå en ejendomshandel. Problemerne med tinglysningssystemet påvirkede ikke ejendomsmæglernes arbejde, men havde betydning for deres kunder. Han deltog ikke konsekvent i brugergruppemøderne, men deltog igen i et møde,

U.2020.2851H

da det stod klart, at projektet ville blive forsinket. Det blev på mødet oplyst, hvilken mængde dokumenter man forventede ville blive udtaget til manuel tinglysning, men han husker ikke længere antallet af dokumenter.

På det tidspunkt var anvendelsen af digital signatur på vej ind i ejendomsmæglerbranchen, men det var ikke da en integreret del af deres it-system. De ejendomsmæglere, der havde behov for at tinglyse, havde oprettet digital signatur. Det har nok været 60-70 procent af butikkerne.

Dansk Ejendomsmæglerforening havde planlagt 10-15 kurser om tinglysningssystemet i 2008. De henviste deres mæglere til kurserne, og interessen blandt mæglerne var stor. Efter hans mening var det ikke i mæglernes interesse at opfordre kunderne til at få oprettet en digital signatur. Det måtte udbyderen af tinglysningssystemet sørge for. Han deltog ikke i brugergruppemøder, efter tinglysningssystemet var gået i luften.

*Jan Schøtt-Petersen* har forklaret, at han er advokat, formand for Danske Boligadvokater og formand for gruppeprepæsentanten. Hans advokatfirma er beliggende i Helsingør. Kontoret har en forholdsvis stor andel ejendomshandler. Han var i en periode i 1995 ansat i Nykredit, hvor Lars Mathiesen var hans chef.

I 1999 blev han valgt ind i Advokatrådet, og han var omkring 2000 med til at stifte Danske Boligadvokater, hvor han var medlem af bestyrelsen frem til 2005. I 2010 blev han valgt ind i bestyrelsen igen og blev formand.

Han fulgte med i arbejdet med den digitale tinglysning og blev løbende gennem advokatorganisationerne orienteret om arbejdet. Han havde medarbejdere på kontoret, som kun arbejdede med ejendomshandler. De var fagligt stærke og havde it-kompetencer, og de holdt sig løbende orienteret om forløbet med den digitale tinglysning. En af medarbejderne var på kursus om den digitale tinglysning i enten den lokale advokatforening eller i regi af Advokaternes Serviceselskab. Han husker ikke, at der var »hands on«-kurser og til indførelsen af den digitale tinglysning, men han mener, at en af hans medarbejdere havde nogle skærmprint fra systemet.

Digital signatur var i sin begyndelse, men kontoret havde den og var vant til at bruge den. Klinterne blev orienteret om og anbefalet at anskaffe digital signatur. De forsøgte af nedbringe sagsbeholdningen af ejendomshandler op til, at den digitale tinglysning blev sat i drift. Han har ikke meget med ejendomsmæglerne at gøre, men det var hans forenmmelse, at de var rustet til det nye. I Dansk Ejendomsmæglerforening lavede man tillempning af købsaftalen i forhold til f.eks. at skaffe sig en digital signatur. Ejendomsmæglerne var således forberedte på, at kunderne skulle rådes til at anskaffe digital signatur.

På kontoret havde de daglige møder om brugen af tinglysningssystemet, herunder hvordan arbejdsgangene skulle håndteres. Han arbejdede ikke selv i systemet. Der var verserende sager på tidspunktet for overgangen til digital tinglysning, og der kom nye sager til. Et stort antal klienter ønskede en fuldmagtsløsning frem for selv at anvende digital signatur, som en del var »fåmlende« overfor. På kontoret så de det som deres opgave at hjælpe klienten frem til det sidste. Det indebar ikke en ekstra indtægt for advokatkontoret. Prisen for en ejendomshandel er »flad«.

Sælgeren i en ejendomshandel er repræsenteret af ejendomsmægleren, og vidnet gjorde derfor ikke noget i forhold til at fremme brugen af digital signatur hos sælgerne. Ejendomsmæglerne kunne også få registret fuldmagt til at underskrive digitalt for sælgeren. De indarbejdede forretningsgange ved en ejendomshandel var uændrede ved den digitale tinglysning.

Da den digitale tinglysning blev sat i drift, var kontoret meget opmærksom på det. Det var kaotiske dage, og der meldte sig med det samme frustrationer over manglende vejledninger. Der var tider,

hvor systemet var »nede«, hvor det ikke var muligt for medarbejderne at komme igennem på telefon til Tinglysningsretten, og hvor man ikke fik svar på henvendelser til Tinglysningsretten i øvrigt. Det var forventningen, at det ville løse sig hurtigt. Det hele skulle testes, herunder klienternes brug af

**2887**

digital signatur og registrering af fuldmagter. Fuldmagterne skulle sendes med almindelig post, og man kom i tidnød, fordi de ikke blev registreret. Der var forsinkede postgange og forsinkede ekspeditioner, og det tog derfor lang tid, før en fuldmagt blev enten registreret eller afvist. Fuldmagterne måtte til tider sendes flere gange. Der kom en frustration på kontoret over de lange sagsbehandlingstider og »goddag mand økseskaft«-svar fra Tinglysningsretten.

I september-oktober 2009 blev en del af fuldmagterne afvist, bl.a. hvis underskriften ikke var inden for rammen på blanketten, eller der var tastefejl. Det var som om, der skulle bruges kodeord. Det var banale forhold, som medførte afvisning. Da de fik lokaliseret årsagerne til afvisningerne, forsøgte de at instruere klienterne, så fejl kunne undgås. Der var ikke adækvate var til udfordringerne med fuldmagterne i de eksisterende vejledninger. Det skete ofte, at fuldmagten ikke var registreret, når et dokument blev anmeldt til tinglysning, og dokumentet blev derfor tinglyst med en frist på 5 dage. Hvis ikke fuldmagten var registret inden fristens udløb, blev dokumentet afvist, og man skulle starte forfra, ligesom tinglysningsafgiften var tabt.

Det varierede meget, hvor lang tid der gik, før et dokument blev tinglyst. Der kunne gå dage, uger eller måneder. Der var således sager, som blev tinglyst straks og ikke voldte problemer, mens andre blev afvist på grund af systemhåndteringen, f.eks. ved mangler ved medarbejdersignaturen. Dette hindrede tinglysning af dokumenterne og medførte en dokumentationsfase. Der var ikke tale om materielle afvisninger, men systembegrundede afvisninger, som til tider var uforståelige. De lange sagsbehandlingstider havde økonomiske konsekvenser for klienterne. En klient var ofte køber i den ene handel og sælger i den anden. For klienter, der fik økonomiske udfordringer, var bankerne ofte venligt indstillet over for at lade renterne på lånene gå ud med renterne på de deponerede købesum.

Han havde meget kompetente medarbejdere, og det var oplevelsen, at problemerne med tinglysningen klingede ud efter ca. 1 år, men der gik nok op mod 2 år, før tinglysningen ikke blev anset for en udfordring.

Afvisningsbegrundelsen: »Forsinkelse som følge af, at dokumenter vedrørende ejendommen ikke blev anmeldt samtidig« er ikke relevant. I den ideel verden anmeldes alle dokumenter samtidig, men det sker ikke i den virkelige verden. Det er ikke muligt at foretage alle tinglysningsmæssige ekspeditioner samtidig.

I januar 2010 blev han opfordret til at træde ind i bestyrelsen for Danske Boligadvokater. Han blev kastet ud i udfordringerne med den digitale tinglysning, og den mest presserende problemstilling var, hvordan danske boligadvokater skulle håndtere udfordringerne med den digitale tinglysning. Hør var branchens opfattelse, at der fortsat var problemer. Der var et tæt samarbejde mellem it-eksperter i Advokatsamfundet, finanssektoren og ejendomsmæglerne, og der var en møderække med justitsministeren og Domstolsstyrelsen. Der var ikke tvivl om, at Domstolsstyrelsen var indstillet på at løse problemerne, men det gik trægt. Systemet havde indbyggede vanskeligheder, som skulle løses. Skønserklæringerne har bekræftet en række uhensigtsmæssigheder både ved den måde, som systemet er bygget op på, og ved udrulningen af systemet.

Det er Danske Boligadvokater, der har taget initiativ til gruppesøgsmålet, fordi de har klienter, der har lidt tab. Der er desuden et behov for at få et ansvar placeret, og det er nødvendigt med et præjudikat for fremtidige digitaliseringsprocesser.

Copyright © 2023 Karnov Group Denmark A/S

*Henrik Høpner* har forklaret, at han er advokat og har været medlem af Advokatrådet og formand for Danske Boligadvokater. Han var medlem af Tinglysningsudvalget og medlem af Domstolsstyrelsens brugergruppe i forbindelse med udviklingen af det digitale tinglysningssystem.

Tinglysningsudvalget burde nok have anbefalet en prøveperiode eller et prøveembede forud for igangsættelsen af den digitale tinglysning. Det blev drøftet under udvalgets arbejde, og Bornholm blev nævnt som en mulighed. Det kom dog ikke til udtryk i betænkningen.

Tinglysningsudvalgets overvejelser var underlagt det faktum, at tinglysningssystemet skulle indføres i forbindelse med retskredsreformen. Han var som advokatrepræsentant i udvalget enig i, at tinglysningen kunne centraliseres og placeres ét sted i landet. Udvalget havde nok den opfattelse, at Tinglysningsretten burde placeres i Aarhus, hvor det ville være muligt at rekruttere og fastholde det nødvendige tinglysningspersonale. Han hørte senere fra en deltager i en middag, hvor bl.a. justitsministeren deltog, at Hobro blev valgt som hjemsted for Tinglysningsretten, fordi det var et ønske fra et folketingsmedlem fra Dansk Folkeparti.

Der var i Danske Boligadvokaters bestyrelse indgående drøftelser om, hvordan idriftsættelsen af tinglysningssystemet skulle håndteres. I 2008 og 2009 holdt han sammen med kolleger mange kurser rundt om i Danmark i brugen af tinglysningssystemet. Der var enorm interesse blandt medlemmerne for disse kurser. Det skyldtes blandt andet, at digital tinglysning ville medføre skærpet konkurrence fra ejendomsmæglerne, hvilket man var meget opmærksom på.

Der var i Domstolsstyrelsens brugergruppe ikke mulighed for at komme med forslag til udviklingen af tinglysningssystemet. Finanssektoren og Domstolsstyrelsen kørte deres eget løb med en system til system-løsning. Det ville blive alt for dyrt for advokaterne at udvikle et sådant system. Advokaternes tinglysninger er mere komplekse. Han betragtede brugergruppen som et

**2888**

orienteringsforum og erindrer ikke, at det var muligt at påvirke systemets udformning. Det var alene et informationsforum, hvor meget af informationen vedrørte de mange udsættelser af idriftsættelsen af systemet. Advokaterne blev ikke inviteret til at foretage tests eller lignende af systemet, inden det blev sat i gang.

Advokaterne modtog ikke materiale til kurser, før de selv blev opmærksom på, at et sådant materiale blev anvendt på kurser, som Anja Olsen fra Domstolsstyrelsen og Brian Pedersen fra Tinglysningsretten underviste på. Advokaterne blev efter hans erindring ikke involveret i arbejdet med informationsmateriale og lignende, men han stillede under brugergruppemøderne flere gange forslag til, hvordan kommunikationen vedrørende systemet burde formidles til brugerne.

Advokatbranchen havde ikke problemer med at anvende digital signatur. Den anvendte advokaterne allerede i forbindelse med oprettelse af selskaber mv. hos Erhvervs- og Selskabsstyrelsen. Det er noget vås, at advokaternes brug af fuldmagter i stedet for klienternes brug af digital signatur var skyld i problemer med den digitale tinglysning. Det var forudsat i tinglysningsudvalget, at alle professionelle brugere også skulle have mulighed for at anvende fuldmagter. På hans kontor gjorde de meget ud af at sikre, at fuldmagterne var i orden, inden de blev sendt til registrering i Tinglysningsretten. Advokaterne bliver typisk først involveret i en ejendomshandel, når klienterne er klar til at handle, og så er der ikke for klienten tid til at indhente en digital signatur. Derfor var det nødvendigt at anvende fuldmagter.

Det var ikke længere muligt at få vejledning af tinglysningspersonalet, når et dokument blev afvist fra tinglysningen, sådan som det

havde været på de gamle tinglysningskontorer. Det var frustrerende, og nogle gange sendte de en afvist fuldmagt afsted igen, hvorefter den blev registreret, uden at der var foretaget ændringer i den. Dokumenter måtte f.eks. ikke hæftes sammen med hæfteklammer, så blev de afvist, hvorefter hans personale måtte tage hæfteklammer ud af dokumenterne og returnere dem til Tinglysningsretten. Han forstår ikke, at Tinglysningsrettens personale ikke kunne gøre det i stedet for at afvise dokumenterne.

Der var i efteråret 2009 under brugergruppemøderne en erkendelse af, at det hele ikke gik så hurtigt, som man havde forventet. Det blev nævnt, at der var problemer med scannerne. Det har hele tiden været hans opfattelse, at to scannere til hele projektet var for lidt, og at man måtte forvente, at der i en årrække ville være behov for at scanne et stort antal fuldmagter.

Det blev under et brugergruppemøde nævnt, at der var et pengeinstitut, der havde sendt en »lastvognsfuld« pantebreve til digitalisering i efteråret 2009, og at det var medvirkende til at skabe forsinkelser i tinglysningen. Han foreslog under mødet, at man skulle returnere pantebrevene med besked om, at pengeinstituttet havde en femårig periode til at få dem digitaliseret, og at man måtte angive, hvis nogle af pantebrevene skulle digitaliseres her og nu, f.eks. fordi konkrete ejendomme blev handlet. Det var tosset på det tidspunkt at påbegynde en samlet digitalisering af ejerpantebreve.

Han er ikke enig i Devoteams udsagn i mail af 2. oktober 2009 til bl.a. Adam Wolf, ekstrakten side 1361. Det er noget vås at sige sådan om advokaternes forhold til digital signatur. Advokaterne havde, som han tidligere har forklaret, allerede digitale signaturer og brugte dem til selskabsregistreringer. Advokatbranchen var på det tidspunkt en af de brancher, der længst fremme med brugen af digital signatur. Det er hans opfattelse, at Devoteam bestod af nogle højtråbende konsulenter, der ikke havde forstand på noget. De optrådte meget arrogant under brugergruppemøderne. Han kan heller ikke genkende udsagnet om, at advokaterne ikke havde registreret deres digitale signatur hos Tinglysningsretten. Det er ikke et problem, som han tidligere har hørt om, men det ville være enkelt for Tinglysningsretten at rette henvendelse til f.eks. Danske Boligadvokater og få dem til at informere advokaterne herom, hvis der var et problem.

I tinglysningsudvalget var man meget opmærksom på afvejningen mellem ressourcer og behovet for digitalisering af f.eks. ejerpantebreve. Det er baggrunden for udvalgets forslag om en periode på 5 år, hvor ejerpantebreve ville bevare deres prioritetsstilling uanset digitalisering. Det var med den ordning hensigten, at den finansielle sektor skulle holde sig tilbage med at få digitaliseret ejerpantebreve. Det var også tilfældet, bortset fra enkelte pengeinstitutter.

Han deltog ikke i Domstolsstyrelsens test- og teknikgruppe. Det var en intern gruppe i styrelsen, der arbejdede sammen med den finansielle sektor. Han mener, at der heller ikke deltog andre advokater i den gruppe.

Advokaterne gjorde sig ingen overvejelser om at deltage i den test, der er omtalt i referatet fra mødet i brugergruppen den 20. april 2009, ekstrakten side 1046. Testen vedrørte den finansielle sektors system til system-løsning. Advokaterne ønskede at anvende portalen, og der var ingen test af den løsning. Han erindrer ikke at have set mail af 24. juni 2009 fra Emil Melchior til Danske Advokater, ekstrakten side 1149, vedrørende kommunikation om digital tinglysning, men han har på et tidspunkt set de vedhæftede budskaber eller noget lignende.

Han har ikke tidligere set afsnittet om ansvarsfordeling for så vidt angår brancheorganisationernes ansvar for kommunikation til eget bagland, som er indeholdt i Domstolsstyrelsens kommunikationspakke fra juni 2009, ekstrakten side 1177, men advokatbranchen

**2889**

U.2020.2851H

gjorde, hvad den kunne, for at kommunikere viden ud om tinglys-
ningssystemet. Det blev løbende drøftet, at organisationerne skulle
sørge for at holde deres medlemmer orienteret om tinglysningspro-
jektet.

Han var i foråret 2009 hyppig gæst i Domstolsstyrelsen på Adam
Wolfs kontor, hvor der bl.a. var drøftelser mellem ham, Adam Wolf
og Sørup Hansen. Møderne vedrørte ikke »teknik«, men problemer
omkring de mange forsinkelser af projektet.

Som han erindrer det, var »sandkassen«, der er omtalt i referatet
af brugergruppemødet den 25. juni 2009, ekstrakten side 1205, et
skrabet eksempel på, hvordan man skulle gå fra skærmbillede til
skærmbillede, når man skulle tinglyse et skøde. Han kan ikke
konkret huske, hvordan de informerede deres medlemmer om
»sandkassen«, men det vil være usædvanligt, hvis det ikke er sket.
Der var også nogle videofilm, men de var efter hans opfattelse
rettet mod »hr. og fru Danmark«. Han har tidligere set Domstols-
styrelsens »Vejledning - fuldmagt (fast ejendom)«, ekstrakten side
1281, eller en lignende vejledning, men han husker ikke, om han
har givet kommentarer til vejledningen.

*Steen Hermansen* har forklaret, at han arbejder i Danske Advokater
som digitaliseringschef. Han er ikke selv advokat, men hjælper
advokatvirksomheder med it-løsninger. Han var oprindeligt ansat
i Advokaternes Serviceselskab, som blev opkøbt af Danske Advo-
kater, efter at den organisation blev etableret i 2008.

Der var et indledende møde i Advokatsamfundet, hvor Sørup
Hansen kom og orienterede om tinglysningsprojektet. Vidnet, ge-
neralsekretær Henrik Rothe og advokat Henrik Høpner deltog i
mødet med Sørup Hansen. Advokaterne var interesserede i at del-
tage i processen med den digitale tinglysning. Han syntes, at tanken
om at idriftsætte digitaliseringen ved et »big bang« var »frisk«. Det
var dog på det tidspunkt planen, at bilbogen skulle digitaliseres
først, og man regnede derfor med, at eventuelle børnesygdomme
ved systemet ville være løst inden digitaliseringen af tingbogen.
Han gav udtryk for, at »big bang« var dristigt. Det var hans
indstilling fra begyndelsen, at en system til system-løsning ikke
var relevant for advokaterne.

Han blev af Advokatsamfundet udpeget til at deltage i brugergrup-
pen i Domstolsstyrelsen. Et projekt som den digitale tinglysning
var ikke unikt i forhold til det, som Advokaternes Serviceselskab
lavede.

Brancheorganisationerne deltog i brugergruppen. Han vidste ikke
på forhånd, hvem der indgik i brugergruppen, men finanssektoren
mødte talstærkt op, og advokaterne, landsinspektørerne og ejen-
domsmæglerne var de »små« i brugergruppen. Der var et teknisk-
baseret opstartsmøde, og det var klart, at der var tale om et kom-
pleksit og stort system. Han blev bekræftet i, at advokaterne ikke
skulle udvikle en system til system-løsning, og ingen advokater
har i dag etableret en sådan løsning. Årsagen er, at advokaterne har
meget forskelligartede tinglysningssager og ekspeditionstyper. Fi-
nanssektoren havde egne møder med Domstolsstyrelsen om deres
tinglysningsløsning.

I 2006 begyndte han at få indsigt i, hvordan systemet ville komme
til at se ud. Han turnerede rundt med kurser på diverse advokatkon-
torer i Danmark sammen med Henrik Høpner og Henrik Øe, der
var kontorchef i Justitsministeriet. De foreviste i den forbindelse
nogle skærmbilleder fra systemet, så kursisterne fik et indtryk af
det. De efterlyste en egentlig demo-model af systemet, da de havde
en interesse i at give et realistisk billede af, hvordan det ville
komme til at se ud. I august 2009 blev der etableret en »sandkasse«,
men det var reelt først, da den digitale tinglysning blev sat i drift i
september 2009, at man kunne se, hvordan systemet var. Projektet
blev udskudt flere gange, men det havde ikke betydning for advo-
katerne.

I advokatbranchen var man vant til at anvende digital signatur,
men med tinglysningssystemet skulle der knyttes cpr-nr. til signa-
turen for de medarbejdere, der skulle arbejde med tinglysningspor-
talen. Der opstod problemer med at sende de rigtige filer med cer-
tifikaterne til den digitale signatur til Tinglysningsretten, og der
var udfordringer med kommunikationen fra Tinglysningsretten til
advokatkontorerne i den forbindelse.

Det blev ikke drøftet på møderne i brugergruppen, at advokaternes
klienter skulle have digital signatur. Klienterne var ikke trygge ved
digital signatur, og der blev i stedet taget en fuldmagtsordningen i
brug. Han fortalte advokaterne om den digitale signatur, men han
vidste, at fuldmagten ville blive anvendt. Hvis der opstod fejl i
tinglysningsprocessen, ville advokaten med fuldmagten kunne
forsøge igen uden at skulle bede klienten om igen at underskrive
med digital signatur. Han blev orienteret om, at der blev sendt
mange fuldmagter til registrering i Tinglysningsretten, efter at sy-
stemet var sat i drift. Det kunne virke lidt tilfældigt, om en fuldmagt
blev registreret, og han modtog mange henvendelser fra medlem-
merne. Mange forsøgte således at kontakte Tinglysningsretten, men
de fik ikke løst problemerne den vej. Supporten i Tinglysningsretten
var ikke i stand til at besvare spørgsmål eller at yde kvalificeret
hjælp.

Han og direktøren i Danske Advokater, Paul Mollerup, havde
møde med Adam Wolf og Sørup Hansen i slutningen af september
2009, hvor de drøftede udfordringerne med den digitale tinglysning
på det tidspunkt. Adam Wolf og Sørup Hansen var ikke helt enige
i omfanget af de udfordringer, der var. Der blev holdt flere møder.
Han husker ikke, om Adam Wolf og Sørup Hansen sagde, hvorfor
den digitale tinglysning ikke fungerede. Det blev ikke sagt, at der
var udfordringer,

**2890**

fordi den digitale signatur ikke blev anvendt. På et brugergruppe-
møde i december 2009 efterlyste han vejledninger til systemet.
Forud for idriftsættelsen af systemet havde de fået at vide, at syste-
met var intuitivt, og at der derfor ikke var brug for vejledninger,
men det viste sig, at det var der.

Efter idriftsættelsen af systemet var der i begyndelsen bl.a. proble-
mer med, at brugere kunne miste indtastede oplysninger. Det blev
oplyst, at årsagen kunne være, at brugeren havde andre systemer
åbne, når de gik på tinglysning.dk, men det var ikke korrekt. Syste-
met blev dog bedre, efterhånden som brugerne blev bedre til at
anvende det, og kommunikationen med Tinglysningsretten blev
bedre. I dag er tinglysningen en succes. Der er dog stadig udfordrin-
ger ved de store tinglysningssager. Advokaterne blev aldrig inviteret
til at deltage i tests af systemet, inden det blev sat i drift, og de har
derfor heller ikke takket nej til at deltage.

Test- og teknikgruppen, som er omtalt i referatet fra brugergrup-
pemødet den 28. april 2008, ekstrakten side 732), tog sig af system
til system-løsningen. Han deltog ikke selv i gruppen. Leverandøren-
ne af it-løsninger til advokatbranchen blev tilbudt at deltage, men
de tvivlede på, at system til system-løsningen ville blive valgt af
advokaterne. Deres deltagelse blev derfor ikke til noget.

Han husker ikke en live-fremvisning af systemet på brugergrup-
pemødet den 20. april 2009, som det fremgår af referatet fra mødet,
ekstrakten side 1046. »Sandkassen« kom først til senere. Den test,
som omtales i referatet, er test af system til system-løsningen. Han
havde ikke selv adgang til at komme på systemet. Det kom senere
frem, at finanssektoren også afprøvede portalløsningen.

Med »sandkassen« blev der etableret en lille testmiljø, men det
blev først tilgængeligt i august 2009. Han havde »sandkassen« med
på sine ture rundt i landet, hvor han besøgte advokatkontorer pr.
dag. »Sandkassen« var ikke super anvendelig, men han husker ikke,

Copyright © 2023 Karnov Group Denmark A/S

at Domstolsstyrelsen fik en tilbagemelding om, at den ikke var anvendelig.

*Lars Mathiesen* har forklaret, at han bl.a. driver rådgivningsvirksomhed. Han har tidligere været direktør i Nykredit og formand for finanssektorens styregruppe vedrørende digital tinglysning, ligesom han har været medlem af e-nettes bestyrelse. Han har en betydelig erfaring i governance og håndtering af store projekter.

Lån med pant i fast ejendom er en kerneydelse for realkreditinstitutterne. Den digitale tinglysning kunne gøre sektoren mere effektiv, og de gik ind i tinglysningsprojektet med et åbent sind. Finanssektoren har 80 procent af volumen af den samlede tinglysning i Danmark.

Finanssektoren har betydelig erfaring med udviklingen af store systemer. Sektorens system blev isoleret set gennemført som planlagt, men det blev forsinket, fordi det skulle vente på tinglysningssystemet, og det kostede sektoren penge.

Tinglysningsprojektet havde overordnet tre faser. Domstolsstyrelsen og finanssektoren skulle udvikle nye systemer. Der fandtes ikke et allerede udviklet og anvendeligt system. Systemet skulle testes. Finanssektoren har tradition for at gennemføre omfattende test af nye systemer, og de turde ikke sætte tinglysningssystemet i verden uden sådanne test. Endelig skulle tinglysningssystemet igangsættes.

Domstolsstyrelsen hørte på deres indsigelser i forbindelse med projektudviklingen. De havde en god dialog med styrelsen, men i den første del af projektets levetid svigtede styrelsens leverandør.

Den sidste fase i udviklingen af system til system-løsningen var integrationstesten, hvor man sikrer, at de to systemer kan tale sammen. Der blev i finanssektoren taget hånd om uddannelsen af personalet i brugen af det nye system. Det var helt nødvendigt, og sektoren har erfaring hermed fra andre store systemændringer.

