# Exhibit 34

**U.2004.104H**
**TfL.2004.9**

*Public authority not liable for guidance etc. Opening of settlement negotiations did not imply recognition of responsibility.*

*Agreements 4 - Non-contractual compensation 111.2 - Administrative law 113.9 - Agriculture etc. 31.9.*

♦ A, who had authorization for organic agricultural production, had sold green pellets to other organic farmers that had been produced from crops harvested in 1994 from areas in the second conversion sowing. In January 1995, when he applied for authorization to sell, among other things, organic feed, the Danish Plant Directorate informed him in a decision dated 13 July 1995 that he could not legally sell the green pellets as 100% organic. A brought the decision before the Ministry of Agriculture and Fisheries, claiming, among other things, that in a letter dated July 6, 1994, the Plant Directorate had stated that the pellets could be sold as organic. In a letter dated August 1, 1996, the Ministry informed Mr. A that it was prepared to settle the claim for damages, as it was the opinion of Kammeradvokaten that the Plant Directorate had incurred a liability for damages. As no agreement was reached on the amount of compensation, A filed a lawsuit claiming payment of a specified amount of compensation. The Supreme Court's judgment acquitted the Directorate. The Ministry had not stated in the letter of August 1, 1996 that it acknowledged liability for damages, but only that the Ministry was prepared to enter into a settlement, and the Directorate was therefore not precluded from contesting liability for damages during the legal proceedings. The Plant Directorate's decision of July 13, 1995 was in accordance with the current rules and practice. A special relief for direct trade in crops between two organic farms did not apply, as the green pills were processed animal feed and as A's sale concerned production based on crops grown under other farmers' authorization. The Directorate had not provided inadequate information in the letter of July 6, 1994, as it had not been proven that A had given the Directorate further information about the planned production during his telephone inquiry prior to the letter.[1]

**H.D. October 20, 2003 in case 498/2001 (1st dept.)**

*Erik Mortensen (adv. Steffen Olsen-Kludt, Copenhagen, n.d.)*
mod
*Plantedirektoratet (Km.adv. v/adv. Sune Fugleholm, Copenhagen).*

## Western High Court

*Judgment of the Western High Court, September 25, 2001 (9th district)*

(Deleuran, Helle Bertung, Dorthe Petersen (ext.)).

In this case, brought on January 26, 1998, the plaintiff, Erik Mortensen, claimed that the defendant, Plantedirektoratet, should be ordered to pay the plaintiff DKK 805,568.55 plus interest from October 19, 1997.

The defendant has claimed acquittal, alternatively acquittal against payment of not more than DKK 100,000 with procedural interest as claimed by the plaintiff and more alternatively acquittal against payment of an amount determined according to

the High Court's estimate, but less than DKK 805,568.55 with the same procedural interest.

The High Court has been informed of the circumstances of the case, including the following:

On 31 August 1993, the applicant's agricultural holding was authorized for organic agricultural production.

On 3 March 1994, the defendant sent out a so-called 'Organic Notice 3/94' to all farms authorized for organic agricultural production. The notice states, inter alia:

". . .

*Breeding rules:*

The breeding rules are stated in the Danish Plant Directorate's Executive Order no. 720 of August 19, 1992, Plantedirektoratets

**105**

amendment order no. 1120 of December 15, 1992 and the Plant Directorate's Guide to organic agricultural production. The Organic Order is currently being revised and will be issued during 1994. In this connection, the organic guidelines will also be revised.

*Feed:*

This summarizes the rules for the use of feed from conversion areas:

Feed crops grown on land in the first year of conversion can be used as 50% organic if the feed is not sold.

Fodder crops grown on land in the 2nd year of conversion can be used as organic if the feed is not traded.

When trading feed crops from areas in the first year of conversion, these are considered non-organic. When fodder crops from areas in the second year of conversion are traded, they are considered 50% organic and can be sold as conversion feed *until July 1,*

*1994.* These crops may not be included in organic compound feed for sale."

After a prior telephone conversation with the plaintiff, Niels Grønbjerg, an employee of the defendant, sent a letter to the plaintiff on July 6, 1994, stating inter alia

*"Regarding inquiry about organic feed crops.*

Forage crops grown on land during the 1st year of conversion cannot be sold as organic.

Forage crops grown on land in the 2nd year of conversion can be sold as 50% organic.

Feed crops grown on land during the 1st year of conversion can be used on your own farm as 50% organic. (This also applies to feed traded directly between two farmers without any kind of intermediary).

*Inquiry about organic compost and fertilizer.*

Section 6 of Executive Order 720 states that vegetable material from approved organic areas can be sold under the designation "Approved for organic agricultural production".

As the regulation states, the material must come from fully converted fields. However, I will ask the Organic Farming Council whether composted plant material from areas under

The 2nd year of conversion can be sold as "Approved for organic farming production".

. . .

If you not only resell compost from your own crops, but also take in plant material from other organic farms and resell it as compost or fertilizer, your company must be *authorized to process and resell organic products.* This is done at the Plant Directorate's Sector for Environment and Production Regulation. I have enclosed an application form for this and "Guidelines for companies selling organic products"."

---

**1** Henning Skovgaard: Offentlige myndigheders erstatningsansvar, p. 182-83, B. Gomard: Moderne erstatningsret p. 62-63.

In the summer of 1994, the applicant entered into agreements with several organic farmers concerning the loan of land for the 1995 harvest year. From an undated agreement

*"AGREEMENT FOR THE 1995 HARVEST YEAR*

In between owner

Organic car no. 20819

Name: Aage Pedersen

. . .

The owner lends said areas against the following conditions being fulfilled by the borrower.

1. The lender provides seed delivery free of charge.
2. Owner provides seeding free of charge.
3. The lender makes sure to harvest the first harvest in July.
4. Borrower makes sure to harvest the last crop in Oct/Nov
5. The Borrower undertakes to harvest the crops at these times regardless of how the crops are standing at these times without charge. CROP ADDR. see field plan

. . .

| The type of crop: | Sunflower | . . . |
| Outlay: | Italian/ryegrass | . . . |
| | Blue lupine | . . . |
| outlay: | White sod lupin | . . . |
| | peas | . . . |
| Type of crop: | Italian/ryegrass | . . . |
| outlay: | Blue lupin | . . . |
| Outlay: | Oats | . . . |
| outlay: | Italian/ryegrass | . . . |

Type of crop:

outlay:

The above agreement is made verbally between the parties between August/Sep-tember 1994.

All areas are converted/under conversion to organic.

. . "

On September 28, 1994, the National Office for Plant Breeding issued a Plant Breeding Orientation, which among other things states:

*"Current rules on the organic status of crops as feed* The following interpretation of the rules on feed crops is confirmed by the Danish Plant Directorate, Thursday September 22, 1994 and is valid from this day.

Persons who have received other information in writing or verbally from the Danish Plant Directorate before this day *and* have already acted on this, will be checked according to the information they received at that time.

. . .

*B. When selling unprocessed feed to another farmer (private sale), the crop is calculated as follows:*
- 1st year of conversion 0% organic

**106**
- 2nd year of conversion 50% organic
- 3rd year 100% organic

between the Plaintiff and Aage Pedersen, Herning, among other things:

and borrows

Turkey farmer

Name:      Erik Mortensen

In November 1994, the plaintiff entered into an agreement with Torrecentralen Vestjylland that organic grass harvested from Aage Pedersen's fields, among others, would be returned as organic pellets. The pellets were to be delivered directly to various buyers.

After Order No 892 of October 27, 1994 on organic agricultural production had replaced the previous Order No 720 of August 19, 1992 on November 5, 1994, the defendant issued an internal notice to the district offices on December 30, 1994. It stated, inter alia, that:

". . .

On the livestock side, there have been no major changes. However, the rules regarding *trade in feed grown on conversion land have* changed,

as trade directly between two organic farms is equated with trade through an intermediary. This means that if a *trade is made on November 5 or later* for feed grown on conversion land, the following applies, regardless of who is the seller or buyer:

Unprocessed feed grown on 1st year conversion land must be counted as 0% organic.

Unprocessed feed grown on 2nd year conversion land can be counted as 50% organic (this is provisionally valid until July 1, 1995). If there has been direct trade between two organic farms *before*

*5. November 1994*, the following applies:

Unprocessed feed grown on 1st year conversion land can be counted as 50% organic.

Unprocessed feed grown on 2nd year conversion land can be considered 100% organic.

It is a requirement to be able to sell the 2nd conversion year's crop as 50% organic that the unprocessed crop is *not* included in a feed mixture when sold. Nor may the crop be used after the sale - at the buyer's
- be included in a compound feed for resale.

This means that 2nd year unprocessed grain can be sold and included as 50% organic in the feed plan on a "neighboring" property.

. . ."

Copyright © 2023 Karnov Group Denmark A/S

. . ."

On 18 January 1995, the applicant applied for authorization to carry on the business of selling organic fertilizers, feedingstuffs and seeds for sowing. The defendant's reply of April 18, 1995 states, inter alia

". . .

2) regarding application for authorization to sell feed

Regarding the production of organic feed, you have stated that sales are made either from your warehouse or directly from companies that dry the product in question.

For further processing of your application for authorization, you are requested to send a supplementary description of your company and the authorization numbers of the farms and companies you have entered into contracts with. Please note that resale of feed as organic requires documentation of the organic origin of the products, e.g. in the form of authorization number and breeding report. The products must originate from areas that have been fully converted.

. . ."

In the applicant's reply of May 6, 1995, it states, inter alia:

". . .

"Item 5.

Regarding the sale of feed from the 1994 harvest year.

First reference to letter of July 6, 1994 from the Danish Plant Directorate.

This letter makes it clear that, as a farmer, I am allowed to sell 2nd year conversion feed as organic when I deal directly with another farmer. After this reply, I make an agreement with Åge Pedersen, Hammerum Hovedgade 151, Hammerum, whereby I borrow his land on condition that I meet the following conditions.

Point 1. The fields must be revealed so they are ready for good spring plowing.

Point 2. I deliver seed according to the field plan that Åge Pedersen and I agree on. The field plan is then prepared by consultant Bjarne Hansen, Års.

Point 3. I must make sure that the crops are harvested regardless of what yields there may be at that time.

In my opinion, the crops should be used for protein feed.

1. The first cut is taken in July and the last cut in Oct/Nov. so the fields are ready for spring 1996. It is also intended that the crops will be harvested by Tørrecentral Vestjylland.

When these conditions are fulfilled to Åge Pedersen, the crops are mine free of charge.

. . ."

The defendant's letter of June 26, 1995 to the plaintiff states inter alia:

" . . .

*2. Regarding authorization to sell organic feed*

You have . . requested authorization to sell organic feed (organic green pellets).

. . .

They refer . . . to the Plant Directorate's letter of July 6, 1994, on the basis of which you have entered into an agreement with Åge Pedersen in Ham- merum, and from which the plant material for the green pellets sold originates. The letter states that feed crops from 2nd year conversion areas can be sold as organic by direct trade between two farmers. The answer in the letter presupposes, according to the Danish Plant Directorate's view, that the fodder crops are unprocessed, as it is not permitted to sell processed conversion fodder as 100% organic under either the then or the new organic regulations.

**107**

It must therefore be clarified that a condition for the sale of processed organic feed (green pellets) is that the feed originates from fully converted land. Violation of this may result in a fine. Unprocessed conversion feed from areas under the 2nd year of conversion can only be sold as 50% organic, regardless of who the buyer and seller are. Unprocessed conversion feed from 1st year areas cannot be sold as organic.

However, it appears from your contract with Tørrecentralen Ve-stjylland that the organic grass you have resold as organic also originates from 1st year conversion fields. A copy of Åge Pedersen's breeding control report is enclosed, which shows that the fields at the addresses Røjenvej 22, Sunds, field no. 35.1 to 35.8, and Firehuse 8 field no. 33.1 to 33.3, are areas under the first year of conversion in 1994. You are therefore asked to comment on the above and to state whether the plant material from the 1st year conversion fields was kept separate in the production and sales process and which of the buyers mentioned above purchased the green pellets.

. . .

It should be noted that the continued sale of feed requires that the plant material originates from fully converted organic areas.

. . ."

Subsequently, on July 1, 1995, the plaintiff wrote the following to the defendant, among others :

" . . .

