# Exhibit 35

**U.2016.1526H**

***Legal interest in an action to prevent access to documents. No suspensive effect of the action. Issues that the High Court had not separated for separate treatment could not be dealt with during the appeal proceedings before the Supreme Court. No legal basis to anonymize parties' names in a civil case.***

*Administrative law 11241.9 and 1.5 - Agriculture etc. 32.5 and 9 - Per-*
*Question 4 - Administration of justice 21.5, 22.9, 23.2, 23.9 and 26.2.*

♦ In 2008-11, the Danish Veterinary and Food Administration, F, conducted a study to test methods for determining the presence of MRSA (multi-resistant staphylococcal bacteria) in pig herds. The study included 48 herds. The study showed that 34 herds, including A-E's, were MRSA-positive. In March 2012, two journalists, H and M, requested access to the survey's information about which pig herds were found to be MRSA-positive in the survey. In July 2014, the Danish Agriculture & Food Council, L, as representative of A-E, filed a lawsuit against F to prevent access to the documents. The Danish Union of Journalists, J, as representative of H and M entered the case as the main intervener. The High Court separated the question of whether L's action should be dismissed or granted suspensive effect for separate consideration, cf. section 253 of the Danish Administration of Justice Act. The High Court found that A-E had a legal interest in having it reviewed whether F's decision to grant access to documents was valid and did not uphold F's and J's motion to dismiss. Furthermore, the High Court granted the action suspensive effect with regard to the implementation of the access to documents. The Supreme Court agreed that A-E were affected to such an extent by the granting of access to documents that they had a legal interest in having it reviewed whether F's decision on access to documents was valid. Their action should therefore not be dismissed.[1] However, the Supreme Court found that the conditions for exceptionally granting the action suspensive effect were not met.[2] Some subsidiary claims from J fell outside the scope of what the High Court had separated for separate consideration and could therefore not be considered during the appeal proceedings. The High Court had anonymized the names of A-E in its order, but the Supreme Court found that there was no legal basis for this and therefore did not anonymize A-E's names in the Supreme Court's order.[3]

**H.K. January 22, 2016 in cases 74/2015 and 75/2015**

*Danish Union of Journalists as representative for Kjeld Hansen and Nils Mulvad (attorney Tyge Trier, Copenhagen)*
against
*Danish Agriculture & Food Council as representative for A-E (attorney Håkun Djur- huus, Copenhagen)*
and
*Fødevarestyrelsen (Km.adv. v/adv. Peter Biering, Copenhagen)*
against
*Landbrug & Fødevarer as representative for A-E (adv. Håkun Djur- huus).*

## Eastern High Court

***Østre Landsret's decision of February 6, 2015 (14. afd.), B-2190-14 and B-2665-14***

(Hans Chr. Thomsen, Lone Kerrn-Jespersen, Bodil Dalgaard Hammer).

**1527**

This case concerns whether two journalists can be granted access to the results of a method testing study on MRSA in pig herds conducted by the Danish Veterinary and Food Administration in 2011.

On July 9, 2014, the case was brought before the Court in Glostrup and was referred to the Eastern High Court by order of July 16, 2014, pursuant to Section 226(1) of the Danish Administration of Justice Act.

*The plaintiffs, the Danish Agriculture & Food Council as representative of plaintiff A-E,* claim that the defendant, the Danish Veterinary and Food Administration, must acknowledge that it is unauthorized to publish or grant access to information that the plaintiffs' pig herds were found positive for MRSA in connection with the research project conducted in 2011.

The applicants further request that the action be granted suspensive effect.

*The Danish Veterinary and Food Administration* has principally claimed dismissal, alternatively acquittal. The Danish Veterinary and Food Administration has also claimed that the action should not be granted suspensive effect.

*The Danish Union of Journalists, on behalf of journalist Kjeld Hansen and journalist Nils Mulvad,* claims the following: Principally: I.1.

*In the alternative:* II.2. order the Danish Agriculture & Food Council to acknowledge that the action B-2190-14 does not have suspensive effect and that the disclosure of information about pig herds with MRSA infection to Kjeld Hansen and Nils Mulvad by February 6, 2015 is justified. II.2B. Order the Danish Agriculture & Food Council to acknowledge that the action B-2190-14 does not have suspensive effect, except for one or two pig herds specified by the High Court, and that disclosure of information about other pig herds with MRSA infection to Kjeld Hansen and Nils Mulvad by February 6, 2015 is justified.

In the further alternative: III.3. acquittal of the Danish Veterinary and Food Administration.

The plaintiffs have claimed dismissal of the defendant's and the main interveners' claims for dismissal and of the main interveners' alternative claims.

The High Court has decided to separate the issues of suspensive effect and inadmissibility for separate preliminary hearing. The issues have been debated orally.

*Case presentation*

In 2008-2011, the Danish Veterinary and Food Administration tested a number of pig herds for Methicillin-resistant Staphylococcus aureus, MRSA, which is a staphylococcal bacterium that is resistant to common penicillins against staphylococcus. There are several types of MRSA. One of these is the CC398 type, which is also referred to as porcine MRSA in the following.

In 2011, the Danish Veterinary and Food Administration also conducted a method testing study to test methods for determining whether MRSA was present in the herd. 48 herds were included in the study, including the five plaintiffs' herds.

The result of the survey is available in the form of a list with the following information:

---

1 Bet. nr. 325/1963, p. 54, bet. nr. 857/1978, p. 310-13, bet. nr. 1510/2009, p. 774 and 800 f., U 2012.605 H, U 2013.3295 H, Hans Gammeltoft-Hansen et al: Forvaltningsret, 2nd edition (2002), p. 805-10, and Jens Garde et al: Forvaltningsret. General topics, 5th edition (2009), pp. 360-65.

2 Bet. no. 1510/2009, p. 804, and U 1994.823 H with comments by Per Walsøe in U 1995B.128.

3 U 2015.922 H, Bernhard Gomard and Michael Kistrup: Civil Procedure, 7th ed. (2013), p. 623 f., Lindencrone & Werlauff: Dansk Retspleje, 6th ed. (2014),

p. 304, and Ulrik Rammeskow Bang-Pedersen & Lasse Højlund Christensen: Den Civile Retspleje, 3rd edition (2015), p. 89.

CHR NO.    Nasal swabs    Dust samples    Air    Ear swabs    MRSA status

Columns 2-6 in the list indicate whether the samples taken were positive or negative. CHR is an abbreviation for the Central Livestock Register. The CHR register contains information such as the name and address of the owner and user of the herd and the address of the herd.

On March 14, 2012, journalists Nils Mulvad and Kjeld Hansen asked the Danish Veterinary and Food Administration for access to information about pig herds that have been found to be MRSA-positive. In their request, they wrote that they wanted "a list of the companies where the Danish Veterinary and Food Administration has found MRSA bacteria in one or more pigs".

By decision of March 23, 2012, the Danish Veterinary and Food Administration refused Nils Mulvad and Kjeld Hansen access to documents. The decision states, among other things:

"...

However, as publication of the MRSA status of some herds has on previous occasions had negative consequences for the herd owner, his family and employees in connection with uncertainty in the local community about the risk of infection, it is the DVFA's assessment that the risk elements of exposure to MRSA are not so great for the individual person who may come into contact with the herd or with persons from it without being notified in advance of the herd's MRSA status that it can outweigh the need to avoid stigmatization of citizens in Danish society.

The Danish Veterinary and Food Administration therefore refuses, with reference to section 13(1)(6) of the Access to Public Administration Files Act and the consideration of private interests, taking into account the special nature of the matter, to disclose information about the herds in which MRSA has been found."

Nils Mulvad and Kjeld Hansen complained to the Danish Veterinary and Food Administration's Complaints Center, which upheld the DVFA's decision. Nils Mulvad and Kjeld Hansen then complained to the Danish Parliamentary Ombudsman on June 14, 2012, who issued his preliminary statement on January 16, 2014 and his final statement on June 6, 2014 [FOB2014-8].

The Ombudsman found that the test results in question are environmental information, cf. section 3(1)(1) of the Environmental Information Act, with the consequence that the Environmental Information Act applies. The Ombudsman also found that information about MRSA infection in a

**1528**

The Ombudsman further found that the information could not be exempted from access pursuant to section 12(1)(2) (economic damage) or section 13(1)(4) (control considerations) of the Access to Public Administration Files Act. The Ombudsman stated that the question of access to documents should then be decided under section 13(1)(6) of the Access to Public Administration Files Act and made the following remarks:

"As stated in my preliminary report (section 4.5), in my opinion, it cannot be ruled out that the public reaction - whether it can be considered justified or not - to the occurrence of disease in animals that humans interact with and may be infected by, could reach a level where the need to avoid stigmatization etc. of those affected is a consideration that can be safeguarded by the provision in section 13(1)(6) of the Public Access Act.

Nor can it be ruled out that, under the circumstances, the consideration could be accommodated within Article 4(2) of the Environmental Information Directive and thus be in accordance with Section 2(6) of the Environmental Information Act.

Based on the material provided in this case, it is my impression that there is to some extent a problem with social consequences (stigmatization) in relation to people who are or may be infected with MRSA. I fully understand the difficulties that this can cause for the people concerned, and I also understand that the authorities - within the framework of the legislation - are very aware of the considerations for these people, including when assessing the question of access to documents.

In contrast, however, is the legal basis on which the present question is to be judged.

As stated in my preliminary report, it appears from the preparatory works to section 13(1)(6) of the Access to Public Administration Files Act *that* the provision is intended to have a narrow scope of application and *that* it is only intended to be used to a limited extent where there is a clear need for it.

In this area, it also follows from the special rules in section 2(3) and (6) of the Environmental Information Act that the provision has an even narrower scope than normal. This is because the Environmental Information Act - and the underlying EU directives etc.

- is based on the principle that there should be particularly extensive public access to environmental information.

In this connection, it is important to note that, according to these rules, it must be precisely the granting of access to the information in question that involves - or at least significantly supports - the stigmatization in question. To the extent that the problem of stigmatization essentially exists independently of the question of granting access to the information, there is thus no basis for refusal under the provisions mentioned.

Against this background, I believe that there must be considerable requirements for documentation of the considerations for avoiding stigmatization etc. which, if applicable, must justify a refusal of access to documents in the case at hand. Such documentation must be provided by the responsible authorities, and it must be based on a thorough and reliable basis, so that - for example in the form of valid information gathering from a sufficient sample of affected individuals or from authorities etc. with special insight - there is really useful documentation for the assumption that access to the information in question will have the stated harmful effects in relation to the affected individuals.

I have reviewed the additional material provided by the authorities and I find that it does not meet these requirements.

...

Against this background, it is my overall opinion that the authorities have not provided an information basis which makes it possible to exempt the information in question from access to documents under section 13(1)(6) of the Access to Public Administration Files Act, cf. section 2(3) and (6) of the Environmental Information Act."

The Ombudsman recommended that the Complaints Center of the Danish Veterinary and Food Administration ensure that the cases were reopened and that new decisions were made in light of his statement.

On July 9, 2014, the plaintiffs filed this action.

On the basis of the Ombudsman's statement and after prior consultation with the affected herd owners, the DVFA made new decisions in the case on September 1, 2014 and granted the requests for access to documents. However, as a request for suspensive effect had been made during this court case, the Danish Veterinary and Food Administration suspended the

UfR ONLINE

U.2016.1526H

disclosure until the courts had taken a position on the request. The Danish Veterinary and Food Administration stated, among other things:

"It is the Danish Veterinary and Food Administration's opinion that the conditions for granting the actions suspensive effect in relation to the disclosure of the information requested by you have not been met. However, due to the very special circumstances of this case, the Danish Veterinary and Food Administration, after weighing the conditions for suspensive effect described above, finds that the disclosure of the information should await the court's imminent decision on the issue of suspensive effect. If the Danish Veterinary and Food Administration were to provide you with the information in question at this time, the Danish Veterinary and Food Administration would anticipate this decision. The Danish Veterinary and Food Administration is thus prepared to await the courts' decision on the issue of suspensive effect, as it is

**1529**

However, a crucial prerequisite is that a quick decision is made by the courts, which in the opinion of the Danish Veterinary and Food Administration means as soon as possible and no later than approximately 3 months after this decision."

Nils Mulvad and Kjeld Hansen complained about the suspension to the Complaints Center of the Ministry of Food and Agriculture, which upheld the suspension. Nils Mulvad and Kjeld Hansen appealed the decision to the Danish Parliamentary Ombudsman, who decided on October 27, 2014 not to initiate an Ombudsman investigation into the complaint. The Ombudsman's decision states the following, among other things:

"I have considered the present - very unusual - situation and, after weighing up the competing considerations, I have decided not to initiate an Ombudsman investigation in connection with your complaint.

...

I also understand your wish for me to verify the suspension decisions. This is partly because it can be said to be a question of principle whether the authorities can suspend the disclosure of information that they - at least now - believe they are obliged to disclose, solely on the grounds that an action has been brought before the courts and a request for suspensive effect of the action.

*4.* However, there are other factors at play here:

Thus, it must be taken into account, among other things, that the authorities' decisions on suspension are - and must be - based to a large extent on a weighing of the same factors that the courts will have to consider when deciding whether the action should be granted suspensive effect.

In particular, it is a question of the public interest in not delaying the disclosure of the information against the nature and extent of the damage that may be caused to the persons concerned and an assessment of the reasonableness of the claim made. See, inter alia, the judgment in U1994.823H, which the authorities have also referred to.

An assessment on my part of the correctness of the authorities' decision on suspension can therefore be said to anticipate the decision on suspensive effect that the courts are now faced with having to make.

In my opinion, it must also be considered that this is a case involving complicated legal issues and important overriding interests, including the need to avoid stigmatization of the affected crew owners etc. As also stated in my statement of June 6, 2014 I have a great understanding of the social consequences that the MRSA issue can have for these people and their families etc.

*5.* In the present, very - and as mentioned - unusual - circumstances, the question of suspension of the Danish Veterinary and Food Administration's decision of September 1, 2014 should,

in my opinion, initially await the courts' decision on whether the action should be granted suspensive effect. In this connection, I assume that the authorities will cooperate to ensure that the courts' decision on suspensive effect can be made as quickly as possible."

*Explanations*

Statements have been submitted by plaintiff D, plaintiff C, Alice Løvendahl Sørensen, Poul Bækbo, Svend Ellermann-Eriksen, Kjeld Hansen, Nils Mulvad, Lars Mark Jensen and Per Henriksen.

*Plaintiff D* has explained, among other things, that he is a farmer and has a farm

- near Faaborg. The herd is a breeding and propagation herd with propagation of sopolte, which he sells. Only 26 farmers in Denmark have a similar herd. Some of the pigs that are bred cannot be used for breeding, so they are sent to a slaughterhouse. About half of the herd goes to slaughter. He has a total of approx.

3,500 pigs in three herds and has three CHR numbers. There are four of them to look after his pigs. He only employs Danes. In 2014, two employees were replaced, so there have been a total of 6 employees. He has talked to his employees about the risk of MRSA. He has information about MRSA hanging in the barn, which he is obliged to do. From summer 2012, he could not sell his pigs. Therefore, as of July 1, 2012, he rented a stable. It was an empty barn - after a reorganized herd - on Langeland. The stable is rented with care, and he does not participate in the care of the pigs on Langeland.

In the spring - probably in May - 2014, he heard that a list showed that one of his CHR numbers had tested positive for MRSA in 2011. This was the CHR number for the stable on Langeland, which he took over in 2012. He received a letter from the Danish Veterinary and Food Administration. The letter was similar to the letters of June 12, 2014 or June 19, 2014, which are presented in the case. He has certainly not had a herd that has tested positive. He knows that all his pigs are negative because they have been tested twice and he has never been the owner or operator of a herd that has tested positive. He has not spoken to the previous owner of the CHR number.

It's not nice to be accused of something you didn't do, and he fears that access to the information about the positive finding on the one CHR number will affect his sales. He hasn't experienced buyers being worried about purchasing animals, but if you find out you've tested positive, it could have implications for non-farmers. If buyers ask, he would have to disclose a positive test. However, no one has asked him if his pigs are positive or negative. He has heard of a farmer from Odense who was hospitalized after a blood clot. The hospital wouldn't treat him until they knew whether he was positive or negative. However, he assumes that the person in question was on blood thinners. The

**1530**

He was hospitalized on a Monday and didn't get a bath until Saturday. The same day or the day after he received the letter that the herd on one of his CHR numbers had tested positive in 2011, the Danish Agriculture & Food Council contacted him. He is not aware of how the Danish Agriculture & Food Council knew about the case. It was consultant Morten Schroll who called. He told Morten Schroll that he did not own the CHR number in question on Langeland at the time of the investigation. He doesn't remember if he spoke to the previous lawyer on the case, lawyer Alex Puggaard. If he was approached by a journalist, he would probably not say anything at all. In that case, he would probably go to his own association for advice. He is a member of the Agricultural Associations and is often in contact with Axelborg's breeding department.

*Plaintiff C* has explained, among other things, that he is a farmer. He has pigs on 3 units and produces 13-14,000 slaughter pigs per year. He has three employees, one of whom is Polish. The employees have all been with him throughout the period from 2011.

In 2011, he was visited by the Danish Veterinary and Food Administration. He was asked if he would participate in a voluntary survey. He was told that he would only be a number on a list and his name would not be

emerge. 15-20 samples were taken from pigs, dust and air. MRSA was found in two air samples. However, there were no positive pig samples.

When new rules came into force in 2012, effective January 1, 2013, banning the restraint of sows, he began to cull his herd. There was a period of half a year where there were no animals in the barn, and all his animals and barns have been sanitized. He is very low in terms of penicillin consumption.

In 2014, the Danish Veterinary and Food Administration contacted him about mess and occupational material in his herd. He was asked if he would participate in testing for MRSA, which he declined as he feared being exposed. This was accepted.

He usually gives a pig on St. Hans Day in the village where he lives. But he doesn't want to do that if he risks being exposed. He fears the reaction if someone gets sick and it comes out that he has been found to have MRSA. He himself has tested positive for MRSA, but the last 3-4 tests have been negative. About 1½ years ago, he developed eczema. He tested positive and was examined at Marselisborg. The head nurse here panicked and wouldn't shake his hand. About a year ago, he tested negative, and he was also found negative in November 2014. His family and his employees who have been with him for 15 years have also tested negative. Therefore, he does not think it is fair to be singled out on a list. He was found positive in 2013, when he was first tested. He has talked to the employees about MRSA. He has asked to be tested several times, so his status is unknown. The foreman has been negative. The last one, who is his son-in-law and is primarily in the field, was also positive. He has informed his employees and has set up a sanitizer. There is information material in the stables about precautions against MRSA.

He has seen the results from 2011. There are 3-4 sheets, but he does not remember if his name is on them. In 2014 he has seen a list with names on it. He assumes it comes from the Danish Veterinary and Food Administration.

If he was approached by a journalist, he doesn't know what he would do. He would be terrified, but it is a fact that the former herd has been put down. When he was contacted by the Danish Veterinary and Food Administration with a few days to respond, he contacted his organization. He was outraged to learn that his name would be revealed when he had participated in a voluntary anonymous survey. In his opinion, if his name appears in relation to the samples that were found positive, it would not be accurate. He has not had the impression that the Danish Agriculture & Food Council was aware of the names on the 2011 list. He agrees that MRSA is a relevant topic. If a journal gets his CHR number, anyone can find out who is the owner, user and vet of the herd.

*Alice Løvendahl Sørensen* has explained, among other things, that she is a nurse and has a master's degree in public health from 2012. She is employed in the Central Denmark Region as a hygiene nurse in the quality department.

Her thesis, "Experience of coherence in carriers of Methicillin Resistant Staphylococcus aureus (MRSA), A qualitative study", is not specifically about swine MRSA. For her thesis, she interviewed 12 MRSA carriers and 4 relatives. Her interview study took place from spring 2010 to spring 2012. She does not know how many of the 12 had swine MRSA, but she knows for certain that three were infected with swine MRSA. It is her impression that being a carrier is apparently just as stressful as being infected. Her interviewees have expressed that they would not talk about infection again.

She also encounters MRSA in her daily work. A guideline states that pregnant women and women in labor should be screened if they are married to a farmer or have worked in agriculture within the last 6 months. There are a lot of people in her area who are infected, and

She feels they can handle it in the hospital system. The problem is greatest when children are hospitalized. Parents are advised to be careful with hand hygiene and not to take food themselves like other parents. She has met some who are very upset and do not want to be swabbed. In her research, she has found that children

**1531**

won't come home to play. During her research, she met a former farmer turned janitor.

After getting an abscess that tested positive for MRSA, he lost his job. There are no health reasons why a janitor should not be able to keep his job. One of the women she interviewed was diagnosed with MRSA in connection with the birth of her first child. The witness found out that it was due to a local outbreak at her place of employment. However, she lost her job. Previously they were very restrictive, but according to the latest guidance, very few people with MRSA will not be able to return to work. Many pregnant women married to farmers are not infected. She has experienced a lot of self-restriction, such as grandparents who stop seeing their grandchildren, husband and wife not sleeping together, and people not seeing their friends. Many feel a lot of guilt.

In her opinion, publishing the names of the five plaintiff farmers will have no impact on the infection inside hospitals. "It's been five years since the infection was found inside hospitals in the Central Denmark Region, but many people have been infected during hospitalization. It will have an impact on citizens if it is made public. The insecurity and fear of the unknown will cause fear. It's a fear based on ignorance.

She agrees that, as stated in the Danish Veterinary and Food Administration's MRSA risk assessment from December 2014, it is important to provide more information about MRSA, and there must be openness, but not about sensitive personal data. It is rare that you can trace where the infection comes from. She agrees that you need to "talk MRSA down".

MRSA seems to be changing and evolving microbiologically. More samples are taken and more positives are found. The question is whether the five people who died died of or with MRSA. Every single day, people die with common staphylococci. You are not sick if you carry MRSA. 70% of the Danish population are carriers of staphylococci.

*Poul Bækbo* has explained, among other things, that he is head of the department for veterinary research and development at Seges, the former VSP (Knowledge Center for Pig Production), which was part of the Danish Agriculture & Food Council. Seges is a subsidiary of the Danish Agriculture & Food Council. He is a trained veterinarian and holds a PhD in pig health.

He has been jointly responsible for the MRSA briefing. In 2008, the Danish Agriculture & Food Council took the initiative to carry out a screening for MRSA among participants in a congress for farmers. In addition to farmers, the congress was attended by veterinarians and consultants. Around 750 people out of a possible 1,200-1,300 participated in the screening. The survey was conducted anonymously and the results were published anonymously in February 2009. Approximately 3.1% of the samples were positive.

In 2009-10, the Danish Agriculture & Food Council advised pig producers that anyone working with pigs should be considered as possibly infected. Herd owners have also been advised to have their herds tested and to inform their employees. This advice is in accordance with the Danish Health Authority's guidelines, so that you are considered possibly infected even if the herd has not been tested. In terms of the working

environment, it makes no difference whether the herd is infected or not. The advisory material is available in English, Russian and Danish. The herd owners have

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2016.1526H

For the past 3 years, pig producers have been encouraged to inform employees, regardless of whether the herd has tested positive or not, and they are informed that they have a duty to inform employees if they test positive. Since 2010, the website has provided guidance on informing employees about infected herds, which is considered an occupational health problem, and all pig producers have now also received an email about this directly. Already in 2011, a guide on MRSA was sent out in collaboration with the trade unions. The guide is now also available in English and is on its way in Russian. He doesn't know of any employees at his workplace who have not been informed about infection. The risk of transmission of swine MRSA from human to human is small compared to the several hundred types of human MRSA. Porcine MRSA is quickly lost to humans. The problems arise with blood poisoning, which has a very small treatment window. This is true for all staphylococci. 50% of the population carries staphylococci, significantly fewer carry MRSA.

You wouldn't gain anything in terms of health by providing the names of MRSA carriers. What matters in terms of health is that you maintain a high level of hygiene, especially when you leave the premises. An infection control plan has been drawn up, which includes changing clothes and hand washing with disinfection. If you work with pigs, you should be treated as if you are carrying MRSA in the healthcare setting.

The problems with MRSA in Denmark are much smaller than in southern European countries. In Italy, Spain and Germany, more than half of the herds are infected. In the Netherlands, it was assumed in 2009-10 that virtually all herds were infected, and this has also been dealt with in relation to potential sources of infection among humans. In the Netherlands, MRSA has become commonplace.

The 2011 study was conducted to find a method. He agrees with the conclusion in the Danish Veterinary and Food Administration's MRSA risk assessment from December 2014 that openness about CC398 is important. Under Danish conditions, he does not agree that a high consumption of antibiotics creates resistance; but he agrees that high consumption, all else being equal, creates resistance. His reservations about Danish

**1532**

It is believed that the clone in Denmark is a clone that originated in Central Europe and was transported by animals and humans to Denmark. *Svend Ellermann-Eriksen* has explained, among other things, that he is Dr. med. and employed as a senior consultant and professor at the Department of Clinical Microbiology at Aarhus University and has worked for many years with microbiology in general. He is also head of the MRSA unit. As there has been a lack of a senior physician in the field, he has been particularly involved with MRSA. He has participated in the preparation of the Danish Veterinary and Food Administration's guidelines on MRSA.

Among people who work with pig herds on a daily basis, 70-80% are MRSA carriers. That's close to 100% who are carriers when they come out of a pigsty. About a quarter of them shed the bacteria again. Many who do not come into the barn for a period of time will shed the bacteria. Being a carrier is not the same as being sick. MRSA is a common average staphylococcus. Staphylococci are part of our normal flora. About half of all blood donors are carriers of staphylococcus in the nose or throat. It is largely harmless. It is estimated that around ½ - 1% of the population are carriers of MRSA, of which porcine MRSA is one type. Staphylococci are different, and MRSA is different too.

Some almost always cause infection, some occasionally and some rarely. Porcine MRSA belongs to the latter group. It is less transmissible from human to human than regular staphylococci. Swine MRSA transmits its other staphylococci, e.g. by touching door handles, but because it is less able to be transmitted from person to person, it is less contagious. It is relatively rare for family members of carriers to become infected multiple times. If a person,

Copyright © 2023 Karnov Group Denmark A/S

who carries MRSA takes the bus, the risk of others on the bus becoming infected is close to 0. In reality, there is no risk of infection when a carrier sneezes, for example. In pigsties, the prevalence of MRSA can be so high that you can become infected by staying in the stable.

In healthcare, almost no one gets infected with MRSA as such. There has been no transmission of CC398 at all in his region. In principle, all workers should be asked about working in a pig herd. Formally, only up to 60% are asked. If a patient states that they work with live pigs, they are inoculated. The patient is considered so low risk that the patient is not isolated unless the sample is found to be positive.

He professionally disagrees with the statement that farmers infect their families, who pass on the infection. "It's true that people who work with pigs will carry the infection and many are infected, but the infection is not passed on.

