# Exhibit 37

**U.2010.603Ø**

***Employees awarded DKK 200,000 in compensation as a result of discriminatory treatment of them due to age in connection with the decision to appoint them for transfer.***

*Employment and labor law 2.9 - Non-contractual compensation 3211.7 - Personal matters 3.*

♦ In connection with a changed structure in SKAT , A and others were selected to move their workplace from Maribo to Ringkøbing. The persons in question, who for various reasons were unable to move, ended up terminating their employment with SKAT. Based on the evidence in the case, the High Court found that there was reason to presume that discrimination on the grounds of age had been practiced in violation of the Discrimination Act. It was then up to SKAT to prove that the principle of equal treatment had not been violated, cf. section 7a of the Discrimination Act. Like the District Court, the High Court found that SKAT had not proved that this principle had not been violated by the decision to appoint the employees for transfer, cf. section 2(1), cf. section 1(2), of the Discrimination Act. The High Court agreed that A and the others should then be awarded compensation, and that, as stated by the District Court, emphasis should be placed on the fact that the decision to transfer them was in reality a dismissal. Accordingly, and based on the fact that they all had more than 25 years of seniority, the compensation for each of them was found to be appropriately set at DKK 200,000.

**Ø.L.D. November 11, 2009 in appeal 6th dept. B-413-09**
(Rosenløv, Gitte Rubæk Pedersen, Per Frydenreim Møller (deputy)).

*SKAT (Km.adv. v/adv. Niels Banke, Kbh.)*
mod
*HK Denmark as representative for Aase Helene Geert*
*Max Broms*
*Jane Halberg Larsen*
*Karin Friis Rasmussen*
*Bente Rasmussen (adv. Peter Breum, Copenhagen, for all).*

## Copenhagen City Court verdict February 2, 2009.
1

### Background to the case and the parties' claims

The plaintiffs, HK Danmark as representative for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen, have made the following *CLAIM against* the defendant, SKAT:

*Claim as far as Aase Helene Geert is concerned:*
Order the defendant to pay DKK 392,959.44 with the addition of the usual procedural interest from the institution of proceedings until payment is made.

*Claim as far as Max Broms is concerned:*
Order the defendant to pay DKK 490,997.16 with the addition of the usual procedural interest from the institution of proceedings until payment is made.

*Claim as far as Jane Halberg Larsen is concerned:*
Order the defendant to pay DKK 400,028.58 with the addition of the usual procedural interest from the institution of proceedings until payment is made.

*Claim as far as Karin Friis Rasmussen is concerned:*
Order the defendant to pay DKK 468,537.48 with the addition of the usual procedural interest from the institution of proceedings until payment is made.

*Claim as far as Bente Grethe Rasmussen is concerned:*

Order the defendant to pay DKK 386,631.00 with the addition of the usual procedural interest from the institution of proceedings until payment is made.

The defendant has claimed acquittal.

The plaintiffs were selected for transfer from their workplace at the defendant in Maribo to a new payment center in Ringkøbing. When the plaintiffs refused to be transferred, they were dismissed.

The case concerns whether the decision to transfer was discriminatory on the grounds of age.

The amounts claimed constitute compensation pursuant to section 7 of the Danish Act on Prohibition of Discrimination in the Labor Market etc. and correspond to 78 weeks' salary.

## The information in the case

In connection with a restructuring in SKAT, a payment center was established in Ringkøbing in 2006 as well as 4 customer centers located in Roskilde, Hjørring, Odense and Ribe.

As it was not possible to fill all the vacant positions in the new centers through voluntary applications, a number of employees from the individual tax centers had to be appointed and transferred to the Payment Center in Ringkøbing and the 4 customer centers respectively.

A memo dated March 1, 2006, prepared by SKAT, Head Office, and entitled: "Criteria for appointment of employees to the Payment Center and Customer Center", the following is stated:

**604**

*"Principles for designation of employees for non-requested transfer* Only objective criteria shall be used when designating employees for non-requested transfer . . .

*Guidelines for appointment to the Payment Center*

The principle for staffing the Payment Center is that it is the employees who specifically deal with the relevant tasks that are designated for transfer. The starting point is therefore the resource consumption of the tax cooperatives and the individual tax centers in 2005 for the relevant tasks.

. . .

The employees appointed for non-requested transfer to the Payment Center must be found among those who are involved in the task to *a certain extent.*

The model for appointment is divided into 2 parts, one part with the SAP bookkeeping task and one part that concerns the other tasks that are transferred to the Payment Center.

*The SAP bookkeeping task*

The part of the model that relates to the SAP bookkeeping task is at the collaboration level, partly because the task is concentrated at a few tax centers, and partly because by far the largest part of the SAP bookkeeping task is not transferred to the Payment Center. Based on a specific professional assessment, it is estimated that the SAP bookkeeping task constitutes 14 FTEs regarding the task that remains to be transferred to the Payment Center. The 14 employees to be appointed to the Payment Center for this task must thus be found among the employees in the tax partnerships who deal with the SAP bookkeeping task - order number N11206000000 SAP bookkeeping.

*Other tasks for the Payment Center*

The model for appointing employees for the rest of the tasks that are transferred to the Payment Center is divided between tax centers. Each tax center's contribution to the Payment Center is based on the relative resource consumption for the task reduced by the number of employees who will be transferred to the Payment Center and the Collection Center after voluntary application, as well as already executed transfers.

As a basis for the appointment of employees for the rest of the Payment Center's tasks, a list of employees has been selected,

---

1    The case is dealt with collegially, cf. section 12(3) of the Administration of Justice Act.

Copyright © 2023 Karnov Group Denmark A/S                                      page 2

U.2010.603Ø

who in 2005 have been working on the tasks that will be handled in the Payment Center in the future.

The following order numbers are used in the search:

N112010000000000 . . .
N11256000000 . .
. N11266000000 .
. . N11336000000

. . .

The following criteria shall be applied when designating employees for unrequested transfer:

* Employees must be appointed who are able to solve the tasks in the Payment Center here and now

* Employees must be appointed who have the competencies to solve and further develop tasks in a responsible manner in the payment center

* Employees with shop steward protection may not be appointed

* . . ."

On 2 March 2006, the personnel department issued an overview of how the staffing of the payment center and customer centers was to take place. This stated, among other things, that it was expected that on March 16, 2006, 13 employees from the Maribo Tax Center would be designated. By letters dated 16 March 2006 from Skattecenter Maribo, represented by Director Jens Broberg, to each of the applicants, each of the applicants was informed that it was intended to transfer them with effect from 1 July 2007 to the payment center and that they would receive a final transfer letter no later than six months before the transfer. It also appeared from the letter that they had the opportunity to present circumstances that made them consider the transfer to be particularly disruptive for them. The applicants each submitted a written objection (party consultation response) and stated the specific circumstances that made a transfer

particularly intrusive for them, and the individual applicants' responses to the party consultation were answered by SKAT. Essentially identical letters of December 13, 2006 from SKAT, Head Office, to each individual claimant state, among other things:

". . Since you are engaged in some of the tasks that will be handled by the Payment Center in Ringkøbing in the future, it is SKAT's opinion that you should be transferred there. As you have not accepted the transfer to the Payment Center in Ringkøbing, you are hereby given notice of dismissal to resign at the end of June 2007

. . ."

The plaintiffs contacted HK Storstrøm, which by letters of December 22, 2006 to the defendant on behalf of each of the plaintiffs claimed that the dismissals were unjustified and that the decisions were not in accordance with the Discrimination Act.

On January 22, 2007, negotiations took place between HK Storstrøm represented by professional consultant Allan Hviid and SKAT represented by tax director Jens Broberg, and a mediation meeting was held on March 6, 2007. A summons was then issued on July 2, 2007.

- - -

The applicants drew up the following list of employees who were designated for transfer to the payment center in Ringkøbing on 16 March 2006:

*"Age distribution at the appointment to the Payment Center in Ringkøbing on 16/03-2006*

According to. HSU minutes of March 2, 2006, it was announced which work tasks should be used as a basis

**605**

for the appointment. A total of 11 people had to be appointed to Ringkøbing Bookkeeping II consisted of a total of 12 employees.

| Name | Age | | Work task A-tax (Bc) | Offset (Bc) Cobra and KL |
|---|---|---|---|---|
| Freddy Jacobsen | | - - 46 years | | (Bc) Transporter |
| Aase Geert | | - - 45 years | | Bc tasks |
| | - - 64 years | | | Transporter + Cobra and KL (Bc) |
| Max Brakes | | | | List system (Bc) Bc tasks |
| Karin Friis Rasmussen | - - 59 years | | | |
| Kate Andersen | | | Transporter + Other Bc tasks | |
| | - - 54 years | | | |
| Bente Rasmussen | - - 53 years | | List system (Bc) List system | |
| Irene Petersen | | | | |
| Jane Halberg Larsen | - - 53 years | | Transporter + Cobra and KL (Bc) | |
| Marianne Bratling | - - 53 years | | | |
| Susanne Krogh | | | Transporter + Other Bc tasks | |
| Bente Laursen | - - 52 years | | | |
| Jessie Kristoffersen | - - 51 years | | | |
| Gitta Larsen | - - 50 years | | | |
| | - - 46 years | | | |
| | - - 46 years | | | |

UfR ONLINE                                                                                                    U.2010.603Ø

|  |  | Remarks |
| --- | --- | --- |
| Designated | Designated | Vans are not moved |
| Designated | Designated |  |
| Appointed |  | moved |
| Appointed | Appointed |  |
| Appointed | Appointed |  |
| Friholdt | Friholdt | HK Vice-Chairman Transporter will not be moved |
| Friholdt | Friholdt |  |
|  |  | Withdrawn Transporter will not be moved |

In addition to the people announced for transfer in Accounting II, the following were also appointed from other departments.

| Name | Age | Work assignment |  | Remarks |
| --- | --- | --- | --- | --- |
| Kathe Rasmussen | - - 64 years | Death estate cases in Køge | Appointed | Withdrawn, gone on back pay Entered early retirement Withdrawn |
| Bente Nielsen |  |  |  |  |
| Lene Nielsen | - - 60 years | Pension tax. Pension tax. | Designated | |
|  | - - 60 years |  | Designated | |

As clearly shown in the table above, everyone who has been appointed is over 50 years old. To keep the 4 people in Accounting II who are under 50 years old, 3 people from other departments have been appointed."

The defendant has submitted an anonymized gross list of 36 employees who, to a greater or lesser extent, were engaged in tasks to be transferred to the Payment Center in Ringkøbing. The list shows by code number that the 36 employees had spent between 0.4% and 117.9% of their time on tasks with the code numbers in question. For the purposes of the case, the defendant's lawyer added the plaintiffs' names in handwriting, and all employees' ages were added. The lawyer has calculated the average age of the 36 employees to be 53 years 5 months. The defendant has furthermore submitted an overview called "Age and gender distribution in Central and South Zealand as of 22 May 2006", and it appears from this that the Maribo Tax Center employed 178 employees and that the total average age was 50.6.

A 7-page leaflet published by the Ministry of Employment entitled: "Your qualifications count" has also been submitted for the case.

- Not your age."

The case also shows that Karin Friis Rasmussen was born on September 12, 1953 and was employed by SKAT on January 8, 1980, Jane Halberg Larsen was born on August 31, 1955 and was employed by SKAT on June 20, 1978, Bente Rasmussen was born on

October 22, 1953 and joined SKAT on March 1, 1975, Aase Helene Geert was born on May 30, 1947 and joined SKAT on June 1, 1966, Max Broms was born on November 24, 1952 and joined SKAT on March 1, 1974.

### Explanations:

Jane Halberg Larsen, Karin Friis Rasmussen, Max Broms, Jens Broberg and Vibeke Stef- fensen gave evidence during the case.

*Jane Halberg Larsen* has explained, among other things, that in 2005 and 2006 she was involved with the self-employed's regular payments, called "Kobra", and voluntary payments of residual tax, called "KL payments". The KL tasks, which are mainly processed in the first six months of the year, were to be moved to Ringkøbing. They were gathered in Maribo in one department, Bookkeeping II, which covered all of South Zealand. There were 11-13 employees in Bookkeeping II. As it turned out, it was their tasks that were to be moved to Ringkøbing. Bookkeeping II was led by Vibeke Steffensen. Jens Broberg's office was located in the same hallway as their department, and his office was 3 offices away from Jane Halberg Larsen's.

During the working day, they made a time registration showing what they had done that day. Meetings or courses were not included in the registration. The registration was done according to their own estimation of what the working day was spent on. Bookkeeping II, which could be described as the bookkeeping department for companies and citizens, did not perform tasks for other departments. There was also a Bookkeeping I, which dealt with the tax centers' finances.

Presented with the anonymized list of 36 employees who had been engaged in work tasks,

**606**

which was handled by Bookkeeping II, she explained that the plaintiffs were able to recognize which persons were hiding behind the numbers. There could have been an employee in another department who had made a registration with one of Bookkeeping II's work codes, which could explain why that person was registered as having spent 0.8% of his time on the

type of work in question. When a person was listed with 112%, it must mean that they had worked overtime. The employees in Bookkeeping II were involved in a number of different administrative tasks related to tax collection.

When shown the table drawn up by the applicants with the heading 'Age distribution at the appointment to the Payment Center in Ringkøbing on 16/03-2006', she explained that 'Bc' meant that these were tasks to be moved to the Payment Center. Immediately before March 16, 2006, it was decided that transports should not be moved to the payment center. Death estates and pension taxation tasks were not moved to the payment center. These tasks continued to be handled by the tax center in Maribo.

She believes that in the latter half of February, they were informed that the customer centers and the payment center could not be staffed with volunteer applicants. However, at that time they did not know the number of staff they were short at these centers. They were only informed of this number in the letter of March 2, 2006 about the staffing of the payment center and the customer centers. They could see at that time which way the wind was blowing, based on the information that 13 employees were to be transferred and the information on the content of the tasks to be transferred. It seemed rather unrealistic that they were moving from one end of the country to the other. When told that according to a table of "Age and gender distribution in Central and South Zealand as of May 22, 2006" they had the highest average age, she explained that their seniority was also high. They had not had any major staff turnover in the years leading up to this structural change.

After they were appointed on March 16, 2006, they tried to have some discussions with management. But they were told that the decisions could not be changed. However, a transfer decision regarding an employee who only performed transportation was withdrawn. Jane Halberg Larsen had worked in Vibeke Steffensen's department for 4½ years.

She became very angry on March 16, 2006. They were called in one by one, and the way it was done was that employees were called in in order of age, with the oldest first, so that they were handed a letter saying that they were designated for transfer. Management stopped at an employee who was 50 years old. When they asked if there were no more to be called up, they were told that they stopped here. She saw the brochure "Your qualifications count - not your age". Max Broms' wife had found the brochure in the library. Jane Halberg Larsen read it and immediately called Vibeke Steffensen in and encouraged her to see the brochure. Vibeke Steffensen read the brochure and then said: "Well, then we've used the wrong concept". Jane Halberg Larsen did not take it as a joke. Karin Rasmus- sen and Max Broms were also present in the office when Vibeke Steffensen said this.

