# Exhibit 38

**U.2010.1253Ø**

***Request for production of responsum from Kammeradvokaten not granted.***

*Administration of justice 14.5.*

♦ During the preparation of an action for damages brought by A against the Danish IT and Telecom Agency, I, the Danish Agency for Economic Affairs, Ø, and the Ministry of Defense, F, A requested that Ø as a party and the Danish National Police, R, as a third party be ordered to produce a report submitted on 2 November 2005 by Kammeradvokaten, K, for use in the work of the Radio Committee, R. It appeared from the statement of case in the application that in 2006, in accordance with a recommendation from a committee with the participation of the authorities concerned (R), the Danish state decided to establish a single radio network for emergency communications in Denmark. This decision was implemented partly through a tender procedure (the SINE tender), which offered services to the emergency response authorities in the form of a contract for connection to and use of a nationwide radio-based telecommunications network, and partly through the adoption of an amendment to section 29 of the Danish Emergency Management Act. All interested parties were invited to participate in the SINE tender by announcement on June 8, 2006. After prequalification, there were three participants in the tender. One of the participants in the tender withdrew from the tender process before submitting a final tender, while final tenders were submitted by a consortium including a hired subsidiary of the A Group and Motorola, M. By letter of 8 June 2007, the said consortium was informed that Ø had chosen to enter into a contract with M on the basis of an evaluation of the tenders submitted. The High Court held that A should use K's response of 2 November 2005 as evidence in support of its view that the authorities had not - internally - abandoned the de facto preference which, in A's opinion, existed in favour of M. The High Court then found that A had stated the facts which A sought to prove by, among other things, presenting the above-mentioned statement of facts, see section 300(1) of the Administration of Justice Act. Furthermore, it was found that it could not be ruled out that the statement of facts had significance as evidence in the case, see sections 298(1), 299(1) and 341 of the Administration of Justice Act. The question was then whether Ø and R were exempt from presenting the response, cf. section 298(1), last indent, of the Administration of Justice Act 299(1), last indent. It was stated, among other things, that as far as the authorities' correspondence with experts on questions of legal doubt, e.g. K, was concerned, the exemption from access to documents, cf. section 10(4) of the Access to Public Administration Files Act, also included documents that were not directly related to an actual or possible legal action, "but where this must be understood as an imminent possibility in connection with the case in question", cf. Report no. 857/1978 on the revision of the Access to Public Administration Files Act, page 240. Documents that were exempt from

**1254**

access pursuant to section 10(4) of the Access to Public Administration Files Act could generally not be demanded during legal proceedings, see sections 298(1) and 299(1) in conjunction with section 169(1) of the Administration of Justice Act. The High Court found no basis for accepting Ø's and R's assessment that the response was exempt from access to documents pursuant to section 10(4) of the Access to Public Administration Files Act. There was no basis for assuming that the response summary contained information to be extracted under section 11(1) of the Access to Public Administration Files Act. The High Court found that the facts of significant importance to the proceedings appeared from the case in which the response was included and was otherwise publicly available.

In the opinion of the High Court, the response in question could not be assumed to be of decisive importance to the outcome of the trial, and there were no special circumstances such that the secrecy of the response had to give way to the disclosure of the case, see Sections 298(1) and 299(1) in conjunction with Section 169(2) of the Administration of Justice Act. Article 6 of the European Convention on Human Rights could not lead to a different result. Failure to hand over the statement of defence therefore did not mean that A was prevented from safeguarding his interests during the trial in a satisfactory manner.

Defendant 3, the Ministry of Defense, are ordered to pay DKK 232,910,000.00 in solidum, in the alternative partially in solidum or, in the further alternative, alternatively to pay DKK 232,910,000.00 plus ordinary procedural interest from the institution of the proceedings until payment is made.

or

*Claim 5:*

In the alternative: Order Defendant 1, the National IT and Telecom Agency, Defendant 2, the National Board of Economic Affairs, and Defendant 3, the Ministry of Defense to pay jointly and severally, in the alternative partially jointly and severally, or in the further alternative, alternatively, to pay a lesser amount than under claim 4, determined by the court

**Ø.L.K. January 19, 2010 in case 21. afd. B-569-08**
(Talevski, Rosenløv, Bettina Bang Jakobsen (deputy)).

*Hans Damm Research A/S (adv. Niels Christian Ellegaard, Copenhagen)*
mod
*Økonomistyrelsen and the Danish National Police (Km.adv. v/adv. Sune Fugleholm v/adv. Lisbet Vedel Thomsen, Copenhagen).*

## Eastern High Court

This order concerns a request for production made by the plaintiff, Hans Damm Research A/S (Damm), in a lawsuit brought before the Copenhagen City Court on February 15, 2008 against the defendants IT and Telecom Agency, the Danish Agency for Governmental Management and the Ministry of Defense. At the request of the parties, the case was referred to the Eastern High Court by order of the Copenhagen City Court on March 5, 2008, pursuant to section 226(1) of the Danish Administration of Justice Act.

During the preparation of the trial at the High Court, the request for redaction was submitted to the defendant, the Danish Agency for Governmental Management, pursuant to section 298 of the Administration of Justice Act, and to a third party, the Danish National Police, pursuant to section 299 of the Administration of Justice Act.

During the oral hearing of the request for production on December 15, 2009, Damm claimed that the Agency for Economic Affairs as a party and the National Police as a third party should be ordered to produce Kammeradvokaten's response of November 2, 2005.

The Danish Agency for Economic Affairs and the Danish National Police have claimed that the application should not be granted.

*Information about the trial*

In his lawsuit, Damm has made the following claims against the Danish IT and Telecom Agency, the Danish Agency for Economic Affairs and the Ministry of Defense:

". . .

*Claim 3:*

Defendant 2, Økonomistyrelsen, is ordered to pay principally DKK 367,908,430.00, alternatively a smaller amount determined at the court's discretion, with the addition of ordinary procedural interest from the institution of proceedings until payment is made.

alternatively

*Claim 4:*

Principally: Defendant 1, the Danish IT and Telecom Agency, Defendant 2, the Danish Agency for Economic Affairs, and

estimate with the addition of ordinary procedural interest from the filing of the case until the decision is made."

The Danish IT and Telecom Agency, the Danish Agency for Governmental Management and the Ministry of Defense have claimed acquittal of these claims.

It appears from the statement of case in the application that in October 2001, the IT and Telecom Agency issued frequency licenses and mobile licenses to T-Cell A/S, which was subsequently transferred to T-Cell Danmark A/S, after a name change now Tetrastar A/S, whose shares were acquired by Damm in 2003, and to ApS KBUS 38 nr. 4418, subsequently converted into Dansk Beredskabskommunikation A/S, a company in the Motorola Group, for the establishment and operation of a nationwide public digital land mobile radio network based on TETRA technology.

The licenses for Damm (410-430 MHz) were granted specifically for specific communication needs in areas other than emergency communications (the civil band), while the licenses for Motor Ola were granted specifically for emergency communications in Denmark (the emergency band). It appears from the statement of case in the application that although the licenses were granted specifically for certain communication purposes, it was the intention that the holders of the two sets of licenses should compete in free competition to obtain customers within both the civil band and the emergency band. As a condition for the issuance of the licenses, the license holders were required to expand their networks by 2006.

**1255**

respective networks, so that there would be an outdoor geographical coverage of 70% in Denmark for Damms civilian band and 98% for Motorola's emergency band.

It appears from the statement of facts in the application that in 2006 the Danish State, in accordance with a recommendation from a committee involving the authorities concerned (Radioudvalget), decided that a single radio network should be established for emergency communications in Denmark. This decision was implemented partly through a tender (the SINE tender), which offered services to the emergency response authorities in the form of a contract for connection to and use of a nationwide radio-based telecommunications network, and partly through the adoption of an amendment to section 29 of the Danish Emergency Management Act, whereby municipalities, regions and the private actors who may assist these authorities were required or could be required to use the established nationwide radio communication network in the emergency and preparedness area when performing their own and joint emergency response tasks.

All interested parties were invited to participate in the SINE tender by announcement on June 8, 2006. After prequalification, there were three participants in the tender. One of the participants in the tender withdrew from the tender process before submitting final offers, while final offers were submitted by a consortium including a wholly owned subsidiary of the Damm Group and Motorola. By letter dated June 8, 2007, the consortium was notified that the Danish Agency for Economic Affairs had decided to conclude a contract with Motorola on the basis of an evaluation of the tenders submitted.

In support of the claims for damages, Damm has in his lawsuit claimed, among other things,

"that prior to the launch of the SINE tender, there was a preference for Motorola, which has access to frequencies in the 380-400 MHz spectrum (the Emergency Band), to be awarded the contract under the tender, which is why the applicant feared that

there would not be equal treatment of the participants in the tender,

that despite this, the applicant participated in the SINE tender, as the authorities had previously stated that all participants would be treated equally and fairly and that the tender would be technology-neutral and frequency-neutral,

Copyright © 2023 Karnov Group Denmark A/S                                      page 3

that, after the tender procedure had been carried out, despite the authorities' assurances to the contrary, the applicant found that the participants had not been treated equally and that the tender procedure had not been carried out in a transparent manner for the participants, and that the tender procedure therefore appears to have been carried out solely t o   justify a decision made in advance to award a contract to the company which had the frequencies in the Emergency Response Band,

at . ."

The Danish IT and Telecom Agency, the Danish Agency for Governmental Management and the Ministry of Defense have claimed acquittal of Damms claims for damages. In support of this, the defendant authorities have, among other things, disputed Damm's claim that there has not been equal treatment of the participants in the tender, including that prior to the implementation of the SINE tender there was a preference for Motorola. In this connection, the Danish IT and Telecom Agency, the Danish Agency for Economic Affairs and the Ministry of Defense have urged Damm to either document or drop the plea that there was a preference for Motorola.

*Procedural process regarding the editing request*

During the exchange of pleadings in the court case, Damm invited the defendants to submit a response prepared by Kammerad- vokaten on November 2, 2005 to the Danish National Police for use in the work of the Radio Committee at the time.

Damm has requested access to Kammeradvokaten's response of November 2, 2005 from the Danish Agency for Governmental Management and the National Police respectively. Access to documents was refused by the Danish Agency for Governmental Management and the National Police by letters dated March 11, 2009 and May 4, 2009, respectively, on the grounds that it follows from section 10(4) of the Public Access Act that the right of access to documents  does  not include authorities' correspondence with experts for use in legal proceedings  or  when  considering whether  legal  proceedings should be conducted.

