# Exhibit 40

# Statute of limitations

according to the Limitation Act of 2007

| BE | Authors |
|---|---|
|  | Bo von Eyben |

ISBN: 978-87-619-4143-5                                    Edition: 2

## Chapter VII. Suspension (§ 3(2) and § 14)

### 3. The individual case groups

The content of the suspension rule is that the *commencement date of* the limitation period *is postponed in* relation to what would otherwise be the commencement date under section 2 if the creditor lacked knowledge of the (actual, cf. see above) circumstances that justified the claim. The commencement date will then instead be the date when the creditor became or should have become aware of these circumstances. The main problem, of course, is to determine whether the creditor *should have become aware of* them at an earlier time than the time when the creditor actually became aware of them and, if so, when. The problem is thus to determine *the extent of a creditor's duty to investigate the circumstances that would have revealed the existence of the claim.* The following is a review of the case law in the areas where the issue is particularly relevant. These are claims for *breach of contractual obligations,* see section 3.1 (in particular, defects in purchases and in construction and consultancy liability), *non-contractual claims,* see section 3.2 (in particular, claims for damages for personal injury and environmental damage), *claims for restitution and claim for back payment,* see section 3.3, and claims for *payment of taxes and duties,* see section 3.4 (in those areas where the general limitation period still applies).

### 3.4. Tax and duty requirements

#### 3.4.2. Suspension practices

*3.4.2.1.* **The requirements for the authorities' diligence**

In tax law theory, it has - especially in the past - been assumed by many that strict requirements are imposed on the tax authorities' diligence,[148]   while more recent theory presents the rule more neutrally (without dealing with the limitations in the meaning of the rule.[149] The strictness seems according to all authors who have
It was claimed that the fact that the information in the tax return was incorrect is not sufficient for suspension if the tax authority should have become aware of the matter through normal investigations (or otherwise had information that could reveal the matter). However, these formulations make it difficult to see where the alleged strictness actually lies. It merely reformulates the problem, since the question is what is to be understood by "unusual investigations", i.e. how much is needed for a duty of investigation to arise. Strictness
seems to fade somewhat when it is recognized that the obligation to initiate further investigations only arises in cases where there is *special reason to* do so.[150]

> A notable exception in the assessment of the suspension rule is *Thøger Nielsen's* claim that:[151] that case law has blurred it so much that a taxpayer rarely succeeds in a claim for limitation because it is difficult to prove that the tax authorities should have known the claim. In addition, it must be said that the burden of proof that the conditions for suspension are met is generally on *the creditor,* i.e. in this case the tax authority, cf. above chap.

II, section 5. Although the burden of proof may be reversed in cases where only the debtor was in possession of the information so that the creditor must prove that it has been communicated to the creditor, there will typically be documentation - in the form of tax returns, etc. - for what has actually been disclosed, so that there is no particular problem with providing proof, what was *not* disclosed[152]

The judgments cited in support of this view are largely the same by the authors who have asserted it, and there is therefore reason to look first at whether these decisions support the view. If it is correct at all, the next question is whether there are other - particularly recent - decisions that point in the opposite direction.

Everyone seems to agree that the "strict" line has been expressed in particular in UfR 1971 856 Ø. The judgment is discussed above in section 2.2.2.2. the problem was not so much whether the tax authorities should have realized that there was - at least potentially - a taxable gift, but whether the municipal tax administration should have brought this to the attention of the gift tax authority. Thus, the main problem was not the scope of the duty to investigate as such, but rather the question of "identification" between the different tax authorities - a problem that the implementation of the "unification" in the tax area has solved. As stated, there could not be said to be any particular strictness in the assessment that, by virtue of the information in the tax return, one should have been aware that there appeared to be a gift disposition. The judgment is therefore not inconsistent with the assumption that the duty of investigation is (more) limited if the information that could give rise to questions about a taxable transaction is available from an authority other than the one to whom the transaction should have been reported. Furthermore, it appeared that even if the authority should have become aware that there was a taxable transaction, this does not necessarily mean that it should have realized (or investigated) that it had not been reported to the relevant authority under the applicable rules. Later judgments, cf. UfR 1996 1021 H and UfR 1998 1485 H, have - as stated - not distanced themselves from the principle of identification (understood as a certain duty of notification in relation to the tax authority), but merely show that the duty of investigation is more limited for the local tax authority when the (potentially) taxable nature of the transaction cannot easily be deduced from the available information. However, the decision in UfR 1981 72 H (a confirmation of UfR 1979 911 V) sheds light on the scope of the duty of investigation of the competent authority itself. The case concerned a claim for back payment of VAT as a result of a farmer having erroneously deducted an amount in the agricultural company's VAT accounts for 1972/73 that related to a real estate agency business that he also ran. The error was discovered in 1978, when customs carried out an audit of the company's accounts, after which an attachment was made for the resulting claim for payment of additional VAT. The question was **then** whether the statute of limitations had been suspended from 1973, or whether the customs authorities at an earlier[598] time should have carried out this control of the accounts. The majority of the Supreme Court found (like the High Court) that Customs had "had the opportunity" to discover the defect earlier than 5 years before the attachment, so the claim was time-barred.

