# Exhibit 47

CERTIFIED TRANSLATION

**U.1994.168H**

**H.D. 16 December 1993 in case I 36/1993**

*Ocean Regntøj A/S (Attorney I. A. Strobel)*
vs.
*The Danish Ministry of Taxation (Kammeradvokaten, the Legal Adviser to the Danish Government, represented by Attorney Benedicte Galbo).*

*Taxes 311.9 Taxes 41.1*
**Right to deduct payments between group companies refused.**

♦ Right to deduct, for tax purposes, amounts received from C, which O surrendered to L refused, e.g. considering that L was formed

| Tax/income year | from | to |
|---|---|---|
| 1972/73 | 338,769 DKK | 454,963 DKK |
| 1973/74 | 290,904 – | 392,917 – |
| 1974/75 | 381,334 – | 561,757 – |
| 1975/76 | 560,918 – | 847,019 – |
| 1976/77 | 433,304 – | 656,235 – |
| 1977/78 | 450,114 – | 692,631 – |
| 1978/79 | 635,452 – | 870,326 – |
| 1979/80 | 598,287 – | 876,861 – |
| 1980/81 | 747,482 – | 979,220 – |
| 1981/82 | 1,295,537 – | 1,554,636 – |
| 1982/83 | 1,401,580 – | 1,713,962 – |
| 1983/84 | 1,298,166 – | 1,338,172 – |

The reason for the increases was that the tax authorities refused to recognise the deduction of expenditure which the plaintiff has recorded as "discount", "trade discount" or "commission fee" in the relevant years. The deducted amounts, totalling DKK 2,454,277, had been paid to a company in Switzerland, Liatex Ltd., later Lia Textile Ltd. In the view of the tax authorities, the majority shareholder of the plaintiff company, Hilmar Liebergreen, effectively controlled the Swiss company. The tax authorities therefore considered the paid services to be disguised distributions to him. The total increase in income amounted to DKK 2,506,902, as there was also an increase by a foreign exchange gain concerning the commission fee for the tax years 1981/82 – 1983/84 totalling DKK 52,625.

In this case, brought on 22 February 1988 pursuant to the Danish Consolidated Act no. 573/1984, section 29 (1), second sentence, cf. the Danish Consolidated Act no. 134/1970, section 13a (2), the plaintiff, Ocean Regntøj A/S, has claimed that the defendant, the Danish Ministry of Taxation, be ordered to recognise that the plaintiff's taxable income for the tax years below be assessed at

| for the tax year | | |
|---|---|---|
| | 1972/73 | 338,769 DKK |
| - - | 1973/74 | 290,904 – |
| - - | 1974/75 | 381,334 – |
| - - | 1975/76 | 560,918 – |
| - - | 1976/77 | 433,304 – |
| - - | 1977/78 | 450,114 – |
| - - | 1978/79 | 635,452 – |
| - - | 1979/80 | 598,287 – |
| - - | 1980/81 | 747,482 – |
| - - | 1981/82 | 1,295,537 – |
| - - | 1982/83 | 1,401,580 – |
| - - | 1983/84 | 1,298,166 – |

by A, which controlled O and through a right of option also dominated L, the only role of which was to be used by O as a factoring company for O's transactions with C, and the agreed factoring commission fee must be deemed to have no business justification.[1] Nor any basis for considering the tax authorities' claim to be barred by limitation.[2]

**Danish Western High Court**

*Judgment of the Danish Western High Court on 30 January 1992 (2nd division)*

(Eskild Jensen, Ida Heide-Jørgensen, Peter Toftager (acting)).

In a letter of 30 April 1984, the County Tax Assessment Council (*amtsligningsrådet*) for the Danish County Tax District (*amtsskattekreds*) Ringkøbing, Denmark, increased the taxable income for the plaintiff, Ocean Regntøj A/S, Herning, Denmark, for the tax years 1972/73 – 1983/84 as follows:

The defendant has denied the claim.

The plaintiff has disputed that Hilmar Liebergreen controlled Lia Textile Ltd. and has submitted that the payments constitute operating expenses and are therefore deductible under section 6 (1) (a) of the Danish Central Government Tax Act (*statsskatteloven*). In the alternative, the plaintiff has submitted that the access to claim supplementary payment of tax for the tax years 1972/73, 1973/74, 1974/75, 1975/76, 1976/77, 1977/78 and 1978/79 is barred by limitation, cf. section 1 (4) of the Danish Limitation Act (*forældelsesloven*) of 1908.

There is no dispute before the High Court about the size of the amounts. It is stated that the plaintiff has paid the tax corresponding to the income increase totalling DKK 950,670.

**The specifics of the case are as follows:**

The plaintiff is the sales company of a business that manufactures waterproof clothing. Hilmar Liebergreen, who originally resided in Birk near Herning, Denmark, but who has lived in France since 31 August 1981, is the majority shareholder of the company. The manufacturing business was run by Hilmar Liebergreen as a private business until 1 August 1980 when it was transformed into a private limited company, Ocean PVC Production ApS, in which Liebergreen is the sole shareholder.

On 6 and 7 July 1970, Hilmar Liebergreen and his auditor, State-Authorised Public Accountant Jens Højmose Kristensen, Herning, Denmark, visited Switzerland, the canton of Zug, where they had discussions with the then resident Danish High Court Attorney Børge Christensen and some Swiss financiers.

On 16 July 1970, the first general meeting was held at the office of the notarial place Z|rich in Liatex Ltd., Zug. The extract from the records of 20

**169**

---

[1] Cf. U.1960.535, U.1982.152, U.1984.784, U.1988.136, U.1988.527 and U.1989.1064 HH.

[2] Cf. U.1963.744 H (U1963B.246).

Copyright © 2021 Karnov Group Denmark A/S

July 1970 states e.g. (from the Danish translation):
```
  "---

1. Dr. Arthur Wiederkehr, ...................... 48 shares
2. Ms. Monique Bezencon, ......................   1 share
3. J|rg Schoch,
   represented by Dr. Arthur Wiederkehr according
   to power of attorney dated 3 July 1969 ......... 1 share
                                              ----------
Total                                         50 shares
                                              ----------
With a nominal value of CHF 1,000 each..."
```

The extract from the records also show that the company's share capital of CHF 50,000 had been paid in cash, *that* Dr. Arthur Wiederkehr was elected sole member of the board of directors and in this capacity was able to sign for the company, that J|rg Schoch was elected business manager and as such could "sign alone", *that* "Treuhand- und Revisionsgesellschaft Zug" was elected as auditors and that Liatex Ltd.'s domicile would be the audit firm's Zug office.

On 2 September 1970, the plaintiff and Liatex Ltd. concluded the following agreement:

"*Introduction*

For some years, Ocean has been the supplier of COSALT LTD., Fish Dock Road, Grimsby, England ("Cosalt") in England. Until now, delivery has been made against payment in Danish kroner within 30 days. Cosalt has contacted Ocean and demanded that the payment terms be changed. The desired terms are:

```
Time:                   180 days
Debit currency: #
```

Ocean does not want to accept these terms in order not to impair its own liquidity and because the company does not want to run any exchange rate risk.

```
"Meeting 16/11-1971
Client: Ocean Regntøj
H. Liebergreen -        HEP
H. Elbrønd              Re Will
                        ...
                        Pre-emption right on Liatex Ltd.,
                        Switzerland, is distributed at a rate
                        of 25% to each of the following
                        persons:
                        Karen Liebergreen
                        Søren   -"-
                        Pernille -"-
                        Kirsten  -"- "
```

On 23 November 1973, B.C. Verwaltungs- und Investment A.G. submitted a letter to "H. Liebergreen, Birk, DK - 7400 Herning", which reads as follows (from Danish translation):

"*Re: Liatex Ltd., Zug.*
With reference to the option agreement of 31. August 1970, we ask you to transfer the following commission fee:

```
for the period 16.7. - 31.12.1970
165/360    CHF   459,-
for 1971   CHF 1,000,-
for 1972   CHF 1,224,-

CFT Cannes Food Trading Ltd., Cham      CHF   2,008,-
Liatex Ltd., Zug                        CHF   2,683,-
Hochbau Beratungs A.G., Zug             CHF   6,056,-
```

Liatex is already engaged in transit trading and is able to provide Ocean with the current payment terms.

1.  Ocean invoices Liatex and ships the goods directly to Cosalt.
2.  Liatex agrees on payment terms and currency directly with Cosalt.
3.  Liatex undertakes to provide payment to Ocean in Danish kroner within 30 days of invoicing.
4.  Exchange rate and del credere risks are borne by Liatex.
5.  Immediately upon Ocean's request, Liatex provides a bank guarantee of the same amount as the average monthly turnover with Cosalt to guarantee the payment to Ocean.
6.  This Agreement is non-terminable until 31 December 1975. After that date, both parties may terminate it at any time giving six months' notice.
     ---"

On 23 March 1971, at an extraordinary general meeting of Liatex Ltd., it was decided to change its name to Lia Textile Ltd.

Accountant Henning Elbrønd Pedersen, who was employed by the auditor Højmose Kristensen in the period 1970 – 1974, prepared minutes from the meeting on 16 November 1971 with the following wording.

```
                                        ----------
                                        CHF 2,683,-
```

to be paid into our account no. 50.174.298 with Nordfinanz-Bank Z|rich."

On the same date, Treuhand- und Revisionsgesellschaft Zug wrote as follows to Dr. Wiederkehr:

"*Re: B.C. Verwaltungs- und Investment A.G., Zug.*
Dear Dr. Wiederkehr,
We enclose commission fee settlements for B.C. Verwaltungs- und Investment A.G. in respect of the following companies:

```
Computa Handels A.G., Zug              CHF 2,673,-
----------------------------------------------------------
                                       CHF 13,420,-
----------------------------------------------------------
```

As you have been informed by means of a copy, Mr. Børge Christensen will, at the end of this year, surrender B.C. Verwaltungs- und Investment A.G. to a

**170**

new owner. We would therefore be grateful if you, as representative of the companies in question, would arrange for the commission fee for the purchase option to be submitted in accordance with the enclosed settlements. Settlement is expected to be carried out before the end of the year.

---"

On 25 August 1980, the plaintiff wrote as follows to Lia Textile Ltd:

"Att. Mr. Sigrist.

With reference to the agreement concluded by us on 2 September 1970, it is our wish to make use of the agreed period of notice.

This period of notice is set at six months from both sides, but as it has been highly desirable in every respect to cooperate positively, we want to give a further six months. This means that the end will be 31 August 1981.

In the hope of your understanding of our rearrangement, which is solely due to our company's improved liquidity and financial situation, we sign

---"

On 9 January 1981, a general meeting was held in the Swiss company. The minutes show e.g. that the general meeting decided to shift the company's registered office to

Cham c/o Willy Sigrist, that Dr. Arthur Wiederkehr and J¦rg Schoch resigned as board of directors and business manager and that Willy Sigrist was elected as new and sole member of the board of directors. In March 1983, the Herning assessment office initiated a tax audit of Hilmar Liebergreen's companies, including the plaintiff. The case was then transferred to the County Tax Inspectorate (*Amtsskatteinspektoratet*), which prepared an audit report stating i.a. as follows:

"- - -

On 18 May 1983, H. Liebergreen informed the municipality of Herning that he had made contact with Liatex through newspaper advertisements and through Cosalt Ltd.'s knowledge of Liatex Ltd.

H. Liebergreen had no knowledge of Liatex Ltd.'s ownership and activities. He had been offered several times to become a co-owner of Liatex Ltd., but had refused because he believed it was illegal.

- - -

After 31 August 1983, Mr. Liebergreen acts as a salesperson abroad for Ocean Regntøj A/S. He receives commission fee of 10% of almost all export sales, including sales to Cosalt Ltd.

- - -

*5.1. Trade discount to Liatex Ltd.*

The trade discount/commission fee to Liatex Ltd totalled 20% of all invoiced sales to Cosalt Ltd. in the period 2 September 1970 – 31 August 1981.

The trade discount charged to Liatex is shown in the balance sheets for each year as at 31 July, and the amounts are as follows:

| Financial period | Account no. and account name | Amount acc. to balance | Expense acc. to Financial statements |
|---|---|---|---|
| 1970/71 | 10,140 discount Liatex | 116,194.62 | 116,194.62 |
| 1971/72 | 10,140 as above | 102,013.21 | 102,013.21 |
| 1972/73 | 10,140 commission fee Liatex | 180,423,- | 180,423,- |
| 1973/74 | 10,140 as above | 286,101.89 | 286,101.89 |
| 1974/75 | 10,140 as above | 222,981.36 | 222,981.36 |
| 1975/76 | 10,140 as above | 242,517.06 | 242,517.06 |
| 1976/77 | 10,140 as above | 234,874.59 | 234,874.59 |
| 1977/78 | 15,110 trade disc. | 278,573.75 | 278,574,- |
| 1978/79 | 15,110 as above | 231,738.48 | 231,738,- |
| 1979/80 | 15,110 as above | 241,902.20 | 241,902,- |
| 1980/81 | 15,110 trade disc. Liatex Ltd | 278,499.71 | 278,500,- |
| 1981/82 | 15,110 as above | 38,461.19 | 38,460,- |
| Total | | 2,454,281.06 | 2,454,279.73 |
| Less trade discount after øre rounding DKK | | | 2,454,277,-. |

--- *6. The agreement between Ocean Regntøj A/S and Liatex Ltd.*

Comments on the agreement:

---

3) Cosalt does not utilise the required credit period of 180 days. The average credit period for Cosalt has thus been as follows:

| | Credit period |
|---|---|
| 1977/78 | 42 days |
| 1978/79 | 60 days |
| 1979/80 | 48 days |
| 1980/81 | 35 days |

It seems odd that Cosalt should pay within two months if the company was entitled to a credit period of six months.

4) According to the agreement, Liatex Ltd. has undertaken to pay Ocean Regntøj A/S within 30 days of the invoice date. The average credit period for Liatex has thus been as follows:

| | Credit period |
|---|---|
| 1978/79 | 42 days |

Copyright © 2021 Karnov Group Denmark A/S

| 1979/80 | 39 days |
| 1980/81 | 29 days |

Only in 1980/81 has Liatex Ltd. complied with the agreement and paid within 30 days.

---

**171**

| Financial year | All export sales according to fin. statements | Sales Cosalt based on commission fee to Liatex | Sales to Cosalt as % of all export sales |
|---|---|---|---|
| 1970/71 | 1,318,719.77 | 580,973,- | 44% |
| 1971/72 | 1,003,878.09 | 510,066,- | 51% |
| 1972/73 | 1,222,291.37 | 902,115,- | 74% |
| 1973/74 | 2,034,548.01 | 1,430,509,- | 70% |
| 1974/75 | 1,501,940.08 | 1,114,906,- | 74% |
| 1975/76 | 1,515,278.84 | 1,212,585,- | 80% |
| 1976/77 | 1,761,705,- | 1,174,373,- | 67% |
| 1977/78 | 1,738,051,- | 1,392,870,- | 80% |
| 1978/79 | 1,744,328,- | 1,158,690,- | 66% |
| 1979/80 | 2,384,785,- | 1,209,510,- | 51% |
| 1980/81 | 2,855,409,- | 1,392,500,- | 49% |
| 1981/82 | 3,097,594,- | – | – |

*7. Description of business procedure, bookkeeping and payment for sales to Cosalt via Liatex.*

Based on information from Bookkeeper Kurt Smedegård to the municipality of Herning on 16 June 1983 and documentation obtained from Ocean Regntøj A/S, the transactions relating to the sale to Cosalt Ltd. can be described as follows:

*7.1. Invoicing.*

Separate invoice sets (consecutive numbers) have always been used for sales to Cosalt Ltd.

---

The invoice set consisted of eight copies:
3 copies were sent to Cosalt Ltd., of which one is the invoice from Liatex Ltd. to Cosalt Ltd.
2 copies to the freight forwarder
1 copy to Liatex Ltd.
2 copies to Ocean Regntøj A/S.
Ocean Regntøj A/S thus performs Liatex Ltd.'s invoicing to Cosalt Ltd., meaning that no invoicing is performed in Switzerland.

*7.2. Shipping*

The goods are shipped directly to Cosalt Ltd. via the freight forwarding company Samson Transport Co. - - -

*7.3. Payment from Cosalt to Liatex.*

At regular intervals – about once a month – Cosalt sends a message to Ocean that it has paid the specified invoices by mail transfer to Switzerland. As mentioned previously, payment is effected 1-2 months after invoicing.

According to the payment messages, Cosalt makes the payment in the invoiced currency. This means that until and including 11 January 1980 (invoices until 30 November 1979) payment is effected in Danish kroner and after that time, payment is effected in GBP.

