# Exhibit 55

U.2010.261H

**Authority's claim in connection with a possible groundwater pollution was time-barred. The limitation period not suspended and objection to limitation not waived due to negotiations between the parties about suspension.**

*Agreements 1.2 - Monetary affairs etc. 58.2.*

♦ For a number of years, A ran a laundry and dry cleaning business, including dry cleaning using perchloroethylene (a chlorine-based solvent). Following a survey and registration of older industrial sites in the municipality initiated by the county, B, contamination was found on A's property in 1999. At B's request, an engineering firm carried out an investigation, and the firm's report of August 3, 1999 stated, among other things, that some contaminants (chlorinated solvents and hydrocarbons) found on A's property were likely to affect the groundwater. This was also stated in a further report dated November 2, 1999. The parties discussed the results of the investigation, including the question of further investigations and remedial measures, but did not reach agreement. In the spring of 2003, pursuant to section 40 of the Soil Pollution Act, B issued an order to A to establish wells and to investigate the possibilities of removing the contamination found. The order was appealed to the Environmental Board. On June 30, 2004

**262**

B's lawyer wrote to A and suggested that the parties enter into an agreement on "suspension of all passivity and limitation" of B's possible claim for damages against A. The letter stated, inter alia, that it was B's opinion that limitation of B's possible claim would take effect in November 2004. A's lawyer replied to B's letter on August 13, 2004, and thereafter the parties exchanged correspondence about the case without reaching an agreement on suspension.

On October 29, 2004, B issued a writ of summons against A, claiming, among other things, that the company should acknowledge that it had to indemnify B for its necessary expenses for the drilling of wells to delimit the pollution and to prevent from affecting the groundwater. During the proceedings, A argued in particular that B's possible claim was time-barred and that the conditions for imposing liability on A for the pollution were not met. The High Court ruled in favor of B. The Supreme Court stated, inter alia, that based on the content of the report of August 3, 1999, it had to be assumed that B already upon receipt of this report became aware not only of the pollution and the need for further investigations, including regarding the delimitation of the pollution, but also that there was an imminent possibility that it would be necessary to implement remedial measures. From this point in time, B could therefore no longer be considered to have been in ignorance of his claim against A under the general rules on indemnification for expenses for both further investigations and any remedial measures, cf. section 3 of the Limitation Act of 1908. The 5-year limitation period under this Act therefore ran from B's receipt on August 5, 1999 of the report of August 3, 1999 or possibly already from June 28, 1999, when B was presumed to have received a draft of the report. Regardless of whether June 28 or

August 5, 1999 was considered to be the starting point of the limitation period, it had to be assumed that the parties did not conduct substantive negotiations about B's claim in the time leading up to the expiry of the limitation period. The fact that in the letter of June 30, 2004, B proposed the conclusion of a suspension agreement, and that A in the letter of August 13, 1999 from the company's lawyer declared his willingness to consider this proposal, could neither justify that the expiry of the limitation period was considered postponed, nor that A was considered to have waived the right to invoke an already occurred limitation period. The Supreme Court thus found that the claim was time-barred prior to the filing of the case and acquitted A.[1]

**H.D. October 28, 2009 in case 575/2006 (2. afd.)**

*Alba A/S (attorney Birgitte Refn Wenzel, Copenhagen)*
mod
*Capital Region of Denmark (formerly Copenhagen County) (attorney René Offersen, Copenhagen).*

## Eastern High Court

***Østre Landsret's judgment of December 7, 2006 (4th Chamber)*** (Rosenløv, Steen Mejer Hansen, Lars Alexander Borke (deputy)). In these proceedings, brought on October 29, 2004 before the District Court
in Tåstrup and by order of January 5, 2005 referred to Østre
Pursuant to section 226(1)(4) of the Danish Administration of Justice Act, the plaintiff, the County of Copenhagen, has finally claimed that the defendant, Alba A/S, be ordered to acknowledge that the defendant must indemnify the plaintiff for its necessary expenses for the drilling of boreholes to delimit the pollution found in E.K. Jørgensen's report of 2 November 1999 and supplementary investigation report. Jørgensen's report of November 2, 1999 and supplementary investigation report on the property matr.nr. 11c, Høje Taastrup By, Taastrup Nykirke, located Rugvænget 1-5, 2630 Taastrup, caused by the defendant's negligence as well as the plaintiff's necessary expenses to prevent the pollution's impact on the groundwater, or alternatively that the obligation is limited to pollution ceased no later than
2. November 1979 or at a time determined by the High Court. Alba A/S has claimed acquittal.

The case concerns the question of whether Alba A/S (the company) is liable for the contamination found on the property Rugvænget 1-5 in Taastrup and is therefore obliged to indemnify the County of Copenhagen (the County) for its necessary costs for delimiting the contamination and preventing the contamination from affecting the groundwater. Furthermore, questions have been raised as to whether claims from the county may be time-barred.

*The circumstances of the case*

The company as a business was originally run personally. The company was involved in both laundry and dry cleaning. The laundry was used to wash oily industrial cloths, among other things. In the dry cleaning department, dry cleaning was carried out using perchloroethylene (PCE), a chlorine-based solvent. On December 19, 1969, the company was converted into a public limited company named A/S Alba Linnedudlejning, which reportedly changed its name to Alba Textil A/S in 1975/1976, but retained the registration number. From 1979, the company was run by a company called Alba Textil ApS. In 1994, Alba Textil ApS was transformed into ALBA A/S, which is identical to the

Copyright © 2023 Karnov Group Denmark A/S

company in this case. The company has been compulsorily    administered by the state from 1982 to 1997. There are

---

**1** U 1929.721 H, U 1989.692 H, U 1992.575 H with comments by Peter Blok in U 1992B.412, U 2001.1511 H, U 2007.529/3 H, bet. 1460/2005 p. 110, Peter Pagh: Erstatningsansvar for miljøskader (1991), p. 156, Bernhard Gomard: Obligationsret, 3. del (1993), pp. 237-40, and Bo von Eyben: Forældelse I (2003), pp. 45-54, 520-31 and 585-610.

Copyright © 2023 Karnov Group Denmark A/S

consensus that the company has been run by the same legal entity from 1969, when the company was founded, until today.

**263**

On October 28, 1985, the company applied for approval as a listed company under the Environmental Protection Act in accordance with current legislation. The application stated that the company was engaged in the washing and cleaning of clothes, and that the annual volume of clothes weighed in was approx. 1,200 tons, divided into approx. 500 tons of rags containing mineral oil and the like, approx. 450 tons of clothes for laundering and approx. 250 tons of mat washing. Høje Taastrup Municipality granted approval on December 8, 1986. The approval stated, among other things, that PCE was used in the company's dry cleaning, and that the company's production would affect the wastewater with water containing solvents and heavy metals, and the air with PCE.

The parties agree that the company ceased to use PCE in production in connection with the last deliveries of PCE to Kommune Kemi, which took place on
July 28, 1993 and November 16, 1994.

In June 1996, soil contamination was discovered in connection with the relocation of sewer pipes on the company's property. In agreement with the county, an action plan was drawn up by the company's environmental consultant, JORDoMILJØ A/S. Remediation measures were carried out, removing approximately 170 tons of soil containing chlorinated solvents and petroleum products. The report prepared by JORDoMILJØ A/S in connection with the pollution, dated August 22, 1996, on the remediation measures concluded that the oil content in the soil was assessed to originate from a leak in a joint in the wastewater system.

In connection with the county initiating a survey and registration of older industrial sites in Høje Taastrup Municipality, contamination was found on the company's property in 1999.

Consulting engineers Erik K. Jørgensen A/S (EKJ) prepared, at the request of the county, an investigation report dated August 3, 1999, called registration investigation, on the company's property. The report states, among other things:

". . .

*Executive Summary*

In 1960, Alba A/S started a dry cleaning and laundry business at Rugvænget 1-5, 2630 Taastrup. Previously there was a nursery on the property. Over time, various activities have taken place, such as industrial laundry and dry cleaning, storage of PCE waste, possible leaking sewers, oil separator systems and oil tanks, etc. that could potentially have caused pollution.

During the registration survey, 5 boreholes were drilled with drilling rigs and two hand drilling. One of the boreholes drilled with a drilling rig was filtered. TV inspection of parts of the sewer system and pore air measurements were also carried out.

The TV inspection revealed that the sewer line examined was tight, but that several wells are in poor condition, crumbled.

No signs of soil contamination were found around the tanks on the northern part of the property. However, samples from hand drilling around the equalization tank on the western part of the property showed heavy contamination with total hydrocarbons in the topsoil. It cannot be ruled out that the contamination found will also be found in deeper layers.

Pore air measurements outside the former dry cleaning building showed clear contamination with chlorinated compounds, BTEXs and total hydrocarbons in both soundings. A water sample showed no signs of contamination.

Overall, it must be assessed that past activities and current production conditions pose a risk of unacceptable impact on soil and groundwater.

Copyright © 2023 Karnov Group Denmark A/S

. . .

### 3. Introduction

#### 3.2 Background information

The registration survey is part of the County of Copenhagen's program for mapping old industrial sites in Høje Taastrup Municipality. Through a historical review, the County of Copenhagen has identified a number of properties in Høje Taastrup Municipality where the county estimates that there is a risk of contamination. The identified properties are current or former industrial sites. Experience shows that the activities on these sites are associated with a certain risk of contamination. The properties are located in a special drinking water area and within the groundwater catchment areas for the source sites at Thorsbro Waterworks.

#### 3.3 Purpose

The purpose of the investigation is to shed light on the pollution conditions on the property and thus clarify whether oil or chemical waste has been spilled, deposited or buried on the site that may pose a risk to groundwater, recipients or land use. Based on the investigation, the County of Copenhagen must assess whether the property must be registered as a waste depot in accordance with the Waste Depots Act. Act on Waste Depots, most recently Consolidated Act no. 939 of 27 October 1996, and to prioritize the time of any clean-up.

. . .

### 4. Historical summary and expected pollution situation

. . .

B. Laundry hall: (built in 1960) with washing machines, centrifuges, steam rollers, dryers and presses for ironing coats, as well as staff rooms and offices. In 1965, a dry-cleaning machine was installed in the building to clean work clothes. The clothes were cleaned in the western corner of the building. Perchloroethylene was used for this cleaning. This was filled directly from the

**264**

tank truck to the tanks on the cleaning machines. The distillation waste has been delivered to e.g. Kommune kemi. In 1994, the cleaning machines were dismantled. The work clothes are then washed using chemicals: Alkali (caustic soda and methacilicates), soap, hypochlorite (bleaching essence) and acetic acid.

When washing rags, there is oily wastewater. In 1960, an oil separator was installed outside the northwestern part of the building (as a trixtank), which was later (1964) supplemented by an above-ground oil separator. The latter was dismantled in 1980 and replaced with a chemical precipitation treatment plant. In this connection, ferrous sulphate was used as a precipitant and sulphuric acid for neutralization.

. . .

There are various potential sources of pollution at Alba A/S. The sources are: the dry cleaning plant, storage of PCE waste, oil tanks, leaking sewers and oil separators, tank for oily wastewater and storage of oil rags under the canopy. . .

### 5. Environmental technical studies

. . .

It is mainly oil, PCE, detergents and neutralizing chemicals that can be the sources of contamination on the property. Wells are located at potential sources of contamination. In the following, the locations of the wells, hand drills and pore air measurements are described.

. . .

### 7. Survey results

#### 7.5 Summary

No leaks have been found on the TV-inspected pipeline section.

The extent of old and new, unplugged and functioning pipes is generally poorly described, and the company has not contributed significantly to clarification.

Copyright © 2023 Karnov Group Denmark A/S

UfR ONLINE    U.2010.261H

The filtered well shows no groundwater contamination, but the location is not in relation to the identified pollution sources. Pore air measurements at the former dry cleaning plant show high concentrations of chlorinated solvents and hydrocarbons. It is likely that these contaminants can lead to groundwater impacts.

Hand drilling in the area around the oil tank storage and oil separation plant shows contamination of the soil layers close to the ground. Especially at the oil separator plant, the operation is considered environmentally inappropriate in terms of soil and groundwater contamination. It cannot be ruled out that the contamination in the two areas may affect the groundwater.

The source of the chlorinated brightener contamination was decommissioned in 1994. With an estimated period of operation from approx. 1965-1994, operation mainly took place in the period after 01-04-1976.

The source of hydrocarbon contamination at the former dry cleaning plant is likely still in operation today.

The source of contamination with petroleum products at the oilcloth storage and oil separator is still in operation today.

None of the contaminants found can be considered to be bounded horizontally or vertically.

*8. Risk assessment*

*8.1 Groundwater*

No contamination was detected in the groundwater sample from B5. The borehole is located approximately 25 m north of the former dry cleaning plant. This well was filtered because it was the only well in the survey that indicated the possibility of water sampling. As B5 is located at some distance from one of the potentially significant sources of contamination with chlorinated solvents and hydrocarbons (pore air measurements performed next to the former dry cleaning plant), it cannot be excluded that the groundwater in B5 is not representative of the contamination situation on properties.

However, the B1 borehole that was drilled did not show any signs of the presence of groundwater at the depth to which the borehole was drilled. It must be considered that it would be appropriate in relation to a risk assessment that a deeper well is drilled for water sampling in the area of the former dry-cleaning plant.

Based on the pore air measurements taken at the dry cleaning plant, it cannot be ruled out that there may be an impact on the secondary groundwater in this area. Experience shows that such high pore air concentrations of chlorinated solvents will also have an impact on groundwater in the saturated zone.

The source - the dry-cleaning plant - is no longer in operation today (operational period approx. 1965-1994). This means that the impact on the groundwater may have ceased. However, subsidence of any phase from the unsaturated zone into the groundwater may still occur. The mapping of the contamination at the former dry cleaning plant is not considered sufficient for an actual risk assessment.

The pore air measurement P2 shows a very high content of mixed pollution, which probably contains hydrocarbons such as BTEXs, in addition to the chlorinated solvents already mentioned.

Hydrocarbons are still used today in connection with the washing process etc. It is therefore not clear whether the source of hydrocarbon pollution has now been eliminated. The substances currently used in the washing process are not described in detail on . It is not possible to provide a more precise risk assessment in relation to groundwater contamination with hydrocarbons on this part of the property, but it cannot be ruled out that there is an impact on the groundwater with hydrocarbons.

No contamination (soil samples) has been found at the 3 oil tanks located on the northern slope. It is assessed,

**265**

that there is no impact on groundwater from these oil tanks.

Copyright © 2023 Karnov Group Denmark A/S

The short hand drilling at the oil separator (HG2) and oil rag storage (HG1) shows heavy contamination of the ground level soil layers with hydrocarbons. There are no filtered wells in the area, so the groundwater contamination can only be estimated. With the concentrations found in the soil, it cannot be ruled out that there is an impact on secondary groundwater in the two areas.

With the production conditions found on the property, it is assessed that the sources of the identified contamination are still in operation (storage of oil rags (HG1) and the oil separator system (HG2). At the oil separator plant, a rubbery "skin" was found on the SF stone pavement over a large area, and there were also signs of oil contamination on nearby unpaved areas north of the oil separator plant. In light of the risk of impact on soil and groundwater, the operation of the oil separator is not considered to be environmentally sound as it is now.

Overall, it must be assessed that past activities and current production conditions pose a risk of unacceptable impact on soil and groundwater.

. . .

*8.3 Recipient*

The nearest recipient is Selsmosen, located approximately 700 m northeast of the site. Based on the distance to the recipient, it is assessed that any contamination on the property will not pose a potential pollution risk to the lake.

. . ."

The county sent the report to the company by letter dated August 11, 1999. Subsequently, the county had an additional well drilled after a water sample of the groundwater on the company's property, which resulted in a report dated November 2, 1999, also prepared by EKJ. The report states, among other things:

". . .

*6.4 Water samples*

A new water sample from well B5 was taken on 14/10-99. The reason for taking a new water sample was that the original analysis for total hydrocarbons (GC/FID) did not have a sufficiently low detection limit, partly because not enough groundwater could be obtained from the well. The new water sample was analyzed by IR spectrophontometry. Before emptying and sampling, the water level in B5 was measured at 1.72 m.t.u. that day. The well was pumped clean with an MP1 pump and emptied of water. There was not enough inflow to the borehole for the water sample to be taken with the pump. Instead, a disposable water retriever was used.

Prior to this, the water was sounded and stood at 4.54 m.u.t. The very slow inflow of water means that the water sample is only representative of the groundwater/pore water in the formation immediately surrounding the borehole (radius of collected groundwater is
< 2m).

. . .

*8.5 Summary*

No leaks have been found on the TV-inspected pipe section, but the wells are in poor condition and may pose a risk of wastewater leakage. Only the pipes in the part of the system that may have received wastewater from the former dry cleaning plant (today these pipes receive wastewater from garment washing and rainwater) were inspected. There are still some uncertainties about the piping systems, and although the company has submitted a partially updated plan, there are still some ambiguities. The filtered well B5 shows no soil contamination and the groundwater contamination is at a low level (9 μg/l for total hydrocarbons) and just meets the Environmental Protection Agency's limit value. However, it should be emphasized that the filtered well is hardly optimally located in relation to the potential sources of contamination, but it was not possible to find traces of water in the other wells drilled.

Copyright © 2023 Karnov Group Denmark A/S

Pore air measurements at the former dry cleaning plant show high concentrations of chlorinated solvents and hydrocarbons. It is likely that these pollutants can affect the groundwater. The contaminants are also likely to be found to some extent under the floor of the wash bay.

. . .

*9. Risk assessment*

*9.1 Groundwater*

A weak contamination has been found in the latest groundwater sample from B5, which was analyzed by IR method for total hydrocarbons, corresponding to 9 μg/l or just on the limit of the Danish Environmental Protection Agency's requirements /6/. The well is located approx. 25 m east of the former dry-cleaning plant. This well is filtered because it was the only well in the study that indicated the possibility of taking a water sample. As B5 is located at some distance from one of the potentially significant sources of chlorinated solvent and hydrocarbon contamination (pore air measurements taken in front of the former dry cleaner) it is likely that the groundwater in B5 is not necessarily representative of the contamination situation on the property as a whole. As previously explained, the effective collection radius for groundwater in the well is < 2 m. Thus, groundwater collected in this well cannot be expected to be particularly representative of any contamination conditions in the most critical areas

**266**

(at the former dry-cleaning plant and at the industrial rags storage and oil separator plant).

However, the B1 borehole drilled did not show any signs of the presence of groundwater at the depth to which the borehole was drilled. It must be considered that it would be appropriate in relation to a risk assessment that a deeper well is drilled for water sampling in the area of the former dry-cleaning plant. It should be noted that the site conditions at the former dry-cleaning plant are extremely poor.

. . .

