# Exhibit 29, Part 2 of 2



## 11.4 Meeting Regulatory Requirements

When considering the risk associated with regulatory change, any assumption that the status quo will be maintained is incorrect. The following actions and mitigants may be applicable:

➢ **Active Engagement:**
  o Scanning the regulatory environment for upcoming changes (actors may choose to perform this in-house or make use of legal advisors or consultants). The resource demand will be material for global firms with multiple business lines.
  o Detailed initial impact analysis
  o Participating in regulator's consultation papers on new or proposed regulation
  o Advocacy / lobbying legislators / regulatory bodies, either directly or through industry / trade associations
➢ **Preparation:**
  The timely and thorough review of the impact of regulatory change on:
  o Products: New opportunity and change to existing products / services should be considered carefully. A new product and services process should include detailed analysis of regulatory requirements and should also capture product and services changes.
  o Clients: Regulatory change may not impact an actor directly but may impact their client. Prompt understanding of the regulation is required to identify any necessary changes to the actor's products and services and how it engages with the client. Product and service offerings may need to be varied to accommodate regulatory impacts on clients.
  o Resourcing: Regulatory change may require additional resources to understand impact and implementation. It may also impact what resources an actor needs

to perform its business. Any such requirements may impact the cost of transacting in certain markets, products or services.

- o Processes: Regulatory change may prompt changes in processes and controls, which should be analysed and the impact understood. Such changes can be highly material and take long periods to implement, particularly if they are associated with material technology builds.
- o Technology: System, messaging and static data changes may be required to cater for regulatory requirements.
- o Business Model: In some cases, regulatory change may affect the landscape to such an extent that an actor would be required to change its business and operating model and adapt to changes that curtail or impact the profitability of certain activities, or to take advantage of new opportunities presented.

➢ **Risk Management:** Regulatory change can often alter the risk profile of a product, service and market to the extent that a 'risk vs return' assessment is required on a periodic basis to ascertain the risk appetite of continuing to do business vs financial reward. In addition, regulatory change may significantly alter the risk profile to the extent that material changes to the operating structure may be required.

➢ **Implementation:** The need to consider project delivery risk, execution risk and the need to recognize and factor in any incremental changes to the risk profile of the organization and associated governance through, for example, the use of risk framework tools such as Key Risk Indicators and Risk Control Self Assessments.

➢ **Governance**: The need for thorough understanding of the implications of each regulation is a given. Setting a suitable internal senior management regime, compliance and risk strategy to ensure that adherence to regulatory requirements are upheld and consequences for non-compliance known each actor will also need to consider the below which are by no means exhaustive:

- o Delegation: There must be acknowledgement that any delegation will lead to further intermediation in the custody chain and should be considered with governance solutions in mind.
- o Policies and procedures: In line with 3 lines of defence methodology they should be drafted to uphold risk standards and ensure a common ground in meeting regulatory demands.
- o Training: Ensure that staff understand their responsibilities and the action and escalation requirements should a breach be identified including 'whistle-blower' protocol.
- o Tone from the top: A management structure that prescribes responsibility under regulations to specific people or functions with periodic attestation of compliance.
- o Risk reporting: A comprehensive suite of management reporting KRIs, KPIs, SLAs and other tools to spot trends or risk events which may challenge an actor's compliance to a regulation and or identify client, operational or any other such behaviours which may bring regulatory compliance into jeopardy.  Use of regulatory reporting is not for the sole use of regulators. Actors in the custody chain each have their own responsibility to identify themes, concerns or areas for further scrutiny.

➢ **Due Diligence:** Consideration of the information or data points required to comply with regulation at the outset of a client or vendor relationship and on an ongoing basis, for example MiFID client classification or tax status, and how that data will be collected, stored and used (refer to the section 'Client Onboarding').

