# Exhibit 47, Part 4 of 5

kan tillægges nogen som helst bevisværdi i forhold til pensionsplanens påståede ejerskab. Tværtimod skaber indrømmelsen og pensionsplanens støtten på ED&F Man en meget klar formodning for, at alle ED&F Mans Tax Vouchers er forkerte. Der påhviler pensionsplanen en meget tung bevisbyrde herefter for at være berettiget til refusion. Denne bevisbyrde har pensionsplanen ikke løftet.

De erkendt ukorrekte Tax Vouchers er imidlertid ikke den eneste grund til, at dokumentation fra ED&F Man ikke kan tillægges nogen bevisværdi. *Udover* de erkendt forkerte Tax Vouchers har ED&F Man nemlig *i andre tilfælde* konstrueret dokumentation for "aktiehandler" og attesteret ejerskab i strid med de faktiske forhold , jf. nedenfor i afsnit 5.1 og 5.2.

Ligesom ved de Shah-kontrollerede custodians er det tilsyneladende ED&F Man, som har orkestreret "handlerne" på vegne af pensionsplanen. En anden pensionsplan i sagskomplekset har således i en af de civile erstatningssager i USA anført, at det netop var ED&F Man, som arrangerede og gennemførte alle transaktioner (**Bilag AC**, side 11). Det samme ser ud til at gøre sig gældende for denne pensionsplan.

ED&F Man har ultimo marts 2019 valgt at lukke deres *"UK equity finance business"*, jf. **bilag AD**.

### 4.2   ED&F Man konkret fejl 1: Valutaomregning foretaget forkert

Skattestyrelsen har konstateret, at bilagsmateriale fra pensionsplanens custodian, ED&F Man, er væsentligt fejlbehæftet. Til illustration heraf kan henvises til bilag X.

Bilag X er en konto fra en anden pensionsplan, der – ligesom AIG – anvender ED&F Man som custodian. Kontoen indeholder en future-position, der pr. 11. april 2013 har en værdi på 6.030.486 DKK (Trade Date Amount). Da kontoen føres i euro (EUR), omregnes future-positionens værdi til EUR. Omregningen fremgår på øverste linje under "Cash Summary", jf. uddraget nedenfor.

```
Cash Summary

Cur Layer            Trade Date Amount       Conv Rate       TD Reporting Amt (EUR)

DKK Var Margin        6,030,486.00 Cr        7.4561000           44,963,906.66 Cr
                                                                =====================
                                                                    44,963,906.66 Cr
```

Som det ses, omregnes future-positionens værdi på 6.030.486 DKK til 44.963.906,66 EUR ved at gange med vekselkursen 7,4561. Ved omregningen fra DKK til EUR skulle beløbet dog naturligvis have været *divideret* med vekselkursen. Denne åbenlyse fejl bevirker, at future-positionens værdi bliver langt højere, end den i virkeligheden er. Hvis beløbet var blevet omregnet rigtigt, ville future-positionen have haft en værdi på 808.798,97 EUR. ED&F Man har altså registeret future-positionen med en værdi, der er ca. 55 gange højere end future-positionens rigtige værdi. Denne fejl resulterer i, at kontoværdien (Total Account Value) bliver lig med netop 44.963.906,66 EUR, jf. bilag X, s. 2. Det er altså en regnefejl på over 330 millioner kr.

Det giver ikke nogen mening, at custodian kan begå en sådan fejl. Dokumenterne fra custodian angår angiveligt investeringer for mange millioner kr. i mange forskellige danske selskaber. Det er således meget store beløb, der er på spil. Det vil nødvendigvis kræve et IT-system, som ikke laver fejl.

En fejl af den karakter i bilagsmateriale fra pensionsplanens custodian, ED&F Man, er i sig selv mistillidsskabende.

### 4.3 ED&F Man konkret fejl 2: Aktiebesiddelse

ED&F Man har i en anden af sagerne inden for udbyttesagskomplekset udstedt dokumentation til en pensionsplan for ejerskab til 50.000 aktier i IC Company A/S (bilag Y). Som det fremgår af bilaget, var Ex date den 25. september 2014.

Skattestyrelsen er i besiddelse af depotudskrift for den konto, hvor ED&F Man tilsyneladende besad denne aktiepost (bilag Z). Som det fremgår heraf, erhvervede ED&F Man 5.000 aktier fra Jefferies International Ltd. den 19. september 2014, som blev leveret den 26. september 2014. Aktierne blev "handlet" til 0 kr., hvilket kraftigt tyder på, at det var et aktieudlån. For disse aktier fik ED&F Man udbetalt udbytte til sin konto. Den 29. september 2014 afhændede ED&F Man 5.000 aktier til Jefferies International Ltd. for 0 kr., hvilket tyder på, at det var tilbagelevering af ovennævnte aktiepost. Levering skete den 30. september 2014.

Herudover fremgår det, at ED&F Man erhvervede 10 x 5.000 aktier den 24. september 2014, som blev leveret den 30. september 2014 (T + 4). ED&F Man solgte 10 x 5.000 aktier den 25. september 2014 og leverede aktierne den 30. september 2014 (T + 3). Aktierne blev således leveret under købsaftalen samme dag, som de skulle leveres under salgsaftalen. Den 30. september 2014 modtog ED&F Man således 50.000 aktier og sendte dem videre samme dag. Aktierne "rørte" dermed blot ED&F Mans konto.

Aktierne blev erhvervet til 167,5 kr. stykket og solgt til 165,5 kr. stykket. Tabet var dermed 2,00 kr. pr. aktie. For 50.000 aktier blev tabet på køb/salg således præcis 100.000,00 kr.

ED&F Man har således ifølge depotudskriften lånt 5.000 aktier. Derudover har ED&F Man "købt" 50.000 aktier den 24., som blev solgt den 25., hvor køb og salg blev gennemført samme dato og for helt runde beløb.

Der er samlet set *ingen* dokumentation for, at ED&F Man skulle have ejet nogen af disse aktiebeholdninger. Tværtimod viser dokumenterne, hvordan ED&F Man ved handler ind/ud af depot har forsøgt at få det til at ligne, at de holdt aktier på vegne af pensionsplaner. Alligevel har ED&F Man attesteret ejerskab til aktierne. Og den dokumentation kan derfor ikke tillægges betydning.

### 4.4 ED&F Man konkret fejl 3: Uoverensstemmelse mellem aktiekøb og Credit Advices

For en anden pensionsplan i sagskomplekset, der – ligesom AIG – anvender ED&F Man som custodian, har Skattestyrelsen konstateret uoverensstemmelser mellem de aktieposter, der er anvendt til refusion, og aktiebesiddelserne ifølge de fremlagte Account Statements (**bilag AE**, s. 1-2) og General Ledger (bilag AE, s. 3). Det giver ikke mening, idet Account Statements og General Ledger burde afspejle pensionsplanens aktiebeholdninger og dermed de aktieposter, som pensionsplanen søger refusion af indeholdt udbytteskat for.

Pensionsplanen anmodede den 7. september 2012 om refusion af udbytteskat for 375.000 TDC-aktier (bilag AE, s. 4).

Ex-datoen var den 9. august 2012, og pensionsplanen skal derfor bl.a. dokumentere, at den har ejet 375.000 aktier henover denne dato.

Ifølge bilag AE, side 3, havde pensionsplanen købt 1,4 mio. TDC-aktier for 41,1405 kr. pr. stk., som blev leveret den 9. august 2012.

Det er imidlertid ingen forklaring på, at pensionsplanen skulle have købt 1.400.000 TDC-aktier og "kun" have anmodet om refusion for 375.000 aktier. På det foreliggende grundlag viser uoverensstemmelsen, at ED&F Man-dokumentationen er usammenhængende og derfor ikke kan lægges til grund.

### 4.5 Aktiekøb: Vilkår for settlement er ikke markedskonforme

Frem til den 6. oktober 2014 var standarden for aktiehandler i Danmark, at aktier blev leveret tre dage efter aftaleindgåelsen (dvs. settlement T+3). Efter 6. oktober 2014 var standarden levering efter to dage (dvs. T+2) (bilag W). Ved beregningen af leveringstid medregnes kun hverdage – dvs. hverken weekender eller helligdage medregnes.

