# Exhibit A

Neutral Citation Number: [2024] EWHC 861 (Admin)

Case No: CO/4528/2022
CO/4674/2022

IN THE HIGH COURT OF JUSTICE
KING'S BENCH DIVISION
ADMINISTRATIVE COURT

Royal Courts of Justice
Strand, London, WC2A 2LL
Date: 17 April 2024

Before :

### LADY JUSTICE WHIPPLE
and
### MR JUSTICE HILLIARD

- - - - - - - - - - - - - - - - - - - -

Between :

THE KING                                        Claimants
on the application of
(1) MCML LIMITED (Formerly ED&F Man Capital Markets
Limited)
(2) VICTORIA FOSTER

- and –

SOUTHWARK CROWN COURT                     Defendant

THE COMMISSIONERS FOR HIS MAJESTY'S REVENUE          Interested
AND CUSTOMS                                          Party

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Clair Dobbin KC (instructed by Rosenblatt) for the First Claimant
Andrew Bird KC (instructed by Blackfords LLP) for the Second Claimant
Nicholas Chapman, Tom Rainsbury and Joanna Buckley (instructed by HMRC) for the Interested
Party

Hearing dates: 6, 7 and 8 February 2024
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 10.30am on 17 April 2024 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

.............................

## Lady Justice Whipple:

### Introduction

1.    This is an application for judicial review of four search warrants issued by HHJ Taylor at Southwark Crown Court on 12 September 2022.  The first claimant is ED&F Man Capital Markets Ltd ("ED&F"), a company which forms part of a large global finance group.  The second claimant is Victoria Foster, who was at the material time employed by ED&F and was described by the Financial Conduct Authority ("FCA") as the manager who oversaw the day to day trading of the Equity Finance desk in London during the relevant period.  The warrants were issued pursuant to requests for mutual legal assistance ("MLA") from the Danish State Prosecutor's Office for Serious Economic and International Crime ("SEIC") and the Public Prosecutor at the Office of Public Prosecutions in Cologne, Germany ("OPPC") (together, the "Requesting Authorities"). Each claimant was subject to two search warrants, one reflecting the Danish request and one reflecting the German request.

2.    Search warrants were also issued against other former employees of ED&F, also at the request of the Danish and German authorities, namely Mark Whitehead, the previous Global Head of the Equity Finance Department, and Stephen Hawksworth, the previous Chief Executive Officer of Equity Finance and Capital Markets Europe.  Neither of them participates in this judicial review.

3.    The named defendant is Southwark Crown Court.  It has not participated in this judicial review.  HMRC are the Interested Party and the effective defendants.  Permission for judicial review was granted by Lavender J on 23 May 2023.

### Facts in Outline

4.    The judge described the Danish investigation into ED&F in the following way (there is no challenge to her description):

> "4. Danish authorities are investigating ED&F Man, Mark Whitehead, Victoria Foster and Stephen Hawksworth during the period 2012 to 2015 in relation to allegations of 421 instances of fraudulently reclaimed Danish withholding tax (WHT) to the value of DKK 573 million (£66 million). The mechanism of the suspected fraud is set out in detail in the application before the court at Appendix A. I now give a brief summary of the information provided by Miss McColl in relation to the fraud in Appendix A.
>
> 5. The investigation began as a result of a police report filed on 3 May 2018 by the Danish customs and tax administration (SKAT) in respect of the suspected fraud involving individuals, reclaim agents, American pension plans, and a custodian bank ED&F Man. The

Danish State Prosecutor for Serious and Economic crime (SEIC) subsequently found that ED&F Man was also named in an earlier report by SKAT of 24th August 2016 regarding a suspected tax fraud in respect of the recovery of DKK 573 million.

6. The investigation has shown that the suspects, either themselves or by instructing another provided misleading documentation in the form of dividend credit advice (DCA) forms to the Danish tax agency, which induced them to believe that 36 US/Canadian pension plans were the beneficial owners of the stocks and had had refunds of tax on dividends withheld. No register of ultimate stockholders of Danish stocks exists, and the DCA document issued by ED&F Man contained the name of the Danish company and the amount of tax withheld. The Danish tax agency relied on this documentation to inform them where refunds were due. As a result refunds were paid to ED&F Man when no stock was held."

5.      She described the German investigation as follows:

"54. The German authorities are investigating a suspected tax evasion in relation to fraud concerning trades of German shares and claims for refunds of German withholding tax between 1 January 2009 and 31 December 2017 in the sum of Eu 586,336,117 equating to roughly £490 million. There are two Applications: firstly an application to give effect to a European Investigation order (the "EIO") pursuant to Regulation 39 of the Criminal Justice (European Investigation Order Regulations) 2017 "the 2017 Regulations", and secondly a section 9 PACE application.

55. On 20 November 2020 the local Court in Cologne made rulings granting warrants in respect of searches to premises of ED&F Man, Mark Whitehead and Victoria Foster, listing the information which could be sought. That information is the subject of the EIO. Subsequently the Public Prosecutor in Cologne sought further material which fell outside the scope of the EIO, which is now the subject of the section 9 PACE application. The Public Prosecutor has provided a letter which is Appendix C to the application which sets out extensively the probative value of documents sought, the documents sought on each premises, and the reasons why it is believed that such documents would be on the premises.

56. The applications made by HMRC are therefore for search warrants in relation to a criminal investigation being carried out by

law enforcement authorities in Germany, following a request for mutual legal assistance from the Public Prosecutor at the office of Public prosecutions in Cologne. The application made by Miss McColl is supported by the rulings at the local Court at Cologne dated 20 November 2020 in respect of ED&F Man, Mark Whitehead and Victoria Foster. To a great extent her statement and Annex A to the EIO repeat the findings of the Court."

6.  The German authorities had started their criminal investigation in 2013. The German investigators noted that MF Global UK Limited ("MF Global"), the company for which Ms Foster and Mr Whitehead had worked until that company went bankrupt in 2011, had also been involved in tax fraud. Ms Foster and Mr Whitehead had moved together from MF Global to work for ED&F.

7.  Quite apart from the two sets of criminal investigations (in Denmark and Germany), various other proceedings and inquiries into the same or related matters have been undertaken or are ongoing:

    a.  The Financial Conduct Authority has investigated ED&F and Ms Foster (the "FCA investigations"). In the course of these investigations, ED&F had produced two reports, prepared by its solicitors, which were referred to as the "Annex E reports".

    b.  Civil proceedings were brought in the courts of England and Wales by SKAT (the Danish customs and tax administration). Those proceedings were issued against a number of defendants including ED&F, alleging negligence. ED&F filed its defence on 6 September 2019 admitting that some of the tax vouchers it issued were inaccurate because in fact no dividend net of withholding tax had been received by ED&F's clients. These inaccurate tax vouchers were referred to by ED&F as the "Annex E Tax Vouchers". ED&F provided SKAT with the Annex E reports in the course of this litigation. Of the £60m or so claimed by SKAT, ED&F admitted that around £20m was attributable to inaccurate tax vouchers but disputed the remainder of SKAT's claim. (These are the "English civil proceedings".)

    c.  After the dismissal of the English civil proceedings by the Court of Appeal in April 2022, SKAT brought a second claim against ED&F alleging fraud. (These are the "second English civil proceedings".)

    d.  Civil proceedings brought in the courts of the US against ED&F's US pension fund clients, to which ED&F has been joined (the "US proceedings").

    e.  The US and Canadian pension fund clients of ED&F had pursued administrative appeals in Denmark against decisions denying them particular tax treatment in consequence of their suspected involvement in these frauds (the "Danish tax appeals"). ED&F was not a party to the Danish tax appeals.

8.  The search warrants were executed on 28 September 2022, without notice.  Material was seized which is currently being held by HMRC, pending the outcome of this judicial review.

## Legislative Framework

### The Council of Europe Convention on Mutual Assistance in Criminal Matters 1959 (the "Convention").

9.  The Convention aims to encourage and facilitate MLA between judicial, police and customs authorities on criminal matters and to improve the speed and efficiency of judicial cooperation. The United Kingdom, Denmark and Germany are all signatories.

### Crime (International Co-operation) Act 2003 ("CICA")

10. CICA is the domestic statute implementing the Convention.  Section 13 of CICA provides that the territorial authority for the relevant part of the United Kingdom may direct an application for a search warrant to be made, where the request for assistance is from a court exercising criminal jurisdiction or a prosecuting authority in a country outside of the United Kingdom.   The territorial authority for the United Kingdom is the Secretary of State for the Home Department.

11. Section 16 of CICA contains the dual criminality rule, permitting a search warrant to be applied for in response to a request for MLA where the conduct in question constitutes an offence under the law of a country outside the United Kingdom and would, if it occurred in England and Wales, constitute an indictable offence.

12. Pursuant to the Crime (International Cooperation) Act 2003 (Exercise of Functions) Order 2013, HMRC can exercise the functions of the Secretary of State for the Home Department for the purposes of ss 13 and 16 CICA.

### Police and Criminal Evidence Act 1984 ("PACE")

13. Section 9(1) PACE authorises a constable to obtain access to "special procedure material" for the purpose of a criminal investigation by making an application under Schedule 1.   It was common ground that the search warrants in this case involved special procedure material, which is defined at s 10 PACE as material, other than privileged material or excluded material, which is in the possession of a person who acquired or created it in the course of any trade or business and who holds it subject to an express or implied undertaking to hold it in confidence, including material held by an employee of that trade or business.

14. HMRC are authorised to exercise the powers and functions set out in s 9 and Schedule 1 of PACE, by operation of s 114(2) PACE and Article 19 of the Police and Criminal Evidence Act 1984 (Application to Revenue and Customs) Order 2015, SI 2015/1783.

15.     Schedule 1, paragraph 1 to PACE provides that a judge may make an order under paragraph 4 "if satisfied that one or other of the sets of access conditions is fulfilled".   Paragraph 4 empowers a judge to make a production order, namely an order on notice to a person, requiring them to produce specified material.

16.     This case involves the first set of access conditions which are set out at Schedule 1, paragraph 2.  The full text of that paragraph appears in the Appendix to this judgment.  The challenge in this case relates to paragraph 2(b)(ii) which requires that there are reasonable grounds for believing that other methods of obtaining the material have not been tried because they appeared bound to fail.

17.     Schedule 1, paragraph 12 provides that the judge may issue a search warrant (ie, an order for search without notice to the person) if (amongst other things) the judge is satisfied that either set of access conditions is fulfilled *and* that any of the further conditions in paragraph 14 are also fulfilled.  The full text of paragraph 14 appears in the Appendix to this judgment.  The challenge in this case relates to paragraph 14(d) which requires that the Court is satisfied that service of notice of an order may seriously prejudice the investigation.

18.     Sections 15 and 16 PACE contain safeguards for the issue of search warrants, including at s 15(6) a requirement to state the name of the person who applies for the warrant.

## Criminal Justice (European Investigation Order) Regulations 2017 ("2017 EIO Regulations")

19.     The EIO regime was established by Directive 2014/41/EU.  An EIO is a judicial decision issued in or validated by the judicial authority in one EU country to have investigative measures to gather or use evidence in criminal matters carried out in another EU country.  The EIO is based on mutual recognition, which means that the executing authority is obliged, in principle, to recognise and ensure execution of the request in another country.  The United Kingdom ceased to participate in the EIO regime on its departure from the EU, but the EU (Withdrawal) Act 2018 contained saving provisions for EIOs received during the transitional period, as the German EIO was.

20.     Regulation 32 provides that HMRC may exercise the functions of the Secretary of State for the purpose of recognising and executing an EIO.  Southwark Crown Court is the nominated court to issue a warrant or make a production order under these regulations.

21.     Regulation 39 provides the conditions for giving effect to an EIO.  Its full terms are set out in the Appendix to this judgment.  The nominated court must give effect to the EIO by making a production order (regulation 39(2)) but may issue a search warrant if the conditions in regulation 39(8) are met, namely that the person has failed to comply with a production order or it appears that one of the conditions of regulation 39(9) is met.  In this case, it is the condition at regulation 39(9)(d) which is in issue; that condition mirrors Schedule 1, paragraph 14(d) PACE, namely that the making of a production order may seriously prejudice the investigation or proceedings to which the EIO relates.

