Exhibit C



12 Endeavour Square
London
E20 1JN

Tel:  +44 (0)20 7066 1000
Fax:  +44 (0)20 7066 1099
www.fca.org.uk

---

**FINAL NOTICE**

---

To:             ED&F Man Capital Markets Ltd

Reference
Number:       194926

Address:      The News Building
              3 London Bridge Street
              London
              SE1 9SG

Date:         5 June 2023

## 1.     ACTION

1.1.    For the reasons given in this Final Notice, the Authority hereby imposes on ED&F Man Capital Markets Limited ("MCM") a financial penalty of £17,219,300 pursuant to section 206 of the Act;

1.2     MCM agreed to resolve this matter and qualified for a 30% (stage 1) discount under the Authority's executive settlement procedures. Were it not for this discount, the Authority would have imposed a financial penalty of £22,428,800 on MCM.

## 2.     SUMMARY OF REASONS

2.1   The Authority hereby takes this action because in the period February 2012 to March 2015 ("the Relevant Period"), MCM breached Principle 2 and Principle 3 of the Authority's Principles for Business:

- Principle 2 requires a firm to conduct its business with due skill, care and diligence; and

- Principle 3 requires a firm to take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems.

As explained in this notice, a direct consequence of these breaches was illegitimate payments in excess of £20 million being paid by the Danish Tax Authority, SKAT, to clients of MCM; MCM benefitted by charging £5 million in fees.

2.2   MCM's breaches date from February 2012, when MCM acquired a new equity finance business from the MF Global group ("the Equity Finance Desk"). The Equity Finance Desk had been engaged in dividend arbitrage trading strategies whilst part of the MF Global group and was to continue this business at MCM. Dividend arbitrage involves trading with the objective of placing shares into certain tax jurisdictions over dividend payment dates, often with the aim of allowing tax payable on dividends ("Withholding Taxes" or "WHT") to be reclaimed.

2.3   Through the clients of the Equity Finance Desk, which were predominantly US Pension Plans, MCM was engaged in dividend arbitrage trading in shares of issuers in a number of foreign jurisdictions during the Relevant Period.

2.4   MCM established an unregulated equity trading business in Dubai ("MPT Dubai") to carry out proprietary trading focussed on dividend arbitrage trading strategies. MPT Dubai was treated as a client of the Equity Finance Desk, although it traded at the direction of Senior Manager A who also headed up the Equity Finance Desk.

2.5   In permitting dividend arbitrage trading, MCM relied heavily on tax and legal opinions supporting and validating the trading strategies. The availability of tax and legal opinions were stated to be a fundamental plank of the approval of the business by MCM in the first instance and they were intended to be a key control as the trading proceeded from 2012 onwards. However, there were only very limited and superficial systems and controls in place to check that the required tax and legal opinions were available; there was a complete absence of any control

2

regarding the review and application of such opinions. MCM are unable to confirm that any legal and tax opinions were in fact obtained prior to or during the course of the dividend arbitrage trading by the Equity Finance Desk.

2.6     The Compliance function at MCM failed to raise any questions or concerns in relation to the tax and legal opinions despite relying heavily on them when considering possible risks arising from the dividend arbitrage trading. No one in Compliance ever saw or asked to see one of these opinions and complete reliance was placed on confirmation from a single senior manager that they were in place.

2.7     There were also fundamental failings relating to monitoring and reviewing the trading undertaken by the Equity Finance Desk. There were no systems and controls for Compliance to monitor or review the trading. MCM's Compliance function had limited understanding of dividend arbitrage trading and considered that it was essentially 'risk free' from their perspective. As such, no monitoring or reviewing processes were put in place and Compliance had limited interaction with the Equity Finance Desk other than carrying out the on-boarding of clients. Compliance left the Equity Finance Desk to run essentially un-checked, save only for a high-level annual Compliance review.

2.8     MCM was responsible for issuing the Tax Vouchers to clients which allowed WHT reclaims to be processed and these were dealt with by the Operations Desk of MCM. Despite the requirement for Tax Vouchers by foreign tax authorities in approving claims for WHT and making payments, Compliance considered that they had no role to play in overseeing the activities of the Equity Finance Desk or the Operations Desk.

