UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTERFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:<br>18-cv-07824; 18-cv-07827; 18-cv-07828; 18-cv-07829; 19-cv-01781; 19-cv-01783; 19-cv-01785; 19-cv-01788; 19-cv-01791; 19-cv-01792; 19-cv-01794; 19-cv-01798; 19-cv-01800; 19-cv-01801; 19-cv-01803; 19-cv-01806; 19-cv-01808; 19-cv-01809; 19-cv-01810; 19-cv-01812; 19-cv-01813; 19-cv-01815; 19-cv-01818; 19-cv-01866; 19-cv-01867; 19-cv-01868; 19-cv-01869; 19-cv-01870; 19-cv-01871; 19-cv-01873; 19-cv-01894; 19-cv-01896; 19-cv-01918; 19-cv-01922; 19-cv-01926; 19-cv-01928; 19-cv-01929; 19-cv-01931; 19-cv-10713; 21-cv-05339. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO SKAT'S MOTION TO EXCLUDE THE TESTIMONY OF DR. EMRE CARR**

## TABLE OF CONTENTS

DR. CARR'S OPINIONS ARE WELL SUPPORTED ................................................................ 1
ARGUMENT ................................................................................................................................ 4
    A.    Dr. Carr's Opinions On Net Settlement Are Reliable ............................................. 4
    B.    Dr. Carr's Opinions On Net Settlement Are Relevant ............................................ 7
    C.    Dr. Carr Does Not Opine On What The Defendants Knew ................................. 10
CONCLUSION ........................................................................................................................... 11

# TABLE OF AUTHORITIES
Page(s)

**CASES**

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997) ........................................................................................................... 6

*In re Rezulin Products Liability Litigation*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................................... 6

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
    306 F.3d 99 (2d Cir. 2002) ................................................................................................ 7

**OTHER AUTHORITIES**

Adam Kirk, James McAndrews, Parinitha Sastry, Phillip Weed, *Matching Collateral Supply and Financing Demands in Dealer Banks*, FRBNY Economic Policy Review, Dec. 2014) ............................................................................. 4

Bank of England Prudential Regulation Authority, *Statement of Policy, Pillar 2 Liquidity*, June 2019, https://www.bankofengland.co.uk/-/media/boe/files/prudential-regulation/statement-of-policy/2023/pillar-2-liquidity-december-2023.pdf  (last accessed July 3, 2024) ......................................... 4

Banque de France, *Payments and Market Infrastructure in the Digital Era*, January 2021, Chapter 13, https://www.banque-france.fr/system/files/2023-04/payments_market.pdf (last accessed July 3, 2024) ................................................ 3

Banque de France, *Payments and Market Infrastructure in the Digital Era*, January 2021, Chapter 13, https://www.banque-france.fr/system/files/2023-04/payments_market.pdf (last accessed July 3, 2024) ................................................ 3

BIS, *Glossary: DvP Model 3,* https://www.bis.org/publ/qtrpdf/r_qt2003c.pdf (last accessed July 3, 2024) ....................................................................................................... 3

ESMA, *Report to the European Commission: CSDR Internalised Settlement*, Nov. 5, 2020, https://www.esma.europa.eu/sites/default/files/library/esma70-156-3729_csdr_report_to_ec_-_internalised_settlement.pdf (last accessed July 3, 2024) ............................................................................................................................... 3

European Banking Federation, *EBF Response to ESMA's CSDR Guidelines on Internalised Settlement Reporting*, Sept. 14, 2017, https://www.ebf.eu/wp-content/uploads/2017/09/2017-09-14-EBF-response-to-ESMA-CSDR-Guidelines-on-Internalised-Settleme....pdf (last accessed July 3, 2024) ................................. 3

London Stock Exchange, *Rules of the London Stock Exchange: Rule Book*,
    Effective July 1, 2019,
    https://docs.londonstockexchange.com/sites/default/files/documents/rules-
    lse.pdf (last accessed July 3, 2024) ........................................................................................4

