# Exhibit 1

CONFIDENTIAL
C. Frederick Reish - March 25, 2022

Page 1

```
 1            UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
 2              CASE NO.  18-MD-2865 (LAK)

 3   _____
                                         )
 4   IN RE:                              )
                                         )
 5   CUSTOMS AND TAX ADMINISTRATION OF   )
     THE KINGDOM OF DENMARK              )
 6   (SKATTEFORVALTNINGEN) TAX REFUND    )
     SCHEME LITIGATION                   )
 7   _____)

 8

 9

10

11

12

13             C O N F I D E N T I A L

14

15

16

17

18   REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

19                    EXAMINATION OF

20                   C. FREDERICK REISH

21

22              DATE: March 25, 2022

23

24

25       REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

GregoryEdwards, LLC | Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

```
 1   C. F R E D E R I C K  R E I S H,
 2            called as a witness, having been first
 3   duly sworn according to law, testifies as follows:
 4
 5
 6
 7   EXAMINATION BY MR. MAGUIRE:
 8       Q    Good morning, Mr. Reish?
 9       A    Good morning.  Actually, it's
10   Reish.
11       Q    Reish.  I'm sorry.
12       A    No problem.
13       Q    So, Mr. Reish, my name is Bill
14   Maguire.  I'm going to be asking you
15   questions today.
16            If any question that I ask you is
17   unclear, will you please let me know before
18   you answer the question?
19       A    Yes.
20       Q    That way you'll give me an
21   opportunity to clear up the question and
22   we'll all know, when you answer the question,
23   you understood the question.
24            Is that agreeable?
25       A    Yes.
```

CONFIDENTIAL
C. Frederick Reish - March 25, 2022

Page 157

1    something came up and you decided to
2    terminate it."  That's not the way the system
3    works.
4          It's an effort by the IRS to
5    determine whether a plan terminated within
6    five years of being established was intended
7    at the beginning to be permanent.  And this
8    is the way they express that.
9          The actual practice, it is more
10   described in more -- described in more detail
11   and more thoroughly in the Internal Revenue
12   manual and in the instructions to the
13   Form 5310.
14     Q    So leaving aside just for a moment
15   the IRS practice, do you know whether these
16   words that we're talking about, that you
17   quote from Ms. Wagner here --
18          (Whereupon a discussion was held
19   off the record.)
20     Q    Sir, leaving aside your experience
21   with IRS practice, just focusing on the words
22   that you quote from Ms. Wagner here, do you
23   know whether she got those words from an IRS
24   regulation?
25          MR. MULLEN:  Objection.

CONFIDENTIAL
C. Frederick Reish - March 25, 2022

Page 158

```
1            MR. DILLMAN:  Objection.
2       A    I -- yes, they are from an IRS
3    regulation.  But I think, consistent with
4    what I've already said, it says that if a
5    plan is terminated within a few years, that
6    would be evidence that the plan wasn't
7    intended to be permanent, but evidence from
8    its inception -- that the plan, from its
9    inception, wasn't intended to be permanent.
10   If you look at -- it literally says right in
11   the regulation, "from its inception."
12            So you'd have to go back to the
13   beginning and then say, "And the plan was
14   terminated two, three, four years later," and
15   then say, "Why was it terminated?"  And does
16   that reason -- is that reason proof that the
17   plan was never intended to be -- last longer,
18   or never intended to be temporary, for a
19   short period -- as they say here, "for a few
20   years," literally from the regulation, "a few
21   years," was the intent at the beginning, for
22   it to exist for an indefinite period of time,
23   rather than to be set up and terminated a
24   year or two or three later.
25            So yes, this is a regulation, but
```

1    it has to be applied.  Because like I said
2    earlier, there are 30, 40,000 plans being
3    terminated every year and the IRS doesn't run
4    around willy-nilly disqualifying plans.
5            And plus it would be unfair to plan
6    sponsors to say, "Hey, your circumstances
7    changed.  We're going to disqualify you from
8    the beginning even though there's good
9    evidence that it was intended to last for an
10   indefinite period of time."
11       Q    And, sir, are you aware whether
12   there is a current IRS regulation that says,
13   "Merely making a single or occasional
14   contribution out of profits for employees
15   does not establish a plan of profit-sharing?"
16           MR. MULLEN:  Objection.
17       A    That is a regulation that predates
18   ERISA and predates 401(k) plans.  It
19   is -- with 401(k) plans, for example,
20   employees make deferrals into the plan,
21   workers make deferrals into the plans.  The
22   employer has no control over the frequency or
23   the amount of contributions.
24           So time, in many ways, has passed
25   that regulation by.  Plus, I don't remember

CONFIDENTIAL
C. Frederick Reish - March 25, 2022

Page 160

