UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to case nos.:<br>18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-01893; 19-cv-01781; 19-cv-01783; 19-cv-01866; 19-cv-01895; 19-cv-01794; 19-cv-01865; 19-cv-01904; 19-cv-01798; 19-cv-01869; 19-cv-01922; 19-cv-01800; 19-cv-01788; 19-cv-01870; 18-cv-07827; 19-cv-01791; 19-cv-01792; 19-cv-01928; 19-cv-01926; 19-cv-01868; 18-cv-07824; 19-cv-01929; 19-cv-01803; 19-cv-01806; 19-cv-01906; 19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-01810; 19-cv-01809; 18-cv-04833; 19-cv-01911; 19-cv-01898; 19-cv-01812; 19-cv-01896; 19-cv-01871; 19-cv-01813; 19-cv-01930; 18-cv-07829; 18-cv-04434; 19-cv-01815; 19-cv-01818; 19-cv-01931; 19-cv-01918; 19-cv-01873; 19-cv-01924; 19-cv-10713; 21-cv-05339. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**PLAINTIFF SKATTEFORVALTNINGEN'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED EXPERT REPORTS, OPINIONS, AND TESTIMONY OF GRAHAM WADE**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen (Customs and Tax Administration of the Kingdom of Denmark)*

**TABLE OF CONTENTS**

                                                      **Page**

PRELIMINARY STATEMENT ..........................................................................................................1

BACKGROUND ................................................................................................................................2

LEGAL STANDARD.........................................................................................................................5

ARGUMENT......................................................................................................................................7

I.      Mr. Wade's opinions that there were no shares or dividends and the Solo custodians deviated from market standards do not usurp the role of the Court or the jury. ..................................................................................................................7

          A.      Mr. Wade's opinion that there were no shares is admissible..................................7

          B.      Mr. Wade's opinion that there were no dividends is admissible. ...........................9

          C.      Mr. Wade's opinion that the trading was fictitious and deviated from market standards is admissible..................................................................................11

II.     Defendants mischaracterize Mr. Wade's deposition testimony concerning his confidentiality obligations to his former Barclays clients. .................................................13

CONCLUSION................................................................................................................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Bernard L. Madoff Inv. Sec. LLC*, No. 1:21-CV-02334-CM,
2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) ........................................................................... 11

*Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328 (S.D.N.Y. 2023) ....................... 6

*In re Blech Sec. Litig.*, No. 94 CIV. 7696 (RWS), 2003 WL 1610775
(S.D.N.Y. Mar. 26, 2003) ................................................................................................. 11, 12

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
815 F. Supp. 2d 673 (S.D.N.Y. 2011) ................................................................................... 10

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993) ......................... 5, 6

*ECD Inv. Grp. v. Credit Suisse Int'l*, No. 14-CV-8486 (VM)(SN),
2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017) ......................................................................... 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999) ......................................... 6

*Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505 (2d Cir. 1977) .................................................... 10

*In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................... 6

*Sec. & Exch. Comm'n v. U.S. Env't, Inc.*, No. 94CIV.6608(PKL)(AJP),
2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ................................................................... 7, 11

*Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250 (S.D.N.Y. 2013) .............................. 12

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122
(S.D.N.Y. 2015) ....................................................................................................................... 7

*United States v. Gatto*, No. 17-CR-0686 (LAK), 2019 WL 266944
(S.D.N.Y. Jan. 17, 2019) ......................................................................................................... 6

*In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 AWT, 2009 WL 8556135 (D.
Conn. Apr. 22, 2009) ........................................................................................................... 6, 9

**Statutes and Rules**

Fed. R. Evid. 702 ........................................................................................................................ 5, 6

Fed. R. Evid. 704 ...................................................................................................................... 6, 12

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in opposition to defendants' motion to exclude the expert testimony of Graham Wade.

