# Exhibit 2

```
1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
2              CASE NO.  18-MD-2865 (LAK)

3

4    _____
                                     )
5    IN RE:                          )
                                     )
6    CUSTOMS AND TAX ADMINISTRATION OF )
     THE KINGDOM OF DENMARK          )
7    (SKATTEFORVALTNINGEN) TAX REFUND )
     SCHEME LITIGATION               )
8    _____)

9

10

11

12

13            C O N F I D E N T I A L

14

15

16

17   REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

18                  EXAMINATION OF

19                   GRAHAM WADE

20

21              DATE: March 16, 2022

22

23

24

25       REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

```
 1    G R A H A M   W A D E,

 2            called as an expert witness, having been

 3    first duly sworn according to law, testifies as

 4    follows:

 5

 6

 7    EXAMINATION BY MR. PRUDEN:

 8        Q    Good morning Mr. Wade?

 9        A    Good morning.   Sorry.

10             Can we get the -- I can't actually

11    see who's talking.

12             MR. OXFORD:  Okay.  Greg, can you

13        say something, make sure we have our

14        video fixed on you?

15             MR. PRUDEN:  Sure.  Can you hear me

16        now?  Can you see me now?

17             THE WITNESS:  That's fine.  Sorry.

18             MR. OXFORD:  Yeah, you're ready for

19        your close-up.

20             Just before you start, Greg, I

21        wanted to put something on the record.

22             We have an agreement with counsel

23        that communications during deposition

24        breaks between the parties' counsel and

25        the parties' expert will remain
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    potentially be one thing that you would want

2    to take into account.

3         Q    The HMRC is the party who

4    ultimately decides whether tax is due on

5    particular transactions or income.

6              Right?

7              MR. OXFORD:  Objection to the form.

8         A    Unfortunately, that's incorrect.  I

9    believe it's -- it's the law, and ultimately

10   the courts that decide what tax is due.

11             But they are the administrative

12   branch of the tax system.

13        Q    Okay.  And so the ultimate question

14   of whether tax is due is a legal one.

15             Right?

16             MR. OXFORD:  Objection to form.

17        A    Again, that's quite a wide-ranging

18   question.  So to be more precise in my

19   answer, I think you need to narrow it down a

20   bit.

21             But certainly in the U.K., taxes

22   paid under tax law, and the question of how

23   to interpret that tax law, is ultimately a

24   question for the courts.

25        Q    Okay.  Are you aware of any similar

```
1        Q    Okay.  So your report is

2   describing, then, your understanding of the

3   facts surrounding the transactions?

4             MR. OXFORD:  Object to form.

5        A    Well, I think my -- my opinions are

6   as laid out in the report.  So the -- you

7   know, the opinions taken in the whole, with

8   the work in the report, those are my

9   opinions.

10            And if you want me to talk about

11  any specific individual one, I'm happy to do

12  that.

13       Q    Okay.  But your report is not

14  providing an opinion on the ultimate legal

15  interpretation of the transactions you

16  analyzed?

17            MR. OXFORD:  Object to the form.

18       A    That's not quite what I said.  What

19  I was saying is I did not understand my role

20  to be one of providing expert opinions on

21  Danish tax law matters.

22            That's slightly different.

23       Q    Okay.  And I'm not sure that was

24  completely responsive to my question, though.

25            I just am asking you whether or
```

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1    not, regardless of what you've said, your

 2    report is providing an opinion on the

 3    ultimate legal interpretation of the

 4    transactions you analyzed?

 5           MR. OXFORD:  Same objection.

 6       A    I think my -- again, my opinions, I

 7    think, speak for themselves, and the full

 8    terms of my opinions, any caveats and any

 9    details supporting those opinions, are as

10    laid out in my report.

11       Q    Okay.  Do you consider, though,

12    that the opinions that you've provided are

13    about the legal interpretation of the

14    transactions you analyzed?

15           MR. OXFORD:  Object to form.

16       A    There's a -- I do not understand my

17    role as one of providing legal opinions.  The

18    opinions given in my report are based on my

19    understanding of the transactions that

20    actually took place and the consequences of

21    those transactions.

22       Q    Okay.  You also cite in these

23    publicly available documents standards

24    released by the European Central Bank and

25    Eurosystem.
```

1      dividends, that -- I don't believe it's a

2      legal conclusion to say that no entity

3      received a dividend.

4           Q    Okay.  So --

5           A    But somehow --

6                MR. OXFORD:  Hold on.  Greg, can

7           you let the witness answer the question?

8                MR. PRUDEN:  Sorry.  I thought he

9           was done.  He can finish his answer.

10          A    No, actually that's fine.  It's

11     fine.  I'm done.

12          Q    Okay.  Well, we can agree that the

13     opinions that you're expressing in this

14     report are not legal opinions about whether

15     the transactions that were executed by the

16     various defendants would entitle them to a

17     dividend.

18               Right?

19               MR. OXFORD:  Objection, form.

20          A    No.  My opinions relate to the

21     transactions that were executed and what

22     happened.  And as I said, in the case of Solo

23     transactions, if there are no shares, I think

24     it's -- I think it's clear my opinion is

25     there were no shares, and therefore there

1    were no dividends.

2            So I don't consider that to be a

3    legal opinion.

4        Q    Is there any reason that you're not

5    answering that question just a "yes" or "no?"

6    Is there nuance to the fact that you're not

7    providing a legal opinion on this?

8            You say it in Paragraph 9.

9            MR. OXFORD:  Objection, asked and

10           answered.  You can answer it again.

11       A    I think you and I just have a

12   difference of opinion on whether the question

13   of whether an entity received a dividend is a

14   legal opinion.  Maybe it has legal

15   consequences.

16           MR. OXFORD:  Hold on, Greg.  You

17           asked the question.  Please give the

18           witness the courtesy of letting him

19           answer it before your next question.

20           So Greg, can you please read the

21           question -- sorry.  Mike, can you read

22           the question back and let Mr. Wade give

23           his full answer to the question?

24           (Whereupon the record was read back

25           by the reporter.)

