**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX REFUND
SCHEME LITIGATION

This document relates to case nos.:

18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-01893; 19-cv-01781; 19-cv-01783; 19-cv-01866; 19-cv-01895; 19-cv-01794; 19-cv-01865; 19-cv-01904; 19-cv-01798; 19-cv-01869; 19-cv-01922; 19-cv-01800; 19-cv-01788; 19-cv-01870; 18-cv-07827; 19-cv-01791; 19-cv-01792; 19-cv-01928; 19-cv-01926; 19-cv-01868; 18-cv-07824; 19-cv-01929; 19-cv-01803; 19-cv-01806; 19-cv-01906; 19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-01810; 19-cv-01809; 18-cv-04833; 19-cv-01911; 19-cv-01898; 19-cv-01812; 19-cv-01896; 19-cv-01871; 19-cv-01813; 19-cv-01930; 18-cv-07829; 18-cv-04434; 19-cv-01815; 19-cv-01818; 19-cv-01931; 19-cv-01918; 19-cv-01873; 19-cv-01924; 19-cv-10713; 21-cv-05339.

MASTER DOCKET

18-md-2865 (LAK)

**PLAINTIFF SKATTEFORVALTNINGEN'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED**
**EXPERT REPORTS, OPINIONS, AND TESTIMONY OF BRUCE DUBINSKY**

HUGHES HUBBARD & REED LLP
William R. Maguire
Marc A. Weinstein
Neil J. Oxford
Dustin P. Smith
Gregory C. Farrell
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................2

LEGAL STANDARD.................................................................................................5

ARGUMENT.............................................................................................................7

    I.     Mr. Dubinsky does not testify as to whether the pension plans owned shares under Danish law ................................................................7

    II.    Mr. Dubinsky's testimony based on the Elysium documents is admissible ...........9

    III.    Mr. Dubinsky is qualified to testify about the structure of the Solo trading and that the plans could not have purchased the shares absent the circular trading ...............................................................................15

CONCLUSION.........................................................................................................17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Amtrak*, 303 F.3d 256 (2d Cir. 2002) ....................................................6

*Arista Records LLC v. Lime Group LLC,* No. 06 CV 5936(KMW), 2011 WL
    1674796 (S.D.N.Y. May 2, 2011)...............................................................7, 15

*AstraAktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp.2d 423 (S.D.N.Y. 2002) ...........10

*Auto. Ins. Co. of Hartford, Connecticut v. Electrolux Home Prod., Inc.*, No. 10-
    CV-0011 (CS), 2012 WL 6629238 (S.D.N.Y. Dec. 20, 2012).................................6

*In re Bernard L. Madoff*, 528 F. Supp.3d 219 (S.D.N.Y. 2021)....................................14

*Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328 (S.D.N.Y. 2023) .......7

*Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83 (S.D.N.Y. 2022)...............10, 13

*City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (AJN), 2021 WL
    5154110 (S.D.N.Y. Nov. 5, 2021).................................................................14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786
    (1993) ...................................................................................................6, 7

*Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373 (M.D. Ga. 2006)....................14

*Floyd v. City of New York*, 861 F. Supp. 2d 274 (S.D.N.Y. 2012)..................................6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999)........................6

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007)............7, 17

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013) ...................................14

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ......................................6, 15

*Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 828 (S.D.N.Y. 2018) .........................9

*In re Pfizer Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016) ..................................................9

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) .......................10

*Roman v. Sprint Nextel Corp.*, No. 12-cv-276 (VEC), 2014 WL 5026093
    (S.D.N.Y. Sept. 29, 2014).............................................................................6

*Sec. & Exch. Comm'n v. U.S. Env't, Inc.*, No. 94CIV.6608(PKL)(AJP), 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ...................................................................9

*SIPC v. Madoff*, 610 B.R. 197 (Bankr. S.D.N.Y. 2019) ............................................16

*SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107 (2d Cir. 2006) .............................................................................................................6, 16

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) .........................................10, 14

*United States v. Rosario*, No. 09-CR-415-2 (VEC), 2014 WL 6076364 (S.D.N.Y. Nov. 14, 2014) ........................................................................................................6

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004)........................................15

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015)............................6

*In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 AWT, 2009 WL 8556135 (D. Conn. Apr. 22, 2009) ...............................................................................................7

**Statutes and Rules**

Fed. R. Evid. 702 .................................................................................5, 6, 13, 15

Fed. R. Evid. 703 .................................................................................................10

Fed. R. Evid. 704 ...................................................................................................7

Plaintiff Skatteforvaltningen ("SKAT") respectfully submits this memorandum of law in opposition to defendants' motion to exclude the testimony of SKAT's expert Bruce Dubinsky.

