# Exhibit 9

OEL2002.B-1886-99
SKM2002.313.ØLR
TfS 2002, 617

**Østre Landsrets dom af 24. maj 2002, j nr. B-1886-99**
(landsdommerne V. Rønne, Plessing og Lone Kerrn-Jespersen (kst.)).

*Gert Rolien Bach Nielsen (Advokat Michael H. Steffensen v/adv. Jens Ravnkilde)*
mod
*Skatteministeriet (Ka. v/advokat Martin Henrichsen, prøve)*

### Forældelse af skattekrav - 1908-loven

- Sagen vedrører, om betaling i henhold til en række fakturaer skulle beskattes som maskeret udlodning til hovedanpartshaveren, jf. ligningslovens § 16 A. Sagen vedrører endvidere, om skattekravene var forældede efter 1908-loven om forældelse. Landsretten fandt, at skattekravet var forældet, idet skattemyndighederne ved modtagelse af oplysninger fra de engelske skattemyndigheder den 25. maj 1994 fandtes at have tilstrækkeligt grundlag for at gøre krav gældende, medens stævning først er indleveret den 30. juni 1999. Ministeriet fandtes ikke at have godtgjort, at der i efteråret 1995 blev indgået aftale om henstand med betaling af skatterne.

- Sagen drejer sig om, hvorvidt skattekrav var forældede efter 1908-loven. Skattemyndighederne havde anset en hovedanpartshaver for skattepligtig af maskeret udlodning for indkomstårene 1989-1991. Landsretten lagde til grund, at skattemyndighederne i 1993 og 1994 fik kendskab til forholdet og på dette tidspunkt kunne gøre krav gældende mod hovedanpartshaveren. Da stævning var indleveret i 1999, tiltrådte landsretten hovedanpartshaverens principale påstand og anså skattekravene for forældede efter 1908-loven.

### Østre Landsret

Under denne sag, der er anlagt den 30. juni 1999 har sagsøgeren, Gert Rolien Bach Nielsen, endeligt nedlagt påstand om, at sagsøgte, Skatteministeriet, skal anerkende principalt, at skattekravene vedrørende indkomstårene 1989, 1990 og 1991 er forældede; subsidiært, at ansættelsen af sagsøgerens indkomst for indkomstårene 1989, 1990 og 1991 skal nedsættes til det selvangivne, således at kapitalindkomsten i 1989 nedsættes med 42.855 kr., kapitalindkomsten i 1990 med 162.775 kr. og udbytteindkomsten i 1991 med 133.250 kr.

Sagsøgte, Skatteministeriet, har endeligt nedlagt påstand om frifindelse.

Landsskatteretten afsagde den 13. april 1999 kendelse vedrørende sagsøgerens skatteansættelse for årene 1989, 1990 og 1991. I kendelsen og denne dom omtales blandt andet et dansk selskab ved navn Nielsen ApS. Selskabets fulde navn er Anpartsselskabet Nielsen af 14. september 1984. Selskabet omtales også som Nielsens ApS. Landsskatterettens kendelse er sålydende:

"Sagen har været forhandlet med klageren og hans advokat, der endvidere har haft lejlighed til at udtale sig under et retsmøde.

Det er oplyst, at klageren, der er bosiddende i England, i de omhandlede indkomstår var ejer af anparterne i selskabet Nielsen ApS, at han endvidere var ejer af en aktie i det engelske selskab Nielsen (UK) Limited, og at Købmandsstandens oplysningsbureau har oplyst, at de resterende aktier i det engelske selskab var ejet af Nielsen ApS. Det engelske selskab var ejet af Nielsen ApS. Det engelske selskab er efterfølgende blevet opløst uden nogensinde at have selvangivet indtægter.

Det er endvidere oplyst, at klageren var direktør i Nielsen ApS og dette selskabs datterselskab Danish Air Service ApS, at begge selskaber drev virksomhed fra Roskilde Lufthavn inden for luftfartsbranchen med bl.a. undervisning-, mægler-, udlejnings- og konsulentvirksomhed, og at Danish Air Service ApS endvidere har haft autorisation til taxa-flyvning, pilotuddannelse og flyvevedligeholdelse. Det engelske selskab Nielsen (UK) Limited har været tilknyttet Nielsen ApS og Danish Air Service ApS.

Det er endelig oplyst, at den stedlige skattemyndighed midt i 1993 modtog 5 kontrolbilag vedrørende honorarindtægter fra to selskaber Jetair ApS og Flemming Frandsen Aircraft Sales ApS, at 4 bilag var udfaktureret af Nielsen (UK) Limited og 1 bilag var udfaktureret af Nielsen ApS, og at skattemyndigheden den 7. april 1995 forhøjede klagerens indkomstansættelser for 1989, 1990 og 1991 med alle honorarindtægterne, idet klageren blev anset for rette indkomstmodtager. Indkomstansættelserne blev efterfølgende genoptaget, idet der var begået en talfejl i indkomstansættelsen for 1991. I denne forbindelse blev det godtgjort, at et honorar på 50.000 USD var indtægtsført i Nielsen ApS, hvorfor klagerens indkomstansættelser i skatteforvaltningens afgørelse af 7. oktober 1996 alene er forhøjet med de 4 honorarer, der er udfaktureret af Nielsen (UK) Limited.

De stedlige skattemyndigheder har til støtte for de foretagne ansættelser anført, at man har foretaget en grundig undersøgelse, af hvorvidt honorarerne skulle være indtægtsført i et eller flere af klagerens selskaber, at honorarerne ikke kan konstateres indtægtsført i nogen af disse selskaber, at fakturabeløbene er afregnet fra de to selskaber i Roskilde Lufthavn, og at alle oplysninger peger på klageren som rette indkomstmodtager af honorarindtægterne.

Myndighederne har fremhævet, at klageren, ved at lade sit engelske selskab fremtræde som modtager af honorarindtægterne, har søgt at holde indtægterne skjult for skattemyndighederne, og at det er ved en tilfældighed, at myndighederne er kommet i besiddelse af oplysninger til at foretage korrekte skatteansættelser. De påklagede ansættelser er derfor foretaget rettidigt, jf. skattestyrelseslovens § 35, stk. 3 (nu stk. 4).

Klagerens advokat har nedlagt påstand om, at indkomstansættelserne for 1989, 1990 og 1991 nedsættes til det selvangivne. Til støtte herfor har advokaten anført, at honorarerne ikke er blevet tilegnet af klageren, men er oppebåret af de af ham ejede selskaber. Ansættelserne for indkomstårene 1990 og 1991 er som følge heraf ugyldige i medfør af den dagældende bestemmelse i skattestyrelseslovens § 35, stk. 1, idet fristen ikke er suspenderet i medfør af den dagældende bestemmelse i skattestyrelseslovens § 35, stk. 3.

Advokaten har endvidere anført, at de omhandlede fakturaer vedrører consulting fees i forbindelse med køb, salg og indchartring af fly, at Jetair ApS og Flemming Frandsen Aircraft Sales ApS, i forbindelse med salg af fly, har indgået aftale med Nielsen ApS og Danish Air Service ApS om at chartre flyene i de perioder, hvor køberen ikke har kunne anvende flyene, og at køberne herved har kunnet begrænse driftsudgifterne. Som vederlag for at chartre flyet har Nielsen ApS og Danish Air Service ApS modtaget et vederlag fra sælgeren til uddannelse og træning af piloter. Den foretagne fakturering fra Nielsen UK Ltd. skete alene for ikke at åbenbare forholdet overfor køberen af flyene og de ansatte i Danish Air Service ApS. Advokaten har i denne forbindelse påpeget, at Nielsen ApS, Danish Air Service ApS og Nielsen (UK) Limited efterfølgende er blevet opløst, at det ikke er muligt at efterprøve,

hvorvidt de omhandlede honorarer er blevet indtægtsført i disse selskaber, idet selskabernes regnskabsgrundlag ikke længere er tilgængeligt for klageren. Advokaten har fremhævet, at det er myndighederne, der skal bevise tesen om, at selskaberne ikke har fået honorarerne, at sagen alene angår bevisvurdering, men at myndighederne ikke har kunnet konstatere, at beløbene ikke er indtægtsført i selskaberne, hvorfor myndighederne mangler bevis via bogføringen. Det engelske selskab, som alene har været en art stråmand, har indtægtsført de pågældende honorarer, og udgiftsført et tilsvarende beløb, idet honorarerne er viderebetalt til Nielsen ApS og Danish Air Service ApS. Dette er baggrunden for, at det engelske selskabs regnskab ikke viser, at der har været nogen omsætning eller dækningsbidrag i de pågældende år.

