# Exhibit 10

**OEL2002.B-1886-99**
**SKM2002.313.ØLR**
**TfS 2002, 617**

**Eastern High Court judgment of May 24, 2002, j nr. B-1886-99**
(District Judges V. Rønne, Plessing and Lone Kerrn-Jespersen (deputy)).

*Gert Rolien Bach Nielsen (Attorney Michael H. Steffensen v/adv. Jens Ravnkilde)*
mod
*Skatteministeriet (Ka. v/advokat Martin Henrichsen, sample)*

***Limitation of tax claims - 1908 Act***

- ♦ The case concerns whether payment under a number of invoices should be taxed as a disguised distribution to the principal shareholder, cf. section 16 A of the Tax Assessment Act. The case also concerned whether the tax claims were time-barred under the 1908 Limitation Act. The High Court found that the tax claim was time-barred
, as the tax authorities, upon receipt of information from the English tax authorities on May 25, 1994, were considered to have sufficient basis for asserting a claim, whereas the summons was not filed until June 30, 1999. The Ministry was not considered to have proved that an agreement was made in the fall of 1995 to defer payment of the taxes.

- ♦  The case concerned whether tax claims were time-barred under the 1908 Act. The tax authorities had considered a principal shareholder to be taxable on a disguised distribution for the income years 1989-1991. The High Court found that the tax authorities became aware of the situation in 1993 and 1994 and could at that time assert claims against the principal shareholder. As a summons was filed in 1999, the High Court agreed with the main shareholder's main claim and considered the tax claims to be time-barred under the 1908 Act.

## Eastern High Court

In the present action, brought on 30 June 1999, the applicant, Gert Rolien Bach Nielsen, claims that the defendant, the Ministry of Taxation, should recognize that the tax claims relating to the income years 1989, 1990 and 1991 are time-barred; alternatively, that the assessment of the applicant's income for the income years 1989, 1990 and 1991 should be reduced to the amount declared, so that the capital income in 1989 is reduced by DKK 42 855, the capital income in 1990 by DKK 162 775 and
dividend income in 1991 with DKK 133,250.
  The defendant, the Ministry of Taxation, has finally claimed acquittal.
  On April 13, 1999, the Danish National Tax Tribunal ruled on the plaintiff's tax assessment for the years 1989, 1990 and 1991. The ruling and this judgment refer, among other things, to a Danish company called Nielsen ApS. The company's full name is Anpartsselskabet Nielsen af 14. september 1984. The company is also referred to as Nielsens ApS. The ruling of the National Tax Tribunal is as follows:
  "The case has been negotiated with the complainant and his lawyer, who has also had the opportunity to speak at a court hearing.
  It is stated that the complainant, who is resident in England, was the owner of the shares in the company Nielsen ApS in the income years in question, that he was also the owner of one share in the English company Nielsen (UK) Limited and that Købmandsstandens oplysningsbureau has stated that the remaining shares in the English company were owned by

Nielsen ApS. The English company was owned by Nielsen ApS. The English company has subsequently been dissolved without ever having declared income.

It is also stated that the complainant was the director of Nielsen ApS and its subsidiary Danish Air Service ApS, that both companies operated from Roskilde Airport within the aviation industry, including training, brokerage, rental and consultancy services, and that Danish Air Service ApS also had authorization for taxi flights, pilot training and aircraft maintenance. The English company Nielsen (UK) Limited has been associated with Nielsen ApS and Danish Air Service ApS.

Finally, it is stated that in mid-1993, the local tax authority received five control vouchers concerning fee income from two companies Jetair ApS and Flemming Frandsen Aircraft Sales ApS, that four vouchers were invoiced by Nielsen (UK) Limited and one voucher was invoiced by Nielsen ApS, and that on April 7, 1995, the tax authority increased the complainant's income assessments for 1989, 1990 and 1991 by all the fee income, as the complainant was deemed to be the correct income recipient. The income assessments were subsequently reinstated as a numerical error had been made in the income assessment for 1991. In this connection, it was established that a fee of USD 50,000 had been entered as income in Nielsen ApS, which is why the complainant's income assessments in the tax administration's decision of October 7, 1996 were only increased by the four fees invoiced by Nielsen (UK) Limited.

In support of the assessments made, the local tax authorities have stated that they have conducted a thorough investigation of whether the fees should have been recognized as income in one or more of the complainant's companies, that the fees cannot be recognized as income in any of these companies, that the invoice amounts have been settled from the two companies at Roskilde Airport, and that all information points to the complainant as the correct income recipient of the fee income.

The authorities have emphasized that the complainant, by having his British company appear as the recipient of the fee income, has sought to hide the income from the tax authorities, and that it is by chance that the authorities have come into possession of information to make correct tax assessments. The tax assessments appealed have therefore been made in a timely manner, cf. section 35(3) (now (4)) of the Tax Administration Act.

The complainant's lawyer has claimed that the income assessments for 1989, 1990 and 1991 be reduced to the amount declared. In support of this, the lawyer has stated that the fees have not been appropriated by the complainant, but have been collected by the companies owned by him. The assessments for the income years 1990 and 1991 are consequently invalid pursuant to the current provision in section 35(1) of the Tax Administration Act, as the time limit has not been suspended pursuant to the current provision in section 35(3) of the Tax Administration Act.

The lawyer has further stated that the invoices in question concern consulting fees in connection with the purchase, sale and chartering of aircraft, that Jetair ApS and Flemming Frandsen Aircraft Sales ApS, in connection with the sale of aircraft, have entered into an agreement with Nielsen ApS and Danish Air Service ApS to charter the aircraft during the periods when the buyer could not use the aircraft, and that the buyers have thereby been able to limit the operating expenses. As consideration for chartering the aircraft, Nielsen ApS and Danish Air Service ApS received a fee from the seller for the education and training of pilots. The invoicing from Nielsen UK Ltd. was done solely to avoid disclosing the relationship to the buyer of the aircraft and the employees of Danish Air Service ApS. In this connection, the lawyer has pointed out that Nielsen ApS, Danish Air Service ApS and Nielsen (UK) Limited have subsequently been dissolved, which is not possible to verify,

whether the fees in question have been recognized as income in these companies, as the companies' accounting basis is no longer available to the complainant. The lawyer has emphasized that it is the authorities who must prove the thesis that the companies have not received the fees, that the case only concerns the assessment of evidence, but that the authorities have not been able to establish that the amounts have not been recognized as income in the companies, which is why the authorities lack proof via the accounting records. The British company, which has only been a kind of straw man, has recognized the fees in question as income and expensed a corresponding amount, as the fees have been paid to Nielsen ApS and Danish Air Service ApS. This is the reason why the UK company's accounts do not show that there has been any turnover or contribution margin in the years in question.