Efter igangsætningen af tinglysningssystemet fik de i sektorens styregruppe meldinger fra de enkelte institutter om, at »bunkerne voksede«. Det førte til møder med bl.a. justitsministeren og styrelsen om problemerne med ekspeditionstiden. Under møderne blev der talt om løsninger og ikke om, hvem der var skyld i hvad. Sektoren var meget indstillet på at være behjælpelig med at finde løsninger. Jørn Knudsen fra e-nettet fik til opgave at udforme det, som var aftalt på mødet med mødet med styrelsen og ministeren.

De væsentligste årsager til problemerne var, at automatiseringsgraden i starten var så lav, hvilket overraskede, og at Tinglysningsretten modtog et stort antal fuldmagter fra advokaterne og ejerpantebreve, der skulle digitaliseres. Digitaliseringen af ejerpantebreve var ikke tidskritisk, medmindre man skulle have nye lån. Nordea sendte en »flyttevogn« ejerpantebreve til digitalisering i efteråret 2009. Han ved ikke, hvordan pantebrevene blev fremsendt, herunder om det fremgik, hvilke pantebreve der var tidskritiske. Aftalen med finanssektoren om ikke at sende ejerpantebrevet til digitalisering blev først indgået efter det tidspunkt. Der var således ikke tale om, at Nordea brød en aftale ved fremsendelsen af pantebrevene til Tinglysningsretten.

*Peter Vilsøe* har forklaret, at han er advokat, og hans advokatkontor beskæftiger sig overvejende med ejendomshandler.

Der blev udbudt kurser om den digitale tinglysning for både advokater og sekretærer op til, at systemet blev sat i drift. Det var ikke svært at finde kurser, som blev udbudt af Danske Advokater. Desuden afholdt Brian Pedersen fra Tinglysningsretten kurser. Advokatfirmaet havde kontakt til sin it-leverandør for at sikre, at

**2891**

kontorets it var forberedt til den digitale tinglysning. Han så selv frem til digital tinglysning, idet firmaet bl.a. havde en årlig udgift på 500.000 kr. til porto ved forsendelse af tinglysningsdokumenter. Der er i dag stor tilfredshed med den digitale tinglysning.

Efter at den digitale tinglysning var sat i drift, var der en hård overgangsperiode, hvor tingene tog lang tid. Der manglede vejledning til systemet og fra Tinglysningsrettens side, og retningslinjerne blev næsten ændret dagligt. Sekretærerne oplevede, at systemet »crashede«. De havde fået en ekstra sekretær på kontoret for at være rustet til det nye, og trods udfordringerne var stemningen god. Det var nok overvejende ejendomssælgerne, der havde problemer, fordi købesummen ikke kunne blive frigivet, før skødet var tinglyst. Han blev nogle gange involveret i udfordringerne, og han skrev til tider til enten sagsbehandleren i Tinglysningsretten eller Sørup Hansen. Det var særligt, når han skrev til Sørup Hansen, at der skete noget.

Han husker ikke, at fuldmagterne gav kontoret problemer, ud over at det tog lang tid at få dem registreret. For de almindelige sager gik der ½-1 år, før det blev bedre, og tinglysningen forløb uden forsinkelser, mens det tog længere tid for de vanskeligere sager.

De sørgede for at sende fuldmagten til registrering i god tid, før skødet blev anmeldt til tinglysning. Det var således ikke hensigtsmæssigt at sende skødet til tinglysning og derefter fuldmagten til registrering, da en afvisning af fuldmagten så samtidig ville medføre, at skødet blev afvist.

*Carsten Holmgaard* har forklaret, at han er partner i advokatfirmaet Kirk Larsen & Ascanius i Esbjerg. I 2009 havde kontoret ca. 65 medarbejdere. Kontoret har i mange år haft en god base med køb og salg af fast ejendom, og i 2009 var der foruden ham selv en advokatfuldmægtig og fem juridiske assistenter i afdelingen for fast ejendom, som han var leder af.

De var i god tid meget opmærksomme på, at tinglysningen ville overgå til digital behandling. Afdelingens medarbejdere var på kursus med Brian Pedersen fra Tinglysningsretten allerede forud for den først udmeldte idriftsættelsesdato. Der var medarbejdere på kursus igen forud for den anden udmeldte idriftsættelsesdato, og han var også på kursus forud for den egentlige idriftsættelse.

De gjorde en stor indsats for at færdiggøre deres sager i det manuelle system inden overgangen til digital tinglysning i september 2009. Tinglysningskontoret i Esbjerg var forberedt herpå, og som han erindrer det, blev advokaterne også opfordret til at få ryddet op, inden overgangen til det nye system.

Alle medarbejdere på kontoret, der havde brug for det, havde fået egen digital signatur, men de havde bevidst ikke opfordret deres klienter til at anvende digital signatur i forbindelse med tinglysning. De ville først se tiden an og selv lære systemet godt at kende, og de havde på kurserne hørt, at alle og så professionelle kunne anvende fuldmagter. Flere af hans klienter ville i øvrigt være »løbet skrigende bort«, hvis han havde foreslået dem, at de selv skulle bruge en digital signatur.

Efter idriftsættelsen begyndte de straks at anmelde fuldmagter vedrørende deres ejendomshandler, men der gik nok 4 uger, inden de anmeldte deres første skøde til tinglysning. Det viste sig hurtigt, at mange af deres fuldmagter blev afvist, fordi der var fejl i dem.

De nåede som regel at få »huset« de fleste fejl ved fuldmagterne ud, inden de skulle tinglyse skøder, men det var alene, fordi de havde sendt fuldmagterne ind i god tid. I nogle tilfælde var det deres egne fejl, der var skyld i afvisningen af fuldmagterne. Det kunne være en forkert datering eller et forkert bynavn eller vitterlighedsvidner, der ikke havde skrevet de sidste 4 cifre i deres cpr.nr på fuldmagten. De sendte de rettede fuldmagter ind igen, men der kunne gå lang tid med registreringen, og det var vanskeligt at komme i kontakt med Tinglysningsretten for at få information.

Der fulgte ofte en forklaring med de afviste fuldmagter, men det var i et meget indforstået sprog. Det var meget frustrerende. Systemet anvendte nye udtryk og lignede slet ikke det papirbaserede

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

system. Alt havde fået nye navne, og systemet kunne f.eks. ikke håndtere æ og ø.

Han blev løbende involveret i problemerne, fordi hans sekretærer sad lige uden for hans dør og kom ind for at få hjælp til at løse problemerne. Der blev brugt rigtig mange timer. De holdt f.eks. ugentlige møder, hvor de delte deres viden. De udvekslede også erfaringer med lokale kolleger.

Han har i anledning af sin vidneforklaring fået kontorets it-chef til at finde alle mails mellem kontoret og Tinglysningsretten i en periode på 6 måneder efter idriftsættelsen. Der er tale om i alt 2.400 mails, hvoraf ca. 140 mails er sendt fra deres kontor med spørgsmål om, hvordan man anvender systemet. De øvrige mails, som er fra Tinglysningsretten, vedrører afvisninger, lysninger med frist og lignende.

Kontakten med Tinglysningsrettens hotline var meget forskellig. Nogle gange fik de hurtigt svar, men ofte kunne de ikke bruge svarerne til noget. Der var ikke noget, der virkede ordentligt. Selv kladder, som de havde gemt i systemet i forbindelse med ekspeditioner, forsvandt ofte. De har også oplevet, at systemet lukkede ned, så de mistede alle de arbejdsprocesser, som de var i gang med. Han har ikke selv arbejdet i systemet, men hørte herom fra sine medarbejdere.

Der var i starten også problemer med tingbogsattesterne. I nogle attester var rette adkomsthaver ikke angivet. Der stod bare »ja« i den relevante rubrik, og det

**2892**

tog lang tid at få det rettet. Han oplevede ikke, at ejendomsmæglerne var særlig godt forberedt på den digitale tinglysning. Ejendomsmæglerne havde de samme problemer med at få registreret fuldmagter.

Ekspeditionstakten på kontoret blev ikke afgørende påvirket af problemerne, men det skyldtes alene hans meget erfarne medarbejdere. Forløbet med de mange fejl gav utryghed, og de skulle fortælle klienter og banker mv., hvorfor der ikke skete tinglysning som forventet. Hvis deres klienter havde anvendt digital signatur i stedet for fuldmagter, skulle de have kontaktet klienterne mange gange for at bede dem om at underskrive på ny. Der gik mange år, inden de overlod det til deres klienter at skrive under. Selv i dag bruger de som regel en digital fuldmagt i forbindelse med ejendomshandler. Det havde været dejligt, hvis fuldmagten allerede den gang havde været digital og ikke skulle udfyldes manuelt. De havde f.eks. slet ikke en gammeldags skrivemaskine på kontoret på det tidspunkt. Skrivemaskiner indeholdt i øvrigt ikke et »@-tegn«, så det skulle under alle omstændigheder skrives på med en kuglepen.

Der kunne gå måneder med tinglysningen, når et dokument blev udtaget til manuel behandling. De modtog besked herom, men ikke om, hvorfor dokumentet var udtaget, eller hvor lang tid der ville gå. Det skete ofte ved særligt vanskelige tinglysninger, der f.eks. involverede selskaber og lignende. De vidste ikke fra starten, at manuel behandling ville tage så lang tid. De orienterede kun deres klienter om sagsbehandlingstiden, hvis de kunne se, at det ville trække ud i lang tid. Generelt forklarede de ikke klienterne i detaljer om årsagen, udover at det var den digitale tinglysning, der var årsagen.

Konsekvensen for køberne var, at de ikke kunne få tinglyst deres ejerskiftelån. De havde derfor en boligkredit i banken til en dyrere rente, som bare ventede på, at skødet blev lyst, så finansieringen kunne falde på plads.

De anmeldte altid alle dokumenter til tinglysning på samme tid. Det har man aldrig gjort, og der var ikke nogen, der havde oplyst om, at de skulle ændre fremgangsmåde. En sådan fremgangsmåde findes alene i den ideelle verden. Efter hans opfattelse er forskellen i den samlede tinglysningstid i øvrigt nærmest neutralt, hvis man

på kontoret foretager de øvrige ekspeditioner, så snart skødet er lyst.

Han overvejede ikke at kære nogle af de mange afvisninger. Han har ikke for vane at belaste domstolene med den slags. I det gamle system blev man ringet op fra det lokale tinglysningskontor, og så fik man klaret problemet i en dialog. Det var en stor omvæltning, at det personlige element forsvandt fra tinglysningen.

Der var mange afvisningsgrunde, der frustrerede personalet. Fuldmagter for selskaber med flere tegningsberettigede var der f.eks. ikke vejledning om, men det viste sig, at man skulle skrive flere navne i samme felt. Man skulle også tydeliggøre underskriverens navn med blokbogstaver under underskriften. Det var »learning by doing«. I det andet eksempel er et feriecenter, hvor der skulle sælges 90 ejerlejligheder. De udarbejdede omhyggeligt 90 fuldmagter, og først senere lærte de, at det kunne være klaret med et bilag til én fuldmagt.

De ville gerne have brugt tid og penge på at deltage i en testperiode forud for idriftsættelsen, hvis det havde været en mulighed. Det var vist også oprindelig planen, men det endte med, at man »skøjtede« hen over dette. Kontoret har på opfordring fra Brian Pedersen fra Tinglysningsretten efterfølgende deltaget i en test vedrørende lysning af tvangsauktionsskøder, og det var en stor succes.

I dag er de meget glade for det digitale tinglysningssystem, og 99 procent af deres anmeldelser til tinglysning fungerer. De får også en pæn behandling fra Tinglysningsrettens personale.

*C* har forklaret, at han blev uddannet cand.jur. i 2003. I 2009 var han projektudviklingschef, men i dag er han advokat.

Han og hans ægtefælle solgte deres lejlighed den 9. september 2009. De var ikke særligt forberedte på den digitale tinglysning, men de vidste, at den ville komme. De flyttede i en midlertidig bolig, indtil de havde købt og kunne overtage deres nye bolig. Han og hans ægtefælle havde i forvejen digitale signaturer, og dem anvendt de. Han ved ikke, om køberen havde udfordringer med at underskrive skødet. Overtagelsen var aftalt til den 28. oktober 2009.

Tinglysningen trak ud, og han var opmærksom på, at det kostede renter på lånene, som ikke kunne indfries. Han prøvede flere gange at ringe til hotline i Tinglysningsretten, men han kom aldrig igennem til nogen, før han blev »smidt af«. Han blev meget frustreret over forløbet. Skødet blev først tinglyst den 22. januar 2010. Det var hans oplevelse, at der var tale om begyndervanskeligheder i systemet. Da han ikke så lang tid senere købte ejendom og selv skulle berigtige handlen, gik alt glat igennem.

Han skrev til Domstolsstyrelsen med krav om erstatning for de forøgede renteudgifter, de havde haft. Domstolsstyrelsen anerkendte, at der ikke havde været fejl fra hans side, men afslog alligevel at betale erstatning, idet det blev anført, at sagsbehandlingstiden ikke havde adskilt sig fra sagsbehandlingstiden for tinglysning af andre dokumenter. Styrelsen fandt derfor ikke, at der var begået fejl, som kunne medføre erstatning. På det tidspunkt valgte han ikke at gøre yderligere ved sagen, men da han senere blev kontaktet vedrørende gruppesøgsmålet, valgte han at tilmelde sig.

Da tinglysningen trak ud, talte han med deres bankrådgiver om begrænsning af rentetabet. Fra den 1.

**2893**

januar 2010 sænkede banken renten på deres lån til en rente svarende til renten på deponeringskontoen. Det er hans indtryk, at det på det tidspunkt var bankens generelle politik, fordi banken ikke ville tjene penge på kundernes problemer med tinglysningen. Det er Danske Bank, der har beregnet deres tab.

*Leif Ekdahl* har forklaret, at han er ansat i CSC. Det har han været siden 1. december 2007. Han var programchef for tinglysningsprojektet indtil den 1. januar 2009, hvor han blev account manager i

U.2020.2851H

forhold til Domstolsstyrelsen. Han er oprindelig uddannet civilingeniør og har været ansat i flere store danske virksomheder, herunder inden for finanssektoren, hvor han bl.a. har arbejdet med store nødlidende it-projekter.

Den oprindelige tidsplan for tinglysningsprojektet var allerede overskredet, og projektet var blevet restruktureret, da han blev programchef i 2007. Hans første opgave var at udarbejde en ny tidsplan. Det var nødvendigt at skære ned på testtiden for, at det kunne hænge sammen. Opgaven skulle løses, og CSC var indstillet på at stille betydelige ressourcer til rådighed, også selvom det ville medføre en overskridelse af budgettet. Da han tiltrådte, var der på grund af bl.a. nogle organisatoriske problemer alene fem mand tilbage i projektet, men det blev hurtig øget til 80 mand. Der havde blandt andet været en strid mellem de to udviklingsteams, der var placeret i Aarhus og København, og CSC havde nok også overvurderet betydningen af, at man havde udviklet det første tinglysningsprojekt. Det forsinkede processen, at finanssektoren, der var en betydelig interessent, løbende havde nye ønsker til systemets funktionalitet. I det store hele forløb samarbejdet mellem CSC, finanssektoren og Domstolsstyrelsen dog fornuftigt.

CSC skulle alene levere selve systemet, herunder infrastrukturen. Den organisatoriske del hørte under Domstolsstyrelsen.

Han vil tro, at CSC havde indblik i Devoteams risikoanalyser, ekstrakten side 521, 545 og 571, men han ved ikke, om CSC var direkte involveret i dem. CSC havde ikke som sådan overvejelser vedrørende risikoen ved at igangsætte systemet som »big bang«. Det koncept anså CSC ikke som en særlig risiko. Der er ikke ved denne vurdering inddraget organisatoriske problemstillinger. De havde diskussioner med Sørup Hansen om automatiseringsgraden. Den havde betydning for antallet af kontroller i systemet, og dermed for antallet af sager, der skulle behandles manuelt. Placeringen af Tinglysningsretten i Hobro havde ikke betydning for CSC's arbejde. Set fra et teknisk synspunkt, var CSC ikke bekymrede for anvendelsen af den digitale signatur.

Det er Devoteam, der har udarbejdet »trykprøven« af CSC's leverance, ekstrakten side 601. Det var bl.a. Devoteams opgave at sikre, at CSC leverede i forhold til det aftalte. CSC's risikolog var et dokument, der skulle sikre, at de kom igennem alle led. Loggen blev regelmæssigt ajourført.

På grund af forsinkelserne med projektet blev det nødvendigt at udvikle den store del af projektet vedrørende fast ejendom først og vente med den mindre del vedrørende bilbogen. Det gjorde systemet mere robust, når man startede med at udvikle fast ejendoms-delen. Havde man først udviklet bilbogen som oprindeligt planlagt, havde det været nødvendig at foretage ændringer i systemets kerne, fordi fast ejendom er langt mere komplekst.

Beredskabsplanen af 4. april 2008, ekstrakten side 721, er udarbejdet af CSC. Den er alene baseret på projektets it-tekniske del. Han deltog i Domstolsstyrelsens brugergruppemøder for at se, hvad der skete, men han havde ikke egentlig indflydelse på møderne. Han deltog som observatør og for at vise CSC's tilstedeværelse. Han deltog nok i 2-3 møder.

Han kender til de drøftelser vedrørende finanssektorens forsøg på at udvide scope og funktionalitet, der fremgår af referatet fra mødet i leverandørstyrergruppen den 9. juni 2008, ekstrakten side 757. Det var CSC's opfattelse, at finanssektoren løbende forsøgte at få flere funktioner med i systemet, og der foregik løbende en kamp mellem finanssektoren og Sørup Hansen om, hvad der var fejlrettelser, og hvad der var nye ønsker. Flere ønsker ville have betydning for tidsplanen. Finanssektoren fik en del nye ting med. Sektoren havde et stærkt bagland, der kunne trykke på de rigtige knapper.

Han tror, at det er CSC, der har lavet risikologgen, der er medtaget på ekstrakten side 761. Loggen blev løbende ændret, blandt andet blev der indsat nogle grafiske illustrationer, f.eks. nogle røde og farver, der skulle anskueliggøre udviklingen. Loggen var et fælles input. Det er på side 1, pkt. 4, i loggen angivet, at korte testforløb vil betyde øget risiko, fordi det vil øge risikoen for, at fejl først bliver opdaget, når systemet er sat i drift. Testforløbene endte imidlertid med at blive forholdsvis lange, og der blev foretaget ændringer i systemet lige indtil go-live. Pkt. 18 er en kontrol af automatiseringsgraden og er indsat efter ønske fra Domstolsstyrelsen. Han tror, at pkt. 27 om mangler ved Domstolsstyrelsens projektorganisation må være medtaget efter ønske fra Devoteam. Der blev efterfølgende »mandet op« i styrelsen ved, at styrelsen tog flere medarbejdere ind fra Devoteam.

Han har tidligere set et udkast til notatet af 24. juni 2008 vedrørende projektforudsætninger aftalt mellem Domstolsstyrelsen, Finansrådet og Realkreditrådet, ekstrakten side 769, og har deltaget i nogle af de forudgående møder. De skulle blive enige om vilkårene for at ændre tidsplanen. Det foregik helt udramatisk.

Devoteams beredskabsplan, ekstrakten side 773, var et gammelt dokument med en ny dato, som CSC intet

**2894**

havde med at gøre. Dokumentet var historisk og kunne ikke bruges til noget på det tidspunkt.

I januar 2009 overtog Ulla Tonne hans stilling. Han sad herefter i CSC's interne projektgruppe og rapporterede løbende til CSC i USA, der viste øget interesse på grund af projektets udvikling og økonomi.

Pilen under pkt. 18 i risikologgen, ekstrakten side 940, viser en mindsket risiko, fordi det på det tidspunkt i højere grad var muligt at skønne over behovet for personale til manuel behandling.

I risikologgen, ekstrakten side 996, blev der defineret tre nye overordnede risikoscenarier. Dels at den digitale tinglysning ikke blev klar på grund af tekniske fejl, dels at Tinglysningsretten ikke nåede at afslutte alle gamle sager inden idriftsættelsen, dels at Tinglysningsretten ikke kunne nå at behandle indkomne sager på grund af personalemangel eller mange sager til manuel behandling på grund af dårlig datakvalitet. Han husker ikke, at det var særlig kritisk.

Jørn Knudsens mail af 11. juni 2009 til Adam Wolf, ekstrakten side 1101, skal ses i lyset af, at finanssektoren på det tidspunkt stadig forsøgte at få ændringer med, og at det var nødvendigt for e-nettets medarbejdere at arbejde i sommerferien. Der sad på det tidspunkt bankfolk og testede deres egne systemer op mod tinglysningssystemet. Advokaterne var ikke interesseret i system til system-løsningen, men der var et testmiljø til brugere af portalen, og det vil undre ham, hvis der ikke var adgang for advokater og ejendomsmæglere hertil.

I løbet af september var der performance problemer, men han ved i dag, at det i mange tilfælde skyldtes forhold hos brugerne, herunder brugernes browsere. CSC havde lavet en »short list« til brug for brugerne. Det lyder meget mærkeligt, hvis det skulle have betydning for tinglysningssystemets funktionalitet, hvis brugere havde programmer fra Advosys åbne på deres pc. Det er et almindeligt kendt princip at begrænse brugeradgangen til et system for at undgå overbelastning. Det anvender Skat hvert år, når de åbner for forrige skatteårs årsopgørelser. I sommeren 2009 valgte de at øge kapaciteten med ny hardware for at sikre en god performance ved idriftsættelsen.

Domstolsstyrelsen bestilte i starten af 2009 et specielt scanningssystem, der skulle fungere sammen med tinglysningssystemet. CSC leverede tre helt nye scannere, men det var alene den ene, der fungerede. De brugte måneder på at finde årsagen til, at de to scannere

U.2020.2851H

ikke fungerede. Der var inden go-live blevet kørt test på den ene scanner, og det var den, der virkede. Såfremt de havde kørt tests på alle tre scannere, havde de nok opdaget fejlene inden driftsstart.

Den tekniske del af tinglysningssystemet fungerede bortset fra scannerne, som CSC havde et vist ansvar for. Det er hans opfattelse, at en stor del af problemerne efter driftsstart skyldes dårlig kommunikation. Det er naivt at tro, at et så komplekst system kan køre optimalt fra dag et. Det kunne være kommunikeret bedre. De ekstra ejerpantebreve tog også ressourcer fra den manuelle tinglysning.

Det vil aldrig blive muligt at foretage automatisk tinglysning af alle dokumenter. Der er i systemet en række kontroller, og jo flere kontroller, der lægges ind, jo højere automatiseringsgrad vil man opnå. Dækker kontrollerne ikke et indkommende dokument, vil dokumentet blive udtaget til manuel behandling.

Antallet af kontroller blev fastlagt i januar 2009, og det var på det tidspunkt, man vidste noget om, hvor meget personale der ville blive behov for til manuel tinglysning. Antallet af medarbejdere vil dog altid blive »et skøn å tågen«. Den, der bedst kunne udøve dette skøn, var Sørup Hansen.

*Søren Sørup Hansen* har forklaret, at han er chef for Tinglysningsretten i Hobro. Han har bortset fra en periode på fem år, hvor han var advokat, været ansat ved domstolene siden 1973 og har særligt beskæftiget sig med tinglysning, herunder med tinglysningsprojekter som omlægning af tingbøgerne til edb og oprettelsen af Bil- og Personbogen.

I 2000 udtrykte den finansielle sektor ønske om en større ensartethed i sagsbehandlingen på tinglysningskontorerne. Sektoren havde personer ansat med særlig kendskab til måden at tinglyse på ved hver enkelt af de 82 tinglysningskontorer rundt i landet. Justitsministeriet nedsatte et tinglysningsudvalg, der skulle se på den fremtidige tinglysning. Han var medlem af udvalget. Udvalget afgav en delbetænkning i 2005, og det var indstillingen, at tinglysning fortsat skulle været et offentligt anliggende, og en ensartet sagsbehandling kunne sikres ved en centralisering af tinglysningen eller en form for automatisering af tinglysningsprocessen. Der blev afgivet betænkning af Tinglysningsudvalget i 2006, hvor det var indstillingen, at tinglysningen skulle både centraliseres og automatiseres. Regeringen havde dog allerede i 2005 beslutte, at tinglysningen skulle digitaliseres.

Det blev besluttet, at de 82 tinglysningskontorer skulle omlægges til en Tinglysningsret. Der var drøftelser om placeringen, og det blev politisk besluttet at placere Tinglysningsretten i Hobro. Centraliseringen medførte, at der skulle gennemføres et byggeprojekt. Samtidig skulle der gennemføres en domstolsreform, og det gjorde det personalemæssigt vanskeligere at løse tinglysningsopgaven ved en række embeder. Der var derfor i 2007 og 2008 nogle rokeringer, som bl.a. betød, at tinglysning ikke over hele landet blev foretaget i den retskreds, hvor ejendommen lå. Fra 2007 foregik papirtinglysningen for så vidt angik 25 af de gamle retskredse i en skurvognsby i Hobro.

**2895**

Organiseringen af tinglysningsprojektet var traditionel. Der blev etableret en intern styregruppe med ansvaret for den overordnede tilrettelæggelse. Der var endvidere en brugergruppe, som også gik under navnene kontaktgruppen eller følgegruppen, med deltagelse af diverse interessenter. Reelt var der tale om en gruppe, der var sammensat med de samme interessenter, som deltog i Tinglysningsudvalget.

Brevet af 15. juni 2005 fra Domstolsstyrelsen til Justitsministeriet, ekstraktens side 507, er udarbejdet af ham og Domstolsstyrelsens daværende direktør, Bent Carlsen, og det omtaler bl.a. deres forventning om personalflugt blandt tinglysningspersonalet i tiden frem til tinglysningssystemets ibrugtagning. På det tidspunkt vidste

han, at det var planen at centralisere tinglysningen, men ingen vidste hvor. De måtte gøre sig overvejelser om, hvorvidt personalet ville flytte med, og de måtte forudse, at nogle ville skifte til arbejde uden for domstolene. Brevet er sendt ca. 1 år før, at Tinglysningsudvalget afgav sin betænkning, og det var et forhandlingsoplæg til Justitsministeriet. Domstolsstyrelsen ønskede flere ressourcer. En automatiseringsgrad ved systemets ibrugtagning på 35 % var et forsigtigt skøn. Det var uvist, hvordan overgangsordningen ville blive, men styrelsen skønnede, at der ud over de forventede 90 medarbejderårsværk ved Tinglysningsretten som en overgangsløsning midlertidigt skulle være et tinglysningsberedskab på ca. 100 tinglysningsårsværk, indtil automatiseringsgraden havde nået det forventede niveau.