Regarding the sale of feed:

In the letter, the Plant Directorate suggests that they did not think it was about green pellets as I received written confirmation last year that I could sell 2nd year conversion feed directly to another farmer. To me it sounds more than strange as that was the starting point for me to get a written answer.

. . .

Regarding the agreements I have

with . . Aage Pedersen

. . .

I have spoken to Hanne Bertelsen by phone and suggested the following to find a solution to the misunderstandings.

These are 2-year conversion areas at the above-mentioned. If I can find some farmers who want to take over a certain area and the farmer himself takes care of harvesting either as silage or the farmer himself goes to Tørrecentralen and has green pellets made at his own expense for use in his own herd, and uses the crop as fully organic in the same way as all other 2-year crops that are used as organic when they are grown on their own land.

I very much hope that this can be done, as I already pre-sold green pellets from these areas last fall. Along with the publication of the new regulations of Nov. 94, attention was also drawn to the fact that agreements made previously will be taken into account.

So if the parties agree to find a solution, there is a possibility to do so without compromising the control system." The defendant's decision in the case was notified to the applicant by letter o f July 13, 1995. It states, inter alia, as follows:

". . .

They refer to the Plant Directorate's letter of July

6, 1994 . . .

In your letter of May 6, 1995, you further state that on the basis of the same letter you have concluded agreements for the purchase of plant material from 2nd year conversion fields for harvest 1995 belonging to the following growers:

Age Pedersen, reg no. 20819,

. . .

The above agreements mean that you supply the seed, take care of harvesting and get the right to the crop, while the grower sows and tends the crop until harvest. The areas in question belong to the farms and authorization numbers of the growers in question.

On July 10, 1995, they submitted a list of the parcels covered by the agreements.

. . .

The Danish Plant Directorate's letter of July 6, 1994 must be understood in the light of section 7 of the current Executive Order no. 720 of August 19, 1992 on organic agricultural production, which was administered in such a way that the crops mentioned there from the 2nd year conversion areas in unprocessed condition could be used as 100% organic feed on own property and could also be sold as 100% organic feed in direct trade between two farmers, i.e. without a middleman.

This administrative practice was changed when the new Executive Order no. 892 of October 27, 1994 came into force, so that feed crops grown on land in the second year of conversion may only be used as 100% organic when feeding their own herd and may only be transferred as conversion feed, i.e. as 50% organic. It was not permitted to sell *processed* feed as conversion feed or as 100% organic if the feed originates from land that is being converted, according to the then Executive Order no. 720 of August 19, 1992 on organic agricultural production, nor is it permitted under the new Executive Order no. 892 of October 27, 1994.

. . .

The Directorate therefore rejects your claim that you should have been authorized to sell the above processed plant material as 100% organic.

**108**

. . .

It should also be noted that the Directorate considers you to be an intermediary when you enter into special agreements with a grower for the right to the crop, which you then have dried and

resell to a third party. This applies regardless of whether you pay for the seed. The decisive factor is,

that the area is not part of your business and therefore not under your authorization.

. . .

Nor can the Directorate give you permission for other growers to take over your obligations regarding the use of the plant material as 100 percent organic, since, as mentioned, this is only permitted for crops of your own breeding.

. . .

The decision of the Directorate may be appealed to the Department of Agriculture and Fisheries, . . .

. . ."

On November 27, 1995, the defendant reportedly brought that decision before the then Ministry of Agriculture and Fisheries. At a meeting in the Ministry's department on January 31, 1996, in which Hanne L. Berthelsen and Torben Milters participated on behalf of the defendant, the plaintiff was assisted by agronomist Hanne Frost, Agricultural Advisory Center, who subsequently prepared a note on the course of the case. The memo states, among other things:

". . .

It is as if the Danish Plant Directorate has completely forgotten their own statement in the fall of 1994 that agreements concerning the 1995 growing season made according to 1994 rules in 1994 could be implemented in the 95 growing season. There are of course financial transactions associated with the conclusion of such agreements. A change in winter at the beginning of a growing season is not always possible.

During the hearing at the Ministry of Agriculture's office on Wednesday, January 31, 1996, Anita Kjeldsen said "yes" to agreements made BEFORE the new regulation came into force being implemented on the basis of what was in force at the time.

It is very late that the Danish Plant Directorate clarifies to Erik Mortensen that he must comply with the 1995 rules rather than what was applicable at the time of the agreement.

If Niels Grønbjerg had withdrawn his letter of July 6, 1994 at some point before sowing, Erik Mortensen could have tried to release himself from his farmer agreements, although it would have had direct costs for him.

. . .

During the hearing, Torben Milters asked whether in 1994 it was allowed to trade the 2nd year crop as 100% organic between two farmers. Anita Kjeldsen replied that no action was taken against it, but it was not official.

Torben Milters noted that in the letter of July 6, 1994, it had just been announced in writing.

If Niels Grønbjerg wanted to secure himself against rule changes when he wrote his letter on July 6, 1994, he could have made reservations for rule changes in the letter/permit. That rule changes would cancel the license.

. . ."

The letter of August 1, 1996 from the Department of Agriculture and Fisheries to the applicant states:

"In connection with your complaint of November 27, 1995, the Department of Agriculture and Fisheries has now received an assessment of the case concerning the turnover of crops harvested on land during the second year of conversion to organic farming in 1995.

It is the opinion of the Attorney General that the Danish Plant Directorate has incurred liability. However, due to your carelessness, it is the opinion of the Attorney General's Office that your claim for damages must be reduced due to your own fault.

The Ministry of Agriculture and Fisheries is therefore prepared to settle any losses you may have suffered as a result of this.

In order to process the case, you are requested to submit a documented statement of your losses as a result of the prohibition

against the sale of the 1995 harvest of crops harvested on land under 2nd year conversion to organic farming."

The parties did not reach agreement on a conciliatory solution. During the case, an expert opinion was held by Pia Strunge Folkmann, researcher at the Danish Institute of Agricultural and Fisheries Economics. The expert's report of March 23, 1999 and later additions show, among other things, that in the 1995 harvest year the plaintiff had cultivated 7 hectares of oats with ryegrass and 139.4 hectares of sunflowers with blue bit terlupin and ryegrass. The oats were estimated to give a yield of 21,000 kg, which with 100% organic status could bring in DKK 1.80 per kg, or a total of DKK 37,800. The cover crop would yield 3,500 feed units (FE) at DKK 1.20, or a total of DKK 4,200. The sunflower is estimated to give a yield of 380,115 FU, which sold on the root with 100% organic status could bring in DKK 1.20 per FU, or a total of DKK 460,598. The harvesting costs would be DKK 0.57 per FU, or a total of DKK 216,665. The cover crop would give a yield of 70,400 FE at DKK 1.20, or a total of DKK 84,480. It would not be possible to sell the crop as 50% organic for a higher price than conventional products. Oats and cover crops could then be sold for a total of DKK 20,650 and sunflower and cover crops for DKK 199,500. Harvest costs would be unchanged. It is not considered to affect the price whether the crops for roughage are sold as silage or green pellets, but it would be important for the possibility of selling the crops as silage that the buyers

**109**

had been found before harvesting. If the catch crop had not been harvested or plowed down, the claimant could have saved DKK 500 per hectare, or a total of DKK 60,700. If the cover crop had to be harvested in order for the claimant to fulfill the loan agreement, but not plowed down, the savings would be DKK 50 per hectare, or a total of DKK 6,070.

The plaintiff's claim is calculated on the basis of the expert's information as the difference between the sales price of the crops as organic and the sales price as conventional crops.

Among other things, *the plaintiff* has explained that he has previously raised turkeys and ducks, and at the same time sold fertilizer from them. After his property was converted to organic production in 1993, he has produced organic fertilizers, growing media and sowing and pricking soil. He has worked hard to become certified and fulfill all the requirements for organic producers. He had problems getting farmers to grow the new products he needed for his production, and so the idea of entering into land loan agreements was born. The first ones were concluded in August 1994, after he had received the letter of July 6, 1994 from the defendant. The loan agreements were that he would supply the seed and be responsible for the fields and the yield. The farmer received EU subsidies and organic subsidies, and reporting should therefore be done under his authorization number. He called the claimant to confirm his understanding of the possibilities of selling green pellets, silage and fertilizer from conversion fields. He felt that he knew the rules as well as the defendant, but he wanted to confirm his understanding of the rules. The green pellets were important because they are used both as feed and fertilizer. He talked about the loan agreements he was thinking of entering into. He doesn't remember if the word "middleman" was mentioned. He has not subsequently spoken to Niels Grønbjerg. He now has authorization for organic farming and to sell organic fertilizers and growing media. He has also sold silage and green pellets since 1995. During inspections, no one has ever asked or questioned whether he was allowed to sell feed, despite the fact

that the defendant's employees have been aware of the situation. When he received the decision from the defendant on July 13, 1995, harvest was approaching. Because of the uncertainty as to whether green pellets could be sold as organic, he chose - to save costs - to make silage from the crop. He does not recall whether he tried to

find buyers through advertising or other channels. He estimates that he has had seed costs of around DKK 1,000 per hectare, or a total of DKK 146,000. It was Aage Pedersen who did the work with sowing, seedbed and rolling. He wanted Hanne Frost to be present at the meeting in January 1996 with the department, and he had asked her to take minutes.

*Surveyor Pia Strunge Folkmann* has also explained that several factors influence the possibilities of selling the sunflower crop as silage on the conventional market. It is an unusual crop with an unknown feed value, and due to transportation costs, a buyer must be found within a radius of 10 km from the cultivation site. In addition, agreements for the sale of root crops are usually concluded long before harvest. In her opinion, it was not necessary for agricultural reasons to harvest or plow down the cover crop. If the main crop had not been harvested, plowing would have been necessary. She would consider a seed cost of DKK 1,000 per hectare to be realistic.

*Niels Grønbjerg* has, among other things, explained that he was employed by the defendant from June 17, 1994 to January 28, 1995. He worked as a scientific assistant and caseworker, among other things with authorization of organic farmers and had to answer inquiries about this. He is a trained agronomist and had previously worked as a plant breeding consultant in a local farmers' association. Prior to the letter of

6. In July 1994, a telephone call had been made to the plaintiff, in which the plaintiff had called to ask what he could do in relation to crops grown on conversion areas. The inquiry was mainly about whether the crops could be used for organic fertilizer/compost. They also talked about the possibility of selling the crop as feed with organic status. He told the applicant that if you used the crop as feed on your own farm, it could be used as 100% organic. If it went on the market, it only had 50% organic status. Only if the crop was sold directly to another organic farmer without an intermediary could the 100% organic status be maintained. These rules applied to unprocessed crops. During the interview, he got the impression from the plaintiff that he was a cautious and modest small farmer who knew about organic rules to a certain extent. The claimant seemed unaware of the possibility of direct sales without losing organic status and he returned to this several times during the conversation. At no point did the applicant mention that he had plans to borrow land from others, and at no point was it mentioned that the applicant wanted to produce green pellets or otherwise process the crop. The issue of selling processed crops was not at all relevant, as it was his opinion that the claimant had a small farm, as previously mentioned. At the end of the conversation, the plaintiff returned to the issue of direct sales between two organic farmers and asked whether this also applied to leased land, which the witness certainly answered in the affirmative. After the conversation, he chose to write to

**110**

the applicant. This was mostly because of the issue of the sale of fertilizers, which required an approval and a registration, and that is why he enclosed a guide. It could and perhaps should have been clarified in the letter that the possibility of direct sale only concerned unprocessed fodder crops. It was an ad- ministrative derogation. The word "fodder crops" appeared in a guide he was copying from. He was aware that a new organic regulation was in the pipeline, but he did not know whether it would affect the issues he discussed with the claimant. He remembers having a telephone conversation with Hanne Frost, during which it was brought to their attention that the administrative exemption rule regarding direct trade between two organic farms would be changed.

men was possibly in breach of some EU rules and the practice was therefore changed. He did not take any action towards the applicant in this regard as he was not aware that there was a problem.