In his opinion, it would not benefit public health to publish the information from 2011 on CHR numbers of infected pig farms. 2/3 of pig herds are contaminated. The effort is not about the individual, but about protecting society and limiting the spread of MRSA. In other countries, MRSA accounts for 20-50% of all staphylococci. If the same happens in Denmark, we will have to use broad-spectrum anti-biotics to a greater extent.

If a farmer can't feel secure that his data won't get out, he doubts that anyone will voluntarily participate in similar studies. In his own world, it's unlikely that anyone would volunteer to be investigated because it's not in their best interests. There is almost a 1:1 relationship between MRSA in the herd and the fact that the farmer is a carrier. The Danish Veterinary and Food Administration's statement encourages voluntary participation. If you can't be sure of getting data, the effort will come to a standstill. The only way to counteract this is to introduce a legal requirement.

The increase in MRSA from 2008, as described in the 2014 report, is due to spread in the stables. More people are also being tested than before and more infected people are being found. This is a real increase in cases, but also a technical increase due to more investigations.

Compared to other countries, Denmark is a human butterfly when it comes to resistance. We have very little MRSA and almost no other resistance. This has been achieved by a restrictive antibiotic policy. Right now, we are in a cautionary period. The current swine MRSA has almost no human-to-human transmission, but the fear is that the bacterium will change, which is the reason for the efforts against MRSA.

Staphylococcus bacteria should be considered harmless without infection. If you do get an infection, the bacteria can become dangerous. There are annual deaths 1,500 of staphylococci, of which between 50 and 100 die from MRSA, and an estimated 7 from or with swine MRSA. The figures do not say anything about whether you die from the bacteria, but indicate that you die within 1 month of being diagnosed. Salmonella is considered more dangerous than MRSA, and there are many bacteria that are much more dangerous. The best way to compare staphylococci is with E. coli. You could live with MRSA, but the Danish efforts are motivated by a desire to limit the use of broad-spectrum antibiotics. In the Netherlands, there is virtually no MRSA either, they do pretty much the same as in Denmark.

It is true that there have been cases of newborn babies with porcine MRSA. Almost all are healthy. When a child is born, it has to build up its flora, which comes from its parents. When the flora is being established, some bacteria can be present in very large quantities until other bacteria take over. Human-to-human transmission

Copyright © 2023 Karnov Group Denmark A/S

can occur. It is very unlikely that infection has come from the air. Air is not a significant transmission route.

**1533**

A recent study shows that 13% of those infected have had no contact with pigs. This is data from sick people who go to the hospital. You don't have data from healthy people who work in stables and have the infection on them. Therefore, 13% would be a gross overestimate. The denominator in the fraction is thus grossly underestimated, as too many people who do not have pig contact are included.

When the Danish Veterinary and Food Administration's MRSA risk assessment from December 2014 states that "The use of antibiotics and other antimicrobials in any context will result in an undesirable development of resistance", this is a very general statement. It is true that the more antibiotics used, the higher the risk of resistance. By using antibiotics that MRSA is resistant to, you help MRSA by removing the other bacteria. He agrees that the awareness of using anti-biotics in the yellow card scheme is important.

Increased information about MRSA is important because there are problems for those who are positive. Information is the best way to avoid stigmatization and inappropriate administration of the rules. There have been a few discoveries of new types of antibiotics against MRSA. However, these types of antibiotics have more serious side effects than current drugs and are not revolutionary.

*Kjeld Hansen* has explained, among other things, that he is a trained journalist and farmer. He runs a 25-hectare farm where he has pigs, among other things. He has been a journalist since 1979 and has worked with agriculture as a subject area for more than 20 years. He has been a journalist at Åbenhedstinget, which is now Investing Reporting Denmark, and he has a blog. He is often a researcher on TV and radio programs. His main business is farming and writing.

Since the late 1980s, environmental problems in agriculture have been a growing concern. In the trade magazine "Sygeplejersken" there was an article about an outbreak of MRSA in a kindergarten. He was very surprised by this, just as he was surprised that it was a secret where it had happened. He found out that it was a kindergarten in Løgstør, but of course he didn't mention the name of the kindergarten in his article.

Via a reply to the Food Committee from the Minister for Food Mette Gjerskov, he found out that the screening had been launched in 2011. In 2012, he and Nils Mulvad, who was editor of Åbenheds- tinget, asked for access to the documents. What piqued his interest was that access was denied. He believes that it is important for public health to know where MRSA originates, and it is naïve to think that you can keep the origin sites secret. MRSA is not a major health problem, but a social problem. He also finds the issue journalistically significant. "When you keep it secret, you create an unnecessary myth. The topic must be described journalistically with caution.

If access to the 2011 information is granted, they will review the lists carefully to catch misinformation before publishing anything. Everyone on the list will be contacted and they will pick up on situations similar to those of the two farmers who have given statements. In particular, they will probably be interested in contacting those whose farms are not infected, as it is also interesting to know how to stay free of infection. After a thorough review of the list, they will decide whether or not to publish. If the information is outdated, they will probably not publish, but in principle they will publish the names. It is still journalistically significant, even if the material is from 2011, as it

may be that you can start to see some patterns. There are

Copyright © 2023 Karnov Group Denmark A/S

are some incorrigibles who keep overusing tibiotics. In relation to the new list from 2014, it is relevant to see how many repeaters there are.

In 2010 they wrote an article with a list of 12 named companies attached. In connection with the article, a misunderstanding had occurred. The article was based on knowledge that he did not have from the Danish Veterinary and Food Administration. His focus is that the number of infected animals has increased 10-fold in 10 years and that the use of antibiotics has increased. The Central Livestock Register does not contain information about the health of employees. The first cases in the courts about MRSA concerned an employee who had been infected without the workplace assessment having provided information about MRSA in the herd. In relation to coverage of this, it is also relevant to know the source of the infection. He was shocked to hear that anonymity had been promised. If this is true, they will write an article about the authorities' sloppiness. In other areas, there is no reluctance to disclose names. Information about salmonella infections is publicly available, and the efforts against salmonella have led to the country being declared salmonella-free in 2016. In his opinion, there is no evidence of stigmatization. Secrecy leads to unpleasant experiences, such as the meeting in Odder that has been reported in the press.

The Danish Veterinary and Food Administration's list of 137 companies with high antibiotic consumption is publicly available. In an article on Investing Reporting Denmark, he highlighted two companies that historically had MRSA. They did not hesitate to publish these names as the companies still had a high consumption of antibiotics.

The article stating that the pig infects the farmer, who infects his wife and children, after which the infection is passed on, was written by him and Nils Mulvad. The source of the statement is an article in Uge-skrift for Læger in September 2013.

**1534**

*Nils Mulvad* has explained, among other things, that he is a trained journalist from 1989 and editor-in-chief of Åbenhedstinget, which is a network under the Danish School of Journalism. He is also a lecturer at the Danish School of Journalism and has been teaching for 20 years. Åbenhedstinget also runs a number of fundamental cases, especially on the environment. In 2003 and 2004, he and Kjeld Hansen were involved in a case about access to agricultural subsidies. Investing Reporting Denmark, of which he is also editor-in-chief, does basic research that is offered to other media.

In 2010, he became aware of MRSA as a subject. In 2012, he and Kjeld Hansen applied for access to the information in question as part of a normal journalistic workflow. The core of their work is to obtain information about medicine consumption and the spread of infection. When the Ombudsman's statement was available, they expected to be granted access. It is still journalistically relevant to get the information, just as it is a matter of principle to clarify whether they were entitled to access. The information is relevant, as they also have information about the use of medicine on the various pig farms. It is also interesting to find out how the farms where no infection has been found have managed to stay free of infection.

If they get access to the list, they will of course investigate the farms in question. In doing so, they would discover the information that one farmer had only acquired a CHR number after the investigation. He will also believe that the other farmer who has given a statement will not be registered as positive at all.

New information is constantly emerging about, among other things, infection routes. It is difficult to measure the value of their work, but they have indirectly contributed to the intensified efforts against MRSA based on media coverage.

Copyright © 2023 Karnov Group Denmark A/S

*Lars Mark Jensen* has explained, among other things, that he is group chairman of the green group, which organizes, among other things, the agricultural sector under 3F in Aalborg.

He first became aware of the MRSA issue in the summer of 2008, when a member contacted him about contracting a disease or virus that she didn't know what it was. They have had 8-10 cases. The problem is that employees are not informed by companies about the potential occupational risk of being infected with MRSA, which members find unpleasant. In October 2014, he had a network meeting with 21 Romanian workers, 17 of whom worked with pigs. Only one had heard of infection with MRSA CC398. From his point of view, it is relevant to know where there is MRSA infection.

As a consequence of the secrecy, many infected people keep to themselves. He cannot carry out his supervision of the conditions for foreign workers for the Danish Immigration Service, as he and the department's secretary have decided not to enter the stables due to the risk of infection spreading. One member, - - - - - , who used to be an operations manager, suffered a mental breakdown after his pregnant wife was found to be infected with CC398, and the member himself has been diagnosed with PTSD. He has spoken to the people mentioned in the article in Politiken on September 9, 2014. He is not aware of any negative consequences just based on information about working with pigs.

He does not believe that publishing information about which herds are infected will have negative consequences. Tina Urth, who has been a hygiene nurse under the Medical Officer of Health, has advised employees on how to protect themselves. Information material has been sent out to members. He is familiar with the Danish Working Environment Authority's guidelines on MRSA, which establishes a duty of information for employers. He is also familiar with the National Board of Industrial Injuries' guidelines on the duty to report. The requirement to post the workplace assessment does not work in practice.

*Per Henriksen* has explained, among other things, that he is Head of Veterinary at the Danish Veterinary and Food Administration. He is a trained veterinarian and has worked as a researcher for a number of years. Since 2002, he has worked in the Ministry of Food, Agriculture and Fisheries with food and animal health. For the last 4 years he has been the veterinary director.

There are many types of MRSA in animals and humans, there is a particular resistance that staphylococci carry. Resistance means that a bacterium can live in an environment where there are toxins/antibiotics. The resistant bacteria only gain an advantage if they are in an environment with antibiotics, as they will then start outcompeting sensitive bacteria. In principle, swine MRSA is no different from other MRSA types in terms of dangerousness to humans. According to the information currently available, swine MRSA is not easily transmitted from human to human. If you have swine MRSA, you can be treated with antibiotics other than the usual ones. MRSA has been present in humans for many years. It wasn't until the 1970s that MRSA was detected in livestock. About 10 years ago, more information about infection became available. In 2005, information came from the Netherlands about the detection of a new type - CC398. During those 10 years, the bacterium has spread all over the world. Pigs are not moved around the world, so there are other mechanisms involved in the spread than export. The European Food Safety Authority (EFSA) has conducted a study of the spread in 2008 in the EU countries. The study shows that the bacterium was already present in many EU countries.

As far as he knows from colleagues, CC398 is in line with other types of MRSA in terms of dangerousness to humans. MRSA bacteria live in the throat and mucous membranes. MRSA is transmitted through contact and open wounds. Campylobacter and Salmonella bacteria, depending on the

**1535**

immune system getting sick. MRSA, on the other hand, does not pose a risk of illness for healthy people. If you are weakened and have an open wound with direct access to the bloodstream, there is a risk that the bacteria will move from the surface and you risk becoming ill. Eating meat is not a traditional route of infection.

The Dutch agricultural and health authorities decided to assess the link between antibiotic consumption and resistance. The results were published in an article from 2011. They came up with a top 3 list of resistant bacteria. MRSA is one of the three bacteria on the list. The greatest risk was considered to come from ESBL. The study provides the scientific basis for the Netherlands to focus on controlling EBSL, but does not consider MRSA to be a major risk of spreading to the population. Denmark also has a strategy to combat resistant bacteria in general by limiting the use of antibiotics. In the case of ESBL, there is a clear correlation with the use of a particular antibiotic. Since 2010, Danish agriculture has phased out the use of these antibiotics, and the incidence of ESBL in Denmark has fallen significantly. For MRSA, it's not quite as simple. There are several reservoirs for MRSA. The Ministry of Food, Agriculture and Fisheries has recently allocated DKK 35 million for research into the spread patterns of MRSA. Reducing antibiotics will have some effect. In addition, hygiene measures have been taken with the Minister of Food's 5-point plan. The plan includes requirements for hand washing and disinfection. If you break the chain of infection, it is effective. Another point is that routine herd medication should be limited. Experiments with calves have shown that this reduces infection, but it does not eliminate it. A third point is the development of infection control plans. A fourth point is to set up an information service with a hygiene nurse who participates in public meetings, etc.

There are two types of studies, mapping and method testing studies. The 2011 study was a methodology study that was initiated because very little was known about how to most effectively detect MRSA on pigs and in the environment. It was therefore not a control study. Therefore, only 48 herds were included in the study. In general, the Danish Veterinary and Food Administration collaborates with the Danish Agriculture & Food Council on information. The method testing is also interesting for the industry. The results of the study can still be used to find out the easiest way to detect MRSA. However, the list is not suitable to say anything about the status of MRSA in 2014 or 2015. In a report from 2012, EFSA recommended testing for MRSA in different reservoirs at appropriate intervals. Against this background, the Danish Veterinary and Food Administration chose to repeat the study in 2013-14 by examining all breeding herds and 200 finisher herds. This was a different type of survey than the 2011 survey. The study is part of an expert report and is part of a project initiated by the Ministry of Food, Agriculture and Fisheries and the Ministry of Health to investigate the risk of MRSA. The study has led to a number of recommendations from the expert group. An action plan is being prepared. He expects that an action plan will be presented to the Danish Parliament in mid-February 2015.

Historical data says nothing about status and cannot be used for enforcement. The more intrusive a finding will be for a farmer, the safer the test should be. There are negative consequences to both positive and false negatives. For a result to be enforceable, it requires a safe method and a safe data base. The 2011 survey was voluntary. Anonymization cannot be promised, but of course he does not know what the sampler has said. So he cannot be 100% sure that anonymity was not promised. If the case leads

to the publication of the names and addresses of the farmers involved, he believes that it will have no impact on public health.

Copyright © 2023 Karnov Group Denmark A/S

The Danish Veterinary and Food Administration has the authority to take the necessary samples to ensure animal and human health - ultimately with the help of the police. Research projects are handled in a different way. However, it may be necessary for research to take samples compulsorily, but this has not been the case. The design of the 2014 study was to get samples from all over the country, but it was less important whether it was from one farmer or another in an area.

CC398 must be considered an increasing problem. The expert group concluded that the prevalence in humans is on the rise. It is also his concern that the bacterium will change and thus change the risk of infection. There is an increasing reservoir in pig herds. There is a risk with every movement of pigs. There are many more movements from production herds to other herds than from breeding herds. There are approximately 8000 pig herds in Danmark.

Staphylococci can survive for a long time in dust, and dust can therefore contain MRSA. Within the local area, the possibility of spread via dust cannot be ruled out, which is something to be investigated in future research projects, but the most common cause of spread is contact between animals. In some cases, there is also transmission via the practicing veterinarian. In a few months, an assessment will be made of whether manure can be a spreading factor, but the immediate assessment is that there is no risk.

The Danish Veterinary and Food Administration has informed the Danish Agriculture & Food Council about the results of the 2011 survey. He is

**1536**

Not aware if the Danish Agriculture & Food Council has been informed of the CHR numbers of the herds involved.

Under the yellow card scheme, farmers can be ordered to reduce their consumption of antibiotics. Information about this is publicly available, but you can't say that high consumption of antibiotics also leads to MRSA. In Norway, it has been shown that in herds that only receive infected pigs a few times, the infection disappears.

*How to proceed*

The Danish Agriculture & Food Council has argued in support of *the claims for acquittal against the claims for dismissal* that the plaintiffs have an individual, substantial and legal interest in obtaining a judicial review of the claim brought. All of the plaintiffs thus have the requisite standing to bring an action.

According to the former Public Access to Public Administration Files Act section 12(1)(1) and

§ Section 13(1)(6) and section 30(1) of the new Public Access to Public Administration Files Act and section 33(5), respectively, the applicants are the direct subjects of protection protected by the laws in relation to the applicants' claim. The applicants' important, individual and legal interest in avoiding stigmatization, not only of the applicants themselves, but also of the applicants' spouses, children and employees, is precisely what is protected by the provisions invoked, and the protection constitutes the very purpose of the exceptions invoked.

If the defendant and the main interveners are successful in their claims for dismissal, the statutory subjects of protection will be deprived of the constitutional right to judicial review of the limits of the executive authority, cf. section 63 of the Constitution, regarding precisely these matters.

Those who, like the plaintiffs, have protection interests that have been found to be so important that they are directly protected by law have at least a presumptive right of review in the form of standing under Article 63 of the Basic Law.

Disclosure in this case would lead to the applicants, their families and their employees being named and shamed, which would lead to social ostracism, and would likely cause the applicants economic loss and non-economic damages in the form of pain and suffering. The stigmatization that the Lead Interveners' claims will cause is the entire rationale for this

Copyright © 2023 Karnov Group Denmark A/S

*i.e. a*

principled case. The stigmatization effect will be so burdensome and intrusive for the applicants, their families and employees that it will significantly outweigh the conflicting interests in the obligatory balancing of the interests of the applicants, their families and employees on the one hand and the possible public interest on the other hand. In this regard, it must be borne in mind that the farmers in question participated voluntarily.

In his statement of 6 June 2014, the Parliamentary Ombudsman states that it cannot be ruled out that the public's reaction to the occurrence of disease in animals which humans interact with and can be infected by could reach a level where the need to avoid stigmatization etc. of those affected is a consideration that can be safeguarded by the provision in section 13(1)(6) of the Access to Public Administration Files Act, cf. the rules in the Environmental Information Act, but the Ombudsman found that the authorities had not provided an information basis which made it possible to exempt information from access to documents under the provisions. Judicial review is more than any administrative review, including review by quasi-judicial boards, the most suitable forum for obtaining the evidentiary knowledge base which the Ombudsman seeks and which could justify a refusal of access, as it allows for actual evidence, including witnesses, and oral proceedings etc.

In relation to the access to documents case, the plaintiffs have administrative law party status, which creates a presumption bordering on certainty that the plaintiffs also have the necessary legal standing. However, it *cannot* be contradictorily concluded from this that lack of administrative law party status implies lack of standing. Even if the plaintiffs do not have administrative law party status - which is the starting point in access to documents cases - the plaintiffs may very well have the necessary legal standing. In recent years, case law has significantly expanded the right to sue, especially in cases related to public law. Regarding the issue of *suspensive effect, the Danish* Agriculture & Food Council has argued that the action must be granted suspensive effect, and in support of this, it has referred to the case law that has developed on this issue despite the provision in section 63(1), second sentence, of the Constitution.

The whole purpose of this fundamental case would be defeated if the action is not granted suspensive effect. If the action is not granted suspensive effect, it is doubtful whether the plaintiffs will have the necessary legal interest in a domestic review of the case at all.

If the action is not granted suspensive effect, it will have irreparable harm to the applicants, their families and employees, in particular in terms of social exclusion and stigmatization. It should also be taken into account that the irreversible effects suffered by the applicants if the action is not granted suspensive effect cannot be financially compensated.

There is a realistic prospect that the plaintiffs will be successful in the substantive case. The subsequent substantive case will be heard within 3-4 months, which is why the suspensive effect, if any, will only be

**1537**

will have a very limited temporal scope. This should be part o f t h e  considerations that the High Court must make.

During the partial hearing, the Danish Agriculture & Food Council has stated that it is now undisputed that this is environmental information.

In support of its *motion to dismiss, the Danish Veterinary and Food Administration* has stated that neither the Danish Agriculture & Food Council nor the Danish Agriculture & Food Council as representative of the plaintiffs has a legal interest,

Copyright © 2023 Karnov Group Denmark A/S

a concrete, individual and actual interest in having the claim brought before the courts.

Neither the Danish Agriculture & Food Council nor the individual clients are the addressees of the Danish Veterinary and Food Administration's decision of September 1, 2014 or the Ombudsman's report. The journalists are, however. Nor can the applicants otherwise be considered parties - or have party-like status - either in relation to the Ombudsman's statement or in relation to the Danish Veterinary and Food Administration's decision of September 1, 2014. The Danish Veterinary and Food Administration's refusal of party status is in accordance with the principle of administrative law, according to which it is generally assumed that only the person seeking access to a case or document is a party in the case in question. The legal or natural person(s) to whom the information in the access case relates is not a party to the access case.

Already because the Danish Agriculture & Food Council and the petitioners are not parties to the access to documents cases, they do not have the necessary legal interest in a civil action such as the present one. Legal interest in such a civil action presupposes that the Danish Agriculture & Food Council and the clients are directly, significantly and individually affected by the Danish Veterinary and Food Administration's decision of September 1, 2014, and furthermore, the issue to be clarified must be relevant.

The information in the access to file cases in this lawsuit concerns test results from 48 herds showing in which herds animal MRSA has been found. The information in the access to documents cases does not concern information about specific persons that could lead to the plaintiffs having a specific, substantial and particular individual interest in the case. As there is a large number of pig herds involved, it also affects the significance of the individual interest, as the number of affected herds causes a dilution of the individual herd owner's interest, so that their interest cannot be considered significant and individual.

Furthermore, as this is information from an investigation in 2011 that does not reflect the circumstances today, there is no current interest necessary for an action.

The crew owners have other legal remedies as they have the opportunity to protect their interests by seeking to prevent publication when access has been granted, by injunction, cf. Chapter 40 of the Danish Administration of Justice Act, by seeking to have any abuse punished under the Danish Criminal Code or Chapter 3 of the Danish Media Liability Act and by bringing an action for damages in connection with any publication, cf. Chapter 4-5 of the Danish Media Liability Act and the general compensation rules of Danish law.

On the issue of *suspensive effect, the Danish Veterinary and Food Administration* has stated that the action should not be granted suspensive effect in relation to the Danish Veterinary and Food Administration's decision of September 1, 2014, which is supported by Danish case law and case law from the European Court of Justice. The main rule on suspensive effect is found in section 63(1) of the Danish Constitution, which states that a person who appeals an administrative decision

"*cannot, by bringing the matter before the courts, avoid complying with the order of the authorities.*

In a ruling of August 24, 1994, printed in UfR 1994.823 H (the Gyproc case), the Supreme Court ruled that even if there is no express statutory authority, the courts are not precluded from exceptionally granting suspensive effect to an action. The Supreme Court also stated that the specific decision as to whether an action should be granted suspensive effect must be based on a

balancing of the public interest in not delaying the implementation of the decision against the nature and extent of the damage that may be caused to the person concerned, just as importance must be attached to whether there is a reasonable basis for the claim of invalidity after a preliminary assessment.

When Danish courts have to decide whether an application for suspensive effect should be granted, they must also follow the conditions set out by the European Court of Justice in its case law.

As neither the Public Access to Information Act, the Public Administration Act nor the Environmental Information Act contain legal authority to grant suspensive effect to an action regarding the validity of a decision, it must be assessed whether the criteria established by the Supreme Court in the Gyproc judgment, which are based on the conditions set out by the European Court of Justice in its practice, are met. The criteria are as follows: 1) does the plaintiff's claim appear to be justified on the face of it,

2) it is necessary to grant suspensive effect in order to prevent the applicant from suffering serious and irreparable damage as a result of the contested decision before final judgment has been given in the case; and

3) a balancing of the interests involved.

There is no basis for assuming that the Ombudsman's opinion is in conflict with the relevant national rules or with EU law.

With regard to the condition that there must be a risk that the party will suffer irreparable harm, a distinction must be made between economic loss and loss of

**1538**

non-economic nature. Neither the Danish Agriculture & Food Council's nor the clients' potential financial loss can in itself justify suspensive effect in this case.

In relation to non-economic loss, it must be assumed, in accordance with the Ombudsman's statement, that there is no such concrete documentation for any stigmatization that the risk of stigmatization constitutes a non-economic loss of a nature that causes irreparable harm. When assessing whether it can be proven that there is a risk of stigmatization, the specific danger associated with MRSA for healthy people must be taken into account. Compared to e.g. listeria, salmonella and similar diseases, this danger is limited. According to case law, very special circumstances must exist before losses of a non-economic nature can justify suspensive effect. There are no such exceptional circumstances in this case.

The third criterion for suspensive effect concerns whether there is a significant public interest that speaks against suspensive effect. The considerations of public access and democracy which underlie the Public Administration Act must be assumed to be so weighty that the interest in granting access to documents must be assumed to outweigh the interest in allowing suspensive effect. In this case, if we follow the Ombudsman's statement, it is even environmental information within the meaning of the Environmental Information Act. Thus, in the Danish Veterinary and Food Administration's opinion, there is a particularly weighty public interest to take into account in relation to public access to the information. None of the basic conditions for granting suspensive effect to an action are met in this action. Thus, based on the present circumstances, there is no basis for deviating from the starting point in section 63(1) of the Constitution. The applicants must instead be referred to the usual instruments (prohibition, penalty and compensation) if the information about notifications of confirmed MRSA in pig herds is misused after it has been handed over to the journalists.

In support of the claim for dismissal, the *Danish Union of Journalists* has stated that neither the Danish Agriculture & Food Council nor the organization's members are addressees of the Danish Veterinary and Food Administration's and the Ombudsman's decisions. Nor does the Danish Veterinary and Food Administration's decision imply a regulation of the conditions for the plaintiffs, as the Agency has carried out its task regarding the 2011 project in the usual way, where the Agency has the right of disposal over its own projects and its own data. Against this background, the Danish Agriculture & Food Council has no legal interest in a review of the claim.

The lawsuit is a questionable and inappropriate attempt to interfere with the established system for the administration's handling of access to documents, where the right to bring an action will open for a

Copyright © 2023 Karnov Group Denmark A/S

very wide range of lawsuits regarding the handling of data by public authorities.

The Danish Agriculture & Food Council has a number of relevant and usual opportunities to safeguard the interests of its members, including providing information and views to the Danish Veterinary and Food Administration in connection with the case processing regarding access to documents, just as the Danish Agriculture & Food Council can act in relation to Nils Mulvad and Kjeld Hansen's journalistic work under the rules of the Media Liability Act, section 264 d etc. of the Danish Criminal Code, the prohibition rules of the Administration of Justice Act and the rules on liability.

Regarding the issue of *suspensive effect, the* Danish Union of Journalists has stated that the action should not be granted suspensive effect. The action is a new formation, where suspensive effect would be particularly worrying via a de facto blocking of news dissemination regarding a central social issue such as MRSA. The suspensive effect of the action will establish a similar effect as censorship of Kjeld Hansen's and Nils Mulvad's journalistic research work, which is separately and strongly protected by Article 10 of the ECHR and the practice of the European Court of Human Rights.

The interpretation of section 63 of the Constitution and the application of the judge-made law established by the Gyproc judgment and subsequent case law must be based on the central overriding good of freedom of the press and publicity regarding environmental matters, which Article 10 protects. The weighty interest that the implementation of the Danish Veterinary and Food Administration's decision is not postponed is supplemented in this case by the special interest that journalists have as representatives of the public. The previous journalistic coverage of MRSA must thus be expanded through access to documents. Kjeld Hansen and Nils Mulvad have a legal right to access the environmental information in the method testing study pursuant to the Council Directive of 1993 and the Environmental Information Act.