*Karin Friis Rasmussen* has explained, among other things, that she was employed in Bookkeeping II and worked with some list systems that were to be moved to Ringkøbing. After each working day, she registered that she had worked with the list system all day. All work tasks had a code.

When asked about the anonymized list of 36 employees, she explained that she could not really know who had been in their work areas. It was not often that they got help from other departments.

The letter of March 16, 2006 was delivered by Jens Broberg. He did not make any additional comments at the same time. They were called in order of age. She saw the leaflet 'Your qualifications count - not your age' on the day Max Broms brought it in. They thought it was about them. She was with Max Broms and Jane Larsen in her and Jane Larsen's shared office. Jane Larsen called Vibeke Steffensen in, and when she had read the brochure, Vibeke Steffensen said: "Then we've

used the wrong concept." It couldn't have been said in jest.

*Max Broms* has explained, among other things, that in 2005 and 2006 he was working with the list system in Bookkeeping II. There had not been

any great turnover in the employee group. When presented with the anonymized list of employees who had been engaged in tasks handled by Accounting II, he explained that they had studied the list somewhat, and they believed that they could most likely identify the people on the list. Among other things, they had assumed that the employees were listed in alphabetical order. He cannot explain how it could be that someone had performed 0.8% of the type of work tasks that fell under Bookkeeping II. Kate Andersen was a member of the cooperation committee. He does not remember if she was on it in 2006, but subsequently she had attended meetings of the Works Council. The

On March 16, 2006, they were gathered in one room and called in with the oldest first, and then in order of age. Irene Petersen was called in from elsewhere in the building, and then they could work out who was going in next. In the moment, he was very concerned that they should get a message that they were being transferred to Ringkøbing. He took the pamphlet "Your qualifications count - not your age" to work and showed it to Jane Larsen, while asking Karin

**607**

Rasmussen take a look. When they had finished reading the booklet, Vibeke Steffensen came by. Jane Larsen called Vibeke Steffensen into the office. Vibeke Steffensen read the brochure and then said that they had started from the wrong concept. Afterwards, he went into his own office and wrote it down immediately, because it was his style to write something down if he wanted to remember it. No one was joking in that department at the time.

*Tax Director Jens Broberg* explained, among other things, that he took over as director of the tax center in Maribo on 1 November 2005. Before that, he had been regional manager for Region Høje Tåstrup. The position at the Payment Center in Ringkøbing had been advertised, but not enough voluntary applications had been received. It was decided that the Payment Center in Ringkøbing should be staffed with employees from the tax centers, with preference given to employees at the tax centers closest to Ringkøbing. However, the other tax centers also had to contribute with employees.

Originally, he was to appoint 13 employees, but the number was changed to 11. He did not have any in-depth knowledge of the employees because he had only been at the tax center in Maribo for a short time. He discussed the selection of the employees to be transferred with the relevant department heads and also with the entire management team. He made the final decision on who should be appointed. V ibeke Steffensen was part of the joint management team when it was discussed. He saw it as a job offer elsewhere in SKAT, but he could see that mobility was not easy in such a remote district. They selected the employees according to the objective criteria, and he had the list with the names of 36 employees, which is presented in anonymized form, because these employees had more or less dealt with the tasks to be moved. He could not and did not use age as a criterion. It was news to him that the employees should have been called up according to age. It was not something he had organized. He had 11 envelopes to hand out. Vibeke Steffensen collected them. He had created a new organization in the Maribo Tax Center, and the area they were working in, which was previously called Bookkeeping II, was now called Customer Portal. An employee was appointed from Estate Administration. The list included virtual employees who were physically located somewhere other than Maribo. The gross squad consisted of the 36 people on the compiled list. But he had also paid some attention to how much of their time they had spent on the tasks that were moved to

Ringkøbing. Kate Andersen was included in his considerations. He had no knowledge that she was to enjoy trustee protection.

tation. He had been a shop steward for a number of years. He had not thought to exempt 4 employees who were 45 and 46 years old. They belonged to the group of those who were not appointed. For him, the differences between the designated and non-designated employees meant nothing.

With regard to the fact that the transfer was to be based on objective criteria and with regard to the list of the 36 employees, he explained that he had not selected the list himself. He had received it from SKAT's headquarters. The list was selected on the basis of the 4 lisy numbers mentioned in SKAT's memo of March 1, 2006 on "Criteria for appointment of employees to the Payment Center and Customer Center". The employees who had registered on the codes in question had to a certain extent been engaged in the tasks in question. He selected the 11 employees after carefully reviewing the list. There could be special circumstances that meant that an employee should not be transferred. He made a mistake by appointing someone who only worked with transportation. He asked whether the employees in question had the skills that the payment center needed, and he also made sure that the employees who were left behind had the skills relevant to Skattecenter Maribo. He also included information about special family circumstances, including illness and, for example, spouses' relationships. Without breaking anonymity, he cannot go into more detail about what special circumstances in the families might be involved. A registration in a work area of 0.8% is not much. They had a flex scheme, which may explain why some had registered over 100%. In principle, it mattered what percentage of their work consisted of the work that was moved away. But he was also able to identify someone where the percentage of their work that was moved was less than 25%, and the decision to transfer them was later overturned. He emphasized that they had been involved in the work in question to a certain extent. He discussed the issue with the heads of department at several meetings. There were no written presentations for these meetings. He inquired about the information he received from the heads of department. The line managers did not bring any written material to the meetings. There was nothing in writing about the selection of the employees to be transferred. He did not make any notes of who was to be appointed and who was not. He does not recall whether he informed the management secretariat, which drafted the letters, by email about who was to receive a transfer letter. The individual employees were not informed of how their competencies were assessed. The individual employees were not informed that the gross list was 36 employees.

Having been at SKAT in Maribo for four months at the time, he explained that he did not know the employees' qualifications on March 16, 2006.

**608**

Considering the applicants' table of "Age distribution on appointment to the Payment Center in Ringkøbing on 16/03-2006" and held that Kate Rasmussen on the gross list of 36 employees is believed by the applicants to be the person listed as the 24th on the gross list and who has spent 1.2% of her time on the tasks to be transferred, that Bente Nielsen should be the 4th on the gross list, and that Lene Nielsen should be placed as the

26. on the gross list and had thus registered that he had spent 3.9% of his working hours on the transferred tasks, he explained that he had not checked this. He had the names of the employees in question and an indication of whether they worked on the tasks full-time or part-time. He cannot say whether Lene Nielsen had spent 3.9% of her time on the transferred tasks. They also looked at who they could build on. They considered ongoing competence development.

Copyright © 2023 Karnov Group Denmark A/S

With reference to the overview of "Age and gender distribution in Central and South Zealand as of May 22, 2006" prepared by Tax Cooperation Central and South Zealand and the fact that Maribo had the highest average age, he explained that some of the older employees left in connection with the structural change, but at that time he had not had time to make forecasts of who was leaving. They did not consider this in connection with the selection of employees for transfer. In connection with recruitment in 2007 at SKAT, they did consider, among other things, generational change. When they looked at whether an employee could be built on, they looked in particular at the willingness and ability to learn new material and acquire new skills. Employee development interviews were conducted, and during these interviews, the employee's wishes and SKAT's wishes were discussed. These conversations did not take place in connection with the appointment for transfer. It was something the department managers were responsible for, and it was confidential between the department manager and the employee. The line managers were not asked in advance to assess who should be transferred. More tasks were assigned to the "Customer Portal" than had been in Bookkeeping II, but Bookkeeping II sat as a single block. The two heads of department, Sonja Davidsen and Kim Lønberg, had been in Maribo for several years. To a certain extent, they had daily contact with the employees, but it was the department managers who were primarily responsible for the daily contact. At SKAT in Maribo, there were a number of department heads, 2 heads of department and the director. The transports are still located in the tax center in Maribo. This task should have been transferred to Ringkøbing, but just before March 16, 2006, it was centrally decided that this would not happen after all.

*Vibeke Steffensen* has explained, among other things, that she has been the head of a department for about 20 years. She had an advisory role in connection with the decision to appoint the employees to be transferred. A management meeting was held, attended by heads of department and Broberg. She was asked if they were involved in the tasks to be transferred. She regarded it as a transfer decision and not a round of dismissals. The people who were transferred were those who were working on the tasks that were being transferred. They had to have the skills that the payment center needed. Aase Geert, Bente Rasmussen, Max Broms and Jane Halberg Larsen worked with the tasks that were the criteria for the appointment.

When told that she should have said: "Well, then we have used the wrong concept" when she was shown the brochure, she has explained that she knows the booklet. The three employees came to her office with the leaflet. As far as she remembers, she said that if you discriminate on the basis of age, you are using the wrong concept. They hadn't done that in Maribo. They had selected according to the skills that were needed in Ringkøbing. There were others in her department who were engaged in the relevant tasks. Bookkeeping II was established in 2002. When shown the gross list of 36 employees, she explained that she had seen this document. She can confirm that it was an extract of the 4 registration codes that covered work tasks to be moved to Ringkøbing. She can confirm that there were 36 employees to choose from. She was to be the manager of those who would stay in her department. The customer portal was established in early 2006. The tasks that were to be moved to Ringkøbing were not to be moved until July 2007. There were around 25 people in the Customer Portal from the start. It was important that someone had the skills that were important for the continued work in Maribo. Consideration was given to social conditions based on the knowledge they had of the employees at the time of appointment. She had knowledge of a few individuals' social circumstances. At that time, she did not have knowledge of everyone's social circumstances. She could not rule out that she might have been informed of other serious

social conditions. It may well be that the 36 employees on the gross list were listed in alphabetical order. According to the set criteria, it was important to emphasize that the people who were transferred,

"to a certain extent" dealt with the work that was transferred. They did not discuss what was meant by "to a certain extent". It could well be that you had the skills that needed to be used, even if you didn't perform as many of the tasks. The fact that an employee had registered having spent 0.4% of their working hours on the tasks in question did not rule out a transfer. There were people on the gross list who were not physically located in Maribo. She thinks it could have been 2-3 people. Kate Rasmussen, for example, was physically located in premises in Køge. It was the heads of department who made the decision. During the discussions, there were 7 department heads

**609**

present. Three of the department managers were new and did not know the employees very well. She was probably the one who had the best knowledge of the employees' work tasks. No written presentations or notes were prepared. She attended a meeting about the appointment. She did not bring a list of names to the meeting. She was asked about the individual employees. They wanted to make sure that the person in question had the task that was to be moved. The list was drawn based on registrations for the whole of 2005. At the meeting, they were given a briefing on the names that the management had nominated. She was also asked if the employees had the skills for the permanent tasks. The meeting lasted 10 minutes.

From the end of February, the line managers had continuously and unannounced asked which employees in Bookkeeping II had been working on the tasks to be moved. Everyone in Accounting II was working on the tasks that were to be moved. They also asked if she was aware of any social issues. She gave the names of two employees who had special social conditions. She doesn't remember if the heads of department wrote down the names. At the later meeting, she was told the names of those who were appointed. It was an orientation meeting. No questions were asked at that meeting about whether they had the qualifications needed for the tasks to be transferred.

When shown the form "Age distribution at appointment to the Payment Center in Ringkøbing on 16/03/2006", she explained that it is true that the employees in question were in Accounting II. For some of the employees, their main task was not mentioned first in the form. This applied to Aase Geert and Bente Rasmus- sen, who both had Bc tasks as their main tasks.

Presented with the overview "Age and gender distribution in Central and South Zealand as of May 22, 2006", she explained that emphasis was placed on whether the prospective employees possessed the relevant skills here and now. When asked that according to the criteria for the appointment of employees to the payment center and customer center announced in the memo of 1 March 2006, employees who were able to solve the tasks in the payment center here and now should be appointed, she explained that Broberg also emphasized that they could handle Maribo's tasks here and now. They had a new structure that took into account the "generational change issue". They did not discuss this in connection with the appointment. Of the 36 employees who were on the gross list, there could be some misregistrations etc. Some of the people on the list worked with debt collection and had to do with bailiff work. When asked about the table with "Age distribution when appointed to the Payment Center in Ringkøbing on 16/03-2006", she explained that Susanne Krogh only worked with payment center tasks. At that time,

Bente Laursen worked 100% with transportation and in addition, at peak times, with Kobra and KL tasks. Jessie Kristoffersen and Gitta Larsen only worked with payment center tasks.

Copyright © 2023 Karnov Group Denmark A/S

## The views of the parties

In support of their claims, *the applicants* have argued that the transfer to Ringkøbing, which actually entailed a dismissal, violated section 2, cf. section 1, of the Discrimination Act. The applicants are therefore entitled to compensation under section 7(1) of the Act. The plaintiffs have demonstrated facts that give reason to assume that the plaintiffs' age was decisive for the decision to transfer them, and the defendant has not demonstrated that the principle of equal treatment has not been violated, cf. section 7a.

As regards the facts, the applicants have stated that the defendant selected the oldest employees in the department Boghol- deri II for transfer, which is apparent from the statistical information about the employees in the department. On March 16, 2006, the management called the employees in order of age with the oldest first and handed the employees the letters concerning the transfer. Finally, the applicants referred to the employees' conversation with Vibeke Steffensen about the leaflet concerning age discrimination.

In view of the very high seniority of the applicants, the compensation should be fixed at 18 months' salary or, in any event, a very substantial amount.

In support of its claim, *the defendant* submits that the decision to transfer the applicants was taken with the overall aim of making the Payment Center in Ringkøbing work. The guidelines followed were objective, objective and well-founded. The applicants were transferred because they worked on the tasks to be moved to Ringkøbing. The decision was neither directly nor indirectly based on the applicants' age, but based on the defendant's list of all employees who had the tasks in question. One cannot look at the department Bookkeeping II in isolation. The average age was high and there was no relevant age difference.

The applicants have not demonstrated facts such that the burden of proof in section 7a of the Act applies. In any event, it must be assumed that the plaintiffs were transferred because their work tasks were to be moved to the new payment center, which was an objective reason. If the court were to find that discrimination has occurred, it is indirect and can only lead to symbolic compensation.

## The Court's reasoning and decision:

Based on the evidence, the court finds that the tasks located in Bookkeeping II were to be moved to the Payment Center in Ringkøbing, and that there were approximately 12 employees in Bookkeeping II.

On the basis of the table drawn up by the applicants concerning the age distribution of the employees in Bookkeeping II, the explanations concerning the age order in

**610**

in connection with the delivery of the letters about the transfer on 16 March 2006 and the explanations about Vibeke Steffensen's statement in connection with the brochure "Your qualifications count - not your age", there is reason to assume that the employees' age had an influence on which employees were selected for transfer to the Payment Center in Ringkøbing.

The burden of proof that the principle of equal treatment has not been violated is then on the defendant, cf. Section 7a of the Act on Prohibition of Discrimination in the Labor Market etc.

The list of 36 employees who had used the codes that referred to the tasks that were to be transferred to the Ringkøbing Payment Center shows neither the names of the individual employees, nor which tasks the individual employees worked with. Furthermore, the majority of the employees on this list only worked with the

relevant codes to a minor extent, which is why the list must also include employees from departments that did not work with Bookkeeping II's tasks on a daily basis.