Furthermore, the Danish IT and Telecom Agency, the Danish Agency for Economic Affairs and the Ministry of Defense have during the exchange of correspondence announced that Damm's request for production of the Kammeradvokaten's response of 2 November 2005 will not be fulfilled, as the defendant authorities dispute that they are obliged to produce the response.

The provocation was discussed at a telephone hearing on May 12, 2009, where it was agreed that Damm would explain in writing the basis and need for the fulfillment of the provocation, including the questions that Damm wanted answered or clarified by presenting the response of November 2, 2005.

In a letter dated May 19, 2009 to the defendant authorities, Damm then explained the assumptions that Damm had made about the preference for Motorola, and Damm asked the following questions, among others:

"(1) What was the legal basis for the Advocate General's conclusions that the State was obliged to enter into an agreement with Motorola and/or that it was highly probable that Motorola would succeed in its claim for damages if the contract concerning the SINE network was not concluded with Motorola?

. . .

5. What (factual/legal) circumstances required the Danish Agency for Economic Affairs to consider tendering (as opposed to initiating direct negotiations with Mo- torola as the holder of the license in the Emergency Broadband (380-400 MHz)?"

**1256**

By letter of June 4, 2009, the defendant authorities replied to the questions raised, including questions 1 and 5:

*"Re question 1*

It is an incorrect assumption that Kammeradvokaten's report of November 2, 2005 assessed that the state had a duty to

to enter into an agreement with TetraNet (Motorola) regarding the SINE tender.

The subject of the response of November 2, 2005 was the state's possibilities of establishing a radio communication system for the emergency authorities under purely state auspices. The broader elucidation of the state's options in connection with the establishment of a nationwide network for emergency and contingency communication was first given in the response of April 3, 2006, submitted to the Ministry of Economic Affairs, and there is no contradiction between the two responses. The response of April 3, 2006 supplements the response of November 2, 2005.

. . .

At the same time, it can be confirmed that the investigations carried out by Kammeradvokaten as the State's legal advisor in connection with the SINE project - as stated on page 35 of the statement of defence - resulted in the conclusion that the State was not obliged in advance to enter into an agreement with any particular player in the market, and that Kammeradvokaten has at no time expressed any other opinion.

. . .

*Re question 5*

As stated on page 35 of the reply, the Ministry of Economic Affairs, together with its technical and legal advisors, carried out further examination of the telecommunications services market and the legal basis.

As stated in the Agency for Economic Affairs' report on the procurement procedure to the Complaints Board for Public Procurement (Appendix AJ), the investigations led to the conclusion that the state was not obliged in advance to enter into an agreement with any particular player in the market, and that it could not be excluded in advance that the planned coordination of emergency and contingency communication could take place by using different technologies, including other than TETRA, within different radio frequency bands. The conclusion was therefore that it should be possible for all players in the market to have the opportunity to bid in the upcoming tender.

At the same time, it was concluded that no EU legal acts had been issued or agreements concluded with other countries that legally obliged Denmark to use certain technologies or radio frequency bands in connection with emergency communications.

As stated in the defence on page 35, it was against this background that the Danish Agency for Economic Affairs assessed that it was both desirable and in accordance with the procurement rules to conduct a procurement procedure."

By pleading I of June 15, 2009, Damm stated that the defendant authorities' answers to the questions raised had not mitigated the need for production of the response of November 2, 2005. In the pleading, Damm asked further questions, including the following:

"6. Did Study 1 [the response of November 2, 2005] concern a general investigation of whether the TETRA licenses to Motorola legally constitute a limitation of the possibilities of implementing a digital nationwide radio system for the emergency authorities, or was Study 1 limited to the specific situation that the State may choose to implement a
"GO-GO" model [Government Owned - Government Operated] or a "GO-CO" model [Government Owned - Company Operated]?

. . .

13. On what basis was it necessary or relevant in Study 1 to address the legal perspectives of offering a nationwide digital radio network to emergency response authorities?

14. Why weren't TetraStar's [Pond] licenses included in Study 1?

15. Why didn't Study 1 include a legal assessment for technologies other than TETRA?"

In continuation of this pleading, on June 26, 2009, Damm filed a request for production with the Danish Agency for Economic Affairs and the Danish National Police. In the pleading of September 14, 2009 concerning Damm's request for production, the defendant authorities answered the questions quoted from Damm's pleading I of June 15, 2009 as follows:

*"Re question 6*

As explained in Kammeradvokaten's letter of June 4, 2009 to Damm's lawyer (Appendix 103), the response of November 2, 2005 concerned the state's ability to establish a radio communication system for the emergency services under purely state auspices. The subject was thus a legal assessment of the significance of the issued TETRA permits for the state's ability to establish a publicly owned network.

. . .

*Re question 13*

The response of November 2, 2005 does not contain legal assessments in relation to the implementation of a tender for a nationwide radio communication network for the emergency services. This was part of the broader legal assessment given in the subsequent response of April 3, 2006, cf. Kammeradvokaten's letter of June 4, 2009 (Appendix 103). As stated in the letter, there is no contradiction between the two responses, and the response of April 3, 2006 supplemented the response of November 2, 2005.

**1257**

The Danish National Police's letter of August 9, 2006, page 2, 3rd last paragraph (Appendix 102) is thus not entirely accurate on this point.

*Re question 14*

Reference is made to the answers to questions 8-12. It may be added that the Danish National Police's request to Kammeradvokaten was not prompted by specific preferences for the frequency band to be used for the coordination of emergency and emergency communications, but rather by considerations regarding the scope of the obligations and rights arising from the frequency licenses issued for TETRA purposes.

As Damm held frequency licenses for TETRA purposes and submitted offers for the use of TETRA technology, the defendants find it difficult to see the relevance of questions 15 to 16 above.

19 However, the defendants have chosen to answer the questions.

As the investigations in connection with the Radio Committee's work pointed to TETRA as the relevant technology, it was the legal conditions concerning the frequency licenses issued for TETRA purposes that were to be assessed in the response of 2 November 2005." During the oral hearing of the request for production, the lawyer for the Agency for Economic Affairs and the National Police stated in relation to the above quoted answer to question 6 regarding "the issued TETRA licenses" that both the TETRA licenses issued to Motorola and the TETRA licenses issued to Damm are mentioned in the response of 2 November 2005.

*Extraction obligation*

During the case, Damm has presented a refusal of access to the response of November 2, 2005 from the National Police to a third party, Professional Mobile Radio. It appears from this that the National Police did not consider the factual information stated by Kammeradvokaten in the response of November 2, 2005 concerning the work of the Radio Committee to be covered by the National Police's duty to extract pursuant to section 11(1) of the Access to Public Administration Files Act, as

this factual information was already publicly available on the website of the Ministry of Justice. During the exchange of correspondence regarding the redaction request, the lawyer for the Agency for Economic Affairs and the National Police stated that, in addition to legal assessments, the request of November 2, 2005 contained an account of the basis for and terms of the contracts concluded by the IT and Communications Agency.

Telestyrelsen issued licenses for TETRA purposes and that this information is publicly available.

*The* response of November 2, 2005 was submitted for use in the work of the Radio Committee, which was established in 2005. In addition to legal assistance from Kammeradvokaten, the Radio Committee received technical assistance from external consultants Gartner Danmark ApS (Gartner) and Rovsing Management A/S. Rovsing Management A/S' written presentation of its consultants mentioned, among other things, the consultants' experience of working for or advising Motorola.

On January 20, 2006, two members of the Ministry of Finance's Radio Committee received a memo from Gartner, which among other things states:

"In this brief note, Gartner will provide a number of recommendations in relation to the further negotiation process in connection with the establishment of an agreement with TetraNet [Motorola] on a nationwide radio network for the emergency services.

The memo is made under the assumption that you will want to enter into a joint agreement with TetraNet [Motorola] covering all emergency authorities, . .

. . .

*Overall delimitation*

A distinction is made between:

• the costs associated with setting up the radio network itself, and

• costs emergency response organizations have for radios, radio rooms, etc.

The license granted to TetraNet [Motorola] covers only the establishment and operation of the radio network. It is therefore advantageous to enter into negotiations with TetraNet [Motorola] for a multi-year agreement covering just the network. Concurrently with these negotiations, a tender should be carried out for the components and services that can be purchased jointly by all authorities. This would include radios, radio room technology and a number of service agreements.

. . .

The negotiation process with TetraNet [Motorola] will require a tailor-made process that takes into account a number of unique circumstances:

• This is an area where an operator is granted monopoly status.

• A number of critical needs have been defined that go beyond the current license agreement.

• . . ."

On February 9, 2006, an employee of the Ministry of Finance and an employee of the Danish Agency for Public Management corresponded about a memo to Gartner regarding international surveys. The draft of this memo states, among other things:

"Two separate analyses are required:

• a systematic review of a number of aspects of other countries' TETRA projects and operator agreements. These conditions are deemed to be relevant in connection with the preparation of the negotiation process with Tetranet [Motorola] and in connection with considerations regarding business model, supply of products and services beyond the agreement with TetraNet [Motorola].

**1258**

• an analysis of Tetra [Motorola] as a retailer and the possibilities to reduce Tetra's [Motorola's] costs of setting up and operating the network.

. . ."

The lawyer for the Agency for Economic Affairs and the National Police stated during the oral hearing of the production request that the latter analysis was never carried out because the

authorities involved realized shortly afterwards that Motorola did not have a monopoly as assumed.

Copyright © 2023 Karnov Group Denmark A/S

In a memo dated February 16, 2006 from the Ministry of Finance about the press in the common radio system project, the following questions and answers are included in the annex "Press readiness and FAQ":

"Why should a foreign supplier decide over Danish security? This is no different to other systems (such as XXX and XXX).

As part of the project, a number of requirements and standards will be set, which must be met by the supplier and guarantee national security in relation to the availability of the technology. . . ."

A draft of the Radio Committee report circulated to Radio Committee members on March 9, 2006, states the following:

"Based on the existing legal basis and the license issued to TetraNet [Motorola], the Radio Committee has found it necessary to request Kammeradvokaten to assess whether the completed tender for the TETRA emergency and emergency response network can be assumed to prevent the state from now establishing a publicly owned emergency response network, because TetraNet [Motorola], by virtue of the tender and the allocated frequencies, has received a protected expectation that it would get the emergency response task without competitors other than TetraStar [Damm] on the civil network.