On the face of it, the latter judgment seems harsh, as it imposed an obligation on customs to carry out further investigations (in the form of checks/audits of the company's accounts) *even if there were no special circumstances* that could give rise to suspicion of errors in the accounts and even if there were no rules *requiring* customs to carry out such checks at certain intervals; the dissenting Supreme Court judges wanted to rule suspension on these very grounds. However, the judgment emphasized that, according to an internal instruction, the customs authorities should "strive" that the accounts of VAT registered companies were called in and reviewed every 5 years, and that the VAT taxable person was only obliged to keep accounting material for 5 years after the end of the financial year. It must therefore be assumed to have had a significant impact on the result that the customs authorities - if they had taken these rules into account so that the accounts were checked at least once every 5 years - would have been able to avoid any limitation problem. At the same time, this was of course an invitation to the customs authorities to comply with this deadline, as they could not expect to be able to check accounts that were more than 5 years old. Customs had a special reason to follow this internal instruction. Without such a basis, the courts would hardly have imposed an obligation to carry out accounting audits at certain intervals, as this could obviously have significant resource implications.

In *Forældelseslovskommentar* p. 278 it is stated that the reason for the result was that it should not be to the detriment of the farmer that he had kept his accounting material longer than he was obliged to. This is of course the consequence of the decision, but the reason must be sought in the general view of the customs' *reason* to carry out a minimum level of control. Nor can it be accepted that the judgment means that the creditor is obliged to act if he wants further information in cases "where the debtor has fulfilled his obligations". This was precisely what the debtor had not done, as he had not submitted correct VAT accounts. Even though the farmer's good faith was not disputed, it was, after all, his error that caused the claim to arise in the first place. Another thing is that the tax authorities perceived UfR 1981 72 H as "strict" and therefore in other cases - in support of a claim for suspension - have claimed that the premises of the judgment could not be transferred, while conversely the taxpayer has referred to the "restrictive" line in (in particular) this judgment, see e.g. TfS 2004 353 Ø (SKM 2004 204 Ø - the judgment was partly amended by UfR 2006 261 H, but the Supreme Court did not have occasion to consider the question of limitation). The case concerned a claim for payment of VAT

of a company operating a travel agency business where the company had charged sales VAT without being registered for VAT and had therefore not accounted for it.

*599*

The company argued that the limitation period for this claim had not been suspended because the company was registered in other contexts (e.g. for A-tax and income tax), so that the authority was aware of the nature of the company and could therefore have considered its VAT status. The company was not successful, as the VAT liability only covered services that did not constitute specific travel agency activities and which the authority was not aware of, just as the authority could not know that a non-VAT-registered company had collected VAT without paying it. The suspension lasted until the time when a VAT inspection was carried out at the company, which revealed the circumstances, as there had been no reason to conduct further investigations. It is not clear from the case what prompted this inspection, but that was also irrelevant; the High Court merely noted that no inspection had actually been carried out previously. In other words: Without any particular reason, no duty to carry out inspections or other investigations could be established.

As an example of the "strictness", reference is also made to TfS 1988 581 V, but the decision is also questioned because TfS 1988 641 V ruled suspension in a similar situation. However, as the situation in the two decisions was not exactly the same, together they are suitable for illustrating what can activate a duty of further investigation in cases where the taxpayer has not provided correct information.