This suggests that payment from Cosalt to Liatex is practically transferred from an English bank (e.g. Midland Bank, London??) to Liatex' bank in Switzerland, Nordfinanz-Bank, Z|rich. This must be documented in more detail.

*7.4. Payment from Liatex to Ocean.*

At the end of each month, invoice copies for the sales of the month were submitted to Liatex Ltd., and from 30 May 1978, invoice numbers and amounts have been separately specified for each month. Apart from April 1979, when there were no invoices to Cosalt, Bookkeeper Kurt Smedegård has submitted copies of the previous month's invoices to Cosalt every month for the period 1 May 1978 – 31 August 1981 as well as a statement of the

total invoice amount of the month. Based on these invoice copies, Liatex has calculated and transferred 80% of the month's sales to Ocean. Payment is usually effected in the month after the invoice month, but there is no actual systematic payment. According to payment documents received, payment until 1 January 1980 is effected in Danish kroner by direct transfer from Nordfinanz-Bank, Z|rich, to Den Danske Bank, Herning branch. After the transition to payment in GBP as at 30 November 1979, Liatex' payment (after 1 January 1980) is also effected in GBP by means of a telex link made by Nordfinanz-Bank between Den Danske Bank, Herning, and Midland Bank Ltd., London. Midland Bank Ltd. is here merely Nordfinanz-Bank's drawee bank in connection with the transfer of GBP.

---

*7.5. Bookkeeping with Ocean Regntøj A/S.*

1.  Upon delivery, the debtor account for Cosalt Ltd. is debited - - -
2.  In a notification from Cosalt Ltd., Ocean Regntøj A/S is informed that last month's invoices have been paid using the invoice amount (without invoice discount) to "Switzerland", after which the debtor account for Cosalt Ltd. is credited and the amount is then transferred to a debtor account for Liatex Ltd. - - - This notification is not received every month from Cosalt Ltd., but Ocean Regntøj A/S then merely transfers the amounts from one account to the other after about a month.
    According to copies received, these notifications from Cosalt Ltd. were received almost every month from 27 July 1977 to 31 August 1981.
3.  When the payment is received from Liatex Ltd., (80% of the invoice amount) the debtor account is credited. The remaining 20% is transferred to the "discount account" - - - Any exchange rate fluctuations relating to the payment (after 1 January 1980) are transferred to the exchange rate gains/losses account.
4.  At the end of each month, invoice copies for the sales of the month are submitted to Liatex Ltd., and from 30 May 1978, invoice numbers and amounts have been separately specified for each month.
    - - -"

In their enquiries, the tax authorities contacted the commercial information company "nov inform" in Luzern with a view to

**172**

find out more about Lia Textile Ltd. "nov inform's" reply to the Danish Consulate General of 13 May 1983 states e.g. as follows:

"Despite efforts, it has not been possible to obtain information about participants, connections etc. It is a pure domicile company. It does not maintain its own local office or employ its own staff.

In the circumstances described, it is difficult to assess the actual business procedure etc.

- - -"

An extract from the principal register of companies of the canton Zug states e.g. that Lia Textile Ltd.'s purpose is "Trade, in particular transit trade in all kinds of textiles and clothing, the conducting of market research and the acquisition and use of intellectual property rights in this area".

After the County Tax Assessment Council informed the plaintiff, in a letter of 22 March 1984, that it intended to increase the plaintiff's taxable income for the tax years 1972/73 – 1983/84, Auditor Højmose Kristensen objected by letter of 2 April 1984 to the County Tax Assessment Council. It states:

"- - -

The reason why Ocean Regntøj A/S in 1970 chose to transfer part of the export sales to a Swiss company was, in particular, that it expected to be able to obtain financial benefits from such transfer. Furthermore, commercial benefits were expected to be obtained through business contracts in Switzerland – mainly in connection with transit trade and procurement in low-cost areas such as Japan and Eastern European countries. In 1970, Denmark's position in the large market areas was completely unclear. At that time, there was a prospect that countries would protect their own markets through protective measures (customs duties, deposit rules etc.).

In 1970, the general gross margin for textile wholesalers was 25%. Out of this margin, the wholesaler must bear marketing, distribution and financing costs.

Throughout the period, the Swiss company had a margin (trade discount) of 20%, corresponding to 4/5 of the usual margin for local textile wholesalers.

As Ocean Regntøj A/S has not incurred significant costs on this part of the turnover, there seems to be a good correspondence between the present case and other sales via the wholesale link.

Ocean Regntøj A/S's sales commission fee on the Danish market has averaged at approximately 8%.

In this case, financing costs also included the exceptional costs incurred in connection with the implementation of the UK deposit rules.

In addition, trading was to take place in English #. However, this part of the agreement was only implemented at a time when the price of GBP was increasing. We have not analysed the effect of this in detail, but we find it to be certain that Ocean Regntøj A/S obtained significant additional income by not immediately switching to invoicing in #.

- - -"

The decision of 30 April 1984 on the increase in income, the County Tax Assessment Council stated e.g.:

"- - -


"*Option agreement*

between

"Grantor

and

- - - hereinafter referred to as Partner.

The reason for the above increases is that the County Tax Assessment Council considers that the amounts transferred to the company Liatex Ltd. (Lia Textile Ltd.) are not thereby excluded from H. Liebergreen's right of disposal and therefore, the payments from Ocean Regntøj A/S to Liatex Ltd. must in fact be seen as dividends/distributions from Ocean Regntøj A/S to H. Liebergreen. The County Tax Assessment Council's reasons for this will be elaborated below:

1) It has been documented that Lia Textile Ltd. is a domicile company without an independent office and staff in Switzerland. The company's owners are anonymous as the shares are bearer shares. The company's founder Dr. Arthur Wiederkehr and the later company representative Willy Sigrist are both well-known persons in connection with Swiss letterbox companies. Against this background, Liatex Ltd., Zug, is considered to be a letterbox company over which H. Liebergreen has controlling influence.

2) The alleged reasons for the conclusion of the agreement (extension of the credit period from 30 days to 180 days and the invoicing currency from DKK to GBP) are not in line with the facts.

3) The actual liquidity of Ocean Regntøj A/S, H. Liebergreen and the companies controlled by him seems to have been able to cope with the additional capital requirements that a possible extension of the credit period from 30 to 180 days would have entailed.

4) There are no relevant reasons for choosing a Swiss company to finance the trade credit to Cosalt Ltd.

5) The price of Liatex' payment of 20% of the invoice amounts is disproportionate, considering Liatex' actual payment as well as Ocean Regntøj A/S' liquidity situation.

These explanatory clarifications all help to establish that the company Liatex Ltd. (Lia Textile Ltd.) cannot be considered an independent third party in relation to Ocean Regntøj A/S/Hilmar Liebergreen.

Also, the transactions between Liatex Ltd. and Ocean Regntøj A/S/Hilmar Liebergreen have been found to be of such a nature that they cannot, according to the County Tax Assessment Council's assessment, be deemed to have been made between independent parties.

- - -"

**173**

In a letter of 22 June 1984, the plaintiff brought the case through their attorney, I.A. Strobel, High Court Attorney, Copenhagen, before the Danish National Tax Tribunal (*Landsskatteretten*).

The County Tax Assessment Council submitted the case to the Danish Revenue Department (*Statsskattedirektoratet*) for consideration of the issue of criminal liability for submitting false tax return, and the chief constable of Herning was then asked to open an investigation into the case. In this connection, the police in the Revenue Department came into possession of a number of documents that were placed under control during a search at High Court Attorney Børge Christensen's address. These documents included the letters mentioned above of 23 November 1973 from B.C. Verwaltungs und Investment AG and from Treuhand- und Revisionsgesellschaft Zug as well as a document dated 5 October 1973 entitled "draft". It states as follows:

```
1. The Grantor has formed a limited liability company under the
name with domicile in Zug.
Share capital amounts to          CHF   and is fully paid up.
The company bodies are:
1.1 Committee of shareholders:
1.2 Business manager:
1.3 Statutory auditor:
```

Treuhand- und Revisionsgesellschaft Zug, Baarerstrasse 57/59, 6300 Zug.

- - -

4.  The Partner has the right to take over the entire share capital of the company at any time by purchase.
    The purchase price corresponds to the issue value *plus* a quarterly current account interest rate calculated at the rate used by NordfinanzBank in Zurich for blank credits vis-à-vis persons resident abroad.
    - - -

5.  The Partner is entitled to transfer to his wife and/or children the rights he has under this Contract. Transfer to other persons requires the consent of the Grantor. Such consent must not be refused without serious reasons. If the Partner dies without such a transfer having taken place or without his last will having provided for it, his wife first assumes the rights under this Contract. If she does not use such right, or if she is deceased, the same right falls to his descendants. If neither wife nor descendants exist, the right passes to the heirs of the Partner. If the entitled parties do not exercise their right to enter into the agreement within a period of six months from the date of death, the Grantor is entitled to liquidate the company; however, the Grantor may, with the deduction of their contractual claims, transfer the proceeds to the entitled parties

6.  The Grantor may at any time require the Partner to exercise the option right within six months or that another contracting partner take the place of the first. If neither one nor the other occurs, the Grantor may, cf. the provision in section 5 hereof, liquidate the company.

7.  For the term of this Contract, the Grantor is entitled to commission fee from the partner. This commission fee is calculated according to the book value of the shares at the beginning of the relevant business year and is always due three months after the settlement date.

For 12 months, it is:
1% of the first CHF 500,000 but at least CHF 1,000
1/2% of the next CHF 500,000
1/4% of any amounts exceeding CHF 1,000,000 but no more than CHF 10.000
For the entire term, the Grantor is, however, entitled to a minimum of CHF 5,000 in commission.

- - -"

On 27 August 1985, High Court Attorney Børge Christensen was questioned by the police. According to the report, he stated, among other things:

"- - -

Hence, the letter of 23 November 1973 from Treuhand- und Revisionsgesellschaft Zug to Dr. Arthur Wiederkehr concerns commission fee payable by the questionee's company B.C. Verwaltungs- und Investment AG for the administration of those companies (e.g. Liatex Ltd.), which his company has managed for the actual founders/owners in the stated period.

- - -

The companies could be founded in i.a. two ways.

One option – the most widely used – was that the questionee's company B.C. Verwaltungs- und Investment AG took out a loan from Nordfinanz-Bank in Z|rich. Usually CHF 50,000 + a minor amount for costs.

The money was handed over to Dr. Arthur Wiederkehr who then arranged the formalities of founding the company, which was usually given a name in relation to the actual founder.

Immediately after the formation, the bearer shares – CHF 50,000 – were entrusted with the questionee's company which had them deposited with – and managed by – Treuhand- und Revisionsgesellschaft Zug, as these shares also served as security for the company in relation to the bank loan.

- - -

Apart from the fact that Liebergreen took over the founded company relatively quickly, the questionee did not recall anything special about the formation etc. of this particular company, - - -"

**174**

After reading the report with his statement and making a few corrections, the High Court attorney approved the statement with his signature.

During 1985, 1986 and 1987, a number of persons were questioned by the police, including Hilmar Liebergreen, who was arrested and questioned by the police on 15 November 1985 during a visit to Denmark. According to the report, he stated, among other things:

"- - -

As far as the suspect remembered, a meeting was held here in Herning with the participation of Børge Christensen, Højmose and the suspect.

Børge Christensen was apparently well acquainted with the situation and he knew companies in Switzerland that were interested in participating in a financing of the suspect's company.

The suspect then stated: "that Børge Christensen knew companies in Switzerland which had or would form a company for financing".

Asked if it was correctly understood that Børge Christensen knew companies in Switzerland that had a company or wanted to form a company that could enter into financing for the suspect, the suspect stated: "that Børge Christensen knew companies in Switzerland which had a company or which would otherwise finance the suspect". The matter was discussed and as the suspect's company lacked capital, they were interested in some sort of scheme to settle the matter more quickly and get the money.

Højmose and the suspect later went to Switzerland where they met Børge Christensen.

A meeting was held. The suspect believed it was with the company Treuhand- und Revisionsgesellschaft. As far as the suspect remembered, participants in this meeting were Schoch, Højmose, Børge Christensen and the suspect. The suspect did not believe that Wiederkehr was present at the meeting, but the suspect knew that he was somehow behind it and believed that he had the money.

An agreement was made that they/someone in Switzerland would help with the financing of the suspect's sales of goods.

The suspect knew very little about the practicalities of this arrangement, as he had always, as stated, been a manufacturer and knew very little about financing. The practicalities were entirely arranged by Højmose, who was the suspect's advisor and auditor.

Specifically asked about the agreement, the suspect stated that he could not remember if anything was stated in writing, but he would not deny this.

To the best of his knowledge, the purpose of the agreement was for the suspect's company to sell, ship and invoice goods to the English company Cosalt, from which the payment was then sent to the company Liatex in Switzerland.

They would then receive 20% of the invoice value, whereas the rest = 80% was sent to the suspect's company in Denmark.

As stated, the agreement was established and action was taken accordingly in the following years.

The suspect had been very pleased with the relevant trade with Cosalt and Liatex, and he had not found it unreasonably expensive to hand over 20% to Liatex for their assistance, as the company handled export interests in the suspect's company in various areas. When asked about these "services", the suspect could not explain them in detail, but he had been very well satisfied.

This was how things were run for a number of years, and the suspect's company gradually got a good grip on things, and the suspect gradually found that it was probably too much money to pay for the said services. The suspect therefore terminated the agreement giving one year's notice. Asked if there might be a connection with the termination of the agreement and the suspect's future status as an expatriate Dane or if it was a coincidence that the termination of the agreement coincided with his withdrawal from France, the suspect stated that there is a certain connection and that it is not entirely accidental.

The suspect thought about moving abroad, and when he terminated the agreement, he had planned to move to France, because he needed something to do and it would be foolish to pay 20% for the services if he could do the same work himself.

He had done so since and it had gone very well. The suspect got 10% for his work for the company.

- - -"

In a letter of 3 September 1987 to High Court Attorney Strobel, the National Tax Tribunal stated that the consideration of the appeal against the County Tax Assessment Council's decision would be put on hold until the question of possible formal charging was settled.

In an indictment of 19 January 1988, the Public Prosecutor in Viborg brought charges before the District Court in Herning against Hilmar Liebergreen for violation of section 289 of the Danish Criminal Code and the exchange control legislation. When Hilmar Liebergreen failed to appear at the trial in the criminal case, the District Court in Herning on 14 March 1989 issued a warrant for his arrest.

For the purposes of the present case, the plaintiff's attorney has provided various information.

In a letter dated 18 September 1984 from Willy Sigrist, Switzerland, to High Court Attorney Strobel, the following is stated:

"I hereby confirm that I am the sole shareholder of Lia Textile Ltd., and since the formation of my company there has been no payment or dividend payment to Hilmar Liebergreen or any refund to Ocean Regntøj A/S or otherwise to Mr. Liebergreen's sphere of influence."

**175**

Hilmar Liebergreen, who did not appear in person during the trial in the High Court, has also replied in an undated letter to the following written questions from High Court Attorney Strobel:

"1)     Was is common, in 1970, for garment manufacturing factories to sell their products through agents? - Yes

2)     Was a written contract usually created between the factory and the agent? - No

3)     Was the contact with the persons behind the formation of Lia Textile established through High Court Attorney Børge Christensen? – Yes

4)     Did you invest money in Lia Textile

a)     upon formation? – No

b)     later? – No

5)     In connection with the formation of Lia Textile, did you provide security in the form of mortgages in properties in Esbjerg, Denmark, to Børge Christensen? – No

6)     Was the name Lia Textile chosen by agreement with you? – No

7)     Did Cosalt, in 1970, demand 180 days of credit? – No

8)     Could Ocean Regntøj, in 1970, have funded 180 days of credit to Cosalt? – No

9)     Was the purpose of the arrangement with Lia Textile first and foremost to get the money faster and without exchange risk? – Yes

10)    Did you expect that Ocean Regntøj could make purchases and sales through Lia Textile if it turned out to be beneficial? – No

11)    Did you expect Lia Textile to conduct market analyses and acquire new customers for Ocean Regntøj? – Yes

12)    Have you ever owned shares in Lia Textile? – No

13)    Have you entered into an agreement on the right to take over shares in Lia Textile? – No

14)    Did you pay the CHF 2,683 concerning "Liatex" charged by B.C. Verwaltungs- und Investment AG on 23 November 1973? – No

15)    Were you ever reminded to pay? – No

16)    Have you had any influence on Lia Textile through agreements with the company, its management or its shareholders? – No

17)    Have you ever received dividend from Lia Textile? – No

18)    Have you ever received financial statements from Lia Textile? – No

19)    Do you believe that Ocean Regntøj could have achieved an arrangement similar to that of Lia Textile, but cheaper, with others? – No

20)    As long as the arrangement with Lia Textile lasted, was the credit period admitted to Cosalt a matter between Cosalt and Lia Textile? – Yes

21)    Why was the name of the commission fee to Lia Textile in Ocean Regntøj's financial statement in 1977 changed to "trade discount"?