The source of the PCE contamination (dry cleaning plant, storage/handling of PCE and PCE waste, possible discharge via sewers) is no longer in operation today (operational period approx. 1965-1994). However, the identified soil contamination resulting from these activities may continue to affect the groundwater in the future through seepage into the saturated zone/groundwater aquifer, especially through the leaching of any free phase that is heavier than water.

The mapping of the contamination at the former dry cleaning plant is not considered sufficient for an actual risk assessment. It cannot be ruled out that there may be an impact on the indoor climate if the contamination under the floor in the production hall is of the same magnitude as that found outside. The likely affected premises are relatively well ventilated and are not used for a full working day, so any impact may be relatively limited. The washing process for industrial wipes continues to produce wastewater containing significant amounts of hydrocarbons and some of this water is recirculated in parts of the sewage system after pre-cleaning/ultra-filtration. It is not possible to provide a more precise risk assessment in relation to groundwater contamination with hydrocarbons on this part of the property, but it cannot be ruled out that there is an impact on groundwater with hydrocarbons, e.g. through seepage via sewers.

. . ."

After discussions with the county, the company initiated a voluntary investigation based on what had emerged in the reports of

August 3, 1999 and November 2, 1999.

In 2000, EKJ prepared a supplementary investigation report (undated) in accordance with an outline finally agreed between the parties. The report states, among other things:

Copyright © 2023 Karnov Group Denmark A/S

" . . .

*1. Introduction*

Erik K. Jørgensen A/S (EKJ) has been requested by Alba A/S to perform a supplementary contamination investigation on their property located . . .

Based on the results of the registration survey, Alba A/S decided to carry out a supplementary and delimiting survey. This will shed light on the extent of the contamination, including source strength and the extent of contamination of chlorinated solvents and petroleum products.

. . .

*2. Purpose*

The purpose of the present contamination investigation is to delimit previously identified contamination with petroleum products and chlorinated solvents. In addition, the purpose is to investigate previously uninvestigated potential sources on the property in order to prepare a risk assessment in relation to land use, specifically indoor and outdoor climate, and to enable an assessment of possible groundwater contamination.

*3. Executive Summary*

Contamination with oil components and chlorinated solvents has been found on the property in both soil and groundwater.

A total of four areas of soil contamination have been identified, the majority of which are found in the topsoil.

. . .

The risk assessments carried out indicate that the Danish Environmental Protection Agency's air quality criteria are not met in the production building. However, the at-values are complied with in the building. Based on the risk assessment calculations performed, it is assessed that there is no risk of outdoor air problems. Based on the risk assessment for groundwater, it must be expected that contamination with chlorinated solvents may occur under the production building, which may pose a risk to groundwater quality.

*6. Field activities and surveys*

. . .

*6.6 Assessment of results*

*6.6.1 Soil*

Hydrocarbons have been found on the property in four areas, named areas I-IV in Appendix 1 - Map 2.

Area I is located to the northeast of the property at the former neutralization well, where hydrocarbon content has been found in the topsoil and from approx. 2.0-3.5 m.u.t. It is estimated that the area covers an area of approx. 35 m$^2$ . In total, there is estimated to be approximately 100-150 tons of oil-contaminated soil in area I.

Area II is located at well B7 northeast of the property, between the technical wing and the production building. Hydrocarbons and a very high content of chlorinated solvents have been found in the area from 1.5 m.u.t. to the bottom of the well at 4.0 m.u.t. It is estimated that the area covers an area of approximately 25 m2, and it is estimated that there is a total of approximately 100-150 tons of soil contaminated with petroleum products and chlorinated solvents in area II.

It should be noted that in recent years an excavation has taken place immediately west of area II.

**267**

The excavation took place in connection with the establishment of the concrete pit, where the conveyor belt transports sacks etc. around the production. It is not known whether contaminated soil was found in this area in connection with the excavation.

Area III is located on the northwestern part of the property and extends from under the canopy at the rag reception over the

equalization tanks. Hydrocarbons have been found in the area in the topsoil (from ground level to approx. 1.5-2.0 meters below ground level) and in a small part of the area around 3.5 meters below ground level (well B9). It is estimated that the

Copyright © 2023 Karnov Group Denmark A/S

The site covers an area of approximately 350 m² , and it is estimated that the area contains around 1,000-1,200 tons of oil-contaminated soil, of which 50-150 tons are estimated to originate from deeper contaminated soil around B9.

Area IV is located on the southwest corner of the storage building. Hydrocarbons have been found in the topsoil in the area. It is estimated that the contaminated area covers an area of approximately 50 m2. The contamination is located from ground level to approx. 1-1.5 m below ground level. It is estimated that the area contains approx. 150-200 tons of oil-contaminated soil.

*6.6.2 Porous air*

Widespread contamination with hydrocarbons and chlorinated solvents in the pore air has been found on the property. It is estimated that the chlorinated solvent contamination covers an area of approximately 400-600 m² .

At present, no actual drilling has been carried out under the floor of the current production hall (the former dry cleaning room etc.). This is because it would be extremely difficult to gain access for other than hand drilling equipment, which cannot drill to the desired depths anyway. Any soil and groundwater contamination during construction can thus only be assessed based on the pore air measurements, especially on P5 and P6.

Both pore air measurements show pronounced contamination with hydrocarbons, including BTEXs and chlorinated solvents. The level is particularly high in both measuring points.

It must therefore be assessed that there is significant contamination in the soil and possibly groundwater under the buildings. The levels found are so high that it cannot be ruled out that there may be a free phase of hydrocarbons and/or chlorinated solvents.

Especially to the south and west under the buildings, the contamination is not delimited.

*6.6.3 Groundwater*

Both hydrocarbons and chlorinated solvents have been found in the groundwater on the property. The highest concentrations were measured in the upper secondary groundwater and the lowest concentrations were measured in the primary aquifer, where the concentration of hydrocarbons and chlorinated solvents is lower than the Environmental Protection Agency's groundwater quality criteria.

The highest concentrations of hydrocarbons and chlorinated solvents were measured in well B22, but this is believed to be due to a sewer pipe connected to the rag press being pierced. As a result, pressed water containing hydrocarbons is directly fed into the lower secondary aquifer.

. . .

*8. Conclusion*

Soil and groundwater contamination with oil components and chlorinated solvents has been found on the property.

The levels of BTEXs found in the production building do not give rise to indoor climate problems in the building. However, the levels of trichloroethylene and tetrachloroethylene found in the pore air under the production building give rise to indoor climate problems if the calculated concentrations in the indoor air are compared with the Danish Environmental Protection Agency's air quality criteria. However, as the property is not used for residential purposes but for production activities, the content of chlorinated solvents has been compared with the Danish Working Environment Authority's limit values, which do not give rise to indoor climate problems in the production building.

The risk assessments performed do not immediately indicate a risk to groundwater quality at the extraction wells for Taastrup Valby Kildeplads. However, due to the high pore air concentrations of chlorinated compounds measured under the production building, it cannot be denied that this contamination can or has given rise to contamination of the groundwater. A calculation has been carried out to determine whether the pore air contamination can give rise to groundwater

Copyright © 2023 Karnov Group Denmark A/S

problems, and this calculation indicates that there may be a problem with groundwater quality."

In June 2000, at the same time as the supplementary investigation, contamination of the property was discovered in connection with excavation near a pumping well. According to a memo dated July 24, 2000, prepared by EKJ, one of the soil samples taken immediately adjacent to the well was found to contain oil components above the Danish Environmental Protection Agency's soil quality criteria, and the excavated soil was deposited.

Based on the supplementary investigation report of 2000, EKJ issued a memo on February 20, 2001 on the background for and assessment of mitigation measures. This states, among other things:

" . . .

*3.1 The contamination found*

Based on findings of oil components and chlorinated solvents in pore air, soil and groundwater, it has been established that the property is contaminated. Based on the investigations, it is to be expected that there is contamination with chlorinated solvents under the production building.

**268**

The contamination of the chlorinated solvents is likely to have been caused by spills during the chemical cleaning process. It is not known exactly when this contamination occurred.

. . .

*3.6 Situational awareness*

The environmental investigations on the property have not provided a complete mapping, as part of the contamination is located under existing buildings, where drilling work is extremely difficult.

Based on previous investigations, very high concentrations have been found in pore air measurements under the buildings, which is why there is probably a free phase under the building. This is probably to be found in the area under the old dry cleaner.

It is difficult to assess the extent to which the contamination has spread down to the primary reservoir. This is because only two boreholes have been drilled into the limestone. The data collected from the boreholes shows that the location is not optimal because the boreholes are generally located at the upstream end of the total extent of the contamination (north of the buildings).

One or two wells downstream - i.e. on the southern side of the buildings on the property - would provide a better technical basis for assessing the extent of contamination and impact on the primary groundwater. It has not yet been decided whether these wells will be drilled, as we are awaiting a response from the County of Copenhagen regarding possible financing of one of these wells located just outside Alba's property.

. . .

*5. Conclusion*

It is not possible to determine the extent of the contamination and where exactly it is located. Furthermore, the geology itself makes any cleanup difficult, as any ventilation or water supply will most likely not be able to remove the contamination.

It can therefore be difficult to remove the contamination itself and the entire contamination and prevent contamination of the primary aquifer.

Therefore, in any case, a remedial pumping system must be proposed that can collect seeping contaminated groundwater. Due to the geological and hydrogeo- logical conditions, this remedial pumping must take place from the primary reservoir

immediately adjacent to the contamination. This prevents any seeping contamination from spreading towards the extraction wells located in the area. A hydrogeological assessment must be carried out before remedial pumping can be designed.

Copyright © 2023 Karnov Group Denmark A/S

and there must also be a commitment from the County of Copenhagen with regard to obtaining an extraction license.

In order to satisfy the County's wishes to attempt to collect a probable free phase under the former dry-cleaning plant, one or more vertical drainage wells can be established under the former dry-cleaning plant. There is no absolute guarantee of success with this solution, but on the other hand it cannot be ruled out that free phase or the more concentrated part of the dissolved contamination could be collected. These drainage wells will require systematic monitoring and emptying.

If you want to remove residual contamination in the unsaturated zone - also the unsaturated zone that occurs as a result of a groundwater lowering, it may be possible to achieve an effect by ventilating the soil under the building. At first glance, this contamination does not pose a problem in relation to the indoor climate, and therefore this mitigation is not recommended."

On February 27, 2001, the parties held a meeting at the company to discuss the available survey results, including discussion of remedial measures.

When the parties could not agree, on August 31, 2001, the county issued a preliminary notice of knowledge level 2 contamination mapping on parts of the company's property:

"In a letter dated December 13, 1999, the County of Copenhagen notified you that your property, cadastral number 11 c, Høje Taastrup By, Taastrup Nykirke, Rugvænget 1-5, 2630 Taastrup, will be regulated as a waste depot under the Waste Depots Act. As of January 1, 2000, the Act on Waste Depots has been replaced by the Act on Contaminated Land, which is why a new assessment of the contamination on your property must be made.

The assessment will be based on registration surveys carried out on your property. The registration surveys are reported in the reports "Københavns Amt, Registreringsun- dersøgelse, Alba A/S, Renseri samt tøjvask, Rugvænget 1-5, 2630 Taastrup, Revision 02 af 99-11-02" and /2/"Supplerende forure- ningsundersøgelse, Rugvænget 1-5, 2630 Taastrup, Revision 2000-11-09".

. . .

*Conclusion*

It is assessed that the high levels of trichloroethylene and tetrachloroethylene in the pore air under the production building may give rise to indoor climate problems. Furthermore, the high concentrations in the pore air indicate heavy soil contamination under the building and there is also a high probability of groundwater contamination. The property is located in an area with special drinking water interests.

In terms of land use, this is not a highly sensitive use as the property is used for laundry and there are no plans to change the land use. As most of the near-surface contamination is paved with SF stone, concrete or asphalt, there is no risk of contact with contaminated soil under normal conditions. In connection with earth moving or

**269**

However, there may be a risk of contact with the contamination during construction work.

It is the county's assessment that the contamination found may have a harmful effect on humans or the environment and is therefore covered by the rules in Act no. 370 of June 2, 1999 on contaminated soil.

It must therefore be announced that the county intends to map the contamination found at knowledge level 2, cf. section 5 of the Act.

. . ."

In a letter to the company dated December 18, 2001, the county announced that part of the company's property had been mapped in accordance with the Contaminated Land Act.

Copyright © 2023 Karnov Group Denmark A/S

In connection with the discussions on further investigation and remediation measures, the company had expressed a wish to be able to use the secondary water that would be produced in connection with the remediation drilling. Furthermore, the company pointed out that it had been compulsorily administered by the state from 1982 to 1997.

In a letter dated March 7, 2002, the county informed the company's lawyer of the county's considerations about issuing an investigation order and its position on the company's use of secondary water. The county also presented its comments on the fact that the company had been under compulsory administration.

On November 7, 2002, the county notified the company of an investigation order under section 40 of the Soil Pollution Act. The letter states, among other things, the following:

". . .

The soil contamination with chlorinated solvents, which is assumed in the registration report to be groundwater threatening, is believed to originate from Alba A/S's dry cleaning operations, which according to the company began in 1965 and continued until 1994/95.

There is no information about accidents involving Alba A/S's dry cleaning activities, and it must therefore be assumed that spills occurred continuously during daily operations, which as mentioned continued until 1994-95. The heavy contamination with chlorinated solvents found in the soil, among other things, cannot, in the opinion of the county, originate from activities other than Alba A/S's cleaning operations.

. . .

Before the County of Copenhagen, Technical Administration decides whether Alba A/S should receive an injunction with the wording stated, the administration must inform the company in this letter of its right to comment on the case so that the company's views can be included in the consideration of the injunction. Furthermore, Alba A/S is invited to contribute with information that can shed light on the costs, advantages and disadvantages of the injunction.

. . ."

On January 6, 2003, lawyer Birgitte Refn Wenzel replied to the county on behalf of the company. The lawyer referred, among other things, to the changing operators on the property and to the fact that the previous environmental inspections had not revealed errors and omissions on the part of the company, including that the company had in two cases taken remedial measures in connection with the discovery of contaminated soil. Given the great uncertainty associated with the company's potential obligations, she disputed that there was a legal basis for issuing an injunction against the company. On May 12, 2003, the county notified the company of an injunction pursuant to section 40 of the Soil Pollution Act to establish two deep wells and to investigate the possibilities of removing the pollution found in the pollution investigations.

On June 6, 2003, lawyer Birgitte Refn Wenzel appealed the order to the Danish Environmental Protection Agency.

In a memo dated January 15, 2004 from Per Nielsen at EKJ for use in the complaint about the investigation order, the following is stated, among other things:

". . .

Thus, there are reasons to assume that contamination with PCE is less likely in the period after approx. 1990 than in the period before 1990. In relation to the age of the contamination, it is therefore most likely to have occurred before around 1990.

. . ."

On June 30, 2004, the county contacted the company's attorney because the county wanted to enter into a suspension agreement on the statute of limitations for the county's potential claims against the company. The county's letter states, among other things:

". . .

According to the County's assessment, the County's potential claims for damages against their client will expire in the fall of 2004 and the County of Copenhagen will therefore

Copyright © 2023 Karnov Group Denmark A/S

In order to avoid a perhaps unnecessary lawsuit, we suggest that an agreement is made between the county and Alba A/S to suspend all passivity and prescription that has not already occurred.

. . .

Since November 2000, Alba A/S has not wanted to initiate further investigations into the contamination.

As the pollution was/is not delimited, in May 2003 the county ordered Alba A/S to drill a deep well downstream of the pollution in order to further clarify the extent of the pollution from Alba A/S.

In the summer of 2003, Alba A/S appealed the injunction to the Danish Environmental Protection Agency. The time horizon for when the agency will make a decision in the case is very uncertain and is probably some time in the future.

Alba A/S is located in area 1, an area with special drinking water interests, which the county gives high priority. The county's action planning under the Water Supply Act is concentrated around the source site and the catchment area for Taastrup-Valby West, of which Rugvænget 1-5 is a part.

Orders can include remediation, while public action under the Soil Pollution Act (jfl) only includes

**270**

is done either for the sake of groundwater or for the sake of land use if this is one of the sensitive purposes mentioned in section 6(1) of the Soil Pollution Act.

On the present basis, the County considers that it does not have sufficiently clear authority under Section 69 of the Environmental Protection Act to issue a remediation order. The county therefore intends to initiate a public clean-up pursuant to the Soil Pollution Act in order to protect the groundwater and will, on the present basis, seek recourse against your client for the costs incurred for such a clean-up.

Any claim for compensation follows the general rules on limitation, which means that the claim for compensation is time-barred 5 years after the county became aware of the existence of the claim, cf. the Limitation Act of 1908

§ 1. The limitation period is interrupted by the institution of legal proceedings.

As mentioned in note 1, the final registration report is available on November 2, 1999, and it is therefore the County's understanding that the statute of limitations for any claims by the County will begin to run in November 2004.

. . ."

The company's lawyer replied on August 13, 2004 and October 11, 2004 the following:

". . .

I have received your letter of 30.6.2004 and would like to inform you that, due to the intervening vacation, I have not been able to answer your letter until now. I would also like to inform you that I wish to consider your proposal to enter into a suspension agreement and to discuss the matter with my client, which is why I would kindly ask you to wait until you have received a more detailed response from me, which is expected to be around September 1, 2004.

. . ."

". . .

With reference to your letter of June 30, 2004, I would like to inform you that my client will consider entering into a suspension agreement with the county, while maintaining all possible objections regarding the county's claim. It is therefore my opinion that the county will not be able to pursue a claim for damages against my client, as the conditions for this are not met.

Before my client makes a final decision to enter into a possible suspension agreement with the county, I kindly ask you to forward a draft suspension agreement to me.

. . ."

The company's plant manager, Tommi V. Larsen, wrote to the county on October 12, 2004 as follows:

Copyright © 2023 Karnov Group Denmark A/S

".. .

*Subject: Order to investigate soil and groundwater.*

For a very long time now, there has been a lot of paper communication between the County of Copenhagen and Alba A/S, and between both parties' legal advisors.

We believe that the discussions and communication have been very positive - there have been very good advisors on both sides. We have had many "heavy" studies to clarify the pros and cons of each side's views, but we have not really made any progress.

Through our collaboration with Høje-Taastrup Municipality and the County of Copenhagen, we have completed major environmental projects such as excavation of contaminated soil, establishment of a tank pit, new tanks, a new ultrafiltration plant, etc. We are currently the only Danish laundry that cleans all the water used in the washing process before it is discharged. Together with the County of Copenhagen, we will also, according to our environmental approval, have to spend a lot of effort/resources in the coming years.

The goal must be that we get the most "environment" for the money and that we use our joint efforts on solutions that benefit the environment. As the case is developing at the moment, I do not see the effort being put into the "environment" but rather into the case processing. If the case continues, the time period for when "we get environment" for the money will be very long. We still do not believe that there is a legal basis for carrying out the submitted order, but we would like to come up with a "solution" that can take us further.