# 12. Working Group Members

Andy Smith, BNY Mellon (Lead)

Emma Johnson, Deutsche Bank (Sub Working Group Lead)

Roger Harrold, AlfaSec (Sub Working Group Lead)

James Greig, BNY Mellon (Sub Working Group Lead)

Simon Bracken, Citi

Nino Ciganovic, SIX SIS

Dale Connock, Strate

Arnaud Delestienne, Clearstream

Josef Landolt, ISSA CEO

Karina Loureiro, HSBC Bank plc

Irene Mermigidis, ISSA OC Chair / Regis-TR

Katey Neate, BNY Mellon

Stephen Scharf, DTCC

Urs Staehli, ISSA Secretary

Hersh Tegala, Clearstream

Richard Thompson, Northern Trust

Marc Tibi, BNPPSS

# 13. Glossary of Terms

| Terminology | Description |
|---|---|
| Accrued Interest | Coupon interest that is earned on a bond from the last coupon date to the relevant record date. |
| Account Holder | The regulated financial institution account holder or customer of the custodian including fund distributors. |
| Account Operator | An Investor can open accounts directly at an exchange or CSD and ask a third party to operate the account on the investor's behalf under a Power of Attorney. This can allow an investor to be visible by name in a market. The third party will be the account operator. |
| Actual Settlement | A process of settlement based on actual ownership change. Actual settlement will only be processed where securities and or cash have been posted to the investor's accounts in final settlement. |
| Agent Bank | A bank that acts on behalf of a third party client. The agent does not usually take any risk in the transaction. An agent bank can be a sub-custodian. |
| Asset Owner | The owner of legal record of the asset and often the client of a custodian bank. |
| Asset Manager | An asset manager acts on behalf of the asset owner and is appointed using an investment management agreement or similar arrangement, which sets out the terms under which the asset manager is authorized to act on behalf of the asset owner to manage the assets referred to in the agreement. |
| Basis Point | One hundred basis points equal one percent. One basis point is 0.01%. |
| Beneficial Owner | A party that is entitled to the rights of ownership of property. In the context of securities, the term is usually used to distinguish this party from the registered holder (a nominee for example) that holds the securities for the beneficial owner.<br><br>The ultimate owner of an asset, who may or may not be the client of the custodian. |
| Broker (Securities or Prime) | Securities or prime brokers offer services to hedge funds and other professional investors including securities lending, leveraged trade execution and cash management. A prime broker may also hold assets in custody on behalf of its clients and act in the capacity of a sub-custodian. The broker may provide investors with access to trading platforms. |
| Cash Correspondent | An agent bank that provides payment and clearing services for a principal, A cash correspondent can be but not always necessarily the same party as a sub-custodian. |
| Central Securities Depository | A specialist financial organization holding securities such as shares either in certificated or uncertificated (dematerialized) form so that ownership can be easily transferred through a book entry rather than the transfer of physical certificates. |

| Terminology | Description |
|---|---|
| **Central Bank** | A national central bank that provides financial and banking services for its country's government and commercial banking system, as well as implementing the government's monetary policy and issuing currency. |
| **Central Counterparty (CCP)** | A central counterparty clearing house (CCP) is an organization that exists in various countries that helps facilitate trading done in derivatives and equities markets. These clearing houses are often operated by the major banks in the country. The CCP steps in and acts as the counterparty to each transaction reducing risk of counterparty/ settlement default. |
| **Client** | The underlying investor or holder. |
| **Client Account** | Any account containing securities interests that are beneficially owned by any party other than the account holder. |
| **Client Assets** | Client assets is a description that applied to certain holdings of property clearly indicates that although the assets are held by a third party these assets are held on behalf of others and are protected under the rules of a local client asset protection regulation and accordingly are not available to the liquidator of the designated account holder. |
| **Collateral** | Securities, financial instruments or deposits that are delivered by a borrower to the lender as security in connection with a financing transaction. |
| **Contagion Risk** | A situation where a shock in a particular corporate entity, economy or region spreads out and affects others by way of, say, price movements. The contagion effect explains the possibility of spread of economic crisis or boom across countries or regions. |
| **Contractual Settlement** | A recordkeeping and accounting process that can be applied by a custodian to help clients manage cash flow or securities delivery difficulties - securities are contractually settled into an account on the technical settlement date for a trade irrespective of settlement date activity but often subject to final settlement on an actual basis. The custodian helps smooth the cash flow but does not take ultimate risk on settlement. |
| **Corporate Action** | A corporate event in relation to which the holder of the security must or may make an election or take some other action in order to secure its entitlement and/or to opt for a particular form of entitlement in respect of a security it owns. |
| **Corporate Event** | An event in relation to a security as a result of which the holder will be or may become entitled to: a benefit (dividend, rights issue etc.); or securities other than those which he holds prior to that event (takeover offer, scheme of arrangement, conversion, redemption etc.). This type of corporate event is also known as a stock situation. |
| **Coupon Date** | The date upon which the issuer of an interest paying security makes an interest payment to the registered holder (as of the ex-coupon date) of that security. Coupons may be paid (in most cases) annually, semi-annually or quarterly. |