Pensionsplanens aktiehandler er settlet således, jf. bilag 5A, 6A, 7A, 7D, 8A, 8C, 9A, 9D, 10A, 10D, 11A, 12A, 13A, 13D, 14A, 14D:

|  | Køb (settlement) | Salg (settlement) |
|---|---|---|
| Coloplast | 5/12-13 (T+4) |  |
| TDC | 5/3-14 (T+3) |  |
|  | 6/3-14 (T+4) |  |
|  | 6/3-14 (T+4) |  |
| Danske Bank | 18/3-14 (T+4) | 10/6-14 (T+3) |
|  | 17/3-14 (T+3) |  |
|  | 18/3-14 (T+4) |  |
| Novo Nordisk | 20/3-14 (T+4) | 10/6-14 (T+3) |
| Mærsk-B | 28/3-14 (T+3) | 10/6-14 (T+3) |
| Tryg | 2/4-14 (T+3) | 10/6-14 (T+3) |
| TDC | 7/8-14 (T+2) |  |
| Chr. Hansen Holding | 27/11-14 (T+2) |  |
| Coloplast | 3/12-14 (T+2) | 10/12-14 (T+2) |
| Novozymes | 25/2-15 (T+3) | 26/2-15 (T+2) |

Skattestyrelsen kan henvise til **støttebilaget, afsnit 6,** for en samlet oversigt over aktiehandler for pensionsplaner repræsenteret af Lundgrens – i sagskompleksets 1. bølge af klagesager – der anvender ED&F Man som custodian.

Som det fremgår af støttebilaget, afsnit 6, er settlement af *køb* i mange tilfælde ikke sket på markedsvilkår (T+3 frem til 6. oktober 2014 og T+2 derefter), men med en dags længere leveringstid end efter markedsstandarden. Pensionsplanerne har ikke redegjort herfor. Det er heller ikke oplyst, hvorfor flere af pensionsplanerne på samme dag (10. juni 2014) har *solgt* deres aktieposter i samme selskaber, men det tyder på, at "handlerne" er orkestreret fra centralt hold.

Afvigelsen fra markedsvilkårene er bemærkelsesværdig, idet afvigelsen – selv hvis der havde været aktiehandler og ikke blot bogføringsmæssige posteringer – i høj grad vanskeliggør kontrol. Det skyldes "tidsplanen" ved udlodninger på det danske marked:

Et selskab beslutter at foretage udlodning på selskabets generalforsamling. I henhold til markedsvilkårene for levering, vil dagen for generalforsamling være at betragte som "dag 0". Når et selskab har besluttet at foretage udlodning, bliver *ex date* (*ex dividend-date*) fastlagt. *Ex date* er den første dag efter generalforsamlingen, hvor aktierne handles uden udbytte, og vil derfor være at betragte som "dag 1".

Herefter bliver *record date* fastlagt. Datoen fastlægges af handelsplatformen ud fra markedsvilkårene for levering af aktier. De, der er registreret som depotindehavere på den pågældende dato (record date), vil modtage udbyttet. Ved levering T+2 vil *record date* være at betragte som "dag 2". Ved levering T+3 vil *record date* være at betragte som "dag 3".

Før den 6. oktober 2014 var markedsstandarden, at levering skete T+3. Det betød, at hvis man erhvervede aktier mandag den 11. august 2014, ville man få aktierne leveret (blive registreret som

ejer) torsdag den 14. august 2014. Aktier skulle derfor erhverves tre dage før *record date*, hvis man skulle være registreret som ejer på *record date*. Ved handel to dage før *record date* ville man nemlig – ved almindelige vilkår for levering (T+3) – ikke længere nå at modtage aktierne, inden selskabet fastlagde ejerkredsen med henblik på udbetaling af udbyttet – og dermed ville *sælgeren* få udbyttet. *Ex date* var derfor to dage før *record date*.

For at opnå ret til udbytte skulle man derfor erhverve aktier <u>senest</u> tre dage inden *record date*. Dermed ville man – ifølge markedsstandarden (T+3) – modtage aktierne og være registreret som ejer på det tidspunkt, hvor det udloddende selskab fastlægger ejerkredsen, og man ville få udbyttet udbetalt til sig.

Den 6. oktober 2014 blev markedsstandarden ændret, således levering sker T+2. Det betyder, at *ex date* blev dagen før *record date* – altså en dag tættere på *record date* pga. den forkortede leveringstid.

Ved pensionsplanens køb af aktier har den imidlertid afveget fra markedsstandarden i flere tilfælde, jf. ovenfor. Pensionsplanen har derfor i disse tilfælde end ikke ifølge sine egne aftaler modtaget udbyttet direkte fra det udloddende selskab eller gennem egne sub-custodians. Det påståede udbytte er derimod blevet udbetalt til en sælger, der var depotindehaver på *record date*, men som havde pligt til at videreføre udlodningen, da aktien jo ifølge pensionsplanen var blevet solgt inkl. udbytte (før *ex date*).

Pensionsplanen gør dermed gældende, at den har været ejer, selvom den ikke har været registreret som ejer på *record date*, da den har handlet på vilkår, der afveg fra markedsstandarden. Det er et set-up, som i høj grad vanskeliggør kontrol, da pensionsplanen dermed – end ikke ifølge egne papirer – vil være registreret som ejer af aktien på *record date*, hvor virksomheden noterer ejerne og udbetaler udbyttet. For pensionsplanen hævder, at den får aktierne leveret *senere* – og med ret til det udbytte, deres sælger modtager. Forholdet indebærer, at pensionsplanens bevisbyrde skærpes.

### 4.6  Flere af de påståede aktiehandler er foretaget via et kaffefirma

To af de fremlagte købsbekræftelser (bilag 6a, s. 1 og 3) er en "Cash Equity Confirmation" udstedt af Volcafe.

Det er bemærkelsesværdigt, at disse købsbekræftelser vedrørende køb af aktier for i alt ca. 157 millioner kr. ikke er forsynet med årstal.

Volcafe, som har udstedt disse købsbekræftelser, er beliggende i Schweiz, og er ifølge sin hjemmeside (www.volcafe.ch) en kaffevirksomhed hørende under ED&F Man (bilag Æ).

Der er ikke redegjort nærmere for, hvorfor disse 2 aktiekøb er foretaget af en kaffevirksomhed. Ifølge det schweiziske virksomhedsregister (Zefix – Zentraler Firmenindex) har Volcafe følgende formål, jf. bilag Ø:

> «Zweck:
> Die Gesellschaft bezweckt die Durchführung von Import-, Export-, Transithandels- und Kommissionsgeschäften mit Waren aller Art, vornehmlich mit Kaffee, in der Schweiz sowie im Ausland. Die Gesellschaft kann Zweigniederlassungen und Tochtergesellschaften im In- und Ausland errichten und sich an anderen Unternehmen im In- und Ausland beteiligen. Die Gesellschaft kann Grundstücke und Immaterialgüterrechte im In- und Ausland erwerben, halten, verwalten, verwerten und veräussern. Die Gesellschaft kann alle kommerziellen, finanziellen und anderen Tätigkeiten ausüben, die geeignet erscheinen, den Zweck der Gesellschaft zu fördern, oder die mit diesem zusammenhängen.»

Det kan – groft – oversættes som følger:

> *"Formål*
> *Formålet med virksomheden er at gennemføre import, eksport, transit og provision af varer af enhver art, primært kaffe, både i Schweiz og i udlandet. Virksomheden kan oprette filialer og datterselskaber i Tyskland og i udlandet og deltage i andre virksomheder i Tyskland og i udlandet. Selskabet kan erhverve, besidde, styre, genbruge og afhænde jord- og immaterielle ejendomsrettigheder i Tyskland og i udlandet. Selskabet kan engagere sig i alle kommercielle, finansielle og andre aktiviteter, der måtte være hensigtsmæssige for at fremme eller tjene selskabets formål."*

Brokervirksomhed er således end ikke i periferien af selskabets formålsbestemmelse.

**5.    Systematikken hos ED&f Man viser, at det har været en skrivebordsøvelse**
Skattestyrelsen har indhentet oplysninger om tre ED&F Man-depoter, der er registreret hos SEB. Oplysningerne omfatter aktiebeholdning, modtagne udbytter og kontobevægelser (pengestrømme).