## Legal Principles

22.    The basic legal principles underpinning these claims are not in dispute and can be summarised as follows:

a.    First, the United Kingdom will generally afford MLA to its treaty partners, pursuant to the Convention, and the first and second protocols to it; see *JP Morgan Chase Bank National Association and others v Director of the Serious Fraud Office and others* [2012] EWHC 1674 (Admin) at [21].

b.    Second, once a request for assistance has been made, the relevant United Kingdom authority (HMRC, in this case) must carry out a PACE-compliant inquiry to put itself in a position to assess whether a search warrant is truly required; see *R (Terra Services) v National Crime Agency* [2020] EWHC 1640 (Admin), [2021] 1 WLR 1 at [64].

c.    Third, before an application for a search warrant is made, the applicant must make proper inquiries, and the duty of disclosure applies not only to material facts known to the applicant but also to any additional facts which he would have known if he had made such inquiries; see *Brink's Mat v Elcombe* [1988] 1 WLR 1350 per Ralph Gibson LJ at p1356H, principle (3).

d.    Fourth, the extent of the inquiries which will be held to be proper, and therefore necessary, must depend on all the circumstances of the case including (a) the nature of the case which the applicant is making when he makes the application; and (b) the order for which application is made and the probable effect of the order on the defendant; see *Brink's Mat* (ibid) at p 1357A, principle (4).

e.    Fifth, the duty of the applicant is to make full and fair disclosure of all the material facts.  The material facts are those which it is material for the judge to know in dealing with the application as made; see *Brink's Mat* (ibid) at p 1356 G, principles (1) and (2) and *R (Brook) v Preston Crown Court* [2018] EWHC 2024 (Admin) at [15]-[16].

f.    Sixth, the obligation to disclose anything known to the applicant which might militate against the grant of the application requires the applicant to "put on his defence hat and ask himself what, if he were representing the defendant or a third party with a relevant interest, he would be saying to the judge, and, having answered that question, that is what he must tell the judge"; see *Re Stanford International Bank Ltd* [2011] Ch 33 at [191] per Hughes LJ.

g.    Seventh, where there is a failure to make full disclosure the question on judicial review is whether the information which should have been given to the court might reasonably have led the judge to refuse to issue the warrant; see *R (Jordan) v Chief Constable of Merseyside* [2020] EWHC 2408 (Admin) at [35]; *R (Mills) v Sussex*

*Police* [2014] EWHC 2523 (Admin), [2015] 1 WLR at [55]. (The position where there is bad faith or deliberate non-disclosure may be different in that the warrants may be quashed as of right; see *R (Mills) v Sussex Police* at [57].)

## HMRC's Applications

### Background

23. SEIC (now known as SCU) is the state prosecutor in Denmark, charged with the investigation of serious economic and international crime. SEIC requested MLA in relation to ED&F by letter dated 26 August 2020. It requested MLA in relation to its investigation of Ms Foster on 18 March 2021. There followed exchanges of correspondence between HMRC and SEIC as well as an in person meeting on 10 September 2021 to discuss the basis for the applications. SEIC approved the applications in draft on 6 June 2022.

24. The German EIO was dated 30 November 2020 and was supplemented by a further letter of request for MLA dated 3 March 2022. It was stated in the EIO that a joint investigation team between the German and Danish authorities had been set up and that coordination of the warrants was requested. There followed exchanges of correspondence between HMRC and OPPC leading up to issue of the German applications. OPPC approved HMRC's applications in draft on 7 June 2022.

25. HMRC issued three applications, all dated 4 August 2022, which were lodged at Southwark Crown Court together with a skeleton argument drafted by counsel. The applications were:

   a. The "Danish s 9 application". This was an application under s 9 of PACE and s 16 of CICA. It was based on the Danish request for MLA.

   b. The "German EIO". This was a European Investigation Order received before the repeal on 31 December 2020 of the 2017 EIO Regulations pursuant to the EU (Withdrawal) Act 2018 as amended, with the consequence that both the 2017 EIO Regulations and the EU Directive 2014/41/EU continue to apply. The German EIO was predicated on the rulings dated 20 November 2020 by the local Court at Cologne.

   c. The "German s 9 application". This was an application under s 9 PACE and s 16 CICA, reflecting a letter dated 3 March 2022 from the Public Prosecutor in Cologne to HMRC, seeking further information which fell outside the German EIO.

### The Danish s 9 Application

26. The Danish s 9 application was signed by Kaia McColl, HMRC officer, at 15.30 on 4 August 2022. It was authorised by Karen Godward, senior HMRC investigating officer, on the same date. It set out the background to the request, noting that the Danish state prosecutor's office had made successful applications for investigation search orders to the Court of Lyngby,

attaching the court orders.  Attached at Appendix A to the application was a description of the evidence and suspicions of SEIC, which formed the basis for the application.  Also attached were a number of annexes containing the key documents referred to in the application.  The application listed the various document categories sought at the business premises of ED&F (paragraph 10) and at the home address of Ms Foster (paragraph 12).  The application extended to material stored on electronic devices, with reasons given for believing that the information might be stored electronically.

27.    It was stated that several employees of ED&F were involved in fraudulent trading activities; Mr Whitehead, Ms Foster and Mr Hawksworth were named (paragraph 20) but it was also noted that the Danish authorities sought the requested material "pertaining to all employees who worked on the Equity Finance Desk, as that desk is believed to be the epicentre of the fraudulent activity" and that suspicions extended beyond the three named suspects (paragraph 21).  It was thought that a considerable amount of material required to progress the investigation would be held on the main servers and systems of ED&F.

28.    In so far as searches of home addresses of the three named individuals were concerned, it was said to be paramount to the investigation to search these addresses (paragraph 59).

29.    The box was ticked to attest that HMRC had not tried to obtain the material in any other way, but it was said that other methods of obtaining the material, such as a production order, had been considered but had been rejected for reasons set out (paragraph 83).  Those reasons included:

a.    that the suspected offence was highly sophisticated and involved numerous entities and persons, whose level of involvement was as yet unascertained (paragraph 84);

b.    that the penalties for involvement would be significant given the size of the suspected fraud, in terms of likely lengths of sentences as well as making the individuals unemployable in the industry (paragraphs 84-86);

c.    that the three named suspects had provided conflicting accounts with each seeking to minimise their own role (paragraph 87).

30.    It was believed that ED&F was unlikely to fully comply with a production order (paragraph 88).  Further, it was noted that ED&F admitted that they had prepared 89 incorrect tax vouchers and had received DKK 184m from pension plans to which they were not lawfully entitled, but that ED&F had not provided any explanation as to how or why such a fundamental and significant error could happen; their poor level of compliance and lack of transparency were said to be indicative that they would not comply fully with a production order (paragraph 88).

31.    Yet further, it was said there was evidence that the alleged fraud might not be limited to the three primary suspects and might involve employees of ED&F who were still employed

there, and that those individuals, who were likely to be senior, would be motivated not to comply with a production order and/or to conceal evidence (paragraph 88).

32.    As to Ms Foster, it was noted that a conviction would probably lead to an immediate custodial sentence and confiscation of assets; that from the FCA interviews, Ms Foster appeared to be minimising her own role and implicating others which could extend to her approach to the provision of information required by a production order; that she had direct oversight of the traders and likely held information as to the extent of knowledge they had of the suspected fraud; and that her employment with ED&F had been terminated following an internal inquiry where she was accused of fraud and bribery in relation to the trading of Danish shares worth £22m but she remained working in the industry and any conviction would put her highly lucrative profession at risk (paragraph 88).

33.    The warrant was said to be in the public interest because this was one of the most serious cases of suspected and organised fraud ever experienced in Denmark and it was in the interests of justice to assist the Danish government with their request for MLA (paragraph 90).

34.    The equivalent offence was fraud, and the likely sentence in England would be more than 7 years (paragraph 91).

35.    There was no intention to seize privileged material.  If material was obviously privileged, it would not be taken.  But other material would be taken and "blue-bagged" and not viewed until the advice of independent counsel had been obtained as to whether it attracted legal professional privilege (paragraph 103).  HMRC's 28-day process would be applied to computers and electronic material so that the owner would have the opportunity to state which electronically-held material attracted LPP (paragraph 104).

36.    HMRC stated that they believed ED&F had retained the material in question, even though the suspected offences were committed as long as 10 years ago, noting that a parallel FCA investigation was ongoing and that the Danish authorities' civil suit for damages was "ongoing and was recently referred to the Court of Appeal" (paragraph 106).

37.    In the section headed "Duty of Disclosure", HMRC stated that it was possible that the material would not be at the premises because of the time that had passed since the period of the suspected offending in 2012-2015 (paragraph 115); that any action to conceal evidence would already have occurred, because ED&F and the three named individuals were aware of the FCA investigation (paragraph 116); that ED&F's own investigation and dismissal of Ms Foster might indicate a proactive approach by the company to dealing with these allegations (paragraph 119); that SEIC had noted that Ms Foster might have been treated as an internal scapegoat (paragraph 120); that Ms Foster had volunteered information and that she might be considered to be cooperating with inquiries (paragraph 121); and that the material held by the FCA had not been provided to HMRC but the Danish authorities had

informed HMRC that the FCA investigation was considerably narrower in scope than their own (paragraph 125).

38.    As to the need for a search warrant and not a production order, the application contained this:

> "131. The Danish authorities state that, while they believe for the reasons set out at paragraph 88 that the suspect would not comply / it would be seriously prejudicial to the investigation to issue a Production Order, there is no specific evidence that the suspects would choose not to comply. Further, there is no evidence that ED&F Man nor the three principal suspects have concealed or destroyed evidence.

> 132. There is no evidence at present to suggest that ED&F Man has deliberately concealed or failed to provide evidence specifically requested by FCA or in the civil suit."

39.    Appendix A set out the facts and suspicions which underpinned the application. It stated, amongst other things, that the FCA's analysis had been based on presentations and trading records from ED&F, and on compelled interviews of eight employees, including Ms Foster. The FCA had provided the transcripts of the interviews to SEIC who then made summary reports from the transcripts. There was no final ruling by the FCA but the FCA's preliminary conclusion strongly suggested that either the transactions or the ownership of the shares was artificial (paragraph 10 of Appendix A).

40.    The reasons for suspecting ED&F were set out at paragraphs 40-48 of Appendix A. That included a passage drawn from Ms Foster's FCA interview where she had stated that although she had never seen a tax opinion herself, Mark Whitehead had orally assured his staff that they were acting within the mandate of the clients' tax opinions, that there were piles of papers on Mr Whitehead's desk which she had presumed were the tax opinions, but that when she later got access to Mr Whitehead's emails, she was unable to find any tax opinions and after speaking to him about it, she formed the view that there probably were no tax opinions (paragraph 46 of Appendix A).

41.    The reasons for suspecting Ms Foster were set out at paragraphs 66-70 of Appendix A. They recorded SEIC's comment on her assertion in interview that she had never seen any tax opinions and had relied on what Mr Whitehead said; SEIC considered it to be "highly unusual" that a manager of the equity finance desk (as Ms Foster was) was not aware of the legal opinions that allegedly formed the basis of the desk's trading strategies on Danish shares and it was "somewhat implausible" that she simply accepted Mr Whitehead's assurance that he had seen those opinions (paragraph 67 of Appendix A). SEIC believed she was one of the driving forces behind the suspected fraud (paragraph 69 of Appendix A).

The German EIO

42.    This application was based on the German EIO dated 30 November 2020 annexing rulings
       of the local court in Cologne dated 20 November 2020 relating to ED&F, Ms Foster and Mr
       Whitehead.  It was stated that the conduct would be an offence under sections 1 and 2 of the
       Fraud Act 2006 if it had occurred in the United Kingdom.  Search warrants for ED&F's
       business premises and Ms Foster's home address were sought.  It was stated that the making
       of a production order would seriously prejudice the investigation to which the EIO related
       for reasons set out, making similar points to those set out in the Danish s 9 application (see
       above).  The EIO was attached as Annex A, and set out the details underpinning the
       application.  The grounds were set out at section G of the EIO and the rulings of the Cologne
       Court were attached.  The German authorities described the conduct as:

           "the planning and execution of tax-detrimental cum/ex transactions with
           short sales and related share transactions across the dividend record date - for
           example the reverse-market-claim strategy, in order to obtain refunds of
           capital gains tax and solidarity surcharge not previously paid."

The German s 9 Application

43.    The German s 9 application was signed by Kaia McColl at 16.00 on 4 August 2022. It was
       authorised by Karen Godward on the same date.  It referred to the criminal investigation
       being carried out by law enforcement authorities in Germany and it followed a request for
       MLA by the public prosecutor at the OPPC in a letter dated 3 March 2022 which
       supplemented the German EIO.  The German offence under investigation was tax evasion,
       which would amount to fraud by false representation contrary to sections 1 and 2 of the
       Fraud Act 2006 if prosecuted in England and Wales (paragraphs 4 and 5).  The application
       set out the categories of documents sought (paragraphs 10-20).  It was stated that Ms Foster
       was a key suspect in the investigation and that, with Mr Whitehead, they were suspected of
       involvement in "cum/ex" schemes during their employment with MF Global.  Cum/ex
       transactions were described as deliberately concealed tax evasion which had caused
       substantial losses to the German treasury (paragraph 21).