2.9     That the Equity Finance Desk was left to trade without any meaningful checks or controls was despite (i) the very significant volume of equities being traded, (ii) the high value of WHT reclaims being generated through the trading strategies and (iii) the high amount of revenue being earned from this activity by MCM. Indeed, the Equity Finance Desk was the only profitable business line within MCM during 2012 and 2013.

2.10    The failures of the Compliance function were compounded by the fact that the Board Member of MCM who was responsible for the Equity Finance Desk also had limited understanding of dividend arbitrage trading. He did not provide any meaningful oversight of the Equity Finance Desk nor challenge whether any form

3

of Compliance review or oversight of the trading activities was needed. Rather, his role in relation to the Equity Finance Desk was confined to considering operational matters and financial performance.

2.11    Crystallised harm from the failings occurred in relation to a trading strategy in Danish stocks carried out by the Equity Finance Desk. Starting in December 2013, the Danish Trading Strategy involved the Equity Finance Desk facilitating trades between (i) MPT Dubai and (ii) US based Pension Plan clients, whereby MPT Dubai would supposedly sell Danish equities to the clients over dividend payment dates. However, MPT Dubai sales were by way of uncovered short positions such that at no point did the Pension Plans own the Danish shares or borrow shares from the market, no dividends were paid by the Danish issuers to the Pension Plans and no tax was withheld. Nevertheless, MCM issued Tax Vouchers to the Pension Plan clients which expressly stated the amount of "*WHT suffered*". Thus, the Tax Vouchers wrongly stated that tax had been withheld from dividend payments paid to the Pension Plan clients. These Tax Vouchers were then used to make illegitimate claims for WHT from SKAT. During the Relevant Period, the Equity Finance Desk traded equities to the value of £4.025 billion pursuant to the Danish Trading Strategy; this volume was a multiple of 10.10 times the volume traded on the wider European Exchanges.

2.12    SKAT paid Pension Plan clients of MCM approximately £20.46 million in illegitimate WHT claims pursuant to the Danish Trading Strategy, of which approximately £5.06 million was deducted by MCM by way of fees (which included a portion of the successful reclaim). This notice does not exclude the possibility that other trading strategies were facilitated by MCM that resulted in further illegitimate WHT payments by SKAT and/or other tax authorities.

2.13    In summary, MCM therefore breached both Principle 2 and Principle 3 as follows:

- MCM did not conduct its business with due skill, care and diligence because its Compliance function failed to provide any meaningful oversight to the trading activities of the Equity Finance Desk. It failed to take any steps to understand the trading activities, it failed to properly consider possible risks and what monitoring or review or other systems and controls would be appropriate from a compliance perspective in relation to the dividend arbitrage trading.

- MCM did not take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems because whilst its dividend arbitrage trading business was underpinned by the requirement for legal and tax opinions, it had inadequate systems and controls to ensure the existence of those opinions and to check that trading was carried out in line with them. Further, there were no systems and controls to monitor or review the trading activities of the Equity Finance Desk, thus allowing its trading activities to proceed entirely unchecked.

2.14    The Authority hereby imposes on MCM a financial penalty of £17.22 million pursuant to section 206 of the Act. Of this sum, £5.06 million represents disgorgement of the monies paid to MCM in connection to the Danish Trading Strategy because this sum was received by MCM as a direct result of the breaches. MCM agreed to resolve this matter and qualified for a 30% (stage 1) discount under the Authority's executive settlement procedures. Were it not for this discount, the Authority would have imposed a financial penalty totalling £22.43 million on MCM (£5.06 million of this would have remained as the disgorged sum).

## 3.    DEFINITIONS

The definitions below are used in this Notice:

"the Act" means the Financial Services and Markets Act 2000

"the Authority" means the body corporate previously known as the Financial Services Authority and renamed on 1 April 2013 as the Financial Conduct Authority

"Danish Trading Strategy" means a dividend arbitrage strategy undertaken by MCM described at paragraphs [30-33] of this Notice;

"Equity Finance Desk" means the equity finance business purchased by MCM from MF Global group in around February 2012;

"Investment Manager" means the entity appointed for discretionary management of the client's portfolio, targeting the agreed strategy;

"MCM" means ED&F Man Capital Markets Ltd;

"MF Global group" means an FSA regulated global financial derivatives broking group which entered into insolvency in 2011;

"OTC" means 'over the counter' trading which does not take place on a regulated exchange;

"Principles" means the Authority's Principles for Business;

"Relevant Period" means February 2012 to March 2015;