SKAT's motion to exclude portions of Dr. Emre Carr's proposed testimony begins from the premise that SKAT has already proven its case and ends by insisting that any opinions that may undermine SKAT's case ought to be inadmissible because they would confuse the jury. This is not how Rule 702 works, and SKAT's motion provides no legitimate basis to exclude any portion of Dr. Carr's testimony. Because Dr. Carr's expert testimony is relevant and reliable—supported by abundant evidence that is consistent with the materials an expert in his field would ordinarily consult—it ought to be admitted, and SKAT can present its critique to the jury by subjecting Dr. Carr to the crucible of cross-examination.

## DR. CARR'S OPINIONS ARE WELL SUPPORTED

There is no genuine question that Dr. Emre Carr has relevant expertise to opine on the transactions at issue in this case. His academic credentials include an MBA from the University of Southern California and a Ph.D. from the Kellogg School of Management at Northwestern University, where Dr. Carr authored a dissertation that related to structured finance transactions. Carr Report ¶¶ 11-12. Professionally, he spent years as a Senior Financial Economist at the United States Securities & Exchange Commission, where he led economic analysis in the SEC's Division of Risk, Strategy, and Financial Innovation, providing sophisticated interdisciplinary analysis and economic advice across the entire spectrum of SEC activities. *Id.* ¶¶ 7-8. At the SEC, Dr. Carr participated in investigations of global banks, broker-dealers, and investment firms, and his work related to all sorts of securities including equities, swaps, other derivatives, and structured financial products. *Id.* He has taught at some of the leading academic institutions in the world, including Columbia University. *Id.* ¶ 10.

Across three reports in this case, Dr. Carr offers a number of opinions that collectively establish the following propositions: *first*, the structured finance transactions in this case used numerous accepted market practices and provided the pension plans with an economic claim to

receive payments of dividend amounts, and *second*, SKAT's experts have failed to prove that the transactions were "fake." In each of his reports, Dr. Carr analyzed several of the transactions SKAT has challenged in this litigation. Dr. Carr opined that these transactions are an example of "dividend arbitrage strategies," which "are neither new nor unique examples of how tax incentives influence financial decisions and investment strategies." Carr Report ¶ 17(a)-(b). Dr. Carr described the processes of structured transactions and trading over-the-counter ("OTC"), which are both widely accepted market practices. Carr Rebuttal ¶ 8(a)-(b). Further, Dr. Carr stated that the analyzed transactions "followed numerous other accepted market practices," including an "industry-standard template for give-up agreements related to the trade executions and the industry-standard Global Master Securities Lending Agreement ('GMSLA') template for their stock lending transactions." *Id.* ¶ 8(c). In the course of his analysis, Dr. Carr described the market practices of net settlement and settlement internalization. Notably, SKAT does not challenge Dr. Carr's expertise or basis for expressing his opinions as to the processes for structured transactions, trading OTC, and the analyzed transactions' compliance with other accepted market practices.

SKAT's challenge is limited to Dr. Carr's opinions regarding net and internal settlement, but those opinions are well supported. As Dr. Carr explains in Paragraphs 113-118 of his Rebuttal Report, "a custodian can settle multiple trades simultaneously, and net settle offsetting transactions." Carr Rebuttal ¶ 113. Thus, "if two or more clients of a Solo Custodian engage in offsetting trades in a Danish stock (e.g., a buy and a sell order) settling on the same day, the custodian can net all the trades. If the trades involve the same number of shares, the custodian's holdings will not change after these offsetting trades." *Id.* This is hardly theoretical, let alone *ispe dixit*. As Dr. Carr explains, VP, the Danish central securities depository "allows for net simultaneous settlement of funds and securities," and EU regulations issued as far back as July

2014 explicitly describe the practice of internalized settlement.[1]  In fact, a report issued by the European Securities and Markets Authority ("ESMA") notes that "[t]he majority of internalised settlement instructions (based on their number) concerns equities," and that "trades worth *trillions* of Euros were settled through internalized settlement."[2]