```
1    the date that it was adopted, but I would
2    imagine that was based on circumstances from
3    perhaps 50 years ago or more.
4         Q    And do you know whether that
5    regulation has ever been withdrawn by the
6    IRS?
7         A    Officially, no.  But it's not being
8    enforced because it no longer applies to the
9    circumstances today.
10        Q    And can you tell us -- can you
11   direct us to any IRS publication that says
12   that regulation is not --
13            (Whereupon a discussion was held
14   off the record.)
15        Q    So, sir, is there any IRS
16   publication you can point us to where the IRS
17   has said that it is not enforcing that
18   regulation?
19            MR. MULLEN:  Objection.
20        A    Nothing that I can think of.
21            MR. MAGUIRE:  Okay.  So why don't
22       we go off the record.
23            THE VIDEOGRAPHER:  Stand by.  The
24       time is 4:21 p.m. and we're going off
25       the record.
```

1               I didn't really focus on whether
2      securities lending had been part of that
3      because it wasn't a qualification issue, and
4      my role in doing this was to evaluate the
5      plan from a qualification perspective.
6               But they very well could have been.
7          Q    Now, where there is securities
8      lending, that's -- that gives rise -- where a
9      plan has investment earnings from
10     debt-financed activities, that gives rise to
11     unrelated business taxable income.
12              Isn't that right?
13              MR. MULLEN:  Objection.
14         A    I have thoughts on that.  First,
15     it's called "debt-financed income," which is
16     a subset of unrelated business taxable
17     income.  But it's in its own category.
18              Secondly, I didn't really look at
19     the transactions.  I didn't -- I didn't look
20     to see if the plan was lending or if the plan
21     was borrowing.  And so I didn't make a
22     determination on that.
23              You have to borrow money to make
24     money in order to have financed income, and I
25     didn't really study the transactions that

CONFIDENTIAL
C. Frederick Reish - March 25, 2022

Page 244

```
1    way.
2         Q    Did you focus on whether, in fact,
3    the RJM plan was borrowing money?
4         A    No.
5         Q    Did you go -- did you focus on
6    whether the RJM plan had debt-financed
7    income?
8         A    No.  That wasn't -- that was
9    outside my focus on the plan's qualification.
10        Q    Where a plan had very substantial
11   borrowings and very substantial debt-financed
12   income, would you expect that to be something
13   that would be the subject of an inquiry in
14   the course of an IRS audit?
15             MR. MULLEN:  Objection.
16             MR. DILLMAN:  Objection as to form.
17        A    A plan borrowed money to make
18   investments and made a profit on that
19   investment.  The IRS agent would likely say
20   that the plan should file an income tax
21   return and pay income taxes on that part of
22   the -- of the -- you know, on those
23   investment -- related to those investments,
24   to the DFI related to those investments.
25             That's -- yes, I would think that
```

1   an IRS agent would raise that issue.
2        Q    And did you see any evidence of the
3   IRS agent here raising that?
4        A    No.  I -- like I said earlier, I
5   just don't know what information was given to
6   the agent on that.  I don't fully understand
7   whether it's lending or borrowing, so I'm
8   not -- I don't have the background to
9   determine whether or not it is DFI.  That's
10  debt-financed income, DFI.
11            MR. MULLEN:  Bill, when you hit a
12       good spot, I think we've been at it for
13       about an hour and 15 minutes.
14            MR. MAGUIRE:  Yeah, just in a
15       couple of minutes, we'll find a good
16       spot, Sean.
17       Q    Sir, do you have any understanding
18  as to why the IRS agent did not raise this
19  issue of debt-financed income in the course
20  of the audit of the RJM plan?
21            MR. BAHNSON:  Objection to form, no
22       foundation.
23       A    I don't know that the IRS agent
24  didn't raise it.  I mean, all I have is what
25  I have.