## PRELIMINARY STATEMENT

Defendants' strained arguments to preclude the proffered testimony of Graham Wade—SKAT's equity finance and market practice expert with over two decades of experience—mischaracterize his opinions and are meritless.

Mr. Wade's opinion that the defendants' "trades" supposedly cleared by the Solo custodians[1] were fictitious and did not result in the defendant plans holding any Danish shares is not, as defendants argue, an inadmissible legal conclusion that turns on whether the plans owned shares under Danish law. Mr. Wade's opinion is grounded firmly in his analysis of the factual circumstances of the Solo trading, *i.e.*, that the Solo custodians never held any Danish shares and purported to settle the defendants' trades without any shares or cash. Nowhere in his expert report does Mr. Wade opine on whether the plans owned shares as a matter of Danish or any other law.

Nor is Mr. Wade's opinion that the plans did not receive any dividends based in any part, as defendants contend, on Danish securities law or what it means to own a dividend under Danish law. Mr. Wade's conclusion in this respect is much more straightforward, *i.e.*, since there were no shares, there were no dividends. Defendants attempt to distort Mr. Wade's opinion by arguing that a distinction he drew (nominally relevant for the ED&F trading not at issue on this motion) between dividends paid by a share issuer and contractual dividend compensation payments by a trade counterparty is a legal one. But that distinction is not only not a legal one, it

---

1. The "Solo custodians" are Solo Capital Partners LLP, Old Park Lane Capital Limited, West Point Derivatives, and Telesto Markets.

also is not relevant to Mr. Wade's opinions about the Solo trading that he concluded was fictitious—because there were no shares or cash and there were other irregularities in the trading—and so did not result in the plans receiving dividends or dividend compensation payments. And, in any event, Mr. Wade's testimony on these terms is based on his experience in the equity finance market and how its participants use and understand them.

Defendants likewise mischaracterize Mr. Wade's opinions about irregularities and "red flags" in the Solo trading as inadmissible testimony on defendants' knowledge or intent and making SKAT's "closing arguments." There is nothing improper about Mr. Wade's testimony on standard practices in the securities industry and how the Solo trading deviated from them. Or, for instance, his testimony that the fact that the Solo trading involved no cash, shares, or market risk should have raised "red flags" for the participants.

Finally, defendants' argument that Mr. Wade's confidentiality obligations to his former clients at Barclays will hamper their ability to cross-examine him is misleading. At his deposition, Mr. Wade answered all of defendants' questions, without mention of any confidentiality obligations, about Barclays' participation in cum-ex transactions, on which defendants suggest they intend to cross-examine him at trial. The only time Mr. Wade raised the question of confidentiality was in respect to an option transaction, in which the issue was the client's tax position, not that of Barclays, that, as publicly available documents make clear, was not even a dividend arbitrage transaction, let alone a cum-ex transaction involving no shares. And he nonetheless answered all the questions about that transaction too.

## BACKGROUND

SKAT retained Mr. Wade to provide his expert opinion "on the nature and structure of the financial transactions purportedly executed by" the defendant pension plans via the Solo custodians, including "whether those financial transactions were executed in a manner consistent

with standard market practice" and "would entitle an entity or individual to a dividend." (Declaration of Marc A. Weinstein, dated July 5, 2024 ("Weinstein Decl."), Ex. 1 (Expert Report of Graham Wade, dated Dec. 31, 2021 ("Wade Report")) ¶ 1.) Mr. Wade has "over twenty years of experience in structured financial transactions," including at Barclays Investment Bank for more than thirteen years, where he was a member of the bank's "Structured Capital Markets" group, eventually becoming the group's "Global Head." (*Id.* ¶¶ 3-4.)[2] His opinions with respect to the purported Solo trading are based, among other things, on his "experience in the design, implementation, and management of complex structured transactions" and "detailed knowledge" of the financial services industry. (*Id.* ¶ 9.)