```
 1            MR. OXFORD:  Okay.  And could you
 2       read, please, Mike, the answer that was
 3       cut off for Mr. Wade.
 4            (Whereupon the record was read back
 5       by the reporter.)
 6            MR. OXFORD:  Mr. Wade, I think you
 7       were about to say something else.  I
 8       mean, your flow may have been entirely
 9       interrupted, but I want to make sure
10       you've had an opportunity.
11       A    I think, probably, just to finish
12   off, I mean, I think I've expressed it there.
13   As -- you know, reviewing these transactions,
14   if an entity does not have shares, and
15   therefore it doesn't receive a dividend, I do
16   not believe that to be expressing a legal
17   opinion.
18       Q    Okay.  Your view of the thrust of
19   your report is that where an entity doesn't
20   have shares, they haven't received a
21   dividend?
22            MR. OXFORD:  Object to the form.
23       A    No.  The opinions in my report are
24   what they are, and they take into account all
25   the factors included in my report.  So I'm
```

1    were no dividends received on the other -- on

2    the cum ex transactions.

3        Q    Okay.  And I'm asking you what you

4    consider your expertise to be that allows to

5    you draw that conclusion?

6        A    My expertise?  Well, it's, you

7    know, the -- I've spent a significant portion

8    of my career involved in structured financial

9    transactions, and I am able to -- you know, I

10   have reviewed the trades that were done, how

11   they were arranged, and all the details as

12   laid out in my report, and I -- I think I've

13   given the reasons why I reached those

14   conclusions as a result of that experience in

15   my report.

16       Q    Okay.  Again, if it's not a legal

17   opinion, would you agree that whether

18   financial transactions executed by the

19   various defendants would entitle an entity or

20   individual to a dividend is informed by legal

21   principles?

22           MR. OXFORD:  Objection to form.

23       A    No, not really, no.  I think, as

24   I've said, my opinions lead me to conclude

25   that as a matter of fact, there were no

1    shares, and so there were no dividends.

2          And so I think that's a fairly

3    straightforward conclusion to draw from my

4    study of these transactions.

5       Q   Okay.  Other than for the trades

6    that you say were used for more than one tax

7    voucher -- withdrawn.  Let me re-ask that

8    question.

9          Other than trades for which you say

10   shares were used to support more than one tax

11   voucher, is there any other basis for

12   concluding that any of the ED&F transactions

13   did not entitle the pension plans to

14   dividends?

15         MR. OXFORD:  Objection.

16      A   There are a number of -- as I said,

17   all of the bases for my opinions are included

18   in my reports and they should be taken as a

19   whole.  So if you have a question on a

20   specific one, I'm very happy to answer it.

21         But it's a combination of all the

22   factors that I've covered in my report taken

23   together.

24      Q   Okay.  Can you tell me what those

25   factors are?  Can you summarize them for me?

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1              MR. OXFORD:  Objection to form.

 2        A    Okay.  Well, apart from

 3    the -- apart from the absence of shares, the

 4    other most fundamental reason, although, as

 5    I've said, there are others in my report, is

 6    that the nature of the way the cum ex

 7    transactions were structured is that even if

 8    there had been shares, it would still not

 9    have been the receipt of the dividend.  It

10    would have been a receipt of a dividend

11    compensation payment.

12        Q    Okay.  And whether something is a

13    dividend or a dividend compensation payment,

14    that's informed by legal principles.

15              Right?

16              MR. OXFORD:  Objection to form.

17        A    I think it's formed by an

18    understanding of the market practice that

19    relates to security financing and equity

20    finance transactions.

21        Q    Okay.  So it's your testimony that

22    whether something is a manufactured dividend

23    or a real dividend or a dividend compensation

24    payment is not informed by any legal

25    principles?
```

```
 1    a final and binding agreement exists on the

 2    acquisition or sale of the share?"

 3            MR. OXFORD:  Object to the form.

 4        A    No, I wouldn't.  Again, I wouldn't

 5    agree with that one because I don't think

 6    that's right in terms of when ownership

 7    rights associated with shares do change

 8    hands.

 9            But I would also ask you to be a

10    bit more precise in defining what you mean by

11    "ownership rights."

12        Q    Would you agree with the principle

13    that "a buyer of a share owns the share at

14    the time when a final and binding agreement

15    exists on the acquisition of the share?"

16            MR. OXFORD:  Object to the form.

17        A    No.

18        Q    Would you agree with that statement

19    if I told you that that principle is being

20    advanced by me in the context of Danish tax

21    law?

22            MR. OXFORD:  Object to the form.

23        A    I think, as I've stated earlier,

24    I'm not expressing opinions as to Danish tax

25    law.  So I would -- I would not have an
```

CONFIDENTIAL
Graham Wade — March 16, 2022

1  have -- you know, there are a whole range of

2  different forms of legal ownership.

3        So I need you to be a bit more

4  precise.

5    Q    Okay.  Is it your understanding

6  that what it means to own a share depends on

7  the legal circumstances in which you're

8  asking that question?

9        MR. OXFORD:  Objection to form.

10    A    Again, the question of what

11  ownership means for the particular purposes

12  in which that question's asked, I need to

13  know what purposes it's asked, and all the

14  facts and circumstances that surround that

15  particular share.

16        So if you give me a specific

17  example, I can give you my thoughts.

18    Q    Is it your testimony that you're

19  unable to tell me, as a general principle,

20  what it means to be a legal owner of a share

21  in Denmark?

22        MR. OXFORD:  Objection.

23    A    What I'm saying is that over the

24  course of my career I spent a long time and I

25  understand that the question you're asking me

CONFIDENTIAL
Graham Wade - March 16, 2022

1    can be a much more complex question than it

2    appears because it requires understanding the

3    exact facts and circumstances, for what

4    purpose, i.e., you know, is it tax, is it

5    accounting, is it regulation, is it, you

6    know, record holder from the issuer's

7    perspective?

8         There's a range of different ways

9    in which one can think about who the owner of

10   a share is.  And without the full facts and

11   circumstances and the specifics and for what

12   purpose the question is being asked, I -- I

13   can't answer it.

14        Q    Is it your understanding that the

15   legal owner of a share can be a different

16   person in different circumstances?

17             MR. OXFORD:  Object to the form.

18        A    It would be highly unusual if a

19   given share for the same -- going back to my

20   point about there are different

21   purposes -- if we're talking about a specific

22   definition of "ownership," in my experience,

23   it would be highly unusual if two people can

24   be the same owner of the share for the same

25   purpose.

1    is you've given me no information about what

2    the terms of the transaction are, who the

3    people are, for what purpose they did the

4    transaction, whether it was on-exchange,

5    off-exchange.

6            You just haven't given me any

7    information, so I'm unable to answer your

8    question.

9        Q    Okay.  So you're unable to answer

10   my question?  That's your answer?

11       A    For the reasons I just gave, I am

12   unable to answer that question, yes.

13       Q    Are you familiar with the term

14   "beneficial owner?"

15           MR. OXFORD:  Object to the form.

16       A    Yes.

17       Q    What's your understanding of what

18   the definition of "beneficial owner" is?

19           MR. OXFORD:  Object to the form.

20       A    Again, it depends on the

21   circumstances and it can have -- even the

22   term "beneficial owner" can have different

23   meanings in different contexts.

24           But as a general proposition, it

25   tends to mean the person who has the overall

CONFIDENTIAL
Graham Wade - March 16, 2022

1    taken in the round, the overall economic,

2    legal, voting ownership rights of a -- of a

3    share.

4         Q    In your view, is there a difference

5    between the concept of legal ownership and

6    the concept of beneficial ownership?

7              MR. OXFORD:  Object to the form.

8         A    As I've said earlier, you know,

9    beneficial ownership is a subcategory of what

10   might broadly be construed as legal

11   ownership.

12             So without being clear on what you

13   mean by "legal ownership," it's hard for me

14   to answer that.

15        Q    Can you provide me with your

16   definition of what it means to be the "legal

17   owner" of a security?

18             MR. OXFORD:  Object to the form,

19        asked and answered.

20        A    No.  Because my point is I would

21   need you to tell me for what purpose you

22   wanted a definition of "legal ownership."

23        Q    Okay.  It's your testimony that --

24             MR. OXFORD:  Sorry.

25             MR. PRUDEN:  Sorry.  I thought you

CONFIDENTIAL
Graham Wade - March 16, 2022

1    when did the buyer of the shares become the

2    legal owner of the shares?

3          A    I'm really sorry, that -- sorry.  I

4    just didn't catch that question.

5                The sound has been a bit worse

6    since we've restarted again.  I don't know if

7    that's -- that's the only change.

8                Sorry, but could you repeat the

9    question?

10         Q    Yes.  For the purposes of making a

11   tax reclaim application in Denmark, in the

12   transactions that you analyzed in this case,

13   when did the buyer of the shares become the

14   owner of those shares?