## PRELIMINARY STATEMENT

Defendants' motion to exclude SKAT's forensic accountant Bruce Dubinsky's expert testimony that the defendants' so-called structured transactions in Danish shares were closed-loop, circular trades that did not result in the plans or the Solo custodians holding any Danish shares or receiving any Danish dividends fails to identify any valid ground on which his testimony is inadmissible.[1]

Defendants' argument that Mr. Dubinsky cannot offer a legal conclusion that the defendant plans did not own shares as a matter of Danish law is beside the point, as Mr. Dubinsky does not do so. Rather, Mr. Dubinsky's testimony is that as a factual matter, based on his review of the defendants' and Solo custodians' trading and other records, there were never any shares or dividends for the defendant plans to own. Defendants' misguided argument, supposedly based on Danish law, that shares do not need to exist for one to own them cannot turn Mr. Dubinsky's factual opinions into legal conclusions.

Defendants also argue that Mr. Dubinsky's opinions about the purported Solo trading should be excluded because his opinions rely on underlying Solo trading records that are unauthenticated or hearsay. But even assuming for the sake of argument that were true, experts may rely on such inadmissible materials in forming their opinions. In fact, despite defendants' protestations to the contrary, it is abundantly clear that the trading records seized from Sanjay Shah's Elysium companies in Dubai are the records of the defendants' purported trading, and

---

1. The "Solo custodians" are Solo Capital Partners LLP, Old Park Lane PLC, West Point Derivatives, and Telesto Markets.

that such records are a reliable basis for an opinion on how the trading was structured. The Solo custodian trading records are precisely the sort of materials that a forensic accountant would rely on in these circumstances to determine the structure of the purported transactions.

Finally, defendants' throw-away arguments, with no citation to any case law on the applicable standards or otherwise, that Mr. Dubinsky is unqualified to opine on defendants' supposedly "complex structured transactions," and the plans' lack of money or credit to purchase billions in Danish shares is frivolous.

## BACKGROUND

SKAT retained Bruce Dubinsky, an expert in forensic accounting and fraud investigations, to examine the Solo custodians' and defendants' trading records, account statements and other materials produced in discovery to assess, among other things, (i) whether any shares of Danish stock existed in the defendant plans' purported trades underlying the defendants' dividend withholding tax refund claims to SKAT; (ii) whether the plans received actual dividends as a result of those trades; and (iii) who received the proceeds from the "refunds" SKAT paid. (Declaration of Marc A. Weinstein, dated July 5, 2024 ("Weinstein Decl."), Ex. 1 (Expert Report of Bruce G. Dubinsky, dated Dec. 31, 2021 ("Dubinsky Report")) ¶ 1.)

Mr. Dubinsky offered four primary opinions in his December 31, 2021 expert report: (i) that there is "no evidence that the Plans ever owned actual shares of Danish companies resulting from the purported Solo Trades, or received actual dividends issues by the Danish companies whose shares were allegedly purchased by the Plans;" (ii) that the plans' Solo trades "were pre-arranged, closed loop, circular transactions in which a short-seller purported to sell Danish shares to the Plans, but only obtained the non-existent shares by purportedly ultimately borrowing those same shares from the Plans that also did not have any shares;" (iii) that the plans

2

did not have sufficient capital, liquidity, or creditworthiness to purchases shares in the amounts and volumes in which they purportedly traded; and (iv) that the "profits" from the plans' trading were just SKAT's payments of purported tax refunds, the majority of which went to Sanjay Shah's Solo Capital and its affiliates and to entities controlled by defendants Richard Markowitz, John van Merkensteijn, and Robert Klugman. (*Id.* ¶¶ 16, 218-21.)

In particular, Mr. Dubinsky concluded that the "essence" of the Solo trading was that all the "purported transactions involved the circular transfer of non-existent Danish shares between the 'seller' and the Plans." (*Id.* ¶ 17.) But there was "no evidence," Mr. Dubinsky found, "that the seller ever possessed the shares it purported to sell to the Plans." (*Id.*) Rather, "[i]n every case, the seller borrowed the shares from the Plan—the very same shares that the seller purportedly sold to the plan in the first place." (*Id.*)

Thus, Mr. Dubinsky "concluded that the Solo Trades did not involve the purchase or ownership of any actual Danish securities, and that the Plans did not receive any actual Danish dividends." (*Id.* ¶ 131.) Mr. Dubinsky made this determination after reviewing (i) account statements from and representations made by the Solo custodians' sub-custodians; (ii) the Solo custodians' "business records for any indicia of share ownership;" (iii) "Solo Capital's bank records for any indication of dividend receipt;" and (iv) "each leg of the Solo Trades to determine whether actual shares existed." (*Id.*)

As Mr. Dubinsky explained, "any securities that were purchased by the Plans would have ultimately been held by the Solo Custodians or any sub-custodians used by the Solo Custodians." (*Id.* ¶ 133.) And "[i]f the Plans had actually held any positions in Danish securities, or received dividend payments from Danish companies, the Solo Custodians, or their sub-custodians, would maintain records of the transactions reflecting that the shares were in fact received and held in

3

custody and that dividends were in fact received." (*Id.*) But none of the Solo custodians' sub-custodians ever held any Danish shares or received any dividends on their behalf. (*Id.* ¶¶ 134-38.)[2] So even setting aside the circularity of the trading, Mr. Dubinsky was able to conclude from this "alone" that "the Plans never owned the Danish shares they purported to own from the Solo Trades, nor did they ever receive the dividends from the Danish companies." (*Id.* ¶ 138.)