Klageren har supplerende anført, at han ikke har fået de omhandlede honorarer, hvorfor beløbene må være indtægtsført i enten Nielsen ApS eller Danish Air Service ApS, at omsætningen i det engelske selskab ikke fremgår af selskabets regnskaber, der er udarbejdet pr. 30. september 1989 og 30. september 1990, men at selskabets revisor i 1998 er fremkommet med en udtalelse desangående. Klageren har fremhævet, at han via Den Danske Bank har modtaget kopi af kontoudtog vedrørende Nielsen ApS og Danish Air Service ApS bankkonti for den omhandlede periode, at han på tidspunkterne for honorarudbetalingerne har udsøgt nogle bankindsætninger, men at banken ikke længere er i besiddelse af underbilag, idet disse makuleres efter 5 år.

Advokaten har videre anført, at de omhandlede honorarer er betalt med checks, der alene kan indløses via indsættelse på en bankkonto, og at indsætningerne på Nielsen ApS' og Danish Air Service ApS' bankkonti dokumenterer, at beløbene har passeret selskabernes bogføring, og dermed er indtægtsført. Advokaten har fremhævet, at en check på 25.000 USD udstedt den 19. marts 1990 indgår i en indsætning på Nielsen ApS' bankkonto den 22. marts 1990 på i alt 292.319 kr., at en check på 100.000 kr. udstedt den 18. september 1991 indgår i en indsætning på Danish Air Service ApS' bankkonto den 24. september 1991 på i alt 210.932 kr., og at der således er en nøje tidsmæssig sammenhæng mellem udbetalinger af honorarerne og indsættelsen på selskabernes bankkonti.

Advokaten har endelig anført, at det ved vurderingen af, hvorvidt honorarerne er indtægtsført i selskaberne må tillægges vægt, at man nu undersøger forhold, der ligger mange år tilbage i tiden. Klageren har vanskeligt ved at modbevise myndighedernes påstand, idet der er tale om konkursramte selskaber. Selskaberne blev i øvrigt solgt af klageren forud for deres opløsning. Klageren er endvidere ikke blevet opfordret til at sikre sig bevis for indtægtsføringen, mens der stadigvæk var muligt at indhente den underliggende dokumentation. Myndighederne har derimod haft en skjult dagsorden om, at klageren har begået et strafbart forhold omfattet af skattekontrolloven eller straffeloven. Myndighederne har således ikke givet klageren den fornødne vejledning, ligesom myndighederne ikke har foretaget de fornødne undersøgelser.

...

Told- og Skatteregion Nærum har på vegne af Told- og Skattestyrelsen indstillet ansættelserne ændret, således at honorarerne anses for en skattepligtig udlodning til klageren, jf. ligningslovens § 16A, stk. 1. Til støtte herfor har regionen anført, at det ikke er godtgjort, at de omhandlede honorarer har passeret de danske selskabers bogføring. De danske selskaber var rette indkomstmodtager til honorarerne, der blev faktureret af skuffeselskabet i England. Regionen har fremhævet, at betaling med frigørende virkning kun kunne ske til det engelske selskab, der blev slettet den 21. januar 1993, og at klageren selv har bragt sig i en situation, hvor han ikke kan dokumentere, at penge er tilgået de danske selskaber. Bevisbyrden er således klagerens. Myndighederne kan ikke gøre mere.

Advokaten har vedrørende regionens indstilling anført, at man må tage afstand til krav om bevisbyrde hos klageren, og at der alene er tale om teser om, at selskaberne ikke har fået honorarerne. Klageren har vanskeligt ved at modbevise myndighedernes påstand, idet der er tale om konkursramte selskaber.

**Landsskatteretten skal udtale:**

...

Klageren havde dominerende indflydelse i selskabet Nielsen (UK) Limited, idet han direkte ejede en aktie i selskabet, og indirekte ejede de resterede aktier via ejerskabet af Nielsen A/S. Nielsen (UK) Limited, der ikke har selvangivet nogen indtægter, har imidlertid udstedt 4 fakturaer til Jetair ApS og Flemming Frandsen Aircraft Sales ApS, der havde indgået aftale med Nielsen ApS og Danish Air Service ApS om chartring af fly. Fakturaerne omhandler angiveligt ydelser vedrørende denne aftale, der er indgået af to danske selskaber, hvori klageren havde dominerende indflydelse.

Retten finder, at Nielsen ApS og Danish Air Service ApS må anses for rette indkomstmodtager af honorarindtægterne, idet selskaberne efter det oplyste havde indgået aftale med Jetair ApS og Flemming Frandsen Aircraft Sales ApS om chartring af fly. Selskabet Nielsen (UK) har således alene kunne fakturere i kraft af klagerens dominerende indflydelse i selskaberne. Da selskaberne Nielsen ApS, Danish Air Service ApS og Nielsen (UK) Limited er opløst, og selskabernes regnskabsgrundlag ikke længere er tilgængeligt, kan det ikke dokumenteres, at de omhandlede honorarer er blevet indtægtsført.

Klageren har fremlagt kopier af kontoudtog vedrørende Nielsen ApS og Danish Air Service ApS's bankkonti for den omhandlede periode. Der findes imidlertid ikke indsætninger svarende til honorarudbetalingerne på disse bankkonti, men der er nogle indsætninger, der overstiger honorarudbetalingerne. Banken er imidlertid ikke længere i besiddelse af underbilagene, hvorfor udbetalingerne ikke kan dokumenteres indeholdt i disse beløb.

Retten finder at måtte være enig med told- og skatteregionen i, at klageren har bevisbyrden for selskabernes indtægtsføring af de omhandlede honorarudbetalingerne, idet han ikke har kunnet give nogen tilfredsstillende forklaring på, hvorfor betalingerne skulle ske til selskabet i England. Klageren har selv bragt sig i en situation, hvor han ikke kan dokumentere, at pengene er tilgået de danske selskaber. Da klageren ikke har løftet bevisbyrden vedrørende de danske selskabers indtægtsføring af honorarerne, må honorarerne anses for en skattepligtig udlodning til klageren, jf. ligningslovens § 16A, stk. 1.

Retten finder endvidere, at ansættelserne for indkomstårene 1990 og 1991 er gyldigt foretaget, jf. skattestyrelseslovens § 35, stk. 1, idet fristen må anses for suspenderet indtil skattemyndigheden i 1993 modtog de 4 kontrolbilag, jf. den dagældende bestemmelse i skattestyrelseslovens § 35, stk. 3. De påklagede forhøjelser af klagerens personlig indkomster nedsættes til 0, og i stedet forhøjes klagerens kapitalindkomst for indkomstårene 1989 og 1990 med tilsvarende beløb, jf. personskattelovens § 4, stk. 1, nr. 4, samt skattegodtgørelse heraf, jf. selskabsskattelovens § 17A, hvilket Told- og Skattestyrelsen har tiltrådt. For indkomståret 1991 ansættes en tilsvarende udbytteindkomst, jf. personskattelovens § 4a.

..."

Supplerende sagsfremstilling.

Honorarerne.

Skatteforvaltningen i Gentofte Kommune, hvor sagsøgerens selskaber var registeret, fik den 7. juni 1993 tilsendt de 5 fakturaer, der er omtalt i Landsskatterettens kendelse, fra skatteforvaltningen

Copyright © 2021 Karnov Group Denmark A/S

i Roskilde Kommune. Fakturaerne var på henholdsvis $ 6.000, $ 25.000, $ 50.000, $ 5.000 og 100.000 kr. Parterne er enige om, at fakturabeløbene i $ svarer til henholdsvis 42.855 kr., 162.775 kr., 286.500 kr. og 33.442 kr.

Den første faktura, der var på $ 6.000, var udstedt den 30. oktober 1989 til ApS Jet Air. Fakturaen angav at angå honorar i henhold til aftale af 20. september. Fakturaerne var udført på brevpapir med følgende bundtekst: "anpartsselskabet Nielsens, h.a. clausensvej 24, 2820 gentofte ..." Om betaling hed det:

"Betaling kan foretages til vor adresse i Roskilde Lufthavn.
Betalingsbetingelser: Netto kontant ved modtagelse af faktura
Nielsens (UK) Ltd. 9 Churchfields, New Road, East Molesey, Surrey, England."

Den anden faktura, der var udstedt den 16. marts 1990 til Flemming Frandsen Aviation ApS, var på $ 25.000 og vedrørte "consulting fee according to agreement". Med håndskrift var tilføjet "provision OYARV". Nederst på fakturaen stod Nielsen UK Ltd. anført med en adresse i England.

Sagsøgeren har fremlagt en kopi af en check dateret den 19. marts 1990 på $ 25.000 til Nielsen UK Ltd. i England. Checken vedrørte "consulting fee OY-ARV ... your invoice of march 16 1990". Sagsøgeren har endvidere fremlagt et arbitragebilag af 22. marts 1990, ifølge hvilket Handelsbanken har købt en check på $ 25.000 for et nettoprovenu på 162.586,67 kr. Endelig fremgår det af et kontoudtog fra Anpartsselskabet Nielsens af 14. september 1984's pengeinstitut, at der den 22. marts 1990 blev indbetalt 292.319,40 kr. ved check.

De involverede selskaber havde alle regnskabsår fra den 1. oktober til den 30. september. De regnskaber, der omtales i det følgende, har alle været forsynet med sædvanlig revisionspåtegning.