The complainant has further stated that he has not received the fees in question, which is why the amounts must have been recorded as income in either Nielsen ApS or Danish Air Service ApS, that the turnover of the English company does not appear from the company's accounts prepared as of September 30, 1989 and September 30, 1990, but that the company's auditor issued a statement to this effect in 1998. The complainant has emphasized that via Den Danske Bank he has received copies of bank statements concerning Nielsen ApS and Danish Air Service ApS bank accounts for the period in question, that at the time of the fee payments he has searched for some bank deposits, but that the bank is no longer in possession of supporting documents as these are shredded after 5 years.

The attorney has further stated that the fees in question were paid by checks that can only be cashed by deposit in a bank account, and that the deposits in Nielsen ApS' and Danish Air Service ApS' bank accounts document that the amounts have passed through the companies' accounts and have thus been recognized as income. The lawyer has pointed out that a check for USD 25,000 issued on March 19, 1990 is included in a deposit in Nielsen ApS' bank account on March 22, 1990 for a total of 292,319, that a check of DKK 100,000 issued on September 18, 1991 is included in a deposit in Danish Air Service ApS' bank account on September 24, 1991 totaling DKK 210,932, and that there is thus a close temporal connection between the payment of t h e   fees and the deposit in the companies' bank accounts. Finally, the lawyer has stated that when assessing whether the fees have been recognized as income in the companies, it must be emphasized that it is now investigating circumstances that lie many years back in time. The complainant finds it difficult to disprove the authorities' claim, as the companies in question are bankrupt. Moreover, the companies were sold by the complainant prior to their dissolution. Furthermore, the complainant has not been invited to secure proof of the revenue recognition while it was still possible to obtain the underlying documentation. Instead, the authorities had a hidden agenda that the complainant had committed a criminal offense covered by the Tax Control Act or the Criminal Code. Thus, the authorities have not provided the complainant the necessary guidance, and the authorities have not carried out the necessary investigations.

...

On behalf of the Danish Customs and Tax Agency, the Nærum Customs and Tax Region has recommended that the assessments be changed so that the fees are considered a taxable distribution to the complainant, cf. section 16A(1) of the Danish Assessment Act. In support of this, the Region has stated that it has not been established that the fees in question have passed through the Danish companies' bookkeeping. The Danish companies were the correct income recipients for the fees, which were invoiced by the shell company in England. The Region has emphasized that payment with discharging effect could only be made to the English company, which was deleted on 21 January 1993, and that the complainant has put himself in a situation where he cannot document that money has been received

the Danish companies. The burden of proof is thus on the complainant. The authorities can do no more.

Regarding the region's recommendation, the lawyer has stated that one must distance oneself from the complainant's burden of proof and that it is only a matter of theories that the companies have not received the fees. The complainant finds it difficult to disprove the authorities' claim, as the companies in question are bankrupt.

**The National Tax Tribunal must pronounce:**

...

The complainant had a dominant influence in the company Nielsen (UK) Limited, as he directly owned one share in the company and indirectly owned the remaining shares through the ownership of Nielsen A/S. However, Nielsen (UK) Limited, which has not declared any income, has issued 4 invoices to Jetair ApS and Flemming Frandsen Aircraft Sales ApS, which had entered into an agreement with Nielsen ApS and Danish Air Service ApS on chartering aircraft. The invoices allegedly concern services related to this agreement concluded by two Danish companies in which the complainant had a dominant influence. The Court finds that Nielsen ApS and Danish Air Service ApS must be considered the correct income recipient of the fee income, as the companies had allegedly entered into an agreement with Jetair ApS and Flemming Frandsen Aircraft Sales ApS on chartering aircraft. The company Nielsen (UK) has thus only been able to invoice by virtue of the complainant's dominant influence in the companies. As the companies Nielsen ApS, Danish Air Service ApS and Nielsen (UK) Limited have been dissolved and the companies' accounts are no longer available, it cannot be documented that the fees in question have been recognized as income.

The complainant has provided copies of bank statements for Nielsen ApS and Danish Air Service ApS's bank accounts for the period in question. However, there are no deposits corresponding to the fee payments in these bank accounts, but there are some deposits that exceed the fee payments. However, the bank is no longer in possession of the supporting documents, which is why the payments cannot be documented as being included in these amounts.

The Court finds that it must agree with the Customs and Tax Administration that the complainant has the burden of proof for the companies' revenue recognition of the fee payments in question, as he has not been able to provide any satisfactory explanation as to why the payments should be made to the company in England. The complainant has put himself in a situation where he cannot document that the money has gone to the Danish companies. As the complainant has not lifted the burden of proof regarding the Danish companies' revenue recognition of the fees, the fees must be considered a taxable distribution to the complainant, cf. the Danish Tax Assessment Act.

§ Section 16A(1).

The Court further finds that the assessments for the income years 1990 and 1991 were validly made, cf. section 35(1) of the Tax Administration Act, as the time limit must be considered suspended until the tax authority in 1993 received the four control vouchers, cf. the current provision in section 35(3) of the Tax Administration Act. The appealed increases of the complainant's personal income are reduced to 0, and instead the complainant's capital income for the income years 1989 and 1990 is increased by corresponding amounts, cf. section 4(1)(4) of the Personal Income Tax Act, and tax credit hereof, cf. section 17A of the Corporation Tax Act, which the Danish Customs and Tax Administration has agreed with. For the income year 1991, a corresponding dividend income is assessed, cf. section 4a of the Danish Personal Income Tax Act.

..."

Supplementary case
presentation. Fees.

On June 7, 1993, the tax administration in Gentofte Municipality, where the plaintiff's companies were registered, received the five invoices referred to in the ruling of the National Tax Court from the tax administration

Copyright © 2021 Karnov Group Denmark A/S

in Roskilde Municipality. The invoices were for $6,000, $25,000, $50,000, $5,000 and DKK 100,000 respectively. The parties agree that the invoice amounts in $ correspond to DKK 42,855 and DKK 162,775 respectively,

286,500 kr. and 33,442 kr.

The first invoice, for $6,000, was issued on October 30, 1989 to ApS Jet Air. The invoice stated that it was for fees under an agreement dated September 20. The invoices were on letterhead with the following footer: "anpartsselskabet Nielsens, h.a. clausensvej 24, 2820 gentofte ..." About payment it said:

"Payment can be made to our address in Roskilde Airport. Terms of payment: Net cash on receipt of invoice Nielsens (UK) Ltd. 9 Churchfields, New Road, East Molesey, Surrey, England."

The second invoice, issued on March 16, 1990 to Flemming Frandsen Aviation ApS, was for $ 25,000 and concerned "consulting fee according to agreement". In handwriting was added "commission OYARV". At the bottom of the invoice, Nielsen UK Ltd. was listed with an address in England.