På tidspunktet for Justitsministeriets aktstykke nr. 38 af 21. november 2006 til Finansudvalget, materialesamlingen side 101, var der udarbejdet kravspecifikation til tinglysningssystemet, der var afholdt udbud, og der var modtaget tilbud på udviklings- og driftsopgaven. Ønsket om, at det digitale tinglysningssystem skulle sættes i drift ved et »big bang«, kom fra Tinglysningsudvalget, og det byggede bl.a. på erfaringerne fra det tidligere tinglysningsprojekt med konverteringen af tingbøgerne til edb, som tog 12 år. Ved et »big bang« ville man opnå fordelene ved digitalisering fra dag et. Det lå fast, at »big bang« var løsningen, og det kom med i lovforslaget. For at imødegå risikoen for, at systemet ikke fungerede tilfredsstillende fra starten ved et »big bang«, skulle et antal medarbejdere uddannes i manuel tinglysning til ansættelse i Hobro, og medarbejderne skulle oplæres i at betjene det nye system. Der blev til dette brug etableret uddannelsescentre i Aalborg, Randers og Aarhus, hvor der i løbet af 2007 og begyndelsen af 2008 blev oplært 60 nye medarbejdere.

Ved udviklingen af systemet blev der anvendt risikologs, og de såkaldte risikoanalyser indeholdt en summarisk præsentation af risikologgene. CSC skulle føre en risikolog, der indeholdt, hvad CSC så som risici ved systemet, og hvad der efter CSC' opfattelse skulle gøres for at minimere risicierne. Domstolsstyrelsen førte også en risikolog, som indeholdt, hvad styrelse så som risici, herunder i forhold til forretningsmæssige forhold eller forhold ved leverandøren, CSC. Endelig førte finanssektoren en risikolog.

Når et punkt i en risikolog har statussen »Åben«, f.eks. punkt 23 i risikolog fra september 2007, ekstraktens side 607, viser det, at punktet ville være en potentiel risiko frem til, at systemet gik i luften. Det skulle så overvejes, hvad man ville gøre for at mindske risikoen, og hvor sandsynligt det var, at den ville indtræde. I risikologgen fra januar 2008 indgår punkt 23 også, ekstraktens side 658. Status er fortsat »Åben«, men teksten er ændret, og det viser, at risikoen blev bearbejdet.

Af referatet fra leverandørstyregruppemøde den 9. juni 2008, ekstrakten side 757, fremgår, at CSC' risikolog blev gennemgået, og det var CSC, der kom med løsningsforslag. Punkt 18 i risikologgen, ekstrakten side 762, vedrørte omfanget af manuel prøvelse af anmeldelser i forhold til antal medarbejdere, og CSC kom med forslag om brug af brugerformularer for at højne automatiseringsgraden.

Ved Domstolsstyrelsens brev af 10. oktober 2008, ekstrakten side 837, blev det varslet, at tinglysningssystemets ikrafttræden ville blive udskudt. Der havde på det tidspunkt allerede været en tidligere udskydelse. De medarbejdere, der da stadig var på de eksisterende tinglysningskontorer, begyndte at »sive«, og pensionsmodne medarbejdere ville gerne gå fra. Der var stort pres. Den bevilling, der havde været til at fastholde medarbejdere under udviklingen af systemet, udløb ved udgangen af 2008. Den store retsskredsreform var godt i gang. Byretterne var pressede og ville gerne bruge deres egne medarbejdere, og det medførte, at det ikke var let at tiltrække

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

medarbejdere til tinglysningsopgaven. Det var derfor personalemæssigt ret kritisk med endnu en udsættelse.

I efteråret 2008, da det stod klart, at der var behov for endnu en udsættelse, udarbejdede Domstolsstyrelsen i samarbejde med CSC, Realkreditrådet og Finansrådet en ny plan for implementering af den digitale tingbog, ekstrakten side 853. Parterne var enige om, at den digitale tingbog skulle implementeres så hurtigt og så sikkert som muligt, herunder at der skulle afsættes den fornødne tid til test. Finanssektoren var den dominerende aktør i forhold til tinglysning af dokumenter, og sektoren ville gerne have længere tid til bl.a. test. Det blev aftalt, at der skulle være et tættere samarbejde på ledelsesniveau mellem Domstolsstyrelsen og finanssektoren. Pantebrevsfølgegruppen, som reelt kun var en orienteringsgruppe, blev opgraderet. Jørn Knudsen fra e-nettet blev inddraget yderligere. Jørn Knudsen kom med udkast til en beskrivelse af et fælles projektrum og det

**2896**

fremtidige samarbejde, ekstrakten side 856. Finanssektorens interesse i arbejdet var navnlig at sikre den investering, som sektoren allerede have foretaget i udviklingen af en system til system-løsning. Det var rimeligt, at sektoren blev knyttet tættere til projektet.

Der blev etableret et projektrum hos CSC. Mange ting kunne løses meget lettere, fordi medarbejdere fra Domstolsstyrelsen, finanssektoren og CSC sad i projektrummet. De foretog tests på både tinglysningsportalen og på system til system-løsningen. Han kom selv i projektrummet, men der var for løse egentlige opgaver. Finanssektoren var meget begejstret for projektrummet, og det var åbent for enhver.

Den 13. januar 2009 sendte han et brev til Domstolsstyrelsen, ekstrakten side 915. Han var vred, fordi han havde modtaget en meddelelse fra Domstolsstyrelsen den 12. december 2008 om »Personalenormering for Tinglysningsretten 2009«, hvoraf det fremgik, at normeringen i alt var på 115 årsværk inkl. administrationschef og præsident. Da ejendommen i Hobro blev bygget, var alle ellers enige om, at antallet af årsværk skulle være 122, og ejendommen blev bygget til 150 medarbejdere. Han havde således regnet med 122 årsværk. I brevet henholdt han sig til den tidligere aftale. Det endte med yderligere 10 årsværk, så Tinglysningsretten blev normeret med i alt 125 årsværk.

Som et af elementerne til en beredskabsplan for implementering af den digitale tinglysning skrev han den 13. maj 2009, ekstrakten side 1195, til fem byretter om »nabohjælp«. Planen var, at Tinglysningsretten skulle kunne trække på 4-5 medarbejdere med tinglysningserfaring fra hver af retterne i Hjørring, Aalborg, Holstebro, Viborg og Herning. Ordningen blev begrænset til de fem retter, da det kun ville være muligt at tinglyse i Tinglysningsrettens lokaler, og der skulle derfor tages hensyn til rejsetiden for de pågældende medarbejdere. Der var 20 medarbejdere, der meldte sig. Vurderingen af, hvor mange medarbejdere der skulle indgå i nabohjælpen, var et skøn, og det blev skønnet, at 20 medarbejdere var tilstrækkeligt. Det viste sig senere ikke at være nok, men på det tidspunkt vurderede man, at 20 medarbejdere var »solidt«. Antallet af årsværk ved Tinglysningsretten var da også øget til 125. Skønnet over antallet af medarbejdere blev drøftet »hen over bordet«. Det gav ikke mening at sætte tal på enkelte dele, og tallene blev ikke indsat i et regneark. Skønnet ville under alle omstændigheder være det samme.

Domstolsstyrelsen udarbejdede i juni 2009 en kommunikationspakke, ekstrakten side 1069, i samarbejde med finanssektoren, advokaterne og ejendomsmæglerne. Brancheorganisationerne havde ansvaret for at kommunikere med eget bagland, dvs. lokale banker, realkreditinstitutter m.v. Finanssektoren og advokaterne ville selv orientere deres brugere. Domstolsstyrelsen skulle kun i begrænset omfang orientere andre end egne medarbejdere, og det var bl.a.

også derfor, at pantebrevsfølgegruppen blev nedsat. Der blev afholdt »gå-hjem-møder« med deltagelse af bl.a. Henrik Høpner, hvor Henrik Høpner spurgte ind til de ting, som han ønskede nærmere oplysninger om. Bagefter kunne han have ønsket, at kommunikationsdelen var blevet gennemført på en anden måde, end at finanssektoren og advokaterne selv stod for at orientere eget bagland.

Anvendelsen af digital signatur er et eksempel på, at kommunikationen ikke hang sammen. Det var advokaternes opfattelse, at digital signatur ikke var et problem, fordi den i et vist omfang allerede blev brugt i forhold til Skat og Erhvervs- og Selskabsstyrelsen. Den digitale signatur, der blev anvendt der, var dog ikke »bred« nok i forhold til den signatur, som skulle anvendes i tinglysningssystemet. I tinglysningssystemet forpligter man sig, og det skulle derfor være muligt ud af den digitale signatur at se, hvem der konkret skrev under. Signaturen skulle knyttes til en bestemt medarbejder med cpr.nr., og det var nyt. Det gav desuden anledning til mange problemer, at der f.eks. ikke måtte være bindestreg mellem dato og navn ved den digitale signatur, og advokater og ejendomsmæglere var ikke opmærksomme på, hvilken signatur der skulle bruges.

Konvertering af pantebreve blev drøftet i Tinglysningsudvalget, og der blev i loven indsat en hjemmel for finanssektoren til selv at konvertere pantebreve. Der blev desuden indsat en overgangsordning på 5 år til at konvertere rettigheder i ejerpantebreve. Tinglysningsretten var ikke i opstartsfasen normeret til at konvertere mange pantebreve. Det er hans opfattelse, at der var en aftale med finanssektoren om ikke at indsende pantebreve til konvertering, medmindre der var tale om pantebreve i konkrete ejendomshandler. Han gik i øvrigt ud fra, at finanssektoren i stort omfang selv ville konvertere pantebreve. Det var finanssektoren, der havde ønsket mulighed herfor.

På mødet i brugergruppen den 25. juni 2009, ekstrakten side 1199, gav han en status på tinglysningssystemet, herunder om test og fællestest. CSC skulle teste systemet først og derefter Domstolsstyrelsen/Tinglysningsretten. Der skulle til sidst gennemføres en test for alle, herunder med involvering af finanssektoren og landinspektørerne. Portalløsningen blev testet af CSC og af Tinglysningsretten. Den blev dog også testet af finanssektoren, da mindre institutter ville anvende portalen. Projektrummet var åbent for alle for tests.

Allerede da leverandørkontrakten var indgået med CSC, blev der tilknyttet en brugervenlighedsekspert til projektet. Vedkommende skulle bl.a. sikre, at der blev udviklet brugervenlige skærmbilleder, og at der blev taget hensyn til handicappede. Som følge af Rigsrevisionens kritik i forhold til brugervenligheden i systemet

**2897**

har der ved senere ændringer af systemet været foretaget nye test for brugere i form af »hr. og fru Hansen«. Disse tests er hver gang gået galt, fordi tinglysning er en kompliceret juridisk disciplin. Det er ikke muligt at foretage test på den måde, som Rigsrevisionen og skønsmanden efterlyser. Der er forskel på professionelle brugere af systemet og almindelige borgere, og det kan ikke undgås, at der anvendes juridisk fagsprog. »Sandkassen«, der blev etableret i august 2009, indeholdt enkle ekspeditionstyper, hvor man f.eks. kunne prøve at anmelde et skøde til tinglysning. Det lignede det endelige system, som i øvrigt ligner systemet i dag. Der kom enkelte tilbagemeldinger på »sandkassen«, men ikke mange, og det var ikke på det tidspunkt muligt at lave noget grundlæggende om i systemet.

Der blev indsat en fuldmagtsblanket som bilag til bekendtgørelsen om adgang til tinglysningssystemet og om tinglysningsmåden. Blanketten blev udarbejdet efter en række møder i brugergruppen, og alle interessenter har derfor været med til at påvirke processen. Da bekendtgørelsen var offentliggjort, blev fuldmagtsblanketten

Copyright © 2023 Karnov Group Denmark A/S

lagt ind på tinglysning.dk. Alle kunne benytte blanketten, men en række professionelle brugere udarbejdede deres egne, der dog havde det samme indhold, men et anderledes layout. Det gav problemer ved scanningen. Da Bil- og Personbogen senere blev digitaliseret, blev det besluttet, at det kun var bekendtgørelsens fuldmagtsblanket, der kunne anvendes.

Lukkeperioden op til idriftsættelsen af tinglysningssystemet var turbulent. 25 retskredse skulle gøres færdige, og alle medarbejdere var på kursus i det nye system.

Der blev i de sidste måneder op til idriftsættelsen af tinglysningssystemet begået mange fejl i papirtinglysningen, og der blev derfor fra starten brugt mange ressourcer i den digitale tinglysning på at rette disse fejl. Det kunne være fejl i form af forkerte navne på adkomsthavere og på kreditorer, forkerte beløb, opdeling af en parcel ejendom i ejerlejligheder m.v. Digitaliseringen gjorde det desuden muligt for brugere at kigge tilbage i tidligere tinglysninger, og de kunne i den forbindelse blive opmærksomme på fejl. I september 2009 kom der ikke mange dokumenter ind til tinglysning, og der var derfor ressourcer til at rette fejl. Op mod halvdelen af medarbejderne blev brugt til at rette fejl. I dag skal der stadig rettes fejl, og det er tre medarbejdere beskæftiget med.

Der var aldrig problemer med de fysiske scannere, som bare skulle scanne dokumenter. Der opstod derimod problemer med softwaren til ocr-læsning af scannede dokumenter. Ocr-læsning kræver, at data skal være tydelig og stå bestemte steder i dokumentet. Ocr-programmet var testet på en scanner, inden tinglysningssystemet blev sat i drift, og alt var da i orden. Der blev anvendt i alt fire scannere, og den scanner, som var anvendt i forbindelse med testen, var i orden, men de tre andre scanner fungerede ikke, og det gav udfordringer. Han pressede CSC for at løse problemet, men CSC handlede ikke hurtigt nok. Han rekvirerede derfor ekstern bistand, og det løste problemet.

Det største problem ved skanningen var kvaliteten af de udfyldte fuldmagter. Kvaliteten var ringe, og Tinglysningsretten måtte i en periode returnere op mod halvdelen af alle modtagne fuldmagter. Tinglysningsretten modtog op til 5.000 fuldmagter pr. dag. Det var overraskende, at kvaliteten var så ringe, og det var en masse forholdsvis elementære fejl, der blev begået. Data blev f.eks. skrevet uden for de felter, hvor teksten skulle indføjes. Der er et felt til underskriften, men der er ingen særlige regler om, at den skal holdes inden for feltet. Hvis flere skal skrive under på et dokument, kan man underskrive længere nede på blanketten. Skemaet på ekstrakten side 2788 blev brugt, når fuldmagten skulle returneres efter afvisning. Det var ikke en afvisningsgrund, at der var clips eller hæfteklamme i fuldmagten, men der blev givet en venlig henstilling til anmelderen om at returnere fuldmagten uden clips.

I det gamle tinglysningssystem kunne man ringe til tinglysningskontoret og få en medarbejder til at læse op fra tingbogen. Den mulighed blev afskaffet med det digitale tinglysningssystem. Der blev i stedet etableret en hotline, og der blev ud fra nogle enkle beregninger skønnet, hvor mange medarbejdere der skulle være i hotline. Det er muligt, at det forventede antal henvendelser blev undervurderet, og der skete en opnormering af medarbejdere i hotline. Der kom mange lavpraktiske spørgsmål, og det medførte, at der sidst i oktober 2009 blev antaget 6 vikarer til at screene henvendelserne i hotline. Der kom mange juridiske spørgsmål, og der blev lidt firkantet henvist til, at Tinglysningsretten var en domstol, der ikke kunne yde juridisk rådgivning. Ventetiderne i hotline var lange. Vikarerne var ansat frem til udgangen af 2010, hvor de i øvrigt blev ansat i Tinglysningsretten.

Rigsrevisionens beretning indeholder på side 46, ekstrakten side 1937, en graf over automatiseringsgraden. Deloitte havde skønnet over graden af automatiseringen. Der blev taget højde for, at der

var opgaver, som kunne falde væk. F.eks. blev annullation af retsanmærkninger automatiseret på den måde, at anmelderen blot fik en mail med meddelelse om, at en retsanmærkning var slettet, hvis betingelserne herfor var opfyldt, uden at det var nødvendigt at anmelde dokumentet på ny. Dette udgør forskellen på 8 %, som er anført i figuren med grafen i Rigsrevisionens beretning. Faldet i begyndelsen af grafen skyldtes de mange fejl fra det gamle tinglysningssystem, mens udviklingen i grafen i øvrigt passede med forventningerne. CSC foreslog, at der blev anvendt flere brugerformularer, og det var med til

**2898**

at højne automatiseringsgraden. Der kom mange dokumenter ind med henblik på annullation af retsanmærkninger på ejendomshandler, der var gennemført før overgangen til det digitale tinglysningssystem, og det tog en del ressourcer, uden at han dog kan sige præcist, hvor mange ressourcer. Hver dag blev det vurderet, hvor ressourcerne skulle sættes ind, og det blev ikke detaljeret registreret.

Der kom flere pantebreve til konvertering end forudsat. I november 2009 kom der således over 100.000 pantebreve. Den 15. november 2009 skrev han en mail til Jørn Knudsen, ekstrakten side 1465, da Jørn Knudsen repræsenterede finanssektoren. Han opfordrede bl.a. til, at finanssektoren i højere grad udnyttede den hjemmel, som sektoren havde fået i loven til selv at konvertere pantebreve. Thomas Nørby Dahl fra Finansrådet skrev den 17. november 2009, ekstrakten side 1467, at Finansrådet ville undersøge muligheden for at anbefale pengeinstitutterne i videre omfang at konvertere pantebreve ved brug af anmelderordningen. Henvendelsen viste, at intentionerne hos finanssektoren var gode nok. Det tog dog indtil medio december 2009, før finanssektoren erkendte, at fremgangsmåden med at sende så mange pantebreve til konvertering uden sammenhæng med en konkret ejendomshandel ikke var »god nok«. Rent praktisk sorterede Tinglysningsretten de modtagne pantebreve. Hvis der var konkrete ejendomshandler, skulle pantebrevene digitaliseres, men alle andre pantebreve blev arkiveret. Når der senere var en konkret ejendomshandel, skulle Tinglysningsretten være i stand til at finde det relevante pantebrev på arkivet. Fremsendelsen af de mange pantebreve var i strid med aftalen med finanssektoren, men han havde ikke i loven eller bekendtgørelsen hjemmel til at returnere pantebrevene. Der er muligt, at der ikke var en egentlig aftale med finanssektoren, men der var en forståelse mellem Domstolsstyrelsen og finanssektoren om, at finanssektoren ikke skulle sende pantebreve til konvertering, uden at der var tale om konkrete handler. Der gik mange ressourcer til konverterings- og arkiveringsopgaven. Tinglysningsretten modtog 15-18.000 breve hver dag, og bare håndteringen af posten krævede betydelige ressourcer. Op til 30 medarbejdere arbejdede med konvertering af pantebreve.

Domstolsstyrelsen udarbejdede medio december 2009 en 10 punkts handleplan for stabil drift af den digitale tinglysning, ekstrakten side 1545. På det tidspunkt kunne det konstateres, at den tekniske løsning fungerede som forudsat. Systemet fungerede, men der var ophobet en bunke tinglysningssager, der var større end forudsat, på grund af de forhold, som han har forklaret om. Det ville ikke være muligt at få bunken væk inden årsskiftet, og der blev derfor taget initiativ til at specialisere medarbejderne, selv om forudsætningen oprindelig var, at de skulle være generalister. Der var møde i brugergruppen den 14. december 2009, ekstrakten side 1551, og han kom med forslag om, at finanssektoren selv konverterede pantebreve, som det var muligt efter loven.

Han deltog i et møde i Justitsministeriet den 17. december 2009, ekstrakten side 1573, om muligheden for at udstationere medarbejdere fra finanssektoren til Tinglysningsretten i Hobro. Det var finanssektorens tilbud, som dog efter hans opfattelse ikke var et reelt

U.2020.2851H

tilbud, da det ville svare til at lade »ræven vogte gæs«. Der var desuden mange uafklarede ansættelsesretlige spørgsmål i tilbuddet. Han agde på mødet, at det store problem var, at finanssektoren havde indsendt alt for mange pantebreve til konvertering, uden at det var et led i konkrete ejendomshandler.

Domstolsstyrelsen udarbejdede den 13. januar 2010 en handleplan, ekstrakten side 1587, som tog udgangspunkt i handleplanen fra medio december 2009. Det var nødvendigt at opsætte konkrete mål for ekspeditionstiderne. Forslaget om tilførsel af yderligere 25 sagsbehandlere til Tinglysningsretten blev ikke til noget, da han vurderede, at ressourcerne til at oplære nye medarbejdere var bedre brugt på andre opgaver. Der blev dog ansat en driftschef. Der blev indgået en aftale med finanssektoren om konvertering af pantebreve, og Tinglysningsretten stoppede derfor med den del.

Det lykkedes i slutningen af marts 2010 at komme ned på en gennemsnitlig tinglysningstid for alle behandlede sager på 10 dage. Årsagerne var dels tekniske løsninger, dels en stor indsats fra medarbejdernes side, dels at de anmeldelser, som kom ind i tinglysningssystemet, var bedre forberedt.

Det er ikke rigtigt, som Rigsrevisionen skriver i sin beretning side 3, ekstrakten side 1894, at der ikke var forudgående beregninger af ressourcer og dimensionering af opgaverne. Der foreligger ikke et regneark, men der var beregninger, og der var taget højde for det hele, bare ikke, at det hele skete på én gang. Der var højere forventninger til medarbejdernes effektivitet, end de kunne indfri. Baggrunden var, at medarbejdere ved indførelse af nye processer glemmer det, som de ellers kan. Fuldmagterne var blevet testet, efter at blanketten var kommet i juni 2009, og en grundigere test ville ikke have afsløret de udfordringer, som kom. Det var først, da fuldmagtsblanketten blev anvendt i »virkeligheden«, at de egentlige problemer viste sig. CSC havde udarbejdet en omfattende vejledning til systemet, men den var ikke hensigtsmæssig. I efteråret 2009 blev der derfor udarbejdet kortere vejledninger på specifikke punkter. I dag anvendes såkaldte navigationssedler. Hotline var egentlig forberedt på opgaven, men presset blev større end forudset.

Han er overordnet set meget enig i skønsmandens erklæringer, men visse dele af erklæringerne viser, at

**2899**

skønsmanden ikke kender nok til tinglysning, og nogle af skønsmandens forslag til idriftsættelse er ikke realistiske. Det drejer sig f.eks. om hans forslag om idriftsættelse hos enkelte brugergrupper og for enkelte dokumenttyper. Han er heller ikke enig i, at risikostyringen ikke var i orden. Yderligere risikostyring ville have været uoverkommelig. Der var en omfattende brugerinddragelse. Der blev således afholdt møder med alle brugergrupper fra starten og inden udarbejdelsen af kravspecifikationen, og der blev afholdt både separate og fælles møder med finanssektoren, advokater m.fl.

Den brugervenlighedstest, som Rigsrevisionen har foretaget den 3. maj 2013, og som skønsmanden ved spørgsmål K6 (afsnit 3.16) spørges til, ekstrakten side 3602, er rimelig positiv, men den siger noget om den juridiske sprogbrug.

Det var ikke et krav, at alle dokumenter blev anmeldt til tinglysning samtidig, og der skete derfor ikke afvisning med den begrundelse, men det var hensigtsmæssigt, at anmelderen ikke afventede f.eks. tinglysning af skødet, inden anmelderen indleverede pantebreve til tinglysning. Hvis skødet for en ejendom blev udtaget til manuel behandling, blev senere indleverede dokumenter også udtaget til manuel behandling. Det forkortede derfor ventetiden, hvis senere dokumenter, f.eks. pantebreve, blev indleveret, når de forelå, da de så ville indgå i en samlet manuel behandling. Siden en lovændring i 2000 er tinglysningsafgiften først forfaldet ved endelig tinglysning, og man risikerede derfor ikke, at en indbetalt tinglysningsafgift gik tabt. Salg af en del af en fast ejendom har, navnlig

i Østdanmark, givet udfordringer. Sælgeren skal angive, hvor meget der sælges, mens køber skal angive, hvor meget der købes. Ejer sælgeren 1/2 ejendom, og sælger han hele sin andel, skal han angive dette med 1/1.

C's handel blev udtaget til manuel behandling. Der var ikke problemer med det anmeldte skøde, men det blev udtaget automatisk til manuel behandling som led i en stikprøvekontrol af, at systemet fungerede, som det skulle.

*Adam Wolf* har forklaret, at han er uddannet cand.scient.pol. og har været administrerende direktør for Danske Regioner siden 2012. Forinden var han direktør for Domstolsstyrelsen, hvor han blev ansat den 1. november 2005. Det var en måned før offentliggørelsen af lovudkastet vedrørende domstolsreformen. Tinglysningsreformen var på det tidspunkt allerede sat i gang.

Justitsministeriets aktstykke nr. 38 fra 2006, materialesamlingen side 101, dannede grundlag for etableringen af det digitale tinglysningsprojekt. Både de økonomiske og organisatoriske vilkår for projektet var ret udtømmende beskrevet i aktstykket, og det var på alle måder et kompliceret puslespil, fordi domstolsreformen og it-projektet skulle spille sammen. Domstolsstyrelsen kunne ikke ændre på vilkårene, der allerede havde været drøftet i Tinglysningsudvalget. Centraliseringen af tinglysningen var allerede besluttet, og placeringen af Tinglysningsretten blev besluttet kort tid efter, at han var tiltrådt som direktør. Placeringen i Hobro var ikke styrelsens første valg. Det var en meget politisk styret proces.