*Hanne Legart Berthelsen* has, among other things, explained that she is a trained lawyer and employed by the Danish Veterinary and Food Administration. From March 1995 to the end of 1996 she was employed by the defendant and worked with legal and administrative tasks in a section dealing with organic farms. She first became acquainted with the applicant in April 1995, after employees from the district office in Viborg had visited him on the occasion of his having submitted an application for approval to produce organic fertilizer, feed and seed. His accounting material was not in order. It took several visits before he could be approved. They found that he was advertising and selling green pellets without a license. He was licensed to sell fertilizer, but not seed or feed. In her opinion, he realized that he had a problem regarding the sale of green pellets. They spoke several times on the phone and there was some correspondence. It was his understanding that in the letter of July 6, 1994 from Niels Grønbjerg he had received permission to sell organic green pellets from 2nd year conversion fields. She expressed surprise that he could perceive the letter as an authorization. She has not encouraged him to come up with solutions. He was very keen to obtain permission to sell organic green pellets, and she investigated whether it was within the framework of current law to make an agreement such as the one he proposed in his letter of July 1, 1995. However, this was not possible. Consumer confidence in organic products is the reason why the area is closely regulated. In order to ensure and maintain this confidence, it is necessary to be able to carry out effective control. This is probably why it was necessary to repeal the previous administrative practice so that processed products from conversion areas could not be sold while maintaining organic status under the narrow exception rule of direct sales between two organic farmers. *Hanne Frost* has, among other things, explained that she is a trained agronomist and was employed in an organic section under Landbrugets Råd- givnings Center from February 15, 1994 to September 8, 1996. She was contacted by the applicant and asked to attend the meeting at the Ministry of Agriculture and Fisheries on January 31, 1996. She knew of the applicant as she had been a regional consultant in Himmerland in 1989 and had visited his property in that connection. She made her report within 14 days of the meeting and it was sent to the defendant, the applicant and Permanent Secretary Milters. The report is based on what happened at the meeting and what she learned from telephone conversations with the plaintiff. The second paragraph of the report also contains her personal opinion. It is she who prepared the plant breeding orientation of September 28, 1994 on the basis of information from an advisory committee under the defendant. She herself had participated in the committee meeting at which the information was provided. It was necessary, for the sake of farmers' planning, for the agreements concluded under the old rules to be checked in accordance with those rules. In 1995, contract drying meant that a farmer delivered a crop to a drying center, which steamed out the water and returned the plant material to the farmer in the form of green pellets. The common understanding of the term 'feed crops' is that it refers to all crops that are harvested and used for animal feed. The term is most often used to refer to the crop in the field, but does not indicate whether it is a processed or unprocessed crop. The term "animal feed" is mostly used in connection with concentrated feed or other feed from a feed store. In her opinion, silage should be considered "unprocessed" even if it consists of

Copyright © 2023 Karnov Group Denmark A/S

several different plants, as long as it comes from the same field.

In support of its claims, *the plaintiff* first of all submits that the defendant's liability for damages is unreservedly recognized in the letter of 1 August 1996 from the then Ministry of Agriculture and Fisheries, which knew all the circumstances of the case and must have dealt with adequacy and causality. Despite settlement negotiations, the defendant did not dispute that it was liable for damages until the exchange of pleadings in the case. In the second row, the plaintiff has claimed that the defendant has acted in a tortious manner towards the defendant. The liability for damages is based on the fact that the defendant's decision of July 13, 1995 is incorrect, as the plaintiff was covered by the transitional scheme announced in the plant breeding orientation of September 28, 1994 and the defendant's notification of December 30, 1994 to

**111**

the district offices. What was changed was an administrative practice, as neither Order No 720 of August 19, 1992 nor Order No 892 of October 27, 1994 regulates trade between farmers. Only in exceptional circumstances can a public authority change a practice to the detriment of citizens. This can only happen if the previous practice has been wrong/illegal, and even then it cannot be changed retroactively. The transitional arrangement, as described in the plant breeding orientation and in Hanne Frost's explanation, was necessary because many farmers had acted in reliance on previous practice. The applicant was thus to be controlled according to what was stated in the defendant's letter of July 6, 1994. There is nothing to indicate that the previous practice was contrary to the legislation, including Council Regulation No. 2092/91, which does not mention direct trade between two farmers. Prior to November 5, 1995, which is considered by the defendant to be the date of the change in practice, the plaintiff had entered into a binding loan agreement with Aage Pedersen and had thus made arrangements for the 1995 harvest season. It is further submitted that the plaintiff is not an intermediary in the legal sense, as he has owned the crop throughout the cultivation period and has had the economic risk. In the defendant's letter of July 6, 1994, no distinction is made between processed and unprocessed crops, and there is no basis for interpreting the term 'fodder crop' as referring exclusively to unprocessed crops. No separate authorization is required for the sale of unmixed feed directly between two organic farmers, and it appears from Hanne Frost's explanation that crops harvested on the same field are considered unmixed, even if they are different crops. The defendant was aware that the plaintiff intended to sell the crops as green pellets/silage. He had indicated this in the telephone conversation with Niels Grønbjerg. If the defendant had not made the wrong decision of July 13, 1995, the plaintiff could therefore legally have sold the crops in question as organic. The plaintiff's loss is thus an adequate consequence of the defendant's error. The defendant must therefore compensate the applicant's loss, including the loss of profit. It is submitted that, on the basis of the expert opinion, the loss can be calculated in accordance with the plaintiff's main claim. The plaintiff could not limit his loss by not harvesting the crops, as he was obliged to do so under the agreement with Aage Pedersen. The plaintiff has not been able to sell the crops on the conventional market and the defendant has not proved that the plaintiff has breached its duty to mitigate its loss.

In support of its main claim, *the defendant submits* that the letter of August 1, 1996 from the - at that time - Ministry of Agriculture and Fisheries does not indicate that the defendant acknowledges having acted in a tortuous manner towards the plaintiff. The plaintiff had raised a claim for damages and

inquired about the possibilities of a settlement, which for procedural economic reasons could be sensible. The letter must be seen as part of these settlement negotiations and, although it is not explicitly mentioned, it is  without

UfR ONLINE

U.2004.104H - TfL2004.9H

prejudice to a subsequent lawsuit. Nor is the defendant liable on any other basis for the plaintiff's alleged loss as a result of his having arranged to sell his crop in 1995 as 100% organic feed. Under no circumstances could the sale have been carried out legally, neither under the 1992 Order nor the 1994 Order.

The applicant did not have a license to sell animal feed, of which he was aware, and he knew that such an activity required a special license. The applicant applied for such authorization in January 1995, but did not meet the conditions. If the authorization had been applied for before he entered into the loan agreements, the plaintiff would have realized that the project could not legally be carried out and he could have saved the costs. The defendant is thus not liable for damages on the basis of the rejection of 13 July 1995 of the application for authorization to sell organic feed. The defendant's letter of July 6, 1994 cannot form the basis for liability for damages either. By its content, the letter is not an authorization, but a very general guidance on rules and practice.

The rules for the sale of organic products are strictly regulated to ensure control and confidence in organic products. The special relaxed rules on the use of crops from conversion areas for on-farm feed were introduced to meet a need for organic feed without impairing control possibilities. When the term "fodder crop" is used in the letter of July 6, 1994, this should be understood as unprocessed feed. The letter explains the rules for the use of crops from fields under

2. year of conversion to feed on own farm and for the administrative derogation that further relaxes the requirements for sales between two organic farmers without an intermediary. The applicant's intended business has never been covered by the latter relaxation, as it is neither unprocessed feed nor direct sales. Feed crop is in common parlance unprocessed feed, which is in accordance with Hanne Frost's understanding of the word. Based on the telephone conversation that preceded the letter, it cannot be considered a liability-inducing error that it was not made clear that this relaxation only applies to unprocessed feed. Based on the information provided by the applicant to Niels Grønbjerg during the conversation, there was no reason for such clarification. The applicant did not indicate that he had plans to sell

**112**

green pellets. On the basis of the conversation, there was no reason for further clarification of the concept of direct sale. If the applicant's intended construction could be implemented, the defendant's ability to exercise effective control of compliance with the organic rules would be significantly impaired, which the applicant had to realize. Against this background, and as the plaintiff had an unusual construction in mind, he should have ensured that Niels Grønbjerg was aware of all relevant facts, so that Grønbjerg had the opportunity to respond adequately. Since the plaintiff could not have lawfully carried out his intended sale on the basis of the lenient practice, he cannot rely on the transitional rule referred to in Planteavlsorienteringen of September 28, 1994. This refers to transactions concluded before September 22, 1994, and the defendant did not conclude any transactions before that date, but only loan agreements concerning land. The communication of December 30, 1994 from the defendant to the district offices does not support the applicant's view either, since it refers to transactions concluded before

November 5, 1994, and therefore does not relate to the 1995 harvest, which is the subject of this action. It is disputed that the applicant suffered a loss corresponding to the claim made. It is disputed that it was necessary to incur the costs of harvesting the catch crops and there is no evidence that the applicant incurred the costs of sowing seeds with

Copyright © 2023 Karnov Group Denmark A/S

DKK 1,000 per hectare. Furthermore, the defendant has not documented that he has fulfilled his obligation to mitigate losses.

## The High Court's reasoning and result:

In the *letter of August 1, 1996* from the - then - Ministry of Agriculture and Fisheries to the applicant, it was stated that it "it is the Chamber's assessment that the Danish Plant Directorate has incurred liability for damages", but that the claimant's claim for damages had to be reduced due to his own fault. It was further stated that the Ministry was prepared to enter into a settlement for compensation for the losses the plaintiff "may have suffered as a result".

The High Court finds - as stated by the plaintiff - that a letter of the aforementioned content from the central management of a ministry as a starting point contains a strong presumption that the plaintiff can assert a claim for damages against the defendant. In this connection, it must also be taken into account that the ministry at the time in question must be assumed to have been in possession of all information relevant to the assessment of liability.

On the other hand, it must also be taken into account that at the time in question, the parties were still negotiating a settlement of the plaintiff's claim, and the letter must be seen as an element in these negotiations. Furthermore, according to the content of the letter, it is completely unclear what the size of a claim for damages would be, and the wording does not exclude that it could turn out that the claim, after a more detailed assessment of the loss calculation and taking into account own fault considerations, had to be set at DKK 0.

Against this background, the High Court finds it questionable to consider the defendant precluded from challenging the liability for damages in this lawsuit based on views based on fundamental principles of tort law, including the principle that only suffered losses are compensated.

It appears from the case that the defendant's admission of liability is based on the view that the letter of July 6, 1994 provided incomplete guidance on the issue of processed animal feed and on when there was a direct sale between two farmers. The content of that letter must be seen in the light of the prior telephone conversation between the applicant and Niels Grønbjerg. According to the evidence, in particular Niels Grønbjerg's testimony, it cannot be considered established that the plaintiff during this conversation explained the contract or the scope of the intended loan arrangement in detail, nor that he made it clear that it was a matter of processed feed in the form of pellets.

It can be assumed in the decision that green pellets are a *processed* feed. The administrative practice developed on the basis of section 7 of the 1992 Order, according to which feed from 2nd year conversion areas could be used as 100% organic, only included unprocessed feed. This practice was abolished at the same time as the entry into force of the 1994 Order on the assumption that it was incompatible with Council Regulation No. 2092/91 on organic production of agricultural products etc. Against this background, it must be considered beyond doubt that the applicant's planned sale of green pellets delivered from Tørrecentralen Vestjylland to various customers would be contrary to both the two regulations and the administrative practice mentioned, and the lack of a reservation in the letter of July 6, 1994 with regard to "processed" feed cannot lead to any change in this legal position. Furthermore, the evidence shows that the applicant intended to sell the feedingstuffs as green pellets. The plaintiff could have reversed this decision and instead chosen to ensile the crops and sell them as unprocessed feed. However, it appears from both the expert's statements and the plaintiff's own explanation that the possibilities for

marketing in this way was very limited, mainly due to high transportation costs and the special nature of the crops.