The access to documents will indicate the herds in question that are registered in CHR, but will not include the owners or employees of specific companies, and the access to documents will not include the identity of the five plaintiffs.

The Danish Agriculture & Food Council's extensive material contains no documentation or probability of a concrete irreparable damage of a particularly serious nature that the five farmers are exposed to by the implementation of the decision on access to documents. Thus, there is no irreparable loss for the individual herd owners, which is why suspensive effect must be rejected.

In support of the most subsidiary claim II.2B, the Danish Union of Journalists has stated that case law requires the individual plaintiff to document the irreparable

**1539**

losses. The individual pig company thus has a specific burden of proof to lift. None of the conditions for suspensive effect are met, but should the High Court find that one or two individual plaintiffs specifically meet the conditions, the suspensive effect must be limited to this particular plaintiff.

**The High Court's reasoning and result**
*The issue of standing to sue*

The case concerns whether the Danish Veterinary and Food Administration is entitled to grant access to and publish information that the applicants' pig herds were found to be MRSA-positive in connection with a method testing study conducted by the Danish Veterinary and Food Administration in

2011.

On the basis of the Danish Parliamentary Ombudsman's final report of June 6, 2014 [FOB2014-8] and after prior hearing of the applicants on September 1, 2014, the Danish Veterinary and Food Administration decided to grant the journalists Kjeld Hansen and Nils Mulvad's

request for access to the relevant list of the herds that were found MRSA-positive during the investigation project in 2011. The applicants are not addressees of the decision, but are specifically and individually affected by it in that the decision makes it public that the herds under their CHR numbers were tested MRSA-positive in 2011.

Against this background, the High Court finds that the plaintiffs have a concrete, individual and actual interest in the claim being reviewed by the courts. As the plaintiffs thus have the necessary legal interest in having their claim reviewed, the High Court will not uphold the motions to dismiss.

*The issue of suspensive effect*

In this case, the Danish Veterinary and Food Administration has decided that the information to which access is sought is environmental information, cf. section 3(1)(1) of the Environmental Information Act. The Danish Veterinary and Food Administration has also found that there is no basis for refusing access under the Environmental Information Act, cf. the provisions of the Public Access Act. However, the Danish Veterinary and Food Administration has not yet disclosed the information, as the Danish Veterinary and Food Administration has suspended the disclosure until the High Court has decided whether the action should be given suspensive effect. According to section 63(1)(2) of the Constitution, a person who challenges an administrative decision may not, by bringing the case before the courts, avoid temporarily complying with the authority's order.

Neither the Environmental Information Act nor the Public Access to Information Act contains a legal basis for granting a lawsuit suspensive effect.

Even if there is no express statutory authority, the courts may exceptionally grant suspensive effect to an action concerning the justification of the Danish Veterinary and Food Administration's decision on access to documents, cf. the Supreme Court's decision of August 24, 1994, reproduced in UfR 1994.823.

According to the Public Access Act, everyone is entitled to access to documents, unless the matter is covered by one of the exceptions in the Act. A request for access to documents must be processed as soon as possible.

In this case, the Danish Agriculture & Food Council argues that the information to which access has been sought must be exempted from access, as the information is covered by exemptions in the Access to Public Administration Files Act. Before the High Court, the affected farmers have in particular referred to the risk of stigmatization for the farmers and their families if the public is given access to information about in which herds MRSA was found in the method testing study in 2011. It was also stated that this was a voluntary study.

Access to the information was requested in March 2012, which was refused with reference to the risk of stigmatization. Following a complaint to the Ombudsman, whose final report was available on June 6, 2014 [FOB2014-8], the Danish Veterinary and Food Administration decided on September 1, 2014 to grant access to the information, but as mentioned, has not yet provided the information. Time has been reserved for the main hearing in the case on May 4, 5 and 6, 2015.

This is a case of principle concerning a number of complicated legal issues and of far-reaching importance also for other farmers with pig herds. The case raises questions about the balance between the public's right of access to documents and the need to avoid possible stigmatization of the farmers involved. The High Court's position on the parties' arguments in this regard will have to be based on the full evidence in the case

after the main hearing. The damage in the form of stigmatization, which the plaintiffs claim that they may suffer as a result of disclosure of the information to which access has been sought, may be irreparable. Against this background and after an overall weighing of the consideration for the implementation of the access sought in March 2012 against the nature and possible extent of the alleged adverse effect, the High Court finds that the risk of the alleged adverse effect is irreparable.

In the present peculiar circumstances, greater weight must be given to the interest in obtaining access to the documents before the High Court has decided on the case.

The High Court therefore grants the action suspensive effect.

- - -

## Supreme Court

### Supreme Court ruling

In a previous instance, a ruling was made by the Eastern High Court's 14th division on February 6, 2015.

**1540**

Five judges participated in the ruling: Poul Søgaard, Thomas Rørdam, Jon Stokholm, Oliver Talevski and Jens Kruse Mikkelsen. In 2008-2011, the Danish Veterinary and Food Administration conducted a study to test methods for determining the presence of MRSA in pig herds. The study included 48 herds. The study showed that 34 herds, including - according to the information provided - the five farmers who were called in, were MRSA-positive. On March 14, 2012, journalists Kjeld Hansen and Nils Mulvad requested access to the survey's information about which pig herds were found to be MRSA-positive in the survey.

On July 9, 2014, the Danish Agriculture & Food Council, as representative of the five farmers, filed a lawsuit to prevent access to the method testing study from being granted. The case was referred to the High Court pursuant to section 226(1) of the Danish Administration of Justice Act. Subsequently, the Danish Union of Journalists has entered as the main intervener in the court case as representative of the two journalists who have applied for access to documents. The High Court has decided to separate the questions as to whether the Danish Agriculture & Food Council's action should be dismissed or granted suspensive effect for separate consideration, cf. section 253 of the Danish Administration of Justice Act.

This appeal case concerns whether the action brought by the Danish Agriculture & Food Council as representative of the five farmers should be dismissed because the farmers have no legal interest in the action. If the action is not dismissed, the question is whether the action should be granted suspensive effect.

*Claims*

The *Danish Veterinary and Food Administration* claims that the action should be dismissed or, alternatively, that the action should not be granted suspensive effect.

*The Danish Union of Journalists,* as representative of Kjeld Hansen and Nils Mulvad, has made the following claims:

Principally: I.1. Rejection of the action.

In the alternative: II.2. The Danish Agriculture & Food Council as representative of A-E must acknowledge that the action does not have suspensive effect and that the disclosure of information about pig herds with MRSA infection to Kjeld Hansen and Nils Mulvad is justified.

II.2B. The Danish Agriculture & Food Council as representative of A-E must acknowledge that the action does not have suspensive effect except for one or two pig herds specified by the Supreme Court, and that the disclosure of information about pig herds with MRSA infection to Kjeld Hansen and Nils Mulvad is justified.

In the alternative: Acquittal of the Danish Veterinary and Food Administration. The Danish *Agriculture & Food Council* as representative for A-E. *Supplementary statement of case*

The Danish Parliamentary Ombudsman's final statement in the

case of June 6, 2014 is published in the Ombudsman's report for 2014 (FOB 2014-8). The report contains a description of the information about the risk of stigmatization that was part of the Ombudsman's basis of assessment. This material included:

" 1) The Ethical Council's opinion on the use of antibiotics

2) Ethical Council Working Paper 3

3) Master project: Experience of coherence in carriers of Meticillin Resistant Staphylococcus aureus (MRSA)

Copyright © 2023 Karnov Group Denmark A/S

4) Weekendavisen's article "Community dilemma" of January 17, 2014

5) Information from Statens Serum Institut about stigmatization (5 emails)".

The statement mentioned under point 1 was adopted by the Ethical Council at its annual meeting on December 19, 2013. The statement states, among other things:

*"Dilemma 2: Preventing infection*

Being a carrier of antibiotic-resistant bacteria carries a risk of infection. Infection can involve medical risks and social burdens.

Non-infected people should be protected from infection. This may include the use of isolation, coercive measures, etc. Non-infected people should also have the opportunity to decide what risks of infection they want to expose themselves to. This argues for openness about sources of infection, for example in the form of public access to infected animal populations or mandatory reporting of knowledge of infected persons. For carriers of resistant bacteria, however, such measures can be stigmatizing, offensive and interfere with the individual's freedom. Experience has also shown that this has led to a greater degree of concealment of the carrier state and thus increased the risk of infection."

The Ethical Council's "Working Paper 3: Social Aspects" mentioned under point 2 states, among other things:

*"Stigma and infectious disease*

...

*Example 2: MRSA in Denmark*

In 2008, journalist (A) applied for access to information from Statens Serum Institut about which pig farms were infected with MRSA. A refusal was based on the grounds that the information could harm the infected farmers financially and that access would also make future cooperation with the farmers more difficult. The Ombudsman assessed the case and found the refusal to be well-founded in terms of the risk of identifying specific farmers. He based his decision on reports from a hygiene nurse in North Jutland about cases of stigmatization of farmers and their families and employees. According to her, there have been cases of farmers' spouses being bullied at their workplaces by colleagues avoiding them; children of pig farmers were reportedly met with suspicion in daycare centers; and employees from infected farms

**1541**

have found it difficult to find new work. In connection with the publication of the addresses of two infected farms by the web media [...], the farmers reportedly lost income and employees resigned. However, the subsequent debate revealed that part of the reason for the resignation was that the farmers had not told their employees that the farm was infected.

Statens Serum Institut has stated that if lists of MRSA-infected farms were published, the consequence would be that farmers would refuse to participate in the studies. This would make it difficult for the authorities to monitor the infection situation.

Recent studies from Sweden show that patients can experience MRSA infection as highly stigmatizing. Those infected felt dirty and a danger to their surroundings. Many feared being rejected. Not least, ignorance among both patients a n d  staff led to unnecessary fear, isolation and suffering." The Master's thesis mentioned in point 3 was written by Alice Løvendahl Sørensen, a hygiene nurse in the Central Denmark Region, in December 2012. The thesis states, among other things:

"Citizens experience being a carrier of MRSA as an unclear and confusing state between health and disease. The study

identifies the core category of "Lack of information" as a

Copyright © 2023 Karnov Group Denmark A/S

resolves feelings of confusion and insecurity, meaninglessness, stress and anger. This results in non-compliance, worries about the future and stigmatization."

The article mentioned under point 4 was published in Weekendavisen on January 17, 2014. The article states, among other things:

"Last year, the Ethical Council [...] felt the threat up close. His 10-year-old daughter had a sore in her mouth that would not heal. She was swabbed and told it was an MRSA bacterium. The family was told to clean the home with rubbing alcohol. They were given a special soap to use for the next few days. They didn't dare invite anyone else into the house. The daughter recovered, but was given a special ID card that she must show for the next two years if she visits a hospital. "It's also starting to have social consequences for those who get infected," says [...]. "When we can't treat people who carry a bacteria that is dangerous to the rest of us, there is a risk that people will react with stigmatization and social exclusion. That's another dilemma we have to deal with. It will affect the way we are together."

The information from Statens Serum Institut mentioned under point 5 are emails sent to Statens Serum Institut from a number of healthcare professionals describing their experiences with MRSA and stigmatization.

An email dated January 30, 2014 states, among other things:

"I don't have much experience with CC398, but based on our people with "human" MRSA, I can get very cold feet about any publication of information about "infection" on this farm.

Our experience with children in daycare centers is that we encourage parents not to disclose that their child is a carrier of MRSA, as it has been shown that then no one will play with that child and we have experienced that parents of non-infected children demanded that the child be taken out of the daycare center.

This was at the beginning of the neonatal outbreaks, and since, according to the Danish Health Authority's guidelines, there is only a duty of disclosure for visits to the healthcare system, we have encouraged parents not to disclose the baby's condition. Some parents have disclosed anyway and have then experienced stigmatization of the child. We saw the same thing with AIDS children in my youth. I've also experienced it with children in TB treatment, even though they were well into treatment and in no way infectious, there was a parental storm at the school in question.

But [...], we also have a duty of confidentiality, so you can't disclose health information to the press, then we lose the public's trust. We consider the people on a farm with MRSA in the pigs to be in the risk zone and potential carriers of infection, and naming them is a breach of the law on health information." An email dated February 3, 2014 states, among other things:

"In Region Zealand, at the time of writing, we do not have widespread examples of stigmatization limited to people with CC398.

Less than 10% of our total MRSA cases are CC398. 35 % of these have no contact with pig farms.

- Several citizens report a lack of precautions when contacting hospitals or medical clinics as there is a misconception that CC398 is not contagious between people!

- Healthcare workers living on pig farms with MRSA whom confirmed MRSA experience pressure from colleagues to become control points and are considered a risk of infection in the working relationship.

On the other hand, we have challenges for our MRSA people with different strains.

Citizens in Region Zealand with children under the age of 2 experience stigmatization to a greater extent than, for example, citizens in nursing homes.

...

- They are rejected in mommy groups.

- They get fewer scheduled visits from nurses
- Scheduled visits to pediatric wards are canceled.

**1542**

- They are installed on admission in depots, without windows and washbasins, due to a lack of single rooms.
- Several have been directed to the parking lot area, only to be called when they had to [find] themselves at the department in question."

An email dated February 4, 2014 states, among other things:

"Among the 14 carriers and 4 relatives, the latter was a very common reaction, which included grandparents not visiting their children and grandchildren, not visiting family members who were considered particularly vulnerable, such as elderly parents or infants, or withdrawing or being excluded from mothers' groups or similar activities in the local area as everyone knew they were infected.

Some described how their surroundings physically withdrew from them; that they no longer got hugs and kisses from close family members or friends; that their children's playmates were not allowed to visit; that it was difficult to get municipal care, etc. Others described how healthcare providers (dentists, GPs) refused to take them in - or became very confused and didn't know what to do and felt like they were plagued or unclean.

Several experienced problems with their jobs and were generally worried about losing them, and one informant told how he had lost a good employment job. Several were on indefinite sick leave as employers were concerned about the risk of infection. The above examples were described in varying degrees of detail during the interviews. One person cried profusely throughout the interview, and several expressed bitterness, anger and sadness, as described in my thesis."

A further email of the same day, February 4, 2014, states, among other things:

"We have also received examples of stigmatization from Region Zealand and the Capital Region of Denmark.

As stated, the problem is nationwide - and as we expected, it is not different from MRSA398 to other MRSA types." The Danish Agriculture & Food Council has submitted a large number of articles and letters to the editor etc. to the Supreme Court to illustrate that farmers are at risk of being stigmatized if access to documents is granted. *Arguments*

In support of the claim for dismissal, the Danish Veterinary and Food *Administration* has in particular stated that the Danish Agriculture & Food Council and the five farmers have no legal interest in having the Danish Veterinary and Food Administration's decision on access to documents reviewed, to which they are not addressees and in which they have no significant and individual interest.

The Danish Veterinary and Food Administration's refusal to grant the farmers party status in the access to documents case is in accordance with the administrative law principle that only the person seeking access to a case or document is a party to the access to documents case. On the other hand, the legal or natural person(s) to whom the information in the access case relates is not a party to the case. The fact that the farmers are not parties to the access to file proceedings means that they do not have the necessary legal interest in a civil action.

The case law also requires that a legal interest must be current. The information from the methodological study is not up-to-date and not accurate for the MRSA picture today, where between 63% and 70% of all pig herds are infected. The requirement for timeliness is therefore not met.

In the Access to Public Administration Files Act, the legislator has decided in which cases there is an obligation to involve the person to whom a request for access applies, namely only when access is requested in personnel matters.

Copyright © 2023 Karnov Group Denmark A/S

The information to which the access case relates is environmental information. In the preparatory works to the Environmental Information Act, it is even assumed that the person to whom the environmental information relates cannot be considered to be a party or entitled to appeal in the access to documents case.

Farmers have other effective remedies at their disposal. They can take legal action against the journalists under the Media Liability Act, report the journalists to the police for violation of the Criminal Code, initiate an injunction or file a lawsuit for damages.

The High Court's ruling represents a significant easing of the conditions for bringing legal proceedings to review decisions made by public authorities, including in cases concerning access to information about other persons or companies. In reality, the only condition will be that a plaintiff takes legal action and invokes the possibility of stigmatization. An indeterminate risk of stigmatization cannot justify a legal interest in a lawsuit when there is no concrete evidence of such stigmatization. This is a far-reaching result that also affects the role of the ombudsman in access to documents cases. As a reflex effect of the High Court's decision, the narrowly defined concept of party that the Danish Veterinary and Food Administration and other authorities use today risks having to be reconsidered and possibly relaxed.

In support of the claim that the farmers' action should not be granted suspensive effect, the Danish Veterinary and Food Administration has in particular stated that according to section 63(1) of the Danish Constitution, the clear starting point is that an action to review a public authority's decision is not granted suspensive effect.

In UfR 1994.823 H, the Supreme Court has established the criteria that are included in the assessment of whether an action should be granted suspensive effect. According to the ruling, the decision is based on a balancing of the public interest in not delaying the implementation of the decision against the nature

**1543**

and the extent of the damage that might be caused to the person concerned, and whether, on a preliminary assessment, there is a reasonable basis for the claim of invalidity. The possibility of granting suspensive effect is to be used with caution and only in clear cases. The criteria are similar to those applied by the European Court of Justice in its equally restrictive case law.

None of these criteria are met. In particular, two weighty public considerations speak against suspensive effect. Firstly, the considerations of openness, freedom of expression and democracy on which the rules on access to documents are based. Secondly, the consideration for the administrative legal process in access to documents cases, which should not be derailed by an action for suspensive effect such as the present one.

The consideration that the public does not gain knowledge of the information obtained in 2011, and does not necessarily reflect the status of the pig herds today, is not so weighty that it can justify suspensive effect. Nor is there any evidence of stigmatization of the farmers. The risk of stigmatization must also be assumed to exist, regardless of whether access to documents is granted.

There are no reasonable grounds to doubt the validity of the Danish Veterinary and Food Administration's decision on access to documents. The decision is based on the Ombudsman's thorough account, which is not in conflict with Danish law, EU law or the European Convention on Human Rights.

*The Danish Union of Journalists* has agreed with the Danish Veterinary and Food Administration's recommendations.

Regarding the issue of suspensive effect, the Danish Union of Journalists has additionally stated that the action is a new formation and even in an area where suspensive effect would be particularly questionable, as it is actually a blocking of news reporting on such a central social issue as MRSA.

The suspensive effect will have the character of censorship of Kjeld Hansen's and Nils Mulvad's journalistic dissemination work, which is protected by Article 10 of the European Convention on Human Rights and the case law of the European Court of Human Rights.

The interpretation of section 63 of the Constitution and the application of the judge-made law established by UfR 1994.823 H must be based on the central overriding legal principle of freedom of the press and publicity concerning environmental matters, which Article 10 protects. The weighty interest in ensuring that the implementation of the Danish Veterinary and Food Administration's decision on access to documents is not postponed is supplemented in this case by the special interest that journalists have as representatives of the public. The previous journalistic coverage must be expanded through the access to documents from the Danish Veterinary and Food Administration, including the critical angle on the industry's and authorities' handling of MRSA.

According to the Environmental Information Directive and the Environmental Information Act, Kjeld Hansen and Nils Mulvad have a legal right of access to the environmental data in the method testing study from 2011. The access to documents will specify the almost 50 herds, i.e. the commercial companies, registered in CHR. However, the file will not include the owners or employees of specific companies. The infected persons will typically not be the owner of the company, but employees who look after the pigs for shorter or longer periods. This must be seen in light of the fact that the owner or tenant of the business can change over time. The identity of carriers in 2010/2011 will not in any way appear from the access to documents material.

The farmers have not presented specific information about individual risk of damage and thus lifted the burden of proof that they will suffer irreparable loss if access to documents is granted. Should the Supreme Court despite this find that one or two individual farmers have met the burden of proof, the suspensive effect must be limited to the individual farmer(s), cf. the submitted claim II.2B.

*The Danish Agriculture & Food Council* has argued that the fact that the five farmers were not parties to the access to documents case does not mean that they do not have standing to sue. The farmers have a specific, substantial and individual interest in having it tested whether the Danish Veterinary and Food Administration is entitled to publish information that the farmers' pig herds were found positive for MRSA in 2011.

The farmers' right of review is directly guaranteed by section 63(1)(1) of the Danish Constitution. As the farmers have participated voluntarily and under the promise of anonymity in a scientific study, their interests are also directly protected by Article 4(4)(g) of the Aarhus Convention, Article 4(2)(g) of the Environmental Information Directive and section 4(c) of the Environmental Information Act, as well as by sections 12 and 13 of the current Public Access Act.

At the very least, publication entails a significant risk that the farmers' names and addresses (the farm address usually coincides with the farmers' residential address) coupled with information that the farmers' herds have been found MRSA-positive could lead to social stigmatization of the farmers, their spouses and children. There are numerous reports that children of farmers whose herds have tested positive are no longer invited to children's birthday parties, cannot participate in PE classes at school, and there are examples of social ostracism of the farmer's spouse and the farmer himself, as well as humiliating embarrassment in contact with

1544

the health care system. That the consequences of publication would be extremely serious and burdensome for the farmers and their families is demonstrated by the explanations given before the High Court and by the very extensive supporting material presented in the case.

Nor has the Ombudsman wanted to exclude the possibility that the information could be exempted from public access, and he has only commented in relation to the material presented to him. The documentation which the Ombudsman asks for in several places in his report requires evidence in the traditional sense. Such evidence has not been possible in connection with the administrative processing of the case or the proceedings before the Ombudsman and requires judicial review. The alternative remedies mentioned by the Danish Veterinary and Food Administration are inapplicable to the farmers, and the significant damage to which the farmers are exposed if they are publicly exposed will be irreparable.

On the issue of suspensive effect, the farmers have referred to the balancing of the High Court's decision between, on the one hand, the need to avoid stigmatizing the farmers, their families and possibly also their employees and, on the other hand, the public interest in knowing the names and addresses of the farmers whose herds tested positive for MRSA more than five years ago in connection with a voluntary scientific study. There is no reason why granting access to documents cannot await the outcome of the substantive case.

The information to which access is sought is based on incorrect, no longer current information (in the case of two of the farmers), which is also outdated and has not undergone any kind of update since the methodological testing study was published in 2011. These factors in themselves strongly suggest that the farmers should not be singled out.

Both the fact that the Danish Veterinary and Food Administration refused access to documents in its original decision and the High Court's ruling show that the farmers have a reasonable prospect of being successful. The evidence already presented before the High Court and partly before the Supreme Court has also provided the documentation of stigmatization which the Ombudsman called for in his statements.

*Legal basis Public Access to Public Administration Files Act*

*Rules on access to documents*

In section 13, subsection 1, no. 6, of the former Public Access to Information Act, Act no. 572 of December 19, 1985, it states:

"*Section 13.* The right of access to documents may be limited to the extent necessary to protect essential interests of

...

6) private and public interests where secrecy is required by the particular nature of the matter."

The provision is continued in section 33, no. 5, of the current Public Administration Act, Act no. 606 of June 12, 2013.

*Right of appeal and standing to sue*

In report no. 325/1963 on public access to public administration, the following is stated about the right to appeal a decision on access to documents and the right to bring an action (p. 54):

"*E. Appeals against decisions taken.*

...

The legal position will then be that the person whose request for access to documents has been refused, and the person who considers himself violated by the provision of such information, will be able to complain to the superior administrative authority, and pursuant to section 63(1) of the Constitution, he will be able to bring the case before the courts."

Report no. 857/1978 on the revision of the Public Access Act states (p. 310-313):

"*b. Complaints etc. about decisions on access to documents.*

1°. The Access to Public Administration Files Act contains no express provision stating that decisions regarding the disclosure of documents under the Act may be appealed to a higher authority. The provision in the Act

§ Section 8(1), however, must undoubtedly be assumed to imply that decisions on access to documents are subject to an administrative appeal to the same extent

as the decision on the merits of the case in question, and it is also possible to lodge a complaint with the Parliamentary Ombudsman in accordance with the usual rules or to have the legality of such decisions reviewed by an action before the courts.

That the legal position would be such without explicit provisions on the right of appeal in the Act was clearly assumed by the Public Access Commission, cf. the report page 54.

...

2° ...

A person who believes that his or her interests have been violated if a request for access to documents is granted must also be able to appeal the decision to a higher authority, but the appeal will not automatically have suspensive effect.

...

4°. As mentioned above under 1°, questions about the legality of decisions refusing requests for access to documents may be brought before the courts in accordance with the general rules in section 63 of the Constitution, and this has occurred in a few cases since the Public Access Act came into force - apparently exclusively in cases concerning party access."

It appears from report no. 1349/1997 on access to personal files (p. 42-43) that the question of the right of appeal for the person to whom the information in an access case relates may give rise to doubt, but that in any case an equally superior supervisory authority and the Ombudsman can be contacted.

**1545**

The issue of access to judicial review is not affected.

Report no. 1510/2009, which forms the basis for the current Access to Public Administration Files Act, states (p. 774):

"4.5.2 In addition to the right to lodge a complaint with the Ombudsman, questions about the legality of the administrative authorities' decisions on access to documents may be brought before the courts in accordance with the general provision in section 63 of the Danish Constitution on judicial review of administrative decisions, cf. Report no. 857/1978, page 311."

*Rules on expedited case processing*

The previous Public Access to Information Act of 1985 stipulated:

"*Section 16.* The relevant authority shall decide as soon as possible whether an application can be granted and whether the person who has made the application shall be made aware of the documents by being given access to inspection on site or by being provided with a transcript or copy. *Stk. 2.* If a request for access to documents is not granted or rejected within 10 days after it has been received by the authority concerned, the authority must inform the applicant of the reason for this and when a decision can be expected."

The current Public Access to Information Act stipulates:

"*§ 36* ...

*Subsection 2.* The relevant authority etc. shall decide as soon as possible whether a request for access to documents can be granted. A request for access to documents must be processed within seven working days of receipt, unless this is exceptionally not possible due to, for example, the scope or complexity of the case. The requester shall, where applicable, be informed of the reason for exceeding the time limit and when the request can be expected to be completed."

Report No 1510/2009 states (p. 804):

"*8.1 Deadline for processing requests for access to documents etc.*

*8.1.1.* The Commission is of the opinion that it is very important that requests for access to documents are processed and decided

as quickly as possible. This is because rapid processing and decision-making of requests for access to documents will generally be an essential prerequisite for the Access to Public Administration Files Act to fulfill its intention that the media, when applying the Act, must have

access to inform the public about current affairs pending before the public administration ...'.

*Environmental Information Act*
*Rules on access to documents*

Section 2(3) and section 4c of the Environmental Information Act states, cf. Executive Order no. 1036 of August 18, 2015:

"*§ 2 ...*

*Stk. 3.* In cases concerning access to environmental information covered by the provisions of ... section 13(1) of the Act on Openness in Public Administration ..., the competent authority must make a concrete assessment of the public interest served by disclosure of the environmental information against the interests served by refusing disclosure. The provisions of ... section 13(1) of the Act on Openness in Public Administration ... shall be applied restrictively, taking into account the public interest in the information being made public in the specific case ...