The Court therefore does not find that this list provides a true and fair overview of the employees who actually worked on the tasks to be transferred to the Ringkøbing Payment Center and who could therefore be considered for transfer to Ringkøbing.

According to Jens Broberg's testimony, the court assumes that he was in charge of the selection process, but that he had no knowledge of the individual employees' work areas and qualifications. He had no written information about the employees and had no conversations with them. It is not specified what information he received from the heads of department and department heads.

Accordingly, the Court finds that the defendant has not met the burden of proof that there was no age discrimination in the selection of the applicants for transfer to the Payment Center in Ringkøbing, cf. Section 7a of the Act on Prohibition of Discrimination in the Labor Market etc. cf. Section 2(1), and the Court does not find that the defendant has demonstrated that the selection of the applicants was objectively justified by an objective purpose, cf. Section 1(1), last indent.

Pursuant to section 7(1), cf. section 2, of the Act, the Court finds that the plaintiffs should be awarded compensation for the non-pecuniary damage suffered by the plaintiffs.

When determining the amount of compensation, the court emphasized the individual plaintiffs' seniority and the circumstances of the case in general, including that the transfer of the plaintiffs from Maribo to the Payment Center in Ringkøbing was in reality a dismissal.

Accordingly, the Court finds that the compensation can appropriately be set at DKK 392,959.44 to the plaintiff Aase H. Geert, who was employed on June 1, 1966 and thus had 40 years of seniority,

DKK 392,797.72 to the plaintiff Max Broms, who was hired on April 1, 1974 and thus had 32 years of seniority,

DKK 299,639.02 to the plaintiff Bente Rasmussen, who was hired on March 1, 1975 and thus had 31 years of seniority,

DKK 280,020.00 to the plaintiff Jane Halberg Larsen, who was employed on June 20, 1978 and thus had 28 years of seniority, and

DKK 304,549.36 to the plaintiff Karin Friis Rasmussen, who was hired

January 8, 1980 and thus had 26 years of seniority.

After the outcome of the case, the defendant must pay the costs of the case to HK as representative of the plaintiffs in the amount of DKK 120,380, of which DKK 80,000 covers legal fees and DKK 40,380 the court fee. In determining the costs, the court has based its decision on the indicative fee rates for procedural cases as of January 1, 2009 in relation to the compensation amounts determined by the judgment. The court has reduced the fees, taking into account that the plaintiffs have been represented by a lawyer.

### For it is known to be right:

Within 14 days, the defendant, SKAT, Head Office, will pay the following: DKK 392,959.44 to the plaintiff Aase Helene Geert,

DKK 392,797.72 to the plaintiff Max Broms,

DKK 299,639.02 to the applicant Bente Rasmussen, DKK 280,020.00 to the applicant Jane Halberg Larsen,

DKK 304,549.36 to the plaintiff Karin Friis Rasmussen.

All compensation amounts are subject to the usual procedural interest from the filing of the case on July 2, 2007, until payment is made.

Within 14 days, the defendant must pay legal costs to HK

Danmark as representative for the plaintiffs of DKK 120,380.

### *Østre Landsret's verdict.*

Copenhagen City Court's judgment of February 2, 2009 - - - - is appealed by SKAT with a claim for acquittal.

The defendant, HK Danmark as representative of Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen, seeks confirmation.

Copyright © 2023 Karnov Group Denmark A/S

*Supplementary case presentation*

The High Court has been presented with an overview of, among other things, the employees (13) from Skattecenter Maribo who

**611**

was originally designated for unrequested transfer to the new payment center Ringkøbing called Betalingscenteret:

[Table 3]

SKAT has also submitted to the High Court the gross list of 36 employees mentioned in the District Court's judgment, now with the names of the individual employees. The list shows that Gitta Larsen spent 117.9% of her working hours on tasks that were to be handled by the Payment Center, Freddy Jacobsen 115.8%, Marianne Bratling 112.3%, Max Broms 105.7%, Bente Rasmussen 105.1%, Jessie Kristoffersen 98.2%, Susanne Eldrup Krog 97.9 %, Karin Friis Rasmussen 94.2%, Aase Geert 93.0%, Irene Petersen 90.6%, Bente Laursen 84.1%, Kate Andersen 63.9%, Jane Halberg Larsen 33.8%, Annelise Hemmingsen 11.9%, Lene M. Nielsen 3.9% and Kathe Rasmussen 1.2%.

Bente K. Nielsen is not included in the gross list.

Of the original group of 13 employees, Jessie Kristof- fersen and Annelise Hemmingsen were subsequently excluded, which is why Skattecenter Maribo ended up appointing 11 employees to participate in the staffing of the Payment Center. The appointment of Kathe Rasmussen and Lene M. Nielsen was subsequently rejected by the main center in SKAT.

The decision on which employees the management of the Maribo Tax Center identified for transfer was communicated to the employees concerned on 16 March 2006 through individual interviews between Jens Broberg, Director of Taxation, and the individual employee. For the purpose of conducting the interviews, the management secretariat in Roskilde had prepared a schedule according to which the interviews were to be held in the following order:

9.00 Freddy Jacobsen
9.20 Aase H Geert
9.40 Marianne L. Bratling
10.00 Bente G. Rasmussen
10.20 Irene K.G. Petersen
10.40 Max Brakes
11.00 Jane H. Larsen
11.20 Bente K. Nielsen
11.40 Karin Friis Rasmussen

The schedule included the employee's age, date of birth and professional organization, among other things. It also followed from the schedule that Sonja Davidsen was to interview Kathe Rasmussen, who had a workplace in Køge, and that Lene M. Nielsen was on vacation.

This case was filed on July 2, 2007 in the District Court (by summons duly issued on June 29, 2007), and concurrently, arbitration proceedings are pending between the parties regarding the validity of the dismissal of Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen.

*Explanations*

In the High Court, supplementary statements were given by Max Broms, Jane Halberg Larsen, Karin Friis

**612**

Rasmussen and Jens Broberg. Aase Geert, Bente Rasmussen, Sonja Davidsen and Kim Lønberg also gave evidence. *Max Broms* has explained, among other things, that the employees in "Bookkeeping II" physically sat together on the 3rd floor in 2- and 3-man offices. He did not deal with Jens Broberg in his daily work. The

On March 16, 2006, when they were to meet with Broberg, they were called in one at a time with the oldest first, i.e. Freddy Jacobsen, then Aase Geert, then himself, etc. The order with times

for the calls as indicated in the list were not followed. They talked among themselves that they were called in by age.

Vibeke Steffensen was shown the booklet "Your qualifications count

- not your age" in Jane and Karin's office, where he was also present. Steffensen's tone of voice was not joking. Personal reasons, including his wife's health, meant that he did not want to move to Ringkøbing. After his dismissal, he got 3 temporary jobs in SKAT, but has since been unemployed. *Jane Halberg Larsen* has explained, among other things, that she had nothing to do with Jens Broberg, who had only been employed since November 2005. On March 16, 2006, they all met in the same office. They were all dressed in black at the request of colleagues in Roskilde who sympathized with them. The order in which they were called in was: Freddy Jacobsen, Aase Geert, Max Broms, Karin Friis Rasmussen, Bente Rasmussen and then Irene Petersen, who was in the middle of a citizens' expedition. Then it was her turn and then Marianne Bratling. Bente Nielsen was sitting somewhere else in the house, and Kathe Rasmussen was working in Køge. All the conversations went quickly and were over before 10:00 am.

The incident with Vibeke Steffensen took place in Karin and her office. She clearly remembers the exchange, as she was very aware of the age issue. She didn't want to be transferred out of consideration for her husband, who is self-employed, which was well known in the house. Overall, they knew about each other's personal relationships. After she resigned from her job at SKAT, she immediately got a job as a secretary in health care in Lolland Municipality. It was not a natural career change or choice.

*Karin Friis Rasmussen* has explained, among other things, that she had not had contact with Jens Broberg until the morning of March 16, 2006, when they were gathered in an office. Vibeke Steffensen brought them one at a time to Broberg. She remembers that they were called in in order with Freddy Jacobsen first, then Aase Geert, Max Broms, herself, Bente Rasmussen, Irene Petersen, Jane Larsen and finally Marianne Bratling. She noted that it was an age-specific order. Her meeting with Broberg lasted 2 minutes. She does not remember the exchange of words. She did not want to be transferred out of consideration for her husband. She had temporary jobs in SKAT until March 9, 2009, but has been unemployed since. There is very little work available in the local area.

*Aase Geert* has explained, among other things, that in 2006 she had been employed by SKAT for 40 years. On March 16, 2006, they all met in an office dressed in black and waited to be called in to see Jens Broberg. The meeting with Broberg could not be called an interview. She was given an envelope and left. She doesn't remember who was called in when, because

"The screen almost went black", but afterwards they talked about how they had been called in by age, with the oldest first. She took the consequence and took early retirement. To get a higher early retirement rate, she would have preferred to wait until she was 62 years old.

*Bente Rasmussen* has explained, among other things, that in 2006 she had been employed at SKAT for 31 years. She can confirm that the first people called in were Freddy Jacobsen and then Aase Geert. She doesn't remember much more, as she felt sick while they waited. They talked about the order being age-based. She was unemployed until May 1, 2008, when she was sent to work. Later she got a cleaning job. It was not a natural choice and the work is physically hard.

*Jens Broberg* has explained, among other things, that he has

been retired since January 1, 2009. Vibeke Steffensen brought the employees in for the interview with him. He did not tick them off a list. He does not remember that all the employees were dressed in black. He received the list with the times of the interviews from the management secretariat in Roskilde. The order was fixed, taking into account whether the employee was organized in HK or DTS, which is why there

employees would be called in alternately. This made it possible for the union representatives to have time to talk to the individual employee if they wanted a conversation. The shop stewards were informed of the sequence. It is a relic of the old agency culture that the employee's age appears in the written material. The original idea was that this would make it easier to identify the individual employee. Previously, even married women's maiden names were included. All he remembers is that the order according to the list was followed.

The reason Jessie Kristoffersen was exempted was that she had approached him directly and expressed her concern for the future if she were to be transferred because - - - - - He does not recall why Annelise Hemmingsen was exempted, but it was probably because she was handling estate administration tasks. Bente Laursen worked with "transports" that should not be transferred to the Payment Center. As far as Susanne Eldrup Krog was concerned, there was information about illness in the family, which is why she was not singled out. Gitta Larsen was also excluded due to special family circumstances. - - - - - They did not give weight to the age of the employees when assessing who should be appointed. He was

**613**

did not ask the employees he knew less well about their personal relationships. He was of the opinion that they would probably come to him themselves if it was important and relevant.

When the District Court's judgment states that he had no knowledge of the individual employees' work areas or qualifications, this is incorrect. He knew the work tasks after many years in the service, and he knew the employees from 4 months of employment in Maribo. In addition, he talked to the heads of departments about the employees at 3-4 management meetings. Vibeke Steffensen was not present at these meetings. No written presentations were prepared for the meetings and no minutes were taken. He did not discuss with the heads of department whether the individual employee was good at their job, but whether there were special private circumstances. He had the gross list to use for the selection, and he worked from that. The list also included work with "transports". He got this list from the main center in SKAT. Initially, the task was to find people who could solve the tasks that were transferred to Ringkøbing. It was discussed with the managers whether the time registration also meant that the respective employees were able to perform the task in Ringkøbing, but they did not go through all the names on the list. However, they were confident that the designated employees were able to perform the tasks that the Payment Center needed to handle. Some of the work in Ringkøbing consisted of pure typing tasks that everyone in SKAT could handle. The main center subsequently rejected a couple of the appointments. He assumed that this was because they were people who had spent less than 25% of their working hours on the tasks to be transferred. There were no fixed or written criteria for which employees Skattecenter Maribo could "build on". He relied on the assessment of the department heads, as they had been at Skattecenter Maribo for a number of years. His own knowledge of individual performance levels was limited.

*Sonja Davidsen* has explained, among other things, that she, who holds a master's degree in law, since

March 1, 2009 has been on availability pay. Previously, she was most recently Head of Department at the Maribo Tax Center and was a member of the Executive Board. When she was asked to assess employees for selection for transfer, she was given the notes on the procedure and its criticisms. Jens Broberg was given the gross list, which was the starting point for the discussions in

management. They held 2-4 management meetings about this. There were no written presentations for the meetings or minutes from them. After the decision on who to transfer was made, they held a meeting with the heads of department to quality assure the decision. She knew the designated employees as colleagues at a higher level.

orderly plan. The original selection criteria were purely objective, but they expanded the criteria slightly. Firstly, the goal of the selection was that the appointed persons should be able to solve the tasks that were transferred to Ringkøbing here and now. However, they also took into account the service of the Maribo Tax Center and the fact that union representatives, students and temporary workers should not be moved, as well as social considerations. She believes that the main center in SKAT had accepted that they took social considerations into account. She questioned Vibeke Steffensen about the individual employees and their social conditions. She therefore already knew most of the information that subsequently emerged in the consultation process. They did not establish fixed criteria for weighing up the various social conditions.

Jessie Kristoffersen was on the list for transfer, but was exempted as they took into account that she - - - - Annelise Hemmingsen had less than 25% of her working hours on the transferred tasks and was also attached to the estate administration department, which had just moved to Tax Center Maribo, which had received all the estate administration tasks from Central and South Zealand. Susanne Eldrup Krog also had competencies that they wanted to keep. - - - - They also had a social consideration for Gitta Larsen, - - - - They also wanted to diversify

"pain" a little, so that it wasn't just the entire Bookkeeping II that was transferred. No weight was given to the age of the employees, which would have been unnatural. She does not believe that there is a real age difference between the employees who were designated for transfer and those who remained in Maribo. If one group had been 35 years old on average and the other 65 years old, it could have been significant in terms of generational change and IT skills, for example. However, they did not think about generational change in relation to the remaining employees. When SKAT's lists included age, it didn't mean anything in concrete terms - everything from SKAT had age on it. Everyone knew that age was an illegal criterion. *Kim Lønberg* has explained that he, who left SKAT in June 2009, was acting head of the Maribo Tax Center in March 2006 and participated in the management meetings. Vibeke Steffensen did not participate in the management meetings, but only in the department meetings. He was hired in Maribo in 1997 and therefore knew the employees well. The management was instructed to select 13 employees for transfer from a gross list of 36 employees that Jens Broberg had received from the head office. In principle, it was Broberg who made the decision, but Sonja Davidsen and he himself provided input. He believes they were very thorough in the process, and in meetings they went through all the employees on the list. Jessie Kristoffersen, Gitta Larsen and Susanne Eldrup Krog were deselected partly for social reasons and partly because they had skills that Maribo would need in the future. The latter was a very skilled employee. So was Gitta Larsen, - - - - He doesn't remember why Annelise Hemmingsen was deselected. The employees' age was not a criterion they included in the decision. They took

**614**

Nor does it take into account a future generational change in Tax Center Maribo. The average age there was high.

*How to proceed*

The parties have made the same pleas as before the district court and proceeded accordingly. Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen have specifically argued that SKAT has acted in violation of section 1(2) of the Danish Discrimination Act on direct discrimination, which only requires that age has been a contributing factor to the decision made on which employees should be transferred.