It is the opinion of Kammeradvokaten that TetraNet [Motorola], on the basis of the legislative history as well as the tender documents and the wording of the award, must have been given a clear expectation that a competing nationwide state network would not be established, as such a network would remove the business basis for TetraNet [Motorola].

. . .

As regards the legal possibilities and limitations in connection with the choice of business model, the Radio Committee must generally refer to the Chamber's assessment of the business model to be used when choosing TETRA as a solution." In the Radio Committee's final report of March 29, 2006 regarding a new nationwide radio communication system for the overall emergency response, the quoted paragraphs were not included.

On April 3, 2006, Kammeradvokaten submitted a response to the Danish Agency for Governmental Management, which was involved as part of the deliberations and preparations made by the Ministry of Finance in parallel with the work of the Radio Committee.

On June 8, 2006, the Danish Agency for Governmental Management issued a tender notice concerning the SINE tender for connection to and use of a nationwide radio-based telecommunications network. The tender was conducted as a competitive dialog, and after prequalification there were three participants in the tender, including the consortium in which Damm participated and Motorola. Along the way, one of the participants withdrew and only the consortium and Motorola submitted final offers. The tender process lasted until June 2007 and included seven preliminary offers from each of the two bidders and a continuous revision of the tender documents. By letter dated June 8, 2007, the consortium, in which Damm participated, was informed that the Danish Agency for Economic Affairs had decided to award the contract to Motorola on the basis of the evaluation of the tenders submitted.

In a statement dated October 12, 2006 from Deputy Director Henrik Pinholdt to the Complaints Board for Public Procurement, the Danish Agency for Governmental Management described the background and process for the SINE tender. The statement states, among other things: "In connection with the pending complaint case between

Nethleas and the Danish Agency for Public Management, the Complaints Board for Public Procurement has requested a written statement from the Danish Agency for Public Management, by Deputy Director Henrik Pinholdt, regarding the background and process for tender no. 2006/S 109-116975.

. . .

*Tender considerations*

At the start of the Agency's work, two licenses had been issued by the National IT and Telecom Agency, which could be relevant when establishing the common radio communication system for the emergency services. A license in the 380-400 MHz frequency band with the title "especially for emergency communication" and a license in the 410-430 MHz frequency band with the title "civil band". Both licenses are based on the use of Tetra technology.

The Danish Agency for Economic Affairs was immediately of the opinion that the agency was obliged to enter into negotiations with the holder of the license in the 380-400 MHz frequency band, which was titled "especially for emergency and emergency communications".

However, a closer analysis of this license by the Agency's legal advisors led to the conclusion that the Agency was not legally obliged to enter into an agreement with this licensee. As described in the rejoinder of 22 September 2006 to the Complaint, the Danish National IT and Telecom Agency had in the preparatory work for the license authorizations and in the license authorizations themselves sought competition for all customer segments between the two licensees.

**1259**

The Agency then investigated whether the Agency was obliged to enter into an agreement with one of the two holders of the licenses in the above-mentioned frequency bands. However, an analysis of this led to the conclusion that the Agency was not obliged to enter into an agreement with the holder of the 380-400 MHz frequency band, nor with the holder of the 410-430 MHz frequency band.

Similarly, the agency's legal advisors conducted a thorough review of potential international obligations in the field of emergency communications. . . .

. . .

In summary, the Danish Agency for Economic Affairs could therefore state that:

1. Despite the title of the license for the 380-400 MHz frequency band, the company in question did not have a monopoly on the sale of radio communication services to the emergency services, nor was the Danish Agency for Economic Affairs obliged to enter into an agreement with the holder of the license in the 410-430 MHz frequency band.

2. Denmark was not internationally obligated to use a specific technology or frequency range for the emergency services' radio communication.

3. Neither the technical advisors, previous reports nor international experience could exclude that technologies other than Tetra could meet the needs of the emergency services. On the contrary, the Radio Committee report identified a number of technologies that could possibly meet the needs of the emergency services.

4. The Agency has had no opportunity to reserve a special frequency band for use by a future operator of the common radio communication system.

Against this background, the Danish Agency for Governmental Management assessed that it was best in accordance with the procurement rules to conduct a tender procedure, cf. Executive Order no. 2006/S 109-116975, . . .

. . .

In the contract notice, the Agency for Economic Affairs specified that the Agency wanted to *conclude a contract for connection to and use of a nationwide radio-based communication network*, cf. point II.1.5 of the contract notice. In doing so, the Danish Agency for Economic Affairs wanted to

ensure that both economic operators with an established network and economic operators without an established network would have the opportunity to make their services available to the emergency response authorities.
. . ."

*Procedure of the parties*

In support of the request that the Danish Agency for Economic Affairs as a party and the Danish National Police as a third party be ordered to produce Kammeradvokaten's response of November 2, 2005, *Damm* has claimed that with Kammeradvokaten's response of November 2, 2005, Damm will prove, cf. section 300(1) of the Danish Administration of Justice Act, that there was a de facto preference for Motorola in the preparatory phase of the SINE tender. It is Damm's opinion that this preference was abandoned externally, but that it continued to exist internally. Damm wants to understand the basis on which authorities and advisors had a perception of being obliged to enter into an agreement with Motorola. The question of the preference and its basis is of significant and central importance in relation to the plea of lack of equal treatment and thus the claim for damages. By stating the questions and the facts on which it is based, the response can contribute to uncovering the two central questions.

Damm has further argued that the document is not exempt from disclosure pursuant to sections 298(1) and 299(1) of the Danish Administration of Justice Act, cf. section 169 of the Danish Administration of Justice Act, cf. section 10(4) of the Access to Public Administration Files Act, because the response concerns a legal issue that is not or cannot be the subject of legal proceedings or dispute, and that the Radio Committee, which requested the response, is not and cannot be a party in legal proceedings. The considerations underlying the secrecy of the response document are taken into account, among other things, by the access that Damm has obtained to the Radio Committee's draft report of March 9, 2006, as the legal conclusions from the response document of November 2, 2005 are reproduced therein. Furthermore, there are such special circumstances that disclosure should be made, as the case has significant societal importance, and as the paradigm shift of the authorities involved during the case processing constitutes an unusual course of events, cf. the Supreme Court ruling referred to in UfR 1999.724. Damm has argued that the Access to Public Administration Files Act must be interpreted on the basis of the European Convention on Human Rights and that Article 6 requires the state to make information available in an action such as the present one. Damm has also argued that the Danish Agency for Economic Affairs and the National Police are subject to a duty to extract and therefore cannot exclude information in the response that does not concern legal assessments. This implies that Damm must be given access to presentations, questions and factual information in Kammeradvokaten's response of November 2, 2005.

In support of the claim that the request for production of Kammeradvokaten's report of November 2, 2005 should not be granted, the *Agency for Economic Affairs and the National Police* have firstly claimed that the request for production does not meet the requirements of the Danish Administration of Justice Act § Section 300(1), as it is pure speculation on Damm's part that there should have been an internal preference for Motorola among the defendant authorities until the decision to award the contract to Motorola in June 2007. In its statement to the Complaints Board for Public Procurement, the Danish Agency for Economic Affairs has openly admitted that the Agency was wrong about Motorola's presumed monopoly up to the time when the matter was clarified and

**1260**

Økonomistyrelsen was put out of its mistake with the

The response of November 2, 2005 is exempt from access to documents pursuant to section 10(4) of the Access to Public Administration Files Act and thus from disclosure pursuant to sections 298(1) and 299(1), cf. section 169, of the Administration of Justice Act. At the time of submission of the response, there was no current or possible legal action, but it was an obvious possibility that this could become relevant in connection with the case, and the document is thus exempt from access pursuant to section 10(4) of the Public Administration Act, cf. Report no. 857/1978 on the Public Administration Act.

Copyright © 2024 Karnov Group Denmark A/S

Kammeradvokaten's legal opinion of April 3, 2006. A legal opinion cannot be used as evidence in a court case.

hedslovens revision, page 240, and the judgment from the Eastern High Court cited in UfR 2007.2536.

The fact that the response of November 2, 2005 was submitted to the Danish National Police for use in the work of the Radio Committee does not change the fact that the document is exempt from public access pursuant to section 10 no.

4. The subsequent disclosure of the response of November 5, 2005 to the Danish Agency for Governmental Management for use in this authority's further work does not imply that the confidentiality of the contents of the document has been waived. Nor is confidentiality waived by the access to the main conclusions of the report that Damm has obtained through access to the Radio Committee's draft report of March 9, 2006.

The Supreme Court decisions cited in UfR 1999.724 and UfR 2009.2198 show that it is an exception that special circumstances exist, cf. section 169(2) of the Danish Administration of Justice Act, such that documents that are exempt from access to documents pursuant to the Public Administration Act can be subject to disclosure. In this connection, there must be particularly weighty reasons to order disclosure when it comes to documents that are not only internal as in the Supreme Court rulings referred to in UfR 1999.724 and UfR 2009.2198, but which contain advice from a lawyer.

Article 6 of the European Convention on Human Rights does not give access to advice received by the other party. Mr. Damm is entitled to a full review of his action, notwithstanding the refusal to disclose Kammeradvokaten's response of November 2, 2005.

The Danish Agency for Economic Affairs and the Danish National Police do not have a duty to extract, as the factual information in Kammeradvokaten's responsum of 2. November 2005 concerns the basis for and terms of the licenses issued by the National IT and Telecom Agency for TETRA purposes. This information is publicly available and cannot be extracted by the authorities.

## The High Court's reasoning and result:

The High Court finds that Damm must use Kammeradvokatens response of November 2, 2005 as evidence in support of his view that the authorities had not - inwardly - abandoned the de facto preference which in Damm's opinion was for Motorola. The High Court then finds that Damm has stated the facts that Damm seeks to prove, among other things, through the presentation of the above-mentioned response, see section 300(1) of the Danish Administration of Justice Act. The High Court further finds that it cannot be ruled out that the response has significance as evidence in the case, cf. the Danish Administration of Justice Act § 298(1), § 299(1) and § 341.

The question is then whether the Agency for Economic Affairs and the National Police are exempt from presenting the summary of evidence, cf. section 298(1), last indent, and section 299(1), last indent, of the Administration of Justice Act. According to these provisions, disclosure may be dispensed with if this would reveal information about matters that the person concerned would be exempt from giving evidence about as a witness, cf. sections 169-172 of the Administration of Justice Act.