> The issue in the cases was whether a loan arrangement should be considered to be without substance for tax purposes with the consequence that interest income and expenses had to be excluded from the tax return. This was the case if the lender - a money exchange company - had the right to dispose (in the form of forward transactions) of the treasury bills that had been purchased for the loan amount, whereas the arrangement had to be considered "real" if the treasury bills only served as security for the loan. In both cases, the former situation existed, but the taxpayer had incorrectly stated in the tax return that he (still) owned the Treasury Bills. The question was thus whether the tax authority in connection with the processing of the tax return should have initiated a closer investigation of the loan arrangement, which would have revealed that the exchange company had access to dispose of them. In TfS 1988 581 V, the court found that the tax authority should have initiated such an investigation, among other things with reference to the fact that
> At the time, a circular had been issued detailing the tax treatment of the loan arrangements in question. The court found that the tax authority had had special reason to be aware of the problem, and that the limitation period would have been avoided if the instructions in the circular had been followed - i.e. the same reasoning that was (more indirectly) expressed in the above-mentioned UfR 1981 72 H. The circular was not specifically mentioned in TfS 1988 641 V, where the tax authority could not be blamed for not having launched further investigations.

*600*

*The difference* between the two cases is that in the first case, the tax authority had received all the material on the loan arrangement from the taxpayer, which *showed that the money exchange company was entitled to carry out* forward *transactions,* whereas in the second case, only a meeting had been held with the taxpayer, where the taxpayer had repeated the incorrect information that the Treasury notes had only been pledged and that they were held in a separate depository. The difference was that in the first case, the tax authority had not corrected the incorrect information in the tax return, but had in fact received *additional information that clearly indicated that the information in the tax return was incorrect,* while no such correction was available in the latter case. It is therefore clear that the *reason* for initiating a further investigation was different in the two cases. Thus, there seems to be no basis for the claim that the

the former decision is particularly strict towards the tax authority.[153] but rather basis for claiming that *the*

*The latter decision* is *quite mild* - particularly in that the tax authority was not harmed by the fact that it had not demanded documentation for the pledge, which the circular would have had every reason to require.[154] ' Nor do the other decisions that are often cited support the assumption of a particularly strict assessment.

> This applies to TfS 1989 618 V concerning the denial of a deduction for losses on a guarantee obligation to a limited liability company, where the tax authority claimed that it only became aware of the nature of the guarantee obligation (and thus that there was no deductible operating expense) at a later date - at a meeting with the taxpayer's auditor. However, the taxpayer's accounts, which were attached to the tax return for the year in question, provided such information about the guarantee obligation that the tax authority had a reasonable basis for deciding the issue - which was also confirmed by the fact that no significant new information had emerged during the subsequent case processing. Conversely, the theory is that TfS 1990 120 Ø indicates that
> suspension is ordered when there is no particular reason to initiate further investigations,[155] but the decision follows precisely
> thereby naturally to the others. The case concerned a deduction for maintenance obligations for relatives in Pakistan, where the employment was later resumed because the tax authority was informed that some of them actually lived in Denmark. It was argued that suspension had to be denied because it had been easy to establish this. However, there had been no reason whatsoever

for the tax authority to doubt the eligibility of the deduction, which is why the statute of limitations was suspended until the matter was actually known.

*601*

The line is thus clear that suspension is not excluded simply because the tax authority *could* have revealed the true situation by initiating further investigations. The decisive factor is whether the *tax authority was actually in possession of sufficient information to make* a *correct tax calculation,* or whether the tax authority had *reason to obtain additional information to clarify the matter* - a reason that will typically lie in the information already available, but which can also be based on the fact that the tax authority itself more generally has shown special attention to the matter in question. The parallel to the warning provisions of the time limit rules is thus quite clear; it is difficult to see any real difference between the time limit rule, which requires a reaction upon *knowledge* of the matter in question, and a limitation rule that includes *should-know knowledge.* If the theory were correct that the latter rule is practiced "strict" towards the tax authorities, there would be reality in the difference, but there is no evidence for this. Among the highlighted judgments, only UfR 1981 72 H can be described as relatively far-reaching, but it is important to note that the reason for the judgment was not *only* a finding that the matter *could* have been discovered by a closer investigation. It is debatable how "strong" reason the tax authorities in this case had to initiate an accounting control, but the judgment must be understood to mean that at least a certain reason was assumed to have existed.