Because the company shifted to electronic data processing. The bookkeeping department and the auditor made the arrangement.

22)    Do you as an export agent for Ocean Regntøj carry the risk of

a)     non-payment by the customer? – No

b)     exchange rate fluctuations? - No"

High Court Attorney Børge Christensen has given evidence before the City Court of Copenhagen. During the trial, the below witnesses have also given evidence.

High Court Attorney Børge Christensen has stated that in 1970 he resided in Switzerland where he had formed the company B.C. Verwaltungs- und Finanz AG, the purpose of which was, i.a. to facilitate the formation of Swiss companies for Danish persons or companies. At that time, the Danish exchange control regulations prevented Danish citizens and companies from transferring capital for the formation of companies in Switzerland and from taking out loans in Switzerland. It was favourable to Danes to take out loans because of the very low interest rate in Switzerland compared to the very high Danish interest rate at the time. The formation of the Swiss companies took place according to a template. Generally, the Danish

interested party would come to Switzerland together with an auditor or an attorney and meet the witness. The meeting took place at the home of Dr. Wiederkehr, who was chairman of the board of directors of Nordfinanz-Bank. Nordfinanz-Bank financed the share capital. Furthermore, as a rule, a meeting was held with the bank manager. After this, the rest was done in accordance with the witness's template without the witness usually having any occasion to go into detail. Treuhand- und Revisionsgesellschaft AG Zug was usually chosen as auditor of the companies. The latter company had ordinary business tasks as well as an actual audit department. The purpose of the formation of the companies concerned was to make it possible to take out loans in Switzerland for the purpose of financing export transactions. He does not know to what extent the companies concerned were used for factoring purposes, but nothing prevents them from being used for that purpose. He had no contact with the companies in general after he had facilitated contact with Dr. Wiederkehr and the bank. Presented with the option agreement document of 5 October 1973, the witness stated that it is a standard option agreement. The present version is more elaborate than the one usually used in connection with the formation of a company. He does not believe it has ever been used. According to the agreement, a person in Denmark was given the option to take over the company.

**176**

The grantor is the owner of the company, which in general would mean one of the Treuhand companies, B.C. Verwaltung, the bank or one of Dr. Wiederkehr's companies. The partner is the Danish person or the Danish company that was interested in the formation of the company. The option right was so designed that if the partner died, the right would pass to the heirs. He does not know how quickly or to what extent the option agreements were used. The last option agreements were made about 15 years ago, as the exchange control rules have later been liberalised. In fact, the option agreement was the only document created from which the identity of the Danish interested party could be seen. The share capital was divided into three bearer shares. He does not remember if B.C. Verwaltung owned the capital of Liatex Ltd.

In relation to B.C. Verwaltung's letter of 23 November 1973 to Liebergreen, the witness has stated that this is a charge for commission (*Danish: kommission*), not commission fee (*Danish: provision*). He assumes that it is payment for work performed by B.C. Verwaltung for Liatex. He does not know why the letter was sent to Liebergreen, but it is quite possible that this is because Liebergreen had the right of option in relation to the company. He considers it almost impossible that there should not have been an option agreement in the Liatex company. He would never have made a company unless there was a customary option agreement. He does not remember the option agreement specifically relating to Liatex, but does remember that Liebergreen's purpose in having a company be formed in Switzerland was to obtain cheap financing for the export of rainwear to England. He does not know if Liebergreen exercised any option agreement.

Presented with his statement to the police report of 27 August 1985, the witness stated that when questioned, he did not say that Liebergreen quickly took over the company. He believes this information comes from the policeman in question.

CEO Kurt Smedegaard, Ikast, Denmark, has stated that in August 1976 he was employed by the plaintiff as an office assistant. His work included invoicing and sending reminders to national and international customers. In 1979 or 1980, he was appointed CEO. Regarding the practical procedure of invoicing and bookkeeping of the deliveries to Cosalt, the witness has essentially stated the same as in the County Tax Assessment Council's audit report. He is not aware that Lia Textile had any activities other than invoice discounting, and he

considered 20% a high price. A sales agent usually gets 10% in commission fee. Only the sale to Cosalt was covered by the agreement with Lia Textile. He has no knowledge of who owned Lia Textile or of the details of the agreement with the company and does not know the reason why the agreement was terminated. When the payment to Lia Textile was initially charged as a discount and commission fee and later as a trade discount, it was due to the introduction of a new chart of accounts in 1977/78 in connection with the transition to electronic data processing. The witness perceived the change in the text as being purely of a practical nature. It was common for larger customers to be granted discounts but Cosalt did not get a discount on its purchases.

State-Authorised Public Accountant Jens Højmose Kristensen, Herning, has stated that in 1970, he took up the position of auditor for the plaintiff. Soon after, Liebergreen expressed a wish to set up a company in Switzerland, as he wanted to save interest by borrowing money in Switzerland for its operation. Liebergreen had a good understanding of these sorts of things, and the witness did not need to advise him. The witness contacted Handelsbanken, which put him in contact with Nordfinanz-Bank in Zürich, which recommended High Court Attorney Børge Christensen as an intermediary. Probably on 7 and 8 July 1970, Liebergreen and the witness were in Zürich, where they held a meeting with Børge Christensen. The witness imagined that the plaintiff would set up a subsidiary in Switzerland, but this was rejected by Børge Christensen. Later, they were at Nordfinanz-Bank and with Wiederkehr. The outcome of the meetings was that Børge Christensen's company, B.C. Verwaltungs- und Investment AG was to form a company and that Wiederkehr and Schoch were to be elected to the board of directors and the executive board, respectively. Initially, Børge Christensen would lay out the money for the formation of the company. Based on the discussions, the witness believes that a right of option was agreed so that Liebergreen or the plaintiff could later take over Lia Textile. However, he does not recall having seen any written option agreement but remembers that High Court Attorney Børge Christensen indicated to Liebergreen that exercising a right of option had consequences. Every year, in connection with the closing of the plaintiff's financial statements, he asked Liebergreen whether the option agreement had been exercised, but each time received a negative answer. The witness firmly believes that it was Liebergreen's opinion that he had a right of option. Lia Textile was used as a debtor financing company, as the interest rate in Switzerland was only 1/3 of the Danish interest rate. At first, he found that the payment to Lia Textile was appropriate, but after an English import deposit scheme was discontinued, he found that the price was too high, particularly considering that the plaintiff did not receive commercial services from the company. He repeatedly wondered why Cosalt as a major customer did not get a discount on its purchases. The wholesale discount during that period was about 25%.

CFO Finn Vilstrup, Tjørring, Denmark, has stated that in March 1970, he was employed as a bookkeeper with the plaintiff and three years later, he became head of the accounting department. The debtor financing scheme with Lia Textile meant that the payments from Cosalt were made earlier than had so far been the case. He is not

**177**

aware that Lia Textile had activities other than financing trade with Cosalt.

Auditor Henning Elbrønd Pedersen, Herning, Denmark, has stated that he is a business economist and that he was employed by the audit firm Højmose Kristensen from September 1970 to May 1974. He has, i.a. advised the plaintiff on insurance matters and once discussed testamentary dispositions with Liebergreen. The minutes of 16 November 1971 were drawn up by the witness in connection with a meeting between him and Liebergreen on the same day. The direct reason for the meeting was that Liebergreen was flying to Africa and therefore wanted to secure his family in the event of his death.

The witness drafted the minutes himself after the meeting with Liebergreen. The witness can say "almost with certainty" that he knew nothing of Lia Textile prior to the meeting. The witness does not recall today whether Liebergreen had a pre-emptive right to purchase the shares, and he cannot deny that the content of the minutes on the pre-emptive right to purchase the shares may have been added after the meeting.

State-Authorised Public Accountant Niels-Christian Juhl Nielsen, Ikast, Denmark, has stated that he has been employed by Højmose Kristensen since 1968. From 1970 he was the person in the audit firm who had day-to-day contact with the plaintiff about accounting and bookkeeping matters. He assumed that Lia Textile worked both as a sales company and a debtor finance company, since this was the purpose of the establishment of the company, according to Liebergreen's information. In his view, the term trade discount may well cover a factoring service. Based on conversations with Højmose Kristensen, he had the impression that Liebergreen had a right of option to the shares in Lia Textile, but he has not directly discussed this issue with Liebergreen.

In support of its primary claim, the plaintiff has stated that the paid services to Lia Textile Ltd. are deductible operating expenses. Because of the five arguments put forward by the County Tax Assessment Council in its decision in support of its findings is valid. In that regard, the plaintiff states that:

Lia Textile Ltd. is a legally existing domicile company. It is stated who owned the shares at the time of formation and who owns them now, and it is reasonable to assume that there have been no other owners in the meantime, for the company did not have any other management during this period. It is disputed that Hilmar Liebergreen has had a right of option to the shares, and the defendant has not provided any evidence of this. The charge of 23 November 1973 from B.C. Verwaltungs- und Investment AG has not been paid and it is also uncertain whether Liebergreen has even received it. Finally, the evidence given concerning the relationship between the plaintiff/Liebergreen and Lia Textile Ltd. was uncertain. Even assuming that there was some form of option agreement, the details of the agreement cannot be determined and there is therefore no basis for establishing that Liebergreen had a dominant influence in the company.

There is nothing commercially unusual in the agreement between the plaintiff and Lia Textile Ltd. When entering into this agreement, it was decisive for the plaintiff that the new requirements from Cosalt in respect of credit and the invoicing in GBP did not cause problems for the plaintiff, and there is no reason to conclude that this purpose was not attained. Hence, the credit period granted by the plaintiff to Cosalt in the financial years 1970/71 – 1976/77 has not been disclosed, since only the following four financial years are known and therefore, it cannot be ruled out that the credit period for the first years was significantly longer than that granted for the last four years. Also, invoicing in GBP was not introduced until December 1979, as the pound began to show an increasing trend at that time.

It is incorrect that, as stated by the County Tax Assessment Council, the plaintiff's liquidity could have been extended by 150 days, and it is immaterial whether Liebergreen could have provided liquidity to the plaintiff in person or through his other companies.

The reason for choosing a Swiss factoring company was the lower level of interest rates in Switzerland, and it is disputed that a cheaper arrangement could have been achieved elsewhere and that, moreover, 20% is an exceptionally high payment for a factoring arrangement such as the one in question. In that regard, the plaintiff has pointed out that the defendant, who bears the burden of proof for the correctness of this point of view, despite repeated requests for further and better particulars during exchange of pleadings, has not taken steps to substantiate the County Tax Assessment Council's

assertion to that effect. Finally, the plaintiff has disputed that, as claimed by the defendant, there was any tax savings to be achieved by the arrangement, as a Swiss domicile company pays federal cantonal tax at approximately 30%, which is only slightly below the Danish corporation tax.

Even if the defendant succeeded in alleging that Lia Textile Ltd. was in fact owned by Liebergreen, the increases in the plaintiff's income must nevertheless be disregarded as insufficiently justified, since the fact that the majority shareholder has not paid any remuneration for the dividends is a prerequisite for establishing disguised dividends. In the present case, however, the plaintiff has received compensatory payments for the remuneration, as the credit period was reduced – for the last three years by 18, 9 and 6 days respectively – and the exchange rate risk was assumed by Lia Textile Ltd. which also assumed the risk that Cosalt would pay. The tax authorities' reasoning that they intervened only when they became aware of the 20% commission fee rate must logically assume that a lower percentage would have been accepted, and such

178

acceptance must once again be conditional on the recognition by the tax authorities of the fact that an actual consideration was given by the Swiss company.

As regards, in particular, the tax years 1972/73 – 1978/79, the plaintiff has furthermore alleged, in support of their claim, that the access to claim supplementary payment must be regarded as being barred by limitation under the Act of 1908, as the County Tax Assessment Council's order was available on 30 April 1984, and the tax in respect of the above-mentioned tax years was due more than five years before that. The commencement of the limitation period cannot be deemed to have been suspended until 1983, as the tax authorities claimed to have become aware of the exact percentage of the factoring arrangement, already because the tax authorities have taken the position of totally refusing to approve the deduction of the commission fee payments. It is irrelevant to the decision on statute of limitations defence that the plaintiff has paid the tax for the tax years in respect of which the claim for supplementary payment is barred by limitation.

In support of its defence, the defendant claims that the tax assessment authorities have been entitled to refuse to recognise the deductions made. In that regard, the defendant refers to the existence of a community of interests between the plaintiff and Lia Textile Ltd., as Liebergreen is the majority shareholder of the plaintiff company and owned or controlled the Swiss company. Both the witnesses Børge Christensen's, Højmose Kristensen's and Elbrond Petersen's statements and the company's formation date and name as well as the letters of 23 November 1973 and the standard option agreement confirm the assumption that Liebergreen was in fact behind the formation of the company and controlled it through a right of option to the shares at their nominal value plus interest and costs. Also the fact that Liebergreen terminated the agreement with Lia Textile Ltd. – giving an unusually long notice – to expire on the same date as he left Denmark, points in the same direction. It is disputed that Liebergreen subsequently took over functions that were previously performed by Lia Textile Ltd. The alleged factoring agreement lacked normal operational justification. It covered only one customer which appears to be solid, and the factoring commission fee was exceptionally high despite the relatively low level of interest rates in Switzerland. Factoring in Denmark, for example, could be done at a commission fee of 2-3%. Finally, it must be assumed that the purpose of the arrangement was to transfer income to the lower level of taxation in Switzerland, and the tax authorities were therefore entitled to take corrective action as appropriate.

As regards the plaintiff's claim for limitation, the defendant has submitted that the limitation period was suspended until 1983, when the tax authorities became aware of the Swiss company and the circumstances of the business relationship between the

plaintiff and this company. There is therefore no limitation for any of the tax years.

If the plaintiff succeeds in its claim for limitation, the defendant has submitted that the plaintiff, who has paid the part of the tax amount which is barred by limitation, is now precluded from claiming repayment of that part of the amount on the basis of the general law of obligations principles.

According to the evidence given by High Court Attorney Børge Christensen, the formation of the companies in Switzerland took place on the basis of a template. This meant, i.a., that the financing of the share capital was provided by Nordfinanz-Bank, that the bank or a Swiss company became the owner of the shares in the newly formed company and that the Danish party, who had an interest in the company formation, was given a right to take over the shares in the option agreement. High Court Attorney Børge Christensen has further stated that he would never have formed a company unless there was a customary option agreement and that he considered it a near impossibility that there was no option agreement in Lia Textile Ltd., which company Liebergreen, according to the witness, had formed in order to obtain cheap financing for the export of rainwear to England. According to the statements given by the witnesses Højmose Kristensen and Juhl-Nielsen, they found, based on discussions with Liebergreen, that the latter had a right of option to the shares in Lia Textile Ltd., and their statements are supported by the witness Elbrønd Pedersen's minutes of 16 November 1971 and his statement as well as the letters of 23 November 1973 from B.C. Verwaltungs- und Investment A.G. to Liebergreen and from Treuhand- und Revisionsgesellschaft Zug to Dr. Arthur Wiederkehr, respectively.

According to the information provided, the High Court thus finds it unobjectionable to assume, as proved, that Lia Textile Ltd. was formed on the initiative of Liebergreen and that he obtained a right of option to the shares by agreement. Following High Court Attorney Børge Christensen's statement, it must be assumed that the basic principles of the standard agreement of 5 October 1973 with regard to the rights and obligations of the parties were applicable to the option agreements of the companies, the formation of which the witness facilitated, including Lia Textile Ltd., and that Liebergreen could thus take over the shares at their issue value plus interest and costs. It follows that Liebergreen – whether or not he effectively took over the shares during the tax years to which the present case relates – by virtue of his right of option effectively controlled Lia Textile Ltd., and it is held in favour of the defendant that there was a community of interests between the plaintiff company, in which Liebergreen is the majority shareholder, and Lia Textile Ltd.