Suggestions/proposals for solving the task:

We perform the groundwater investigations according to the injunction against:

• To be allowed to use secondary water from your own wells if it is the most appropriate mitigation method and it is technically feasible.

• That we close the last of the disagreement regarding the time of the contamination. This could be done by the County of Copenhagen accepting that the contamination of the soil occurred before January 1, 1992.

.. ."

In a letter dated October 18, 2004, the county rejected the proposal from Tommi

V. Larsen and at the same time stated about the conclusion of a suspension agreement:

".. .

Without a suspension agreement, the County is forced to issue a writ of summons against you to interrupt the statute of limitations, which the County believes will expire on November 2, 2004.

In the absence of a suspension agreement, the county will continue the preparation of the lawsuit against you. In this connection, the county can inform you that the summons is currently in draft form and will be finalized and sent to the court in Tåstrup before the end of October.

According to the county's letter to your attorney, the subpoena will only be stopped if the county receives a signed

**271**

and unconditional suspension agreement that the county can approve the content of.

.. ."

By letter of the same date, the county answered the inquiry of October 11, 2004 from lawyer Birgitte Refn Wenzel. The reply states the following, among other things:

".. .

Considering that you stated in your letter of August 13 that

your client's decision to enter into a suspension agreement would be made around September 1, and that the county has not heard from you since then, the county has assumed that your client was not prepared to enter into a suspension agreement.

It is noted that your client has been in contact with the county on several occasions since August 13 regarding the case, including

Copyright © 2023 Karnov Group Denmark A/S

at a meeting with the deputy director of the technical administration on August 19. At each of these contacts, your client was informed that if a suspension agreement was not reached, the county would issue a summons.

On these occasions, your client has not indicated a willingness to enter into a suspension agreement.

. . .

As the limitation period of November 2 is now imminent, and as you and your client have now had 3½ months to enter into a suspension agreement, the county does not find that there is a time basis for preparing a draft and subsequently discussing its content with you or your client.

. . ."

*Explanations*

During the case, Helle Okholm testified as a witness, Jørgen Anton Kristensen testified as a party and Per Nielsen, Britt Malling, Jørn Jakobsen, Ole Arenfeldt Jensen and Tommi V. Larsen testified as witnesses.

*Helle Okholm* has explained that she is employed as a lawyer in the county's technical administration, where she has mainly worked with environmental issues since 1993. The company was a so-called list company, which was on a list of highly polluting companies that required prior environmental approval. Since the early 1980s, the county has been trying to map the area around Høje-Taastrup, where a lot of water is extracted. Environmental inspections relate to the daily operations of the company. Mapping is done to maintain knowledge about pollution that has already occurred. According to the Soil Pollution Act, which came into force on January 1, 2000, the mapping system means that contaminated properties are divided into knowledge levels 1 and 2. Knowledge level 1 includes properties where contamination is suspected. Knowledge level 2 includes properties where physical investigations, engineering reports, etc. conclude that there is contamination on the property. The company was registered at knowledge level 2. The county's responsibility for remediation measures is subsidiary in relation to pollution. The county was of the opinion that the contamination was in "free phase", i.e. it was undiluted just below the factory. However, it was not known that the contamination had "escaped". The assessment of the contamination considered whether it posed a threat to those using the plant and/or the groundwater. In the company's case, it was the groundwater that concerned the county. The result of the mapping investigation was the investigation order pursuant to section 40. The company has subsequently appealed the order to the Environmental Protection Agency. She is aware that the case has subsequently been heard by the county, but that no decision has yet been made by the agency. The county has considered issuing the company with an injunction under the Environmental Protection

§ 69. In her opinion, an injunction could not achieve the same result as an action for recognition. Furthermore, based on the "Shell judgment", the county was in doubt as to whether an injunction could be applied in the specific case, as most of the pollution had to be considered to have occurred before 1/1 1992. She was in no doubt that there was a connection between the pollution found and the company's activity. The county's prioritized list only includes properties where the polluter is not known, and where it is therefore the county's task to carry out remediation measures, etc. The company is therefore not on the list despite its registration at knowledge level 2. The list is revised once a year. Secondary water is purified water from a well, which is carried out in connection with a remediation measure. The company wanted to use secondary water in

production, which the county was not opposed to.

*Jørgen Anton Kristensen* has explained that he is the CEO, chairman of the board and sole owner of the company. The company was established in 1936 by his grandfather and was run from 1960 from the current property in Taastrup. In 1969 Jørgen Kristensen founded

Copyright © 2023 Karnov Group Denmark A/S

Alba Linen Rental A/S. He took over the company himself in 1980 or 1981. In the 1970s, he had a summer vacation job as a driver's assistant at the company. Discipline at the company was strict. His grandfather wanted the company to be run in a correct and orderly manner. It had to be clean and tidy. The company is the largest distributor of rags in Scandinavia. The dry cleaning was a small part of the company's production, no bigger than the equivalent of a normal dry cleaner on a high street. Gert Thorsen was responsible for the two dry cleaning machines. He was a full-time employee and only had the dry cleaning machines as his job, including draining and filling chemicals. He does not remember seeing or hearing about any spills of perchlorine from the machines. If there had been any such spills in his time, he would have been informed. The company has always focused on the environment, especially water purification, due to environmental requirements. In 1979, the company started

**272**

The company has a partnership with Alfa-Laval for water purification. The company has always been at the forefront in this area, which is also reflected in the company's accounts. He has lived in Rome for the past 16 years and has therefore not been involved in the company on a daily basis. However, he is aware of operations through reports and daily telephone contact with the company. The public supervision of the company has always been very strict, but there has always been a good dialog, which is also confirmed by the many wells on the property.

*Per Nielsen* has explained that he has a degree in environmental biology from the University of Copenhagen. He is head of the environmental department at EKJ, where he has been employed for the past 17 years. The investigation report of August 3, 1999, is the result of an inquiry from the county, which wanted a registration survey carried out on the company's property. The registration survey is a preliminary investigation that can form the basis for possible remedial measures. The report of August 3, 1999 concludes that there is pollution on the property. The report also shows findings of chlorinated solvents. The pore air measurements "P 1" and "P 2" did not show that the groundwater had been contaminated, but based on the test results he suspected that the groundwater might be contaminated. Therefore, it was agreed with the county that further samples should be taken, also because the first sample was not very good. In a later sample in connection with the preparation of the report of November 2, 1999, oil-containing products, hydrocarbons, were found in the groundwater in relatively small concentrations. On this basis, EKJ, in consultation and agreement with the county, entered into cooperation with the company to prepare a supplementary report. The report of November 9, 2000 was a continuation of the registration study, but was paid for by the company. The supplementary investigation was costly and extensive. The contamination of oil components and chlorinated solvents referred to in the summary of the 2000 report was found in several locations on the property. The pore air measurements performed in the investigation showed signs of contamination. Hydrocarbons are oily products. Chlorinated solvents are hydrocarbons that contain chlorine, typically cleaning fluids and liquids used for degreasing. PCH decomposes to TCE, which has been found in significant amounts on the property. Tetrachloroethylene is a chlorinated solvent that is the main element in cleaning fluids. "Free phase" is the liquid as if it were undiluted in a canister. Free phase occurs directly from the source of contamination. It is likely that tetrachloroethylene is found in

"free phase" under company property. If you need to find drugs in "free phase", you may have to go 8-10 m "below the floor", and the pore air measurements were typically ½-1 m "below the floor". It can be very difficult to say when contamination occurred unless you can attribute it to a major accident, so it can only be an estimate. This estimate of the time of contamination can be

Copyright © 2023 Karnov Group Denmark A/S

This is based on his experience and the way in which such chemicals were handled in the past, which, especially in the 60s and 70s, was done more carelessly. In the 1980s there was more focus on the environment. He is not able to elaborate on the exact time of contamination, as the degradation can be difficult to determine, as the environment in the soil layers is crucial to the degradation. The information in the report of August 3, 1999 that the contamination must originate from before April 1, 1976, is based on statements from the owner or washerman. The analysis result of well "B 22", which appears in the report from 2000, may be due to the influence of wastewater that has run out from a leaking sewer pipe. Due to the soil layers in the area, it is very difficult to say whether direct seepage has occurred. However, there were several aspects that pointed to it. It cannot be ruled out that the contamination may be deeper, although there is no evidence of this in the groundwater at ground level. The fact that the contamination is under a building is significant, as leaching will take longer. Contaminants may have penetrated through the concrete floor of the company's buildings. A concrete floor is not dense, but has many small cracks. The contamination may also have come through the sewer. He has carried out several investigations for the county, also concerning small dry cleaners that cannot be compared to the company's business, which was a large dry cleaner with large machines. Chlorinated solvents are found on most of the dry cleaning sites. Apart from a single water sample, no further investigations were carried out for the report of November 2, 1999. There is no significant difference in the certainty of the opinion on groundwater contamination in the reports of August 3 and November 2, 1999.

*Britt Malling* has explained that she is a civil engineer in environmental engineering and a former employee of EKJ. She was involved in preparing the report of November 2, 1999 and the outline for the investigation. Per Nielsen was the project manager. Oil components and chlorinated solvents were found in the soil and groundwater. She was involved in performing two of the pore air measurements mentioned in the report. The pore air measurements were taken with two parallel carbon tubes. The sample "P 6" showed that both coal pipes were saturated and that contamination was detected. It cannot be denied that there is a "free phase" under the building, but it cannot be denied that there is no "free phase" either.

*Jørn Jakobsen* has explained that he was employed by the company in 1985, where he cleaned after school. Two years later, he was hired as a regular, hourly-paid employee with various tasks. In 1988 or 1989, he began to work more intensively with cleaning. Gert Thorsen alone was responsible for the use and maintenance

**273**

of the cleaning machines. Initially, the witness was only a helper and vacation replacement for Gert Thorsen, but when Gert Thorsen left the company in 1991, he took over his tasks completely. Gert Thorsen was very conscientious and gave him thorough instruction in the use of the machines. In addition, he attended courses over time. When he was hired, the company had two cleaning machines. One of them was possibly 7-8 years old. Punch cards were used to operate it, but it was absolutely functional. The other was very modern and probably almost new. They were both used for the shutdown in 1994. The cleaning machines were regularly serviced by the same person from a specific service company. The person seemed competent. He had the impression from his participation in courses and from other people's visits to the company that the company's machines were newer and better than most. There were manuals for the machines both from the manufacturer and from his and Gert Thorsen's participation in courses. About every three months, perchlorine was added to the cleaning machines. Filling was done directly from the tanker. It was a closed circuit. However, every morning, 10-15 liters of distilled perchlorine was taken from the machine in a 25-liter canister, and the liquid was poured onto the machine

Copyright © 2023 Karnov Group Denmark A/S

again. The machine was also emptied of sludge once a week. The sludge was emptied directly into a container. The remaining sludge was scraped out and filled into the container. The container, which could hold around 50 liters, was always filled ¾ to the line and placed in the same place outside the dry cleaner. When there were 5-6 full containers, they were emptied by a vacuum cleaner in the presence of him or Gert Thorsen. Gert Thorsen told him that perchlorine was toxic. With his current knowledge, he would not have handled the machines any differently today than he did back then. When Ole Arenfeldt Jensen took over as CEO, the company began washing clothes rather than dry cleaning them for environmental reasons, which was made possible by more effective soaps, among other things. He has no knowledge of any individual polluting emissions from the company.

 *Ole Arenfeldt Jensen* has explained that with effect from January 1, 1993, he was employed as sales manager in the company and with effect from June 1, 1993, as director of the same company. At that time, the company had around 75 employees, most of whom were unskilled. The company had been very conservatively managed with few investments. He changed that. Under his leadership, the company's main activity was the rental of industrial cloths, which were washed and returned to the customer after use. The cloths were used for printing ink, which is classified as environmentally hazardous waste, so it was important for the company to be in control of the environmental conditions. As washing methods had become more efficient, dry cleaning had become less attractive. The company's turnover from cleaning was estimated at 5 or 10% of the company's total turnover when he joined, and the company stopped cleaning altogether during his tenure. The company's cleaning machines were not modern, but functioned properly. Employees were aware that perchlorine was toxic and should be handled with care. It was important to signal to the company's customers that the company was aware of and was doing something about the environmental conditions. In 1995, the company received Taastrup Municipality's business award for environmental efforts and was environmentally certified in 1996. He does not recall that the company has been reprimanded by anyone for environmental issues. While he was CEO, six different lawyers were chairmen of the board. It was very important to them that the company was handled in an environmentally correct manner. In February 1998, when the management of the company ceased, he resigned from his position as director at the same time as the current board of directors resigned. He does not recall any individual polluting emissions from the company.

 *Tommi V. Larsen* has explained, among other things, that with effect from January 1, 1999, he was employed as plant manager in the company. He had a versatile education and had, among other things, studied HD. He was in continuous dialog with the county, including in the form of meetings. After reading the report from August 1999, he approached the company's CEO. The company was in favor of an open environmental policy and wanted to cooperate. It was decided to ask EKJ to carry out a supplementary investigation with a number of additional wells. After approving the proposed boreholes himself, he obtained the county's approval. When the results of the survey were available, he attended a meeting with representatives from the county about mitigation measures. The company was unsure whether the chlorinated solvent contamination originated from the company, as there were neighboring companies that also emitted such substances. It was costly to carry out more drilling to detect any further contamination. The county requested that

this be done. He suggested "splitting at the gate". The county refused, after which the matter was handed over to the management, who contacted a lawyer. The company photographed all its sewers for leaks, but found none serious. One of the

Copyright © 2023 Karnov Group Denmark A/S

sewer for water from production was lined. Today, all wastewater is purified. He is no longer employed by the company.

*Procedure of the parties*

*The County* has argued that the conditions for bringing an action for recognition have been met. In the investigation reports of November 2, 1999 and 2000, it has been established that there is pollution on the company's property that poses a threat to groundwater. There is a concrete and current legal uncertainty as to whether the company is liable for compensation for the pollution and whether,

**274**

whether the company must indemnify the county for its necessary expenses for the delimitation of the contamination and the impact on the groundwater. The county has a legal interest in such clarification, and the claim is not too imprecisely formulated.

It is not a condition for the county to make a claim for compensation that an order can be issued under section 69 of the Environmental Management Act, which deals with remediation. The county can reclaim expenses if the polluter, the company, is responsible.

The County's claim is not time-barred. The limitation period is only to be calculated from the date of the investigation report of November 2, 1999. The County did not deal with the report of August 3, 1999, which did not comment on the groundwater and therefore gave rise to the preparation of a new report. If the time limit is to be calculated from August 3, 1999, the time limit must be considered to be suspended in view of the parties' negotiations, during which the parties had the common conviction that the limitation period should be calculated from November 2, 1999.

The *company* used chlorinated solvents, including PCE, in connection with the laundry and dry cleaning production on the property, at least in the period 1976 to 1994. There is a coincidence between the substances used by the company in production and the pollution registered on the property. The registered contamination is therefore undoubtedly caused by the company's activities on the property. The company has the burden of proof that it has not acted recklessly in relation to the registered pollution. Thus, a presumption of liability applies. Even if such liability does not apply, it has been proven with certainty that the company has acted culpably and is liable.

The company, which was converted into a limited liability company on June 21, 1994, has, as a continuing company, succeeded to the obligations incurred by the previous legal entities in connection with the operation of the property. The company is therefore the proper defendant.

*The company* has argued that the county's claim is too imprecise to be considered. The county had the right and duty to issue an injunction under section 40 of the Soil Pollution Act rather than raise a claim for damages.

The conditions for imposing liability on the company under the general liability rules of Danish law are not met. There is no basis for liability, as the county has not proven that the pollution is due to errors and omissions on the part of the company. The fact that the company has had a commercial interest in the production does not in itself mean that it has acted in a liable manner. The assessment of the company's handling of the chemicals must be based on the knowledge available at the time. According to Jørn Jakobsen's statement, the company's machines were well maintained. According to the explanations, the company's employees were careful when handling the chemicals,

and no individual accidents have been reported. The environmental certification of the company did not give rise to any comments. Nor has it been demonstrated that the conditions of causality and adequacy have been met, among other things because there have been several companies on the property, and because the timing of the pollution is very difficult as explained by Per Nielsen.

Copyright © 2023 Karnov Group Denmark A/S

There is no causal link between the company's production and handling of chemicals on the property and the later registered pollution. There is no basis for assuming that a presumption of liability applies to the company in this case. The county has not proved that the contamination registered on the property poses a risk to the groundwater, which is why there is no obligation to act for the county. The county has therefore not documented that it has suffered any financial loss or documented a protected interest.

The County's claim is also time-barred. The limitation period shall be calculated from the investigation report of August 3, 1999. There are no circumstances that suspend the statute of limitations. The County was only in ignorance of its claim until August 1999, when it had the requisite knowledge to raise the claim. The County cannot invoke negotiations on suspension of the limitation period, as the County has only expressed its opinion to the company that the limitation period should be calculated from November 2, 1999. However, the County has not indicated that the limitation period should be suspended as a result of negotiations, and the County's failure to do so must be detrimental to the County.

Finally, the company has argued that the laundry and dry-cleaning operations on the property have been run by various operators, which is why the company cannot be responsible for operations on the property before the company was founded in 1969.

### The High Court's reasoning and result:

Based on the content of EKJ's reports, the county is found to have a current interest in obtaining a judicial review of whether the company is liable for compensation for the pollution found in the reports and whether the company must indemnify the county for the costs of delimiting the pollution and preventing its impact on the groundwater. Although the wording of the claim leaves the extent of the company's obligations dependent on circumstances that are not known at the present time, the claim is sufficiently precise to be adjudicated.

As the parties agree that the business at Rug- vænget 1-5 has been operated by the same legal entity from December 19, 1969, where

**275**

The company is also considered to be the proper defendant from the date of incorporation to the present day.

The county's right to bring an action for recognition as in this case is not found to be dependent on the county's right to issue an administrative order to the company.

In accordance with EKJ's reports, the High Court found that the significant contamination with, among other things, perchloroethylene at the property Rugvænget 1-5 was caused by the company's activities up to the closure of the dry-cleaning plant in 1994. It has not been established with certainty whether the contamination was caused by direct discharge or by spillage in connection with the handling of the chemicals or in some other way. However, it is undisputed that the company used hydrocarbons to a significant extent in production. Although the company had no special expertise in chemical waste, based on the general knowledge in the years when the pollutants were used, the company should have been aware that discharges or spills, even in small quantities, could pose a risk of spreading to the groundwater. Against this background, the company is found not to have exercised sufficient diligence and taken sufficiently effective measures to avoid pollution such as that which occurred. The High Court then finds that the company, through reckless conduct, has caused the pollution found on the property.