| Terminology | Description |
|---|---|
| **Credit Risk** | The risk of default on an extension of credit (whether a formal loan or other facility provision) that may arise from a borrower failing to make required payments. In the first resort, the risk is that of the lender and includes lost principal and interest, disruption to cash flows, and increased collection costs. |
| **Custodian** | An entity that holds securities of any type for investors, effects receipts and deliveries, and supplies appropriate reporting. It can be considered the upstream account holding institution which may be a bank acting as global custodian and sub-custodian, fund distributor, trustee/depositary bank, broker, prime broker, International Central Securities Depository and Central Securities Depository, to the extent that cross-border operations are involved. |
| **Custody** | The range of services provided by the custodian as defined within the custody agreement. The services largely include safekeeping, securities movement and settlement, dividend collection, tax and corporate action processing. |
| **Delivery versus Payment (DVP)** | The securities trade settlement process where the trade is settled by the simultaneous delivery of securities against the payment of funds. |
| **Dematerialized Securities** | Securities that have no certificates (maybe presented by a single certificate for entire issue) and where all trading takes place based on electronic book entries. |
| **Dividend Date** | The date upon which the issuer of the share pays the dividend to the registered holder as at the record date of the security. |
| **Embargo** | An embargo is a government order that restricts commerce or exchange with a specified country or the exchange of specific goods. An embargo is usually created as a result of unfavou-rable political or economic circumstances between nations. |
| **Embargo Screening** | A process that screens certain accounts or transactions against known embargos. |
| **Emerging Market** | Jurisdictions where there is an immature securities market, in which there is neither a sophisiticated domestic securities market nor a long history of substantial foreign investment. |
| **Fail** | The failure to deliver cash, securities or collateral in time for the settlement of a transaction. |
| **Financial Market Utility** | A term defined in the US Dodd-Frank Act, and referred to by the Bank of International Settlements as financial market infrastructures or 'FMIs', meaning the providers or operators of the necessary financial market infrastructure to transfer, clear or settle payments, securities or other transactions between financial institutions. |
| **General Collateral** | Securities that are not "special" in the market and may be used, typically, simply to collateralize cash borrowings. Also known as "stock collateral". |

| Terminology | Description |
|---|---|
| **Immobilized Securities** | Securities that have been centralized in one place and taken out of circulation to enable book entry transactions and are represented by a legal registry of guaranteed ownership at a central point i.e. by a CSD |
| **Income Processing** | The processing of cash derived from securities holdings such as dividends, interest on bond holdings, redemptions from bond repayments to the beneficial owners of that entitlement. |
| **Indemnity** | A form of contractual undertaking, offered by a party supporting a liability. Terms vary significantly and the value of the indemnity always depends on the credit worthiness of the giver of the Indemnity. |
| **Initial Margin** | Initial margin is the excess of cash over securities or securities over cash required by a third party in respect of a particular transaction. One party may require an initial margin because of the perceived credit risk of the counterparty. The size of the margin often varies according to the volatility of the collateral and the credit standing of the counterparties. |
| **International Central Depository (ICSD)** | An ICSD is a central securities depository that settles trades in international securities such as Eurobonds although many also settle trades in various domestic securities, usually through direct or indirect (through local agents) links to local CSDs. |
| **Know Your Client (KYC)** | The process of verifying the identity and material characteristics of clients, including legal identity, nationality, business etc. The term is also used to refer to the bank regulation which governs these activities. |
| **Lien** | The right of a person who has lawfully received property belonging to another to retain that property for so long as a debt owed by the owner of the property remains unpaid. |
| **Liquidity Risk** | The risk that a company or bank may be unable to meet short term financial demands. This usually occurs due to the inability to convert a security or hard asset to cash without a loss of capital and / or income in the process or in a timely fashion to meet an immediate cash requirement. |
| **Margin Call** | A request by one party in a transaction for the initial margin to be reinstated or to restore the original cash/securities ratio to parity. Usually follows a mark to market of the exposure to reflect current market prices. |
| **Mark to Market** | The act of revaluing the securities to current market values. This may be done daily or at a suitable interval agreed upon by the parties to a transaction. |
| **Market Risk** | The risk that the value of an investment will decrease due to moves in market factors. Volatility frequently refers to the standard deviation of the change in value of a financial instrument with a specific time horizon. |