Oplysningerne om ED&F Mans depoter kan sammenholdes med andre pensionsplaners oplysninger om køb og salg af aktier, samt disse pensionsplaners oplysninger om påståede udbytter.

Det kan ikke udelukkes, af ED&F Man har yderligere aktiedepoter. Skattestyrelsen har imidlertid taget udgangspunkt i tilfælde, hvor oplysningerne fra ED&F Mans depoter *nøjagtigt* matcher pensionsplanernes oplysninger. På det foreliggende grundlag må det derfor lægges til grund, at det er netop disse depoter, der hænger sammen med pensionsplanernes påståede investeringer.

Dokumenterne, som pensionsplanerne fremlægger for Skatteankestyrelsen, er <u>ikke</u> udtryk for de faktiske forhold. Tværtimod kan "dokumentationen" udstedt af ED&F Man ikke tillægges nogen bevismæssig betydning.

Gennemgangen viser nemlig, at ED&F Man har konstrueret dokumentation for aktiehandler, og at ED&F Man har attesteret ejerskab i strid med de faktiske forhold, jf. nedenfor afsnit 5.1 og 5.2. Samtidig viser oplysningerne sammen med indrømmelsen under den engelske retssag af at ED&F Man har udstedt fejlagtige Tax Vouchers, at ED&F Man må have gjort dette *systematisk*.

Når det bare i ét tilfælde kan konstateres, at dokumentationen for ejerskab udstedt af ED&F Man er konstrueret og forkert, medfører det, at ED&F Man-dokumentationen ikke kan lægges til grund i *nogen* af sagerne. Og Skattestyrelsens gennemgang har afsløret *betydelige* fejl i ED&F Man-dokumentationen for *flere handler* på tværs af pensionsplanerne i sagskomplekset.

Dertil kommer, at ED&F Man som nævnt har indrømmet at have udstedt 89 forkerte Tax Vouchers, som har dannet grundlag for uberettigede refusioner på i alt ca. 184 mio. kr., jf. ovenfor i afsnit 4.1. Disse *erkendt* forkerte Tax Vouchers omfatter <u>ikke</u> de konstruerede handler, der dokumenteres og gennemgås i afsnit 5.1 og 5.2 nedenfor. "Dokumentation" fra ED&F Man er altså forkert i videre omfang end de 89 erkendt forkerte Tax Vouchers.

Det betyder, at "dokumentation" fremstillet af ED&F Man i bevismæssig henseende er værdiløs. Det betyder også, at når der har været behov for at konstruere forkert "dokumentation", viser dette sammenholdt med ED&F Mans erkendelse, jf. afsnit 4.1, entydigt, at der ikke har fundet handler sted. Det kan herefter ikke lægges til grund, at ED&F Man har "handlet" aktier på pensionsplanens vegne, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit.

### 5.1 Chr. Hansen-aktier – 2014

Det samlede forløb, som er beskrevet i detaljer nedenfor, viser:

- at ED&F Man låner aktier
- at ED&F Man "sælger" de lånte aktier til en anden ED&F Man-konto
- at ED&F Man "køber" de lånte (og "solgte") aktier tilbage fra samme ED&F Man-konto *to minutter* efter, og
- at de lånte aktier tilbageleveres til aktielångiver efter udbetaling af udbytte.

Transaktionerne i bullet 2 og 3 hænger helt tæt sammen.

Alligevel anvender AIG dokumenter fra transaktion nr. 3 til at "dokumentere" et køb (afsnit 5.1.1, nedenfor). De dokumenter er imidlertid uden nogen realitet. Der er jo ikke *købt* aktier af pensionsplanen (eller på pensionsplanens vegne). Tværtimod har ED&F Man "solgt" og straks "tilbagekøbt" aktier internt, for derved at *konstruere* købsdokumentation (uden nogen realitet), som pensionsplanen bruger som grundlag for sin påstand om at have købt og ejet aktier.

#### *5.1.1  ED&F Man-dokumentationen for køb er konstrueret og uden bevisværdi*

Klageren, AIG, har gjort gældende, at pensionsplanen erhvervede 800.000 Chr. Hansen-aktier den 27. november 2014 med levering (settlement/value date) den 1. december 2014 (bilag Å1). Prisen var 207.122.592 kr.

Til dokumentation af købet har AIG fremlagt

- en "bekræftelse fra ED&F Man", der er en intern mail hos ED&F Man fra Paul Schofield til Sara Mina (bilag Å1, s. 2)
- et kontoudtog fra ED&F Man ("Account Equity") i pensionsplanens navn, hvor handlen er posteret (bilag Å1, s. 3), og
- en SWIFT-meddelelse, der viser gennemførsel af betalingen (bilag Å1, s. 4).

ED&F Man har da også udstedt en Tax Voucher, hvori det angives, at AIG ejede 800.000 Chr. Hansen-aktier hen over udbyttedatoen (ex date var den 28. november 2014) (bilag Å1, s. 5).

Skattestyrelsen har kontrolleret disse oplysninger i forhold til ED&F Mans handler med Chr. Hansen-aktier. Ved gennemgangen er det blevet afdækket, at der ikke er nogen realitet bag de dokumenter, som pensionsplanen har fremlagt, idet "købet" er konstrueret.

Som bilag Å2 er fremlagt et bearbejdet uddrag af alle Chr. Hansen-transaktioner på ED&F Mans konti med Skattestyrelsens fremhævninger. Bilaget viser, at ED&F Man ganske rigtigt "købte" 800.000 Chr. Hansen-aktier den 27. november 2014 med levering den 1. december 2014 for 207.122.592 kr. Imidlertid var aktierne samme dag blevet "solgt" til samme aftalepart for 207.120.000 kr. – altså 2.592 kr. mindre (bilag Å2, s. 1, depot nr. 05295142806):

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
| --- | --- | --- | --- | --- | --- |
| 2014-12-01 | SEB, acc. ED&F Man Man Capital Markets Limited | 2014-11-27 | Buy | 800.000,00 | -207.122.592,00 |
| 2014-12-01 | SEB, acc. ED&F Man Man Capital Markets Limited | 2014-11-27 | Sale | -800.000,00 | 207.120.000,00 |

Som det fremgår, er modparten til transaktionerne en anden konto, der er registreret i ED&F Mans navn.

En gennemgang af den tilhørende Cash Account (uddrag er fremlagt som bilag Å3) viser faktisk, at der – i hvert fald på leveringstidspunktet – rettelig er tale om, at aktierne blev solgt og derefter købt tilbage to minutter senere (min opstilling af oplysningerne):

| | | | |
|---|---|---|---|
| [SALG] | Kl. 05.12 | Securities sal | 207.120.000,00 CR |
| [KØB]  | Kl. 05.14 | Securities pur | 207.122.592,00 DR |

Dette viser, at ED&F Man *ikke* købte 800.000 aktier til AIG for 207.122.592 kr. ED&F Man har i stedet flyttet 800.000 lånte aktier frem og tilbage mellem to interne konti og dermed konstrueret en konto-bevægelse af aktier og en pengestrøm. ED&F Man har med andre ord konstrueret et "køb" ved at "sælge" de lånte aktier til sig selv for straks derefter at "tilbagekøbe" aktierne fra sig selv. Dokumentationen for "tilbagekøbet" er de dokumenter, AIG har fremlagt som dokumentation for at have købt og ejet aktier.

Købet er således konstrueret og uden realitet. Dokumenterne (bilag Å1) viser ikke et aktiekøb – men blot at 800.000 aktier er blevet flyttet frem og tilbage. Og betalingerne ligner næsten, at der er blevet betalt et "gebyr" på 2.592 kr. (differencen i de to handler) for "ulejligheden". Handlerne har således alene medført et *minimalt* likviditetstræk på 2.592 kr.

### 5.1.2  ED&F Man har attesteret ejerskab i strid med de faktiske forhold

ED&F Man har attesteret ejerskab til Chr. Hansen-aktier hen over udbyttedatoen (ex date den 28. november 2014) for fem pensionsplaner:

| Shareholder (Pension Plan) | Claimed Withheld dividend tax | Share | Number of shares | Ex-date |
|---|---|---|---|---|
| American Investment Group Of New York, L.P. Pension Plan | 814.320,00 kr. | Chr. Hansen Holding A/S | 800.000 | 28-11-2014 |
|  | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |
|  | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |
|  | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |
|  | 834.678,00 kr. | Chr. Hansen Holding A/S | 820.000 | 28-11-2014 |

ED&F Man har således i alt attesteret ejerskab til 4.080.000 aktier hen over udbyttedatoen. Det stemmer nøjagtigt overens med det antal aktier, som ED&F Man holdt i sit aktiedepot hen over udbyttedatoen (bilag Å2, s. 1).