44.    The German s 9 application attached the German EIO as an annex.  The contents of the
       application to a large extent replicated the Danish s 9 application and the German EIO.

Hearing

45.    The applications were heard at Southwark Crown Court on 2 September 2022.  The
       hearings were without notice, meaning that only HMRC, represented by Counsel (Ms
       Shada Mellor), were present.  The judge had the benefit of a day's reading time and the
       hearing was listed for some hours but in the event only lasted around 30 minutes.  At the end

of the hearing, the judge indicated that she would grant the applications, issue the search warrants and give reasons in writing.

## Judgment

46.    The search warrants were issued on 12 September 2022 and the judge delivered her reasons in a judgment dated 14 September 2022 (the "Judgment").

47.    In the Judgment, the judge first dealt with the Danish investigation and request. She summarised the information contained in Appendix A to the application and set out the relevant legal framework, referring to *R (Rawlinson & Hunter) v CCC and SFO* [2012] EWHC 2254 (Admin) per Lord Thomas CJ at [85] and [89] and *R (Golfrate) v Southwark Crown Court* [2014] 2 Cr App R 12 per Lord Thomas CJ at [113].

48.    Her reasons for granting the orders were, first, that there were reasonable grounds for believing in relation to all of the suspects that conduct which constitutes an offence under the law of Denmark had been committed which conduct would, if committed in England and Wales, constitute an indictable offence. She referred to the offences of cheating the public revenue contrary to common law and fraud contrary to sections 1 and 2 of the Fraud Act 2006. Secondly, she was satisfied that there were reasonable grounds for believing that there was special procedure material on the premises specified in the application. Thirdly, she found that there were reasonable grounds for believing that the material was likely to be of substantial value to the Danish investigation. Fourth, she held that other methods of obtaining the material had not been tried because it appeared that they were bound to fail. In that connection, she noted that the individuals were aware that they were under scrutiny, for example because they had been interviewed by the FCA (albeit in relation to civil and regulatory matters and not a criminal investigation); and that ED&F had disclosed some material which HMRC described as "the minimum required" to comply with the requests made by the FCA. She referred to *Hart and Others v Crown Court at Blackfriars* [2017] EWHC 3091 (Admin) per Holroyde LJ at [16]-[18], and *R (Newcastle Utd Football Club Ltd) v HMRC* [2017] EWHC 2402 (Admin), [2017] 4 WLR 187 per Beatson LJ and Whipple J at [93] (Judgment [18]). She noted the reasons given by Ms McColl at paragraph 83 and elsewhere in the application. She said that the potential sentence and prospect of confiscation were not themselves reasons to grant a search warrant rather than a production order but:

> "43. ... I do however take account of the further reason given which is the sophisticated nature of the investigation and the involvement of numerous entities and persons, and in particular that a coordinated approach is necessary given the previous regulatory investigation by the FCA. That investigation has produced material and statements which are conflicting, with individual suspects indicating that they are blaming others. In the circumstances a series of production orders would be unlikely to be effective

in obtaining outstanding documentation without the risk of destruction of documents."

49.    The judge then summarised Ms McColl's evidence that she believed that other methods would fail, as justification for the applications for search warrants (and not merely production orders). The judge said:

> "49. I bear in mind that the belief in relation to each suspect must be considered separately and that different conclusions can be drawn even though the applications are made together. I am satisfied that Miss McColl believes that obtaining the material by other methods would be bound to fail for the reasons she gives. In my judgment she is entitled to have regard to the approach taken by all suspects in the statements in the previous FCA investigation. That supports what I consider to be the main underpinning of her belief – the need for a co-ordinated approach to seizing all relevant material from each of the suspects at once, rather than an approach which would allow for selective compliance or destruction of materials."

50.    She reminded herself of the information set out in section 8 of the application, under the heading "Duty of Disclosure". Then she considered whether the requirement in paragraph 14(d) of Schedule 1 of PACE was met, namely that service of a production order may seriously prejudice the investigation. She said:

> "51. I bear in mind the following features of this investigation: the time which has elapsed since the original Danish Police report in 2018, the separate FCA investigation which started in 2017 with interviews in 2018 and 2019 in respect of which limited disclosure has been given by ED&F Man thus far, and the opportunities for the destruction of documents which there have already been. As is accepted in the Application in Section 8 and paragraphs 115-133 the passage of time may mean that documents could have been destroyed already, or may not be at the premises to be searched. Whilst there have been compelled interviews, there appears to have been no previous attempt to obtain documents from the individuals under investigation. On one view, the fact that points made in the Duty of Disclosure section coupled with the fact that no attempt to obtain documents by a production order leaves open the question whether there would be and could be compliance which does not seriously prejudice the investigation.
>
> 52. Having considered this aspect carefully, I conclude that at this stage an approach which does not involve a simultaneous co-

> ordinated [sic] to obtaining of all material may seriously prejudice the investigation. There are different interests which have been expressed in the interviews and statements. Whilst this court has to make its own decision, I have regard to the decision of the Danish court and that the request is being made in relation to a Danish investigation. I note the extent and nature of the material sought which is more extensive than the more limited investigation by the FCA. I conclude that despite the factors set out in the Duty of Disclosure section the significant opportunity which would be given by production order or voluntary disclosure for destruction of extant documentation. The FCA investigation appear [sic] to have proceeded at a leisurely pace, and I consider that service of a Notice in Danish Criminal proceedings may well have a negative effect, not one necessarily prompted by the FCA civil proceedings. I therefore find that service of a Notice may seriously prejudice the investigation."

51.    She concluded that it was in the public interest to issue search warrants as requested in the s 9 Danish application.

52.    The judge turned to the German investigation and requests.  She summarised the facts, referring to the EIO and the further request made by the OPPC on 3 March 2022.  She considered the legal framework for the EIO.  She referred to Regulation 39 which sets out the grounds on which a Court can refuse to give effect to an EIO, and concluded that none of the limited reasons for refusing or postponing the putting into effect of an EIO applied, and that in the circumstances, a limited infringement of Convention rights was appropriate (Judgment [62]).

53.    As to whether a production order would be sufficient, she held:

> "63. Regulation 38(9) provides that the court may issue a warrant in respect of such material if the making of a production order may seriously prejudice the investigation or proceedings to which the European investigation order relates. I have considered the same materials (which are repeated from the Danish application) including the section on duty to disclose and the points made in it, and come to the same conclusion that were production orders to be granted instead of warrants, that may seriously prejudice the investigation to which the Order relates. The cumulative effect of tow [sic] separate investigations into serious criminal matters conducted by the Danish and German authorities gives rise to a significant risk that there would be inadequate disclosure, but more importantly, destruction of documents."

54.    She gave effect to the EIO.  She also granted the German s 9 application.  Her reasons were that first, that there were reasonable grounds for believing in relation to all of the suspects that conduct which constituted an offence under the law of Germany had been committed which conduct would, if committed in England and Wales, constitute an indictable offence, namely fraud contrary to sections 1 and 2 of the Fraud Act 2006.  Secondly, she was satisfied that there were reasonable grounds for believing that there was special procedure material on the premises specified in the application.  Thirdly, she found that there were reasonable grounds for believing that the material was likely to be of substantial value to the German investigation.  Fourth, she was satisfied that other methods of obtaining the material had not been tried because it appeared they were bound to fail, noting Ms McColl's belief that there was a real risk of concealment or destruction.  She concluded:

> "74. I bear in mind that the belief in relation to each suspect and each application must be considered separately and that different conclusions can be drawn even though the applications are made together.  Nonetheless in relation to this application too, I am satisfied that Miss McColl believes that obtaining the material by other methods would be bound to fail for the reasons she gives."

55.    She considered whether the requirement in paragraph 14(d) of Schedule 1 to PACE was met and concluded that it was:

> "75. As with the Danish application, and for the same reasons, I conclude that at this stage an approach which does not involve a simultaneous co-ordinated [sic] to obtaining of all material may seriously prejudice the investigation. There are different interests which have been expressed in the interviews – and the Court of Cologne has conducted interviews of its own. Whilst this court has to make its own decision, I have regard to the decision of the German Court and that the request is being made in relation to a German investigation. I make the same analysis as for the Danish application, and it is of note that the information provided in respect of this application is more extensive, but shows a pattern of behaviour consistent with the Danish allegations."

56.    Finally, she held that it was in the public interest and proportionate that access to the material should be given (Judgment [76]).

## The Warrants

57.    The judge granted hybrid warrants in response to the German applications.  They combined the EIO with the s 9 German application.  She did this because "this makes the position

clearer for the occupants all items in the same document" (Judgment [77]). That meant that the three applications gave rise to four warrants which are the subject of this judicial review.

58.  The four warrants were as follows:

   a.  A search warrant in relation to ED&F's business premises, made in response to the Danish s 9 application.

   b.  A hybrid search warrant to search ED&F's premises, made in response to the German EIO and the German s 9 application.

   c.  A search warrant for Ms Foster's home address, made in response to the Danish s 9 application.

   d.  A hybrid search warrant for Ms Foster's home address, made in response to the German EIO and the German s 9 application.

## The Judicial Review

59.  The warrants were executed on 28 September 2022 at ED&F's business premises and Ms Foster's home. Material was seized from both sites. Following pre-action exchanges, claim forms were issued. ED&F applied for judicial review of the warrants issued against it on 2 December 2022, supported by a number of documents including a witness statement dated 1 December 2022 from Luther Kisanga, a barrister employed by Rosenblatt, a trading name of RBG Legal Services Ltd, solicitors for ED&F. In the course of the judicial review, Mr Kisanga filed three more witness statements (dated 9 May 2023, 3 July 2023 and 26 September 2023 respectively). Ms Foster applied for judicial review of the warrants issued against her on 13 December 2022. The Court was not referred to any witness statement in support of that claim form.

60.  The Court has before it a consolidated and re-amended statement of facts and grounds for both claimants. They advance, between them, 8 grounds of challenge:

   1.  Unlawful Danish application (ED&F only).

   2.  Material non-disclosure (both claimants).

   3.  Failure to meet the statutory test, in respect of the Danish s 9 warrant against ED&F (ED&F only).

   4.  Failure to meet the statutory test, in respect of the German s 9 warrant against ED&F (ED&F only).

   5.  Failure to establish dual criminality (ED&F only).

   6.  Breach of s 15(6)(a)(i) of PACE (both claimants).

7.      Unlawful LPP authorisation (Ms Foster).

8.      Breach of Article 8 ECHR (both claimants).

61.    The central focus of the challenge by ED&F, albeit split into a number of separate grounds, was that ED&F had already cooperated extensively with the FCA and SKAT in the course of their investigations; it had made very extensive disclosure to the FCA and SKAT; there was no evidence that it had concealed or destroyed evidence; moreover, the events in question took place many years earlier and were thought to have been perpetrated by three named individuals, none of whom still worked for ED&F. In those circumstances, it was disproportionate and unnecessary to seize the material by means of search warrants. The proportionate, and appropriate means of securing the material sought by SEIC was by means of a production order (on notice) against ED&F, possibly combined with third party disclosure requests (given that much of this material was already in the possession of third parties) and not by means of search warrant (executed without notice). Ms Foster advanced a similar case, noting the extent of her cooperation with the FCA and the fact, not disclosed to the judge, that the FCA had closed its investigation into her without taking any action against her. It is said, in her case, that the intrusion into her private life was egregious and disproportionate. Both claimants say that the judge was only persuaded to issue the search warrants on the basis of inaccurate statements in and a false picture presented by HMRC's applications.

62.    HMRC filed their Acknowledgements of Service on 23 March 2023. By their Detailed Grounds of Resistance, they resisted each of the claimants' grounds and invited the Court to dismiss both applications for judicial review. HMRC relied on witness statements from Angela Rü□man, Public Prosecutor of Cologne dated 7 August 2023, Kaia McColl, higher officer of HMRC working in the Fraud Investigation Service and signatory to the applications for search warrants dated 8 August 2023, James Ham, assistant director for HMRC Fraud Investigation Service, Organised Crime Directorate dated 8 August 2023 and Christian Jakobsen, chief superintendent of the National Special Crime Unit in Denmark dated 8 August 2023.