"Senior Manager A" means an individual with responsibility for the Equity Finance Desk at MCM;

"Senior Manager B" means a director at MCM to whom Senior Manager A reported;

"SKAT" means the Danish Tax Agency (Skattestyrelsen);

"Tax Vouchers" means a document which is submitted to a tax authority in support of a claim for Withholding Tax;

"Tribunal" means the Upper Tribunal (Tax and Chancery chamber);

"Withholding Tax" or "WHT" means a levy deducted at source from income and passed to the relevant government agency by the entity paying the income (in this case, it refers to the levy on dividends paid on shares);

"US Pension Plan" means a US 401(k) Pension Plan which is an employer-sponsored pension plan based in the United States;

## 4.    FACTS AND MATTERS

### The Equity Finance Desk and MPT Dubai

4.1    MCM is a global financial brokerage firm. During the Relevant Period it was part of the ED&F Man group. As a legal entity, it has been authorised by the Authority since December 2001 although prior to February 2012 its activities were extremely limited and it traded as ED&F Man Commodity Advisors Limited.

6

4.2    In February 2012, the ED&F Man group took steps to establish MCM as a global financial brokerage.  As part of this, MCM acquired an equity finance business ("the Equity Finance Desk") from a company within the MF Global group, an FSA regulated global financial derivatives broking group which had entered into insolvency the previous year.

4.3    Other business areas were also set up within MCM from 2012 onwards, but these were unrelated to the Equity Finance Desk.

4.4    Upon joining MCM, the operation of the Equity Finance Desk remained largely as it had been previously at MF Global:

- It was run by principally the same team who had previously operated this part of the business from within the MF Global group.

- The broker network used by the Equity Finance Desk was similar to when it was operating within the MF Global group, but an ED&F Man group entity based in Switzerland was added to the network of brokers used.

- Many of the clients of the Equity Finance Desk were the same. These were primarily US 401(k) Pension Plans ("the Pension Plans") and their associated Investment Managers. US statutes limited the sum of annual contributions to a Pension Plan at a maximum of $17,000 USD per year during the Relevant Period.

4.5    An individual with key responsibility for the operation of the Equity Finance Desk ("Senior Manager A") reported into an existing director of MCM, Senior Manager B. Senior Manager B had also previously worked at MF Global.

4.6    The Equity Finance Desk at MCM was initially intended to pursue the same line of business that it had run previously within the MF Global group: dividend arbitrage trading with respect to German stock. The business was intended to cover facilitation of client dividend arbitrage trading strategies and also proprietary trading.

4.7    However, two key changes were made to the business of the Equity Finance Desk at MCM. First, due to restrictions on proprietary trading by MCM, the Equity

7

Finance Desk was not permitted to engage in proprietary trading. Approval was therefore given for the creation of an unregulated proprietary trading company based in Dubai which would be a wholly owned subsidiary of the ED&F Man group - ED&F Man Professional Trading (Dubai) Ltd ("MPT Dubai"). Second, there were changes to the German tax rules which meant the dividend arbitrage strategies run previously in German equities could no longer be successfully run at MCM. The Equity Finance Desk therefore had to operate its dividend arbitrage trading strategies in different jurisdictions.

4.8     MPT Dubai became operational in October 2012. It operated as a client of MCM. Senior Manager A was a director of MPT Dubai, along with Senior Manager B and other ED&F Man directors. Senior Manager A was the controlling mind behind the trading of MPT Dubai. MPT Dubai had a single equity finance trader who had previously worked with Senior Manager A and who transferred from London to go and work in Dubai. MPT Dubai shared a common board of directors, back-office functionality and banking with MCM. MPT Dubai was purely a proprietary trading business; it was not permitted to have clients or to provide any services to the clients of the Equity Finance Desk.

**Dividend Arbitrage Trading**

4.9     Tax is often payable on share dividends in the jurisdiction of the issuer. The aim of a dividend arbitrage strategy is to place shares into certain tax jurisdictions over dividend dates with the aim of minimising tax charges payable on dividends or allowing for any such taxes to be reclaimed. Tax imposed on cross-border dividend payments is often referred to as Withholding Taxes ("WHT").