Dr. Carr provides additional support for his opinions regarding net settlement and internal settlement in his Reply Report.  Indeed, Dr. Carr notes in his Reply Report that the practice of internal settlement is "very common and was formally recognized in EU regulations in 2017."[3] Moreover, Dr. Carr stated that netting is very common, noting that SKAT admitted in its responses to an interrogatory that it uses netting in assessing its taxes.[4]  Dr. Carr also cites to the London Stock Exchange Rule Book for the proposition that zero cash and zero stock position is a possible outcome in a net settlement; a Policy Statement from the Bank of England for the proposition that Solo could have settled the analyzed transactions even though it did not have the shares or sufficient cash for all of the transactions it settled; and a paper published by current and former

---

[1] Carr Rebuttal ¶¶ 115-116 (citing BIS, *Glossary: DvP Model 3*, https://www.bis.org/publ/qtrpdf/r_qt2003c.pdf (last accessed July 3, 2024); Banque de France, *Payments and Market Infrastructure in the Digital Era*, January 2021, Chapter 13, at 220https://www.banque-france.fr/system/files/2023-04/payments_market.pdf (last accessed July 3, 2024); Regulation (EU) No 909/2014 Of The European Parliament And Of The Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositories and amending Directives 98/26/EC and 2014/65/EU and Regulation (EU) No 236/2012, Chapter IV, "Internalized Settlement.").

[2] Carr Rebuttal ¶ 116 (citing ESMA, *Report to the European Commission: CSDR Internalised Settlement*, Nov. 5, 2020, at 23, https://www.esma.europa.eu/sites/default/files/library/esma70-156-3729_csdr_report_to_ec_-_internalised_settlement.pdf (last accessed July 3, 2024)).

[3] Carr Reply ¶ 58 (citing European Banking Federation, *EBF Response to ESMA's CSDR Guidelines on Internalised Settlement Reporting*, Sept. 14, 2017, at 3, https://www.ebf.eu/wp-content/uploads/2017/09/2017-09-14-EBF-response-to-ESMA-CSDR-Guidelines-on-Internalised-Settleme....pdf (last accessed on July 3, 2024) ("Furthermore, Art. 1 para 1 of Regulation (EU) 2017/391 defines that 'internalised settlement instruction' means 'an instruction by a client of the settlement internaliser to place at the disposal of the recipient an amount of money or to transfer the title to, or interest in, a security or securities by means of a book entry on a register, or otherwise, which is settled by the settlement internaliser in its own books and not through a securities settlement system.")).

[4] Carr Reply ¶ 63 (citing Plaintiff Skatteforvaltningen's Amended Response And Objections To Interrogatory No. 10 From Defendants' Second Set Of Interrogatories, p. 4 ("company taxes are paid on a balance principle, in which a company's tax liabilities to SKAT are aggregated and offset by any tax credits/refunds due from SKAT to that company")).

researchers at the Federal Reserve Bank of New York for the proposition that a prime broker can internalize trading activities, and there is no need for sourcing funds externally for a client needing financing.[5]

## ARGUMENT

### A. Dr. Carr's Opinions On Net Settlement Are Reliable

SKAT's attack on Dr. Carr's opinions is misdirected. SKAT begins its challenge by characterizing as "*ipse dixit*" Dr. Carr's conclusion "that the plans had an economic claim to dividends" because the Solo custodians could have "'net settled' the plans' share purchases." Mot. 11; *see also id.* (critiquing the opinion as supported by "nothing more than his say so," in case the previous use of Latin was insufficient). But as SKAT itself admits, there are many "sources on which Dr. Carr relies" for the opinion SKAT is challenging, *Id.* That is the opposite of *ipse dixit*.