In his December 31, 2021 expert report, Mr. Wade analyzed two of the defendant plans' so-called structured transactions and concluded based on his experience in equity finance markets that the transactions were "in totality, completely fictitious." (*Id.* ¶ 225.)[3] For instance, Mr. Wade concluded that the Solo trading "was completely circular," "did not require holdings of either shares or cash," and the participants "faced no market risk whatsoever." (*Id.*) And based on his review, Mr. Wade found that the Solo custodians in fact "never held any actual Danish" shares. (*Id.* ¶¶ 225, 234-36.)

---

2. As the Global Head of the Barclays' Structured Capital Markets group, Mr. Wade, among other things, "was responsible for setting, supervising, and promulgating guidelines for all equity finance transactions with tax risk" and "worked jointly with Barclays' Legal, Tax, and Compliance teams on an annual process of reviewing and promulgating trading and execution guidelines for all markets in which Barclays undertook equity finance activities." (*Id.* ¶ 4.)

3. Mr. Wade's (and the other experts') reports focused on the bellwether cases the parties selected for summary judgment. But as he explained in his report, Mr. Wade's conclusions with respect to the two sample "trades" apply equally to all the defendants' supposed trades to the extent they are not materially different from the two that he reviewed. (*Id.* ¶ 226.) Mr. Wade also analyzed additional trades for his subsequent rebuttal report and reached the same conclusions.

3

Because there were no shares or cash, there was no way in Mr. Wade's opinion for the Solo custodians to have "independently settle[d] any of the[] transactions." (*Id.* ¶ 238.) In Mr. Wade's market practice "experience," that the Solo custodians purported to do so by "an inexplicable book-keeping entry" "despite lacking cash" or "shares" was "not a usual or appropriate thing for a custodian to do." (*Id.* ¶ 239.) And since "[t]here were no shares[] and no cash was used to settle the trades," in Mr. Wade's view, the trading was "simply fictitious." (*Id.* ¶ 240.)

Further, in Mr. Wade's opinion, the Solo custodians' issuance of dividend credit advices to the defendants—stating that the plans had received dividends on Danish shares, net of withholding tax—based on purported "equal and offsetting long and short positions" was contrary to industry practice. (*Id.* ¶ 237.) In Mr. Wade's "experience, a custodian would only issue tax vouchers which totaled its combined net *long* position, not the long side of its net *flat*, or equal and offsetting long and[] short positions." (*Id.*) The Solo custodians never held "a long position in any Danish stock," so it was "obviously wrong" for them to "treat" the defendant plans "as if [they] did, in fact, have actual shares for which" they were "entitled to real dividends." (*Id.* ¶¶ 234, 237.)

As Mr. Wade explained based on his experience, "[i]t is well understood in equity finance markets" that there is a distinction between "a real dividend," *i.e.*, a "payment of a dividend from a share issuer," and a "dividend compensation payment," *i.e.*, "a contractual payment which arises under a contract for the sale or transfer of securities." (*Id.* ¶¶ 69-71.) And the circular, offsetting Solo trading, even assuming it was real, at most gave rise to contractual payments, not receipt of dividends from the share issuer. (*Id.* ¶ 71.)

4

Finally, Mr. Wade's report also explained other ways in which the Solo "trading" deviated from industry standards. For instance, in Mr. Wade's opinion, it was "highly irregular" that the Solo custodians instructed the pension plans—their purported customers—"on which shares each Plan was to trade, trade volumes, and trade counterparties." (*Id.* ¶ 241.) And, in Mr. Wade's view, "there is no way" the automated system Solo developed (called "Brokermesh") to instantaneously match buyers and sellers of massive amounts of shares among Solo's limited number of customers was "a genuine liquidity finding venue." (*Id.* ¶ 245.) The plans' stock loans and futures, in Mr. Wade's experience, were also "irregular." (*Id.* ¶¶ 246-58.) And it was "highly abnormal" that the Solo custodians "retroactively modif[ied] the interest and fees on" the plans' "stock loans" so that the trading collectively netted to zero, further confirming "that no real shares or real money ever traded hands." (*Id.* ¶ 266.)