15               MR. OXFORD:  Object to the form.

16         A    I don't believe I've given an

17   opinion as to the requirements for when or

18   what exactly is required to make a tax

19   reclaim.

20               My opinions relate to the fact that

21   if we go back to the tax vouchers, there are

22   three key facts in the tax vouchers.

23   Number 1, that the pension plans held shares;

24   Number 2, that they received dividends; and

25   Number 3, that they suffered tax.

CONFIDENTIAL
Graham Wade - March 16, 2022

1           And my opinions are fundamentally

2    that those three statements are false.  But I

3    have offered no opinion as to, you know, what

4    the Danish tax consequences of -- as a result

5    of that are.

6       Q    Okay.  Well, you said that -- you

7    told me in response to a question that I

8    asked you, Mr. Wade, whether and in what

9    context I was using the term "ownership"

10   would inform your answer to my question.

11          I'm not asking you about opinions

12   that you provided or not.  What I'm asking

13   you right now is whether you understand that

14   for the purpose of making a tax reclaim in

15   Denmark, when, in a securities transaction,

16   the ownership would transfer from the seller

17   to the buyer?

18          MR. OXFORD:  Object to the form.

19      A    And my response is that given the

20   opinions that I gave and the fact that I am

21   not giving opinions on Danish tax law, I have

22   not given an opinion on the question of what

23   the precise conditions required are to obtain

24   a Danish tax reclaim.

25          But it's my opinion that the three

```
 1    key pieces of information on the tax voucher,

 2    which I understand to have formed a very

 3    important part of that tax group claim, in my

 4    opinion, and based on my review, and for all

 5    the reasons given in my report, that

 6    information is false.  So it seems highly

 7    unlikely to me that that would mean that the

 8    person is the owner for Danish tax purposes.

 9            But that is not something I've

10    expressed an opinion on.

11      Q    Okay.  For the purposes of

12    determining whether a payment made from a

13    seller to a buyer in reference to a dividend

14    is a dividend or a manufactured dividend,

15    when do you understand that legal ownership

16    transfers in a securities transaction from

17    the seller to the buyer?

18            MR. OXFORD:  Object to the form.

19      A    I just don't think that's a

20    question that makes sense on its own terms.

21    A -- as I think I defined in my report, a

22    dividend compensation payment is a

23    contractual payment that arises under a

24    transfer -- a contract for the transfer of

25    securities.
```

1          So I -- I don't think that your

2    question makes sense on its own terms.

3        Q    Okay.  Well, that's your

4    understanding of the definition of

5    "manufactured dividends?"

6        A    Amongst other things, and, as laid

7    out in my reports, extensive experience over

8    the course of my career in understanding

9    equity finance transactions.

10        Q    What is the definition of

11    "manufactured dividends?"

12        A    I think -- I think I just gave a

13    definition which is, I believe, the one I

14    used in my report, which is it's a

15    contractual payment representative of a

16    dividend that arises under a contract for the

17    transfer of securities.

18          That, I think, is the generally

19    accepted definition based on my market

20    practice.

21        Q    And what determines whether a

22    payment that's representative of a dividend

23    is, itself, a dividend or a manufactured

24    dividend?

25          MR. OXFORD:  Object to form.

1    execute a trade before the trade date, but

2    only deliver ex-dividend shares.

3         Q    Okay.  And is your only basis for

4    stating that ex-dividend shares were

5    delivered that the shares were delivered

6    after the record date?

7              MR. OXFORD:  Object to the form.

8         A    No, because -- and again, what

9    does -- what does "delivered" mean?  That's a

10   slightly imprecise term.

11             But in the transactions in this

12   case and for all the reasons given in the

13   report, including the way they were

14   settled -- the pricing, who the

15   counterparties were, the nature of all the

16   arrangements -- it is clear to me that what

17   the parties intended to do was have a

18   contract where the cum ex seller had agreed a

19   trade under which they were going to deliver

20   ex-dividend shares.

21             That's -- that's my opinion.

22        Q    Mr. Wade, I used your term.  You

23   said, "What people understand that to mean is

24   a transaction where you're going to execute a

25   trade before the trade date but only deliver

1    authoritative source on this point.

2        Q    Other than tax law, are you aware

3    of any sources of the distinction between a

4    dividend and a dividend compensation payment?

5            MR. OXFORD:  Object to the form.

6        Misstates his testimony.

7        A    I think as I've explained, anyone

8    who worked in the equity finance market in

9    Europe at the relevant period understood the

10   difference between a dividend compensation

11   payment and a real dividend.  It had a number

12   of consequences for tax and other reasons.

13           And I think the definition that

14   HMRC that I cited to in my manual is

15   reflective of what market participants,

16   including myself, considered to be the

17   market's definition of a dividend

18   compensation payment.

19       Q    And how did the market come to

20   establish that as a definition, in your view?

21           MR. OXFORD:  Object to the form.

22       A    The -- I don't really know where to

23   start with that question.  There are -- you

24   know, transactions happen all the time,

25   practice develops, you know.

1    European tax liability or their U.S. tax

2    liability, and that therefore, the overall

3    after-tax affect of acquiring the dividend

4    would be to receive a hundred percent of the

5    dividend on an after-tax basis.

6        Q    All right.

7            MR. PRUDEN:  Why don't we take a

8        short break?  I'm conscious of the other

9        questioners who might want to ask.  I'll

10        probably have a little more when we come

11        back, but I just want to organize a

12        little bit first to streamline this a

13        bit.

14            MR. OXFORD:  Okay.  Let's take ten

15        minutes.

16            THE VIDEOGRAPHER:  Okay.  Stand by.

17        The time is 12:50 p.m. New York time and

18        we're going off the record.

19            (Brief recess taken.)

20            THE VIDEOGRAPHER:  Stand by.  The

21        time is 1:06 p.m. New York time and

22        we're back on record.

23        Q    I just have a few more minutes of

24    questions.

25            Are you familiar with a set of

Graham Wade - March 16, 2022

1    options at Barclays for Renaissance

2    Technologies known as "Cult"?

3              MR. OXFORD:  Object to the form.

4        A    Yes.

5        Q    And what do you understand Cult to

6    be?

7        A    Well, I have to be careful here

8    because, you know, I -- under my contractual

9    position with Barclays, I have to be careful

10   about talking about the specifics of a given

11   transaction.

12             And this was a transaction that

13   Barclays executed for one of its clients, so.

14       Q    Okay.  Let's do it this way.  I'll

15   ask you questions and you tell me if you

16   agree or not.

17             Were Cult options designed to be

18   written for a period of longer than 12 months

19   so that Renaissance could realize long-term

20   capital gains even on short-term trading that

21   they did within the options basket?

22             MR. OXFORD:  Object to the form.

23       A    The -- the transactions as I

24   understand them were originally designed by

25   Renaissance Technologies, so I am unable

CONFIDENTIAL
Graham Wade - March 16, 2022

1    to -- and also I was not involved in the

2    original execution of the transactions

3    because it went on -- the first transactions

4    were quite a long time ago.

5              So I can't comment on why they were

6    designed, what the reasons for the design

7    were.

8         Q    Okay.  But regardless of why they

9    were designed, you were aware of the fact, at

10   some point, that they didn't work.

11             Right?

12             MR. OXFORD:  Object to the form.

13        A    No, that's not -- that's not

14   correct.

15        Q    Okay.  Are you aware of the fact

16   that the IRS says that the transactions as

17   designed didn't work?