Further "underscore[ing]" his "conclusion that the Solo Trades did not include any actual Danish securities or dividends," Mr. Dubinsky found no evidence of any such holdings or receipt of dividends in the Solo custodians' business records or bank account statements. (*Id.* ¶¶ 139-45.) For instance, Mr. Dubinsky reviewed the Solo custodians' bank records and found that they included "no evidence that they received, on behalf of the Plans, actual dividend payments arising from the ownership of Danish shares, either from Danish issuers directly or from other custodian institutions." (*Id.* ¶ 143.)

And Mr. Dubinsky also had access to a trove of over ten million documents seized from Sanjay Shah's Elysium Properties Limited and Elysium Global (Dubai) Limited pursuant to a search order issued by the Dubai International Financial Center courts in SKAT's Dubai actions against those entities. (*Id.* ¶ 141.)[3] If the Solo custodians "used sub-custodians to custody the Plans' Danish securities," Mr. Dubinsky expected, based on his experience, that such documents

---

2. As Mr. Dubinsky explained, "at various times," Solo Capital and Sanjay Shah "ha[d] identified three possible financial institutions that acted as sub-custodians for holdings of Danish securities for Solo Capital' clients:" JPMorgan Chase, Skandinaviska Enskilds Banken AB and the Zurich Branch of Société Générale SA. (*Id.* ¶ 134.) Mr. Dubinsky reviewed "the custodial records from Solo Capital's accounts at Société Générale" and "noted that there were no transactions or positions in the purported Danish equities in the Solo Trades." (*Id.* ¶ 136.) And he reviewed the sworn affidavits from representatives of JPMorgan Chase and Skandinaviska Enskilda Banken produced in response to letters rogatory issued by the Court and "attesting to the fact that they performed an internal review of their own records and found no evidence that they held any of the relevant Danish securities on behalf of the Solo Custodians during the relevant period or had any record of receiving dividends from Danish companies they were asked to search for." (*Id.*)

3. These documents were produced to defendants as part of discovery in this multidistrict litigation. (*See* Order Granting Pl. Skatteforvaltningen's Consent Mot. to Produc., ECF No. 286.)

would include "records from third parties" and "internal record keeping" related to share holdings and dividend receipt. (*Id.* ¶¶ 139-40.) But while the records showed that "the Solo Custodians kept detailed records of the [circular] paper trades" and "payments made to the various participants of the scheme," Mr. Dubinsky found no evidence therein "that the Solo Custodians received or custodied any Danish securities for the Plans." (*Id.* ¶¶ 142, 144.)

In addition, Mr. Dubinsky concluded that "[t]he Plans did not have sufficient capital, liquidity or access to real credit to complete the purported Solo Trades but for the circular nature of the structure scheme," providing "further evidence that the purported purchases of securities were not real." (*Id.* § F.) Based on his review of available records and bank statements, Mr. Dubinsky noted that the plans' sponsoring companies "were, at best, thinly capitalized, with opening bank balances of typically only a few thousand dollars or less." (*Id.* ¶ 213.) And the plans themselves were likewise "thinly capitalized, as few contributions were made" to them. (*Id.* ¶ 214.) "As a result," Mr. Dubinsky concluded, "the Plans lacked the liquidity and financial wherewithal necessary to purchase the shares . . . which were worth hundreds of millions of dollars in certain instances." (*Id.*) Nevertheless, the plans were supposedly able "to instantaneously and repeatedly obtain financing through the stock loans" for "trades in the hundreds of millions of dollars," despite "not having the financial wherewithal" or the "credit history to back up such trades." (*Id.* ¶ 215.)

## LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert qualified "by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if (i) "the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (ii) "the testimony is based on sufficient facts or data;" (iii) "the testimony is the product of reliable principles and methods;" and (iv) "the expert's opinion

reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[4] and its progeny require the Court to play a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony" and "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999).