Af regnskabet for 1989/1990 for Nielsen ApS og specifikationerne til regnskabet fremgår, at nettoomsætningen var på ca. 1,47 mio. kr., og at der var salg af varer og tjenesteydelser for 62.738 kr. De øvrige poster var administrationshonorar datterselskab, udlejning fast ejendom og udlejning biler og edb.

Af regnskabet for Danish Air Service for 1989/1990 og specifikationerne hertil fremgår, at selskabets bruttoavance var på ca. 2,65 mio. kr., og at nettoomsætningen var på ca. 10,3 mio. kr. Nettoomsætningen bestod af følgende poster: Skoleflyvning og instruktion, teoriundervisning, flyudlejning og taxaflyvning, kunst-, banner- og fotoflyvning; rundflyvning, maitenance, diverse omsætning, bonus, rabatter og provisioner, gebyrer og materiel til viderefakturering. Posten vedrørende diverse omsætning var på 1.226.207 kr. Posten vedrørende bonus, rabatter og provisioner var negativ. Administrationsomkostningerne til moderselskabet var opgjort til 960.000 kr. Ifølge en note bestod diverse omsætning af "startafgifter, viderefakturering af gebyrer mv., faktureret selvrisiko, salg af undervisningsmaterialer, pilotudleje samt diverse videresalg mv."

I beretningen til regnskabet for 1989/1990 for Nielsens UK Ltd. var det under "Principal activity" oplyst, at "the company has not traded during the year". Regnskabet indeholdt "balance sheet", hvor det under Profit and Loss Account-Deficit var oplyst, at denne var negativ med £ 820. Omsætningen (turn-over) var i regnskabet angivet med "-", og det var i en note oplyst, at "the company has not traded". Parterne har været enige om, at dette skal oversættes med, at selskabet ikke har haft erhvervsmæssig aktivitet. Regnskabet for 1988/1989 for det engelske selskab var identisk med hensyn til angivelsen af omsætning og oplysning om, at der ikke havde været erhvervsmæssig aktivitet.

Sagsøgeren har indhentet en erklæring fra Garners, Chartered Accountants, hvoraf det i en dansk oversættelse, som parterne er enige om, fremgår:

"Vi kan ikke finde vores gamle sagsakter for Nielsen UK Limited, men kan bekræfte, at forkortede regnskaber er blevet indgivet til Selskabsregisteret, hvilke regnskaber kun indeholdt en kopi af balancen, og ingen detaljer om selskabets handel.

Hvis indtægter og udgifter udlignede hinanden i den relevante periode, ville der ikke have været nogen bevægelser på resultatopgørelsen (profit and loss account) fra år til år."

Den tredje faktura, der var udstedt den 31. januar 1991 til Fl. Frandsen Aircraft Sales ApS, var på $ 50.000 og angik "consulting fee OY-JEY-Citation". Beløbet skulle ifølge fakturaen betales til ApS Nielsen i Roskilde. Sagsøgeren har fremlagt kopi af en check dateret den 6. februar 1991 på $ 50.000 til ApS Nielsen.

Den fjerde faktura var på $ 5.000 og udstedt den 13. august 1991 til Jetair att. Flemming Frandsen. Den angik "consulting fee according to R22 Torben Lindegaard". Nederst på fakturaen var angivet Nielsens UK Ltd. og en underskrift. Fakturaen var udstedt på fælles brevpapir fra "nielsens (DK) anpartsselskab" og "nielsens (UK) limited". På den fremlagte kopi af fakturaen findes et stempel med oplysning om, at den var modtaget den 27. august 1991.

Det fremgår af kontoudtog fra Anpartsselskabet Nielsens af 14. september 1984's pengeinstitut, at der den 26. august 1991 blev indbetalt 134.885,90 kr. helt eller delvis ved check på selskabets konto.

Den femte faktura var på 100.000 kr. og udstedt den 17. september 1991 til Jetair Aircraft Sales. Den angik "consulting fee according to OY-ARV". Fakturaen havde samme udseende som den fjerde faktura. Sagsøgeren har fremlagt en kopi af en check på 100.000 til Nielsens (UK) Ltd. dateret den 18. september 1991 angående "consulting fee according to OY-ARV".

Det fremgår af kontoudtog fra Danish Air Service's pengeinstitut, at der den 24. september 1991 blev indbetalt 210.932,15 kr. ved check på selskabets konto.

Af Nielsen ApS' regnskab for 1990/1991 fremgår, at nettoomsætningen var på ca. 2,17 mio. kr. Af specifikationerne fremgår, at salg af varer og tjenesteydelser var opgjort til 338.009 kr. De øvrige poster var administrationshonorar datterselskab, udlejning fast ejendom, udlejning biler og edb og udlejning fly.

Af Danish Air Services regnskab for 1990/1991 fremgår, at bruttoavancen var på ca. 2,54 mio. kr. Af specifikationen hertil fremgår, at nettoomsætningen var på i alt ca. 13 mio. kr., og at posten diverse omsætning var på 1.258.646 kr. De øvrige poster var skoleflyvning og instruktion, teoriundervisning, flyudlejning, taxaflyvning mv., rundflyvning, maintenance, bonus, rabatter og provisioner og gebyrer og materiel til viderefakturering. De to sidste poster var negative. Der var en note vedrørende indholdet af posten diverse omsætning. Noten var i det væsentlige identisk med noten i det foregående regnskab.

Ifølge Luftfartsdirektoratets nationalitetsregister var flyet OY-ARV, som fakturaerne af 16. marts 1990 og 17. september 1991 angik, registeret med Mackler Totalbyg som ejer den 12. marts 1990 og derefter den 1. april 1992 med Flemming Frandsen Aircraft Sales ApS som ejer.

Der er fremlagt fire rådighedserklæringer, herunder en erklæring af 11. juni 1990, hvorefter ejeren af OY-ARV stillede flyet til rådighed for Danish Air Service ApS til indtræden på selskabets taxa-koncession. De øvrige erklæringer var af samme dato og angik henholdsvis OY-JEC, OY-JED og OY-JEE.

Skattevæsenets undersøgelser.

Den 12. februar 1993 meldte sagsøgeren flytning til en adresse i England med virkning fra den 1. januar 1993. Sagsøgeren indgik desuden en aftale om udleje af sin andelslejlighed for perioden 1. januar 1993 til 1. januar 1996 til selskabet Neilor Ltd, 33 Bridge

Road, Hampton Court, East Molesey, Surrey KT 8 9ER. Lejeaftalen var underskrevet den 3. januar 1993.

I oktober 1993 modtog skattemyndighederne efter anmodning til Købmandsstandens Oplysningsbureau oplysning om blandt andet Nielsens (UK) Ltd. og Neilor Limited. Det fremgik af oplysningerne vedrørende Nielsens UK, at sagsøgeren var "director" i selskabet, og ejerne var Nielsens (DK) A/S med 7.999 andele og sagsøgeren med 1 andel. Af oplysningerne vedrørende Neilor Ltd. fremgik, at dette selskab havde adresse Hampton Court, 33 Bridge Road, East Molesey, Surrey, KT8 9PV, og at selskabet var stiftet den 21. maj 1992. Kendt "director" var sagsøgeren. Selskabet var ejet af sagsøgeren med 999 andele og af sagsøgerens fader med én andel. Som associate companies var angivet Danish Air Service, Nielsens DK A/S og Desmark (UK) Ltd.

Den 26. januar 1994 anmodede Skattedirektoratet i Gentofte Kommune Skatteministeriet, Told- og Skattestyrelsen, om bistand med indhentning af en række oplysninger fra udlandet. Skrivelsen var sålydende:

"...

Baggrund for anmodningen

Roskilde skattevæsen har under en revision udtaget nogle kontrolbilag vedrørende udbetalte honorarer til det i Gentofte kommune skatteansatte selskab (til og med skatteåret 1992/93) ApS Nielsen af 14. sept. 1984. Selskabet har udskrevet fakturaer til virksomheder i Roskilde på eget brevpapir med fortrykt logo, telefonnr. og forneden på dette brevpapir er fortrykt navne på 2 udenlandske tilknyttede selskaber, et i England og et i USA.

På fakturaerne er med maskinskrevet tekst anført:

Nielsens (UK) Limited, 9, Churchfields, New Road, East Molesey, Surrey KT8 9 PU, England,

således at man får det indtryk, at de udfakturerede honorarer skal tilgå dette selskab i stedet for ApS Nielsen af 14. sept. 1984. Det forholder sig samtidig således, at den specificerede selvangivne omsætning i det danske selskab ikke kan indeholde de fra virksomhederne i Roskilde udbetalte honorarer.

Det danske selskab er erklæret konkurs den 4. december 1992. Samtidig er hovedaktionæren ... Gert Rolien Bach Nielsen ifølge folkeregisteret fraflyttet Danmark til samme adresse som ovenfor anført vedrørende Nielsens (UK) Limited pr. 1. januar 1993.