The applicant has produced a copy of a check dated March 19, 1990 for $25,000 payable to Nielsen UK Ltd. in England. The check was for "consulting fee OY-ARV ... your invoice of march 16 1990". The plaintiff has also produced an arbitration attachment dated March 22, 1990, according to which Handelsbanken purchased a check for $25,000 for net proceeds of DKK 162,586.67. Finally, a bank statement from Anpartsselskabet Nielsen's bank of September 14, 1984 shows that on March 22, 1990, DKK 292,319.40 was paid by check.

The companies involved all had financial years from October 1 to September 30. The financial statements referred to in the following have all been provided with the usual auditors' report.

The accounts for 1989/1990 for Nielsen ApS and the specifications to the accounts show that the net turnover was approximately DKK 1.47 million, and that there were sales of goods and services for DKK 62,738. The other items were administration fees for a subsidiary, rental of real estate and rental of cars and computers.

The accounts of Danish Air Service for 1989/1990 and the related specifications show that the company's gross profit amounted to approximately DKK 2.65 million and that net turnover was approximately DKK 10.3 million. The net turnover consisted of the following items: School flying and instruction, theoretical training, aircraft rental and taxiing, aerobatics

, banner and photo flights, sightseeing flights, maitenance, miscellaneous revenue, bonus, discounts and commissions, fees and materials for re-invoicing. The item regarding miscellaneous revenue was

DKK 1,226,207. The item relating to bonuses, discounts and commissions was negative. Administration costs for the parent company were calculated at DKK 960,000. According to a note, miscellaneous revenue consisted of "start-up fees, re-invoicing of fees, etc. invoiced deductibles, sale of training materials, pilot rental and various resales, etc."

In the report on the accounts for 1989/1990 for Nielsens UK Ltd. it was stated under "Principal activity" that "the company has not traded during the year". The accounts contained a "balance sheet" where it was stated under Profit and Loss Account-Deficit that this was negative by £ 820. The turnover (turn-over) was indicated in the accounts as "-", and a note stated that "the company has not traded". The parties have agreed that this should be translated as "the company has not traded". The accounts for 1988/1989 for the English company were identical with regard to the statement of turnover and the statement that there had been no commercial activity.

The applicant has obtained a statement from Garners, Chartered Accountants, which, in a Danish translation agreed by the parties, states

"We cannot locate our old files for Nielsen UK Limited but can confirm that abbreviated accounts have been filed with the Companies House, which accounts contained only a copy of the balance sheet and no details of the company's trading.

If income and expenses offset each other in the relevant period, there would have been no movement in the profit and loss account from year to year."

The third invoice, issued on January 31, 1991 to Fl. Frandsen Aircraft Sales ApS, was for $ 50,000 and concerned "consulting fee OY-JEY-Citation". According to the invoice, the amount was payable to ApS Nielsen in Roskilde. The plaintiff has submitted a copy of a check dated February 6, 1991 for $ 50,000 to ApS Nielsen.

The fourth invoice was for $5,000 and issued on August 13, 1991 to Jetair att. Flemming Frandsen. It concerned "consulting fee according to R22 Torben Lindegaard". At the bottom of the invoice was Nielsens UK Ltd. and a signature. The invoice was issued on joint letterhead from "nielsens (DK) anpartsselskab" and "nielsens (UK) limited". The copy of the invoice presented bears a stamp stating that it was received on August 27, 1991.

Account statements from Anpartsselskabet Nielsen's bank of September 14, 1984 show that on August 26, 1991, DKK 134,885.90 was paid in full or in part by check into the company's account.

The fifth invoice was for DKK 100,000 and issued on September 17, 1991 to Jetair Aircraft Sales. It concerned "consulting fee according to OY-ARV". The invoice had the same appearance as the fourth invoice. The applicant has produced a copy of a check for 100,000 to Nielsens (UK) Ltd. dated September 18, 1991 for "consulting fee according to OY-ARV".

Bank statements from Danish Air Service's bank show that on September 24, 1991, DKK 210,932.15 was paid into the company's account by check.

Nielsen ApS' accounts for 1990/1991 show that net turnover was approximately DKK 2.17 million. The specifications show that the sale of goods and services amounted to DKK 338,009. The other items were administration fee subsidiary, rental of real estate, rental of cars and IT and rental of aircraft. Danish Air Services' accounts for 1990/1991 show that gross profit was approximately DKK 2.54 million. The specification shows that net turnover totaled approximately DKK 13 million and that the item miscellaneous turnover was DKK 1,258,646. The other items were school flights and instruction, theory lessons, aircraft rental, taxi flights etc., sightseeing flights, maintenance, bonuses, discounts and commissions and fees and equipment for re-invoicing. The last two items were negative. There was a note regarding the content of the item miscellaneous revenue. The note was essentially identical to the note in the previous financial statements.

According to the Danish Civil Aviation Authority's nationality register, the aircraft OY- ARV, to which the invoices of March 16, 1990 and September 17, 1991 referred, was registered with Mackler Totalbyg as owner on March 12, 1990 and then on April 1, 1992 with Flemming Frandsen Aircraft Sales ApS as owner.

Four declarations of availability have been submitted, including a declaration dated June 11, 1990, according to which the owner of OY-ARV placed the aircraft at the disposal of Danish Air Service ApS for entry into the company's taxi concession. The other declarations were of the same date and concerned OY-JEC, OY-JED and OY-JEE respectively.

IRS investigations.

On February 12, 1993, the applicant notified his removal to an address in England with effect from January 1, 1993. The applicant also entered into an agreement for the letting of his condominium for the period January 1, 1993 to January 1, 1996 to the company Neilor Ltd, 33 Bridge

Road, Hampton Court, East Molesey, Surrey KT 8 9ER. The lease agreement was signed on January 3, 1993.

In October 1993, the tax authorities received information about Nielsens (UK) Ltd. and Neilor Limited, among others, following a request to Købmandsstandens Oplysningsbureau. It appeared from the information concerning Nielsens UK that the applicant was a director of the company, and the owners were Nielsens (DK) A/S with 7,999 shares and the applicant with 1 share. The information relating to Neilor Ltd. showed that the company's address was Hampton Court, 33 Bridge Road, East Molesey, Surrey, KT8 9PV and that the company was incorporated on May 21, 1992. The known director was the Applicant. The company was owned by the claimant with 999 shares and by the claimant's father with one share. Danish Air Service, Nielsens DK A/S and Desmark (UK) Ltd. were listed as associate companies.

On January 26, 1994, the Tax Directorate in Gentofte Municipality requested assistance from the Ministry of Taxation, Customs and Tax Agency, in obtaining a number of information from abroad. The letter was worded as follows:

"...