Alle interessenter, som havde deltaget i Tinglysningsudvalget, havde nikket ja til en idriftsættelse af det kommende digitale system som et »big bang«, og den løsning var efterfølgende godkendt af Finansudvalget. Der blev ikke på noget tidspunkt rejst spørgsmål ved et »big bang«. Løsningen var givet og blev ikke problematiseret undervejs. En eventuel idriftsættelse af nogle få retskredse ville heller ikke have været risikofri og ville formentlig have givet vanskeligheder for de store aktører på den anden side af bordet, herunder navnlig den finansielle sektor, der foretog betydelige investeringer i at udvikle egne systemer, så de kunne fungere sammen med den digitale tinglysning. Det er heller ikke sikkert, at man ville have fået en billede af den reelle belastning af systemet ved at gennemføre et pilotprojekt. Det ville forudsætte, at man kunne få alle aktørerne til at agere realistisk i pilot-processen, og det er svært at forestille sig. Problemstillingen med massekonverteringen umiddelbart efter idriftsættelsen ville f.eks. ikke have vist sig ved et pilotprojekt. Der har for øvrigt aldrig været en beskrivelse af et pilotprojekt, så et sådant forløb er helt hypotetisk.

Skønsmandens skønnede meromkostninger ved en trinvis idriftsættelse af den digitale tinglysning er sat til ca. 40 mio. kr., ekstrakten side 3575 ff. Beløbet skal sammenholdes med den samlede kontraktsum på ca. 48 mio. kr., ekstrakten side 5012. Trinvis idriftsættelse ville således have medført en fordobling af omkostningerne, og det ville have svært at bede Finansudvalget om beløbet, når der allerede var indregnet betydelige rationaliseringsgevinster som en forudsætning for projektet. Der var reelt ingen, der efterspurgte et pilotprojekt.

Placeringen af Tinglysningsretten i Hobro medførte en forøget risiko for projektets organisatoriske del. Domstolsstyrelsen havde foretrukket f.eks. Aarhus, Roskilde eller Ringsted, hvor det ville være mere realistisk at rekruttere kvalificeret tinglysningspersonale. Der blev i den periode i Domstolsstyrelsen regnet meget på køreafstande for det eksisterende personale ved tinglysningskontorerne.

Projektets økonomiske forudsætninger fremgår klart af aktstykke nr. 38, pkt. b, herunder tabel 1. Domstolsstyrelsen havde argumenteret for en gradvis afvikling af overtallet af tinglysningsmedarbejdere, så de kunne bistå i en indkøringsperiode. Det var en usædvan-

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

lig situation, at man skulle forsøge at fastholde 200 medarbejdere lige indtil driftsættelsen af den digitale

**2900**

tinglysning, hvorefter de ikke længere skulle være ansat. Hans forgænger havde foreslået Justitsministeriet, at man fastholdt medarbejderne i en 3-årig overgangsperiode. Justitsministeriet havde meldt tilbage, at ministeriet have forelagt styrelsens forslag for Finansministeriet, men Finansministeriet havde afvist det uden nærmere forhandling. Det tyder på, at man med forslaget havde »skudt helt ved siden af skiven«.

Hans mail af 16. november 2005 til afdelingschef Thorkild Fogde i Justitsministeriet, ekstrakten side 515, er et udtryk for, hvordan Domstolsstyrelsen måtte kæmpe for at fastholde bare nogle medarbejdere i en overgangsordning og kæmpe imod, at den fulde rationaliseringsgevinst skulle indfris ved »big bang«.

Udskydelsen af den påtænkte idriftsættelse af den digitale tinglysning den 25. marts 2008, som blev godkendt af Finansudvalget ved aktstykke nr. 11, ekstrakten side 643, medførte, at Domstolsstyrelsen mistede den forventede buffer. Rationaliseringsgevinsten skulle indfries som forventet. De var i Domstolsstyrelsen på den baggrund meget bekymrede for, om det ville være muligt at fastholde det nødvendige personale for at holde papirtinglysningen i gang indtil »big bang«. På den anden side medførte udskydelsen, at Tinglysningsrettens nye bygning blev færdig inden »big bang«, og at der var bedre tid til at oplære nye lokale medarbejdere i tinglysning. For nogle forhold blev risikoen således formindsket ved udskydelsen, og for andre forhold blev risikoen forøget.

Domstolsstyrelsen havde en velfungerende projektorganisering både internt og i forhold til leverandøren. Styrelsen var i samme periode projektorganisation for hele retskredsreformen og var på den måde allerede gearet til projektarbejdet med den digitale tinglysning. Tingene hang sammen, og det fremgår slet ikke af Rigsrevisionens beretning. Han og Sørup Hansen havde et tæt samarbejde, hvor Sørup tog sig af det løbende projektarbejde, mens han tog sig af »storpolitikken«. Der var en naturlig arbejdsdeling i processen. Han sad i styregruppen med leverandøren, i den interne styregruppe og i brugergruppen. Brugergruppen var vigtig i hele forløbet, både før og efter idriftsættelsen. Den digitale tinglysning er det mest integrerede offentlig/private it-projekt, som man har haft i Danmark. Der var i et tæt samarbejde med den finansielle sektor, der var de eneste, som lavede en system til system-løsning. Det medførte også, at der løbende var ønske om ændringer af systemet fra den finansielle sektor, som blev imødekommet. Pantebrevsfølgegruppen var i den forbindelse en helt naturlig del af samarbejdet.

I starten var samarbejdet med CSC helt forfærdeligt, fordi det viste sig, at CSC havde ført styrelsen bag lyset. Reelt havde CSC ikke produceret noget det første halve år, fordi et antal kernemedarbejdere var rejst fra virksomheden. I gennem hele projektforløbet var der 5 forskellige projektledere, som styrelsen skulle arbejde sammen med. Det var også en udfordring.

Domstolsstyrelsen havde en åben tilgang til interessenterne, og alle i kredsen af interessenter havde forudgående kendskab til Sørup Hansen. Styrelsen var fra starten indstillet på at lytte til interessenterne og deres ønsker. Han havde separate møder med repræsentanter for advokaterne og ejendomsmæglerne. Det var en del af den åbne dialog. Dialogen var konstruktiv, og han havde et fint forhold til Henrik Høpner, men de kunne begge være barske, hvis det skulle være. Det er vigtigt at forstå, at alle interessenter havde en bagland, som de skulle repræsentere. Nogle af brevene fra Finansrådet er et udtryk herfor og en del af et magt- og interessentspil. Han kendte til disse forhold fra sin tid i blandt andet Finansministeriet.

Han havde i brugergruppen en dialog med Henrik Høpner om uddannelse og kommunikation i forbindelse med idriftsættelsen af den digitale tinglysning. Advokaterne var meget tydelige med hensyn til, at Domstolsstyrelsen ikke skulle »gå ind i« deres bagland vedrørende disse forhold. Advokaterne ville selv stå for uddannelse og kommunikation, og de havde allerede i 2006 en stor forretning med at afholde kurser om digital tinglysning. Advokaterne ville også selv distribuere Domstolsstyrelsens kommunikationspakke. Han har svært ved at se, hvordan styrelsen på den baggrund kunne have tilladt sig at gøre tingene anderledes i forhold til advokaterne.

Skønsmandens kritik for så vidt angår kommunikationen med interessenterne svarer dårligt til hans oplevelse. Kommunikationen foregik igennem brugergruppen, der selv skulle kommunikere videre til deres bagland. Da opfordrede kraftigt alle til at deltage i CSC's testsiden, herunder »sandkassen«, men de fik ikke rigtigt tilbagemeldinger fra nogen. Nogle af deres vejledninger kunne måske have været bedre udformet, men det er slet ikke noget, der havde væsentlig betydning for forløbet.

Han har svært ved at forstå Rigsrevisionens kritik af rolle- og ansvarsfordelingen i projektet. Samarbejdet var i realiteten fortrinligt, og rolle- og ansvarsfordelingen var meget klar, også i forhold til leverandør og interessenter. Han forstår heller ikke kritikken vedrørende milepælstyring. Der var sat tid på delmålene, og Rigsrevisionen overser, at tinglysningsprojektet alene var en del af hele domstolsreformen.

Der var gennem projektet en erkendelse af, at finanssektoren lavede en omfattende teknisk og dyr løsning, der var dybt integreret i den digitale tinglysning. Derfor var det også fornuftigt og naturligt, at parterne i den sidste fase fik et tættere samarbejde. Det er det, der kommer til udtryk i aftalen af 30. oktober 2008 mellem

**2901**

Domstolsstyrelsen, Realkreditrådet, Finansrådet og CSC, ekstrakten side 853. Det var en fordel, at Devoteam både rådgav den finansielle sektor og Domstolsstyrelsen, fordi man på den måde kunne binde viden sammen i det samlede projekt. Alle erkendte den gensidige afhængighed. Det var tydeligt, at CSC i den periode havde budt på mere, end de magtede. Han talte med kolleger i både politiet og Skat, som oplevede, at det var de samme dygtige CSC-ansatte, der blev flyttet rundt mellem kunderne.

Risikologs var for ham et dagligt arbejdsredskab. Han havde mest fokus på det, der i en log blinkede rødt eller gult. Det er ikke rigtigt, at der ikke løbende blev »lukket risici«. De lavede ikke andet end at ændre risici-billedet. Nogle risici blev nedtonet og lå derfor stille, mens andre risici kom til, og dem blev der så arbejdet på at mindske. Risikovurderingen i aktstykke nr. 38 til Finansudvalget byggede blandt andet på et skøn. Det var ikke muligt at foretage en egentlig beregning. Han er ikke kendt for at tage risici, og det er Domstolsstyrelsen som organisation heller ikke. Skønsmandens betegnelse »risikoappetit« er derfor for ham helt uforståelig i den sammenhæng. Der kan i et så stort projekt være ting, der kunne være gjort anderledes, men han har svært ved at se, at der er ting vedrørende arbejdet med deres risikologs, der burde være gjort anderledes.

I foråret 2009 var en af de store udfordringer at fastholde bemandingen af papirtinglysningen frem til idriftsættelsen af den digitale tinglysning i september. Det var klart, at man måtte forvente en lavere automatiseringsgrad i starten. De havde derfor planlagt et beredskab, der kunne træde til og tinglyse manuelt. Det var aftalt, at man kunne trække på medarbejdere fra naboretterne, og der var afsat midler til yderligere 10 årsværk. Beredskabet blev planlagt på grundlag af et skøn. Han tror ikke, at det ville være muligt at foretage en egentlig beregning. Det var i den forbindelse helt unikt at have Sørup Hansen, der havde udtænkt systemet, og som havde arbejdet i mange år med tinglysning. Sørup Hansen og Devoteam

U.2020.2851H

var det perfekte team til at skønne over behovet for ressourcer i indkøringsperioden.

Umiddelbart forud for idriftsættelsen den 8. september 2009 var alle lettede over, at afslutningen af den papirbaserede tinglysning var i mål, og at datakonverteringen var gået godt. De kendte fejl ved tinglysningssystemet var til at håndtere, og der var ingen interessenter eller kontraktpartnere, der mente, at man ikke skulle gå i luften som planlagt. Den helt store udfordring var performance i systemet, når det blev sat i egentlig drift.

Ved idriftsættelsen virkede systemet, og de første reaktioner var meget positive. Han modtog mange lykønskninger i de første uger. Ved udgangen af september var der bekymringer, men også en stor tro på, at problemerne kunne klares i indkøringsperioden indtil årsskiftet. I løbet af oktober blev det mere kritisk, og brugerne blev meget tydelige med hensyn til, at der var ting, der ikke fungerede. Konverteringen af ejerpantebreve blev også et problem. Han var selv i Hobro og så alle flyttekasserne med pantebreve til konvertering. Først i november blev de klar over, at det var nødvendigt med en egentlig handlingsplan for at få bunkerne væk. Det var bunkerne, der var problemet, for selve driften var da ok. Medarbejderne skulle sagsbehandle mere og ikke bruge så meget tid på andre ting. Man måtte prioritere sagsbehandlingen. Der kom i december en systemændring, der reducerede bunken med 10.000 dokumenter. Det skal man ikke se bort fra.

Han havde tiltro til, at Sørup Hansen og finanssektoren kunne løse problemerne med de mange pantebreve, men det viste sig, at der var problemer i finanssektorens bagland. Det var således meget overraskende, at finanssektoren ikke brugte hjemmeretten til selv at konvertere pantebrevene. Den finansielle sektors brev af 15. december 2009 til Økonomi- og Erhvervsministeriets og Justitsministeriets departementschefer, ekstrakten side 1561, opfattede han som noget, som sektoren havde brug for i forhold til sit bagland, og det var helt fair. Brevet førte i virkeligheden til, at de fik naglet finanssektoren fast på sit ansvar for projektets succes. Det var i den forbindelse helt afgørende, at man i Tinglysningsretten stoppede med at konvertere pantebreve. Det frigjorde ressourcer til den daglige drift og til bekæmpelse af bunker. De 25 ekstra årsværk er et politisk signal. De havde i efteråret ikke manglet økonomiske ressourcer, men muligvis kompetente medarbejdere, som imidlertid ikke var til at skaffe. Udviklingen i driften fra december 2009 og frem, var den udvikling, som de havde forventet fra den 8. september og frem. Man kan sige, at de på grund af de omtalte forhold blev forsinket i 3 måneder. Efter hans opfattelse var der i stabil drift fra sommeren 2010. Der var da et flow, og man fik løbende ekspederet de sager, der blev sendt til Tinglysningsretten. På det tidspunkt, var det alene de helt særlige sager, der lå stille.

**Procedure**

*Foreningen* har gjort gældende, at der påhviler Domstolsstyrelsen erstatningspligt over for enhver af de tilmeldte, der har lidt tab på grund af forsinkelser med tinglysning i den periode, der er anført i påstanden, idet sådanne forsinkelser skyldes dispositioner, som Tinglysningsretten, Domstolsstyrelsen, Justitsministeriet eller andre offentlige myndigheder har truffet i forbindelse med indførelsen af digital tinglysning.

Domstolsstyrelsens ansvar støttes i første række på culpareglen. Både Rigsrevisionens undersøgelse og skønserklæringerne påviser, at der er begået fejl og

**2902**

forsømmelse, som har forårsaget forsinkelser, som kunne og burde være forudset og dermed afværget.

Domstolsstyrelsens ansvar støttes også på almindelige regler om risikoansvar. Domstolsstyrelsen har enerådigt og bevidst truffet

beslutninger, der har forøget risikoen for forsinkelser, som kunne medføre og har medført tab for brugerne af tinglysningssystemet. Den omhandlede risiko kunne være elimineret eller dog reduceret, hvis Domstolsstyrelsen havde disponeret anderledes. Ved bedømmelsen af Domstolsstyrelsens risikoansvar skal der tages hensyn til, at styrelsen har givet sig selv eneret til at tinglyse og har besluttet ikke at lade dette virksomhedsområde privatisere. Domstolsstyrelsen opnår en økonomisk fortjeneste ved driften af tinglysningen, der langt overstiger udgifterne. Såfremt en privat virksomhed havde stået for tinglysningen, ville en lignende fortjeneste blive anset for ublu og urimelig. For en privat aktør ville en lignende monopolstilling føre til konkurrenceretlige indgreb for at beskytte forbrugerne. Den digitale tinglysning har medført betydelige besparelser på driften, og Domstolsstyrelsen har besluttet at beholde de opnåede besparelser, idet styrelsen ikke gennem reduktion af brugerbetalingen har ladet besparelserne komme brugerne til gode. Domstolsstyrelsen var ved de beslutninger, der blev truffet, drevet af et ønske om at »indhøste« besparelser så hurtigt, det kunne lade sig gøre. Domstolsstyrelsen kunne ikke nøjes med fremtidige besparelser, som kunne optimere fortjenesten, men valgte at forcere projektet og gennemføre det på en måde, der medførte risiko for omfattende negative konsekvenser for tinglysningens brugere. Motivet herfor var dels at spare på selve udgifterne ved at indføre digital tinglysning dels at »indhøste« gevinsterne så hurtigt som muligt. Under disse omstændigheder påhviler der Domstolsstyrelsen et ansvar for den risiko, som styrelsens dispositioner har påført brugerne af tinglysningen - også selvom landsretten måtte finde, at der ikke er ført bevis for konkrete fejl eller forsømmelser, der kan tilregnes styrelsen som culpøse.

Endelig støttes Domstolsstyrelsens ansvar på den almindelige berigelsesgrundsætning. Domstolsstyrelsens dispositioner ved indførelsen af digital tinglysning skete på en måde, hvor hensyn til at spare udgifter og indhøste besparelser så tidligt som muligt medførte en forcering af implementeringen, og hvor Domstolsstyrelsen undlod at træffe en række nødvendige forholdsregler, fordi disse ville medføre forøgede omkostninger, som styrelsen ikke ønskede at afholde.

Domstolsstyrelsen har således truffet dispositioner, der har beriget staten på bekostning af økonomiske tab for de tilmeldte, som i perioden efter systemets implementering blev ofre for de valg, som styrelsen havde truffet. Domstolsstyrelsen har opnået en berigelse på bekostning af tab, som overgik de tilmeldte, og må derfor rimeligvis dømmes til at betale erstatning til de tilmeldte, idet de har lidt økonomiske tab, der står uløseligt i forbindelse med den berigelse, som Domstolsstyrelsen har opnået.

Domstolsstyrelsens beregninger af de tilmeldtes tab er teoretiske og stemmer ikke med de faktiske forhold. Det er imidlertid rigtigt, at de tilmeldtes økonomiske tab også ved en rigtig opgørelse er mindre end den betydelige fortjeneste, som Domstolsstyrelsen har opnået ved at indføre systemet uden at tage hensyn til de økonomiske tab, som styrelsen gennem enerådige beslutninger har påført de tilmeldte. Dette understøtter, at Domstolsstyrelsen ud fra en grundlæggende berigelsesgrundsætning må kompensere de tilmeldte. Erstatning til ofrene for Domstolsstyrelsens dispositioner vil kun betyde, at styrelsens fortjeneste ikke blive helt så stor som ønsket og håbet, men styrelsen vil stadig have en økonomisk fordel.

Det ændrer ikke på Domstolsstyrelsens ansvar, hvis de tilmeldtes tab er forårsaget af fejl begået af CSC, Devoteam eller andre, der var antaget af Domstolsstyrelsen til at bistå med projektets gennemførelse. Domstolsstyrelsen hæfter i forhold til de tilmeldte for sådanne fejl.

De private boligejere har været helt uden indflydelse på, hvorledes Domstolsstyrelsen i forhold til advokater, pengeinstitutter og andre

U.2020.2851H

større brugere af systemet har forberedt sig med henblik på at tilrettelægge en hensigtsmæssig brug af systemet. Det påhvilede Domstolsstyrelsen gennem aftaler med de involverede større brugere eller ved en anderledes indretning af systemet at sikre sig mod advokater og pengeinstitutters påståede uhensigtsmæssige brug. Domstolsstyrelsens egen sagsfremstilling viser, at det skyldtes beslutninger, som blev taget af Tinglysningsretten ved disponeringen af de forhåndenværende ressourcer, at virkningerne af den påståede uhensigtsmæssige brug af systemet ikke blev afhjulpet i tide.

De private boligejere var sagesløse ofre for, at staten ikke forud for indførelsen af digital tinglysning i tilstrækkelig grad havde taget forholdsregler mod uhensigtsmæssig adfærd fra f.eks. pengeinstitutternes side, og at staten efter indførelsen af systemet prioriterede sine opgaver forkert til skade for de private boligejere.

Det ændrer ikke på Domstolsstyrelsens ansvar, hvis den finansielle sektor, advokater eller andre professionelle brugere af det digitale tinglysningssystem har brugt systemet på en måde, der var uhensigtsmæssig, og derved har medvirket til at forårsage forsinkelser. Det var Domstolsstyrelsen, der besluttede, hvordan systemet skulle indrettes. Hvis det var indrettet på en måde, der skabte risiko for, at professionelle brugere brugte systemet uhensigtsmæssigt og derved forårsagede forsinkelser, så er det Domstolsstyrelsens ansvar. Det er

**2903**

Domstolsstyrelsen, som har forsømt at sikre sig gennem aftaler med eller ordentlig vejledning til de professionelle brugere, at disses anvendelse af den funktionalitet, der var lagt ind i systemet, ikke førte til forsinkelser. Hertil kommer, at Domstolsstyrelsen ved at undlade i rette tid at foretage foranstaltninger, da den muligt uhensigtsmæssige brug viste sig, herved selvstændigt har begået en erstatningspådragende forsømmelse. Som det fremgår af både Rigsrevisionens og skønsmandens konklusioner, var brugervenligheden, vejledningerne og mulighederne for hjælp via Tinglysningsrettens hotline kritisable. På den baggrund må det afvises, at Domstolsstyrelsen under denne sag kan blive frifundet med henvisning til, at advokater, ejendomsmæglere og andre professionelle brugere brugte systemet uhensigtsmæssigt. Tilsvarende gælder det, hvis man vil undskylde sig med, at advokater og andre professionelle ved at bruge fuldmagtsordningen har belastet Tinglysningsretten unødigt, eller man vil undskylde sig med, at den finansielle sektor ved at konvertere pantebreve har belastet Tinglysningsretten unødigt.

Domstolsstyrelsen valgte at disponere med bestemte funktioner og muligheder i det digitale tinglysningssystem. Brugerne af systemet - herunder advokater, ejendomsmæglere og den finansielle sektor - må herefter være berettiget til at anvende de funktioner, som var stillet til rådighed i det digitale tinglysningssystem. Hvis ikke systemet og de ressourcer, der var afsat til betjening af brugerne, var egnet til denne brug, så påhviler ansvaret Domstolsstyrelsen, der havde truffet beslutning om at lancere systemet med en funktionalitet og muligheder, som systemet tilsyneladende ikke kunne klare.

Den omstændighed, at beslutningstagerne bag systemet ikke havde dimensioneret systemet hensigtsmæssigt, havde undervurderet interessen for brugen af de udbudte funktioner og havde fejlvurderet konsekvenserne af, at systemets brugere benyttede de fremgangsmåder, der var skabt mulighed for, kan ikke påberåbes som begrundelse for, at der ikke foreligger erstatningspligt.

Såfremt det lægges til grund, at professionelle brugere ved deres brug af systemet på forsætlig eller uagtsom måde har forårsaget forsinkelser og tab for de tilmeldte, ændret det ikke på, at Domstolsstyrelsen har pådraget sig erstatningspligt ved at indrette systemet på en måde, der skabte denne risiko, og Foreningen er frit stillet til

i forhold til flere mulige skadevoldere at vælge at rejse sit erstatningskrav over for Domstolsstyrelsen.

De statistiske oplysninger viser med stor tydelighed, at de tilmeldte ved tinglysning i det gamle system havde været markant bedre stillet i forhold til det, som de blev udsat for i det nye system. De tilmeldte ville således i det gamle system ikke være blevet udsat for tabsforvoldende forsinkelser. Heller ikke i det nye system er der, efter at de fejl og mangler, som gjaldt i tiden efter systemets indførelse, er blevet afhjulpet, risiko for så betydelige forsinkelser, som overgik de uheldige brugere, der måtte »lægge ryg« til systemet i den første tid. Under disse omstændigheder er det irrelevant, om lovgivningen giver brugerne et retskrav på tinglysning inden for bestemte frister.

En eventuel usikkerhed om, hvorvidt enkelte af de tilmeldte måtte befinde sig i en retskreds, der tilfældigvis i en kortere eller længere periode havde sagsbehandlingstider, der oversteg sagsbehandlingstiden for sager til manuel behandling under det nye system, skal komme Domstolsstyrelsen til skade. Det vil stemme godt med erstatningsrettens almindelige udgangspunkt om, at såfremt der er påvist et ansvarsgrundlag for en skadevolder, er det skadevolderen, der har bevisbyrden, hvis skadevolderen vil søge at gøre gældende, at der trods ansvarsgrundlaget af en eller anden grund alligevel ikke skal betales erstatning.

I øvrigt viser de statistiske oplysninger, at tinglysningen i de fleste retskredse i årene forud for indførelsen af det digitale tinglysningssystem i bred almindelighed blev afviklet inden for 10 dage. Det understøtter det ovenfor anførte synspunkt om, at der ikke skal tages hensyn til, om der i enkelte retskredse i kortere eller længere perioder måtte have været en længere sagsbehandlingstid.

10-dagesfristen i tinglysningslovens § 16, stk. 4, udgør et rimeligt målepunkt i forhold til den sagsbehandlingstid, der skal udløse erstatning i den foreliggende sag. Det kan nemlig godtgøres, at de tilmeldte til gruppesøgsmålet med stor sandsynlighed ved tinglysning i det gamle tinglysningssystem havde opnået tinglysning inden for 10 dage.

Egentlig bør der ved den senere beregning af de tilmeldtes erstatningskrav ikke foretages fradrag på 10 dage, men det bør fastsættes på baggrund af de tinglysningstider, som er opnået, efter at de skavanker, som Domstolsstyrelsen havde påført systemet i dets første tid, er blevet afhjulpet. Det kunne have ladet sig gøre at indføre digital tinglysning på en måde, der ikke havde forringet mulighederne for at opnå tinglysning på langt mindre end 10 dage. Beviset herfor består dels i Domstolsstyrelsens egne oplysninger om de tinglysningstider, som nu er gældende, dels i skønserklæringens konklusioner, der viser, at sådanne tinglysningstider kunne være opnået ved en mere hensigtsmæssig tilrettelæggelse

Domstolsstyrelsen har erkendt, at der ikke var problemer i forbindelse med indførelsen af den digitale tinglysning, og at disse problemer medførte forlængede sagsbehandlingstider, men har gjort gældende, at disse problemer skulle bero på ekstraordinære omstændigheder, der ikke

**2904**

kunne forudses. Ekstraordinære omstændigheder, som medførte, at medarbejderne i tinglysningsretten blev nødsaget til at tage sig af andre ting end ekspedition af de sager, som krævede manuel behandling, uden det kan bebrejdes Domstolsstyrelsen.

Det fremgår imidlertid af de dokumenter, som Domstolsstyrelsen har fremlagt, Rigsrevisionens udtalelse og de indhentede skønserklæringer, at problemerne ikke skyldtes ekstraordinære omstændigheder, som ikke kunne forudses af Domstolsstyrelsen.

Sagens oplysninger, herunder Rigsrevisionens og skønsmandens konklusioner, understøtter, at Domstolsstyrelsen var bevidst om, at der forelå en risiko for, at mange borgere ville blive udsat for

Copyright © 2023 Karnov Group Denmark A/S

forsinkede tinglysningsekspeditioner med deraf følgende tab. Det er i den forbindelser uden betydning, om det skyldes et pres fra Finansministeriet eller andre med henblik på at »indhøste« besparelser.