### 113

Regarding the issue of *direct sales*, it is noted:

As stated by the defendant, it must be assumed to be of decisive importance for the promotion of organic food production that the purchasers, ultimately the consumers, have confidence that the products have been produced in strict compliance with the rules laid down for that purpose. It seems obvious that this requires quite intensive control measures. It must be assumed that the complex of agreements on which the applicant's production and sales were based meant that the landowners - in this case Aage Pedersen - sowed the fields and that the cultivation took place under their organic authorization number. The production subsidy therefore also went to the owners. On the other hand, the harvest was to be carried out by the applicant, who then delivered the crops to the drying center, from where they were delivered to various customers in accordance with the contracts presented. This arrangement, which must be assumed to have been of an unusual nature and to have significantly impaired the authorities' control possibilities, was - as mentioned - not mentioned in detail in the conversation with Niels Grønbjerg, and the authorities were hardly aware of it in any other way. The High Court finds that the event clearly falls outside the exception rule based on an administrative practice regarding direct sales between two (organic) farmers. Based on the unusual nature of the arrangement and the plaintiff's inadequate information to the authorities, it is considered most obvious that it was incumbent on the plaintiff to secure their approval that it was within the said administrative exemption practice. The applicant's sale of the said crops grown on Aage Pedersen's fields was therefore contrary to both the 1992 Order and the 1994 Order, and the fact that the letter of July 6, 1994 does not describe in detail when a farmer can be considered a trader cannot lead to any change in this legal position. Regarding the plaintiff's possibilities to sell the crops as conventional, reference is made to what is stated above under the section on processed animal feed.

In the light of the above, the plaintiff - regardless of the nature of the instructions he received in the letter of July 6, 1994 - could not sell the crops as organic. As it is the predominant principle in Danish law that any expectation value does not give rise to damages, and as there is no sufficient reason to deviate from this principle in the present case, there is no basis for upholding the plaintiff's claim for damages - even if a financial loss was suffered. The High Court therefore upholds the defendant's claim for acquittal.

Based on the background and course of the case, the High Court finds that each party must pay its own costs, however, all costs for the expert witness must be paid by the defendant.

- - -

The defendant must pay DKK 53,000 in partial legal costs to the plaintiff.

The ordered legal costs must be paid within 14 days.

## Supreme Court

### Supreme Court ruling.

In a previous instance, judgment was handed down by the 9th division of the Western High Court on September 25, 2001.

Five judges participated in the adjudication: Torben Melchior, Asbjørn Jensen, Poul Søgaard, Niels Grubbe and Marianne Højgaard Pedersen.

Copyright © 2023 Karnov Group Denmark A/S

The appellant, Erik Mortensen, has repeated his claim.

The defendant, Plantedirektoratet, has claimed that the judgment should be upheld and has repeated its claims in the alternative.

Erik Mortensen's claim is calculated as the amount he would have been able to achieve by selling as a 100% organic crop without deducting the price of any sale as a conventional crop.

Erik Mortensen has clarified that the Danish Plant Directorate has also incurred liability for damages as a result of incorrect advice in the letter of July 6, 1994, if the letter is not in accordance with rules and practice in the area.

Additional information has been provided for the Supreme Court. In the letter of July 6, 1994 from Niels Grønbjerg, Plant Directorate, to Erik Mortensen, in the section on fodder crops, further information is stated:

"Feed crops grown on land under the 2nd year of conversion can be used on own farm as 100% organic. (This also applies to feed traded directly between two farmers without any kind of intermediary)."

**The Supreme Court's comments**

In its letter of August 1, 1996, the Ministry of Agriculture and Fisheries did not state that the Ministry acknowledged liability, but only that the Ministry was prepared to enter into a settlement for compensation with a reduction due to contributory negligence.  This statement can be
- despite the reference to the Attorney General's assessment of the basis of liability - cannot be regarded as an acknowledgement that the Plant Directorate had incurred liability for damages, and therefore does not prevent the Directorate from contesting this in court proceedings.

According to the rules and administrative practice that applied to transactions concluded before November 5, 1994, Erik Mortensen was not entitled to sell the green pellets as organic. The green pellets, which were to be produced from crops grown on land in the second year of conversion, had to

**114**

considered to be processed animal feed. Furthermore, there was no direct trade between two organic farms, as Erik Mortensen's sale concerned production based on crops grown under other farmers' authorization. Accordingly, and since the Plant Directorate's letter of July 6, 1994 does not contain an authorization for Erik Mortensen to sell the green pellets as organic, the Directorate's decision of July 13, 1995 was rightly made.

It has not been proven that Erik Mortensen during the telephone conversation with Niels Grønbjerg prior to the letter of 6 July 1994 stated that the crop was to be grown under other farmers' authorization and processed into green pellets before sale.

Under these circumstances, the Danish Plant Directorate has not incurred liability by informing in the letter of July 6, 1994 about applicable rules and practice without stating that the intended adjustment of production and sales could not be considered as trade directly between two organic farms and that "fodder crops" did not include processed feed, such as green pellets.

The Supreme Court then upholds the judgment.

**For it is known to be right:**

*The judgment of the High Court is upheld.*

*The Danish Treasury must pay DKK 50,000 in legal costs before the Supreme Court to the Danish Plant Directorate.*

*The ordered costs must be paid within 14 days of the date of this Supreme Court judgment.*

Copyright © 2023 Karnov Group Denmark A/S

**U.2004.104H**
**TfL2004.9**

*Offentlig myndighed ikke erstatningsansvarlig for vejledning m.m. Åbning af forligsforhandlinger indebar ikke anerkendelse af ansvar.*

*Aftaler 4 - Erstatning uden for kontraktforhold 111.2 - Forvaltningsret 113.9 - Landbrug m.v. 31.9.*

♦ A, der havde autorisation til økologisk jordbrugsproduktion, havde til andre økologiske landmænd solgt grønpiller, der var produceret af afgrøder høstet i 1994 fra arealer i 2. omlægningsår. I forbindelse med at han i januar 1995 søgte om autorisation til salg af bl.a. økologisk foder, meddelte Plantedirektoratet ham ved en afgørelse af 13. juli 1995, at han ikke lovligt kunne sælge grønpillerne som 100 % økologiske. A indbragte afgørelsen for Landbrugs- og Fiskeriministeriet, idet han bl.a. gjorde gældende, at Plantedirektoratet i et brev af 6. juli 1994 havde oplyst, at pillerne kunne sælges som økologiske. I et brev af 1. august 1996 meddelte ministeriet A, at det var indstillet på at indgå et forlig om erstatning, idet det var under Kammeradvokatens vurdering, at Plantedirektoratet havde pådraget sig et erstatningsansvar. Da der ikke blev opnået enighed om erstatningens størrelse, anlagde A sag med påstand om betaling af en nærmere opgjort erstatning. Ved Højesterets dom blev direktoratet frifundet. Ministeriet havde ikke anført i brevet af 1. august 1996, at det anerkendte at være erstatningsansvarligt, men alene at ministeriet var indstillet på at indgå et forlig, og direktoratet var derfor ikke afskåret fra at bestride erstatningsansvaret under retssagen. Plantedirektoratets afgørelse af 13. juli 1995 var i overensstemmelse med de gældende regler og praksis. En særlig lempelse for direkte handel med afgrøder mellem to økologiske bedrifter fandt ikke anvendelse, da grønpillerne var forarbejdede foderstoffer, og da A's salg angik produktion på grundlag af afgrøde dyrket under andre landmænds autorisation. Direktoratet havde ikke givet ufyldestgørende oplysninger i brevet af 6. juli 1994, idet det ikke var godtgjort, at A under sin telefoniske forespørgsel forud for brevet havde givet direktoratet nærmere oplysninger om den planlagte produktion.[1]

**H.D. 20. oktober 2003 i sag 498/2001 (1. afd.)**

*Erik Mortensen (adv. Steffen Olsen-Kludt, Kbh., e.o.)*
mod
*Plantedirektoratet (Km.adv. v/adv. Sune Fugleholm, Kbh.).*

## Vestre Landsret

### Vestre Landsrets dom 25. september 2001 (9. afd.)

(Deleuran, Helle Bertung, Dorthe Petersen (kst.)).

Under denne sag, der er anlagt den 26. januar 1998, har sagsøgeren, Erik Mortensen, påstået sagsøgte, Plantedirektoratet, dømt til at betale sagsøgeren 805.568,55 kr. med tillæg af procesrente fra den 19. oktober 1997.

Sagsøgte har påstået frifindelse, subsidiært frifindelse mod betaling af ikke over 100.000 kr. med procesrente som påstået af sagsøgeren og mere subsidiært frifindelse mod betaling af et beløb fastsat efter

landsrettens skøn, men mindre end 805.568,55 kr. med samme procesrente.

Om sagens omstændigheder er for landsretten oplyst bl.a. følgende:

Sagsøgerens jordbrugsbedrift blev den 31. august 1993 autoriseret til økologisk jordbrugsproduktion.

Sagsøgte udsendte den 3. marts 1994 en såkaldt »Øko-meddelelse 3/94« til alle bedrifter, der var autoriserede til økologisk jordbrugsproduktion. Af meddelelsen fremgår blandt andet:

». . .

*Avlsregler:*

Avlsreglerne fremgår af Plantedirektoratets bekendtgørelse nr. 720 af 19. august 1992, Plantedirektoratets

**105**

ændringsbekendtgørelse nr. 1120 af 15. december 1992 samt Plantedirektoratets Vejledning om økologisk jordbrugsproduktion. Økologibekendtgørelsen er under revision og vil blive udsendt i løbet af 1994. I denne forbindelse vil økologivejledningen ligeledes blive revideret.

*Foder:*

Hermed opsummeres regler for anvendelse af foder fra omlægningsarealer:

Foderafgrøder dyrket på arealer i 1. omlægningsår kan anvendes som 50% økologiske, såfremt foderet ikke kommer i handel.

Foderafgrøder dyrket på arealer i 2. omlægningsår kan anvendes som økologiske, såfremt foderet ikke kommer i handel.

Ved handel med foderafgrøder fra arealer i 1. omlægningsår regnes disse som ikke-økologiske. Ved handel med foderafgrøder fra arealer i 2. omlægningsår, regnes disse som 50% økologiske og kan sælges som omlægningsfoder *indtil den 1. juli 1994*. Disse afgrøder må ikke indgå i foderblandinger til salg.«

Efter en forudgående telefonsamtale med sagsøgeren sendte Niels Grønbjerg, der var ansat hos sagsøgte, den 6. juli 1994 et brev til sagsøgeren, hvori det bl.a. hedder:

»*Vedr. forespørgsel om økologisk foderafgrøder.*

Foderafgrøder der er avlet på arealer under 1. omlægningsår kan ikke sælges som økologiske.

Foderafgrøder der er avlet på arealer under 2. omlægningsår kan sælges som 50% økologiske.

Foderafgrøder der er avlet på arealer under 1. omlægningsår kan anvendes på eget brug som 50% økologiske. (Dette gælder også for foder der handles direkte mellem to landmand uden nogen form for mellemhandler.)

*Vedr. forespørgsel om økologisk kompost og gødning.*

Af bekendtgørelse 720 § 6 fremgår det at vegetabilsk materiale fra godkendte økologiske arealer kan sælges under betegnelsen »Godkendt til økologisk jordbrugsproduktion«.

Som det står i bekendtgørelsen skal materialet altså stamme fra fuldt omlagte arealer. Jeg vil dog forelægge det Økologiske Jordbrugsråd, om også komposteret plantemateriale fra arealer under 2. omlægningsår kan sælges som »Godkendt til økologisk jordbrugsproduktion«.

. . .

Nar det ydermere er sådan, at du ikke blot videresælger kompost der stammer fra dine egne afgrøder, men også tager plantemateriale ind fra andre økologiske jordbrug og videresælger det som kompost eller gødning, så skal din virksomhed *autoriseres til forarbejdning og videresalg af økologiske produkter*. Det sker hos os i Plantedirektoratets Sektor for Miljø og Produktionsregulering. Jeg har vedlagt et ansøgningsskema hertil samt »vejledning for virksomheder med salg af økologiske produkter«.«

**1** Henning Skovgaard: Offentlige myndigheders erstatningsansvar, s. 182-83, B. Gomard: Moderne erstatningsret s. 62-63.

Copyright © 2023 Karnov Group Denmark A/S                                                    side 1

Sagsøgeren indgik i sommeren 1994 aftaler med flere økologiske landmænd om lån af jord for høståret 1995. Af udateret aftale

*»AFTALE FOR HØSTÅRET 1995*

Imellem ejer

Økologisk aut.nr. 20819

Navn: Aage Pedersen

. . .

Ejer låner nævnte arealer ud mod at følgende betingelser bliver opfyldt af låner.

1. Låner sørger for levering af udsæd uden beregning.

2. Ejer sørger for såning uden beregning.

3. Låner sørger for at høste første slet i juli.

4. Låner sørger for at høste sidste slet i okt/nov

5. Låner forpligter sig til at høste afgrøderne på nævnte tidspunkter uanset hvordan afgrøderne står på disse tidspunkter uden beregning.