§ Authorities ... shall, when requesting environmental information for the preparation of public statistics or scientific studies and when the person to whom the request is addressed is not obliged or cannot be obliged to provide the information, inform him of this and of the right to indicate that the information should not be published."

Section 2(3) and section 4c of the Environmental Information Act were inserted into the Act by Act no. 310 of May 2, 2005, which implemented the Environmental Information Directive, European Parliament and Council Directive 2003/4.

The comments to section 2(3) state, among other things, cf. the Danish Parliamentary Decree 2004-05, 2nd session, Appendix A, bill no. L 4, p. 100-101:

"*To no. 3.*

The proposal implements the Directive's general balancing rule in Article 4(2) that the right to restrict access to documents must be interpreted restrictively, taking into account the public interest in disclosure and the Directive's specific balancing rule, according to which the public interests served by disclosure must be weighed against the interests served by refusing disclosure in each individual case of access to documents.

It is therefore proposed that the Directive's specific balancing rule be incorporated for all exemptions in the Public Access Act and the Public Administration Act ...

The exemption provisions covered by the proposal are the Public Administration Act ... Section 12(1) on the exemption of information about individuals' private, including financial matters and business secrets, etc. and Section 13 on the exemption of information about e.g. national security, etc. in the Public Administration Act ...

In all cases of access to environmental information covered by the provisions in question, the authorities will thus be obliged to carry out a concrete weighing of the competing interests ...".

The explanatory notes to section 4 c state, cf. the Danish Parliamentary Gazette 2004- 05, 2nd session, Appendix A, bill no. L 4, p. 104:

"*To no. 10.*

The provision corresponds to the current provision with the change that there is no longer a legal requirement for the person who is requested information for the preparation of public statistics and scientific

**1546**

investigations, to decide that the information may not be made public.

This is a consequence of the proposal to incorporate the Directive's balancing rule into the Act, according to which it will not be possible to maintain the legal requirement in the current section 4a of the Act.

Instead, the provision ensures a right of opinion for the person requesting the information. A statement that the information should not be disclosed may be given weight in the authority's decision.

Copyright © 2023 Karnov Group Denmark A/S

weighing of competing interests in deciding whether the information can be disclosed."

*Right of appeal and standing to sue*

Article 6(2) of the Environmental Information Directive contains the following provision on access to justice:

"2. *In* addition to the right of appeal provided for in paragraph 1, Member States shall ensure that the applicant has access to a review procedure before a court of law or another independent and impartial body established by law which has the power to review acts or omissions of the public authority concerned and whose decisions are final. Member States may also ensure that third parties adversely affected by the disclosure of information also have access to legal remedies."

*Fast-track rules*

Section 4(3) of the Environmental Information Act provides:

"*§ 4 ...*

*Stk. 3.* Cases concerning access to documents must, taking into account any deadline stated by the person who made the request, be decided as soon as possible and no later than one month after receipt of the request or, if the scope and complexity of the case is such that the deadline of one month cannot be met, no later than two months after receipt. However, cases under paragraph 2 where a refusal to provide the information in the form requested by the requester shall be decided within one month of receipt of the request."

### The Supreme Court's reasoning and result

The complaint concerns whether A-E (the five farmers) have a legal interest in having the Danish Veterinary and Food Administration's decision of September 1, 2014, as upheld by the Ministry of Food, Agriculture and Fisheries' Complaints Center's decision of October 6, 2014, on access to a method testing study's information on which pig herds were found to be MRSA-positive in the study in 2011.

If the farmers have a legal interest, the question is whether the High Court was right to grant the action suspensive effect.

*Competence to sue*

According to the preparatory works to the Access to Public Administration Files Act, the person to whom the information in an access case relates is not a party to the access case. However, the administrative authority may be obliged to involve the person concerned on other legal grounds, including by virtue of the official principle, cf. most recently report no. 1510/2009 on the Access to Public Administration Files Act, p. 800-801.

The fact that the person to whom the information relates is not a party to the access proceedings does not preclude that person from being entitled to have the decision reviewed by the courts under the Constitution

§ Section 63(1), first sentence, if the general conditions for bringing legal proceedings are met, including the requirement of legal interest.

The methodology study involved 48 pig herds, of which 34 herds were found to be MRSA-positive. The five farmers' herds were reportedly among the 34 herds that were found positive. The methodological study only states the number of the farms in CHR (Central Livestock Register), but via CHR there is public and free access to current information about the herd's owner, user and the herd's geographical location, among other things. For a fee, there is also access to historical ownership information.

Even though the method testing study only states the number of the farms in CHR, access to this - through the search in CHR - will reveal that the five farmers' pig herds were found to be MRSA-positive. The Supreme Court then finds that these farmers'

circumstances are affected to such an extent by the granting of access that they have a legal interest in having it tested whether the decision on access to the information on MRSA infection in their pig herds is justified.

Copyright © 2023 Karnov Group Denmark A/S

pig farms is valid. The claims of inadmissibility are therefore rejected.

*Suspensive effect*

As regards the question of whether to grant suspensive effect to the action, it should first be noted that suspensive effect will only prevent the disclosure of information about MRSA infection in the five farmers' pig herds. Suspensive effect will thus not prevent the disclosure of information about MRSA infection in other farmers' pig herds. However, in connection with its decision on access to documents, the Danish Veterinary and Food Administration has suspended the disclosure of information about MRSA infection in all the pig herds of the farmers involved until the courts have decided on the issue of suspensive effect in this case. The Complaints Center of the Ministry of Food, Agriculture and Fisheries has upheld the suspension. The authorities' decision on suspension is not subject to review in this case.

According to section 63(1)(2) of the Constitution, anyone who challenges the validity of an administrative decision may,

**1547**

"not, by bringing the case before the courts, evade from provisionally complying with the order of the authorities".

As established in the Supreme Court's judgment of August 24, 1994 (UfR 1994.823), the courts may exceptionally, without express statutory authority, grant suspensive effect to an action for review of an administrative decision. The specific decision as to whether an action should be granted suspensive effect must be based on a balancing of the public interest in not delaying the implementation of the decision against the nature and extent of the damage that may be caused to the person concerned, just as importance must be attached to whether there is a reasonable basis for the claim of invalidity after a preliminary assessment.

The Public Access to Public Administration Files Act aims to ensure openness at the authorities to support freedom of information and freedom of expression and the media's dissemination of information to the public (the Act's

§ Section 1(1)). A quick processing and decision of requests for access to documents will in general be an essential prerequisite for the Public Access Act to fulfill its intention that the media, when applying the Act, must have access to inform the public about current cases under consideration by the public administration (report no. 1510/2009 on the Public Access Act p. 804). The Access to Public Administration Files Act therefore stipulates that a request for access to documents must be decided as soon as possible and, as a rule, completed within 7 working days (previously 10 days) of receipt (section 36(2) of the Act and section 16(2) of the previous Act) In order for this to be possible in practice, the Access to Public Administration Files Act presupposes, among other things, that the person to whom the information relates is not a party to the access case and therefore does not have to be heard in connection with a request for access. In the Environmental Information Act, absolute deadlines of 1 and 2 months for deciding on requests for access to environmental information have been set as a supplement to the rules of the Public Access Act (section 4(3) of the Act).

In view of the above, the Supreme Court finds that there is a very important public interest in ensuring that disclosure of information pursuant to a decision on access to documents is not prevented by an action for suspensive effect.

According to the available information, it cannot be assumed that the alleged adverse effects in the form of social consequences for the five farmers and their families (stigmatization) as a result of the publication of the information about MRSA infection in their pig herds in 2011 are obvious and

significant.

The Danish Veterinary and Food Administration's decision on access to documents of September 1, 2014, as confirmed by the Ministry of Food, Agriculture and Fisheries' Complaints Center's decision of October 6, 2014, is based on the Danish Parliamentary Ombudsman's

decision of June 6, 2014 (Case No. 2014-8). In this decision, the Ombudsman found that there was no basis for refusing access to the information in the method testing study about the pig herds in which MRSA infection had been found. He therefore recommended that the cases for access to documents be reopened. Based on a preliminary assessment, there is no basis for establishing that the Danish Veterinary and Food Administration's subsequent decision on access to documents as upheld by the Complaints Center of the Ministry of Food, Agriculture and Fisheries is invalid.

After an overall consideration, the Supreme Court finds that the action should not be granted suspensive effect.

*The Danish Union of Journalists' other claims*

The Supreme Court finds that the Danish Union of Journalists' alternative claims

- to the extent that they go beyond objecting to the Danish Agriculture & Food Council's request for suspensive effect - cannot be considered to be covered by the issues of rejection and suspensive effect which the High Court separated for separate consideration, cf. the Danish Administration of Justice Act § 253, and therefore they cannot be dealt with in this appeal.

*Procedural issues*

In its ruling, the High Court has anonymized the names of the five farmers, including the two farmers who gave evidence during the partial main hearing. This should probably be seen in connection with the fact that lawyer Tyge Trier, in connection with the hearing of the main intervention from the Danish Union of Journalists as representative of Kjeld Hansen and Niels Mulvad, made a procedural declaration that he would handle information about the individual pig farms, their owners and staff confidentially and that he would not disclose this information to the union or the two journalists.

The Supreme Court finds that an arrangement whereby the name of a party in a civil lawsuit is kept secret from another party, including in court decisions, must require statutory authority and is not a matter that the parties can decide by agreement. There is no such legal basis. The Supreme Court has therefore not anonymized the names of the five farmers in this ruling.

*Legal costs*

According to the outcome and nature of the issues decided by the Supreme Court in this action for annulment, none of the parties must pay legal costs to any other party in connection with the action for annulment.

## For it is determined

*The claims for dismissal made by the Danish Veterinary and Food Administration and by the Danish Union of Journalists on behalf of Kjeld Hansen and Niels Mulvad are not upheld.*

*The request from the Danish Agriculture & Food Council as representative of A-E for the action to be granted suspensive effect is not granted. None of the parties shall pay legal costs to any other party in connection with the appeal.*

**U.2016.1526H**

*Retlig interesse i søgsmål med henblik på at forhindre aktindsigt. Ikke opsættende virkning af søgsmålet. Spørgsmål, som landsretten ikke havde udskilt til særskilt behandling, kunne ikke behandles under kæresag for Højesteret. Ikke hjemmel til at anonymisere parters navne i civil sag.*

*Forvaltningsret 11241.9 og 1.5 - Landbrug m.v. 32.5 og 9 - Personspørgsmål 4 - Retspleje 21.5, 22.9, 23.2, 23.9 og 26.2.*

♦ I 2008-11 gennemførte Fødevarestyrelsen, F, en undersøgelse for at afprøve metoder til at fastslå, om der er MRSA (multiresistente stafylokokbakterier) i svinebesætninger. I undersøgelsen indgik 48 besætninger. Undersøgelsen viste, at 34 besætninger, herunder A-E's, var MRSA-positive. I marts 2012 anmodede to journalister, H og M, om aktindsigt i undersøgelsens oplysninger om, hvilke svinebesætninger der var konstateret MRSA-positive. I juli 2014 anlagde Landbrug & Fødevarer, L, som mandatar for A-E retssag mod F for at forhindre, at der blev givet aktindsigt. Dansk Journalistforbund, J, som mandatar for H og M indtrådte i sagen som hovedintervenient. Landsretten udskilte spørgsmålet om, hvorvidt L's søgsmål skulle afvises eller tillægges opsættende virkning, til særskilt behandling, jf. retsplejelovens § 253. Landsretten fandt, at A-E havde retlig interesse i at få prøvet, om F's afgørelse om at give aktindsigt var gyldig, og tog ikke F's og J's afvisningspåstand til følge. Endvidere tillagde landsretten søgsmålet opsættende virkning med hensyn til gennemførelse af aktindsigten. Højesteret tiltrådte, at A-E var berørt i en sådan grad af, at der blev givet aktindsigt, at de havde retlig interesse i at få prøvet, om F's afgørelse om aktindsigt var gyldig. Deres søgsmål skulle derfor ikke afvises.[1] Derimod fandt Højesteret, at betingelserne for undtagelsesvis at tillægge søgsmålet opsættende virkning ikke var opfyldt.[2] Nogle subsidiære påstande fra J faldt udenfor, hvad landsretten havde udskilt til særskilt behandling, og kunne derfor ikke tages under behandling under kæresagen. Landsretten havde i kendelsen anonymiseret navnene på A-E, men Højesteret fandt, at der ikke var hjemmel hertil, og anonymiserede derfor ikke A-E's navne i Højesterets kendelse.[3]

**H.K. 22. januar 2016 i sag 74/2015 og 75/2015**

*Dansk Journalistforbund som mandatar for Kjeld Hansen og Nils Mulvad (adv. Tyge Trier, Kbh.)*
mod
*Landbrug & Fødevarer som mandatar for A-E (adv. Håkun Djurhuus, Kbh.)*
og
*Fødevarestyrelsen (Km.adv. v/adv. Peter Biering, Kbh.)*
mod
*Landbrug & Fødevarer som mandatar for A-E (adv. Håkun Djurhuus).*

---

**Østre Landsret**

*Østre Landsrets kendelse 6. februar 2015 (14. afd.), B-2190-14 og B-2665-14*

(Hans Chr. Thomsen, Lone Kerrn-Jespersen, Bodil Dalgaard Hammer).

**1527**

Denne sag drejer sig om, hvorvidt der kan meddeles to journalister aktindsigt i resultatet af et metodeafprøvningsstudie vedrørende MRSA i svinebesætninger, som Fødevarestyrelsen gennemførte i 2011.

Sagen er den 9. juli 2014 anlagt ved Retten i Glostrup og er ved kendelse af 16. juli 2014 henvist til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

*Sagsøgerne, Landbrug & Fødevarer som mandatar for sagsøger A-E, har nedlagt påstand om, at sagsøgte, Fødevarestyrelsen, skal anerkende at være uberettiget til at offentliggøre henholdsvis meddele aktindsigt i oplysninger om, at sagsøgernes svinebesætninger blev fundet positive for MRSA i forbindelse med det undersøgelsesprojekt, der blev gennemført i 2011.*

Sagsøgerne har endvidere anmodet om, at søgsmålet tillægges opsættende virkning.

*Fødevarestyrelsen har principalt påstået afvisning, subsidiært frifindelse. Fødevarestyrelsen har endvidere nedlagt påstand om, at søgsmålet ikke tillægges opsættende virkning.*

*Dansk Journalistforbund som mandatar for journalist Kjeld Hansen og journalist Nils Mulvad har nedlagt følgende påstande:*

*Principalt: I.1. Afvisning*

*Subsidiært: II.2. Landbrug & Fødevarer tilpligtes at anerkende, at søgsmålet B-2190-14 ikke har opsættende virkning, og at udlevering senest 6. februar 2015 af oplysninger om svinebesætninger med MRSA-smitte til Kjeld Hansen og Nils Mulvad er berettiget.*

*II.2B. Landbrug & Fødevarer tilpligtes at anerkende, at søgsmålet B-2190-14 ikke har opsættende virkning, bortset fra en eller to svinebesætninger angivet af landsretten, og at udlevering senest 6. februar 2015 af oplysninger om øvrige svinebesætninger med MRSA-smitte til Kjeld Hansen og Nils Mulvad er berettiget.*

*Mere subsidiært: III.3. Frifindelse af Fødevarestyrelsen.*

Sagsøgerne har påstået frifindelse over for sagsøgtes og hovedintervententernes afvisningspåstande og over for hovedintervententernes subsidiære påstande.

Landsretten har besluttet at udskille spørgsmålene om opsættende virkning og afvisning til særskilt forlods behandling. Spørgsmålene har været mundtligt forhandlet.

*Sagsfremstilling*

Fødevarestyrelsen testede i 2008-2011 en række svinebesætninger for Methicillin resistente Staphylococcus aureus, MRSA, der er en stafylokokbakterie, der er resistent over for almindelige penicilliner mod stafylokok. Der findes flere typer af MRSA. En af disse er typen CC398, som i det følgende også kaldes svine-MRSA.

I 2011 foretog Fødevarestyrelsen endvidere et metodeafprøvningsstudie, der gik ud på at teste metoder til at fastslå, om der var MRSA i besætninger. Der indgik 48 besætninger i undersøgelsen, herunder de fem sagsøgeres besætninger.

Resultatet af undersøgelsen foreligger i form af en liste med følgende oplysninger:

---

1 Bet. nr. 325/1963, s. 54, bet. nr. 857/1978, s. 310-13, bet. nr. 1510/2009, s. 774 og 800 f., U 2012.605 H, U 2013.3295 H, Hans Gammeltoft-Hansen m.fl.: Forvaltningsret, 2. udg. (2002), s. 805-10, og Jens Garde m.fl.: Forvaltningsret. Almindelige emner, 5. udg. (2009), s. 360-65.

2 Bet. nr. 1510/2009, s. 804, og U 1994.823 H med kommentar af Per Walsøe i U 1995B.128.

3 U 2015.922 H, Bernhard Gomard og Michael Kistrup: Civilprocessen, 7. udg. (2013), s. 623 f., Lindencrone & Werlauff: Dansk Retspleje, 6. udg. (2014), s. 304, og Ulrik Rammeskow Bang-Pedersen & Lasse Højlund Christensen: Den Civile Retspleje, 3. udg. (2015), s. 89.

CHR NO.    Næsesvabere  Støvprøver  Luft         Øresvabere   MRSA status

I listens kolonne 2-6 er det angivet, om de udtagne prøver er fundet positive eller negative. CHR er en forkortelse for det Centrale HusdyrbrugsRegister. CHR-registeret indeholder bl.a. oplysninger om navn og adresse på besætningens ejer og bruger og besætningens adresse.

Den 14. marts 2012 anmodede journalisterne Nils Mulvad og Kjeld Hansen Fødevarestyrelsen om aktindsigt i oplysninger om svinebesætninger, der var konstateret MRSA-positive. I anmodningen skrev de bl.a., at de ønskede »en liste over de virksomheder, hvor Fødevarestyrelsen har konstateret MRSA-bakterier i en eller flere grise«.

Fødevarestyrelsen meddelte ved afgørelse af 23. marts 2012 Nils Mulvad og Kjeld Hansen afslag på aktindsigt. Af afgørelsen fremgår bl.a.:

»…

Da offentliggørelse af nogle besætningers MRSA-status imidlertid ved tidligere lejligheder har haft negative konsekvenser for besætningsejeren, dennes familie og ansatte i forbindelse med usikkerhed i lokalsamfundet om smitterisiko, er det Fødevarestyrelsens vurdering, at risikoelementerne ved eksponering for MRSA ikke er så store for det enkelte menneske, som måtte komme i kontakt med besætningen eller med personer herfra uden på forhånd at være adviseret om besætningens MRSA-status, at det kan opveje hensynet til at undgå stigmatisering af borgere i det danske samfund.

Fødevarestyrelsen afslår derfor, under henvisning til offentlighedslovens § 13, stk. 1, nr. 6, og hensynet til private interesser under hensyntagen til forholdets særlige karakter at udleveres oplysninger om i hvilke besætninger, der er fundet MRSA.«

Nils Mulvad og Kjeld Hansen klagede til Fødevarestyrelsens Klagecenter, der stadfæstede Fødevarestyrelsens afgørelse. Nils Mulvad og Kjeld Hansen klagede herefter den 14. juni 2012 til Folketingets Ombudsmand, der afgav sin foreløbige redegørelse den 16. januar 2014 og sin endelige redegørelse den 6. juni 2014 [FOB2014-8].

Ombudsmanden fandt, at de omhandlede undersøgelsesresultater er miljøoplysninger, jf. miljøoplysningslovens § 3, stk. 1, nr. 1, med den konsekvens, at miljøoplysningsloven finder anvendelse. Ombudsmanden fandt endvidere, at oplysninger om MRSA-smitte i en

**1528**

svinebesætning ikke kan anses for oplysninger om enkeltpersoners helbredsforhold, og at oplysningerne derfor ikke er omfattet af offentlighedslovens § 12, stk. 1, nr. 1. Ombudsmanden fandt yderligere, at oplysningerne ikke kunne undtages fra aktindsigt i medfør af offentlighedslovens § 12, stk. 1, nr. 2, (økonomisk skadevirkning) eller § 13, stk. 1 nr. 4, (kontrolhensyn). Ombudsmanden anførte, at spørgsmålet om aktindsigt herefter skulle afgøres efter offentlighedslovens § 13, stk. 1, nr. 6, og bemærkede herom følgende:

»Som anført i min foreløbige redegørelse (pkt. 4.5) kan det efter min opfattelse ikke udelukkes, at befolkningens reaktion - hvad enten den kan anses for berettiget eller ej - på forekomst af sygdom hos dyr, som mennesker omgås og kan blive smittet af, kunne nå et niveau, hvor hensynet til at undgå stigmatisering mv. af de berørte er et hensyn, som kan varetages ved bestemmelsen i offentlighedslovens § 13, stk. 1, nr. 6.

Det kan heller ikke udelukkes, at hensynet efter omstændighederne ville kunne rummes inden for miljøoplysningsdirektivets art. 4, stk. 2, og dermed være i overensstemmelse med miljøoplysningslovens § 2, stk. 6.

På baggrund af det materiale, som er tilvejebragt i den foreliggende sag, er det mit indtryk, at der i en vis udstrækning foreligger et problem med sociale konsekvenser (stigmatisering) i forhold til mennesker, som er eller kan være smittet med MRSA. Jeg har stor forståelse for de vanskeligheder, som dette kan medføre før de berørte, og jeg har også forståelse for, at myndighederne - inden for rammerne af lovgivningen - er meget opmærksomme på hensynene til disse mennesker, bl.a. i vurderingen af spørgsmålet om aktindsigt.

Heroverfor står imidlertid det retsgrundlag, som det foreliggende spørgsmål skal bedømmes efter.

Som nærmere anført i min foreløbige redegørelse fremgår det således bl.a. af forarbejderne til offentlighedslovens § 13, stk. 1, nr. 6, at bestemmelsen er tiltænkt et snævert anvendelsesområde, og at den kun forudsættes anvendt i begrænset omfang, hvor der er et klart behov for det.

På det foreliggende område følger det yderligere af de særlige regler i miljøoplysningslovens § 2, stk. 3 og 6, at bestemmelsen har et endnu snævrere anvendelsesområde end normalt. Det skyldes, at miljøoplysningsloven - og de bagvedliggende EU-direktiver mv. - bygger på et principielle synspunkt, at der bør være særligt vidtgående adgang til aktindsigt for offentligheden, når det drejer sig om miljøoplysninger.

Det er i den forbindelse vigtigt at være opmærksom på, at det efter de nævnte regler skal være netop meddelelse af aktindsigt i de omhandlede oplysninger, der indebærer - eller i hvert fald væsentligt understøtter - den omhandlede stigmatisering. I det omfang problemet med stigmatisering i det væsentlige består uafhængigt af spørgsmålet om meddelelse af aktindsigt i oplysningerne, er der således ikke grundlag for afslag efter de nævnte bestemmelser.

På denne baggrund må der efter min opfattelse stilles betydelige krav til dokumentation af de hensyn til at undgå stigmatisering mv., som i givet fald skal begrunde et afslag på aktindsigt i den foreliggende sag. En sådan dokumentation må tilvejebringes af de ansvarlige myndigheder, og den må bygge på et gennemarbejdet og pålideligt grundlag, således at der - f.eks. i form af valid informationsindsamling hos et tilstrækkeligt udsnit af berørte enkeltpersoner eller af myndigheder mv. med særlig indsigt - er reelt anvendelig dokumentation for antagelsen om, at netop aktindsigt i de omhandlede oplysninger vil have de anførte skadevirkninger i forhold til de berørte enkeltpersoner.

Jeg har gennemgået det supplerende materiale, som myndighederne har tilvejebragt, og jeg finder at måtte konstatere, at det ikke lever op til disse krav.

…

På den anførte baggrund er det sammenfattende min opfattelse, at myndighederne ikke har tilvejebragt et oplysningsgrundlag, som gør det muligt at undtage de omhandlede oplysninger fra aktindsigt efter offentlighedslovens § 13, stk. 1, nr. 6, jf. miljøoplysningslovens § 2, stk. 3 og 6.«

Ombudsmanden henstillede til Fødevarestyrelsens Klagecenter at sørge for, at sagerne blev genoptaget, og at der blev truffet nye afgørelser i lyset af hans redegørelse.

Den 9. juli 2014 anlagde sagsøgerne denne sag.

På baggrund af ombudsmandens udtalelse og efter forudgående høring af de berørte besætningsejere traf Fødevarestyrelsen den 1. september 2014 nye afgørelser i sagen og imødekom anmodningerne om aktindsigt. Under henvisning til at der under denne retssag var fremsat anmodning om opsættende virkning, suspenderede Fødevarestyrelsen imidlertid udleveringen, indtil domstolene havde taget stillingen i anmodningen. Fødevarestyrelsen anførte bl.a.:

»Det er Fødevarestyrelsens opfattelse, at betingelserne for at give søgsmålene opsættende virkning i forhold til udleveringen af de af dig ønskede oplysninger ikke er opfyldt. På baggrund af denne sags ganske særlige omstændigheder finder Fødevarestyrelsen imidlertid efter en afvejning af de ovenfor beskrevne betingelser for opsættende virkning, at udleveringen af oplysningerne bør afvente domstolenes umiddelbart forestående stillingtagen til spørgsmålet om opsættende virkning. Hvis Fødevarestyrelsen udleverede de pågældende oplysninger til dig på nuværende tidspunkt, ville Fødevarestyrelsen foregribe denne afgørelse. Fødevarestyrelsen er således indstillet på at afvente domstolenes stillingtagen til spørgsmålet om opsættende virkning, idet det

**1529**

dog er en afgørende forudsætning, at der ved domstolene træffes en hurtig afgørelse, hvilket efter Fødevarestyrelsens opfattelse vil sige snarest og senest ca. 3 måneder efter denne afgørelse.«

Nils Mulvad og Kjeld Hansen klagede over suspensionen til Fødevareministeriets Klagecenter, der fastholdt suspensionen. Nils Mulvad og Kjeld Hansen påklagede afgørelsen til Folketingets Ombudsmand, der den 27. oktober 2014 traf afgørelse om ikke at iværksætte en ombudsmandsundersøgelse i anledning af klagen. Af ombudsmandens afgørelse fremgår bl.a. følgende:

»Jeg har overvejet den foreliggende - meget usædvanlige - problemstilling, og jeg har efter afvejning af modstående hensyn besluttet ikke at iværksætte en ombudsmandsundersøgelse i anledning af jeres klage.

…

Jeg har også forståelse for jeres ønske om, at jeg efterprøver beslutningerne om suspension. Det skyldes bl.a., at det kan siges at være et principielt spørgsmål, om myndighederne kan suspendere udlevering af oplysninger, som man - i hvert fald nu - mener, at man er forpligtet til at udlevere, alene med den begrundelse, at der er anlagt sag ved domstolene og begæret opsættende virkning af søgsmålet.