Copyright © 2023 Karnov Group Denmark A/S

## The High Court's reasoning and result:

As a basis for the appointment of employees to be transferred to the new payment center in Ringkøbing, a gross list was prepared of the 36 employees at Tax Center Maribo who had been involved to a greater or lesser extent with the tasks that were to be performed by the Payment Center in the future. Jens Broberg has explained that the gross list of percentages of how much of the individual employees' working hours had been spent on the tasks in question also included work referred to in the case as "transportation". These tasks should not be transferred to the Payment Center.

Based on the information available to the High Court, the High Court finds that Skattecenter Maribo ended up appointing eight employees for unrequested transfer from Bookkeeping II, while four employees and Kate Andersen, who was HK vice-president, were exempted. At the same time, Kathe Rasmussen, Bente Nielsen and Lene Nielsen, who worked in other departments, were designated for transfer. These three, as well as the designated employees from Accounting II, were all older than the retained employees from Accounting II. If this is compared to the fact that Bente Nielsen is not included in the gross list, while it appears that Kathe Rasmussen and Lene Nielsen had spent 1.2% and 3.9% of their working hours, respectively, on the tasks included in the gross list percentages, the High Court finds that there is reason to assume that there has been discrimination on the basis of age in violation of the Discrimination Act. It is then up to SKAT to prove that the principle of equal treatment has not been violated, cf. section 7a of the Discrimination Act.

According to the percentages in the gross list, the four exempt employees from Accounting II, who were all in their mid-forties, had spent all or almost all their working hours on the tasks covered by the percentages in the list. The same applied to the employees from Accounting II who were designated for transfer, except for Jane Halberg Larsen, who had only spent 33.8% of her working hours on this. It is not clear to what extent the individual employee had worked with "transportation". As described above, two of the three employees who had not been employed in Accounting II had only spent 1.2 and 3.9% of their working hours on the tasks included in the list, while there is no information about the third employee. Two of these three employees were 59 years old when the decision to transfer was made, while the third was 63 years old.

In view of the fact that there is no written material to illustrate the decision-making process in the Maribo Tax Center, the High Court finds that the above information must be given considerable weight in the assessment of evidence. After an overall assessment of this information compared to the statements given by Jens Broberg, Vibeke Steffensen, Sonja Davidsen and Kim Lønberg, including the situations in which social considerations were taken into account and to whom this was done, the High Court finds that SKAT has not proven that the principle of equal treatment under the Discrimination Act has not been violated by the decision to appoint Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen for transfer, cf. Section 2(1) of the Discrimination Act, cf. Section 1(2).

The High Court agrees that Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen should be awarded compensation, and that, as stated by the District Court, emphasis should be placed on the fact that the decision to transfer the employees in question in reality meant a dismissal. Accordingly, and on the basis that Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente

Rasmussen all had more than 25 years of seniority, the High Court finds that the compensation to each of them can be appropriately set at DKK 200,000.

Copyright © 2023 Karnov Group Denmark A/S

Considering the nature, scope and outcome of the case, SKAT must pay DKK 100,000 in legal costs to HK as representative for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen to cover legal fees.

### For it is known to be right:

*SKAT must pay Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen DKK 200,000 each with procedural interest from the commencement of the case.*

*SKAT must pay DKK 100,000 in legal costs to HK as representative for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen and Bente Rasmussen.*

*The amounts ordered must be paid within 14 days and the amount of legal costs shall bear interest in accordance with section 8a of the Interest Act.*

Copyright © 2023 Karnov Group Denmark A/S

**[Table 3]**

Payment center

| CenterName (HRP) | Employee no. | Age | Born in | Organization Department | Estate | Workplace text (HRP) | Standard time | AV |
|---|---|---|---|---|---|---|---|---|
| BCKathe Rasmussen | W01560 | 63 | - - - | HK administration | Estate | Gymnasievej 21, 4600 Køge, Denmark | 31,2 | 0,8 |
| BCFreddy Jacobsen | W01598 | 64 | - - - | HK | Customer portal | The bridge road | 37 | 1,0 |
| BCKarin Friis Rasmussen | W01605 | 52 | - - - | HK | Customer portal | The bridge road | 37 | 1,0 |
| BCMax Brakes | W01612 | 53 | - - - | HK | Customer portal | Bridge Road | 37 | 1,0 |
| BClane H. Larsen | W01615 | 51 | - - - | HK | Customer portal | The bridge road | 25 | 0,7 |
| BCJessie L. Kristoffersen | W01617 | 46 | - - - | DTS | Customer portal | The bridge road | 37 | 1,0 |
| BCMarianne L. Brafling | W01648 | 49 | - - - | DTS | Customer portal | The bridge road | 37 | 1,0 |
| BCIrene K.G. Petersen | W01651 | 52 | - - - | DTS | Customer portal | The bridge road | 28,5 | 0,8 |
| BCLene M. Nielsen | W01676 | 60 | - - - | | HKLegal service - tax | The bridge road | 37 | 1,0 |
| BCBente G. Rasmussen | W01682 | 52 | - - - | HK | Customer portal | Bridge Road | 28,5 | 0,8 |
| BCBente K. Nielsen | W01683 | 60 | - - - | | DTSLegal service - tax | The bridge road | 28,5 | 0,8 |
| BCAase H. Geert | W01684 | 59 | - - - | HK | Customer portal | The bridge road | 31 | 0,8 |
| BCAnnelise Hemmingsen | W01704 | 61 | - - - | DTS | Estate management | Bridge Road | 37 | 1,0 |

Copyright © 2023 Karnov Group Denmark A/S

**U.2010.603Ø**

***Ansatte tilkendt 200.000 kr. i godtgørelse som følge af forskelsbehandling af dem på grund af alder i forbindelse med beslutning om at udpege dem til forflyttelse.***

*Ansættelses- og arbejdsret 2.9 - Erstatning uden for kontraktforhold 3211.7 - Personspørgsmål 3.*

♦ A m.fl. blev i forbindelse med en ændret struktur i SKAT udpeget til at flytte arbejdssted fra Maribo til Ringkøbing. De pågældende, der af forskellige årsager ikke ønskede at stå til at flytte, endte med at afslutte deres ansættelse i SKAT. Landsretten fandt på baggrund af bevisførelsen i sagen, at der var anledning til at formode, at der var udøvet forskelsbehandling på grund af alder i strid med forskelsbehandlingsloven. Det påhvilede herefter SKAT at bevise, at lovens ligebehandlingsprincip ikke var blevet krænket, jf. forskelsbehandlingslovens § 7a. Ligesom byretten fandt landsretten, at SKAT ikke havde bevist, at dette princip ikke var blevet krænket ved beslutningen om at udpege de pågældende til forflyttelse, jf. forskelsbehandlingslovens § 2, stk. 1, jf. § 1, stk. 2. Landsretten tiltrådte, at A m.fl. herefter skulle tilkendes en godtgørelse, og at der som anført af byretten herved burde lægges vægt på, at beslutningen om forflyttelse af dem i realiteten indebar en afskedigelse. Herefter, og på baggrund af at de alle havde mere end 25 års anciennitet, fandtes godtgørelsen til hver af dem passende at kunne fastsættes til 200.000 kr.

**Ø.L.D. 11. november 2009 i anke 6. afd. B-413-09**
(Rosenløv, Gitte Rubæk Pedersen, Per Frydenreim Møller (kst.)).

SKAT (Km.adv. v/adv. Niels Banke, Kbh.)
mod
HK Danmark som mandatar for Aase Helene Geert
Max Broms
Jane Halberg Larsen
Karin Friis Rasmussen
Bente Rasmussen (adv. Peter Breum, Kbh., for alle).

**Københavns Byrets dom 2. februar 2009.**
¹

**Sagens baggrund og parternes påstande**

Sagsøgerne, HK Danmark som mandatar for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen, har over for sagsøgte, SKAT, nedlagt følgende
*PÅSTAND:*
*Påstand for så vidt angår Aase Helene Geert:*
Sagsøgte tilpligtes at betale kr. 392.959,44 med tillæg af sædvanlige procesrenter fra sagens anlæg, til betaling finder sted.
*Påstand for så vidt angår Max Broms:*
Sagsøgte tilpligtes at betale kr. 490.997,16 med tillæg af sædvanlige procesrenter fra sagens anlæg, til betaling finder sted.
*Påstand for så vidt angår Jane Halberg Larsen:*
Sagsøgte tilpligtes at betale kr. 400.028,58 med tillæg af sædvanlige procesrenter fra sagens anlæg, til betaling finder sted.
*Påstand for så vidt angår Karin Friis Rasmussen:*
Sagsøgte tilpligtes at betale kr. 468.537,48 med tillæg af sædvanlige procesrenter fra sagens anlæg, til betaling finder sted.

*Påstand for så vidt angår Bente Grethe Rasmussen:*
Sagsøgte tilpligtes at betale kr. 386.631,00 med tillæg af sædvanlige procesrenter fra sagens anlæg, til betaling finder sted.
Sagsøgerne har nedlagt påstand om frifindelse.
Sagsøgerne blev udvalgt til overflytning fra deres arbejdsplads hos sagsøgte i Maribo til et nyt betalingscenter i Ringkøbing. Da sagsøgerne nægtede at lade sig forflytte, blev de afskediget.
Sagen drejer sig om, hvorvidt der ved beslutningen om forflyttelse skete diskrimination på grund af alder.
De påstævnte beløb udgør godtgørelse i henhold til lov om forbud mod forskelsbehandling på arbejdsmarkedet m.v. § 7 og svarer til 78 ugers løn.

**Oplysningerne i sagen**

I forbindelse med en omstrukturering i SKAT blev der i 2006 etableret et betalingscenter i Ringkøbing samt 4 kundecentre, der blev placeret i Roskilde, Hjørring, Odense og Ribe.
Da man ikke ved frivillig ansøgning kunne få besat alle de ledige stillinger i de nye centre, skulle der udpeges en række medarbejdere fra de enkelte skattecentre, som så skulle overflyttes til henholdsvis Betalingscentret i Ringkøbing og de 4 kundecentre.
Af et notat af 1. marts 2006 udarbejdet af SKAT, Hovedcentret, og som har overskriften: »Kriterier for udpegning af medarbejdere til Betalingscentret og Kundecentret«, fremgår bl.a. følgende:

> **604**
> *»Principper for udpegning af medarbejdere til uansøgt forflyttelse*
> Der skal ved udpegning af medarbejdere til uansøgt forflyttelse alene lægges objektive kriterier til grund . . .
> *Retningslinier for udpegning til Betalingscentret*
> Princippet for bemanding af Betalingscentret er, at det er de medarbejdere, der konkret beskæftiger sig med de relevante opgaver, der udpeges til forflyttelse. Der tages derfor udgangspunkt i skattesamarbejdernes og de enkelte skattecentres ressourceforbrug i 2005 til de relevante opgaver.
>
> . . .
>
> De medarbejdere, der udpeges til uansøgt forflyttelse til Betalingscentret, skal findes blandt dem, der *i et vist omfang* er beskæftiget med opgaven.
> Modellen for udpegning er delt i 2 dele, en del med SAP-bogholderiopgaven, og en del der vedrører de øvrige opgaver, der overgår til Betalingscentret.
> *SAP-bogholderiopgaven*
> Den del af modellen, der vedrører SAP-bogholderiopgaven, er på samarbejdsniveau, dels fordi opgaven er koncentreret ved nogle få skattecentre, og dels fordi langt den største del af SAP-bogholderiopgaven ikke overgår til Betalingscentret. Udfra en konkret faglig vurdering skønnes det, at SAP-bogholderiopgaven udgør 14 årsværk vedrørende den opgave, der mangler at blive overført til Betalingscentret. De 14 medarbejdere, der skal udpeges til Betalingscentret til denne opgave, skal således findes blandt de medarbejdere i skattesamarbejderne, der beskæftiger sig med SAP-bogholderiopgaven - ordrenummer N11206000000 SAP-bogholderiet.
> *Øvrige opgaver til Betalingscentret*
> Modellen for udpegning af medarbejdere til den øvrige del af de opgaver, der overgår til Betalingscentret, er fordelt på skattecentre. Hvert skattecentres bidrag til Betalingscentret beror på det relative ressourceforbrug på opgaven reduceret med det antal medarbejdere, der efter frivillig ansøgning kommer til Betalingscentret og Inddrivelsescentret samt allerede effektuerede flytninger.
> Som grundlag for udpegningen af medarbejdere til den øvrige del af Betalingscentrets opgaver er der udsøgt liste over medarbejdere,

---

¹  Sagen behandlet kollegialt, jf. retsplejelovens § 12, stk. 3.

Copyright © 2023 Karnov Group Denmark A/S

som i 2005 har været beskæftiget med de opgaver, som fremover skal løses i Betalingscentret.

Nedenstående ordrenumre er anvendt i udsøgningen:

N11201000000 . . .
N11256000000 . . .
N11266000000 . . .
N11336000000 . . .

Følgende kriterier ved udpegningen af medarbejdere til uansøgt forflyttelse skal lægges til grund:

  * Der skal udpeges medarbejdere, som er i stand til at løse opgaverne i Betalingscentret her og nu

  * Der skal udpeges medarbejdere, som har kompetencer til at kunne løse og videreudvikle opgaver på forsvarlig vis i Betalingscentret

  * Der må ikke udpeges medarbejdere med tillidsrepræsentantbeskyttelse

  * . . .«

Den 2. marts 2006 udsendte personaleafdelingen en oversigt over måden, hvorpå bemandingen af betalingscentret og kundecentrene skulle foregå. Det fremgår heraf bl.a., at man forventede, at der den 16. marts 2006 fra Skattecenter Maribo skulle udpeges 13 medarbejdere til uansøgt forflyttelse. Ved skrivelser af 16. marts 2006 fra Skattecenter Maribo v/direktør Jens Broberg til hver af sagsøgerne modtog hver enkelt af sagsøgerne meddelelse om, at man påtænkte at forflytte dem med virkning fra den 1. juli 2007 til betalingscentret, og at de senest 6 måneder før forflyttelsen ville modtage et endeligt forflyttelsesbrev. Det fremgik endvidere af skrivelsen, at de havde mulighed for at fremkomme med forhold, der gjorde, at de anså forflyttelsen for særlig indgribende for dem.

Sagsøgerne fremsatte hver især skriftlig indsigelse (partshøringssvar) og anførte de konkrete forhold, som gjorde en forflyttelse særligt indgribende for dem, og de enkelte sagsøgeres partshøringssvar blev besvaret af SKAT. Af i det væsentlige enslydende skrivelser af 13. december 2006 fra SKAT, Hovedcentret, til hver enkelt sagsøger fremgår bl.a.:

». . . Eftersom du beskæftiger dig med nogle af de arbejdsopgaver, der fremover skal varetages af Betalingscentret i Ringkøbing, er det SKATs opfattelse, at du bør forflyttes dertil. I og med du ikke har accepteret forflyttelsen til Betalingscentret i Ringkøbing, varsles du hermed til afskedigelse til fratræden med udgangen af juni 2007 . . .«

Sagsøgerne henvendte sig til HK Storstrøm, som ved skrivelser af 22. december 2006 til sagsøgte på vegne af hver enkelt af sagsøgerne gjorde gældende, at afskedigelserne var uberettigede, og at afgørelserne ikke var i overensstemmelse med lov om forskelsbehandling.