Authorities' correspondence with experts for use in legal proceedings or when considering whether legal proceedings should be conducted is - apart from facts of significant importance to the case, cf. section 11(1) of the Access to Public Administration Files Act - exempt from access pursuant to section 10(4) of the Act. As far as authorities' correspondence with experts on questions of legal doubt, e.g. the Danish Bar and Law Society, the exemption from access to documents also includes documents that are not directly related to an actual or potential lawsuit, "but

where this must be implied as an obvious possibility in connection with the case in question", cf. report no. 857/1978 on the revision of the Public Access Act, page 240.

Copyright © 2023 Karnov Group Denmark A/S

Documents that are exempt from access to documents pursuant to section 10(4) of the Public Administration Act cannot, in principle, be ordered to be produced during legal proceedings, see sections 298(1) and 299(1) in conjunction with section 169(1) of the Danish Administration of Justice Act. However, the court may decide that the authority must be ordered to produce documents if these are assumed to be of decisive importance to the outcome of the case, and there are such special circumstances that the consideration of secrecy should prevail over the consideration of the information in the case, see sections 298(1) and 299(1) of the Danish Administration of Justice Act in conjunction with section 169(1).

with § 169, paragraph 2.

The High Court finds no basis to set aside the assessment of the Ministry of Economic Affairs and the National Police, according to which Kammeradvokaten's response of November 2, 2005 is exempt from access to documents pursuant to section 10, no. 4 of the Access to Public Administration Files Act. In the opinion of the High Court, it is of no significance that the Radio Committee - as a special ad hoc committee that no longer exists - could not itself

**1261**

become a party to the lawsuit. Even though the response was not directly related to an actual or potential lawsuit, it must be assumed that a lawsuit against the state on the matters covered by the response was an obvious possibility when the response was prepared, as this lawsuit also shows. In this connection, it is particularly noted that the response was prepared for the work of the Radio Committee, which in March 2006 submitted a report on a new nationwide radio communication system for the overall emergency response, and that the subject of response was reportedly a legal assessment of the significance of the issued TETRA licenses for the state's ability to establish a publicly owned network. It is further noted that the response document should be seen in connection with the response document of April 3, 2006, which was prepared for the Danish Agency for Economic Affairs and which, according to the information provided, contained a broader assessment of the state's options in connection with the establishment of a nationwide network for emergency communication.

Nor is it of any significance to the question of whether the response document is covered by the exemption provision in section 10(4) of the Public Administration Act that the response document has been exchanged between authorities involved in the preparation and processing of the SINE tender. It is also of no significance that the main conclusions of the response document are reproduced in the Radio Committee's draft report of March 9, 2006, which Damm has been given access to

In both respects, the High Court has emphasized that the protective purpose behind the provision in section 10(4) of the Access to Public Administration Files Act has not been abandoned.

The High Court finds no basis for assuming that Kammeradvokaten response of November 2, 2005 contains information that must be extracted under section 11(1) of the Access to Public Administration Files Act. The High Court has based its decision on the fact that the facts of significant importance to the case, which are contained in the response, appear from the case in which the response is included and are otherwise publicly available.

In the opinion of the High Court, the response in question cannot be assumed to be of decisive importance to the outcome of the trial, and there are no special circumstances such that the

secrecy of the response must give way to the disclosure of the case, see Sections 298(1) and 299(1) in conjunction with Section 169(2) of the Administration of Justice Act. Article 6 of the European Convention on Human Rights cannot lead to a different result. In this connection, it is noted *that* through access to documents held by the authorities involved and through the Danish Agency for Economic Affairs and the National Police's answers to a number of questions during the preparation of the request for production, Damm has become aware of, among other things, the main conclusions in and the basis for the response, *that* the relevant facts of the case are, which feature in the response are publicly accessible,

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE

U.2010.1253Ø

and *that what* is thus kept secret is in particular Kammeradvokaten's legal analysis in support of the main conclusions drawn in the response. Failure to disclose the response does not therefore mean that Damm is prevented from protecting his interests during the trial in a satisfactory manner.

Based on the above, Damm's claim for discovery will not be granted. Following the outcome of the issue of discovery, Damm must pay legal costs to the National Police as determined below. The amount concerns expenses for legal assistance in connection with the exchange of correspondence and oral hearing of the discovery request. In determining the amount, in addition to the nature and scope of the matter, account has been taken of the fact that the Danish National Police's lawyer has also represented the Danish Ministry of Finance. The question of legal costs to the Agency for Economic Affairs will be decided at the conclusion of the case.

### Thi is determined:

*Hans Damm Research A/S' request that the Danish Economic and Financial Affairs Authority as a party and the Danish National Police as a third party be ordered to produce Kammeradvokaten's response of November 2, 2005, is not granted.*

*Hans Damm Research A/S must pay DKK 20,000 to the Danish National Police as legal costs regarding the request for production.*

*The amount of legal costs must be paid within 14 days and interest is charged according to section 8a of the Interest Act.*

Copyright © 2023 Karnov Group Denmark A/S

**U.2010.1253Ø**

### Begæring om fremlæggelse af responsum fra Kammeradvokaten ikke taget til følge.

*Retspleje 14.5.*

♦ Under forberedelsen af en erstatningssag anlagt af A mod IT-Telestyrelsen, I, Økonomistyrelsen, Ø, og Forsvarsministeriet, F, fremsatte A begæring om, at det blev pålagt Ø som part og Rigspolitiet, R, som tredjemand at fremlægge et responsum afgivet den 2. november 2005 af Kammeradvokaten, K, til brug for arbejdet i Radioudvalget, R. Det fremgik af sagsfremstillingen i stævningen, at den danske stat i 2006 i overensstemmelse med en anbefaling fra et udvalg med deltagelse af de berørte myndigheder (R) besluttede, at der skulle etableres ét fælles radionet til nød- og beredskabskommunikation i Danmark. Denne beslutning blev effektueret dels ved en udbudsforretning (SINE-udbuddet), der udbød tjenesteydelser til beredskabsmyndighederne i form af kontrakt om tilslutning til og brug af et landsdækkende telekommunikationsnet, dels ved vedtagelse af en ændring til beredskabsloven s § 29. Alle interesserede blev ved bekendtgørelse af 8. juni 2006 opfordret til at deltage i SINE-udbuddet. Efter prækvalifikation var der tre deltagere i udbuddet. Den ene deltager i udbuddet trak sig fra udbudsprocessen før endelig tilbudsafgivning, mens endelige tilbud blev indgivet af henholdsvis et konsortium, hvori et hel ejet datterselskab i A-koncernen indgik, og Motorola, M. Ved brev af 8. juni 2007 fik det nævnte konsortium meddelelse om, at Ø på grundlag af evaluering af de indgivne tilbud havde valgt at indgå kontrakt med M. Landsretten lagde til grund, at A skulle bruge K's responsum af 2. november 2005 som bevis til støtte for sit synspunkt om, at myndighederne ikke - indadtil - havde opgivet den de facto-præference, der efter A's opfattelse var for M. Landsretten fandt herefter, at A havde angivet de kendsgerninger, som A søgte at bevise bl.a. gennem fremlæggelse af det ovennævnte responsum, jf. retsplejelovens § 300, stk. 1. Endvidere fandtes det, at det ikke kunne udelukkes, at responsummet havde betydning som bevis i sagen, jf. retsplejelovens § 298, stk. 1, § 299, stk. 1, og § 341. Spørgsmålet var herefter, om Ø og R var fritaget for at fremlægge responsummet, jf. henholdsvis retsplejelovens § 298, stk. 1, sidste led, og § 299, stk. 1, sidste led. Anført bl.a., at for så vidt angik myndigheders brevveksling med sagkyndige om juridiske tvivlsspørgsmål, f.eks. K, omfattede undtagelsen fra aktindsigt, jf. offentlighedslovens § 10, nr. 4, også dokumenter, der ikke havde direkte sammenhæng med et aktuelt eller eventuelt sagsanlæg, »men hvor dette må underforstås som en nærliggende mulighed i forbindelse med den pågældende sag«, jf. betænkning nr. 857/1978 om offentlighedslovens revision, s. 240. Dokumenter, der var undtaget fra

**1254**

aktindsigt i medfør af offentlighedslovens § 10, nr. 4, kunne som udgangspunkt heller ikke kræves fremlagt under retssager, jf. retsplejelovens § 298, stk. 1, og § 299, stk. 1, sammenholdt med § 169, stk. 1. Landsretten fandt ikke grundlag for at tilsidesætte Ø's og R's vurdering, hvorefter responsummet var undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4. Der fandtes ikke grundlag for at antage, at responsummet indeholdt oplysninger, der skulle ekstraheres efter offentlighedslovens § 11, stk. 1. Landsretten lagde herved til grund, at de faktiske omstændigheder af væsentlig betydning for sagsfor-

holdet, som var indeholdt i responsummet, fremgik af den sag, hvori responsummet indgik, og i øvrigt var almént tilgængelige. Det omhandlede responsum kunne efter landsrettens opfattelse ikke antages at være af afgørende betydning for retssagens udfald, og der forelå i øvrigt ikke sådanne særlige omstændigheder, at hensynet til hemmeligholdelse af responsummet måtte vige for sagens oplysning, jf. retsplejelovens § 298, stk. 1, og § 299, stk. 1, sammenholdt med § 169, stk. 2. Artikel 6 i Den Europæiske Menneskerettighedskonvention kunne ikke føre til andet resultat. Manglende udlevering af responsummet indebar derfor ikke, at A blev forhindret i at varetage sine interesser under retssagen på en betryggende måde.

**Ø.L.K. 19. januar 2010 i sag 21. afd. B-569-08**
(Talevski, Rosenløv, Bettina Bang Jakobsen (kst.)).

*Hans Damm Research A/S (adv. Niels Christian Ellegaard, Kbh.)*
mod
*Økonomistyrelsen og Rigspolitiet (Km.adv. v/adv. Sune Fugleholm v/adv. Lisbet Vedel Thomsen, Kbh.).*

## Østre Landsret

Denne kendelse vedrører en editionsbegæring fremsat af sagsøgeren, Hans Damm Research A/S (Damm), i en retssag anlagt ved Københavns Byret den 15. februar 2008 mod de sagsøgte IT- og Telestyrelsen, Økonomistyrelsen og Forsvarsministeriet. Retssagen er på parternes anmodning ved Københavns Byrets kendelse af 5. marts 2008 henvist til behandling ved Østre Landsret i medfør af retsplejelovens § 226, stk. 1.