## Footnotes

148. See e.g. *Elmelund* in SpO 1983 p. 198 and *P. E. Hjerrild-Nielsen* in SR-Skat 1990 p. 146.
149. Cf. *Høgsbro:* Skatte- og afgiftsprocessen p. 460 ff (which only mentions the time limit rules in this context in passing, cf. p. 463 note 82 and p. 471 note 91) and *Skatteretten 4* p. 133 f.
150. Cf. thus *P.E. Hjerrild-Nielsen* in SR-Skat 1990 p. 146 and Bet. 1339/1997 p. 26.
151. J 1960 p. 462 f.
152. Sml. *Obsolescence law commentary* p. 271 f.
153. Cf. *Commentary on the Limitation Act,* p. 280 (finding the claim to be "unlawfully bombastic").
154. Cf. *A. Bengtssen* in TfS 1988 639 (and in TfS 1989 343 on the further course of the case, where the tax authority responded affirmatively before the Supreme Court).
155. Cf. *P. E. Hjerrild-Nielsen* in SR-Skat 1990 p 146.

# Forældelse

efter forældelsesloven af 2007

BE  Forfattere
**Bo von Eyben**

**ISBN:** 978-87-619-4143-5                                                                     **Udgave:** 2

## Kapitel VII. Suspension (§ 3, stk. 2, og § 14)

### 3. De enkelte tilfældegrupper

Suspensionsreglens indhold er, at forældelsesfristens *begyndelsestidspunkt udskydes* i forhold til det, der ellers ville være begyndelsestidspunktet efter § 2, hvis fordringshaveren manglede kendskab til de (faktiske, jf. ovenfor) omstændigheder, der begrundede fordringen. Begyndelsestidspunktet bliver da i stedet det tidspunkt, hvor fordringshaveren fik eller burde have fået kendskab til disse omstændigheder. Hovedproblemet er selvsagt at fastlægge, om fordringshaveren *burde have fået kendskab* hertil på et tidligere tidspunkt end det tidspunkt, hvor fordringshaveren faktisk fik kendskab hertil, og i bekræftende fald hvornår. Problemet er således at fastlægge *omfanget af en fordringshavers pligt til at iværksætte undersøgelse af de omstændigheder, som ville have afsløret fordringens eksistens*. I det følgende gennemgås retspraksis herom på de områder, hvor problemstillingen især er aktuel. Det drejer sig om krav i anledning af *misligholdelse af kontraktmæssige forpligtelser*, jf. afsnit 3.1. (navnlig om mangler i køb og i entreprise samt rådgivningsansvar), *erstatningskrav uden for kontraktsforhold*, jf. afsnit 3.2. (navnlig krav om erstatning for personskade og miljøskade), *tilbagesøgnings- og efterbetalingskrav*, jf. afsnit 3.3., og krav om *betaling af skatter og afgifter*, jf. afsnit 3.4. (på de områder, hvor den almindelige forældelsesfrist fortsat er gældende).

### 3.4. Skatte- og afgiftskrav

#### 3.4.2. Praksis om suspension

*3.4.2.1. Kravene til myndighedens agtpågivenhed*

I den skatteretlige teori er det – navnlig tidligere – af flere blevet antaget, at der stilles strenge krav til skattemyndighedernes agtpågivenhed,[Note 148] mens nyere teori fremstiller reglen mere neutralt (uden i øvrigt at beskæftige sig med begrænsningerne i reglens betydning.)[Note 149] Strengheden synes ifølge alle forfattere, der har hævdet den, at bestå i, at det ikke er tilstrækkeligt til at statuere suspension, at oplysningerne i selvangivelsen var urigtige, hvis skattemyndigheden ved sædvanlige undersøgelser burde være blevet opmærksom på forholdet (eller i øvrigt havde oplysninger, som kunne afdække forholdet). Disse formuleringer gør det dog svært at se, hvori den påståede strenghed egentlig skulle ligge. Man reformulerer jo blot derved problemet, idet spørgsmålet er, hvad der skal forstås ved »sædvanlige undersøgelser«, dvs. hvor meget der skal til, for at en nærmere undersøgelsespligt opstår. Strengheden synes at fortone sig en del, når det erkendes, at pligten til at iværksætte nærmere undersøgelser kun opstår i tilfælde, hvor der er *særlig anledning* hertil.[Note 150]

> En markant undtagelse i vurderingen af suspensionsreglen er *Thøger Nielsens* påstand om,[Note 151] at retspraksis har udvisket den så meget, at en skatteyder sjældent får medhold i en påstand om forældelse, fordi det er vanskeligt at godtgøre, at skattemyndighederne burde have kendt kravet. Hertil må siges, at bevisbyrden for, at betingelserne for suspension er opfyldt, som udgangspunkt påhviler *kreditor*, dvs. her skattemyndigheden, jf. ovenfor kap.