**Re the question of whether or not the agreement between the plaintiff and Lia Textile Ltd. was commercially justified, the following is noted:**

**179**

Following the evidence, it must be submitted that Lia Textile Ltd did not have its own office and did not employ its own staff, and that its sole function was to act as a factoring company for the plaintiff's trade with Cosalt Ltd. It is clear from the agreement of 2 September 1970 between the plaintiff and the Swiss company that it was based on Cosalt Ltd.'s demand to extend the credit period from 30 to 180 days and that invoicing was to be effected in GBP. However, according to the information available, Cosalt did not make use of the extended credit period in the years 1977/78 and 1980/81, while there is no information available for the previous years, and invoicing in GBP did not begin until after 30 November 1979. Furthermore, the agreement with Lia Textile Ltd. was terminated by Liebergreen on behalf of the plaintiff giving one year's notice, notwithstanding that the period of notice was only six months. and notwithstanding that the reason for the termination, according to his statement to the police report, was that he considered the agreement too expensive for

the plaintiff. Liebergreen has also stated in the police report that he, who moved from Denmark to France on the same date as the agreement with Lia Textile Ltd. expired, believed that he could perform the same work as Lia Textile Ltd. but cheaper than the Swiss company and that this was the reason for the termination. However, as stated above, it must be assumed that Lia Textile Ltd. alone was responsible for the factoring arrangement, which undisputedly ended with the expiry of the factoring agreement, and it appears from Liebergreen's information to the tax authorities and the police that he has acted as a sales agent for the applicant since the move to France.

In the circumstances of the present case and in view of the evidence relied on in support of Hilmar Liebergreen's – denied – control of Lia Textile Ltd., it is found that the defendant, notwithstanding that no information has been provided as to whether a factoring percentage of 20 can be regarded as customary, has rendered probable that the agreement with Lia Textile Ltd. has not been commercially justified to the plaintiff. As the agreement with the Swiss company must be regarded as a consequence of the community of interests established, the tax authorities are deemed to have been entitled to take the corrective action they did, since the plaintiff's objections cannot lead to any other result.

**Re the question of limitation, the following is noted:**

The factoring commission fee was recorded as a discount, trade discount and commission fee and according to the information available, it is applied that the financial statements did not show that the services were factoring commission fee to a Swiss domicile company. There is therefore no reason to consider that the tax authorities, prior to the audit which began in March 1983, and which led to the decision of the County Tax Assessment Council of 30 April 1984, should have realised that there was a basis for a claim for supplementary payment and therefore, no part of the claim can be considered to be barred by limitation.

The High Court therefore finds for the defendant.

- - -

The plaintiff pays the costs of DKK 55,000 to the defendant.

**Supreme Court of Denmark**

**The Supreme Court's judgment.**

The judgment under appeal was delivered by the Western High Court.

Five judges ruled in the case: Kiil, Kardel, Hornslet, Per Sørensen and Jørgen Nørgaard.

The appellant, Ocean Regntøj A/S, has, as its primary claim, made the same claim as before the High Court.

In the alternative, the company has claimed that the defendant, the Danish Ministry of Taxation, be ordered to recognise that its taxable income for the tax years 1972/73 – 1978/79 be assessed at the amounts indicated in the primary claim, whereas for the tax years 1979/80 – 1983/84, the tax assessment authorities must reassess the company's taxable income.

In the second alternative, the company has claimed that the Ministry of Taxation be ordered to recognise that the tax assessment authorities must reassess the company's taxable income for the tax years to which the case relates.

In the third alternative, the company has claimed that the Ministry of Taxation be ordered to recognise that the company's taxable income must be set at

for the tax year 1981/82 DKK 1,537,439,
for the tax year 1982/83 DKK 1,680,080,
for the tax year 1983/84  DKK 1,336,626.

The Ministry of Taxation has claimed affirmation.

As regards the tax years 1972/73 – 1978/79, the company's alternative claim is based on the fact that the tax authorities' access to demand supplementary payment

is barred by limitation, and as regards the tax years 1979/80 – 1983/84 that the right of deduction cannot be denied to the extent that it concerns payment for services provided to the company by Lia Textile Ltd. and/or Hilmar Liebergreen.

The company's claim in the second alternative is based on the claim for remuneration raised in respect of the alternative claim concerning the tax years 1979/80 – 1983/84.

The company's claim in the third alternative concerns the exchange rate gains of DKK 52,625 referred to in the judgment which are included in the amounts by which the company's taxable income for the tax years 1981/82, 1982/83 and 1983/84 was increased. The parties agree that the increase for the three tax years amounts to DKK 17,197, DKK 33,882 and DKK 1,546, respectively. For each tax year, the said amount represents the difference between the assessment by the tax authorities and the amounts in the claim in the third alternative.

**180**

this claim, the company has stated that irrespective of the tax treatment of the amounts received from Cosalt Ltd and transferred to Lia Textile Ltd., there is no legal basis for taxing the company on amounts which it has never received and which it has therefore never transferred to Lia Textile Ltd.

To the reproduction in the judgment of the draft option agreement of 5 October 1973, it is added that the end of item 4 in the draft on the "partner's" right to purchase reads:

"The purchase price includes: The deposit paid and the net dividends received in accordance with items 8-10 below, to the extent that these amounts have not been used to cover other receivables that may appear in this Contract. The balance must be paid in cash on the transfer of the shares."

Items 8-10 of the draft read as follows:

"8.   The Grantor is entitled to receive dividends from the company referred to in item 1. The dividend may be a maximum of the price of the purchase right applicable from time to time, cf. item 4 above, section 2, and the commission fee that can be calculated in accordance with item 7 above, less ---

9.   As security for its obligations under this Contract, the partner ensures that the nominal amount of the share capital of --- is deposited with the Grantor. Such deposit is payable upon the conclusion of this Contract. The Grantor is entitled to levy execution in the amount deposited when amounts payable to him under this Contract fall due for payment.

10.   The amount deposited in accordance with item 9 and the *net dividends* distributed in accordance with item 8 will be set off for current account purposes against the purchase price mentioned in item 4 – to the extent that they have not been used to cover other receivables under this agreement. As soon as the distributed net dividends and the deposited amount, cf. items 8 and 9 above, exceed the amount that would be payable upon exercise of the option, the partner is entitled to reduce the deposited amount in accordance with the excess amount, i.e. to demand a corresponding refund. No interest will be calculated on the excess amount."

Further information has been provided for the Supreme Court, and Hilmar Liebergreen has given a statement before the Consulate General in Marseille.

Kammeradvokaten, the Legal Adviser to the Danish Government, has obtained information on the amount of the factoring commission fee from four factoring companies.

**The Supreme Court's observations.**

According to the statements given by Børge Christensen, Højmose Kristensen and Elbrønd Pedersen and according to the latter's

minutes of 16 November 1971, the Supreme Court agrees that the judgment assumes that Liatex Ltd., later Lia Textile Ltd., was formed at the request of Hilmar Liebergreen and that from the formation, he obtained a right of option to the shares. According to the statements from Børge Christensen and Højmose Kristensen and the letter of 23 November 1973 from B.C. Verwaltungs- und Investment AG to Liebergreen, the Supreme Court also agrees that it can be applied that the principles in the draft option agreement of 5 October 1973 became applicable in Lia Textile, so that Liebergreen, who effectively controlled Ocean Regntøj A/S, from the formation also controlled Lia Textile, as he could – at any time – without risk of intermediate dilution of accumulated capital through payment to the shareholders – take over the shares at their issue value plus interest and costs.

As stated by the High Court, Lia Textile had neither its own office nor its own staff, and its only role was to be used by Ocean Regntøj as a factoring company for its trade with Cosalt Ltd. According to the information available, a factoring commission fee of 20% must be considered to have been without commercial justification.

In the light of the foregoing, Ocean Regntøj's primary claim cannot be allowed and as the case has been presented to the Supreme Court, there is no basis for referring the tax assessment back to the tax assessment authorities as a result of Ocean Regntøj's claim for payment of services from Lia Textile and/or Liebergreen to Ocean Regntøj.

According to the agreement of 2 September 1970, Lia Textile was obliged to make payment to Ocean Regntøj in Danish kroner even after the latter company from 30 November 1979 started to invoice the deliveries to Cosalt in GBP. In fact, amounts in GBP were, however, transferred from Lia Textile to Ocean Regntøj from the start of the modified invoicing process. Consequently, taxation of the exchange rate gain of DKK 52,625 will not – as stated by Ocean Regntøj – amount to taxation of amounts which the company has never received and which it has therefore not given to Lia Textile.

Noting that there is no evidence that the tax authorities before 1983 should have initiated an audit, the Supreme Court agrees, for the reasons stated by the High Court, that no part of the tax claim has become barred by limitation.

Accordingly, neither Ocean Regntøj's primary or any alternative claims can be allowed, and the Supreme Court therefore upholds the judgment.

**On these grounds the Court rules that:**

*The High Court's judgment is affirmed.*

*Ocean Regntøj A/S must pay legal costs before the Supreme Court of DKK 60,000 to the Ministry of Taxation.*

*The imposed legal costs must be paid within 14 days of the passing of this Supreme Court judgment.*

# THIS IS TO CERTIFY

that the foregoing

**"Judgment"**

is a true and faithful translation of the
attached document
in the Danish language produced to me.

This translation consists of 12 (twelve) pages, including this page.

In witness whereof I have hereunto set
my hand and affixed my seal of office
this 17th day of May 2022.



Certified Translator at Aarhus, Denmark

Lea Mathiasen

**U.1994.168H**

**H.D. 16. december 1993 i sag I 36/1993**

*Ocean Regntøj A/S (adv. I. A. Strobel)*
mod
*Skatteministeriet (Km.adv. v/ adv. Benedicte Galbo).*

*Skatter 311.9 Skatter 41.1*
**Fradragsret for ydelser mellem koncernselskaber nægtet.**

♦ Skattemæssig fradragsret for beløb indgået fra C, og som O afstod til L nægtet, bl.a. under hensyn til, at L var blevet stiftet

| Skatte-/indkomstår | fra | til |
|---|---|---|
| 1972/73 | 338.769 kr. | 454.963 kr. |
| 1973/74 | 290.904 - | 392.917 - |
| 1974/75 | 381.334 - | 561.757 - |
| 1975/76 | 560.918 - | 847.019 - |
| 1976/77 | 433.304 - | 656.235 - |
| 1977/78 | 450.114 - | 692.631 - |
| 1978/79 | 635.452 - | 870.326 - |
| 1979/80 | 598.287 - | 876.861 - |
| 1980/81 | 747.482 - | 979.220 - |
| 1981/82 | 1.295.537 - | 1.554.636 - |
| 1982/83 | 1.401.580 - | 1.713.962 - |
| 1983/84 | 1.298.166 - | 1.338.172 - |

Baggrunden for forhøjelserne var, at skattemyndighederne nægtede at anerkende fradrag for udgifter, som sagsøgeren i de pågældende skatteår havde bogført som »rabat«, »varerabat« eller »provision«. De fradragne beløb, der ialt udgjorde 2.454.277 kr., var betalt til et selskab i Schweiz, Liatex Ltd., senere Lia Textile Ltd. Efter skattemyndighedernes opfattelse beherskede hovedaktionæren i det sagsøgende selskab, Hilmar Liebergreen, reelt det schweiziske selskab. Skattemyndighederne anså derfor de betalte ydelser for maskeret udlodning til ham. Den samlede forhøjelse af indkomsterne udgjorde 2.506.902 kr., idet der tillige skete forhøjelse med en valutakursgevinst vedrørende provisionen for skatteårene 1981/82 - 1983/84 på ialt 52.625 kr.

Under denne sag, der er anlagt den 22. februar 1988 i medfør af lovbekendtgørelse nr. 573/1984 § 29, stk. 1, 2. pkt., jf. lovbekendtgørelse nr. 134/1970 § 13 a, stk. 2, har sagsøgeren, Ocean Regntøj A/S, påstået sagsøgte, Skatteministeriet, dømt til at anerkende, at sagsøgerens skattepligtige indkomst for nedenstående skatteår ansættes til

| for skatteåret | | |
|---|---|---|
| - - | 1972/73 | 338.769 kr. |
| - - | 1973/74 | 290.904 - |
| - - | 1974/75 | 381.334 - |
| - - | 1975/76 | 560.918 - |
| - - | 1976/77 | 433.304 - |
| - - | 1977/78 | 450.114 - |
| - - | 1978/79 | 635.452 - |
| - - | 1979/80 | 598.287 - |
| - - | 1980/81 | 747.482 - |
| - - | 1981/82 | 1.295.537 - |
| - - | 1982/83 | 1.401.580 - |
| - - | 1983/84 | 1.298.166 - |

af A, der beherskede O og gennem optionsret dominerede også L, der kun havde den rolle at blive brugt af O som factoringselskab for O's handel med C, og den aftalte factoringprovision måtte anses for at være uden forretningsmæssig begrundelse. [1] Ej heller grundlag for at anse skattevæsenets krav for forældet. [2]

**Vestre Landsret**

**Vestre Landsrets dom 30. januar 1992 (2. afd.)**

(Eskild Jensen, Ida Heide-Jørgensen, Peter Toftager (kst.)).

Ved skrivelse af 30. april 1984 forhøjede amtsligningsrådet for Ringkøbing amtsskattekreds den skattepligtige indkomst for sagsøgeren, Ocean Regntøj A/S, Herning, for skatteårene 1972/73 - 1983/84 således:

Sagsøgte har nedlagt påstand om frifindelse.

Sagsøgeren, der har bestridt, at Hilmar Liebergreen beherskede Lia Textile Ltd., har gjort gældende, at de betalte ydelser er driftsudgifter og derfor fradragsberettigede i medfør af statsskattelovens § 6, stk. 1, litra a. Sagsøgeren har subsidiært gjort gældende, at adgangen til at kræve efterbetaling af skat for skatteårene 1972/73, 1973/74, 1974/75, 1975/76, 1976/77, 1977/78 og 1978/79 er forældet, jf. forældelsesloven af 1908 § 1, nr. 4.

Der er for landsretten ikke strid om beløbene i størrelsesmæssig henseende. Det er oplyst, at sagsøgeren har betalt skatten, der svarer til indkomstforhøjelsen, og som udgør 950.670 kr.

**Sagens nærmere omstændigheder er følgende:**

Sagsøgeren er salgsselskab for en virksomhed, der fabrikerer vandtæt beklædning. Hilmar Liebergreen, der oprindelig var bosiddende i Birk ved Herning, men som siden den 31. august 1981 har boet i Frankrig, er hovedaktionær i selskabet. Fabrikationsvirksomheden blev drevet af Hilmar Liebergreen som et personligt firma, indtil den fra 1. august 1980 overgik til et anpartsselskab, Ocean PVC Production ApS, hvori Liebergreen er eneanpartshaver.

Den 6. og 7. juli 1970 aflagde Hilmar Liebergreen og hans revisor, statsautoriseret revisor Jens Højmose Kristensen, Herning, besøg i Schweiz, hvor de i kanton Zug førte drøftelser med den dengang dérboende danske advokat, lrs. Børge Christensen og med nogle schweiziske finansfolk.

Den 16. juli 1970 afholdtes der på embedskontoret for notariatstedet Z¦rich konstituerende generalforsamling i Liatex Ltd., Zug. I protokoludskriften af 20.

**169**

---

**1** Jf. U.1960.535, U.1982.152, U.1984.784, U.1988.136, U.1988.527 og U.1989.1064 HH.
**2** Jf. U.1963.744 H (U1963B.246).

juli 1970 fra generalforsamlingen hedder det i dansk oversættelse bl.a.:

»- - -

```
1. Dr. Arthur Wiederkehr, .................... 48 aktier
2. Frk. Monique Bezencon, ....................  1 aktie
3. J|rg Schoch,
     repræsenteret ved Dr. Arthur Wiederkehr
     ifølge fuldmagt dateret 3. juli 1969 .........  1 aktie
                                                -----------
i alt                                           50 aktier
                                                -----------
```

hver til en pålydende værdi af 1.000 fr. stykket ...«

Det fremgår i øvrigt af protokoludskriften bl.a., at selskabets aktiekapital på 50.000 Sfr. var indbetalt kontant, *at* dr. Arthur Wiederkehr blev valgt til eneste medlem af bestyrelsen og i denne egenskab kunne tegne selskabet, at J|rg Schoch blev valgt til forretningsfører og som sådan kunne »underskrive alene«, *at* »Treuhand- und Revisionsgesellschaft Zug« blev valgt som revisor, og at Liatex Ltd.'s domicil skulle være på revisionsfirmaets kontor i Zug.