Under point 7.5, summary, of the registration investigation of August 3, 1999, it is stated that "Pore air measurements at the former dry-cleaning plant show high concentrations of chlorinated

Copyright © 2023 Karnov Group Denmark A/S

solvents and hydrocarbons. It is likely that these contaminants can cause groundwater impact". The same report also states under point 8, risk assessment, that "Overall, it must be assessed that previous activities and current production conditions pose a risk of unacceptable impact on soil and groundwater". Against this background, the county should have realized from the time this report was produced that it was likely that county action was required. The 5-year limitation period in the 1908 Act, which is considered to regulate the matter, must therefore be calculated from this time, cf. section 3 of the Act.

However, it appears from the correspondence in the case that by letter of June 30, 2004, the County submitted a proposal to the company's lawyer for an agreement on suspension of the limitation period, and that the company's lawyer then by letter of August 13, 2004, requested the County to await the possible issuance of a summons and later by letter of October 11, asked the County to submit a draft suspension agreement. It also appears that throughout the process, the County expressed its opinion that the limitation period ran from November 2, 1999. Under these circumstances, the High Court finds that the company has given the county reason not to bring an action despite the expiry of the time limit, which is then found to be suspended until the time when the county issued a summons.

The High Court then accepts the county's claim.

Depending on the scope and outcome of the case, the company shall pay legal costs to the county as determined below for compensation of expenses for legal assistance.

- - -

## Supreme Court

### Supreme Court ruling.

In a previous instance, judgment was handed down by the Eastern High Court's 4th division on
December 7, 2006.

Seven judges participated in the ruling: Poul Sørensen, Peter Blok, Per Walsøe, Asbjørn Jensen, Niels Grubbe, Jon Stokholm and Henrik Waaben.

*Claims*

The appellant, Alba A/S, has claimed dismissal, alternatively acquittal and more alternatively that Alba A/S' obligations under the defendant, the Capital Region of Denmark's, claims are limited to pollution that occurred after October 30, 1984.

The Capital Region of Denmark has repeated its claims.

*Requester*

In support of its motion to dismiss, *Alba A/S* has stated that the Capital Region of Denmark's claims are not suitable for admission as they are too imprecise, too far-reaching, too inapplicable and of too indefinite scope.

In support of the claim that the region's claim is outdated, Alba A/S has further referred to the fact that the content of the draft report that the consulting engineering firm Erik K. Jørgensen A/S sent to the County of Copenhagen on Friday, June 25, 1999, must be assumed to correspond to the contents of the report of August 3, 1999. The draft report must have reached the county on Monday, June 28, 1999. At this time, or alternatively on August 5, 1999, when the county received the report of August 3, 1999, the county became, or should have become, aware of the contamination and the risk of contamination of the groundwater, and the county could then anticipate having to incur expenses for investigation and removal of the contamination. The commencement date of the 5-year limitation period under the 1908 Act must therefore in principle be calculated from June 28, 1999, alternatively from August 5, 1999. The commencement date should not be calculated from the receipt of the revised report of November 2, 1999, as there is no difference between the conclusions in the reports from August and November 1999, and

Copyright © 2023 Karnov Group Denmark A/S

Nothing significant has been added in the November report compared to the August report. Alba A/S cannot be considered to have waived the statute of limitations at any time.

*The Capital Region of Denmark* has argued that the region's claims are sufficiently clear and precise and generally meet the requirements that can be imposed when the purpose of the application is to interrupt a possible limitation period.

**276**

With regard to limitation, the county does not appear to have received the draft report of June 25, 1999 from Erik K. Jørgensen A/S. Neither the report of August 3, 1999 nor the report of November 2, 1999 gave the county sufficient knowledge of the contamination of the groundwater or certainty about who might be liable for the contamination or about the necessity and extent of the remedial measures that could form the basis for the region's claim for compensation. This has still not been clarified. The limitation period was therefore still suspended when the case was brought on October 29, 2004. If the time limit is to be calculated from the date of the report of August 3, 1999, it must be considered suspended until the case was filed, taking into account the parties' negotiations.

*Supplementary case presentation*

The Supreme Court allows Alba A/S to present a copy of the letter of June 25, 1999 from Erik K. Jørgensen A/S to the County of Copenhagen. The letter states, among other things:

"Draft reports are hereby submitted for your perusal:

- . . .

- Rugvænget 1-5, Taastrup - registration survey

. . ."

New information has been presented to the Supreme Court, particularly to clarify responsibility for the pollution, including a report dated June 28, 1994 entitled "Indledende Miljøgennemgang og Miljøstyringssy- stem for Alba Textil ApS", prepared by civil engineer Else Marie Jakobsen and cand.scient. Erik Søndberg Clausen as part of their continuing education.

*Explanations*

Supplementary statements were submitted to the Supreme Court by Jørgen Anton Kristensen, Jørn Jacobsen, Per Nielsen and Ole Arenfeldt Jensen as well as statements by lawyer and former board member of Alba A/S Erik Christoffersen, lawyer and former board member of Alba A/S Jørgen Bang, former chairman of the board of Alba A/S Bjarne Lehmann Weng, former director and board member of Alba A/S Christian Boy Birck, former employee of Alba A/S Jørgen Pedersen, civil engineer Else Marie Jakobsen and biologist Erik Søndberg Clausen.

### The Supreme Court's reasoning and result

For the reasons stated by the High Court, the Supreme Court agrees that the Capital Region's claims can be adjudicated.

The consulting engineering firm Erik K. Jørgensen A/S' investigation report of August 3, 1999 states, among other things, *that* Alba A/S' property is located in a special drinking water area and within the groundwater catchment areas for the source sites at Thorsbro Waterworks, *that* pore air measurements at the former chemical cleaning plant show high concentrations of chlorinated solvents and hydrocarbons, and *that* these contaminants can probably affect the groundwater. Against this background, it must be assumed that already upon receipt of this investigation report, the County of Copenhagen became aware not only of the contamination and the need for further investigations, including regarding the delimitation of the

contamination, but also that there was an imminent possibility that it would be necessary to implement remediation measures. The Supreme Court therefore finds that from this point in time, the county can no longer be considered to have been in unaccountable ignorance of its

Copyright © 2023 Karnov Group Denmark A/S

claims against Alba A/S according to the general rules on indemnification for expenses for both further investigations and any remedial measures, cf. section 3 of the Limitation Act of 1908. In this respect, the investigation report of August 3, 1999 does not differ from the revised report of November 2, 1999, to which the county itself attached importance in relation to the application of the Limitation Act of 1908. The 5-year limitation period under this Act therefore runs from the county's receipt on August 5, 1999 of the report of August 3, 1999 or possibly already from June 28, 1999, when the county must be presumed to have received a draft of the report.

Regardless of whether June 28 or August 5, 1999 is considered the starting date of the limitation period, it must be assumed that the parties did not conduct substantive negotiations on the county's claim in the period leading up to the expiry of the limitation period. The fact that the County in its letter of June 30, 2004 proposed the conclusion of a suspension agreement, and that Alba A/S in the letters of August 13 and October 11, 2004 from the company's lawyer declared its willingness to consider this proposal, can neither justify that the expiry of the limitation period is considered postponed, nor that Alba A/S is considered to have waived the right to invoke a limitation period that has already begun. The County's claim was thus time-barred before the lawsuit was filed on October 29, 2004.

On this basis, the Supreme Court accepts Alba A/S's claim for acquittal and there is no need to consider the other issues in the case, including the question of the basis of defense.

It should be noted that this judgment does not consider whether the county's investigation order pursuant to section 40 of the Soil Pollution Act should be upheld.

Legal costs before the High Court and the Supreme Court are fixed to cover legal fees of DKK 300,000, witness fees of DKK 3,568.48 and court fees of DKK 72,460, totaling DKK 376,028.48.

### For it is known to be right:

*Alba A/S is acquitted.*

*In legal costs before the High Court and the Supreme Court, the Capital Region must within 14 days after this*

**277**

*pay DKK 376,028.48 to Alba A/S. The amount bears interest in accordance with section 8a of the Interest Act.*

Copyright © 2023 Karnov Group Denmark A/S

**U.2010.261H**

***Myndigheds krav i anledning af en mulig grundvandsforurening var forældet. Forældelsesfristen ikke suspenderet og indsigelse om forældelse ikke frafaldet pga. forhandlinger mellem parterne om suspension.***

*Aftaler 1.2 - Pengevæsen m.v. 58.2.*

♦ A drev i en årrække virksomhed med vaskeri og renseri og foretog bl.a. kemisk rensning med anvendelse af perclorethylen (et klorbaseret opløsningsmiddel). Efter gennemførelse af en kortlægning og registrering af ældre industrigrunde i kommunen, som blev iværksat af amtet, B, blev der i 1999 konstateret forurening på A's ejendom. Et ingeniørfirma udarbejdede på B's anmodning en undersøgelse, og af firmaets rapport af 3. august 1999 fremgik bl.a., at nogle konstaterede forureninger (klorerede opløsningsmidler og kulbrinter) på A's ejendom sandsynligvis kunne medføre påvirkning af grundvandet. Dette fremgik også af en yderligere rapport af 2. november 1999. Parterne drøftede undersøgelsesresultaterne, herunder spørgsmålet om yderligere undersøgelser og afværgetiltag, men opnåede ikke enighed. I foråret 2003 meddelte B i medfør af jordforureningslovens § 40 påbud over for A om etablering af boringer og om undersøgelse af mulighederne for at fjerne den konstaterede forurening. Påbuddet blev påklaget til Miljøstyrelsen. Den 30. juni 2004 henvendte

**262**

B's advokat sig til A og foreslog, at parterne indgik en aftale om »suspension af at ikke allerede indtrådt passivitet og forældelse« af B's eventuelle erstatningskrav mod A. I brevet anførtes bl.a., at der var B's opfattelse, at der ville indtræde forældelse af B's eventuelle krav i november 2004. A's advokat besvarede B's brev den 13. august 2004, og herefter brevvekslede parterne om sagen uden at indgå en aftale om suspension. Den 29. oktober 2004 udtog B stævning mod A med krav om bl.a., at selskabet skulle anerkende at skulle frihold B for dets nødvendige udgifter dels til gennemførelse af boringer til afgrænsning af forureningen, dels til at afværge forureningens påvirkning af grundvandet. Under sagen anførte A navnlig, at B's eventuelle krav var forældet, og at betingelserne for at pålægge A ansvar for forureningen i øvrigt ikke var opfyldt. Landsretten gav B medhold. Højesteret udtalte bl.a., at det på baggrund af indholdet at rapporten af 3. august 1999 måtte lægges til grund, at B allerede ved modtagelsen af denne rapport fik kendskab ikke alene til forureningen og behovet for yderligere undersøgelser, herunder vedrørende afgrænsning af forureningen, men også til, at der bestod en nærliggende mulighed for, at det ville være nødvendigt at iværksætte afværgeforanstaltninger. B kunne derfor fra dette tidspunkt ikke længere anses at have været i utilregnelig uvidenhed om sit krav mod A efter almindelige erstatningsregler om frihodelse for udgifter til både yderligere undersøgelser og til eventuelle afværgeforanstaltninger, jf. § 3 i forældelsesloven af 1908. Den 5-årige forældelsesfrist efter denne lov løb derfor fra B's modtagelse den 5. august 1999 af rapporten af 3. august 1999 eller eventuelt allerede fra den 28. juni 1999, hvor B måtte formodes at have modtaget et udkast til rapporten. Uanset om den 28. juni eller

den 5. august 1999 anså for begyndelsestidspunkt for forældelsesfristen, måtte det lægges til grund, at parterne ikke førte realitetsforhandlinger om B's krav i tiden op til forældelsesfristens udløb. Det forhold, at B i brevet af 30. juni 2004 stillede forslag om indgåelse af en suspensionsaftale, og at A ved bl.a. brevet af 13. august 1999 fra selskabets advokat erklærede sig villig til at overveje dette forslag, kunne hverken begrunde, at forældelsesfristens udløb havde været udskudt, eller at A ansås at have givet afkald på at påberåbe sig en allerede indtrådt forældelse. Højesteret fandt således, at kravet var forældet forud for sagsanlægget, og frifandt A.[1]

**H.D. 28. oktober 2009 i sag 575/2006 (2. afd.)**

*Alba A/S (adv. Birgitte Refn Wenzel, Kbh.)*
mod
*Region Hovedstaden (tidl. Københavns Amt) (adv. René Offersen, Kbh.).*

## Østre Landsret

### Østre Landsrets dom 7. december 2006 (4. afd.)

(Rosenløv, Steen Mejer Hansen, Lars Alexander Borke (kst.)).

Under denne sag, der er anlagt den 29. oktober 2004 ved Retten i Tåstrup og ved kendelse af 5. januar 2005 henvist til Østre Landsret i medfør af retsplejelovens § 226, stk. 1, nr. 4, har sagsøgeren, Københavns Amt, nedlagt endelig påstand om, at sagsøgte, Alba A/S, tilpligtes at anerkende, at sagsøgte skal frihold sagsøgeren for dennes nødvendige udgifter til gennemførelse af boringer til afgrænsning af forureningen konstateret i E.K. Jørgensens rapport af 2. november 1999 og supplerende undersøgelsesrapport på ejendommen matr.nr. 11c, Høje Taastrup By, Taastrup Nykirke, beliggende Rugvænget 1-5, 2630 Taastrup, forårsaget ved sagsøgtes ansvarspådragende forhold samt sagsøgerens nødvendige udgifter til at afværge forureningens påvirkning af grundvandet, subsidiært at forpligtigelsen dog begrænses til forurening ophørt senest den 2. november 1979 eller på et af landsretten fastsat tidspunkt.

Alba A/S har påstået frifindelse.

Sagen vedrører spørgsmålet om, hvorvidt Alba A/S (selskabet) er ansvarlig for den på ejendommen Rugvænget 1-5 i Taastrup konstaterede forurening og derfor er forpligtet til at frihold Københavns Amt (amtet) for dets nødvendige omkostninger til afgrænsning af forureningen og afværgelse af forureningens påvirkning af grundvandet. Endvidere er der rejst spørgsmål om, hvorvidt krav fra amtet måtte være forældet.

*Sagens omstændigheder*

Selskabet som virksomhed blev oprindeligt drevet personligt. Virksomheden beskæftigede sig med såvel vaskeri som renseri. I vaskeriet blev der blandt andet vasket olieholdige industrikkdude. I renseriet blev der foretaget kemisk rensning med blandt andet anvendelse af perclorethylen (PCE), et klorbaseret opløsningsmiddel. Den 19. december 1969 blev virksomheden overdraget til et aktieselskab ved navn A/S Alba Linnedudlejning, der efter det oplyste i 1975/1976 skiftede navn til Alba Textil A/S, men bibeholdt registreringsnummeret. Virksomheden blev fra 1979 drevet af et selskab ved navn Alba Textil ApS. Alba Textil ApS blev i 1994 omdannet til ALBA A/S, som er identisk med selskabet i denne sag. Selskabet har været tvangsadministreret af staten fra 1982 til 1997. Der er

**1** U 1929.721 H, U 1989.692 H, U 1992.575 H med kommentar af Peter Blok i U 1992B.412, U 2001.1511 H, U 2007.529/3 H, bet. 1460/2005 s. 110, Peter Pagh: Erstatningsansvar for miljøskader (1991), s. 156, Bernhard Gomard: Obligationsret, 3. del (1993), s. 237-40, og Bo von Eyben: Forældelse I (2003), s. 45-54, 520-31 og 585-610.

Copyright © 2023 Karnov Group Denmark A/S

enighed om, at virksomheden har været drevet af den samme juridiske enhed fra 1969, hvor der skete selskabsstiftelse, til i dag.

**263**

I henhold til dagældende lovgivning ansøgte selskabet den 28. oktober 1985 om godkendelse af selskabet som listevirksomhed i henhold til miljøbeskyttelsesloven. Det fremgik af ansøgningen, at selskabet beskæftigede sig med vask og rensning af tøj, og at der årligt blev indvejet en tøjmængde af ca. 1.200 ton, der fordelte sig på ca. 500 ton klude med mineraloleieindhold og lignende, ca. 450 ton tøj til hvidvask og ca. 250 ton måttevask. Høje Taastrup Kommune meddelte godkendelse den 8. december 1986. Det fremgik af godkendelsen blandt andet, at der blev anvendt PCE i virksomhedens renseri, samt at selskabets produktion ville påvirke spildevandet med vand, der indeholdt blandt andet opløsningsmidler og tungmetaller, samt luften med PCE.

Der er mellem parterne enighed om, at selskabet ophørte med at anvende PCE i produktionen i forbindelse med de sidste afleveringer af PCE til Kommune Kemi, som fandt sted henholdsvis den 28. juli 1993 og 16. november 1994.

I juni 1996 blev der i forbindelse med en omlægning af kloakrør på selskabets ejendom konstateret en jordforurening. Det blev efter aftale med amtet udarbejdet en handlingsplan af selskabets miljøkonsulent, JORDoMILJØ A/S. Der blev foretaget afværgeforanstaltninger, hvorved der blev fjernet ca. 170 ton jord, der indeholdt klorerede opløsningsmidler og olieprodukter. Den af JORDoMILJØ A/S i forbindelse med forureningen udarbejdede rapport af 22. august 1996 over afværgeforanstaltningerne konkluderede, at indholdet af olie i jorden vurderedes at stamme fra en utæthed i en samling i spildevandssystemet.

I forbindelse med at amtet iværksatte en kortlægning og registrering af ældre industrigrunde i Høje Taastrup Kommune blev der i 1999 konstateret forurening på selskabets ejendom.

Rådgivende ingeniørfirma Erik K. Jørgensen A/S (EKJ) udarbejdede efter anmodning fra amtet en undersøgelsesrapport af 3. august 1999, benævnt registreringsundersøgelse, på selskabets ejendom.

Af rapporten fremgår blandt andet:

».. .

*Resumé*

I 1960 startede Alba A/S renseri og tøjvask på Rugvænget 1-5, 2630 Taastrup. Tidligere var der gartneri på ejendommen. Der har igennem tiden foregået forskellige aktiviteter, som industriel tøjvask og kemisk rens, været oplag af PCE-affald, evt. utætte kloakker, olieudskilleranlæg samt olietanke m.v., som potentielt kan have forårsaget forurening.

Der er ved registreringsundersøgelsen udført 5 boringer med borerig samt to håndboringer. Den ene af boringerne udført med borerig er filtersat. Der er desuden udført TV-inspektion på dele af kloaksystemet samt poreluftmålinger.

Ved TV-inspektionen fremgår det at den undersøgte kloakledning var tæt, men at flere brønde er i dårlig stand, smuldret.

Der blev ikke konstateret tegn på jordforurening omkring tankene på den nordlige del af ejendommen. Derimod viste prøver fra håndboringer omkring udligningstanken på den vestlige del af ejendommen en kraftig forurening med total kulbrinter i overjorden. Det kan ikke udelukkes, at den konstaterede forurening også vil være at finde i dyberetliggende lag.