| Terminology | Description |
|---|---|
| **Market Value** | The value of securities or collateral as determined using the last (or latest available) sale price on the principal exchange where the instrument was traded or, if not so traded, using the most recent bid or offered prices. |
| **Net Asset Value (NAV)** | A financial statement that calculates the value of assets in a portfolio including all accrued costs and income to value a holding. This value is then used as a basis to calculate the net vsset Value of a  fund or unit holding. |
| **Network Management** | A term given to a process carried on within an organization for the selection and management of key counterparties in the custody chain (typically third party sub-custodians and agent banks) |
| **Nominee Account** | Typically, an account opened in the name of a company created for the sole purpose of holding securities on behalf of investors. Often the nominee appears on the register as the owner of the securities. |
| **Offboarding** | A term used to describe a process of taking a client and assets out of an organization. |
| **Off-Book Currency** | The custodian will open cash accounts in the domestic market in the name of the client. The client gives power of attorney to the custodian to operate the account. The risk of third party insolvency is now carried directly by the client. |
| **Omnibus Account** | Account opened in the name of a custodian at a CSD or sub-custodian that holds cash or securities on behalf of multiple clients. The ultimate ownership of all the assets in the account are shown by the account holder (custodian) in the custodian's books of records. |
| **Onboarding** | A term used to describe a process of bringing a client and assets into an organization. |
| **On-Book Currency** | The custodian will open and operate in its own books and records a deposit account for clients and assume the risk of third party agent insolvency on that position. |
| **Operational Risk** | Operational risk is defined as the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events. This definition includes legal risk, but excludes strategic and reputational risk. |
| **Pledge** | Transfer of possession of an asset to a creditor for the purpose of allowing the creditor to secure a debt. |
| **Principal** | A principal is a party to a transaction that acts on its behalf (and therefore always represents its own risks rather than that of a client). |
| **Proprietary Assets** | These assets belong to the account owner and are clearly segregated form client assets. The proprietary assets of a client may become available to any liquidator. |
| **Receive versus Payment (RVP)** | The process for settling a securities transaction involving the simultaneous receipt of securities against the payment of funds |

| Terminology | Description |
|---|---|
| **Registrar** | An entity that maintains a registry of the securities owners and number of securities held for a fund, bond or equity issuance, and ensures that not more securities are issued than have been authorized.  Registrar and transfer agency functions are often provided by the same entity. |
| **Regulator** | Regulators govern the operation of the financial markets for the jurisdiction for which they are responsible. Whilst the remit and scope of the regulator will vary from market to market, they often have a role to play in monitoring market conditions and stability and providing oversight. In some markets, the regulators play a direct role in the operation of market infrastructures (CCPs, CSDs) and central banks. Within the custody lifecycle, regulators set the rules by which market participants must operate, and may exercise their oversight responsibilities by, for example, taking feeds of data from CSDs and global custodians. |
| **Safekeeping** | The holding of assets in a secure and controlled environment. |
| **Segregated Account** | An account opened for one party that may have a specific purpose to segregate holdings. (i.e. tax purpose or identify specific ownership etc.).<br><br>Any client account containing securities interests that are legally owned by a single party other than the account holder. |
| **Settlement Date** | The date of finalization of a securities transaction, and registration of the  transfer of securities and cash in fulfilment of the obligations committed to in an executed trade. |
| **Settlement Risk** | The risk that a counterparty does not deliver a security or its value in cash as per agreement when the security was traded after the other counterparty or counterparties have already delivered security or cash value as per the trade agreement. |
| **Sub Custodian / Agent Bank** | An agent that provides defined domestic markets services. A sub-custodian is often employed by a global custodian. |
| **Trade Date** | Date when an irrevocable trade is executed and the price fixed for settlement on the same day or an agreed date after trade date. |
| **Transfer Agent** | Party appointed by a fund manager or issuer of securities to issue or cancel certificates in physical or dematerialized form to reflect a record of ownership. |
| **Value Date** | The date upon which funds are received and credited to a cash account. |