Skattestyrelsen har foretaget en nærmere gennemgang af ED&F Mans depot. Gennemgangen viser, at 800.000 af aktierne på depotet blev erhvervet for 0 kr. (bilag Å2, s. 1):

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-11-28 | Morgan Stanley International Ltd | 2014-11-24 | Buy | 300.000,00 | 0,00 |
| 2014-11-28 | Morgan Stanley International Ltd | 2014-11-21 | Buy | 250.000,00 | 0,00 |
| 2014-11-28 | Morgan Stanley International Ltd | 2014-11-21 | Buy | 250.000,00 | 0,00 |

Når aktierne er erhvervet for 0 kr., er det *sandsynligvis* udtryk for, at aktierne er *lånte*. Det *kunne* også være tilbagelevering af lånte aktier, men det er ikke tilfældet her, hvor der ikke tidligere er foretaget udlån af Chr. Hansen-aktier fra kontoen.

ED&F Man har altså lånt 800.000 aktier. Det ses ikke, om ED&F Man låner aktierne på vegne af en bestemt pensionsplan eller på vegne af andre kunder eller på vegne af sig selv.

Aktierne tilbageleveres umiddelbart efter udbyttedatoen på samme vis uden betaling og til samme medkontrahent:

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
| --- | --- | --- | --- | --- | --- |
| 2014-12-02 | Morgan Stanley International Ltd | 2014-12-01 | Sale | -300.000,00 | 0,00 |
| 2014-12-02 | Morgan Stanley International Ltd | 2014-12-01 | Sale | -250.000,00 | 0,00 |
| 2014-12-02 | Morgan Stanley International Ltd | 2014-12-01 | Sale | -250.000,00 | 0,00 |

ED&F Man har altså *lånt* i hvert fald 800.000 aktier. Der foreligger ikke oplysninger om, hvorvidt de øvrige 3.280.000 aktier *faktisk* ejes af (andre af) ED&F Mans kunder, eller om der ligeledes er tale om lånte aktier, hvor lånet blot er maskeret yderligere. Skattestyrelsen kan i hvert fald konstatere, at ED&F Man ikke har registreret Chr. Hansen-aktier i sin besiddelse andet end i perioden 28. november 2014 til 8. december 2014.

Der kan ikke søges udbytterefusion for lånte aktier – for refusionen tilkommer ejeren (långiver), ikke låntager.

*Alligevel* har ED&F Man attesteret ejerskab til 4.080.000 aktier – og dermed *i hvert fald* til 800.000 lånte aktier. ED&F Man har således attesteret *ejerskab* – på en Tax voucher – til *lånte* aktier. ED&F Man har *vidst*, at denne ville kunne anvendes til at tilbagesøge indeholdt udbytteskat – selvom der ikke er ret hertil for lånte aktier.

Når ED&F Man udsteder dokumentation i strid med de faktiske forhold i bare ét tilfælde, medfører det, at Skattestyrelsen ikke kan lægge dokumentation fra ED&F Man til grund. For det er usikkert, om dokumentationen stemmer overens med de *faktiske* ejerforhold. Og som de følgende afsnit vil vise, er det i *mange* tilfælde, at ED&F Mans dokumentation har vist sig urigtig og/eller vildledende.

De 800.000 lånte aktier svarer i øvrigt nøjagtig til AIGs påståede aktiebesiddelse. Det *ligner* dermed, at det er AIGs aktiepost, der er lånt fra Morgan Stanley International Ltd.

### 5.1.3   Har ED&F Man forsøgt at maskere de faktiske forhold?
Sagt med andre ord; det man har gjort er, at ED&F Man har lånt nogle aktier (afsnit 5.1.2, ovenfor). Det kan være til pensionsplanen, men det behøver ikke at være det. En aktielåntager har ikke ret til udbytterefusion. Pensionsplanen opnår ikke dokumentation for ejerskab ved, at ED&F Man låner nogle aktier.

Dokumentation for ejerskab skaffer man ved, at ED&F Man sælger de lånte aktier til en intern konto. To minutter efter sælges aktierne tilbage til ED&F Mans første konto. Den sidste handel bruger man som dokumentation for, at pensionsplanen er ejer af aktierne.

Arrangementet viser, at ED&F Man er klar over, at aktielånere ikke har ret til udbytterefusion, for ellers ville køb og tilbagesalg inden for to minutter ikke være nødvendigt.

Forløbet viser også den dubiøse karakter, når anden og tredje transaktion ikke kan tjene andet formål end at maskere de virkelige forhold. Pensionsplanen er højest – men det er heller ikke dokumenteret – aktielåner. Og det er ubestridt, at låntager ikke har ret til refusion.

Dertil kommer, at ED&F Man til fulde styrer "handlerne" inkl. kurssikring og finansiering på vegne af pensionsplanerne (jf. afsnit 6.4). Det er således – tilsyneladende – ED&F Man, der styrer hele dette set-up og derefter dokumenterer ejerskab i strid med de faktiske forhold. Det skærper kravene til dokumentation for pensionsplanens aktiebesiddelser betydeligt.

Det har betydelige fællestræk med det mønster for skrivebordsøvelser og urealistiske handler, der ses i sagerne, hvor pensionsplanerne har anvendt custodians fra Solo-gruppen, der er kontrolleret af Sanjay Shah.

### 5.2    TDC-aktier – 2014

Ved TDC-aktierne i 2014 kan det – som for Chr. Hansen-aktierne i 2014 – konstateres, at der foretages interne "køb/salg" af aktieposter for at konstruere et "køb" med handelsnotaer og SWIFT-meddelelser, som pensionsplanen fremlægger som bevis for, at der er handlet aktier, men som er uden realitet og som ikke stemmer overens med de underliggende forhold.

Også ved TDC-aktierne kan det konstateres, at der er *lånt* aktier hen over udbyttedatoen, og formålet med de interne "handler" synes således alene at være at maskere, at aktiebesiddelserne er lånte, og at der dermed ikke er krav på udbytterefusion.

Dertil kommer, at der for TDC-aktierne dels også er konstrueret et "salg" af aktier, og dels at en pensionsplan hævder at have ejet TDC-aktier på et tidspunkt, hvor der ikke var TDC-aktier i ED&F Mans depoter. Alligevel fremlægger pensionsplanen dokumenter fra ED&F Man til støtte herfor:

I en af de øvrige førersager, Kamco LP Profit Sharing Pension Plan (SANST j.nr. 18-0005414) ("Kamco"), hævder pensionsplanen (som også er repræsenteret af Lundgrens) at have ejet 2.901.000 TDC-aktier fra 7. august 2014 til 22. september 2016 – altså i over to år – og har fremlagt "dokumentation" fra ED&F Man herfor.

Skattestyrelsen har efterprøvet dokumentationen, og det kan konstateres, at den er konstrueret og på ingen måde dokumenterer, at ED&F, endsige Kamco, skulle have ejet de aktier, som "dokumentationen" angår:

- På tidspunktet for pensionsplanens "køb" havde ED&F Man lånte TDC-aktier i sine depoter.
- ED&F Mans "køb" på pensionsplanens vegne er konstrueret ved, at aktier "sælges"/"købes" internt mellem to ED&F Man-konti.
- I lange perioder fra pensionsplanens "køb" til "salg" havde ED&F Man slet ingen TDC-aktier i depoterne. Dvs. pensionsplanen *kan* ikke have ejet de påståede aktier.
- På tidspunktet for pensionsplanens "salg" havde ED&F Man *kun* lånte aktier i sine depoter. Dvs. pensionsplanen *kan* ikke have ejet de aktier, som den påstår at have "solgt".
- "Salget" er konstrueret ved, at aktier "sælges"/"købes" internt mellem to ED&F Man-konti.