63.    I shall summarise the parties' submissions under each ground of challenge, below. I would wish to acknowledge, before getting there, the substantial assistance the Court was given by all counsel appearing in this case which involved a large amount of documentation and many different strands of argument.

## Ground 1 – unlawful Danish application

### Submissions

64.    Ground 1 is advanced by ED&F only. Ms Dobbin KC (counsel for ED&F) argues that the Danish s 9 application in relation to ED&F was unlawful. She submits that there was no evidence that ED&F would not comply with a production order, and it followed that such

an order, on notice to ED&F and less intrusive than a search warrant, was available and appropriate. The Danish authorities only requested a search warrant because there was no equivalent to a production order under Danish law and when asked, the Danish authorities could not substantiate any suggestion that ED&F would destroy or conceal evidence. She points, in particular, to a note prepared by Mark Bagley of HMRC, who attended a Eurojust meeting with the SEIC on 10 September 2021 (Eurojust is the European Union Agency for Criminal Justice Coordination) which recorded:

> "Unlikely to get a search warrant for business ED&F Man as Danish themselves say not likely to tamper or destroy evidence".

65.    Thus, she says, it was not enough that the Danish authorities asked for MLA in obtaining a search warrant. The onus was on HMRC to check the basis on which the applications were being advanced and to recognise that a search warrant was not necessary, because other less intrusive methods were not "bound to fail", alternatively because it could not be said that any less intrusive methods may seriously prejudice the investigation. She says that HMRC failed to carry out a PACE-compliant inquiry as recognised in *Terra* (see paragraph [22.b] above).

66.    HMRC responds by reminding the Court that the issue is whether Ms McColl genuinely believed that less intrusive measures were "bound to fail", that being the language of the statute (see paragraph 2(b)(ii) of Schedule 1 of PACE). If that condition was met, HMRC's application was lawfully made. The judge found that Ms McColl did hold that belief (at [49] of the judgment); the judge was plainly entitled to so find, noting that there was no application to cross-examine Ms McColl in the course of this judicial review to challenge her assertion of that belief. That is sufficient to determine this challenge: HMRC was acting lawfully in making the s 9 applications.

67.    Further and in any event, HMRC submit that ED&F's reliance on Mr Bagley's note was misplaced. It was clear from the Power Point presented at the Eurojust meeting attended by Mr Bagley that although the Danes could not provide any direct evidence that ED&F was likely to conceal, the inference could readily be drawn from the surrounding circumstances of this fraud that there was such a risk. The relevant slide on the Power Point, which appears to have been prepared by the Danish authorities to address points raised by HMRC, had contained this:

> "**UK Law**
>
> • We cannot substantiate that evidence is likely to be destroyed or tampered with by ED&F Man.
>
> • None of the natural persons under suspicion are employed with ED&F Man today."

Discussion

68.    PACE contains a two-limbed test, the first relating to the state of belief of the person applying
for the search warrant (cf Schedule 1, paragraph 2(b)), and the second relating to the Court's
satisfaction that any lesser measure may seriously prejudice the investigation (cf Schedule 1,
paragraph 14(d)).  This ground of appeal turns on the first limb, because if HMRC genuinely
believed that lesser measures were bound to fail, then HMRC were justified in making the
application for a search warrant.

69.    The approach to the first limb was explained in *R (Newcastle United Football Club Ltd) v
HMRC* [2017] EWHC 2402 (Admin), [2017] 4 WLR 187, per Beatson LJ and Whipple J:

> "92.  ... By paragraph 2(b)(ii) of Schedule 1, the investigating officer must, at
> the time of the application, believe that other less intrusive methods "were
> bound to fail", and, when the application comes [to] the circuit judge, he or
> she must consider whether the officer so believed. ... as HMRC emphasised in
> its written and oral submissions, the use of the past tense in paragraph 2(b)(ii),
> appears directed at the officer's belief at the time of the application.

> 93.  In considering whether the requirements of paragraph 2 have been met,
> the investigator is obviously not in a position to know for certain what the
> outcome of any request for voluntary disclosure of documents might be. Nor,
> in the context of an application for a warrant under paragraph 12, can the
> investigator know for sure whether a production or access order under
> paragraph 4 might have been sufficient to secure the documents. Therefore,
> paragraph 2 cannot, consistently with the purpose of the statute, be read
> literally: whether a less intrusive measure would, or would not, be "bound to
> fail" must in the end be a matter of judgment for the investigator, based on his
> or her knowledge of the investigation so far and the evidence available. It
> must, in our judgment, be understood to mean that the investigator believes
> on the basis of the evidence that there is no lesser measure available which is
> likely to be effective in securing the relevant documents. Plainly, the
> investigator must have cogent grounds for his belief. In the context of an
> application for a warrant, where no notice will be given in advance of
> execution, the belief is likely to be based on the investigator's suspicion that
> the relevant material will be disposed of or hidden if advance warning is
> given, and for that reason, any lesser measure (which would mean that the
> target is put on notice of the investigation) would be an ineffective means of
> pursuing the investigation. But, as is clearly stated in *R (S)*, at paras 62–64
> and 95–97, a bare assertion of such a belief is insufficient if the basis of that
> belief is not adequately explained in a focussed application dealing with the
> actual facts of the case. If the investigator has explained the reasons for so
> suspecting, in terms that are reasonable and compelling, he or she will have
> fulfilled the requirement in paragraph 2."

70.    Ms McColl explained in the Danish s 9 application why other measures such as a production order had been rejected (see [88]-[89]). She concluded that there was a considerable risk that if a production order or other measures were used, the information would be cherry-picked or that relevant material would be destroyed or concealed.

71.    In her witness statement for the judicial review, she confirmed that she believed that production orders were bound to fail in relation to both claimants, giving a number of reasons at [59], including the following, specific to ED&F:

a.    The highly sophisticated nature of the suspected offence, which relied on the involvement of numerous entities and persons to succeed. Persons involved had given highly misleading documents in the form of faulty tax vouchers to the Danish tax authorities;

b.    ED&F had not been fully compliant when providing an explanation for the faulty tax vouchers in civil proceedings brought by SKAT. She referred to a letter from the Danish Requesting Authorities highlighting their suspicion that ED&F could make such a major error and until now refuse to explain how it could happen; and to the ruling by the Court of Lyngby that ED&F's pleading filed in the civil proceedings brought by SKAT did not explain what the errors were.

c.    ED&F had been selective and not frank in their disclosure to the Danish tax authorities. She referred to a letter from the Danish prosecutor which said that the material produced by ED&F in the course of the civil proceedings brought by SKAT, as well as in domestic tax appeals, appeared selective and partly anonymised.

d.    ED&F had not been fully compliant in relation to the investigation by the FCA, noting a letter from the Danish Requesting Authority to the effect that the FCA had left that Authority with the impression that during the FCA investigation ED&F had been disclosing no more than the minimum of information and had been downplaying the seriousness of the case.

e.    ED&F had not been meeting their duties of compliance, drawing on various pieces of evidence considered by the Lyngby Court.

f.    The seriousness of the offence and the potential possibility of a substantial fine and the corresponding reputational damage meant that ED&F was unlikely to comply with a production order.

72.    Ms Dobbin launches a sustained attack on the various points made by Ms McColl to justify her belief. Ms Dobbin combines that attack with a submission that HMRC failed to undertake its own "PACE-compliant" inquiry prior to issuing the applications. Thus, her submissions on this ground overlap extensively with Grounds 2 and 3. For present purposes, I focus on the core of Ground 1 which is that HMRC acted unlawfully in issuing the Danish

s 9 search warrant application. I agree with HMRC that lawfulness at the point of issue turns on whether HMRC (by its relevant officers) genuinely believe that lesser measures were bound to fail. In my judgment, the judge was entitled to conclude that Ms McColl did genuinely believe that lesser measures were bound to fail, on the basis of cogent reasons, which she has explained in greater detail for this Court. As the judge found, the central point underpinning Ms McColl's belief was that it was necessary to have a coordinated approach to seizing the relevant material, rather than an approach which would allow for selective compliance or destruction of materials.

73.    The reliance on Mr Bagley's note does not detract from that conclusion. First, Ms McColl was not present at the Eurojust meeting which pre-dated her involvement in this case and there is nothing to suggest she was specifically aware of Mr Bagley's note in advance of making the applications to the Court. But secondly, and in any event, the point being made in the Power Point, and captured by Mr Bagley in his note, was that there was no direct evidence to suggest that ED&F would destroy or tamper with evidence. This was a point to which the judge's attention was drawn, in terms (see paragraph 131 of the Danish s 9 application). But still an inference could properly and reasonably be drawn, from the wider circumstances and available evidence, that there was a risk of destruction or tampering by ED&F. Ms McColl was of the view that a coordinated approach was needed because of the value, seriousness and sophistication of this suspected fraud, which involved many entities and persons, which was to draw an inference that no lesser measure was likely to be effective. The judge was entitled to accept that that was Ms McColl's genuinely held belief. HMRC was therefore acting lawfully in making the applications.

74.    For those reasons, I reject Ground 1.

## Ground 2- Material Non-Disclosure

75.    I address first Ms Dobbin's submission, based on *Stanford International,* that the duty of disclosure in an MLA case extends to facts which were known to the Requesting Authority, even if they were unknown to the applicant authority despite that authority carrying out all reasonable and proper inquiries.

76.    Mr Chapman disputes that proposition which he says represents a novel development of the law and is unsupported by authority.

77.    I agree with HMRC. In *Stanford International,* restraint orders were set aside for lack of disclosure of material facts; but in that case, the particular facts which were unknown would have been known to the Serious Fraud Office which made the application on behalf of the US Department of Justice "if the most elementary inquiries had been made": see eg [88], [89] of the judgment in that case. *Stanford International* is, in my judgment, consistent with and supportive of the established position, outlined above and summarised in *Brink's Mat* (see paragraph [22.c] above), to the effect that there is a duty to make proper inquiries. It

does not support Ms Dobbin's submission that the applicant should be treated as having the same information as the Requesting Authority regardless of whether it in fact has that information. The obligation on HMRC was to make proper inquiries and to make disclosure of anything material obtained as a consequence. There is no higher or different obligation because this was an MLA case. Specifically, there is no form of "strict liability" fixing HMRC with information which was or should have been known to the Requesting Authorities.

78.  The issue is whether the applicant has made proper and necessary inquiries. Ms Dobbin drew our attention to various parts of the applications against ED&F which she said contained misrepresentations which were the product of HMRC's failure to carry out proper inquiries. I will deal with those item by item below. But it may be helpful to make a general response to her point before looking to the specifics. The extent of the inquiries which will be held to be proper, and therefore necessary, will depend on the circumstances of the case including the nature of the case which the application is making, the order for which the application is made and its probable effect on the defendant of such an order (see *Brink's Mat* again, paragraph [22.d] above). In this case, HMRC's applications were made in response to requests for MLA from the Danish and German investigating authorities in each case accompanied by extensive information including judgments of local courts in their jurisdictions. HMRC considered the information provided and followed it up with a series of communications and questions. It was not necessary, as part of any proper inquiry, for HMRC to start from scratch with their own investigations or to double check every aspect of the foreign request; they had to make only such inquiries as were proper and necessary, judged in the context of the request for MLA by another state signatory to the Convention.

79.  I turn then to the suggested specific and material failures of disclosure. Ms Dobbin suggested that the disclosure failures were "grievous" and rendered the warrants themselves unlawful (accepting that all issues going to remedy would involve further argument and were not for this hearing). She focused in particular on aspects of the other investigations and related litigation and on the disclosure given by ED&F in those other investigations and cases.

80.  For Ms Foster, Mr Bird KC adds further complaints. He says there was a failure to disclose evidence about the status of the FCA investigation in relation to Ms Foster, that she was aware of the criminal investigation by the German authorities, and that she was engaging with the German authorities via her solicitors. He says that these matters undermined the case for a search warrant and that fully informed HHJ Taylor might have made a production order.

81.  Mr Chapman for HMRC invites the Court to reject the allegations of material non-disclosure in their entirety. He emphasises the real-world context in which the applications were made, noting that HMRC were seeking to give effect to the United Kingdom's international obligations to provide MLA in an enormously serious, complex and paper-heavy multi-jurisdictional investigation. HMRC made reasonable inquiries of the two

Requesting Authorities and made appropriate disclosure of such information as was in its possession; that is sufficient to rebut the disclosure challenges. But further and in any event, he submits that none of the matters complained of are material and even if the particular point or material had been disclosed, the judge would still have reached the same conclusion. Yet further, he reminds the Court that neither of the Requesting Authorities was party to the English civil claim, the US proceedings or the FCA investigations, where much of the information which it is now said should have been disclosed to HHJ Taylor came from.