4.10    One commonly known dividend arbitrage strategy involves jurisdictions that have entered into 'double taxation' treaties that allow WHT to be reclaimed. A double taxation treaty between Country A and Country B would mean that where an issuer in Country A pays a dividend to a holder of its shares in Country B, the tax paid on the dividend by the shareholder (which is withheld at source) can be reclaimed from Country A's tax authority. The strategy involves temporarily transferring the ownership of shares of an issuer in Country A from the current shareholder to a new shareholder in Country B *before* the date upon which a dividend becomes payable ("cum dividend"). The dividend is paid to the shareholder in Country B on the dividend payment date with tax deducted, but that shareholder is entitled under the tax treaty to reclaim the WHT. The tax

reclaim is made by application to Country A's tax authority supported by a Tax Voucher issued by the custodian of the shares.  The Tax Voucher sets out the share ownership on the dividend date, the amount of the dividend paid and the amount of tax withheld. *After* the dividend payment date ("ex dividend"), the strategy is unwound.

4.11    This type of dividend arbitrage gives rise to significant market risk for the parties involved as the shares may rise or fall in value during the term of temporary ownership. In order to mitigate this, a strategy will often include derivative transactions to hedge market exposure. The cost of executing these strategies will usually be commercially justifiable only if large quantities of shares are traded.

4.12    During the Relevant Period, the Equity Finance Desk facilitated dividend arbitrage trading strategies in relation to a number of different jurisdictions. It executed cum-dividend trades in respect of equities to the value of approximately £10.481 billion, its clients made tax reclaims in the sum of approximately £65.463 million and it generated £128.7m in revenues for MCM.

**The Danish Trading Strategy**

4.13    One of the jurisdictions on which the dividend arbitrage trading of the Pension Plan clients of the Equity Finance Desk focussed was Denmark. Denmark had a double taxation treaty with the US during the Relevant Period, allowing US shareholders to reclaim WHT from the Danish tax authority ("SKAT").

4.14    From December 2013 onwards, a large number of trades in Danish stocks involved a particular trading scheme between MPT Dubai and Pension Plan clients of MCM ("the Danish Trading Strategy"). Based on the Danish Trading Strategy, MCM issued Tax Vouchers to the Pension Plans which stated the amount of "*WHT suffered*" and which enabled WHT to be reclaimed from SKAT. However, in reality, the shares were not purchased, borrowed or sold, and no dividend payments were made by the Danish issuers.

4.15    The essential components of the Danish Trading Strategy were as follows:

- MPT Dubai short sold shares in Danish issuers often via an inter-dealer broker, owned by the wider ED&F Man Group, to a Pension Plan prior to the cum-

9

dividend date of the relevant issuer.  At no point in the trading strategy did MPT Dubai own or borrow the shares it sold to the Pension Plan and its short positions were therefore uncovered.

- In place of a dividend, MPT Dubai would make a compensation payment to the Pension Plan in the same amount of the dividend that it would have been paid, less the tax that would have been withheld. The amount of this compensation payment was only a book entry administered by MCM and the sum was generated by MPT Dubai in book entry trading in equities and futures.

- Following the shares going ex-dividend from cum-dividend, MCM would use/sell the Pension Plans' security positions to flatten the leverage MCM had extended to the Pension Plans, known as rehypothecation.

- MPT Dubai would later enter a trade to buy back the same amount of shares via a MCM arranged trade, thus leaving a flat position for MPT Dubai.  The sale and purchase of the equity transactions would settle on the same day.

- All of the trades were split into small 'shapes' to manage MCM's credit risk. Therefore, a much larger trade size of many million shares would be divided up into a number of smaller size trades.

4.16    Despite the fact that at no time during the Danish Trading Strategy was the stock traded either purchased, borrowed or sold by MPT Dubai or the Pension Plan, eighty Tax Vouchers were issued by MCM pursuant to this strategy which wrongly confirmed tax had been withheld on dividends, resulting in around £20.465 million of WHT reclaims being paid to the Pension Plans by SKAT.

**Tax and legal opinions**

4.17    The dividend arbitrage trading to be undertaken by the Equity Finance Desk at MCM was approved by MCM on the basis that there would be legal and tax advice supporting every trade.

4.18    The Equity Finance Desk's business plan and approved trading structures were set out in a document entitled "Structured Equity Finance Opportunities" which was presented by Senior Manager A and approved by MCM's Financial Risk Committee on 20 February 2012. This confirmed as follows: "*All structured equity*

*finance trades engaged in by the desk are backed by comprehensive legal and tax opinions."*

4.19    In a further document entitled "MCM's Structured Equity Finance – Risk Approval" there was again reference to the fact that the trading structures would be supported by annually updated legal and tax advice. MCM's Group Risk Committee gave its approval to the proposed trading of the Equity Finance Desk on this basis on 15 March 2012.