Indeed, Dr. Carr cites to abundant authority for the unremarkable proposition that a custodian can engage in net settlement and settlement internalization to settle equal and offsetting transactions without going to the market to obtain shares. For example:

- Bank of England: "If a PB [Prime Broker] has two clients that are taking opposite positions on the same asset (one long, the other short), the PB may ***internally net these amounts to avoid having to fund the positions elsewhere***: a client short position is therefore funding a client long position. Liquidity risk arises if one client wishes to withdraw from their transaction: the PB will either need to find additional funding ***or will need to purchase or borrow the asset to match the remaining transaction***."

---

[5] *See* Carr Reply ¶¶ 68-71 (citing London Stock Exchange, *Rules of the London Stock Exchange: Rule Book*, Effective July 1, 2019, at 68, https://docs.londonstockexchange.com/sites/default/files/documents/rules-lse.pdf (last accessed July 3, 2024); Bank of England Prudential Regulation Authority, *Statement of Policy, Pillar 2 Liquidity*, June 2019, at 10, https://www.bankofengland.co.uk/-/media/boe/files/prudential-regulation/statement-of-policy/2023/pillar-2-liquidity-december-2023.pdf (last accessed July 3, 2024); Adam Kirk, James McAndrews, Parinitha Sastry, Phillip Weed, *Matching Collateral Supply and Financing Demands in Dealer Banks*, FRBNY Economic Policy Review, Dec. 2014, at 134).

- London Stock Exchange: "[A] net settlement which results in a ***zero cash and zero stock position may still be created***, 'settle' on ISD [intended settlement date] and be time-stamped at the time of settlement."

- Federal Reserve Bank of New York: "Dealers achieve yet another source of collateralized financing efficiency by 'internalizing' their trading activities, that is, by using offsetting trading positions between two clients or between clients and the dealer bank to 'finance' each other. Similar to the concept of matched book, opportunities to 'internalize' can arise via the provision of funds by the dealer bank collateralized by client securities. Those securities are then ***reused and delivered into another transaction as a means of financing the client position***."

Carr Reply ¶¶ 68-71 (emphasis added and in original). And there's more: as referenced above, Dr. Carr also has cited to supporting authority from the Bank for International Settlements, the Banque de France, the EU, the ESMA, the European Banking Federation, and SKAT itself.

Of this litany of sources, SKAT only directly acknowledges the Federal Reserve paper and the London Stock Exchange Rule Book, asserting in a glancing and conclusory manner that these authorities "do[] not support" Dr. Carr's opinions. Mot. 11-12. Notably, however, when given the chance to depose Dr. Carr, SKAT never confronted Dr. Carr on the supposed discrepancies between these sources and his opinions. SKAT does not even reference by name the other sources cited by Dr. Carr—including the formal "Statement of Policy" of the Bank of England quoted above. SKAT simply states that these sources "say nothing one way or the other about whether settlement without shares at the Solo custodians was possible" and provides a footnote replete with parentheticals but devoid of context. *Id.* at 12. Of course these sources do not directly say whether "settlement without shares" was "possible" in the precise circumstances at issue here—they are

- 5 -

statements by regulatory bodies that announce general principles.  But the authorities cited by Dr. Carr repeatedly recognize the propriety of net and internal settlement.  SKAT has not come close to demonstrating that those well accepted techniques cannot reasonably be applied to the transactions at issue here.  It would be improper to strike an expert opinion for a purported "analytical gap" between the sources on which the expert relies and "the opinion proffered" where, as here, the party moving to exclude never asked the expert about the alleged lack of fit between the source and opinion and failed to present more than a conclusory explanation as to why a gap exists.  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see Joiner*, 522 U.S. at 144-145 (rejection of expert testimony was not abuse of discretion because the animal studies the experts relied on "were *so dissimilar to the facts* presented in this litigation," which involved an electrician's potential exposure to cancer-causing substances on the job) (emphasis added).