## **LEGAL STANDARD**

Under Federal Rule of Evidence 702, an expert qualified "by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if (i) "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (ii) "the testimony is based on sufficient facts or data;" (iii) "the testimony is the product of reliable principles and methods;" and (iv) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[4] and its progeny require the Court to play a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony" and "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the

---

4. 509 U.S. 579, 113 S. Ct. 2786 (1993).

practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).

Nevertheless, "Rule 702 represents a liberal standard of admissibility for expert opinions." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016). As such, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" expert testimony. *United States v. Gatto*, No. 17-CR-0686 (LAK), 2019 WL 266944, at *6 (S.D.N.Y. Jan. 17, 2019) (quoting *Daubert*, 509 at 596, 113 S. Ct. at 2798), *aff'd*, 986 F.3d 104 (2d Cir. 2021).

And under Federal Rule of Evidence 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Thus, while "testimony in the form of legal conclusions" is inadmissible, experts are "expressly permit[ted] . . . to opine on 'ultimate issues.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 375 (S.D.N.Y. 2023) (citations omitted). For instance, "[a]n expert may properly give evidence stating a factual conclusion even if it embraces an ultimate issue to be decided by the jury;" "may discuss the conduct that is the basis for . . . a legal conclusion;" and may "point to factors tending to show that conclusion." *In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 AWT, 2009 WL 8556135, at *5 (D. Conn. Apr. 22, 2009) (quotation marks and citations omitted).

## ARGUMENT

**I.      Mr. Wade's opinions that there were no shares or dividends and the Solo custodians deviated from market standards do not usurp the role of the Court or the jury.**

**A.      Mr. Wade's opinion that there were no shares is admissible.**

Defendants' arguments to the contrary notwithstanding, Mr. Wade's opinions that the Solo custodians and the defendant plans never held any Danish shares are not legal conclusions that "directly rel[y] on a determination of what constitutes legal ownership of securities under Danish law." (Defs. Br. 6.) Nor, as defendants contend, does Mr. Wade even opine on whether the plans "owned" Danish shares as a matter of Danish law or otherwise. (Defs. Br. 6-8.)

Rather, as set forth in his report, Mr. Wade's testimony is that the plans' Solo trading was "fictitious" because, among other things, the Solo custodians never held any Danish shares and there were no shares or cash used to settle the supposed trades (which defendants contend is irrelevant under their meritless Danish law argument that a final and binding agreement is in itself sufficient for share ownership). (Wade Report ¶¶ 225, 234, 240.) These opinions—based on Mr. Wade's equity finance experience—are "factual conclusions that" at most "embrace an ultimate issue" and "will likely prove helpful in allowing the" jury "to understand the evidence better and providing the" jury "with the necessary tools to make an ultimate determination about whether" the defendants' representations of share ownership in their tax refund claims were fraudulent. *Sec. & Exch. Comm'n v. U.S. Env't, Inc.*, No. 94CIV.6608(PKL)(AJP), 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002).[5]

---

[5] There is nothing to defendants' argument that Mr. Wade's opinions are "particularly unreliable" because he "reviewed only two sets of trades" and "[h]e cannot possibly speak to more than the transactions he actually reviewed." (Defs. Br. 6.) As Mr. Wade explained in his report, SKAT's expert Bruce Dubinsky reviewed all the purported Solo trading and concluded that none of it "differ[ed] in any material respect." (Wade Report ¶ 226.) An "expert is permitted to rely," as Mr. Wade does, "on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case." *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015). Further, defendants' expert Dr.