18             MR. OXFORD:  Object to the form.

19        A    I -- I am aware that at a certain

20   point in time the IRS -- the IRS issued a

21   notice stating that it was their position

22   that transactions which weren't explicitly

23   said to be the Renaissance transactions, but

24   which at the time I understood to be the

25   Renaissance transactions, they took the view

```
1     that they -- the Renaissance phrase did not

2     work, but that the options should be, in

3     effect, looked through for U.S. tax purposes.

4          Q    Okay.  I'm going to turn to

5     Exhibit 5008, please.

6               MR. OXFORD:  Which one, Greg?

7               MR. PRUDEN:  5008.  We'll mark this

8          as a new exhibit.

9               (Whereupon the above mentioned was

10         marked for Identification.)

11              (Whereupon a discussion was held

12         off the record.)

13         Q    Do you have that in front of you,

14    Mr. Wade?

15         A    I do.

16         Q    Okay.  And I'll represent to you

17    that the cover page says that this is

18    Exhibits 52 to 68, but to save some space on

19    these binders, we have cut it down to only

20    Exhibit 60 to 68.

21              Can you turn to the first page

22    after the cover page, Mr. Wade?

23         A    Yeah.

24         Q    And you wrote that this is a

25    detailed writeup of Cult, including it
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 212

```
 1    doesn't work.

 2            Right?

 3            MR. OXFORD:  Object to the form.

 4        A   I agree that that's what the e-mail

 5    says, yeah.

 6        Q   And it's an e-mail that you wrote.

 7            Right?

 8        A   That's correct.

 9        Q   Right.  And what was your role at

10    Barclays as of November 12, 2010?

11        A   I believe at that time I was the

12    head of the structured capital markets group

13    based in New York.

14        Q   What were your responsibilities in

15    that role?

16        A   My responsibilities were for

17    managing all of the activities of the

18    structured capital markets group in the

19    Americas, which included the U.S. and any

20    other parts of the Americas, although it was

21    primarily the U.S.

22        Q   Did you have any role in Barclays'

23    German structured capital markets operations

24    during that time?

25        A   Sorry?  Barclays German?
```

CONFIDENTIAL
Graham Wade – March 16, 2022

1      Q    Structured capital markets

2    operations at that time?

3              MR. OXFORD:  Object to the form.

4      A    Not to my recollection, no.

5      Q    Were you on the approvals committee

6    for global structured capital markets at

7    Barclays at that time?

8      A    No, because the U.S. had a separate

9    approvals process.

10     Q    Okay.  And you were on that

11   committee for the U.S.

12             Right?

13             MR. OXFORD:  Object to the form.

14     A    That's my recollection.  I mean,

15   it's going back a long time now, so -- but

16   that's my recollection.

17     Q    Okay.  Could you turn forward to

18   Exhibit 5010, please?  That's Tab 10 of the

19   binder.  It's two tabs ahead.

20             MR. PRUDEN:  Mark this as

21   Exhibit 5010.

22             (Whereupon the above mentioned was

23       marked for Identification.)

24     Q    Do you have that, Mr. Wade?

25     A    The -- this is the one that's

CONFIDENTIAL
Graham Wade – March 16, 2022

```
 1     "Office of Chief Counsel, Internal Revenue
 2     Service."
 3         Q    I was just getting there.  Yes,
 4     that's correct.
 5            And do you recognize this to be the
 6     more generalized term memo from the IRS that
 7     addressed Cult and options baskets like Cult?
 8            MR. OXFORD:  Object to the form.
 9         A    Well, let me just take a look at
10     it.
11            (Witness reviewing.)
12            I mean, it's a very long time since
13     I have seen this, if this is the same one,
14     which -- but it seems reasonable that it is.
15         Q    Okay.  I'd note this e-mail is also
16     dated November 12th of 2010 based on this
17     date.
18            Right?
19         A    Sorry.  That, you completely broke
20     up in that question.  I didn't hear you.
21         Q    Sorry about that.  I was turning
22     the page.
23            If you look at the release date at
24     the top, it's 11/12/10.
25            Right?
```

```
 1        A    I can see that's what it says,

 2   yeah.

 3        Q    Okay.  And November 12, 2010 is the

 4   same date as your e-mail that we just looked

 5   at.

 6             Right?

 7        A    If you tell me that it is.

 8        Q    Okay.  I'll represent to you for

 9   these purposes that it's --

10        A    No, that's fine.

11        Q    Okay.  And one of the things that

12   the IRS addresses here is whether a taxpayer

13   should be treated as the tax owner of the

14   securities.

15             Right?

16             MR. OXFORD:  And Mr. Wade, you

17        should, of course, feel free to review

18        that document before you answer

19        Mr. Pruden's question.

20        A    Yeah.

21             (Witness reviewing.)

22             Sorry.  So I've reviewed.

23             So can you remind me what the

24   question was?

25        Q    Sure.  The question was:  Looking
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    at the "Issues" section and Point 2, that one

2    of the issues that's discussed in this memo

3    is "whether the tax payor should be treated

4    as the tax owner of the securities."

5            Do you see that?

6            MR. OXFORD:  Object to the form.

7        A    Are you talking about Point 2 of

8    the "Conclusions?"

9        Q    Going to "Issues?"

10       A    Sorry.  "Issues."

11       Q    "Whether the tax payor should be

12   treated as the tax owner of the securities."

13           Do you see that?

14       A    Yeah, I see that.

15       Q    Okay.  And the IRS opinion around

16   this is signaling that whether someone is the

17   tax owner for tax purposes depends on the

18   revenue law of the jurisdiction.

19           Right?

20           MR. OXFORD:  Objection to the form.

21       A    Well, the question of who is the

22   tax owner of the securities in this case is a

23   question of U.S. tax law, if that's your

24   question.

25       Q    Okay.  And one of the IRS's

CONFIDENTIAL
Graham Wade - March 16, 2022

1    conclusions here, if you look at Point 2 in

2    "Conclusions," is that the hedge fund is the

3    tax owner because they have beneficial

4    ownership of the securities for tax purposes.

5            Right?

6            MR. OXFORD:  Object to the form.

7        A    Well, I read that as saying that

8    it's the IRS's position that for U.S. tax

9    purposes, the tax owner of the securities is

10   the party who has the option contract.

11       Q    Is it your understanding that the

12   IRS's opinion on that issue is suppositive?

13           MR. OXFORD:  Object to the form.

14       A    No, because as I think I've

15   mentioned earlier, ultimately the question

16   of, you know, any given tax issue, what

17   the -- what the ultimate outcome of it is is

18   subject to the relevant tax law, which,

19   ultimately, if there's a dispute, needs to be

20   agreed by the relevant courts.

21           So I think the -- this is -- this

22   is the IRS effectively stating what their

23   position is.  But that doesn't necessarily

24   mean that that is what would ultimately be

25   found to be the case as a matter of U.S. tax

CONFIDENTIAL
Graham Wade — March 16, 2022

1      law.

2          Q     Okay.  Have you ever taken a view

3      of U.S. tax law in your work at Barclays that

4      was contrary to the view that was taken by

5      the IRS?

6               MR. OXFORD:  Object to form.

7          A     That's a -- that's a very -- that's

8      a very wide-open question and, you know, I

9      wouldn't -- I wouldn't like to be able to be

10     specific on that.

11              In this particular case, the -- and

12     as the memo explains, it was not Barclays

13     that was taking a -- the relevant U.S. tax

14     position.  It was our client.

15         Q     Yeah.  And that was one of the

16     reasons why Barclays continued to write the

17     options for RenTech after this memo came out.