But, nevertheless, the standard for admissibility is not a rigid one and, in keeping with the purpose of the Federal Rules of Evidence, it is liberally applied to admit expert testimony. *See United States v. Rosario*, No. 09-CR-415-2 (VEC), 2014 WL 6076364, at *1 (S.D.N.Y. Nov. 14, 2014) (finding that the Supreme Court has rejected a "rigid" standard and that such a standard would be "inconsistent with the liberal thrust of the Federal Rules") (citing *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995)).[5] Doubts regarding an expert's testimony are resolved in favor of admission, *see, e.g.*, *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 308 (S.D.N.Y. 2015) (citation omitted), and gaps in an expert witness's qualifications or knowledge generally go to the weight, not the admissibility, of the testimony. *See SR Int'l. Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006) (citation omitted). Thus, "rejection of expert testimony is the exception rather than the rule," *Floyd v. City of New York*,

---

4.  509 U.S. 579, 113 S. Ct. 2786 (1993).

5.  *See also Auto. Ins. Co. of Hartford, Connecticut v. Electrolux Home Prod., Inc.*, No. 10-CV-0011 (CS), 2012 WL 6629238, at *1 (S.D.N.Y. Dec. 20, 2012) ("admissibility of expert testimony is governed principally by Rule 702[] which represents a more liberal standard of admissibility for expert opinions, as compared to the previous, more rigid standard") (citing *Daubert*, 509 U.S. at 588-89, 113 S. Ct. at 2794-95); *Roman v. Sprint Nextel Corp.*, No. 12-cv-276 (VEC), 2014 WL 5026093, at *4 (S.D.N.Y. Sept. 29, 2014) ("in accordance with the 'liberal admissibility standards of the federal rules,' only flaws in reasoning or methodology 'large enough that the expert lacks good grounds for his or her conclusions' warrant exclusion") (citing *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)).

861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (citation omitted), and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007) (citation omitted). Claims that an expert's opinions are unreliable generally go to their weight rather than admissibility. *See Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936(KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (citations omitted). "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of assessing the value of admissible expert testimony. *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798).

And under Federal Rule of Evidence 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Thus, while "testimony in the form of legal conclusions" is inadmissible, experts are "expressly permit[ted] . . . to opine on 'ultimate issues.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 375 (S.D.N.Y. 2023) (citations omitted). For instance, "[a]n expert may properly give evidence stating a factual conclusion even if it embraces an ultimate issue to be decided by the jury;" "may discuss the conduct that is the basis for . . . a legal conclusion;" and may "point to factors tending to show that conclusion." *In re Xerox Corp. Sec. Litig.*, No. 3:99CV02374 AWT, 2009 WL 8556135, at *5 (D. Conn. Apr. 22, 2009) (quotation marks and citations omitted).

## ARGUMENT

### I.    Mr. Dubinsky does not testify as to whether the pension plans owned shares under Danish law.

Mr. Dubinsky's testimony that there were no shares is not a legal conclusion. Defendants' argument to the contrary confuses the underlying fact that no shares existed, on which Mr. Dubinsky opines, with the legal significance of that fact, on which Mr. Dubinsky does

not offer any opinion.  (Defs. Br. 5-6.)  Nowhere in his report does Mr. Dubinsky mention, much

less offer any opinions on, whether the defendants owned, or were beneficial owners of, shares

under Danish or any other law.  Mr. Dubinsky's conclusion is a factual, not a legal, one that the

plans did not own shares because there were no such shares.  And he reached that conclusion, not

by interpreting Danish law, but rather by examining, among other things, trading records,

account statements and the Solo custodians' other documents.  (Dubinsky Report ¶ 131; *see*

*generally id.* § VI.)

Nor did Mr. Dubinsky admit even once at his deposition, let alone "multiple times," that

whether the plans "owned shares is an issue of Danish securities law that he is not qualified to

address."  (Defs. Br. 5.)  To be sure, Mr. Dubinsky readily agreed with defendants that

"beneficial ownership," "legal ownership under Danish law" or "U.S. law," and "who had legal

title" all are legal questions.  (Defs. Br. 6 (citing Weinstein Decl. Ex. 2 (Dubinsky Dep Tr.)

190:4-8, 28:11-22, 69:22-70:3).)  But as Mr. Dubinsky explained (and as is clear from his

report), the term "ownership" relates to both a factual or "accounting" concept, and a "legal"

concept, and what Mr. Dubinsky did was "a forensic accounting investigation to determine

whether there was evidence that the[] shares actually existed."  (Dubinsky Dep Tr., 69:22-70:11.)

And based on that investigation, he found "no evidence to support that the shares actually

existed," and "therefore, if the shares didn't exist, certainly from a forensic accounting

standpoint, the plans couldn't have owned them."  (*Id.* 70:12-71:1.)[6]

---

6.  *Id.* 71:2-21 (Q: "You say if the shares didn't exist, the plan – the plans couldn't have owned them. . . . I ask you:
Is that a legal opinion?" A: "No, I think that's a forensic accounting opinion, I think the genesis being, after
doing a forensic investigation and looking for evidence of the actual shares existing at either – ultimately at a
custodian that Solo used as a sub-custodian, and the fact that those shares didn't exist, I concluded that
therefore, the plans could not have owned them.  And I think that's a forensic accounting conclusion.
Ultimately, the judge or jury . . . would have to make a determination from a legal standpoint if there's
something different than that, if there was legal ownership or not.").