Det er imidlertid ikke muligt for skattevæsenet at komme i kontakt med skatteyderen, idet post til ovenstående adresse kommer retur med teksten "Gone away, Demenage", som er henholdsvis det engelske og det franske ord for flyttet.

Ved fraflytningen fremviste skatteyderen lejekontrakt af 3. januar 1993, hvoraf det fremgår, at har udlejet sin andelsbolig på Lindegårdsvej 2, 1. th., 2920 Charlottenlund til et engelsk selskab, nemlig:

Neilor Ltd., 33 Bridge Road, Hampton Road, Hampton Court, East Molesey, Surrey KT8 9 ER, England.

Da Gert Rolien Bach Nielsen stadig er registreret i KTAS som bruger af et telefonnummer på Lindegårdsvej 2, samt at hans navn stadig er opført ud for en trykknap på dørtelefonen, samtidig med at post ikke kan anbringes på den engelske adresse, anser regionen det for sandsynligt, at skatteyderen faktisk bor på Lindegårdsvej 2. I den forbindelse bemærkes, at det er oplyst af Købmandsstandens Oplysningsbureau - hvilket vil blive nærmere beskrevet nedenfor - at skatteyderen ejer 999/1000 af Neilor Ltd. Den resterende 1/1000 ejes af skatteyderens far.

Gennem Købmandstandens Oplysningsbureau har revisionen indhentet oplysninger om de to udenlandske selskaber, således som de er identificeret i den fortrykte tekst forneden på de modtagne kontrolbilag:

Nielsens (UK) Limited, 33 Bridge Road, East Molesey, Surrey KT 8 9ER, England, tlf. nr. ... og

Nielsens (UT) coporated, ..., USA, tlf. nr. ... samt

Neilor Ltd., 33 Bridge Road, Hampton Road, Hampton Court, East Molesey, Surrey KT8 9 ER, England, jf. lejekontrakten.

Førstnævnte selskab er det samme, som formentlig har modtaget honorarindtægterne fra virksomhederne i Roskilde, dog således at adressen er forskellig angivet. Den her nævnte adresse er identisk med den i lejekontrakten angivne adresse for Neilor Ltd.

Til Deres orientering vedlægges fotokopier af de fra Købmandsstandens Oplysningsbureau modtagne rapporter vedrørende de tre udenlandske selskaber.

Det fremgår heraf, at de alle er familieaktieselskaber, samt at de to engelske selskaber ejes af Gert Rolien Bach Nielsen og hans nu konkursramte hovedanpartsselskab, og som før nævnt en ubetydelig andel ejes af hans far. Selskabet i USA ejes af Jens Bach Nielsen og Børge Andersen, hvilket tyder på at den ene ejer er i familie med Gert Rolien Bach Nielsen.

..."

Gentofte Kommune specificerede herefter de ønskede oplysninger og anførte, at man ønskede oplyst, om de to selskaber havde været ansat som selvstændige juridiske enheder, om de havde betalt skat til de engelske myndigheder. Endvidere ønskedes det oplyst, om de havde indgivet selvangivelser og regnskaber, og i bekræftende fald ønskede man kopi heraf for samtlige år, hvori der havde været skatteansættelser. Endelig ønskede man oplyst, hvorvidt selskaberne havde ansat personale og rådede over et driftssted, og i bekræftende fald ønskedes nærmere oplysninger herom. For så vidt angik sagsøgeren personlig ønskede man oplyst, hvorledes han var registreret hos de engelske myndigheder, såvel i folkeregisteret som skattemæssigt, og hvilken periode han havde været registreret. Man ønskede endvidere kopi af de oplysninger, han havde givet til skattemyndighederne om sine bopæls- og indkomstforhold og kopi af eventuel selvangivelse og oplysning om betalte skatter. Endelig anmodede man om en undersøgelse af hans boligforhold i England, herunder hvilken type bolig han havde til rådighed, dennes beliggenhed og ejerforholdet til denne.

Told- og Skat anmodede ved en skrivelse af 23. februar 1994 de engelske myndigheder om at indhente de ønskede oplysninger.

Anmodningen om bistand blev besvaret af de engelske myndigheder ved en skrivelse af 25. maj 1994. Besvarelsen var i dansk oversættelse, som parterne er enige om, sålydende:

"Jeg henviser til Deres skrivelse af 23. februar 1994, i hvilken De anmoder om oplysninger vedrørende ovennævnte. Jeg kan nu fremkomme med følgende foreløbige redegørelse:

1. Nielsens (UK) Ltd

Dette selskab blev stiftet den 3. august 1988 under navnet Loadman Ltd. Navnet blev ændret til Nielsen UK Ltd. den 28. september 1988 og Nielsens UK Ltd den 2. november 1988. Denne dato blev også selskabets hjemstedsadresse ændret til 9 Churchfields, ... Bach Nielsen havde oprindeligt meddelt, at dette var hans personlige adresse, selv om hans senest kendte personlige adresse var 186 Fleetside, West Molesey, Surrey KT 8 2NH.

Selskabets hjemstedsadresse blev senere ændret til 233 Bridge Road, ... som er forretningsadresse for selskabet Neilor Ltd., jf. afsnit 2 nedenfor.

Nielsens UK Ltd har kun indgivet regnskaber til de engelske myndigheder for perioden 3. august 1988 til 30. september 1989, og for det efterfølgende år, der afsluttedes den 30. september 1990, men ifølge regnskaberne var der ingen forretningsmæssig aktivitet i selskabet i disse perioder. Kopier af regnskaberne vedlægges. Det fremgår, at selskabet ikke har haft nogen ansatte eller egne forretningslokaler.

Da der ikke har været nogen forretningsmæssig aktivitet er selskabet ikke blevet pålignet selskabsskat i UK. Det blev slettet fra selskabsskatteregisteret den 12. januar 1993.

Udover disse oplysninger fra vores akter kan jeg give følgende oplysninger fra Selskabsregisteret, som er offentligt tilgængeligt:

(a) Bach Nielsen blev udnævnt til eneste "director" i selskabet den 23. september 1988. Hans adresse blev oprindelig opgivet som HA Clausensvej 27, 2820 Gentofte, Danmark, men blev senere opgivet at være Jaegenborg-Alle 27A, 4.th., 2920 Charlottenlund, Danmark.

(b) Bach Nielsen er angivet som ejer af en af de 8.000 udstedte aktier på hver GBP 1,00 i selskabet, og resten ejes af Nielsens (Denmark) A/S, også med adressen HA Clausensvej 27.

...

3. Gert Rolien Bach Nielsen

Som anført i min skrivelse af 24. februar 1994 har Bach Nielsen oplyst, at han ankom i UK den 1. januar 1993 og bliver betragtet som bosiddende i UK og pligtig at betale skat i UK fra den dato. Yderligere undersøgelser vil blive foretaget med hensyn til hans ejerforhold til ejendomme i UK, og disse oplysninger tillige med kopi af hans første udfærdigede engelske selvangivelse vil blive fremsendt så hurtigst som muligt, efter at de er blevet tilgængelige.

..."

I skrivelsen havde de engelske myndigheder desuden givet en række oplysninger om Neilor Ltd. og oplyst, at man ville komme med supplerende oplysninger i form af regnskab og oplysning om beskaffenhed og ejerforholdet til den adresse, selskabet drev virksomhed fra, ligesom man ville oplyse antallet af ansatte i selskabet.

Ved skrivelse af 8, januar 1995 sendte de engelske myndigheder den endelige redegørelse. Skrivelsen er i dansk oversættelse, som parterne er enige om, sålydende:

"Jeg henviser til Deres skrivelse af 23. februar 1994, i hvilken De anmoder om oplysninger vedrørende ovennævnte og min foreløbige redegørelse af 25. maj 1994. Jeg kan nu fremkomme med en endelig redegørelse.

Der er nu indhentet oplysninger fra tinglysningskontoret vedrørende de 3 adresser, som Nielsen kan forbindes med. Han er dog ikke registreret som nuværende ejer af nogen af disse ejendomme, og det er heller ikke tilfældet med de engelske selskaber, i hvilke han er "director".

Oplysningerne indeholder ikke beskrivelser af ejendommene eller deres størrelse. Det er dog tydeligt, at ejendommen på 33 Bridge Road er på 3 etager, af hvilke de 2 øverste er selvstændige lejligheder.

...

Hvad angår selskabet Neilor Limited har vi nu fået oplyst, at alle forretningsmæssige aktiviteter er standset, og der er ingen aktiver. Selskabet indgav ingen regnskaber, og vi har derfor ikke modtaget nogen oplysninger om ansatte. Under disse omstændigheder er det ikke muligt på nuværende tidspunkt at undersøge dette nærmere.

..."

Skatteansættelsen og spørgsmål om henstand.

Den 17. januar 1995 sendte Gentofte Kommune en skrivelse til sagsøgerens engelske adresse og meddelte, at man på baggrund af fremkomsten af de 5 fakturaer vedrørende konsulenthonorar agtede at forhøje hans skatteansættelse for årene 1989-1991 i nærmere angivet omfang.