Background for the request

During an audit, the Roskilde tax authorities have taken some control documents concerning fees paid to the company Aps Nielsen of Sept. 14, 1984, which was taxed in Gentofte municipality (up to and including the tax year 1992/93). The company has printed invoices to companies in Roskilde on its own letterhead with pre-printed logo, telephone number and at the bottom of this letterhead are pre-printed names of two foreign affiliated companies, one in England and one in the USA.

The invoices include typed text on the invoices:

Nielsens (UK) Limited, 9, Churchfields, New Road, East Molesey, Surrey KT8 9 PU, England,

so that one gets the impression that the invoiced fees should go to this company instead of ApS Nielsen of Sept. 14, 1984. It is also the case that the specified self-declared turnover in the Danish company cannot include the fees paid by the companies in Roskilde.

The Danish company was declared bankrupt on December 4, 1992. At the same time, the main shareholder ... Gert Rolien Bach Nielsen moved from Denmark to the same address as stated above for Nielsens (UK) Limited as of January 1, 1993 according to the Danish National Register.

However, it is not possible for the tax authorities to get in touch with the taxpayer, as mail to the above address is returned with the text "Gone away, Demenage", which is the English and French word for moved.

When the taxpayer moved out, he presented a lease of January 3, 1993, which stated that he had rented out his cooperative property at Lindegårdsvej 2, 1st floor, 2920 Charlottenlund to an English company, namely:

Neilor Ltd, 33 Bridge Road, Hampton Road, Hampton Court, East Molesey, Surrey KT8 9 ER, England.

As Gert Rolien Bach Nielsen is still registered in KTAS as a user of a telephone number at Lindegårdsvej 2, and his name is still listed next to a push button on the door phone, while mail cannot be placed at the English address, the region considers it likely that the taxpayer actually lives at Lindegårdsvej 2. In this connection, it should be noted that it has been stated by the Merchants' Information Bureau - which will be described in more detail below

- the taxpayer owns 999/1000 of Neilor Ltd. The remaining 1/1000 is owned by the taxpayer's father.

Through Købmandstandens Oplysningsbureau, the audit has obtained information about the two foreign companies as identified in the pre-printed text at the bottom of the control vouchers received:

Nielsens (UK) Limited, 33 Bridge Road, East Molesey, Surrey KT 8 9ER, England, tel. no. and

Nielsens (UT) coporated, ..., USA, phone number and

Neilor Ltd, 33 Bridge Road, Hampton Road, Hampton Court, East Molesey, Surrey KT8 9 ER, England, according to the lease agreement.

The former is the same company that probably received the fee income from the companies in Roskilde, although the address is stated differently. The address mentioned here is identical to the address of Neilor Ltd. stated in the lease agreement.

For your information, we enclose photocopies of the reports received from Købmandsstandens Oplysningsbureau regarding the three foreign companies.

It appears that they are all family limited companies, and that the two British companies are owned by Gert Rolien Bach Nielsen and his now bankrupt main limited partnership, and as mentioned above, an insignificant share is owned by his father. The US company is owned by Jens Bach Nielsen and Børge Andersen, which suggests that one owner is related to Gert Rolien Bach Nielsen.

..."

Gentofte Municipality then specified the requested information and stated that they wanted to know whether the two companies had been employed as independent legal entities and whether they had paid tax to the UK authorities. They also wanted to know whether they had filed tax returns and accounts, and if so, they wanted copies of these for all years in which tax assessments had been made. Finally, it was requested whether the companies had employed staff and had a place of business, and if so, details were requested. As far as the claimant personally was concerned, they wanted to know how he was registered with the English authorities, both in the population register and for tax purposes, and for what period he had been registered. They also requested copies of the information he had provided to the tax authorities about his residence and income and copies of any tax returns and information about taxes paid. Finally, an investigation was requested into his housing conditions in England, including the type of housing available to him, its location and ownership.

In a letter dated February 23, 1994, Customs and Excise requested the British authorities to obtain the requested information.

The request for assistance was answered by the English authorities by letter dated May 25, 1994. The reply, in a Danish translation agreed by the parties, was as follows:

'I refer to your letter of February 23, 1994, in which you request information concerning the above. I can now make the following preliminary statement:

1. Nielsens (UK) Ltd

This company was incorporated on August 3, 1988 under the name Loadman Ltd. The name was changed to Nielsen UK Ltd. on September 28, 1988 and Nielsen UK Ltd on November 2, 1988. On this date the company's registered office address was also changed to 9

Churchfields, Bach Nielsen had originally announced that this was his personal address, although his last known personal address was 186 Fleetside, West Molesey, Surrey KT 8 2NH. The company's registered office address was subsequently changed to 233 Bridge Road,        which is the business address of the company Neilor Ltd.

section 2 below.

Nielsens UK Ltd has only filed accounts with the UK authorities for the period August 3, 1988 to September 30, 1989, and for the subsequent year ended September 30, 1990, but according to the accounts there was no business activity in the company during these periods. Copies of the financial statements are attached. It appears that the company had no employees or business premises of its own.

As there has been no business activity, the company has not been subject to UK corporation tax. It was deleted from the corporation tax register on January 12, 1993.

In addition to this information from our files, I can provide the following information from the Company Register, which is publicly available:

(a) Bach Nielsen was appointed sole director of the company on September 23, 1988. His address was originally given as HA Clausensvej 27, 2820 Gentofte, Denmark, but was later given as Jaegenborg-Alle 27A, 4th floor, 2920 Charlottenlund, Denmark.

(b) Bach Nielsen is listed as the owner of one of the 8,000 issued shares of GBP 1.00 each in the company, and the rest are owned by Nielsens (Denmark) A/S, also with the address HA Clausensvej 27.

...
3. Gert Rolien Bach Nielsen

As indicated in my letter of February 24, 1994, Mr. Bach Nielsen has stated that he arrived in the UK on January 1, 1993 and will be regarded as resident in the UK and liable to pay UK tax from that date. Further enquiries will be made as to his ownership of UK property and this information, together with a copy of his first completed UK tax return, will be forwarded as soon as possible after it becomes available.
..."

In the letter, the British authorities had also provided a number of information about Neilor Ltd. and stated that they would provide additional information in the form of accounts and information about the nature and ownership of the address from which the company operated, as well as the number of employees in the company.

By letter dated January 8, 1995, the English authorities sent the final statement. The letter, in a Danish translation agreed by the parties, reads as follows:

"I refer to your letter of February 23, 1994, in which you request information concerning the above and my preliminary statement of May 25, 1994. I am now in a position to make a final statement.

Information has now been obtained from the Land Registry regarding the 3 addresses that Nielsen can be linked to. However, he is not registered as the current owner of any of these properties, nor is this the case with the English companies in which he is a director.