Domstolsstyrelsen påstår, at tinglysning ikke er »økonomisk virksomhed«, og mener åbenbart dermed, at staten i en erstatningssag om skade, som den forvolder sine borgere, skal bedømmes efter andre og mere lempelige normer end det, der gælder for andre, der volder tab eller skade. Det er ikke et synspunkt, der har hjemmel, eller som er rimeligt.

Domstolsstyrelsen har indrømmet, at systemets indførelse var præget af fejl og uhensigtsmæssigheder. Samtidig kan man i sagens dokumenter konstatere, at Domstolsstyrelsen fravalgte at foretage en bedre sikring af projektet, fordi det var mere vigtigt at »indhøste« besparelser for staten. Mere tydeligt kan det ikke blive, at Domstolsstyrelsens dispositioner i høj grad var udslag af økonomiske overvejelser, der fuldt ud kan sammenlignes med en privat virksomheds motiver om at opnå størst mulig profit. Havde private virksomheder taget bevidste beslutninger, der påførte brugerne en risiko for tabsforvoldende forsinkelser, for at spare penge og dermed opnå et forbedret økonomisk resultat for sig selv (i statsligt sprogbrug: »indhøste besparelser«), så havde der ikke været nogen tvivl om de pågældende virksomheders erstatningspligt.

Der er intet juridisk grundlag for, at Domstolsstyrelsen skal bedømmes efter andre og mildere normer. Tværtimod bør Domstolsstyrelsen bedømmes efter en streng målestok, herunder fordi Domstolsstyrelsen har en monopolstilling, der bevirker, at brugerne af systemet ikke har frihed til at vælge en leverandør, der er bedre i stand til at levere en fejlfri ydelse uden forsinkelser.

Domstolsstyrelsen påtvang borgerne en for tidlig og usikker indførelse af det digitale tinglysningssystem med viden om, at det var forbundet med risiko for alvorlige forsinkelser for brugernes tinglysninger. Brugerne har ikke haft noget valg. Der findes kun et tinglysningssystem. Domstolsstyrelsen har dermed påtvunget brugerne en risiko for tab og udgifter, som blev en realitet. Risikoen kunne være undgået ved en anderledes og mere hensigtsmæssig tilrettelæggelse. Det blev fravalgt, for at man kunne opnå økonomiske fordele. Hermed er samtlige betingelser for at pålægge Domstolsstyrelsen erstatningsansvar opfyldt, hvilket bliver særlig klart, når man husker på, at Domstolsstyrelsen derved - på brugernes bekostning - sikrede sig økonomiske fordele, der langt oversteg de udgifter, som en bedre sikring havde kostet, og som langt oversteg de tab, som blev påført borgerne.

Domstolsstyrelsen skal erstatte borgernes tab, også fordi staten ikke har leveret den ydelse, som borgerne har betalt for gennem den erlagte tinglysningsafgift. Netop statens overvejelser om privatisering viser, at dette område er et indtægtsdækket område, hvor staten leverer ydelser mod betaling, som lige så godt kunne være leveret af private virksomheder (f.eks. bilinspektionen). Private virksomheder kunne ikke levere en forringet og tabsforvoldende ydelse og herefter påstå sig ansvarsfri med argumenter om at gøre noget godt for almenvellet, ikke at drive »økonomisk virksomhed« eller lignende.

Det er ikke rigtigt, som det er påstået af Domstolsstyrelsen, at der forelå ekstraordinære omstændigheder. Hertil kommer, at de udløsende omstændigheder ikke skal bedømmes som isolerede problemstillinger. I så fald ville enhver, der påtager sig at gennemføre et større projekt, der har betydning for mange menneskers velfærd og økonomi, til enhver tid kunne hævde at være fri for ansvar, hvis blot de tab, som projektet påfører sagsløse brugere, kan bortforklares som isolerede ekstraordinære omstændigheder.

Gennemførelsen af et projekt som det foreliggende kræver, at beslutningstagerne tager højde for, at der er mange forhold, der

skal fungere i et samspil, og at hvis der ikke sker en passende sikring mod de risici, som hver eneste faktor kan indebære, vil samspillet mellem disse faktorer kunne bevirke, at det samlede projekt udsættes for alvorlige funktionelle mangler.

Skulle det være rigtigt, at det var en kombination af enkeltstående årsager, der udløste de store forsinkelser, så gælder, at disse enkeltstående årsager isoleret kunne være løst. Derfor påhviler der Domstolsstyrelsen et ansvar for ikke at have forudset, hvordan de forskellige årsager samlet kunne udløse forsinkelser, og et ansvar for ikke at have løst disse enkeltstående årsager effektivt, efterhånden som de opstod.

For så vidt har Domstolsstyrelsen anerkendt sit ansvar, når det indrømmes, at problemerne med forsinkelse skyldtes enkeltstående årsager, som hver for sig kunne være løst, idet det herved er erkendt, at mere effektive foranstaltninger - efter at man endelig havde erkendt

**2905**

de problemer, som man havde forvoldt - kunne have hindret den lange periode med tinglysningsforsinkelser. Sådanne mere effektive foranstaltninger fravalgte man tilsyneladende.

Rigsrevisionens og skønsmandens konklusioner dokumenterer, at de sagsbehandlingstider, som Domstolsstyrelsen udsatte borgerne for, kunne og burde være reduceret betydeligt ved en anderledes og mere hensigtsmæssig tilrettelæggelse. Allerede derfor er synspunktet om, at borgerne må finde sig i forlængede sagsbehandlingstider, når staten vælger at foretage forandringer, uden betydning, også selvom sådanne forlængede sagsbehandlingstider var varslet. Domstolsstyrelsen tog bevidst beslutninger under planlægningen om at ignorere kendte risici og dermed forøge risikoen for negative virkninger. Når sådanne negative virkninger kunne have været undgået ved en anderledes og mere hensigtsmæssig tilrettelæggelse - til overmål for at »indhøste« besparelser for sig selv - foreligger der erstatningspligt. Der skal i den forbindelse tages hensyn til, at brugerne ikke havde noget valg, fordi staten har tiltaget sig eneretten til at levere tinglysningsydelser.

De fastsatte rammebetingelser og den økonomiske ramme var fastsat af staten. Rammerne var kendt på forhånd, og opgaven var at udfærdige et forsvarligt og sikkert projekt inden for disse rammer. Hvis der ikke kunne indføres et forsvarligt system inden for de rammer, der var sat, skulle disse rammer have være ændret. Den eneste, der kunne foretage en sådan ændring, var staten. Rammebetingelserne og den økonomiske ramme kan således ikke anvendes som undskyldning for, at systemet blev tilrettelagt og implementeret som gjort. Det var staten, der fastsatte rammen, og det er derfor staten, der må stå til ansvar for, at der ikke blev udfærdiget et forsvarligt system inden for den ramme, der var fastsat, eller at rammerne ikke blev ændret på en sådan måde, at systemet kunne implementeres på en forsvarlig måde.

De tilmeldtes tab kræves forrentet med procesrente, selv om der ikke er nedlagt en fuldbyrdelsespåstand, jf. herved rentelovens § 3, stk. 5. Der er udtrykkeligt nedlagt påstand om, at Domstolsstyrelsen skal anerkende at betale rente. Sagen består af en række individuelle krav, der - hvis de var fremsat individuelt - ville udløse en lang række retssager, hvorunder der kunne nedlægges fuldbyrdelses- og rentepåstande om de individuelle krav. Når rentelovens som udgangspunkt kræver, at der afgives et påkrav på baggrund af et opgjort krav om erstatning, skyldes det det hensyn til, at den, der skal betale, kan frigøre sig fra fremtidig rente ved at betale. Dette hensyn er ikke til stede i den foreliggende sag, hvor Domstolsstyrelsen har nægtet at være ansvarlig for de tilmeldtes tab og altså herved på forhånd har gjort det klart, at man ikke vil betale - heller ikke, hvis der blev fremsat individuelle og konkret opgjorte erstatningskrav.

Copyright © 2023 Karnov Group Denmark A/S

*Domstolsstyrelsen* har overordnet gjort gældende, at der ved indførelsen af det digitale tinglysningssystem er opnået en markant effektivisering og forbedring af tinglysningsprocessen til gavn for borgere og virksomheder i Danmark. Den digitale tinglysning er både hurtigere, bedre og mere effektiv end det gamle tinglysningssystem. Før tinglysningen blev digitaliseret i 2009, var sagsbehandlingstiden i gennemsnit 6,7 dage (perioden januar-august 2009), men med store variationer i sagsbehandlingstiden ved de forskellige retter. Idriftsættelsen af den digitale tinglysning medførte, at sagsbehandlingstiderne i en periode steg. Sagsbehandlingstiden var længst i perioden umiddelbart efter idriftsættelsen af den digitale tinglysning (september-december 2009), hvor den gennemsnitlige sagsbehandlingstid var 8,1 dage. Det digitale tinglysningsprojekt har været en succes og har levet op til de forudsætninger og rammebetingelser, som lovgivningsmagten har foreskrevet for forberedelse, idriftsættelse og drift af det digitale tinglysningssystem.

Ansvarsbedømmelsen i forhold til Domstolsstyrelsen skal ske efter dansk rets almindelige culparegel. Uden for områder, hvor der ved lov eller i retspraksis er fastlagt en anden ansvarsnorm, er ansvarsstandarden for offentlige myndigheder den almindelige culparegel. Hverken lovgivning eller retspraksis indeholder grundlag for at pålægge et objektivt ansvar for de tab, som sagen vedrører. Ansvar for Domstolsstyrelsen forudsætter derfor, at der er begået klare fejl i forhold til den agtpågivenhed, som samfundet med rimelighed kan forvente fra de ansvarlige myndigheder i en situation som den foreliggende, hvor der er tale om omlægning inden for rammer fastlagt af Folketinget at en samfundskritisk funktion med betydning for en stor del af befolkningen.

Den samlede forberedelse og gennemførelse af det digitale tinglysningsprojekt inden for de rammer, der var fastlagt af Folketinget, lever op til de krav til agtpågivenhed, der med rimelighed kan stilles til et så stort og komplekst udviklings- og forandringsprojekt i en situation som den foreliggende.

Den forlængede sagsbehandlingstid skyldtes et uforudseeligt sammenfald af en række ekstraordinære omstændigheder. Der blev hurtigt sat ind med effektive tiltag for at håndtere de ekstraordinære omstændigheder og for at nedbringe sagsbehandlingstiden. Der er ikke grundlag for at fastslå, at der burde have været reageret væsentlig hurtigere eller mere effektivt over for de ekstraordinære omstændigheder og over for den stigende sagsbehandlingstid.

Der måtte som led i det digitale tinglysningsprojekt træffes en række beslutninger og foretages en række

**2906**

skøn. Nogle af disse skøn og beslutninger har efterfølgende vist sig ikke at holde eller at være forkerte. Dette er uundgåeligt i så komplekst og langvarigt udviklings- og forandringsprojekt som det digitale tinglysningsprojekt. Ingen af de pågældende fejlskøn og forkerte beslutninger skyldtes manglende omhu, kompetence eller respekt for opgaven, og de kan derfor ikke pådrage ansvar.

Ekspeditionsfristen på 10 dage i tinglysningslovens § 16, stk. 4, er efter teori og retspraksis en intern ordensforskrift, hvis tilsidesættelse ikke i sig selv begrunder erstatningsansvar over for anmelder. Bedømmelsen skal ske efter den almindelige culparegel, således som den er udviklet i relation til varetagelse af myndighedsopgaver. Erstatningsansvar forudsætter, at myndigheden har begået klare fejl i forhold til den agtpågivenhed, som samfundet med rimelighed kan kræve i en situation som den foreliggende. Kravene til en myndigheds agtpågivenhed beror på en konkret vurdering. I vurderingen indgår bl.a. myndighedsområdets betydning for borgerne, hvor nærliggende den pågældende tabsmulighed er, tabets typiske størrelse, og om kun nogle få eller alle i samme situation rammes.

Domstolene efterprøver myndighedens forberedelse og tilrettelæggelse af opgaven samt prioriteringen af myndighedens ressourcer.

Prøvelsen er imidlertid tilbageholdende, og der er ingen eksempler på, at mangelfuld tilrettelæggelse af opgaven eller forkert ressourceprioritering i sig selv har udløst erstatningsansvar for lang sagsbehandlingstid. Domstolene er særligt tilbageholdende i deres prøvelse og eventuelle statuering af fejl, hvor forholdet skyldes, at der ikke er de fornødne ressourcer til rådighed for myndigheden, jf. Højesterets dom trykt i UfR 1985, side 368 (Odder Sygehussagen). Det skyldes, at der ikke i første række er et juridisk, men snarere et politisk-økonomisk spørgsmål, hvilke ressourcer der skal stilles til rådighed for myndigheden, og at dette er et led i de generelle spørgsmål om det samlede offentlige ressourceforbrug og om fordelingen af forhåndenværende ressourcer mellem de forskellige sektorer og blandt institutioner mv. inden for den pågældende sektor. Højesteret har bekræftet den linje, der blev lagt i Odder Sygehus-sagen, ved dommene trykt i UfR 2000, side 1196 (ægtransplantation til ufrivilligt barnløse), i UfR 2008, side 2813 (akut beredskab i weekenden til operation af nethindeløsning) og i UfR 2010, side 1394 (ordblinde-sagen). Denne retspraksis er udtryk for, at afgørelser, der indebærer bare nogenlunde grundlæggende interesseafvejninger i samfundet, bør træffes af politikere snarere end dommere.

Det digitale tinglysningsprojekt blev iværksat på grundlag af en analyse af de danske domstole gennemført af konsulentvirksomheden Deloitte i 2005 og Tinglysningsudvalgets betænkning nr. 1471/2006 om digital tinglysning. Tinglysningsretten blev oprettet ved lov nr. 538 af 8. juni 2006, som trådte i kraft den 1. januar 2007. Projektet var genstand for budgetforhandlinger som en del af forhandlingerne om de økonomiske rammer for domstols- og tinglysningsreformen. I forhandlingerne var der forudsat en effektiviseringsgevinst på ca. 86 mio. kr. årligt (2006-priser), som skulle realiseres et halvår efter idriftsættelse, som var forudsat at finde sted den 1. januar 2008. Det bevillingsmæssige grundlag for udviklingen af det digitale tinglysningssystem blev tilvejebragt ved aktstykke nr. 38 af 21. november 2006. Her var idriftsættelse forudsat til den 1. april 2008, hvilket medførte, at effektiviseringsgevinsten nu skulle realiseres efter 3 måneder. Senere blev idriftsættelse udsat, hvilket medførte, at effektiviseringsgevinsten skulle realiseres ved idriftsættelse. Dette fremgår tillige af aktstykke nr. 151 af 26. maj 2009.

Ved bedømmelsen af ansvaret for den forøgede sagsbehandlingstid må der lægges betydelig vægt på, at Domstolsstyrelsen således ikke havde valgfrihed i forhold til, hvordan implementeringen og idriftsættelsen af den digitale tinglysning skulle finde sted. Det digitale tinglysningsprojekt var således underlagt en række rammebetingelser, der skulle overholdes. F.eks. skulle tinglysningsopgaven centraliseres for hele landet ved én tinglysningsret, som skulle placeres i Hobro, og den økonomiske ramme for projektet, herunder at den forventede besparelse skulle realiseres på idriftsættelsestidspunktet. Ligesom idriftsættelse skulle ske samtidig for hele landet og uden pilotdrift.

Rammebetingelserne blev vedtaget af et flertal i Folketinget, og de er udtryk for lovgivningsmagtens prioritering af ressourcer. Rammebetingelserne udgjorde det rum, som Domstolsstyrelsen, Tinglysningsretten og Justitsministeriet kunne handle inden for ved forberedelsen og gennemførelsen af det digitale tinglysningsprojekt. Rammerne indebar bl.a., at der måtte foretages en række prioriteringer af ressourcerne. Der kan ikke stilles krav om, at projektet burde have været forberedt og gennemført på en måde, som rammerne ikke tillod, f.eks. ved overskridelse af de økonomiske rammer eller ved gennemførelse af pilotdrift af det nye tinglysningssystem. Domstolenes efterprøvelse af den måde, hvorpå projektet inden for de givne rammer blev forberedt og gennemført, og

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

om der blev begået fejl i den forbindelse, bør på den baggrund være tilbageholdende.

Skønsmanden har kritiseret, at driftsættelsen af den digitale tinglysning skulle ske som »big bang«. Dette er skønsmandens væsentligste kritikpunkt, og han mener, at en række af de fejl, der efterfølgende blev konstateret, kunne være undgået, hvis der i stedet var blevet foretaget en trinvis idriftsættelse. Det var imidlertid som følge af rammebetingelserne ikke muligt for Domstolsstyrelsen at vælge en trinvis idriftsættelse, og den

**2907**

manglende trinvise idriftsættelse er allerede af den grund uden betydning for ansvarsbedømmelsen. Hvis lovgivningsmagten kunne ifalde erstatningsansvar for prioritering af ressourcer, ville det åbne helt uoverskuelige konsekvenser for lovgivningsmagtens adgang til at foretage den nødvendige fordeling og prioritering af ressourcer. Lovgivningsmagten er alene ansvarlig for overholdelse af grundloven.

Den samlede forberedelse og gennemførelse af det digitale tinglysningsprojekt inden for de givne rammer lever op til de krav til agtpågivenhed, som med rimelighed kan stilles til et så stort og komplekst udviklings- og forandringsprojekt i en situation som den foreliggende. Det må i den forbindelse indgå, at der er tale om en omlægning og udvikling af et helt sagsområde, hvilket uundgåeligt vil medføre gener for en bredere og i forvejen ukendt kreds af borgere i en periode, således som det også på forhånd var meldt ud. Dertil kommer, at der alene er tale om formuetab, og at skaden antageligt typisk er af relativt begrænset størrelse.

Det var forud for idriftsættelsen af den digitale tinglysning vurderingen, at Tinglysningsretten var dimensioneret og forberedt til opgaven, og at der var taget tilstrækkelig højde for en indkøringsperiode med lavere produktivitet og en række engangsopgaver. Dimensioneringen og forberedelsen til opgaven, herunder uddannelsen af medarbejderne, var baseret på Deloitte-analysen og på vurderinger foretaget af præsidenten for Tinglysningsretten, som besad den bedste indsigt i både det digitale tinglysningssystem og i kapacitet og kompetencer hos Tinglysningsrettens medarbejdere. Alle relevante oplysninger blev inddraget i vurderingerne.

Oprindeligt var det planlagt, at den digitale tinglysning skulle idriftsættes den 26. marts 2008. Idriftsættelsen blev dog udskudt tre gange. Allerede fra den anden udskydelse opstod der vanskeligheder med at fastholde medarbejderne i de eksisterende tinglysningsafdelinger, og ved den tredje udskydelse var det nødvendigt at indgå særlige bonus- og fastholdelsesaftaler med medarbejderne. På grund af medarbejdersituationen i de eksisterende tinglysningsafdelinger ved de enkelte byretter ville en yderligere udskydelse af idriftsættelsen have været kritisk.

Det er sædvanligt og bredt accepteret, at større omstruktureringer i offentligt regi i en periode medfører en forlænget sagsbehandlingstid og en nedsat produktivitet til gene for brugerne, uden at dette giver brugerne et krav på erstatning. Det har også været konsekvensen ved en lang række andre centrale reformer i Danmark, herunder ved implementeringen af kommunalreformen fra 2007, politi- og domstolsreformen fra 2007 og en ny struktur for statsforvaltningen i 2012. Det var uundgåeligt, at digitaliseringen af det mere end 100 år gamle tinglysningssystem i en periode kunne få negative konsekvenser for brugerne, men det gør ikke, at disse borgere har krav på erstatning.

Den forlængede sagsbehandlingstid i Tinglysningsretten skyldes sammenfaldet af en række ekstraordinære omstændigheder op til og efter idriftsættelsen, som gjorde det nødvendigt for Tinglysningsretten at tage sig af andre opgaver end forudset. Konsekvensen af dette var for det første, at der betydeligt færre ressourcer til rådighed til behandling af sager udtaget til manuel behandling, og

for det andet, at medarbejderne ikke opnåede den forudsatte rutine i at anvende det nye system. Medarbejderne kunne derfor i en periode ikke følge den sagstilgangen, hvilket medførte forlængede sagsbehandlingstider for manuelt behandlede sager.

De ekstraordinære omstændigheder var især, at finanssektoren sendte et meget stort antal papirpantebreve til konvertering, uanset at der ikke var noget aktuelt behov for konvertering, og uanset at der mellem sektoren og retten var en forståelse om, at sådanne anmodninger kun ville blive indgivet i meget begrænset omfang, at der opstod problemer med fuldmagtsordningen, at der op til lukkeperioden kom betydeligt flere anmeldelser end forventet, at der efter idriftsættelsen skulle rettes uventet mange fejl begået i det papirbaserede tinglysningssystem, og at Tinglysningsretten i indkøringsperioden skulle annullere retsanmærkninger i et uventet stort omfang. Sammenfaldet af disse ekstraordinære omstændigheder var ikke forudseeligt, og Tinglysningsretten kunne - med undtagelse af konverteringssagerne - have håndteret de ekstraordinære omstændigheder, uden at dette ville have haft væsentlig betydning for sagsbehandlingstiden. Der blev hurtigt sat ind med effektive tiltag for at håndtere de ekstraordinære omstændigheder.

Den væsentligste uforudsete begivenhed var nogle pengeinstitutters anmodninger om massekonverteringer i efteråret 2009. Det skete på trods af en klar forståelse mellem finanssektoren og Tinglysningsretten om, at denne type anmodninger kun ville forekomme i begrænset omfang, og at det i givet fald kun skulle ske efter forudgående aftale med Tinglysningsretten. Det har finanssektoren efterfølgende bekræftet. Det var således uforudset, at finanssektoren i løbet af efteråret fremsendte en meget stor mængde papirpantebreve - omkring 200.000 - til Tinglysningsretten med anmodning om konvertering. Herudover havde Domstolsstyrelsen en berettiget forventning om, at den finansielle sektor ville gøre brug af mulighederne for selv at konvertere ejerpantebreve i medfør af § 15, stk. 14, i overgangsreglerne, idet den finansielle sektor selv forud for idriftsættelsen af den elektroniske tinglysning havde medvirket til at få indsat denne bestemmelse i tinglysningsloven. Der blev i perioder anvendt op til 30 medarbejdere til opgaven, og konverteringen af pantebrevene var det

**2908**

enkeltstående forhold, der havde størst betydning for sagsbehandlingstiden efter idriftsættelsen af den digitale tinglysning. I december 2009 stod det klart, at Tinglysningsretten ville få svært ved at behandle så mange konverteringssager og samtidig nedbringe bunkerne. Ved årsskiftet 2009/2010 blev der derfor opnået en forståelse med finanssektoren om, at sektoren overtog opgaven med at konvertere pantebreve. Herefter blev sagsbehandlingstiden hurtigt reduceret.

De uforudsete begivenheder med fuldmagtsordningen opstod i september 2009 og krævede en meget stor indsats, indtil sagsbehandlingstiden for behandling af fuldmagter var normaliseret med udgangen af november 2009. Tinglysningsretten modtog for det første flere fuldmagter end forudset. Tinglysningsretten modtog således 4.000 fuldmagter dagligt, hvilket var flere end det daglige antal anmeldelser af dokumenter til tinglysning. Det var overraskende, eftersom repræsentanterne for de professionelle brugere under udviklingsprocessen havde meddelt, at de ville arbejde for at få deres kunder til at anvende digital signatur frem for fuldmagtsordningen.

Efter idriftsættelsen opstod der endvidere problemer med den software, som fuldmagtsscannerne benyttede. Tinglysningsretten rekvirerede straks hjælp til løsning af de softwareproblemer, der bevirkede, at to ud af de tre scannere var ude af drift, og problemerne var løst ved udgangen af september/begyndelsen af oktober

U.2020.2851H

2009. Det bestrides, at den forudgående test af scannerne havde været mangelfuld.

Herudover var der mange såkaldte »begynderfejl«, hvor brugerne udfyldte fuldmagterne i strid med vejledningen. Dette gjaldt også for de professionelle brugere, selv om kravene til fuldmagten var fastlagt af Justitsministeriet i en bekendtgørelse efter drøftelser og møder med brugerne. I en periode måtte Tinglysningsretten dagligt tilbagesende op mod halvdelen af fuldmagterne på grund af fejl, hvilke var meget ressourcekrævende. Det bestrides, at dette kan henføres til mangelfuld brugerinddragelse.

For at nedbringe bunken af fuldmagter blev der foretaget en personalemæssig opnormering og etableret et særligt hold af medarbejdere, der udelukkende beskæftigede sig med at oprette fuldmagter. Holdet arbejdede i perioder døgnet rundt i 3-holdsskift for at udnytte scannerkapaciteten maksimalt og nedbringe bunken med fuldmagter. Tinglysningsretten brugte, i det omfang det kunne lade sig gøre, andet personale end de tinglysningsfaglige medarbejdere til at varetage arbejdet med fuldmagterne. Samtidig reagerede Domstolsstyrelsen på de mange fejl i fuldmagterne. Domstolsstyrelsen indførte således et helt nyt fuldmagtssystem (i januar 2011), hvor data indtastes direkte i tinglysningssystemet. Det forhold, at Domstolsstyrelsen valgte at indføre et helt nyt fuldmagtssystem, skal også ses i lyset af udviklingen i den generelle teknologiske modenhed fra 2009 til 2011.

Det var endvidere en uforudset ekstraordinær omstændighed, at der i tiden op til klageperioden forud for idriftsættelsen af den digitale tinglysning kom et betydeligt antal anmeldelser, som skulle ekspederes, inden idriftsættelse kunne ske. Dette medførte, at der var mindre tid til oplæring og træning end forudsat, da medarbejderne havde travlt med at ekspedere de mange anmeldelser. Herudover blev der efter idriftsættelsen konstateret et stort antal fejl i sager, der var blevet tinglyst i det papirbaserede tinglysningssystem, og som skulle rettes, første gang den fejlbehæftede sag blev behandlet efter idriftsættelsen. Omfanget af fejlene var uventet. Endelig skulle Tinglysningsretten i indkøringsperioden annullere retsanmærkninger i et uventet omfang. Efter idriftsættelsen var der fortsat mange papirdokumenter med anmærkninger, og disse kunne sendes til Tinglysningsretten med anmodning om annullation. Det var imidlertid forventningen, at kun de færreste anmeldere ville benytte denne mulighed, men de fleste anmeldere valgte at fremsende dokumenterne til annullation af retsanmærkninger, og det drejede sig om et ganske betydeligt antal dokumenter.