AFGRØDENS adr. se markplan

. . .

| Afgrødens art: | Solsikke | . . . |
| udlæg: | Italiensk/rajgræs | . . . |
| udlæg: | Blå lupin | . . . |
| | | |
| Afgrødens art: | Hvid sodlupin | . . . |
| udlæg: | ærter | . . . |
| udlæg: | Italiensk/rajgræs | . . . |
| udlæg: | Blå lupin | . . . |
| | | |
| Afgrødens art: | Havre | . . . |
| udlæg: | Italiensk/rajgræs | . . . |

Ovennævnte aftale er lavet mundtlig parterne imellem august/september 1994.

Alle arealer er omlagt/under omlægning til økologisk.

. . . «

Landskontoret for Planteavl udsendte den 28. september 1994 en Planteavlsorientering, hvoraf blandt andet fremgår:

*»Nugældende regler om afgrøders økologiske status som foder*

Nedenstående fortolkning af reglerne om foderafgrøder er stadfæstet af Plantedirektoratet, torsdag d. 22/9 1994 og er gældende fra denne dag.

Personer der skriftligt eller mundtligt fra Plantedirektoratet for denne dag, har fået andre oplysninger *og* allerede har handlet efter disse, vil blive kontrolleret efter de oplysninger, de fik på daværende tidspunkt.

. . .

*B. Ved salg af uforarbejdet foder til anden landmand (privat salg) regnes afgrøde således:*

- 1. omlægningsår 0% økologisk

**106**

- 2. omlægningsår 50% økologisk

- 3. år 100% økologisk

Det er et krav for at kunne sælge 2. omlægningsårs afgrøde som 50% økologisk, at den uforarbejdede afgrøde *ikke* indgår i en foderblanding ved salget. Afgrøden må heller ikke efter salget - hos køber - indgå i en foderblanding til videresalg.

Dette betyder altså, at 2. års uforarbejdet korn kan sælges og indregnes som 50% økologisk i foderplanen på en »nabo«ejendom.

. . .«

mellem sagsøgeren og Aage Pedersen, Herning, fremgår blandt andet:

og låner

　　　　　　Kalkunfarmer

Navn:　　Erik Mortensen

I november 1994 indgik sagsøgeren aftale med Tørrecentralen Vestjylland om, at økologisk græs, høstet på blandt andre Aage Pedersens marker, skulle returneres som økologiske piller. Pillerne skulle leveres direkte til forskellige aftagere.

Efter at bekendtgørelse nr. 892 af 27. oktober 1994 om økologisk jordbrugsproduktion den 5. november 1994 havde afløst den tidligere bekendtgørelse nr. 720 af 19. august 1992, udsendte sagsøgte den 30. december 1994 en intern meddelelse til distriktskontorerne. Heraf fremgår blandt andet:

». . .

På husdyrsiden er der ikke sket de store ændringer. Dog er reglerne omkring *handel med foder, der er avlet på omlægningsjord* ændret, idet handel direkte mellem to økologiske bedrifter ligestilles med handel over en mellemmand. Dette betyder, at hvis der er *indgået handel med foder den 5. november eller senere* om foder avlet på omlægningsjord gælder følgende, uanset hvem der er sælger eller køber:

Uforarbejdet foder avlet på 1. års omlægningsjord skal regnes som 0% økologisk.

Uforarbejdet foder avlet på 2. års omlægningsjord kan regnes som 50% økologisk (dette er foreløbig gældende frem til 1. juli 1995).

Er der handlet direkte mellem to økologiske bedrifter *inden den 5. november 1994*, gælder følgende:

Uforarbejdet foder avlet på 1. års omlægningsjord kan regnes som 50% økologisk.

Uforarbejdet foder avlet på 2. års omlægningsjord kan regnes som 100% økologisk.

. . .«

Sagsøgeren søgte den 18. januar 1995 om autorisation til virksomhed med salg af økologisk gødning, foderstoffer og frø til udsæd. I sagsøgtes besvarelse af 18. april 1995 hedder det blandt andet:

». . .

2) vedr. ansøgning om autorisation til salg af foder

M.h.p. produktion af økologisk foder har De oplyst, at salget sker enten fra Deres lager eller direkte fra firmaer, som tørrer det pågældende produkt.

Med henblik på den videre behandling af Deres autorisationsansøgning, anmodes De om at sende supplerende beskrivelse af Deres virksomhed, samt autorisationsnummer på de bedrifter og virksomheder, De har indgået kontrakt med. Opmærksomheden henledes på, at videresalg af foder som værende økologiske, kræver dokumentation for produkternes økologiske oprindelse, f.eks. i form af autorisationsnummer og avlsrapport. Produkterne skal stamme fra arealer, som er fuldt omlagt.

. . .«

I sagsøgerens besvarelse af 6. maj 1995 hedder det blandt andet:

». . .

»Punkt 5.

Angående salg af foder fra høståret 1994.

Først henvisning til brev af 6. juli 1994 fra Plantedirektoratet.

I dette brev gøres det klart, at jeg som landmand må sælge 2. års omlægningsfoder uden at det handles, når jeg handler direkte med en anden landmand. Efter dette svar laver jeg aftale med Åge Pedersen, Hammerum Hovedgade 151, Hammerum, der går ud på, at jeg låner hans jord mod at jeg opfylder følgende betingelser.

Punkt 1. Markerne skal afslåes så de er klar til god forårspløjning.

Punkt 2. Jeg leverer såsæd efter markplan som Åge Pedersen og jeg er enige om. Markplanen bliver herefter udarbejdet af konsulent Bjarne Hansen, Års.

Punkt 3. Jeg skal sørge for at afgrøderne bliver høstet uanset hvilke udbytte der måtte være til den tid.

Det er her min mening at afgrøderne skal bruges til proteinfoder. 1. slet tages i juli og sidste slet i okt/nov. så markerne er klar til foråret 1996. Det er også meningen at afgrøderne skal høstes af Tørrecentral Vestjylland.

Når disse betingelser er opfyldt overfor Åge Pedersen er afgrøderne mine uden beregning.

. . .«

Af sagsøgtes skrivelse af 26. juni 1995 til sagsøgeren fremgår blandt andet:

». . .

*2. Vedr. autorisation til salg af økologisk foder*

De har . . . anmodet om autorisation af salg af økologisk foder (økologiske grønpiller).

. . .

De henviser . . . til Plantedirektoratets brev af 6. juli 1994, på hvilket grundlag De har indgået aftale med Åge Pedersen i Hammerum, og hvorfra plantematerialet til de solgte grønpiller stammer. Brevet oplyser, at foderafgrøder fra 2. års omlægningsarealer, kan sælges som økologiske ved direkte handel mellem 2 landmænd.

Besvarelsen i brevet forudsætter ifølge Plantedirektoratets opfattelse, at der er tale om uforarbejdede foderafgrøder, idet det hverken ifølge den daværende eller den nye økologibekendtgørelse er tilladt at sælge forarbejdet omlægningsfoder som 100% økologisk.

**107**

Det må derfor præciseres, at en betingelse for salg af forarbejdet økologisk foder (grønpiller) er, at foderet stammer fra fuldt omlagte arealer. Overtrædelse heraf kan medføre bøde. Uforarbejdet omlægningsfoder fra arealer under 2. omlægningsår kan endvidere efter bekendtgørelse af oktober 1994 kun sælges som 50% økologisk uanset hvem, der er køber og sælger. Uforarbejdet omlægningsfoder fra 1. års arealer kan ikke sælges som økologisk.

Imidlertid fremgår det af Deres kontrakt med Tørrecentralen Vestjylland, at det økologiske græs, De har videresolgt som økologisk, også stammer fra 1. års omlægningsmarker. Kopi af Åge Pedersens avlskontrolrapport er vedlagt, hvoraf fremgår, at markerne på adresserne Røjenvej 22, Sunds, mark nr. 35,1 til 35,8, samt Firehuse 8 mark nr. 33,1 til 33,3, er arealer under 1. omlægningsår i 1994.

De foreholdes derfor ovenstående til bemærkninger, idet De bedes oplyse om plantematerialet fra 1. års omlægningsmarker blev holdt adskilt i produktions- og salgsprocessen samt hvem af de nævnte købere, der aftog grønpillerne.

. . .

Det bemærkes, at en fortsat salg af foder forudsætter, at plantematerialet stammer fra fuldt omlagte økologiske arealer.

. . .«

Herefter skrev sagsøgeren den 1. juli 1995 blandt andet følgende til sagsøgte:

». . .

Vedr. salg af foder:

I brevet antyder Plantedirektoratet at de ikke troede det drejede sig om grønpiller da jeg sidste år fik bekræftet skriftlig at jeg måtte sælge 2. års omlægningspiller direkte til anden landmand. For mig lyder det mere end mærkelig da det var det der var udgangspunktet for at jeg ønskede at få et skriftlig svar.

. . .

Angående de aftaler jeg har med . . .

Aage Pedersen

. . .

Har jeg telefonisk talt med Hanne Bertelsen og foreslået følgende for at finde en løsning på de ting man kan sætte hen under misforståelser.

Det drejer sig om 2års omlægningsarealer hos ovennævnte.

Hvis jeg kan finde nogle landmænd der vil overtage et bestemt areal og vedkommende selv sørger for at høste enten som ensilage eller landmanden selv går til Tørrecentralen og får for egen regning lavet grønpiller til brug i egen besætning, og bruger afgrøden som fuld økologisk på samme måde som alle andre 2 års afgrøder der bliver brugt som økologisk når de er avlet på egne arealer.

Jeg håber meget at dette kan lade sig gøre, da jeg allerede sidste efterår har forhåndssolgt grønpiller fra disse arealer. Sammen med udgivelsen af de nye bekendtgørelser af nov. 94 blev der samtidig gjort opmærksom på at aftaler der var indgået forinden vil der blive taget hensyn til.

Så hvis parterne er indforstået med at finde en løsning, så er der mulighed for dette uden at det går ud over kontrolsystemet.«

Sagsøgtes afgørelse i sagen blev meddelt sagsøgeren i skrivelse af 13. juli 1995. Heraf fremgår blandt andet:

». . .

De henviser til Plantedirektoratets brev af 6. juli 1994 . . .

I Deres brev af 6. maj 1995, oplyser De endvidere, at De på grundlag af samme brev har indgået aftaler om køb af plantemateriale fra 2. års omlægningsmarker for høst 1995 tilhørende følgende avlere:

Age Pedersen, reg nr. 20819,

. . .

De ovennævnte aftaler indebærer, at De leverer såsæd, sørger for afhøstning og får ret til afgrøden, mens avleren sår og passer afgrøden til høst. De pågældende arealer hører under de pågældende avleres bedrifter og autorisationsnumre.

De har den 10. juli 1995 indsendt en liste over de marker, som aftalerne vedrører.

. . .

Plantedirektoratets brev af 6. juli 1994 skal forstås på baggrund af § 7 i den dagældende bekendtgørelse nr. 720 af 19. august 1992 om økologisk jordbrugsproduktion, der blev administreret således, at de der nævnte afgrøder fra 2. års omlægningsarealer i uforarbejdet stand kunne anvendes som 100 pct. økologisk foder på egen ejendom og tillige kunne sælges som 100 pct. økologisk foder ved direkte handel mellem to landmænd, d.v.s. uden mellemhandler.

Denne administrative praksis blev ændret ved ikrafttræden af den nye bekendtgørelse nr. 892 af 27. oktober 1994 således, at foderafgrøder dyrket på arealer i 2. omlægningsår herefter kun må anvendes som 100 pct. økologiske ved fodring i egen besætning og kun må overdrages som omlægningsfoder, d.v.s som 50% økologiske.

Det var ikke efter den daværende bekendtgørelse nr. 720 af 19. august 1992 om økologisk jordbrugsproduktion er heller ikke efter den nye bekendtgørelse nr. 892 af 27. oktober 1994 tilladt at sælge *forarbejdet* foder som omlægningsfoder eller som 100 pct. økologisk, hvis foderet stammer fra arealer, der er under omlægning.

. . .

Direktoratet afviser derfor Deres påstand om, at De skulle have fået tilladelse til salg af ovennævnte forarbejdede plantemateriale som 100 pct. økologisk.

**108**

. . .