*4.* Heroverfor står imidlertid andre forhold:

Det må således bl.a. tages i betragtning, at myndighedernes beslutninger om suspension i vidt omfang bygger - og må bygge - på en afvejning af de samme forhold, som domstolene vil skulle tage stilling til i forbindelse med afgørelsen af, om søgsmålet skal tillægges opsættende virkning.

Det drejer sig navnlig om offentlighedens interesse i, at udlevering af oplysningerne ikke udsættes, over for arten og omfanget af den skade, som de pågældende personer kan blive påført, og en vurdering af rimeligheden af den nedlagte påstand. Se bl.a. dommen i U1994.823H, som myndighederne også har henvist til.

En vurdering fra min side af rigtigheden af myndighedernes beslutning om suspension kan derfor siges at foregribe den afgørelse om opsættende virkning, som domstolene nu står over for at skulle træffe.

Det må efter min opfattelse også indgå, at der er tale om en sag, der vedrører komplicerede retlige spørgsmål og væsentlige overordnede interesser, herunder hensynet til at undgå stigmatisering af de berørte besætningsejere mv. Som også anført i, min redegørelse af 6. juni 2014 har jeg således stor forståelse for de sociale konsekvenser, som MRSA-problemstillingen kan have for disse mennesker og deres familie mv.

*5.* Under de foreliggende - og som nævnt meget usædvanlige - omstændigheder bør spørgsmålet om suspension af Fødevarestyrelsens afgørelse af 1. september 2014 efter min opfattelse i første omgang afvente domstolenes stillingtagen til, om søgsmålet skal tillægges opsættende virkning. Jeg forudsætter i den forbindelse, at myndighederne medvirker til, at domstolenes afgørelse om opsættende virkning kan blive truffet så hurtigt som muligt.«

*Forklaringer*

Der er afgivet forklaringer af sagsøger D, sagsøger C, Alice Løvendahl Sørensen, Poul Bækbo, Svend Ellermann-Eriksen, Kjeld Hansen, Nils Mulvad, Lars Mark Jensen og Per Henriksen.

*Sagsøger D* har forklaret bl.a., at han er landmand og har en gård - - - ved Faaborg. Besætningen er en avls- og opformeringsbesætning med opformering af sopolte, som han sælger. Der er kun 26 landmænd i Danmark, der har en tilsvarende besætning. En del af de svin, der avles, kan ikke bruges til avl, så de kommer på slagteri. Ca. halvdelen af besætningen kommer på slagteri. Han har i alt ca. 3.500 grise fordelt på tre besætninger og har tre CHR-numre. De er fire til at passe hans grise. Han har kun danskere ansat. I 2014 er der udskiftet to medarbejdere, så der har i alt været tale om 6 medarbejdere. Han har talt med sine ansatte om risikoen for MRSA. Han har en information om MRSA hængende i stalden, som han er pligtig til. Fra sommeren 2012 kunne han ikke sælge sine grise. Derfor lejede han pr. 1. juli 2012 en stald. Der var tale om en tom stald - efter en saneret besætning - på Langeland. Stalden er lejet med pasning, og han deltager ikke i pasningen af grisene på Langeland.

I foråret - vist nok i maj - 2014 hørte han, at det fremgik af en liste, at et af hans CHR-numre i 2011 var fundet positiv for MRSA. Det drejer sig om det CHR-nummer vedrørende stalden på Langeland, som han overtog i 2012. Han fik et brev fra Fødevarestyrelsen. Brevet mindede om de breve af 12. juni 2014 eller 19. juni 2014, der er fremlagt i sagen. Han har med sikkerhed ikke haft en besætning, der er fundet positiv. Han ved, at alle hans grise er negative, fordi de er blevet testet 2 gange, og han har aldrig været ejer eller driftsherre på en besætning, der er testet positiv. Han har ikke talt med den tidligere ejer af CHR-nummeret.

Det er ikke rart at blive beskyldt for noget, som man ikke har gjort, og han frygter, at adgang til oplysningen om det positive fund på det ene CHR-nummer vil smitte af på hans afsætning. Han har ikke været ude for, at købere har været bekymret for at aftage dyr, men hvis man får at vide, at man er testet positiv, kan det have virkninger i forhold til ikke-landmænd. Hvis aftagere opgiver, ville han skulle oplyse om en positiv testning. Der er dog ingen, der har spurgt ham, om hans grise er positive eller negative. Han har hørt om en landmand fra Odense, der blev indlagt efter en blodprop. På sygehuset ville man ikke behandle ham, før man vidste, om han var positiv eller negativ. Han går dog ud fra, at den pågældende fik blodfortyndende medicin. Den

**1530**

pågældende blev indlagt en mandag og fik først et bad om lørdagen.

Samme dag eller dagen efter at han fik brevet om, at besætningen på et af hans CHR-numre var fundet positiv i 2011, henvendte Landbrug & Fødevarer sig til ham. Han er ikke klar over, hvordan Landbrug & Fødevarer kendte til sagen. Det var konsulent Morten Schroll, der ringede. Han fortalte Morten Schroll, at han ikke ejede det pågældende CHR-nummer på Langeland på tidspunktet for undersøgelsen. Han husker ikke, om han har talt med den tidligere advokat på sagen, advokat Alex Puggaard. Hvis han fik en henvendelse fra en journalist, ville han formentlig slet ikke udtale sig. I det tilfælde ville han nok gå til sin egen forening for at få rådgivning. Han er medlem af Landboforeningerne og er tit i kontakt med Axelborgs avlsafdeling.

*Sagsøger C* har forklaret bl.a., at han er landmand. Han har svin på 3 enheder og producerer 13-14.000 slagtesvin om året. Han har tre ansatte, heraf 1 polak. De ansatte har alle været hos ham igennem hele perioden fra 2011.

I 2011 fik han besøg af Fødevarestyrelsen. Han blev spurgt, om han ville deltage i en frivillig undersøgelse. Han fik at vide, at han kun ville være et nummer på en liste, og hans navn ville ikke

komme frem. Der blev taget 15-20 prøver af grise, støv og luft. Der blev fundet MRSA i to prøver taget fra luften. Derimod var der ikke positive svabeprøver.

Da der i 2012 kom nye regler med ikrafttræden pr. 1. januar 2013 med forbud mod fiksering af søer, begyndte han at nedslagte sin besætning. Der var en periode på ½ år, hvor der ikke var dyr i stalden, og alle hans dyr og stalde er saneret. Han ligger meget lavt med hensyn til penicillinforbrug.

I 2014 henvendte Fødevarestyrelsen sig vedrørende rode- og beskæftigelsesmateriale i hans besætning. Han blev i den forbindelse spurgt, om han ville deltage i testning for MRSA, hvilket han afviste, idet han frygtede at blive hængt ud. Dette blev accepteret.

Han plejer at give en gris i forbindelse med Skt. Hans-festen i den landsby, hvor han bor, men det har han ikke lyst til, hvis han risikerer at blive hængt ud. Han frygter reaktionen, hvis nogen bliver syge, og det kommer frem, at der har været fundet MRSA hos ham.

Han har selv været testet positiv for MRSA, men de sidste 3-4 prøver har været negative. For ca. 1½ år siden fik han noget eksem. I den forbindelse blev han testet positiv, og han var til undersøgelse på Marselisborg. Oversygeplejersken her blev helt panisk og ville ikke give ham hånden. For ca. 1 år siden blev han testet negativ, og han er også fundet negativ i november 2014. Hans familie og hans ansatte, der var testet hos ham i 15 år, er også testet negativ. Han finder det derfor ikke rimeligt at blive hængt ud på en liste. Han blev konstateret positiv i 2013, hvor han første gang blev testet. Han har talt med de ansatte om MRSA. Polakken har han bedt om at blive testet flere gange, så hans status kendes ikke. Fodermesteren har været negativ. Den sidste, der er hans svigersøn, og primært er i marken, var også positiv. Han har informeret sine ansatte og har sat afspritning op. Der er informationsmateriale i staldene om forholdsregler mod MRSA.

Han har set resultatet fra 2011. Der er tale om 3-4 ark, men han husker ikke, om hans navn står på. I 2014 har han set en liste med navne på. Han antager, at den kommer fra Fødevarestyrelsen.

Hvis han blev kontaktet af en journalist, ved han ikke, hvad han ville gøre. Han ville være skræmt, men det er et faktum, at den tidligere besætning er slået ned. Da han blev kontaktet af Fødevarestyrelsen med få dages frist til at svare, kontaktede han sin organisation. Han blev forarget over at høre, at hans navn skulle frem, når han har deltaget i en frivillig anonym undersøgelse. Hvis hans navn kommer frem i relation til de prøver, der blev fundet positive, vil det efter hans opfattelse ikke være retvisende. Han har ikke haft indtryk af, at Landbrug & Fødevarer kendte til navnene på 2011-listen. Han er enig i, at MRSA er et relevant emne. Hvis en journalist får hans CHR-nr., kan enhver finde ud af bl.a., hvem der er ejer, bruger og dyrlæge på besætningen.

*Alice Løvendahl Sørensen* har forklaret bl.a., at hun er sygeplejerske og har en master i folkesundhed fra 2012. Hun er ansat i Region Midtjylland som hygiejnesygeplejerske i kvalitetsafdelingen.

Hendes afhandling, »Oplevelse af sammenhæng hos bærere af Meticillin Resistente Staphylococcus aureus (MRSA), Et kvalitativt studie«, angår ikke specielt svine-MRSA. Til brug for afhandlingen har hun interviewet 12 bærere af MRSA og 4 pårørende. Hendes interviewundersøgelse fandt sted fra foråret 2010 til foråret 2012. Hun ved ikke, hvor mange af de 12, der havde svine-MRSA, men hun ved med sikkerhed, at tre var smittede med svine-MRSA. Det er hendes indtryk, at det tilsyneladende er ligeså belastende at være bærer som at være smittet. Hendes interviewpersoner har givet udtryk for, at de ikke ville fortælle om smitte.

Hun møder også MRSA i sit daglige arbejde. Det fremgår af en vejledning, at gravide og fødende skal screenes, hvis de er gift med en landmand, eller selv har arbejdet i landbrug inden for de sidste 6 måneder. Der er rigtig mange i hendes område, der er smittet, og

hun føler, at de kan håndtere det i sygehusvæsenet. Problemet er størst, når børn skal indlægges. Forældrene bliver vejledt om at være omhyggelige med håndhygiejne, og at de ikke selv må tage mad som andre forældre. Hun har mødt en del, som er meget kede af det, og som ikke vil podes. Hun har i sin undersøgelse mødt, at børn

**1531**

ikke vil komme hjem og lege. I forbindelse med sin undersøgelse har hun mødt en tidligere landmand, der blev pedel.

Efter at have fået en byld, der blev testet positiv for MRSA, mistede han sit arbejde. Der er ikke sundhedsmæssige årsager til, at en pedel ikke skulle kunne beholde sit arbejde. En af de kvinder, hun interviewede, fik konstateret MRSA i forbindelse med fødsel af sit første barn. Vidnet fandt ud af, at det skyldtes et lokalt udbrud på dennes ansættelsessted. Den pågældende mistede imidlertid sit arbejde. Tidligere var man meget restriktiv, men ifølge den seneste vejledning er det meget få med MRSA, der ikke til kunne komme tilbage til sit arbejde. Mange gravide kvinder gift med landmænd er ikke smittede. Hun har oplevet meget selvbegrænsning, f.eks. bedsteforældre, der holder op med at se deres børnebørn, mand og kone, der ikke sover sammen, og folk der ikke ser deres venner. Mange føler stor skyld.

Efter hendes opfattelse, vil det ikke have nogen betydning for smitten inde på hospitaler, hvis man offentliggør navnene på de fem sagsøgende landmænd. Det er 5 år siden, at man har fundet smitten inde på hospitalerne i Region Midtjylland, men man finder mange, der er smittet ved indlæggelse. Det vil have en betydning for borgerne, hvis der sker offentliggørelse. Utryghden og angsten for det ukendte vil give frygt. Det er en frygt, der er baseret på uvidenhed.

Hun er enig i, at det, som det fremgår af Fødevarestyrelsens MRSA-risikovurdering fra december 2014, er vigtigt at informere mere om MRSA, og der skal være åbenhed, men ikke om personfølsomme data. Det er sjældent, at man kan spore, hvor smitten kommer fra. Hun er enig i, at man skal »tale MRSA ned«.

MRSA ser ud til at forandre og udvikle sig mikrobiologisk. Der tages flere prøver, og der findes flere positive. Det er spørgsmålet, om de 5, der er døde, er døde af eller med MRSA. Hver eneste dag dør borgere med almindelige stafylokokker. Man er ikke syg, hvis man er bærer af MRSA. 70 % af den danske befolkning er bærere af stafylokokker.

*Poul Bækbo* har forklaret bl.a., at han er afdelingschef i afdelingen for veterinær forskning og udvikling under Seges, det tidligere VSP (Videncenter for Svineproduktion), der var en del af Landbrug & Fødevarer. Seges er et datterselskab under Landbrug & Fødevarer. Han er uddannet som dyrlæge og har en ph.d i svinesundhed.

Han har været medansvarlig for orientering om MRSA. Landbrug & Fødevarer tog i 2008 initiativ til foretagelse af en screening for MRSA hos deltagere i en kongres for landmænd. I kongressen deltog ud over landmænd både dyrlæger og konsulenter. I screeningen deltog omkring 750 personer ud af 1.200-1.300 mulige. Undersøgelsen blev foretaget anonymt, og resultaterne blev i anonym form offentliggjort i februar 2009. Det var ca. 3,1 % af prøverne, der var positive.

Over for svineproducenterne har Landbrug & Fødevarer i 2009-10 rådgivet om, at enhver, der arbejder med svin, skal betragtes som muligt smittet. Besætningsejerne er også rådgivet om at lade besætningen teste og oplyse herom over for de ansatte. Der er således des-ligaget i overensstemmelse med Sundhedsstyrelsens vejledning, således at man betragtes som muligt smittet, selvom besætningen ikke er undersøgt. Arbejdsmiljømæssigt gør det således ikke nogen forskel, om besætningen er smittet eller ej. Rådgivningsmaterialet ligger på engelsk, russisk og dansk. Besætningsejerne har

de sidste 3 år været opfordret til at orientere medarbejderne, uanset om besætningen er testet positiv eller ej, og de er oplyst om, at de har pligt til at orientere medarbejderne, hvis der er testet positivt. Siden 2010 er de på hjemmesiden vejledt om, at medarbejderne skal oplyses om inficerede besætninger, som betragtes som et arbejdsmiljøproblem, og alle svineproducenter har nu også fået en mail herom direkte. Allerede i 2011 blev der sendt en vejledning om MRSA ud i samarbejde med fagforeningerne. Vejledningen findes nu også på engelsk og er på vej på russisk. Han kender ikke fra sit arbejde til medarbejdere, der ikke er informeret om smitte.

Smitterisikoen ved svine-MRSA fra menneske til menneske er ringe i forhold til de flere hundrede typer menneske-MRSA. Svine-MRSA tabes hurtigt på mennesker. Problemerne opstår ved blodforgiftninger, der har et meget lille behandlingsvindue. Det gælder for alle stafylokokker. 50 % af befolkningen bærer stafylokokker, væsentligt færre bærer MRSA.

Man ville ikke vinde noget sundhedsmæssigt ved at oplyse navne på bærere af MRSA. Det, der har betydning sundhedsmæssigt, er, at man holder et højt hygiejnieniveau, navnlig når man forlader besætningen. Der er udarbejdet en smittebeskyttelsesplan, hvori indgår tøjskift og håndvask med desinfektion. Hvis man arbejder med svin, skal man i sundhedsvæsenet håndteres, som om man bærer MRSA.

Problemerne med MRSA i Danmark er langt mindre end i de sydeuropæiske lande. I Italien, Spanien og Tyskland er over halvdelen af besætningerne smittet. I Holland regnede man i 2009-10 med, at stort set alle besætninger var smittet, og man har håndteret det også i relation til potentielle smittekilder blandt mennesker. I Holland er MRSA blevet hverdag.

Undersøgelsen i 2011 blev foretaget for at finde metode. Han er enig i konklusionen i Fødevarestyrelsens MRSA-risikovurdering fra december 2014 om, at åbenhed om CC398 er af betydning. Han er under danske forhold ikke enig i, at et højt forbrug af antibiotika skaber resistens; men han er enig i, at højt forbrug af antibiotika lige skaber resistens. Hans forbehold om danske

**1532**

forhold går på, at der er i Danmark er tale om en klon, der er opstået i Centraleuropa og transporteret med dyr og mennesker til Danmark.

*Svend Ellermann-Eriksen* har forklaret bl.a., at han er dr.med. og ansat som ledende overlæge og professor på Klinisk Mikrobiologisk Afdeling på Aarhus Universitet og har arbejdet i mange år med mikrobiologi generelt. Han er også chef for MRSA-enheden. Da der har manglet en overlæge på området, har han beskæftiget sig særlig meget med MRSA. Han har deltaget i udarbejdelsen af Fødevarestyrelsens vejledning om MRSA.

Blandt personer, der dagligt har arbejde med svinebesætninger, er 70-80 % bærere af MRSA. Det vil være tæt på 100%, der er bærere, når de kommer ud fra en svinestald. Det er ca. en fjerdedel, der smider bakterien igen. Mange, der i en periode ikke kommer i stalden, vil smide bakterien. At være bærer er ikke det samme som at være syg. MRSA er en almindelig gennemsnitlig stafylokok. Stafylokokker er en del af vores normalflora. Ca. halvdelen af alle bloddonorer er bærere af stafylokok i næsen eller svælget. Det er stort set ufarligt. Man estimerer, at omkring ½ - 1 % af befolkningen er bærer af MRSA, hvoraf svine-MRSA er en type. Stafylokker er forskellige, og MRSA er også forskellig. Nogle giver næsten altid infektion, nogle en gang imellem og nogle sjældent. Sviner-MRSA hører til den sidste gruppe. Den smitter dårligere fra menneske til menneske end almindelige stafylokokker. Svine-MRSA smitter son andre stafylokokker, f.eks. ved berøring af dørhåndtag, men i og med at den er dårligere til at blive overført fra menneske til menneske, smitter den mindre. Der er relativt sjældent, at familiemedlemmer til bærere bliver smittet flere gange. Hvis en person,

der bærer MRSA, tager bussen, er risikoen tæt på 0 for, at andre i bussen bliver smittet. Reelt er der ikke smitterisiko ved, at en bærer f.eks. nyser. I svinestalde kan der være så store forekomster af MRSA, at man bliver inficeret ved at opholde sig i stalden.

I sundhedsvæsenet er der næsten ingen, der bliver smittet med MRSA som sådan. Der har slet ikke været transmission af CC398 i hans region. Alle patienter skal i princippet spørges om arbejde i svinebesætning. Formelt bliver kun op mod 60 % spurgt. Hvis en patient oplyser, at vedkommende arbejder med levende svin, bliver den pågældende podet. Patienten bliver betragtet som så lidt risikofyldt, at man ikke isolerer patienten, medmindre prøven bliver fundet positiv.

Han er fagligt set uenig i et udsagn om, at landmænd smitter deres familie, som bringer smitten videre. Det er nok rigtigt, at folk, der arbejder med svin, vil have smitten på sig og mange også er smittet, men smitten bæres ikke videre.

Efter hans vurdering vil det ikke gavne folkesundheden at offentliggøre oplysningerne fra 2011 om CHR-numre på inficerede svinebrug. 2/3 af svinebesætningerne er kontaminerede. Indsatsen handler ikke om det enkelte menneske, men om at beskytte samfundet og om at begrænse spredningen af MRSA. I andre lande udgør MRSA 20-50 % af alle stafylokokker. Hvis det samme bliver tilfældet i Danmark, vil man være nødt til at bruge bredspektret antibiotika i videre omfang.

Hvis man som landmand ikke kan føle sikkerhed for, at ens data ikke kommer ud, tvivler han på, at nogen frivilligt vil deltage i lignende undersøgelser. I hans egen verden vil man næppe lade sig undersøge frivilligt, for det gavner ikke en selv. Der er stort set 1:1-relation mellem MRSA i besætningen, og det forhold, at landmanden er bærer. Fødevarestyrelsens redegørelse lægger op til frivillig deltagelse. Hvis man skal have sikker på at få data frem, vil indsatsen gå i stå. Det vil man kun kunne imødegå ved at indføre et lovkrav.

Stigningen i MRSA fra 2008, som beskrevet i 2014-rapporten, beror på spredning i staldene. Man undersøger også flere personer end tidligere, og man finder flere smittede. Der er tale om reel stigning af tilfælde, men også en teknisk stigning på grund af flere undersøgelser.

Sammenlignet med andre lande er Danmark et smørhul humant, når det drejer sig om resistens. Vi har meget lidt MRSA og næsten ingen anden resistens. Det er opnået ved en restriktiv antibiotikapolitik. Lige nu befinder vi os i en forvarselstid. Den nuværende svine-MRSA smitter næsten ikke mellem mennesker, men frygten er, at bakterien vil ændre sig, hvilket er baggrunden for indsatsen mod MRSA.

Stafylokokbakterier må betragtes som ufarlige uden infektion. Hvis man får en infektion, kan bakterien blive farlig. Der dør årligt 1.500 af stafylokokker, heraf dør mellem 50 og 100 af MRSA, og vistnok 7 af eller med svine-MRSA. Tallene siger ikke noget om, hvorvidt man dør af bakterien, men er udtryk for, at man dør inden for 1 måned efter konstatering. Salmonella anses for farligere end MRSA, og der er mange bakterier, der er meget farligere. Man bedst sammenligne stafylokokker med colibakterier. Man kunne leve med MRSA, men den danske indsats er begrundet i et ønske om at begrænse brugen af bredsprektet antibiotika. I Holland har man stort set heller ikke MRSA, her gør man stort set det samme som i Danmark.

Det er rigtigt, at der har været tilfælde af nyfødte børn med svine-MRSA. Næsten alle er raske. Når et barn bliver født, skal det opbygge sin flora, som kommer fra barnets forældre. Når floraen skal etableres, kan nogle bakterier være til stede i meget store mængder, indtil andre bakterier tager over. Smitte fra menneske til menneske

kan forekomme. Det er meget usandsynligt, at smitte er kommet fra luften. Luften er ikke en betydende transmissionsvej.

**1533**

Det fremgår af en nylig undersøgelse, at 13 % af de smittede har været uden svinekontakt. Det er data fra syge personer, der kommer på sygehuset. Man har ikke data fra raske, der arbejder i stalde og har smitten på sig. Derfor vil 13 % være udtryk for et voldsomt overestimat. Nævneren i brøken er således voldsomt underestimeret, idet man tæller for mange med, der ikke har svinekontakt.

Når det er anført i Fødevarestyrelsens MRSA-risikovurdering fra december 2014, at »Brug af antibiotika og andre antimikrobielle stoffer i enhver sammenhæng vil resultere i en uønsket udvikling af resistens«, er det udtryk for en helt generel bemærkning. Det er rigtigt, at jo mere antibiotika, der anvendes, jo højere er risikoen for resistens. Ved at bruge antibiotika, som MRSA er resistent overfor, hjælper man MRSA, idet man fjerner de andre bakterier. Han er enig i, at den opmærksomhed, man har mod at bruge antibiotika ved gult kort-ordningen, er vigtig.

Øget information om MRSA er vigtig, fordi der er problemer for de personer, der er positive. Information er den bedste måde til at undgå stigmatisering og uhensigtsmæssig administration af reglerne.

Der er kommet enkelte opdagelser af nye typer antibiotika mod MRSA. Disse typer antibiotika har dog mere alvorlige bivirkninger end de nuværende midler, og der er ikke tale om noget revolutionerende.

*Kjeld Hansen* har forklaret bl.a., at han er uddannet journalist og gårdejer. Han driver et landbrug på 25 ha, hvor han bl.a. har svin. Han har været journalist siden 1979 og har arbejdet med landbruget som stofområde i mere end 20 år. Han har været journalist på Åbenhedstinget, der nu er Investing Reporting Denmark, ligesom han har en blog. Han er ofte researcher på tv- og radioprogrammer. Hans egentlige virksomhed er at drive landbrug og forfattervirksomhed.

Siden slutningen af 1980'erne har miljøproblemer i landbruget været et stigende problem. I fagbladet »Sygeplejersken« var der en artikel om et udbrud med MRSA i en børnehave, Det blev han meget overrasket over, ligesom han blev overrasket over, at det var hemmeligt, hvor det var sket. Han fandt ud af, at der var tale om en børnehave i Løgstør, men han nævnte selvfølgelig ikke navnet på børnehaven i sin omtale.

Via et svar til Fødevareudvalget fra fødevareminister Mette Gjerskov fandt han ud af, at screeningen i 2011 var iværksat. I 2012 bad han sammen med Nils Mulvad, der var redaktør på Åbenhedstinget, om aktindsigt. Det, der vakte interesse, var, at man nægtede aktindsigt. Han mener, at det er vigtigt for folkesundheden at kende arnestederne for MRSA, og det er naivt at tro, at man kan hemmeligholde arnestederne. MRSA er ikke et stort sundhedsmæssigt problem, men et samfundsmæssigt problem. Han finder også spørgsmålet journalistisk væsentligt. Når man hemmeligholder, skaber man en unødvendig mytedannelse. Emnet skal beskrives journalistisk med varsomhed.

Hvis der bliver givet adgang til oplysningerne fra 2011, vil de gennemgå listerne omhyggeligt for at opfange misinformationer, før de offentliggør noget. Alle på listen vil blive kontaktet, hvorved de vil opfange situationer, som dem de to landmænd, der har afgivet forklaring, er i. Især vil de formentlig være interesseret i at kontakte dem, hvis brug ikke er smittet, idet det også er interessant at vide, hvordan man holder sig fri af smitte. Efter en grundig gennemgang af listen vil de træffe beslutning om, hvorvidt der skal ske offentliggørelse. Hvis oplysningerne er forældede, vil de næppe offentliggøre, men principielt set vil de offentliggøre navnene. Det er stadig journalistisk væsentligt, selvom materialet er fra 2011, idet der kan være tale om, at man kan begynde at se nogle mønstre. Der

er nogle uforbederlige, som bliver ved med at bruge for meget antibiotika. I forhold til den nye liste fra 2014 er det relevant at se, hvor mange gengangere der er.