Den 22. januar 2007 fandt en forhandling sted mellem HK Storstrøm ved faglig konsulent Allan Hviid og SKAT ved skattedirektør Jens Broberg, og den 6. marts 2007 blev der afholdt mæglingsmøde.

Stævning blev herefter udtaget den 2. juli 2007.

- - -

Sagsøgerne udarbejdede følgende oversigt over medarbejdere, som den 16. marts 2006 blev udpeget til forflyttelse til Betalingscentret i Ringkøbing:

»Aldersfordeling ved udpegningen til Betalingscentret i Ringkøbing den 16/03-2006

Iht. HSU referat af 2. marts 2006, blev det offentliggjort hvilke arbejdsopgaver der skulle lægges til grund

**605**

for udpegningen. I alt 11 personer skulle udpeges til Ringkøbing Bogholderi II bestod af i alt 12 medarbejdere.

| Navn | Alder | Arbejdsopgave | | Bemærkninger |
|---|---|---|---|---|
| Freddy Jacobsen | - - - 64 år | A-skat (Bc) | Udpeget | |
| Aase Geert | - - - 59 år | Transporter + Andre Bc-opgaver | Udpeget | Transporter flyttes ikke |
| Max Broms | - - - 54 år | Listesystem (Bc) | Udpeget | |
| Karin Friis Rasmussen | - - - 53 år | Listesystem | Udpeget | |
| Kate Andersen | - - - 53 år | Transporter + Kobra og KL (Bc) | | HK-næstformand |
| Bente Rasmussen | - - - 53 år | Transporter + Andre Bc-opgaver | Udpeget | Transporter flyttes ikke |
| Irene Petersen | - - - 52 år | Modregning (Bc) | Udpeget | |
| Jane Halberg Larsen | - - - 51 år | Kobra og KL (Bc) | Udpeget | |
| Marianne Bratling | - - - 50 år | Transporter | Udpeget | Trukket tilbage |
| Susanne Krogh | - - - 46 år | Bc-opgaver | Friholdt | |
| Bente Laursen | - - - 46 år | Transporter + Kobra og KL (Bc) | Friholdt | Transporter flyttes ikke |
| Jessie Kristoffersen | - - - 46 år | Listesystem (Bc) | Friholdt | |
| Gitta Larsen | - - - 45 år | Bc-opgaver | Friholdt | |

Udover de personer som er udmeldt til forflyttelse i bogholderi II blev der også udpeget følgende fra andre afdelinger.

| Navn | Alder | Arbejdsopgave | | Bemærkninger |
|---|---|---|---|---|
| Kathe Rasmussen | - - - 64 år | Dødsbosager i Køge | Udpeget | Trukket tilbage, gået på efterløn |
| Bente Nielsen | - - - 60 år | Pensionsbeskat. | Udpeget | Gået på efterløn |
| Lene Nielsen | - - - 60 år | Pensionsbeskat. | Udpeget | Trukket tilbage |

Som det tydeligt fremgår i ovenstående skema er alle, som er udpeget over 50 år. For at friholde de 4 personer i bogholderi II som er under 50 år, har man udpeget 3 personer fra andre afdelinger.«

Sagsøgte har fremlagt en anonymiseret bruttoliste med 36 medarbejdere, der i større eller mindre omfang var beskæftiget med arbejdsopgaver, der skulle overflyttes til Betalingscentret i Ringkøbing. Listen viser med angivelse af kodenummer, at de 36 medarbejdere havde anvendt mellem 0,4 pct. og 117,9 pct. af deres tid på opgaver med de pågældende kodenumre. Til brug for sagen har sagsøgtes advokat med håndskrift tilføjet sagsøgernes navne, ligesom alle medarbejdernes alder er tilføjet. Advokaten har udregnet de 36 medarbejderes gennemsnitsalder til at være 53 år 5 måneder.

Sagsøgte har endvidere fremlagt en oversigt kaldet »Alders- og kønsfordeling i Midt- og Sydsjælland pr. 22. maj 2006«, og det fremgår heraf, at der ved Skattecenter Maribo var ansat 178 medarbejdere, og at det samlede aldersgennemsnit var 50,6.

Til brug for sagen er endvidere fremlagt en 7-siders folder udgivet af Beskæftigelsesministeriet med titlen: »Dine kvalifikationer tæller - ikke din alder.«

Det fremgår endvidere af sagen, at Karin Friis Rasmussen er født den 12. september 1953 og blev ansat hos SKAT den 8. januar 1980, Jane Halberg Larsen er født den 31. august 1955 og blev ansat hos SKAT den 20. juni 1978, Bente Rasmussen er født den 22. oktober 1953 og blev ansat hos SKAT den 1. marts 1975, Aase Helene Geert er født den 30. maj 1947 og blev ansat hos SKAT den 1. juni 1966, Max Broms er født den 24. november 1952 og blev ansat hos SKAT den 1. marts 1974.

## Forklaringer:

Der er under sagen afgivet forklaring af Jane Halberg Larsen, Karin Friis Rasmussen, Max Broms, Jens Broberg og Vibeke Steffensen.

*Jane Halberg Larsen* har blandt andet forklaret, at hun i 2005 og 2006 var beskæftiget med selvstændiges løbende indbetalinger, kaldet »Kobra«, og frivillige indbetalinger af restskat, kaldet »KL-indbetalinger«. KL-opgaverne, som fortrinsvis behandles i årets første 6 måneder, skulle flyttes til Ringkøbing. De var samlet i Maribo i en afdeling, Bogholderi II, der dækkede hele Sydsjælland. I Bogholderi II var de 11-13 ansatte. Det viste sig, at det netop blev deres opgaver, der skulle flyttes til Ringkøbing. Bogholderi II blev ledet af Vibeke Steffensen. Jens Brobergs kontor var beliggende på samme gang som deres afdeling, og hans kontor lå 3 kontore fra Jane Halberg Larsens.

I løbet af arbejdsdagen foretog de en tidsregistrering, der viste, hvad de havde beskæftiget sig med den pågældende dag. Møder eller kurser indgik ikke i registreringen. Man foretog registreringen efter eget skøn over, hvad arbejdsdagen var brugt til. Bogholderi II, der kunne betegnes som virksomhedernes og borgernes bogholderi, udførte ikke arbejdsopgaver for andre afdelinger. Der fandtes også et Bogholderi I, som havde med skattecentrenes økonomi at gøre.

Forevist den anonymiserede liste over 36 medarbejdere, der havde været beskæftiget med arbejdsopgaver,

**606**

som blev varetaget af Bogholderi II, har hun forklaret, at sagsøgerne godt kunne gennemskue, hvilke personer der gemte sig bag tallene. Der kunne have været en ansat i en anden afdeling, der havde foretaget en registrering med en af Bogholderi II's arbejdskoder, og det kunne forklare, at vedkommende var registreret til at have anvendt 0,8 pct. af sin tid på den pågældende type arbejde. Når en person var anført med 112 pct., måtte det betyde, at vedkommende havde arbejdet over. De ansatte i Bogholderi II beskæftigede sig med en del forskellige administrative opgaver vedrørende skatteopkrævning.

Forevist den af sagsøgerne udarbejdede skemaoversigt med overskriften »Aldersfordeling ved udpegningen til Betalingscentret i Ringkøbing den 16/03-2006« har hun forklaret, at »Bc« betød, at det var opgaver, der skulle flyttes til betalingscentret. Umiddelbart før den 16. marts 2006 blev det besluttet, at transporter ikke skulle flyttes til betalingscentret. Dødsbosager og pensionsbeskatningsopgaverne blev ikke flyttet til betalingscentret. Disse opgaver fortsatte med at henhøre under skattecentret i Maribo.

Hun mener, at de i sidste halvdel af februar fik oplysning om, at man ikke kunne bemande kundecentrene og betalingscentret med frivillige ansøgere. Imidlertid kendte man på det tidspunkt ikke antallet af ansatte, som man manglede ved disse centre. De fik først dette antal oplyst ved brevet af 2. marts 2006 om bemanding af betalingscentret og kundecentrene. De kunne på det tidspunkt se, hvilken vej vinden blæste, på grundlag af oplysningerne om, at der skulle overføres 13 medarbejdere, og oplysningerne om indholdet af de opgaver, der skulle flyttes. Det forekom temmelig urealistisk, at de skulle flytte fra den ene ende til den anden ende af landet.

Foreholdt, at de ifølge et skema over »Alders- og kønsfordeling i Midt- og Sydsjælland pr. 22. maj 2006« havde den højeste gennemsnitsalder, har hun forklaret, at deres anciennitet også var høj. De havde ikke haft nogen stor udskiftning af personale i årene op til denne strukturændring.

Efter de var blevet udpeget den 16. marts 2006, forsøgte de at få nogle drøftelser med ledelsen. Men de fik at vide, at der ikke kunne ændres på beslutningerne. Dog blev en afgørelse om forflyttelse vedrørende en ansat, som kun udførte transporter, trukket tilbage. Jane Halberg Larsen havde arbejdet i Vibeke Steffensens afdeling i 4½ år.

Hun blev meget sur den 16. marts 2006. De blev kaldt ind én efter én, og man gik frem på den måde, at man kaldte de ansatte ind i aldersrækkefølge med den ældste først, således at man fik overbragt brev om, at man var udpeget til forflyttelse. Ledelsen stoppede ved en ansat, der var 50 år. Da de spurgte, om der ikke var flere, der skulle indkaldes, fik de oplyst, at man stoppede her. Hun så brochuren »Dine kvalifikationer tæller - ikke din alder«. Max Broms' kone havde fundet brochuren på biblioteket. Jane Halberg Larsen læste den og kaldte umiddelbart efter Vibeke Steffensen ind og opfordrede hende til at se brochuren. Vibeke Steffensen læste brochuren og sagde derefter: »Jamen, så har vi jo brugt et forkert koncept«. Jane Halberg Larsen opfattede det ikke som sagt i spøg. Karin Rasmussen og Max Broms var også til stede på kontoret, da Vibeke Steffensen sagde det.

*Karin Friis Rasmussen* har blandt andet forklaret, at hun var beskæftiget i Bogholderi II og arbejdede med nogle listesystemer, som skulle flyttes til Ringkøbing. Efter hver arbejdsdag registrerede hun, at hun havde arbejdet med listesystemet hele dagen. Alle arbejdsopgaver havde en kode.

Foreholdt den anonymiserede liste over 36 medarbejdere, har hun forklaret, at hun ikke rigtig kunne vide, hvem der havde været inde på deres arbejdsområder. Det var ikke ofte, at de fik hjælp fra andre afdelinger.

De fik brevet af 16. marts 2006 overbragt af Jens Broberg. Han kom ikke samtidig med nogen supplerende bemærkninger. De blev kaldt ind i aldersorden. Hun så brochuren »Dine kvalifikationer tæller - ikke din alder« den dag, Max Broms kom ind med den. De mente, at det vedrørte dem. Hun var sammen med Max Broms og Jane Larsen på hendes og Jane Larsens fælles kontor. Jane Larsen kaldte Vibeke Steffensen ind, og da hun havde læst brochuren, sagde Vibeke Steffensen: »Så har vi jo brugt et forkert koncept«. Det kunne ikke være sagt i spøg.

*Max Broms* har blandt andet forklaret, at han i 2005 og 2006 var beskæftiget med listesystemet i Bogholderi II. Der havde ikke været

nogen stor udskiftning i medarbejdergruppen. Forevist den anonymiserede liste over medarbejdere, der havde været beskæftiget med arbejdsopgaver, som blev varetaget af Bogholderi II, forklarede han, at de havde studeret listen noget, og de mente, at de med stor sandsynlighed kunne identificere de personer, der optrådte på listen. De var blandt andet gået ud fra, at medarbejderne var opført i alfabetisk rækkefølge. Han kan ikke forklare, hvordan det kunne være, at nogen havde udført 0,8 pct. af den type arbejdsopgaver, der henhørte under Bogholderi II. Kate Andersen var med i samarbejdsudvalget. Han husker ikke, om hun var med i 2006, men efterfølgende havde hun været med til møder i samarbejdsudvalget. Den 16. marts 2006 blev de samlet i ét lokale og indkaldt med den ældste først, og derefter i aldersrækkefølge. Irene Petersen blev tilkaldt fra et andet sted i bygningen, og derefter kunne de selv regne ud, hvem der skulle hed som den næste. I nuet var han meget optaget af, at de skulle have en besked om, at de skulle forflyttes til Ringkøbing. Han tog pjecen »Dine kvalifikationer tæller - ikke din alder« med på arbejde og viste den til Jane Larsen, idet han samtidig bad Karin

**607**

Rasmussen kigge med. Da de havde læst pjecen, kom Vibeke Steffensen forbi. Jane Larsen kaldte Vibeke Steffensen ind på kontoret. Vibeke Steffensen læste brochuren og sagde derefter, at så var det jo det forkerte koncept, de var gået ud fra. Han gik bagefter ind på sit eget kontor og noterede det passerede ned med det samme, fordi det var hans stil at notere noget ned, hvis han ville huske det. Der var ikke nogen, der på det tidspunkt spøgte i den afdeling.

*Skattedirektør Jens Broberg* forklarede blandt andet, at han tiltrådte som direktør i skattecentret i Maribo den 1. november 2005. Han havde inden da været regionschef for Region Høje Tåstrup. Stillingerne i Betalingscentret i Ringkøbing var blevet opslået, men der var ikke kommet tilstrækkeligt med frivillige ansøgninger. Det blev besluttet, at Betalingscentret i Ringkøbing skulle bemandes med medarbejdere fra skattecentrene med fortrinsret for medarbejdere ved de skattecentre, der lå tættest på Ringkøbing. De øvrige skattecentre måtte imidlertid også bidrage med medarbejdere.

Oprindelig skulle han udpege 13 medarbejdere, men antallet blev ændret til 11. Han havde ikke noget indgående kendskab til medarbejderne, fordi han kun havde været kort tid i skattecentret i Maribo. Han drøftede udvælgelsen af de medarbejdere, der skulle forflyttes, med de pågældende fagchefer og også i den samlede ledelse. Han traf den endelige beslutning om, hvem der skulle udpeges. Vibeke Steffensen var med i den samlede ledelse, da det blev drøftet. Han så det som et tilbud om job et andet sted i SKAT, men han kunne godt se, at mobiliteten ikke var nem i et sådant yderdistrikt. De udvalgte medarbejdere efter de objektive kriterier, og havde den listen med navnene på 36 medarbejdere. som er fremlagt i anonymiseret form, fordi disse medarbejdere mere eller mindre havde beskæftiget sig med de opgaver, der skulle flyttes. Han kunne ikke anvende alder som kriterium, og det gjorde han heller ikke. Det er nyt for ham, at de ansatte skulle være blevet indkaldt efter alder. Det var ikke noget, han havde tilrettelagt. Han havde 11 kuverter, han skulle dele ud. Vibeke Steffensen hentede de pågældende. Han havde lavet en ny organisation i Skattecenter Maribo, og det område, som de pågældende var beskæftiget ved, og som tidligere blev kaldt Bogholderi II, hed derefter Kundeportalen. Der blev udpeget en medarbejder fra Bobehandlingen. På listen var blandt andet virtuelle medarbejdere, der fysisk var placeret et andet sted i Maribo. Bruttotruppen bestod af de 36 personer, der er opført på den udarbejdede liste. Men han havde også lagt nogen vægt på, hvor meget af deres tid de havde brugt på de opgaver, der blev flyttet til Ringkøbing. Kate Andersen var med i hans overvejelser. Han havde ikke kendskab til, at hun skulle nyde tillidsmandsbeskyt

telse. Han havde selv været tillidsmand i en række år. Han havde ikke tænkt på at friholde 4 medarbejdere, der var 45 og 46 år. De hørte til gruppen af dem, der ikke blev udpeget. For ham betød alderen på de udpegede og ikke-udpegede ikke noget.