Editionsbegæringen er under retssagens forberedelse ved landsretten fremsat over for sagsøgte, Økonomistyrelsen, i medfør af retsplejelovens § 298, og over for tredjemand, Rigspolitiet, i medfør af retsplejelovens § 299.

Under mundtlig forhandling af editionsbegæringen den 15. december 2009 har Damm nedlagt påstand om, at det tilpligtes Økonomistyrelsen som part og Rigspolitiet som tredjemand at fremlægge Kammeradvokatens responsum af 2. november 2005.

Økonomistyrelsen og Rigspolitiet har nedlagt påstand om, at begæringen ikke tages til følge.

*Oplysninger om retssagen*

Damm har i sin stævning nedlagt blandt andet følgende påstand mod IT- og Telestyrelsen, Økonomistyrelsen og Forsvarsministeriet: ». . .

*Påstand 3:*

Sagsøgte 2, Økonomistyrelsen, tilpligtes at betale principalt kr. 367.908.430,00, subsidiært et mindre beløb fastsat efter rettens skøn, med tillæg af almindelig procesrente fra sagens anlæg til betaling sker.

alternativt

*Påstand 4:*

Principalt: Sagsøgte 1, IT- og Telestyrelsen, sagsøgte 2, Økonomistyrelsen, og sagsøgte 3, Forsvarsministeriet, tilpligtes principalt in solidum, subsidiært delvist in solidum eller mere subsidiært alternativt at betale kr. 232.910.000,00 med tillæg af almindelig procesrente fra sagens anlæg til betaling sker.

eller

*Påstand 5:*

Subsidiært: Sagsøgte 1, IT- og Telestyrelsen, sagsøgte 2, Økonomistyrelsen, og sagsøgte 3, Forsvarsministeriet tilpligtes in solidum, subsidiært delvist in solidum eller mere subsidiært alternativt at betale et mindre beløb end under påstand 4, fastsat efter rettens

skøn med tillæg af almindelig procesrente fra sagens anlæg til betaling sker.«

IT- og Telestyrelsen, Økonomistyrelsen og Forsvarsministeriet har påstået frifindelse for disse påstande.

Det fremgår af sagsfremstillingen i stævningen, at IT- og Telestyrelsen i oktober 2001 udstedte frekvenstilladelser og mobiltilladelser til henholdsvis T-Cell A/S, der efterfølgende blev overdraget til T-Cell Danmark A/S, efter navneændring nu Tetrastar A/S, hvis aktier i 2003 blev erhvervet af Damm, og til ApS KBUS 38 nr. 4418, efterfølgende omdannet til Dansk Beredskabskommunikation A/S, et selskab i Motorola-koncernen, til etablering og drift af et landsdækkende offentligt digitalt landmobilt radionet, der bygger på TETRA-teknologien.

Tilladelserne til Damm (410-430 MHz) blev givet særligt til specifikke kommunikationsbehov på andre områder end nød- og beredskabskommunikation (civilbåndet), mens tilladelserne til Motorola blev givet særligt til nød- og beredskabskommunikation i Danmark (beredskabsbåndet). Det fremgår af sagsfremstillingen i stævningen, at selv om tilladelserne blev givet særligt til bestemte kommunikationsformål, var det hensigten, at indehaverne af de to sæt tilladelser indbyrdes skulle konkurrere i fri konkurrence om at skaffe kunder inden for såvel civilbåndet som beredskabsbåndet. Som betingelse for tilladelsernes udstedelse skulle tilladelsesindehaverne inden 2006 foretage udbygning af deres

**1255**

respektive net, således at der ville være en udendørs geografisk dækning på 70% i Danmark for Damms civilbånd og 98% for Motorolas beredskabsbånd.

Det fremgår af sagsfremstillingen i stævningen, at den danske stat i 2006 i overensstemmelse med en anbefaling fra et udvalg med deltagelse af de berørte myndigheder (Radioudvalget) besluttede, at der skulle etableres ét fælles radionet til nød- og beredskabskommunikation i Danmark. Denne beslutning blev effektueret dels ved en udbudsforretning (SINE-udbuddet), der udbød tjenesteydelser til beredskabsmyndighederne i form af kontrakt om tilslutning til og brug af et landsdækkende radiobaseret telekommunikationsnet, dels ved vedtagelse af en ændring til beredskabslovens § 29, hvor kommuner, regioner og de private aktører, der måtte bistå disse myndigheder, får påbudt eller kunne påbydes at benytte det etablerede landsdækkende radiokommunikationsnet på nød- og beredskabsområdet ved løsning af egne og fælles beredskabsmæssige opgaver.

Alle interesserede blev ved bekendtgørelse af 8. juni 2006 opfordret til at deltage i SINE-udbuddet. Efter prækvalifikation var der tre deltagere i udbuddet. Den ene deltager i udbuddet trak sig fra udbudsprocessen før endelig tilbudsafgivning, mens endelige tilbud blev indgivet af henholdsvis et konsortium, hvori et helejet datterselskab i Damm-koncernen indgik, og Motorola. Ved brev af 8. juni 2007 fik der nævnte konsortium meddelelse om, at Økonomistyrelsen på grundlag af evaluering af de indgivne tilbud havde valgt at indgå kontrakt med Motorola.

Til støtte for erstatningspåstandene har Damm i sin stævning blandt andet gjort gældende,

»at der forud for SINE-udbuddets iværksættelse var en præference for at Motorola, som har adgang til frekvenser i spektret 380-400 MHz (Beredskabsbåndet), skulle tildeles kontrakten under udbuddet, hvorfor sagsøger måtte befrygte, at der ikke ville ske en ligebehandling af deltagerne i udbuddet,

at sagsøger på trods heraf deltog i SINE-udbuddet, da myndighederne forinden havde tilkendegivet, at alle deltagere ville blive behandlet lige og fair, og at udbuddet ville være teknologineutralt og frekvensneutralt,

at sagsøger efter udbuddets gennemførelse på trods af myndighedernes forsikringer om det modsatte måtte konstatere, at der ikke var sket en ligelig behandling af deltagerne, og at udbuddet i øvrigt ikke var blevet gennemført på en for deltagerne gennemsigtig måde,

at udbuddet derfor fremstår som alene værende gennemført for at retfærdiggøre en på forhånd truffet beslutning om tildeling af kontrakt til det selskab, som havde rådighed over frekvenserne i Beredskabsbåndet,

at . . .«

IT- og Telestyrelsen, Økonomistyrelsen og Forsvarsministeriet har påstået frifindelse for Damms erstatningspåstande. De sagsøgte myndigheder har til støtte herfor blandt andet bestridt Damms anbringende om, at der ikke er sket ligelig behandling af deltagerne i udbuddet, herunder ved at der forud for SINE-udbuddets iværksættelse var en præference for Motorola. IT- og Telestyrelsen, Økonomistyrelsen og Forsvarsministeriet har i den forbindelse opfordret Damm til enten at dokumentere eller frafalde anbringendet om, at der var en præference for Motorola.

*Processuelt forløb vedrørende editionsbegæringen*

Damm har under skriftvekslingen i retssagen opfordret de sagsøgte til at fremlægge et responsum udarbejdet af Kammeradvokaten den 2. november 2005 til Rigspolitiet til brug for Radioudvalgets daværende arbejde.

Damm har begæret aktindsigt i Kammeradvokatens responsum af 2. november 2005 hos henholdsvis Økonomistyrelsen og Rigspolitiet. Aktindsigt blev afslået af Økonomistyrelsen og Rigspolitiet ved breve af henholdsvis 11. marts 2009 og 4. maj 2009, med henvisning til at efter offentlighedslovens § 10, nr. 4, følger, at retten til aktindsigt ikke omfatter myndigheders brevveksling med sagkyndig til brug for retssag eller ved overvejelse af, om retssag bør føres.

Endvidere har IT- og Telestyrelsen, Økonomistyrelsen og Forsvarsministeriet under skriftvekslingen meddelt, at Damms provokation om fremlæggelse af Kammeradvokatens responsum af 2. november 2005 ikke vil blive opfyldt, idet de sagsøgte myndigheder bestrider at være forpligtede til at fremlægge responsummet.

Provokationen blev drøftet på et telefonisk retsmøde den 12. maj 2009, hvor det blev aftalt, at Damm skriftligt skulle redegøre for grundlaget og behovet for opfyldelsen af provokationen, herunder for de spørgsmål, som Damm ønskede besvaret eller belyst ved fremlæggelse af responsummet af 2. november 2005.

I et brev af 19. maj 2009 til de sagsøgte myndigheder redegjorde Damm herefter for de antagelser, som Damm havde gjort sig om præferencen for Motorola, og Damm stillede blandt andet følgende spørgsmål:

»1. Hvad var det juridiske grundlag for Kammeradvokatens konklusioner om, at Staten havde pligt til at indgå aftale med Motorola, og/eller at det var overvejende sandsynligt, at Motorola ville få medhold i erstatningskrav, hvis ikke kontrakten vedrørende SINE-nettet blev indgået med Motorola?

. . .

5. Hvilke (faktiske/juridiske) omstændigheder betingede, at Økonomistyrelsen fandt anledning til at foretage overvejelser om udbud (i modsætning til at indlede direkte forhandlinger med Motorola som indehaver af tilladelsen i Beredskabsbåndet (380-400 MHz)?«

**1256**

Ved brev af 4. juni 2009 besvarede de sagsøgte myndigheder de stillede spørgsmål, herunder spørgsmål 1 og 5:

*»Ad spørgsmål 1*

Det er en urigtig formodning, at det i Kammeradvokatens responsum af 2. november 2005 blev vurderet, at staten havde pligt

til at indgå aftale med TetraNet (Motorola) vedrørende SINE-ud-buddet.

Emnet for responsummet af 2. november 2005 var statens mulig-heder i rent statsligt regi at etablere et radiokommunikations-system til beredskabsmyndighederne. Den bredere belysning af statens handlemuligheder i forbindelse med etablering af et landsdækkende net til nød- og beredskabskommunikation blev først givet i Kam-meradvokatens responsum af 3. april 2006 afgivet til Økonomisty-relsen, og der er ingen modstrid mellem de to responsa. Responsum-met af 3. april 2006 supplerer responsummet af 2. november 2005.

. . .

Det kan samtidig bekræftes, at undersøgelserne udført af Kammer-advokaten som statens juridiske rådgiver i forbindelse med SINE-projektet - som det fremgår af svarskriftet side 35 - bl.a. mundede ud i den konklusion, at staten ikke på forhånd var forpligtet til at slutte aftale med nogen bestemt aktør i markedet, og at Kammerad-vokaten ikke på noget tidspunkt har givet udtryk for nogen anden opfattelse.