II, afsnit 5. Selv om bevisbyrden – som det fremgik heraf – kan vendes i tilfælde, hvor kun skyldneren sad inde med de pågældende oplysninger, således at denne må bevise, at de er meddelt kreditor, vil der netop i sager om skattekrav typisk foreligge dokumentation – i form af selvangivelser m.v. – for, hvad der faktisk er oplyst, således at der for så vidt ikke opstår noget særligt problem med at godtgøre, hvad der *ikke* blev oplyst.[Note 152]

De domme, der anføres til støtte for opfattelsen, er stort set de samme hos de forfattere, der har hævdet den, og der er derfor grund til først at se på, om disse afgørelser giver støtte for opfattelsen. Hvis den overhovedet er rigtig, er spørgsmålet dernæst, om der foreligger andre – navnlig nyere – afgørelser, der peger i modsat retning.

Alle synes at være enige om, at den »strenge« linje navnlig er kommet til udtryk i UfR 1971.856 Ø. Dommen er omtalt ovenfor i afsnit 2.2.2., idet problemet ikke så meget var, om skattemyndighederne burde have indset, at der – i hvert fald potentielt – forelå en afgiftspligtig gave, men om, hvorvidt den kommunale skatteforvaltning burde have henledt gaveafgiftsmyndighedens opmærksomhed herpå. Hovedproblemet var således ikke omfanget af undersøgelsespligten som sådan, men derimod spørgsmålet om »identifikation« mellem de forskellige skattemyndigheder – et problem, som gennemførelsen af »enhedsforvaltningen« på skatte- og afgiftsområdet som nævnt har løst. Som anført kunne der ikke siges at foreligge nogen særlig strenghed ved vurderingen af, at man i kraft af oplysningerne i selvangivelsen burde have været opmærksom på, at der syntes at foreligge en gavedisposition. Dommen er derfor ikke uforenelig med en antagelse om, at undersøgelsespligten er (mere) begrænset, hvis de oplysninger, som kunne give anledning til at rejse spørgsmål om en afgiftspligtig disposition, foreligger hos en anden myndighed end den, til hvem dispositionen skulle være anmeldt. Endvidere fremgik det, at selv om myndigheden burde være blevet opmærksom på, at der forelå en afgiftspligtig disposition, er dette ikke nødvendigvis ensbetydende med, at man også burde have indset (eller undersøgt), at den ikke var blevet anmeldt til den relevante myndighed efter de herom gældende regler. Senere domme, jf. UfR 1996.1021 H og UfR 1998.1485 H, har – som det fremgik – ikke taget afstand fra princippet om identifikation (forstået som en vis meddelelsespligt i forhold til afgiftsmyndigheden), men viser blot, at undersøgelsespligten netop er mere begrænset for den lokale skattemyndighed, når dispositionens (potentielt) afgiftspligtige karakter ikke uden videre kan udledes af de foreliggende oplysninger. Derimod belyser afgørelsen i UfR 1981.72 H (en stadfæstelse af UfR 1979.911 V) omfanget af undersøgelsespligten hos selve den kompetente myndighed. Sagen drejede sig om et krav om efterbetaling af moms som følge af, at en landmand fejlagtigt i landsbrugsvirksomhedens momsregnskaber for 1972/73 havde fradraget et beløb, der vedrørte en ejendomsmæglervirksomhed, som han tillige drev. Fejlen blev opdaget i 1978, hvor toldvæsenet gennemførte en revision af virksomhedens regnskaber, hvorefter der blev foretaget udlæg for det heraf følgende krav om betaling af yderligere moms. Spørgsmålet var herefter, om forældelsen var suspenderet fra 1973, eller om toldvæsenet på et tidligere

*598*

tidspunkt burde have gennemført denne kontrol af regnskaberne. Højesterets flertal fandt (ligesom landsretten), at toldvæsenet havde »haft mulighed« for at konstatere fejlen tidligere end 5 år før udlægget, hvorfor kravet var forældet.