Den 2. september 1970 blev der mellem sagsøgeren og Liatex Ltd. indgået følgende overenskomst:

»*Indledning*
Ocean har i nogle år leveret til fa. COSALT LTD., Fish Dock Road, Grimsby, England (»Cosalt«)i England. Indtil nu er levering sket mod betaling i danske kroner inden 30 dage. Cosalt har henvendt sig til Ocean og har forlangt betalingsvilkårene ændret. De ønskede vilkår er:

```
Tid:                 180 dage
Debiteringsvaluta:   #
```

Ocean ønsker ikke at acceptere disse vilkår for ikke at forringe sin egen likviditet og fordi selskabet ikke vil løbe nogen kursrisiko.

```
»Møde 16/11-1971
Klient: Ocean Regntøj
H. Liebergreen -         HEP
H. Elbrønd               Ad Testamente
                         ...
                         Forkøbsret på Liatex Ltd., Schweiz,
                         fordeles med 25% til hver af følgende
                         personer
                         Karen Liebergreen
                         Søren    -"-
                         Pernille -"-
                         Kirsten  -"-«
```

Den 23. november 1973 fremsendte B.C. Verwaltungs- und Investment A.G. til »H. Liebergreen, Birk, DK - 7400 Herning«, en skrivelse, der lyder således i dansk oversættelse:
»*Vedrørende: Liatex Ltd., Zug.*
Med henvisning til optionsaftalen af 31.08.70 anmoder vi Dem om at overføre følgende provision:

```
for tiden 16.7. - 31.12.1970
165/360    Fr.  459,-
for 1971   Fr. 1.000,-
for 1972   Fr. 1.224,-

CFT Cannes Food Trading Ltd., Cham      Fr.  2.008,-
Liatex Ltd., Zug                        Fr.  2.683,-
Hochbau Beratungs A.G., Zug             Fr.  6.056,-
```

Liatex er allerede engageret i transithandel og er i stand til at yde Ocean de hidtidige betalingsvilkår.

Følgende aftales:
1. Ocean fakturerer til Liatex og sender varerne direkte til Cosalt.
2. Liatex træffer aftale direkte med Cosalt om betalingsbetingelser og om betalingsvaluta.
3. Liatex forpligter sig til at præstere betaling til Ocean i danske kroner inden 30 dage efter fakturering.
4. Kurs- og delkredererisiko bæres af Liatex.
5. Så snart Ocean beder om det, stiller Liatex en bankgaranti af samme størrelse som den gennemsnitlige månedlige omsætning med Cosalt til sikkerhed for betalingen til Ocean.
6. Denne aftale løber uopsigeligt til 31. december 1975. Efter denne dato kan begge parter til enhver tid sige den op med seks måneders varsel.
- - -«

Den 23. marts 1971 blev det på en ekstraordinær generalforsamling i Liatex Ltd. vedtaget at ændre selskabets navn til Lia Textile Ltd.

Revisor Henning Elbrønd Pedersen, der i 1970 - 1974 var ansat hos revisor Højmose Kristensen, udfærdigede den 16. november 1971 et mødenotat med følgende ordlyd.

```
                                         -----------
                                         Fr. 2.683,-
```

som bedes indbetalt på vor konto nr. 50.174.298 hos Nordfinanz-Bank Z|rich.«

Samme dato skrev Treuhand- und Revisionsgesellschaft Zug således til Dr. Wiederkehr:
»*Vedrørende: B.C. Verwaltungs- und Investment A.G., Zug.*
Ærede dr. Wiederkehr,
Vi vedlægger provisionsafregninger for fa. B.C. Verwaltungs-und Investment A.G. med hensyn til følgende selskaber:

```
Computa Handels A.G., Zug              Fr.  2.673,-
-------------------------------------------------------
                                       Fr. 13.420,-
-------------------------------------------------------
```

Sådan som De er blevet orienteret via en kopi vil hr. Børge Christensen ved udgangen af dette år overgive fa. B.C. Verwaltungs- und Investment A.G. til en

**170**

ny ejer. Vi vil derfor være Dem taknemmelig, såfremt De som repræsentskab i omhandlede selskaber vil sørge for fremsendelsen af køberetsprovision ifølge vedlagte afregninger; afregning påregnes udført inden årets udgang.

- - -«

Den 25. august 1980 skrev sagsøgeren således til Lia Textile Ltd: »Att. Hr. Sigrist.

Under henvisning til den af os indgåede aftale dateret 2. september 1970 er det hermed vort ønske at gøre brug af den aftalte opsigelsesfrist.

Denne opsigelsesfrist er fastsat til 6 måneder fra begge sider, men fordi det i enhver henseende gode samarbejde har været særdeles ønskværdigt, ønsker vi at give yderligere 6 måneder. Det vil sige, at ophøret så bliver 31. august 1981.

I håbet om Deres forståelse for vores omdisponering, som alene skyldes vort firmas forbedrede likviditetstilstand og finansielle situation, tegner vi

- - -«

Den 9. januar 1981 afholdtes der ekstraordinær generalforsamling i det schweiziske selskab. Af protokoludskriften fremgår bl.a., *at* generalforsamlingen besluttede at forlægge selskabets hjemsted til Cham c/o Willy Sigrist, at dr. Arthur Wiederkehr og J|rg Schoch trådte tilbage som henholdsvis bestyrelse og forretningsfører, og at Willy Sigrist blev valgt som nyt og eneste medlem af bestyrelsen.

I marts 1983 påbegyndte Herning ligningskontor en skatterevision af Hilmar Liebergreens selskaber, herunder sagsøgeren. Sagen blev herefter oversendt til Amtsskatteinspektoratet, der udarbejdede en revisionsrapport, hvori der bl.a. anføres:

»- - -

H. Liebergreen har overfor Herning kommune den 18/5 1983 oplyst, at han havde fået kontakt med Liatex igennem avisannoncer samt ved Cosalt Ltd's kendskab til Liatex Ltd.

H. Liebergreen havde ingen kendskab til Liatex Ltd.'s ejerforhold og aktiviteter. Han var flere gange blevet tilbudt at blive medejer af Liatex Ltd., men havde afslået, fordi han mente, at det var ulovligt.

- - -

Hr. Liebergreen fungerer efter 31/8 1981 som sælger i udlandet for Ocean Regntøj A/S. Han får i provision 10% af næsten alt eksportsalg, bl.a. af salget til Cosalt Ltd.

- - -

*5.1. Varerabat til Liatex Ltd.*

Varerabatten/provisionen til Liatex Ltd. har udgjort 20% af al faktureret salg til Cosalt Ltd. i perioden 2/9 1970 - 31/8 1981.

Den udgiftsførte varerabat til Liatex fremgår af de enkelte års saldobalancer pr. 31/7, og beløbene sammensætter sig således:

| Regnskabs-periode | Konto nr. og kontonavn | Beløb iflg. saldobalance | Udgift iflg. regnskab |
|---|---|---|---|
| 1970/71 | 10.140 rabat Liatex | 116.194,62 | 116.194,62 |
| 1971/72 | 10.140 do | 102.013,21 | 102.013,21 |
| 1972/73 | 10.140 provision Liatex | 180.423,- | 180.423,- |
| 1973/74 | 10.140 do | 286.101,89 | 286.101,89 |
| 1974/75 | 10.140 do | 222.981,36 | 222.981,36 |
| 1975/76 | 10.140 do | 242.517,06 | 242.517,06 |
| 1976/77 | 10.140 do | 234.874,59 | 234.874,59 |
| 1977/78 | 15.110 varerabat | 278.573,75 | 278.574,- |
| 1978/79 | 15.110 do | 231.738,48 | 231.738,- |
| 1979/80 | 15.110 do | 241.902,20 | 241.902,- |
| 1980/81 | 15.110 varerabat Liatex Ltd | 278.499,71 | 278.500,- |
| 1981/82 | 15.110 do | 38.461,19 | 38.460,- |

```
-------------------------------------------------------
I alt                        2.454.281,06   2.454.279,73
Fratrukket varerabat efter øreafrunding      2.454.277,-  kr.
-------------------------------------------------------
```

- - - *6. Aftalen mellem Ocean Regntøj A/S og Liatex Ltd.*

- - -

Bemærkninger til aftalen:

- - -

3) Cosalt udnytter ikke den forlangte kredittid på 180 dage. Den gennemsnitlige kredittid for Cosalt har været således:

|  | *Kredittid* |
|---|---|
| 1977/78 | 42 dage |
| 1978/79 | 60 dage |

| 1979/80 | 48 dage |
|---|---|
| 1980/81 | 35 dage |

Det forekommer besynderligt, at Cosalt betaler inden 2 mdr., hvis selskabet havde ret til en kredittid på et ½ år.

*4)* Ifølge aftalen har Liatex Ltd. forpligtet sig til at betale Ocean Regntøj A/S inden 30 dage efter fakturadato. Den gennemsnitlige kredittid for Liatex har været således:

| *Kredittid* | |
|---|---|
| 1978/79 | 42 dage |

```
1979/80   39 dage
1980/81   29 dage
```

**171**

| Regnskabsår | Al exportsalg ifølge regnskab | Salg Cosalt udregnet udfra provisionen til Liatex | Salg til Cosalt i % af al eksportsalg |
|---|---|---|---|
| 1970/71 | 1.318.719,77 | 580.973,- | 44% |
| 1971/72 | 1.003.878,09 | 510.066,- | 51% |
| 1972/73 | 1.222.291,37 | 902.115,- | 74% |
| 1973/74 | 2.034.548,01 | 1.430.509,- | 70% |
| 1974/75 | 1.501.940,08 | 1.114.906,- | 74% |
| 1975/76 | 1.515.278,84 | 1.212.585,- | 80% |
| 1976/77 | 1.761.705,- | 1.174.373,- | 67% |
| 1977/78 | 1.738.051,- | 1.392.870,- | 80% |
| 1978/79 | 1.744.328,- | 1.158.690,- | 66% |
| 1979/80 | 2.384.785,- | 1.209.510,- | 51% |
| 1980/81 | 2.855.409,- | 1.392.500,- | 49% |
| 1981/82 | 3.097.594,- | - | - |

*7. Beskrivelse af forretningsgang, bogføring og betaling vedrørende salg til Cosalt via Liatex.*

Ud fra oplysninger afgivet af bogholder Kurt Smedegård overfor Herning kommune den 16/6 1983 samt indhentede dokumentationer fra Ocean Regntøj A/S kan transaktionerne omkring salg til Cosalt Ltd. beskrives således:

*7.1. Fakturering.*

Der har hele tiden været benyttet særskilte fakturasæt (fortløbende numre) for salg til Cosalt Ltd.

- - -

Fakturasættet bestod af 8 eksemplarer:

3 stk. blev sendt til Cosalt Ltd., hvoraf 1 stk. er fakturaen fra Liatex Ltd. til Cosalt Ltd.

2 stk. til speditøren

1 stk. til Liatex Ltd.

2 stk. til Ocean Regntøj A/S.

Ocean Regntøj A/S foretager herved Liatex Ltd.'s fakturering til Cosalt Ltd., således at der end ikke foretages fakturering i Schweiz.

*7.2. Forsendelse.*

Varerne sendes direkte til Cosalt Ltd. via speditørfirmaet Samson Transport Co. - - -

*7.3. Betaling fra Cosalt til Liatex.*

Med jævne mellemrum - ca. 1 gang om måneden - afsender Cosalt en meddelelse til Ocean om, at man ved postoverførsel til Schweiz har betalt de angivne fakturaer. Betalingen sker som tidligere nævnt fra 1-2 mdr. efter faktureringen.

Cosalt foretager ifølge betalingsmeddelelserne betalingen i den fakturerede valuta. D.v.s. betalingen til og med 11/1 1980 (fakturaer indtil 30/11 1979) sker i danske kr. og efter dette tidspunkt sker betalingen i engelske pund.

Det tyder på, at betalingen fra Cosalt til Liatex rent praktisk overføres fra en engelsk bank (f.eks. Midland Bank, London??) til Liatex's bankforbindelse i Schweiz, Nordfinanz-Bank, Zürich. Dette forhold må nærmere dokumenteres.

*7.4. Betaling fra Liatex til Ocean.*

Ved hver måneds udgang blev fakturakopier for månedens salg sendt til Liatex Ltd. og fra 30/5 1978 er der lavet særskilt specifikation af fakturanumre og beløb for hver måned. Bortset fra april 1979, hvor der ingen faktureringer har været til Cosalt, har bogholder Kurt Smedegård overfor bogholder for eneste måned for perioden 1/5 1978 - 31/8 1981 tilsendt Liatex Ltd. kopier af den forgangne måneds fakturaer til Cosalt tillige med en opgørelse over månedens

samlede fakturabeløb. På baggrund af disse fakturakopier har Liatex beregnet og overført 80% af månedens salg til Ocean. Betalingen sker oftest i måneden efter faktureringsmåneden, men nogen egentlig systematisk betaling kan ikke ses. Ifølge modtagne betalingsbilag sker betalingen indtil 1/1 1980 i danske kr. ved direkte overførsel fra Nordfinanz-Bank, Zürich, til Den Danske Bank, Herning-afdeling. Efter overgangen til fakturering i pund pr. 30/11 1979 sker Liatex's betaling (efter 1/1 1980)også i pund, ved at Nordfinanz-Bank telexforbinder Den Danske Bank, Herning, med Midland Bank Ltd., London. Midland Bank Ltd. er her formentlig blot Nordfinanz-Bank's trassatbank i forbindelse med overførsel af pund.

- - -

*7.5. Bogføring ved Ocean Regntøj A/S.*

1.  Ved levering debiteres debitorkonto for Cosalt Ltd. - - -

2.  Ved meddelelse fra Cosalt Ltd. meddeles Ocean Regntøj A/S, at forrige måneds fakturaer er betalt med fakturabeløbet (uden fakturarabat) til »Switzerland«, hvorefter debitorkonto for Cosalt Ltd. bliver krediteret og beløbet bliver herefter overført til debitorkonto for Liatex Ltd. - - - Ikke hver måned modtager man denne meddelelse fra Cosalt Ltd., men så overfører Ocean Regntøj A/S blot beløbene fra den ene konto til den anden efter ca. en måned.

   Ifølge modtagne kopier er disse meddelelser fra Cosalt Ltd. konstateret modtaget næsten hver måned fra 27/7 1977 til 31/8 1981.

3.  Når betalingen indgår fra Liatex Ltd. (80% af fakturabeløbet) bliver debitorkontoen - - - krediteret. De resterende 20% overføres til »rabatkontoen« - - - Eventuelle kursudsving vedrørende betalingen (efter 1/1 1980) overføres til kontoen for valutagevinst/-tab.

4.  Ved hver måneds udgang bliver fakturakopierne for månedens salg sendt til Liatex Ltd. og fra 30/5 1978 er der lavet særskilt specifikation af fakturanumre og beløb for hver måned.

    - - -«

Skattemyndighederne rettede i forbindelse med deres undersøgelser henvendelse til handelsoplysningsfirmaet »nov inform« i Luzern med henblik på

**172**

at få nærmere oplysninger om Lia Textile Ltd. I »nov inform's« svarskrivelse til det danske generalkonsulat af 13. maj 1983 hedder det bl.a.:

»Trods anstrengelser har det ikke været muligt at få oplysninger om deltagere, forbindelser o.s.v. Det er et rent domicil-selskab. Der bliver ikke hersteds opretholdt eget kontor og heller ikke beskæftiget eget personale.

Under de beskrevne omstændigheder, er det svært at vurdere den virkelige forretningsgang o.s.v.

- - -«

Af en udskrift af Aktieselskabshovedregisteret ved Handelsregisteret Kanton Zug fremgår bl.a., at Lia Textile Ltd.'s formål er »Handel, specielt transithandel med tekstiler og beklædning af enhver art, udførelse af markedsundersøgelser, erhvervelse og udnyttelse af immaterielle formueretsforhold på dette felt«.

Efter at amtsligningsrådet i en skrivelse af 22. marts 1984 havde meddelt sagsøgeren, at rådet agtede at forhøje sagsøgerens skattepligtige indkomst for skatteårene 1972/73 - 1983/84, protesterede revisor Højmose Kristensen i en skrivelse af 2. april 1984 til amtsligningsrådet. Det anføres heri:

»- - -

Når Ocean Regntøj A/S i 1970 valgte at overføre en del af eksportsalget til et schweizisk selskab var det især, fordi man ventede at kunne opnå finansielle fordele herved. Videre ventede man at kunne opnå kommercielle fordele via forretningskontrakter i Schweiz - først og fremmest i forbindelse med transithandel og indkøb i lavprisområder som Japan og østeuropæiske lande. I 1970 var Danmarks placering i de store markedsområder jo helt uafklaret.

Der var på dette tidspunkt udsigt til, at landene via beskyttelsesforanstaltninger (told, deponeringsregler m.v.) ville beskytte egne markeder.