Poreluftmålingerne udenfor den tidligere renseribygning viste i begge sonderinger tydelig forurening med chlorerede forbindelser, BTEX'er og total kulbrinter. En vandprøve viste ikke tegn på forurening.

Samlet må det vurderes, at tidligere aktiviteter samt de nuværende produktionsforhold udgør en risiko for uacceptabel påvirkning af jord og grundvand.

.. .

*3. Indledning*

*3.2 Baggrund*

Registreringsundersøgelsen indgår i Københavns Amts program for kortlægning af gamle industrigrunde i Høje Taastrup Kommune. Københavns Amt har ved en historisk gennemgang identificeret en række ejendomme i Høje Taastrup Kommune, hvor amtet skønner, at der er risiko for forurening. De udpegede ejendomme udgøres af nuværende eller tidligere industrigrunde. Aktiviteterne på disse grunde er erfaringsmæssigt forbundet med en vis forureningsrisiko. Ejendommene er beliggende i et særligt drikkevandsområde og inden for grundvandsoplandene for kildepladserne ved Thorsbro Vandværk.

*3.3 Formål*

Formålet med undersøgelsen er at belyse forureningsforholdene på ejendommen, og dermed afklare om der på grunden er spildt, henlagt eller nedgravet olie- eller kemikalieaffald, der kan udgøre en risiko overfor grundvand, recipienter eller arealanvendelse. På baggrund af undersøgelsen skal Københavns Amt dels vurdere, om ejendommen skal registreres som affaldsdepot i hht. Lov om affaldsdepoter, senest lovbekendtgørelse nr. 939 af 27. oktober 1996, dels foretage prioritering af evt. oprydningstidspunkt.

.. .

*4. Historisk sammendrag og forventet forureningssituation*

.. .

B. Vaskehal: (opført 1960) hvor der er vaskemaskiner, centrifuger, dampruller, tørretumblere og pressere til strygning af kitler, samt personalerum og kontorer. I bygningen installeres i 1965 rensemaskine til rensning af arbejdsbeklædning. Rensningen af tøj har fundet sted i det vestlige hjørne i bygningen. Til denne rensning er anvendt perchlorethylen. Dette blev påfyldt direkte fra

**264**

tankbil til tanke på rensemaskinerne. Destillationsaffaldet er blevet afleveret til bl.a. Kommune kemi. I 1994 blev rensemaskinerne nedtaget. Arbejdsbeklædningen bliver derefter vasket ved brug af kemikalier: Alkali (natronlud og metacilikater), sæbe, Hypochlorid (blegeessens) og eddikesyre.

Ved vask af klude er der olieholdigt spildevand. I 1960 blev der installeret en olieudskiller udfor bygningens nordvestlige del (som trixtank) som siden hen (1964) blev suppleret med 1 olieudskiller over terræn. Sidstnævnte blev nedtaget i 1980 og erstattet med et rensningsanlæg for kemisk fældning. Der blev i den forbindelse anvendt jernsulfat, som fældningsmiddel og svovlsyre til neutralisering.

.. .

Der er forskellige potentielle forureningskilder på Alba A/S. Kilderne udgøres af: renseriet, oplag af PCE-affald, olietanke, utætte kloakker og olieudskillere, tank for olieholdigt spildevand og oplag for olieklude under halvtag . . .

*5. Miljøtekniske undersøgelser*

.. .

Det er hovedsagelig olie, PCE, vaskemidler og neutraliseringskemikalier, der kan være forureningskilderne på ejendommen. Boringer er placeret ved potentielle forureningskilder. I det følgende er beskrevet, hvor boringer, håndboringer og poreluftmålinger er placeret.

.. .

*7. Undersøgelsesresultater*

*7.5 Sammendrag*

Der er ikke konstateret utætheder på den TV-inspicerede ledningsstrækning. Omfanget af gamle og nye, afproppede og fungerende ledninger er generelt dårligt beskrevet, og virksomheden har ikke bidraget væsentligt til en afklaring.

Den filtersatte boring viser ingen grundvandsforurening, men placeringen er ikke i relation til de konstaterede forureningskilder. Poreluftmålinger ved det tidligere kemiske renseri viser høje koncentrationer af chlorerede opløsningsmidler og kulbrinter. Sandsynligvis kan disse forureninger medføre påvirkning af grundvandet.

Håndboringerne i området ved oplag af olietanke og ved olieudskilleranlæg viser forurening af de terrænnære jordlag. Specielt ved olieudskilleranlægget vurderes driften at være miljømæssig uhensigtsmæssigt i forhold til forurening i jord og grundvand. Det kan ikke udelukkes, at forureningen i de to områder kan påvirke grundvandet.

Kilden til forureningen med chlorerede oplysningsmidler er taget af drift i 1994. Med en anslået driftsperiode fra ca. 1965-1994 er driften hovedsageligt sket i perioden efter 01-04-1976.

Kilden til forurening med kulbrinter ved det tidligere kemiske renseri er sandsynligvis stadig i drift i dag.

Kilden til forurening med olieprodukter ved oplag af olieklude og olieudskiller er fortsat i drift i dag.

Ingen af de konstaterede forureninger kan anses for at være afgrænset horisontalt eller vertikalt.

### 8. Risikovurdering

#### 8.1 Grundvand

Der er ikke konstateret forurening i grundvandsprøven fra B5. Boringen er beliggende ca. 25 m nord for det tidligere kemiske renseri. Denne boring er filtersat, fordi det var den eneste boring i undersøgelsen som indicerede mulighed for udtagning af vandprøve.

Da B5 ligger i en vis afstand fra en af de potentielt væsentlige kilder til forurening med chlorerede opløsningsmidler og kulbrinter (poreluftmålinger udført ud for det tidligere kemiske renseri), kan det ikke udelukkes at grundvandet i B5 ikke er repræsentativt for forureningssituationen på ejendomme.

Den udførte boring B1 viste imidlertid ikke tegn på tilstedeværelse af grundvand i den dybde, som boringen blev ført til. Det må vurderes, at det ville være hensigtsmæssigt i relation til en risikovurdering, at der udføres en dybere boring til udtagning af vandprøve i området ved det tidligere kemiske renseri.

Vurderet ud fra de udførte poreluftmålinger ved renseriet, kan det ikke udelukkes, at der kan findes en påvirkning af det sekundære grundvand i dette område. Erfaringsmæssigt vil så høje poreluftkoncentrationer af chlorerede opløsningsmidler også medføre en påvirkning af grundvand i den mættede zone.

Kilden - det kemiske renseri - er i dag ikke længere i drift (driftsperiode ca. 1965-1994). Dermed kan påvirkningen af grundvandet være ophørt. Nedsynkning af evt. fase fra den umættede zone til grundvandet kan dog fortsat ske. Kortlægningen af forureningen ved det tidligere renseri vurderes ikke at være tilstrækkelig til en egentlig risikovurdering.

Poreluftmålingen P2 viser et meget højt indhold af en blandet forurening, som sandsynligvis indeholder kulbrinter som BTEX'er, som udover de allerede omtalte chlorerede opløsningsmidler.

Der anvendes fortsat i dag kulbrinter i forbindelse med vaskeprocessen m.v. Det er derfor ikke klart, om kilden til kulbrinteforureningen i dag er bragt til ophør. Det er ikke nærmere beskrevet hvilke stoffer, der i dag anvendes i vaskeprocessen. Det er ikke muligt at give en mere præcis risikovurdering i relation til grundvandsforurening med kulbrinter på denne del af ejendommen, men det kan ikke udelukkes, at der sker en påvirkning af grundvandet med kulbrinter.

Ved de 3 olietanke beliggende ved nordskellet er der ikke konstateret forurening (jordprøver). Det vurderes,

**265**

at der ikke sker påvirkning af grundvandet fra disse olietanke.

De korte håndboringer ved olieudskilleranlæg (HG2) og opbevaring af olieklude (HG1) viser kraftig forurening af de terrænnære jordlag med kulbrinter. Der er ikke filtersatte boringer i området, så grundvandsforureningen kan kun vurderes skønsmæssigt. Med de fundne koncentrationer i jorden, kan det ikke udelukkes, at der sker en påvirkning af sekundært grundvand i de to områder.

Med de konstaterede produktionsforhold på ejendommen, vurderes det at kilderne til den konstaterede forurening fortsat er i drift (opbevaring af olieklude (HG1) og olieudskilleranlægget (HG2). Ved olieudskilleranlægget kunne der konstateres en gummiagtig »hud« på SF-stenbelægningen over et større areal, ligesom der på nærtliggende ubefæstede arealer nord for olieudskilleranlægget var tegn på olieforurening. Set i lyset af risikoen for påvirkning af jord og grundvand, vurderes driften af olieudskilleren ikke at være miljømæssig forsvarlig, som det foregår nu.

Samlet må det vurderes, at tidligere aktiviteter samt de nuværende produktionsforhold udgør en risiko for uacceptabel påvirkning af jord og grundvand.

. . .

#### 8.3 Recipient

Nærmeste recipient er Selsmosen, der ligger ca. 700 m nordøst for lokaliteten. På baggrund af afstanden til recipienten vurderes det at en evt. forurening på ejendommen ikke vil udgøre en potentiel forureningsrisiko af søen.

. . .«

Amtet sendte rapporten ved brev af 11. august 1999 til selskabet. Efterfølgende lod amtet udføre en supplerende boring efter en vandprøve af grundvandet på selskabets ejendom, hvilket resulterede i rapport af 2. november 1999, ligeledes udarbejdet af EKJ.

Af rapporten fremgår det blandt andet:

». . .

#### 6.4 Vandprøver

En ny vandprøve fra boring B5 blev udtaget d. 14/10-99. Baggrunden for at tage en ny vandprøve var, at den oprindeligt udførte analyse for totalkulbrinter (GC/FID) ikke havde en tilstrækkeligt lav detektionsgrænse, bl.a. fordi man ikke kunne få tilstrækkeligt med grundvand fra boringen. Den ny vandprøve blev analyseret ved IR-spektrofontometri. Inden tømning og prøveudtagning blev vandspejlet i B5 den pågældende dag målt til 1,72 m.t.u. Boringen blev renpumpet med MP1-pumpe og tømt for vand. Der var ikke nok tilstrømning til boringen, så vandprøven kunne udtages med pumpen. I stedet blev der benyttet engangsvandhenter.

Forinden blev der pejlet, og vandet stod 4,54 m.u.t. Den meget langsomme tilstrømning af vand betyder, at vandprøven kun er repræsentativ for det grundvand/porevand, der står i formationen umiddelbart omkring boringen (radius på opsamlet grundvand er < 2m).

. . .

#### 8.5 Sammendrag

Det er ikke konstateret utætheder på den TV-inspicerede ledningsstrækning, men brøndene er i dårlig stand og kan udgøre en risiko for udsivning af spildevand. Det er kun ledninger på den del af systemet, der har modtaget evt. spildevand fra det tidligere kemiske renseri (i dag modtager disse ledninger spildevand fra beklædningsvask og regnvand), som er inspiceret. Der er stadig en del usikkerheder omkring ledningssystemerne, og selvom virksomheden har fremsendt en delvist opdateret plan, er der stadig en del uklarheder.

Den filtersatte boring B5 viser ingen jordforurening, og grundvandsforureningen er på et lavt niveau (9 µg/l for totalkulbrinter) og overholder lige miljøstyrelsens grænseværdi. Det skal dog fremhæves, at den filtersatte boring næppe er placeret optimalt i forhold til de potentielle forureningskilder, men det var ikke muligt at finde spor af vand i de øvrige udførte boringer.

Poreluftmålinger ved det tidligere kemiske renseri viser høje koncentrationer af chlorerede opløsningsmidler og kulbrinter. Sandsynligvis kan disse forureninger medføre påvirkning af grundvandet. Forureningerne må forventes i en eller anden udstrækning også at kunne findes under gulvet i vaskehallen.

. . .

### 9. Risikovurdering

#### 9.1 Grundvand

Der er konstateret en svag forurening i den seneste grundvandsprøven fra B5, hvor der er analyseret v. IR-metode for total kulbrinter, svarende til 9 μg/l eller lige på grænsen af Miljøstyrelsens kravværdi /6/. Boringen er beliggende ca. 25 m Øst for det tidligere kemiske renseri. Denne boring er filtersat, fordi det var den eneste boring i undersøgelsen som indicerede mulighed for udtagning af vandprøve.

Da B5 ligger i en vis afstand fra en af de potentielt væsentlige kilder til forurening med chlorerede opløsningsmidler og kulbrinter (poreluftmålinger udført udfor det tidligere kemiske renseri), kan det sandsynligvis påregnes, at grundvandet i B5 ikke nødvendigvis er repræsentativt for forureningssituationen på ejendommen som helhed. Som der også tidligere er redegjort for, er den effektive opsamlingsradius af grundvand i boringen < 2 m. Der kan altså ikke forventes opsamlet grundvand i denne boring, som særlig godt repræsenterer evt. forureningsforhold i de mest kritiske områder

**266**

(ved det tidligere kemiske renseri og ved oplag for industriklude samt olieudskilleranlæg).

Den udførte boring B1 viste imidlertid ikke tegn på tilstedeværelse af grundvand i den dybde, som boringen blev ført til. Det må vurderes, at det ville være hensigtsmæssigt i relation til risikovurdering, at der udføres en dybere boring til udtagning af vandprøve i området ved det tidligere kemiske renseri Det skal bemærkes, at pladsforholdene ved det tidligere kemiske renseri er ekstremt dårlige.

. . .

Kilden til forureningen med PCE (det kemiske renseri, oplag/håndtering af PCE og PCE-affald, evt. udslip via kloakker) er i dag ikke længere i drift (driftsperiode ca. 1965-1994). Den konstaterede jordforurening, der er opstået som følge af disse aktiviteter, kan dog fortsat fremover påvirke grundvandet gennem nedsivning til den mættede zone/grundvandsmagasinet, specielt ved udsynkning af evt. fri fase, der er tungere end vand.

Kortlægningen af forureningen ved det tidligere renseri vurderes ikke at være tilstrækkelig til en egentlig risikovurdering. Det kan ikke udelukkes, at der kan ske en indeklimapåvirkning, såfremt forureningen under gulvet i produktionshallen er af samme størrelsesorden som konstateret udenfor. De sandsynligvis berørte lokaler er relativt godt ventileret, og anvendes ikke til ophold en hel arbejdsdag igennem, så en evt. påvirkning kan være relativt begrænset.

Vaskeprocessen for industriklude giver fortsat anledning til produktion af spildevand, der indeholder væsentlige mængder af kulbrinter, og en del af dette vand recirkuleres i dele af kloaksystemet efter en forrensning/ultrafiltrering. Det er ikke muligt at give en mere præcis risikovurdering i relation til grundvandsforurening med kulbrinter på denne del af ejendommen, men det kan ikke udelukkes, at der sker en påvirkning af grundvandet med kulbrinter, f.eks. gennem udsivning via kloaker.

. . .«

Selskabet iværksatte efter drøftelser med amtet en frivillig undersøgelse på baggrund af det, der var fremkommet i rapporterne af 3. august 1999 og 2. november 1999.

EKJ udarbejdede i 2000 en supplerende undersøgelsesrapport (udateret) i henhold til et oplæg, aftalt endeligt mellem parterne. Af rapporten fremgår blandt andet:

». . .

#### 1. Indledning

Erik K. Jørgensen A/S (EKJ) er af Alba A/S blevet anmodet om at udføre en supplerende forureningsundersøgelse på deres ejendom beliggende . . .

På baggrund af resultaterne fra registreringsundersøgelsen besluttede Alba A/S at gennemføre en supplerende samt afgrænsende undersøgelse. Den skal belyse omfanget af forureningen, herunder kildestyrke og forureningsudbredelse af dels chlorerede opløsningsmidler og af dels olieprodukter.

. . .

#### 2. Formål

Formålet med den nærværende forureningsundersøgelse er at afgrænse tidligere konstateret forurening med olieprodukter samt chlorerede opløsningsmidler. Desuden er formålet at undersøge ikke tidligere undersøgte potentielle kilder på ejendommen, med henblik på at udarbejde en risikovurdering i relation til arealanvendelse specifikt inde- og udeklima samt at muliggøre en vurdering af evt. grundvandsforurening.

#### 3. Resumé

Der er på ejendommen konstateret forurening med oliekomponenter og chlorerede opløsningsmidler i både jord og grundvand.

Der er konstateret i alt fire områder med jordforurening, hvor størstedelen er konstateret i overjorden.

. . .

De udførte risikovurderinger angiver, at Miljøstyrelsens luftkvalitetskriterier ikke er overholdt i produktionsbygningen. At-værdierne er derimod overholdt i bygningen. Ud fra de udførte risikovurderingsberegninger vurderes det, at der ikke er risiko for udeluftproblemer. Ud fra risikovurderingen på grundvandet må det forventes, at der under produktionsbygningen kan forekomme en forurening med chlorerede opløsningsmidler som kan udgøre en risiko for grundvandskvaliteten.

#### 6. Feltaktiviteter og undersøgelser

. . .

#### 6.6 Vurdering af resultater

##### 6.6.1 Jord

Der er på ejendommen konstateret indhold af kulbrinter i fire områder, benævnt område I-IV i bilag 1 - kort 2.

Område I er beliggende mod nordøst på ejendommen ved den tidligere neutraliseringsbrønd, hvor der er konstateret indhold af kulbrinter i overjorden samt fra ca. 2,0-3,5 m.u.t. Det skønnes, at område I udgør et areal på ca. 35 m$^2$. I alt vurderes der at være ca. 100-150 ton olieforurenet jord i område I.

Område II er beliggende ved boring B7 nordøstlig på ejendommen, mellem teknikfløjen og produktionsbygningen. Der er i området konstateret indhold af kulbrinter og et meget højt indhold af chlorerede opløsningsmidler fra 1,5 m.u.t. til bund af boringen 4,0 m.u.t. Det skønnes, at området udgør et areal på ca. 25 m2, og der vurderes, at der i alt er ca. 100-150 ton jord forurenet med olieprodukter og chlorerede opløsningsmidler i område II.

Det skal bemærkes, at der indenfor de seneste år er sket en opgravning umiddelbart vest for område II.

**267**

Opgravningen er sket i forbindelse med etablering af betongraven, hvor conveyorbåndet transporterer sække m.v. rundt i produktionen. Det vides ikke, om der i forbindelse med opgravningen blev konstateret forurenet jord i dette område.

Område III er beliggende ved den nordvestlige del af ejendommen, og breder sig fra under halvtaget ved kludemodtagelsen over under udligningstankene. Der er i området konstateret indhold af kulbrinter i overjorden (fra terræn til ca. 1,5-2,0 m.u.t.) samt i en mindre del af området omkring 3,5 m.u.t.(boring B9). Det skønnes at om-

rådet udgør et areal på ca. 350 m², og det skønnes, at der i området findes omkring 1.000-1.200 ton olieforurenet jord, hvoraf de 50-150 ton skønnes at stamme fra dybereliggende forurenet jord omkring B9.