# Appendix 1

## Custody Lifecycle – Equities & Bonds Settlement

The following table illustrates the typical relationships and transaction flows between the participants in the custody chain where the asset is a traditional equity or bond.



The lifecycle starts with an investor who is interested to buy / sell securities. The asset owner may take this decision directly or employ a specialized asset manager. Upon deciding on the desired asset the asset owner or asset manager will engage a broker.

Broker A will receive a trade order from the asset manager and will either route the order directly or if the broker is not represented in the domestic market, go via a domestic broker (Broker 1). Broker 1 will place the order on the stock exchange.

Broker(s) 2:  These are other brokers who will also be entering orders from their clients on the stock exchange.

The stock exchange receives orders from buyers and sellers throughout the day and will attempt to match the orders from a buyer and a seller broker. When matched the order will be executed at a defined price.

In some markets the stock exchange will execute all orders against a central counterparty (CCP) The CCP steps in on behalf of the brokers to fulfil the settlement obligations and by doing so reduces the exposure for buyers and sellers dealing with brokers directly.

Upon execution brokers 1 and 2 confirm the trade details via a trade confirmation to the asset owners or asset managers. If broker 1 acts for broker A then broker A informs the asset owners or asset managers.

Broker 1 and broker 2 both issue instructions to the CSD to receive/ deliver securities against payment to the named broker account. Where a CCP is involved the CCP will debit the brokers and collect the money accordingly. If broker 1 acts for broker A then broker A will issue instruction via sub-custodian Y of broker A to the CSD.

The global custodian B receives notification from the asset owner or asset manager to settle the trade executed on the stock exchange. The global custodian will check the client account, make sure securities or cash are available and then instruct its sub-custodian to settle the trade.

Sub-custodian X of global custodian B receives the instruction. The sub-custodian checks the availability of cash and securities in the global custodian's account held with the sub-custodian and enters an instruction into the CSD.

CSD matches instructions from both the buyer and seller and then on settlement date will move the securities to the buyer's account. CSD simultaneously debits the cash account of the sub-custodian. The cash account of the sub-custodian will be either at the central bank or via a designated cash correspondent.

Sub-custodian X of global custodian B confirms the settlement to the global custodian B. Sub-custodian will book securities and cash to the account of the global custodian.

Global custodian B confirms the trade to the asset owner or asset manager. Global custodian will book the securities and cash to the account of the asset owner/ asset manager.

# Appendix 2

## Custody Lifecycle – Funds Settlement

The following table illustrates an example (typical but not universal) of the relationships and transaction flows between the participants in the custody chain where the asset is an investment in fund units.



The lifecycle for funds starts with an investor wishing to buy or sell a fund unit.

The asset owner decides to buy / sell units in a selected fund. The owner will hold these in an account at a transfer agent who will be connected to an electronic trading platform.

Trades are entered on the trading platform. The trading platform will allocate trades and creates the actual trade confirmation.

These trades are sent to the transfer agent. The transfer agent then creates or cancels units for each investor in each fund throughout the day to reflect the trading activity and gives the net positions to the fund manager and fund accountant. For purchases, the transfer agent will instruct or pay monies to the banker. For sales it will instruct the payment to investors based on trades received by issuing instructions to the banker. All activity through the banker is reconciled by the global custodian.