Som bilag AA1 er fremlagt et bearbejdet uddrag af alle TDC-transaktioner på ED&F Mans konti. På bilaget er markeret med gult, hvor kontoen "går i 0" for en periode, dvs. hvor der *ikke* er nogen TDC-aktier tilbage på ED&F Mans konto.

Henset til det store antal transaktioner har Skattestyrelsen udarbejdet nogle hjælpebilag (bilag AA2 og bilag AA3) med uddrag fra dette bilag for at fremhæve bestemte forhold.

### 5.2.1 ED&F Man-dokumentationen for køb er konstrueret og uden bevisværdi

Kamco hævder at have købt 2.901.000 TDC-aktier den 7. august 2014 til 150.273.685,65 kr. Til dokumentation heraf har Kamco fremlagt købsordre fra ED&F (bilag AA4, s. 2).

Skattestyrelsen har tjekket disse oplysninger i forhold til ED&F Mans depoter. Skattestyrelsen har i den sammenhæng fundet følgende transaktioner på de tre ED&F Man-konti (bilag AA1), hvor netop 2.901.000 TDC-aktier handles den 7. august 2014:

Konto 05295142806

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Buy | 2.901.000,00 | 0,00 |

Konto 05295142814

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Buy | 2.901.000,00 | -150.273.685,65 |
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Sale | -2.901.000,00 | 0,00 |
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Sale | -2.901.000,00 | 150.271.800,00 |

Konto 05295142822

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Sale | -2.901.000,00 | 150.273.685,65 |
| 2014-08-11 | SEB, acc. ED&F Man Capital Markets Limited | 2014-08-07 | Buy | 2.901.000,00 | -150.271.800,00 |

Transaktionen fremhævet med gult matcher den transaktion, som Kamco har fremlagt SWIFT-meddelelse og handelsnota for.

Transaktionen er imidlertid ikke udtryk for en aktiehandel. Som det fremgår, gennemføres transaktionerne med ED&F Man selv som "medkontrahent". Og aktierne "tilbagesælges" for 150.271.800 kr. Prisforskellen på 1.885,65 kr. ligner nærmest et "gebyr" for ulejligheden. Og transaktionerne ("køb"/"salg") gennemføres med to minutters mellemrum (bilag AA5).

Som det var tilfældet ved Chr. Hansen-aktierne (afsnit 5.1.1, ovenfor), har ED&F Man således konstrueret "købet". Der er ikke blevet købt 2.901.000 TDC-aktier (på pensionsplanens vegne). Der er bare blevet flyttet aktier frem og tilbage mellem to interne ED&F Man-konti for at kunne producere "dokumentation".

Derimod fremgår det på kontoudtoget (bilag AA1, se f.eks. s. 1), at der i en lang række tilfælde er lånt aktier. De interne handler frem og tilbage ligner dermed et forsøg på at maskere de faktiske forhold så der kan søges udbytterefusion, selvom aktierne faktisk er lånte.

### 5.2.2 ED&F Man-dokumentationen for ejerskab og salg er konstrueret og i strid med de faktiske forhold

Kamco har henvist til bilag AA4, s. 5, hvor det fremgår, at de 2.901.000 TDC-aktier blev afhændet den 22. september 2016 for 115.401.780 kr., og at salget blev gennemført den 23. september 2016.

Pensionsplanen har således i henhold til den fremsendte "dokumentation" ejet aktierne i mere end to år.

Det stemmer *på ingen måde* overens med, at ED&F Man-kontiene i lange perioder ikke har holdt én eneste TDC-aktie. Blandt andet var der ingen TDC-aktier på kontiene i følgende perioder (bilag AA2):

- 20. september 2014 til 16. november 2014
- 25. november 2014 til 3. marts 2015
- 20. marts 2015 til 5. august 2015
- 26. august 2015 til 15. december 2015
- 22. december 2015 til 22. september 2016

Kamco kan dermed ikke have ejet TDC-aktier fra den 7. august 2014 til den 22. september 2016. For i størstedelen af den påståede ejerperiode havde ED&F Man ikke nogen TDC-aktier.

Oplysningerne om Kamcos ejertid, som er udstedt af ED&F Man, er således uden hold i de faktiske forhold.

---

Kamcos "salg" i 2016 er konstrueret ved, at ED&F Man lånte TDC 3,5 mio. aktier fra ING Bank N.V. ED&F Man "solgte" disse aktier til en anden ED&F Man-konto, hvorefter ED&F Man "tilbagekøbte" aktierne fra samme konto. Aktierne blev altså bare "flyttet" frem og tilbage mellem interne ED&F Man-konti for at konstruere et "salg" af 2.901.000 aktier.

TDC-handlerne for 2016 er fremlagt i uddrag som bilag AA3. Ved indgangen til 2016 havde ED&F Man ikke nogen TDC-aktier på deres konti.

Som bilag AA3 viser, foretages en lang række transaktioner på få dage i august måned. Imidlertid er kun to af transaktionerne med en ekstern part, nemlig ING Bank N.V.:

| Dato | Cprt. name | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2016-09-23 | SEB, acc. ING Bank N.V. | 2016-09-22 | Buy | 3.500.000,00 | 0,00 |
| 2016-09-26 | SEB, acc. ING Bank N.V. | 2016-09-23 | Sale | -3.500.000,00 | 0,00 |

Som det fremgår, *låner* ED&F Man 3.500.000 TDC-aktier fra ING Bank N.V. torsdag den 22. september 2016, som bliver leveret fredag den 23. september 2016.

De lånte aktier bliver aftalt tilbageleveret fredag den 23. september 2016, og tilbageleveringen sker mandag den 26. september 2016.

Disse *lånte* aktier "sælges" i låneperioden frem og tilbage mellem ED&F Mans konti mange gange, herunder ved følgende to transaktioner:

| Dato | Cprt. | Trade Date | Buy - Sale | SHS/FMT | Cash Amount |
|---|---|---|---|---|---|
| 2016-09-23 | MACVGB22XXX | 2016-09-22 | Sale | -2.901.000,00 | 115.401.780,00 |
| 2016-09-23 | MACVGB22XXX | 2016-09-22 | Buy | 2.901.000,00 | -115.403.230,50 |

"Salget" der her gennemføres den 23. september 2016 af 2.901.000 TDC-aktier og som er aftalt den 22. september 2016, sker til en pris, der netop matcher det "salg", som Kamco har fremlagt som "dokumentation" for, at pensionsplanen afhændede sin påståede aktiebeholdning. Det må derfor være Kamcos salg af aktier.

"Medkontrahentens" navnefelt er tomt ved de to transaktioner, men der er angivet en ID-kode, "MACVGB22XXX". Den ID-kode dækker over ED&F Man (bilag AA6).

En gennemgang af den tilhørende Cash Account (uddrag er fremlagt som bilag AA7) viser, at der – i hvert fald på leveringstidspunktet – er tale om, at aktierne blev solgt og derefter købt tilbage *fire minutter* senere (min opstilling af oplysningerne):

| [SALG] | Kl. 05.15 | Securities sal | 115.401.780,00 CR |
| [KØB]  | Kl. 05.19 | Securities pur | 115.403.230,50 DR |

Dette viser, at ED&F Man <u>ikke</u> solgte 2.901.000 TDC-aktier for Kamco for 115.401.780 kr. ved disse transaktioner. ED&F Man har i stedet flyttet 2.901.000 aktier frem og tilbage mellem to interne konti og dermed konstrueret et "salg" med en kontobevægelse af aktier og en pengestrøm.

"Salget" er således konstrueret og uden realitet. Dokumentet (bilag AA4, s. 5) viser ikke et aktiesalg – men blot at 2.901.000 aktier er blevet flyttet frem og tilbage. Og betalingerne ligner næsten, at der er blevet betalt et "gebyr" på 1.450,50 kr. (differencen i de to handler) for "ulejligheden".

Handlerne har således alene medført et *minimalt* likviditetstræk på 1.450,50 kr.

Det er *særligt* tydeligt, at ED&F Man ikke kan have solgt 2.901.000 TDC-aktier på vegne af Kamco den 22. september 2016. For ED&F Man besad *kun* lånte aktier i 2016. Nemlig de 3.500.000 aktier, der var blevet lånt fra ING Bank N.V.