(i) Failure to provide accurate information about the status of the civil proceedings

82. The Danish s 9 application referred to the English civil litigation as "ongoing" and as having been "recently" referred to the Court of Appeal. These statements were wrong because in fact judgment had been given by the Court of Appeal on 25 February 2022 (see *Skatteforvaltningen v Solo Capital Partners LLP (in special administration)* [2022] EWCA Civ 234), bringing the first piece of civil litigation by SKAT against ED&F, alleging negligence, to an end. By that judgment, SKAT's claims against ED&F were held to inadmissible under "Dicey Rule 3"[1], which provides that English courts have no jurisdiction to entertain an action for the enforcement of a revenue law of a foreign state.

83. HMRC accepts that SEIC had in fact told HMRC that the Court of Appeal had dismissed SKAT's claim on the basis of Dicey Rule 3 (see SEIC's letter to HMRC dated 4 May 2021) but HMRC had overlooked that information in error. But HMRC says that point is immaterial. Nothing turned on the status of the English civil proceedings, which were anyway concluded for technical reasons and not after consideration on the merits.

84. It is regrettable that HMRC overlooked information about the status of the English civil proceedings and gave incorrect information to the Court. But I agree with HMRC that the mistake carries no significance. The judge would not have been assisted by knowing that the English proceedings were now ended: SKAT (the claimant in the English civil proceedings) was not the same entity as was now requesting MLA. In any event, the English civil proceedings had failed for a technical reason unrelated to the matters under investigation by SEIC.

(ii) Failure to provide any information about the scale of the disclosure exercise in the civil proceedings

85. Disclosure in the civil proceedings had, according to Mr Kisanga, witness for ED&F, been provided by ED&F to SKAT in nine tranches which he described in his witness statements. He said that those representing ED&F had reviewed 926,000 documents extracted from a pool of 4 million documents using search words agreed in advance with SKAT. As a result, ED&F disclosed 183,000 documents to SKAT. Ms Dobbin argued that the large scale of this review process and the volume of resulting disclosure should have been made known to

---

[1] As it was captioned by Andrew Baker J; see also Dicey, Morris & Collins on the Conflict of Laws, 15th Ed., R5-019

the judge because it showed ED&F in a positive light.  She said that this information would or might have led to a different outcome if it had been known to the judge.

86.    HMRC's answer is that they did not know about the scale of disclosure by ED&F in the civil proceedings, because they were not told about that by SEIC, even though reasonable and proper inquiries were made of SEIC.  But in any event, they say that information about ED&F's disclosure in the English civil proceedings would not have made any difference to the outcome, because it was not established that ED&F had disclosed *all* relevant documents in the course of its engagement with SKAT in the course of the English civil proceedings; further, the documents had been disclosed to SKAT which was not at liberty to onward disclose them to the Danish Requesting Authority (as evidenced by Mr Jakobsen at paragraph 17(2) of his witness statement) because of confidentiality restrictions imposed by the English courts.

87.    I agree with HMRC that the mere fact that ED&F had disclosed an objectively large number of documents in the English civil proceedings is neither here nor there and would not have assisted the judge in reaching her conclusion.  Even with extensive disclosure, it could not be said with any certainty that ED&F had supplied *all* relevant documents to SKAT – whether it had or had not done so was unknown, not least because the disclosure which had been provided had not been tested at trial.  Nor could it be said with any certainty that the disclosure in the English civil proceedings indicated such a level of cooperation and willingness that a production order would now be effective as a means of securing the documents necessary for the Danish and German criminal investigations – that too was simply unascertained.  I am not persuaded that HMRC should have known about the scale of ED&F's disclosure through any reasonable inquiry.  SEIC was not in possession of that disclosure and it is unknown whether SEIC even knew of its volume.  One notable feature of this case is that, despite all that disclosure by ED&F, at no point – so far as the Court is aware - had ED&F provided a clear explanation as to how it came to issue so many faulty tax vouchers (a point which I shall examine in more detail below); there was a very large question which remained unanswered.  For those reasons, it is simply unrealistic to suggest that the disclosure exercise in the English civil proceedings, if known about, would have made any difference to the outcome of these applications set in the context of ongoing criminal investigations.

(iii) HMRC provided false or misleading information to the judge about disclosure

88.    Ms Dobbin complains about false statements in the applications, as follows (see paragraph 121 of the Consolidated Re-amended Statement of Facts and Grounds filed by the claimants in this judicial review):

    a.    That the material disclosed in the course of the English civil proceedings had resulted in the disclosure of "several documents"; that the disclosure appeared "selective and

partly anonymised" when produced; that this suggested that relevant material was still in ED&F's possession recently.

b.      That the material in the possession of the Danish authorities was "highly processed and censored" indicating a "practice of concealment" of information and that ED&F may have been deleting material from its servers.

c.      That ED&F had been disclosing "no more than the absolute minimum information required" to comply with requests by the FCA, leading to a suspicion that relevant material would not now be disclosed.

d.      That the FCA had "seized" documents from ED&F.

89.    She took the Court to the material underlying each of these statements, and in each case submitted that the statement in the application was inaccurate and unjustified, and created a misleading picture for the judge.

90.    Mr Chapman argued that these statements were factually correct or, if not correct, resulted from a genuine mistake by HMRC and in any event were immaterial to the judge's decision; that Ms McColl did genuinely believe the truth of what was stated in the applications; that the judge was properly satisfied that there may be serious prejudice if advance notice was given by way of production order. In the circumstances, the statutory tests were satisfied and that would have remained the position regardless.

91.    It is necessary to consider each of Ms Dobbin's incidents of misstatement separately, which is an unavoidably detailed exercise.

   *a. Selective and Partly Anonymised*

92.    The phrase "selective and partly anonymised" was used in relation to material provided by ED&F at paragraph 106 of the s 9 Danish application, which was addressed to the English civil proceedings:

> "Though the material provided appears selective and partly anonymised when produced, it indicates that relevant material was still in the company's possession recently. It is therefore reasonable to assume the material will still be on the premises at the time of the search."

93.    Paragraph 106 also made the point that if (contrary to the foregoing assumption) ED&F had recently deleted material from their systems, it was reasonable to think that it could be retrieved by data analysts and thus could also be obtained by means of a premises search.

94.    These points were made in a document prepared by SEIC for HMRC to support their request for MLA. The original version of that document was dated 18 December 2021 but

the Court was shown a revised version dated 7 January 2022. That document listed the material expected to be at ED&F's premises. Under the heading 1.1 Presence of Material, SEIC noted (emphasis added):

> "Secondly, the Danish tax authorities have engaged in a civil suit for damages against [ED&F] that is ongoing and recently referred to the UK Court of Appeals. In this civil suit as well as in the appeals case, [ED&F] has provided a number of documents covering the below material categories and years of interest. Though the material produced by [ED&F] appears *selective and partly anonymised* when presented, it displays that relevant materials was in the company's possession in recent time. It is therefore reasonable to presume, that the material still is present and available at the premises and therefore should be obtainable in a house search."

95.    The phrase was then incorporated into the draft application for search warrants prepared by HMRC, which draft was shared with SEIC. Ms McColl wrote to SEIC on 24 August 2022, as already noted, asking for a description of the kind of material that was disclosed and how it appeared selective or had been anonymised. The Danish response was in a letter dated 31 August 2022. SEIC did not offer any explanation of the selective and anonymised material, instead simply referring to material disclosed in the English civil proceedings.

96.    Ms Dobbin points out that the description of "selective and partly anonymised" is, in fact, a description of material obtained by SEIC from SKAT, not in relation to the English civil proceedings at all, but from the Danish tax appeals pursued by US and Canadian pension fund clients of ED&F. This was confirmed by Mr Jacobsen in his witness statement, where he says that in the course of the tax appeals, SEIC came into possession of material which was "very incomplete, partly anonymised and redacted" (paragraphs 17(1), 20-22 of his witness statement); he confirmed that SEIC holds no documentation obtained from the English civil proceedings (paragraph 22).

97.    Ms Dobbin says that in light of Mr Jacobsen's evidence, the suggestion that ED&F has provided selective and partly anonymised material was self-evidently incorrect. The truth was quite the opposite because ED&F had fully cooperated with SKAT in the provision of disclosure in the course of the English civil proceedings. Further, there was no proper basis for HMRC's suggestion that any material might be or have been deleted from the servers, which HMRC tacked on to its comments about ED&F's material being selective and partly anonymised.

98.    Mr Chapman's response is to direct us to the issue in question, which was whether Ms McColl genuinely believed that there was a risk that ED&F would seek to conceal or dispose of relevant documents if it was given notice (ie the first limb of the legal test, see the citation from *Newcastle Utd* at paragraph [69] above). He relies on Ms McColl's witness statement

where she says, in terms, that she had formed the view that ED&F had behaved in a way that indicated a practice of concealment (see paragraph 69 of that witness statement). Based on that, he argues that her belief that there was a risk of concealment was genuine and the judge was entitled so to conclude.

99.   In my judgment, it is clear that HMRC was in error in suggesting that ED&F was responsible for disclosing selective and partly anonymised material. As Mr Jacobsen accepts, material fitting that description was generated in the course of the Danish tax appeals, to which ED&F was not a party, and the criticism could not properly be laid at the door of ED&F. However, as Mr Chapman submits, the issue is the genuineness of Ms McColl's belief. Ms McColl was not aware of the error, which has emerged since the commencement of judicial review proceedings. The judge was undoubtedly entitled to accept Ms McColl's evidence that she genuinely did believe, at the time of the applications, that ED&F had produced selective and partly anonymised material. That, together with other factors she referred to (including the lack of any explanation of the Annex E faulty vouchers) amply justified her asserted, and genuine, belief that there was a risk that ED&F would conceal or destroy documents. As I have already held, the first limb of the legal test was met.

100.  The next question is whether the error, as it has now been revealed, undermined the judge's conclusion on the second limb of the test, ie that the Court was satisfied that that any lesser measure might seriously prejudice the investigation. In this case, realistically, the error makes no difference. The judge took the view that a coordinated approach was needed for a number of reasons. One of her main reasons was the approach taken by the suspects in their statements to the FCA by seeking to avoid or deflect blame; further, the judge was alive to the context of a suspected widespread, sophisticated and very high value fraud for personal gain. Whether or not ED&F had a track record of producing selective and partly anonymised material in the course of previous litigation would not have affected the judge's reasoning. The error which has now been revealed would have made no difference to the judge's ultimate conclusion.

   *b. Processed and Censored*

101.  The phrase "processed and censored" appeared in the s 9 Danish application in two places. First, it was at paragraph 16 where HMRC asserted that "Additionally, the material which is already in possession of the Danish authorities has been highly processed and censored, indicating a practice of concealment of information ...". At paragraph 25, HMRC asserted that: "So far, the investigation has uncovered some files from the systems, but in processed and censored formats containing small amounts of information, if any at all".

102.  The phrase came from the same document prepared by SEIC as already referred to (dated 7 January 2022). That document lists the material expected to be at ED&F's premises. Under a heading "3.2 Material in relation to internal client and trading documentation" SEIC said this (emphasis added):

> "Preliminary findings of the investigation suggest that a very substantial part of the material related to the activities under investigation were generated, processed and stored via ED&F systems and servers. So far, the investigation has uncovered some files from the systems, *but in processed and censured* [sic] *versions* containing small amounts of information, if any at all."

103. The phrase was then incorporated in the draft application for search warrants prepared by HMRC. Ms McColl wrote to SEIC on 24 August 2022, as already noted, asking for further information. In that letter, Ms McColl asked where the processed and censored filed material had come from and how the material had been censored. In its response dated 31 August 2022, SEIC referred to the FCA proceedings, noting that both the FCA and the Danish investigation team had found the material disclosed "obscured rather than clarified" the picture, but then stating that other materials had been provided by SKAT from disclosure provided in the course of the Danish tax appeals by the litigants themselves (and not ED&F who was not a party to the tax appeals) and that it was these documents that had been "blacked out" in parts.