4.20    The existence of legal and tax opinions supporting the trading undertaken was of central importance to the operation and oversight of the Equity Finance Desk:

- the manager overseeing the day-to-day trading of the Equity Finance Desk relied on these opinions being in place to verify the acceptability of the trading;

- Senior Management of MCM relied on these opinions, especially given they had limited understanding and no experience of dividend arbitrage trading themselves;

- the Compliance Function at MCM relied on these legal and tax opinions as a material control over the trading being undertaken by the Equity Finance Desk.

4.21    Despite this considerable level of reliance, there were no meaningful systems and controls in place to ensure that opinions were obtained or to check that the trading being carried out accorded with the structure approved in those legal and tax opinions.

4.22    The only check in place was by way of the annual Compliance Risk Assessments ("CRAs") carried out by Compliance in relation to the Equity Finance Desk. However, this check was cursory and wholly insufficient to give any assurance that the legal and tax opinions had even been obtained.

4.23    The first CRA was in June 2012 and the Compliance Department emailed the Equity Finance Desk requesting information about the legal and tax opinions, and also about Senior Management approval for transactions:

"*In the Compliance Risk Assessment it is referenced that you have had tax and legal opinions obtained for all transactions. Can you please provide evidence of*

11

*these. Are these on-off opinions or do we get an opinion on a trade by trade basis? Are these provided by external Tax advisors? Furthermore – under point 12 below – it states that all transactions are reviewed and approved by Senior Management. Is this statement correct? Following our conversations yesterday my understanding is that as long as the transactions are within the Desk and Risk Mandates no Management approval is required on a per trade basis.  Can you please confirm*."

4.24    Senior Manager A replied to this email explaining that the tax and legal opinions are historical and that "*For recent developments in the market we have liaised with our internal tax dept who in turn have spoken to external counsel….*" and "*For new transactions we would seek external advice*."  With regard to Senior Manager approval, Senior Manager A said "*If already mandated then that is not the case.  If a new structure, then it is reviewed by a committee of senior management and support partner*."

4.25    This explanation was accepted by Compliance without further checks being undertaken, either to physically see the legal and tax opinions that were said to exist or to verify the position with MCM's Tax Department.

4.26    For all future CRAs for the Equity Finance Desk from 2012-2015, the Compliance Department simply sought Senior Manager A's confirmation that tax and legal opinions were obtained for all transactions, including new transactions, and that all new transactions not covered by the Equity Finance Desk's mandate were approved by Senior Management through New Business and Transaction Committee process. This system meant that the answers given were not probed or tested and Senior Manager A repeatedly provided the confirmations sought. No further Compliance checks were carried out, despite the heavy reliance MCM placed on these opinions supporting the high-volume trading which was known to result in high value WHT reclaims being made and considerable revenue for MCM. The Compliance Function took no steps to check that the trading undertaken accorded with legal and tax opinions and did not have the ability to do so; but neither did they set up any other system for such checks to be undertaken.

4.27    Therefore, two key areas of control were missing. First, a meaningful check regarding the existence of the legal and tax opinions and, second, a system to ensure that the trading being carried out was in accordance with current legal and tax advice.

4.28    There is no evidence that any legal or tax opinions in relation to dividend arbitrage trading were ever received or reviewed by anyone at MCM during the Relevant Period. Such opinions were not found by MCM in either hard or soft copy; there is no reference to any such opinions in emails of those running the Equity Finance Desk; and none of the key personnel who relied on these opinions being in place ever saw them (including those responsible for the day-to-day trading, those in Compliance and those in Senior Management).

4.29    On only one occasion did the Equity Finance Desk seek a legal advice regarding a dividend arbitrage strategy. In April 2012, Senior Manager A engaged a global law firm regarding a dividend arbitrage strategy which the law firm described as "*extremely aggressive*" and the opinion sought was not provided.

**Compliance oversight of the Equity Finance Desk**

4.30    Compliance took the view that the trading carried out by the Equity Finance Desk was low risk because it comprised structured trades which were financed and carried out OTC (*i.e.,* 'over the counter' which means the trading was not on an exchange).   Compliance considered that this did not present MCM with money laundering risk by way of money being introduced to the firm (because the trading was financed and therefore only a small amount of money was payable by clients) or market abuse risk. As such, Compliance concluded that the trading of the Equity Finance Desk was low risk and that there was no need to monitor or review it.