SKAT's invocation of regulatory action against non-parties by the U.K. Financial Conduct Authority ("FCA") does not support its position.  As an initial matter, the relevant question here is not about whether Solo Capital violated British securities laws (which the FCA might at least be able to speak to), but about the veracity of U.S. pension plans' statements about their beneficial ownership of **Danish** dividends arising under **Danish law**.  The FCA's view of conduct by non-parties to this litigation is irrelevant.  Even if it were, however, SKAT's own quotes from the FCA's decisions undermine its arguments here:  the FCA acknowledged that "legitimate trades between parties who use the same custodian can be net settled," and that the "industry practice of internalized, or book-entry, settlements" was "normal" industry practice. Mot. 13-14. Further, the FCA made clear that it was ***not*** making a determination about whether "the applications for

- 6 -

Withholding Tax were fraudulent, and whether or not the Trading Strategy was lawful," as this was "beyond the scope" of its inquiry. Weinstein Decl. Ex. 21 at 40.

Dr. Carr's testimony is built upon a reliable foundation, and there is no basis to exclude it.

### B.   Dr. Carr's Opinions On Net Settlement Are Relevant

SKAT is flatly wrong in arguing that Dr. Carr's opinions about net settlement are irrelevant. At the outset, the bar for establishing relevance of evidence, including expert testimony, is extremely low. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 n.3 (2d Cir. 2002) (quoting Fed. R. Evid. 401) ("'Relevant evidence' means evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (emphasis in original)). Dr. Carr's opinion about net settlement easily meets that standard because it tends to rebut one of SKAT's arguments: that the absence of shares at the custodian would imply the absence of beneficial share ownership by each of the custodian's account holders. Dr. Carr's opinion on this point is supported not only by the sources he cites, but also by other record evidence in this case. For example, a representative of the Danish securities depository explained under oath the following: if a custodian begins the day with zero shares, and has one customer who buys 100 shares and another customer who sells 100 shares of the same security, the custodian will end the day with zero shares. Ex. 1 (Sorensen Vol. 2 Tr. 60-63). And Danish legal expert Kasper Pilgaard explained:

> [It]t is a well understood market phenomenon both within Denmark and around the world that ordinary trading activity can result in claims to ownership of shares in excess of the number of shares issued by the company. Within Denmark, this has been recognized by the Ministry of Taxation itself: in a Reply to Early Warning, the Ministry acknowledged that "the share loan structure carries the risk" that both a securities lender (deemed the beneficial owner of shares for tax purposes) and the securities borrower (reported to SKAT as owner of the shares) could "seek reimbursement for the dividend tax." In other words, SKAT acknowledges that two different investors could claim to be the owner of the same share.

> Another well-known example involved shares of the public company GameStop. As a result of securities lending and short selling—both of which are legal in Denmark—investors shorted shares representing more than 100% of the company's "float." I am aware of no regulation or rule of law in Denmark that would prevent shareholders in a Danish company from holding long or short positions that exceed more than 100% of the issued shares of that company as a result of securities lending. In other words, what happened to GameStop could just as easily have happened to Maersk.

Ex. 2 (Pilgaard June 27, 2022 Decl. ¶¶ 85-86).[6]

SKAT contends that the combination of (a) its legal argument that *nemo dat* applies, and (b) its factual argument that Solo held no Danish shares together establish that Dr. Carr's opinions about net and internal settlement should not even be heard by the jury. That is incorrect for multiple reasons. *First*, in denying SKAT's motion for summary judgment on falsity, this Court squarely ruled that SKAT has not proven that Solo held no shares. *See* Order Denying SKAT's Summary Judgment Motion at 2 ("there is a genuine issue of material fact as to whether the Danish shares that the bellwether defendants claim they beneficially owned in fact existed"). It cannot be the case that this factual proposition is so well established that the admissibility of other evidence must be judged by presuming it to be true.[7] *Second*, SKAT's core legal proposition regarding *nemo dat* is hotly contested and will need to be resolved in connection with the pending motions regarding foreign law. *See* ECF No. 1077 (Defs.' 44.1 Brief) at 7 (quoting James Steven Rogers, *Policy Perspectives on Revised U.C.C. Article 8*, 43 UCLA L. Rev. 1431, 1461-62 (1996)) ("[T]he general rule of *nemo dat* has never been thought appropriate for investment securities."); *id.* at 8 ("Under a *nemo dat* regime, short sales would be a nullity until settlement. But that is not the way

---

[6] SKAT labels Dr. Carr's analysis as "far-fetched" because it would supposedly allow the creation of "economic claims to Danish Dividends out of thin air." Mot. 2. But as the Gamestop example illustrates, legitimate transactions can sometimes result in the purchase or sale of more shares than a company has issued.