7

Nor did Mr. Wade "admit[]" at his deposition "that his opinions are in part based on Danish legal principles." (Defs. Br. 2.) To be sure, defendants peppered Mr. Wade with questions about whether he was offering legal conclusions, including about ownership of shares under Danish law.[6] To which Mr. Wade responded that he did "not understand [his] role as one of providing legal opinions," but rather that his "opinions" were "based on [his] understanding of the transactions that actually took place and the consequences of those transactions." (Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 45:16-21.)[7] Defendants cannot contort Mr. Wade's opinions that there were no shares into legal conclusions by asking him about Danish law at his deposition.[8]

---

Emre Carr similarly analyzed just two of defendants' transactions on the assumption they were all the same. And, in any event, the parties have agreed that expert testimony at trial should not be limited to just the bellwether plans' trading that the experts focused on in their reports. (*See* Weinstein Decl. Ex. 3.) And in that respect, SKAT expects that at trial, Mr. Wade will have by then analyzed all the defendant plans' trades.

6. *See, e.g.*, Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 42:13-15 ("And so the ultimate question of whether tax is due is a legal one. Right?"); 44:13-16 ("But your report is not providing an opinion on the ultimate legal interpretation of the transactions you analyzed?"); 98:18-21 ("Would you agree with that statement if I told you that that principle is being advanced by me in the context of Danish tax law?"); 106:18-21 ("Is it your testimony that you're unable to tell me, as a general principle, what it means to be a legal owner of a share in Denmark?"); 107:14-16 ("Is it your understanding that the legal owner of a share can be a different person in different circumstances?"); 112:17-18 ("What's your understanding of what the definition of 'beneficial owner' is?"); 113:15-17 ("Can you provide me with your definition of what it means to be the 'legal owner' of a security?").

7. *See also id.* 58:20-59:1 ("My opinions relate to the transactions that were executed and what happened. And as I said, in the case of the Solo transactions . . . I think it's clear my opinion is there were no shares, and therefore there were no dividends. So I don't consider that to be a legal opinion."); 60:11-17 ("reviewing these transactions, if an entity does not have shares, and therefore it doesn't receive a dividend, I do not believe that to be expressing a legal opinion").

8. Defendants mischaracterize Mr. Wade's deposition testimony in claiming he could not answer "what it means for shares to be delivered to a Plan or individual." (Defs. Br. 7 n.1.) In the context of the ED&F trading not at issue on this motion or at this trial, Mr. Wade drew a distinction between circumstances where a short seller delivers shares acquired after the ex-dividend date, *i.e.*, where the short seller would not be entitled to the dividend from the share issuer, and where the short seller acquires the shares cum-dividend entitling the short seller to the dividend payment. (Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 159:3-20 (Q: "And is your only basis for stating that ex-dividend shares were delivered that the shares were delivered after the record date?" A: "No, because—and again . . . what does 'delivered' mean? That's a slightly imprecise term. But in the transactions in this case . . . it is clear to me that what the parties intended to do was have a contract where the cum ex seller had agreed a trade under which they were going to deliver ex-dividend shares.").) This distinction between delivery of ex- and cum-dividend shares is irrelevant with respect to the Solo trading where Mr. Wade concluded no shares of any kind were delivered.

8

### B. Mr. Wade's opinion that there were no dividends is admissible.

Mr. Wade's corresponding opinion that since there were no shares in the Solo trading, there were no dividends is likewise admissible and does not, as defendants contend, "turn[] in part on" some unexplained "underlying issues of Danish securities law." (Defs. Br. 8-9.) As set forth in his report, Mr. Wade's testimony is that the Solo custodians never held "a long position in any Danish stock," and as such, it was "wrong" for the Solo custodians to "treat the" pension plans "as if [they] did, in fact, have actual shares for which" they were "entitled to real dividends" based on its customers' supposed "equal and offsetting long and short positions." (Wade Report ¶¶ 234, 237.)