18              Right?

19              MR. OXFORD:  Object to the form.

20         A     I have to be -- for the reasons I

21     gave earlier, I have to be very careful here

22     because I know, obviously, there has been a

23     significant hearing in the U.S.  And I also

24     know -- I'm sure it's a matter of public

25     record that Nason Square and Flowana may

CONFIDENTIAL
Graham Wade - March 16, 2022

1    still be in dispute with the IRS.

2             But on this particular transaction,

3    it is fair to say there was a -- particularly

4    at this time, there was a -- there were

5    differing views on what the appropriate U.S.

6    tax consequences for this transaction were.

7        Q    Okay.  Well, given your

8    restrictions, let's make reference to a

9    document.

10            Can you go back to Tab 8, please?

11       A    Sorry?  Tab 8?

12       Q    Eight, correct.  It was the one we

13   were on before, the exhibits that started

14   with your e-mail.

15            Are you there?

16       A    Yeah.

17       Q    Okay.  Can you go to the fourth

18   page?  It says "Exhibit 61" on the bottom,

19   and it's a memo with a Barclays header on it.

20       A    Sorry?  Page?

21       Q    It's the fourth page.  It has a

22   Bates number at the bottom,

23   Barclays-PSI-016946.

24       A    6946.  Sorry.  My 6946 is Page 1 of

25   the -- a memo, "SCMUS Prudence Committee."

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1        Q    That's correct, you're there.  And
 2   this is a memo written by you and Maxim
 3   Kulikov to the U.S. Approvals Committee.
 4             Right?
 5        A    I'm just reminding myself of this.
 6             (Witness reviewing.)
 7             Okay.  I've reviewed it.
 8        Q    Okay.  So the question was:  This
 9   is a memo written by you and Maxim Kulikov to
10   the SCUS Approvals Committee.
11             Right?
12        A    That's correct.
13        Q    And the date of this memo is
14   October 3, 2012?
15        A    That's correct.
16        Q    And that's a little less than two
17   years after the November 2010 IRS memo we
18   just looked at.
19             Right?
20        A    That's correct.
21        Q    Okay.  And this is about a new
22   option transaction, which is the Cult, and
23   then Roman 27 option transaction.
24             Do you see that?
25        A    Yeah.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1        Q     Okay.  And you're one of the
 2   attendees with abbreviation "GW."
 3              Do you see that?
 4        A     Yeah.
 5        Q     And then the other abbreviated
 6   person is Gerard LaRosa.
 7              Who's that?
 8        A     I can't remember exactly what his
 9   job title was, but he was -- he was the chair
10   of the -- my recollection is he was chair of
11   the SCM Approvals Committee, and he was, I
12   believe, one of the directors at Barclays
13   main subsidiary in the U.S.
14        Q     It says that you discussed the
15   background of the new option transaction, and
16   then that there was a lengthy discussion.
17              Do you see that below?
18        A     I see where it says that, yeah.
19        Q     Okay.  And then the third bullet is
20   that "the tax risk is assumed by the client."
21              Do you see that?
22        A     Yes.
23        Q     And then the -- not the bullet
24   after that, but the one after that, it says,
25   "The new option transaction does not
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    meaningfully increase Barclays reputation

2    risk in relation to the options transactions

3    because writing a new option should be viewed

4    as the maintenance of a longstanding

5    structure."

6            Do you see that?

7        A    I do see that.

8        Q    Okay.  So the approvals committee

9    in 2012 was recognizing that Renaissance was

10   assuming the tax risk, and also, because the

11   options structure had been ongoing, it wasn't

12   a significant risk to the bank to write a new

13   one.

14           Would you agree?

15           MR. OXFORD:  Object to the form.

16       A    So what was -- there were two parts

17   to that question, What was -- the first part

18   was?

19       Q    Sure.  Let me address Mr. Oxford's

20   objection.

21           The first thing is that the

22   committee recognized that the tax risk was

23   assumed by the client.

24           Right?

25           MR. OXFORD:  Object to the form.

CONFIDENTIAL
Graham Wade — March 16, 2022

 1      A     That's -- that's what it says.

 2      Q     Okay.  And it also says that the

 3  new option transaction, which is "this

 4  transaction doesn't meaningfully increase

 5  reputation risk because writing a new option

 6  should be viewed as a maintenance of a

 7  longstanding structure."

 8            Right?

 9      A     I agree that's what it says.

10      Q     Okay.  And do you recall that this

11  transaction was approved?

12      A     I do not recall, actually.

13      Q     Okay.  If you look at the last

14  sentence of the memo, the last line, if you

15  look at it, is that "the committee approved

16  the new option transactions subject to the

17  condition mentioned above."

18            Right?

19      A     It does say that.  But my

20  recollection of the situation around this

21  time -- and it mentions both -- the approval

22  was in effect contingent on further

23  discussions with senior management and the

24  client.

25            And I can't remember the exact

CONFIDENTIAL
Graham Wade – March 16, 2022

1   timing or events because this is a long time

2   ago.  But I know that at some point we

3   negotiated with the clients to restructure

4   the transactions so that the particular point

5   of contention with the IRS was no longer

6   present.

7           But I do not -- I cannot recall

8   whether that was as a result of this meeting

9   or a later meeting.

10      Q    Sure.  And that was actually after

11  the Senate investigation into Cult.

12          Right?

13          MR. OXFORD:  Object to the form.

14      A    I don't recall the relevant -- the

15  relative timing of all the different events,

16  I'm afraid.

17      Q    Okay.  But you would agree either

18  way that the -- that Barclays continued to

19  write these options for Renaissance even

20  though the IRS had expressed a view that they

21  did not give the tax benefits that they were

22  supposed to give.

23          Right?

24          MR. OXFORD:  Object to the form.

25      A    I would state it differently.

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1    The -- the tax treatment of the options was

 2    one of a number of components of a very

 3    longstanding arrangement between Barclays and

 4    Renaissance that related to its -- the

 5    overall prime brokering services provided to

 6    a very important client even before -- this

 7    is my recollection now, it's a long time ago.

 8            But even before the -- the notice

 9    was issued by the IRS, it's my recollection

10    that discussions had been had as between -- I

11    think in some respects, in part, due to

12    voluntary disclosures which Barclays had made

13    about this structure many years earlier,

14    because we voluntarily disclosed every

15    transaction that structured capital markets

16    did to the relevant tax authorities.

17            So it's my recollection that even

18    at the point that the IRS issued their

19    notice, we were already aware that there was

20    some difference of opinion between the

21    clients and the IRS on the transactions, but

22    that on the basis that we had, you know,

23    legal advice, that the position they were

24    taking was appropriate and the basis that

25    they, you know, they had referenced
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    throughout the transaction, it was -- it's

2    clearly their tax filings and there was very

3    clear contractual arrangements around that.

4            That -- so each individual option

5    was not really a separate transaction.  It

6    was part of an overall synthetic prime

7    brokerage arrangement between Barclays and

8    one of its important clients.

9       Q    And do you recall at the time

10   whether Barclays itself disagreed with the

11   IRS' reading of the revenue laws that

12   prohibit the Cult transactions?