It is of no moment that Mr. Dubinsky's expert opinion that from a forensic accountant's perspective, the plans could not have owned shares that did not exist conflicts with defendants' meritless Danish law argument that final and binding share purchase agreements are sufficient for ownership, irrespective of whether shares existed. Mr. Dubinsky's testimony "must be evaluated within the context of" SKAT's "theory of the case" under which the plans could not have owned shares that did not exist. *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 828, 835 (S.D.N.Y. 2018) (citing *In re Pfizer Sec. Litig.*, 819 F.3d 642, 659 (2d Cir. 2016)). Mr. Dubinsky's "factual conclusions" from his forensic accounting investigation that no shares existed at most "embrace an ultimate issue" and "will likely prove helpful in allowing the" jury "to understand the evidence better and providing the" jury "with the necessary tools to make an ultimate determination about whether" the defendants' representations of share ownership in their tax refund claims were fraudulent. *Sec. & Exch. Comm'n v. U.S. Env't, Inc.*, No. 94CIV.6608(PKL)(AJP), 2002 WL 31323832, at *4 (S.D.N.Y. Oct. 16, 2002).

## II.    Mr. Dubinsky's testimony based on the Elysium documents is admissible.

Mr. Dubinsky's conclusion that the Solo trades "were circular, closed loop transactions" is not inadmissible, as defendants argue, just because it is based in part on the Solo custodian trading records seized from Shah's Elysium companies in Dubai. (Defs. Br. 9-12.) As SKAT previously explained in its summary judgment motion, the Solo custodian trading records from the Elysium documents on which Mr. Dubinsky relies are admissible.[7] But even assuming for

---

7. *See* Pl. Skatteforvaltningen's Mem. of Law in Supp. of Its Mot. for Partial Summ. J., ECF No. 817, at 44-51. Defendants announce that they will move *in limine* to exclude all the Elysium documents from evidence, including any expert opinions that are relying on those documents. (Defs. Br. 9 n.1.) As such, SKAT will address the admissibility of the underlying Elysium documents in response to any such motion and addresses herein only the admissibility of Mr. Dubinsky's testimony based on those documents.

argument's sake that they were not, they are reliable and precisely the type of records on which a forensic accountant would rely in determining whether the Solo trading was fictitious.

Under Federal Rule of Evidence 703, "[a]n expert may base an opinion on facts and data in the case that the expert has been made aware of or personally observed," and "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. "*Daubert's* broad mandate requiring district courts to act as gatekeepers . . . applies fully to the analysis under Rule 703, and courts have broad discretion in determining whether [inadmissible] evidence is of a type reasonably relied upon by experts." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 561 (S.D.N.Y. 2004) (internal quotation omitted). Further, "district courts must make an independent determination that the material in question is sufficiently reliable for experts in the field to rely upon it." *Id.*

Thus, irrespective of whether the Solo custodian trading records on which Mr. Dubinsky relies are "unauthenticated" or "hearsay," as defendants contend, (Defs. Br. 9-10), Mr. Dubinsky's opinions based on them still are admissible because the records are reliable and of the sort on which a forensic accountant would rely. *See Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 150 (S.D.N.Y. 2022) ("[S]ources cited by [expert] . . . would require authentication if offered on its own," but "an expert has the latitude to rely on a broader array of material.").[8] Defendants' doubts about the provenance of the Elysium documents, *i.e.*, whether "the Elysium Documents—purportedly seized from an office in Dubai—are, in fact, business

---

8.  *See also United States v. Dukagjini*, 326 F.3d 45, 57 (2d Cir. 2003) ("[E]xpert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions."); *AstraAktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp.2d 423, 491 (S.D.N.Y. 2002) ("Pursuant to Rule 703, an expert may rely on facts or data of a type reasonably relied upon by experts in the particular field, including facts, data, and opinions that are otherwise inadmissible.") (internal quotation omitted).

records of the Solo Custodians, whose offices were in the United Kingdom," are easily set aside. (Defs. Br. 9.)[9]