Skattedirektoratet i Gentofte Kommune har udarbejdet en indledende revisionsrapport dateret den 8. marts 1995 med gennemgang af sagsøgerens indkomst- og formueforhold samt hans bopælsforhold. Revisionsrapporten indeholdt endvidere en gennemgang af selskaberne ApS Nielsen af 14. september 1984, Danish Air Service af 2/6 87 ApS og udenlandske datterselskaber, herunder Nielsens (UK) Limited, Nielsens (UT) Corporated, Neilor Ltd. England og Neilor ApS.

Sagsøgerens skatteansættelse for 1989-1991 blev forhøjet med Gentofte Kommunes skrivelse af 7. april 1995 i overensstemmelse med skrivelsen af 17. januar 1995.

Den 26. juni 1995 rettede sagsøgeren telefonisk henvendelse til Gentofte Kommunes skattedirektorat, idet han oplyste, at han via sin tidligere ægtefælle først nu var blevet gjort bekendt med skrivelsen af 17. januar 1995 og afgørelsen af 7. april 1995, hvorfor han ikke tidligere havde haft mulighed for at gøre indsigelse over for forhøjelserne.

Efter korrespondance mellem parterne afholdtes et møde den 19. juli 1995 med deltagelse af sagsøgeren og hans revisor, Dan Malmstrøm.

Samme dag skrev revisoren til Skattedirektoratet:

"På given foranledning skal jeg herved bekræfte, at selvangivelsen for 1992 forventes indleveret indenfor en måned, og at jeg i løbet af 14 dage vil holde Dem orienteret om forløbet.

Jeg skal endvidere bekræfte, at det er min opfattelse at ændringerne for 1989 - 1993 ikke er korrekte, hvorfor jeg på vegne af min klient skal anmode om henstand med betaling af disse beløb til forholdet er afklaret endeligt. Dette forhold vil De ligeledes løbende blive holdt orienteret om."

Skattedirektoratets inkassokontor besvarede den 24. juli 1995 skrivelsen således:

"Inkassokontoret har modtaget Deres skrivelse af 19/7 1995 hvori De, på Deres klients vegne, blandt andet anmoder om henstand med betaling af pålydende krav for indkomstårene 1989-1993.

Deres anmodning kan besvares, når selvangivelsen for 1992 tilligemed Deres korrektioner vedrørende årene 1989-1993 er indsendt.

..."

Der er endvidere fremlagt en række af inkassokontorets notater eller skærmprint vedrørende blandt andet spørgsmålet om henstand. Der er blandt andet tale om følgende notater.

4. august 1995

"rev hertil pr tlf. SA/92 samt information vedr 93/94 (skattepl. her til landet ej afgjort) og klage vedr forhøjelserne 89-91 indsendes i uge 33, Der tages så stilling til henstandsanmodningen samt aftales betaling"

22. august 1995

"kopi af klager vedr 89-91 og SA 92 modt. - talt med Gitte Thuesen i Bodils's fravær, hvilken indflydelse vil det indsendte materiale får på restancerne, skal bruges til vurdering af en betalingsmæssig henstandsanmodning. Afvent besked fra 3. ligning"

28. august 1995

"klage over tax. for 92 behandles af gruppe A"

11. september 1995

Bodil inf om, at de tidligere forhøjelser vil blive nedsat således der totalt er forhøjelse på ca. kr. 200.000,00 - bliver behandlet som genoptagelsessag derfor pt. ingen mulighed for "henstand" ved klagebeh. - aftalt jeg retter henv, til rev./CB"

...

B.B.H. i ligningen forgæves søgt truffet - er der indrømmet henstand vedr. 92 ??? /CB"

12. september 1995

"der er ikke indrømmet henstand - er jo ikke en egentlig klage og der er ikke udsigt til ansættelserne for 92 og frem behandles hurtigt - hænger sammen med de øvrige indkomstår/CB"

25. september 1995

"rev. Dan Malmstrøm inf om, at der ikke er hjemmel til at indrømme henstand begrundet i de nævnte sager i ligningen - det

eneste der herfra kan aftales er en betalingsmæssig henstand, men undertegn. vil alene pt imødekomme at der ikke tvangsinddr. og under forudsætning af at der fra 011095 afvikles på restancen, aftalt til kr. 5.000,00/md. /CB"
5. oktober 1995
"CPR AFTALE SLETTET ...
OO 1156614,00 30000,00 6 4 9 05.03.1996 OPRETTET"
Sagsøgeren betalte 5.000 kr. den 3. oktober 1995.

Den 18. august 1995 skrev sagsøgerens revisor til kommunens skattedirektorat vedrørende fakturaen af 31. januar 1991 på 50.000 $:
"I henhold til aftale på vort møde fremsendes hermed yderligere dokumentation vedrørende indtægtsførsel af USD 50.000 i Anpartsselskabet Nielsen af 14. september 1984 ApS i regnskabsåret 1990/91.
...
I regnskabet indgår provisionen i posten "salg af varer og tjenesteydelser" kr. 338.009. Dette beløb fremkommer således:

| Provision salg af fly | 302.106 |
| Konto 120 | 1.230 |
| Konto 121 | 34.235 |
| Konto 113 | 438 |
|  | 338.009 |

..."

Endvidere havde revisoren en række bemærkninger vedrørende sagsøgerens bopælsforhold.

Ved skrivelse af 7. oktober 1996 meddelte Gentofte Kommune, Økonomi- og skatteforvaltningen, at man havde ændret sagsøgerens skatteansættelse vedrørende 1991 for så vidt angik for meget ansat konsulenthonorarer. Ansættelsen blev således nedsat med 286.750 kr. vedrørende fakturaen af 31. januar 1991 på 50.000 $ og med 545.000 kr. vedrørende fakturaen af 17. september 1991, der rettelig var på 100.000 kr. og ikke på 100.000 $.

Skatteankenævnet fastholdt administrationens afgørelse i sagen den 18. september 1997.

Forklaringer.

Under domsforhandlingen er der afgivet forklaring af sagsøgeren, Ulla Britta Brasen, Dan Malmstrøm, Niels Martin Nikolaj Victor og Carsten Bøje.

Sagsøgeren har forklaret, at han i 1987 stiftede en flyveklub og sammen med flyveklubbens 5 medlemmer stiftede Danish Air Service ApS. I løbet af nogle år overtog han de øvrige anpartshaveres anparter. Selskabet, der i begyndelsen lejede lokaler i Tune Lufthavn, fik senere egne bygninger i Tune. Selskabet beskæftigede sig med tre forretningsområder og havde et Flight Academy (en flyveskole), en vedligeholdelsesafdeling og en afdeling, der beskæftigede sig med Executive Flight, taxaflyvning, rundflyvninger mv. I den forbindelse havde man en kontrakt med Miljøministeriet vedrørende overvågning af olieudslip. I 1991/92, da selskabet var på toppen, havde det koncession til 35 flyvemaskiner. Selskabet var ikke ejer af disse fly men havde operatørtilladelse til flyene. En operatørtilladelse har to led; dels en koncessionsholder, der kan være en person eller et selskab, dels en koncessionsbærer, som er en enkeltperson. Flyoperatøren har en pilot, der kan flyve flyet, og er ansvarlig over for luftfartsmyndighederne, tilknyttet. Der var ca. 50 personer tilknyttet selskabet. Disse personer, der var selvstændige, var piloter, instruktører og tekniske medarbejdere, hvilket navnlig vil sige flymekanikere. Der var to til tre egentlige ansatte i Danish Air Service. De beskæftigede sig med administrationen. Virksomhedens grundlag var samarbejdet med de tilknyttede piloter og teknikere. Når en pilot skal flyve en ny type fly, skal den pågældende have en typeuddannelse til dette fly. En typeuddannelse koster 50.000-75.000 kr. for en pilot og 25.000-50.000 kr. for en mekaniker. Principielt skulle udgiften til videreuddannelse betales af den pågældende selv, men for at få bedst mulige medarbejdere var det genstand for forhandling med operatøren om - og i givet fald i hvilket omfang - denne skulle deltage i udgiften.