The information does not contain descriptions of the properties or their size. However, it is clear that the property at 33 Bridge Road is on 3 floors, of which the top 2 are self-contained apartments.

...
Regarding the company Neilor Limited, we have now been informed that all business activities have ceased and there are no assets. The company did not file any financial statements and we have therefore not received any information about employees. Under these circumstances, it is not possible to investigate this further at this time.
..."

Tax assessment and deferral issues.

On January 17, 1995, Gentofte Municipality sent a letter to the plaintiff's English address stating that, on the basis of the five invoices concerning consultancy fees, they intended to increase his tax assessment for the years 1989-1991 to a specified extent.

The Tax Directorate in Gentofte Municipality has prepared a preliminary audit report dated March 8, 1995 with a review of the plaintiff's income and assets as well as his place of residence. The audit report also contained a review of the companies ApS Nielsen of September 14, 1984,

Danish Air Service af 2/6 87 ApS and foreign subsidiaries, including Nielsens (UK) Limited, Nielsens (UT) Corporated, Neilor Ltd. England and Neilor ApS.

The applicant's tax assessment for 1989-1991 was increased by Gentofte Municipality's letter of April 7, 1995 in accordance with the letter of January 17, 1995.

On June 26, 1995, the plaintiff contacted Gentofte Municipality's tax department by telephone, stating that his former spouse had only now made him aware of the letter of January 17, 1995, and the decision of April 7, 1995, which is why he had not previously had the opportunity to object to the increases.

Following correspondence between the parties, a meeting was held on July 19, 1995 with the participation of the applicant and his accountant, Dan Malmstrøm.

On the same day, the auditor wrote to the Directorate of Taxes:

"I hereby confirm that the tax return for 1992 is expected to be filed within one month and that I will keep you informed of the progress within 14 days.

I must also confirm that it is my opinion that the changes for 1989 - 1993 are not correct, which is why, on behalf of my client, I must request a deferral of payment of these amounts until the matter is finally clarified. You will also be kept informed of this matter on an ongoing basis."

On July 24, 1995, the Tax Directorate's Collection Office replied to the letter as follows:

"The Collection Office has received your letter of July 19, 1995, in which you, on behalf of your client, among other things, request a deferral of payment of nominal claims for the income years 1989-1993.

Your request can be answered when the tax return for 1992 together with your corrections for the years 1989-1993 have been submitted.

..."

Furthermore, a number of the debt collection office's notes or screen prints concerning, among other things, the issue of deferral have been submitted. These include the following memos.

4. August 1995

"rev here by phone. SA/92 and information regarding 93/94 (tax plan in this country not settled) and complaint regarding the increases 89-91 is submitted in week 33, a decision is then made on the deferral request and payment is agreed"

August 22, 1995

"Copy of complaints regarding 89-91 and SA 92 received - talked to Gitte Thuesen in Bodils absence, what influence will the submitted material have on the arrears, must be used to assess a payment deferral request. Await message from 3rd equation"

August 28, 1995

"complaint about tax for 92 is handled by group A"

September 11, 1995

Bodil inf that the previous increases will be reduced so that there is a total increase of approx. DKK 200,000.00 - being treated as a reopening case, therefore currently no possibility of "deferment" in case of appeal - agreed I will direct referral to Rev./CB"

...

B.B.H. in the equation unsuccessfully applied for - has deferment been granted regarding 92 ???? /CB"

September 12, 1995

"no deferral has been granted - this is not an actual complaint and there is no prospect of the recruitments for 92 and onwards being processed quickly

- is related to the other income years/CB"

September 25, 1995

"Rev. Dan Malmstrøm inf that there is no legal basis for granting a deferral based on the cases mentioned in the assessment - it

The only thing that can be agreed from here is a payment deferral, but the undersigned. will only currently accommodate that there is no forced collection and on the condition that from 011095 the arrears are settled, agreed at DKK 5,000.00 / month. /CB"

5. October 1995

"CPR AGREEMENT DELETED...

OO 1156614,00 30000,00 6 4 9 05.03.1996 CREATED"

The plaintiff paid DKK 5,000 on October 3, 1995.

..."

Furthermore, the auditor had a number of comments regarding the plaintiff's place of residence.

By letter dated October 7, 1996, the Municipality of Gentofte, Economic and Tax Administration, announced that it had changed the plaintiff's tax assessment for 1991 with regard to overpaid consultancy fees. The assessment was thus reduced by DKK 286,750 in respect of the invoice of January 31, 1991 for $50,000 and by

545,000 regarding the invoice of September 17, 1991, which was for DKK 100,000 and not $100,000.

The Tax Appeals Board upheld the administration's decision in the case on September 18, 1997.

Explanations.

During the court hearing, the plaintiff, Ulla Britta Brasen, Dan Malmstrøm, Niels Martin Nikolaj Victor and Carsten Bøje gave evidence.

The applicant has explained that in 1987 he founded a flying club and together with the five members of the flying club founded Danish Air Service ApS. Over the course of a few years, he took over the shares of the other shareholders. The company, which initially rented premises at Tune Airport, later acquired its own buildings in Tune. The company operated in three business areas and had a Flight Academy (a flight school), a maintenance department and a department that dealt with executive flights, taxi flights, sightseeing flights, etc. In this connection, the company had a contract with the Ministry of the Environment for monitoring oil spills. In 1991/92, when the company was at its peak, it had a concession for 35 aircraft. The company was not the owner of these aircraft but had an operator license for the aircraft. An operator's license has two parts: a concession holder, which can be a person or a company, and a concession holder, which is an individual. The aircraft operator is assigned a pilot who can fly the aircraft and is responsible to the aviation authorities. There were approximately 50 people associated with the company. These self-employed people were pilots, instructors and technical staff, which mainly means aircraft mechanics. There were two to three actual employees in Danish Air Service. They dealt with the administration. The basis of the company was the cooperation with the associated pilots and technicians. When a pilot has to fly a new type of aircraft, he or she must have type training for that aircraft. Type training costs 50,000 Danish kroner.

DKK 75,000 for a pilot and DKK 25,000-50,000 for a mechanic.

On August 18, 1995, the applicant's accountant wrote to the municipal tax department regarding the invoice of January 31, 1991 for 50,000

$:

"As agreed at our meeting, we hereby submit further documentation regarding the recognition of USD 50,000 in Anpartsselskabet Nielsen af 14. september 1984 ApS in the financial year 1990/91.

...

In the financial statements, the commission is included in the item "Sales of goods and services", DKK 338,009. This amount appears as follows:

| Commission on aircraft sales | 302.106 |
| Account 120 | 1.230 |
| Account 121 | 34.235 |
| Account 113 | 438 |
| | 338.009 |

In principle, the cost of further training was to be paid by the individual, but in order to get the best possible employees, it was negotiated with the operator whether - and if so, to what extent - the operator should participate in the cost.