Der blev efter idriftsættelsen iværksat en række tiltag for at nedbringe sagsbehandlingstiden. Der blev herunder iværksat tiltag med henblik på at forbedre medarbejderproduktiviteten, bl.a. ved oprettelse af specialiserede teams. Der blev desuden trukket på beredskabet fra de omliggende retter og udført merarbejde. Det blev også løbende overvejet at indsætte flere sagsbehandlere, men det var ikke muligt i indkøringsperioden, fordi oplæringen af nye sagsbehandlere ville have taget tid fra behandlingen af sager, som var udtaget til manuel behandling. Efterhånden som det blev vurderet, at det var fagligt forsvarligt at tilføre yderligere sagsbehandlere, skete det. Det blev desuden i løbet af efteråret, vinteren og foråret 2009/2010 overvejet, om der var opgaver, som ikke nødvendigvis behøvede at blive løst af Tinglysningsrettens uddannede medarbejdere, og som derfor kunne løses af andre. Der blev også løbende arbejdet på at rette fejl i og forbedre it-systemet. Der blev arbejdet målrettet med at forbedre systemets automatiseringsgrad, da denne havde stor betydning for det antal sager, der skulle behandles manuelt, og dermed for sagsbehandlingstiden. Dette arbejde førte midt i december til, at sagsbunken som følge af opdateringer af systemet blev reduceret med ca. 10.000 sager.

Det må indgå i ansvarsbedømmelsen, at det mest kritiske element i omlægningen af tinglysningen, nemlig it-systemet, fra årsskiftet 2009/2010 fungerede tilfredsstillende, og at automatiseringsgraden ved årsskiftet, som forventet under udviklingen af systemet, var på ca. 69 pct.

**2909**

Der er samlet set ikke grundlag for at fastslå, at der burde have været reageret væsentligt hurtigere eller mere effektivt over for de ekstraordinære omstændigheder, som indtraf i forbindelse med idriftsættelsen, og over for den stigende sagsbehandlingstid. Problemerne med sagsbehandlingstiden var et ressourceproblem, idet de ovenfor nævnte ekstraordinære og uforudsigelige omstændigheder medførte, at der var betydeligt færre ressourcer til rådighed for den manuelle ikke automatiserede sagsbehandling end forudsat. Der måtte som tidligere anført under det digitale tinglysningsprojekts forberedelse og gennemførelse, herunder efter systemets idriftsættelse, træffes en række beslutninger og foretages en række skøn. Nogle af disse skøn har efterfølgende vist sig ikke at holde, ligesom nogle af beslutningerne med den viden, der er tilgængelig i dag, har vist sig at være forkerte. Dette er uundgåeligt i et så komplekst og langvarigt udviklings- og forandringsprojekt som det digitale tinglysningsprojekt. Ingen af de pågældende fejlskøn og forkerte beslutninger skyldtes manglende omhu, kompetence eller respekt for opgaven, og de kan derfor ikke pådrage ansvar. Skønnet over det forventede ressourcetræk blev foretaget af de personer (Sørup Hansen og Devoteam), der var mest kvalificerede hertil, og som havde bedst indsigt i tinglysningsprojektet og det bedste faktuelle grundlag herfor. Hvis deres bedste skøn baseret på det bedste foreliggende faktuelle grundlag skulle være culpøst, så er der reelt tale om ansvar på objektivt grundlag. Samlet har Domstolsstyrelsen ikke begået klare eller uundskyldelige fejl i forbindelse med implementeringen og idriftsættelsen af den digitale tinglysning, og Domstolsstyrelsen har ikke handlet culpøst.

Rigsrevisionens undersøgelse af det digitale tinglysningsprojekt blev udført med et andet sigte end en erstatningsretlig vurdering. Det fremgår udtrykkeligt af beretningen, at ansvarsspørgsmål ikke er indgået i Rigsrevisionens undersøgelse, og at Rigsrevisionen ikke har forholdt sig til spørgsmål om erstatningsansvar. Den kritik, der er fremført af Rigsrevisionen, er derfor ikke udtryk for nogen stillingtagen fra Rigsrevisionens side til, om der i den anledning kan blive tale om erstatningsansvar.

Det bestrides, at 10-dagesfristen i tinglysningslovens § 16, stk. 4, kan anvendes som en målestok for sagsbehandlingstiden. Der er tale om en intern ordensforskrift, og overskridelse af fristen kunne i det papirbaserede tinglysningssystem ikke i sig selv begrunde erstatningsansvar over for anmeldere. Der er ingen holdepunkter for, at dette skulle være anderledes efter indførelse af digital tinglysning, og fristen kan derfor heller ikke anvendes som et rimeligt målepunkt for, hvad der udløser erstatning i denne sag. Hvis ansvaret skal bedømmes ved sammenligning med, hvordan en anmeldelse i det papirbaserede system ville være blevet behandlet, må Foreningen godtgøre, hvad en sådan anmeldelse ville have haft til, hvilket vil være forskelligt alt efter, hvor anmeldelsen blev indgivet og hvornår. Det bestrides ligeledes, at staten hæfter for fejl, der måtte være begået af CSC, Devoteam eller andre selvstændigt virkende tredjemænd.

Indførelsen af den digitale tinglysning har ikke karakter af et projekt, som kan sammenlignes med større anlægsarbejder og lignende, hvor der er pålagt objektivt ansvar ud fra risikobetragtninger. Sagen adskiller sig på helt afgørende punkter fra de sager om byggearbejder og forsyningsvirksomhed, hvor der i retspraksis er statueret objektivt ansvar, og der er intet grundlag for at fortolke denne praksis udvidende. Pålæggelse af objektivt ansvar (risiko-

U.2020.2851H

ansvar) for gennemførelse af offentlige it-projekter og andre større offentlige forandringsprojekter må kræve lovhjemmel.

Det retspraksisbaserede objektive risikoansvar er begrænset til at angå skader forvoldt ved byggearbejder og brud på forsyningsledninger. I samtlige højesteretsdomme med undtagelse af dommen trykt i UfR 1983, side 895, hvor der skete personskade som følge af brud på en hovedgasledning, var der tale om skader på naboejendomme. Det var alvorlige beskadigelser, som blev påført enkelte skadelidtes ejendomme som følge af deres nære beliggenhed, og skaderne kunne henføres direkte til byggearbejdet eller ledningsbruddet. Der var tale om økonomisk virksomhed, og Højesteret lagde vægt på, at bygherren eller ejeren af forsyningsnettet ved sin tekniske og økonomiske planlægning af arbejdet eller driften havde mulighed for at tage risikoen for sådanne ikke upåregnelige skaders opståen i betragtning. Højesterets praksis er udtryk for, at objektivt ansvar enten må kræve lovhjemmel eller i hvert fald have meget stærke grunde for sig.

Der findes i denne sag ikke de stærke grunde, som skal være til stede for uden lovhjemmel at fravige dansk rets almindelige ansvarsregel og pålægge objektivt ansvar. Sagen vedrører ikke økonomisk virksomhed. Det digitale tinglysningsprojekt kan endvidere ikke sammenlignes med et byggearbejde eller forsyningsvirksomhed, og sagen vedrører ikke valget mellem en økonomisk fordelagtig løsning, der indebar en betydelig, konkret og påregnelig økonomisk risiko for en mindre, identificerbar kreds af umiddelbart og ufrivilligt berørte, og en dyrere løsning, der ville forringe projektets økonomiske værdi. Der var med andre ord ikke tale om for egen vindings skyld at påføre »naboer« en betydelig økonomisk risiko, som de ingen mulighed havde for at gardere sig imod. Det er i den forbindelse af væsentlig betydning, at det digitale tinglysningsprojekt i meget høj grad var fastlagt ved de tidligere anførte rammebetingelser besluttet af Folketinget. Sagen vedrører tab for

**2910**

en på forhånd ukendt og tilfældig kreds af personer, og enhver borger kunne have været omfattet af kredsen. Der er tale om ren formueskade, og størrelsen af de tab, der måtte være lidt som følge af den forlængede sagsbehandlingstid, må antages relativt set at være betydeligt mindre end de tab, som skaderne på naboejendomme udløste i sagerne om byggearbejder og ledningsbrud. Endvidere er årsagen til de tab, som måtte være påført de erstatningssøgende, ikke så entydig som i Højesterets domme vedrørende byggearbejder og ledningsbrud.

Det bør altid tages i betragtning, at der kan opstå forlængede sagsbehandlingstider i en opstartsperiode for et helt nyt system og efter større organisationsændringer. Forlængede sagsbehandlingstider er med andre ord altid en påregnelig følge af idriftsættelsen af sådanne systemer. Det er domstolsreformen også et eksempel på. Muligheden for forlængede sagsbehandlingstider i en vis periode efter idriftsættelsen af den digitale tinglysning var også erkendt og meldt ud til brugerne. Konsekvenserne af objektivt ansvar for tab bestående af ren formueskade hos en på forhånd ukendt og tilfældig kreds af borgere og virksomheder i forbindelse med større samfundsmæssige omlægninger som digitaliseringen af tinglysningen vil være vidtrækkende og uoverskuelige for fremtidige projekter, som gennemføres til gavn for samfundet. Det må derfor afvises ud fra risikobetragtninger at gøre Domstolsstyrelsen erstatningsansvarlig for de tab, som måtte være lidt ved forlænget sagsbehandlingstid i Tinglysningsretten i den første tid efter idriftsættelsen.

Det er Domstolsstyrelsens opfattelse, at det er en forudsætning for at kunne vurdere Domstolsstyrelsens eventuelle erstatningsansvar, at der er kendskab til de tab, som de tilmeldte til gruppesøgsmålet har lidt. Eftersom Foreningen gennem sagens forberedelse har værget sig mod at fremlægge gennemarbejdede og dokumen-

terede tabsopgørelser for de tilmeldte til gruppesøgsmålet, har Domstolsstyrelsen været nødsaget til selv at udarbejde typeeksempler, der efter Domstolsstyrelsens opfattelse viser omfanget af det tab, som borgeren kan have lidt i forbindelse med idriftsættelsen af den digitale tinglysning. De fremlagte typeeksempler baserer sig på en samlet købesum/lånesum på 1.000.000 kr. og viser, at sælgeren af en ejendom typisk vil have en merudgift på 97 kr. pr. dag ved forsinket tinglysning, at køberen af en ejendom typisk vil have en merudgift på 86 kr. pr. dag ved forsinket tinglysning, at boligejeren ved optagelse af et tillægslån typisk vil have en merudgift på 115 kr. pr. dag ved forsinket tinglysning, og at boligejeren ved omprioritering af lån typisk vil have en merudgift på 138 kr. pr. dag ved forsinket tinglysning. Typeeksemplerne viser den økonomiske belastning, som Foreningens medlemmer kunne være udsat for i søgsmålsperioden.

Det er i øvrigt givet, at det ikke er hele sagsbehandlingstiden, der vil kunne være ansvarspådragende. Det kan f.eks. lægges til grund, at de første 10 dage af sagsbehandlingstiden ikke kan kræves erstattet af Domstolsstyrelsen. Desuden må kurs- eller rentegevinster indgå i tabsopgørelsen. Det kan i den forbindelse have betydning, om den erstatningssøgende har optrådt som køber eller sælger af en ejendom, allerede fordi kurs- og renteudviklingen almindeligvis vil påvirke udgifterne til henholdsvis hjemtagelse og indfrielse af realkreditlån forskelligt. Det er endvidere ikke nødvendigvis enhver forsinkelse ved hjemtagelse af et realkreditlån, der udløser et tab. I en del situationer vil en forsinkelse tværtimod indebære en økonomisk gevinst for låntageren. Det kan forekomme, hvis kursen på obligationen stiger, eller en variabel rente falder, i tiden frem til hjemtagelsen, og der ikke er foretaget kurssikring. I disse tilfælde vil låntageren (f.eks. en ejendomskøber) ved en kursstigning få udbetalt et større provenu eller ved et fald i den variable rente have en lavere fremtidig ydelse på sit lån, end en tidligere tinglysning ville have medført. For obligationslån vil en kursstigning have betydning for provenuet, både når obligationslånet har fast rente, og når lånet har variabel rente. Generelt vil en kursstigning indebære, at renten falder. For så vidt angår perioden omfattet af søgsmålet (8. september 2009 til 31. december 2010), vil der som udgangspunkt være opnået en kurs- og rentegevinst for obligationslån uden kurssikring, da obligationsrenten generelt har været faldende i perioden.

*Biinterventienterne* har til støtte for Foreningens påstande gjort gældende, at Rigsrevisionens beretning til Statsrevisorerne om det digitale tinglysningsprojekt, Kammeradvokatens erstatningsretlige undersøgelse af forsinkelserne i forbindelse med det digitale tinglysningsprojekt og skønserklæringerne alle grundlæggende støtter, at Domstolsstyrelsen har handlet ansvarspådragende i forbindelse med planlægningen og implementeringen af den digitale tinglysning.

Domstolsstyrelsen har således begået ansvarspådragende fejl og udvist ansvarspådragende forsømmelser i forbindelse med etableringen og igangsættelsen af den digitale tinglysning. Navnlig Domstolsstyrelsens organisatoriske forberedelse forud for idriftsættelsen af den digitale tinglysning var mangelfuld. Domstolsstyrelsen undervurderede omfanget af kompleksiteten af de opgaver, der skulle løses, og havde derfor en helt urealistisk forventning til medarbejderproduktiviteten. Domstolsstyrelsen havde på samme vis ikke i tilstrækkelig grad forberedt håndteringen af fuldmagter, som var en helt afgørende forudsætning for, at systemet kunne fungere tilfredsstillende, og styrelsen havde ikke afsat

**2911**

tilstrækkelige ressourcer hertil. Hertil kommer, at vejledningerne om brug af systemet var mangelfulde og vanskeligt forståelige, og den oprettede hotline havde for få ressourcer og blev i perioder

bemandet af vikarer uden tilstrækkeligt kendskab til tinglysnings-systemet. Dette skal ses i sammenhæng med, at Domstolsstyrelsen fravalgte at udføre den planlagte - og af CSC forudsatte - bruger-venlighedstest, og styrelsen havde derfor ikke testet systemet til-strækkeligt i forhold til brugervenligheden forud for implemente-ringen.

Domstolsstyrelsen havde ikke i tilstrækkelig grad planlagt eller afsat ressourcer til at håndtere den forudsatte konvertering af papir-baserede pantebreve til digitale pantebreve og havde i øvrigt i væ-sentlig grad undervurderet ressourcebehovet. Der forelå ikke en aftale med den finansielle sektor om, at pengeinstitutterne i et vist omfang selv skulle håndtere konverteringen. En sådan aftale blev først indgået med bindende virkning den 11. februar 2010. Det gøres på den baggrund gældende, at Domstolsstyrelsen ikke kan fraskrive sig ansvaret over for brugerne ved at henvise til en aftale med den finansielle sektor, når denne aftale de facto ikke forelå før længe efter idriftsættelsen. Det gøres endvidere gældende, at Domstolsstyrelsens eventuelle aftaler med den finansielle sektor eller andre professionelle aktører er uden relevans i forhold til Domstolsstyrelsens ansvar over for brugerne af systemet. Domstols-styrelsen er således nærmere til at bære ansvaret og risikoen for tab som følge af forsinkelser og mangler ved systemet end brugerne, uanset hvilken rolle den finansielle sektor eller andre udenforstående måtte have spillet.

Helt grundlæggende var ovennævnte problemer i høj grad forank-ret i det forhold, at Domstolsstyrelsen valgte at høste effektivise-ringsgevinsten ved digitaliseringen af tinglysningen for hurtigt. Frem for at vente til systemet havde været i drift i 3 måneder som oprindeligt planlagt i henhold til aktstykke nr. 38 af 21. november 2006, valgte Domstolsstyrelsen at indhøste gevinsten og dermed spare 200 årsværk, allerede inden systemet var implementeret. Dette førte til, at der var for få sagsbehandlere til at behandle de mange anmeldelser, herunder navnlig de sager, som på grund af deres kompleksitet eller fejl og mangler i systemet skulle behandles manuelt, og for få medarbejdere til at besvare brugernes spørgsmål og henvendelser. Dette skal igen ses i sammenhæng med, at syste-met ved idriftsættelsen ikke indeholdt alle de funktionaliteter, som var planlagt, hvilket førte til, at flere sager måtte udtages til manuel behandling, hvilket igen førte til et større ressourcebehov og større forsinkelser.

Problemerne blev navnlig kritiske, da Domstolsstyrelsen havde valgt at igangsætte den digitale tinglysning som et såkaldt »big bang« projekt frem for at gennemføre implementeringen gradvist over en længere periode. Dette stillede store krav til, at systemet skulle fungere fra starten, hvilket ikke var tilfældet.

Domstolsstyrelsen har derfor pådraget sig et erstatningsansvar i nærværende sag. Det gøres endvidere gældende, at Domstolsstyrel-sens overtrædelse af 10-dages fristen i tinglysningslovens § 16, stk. 4, i sig selv er ansvarspådragende. Fristen er præceptiv og følger direkte af tinglysningsloven, og der er ikke grundlag for at påstå, at fristen alene skulle have karakter af en intern ordensforskrift. I så fald ville fristen have været angivet i et cirkulære eller en intern vejledning og ikke i en lov, som borgerne kan støtte ret på. Såfremt retten måtte finde, at overskridelsen af 10-dages fristen ikke i sig selv er ansvarspådragende, må den lovbestemte frist som det mindste føre til, at Domstolsstyrelsen underlægges et præsumptions-ansvar, således at styrelsen må bevise, at overskridelsen af fristen ikke skyldes ansvarspådragende forhold. Denne bevisbyrde er ikke løftet og kan ikke løftes.

10-dages fristen udgør et rimeligt fixpunkt i forhold til bedømmel-sen af Domstolsstyrelsens ansvar, da styrelsens forlængede sagsbe-handling som følge af etablering og igangsættelse af den digitale

tinglysning medførte en klar forringelse af den hidtil gældende mulighed for at opnå tinglysning inden 10 dage.

Der påhviler desuden Domstolsstyrelsen et risikoansvar for etab-leringen og igangsættelsen af den digitale tinglysning, da Domstols-styrelsen planlagde og gennemførte digitaliseringen af tinglysnings-systemet på en måde, som medførte væsentligt forøget risiko for at påføre brugerne af tinglysningssystemet tab. Det bestrides i den forbindelse, at de økonomiske og tidsmæssige rammer for digitali-seringen af tinglysningssystemet ikke tillod Domstolsstyrelsen at agere anderledes, herunder i forhold til at idriftsætte det digitale tinglysningssystem ved et »big bang«.

Som det fremgår af Rigsrevisionens beretning, var det ved fast-læggelsen af budgettet for det digitale tinglysningssystem ved akt-stykke nr. 38 af 21. november 2006 forudsat, at driftsbesparelserne først skulle realiseres, efter at systemet havde været i drift i ca. 3 måneder. Det oprindelige rammebetingelser gav således mulighed for en gradvis udrulning af systemet tilpasset den faktiske kapacitet. Idriftsættelsen af det digitale tinglysningssystem ved et »big bang« blev alene nødvendiggjort som følge af forsinkelser i implemente-ringen af den digitale tingbog, for hvilket Domstolsstyrelsen er ansvarlig.

De ekstraordinære omstændigheder, som Domstolsstyrelsen peger på, var hverken uforudsigelige eller ekstraordinære, men derimod forudset og påeget allerede inden idriftsættelsen. Forsinkelserne skyldtes således, at Domstolsstyrelsen på trods af de kendte risici undervurderede problemernes omfang og ikke planlagde tilstræk-kelige ressourcer til at håndtere dem.

**2912**

For så vidt angår spørgsmålet om konvertering af pantebreve sikrede Domstolsstyrelsen først i februar 2011, et halvt år efter idriftsættelsen af systemet, at der blev indgået en klar aftale med den finansielle sektor om at bistå med konverteringen.

Domstolsstyrelsen kunne ved at have afsat de nødvendige ressour-cer til at behandle de problemer, som med stor sandsynlighed ville opstå, herunder ved ikke at indhøste effektiviseringsgevinsterne allerede før idriftsættelsen, have afbødet de negative konsekvenser af Domstolsstyrelsens fejlagtige skøn. Uanset hvor komplekst og omfangsrigt det digitale tinglysningsprojekt var, kunne de negative konsekvenser af de konstaterede fejl og mangler have været mind-sket betragteligt, såfremt Domstolsstyrelsen havde planlagt og rea-listisk og tilstrækkeligt beredskab til at håndtere problemerne. Det understreges, at styrelsen havde muligheden for at indfase den di-gitale tinglysning gradvist frem for som et »big bang« projekt, jf. Tinglysningsudvalgets betænkning, og at Domstolsstyrelsen på samme vis kunne have ventet med at høste effektiviseringsgevin-sterne til et tidspunkt, hvor systemet rent faktisk skabte disse gevin-ster.

Disse muligheder var netop til stede for at mindske problemerne ved idriftsættelsen af den digitale tinglysning og ikke mindst kon-sekvenserne heraf. Det var således ikke uundgåeligt, at de massive forsinkelser og øvrige problemer opstod. Dette var derimod en konsekvens af de valg, Domstolsstyrelsen havde truffet med hensyn til implementeringsprocessen. Det gør i den sammenhæng ingen forskel, at Finansrådet og Realkreditrådet ifølge Domstolsstyrelsen ikke var tilhængere af pilotdrift, da det var Domstolsstyrelsen, som havde ansvaret for idriftsættelsen, som traf den endelige beslutning om idriftsættelse ved et »big bang«, og som derfor også bærer an-svaret i forhold til brugerne.

Tinglysningssystemet er et grundlæggende og monopolistisk sy-stem i dansk retspleje, og brugerne havde derfor ikke noget alterna-tiv til den digitale tinglysning efter implementeringen heraf. Dom-stolsstyrelsen var bekendt med de betydelige konsekvenser, som eventuelle fejl og mangler ved systemet og idriftsættelsen ville

U.2020.2851H

have for brugerne, og Domstolsstyrelsen var den eneste aktør, som kunne imødegå disse risici. Under de omstændigheder må Domstolsstyrelsen være nærmere til at bære ansvaret og risikoen for de opståede gener end brugerne og må derfor også tåle at erstatte deres tab.

## Landsrettens begrundelse og resultat

*Ansvarsnormen*

Af tinglysningslovens § 16, stk. 4, fremgår det bl.a., at prøvelsen af og den endelige eller foreløbige indførelse af et dokument, der er anmeldt til tinglysning, skal ske snarest muligt og senest 10 dage efter dokumentets anmeldelse til tingbogen.

Forud for etableringen af Tinglysningsretten i Hobro i 2007 foregik tinglysningen i tinglysningsafdelinger ved de daværende 82 byretter i Danmark. Ekspeditionstiden for indførelse af dokumenter anmeldt til tinglysning har varieret gennem årene og fra byret til byret. Der har været perioder, hvor der i nogle retskredse har været gennemsnitlige sagsbehandlingstider, der oversteg 10 dage. Foreningen har imidlertid ikke påvist, at der er udbetalt erstatning alene som følge af en overskridelse af fristen på 10 dage i tinglysningslovens § 16, stk. 4.

Landsretten finder, at fristen på 10 dage i tinglysningslovens § 16, stk. 4, ikke giver en anmelder et retskrav på tinglysning inden for fristen, således at en overskridelse af fristen i sig selv er ansvarspådragende, men at der er tale om en ordensforskrift. Det udgør derfor ikke en ansvarspådragende omstændighed i sig selv, at sagsbehandlingstiden efter indførelse af den digitale tinglysning har været længere end 10 dage. Der er endvidere ikke grundlag for at vende bevisbyrden, således at det pålægges Domstolsstyrelsen at godtgøre, at en sagsbehandlingstid, der har overskredet 10 dage, ikke skyldes ansvarspådragende forhold fra styrelsens side.

Indførelsen af den digitale tinglysning skete ved lov og indebar en overgang fra en papirbaseret og decentral tinglysning, der blev varetaget af tinglysningsafdelingerne ved de daværende byretter, til en digital og centraliseret tinglysning, der blev varetaget af Tinglysningsretten. Indførelsen af en centraliseret digital tinglysningsbehandling var en ændring, som havde virkning for alle fysiske og juridiske personer i Danmark, og som ikke påførte bestemte grupper eller enkeltpersoner en særlig risiko for tab eller særlige ulemper.

Der er på den baggrund ikke grundlag for at bringe skærpede ansvarsregler som f.eks. objektivt ansvar eller risikoansvar i anvendelse ved vurderingen af, om Domstolsstyrelsen har pådraget sig et erstatningsansvar i forbindelse med indførelsen af den digitale tinglysning.

Lovgivningsmagten har bestemt, at tinglysning i Danmark er en opgave, der varetages af en offentlig myndighed. Tinglysningsområdet har gennem årene konstant været en overskudsforretning, således at indtægterne i form af tinglysningsafgifterne oversteg udgiften til driften af tinglysningsvæsenet. Dette har lovgivningsmagten ikke ændret ved gennem årene. Det var en af forudsætningerne i forbindelse med beslutningen om indførelse af digital tinglysning, at personaleudgifterne ville kunne reduceres kraftigt. Dette har vist sig at holde stik. Indførelsen af digital tinglysning har således medført, at overskuddet for det offentlige ved varetagelsen af tinglysningsopgaven er steget. Samtidig er udgifterne for de professionelle bruger af tinglysningssystemet i øvrigt faldet. Lovgivningsmagten var bekendt med de forventede besparelser for det offentlige

**2913**

ved indførelse af digital tinglysning, og dette førte ikke til, at lovgivningsmagten satte tinglysningsafgiften ned i forbindelse med indførelsen af digital tinglysning.

Der er på den baggrund ikke grundlag for at anvende berigelsessynspunkter ved vurderingen af, om Domstolsstyrelsen har pådraget sig et erstatningsansvar ved indførelsen af den digitale tinglysning.

Det er således den almindelige culparegel, der finder anvendelse ved afgørelsen af denne sag, og det er dermed en forudsætning for, at Foreningen helt eller delvist kan få medhold i sine påstande, at Foreningen godtgør, at Domstolsstyrelsen har begået ansvarspådragende fejl i forbindelse med indførelsen af den digitale tinglysning.