Det bemærkes i øvrigt, at direktoratet betragter Dem som mellemhandler, når De indgår særlige aftaler med en avler om ret til afgrøden, som De derefter får tørret og videresælger til tredjemand. Dette gælder uanset om De betaler for såsæden. Det afgørende er,

at arealet ikke indgår under Deres bedrift og derfor heller ikke under Deres autorisation.

. . .

Direktoratet kan heller ikke give Dem tilladelse til, at andre avlere overtager Deres forpligtelser m.h.p. brug af plantemateriale som 100 pct. økologisk, da det som nævnt kun er tilladt, f.s.v.a. afgrøder af egen avl.

. . .

Direktoratets afgørelse kan indbringes for Landbrugs- og Fiskeriministeriets departement, . . .

. . .«

Sagsøgte indbragte efter det oplyste den 27. november 1995 denne afgørelse for det daværende Landbrugs- og Fiskeriministerium. Under et møde i ministeriets departement den 31. januar 1996, hvori fra sagsøgtes side deltog Hanne L. Berthelsen og Torben Milters, var sagsøgeren bistået af agronom Hanne Frost, Landbrugets Rådgivnings Center, som efterfølgende har udarbejdet et notat om sagsforløbet. Af notatet fremgår blandt andet:

». . .

Det er som om, Plantedirektoratet helt har glemt deres eget udsagn i efteråret 1994, om at aftaler omkring vækstsæsonen 1995 indgået efter 1994 regler i 1994 kunne gennemføres i vækstsæsonen 95. Der er jo økonomiske dispositioner forbundet med indgåelsen af sådanne aftaler. En ændring om vinteren i begyndelsen af en vækstsæson er ikke altid mulig.

Under høringen på Landbrugsministeriets kontor onsdag den 31. januar 1996 sagde Anita Kjeldsen »ja« til, at aftaler indgået, FØR den nye bekendtgørelse trådte i kraft, på baggrund af det, der var gældende på afgørende tidspunkt, kunne føres ud i livet.

Det er meget sent, at Plantedirektoratet præciserer overfor Erik Mortensen, at han skal overholde 1995 reglerne fremfor, det der var gældende på aftaletidspunktet.

Hvis Niels Grønbjerg havde trukket sit brev af 6. juli 94 tilbage på et tidspunkt før såning, kunne Erik Mortensen have forsøgt at løse sig fra sine landmandsaftaler, selvom det ville have haft direkte omkostninger for ham.

. . .

Under høringen spurgte Torben Milters, om det i 1994 var tilladt at handle 2. års afgrøde som 100% økologisk mellem to landmænd.

Anita Kjeldsen svarede, at der ikke blev grebet ind overfor det, men det var ikke officielt.

Torben Milters konstaterede, at i brevet af 6. juli 1994 var det jo netop meldt ud skriftligt.

Hvis Niels Grønbjerg ville have sikret sig mod regelændringer, da han skrev sit brev 6. juli 94 kunne han i brevet/tilladelsen have taget forbehold for regelændringer. At regelændringer ville ophæve tilladelsen.

. . .«

I skrivelse af 1. august 1996 fra Landbrugs- og Fiskeriministeriets departement til sagsøgeren hedder det:

»I forbindelse med Deres klage den 27. november 1995, har Landbrugs- og Fiskeriministeriets departement nu modtaget en vurdering af sagen om omsætning af afgrøder høstet på arealer under 2. års omlægning til økologisk jordbrug i 1995.

Det er Kammeradvokatens vurdering, at Plantedirektoratet har pådraget sig et erstatningsansvar. På grund af udvist uforsigtighed fra Deres side er det imidlertid Kammeradvokatens opfattelse, at Deres erstatningskrav må reduceres på grund af egen skyld.

Landbrugs- og Fiskeriministeriet er derfor indstillet på at indgå et forlig om erstatning for de tab, De måtte have lidt som følge heraf.

Til brug for sagens behandling beder man Dem om at fremsende en dokumenteret opgørelse over Deres tab som følge af forbudet

mod salg af 1995-høsten af afgrøder høstet på arealer under 2. års omlægning til økologisk jordbrug.«

Parterne opnåede ikke enighed om en forligsmæssig løsning.

Under sagen er der afholdt syn og skøn ved forsker Pia Strunge Folkmann, Statens Jordbrugs- og Fiskeriøkonomiske Institut. Af syns- og skønserklæring af 23. marts 1999 og senere tillæg fremgår blandt andet, at sagsøgeren i høståret 1995 havde dyrket 7 ha havre med udlæg af rajgræs, og 139,4 ha solsikke med udlæg af blå bitterlupin og rajgræs. Havren skønnes at ville give et udbytte på 21.000 kg, der med status som 100% økologisk kunne indbringe 1,80 kr. pr. kg, eller i alt 37.800 kr. Efterafgrøden ville give et udbytte på 3.500 foderenheder (FE) a 1,20 kr., eller i alt 4.200 kr. Solsikken skønnes at ville give et udbytte på 380.115 FE, der solgt på roden med status som 100% økologisk kunne indbringe 1,20 kr. pr. FE, eller i alt 460.598 kr. Høstudgifterne ville være 0,57 kr. pr. FE, eller i alt 216.665 kr. Efterafgrøden ville give et udbytte på 70.400 FE a 1,20 kr., eller i alt 84.480 kr. Det ville ikke være muligt at afsætte afgrøden som 50% økologisk for en højere pris end konventionelle varer. Havre og efterafgrøde ville da kunne afsættes til i alt 20.650 kr. og solsikke og efterafgrøder til 199.500 kr. Høstudgifterne ville være uændrede. Det vurderes ikke at have indflydelse på prisen, om afgrøderne til grovfoder sælges som ensilage eller grønpiller, dog ville det være af betydning for mulighederne for afsætning af afgrøderne som ensilage, at aftagerne

**109**

var fundet inden høst. Hvis efterafgrøden ikke var blevet høstet eller pløjet ned, kunne sagsøgeren have sparet 500 kr. pr. ha, eller i alt 60.700 kr. Hvis efterafgrøden skulle høstes, for at sagsøgeren kunne opfylde låneaftalen, men ikke pløjes ned, ville besparelsen være 50 kr. pr. ha, eller i alt 6.070 kr.

Sagsøgerens påstand er opgjort på grundlag af syns- og skønsmandens oplysninger som forskellen mellem afgrødernes salgspris som økologiske og salgsprisen som konventionelle afgrøder.

*Sagsøgeren* har blandt andet forklaret, at han tidligere har opdrættet kalkuner og ænder, og sideløbende solgt gødning herfra. Efter at hans ejendom i 1993 blev omlagt til økologisk produktion, har han fremstillet økologisk gødning, vækstmedier og så- og priklejord. Han har arbejdet målrettet mod at blive godkendt og opfylde alle betingelser for økologiske producenter. Han havde problemer med at få landmænd til at dyrke de nye produkter, som han skulle bruge i sin produktion, og derfor opstod tanken om at indgå aftaler om at låne jord. De første blev indgået i august 1994, efter han havde fået brevet af 6. juli 1994 fra sagsøgte. Låneaftalerne gik nærmere ud på, at han skulle levere såsæden og have ansvaret for markerne og have udbyttet. Landmanden fik EU-tilskud og økologitilskud, og indrettening skulle derfor ske under dennes autorisationsnummer. Han ringede til sagsøgeren for at få bekræftet sin opfattelse af mulighederne for salg af grønpiller, ensilage og gødning fra omlægningsmarker. Det var hans opfattelse, at han kendte reglerne lige så godt som sagsøgte, men han ville have sin forståelse af reglerne bekræftet. Det var vigtigt med grønpillerne, fordi de både bruges som foder og gødning. Han fortalte om de låneaftaler, han tænkte på at indgå. Han husker ikke, om ordet »mellemhandler« blev nævnt. Han har ikke efterfølgende talt med Niels Grønbjerg. Han har nu autorisation til økologisk jordbrug til at sælge økologisk gødning og vækstmedier. Han har siden 1995 også solgt ensilage og grønpiller. Der er aldrig nogen, der under kontrolbesøg har spurgt om eller betvivlet, at han havde lov til at sælge foder, på trods af at ansatte hos sagsøgte har kendt til forholdene. Den 13. juli 1995 fik afgørelsen fra sagsøgte, nærmede høsten sig. På grund af usikkerheden med hensyn til om grønpiller ville kunne sælges som økologiske, valgte han - for at spare omkostninger - at lave ensilage af afgrøden. Han husker ikke, om han har forsøgt at

finde købere ved annoncering eller ad andre kanaler. Han vil anslå, at han har haft udgifter til såsæd på ca. 1.000 kr. pr. hektar, eller i alt ca. 146.000 kr. Det var Aage Pedersen, der lavede arbejdet med såning, såbed og tromling. Han ønskede at have Hanne Frost med til mødet i januar 1996 med departementet, og han havde bedt hende lave referat.

*Syns- og skønsmand Pia Strunge Folkmann* har supplerende forklaret, at flere faktorer har indflydelse på mulighederne for at afsætte solsikkeafgrøden som ensilage på det konventionelle marked. Der er tale om en usædvanlig afgrøde, som har en ukendt foderværdi, og på grund af transportomkostningerne skal en køber findes inden for en radius af 10 km fra dyrkningsstedet. Hertil kommer, at aftaler om salg af afgrøder på rod normalt indgås lang tid før høst. Det har efter hendes opfattelse ikke været nødvendigt at landbrugsmæssige hensyn at høste eller nedpløje efterafgrøden. Hvis hovedafgrøden ikke havde været høstet, ville en nedpløjning være nødvendig. Hun vil anse en udgift til såsæd på 1.000 kr. pr. ha for realistisk.

*Niels Grønbjerg* har blandt andet forklaret, at han var ansat hos sagsøgte fra den 17. juni 1994 til den 28. januar 1995. Han arbejdede som videnskabelig assistent og sagsbehandler bl.a. med autorisation af økologiske landmænd og skulle besvare henvendelser herom. Han er uddannet agronom og havde tidligere arbejdet som planteavlskonsulent i en lokal landboforening. Forud for brevet af 6. juli 1994 til sagsøgeren var gået en telefonsamtale, idet sagsøgeren havde ringet for at høre, hvad han måtte i relation til afgrøder avlet på omlægningsarealer. Henvendelsen drejede sig hovedsagelig om, hvorvidt afgrøderne kunne bruges til økologisk gødning/kompost. Desuden talte de om mulighederne for at sælge afgrøden som foder med økologisk status. Han fortalte sasøgeren, at hvis man anvendte afgrøden som foder i sin egen bedrift, kunne det anvendes som 100% økologisk. Hvis det kom ud i handlen, havde det kun status som 50% økologisk. Kun hvis afgrøden blev solgt direkte til en anden økologisk landmand uden mellemhandler, kunne status som 100% økologisk bevares. Disse regler var gældende for uforarbejdede afgrøder. Han fik under samtalen det indtryk af sagsøgeren, at han var en forsigtig og beskeden mindre landmand, der i et vist omfang kendte til økologiregler. Sagsøgeren virkede ubekendt med mulighederne for direkte salg uden at miste økologisk status, og han vendte flere gange i samtalens løb tilbage hertil. Sagsøgeren nævnte på intet tidspunkt, at han havde planer om at låne jord fra andre, ligesom det på intet tidspunkt blev nævnt, at sagsøgeren ønskede at producere grønpiller eller på anden måde forarbejde afgrøden. Spørgsmålet om salg af forarbejdede afgrøder var slet ikke aktuelt, da det som tidligere nævnt var hans opfattelse, at sagsøgeren havde et mindre landbrug. Sagsøgeren vendte i slutningen af samtalen igen tilbage til spørgsmålet om direkte salg mellem to økologiske landmænd og spurgte, om det også gjaldt for forpagtede arealer, hvilket vidnet givetvis besvarede bekræftende. Han valgte efter samtalen at skrive til

**110**

sagsøgeren. Dette var mest af hensyn til spørgsmålet om salg af gødning, som krævede en godkendelse og en registrering, og det var derfor, han vedlagde en vejledning. Det kunne og burde måske have været præciseret i skrivelsen, at muligheden for direkte salg kun vedrørte uforarbejdede foderafgrøder. Der var tale om en administrativ undtagelsesregel. Ordet »foderafgrøder« fremgik af en vejledning, han skrev at efter. Han var klar over, at der var en ny økologibekendtgørelse undervejs, men han vidste ikke, om den ville få indflydelse på de emner, han drøftede med sagsøgeren. Han husker at have haft en telefonsamtale med Hanne Frost, og i forlængelse af den blev man opmærksom på, at den administrative undtagelsesregel vedrørende direkte handel mellem to økologiske land-

mænd muligvis var i strid med nogle EU-regler, og praksis blev derfor ændret. Han foretog sig ikke noget over for sagsøgeren i den anledning, da han ikke var klar over, at der var et problem.