I 2010 skrev han en artikel vedhæftet en liste med 12 navngivne virksomheder. I forbindelse med artiklen var der sket en misforståelse. Artiklen byggede på en viden, som han havde fra Fødevarestyrelsen. Hans fokus er, at antallet af smittede er 10-doblet på 10 år, og at antibiotikaforbruget er steget. Det Centrale Husdyrbrugs-Register indeholder ikke oplysninger om de ansattes sundhed. De første sager ved domstolene om MRSA angik en ansat, der var blevet smittet, uden at der via arbejdspladsvurderingen var givet oplysning om MRSA i besætningen. I relation til dækning af dette er det også relevant at kende arnestederne. Han er blevet chokeret over at høre, at der skulle være lovet anonymitet. Hvis det er sandt, vil de skrive en artikel om myndighedernes sjusk. På andre områder er man ikke tilbageholdende med at oplyse navne. Oplysninger om salmonellasmitte er således offentligt tilgængelige, og indsatsen mod salmonella har ført til, at man regner med i 2016 at erklære landet salmonellafrit. Efter hans opfattelse er der ikke dokumentation for stigmatisering. Hemmeligholdelsen gør, at man får ubehagelige oplevelser som det møde i Odder, der har været omtalt i pressen.

Fødevarestyrelsens liste over 137 virksomheder med højt antibiotikaforbrug er offentlig tilgængelig. Han har i en artikel på Investing Reporting Denmark fremhævet to virksomheder, som historisk havde MRSA. De navne tøvede de ikke med at offentliggøre, da virksomhederne stadig havde et højt antibiotikaforbrug.

Den artikel, hvor der står, at svinet smitter landmanden, som smitter sin kone og børn, hvorefter smitten bringes videre, er skrevet af ham og Nils Mulvad. Kilden til det udsagn er en artikel i Ugeskrift for Læger i september 2013.

**1534**

*Nils Mulvad* har forklaret bl.a., at han er uddannet journalist fra 1989 og ansvarshavende redaktør for Åbenhedstinget, som er et netværk under Danmarks Journalisthøjskole. Han er også lektor på Danmarks Journalisthøjskole og har undervist i 20 år. Åbenhedstinget kører også en række principielle sager, særligt om miljø. Allerede i 2003 og 2004 kørte han og Kjeld Hansen en sag om aktindsigt i landbrugsstøtte. Investing Reporting Denmark, som han også er ansvarshavende redaktør på, laver grundlæggende research, som udbydes til andre medier.

I 2010 blev han opmærksom på MRSA som emne. Han og Kjeld Hansen søgte aktindsigt i 2012 i de omhandlede oplysninger som led i en almindelig journalistisk arbejdsgang. Kernen i deres arbejde er at få oplysninger om medicinforbrug og spredning af smitte. Da ombudsmandens udtalelse forelå, regnede de med at få aktindsigt. Det er stadig journalistisk relevant at få oplysningerne, ligesom det er principielt at få afklaret, om de havde krav på aktindsigt. Oplysningerne er relevante, idet de også har oplysninger om medicinforbrug på de forskellige svinefarme. Det er også interessant at finde ud af, hvordan de landbrug, hvor der ikke er fundet smitte, har formået at holde sig fri af smitte.

Hvis de får adgang til listen, vil de naturligvis foretage en undersøgelse af de pågældende farme. I den forbindelse ville de opdage oplysningen om, at en landmand først havde overtaget et CHR-nummer efter undersøgelsen. Han vil også tro, at den anden landmand, der har afgivet forklaring, slet ikke vil være registreret som positiv.

Der kommer løbende nye Oplysninger frem om bl.a. smitteveje. Det er svært at måle værdien af deres arbejde, men de har indirekte på baggrund af medieomtalen bidraget, idet indsatsen mod MRSA er intensiveret.

Copyright © 2023 Karnov Group Denmark A/S

*Lars Mark Jensen* har forklaret bl.a., at han er gruppeformand for den grønne gruppe, der organiserer bl.a. landbrugssektoren under 3F i Aalborg.

Han blev første gang opmærksom på MRSA-problemstillingen i sommeren 2008, hvor et medlem henvendte sig om, at hun havde fået en sygdom eller virus, som hun ikke vidste, hvad var. De har haft 8-10 sager. Problemet er, at medarbejderne ikke af virksomhederne bliver informeret om den potentielle arbejdsmæssige risiko for at blive smittet med MRSA, hvilket medlemmerne finder urimeligt. I oktober 2014 havde han et netværksmøde med 21 rumænske arbejdere, heraf havde 17 arbejde med svin. Kun én havde hørt om smitte med MRSA CC398. Set fra hans synspunkt er det relevant at få vide, hvor der er MRSA-smitte.

Som konsekvens af hemmelighedskræmmeriet holder mange smittede sig for sig selv. Han kan ikke udføre sit tilsyn med forholdene for udenlandsk arbejdskraft for Udlændingestyrelsen, idet han og afdelingens sekretær har besluttet, at de ikke går ind i staldene på grund af risikoen for smittespredning. Et medlem, - - - , der har været driftsleder, er gået psykisk helt ned, efter at hans gravide hustru var blevet konstateret smittet med CC398, og medlemmet har selv fået konstateret PTSD. Han har talt med de personer, som er omtalt i artiklen i Politiken den 9. september 2014. Han har ikke kendskab til negative konsekvenser bare på grundlag af oplysninger om, at man arbejder med svin.

Han mener ikke, at det vil have negative konsekvenser, hvis man offentliggør oplysninger om, hvilke besætninger der er smittet. Tina Urth, der har været hygiejnesygeplejerske under embedslægen, har vejledt ansatte om, hvordan de skal beskytte sig. Der er udsendt informationsmateriale til medlemmerne. Han er bekendt med Arbejdstilsynets vejledninger om MRSA, der fastslår en oplysningspligt for arbejdsgiverne. Han er også bekendt med Arbejdsskadestyrelsens vejledning om pligt til indberetning. Kravet om opslag af arbejdspladsvurderingen fungerer ikke i praksis.

*Per Henriksen* har forklaret bl.a., at han er veterinærchef i Fødevarestyrelsen. Han er uddannet dyrlæge og har i en del år arbejdet som forsker. Fra 2002 har han arbejdet i Fødevareministeriet med fødevare- og dyresundhed. I de sidste 4 år har han været veterinærdirektør.

Der findes hos dyr og mennesker mange typer af MRSA, der er en særlig resistens, som stafylokokker bærer. Resistens betyder, at en bakterie kan leve i et miljø, hvor der er antibiotika. De resistente bakterier får kun et fortrin, hvis de er i et miljø med antibiotika, idet de så vil begynde at udkonkurrere følsomme bakterier. Svine-MRSA er i princippet ikke anderledes end andre MRSA-typer med hensyn til farlighed for mennesker. Svine-MRSA smitter efter de nu foreliggende oplysninger ikke så let fra menneske til menneske. Hvis man har svine-MRSA, kan man behandles med andre antibiotika end de gængse. Der har været MRSA i mange år hos mennesker. Først i 1970'erne påviste man MRSA hos husdyr. For ca. 10 år siden fik man flere informationer om smitte. I 2005 kom der information fra Holland om påvisning af en ny type - CC398. I løbet af de 10 år er bakterien spredt over hele verden. Der flyttes ikke grise over hele verden, så der er i relation til spredningen andre mekanismer, der gør sig gældende, end eksport. European Food Sagety Authority (EFSA) har lavet en undersøgelse af udbredelsen i 2008 i EU-landene. Det fremgår af undersøgelsen, at bakterien da allerede fandtes i mange EU-lande.

Så vidt han er orienteret fra kolleger, er CC398 med hensyn til farlighed for mennesker på linje med andre typer MRSA. MRSA-bakterien lever i svælg og slimhinder. MRSA smitter ved kontakt og ved åbne sår. Campylobacter- og salmonellabakterier vil man afhængig af

immunforsvar blive syg af. MRSA udgør derimod for raske mennesker ikke nogen risiko for at blive syg. Hvis man er svækket og får åbent sår med direkte adgang til blodbanen, er der risiko for, at bakterien flytter sig fra overflade, og man risikerer at blive syg. Indtagelse af kød er ikke en traditionel smittevej.

De hollandske landbrugs- og sundhedsmyndigheder besluttede at vurdere sammenhængen mellem antibiotikaforbrug og resistens. Resultatet fremgår af en artikel fra 2011. Man kom frem til en top 3-liste over resistente bakterier. MRSA er en af de tre bakterier på listen. Den største risiko blev anset for at hidrøre fra ESBL. Undersøgelsen danner den videnskabelige baggrund for, at Holland satser på at få kontrol med EBSL, men ikke anser MRSA for at være en stor risiko for spredning til befolkningen. Danmark har også den strategi at bekæmpe resistente bakterier generelt ved at begrænse antibiotikaanvendelsen. For så vidt angår ESBL er der en entydig sammenhæng med brug af et bestemt antibiotikum. Dansk landbrug har fra 2010 udfaset anvendelsen heraf, og forekomsten af ESBL er i Danmark faldet meget. For MRSA er det ikke helt så simpelt. Der er flere reservoirer for MRSA. Fødevareministeriet har for nylig afsat 35 mio. kr. til forskning i spredningsmønstre for MRSA. Reduktion af antibiotika vil have en vis effekt. Derudover er der taget bl.a. hygiejnetiltag med fødevareministerens 5-punktsplan. Planen stiller bl.a. krav om håndvask og desinfektion. Hvis man bryder smittekæden, er det effektivt. Et andet punkt er, at rutinemæssig flokmedicinering bør begrænses. Forsøg med kalve har vist, at man derved reducerer smitten, men den forsvinder ikke. Et tredje punkt er udarbejdelse af smittebeskyttelsesplaner. Desuden er der som et fjerde punkt iværksat en informationstjeneste med en hygiejnesygeplejerske, der deltager i borgermøder mv.

Der er to typer undersøgelser, henholdsvis kortlægning og metodeafprøvningsstudium. Undersøgelsen i 2011 var en metodeafprøvning, der blev iværksat, fordi man havde meget lidt viden om, hvordan man mest effektivt kunne finde MRSA dels på grisen, dels i miljøet. Der var således tale om en kontrolundersøgelse. Derfor indgik der kun 48 besætninger i undersøgelsen. Generelt samarbejder Fødevarestyrelsen med Landbrug & Fødevarer om information. Metodeafprøvningen er også interessant for erhvervet. Resultatet af undersøgelsen kan fortsat bruges til at finde ud af, hvordan man lettest finder MRSA. Listen er derimod ikke egnet til at sige noget om, hvad status for MRSA er i 2014 eller 2015.

EFSA anbefalede i en rapport fra 2012 undersøgelse af MRSA i forskellige reservoirer med passende intervaller. På den baggrund valgte Fødevarestyrelsen i 2013-14 at gentage undersøgelsen ved at undersøge alle avlsbesætninger og 200 slagtesvinbesætninger. Der var tale om en anden type undersøgelse end 2011-undersøgelsen. Undersøgelsen indgår i en ekspertrapport og indgår i et arbejde, som Fødevareministeriet og Sundhedsministeriet har iværksat for at undersøge MRSA-risikoen. Undersøgelsen har ført til en række anbefalinger fra ekspertgruppen. Der er en handlingsplan under udarbejdelse. Han forventer, at en handlingsplan vil blive forelagt for folketinget medio februar 2015.

Historiske data siger intet om status og kan ikke bruges til håndhævelse. Jo mere indgribende et fund vil være for en landmand, jo sikrere skal testen være. Det har negative konsekvenser både at dømme positiv og forkert negativt. Hvis et resultat skal kunne håndhæves, kræver det en sikker metode og et sikkert datagrundlag.

Undersøgelsen i 2011 var frivillig. Anonymisering var man ikke i tvivl om, men han ved selvfølgelig ikke, hvad prøveudtageren har sagt. Han kan således ikke være 100 % sikker på, at der ikke blev lovet anonymitet. Hvis sagen fører til offentliggørelse af navne og adresser på de involverede landmænd, vil det efter hans vurdering ikke have betydning for folkesundheden.

**1535**

Copyright © 2023 Karnov Group Denmark A/S

Fødevarestyrelsen har hjemmel til at udtage de nødvendige prøver for at sikre dyrs og menneskers sundhed - i sidste ende med politiets hjælp. Forskningsprojekter håndteres på en anden måde. Det kan dog være nødvendigt for forskningen at udtage prøver tvangsmæssigt, men det har ikke været aktuelt. Designet for undersøgelsen i 2014 var at få prøver i hele landet, men det var af mindre betydning, om det var fra den ene eller anden landmand i et område.

CC398 må anses for et stigende problem. Ekspertgruppens konklusion var, at forekomsten hos mennesker er i stigning. Det er også hans bekymring, at bakterien vil ændre sig og dermed ændre smitterisikoen. Der er stigende reservoir i svinebesætninger. Det er risiko ved hver flytning af svin. Der er mange flere flytninger fra produktionsbesætninger til andre besætninger end fra avlsbesætninger. Der er ca. 8000 svinebesætninger i Danmark.

Staflokokker kan overleve lang tid i støv, og støv kan dermed indeholde MRSA. Inden for nærområdet kan man ikke afvise, at der kan ske spredning via støv, hvilket er noget af det, der skal undersøges i kommende forskningsprojekter, men den hyppigste spredningsårsag er kontakt mellem dyrene. Der er også i nogle tilfælde tale om smitte via den praktiserende dyrlæge. I løbet af et par måneder har man været in vurdering af, om gylle kan være en spredningsfaktor, men det er den umiddelbare vurdering, at der ikke er en risiko.

Fødevarestyrelsen har informeret Landbrug & Fødevarer om resultaterne fra 2011-undersøgelsen. Han er

**1536**

ikke klar over, om Landbrug & Fødevarer har fået oplyst CHR-numre på de involverede besætninger.

I gult kort-ordningen kan en landmand få påbud om nedbringelse af sit antibiotikaforbrug. Oplysning om det er offentlig. Man kan ikke sige, at man ved højt forbrug af antibiotika også finder MRSA. I Norge har man påvist, at i besætninger, der kun få gange modtager smittede grise, forsvinder smitten.

*Procedure*

*Landbrug & Fødevarer* har til støtte for *frifindelsespåstandene over for afvisningspåstandene* anført, at sagsøgerne har en individuel, væsentlig og retlig interesse i at få en indenretlig prøvelse af den nedlagte påstand. Alle sagsøgerne har således den til iværksættelse af søgsmål fornødne søgsmålskompetence.

I henhold til den tidligere offentlighedslovs § 12, stk. 1, nr. 1, og § 13, stk. 1, nr. 6, og den nye offentlighedslovs § 30, nr. 1, henholdsvis § 33, nr. 5, er sagsøgerne de direkte af lovene værnede beskyttelsessubjekter i relation til sagsøgernes påstand. Sagsøgernes væsentlige, individuelle og retlige interesse i at undgå stigmatisering, ikke blot at sagsøgerne selv, men tillige af sagsøgernes ægtefæller, børn og ansatte er netop det, som de påberåbte bestemmelser værner, og værnet udgør selve formålet med de påberåbte undtagelsesbestemmelser.

Såfremt sagsøgte og hovedintervenienterne får medhold i deres afvisningspåstande, vil de lovmæssige beskyttelsessubjekter blive afskåret fra den grundlovssikrede ret til indenretlig prøvelse af øvrighedsmyndighedens grænser, jf. grundlovens § 63, vedrørende netop disse forhold.

De, der som sagsøgerne har beskyttelsesinteresser, der er fundet så væsentlige, at de direkte er værnet af lovgivningen, har som det mindste en præsumptiv prøvelsesret i form af søgsmålskompetence i henhold til grundlovens § 63.

Meddelelse af aktindsigt i denne sag vil føre til, at sagsøgerne, deres familier og deres ansatte vil blive hængt ud ved navns nævnelse, hvilket vil føre til social udstødelse, ligesom det antageligt vil påføre sagsøgerne økonomiske tab samt ikke økonomiske skadevirkninger i form af tort. Den stigmatisering, som hovedintervenienternes krav til bevirke, udgør hele baggrunden for denne

principielle sag. Stigmatiseringseffekten vil være så bebyrdende og indgribende over for sagsøgerne, disses familier og ansatte, at det i markant grad vil opveje de modsatrettede interesser i den pligtige afvejning mellem hensynene til sagsøgerne, disses familier og ansatte på den ene side og offentlighedens mulige interesse på den anden side. Der må i den forbindelse henses til, at de pågældende landmænd medvirkede frivilligt.

Folketingets Ombudsmand anfører i udtalelsen af 6. juni 2014, at det ikke kan udelukkes, at befolkningens reaktion på forekomst af sygdom hos dyr, som mennesker omgås og kan blive smittet af, kunne nå et niveau, hvor hensynet til at undgå stigmatisering m.v. af de berørte, er i en og hensyn, der kan varetages ved bestemmelsen i offentlighedslovens § 13, stk. 1, nr. 6, jf. reglerne i miljøoplysningsloven, men ombudsmanden fandt, at myndighederne ikke havde tilvejebragt et oplysningsgrundlag, som gjorde det muligt at undtage oplysninger fra aktindsigt efter bestemmelserne. Domstolsprøvelse er mere end nogen administrativ prøvelse, herunder prøvelse ved domstolslignende nævn, det bedst egnede forum til at tilvejebringe det bevismæssige vidensgrundlag, som ombudsmanden efterlyser, og som vil kunne begrunde et afslag på aktindsigt, idet der her er mulighed for egentlig bevisførelse, herunder vidneførelse, samt mundtlig forhandling m.v.

Sagsøgerne har i relation til aktindsigtssagen forvaltningsretlig partsstatus, hvilket skaber en til vished grænsende præsumption for, at sagsøgerne ligeledes har den fornødne søgsmålskompetence. Herfra kan det imidlertid *ikke* modsætningsvist sluttes, at manglende forvaltningsretlig partsstatus indebærer manglende søgsmålskompetence. Selv hvis sagsøgerne ikke måtte have forvaltningsretlig partsstatus - hvilket jo er udgangspunktet i aktindsigtssager - vil sagsøgerne meget vel kunne have den fornødne søgsmålskompetence. Retspraksis har gennem de senere år i væsentlig grad udvidet adgangen til søgsmål, navnlig i offentligretligt relaterede sager.

Vedrørende spørgsmålet om *opsættende virkning* har Landbrug & Fødevarer anført, at søgsmålet skal tillægges opsættende virkning, og har til støtte herfor henvist til den retspraksis, der trods bestemmelsen i grundlovens § 63, stk. 1, andet punktum, har udviklet sig om dette forhold.

Hele formålet med denne principielle sag ville forspildes, såfremt søgsmålet ikke tillægges opsættende virkning. Tillægges søgsmålet ikke opsættende virkning, er det tvivlsomt, hvorvidt sagsøgerne overhovedet vil have den fornødne retlige interesse i en indenretlig prøvelse af sagen.

Såfremt søgsmålet ikke tillægges opsættende virkning, vil det have uoprettelige skadevirkninger for sagsøgerne, disses familier og ansatte i form af navnlig social udstødelse og stigmatisering. Det bør endvidere tillægges betydning, at der er tale om intensive irreversible virkninger, Det bør endvidere tillægges betydning, at de irreversible virkninger, der påføres sagsøgerne, såfremt søgsmålet ikke tillægges opsættende virkning, ikke kan erstattes økonomisk.

Der er realistisk udsigt til, at sagsøgerne vil kunne få medhold i den materielle sag. Den efterfølgende materielle sag vil kunne hovedforhandles inden for 3-4 måneder, hvorfor den opsættende virkning i givet fald kun

**1537**

får en meget begrænset tidsmæssig udstrækning. Dette bør indgå i afvejningerne, som landsretten skal foretage.

Landbrug & Fødevarer har under delforhandlingen oplyst, at det nu er ubestridt, at der er tale om miljøoplysninger.

*Fødevarestyrelsen* har til støtte for den nedlagte *afvisningspåstand* anført, at hverken Landbrug & Fødevarer eller Landbrug & Fødevarer som mandatar for sagsøgerne har retlig interesse, dvs. en

Copyright © 2023 Karnov Group Denmark A/S

konkret, individuel og aktuel interesse i at få den nedlagte påstand påkendt af domstolene.

Hverken Landbrug & Fødevarer eller de enkelte mandanter, er adressat for Fødevarestyrelsens afgørelse af 1. september 2014 eller for ombudsmandens redegørelse. Det er derimod journalisterne. Sagsøgerne kan heller ikke i øvrigt anses for at være parter - eller have partslignende status - hverken i relation til ombudsmandens udtalelse eller i relation til Fødevarestyrelsens afgørelse af 1. september 2014. Fødevarestyrelsens afslag på partsstatus er i overensstemmelse med det forvaltningsretlige princip, hvorefter det er almindeligt antaget, at det kun er den, der søger aktindsigt i en sag eller et dokument, der er part i den pågældende aktindsigtssag. Den eller de juridiske eller fysiske personer, som oplysningerne i aktindsigtssagen angår, er ikke part i aktindsigtssagen.

Allerede fordi Landbrug & Fødevarer og mandanterne ikke er parter i aktindsigtssagerne, har de ikke den fornødne retlige interesse til et civilt søgsmål som det foreliggende. Retlig interesse i et sådant civilt søgsmål forudsætter, at Landbrug & Fødevarer og mandanterne er direkte, væsentligt og individuelt berørt af Fødevarestyrelsens afgørelse af 1. september 2014, og desuden skal spørgsmålet, som søges afklaret, være aktuelt.

Oplysningerne i aktindsigtssagerne under denne retssag angår undersøgelsesresultater fra 48 besætninger, der viser, i hvilke besætninger der er fundet husdyr-MRSA. Oplysningerne i aktindsigtssagerne vedrører ikke oplysninger om bestemte personer, der kan medføre, at sagsøgerne har en konkret, væsentlig og særlig individuel interesse i sagen. Da der er tale om en større mængde af svinebesætninger, påvirker det endvidere betydningen af den individuelle interesse, idet antallet af berørte besætninger bevirker en udtynding af den enkelte besætningsejers interesse, således at deres interesse ikke kan anses for væsentlig og individuel.

Da der er tale om oplysninger fra en undersøgelse i 2011, der ikke er udtryk for omstændighederne i dag, er der endvidere ikke en sådan aktuel interesse, der er nødvendig for et søgsmål.

Besætningsejerne har andre retsmidler, idet de har mulighed for at varetage deres interesser ved at søge offentliggørelse forhindret, når der er meddelt aktindsigt, ved forbud, jf. retsplejelovens kap. 40, ved at søge eventuelt misbrug straffet efter straffelovens eller medieansvarslovens kapitel 3 og ved at anlægge erstatningssag i anledning af en eventuel offentliggørelse, jf. medieansvarslovens kapitel 4-5 og dansk rets almindelige erstatningsregler.

Vedrørende spørgsmålet om *opsættende virkning* har Fødevarestyrelsen anført, at spørgsmålet ikke skal tillægges opsættende virkning i forhold til Fødevarestyrelsens afgørelse af 1. september 2014, hvilket støttes af dansk retspraksis og praksis fra EU-Domstolen.

Hovedreglen om opsættende virkning findes i grundlovens § 63. stk. 1, hvoraf følger, at den, der indbringer en forvaltningsafgørelse »ikke ved at bringe sagen for domstolene kan unddrage sig fra foreløbig at efterkomme øvrighedens befaling.

Højesteret har i kendelse af 24. august 1994, trykt i UfR 1994.823 H (Gyproc-sagen), fastslået, at selv om udtrykkelig lovhjemmel ikke foreligger, er domstolene ikke afskåret fra undtagelsesvis at tillægge et søgsmål opsættende virkning. Højesteret fastslog endvidere, at den konkrete afgørelse af, om et søgsmål bør tillægges opsættende virkning, må bero på en afvejning af det offentliges interesse i, at gennemførelsen af afgørelsen ikke udsættes, over for arten og omfanget af den skade, den pågældende kan blive påført, ligesom det må tillægges betydning, om der efter en foreløbig vurdering foreligger et rimeligt grundlag for påstanden om ugyldighed.

Når danske domstole skal tage stilling til, om en begæring om opsættende virkning skal tages til følge, skal de endvidere følge de betingelser, som EU-Domstolen har opstillet i sin praksis.

Da hverken offentlighedsloven, forvaltningsloven eller miljøoplysningsloven indeholder hjemmel til at tillægge et søgsmål om en afgørelses gyldighed opsættende virkning, skal det vurderes, om de kriterier, der er fastslået af Højesteret i Gyproc-dommen, og som baserer sig på de betingelser, som EU-Domstolen har opstillet i sin praksis, er opfyldt. Kriterierne er følgende: 1) forekommer sagsøgers påstand ud fra en umiddelbar vurdering at være berettiget, 2) er det nødvendigt at indrømme opsættende virkning for at undgå, at sagsøger påføres et alvorligt og uoprettelig tab som følge af den omtvistede afgørelse, inden der er afsagt endelig dom i sagen og 3) en afvejning af de involverede interesser.

Der er ikke grundlag for at antage, at ombudsmandens udtalelse skulle være i strid med de relevante nationale regler eller med EU-retten.

For så vidt angår betingelsen om, at der skal være en risiko for, at parten vil lide et uopretteligt tab, må der sondres mellem tab af økonomisk karakter og tab af

**1538**

ikke-økonomisk karakter. Hverken Landbrug & Fødevarers eller mandanternes potentielle økonomiske tab kan i sig selv begrunde opsættende virkning i denne sag.

I relation til ikke-økonomisk tab må det i overensstemmelse med ombudsmandens udtalelse, antages, at der ikke er en sådan konkret dokumentation for en eventuel stigmatisering, at risikoen for stigmatisering udgør et ikke-økonomisk tab af en karakter, der medfører ikke oprettelig skade. I vurderingen af, om det kan godtgøres, at der er risiko for stigmatisering, skal der tages højde for den konkrete farlighed, der er forbundet med MRSA for sunde og raske mennesker. Denne farlighed er sammenlignet med f.eks. listeria, salmonella og tilsvarende sygdomme begrænset. Der skal i henhold til retspraksis foreligge helt særlige omstændigheder, for tab af ikke-økonomisk karakter kan begrunde opsættende virkning. Sådanne helt særlige omstændigheder er der ikke i denne sag.

Det tredje kriterium for opsættende virkning angår, om der er en væsentlig offentlig interesse, der taler imod opsættende virkning. De hensyn til offentlighed og demokrati, der ligger bag offentlighedsloven, må antages at være så tungtvejende, at hensynet til at meddele aktindsigt må antages at være mere tungtvejende end hensynet til at tilbage opsættende virkning. I denne sag er der endda, såfremt man følger ombudsmandens redegørelse, tale om miljøoplysninger i miljøoplysningslovens forstand. Der er således efter Fødevarestyrelsens opfattelse en særlig tungtvejende offentlig interesse at tage hensyn til i forhold til offentlighed i oplysningerne. Ingen af de grundlæggende betingelser for at tillægge et søgsmål opsættende virkning er opfyldt under dette søgsmål. Der er således ikke ud fra de foreliggende omstændigheder grundlag for at fravige udgangspunktet i grundlovens § 63, stk. 1. Sagsøgerne må i stedet henvises til at benytte de sædvanlige instrumenter (forbud, straf og erstatning), hvis oplysningerne om underretningen om konstateret MRSA i svinebesætninger misbruges, efter at de er udleveret til journalisterne.