Foreholdt, at forflyttelse skulle ske efter objektive kriterier, og foreholdt listen over de 36 medarbejdere, har han forklaret, at han ikke selv havde udsøgt listen. Han havde fået den fra SKATs hovedsæde. Listen var udsøgt på grundlag af de 4 lisy-numre, der er nævnt i SKATs notat af 1. marts 2006 om »Kriterier for udpegning af medarbejdere til Betalingscentret og Kundecentret«. De medarbejdere, der havde registreret på de pågældende koder, havde i et vist omfang været beskæftiget med de pågældende opgaver. Han udpegede de 11 medarbejdere efter nøje at have gennemgået listen. Der kunne jo være specielle forhold, der gjorde, at en medarbejder ikke skulle forflyttes. Han lavede en fejl, idet han udpegede en, der kun sad med transporter. Han spurgte ind til, om de pågældende medarbejdere havde de kompetencer, som betalingscentret havde brug for, og han sikrede sig også, at de medarbejdere, der blev tilbage, havde de for Skattecenter Maribo relevante kompetencer. Desuden inddrog han oplysninger om specielle familieforhold, herunder sygdom og f.eks. ægtefællers forhold. Han kan ikke uden at bryde anonymiteten komme nærmere ind på, hvilke specielle forhold i familierne der kunne være tale om. En registrering på et arbejdsområde på 0,8 pct. er ikke meget. De havde en fleks-ordning, og det kan forklare, hvorfor nogen havde registreret over 100 pct. I princippet betød det noget, hvor stor en procentdel af deres arbejde der bestod af det arbejde, der blev flyttet væk. Men han fik også udpeget nogen, hvor den del af deres arbejdsopgaver, der blev flyttet, lå på under 25 pct., og beslutningen om forflyttelse af de pågældende blev senere underkendt. Han lagde vægt på, at man i et vist omfang havde beskæftiget sig med det pågældende arbejde. Han drøftede spørgsmålet med fagcheferne på flere møder. Der var ikke nogen skriftlige oplæg til disse møder. Han spurgte nærmere ind til de oplysninger, han fik fra fagcheferne. Fagcheferne havde ikke skriftligt materiale med til møderne. Der var ikke noget på skrift om udvælgelsen af de medarbejdere, der skulle forflyttes. Han foretog ikke selv nogen noteringer af, hvem der skulle udpeges, og hvem der ikke skulle. Han husker ikke, om han ved mail gav ledelsessekretariatet, der udfærdigede brevene, besked om, hvem der skulle have brev om forflyttelse. De enkelte medarbejdere fik ikke oplysning om, hvordan deres kompetencer var vurderet. De enkelte medarbejdere fik ikke oplyst, at bruttolisten var på 36 medarbejdere.

Foreholdt, at han på det tidspunkt havde været ved SKAT i Maribo i 4 måneder, har han forklaret, at han den 16. marts 2006 ikke kendte medarbejdernes kvalifikationer.

**608**

Foreholdt sagsøgernes skema over »Aldersfordeling ved udpegningen til Betalingscentret i Ringkøbing den 16/03-2006« og foreholdt, at Kate Rasmussen på bruttolisten med 36 medarbejdere af sagsøgerne menes at være den person, der er anført som den 24. på bruttolisten, og som har brugt 1,2 pct. af sin tid på arbejdsopgaver, der skulle overflyttes, at Bente Nielsen skulle være den 4. på bruttolisten, og at Lene Nielsen skulle være placeret som den 26. på bruttolisten og således havde registreret at have brugt 3,9 pct. af sin arbejdstid på de overflyttede opgaver, har han forklaret, at det havde han ikke undersøgt. Han havde navnene på de pågældende medarbejdere og en angivelse af, om de arbejdede med opgaverne på fuld tid eller delt tid. Han kan ikke oplyse, om Lene Nielsen havde brugt 3,9 pct. af sin tid på de overflyttede arbejdsopgaver. Man så også på, hvem man kunne bygge videre på. De overvejede løbende kompetenceudvikling.

Foreholdt den af skattesamarbejde Midt- og Sydsjælland udarbejdede oversigt over »Alders- og kønsfordeling i Midt- og Sydsjælland pr. 22. maj 2006« og foreholdt, at Maribo havde den højeste gennemsnitsalder, har han forklaret, at der var en del af de ældre, der gik af i forbindelse med strukturændringen, men han havde ikke på det tidspunkt haft tid til at lave prognoser for, hvem der gik af. De gjorde sig ikke overvejelser om det i forbindelse med udpegningen af medarbejdere til forflyttelse. I forbindelse med rekruttering i 2007 i SKAT gjorde de sig overvejelser, hvor man blandt andet tænkte på generationsskifte. Når de så på, om en medarbejder var til at bygge videre på, så de nævnlig på viljen og evnen til at kunne tilegne sig nyt stof og erhverve nye kompetencer. Der blev jo ført medarbejderudviklingssamtaler, og under disse samtaler drøftede man medarbejderens ønsker og SKATs ønsker. Disse samtaler var ikke fremme i forbindelse med udpegningen til forflyttelse. Det var noget, afdelingslederne stod for, og det var fortroligt mellem afdelingslederen og medarbejderen. Fagchefer var ikke på forhånd blevet bedt om at vurdere, hvem der skulle forflyttes. Der blev knyttet flere opgaver til »Kundeportalen«, end der havde ligget i Bogholderi II, men Bogholderi II sad som en samlet blok. De to fagchefer, Sonja Davidsen og Kim Lønberg, havde været i Maribo i adskillige år. De havde i et vist omfang daglig kontakt med medarbejderne, men det var afdelingslederne, der først og fremmest stod for den daglige kontakt. Der var ved SKAT i Maribo et antal afdelingsledere, 2 fagchefer og direktøren. Transporterne ligger stadig i skattecentret i Maribo. Den opgave skulle have været overført til Ringkøbing, umiddelbart før den 16. marts 2006 blev det centralt besluttet, at det alligevel ikke skulle ske.

*Vibeke Steffensen* har blandt andet forklaret, at hun i ca. 20 år har været leder af en afdeling. Hun havde en rådgivningsrolle i forbindelse med beslutningen om udpegning af de ansatte, der skulle forflyttes. Der blev holdt et ledelsesmøde, hvor fagchefer og Broberg deltog. Hun blev spurgt, om de pågældende var beskæftiget med de opgaver, der skulle overføres. Hun betragtede det som en beslutning om forflyttelse og ikke en afskedigelsesrunde. De personer, der blev flyttet, var dem, der var beskæftiget med de opgaver, der blev overflyttet. De skulle have de kompetencer, som betalingscentret skulle bruge. Aase Geert, Bente Rasmussen, Max Broms og Jane Halberg Larsen arbejdede med de opgaver, som var kriteriet for udpegningen.

Foreholdt, at hun skulle have sagt: »Jamen, har vi jo brugt et forkert koncept«, da hun fik forevist brochuren, har hun forklaret, at hun kender pjecen. De tre ansatte kom over på hendes kontor med pjecen. Så vidt hun husker, sagde hun, at hvis man forskelsbehandler på grund af alder, så brugte man et forkert koncept. Det havde man ikke gjort i Maribo. Man havde udvalgt efter de kompetencer, der skulle bruges i Ringkøbing. Der var andre i hendes afdeling, der var beskæftiget med de relevante opgaver. Bogholderi II blev etableret i 2002. Forevist bruttolisten med 36 ansatte, har hun forklaret, at hun havde set dette bilag. Hun kan bekræfte, at det var et udtræk på de 4 registreringskoder, der dækkede over arbejdsopgaver, der skulle flyttes til Ringkøbing. Hun kan bekræfte, at der var 36 ansatte man skulle vælge iblandt. Hun skulle være leder for dem, der skulle blive i hendes afdeling. Kundeportalen blev etableret i begyndelsen af 2006. De opgaver, som skulle til Ringkøbing, skulle først flyttes i juli 2007. Der var ca. 25 personer i Kundeportalen fra starten. Man lagde vægt på, at nogen besad de kompetencer, der var vigtige for det fortsatte arbejde i Maribo. Hensyn til sociale forhold blev taget ud fra det kendskab, man havde til medarbejderne og udpegningstidspunktet. Hun havde kendskab til et par enkeltes sociale forhold. Hun havde ikke på daværende tidspunkt kendskab til alles sociale forhold. Hun kunne ikke udelukke, at hun kunne have fået oplyst om andre tungtvejende

sociale forhold. Det kan godt være, at de 36 medarbejdere på bruttolisten var opført i alfabetisk rækkefølge. Efter de udstukne kriterier skulle man lægge vægt på, at de pågældende, der blev forflyttet, »i et vist omfang« beskæftigede sig med det arbejde, der blev overført. De drøftede ikke, hvad er lå i »i et vist omfang«. Det kunne jo godt være, at man havde de kompetencer, der skulle bruges, selv om man ikke udførte så mange af opgaverne. Det forhold, at en medarbejder havde registreret at have brugt 0,4 pct. af sin arbejdstid på de pågældende opgaver, udelukkede ikke forflyttelse. Der var personer på bruttolisten, som ikke fysisk var placeret i Maribo. Hun mener, at det kunne være 2-3 stykker. Kate Rasmussen sad f.eks. fysisk i lokaler i Køge. Det var fagcheferne, der traf beslutningen. Der var under drøftelserne 7 afdelingsledere

**609**

til stede. Tre af afdelingslederne var nye og havde ikke så godt kendskab til de ansatte. Hun var nok den, der havde det bedste kendskab til de ansattes arbejdsopgaver. Der blev ikke udarbejdet nogen skriftlige oplæg eller notater. Hun deltog i et møde om udpegningen. Hun havde ikke en liste med navne med til mødet. Hun blev spurgt ud om de enkelte medarbejdere. Man ville sikre sig, at den pågældende sad med den opgave, der skulle flyttes. Listen blev trukket på baggrund af registreringer for hele 2005. På mødet fik de en orientering om de navne, som direktionen havde udpeget. Hun blev også spurgt, om medarbejderne havde kompetencer til de blivende opgaver. Mødet varede 10 minutter.

Fagcheferne havde løbende uanmeldt fra slutningen af februar spurgt til, hvilke medarbejdere i Bogholderi II der havde siddet med de opgaver, der skulle flyttes. Alle i Bogholderi II var beskæftiget med de opgaver, der skulle flyttes. De spurgte også, om hun havde kendskab til nogle sociale forhold. Hun oplyste navnene på to ansatte, som havde specielle sociale forhold. Hun husker ikke, om fagcheferne noterede navnene. På det senere møde fik hun oplyst navnene på dem, der blev udpeget. Det var et orienteringsmøde. Der blev ikke på det møde spurgt til, om de havde de kvalifikationer, der skulle bruges til de opgaver, der skulle overføres.

Forevist skemaet »Aldersfordeling ved udpegningen til Betalingscentret i Ringkøbing den 16/03-2006« har hun forklaret, at det er rigtigt, at de pågældende medarbejdere var i Bogholderi II. For nogle af medarbejdernes vedkommende var deres hovedopgave ikke nævnt først i skemaet. Det gjaldt Aase Geert og Bente Rasmussen, der begge havde Bc-opgaver som hovedopgaver.

Forevist oversigten »Alders- og kønsfordeling i Midt- og Sydsjælland pr. 22. maj 2006«, har han forklaret, at man lagde vægt på, om de blivende medarbejdere besad den relevante kompetence her og nu. Foreholdt, at man ifølge de ved notat af 1. marts 2006 udmeldte kriterier for udpegning af medarbejdere til betalingscenter og kundecentret skulle udpege medarbejdere, som var i stand til at løse opgaverne i betalingscentret her og nu, har hun forklaret, at Broberg også lagde vægt på, at man her og nu kunne klare Maribos opgaver. De stod med en ny struktur, som tog højde for »generationsskifteproblematikken«. De drøftede ikke dette i forbindelse med udpegningen. Ud af de 36 medarbejdere, der optrådte på bruttolisten, kunne der være nogle fejlregistreringer mv. Nogle af personerne på listen arbejdede med inddrivelse og havde med fogedarbejdet at gøre. Foreholdt skemaet med »Aldersfordeling ved udpegningen til Betalingscentret i Ringkøbing den 16/03-2006«, har han forklaret, at Susanne Krogh udelukkende arbejdede med betalingscenter-opgaver. Bente Laursen beskæftigede sig på det tidspunkt 100 pct. med transporter og derudover ved spidsbelastning med Kobra og KL-opgaver. Jessie Kristoffersen og Gitta Larsen arbejdede kun med betalingscenter-opgaver.

Copyright © 2023 Karnov Group Denmark A/S

## Parternes synspunkter

*Sagsøgerne* har til støtte for deres påstande gjort gældende, at forflyttelsen til Ringkøbing, der reelt indebar en afskedigelse, stred mod forskelsbehandlingslovens § 2, jf. § 1. Sagsøgerne har derfor krav på godtgørelse efter lovens § 7, stk. 1. Sagsøgerne har påvist faktiske omstændigheder, som giver anledning til at formode, at sagsøgernes alder var afgørende for beslutningen om forflyttelse, og sagsøgte har ikke godtgjort, at ligebehandlingsprincippet ikke er krænket, jf. herved § 7a.

Sagsøgerne har om de faktiske omstændigheder nærmere anført, at sagsøgte udvalgte de ældste medarbejdere i afdelingen Bogholderi II til forflyttelse, hvilket fremgår af de statistiske oplysninger om medarbejderne i afdelingen. Den 16. marts 2006 kaldte ledelsen medarbejderne ind i aldersorden med den ældste først og overbragte medarbejderne brevene vedrørende forflyttelsen. Sagsøgerne har endelig henvist til medarbejdernes samtale med Vibeke Steffensen om folderen vedrørende aldersdiskrimination.

Godtgørelsen bør under hensyn til sagsøgernes meget høje anciennitet fastsættes til 18 måneders løn eller i alt fald et meget betydeligt beløb.