. . .

*Ad spørgsmål 5*

Som det fremgår af svarskriftet side 35 gennemførte Økonomisty-relsen med dennes tekniske og juridiske rådgivere yderligere granskning af markedet for teleydelser og retsgrundlaget.

Som det fremgår af Økonomistyrelsens redegørelse for udbudsfor-retningen til Klagenævnet for Udbud (bilag AJ) mundede undersø-gelserne ud i den konklusion, at staten ikke på forhånd var forpligtet til at slutte aftale med nogen bestemt aktør i markedet, og at det ikke på forhånd kunne udelukkes, at den påtænkte samordning af nød- og beredskabskommunikationen ville kunne ske ved anven-delse af forskellige teknologier, herunder andre end TETRA, inden for forskellige radiofrekvensbånd. Konklusionen var derfor, at der burde åbnes mulighed for, at alle aktører i markedet fik mulighed for at byde sig til i den forestående udbudsforretning.

Det var samtidig konklusionen, at der ikke var udstedt EU-retsakter eller var indgået aftale med andre lande, som retligt for-pligtede Danmark til at anvende bestemte teknologier eller radiofrekvensbånd i forbindelse med nød- og beredskabskommunika-tionen.

Som anført i svarskriftet side 35, var det på denne baggrund, at Økonomistyrelsen vurderede, at det både var ønskeligt og i over-ensstemmelse med udbudsreglerne at gennemføre et udbud.«

Ved processkrift I af 15. juni 2009 tilkendegav Damm, at de sagsøgte myndigheders besvarelse af de stillede spørgsmål ikke havde afvækket behovet for fremlæggelse af responsummet af 2. november 2005. I processkriftet stillede Damm yderligere spørgs-mål, herunder følgende:

»6. Vedrørte Undersøgelse 1 [responsummet af 2. november 2005] en generel undersøgelse af, om TETRA-tilladelserne til Motorola retligt set udgør en begrænsning af mulighederne for at implemen-tere et digitalt landsdækkende radiosystem til beredskabsmyndig-hederne, eller var Undersøgelse 1 begrænset til alene at vedrøre den specifikke situation, at Staten måtte vælge at implementere en »GO-GO«-model [Government Owned - Government Operated] eller en »GO-CO«-model [Government Owned - Company Opera-ted]?

. . .

13. På hvilket grundlag var det i Undersøgelse 1 nødvendigt eller relevant at adressere de retlige perspektiver for et udbud af et landsdækkende digitalt radionet til beredskabsmyndighederne?

14. Hvorfor blev TetraStars [Damms] tilladelser ikke inddraget i Undersøgelse 1?

15. Hvorfor blev der ikke i Undersøgelse 1 inddraget en juridisk vurdering i forhold til andre teknologier end TETRA?«

I forlængelse af dette processkrift fremsatte Damm den 26. juni 2009 editionsbegæring over for Økonomistyrelsen og Rigspolitiet. I processkrift af 14. september 2009 vedrørende Damms editions-begæring har de sagsøgte myndigheder besvaret de citerede spørgsmål fra Damms processkrift I af 15. juni 2009 som følger:

»*Ad spørgsmål 6*

Som der er redegjort for i Kammeradvokatens brev af 4. juni 2009 til Damms advokat (bilag 103), vedrørte responsummet af 2. november 2005 statens muligheder i rent statsligt regi at etablere et radiokommunikationssystem til beredskaberne. Emnet var således en retlig vurdering af, hvilken betydning de udstedte TETRA-tilla-delser havde for statens muligheder for at etablere et offentligt ejet net.

. . .

*Ad spørgsmål 13*

Responsummet af 2. november 2005 indeholder ikke retlige vur-deringer i relation til gennemførelsen af et udbud af et landsdæk-kende radiokommunikationsnet til beredskaberne. Dette var en del af den bredere retlige vurdering, som blev givet i det efterfølgende responsum af 3. april 2006, jf. Kammeradvokatens brev af 4. juni 2009 (bilag 103). Der er som anført i brevet ingen modstrid mellem de to responsa, og responsummet af 3. april 2006 supplerede re-sponsummet af 2. november 2005.

**1257**

Rigspolitiets brev af 9. august 2006, side 2, 3. sidste afsnit (bilag 102) er således ikke helt retvisende på dette punkt.

*Ad spørgsmål 14*

Der henvises til besvarelsen af spørgsmål 8-12. Det kan tilføjes, at Rigspolitiets anmodning til Kammeradvokaten ikke var foranle-diget af bestemte præferencer for hvilket frekvensbånd, der skulle anvendes ved en samordning af nød- og beredskabskommunikation, men derimod overvejelser vedrørende omfanget af de forpligtelser og rettigheder, som fulgte af de udstedte frekvenstilladelser til TETRA-formål.

*Ad spørgsmål 15*

Da Damm rådede over frekvenstilladelser til TETRA-formål og afgav tilbud, som lød på anvendelse af TETRA-teknologien, har de sagsøgte vanskeligt ved at se relevansen af spørgsmålene 15-19. De sagsøgte har dog valgt at besvare spørgsmålene.

Da undersøgelserne i forbindelse med Radioudvalgets arbejde pegede på TETRA som den relevante teknologi, var det de retlige forhold vedrørende de udstedte frekvenstilladelser til TETRA-for-mål, som ønskedes vurderet i responsummet af 2. november 2005.«

Under den mundtlige forhandling af editionsbegæringen har Økonomistyrelsens og Rigspolitiets advokat vedrørende den ovenfor citerede besvarelse af spørgsmål 6 uddybende om »de ud-stedte TETRA-tilladelser« oplyst, at både de til Motorola og de til Damm udstedte TETRA-tilladelser er omtalt i responsummet af 2. november 2005.

*Ekstraheringspligt*

Damm har under sagen fremlagt en afslag på aktindsigt i re-sponsummet af 2. november 2005 fra Rigspolitiet til en tredjepart, Professional Mobile Radio. Det fremgår heraf, at Rigspolitiet ikke anså de faktiske oplysninger, som Kammeradvokaten har anført i responsummet af 2. november 2005 vedrørende Radioudvalgets arbejde, for at være omfattet af Rigspolitiets ekstraheringspligt i medfør af offentlighedslovens § 11, stk. 1, idet disse faktiske oplys-ninger allerede var offentligt tilgængelige på Justitsministeriets hjemmeside. Under skriftvekslingen vedrørende editionsbegæringen har Økonomistyrelsens og Rigspolitiets advokat oplyst, at re-sponsummet af 2. november 2005 ud over retlige vurderinger inde-holder en redegørelse for grundlaget for og vilkårene i de af IT- og

Copyright © 2023 Karnov Group Denmark A/S                                    side 3

Telestyrelsen udstedte tilladelser til TETRA-formål, og at disse oplysninger er almindeligt tilgængelige.

*Sagsfremstilling vedrørende editionsbegæringen*

Responsummet af 2. november 2005 blev afgivet til brug for arbejdet i Radioudvalget, der var blevet nedsat i 2005. I tillæg til juridisk bistand fra Kammeradvokaten fik Radioudvalget teknisk bistand fra blandt andre de eksterne konsulenter Gartner Danmark ApS (Gartner) og Rovsing Management A/S. I Rovsing Management A/S' skriftlige præsentation af sine konsulenter omtales blandt andet de pågældende konsulenters erfaring med arbejde for eller rådgivning vedrørende Motorola.

Den 20. januar 2006 modtog to af Finansministeriets medlemmer af Radioudvalget et notat fra Gartner, hvoraf blandt andet fremgår:

»I dette kortfattede notat vil Gartner give en række anbefalinger i forhold til det videre forhandlingsforløb i forbindelse med etablering af en aftale med TetraNet [Motorola] om et landsdækkende radionetværk for beredskabet.

Notatet er lavet under den antagelse, at man vil ønske at indgå en fælles aftale med TetraNet [Motorola], der dækker alle beredskabsmyndigheder, . . .

. . .

*Overordnet afgrænsning*

Der skelnes mellem:

• omkostningerne knyttet til at etablere selve radionetværket, og

• omkostninger beredskabsorganisationerne har til radioer, radiorum, etc.

Den licens, der er tildelt TetraNet [Motorola], omfatter alene etablering og drift af radionetværket. Man kan derfor med fordel indlede forhandlinger med TetraNet [Motorola] omkring en flerårig aftale, der dækker netop netværket. Sideløbende med disse forhandlinger bør man gennemføre et udbud af de komponenter og services, der med fordel kan købes fælles for alle myndigheder. Det vil f.eks. gælde radioer, radiorums-teknologi og en række serviceaftaler.

. . .

Forhandlingsforløbet med TetraNet [Motorola] vil kræve et skræddersyet forløb, der tager hensyn til en række helt specielle forhold:

• Der er tale om et område, hvor en operatør er givet monopolstatus.

• Der er defineret en række kritiske behov, der går ud over den nuværende licensaftale.

• . . .«

Den 9. februar 2006 korresponderede en medarbejder i Finansministeriet og en medarbejder i Økonomistyrelsen om et notat til Gartner vedrørende internationale undersøgelser. I udkastet til dette notat fremgår blandt andet:

»Der ønskes foretaget to separate analyser:

• en systematisk gennemgang af en række forhold ved andre landes TETRA-projekter og operatør-aftaler. Der er tale om forhold der skønnes at være relevante i forbindelse med forberedelsen af forhandlingsforløbet med Tetranet [Motorola] og i forbindelse med overvejelser vedrørende forretningsmodel, udbud af produkter og ydelser der ligger ud over aftalen med TetraNet [Motorola].

**1258**

• en analyse af Tetra [Motorola] som forhandlingsaktør og mulighederne for at reducere Tetras [Motorolas] omkostninger ved etablering og drift af nettet.

. . .«

Økonomistyrelsens og Rigspolitiets advokat har under den mundtlige forhandling af editionsbegæringen oplyst, at sidstnævnte analyse aldrig blev foretaget, fordi de involverede myndigheder kort tid efter blev klar over, at Motorola ikke som antaget havde monopol.

I et notat af 16. februar 2006 fra Finansministeriet om presse i projekt om fælles radiosystem indgår følgende spørgsmål og svar under bilaget »Presseberedskab og FAQ«:

»Hvorfor skal en udenlandsk leverandør bestemmer over dansk sikkerhed?

Dette er ikke anderledes end andre systemer (såsom XXX og XXX).