Umiddelbart forekommer den sidstnævnte dom streng, idet den pålagde toldvæsenet en pligt til at foretage nærmere undersøgelser (i form af kontrol/revision af virksomhedens regnskaber), *selv om der ikke forelå særlige omstændigheder*, som kunne give anledning til mistanke om fejl i regnskaberne, og selv om der ikke fandtes regler, der *pålagde* toldvæsenet at foretage en sådan kontrol med visse mellemrum; de dissentierende højesteretsdommere ville netop statuere suspension af disse grunde. Imidlertid fremhævedes det i dommen, at toldmyndighederne ifølge en intern instruks skulle »tilstræbe«, at momsregistrerede virksomheders regnskaber blev indkaldt og gennemgået hvert 5. år, og at den momspligtige kun havde pligt til at opbevare regnskabsmateriale i 5 år efter regnskabsårets udgang. Det må derfor antages at have haft væsentlig betydning for resultatet, at toldvæsenet – hvis det havde taget hensyn til disse regler, således at regnskaberne blev kontrolleret i hvert fald en gang hvert 5. år – ville have kunnet undgå ethvert forældelsesproblem. Samtidig lå der naturligvis heri en opfordring til toldmyndighederne om at overholde denne tidsfrist, idet man jo ikke kunne forvente at være i stand til at kontrollere regnskaber, der var mere end 5 år gamle. Toldvæsenet havde for så vidt særlig anledning til at følge denne interne instruks. Domstolene ville næppe uden et sådant grundlag have institueret en pligt til at foretage regnskabsmæssig kontrol med visse intervaller, da dette selvsagt kan få betydelige ressourcemæssige konsekvenser.

I *Forældelseslovskommentar* s. 278 anføres det, at begrundelsen for resultatet var, at det ikke skulle gå ud over landmanden, at han havde gemt sit regnskabsmateriale længere, end han var forpligtet til. Dette er naturligvis konsekvensen af afgørelsen, men begrundelsen må søges i det generelle synspunkt om toldvæsenets *anledning* til at foranstalte et mindstemål af kontrol. Det kan heller ikke tiltrædes, at dommen er udtryk for, at kreditor har pligt til at handle, såfremt han ønsker yderligere oplysninger, i tilfælde »hvor debitor har opfyldt sine forpligtelser«. Dette havde debitor jo netop ikke, idet han ikke havde aflagt et korrekt momsregnskab. Selv om landmandens gode tro ikke blev bestridt, var det trods alt hans fejl, der var anledning til, at kravet overhovedet opstod. Noget andet er, at skattemyndighederne opfattede UfR 1981.72 H som »streng« og derfor i andre sager – til støtte for en påstand om suspension – har gjort gældende, at dommens præmisser ikke kunne overføres, mens omvendt den skatte- eller afgiftspligtige har henvist til den »restriktive« linje i (navnlig) denne dom, jf. f.eks. TfS 2004.353 Ø (SKM 2004.204 Ø – dommen blev delvis ændret ved UfR 2006.261 H, men Højesteret fik ikke anledning til at tage stilling til spørgsmålet om forældelse). Sagen drejede sig om et krav om betaling af moms

af et selskab, der drev rejsebureauvirksomhed, hvor selskabet havde opkrævet salgsmoms uden at være momsregistreret og derfor ikke havde afregnet denne.

*599*

Selskabet gjorde gældende, at forældelsesfristen vedrørende dette krav ikke havde været suspenderet, fordi virksomheden var registreret i andre sammenhænge (bl.a. vedrørende A-skat og lønsumsafgift), således at myndigheden var bekendt med virksomhedens karakter og derfor kunne have forholdt sig til dens momsstatus. Selskabet fik ikke medhold heri, da momspligten netop kun omfattede ydelser, der ikke udgjorde specifik rejsebureauvirksomhed, og som myndigheden ikke var bekendt med, ligesom myndigheden ikke kunne vide, at en ikke-momsregistreret virksomhed havde opkrævet moms uden at afregne den. Suspensionen varede frem til det tidspunkt, hvor der gennemførtes en momskontrol hos virksomheden, der afslørede forholdene, da der ikke havde været anledning til at foretage yderligere undersøgelser. Det fremgår ikke af sagen, hvad der foranledigede dette kontrolbesøg, men det var netop også uden betydning; landsretten nøjedes med at konstatere, at der faktisk ikke var gennemført noget kontrolbesøg tidligere. Med andre ord: Uden nogen særlig anledning hertil kunne der ikke opstilles en pligt til at udføre kontrolbesøg eller andre undersøgelser.