I 1970 var den for tekstilgrossister almindelige bruttoavance 25%. Af avancen skal grossisten afholde markedsførings-, distributions- og finansieringsomkostninger.

Det schweiziske selskab har over hele perioden haft en avance (varerabat)på 20% svarende til 4/5 af den for herværende tekstilgrossister sædvanlige avance.

Da Ocean Regntøj A/S ikke har afholdt væsentlige omkostninger på denne del af omsætningen, forekommer der at være god overensstemmelse mellem nærværende sag og andet salg via grossistleddet.

Hos Ocean Regntøj A/S har salgsprovisionen på det danske marked gennemsnitlig andraget ca. 8%.

Finansieringsomkostningerne omfattede i dette tilfælde også de ekstraordinære udgifter opstået i forbindelse med indførelsen af de engelske deponeringsregler.

I øvrigt skulle samhandelen ske i engelske #. Denne del af aftalen blev dog først gennemført på et tidspunkt, hvor kursen på engelske # viste stigende tendens. Vi har ikke nærmere analyseret effekten heraf, men betragter det som sikkert, at Ocean Regntøj A/S ved ikke straks at gå over til fakturering i #, opnåede væsentlige merindtægter.

- - -«

I afgørelsen af 30. april 1984 om forhøjelsen af indkomsten anførte amtsligningsrådet bl.a.:

»- - -

»*Optionsaftale*

mellem

»Optionsgiver

og

- - - som herefter betegnes Partner.

Begrundelsen for foranstående forhøjelser er, at Amtsligningsrådet finder, at de overførte beløb til selskabet Liatex Ltd. (Lia Textile Ltd.) ikke herved er unddraget H. Liebergreens dispositionsret, hvorfor ydelserne fra Ocean Regntøj A/S til Liatex Ltd. reelt må anses for udbytte/udlodning fra Ocean Regntøj A/S til H. Liebergreen. Amtsligningsrådets begrundelse herfor skal nærmere uddybes i nedennævnte punkter:

1) Det er dokumenteret, at Lia Textile Ltd. er et domicilselskab uden selvstændigt kontor og personale i Schweiz. Selskabets ejere er anonyme, da der er tale om ihændehaveraktier. Selskabets stifter Dr. Arthur Wiederkehr og den senere selskabsrepræsentant Willy Sigrist er begge kendte personer i forbindelse med schweiziske postkasseselskaber. På denne baggrund anses Liatex Ltd., Zug for at være et postkasseselskab, over hvilket H. Liebergreen har bestemmende indflydelse.

2) De påståede begrundelser for aftalens indgåelse (forlængelse af kredittiden fra 30 dage til 180 dage og at faktureringsvalutaen fra danske kroner til engelske pund) er ikke i overensstemmelse med de faktiske forhold.

3) Den faktiske likviditet hos Ocean Regntøj A/S, H. Liebergreen samt de af ham dominerede selskaber synes nok at kunne have klaret det yderligere kapitalbehov en eventuel forlængelse af kredittiden fra 30 - 180 dage ville have medført.

4) Der findes ingen relevante begrundelser for at vælge et schweizisk selskab til finansieringen af varekreditten til Cosalt Ltd.

5) Prisen for Liatex's ydelse på 20% af fakturabeløbene er uforholdsmæssig stor, når der henses til Liatex's faktiske ydelse samt Ocean Regntøj A/S's likviditetssituation.

Disse uddybende punkter i begrundelsen er alle med til at fastslå, at selskabet Liatex Ltd. (Lia Textile Ltd.) ikke kan anses for uafhængig tredjemand i forhold til Ocean Regntøj A/S / Hilmar Liebergreen.

Det tilføjes, at de stedfundne transaktioner mellem Liatex Ltd. og Ocean Regntøj A/S / Hilmar Liebergreen, efter hvad der herfra har kunnet konstateres, er af en sådan art, at de efter amtsligningsrådets bedømmelse ikke kan tænkes foretaget mellem uafhængige parter.

- - -«

**173**

Sagsøgeren indbragte gennem sin advokat, lrs. I.A. Strobel, København, ved skrivelse af 22. juni 1984 afgørelsen for Landsskatteretten.

Sagen blev af amtsligningsrådet oversendt til Statsskattedirektoratet med henblik på overvejelse af spørgsmålet om strafferetligt ansvar for indgivelse af urigtig selvangivelse, og politimesteren i Herning blev herefter anmodet om at indlede efterforskning i sagen. I forbindelse hermed kom politiet i Statsskattedirektoratet i besiddelse af en række dokumenter, som under en ransagning hos lrs. Børge Christensen var blevet taget i bevaring. Det drejede sig bl.a. om de fornævnte skrivelser af 23. november 1973 fra B.C. Verwaltungs und Investment AG og fra Treuhand- und Revisionsgesellschaft Zug samt et dokument, der er dateret 5. oktober 1973, og som betegner sig »udkast«. Det lyder således:

1. Optionsgiveren har haft stiftet et aktieselskab under navnet
med domicil i Zug.
Aktiekapitalen udgør          Fr.   og er fuldt indbetalt.
Selskabets organer er:
1.1 Repræsentantskab:
1.2 Forretningsfører:
1.3 Lovkrævet revisor:

Treuhand- und Revisionsgesellschaft Zug, Baarerstrasse 57/59, 6300 Zug.

- - -

4.   Partneren har ret til til enhver tid ved køb at overtage hele selskabets aktiekapital.
     Købsprisen svarer til aktiernes udstedelsesværdi *plus* en kvartalsvis kontokurantmæssig pålagt forrentning, beregnet efter den sats som NordfinanzBank i Zurich benytter for blankokreditter over for personer, som har hjemsted i udlandet.

- - -

5.   Partneren er berettiget til at overdrage til sin hustru/og/eller sine børn de rettigheder han har, ifølge denne kontrakt. Overdragelse til andre personer nødvendiggør optionsgiverens tilslutning. Denne tilslutning må ikke nægtes uden vægtige årsager. Såfremt partneren dør, uden en sådan overdragelse har fundet sted, eller uden han i sin sidste vilje har truffet bestemmelse herom, skal først hans hustru indtræde i rettighederne ifølge denne kontrakt. Gør hun ikke brug heraf, eller er hun afgået ved døden, tilkommer den samme ret hans efterkommere. Såfremt hverken hustru eller efterkommere eksisterer, overgår retten til partnerens arvinger. Hvis de dertil berettigede ikke gør brug af deres ret til at indtræde i aftalen indenfor en periode af 6 mdr. fra dødsdagen, er optionsgiveren berettiget til at likvidere selskabet; optionsgiveren må dog, med fradrag af sine kontraktmæssige fordringer, overdrage provenuet til de købeberettigede.

6.   Optionsgiveren kan til enhver tid forlange af partneren, at optionsretten bliver udnyttet indenfor 6 mdr., eller at en anden aftalepartner indtræder i den førstes sted. Sker hverken det ene eller det andet kan optionsgiveren, jfr. bestemmelsen i pkt. 5 herom, likvidere selskabet.

7.   Sålænge denne kontrakt løber har optionsgiveren krav på provision fra partneren. Denne provision beregnes efter aktiernes indre værdi ved begyndelsen af pågældende forretningsår og forfalder altid 3 mdr. efter opgørelsesdatoen.

Den udgør for 12 mdr.:

1% af de første 500.000,- Fr., dog mindst 1.000,- Fr.

1/2% af de næste 500.000,- Fr.

1/4% af eventuelle beløb, som overstiger 1.000.000,- Fr., dog max 10.000,- Fr.

For hele kontraktperioden har Optionsgiveren dog krav på minimum 5.000,- Fr. i kommission.

- - -«

Den 27. august 1985 blev lrs. Børge Christensen afhørt af politiet. Han forklarede ifølge rapporten bla.:

»- - -

Skrivelsen af 23. nov. 1973 fra Treuhand- und Revisionsgesellschaft Zug til Dr. Arthur Wiederkehr vedrører således provision, som afh.s selskab, B.C. Verwaltungs- und Investment AG, afkræves for administration af de nævnte selskaber (bl.a. Liatex Ltd.), som hans selskab i den anførte periode har administreret for de reelle stiftere/ejere.

- - -

Stiftelsen af selskaberne kunne finde sted på bl.a. 2 måder.

Den ene mulighed - den mest anvendte - var, at afh.s selskab B.C. Verwaltungs- und Investment AG optog et lån i Nordfinanz-Bank i Z|rich. Som regel på 50.000 S.fr. + lidt til omkostninger.

Pengene blev overladt til dr. Arthur Wiederkehr, som så ordnede det formelle med stiftelse af selskabet, der som regel navnemæssigt fik en eller anden relation til den reelle stifter.

Umiddelbart efter stiftelsen blev ihændehaveraktierne - 50.000 S.fr. - så overladt til afh.s selskab, der fik dem deponeret hos - og administreret af - Treuhand- und Revisionsgesellschaft Zug, idet disse aktier også skulle tjene som sikkerhed for afh.s selskab m.h.t. lånet i banken.

- - -

Bortset fra, at det stiftede selskab forholdsvis hurtigt blev overtaget af Liebergreen, erindrede afh. ikke noget specielt i forbindelse med stiftelsen m.v. af neop dette selskab, - - -«

**174**

Efter at have gennemlæst sin rapportforklaring og foretaget nogle rettelser godkendte landsretssagføreren med sin underskrift forklaringen.

I løbet af 1985, 1986 og 1987 blev en række personer afhørt af politiet, herunder Hilmar Liebergreen, der under et besøg i Danmark blev anholdt og afhørt af politiet den 15. november 1985. Han forklarede ifølge rapporten bl.a.:

»- - -

Såvidt sigtede huskede, blev der afholdt et møde her i Herning, hvor Børge Christensen, Højmose og sigtede deltog.

Børge Christensen var tilsyneladende godt ind i forholdene, og han kendte firmaer i Schweiz, som var interesserede i at deltage i en finansiering for sigtedes virksomhed.

Sigtede udtalte herefter: »At Børge Christensen kendte firmaer i Schweiz, som havde eller ville stifte selskab til finansiering«.

Forespurgt om det var korrekt forstået, at Børge Christensen kendte firmaer i Schweiz, som havde et selskab eller ville stifte et selskab, der kunne gå ind i en finansiering for sigtede, oplyste sigtede: »At Børge Christensen kendte firmaer i Schweiz, som havde selskab eller som på anden måde ville finansiere for sigtede«.

Der blev talt om sagen, og da sigtedes virksomhed manglede kapital, var de interesseret i en eller anden ordning, så de kunne få afregnet hurtigere og få pengene hjem.

Højmose og sigtede rejste senere til Schweiz, hvor de mødte Børge Christensen.

Der blev afholdt et møde. Sigtede mente, at det var hos fa. Treuhand- und Revisionsgesellschaft. Såvidt sigtede kunne huske, deltog i dette møde Schoch, Højmose, Børge Christensen og sigtede. Sigtede mente ikke, at Wiederkehr var med til mødet, men det var sigtede bekendt, at denne på en eller anden måde stod bagved, idet han vist nok havde pengene.

Der blev lavet en aftale, som gik ud på, at de/nogen i Schweiz skulle være behjælpelig med finansiering af sigtedes varesalg.

Hvordan det rent praktisk skulle ordnes, vidste sigtede ikke ret meget om, idet han som anført hele tiden har været produktionsmand, hvorfor han ikke havde ret meget forstand på finansiering. Det praktiske blev helt igennem forestået af Højmose, der var sigtedes rådgiver og revisor.

Nærmere udspurgt om aftalen oplyste sigtede, at han ikke kunne huske, om der blev lavet noget skriftligt, men det ville han ikke afvise.

Aftalen gik vist nok ud på, at sigtedes virksomhed skulle sælge, forsende og fakturere varer til det engelske firma Cosalt, hvorfra betalingen så blev sendt til firmaet Liatex i Schweiz.

Her skulle man så have 20% af fakturaværdien, medens resten = 80% blev sendt til sigtedes virksomhed i Danmark.

Som anført blev aftalen etableret, og der blev handlet derefter i årene derefter.

Sigtede havde været vældig tilfreds med den omh. samhandel med Cosalt og Liatex, og han havde ikke fundet det urimelig dyrt med aflevering af 20% til Liatex for deres bistand, idet firmaet varetog eksportinteresser for sigtedes virksomhed på forskellige områder.

Forespurgt om disse »tjenesteydelser« kunne sigtede ikke nærmere redegøre for disse, men han havde været meget godt tilfreds.

Således kørte man så gennem en årrække, og efterhånden fik sigtedes virksomhed godt fat og greb om tingene, og efterhånden syntes sigtede, at det nok var for mange penge at betale for de nævnte ydelser. Sigtede opsagde derfor aftalen med 1 års varsel.

Forespurgt om der evt. kunne tænkes at være en sammenhæng med aftalens ophævelse og sigtedes fremtidige status som udlandsdansker, eller om det var en tilfældighed, at aftalens ophør på dato falder sammen med hans framelding til Frankrig, oplyste sigtede, at der er en vis sammenhæng, og at det ikke er helt tilfældigt.

Sigtede havde tanker om at flytte til udlandet, og da han opsagde aftalen, havde han planlagt at flytte til Frankrig, for han skulle jo have noget at lave der, og det var jo tåbeligt at betale 20% for ydelserne, hvis han selv kunne udføre det samme arbejde.

Det havde han så gjort siden, og det var da gået meget godt.

Sigtede fik 10% for sit arbejde for firmaet.

- - -«

Ved skrivelse af 3. september 1987 til lrs. Strobel meddelte landsskatteretten, at behandlingen af klagen over amtsligningsrådets afgørelse ville blive stillet i bero, indtil spørgsmålet om eventuel tiltalerejsning var afgjort.

Ved anklageskrift af 19. januar 1988 rejste statsadvokaten i Viborg tiltale ved retten i Herning mod Hilmar Liebergreen for overtrædelse af straffelovens § 289 og valutalovgivningen. Da Hilmar Liebergreen udeblev fra domsforhandlingen i straffesagen, traf retten i Herning den 14. marts 1989 anholdelsesbeslutning over ham.

Til brug for nærværende sag har sagsøgerens advokat tilvejebragt forskellige oplysninger.

I en skrivelse af 18. september 1984 fra Willy Sigrist, Schweiz, til lrs. Strobel hedder det således:

»Jeg bekræfter hermed, at jeg er eneste aktionær i Lia Textile Ltd., og siden mit selskabs stiftelse er der ikke sket nogen betaling eller dividendebetaling til Hilmar Liebergreen eller nogen tilbagebetaling til Ocean Regntøj A/S eller på anden måde overgivet til hr. Liebergreens indflydelsessfære.«

**175**

Hilmar Liebergreen, der ikke har givet møde personligt under domsforhandlingen i landsretten, har endvidere i en udateret skrivelse besvaret nedenstående skriftligt stillede spørgsmål fra lrs. Strobel således:

»1)  Var det i 1970 almindeligt, at fabriker i beklædningsbranchen solgte deres produkter gennem agenter? - ja

2)  Blev der normalt oprettet skriftlig kontrakt mellem fabriken og agenten? - nej

3)  Blev kontakten med de personer, der stod bag oprettelsen af Lia Textile, etableret gennem landsretssagfører Børge Christensen? - ja

4)  Skød De penge i Lia Textile
    a)  ved oprettelsen? - nej
    b)  senere? - nej

5)  Stillede De i forbindelse med oprettelsen af Lia Textile sikkerhed i form af pantebreve i ejendomme i Esbjerg over for Børge Christensen? - nej

6)  Blev navnet Lia Textile valgt efter aftale med Dem? - nej

7)  Krævede Cosalt i 1970 180 dages kredit? - ja

8)  Kunne Ocean Regntøj i 1970 have finansieret 180 dages kredit til Cosalt? - nej

9)  Var formålet med arrangementet med Lia Textile først og fremmest at få pengene hjem hurtigere og uden kursrisiko? - ja

10)  Regnede De med, at Ocean Regntøj kunne foretage indkøb og salg gennem Lia Textile, hvis det skulle vise sig at være fordelagtigt? - ja

11)  Regnede De med, at Lia Textile kunne foretage markedsanalyser og skaffe nye kunder til Ocean Regntøj? - ja

12)  Har De nogensinde ejet aktier i Lia Textile? - nej

13)  Har De indgået en aftale om ret til at overtage aktier i Lia Textile? - nej

14)  Betalte De den opkrævning på 2.683 fr. vedrørende »Liatex«, som B.C. Verwaltungs- und Investment AG sendte d. 23. november 1973? - nej

15)  Blev De nogensinde rykket for betaling? - nej

16)  Har De haft indflydelse på Lia Textile i kraft af aftaler med selskabet, dets ledelse eller dets aktionærer? - nej

17)  Har De nogensinde modtaget dividende fra Lia Textile? - nej

18)  Har De nogensinde modtaget regnskaber fra Lia Textile? - nej

19)  Mener De, at Ocean Regntøj kunne have opnået et arrangement, der svarede til det med Lia Textile indgåede, billigere hos andre? - nej

20)  Var - så længe arrangementet med Lia Textile bestod - den Cosalt indrømmede kredittid en sag mellem Cosalt og Lia Textile? - ja

21)  Hvorfor blev betegnelsen på provisionen til Lia Textile i Ocean Regntøjs regnskaber i 1977 ændret til »varerabat«?