Område IVer beliggende på det sydvestlige hjørne af lagerbygningen. Der er i området konstateret indhold af kulbrinter i overjorden. Det skønnes, at det forurenede område udgør et areal på ca. 50 m2. Forureningen er beliggende fra terræn til ca. 1-1,5 m.u.t. Det skønnes at der i området er ca. 150-200 ton olieforurenet jord.

*6.6.2 Poreluft*

Der er på ejendommen konstateret en udbredt forurening med kulbrinter og chlorerede opløsningsmidler i poreluften. Det vurderes, at forureningen med chlorerede opløsningsmidler udgør et areal på ca. 400-600 m².

Der er p.t. ikke udført egentlige boringer under gulvet i den nuværende produktionshal (Det tidligere renserirum m.v.). Der skyldes, at det vil være særdeles vanskeligt at skaffe adgang for andet end håndbore-udstyr, som alligevel ikke kan bore til de ønskede dybder. Evt. jord- og grundvandsforurening under bygning kan således alene vurderes ud fra poreluftmålingerne, specielt på P5 og P6.

Begge poreluftmålinger viser udtalt forurening med såvel kulbrinter herunder BTEX'er som chlorerede opløsningsmidler. Niveauet er særdeles højt i begge målepunkter.

Det må derfor vurderes, at der under bygningerne ligger en betydelig forurening i jorden og evt. grundvandet. De konstaterede niveauer er så høje, at det ikke kan udelukkes, at der kan være fri fase af kulbrinter og/eller chlorerede opløsningsmidler.

Specielt mod syd og vest under bygningerne er forureningen ikke afgrænset.

*6.6.3 Grundvand*

Der er i grundvandet på ejendommen konstateret indhold af både kulbrinter og chlorerede opløsningsmidler. De højeste koncentrationer er målt i det øvre sekundære grundvand, og de laveste koncentrationer er målt i det primære grundvandsmagasin, hvor koncentrationen af kulbrinter og chlorerede opløsningsmidler er lavere end Miljøstyrelsens grundvandskvalitetskriterium.

I boring B22 er der målt de højeste koncentrationer af kulbrinter og chlorerede opløsningsmidler, men dette vurderes at skyldes gennemboring af et kloakrør med forbindelse til kludepressen. Herved er udpresset vand indeholdende kulbrinter direkte tilledt det nedre sekundære grundvandsmagasin.

. . .

*8. Konklusion*

Der er konstateret jord og grundvandsforurening med oliekomponenter samt chlorerede opløsningsmidler på ejendommen.

De konstaterede indhold af BTEX'er under produktionsbygningen giver ikke anledning til indeklimaproblemer i bygningen. Derimod giver de konstaterede indhold af trichlorethylen og tetrachlorethylen i poreluften under produktionsbygning anledning til indeklimaproblemer såfremt de beregnede koncentrationer i indeluften sammenholdes med Miljøstyrelsens luftkvalitetskriterier. Da ejendommen imidlertid ikke anvendes til beboelse men til produktionsvirksomhed er indholdet af de chlorerede opløsningsmidler sammenholdt med Arbejdstilsynets grænseværdier, hvilke ikke giver anledning til indeklimaproblemer i produktionsbygningen.

De udførte risikovurderinger indikerer ikke umiddelbart en risiko for grundvandskvaliteten ved indvindingsboringerne til Taastrup Valby Kildeplads. Men på grund af de høje poreluftskoncentrationer af chlorerede forbindelser der er målt under produktionsbygningen kan det ikke afvises, at denne forurening kan eller har givet anledning til forurening af grundvandet. Der er udført en beregning på, hvorvidt poreluftsforureningen kan give anledning til grundvand-

sproblemer, og denne beregning indikerer, at der kan være et problem med grundvandskvaliteten.«

Samtidig med den supplerende undersøgelse blev der i juni 2000 konstateret en forurening af ejendommen i forbindelse med en udgravning nær en pumpebrønd. Det fremgår af et notat af 24. juli 2000, udfærdiget af EKJ, at der i en af jordprøverne, som blev udtaget umiddelbart op ad brønden, blev konstateret et indhold af oliekomponenter over Miljøstyrelsens jordkvalitetskriterier, og at opgravet jord blev deponeret.

På baggrund af den supplerende undersøgelsesrapport af 2000 fremkom EKJ den 20. februar 2001 med et notat om baggrunden for og vurderingen af afværgetiltag. Heraf fremgår blandt andet:

». . .

*3.1 Den konstaterede forurening*

På baggrund af fund af oliekomponenter og chlorerede opløsningsmidler i poreluft, jord og grundvand er det konstateret, at der er en forurening af ejendommen. Ud fra undersøgelserne må det forventes, at der under produktionsbygningen forekommer en forurening med chlorerede opløsningsmidler.

**268**

Forureningen af de chlorerede opløsningsmidler er sandsynligvis sket ved spild under den kemiske rensning. Hvornår denne forurening har fundet sted, vides ikke nøjagtigt.

. . .

*3.6 Situationsbillede*

Miljøundersøgelserne på ejendommen har ikke givet en fuldstændig kortlægning, idet en del af forureningen befinder sig under eksisterende bygninger, hvor borearbejde er særdeles vanskeligt.

Ud fra de hidtidige undersøgelser er der fundet meget høje koncentrationer i poreluftsmålinger under bygningerne, hvorfor der sandsynligvis findes en fri fase under bygningen. Denne er formodentlig at finde i området under det gamle renseri.

Det er vanskeligt at vurdere, i hvor stort omfang forureningen har bredt sig ned til det primære magasin. Det skyldes, at der kun er udført to boringer til kalken. De data, der er indsamlet fra boringerne viser, at placeringen ikke er optimal, fordi boringerne generelt ligger i den opstrøms ende af forureningens samlede udbredelse (nord for bygningerne).

En eller to boringer nedstrøms - dvs. på den sydlige side af bygningerne på ejendommen - ville give et teknisk set bedre grundlag for at vurdere forureningsudbredelse og påvirkning af det primære grundvand. Evt. udførelse af disse boringer er ikke besluttet på nuværende tidspunkt, idet der bl.a. afventes svar fra Københavns Amt vedr. evt. finansiering af en af disse boringer placeret lige uden for Alba's grund.

. . .

*5. Konklusion*

Det er ikke muligt at klarlægge forureningens udbredelse, samt hvor forureningen præcist befinder sig. Ydermere vanskeliggør selve geologien en evt. oprensning, da eventuel ventilering eller tilførsel af vand med stor sandsynlighed ikke vil kunne fjerne forureningen.

Det kan derfor være svært at fjerne selve forureningen og hele forureningen samt forhindre en forurening af det primære grundvandsmagasin.

Der må derfor under alle omstændigheder foreslås en afværgepumpning, der kan opsamle nedsivende, forurenet grundvand. Denne afværgepumpning må grundet de geologiske og hydrogeologiske forhold foregå fra det primære magasin umiddelbart ved forureningen. Derved hindres evt. nedsivende forurening i at spredes mod de i området placerede indvindingsboringer. Der skal udføres en hydrogeologisk vurdering inden en afværgepumpning kan desig-

UfR ONLINE                                                                                       U.2010.261H

nes, og der skal desuden foreligge et tilsagn fra Københavns Amt for så vidt angår opnåelse af indvindingstilladelse.

For at tilfredsstille Amtets ønsker om forsøg på at opsamle en sandsynlig fri fase under det tidligere renseri, kan der etableres en eller flere vertikale drænbrønde under det tidligere renseri. Der er ingen absolut sikkerhed for succes med denne løsning, men det kan på den anden side heller ikke udelukkes, at man vil kunne opsamle fri fase eller den mere koncentrerede del af den opløste forurening. Disse drænbrønde vil kræve en systematisk kontrol og tømning.

Såfremt man ønsker at fjerne en restforurening i den umættede zone - også den umættede zone, der opstår som følge af en grundvandssænkning, kan der muligvis opnås en effekt ved en ventilering af jorden under bygningen. Umiddelbart udgør denne forurening ikke et problem i relation til indeklimaet, og derfor anbefales denne afværge ikke iværksat.»

Den 27. februar 2001 afholdt parterne møde hos selskabet med henblik på en drøftelse af de foreliggende undersøgelsesresultater, herunder drøftelse af afværgetiltag.

Da parterne ikke kunne blive enige, fremsendte amtet den 31. august 2001 forvarsel om kortlægning af forurening på vidensniveau 2 på dele af selskabets ejendom:

»Københavns Amt har med brev af 13. december 1999 forvarslet Dem om, at Deres ejendom, matr. nr. 11 c, Høje Taastrup By, Taastrup Nykirke, Rugvænget 1-5, 2630 Taastrup, vil blive registreret som affaldsdepot ifølge Lov om affaldsdepoter. Pr. 1. januar 2000 er Lov om affaldsdepoter blevet erstattet af Lov om forurenet jord, hvorfor der skal foretages en ny vurdering af forureningen på Deres ejendom.

Vurderingen vil blive foretaget på baggrund af registreringsundersøgelser udført på Deres ejendom. Registreringsundersøgelserne er afrapporteret i rapporterne »Københavns Amt, Registreringsundersøgelse, Alba A/S, Renseri samt tøjvask, Rugvænget 1-5, 2630 Taastrup, Revision 02 af 99-11-02« samt /2/»Supplerende forureningsundersøgelse, Rugvænget 1-5, 2630 Taastrup, Revision 2000-11-09«.

. . .

*Konklusion*

Det vurderes, at den kraftige forurening med trichlorethylen og tetrachlorethylen i poreluften under produktionsbygningen kan give anledning til indeklimaproblemer. Desuden indikerer de høje koncentrationer i poreluften en kraftig jordforurening under bygningen, og der er tillige med stor sandsynlighed en risiko for forurening af grundvandet. Ejendommen er beliggende i et område med særlige drikkevandsinteresser.

Med hensyn til arealanvendelsen er der ikke tale om meget følsom anvendelse, idet ejendommen benyttes til vaskeri, og der ikke er planer om ændring af arealanvendelsen. Da størstedelen af den overfladenære forurening er befæstet med SF-sten, beton eller asfalt, er der således ikke risiko for kontakt med forurenet jord under normale forhold. I forbindelse med jordflytning eller

**269**

anlægsarbejder vil der dog kunne forekomme en risiko ved kontakt med forureningen.

Det er amtets vurdering, at den konstaterede forurening kan have skadelig virkning på mennesker eller miljø og dermed er omfattet af reglerne i Lov nr. 370 af 2. juni 1999 om forurenet jord.

Det skal derfor meddeles, at amtet har til hensigt at kortlægge den fundne forurening på vidensniveau 2, jf. lovens § 5.

. . .«

Ved brev af 18. december 2001 til selskabet meddelte amtet, at en del af selskabets ejendom var kortlagt i henhold til lov om forurenet jord.

Selskabet havde i forbindelse med drøftelserne om yderligere undersøgelse og afværgetiltag fremsat ønske om at kunne anvende det sekundavand, der ville fremkomme i forbindelse med afværgeboringerne. Endvidere påpegede selskabet, at det havde været tvangsadministreret af staten fra 1982 til 1997.

I brev af 7. marts 2002 orienterede amtet selskabets advokat om amtets overvejelser om at meddele et undersøgelsespåbud og holdning til selskabets brug af sekundavand. Amtet fremkom tillige med sine bemærkninger til det forhold, at selskabet havde været tvangsadministreret.

Den 7. november 2002 varslede amtet over for selskabet undersøgelsespåbud i henhold til jordforureningslovens § 40. Det anføres i brevet herom blandt andet:

». . .

Den konstaterede jordforurening med chlorerede opløsningsmidler, der i registreringsrapporten antages at være grundvandstruende, menes at stamme fra Alba A/S's renseridrift, der iflg. virksomheden påbegyndtes i 1965 og som fortsatte frem til 1994/95.

Der findes ikke oplysninger om uheld med Alba A/S's renseriaktiviteter, og det må derfor formodes, at der løbende er sket spild under den daglige drift, der som nævnt er forsat indtil 1994-95. Den kraftige forurening med chlorerede opløsningsmidler, der er fundet bl.a. i jorden, kan efter amtets opfattelse ikke stamme fra andre aktiviteter end Alba A/S's rensedrift.

. . .

Inden Københavns Amt, Teknisk Forvaltning beslutter om Alba A/S skal have et påbud med den anførte ordlyd, skal forvaltningen med denne skrivelse oplyse om virksomhedens ret til at udtale sig i sagen, således at virksomhedens synspunkter kan indgå i overvejelserne om påbudet. Endvidere opfordres Alba A/S til at bidrage med oplysninger, der kan belyse omkostninger, fordele og ulemper ved påbudet.

. . .«

Advokat Birgitte Refn Wenzel svarede den 6. januar 2003 amtet på vegne selskabet. Advokaten henviste blandt andet til de på ejendommen skiftende driftsherrer og til, at de tidligere miljøtilsyn ikke havde påvist fejl og forsømmelser fra selskabets side, herunder at selskabet i to tilfælde havde foretaget afværgeforanstaltninger i forbindelse med konstatering af forurenet jord. Ud fra den store usikkerhed forbundet med selskabets eventuelle forpligtelser bestred hun, at der var hjemmel til at udstede et påbud over for selskabet.

Den 12. maj 2003 meddelte amtet selskabet påbud i henhold til jordforureningslovens § 40 om etablering af to dybe boringer samt om undersøgelse af mulighederne for at fjerne forureningen konstateret ved forureningsundersøgelserne.

Advokat Birgitte Refn Wenzel påklagede den 6. juni 2003 påbudet til Miljøstyrelsen.

I et notat af 15. januar 2004 fra Per Nielsen hos EKJ til brug for klagesagen om undersøgelsespåbudet anføres følgende blandt andet:

». . .

Der er således begrundelser for at antage, at forurening med PCE er mindre sandsynlig i perioden efter ca. 1990, end i perioden før 1990. Set i forhold til alderen af forureningen, er den sandsynligst derfor sket før ca. 1990.

. . .«

Den 30. juni 2004 henvendte amtet sig til selskabets advokat, idet amtet ønskede at indgå en suspensionsaftale om forældelse af amtets eventuelle erstatningskrav mod selskabet. I amtets brev hedder det blandt andet:

». . .

Efter Amtets vurdering forældes amtets eventuelle erstatningskrav mod deres klient i efteråret 2004, og Københavns Amt vil derfor

Copyright © 2023 Karnov Group Denmark A/S                                                                         side 6

for at undgå en måske unødvendig retssag foreslå, at der mellem amtet og Alba A/S indgås en aftale om suspension af al ikke allerede indtrådt passivitet og forældelse.

. . .

Siden november 2000 har Alba A/S ikke ønsket at iværksætte yderligere undersøgelser af forureningen.

Eftersom forureningen ikke var/er afgrænset påbød amtet i maj 2003 Alba A/S at lave en dyb boring nedstrøms forureningen med det formål nærmere at få klarlagt omfanget af forureningen fra Alba A/S.

Alba A/S påklagede i sommeren 2003 påbudet til Miljøstyrelsen. Tidshorisonten, for hvornår styrelsen træffer afgørelse i sagen, er meget usikker, og ligger formentlig et stykke ud i fremtiden.

Alba A/S er beliggende i område 1, et område med særlig drikkevandsinteresser, som amtet prioriterer højt. Amtets indsatsplanlægning efter vandforsyningsloven er koncentreret omkring kildepladsen og oplandet til Taastrup-Valby vest, som Rugvænget 1-5 er en del af.

Påbud kan omfatte genopretning, mens den offentlige indsats i henhold til jordforureningsloven (jfl) alene

**270**

sker enten af hensyn til grundvandet eller af hensyn til arealanvendelsen, hvis denne er et af de følsomme formål, der er nævnt i jordforureningslovens § 6, stk. 1.

På det foreliggende grundlag finder amtet ikke at have tilstrækkelig klar hjemmel i miljøbeskyttelseslovens § 69 til at meddele påbud om genopretning. Amtet agter derfor i henhold til jordforureningsloven at iværksætte en offentlig oprydning af hensyn til grundvandet og vil på det foreliggende grundlag gøre regres mod Deres klient for de afholdte udgifter til en sådan oprydning.

Et eventuelt erstatningskrav følger de almindelige regler om forældelse hvilket betyder, at erstatningskravet forældes 5 år efter amtet blev klar over kravets eksistens, jfr. Forældelsesloven af 1908 § 1. Forældelse afbrydes ved anlæg af retssag.

Som nævnt i note 1 foreligger den endelige registreringsrapport den 2. november 1999, og det er derfor amtets opfattelse, at der indtræder forældelse af amtets eventuelle krav i november 2004.

. . .«

Selskabets advokat svarede henholdsvis den 13. august 2004 og 11. oktober 2004 følgende:

».. .

Jeg har modtaget Deres brev af 30.6.2004 og skal oplyse, at jeg på grund af den mellemliggende ferie ikke har været i stand til at besvare Deres brev før nu. Det skal samtidig oplyses, at jeg ønsker at overveje Deres forslag om at indgå aftale om suspension samt at drøfte spørgsmålet med min klient, hvorfor jeg venligst skal anmode Dem om at afvente eventuel udtagelse af stævning, indtil De har fået en nærmere tilbagemelding fra mig, der forventes at foreligge omkring 1. september 2004.

. . .«

».. .

Idet jeg henviser til Deres brev af 30.6.2004, skal jeg oplyse, at min klient vil overveje at indgå aftale om suspension med amtet, idet dog samtlige mulige indsigelser vedrørende amtets krav fastholdes. Det er således min opfattelse, at amtet ikke vil kunne gennemføre et erstatningskrav mod min klient, idet betingelserne herfor ikke er opfyldt.

Før min klient tager endelig stilling til at indgå en eventuel aftale med amtet om suspension, skal jeg venligst bede Dem fremsende udkast til suspensionsaftale til mig.

. . .«

Selskabets fabrikschef, Tommi V. Larsen, skrev den 12. oktober 2004 således til amtet:

».. .

Vedr.: Påbud på undersøgelse af jord og grundvand.

Der har nu gennem en meget lang periode været udført en del papirkommunikation mellem dels Københavns Amt og Alba A/S, og dels mellem begge parters juridiske rådgivere.

Vi mener at drøftelserne og kommunikationen er foregået i en meget positiv ånd - der har været meget dygtige rådgivere på begge sider. Vi har haft mange »tunge« undersøgelser, som skulle klarlægge for og imod de enkeltes synspunkter, men vi er sådan set ikke kommet videre.

Vi har gennem vores samarbejde med Høje-Taastrup Kommune og Københavns Amt gennemført endda meget store miljøprojekter såsom fx opgravning af forurenet jord, etablering af tankgrav, nye tanke, nyt ultrafiltreringsanlæg m.m. Vi er i dag fx det eneste danske vaskeri som renser al vandet som indgår i vaskeprocessen inden det udledes. Sammen med Københavns Amt vil vi også jf. vores miljøgodkendelse skulle bruge store kræfter/midler i de kommende år.