The fund manager will adjust the fund to make sure that all trade obligations can be meet. If there are more redemptions requests than cash available, assets need to be sold to meet the cash proceeds. Likewise, if the fund attracts new asset owners and the cash is surplus then the fund manager can allocate these monies and buy new assets for the fund.

Any trades executed by the fund manager are sent to the fund accountant and to the depositary bank. In some countries global custodian and depositary bank are the same institution. If this is not the case the global custodian will update the depositary bank on changes / movements.

The fund accountant runs the net asset value (NAV) based on the information received from the transfer agent that shows the number of units in existence and the assets in the fund – managed by the fund manager. The fund accountant will also reconcile all fund assets with the global custodian.

The global custodian will hold all the assets for the fund and make sure that the cash is paid to the banker for payment date and that all assets are reconciled towards the fund manager, fund accountant and transfer agent.

# Appendix 3

## Differing Market Protocols

The following are examples of the different account holding structures used across the global securities industry and show the diverse protocols adopted across the globe.

| Developed Markets | | |
|---|---|---|

| USA | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | Yes |
| Settlement Convention | T+3 | T+1 UST / T+3 Corps |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

| Germany | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | No |
| Bearer | Yes | Yes |
| Settlement Convention | T+2 | T+2 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

| Australia | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | No |
| Settlement Convention | T+2 | T+2 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

| Singapore | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | Yes |
| Settlement Convention | T+3 | T+1 / T+3 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

| Emerging Markets | | |
|---|---|---|

| Poland | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | Yes | Yes |
| Settlement Convention | T+2 | T+2 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

| Turkey | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | Yes | Yes |
| Settlement Convention | T+2 | T+0 / negotiable |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | No |
| Designated Segregated | Yes | Yes |

| India | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | No |
| Settlement Convention | T+2 | T+0-T+2 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | No | No NSDL/CDSL / Yes RBI |
| Designated Segregated | Yes | Yes |

| South Africa | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | No |
| Settlement Convention | T+3 | T+3 negotiable |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

International Securities Services Association ISSA    Inherent Risks within the Global Custody Chain

**Frontier Markets**

| Nigeria | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | No |
| Settlement Convention | T+3 | T+2 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | Yes | Yes |

| Vietnam | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | No |
| Settlement Convention | T+2 | T+1 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | Yes | Yes |
| Designated Segregated | No | No |

| Colombia | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | Yes |
| Settlement Convention | T+3 | T+0-T+3 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | No | No |
| Designated Segregated | Yes | Yes |

| Qatar | | |
|---|---|---|
| Securities Instrument Type | Equities | Fixed Income |
| Registered | Yes | Yes |
| Bearer | No | No |
| Settlement Convention | T+3 | T+3 |
| Account Structure at CSD | Equities | Fixed Income |
| Omnibus | No | No |
| Designated Segregated | Yes | Yes |

# Appendix 4

## Omnibus versus Segregated Accounts

There is currently a wave of industry analysis and much consideration by the global regulators, in Europe in particular, of securities account structures. Such evaluation includes the regional differences and the advantages versus the disadvantages of one account type versus another. Until the regulators provide definition and clarity this debate is likely to continue. One current study (2016) is the **AFME Working Group paper titled 'Position & Proposed Principles on Asset Segregation'** which documents the following concise Investor, Intermediary and Account Structure Matrix:

### Account Structures – Asset Segregation



Excerpt from
AFME Principles on Asset Segregation, Due Diligence and Collateral Treatment
Report September 2016