### 5.2.3  *ED&F Man har aldrig købt, ejet eller afhændet de påståede 2.901.000 TDC-aktier*

Samlet set viser ovenstående, at ED&F Man ikke har købt 2.901.000 TDC-aktier på vegne af Kamco. "Købet" er nemlig blot interne posteringer mellem to af ED&F Mans konti, som udligner hinanden bortset fra en nettopengestrøm (måske et gebyr) på 1.885,65 kr.

ED&F Man har til gengæld en stor mængde aktier, der er *lånt* hen over udbyttedatoen (ex date den 8. august 2014), jf. f.eks. bilag AA1, s. 1. "Handlerne" kan derfor – ligesom ved Chr. Hansen-aktierne (afsnit 5.1, ovenfor) – have haft til formål at maskere aktieudlån for at opnå udbytterefusion på urigtigt grundlag.

Dertil kommer, at ED&F Man slet ikke har besiddet aktier i hele den periode, som Kamco hævder at have ejet TDC-aktieposten i. I størstedelen af Kamcos påståede ejerperiode havde ED&F Man ingen aktier i TDC.

Endelig er også "salget" af aktieposten konstrueret. ED&F Man lånte en aktiepost fra ING Bank N.V., der blev flyttet frem og tilbage mellem to interne konti hos ED&F Man for at konstruere et "salg", inden den lånte aktiepost blev leveret tilbage til ING Bank N.V.

Disse forhold bevirker, at "dokumentation" udstedt af ED&F Man er værdiløs. ED&F Man har nemlig udstedt dokumentation for køb, salg og aktiebesiddelser, uden dokumenterne stemmer overens med de faktiske forhold.

### 6.  Manglende dokumentation og usammenhængende set-up
### 6.1  Fremlagte købs- og salgsbekræftelser dokumenterer ikke, at pensionsplanen har købt aktier

Pensionsplanen har for hver af aktiehandlerne fremlagt købsbekræftelser fra ED&F Man. Det er imidlertid ikke dokumenteret, at købsbekræftelserne er sendt til pensionsplanen eller i øvrigt kommet pensionsplanen til kundskab.

Købsbekræftelserne er i øvrigt købsbekræftelser sendt som mails internt i ED&F Man.

Tilsvarende er det ikke dokumenteret, at de fremlagte salgsbekræftelser er kommet til pensionsplanens kundskab.

Derudover er der ikke fremlagt dokumentation for, at pensionsplanen har afgivet købs- og salgsordrer til ED&F Man. Det er særligt bemærkelsesværdigt, når Skattestyrelsen allerede i sit indlæg af 27. september 2018 (s. 27, opfordring 7) opfordrede pensionsplanen til at fremlægge *"al korrespondance med ED&F Man"*. Det er også bemærkelsesværdigt, når der henses til, at ED&F Man – ifølge pensionsplanen – har købt aktier på pensionsplanens vegne for op over 1 milliard kr. ad gangen.

I sit indlæg af 11. juni 2019, s. 15, henviser pensionsplanen til, at der i én købsbekræftelse (bilag 13a) *"specifikt"* er anført, at handelen foretages af ED&F Man på pensionsplanens vegne. Det ændrer imidlertid ikke ved, at der ikke er fremlagt dokumentation for hverken en købsordre eller for, at købsbekræftelsen er kommet pensionsplanen til kundskab.

Det er ikke korrekt, når pensionsplanen i sit indlæg af 11. juni 2019, s. 12, betegner bilag 9d som *"klagers ordre til at foretage salget"*. Bilag 9d er en intern mail i ED&F Man og fremstår som en salgsbekræftelse.

For ingen af handlerne er der fremlagt dokumentation for købs- eller salgsordrer afgivet af pensionsplanen til ED&F Man.

Det fremgår af kontormødereferatet af 10. maj 2019, s. 1, at pensionsplanens repræsentanter *"mente"*, at

> *"der var indgået en rammeaftale mellem pensionsplanen og EDF om køb, salg af aktier m.v., hvorfor der ikke var videre korrespondance herom."*

Der er ikke fremlagt nogen form for dokumentation for eksistensen af en sådan rammeaftale. Det forekommer ganske utroværdigt, at pensionsplanen ikke ligger inde med en (kopi af) en rammeaftale, der skulle bemyndige ED&F Man til at købe aktier for milliardbeløb på pensionsplanens vegne. Selv hvis en sådan rammeaftale eksisterer, er det helt usandsynligt, at der ikke skulle være korrespondance med udtrykkelige købs- og salgsordrer, når der er tale om så store aktieposter.

Som det fremgår af kontormødereferatet, er der heller ikke fremlagt aftaler mellem pensionsplanen og trustee om, hvordan pensionsplanens beskedne midler skulle investeres. Den "dokumentation", der er fremlagt, dokumenterer således ikke pensionsplanens påståede ejerskab til aktierne, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit.

Det er udokumenteret, at pensionsplanen skulle have befuldmægtiget trustee til på pensionsplanens vegne at handle kæmpe aktieposter for lånte penge. Det er også udokumenteret, at pensionsplanen skulle have accepteret, at trustee videregav en sådan fuldmagt til ED&F Man.

### 6.2 Pensionsplanen havde ikke nogen penge og har ikke modtaget nettoudbytter

Pensionsplanen er "one-participant plan" (støttebilaget, afsnit 1.3), og det årlige indskud pr. deltager er således ifølge IRS' hjemmeside for 2016 begrænset til maksimalt $53.000 ($59.000 for deltagere, der er ældre end 55 år), jf. bilag H. Der er ikke fremlagt dokumentation for, at der faktisk er foretaget sådanne indskud til pensionsplanen.

Alligevel påstår pensionsplanen at have ejet aktier i danske C20-selskaber for meget store millionbeløb (DKK).

Oplysningerne om pensionsplanens aktiver ved udgangen af deres regnskabsår (plan year), jf. afsnit 2.2 ovenfor, understøtter ikke blot, at pensionsplanen ikke havde et tilstrækkeligt kapitalgrundlag til at købe de massive påståede aktieposter, men også at pensionsplanen ikke har modtaget de påståede nettoudbytter. De påståede nettoudbytter kommer således ikke til udtryk i pensionsplanens aktivmasser.

Det anføres i klageskrivelsen, s. 3, at pensionsplanen foretog

> "handler i danske børsnoterede aktier, som alle gav udbytte".

Det anføres videre i klageskrivelsen, s. 4, at de indsendte Credit Advices (Tax Vouchers)

> "dokumenterer dels udbytteudlodningen, dels den indeholdte udbytteskat."

Hvis pensionsplanen faktisk havde modtaget de påståede udbytter, ville den kunne fremlægge objektiv dokumentation herfor, f.eks. i form af udbyttenota, kontoudtog, fonds-/depotoversigt eller lignende. Men pensionsplanen kan ikke dokumentere, at de påståede aktietransaktioner m.v. har passeret pensionsplanens økonomi, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit.

### 6.3 Der er ikke dokumentation for finansiering

*Det er ubestridt, at pensionsplanen ikke* havde det fornødne kapitalgrundlag til at foretage de påståede aktiekøb på flere hundrede millioner kr. Pensionsplanen havde brug for ekstern finansiering.

Som nævnt har pensionsplanen imidlertid ikke fremlagt nogen form for dokumentation for, hvorledes pensionsplanen *faktisk* har finansieret de påståede meget betydelige aktiekøb i danske børsnoterede selskaber, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit.

Pensionsplanen anfører i indlægget af 11. juni 2019 (bl.a. s. 8), at

> "der ikke synes at være grundlag for at beskæftige sig med spørgsmålet om finansieringen".

Pensionsplanen forsøger således ikke engang at forklare, hvordan den med sit beskedne kapitalgrundlag har kunnet finansiere aktiekøb for op til en milliard kr. ad gangen. Efter pensionsplanens opfattelse er dokumentation for finansiering af aktiehandlerne (herunder det specifikke aftalegrundlag) altså uden relevans for spørgsmålet om ejerskab. Dette er klart forkert. For spørgsmålet i sagen er, om pensionsplanen kan bevise at have erhvervet påståede massive aktieposter på flere hundrede millioner kr. Det kræver finansiering, for ellers kan man ikke købe aktier, når man ikke selv er i nærheden af at have et tilstrækkeligt kapitalgrundlag.