104. Ms Dobbin is right to say, based on what we now know (from Mr Jacobsen) that the processed and censored description therefore belongs to the material disclosed in the Danish tax appeals to which ED&F was not a party and that Ms McColl wrongly attributed that material to ED&F. Ms McColl's mistake is revealed clearly by Mr Jacobsen but I accept that it also appears, on close reading, in SEIC's letter dated 31 August 2022. However, the answer here is much the same as in relation to Ms Dobbin's last point about the use of the words "selective and partly anonymised". Ms McColl genuinely did believe, at the time of the applications, that ED&F had produced processed and censored material in the course of the FCA investigation. That, together with other factors she referred to (including the lack of any explanation of the Annex E faulty vouchers) led her to believe that there was a risk that ED&F would conceal or destroy documents. The first limb of the legal test was satisfied. There was ample material in any event to found her belief even once these misunderstandings (in relation to "selective and partly anonymised" and "processed and censored") are corrected.

105. For reasons already given in the context of "selective and partly anonymised", the mistake made no difference to the judge's conclusion on the second limb, because there was an ample basis for her satisfaction that any lesser measure might seriously prejudice the investigation. In my judgment, this error made no difference.

   c. *No more than minimal information*

106. The s 9 Danish application asserted, as part of the case for seeking a warrant and not merely a production order, that material obtained from the FCA investigation suggested that ED&F "have been disclosing no more than the minimum information required to comply with

Case 1:18-md-02865-LAK    Document 1080-1    Filed 06/25/24    Page 32 of 50

Judgment Approved by the court for handing down.                                R (MCML & Foster) v Southwark

requests" and that if a production order was obtained there was a high prospect of the material requested not being disclosed (paragraph 88).

107.    The assertion comes from SEIC's letter of 4 May 2021 in answer to HMRC's request for further information in which SEIC stated (emphasis added):

> "FCA has left us with the impression that during the investigation ED&F Man has been disclosing *no more than a minimum of information* in order to comply with requests from FCA and that ED&F Man has been downplaying the seriousness of the case."

108.    Ms Dobbin argues that HMRC were inaccurate in suggesting that ED&F had disclosed no more than the minimum required. Even if it might have been justified at the date of SEIC's letter, by the date of the applications, the position was known to be different because SEIC had confirmed in its letter to HMRC dated 31 August 2022 that ED&F had produced a number of additional "document packages" to the FCA. She drew the Court's attention to Mr Kisanga's evidence about the extensive disclosure by ED&F to the FCA. Further, SEIC had told HMRC by this stage that the FCA had not shared ED&F's disclosure with it for legal reasons, which meant that HMRC knew (or ought to have known) that SEIC was not in any position to form an impression as to the adequacy of that disclosure, anyway. Alternatively, she says that HMRC should itself have asked FCA about the adequacy of disclosure to it by ED&F.

109.    Mr Chapman says that HMRC were entitled to rely on what SEIC told them in the letter of 4 May 2021, which was not countered in terms in the later correspondence. In any event, there was and is no evidence to suggest that ED&F had made disclosure beyond the minimum required, which is all that HMRC were saying so that the statement remains substantially true and justified. SEIC was plainly of the view that the ambit of the FCA investigation was much narrower than its own investigation, so any view as to minimum compliance with the FCA investigation was not significant anyway.

110.    I am not persuaded that HMRC made an error at all. SEIC did have the impression that ED&F had only complied to the minimum extent necessary. There was no reason for HMRC to doubt that. But further, minimum compliance is still compliance, and HMRC was not suggesting ED&F had done anything wrong (see paragraph 132 of the s 9 Danish application where HMRC stated in terms that there was no evidence that ED&F had deliberately concealed or failed to provide evidence requested by the FCA or in the English civil proceedings). If I am wrong about that, and this statement does carry some negative connotation about the extent of ED&F's compliance with the FCA investigation, then the point is such a modest one in the overall context of these applications that it would not, even if corrected, have made any difference to the outcome.

   *d . Seized*

111.    It was stated at paragraph 35 of the s 9 Danish application in relation to ED&F that "it is anticipated that documents like those seized by the FCA will also be on the premises...".  Ms Dobbin takes exception to the use of the word seized because there was no seizure by the FCA; all disclosure to the FCA by ED&F was voluntary.

112.    Mr Chapman accepts that the word is inaccurate, but says that the judge would not have been confused or misled by this one word, because the application made clear at paragraphs 88, 108 and 132 that ED&F had made disclosure to the FCA voluntarily and not in consequence of any compelled process.

113.    Ms Dobbin did not press her point about misuse of the word "seized" at the hearing.  I accept that the FCA had not seized any documents from ED&F, in fact.  But the use of that single word in the course of a lengthy and detailed application was insignificant.  In any event, it was clear from other passages in the application that ED&F had made voluntary disclosure to the FCA, and not under compulsion or seizure.

(iv) Failure to disclose the costs judgment of Baker J

114.    Andrew Baker J awarded costs against SKAT on an indemnity basis when dismissing the English civil claim against ED&F (see *Skatteforvaltningen v Solo Capital Partners LLP (in special administration)* [2021] EWHC 1222.)  Andrew Baker J concluded that this was "extraordinary litigation" for various reasons including (at [18] of his judgment):

> "(iii) The litigation was brought and aggressively pursued, by a sovereign with a willingness to expend effectively unlimited resources, as much to set an example to the world and make an example of all those involved (whether said to be guilty of dishonesty or not), that where it believed it had been the victim of dishonest wrongdoing there would be consequences, as to make a financial recovery. It was litigation that was politically as well as financially motivated.
>
> (iv) The litigation was the subject of ill-judged public statements by senior Danish politicians appearing to pre-judge the factual issues that would have fallen to be determined by the court. They both confirmed, or reinforced, the impression that there was a substantial political dimension to the bringing and vigorous pursuit of the claims brought here, in particular that their purpose was punishment and deterrence as much as it was financial recovery for the Danish taxpayer, and also involved a degree of 'playing to the gallery' in response to the significant media interest this affair has generated in Denmark. ..."

115.   Ms Dobbin says this was important information which the judge should have been given. It might have altered the judge's perception of the merits of the warrant applications and shown these accusations of fraud against ED&F and Ms Foster in a different light.

116.   HMRC say that they were unaware of this judgment when they made the warrant applications. They say that it is not reasonable to suggest HMRC should have known about this judgment. Further, they say that the views expressed by Andrew Baker J in this judgment, even if they had been known and communicated to the judge, would not have assisted the judge or led to a different outcome.

117.   Whether or not HMRC should have been aware of this judgment (a point which it is not necessary to decide), I agree with HMRC that the judge would not have been assisted by it in reaching her decision on the warrant applications. The costs judgment was specific to the English civil claim, which had been dismissed for technical reasons. Andrew Baker J was explaining the basis for his award of indemnity costs against SKAT; it was in that context that the political motivation for bringing the English civil proceedings had some relevance. The applications addressed by the judge were not brought by SKAT, but by a different Danish state agency, SEIC, and politically motivated or not, were driven by suspicion of a substantial fraud on state funds. The comments of Andrew Baker J did not undermine the merit or cogency of the warrant applications, nor were they capable of changing, in any substantial way, the judge's view of whether lesser measures (on notice) might seriously prejudice the investigation.

(v) Failure to disclose the correct position as regards ED&F's current employees

118.   Ms Dobbin emphasised the Power Point produced at the Eurojust meeting which recorded the view that no natural persons under suspicion were still employed by ED&F; the Danish authorities suggested that one named individual might work at ED&F still, but others named did not. She says that in any event, as was known to SKAT, ED&F had closed its equity finance desk in 2019 and had sold its business. If the judge had understood that there were no longer any individuals employed by ED&F who might have been connected with the tax fraud, she might have taken a different view about the necessity for search warrants. It is said that the judge should have been made aware of that fact.

119.   HMRC respond that Ms McColl was justified in her view that the alleged fraud may not be limited to the three named employees. It was accepted that none of those three worked for ED&F anymore. But given the scale and nature of the fraud, it was obvious that other employees might have been involved and might still be in a position to interfere with the production of information by ED&F. Relying on a late witness statement of Ms McColl dated 5 February 2024, HMRC argued that at least one person identified in the Danish s 9 application as a person of interest was still employed by ED&F (now called MCML Ltd, and in the ownership of Marex Group Ltd); that person was Adam Piper, the head of risk at ED&F at the time of the alleged fraud.

120.    I accept HMRC's submissions.  Given the scale and nature of this suspected fraud, it was an obvious possibility that ED&F (now MDML Ltd) or its new owners (Marex Group Ltd or one of the companies in that group) might still employ individuals who would have an interest in concealing documents relevant to the criminal investigations.  HMRC had successfully identified at least one person who had remained in a senior position throughout (and to establish that point, I would admit Ms McColl's late witness statement, which answers a point raised by ED&F in this judicial review).  I do not therefore accept the factual premise of Ms Dobbin's submission that there were no longer any individuals employed by ED&F who might have been connected with the tax fraud – none of the three named individuals still worked there, but it is simply unknown whether there were others who were connected with the fraud who still might work there.  But in any event, Ms Dobbin's submission rather misses the point that the fraud was of uncertain ambit and the investigation was itself focussed on determining who was, and was not, involved in it.  In those circumstances, the judge would not have been assisted by information about the current whereabouts of specific former employees of ED&F because that begged the question about who was involved in the fraud in the first place.

(vi) Failed to disclose the explanations by ED&F in the English civil proceedings about Annex E

121.    Ms Dobbin complains about HMRC's assertion in the warrant applications to the effect that ED&F had failed to provide an explanation for the Annex E Tax Vouchers.  She took us to ED&F's defence filed in the English civil proceedings as well as certain Part 18 responses and correspondence between the parties in the course of those proceedings.

122.    Mr Chapman maintained that no proper explanation had ever been put forward by ED&F for the faulty Annex E Tax Vouchers and that the Danish authorities were justified in pointing to this as a factor of concern.

123.    I agree with HMRC.  The Danish authorities were of the view that ED&F had failed to advance a full explanation.  I do not accept that HMRC were required, as part of any reasonable or proper inquiry, to question that belief.  HMRC were entitled simply to accept as a fact that SEIC held that belief, and to set that out as part of the narrative contained in the warrant applications.  That deals with the point.  But further and in any event, I would not accept that ED&F had offered a full explanation for the faulty tax vouchers.  In none of the documents we were shown was any clear explanation given as to how it came to pass that ED&F issued, on its own case, £20 million-worth of defective tax vouchers (and on SKAT's case, vouchers worth considerably more than that).  Mr Justice Hilliard asked Ms Dobbin during the course of the hearing whether any evidence had been filed by any officer of ED&F at any stage to explain the faulty tax vouchers listed at Annex E; but we were shown only witness statements prepared by Mr Kisanga, an employed barrister of the company's solicitors; he did not put forward any explanation for what had occurred.  A technical denial of liability, as advanced in the pleadings prepared in the course of the English civil claim, is not the same thing as a full explanation of what occurred.  Accordingly, I am not persuaded

that there was any failure of disclosure by HMRC in this respect or that ED&F's pleaded defence in the English civil proceedings would have counted for much if the judge's attention had been drawn to it.

### (vii) Failed to provide the judge with other information about the English civil proceedings

124.    Ms Dobbin complains that the judge was not made aware of the likely privileged status of some of the material sought.  So, for example, HMRC were seeking material that post-dated the period of the fraud which had been prepared in the course of the FCA investigation and the English civil proceedings.  Ms Dobbin said that within this, there was material which ED&F had objected to disclosing because of litigation privilege; this point had been raised in the course of the English civil proceedings and was the subject of a judgment by HHJ Pelling QC but the appeal against his judgment never got to the Court of Appeal because the proceedings were struck out on other grounds; the judge should have been put on notice that the applications before her extended to this material.  Separately, Ms Dobbin argued that there had anyway been further disclosure in the course of the US proceedings which, together with the FCA and English civil proceedings, showed the extent to which ED&F had volunteered disclosure.

125.    Mr Chapman says that HMRC were not aware of ED&F's position on privileged material in the course of the English civil proceedings but nor should they have been: Judge Pelling QC's judgment was not reported publicly, and SEIC did not offer these details to HMRC (if indeed SEIC itself was aware of any of them, which is unknown).  Anyway, these matters would have made no difference to the judge because they were not material to the issues she had to determine.

126.    I agree with HMRC.  HMRC did not know about any of these matters.  It is not reasonable to assert that HMRC should have known about them.  In any event, they are details connected with the English civil proceedings and the US proceedings which would not have affected the judge's approach to or decision on the warrant applications.  HMRC had explained its system for dealing with privileged material, and if any such material was included in what was seized, the judge was aware that it would be returned without being inspected.  That would have allayed any concerns she had about privileged material being included.