4.31    Compliance took no steps to understand the trading strategies or to give proper consideration to the possibility of risks arising. Compliance took this approach despite the high volume of equities being traded, the high value of reclaims being made pursuant to the trading and subsequent substantial revenue generated for MCM. It considered that the only form of trade monitoring needed was that undertaken by the Risk department, but this monitoring was limited to considering only financial risk exposure.

4.32    The Compliance function at MCM therefore failed from the outset in a number of fundamental respects:

- It failed to take any steps to properly understand the trading undertaken by the Equity Finance Desk;

13

- It failed to consider what risks might arise (aside from money laundering and market abuse which were discounted); and

- It failed to undertake any type of trade monitoring or review.

4.33    As well as the high level obligations on firms to conduct business with due skill, care and diligence and have adequate risk management systems, the Money Laundering Regulations place specific requirements on firms to conduct on-going monitoring of their business relationships with their clients. Part of this includes scrutiny of transactions undertaken and appropriate risk-sensitive policies and procedures to monitor activities. These requirements were disregarded by MCM in relation to the clients of the Equity Finance Desk.

4.34    Aside from trading activity, other particular risks that should have been identified, considered and actioned were left unchecked.  For example:

- MPT Dubai and the Equity Finance Desk were operating on the basis that there would be no interaction between MPT Dubai and the clients of the Equity Finance Desk, however, there were no checks to ensure that these business areas operated separately. This was a clear area of risk because the same individual was in charge of the entities in the primary trading chain; MPT Dubai and the Equity Finance Desk. Most of the MPT Dubai trading was also carried out via an inter-dealer broker which was part of the ED&F Man group.  Had systems and controls around this been in place, it may have detected the uncovered short selling by MPT Dubai to clients of the Equity Finance Desk over dividend payment dates.

- There were no systems to check the correct procedures were in place in relation to the issuance of tax vouchers by the Operations Desk and, as a result, the individual responsible for producing the tax vouchers did so even in circumstances where they knew no dividend had been paid and no tax had been withheld.

MCM failed to give due consideration to the risks arising from the trading of the Equity Finance Desk and, therefore, key controls that should have been in place were missing.   The dividend arbitrage trading proceeded unchecked over a

14

considerable period of time, including a period of 15 months during which the Danish Trading Strategy was undertaken.

**5.    FAILINGS**

5.1    The statutory and regulatory provisions relevant to this Notice are set out at Annex A.

### Principle 2

5.2    Principle 2 requires a firm to act with due skill, care and diligence. MCM breached Principle 2 during the Relevant Period in relation to the dividend arbitrage trading undertaken by its Equity Finance Desk, as summarise below:

   a)    Neither the Compliance function nor Senior Management at MCM had only a basic understanding of the business of the Equity Finance Desk and allowed the business to continue trading without any steps being taken to increase their level of understanding;

   b)    There was a failure to exercise due skill and care in ensuring risks arising from the dividend arbitrage trading were properly considered and understood;

   c)    The Compliance function and Senior Management took no steps to oversee the business of the Equity Finance Desk or to ensure this business was otherwise properly reviewed and monitored.

### Principle 3

5.3    Principle 3 requires a firm to take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems. MCM breached Principle 3 during the Relevant Period in relation to the dividend arbitrage trading undertaken by its Equity Finance Desk, as summarised below:

   a)    There was no system in place to ensure tax and legal opinions were obtained as required and Compliance instead accepted Senior Manager A's word without any verification;

b) There was no system in place to assess the trading undertaken was in line with tax and legal opinions even though these opinions were meant to validate the trading strategies undertaken;

c) There were no systems in place to monitor or review the trading undertaken by the Equity Finance Desk.

## 6.    SANCTION

6.1    The Authority's policy for imposing a financial penalty is set out in Chapter 6 of DEPP. In respect of conduct occurring on or after 6 March 2010, the Authority applies a five-step framework to determine the appropriate level of financial penalty. DEPP 6.5A sets out the details of the five-step framework that applies in respect of financial penalties imposed on firms.