[7] SKAT's citation to Sanjay Shah's testimony in the U.K. proceeding, Mot. 9 n.10, changes nothing, as Defendants have had no opportunity to question Mr. Shah.

the market works, and it would be profoundly destabilizing of markets…. The application of *nemo dat* to securities transactions is simply incompatible with stable financial markets and has no place in this case.").[8]

SKAT mischaracterizes the Court as having already held that "'the starting point'" is "'whether the [short sellers] from which the defendants purportedly purchased the shares owned the shares in the first place.'" Mot. 15 (quoting Order Denying Defendants' Summary Judgment Motion ("SJ Decision") at 22). But SKAT leaves out both the sentence before the one it quotes, which begins "Skat contends", and the sentence immediately after, which summarizes the sentence fragment SKAT quotes as meaning only that the Court "*might* not need to reach the question of whether the defendants beneficially owned the shares." SJ Decision at 22 (emphasis added). Read in context, the passage SKAT quotes summarizes SKAT's argument; it does not endorse it. This is miles away from SKAT's suggestion that the matter is already decided and no contrary testimony permissible. And the legal position SKAT mistakenly attributes to the Court—that a short sale transfers ownership only when the seller "owned the shares in the first place"—is contrary to the whole idea of short selling. As the Securities and Exchange Commission has succinctly explained, "[s]hort selling involves the sale of a stock that the seller does not own." Staff Report on Equity and Options Market Structure Conditions in Early 2021, at 24 n. 74.

---

[8] Pilgaard explained the inapplicability of *nemo dat* to Danish securities transactions in his Declaration:

> [F]or many years, the practice of "naked short selling" was, in fact, legal in Denmark. A naked short seller is a seller of shares who does not own them and has no right to acquire them. Of course, it would not be possible for naked short selling to exist at all—and give rise to gains and losses—if those trades were nullities because of the concept of *nemo dat*. When naked short sales were permitted in Denmark (before 2012), Danish tax law did not treat naked short sales any differently from other sales, including from the perspective of the buyer of shares (sold by a short seller) who was the tax owner even though no shares existed.

Ex. 2 (Pilgaard June 27, 2022 Decl. ¶ 93).

Third, even if Solo held no shares, and even if *nemo dat* applies, it simply does not follow that Dr. Carr's opinion about net settlement would be irrelevant to this case. There would still be a disputed issue about whether the absence of shares at the custodian means that the custodian's customers lack beneficial ownership of dividends on shares the custodian's own records indicated they purchased. And Dr. Carr's opinion would support a conclusion by the jury that the custodian's employment of a routine practice like net settlement does not deprive the custodian's customers of beneficial ownership of the securities they purchased through the custodian. That is, a jury could reasonably find support in Dr. Carr's opinion for the conclusion that the reason the custodian held no shares was not that the trading was fictitious, but rather because that was an appropriate way, consistent with regulatory guidance, for the custodian to manage its (and its clients) own capital needs.

For all of these reasons, Dr. Carr's testimony regarding net settlement is relevant and reliable. SKAT may think that it has "proven" that "there are no shares," but this Court has already found that it will be up to the jury to render that judgment. SKAT is, of course, free to cross-examine Dr. Carr on that subject. But SKAT's misguided belief that it has already proven its case is no basis to exclude reliable expert testimony.