As Mr. Wade explained at his deposition, this "fairly straightforward conclusion" that "as a matter of fact," since "there were no shares . . . there were no dividends" is not "informed by legal principles." (Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 63:16-64:4.)[9] Like his opinion that there were no shares, Mr. Wade's conclusion rooted in his market practice experience that therefore were no dividends is a "factual conclusion" that at most "embraces an ultimate issue to be decided by the jury." *In re Xerox Corp. Sec. Litig.*, 2009 WL 8556135, at *5.

Nor is the distinction between a dividend paid by the issuer of the shares and a contractual "dividend compensation payment" paid by a trade counterparty a legal one. (Defs. Br. 8-9.) As an initial matter, Mr. Wade's opinion is that the plans did not receive dividend payments of any kind because their trading was "fictitious." (*See* Wade Report ¶ 71 ("*Subject to the caveat . . . about whether the Solo trades actually occurred*, the Market Claims which arose .

---

9. *Id.* (Q: "Again, if it's not a legal opinion, would you agree that whether financial transactions executed by the various defendants would entitle an entity or individual to a dividend is informed by legal principles?" . . . A: "No, not really, no. I think, as I've said, my opinions lead me to conclude that as a matter of fact, there were no shares, and so there were no dividends. And so I think that's a fairly straightforward conclusion to draw from my study of these transactions.").

9

. . involved purported dividend compensation payments.") (emphasis added).) And, in any event, the distinction between "a real dividend" and "a dividend compensation payment" is "well understood in equity finance markets." (*Id.* ¶ 69.) There is nothing improper about Mr. Wade's testimony explaining the meaning of these industry terms. *See ECD Inv. Grp. v. Credit Suisse Int'l*, No. 14-CV-8486 (VM)(SN), 2017 WL 3841872, at *17 (S.D.N.Y. Sept. 1, 2017) (expert's opinion as to the meaning of "hedging" in industry practice was admissible).[10]

Mr. Wade's understanding of these terms is not, as defendants argue, based on "U.K. tax law." (*See* Defs. Br. 8.) As he testified at his deposition, Mr. Wade's understanding comes from his "extensive experience over the course of [his] career in understanding equity finance transactions." (Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 128:3-9.) Mr. Wade's report noted "U.K. guidance on manufactured dividend rules" just to illustrate that "it was well understood by market participants" that there is "a significant difference between receiving a real dividend and receiving a dividend compensation payment." (Wade Report ¶ 73.)[11]

Nor did Mr. Wade give "evasive answers" to defendants' repeated deposition questions asking whether the "concept of 'dividend compensation payment' was a legal determination." (Defs. Br. 8.) For instance, in response to defendants' question, "whether something is a dividend or a dividend compensation payment, that's informed by legal principles. Right?" Mr. Wade answered, "I think it's formed by an understanding of the market practice that relates to

---

10. *See also Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 512 (2d Cir. 1977) (securities expert may testify as "to the practices and usage of [the] trade"); *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) ("prevailing customs and practices in the commercial lending industry is relevant and reliable and . . . admissible for that purpose").

11. Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 188:7-18 ("I think as I've explained, anyone who worked in the equity finance market in Europe at the relevant period understood the difference between a dividend compensation payment and a real dividend. It had a number of consequences for tax and other reasons. And I think the definition [of] HMRC that I cited to in my [report] is reflective of what market participants, including myself, considered to be the market's definition of a dividend compensation payment.").

security financing and equity finance transactions." (Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 65:12-20.)

        **C.    Mr. Wade's opinion that the trading was fictitious and deviated from market standards is admissible.**

Mr. Wade's opinion that the plans' supposed trades were "fictitious" because there were no shares or cash is admissible. *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 1:21-CV-02334-CM, 2022 WL 493734, at *14 (S.D.N.Y. Feb. 17, 2022) (expert "testified that the T-Bill assets that were listed on customer statements . . . were fictitious"). And the same is true with respect to his testimony that the "fictitious nature of the transactions should have been obvious to any of the participants involved" because, for instance, the trading involved no cash, shares, or market risk. (Defs. Br. 9 (quoting Wade Report ¶ 225).)