13           MR. OXFORD:  Objection to form.

14      A    I'm not sure that's what I just

15   said.  I think our client -- my recollection,

16   and I have to be getting close to -- I mean,

17   I have to think about what my duty of

18   confidentiality to the client is -- but my

19   recollection is that the clients have made us

20   aware that the IRS was investigating, through

21   the normal IRS audit process, the

22   transactions and that they opened a

23   transparent dialogue between us, Renaissance,

24   and the IRS had already existed before the

25   IRS issued the notice that's in this pact.

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1        Q    Okay.  You were describing -- by
 2   "client," were you referring to Barclays?
 3        A    No.  By "client" I'm referring to
 4   Renaissance Technologies.
 5        Q    I understand.  Okay.
 6             MR. PRUDEN:  I have no further
 7        questions at this time.  I understand
 8        that there are others who do.
 9             Thank you.
10             MR. BLESSINGTON:  Neil, if it's all
11        right, I've got a few questions,
12        probably five, ten minutes at most,
13        Mike.  I'm looking at you, Mike.  I
14        think -- where are we on time?
15             MR. BONGIORNO:  We have questions
16        we want to ask first.  But can we take a
17        break for maybe five minutes?
18             MR. OXFORD:  Let's go off the
19        record.
20             MR. BONGIORNO:  Let's go off the
21        record and we can discuss.
22             THE VIDEOGRAPHER:  Stand by.  The
23        time is 1:34 p.m. New York time and
24        we're going off the record.
25             (Brief recess taken.)
```

CONFIDENTIAL
Graham Wade – March 16, 2022

1          That is the result of some

2     discussions that must have happened prior to

3     the sending of that e-mail.

4          Q    And that -- and those discussions

5     could have taken place between Morgan Stanley

6     and ED&F, and not Acer?

7               MR. OXFORD:  Objection to form.

8          A    Based on my experience and the

9     general nature of the relationship between a

10    client and its prime broker, it would be very

11    surprising to me if Acer were not in any way

12    involved in those discussions.

13         Q    All right.

14              MR. BLESSINGTON:  I have no further

15    questions.  Thank you, Mr. Wade and

16    sorry, Julia.

17              MR. OXFORD:  Thanks, John.  Thanks.

18              Anybody else?

19

      EXAMINATION BY MS. MCCARTHY:

20

21         Q    I'm Sharon McCarthy from Costello &

22    Fink.  I represent John Van Merkensteijn.

23    Mr. Wade, I'm just going to ask you a few

24    questions.

25              You've testified a bit about your

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1    time at Barclays and I want to ask you about
 2    Project Cum Ex.
 3              Are you familiar with that,
 4    Mr. Wade?
 5              MR. OXFORD:  Object to the form.
 6        A    I think as I stated earlier today,
 7    I'm aware as a matter of public record that
 8    Barclays undertook certain cum ex
 9    transactions, so yes.
10        Q    Are you familiar with the details
11    of Project Cum Ex and how Barclays conducted
12    cum ex transactions?
13              MR. OXFORD:  Object to the form.
14        A    As I've already said earlier today,
15    I was not personally involved in the
16    execution of those transactions and they were
17    undertaken a very long time ago.  So I would
18    not be able to discuss specific details of
19    those transactions.
20        Q    Well, I'm going to ask you to take
21    a look at Exhibit 5019.
22              (Whereupon the above mentioned was
23         marked for Identification.)
24        A    Is that File 2?  Which --
25              MR. OXFORD:  Can you help us out
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1          with the binder, Sharon?

2              MS. MCCARTHY:  Binder 2.  It's the

3      second exhibit.

4              MR. OXFORD:  This is the ED&F

5      binders?

6              MS. MCCARTHY:  Yes.

7              MR. OXFORD:  Okay.  Thank you.

8              MS. MCCARTHY:  Sorry about that.

9              MR. OXFORD:  That's okay.  I just

10     want to make sure we're all at least

11     starting on the same document and then

12     we can try to get to the same page.

13     A    So my number "9" is the --

14     Q    5019?  It's 19.

15     A    Sorry, sorry.

16             MR. OXFORD:  So that's not in the

17     second binder.

18             MS. MCCARTHY:  You must have

19     different binders.

20             MR. OXFORD:  Okay.  I think we're

21     on the same document now.

22     Q    And Mr. Wade, is it fair to say

23     that Exhibit 5019 is a memo -- Barclays memo

24     to the SCM Approvals Committee on

25     January 22nd of 2010?

CONFIDENTIAL
Graham Wade - March 16, 2022

```
 1          A    It's actually -- and I can tell

 2    this from the -- the legend at the top, it's

 3    actually a copy of that memo that was

 4    submitted on a voluntary basis to HMRC.

 5          Q    Okay.  Have you seen this before?

 6          A    Yes, I believe I have.

 7          Q    And I just want to represent to you

 8    that this was a document taken off the

 9    Internet and the green highlighting was there

10    when it was taken off.  So that is not

11    something that we highlighted on purpose.

12    That's how it came out.

13               So are you familiar, then,

14    Mr. Wade, with the contents of this document?

15          A    I'm not fully familiar with all the

16    details of it.  But the reason I recognize

17    this document is, as I said, it was submitted

18    to the U.K. tax authorities and the German

19    tax authorities, and then it was subject of a

20    leak, and I -- I recall because at the time

21    of that leak, I was, I believe, the global

22    head of SCM.

23               So I have seen this memo before in

24    that context.

25          Q    Okay.  And you are familiar with
```

```
 1      the fact that Barclays engaged in cum ex

 2      trading in Germany.

 3             Correct?

 4             MR. OXFORD:  Object to the form.

 5      A    I think I've already said it's a

 6      matter of public record that yes, Barclays

 7      undertook cum ex transactions in Germany --

 8             MR. OXFORD:  Hold on, Sharon.  He

 9         wasn't finished with his answer.

10             Please continue, Mr. Wade.

11      A    Undertook transactions in Germany

12      prior to 2012.

13      Q    Okay.  And are you aware that in

14      connection with that, Barclays was a short

15      seller?

16             MR. OXFORD:  Object to form.

17      A    If I can just --

18             MR. OXFORD:  Yeah, take a moment to

19         review the memo if you need it to answer

20         the questions, Mr. Wade.

21      A    (Witness reviewing.)

22             MR. OXFORD:  Sharon, there's a lot

23         of background noise where you are.  We

24         didn't have the problem with the other

25         examiners.
```

CONFIDENTIAL
Graham Wade − March 16, 2022

```
 1                Is there a way to mute the mics in
 2        what I assume is a very large room?
 3                MS. MCCARTHY:  I'll mute it when
 4        I'm not speaking.  How's that?
 5                MR. OXFORD:  You -- but can you
 6        mute the rest of them and let you speak?
 7                MS. MCCARTHY:  I don't think any
 8        other mics are on.
 9                MR. OXFORD:  Okay.  Thanks for
10        checking.
11        A     So yes, it appears that under the
12   terms of this memo, the expectation was that
13   Barclays would be acting as a short seller.
14                However, it's my recollection that
15   no transactions were undertaken as a result
16   of this memo.  But that's a recollection and
17   I can't be a hundred percent sure on that.
18        Q     So you don't think that Barclays
19   actually engaged in any cum ex trades?
20        A     No.  That's --
21                MR. OXFORD:  Object to the form.
22        Not what he said.
23        A     No, that's not what I said.
24   This -- this memo was produced in 2010 and it
25   was discussing the potential for transactions
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    to take place in 2010.

2            And as it notes, by that point

3    there was already starting to be some

4    question marks about whether this specific

5    procedural rule in Germany on which previous

6    cum ex transactions had taken place was

7    either effective or even if it was legally

8    permissible, was something that the German

9    tax authorities thought was appropriate.

10            And this is my recollection.  I

11    can't be a hundred percent sure, but my

12    recollection is as a result of the

13    discussions that followed from this memo, a

14    decision was taken that Barclays would not

15    conduct any further cum ex transactions.