As set forth in the November 26, 2021 declaration of Rana Shashaa,[10] a Partner and Middle East Forensic Leader at Deloitte Professional Services (Dubai) Limited, Deloitte seized the Elysium documents, under the supervision of a court-appointed supervising legal representative, from the business offices of Elysium Properties Limited and Elysium Global (Dubai) Limited in June and July 2018 pursuant to a search order issued by the Dubai International Financial Centre courts. (Weinstein Decl., Ex. 3 (Declaration of Rana Shashaa, dated November 26, 2021 ("Shashaa Decl.")) § B.)[11] And there is no doubt that the Elysium companies are Shah's companies. As Shah testified in England, Elysium Global (Dubai) Ltd., one of the companies whose records were seized, was previously called Solo Capital (Dubai) Limited and created "to support the business in the UK." (*See* Weinstein Decl. Ex. 4 (First Witness Stmt. of Sanjay Shah, dated January 19, 2024) ¶¶ 217-19.) Shah described "Elysium Global" as "my company" in his English testimony, (*id.* ¶¶ 242-43), represented the Elysium

---

9. There is no requirement, as defendants argue, that Mr. Dubinsky himself establish that the trading records in the Elysium documents are in fact the Solo custodians' records before relying on them. (Defs. Br. 9.) Mr. Dubinsky's "understand[ing] that through proceedings in England and Dubai, SKAT obtained records . . . from Elysium Global (Dubai) Limited, an entity within the Shah-controlled universe" is based on representations from counsel. (Dubinsky Report ¶ 141.)

10. Defendants repeat the false statement from their summary judgment opposition that SKAT produced Ms. Shashaa's declarations for the first time during summary judgment. (Defs. Br. 9.) As SKAT pointed out in its summary judgment reply, SKAT produced the declaration to the defendants on December 3, 2021, before the close of fact discovery and about a week after Ms. Shashaa signed the declaration. (*See* Weinstein Decl. Ex. 10, at 2.)

11. As Ms. Shashaa explained, Deloitte executed the search order by inspecting and forensically imaging electronic material found on the premises of the Elysium business offices and from cloud-based repositories controlled by the Elysium companies, supervising the scanning and uploading of hardcopy materials from the premises and from Elysium's off-site storage facility, and subsequently forensically imaging the electronic materials from hard drives that Elysium representatives removed from the premises during the original search. (Shashaa Decl. §§ B-C.) Subject to a privilege review by a Deloitte team under the supervision of the court-appointed Supervising Legal Representative of all documents collected from the Elysium companies (*id.* § D), Deloitte produced those documents to SKAT and SKAT in turn produced the same to the defendants.

companies as their director during the seizure and collection of the documents, and asserted privilege on behalf of Elysium during the search. (Weinstein Decl. Ex. 5, at ¶¶ 2.8, 2.11-16, 2.21, 2.36, 2.55-58 & Annex 2.)

Shah freely admits in his trial testimony in England that the Solo trading was circular (as Mr. Dubinsky opines), (Weinstein Decl. Ex. 6, at 116:4-118:3), and Solo trading records from the Elysium documents have been offered into evidence to prove as much, with no objection by Shah as to their authenticity. (*See* Weinstein Decl. Ex. 7, at C/199/7 ¶ 28, C/271/7 ¶ 12(c), C/324/4 ¶ 4 (setting deadlines for notices requiring proof of authenticity); Weinstein Decl. Ex. 8, at 109:16-111:22 (testifying regarding structure of Solo Capital transactions recorded in Elysium document).) Even defendants' own expert Dr. Emre Carr acknowledges that the Solo trading was circular (or in his words, "offsetting") and relies on Solo trading records in the Elysium documents for that conclusion. (*See* Weinstein Decl. Ex. 9 (Rebuttal Expert Report of Emre Carr, dated Feb. 1, 2022) § VIII (citing Dubinsky Report figures).)

Further evidencing that the trading records in the Elysium documents are in fact the Solo custodian trading records, many of the trading records defendants produced in this litigation (and on which they intend to rely to establish purported ownership of shares) are also among the records seized from the Elysium companies.[12] The other Solo custodian trading records in the Elysium documents are identical in form and substance to those that defendants produced.[13]

---

12. For example, in his discussion of a sample "complex loop" transaction purportedly executed by the Loggerhead Plan, Mr. Dubinsky relies on a trade approval for the purchase of Novo Nordisk A/S shares (Dubinsky Report ¶ 180 n.232 & fig.21; Weinstein Decl. Ex. 11), an identical copy of which the defendants produced to SKAT (Weinstein Decl. Ex. 12). In another step of the same sample transaction, Mr. Dubinsky discusses another Solo Capital trade approval for a stock loan transaction (Dubinsky Report ¶¶ 183 n.236 & fig.23; Weinstein Decl. Ex. 13), which the defendants also produced (Weinstein Decl. Ex. 14).

13. For example, the trade approvals, confirmations, account statements and invoices the defendants produced are identical to the same records found in the Elysium database, and identical in form and substance to those found for the purported non-party sellers and stock loan counterparties in the additional transactions in the circular

Further, the trading records in the Elysium documents identify the defendants' trades (which defendants contend were real) in addition to those of the other participants in the circular Solo trading,[14] and for the transactions that defendants contend were real, the Elysium documents record other matching transactions that in each case is equal and offsetting, so as to have the effect of netting the defendants' purported trades to zero, rendering the defendants' purported acquisition of Danish shares entirely circular.  (*See* Dubinsky Report, §§ VI(C)-(D).)