Købere af fly vil ofte gerne have kontakt med en operatør, der har piloter og uddannede teknikere samt de nødvendige tilladelser til at flyve flyet. Køberen har desuden en interesse i, at flyet bliver udnyttet, idet det også koster penge at have flyet stående på jorden. Sælgeren af et fly tilbyder ikke kun flyet men også en operatør. Sælgeren vil gennemsnitligt kunne regne med en bedre pris, når der kan tilbydes en attraktiv operatør. Det er almindelig kendt i branchen, at sælgeren betaler et honorar/provision til operatøren og betaler således en del af de udgifter, der er til videreuddannelse af piloterne. Flykøberen betaler en årlig afgift og et beløb pr. time flyet er i brug til operatøren. Når efteruddannelse drøftes med en pilot, vil piloten have interesse i at få selskabet til at betale så meget som muligt, medens selskabet gerne vil gøre det så billigt som muligt. Hvis piloterne og teknikerne vidste, at en sælger af et fly betalte provision til selskabet som operatør af flyet, ville de have et bedre udgangspunkt i forhandlingen med Danish Air Service om betaling for efteruddannelsen. Det var vigtigt, at fakturaerne blev udstedt gennem Nielsen UK eller Nielsen DK, da det ikke måtte fremstå sådan, at det havde noget med Danish Air Service at gøre. På kontoret var der et åbent klubmiljø. Piloterne og teknikerne havde deres daglige gang på kontoret, idet operationshåndbøgerne var placeret centralt i kontoret. Det kostede ikke noget at lade fakturaerne udstede af det engelske selskab. Provisionerne gik ind i den daglige drift. Der er udstedt fem fakturaer vedrørende provision til Flemming Frandsen koncernen. Jetair Aircraft Sales var ejet af Flemming Frandsen, der er en af de største flysælgere i Norden. Der er ikke udstedt sådanne fakturaer til andre.

Fakturaen af 30. oktober 1989 vedrører tre skolefly OY-JEC, OY-JED og OY-JEE. Flyene blev købt af Kræn Hjortlund. Fakturaen må være betalt med en check, idet der ikke er nogen af de omhandlede honorarer, der er blevet betalt kontant. Han er ikke klar over, om checken vedrørende denne faktura er blevet indsat på Danish Air Services eller Nielsen DK's konto, ligesom han ikke er klar over, om bogføringsstemplet på de to fakturaer kommer fra et af hans selskaber.

Fakturaen af 16. marts 1990 angår salg af et fly til Mäckler. Det er ikke ham, der med håndskrift på denne faktura har skrevet, at den vedrører OY-ARV. Da checken på $ 25.000 vedrørende denne faktura blev indsat i banken skete det sammen med andre checks, hvorfor indsætningen på 292.319,40 kr. er større end checkbeløbet på 162.586,67 danske kroner.

Flyet OY-ARV var et mere avanceret fly end Danish Air Service sædvanligvis opererede. Man var ikke operatør på flyet i forvejen.

Fakturaen af 13. august 1991 angik en Radisson 22 helikopter. Der var ikke tale om en operatøraftale men en

vedligeholdelsesaftale, og man sendte en mand til USA for at få den nødvendige uddannelse til at vedligeholde helikopteren.

Fakturaen af 17. september 1991 angik et fly - en PA40 -, der blev solgt til Claus Hecht Johansen. Fakturaen angik ikke OY-ARV, men Flemming Frandsen ønskede, at dette fly skulle være angivet på fakturaen.

Danish Air Service kom i økonomiske vanskeligheder i 1991/92, og aktiviteterne blev solgt til de nye ejere af Jetair pr. 1. januar 1994. Han flyttede til England den 1. januar 1993 og har boet på tre forskellige adresser i England. Siden 1. april 1994 har han boet på samme adresse i London, hvorimod han ikke har boet på Lindegårdsvej, der blev udlejet. I maj eller juni 1995 hørte han via sin tidligere ægtefælle om ændringen i skatteansættelsen. Han har ikke aftalt en afdragsordning med skattevæsenet og ikke fået en skrivelse om henstand.

Ulla Britta Brasen har blandt andet forklaret, at hun i 1987 blev tilknyttet Danish Air Service ApS og Nielsen DK på fritidsbasis. Senere blev hun ansat, og hun fratrådte i august 1990. Hendes opgave var at bogføre for de danske selskaber, der havde samme fysiske lokaliteter. Bogføringen skete særskilt i de to danske selskaber. Når de danske selskaber modtog en check, blev den af hende sat i banken. Det var hende, der har skrevet fakturaen af 30. oktober 1989 og sandsynligvis hende, der skrev fakturaen af 16. marts 1990. Hun har skrevet to sådanne fakturaer. Det kan være hende, der har sat stemplet vedrørende bogføring på fakturaerne, men det er ikke hende, der har sat det andet stempel med oplysning om modtagelsesdato. Hun er ikke klar over, hvorfor der skulle betales til det engelske selskab. Det var ikke sædvanligt, at hun udskrev fakturaer for det engelske datterselskab, der var ret nyt. Hun erindrer ikke at have set check på de beløb, der er faktureret af det engelske selskab.

Dan Malmstrøm har blandt andet forklaret, at han har været revisor for sagsøgeren siden 1987. Han var endvidere valgt som revisor for Nielsen ApS og Danish Air Service ApS. Efter at sagsøgeren var flyttet til England i 1993 havde han løbende kontakt med ham via mobiltelefon. Selskabernes selvangivelser for 1989-1991 har været indsendt rettidigt. I forbindelse med fremsendelsen af disse har han gjort en bemærkning om, at spørgsmål i forbindelse med disse kunne rettes til ham. Sagsøgerens selvangivelse for 1992 blev indsendt i juli eller august 1995. Sagsøgeren har ikke indleveret selvangivelse for 1993. Skattevæsenet, der antog, at sagsøgeren var skattepligtig i Danmark, har foretaget en skønsmæssig ansættelse af sagsøgerens indkomst for 1993, hvilket er blevet tilbageført i 2001. Han har ikke fået et endeligt svar på sin skrivelse af 19. juli 1995 om henstand med betaling foranlediget af skattevæsenets ændringer vedrørende 1989-1993, men han har talt med Carsten Bøje om en afdragsordning. Han havde alene hjemmel fra sagsøgeren til at indgå en afdragsaftale vedrørende 1992 men ikke vedrørende de andre år, idet sagsøgeren ikke mente at skylde noget vedrørende disse. Restskatten vedrørende 1992 var på ca. 40.000 kr. Det var meningen, at ordningen skulle løbe, indtil restskatten for 1992 var betalt. Han er ikke klar over, hvorfor der kun blev betalt et afdrag, og han husker ikke, om skattevæsenet i den anledning rettede henvendelse til ham.

Vedrørende fakturaen af 16. marts 1991 på 25.000 $ skal man ikke alene se på regnskabet for Nielsen ApS men også på regnskabet for Danish Air Service. Indtægten kan være indtægtsført ved en fejl i Danish Air Service og derfor indgået i dette selskabs omsætning. Hvis moderselskabet modtog et beløb, som tilkom datterselskabet, ville det blive bogført på mellemregningskontoen. Mellemregningskontoen i 1989/90 regnskabet for moderselskabet, der er på 585.000 kr., kan indeholde en lang række posteringer.

Fakturaen af 31. januar 1991 på 50.000 $ indgik i regnskabet for 1990/91 for Nielsen ApS under salg af varer og tjenesteydelser. Han husker ikke, hvad konto 120, 121 og 113, som han har omtalt i sin skrivelse af 18. august 1995 vedrørte, men de vedrørte ikke provision ved salg af fly. Flyprovisioner blev i regnskabet for Nielsen ApS 1989/90 henført under salg af varer og tjenesteydelser eller under en separat post. De øvrige indtægtsposter i regnskabet er så specifikke, at det ville være misvisende, hvis sådanne indtægter indgik under disse. Han har revideret regnskaberne og herunder checket bogføringen. Fakturaen på $ 50.000 husker han, fordi den var så stor. De øvrige fakturaer har han først set under sagen.

Niels Martin Nikolaj Victor har forklaret, at han fra 1989 var ansat i tre til fire år i Danish Air Service som operationschef. General Agency-branchen, som Danish Air Service tilhørte, er en speciel del af flybranchen. Han beskæftigede sig blandt andet med at bestyre flyparken og booking af fly. Stillingen var en lederstilling med fast løn. Det var normalt, at der blev betalt honorar til operatøren. Han er ikke klar over, om provisionen skyldtes, at operatøren medvirkede ved salget, eller om den skyldtes, at vedkommende blev operatør. Han har ikke kendskab til de enkelte fakturaer eller bogføringen heraf, men han har haft overordnet kendskab til, at der faldt provision i forbindelse med operation af fly. Han har heller ikke haft kendskab til, at fakturaerne blev udstedt via et engelsk selskab. De tilknyttede piloter og instruktører var selvstændige erhvervsdrivende, der i hvert fald i starten havde job i andre selskaber. De var også ofte kunder i selskaberne og gik på flyskolen. Piloterne skulle typisk selv betale for deres typeuddannelse, men der var en dialog med piloterne om, hvorvidt de beløb, de skulle betale, var rimelige i forhold til indtægterne. De tilknyttede piloter og teknikere fik ikke kendskab til provisionerne, hvilket han fandt meget naturligt. Han har ikke kendskab til, om denne fremgangsmåde er almindeligt brugt. Der var mange unge piloter, der ikke kunne opnå så høj en løn, og som havde gæld i forbindelse med deres uddannelse. Hvis de havde kendskab til provisionerne, ville de forlange større honorar.