Aircraft buyers often want to deal with an operator that has pilots and trained technicians as well as the necessary licenses to fly the aircraft. The buyer also has an interest in the aircraft being utilized, as it also costs money to keep the aircraft on the ground. The seller of an aircraft offers not only the aircraft but also an operator. On average, the seller can expect a better price when an attractive operator can be offered. It is common knowledge in the industry that the seller pays a fee/commission to the operator and thus pays part of the costs of training the pilots. The aircraft buyer pays an annual fee and an amount per hour the aircraft is in use to the operator. When discussing training with a pilot, the pilot will have an interest in getting the company to pay as much as possible, while the company will want to do it as cheaply as possible. If the pilots and technicians knew that a seller of an aircraft paid commission to the company as operator of the aircraft, they would be in a better position when negotiating with Danish Air Service about payment for the training. It was important that the invoices were issued through Nielsen UK or Nielsen DK, as it should not appear that it had anything to do with Danish Air Service. The office was an open club environment. The pilots and technicians had their daily routine in the office, as the operations manuals were centrally located in the office. It didn't cost anything to have the invoices issued by the British company. The commissions went into the daily operations. Five commission invoices were issued to the Flemming Frandsen Group. Jetair Aircraft Sales was owned by Flemming Frandsen, who is one of the largest aircraft salesmen in the Nordic region. No such invoices have been issued to others.

The invoice dated October 30, 1989 concerns three training aircraft OY-JEC, OY-JED and OY-JEE. The planes were purchased by Kræn Hjortlund. The invoice must have been paid with a check, as none of the fees in question were paid in cash. He is not aware whether the check relating to this invoice has been deposited in Danish Air Services' or Nielsen DK's account, and he is not aware whether the accounting stamp on the two invoices comes from one of his companies.

The invoice dated March 16, 1990 concerns the sale of an aircraft to Mäckler. He is not the one who handwrote on this invoice that it concerns OY-ARV. When the check for $ 25,000 regarding this invoice was deposited in the bank, it was deposited together with other checks, which is why the deposit of DKK 292,319.40 is larger than the check amount of DKK 162,586.67.

The OY-ARV was a more advanced aircraft than Danish Air Service usually operated. They were not already the operator of the aircraft. The invoice of August 13, 1991 concerned a Radisson 22 helicopter. It was not an operator agreement, but an

maintenance agreement, and a man was sent to the US to get the necessary training to maintain the helicopter.

The invoice dated September 17, 1991 concerned an aircraft - a PA40 - that was sold to Claus Hecht Johansen. The invoice did not mention OY-ARV, but Flemming Frandsen wanted this aircraft to be stated on the invoice.

Danish Air Service ran into financial difficulties in 1991/92 and the activities were sold to the new owners of Jetair on January 1, 1994. He moved to England on January 1, 1993 and has lived at three different addresses in England. Since April 1, 1994, he has lived at the same address in London, whereas he has not lived at Lindegårdsvej, which was rented out. In May or June 1995 he heard about the change in tax assessment via his former spouse. He has not agreed an installment plan with the tax authorities and has not received a letter of deferment.

Among other things, Ulla Britta Brasen has explained that in 1987 she became affiliated with Danish Air Service ApS and Nielsen DK on a casual basis. She was later employed and resigned in August 1990. Her task was to do the bookkeeping for the Danish companies that had the same physical locations. The bookkeeping was done separately in the two Danish companies. When the Danish companies received a check, she deposited it in the bank. It was she who wrote the invoice of October 30, 1989 and probably she who wrote the invoice of March 16, 1990. She has written two such invoices. She may be the one who stamped the invoices with the bookkeeping stamp, but she is not the one who stamped the second one with the date of receipt. She does not know why the payment had to be made to the English company. It was not usual for her to print invoices for the UK subsidiary, which was fairly new. She does not recall seeing checks for the amounts invoiced by the UK company.

Dan Malmstrøm has, among other things, explained that he has been an auditor for the plaintiff since 1987. He was also elected as auditor for Nielsen ApS and Danish Air Service ApS. After the plaintiff moved to England in 1993, he had regular contact with him via cell phone. The companies' tax returns for 1989-1991 were submitted on time. In connection with the submission of these, he made a remark that questions in connection with these could be directed to him. The applicant's 1992 tax return was submitted in July or August 1995. The applicant has not filed a tax return for 1993. The tax authorities, assuming that the applicant was liable to tax in Denmark, made an assessment of the applicant's income for 1993, which was reversed in 2001. He has not received a final reply to his letter of July 19, 1995 concerning deferment of payment due to the changes made by the tax authorities concerning 1989-1993, but he has spoken to Carsten Bøje about an installment arrangement. He only had authority from the claimant to enter into an installment agreement for 1992 but not for the other years, as the claimant did not believe he owed anything for these. The residual tax for 1992 was approx.

DKK 40,000. The scheme was intended to run until the remaining tax for 1992 had been paid. He does not know why only one installment was paid, and he does not remember whether the tax authorities contacted him in this connection.

Regarding the invoice of March 16, 1991 for $25,000, one must not only look at the accounts of Nielsen ApS but also at the accounts of Danish Air Service. The income may have been recognized by mistake in Danish Air Service and therefore included in the turnover of this company. If the parent company received an amount due to the subsidiary, it would be recorded in the suspense account. The suspense account in the 1989/90 accounts for the parent company, which is DKK 585,000, may contain a large number of entries.

The January 31, 1991 invoice for $50,000 was included in the 1990/91 accounts for Nielsen ApS under sales of goods and services. He does not remember what accounts 120, 121 and 113, which he referred to in his letter of August 18, 1995, related to, but they did not relate to commissions on the sale of aircraft. In the accounts for Nielsen ApS 1989/90, aircraft commissions were included under sales of goods and services or under a separate item. The other income items in the accounts are so specific that it would be misleading if such income were included under them. He has audited the accounts, including checking the accounting records. He remembers the $50,000 invoice because it was so large. He only saw the other invoices during the case.

Niels Martin Nikolaj Victor has explained that from 1989 he was employed for three to four years at Danish Air Service as Operations Manager. The General Agency industry, to which Danish Air Service belonged, is a special part of the aviation industry. Among other things, he was involved in managing the aircraft fleet and booking aircraft. The position was a management position with a fixed salary. It was normal that a fee was paid to the operator. He is not aware whether the commission was due to the operator being involved in the sale or whether it was due to the fact that he became an operator. He has no knowledge of the individual invoices or the bookkeeping thereof, but he has had general knowledge that commission was paid in connection with the operation of aircraft. Nor was he aware that the invoices were issued via an English company. The associated pilots and instructors were self-employed and, at least initially, had jobs with other companies. They were also often customers of the companies and attended flight school. The pilots typically had to pay for their type training themselves, but there was a dialog with the pilots about whether the amounts they had to pay were reasonable in relation to the income. The associated pilots and technicians were not informed of the commissions, which he found very natural. He has no knowledge of whether this approach is commonly used. There were many young pilots who could not earn such a high salary and who had debts related to their education. If they knew about the commissions, they would demand higher fees.