*Har Domstolsstyrelsen handlet ansvarspådragende?*

De overordnede rammer for indførelsen af digital tinglysning blev fastsat af lovgivningsmagten og indebar bl.a., *at* tinglysningsopgaven skulle centraliseres ved ét embede, Tinglysningsretten, *at* denne skulle placeres i Hobro, *at* idriftsættelsen skulle ske samtidigt for hele landet (»big bang«), og *at* den forventede besparelse skulle iværksættes på idriftsættelsestidspunktet.

Dette indebærer imidlertid ikke, at Domstolsstyrelsen er fri for ansvar for uacceptabelt forlængede sagsbehandlingstider efter indførelsen af digital tinglysning, hvis det burde have stået Domstolsstyrelsen klart, at sådanne uacceptabelt forlængede sagsbehandlingstider sandsynligvis ville opstå under den fastlagte ramme, men undlod at informere lovgivningsmagten herom.

Domstolsstyrelsen vil endvidere kunne ifalde et erstatningsansvar, hvis uacceptabelt forlængede sagsbehandlingstider skyldtes fejl eller forsømmelser ved planlægningen og organiseringen af indførelsen af den digitale tinglysning, ved beslutningen om at sætte den digitale tinglysning i kraft og ikke udskyde ikraftsættelsen endnu engang eller ved håndteringen af de problemer, der viste sig, efter at den digitale tinglysning var trådt i kraft.

Domstolsstyrelsens valg af CSC som leverandør skete efter en udbudsrunde og kan ikke anses som ansvarspådragende for Domstolsstyrelsen. Der opstod ganske vist i de indledende faser nogle forsinkelser, som efter det oplyste i det mindste delvist må tilskrives CSC, men da ikraftsættelsen af den digitale tinglysning som følge af forsinkelserne blev udskudt fra den 26. marts 2008 til den 8. september 2009, fik forsinkelserne ikke nogen betydning for de forlængede sagsbehandlingstider efter indførelsen af den digitale tinglysning.

I forbindelse med forberedelsen og planlægningen af indførelsen af digital tinglysning etablerede Domstolsstyrelsen bl.a. en intern styregruppe, en ekstern følgegruppe (brugergruppe) med repræsentanter for alle væsentlige brugere af tinglysningen og et projektsekretariat. Domstolsstyrelsen antog endvidere Devoteam som ekstern konsulent. Devoteam ydede rådgivning om design af og kravspecifikation til det digitale tinglysningssystem og om leverandørstyring.

Der blev i hele forløbet frem til idriftsættelsen af den digitale tinglysning udarbejdet risikovurderinger, således at der dels blev foretaget risikovurderinger opdelt på fire hovedområder (organisation, teknisk løsning, leverandør og interessenter), dels blev foretaget en samlet risikovurdering for alle fire områder. Sideløbende blev der gennem den eksterne følgegruppe/brugergruppe holdt kontakt til de kommende brugere af den digitale tinglysning, der fik mulighed for at fremkomme med deres ønsker til systemet og deres vurderinger af de foreslåede løsninger.

Det er landsrettens vurdering, at risikovurderingerne hvilede på et tilstrækkeligt grundlag, at der blev fulgt op på kendte risici i tilstrækkeligt omfang, og at der havde været den fornødne mulighed for, at de kommende brugere af den digitale tinglysning kunne få viden om og indflydelse på projektet.

Copyright © 2023 Karnov Group Denmark A/S

Hvad angår brugerinvolveringen var situationen i øvrigt den, at gruppen af brugere af den digitale tinglysning var organiseret på meget forskellig vis, og at de havde forskellige ønsker til systemets indretning, og forskellige muligheder for eller interesse i at involvere sig detaljeret i processen forud for indførelsen af den digitale tinglysning. Den finansielle sektor (realkreditinstitutterne og bankerne), som udgjorde den største gruppe af brugere af tinglysningssystemet, var således karakteriseret ved hovedsageligt at bestå af store enheder med specialiserede arbejdsgange. Den finansielle sektor havde som følge heraf en stor interesse i at få udviklet et tinglysningssystem, som kunne medføre besparelser i en stor organisation (system til system-løsning), og den finansielle sektor havde derfor en væsentlig interesse i at deltage aktivt i forarbejdet til indførelsen af den digitale tinglysning. Andre grupper af brugere som eksempelvis advokater, ejendomsmæglere og landinspektører var i højere grad organiseret i mindre enheder og havde ikke samme interesse i en system til system-løsning. Navnlig for advokater og ejendomsmæglere blev det tillagt betydning, at det ville blive muligt at anvende en fuldmagtsordning ved siden af digital signatur.

Det er ikke påvist af Foreningen, at nogen af brugerne i forbindelse med brugergruppemøderne eller på anden måde har peget på forhold, herunder de forhold, som senere gav anledning til problemer, som burde håndteres, og som blev tilsidesat.

Der er således ikke påvist ansvarspådragende forhold hos Domstolsstyrelsen i forløbet frem til beslutningen om at sætte den digitale tinglysning i kraft den 8. september 2009.

Indførelsen af digital tinglysning samtidigt for hele landet (»big bang«) var som anført ovenfor bestemt af

**2914**

lovgivningsmagten. Domstolsreformen trådte i kraft den 1. januar 2007, og som følge heraf blev 82 byretter centraliseret i 24 byretter og 1 landsdækkende Tinglysningsret. Medarbejderne i tinglysningsafdelingerne ved de enkelte byretter var således klar over, at tinglysningsopgaven i løbet af kort tid ville overgå til Tinglysningsretten i Hobro. Dette indebar, at erfarne og dygtige medarbejdere, der ikke var i nærheden af pensionsalderen eller af andre grunde måtte ønske at ophøre med at være ansat ved retsvæsenet, havde en stærk tilskyndelse til at søge væk fra den fortsat eksisterende tinglysningsafdelinger og over i andre dele af byretten, der forblev, hvor de var, medmindre de var interesserede in at blive ansat i Tinglysningsretten i Hobro. Dette havde allerede i 2007 og 2008 ført til problemer med bemandingen i nogle tinglysningsafdelinger, og det havde på baggrund heraf vist sig nødvendigt at foretage nogle tilpasninger, som medførte, at tinglysning ikke over hele landet blev foretaget i den retskreds, hvor den pågældende faste ejendom var beliggende. Fra 2007 foregik papirtinglysningen for 25 af de gamle retskredse i en skurvognsby i Hobro.

Det var således efter landsrettens opfattelse klart og et godt stykke tid forud for september 2009, at det ikke ville være muligt at andre idriftsættelsen af den digitale tinglysning fra en »big bang« model til en model med pilotdrift og trinvis udrulning. Der er på den baggrund ikke begået ansvarspådragende fejl fra Domstolsstyrelsens side ved ikke i tiden op til indførelsen af den digitale tinglysning at forsøge at få ændret det fastlagte rammevilkår om samtidig idriftsættelse af den digitale tinglysning for hele landet til en ordning med pilotdrift og trinvis indførelse af den digitale tinglysning.

Det må lægges til grund, at de fejl, der blev konstateret ved overtagelsesprøven inden idriftsættelsen af den digitale tinglysning, ikke var af en karakter eller et omfang, der burde have medført, at den digitale tinglysning ikke blev sat i drift den 8. september 2009. Det bemærkes i øvrigt, at de problemer, der medførte forlængede sagsbehandlingstider efter idriftsættelsen, stort set ikke vedrørte selve tinglysningssystemet, men derimod skyldtes andre forhold.

Der er således ikke påvist ansvarspådragende forhold hos Domstolsstyrelsen i forbindelse med beslutningen om at sætte den digitale tinglysning i kraft den 8. september 2009.

Tinglysningsudvalget havde i betænkning nr. 1471/2006 om digital tinglysning anbefalet, at det blev muligt at anvende en fuldmagtsordning ved siden af adgangen til digital tinglysning via digital signatur. En sådan fuldmagtsordning blev gennemført ved bekendtgørelse nr. 763 af 20. juli 2009, der indeholdt en blanket, som en sådan fuldmagt skulle gives på.

Til brug for håndteringen af fuldmagterne i det digitale tinglysningssystem anskaffede Tinglysningsretten et antal scannere. Da den digitale tinglysning blev sat i kraft, og Tinglysningsretten modtog fuldmagter i stort antal, viste det sig, at der var problemer med den software, som CSC havde leveret til ocr-læsning af de scannede dokumenter. Det er landsrettens vurdering, at dette forhold ikke i sig selv er ansvarspådragende for Domstolsstyrelsen. Landsretten har i den forbindelse også tillagt det vægt, at problemerne med den mangelfulde software blev afhjulpet i løbet af relativt kort tid.

Hvad angår beredskabet hos Tinglysningsretten i startfasen, havde Deloitte i rapporten fra 2005, som udgjorde grundlaget for den videre proces med digital tinglysning, estimeret, at ca. 69 % af tinglysningsopgaverne kunne automatiseres, og at dette i kombination med en centralisering af tinglysningen ved ét center kunne medføre en nedbringelse af antallet af årsværk fra ca. 357 til ca. 91. Da den digitale tinglysning trådte i kraft den 8. september 2009, var Tinglysningsretten normeret med 125 årsværk. Det må efter Sørup Hansens forklaring lægges til grund, at der derudover var indgået aftaler med naboembederne til Tinglysningsretten i Hobro om »nabohjælp« i et omfang på 20 medarbejdere.

Det er landsrettens vurdering, at Tinglysningsrettens og Domstolsstyrelsens skøn over omfanget af de nødvendige personalemæssige resurser ved overgangen til digital tinglysning blev foretaget med den fornødne omhu og under inddragelse af den viden, Tinglysningsretten og Domstolsstyrelsen var i besiddelse af.

Efter indførelsen af den digitale tinglysning den 8. september 2009 opstod der hurtigt en række problemer, som medførte, at mange ekspeditioner ikke blev behandlet tilstrækkeligt hurtigt.

Det må lægges til grund, at selve det digitale tinglysningssystem overordnet set fungerede efter hensigten. Der var en række problemer af teknisk karakter i startfasen, men disse var ikke større end forventeligt og acceptabelt ved en så omfattende ændring af et teknisk og juridisk kompliceret system, og de nævnte tekniske problemer blev endvidere løst tilstrækkeligt hurtigt. Ved årsskiftet 2009/2010 havde systemet således opnået den automatiseringsgrad på 69 %, som Deloitte havde skønnet oprindelig.

Det må anses for godtgjort, at de problemer, der i en periode medførte forlængede sagsbehandlingstider, hovedsagelig skyldtes følgende forhold:

- Der opstod problemer med fuldmagtsordningen.
- Finanssektoren sendte et meget stort antal pantebreve ind til Tinglysningsretten til konvertering.
- Der var kommet et betydeligt antal anmeldelser i perioden op til lukningen af tinglysningen i 14 dage inden idriftsættelsen.

  **2915**

- Der skulle efter idriftsættelsen rettes et uventet stort antal fejl begået i det papirbaserede tinglysningssystem.
- Hotline blev overbelastet.

Af disse forhold må det lægges til grund, at det meget store antal pantebreve, der blev sendt ind til konvertering fra banker og kreditforenings side, var af langt størst betydning for de forlængede

sagsbehandlingstider. Det må således lægges til grund, at Tinglysningsretten i startfasen af den digitale tinglysning modtog op til 200.000 pantebreve til konvertering, og at arbejdet med registrering, konvertering og tilbagesendelse af pantebrevene lagde beslag på et stort antal medarbejdere, op til 30 årsværk ud af 125.

Spørgsmålet er, om det kan bebrejdes Domstolsstyrelsen, at der blev indsendt langt flere pantebreve til konvertering til digitale pantebreve i månederne umiddelbart efter idriftsættelsen af den digitale tinglysning end forventet.

Sørup Hansen har forklaret, at Tinglysningsretten i starten ikke var normeret til at konvertere mange pantebrevet, og at det var hans opfattelse, at der var en aftale med finanssektoren om ikke at indsende pantebreve til konvertering, medmindre der var tale om pantebreve i en konkret ejendomshandel. Opfattelsen af, at der var en sådan aftale, støttes af indholdet af finanssektorens brev af 19. august 2010 til formanden for Domstolsstyrelsens bestyrelse, hvori det bl.a. er anført, *at* der allerede inden idriftsættelsen af den digitale tinglysning havde været en dialog mellem de finansielle organisationer og Domstolsstyrelsen om, at de finansielle virksomheder ikke skulle sende pantebreve ind til ren digitalisering, *at* denne praksis blev meldt ud til de finansielle virksomheder, og *at* tilbagemeldingerne samstemmende er gået ud på, at henstillingen fuldt ud blev efterlevet.

Det lægges på den baggrund til grund, at der i god tid forud for idriftsættelsen af den digitale tinglysning var opnået en fælles forståelse mellem Domstolsstyrelsen og finanssektoren om, at der ikke skulle sendes pantebreve ind til ren digitalisering. Det kan derfor ikke bebrejdes Domstolsstyrelsen, at styrelsen ikke havde forudset, at der ville blive indsendt pantebreve til konvertering i det meget store omfang, som der faktisk blev.

For så vidt angår de øvrige forhold anført ovenfor finder landsretten, at de alene kan antages at have bidraget til forlængelse af sagsbehandlingstiderne i mindre omfang, og at der i øvrigt er tale om forhold, der ville kunne have været håndteret med den personalenormering, der var til rådighed i startfasen, hvis ikke problemet med det meget store antal pantebreve til konvertering var opstået.

Der er således ikke påvist ansvarspådragende forhold hos Domstolsstyrelsen i forbindelse med håndteringen af de problemer, der opstod efter idriftsættelsen af den digitale tinglysning.

Landsretten tager herefter Domstolsstyrelsens frifindelsespåstand til følge.

*Sagsomkostninger*

Efter sagens udfald sammenholdt med parternes påstande skal statskassen, fordi Foreningen har fri proces, betale sagsomkostninger til Domstolsstyrelsen med i alt 3.259.125 kr.

Beløbet omfatter 259.125 kr. inklusive moms til syn og skøn og 3.000.000 kr. inklusive moms til udgifter til advokatbistand. Beløbet til advokatbistand er skønsmæssigt opgjort efter en samlet vurdering af sagens omfang og karakter samt omfanget af det arbejde, der har været forbundet med at føre sagen.

Biintervenienterne, der ligeledes har fri proces, har i det væsentlige alene gentaget eller uddybet Foreningens anbringender og har ikke i øvrigt ved deres deltagelse i sagen påført Domstolsstyrelsen særskilte omkostninger i gruppesøgsmålet. Herefter og efter en samlet vurdering finder landsretten, at der ikke foreligger særlige grunde, der kan føre til, at statskassen i forhold til biintervenienterne skal betale sagsomkostninger til Domstolsstyrelsen, jf. retsplejelovens § 252, stk. 4, 2. punktum.

## Thi kendes for ret

Domstolsstyrelsen frifindes.

Statskassen skal betale sagens omkostninger til Domstolsstyrelsen med 3.259.125 kr.

De idømte sagsomkostninger skal betales inden 14 dage og forrentes efter rentelovens § 8 a.

## Højesterets dom

Biintervenienter til støtte for Gruppesøgsmål.nu:

Poul Due, Ejendomsselskabet Otto ApS (tidligere Kanalhuset ApS), Soeborg Ejendomme ApS, Frank Lyngholm Andersen, Gartneriet Blomstergården, Jens Jørgen Bonde og David Holm (alle ved advokat Jens Rostock-Jensen (beskikket) og advokat Jes Anker Mikkelsen)

I tidligere instans er afsagt dom af Østre Landsrets 4. afdeling den 27. maj 2019 (B-3159-11).

I pådømmelsen har deltaget syv dommere: Thomas Rørdam, Jon Stokholm, Vibeke Rønne, Henrik Waaben, Michael Rekling, Oliver Talevski og Kristian Korfits Nielsen.

### Påstande

Parterne har gentaget deres påstande.

### Forklaringer

Til brug for Højesteret er der afgivet forklaring af skønsmand Klaus Kvorning Hansen og af Merete Steen og Jette Sjælland.

*Skønsmand Klaus Kvorning Hansen* har forklaret bl.a., at han besvarede spørgetemaet ud fra, hvad der er

**2916**

god praksis og sædvanemæssigt i it-branchen. Han er ansat ved Københavns Universitet. Han har ikke personlig erfaring med at udvikle og implementere statslige it-projekter.

Der er i alle projektforløb elementer, som er specifikke for det pågældende projekt, og man kan derfor ikke bare henvise til, hvad man plejer at gøre. Han har i skønserklæringerne udbygget sit skøn med mere specifikke overvejelser ud fra sine personlige erfaringer, da han ikke kunne besvare de stillede spørgsmål alene på baggrund af kutyme.

Det anførte om fuldmagtsscannere i skønserklæringen er ikke udtryk for hans eget personlige skøn, men er et udtryk for kutyme og god skik. Hvor han i rapporten har skrevet »almindeligt« eller »almindeligvis« er det oftest en henvisning til almindelig praksis i branchen. Ham bekendt findes der ikke et dokument, der udtrykker praksisstandarden generelt, men der findes praksisstandarder på en række specifikke områder, f.eks. vedrørende brugervenlighedstests. Der er altid et skøn involveret, men flertallet i hans position ville nok besvare spørgsmålene på tilsvarende vis.

Når man ser på udviklingen i god skik fra 2003 til i dag, så er de agile udviklingsmetoder for projektledelse og projektteknik vundet frem. Der er en anden måde at gribe projekter an på. Det var en god beslutning, at man i tinglysningsprojektet ikke undervejs skiftede model fra vandfaldsmodellen til en agil model. Vandfaldsmodellen er stadig udbredt, og han bruger den fortsat i visse projekter. Valg af projektmodel baseres på projektets karakter. Der har været udvikling også i vandfaldsmodellen. Efterhånden er det blevet almindeligt, at man bygger agile forløb i vandfaldsmodellen. Når man nærmer sig implementeringsfasen, kører man »sprint«. God skik på området har ikke udviklet sig generelt siden 2006. Dog er forståelsen af it langt større i dag. Det gælder også håndteringen af brugeradfærd. I dag ville man f.eks. insistere på, at der gennemføres brugervenlighedstests.

Med formuleringen »brugeradfærden i bredeste forstand« i den supplerende skønserklæring har han tænkt på adfærden blandt anvendere af systemet i allerbredeste forstand, herunder bl.a. advokatsekretærer og medarbejdere ved Tinglysningsretten. Brugernes realistiske tilgang til systemet kunne have været involveret i større

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

udstrækning, og hvis man havde inddraget dem tidligere i processen, havde man måske opdaget nogle af udfordringerne tidligere.

Svaret på spørgsmål 10.2 bygger på, at det efter hans erfaring kan være vanskeligt for en projektledelse at få de enkelte ledelsesmedlemmer motiveret for projektet. Det kan være, fordi den eller de pågældende har et forbehold over for projektejerne. Han havde ikke indblik i, om det forholdt sig sådan i dette projekt. Det er et åbent spørgsmål, om det kunne være lykkedes at få interessenterne involveret i brugertests. Betragtningen er rent teoretisk. Hvis nogen havde sådanne forbehold, ville man normalt eskalere problemstillingen til »sponsorgruppen«, som skulle træffe de nødvendige beslutninger og sikre, at dem, der skulle involveres, blev involveret. Sponsorgruppen eller projektsponsoren er blot andre betegnelser for projektejeren. Domstolsstyrelsen havde projektejerskabet. Projektledelsen skulle have haft lejlighed til at eskalere problemstillingen til Domstolsstyrelsen, især da der var tale om ekstern projektledelse. Domstolsstyrelsen havde projektejerskabet og burde måske have støttet projektet i højere grad. Det er blot hans antagelse.

Han er enig i Rigsrevisionens vurdering af, at det var mindre hensigtsmæssigt at fravælge at gennemføre brugervenlighedstests. Det har han forholdt sig til i den supplerende skønsrapport. Når man er afhængig af brugen af systemet, er det afgørende, at brugerne også er i stand til at benytte systemet, og at der ikke er forsinkelser eller hindringer, som er afledt af, at man ikke ved, hvordan man betjener systemet. Hvis man havde lavet brede brugervenlighedstests, havde man på forhånd vidst, hvilke udfordringer der var i systemet, herunder f.eks. i brugergrænsefladen. En bred brugerskare inkluderer også brugerne af selvbetjeningen. Praksis vedrørende brugervenlighedstest er, at det skal være rigtige brugere, som ikke har medvirket i projektet, og testen skal foregå under kontrollerede former, så man uden indblanding kan konstatere, om der er noget, der ikke lader sig gøre. Man beder ofte brugerne tale højt under brugen for at registrere, hvor det går galt undervejs. I mange projekter er det dog noget, man sparer væk, fordi det er relativt bekosteligt og kan være vanskeligt rent teknisk. Det er ikke en funktionalitetstest som sådan. Det er en test af, om brugerne kan interagere med systemet. Ideelt set bør test af systemer også inkludere test af brugervejledninger.

Der kan være sessioner, der tager dage, men det kan også tage en time, afhængigt af, hvad man vil teste. Man laver drejebøger for brugervenlighedstests og beder brugeren om at gennemløbe deres opgaver, og så lader man dem blive frustreret, hvis der er noget, der ikke fungerer optimalt. Der findes specialister på området, som man kan hyre ind til f.eks. design af brugergrænseflader og andet, men oftest vil det være projektmedarbejdere, der overværer testen. Testen kan f.eks. føre til, at man reviderer brugervejledningen. Man kan også f.eks. opdage, at der er behov for »ledetekster« undervejs i systemet.

Man burde have gennemført brugervenlighedstests på det tidspunkt, da systemet var blevet funktionelt, dvs. sidst i forløbet. Desværre er der ofte ikke tid til det på det tidspunkt, så man skærer på det, selv om det ikke

**2917**

er hensigtsmæssigt. Han har ikke forholdt sig til baggrunden for, at man fravalgte at lave brugervenlighedstests.

Nogle af de problemer, der var ved fuldmagterne kunne måske have været afhjulpet ved forudgående brugervenlighedstests. F.eks. hvis man havde bedt borgere udfylde fuldmagter og indscanne dem efterfølgende. Det mente han, at man burde have gjort. Når han angiver, at man »burde have gjort« er det med forbehold for, hvad der var muligt under de rammebetingelser, der var givet for projektet.

En brugerekspert kan f.eks. kan være én, der har ekspertise i, hvordan en brugergrænseflade skal være indrettet for at fungere optimalt i forhold til brugerne. En brugerekspert kan være rigtig nyttig, men kan ikke erstatte en egentlig brugervenlighedstest.

Han har ikke set den »sandkasse«, som blev anvendt i forhold til brugerne, men den er beskrevet i sagens materiale. Sandkassen kunne ikke erstatte brugervenlighedstests. Brugervenlighedstests bør foretages på det system, man er tæt på at lancere, og så tæt på lanceringen som muligt. Som han har forstået det, var sandkassen et testmiljø, og var derfor ikke en realistisk situation. Han forstod det heller ikke sådan, at almindelige brugere blev lukket ind i sandkassen. Det er absolut relevant at have et testmiljø som sandkassen for at teste systemets funktionalitet, men det kan ikke erstatte en brugervenlighedstest.

En hotline kan ikke reparere på, at der ikke er foretaget brugervenlighedstests, men det er almindeligt, at man sørger for ekstraordinær bemanding af en sådan hotline - og af det interne tekniske beredskab til at rette fejl - i startfasen efter idriftsættelsen. Det kaldes »hypercare« eller »brandvagt«. Manglende brugervenlighed i systemet opleves ofte som pres på en sådan hotline.

Han mener ikke, at man burde have idriftsat en betaversion af systemet. Han har alene forholdt sig til, at man kunne have kørt testsystemet parallelt med det manuelle system for at teste, om det fungerede. Man er stoppet med manuel behandling på det tidspunkt, hvor man har idriftsat systemet. Han har ikke haft det med i overvejelserne, men man kunne have udviklet en pilot med en betaversion af systemet på et tidspunkt, hvor systemet ikke var fuldt udviklet, for at teste systemet i drift med nogle brugere, for så efterfølgende at have tid til at rette fejlene. Han ville dog aldrig anbefale en betaversion som et »big bang«.

Hans bemærkning i den supplerende skønserklæring om, at forholdene på ingen måde er »usædvanlige eller usandsynlige«, sigter til, at man burde have taget højde for risikoen for, at problemerne kunne optræde. Det er det, en risikoanalyse går ud på. Med svaret sigter han til, at man går direkte fra et meget manuelt baseret system til et digitalt system. I en sådan transformation er det vigtigt, at det brugerne gør, inddrages. Risikofaktoren vedrører, om systemets måde at håndtere sager på afspejler den praksis, man har indarbejdet, når man har foretaget opgaverne manuelt. Ofte er et system baseret på, at man gør tingene på samme måde som i en manuel proces, men der kan være vidt forskellige processer. Det er en risiko i sig selv, at man foretager den transformation, fordi systemerne ikke afspejler, hvad man gør i den manuelle proces. I en manuel proces har brugerne forskellige tilgange til processen, hvilket ikke kan afspejles i et digitalt system. Det kom også til udtryk i algoritmen, der udtog visse sager til manuel behandling, da systemet ikke kunne håndtere afvigelser. Idéen med brugertests er netop at dække sig ind i forhold til ting, man ikke kunne have forudset.

Med en lidt bedre projektledelse havde man nok trukket interessenterne til bordet. Man bør lave interessentanalyser i alle projekter. Det fremgår ikke af materialet, hvordan ledelsen faktisk håndterede spørgsmålet, og det har heller ikke været en del af hans skøn. Hvis interessenterne gav nægtede at medvirke til brugervenlighedstests, ville det have været en hindring for at foretage dem, men det har han aldrig oplevet i praksis.

Betegnelsen »risikoappetit« i skønserklæringen går ud på at vurdere, hvilke risici man vil løbe i forhold til de gevinster, man kan opnå. Det er alene en forretningsmæssig vurdering. Det er projektejeren eller projektsponsoren, der foretager den vurdering. Projektejerne tog f.eks. risikoen ved at springe brugervenlighedstesten over. Han ser ofte, at der skæres til - enten på tid eller økonomi. Det er normalt at se på, om man skal skære på funktionaliteten, brugervenligheden eller andre forhold, når tiden er et parameter.