*Hanne Legart Berthelsen* har blandt andet forklaret, at hun er uddannet jurist og ansat i Fødevaredirektoratet. Fra marts 1995 til slutningen af 1996 var hun ansat hos sagsøgte og beskæftigede sig med juridiske og administrative opgaver i en sektion, der arbejdede med økologiske bedrifter. Hun blev første gang bekendt med sagsøgeren i april 1995, efter at medarbejdere fra distriktskontoret i Viborg havde været på kontrolbesøg hos ham, i anledning af at han havde indsendt en ansøgning om godkendelse til produktion af økologisk gødning, foderstoffer og frø. Hans regnskabsmateriale var ikke i orden. Der skulle flere besøg til, før han kunne godkendes. De kunne konstatere, at han annoncerede og solgte grønpiller uden at have fået tilladelse. Han fik tilladelse til salg af gødning, men ikke til salg af frø eller foder. Efter hendes opfattelse blev han klar over, at han havde et problem med hensyn til salg af grønpiller. De talte flere gange sammen i telefon, og der var nogen korrespondance. Det var hans opfattelse, at han i brevet af 6. juli 1994 fra Niels Grønbjerg havde fået en tilladelse til at sælge økologiske grønpiller fra 2. års omlægningsmarker. Hun udtrykte undren over, at han kunne opfatte brevet som en tilladelse. Hun har ikke opfordret ham til at komme med løsningsforslag. Han var meget opsat på at få tilladelse til salg af økologiske grønpiller, og hun undersøgte, om det lå inden for rammerne af gældende ret at lave en aftale, som den, han foreslog i sit brev af 1. juli 1995. Det kunne imidlertid ikke lade sig gøre. Det er hensynet til forbrugernes tillid til økologiske produkter, der er årsagen til, at man har en tæt regulering af området. For at sikre og opretholde denne tillid er det nødvendigt, at der er mulighed for at føre en effektiv kontrol. Det var formentlig derfor, at det var nødvendigt at ophæve den tidligere administrative praksis, så der ikke mere bevarelse af økologisk status kunne sælges forarbejdede produkter fra omlægningsarealer efter den snævre undtagelsesregel om direkte salg mellem to økologiske landmænd.

*Hanne Frost* har blandt andet forklaret, at hun er uddannet agronom, og var ansat i en økologisk sektion under Landbrugets Rådgivnings Center fra den 15. februar 1994 til den 8. september 1996. Hun blev kontaktet af sagsøgeren og bedt om at deltage i mødet i Landbrugs- og Fiskeriministeriets departement den 31. januar 1996. Hun kendte til sagsøgeren, idet hun i 1989 havde været regional konsulent i Himmerland og i den forbindelse havde besøgt hans ejendom. Hun lavede sin redegørelse inden for 14 dage efter mødet, og den blev sendt til sagsøgte, sagsøgeren og departementschef Milters. Redegørelsen er udarbejdet ud fra, hvad der skete på mødet, og hvad hun har fået oplyst gennem telefonsamtaler med sagsøgeren. Redegørelsen indeholder i 2. afsnit også hendes personlige mening. Det er hende, der har udarbejdet planteavlsorienteringen af 28. september 1994 på baggrund af oplysninger fra et rådgivende udvalg under sagsøgte. Hun havde selv deltaget i det udvalgsmøde, hvor oplysningerne kom frem. Det var nødvendigt af hensyn til landmændenes planlægning, at de aftaler, der var indgået efter de gamle regler, blev kontrolleret efter disse regler. Ved løntørring forstod man i 1995, at en landmand afleverede en afgrøde til en torrecentral, som dampede vandet ud, hvorefter landmanden fik plantematerialet retur i form af grønpiller. Den almindelige opfattelse af ordet »foderafgrøder« er, at det er alle afgrøder, der høstes og bruges til dyrefoder. Udtrykket bruges oftest om afgrøden på marken, men siger ikke noget om, hvorvidt der er tale om en forarbejdet eller uforarbejdet afgrøde. Udtrykket »foderstoffer« bruges mest i forbindelse med kraftfoder eller andet foder fra en foderstofhandel. Efter hendes opfattelse må ensilage betegnes som »ublandet«, selv om det består af flere forskellige planter, bare det kommer fra samme mark.

Copyright © 2023 Karnov Group Denmark A/S

*Sagsøgeren* har til støtte for sine påstande i første række gjort gældende, at sagsøgtes erstatningsansvar uden forbehold er anerkendt i brevet af 1. august 1996 fra daværende Landbrugs- og Fiskeriministeriets departement, som kendte alle sagens omstændigheder og må have gjort op med adækvans og årsagssammenhæng. Sagsøgte har på trods af førte forligsforhandlinger først under skriftvekslingen i sagen bestridt at være erstatningsansvarlig. Sagsøgeren har i anden række gjort gældende, at sagsøgte har handlet ansvarspådragende over for sagsøgte. Erstatningsansvaret er begrundet i, at sagsøgtes afgørelse af 13. juli 1995 er forkert, idet sagsøgeren var omfattet af den overgangsordning, der blev tilkendegivet i planteavlsorienteringen af 28. september 1994 og sagsøgtes meddelelse af 30. december 1994 til

**111**

distriktskontorerne. Det, der blev ændret, var en administrativ praksis, idet hverken bekendtgørelse nr. 720 af 19. august 1992 eller bekendtgørelse nr. 892 af 27. oktober 1994 regulerer handel mellem landmænd. Kun under helt særlige omstændigheder kan en offentlig myndighed ændre praksis til skade for borgerne. Dette kan kun ske, hvis den tidligere praksis har været forkert/ulovlig, og selv da kan der ikke ske ændring med tilbagevirkende kraft. Overgangsordningen, som den er beskrevet i planteavlsorienteringen og i Hanne Frosts forklaring, var nødvendig, fordi mange landmænd havde disponeret i tillid til hidtidig praksis. Sagsøgeren skulle således kontrolleres efter det, der fremgik af sagsøgtes skrivelse af 6. juli 1994. Der er ikke noget, der tyder på, at den hidtidige praksis var i strid med lovgivningen, herunder rådsforordning nr. 2092/91, der ikke omtaler direkte handel mellem to landmænd. Sagsøgeren havde inden den 5. november 1995, der af sagsøgte anses for skæringsdag for praksisændringen, indgået en bindende låneaftale med Aage Pedersen og havde dermed disponeret for høstsæsonen 1995. Det gøres videre gældende, at sagsøgeren ikke er mellemhandler i juridisk forstand, idet han i hele dyrkningsperioden har ejet afgrøden og haft den driftsøkonomiske risiko. I sagsøgtes skrivelse af 6. juli 1994 er der ikke skelnet mellem forarbejdede og uforarbejdede afgrøder, og der er ikke grundlag for at fortolke ordet »foderafgrøde« således, at der udelukkende er tale om uforarbejdet afgrøde. Der kræves ikke særskilt autorisation til salg af ublandet foder direkte mellem to økologiske landmænd, og det fremgår af Hanne Frosts forklaring, at afgrøder høstet på samme mark betragtes som ublandet, selv om det er forskellige afgrøder. Sagsøgte var bekendt med, at sagsøgeren havde til hensigt at sælge afgrøderne som grønpiller/ensilage. Det havde han tilkendegivet i telefonsamtalen med Niels Grønbjerg. Hvis sagsøgte ikke havde truffet den forkerte afgørelse af 13. juli 1995, havde sagsøgeren derfor lovligt kunnet sælge de omhandlede afgrøder som økologiske. Sagsøgerens tab er således en adækvat følge af sagsøgtes fejl. Sagsøgte må herefter erstatte sagsøgerens tab, herunder den manglende fortjeneste. Det gøres gældende, at tabet på baggrund af syns- og skønserklæringen kan opgøres i overensstemmelse med sagsøgerens principale påstand. Sagsøgeren kunne ikke begrænse sit tab ved at undlade at høste afgrøderne, da han efter aftalen med Aage Pedersen var forpligtet hertil. Sagsøgeren har ikke kunnet sælge afgrøderne på det konventionelle marked, og sagsøgte har ikke bevist, at sagsøgeren har tilsidesat sin tabsbegrænsningspligt.

*Sagsøgte* har til støtte for sin principale påstand gjort gældende, at skrivelsen af 1. august 1996 fra - daværende - Landbrugs- og Fiskeriministeriets departement ikke er udtryk for, at sagsøgte anerkender at have handlet erstatningspådragende over for sagsøgeren. Sagsøgeren havde rejst et krav om erstatning og forespurgt om mulighederne for et forlig, hvilket af procesøkonomiske årsager kunne være fornuftigt. Skrivelsen skal ses som et led i disse forligsforhandlinger og er, uanset det ikke udtrykkeligt nævnes, uden

præjudice for en efterfølgende retssag. Sagsøgte er heller ikke på andet grundlag erstatningsansvarlig for sagsøgerens påståede tab, som følge af at han har indrettet sig på at kunne afsætte sin afgrøde i 1995 som 100% økologisk foder. Salget kunne under ingen omstændigheder have været gennemført på lovlig vis, hverken efter 1992-bekendtgørelsen eller 1994-bekendtgørelsen.

Sagsøgeren havde ikke autorisation til salg af foder, hvilket han var klar over, ligesom han vidste, at en sådan virksomhed krævede særlig autorisation. Sagsøgeren søgte en sådan autorisation i januar 1995, men opfyldte ikke betingelserne. Hvis autorisationen havde været søgt, inden han indgik låneaftalerne, ville sagsøgeren have indset, at projektet ikke lovligt ville kunne gennemføres, og han kunne have sparet omkostningerne. Sagsøgte er således ikke erstatningsansvarlig og grundlag af afslaget af 13. juli 1995 på ansøgningen om autorisation til salg af økologisk foder. Sagsøgtes skrivelse af 6. juli 1994 kan heller ikke danne grundlag for et erstatningsansvar. Skrivelsen er efter sit indhold ikke en tilladelse, men en række generel vejledning om regler og praksis.

Reglerne for salg af økologiske produkter er reguleret nøje af hensyn til kontrollen med og tilliden til økologiske varer. De særlige lempelige regler om anvendelse af afgrøder fra omlægningsarealer til foder i egen bedrift blev givet for at få dækket et behov for økologisk foder, uden at kontrolmulighederne blev forringet. Når udtrykket »foderafgrøde« er anvendt i skrivelsen af 6. juli 1994, skal dette forstås som uforarbejdede foderstoffer. Der redegøres i skrivelsen for reglerne for anvendelse af afgrøder fra marker under 2. omlægningsår til foder i egen bedrift og for den administrative undtagelse, der yderligere lemper kravene ved salg mellem to økologiske landmænd uden mellemhandler. Sagsøgerens påtænkte virksomhed har aldrig været omfattet af sidstnævnte lempelse, da der hverken er tale om uforarbejdet foder eller direkte salg. Foderafgrøde er efter sædvanlig sprogbrug uforarbejdet foder, hvilket er i overensstemmelse med Hanne Frosts opfattelse af ordet. Det kan ikke på baggrund af den telefonsamtale, der gik forud for skrivelsen, anses for en ansvarspådragende fejl, at det ikke præciseres, at denne lempelse kun gælder uforarbejdet foder. Der var på baggrund af de oplysninger, sagsøgeren havde givet til Niels Grønbjerg under samtalen, ingen anledning til en sådan præcisering. Sagsøgeren tilkendegav ikke, at han havde planer om at sælge

**112**

grønpiller. Der var heller ikke på baggrund af samtalen anledning til en yderligere præcisering af begrebet direkte salg. Såfremt sagsøgerens påtænkte konstruktion kunne gennemføres, ville sagsøgtes muligheder for at udøve en effektiv kontrol med overholdelsen af økologireglerne blive væsentligt forringet, hvilket sagsøgeren måtte indse. På baggrund heraf, og da sagsøgeren havde en usædvanlig konstruktion i tankerne, burde han have sikret sig, at Niels Grønbjerg var klar over alle relevante faktiske forhold, således at Grønbjerg havde mulighed for at svare fyldestgørende. Da sagsøgeren ikke med støtte i den lempelige praksis lovligt kunne have gennemført sit påtænkte salg, kan han heller ikke støtte ret på den overgangsregel, der er omtalt i Planteavlsorienteringen af 28. september 1994. Denne omtaler handler indgået inden 22. september 1994, og sagsøgte har ikke indgået handler inden denne dato, men alene låneaftaler vedrørende jord. Heller ikke meddelelsen af 30. december 1994 fra sagsøgte til distriktskontorerne støtter sagsøgerens synspunkt, idet den omtaler handler indgået inden den 5. november 1994, og den tager derfor ikke sigte på 1995-høsten, som sagen drejer sig om. Det bestrides, at sagsøgeren har haft et tab, der svarer til den nedlagte påstand. Det bestrides, at det var nødvendigt at afholde udgifter til høst af efterafgrøderne, og det er udokumenteret, at sagsøgeren har afholdt udgifter til såsæd med

Copyright © 2023 Karnov Group Denmark A/S

1.000 kr. pr. ha. Sagsøgte har endvidere ikke dokumenteret, at han har opfyldt sin tabsbegrænsningspligt.