*Dansk Journalistforbund* har til støtte for afvisningspåstanden anført, at hverken Landbrug & Fødevarer eller organisationens medlemmer er adressater for Fødevarestyrelsens og ombudsmandens afgørelser. Fødevarestyrelsens afgørelse indebærer heller ikke en regulering af forholdene for sagsøgerne, idet styrelsen har udført sin opgave angående 2011-projektet på sædvanlig måde, hvor styrelsen har dispositionsretten over egne projekter og egne data. Landbrug & Fødevarer har på den baggrund ikke retlig interesse i en prøvelse af den nedlagte påstand.

Søgsmålet er et betænkeligt og uhensigtsmæssigt forsøg på at gribe ind i forhold til den etablerede ordning for forvaltningens håndtering af aktindsigt, hvor søgsmålskompetence vil åbne for en

meget bred vifte af søgsmål angående offentlige myndigheders håndtering af data.

Landbrug & Fødevarer har en række relevante og sædvanlige muligheder for at varetage medlemmernes interesser, herunder fremkomme med oplysninger og synspunkter til Fødevarestyrelsen i forbindelse med sagsbehandlingen angående aktindsigt, ligesom Landbrug & Fødevarer kan agere i forhold til Nils Mulvad og Kjeld Hansens journalistiske arbejde efter reglerne i medieansvarsloven, straffelovens § 264 d m.v., retsplejelovens forbudsregler samt reglerne om erstatningsansvar.

Vedrørende søgsmålet om *opsættende virkning* har Dansk Journalistforbund anført, at søgsmålet ikke skal tillægges opsættende virkning. Søgsmålet er en nydannelse, hvor opsættende virkning vil være særskilt betænkeligt via en de facto blokering af nyhedsformidlingen angående et centralt samfundsanliggende som MRSA. Opsættende virkning af søgsmålet vil etablere tilsvarende virkning som censur af Kjeld Hansens og Nils Mulvads journalistiske formidlingsarbejde, som er særskilt og stærkt beskyttet via EMRK artikel 10 og praksis fra Den Europæiske Menneskerettighedsdomstol.

Fortolkningen af grundlovens § 63 og anvendelse af den dommerskabte ret, som er etableret ved Gyproc-dommen og efterfølgende praksis, må ske med udgangspunkt i det centrale overordnede gode om pressefrihed og offentlighed angående miljømæssige anliggender, som artikel 10 beskytter. Den tungtvejende interesse i, at gennemførelsen af Fødevarestyrelsens afgørelse ikke udsættes, suppleres i denne sag af den særskilte interesse, som journalisterne varetager som repræsentanter for offentligheden. Den hidtidige journalistiske dækning af MRSA skal således udbygges via aktindsigten.

Kjeld Hansen og Nils Mulvad har i medfør af rådsdirektivet fra 1993 og miljøoplysningsloven retskrav på adgang til miljøoplysningerne i metodeafprøvningsstudiet.

Aktindsigten vil angive de omhandlede besætninger, som er registreret i CHR, men vil ikke omfatte ejerne eller de ansatte i konkrete virksomheder, herunder vil aktindsigten ikke indeholde identiteten på de fem sagsøgere.

Landbrug & Fødevarers omfattende materiale indeholder ingen dokumentation endsige sandsynliggørelse af en konkret uoprettelig skade af helt særlig alvorlig karakter, som de fem landmænd udsættes for ved gennemførelsen af afgørelsen om aktindsigt. Der foreligger således ikke et uoprettelig tab for de enkelte besætningsejere, hvorfor opsættende virkning må afvises.

Til støtte for den mest subsidiære påstand II.2B har Dansk Journalistforbund anført, at retspraksis pålægger den enkelte sagsøger at dokumentere det uoprettelige

**1539**

tab. Den enkelte svinevirksomhed har således en konkret bevisbyrde at løfte. Ingen af betingelserne for opsættende virkning er opfyldte, men skulle landsretten finde, at en eller to individuelle sagsøgere konkret opfylder betingelserne, må opsættende virkning begrænses til netop denne sagsøger.

**Landsrettens begrundelse og resultat**

*Spørgsmålet om søgsmålskompetence*

Sagen angår, om Fødevarestyrelsen er berettiget til at meddele aktindsigt i og offentliggøre oplysninger om, at sagsøgerens svinebesætninger blev konstateret MRSA-positive i forbindelse med en af Fødevarestyrelsen i 2011 foretaget metodeafprøvningsundersøgelse.

Fødevarestyrelsen har på grundlag af Folketingets Ombudsmands endelige redegørelse af 6. juni 2014 [FOB2014-8] og efter forudgående høring af sagsøgerne den 1. september 2014 truffet afgørelse om at imødekomme journalisterne Kjeld Hansen og Nils Mulvads

anmodning om aktindsigt i den relevante liste over de besætninger, der blev fundet MRSA-positive under undersøgelsesprojektet i 2011. Sagsøgerne er ikke adressater for afgørelsen, men er konkret og individuelt berørt af den derved, at der ved afgørelsen meddeles offentlighed i, at besætningerne under deres CHR-numre blev testet MRSA-positive i 2011.

Landsretten finder på den baggrund, at sagsøgerne har en konkret, individuel og aktuel interesse i, at den nedlagte påstand påkendes af domstolene. Da sagsøgerne således har fornøden retlig interesse i at få deres påstand prøvet, tager landsretten ikke afvisningspåstandene til følge.

*Spørgsmålet om opsættende virkning*

Fødevarestyrelsen har under denne sag truffet afgørelse om, at de oplysninger, der søges aktindsigt i, er miljøoplysninger, jf. § 3, stk. 1, nr. 1, i miljøoplysningsloven. Fødevarestyrelsen har endvidere fundet, at der ikke efter miljøoplysningsloven, jf. offentlighedslovens bestemmelser, er grundlag for at nægte aktindsigt. Fødevarestyrelsen har imidlertid endnu ikke udleveret oplysningerne, idet Fødevarestyrelsen har suspenderet udleveringen, indtil landsretten har truffet afgørelse om, hvorvidt søgsmålet skal tillægges opsættende virkning. Efter grundlovens § 63, stk. 1, 2. pkt., kan den, der anfægter en administrativ afgørelse, ikke ved at bringe sagen for domstolene unddrage sig fra foreløbig at efterkomme øvrighedens befaling.

Hverken miljøoplysningsloven eller offentlighedsloven indeholder hjemmel til at tillægge et søgsmål opsættende virkning.

Selv om en udtrykkelig lovhjemmel ikke foreligger, kan domstolene undtagelsesvis tillægge et søgsmål vedrørende berettigelsen af Fødevarestyrelsens afgørelse om aktindsigt opsættende virkning, jf. Højesterets kendelse af 24. august 1994, gengivet i UfR 1994.823.

Enhver har efter offentlighedsloven krav på aktindsigt, medmindre forholdet er omfattet af en af lovens undtagelser. En anmodning om aktindsigt skal behandles snarest muligt.

Under denne sag gør Landbrug & Fødevarer gældende, at de oplysninger, der er søgt aktindsigt i, skal undtages fra aktindsigt, idet oplysningerne er omfattet af undtagelser i offentlighedsloven. De berørte landmænd har for landsretten navnlig henvist til risikoen for stigmatisering for landmændene og deres familier, hvis der gives offentligheden adgang til oplysninger om, i hvilke besætninger der ved metodeafprøvningsstudiet i 2011 blev fundet MRSA. Det er endvidere anført, at der var tale om en frivillig undersøgelse.

Der blev søgt aktindsigt i oplysningerne i marts 2012, hvilket blev afslået under henvisning til risikoen for stigmatisering. Efter klage til ombudsmanden, hvis endelige redegørelse forelå den 6. juni 2014 [FOB2014-8], har Fødevarestyrelsen den 1. september 2014 truffet afgørelse om at give aktindsigt i oplysningerne, men som nævnt endnu ikke udleveret oplysningerne. Der er reserveret tid til hovedforhandling i sagen den 4., 5. og 6. maj 2015.

Der er tale om en principiel sag vedrørende en række komplicerede retlige spørgsmål af vidererækkende betydning også for andre landmænd med svinebesætninger. Sagen rejser spørgsmål om afvejningen mellem offentlighedens ret til aktindsigt over for hensynet til at undgå mulig stigmatisering af de involverede landmænd. Landsrettens stillingtagen til parternes anbringender herom vil skulle ske på grundlag af den fulde bevisførelse i sagen efter hovedforhandlingen. Den skade i form af stigmatisering, som sagsøgerne påberåber sig, at de kan blive påført ved en udlevering af de oplysninger, der er søgt aktindsigt i, vil i givet fald kunne være uoprettelig. På den baggrund og efter en samlet afvejning af hensynet til gennemførelsen af den aktindsigt, der blev søgt i marts 2012, over for arten og det mulige omfang af den påberåbte skadevirkning, finder landsretten, at risikoen for den angivne skadevirk-

Copyright © 2023 Karnov Group Denmark A/S

ning under de foreliggende særegne omstændigheder må tillægges større vægt end interessen i at få gennemført aktindsigten, før landsretten har taget stilling til sagen.

Landsretten tillægger derfor søgsmålet opsættende virkning.

- - -

## Højesteret

### Højesterets kendelse

I tidligere instans er afsagt kendelse af Østre Landsrets 14. afdeling den 6. februar 2015.

**1540**

I påkendelsen har deltaget fem dommere: Poul Søgaard, Thomas Rørdam, Jon Stokholm, Oliver Talevski og Jens Kruse Mikkelsen.

I 2008-2011 gennemførte Fødevarestyrelsen en undersøgelse for at afprøve metoder til at fastslå, om der er MRSA i svinebesætninger. I undersøgelsen indgik 48 besætninger. Undersøgelsen viste, at 34 besætninger, herunder - efter det oplyste - de fem indkærede landmænds, var MRSA-positive. Den 14. marts 2012 anmodede journalisterne Kjeld Hansen og Nils Mulvad om aktindsigt i undersøgelsens oplysninger om, hvilke svinebesætninger der ved undersøgelsen var konstateret MRSA-positive.

Den 9. juli 2014 anlagde Landbrug & Fødevarer som mandatar for de fem landmænd retssag med henblik på at forhindre, at der gives aktindsigt i metodeafprøvningsundersøgelsen. Sagen er henvist til landsretten i medfør af retsplejelovens § 226, stk. 1. Efterfølgende er Dansk Journalistforbund indtrådt som hovedintervenient i retssagen som mandatar for de to journalister, der har søgt om aktindsigt. Landsretten har besluttet at udskille spørgsmålene om, hvorvidt Landbrug & Fødevarers søgsmål skal afvises eller tillægges opsættende virkning, til særskilt behandling, jf. retsplejelovens § 253.

Denne kæresag angår, om søgsmålet fra Landbrug & Fødevarer som mandatar for de fem landmænd skal afvises, fordi landmændene ikke har retlig interesse i søgsmålet. Afvises søgsmålet ikke, er spørgsmålet, om søgsmålet skal tillægges opsættende virkning.

*Påstande*

*Fødevarestyrelsen* har nedlagt påstand om afvisning af søgsmålet, subsidiært at søgsmålet ikke tillægges opsættende virkning.

*Dansk Journalistforbund* som mandatar for Kjeld Hansen og Nils Mulvad har nedlagt følgende påstande:

Principalt: I.1. Afvisning af søgsmålet.

Subsidiært: II.2. Landbrug & Fødevarer som mandatar for A-E skal anerkende, at søgsmålet ikke har opsættende virkning, og at udlevering af oplysninger om svinebesætninger med MRSA-smitte til Kjeld Hansen og Nils Mulvad er berettiget.

II.2B. Landbrug & Fødevarer som mandatar for A-E skal anerkende, at søgsmålet ikke har opsættende virkning bortset fra en eller to svinebesætninger angivet af Højesteret, og at udlevering af oplysninger om svinebesætninger med MRSA-smitte til Kjeld Hansen og Nils Mulvad er berettiget.

Mere subsidiært: Frifindelse af Fødevarestyrelsen.

*Landbrug & Fødevarer* som mandatar for A-E.

*Supplerende sagsfremstilling*

Folketingets Ombudsmands endelig redegørelse i sagen af 6. juni 2014 er offentliggjort i ombudsmandens beretning for 2014 (FOB 2014-8). Redegørelsen indeholder en beskrivelse af de oplysninger om stigmatiseringsrisiko, der var en del af ombudsmandens bedømmelsesgrundlag. Dette materiale omfattede:

»1) Det Etiske Råds udtalelse vedr. anvendelse af antibiotika

2) Det Etiske Råds Arbejdspapir 3

3) Masterprojekt: Oplevelse af sammenhæng hos bærere af Meticillin Resistente Staphylococcus aureus (MRSA)

4) Weekendavisens artikel »Fællesskabets dilemma« af den 17. januar 2014

5) Information fra Statens Serum Institut om stigmatisering (5 mails)«.

Udtalelsen nævnt under punkt 1 blev vedtaget af Det Etiske Råd på rådets årsmøde den 19. december 2013. Af udtalelsen fremgår bl.a.:

»*Dilemma 2: Forebyggelse af smitte*

At være bærer af antibiotika-resistente bakterier indebærer en smitte risiko. Smitte kan indebære medicinske risici og sociale belastninger.

Ikke-smittede bør beskyttes imod smitte. Det kan tale for brug af isolation, tvangsforanstaltninger, osv. Ikke-smittede bør også have mulighed for at bestemme, hvilke smitterisici de vil udsætte sig for. Dette taler for åbenhed om smittekilder, f.eks. i form af offentlighed om inficerede bestående eller indberetningspligt om kendskab til smittede personer. For bærere af resistente bakterier kan sådanne tiltag imidlertid være stigmatiserende, krænkende og indebære indgreb i den enkeltes frihed. Erfaringsmæssigt har det endvidere medført, at bærertilstand i højere grad er blevet skjult, og dermed at risikoen for smitte er steget.«

Af Det Etiske Råds »Arbejdspapir 3: Sociale Aspekter« nævnt under punkt 2 fremgår bl.a.:

»*Stigmatisering og smitsom sygdom*

…

*Eksempel 2: MRSA i Danmark*

I 2008 søgte journalist (A) om aktindsigt i Statens Serum Instituts information om, hvilke svinebedrifter, der var inficeret med MRSA. Et afslag blev begrundet med, at informationen ville kunne skade de smittede landmænd økonomisk, og at aktindsigt desuden ville besværliggøre det fremtidige samarbejde med landmændene. Ombudsmanden vurderede sagen og fandt afslaget velbegrundet for så vidt angår risikoen for at udpege bestemte landmænd. Til grund for afgørelsen lagde han beretninger fra en hygiejnesygeplejerske i Nordjylland om tilfælde af stigmatisering af landmænd og deres familier og ansatte. Ifølge hendes udsagn har man set en del tilfælde, hvor ægtefæller til landmænd er blevet mobbet på deres arbejdspladser, fx ved at kollegaer undgik dem; børn af svineproducenter blev angivelig mødt med mistænksomhed i dagsinstitutionerne; og ansatte fra inficerede bedrifter

**1541**

har haft svært ved at finde nyt arbejde. I sammenhæng med webmediet […]s offentliggørelse af adresser på to inficerede bedrifter, mistede landmændene ifølge de fremlagte oplysninger indtægter og ansatte sagde op. Af den efterfølgende debat fremgår det dog, at en del af baggrunden for opsigelsen var, at landmændene ikke havde fortalt deres ansatte, at bedriften var inficeret.

Statens Serum Institut har udtalt, at hvis man offentliggjorde lister over MRSA-inficerede bedrifter, ville konsekvensen være, at landmændene ville nægte at indgå i undersøgelserne. Det ville vanskeliggøre myndighedernes arbejde med at følge smittesituationen.

Nyere undersøgelser fra Sverige viser, at patienter kan opleve MRSA-smitte som stærkt stigmatiserende. De smittede følte sig beskidte og som en fare for deres omgivelser. Mange frygtede at blive afvist. Ikke mindst uvidenhed blandt såvel patienter som personale medførte unødig frygt, isolation og lidelse.«

Masterafhandlingen nævnt under punkt 3 er udarbejdet af Alice Løvendahl Sørensen, hygiejnesygeplejerske i Region Midtjylland, i december 2012. I afhandlingen anføres bl.a.:

»Borgere oplever det at være bærer af MRSA som en uklar og forvirrende tilstand mellem sundhed og sygdom. Undersøgelsen identificerer kernekategorien »Mangelfuld information«, som ud-

løser følelser som forvirring og utryghed, meningsløshed, stress og vrede. Dette resulterer i manglende compliance, bekymringer for fremtiden og stigmatisering.«

Den under punkt 4 nævnte artikel blev bragt i Weekendavisen den 17. januar 2014. Af artiklen fremgår bl.a.:

»Sidste år mærkede Etisk Råds […] truslen på nærmeste hold. Hans 10-årige datter havde et sår i mundhulen, der ikke ville hele. Hun blev podet og fik besked på, at det var en MRSA-bakterie. Familien fik besked om at vaske hjemmet ned med sprit. De fik udleveret en særlig sæbe, som skulle bruges de næste dage. De turde ikke invitere andre ind i huset. Datteren blev rask, men fik udleveret et særligt ID-kort, som hun skal fremvise de næste to år, hvis hun besøger et sygehus. »Det begynder også at have sociale konsekvenser for dem, der bliver smittet«, siger […]. »Når vi ikke kan behandle mennesker, som bærer på en bakterie, der er farlig for os andre, så er der en risiko for, at vi mennesker reagerer med stigmatisering og social eksklusion. Det er et andet dilemma, vi skal forholde os til. Det kommer til at påvirke den måde, vi er sammen på.««

Den information fra Statens Serum Institut, som er nævnt under punkt 5, er en mail fremsendt til Statens Serum Institut fra en række sundhedsfaglige personer, som beskriver deres erfaringer med MRSA og stigmatisering.

Af en mail af 30. januar 2014 fremgår bl.a.:

»Jeg har ikke de store erfaringer med CC398, men på baggrund af vore personer med »human« MRSA, kan jeg få meget kolde fødder med hensyn til eventuel offentliggørelse af oplysninger om at der på dette landbrug er »smitte«.

Vore erfaringer med børn i daginstitutioner, er den at vi opfordrer forældre til ikke at oplyse om at barnet er bærer af MRSA, da det har vist sig, at så vil ingen lege med det barn og vi har oplevet at forældre til ikke smittede børn, forlangte at barnet blev taget ud af vuggestuen.

Det var i starten af neonataludbruddene, og da der ifølge sundhedsstyrelsens vejledning, kun er oplysningspligt overfor besøg i sundhedsvæsnet, har vi opfordret til at undlade oplysning om bærertilstand. Nogle forældre, har så oplyst alligevel, og har så oplevet stigmatisering af barnet. Vi så jo det samme med AIDS børn i min ungdom. Jeg har også oplevet det med børn i TB behandling, selvom de var langt inde i behandlingen og på ingen måde smittefarlige, så var der forældrestorm på den pågældende skole.

Men […], vi har vel også tavshedspligt, så man kan da ikke udlevere sundhedsoplysninger til pressen, så mister vi da helt befolkningens tillid. Vi betragter jo personerne på et landbrug med MRSA hos svinene, som værende i risikozone og potentielle smittebærer, og at udgge dem er vel et brud på loven om helbredsoplysninger.«

Af en mail af 3. februar 2014 fremgår bl.a.:

»I Region Sjælland har vi i skrivende stund ikke udbredte eksempler på stigmatisering begrænset til personer med CC398.

Under 10 % af vores samlede MRSA tilfælde udgør CC398. 35 % af disse har ikke kontakt til svinebesætninger.

- Flere borgere melder om manglende forholdsregler, ved kontakt med sygehuse eller lægeklinikker, da der er en misforstået opfattelse om, at CC398 ikke smitter mellem mennesker!

- Sundhedspersonale bosiddende på svinebesætninger, uden konstateret MRSA, oplever pres fra kollegaer om, at blive kontrol podet, og anses i arbejdsrelation, at være en smitterisiko.

Derimod har vi udfordringer for vores MRSA personer med humane stammer.

De borgere i Region Sjælland med børn under 2 år, oplever i større grad stigmatisering, end f.eks. borgere på plejehjem.

…

- De afvises i mødre grupper.

- De får færre planlagte besøg fra sundhedsplejersker
- Planlagte besøg på børneafdelinger aflyses.

**1542**

- De installeres ved indlæggelse i depoter, uden vinduer og håndvask, gr. mangel på enestuer.

- Flere har været henvist til parkeringsplads areal, for derefter at blive ringet op når de måtte [ind]finde sig på den pågældende afdeling.«

Af en mail af 4. februar 2014 fremgår bl.a.:

»Blandt de 14 bærere og 4 pårørende var sidstnævnte en meget almindelig reaktion, som f.eks. medførte, at bedsteforældre undlod at besøge deres børn og børnebørn, at man undlod at besøge personer i familien, som man betragtede som særligt sårbare - f.eks. gamle forældre eller spædbørn, eller at man trak sig tilbage fra eller blev udelukket fra mødregrupper eller lignende aktiviteter i lokalområdet, da de vidste, man var smittet.

Nogle beskrev, hvordan deres omgivelser fysisk trak sig tilbage fra dem; at de ikke længere fik knus og kram af nære familiemedlemmer eller venner; at deres børns legekammerater ikke måtte komme på besøg; at det var svært at få en kommunal pasning o. lign. Andre beskrev, hvordan sundhedsvæsenet (tandlæger, praktiserende læger) afviste at tage dem ind - eller blev meget forvirrede og ikke vidste, hvad de skulle gøre, og at de følte sig som pestramte eller urene.

Flere oplevede problemer mht. deres arbejde, og var generelt bekymrede for at miste dette, og en informant fortalte, hvordan han havde mistet et godt beskæftigelsesjob. Flere blev sygemeldt på ubestemt tid, da arbejdsgiverne var bekymrede for smitterisikoen.

Ovenstående eksempler blev beskrevet mere eller mindre detaljeret under interviewene. En enkelt græd voldsomt under hele samtalen, og flere gav, som beskrevet i mit speciale, udtryk for både bitterhed, vrede og tristhed.«

Af en yderligere mail af samme dag, 4. februar 2014, fremgår bl.a.:

»Fra Region Sjælland og fra Region Hovedstaden har vi ligeledes modtaget eksempler på stigmatisering.

Problematikken er som anført landsdækkende - og som vi havde ventet er den ikke forskellig fra MRSA398 til andre MRSA typer.«

Landbrug & Fødevarer har for Højesteret fremlagt et stort antal artikler og læserbreve mv. med henblik på at belyse, at landmændene er i risiko for at blive stigmatiseret, hvis der gives aktindsigt.

*Anbringender*

*Fødevarestyrelsen* har til støtte for afvisningspåstanden navnlig anført, at Landbrug & Fødevarer og de fem landmænd ikke har retlig interesse i at få prøvet Fødevarestyrelsens afgørelse om aktindsigt, som de ikke er adressat for og heller ikke har væsentlig og individuel interesse i.

Fødevarestyrelsens afslag på at give landmændene partsstatus i aktindsigtssagen er i overensstemmelse med det forvaltningsretlige princip om, at kun den, der søger aktindsigt i en sag eller et dokument, er part i aktindsigtssagen. Derimod er den eller de juridiske eller fysiske personer, oplysningerne i aktindsigtssagen angår, ikke part i sagen. Allerede fordi landmændene ikke er parter i aktindsigtssagen, har de ikke den fornødne retlige interesse i et civilt søgsmål.

I retspraksis stilles også krav om, at en søgsmålsinteresse skal være aktuel. Oplysningerne fra metodeafprøvningsundersøgelsen er ikke ajourførte og ikke retvisende for MRSA-billedet i dag, hvor mellem 63 % og 70 % af alle svinebesætninger er inficerede. Kravet om aktualitet er derfor ikke opfyldt.

Lovgiver har i offentlighedsloven taget stilling til, i hvilke tilfælde der gælder en pligt til at inddrage den, som en begæring om aktindsigt angår, nemlig kun hvor der begæres aktindsigt i personalesager.

De oplysninger, som aktindsigtssagen angår, er miljøoplysninger. I forarbejderne til miljøoplysningsloven er det endda forudsat, at den, som miljøoplysningerne angår, ikke kan anses for at være part eller klageberettiget i aktindsigtssagen.

Landmændene har andre effektive retsmidler til rådighed. De kan anlægge sag mod journalisterne efter medieansvarsloven, anmelde journalisterne til politiet for overtrædelse af straffeloven, indlede en forbudssag eller anlægge en erstatningssag.

Landsrettens kendelse er udtryk for en væsentlig lempelse af betingelserne for at anlægge retssager til prøvelse af afgørelser truffet af offentlige myndigheder, herunder i sager om aktindsigt i oplysninger om andre personer eller virksomheders forhold. Den eneste betingelse vil i realiteten være, at en sagsøger anlægger sag og påberåber sig muligheden for stigmatisering. En ubestemt risiko for stigmatisering kan ikke begrunde retlig interesse i et søgsmål, når der ikke foreligger konkrete beviser for en sådan stigmatisering. Der er tale om et vidtrækkende resultat, som også berører ombudsmandens rolle i aktindsigtssager. Som en reflexvirkning af landsrettens afgørelse risikerer det snævert afgrænsede partsbegreb, som Fødevarestyrelsen og andre myndigheder anvender i dag, at skulle genovervejes og muligvis lempes.

Fødevarestyrelsen har til støtte for påstanden om, at landmændenes søgsmål ikke skal tillægges opsættende virkning, navnlig anført, at efter grundlovens § 63, stk. 1, er det klare udgangspunkt, at et søgsmål til prøvelse af en offentlig myndigheds afgørelse ikke tillægges opsættende virkning.

Højesteret har i UfR 1994.823 H fastlagt de kriterier, der indgår i vurderingen af, om et søgsmål skal tillægges opsættende virkning. Efter kendelsen beror afgørelsen på en afvejning af det offentliges interesse i, at gennemførelsen af afgørelsen ikke udsættes, over for arten

**1543**

og omfanget af den skade, den pågældende kan blive påført, ligesom det tillægges betydning, om der efter en foreløbig vurdering foreligger et rimeligt grundlag for påstanden om ugyldighed. Adgangen til at tillægge et søgsmål opsættende virkning anvendes med forsigtighed og kun i klare tilfælde. Kriterierne svarer til de kriterier, EU-Domstolen anvender i sin lige så restriktive praksis.

Ingen af de nævnte kriterier er opfyldt. Navnlig to tungtvejende offentlige hensyn taler imod opsættende virkning. For det første de hensyn til åbenhed, ytringsfrihed og demokrati, som reglerne om aktindsigt hviler på. For det andet hensynet til den forvaltningsretlige proces i aktindsigtssager, der ikke bør kunne afspores ved et søgsmål om opsættende virkning som det foreliggende.

Hensynet til, at offentligheden ikke opnår kendskab til oplysningerne, der er indhentet i 2011, og ikke nødvendigvis er udtryk for svinebesætningernes status i dag, er ikke så tungtvejende, at det kan begrunde opsættende virkning. Der er heller ikke dokumentation for stigmatisering af landmændene. Den risiko, der måtte være for stigmatisering, må desuden antages at eksistere, uafhængigt af om der gives aktindsigt.