*Sagsøgte* har til støtte for sin påstand gjort gældende, at beslutningen om forflyttelse af sagsøgerne blev truffet med det overordnede sigte at få Betalingscentret i Ringkøbing til at fungere. Retningslinjerne, der blev fulgt, var objektive, saglige og velbegrundede. Sagsøgerne blev forflyttet, fordi de arbejdede med de opgaver, der skulle flyttes til Ringkøbing. Beslutningen var hverken direkte eller indirekte begrundet i sagsøgernes alder, men baseret på sagsøgtes liste over samtlige medarbejdere, der havde de pågældende opgaver. Man kan ikke se isoleret på afdelingen Bogholderi II. Gennemsnitsalderen var høj, og der var ingen relevant aldersforskel.

Sagsøgerne har alene gjort sådanne faktiske omstændigheder, at bevisbyrdereglen i lovens § 7a finder anvendelse. Under alle omstændigheder må det lægges til grund, at sagsøgerne blev forflyttet, fordi deres arbejdsopgaver skulle flyttes til det nye betalingscenter, hvilket var en saglig begrundelse. Hvis retten måtte finde, at der er sket forskelsbehandling, er denne indirekte og kan alene føre til en symbolsk godtgørelse.

## Rettens begrundelse og afgørelse:

Efter bevisførelsen lægger retten til grund, at opgaverne, der lå i Bogholderi II, skulle flyttes til Betalingscentret i Ringkøbing, og at der i Bogholderi II var ca. 12 medarbejdere.

På grundlag af det af sagsøgerne udarbejdede skema over aldersfordelingen blandt medarbejderne i Bogholderi II, forklaringerne om aldersrækkefølgen i

**610**

forbindelse med overbringelsen af brevene om forflyttelsen den 16. marts 2006 og forklaringerne om Vibeke Steffensens udtalelse i forbindelse med brochuren »Dine kvalifikationer tæller - ikke din alder« er der anledning til at formode, at de ansattes alder havde indflydelse på, hvilke medarbejdere der blev udvalgt til forflyttelse til Betalingscentret i Ringkøbing.

Bevisbyrden for, at ligebehandlingsprincippet ikke er blevet krænket, påhviler herefter sagsøgte, jf. lov om forbud mod forskelsbehandling på arbejdsmarkedet mv. § 7a.

Listen over 36 medarbejdere, som havde benyttet koderne, der refererede til de arbejdsopgaver, der skulle overflyttes til Betalingscenter Ringkøbing, viser hverken navnene på de enkelte medarbejdere, eller hvilke opgaver de enkelte medarbejdere beskæftigede sig med. Endvidere har størstedelen af medarbejderne på denne liste kun i mindre omfang beskæftiget sig med de relevante koder, hvorfor listen tillige må indeholde medarbejdere fra afdelinger, som ikke i daglig beskæftigede sig med Bogholderi II's opgaver.

Retten finder herefter ikke, at denne liste giver en retvisende oversigt over de medarbejdere, som reelt beskæftigede sig med de opgaver, der skulle overflyttes til Betalingscenter Ringkøbing, og som derfor kunne komme i betragtning med hensyn til overflytning til Ringkøbing.

Efter Jens Brobergs forklaring lægger retten til grund, at han forestod udvælgelsesprocessen, men at han intet kendskab havde til de enkelte medarbejderes arbejdsområder og kvalifikationer. Han havde ingen skriftlige informationer om medarbejderne og førte ingen samtaler med dem. Det er ikke nærmere oplyst, hvilke informationer han modtog fra fagcheferne og afdelingslederne.

Herefter finder retten ikke, at sagsøgte har løftet bevisbyrden for, at der ikke er sket en forskelsbehandling med hensyn til alder ved udvælgelsen at sagsøgerne til overflytning til Betalingscentret i Ringkøbing, jf. lov om forbud mod forskelsbehandling på arbejdsmarkedet m.v. § 7a, jf. § 2, stk. 1, og retten finder ikke, at sagsøgte har godtgjort, at udvælgelsen af sagsøgerne har været objektivt begrundet i et sagligt formål, jf. § 1, stk. 1, sidste led.

I medfør af lovens § 7, stk. 1, jf. § 2, finder retten, at sagsøgerne bør tilkendes en godtgørelse for den ikke-økonomiske skade, som sagsøgerne har lidt.

Ved udmålingen af godtgørelsen har retten lagt vægt på de enkelte sagsøgeres anciennitet og sagens omstændigheder i øvrigt, herunder at overflytningen af sagsøgerne fra Maribo til Betalingscentret i Ringkøbing i realiteten indebar en afskedigelse.

Herefter finder retten, at godtgørelsen passende kan fastsættes til kr. 392.959,44 til sagsøger Aase H. Geert, som blev ansat den 1. juni 1966 og således havde 40 års anciennitet,

kr. 392.797,72 til sagsøger Max Broms, som blev ansat den 1. april 1974 og således havde 32 års anciennitet,

kr. 299.639,02 til sagsøger Bente Rasmussen, som blev ansat 1. marts 1975 og således havde 31 års anciennitet,

kr. 280.020,00 til sagsøger Jane Halberg Larsen, som blev ansat den 20. juni 1978 og således havde 28 års anciennitet, og

kr. 304.549,36 til sagsøger Karin Friis Rasmussen, som blev ansat 8. januar 1980 og således havde 26 års anciennitet.

Efter sagens udfald skal sagsøgte betale sagens omkostninger til HK som mandatar for sagsøgerne med 120.380 kr., hvoraf 80.000 kr. dækker advokatudgifter og 40.380 kr. retsafgiften. Ved omkostningsfastsættelsen har retten taget udgangspunkt i de vejledende salærtakster for proceduresager pr. 1. januar 2009 i forhold til godtgørelsesbeløbene, der er fastsat ved dommen. Retten har reduceret salæret, under hensyn til at sagsøgerne har været repræsenteret af en advokat.

## Thi kendes for ret:

Inden 14 dage betaler sagsøgte, SKAT, Hovedcentret, følgende:

kr. 392.959,44 til sagsøgeren Aase Helene Geert,

kr. 392.797,72 til sagsøgeren Max Broms,

kr. 299.639,02 til sagsøgeren Bente Rasmussen,

kr. 280.020,00 til sagsøgeren Jane Halberg Larsen,

kr. 304.549,36 til sagsøgeren Karin Friis Rasmussen.

Alle godtgørelsesbeløb tillægges sædvanlig procesrente fra sagens anlæg den 2. juli 2007, til betaling sker.

Inden 14 dage skal sagsøgte betale sagsomkostninger til HK Danmark som mandatar for sagsøgerne med 120.380 kr.

## *Østre Landsrets dom.*

Københavns Byrets dom af 2. februar 2009 - - - er anket af SKAT med påstand om frifindelse.

Indstævnte, HK Danmark som mandatar for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen, har nedlagt påstand om stadfæstelse.

Copyright © 2023 Karnov Group Denmark A/S

*Supplerende sagsfremstilling*

Der er for landsretten fremlagt en oversigt over bl.a. de medarbejdere (13) fra Skattecenter Maribo, der

**611**

oprindelig blev udpeget til uansøgt forflyttelse til det nye betalingscenter Ringkøbing ved navn Betalingscenteret:

[Tabel 3]

SKAT har endvidere for landsretten fremlagt den i byrettens dom nævnte bruttoliste med 36 medarbejdere nu med angivelse af navn på de enkelte medarbejdere. Af listen fremgår det bl.a., at Gitta Larsen brugte 117,9 % af sin arbejdstid på opgaver, der fremover skulle varetages af Betalingscenteret, Freddy Jacobsen 115,8 %, Marianne Bratling 112,3 %, Max Broms 105,7 %, Bente Rasmussen 105,1 %, Jessie Kristoffersen 98,2 %, Susanne Eldrup Krog 97,9 %, Karin Friis Rasmussen 94,2 %, Aase Geert 93,0 %, Irene Petersen 90,6 %, Bente Laursen 84,1 %, Kate Andersen 63,9 %, Jane Halberg Larsen 33,8 %, Annelise Hemmingsen 11,9 %, Lene M. Nielsen 3,9 % og Kathe Rasmussen 1,2 %.

Bente K. Nielsen fremgår ikke af bruttolisten.

Af den oprindelige gruppe på 13 medarbejdere blev Jessie Kristoffersen og Annelise Hemmingsen efterfølgende undtaget, hvorfor Skattecenter Maribo endte med at udpege 11 medarbejdere til at deltage i bemandingen af Betalingscenteret. Udpegningen af Kathe Rasmussen og Lene M. Nielsen blev efterfølgende underkendt af hovedcenteret i SKAT.

Beslutningen om, hvilke medarbejder ledelsen af Skattecenter Maribo pegede på til forflyttelse, blev den 16. marts 2006 meddelt de pågældende ved individuelle samtaler mellem skattedirektør Jens Broberg og den enkelte medarbejder. Til brug for afviklingen af samtalerne havde ledelsessekretariatet i Roskilde udarbejdet en tidsplan, hvorefter samtalerne skulle afholdes i følgende rækkefølge:

    9.00 Freddy Jacobsen
    9.20 Aase H Geert
    9.40 Marianne L. Bratling
    10.00 Bente G. Rasmussen
    10.20 Irene K.G. Petersen
    10.40 Max Broms
    11.00 Jane H. Larsen
    11.20 Bente K. Nielsen
    11.40 Karin Friis Rasmussen

På tidsplanen var bl.a. andet anført medarbejderens alder, fødselsdato og faglige organisation. Det fulgte endvidere af planen, at Sonja Davidsen skulle afholde samtale med Kathe Rasmussen, der havde arbejdssted i Køge, og at Lene M. Nielsen havde ferie.

Denne sag er anlagt den 2. juli 2007 i byretten (ved stævning rettelig udtaget den 29. juni 2007), og sideløbende hermed verserer der en voldgiftssag mellem parterne om sagligheden af afskedigelsen af Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen.

*Forklaringer*

Der er i landsretten afgivet supplerende forklaringer af Max Broms, Jane Halberg Larsen, Karin Friis

**612**

Rasmussen og Jens Broberg. Der er endvidere afgivet forklaring af Aase Geert, Bente Rasmussen, Sonja Davidsen og Kim Lønberg.

*Max Broms* har forklaret bl.a., at medarbejderne i »Bogholderi II« fysisk sad sammen på 3. sal i 2- og 3-mandskontorer. Han havde ikke med Jens Broberg at gøre i det daglige arbejde. Den 16. marts 2006, hvor de skulle mødes med Broberg, blev de kaldt ind en ad gangen med den ældste først, dvs. Freddy Jacobsen, dernæst Aase Geert, så ham selv osv. Rækkefølgen med tidspunkter

for samtalerne som angivet i listen blev ikke fulgt. De talte indbyrdes om, at de blev kaldt ind efter alder.

Vibeke Steffensen fik forevist pjecen »Dine kvalifikationer tæller - ikke din alder« på Janes og Karins kontor, hvor han også selv var til stede. Steffensens stemmeføring var ikke spøgefuld. Personlige årsager, herunder hans hustrus helbredsmæssige situation, bevirkede, at han ikke ønskede at flytte til Ringkøbing. Han fik efter sin afskedigelse 3 vikariater i SKAT, men har siden gået arbejdsløs.

*Jane Halberg Larsen* har forklaret bl.a., at hun i det daglige intet havde at gøre med Jens Broberg, der kun havde været ansat siden november 2005. Den 16. marts 2006 mødtes de alle på det samme kontor. De var alle sortklædte efter opfordring fra kollegaer i Roskilde, der sympatiserede med dem. Den rækkefølge, de blev kaldt ind i, var: Freddy Jacobsen, Aase Geert, Max Broms, Karin Friis Rasmussen, Bente Rasmussen og dernæst Irene Petersen, der dog var midt i en borgerekspedition. Så blev det hendes tur og derefter Marianne Bratling. Bente Nielsen sad et helt andet sted i huset, og Kathe Rasmussen arbejdede i Køge. Alle samtalerne gik hurtigt og var afviklet før kl. 10.00.

Episoden med Vibeke Steffensen fandt sted på Karins og hendes kontor. Hun husker tydeligt ordvekslingen, da hun var meget opmærksom på aldersspørgsmålet. Hun ønskede ikke at blive forflyttet af hensyn til sin mand, der er selvstændig erhvervsdrivende, hvilket var velkendt i huset. Overordnet kendte de til hinandens personlige forhold. Efter at hun fratrådte sit arbejde i SKAT, fik hun straks job som sekretær i sundhedsplejen i Lolland Kommune. Det var ikke et naturligt karriereskift eller -valg.

*Karin Friis Rasmussen* har forklaret bl.a., at hun ikke havde haft kontakt med Jens Broberg før den 16. marts 2006 om morgenen, hvor de var forsamlet på et kontor. Vibeke Steffensen hentede dem en ad gangen ind til Broberg. Hun husker, at de blev kaldt ind i rækkefølge med Freddy Jacobsen først, dernæst Aase Geert, Max Broms, hende selv, Bente Rasmussen, Irene Petersen, Jane Larsen og til sidst Marianne Bratling. Hun hæftede sig ved, at det var en aldersbestemt rækkefølge. Hendes møde med Broberg varede 2 minutter. Hun husker ikke ordvekslingen. Hun ønskede ikke at blive forflyttet af hensyn til sin mand. Hun havde vikariater i SKAT indtil 9. marts 2009, men har været arbejdsløs siden. Der er meget lidt arbejde at få i lokalområdet.

*Aase Geert* har forklaret bl.a., at hun i 2006 havde været ansat i 40 år i SKAT. Den 16. marts 2006 mødtes de alle klædt i sort på et kontor og afventede at blive kaldt ind til Jens Broberg. Mødet med Broberg kunne ikke kaldes en samtale. Hun fik en kuvert og gik igen. Hun husker ikke, hvem der blev kaldt ind hvornår, for »skærmen gik nærmest i sort«, men efterfølgende talte de om, at de var blevet kaldt ind efter alder med den ældste først. Hun tog konsekvensen og gik på efterløn. For at opnå en højere efterlønssats ville hun gerne have ventet hermed, til hun var fyldt 62 år.

*Bente Rasmussen* har forklaret bl.a., at hun i 2006 havde været ansat i 31 år i SKAT. Hun kan bekræfte, at de første, der blev kaldt ind, var Freddy Jacobsen og så Aase Geert. Hun husker ikke nærmere, idet hun fik det dårligt, mens de ventede. De talte om, at rækkefølgen var aldersbestemt. Hun var ledig indtil den 1. maj 2008, hvor hun blev sendt i arbejde. Senere har hun fået et rengøringsjob. Det har ikke været et naturligt valg, og arbejdet er fysisk hårdt.

*Jens Broberg* har forklaret bl.a., at han siden den 1. januar 2009 har været pensioneret. Vibeke Steffensen hentede medarbejderne ind til samtalen med ham. Han krydsede dem efter en liste. Han kan ikke erindre, at alle medarbejderne var klædt i sort. Han modtog listen med tidspunkterne for samtalerne fra ledelsessekretariatet i Roskilde. Rækkefølgen var fastsat, under hensyntagen til om medarbejderen var organiseret i HK eller DTS, hvorfor der

skulle ske skiftevis indkaldelse af medarbejderne. På den måde blev det muligt for tillidsmændene at få tid til at tale med den enkelte medarbejder, hvis han pågældende ønskede en samtale. Tillidsmændene blev orienteret om rækkefølgen. Det er et levn fra den gamle etatskultur, at medarbejderens alder fremgår af det skriftlige materiale. Den oprindelige ide hermed har været, at man på den måde bedre kan identificere den enkelte medarbejder. Tidligere fremgik endog tillige gifte kvinders pigenavn. Han erindrer ikke andet, end at rækkefølgen ifølge listen blev fulgt.