Som led i projektet vil der blive stillet en række krav og laves standarder, som skal overholdes af leverandøren og som garanterer den nationale sikkerhed i forhold til at råde over teknologien.

. . .«

I et udkast til Radioudvalgets rapport, der blev cirkuleret til Radioudvalgets medlemmer den 9. marts 2006, fremgår følgende:

»På baggrund af det foreliggende lovgrundlag, og den udstedte tilladelse til TetraNet [Motorola], har Radioudvalget fundet det nødvendigt at anmode Kammeradvokaten om en vurdering af, om det gennemførte udbud vedrørende TETRA nød- og beredskabsnettet kan antages at afskære staten fra nu at etablere et offentligt ejet beredskabsnet, fordi TetraNet [Motorola] i kraft af udbuddet og de tildelte frekvenser har fået en beskyttet forventning om, at man ville få beredskabsopgaven uden andre konkurrenter end TetraStar [Damm] på civilnettet.

Det er Kammeradvokatens vurdering, at TetraNet [Motorola], på baggrund af såvel lovforarbejderne som udbudsmaterialet og tilladelsens ordlyd, må være bibragt en klar forventning om, at der ikke ville blive etableret et konkurrerende landsdækkende statsligt net, idet et sådant net ville fjerne forretningsgrundlaget for TetraNet [Motorola].

. . .

. . .

For så vidt angår de retlige muligheder og begrænsninger i forbindelse med valg af forretningsmodel skal Radioudvalget generelt henholde sig til Kammeradvokatens vurdering af, hvilken forretningsmodel der skal anvendes ved valg af TETRA som løsning.«

I Radioudvalgets endelige rapport af 29. marts 2006 vedrørende et nyt landsdækkende radiokommunikationssystem for det samlede beredskab indgik de citerede afsnit ikke.

Den 3. april 2006 afgav Kammeradvokaten et responsum til Økonomistyrelsen, der var inddraget som led i de overvejelser og forberedelser, der blev gjort i Finansministeriets regi sideløbende med arbejdet i Radioudvalget.

Den 8. juni 2006 udsendte Økonomistyrelsen udbudsbekendtgørelse vedrørende SINE-udbuddet om tilslutning til og brug af et landsdækkende radiobaseret telekommunikationsnet. Udbuddet blev foretaget som konkurrencepræget dialog, og efter prækvalifikation var der tre deltagere i udbuddet, herunder konsortiet, hvori Damm deltog, og Motorola. Undervejs trak den ene deltager sig, og det var således kun det nævnte konsortium og Motorola, der indgav endelige tilbud. Udbudsprocessen strakte sig indtil juni 2007 og indebar blandt andet syv foreløbige tilbud fra hver af de to bydende og en løbende revision af udbudsdokumenterne. Ved brev af 8. juni 2007 fik konsortiet, hvori Damm deltog, meddelelse om, at Økonomistyrelsen på grundlag af evaluering af de indgivne tilbud havde valgt at indgå kontrakt med Motorola.

Økonomistyrelsen har i en redegørelse af 12. oktober 2006 fra vicedirektør Henrik Pinholdt til Klagenævnet for Udbud beskrevet baggrunden og processen for SINE-udbuddet. Af redegørelsen fremgår blandt andet:

»Klagenævnet for udbud har i forbindelse med verserende klagesag mellem Nethleas og Økonomistyrelsen anmodet om en skriftlig redegørelse fra Økonomistyrelsen, ved vicedirektør Henrik Pinholdt, vedrørende baggrund og proces for udbud nr. 2006/S 109-116975.

. . .

*Overvejelser om udbud*

Ved opstart af Økonomistyrelsens arbejde var der udstedt to licenser hos IT- og Telestyrelsen, som kunne være relevante ved etablering af det fælles radiokommunikationssystem til beredskaberne. En licens i 380-400Mhz-frekvensbåndet med titlen »særligt til nød- og beredskabskommunikation« og en licens i 410-430Mhz-frekvensbåndet, med titlen »civilbåndet«. Begge licenser er baseret på brug af Tetra-teknologi.

Økonomistyrelsen var umiddelbart af den opfattelse, at styrelsen var forpligtet til at indlede forhandlinger med indehaveren af licensen i 380-400Mhz-frekvensbåndet, som bar titlen »særligt til nød- og beredskabskommunikation«.

En nærmere analyse foretaget af styrelsens juridiske rådgivere af denne licenstilladelse førte imidlertid til den konklusion, at Økonomistyrelsen ikke var retligt forpligtet til at indgå aftale med denne licenshaver. Som beskrevet i duplik af 22. september 2006 tin Klagenævnet havde IT- og Telestyrelsen i forarbejderne til licenstilladelserne og i selve licenstilladelserne netop tilstræbt konkurrence om alle kundesegmenter mellem de to licenshavere.

**1259**

Økonomistyrelsen undersøgte herefter, om styrelsen var forpligtet til at indgå aftale med en af de to indehavere af licenserne i ovennævnte frekvensbånd. En analyse heraf førte imidlertid til, at styrelsen hverken var forpligtet til at indgå aftale med indehaveren af 380-400Mhz-frekvensbåndet, ej heller med indehaveren af 410-430Mhz-frekvensbåndet.

På samme måde gennemførte styrelsens juridiske rådgivere en nøje gennemgang af mulige internationale forpligtelser på området for beredskabskommunikation. . . .

. . .

Opsamlende kunne Økonomistyrelsen derfor konstatere at:

1. Trods titlen på licensen for frekvensområde i 380-400Mhz frekvensbåndet, var der ikke tale om, at den pågældende virksomhed havde monopol på salg af radiokommunikationsydelser til beredskaberne, ligesom Økonomistyrelsen ej heller var forpligtet til at indgå aftale med indehaveren af licensen i 410-430Mhz-frekvensbåndet.

2. Danmark ikke internationalt var forpligtet til at anvende en særlig teknologi eller et særligt frekvensområde for beredskabernes radiokommunikation.

3. Hverken de tekniske rådgivere, forudgående rapporter eller internationale erfaringer kunne udelukke, at andre teknologier end Tetra ville kunne opfylde beredskabernes behov. Tværtimod blev der i Radioudvalgets rapport peget på en række teknologier, som muligvis ville kunne opfylde beredskabernes behov.

4. Økonomistyrelsen har haft nogen mulighed for at reservere et særligt frekvensbånd til brug for en kommende operatør af det fælles radiokommunikationssystem.

På den baggrund vurderede Økonomistyrelsen, at det var bedst stemmende med udbudsreglerne, at gennemføre et udbud, jf. udbudsbekendtgørelse nr. 2006/S 109-116975, . . .

. . .

Økonomistyrelsen præciserede i udbudsbekendtgørelsen, at Økonomistyrelsen ønskede at *indgå kontrakt om tilslutning til og brug af et landsdækkende radiobaseret kommunikationsnet*, jf. bekendtgørelsens punkt II.1.5. Herved ønskede Økonomistyrelsen at sikre, at både økonomiske aktører med et etableret netværk og økonomiske aktører uden et etableret netværk, ville have mulighed for at stille deres tjenesteydelser til rådighed for beredskabsmyndighederne.

. . .«

*Parternes procedure*

*Damm* har til støtte for begæringen om, at det pålægges Økonomistyrelsen som part og Rigspolitiet som tredjemand at fremlægge Kammeradvokatens responsum af 2. november 2005, gjort gældende, at Damm med Kammeradvokatens responsum af 2. november 2005 vil bevise, jf. retsplejelovens § 300, stk. 1, at der i SINE-udbuddets beredelsesfase var en de facto-præference for Motorola. Det er Damms opfattelse, at denne præference blev forladt udadtil, men at den fortsat bestod indadtil. Damm ønsker at forstå grundlaget for, at myndigheder og rådgivere havde en opfattelse af at være forpligtet til at indgå aftale med Motorola. Spørgsmålet om præferencen og dens grundlag er af væsentlig og central betydning i forhold til anbringendet om manglende ligebehandling og dermed kravet om erstatning. Responsummet kan med gengivelse af de spørgsmål og de fakta, der lægges til grund, medvirke til at afdække de to centrale spørgsmål.

*Damm* har videre gjort gældende, at dokumentet ikke er undtaget fra editionspligt i medfør af retsplejelovens §§ 298, stk. 1, og 299, stk. 1, jf. retsplejelovens § 169, jf. offentlighedslovens § 10, nr. 4, fordi responsummet vedrører et juridisk spørgsmål, som ikke er eller kan blive genstand for retssag eller tvist, og at Radioudvalget, der rekvirerede responsummet, ikke er og ikke kan være part i en retssag. De hensyn, der ligger bag hemmeligholdelse af responsummet er prisgivet blandt andet ved den aktindsigt, som Damm har opnået i Radioudvalgets udkast til rapport af 9. marts 2006, idet de retlige konklusioner fra responsum af 2. november 2005 er gengivet heri. Der foreligger endvidere sådanne særlige omstændigheder, at fremlæggelse bør ske, idet sagen har væsentlig samfundsmæssig betydning, og idet de involverede myndigheders paradigmeskift under sagsbehandlingen udgør et usædvanligt forløb, jf. den i UfR 1999.724 refererede højesteretskendelse. Damm har gjort gældende, at offentlighedsloven skal fortolkes på grundlag af Den Europæiske Menneskerettighedskonvention, og at artikel 6 kræver, at staten stiller oplysninger til rådighed i et søgsmål som det foreliggende. Damm har endvidere gjort gældende, at Økonomistyrelsen og Rigspolitiet er undergivet ekstraheringspligt og derfor ikke kan undtage oplysninger i responsummet, som ikke vedrører retlige vurderinger. Det indebærer, at der skal gives Damm indsigt i oplæg, spørgsmål og faktiske oplysninger i Kammeradvokatens responsum af 2. november 2005.

*Økonomistyrelsen og Rigspolitiet* har til støtte for påstanden om, at begæringen om fremlæggelse af Kammeradvokatens responsum af 2. november 2005 ikke tages til følge, for det første gjort gældende, at editionsbegæringen ikke opfylder kravene i retsplejelovens § 300, stk. 1, idet det er en spekulation fra Damms side, at der skulle have været en intern præference for Motorola blandt de sagsøgte myndigheder frem til beslutningen om at tildele Motorola kontrakten i juni 2007. Økonomistyrelsen har åbent erkendt i redegørelsen til Klagenævnet for Udbud, at Økonomistyrelsen tog fejl med hensyn til Motorolas formodede monopol frem til det tidspunkt, hvor forholdet blev afklaret og

**1260**

Økonomistyrelsen bragt ud af sin vildfarelse med Kammeradvokatens responsum af 3. april 2006. Et juridisk responsum kan heller ikke benyttes som bevismiddel i en retssag.