Som eksempel på »strengheden« henvises endvidere til TfS 1988.581 V, men samtidig sættes dog også spørgsmålstegn ved afgørelsen, fordi TfS 1988.641 V i en omtrent tilsvarende situation statuerede suspension. Da imidlertid situationen i de to afgørelser netop ikke var helt ens, er de tilsammen egnede til belysning af, hvad der kan aktivere en nærmere undersøgelsespligt i tilfælde, hvor den skattepligtige ikke har givet korrekte oplysninger.

Problemstillingen i sagerne var, om et lånearrangement skulle anses for at være uden indhold i skattemæssig henseende med den konsekvens, at renteindtægter og -udgifter skulle holdes uden for selvangivelsen. Dette var tilfældet, dersom långiveren – et vekselererfirma – havde ret til at disponere (i form af terminsforretninger) over de statsgældsbeviser, der var blevet indkøbt for lånebeløbet, hvorimod arrangementet måtte betragtes som »reelt«, dersom statsgældsbeviserne alene lå til sikkerhed for lånet. I begge sager forelå den førstnævnte situation, men således, at skatteyderen i selvangivelsen urigtigt havde oplyst, at han (fortsat) ejede statsgældsbeviserne. Spørgsmålet var således, om skattemyndigheden i forbindelse med behandlingen af selvangivelsen skulle have iværksat en nærmere undersøgelse af lånearrangementet, som ville have afsløret, at vekselererfirmaet havde adgang til at disponere over dem. I TfS 1988.581 V fandt retten, at skattemyndigheden burde have iværksat en sådan undersøgelse, bl.a. under henvisning til, at der på det tidspunkt var blevet udstedt et cirkulære, der nærmere beskrev den skattemæssige behandling af de pågældende lånearrangementer. Retten fandt, at skattemyndigheden især af den grund havde haft særlig anledning til at være opmærksom på problemstillingen, og at forældelsen ville være undgået, hvis man havde fulgt anvisningerne i cirkulæret – altså samme tankegang, som (mere indirekte) kom til udtryk i den ovenfor nævnte UfR 1981.72 H. Cirkulæret nævntes derimod ikke særligt i TfS 1988.641 V, hvor det ikke fandtes at kunne bebrejdes skattemyndigheden, at den ikke havde iværksat nærmere undersøgelser.

*600*

*Forskellen* mellem de to sager er, at skattemyndigheden i den førstnævnte sag af skatteyderen havde fået tilsendt alt materiale om lånearrangementet, og at det heraf *fremgik, at vekselererfirmaet var berettiget til at foretage terminsforretninger*, hvorimod der i den sidstnævnte sag alene var blevet afholdt et møde med skatteyderen, hvor denne havde gentaget den urigtige oplysning om, at statsgældsbeviserne alene var givet i pant, og at de befandt sig i et separat depot. Forskellen var således, at skattemyndigheden i den første sag vel ikke havde fået korrigeret den urigtige oplysning i selvangivelsen, men dog faktisk fået *supplerende oplysninger, der klart indicerede, at oplysningerne i selvangivelsen var urigtige*, mens en sådan korrektion ikke forelå i den sidstnævnte sag. Det er derfor klart, at *anledningen* til at iværksætte en nærmere undersøgelse var forskellig i de to sager. Der synes således ikke at være grundlag for påstanden om, at den førstnævnte afgørelse er særligt streng over for skattemyndigheden,[Note 153] men snarere grundlag for at hævde, *at den sidstnævnte afgørelse er ganske mild* – navnlig ved, at det ikke kom skattemyndigheden til skade, at den ikke havde stillet krav om dokumentation for pantsætningen, hvad der efter cirkulæret havde været al anledning til at kræve.[Note 154] Ej heller de øvrige afgørelser, der gerne påberåbes, støtter antagelsen om en særlig strenghed i vurderingen.