Fordi selskabet overgik til EDB. Det var bogholderiet og revisionen, der lavede aftalen.

22)  Bærer De som exportagent for Ocean Regntøj risikoen for
    a)  manglende betaling fra kunden? - nej
    b)  kurssvingninger? - nej.«

Lrs. Børge Christensen har afgivet vidneforklaring for Københavns Byret. Der er endvidere under domsforhandlingen afgivet forklaring af nedennævnte vidner.

Lrs. Børge Christensen har forklaret, at han i 1970 var bosat i Schweiz, hvor han havde stiftet selskabet B.C. Verwaltungs- und Finanz AG, som bl.a. havde til opgave at formidle stiftelse af schweiziske selskaber for danske personer eller selskaber. De danske valutabestemmelser forhindrede dengang danske statsborgere og selskaber i at overføre kapital til stiftelse af selskaber i Schweiz og i at foretage låntagning i Schweiz. Låntagningen var favorabel for danskere på grund af den meget lave rente i Schweiz set i forhold til den på daværende tidspunkt meget høje danske rente. Stiftelsen af de schweiziske selskaber foregik efter en skabelon. I almindelighed kom den danske

interesserede sammen med en revisor eller advokat til Schweiz, hvor de havde møde med vidnet. Mødet fandt sted hos doktor Wiederkehr, som var formand for bestyrelsen i Nordfinanz-Bank. Nordfinanz-Bank finansierede aktiekapitalen. Endvidere fandt der som regel et møde sted med bankdirektøren. Derefter skete resten i overensstemmelse med vidnets model, uden at vidnet normalt havde anledning til at gå i detaljer. Som revisor i selskaberne blev normalt indsat Treuhand- und Revisionsgesellschaft AG Zug. Sidstnævnte selskab havde dels almindelige forretningsmæssige opgaver og havde desuden en egentlig revisionsafdeling tilknyttet. Formålet med stiftelsen af de pågældende selskaber var i udpræget grad at skaffe mulighed for låntagning i Schweiz med henblik på finansiering af eksportforretninger. Han ved ikke, i hvilket omfang de pågældende selskaber er blevet anvendt til factoring, men der er intet til hinder for, at selskaberne blev anvendt til dette formål. Han havde ikke nogen kontakt til selskaberne i al almindelighed, efter at han havde formidlet kontakten til doktor Wiederkehr og banken. Foreholdt optionsaftaledokumentet af 5. oktober 1973 har vidnet forklaret, at det er en standardoptionsaftale. Den er i den foreliggende udgave affattet mere omstændeligt end den, der i almindelighed blev anvendt i forbindelse med selskabsoprettelsen. Han mener ikke, at den nogensinde har været anvendt. Aftalen indebar, at en person i Danmark fik option på at overtage selskabet.

### 176

Optionsgiveren er ejeren af selskabet, hvilket i almindelighed ville sige et af Treuhand-selskaberne, B.C. Verwaltung, banken eller ef af doktor Wiederkehrs selskaber. Partneren er den danske person eller det danske selskab, som havde interessen i selskabsstiftelsen. Optionsretten var således udformet, at såfremt partneren døde, ville retten overgå til arvingerne. Han er ikke bekendt med, hvor hurtigt eller i hvilket omfang optionsaftalerne er blevet benyttet. De sidste optionsaftaler blev lavet for ca. 15 år siden, idet valutareglerne senere er liberaliseret. Optionsaftalen var faktisk det eneste af de oprettede dokumenter, hvoraf den danske interesseredes identitet fremgik. Aktiekapitalen var fordelt på 3 ihændehaveraktiebeviser. Han erindrer ikke, om B.C. Verwaltung ejede kapitalen i Liatex Ltd.

Vedrørende B.C. Verwaltungs skrivelse af 23. november 1973 til Liebergreen har vidnet forklaret, at denne er en opkrævning af kommission, ikke provision. Han antager, at der er tale om betaling for arbejde udført af B.C. Verwaltung for Liatex. Han ved ikke, hvorfor brevet er sendt til Liebergreen, men det er meget muligt, at dette skyldes, at Liebergreen havde optionsretten i forhold til selskabet. Han anser det som noget nær en umulighed, at der ikke skulle have været en optionsaftale i Liatex selskabet. Han ville aldrig have lavet en optionsaftale, med mindre der forelå en sædvanlig optionsaftale. Han husker ikke konkret optionsaftalen vedrørende Liatex, men erindrer, at Liebergreens formål med at lade et selskab stifte i Schweiz var at skaffe billig finansiering af eksport af regntøj til England. Han ved ikke, om Liebergreen udnyttede en eventuel optionsaftale.

Foreholdt sin forklaring til politirapport af 27. august 1985, har vidnet forklaret, at han ikke har sagt under afhøringen, at Liebergreen hurtigt overtog selskabet. Han mener, denne oplysning stammer fra den pågældende politimand.

Direktør Kurt Smedegaard, Ikast, har forklaret, at han i august 1976 blev ansat hos sagsøgeren som kontorassistent. Hans arbejde bestod bl.a. i at fakturere og i at rykke inden- og udenlandske kunder. I 1979 eller 1980 blev han udnævnt til direktør. Om den praktiske fremgangsmåde ved faktureringen og bogføringen af leverancerne til Cosalt har vidnet i det væsentlige forklaret som i amtsligningsrådets revisionsrapport. Han har ikke kendskab til, at Lia Textile har haft andre aktiviteter end fakturabelåning, og han

anså de 20% for en høj pris. En salgsagent får normalt 10% i provision. Det var kun salget til Cosalt, der var omfattet af aftalen med Lia Textile. Han har ikke kendskab til, hvem der ejede Lia Textile eller til enkelthederne i aftalen med selskabet, og ved ikke, hvad der var grunden til, at aftalen blev opsagt. Når betalingen til Lia Textile i begyndelsen blev konteret som rabat og provision og senere som vareabat, skyldtes det indførelse af en ny kontoplan i 1977/78 i forbindelse med overgang til EDB. Vidnet opfattede ændringen i teksten som værende udelukkende af praktisk karakter. Det var almindeligt, at der blev ydet større kunder rabat, men Cosalt fik ikke rabat på sine køb.

Statsautoriseret revisor Jens Højmose Kristensen, Herning, har forklaret, at han i 1970 tiltrådte som revisor for sagsøgeren. Kort tid efter udtrykte Liebergreen ønske om etablering af et selskab i Schweiz, idet han ønskede at spare renter ved at låne penge i Schweiz til driften. Den slags ting havde Liebergreen god forstand på, og vidnet behøvede ikke at rådgive ham herom. Vidnet henvendte sig til Handelsbanken, som satte ham i forbindelse med Nordfinanz-Bank i Z|rich, der anbefalede landsretssagfører Børge Christensen som mellemmand. Vistnok den 7. og 8. juli 1970 var Liebergreen og vidnet i Z|rich, hvor de holdt møde med Børge Christensen. Vidnet forestillede sig, at sagsøgeren skulle etablere et datterselskab i Schweiz, men dette blev afvist af Børge Christensen. Senere var de i Nordfinanz-Bank og hos Wiederkehr. Resultatet af møderne blev, at Børge Christensens selskab, B.C. Verwaltungs- und Investment AG skulle stifte et selskab, og at Wiederkehr og Schoch skulle indvælges i henholdsvis bestyrelse og direktion. Børge Christensen skulle i første omgang lægge pengene ud til stiftelsen af selskabet. Vidnet vil ud fra drøftelserne tro, at der blev aftalt en optionsret, således at Liebergreen eller sagsøgeren senere kunne overtage Lia Textile. Han erindrer dog ikke at have set nogen skriftlig optionsaftale, men kan huske, at landsretssagfører Børge Christensen betydede Liebergreen, at det havde konsekvenser, hvis man udnyttede en optionsret. Hvert år i forbindelse med afslutningen af sagsøgerens årsregnskab forhørte han sig hos Liebergreen, om optionsaftalen var udnyttet, men fik hver gang benægtende svar. Vidnet mener bestemt, at det var Liebergreens opfattelse, at han havde en optionsret. Lia Textile blev brugt som debitorfinansieringsselskab, idet renten i Schweiz kun var 1/3 af den danske rente. I begyndelsen mente han, at betalingen til Lia Textile var passende, men efter at en engelsk importdeponeringsordning faldt væk, fandt han prisen for høj, navnlig i betragtning af, at sagsøgeren ikke fik kommercielle ydelser fra selskabet. Han undrede sig flere gange over, at Cosalt som stor kunde ikke fik rabat på sine varekøb. Grossistrabatten var i den periode på ca. 25%.

Regnskabschef Finn Vilstrup, Tjørring, har forklaret, at han i marts 1970 blev ansat som bogholder hos sagsøgeren, og at han 3 år senere blev leder af regnskabsafdelingen. Debitorfinansieringsordningen med Lia Textile indebar, at betalingerne fra Cosalt indgik tidligere end hidtil. Han er ikke

### 177

bekendt med, at Lia Textile havde andre aktiviteter end finansiering af samhandlen med Cosalt.

Revisor Henning Elbrønd Pedersen, Herning, har forklaret, at han er uddannet civiløkonom, og at han var ansat i revisionsfirmaet Højmose Kristensen fra september 1970 til maj 1974. Han har bl.a. rådgivet sagsøgeren i forsikringsmæssige spørgsmål og en enkelt gang drøftet testamentariske dispositioner med Liebergreen. Mødenotatet af 16. november 1971 er udfærdiget af vidnet i forbindelse med et møde, han havde med Liebergreen samme dag. Den direkte årsag til mødet var, at Liebergreen skulle flyve til Afrika og derfor ønskede at sikre sin familie i tilfælde af sin død.

Vidnet udfærdigede selve notatet efter mødet med Liebergreen. Vidnet kan »næsten med sikkerhed« sige, at han ikke kendte noget til Lia Textile forud for mødet. Vidnet husker ikke i dag, om Liebergreen havde en forkøbsret til aktierne, og han kan ikke afvise, at notatets indhold om forkøbsret til aktierne kan være tilføjet efter mødet.

Statsautoriseret revisor Niels-Christian Juhl Nielsen, Ikast, har forklaret, at han fra 1968 har været ansat hos Højmose Kristensen. Han var fra 1970 den person i revisionsselskabet, som havde den daglige kontakt til sagsøgeren om regnskabs- og bogføringsmæssige forhold. Han gik ud fra, at Lia Textile både virkede som salgsselskab og debitorfinansieringsselskab, da det var det, som ifølge Liebergreens oplysning var formålet med etableringen af selskabet. Det er hans opfattelse, at betegnelsen varerabat godt kan være dækkende for en factoringydelse. Han havde ud fra samtaler med Højmose Kristensen fået den opfattelse, at Liebergreen havde optionsret til aktierne i Lia Textile, men han har ikke direkte drøftet dette spørgsmål med Liebergreen.

Sagsøgeren har til støtte for sin principale påstand anført, at de betalte ydelser til Lia Textile Ltd. er fradragsberettigede driftsudgifter. Ingen af de fem argumenter, som amtsligningsrådet i sin afgørelse har påberåbt sig til støtte for sit resultat, er holdbare. Herom har sagsøgeren nærmere anført:

Lia Textile Ltd. er et lovligt eksisterende domicilselskab. Det er oplyst, hvem der ejede aktierne ved stiftelsen, og hvem der ejer dem nu, og det er nærliggende at antage, at der ikke har været andre ejere i den mellemliggende tid, for selskabet fik i denne periode ingen anden ledelse. Det bestrides, at Hilmar Liebergreen har haft en optionsret til aktierne, og sagsøgte har heller ikke ført bevis herfor. Opkrævningen af 23. november 1973 fra B.C. Verwaltungs- und Investment AG er ikke betalt, og det henstår i øvrigt som usikkert, om den overhovedet er kommet frem til Liebergreen. Endelig har de afgivne vidneforklaringer om forholdet mellem sagsøgeren/ Liebergreen og Lia Textile Ltd. været præget af usikkerhed. Selv om det antages, at der forelå en form for optionsaftale, kan aftalens nærmere indhold ikke fastlægges, og der er derfor intet grundlag for at statuere, at Liebergreen havde en dominerende indflydelse i selskabet.

Der er intet factoringmæssigt usædvanligt i aftalen mellem sagsøgeren og Lia Textile Ltd. Det var ved indgåelsen af denne afgørende for sagsøgeren, at de nye krav fra Cosalt med hensyn til kredittid og fakturering i pund ikke bragte sagsøgeren i vanskeligheder, og der er intet grundlag for at fastslå, at dette formål ikke blev opfyldt. Det er således uoplyst, hvor lang kredittid sagsøgeren indrømmede Cosalt i regnskabsårene 1970/71 - 1976/77, idet der kun foreligger oplysning om de 4 følgende regnskabsår, og det kan derfor ikke udelukkes, at kredittiden de første år var væsentlig længere end de 4 sidste. Hertil kommer, at faktureringen først i december 1979 gik over til at ske i pund, fordi pundet på dette tidspunkt begyndte at vise stigende tendens.

Det er urigtigt, at sagsøgerens likvider - som anført af amtsligningsrådet - kunne klare en forlængelse af kredittiden med 150 dage, og det er uden betydning, om Liebergreen personligt eller gennem andre af sine selskaber kunne have stillet likvider til rådighed for sagsøgeren.

Begrundelsen for at vælge et schweizisk factoringselskab var det lavere renteniveau i Schweiz, og det bestrides, at et billigere arrangement kunne være opnået andre steder, og at 20% i øvrigt er en usædvanlig høj betaling for et factoringarrangement som det foreliggende. Sagsøgeren har herved henvist til, at sagsøgte, hvem bevisbyrden påhviler for rigtigheden af dette standpunkt, trods gentagne provokationer under skriftvekslingen ikke har taget skridt til - f.eks. ved syn og skøn - at underbygge amtsligningsrådets

postulat herom. Endelig har sagsøgeren bestridt, at der som hævdet af sagsøgte var nogen skattebesparelse at opnå ved arrangementet, idet et schweizisk domicilselskab betaler federal kantonskat med ca. 30%, og det er kun lidt under den danske selskabsskat.

Selv om sagsøgte måtte få medhold i, at Lia Textile Ltd. reelt ejedes af Liebergreen, må forhøjelserne af sagsøgerens indkomster alligevel tilsidesættes som utilstrækkeligt begrundede, fordi det er en forudsætning for at statuere maskeret udbytte, at hovedaktionæren ikke har ydet vederlag for udbyttet. I det foreliggende tilfælde har sagsøgeren imidlertid opnået modydelser for vederlaget, idet kredittiden blev forkortet - for de sidste 3 år med henholdsvis 18, 9 og 6 dage, og kursrisikoen blev overtaget af Lia Textile Ltd., der ligeledes overtog risikoen for, at Cosalt betalte. Skattemyndighedernes argumentation, hvorefter de først greb ind, da de blev bekendt med provisionssatsen på 20%, må logisk forudsætte, at en lavere procentsats ville være blevet accepteret, og en

**178**

sådan accept må atter forudsætte skattemyndighedernes anerkendelse af, at der blev præsteret en reel modydelse fra det schweiziske selskabs side.

Særligt for så vidt angår skatteårene 1972/73 - 1978/79 har sagsøgeren til støtte for sin påstand yderligere gjort gældende, at adgangen til at kræve efterbetaling må anses for forældet i medfør af loven af 1908, idet amtsligningsrådets kendelse forelå den 30. april 1984, og skatten for de fornævnte skatteår forfaldt til betaling mere end fem år forud herfor. Forældelsesfristens begyndelse kan ikke anses for suspenderet til 1983, da skattemyndighederne hævdede at være blevet bekendt med den nøjagtige procentsats for factoringarrangementet, allerede fordi skattemyndighederne har indtaget det standpunkt helt at nægte godkendelse af fradrag for provisionsydelserne. Det er uden betydning for afgørelsen om forældelsesindsigelsen, at sagsøgeren har indbetalt skatten for de skatteår, for hvilke efterbetalingskravet er forældet.