Målet må være, at vi får mest »miljø« for pengene, og at vi bruger vores fælles kræfter på løsninger, som er til gavn for miljøet. Som sagen udvikler sig p.t. ser jeg ikke at kræfterne bliver lagt i »miljø-et« men snarere i sagsbehandlingen. Hvis sagen fortsætter vil tidsperioden for hvornår »vi får miljø« for pengene være meget lang. Vi mener stadig ikke, at der er lovgrundlag for at udføre det fremsendte påbud, men vi vil gerne komme med en »løsning« som kan bringe os videre.

Forslag/oplæg til løsning af opgaven:

Vi udfører undersøgelserne af grundvandet jf. påbuddet mod:

• At få lov at benytte sekundavand fra egne boringer, hvis det er den mest rigtige afværgemetode, og at det er teknisk muligt.

• At vi får lukket det sidste af uenigheden vedr. tidspunktet for forureningen. Dette kunne gøres ved at Københavns Amt accepterede at forureningen af jorden er sket før d. 1. januar 1992.

. . .«

Amtet afviste ved brev af 18. oktober 2004 oplægget fra Tommi V. Larsen og anførte samtidig om indgåelsen af en suspensionsaftale:

».. .

Uden en suspensionsaftale er amtet nødsaget til at udtage stævning mod Dem for at afbryde forældelsesfristen, der efter amtets vurdering udløber den 2. november 2004.

Idet der ikke foreligger en suspensionsaftale, vil amtet fortsætte forberedelsen af retssagen mod Dem. Amtet kan i den forbindelse oplyse, at stævningen på nuværende tidspunkt foreligger i udkast og vil blive færdiggjort og sendt til retten i Tåstrup inden udgangen af oktober måned.

Stævningen vil, jf. amtets brev til Deres advokat, alene blive standset, hvis amtet modtager en underskrevet

**271**

og ubetinget suspensionsaftale, som amtet kan godkende indholdet af.

. . .«

Ved brev af samme dato besvarede amtet henvendelsen af 11. oktober 2004 fra advokat Birgitte Refn Wenzel. Af svaret fremgår følgende blandt andet:

».. .

Under hensyn til at De i brev af 13. august meddelte, at Deres klients stillingtagen til indgåelse af en suspensionsaftale ville foreligge omkring 1. september, og til at amtet ikke siden da har hørt fra Dem, har amtet lagt til grund at Deres klient ikke var indstillet på at indgå en suspensionsaftale.

Det bemærkes, at Deres klient ved flere lejligheder siden den 13. august har været i kontakt med amtet angående sagen, herunder

ved et møde med teknisk forvaltnings vicedirektør den 19. august. Deres klient har ved hver af disse kontakter fået oplyst, at såfremt der ikke blev indgået en suspensionsaftale ville amtet udtage stævning.

Deres klient har ved disse lejligheder ikke tilkendegivet at være indstillet på at indgå en suspensionsaftale.

. . .

Idet forældelsesfristen den 2. november nu er umiddelbart forestående, og idet De og Deres klient på nuværende tidspunkt har haft 3½ måned til at indgå en suspensionsaftale, finder amtet ikke, at der tidsmæssigt er basis for at skulle udarbejde udkast samt efterfølgende drøfte dennes indhold med Dem eller Deres klient.

. . .«

*Forklaringer*

Der er under sagen afgivet forklaringer af Helle Okholm som vidne, partsforklaring af Jørgen Anton Kristensen og vidneforklaring af Per Nielsen, Britt Malling, Jørn Jakobsen, Ole Arenfeldt Jensen samt Tommi V. Larsen.

*Helle Okholm* har forklaret, at hun er ansat som jurist i amtets tekniske forvaltning, hvor hun siden 1993 hovedsageligt har været beskæftiget med miljøspørgsmål. Selskabet var en såkaldt listevirksomhed, der var på en liste over meget forurenende virksomheder, der krævede forudgående miljøgodkendelse. Siden begyndelsen af 1980'erne har amtet prøvet at kortlægge området omkring Høje-Taastrup, hvor der indvindes meget vand. Miljøtilsyn vedrører den daglige drift på virksomheden. Kortlægning sker for at opretholde en viden om allerede sket forurening. Kortlægningssystemet indebærer efter jordforureningsloven, der trådte i kraft 1. januar 2000, at forurenede ejendomme opdeltes i vidensniveau 1 og 2. Vidensniveau 1 omfatter ejendomme, hvor der er mistanke om forurening. Vidensniveau 2 omfatter ejendomme, hvor det efter fysiske undersøgelser, ingeniørrapporter m.v. konkluderes, at der er forurening på ejendommen. Selskabet blev registreret på vidensniveau 2. Amtets ansvar for afværgetiltag er subsidiært i forhold til forurenerens. Amtet var af den opfattelse, at forureningen var i »fri fase«, dvs. lå ufortyndet lige under fabrikken. Man vidste derimod ikke, at forureningen var »stukket af«. I vurderingen af forureningen vurderedes, om den var en trussel mod dem, som benyttede virksomheden og/eller grundvandet. I selskabets tilfælde var det grundvandet, som bekymrede amtet. Resultatet af kortlægningsundersøgelsen var undersøgelsespåbuddet i medfør af § 40. Selskabet har efterfølgende påkæret påbuddet til Miljøstyrelsen. Hun er bekendt med, at sagen efterfølgende har været til høring i amtet, men at der endnu ikke er truffet nogen afgørelse af styrelsen. Amtet har overvejet at meddele selskabet påbud efter miljøbeskyttelseslovens § 69. Efter hendes opfattelse kunne der gennem et påbud ikke opnås samme resultat som ved et anerkendelsessøgsmål. Endvidere var amtet på baggrund af »Shell-dommen« i tvivl om, hvorvidt et påbud kunne anvendes i den konkrete sag, idet hovedparten af den skete forurening måtte anses at være sket før 1/1 1992. Hun var ikke i tvivl om, at der var sammenhæng mellem den konstaterede forurening og selskabets aktivitet. På amtets prioriterede liste medtages alene ejendomme, hvor forureneren ikke er kendt, og hvor det således er amtets opgave at udføre afværgeforanstaltninger m.v. Selskabet er derfor trods sin registrering på vidensniveau 2 ikke med på listen. Listen bliver revideret en gang årligt. Sekundavand er renset vand fra en boring, som udføres i forbindelse med en afværgeforanstaltning. Selskabet ønskede at benytte sekundavand i produktionen, hvilket amtet ikke var afvisende over for.

*Jørgen Anton Kristensen* har forklaret, at han er adm. direktør, bestyrelsesformand og eneejer af selskabet. Virksomheden blev etableret i 1936 af hans farfar og blev fra 1960 drevet fra den nuværende ejendom i Taastrup. I 1969 stiftede Jørgen Kristensen

Alba linnedudlejning A/S. Han overtog selv virksomheden i 1980 eller 1981. Han havde i 1970'erne sommerferiejob som chaufførafløser på virksomheden. Disciplinen på virksomheden var streng. Hans farfar ønskede, at virksomheden skulle drives på en korrekt og ordentlig måde. Der skulle være rent og pænt. Virksomheden er den største distributør af klude i Skandinavien. Renseriet var en lille del af virksomhedens produktion, ikke større end svarende til et normalt renseri på en hovedgade. Gert Thorsen var ansvarlig for de to renserimaskiner. Han var fuldtidsansat og havde kun renserimaskinerne som arbejdsopgave, herunder aftapning og påfyldning af kemikalier. Han kan ikke huske at have set eller hørt om spild af perchlor fra maskinerne. Hvis der i hans tid har været spild af den art, ville han have fået det oplyst. Virksomheden har altid haft fokus på miljøet, især vandrensning, grundet miljøkravene. I 1979 indledte

**272**

virksomheden således et samarbejde med Alfa-Laval om rensning af vand. Virksomheden har altid været på forkant på dette område, hvilket også har kunnet aflæses i virksomhedens regnskaber. Han har de seneste 16 år boet i Rom og har derfor ikke haft sin daglige gang i virksomheden. Han har imidlertid løbende fulgt driften via rapporter og daglig telefonisk kontakt med virksomheden. Det offentlige tilsyn med virksomheden har altid været meget strengt, dog således at der altid har været en god dialog, hvilket de mange boringer på ejendommen også bekræfter.

*Per Nielsen* har forklaret, at han er uddannet miljøbiolog fra Københavns Universitet. Han er leder af miljøafdelingen hos EKJ, hvor han har været ansat de seneste 17 år. Undersøgelsesrapporten af 3. august 1999 er et resultatet af en henvendelse fra amtet, som ønskede en registreringsundersøgelse foretaget på selskabets ejendom. Registreringsundersøgelsen er en indledende undersøgelse, der kan danne grundlag for eventuelle afværgeforanstaltninger. Rapporten af 3. august 1999 konkluderer, at der er forurening på ejendommen. Rapporten viser endvidere fund af klorerede opløsningsmidler. Poreluftmålingerne »P 1« og »P 2« viste ikke, at der var sket en forurening af grundvandet, men han havde på baggrund af prøveresultatet en mistanke om, at grundvandet kunne være forurenet. Derfor blev det aftalt med amtet, at der skulle tages yderligere prøver, også fordi den første prøve ikke var ret god. I en senere prøve i forbindelse med udarbejdelsen af rapporten af 2. november 1999 blev der fundet olieholdige produkter, kulbrinter, i grundvandet i relativt små koncentrationer. På baggrund heraf indgik EKJ i samråd og efter aftale med amtet et samarbejde med selskabet om at udarbejde en supplerende redegørelse. Redegørelsen af 9. november 2000 var en fortsættelse af registreringsundersøgelsen, men blev betalt af selskabet. Den supplerende undersøgelse var kostbar og omfattende. Den i resuméet i rapporten fra 2000 omtalte forurening af oliekomponenter og klorerede opløsningsmidler blev fundet flere steder på ejendommen. De i undersøgelsen udførte poreluftmålinger viste tegn på forurening. Kulbrinter er olieholdige produkter. Klorerede opløsningsmidler er kulbrinter, der indeholder klor, typisk rensevæsker og væsker brugt til affedtning. PCH nedbrydes til TCE, som er fundet i væsentligt omfang på ejendommen. Tetrachloretylen er et kloreret opløsningsmiddel, der er hovedelementet i rensevæsker. »Fri fase« er væsken, som havde man den ufortyndet i en dunk. Fri fase opstår direkte fra forureningskilden. Det er sandsynligt, at tetrachloretylen findes i »fri fase« under selskabets ejendom. Hvis man skal finde stoffer i »fri fase«, skal man måske 8-10 m »under gulv«, og poreluftsmålingerne skete typisk ½-1 m »under gulv«. Det kan være meget vanskeligt at udtale sig om, hvornår en forurening har fundet sted, medmindre man kan henføre det til et stort uheld, hvorfor der alene kan være tale om et skøn. Dette skøn over tidspunktet for forure-

Copyright © 2023 Karnov Group Denmark A/S                                side 8

ningen bygger på hans erfaring og på den måde, hvorpå man tidligere håndterede den slags kemikalier, hvilket især i 60'erne og 70'erne skete mere lemfældigt. I 1980'erne kom der mere fokus på miljøet. Han er ikke i stand til at uddybe det nærmere tidspunkt for forureningen, da nedbrydningen kan være vanskelig at bestemme, da omgivelser i jordlagene er afgørende for nedbrydningen. Oplysningen i rapporten af 3. august 1999 om, at forureningen må stamme fra før 1. april 1976, er baseret på udtalelser fra ejer eller vaskemester. Analyseresultatet af boringen »B 22«, som fremgår af rapporten fra 2000, kan skyldes påvirkning fra spildevand, der er løbet ud fra et utæt kloakrør. Det er meget vanskeligt, grundet jordlagene i området, at sige, om der er sket en direkte nedsivning. Der var dog flere aspekter, der tydede på det. Det kan ikke udelukkes, at forureningen kan være dybereliggende, selvom der ikke er tegn på det i det terrænnære grundvand. Det har betydning, at forureningen ligger under en bygning, idet udvaskningen vil tage længere tid. Forurenende stoffer kan være trængt ned gennem betongulvet i selskabets bygninger. Et betongulv er ikke tæt, men har mange mindre revner. Forureningen kan også være sket gennem kloakken. Han har udført flere undersøgelser for amtet, også vedrørende almindelige renserier, der ikke kan sammenlignes med selskabets virksomhed, som var et stort renseri med store maskiner. Man finder klorerede opløsningsmidler på hovedparten af renserigrundene. Der blev ikke, ud over en enkelt vandprøve, foretaget yderligere undersøgelser til brug for udfærdigelsen af rapporten af 2. november 1999. Der er ikke væsentlig forskel på sikkerheden i udtalelsen om grundvandsforureningen i rapporterne af 3. august og 2. november 1999.

*Britt Malling* har forklaret, at hun er civilingeniør i miljøteknik og tidligere ansat hos EKJ. Hun var med til at lave rapporten af 2. november 1999 og oplægget til undersøgelsen. Per Nielsen var projektleder. Der blevet fundet oliekomponenter og klorerede opløsningsmidler i jorden og grundvandet. Hun var med til at udføre to af de i rapporten omhandlede poreluftsmålinger. Poreluftsmålingerne blev foretaget med to parallelle kulrør. Prøven »P 6« viste, at begge kulrør blev mættet, og at der var påvist en forurening. Det kan ikke afvises, at der er »fri fase« under bygningen, men det kan heller ikke afvises, at der ikke er »fri fase«.

*Jørn Jakobsen* har forklaret, at han i 1985 blev ansat i selskabet, hvor han gjorde rent efter skoletid. Han blev to år senere ansat på almindelig, timelønnet medarbejder med diverse arbejdsopgaver. Han begyndte i 1988 eller 1989 at arbejde mere intensivt med renseri. Alene Gert Thorsen stod for brugen og vedligeholdelsen

### 273

af rensemaskinerne. Vidnet var i starten alene hjælper og ferieafløser for Gert Thorsen, men da Gert Thorsen i 1991 ophørte i selskabet, overtog han helt hans opgaver. Gert Thorsen var meget pligtopfyldende, og han gav ham en grundig instruktion i anvendelsen af maskinerne. Herudover deltog han med tiden i kurser. Selskabet havde ved hans ansættelse to rensemaskiner. Den ene var da muligvis 7-8 år gammel. Der blev brugt hulkort ved anvendelsen af denne, men den var absolut funktionsduelig. Den anden var meget moderne og vistnok næsten ny. De blev begge anvendt til nedlukningen i 1994. Rensemaskinerne blev løbende efterset af samme person fra et bestemt servicefirma. Personen virkede kompetent. Han havde fra sin deltagelse i kurser og fra andres besøg hos selskabet indtryk af, at selskabets maskiner var nyere og bedre end de flestes. Der var manualer til maskinerne både fra fabrikanten og fra hans og Gert Thorsens deltagelse i kurser. Omkring hver tredje måned blev der fyldt perchlor på rensemaskinerne. Påfyldning skete direkte fra tankbilen. Der var tale om et lukket kredsløb. Der blev dog hver morgen tappet 10-15 liter destilleret perchlor fra maskinen i en 25-liters dunk, og væsken blev hældt på maskinen

på ny. Maskinen blev herudover en gang om ugen tømt for slam. Tømning skete direkte i en beholder. Resterende slam blev skrabet ud og fyldt i beholderen. Beholderen, der kunne indeholde omkring 50 liter, blev altid fyldt ¾ op til en streg og placeret det samme sted uden for renseriet. Når der var 5-6 fyldte beholdere, blev de under overværelse af ham eller Gert Thorsen tømt af en slamsuger. Gert Thorsen fortalte ham, at perchlor var giftigt. Han ville med sin nuværende vision ikke have håndteret maskinerne anderledes i dag, end han gjorde dengang. I forbindelse med at Ole Arenfeldt Jensen tiltrådte som direktør, begyndte selskabet at miljøhensyn i langt højere grad at vaske tøj frem for at rense dette, hvilket var muligt blandt andet i kraft af mere effektive sæber. Han har ikke kendskab til enkeltstående forurenende udslip fra virksomheden.

*Ole Arenfeldt Jensen* har forklaret, at han med virkning fra 1. januar 1993 blev ansat som salgschef i selskabet og med virkning fra 1. juni 1993 som direktør samme sted. Virksomheden havde da omkring 75 medarbejdere, hvoraf størstedelen var ufaglærte. Selskabet havde været meget konservativt ledet med få investeringer. Det ændrede han då. Under hans ledelse var selskabets hovedaktivitet udlejning af industriklude, der efter brug blev vasket og sendt retur til kunden. Kludene blev blandt andet brugt til tryksværte, der er klassificeret som miljøfarligt affald, og det var derfor vigtigt for selskabet at have styr på de miljømæssige forhold. Da vaskemetoderne var blevet mere effektive, var rensning blevet mindre attraktivt. Virksomhedens omsætning ved rensning udgjorde ved hans tiltrædelse anslået 5 eller 10 % af virksomhedens samlede omsætning, og selskabet ophørte helt med rensning i den periode, hvor han var direktør. Selskabets rensemaskiner var ikke moderne, men fungerede forsvarligt. Medarbejderne var bekendt med, at perchlor var giftigt og skulle behandles forsigtigt. Det var i forhold til virksomhedens kunder vigtigt at få signaleret, at virksomheden var opmærksom på og gjorde noget ved de miljømæssige forhold. Selskabet fik i 1995 Taastrup Kommunes erhvervspris for miljørigtig indsats og blev i 1996 miljøcertificeret. Han erindrer ikke, at virksomheden har fået påtale fra nogen i anledning af miljømæssige forhold. Mens han var direktør, var seks forskellige advokater bestyrelsesformænd. Det var dem meget magtpåliggende, at virksomheden blev håndteret miljømæssigt korrekt. I februar 1998, da beslaglæggelsen af virksomheden ophørte, opsagde han sin stilling som direktør, samtidig med at den siddende bestyrelse fratrådte. Han erindrer ikke enkeltstående forurenende udslip fra virksomheden.

*Tommi V. Larsen* har forklaret blandt andet, at han med virkning fra 1. januar 1999 blev ansat som fabrikschef i selskabet. Han havde en alsidig uddannelse og havde blandt andet læst HD. Han var i løbende dialog med amtet blandt andet i form af møder. Efter at have gennemlæst rapporten fra august 1999 henvendte han sig til selskabets administrerende direktør. Selskabet gik ind for en åben miljøpolitik og ville gerne samarbejde. Det blev vedtaget at anmode EKJ om at foretage en supplerende undersøgelse med yderligere et antal boringer. Efter selv at have godkendt de foreslåede borehuller indhentede han amtets godkendelse. Da resultatet af undersøgelsen forelå, deltog han i et møde med repræsentanter fra amtet om afværgeforanstaltninger. Selskabet var i tvivl om, hvorvidt forureningen med klorerede opløsningsmidler stammede fra selskabet, idet der var omkringliggende virksomheder, der også udskilte sådanne stoffer. Det var kostbart at foretage flere boringer med henblik på eventuel konstatering af yderligere forurening. Amtet anmodede om, at det blev gjort. Han foreslog, at »man delte i porten«. Det afslog amtet, hvorefter sagen blev overdraget direktionen, der henvendte sig til en advokat. Selskabet fotograferede alle sine kloakker for utætheder, men fandt ingen alvorlige. En

kloak til vand fra produktionen blev foret. I dag renses alt spilde-
vand. Han er ikke længere ansat i selskabet.