# Appendix 5

## The Advantages and Disadvantages of Omnibus Accounts

|  | Advantages of Omnibus Accounts | Disadvantages of Omnibus Accounts |
|---|---|---|
| **Settlement Processing & Inventory Management** | ➢ Custodian / CSD operating efficiency (time and resources) as one account is used for multiple investors.<br><br>➢ Opportunities for internalized settlement (where both parties to a trade have holdings in the same omnibus) as there may be no requirement to instruct the CSD, therefore leading to reduced cost and greater settlement certainty.<br><br>➢ Aligns to omnibus related market infrastructure strategies (e.g. T2S)<br><br>➢ Cost and time efficient position level settlement fails coverage / securities lending subject to client agreement and service offered. | ➢ Potential for investors within the omnibus account delivering securities that they do not hold, leading to a securities shortfall with other investors in the account, leading to a loss of investor assets and a client asset safety rule breach.<br><br>➢ Short positions could force the need to borrow creating ambiguity, at least initially, possible as to who should bear the cost. A permanent shortfall on the account could cause a loss. |
| **Corporate Action Processing** | ➢ Single point of processing for issuers and investors for corporate actions.<br><br>➢ Custodian / CSD operating efficiency (time and resources) as one account is used for multiple investors.<br><br>➢ Collectively held securities allow for simpler processing of corporate events as significantly fewer messages to receive and send and fewer accounts to apply. | ➢ Distance between issuers and investors can create delays in custodian processing; e.g. notification time to the end investor versus cut-off times, particularly where operating model does not benefit from full automation.<br><br>➢ The processing of certain corporate events may lead to rounding issues or imperfect division of assets amongst investors.<br><br>➢ Potential for issuers to prevent differing votes within one omnibus account. |
| **Administration** | ➢ Reduced burden for issuers dealing directly with the account holder rather than a large number of investors directly.<br><br>➢ Due to the account being held at the CSD by the intermediary the omnibus acount proves a quicker route to enter a market for a new investor since the account is in existence. | ➢ Corporate communications are made more difficult in particular in countries where issuers are required to stay in touch with investors. |
| **Control** | ➢ Reduced number of accounts leads to reduced number of reconciliations required. It also leads to a reduction in the number of accounts that may become dormant. | ➢ The one-to-many nature of the omnibus account makes stock reconciliation more cumbersome and requires a sophisticated and timely settlement system / stock record to be able to reconcile positions and identify breaks on an investor level. |

| | Advantages of Omnibus Accounts | Disadvantages of Omnibus Accounts |
|---|---|---|
| **Collateralization** | ➢ Streamlined flow of settlement and collateral cross border. Aligns to omnibus related market infrastructure strategies (such as T2S).<br><br>➢ Auto-collateralization of flow in T2S for omnibus accounts increases liquidity mobility subject to client agreement of service. | |
| **Cost** | ➢ Operational efficiency due to reduced number of accounts / messages leads to lower cost.<br><br>➢ Opportunity for internalized / net settlement across the books of the account provider reduces transaction costs. | |
| **Transparency of Ownership** | | ➢ Risk that the relevant legal system does not recognize the omnibus account as a valid form of co-ownership which creates the risk that the investor may not have any property rights at all if the account provider pools its securities with those of other investors.<br><br>➢ Disintermediation of ownership through distance between issuer and investor. The issuer loses transparency of who the investors are and who has title to the investment.<br><br>➢ No look through to the end investor at client onboarding stage. |

# Appendix 6

## The Advantages and Disadvantages of Segregated Accounts

| | Advantages of Omnibus Accounts | Disadvantages of Omnibus Accounts |
|---|---|---|
| **Settlement Processing & Inventory Management** | ➢ Transparency of a single investor's position.<br><br>➢ Segregation of position ownership eliminates potential use of another investor's position to satisfy a delivery of an investor.<br><br>➢ Potential for improved deadlines when direct segregated account at the CSD level. | ➢ Inability for internalized settlement requires all trades to settle at the CSD (cost). |
| **Corporate Action Processing** | ➢ Transparency of the end investor (or the intermediary accountable for the end investor) aids the notification process providing clarity as to who should elect / vote.<br><br>➢ Segregated positions prevent any detrimental rounding issues.<br><br>➢ No opportunity for an investor's vote to be compromised. | ➢ Operationally more demanding for a custodian (see cost). |
| **Administration** | ➢ Transparency of the investor makes corporate communications easier, particularly in countries where issuers are required to stay in touch with investors. | ➢ Restrictions by the CSD in regards to the entities that are eligible as participants – segregated account may not be possible.<br><br>➢ Greater burden for issuers who have to deal directly with the end investors rather than through the intermediary.<br><br>➢ Opening an account at the CSD itself takes a greater time to market than onboarding a new client into an omnibus structure. |
| **Control** | ➢ The 1:1 nature of the segregated account often renders  the investigation and resolution process associated with reconciliation breaks more straightforward. | ➢ The number of reconciliations required can be significant.<br><br>➢ The increased number of accounts can lead to increased number of dormant accounts and increased client data to safeguard. |
| **Cost** | | ➢ Increased number of accounts, reconciliations and messaging increases operational cost.<br><br>➢ Due to the silo'd nature of the account, all instructions need to be settled across the CSD, therefore no benefit of reduced internalized settlement cost. |