Pensionsplanen havde ikke – og har aldrig haft – den fornødne kapital til at foretage de massive investeringer i danske aktier, som ligger til grund for pensionsplanens anmodninger om refusion af udbytteskat.

Den manglende fremlæggelse af det konkrete aftalegrundlag vedrørende finansiering har derfor en åbenlys bevismæssig betydning. Når pensionsplanen ikke kan bevise at have finansieret køb af aktier, bliver pensionsplanen nødt til i strid med al virkelighed at påstå, at finansieringen er lige meget. Også dette viser den manglende realitet i de påståede aktiehandler.

Det er i øvrigt bemærkelsesværdigt, at pensionsplanen end ikke vil *forklare*, hvordan aktiekøbene er finansieret. I f.eks. førersagen Del Mar Asset Management Saving & Retirement Plan (SANST j.nr. 18-0005308), hvor pensionsplanen også er repræsenteret af Lundgrens, og hvor pensionsplanen også har "handlet" aktier gennem ED&F Man, er der i det mindste et *forsøg* på en forklaring af

finansieringen. Forklaringen er i det hele udokumenteret, men der er i det mindste et forsøg på en forklaring. Det har pensionsplanen i nærværende sag altså ikke ulejliget sig med.

Pensionsplanen har *fortsat* ikke fremlagt dokumentation for at have indgået finansielle aftaler, der kunne skaffe pensionsplanen likviditet til at foretage de påståede aktiekøb.

Pensionsplanen har *fortsat* heller ikke fremlagt dokumentation for at have sikret sig mod kurstab (som pensionsplanen ubestridt ikke ville kunne bære) eksempelvis ved hedging i form af futures, selvom der henvises til futures i f.eks. bilag 16.

Hertil kommer, at pensionsplanens fremlagte kontoudtog hos ED&F Man viser meget betydelige overtræk uden nogen dokumenteret sikkerhedsstillelse. Det fremgår f.eks. af bilag 16 (s. 24), at pensionsplanen den 28. marts 2014 havde en negativ "Running Balance" på ca. 2,4 milliarder kr.

Det er højst usandsynligt, at en finansiel virksomhed som ED&F Man skulle stille så store milliard kreditter til rådighed uden sikkerhedsstillelse. Det var endnu mere usandsynligt i årene umiddelbart efter finanskrisen. Det skal dertil bemærkes, at eventuel sikkerhed i aktierne ikke vil sikre ED&F Man tilstrækkeligt i tilfælde af kursfald.

Det enorme usikrede overtræk er i det hele uden forklaring. Oplysningerne underbygger, at kontoudtoget ikke viser pensionsplanens aktiebesiddelser. Tværtimod illustrerer kontoudtoget, at pensionsplanen ikke ville have økonomi til at handle sådanne aktieposter, som krævedes for at opnå den udbytterefusion, som pensionsplanen gør gældende at være berettiget til.

Hertil kommer, at når man køber aktier for så store beløb, skal man også være i stand til at bære et eventuelt kurstab. Det er velkendt, at også børsnoterede aktier pludseligt kan falde voldsomt i værdi og derved udløse store kurstab. F.eks. faldt kursen på Pandora-aktier den 7. august 2018 med 18,5 %, jf. bilag L-M. Hvis en pensionsplan f.eks. påstår at skulle have købt en dansk aktiepost med en værdi på 1 milliard kr., vil et kursfald på 5 % medføre et kurstab på 50 millioner kr. Et tab, som pensionsplanen ikke ville kunne bære med dens kapitalgrundlag. Og pensionsplanen ville slet ikke kunne bære et kurstab på 18,5 %.

Pensionsplanen har således ikke været en reel spiller i forhold til de påståede investeringer i danske aktier.

### 6.4   Der er ingen kobling mellem aktier og pensionsplanens økonomi

Pensionsplanens fremlagte materiale dokumenterer ikke, at pensionsplanen har ejet aktier, allerede fordi der ikke er nogen kobling mellem aktier/penge og pensionsplanens økonomi.

De påståede aktiehandler overstiger langt pensionsplanens kapitalgrundlag, og pensionsplanen har ikke dokumenteret – eller blot forklaret – hvordan aktiekøbene er finansieret. Ifølge pensionsplanens kontoudtog fra ED&F Man er det dog tilsyneladende ED&F Man, der yder massive og usikrede kreditter. Aktierne er med andre ord købt for ED&F Mans penge.

Pensionsplanen har fortsat ikke fremlagt bankkontoudtog, og der er således ikke dokumenteret pengestrømme mellem pensionsplanens bankkonti og kontoen hos ED&F Man. Det er derfor – for det første – ikke dokumenteret, at pensionsplanen har overført midler til ED&F Man (f.eks. til at dække tab på aktieinvesteringer). Det er derfor også uklart, hvem der skulle dække pensionsplanens tab på ca. 30 millioner kr. på Novo Nordisk-aktierne (jf. bilag 8a sammenholdt med bilag 8c) og ca. 13 millioner kr. op Coloplast-aktier (jf. bilag 13a sammenholdt med bilag 13d). For det andet er det ikke dokumenteret, hvad der sker med pensionsplanens gevinster. Det er således ikke dokumenteret, at gevinster fra investeringer, nettoudbytte og refusion indgår på pensionsplanens bankkonto.

Det vides altså ikke, hvorfra pensionsplanen får penge til de massive aktiekøb, og det vides ikke, hvor pensionsplanens indtægter ryger hen.

Dertil kommer, at pensionsplanen ikke har fremlagt nogen form for dokumentation for aftalegrundlaget mellem pensionsplanen og ED&F Man henholdsvis pensionsplanen og trustee, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit. Der er heller ikke fremlagt købs- og salgsordrer.

Det fremlagte materiale vedrørende køb og salg af aktier (købs- og salgsbekræftelser, SWIFT-udskrifter og kontoudtog hos ED&F Man) dokumenterer ikke pensionsplanens ejerskab til aktierne. Som anført er der ikke fremlagt

- købs- og salgsordrer fra pensionsplanen,
- dokumentation for ED&F Mans bemyndigelse til at handle aktier for milliardbeløb på pensionsplanens vegne,
- dokumentation for, at købs- og salgsbekræftelser er kommet pensionsplanen til kundskab,
- dokumentation (i form af bankkontoudtog) for pengestrømme til/fra pensionsplanens bankkonti,
- dokumentation for pensionsplanens hedging af kursrisici,
- dokumentation for pensionsplanens finansiering.

Det er således ikke dokumenteret, hverken at transaktionerne er kommet pensionsplanen til kundskab, eller at transaktionerne har passeret pensionsplanens økonomi, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit.

Aktietransaktionerne har dermed ikke nogen forbindelse til pensionsplanen, men fremstår mest af alt som transaktioner foretaget af og for ED&F Man. Det fremlagte materiale viser med andre ord højst, at *ED&F Man* har købt eller lånt aktier, men ikke at dette i givet fald er sket på pensionsplanens vegne og for pensionsplanens regning og risiko.

7. **Pensionsplanen har kun delvist besvaret skattestyrelsens og skatteankestyrelsens opfordringer**

I indlæg af 27. september 2018 fremsatte Skattestyrelsen følgende 7 opfordringer til pensionsplanen:

*"AIG **opfordres (1)** til at fremlægge sine regnskaber for 2012-2015, alle bankkontoudtog for 2012-2015 og kontoudtog fra konto hos ED&F Man for 2014-2015.*

*AIG **opfordres (2)** til at oplyse, om der fra AIG på noget tidspunkt siden stiftelsen til nu er udloddet beløb og i givet fald fremlægge dokumentation herfor, f.eks. ved fremlæggelse af Form 1099-R indsendt til IRS.*

*Det anføres i klagen, s. 3, at AIG i 2014 blev anbefalet at investere i danske aktier som følge af, at AIG kan få refunderet indeholdt udbytteskat. AIG **opfordres (3)** til dels at oplyse, hvem der kom med denne anbefaling og dels at fremlægge anbefalingen.*

*AIG **opfordres (4)** til at oplyse og dokumentere, hvilke investeringer AIG foretog forud for investeringerne i danske aktier.*

*Det anføres i klagen, s. 5, at AIG har modtaget dokumentation fra ED&F Man for at have ejet og været i besiddelse af de omhandlede aktier på tidspunktet for vedtagelsen af udbytteudlodningen. AIG **opfordres (5)** til at fremlægge denne dokumentation.*