### (viii) Failed to inform HHJ Taylor of ED&F's duty to preserve documents relevant to the FCA investigation

127.    Ms Dobbin refers to s 177(3) of the Financial Services and Markets Act 2000 which imposes a statutory duty to preserve relevant documents.  The existence of that obligation was a further safeguard for SEIC and a further reason for considering a production order instead of a search warrant.

128. Mr Chapman says this challenge is misconceived. The judge was given to understand that the FCA investigations were ongoing. The judge would have understood the statutory duty on ED&F and Ms Foster to preserve documents at least for the duration of those investigations, if not beyond. That was the reason why the applications stated that "the material should still be present and available" (paragraph 106 of the Danish s9 application).

129. I agree with HMRC. The judge understood that relevant material was expected still to be present at ED&F's offices. One reason for that was the FCA investigation which the judge was told was ongoing. Further, and in any event, the existence of an obligation to preserve documents under the FSMA 2000 would not have affected the judge's evaluation of the merits of the applications. If these individuals were involved in fraud of the nature and scale suggested, the fact that they owed an obligation to their regulator to preserve material would be unlikely, in and of itself, to prevent them disposing of or concealing that material. This was a makeweight.

(ix) Failed to inform HHJ Taylor that Ms Foster had cooperated with the FCA and that the FCA had closed their investigation into Ms Foster with no further action taken against her.

130. Mr Bird notes the emphasis in the applications on the fact of the FCA investigation and the compelled accounts given by Ms Foster as part of that investigation. He says HMRC should have known, and should have told the judge, that the FCA had concluded its investigation into her and had issued a letter to her on 1 February 2021 stating that no further action was proposed against her. The judge commented on the FCA investigation in her judgment, inaccurately stating at paragraph [52] that it was proceeding "at a leisurely pace". This was a material error. Further, in fact Ms Foster had cooperated extensively with the FCA, including by means of a number of interviews where she had given frank evidence, now relied on by SEIC and HMRC.

131. As to the status of the FCA investigation into Ms Foster: Mr Chapman draws the Court's attention to correspondence from Ms McColl to SEIC on 24 August 2022 asking SEIC for an update on the FCA investigation. The answer from SEIC was dated 31 August 2022. SEIC stated that the "last known status" of the FCA investigation was that the investigation into Mr Whitehead had been dropped primarily due to resources and that the FCA expected to conclude the investigation around the summer of 2022, and that an update from the Danish police had been requested on 30 August 2022. SEIC said that they had the impression that the FCA had not received the "extensive material" SEIC was seeking in the criminal investigation but that "the scope and extent of the current FCA investigation is different from and has never been identical to the Danish criminal investigation". The letter said nothing about the investigation into Ms Foster. Based on this exchange, Mr Chapman says that HMRC did not know that the FCA investigation into Ms Foster was concluded and that it was reasonable for HMRC to rely on the response from SEIC without questioning further or seeking any information direct from the FCA; in any event, even if HMRC had

known and had disclosed the true state of the FCA investigation into Ms Foster, it would not have made any difference to outcome.

132.   It is regrettable that HMRC was not aware of the true status of the FCA investigation into Ms Foster. If HMRC had known about it, I have no doubt HMRC would have included that fact in the applications concerning Ms Foster or at least told the judge that the FCA investigation into Ms Foster was now closed. It was, I think, reasonable to expect HMRC to press SEIC for an answer on the status of Ms Foster's FCA investigation, given that HMRC had asked the question in terms of SEIC but had received no answer, and given that SEIC suggested the FCA would conclude its investigations in the summer of 2022 - the applications were issued on 4 August 2022 and the hearing was on 2 September 2022 so HMRC knew the answer from the FCA was imminent. This was a reasonable line of inquiry which HMRC should have pursued.

133.   However, I agree with HMRC that even if HMRC had informed the judge of the closure of the FCA investigation into Ms Foster, the judge would have reached the same conclusion in her case. The failure to make proper inquiries, and in consequence the failure to inform the judge of the current status of the FCA investigation into Ms Foster, thus made no difference and was not material. SEIC believed that the scope of the FCA investigation was considerably narrower than its criminal investigation, so the conclusion of the FCA investigation was of only marginal relevance. Further, the judge's reasons for issuing a search warrant (and not putting Ms Foster on notice by means of a production order) were that a "coordinated approach" was needed, whereby all the material was seized from all the suspects at once. That reasoning would have been unaffected by knowledge of the conclusion of the FCA investigation into Ms Foster.

134.   I am not persuaded that Ms Foster's cooperation with the FCA, even if emphasised more expressly by HMRC in the applications, would have carried any real weight with the judge who could see for herself that Ms Foster had given a number of compelled interviews and had, in that sense, cooperated. In those interviews, Ms Foster denied any knowledge of the fraud and sought to blame others; she put forward a version of events that SEIC plainly doubted. There were clearly questions arising from her account and the judge would have been alive to those questions, and the modest weight which could, in consequence, be placed on her cooperation with the FCA.

<u>(x) and (xi) Failed to inform the judge that Ms Foster knew she was a suspect in the German investigation and was cooperating with the German authorities</u>

135.   On 26 February 2020 Ms Foster was informed that she was a suspect in the German investigation. Mr Bird said this was an important detail because it made it less likely that she would hold incriminating material or seek to destroy that material now, and it increased the likelihood of a production order being effective (not least because a production order would extend to material held off premises, including by solicitors representing her in relation to

the German investigation). Further, her engagement with the German authorities was to her credit and further weighed in favour of a production order.

136.    Mr Chapman says that HMRC was not aware that Ms Foster knew she was under suspicion in the German investigation. HMRC had explained the duty of candour to OPPC by letter dated 5 June 2022 and had asked OPPC if there were any further matters to disclose. On 7 June 2022, OPPC confirmed that there were no such matters. It was reasonable for HMRC to rely on that answer. Further, OPPC suggested in this letter that the suspects were <u>not</u> cooperating with OPPC, so that Mr Bird's submission was not built on solid foundations. In any event, awareness of the German investigation and any cooperation with it would have made no difference to the judge's assessment of the merits of the application or the outcome.

137.    I accept that it was reasonable for HMRC to rely on the letter from OPPC confirming compliance with the duty of candour and that no further inquiries were proper or necessary, given the context of this application. Further, I accept that knowledge that Ms Foster was under investigation in Germany and that she had cooperated with the Germans (assuming the latter to be true, for present purposes) would not have made any difference to the outcome. The case for simultaneous, coordinated seizure would still have outweighed, by some margin, the suggestion that a production order might be an effective means of obtaining disclosure from her.

<u>Standing Back</u>

138.    I have accepted that HMRC should have followed up its inquiries about the status of the FCA investigation so far as Ms Foster was concerned. I have accepted that some words in the application were misplaced; others amounted to misrepresentations of fact. I have considered these various points one by one, but I acknowledge that Ms Dobbin's and Mr Bird's cases are built on the combined effect of these various points which they say resulted in an application of such unfairness that the warrants are unlawful. Standing back and considering the combined effect, I am not persuaded they are right. In the overall scheme of things, these are all relatively minor points which would not have altered the judge's assessment if corrected, even when considered in combination. The overarching point which outweighs all the challenges made under this ground is that there were very grave suspicions about the past conduct of ED&F, by its officers and Ms Foster. It is naïve to suggest that production orders might have been effective and sufficient in the circumstances. The judge was clear that coordination and compulsion were required. Her reasons for reaching that view would have been unaltered by these points, to the extent that there is merit in them.

139.    I dismiss Ground 2.

**Grounds 3 and 4 – Failure to meet the statutory test for issue of warrants**

140.    By ground 3, ED&F argues that there was no proper basis for concluding that other less intrusive methods were bound to fail (cf. paragraph 2(b) of Schedule 1 to PACE), or that service of notice of an application may seriously prejudice the application (cf. paragraph 14 of Schedule 1 to PACE), in relation to the s 9 PACE applications.  By ground 4, ED&F argues that there was no proper basis for concluding that a production order may seriously prejudice the investigation (cf. regulation 39 of the 2017 EIO Regulations in relation to the German EIO).  Ms Dobbin relies on a number of points which are already familiar, including: that ED&F had already made substantial disclosure in the course of the English civil proceedings, that no natural persons under suspicion remained employed by ED&F; and that there was no direct evidence to suggest ED&F might seek to destroy or conceal documents.

141.    HMRC resist these grounds, arguing that the judge set out her reasons for concluding that the statutory threshold tests were met in relation to each application.  The judge's conclusions were obviously rational and correct.

142.    I agree with HMRC. For reasons already explained, the judge's conclusion that less intrusive methods, namely production orders against ED&F and Ms Foster, would not be effective was fully justified on the material before her.  The judge's conclusion that service of a notice might seriously prejudice the investigation was also justified on that material.

143.    I dismiss grounds 3 and 4.

## Ground 5 – Dual criminality

144.    Ms Dobbin submits that the condition precedent of dual criminality in Germany was not met. That condition is imposed by s 16 of CICA for the German s 9 PACE applications and regulation 38(3) of the 2017 EIO Regulations for the German EIO.  She says that it was necessary to ascertain the essence of the conduct alleged in the foreign state, transpose that conduct to England and ascertain what offence that conduct would amount to in England, applying *Norris v Government of the USA* [2008] 1 AC 920.  She suggests that the conduct alleged in the German s 9 and EIO applications was indecipherable (see the extract at paragraph [42] above, referring to cum/ex transactions with short sales and related share transactions across the dividend record rate).  The judge was wrong simply to accept that description at [66]-[67] of her judgment and to conclude, as she did at [67], that "what is alleged would if it occurred in England and Wales constitute an indictable offence, namely fraud contrary to sections 1 and 2 of the Fraud Act 2006".

145.    Mr Chapman resists this challenge.  He argues that the judge was entitled to conclude on the material before her that the dual criminality test was met in relation to the German applications.  Further, he reminds us of the evidence of Mr Ham in his statement dated 8 August 2023:

> "4. In relation to the criminality in Germany I understood this to be captured under Section 370 of their criminal code. Historically, I have worked jointly with German law enforcement in relation to a criminal matter which was also investigated in Germany under Section 370 of their criminal code. I believed this offence to be an 'umbrella' offence that captured all elements of tax evasion. I do not believe in the UK we have a direct equivalent however reading the EIO submissions from the Courts of Cologne, it was stated that 'incorrect or incomplete information' had been provided to German tax administrations. This led me to believe that the German investigation could be captured under The Fraud Act 2006, Sections 1 & 2 and thus this is what I approved."

146.    I agree with HMRC. The judge considered the nature of the conduct in question and asked herself what offence (if any) that would constitute if it occurred in this jurisdiction. The German applications were predicated on ED&F having provided incorrect information to the German authorities, in the form of incorrect tax vouchers; that information was provided dishonestly and with a view to gain at the expense of the German revenue, and with the result that tax refunds were credited to which ED&F (or its clients) were not entitled. That conduct was described in relation to MF Global and ED&F. That conduct would plainly come within the ambit of s 2 as fraud by false representation.

## Ground 6 – Failing to name the applicants in breach of s 15(6)(a)(i)

147.    Both claimant contend that the hybrid German search warrant was invalid for failure to specify the name of the person applying for it, as required by s 15(6) of PACE. ED&F also suggest that the hybrid nature of the warrant was unlawful.

148.    HMRC accept that the German search warrant fails to identify Ms McColl as the person applying for it, but note that it does name HMRC as the persons who will execute the warrant, that it was served alongside the s 9 Danish warrant which gives Ms McColl's name as applicant, and further that in reality there was not and could not have been any misunderstanding at any point about who was applying for the warrant. They say that the hybrid form of the German warrant is lawful and preferred as providing clarity by combining the German s 9 PACE application with the German EIO.

149.    The parties refer to a number of authorities to support their rival cases. The claimant refer to *R (G) v Metropolitan Police Commissioner* [2011] EWHC 3331 (Admin) where the Divisional Court (Laws LJ and Simon J) quashed search warrants in circumstances where the application had been made in a "casual and slipshod manner" ([15]). The Court emphasised three important propositions to be drawn from the authorities, at [17]:

> "1.  The issue of a search warrant or a warrant for seizure is a very serious interference with the liberty of the subject.
>
> 2. The officer applying for such a warrant must give full, complete and frank disclosure to the magistrate so as to enable the latter to base his decision on the fullest possible information.
>
> 3: The court itself must give the most mature and careful consideration to all the facts of the case (see amongst many instances *Williams v Somerfield* [1972] 2 QB 512 at 518 and *Wood v North of England Magistrates' Court*[2] [2009] EWHC (Admin) 3614 per Moses LJ at paragraph 29)."