### Step 1: disgorgement

6.2    Pursuant to DEPP 6.5A.1G, at Step 1 the Authority seeks to deprive a firm of the financial benefit derived directly from the breach where it is practicable to quantify this.

6.3    MCM did derive direct financial benefit from its breaches because the fees it received from the Danish Trading Strategy were earned as a direct result of the breaches.

6.4    Step 1 is therefore £5,063,821.72.

### Step 2: the seriousness of the breach

6.5    Pursuant to DEPP 6.5A.2G, at Step 2 the Authority determines a figure that reflects the seriousness of the breach. Where the amount of revenue generated by a firm from a particular product line or business area is indicative of the harm or potential harm that its breach may cause, that figure will be based on a percentage of the firm's revenue from the relevant products or business area.

6.6    The Authority considers that the revenue generated by the Equity Finance Desk of MCM is indicative of the harm or potential harm caused by its breach. The Authority has therefore determined a figure based on a percentage of the Equity

Finance Desk's relevant revenue during the Relevant Period. The Authority considers the relevant revenue for this period to be £128,629,948.39.

6.7    In deciding on the percentage of the relevant revenue that forms the basis of the step 2 figure, the Authority considers the seriousness of the breach and chooses a percentage between 0% and 20%. This range is divided into five fixed levels which represent, on a sliding scale, the seriousness of the breach; the more serious the breach, the higher the level. For penalties imposed on firms there are the following five levels:

Level 1 – 0%

Level 2 – 5%

Level 3 – 10%

Level 4 – 15%

Level 5 – 20%

6.8    In assessing the seriousness level, the Authority takes into account various factors which reflect the impact and nature of the breach, and whether it was committed deliberately or recklessly. DEPP 6.5A.2G(11) lists factors likely to be considered 'level 4 or 5 factors'. Of these, the Authority considers the following factors to be relevant:

(a)    The breach caused a significant loss or risk of loss to individual consumers, investors or other market users.

The breaches resulted in the issuance of Tax Vouchers that allowed for illegitimate claims for WHT to be made of SKAT causing significant loss. There was a wider risk of loss from the trading outside the Danish Trading Strategy and it is possible that further illegitimate payments were made by SKAT or other tax authorities pursuant to trading facilitated by the Equity Finance Desk.

(b)    The breach revealed serious or systemic weaknesses in the firm's procedures or in the management systems or internal controls relating to all or part of the firm's business.

The procedures and systems around risk arising from the trading by the Equity Finance Desk were both serious and systemic; these were not isolated aspects of an otherwise adequate system and they were not minor matters.

(d)  The breach created a significant risk that financial crime would be facilitated, occasioned or otherwise occur.

The risk of financial crime arose from the breaches because the Equity Finance Desk was allowed to trade over a significant period of time without any meaningful oversight.

(f)  The breach was committed deliberately or recklessly.

Whilst the breaches were not deliberate, there were at least aspects of recklessness. For example, both Senior Manager B and the head of Compliance knew that they did not understand the trading of the Equity Finance Desk, yet they allowed it to proceed without any meaningful checks or controls.  They much have known that this gave rise to risk as they were aware of their basic level of understanding, but the trading was allowed to continue regardless.

6.9  DEPP 6.5A.2G(12) lists factors likely to be considered 'level 1, 2 or 3 factors'. We do not consider that any of these are relevant such that the breaches would be considered to be seriousness level 3 or below.

6.10  Taking all of these factors into account, the Authority considers the seriousness of the breach to be level 4 and so the Step 2 figure is 15% of £128,629,948.39.

6.11  Step 2 is therefore £19,294,492.26.

**Step 3: mitigating and aggravating factors**

6.12  Pursuant to DEPP 6.5A.3G, at Step 3 the Authority may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

6.13  The Authority considers that the following factor mitigates the breach:

(1)  MCM took the initiative to commission third party reviews by both forensic consultants and legal advisors to review the Danish Trading Strategy and

its Compliance procedures. MCM reviewed the reports and accepted the findings that the Danish Trading Strategy had resulted in illegitimate claims for WHT. It provided the unredacted privileged reports to the Authority, which assisted the investigation.

6.14   The Authority considers that there are no aggravating factors.

6.15   Having taken into account this mitigation, the Authority considers that the Step 2 figure should be decreased by 10%.