### C. Dr. Carr Does Not Opine On What The Defendants Knew

Finally, SKAT seeks to preclude Dr. Carr from opining "about what the defendants knew," Mot. 17, but its brief reveals no instance in which Dr. Carr did any such thing. Rather, Dr. Carr made the appropriate point that **SKAT's experts** had failed to demonstrate that the pension plans knew about (A) trades to which they were not parties, and (B) whether Solo's holdings included Danish securities. Carr Rebuttal ¶¶ 8(g) & 83. This says nothing about what Defendants knew or did not know, but merely speaks to SKAT's failure of proof. Having not supplied inadmissible state of mind opinions in the first place, there is nothing for this Court to exclude.

## CONCLUSION

Dr. Carr's challenged opinions are relevant, they are reliable, and they ought to be presented to the jury. SKAT's *Daubert* motion should be denied.

Dated: New York, New York
July 3, 2024

Respectfully submitted,

/s/ *Peter G. Neiman*
Boyd M. Johnson
Peter G. Neiman
Alan E. Schoenfeld
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Boyd.Johnson@wilmerhale.com
Peter.Neiman@wilmerhale.com
Alan.Schoenfeld@wilmerhale.com

Andrew S. Dulberg
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6352
Andrew.Dulberg@wilmerhale.com

*Attorneys for Richard Markowitz, Jocelyn Markowitz, Avanix Management LLC Roth 401(K) Plan, Batavia Capital Pension Plan, Calypso Investments Pension Plan, Cavus Systems LLC Roth 401(K) Plan, Hadron Industries LLC Roth 401(K) Plan, RJM Capital Pension Plan, RJM Capital Pension Plan Trust, Routt Capital Pension Plan, Routt Capital Trust*

/s/ *Sharon L. McCarthy*
Sharon L. McCarthy
KOSTELANETZ LLP
7 World Trade Center
250 Greenwich Street
34th Floor
New York, NY 10007
(212) 808-8100
smccarthy@kostelanetz.com

        Nicholas S. Bahnsen
        Daniel C. Davidson
        KOSTELANETZ LLP
        601 New Jersey Avenue, NW
        Suite 260
        Washington, DC 20001
        (202) 875-8000
        nbahnsen@kostelanetz.com
        ddavidson@kostelanetz.com

*Attorneys for Defendants John van Merkensteijn, III, Elizabeth van Merkensteijn, Azalea Pensión Plan, Basalt Ventures LLC Roth 401(K) Plan, Bernina Pension Plan, Bernina Pension Plan Trust, Michelle Investments Pension Plan, Omineca Pension Plan, Omineca Trust, Remece Investments LLC Pension Plan, Starfish Capital Management LLC Roth 401(K) Plan, Tarvos Pension Plan, Voojo Productions LLC Roth 401(K) Plan, Xiphias LLC Pension Plan*

/s/ *David L. Goldberg*
David L. Goldberg
Michael M. Rosensaft
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY 10020
(212) 940-8800
david.goldberg@katten.com
michael.rosensaft@katten.com

*Attorneys for Defendants Robert Klugman, RAK Investment Trust, Aerovane Logistics LLC Roth 401K Plan, Edgepoint Capital LLC Roth 401K Plan, Headsail Manufacturing LLC Roth 401K Plan, The Random Holdings 401K Plan, The Stor Capital Consulting LLC 401K Plan*

/s/ *Thomas E.L. Dewey*
Thomas E.L. Dewey
Sean K. Mullen
DEWEY PEGNO & KRAMARSKY LLP
777 Third Avenue

- 13 -

37th Floor
New York, New York 10017
(212) 943-9000
tdewey@dpklaw.com
smullen@dpklaw.com

/s/ *Elliot R. Peters*
Elliot R. Peters
Julia L. Allen
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111
(415) 962-7188
epeters@keker.com
jallen@keker.com

*Attorneys for Defendant Michael Ben-Jacob*

- 15 -

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024 the foregoing document was served electronically to all parties of record by the CM/ECF system.

                                                  */s/ Peter G. Neiman*
                                                  Peter G. Neiman

July 3, 2024