Testimony that "certain trading patterns would raise red flags" and "would have raised questions for an experienced trader" where, as here, based on "knowledge of typical trading activity and the types of trading patterns that an experienced trader would recognize as irregular" may be "helpful" to the jury. *U.S. Env't, Inc.*, 2002 WL 31323832, at *3. In giving such testimony, Mr. Wade would not "go far beyond instructing the jury on his expertise on structured transactions" or "simply tell[] the jury what he thinks are the answers to the questions it must decide." (Defs. Br. 9-10.) An expert may, as Mr. Wade does, "testify as to the customs and standards of an industry, and . . . opine as to how a party's conduct measured up against such standards." *In re Blech Sec. Litig.*, No. 94 CIV. 7696 (RWS), 2003 WL 1610775, at *19 (S.D.N.Y. Mar. 26, 2003).

Further, Mr. Wade's testimony that "there is no way" Solo's automated "Brokermesh" program "can be considered a genuine liquidity finding venue" and that how it supposedly worked "further support[s] the conclusion that the[] transactions were simply fictitious" is

11

admissible for the same reasons. (Defs. Br. 9 (quoting Wade Report ¶ 245).)[12] Mr. Wade's opinions in this respect explain "why . . . various types of conduct would be considered 'red flags' within the industry, and the types of fraudulent activity they suggested." *Sharkey v. J.P. Morgan Chase & Co.*, 978 F. Supp. 2d 250, 254 (S.D.N.Y. 2013). And they further "present[] circumstantial evidence of [defendants'] scienter, or knowledge of [the fictious] trading." *In re Blech Sec. Litig.*, 2003 WL 1610775, at *24 (S.D.N.Y. Mar. 26, 2003).

Nor is there anything improper about Mr. Wade's opinion that in his "experience, a custodian would only issue tax vouchers which totaled its combined net *long* position," (Wade Report ¶ 237), or his deposition testimony that the statements in the dividend credit advices the Solo custodians issued that the plans held shares and received dividends, net of withholding tax, were false because there were no shares or dividends. (Defs. Br. 10 (quoting Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 125:20-126:2).)[13] Such testimony is not inadmissible merely because it "embraces an ultimate issue." Fed. R. Evid. 704(a).

Finally, defendants argue that Mr. Wade's testimony is inadmissible to the extent it is based on the "so-called Elysium documents" that are the records of the purported Solo trading seized from Sanjay Shah in Dubai, incorporating by reference the argument in their motion to exclude SKAT's expert Mr. Dubinksy's testimony on the same grounds. (Defs. Br. 10.) But as

---

12. SKAT will not elicit at trial Mr. Wade's testimony that defendants were "in league" with Solo or any "opinions about defendants' intent." (Defs. Br. 9.)

13. *See also* Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 126:11-127:10 (Q: "I'm not asking you about opinions that you provided or not. What I'm asking you right now is whether you understand that for the purpose of making a tax reclaim in Denmark, when, in a securities transaction, the ownership would transfer from the seller to the buyer?" A: "And my response is that given the opinions that I gave and the fact that I am not giving opinions on Danish tax law, I have not given an opinion on the question of what the precise conditions required are to obtain a Danish tax reclaim. But it's my opinion that the three key pieces of information on the tax voucher, which I understand to have formed a very important part of that tax group claim, in my opinion, and based on my review, and for all the reasons given in my report, that information is false. So it seems highly unlikely to me that that would mean that the person is the owner for Danish tax purposes. But that is not something I've expressed an opinion on.").

12

SKAT explains in its opposition to that motion, even assuming for the sake argument the trading records in the Elysium documents are inadmissible, they still are sufficiently reliable to form the basis for Mr. Wade's and Mr. Dubinsky's testimony that the Solo trading was circular.

## II. Defendants mischaracterize Mr. Wade's deposition testimony concerning his confidentiality obligations to his former Barclays clients.