16            But that's -- I was not personally

17    involved in those discussions at the time.

18    But in my responsibility in later years, and

19    in particular in dealing with the leak of

20    this document, that is my recollection of

21    what happened.

22        Q    If you turn to Page 2 of

23    Exhibit 5019, in the middle, right above

24    "Trade Execution?"

25        A    Yeah.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 248

```
 1        Q    It says, "On this basis,
 2   BCSL" -- which is Barclays, correct?
 3             MR. OXFORD:  Objection to the form.
 4        A    Yes.
 5        Q    -- "intends to continue to execute
 6   Project Cum Ex to the extent that market
 7   demand exists.  Consistent with the 2009
 8   year, initial indications are that market
 9   participants continue to have appetite."
10             Does that suggest to you, sir, that
11   Barclays had been engaging in cum ex
12   transactions, since it says it "intends to
13   continue to execute Project Cum Ex?"
14             MR. OXFORD:  Objection to the form.
15        Asked and answered.
16        A    I believe I've already confirmed
17   and I think it's a matter of public record
18   that Barclays did execute some cum ex
19   transactions.
20             My point is that my recollection,
21   and this is a long time ago, and I wasn't
22   directly involved in the particular
23   conversations around this approvals process,
24   the SCM approvals process starts with a
25   business proposing a suggested transaction.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1              But then the whole point of the

2    process is that all the appropriate

3    governance process within Barclays and all

4    the infrastructure areas need to consider to

5    review that transaction, there are often

6    follow-up conversations, due diligence,

7    conditions, all those other kind of things.

8    And I can say and it's my recollection that,

9    you know, the German tax authorities by this

10   stage had already put out some slightly

11   ambiguous changes in rules, changes in

12   guidance, that the market at this time was

13   trying to digest.

14             And my recollection is that

15   notwithstanding approval was requested to

16   continue doing transactions, that ultimately

17   a decision was made not to do any

18   transactions for -- in 2010.  But that's my

19   recollection and I cannot be a hundred

20   percent sure on that.

21        Q    Okay.  So Barclays did engage in

22   cum ex transactions.  They were a short

23   seller.

24             Correct?

25             MR. OXFORD:  Object to form.  Asked

CONFIDENTIAL
Graham Wade — March 16, 2022

1    and answered.

2        A    It is — as I've said, it's my

3    recollection and I believe it's public

4    information that Barclays did enter into

5    cum ex transactions at the exact details of

6    what those particular transactions were and

7    Barclays role in them.

8            I was not personally involved and I

9    can't recollect.  But I think in general

10    Barclays was — we were — we were not

11    a — we were a U.K. entity, and so generally,

12    I would have expected us to be on the selling

13    side.

14            But I can't remember the full

15    details of any and all transactions which

16    Barclays may have undertaken.

17        Q    Mr. Wade, would you have expected

18    Barclays to inform the purchaser that it was

19    selling short?

20            MR. OXFORD:  Object to form.

21        A    Well, I think there are some

22    important differences between the way

23    Barclays executed its cum ex transactions

24    from the transactions in this case.

25            Obviously, there's —

CONFIDENTIAL
Graham Wade - March 16, 2022

1      Q    Well, I'm just asking

2    you a -- Mr. Wade, sorry.  I'm just asking

3    you literally a yes-or-no question.

4    That's -- it's literally a yes-or-no

5    question.

6             MR. OXFORD:  Okay.  So, Mr. Wade,

7         you don't have to answer the question

8         "yes" or "no" if the answer is not "yes"

9         or "no."

10            Mike, can you please read back the

11        question that Sharon asked?  Can you

12        read back the portion of the answer the

13        witness was permitted to give before he

14        was interrupted by Ms. McCarthy?

15            (Whereupon the record was read back

16        by the reporter.)

17            MR. OXFORD:  Please continue.

18       A    Okay.  Obviously, Barclays at that

19    time, and still is, a significant market

20    maker in a number of securities, and has a

21    range of equity finance activities.

22            And my recollection, and I can see

23    it in this thing, there were a number of

24    execution conditions on Barclays in

25    particular that it would only be done on

CONFIDENTIAL
Graham Wade - March 16, 2022

1    exchange, by which my understanding is that

2    this was a -- primarily a pricing arbitrage

3    and that we did not know who we were selling

4    the shares to, and therefore would have been

5    unable to make any representations to.

6              And I don't think that -- I think

7    the facts in the -- I'm not sure whether we

8    are talking about ED&F Man or Solo here.

9    Obviously, in the Solo case, there were no

10   shares, so it's very easy to distinguish.

11             But even in the case of ED&F Man, I

12   think for all the reasons given in my report,

13   it's clear that the counterparties did

14   know -- the short sellers did know who they

15   were -- who they were selling to.

16       Q    So the answer to my question is

17   "no?"

18             MR. OXFORD:  Object to form.

19       A    The --

20       Q    Barclays would not have told the

21   purchaser that it was selling short.

22             Correct?

23             MR. OXFORD:  Object to the form.

24   Asked and answered.

25       A    The answer to my question -- to

CONFIDENTIAL
Graham Wade — March 16, 2022

1    that question was that my recollection is

2    that the way Barclays executed any cum ex

3    transactions that it did was very different

4    and it would not have known who it was

5    selling to.  And so, therefore,

6    definitionally, it would have been impossible

7    for it to make any representations.

8           But it's a very long time ago and I

9    wasn't directly involved in the execution of

10   those transactions.  So those caveats

11   definitely apply.

12   Q    Mr. Wade, when Barclays borrowed

13   the shares, it would not have known if the

14   counterparty it borrowed from was the same

15   entity to whom it sold.

16           Is that correct?

17           MR. OXFORD:  Object to the form.

18   A    No, I don't think that's correct.

19   Q    What do you base that on?

20   A    Well, the basis is that

21   Barclays — the type of entities and

22   counterparties for who Barclays borrowed

23   shares from were completely different types

24   of entities than the types of entities that

25   would be in the market to execute

CONFIDENTIAL
Graham Wade - March 16, 2022

1    exchange-based equity purchases on a cum ex

2    basis.

3         Q    So sir, in your -- is it your

4    understanding -- withdrawn.

5              Your understanding is that

6    reputable market participants conducted

7    cum ex trades in Germany until 2012 because

8    German tax provisions created a possibility

9    that the economic owner should be entitled to

10   the dividend and therefore to the set tax

11   certificate related thereto.

12             Is that correct?

13             MR. OXFORD:  Object to the form.

14        A    No, that's not correct.

15   That's -- and the reason for that is that the

16   specific procedure, which is obviously now

17   heavily disputed in Germany, was one where,

18   in the situation of a cum ex transaction

19   which resulted in a dividend compensation

20   payment, notwithstanding that the payment was

21   a dividend compensation payment, the -- the

22   custodian of that dividend compensation

23   payment was, under this procedural rule, in

24   title straight requires to issue a specific

25   type of tax voucher.

CONFIDENTIAL
Graham Wade — March 16, 2022

Page 255

| | |
|---|---|
| 1 | In other -- in relation to that, |
| 2 | there were often situations where the short |
| 3 | seller would have to withhold German tax on |
| 4 | that dividend compensation payment.  But that |
| 5 | rule did not apply to -- and this is my |
| 6 | recollection -- that rule did not apply to |
| 7 | foreign financial institutions. |
| 8 | And it was on the basis of that |
| 9 | understanding that a number of market |
| 10 | participants undertook cum ex transactions in |
| 11 | Germany. |
| 12 | And as explained in this memo, |
| 13 | starting firstly in 2009, the German tax |
| 14 | authorities began a process of changing those |
| 15 | rules and issuing guidance around those |
| 16 | rules, which ultimately lead into a complete |
| 17 | change of the rules which had effect from the |
| 18 | beginning of 2012. |
| 19 | Q   Mr. Wade, I just want to alert you |
| 20 | to the fact that I was reading from your |
| 21 | reply report that you disagreed with. |
| 22 | So if you could turn to |
| 23 | Exhibit 5003, which is your reply, and go to |
| 24 | Page 5, Paragraph 10? |
| 25 | A   I'm sorry.  5003? |

CONFIDENTIAL
Graham Wade – March 16, 2022

```
 1        Q     Paragraph 10, Page 5.