Nor is there any merit to defendants' argument that Mr. Dubinsky's opinion is "not 'based on sufficient facts or data'" because there is an encrypted hard drive that was seized from the Elysium companies that no one can access.  (Defs. Br. 10 (quoting Fed. R. Evid. 702(b).)  "[E]ven crediting" that "critique[]," there is adequate, if not ample, factual basis for" Mr. Dubinsky's conclusion that the trading was circular in the Solo custodian trading records he reviewed.  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp.3d 83, 135 (S.D.N.Y. 2022).  And defendants have provided no explanation for why access to more Elysium documents would affect Mr. Dubinsky's opinion that the trading was circular.

Equally unavailing is the argument that the Solo trading records are insufficiently reliable because, as SKAT's expert Graham Wade described in his expert report, "Solo 'retroactively adjusted interest and fees'" on the stock loans so that there were no profits or losses on the

---

trading loops.  Stock loan confirmations were sent from addresses called "tradeapprovals@[Solo Custodian]" to the purported stock lender on the same date of the defendant plans' purported stock lending transactions, and appear identical to those relied on by the defendants other than the names of counterparties involved.  (*E.g.* compare Weinstein Decl. Ex. 15 *with* Weinstein Decl. Exs. 16 & 17.)  Invoices were created on the Solo Custodians' letterhead, dated shortly after the period covered by the invoice ended, and again appear identical to those sent to the defendant plans.  (*See, e.g.*, Weinstein Decl. Ex. 18.)

14.   For example, the February-March 2015 spreadsheet of Telesto's customer trades on which SKAT relies includes the Basalt Ventures plan's purported March 26, 2015 purchase of Carlsberg shares identified in the email trade confirmation Sunrise Brokers sent to the Basalt Ventures plan on that date, which was produced by defendant van Merkensteijn, and identified in the plan's Telesto-issued 2015 yearly account statement.  (*Compare* Weinstein Decl. Ex. 19 at ELYSIUM-09140791 *with* Weinstein Decl. Ex. 20 at JHVM_0001406 *and* Weinstein Decl. Ex. 21 at GUNDERSON 00009434.)

trading (aside from SKAT's "refund" payments). (Defs. Br. 10.) That fact only corroborates that the Solo trading was designed to be circular and offsetting with the only potential source of profit being the submission of false reclaim applications to SKAT and the reliability of the Solo trading records on which Mr. Dubinsky relied showing as much. Further, the fact that the Solo custodians were not a "legitimate business," (Defs. Br. 11), does not mean that the trading records showing how the fraud was perpetrated are unreliable for that purpose. *See In re Bernard L. Madoff*, 528 F. Supp.3d 219, 232 (S.D.N.Y. 2021) ("business records of entities engaged in fraud are commonly admitted into evidence").

Finally, Mr. Dubinsky's opinion that the Solo trading was circular does not, as defendants argue, serve as "a conduit for introducing hearsay," even assuming *arguendo* that the Solo custodian records were inadmissible on that ground. (Defs. Br. 12 n.2 (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013).) "[E]xperts can testify to opinions based on inadmissible evidence, including hearsay," where, as Mr. Dubinsky does here, the expert "form[s] his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (AJN), 2021 WL 5154110, at *9 (S.D.N.Y. Nov. 5, 2021) (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003)) (internal quotation marks omitted).[15]

---

15. Defendants' reliance on the Middle District of Georgia decision in *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1376 n.10 (M.D. Ga. 2006), is misplaced. That case noted in dicta that a proffered expert with no experience as an underwriter could not base his understanding of insurance underwriting guidelines on unidentified conversations with insurance company employees and his internet search on that subject without making any showing that they are a type of "facts or data" reasonably relied on by experts in insurance underwriting to form opinions regarding underwriting practices—far afield from the circumstances here. *See id.*

**III.    Mr. Dubinsky is qualified to testify about the structure of the Solo trading and that the plans could not have purchased the shares absent the circular trading.**

Defendants' arguments that Mr. Dubinsky "does not have the training or qualifications" to opine on the circular structure of the Solo trading or that the plans did not have the "liquidity" or "creditworthiness" to purchase the shares absent that structure are frivolous.  (Defs. Br. 8, 12-13.)  The Federal Rules of Evidence permit expert testimony when the witness is "qualified as an expert by knowledge, skill, experience, training, or education." *McCullock*, 601 F.3d at 1042 (quoting Fed. R. Evid. 702).  To determine whether a proffered witness is qualified, a court need only "ascertain whether the proffered expert has the educational background or training in a relevant field by looking at the totality of the witness's background," and then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Arista Records*, 2011 WL 1674796, at *2 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