Carsten Bøje har blandt andet forklaret, at han er pantefoged i Gentofte Kommune. De skærmprint, der er fremlagt under sagen, er inkassokontorets notater vedrørende sagsbehandlingsskridt. Enhver debitoraftale noteres i den elektroniske kalender. Om de fremlagte skærmprint har Carsten Bøje forklaret:

Ad den 11. september 1995: Der kunne ikke gives ligningsmæssig henstand, men inkassokontoret kunne give betalingsmæssig henstand. Ligningsmæssig henstand medfører, at man undlader at inddrive restancen, så længe en rettidig indgivet klage behandles. Når en aftale om betaling af afdrag i forbindelse med aftale om undladelse af at tvangsinddrive ikke overholdes, går tvangsinddrivelsen i gang igen.

Ad den 12. september 1995: Der var ikke rettidigt indgivet regnskab for 1992. Da regnskabet kom ind, betragtedes det som en anmodning om genoptagelse, og derfor kunne der ikke gives ligningsmæssig henstand.

Ad den 25. september 1995: Han meddelte, at der ikke kunne gives ligningsmæssig henstand, men at der kunne gives en betalingsmæssig henstand. Han vurderede, at man kunne undlade tvangsmæssig inddrivelse under forudsætning af, at der blev betalt afdrag på 5.000 kr. Der blev med sikkerhed indgået en sådan aftale med revisor Malmstrøm vedrørende hele restancen for 1989 til 1991 på 1.156.614 kr. Aftalen skulle løbe så længe sagerne kørte. Det var forudsat, at der ville gå 6 måneder med klagesagsbehandlingen. Aftalen blev ikke bekræftet skriftligt. Der var ikke tvivl om aftalens indhold. Nu bekræftes aftaler om afdragsordninger skriftligt, men det var ikke kutyme dengang.

Ad den 5. oktober 1995: Aftalen blev indberettet i systemet. Aftaler indberettes for ca. et halvt år, medmindre hele restancen kan afdrages inden for kortere tid. Beløbet på 30.000 udgør 6 måneders afdrag. "9" angiver, at aftalen vedrører alle debitorforhold og "4" angiver, at afdragene skal betales månedsvis. Koden "rykker beløb" er indsat, da afdraget ikke blev betalt. Han tog ikke kontakt med Malmstrøm i anledning af, at betalingsaftalen blev misligholdt. Af afdraget på 5.000 kr. blev 100 kr. trukket fra til betaling af tingbogsattest, som inkassokontoret havde rekvireret. Resten blev anvendt til betaling af restskat for 1989. De 200.000 kr. var den skønsmæssige forhøjelse af ansættelsen vedrørende samtlige de skatteår, som var til behandling.

**Procedure.**

Parterne har i det væsentligt procederet i overensstemmelse med deres påstandsdokumenter.

Sagsøgeren har således til støtte for den principale påstand gjort gældende, at et eventuelt skattekrav er forældet efter 1908-loven. Begyndelsestidspunktet for forældelsen er det tidspunkt, hvor restskatten for de enkelte skatteår er forfalden. Forældelsesfristen skal således regnes fra den 1. september, 1. oktober og 1. november i året efter det pågældende skatteår. Fristen kan senest begynde at løbe fra det tidspunkt, hvor skattemyndighederne kom i besiddelse af de omhandlede fakturaer, hvilket skete den 7. juni 1993. Forældelse er derfor senest indtrådt den 7. juni 1998. På dette tidspunkt kunne skattemyndighederne have foretaget omligning og inddrevet kravet. En eventuel udlægsforretning havde afbrudt forældelse.

Forældelsesfristen løber, uanset om skattekravet er pålignet og beregnet og suspenderes ikke, medens skattevæsenet forsøger at indhente yderligere oplysninger. Hvorvidt fakturaerne var beskattet i England er uden betydning for den danske skattesag. Det seneste tidspunkt en eventuel suspension ophører var den 25. maj 1994, da skattevæsenet fik tilsendt regnskaber vedrørende det engelske selskab. Det endelige svar fra den 8. januar 1995 er uden betydning for denne sag. De eventuelle skattekrav er således senest forældet den 25. maj 1999.

Sagsøgeren har supplerende gjort gældende,

at forældelse ikke afbrydes ved skatteyderens udtagelse af stævning til judiciel prøvelse af ligningen,

at den blotte anmodning om henstand ikke har virkning som anerkendelse af gælden, når der som i det foreliggende tilfælde samtidig verserer en administrativ klagesag om ligningen,

at henstand ikke er meddelt,

at afdragsordningen vedrører en skatterestance for 1992 og derfor er sagen uvedkommende.

subsidiært at henstandsordningen er misligholdt af sagsøger og derfor bortfaldet automatisk eller i medfør af stiltiende overenskomst, med den konsekvens at ordningen kun har suspenderet forældelse igennem et par måneder.

Til støtte for den subsidiære påstand har sagsøgeren gjort gældende, at honorarerne ikke er blevet tilegnet af sagsøgeren, men er oppebåret af de af ham ejede selskaber Nielsen ApS og Danish Air Service ApS. Til støtte herfor har sagsøgeren især anført,

at skattemyndighederne altid har bevisbyrden for, at en given indtægt er skattepligtig,

at de omhandlede honorarer er betalt med checks, der alene kan indløses via indsættelse på en bankkonto,

at sagsøgeren i forbindelse med landsskatteretssagen har fremlagt udskrifter over sine personlige bankkonti, hvoraf fremgår, at beløbene ikke er indsat dér,

at det af indsætningen på selskabernes bankkonto fremgår, at beløbene har passeret selskabernes bogføring, og dermed er indtægtsført,

at skattemyndighederne allerede henset til det netop anførte ikke har løftet bevisbyrden for, at honorarerne ikke er indtægtsført i selskaberne,

og at det ved vurderingen af beviserne under alle omstændigheder skal tillægges vægt til gunst for sagsøger, at man nu undersøger anliggender, som grundet skattevæsenets forhold ligger mange år tilbage i tiden.

For så vidt angår Nielsen UK har sagsøgeren anført, at der efter engelsk regnskabspraksis ikke er oplyst om omsætningen i regnskabet, men alene at der ikke har været tale om noget dækningsbidrag.

Sagsøgeren har supplerende gjort gældende, at skattemyndighedernes korrektion af selvangivelserne er forældet. Til støtte herfor er det anført,

at sagsøgerens selvangivelser for 1989-1991 var korrekte og dækkende,

at skattevæsenet ikke svævede i utilregnelig uvidenhed om kravene, eftersom det angivelige forhold, at de omhandlede fakturaer først kom for en dag 7. juni 1993, alene beror på skattemyndighedernes fejl,

og at agterskrivelsen af 17. januar 1995 derfor fremkom for sent.

I øvrigt har sagsøgeren gjort gældende, at sagsøgte har bevisbyrden for alle forhold af betydning for sagen. Til støtte herfor har sagsøgeren anført, at skattemyndighederne lige fra selvangivelserne blev indgivet, havde haft de omhandlede fakturaer i sin besiddelse men opdagede dem angiveligt først ved en "revision" 7. juni 1993. Først 13 måneder senere søgte skattemyndighederne at fremskaffe oplysninger fra det britiske skattevæsen, og først 17. januar 1995 fremsendte sagsøgte en agterskrivelse, hvorved sagsøgeren fik anledning til at sikre bevis. Grundet dette sløseri er beviser og bevismuligheder meget muligt gået tabt.

Sagsøgeren har under proceduren gjort gældende, at de streger, der ses i det engelske selskabs regnskaber under omsætningen, ikke angiver, at omsætningen har været 0 kr., men er udtryk for at tallene af forretningsmæssige grunde hemmeligholdes.

Sagsøgte har over for sagsøgerens principale påstand om forældelse gjort gældende, at skattekravene vedrørende indkomstårene 1989 - 1991 ikke er forældede efter 1908-loven.

Sagsøgte har erklæret sig enig i, at begyndelsestidspunktet for forældelse af restskattekrav regnes fra forfaldstidspunktet. I denne sag havde sagsøgte imidlertid ikke kendskab til kravene på dette tidspunkt.

Skattemyndighederne var på tidspunktet for honorarbilagenes fremkomst den 7. juni 1993 ikke i stand til at afgøre, om skattemyndighederne havde et krav på sagsøgeren eller ej.

Skattemyndighederne har derfor forsøgt at kontakte sagsøgeren på den af ham opgivne adresse i England med henblik på at få afklaret de nærmere omstændigheder omkring honorarbilagene, dog uden at det lykkedes at komme i kontakt med sagsøgeren før den 27. juni 1995. Som led i undersøgelsen af de faktiske forhold omkring de fremkomne honorarbilag rettede skattemyndighederne den 23. februar 1994 henvendelse til de engelske skattemyndigheder med henblik på at få en række oplysninger omkring sagsøgeren og dennes selskaber. De engelske skattemyndigheders endelige svar forelå den 8. januar 1995. På baggrund af de foregåede undersøgelser og svaret fra de engelske skattemyndigheder udsendte skatteforvaltningen i Gentofte den 17. januar 1995 agterskrivelse om forhøjelse af sagsøgerens skattepligtige indkomst for indkomstårene 1989-1991. Sagsøgte har gjort gældende, at skattemyndighederne som følge af utilregnelig uvidenhed før dette

Copyright © 2021 Karnov Group Denmark A/S

tidspunkt ikke var i stand til at gøre sit krav op, hvorfor forældelsesfristen efter 1908-loven tidligst kan anses for at løbe fra dette tidspunkt.