Carsten Bøje has explained, among other things, that he is a mortgage officer in Gentofte Municipality. The screen prints presented during the case are the debt collection office's notes regarding case processing steps. Every debtor agreement is noted in the electronic calendar. Carsten Bøje has explained about the screen prints presented:

Re September 11, 1995: No tax deferral could be granted, but the collection office could grant a payment deferral. A deferment of assessment results in a waiver of collection of the arrears while a timely filed complaint is being processed. When an installment payment agreement in connection with a forbearance agreement is not met, the debt collection process starts again.

Re September 12, 1995: The accounts for 1992 had not been submitted on time. When the accounts were received, they were regarded as a request for reopening and therefore no tax deferral could be granted.

Re September 25, 1995: He stated that no tax deferral could be granted, but that a payment deferral could be granted. He assessed that compulsory collection could be avoided on condition that installments of DKK 5,000 were paid. Such an agreement was securely entered into with accountant Malmstrøm regarding the entire arrears for 1989 to 1991 of DKK 1,156,614. The agreement was to run as long as the cases were ongoing. It was assumed that it would take 6 months to process the complaints. The agreement was not confirmed in writing. There was no doubt about the content of the agreement. Now agreements on installment agreements are confirmed in writing, but it was not customary at the time.

Re October 5, 1995: The agreement was reported in the system. Agreements are reported for approximately six months, unless the entire balance can be repaid within a shorter period. The amount of 30,000 represents 6 months installments. "9" indicates that the agreement concerns all debtor relationships and "4" indicates that the installments must be paid monthly. The code "reminder amount" is inserted as the installment was not paid. He did not contact Malmstrøm in connection with the payment agreement being breached. Of the DKK 5,000 installment, DKK 100 was deducted for payment of the land registry certificate, which the debt collection office had requested. The rest was used to pay the outstanding tax for 1989. The DKK 200,000 was the estimated increase in the assessment for all the tax years under consideration.

**Procedure.**

The parties have essentially proceeded in accordance with their pleadings.

In support of the main claim, the applicant has thus argued that any tax claim is time-barred under the 1908 Act. The commencement date of the limitation period is the date on which the residual tax for the individual tax years is due. The limitation period must therefore be calculated from September 1, October 1 and November 1 of the year following the tax year in question. The limitation period can begin to run at the latest from the time when the tax authorities came into possession of the invoices in question, which occurred on June 7, 1993. The limitation period therefore began to run at the latest on June 7, 1998. At this point in time, the tax authorities could have made an adjustment and recovered the claim. Any attachment proceedings would have interrupted the limitation period.

The limitation period runs regardless of whether the tax claim has been assessed and calculated and is not suspended while the tax authorities attempt to obtain further information. Whether the invoices were taxed in England is irrelevant to the Danish tax case. The latest time any suspension was lifted was May 25, 1994, when the Inland Revenue received accounts relating to the UK company. The final answer from January 8, 1995 is irrelevant to this case. Any tax claims are thus time-barred at the latest on May 25, 1999.

The applicant further submits,

that the limitation period is not interrupted by the taxpayer issuing a summons for judicial review of the assessment,

that the mere request for deferral does not have the effect of acknowledging the debt when, as in the present case, an administrative appeal against the assessment is pending at the same time,

that a grace period has not been granted,

that the installment scheme concerns a tax arrears for 1992 and is therefore irrelevant to the case.

alternatively, that the deferral arrangement has been breached by the plaintiff and therefore lapsed automatically or by implied agreement, with the consequence that the arrangement has only suspended the limitation period for a few months.

In support of the alternative claim, the applicant submits that the fees were not appropriated by the applicant, but were collected by the companies Nielsen ApS and Danish Air Service ApS, which it owns. In support thereof, the applicant has in particular stated,

that the tax authorities always have the burden of proof that a given income is taxable,

that the fees in question were paid by checks that can only be cashed by depositing them in a bank account,

that in connection with the National Tax Court case, the claimant has submitted statements of his personal bank accounts showing that the amounts have not been deposited there,

that the deposit in the companies' bank accounts shows that the amounts have passed through the companies' accounts and have thus been recognized as income,

that, in view of the above, the tax authorities have not met the burden of proof that the fees have not been recognized as income in the companies,

and that in the assessment of the evidence it must in any event be weighted in favor of the plaintiff that matters are now being investigated which, due to the tax authorities' circumstances, are many years in the past.

With regard to Nielsen UK, the plaintiff has stated that, according to English accounting practice, no turnover is disclosed in the accounts, but only that there has been no contribution margin.

The applicant further submits that the tax authorities' correction of the tax returns is time-barred. In support of this, it is stated,

that the applicant's tax returns for 1989-1991 were correct and complete,

that the tax authorities were not in ignorance of the claims, since the alleged fact that the invoices in question did not arrive until June 7, 1993 is due solely to the tax authorities' error,

and that the letter of intent of January 17, 1995 therefore arrived too late. In addition, the applicant claims that the defendant has the burden of proof for all matters relevant to the case. In support thereof, the plaintiff states that the tax authorities had been in possession of the invoices in question since the tax returns were filed, but allegedly only discovered them during an "audit" on June 7, 1993. It was not until 13 months later that the tax authorities sought to obtain information from HMRC and it was not until January 17, 1995 that the defendant sent a letter of formal notice giving the plaintiff the opportunity to secure evidence. As a result of this negligence, evidence and opportunities for evidence may well have been lost.

During the proceedings, the applicant argued that the lines under turnover in the English company's accounts do not indicate that the turnover was DKK 0, but are an indication that the figures are kept secret for commercial reasons.

The defendant has countered the plaintiff's main claim for limitation by arguing that the tax claims relating to the income years 1989 - 1991 are not time-barred under the 1908 Act.

The defendant has stated that it agrees that the starting point for the limitation period for residual tax claims is calculated from the due date. However, in this case, the defendant had no knowledge of the claims at that time.

The tax authorities were not in a position to determine whether or not the tax authorities had a claim against the claimant at the time the fee vouchers appeared on June 7, 1993.