Copyright © 2023 Karnov Group Denmark A/S

U.2020.2851H

Der kan være rammebetingelser for et projekt, som man ikke kan ændre på. Det gælder f.eks. persondataforordningens krav og implementeringsfrist, men det kan også være f.eks. en bestemt tidsfrist eller budget og ikke nødvendigvis lovgivningsmæssige rammebetingelser. Det er sættet af rammebetingelser, der i høj grad vil præge projektet, og som har væsentlig indflydelse på det råderum, som en projektledelse har.

Ud fra rammebetingelserne foretager man en risikoafvejning for at vurdere, hvor man skal sætte ind. Det vil være umuligt at lave systemer, som udelukker risici. Det ligger i projektledelsens opgave løbende at analysere konsekvensen af de rammebetingelser, som projektet hviler på, og så råbe op over for ledelsen, hvis der er udfordringer med rammen. Hvis Domstolsstyrelsen kunne se, at rammen medførte risici, som kunne være betænkelige, så skulle de have fortalt hvervgiveren, at rammebetingelserne var for stramme eller ikke var hensigtsmæssige. Det er en helt normal proces og er også sket i dette projekt, da man har forlænget projektet flere gange. Det er helt normalt, fordi man ikke kan forudse

**2918**

alt på forhånd. Han ved ikke, hvilken dialog der har været mellem parterne. Hans antagelser herom er hypotetiske.

Det er sædvanligt, at man på baggrund af rammebetingelserne skærer projektet til løbende eller udfordrer rammebetingelserne. Det er almindeligt, at man skærer i de aktiviteter, der ligger til sidst i et projektforløb, f.eks. brugervenlighedstests. Han har ikke konkret haft mulighed for at efterprøve, om det var en dårlig idé, at man fravalgte brugervenlighedstest, men set ud fra projektets karakter, mener han, at det var en dårlig idé. Ud fra en faglig vurdering, skulle man ikke have undladt brugervenlighedstests. Han har ikke i sagen kunnet finde en indstilling om fravalget. Som han kan se det, er fravalget begrundet med, at man havde en brugerekspert, men man skulle hellere have udfordret rammebetingelserne. Domstolsstyrelsen skulle være gået til Folketinget med deres bekymringer. Hans skøn går på, hvad man projektmæssigt skulle have gjort.

Der er på ledelsesplan sket en meget bred involvering af interessenter i de fora, der blev etableret. Så vidt han kan se, har man ikke taget højde for at involvere slutbrugere, dvs. dem, der anvender systemet.

Efter et system er sat i drift, skal man have en tilstrækkelig stor gruppe medarbejdere i hotline og i teknikerstaben, der kan agere beredskab og vurdere hvilke fejl, der er kritiske, og hvilke der er mindre kritiske, og kan gøre noget ved systemets performance. Han har selv været ude for, at man i en hypercare-periode måtte rulle et system helt tilbage til det gamle system. Det må have været et relativt godt system, man har sat i drift i tinglysningsprojektet, da det er beundringsværdigt, så hurtigt man får rettet op på problemerne. Systemet blev relativt hurtigt stabilt i drift. Det er hans antagelse, at tinglysningssystemet i dag er en succes både nationalt og internationalt.

Automatiseringsgraden endte på 69-70 % ved årsskiftet, men automatiseringsgraden var i den første tid efter idriftsættelsen lavere end forudsat. Hvis man havde foretaget brugervenlighedstests, kunne man have forudset en lavere automatiseringsgrad i den første periode efter idriftsættelsen, og så kunne man have bemandet derefter. Han husker ikke den præcise dato for, hvornår man indhentede det, men der kom hurtigt styr på automatiseringen.

Temaerne i risikoanalysen blev ikke overført én til én til temaerne i risikologgen. Når f.eks. sandsynligheden ændrer sig for, at en bestemt risiko indtræder, så bør det afspejles i risikoanalysen. Risikologgen knytter sig ikke direkte til risikotemaerne i risikoanalysen. Det kan undre, at risikoanalysen stort set ikke ændrer sig i hele perioden. Alle risici burde have været håndteret, og man burde

have minimeret dem, men projektet forblev et højrisikoprojekt i hele projektperioden. Dermed håndterede man ikke risikoen godt nok. Det er ofte et forsømt område i projektledelsen, at man ikke bruger risikologgen tilstrækkeligt. Det kan være udtryk for høj risikoappetit i projektledelsen generelt, men kan også være ureflekteret. Det er en metarisiko, at man ikke forholder sig til risikoanalysen.

Når man på de daglige møder i projektledelsen forholder sig til risikologgen, er det underligt, at man ikke revurderer risikoanalysen, som man præsenterer ledelsen for. Risikovurderingen af temaerne i risikoanalysen ændrer sig ikke, selv om risikobilledet i risikologgen ændrer sig. Han forstår risikoanalysen som et isoleret produkt uden sammenhæng med risikologgen. Projektledelse, herunder håndtering af risikoanalysen, går ud på at minimere risici. Han stiller spørgsmålstegn ved, om dem, der modtog risikoanalysen, reagerede på den. Det baserer han på, at risikoanalysen ikke ændrede sig over tid. Han har ikke indblik i baggrunden for det, men han har studset over det.

Projektejerne, dvs. Domstolsstyrelsen, burde have rapporteret risici til hvervgiveren. Særligt da risikovurderingen forblev høj. Det udgjorde f.eks. en risiko, at der var problemer med fuldmagterne. Det er brugeradfærden, der udgør risiciene, men også f.eks. problemerne med scannerne. Der burde have været udført funktions- og belastningstests af scannerne. Hvor mange sager, der blev udtaget til manuel behandling på grund af in-data, der ikke var korrekt, var også en risiko, der materialiserede sig. Han har nævnt risiciene i skønsrapporten.

*Jette Sjælland* har forklaret bl.a., at hun i 2009 arbejdede hos Ret & Råd i Ballerup. Hun stod primært for ejendomshandler og køberrådgivning. Hun var den eneste, der sad med ejendomshandler, køberrådgivning og tinglysning hos Ret & Råd, Ballerup. Steen Hermansen fra Danske Advokater har henvist advokat Morten Samuelsson til hende, fordi hun var en af dem, der i 2009 brokkede sig mest over tinglysningssystemet.

Ret & Råd var særligt godt forberedt på det digitale tinglysningssystem. I foråret 2009 var hun dog på et kursus med Henrik Høpner, hvor deltagerne blev overordnet orienteret om systemet. De havde ikke mulighed for at blive bedre forberedt via Danske Advokater. Hun prøvede at rydde op i papirsagerne, inden idriftsættelsen, så hun var klar til det.

Hun oplevede det digitale tinglysningssystem som noget nyt og spændende, men hun var også bevidst om sit ansvar for, at det, hun foretog sig i tinglysningssystemet, skulle være korrekt. Før lavede retten det for én. Systemet bremsede hende i at forsøge at gøre det korrekt, fordi hun ofte blev smidt af, uden at systemet havde gemt det, hun havde lavet. Man skulle næsten gemme efter hver side, så man vidste, at man i hvert fald havde noget, inden man blev smidt af. Der var

**2919**

frustrationer i opstartsfasen, og hun efterlyste derfor hjælp hos Danske Advokater. Hun blev efterfølgende meldt ind i en brugergruppe under Danske Advokater. Merete Steen var også med i den gruppe.

Der var ingen vejledninger til brugerne, men kun overordnede vejledninger til selve systemets funktion og om, hvilke typer af anmeldelser man kunne lave i systemet. Brugerne, der skulle foretage anmeldelserne, savnede brugervejledninger. De kunne ikke læse, om det, de gjorde, var korrekt. De havde mulighed for at ringe til Tinglysningsrettens hotline, som de ofte kaldte »notline«, fordi de ikke fik de svar, de havde brug for. I brugergruppen hjalp de hinanden med at besvare spørgsmål om systemet. Det var en stor hjælp, særligt da hun var alene om tinglysningen. Mange advokatkontorer efterspurgte brugervejledninger, så Steen Hermansen rettede henvendelse til brugergruppen for at spørge, om de ville

U.2020.2851H

skrive en vejledning. Brugergruppen begyndte at skrive en vejledning på den måde, at de delte anmeldelsestyperne op imellem sig og lavede vejledninger til, hvad man skulle gøre ved hvert enkelt skærmbillede. De nåede rigtig langt med vejledningen, men lige inden jul i 2009 offentliggjorde Tinglysningsretten sine brugervejledninger, der erstattede dem, som brugergruppen var i gang med at lave. Tinglysningsrettens brugervejledninger var ok, men kunne have været bedre. De er blevet meget bedre, og nu er der vejledninger for alt. Hun var på en workshop hos Domstolsstyrelsen sammen med andre brugere, herunder landinspektører, advokater mv. Hun husker ikke, om Adam Wolf var til stede.

I starten oplevede hun ikke kunder, som ønskede at bruge digital signatur. Det var for nyt for kunderne, og der var mange, der endnu ikke havde netbank osv. De fleste valgte at give kontoret en tinglysningsfuldmagt. I hele det første halve år efter idriftsættelsen brugte de mest fuldmagter. Hun oplevede, at det var svært at overtale kunderne til at gøre noget nyt, særligt ældre kunder. De havde glæde af at have tinglysningsfuldmagt, fordi de ikke skulle henvende sig til kunderne, hvis der blev behov for ændringer undervejs. Det gav en arbejdsmæssig fordel.

Hun oplevede, at det var svært at forstå, hvorfor nogle oplysninger blev afvist. Det blev f.eks. afvist, hvis man på fuldmagten skrev uden for underskriftsrubrikken. Manglende udfyldelse af »landsejerlavskode« var også en afvisningsgrund i starten. Det ord havde hun aldrig hørt før. Hvis fuldmagten var klipset sammen, blev den i starten også afvist, fordi man hurtigt skulle kunne scanne det ind. Det ændrede på det efterfølgende. Hun kan ikke genkende Søren Sørup Hansens forklaring om, at Tinglysningsretten ikke afviste fuldmagter på grund af klips.

Ved henvendelser til hotline fik hun oftest at vide, at de ikke kunne hjælpe, da de ikke måtte give juridisk rådgivning - også hvis hun blot spurgte, hvilken rubrik hun skulle benytte til at oplyse dette eller hint. Senere fik de en kontaktformular, hvor man bedre kunne forklare sig igennem spørgsmålet. Det blev bedre hen ad vejen, og det fungerer rigtig godt nu.

Hun har sjældent oplevet, at man skal indsende skøde og bankernes pantebreve samtidig. Dengang tinglyste hun skødet, og når hun fik det tilbage med anmærkninger, så oplyste hun bankerne om, at de kunne gå i gang med at tinglyse nyt lån og aflyse det gamle lån osv., og det gjorde de så. Det gør hun også i dag.

*Merete Steen* har forklaret bl.a., at hun var med i brugergruppen under Danske Advokater sammen med Jette Sjælland. Hun har været hos Winsløw Advokatfirma siden 2007. Hun var på barsel i 2009 og kom tilbage fra barsel i august 2009. Hun var ansvarlig for ejendomshandler og tinglysning. Hun havde kolleger, som stod for den simple tinglysning, mens hun stod for den mere avancerede tinglysning. Hun blev forberedt på det nye tinglysningssystem ved at deltage i et kursus i efteråret 2008, hvor Adam Wolf og Henrik Høpner underviste. Hun kom ikke på andre kurser, men fik løbende orientering fra Steen Hermansen fra Danske Advokater. De brugte mange kræfter på at få indleveret og behandlet alle deres papirsager, inden det digitale tinglysningssystem trådte i kraft. Det var kun, hvis noget blev forsinket, f.eks. i posten, at det måtte vente. Ellers havde de ryddet alle papirsager op inden idriftsættelsen, fordi de på kontoret var usikre på, hvad der ventede dem med det nye system.

De var forberedt med hensyn til digital signatur. Nogle kunder var nemme at få overbevist om at bruge digital signatur, men det var mest erhvervskunderne. Privatkunder var sværere at overbevise, særligt i det første halve år, hvor systemet var udskældt i pressen. Der var sager, hvor de vurderede, at det ville være nemmere med en tinglysningsfuldmagt, men de var indstillet på at prøve noget

nyt, så hun prøvede at overbevise kunderne om at bruge digital signatur.

Da systemet blev idriftsat, var det ikke særligt intuitivt. Det var ikke svært at tinglyse et skøde fra hr. Hansen til fru Jensen, men der var problemer undervejs. Noget af det første hun skulle tinglyse, var en ejerlejlighedsopdeling og et skøde med en skifteretsattest. Hun var vant til, at man tog skødet og skifteretsattesten, og lagde begge dele i en kuvert, og sendte det til retten. I det nye system fik hun anmeldelsen afvist, fordi hun først skulle tinglyse skifteretsattesten, og der måtte heller ikke være CPR-numre på skifteretsattesten. Det var hun ikke vant til. Der forelå enkelte vejledninger. Hun husker ikke præcis hvor mange, men der var nok under 10 vejledninger til systemet. Én af dem var om, hvordan man lavede simple skøder, men der var ingen vejledning om f.eks. tinglysning af en skifteretsattest.

## 2920

Hun kom med i brugergruppen under Danske Advokater. Brugergruppen prøvede at kompensere for den manglende vejledning. I kraft af hendes rolle i brugergruppen var hun med til en workshop i Domstolsstyrelsen i februar 2010, hvor Adam Wolf var til stede. Der sagde hun, at de manglede vejledninger til systemet. Der var 58 anmeldelsestyper, så hun sagde, at der var behov for 58 vejledninger. Adam Wolf svarede, at »det må vi se på«. Brugervejledningerne begyndte at komme fra Tinglysningsretten i november og december 2009, men det fulde omfang kom først langt senere.

I forhold til fuldmagterne var der pludselig noget, der hed »landsejerlavskode«, som man skulle anføre, hvis de skulle godkendes. Det vidste hun ikke, hvad var, selv om tinglysningsretten sagde, at det ikke var noget nyt. Hvis der var skrevet noget med kuglepen i fuldmagten før underskriftsrubrikken, så blev den afvist. Det fandt de ud af efterfølgende, når anmeldelsen blev sendt retur som afvist. Der fulgte ikke altid en grund med, når man fik noget retur som afvist. Hun følte, at nogle af medarbejderne i Tinglysningsretten havde en lyst til at afvise anmeldelserne uden videre. Hvis man på forhånd havde vidst, at en fuldmagt ville blive afvist, hvis der var skrevet med kuglepen i den, så havde hun ikke sendt den af sted. Når de blev afvist, så tog det tid at få lavet en ny og indsendt den.

Hun husker ikke, om det var en af afvisningsgrundene, at fuldmagterne var klipset sammen. Kontoret klipser dem ikke sammen i dag, men hun husker ikke, hvad baggrunden for det er. Hun antog, at det er baseret på erfaring.

Hun ringede på et tidspunkt til hotlinen og var i kø i knap to timer, hvorefter forbindelsen blev afbrudt. Da var hun nummer to i køen. Langt hovedparten af hotlinens medarbejdere svarede hurtigt, at hendes spørgsmål var juridiske, og at de ikke måtte besvare juridiske spørgsmål. Hun vidste ikke, om det dækkede over, at de ikke kunne svare. Det var svært at få et klart svar. Efter et halvt års tid fik medarbejderne ved Tinglysningsretten mere indsigt, og der var mere ro på. Hun brugte også meget sin brugergruppe og sit netværk til at besvare spørgsmål til systemet.

Ved anmeldelse af en ejerlejlighedsopdeling, hvor man skulle gå fra 144 til 157 lejligheder, frøs systemet efter nummer 95, og hun skulle starte forfra. Hun kom igennem til hotline, der anbefalede at dele anmeldelsen op. Det var en hjørneejendom, så hun prøvede efterfølgende at dele anmeldelsen op i tre. Hun fik besked på, at den skulle tastes ud i ét uden at gemme kladden. Hun tastede anmeldelsen en aften mellem kl. 20 og kl. 24, fordi systemet var mere stabilt på det tidspunkt. Der var flere fejl midt på dagen. Anmeldelsen gik igennem i tre stykker, men blev så afvist af systemet, fordi den ikke var anmeldt på hele ejendommen. Tinglysningen nåede at afvise den ene af anmeldelserne, men så fik hun telefonisk stoppet afvisningen af de to andre, og fik besked om, at de ville se på det samlet. Det blev behandlet manuelt.

Copyright © 2023 Karnov Group Denmark A/S

Hun skønnede, at hun nok brugte 50-75 % mere tid på tinglysning i perioden september 2009 til udgangen af 2009, end hun gjorde før. På den konkrete sag om ejerlejlighedsopdeling brugte hun nok 600-700 % mere tid på sagen, end hun ville have brugt i det gamle system.

Systemet fungerer i det store hele godt i dag. Ved de mere komplicerede sager om relaksationer, arealoverførsler osv. kniber det dog stadig. De oplever også stadig uens sagsbehandling i fuldstændig ens sager. I dag ved hun, hvem hun skal skrive til for at få hjælp, og hun er selv blevet bedre til systemet.

## Højesterets begrundelse og resultat

### Sagens baggrund og problemstilling

I 2006 blev det besluttet at indføre papirløs (digital) tinglysning i Danmark. Den valgte ordning indebar, at opgaven med at tinglyse rettigheder over fast ejendom mv. ikke længere skulle varetages i de enkelte byretskredse, men skulle samles hos en landsdækkende specialret, Tinglysningsretten, som blev placeret i Hobro. Det var oprindelig planen, at det digitale tinglysningssystem skulle sættes i drift den 1. april 2008, men idriftsættelsen måtte udsættes, således at systemet endte med at blive sat i drift den 8. september 2009.

Sagen angår, om Domstolsstyrelsen, der havde ansvaret for udviklingen og idriftsættelsen af det digitale tinglysningssystem, er erstatningsansvarlig for lang sagsbehandlingstid for tinglysningsekspeditioner over for de 422 private boligejere, der er tilmeldt gruppesøgsmålet.

Spørgsmålet er alene, om der er det fornødne ansvarsgrundlag. Parterne er enige om, at dette spørgsmål også omfatter adfærd hos andre statslige myndigheder, der har været involveret i indførelsen af det digitale tinglysningssystem. Højesteret skal ikke tage stilling til, om det enkelte gruppemedlem har ret til erstatning, herunder om der foreligger årsagssammenhæng, om der er et tab, og om der foreligger egen skyld.

### Ansvarsnormen

Højesteret tiltræder, at der ikke er grundlag for at anvende skærpede ansvarsregler i form af objektivt ansvar (risikoansvar) ved vurderingen af, om Domstolsstyrelsen har pådraget sig erstatningsansvar for lang sagsbehandlingstid.

Højesteret tiltræder endvidere, at berigelsessynspunkter ikke kan føre til at pålægge Domstolsstyrelsen at dække de private boligejeres tab.

Højesteret finder herudover anledning til at bemærke, at det ikke i sig selv er ansvarspådragende, at

**2921**

sagsbehandlingstiden overskrider den frist på 10 dage, som er fastsat i tinglysningslovens § 16, stk. 4. Bestemmelsen giver ikke en anmelder et retskrav på tinglysning inden for 10 dage, men må i overensstemmelse med langvarig retspraksis anses for at være en intern ordensforskrift. Der er heller ikke grundlag for at vende bevisbyrden, således at det pålægges Domstolsstyrelsen at godtgøre, at en sagsbehandlingstid, der har overskredet 10-dagesfristen i § 16, stk. 4, ikke skyldes ansvarspådragende forhold.

Højesteret tiltræder herefter, at det er dansk erstatningsrets almindelige ansvarsnorm - culpareglen - som finder anvendelse ved sagens afgørelse. Det er derfor en betingelse for, at foreningen Gruppesøgsmål.nu kan få medhold i sine påstande, at foreningen godtgør, at Domstolsstyrelsen (de involverede statslige myndigheder) har foretaget ansvarspådragende dispositioner i forbindelse med indførelsen af den digitale tinglysning.

Indførelsen af digital tinglysning skulle ske inden for nærmere angivne rammebetingelser, som indebar, at tinglysningsopgaven

skulle centraliseres ved ét embede (Tinglysningsretten), som blev placeret i Hobro, at driftsættelsen skulle ske samtidig for hele landet (»big bang«) uden forudgående pilotdrift, og at den forventede personalemæssige besparelse skulle opnås allerede fra driftsættelsestidspunktet.

Der er tale om grundlæggende rammer for det digitale tinglysningssystem, som er fastsat ved lov og i aktstykker tiltrådt af Folketingets Finansudvalg. Højesteret finder, at der ikke foreligger sådanne helt særlige omstændigheder, at det var ansvarspådragende, at Domstolsstyrelsen ikke søgte rammebetingelserne ændret.

Spørgsmålet er herefter, om Domstolsstyrelsen - inden for de fastsatte rammebetingelser - har handlet ansvarspådragende i forbindelse med indførelsen af det digitale tinglysningssystem.

Det er en særdeles kompliceret opgave at udvikle og gennemføre et it-system som det digitale tinglysningssystem. Selv med en omhyggelig planlægning og gennemførelse kan der vise sig problemer af teknisk, administrativ, organisatorisk eller anden art, som fører til forlængede sagsbehandlingstider. Under hensyn hertil finder Højesteret, at erstatning efter culpareglen for forlængede sagsbehandlingstider, som er en følge af overgangen til den digitale tinglysning, må forudsætte, at der er tale om en betydelig forsinkelse, og at denne forsinkelse skyldes væsentlige og klare fejl eller forsømmelser.

Rigsrevisionens vurderinger i beretningen om det digitale tinglysningsprojekt er foretaget som led i almindelig forvaltningsrevision og er ikke udtryk for en erstatningsretlig vurdering. Skønsmand Klaus Kvorning Hansens besvarelse af de stillede spørgsmål er baseret på, hvordan man ud fra et it-fagligt eller projektmetodisk synspunkt generelt set og almindeligvis ville have forholdt sig. Rigsrevisionens vurderinger og skønsmandens erklæringer kan derfor ikke tillægges afgørende betydning for den vurdering, som Højesteret skal foretage efter den nævnte relativt milde ansvarsnorm. I øvrigt angår Rigsrevisionens beretning og skønsmandens erklæringer i vidt omfang rammebetingelserne for det digitale tinglysningssystem, og dette kan som nævnt ikke begrunde erstatningsansvar for Domstolsstyrelsen.

### Væsentlige og klare fejl eller forsømmelser

Beslutningen om at sætte det digitale tinglysningssystem i drift den 8. september 2009 blev truffet, efter at der var kørt overtagelsesprøver og på baggrund af rådgivning fra konsulentfirmaet Devoteam. De fejl og mangler ved it-systemet, som skabte problemer, var rettet ved udløbet af indkøringsfasen den 31. december 2009, og andelen af tinglysningsekspeditioner, som kunne foretages automatisk, var på dette tidspunkt som forudsat.

I tiden efter idriftsættelsen af systemet steg sagsbehandlingstiden for de tinglysningsekspeditioner, som skulle foretages manuelt. Sagsbehandlingstiden var navnlig lang i perioden fra september 2009 til og med februar 2010. Da det i november/december 2009 stod klart, at sagsbehandlingstiden ikke kunne bringes ned under 10 dage ved udløbet af indkøringsfasen, blev der iværksat tiltag, som medførte, at sagsbehandlingstiden begyndte at falde væsentligt.

Som anført af landsretten må det lægges til grund, at det var konverteringen af pantebreve, som lagde beslag på op til 30 årsværk ud af 125, der var af langt størst betydning for de forlængede sagsbehandlingstider. Højesteret lægger ligesom landsretten til grund, at der forud for idriftsættelsen af det digitale tinglysningssystem var opnået en fælles forståelse mellem Domstolsstyrelsen og finanssektoren om, at der ikke skulle sendes et større antal pantebreve ind alene med henblik på digitalisering uden en nærmere aftale herom med Tinglysningsretten. På denne baggrund udgjorde bankernes og realkreditinstitutternes indsendelse af pantebreve til massekonvertering en ekstraordinær omstændighed, som Domstols-

U.2020.2851H

styrelsen ikke kunne forudse. Det må efter oplysningerne i sagen lægges til grund, at Tinglysningsretten i hvert fald reagerede på konverteringsproblemet medio november 2009, og at problemet var håndteret i begyndelsen af 2010 på den måde, at Tinglysningsretten ophørte med at massekonvertere pantebreve. Senere overtog den finansielle sektor denne opgave.

Tinglysningsretten modtog et stort antal fuldmagter efter idriftsættelsen af det digitale tinglysningssystem, fordi den digitale signatur på dette tidspunkt kun blev anvendt i begrænset omfang. Det viste sig, at der var problemer med scannere, som CSC havde leveret. Der

**2922**

var også andre problemer med fuldmagtsordningen, herunder bl.a. med forkert udfyldte fuldmagtsblanketter. Der blev taget initiativ til at løse disse problemer, bl.a. ved at fejlen i scannerne blev rettet og ved at afsætte flere medarbejdere til opgaven, og Tinglysningsretten var i løbet af anden halvdel af oktober 2009 i stand til løbende at scanne nye, modtagne fuldmagter.

Højesteret finder på den anførte baggrund, at foreningen Gruppesøgsmål.nu ikke har påvist væsentlige og klare fejl eller forsømmelser fra Domstolsstyrelsen ved idriftsættelsen af det digitale tinglysningssystem eller ved håndteringen af de problemer, der viste sig efter idriftsættelsen. Der er heller ikke i relation til de øvrige forhold, som foreningen Gruppesøgsmål.nu har påberåbt sig, påvist væsentlige og klare fejl eller forsømmelser.

Der er herefter ikke grundlag for at pålægge Domstolsstyrelsen erstatningsansvar over for de boligejere, som er tilmeldt gruppesøgsmålet.

## Konklusion og sagsomkostninger

Højesteret stadfæster landsrettens dom.

Statskassen skal i sagsomkostninger for Højesteret betale 1.000.000 kr. til Domstolsstyrelsen. Der er herved lagt vægt på sagens karakter og omfang samt det udførte arbejde.

## Thi kendes for ret

Landsrettens dom stadfæstes.

I sagsomkostninger for Højesteret skal statskassen betale 1.000.000 kr. til Domstolsstyrelsen.

De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse og forrentes efter rentelovens § 8 a.

Copyright © 2023 Karnov Group Denmark A/S