## Landsrettens begrundelse og resultat:

I *skrivelse af 1. august 1996* fra - daværende - Landbrugs- og Fiskeriministeriets department til sagsøgeren blev det anført, at det »er Kammeradvokatens vurdering, at Plantedirektoratet har pådraget sig et erstatningsansvar«, men at sagsøgerens erstatningskrav måtte reduceres på grund af egen skyld. Det blev videre anført, at ministeriet var indstillet på at indgå en forlig om erstatning for de tab, sagsøgeren »måtte have lidt som en følge heraf«.

Landsretten finder - som anført af sagsøgeren - at en skrivelse af det nævnte indhold fra et ministeriums centrale ledelse som udgangspunkt indeholder en stærk formodning for, at sagsøgeren kan gøre et erstatningskrav gældende over for sagsøgte. Det må i denne forbindelse også tages i betragtning, at ministeriet på det pågældende tidspunkt må antages at have været i besiddelse af alle oplysninger af betydning for vurderingen af ansvaret.

Det må på den anden side også indgå i vurderingen, at parterne på det pågældende tidspunkt fortsat forhandlede om en forligsmæssig løsning af sagsøgerens krav, og skrivelsen må ses som et element i disse forhandlinger. Endvidere er det efter skrivelsens indhold helt uafklaret, hvad størrelsen af et erstatningskrav ville være, og ordlyden udelukker ikke, at det kunne vise sig, at kravet efter en nærmere vurdering af tabsopgørelsen og under hensyntagen til egenskylds-betragtninger måtte sættes til 0 kr.

Landsretten finder det på denne baggrund betænkeligt at anse sagsøgte afskåret fra under denne retssag at anfægte erstatningsansvaret ud fra synspunkter baseret på grundlæggende erstatningsretlige principper, herunder grundsætningen om, at alene lidte tab erstattes.

Det fremgår af sagen, at sagsøgtes erkendelse af erstatningsansvar bygger på et synspunkt om, at der i skrivelse af 6. juli 1994 er ydet en ufuldstændig vejledning dels vedrørende spørgsmålet om forarbejdede foderstoffer, dels med hensyn til hvornår der var tale om direkte salg mellem to landmænd. Indholdet af den nævnte skrivelse må ses på baggrund af den forudgående telefonsamtale mellem sagsøgeren og Niels Grønbjerg. Efter bevisførelsen, navnlig Niels Grønbjergs vidneforklaring, kan det ikke anses for godtgjort, at sagsøgeren under denne samtale har redegjort nærmere for karakteren eller omfanget af det påtænkte lånearrangement, og heller ikke at han har gjort det klart, at der var tale om forarbejdede foderstoffer i form af foderpiller.

Det kan ved sagens afgørelse lægges til grund, at grønpiller er et *forarbejdet* foderstof. Den med udgangspunkt i 1992-bekendtgørelsens § 7 udviklede administrative praksis, hvorefter foderstoffer fra 2. års omlægningsarealer kunne anvendes som 100% økologiske, omfattede kun uforarbejdede foderstoffer. Denne praksis blev ophævet samtidig med ikrafttrædelsen af 1994-bekendtgørelsen ud fra en antagelse om dens uforenelighed med rådsforordning nr. 2092/91 om økologisk produktionsmåde for landbrugsprodukter m.v. Det må på denne baggrund anses for utvivlsomt, at sagsøgerens planlagte salg af grønpiller leveret fra Tørrecentralen Vestjylland til forskellige aftagere ville være i strid med såvel de to bekendtgørelser som den nævnte administrative praksis, og det manglende forhold i skrivelsen af 6. juli 1994 med hensyn til »forarbejdede« foderstoffer kan ikke medføre nogen ændring af denne retstilstand. Det må endvidere efter bevisførelsen lægges til grund, at der var sagsøgerens hensigt at sælge foderstofferne som grønpiller. Sagsøgeren har muligt kunnet omgøre denne beslutning og i stedet vælge at ensilere afgrøderne og sælge dem som uforarbejdede foderstoffer. Det fremgår imidlertid af såvel syns- og skønsmandens udtalelser som sagsøgerens egen forklaring, at mulighederne for

afsætning på denne måde var meget begrænsede navnlig på grund af høje transportomkostninger og afgrødernes specielle karakter.

**113**

Med hensyn til spørgsmålet om *direkte salg* bemærkes:

Som anført af sagsøgte må det antages at være af afgørende betydning for fremme af den økologiske fødevareproduktion, at aftagerne, i sidste led forbrugerne, har tillid til, at produkterne er produceret under nøje iagttagelse af de herfor fastsatte regler. Det forekommer indlysende, at dette fordrer ganske intensive kontrolforanstaltninger. Det må lægges til grund, at det aftalekompleks, som sagsøgerens produktion og salg byggede på, indebar, at jordejerne - i dette tilfælde Aage Pedersen - foretog tilsåning af markerne, og at dyrkningen fandt sted under disses økologiske autorisationsnummer. Produktionstilskuddet tilfaldt derfor også ejerne. Dermod skulle høsten foretages af sagsøgeren, der derefter leverede afgrøderne til tørrecentralen, hvorfra der skete levering til forskellige aftagere i overensstemmelse med de foreviste kontrakter. Dette arrangement, der må antages at have været af en usædvanlig karakter og at have bevirket en væsentlig forringelse af myndighedernes kontrolmuligheder, blev - som nævnt - ikke nærmere omtalt i samtalen med Niels Grønbjerg, og det har næppe heller på anden vis været myndighederne bekendt. Landsretten finder, at arrangementet klart falder uden for den på en administrativ praksis baserede undtagelsesregel om direkte salg mellem to (økologiske) landmænd. På baggrund af arrangementets usædvanlige karakter og sagsøgerens mangelfulde oplysninger til myndighederne findes det mest nærliggende at have påhvilet sagsøgeren at sikre sig disses godkendelse af, at det lå inden for den nævnte administrative undtagelsespraksis. Sagsøgerens salg af de nævnte afgrøder dyrket på Aage Pedersens marker har derfor været stridende mod både 1992-bekendtgørelsen og 1994-bekendtgørelsen og den omstændighed, at skrivelsen af 6. juli 1994 ikke nærmere beskriver, hvornår en landmand kan anses for mellemhandler, kan ikke medføre nogen ændring af denne retstilstand. Om sagsøgerens muligheder for at afsætte afgrøderne som konventionelle henvises til det ovenfor anførte under afsnittet om forarbejdede foderstoffer.

Efter det anførte har sagsøgeren således - uanset karakteren af den vejledning, han fik i skrivelsen af 6. juli 1994 - ikke kunnet sælge afgrøderne som økologiske. Da det i dansk ret er det helt overvejende udgangspunkt, at en eventuel forventningsværdi ikke giver grundlag for erstatning, og da der ikke findes tilstrækkelig anledning til at fravige dette udgangspunkt i den foreliggende sag, er der - selv om et økonomisk tab skulle være lidt - ikke grundlag for at tage sagsøgerens krav om erstatning til følge. Landsretten tager derfor sagsøgtes frifindelsespåstand til følge.

Efter sagens baggrund og forløb finder landsretten, at hver part skal betale egne omkostninger, dog således at alle omkostninger til syns- og skønsmanden skal udredes af sagsøgte.

- - -

Sagsøgte skal i delvise sagsomkostninger betale 53.000 kr. til sagsøgeren.

De idømte sagsomkostninger skal betales inden 14 dage.

## Højesteret

## Højesterets dom.

I tidligere instans er afsagt dom af Vestre Landsrets 9. afdeling den 25. september 2001.

I pådømmelsen har deltaget fem dommere: Torben Melchior, Asbjørn Jensen, Poul Søgaard, Niels Grubbe og Marianne Højgaard Pedersen.

Appellanten, Erik Mortensen, har gentaget sin påstand.

Indstævnte, Plantedirektoratet, har påstået stadfæstelse og har gentaget sine subsidiære påstande.

Erik Mortensens påstand er opgjort som det beløb, han ville have kunnet opnå ved salg som 100 % økologisk afgrøde uden fradrag af prisen ved eventuelt salg som konventionel afgrøde.

Erik Mortensen har præciseret, at Plantedirektoratet også har pådraget sig erstatningsansvar som følge af forkert rådgivning i brevet af 6. juli 1994, hvis brevet ikke er i overensstemmelse med regler og praksis på området.

Til brug for Højesteret er der tilvejebragt yderligere oplysninger.

I brevet af 6. juli 1994 fra Niels Grønbjerg, Plantedirektoratet, til Erik Mortensen er i afsnittet om foderafgrøder yderligere anført:

»Foderafgrøder der er avlet på arealer under 2. omlægningsår kan anvendes på eget brug som 100 % økologiske. (Dette gælder også for foder der handles direkte mellem to landmænd uden nogen form for mellemhandler).«

**Højesterets bemærkninger**

Landbrugs- og Fiskeriministeriet udtalte i sit brev af 1. august 1996 ikke, at ministeriet anerkendte at være erstatningsansvarligt, men alene at ministeriet var indstillet på at indgå et forlig om erstatning med nedsættelse på grund af egen skyld. Denne udtalelse kan - på trods af henvisningen til kammeradvokatens bedømmelse af ansvarsgrundlaget - ikke anses som en anerkendelse af, at Plantedirektoratet havde pådraget sig erstatningsansvar, og afskærer derfor ikke direktoratet fra at bestride dette under en retssag.

Efter de regler og den administrative praksis, der gjaldt for handler indgået inden 5. november 1994, var Erik Mortensen ikke berettiget til at sælge grønpillerne som økologiske. Grønpillerne, der skulle produceres af afgrøde fra arealer i 2. omlægningsår, måtte nemlig

**114**

anses som forarbejdede foderstoffer. Der var endvidere ikke tale om direkte handel mellem to økologiske bedrifter, idet Erik Mortensens salg angik en produktion på grundlag af afgrøde dyrket under andre landmænds autorisation. Herefter, og da Plantedirektoratets brev af 6. juli 1994 ikke indeholder en tilladelse til, at Erik Mortensen måtte sælge grønpillerne som økologiske, er direktoratets afgørelse af 13. juli 1995 truffet med rette.

Det er ikke godtgjort, at Erik Mortensen under telefonsamtalen med Niels Grønbjerg forud for brevet af 6. juli 1994 oplyste, at afgrøden skulle dyrkes under andre landmænds autorisation og forarbejdes til grønpiller inden salg.

Under disse omstændigheder har Plantedirektoratet ikke pådraget sig erstatningsansvar ved i brevet af 6. juli 1994 at informere om gældende regler og praksis uden at oplyse, at den påtænkte tilrettelæggelse af produktion og salg ikke kunne anses som handel direkte mellem to økologiske bedrifter, og at »foderafgrøder« ikke omfattede forarbejdede foderstoffer, såsom grønpiller.

Højesteret stadfæster herefter dommen.

**Thi kendes for ret:**

*Landsrettens dom stadfæstes.*

*Statskassen skal i sagsomkostninger for Højesteret betale 50.000 kr. til Plantedirektoratet.*

*De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.*

Copyright © 2023 Karnov Group Denmark A/S