Der er ikke rimeligt grundlag for at betvivle gyldigheden af Fødevarestyrelsens afgørelse om aktindsigt. Afgørelsen hviler på ombudsmandens grundige redegørelse, som ikke er i strid med dansk ret, EU-retten eller med Den Europæiske Menneskerettighedskonvention.

*Dansk Journalistforbund* har tilsluttet sig Fødevarestyrelsens anbringender.

Vedrørende spørgsmålet om opsættende virkning har Dansk Journalistforbund supplerende anført, at søgsmålet er en nydannelse og endda på et område, hvor opsættende virkning vil være særskilt betænkelig, da der reelt er tale om en blokering af nyhedsformidlingen angående et så centralt samfundsanliggende som MRSA.

Opsættende virkning vil have karakter af censur af Kjeld Hansens og Nils Mulvads journalistiske formidlingsarbejde, som er beskyttet af artikel 10 i Den Europæiske Menneskerettighedskonvention og praksis fra Den Europæiske Menneskerettighedsdomstol.

Fortolkningen af grundlovens § 63 og anvendelse af den dommerskabte ret, som er etableret ved UfR 1994.823 H, må ske med udgangspunkt i det centrale overordnede retsgode om pressefrihed og offentlighed angående miljømæssige anliggender, som artikel 10 beskytter. Den tungtvejende interesse i, at gennemførelsen af Fødevarestyrelsens afgørelse om aktindsigt ikke udsættes, suppleres i denne sag af den særskilte interesse, som journalisterne varetager som repræsentanter for offentligheden. Den hidtidige journalistiske dækning skal udbygges via aktindsigten fra Fødevarestyrelsen, herunder med den kritiske vinkel på industriens og myndighedernes håndtering af MRSA.

Kjeld Hansen og Nils Mulvad har i medfør af miljøoplysningsdirektivet og miljøoplysningsloven et retskrav på aktindsigt i miljøoplysningerne i metodeafprøvningsundersøgelsen fra 2011. Aktindsigten vil angive de knap 50 besætninger, altså erhvervsvirksomheder, som er registreret i CHR. Aktindsigten vil derimod ikke omfatte ejerne eller de ansatte i konkrete virksomheder. De smittede personer vil typisk ikke være ejeren af virksomheden, men ansatte som passer svinene i kortere eller længere perioder. Det må sammenholdes med, at virksomhedens ejer eller forpagter kan ændres over tid. Identiteten på smittebærere i 2010/2011 vil ikke på nogen måde fremgå af aktindsigtsmaterialet.

Landmændene har ikke fremlagt konkrete oplysninger om individuel risiko for skade og dermed løftet bevisbyrden for, at de vil lide et uopretteligt tab, hvis der gives aktindsigt. Skulle Højesteret trods dette finde, at en eller to individuelle landmænd har løftet bevisbyrden, må opsættende virkning begrænses til den eller disse landmænd, jf. herved den nedlagte påstand II.2B.

*Landbrug & Fødevarer* har over for afvisningspåstandene navnlig anført, at der ikke kan sluttes modsætningsvis fra det forhold, at de fem landmænd ikke var part i aktindsigtssagen, til, at de ikke har søgsmålskompetence. Landmændene har en konkret, væsentlig og individuel interesse i at få prøvet, om Fødevarestyrelsen er berettiget til at offentliggøre oplysninger om, at landmændenes svinebesætninger blev fundet positive for MRSA i 2011.

Landmændenes prøvelsesret er direkte sikret ved grundlovens § 63, stk. 1, 1. pkt. Da landmændene har medvirket frivilligt og under løfte om anonymitet i en videnskabelig undersøgelse, er deres interesser også direkte værnet af Århuskonventionens artikel 4, stk. 4, litra q, miljøoplysningsdirektivets artikel 4, stk. 2, litra q, og miljøoplysningslovens § 4, litra c, samt af § 12 og § 13 i den dagældende offentlighedslov.

Offentliggørelse indebærer i hvert fald en væsentlig risiko for, at landmændenes navne og adresser (bedriftens adresse er sædvanligvis sammenfaldende med landmændenes bopælsadresse) koblet med oplysninger om, at landmændenes besætninger er fundet MRSA-positive, vil kunne betyde social stigmatisering af landmændene, deres ægtefæller og børn. Der er talrige beretninger om, at børn af landmænd, hvis besætninger er fundet positive, ikke længere inviteres med til børnefødselsdage, ikke kan deltage i gymnastikundervisningen i skolen, ligesom der er eksempler på social udstødelse af landmandens ægtefælle og landmanden selv samt ydmygende gener ved kontakt med

**1544**

sundhedsvæsenet. At følgevirkningerne af offentliggørelse vil være særdeles alvorlige og byrdefulde for landmændene og deres familier er påvist ved de forklaringer, der er afgivet for landsretten, og af det meget omfattende bilagsmateriale, der er fremlagt i sagen.

Copyright © 2023 Karnov Group Denmark A/S

Ombudsmanden har heller ikke villet udelukke, at oplysningerne kan undtages aktindsigt, og har alene udtalt sig i forhold til det for ham fremlagte materiale. Den pågældende, ombudsmanden efterspørger flere steder i sin redegørelse, nødvendiggør bevisførelse i traditionel forstand. En sådan bevisførelse har ikke været mulig i forbindelse med den administrative behandling af sagen eller behandlingen for ombudsmanden og forudsætter indenretlig prøvelse.

De alternative retsmidler, Fødevarestyrelsen nævner, er uanvendelige for landmændene, og de væsentlige skadevirkninger, landmændene udsættes for, hvis de offentligt hænges ud, vil være uoprettelige.

Vedrørende spørgsmålet om opsættende virkning har landmændene henvist til den afvejning, landsrettens kendelse er udtryk for, af på den ene side hensynet til at undgå, at landmændene, deres familier og muligvis tillige deres ansatte stigmatiseres, og på den anden side offentlighedens interesse i at få kendskab til navne og adresser på de landmænd, hvis besætninger i forbindelse med en frivillig videnskabelig undersøgelse blev testet positive for MRSA for mere end ca. fem år siden. Der er ingen grund til, at meddelelse af aktindsigt ikke kan afvente udfaldet af den materielle sag.

De oplysninger, der søges aktindsigt i, er baseret på forkerte, ikke længere aktuelle oplysninger (for to af landmændenes vedkommende), som i øvrigt er foreældet og ikke har undergået nogen form for opdatering, siden metodeafprøvningsundersøgelsen blev offentliggjort i 2011. Disse forhold taler i sig selv med styrke for, at landmændene ikke hænges ud.

Både det forhold, at Fødevarestyrelsen i sin oprindelige afgørelse gav afslag på aktindsigt, og landsrettens kendelse viser, at landmændene har rimelig udsigt til at få medhold. Den allerede for landsretten og til dels for Højesteret gennemførte bevisførelse har desuden tilvejebragt den dokumentation for stigmatisering, ombudsmanden efterlyste i sine redegørelser.

*Retsgrundlag*

*Offentlighedsloven*

*Regler om aktindsigt*

I § 13, stk. 1, nr. 6, i den tidligere offentlighedslov, lov nr. 572 af 19. december 1985, hedder det:

»*§ 13.* Retten til aktindsigt kan begrænses i det omfang, det er nødvendigt til beskyttelse af væsentlige hensyn til

…

6) private og offentlige interesser, hvor hemmeligholdelse efter forholdets særlige karakter er påkrævet.«

Bestemmelsen er videreført i § 33, nr. 5, i den gældende offentlighedslov, lov nr. 606 af 12. juni 2013.

*Klageret og søgsmålskompetence*

I betænkning nr. 325/1963 om offentlighed i forvaltningen anføres følgende om retten til at klage over en afgørelse om aktindsigt samt om søgsmålskompetence (s. 54):

»*E.* Klage over trufne afgørelser.

…

Retsstillingen vil herefter være den, at den, der har fået afslag på begæringen om aktindsigt, og den, som anser sig for krænket ved meddelelse af sådan oplysning, vil kunne klage til overordnet administrativ myndighed, ligesom han i medfør af grundlovens § 63, stk. 1, vil kunne indbringe sagen for domstolene.«

I betænkning nr. 857/1978 om offentlighedslovens revision anføres (s. 310-313):

»*b.* Klager m.m. over afgørelser om aktindsigt.

1°. Offentlighedsloven indeholder ingen udtrykkelig bestemmelse om, at afgørelser med hensyn til udlevering af dokumenter efter loven kan indbringes for højere myndighed. Bestemmelsen i lovens § 8, stk. 1, må dog utvivlsomt antages at indebære, at afgørelser om aktindsigt er undergivet en administrativ rekurs i samme omfang

som afgørelsen vedrørende den pågældende sags realitet, ligesom der er adgang til efter de sædvanlige regler at indgive klage til folketingets ombudsmand eller ved et søgsmål for domstolene at få efterprøvet lovligheden af afgørelser herom.

At retsstillingen ville være sådan uden udtrykkelige bestemmelser om klageadgangen i loven blev klart lagt til grund af offentlighedskommissionen, jfr. herved betænkningen side 54.

…

2° …

Også den, der mener sine interesser tilsidesat, såfremt en begæring om aktindsigt imødekommes, må kunne påklage afgørelsen herom til højere myndighed, men klagen vil ikke uden videre have suspensiv virkning.

…

4°. Som nævnt ovenfor under 1° kan spørgsmål om lovligheden af beslutninger, hvorved begæringer om aktindsigt afslås, indbringes for domstolene efter de almindelige regler i grundlovens § 63, og dette er i tiden efter offentlighedslovens ikrafttræden forekommet i enkelte tilfælde - vistnok udelukkende i sager om partsoffentlighed.«

Det fremgår af betænkning nr. 1349/1997 om aktindsigt i personalesager (s. 42-43), at spørgsmålet om klageberettigelse for den, som oplysningerne i en aktindsigtssag angår, kan give anledning til tvivl, men at der i hvert fald kan rettes henvendelse til en eventuelt overordnet tilsynsmyndighed og til ombudsmanden.

**1545**

Spørgsmålet om adgangen til domstolsprøvelse berøres ikke.

Af betænkning nr. 1510/2009, der danner grundlag for den gældende offentlighedslov, fremgår (s. 774):

»4.5.2. Foruden adgangen til at indgive klage til ombudsmanden, kan spørgsmål om lovligheden af forvaltningsmyndighedernes afgørelser om aktindsigt indbringes for domstolene efter den almindelige bestemmelse i grundlovens § 63 om domstolskontrol med forvaltningens afgørelser, jf. betænkning nr. 857/1978, side 311.«

*Regler om hurtig sagsbehandling*

Den tidligere offentlighedslov fra 1985 bestemte:

»*§ 16.* Vedkommende myndighed afgør snarest, om en begæring kan imødekommes, og om den, der har fremsat begæringen, skal gøres bekendt med dokumenterne ved, at der gives adgang til gennemsyn på stedet, eller ved, at der udleveres en afskrift eller kopi.

*Stk. 2.* Er en begæring om aktindsigt ikke imødekommet eller afslået inden 10 dage efter, at den er modtaget af vedkommende myndighed, skal myndigheden underrette den begærende om grunden hertil samt om, hvornår en afgørelse kan forventes at foreligge.«

Den nugældende offentlighedslov bestemmer:

»*§ 36* …

*Stk. 2.* Vedkommende myndighed m.v. afgør snarest, om en anmodning om aktindsigt kan imødekommes. En anmodning om aktindsigt skal færdigbehandles inden 7 arbejdsdage efter modtagelsen, medmindre dette på grund af f.eks. sagens omfang eller kompleksitet undtagelsesvis ikke er muligt. Den, der har anmodet om aktindsigt, skal i givet fald underrettes om grunden til fristoverskridelsen og om, hvornår anmodningen kan forventes færdigbehandlet.«

I betænkning nr. 1510/2009 anføres (s. 804):

»8.1. Frist for behandlingen af anmodninger om aktindsigt mv.

8.1.1. Det er kommissionens opfattelse, at det er af meget væsentlig betydning, at anmodninger om aktindsigt behandles og afgøres så hurtigt som muligt. Dette skyldes, at en hurtig sagsbehandling og afgørelse af aktindsigtsanmodninger i almindelighed vil være en væsentlig forudsætning for, at offentlighedsloven kan opfylde sin intention om, at medierne ved anvendelsen af loven skal have

adgang til at orientere offentligheden om aktuelle sager, der er under behandling i den offentlige forvaltning …«.

*Miljøoplysningsloven*

*Regler om aktindsigt*

I miljøoplysningslovens § 2, stk. 3, og § 4 c hedder det, jf. lovbekendtgørelse nr. 1036 af 18. august 2015:

»*§ 2* …

*Stk. 3.* I sager om aktindsigt i miljøoplysninger, der er omfattet af bestemmelserne i … § 13, stk. 1, i lov om offentlighed i forvaltningen …, skal vedkommende myndighed foretage en konkret afvejning af offentlighedens interesser, der varetages ved udlevering af miljøoplysningerne, over for de interesser, der varetages ved at afslå udlevering. Bestemmelserne i … § 13, stk. 1, i lov om offentlighed i forvaltningen … skal anvendes restriktivt under hensyntagen til samfundets interesse i, at oplysningerne offentliggøres i det konkrete tilfælde …

*§ 4 c.* Myndigheder … skal, når de anmoder om miljøoplysninger til brug for udarbejdelse af offentlig statistik eller videnskabelige undersøgelser, og når den, som anmodningen stiles til, ikke er forpligtet eller kan forpligtes til at give oplysningerne, gøre denne bekendt hermed og meddele anmodningen til at tilkendegive, at oplysningerne ikke bør offentliggøres.«

Miljøoplysningslovens § 2, stk. 3, og § 4 c blev indsat i loven ved lov nr. 310 af 2. maj 2005, om gennemførte miljøoplysningsdirektivet, Europa-Parlamentets og Rådets direktiv 2003/4.

Af bemærkningerne til § 2, stk. 3, fremgår bl.a., jf. Folketingstidende 2004-05, 2. samling, tillæg A, lovforslag nr. L 4, s. 100-101:

»*Til nr. 3.*

Forslaget gennemfører direktivets generelle afvejningsregel i artikel 4, stk. 2, om at adgangen til at begrænse aktindsigten skal fortolkes restriktivt under hensyn til offentlighedens interesse i, at oplysningerne offentliggøres og direktivets konkrete afvejningsregel, hvorefter de offentlige interesser, der varetages ved udlevering i hvert enkelt sag om aktindsigt, skal afvejes overfor de interesser, der varetages ved at afslå udlevering.

Det foreslås derfor, at direktivets konkrete afvejningsregel indarbejdes for alle offentlighedslovens og forvaltningslovens undtagelsesbestemmelser …

De undtagelsesbestemmelser, der er omfattet af forslaget, er offentlighedslovens … § 12, stk. 1, om undtagelse af oplysninger om enkeltpersoners private, herunder økonomiske forhold og forretningshemmeligheder m.v. og § 13 om undtagelse af oplysninger om f.eks. hensynet til statens sikkerhed m.v. i lov om offentlighed i forvaltningen …

Myndighederne vil således i alle sager om aktindsigt i miljøoplysninger, der er omfattet af de pågældende bestemmelser, få pligt til at foretage en konkret afvejning af de modstående hensyn …«.

Af bemærkningerne til § 4 c fremgår, jf. Folketingstidende 2004-05, 2. samling, tillæg A, lovforslag nr. L 4, s. 104:

»*Til nr. 10.*

Bestemmelsen svarer til den nugældende bestemmelse med den ændring, at der ikke længere består et retskrav for den, der anmodes om oplysninger til brug for udarbejdelse af offentlig statistik og videnskabelige

**1546**

undersøgelser, til at bestemme, at oplysningerne ikke må offentliggøres.

Dette er en konsekvens af forslaget om at indarbejde direktivets afvejningsregel i loven, hvorefter det ikke vil være muligt at opretholde retskravet i lovens nugældende § 4 a.

Bestemmelsen sikrer i stedet en udtaleret for den, der anmodes om oplysningerne. En tilkendegivelse om, at oplysningerne ikke bør offentliggøres, vil kunne indgå med vægt i myndighedens af-

vejning af modstående hensyn i afgørelsen om, hvorvidt oplysningerne kan udleveres.«

*Klageret og søgsmålskompetence*

Miljøoplysningsdirektivet indeholder i artikel 6, stk. 2, følgende bestemmelse om adgangen til klage og domstolsprøvelse:

»*2.* Ud over den i stk. 1 omhandlede adgang til klage sikrer medlemsstaterne, at den informationssøgende har adgang til prøvelse af en afgørelse ved en domstol eller et andet ved lov oprettet uafhængigt og upartisk organ, som kan efterprøve den pågældende offentlige myndigheds handlinger eller undladelser, og hvis afgørelser kan gøres endelige. Medlemsstaterne kan endvidere sikre, at tredjeparter, som belastes i forbindelse med offentliggørelse af oplysninger, også har adgang til retsmidler.«

*Regler om hurtig sagsbehandling*

Miljøoplysningslovens § 4, stk. 3, bestemmer:

»*§ 4* …

*Stk. 3.* Sager om aktindsigt skal under hensyntagen til en eventuel tidsfrist, som anføres af den, der har fremsat anmodningen, afgøres hurtigst muligt og senest 1 måned efter modtagelsen af anmodningen eller, hvis sagens omfang og komplekse karakter er af en sådan art, at fristen på 1 måned ikke kan overholdes, senest 2 måneder efter modtagelsen. Sager efter stk. 2, hvor der gives afslag på at stille oplysningerne til rådighed i den form, som den, der fremsatte anmodningen, ønsker, skal dog afgøres senest 1 måned efter modtagelsen af anmodningen.«

## Højesterets begrundelse og resultat

Kæren angår, om A-E (de fem landmænd) har retlig interesse i at få prøvet Fødevarestyrelsens afgørelse af 1. september 2014, som stadfæstet ved Fødevareministeriets Klagecenters afgørelse af 6. oktober 2014, om aktindsigt i en metodeafprøvningsundersøgelses oplysninger om, hvilke svinebesætninger der ved undersøgelsen i 2011 blev konstateret MRSA-positive.

Har landmændene retlig interesse, er spørgsmålet, om det er med rette, at landsretten har tillagt søgsmålet opsættende virkning.

*Søgsmålskompetence*

Efter forarbejderne til offentlighedsloven er den, som oplysningerne i en aktindsigtssag angår, ikke part i aktindsigtssagen. Forvaltningsmyndigheden kan dog på andet retsgrundlag have pligt til at inddrage den pågældende, herunder i kraft af officialprincippet, jf. senest betænkning nr. 1510/2009 om offentlighedsloven, s. 800-801.

Det forhold, at den person, som oplysningerne angår, ikke er part i aktindsigtssagen, udelukker ikke, at den pågældende kan være berettiget til få prøvet afgørelsen ved domstolene efter grundlovens § 63, stk. 1, 1. pkt., hvis de almindelige betingelser for at anlægge en retssag er opfyldt, herunder kravet om retlig interesse.

Metodeafprøvningsundersøgelsen angik 48 svinebesætninger, hvoraf de 34 besætninger blev fundet MRSA-positive. De fem landmænds besætninger var efter det oplyste blandt de 34 besætninger, der blev fundet positive. Metodeafprøvningsundersøgelsen angiver alene bedrifternes nummer i CHR (Det Centrale Husdyrbrugsregister), men der er via CHR offentlig og vederlagsfri adgang til aktuelle oplysninger om bl.a. besætningens ejer, bruger og besætningens geografiske placering. Mod betaling er der endvidere adgang til historiske ejerforhold.

Selv om metodeafprøvningsundersøgelsen således alene angiver bedrifternes nummer i CHR, vil aktindsigt heri - gennem søgninger i CHR - afsløre, at de fem landmænds svinebesætninger var konstateret MRSA-positive. Højesteret finder herefter, at disse landmænds forhold berøres i en sådan grad af, at der gives aktindsigt, at de har retlig interesse i at få prøvet, om afgørelsen om aktindsigt i metodeafprøvningsundersøgelsens oplysninger om MRSA-smitte i deres

Copyright © 2023 Karnov Group Denmark A/S

svinebesætninger er gyldig. Afvisningspåstandene tages derfor ikke til følge.

*Opsættende virkning*

For så vidt angår spørgsmålet om at tillægge søgsmålet opsættende virkning bemærkes indledningsvis, at opsættende virkning i givet fald alene vil forhindre, at der udleveres oplysninger om MRSA-smitte i de fem landmænds svinebesætninger. Opsættende virkning vil således ikke forhindre, at der udleveres oplysninger om MRSA-smitte i andre landmænds svinebesætninger. Fødevarestyrelsen har imidlertid i forbindelse med sin afgørelse om aktindsigt suspenderet udleveringen af oplysninger om MRSA-smitte for så vidt angår alle de involverede landmænds svinebesætninger, indtil domstolene har taget stilling til spørgsmålet om opsættende virkning i denne sag. Fødevareministeriets Klagecenter har stadfæstet suspensionen. Myndighedernes afgørelse om suspension er ikke til prøvelse under denne sag.

Efter grundlovens § 63, stk. 1, 2. pkt., kan den, der anfægter gyldigheden af en administrativ afgørelse,

**1547**

»ikke ved at bringe sagen for domstolene unddrage sig fra foreløbig at efterkomme øvrighedens befaling«.

Som fastslået i Højesterets dom af 24. august 1994 (UfR 1994.823) kan domstolene undtagelsesvis uden udtrykkelig lovhjemmel tillægge et søgsmål vedrørende prøvelse af en administrativ afgørelse opsættende virkning. Den konkrete afgørelse af, om et søgsmål bør tillægges opsættende virkning, må bero på en afvejning af det offentliges interesse i, at gennemførelsen af afgørelsen ikke udsættes, over for arten og omfanget af den skade, den pågældende kan blive påført, ligesom det må tillægges betydning, om der efter en foreløbig vurdering foreligger et rimeligt grundlag for påstanden om ugyldighed.

Offentlighedsloven har til formål at sikre åbenhed hos myndighederne for bl.a. at understøtte informations- og ytringsfrihed samt mediernes formidling af informationer til offentligheden (lovens § 1, stk. 1). En hurtig sagsbehandling og afgørelse af aktindsigtsanmodninger vil i almindelighed være en væsentlig forudsætning for, at offentlighedsloven kan opfylde sin intention om, at medierne ved anvendelsen af loven skal have adgang til at orientere offentligheden om aktuelle sager, der er under behandling i den offentlige forvaltning (betænkning nr. 1510/2009 om offentlighedsloven s. 804). I offentlighedsloven er det derfor fastsat, at en anmodning om aktindsigt skal afgøres snarest muligt og som hovedregel skal færdigbehandles inden 7 arbejdsdage (tidligere 10 dage) efter modtagelsen (lovens § 36, stk. 2, og den tidligere lovs § 16, stk. 2). For at dette i praksis kan lade sig gøre, forudsætter offentlighedsloven bl.a., at den person, oplysningerne angår, ikke er part i aktindsigtssagen, og derfor ikke skal partshøres i anledning af en anmodning om aktindsigt. I miljøoplysningsloven er der som supplement til offentlighedslovens regler fastsat absolutte frister på 1 og 2 måneder for afgørelse af anmodninger om aktindsigt i miljøoplysninger (lovens § 4, stk. 3).

Under hensyn til det anførte finder Højesteret, at der er en meget væsentlig offentlig interesse i, at udlevering af oplysninger i henhold til en afgørelse om aktindsigt som det helt klare udgangspunkt ikke forhindres ved søgsmål om opsættende virkning.

Efter de foreliggende oplysninger kan det ikke lægges til grund, at de påberåbte skadevirkninger i form af sociale konsekvenser for de fem landmænd og deres familier (stigmatisering) som følge af offentliggørelse af oplysningen om MRSA-smitte i deres svinebesætninger i 2011 er nærliggende og væsentlige.

Fødevarestyrelsens afgørelse om aktindsigt af 1. september 2014, som stadfæstet ved Fødevareministeriets Klagecenters afgørelse af 6. oktober 2014, hviler på Folketingets Ombudsmands redegø-

relse af 6. juni 2014 (FOB 2014-8). Heri fastslog ombudsmanden, at der ikke var grundlag for at afslå aktindsigt i oplysningerne i metodeafprøvningsundersøgelsen om, i hvilke svinebesætninger der var konstateret MRSA-smitte. Han henstillede derfor, at sagerne om aktindsigt blev genoptaget. Ud fra en foreløbig vurdering er der ikke grundlag for at fastslå, at Fødevarestyrelsens efterfølgende afgørelse om aktindsigt som stadfæstet af Fødevareministeriets Klagecenter er ugyldig.

Efter en samlet afvejning finder Højesteret herefter, at søgsmålet ikke skal tillægges opsættende virkning.

*Dansk Journalistforbunds øvrige påstande*

Højesteret finder, at Dansk Journalistforbunds subsidiære påstande - i det omfang de går videre end at gøre indsigelse mod Landbrug & Fødevarers anmodning om opsættende virkning - ikke kan anses for omfattet af de spørgsmål om afvisning og opsættende virkning, som landsretten udskilte til særskilt behandling, jf. retsplejelovens § 253, og de kan derfor ikke behandles under denne kæresag.

*Processuelle spørgsmål*

Landsretten har i sin kendelse anonymiseret navnene på de fem landmænd, herunder de to landmænd, som afgav forklaring under delhovedforhandlingen. Dette skal antagelig ses i sammenhæng med, at advokat Tyge Trier i forbindelse med behandlingen af spørgsmålet om hovedintervention fra Dansk Journalistforbund som mandatar for Kjeld Hansen og Niels Mulvad afgav proceserklæring om at ville håndtere information om de enkelte svinebesætninger, deres ejere og personale fortroligt og om ikke at ville videregive disse oplysninger til forbundet eller de to journalister.

Højesteret finder, at en ordning, hvorefter navnet på en part i en civil retssag hemmeligholdes for en anden part, herunder i rettens afgørelser, må kræve lovhjemmel og ikke er et spørgsmål, som parterne ved enighed kan råde over. En sådan lovhjemmel foreligger ikke. Højesteret har derfor ikke anonymiseret de fem landmænds navne i denne kendelse.

*Sagsomkostninger*

Efter udfaldet og karakteren af de spørgsmål, som Højesteret har taget stilling til under denne kæresag, skal ingen af parterne betale sagsomkostninger til nogen anden part i anledning af kæresagen.

**Thi bestemmes**

*De afvisningspåstande, der er nedlagt af Fødevarestyrelsen og af Dansk Journalistforbund som mandatar for Kjeld Hansen og Niels Mulvad, tages ikke til følge.*

*Anmodningen fra Landbrug & Fødevarer som mandatar for A-E om, at søgsmålet tillægges opsættende virkning, tages ikke til følge.*

*Ingen af parterne skal betale sagsomkostninger til nogen anden part i anledning af kæresagen.*

Copyright © 2023 Karnov Group Denmark A/S