Grunden til, at Jessie Kristoffersen blev undtaget, var, at hun havde henvendt sig direkte til ham og udtrykt sin bekymring for fremtiden, hvis hun skulle forflyttes, fordi - - - Han mindes ikke, hvorfor Annelise Hemmingsen blev undtaget, men det beroede formentlig på, at hun varetog opgaver vedrørende bobehandling. Bente Laursen arbejdede med »transporter«, der ikke skulle overgå til Betalingscenteret. For så vidt angik Susanne Eldrup Krog forelå der oplysninger om sygdom i familien, hvorfor hun ikke blev udpeget. Gitta Larsen blev også undtaget, hvilket skyldtes særlige familiære forhold. - - - De tillagde ikke medarbejdernes alder vægt ved vurderingen af, hvem der skulle udpeges. Han

**613**

spurgte ikke de medarbejdere, han kendte mindre godt, om deres personlige forhold. Han var af den opfattelse, at de nok selv ville komme til ham, hvis det havde betydning og var relevant.

Når det i byrettens dom er anført, at han ikke havde kendskab til de enkelte medarbejderes arbejdsområder eller kvalifikationer, er det forkert. Arbejdsopgaverne kendte han efter mange år i tjenesten, og han havde kendskab til medarbejderne fra 4 måneders ansættelse i Maribo. Derudover talte han med fagcheferne om medarbejderne på 3-4 ledelsesmøder. Vibeke Steffensen var ikke til stede ved disse møder. Det blev ikke udarbejdet skriftlige oplæg til møderne eller taget referater herfra. Han drøftede ikke med fagcheferne, om den enkelte medarbejder var dygtig til sit arbejde, men om der forelå særlige private forhold. Han havde bruttolisten til brug for udvælgelsen, og den arbejdede han ud fra. På listen var også arbejdet med »transporter« registreret. Han fik denne liste fra hovedcenteret i SKAT. Opgaven var i første omgang at finde personer, der kunne løse de opgaver, som blev overført til Ringkøbing. Det blev drøftet med fagcheferne, om den tidsmæssige registrering også betød, at de respektive medarbejdere var i stand til at udføre opgaven i Ringkøbing, men de gennemgik ikke alle navne på listen. De var dog overbeviste om, at de udpegede medarbejdere kunne løse de opgaver, som Betalingscenteret skulle varetage. Noget af arbejdet i Ringkøbing bestod af rene tasteopgaver, som alle i SKAT kunne klare. Hovedcenteret underkendte efterfølgende et par af udpegningerne. Han gik ud fra, at det skyldtes, at der var tale om personer, som havde brugt mindre end 25 % af deres arbejdstid på de opgaver, der skulle overflyttes. Der blev ikke opstillet faste eller skriftlige kriterier for, hvilke medarbejdere Skattecenter Maribo »kunne bygge videre på«. Han støttede sig til fagchefernes vurdering, eftersom de havde været i Skattecenter Maribo i en lang årrække. Hans eget kendskab til de enkeltes præstationsniveau var begrænset.

*Sonja Davidsen* har forklaret bl.a., at hun, der er cand.jur., siden 1. marts 2009 har været på rådighedsløn. Hun var tidligere senest fagchef i Skattecenter Maribo og indgik i direktionen. Da hun som fagchef blev bedt om at vurdere medarbejderne med henblik på udvælgelse til forflyttelse, fik hun notaterne om procedure og kriterierne herfor. Jens Broberg fik bruttolisten, som var udgangspunkt for drøftelserne i ledelsen. De holdt 2-4 ledelsesmøder herom. Der var ingen skriftlige oplæg til møderne eller referater herfra. Efter at beslutningen om, hvem der skulle forflyttes, var taget, holdt de et møde med afdelingscheferne for at kvalitetssikre beslutningen. Hun kendte de udpegede medarbejdere som kollegaer på et over-

ordnet plan. De oprindelige kriterier, som de skulle udpege efter, var rent objektive, men de udvidede selv kriterierne lidt. Målet for udvælgelsen var for det første, at de udpegede personer her og nu skulle kunne løse de opgaver, der blev overflyttet til Ringkøbing. De tog imidlertid også hensyn til betjeningen af Skattecenter Maribo og til, at tillidsrepræsentanter, elever og vikarer ikke måtte flyttes, ligesom de tog sociale hensyn. Hun mener, at hovedcenteret i SKAT havde accepteret, at de tog sociale hensyn. Hun spurgte Vibeke Steffensen ud om de enkelte medarbejdere og deres sociale forhold. De fleste af de oplysninger, der efterfølgende fremkom i høringsfasen, kendte hun derfor i forvejen. De opstillede ikke faste kriterier for afvejningen af de forskellige sociale forhold.

Jessie Kristoffersen var på listen til forflyttelse, men blev undtaget, da man tog hensyn til, at hun - - - Annelise Hemmingsen havde under 25 % af sin arbejdstid på de overflyttede opgaver og var derudover tilknyttet afdelingen for bobehandling, som netop var flyttet til Skattecenter Maribo, der havde fået alle bobehandlingsopgaverne fra Midt- og Sydsjælland. Susanne Eldrup Krog havde også kompetencer, som de gerne ville beholde. - - - Gitta Larsen tog de også i socialt hensyn til, - - - De ville samtidig gerne sprede »smerten« lidt, således at det ikke blot var hele Bogholderi II, der blev forflyttet. Medarbejdernes alder tillagde de ingen vægt, hvilket i givet fald også ville have været unaturligt. Hun mener ikke, at der er en reel aldersforskel mellem de medarbejdere, der blev udpeget til forflyttelse, og dem, som forblev i Maribo. Havde den ene gruppe gennemsnitligt været 35 år og den anden 65 år, kunne det have været af betydning f.eks. i henseende til generationsskifte og i forhold til it-kompetencer. De tænkte dog ikke på generationsskifte i forhold til de tilbageværende medarbejdere. Når der på listerne fra SKAT var anført alder, betød det konkret ingenting - der stod alder på alt fra SKAT. Alle vidste, at alder var et ulovligt kriterium.

*Kim Lønberg* har forklaret bl.a., at han, der i juni 2009 forlod SKAT, i marts 2006 var fungerende fagchef i Skattecenter Maribo og deltog i ledelsesmøderne. Vibeke Steffensen deltog ikke i ledelsesmøderne, men alene i afdelingsmøderne. Han blev i 1997 ansat i Maribo og kendte derfor medarbejderne godt. Ledelsen fik besked på at udvælge 13 medarbejdere til forflyttelse ud af en bruttoliste på 36 medarbejdere, som Jens Broberg havde modtaget fra hovedcenteret. Det var principielt Broberg, der bestemte, men Sonja Davidsen og han selv kom med »input«. Han mener, at de var meget grundige i processen, og på møder gennemgik de alle medarbejderne på listen. Jessie Kristoffersen, Gitta Larsen og Susanne Eldrup Krog blev fravalgt dels af sociale årsager, dels fordi de havde kompetencer, som de i Maribo skulle bruge fremover. Sidstnævnte var således en meget dygtig medarbejder. Det var Gitta Larsen også, - - - Han husker ikke, hvorfor Annelise Hemmingsen blev fravalgt. Medarbejdernes alder var ikke et kriterium, de inddrog i afgørelsen. De tog

**614**

heller ikke hensyn til et fremtidigt generationsskifte i Skattecenter Maribo. Gennemsnitsalderen der var høj.

*Procedure*

Parterne har gjort de samme anbringender gældende som for byretten og procederet i overensstemmelse hermed. Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen har præciserende anført, at SKAT har handlet i strid med forskelsbehandlingslovens § 1, stk. 2, om direkte forskelsbehandling, hvortil alene kræves, at alder har været en medvirkende årsag til den trufne afgørelse om, hvilke medarbejdere der skulle forflyttes.

Copyright © 2023 Karnov Group Denmark A/S

## Landsrettens begrundelse og resultat:

Som grundlag for udpegningen af medarbejdere til forflyttelse til det nye betalingscenter i Ringkøbing blev der udarbejdet en bruttoliste over de 36 medarbejdere ved Skattecenter Maribo, der i større eller mindre omfang havde været beskæftiget med de opgaver, som fremover skulle løses af Betalingscenteret. Jens Broberg har forklaret, at der i bruttolistens procentangivelser over, hvor meget af de enkelte medarbejderes arbejdstid, der havde været anvendt på de omhandlede arbejdsopgaver, også indgik arbejde, der under sagen er omtalt som »transporter«. Arbejdsopgaverne hermed skulle ikke overflyttes til Betalingscenteret.

På bagrund af de for landsretten foreliggende oplysninger lægger landsretten til grund, at Skattecenter Maribo endte med at udpege otte medarbejdere til uansøgt forflyttelse fra Bogholderi II, medens fire medarbejdere samt Kate Andersen, der var HK-næstformand, blev friholdt. Samtidig blev Kathe Rasmussen, Bente Nielsen og Lene Nielsen, der arbejdede i andre afdelinger, udpeget til forflyttelse. Såvel disse tre som de udpegede medarbejdere fra Bogholderi II var alle ældre end de friholdte medarbejdere fra Bogholderi II. Sammenholdes dette med, at Bente Nielsen ikke fremgår af bruttolisten, medens det for så vidt angår Kathe Rasmussen og Lene Nielsen fremgår, at de havde anvendt henholdsvis 1,2 % og 3,9 % af deres arbejdstid på de arbejdsopgaver, der indgik i bruttolistens procentangivelser, finder landsretten, at der er anledning til at formode, at der er udøvet forskelsbehandling på grund af alder i strid med forskelsbehandlingsloven. Det påhviler herefter SKAT at bevise, at lovens ligebehandlingsprincip ikke er blevet krænket, jf. forskelsbehandlingslovens § 7a.

De fire friholdte medarbejdere fra Bogholderi II, der alle var midt i fyrrerne, havde ifølge procentangivelserne i bruttolisten brugt enten al eller næsten al deres arbejdstid på de arbejdsopgaver, der var omfattet af listens procentangivelser. Det samme gjaldt for de medarbejdere fra Bogholderi II, som blev udpeget til forflyttelse, bortset fra Jane Halberg Larsen, der kun havde anvendt 33,8 % af sin arbejdstid herpå. Det fremgår ikke, i hvilket omfang den enkelte medarbejder eventuelt havde haft arbejde med »transporter«. Som beskrevet ovenfor havde to af tre medarbejdere, der ikke havde været beskæftiget i Bogholderi II, kun brugt henholdsvis 1,2 og 3,9 % af deres arbejdstid på de af listen omfattede arbejdsopgaver, medens der ikke foreligger oplysninger om den tredje medarbejder. To af disse tre medarbejdere var 59 år, da beslutningen om forflyttelse blev truffet, medens den tredje var 63 år.

Henset til at der ikke foreligger skriftligt materiale til belysning af beslutningsprocessen i Skattecenter Maribo, finder landsretten, at ovennævnte oplysninger må tillægges betydelig vægt ved bevisbedømmelsen. Efter en samlet bedømmelse af disse oplysninger sammenholdt med de afgivne forklaringer fra Jens Broberg, Vibeke Steffensen, Sonja Davidsen og Kim Lønberg, herunder om, i hvilke situationer der blev taget sociale hensyn, og over for hvem dette skete, finder landsretten, at SKAT ikke har bevist, at forskelsbehandlingslovens ligebehandlingsprincip ikke er blevet krænket ved beslutningen om, at udpege Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen til forflyttelse, jf. forskelsbehandlingslovens § 2, stk. 1, jf. § 1, stk. 2.

Landsretten tiltræder, at Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen herefter skal tilkendes en godtgørelse, og at der som anført af byretten herved bør lægges vægt på, at beslutningen om forflyttelse af de pågældende i realiteten indebar en afskedigelse. Herefter, og på baggrund af at Aase Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen alle havde mere end 25 års anciennitet, finder landsretten, at godtgørelsen til hver af dem passende kan fastsættes til 200.000 kr.

Under hensyn til sagens karakter, omfang og udfald skal SKAT i sagsomkostninger for landsretten betale 100.000 kr. til HK som mandatar for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen til dækning af salær til advokat.

## Thi kendes for ret:

*SKAT skal til Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen betale hver 200.000 kr. med procesrente fra sagens anlæg.*

*I sagsomkostninger for landsretten skal SKAT betale 100.000 kr. til HK som mandatar for Aase Helene Geert, Max Broms, Jane Halberg Larsen, Karin Friis Rasmussen og Bente Rasmussen.*

*De idømte beløb skal betales inden 14 dage, og sagsomkostningsbeløbet forrentes efter rentelovens § 8 a.*

**[Tabel 3]**

| Center | Navn (HRP) | Medarb.nr. | Alder | Født | Organisation | Afdeling | Arbejdssted tekst (HRP) | Normtid | AV |
|---|---|---|---|---|---|---|---|---|---|
| BC | Kathe Rasmussen | W01560 | 63 | - - | HK | Bobehandling | Gymnasievej 21, 4600 Køge | 31,2 | 0,8 |
| BC | Freddy Jacobsen | W01598 | 64 | - - | HK | Kundeportal | Brovejen | 37 | 1,0 |
| BC | Karin Friis Rasmussen | W01605 | 52 | - - | HK | Kundeportal | Brovejen | 37 | 1,0 |
| BC | Max Broms | W01612 | 53 | - - | HK | Kundeportal | Brovejen | 37 | 1,0 |
| BC | Jane H. Larsen | W01615 | 51 | - - | HK | Kundeportal | Brovejen | 25 | 0,7 |
| BC | Jessie L. Kristoffersen | W01617 | 46 | - - | DTS | Kundeportal | Brovejen | 37 | 1,0 |
| BC | Marianne L. Bratling | W01648 | 49 | - - | DTS | Kundeportal | Brovejen | 37 | 1,0 |
| BC | Irene K. G. Petersen | W01651 | 52 | - - | DTS | Kundeportal | Brovejen | 28,5 | 0,8 |
| BC | Lene M. Nielsen | W01676 | 60 | - - | HK | Juridisk service - skat | Brovejen | 37 | 1,0 |
| BC | Bente G. Rasmussen | W01682 | 52 | - - | HK | Kundeportal | Brovejen | 28,5 | 0,8 |
| BC | Bente K. Nielsen | W01683 | 60 | - - | DTS | Juridisk service - skat | Brovejen | 28,5 | 0,8 |
| BC | Aase H. Geert | W01684 | 59 | - - | HK | Kundeportal | Brovejen | 31 | 0,8 |
| BC | Annelise Hemmingsen | W01704 | 61 | - - | DTS | Bobehandling | Brovejen | 37 | 1,0 |

Betalingscenter

Copyright © 2023 Karnov Group Denmark A/S