Responsummet af 2. november 2005 er undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4, og dermed fra edition i medfør af retsplejelovens §§ 298, stk. 1, og 299, stk. 1, jf. § 169, fordi dokumentet vedrører retlige vurderinger og juridiske tvivlsspørgsmål. Der var ikke på tidspunktet for afgivelse af responsummet et aktuelt eller eventuelt sagsanlæg, men det var en nærliggende mulighed, at dette kunne blive aktuelt i forbindelse med sagen, og dokumentet er dermed undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4, jf. Betænkning nr. 857/1978 om offentlig-

Copyright © 2023 Karnov Group Denmark A/S

hedslovens revision, side 240, og den i UfR 2007.2536 gengivne dom fra Østre Landsret.

At responsummet af 2. november 2005 er afgivet til Rigspolitiet til brug for Radioudvalgets arbejde, ændrer ikke ved, at dokumentet er undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4. Den senere videregivelse af responsummet af 5. november 2005 til Økonomistyrelsen til brug for denne myndigheds videre arbejde indebærer ikke, at fortroligheden omkring dokumentets indhold er opgivet. Fortroligheden er heller ikke opgivet ved den adgang til responsummets hovedkonklusioner, som Damm har opnået ved aktindsigt i Radioudvalgets udkast til rapport af 9. marts 2006.

De i UfR 1999.724 og UfR 2009.2198 refererede højesteretskendelser viser, at det har undtagelsens karakter, at der foreligger sådanne særlige omstændigheder, jf. retsplejelovens § 169, stk. 2, at dokumenter, der er undtaget fra aktindsigt i medfør af offentlighedsloven, kan gøres til genstand for edition. Der må i den forbindelse foreligge særligt tungtvejende grunde til at pålægge edition, når det drejer sig om dokumenter, der ikke blot er interne som i de i UfR 1999.724 og UfR 2009.2198 refererede højesteretskendelser, men som indeholder rådgivning fra advokat.

Den Europæiske Menneskerettighedskonventions artikel 6 giver ikke adgang til at få fremlagt rådgivning, som modparten har modtaget. Damm har adgang til fuld prøvelse af sit søgsmål, uanset at edition af Kammeradvokatens responsum af 2. november 2005 nægtes.

Økonomistyrelsen og Rigspolitiet har ikke ekstraheringspligt, idet de faktiske oplysninger i Kammeradvokatens responsum af 2. november 2005 vedrører grundlaget for og vilkårene i at IT- og Telestyrelsen udstedte tilladelser til TETRA-formål. Disse oplysninger er alment tilgængelige og kan ikke kræves ekstraheret af myndighederne.

## Landsrettens begrundelse og resultat:

Landsretten lægger til grund, at Damm skal bruge Kammeradvokatens responsum af 2. november 2005 som bevis til støtte for sit synspunkt om, at myndighederne ikke - indadtil havde opgivet den de-facto-præference, der efter Damms opfattelse var for Motorola.

Landsretten finder herefter, at Damm har angivet de kendsgerninger, som Damm søger bevist blandt andet gennem fremlæggelse af det ovennævnte responsum, jf. retsplejelovens § 300, stk. 1. Landsretten finder endvidere, at det ikke kan udelukkes, at responsummet har betydning som bevis i sagen, jf. retsplejelovens § 298, stk. 1, § 299, stk. 1, og § 341.

Spørgsmålet er herefter, om Økonomistyrelsen og Rigspolitiet er fritaget for at fremlægge responsummet, jf. henholdsvis retsplejelovens § 298, stk. 1, sidste led, og § 299, stk. 1, sidste led. Efter disse bestemmelser kan fremlæggelse undlades, hvis der derved vil fremkomme oplysning om forhold, som den pågældende vil være fritaget for at afgive forklaring om som vidne, jf. retsplejelovens §§ 169-172.

Myndigheders brevveksling med sagkyndige til brug for retssager eller ved overvejelse af, om retssag bør føres, er - bortset fra faktiske omstændigheder af væsentlig betydning for sagsforholdet, jf. offentlighedslovens § 11, stk. 1 - undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4. For så vidt angår myndigheders brevveksling med sagkyndige om juridiske tvivlsspørgsmål, f.eks. Kammeradvokaten, omfatter undtagelsen fra aktindsigt også dokumenter, der ikke har direkte sammenhæng med et aktuelt eller eventuelt sagsanlæg, »men hvor dette må underforstås som en nærliggende mulighed i forbindelse med den pågældende sag«, jf. betænkning nr. 857/1978 om offentlighedslovens revision, side 240.

Dokumenter, der er undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4, kan som udgangspunkt heller ikke kræves fremlagt under retssager, jf. retsplejelovens § 298, stk. 1, og § 299, stk. 1, sammenholdt med § 169, stk. 1. Retten kan imidlertid bestemme, at myndigheden skal pålægges at fremlægge dokumenter, såfremt disse må antages at være af afgørende betydning for sagens udfald, og der foreligger sådanne særlige omstændigheder, at hensynet til hemmeligholdelse bør vige for hensynet til sagens oplysning, jf. retsplejelovens § 298, stk. 1, og § 299, stk. 1, sammenholdt med § 169, stk. 2.

Landsretten finder ikke grundlag for at tilsidesætte Økonomistyrelsens og Rigspolitiets vurdering, hvorefter Kammeradvokatens responsum af 2. november 2005 er undtaget fra aktindsigt i medfør af offentlighedslovens § 10, nr. 4. Det har efter landsrettens opfattelse ingen betydning, at Radioudvalget - som et særligt ad hoc-udvalg, der ikke længere eksisterer - ikke selv kunne

**1261**

blive part i retssagen. Selv om responsummet ikke havde direkte sammenhæng med et aktuelt eller eventuelt sagsanlæg, må det lægges til grund, at retssag mod staten om de forhold, som responsummet vedrører, var en nærliggende mulighed, da responsummet blev udarbejdet, således som nærværende retssag også viser. Det bemærkes herved særligt, at responsummet blev udarbejdet til brug for arbejdet i Radioudvalget, der i marts 2006 afgav rapport vedrørende et nyt landsdækkende radiokommunikationssystem for det samlede beredskab, og at responsummets emne efter det oplyste var en retlig vurdering af, hvilken betydning de udstedte TETRA-tilladelser havde for statens muligheder for at etablere et offentligt ejet net. Det bemærkes videre, at responsummet skal ses i sammenhæng med Kammeradvokatens responsum af 3. april 2006, som blev udarbejdet til brug for Økonomistyrelsen, og som efter det oplyste indeholdt en bredere vurdering vedrørende statens handlemuligheder i forbindelse med etablering af et landsdækkende net til- og beredskabskommunikation.

Det har heller ikke nogen betydning for spørgsmålet om, hvorvidt responsummet er omfattet af undtagelsesbestemmelsen i offentlighedslovens § 10, nr. 4, at responsummet har været udvekslet mellem myndigheder, der var involveret i forberedelsen og behandlingen af SINE-udbuddet. Det har endvidere ikke nogen betydning, at responsummets hovedkonklusioner er gengivet i Radioudvalgets udkast til rapport af 9. marts 2006, som Damm har fået aktindsigt i. I begge henseender har landsretten lagt vægt på, at det beskyttelseshensyn, der ligger bag bestemmelsen i offentlighedslovens § 10, nr. 4, ikke herved er blevet opgivet.

Landsretten finder ikke grundlag for at antage, at Kammeradvokatens responsum af 2. november 2005 indeholder oplysninger, der skal ekstraheres efter offentlighedslovens § 11, stk. 1. Landsretten har herved lagt til grund, at de faktiske omstændigheder af væsentlig betydning for sagsforholdet, som er indeholdt i responsummet, fremgår af den sag, hvori responsummet indgår, og i øvrigt er alment tilgængelige.

Det ommeldte responsum kan efter landsrettens opfattelse ikke antages at være af afgørende betydning for retssagens udfald, og der foreligger i øvrigt ikke sådanne særlige omstændigheder, at hensynet til hemmeligholdelse af responsummet må vige for sagens oplysning, jf. retsplejelovens § 298, stk. 1, og § 299, stk. 1, sammenholdt med § 169, stk. 2. Artikel 6 i Den Europæiske Menneskerettighedskonvention kan ikke føre til andet resultat. Det bemærkes herved, at Damm gennem aktindsigt hos de involverede myndigheder og gennem Økonomistyrelsens og Rigspolitiets besvarelse af en række spørgsmål under editionsbegæringens forberedelse er blevet bekendt med blandt andet hovedkonklusionerne i og baggrunden for responsummet, at de faktiske omstændigheder af væ-

Copyright © 2023 Karnov Group Denmark A/S

sentlig betydning for sagsforholdet, som indgår i responsummet, efter det oplyste er alment tilgængelige, og *at* det, som således er hemmeligholdt, navnlig er Kammeradvokatens juridiske analyse til støtte for de hovedkonklusioner, der er draget i responsummet. Manglende udlevering af responsummet indebærer derfor ikke, at Damm bliver forhindret i at varetage sine interesser under retssagen på en betryggende måde.

Efter det anførte tages Damms påstand om edition ikke til følge.

Efter udfaldet af spørgsmålet om edition skal Damm betale sagsomkostninger til Rigspolitiet som nedenfor bestemt. Beløbet angår udgifter til advokatbistand i forbindelse med skriftveksling og mundtlig forhandling af editionsbegæringen. Ved beløbets fastsættelse er der ud over spørgsmålets karakter og omfang taget hensyn til, at Rigspolitiets advokat tillige har repræsenteret Økonomistyrelsen. Spørgsmålet om sagsomkostninger til Økonomistyrelsen vil blive afgjort ved sagens afslutning.

### Thi bestemmes:

*Hans Damm Research A/S' begæring om, at det pålægges Økonomistyrelsen som part og Rigspolitiet som tredjemand at fremlægge Kammeradvokatens responsum af 2. november 2005, tages ikke til følge.*

*I sagsomkostninger vedrørende editionsbegæringen skal Hans Damm Research A/S betale 20.000 kr. til Rigspolitiet.*

*Sagsomkostningsbeløbet skal betales inden 14 dage og forrentes efter rentelovens § 8a.*