Dette gælder således TfS 1989.618 V om nægtelse af et fradrag for tab ved en kautionsforpligtelse over for et aktieselskab, hvor skattemyndigheden gjorde gældende, at den først på et senere tidspunkt – ved et møde med skatteyderens revisor – fik kendskab til kautionsforpligtelsens karakter (og dermed til, at der ikke forelå en fradragsberettiget driftsudgift). Af skatteyderens regnskab, der var bilagt selvangivelsen for vedkommende år, var der imidlertid givet sådanne oplysninger om kautionsforpligtelsen, at skattemyndigheden havde haft rimeligt grundlag for at træffe afgørelse om spørgsmålet – hvilket i øvrigt bestyrkedes af, at der ikke under den efterfølgende sagsbehandling var fremkommet væsentlige nye oplysninger herom. Omvendt finder teorien, at TfS 1990.120 Ø er udtryk for, at suspension statueres, når der ikke er særlig anledning til at iværksætte nærmere undersøgelser,[Note 155] men afgørelsen føjer sig netop derved naturligt til de øvrige. Sagen drejede sig om et fradrag for underholdsforpligtelser for pårørende i Pakistan, hvor ansættelsen senere blev genoptaget, fordi skattemyndigheden fik oplysning om, at nogle af disse faktisk boede i Danmark. Det blev gjort gældende, at suspension måtte nægtes, fordi det havde været let at konstatere dette. Der havde imidlertid ikke været nogen som helst anledning

for skattemyndigheden til at betvivle berettigelsen af fradraget, hvorfor forældelsen var suspenderet, indtil man faktisk fik kendskab til forholdet.

*601*

Linjen er således klart den, at suspension ikke udelukkes, blot fordi skattemyndigheden *kunne* have afsløret det virkelige forhold ved at iværksætte nærmere undersøgelser. Afgørende er, om *skattemyndigheden faktisk var i besiddelse af tilstrækkelige oplysninger til at kunne foretage en korrekt skatte- eller afgiftsberegning*, eller om skattemyndigheden dog havde *anledning til at søge fremskaffet yderligere oplysning til belysning af forholdet* – en anledning, der typisk vil ligge i de oplysninger, man i forvejen havde, men som tillige kan støttes på, at skattevæsenet selv mere generelt har markeret en særlig opmærksomhed omkring det pågældende forhold. Parallellen til fristreglernes varslingsbestemmelser er således ganske klar; det er svært at se nogen reel forskel mellem fristreglen, der kræver reaktion ved *viden* om det pågældende forhold, og en forældelsesregel, der medtager *burde-viden*. Hvis teorien havde ret i, at den sidstnævnte regel praktiseres »strengt« over for skattemyndighederne, ville der være realitet i forskellen, men der er ikke belæg herfor. Blandt de fremhævede domme kan kun UfR 1981.72 H betegnes som forholdsvis vidtgående, men det er væsentligt at fastholde, at dommens begrundelse ikke *kun* var en konstatering af, at forholdet *kunne* være opdaget ved en nærmere undersøgelse. Man kan diskutere, hvor »stærk« anledning skattevæsenet i dette tilfælde havde haft til at iværksætte en regnskabskontrol, men dommen må forstås således, at der i hvert fald forudsattes at have været en vis anledning.

**Fodnoter**

148. Jf. bl.a. *Elmelund* i SpO 1983 s. 198 og *P. E. Hjerrild-Nielsen* i SR-Skat 1990 s. 146.
149. Jf. *Høgsbro*: Skatte- og afgiftsprocessen s. 460 ff (der kun en passant nævner fristreglerne i denne sammenhæng, jf. s. 463 note 82 og s. 471 note 91) og *Skatteretten 4* s. 133 f.
150. Jf. således *P. E. Hjerrild-Nielsen* i SR-Skat 1990 s. 146 og Bet. 1339/1997 s. 26.
151. J 1960 s. 462 f.
152. Sml. *Forældelseslovskommentar* s. 271 f.
153. Jf. *Forældelseslovskommentar* s. 280 (der finder påstanden herom »lovlig bombastisk«).
154. Jf. *A. Bengtssen* i TfS 1988.639 (og i TfS 1989.343 om det videre forløb i sagen, hvor skattemyndigheden tog bekræftende til genmæle for Højesteret).
155. Jf. således *P. E. Hjerrild-Nielsen* i SR-Skat 1990 s. 146.