Sagsøgte har til støtte for frifindelsespåstanden gjort gældende, at ligningsmyndighederne har været berettiget til at nægte at anerkende de foretagne fradrag. Sagsøgte har herved henvist til, at der mellem sagsøgeren og Lia Textile Ltd. foreligger en interessefællesskab, idet Liebergreen er hovedaktionær i det sagsøgende selskab og ejede eller dog beherskede det schweiziske selskab. Såvel vidnerne Børge Christensens, Højmose Kristensens og Elbrønd Petersens forklaringer som selskabets stiftelsestidspunkt og navn samt skriveserne af 23. november 1973 og standardoptionsaftalen bekræfter antagelsen om, at Liebergreen reelt stod bag stiftelsen af selskabet og beherskede dette gennem en optionsret til aktierne til disses pålydende med tillæg af renter og omkostninger. Også den omstændighed, at Liebergreen opsagde aftalen med Lia Textile Ltd. - med usædvanligt langt varsel - til ophør på samme dato, som han forlod Danmark, peger i samme retning. Det bestrides, at Liebergreen herefter overtog funktioner, som Lia Textile Ltd. hidtil havde haft. Den påberåbte factoringaftale savnede normal driftsmæssig begrundelse. Den omfattede kun én kunde, der efter alt at dømme var solid, og factoringprovisionen var ekstraordinært høj til trods for det forholdsvis lave renteniveau i Schweiz. Factoring i Danmark kunne f.eks. ske for en provision på 2 - 3%. Det må endelig lægges til grund, at arrangementet har haft til formål at overflytte indkomst til den lempeligere beskatning i Schweiz, og skattemyndighederne har derfor været berettiget til at gribe korrigerende ind som sket.

Over for sagsøgerens anbringende om forældelse har sagsøgte anført, at forældelsesfristen har været suspenderet indtil 1983, da skattemyndighederne fik kendskab til det schweiziske selskab og de nærmere omstændigheder ved forretningsforbindelsen mellem

Copyright © 2021 Karnov Group Denmark A/S                              side 9

sagsøgeren og dette. Der foreligger derfor ikke forældelse for noget af skatteårene.

Såfremt der gives sagsøgeren medhold i anbringendet om forældelse, har sagsøgte anført, at sagsøgeren, der har betalt den forældede del af skattebeløbet, efter almindelige obligationsretlige grundsætninger nu er afskåret fra at kræve tilbagebetaling af denne del af beløbet.

Efter landsretssagfører Børge Christensens vidneforklaring foregik stiftelsen af selskaberne i Schweiz efter en skabelon. Dette indebar bl.a., at finansieringen af aktiekapitalen skete ved Nordfinanz-Bank, at banken eller et schweizisk selskab blev ejer af aktierne i det nystiftede selskab, og at den danske part, som havde interesse i selskabsstiftelsen, ved optionsaftalen fik ret til overtagelse af aktierne. Landsretssagfører Børge Christensen har videre forklaret, at han aldrig ville have lavet et selskab, med mindre der forelå en sædvanlig optionsaftale, og at han anså det for noget nær en umulighed, at der ikke skulle have været en optionsaftale i Lia Textile Ltd., hvilket selskab Liebergreen ifølge vidnet lod stifte for at skaffe billig finansiering af eksport af regntøj til England. Efter vidnerne Højmose Kristensens og Juhl-Nielsens forklaringer var det deres opfattelse ud fra drøftelser med Liebergreen, at denne havde en optionsret til aktierne i Lia Textile Ltd., og deres forklaringer støttes af vidnet Elbrønd Pedersens notat af 16. november 1971 og af hans forklaring samt af skrivelserne af 23. november 1973 fra henholdsvis B.C. Verwaltungs- und Investment A.G. til Liebergreen og fra Treuhand- und Revisionsgesellschaft Zug til dr. Arthur Wiederkehr.

Landsretten finder det efter det således oplyste ubetænkeligt at lægge til grund som bevist, at Lia Textile Ltd. blev stiftet på foranledning af Liebergreen, og at han ved aftale opnåede en optionsret til aktierne. Det må efter landsretssagfører Børge Christensens forklaring antages, at de grundlæggende principper i standardaftalen af 5. oktober 1973 med hensyn til parternes rettigheder og forpligtelser var gældende i optionsaftalerne i de selskaber, vidnet formidlede stiftelsen af, herunder Lia Textile Ltd., og at Liebergreen således kunne overtage aktierne til deres udstedelsesværdi med tillæg af renter og omkostninger. Herefter findes Liebergreen - uanset om han faktisk overtog aktierne i løbet af de skatteår, denne sag angår - i kraft af sin optionsret reelt at have behersket Lia Textile Ltd., og der må derfor gives sagsøgte medhold i, at der har bestået et interessefællesskab mellem det sagsøgende selskab, som Liebergreen er hovedaktionær i, og Lia Textile Ltd.

### Vedrørende spørgsmålet om, hvorvidt aftalen mellem sagsøgeren og Lia Textile Ltd. har været forretningsmæssigt begrundet, bemærkes:

**179**

Det må efter bevisførelsen lægges til grund, at Lia Textile Ltd. ikke havde eget kontor og ikke beskæftigede eget personale, samt at selskabets eneste funktion var at stå som factoringselskab for sagsøgerens handel med Cosalt Ltd. Det fremgår af aftalen af 2. september 1970 mellem sagsøgeren og det schweiziske selskab, at den havde sin baggrund i Cosalt Ltd.'s krav om, dels at kredittiden skulle forlænges fra 30 til 180 dage, dels at faktureringen skulle ske i pund. Efter det oplyste udnyttede Cosalt imidlertid ikke den forlængede kredittid i årene 1977/78 - 1980/81, medens der ikke foreligger oplysninger om de foregående år, og faktureringen i pund begyndte først at ske efter den 30. november 1979. Efter aftalen blev aftalen med Lia Textile Ltd. opsagt af Liebergreen på sagsøgerens vegne med 1 års varsel, uanset at opsigelsesvarslet kun var 6 måneder, og uanset at opsigelsen ifølge hans forklaring til politirapport bl.a. skyldtes, at han fandt aftalen for dyr for

sagsøgeren. Liebergreen har endvidere forklaret til politirapport, at han, der flyttede fra Danmark til Frankrig samme dato, som aftalen med Lia Textile Ltd. ophørte, mente, at han kunne udføre det samme arbejde som Lia Textile Ltd. billigere end det schweiziske selskab, og at dette også var en begrundelse for opsigelsen. Det må imidlertid som foran anført lægges til grund, at Lia Textile Ltd. alene stod for factoringarrangementet, der ubestridt opfylder med factoringaftalens ophør, og det fremgår af Liebergreens oplysninger til skattemyndighederne og politiet, at han siden flytningen har virket som salgsagent for sagsøgeren.

Under de således foreliggende omstændigheder og under hensyn til det, der foran er lagt til grund som bevist vedrørende Hilmar Liebergreens - benægtede - beherskelse af Lia Textile Ltd., findes sagsøgte, uanset at der ikke er tilvejebragt oplysning om, hvorvidt en factoringprocent på 20 kan anses for sædvanlig, at have sandsynliggjort, at aftalen med Lia Textile Ltd. ikke har været forretningsmæssigt begrundet for sagsøgeren. Da aftalen med det schweiziske selskab må anses for at være en følge af det statuerede interessefællesskab, findes skattemyndighederne at have været berettiget til at gribe korrigerende ind som sket, idet det, sagsøgeren i øvrigt har anført herimod, ikke kan føre til andet resultat.

### Vedrørende spørgsmålet om forældelse bemærkes:

Factoringprovisionen var bogført som rabat, varerabat og provision, og det må, som sagen foreligger oplyst, lægges til grund, at det ikke af regnskaberne fremgik, at ydelserne var factoringprovision til et schweizisk domicilselskab. Der er således ikke holdepunkt for at statuere, at skattemyndighederne forud for revisionen, der påbegyndtes i marts 1983, og som førte til amtsligningsrådets afgørelse af 30. april 1984, burde have indset, at der var grundlag for et efterbetalingskrav, og ingen del af kravet kan derfor anses som forældet.

Landsretten tager herefter sagsøgtes frifindelsespåstand til følge.

- - -

Sagens omkostninger betaler sagsøgeren til sagsøgte med 55.000 kr.

# Højesteret

## Højesterets dom.

Den indankede dom er afsagt af Vestre Landsret.

I pådømmelsen har deltaget fem dommere: Kiil, Kardel, Hornslet, Per Sørensen og Jørgen Nørgaard.

Appellanten, Ocean Regntøj A/S, har som sin principale påstand nedlagt samme påstand som for landsretten.

Subsidiært har selskabet påstået indstævnte, Skatteministeriet, tilpligtet at anerkende, at selskabets skattepligtige indkomst for skatteårene 1972/73 - 1978/79 skal ansættes til de beløb, der er angivet i den principale påstand, medens der for skatteårene 1979/80 - 1983/84 af ligningsmyndighederne skal foretages ny ansættelse af selskabets skattepligtige indkomst.

Mere subsidiært har selskabet påstået Skatteministeriet tilpligtet at anerkende, at der af ligningsmyndighederne skal foretages ny ansættelse af selskabets skattepligtige indkomst for de skatteår, sagen vedrører.

Mest subsidiært har selskabet påstået Skatteministeriet tilpligtet at anerkende, at selskabets skattepligtige indkomst skal sættes til

```
for skatteåret 1981/82   1.537.439 kr.
for skatteåret 1982/83   1.680.080 kr.
for skatteåret 1983/84   1.336.626 kr.
```

Skatteministeriet har påstået stadfæstelse.

Selskabets subsidiære påstand støttes for så vidt angår skatteårene 1972/73 - 1978/79 på, at skattemyndighedernes adgang til at kræve

efterbetaling er forældet, og for så vidt angår skatteårene 1979/80 - 1983/84 på, at fradragsret ikke kan nægtes i det omfang, hvori der er tale om betaling for ydelser, der er tilgået selskabet fra Lia Textile Ltd. og/eller Hilmar Liebergreen.

Selskabets mere subsidiære påstand støttes på det anbringende om vederlag, der for så vidt angår den subsidiære påstand er anført vedrørende skatteårene 1979/80 - 1983/84.

Selskabets mest subsidiære påstand vedrører de i dommen omtalte valutakursgevinstbeløb på 52.625 kr., der indgår i de beløb, hvormed selskabets skattepligtige indkomst for skatteårene 1981/82, 1982/83 og l983/84 blev forhøjet. Parterne er enige om, at forhøjelsen for de tre skatteår udgør henholdsvis 17.197 kr., 33.882 kr. og 1.546 kr. For det enkelte skatteår udgør det nævnte beløb forskellen mellem skattemyndighedernes ansættelse og beløbene i den mest subsidiære påstand. Selskabet har til støtte for

**180**

denne påstand anført, at uanset hvorledes man skatteretligt kvalificerer de beløb, som indgik fra Cosalt Ltd., og som selskabet afstod til Lia Textile Ltd., er der ikke hjemmel til at beskatte selskabet af beløb, som det aldrig har erhvervet, og som det derfor ikke har afstået til Lia Textile.

Til gengivelsen i dommen af udkastet af 5. oktober 1973 til optionsaftale føjes, at det i udkastets punkt 4 om »partnerens« køberet afslutningsvis hedder:

»I købsprisen indregnes: Det indbetalte depositum og de modtagne nettoudividender ifølge pkt. 8 - 10 herunder, for så vidt disse beløb ikke er benyttet til dækning af andre fordringer, der måtte fremgå af denne kontrakt. Restbeløbet skal betales kontant ved aktiernes overdragelse.«

Udkastets punkt 8 - 10 lyder således:

»8.    Optionsgiveren er berettiget til at modtage udbytte fra det selskab, som er nævnt i pkt. 1. Udbyttet kan være max. den til enhver tid gældende køberets pris, jfr. pkt. 4 herover, afsnit 2, og den provision som kan beregnes iflg. pkt. 7 herover, med fradrag af - - -

9.    Til sikkerhedsstillese for sine forpligtelser ifølge denne kontrakt, sørger partneren for at der hos optionsgiveren deponeres aktiekapitalens nominelle beløb på - - -
Deponeringen sker ved indgåelse af denne kontrakt. Det deponerede beløb er optionsgiveren berettiget til at gøre udlæg i, når beløb, som han ifølge denne kontrakt har tilgode, forfalder til betaling.

10.    Det deponerede beløb ifølge pkt. 9 og de *nettoudbytter*, som iflg. pkt. 8 er blevet udloddet, bliver kontokurantmæssigt modregnet i den købspris, som er nævnt i pkt. 4 - f.s.v. de ikke er blevet benyttet til dækning af andre fordringer iflg. denne aftale. Så snart de udloddede nettoudbytter og det deponerede beløb, jfr. pkt. 8 og 9 herover, overstiger det beløb, som ville forfalde ved udnyttelse af optionen, er partneren berettiget til at reducere det deponerede beløb i overensstemmelse med det overskydende beløb, d.v.s. at forlange en tilsvarende tilbagebetaling. For det overskydende beløb bliver der ikke beregnet rente.«

Til brug for Højesteret er der tilvejebragt yderligere oplysninger og ved generalkonsulatet i Marseille afgivet forklaring af Hilmar Liebergreen.

Kammeradvokaten har indhentet oplysning om størrelsen af factoringprovisionen fra fire factoringselskaber.

**Højesterets bemærkninger.**

Efter de forklaringer, som er afgivet af Børge Christensen, Højmose Kristensen og Elbrønd Pedersen, samt efter sidstnævntes

notat af 16. november 1971, tiltræder Højesteret, at det ved dommen er lagt til grund, at Liatex Ltd., senere Lia Textile Ltd., blev stiftet på foranledning af Hilmar Liebergreen, og at han fra stiftelsen opnåede en optionsret til aktierne. Efter Børge Christensens og Højmose Kristensens forklaringer og skrivelse af 23. november 1973 fra BC Verwaltungs- und Investment AG til Liebergreen tiltræder Højesteret endvidere, at det kan lægges til grund, at principperne i udkastet af 5. oktober 1973 til optionsaftale blev gældende i Lia Textile, således at Liebergreen, der reelt beherskede Ocean Regntøj A/S, fra stiftelsen beherskede også Lia Textile, idet han når som helst - uden risiko for mellemkommende udvanding af opsamlet kapital gennem udbetaling til aktionærerne - kunne overtage aktierne til deres udstedelsesværdi med tillæg af renter og omkostninger.

Som anført af landsretten havde Lia Textile hverken eget kontor eller eget personale og havde kun den rolle at blive brugt af Ocean Regntøj som factoringselskab for denne virksomheds handel med Cosalt Ltd. Efter de foreliggende oplysninger må en factoringprovision på 20% anses for at have været uden forretningsmæssig begrundelse.

Efter det anførte kan Ocean Regntøj's principale påstand ikke tages til følge, og som sagen er oplyst for Højesteret, findes der ikke grundlag for at hjemvise skatteansættelsen til ligningsmyndighederne som følge af det af Ocean Regntøj påberåbte anbringende om betaling for ydelser fra Lia Textile og/eller Liebergreen til Ocean Regntøj.

Efter overenskomsten af 2. september 1970 var Lia Textile forpligtet til at præstere betaling til Ocean Regntøj i danske kr. også efter, at det sidstnævnte selskab fra 30. november 1979 begyndte at fakturere leverancerne til Cosalt i engelske pund. Faktisk overførtes der imidlertid engelske pund fra Lia Textile til Ocean Regntøj fra iværksættelsen af den ændrede fakturering. En beskatning af valutakursgevinstbeløbet på 52.625 kr. vil følgelig ikke - som hævdet af Ocean Regntøj - være ensbetydende med beskatning af beløb, som selskabet aldrig har erhvervet, og som det derfor ikke har afstået til Lia Textile.

Med bemærkning, at der ikke er holdepunkter for, at skattemyndighederne før 1983 burde have iværksat en revision, tiltræder Højesteret af de grunde, som landsretten har anført, at der ikke er indtrådt forældelse af nogen del af skattekravet.

Herefter kan hverken Ocean Regntøj's principale eller de forskellige subsidiære påstande tages til følge, og Højesteret stadfæster derfor dommen.

**Thi kendes for ret:**

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for Højesteret skal Ocean Regntøj A/S betale 60.000 kr. til Skatteministeriet.*

*De idømte sagsomkostninger skal betales inden 14 dage efter denne højesteretsdoms afsigelse.*