*Parternes procedure*

*Amtet* har gjort gældende, at betingelserne for at anlægge anerken-
delsessøgsmål er opfyldt. Ved undersøgelsesrapporterne af 2.
november 1999 henholdsvis 2000 er det godtgjort, at der på sel-
skabets ejendom er en forurening, der udgør en grundvandstrussel.
Der består en konkret og aktuel retsuvished om, hvorvidt selskabet
er erstatningsansvarlig for forureningen, og om,

**274**

hvorvidt selskabet skal friholde amtet for dets nødvendige udgifter
til afgrænsning af forureningen og påvirkningen af grundvandet.
Amtet har en retlig interesse i en sådan afklaring, og påstanden er
ikke for upræcist formuleret.

Det er ikke en betingelse for amtets fremsættelse af erstatnings-
krav, at der kan meddeles påbud efter miljøstyrelseslovens § 69,
der handler om genopretning. Amtet kan gøre regres for udgifter,
hvis forureneren, selskabet, er ansvarlig.

Amtets krav er ikke forældet. Forældelsesfristen skal først regnes
fra fremkomsten af undersøgelsesrapporten af 2. november 1999.
Amtet beskæftigede sig ikke nærmere med rapporten af 3. august
1999, der ikke udtalte sig om grundvandet og derfor gav anledning
til udarbejdelsen af en ny rapport. Såfremt fristen skal regnes fra
den 3. august 1999, må fristen anses for at være suspenderet under
hensyn til parternes forhandlinger, under hvilke parterne har haft
den fælles overbevisning, at forældelsesfristen skulle regnes fra
den 2. november 1999.

*Selskabet* har i forbindelse med den på ejendommen drevne vaske-
ri- og renseriproduktion i hvert fald i perioden 1976 til 1994 anvendt
blandt andet klorerede opløsningsmidler, herunder PCE. Der er
sammenfald mellem de stoffer, som selskabet har anvendt i produk-
tionen, og den forurening, der er registreret på ejendommen. Den
registrerede forurening er derfor utvivlsomt forårsaget af den
virksomhed, som selskabet drev på ejendommen. Selskabet har
bevisbyrden for, at det ikke har handlet uforsvarligt i relation til
den registrerede forurening. Der gælder således et præsumptions-
ansvar. Selvom et sådant ansvar ikke gælder, er det med sikkerhed
godtgjort, at selskabet har handlet culpøst og er ifaldet ansvar.

Selskabet, der den 21. juni 1994 blev omdannet til et aktieselskab,
er som fortsættende selskab succederet i de forpligtelser, som de
tidligere juridiske personer har pådraget sig ved virksomhedsdriften
på ejendommen. Selskabet er derfor rette søgsøgte.

*Selskabet* har gjort gældende, at amtets påstand er for upræcis til
at blive taget under pådømmelse. Amtet har haft ret og pligt til at
afgive påbud i henhold til jordforureningslovens § 40 frem for at
rejse et erstatningskrav.

Betingelserne for at pålægge selskabet et erstatningsansvar efter
dansk rets almindelige erstatningsregler er ikke opfyldt. Der fore-
ligger ikke noget ansvarsgrundlag, da amtet ikke har godtgjort, at
forureningen skyldes fejl og forsømmelser fra selskabets side. At
selskabet har haft en kommerciel interesse i produktionen, medfører
ikke i sig selv, at der er handlet ansvarspådragende. Vurderingen
af selskabets håndtering af kemikalierne skal ske på baggrund af
den viden, der på daværende tidspunkt var tilgængelig. Selskabets
maskiner blev ifølge Jørn Jakobsens forklaring vel vedligeholdt.
Efter forklaringerne var selskabets medarbejdere omhyggelige i
omgangen med kemikalierne, og der er ikke konstateret enkeltstå-
ende uheld. Miljøcertificeringen af selskabet gav ikke anledning
til bemærkninger. Det er heller ikke godtgjort, at betingelserne om
kausalitet og adækvans er opfyldt, blandt andet fordi der har været
flere virksomheder på ejendommen, og fordi tidsfæstelsen af foru-
reningen er meget vanskelig som forklaret af Per Nielsen.

Der er ikke årsagsforbindelse mellem selskabets produktion og
håndtering af kemikalier på ejendommen og den senere registrerede
forurening. Der er ikke grundlag for at antage, at der i denne sag
gælder et præsumptionsansvar for selskabet. Amtet har ikke ført
bevis for, at den på ejendommen registrerede forurening udgør en
risiko for grundvandet, hvorfor der ikke foreligger nogen hand-
lepligt for amtet. Amtet har derfor ikke dokumenteret at have lidt
noget økonomisk tab eller dokumenteret en værnet interesse.

Amtets krav er endvidere forældet. Forældelsen skal regnes fra
undersøgelsesrapporten af 3. august 1999. Der er ikke forhold, som
suspenderer forældelsen. Amtet var kun i utilregnelig uvidenhed
om sit krav indtil august 1999, hvor man havde den fornødne viden
til at rejse kravet. Amtet kan ikke påberåbe sig forhandlinger om
suspension af forældelsesfristen, da amtet over for selskabet alene
har tilkendegivet som sin opfattelse, at forældelsesfristen skal regnes
fra den 2. november 1999. Amtet har derimod ikke tilkendegivet,
at forældelsesfristen skal suspenderes som følge af forhandlinger,
og amtets forsømmelse heraf må komme amtet til skade.

Endelig har selskabet gjort gældende, at vaskeri- og renseripro-
duktionen på ejendommen har været drevet af skiftende driftsherrer,
hvorfor selskabet ikke kan være ansvarlig for driften på ejendom-
men før stiftelsen af selskabet i 1969.

## Landsrettens begrundelse og resultat:

Efter indholdet af EKJ's rapporter findes amtet at have en aktuel
interesse i at få en retlig prøvelse af, om selskabet er erstatnings-
ansvarlig for den ved rapporterne konstaterede forurening, og om
selskabet skal friholde amtet for omkostninger til afgrænsning af
forureningen og afværgelse af dens påvirkning af grundvandet.
Selv om påstandens formulering lader omfanget af selskabets for-
pligtelser være afhængig af forhold, der ikke på nuværende tids-
punkt er bekendt, er påstanden tilstrækkelig præcis til at kunne
pådømmes.

Da der mellem parterne er enighed om, at virksomheden på Rug-
vænget 1-5 har været drevet af den samme juridiske enhed fra den
19. december 1969, hvor der

**275**

skete selskabsstiftelse, til i dag, anses selskabet endvidere for at
være rette søgsøgte.

Amtets adgang til at anlægge anerkendelsessøgsmål som i denne
sag findes ikke at være afhængig af amtets adgang til administrativt
at udstede påbud til selskabet.

Landsretten lægger i overensstemmelse med EKJ's rapporter til
grund, at den konstaterede betydelige forurening med blandt andet
perchloretylen på ejendommen Rugvænget 1-5 var forårsaget af
selskabets virksomhed frem til ophøret af renseriet i 1994. Det er
ikke med sikkerhed konstateret, om forureningen er sket ved direkte
udledning eller ved spild i forbindelse med håndtering af kemikali-
erne på anden måde. Det er imidlertid ubestridt, at selskabet
anvendte kulbrinter i betydeligt omfang i produktionen. Selv om
selskabet ikke havde speciel ekspertise i kemisk affald, burde sel-
skabet på baggrund af den almindelige viden i de år, hvor anven-
delsen af de forurenende stoffer fandt sted, have været klar over,
at udledning eller spild selv i mindre mængder kunne medføre fare
for udbredelse til grundvandet. Selskabet findes på denne baggrund
ikke at have udvist tilstrækkelig omhu og truffet tilstrækkelige ef-
fektive foranstaltninger for at undgå en forurening som den opstå-
ede. Landsretten finder herefter, at selskabet ved uforsvarlig
handlemåde har forårsaget den konstaterede forurening på ejendom-
men.

Det fremgår under punkt 7.5, sammendrag, i registreringsunder-
søgelsen af 3. august 1999 blandt andet, at »Poreluftmålinger ved
det tidligere kemiske renseri viser høje koncentrationer af chlorerede

opløsningsmidler og kulbrinter. Sandsynligvis kan disse forureninger medføre påvirkning af grundvandet«. Af samme rapport fremgår endvidere under punkt 8, risikovurdering, at »Samlet må det vurderes, at tidligere aktiviteter samt de nuværende produktionsforhold udgør en risiko for uacceptabel påvirkning af jord og grundvand«. På denne baggrund burde amtet allerede fra fremkomsten af denne rapport have indset, at det var sandsynligt, at amtslig indsats var påkrævet. Den 5-årige forældelsesfrist i 1908-loven, der anses at regulere forholdet, skal således som udgangspunkt regnes fra dette tidspunkt, jf. lovens § 3.

Det fremgår imidlertid af brevvekslingen i sagen, at amtet ved brev af 30. juni 2004 over for selskabets advokat fremsatte forslag til aftale om suspension af forældelse, og at selskabets advokat herefter ved brev af 13. august 2004 anmodede amtet om at afvente eventuel udtagelse af stævning og senere ved brev af 11. oktober bad amtet om at fremsende udkast til suspensionsaftale. Det fremgår endvidere, at amtet under hele forløbet tilkendegav som sin opfattelse, at forældelsesfristen løb fra den 2. november 1999. Landsretten finder under disse omstændigheder, at selskabet har givet amtet grund til ikke at anlægge sag trods udløbet af fristen, der herefter findes at være suspenderet til tidspunktet, hvor amtet udtog stævning.

Landsretten tager herefter amtets påstand til følge.

Efter sagens omfang og udfald skal selskabet betale sagsomkostninger til amtet som nedenfor bestemt til erstatning af udgift til advokatbistand.

- - -

## Højesteret

### Højesterets dom.

I tidligere instans er afsagt dom af Østre Landsrets 4. afdeling den 7. december 2006.

I pådømmelsen har deltaget syv dommere: Poul Sørensen, Peter Blok, Per Walsøe, Asbjørn Jensen, Niels Grubbe, Jon Stokholm og Henrik Waaben.

*Påstande*

Appellanten, Alba A/S, har påstået afvisning, subsidiært frifindelse og mere subsidiært, at Alba A/S' forpligtelser efter indstævnte, Region Hovedstadens, påstande begrænses til forurening, der er sket efter den 30. oktober 1984.

Region Hovedstaden har gentaget sine påstande.

*Anbringender*

*Alba A/S* har til støtte for påstanden om afvisning præciserende anført, at Region Hovedstadens påstande ikke er egnede til at tages under påkendelse, idet de er for upræcise, for vidtgående, for uaktuelle og af for ubestemt rækkevidde.

Alba A/S har til støtte for, at regionens krav er forældet, yderligere henvist til, at indholdet af det udkast til rapport, som det rådgivende ingeniørfirma Erik K. Jørgensen A/S sendte til Københavns Amt fredag den 25. juni 1999, må formodes at svare til indholdet af rapporten af 3. august 1999. Rapportudkastet må være kommet frem til amtet mandag den 28. juni 1999. På dette tidspunkt, subsidiært den 5. august 1999, da amtet modtog rapporten af 3. august 1999, blev amtet, eller burde amtet være blevet, opmærksom på forureningen og risikoen for forurening af grundvandet, og amtet kunne da forudse at skulle afholde udgifter til undersøgelse og fjernelse af forurening. Begyndelsestidspunktet for den 5-årige forældelsesfrist efter 1908-loven skal derfor principalt regnes fra den 28. juni 1999, subsidiært fra den 5. august 1999. Begyndelsestidspunktet skal ikke først regnes fra modtagelsen af den reviderede rapport af 2. november 1999, idet der ikke er forskel på konklusionerne i rapporterne fra henholdsvis august og november 1999, og

der er ikke i rapporten fra november tilføjet noget væsentligt nyt i forhold til rapporten fra august. Alba A/S kan ikke anses på noget tidspunkt at have givet afkald på at gøre forældelse gældende.

*Region Hovedstaden* har heroverfor anført, at regionens påstande er tilstrækkelig klare og præcise og i det hele lever op til de krav, der kan stilles, når formålet med stævningen er at afbryde en mulig forældelse.

**276**

Med hensyn til forældelse ses amtet ikke at have modtaget rapportudkastet af 25. juni 1999 fra Erik K. Jørgensen A/S. Hverken rapporten af 3. august 1999 eller rapporten af 2. november 1999 gav amtet tilstrækkeligt kendskab til forureningen af grundvandet eller vished om, hvem der eventuelt kunne være erstatningsansvarlig for forureningen, eller om nødvendigheden og omfanget af de afværgeforanstaltninger, der vil kunne danne grundlag for regionens erstatningskrav. Dette er fortsat ikke klarlagt. Forældelsesfristen var derfor fortsat suspenderet ved sagens anlæg den 29. oktober 2004. Hvis fristen skal regnes fra fremkomsten af rapporten af 3. august 1999, må den anses for suspenderet frem til sagsanlægget under hensyn til parternes forhandlinger.

*Supplerende sagsfremstilling*

Højesteret tillader Alba A/S at fremlægge kopi af brev af 25. juni 1999 fra Erik K. Jørgensen A/S til Københavns Amt. I brevet hedder det bl.a.:

»Hermed fremsendes udkast til rapporter til gennemlæsning:

- . . .
- Rugvænget 1-5, Taastrup - registreringsundersøgelse

. . .«

Der er for Højesteret fremlagt nye oplysninger navnlig til belysning af ansvaret for forureningen, herunder en rapport af 28. juni 1994 betegnet »Indledende Miljøgennemgang og Miljøstyringssystem for Alba Textil ApS«, der er udarbejdet af civilingeniør Else Marie Jakobsen og cand.scient. Erik Søndberg Clausen som led i deres efteruddannelse.

*Forklaringer*

Til brug for Højesteret er der afgivet supplerende forklaringer af Jørgen Anton Kristensen, Jørn Jacobsen, Per Nielsen og Ole Arenfeldt Jensen samt forklaringer af advokat og tidligere bestyrelsesmedlem i Alba A/S Erik Christoffersen, advokat og tidligere bestyrelsesmedlem i Alba A/S Jørgen Bang, tidligere bestyrelsesformand i Alba A/S Bjarne Lehmann Weng, tidligere direktør og bestyrelsesmedlem i Alba A/S Christian Boy Birck, tidligere ansat i Alba A/S Jørgen Pedersen, civilingeniør Else Marie Jakobsen og biolog Erik Søndberg Clausen.

### Højesterets begrundelse og resultat

Af de grunde, der er anført af landsretten, tiltræder Højesteret, at Region Hovedstadens påstande kan tages under pådømmelse.

Af det rådgivende ingeniørfirma Erik K. Jørgensen A/S' undersøgelsesrapport af 3. august 1999 fremgår bl.a., *at* Alba A/S' ejendom er beliggende i et særligt drikkevandsområde og inden for grundvandsoplandene for kildepladserne ved Thorsbro Vandværk, *at* poreluftsmålinger ved det tidligere kemiske renseri viser høje koncentrationer af klorerede opløsningsmidler og kulbrinter, og *at* disse forureninger sandsynligvis kan medføre påvirkning af grundvandet. Det må på denne baggrund lægges til grund, at Københavns Amt allerede ved modtagelsen af denne undersøgelsesrapport fik kendskab ikke alene til forureningen og behovet for yderligere undersøgelser, herunder vedrørende afgrænsning af forureningen, men også til, at der bestod en nærliggende mulighed for, at det ville være nødvendigt at iværksætte afværgeforanstaltninger. Højesteret finder derfor, at amtet fra dette tidspunkt ikke længere kan anses at have været i utilregnelig uvidenhed om sit

krav mod Alba A/S efter almindelige erstatningsregler om frihol-
delse for udgifter til både yderligere undersøgelser og til eventuelle
afværgeforanstaltninger, jf. § 3 i forældelsesloven af 1908. I denne
henseende adskiller undersøgelsesrapporten af 3. august 1999 sig
da heller ikke fra den reviderede rapport af 2. november 1999, som
amtet selv tillagde betydning i relation til anvendelsen af forældel-
sesloven af 1908. Den 5-årige forældelsesfrist efter denne lov løber
derfor fra amtets modtagelse den 5. august 1999 af rapporten af 3.
august 1999 eller eventuelt allerede fra den 28. juni 1999, hvor
amtet må formodes at have modtaget et udkast til rapporten.

Uanset om den 28. juni eller den 5. august 1999 anses for begyn-
delsestidspunkt for forældelsesfristen, må det lægges til grund, at
parterne ikke førte realitetsforhandlinger om amtets krav i tiden op
til forældelsesfristens udløb. Det forhold, at amtet i brevet af 30.
juni 2004 stillede forslag om indgåelse af en suspensionsaftale, og
at Alba A/S ved brevene af 13. august og 11. oktober 2004 fra
selskabets advokat erklærede sig villig til at overveje dette forslag,
kan hverken begrunde, at forældelsesfristens udløb anses for ud-
skudt, eller at Alba A/S anses at have givet afkald på at påberåbe
sig en allerede indtrådt forældelse. Amtets krav var således forældet
forud for sagsanlægget den 29. oktober 2004.

Højesteret tager med denne begrundelse Alba A/S' påstand om
frifindelse til følge, og der er herefter ikke anledning til at tage
stilling til sagens øvrige spørgsmål, herunder spørgsmålet om an-
svarsgrundlag.

Det bemærkes, at der ikke ved denne dom er taget stilling til be-
tydningen af, at amtets undersøgelsespåbud i medfør af jordforure-
ningslovens § 40 måtte blive stadfæstet.

Sagsomkostninger for landsret og Højesteret er fastsat til dækning
af advokatudgift med 300.000 kr., udgifter til vidneførsel med
3.568,48 kr. og retsafgift med 72.460 kr., i alt 376.028,48 kr.

**Thi kendes for ret:**

*Alba A/S frifindes.*

*I sagsomkostninger for landsret og Højesteret skal Region Hoved-
staden inden 14 dage efter denne*

**277**

*højesteretsdoms afsigelse betale 376.028,48 kr. til Alba A/S. Beløbet
forrentes efter rentelovens § 8 a.*

Copyright © 2023 Karnov Group Denmark A/S                                    side 12