| | Advantages of Omnibus Accounts | Disadvantages of Omnibus Accounts |
|---|---|---|
| **Transparency of Ownership** | ➢ Potential for faster identification of the end investor to the issuers, to the regulators and to administrators in the event of the account holder's insolvency or any other default / insolvency in the transaction lifecycle (albeit this cannot always guarantee more time favourable remediation in a default scenario). | |

# Appendix 7

## Questions for Asset Safety Global Legal Opinions

Questions to consider in respect of ascertaining the robustness of asset safety regimes globally include:

➢ *Are all securities of a particular class or series of any issuer that are deposited in your institution treated as fungible, and can they be transferred or pledged by bookkeeping entry without physical delivery of the securities?*

➢ *Please provide details of the structure and composition of your Board together with their industry experience and responsibilities in governing the depository. What are the qualifications to become a board member? What are the election procedures?*

➢ *Are annual financial statements publicly disclosed? If no, and annual report and/or financial statements are not disclosed, please state your share capital, reserves, and retained earnings (or equivalents as determined under local accounting standards).*

➢ *Is an operational audit performed by an Audit Firm, Regulatory Authority, or other external party?*

➢ *Please confirm the basis for the arrangements in place to ensure that the assets you hold for custodians receive the same level of safekeeping protection as the assets held for other categories of participants.*

➢ *Please list by instrument type the percentage of the total market in your jurisdiction (either volume or value) settled within your institution, exclusive of your links with third parties.*

➢ *Are there any activities performed by a third party on behalf of the depository for the depository participants (e.g., vaulting of physical securities, registration, entitlement processing, etc.)? If third parties are employed, does the depository assume liability for losses incurred by participants as a result of the actions/inactions of the third parties?*

➢ *Are procedures and controls (firewalls) in place to avoid systemic collapse or contamination if one of the linked entities should experience business interruptions for whatever reason?*

➢ *Are participants required/permitted to segregate assets held for their own benefit from those they hold for their clients? How does segregation occur? (Choose all that apply.) Do laws exist, which define as well as protect the rights of beneficial owners with respect to securities registered in nominee name? Does the depository maintain records that identify the assets of each participant and segregate the system's own assets from the assets of participants?*

➢ *In the event a participant's single or main account is blocked for any reason (e.g., insolvency, penalties, violations, liens), would securities held in any account or accounts on behalf of the participant's clients be accessible?*

➢ *Can the depository assess a lien on participant accounts? (A lien would entitle the depository to take and hold or sell the securities of the participant in*

*payment of a debt.) If yes, for what reasons are liens or similar claims imposed? If a lien is placed on a participant's account which has been designated for its clients, will the depository select certain securities to be subject to the lien? For accounts designated as client accounts, do procedures exist to restrict the placement of liens only to obligations arising from safe custody and administration of those accounts?*

➢ *When does title or entitlement to depository securities pass between participants? Does the depository accept liability (independent of any insurance coverage) for E.G: Reconciliation errors with the registrar and / or the issuer that result in direct damages or losses to participants? Failure of the depository's systems that result in direct damages or losses to participants because they cannot use either securities or funds? Any direct damages or losses to participants caused by the depository as a result of force majeure events, acts of God, or political events, etc.?*

➢ *Do the depository's written contracts, rules, or established practices and procedures provide protection against risk of loss of participant assets by the depository in the form of Indemnification?*

➢ *Do participants have access to affect their holdings, including confirming and affirming trades, movement of securities on their accounts, etc.?*

---

The above is an excerpt from a recent exercise conducted by Baker & McKenzie and the Association of Global Custodians.