*Det fremgår af SKATs afgørelse, s. 16, at SKAT i forbindelse med tidligere kontrol af AIGs refusionsanmodning har modtaget udvalgte dele af materiale fra ED&F Man (bilag G).*

> *Udskrifterne er mangelfulde, idet der mangler sider, ligesom en stor del af teksten var gjort ulæselig med overstregninger. AIG **opfordres (6)** til at fremlægge materialet i sin fulde længde og uden overstregninger.*
>
> *AIG **opfordres (7)** til at fremlægge al korrespondance med ED&F Man, herunder korrespondance mellem AIG og ED&F Man og korrespondance mellem ED&F Man og AIGs agenter og andre mellemmænd."*

Pensionsplanen har kun delvist besvaret opfordringerne:

> Pensionsplanen har ikke fremlagt regnskaber eller bankkontoudtog, jf. opfordring (1).
> Pensionsplanen har ikke oplyst om – og givet fald dokumenteret at – der er udloddet beløb fra pensionsplanen, jf. opfordring (2).
> Pensionsplanen har ikke fremlagt anbefalingen om at investere i danske aktier som følge muligheden for at få refunderet indeholdt udbytteskat, jf. opfordring (3).
> Pensionsplanen har ikke dokumenteret sine investeringer forud for investeringerne i danske aktier, jf. opfordring (4).
> Pensionsplanens kontoudtog fra ED&F Man (bilag 16) er fortsat kun fremlagt i en udgave, der for en stor dels vedkommende ulæselig på grund af overstregninger, jf. opfordring (6).
> Pensionsplanen har ikke fremlagt korrespondance med ED&F Man, jf. opfordring (7).

Derudover fremgår det af kontormødereferatet, s. 1, at Skatteankestyrelsen på kontormødet den 10. maj 2019 anmodede om følgende *yderligere* materiale i forhold til Skattestyrelsens opfordringer:

> Aftaler mellem pensionsplanen og trustee.
> Korrespondance mellem pensionsplanen og ED&F Man.
> Den af pensionsplanen påberåbte rammeaftale mellem pensionsplanen og ED&F Man.

Dette materiale har pensionsplanen heller ikke fremlagt, jf. også Skatteankestyrelsens kontorindstilling, s. 2, 4. afsnit.

I en sag, der netop handler om, hvorvidt pensionsplanen kan dokumentere at have ejet de påståede aktier, er det helt uforståeligt, at der ikke er fremlagt dokumentation, som skattemyndighederne udtrykkeligt har efterspurgt, og som pensionsplanen *må* være i besiddelse af."

### Skattestyrelsens støttebilag af 18. oktober 2019

"**Skattestyrelsens støttebilag**

Indholdsfortegnelse

| | | | |
|---|---|---|---|
| 1. | AKTØRER | | 2 |
| | 1.1 | Custodian | 2 |
| | 1.2 | Agenter | 3 |
| | 1.3 | Amerikanske pensionsplaner | 4 |
| | 1.4 | Brokere | 6 |
| 2. | REFUSIONSANSØGNINGER | | 6 |
| | 2.1 | Perioden 2012-2015 | 6 |
| | | 2.1.1  Blanketten | 7 |
| | | 2.1.2  Credit Advice | 7 |
| | | 2.1.3  Form 6166 | 8 |
| | | 2.1.4  Power of Attorney | 8 |
| | 2.2 | Ny ansøgningsproces fra 2017 og fremefter | 9 |
| 3. | AFTALETYPER | | 9 |
| | 3.1 | Global Master Securities Lending Agreement (GMSLA) | 9 |

|   | 3.2 | Forwards | 9 |
| 4. | CIVILE RETSSKRIDT | | 10 |
|   | 4.1.1 | Tyskland: Arrest for ca. 2,2 milliarder kroner | 11 |
|   | 4.1.2 | USA: Retssager for ca. 5,4 milliarder kr. anlagt – og ikke afvist | 11 |
|   | 4.1.3 | Forlig: Tilbagebetaling af hhv. 10 mio. kr. og 1,6 mia. kr. | 12 |
| 5. | SKATS DATAANALYSE | | 13 |
|   | 5.1.1 | Grundlaget for SKATs analyse | 13 |
|   | 5.1.2 | Resultatet af analysen | 15 |
| 6. | AKTIEKØB: VILKÅR FOR SETTLEMENT ER IKKE MARKEDSKONFORME | | 17 |

## 1. Aktører

Sagskomplekset vedrørende refusion af udbytteskat angår i alt 306 pensionsplaner og selskaber fra forskellige udenlandske jurisdiktioner, der via agenter *uberettiget* har anmodet SKAT (nu Skattestyrelsen) om refusion af udbytteskat på i alt ca. 12,7 milliarder kr. i perioden fra 2012 til og med 2015. SKAT har på grundlag af refusionsanmodningerne udbetalt de anmodede beløb i alt ca. 12,7 milliarder kr. i den tilsvarende periode. Udbetalingerne er sket til udenlandske bankkonti anvist af – og tilhørende – agenterne.

Af de i alt 306 pensionsplaner og selskaber, der har ansøgt SKAT om refusion af udbytteskat, er 277 pensionsplaner hjemmehørende i USA.

De forskellige centrale aktører og dokumenter kan illustreres som følger:



### 1.1 Custodian

Almindeligvis er en "custodian" (formueforvalter) et finansielt institut, der opbevarer kunders aktiebeholdninger og øvrige værdipapirer.

De i sagskomplekset indsendte Credit Advices (Tax Vouchers), som alene udgør den påberåbte "dokumentation" for ejerskabet af aktierne og modtagelse af udbytte, er produceret af 12 forskellige internationale custodian-firmaer, der oplistes nedenfor.

Fordelingen af de anmodningsbeløb, som hver custodian har leveret påberåbt "dokumentation" (Credit Advices) til, kan opgøres således (i forhold til de 12,7 milliarder kr., som *uberettiget* er blevet udbetalt):

| Custodian | Total (DKK) |
|---|---|
| Solo Capital Partners LLP | 5.442.113.750 |
| Old Park Lane Capital PLC | 1.776.763.390 |
| North Channel Bank | 1.135.775.342 |
| Telesto Markets LLP | 925.443.359 |
| Lindisfarne Partners | 920.721.387 |
| West Point Derivatives Ltd | 880.884.044 |
| Indigo Securities Ltd | 688.383.335 |
| ED & F Man Capital Markets | 582.830.675 |
| Salagado Capital | 320.758.845 |
| Investec | 33.748.380 |
| BNP Paribas | 1.863.000 |
| Argon Markets | 810.000 |
| Hovedtotal | 12.710.095.507 |

De involverede custodians har alle hjemsted i England bortset fra Salgado Capital og North Channel Bank, der har hjemsted i henholdsvis Comoros og Tyskland.

**1.2    Agenter**

Alle de i sagen omhandlede 306 pensionsplaner og selskaber ansøgte om refusion af udbytteskat via en af SKAT reguleret blanketordning. De 306 enheder anvendte seks internationale eksterne rådgivningsfirmaer, såkaldte "agenter", der videreformidlede de anmodende enheders ansøgning om refusion af tilbageholdt udbytteskat til SKAT.

Fordelingen af refusionsanmodninger mellem de seks agenter har været som følger:

| Agent | Udbetalt (DKK) |
|---|---|
| Goal Taxback Limited | 4.549.985.549 |
| Acupay System LLC | 3.610.468.065 |
| Syntax GIS | 3.043.663.066 |
| KOI Associates | 1.220.975.179 |
| Global Equities GmbH | 262.207.548 |
| Globe Tax Services Incorporated | 22.796.100 |
| Hovedtotal | 12.710.095.507 |

Goal Taxback Limited har spillet den største rolle som agent i komplekset, idet agenten har været involveret i fremsættelse af anmodninger om refusion af udbytteskat for ca. 4,5 milliarder kr. ud af de svindlede 12,7 milliarder kr.

Goal Taxback Limited har hjemsted i England, hvilket også er tilfældet for Acupay System LLC, Syntax GIS og Koi Associates. Agenterne Globe Tax Services Incorporated og Global Equities GmbH har hjemsted i henholdsvis USA og Tyskland.