150.    The Court also emphasised the importance of maintaining the standards which apply to warrants (at [20] of the judgment) and then considered a specific challenge based on the failure to name the person who applied for the warrant in breach of s 15(6)(a)(i) of PACE, upholding that challenge on the basis that "this is a context in which the statute must be complied with to the letter" (at [23] of the judgment).

151.    HMRC relies on the de minimis principle, as it was explained in the context of search warrants in *R v Chief Constable of Warwickshire ex p Fitzpatrick* [1999] 1 WLR 564, where the Divisional Court (Rose LJ and Jowitt J) dealt with a challenge that material seized under search warrants exceeded the authorised scope of the warrants.  Rose LJ set out the criteria which had to be satisfied before material can be seized (p 574H), confirmed that the legislation provided a statutory code governing the application for, issue and execution of search warrants (p 575F) and that (emphasis added):

> "*Subject to the de minimis principle, which common sense requires*, I conclude that a search has exceeded the purpose for which the warrant was issued ... when material which does not satisfy those criteria has been seized" (p 575 G).

152.    HMRC also cites *R (Goode) v Nottingham Crown Court* [2013] EWHC 1726, a case where the two search warrants failed to name the applicant but were still held to be valid.  Pitchford LJ (with whom Burnett J agreed) rejected an argument that the warrants were unlawful for breach of s 15(6) PACE:

> "45. It is conceded on behalf of the Chief Constable that each of the warrants was defective on the first ground. It is further conceded that the effect of section 15(1) is to render the entries onto property and the searches unlawful. In the circumstances of the present case, however, it is submitted on behalf of the Chief Constable that the

---

[2] The correct name for that case is in fact *R (Wood) v North Avon Magistrates' Court*

breach was technical only. The claimant was himself present at the search which took place in his own home. He would have had no difficulty, if it was relevant, in discovering the identity of the officer who made the application. No prejudice has resulted to the claimant from the fact that the officer was not named in either warrant. I accept these submissions. Section 15(1) in its terms operates to render interference with the claimant's property under the authority of the warrant unlawful but it does not render the warrant itself unlawful. The claimant is seeking discretionary relief from the court. It is most improbable, in my view, that on this ground a court would make an order quashing the warrant after its execution."

153.    Pitchford LJ concluded:

> "48. In my judgment the only ground of challenge to these warrants which has legal merit is the omission of DI Kennedy's name as the applicant on the face of the warrants. It is my view that the breach of section 15(6)(a) was so technical that in the circumstances of the present case there is no prospect that the court would use its discretionary powers either to quash the warrants or to make a declaration of invalidity. ..."

154.    The approach and reasoning in *Goode* is applicable to this case. Here too there was a failure to comply with the statutory requirement to include Ms McColl's name on the German warrants, but here too that failure was technical: it caused no confusion about who had applied for the warrant, which stated in terms that it was to be executed by HMRC, was accompanied by the Danish warrant which did name Ms McColl and it was easy for ED&F and Ms Foster to find out who had made the application; there was no prejudice whatsoever arising from the breach. I would adopt the analysis in *Goode* to conclude that the breach would not give rise to a remedy by the Court in its discretion.

155.    *G,* relied on by Ms Dobbin, was a very different case on different facts, because the applications in that case were slipshod and casual which is not a description which could be applied to these applications. Further, the single defect in the German application was merely technical, unlike the multiple failings identified in that case. Although *Fitzpatrick* refers to de minimis breaches, I think the language of a technical breach (as in *Goode*) is more appropriate, at least in this case, because the statute does require the name of the person applying for the order to be stated and a failure to do so should not be overlooked as "de minimis", although it may be merely technical.

156.    I see no difficulty in the hybrid form of the German warrant. Neither claimant developed their submissions on this point. It was in my view open to the judge to adopt HMRC's

suggestion and combine the s 9 warrant with the German EIO warrant.  Indeed, as she said, this promoted clarity because the result was a single warrant combining the two applications.

157.    I reject Ground 6.

## Ground 7 – Unlawful LPP Authorisation

158.    By Mr Bird, Ms Foster complains that the German warrant issued against her impliedly authorised the seizure of privileged material.  She points to the wording of the warrant, which only expressly excluded privileged material in relation to categories 5 (internal correspondence between employees at ED&F) and 6 (minutes and notes of meetings) out of the 10 categories of documents listed.  She argues that the resulting impression was that privileged material in other categories could be lawfully uplifted and inspected.

159.    HMRC resist this ground of challenge.  They say that the warrant expressly excluded LPP material in relation to documents in categories 5 and 6, simply because those categories were particularly likely to include LPP material, being concerned with the legal and tax treatment of cum/ex and similar transactions, whereas the other categories were very different in terms of content.  There is no requirement for warrants expressly to exclude privileged material because the exclusion operates in law, and not merely as a result of the wording of the warrant.  They say that on a reasonable construction of the warrant, there was no implied permission to officers to search for privileged material.

160.    I agree with HMRC.  In *Gittins v Central Criminal Court* [2011] EWHC 131 (Admin), Gross LJ (with whom Davis J agreed) said:

> "4) There can be no general, still less universal, rule, but, in a case such as the present where a search is to be conducted of the premises of a professional man where items subject to LPP may be encountered, no harm would be done by an express exclusion for such items.  Indeed, it might be better if the warrants in this case had included such wording.  That said, the absence of an express exclusion for items subject to LPP does not require the quashing of a warrant which is otherwise appropriately drafted. As already underlined, an exclusion of this nature is simply making express that which is in any event implicit."

161.    This answers Ms Foster's point. The German warrant did contain an express exclusion for LPP material in the two categories where such material was likely to exist.  The absence of such an express exclusion in relation to other categories did not amount to implied permission that LPP material in those categories could be uplifted.  It was implicit, and followed as a matter of law, that LPP material in all categories was excluded whether expressly stated in the warrant or not.

162.    I reject ground 7.

## Ground 8 – Article 8 ECHR

163.    The claimants complain that their rights under Article 8 of the European Convention on Human Rights ("ECHR") have been infringed.

164.    Article 8 is a qualified right.  It prohibits interference with a person's private and family life except to the extent that such interference is in accordance with the law, is necessary in a democratic society and is in the public interest.

165.    Given that I have not found any of the claimants' various challenges to the warrants to be made out, it follows that the warrants were lawful and their execution amounted to a lawful interference with the claimants' Article 8 rights.

166.    I reject ground 8.

## Conclusion

167.    I conclude that there is no merit in any of the grounds advanced.  Subject to the views of Hilliard J, I would dismiss this claim for judicial review.


## Mr Justice Hilliard:

168.    I agree.

## Appendix of Relevant Legislation

<u>CICA 2003</u>

Section 13: Requests for assistance from overseas authorities

"(1) Where a request for assistance in obtaining evidence in a part of the United Kingdom is received by the territorial authority for that part, the authority may–

(a) if the conditions in section 14 are met, arrange for the evidence to be obtained under section 15, or

(b) direct that a search warrant be applied for under or by virtue of section 16 or 17 or, in relation to evidence in Scotland, 18.

(2) The request for assistance may be made only by–

(a) a court exercising criminal jurisdiction, or a prosecuting authority, in a country outside the United Kingdom,

(b) any other authority in such a country which appears to the territorial authority to have the function of making such requests for assistance,

(c) any international authority mentioned in subsection (3).

..."

Section 16: Extension of statutory search powers in England and Wales and Northern Ireland

"(1) Part 2 of the Police and Criminal Evidence Act 1984 (c. 60) (powers of entry, search and seizure) is to have effect as if references to indictable offences] 1 in section 8 of, and Schedule 1 to, that Act included any conduct which –

(a) constitutes an offence under the law of a country outside the United Kingdom, and

(b) would, if it occurred in England and Wales, constitute an indictable offence.

(2) But an application for a warrant or order by virtue of subsection (1) may be made only–

(a) in pursuance of a direction given under section 13, or

(b) if it is an application for a warrant or order under section 8 of, or Schedule 1 to, that Act by a constable for the purposes of an investigation by an international joint investigation team of which he is a member.

..."

<u>PACE 1984</u>

Schedule 1, paragraph 2:

"2.  The first set of access conditions is fulfilled if—

(a)  there are reasonable grounds for believing—

(i) that an indictable offence has been committed;

(ii)  that there is material which consists of special procedure material or includes special procedure material and does not also include excluded material on premises specified in the application, or on premises occupied or controlled by a person specified in the application (including all such premises on which there are reasonable grounds for believing that there is such material as it is reasonably practicable so to specify);

(iii)  that the material is likely to be of substantial value (whether by itself or together with other material) to the investigation in connection with which the application is made; and

(iv)  that the material is likely to be relevant evidence;

(b)  other methods of obtaining the material—

(i)  have been tried without success; or

(ii)  have not been tried because it appeared that they were bound to fail; and

(c)  it is in the public interest, having regard—

(i)  to the benefit likely to accrue to the investigation if the material is obtained; and

(ii)  to the circumstances under which the person in possession of the material holds it,

that the material should be produced or that access to it should be given."

Schedule 1, paragraph 12:

"If on an application made by a constable a [judge]  —

(a)  is satisfied —

(i)  that either set of access conditions is fulfilled; and

(ii)  that any of the further conditions set out in paragraph 14 below is also fulfilled in relation to each set of premises specified in the application; or

(b)  is satisfied—

(i)  that the second set of access conditions is fulfilled; and

(ii)  that an order under paragraph 4 above relating to the material has not been complied with,

he may issue a warrant authorising a constable to enter and search the premises or (as the case may be) all premises occupied or controlled by the person referred to in paragraph 2(a)(ii) or 3(a), including such sets of premises as are specified in the application (an "all premises warrant")."

Schedule 1, paragraph 14:

"The further conditions mentioned in paragraph 12(a)(ii) above are—

(a) that it is not practicable to communicate with any person entitled to grant entry to the premises;

(b)  that it is practicable to communicate with a person entitled to grant entry to the premises but it is not practicable to communicate with any person entitled to grant access to the material;

(c)  that the material contains information which—

(i)  is subject to a restriction or obligation such as is mentioned in section 11(2)(b) above; and

(ii)  is likely to be disclosed in breach of it if a warrant is not issued;

(d)  that service of notice of an application for an order under paragraph 4 above may seriously prejudice the investigation."

2017 EIO Regulations

Regulation 38

> "Search warrants and production orders: nominating a court
>
> (1)  This regulation applies if it appears to the central authority that in order to give effect to the European investigation order it will be necessary for a court to issue a warrant or, as the case may be, make a production order under regulation 39.
>
> (2)  Where it appears to the central authority that the condition in paragraph (3) is met, it may by notice nominate a court to issue a warrant or make a production order.
>
> (3) The condition is that the conduct in relation to which the European investigation order was issued would, if it had occurred in the relevant part of the United Kingdom, constitute an indictable offence under the law of that part of the United Kingdom.
>
> ..."

Regulation 39

> "Search warrants and production orders: giving effect to the European investigation order
>
> (1)  Within a period prescribed by rules of court, the nominated court must give effect to the European investigation order by issuing a warrant authorising a constable—
>
> > (a)  to enter the premises to which the European investigation order relates and search the premises to the extent reasonably required for the purpose of discovering any evidence to which the order relates, and
> >
> > (b)  to seize and retain any evidence for which that constable is authorised to search.
>
> (2) But in relation to England and Wales and Northern Ireland, so far as the European investigation order relates to excluded material or special procedure material, the court must give effect to the order by making a production order (subject to paragraph (8)).
>
> ...
> (8)  The nominated court may issue a warrant under paragraph (1) in respect of excluded material or special procedure material only where—
>
> > (a)  a person has failed to comply with a production order made in respect of the same material (whether or not the court also deals with the matter as a contempt of court), or

R (MCML & Foster) v Southwark

       (b) it appears that one or more of the conditions in paragraph (9) is satisfied.

(9)  The conditions are that—

       (a)  it is not practicable to communicate with any person entitled to grant entry to the premises;

       (b) it is practicable to communicate with a person entitled to grant entry to the premises but it is not practicable to communicate with any person entitled to grant access to the material;

       (c)  the material consists of information which—

            (i)  is subject to a restriction on disclosure or obligation of secrecy under the law of the issuing State, and

            (ii)  is likely to be disclosed in breach of it if a warrant is not issued;

       (d) the making of a production order may seriously prejudice the investigation or proceedings to which the European investigation order relates."