6.16   Step 3 is therefore £17,365,043.03.

**Step 4: adjustment for deterrence**

6.17   Pursuant to DEPP 6.5A.4G, if the Authority considers the figure arrived at after Step 3 is insufficient to deter the firm who committed the breach, or others, from committing further or similar breaches, then the Authority may increase the penalty.

6.18   The Authority considers that the Step 3 figure of £17,365,043.03 represents a sufficient deterrent to MCM and others, and so has not increased the penalty at Step 4.

6.19   Step 4 is therefore £17,365,043.03.

**Step 5: settlement discount**

6.20   Pursuant to DEPP 6.5A.5G, if the Authority and the firm on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the Authority and the firm reached agreement. The settlement discount does not apply to the disgorgement of any benefit calculated at Step 1.

6.21   The Authority and MCM reached agreement at Stage 1 and so a 30% discount applies to the Step 4 figure.

6.22    The Authority has rounded down the final penalty to the nearest £100. Step 5 is therefore £17,219,300.

**Penalty**

6.23    The Authority hereby imposes a total financial penalty of £17,219,300 on MCM for breaching Principle 2 and Principle 3.

## 7.    PROCEDURAL MATTERS

7.1.    This Notice is given to MCM under and in accordance with section 390 of the Act. The following statutory rights are important.

**Decision maker**

7.2.    The decision which gave rise to the obligation to give this Notice was made by the Settlement Decision Makers.

**Manner and time for payment**

7.3.    The financial penalty must be paid in full by MCM to the Authority no later than 20 June 2023.

**If the financial penalty is not paid**

7.4.    If all or any of the financial penalty is outstanding on 21 June 2023, the Authority may recover the outstanding amount as a debt owed by MCM and due to the Authority.

**Publicity**

7.5.    Sections 391(4), 391(6) and 391(7) of the Act apply to the publication of information about the matter to which this notice relates. Under those provisions, the Authority must publish such information about the matter to which this notice relates as the Authority considers appropriate. The information may be published in such manner as the Authority considers appropriate. However, the Authority may not publish information if such publication would, in the opinion of the

Authority, be unfair to you or prejudicial to the interests of consumers or detrimental to the stability of the UK financial system.

7.6.    The Authority intends to publish such information about the matter to which this Final Notice relates as it considers appropriate.

**Authority contacts**

7.7    For more information concerning this matter generally, contact Giles Harry (direct line: 020 7066 8072 / giles.harry@fca.org.uk) of the Enforcement and Market Oversight Division of the Authority.

Mario Theodosiou

**Head of Department**

**Financial Conduct Authority, Enforcement and Market Oversight Division**

<u>**ANNEX A**</u>

**RELEVANT STATUTORY AND REGULATORY
PROVISIONS**

**1.    RELEVANT STATUTORY PROVISIONS**

**Financial Services and Markets Act 2000**

1.1.    The Authority's statutory objectives, set out in section 1B(3) of the Act, include the integrity objective (section 1D FSMA).

1.2.    Section 206(1) of the Act provides:

> "If the Authority considers that an authorised person has contravened a requirement imposed on him by or under this Act… it may impose on him a penalty, in respect of the contravention, of such amount as it considers appropriate."

1.3.    ED&F Man Capital Markets Limited ("MCM") is an authorised person for the purposes of Section 206 of the Act.

**2.    RELEVANT REGULATORY PROVISIONS**

2.1.    In exercising its powers to impose a financial penalty, the Authority has had regard to the relevant regulatory provisions published in the Authority's handbook. The main provisions that the Authority considers relevant are set out below.

*Principles for Businesses*

2.2.    The Principles are a general statement of the fundamental obligations of firms under the regulatory system and are set out in the Authority's Handbook. They derive their authority from the Authority's rule-making powers set out in the Act.

The relevant Principles are as follows.

22

a)    Principle 2 provides that a firm must conduct its business with due skill, care and diligence;

b)    Principle 3 provides that a firm must take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems.

## 3.    RELEVANT GUIDANCE

### *Decision Procedures and Penalties Manual (DEPP)*

3.1.    Chapter 6 of DEPP, which forms part of the Authority's Handbook, sets out the Authority's statement of policy with respect to the imposition and amount of financial penalties under the Act.

### *The Enforcement Guide*

3.2.    The Enforcement Guide sets out the Authority's approach to exercising its main enforcement powers under the Act.

3.3.    Chapter 7 of the Enforcement Guide sets out the Authority's approach to exercising its power to impose a financial penalty.

23