There is no merit to defendants' argument that Mr. Wade's "duties of confidentiality related to his time working for Barclays . . . inappropriately would curtail a vigorous cross-examination." (Defs. Br. 11-12.) Defendants point to Barclays' participation in "cum-ex transactions prior to 2012" as a "formidable area of cross-examination" and imply that Mr. Wade was "hesitant" to answer questions about them at his deposition. (Defs. Br. 11-12.) But Mr. Wade answered all defendants' questions about Barclays' cum-ex transactions without hesitation, even though he "was not personally involved in" them and so was unable "to discuss specific details." (Weinstein Decl. Ex. 2 (Wade Dep. Tr.) 242:10-19.)[14]  At no point did Mr. Wade mention any confidentiality obligations in response to a question about Barclays' participation in cum-ex transactions. (*See generally id.* 241:21-262:15.)

Rather, Mr. Wade considered the confidentiality obligations he may owe to a Barclays client in answering defendants' separate questions about an option transaction Barclays executed for that client that had nothing to do with dividend arbitrage (let alone a cum-ex transaction involving no shares), presumably to make the point that Barclays supposedly wrote the option for its client "even though the IRS had expressed a view that they did not give the tax benefits

---

14. *See, e.g.*, *id.* 241:25-242:9 (Q: "You've testified a bit about your time at Barclays and I want to ask you about Project Cum Ex. Are you familiar with that, Mr. Wade?" A: "I think as I stated earlier today, I'm aware as a matter of public record that Barclays undertook certain cum ex transactions, so yes.")

13

that they were supposed to give." (*Id.* 224:17-22.)[15]  But Mr. Wade nevertheless answered all of defendants' questions about that transaction too.  (*See generally id.* 208:25-227:4.)[16]

## CONCLUSION

For the reasons set forth above, SKAT respectfully requests that the Court deny defendants' motion to exclude Mr. Wade's expert testimony.

---

15. *Id.* 208:25-209:13 (Q: "Are you familiar with a set of options at Barclays for [client] known as '[Colt]'?" A: "Yes." Q: "And what do you understand [Colt] to be?" A: "Well, I have to be careful here because . . . under my contractual position with Barclays, I have to be careful about talking about the specifics of a given transaction. And this was a transaction that Barclays executed for one of its clients, so.").

16. *Id.* 218:15-219:6 (Q: "And that was one of the reasons why Barclays continued to write the options for [client] after this memo came out.  Right?" A: "I have to be – for the reasons I gave earlier, I have to be very careful here because I know, obviously, there has been a significant hearing in the U.S.  And I also know – I'm sure it's a matter of public record that" two entities "may still be in dispute with the IRS.  But on this particular transaction, it is fair to say there was a – particularly at this time, there was a – there were differing views on what the appropriate U.S. tax consequences for this transaction were."); 226:9-25 (Q: "And do you recall at the time whether Barclays itself disagreed with the IRS' reading of the revenue laws that prohibit the [Colt] transaction?" A: "I'm not sure that's what I just said.  I think our client – my recollection, and I have to be getting close to – I mean, I have to think about what my duty of confidentiality to the client is – but my recollection is that the clients had made us aware that the IRS was investigating, through the normal IRS audit process, the transactions and that they opened a transparent dialogue between us, [the client], and the IRS [that] had already existed before the IRS issued the notice . . . .").

14

Dated: New York, New York
July 5, 2024

HUGHES HUBBARD & REED LLP

By: /s/ Marc A. Weinstein
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Fax: (212) 422-4726
bill.maguire@hugheshubbard.com
marc.weinstein@hugheshubbard.com
neil.oxford@hugheshubbard.com
dustin.smith@hugheshubbard.com com
gregory.farrell@hugheshubbard.com

*Counsel for Plaintiff Skatteforvaltningen (Customs and Tax Administration of the Kingdom of Denmark)*

15