 2        A     I must be looking at the wrong

 3   thing.

 4              MR. OXFORD:  It's your reply

 5        report, Mr. Wade.  It should be Tab 3.

 6        A     Yeah.   Page 10?

 7              MR. OXFORD:  No, it's Page --

 8              MS. MCCARTHY:  Paragraph 10.

 9              MR. OXFORD:  Ten.   Paragraph 10.

10        A     Sorry.  I was on page 10.   Okay.

11   I'm -- yeah.

12        Q     And is it -- is it accurate that

13   your report indicates that in -- the only

14   jurisdiction that you're aware of where

15   reputable market participants ever considered

16   deliberately conducting cum ex trades was

17   Germany prior to 2012.

18              "The only jurisdiction that I'm

19   aware of where reputable market participants

20   ever considered deliberately conducting

21   cum ex trades was Germany prior to 2012.   The

22   ESMA report confirms my understanding and

23   states that, quote, BaFin, the German banking

24   regulator, reported that until 2012, a

25   controversial reading of the German tax
```

CONFIDENTIAL
Graham Wade - March 16, 2022

1    provisions seems to have created a

2    possibility that the economic owner should be

3    entitled to the dividend and therefore to the

4    tax certificate related thereto."

5          Your report, sir, does that -- did

6    I accurately read your report there on

7    Paragraph 10?

8    A    You've -- you have accurately read

9    Paragraph 10.  I agree.

10    Q    Okay.  And then, in your next

11    paragraph, Paragraph 11, you state that the

12    relevance of the year 2012 is that "with

13    effect from January 1, 2012, Germany changed

14    its tax law related to the dividend

15    withholding tax, thereby removing any doubt

16    on the question of the availability of a

17    reclaim on a dividend compensation payment in

18    a cum ex transaction."

19          Is that accurate?

20    A    That is accurate.

21    Q    All right.  Sir, do you have any

22    knowledge of what the Danish law is or was

23    relating to cum ex transactions until 2015?

24          MR. OXFORD:  Objection to form,

25          asked and answered.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 258

1          A     I have, from my time at Barclays

2     and my responsibilities there, Barclays --

3     every -- on an annual basis obtained legal

4     advice relating to the types of equity

5     finance transactions and execution rules in

6     all the European jurisdictions in which it

7     operated.  There was an annual review of

8     those rules and annual approval of execution

9     guidelines.

10              And based on that understanding,

11     and also my wider understanding of what other

12     market participants were doing in the market

13     at the relevant times, I outside -- as I say

14     in this particular section -- outside of

15     Germany and after 2012, before getting

16     involved in this case, I was -- I had -- I

17     would go further and say I have no awareness

18     of people doing cum ex.

19              I think it's a positive view of the

20     market that cum ex transactions did not work

21     and could not work, and the main reason for

22     that being that absent a very specific

23     procedural rule which Germany had relating to

24     compensation payments, there was no basis for

25     it to work.  Because if you receive a

1    dividend compensation payment and there isn't

2    some explicit, you know, basis on which to

3    make a reclaim, then there's no basis for

4    thinking that a withholding tax reclaim could

5    be made.

6        Q    So, in answer to my question, are

7    you specifically familiar with the Danish tax

8    law as it existed between 2012 and 2015

9    related to cum ex transactions?

10           MR. OXFORD:  Object to the form.

11       What is your question?

12           MS. MCCARTHY:  Does he have any

13       specific knowledge of the state of the

14       Danish tax law as it relates to cum ex

15       transactions between the years 2012 and

16       2015.

17           MR. OXFORD:  Objection, asked and

18       answered.

19       A    So on the basis of the work that

20   Barclays did in which -- for which I was

21   responsible for at the relevant period of

22   time, and the obtaining of advice and market

23   understanding and discussions about various

24   transactions and the execution rules that

25   Barclays had, I -- it is my understanding

CONFIDENTIAL
Graham Wade — March 16, 2022

1    that outside Germany, it was a very

2    well-understood position of reputable market

3    participants that a cum ex transaction could

4    not give rise to a withholding tax reclaim.

5         Q    So no specific knowledge of the law

6    in Denmark.

7             Is that correct?

8             MR. OXFORD:  Objection, asked and

9         answered.  I think twice.

10            MS. MCCARTHY:  I actually haven't

11        gotten a direct answer to that question,

12        Neil, so I would like an answer to that

13        question.

14            MR. OXFORD:  My objection is on the

15        record.  If you -- you can answer the

16        question, Mr. Wade, as many times as you

17        like.

18        A    As I've said, on the basis of the

19    annual process that Barclays undertook and

20    all the other knowledge I had in being

21    involved in the market at the time, it is my

22    understanding that the only place where any

23    market participant thought that cum ex might

24    give rise to a tax reclaim in the hands of

25    the purchaser under a cum ex transaction was

CONFIDENTIAL
Graham Wade — March 16, 2022

1    Germany and was prior to 2012.

2        Q    I'm going to ask you just another

3    question on short selling.

4            When Barclays was a short seller,

5    is there any way it would have known if it

6    borrowed shares indirectly from the purchaser

7    of the shares?

8            MR. OXFORD:  Object to the form.

9        A    I was -- I was not directly

10   involved in the execution of those

11   transactions, so it's difficult to give an

12   answer to that.

13           But my general understanding is

14   that the typical counterparties from whom

15   Barclays would borrow shares would be the

16   large asset managers' pension funds and agent

17   lenders, and it would be highly unlikely that

18   they were also acting as a cum ex purchaser,

19   directly or indirectly, in the transaction by

20   the nature of what they do.

21       Q    So highly unlikely, yet possible.

22           Correct?

23           MR. OXFORD:  Object to the form.

24       A    As I've said, because I was not

25   personally involved in the execution of these

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 262

1    trades, it was a very long time ago, and I
2    don't know all the -- all the ins and outs of
3    it.
4            In the case of Barclays, it is, I
5    guess, theoretically possible that in the
6    case of the particular transactions that I've
7    reviewed for this case, it's my opinion that
8    it's -- it's clear to see where the shares
9    came from.
10           In the case of Solo, there were no
11   shares, and in the case of ED&F Man, we can
12   see that the shares had been recycled back.
13           MS. MCCARTHY:  I have no further
14       questions.  I will just mute for a
15       moment while we re-setup.
16           (Whereupon a discussion was held
17       off the record.)
18
         EXAMINATION BY MR. BONGIORNO:
19
20           MR. BONGIORNO:  Good evening,
21       Mr. Wade.
22       A    Good evening.
23       Q    My name is Mike -- what's that?
24       A    It's very dark here.
25       Q    Yeah.  Well, it's still light over