Mr. Dubinsky is a forensic accountant with more than forty years of experience in financial fraud investigations, including as a testifying expert in litigation involving the investigations of the Bernard Madoff Ponzi scheme, the Parmalat S.p.A. fraud, the Enron fraud, and dozens of offshore tax fraud cases, among others.  (Dubinsky Report ¶ 5.)  Federal courts have previously found that Mr. Dubinsky's expertise in forensic accounting and fraud investigation qualify him to testify regarding complex securities trades used to perpetrate fraud. For example, as the expert for the trustee in the liquidation of Bernard L. Madoff Investment Securities LLC, Mr. Dubinsky was qualified by the Southern District of New York bankruptcy court to testify as an expert in subjects including forensic accounting, fraud examinations, and

15

investment theory and practices.  *See SIPC v. Madoff*, 610 B.R. 197, 210 (Bankr. S.D.N.Y. 2019).[16]

Thus, Mr. Dubinsky is well-qualified to opine on the circular nature of the Solo trading and that the plans did not have the money or the creditworthiness to finance their purported share purchases, further evidencing that the trading was "not real."  (Dubinsky Report ¶¶ 213-15.) Defendants mischaracterize Mr. Dubinsky's opinions in arguing that he is unqualified to testify on the plans' "liquidity and creditworthiness."  (Defs. Br. 8.)  Mr. Dubinsky's opinion in this respect is that "[t]he Plans did not have sufficient capital, liquidity or access to real credit to complete the purported Solo Trades but for the circular nature of the structured scheme." (Dubinsky Report § F.)  Mr. Dubinsky does not need specialized expertise "in the creditworthiness of Pension Plans" or "security lending transactions," (Defs. Br. 8), to draw this conclusion.  And any such purported gaps in his qualifications or knowledge at most go the weight, not the admissibility, of his testimony.  *See SR Int'l. Bus. Ins. Co.*, 467 F.3d at 134.

Further, defendants contend that Mr. Dubinsky is unqualified just because "he has never engaged in arbitrage trading" and "has no experience in arranging structured transactions." (Defs. Br. 13.)  But defendants give no reason why an expert would need to have performed dividend arbitrage trading or have arranged transactions such as those purportedly executed by the defendants in order to conduct an analysis of the Solo trading records and reach the

---

16.  In that case, Mr. Dubinsky conducted forensic accounting analyses of BLMIS's records based on which he was able to conclude and testify regarding:  (a) the impossible reported volume of equity trades, (b) the daily trading performance and positive rates of return inconsistent with the volatility of the markets; and (c) the lack of Depository Trust Corporation records and Options Clearing Corporation records to confirm the reported trades. *See id.* at 210-11.

conclusion that the records reveal the defendants' trades were closed-loop and circular and did not involve any actual Danish shares.[17]

Nor is it material if Mr. Dubinsky is not an expert in "net settlement." (Defs. Br. 5.) Defendants may explore any such gaps in Mr. Dubinsky's knowledge on cross-examination to the extent "net settlement" has any relevance, but that is not grounds to preclude his testimony. *See Malletier*, 525 F. Supp. 2d at 562 ("the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system"). And defendants' argument that Mr. Dubinsky does not explain why the Solo trading "creates a closed loop," (Defs. Br. 12), ignores the many descriptions and graphic representations showing as much in his report. (*See* Dubinsky Report, §§ VI(C)-(D).)

## **CONCLUSION**

For the reasons set forth above, SKAT respectfully requests that the Court deny the defendants' motion to exclude Mr. Dubinsky's expert testimony.

---

17. Defendants' expert Dr. Carr admits that he has no experience in the front office, middle office, or back office of any financial services company, no experience executing trades, and that his only "experience" with dividend arbitrage related to "look[ing] at stock prices around dividend dates" for no particular purpose around 20 years ago. (Weinstein Decl. Ex. 22, at 17:4-23; 83:18-86:18.) Nonetheless, defendants propose that Dr. Carr has adequate qualifications to opine on the Solo trading.

Dated: New York, New York
        July 5, 2024

HUGHES HUBBARD & REED LLP

By: /s/ Marc A. Weinstein

      William R. Maguire
      Marc A. Weinstein
      Neil J. Oxford
      Dustin P. Smith
      Gregory C. Farrell
      One Battery Park Plaza
      New York, New York 10004-1482
      Telephone: (212) 837-6000
      Fax: (212) 422-4726
      bill.maguire@hugheshubbard.com
      marc.weinstein@hugheshubbard.com
      neil.oxford@hugheshubbard.com
      dustin.smith@hugheshubbard.com com
      gregory.farrell@hugheshubbard.com

      *Counsel for Plaintiff Skatteforvaltningen*
      *(Customs and Tax Administration of the*
      *Kingdom of Denmark)*