Sagsøgeren rettede den 19. juli 1995 henvendelse til skattemyndighederne og anmodede om henstand med betalingen af de foretagne forhøjelser, indtil forholdet var endeligt afklaret. Den 25. september 1995 blev der indgået aftale om henstand under forudsætning af, at sagsøgeren afdragede det udestående skattekrav med 5.000 kr. månedligt fra 1. oktober 1995. Sagsøgeren betalte 6. oktober 1995 5.000 kr. i afdrag, hvorefter sagsøgeren ikke har betalt flere afdrag. Da der mellem sagsøgeren og sagsøgte er indgået en aftale om henstand med betalingen af de omhandlede skattebeløb, bevirker denne aftale, at forældelsesfristen blev afbrudt og først begyndte at løbe fra henstandens slutning, jf. U 1930.68 H og U 1989.1064 H. Henstandsperioden er tidligst ophørt den 1. november 1995, og en ny 5-årig forældelsesperiode skal derfor tidligst beregnes fra dette tidspunkt.

Sagsøgte har endvidere gjort gældende, at sagsøgerens sagsanlæg ved stævning den 29. juni 1999 er egnet til at skabe klarhed over kravet, hvorfor der er foretaget retslige skridt i henhold til 1908-lovens § 2 inden udløbet af forældelsesfristen efter lovens § 1, jf. TfS 1990.120 Ø og 2001.171 Ø.

Over for sagsøgerens subsidiære påstand har sagsøgte gjort gældende, at sagsøgeren i indkomstårene 1989 - 1991 som følge af sit 100 % ejerskab af Nielsens ApS og dermed 100 % ejerskab af Danish Air Service ApS og Nielsen (UK) Ltd. samt i kraft af sin stilling som direktør i Nielsens ApS og Danish Air Service ApS har haft dominerende indflydelse på, hvilket af selskaberne der skulle udstede de i sagen omhandlede fakturaer.

Sagsøgeren er ikke fremkommet med en forståelig og underbygget redegørelse for, hvorfor Nielsens (UK) Ltd. var involveret i arrangementet.

Til trods for sagsøgtes opfordringer til sagsøgeren om at redegøre for ved navns nævnelse, hvem de omhandlede fakturaer skulle hemmeligholdes for, er sagsøgeren ikke fremkommet med disse oplysninger. Den manglende opfyldelse af opfordringen skal tillægges processuel skadevirkning i henhold til retsplejelovens § 344, stk. 2, med den konsekvens, at det må anses som udokumenteret, at der har været et forretningsmæssigt formål med involveringen af Nielsens (UK) Ltd. i fakturering af honorarbeløbene.

Under henvisning til de usædvanlige omstændigheder omkring fakturering via Nielsens (UK) Ltd. og henset til sagsøgerens dominerende indflydelse i kraft af sit 100 % ejerskab af selskaberne og sin stilling som direktør i de danske selskaber har sagsøgte gjort gældende, at bevisbyrden for, at de omhandlede honorarbeløb er blevet beskattet i Nielsens ApS eller Danish Air Service ApS tilkommer sagsøgeren, ligesom det tilkommer sagsøgeren at sikre, at de regnskabsmæssige forhold i selskaberne er i orden, jf. UfR 1998.1538H .

Sagsøgte har endvidere gjort gældende, at det er udokumenteret, at honorarbeløbene er blevet indtægtsført i Nielsens ApS eller Danish Air Service ApS. De fremlagte checkbilag/bankkontoudtog udgør ikke dokumentation for, at honorarbeløbene har passeret Nielsens ApS eller Danish Air Service ApS' bogføring, endsige at der har fundet indtægtsførsel af beløbene sted i et af de to selskaber.

Hertil kommer, at sagsøgerens oplysning om, at betalingen vedrørende fakturaen af 13. august 1991 er indgået i banken den 26. august 1991 ikke kan passe, idet fakturaen først er stemplet modtaget af Jet Air 27. august 1991. Endvidere stemmer oplysningen i fakturaen af 17. september 1991 om, hvilket fly den angik, ikke.

Da der ikke foreligger dokumentation for, at honorarerne er blevet indtægtsført i Nielsens ApS eller Danish Air Service ApS som rette indkomstmodtager, og da sagsøgeren var eneanpartshaver i koncernen, skal beløbene beskattes hos sagsøgeren som maskeret udlodning, jf. ligningslovens § 16 A.

I forhold til sagsøgerens subsidiære påstand har sagsøgte videre gjort gældende, at de oprindelige skatteansættelser for indkomstårene 1990 og 1991 som følge af i hvert fald grov uagtsomhed hos sagsøgeren, blev foretaget på et urigtigt eller ufuldstændigt grundlag. Den 3-årige forhøjelsesfrist i skattestyrelseslovens § 35, stk. 1, var i hvert fald indtil det tidspunkt, hvor skatteforvaltningen kom i besiddelse af fakturaerne suspenderet i medfør af § 35, stk. 3. Skattemyndighedernes forhøjelse af sagsøgerens skattepligtige indkomst for indkomstårene 1990 - 1991 ved afgørelse af 7. april 1995 er derfor ikke ugyldig, jf. skattestyrelseslovens § 35, stk. 1, jf. stk. 3. Skattemyndighedernes afgørelse af 7. oktober 1996 var en nedsættelse af sagsøgerens skattepligtige indkomst, hvorfor den efter ordlyden i § 35 ikke er omfattet af bestemmelsen. Endvidere ligger afgørelsen inden for rammerne af den ved agterskrivelsen af 17. januar 1995 bebudede indkomstforhøjelse, da der alene foretages en beløbsmæssig nedsættelse. Forældelsesfristen i skattestyrelseslovens § 35 blev i forhold til den efterfølgende nedsættelse den 7. oktober 1996 afbrudt ved afgørelsen af 7. april 1995. Reglen i skattestyrelseslovens § 35, stk. 1, har ikke virkning for 1989.

Er sagsøgeren kommet i en bevismæssigt vanskelig situation uanset at indkomstårene 1989 - 1990 og 1990 - 1991 var omfattet af den 5-årige regnskabsopbevaringspligt på tidspunktet for agterskrivelsen den 17. januar 1995, beror dette ikke på myndighedens adfærd, men derimod på sagsøgerens usædvanlige faktureringskonstruktioner via datterselskabet i England.

Sagsøgte har protesteret imod, at sagsøger først under proceduren fremsatte anbringende om betydningen af stregmarkeringen i de engelske regnskaber tages under påkendelse.

**Landsrettens bemærkninger.**

Skattemyndighederne fik først den 7. juni 1993 kendskab til de omhandlede fakturaer, hvorefter der foretoges relevante undersøgelser ved indhentelse af oplysninger om de omhandlede selskaber, herunder ved henvendelse til de engelske myndigheder med henblik på konstatering af, om der var et muligt krav på restskat.

Da sagsøgte modtog de engelske myndigheders svar af 25. maj 1994, og herunder modtog regnskaberne for det engelske selskab og oplysning om, at det var blevet slettet af selskabsregisteret den 12. januar 1993 fik sagsøgte tilstrækkeligt grundlag for at gøre krav gældende mod sagsøgeren. Sagsøgte findes at have været i utilregnelig uvidenhed om skattekravene indtil den engelske myndigheders svar af 25. maj 1994 forelå. Den omstændighed at der var tale om en foreløbig rapport fra de engelske myndigheder kan ikke føre til noget andet resultat, da de oplysninger, som de engelske myndigheder angav, at man senere ville fremkomme med, og som fremkom med de engelske myndigheders skrivelse af 8. januar 1995, alene angik forhold, der var uden betydning for skatten vedrørende de fem fakturaer.

Sagsøgte har ikke mod sagsøgerens og Dan Malmstrøms forklaring godtgjort, at der i efteråret 1995 blev indgået en aftale om henstand vedrørende de omtvistede skattekrav.

Da stævning er indleveret den 30. juni 1999, er skattekravene herefter forældede. Sagsøgerens principale påstand tages derfor til følge.

Copyright © 2021 Karnov Group Denmark A/S

**Thi kendes for ret:**

Sagsøgte, Skatteministeriet, skal anerkende, at skattekravene mod sagsøgeren, Gert Rolien Bach Nielsen, vedrørende indkomstårene 1989, 1990 og 1991 er forældede.

I sagsomkostninger betaler sagsøgte inden 14 dage 21.000 kr. til sagsøgeren.

Copyright © 2021 Karnov Group Denmark A/S