The tax authorities have therefore attempted to contact the claimant at the address given by him in England in order to clarify the circumstances surrounding the fee vouchers, but without succeeding in contacting the claimant before June 27, 1995. On February 23, 1994, as part of the investigation of the facts surrounding the fee vouchers, the tax authorities contacted the English tax authorities in order to obtain a number of information about the applicant and his companies. The British tax authorities' final reply was received on January 8, 1995. On the basis of the investigations carried out and the reply from the English tax authorities, on January 17, 1995, the tax administration in Gentofte issued a notice of intention to increase the plaintiff's taxable income for the income years 1989-1991. The defendant argues that the tax authorities, as a result of unaccountable ignorance before that date

Copyright © 2021 Karnov Group Denmark A/S

was not able to settle his claim at that time, which is why the limitation period under the 1908 Act can be considered to run from that time at the earliest.

On July 19, 1995, the plaintiff contacted the tax authorities and requested a deferment of payment of the increases made until the matter was finally resolved. On September 25, 1995, an agreement was entered into on the condition that the claimant repaid the outstanding tax claim by DKK 5,000 monthly from October 1, 1995. The applicant paid

6. October 1995, DKK 5,000 in installments, after which the plaintiff has not paid any more installments. As the plaintiff and the defendant had entered into an agreement to defer payment of the tax amounts in question, this agreement had the effect that the limitation period was interrupted and only began to run from the end of the deferment, cf. U 1930.68 H and U 1989.1064 H. The grace period ended on November 1, 1995 at the earliest, and a new 5-year limitation period must therefore be calculated from this date at the earliest.

The defendant has furthermore claimed that the plaintiff's action by writ of summons on June 29, 1999 is suitable to clarify the claim, which is why legal action has been taken pursuant to section 2 of the 1908 Act before the expiry of the limitation period under section 1 of the Act, see TfS 1990.120 Ø and 2001.171 Ø.

With regard to the plaintiff's alternative claim, the defendant submits that, in the income years 1989 - 1991, the plaintiff, as a result of its 100 % ownership of Nielsens ApS and thus 100 % ownership of Danish Air Service ApS and Nielsen (UK) Ltd. and by virtue of its position as director of Nielsens ApS and Danish Air Service ApS, had a dominant influence on which of the companies should issue the invoices at issue in the case.

The applicant has failed to provide an intelligible and substantiated explanation as to why Nielsens (UK) Ltd. was involved in the arrangement.

Despite the defendant's requests to the plaintiff to explain by name to whom the invoices in question should be kept secret, the plaintiff has not provided this information. The failure to comply with the request must be attributed procedural prejudice pursuant to section 344(2) of the Danish Administration of Justice Act, with the consequence that it must be considered undocumented that there was a commercial purpose for the involvement of Nielsens (UK) Ltd. in the invoicing of the fee amounts.

With reference to the unusual circumstances surrounding invoicing via Nielsens (UK) Ltd. and in view of the plaintiff's dominant influence by virtue of its 100% ownership of the companies and its position as director of the Danish companies, the defendant has argued that the burden of proof that the fee amounts in question have been taxed in Nielsens ApS or Danish Air Service ApS lies with the plaintiff, just as it lies with the plaintiff to ensure that the accounting conditions in the companies are in order, see UfR 1998.1538H .

The defendant has also claimed that it is undocumented that the fees have been recognized as income in Nielsens ApS or Danish Air Service ApS. The presented check vouchers/bank account statements do not constitute documentation that the fees have passed through Nielsens ApS' or Danish Air Service ApS' bookkeeping, nor that the amounts have been recognized as income in one of the two companies. In addition, the plaintiff's information that the payment regarding the invoice of August 13, 1991 was received in the bank on

August 26, 1991 cannot be correct, as the invoice was not stamped received by Jet Air until August 27, 1991. Furthermore, the information in the invoice of September 17, 1991 about which aircraft it concerned is not correct.

As there is no documentation that the fees have been recognized as income in Nielsens ApS or Danish Air Service ApS as the correct income recipient, and as the claimant was the sole shareholder in the group, the amounts must be taxed to the claimant as a masked distribution, cf. section 16 A of the Tax Assessment Act.

In relation to the plaintiff's alternative claim, the defendant further argued that the original tax assessments for the income years 1990 and 1991 were made on an incorrect or incomplete basis as a result of at least gross negligence on the part of the plaintiff. The three-year extension period in section 35(1) of the Tax Administration Act was suspended pursuant to section 35(3) at least until the time when the tax administration came into possession of the invoices. The tax authorities' increase of the applicant's taxable income for the income years 1990 - 1991 by decision of April 7, 1995 is therefore not invalid, cf. section 35(1) of the Tax Administration Act, cf. section 35(3). The tax authorities' decision of October 7, 1996 was a reduction of the applicant's taxable income and is therefore not covered by the wording of section 35. Furthermore, the decision is within the scope of the increase in income announced in the letter of formal notice of January 17, 1995, as only a reduction in amount is made. The limitation period in section 35 of the Danish Tax Administration Act was interrupted in relation to the subsequent reduction on October 7, 1996 by the decision of April 7, 1995. The rule in section 35(1) of the Tax Administration Act has no effect for 1989.

If the claimant has been placed in a difficult situation in terms of proof despite the fact that the income years 1989-1990 and 1990-1991 were covered by the 5-year accounting retention obligation at the time of the letter of 17 January 1995, this is not due to the authority's conduct but rather due to the claimant's unusual invoicing constructions via the subsidiary in England.

The defendant has objected to the admissibility of the plaintiff's plea concerning the significance of the line marking in the English accounts, which was not raised until the proceedings.

**The High Court's comments.**

The tax authorities did not become aware of the invoices in question until June 7, 1993, after which relevant investigations were carried out by obtaining information about the companies in question, including contacting the British authorities in order to determine whether there was a possible claim for residual tax.

When the defendant received the English authorities' reply of May 25, 1994, including the accounts of the English company and the information that it had been struck off the register of companies on
On January 12, 1993, the defendant obtained sufficient grounds to bring a claim against the plaintiff. The defendant is found to have been in excusable ignorance of the tax claims until the UK authorities' reply of May 25, 1994 was received. The fact that this was a preliminary report from the English authorities cannot lead to any other result, since the information which the English authorities stated that they would provide later, and which was provided in the English authorities' letter of January 8, 1995, related only to matters which had no bearing on the tax on the five invoices.

The defendant has not proved against the plaintiff's and Dan Malmstrøm's testimony that in the fall of 1995 an agreement was entered into regarding deferral of the disputed tax claims.

As the summons was filed on June 30, 1999, the tax claims are now time-barred. The applicant's main claim is therefore upheld.

Copyright © 2021 Karnov Group Denmark A/S

**For it is known to be right:**

The defendant, the Ministry of Taxation, shall recognize that the tax claims against the plaintiff, Gert Rolien Bach Nielsen, regarding the income years 1989, 1990 and 1991 are time-barred.

The defendant will pay DKK 21,000 in legal costs to the plaintiff within 14 days.