# Exhibit 19

**43 UCLA L. Rev. 1431**

UCLA Law Review

June, 1996

James Steven Rogers [a]

Copyright (c) 1996 Regents of the University of California; James Steven Rogers

# POLICY PERSPECTIVES ON REVISED U.C.C. ARTICLE 8

| | | |
|---|---|---|
| | Introduction   1432 | |
| I. | Article 8 Revision and Clearance and Settlement Reform | 1435 |
| | A. Systemic Risk | 1437 |
| | B. From Trade to Settlement | 1438 |
| | C. Providing an Adequate Legal Structure for the Indirect Holding System--General Requirements | 1441 |
| II. | The Basic Drafting Technique of Revised Article 8 | 1449 |
| III. | Some Advantages of the New Security Entitlement Structure | 1453 |
| | A. Direct/Indirect Versus Certificated/Uncertificated | 1453 |
| | B. An Entitlement Holder's Rights Can Be Asserted Only Against Its Own Intermediary | 1455 |
| | C. Coherent Choice of Law Rules | 1457 |
| IV. | Post-Settlement Finality | 1460 |
| V. | Secured Transaction Rules | 1473 |
| | A. Outline of Secured Transaction Rules | 1473 |
| | B. The Control Principle and Its Application to Key Transaction Categories | 1477 |
| | C. Drafting Approach: General Structural Principles Versus Transaction Specific Rules | 1483 |
| | 1. Would a Purchase Money Security Interest Priority Rule Serve Better than Rules Based on the Control Principle? | 1485 |
| | 2. Are There Better Alternatives to the Rule Giving Intermediaries Priority over Other Secured Parties? | 1486 |
| | 3. Would Priority Rules Based upon Knowledge or Notice of Prior Claims Work Better than Rules Based on the Control Principle? | 1488 |
| VI. | Revised U.C.C. Article 8 and the Individual Investor | 1493 |
| | A. Revised Article 8 Deals with the Custodial Function | 1494 |
| | B. Rules Protecting Securities Intermediaries Against Adverse Claim Liability | 1497 |
| | C. Agreements Concerning the Statutory Duties of Securities Intermediaries | 1503 |
| | D. Risk of Intermediary Wrongdoing: Customers Versus Creditors and Transferees | 1511 |
| | 1. Could Customer Protection Goals Be Achieved by a Simple Rule that the Customers Get Their Securities? | 1514 |
| | 2. Customers Do Not Take Intermediary Credit Risk | 1517 |
| | 3. Theft Risk | 1520 |
| | 4. Should the Finality Rules Differ for Transferees Who Take Securities as Collateral, Rather than as Outright Buyers? | 1523 |
| | 5. Choice of Words for Statement of the 'Bad Actor Transferee' ' Exception to the Finality Rule | 1530 |
| | 6. Is Honesty Bad? | 1537 |

Conclusion: The Need for Prompt, Uniform Enactment                1540

**\*1432  Introduction**

In 1994, the sponsors of the Uniform Commercial Code, the American Law Institute ("ALI") and the National Conference of Commissioners on Uniform State Laws ("NCCUSL"), approved a revision of U.C.C. Article 8--Investment Securities, along with related amendments to Article 9 and conforming amendments to various other articles. [1]  The state enactment process is proceeding promptly. Before the end of the second year of legislative activity, Revised Article 8 had been adopted by more than one-half of the states, including such major commercial jurisdictions as Illinois, Pennsylvania, and Texas.

Article 8 is one of the more recondite branches of commercial law. Neither the generalist practicing lawyer nor the commerical law expert is likely to feel comfortable with this subject. Article 8 is not commonly taught in law school commercial law courses and is omitted or given scant coverage in the principal secondary sources on commercial law. Even among the initiates, the particular concerns that led to the 1994 revision project are the major arcana of the field. The revision project was a response to expressions of concern by numerous governmental bodies and others that the prior version of Article 8 provided an inadequate structure for the modern book-entry system of securities holding and transfer. The operations of the modern book-entry system are not matters within the daily experience of ordinary lawyers, law professors, legislators, or judges. It  **\*1433**  is, therefore, not an easy task for a nonexpert lawyer to understand, let alone feel an intuitive mastery of, some of the concerns that were the principal reason for the Article 8 revision project.

One of the major challenges that I faced in my capacity as Reporter for the Article 8 revision project was to acquire a sufficient level of information about these matters not only to feel confident that I was not making errors in my work as a drafter, but also to serve as a "translator" between the clearance and settlement experts and the group of intelligent and dedicated generalist lawyers who served as the key decision makers in the project, both on the drafting committee and within the review process in the ALI and NCCUSL. The principal objective of this Article is to memorialize and more widely publicize the results of that education and translation effort so that lawyers working with Revised Article 8, both during the process of review and enactment by the states and thereafter in the process of application and interpretation, will have the benefit of some of the information and perspective that those involved in the drafting process brought to or acquired during the project. [2]

The topics covered in the principal portions of this Article are as follows:

Part I describes the reasons for the revision project and explains the concept of "systemic risk" as well as the systems that are being developed by securities market participants and securities regulators to control systemic risk. Part I also explains how revision of the commercial law rules in Article 8 is essential if these risk control measures are to operate as intended--to protect the interests of investors in times of financial crisis.

 **\*1434**  Part II provides a summary of the organization and basic drafting technique of Revised Article 8, including a brief explanation of the concept of "securities entitlement," the term used in Revised Article 8 to describe, for purposes of commercial law, the interest of a person who holds securities through an account with a broker or other securities intermediary.

Part III describes several specific topics that illustrate how the new security entitlement concept facilitates the articulation of simple, certain rules for the modern securities holding system, including the very important matter of choice-of-law rules.

Part IV shows how the revision advances one of the key objectives of commercial law for the securities holding system--ensuring finality in securities settlement. Part IV of the article explains how Revised Article 8 generalizes and makes more clear the rules protecting all purchasers against adverse claims that, under previous law, applied only to certain categories of transfers. This part also explains the changes made by Revised Article 8 in the wording of the rules concerning the standard that a purchaser must meet to obtain protection against adverse claims. This part includes an explanation of how the revision seeks to resolve long-standing confusion over the relationship between the concepts of good faith and notice of adverse claims in this context.

Part V deals with security interests in investment securities. This part includes a thumbnail sketch of the new security interest rules, a brief survey of how the new rules meet the needs of the wide variety of transactions in which securities are used as collateral, and some thoughts on the general drafting approach used in the design of these new secured transaction rules.

Part VI addresses the concerns that have been expressed in some quarters about the relationship between the Article 8 rules and legal regimes for the protection of the interests of individual investors. This part of the Article points out that Article 8 is not the body of law that regulates the relationship between brokers as sellers of securities and investors as their customers. Rather, insofar as Article 8 applies to the relationship between customers and brokers, it does so only with respect to the essentially ministerial, record-keeping function of securities custody. Part VI explains the provisions of Revised Article 8 regarding the extent to which agreements between intermediaries and their customers can specify the manner in which the intermediary will perform the statutory duties of a securities custodian. This part of the Article also explains the Revised Article 8 rule concerning the circumstances in which the claims of persons, including secured creditors, to whom a securities intermediary has wrongfully transferred **\*1435** securities have priority over the claims of customers of a failed intermediary. This is a provision that, initially, strikes many readers as counterintuitive. The Article notes that this issue was given very careful consideration during the drafting process and that a very large number of thoughtful lawyers, many of whom started from the standpoint of unease about the rule, have concluded, after careful consideration, that their initial impressions were incorrect and that the rules set out in Revised Article 8 are entirely sound from all perspectives, including that of individual investors.

Part VII explains the need for prompt, uniform enactment of the 1994 revision and summarizes the extensive consideration that the Article 8 revision has received from all affected interests, including representatives of the governmental and regulatory authorities who have both expert knowledge of the operations of the securities markets and statutory responsibility for ensuring the protection of the interests of investors.

I. Article 8 Revision and Clearance and Settlement Reform

Article 8 was drafted nearly a half-century ago. Changes were made in 1977, but that revision project had a rather limited scope and did not seek a comprehensive modernization. Lawyers and academics who have had occasion to deal with Article 8 in any context have commonly concluded there are significant problems with the statute. These problems exist even when the statute is applied to relatively simple transactions, such as nonmarket transactions in which securities transactions are implemented by physical delivery of certificates or retail-level transactions in which investors who hold securities through brokerage accounts seek to use their assets as collateral for loans. Yet it is unlikely that concerns of this sort would alone have led to the recent revision project. There are many statutes on the books that are showing signs of age and could be improved to promote clarity and simplicity in their application. Yet the process of statutory revision itself has significant costs. It would have been difficult to argue persuasively that law reform bodies or legislatures should devote scarce resources to improving Article 8 solely on the basis of the type of concerns that commercial lawyers involved in general business practice have expressed about it.

The immediate impetus for the recent revision project came from another quarter altogether. The Article 8 revision project was one part of worldwide efforts to assure that the clearance and settlement system for securities trading is adequate for the task of processing the ever-increasing **\*1436** volume and complexity of trading in the modern securities markets.[3] The work of which the Article 8 revision project is a part might be described as "Armageddon planning" for the financial system. There are, thankfully, people in both governmental bodies and private sector groups who devote a significant portion of their professional activities to contemplating what might happen in the event of major crises in the financial system, such as the unexpected failure of an institution that plays a major role in the national and international financial system, and assessing concrete steps that might be taken to lessen the impact of such events.

In recent years, a major topic of concern within the international financial community has been the control of systemic risk in the payment and securities systems. A part of that concern is directed toward assuring that the clearance and settlement system for securities trading operates in a safe and efficient fashion. In turn, one part of clearance and settlement reform is assessment and improvement of the legal foundation of the clearance and settlement system. It has increasingly been recognized that an antiquated system of commercial law rules for securities transfers could, in times of stress in the financial markets, operate as a destabilizing factor, or at least impede efforts by responsible agencies to ensure the continued safe and efficient operation of the national system for the clearance and settlement of securities transactions. That is how a project to modernize a body **\*1437** of law as obscure as Article 8 of the Uniform Commercial Code got onto the agenda of law revision process.

**A. Systemic Risk**

Clearance and settlement reform is an aspect of the general problem of controlling "systemic risk," or, "the risk that the inability of one institution to meet its obligations when due will cause other institutions to be unable to meet their obligations when

due." [4]  Put bluntly, the absence of mechanisms for control of systemic risk is why disturbances in the financial system used to be called "panics."

In itself, the prospect of the failure of an institution that is a major player in the securities or financial markets is neither particularly surprising nor particularly troublesome. The essence of securities trading is making guesses about the future course of financial markets. That is necessarily a risky business. Securities firms and others who engage in securities trading sometimes make bad decisions or fail to exercise sufficient control over the decisions made by their operatives, and they suffer losses as a result. Sometimes those losses are big enough that the firm itself fails. The objective of clearance and settlement reform initiatives is not to eliminate the possibility that major players in the securities markets may fail. To the contrary, recognition of the reality of that possibility is the starting point of all modern work on clearance and settlement. The real issue is what happens to others when one firm does fail.

The major reason that clearance and settlement has become a matter of significant public policy concern in recent years is that inadequacies in the clearance and settlement system can be one of the main vehicles by which the consequences of one firm's failure spread to others. Suppose, for example, that a particular firm makes bad guesses about the price movements of some category of security and enters into large trades on the basis of those assumptions. The longer the settlement cycle for those trades, the larger will be the magnitude of the losses that the firm has accrued but not yet paid. But, saying that this firm has made bad bets about price movements is the same thing as saying that the counterparties with whom it has dealt have made good bets to hedge their risk of that price movement. If the "bad gambler" firm fails and those trades are not settled, then those other firms (the "good guessers" or "prudent investors") will lose the benefit of the protection they expected to obtain by making those trades. If those  **\*1438**  losses are sufficiently large and concentrated, the failure of the bad gambler firm may lead to the failure of other firms. Limiting the risk that the failure of one firm will spread to others is perhaps the central objective of clearance and settlement initiatives.

In a speech given shortly after the failure of one of the oldest British financial firms, the Barings, as a result of massive losses incurred by one of its securities traders, [5]  Alan Greenspan [6]  emphasized the critical role of clearance and settlement reform in controlling systemic risk. [7]  Chairman Greenspan stated that the key to preventing the failure of one firm from adversely affecting the rest of the financial system was to ensure that the liquidity of the underlying markets is preserved, and he remarked that "my experience with financial crises has convinced me that the greatest threat to the liquidity of our financial markets is the potential for disturbance to the clearance and settlement process for financial transactions." [8]  Further, he noted that in assessing the adequacy of the clearance and settlement system, "the most important set of concerns relates to the legal and institutional foundations of book-entry settlement systems," and he urged other nations to follow the lead of the United States in eliminating legal uncertainties by modernizing their legal rules as has been done in the Article 8 revision project. [9]

## B. From Trade to Settlement

A major part of clearance and settlement reform initiatives is directed toward minimizing the risks that result from temporal lags between trade and settlement. When we think of securities trading, we are likely to imagine either the hurly-burly of the stock exchange pits, with traders scurrying about conducting transactions, or, to an increasing extent today, traders seated at desks piled high with complex modern computers on a massive trading floor of a major securities dealer. From the usual standpoint of either economic or legal analysis of the securities markets, that is entirely appropriate. The events that take place on the floor of the exchanges or by telephone or computer in the over-the-counter markets are, indeed, the key to the principal functions of securities markets--providing  **\*1439**  liquidity and establishing a price by the mechanism of an open public marketplace. For purposes of commercial law and clearance and settlement reform, however, it is critical to understand exactly what is, and what is not, happening when a securities trade is effected by these mechanisms.

The phrase "trade" connotes an exchange of property for other property or money; hence, it is common to think of the securities exchanges and markets as the mechanisms through which securities are transferred from party to party. In a general sense, of course, that is true; but to be precise, one must realize that the traders in the securities exchanges and markets are not buying and selling securities--at least not in the sense of exchanging securities for money--they are entering into contracts for the purchase and sale of securities.

The rules or customs of the market or exchange set the terms of the contracts that are formed through securities trading activities. Until quite recently, contracts for most categories of equity and long-term debt securities called for settlement to occur five

business days after the trade. At the settlement date, the seller is required to deliver the securities to the buyer and the buyer is required to pay the agreed-upon price to the seller. The phrase "clearance and settlement" refers to the process by which the securities and cash are actually exchanged in performance of the contracts entered into by the trading process.

A large part of clearance and settlement reform is directed toward problems that are analogous to concerns that are within the common experience of most lawyers. Careful lawyers involved in the planning of any sales transaction devote considerable attention to analysis of the positions of the parties in the period between execution of the contract and before performance. They seek to assure that when the time for performance comes, the obligations of buyer and seller will be performed simultaneously or as close to simultaneously as possible. For example, in a real estate transaction, no careful lawyer would advise the buyer that "the house is as good as yours" once the purchase and sale agreement had been signed; nor would the lawyer fail to object vociferously if the terms of the purchase and sale agreement called for the buyer to pay the purchase price in advance of delivery of the deed. A major part of the lawyer's role in planning such transactions is taking steps to minimize the risk that one party will have performed but not yet have received performance. A variety of fairly elaborate practices have evolved to avoid that risk, for example, conducting closings at the office of the registry of deeds or employing escrow arrangements to assure simultaneous performance. Similarly, in the area of sales of goods, a variety of mechanisms, such as those employed in documentary **\*1440** sales transactions, have evolved to enable the parties to manage or allocate the risk of having performed but not yet having received performance.

The contracts formed by securities trading are obviously not the sort of arrangements where it is feasible for the parties to negotiate individually about the terms of performance. Accordingly, in the securities business, efforts to identify and manage the risks that come from the inevitable lag between contract formation and contract performance have occurred principally through the efforts of governmental bodies, such as securities regulators and central banks, and nongovernmental industry groups interested in general improvements in the operations of the securities markets.

A major concern in recent clearance and settlement initiatives is the effort to reduce the temporal lag between trade and settlement. The reason is fairly simple. A longer period between trade and settlement means a greater volume of unsettled transactions. As one recent study of the clearance and settlement system put it, "time equals risk." [10] In an ideal world, there would be no temporal lag at all--at the same instant that the traders reached agreement on a transaction, that transaction would be settled by a simultaneous movement of securities and funds. In any system that deviates from this ideal, the parties face the risk of nonperformance of an agreed trade. Suppose, for example, that Seller agrees to sell a certain quantity of Security A to Buyer for a price of $1,000,000, but Seller becomes insolvent before settlement and fails to deliver. Even if Buyer has not prepaid, Buyer faces the risk that the price will have risen in the interim so that Buyer may have to pay more than $1,000,000 to obtain those securities from another source. Buyer may have little choice but to buy the securities at that higher price from another source, for Buyer may well have entered into a subsequent agreement to resell and hence may need the securities in order to perform its own agreement. Contract law will, of course, give Buyer a right to damages, but that right will be of little value if Seller is insolvent. Hence, shortening the settlement cycle has been a major goal in clearance and settlement reform in recent years. The first major clearance and settlement study in recent years, the 1989 Group of Thirty Report, recommended that all nations move to reduce their securities settlement cycle to at least "T 3," that is, settlement should occur no later than three business days after the trade date. [11] In the United States, that recommendation has recently been implemented by a new Securities and Exchange Commission Rule, effective June 7, 1995, that reduces the ordinary **\*1441** settlement cycle for most categories of equity and long-term debt securities from T 5 to T 3. [12]

Another element of reduction of clearance and settlement risk is the effort to minimize the temporal lag, not between trade and settlement, but between the two components of settlement: transfer of securities from seller to buyer and transfer of funds from buyer to seller. This is simply an instance of the general problem, familiar to all business lawyers, of attempting to implement an exchange in such a fashion that minimizes or avoids the possibility that one will find oneself in the situation of having paid for property but not yet received it, or having transferred property but not yet received payment. Thus, considerable attention has been devoted in recent years to steps that might be taken to implement a settlement system that comes as close as possible to achieving "delivery versus payment," or "DVP." [13]

To a large extent, minimizing temporal risks in the clearance and settlement system requires changes and improvements not in the law, but in industry practices and operational systems. Law, particularly regulatory law, may play a role in influencing or requiring operational change, as in the recent SEC rule requiring reduction in the settlement cycle from T 5 to T 3. Yet on such matters, it is the operational change that counts, not the way that the industry is induced to make the operational change.

There are, however, aspects in which revision of legal rules themselves, particularly the commercial law rules of securities transfer, is an important part of clearance and settlement reform.

## C. Providing an Adequate Legal Structure for the Indirect Holding System-- General Requirements

At the most general level, the need for commercial law revision arises from the fact that efforts to ensure that the clearance and settlement system has adequate capacity to handle ever-increasing trading volumes has led to increased reliance on book-entry systems of securities holding. This, in turn, requires that the commercial law of securities transfer be as clear and certain as applied to the book-entry system as to the traditional system of securities transfer by physical delivery of certificates.

**\*1442**  A generation or more ago, the principal mechanism of settlement in the securities markets was physical delivery of certificates representing securities. If one traced the history of securities clearance and settlement back far enough, one would presumably find a period at which each individual trade was settled by a corresponding delivery of a physical certificate, followed, in the case of registered securities, by registration of transfer on the issuer's books. In most markets, that stage was passed long ago, at least with respect to the clearing function. Any two major players in the markets, such as large broker-dealers or banks acting as dealers or custodians, may have entered into numerous trades with each other in a given security on a given day. Rather than settling each of those trades one-by-one by passing certificates back and forth, a more efficient system can be devised by netting all of the transactions between the two parties into a single net deliver or receive obligation to the other. Even further efficiency can be achieved by moving from a bilateral to a multilateral netting system through a centralized clearing facility, so that all trading activity of each participant on a given day is netted to a single deliver or receive position in each security with respect to all other participants. For trading in ordinary corporate equity and debt securities, netted clearing arrangements of this sort have evolved over a fairly long period, beginning with clearing arrangement performed by the individual exchanges, and culminating in the 1970s with the establishment of a centralized net clearing arrangement operated by the National Securities Clearing Corporation ("NSCC"). [14]

Net clearing arrangements, however, simply reduce the number of transactions that need to be effected to settle a given day's trading. Some other step is needed to effect settlement itself. Even as late as the 1960s, that step was still delivery of physical certificates. Once each firm's net deliver or receive position had been determined, physical certificates were delivered from firm to firm to settle those obligations. By the late 1960s, the mechanical problems of processing the paperwork for securities settlement had reached crisis proportions. During the so-called "paperwork crunch" of the late 1960s, it even became necessary for the exchanges to curtail the trading period because of the mounting backlog of unsettled transactions.

One response to the inefficiency of paper settlement might have been the elimination of paper certificates altogether. During the 1970s, considerable attention was given to the possibility of establishing legal rules on **\*1443**  securities transfer that would permit securities ownership to be evidenced simply by electronic records maintained by issuers, without any definitive paper certificate as evidence of the owner's interest. [15]  Those efforts resulted in the 1978 amendments to Article 8, designed to establish the commercial law rules that were thought necessary to permit the evolution of a system in which issuers would no longer issue certificates. The securities holding system contemplated by the 1978 amendments differed from the traditional system only in that ownership of securities would not be evidenced by physical certificates. It was contemplated that changes in ownership would continue to be reflected by changes in the records of the issuer. The main difference would be that instead of surrendering an indorsed certificate for registration of transfer, an instruction would be sent to the issuer directing it to register the transfer.

In some segments of the securities markets, physical certificates have been eliminated. Perhaps the most important example is United States Government securities, which have been issued only in book-entry form since the late 1970s. Most mutual fund shares are not now, and never have been, represented by physical certificates. Just within the past year or so, there has been another flurry of activity in this field, as some of the banks active in the transfer agent business have begun projects to take the processing systems that were developed in connection with dividend reinvestment plans and expand them into a general system of direct book-entry holdings of corporate equities. [16]

A direct uncertificated system of the sort contemplated by the 1978 amendments to Article 8 was not, however, the mechanism by which the problems of the securities settlement system were solved. To use clearance and settlement jargon, the key development in the modern securities settlement system in the United States has been "immobilization" rather than "dematerialization." A useful starting place in understanding how the system operates is to consider where one would find the records of ownership of shares of any publicly held United States corporation.

If one examined the shareholder records of large corporations whose shares are publicly traded on the exchanges or in the over-the-counter market, one would find that one entity--Cede & Co.--is listed as the shareholder of record of somewhere in the range of sixty to eighty per cent of the **\*1444** outstanding shares of all publicly traded companies. Cede & Co. is the nominee [17] used by The Depository Trust Company ("DTC"), a limited purpose trust company organized under New York law for the purpose of acting as a depository to hold securities for the benefit of its participants, some six hundred or so broker-dealers and banks. Essentially all of the trading in publicly held companies is executed through the broker-dealers who are participants in DTC, and the great bulk of public securities--the sixty to eighty per cent figure noted above--is held by these broker-dealers and banks on behalf of their customers. If all of these broker-dealers and banks held physical certificates, then as trades were executed each day it would be necessary to deliver the certificates back and forth among these broker-dealers and banks. By handing all of their securities over to a common depository, all of these deliveries can be eliminated. Transfers can be accomplished by adjustments to the participants' DTC accounts.

Encouraging the establishment and expansion of central securities depositories such as DTC has been a principal theme in studies of the securities clearance and settlement system in recent years. One of the principal recommendations of the 1989 G-30 study was that a central securities depository be established in each country at least by 1992. [18] Inasmuch as the United States has had such a system for some years now, the efforts here have been devoted to expansion of the use and capacity of the system. Since the enactment of the Securities Acts Amendments of 1975, the SEC has been charged by Congress with responsibility for foster ing **\*1445** the development of the national system for securities clearance and settlement, [19] including taking steps "to end the physical movement of securities certificates in connection with the settlement among brokers and dealers." [20] In furtherance of that objective, the SEC has recently taken action to require that all trades among broker-dealers in securities that are depository eligible be settled by the clearing corporation book-entry process, [21] and that all new issues of publicly traded securities be made depository eligible. [22]

The development of the book-entry system of settlement seems to have accomplished the objective of ensuring that the settlement system has adequate operational capacity to process current trading volumes. At the time of the "paperwork crunch" in the late 1960s, the trading volume on the New York Stock Exchange that so seriously strained the capacities of the clearance and settlement system was in the range of ten million shares per day. Today, the system can easily handle trading volume on routine days of hundreds of millions of shares. Even during the October 1987 market break, when daily trading volume reached the current record level of six hundred eight million shares, the clearance and settlement system functioned relatively smoothly. Yet, as the securities settlement system comes to rely increasingly on the book-entry system, the need for an adequate modern legal structure of commercial law rules concerning the system of securities holding through intermediaries becomes more and more pressing.

This general concern was the immediate impetus to the Article 8 revision project. In a number of the studies issued after the October 1987 stock market break, it was suggested that uncertainties about the application of the commercial law rules found in old Article 8 to the modern system of securities holding through intermediaries might operate as an impediment to efforts to control or limit risks in times of disturbances in **\*1446** the securities and financial markets. [23] In October 1988, the Chairman of the SEC requested that the American Bar Association ("ABA") undertake a study of the need for revisions of Article 8 and related provisions of bankruptcy law. [24] In response, the Business Law Section of the ABA formed an Advisory Committee on Settlement of Market Transactions. In February of 1991, the ABA Committee issued an interim report that made tentative recommendations for revision of Article 8 and various provisions of the federal Bankruptcy Code. At the same time that the ABA Committee was at work, the United States Congress was considering various legislative packages for amendments to the federal securities laws in response to the October 1987 market break and the failure of Drexel Burnham in February of 1990.

Recognizing the need for revision in the commercial law foundation of the securities holding system, [25] as well as the concern that revision of commercial law by the uniform state laws process might not be feasible, Congress gave the SEC the authority to promulgate federal regulations that would preempt state law on the transfer and pledge of securities if the SEC finds, after recommendations of an Advisory Committee and consultation with the Secretary of the Treasury and Board of Governors of the Federal Reserve System, that the absence of a uniform federal rule substantially impedes the safe and efficient operation of the national system for clearance and settlement of securities transactions. In response to these developments, NCCUSL and the ALI formed a drafting committee in the spring of 1991 and directed the committee to proceed as quickly as possible with the work of revising **\*1447** Article 8 to meet the needs identified in these various studies. [26] When I was appointed Reporter for the Article 8 project and told that the project was made necessary by problems with prior law revealed after October 1987,

my first task was to review these studies expecting to find a "check-list" of things that were broken and needed to be fixed. Somewhat to my surprise, I found that, although there were many general expressions to the effect that prior law did not provide a sufficiently certain legal framework for transactions implemented through the modern securities holding system, there was relatively very little specific description of problems. Ultimately, I came to realize that the problem with old Article 8 was less a matter of specific rules enunciated in the statute that needed to be changed, though there were some such instances, than that the statute was simply too difficult to use.

Old Article 8 was drafted in light of the transaction patterns of the paper-based system of securities transfers by physical delivery of certificates. The focus and organization of the statutory language itself, the content and emphasis of the accompanying official comments, and the available secondary literature discussing the statute all bespeak the paper-based origins of the statute. Thus, if one is seeking the statutory rules applicable to a securities transfer effected by physical delivery of a certificate, even a novice would have a relatively easy time finding one's way around the statute. By contrast, although old Article 8 does contain rules that apply to the indirect holding system, these matters were added onto a statutory structure devised for entirely different sorts of transactions. Not surprisingly then, it is considerably more difficult even to find the provisions of old Article 8 that apply to the indirect holding system, let alone to be confident about **\*1448** their interpretation. For example, the most basic rule for the indirect holding system--that a person acquires a property interest when securities are credited to the person's account with an intermediary--is buried four levels down in the complex paragraph structure of old Section 8-313, in subparagraph (iii) of paragraph (d) of subsection (1); and even then, only a person who already knows what Section 8-313(1)(d)(iii) means would be able to understand this provision.

The commercial law rules of the securities holding and transfer system are a bit like the utility systems of a building. When they are working right, no one notices them; as they age, it takes more and more effort to keep them working, and the people who know how they work come to realize that they may break down altogether if conditions put them under heavy load. At some point prudence demands that they be replaced with systems that are designed for modern conditions and have the capacity to handle heavy loads, even though at the time they are replaced they are still "working." Indeed, the Article 8 revision project reminded me quite a bit of my own thought process in deciding to replace the electrical system of my nearly century-old house. When we moved in, we found an electrical system that had been "designed" in very much the same manner as old Article 8. Starting with a small main box of but four fuses, installed sometime in the early part of the twentieth century, additional boxes and panels had been patched on with the installation of each new electrical device added to the house over the decades, yielding a product that in the whole resembled something out of an M.C. Escher print. No doubt, any electrician could have figured how that system worked fairly quickly, and having spent many hours poring over the elaborate arrangement of boxes and cables and pulling out fuses to see what went out, I too pretty much knew how it worked. One day at work, I received a panicked phone call from my spouse, telling me that the repairmen working on our furnace had blown a fuse, putting the whole house into darkness, and none of them could figure out which of the dozens of fuses of all different sorts was the one that needed to be replaced. That experience got me thinking. Suppose the problem had not been that a fuse had blown, but that someone needed to shut off the electricity to some part of the house? Would anyone who had not spent all that time figuring out how the system worked be able to react promptly in an emergency? Not long thereafter we bit the bullet and made the investment to replace the old "working" system with a new, modern working system. One of the things that it means when we say that a system **\*1449** "works" is that people can figure out how it works and can do so quickly in times of emergency.

The present commercial law rules were designed for the system in which delivery of physical certificates was the key to the securities transfer process. Trying to use those rules for the modern system of securities holding through intermediaries is like trying to use an old electric system for a modern building; it can be done, but it takes a lot of effort and provides little protection against emergencies. Today, an inordinate amount of legal time--which, of course, means cost--is required to fit modern securities transactions into the conceptual scheme of a prior era. Of even greater concern, the poor fit between law and practice means that lawyers are unlikely to be able to provide quick and certain answers when they are most needed. As one knowledgeable observer remarked, "That's an interesting question" is not an acceptable answer to questions about the legal rights of securities market participants at a time when the prospect of the collapse of the financial system is a matter of more than theoretical concern.

## II. The Basic Drafting Technique of Revised Article 8

Martin Aronstein, the Reporter for the 1978 amendments to Article 8, has stated well the basic problem with the approach that has previously been taken to the formulation of commercial law rules for the indirect holding system:

Recent changes in the law of securities transfer might be characterized as trying to put an expanding multi-faceted peg in a round hole. The proverbial round hole, of course, is the traditional negotiable instrument concept that a security is transferred by delivery. The peg is the rapidly developing system of securities issuance and holding practices in which an owner's interest in a security is evidenced by an entry on his account with a broker, bank, clearing corporation, or other intermediary, and the security itself is represented by a piece of paper in the possession of that or another third party, or in some cases, by nothing more than an entry on the books of the issuer.

. . . .

It has been said that a lawyer will never tell you what something is, but only what it's like. Reasoning by analogy, a time-honored **\*1450** legal art, falls increasingly short of the mark in a business environment that has so drastically changed from that in which the old principles had developed and which they served well. [27]

In the revision project that produced the 1994 version of Article 8, this lesson was the guiding principle in the drafting of rules for the indirect holding system. The essence of the Revised Article 8 drafting technique can be stated in a few words: First describe it, then name it.

The starting point of the Revised Article 8 approach is to identify, in functional rather than categorical terms, what it means to say that a person holds a security through an intermediary. The answer to that inquiry comes in the form of the statement, in Sections 8-503 through 8-508, of the core of the package of rights and duties that define the relationship between a securities intermediary and a person ("entitlement holder") who holds a securities position through that intermediary. The elements of this package are as follows:

the entitlement holder does not take credit risk of the intermediary's other business activities; that is, property held by the intermediary is not subject to the claims of the intermediary's general creditors; [28]

the intermediary will maintain a one-to-one match between the assets that it itself holds and all of the claims of its entitlement holders; [29]

the intermediary will pass through to the entitlement holder payments or distribution made with respect to the securities; [30]

the intermediary will exercise voting rights and other rights and privileges of ownership of the securities in the fashion directed by the entitlement holder; [31]

the intermediary will transfer or otherwise dispose of the positions at the direction of the entitlement holder; [32] and

the intermediary will act at the direction of the entitlement holder to convert the position into any other available form **\*1451** of securities holding, e.g., obtain and deliver a certificate. [33]

Having described the package, the statute then gives it a name. Section 8-102(a)(17) defines the new term "security entitlement" as "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5." The term "security entitlement" can then be used as a convenient shorthand for "the package of rights that a person who holds a securities position through an intermediary has against that intermediary and the property held by that intermediary." For example, the rules on secured transactions can now be written in terms of the attachment, perfection, and priority of security interests in "security entitlements." [34]

It is worth emphasizing that the reformulation of the commercial law analysis of the indirect holding system in Revised Article 8 is a matter of providing a more precise terminology by which to describe the manner in which one's securities positions are held, rather than changing the essential nature of the underlying asset. For many purposes, the precise manner in which a person holds a certain species of property is not particularly important. Consider, for example, the usage of the concept of "money" or "cash" both in colloquial speech and in legal discourse. A deposit account with a bank is, from the standpoint of precise private law analysis, a debtor-creditor relationship. Yet, we still routinely use such phrases as "money in the bank," or "funds transfer through the banking system," and ordinarily, doing so does not engender significant confusion. It would be

POLICY PERSPECTIVES ON REVISED U.C.C. ARTICLE 8, 43 UCLA L. Rev. 1431

an extreme display of pedantry for a lawyer to insist on going through all legal documents to replace such words as "money," "cash," or "funds" with cumbersome locutions about "demand debt obligations of financial institutions." The same is true of the new terminology used in Revised Article 8. In most discourse about securities transactions, the precise form in which one holds one's securities positions is not particularly relevant, and in such contexts the fact that one's arrangements would be described under Revised Article 8 as "security entitlements" rather than direct holdings of securities should neither make any difference for purposes of legal analysis nor require any change in documentation. No one will be confused if agreements between brokers or other custodians and their customers continue to be written in terms of "securities held in your account," rather than "security entitlements." No one need wonder whether financial disclosure forms should be altered to list separately "securities" and "security entitlements."   **1452**   And certainly no perpetrator of a fraudulent securities transaction should expect to be taken seriously if he insists that his victim cannot sue under the federal securities acts because the victim "acquired a security entitlement" and so is not a "purchaser of a security."

For certain commercial law purposes, however, it is important to speak precisely about the manner in which one holds a certain species of property. The late Fairfax Leary, one of the leading authorities on the law of the check collection system, used to say that the biggest obstacle to most lawyers' comprehension of the details of the commercial law of funds transfer was the implicit assumption that the system works in the fashion of a plumbing system-- one puts money in here and it squirts out there. Similarly, if one wishes to transfer a property interest in one's "cash" holdings as collateral for an obligation, one cannot ignore the difference between currency and bank deposits.

The technique used in Revised Article 8--using a new term to describe a distinct manner of holding a particular form of property-- has many antecedents in the development of commercial law. Commercial law is frequently concerned not so much with what rights one has by holding a certain form of property, but with how one deals with that form of property, for example, how one transfers it and what rights the transferee obtains. For those purposes the manner of holding does matter, and new bodies of commercial law have often developed as new forms of holding became commercially significant. Negotiable instruments law is a good example. In many contexts, a promise to pay money is just that; how it is evidenced is not terribly important. But, for purposes of transfer mechanics and other commercial law issues, there are important differences between promise to pay money that are governed by general contract law and those that are governed by the special law of negotiable instruments. Or, to put the point a different way, once a commercial practice developed in which the piece of paper on which a promise to pay money was written itself had significant legal consequences, a special body of law developed for that form of representation of monetary promises. [35]

Within the field of investment securities, Revised Article 8's development of a special terminology and package of commercial law rules for security entitlements can be seen as a reprise of the developments that led to the original version of Article 8. The reason there is a special branch of commercial law dealing with securities certificates is that a commercial   **1453**   practice developed in which the underlying intangible rights were transferred and otherwise dealt with by means of possession and delivery of paper certificates. Had that practice not developed, there would have been no need for a body of law like Article 8; questions about transfer of ownership of securities would have remained part of the general contract law of assignments or part of the law of membership in corporations or other associations. The commercial development that gave rise to the present revision of Article 8 is the evolution of a system in which the important evidence of ownership of securities is not definitive paper certificates, but accounting entries on the records of chains of intermediaries. Using a new word--security entitlement-- to describe the package of rights that one obtains when such accounting entries are made is very much like using a new word-- stock certificate--to describe the package of rights that one obtains by taking delivery of a special form of paper that embodies underlying rights.

### III. Some Advantages of the New Security Entitlement Structure

As is probably the case with most instances of linguistic evolution, the advantage of using a new term is that it calls attention to particular aspects of a social practice. Both librarians and computer professionals today insist upon describing the subject of their professions as information rather than the particular means by which that information is stored or manipulated. To lawyers, however, the details are everything; hence, the principal advantage of the new security entitlement vocabulary in Revised Article 8 is that it forces us to focus on various respects in which the details of the form of securities holding do make a difference. Though a comprehensive explanation of the new indirect holding system rules is beyond the scope of this Article, it may be useful to note a number of specific respects in which the shift of focus that comes with the new terminology provides significant assistance in the effort to write clear and certain commercial law rules for the securities clearance and settlement system.

## A. Direct/Indirect Versus Certificated/Uncertificated

At the time that work was begun on the project that resulted in the 1978 version of Article 8, a basic decision was made that, though it must have seemed entirely sensible at the time, turned out to have unfortunate consequences. The objective of that project was to make the changes to **\*1454** Article 8 that were thought necessary to facilitate the development of a system in which issuers would no longer issue paper certificates to evidence ownership of securities. Inasmuch as that was a project intended to formulate legal rules for a practice that had not yet developed, it was entirely sensible to adopt an approach of fundamental conservatism, that is, to retain in all respects the structure and organization of the existing law concerning certificated securities and simply add on new provisions concerning uncertificated securities. The result was a structure in which virtually all provisions of Article 8 contained separate but parallel rules, one for certificated securities and another for uncertificated securities. The 1978 revision project also devoted some effort to provide somewhat more detailed rules concerning securities held through intermediaries, [36] but these were folded within the drafting structure dictated by the decision to seek parallelism between provisions on certificated and uncertificated securities. The result was an organizational structure that is almost certain to lead a lawyer studying the statute for the first time into a basic conceptual confusion.

Because Article 8 has long been a fairly obscure corner of commercial law, lawyers rarely receive any detailed training in it. Most lawyers come to the statute with a few rough notions about what it is supposed to cover and how it has evolved, and then must fend for themselves in seeking answers to particular problems. Most lawyers who have occasion to look to Article 8 are probably aware of the fact that it was amended in the 1970s, and that the amendments had something to do with the evolution from paper to electronics in the securities industry. From either their own personal financial affairs or those of their clients, most lawyers probably come to Article 8 with an awareness that, while investors in the past routinely took physical possession of certificates to evidence their holdings, it is now routine for investors to purchase, hold, and sell securities without ever obtaining certificates.

Armed with these basic pieces of information, the lawyer turns to Article 8 or the secondary literature explaining it and finds that each section has one set of rules for "certificated securities" and another set of rules for "uncertificated securities." It would be surprising if the lawyer did not reach the conclusion that the provisions on uncertificated securities must be the provisions that govern transactions in which people purchase, hold, and sell securities without obtaining certificates. That conclusion would be entirely wrong, but it is very easy to see how one would be so misled. And **\*1455** one would have plenty of distinguished company. Judges, too, have described arrangements in which investors hold securities positions through brokerage accounts as instances of the Article 8 "uncertificated securities" provisions. [37]

The organizational structure of Revised Article 8 should go a long way toward alleviating this sort of confusion. By using different terms to describe the direct and indirect holding systems, and by placing the rules for the indirect holding system in separate Part 5 of Article 8, it should be fairly apparent even to a casual reader that the commercial law rules for securities holding through intermediaries differ from those for securities held directly. Revised Article 8 retains, to the extent necessary, rules that distinguish between certificated and uncertificated securities; but because these are now part of the direct holding system rules in Parts 2, 3, and 4, it should be easier for readers of the statute to see that the distinction is relevant only to the relationship between the issuer and the immediate registered owner.

## B. An Entitlement Holder's Rights Can Be Asserted Only Against Its Own Intermediary

One of the principal advantages of the security entitlement structure is that it makes clear a basic feature of the indirect holding system--that an entitlement holder's property interest is a bundle of rights that can be asserted directly only against the entitlement holder's own intermediary. The principle that an entitlement holder can look only to its own intermediary is not really a creation of Revised Article 8. Revised Article 8 only gives legal recognition to the factual realities of the modern securities holding system. In a multi-tiered system of intermediaries, only a person's own immediate intermediary knows anything about that person's interest. Each intermediary knows only the identity of its own customers and the extent of their positions. An upper-tier intermediary's customer may be someone else's intermediary, but the upper-tier intermediary has no way of knowing anything about its customer's customers. Accordingly, the realities of the marketplace dictate that an intermediary can only be held responsible to its own customers.

The traditional Article 8 rules on securities certificates were based on the idea that the paper certificate can be regarded as a complete reification of the underlying right. The rules on transfer and the consequences of **\*1456** wrongful transfer could then

be written using the same basic concepts as the rules for physical chattels. For example, a person's claim of ownership of a securities certificate is a right to a specific identifiable physical object, and that right can be asserted against any person who ends up in possession of that physical certificate, except to the extent that bona fide purchaser rules cut off the adverse claim.

Application of the traditional concepts to the modern indirect holding system gives a certain plausibility to arguments which, if accepted, could significantly impair the operation of the indirect holding system. Suppose that A holds securities through Custodian, who in turn holds through Clearing Corporation. Suppose that C asserts some interest in A's property, for example, C is a creditor of A seeking to collect a judgment, or C claims some form of equitable interest in A's property. Can C enforce its asserted claim, either by legal process or by simple notice of the assertion, directed to the Clearing Corporation? For the indirect holding system to work, the answer has to be no. Any effort by C to reach or affect A's interest by legal process or other means should be directed to A's own intermediary, Custodian, not to Clearing Corporation. Yet the conceptual structure of old Article 8 lends plausibility to an assertion by C against Clearing Corporation. The old Article 8 rules describe all relationships in the indirect holding system in terms of transfers of property interests in "the security." The security in question is in the hands of Clearing Corporation, so it seems to follow that Clearing Corporation has possession of an item of property that belongs to A. If so, then it would seem to be consistent with general property concepts and the law of creditors' rights to say that C could seek to reach A's property by process, notice, or other action directed to Clearing Corporation. [38]

The rules of Revised Article 8 for the indirect holding system are based on entirely different concepts. A security entitlement is not a claim to a specific identifiable thing; it is a package of rights and interests that a person has against the person's securities intermediary and its property. The idea that discrete objects might be traced through the hands of different persons has no place in the Revised Article 8 rules for the indirect holding system. Rather, the fundamental principles of the indirect holding  **\*1457** system rules are that an entitlement holder's own intermediary has the obligation to see to it that the entitlement holder receives all of the economic and corporate rights that comprise the security, and therefore, that an entitlement holder can look only to that intermediary for performance of the obligations. The entitlement holder cannot assert rights directly against other persons, such as other intermediaries through whom the intermediary holds the positions. Under the Revised Article 8 approach, the resolution of the problem described above is simple. A's property interest is described as a security entitlement, which is a package of rights against its intermediary, Custodian. Because A's property interest is "located" at Custodian, it is clear, as a matter of general principle, that the only proper subject of legal process by A's creditors would be Custodian. Clearing Corporation does not have possession of some item of property in which A has a direct property interest, and hence, is not subject to legal process by A's creditors. The Revised Article 8 rules state this point explicitly in the section on creditor process, [39] but the important point for present purposes is that it is the security entitlement analysis itself that facilitates the clear statement of the rules on this specific point. This particular point could have been made clear in old Article 8 by a specific rule, but the point of such a rule would have been to head off one specific consequence of the ill-fitting conceptual structure used for the basic property analysis of the indirect holding system. One can, of course, never be confident that one has imagined every possible situation in statutory drafting. Thus, if one knows that the basic concepts used do not fit current reality, one can have little or no confidence that one will have remembered to cover each possible unfortunate consequence of that misfit.

## C. Coherent Choice of Law Rules

Another advantage of the security entitlement concept is that it greatly facilitates the choice of law analysis of transactions involving intermediaries in different jurisdictions. Because present Article 8 analyzes the interests of all of the parties as interests in the same "security," general choice of law principles would seem to suggest that a key factor in determining the governing law is the location of the "security." That approach, simple as it seems in the setting of the traditional securities holding system,  **\*1458** turns out to produce horrendous complexity when applied to modern conditions. The choice of law problems are particularly troublesome in connection with secured transactions.

Suppose, for example, that Borrower, a resident of Massachusetts, holds a diverse portfolio of securities through an account with Custodian, a bank located in Massachusetts. Borrower wishes to grant a security interest to Lender, also located in Massachusetts (indeed, Lender and Custodian might be the same bank). To make the anomaly of the current choice of law rules even more apparent, let us stipulate that Borrower has never set foot outside of Massachusetts and has never had any dealings with any other person who has ever set foot outside of Massachusetts. All that Borrower and Lender wish to do is to make a transfer from Borrower to Lender, for purposes of security, of the package of rights that Borrower has in the securities positions held through the account with Custodian. The only parties who could be affected by the creation of this security interest are Borrower, Lender, Custodian, and Borrower's other creditors, all of whom by hypothesis are located in Massachusetts. One would think that this is a legal matter that could adequately be handled by Massachusetts law and Massachusetts law alone.

Ironically, Massachusetts, like every other jurisdiction that has adopted the U.C.C., currently has in force a statutory choice of law rule that has the effect of telling its own courts that if they are called upon to adjudicate a dispute concerning this transaction they must look to the law of other jurisdictions; indeed, they may have to look to the law of dozens of different jurisdictions, both within the United States and abroad. Moreover, it is virtually certain that no one will be able to tell for sure, either at the time the transaction is implemented or at the time of the litigation, exactly which jurisdiction it is that the Massachusetts court is supposed to be consulting.

The statutory choice of law rules that have these bizarre consequences are the seemingly simple rules in old Section 9-103(3), under which "perfection and the effect of perfection or nonperfection" of a security interest in instruments, including certificated securities, is governed by the law of the jurisdiction where the collateral is located, and old Section 9-103(6), under which such questions for security interests in uncertificated securities are governed by "the law (including the conflict of laws rules) of the jurisdiction of organization of the issuer." To apply these rules, we must consider individually each security carried in Borrower's account with Custodian to determine what law applies. First, we would have to determine whether each underlying security is certificated or uncertificated. If the security is uncertificated, then we must look to the law of the issuer's jurisdiction; **\*1459** indeed, we must look to the conflict of laws rules of the issuer's jurisdiction and then see where those rules lead us for the applicable substantive law. If the security is certificated, we must look to the law of the jurisdiction where the certificate is located.

To settle these questions, we must determine how Custodian holds the securities. This might present an irresolvable problem. Suppose that Custodian holds its aggregate position in a given security in a variety of ways, for example, some units are represented by certificates in its own vaults and some are held through Custodian's account with a clearing corporation. There is no way to give any intelligible meaning to the question whether the securities that Custodian holds for Borrower are part of the units in the vaults or the units held through the clearing corporation account, but the choice of law analysis depends on the resolution of that unanswerable question.

Suppose, though, we conclude that all of Custodian's holding of a given security are carried through a clearing corporation account. We then need to determine the form in which the clearing corporation holds its aggregate position. It is, of course, highly unlikely that Borrower, Lender, or Custodian, or any lawyer involved in litigation of the dispute would have access to the information needed to determine that question. If, however, we do somehow obtain the necessary information, we may encounter the same kinds of questions as we did at the Custodian level, if, for example, the clearing corporation holds its aggregate position in a variety of ways. Indeed, even if the arrangements at the clearing corporation level are as simple as they can be, we may have difficulty determining whether the securities in question are certificated or uncertificated. In one of the most common forms of arrangement between clearing corporations and transfer agents, the aggregate holdings of the clearing corporation are represented by a single certificate that on its face says only that the clearing corporation is the holder of record of whatever number of shares are so indicated in the computerized accounting records maintained by the transfer agent. Whether that constitutes a certificated or uncertificated security is a question upon which one could imagine learned disagreement. [40]

If the question at stake here were which state's enactment of the identical substantive rules set out in the Uniform Commercial Code applies to a given transaction, one might dismiss these speculations as amusing but inconsequential. But the problem is more serious than that. First, for most **\*1460** of the period of the last two decades, different states have had different versions of the relevant portions of the U.C.C. as the 1978 amendments were slowly enacted by the states. For at least some time in the future, that will again be the case as the states proceed with enactment of the 1994 revision. Equally serious, if not more so, is the problem of determining the governing law for transactions involving securities issued by entities outside the United States. As the securities markets become increasingly global, it becomes more and more likely that someone in the position of Borrower in our hypothetical will be carrying foreign securities through the account with Custodian. The fact that Borrower is carrying French, German, and Japanese securities through its account does not change the fact that the only parties affected by the secured transaction between Borrower and Lender are residents of Massachusetts, but under the current choice of law rules these Massachusetts residents are required by Massachusetts law to worry about the details of foreign law. It is quite common today for lawyers involved in transactions of the sort described here to conclude that they must seek opinions from foreign counsel before they can safely advise their local clients about the legal effect of a purely local transaction.

Under the security entitlement analysis of Revised Article 8, these choice of law conundrums disappear. Under Revised Article 8, Borrower would be described as an entitlement holder having security entitlements through Custodian. These security entitlements are the collateral in the secured transaction between Borrower and Lender. Once the collateral is described in

that fashion, choice of law questions become rather simple. One need only specify the jurisdiction that is most appropriately associated with the package of rights that constitutes the collateral. The 1994 revision does so by a series of mechanical rules that, in essence, may be regarded as specifying that the "location" of this collateral is the place where the securities account is maintained.[41] Thus, in transactions such as the example described above, the 1994 revision makes it clear that one need only look to Massachusetts law to determine the effect of the transfer of securities positions carried through an account with a Massachusetts custodian.

## IV. Post-Settlement Finality

Inasmuch as the 1994 revision project was prompted primarily by concerns about the inadequacy of prior law as a foundation for the modern **\*1461** securities clearance and settlement system, the provisions of Article 8 that warranted the most careful attention were those commercial law rules that have a direct bearing on the objectives of clearance and settlement reform. Among the prime examples are the commercial law rules needed to assure "post-settlement finality."[42]

Suppose that Firm A and Firm B agree to a trade for a certain quantity of Security X for a price of $5,000,000, and that at settlement date the transaction does settle. On the securities side, settlement occurs when the appropriate quantity of Security X is transferred from Firm A to Firm B, whether by physical delivery of certificates, by entries on the records of the issuer, or by entries on the records of a clearing corporation or other securities intermediary. On the payment side, settlement occurs when final payment is made through whatever funds transfer system is used. Suppose that at some later time a third party ("Claimant") appears and asserts that the securities that Firm A transferred to Firm B really belonged to or otherwise were subject to a property interest in favor of Claimant and should not have been transferred by Firm A to Firm B. To the extent that the applicable legal rules permit the Claimant to recover the securities from Firm B on such grounds, Firm B faces a form of settlement risk that continues even beyond the point at which it appeared that the transaction had settled. It was noted above that a great deal of time and effort has been devoted in recent years to operational changes that would shorten the period of risk in securities settlements by a few days or hours. Here, we confront a form of settlement risk that extends far longer and that cannot be cured by efforts to improve the operational mechanisms of the settlement system. Rather, this is a problem that is solely within the province of commercial law.

Under the general principles of property transfers applicable under Anglo-American law to chattels and most other forms of personal property, one can transfer no greater title than one has--as the Latin maxim puts it, nemo dat qui non habet. If that approach were applied to securities settlements, Claimant would be able to assert the claim against Firm B. In other words, the commercial law rules would themselves be a means by which the consequences of a problem that occurred within the operations of one firm could be spread to affect other firms. In short, the commercial law rules would themselves be a vehicle for creation of systemic risk. It is, then, **\*1462** hardly surprising that the general rule of nemo dat has never been thought appropriate for investment securities. Rather, a principle of finality has long been a fundamental policy of the commercial law of investment securities. The finality principle dictates that once a securities transfer has been implemented by the appropriate formal mechanism, the transfer of the property interest is final. To state the point in slightly different terms, once a purchaser has acquired a property interest in a security by a transfer implemented through the appropriate formal mechanism, that purchaser's acquisition of the property interest cannot be unsettled on the basis of an assertion that the transferor acted wrongfully in transferring the securities to the purchaser.[43]

The rule that a person who takes delivery of a security certificate in proper form for value and without notice qualifies as a bona fide purchaser who takes the certificate free from any adverse claim is the specific legal technique by which the finality principle was implemented for the traditional system of securities settlement by physical delivery of certificates. Although the bona fide purchaser, or "negotiability," rules had long been applied to some forms of investment securities, a variety of technical problems arose under pre-Code law that made it difficult to apply the finality principle to all forms of securities.[44] It would not really be an exaggeration to say that the main reason for Article 8 in its original form was to overcome the obstacles to general application of this principle. The first sentences of the first explanation of the first draft of what was to become Article 8 make the point quite clearly:

Originally this Article of the Code was intended to deal only with the requirements for creating a "holder in due course" with respect to noncommercial paper. The basic problem was one of defining the **\*1463** types of investment paper which should be the subject-matter of protection in the hands of such a holder.[45]

Similarly, one of the principal objectives of the Revised Article 8 project was to eliminate various legal uncertainties that arose from the effort to apply to the indirect securities holding system the adverse claim cutoff rules that had become well-settled for the direct holding system long before.

With respect to the direct holding system, old Article 8 implemented the finality principle comprehensively. A purchaser for value without notice of certificated bearer securities takes the securities free from any adverse claims. [46]  Thus, suppose that Thief breaks into Owner's house and steals bearer bonds. Thief sells the bonds to Buyer or borrows money from Bank granting Bank a security interest in the bonds. Buyer or Bank takes possession, without notice of the theft. Or, suppose that Trustee holds bearer bonds in trust for Beneficiary. In violation of fiduciary obligations, Trustee sells the bonds to Buyer, devoting the proceeds to personal use, or borrows money from Bank for personal use, granting Bank a security interest in the bonds. Buyer or Bank takes possession, without notice of the breach of duty. Or, to take an example involving wrongdoing by a securities industry professional, suppose that Customer buys bearer bonds through Broker, but leaves the bonds in the custody of Broker. In violation of its common law and statutory duties, Broker sells the bonds to Buyer, or borrows from Bank for Broker's own account and grants Bank a security interest in the bonds. Buyer or Bank takes possession without notice of Broker's wrongdoing. The outcome in each of these cases is entirely clear under old Article 8, and was clear as a matter of common law for decades if not centuries before Article 8. In each case the transferee, whether an outright buyer of the securities or a creditor holding a security interest in the securities, takes free from adverse claims, that is, the transfer is final and cannot be unwound on the grounds that the transferor was acting wrongfully. Were one designing the world afresh, one might puzzle over whether this finality rule is necessary or appropriate, but for purposes of practical law revision, these are just not open questions. The finality principle is so  **\*1464**  deeply ingrained in the commercial law of the securities transfer system that it is hard to imagine any plausible grounds for suggesting a basic change in approach.

With respect to certificated securities in registered form, such as ordinary corporate stock, the results are essentially the same. The only difference between certificates in registered form and those in bearer form is the appropriate mechanism of transfer. The mechanism for bearer securities is simple delivery, while for registered securities the appropriate mechanism for a complete transfer is delivery, with indorsement, followed by registration of transfer on the books of the issuer. Article 8, however, unambiguously applies the same finality principle to protect transferees of registered securities from adverse claims. Thus, suppose Thief breaks into Owner's house, steals stock certificates registered in Owner's name, and sells or pledges them. To transfer the certificates, Thief would need to forge Owner's indorsement. Taking possession of the certificate under a forged indorsement would not suffice to qualify the transferee as a bona fide purchaser who takes free from adverse claims. [47]  However, if the transferee surrenders the certificate to the issuer and the issuer registers transfer, issuing a new certificate in the name of the transferee, the transferee will take free from adverse claims, just as if a bearer security had been delivered. [48]  Or, suppose that Trustee holds stock in trust for Beneficiary, with the certificate registered in the name of "Trustee, as trustee for Beneficiary," and Trustee sells or pledges the certificate for personal use, in violation of fiduciary duties. No forgery is necessary for Trustee to indorse, so the buyer or pledgee would take free from adverse claims simply by taking possession of the certificate without notice of the breach of duty. The case of wrongful conduct by a broker or other securities custodian is essentially the same. Thus, suppose that Customer buys stock through Broker, but leaves the stock "in street name" with the Broker and that Broker obtains a certificate representing the stock, registered in the name of Broker or its nominee. If Broker, in violation of common law and statutory duties, sells or pledges the stock for its own account, no forgery would be needed to indorse, so that the buyer or pledgee would take free from adverse claims simply by taking possession of the certificate without notice.

From a relatively early point, Article 8 has included rules that implement the same finality principle for the core cases of securities transfers through the depository system. The modern system of securities depositories  **\*1465**  or clearing corporation began to develop at about the time that the original Uniform Commercial Code project was coming to completion. Although the original version of Article 8, drafted in the 1940s and 1950s, had no provisions contemplating the depository system, a special section on transfers by entries on clearing corporation books (Section 8-320) was added in 1962. The principal point of this section was to ensure that the same finality rules that applied to physical delivery of certificates would apply to clearing corporation transfers. Indeed, that was the drafting technique as well as the objective. Section 8-320, in its original version, provided that transfer or pledge could be effected by entries on the books of a central depository and stated that such an entry "has the effect of a delivery of a security in bearer form or duly indorsed in blank." [49]

It is a bit difficult to imagine precise analogs of the ordinary examples of stolen securities in the setting of clearing corporation transfers. Indeed, one of the reasons for the development of such arrangements is to minimize the possibility of theft of certificates. Other forms of adverse claims, however, could as easily arise in this setting as in the case of securities transferred by physical deliveries. Suppose, for example, that Trust Company holds securities as trustee for Beneficiary, holding the securities

in an account at Clearing Corporation, and that Trust Company, in violation of its fiduciary duties, sells or pledges the securities for its own account. If the transaction is effected by debiting Trust Company's clearing corporation account and crediting the account of the buyer or pledgee at the clearing corporation, the buyer or pledgee can qualify as a bona fide purchaser and take free from Beneficiary's adverse claim. As another example, suppose that Customer buys securities through Broker, but leaves the securities in the custody of Broker, who carries the securities in its account at Clearing Corporation. If Broker, in violation of common law and statutory duties, sells or pledges the stock for its own account, and the transaction is effected by debiting Broker's clearing corporation account and crediting the account of the buyer or pledgee at the clearing corporation, the buyer or pledgee can qualify as a bona fide purchaser and take free from Customer's adverse claim. The application of the finality principle to such cases has been entirely clear from the earliest stages of the development of the depository system; the application and interpretation of the old Article 8 rules here are no less clear than for the traditional cases of purchasers who take physical delivery of stolen bearer bonds.

 *1466  What, then, is the problem with the application of old Article 8 to the modern indirect holding system? The answer is that once one moves a bit to one side or the other of the simplest core cases, clarity in the implementation of the basic finality policy begins to evaporate. Suppose, for example, that Pension Fund purchased certain securities on December 6, 1994. Pension Fund purchased the securities in an ordinary market transaction, having absolutely no idea who the seller might be, and holds those securities through a custodial account that it maintains with a major bank. Suppose that it turns out that the seller in that transaction happened to have been one of the lenders to Orange County, California that was foreclosing on securities held as collateral for the county's debts on the eve of the county's bankruptcy filing that day. [50] It would hardly be surprising if there were circumstances in which the trustee in a case such as the Orange County bankruptcy could frame a plausible contention that the lender's action in selling off the bonds was wrongful against the county in some respect that gave the county a continuing property interest in the bonds. [51] Can one be assured that the existing Article 8 rules would preclude the assertion of an adverse claim against Pension Fund? Surprisingly, the answer is no; from the facts assumed above, one cannot be sure. If settlement of the trade occurred by entries on the books of a clearing corporation, then the case is governed by the Article 8 rules that apply the finality principle to clearing corporation transfers. It is possible, however, that a trade such as this could have been settled by a mechanism that did not involve entries on the books of an intermediary that falls within the old Article 8 definition of clearing corporation. For example, the securities might originally have been held through an account at a bank acting as custodian for the collateral arrangement between Orange County and its creditor. If, by chance, the bank that acted as custodian in the arrangement between Orange County and its creditor was the same bank that Pension Fund used as its securities custodian, settlement of the transaction in which the securities were sold to Pension Fund upon foreclosure of Orange County's creditor's interest might have been effected simply by entries on the books of that bank. If so, Pension Fund cannot qualify as a  *1467 bona fide purchaser under the old Article 8 rules, and so may not be protected against the assertion of adverse claims.

There is no reason to suppose that the absence of an adverse claim cutoff rule in old Article 8 for transfers effected by book-entry through a nonclearing corporation intermediary reflects a deliberate policy choice that transactions effected through entries on the books of intermediaries other than clearing corporations should not receive the benefits of the finality rules applicable to other forms of securities settlement. Rather, it is quite clear that this statutory lacuna is the result of the fact that old Article 8 sought to squeeze the analysis of the modern indirect holding system into the conceptual structure of the old paper-based system.

Under old Article 8, the basic finality principle was implemented by conferring bona fide purchaser status upon transferees of securities. A person who qualifies, such as one who takes physical delivery of a bearer security, takes that security free from all other property interests. That implementation of the finality principle works fine for the direct holding system, because in the direct holding system, where the ultimate investor stands in a direct relationship with the issuer, only one entity will typically have an interest in a particular security at a particular time. That implementation of the finality principle will not, however, work for the indirect holding system. It is simply not the case that a person who holds through an intermediary can be said to hold an interest in "the security" free from any competing claims. There is always the possibility that the intermediary through whom various investors hold their interests may not itself have sufficient holdings to satisfy the claims of all of its customers. Yet under the approach of old Article 8, an investor in the indirect holding system was regarded as a transferee of an interest in "the security." This meant that once all of the entries were made in the chain of accounts of all of the intermediaries involved in processing a transaction, the result was a transfer to the ultimate purchaser of an interest in the security that may actually have been held by a clearing corporation several layers removed from the ultimate purchaser. Since a bona fide purchaser is, by definition, one who takes free from all adverse claims, and since an investor in the indirect holding system necessarily holds in some form of common ownership with others, it seemed to follow that the legal rules could not confer bona fide purchaser status on a person who holds through an intermediary. As the comment to old Section 8-313 put it:

Subsection (2) sets forth the principle that a purchaser is the owner of any security "held for him"--i.e. controlled pursuant to his instructions--by a financial intermediary. For example, a purchaser **\*1468** owns the securities in his custody account with a bank or his margin account with a broker. However, unless specific securities are separately identified as belonging to the purchaser, he cannot become a bona fide purchaser. A bona fide purchaser takes particular securities free of all claims and defenses. If bona fide purchaser status were given to those whose securities are held as part of a fungible bulk, there would be a possibility of inconsistent claims between two or more bona fide purchasers, since if the bulk should prove to be smaller than was expected, the claim of one or both must be compromised. [52]

The same comment explains that old Article 8 took a different approach at the top tier, not because of a different legal analysis, but because of a factual assumption that the chances of a shortfall at the clearing corporation level were negligible:

An exception is made with respect to securities held by clearing corporations, since the fact that those entities hold only for customer accounts makes the chance of inconsistent claims small. [53]

What we see here is a significant consequence of the confusion between a general policy, such as the finality principle, and a particular implementation of that policy, such as the rule that a bona fide purchaser of a security takes free from all adverse claims. [54] Old Article 8 failed to distinguish two very different questions about the property interest of a person who holds through an intermediary. One question is how to analyze the attributes of that property interest, or, to use the conventional metaphor, how to describe the bundle of sticks. An entirely different question is whether that bundle of sticks can be taken away from a person if it turns out that the person acquired that bundle as the end result of a transaction that was initiated by conduct that was wrongful against another. For example, in the hypothetical concerning Pension Fund's purchase of securities previously held as collateral for Orange County's debts, the fact that Pension Fund necessarily holds in common with other custodial customers of **\*1469** Bank who have positions in the same security need have no consequences about whether Orange County's trustee should be permitted to undo the transaction in which Pension Fund acquired that interest.

The new conceptual structure of Revised Article 8 greatly facilitates separation of these two different issues. Under Revised Article 8, the package of rights that an investor has against its intermediary and the property held by its intermediary is referred to as a "security entitlement." One of the attributes of a security entitlement is the fact that if the intermediary itself lacks sufficient holdings to satisfy all entitlement holders having security entitlements to the same issue, the entitlement holders share pro rata. In that sense, it is of course true that the investor's property interest is "subject to" other claims. Yet once one has described the property interest in this fashion, it becomes as easy to implement the finality principle for this form of securities holding as for direct holdings. The technique is slightly different, but the objective is the same. Revised Section 8-502 provides that once a person has acquired a security entitlement, for value and without notice, no adverse claim can be asserted against that person's security entitlement. That rule can readily be applied to all levels of the indirect holding system. Accordingly, under Revised Article 8, unlike former law, no distinction need be drawn with respect to finality between settlements on the books of clearing corporations and settlements on the books of any other intermediary. Thus, to return to the Orange County hypothetical, the answer under Revised Article 8 is clear. Orange County's trustee would be precluded from asserting an adverse claim against Pension Fund, regardless of the details of the mechanical process by which the sale of the securities to Pension Fund happened to have been implemented.

In addition to assuring that the finality principle applies comprehensively to all mechanisms by which securities transactions may be settled, Revised Article 8 also clarifies the standards for application of the finality principle. Under old Article 8, to qualify as a bona fide purchaser who took free from adverse claims, the purchaser had to take "for value in good faith and without notice of any adverse claim." The relationship between the "in good faith" and "without notice" requirements of prior law was unclear and gave rise to a considerable degree of confusion. [55]

**\*1470** Part of the confusion may be attributable to a quirk of language. In eighteenth-and nineteenth-century negotiable instruments law cases, the term used to describe a person who took free from adverse claims was not "good faith purchaser" but "bona fide purchaser for value and without notice." The requirements for protection were that the purchaser gave value and had no notice of adverse claims. Good faith was not an independent third requirement; indeed, the word "good faith" does not even appear in the classic nineteenth-century English cases in which the courts wrestled with the question whether a purchaser was disqualified from adverse claim protection if the purchaser honestly, but foolishly, did not suspect that there was anything amiss even though the circumstances were such as to have excited the suspicions of a reasonably prudent person. [56] The words "bona fide" in the phrase "bona fide purchaser for value and without notice" did not refer to a separate third requirement. Instead,

they served the linguistic function of a modifier of the phrase "for value and without notice," emphasizing that the purchaser must genuinely have given value and must genuinely have been without notice of adverse claims. [57] In this context, the Latin words "bona fide" were used in the sense they commonly carry in English, to wit, "genuine." Although the phrase "bona fide purchaser" remains a common locution in legal discourse, twentieth-century lawyers--perhaps motivated by a desire to substitute all-English phrases for Latinisms--frequently use the phrase "good faith purchaser" in place of "bona fide purchaser" as a shorthand for the category of purchasers protected against adverse claims. That is a somewhat unfortunate locution, inasmuch as it further obscures the fact that the ultimate inquiry is still whether the purchaser really did or did not give value and take without notice. [58]

 **\*1471**  Another cause of confusion on this point is that the phrases "bad faith" and, somewhat less commonly, "good faith," have been used, from the mid-nineteenth-century to the present, in opinions dealing with one recurring category of case. By the mid-nineteenth-century, it was settled that a purchaser had no general affirmative duty to investigate and would not be disqualified from adverse claim protection merely by virtue of a lack of circumspection. [59] That principle has continued to be recognized in cases under the U.C.C. [60] There are, of course, limits to that principle, as when the purchaser took the security in circumstances that were so suspicious that one is forced to conclude either (1) that the purchaser is lying in claiming lack of awareness of adverse clams, or (2) that the purchaser deliberately manipulated affairs to avoid obtaining the feared information, thereby preserving the ability to assert--with a straight face but a smirk--a lack of awareness. The outcome in cases presenting such facts is quite predictable--the purchaser will lose. The language used by the courts in explaining that outcome is considerably less uniform. In some cases the point has been treated via notions of constructive knowledge or notice. That was the linguistic approach taken in the leading English decision of May v. Chapman, [61] where Baron Parke observed that " 'notice and knowledge' means not merely express notice, but knowledge, or the means of knowledge to which the party wilfully shuts his eyes." [62] In the leading American decision, Goodman v. Simonds, [63] the United States Supreme Court expressed the same substantive point, but used the phrase "bad faith" in doing so:

Every one must conduct himself honestly in respect to the antecedent parties, when he takes negotiable paper, in order to acquire a title which will shield him against prior equities. While he is not obliged to make inquiries, he must not wilfully shut his eyes to the means of knowledge which he knows are at hand . . . for the reason that such conduct, whether equivalent to notice or not, would be plenary evidence of bad faith. [64]

 **\*1472**  In a later case, the Supreme Court made the same point, using the affirmative phrase "good faith":

[O]ne may purchase stolen negotiable bonds and acquire valid title as a holder in due course, although before the purchase, notice of the theft had come to him; but he may not willfully close his eyes to the notice, or resort to trick or artifice to avoid knowledge of its contents, or purposely forget it. He must act in good faith. [65] Courts have continued to apply this "willful blindness" under Article 8. [66]

If the only place that the phrase "good faith" were used in commercial law were in stating the requirements for protection against adverse claims, the ambiguity of that phrase might well be manageable. Yet as the very different concept of "good faith performance" of contractual and statutory duties [67] comes to play a larger and more controversial role in commercial law, it becomes more and more difficult to achieve a clear and coherent statement of the requirements for protection against adverse claims by means of concepts of good faith or bad faith. Here, as on many other issues, the approach taken by Revised Article 8 is to seek to minimize confusion by stating the rules directly, eschewing words of legal conclusion that have over time taken on so many different meanings as to have virtually lost all meaning. Accordingly, Revised Article 8 abandons the phrases "bona fide purchaser" and "good faith," and states directly the rules determining whether one takes free from adverse claims.

For the direct holding system, Section 8-303 provides that a purchaser can qualify as a "protected purchaser" [68] who takes free from adverse claims if the purchaser "gives value [and] does not have notice of any adverse claim." For the indirect holding system, a parallel rule is set out in Section 8-502 that provides adverse claim protection to a person who acquires a security entitlement "for value and without notice of the adverse claim." The question whether a person who takes under suspicious circumstances is disqualified is treated in the rules of Section 8-105 on notice of adverse claims. The category of cases that has generated most of the confusion is  **\*1473**  treated by a direct statement of the "willful blindness" test that has been applied in the cases over the past century or more: "A person has notice of an adverse claim if . . . the person is aware of facts sufficient

to indicate that there is a significant probability that the adverse claim exists and deliberately avoids information that would establish the existence of the adverse claim." [69]

## V. Secured Transaction Rules

The rules on security interests in investment securities are one of the most important aspects of the commercial law rules concerning investment securities. Accordingly, a major objective of the Article 8 revision project was to ensure that the commercial law rules concerning security interests in investment securities were sufficiently simple and certain to provide an adequate framework not only for the wide variety of transactions in which securities are used as collateral today, but also for transactions and arrangements that may evolve in the future.

It is beyond the scope of this Article to undertake a detailed explanation of the secured transaction rules of the 1994 revision. Rather, what will be attempted here is a thumbnail sketch of the new security interest rules, a brief survey of how the new rules meet the needs of the wide variety of transactions in which securities are used as collateral, and some thoughts on the general drafting approach used in the design of these new secured transaction rules.

### A. Outline of Secured Transaction Rules

Organizationally, one of the major changes effected by the 1994 revision is to return to the pre-1978 structure in which the rules on security interests in investment securities are set out in Article 9. This is a reversal of the reorganization effected by the 1978 version, in which the requirements for attachment and perfection of a security interest were covered in Article 8, while priority and other issues concerning security interests in **\*1474** investment securities remained governed by the usual Article 9 rules. [70] Under the 1994 revision, a security interest in securities can be created in the same fashion as a security interest in any other form of property, that is, by agreement between the debtor and the secured party. There is no additional requirement of a "transfer," "delivery," or any similar action, physical or metaphysical, for the creation of an effective security interest. Thus, analysis of security interests in investment securities under the 1994 revision follows the familiar pattern of defining and describing the relevant collateral category and then specifying rules on attachment, perfection, and priorities in a fashion appropriate to that form of collateral.

The 1994 revision introduces a new defined term, "investment property," as the general collateral category covering investment securities and related property. The term "investment property" plays a role in the Article 9 scheme akin to the categories of "goods," "instruments," "documents," "chattel paper," "accounts," and "general intangibles." Investment property includes interests in securities, whether held directly or indirectly, as well as interests in other financial assets held through securities accounts, and interests in commodity contracts.

Attachment of a security interest in investment property is governed by the familiar rules in Section 9-203, under which a security interest attaches when (i) there is a written security agreement describing the collateral or the secured party takes possession, (ii) the debtor has rights in the collateral, and (iii) the secured party gives value. The new rules on attachment of security interests in investment property involve only relatively modest adaptations of these familiar principles, such as substituting the new concept of "control" for possession as a means of attachment in addition to execution of a written security agreement. [71]

The new perfection rules are set out in Section 9-115(4). The most important general rule is stated in paragraph (a) of subsection (4): "A security interest in investment property may be perfected by control." Revised Section 8-106 is the primary locus of the definition of the term "control," specifying the specific steps that a secured party or other purchaser must take in order to obtain control with respect to securities positions held in **\*1475** various ways. [72] As the Official Comment to Section 8-106 notes, the general import of the concept of control is easily understood: "Obtaining 'control' means that the purchaser [secured party] has taken whatever steps are necessary, given the manner in which the securities are held, to place itself in a position where it can have the securities sold, without further action by the owner [debtor.]" For example, if the debtor is the direct holder of certificated bearer securities, the secured party obtains control by delivery. [73] If the debtor holds indirectly, that is, through an account with a securities intermediary, the secured party can obtain control by either having the positions transferred into an account in its own name or by obtaining an agreement under which the debtor's securities intermediary agrees that it will, without further act by the debtor, act on directions initiated by the secured party. [74] Although control is the primary means of perfection, it is not exclusive. Where the debtor is itself a broker or securities intermediary, Section 9-115(4)(c) establishes an

automatic perfection rule. [75]  In other cases, Section 9-115(4)(b) provides that a security interest in investment property can be perfected by filing.

Moving from perfection to priorities, the key rule again turns on the concept of control. Section 9-115(5)(a) provides that "[a] security interest of a secured party who has control over investment property has priority over a security interest of a secured party who does not have control over the investment property." The rest of subsection (5) deals with a variety of **\*1476** matters subsidiary to the general principal embodied in the control priority rule, such as establishing rules for cases where both or neither secured party has obtained control.

One of these subsidiary priority rules may warrant discussion at the outset-- not because of its importance, but because it is easily misunderstood. [76]  The rule in question is found in paragraph (c) of subsection (5), which provides that unless the parties agree otherwise, a security interest granted to a debtor's own intermediary has priority over other security interests. [77]  At first glance, this provision seems to establish a special rule of general significance preferring intermediaries over other secured creditors. In fact, however, the paragraph (c) rule has a very narrow impact. For most potential priority disputes between an intermediary as secured creditor and another claimant to whom the entitlement holder has granted a security interest, there is no need to look to the paragraph (c) rule. Paragraph (a) establishes the general rule that a control security interest has priority over a noncontrol security interest. Section 8-106, which defines the concept of control, provides that "if an interest in a security entitlement is granted by the entitlement holder to the entitlement holder's own securities intermediary, the securities intermediary has control." Thus, even if there were no special rule in paragraph (c) for priority disputes involving the debtor's own securities intermediary, the routine case of a dispute between a debtor's securities intermediary and another secured creditor holding a perfected noncontrol security interest, for example, a lender who had perfected by filing, would be governed by the general control priority rule in paragraph (a). [78]  The special rule in paragraph (c) is needed only to **\*1477** deal with cases in which (i) a debtor has granted security interests to both its own intermediary and an external lender, (ii) the lender has entered into an agreement with the intermediary sufficient to give the external lender control, but (iii) the parties to that agreement forgot to deal specifically with the relative rights of the intermediary and the external lender. Further explanation of the special rule in paragraph (c) will appear below, after discussion of the far more important matter of understanding the policy basis of the basic priority rule set out in paragraph (a).

## B. The Control Principle and Its Application to Key Transaction Categories

The rule of Section 9-115(5)(a), that a control security interest has priority over a noncontrol security interest, is the statutory expression of the fundamental structural principle that underlies the secured transactions rules of Revised Article 8/9. Stated in general terms, the principle is as follows: If A seeks an advance of value from B, offering as collateral securities that are held in such fashion that B has the power to have the securities sold off without further act by A, then B should be able to proceed without fear that A may have granted a conflicting interest to some other party. That basic principle provides a simple and clear basis for secured transactions rules covering the wide range of transactions in which investment securities are used as collateral for obligations.

To most commercial lawyers, such phrases as "security interest" or "secured transaction" call to mind some form of relatively simple lending transaction. To be sure, investment securities can be and are used in a variety of important but relatively routine commercial financing arrangements involving individual and business debtors. Yet, such transactions are by no means either the sole or even the most important category that must be accommodated by the commercial law rules concerning security interests in investment securities. Rather, these rules must be designed in light of the fact that security interests in investment securities play a critical role in a variety of transactions and systems in the securities and financial markets.  **\*1478**  Perhaps the most important perspective from which to assess the commercial law of security interests in securities is the adequacy of that law as a basis for the implementation of risk control systems for the securities clearance and settlement system.

As was noted above, a major objective in the design of securities clearance and settlement systems is to minimize the risks that result from the inevitable temporal lags in securities settlement, including both the lag between trade and settlement and the lags in the settlement process itself. In an ideal world, there would be no such temporal lags. Settlement would occur at exactly the same instant that the counterparties to a trade commit to the trade, and the settlement process, on both the securities and the cash sides of the transaction, would be instantaneous and simultaneous. It is unlikely that that ideal will ever be realized and thus, clearance and settlement systems make arrangements to deal with transactions that are in process at the moment that a securities market participant goes bankrupt.

Given the complex interdependencies of trading arrangements among securities market participants, particularly in multilateral netted clearance arrangements, there is a strong interest in implementing arrangements that will permit completion of the settlement process on the securities side even if a market participant is unable to make settlement on the cash side. Thus, clearance and settlement systems typically put in place stand-by arrangements that will make it possible to complete securities settlement and payment upon the failure of a major participant. In one common form of such systems, the participants of a clearing corporation are required to make contributions to a guaranty fund, so that, in the event of the failure of a participant, the securities side of all unsettled transactions involving the failed participant can be settled, with the failed participants' payment obligations being met from the guaranty fund. Such arrangements may be implemented in a fashion that permits participants to make their required contributions either in cash or with other highly liquid property such as securities or letters of credit. The arrangements may be implemented in such fashion that the participants retain legal title to the property that they have contributed to the fund, granting to the clearing corporation a security interest in that property so that the clearing corporation will have the right to liquidate the property and use the proceeds to complete payment on behalf of a failed participant. It is essential that the clearing corporation's security interest be absolutely "iron-clad." It would defeat the entire purpose of the arrangements if there were any possible legal questions about the right of the clearing corporation to liquidate the property instantaneously or about possible conflicting interests that a participant may have granted or purported to grant to some other party.

**\*1479**  The control priority provisions of the 1994 revision are well-suited to the needs of systems of this sort. The clearing corporation will be holding securities contributed to the guaranty fund by the participants in such fashion that the clearing corporation has the power to have the securities liquidated immediately. If the arrangements are implemented in such fashion that the participants have granted a security interest to the clearing corporation, the clearing corporation, qua secured party, will have control. Thus, under the control priority rule of Section 9-115(5)(a), the clearing corporation's ability to make use of the guaranty fund in an emergency will not be impaired by fear that participants may have entered into transactions with others that might be thought to give the others conflicting security interests in that property.

The need for iron-clad security interest arrangements to assure smooth operation of the clearance and settlement system is by no means limited to the top tier. Consider, for example, another fairly typical pattern of securities settlement in which trades made by a given entity are settled, on both the securities and funds sides, through a clearing bank. Suppose that Clearing Bank receives securities on behalf of Dealer, and Clearing Bank makes payment for those securities on behalf of Dealer. Dealer, of course, is ultimately obligated to reimburse its Clearing Bank for the payment that Clearing Bank made on Dealer's behalf when the securities were received. It is, however, quite possible, indeed, it is all but certain, that there will be times when Clearing Bank has made payments on behalf of Dealer in advance of the completion of the arrangements that Dealer will make to obtain the funds to reimburse Clearing Bank. The amounts involved in such arrangements can be staggering; [79] hence, it is important to the safety not only of the securities markets, but to the banking and financial system in general, that the advances by clearing banks in arrangements of this sort be secured by legally unquestionable security interests. The control priority rule accomplishes this objective in a simple and clear fashion. In an arrangement in which a dealer takes delivery and makes payment through a clearing bank, it will be the case that the clearing bank will be holding the securities delivered to it for credit to the dealer's account in such fashion that the clearing bank has the power to have the securities sold off without  **\*1480**  further action by the dealer. Accordingly, if the clearing bank has a security interest in such securities to protect it against the risk that the dealer fails to reimburse the clearing bank for funds paid by the clearing bank in settlement of trades by the dealer, the clearing bank will have control. Under the control priority rule of Section 9-115(5)(a), a clearing bank can safely make payments to others to settle its dealer customer's trades, because the clearing bank can be assured that it will be able to realize upon its security interest in the event of a default by the dealer without concern that the dealer may have entered into transactions with others that might be thought to give the others conflicting security interests in that property.

The control priority rule works in essentially the same fashion to facilitate settlement of transactions involving investors at the retail level. The clearing bank-dealer arrangement described above is merely a high-level, megadollar example of a form of transaction that occurs at all levels of the securities holding system. Consider the case of an individual investor who purchases a few thousand dollars worth of securities through her broker. Once the broker executes the trade on her behalf in the relevant market or exchange, the broker itself is obligated to settle, that is, receive and pay for the securities. As in the clearing bank-dealer arrangement described above, the broker in this retail-level transaction may well make payment for the customer's purchase in advance of completion of final funds transfer arrangements by the customer to pay the broker, for instance, if the broker permits the customer to pay for the purchase by check. Accordingly, either by general law or by specific agreement, the securities that the broker has received and paid for on behalf of the customer should be subject to a lien in favor of the broker to secure the obligation of the customer to make payment. [80]  Under the control priority rule of Section 9-115(5)(a), the broker can rely with

confidence on such an arrangement. When a customer purchases securities through a broker and holds the securities through a securities account with that broker, it will be the case that the broker will be holding the securities in such fashion that the broker has the power to have the securities sold off without further action by the customer; that is, the broker, qua secured party, has control. Thus, the broker can safely permit its customer to make payment for securities purchased by check or in **\*1481** some other fashion that does not assure the broker of receipt of immediately available funds, because the broker can be assured that it will be able to realize upon its security interest in the event of a default by the customer without concern that the customer may have entered into transactions with others that might be thought to give the others conflicting security interests in that property.

The control priority principle that underlies the secured transaction rules of the 1994 revision is equally well-suited to routine commercial finance transactions. It provides the basis for clear and simple rules covering such transactions ranging from the simple physical pledge of certificated securities to more complex arrangements in which securities and other financial assets held through a securities account are used as collateral. Though the control concept may, at first examination, seem novel, it is, in fact, fully consistent with basic principles of the law of secured transactions; indeed, the control concept can usefully be regarded as merely a generalization from several specific rules that have long been part of the law of securities and secured transactions. A few examples will illustrate this point.

Example 1. Suppose that Debtor borrows money from X, to be secured by a security interest in specific securities for which Debtor holds certificates. X chooses to perfect solely by filing, as X is permitted to do under Section 9-115(4)(b). Thereafter, Debtor borrows from Y, granting Y a security interest in the same securities. Y, however, requires Debtor to deliver the certificates, with any necessary indorsement. Y thereby obtains control, and accordingly Y has priority over X under Section 9-115(5)(a). From the perspective of the policy that underlies the 1994 revision, this is a straightforward application of the control principle. Y placed itself in a position where it could have the securities liquidated without further act by the Debtor, and hence should be able to rely on the collateral without fear of conflicting claims of others, such as X, who did not do so. From the perspective of traditional negotiable instruments principles, this is also a simple case. By taking delivery of the certificates, Y implemented the transaction in the appropriate fashion to satisfy the formal requirements for a transfer that can qualify the transferee for protection against adverse claims. This is an equally simple case if viewed from the perspective of ordinary Article 9 principles. For various forms of collateral, Article 9 permits perfection by several different means. In those instances where one of these means has, by commercial custom, come to be regarded as the preferred method for a secured party who genuinely is relying on the collateral, **\*1482** the Article 9 rules further specify that perfection by the preferred mechanism trumps perfection by the alternative mechanism. [81]

Example 2. Suppose that Debtor borrows money from X, to be secured by a security interest in securities that Debtor holds through an account with Broker. X chooses to perfect solely by filing, as X is permitted to do under Section 9-115(4)(b). Thereafter, Debtor borrows from Y, granting Y a security interest in the same securities. Y, however, requires either that Debtor have the securities transferred into an account in Y's name with Broker or another intermediary, or Y obtains an agreement from Broker under which Broker will dispose of the securities at Y's direction, without further act or consent by Debtor. Y thereby obtains control, and accordingly Y has priority over X under Section 9-115(5)(a). From the perspective of the control principle, the situation is essentially the same as in Example 1. Y placed itself in a position where it could have the securities liquidated without further act by the Debtor, and hence should be able to rely on the collateral without fear of conflicting claims of others, such as X, who did not do so. From the perspective of traditional negotiable instruments principles, this is merely an adaptation to the modern book-entry system of the adverse claim cutoff principle that the bona fide purchaser rules implemented for certificated securities. From the perspective of ordinary Article 9 principles, this case is essentially the same as Example 1. X chose to rely on a form of perfection that X knew would not necessarily provide priority over other secured parties, and that is what X got.

Example 3. Suppose the facts are as in Example 2, except that after granting a filed security interest to X, Debtor borrows not from another external lender, but from Broker. X has a perfected security interest but does not have control. Broker's security interest is perfected, and Broker has control by virtue of Section 8-106(e). Thus, Broker has priority under Section 9-115(5)(a). Note that this is not an instance of any special "super-priority" rule for broker or other intermediaries; it is a routine application of the basic priority rule of Section 9-115(5)(a) under which a control security interest has priority over a noncontrol security interest. As a matter of policy, all of the considerations noted in the discussion of Example 2 are equally applicable here. Broker was in a position where it could have the **\*1483** securities liquidated without further act by the Debtor, and hence, should be able to rely on the collateral without fear of conflicting claims of others, such as X, who did not do so.

Indeed, from the perspective of basic Article 9 principles, Example 3 is an even easier case than Example 2. Example 2 may be described as a case in which the usual "first in time, first in right" principle that underlies the Article 9 priority rules must yield to a priority rule based on preferences between different methods of perfection. It is, however, a bit misleading to describe Example 3 as a case where the control priority rule deviates from ordinary "first in time, first in right" principles. It must be recalled that the basic Section 9-312(5) priority rule does not say that security interests rank in temporal order of creation or perfection. What Section 9-312(5) says is that security interests rank in temporal order of filing or perfection. Suppose that X is contemplating making a secured loan to be secured by Debtor's inventory. X checks the files and finds that Y already has a financing statement on file covering Debtor's inventory. Y may or may not have a security interest in Debtor's inventory, but if X does proceed, X is on notice that if Y either then does have a security interest or thereafter acquires a security interest, Y will have priority. Example 3, in which X chooses to lend to Debtor relying on filing to perfect a security interest in securities that Debtor holds through an account with Broker, is essentially the same. X, after all, can hardly claim surprise upon learning that Debtor's brokerage account is held through a broker.

## C. Drafting Approach: General Structural Principles Versus Transaction Specific Rules

The fact that securities are used as collateral in a wide variety of transactions, ranging from loans of a few thousand dollars to an individual secured by a physical pledge of certificated securities to multibillion dollar arrangements of baffling complexity, has important consequences for the basic architecture of the secured transaction rules. In many contexts, the sensible way to draft commercial law rules is to keep in mind a few basic transaction patterns, establish rules that seem to fit the expectations of the parties in those transactions, and hope that the resulting product will also work tolerably well for other transaction patterns not contemplated. One inevitable consequence, which in many contexts may be perfectly acceptable, is that the rules will be drafted in light of the type of transactions that happen to be most familiar to the individual human beings sitting at the drafting table. The temptation to follow that approach in the Article 8 revision project was great. We were, after all, a group of generalist commercial **\*1484** lawyers asked to devise sensible rules for transactions that few of us had ever even heard of before we sat at the table. The urge to filter all through the lens of familiar, homey examples about "me, my broker, and my local savings bank" was great. Yet that was a temptation that should have been, and on the whole was, resisted. As Reporter, I probably was in a position to acquire a broader range of familiarity with the transaction patterns affected by the project than anyone else, yet I constantly found myself being surprised to learn of some other form of transaction in which securities were used as collateral, and then realizing that my intuitive reactions as a commercial law professor more comfortable with examples about floor plan financing for car dealers provided an utterly abysmal guide to sensible policy or drafting. Worse still, the "oddball"--or so they seemed to me--transactions stubbornly resisted my urge to dismiss them on the grounds that no drafting project can take account of everything, for they tended to involve sums of money larger than I would ever be able to comprehend.

Thus, the task the drafters faced was this: We could be quite certain that the rules we were drafting would have to apply to transactions that we had not contemplated, and we could be fairly certain that some of these uncontemplated transactions would be of far greater economic significance than any of the ones we did think about. Only time will tell whether the approach taken to this challenge will succeed. There was, however, a very deliberate approach. In a nutshell, it was this: Base the rules on general structural factors rather than on factors specific to particular transaction patterns or specific categories of actors. Thus, as has been discussed above, the key perfection and priority rules are based upon the general structural principle that a person who is in a position to have securities held by a debtor disposed of without further act of the debtor should be able to rely on those securities as collateral without concern that the debtor may have granted a conflicting interest to some other party. To be sure, an essential part of the drafting process was to assess the wisdom of the general structural rules as applied to particular transactions. Obviously, a general structural rule that generates unsettling results as applied to a wide variety of specific transactions is not a very good general rule. Yet in this revision project, the fact that one might devise a rule for a specific transaction pattern that, in that specific context, seems to generate more satisfying results than the general rule under contemplation was not taken to be a good reason for rejecting the general rule.

One way of assessing the wisdom of this approach is to consider what might have been gained or lost had the drafters taken a different tack and tried to treat various issues by transaction specific rules. Let us, then, consider **\*1485** several specific issues where it seems plausible that such alternative approaches might have been employed.

## 1. Would a Purchase Money Security Interest Priority Rule Serve Better than Rules Based on the Control Principle?

It was noted above that the control principle provides a simple basis for the rules needed to assure legal certainty for systems designed to control risk in the securities settlement process. It may be observed that some of the transaction patterns in which

security interest arrangements are used to facilitate the settlement process could be described in traditional Article 9 terms as a form of purchase money financing. For example, a clearing bank that advances the funds to enable its dealer customer to make payment for the securities, or a broker that takes a security interest in its customer's securities to secure the customer's obligations to pay the purchase price, could be described as holding a purchase money security interest in the collateral. The traditional purchase money security interest rules would, however, provide an inadequate foundation for the wide variety of security interest arrangements that may be encountered in securities settlement arrangements. The traditional purchase money security interest rules assume that one can implement arrangements to finance the debtor's acquisition of property in such a fashion that it is possible to match a specific advance of funds with the exact item of property acquired with that advance of funds. Even in low-volume, low-speed transactions involving physical goods, that aspect of the purchase money security interest concept has proven rather problematic, as is illustrated by the complexities of the case law on the so-called "transformation" issue and related problems. [82] Accordingly, it seems highly unlikely that one could provide the legal certainty necessary for high-volume, rapid transactions of the sort involved in securities settlement arrangements by an adaptation of the traditional purchase money security interest concept. One of the key elements in the design of clearance and settlement systems and systems for the control of systemic risk in securities settlement is that one must address the relationships between parties on an aggregate, net basis. Thus, at a very fundamental level, the traditional purchase money security interest rules are out of sync with the ways that security interest arrangements are likely to be used in clearance and settlement systems. By contrast, the control concept is **\*1486** well-suited to modern securities settlement arrangements. Under the control priority concept, an entity that is advancing funds or other value to enable settlement of the funds side of securities transactions can put in place systems under which it monitors the aggregate levels of the credit it is extending, and matches those credit levels against the aggregate value of the collateral to which it is looking for assurance of payment--provided only that the entity extending the credit is holding the collateral in such fashion that it can be liquidated without further act of the parties to whom it is extending the credit.

## 2. Are There Better Alternatives to the Rule Giving Intermediaries Priority over Other Secured Parties?

The Section 9-115(5)(c) rule that gives a security interest held by an intermediary priority over a conflicting control security interest granted to another secured party by the intermediary's customer provides another useful test case for assessing the wisdom of the approach of adopting general structural rules rather than seeking to fine-tune the rules to specific transaction patterns. As was noted above, this rule is needed only for a rather narrow category of situations. By hypothesis, the situations covered by this rule are ones in which the competing claimants did, at the outset of the transaction that gave rise to the contest, sit down and bargain over an agreement concerning the transaction. Accordingly, the parties had the opportunity to adjust their priorities by agreement in whatever fashion they may have wished. The function of a priority rule in such circumstances is merely to furnish a default rule that will not produce problematic consequences in cases where, for some reason, the parties have neglected to arrange matters by agreement. One approach to a statutory drafting problem of this sort would be to establish a baseline default rule of equal priority--an approach that the 1994 revision does adopt in certain other circumstances. [83] If, however, there are circumstances in which it seems clear that one or the other of the potential claimants should have priority, then it is probably a far safer course to specify that as the default rule.

There are a number of circumstances in which it is quite clear that the appropriate outcome, as a matter of policy, is that the intermediary has **\*1487** priority over an external control lender. Suppose, for example, that a debtor who holds securities through a broker or bank custodian grants a security interest to an external lender, the external lender obtains an agreement in which the intermediary agrees to act on instructions from the external lender, but the debtor is permitted to continue to trade. Suppose that the debtor enters an order through the intermediary for the purchase of securities and the securities are credited to the account, but the customer does not make payment to the intermediary. It seems quite uncontroversial to say that the intermediary's right to "undo" the entries crediting the securities to the customer's account should not be prejudiced by the fact that the external lender was to have first claim to the securities if the debtor had indeed paid for them. Indeed, if that result did not obtain as a matter of the default rules on the priority of an intermediary's lien versus an external lender's lien, the result would very likely be that intermediaries would establish more cumbersome accounting mechanisms designed to ensure that no entries were made that could be construed as crediting the positions to a customer's account until final payment had been received.

The default rule that a security interest granted to one's own intermediary has priority over a security interest granted to an external control lender is particularly significant as applied to security interests in commodity contracts. A customer who carries commodity futures contracts in an account with a commodity broker is not really purchasing discrete assets that are held by the commodity broker on the customer's behalf. Rather, the customer is entering into a contract with the commodity broker to buy or sell a commodity at a set price for delivery at a future time, under an arrangement in which the fluctuating value of that future right is adjusted on a daily basis by credits or debits to the account. [84] When a commodity customer grants a security interest

to an external lender in the commodity futures contract, the customer is assigning to the lender whatever value the contract may have, net of obligations of the customer to the commodity broker arising from the contract. The fact that the commodity intermediary has agreed to pay any net value to an assignee of its customer in the event that the price movements turn out to be favorable to the customer obviously should not be taken to imply that the commodity intermediary has given up its right to charge the customer's account for the sums that will be due from the customer in the event that the price movements turn **\*1488** out to be unfavorable to the customer. The rule that a security interest granted to one's own intermediary has priority over a security interest granted to an external control lender makes it possible to treat security interests in commodity positions in exactly the same fashion as security interests in securities positions. Section 9-115(5)(d) sets out a priority rule for commodity positions that is generally parallel to the Section 9-115(5)(c) rules for securities positions. The commodity intermediary's right to net obligations of the customer to it against obligations of it to the customer can be treated as a security interest held by the intermediary in the customer's right to receive payment from the intermediary securing the obligation of the customer to the intermediary. The intermediary need not fear that an agreement with an external lender will prejudice the intermediary's right, for the intermediary's security interest will have priority over any security interest that the customer might grant to an external lender. Whatever rule one might adopt on the securities side, the rule of priority for "internal" over "external" security interests would have to be the baseline rule for commodities positions. Thus, the simplified parallel treatment of securities positions and commodity positions that the 1994 revision adopts would not be possible if one wanted to set a different default rule for conflicts between securities intermediaries and external control lenders.

### 3. Would Priority Rules Based upon Knowledge or Notice of Prior Claims Work Better than Rules Based on the Control Principle?

It is possible to imagine some circumstances in which the results yielded by priority rules based on the general control principle seem troublesome. Suppose, for example, that Debtor grants Lender, Y, a security interest in Debtor's inventory. Y perfects by filing. The agreement between Debtor and Y provides that Debtor will turn over all proceeds of sales of the inventory to Y. Debtor sells inventory for cash and, in violation of the agreement, retains the cash, using it to purchase securities held through an account with Broker. Debtor then borrows from X, granting X a security interest in all of the securities carried in the account. X takes the necessary steps to obtain control. Debtor goes bankrupt, leaving unpaid debts to X and Y. Both X and Y have security interests in the securities account, because Y has a claim to the securities account as proceeds of the inventory. Assume that the events occur in such a fashion **\*1489** that Y's proceeds interest is perfected. [85] Under the control priority rule of Section 9-115(5)(a), X's security interest would have priority because X has control and Y does not have control. [86]

If we consider this specific fact pattern in isolation as posing a discrete problem in the formulation of the legal rules governing commercial financing transactions, there are plausible arguments of policy for a wide range of possible rules. In favor of giving X priority, one might suggest that the problem arose only because Y did not take the steps necessary to ensure that the Debtor would account for proceeds, such as establishing a lock box arrangement, and that Y should suffer the consequences. In favor of giving Y priority, one might suggest either that X could have prevented the problem by inquiring a bit more carefully about the source of Debtor's money, or one might say that this is simply one of many instances in which people who acquire property subject to prior claims are just out of luck. Given the difficulty of choosing between these two arguments, one might adopt a rule that made the outcome turn on other factors; for example, one might draw a distinction based on the extent to which X was or should have been aware of Y's interest.

This particular scenario was discussed at some length in the final deliberations of the American Law Institute on Revised Article 8. The result of those discussions was the suggestion that, although the priority rules of Section 9-115 should not be changed so that the outcome of priority questions turned upon a determination of awareness of conflicting claims, the commentary should indicate that the statement of priority rules does not necessarily preclude the possibility that, in egregious cases, a court might appropriately invoke principles of general law outside of the U.C.C. [87] to hold that persons who are otherwise entitled to priority under Article 9 are **\*1490** accountable to the victims of their misconduct. The final version of the commentary contains an extensive discussion of this point. [88]

**\*1491** The approach taken to this particular issue is supported by general principles of the law of secured transactions as well as by considerations specific to the Article 8/9 revision project. The basic problem illustrated by the inventory lender proceeds hypothetical is not really a matter of the new priority rules concerning investment property. Rather, it is a general problem that arises in any situation where the Article 9 rules establish differing regimes for different categories of secured transactions. Consider, for example, the following scenario. Debtor grants Smith a security interest in livestock, including after-acquired

property. Smith perfects by filing. Thereafter, Debtor grants Jones a security interest in equipment, and Jones perfects by filing. Debtor then swaps a tractor for a cow. Smith has a security interest in the cow under the after-acquired property clause; Jones has a security interest in the cow as proceeds of the tractor. There being no special rule for such cases in Article 9, the dispute is presumably governed by the general rule of Section 9-312(5). Thus, Smith has priority over Jones because Smith filed before Jones. Nothing in Article 9 suggests that before applying the Section 9-312(5) priority rule to a case such as this, one must determine whether Smith may have been aware of the fact that the cow that became subject to Smith's lien was the proceeds of a tractor in which Jones had a perfected security interest. Quite to the contrary, numerous cases have held that a secured party is not disqualified from priority under Section 9-312(5) by knowledge or notice of a prior conflicting security interest.[89] Cases have also explicitly considered and rejected the argument that courts should regard the statutory omission of mention of knowledge as inadvertent and use the general requirement of good faith performance to imply a knowledge component to the Article 9 priority rules.[90] Cases under present Article 9 do, however, suggest that in circumstances **1492** of egregious misconduct, it may be appropriate to look to other law;[91] that is, the fact that the specific means by which one commits a tort happens to involve acquisition of a security interest does not insulate one from tort liability.

In the specific setting of the objectives of the 1994 revision project, there are additional reasons to doubt the wisdom of including knowledge or notice as an explicit factor in the priority rules. As has been explained above, the general structure of the secured transaction rules of the 1994 revision is based on what I have termed the "control principle," that is, the notion that a person who is in a position to have securities sold off without further action by the debtor should be able to rely on those securities as collateral without fear that the debtor may have granted a conflicting interest to another party. As is also explained above, rules based upon this control principle work very well in a very wide range of transactions. If one limits one's attention to a particular sort of case, such as the proceeds hypothetical here under consideration, it is tempting to suppose that one could retain the general structure of the rules based upon the control principle and make a slight improvement by adding a subsidiary principle that the outcome of the general control principle might in some cases be affected by knowledge, notice, or some other standard of awareness. It is, however, unlikely that any such simple "fine-tuning" would be feasible. Some of the concerns that would be presented by an effort to adjust the control priority rules in this fashion are rather familiar; for example, any priority rule that turns on the competing claimants' awareness of potential conflicting claims is necessarily less certain than a rule that does not do so, and any such priority rule must deal not only with egregious cases where one of the claimant's conduct seems close to theft, but also must specify precisely what standard of awareness suffices to disqualify one from protection.

There is, however, an even more fundamental problem with any effort to adapt the control priority rule to take account of knowledge or awareness. The suggestion that priority rules should not protect those who act **1493** with knowledge of a prior claim assumes that one can decide what counts as a prior claim. Rules that take account of knowledge or awareness are predicated on the assumption that the fundamental rules are temporal, that is, one assumes that the baseline rule is "first in time, first in right." Then, one says that in certain circumstances a later in time claim may prevail, unless the later claimant had some degree of guilty awareness of the earlier claim, in which case one reverts to the baseline first in time rule. The secured transactions rules of the 1994 revision, however, are not temporal rules. Note, for example, that in all of the hypothetical cases discussed in this Article as illustrations of the new secured transaction rules, it has never been necessary to determine the temporal order of the conflicting claims in order to resolve the case. That is by no means unintentional. One of the basic assumptions of the 1994 revision was that under modern conditions it would be counterproductive, if not futile, to attempt to devise legal rules based upon the notion that individual securities can be regarded as discrete items, so that one can follow the passage of individual items through the securities settlement system in the fashion necessary to apply traditional property concepts. That is precisely what one must do if one wishes to adopt temporal rules, and unless one adopts temporal rules, then one cannot make adjustments based on awareness of prior claims.

## VI. Revised U.C.C. Article 8 and the Individual Investor

Although Revised Article 8 has generally received favorable reviews from the standpoint of modernization and clarification of the commercial law foundation of the modern complex system of securities holding through intermediaries, concerns have been expressed that in the effort to provide a modern law for the securities markets the drafters may have lost sight of other goals--goals of simple fairness and concern for the common investor.[92] That sense of unease is largely attributable to misunderstandings about the scope of Revised Article 8, about the state of present law, and about the impact of commercial law rules on investors risks. The balance of this Article will endeavor to provide the perspective that will enable one to see that enactment of Revised Article 8 would not in any fashion **1494** adversely affect the interests of individual investors or change current law in a fashion that is prejudicial to the interests of individual investors.

## A. Revised Article 8 Deals with the Custodial Function

Early in this Article, it was noted that to understand clearance and settlement reform initiatives, it is necessary to analyze with some care the different aspects of a securities transaction. Similarly, to understand the impact of Revised Article 8 on the relationship between customers and their brokers, one must carefully analyze the different roles performed by securities firms.

There are at least three different functions that the firms we call stockbrokers commonly perform for their clients: (1) the investment advisory function, (2) the trade execution function, and (3) the custodial function. For most purposes, there is no occasion to think about the difference among these, nor is there anything about the common sequence in the conduct of a retail transaction that would bring to one's attention the fact that different functions are being performed. You get a call from your broker giving you a recommendation, you tell the broker that you do want to buy, and a few days later you get a statement showing that the securities have been credited to your account and the purchase price has been debited from the money market account linked to your account where you keep your liquid balances. It all looks and feels like one simple transaction. There are, however, other common arrangements in which these different functions are performed by different entities. An investor such as a pension fund, for example, might use A as its investment advisor, B as its broker, and C as its securities custodian. From A, the pension fund obtains advice about what investments to buy, sell, and hold, or the fund may delegate actual decision making authority to A. From B, the pension fund obtains the service of entering into contracts for the purchase and sale of securities with others through the facilities of the various securities markets and exchanges. From C, the fund obtains the services of safekeeping of the securities, as well as related services such as monitoring and arranging for the collection of dividends and distributions, watching for calls or conversion opportunities, and the like.[93] For purposes of Revised Article **\*1495** 8, the important point is to distinguish the custodial function from the other roles played by securities firms, for even in an arrangement in which these functions are all performed by the same entity, the indirect holding system rules in Revised Article 8 come into play only with respect to the custodial function.

There is an old quip in the securities business that securities are not bought, they are sold. Much of securities regulation law is a response to the inherent divergence of interest between securities firms and their customers captured, or caricatured, in that quip. A major reason that we need special legal rules to protect investors is that securities firms are salespeople, and they are selling products that are hard to understand and evaluate. Inasmuch as they are paid on commission, there is an obvious potential for divergence of interest between the customer and the firm. That is why securities brokers are carefully regulated, and that is the part of the relationship that remains perennially troublesome. The characteristic disputes between customers and securities brokers that end up in arbitration or litigation arise out of this divergence of interest--customers' contentions that the broker advised them to buy securities that were unsuitable for their investment objectives, or that the broker failed to provide adequate information about the securities or provided inaccurate information, or that the broker "churned" the account to generate commissions, or that the broker exercised discretionary trading authority improperly or without authority. To put it in very colloquial terms, the customer's classic beef is, "You sold me junk."

Suppose that a customer uses two different institutions in securities dealings: Broker provides investment advice and trade execution, but the customer's securities are carried in an account with Custodian. In such an arrangement, the firm in a position to be guilty of "selling junk" is Broker. All that Custodian does is perform the mechanical operation of processing the trades and holding the securities that Broker persuades the customer to buy. If the customer is going to have problems, chances are pretty good that the problem is not going to be that Custodian does not have the securities that Broker persuaded Customer to buy. Quite the contrary, the problem is that Custodian does have exactly the securities that Broker persuaded the customer to buy.

Revised Article 8 has nothing to do with the selling relationship between securities firms and their customers. Thus, enactment of Revised **\*1496** Article 8 will not in any fashion change the law concerning the responsibilities of securities brokers to their customers on this most critical aspect of the relationship.

Although the distinction between the custodial function and other roles performed by brokers is fundamental to Revised Article 8, it is easy to see how a person unfamiliar with Revised Article 8 could easily be led to the mistaken impression that the new indirect holding system rules implicate matters of the sort that genuinely do raise significant concerns about protection of the interests of individual investors in their relationship with brokers. That mistaken impression is an unfortunate, but probably unavoidable, consequence of the basic drafting structure of Part 5 of Revised Article 8. Relatively early in the drafting process, the decision was reached to eschew the approach of trying to squeeze the analysis of the property interest of a person who holds securities through an intermediary into old legal concepts, such as bailment. Instead, Revised Article 8 describes the

investor's interest as a sui generis form of property interest, and states its commercial law attributes directly. That decision about basic drafting approach yielded a rather challenging definitional task. One could not define the custodial relationships that Revised Article 8 covers by conventional terms, such as "one person holding securities on behalf of another" or "one person having possession of securities that belong to another." Instead, one had to find a way of identifying the covered transactions in functional terms. That is the purpose of Sections 8-504 through 8-508. These rules specify the core of the package of rights that make up a security entitlement. These sections are best thought of as definitional; that is, a relationship which does not include these rights is not the kind of relationship that Revised Article 8 addresses. Because these sections take the form of statements of the duties of an intermediary toward its entitlement holders, one must be careful to avoid a distorted perspective on what Revised Article 8 is and is not designed to do. Revised Article 8 is not, and should not be, a comprehensive body of private law governing the relationship between brokers and their customers. Nor is Article 8 a body of regulatory law to police against improper conduct by brokers or other intermediaries. Many, if not most, aspects of the relationship between brokers and customers are governed by the common law of contract and agency, supplemented or supplanted by federal and state regulatory law. Revised Article 8 is not intended to take the place of this body of private and regulatory law.

Inasmuch as Revised Article 8 deals with the essentially ministerial, record-keeping function of securities custodians, it articulates the applicable legal rules in terms appropriate to such functions. If Article 8 were a comprehensive **\*1497** body of law dealing with the obligations of securities professionals to their customers, it would look and feel very different, as do the bodies of law that in fact govern those matters, such as federal and state securities regulation or the private law dealing with the obligations of brokers as agents for their customers in buying and selling securities. Indeed, one of the main reasons to insist upon a fairly sharp division between the custodial function governed by Revised Article 8 and the other functions of securities professionals not treated by Article 8 is to assure that the rules and approaches appropriate to the ministerial role of a securities custodian will not be misinterpreted as bearing upon the obligations that securities firms incur by performing nonministerial functions.

## B. Rules Protecting Securities Intermediaries Against Adverse Claim Liability

A good example of the point that one cannot decide whether a given rule is good or bad for investors merely by asking whether it imposes liability on intermediaries or exonerates intermediaries from liability is Revised Section 8-115. This Section protects securities intermediaries against possible liability to persons having adverse claims to securities positions carried through that intermediary. The general rule under Section 8-115 is that an intermediary is not liable to an adverse claimant except in extreme cases where the intermediary "acted in collusion with the wrongdoer in violating the rights of the adverse claimant." Short of that, the intermediary is privileged to carry out instructions unless the claimant obtains a court order enjoying the intermediary from so acting.

Is this an instance of the failure of Revised Article 8 to strike the proper balance between the interests of investors and the interests of securities professionals?[94] Clearly it is not. Here, as in so many issues within the limited scope of Article 8, we are not dealing with a matter on which the interests of providers of financial services and users of financial services diverge. More liability for intermediaries does not mean more protection for investors. Quite the contrary, the sole reason for the rule exonerating intermediaries from liability is to ensure that intermediaries will perform the functions that customers wish them to perform.

Consider an example of the type of case to which Section 8-115 might apply: John Smith, having spent his life developing a small business, decides to retire and sells the business to MegaFirm. Smith invests the proceeds **\*1498** of the sale in securities carried through an account with Broker. Some years later, regretting the purchase, MegaFirm asserts a right to rescind on the basis of fabricated assertions that Smith misrepresented the financial condition of the business. Learning that Smith holds the proceeds of the sale in his brokerage account, MegaFirm sends notice to Broker demanding that Broker freeze Smith's account and hold it for them. MegaFirm contends that, because of Smith's asserted fraud, he holds the proceeds of the sale in constructive trust for MegaFirm.

Old Article 8 did not provide protection to an investor such as Smith in such a scenario. If MegaFirm's contention that Smith induced the purchase of the business by fraud were correct, then MegaFirm might well have a right to reach the proceeds on a constructive trust theory.[95] If so, then MegaFirm has an interest in the securities carried in Smith's account with Broker that might form the basis for an action against Broker in conversion or the like if Broker ignores MegaFirm's contention and continues to honor Smith's instructions concerning the account. The only provision of old Article 8 that might apply here was Section 8-318 which provided that an agent who disposes of securities at the direction of its principal was not liable in conversion

if the agent acted "in good faith (including observance of reasonable commercial standards . . .)." It is hard to see how a lawyer could advise Broker that it could safely rely on that provision in a case such as this where Broker has received actual notice of the assertion of an adverse claim. [96]

Under Revised Article 8, the outcome in such a case is clear. If a person asserting an adverse claim to a customer's account wants to preclude the customer's securities intermediary from acting on the customer's instructions, the claimant has to get a court order. Merely sending a notice or demand would not suffice, because Revised Section 8-115 makes it clear that an intermediary's liability to an adverse claimant is not based on a notice standard.

It is very difficult to understand how one could conclude, after due consideration, that Section 8-115 is prejudicial to the interests of investors. If a person holds wealth in any form other than a securities account, such as valuable chattels or certificated securities, third parties seeking to reach  **\*1499**  the person's property to satisfy asserted claims would need a court order. Section 8-115 simply assures that investors who hold their assets through intermediaries do not lose the usual protections against nonjudicial seizures of their property. Rules permitting creditors or other claimants to seize a person's property without judicial process have not commonly been thought to be pro-consumer.

Though the suggestion that the rule of Section 8-115 is prejudicial to investors will not withstand scrutiny, it is not difficult to see how one might form that sort of impression on an initial casual read of the statute. In the setting of federal securities law or related state statutory or common law concerning the obligations of brokers as salesmen of securities, it is probably a safe bet to suppose that any rule that takes the form of "a broker is not liable if . . ." is a rule that bears careful examination from the standpoint of investor protection. Open textured legal rules that recognize the ethical obligations of parties to understand, investigate, and take account of the interests of others with whom they are dealing play an important role in bodies of law dealing with the duties of sellers or buyers of property and advisers to sellers and buyers. It is, for example, well settled that a securities firm does have an obligation to consider the suitability of investments for its customer's circumstances when it is acting in the role of a salesman seeking to persuade the customer to buy and sell. In that context, rules limiting brokers' liabilities are likely to be rules that favor the interests of securities professionals over the interests of investors. That perspective, however, is entirely inapt as applied to a body of law such as Article 8 that deals with completely different matters.

The indirect holding system rules of Revised Article 8 do not deal with the role of brokers as salesmen, they deal with the role of brokers and others as custodians, or, to drop the somewhat physical sounding metaphor, the role of securities intermediaries as ministerial record-keepers in a system for recording and transferring property interests based upon accounting entries. The general tenor and approach of a body of property transfer rules is, and should be, quite different from the general tenor and approach of a body of law that deals with the obligations of buyers and sellers of property to each other or the obligations of professionals engaged in the business of advising others in their decisions about whether to buy or sell property. One would not, for example, want to establish rules concerning the obligations of the keepers of the real estate recording system on the basis of an assumption that the clerks in the registry of deeds should take care to assure that recorded real estate transfers not be used to perpetrate schemes to defraud or otherwise cause injury to innocent parties. The expectation is,  **\*1500**  and should be, that the keepers of the real estate recording system will promptly, efficiently, and carefully record whatever documents are presented to them. The same approach is appropriate for the legal rules governing the mechanics of the system of securities holding through intermediaries. The principal objectives of such a body of law should be to assure that the record-keepers can operate the system rapidly, efficiently, and at low cost, and that investors can be assured that their record-keepers will, promptly and without question or inquiry, implement changes in the records at the direction of the customer. To be sure, even in the law dealing with the duties of ministerial record-keepers, there may be need for an "escape valve" provision for egregious cases. Fairly early in the drafting process, a general consensus emerged on the appropriate standard in this setting. Expressed in very colloquial language, the notion was that intermediaries should not be exempt from liability if they acted "in cahoots with" their customers, but should not be placed in the position that they act at peril of liability to third parties for simply carrying out their ordinary function of following the directions of their customers. Lengthy consideration was given to how one would state this notion in statutory language.

In particular, a great deal of consideration was given to whether a rule based on some suitably high level of awareness of adverse claims would do the job. Numerous difficulties were encountered. A clearing corporation or other intermediary involved as a record-keeper in the settlement system is certainly aware of the fact that its customers are frequently acting as intermediaries for their own customers. In that sense, the record-keeper is always aware of the fact that its customers are dealing with property in which third parties have some interest. Thus, it is not enough to speak of awareness of the fact that third persons have an interest; one must speak of awareness of the fact that the particular transfer is wrongful as against those third persons. Beyond that, one

must distinguish possible awareness that someone asserts something from awareness that the assertion is, or is likely to be, true. One certainly does not want to establish rules under which any time an assertion is made, or rumor spread, that someone is or may be acting wrongfully, the record-keepers in the settlement system have to treat the situation as if that assertion or rumor were true, or otherwise act at their peril. Moreover, in formulating a rule that will be applied in litigation, one must deal with the unavoidable consequences of the fact that the only cases that go to litigation are the ones where something did, in fact, go wrong. For example, suppose that an intermediary acting as conduit or record-keeper has heard an assertion of wrongdoing, or otherwise has received information consistent with the possibility that wrongdoing has occurred. It may be that nine times out of ten or ninety-nine times out of a **\*1501** hundred, those sorts of assertions or rumors prove to be unfounded, but the only cases where there will be occasion to apply the legal standard will be the one in ten or one in a hundred where the assertions turned out to have had some foundation. If Person A knows that someone asserts Proposition X, and Person A knows some of the facts that led that other person to believe Proposition X, and if it later turns out that in fact Proposition X was true, Person A may have difficulty explaining why it should not be concluded that Person A was aware of Proposition X.

Perhaps some way might have been found to deal with the problems that one encounters in an effort to use an awareness standard for record-keeper liability. Yet, it became apparent that there was a much simpler solution. A consensus had already emerged that the objective was to find a legally precise way of expressing the general notion summed up in the colloquial phrase "acting in cahoots with." Why not just say that, albeit using standard English rather than slang. Thus was born the "collusion" standard for "conduit" or "record-keeper" liability now set out in Revised Section 8-115. As the comments to that section explain, the effect of the collusion standard is to treat intermediaries in the same fashion as anyone else who is charged with having taken part in wrongful conduct. Under general principles of tort law, a person who acts in complicity with a tortfeasor may incur liability to the person harmed by the tortious conduct. For similar reasons, if a customer's action in transferring or otherwise disposing of securities is genuinely wrongful against another party, and the customer's intermediary acts in complicity with the customer in committing that wrong, the general nonliability of Section 8-115 would not apply.[97]

Section 8-115 is a good illustration of the fallacy of assuming that there is an inherent conflict between systemic concerns about efficient operation of the securities clearance and settlement system and concerns about fairness in the treatment of individual investors. As the foregoing explanation shows, the rule in Section 8-115 is exactly the rule that one **\*1502** would adopt if one contemplated rules for the indirect holding system solely from the perspective of the relationship between a retail customer and securities broker with whom the customer maintains a modest-sized account for investment of a retirement nest egg. The wisdom of the Section 8-115 rule, including the collusion standard, is even more apparent if one contemplates its application to relationships at the level of clearing corporations and other upper-tier intermediaries.

Suppose, for example, that a major bank or securities dealer ("Troubled Firm") encounters serious financial difficulties and rumors begin to spread that the firm may soon fail. Other major players are likely to look quite carefully at the state of their relationships with Troubled Firm. Some ("Creditor Firms") may find that they are likely to have large creditor claims against Troubled Firm in the event of its failure. Others ("Trading Counterparties") may find that their only dealings with Troubled Firm are the usual relationships that arise in the course of securities trading and settlement, so that if all of their trades with Troubled Firm do settle, they will have no significant exposure in the event that the firm fails. The Creditor Firms will be anxious to take any possible steps to improve their positions. As any lawyer knows, it is not all that difficult for a creditor to devise a plausible contention that the debtor not only owes money, but is wrongfully holding property that should be turned over to the creditor. Suppose, then, that a Creditor Firm fires off a notification to a clearing corporation or other intermediary through whom Troubled Firm holds securities, asserting that securities that Troubled Firm is carrying in that account are held in constructive trust for Creditor Firm. The securities in question would otherwise be delivered to Trading Counterparties in settlement of Troubled Firm's open trading commitments. What is the clearing corporation supposed to do? If the applicable legal standard is that an intermediary is potentially liable to adverse claimants if the intermediary follows the customer's instructions in circumstances where the intermediary knows or has notice of an adverse claim, then one can imagine the clearing corporation concluding that it is not safe to proceed with settlement of Troubled Firm's trades. It is, of course, not the clearing corporation that suffers as a result of that rule, but the Trading Counterparties whose trades with Troubled Firm do not settle. Legal rules that do not insulate intermediaries **\*1503** from adverse claim liability are rules that create systemic risk.[98] That is the main reason for the rule of Section 8-115.

## C. Agreements Concerning the Statutory Duties of Securities Intermediaries

During the process of review of Revised Article 8 in the individual states, some concern has been expressed about the provisions in Sections 8-504 through 8-508 that permit agreements to specify the manner in which a securities intermediary will perform

the duties stated in those sections. The basic problem to which these provisions are addressed is a recurring one in the drafting of commercial statutes--for which it is unlikely that any entirely satisfactory solution will ever be devised--of providing the flexibility necessary to adapt general rules to particular circumstances in a fashion that does not rob the general rules of any core content. Some reviewers have wondered whether it might not have been preferable to have stated that the intermediary has a duty of "reasonable care" and that this duty cannot be varied by agreement. That approach was considered during the drafting process. Ultimately, however, the conclusion of the Drafting Committee was that a different formulation was preferable, both from the standpoint of protection of the expectations of investors and from the standpoint of ensuring that the statutory rules will provide sufficient  **\*1504**  flexibility so that new arrangements can be accommodated within Revised Article 8.

The drafting approach used in Sections 8-504 through 8-508 is as follows: First, the statute states the basic core duty of the intermediary, such as the Section 8-504 duty to "have the securities" or the Section 8-505 duty to pass through dividends and distributions. In each case, the statutory duty is stated in categorical terms, such as the intermediary "shall promptly obtain and thereafter maintain a financial asset,"[99] or "shall take action to obtain a payment or distribution made by the issuer . . . ."[100] Then, each section provides a standard by which performance of this duty is to be measured. The first prong of the performance standard specifies that the intermediary satisfies the relevant statutory duty if the intermediary "acts with respect to the duty as agreed upon by the entitlement holder and the securities intermediary."[101]  The second prong states that if there is no agreement specifying the manner of performance, the intermediary satisfies the duty if the intermediary "exercises due care in accordance with reasonable commercial standards to [satisfy that duty]."[102]  Finally, Section 8-509 contains a general rule that "if the substance of a duty imposed upon a securities intermediary by Sections 8-504 through 8-508 is the subject of other statute, regulation, or rule, compliance with that statute, regulation, or rule satisfies the duty."[103]  Overlaying all of these provisions is the general provision, stated in Section 1-203 of the U.C.C., that "every . . . duty within this Act imposes an obligation of good faith in its performance." Under the formulation used in Revised Article 8, the duty of good faith performance plays a key role in assuring that agreements are not  **\*1505**  used in an abusive fashion in this context. For precisely that reason, the Drafting Committee decided after long discussion to adopt in Article 8 the definition of good faith that incorporates the requirement of "observance of reasonable commercial standards of fair dealing."[104]

To be sure, there would be good cause for concern if the formulation used in these sections had the result of permitting intermediaries to exonerate themselves from the consequences of their own neglect or wrongdoing by including general exculpatory language in the fine print of boilerplate provisions of retail-level customer agreements. Fairly read, the Revised Article 8 provisions have no such effect. Quite the contrary, the relevant provisions are at least as protective of the position of individual investors as is current law.

It is a bit difficult to state precisely how these matters would be treated under current law. Insofar as one can tell from reported decisions, this is just not a problem. The absence of litigation is not all that surprising. One of the main reasons for the development of book-entry systems of securities holding is to eliminate the problem of loss or theft of paper certificates. Other forms of custodial error are, of course, still possible in a book-entry environment, such as failure to identify or properly exercise conversion privileges and the like, but these matters too seem not to have generated any substantial body of case law. Various plausible surmises might be advanced for the absence of reported decisions on these issues. It may be that the disputed issues in litigation are merely factual questions about whether the custodian did in fact commit some error. In those cases where it is clear that the custodian did commit some error, it may be that the custodian realizes both its legal obligations and its economic self-interest in business reputation dictate that the custodian make good any loss the customer may have incurred.

Presumably, though, the relationship between a securities custodian and its customers would be analyzed under current law as an aspect of the common law of bailment.[105]  Under general bailment law, a bailee for hire has a duty to exercise reasonable care to protect and preserve the property,  **\*1506**  taking account of the circumstances of the bailment and the nature and value of the property.[106] It is, however, equally well-settled that, by a specific agreement, the parties to a bailment can vary the extent of the bailee's responsibility, either increasing or diminishing it, so long as the agreement does not contravene public policy.[107] Although the principle that an agreement can vary the default standard of reasonable care necessarily means that there are circumstances in which a bailee can disclaim liability for simple negligence, the public policy limitation does impose some restraints on contractual disclaimers. An agreement in which a bailee sought exemption for its own fraud or other intentional wrong would certainly be held to violate public policy, and an agreement that exempted the bailee from liability for its own gross negligence would, in most circumstances, probably also violate public policy.[108] As one would expect, the outcome is

likely to be significantly affected by the nature and circumstances of the agreement. A fine print legend on the back of a hat-check ticket is not likely to be treated in the same fashion as a carefully negotiated agreement between commercial entities.

I can recall no discussions during the Article 8 revision project in which it was suggested that the restrictions that current law presumably places on exculpatory provisions in custodial agreements needed to be changed. The reason that the provisions about agreements were included in the Part 5 rules was not to change something that had been perceived as a problem, but to assure that the enactment of Revised Article 8 did not create a new problem. As noted above, bailment law provides flexibility to assure that a bailee's duty can be adapted by agreement to special circumstances, but also includes limits to prelude abuse of that contractual flexibility. Moreover, current bailment law does not seek to draw the line between permissible and impermissible agreements by stating a specific nonvariable standard of care. Under Revised Article 8, the relationship between a securities custodian and its customer is no longer treated as an aspect of common law bailment. Rather, the relationship is defined by the statement of the statutory duties of an intermediary in Part 5. Thus, it was thought necessary also to include in the statute an analog of the provisions of current law concerning contractual variation of a bailee's common law duties.

 **\*1507**  As applied to cases where no agreement specifies the details of the intermediary's duties, there is probably no difference in result between current law and Revised Article 8. The Revised Article 8 formulation begins with a general categorical obligation but then adds a performance standard specifying that the intermediary satisfies its duty if the intermediary's action to perform that duty constitutes "due care in accordance with reasonable commercial standards." [109]  This degree of variation from a standard of absolute liability is warranted both by analogy to common law bailment concepts and by the fact that unusual circumstances that preclude an intermediary from performing its usual functions do sometimes occur. For example, during my work on the Article 8 revision project, I recall hearing an anecdote about a shipment of paper certificates being transmitted by air freight on a plane that also happened to be carrying some toxic substance. The toxic parcel ruptured, whereupon health authorities quarantined the plane and all its cargo. While the Revised Article 8 performance standard of "due care in accordance with reasonable commercial standards" would certainly excuse an intermediary from its usual obligation of prompt delivery of certificated securities in a case like that, it is worth noting that the Revised Article 8 formulation is not the equivalent of a standard that would absolve an intermediary from responsibility for all accidents. "Reasonable commercial standards" in this context would mean the standards of professional securities custodians, whose principal reason for existence is to provide, for a fee, a level of expertise in securities processing that avoids or minimizes the risk of accidents.

To understand the other prong of the "agreement/due care" performance standard, one must parse the statutory language carefully. Under Revised Article 8, the starting point in the analysis of an intermediary's obligation is not a general standard of "reasonable care," "ordinary care," or the like. Rather, the starting point is the categorical statement of the relevant statutory duty, such as the Section 8-504 duty to obtain and maintain sufficient assets. [110]  That is the statutory duty to which the obligation of good faith performance attaches. Making an agreement specifying the details of the intermediary's duties and performing in accordance with that agreement would be a method by which the intermediary seeks to carry out its statutory duty. Whether action taken in accordance with such an agreement is sufficient depends on whether that action can be said to satisfy  **\*1508** the obligation of good faith performance of the underlying statutory duty. [111]

As is noted in the commentary to the good faith performance provision of the Restatement of Contracts, a core element of the concept is "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." [112] Thus, in the context of the statutory duties of securities intermediaries articulated in Revised Article 8, good faith performance must be tested by reference to the purpose of the arrangement and expectations of the parties. One of the central points of the indirect holding system rules of Revised Article 8 is the recognition that a person who holds securities through an intermediary has a package of rights that can be asserted directly only against that intermediary. The necessary concomitant is that the intermediary is obligated to take appropriate action to ensure that the customer does obtain the benefit of the economic and other rights that comprise ownership of the security. The ordinary expectation of an investor who holds securities through an intermediary is that the arrangements between that investor and the issuer will be, for all practical purposes, essentially transparent. To be sure, an investor who holds through an intermediary does incur certain risks different from those faced by an investor who holds directly, such as the risk that one's intermediary will fail having absconded with the property. The present point, however, is not the consequence of nonperformance of an intermediary's duties, but what counts as performance of those duties. In that setting, the investor's ordinary expectation is that the intermediary will do whatever needs to be done to assure that the investor enjoys the benefit of ownership of the securities. That is the expectation by reference to which good faith performance must be tested.

As applied to agreements concerning retail level arrangements in which individual investors leave ordinary, garden-variety securities in the custody of their stockbrokers, Revised Article 8 certainly provides at least as great protection against abusive use of exculpatory provisions in standard **\*1509** form agreements as does current law. In the first place, the provisions of Sections 8-504 through 8-508 that permit specification of an intermediary's duty by agreement presuppose that the agreement in question is enforceable as a matter of the general contract law. [113] Thus, if the contract law of a particular jurisdiction includes general principles limiting the effectiveness of disclaimers of liability in standard form contracts, nothing in Revised Article 8 would preclude application of those principles to an agreement between an intermediary and an entitlement holder concerning the intermediary's duties. Moreover, even if a particular jurisdiction has not addressed such issues as a matter of general contract law, the manner in which the Revised Article 8 rules themselves are drafted provides a fully adequate basis for policing against abusive use of exculpatory language. The question is not simply whether the agreement disclaims responsibility, but whether in the particular circumstances an agreement that does disclaim responsibility can fairly be treated as good faith performance of the statutory duty in question. [114]

The advantage of the formulation used in Revised Article 8 is that it provides adequate protection against abuse without erecting an obstacle to the development of nonstandard custodial arrangements. One can imagine various circumstances for which a custodial customer and securities intermediary might wish to include provisions in their agreement specifying that the custodian's duties are to differ in some respect from those customarily undertaken by securities custodians with respect to ordinary securities. Suppose, for example, that a custodial customer wishes to have its securities custodian carry in its account a particular category of foreign securities, and **\*1510** the custodian discovers that the only way in which it can carry those securities is through a particular local depository or custodian located in a foreign jurisdiction. As a general matter, the duty of care of a securities custodian would include exercise of care in the selection of subcustodians. [115] In this case, however, the custodian may have no realistic choice, and the only feasible subcustodian may be an entity that would not otherwise meet the custodian's usual standards for subcustodians. Similar circumstances might arise even in the domestic setting. Suppose, for example, that a custodial customer wishes to have its custodian carry in the account a security that is not widely traded, that is not eligible for deposit in the DTC depository system, and for which information on redemptions, calls, conversion privileges, or the like, is not available from the usual reporting services used by professional securities custodians. The custodian may be willing to act as custodian for such a security only if the customer acknowledges that the circumstances are such that the custodian cannot provide the customer the same level of services as it does for routine securities.

What might the consequences be for the development of nonroutine custodial arrangements if the rule in Revised Article 8 were that a custodian must in all cases exercise "reasonable care" and that this duty was not subject to variation by agreement? One possibility is that custodians would be less willing to develop custodial arrangements for unusual securities. That is hardly a desirable result. Another possibility is that custodial arrangements would have to be implemented in some fashion that sought to place them outside the scope of Revised Article 8, so that an agreement specifying the limitations on the custodian's duties would not run afoul of nonvariable rules written into Revised Article 8. That, too, would be unfortunate since it would mean continuation for such arrangements of the problems of uncertainty of legal analysis that prompted the Article 8 revision project.

Perhaps, though, nonroutine custodial arrangements would still develop even under a legal regime that imposed a nonvariable duty of reasonable care, on the theory that the concept of reasonable care is sufficiently capacious to accommodate whatever special circumstances make it impractical for the custodian to assume the same responsibilities for the unusual case as it does in the routine. Yet it is easy to see problems with that approach. The content of the concept of reasonable care is necessarily determined by expectations about the usual behavior in a given circumstance. **\*1511** For securities custodians, the expected behavior in the usual case is that the custodian will exercise its professional expertise so that paper certificates will not be lost or misplaced, accounting records will be accurate, and redemptions, calls, conversion privileges, and the like will not be overlooked. If the circumstances are such that the custodian realizes that such a level of service cannot be provided, there is much to be said for a legal regime that encourages the custodian to make that fact clear to the customer by an explicit provision in the agreement, rather than relying on the assumption that reasonable care in the circumstances would not require the usual level of performance. Moreover, it is by no means certain that it would be a good thing for investors to adopt a unitary standard of reasonable care not subject to variation by agreement. If the concept of reasonable care must become more and more flexible to accommodate novel arrangements, the possibility increases that an unscrupulous intermediary might seek to defend its own failure to exercise appropriate care in routine circumstances by pointing to a case involving nonroutine circumstances where an intermediary might be held exempt from liability.

**D. Risk of Intermediary Wrongdoing: Customers Versus Creditors and Transferees**

The provision of Revised Article 8 that is most likely to strike the casual reader as surprising or troubling is Section 8-511, entitled "Priority among Security Interests and Entitlement Holders." Subsection (b) of Section 8-511 provides that the interest of a secured creditor of a securities intermediary who obtains control of investment property has priority over the claims of the intermediary's entitlement holders in the event that the firm fails, leaving a shortfall of securities to satisfy all claimants. Initial reactions tend to run along the lines of the following:

This is outrageous! If this statute is enacted then customers will never be safe. You mean to say that if my broker goes insolvent, then the banks that lent it money will be able to come in and take away my securities! You people are either crazy, tools of the plutocrats, or both. It would be terrible if Article 8 were adopted to change the law like this. We should stick with the simple tried and true property concepts. If we need to modernize the law, that's fine, but we've got to preserve the simple basic point that if I decide to leave my securities with my broker, they're still mine. And, doggone **\*1512** it, nobody else should be able to get their mitts on them--especially not some bank that lent money to the broker.

That's the mild form.

This subject was given extensive consideration during the drafting process. The concerns that casual readers so often feel about Section 8-511 were expressed quite openly and forcefully by many lawyers who examined Revised Article 8 during the multiyear drafting process. They were a principal topic at the numerous meetings of the Drafting Committee and at the annual meetings of both the ALI and the NCCUSL at which Revised Article 8 was discussed and approved. Thus, a very large number of thoughtful lawyers, many of whom started from the standpoint of unease about the rules now in Section 8-511, have concluded after careful consideration that their initial impressions were incorrect and that the rules set out in Revised Article 8 are entirely sound from all perspectives, including that of individual investors. It may be worth noting that I count myself among this group. When I first thought about the issues covered by Revised Article 8, my initial intuitive reaction was that it would be desirable, and consistent with other law, to have a rule saying that "customers" usually or always win over "secured creditors." Yet, like virtually all the other lawyers who have examined this issue carefully, I eventually realized that this initial intuitive reaction was erroneous. [116]

 **\*1513**  The full explanation of why the initial reaction that I and others had to the rule in Section 8-511 was wrong requires a fair bit of detail concerning current law, the financing practices of the securities industry, and the relationship between commercial law and regulatory law. To summarize, the principal points are as follows:

• Revised Article 8 does not change the priority rules in a fashion prejudicial to the interests of persons who hold securities through intermediaries. Indeed, it makes no basic change in the priority rules at all.

• Revised Article 8 does not impose upon investors the credit risk of their intermediaries' proprietary operations. To the contrary, Revised Article 8 provides even greater assurance than present law that customers' claims will rank ahead of the claims of a firm's general creditors.

• Revised Article 8 does not, nor could it, eliminate theft risk, that is, the risk that an intermediary will dispose of securities that should have been held for customers and abscond with or dissipate the proceeds.

• The special priority rule in subsection (b) of Revised Section 8-511 concerning secured creditors of an intermediary who obtain control is included only because of the decision to include in subsection (a) a new rule that subordinates the claims of secured creditors of an intermediary holding perfected security interests to the claims of customers if the secured creditor does not obtain control. Aside from that point, the subsection (b) control rule is simply a routine application of finality principles well established in present law and continued in Revised Article 8.

• Changing the commercial law rules in such a fashion as would permit entitlement holders of a failed intermediary **\*1514** to recover securities from transferees, whether outright buyers or pledgees, would not work to the advantage of investors.

• Changing the finality rules to impose duties of inquiry on transferees, whether buyers or pledgees, would not work to the advantage of investors.

**1. Could Customer Protection Goals Be Achieved by a Simple Rule that the Customers Get Their Securities?**

One of the implicit assumptions of the surprise and concern that many people experience upon first encountering the Revised Article 8 provisions of these issues is that Revised Article 8 is in fact changing the law in some material way. As we shall shortly see, that is not the case. But let us set aside for the moment questions about what the current law is and how or whether Revised Article 8 changes the law, and deal directly with a more basic point that underlies the common reaction to Revised Article 8-- the notion that these commercial law rules do not give due regard to the simple point that the securities that a broker holds for its customer belong to those customers, so that any regime which allows those property rights to be defeated is a regime which does not provide adequate protection for investors. That notion has enormous intuitive appeal, but it simply will not withstand scrutiny. To see why, let us rephrase the question slightly and ask whether one could accomplish the objective of protecting investors against intermediary risk by applying as our basic principle the notion that "when a broker or other intermediary buys and holds securities for someone, those securities belong to that person and that person alone; nobody else can touch them."

When we contemplate the scenario of a broker or other intermediary having failed and leaving a shortfall in the securities needed to satisfy customer claims, we tend to think of the case as one in which the broker took "my securities" and wrongfully sold them off. That is why our attention moves immediately to consideration of the legal rules that govern whether we will be able to take those securities back from the transferee. If we are going to be realistic about the role of commercial law in protecting investors against intermediary risk, we must realize that in stating the issue in this way, we are implicitly making assumptions about the particular fact pattern and temporal sequence that might have generated that result of a shortfall in customer securities.

There is, however, no a priori reason to think that a shortfall would be the result of a wrongful disposition of securities that formerly were there. **\*1515** Suppose that at Time 1, Broker holds no shares of XYZ Co. stock. At Time 2, Customer directs Broker to buy 1000 shares of XYZ Co. stock. Broker receives the money from Customer but converts the money to itsown use and does not purchase the 1000 shares of XYZ Co. stock. If Broker fails, it will not have the necessary shares of XYZ Co. stock to satisfy Customer's claim. That is going to be the case no matter what the commercial law rules say about the assertion of adverse claims against transferees.

Next, let us consider cases where Broker does have some units of the security in question, but has an insufficient number to satisfy all claimants. Suppose that at Time 1, Broker buys 1000 shares of XYZ Co. stock for Customer 1 and holds the securities for Customer 1. At Time 2, Customer 2 directs Broker to buy 1000 shares of XYZ Co. stock. Broker receives the money from Customer 2 but converts the money to its own use and does not purchase the additional 1000 shares of XYZ Co. stock. If Broker fails, it will not have the necessary 2000 shares of XYZ Co. stock to satisfy the claims of Customer 1 and Customer 2. If we truly believe in the principle that "when a broker or other intermediary buys and holds securities for someone, those securities belong to that person and that person alone," the outcome is clear. Customer 1 gets the 1000 units; Customer 2 loses entirely. Whether one likes that result or not is likely to depend on whether one happens to be Customer 1 or Customer 2. There is, of course, absolutely no way for an actual customer of an actual broker to know whether she might be in the position of Customer 1 or Customer 2.

The potential conflict between customers of a broker and the broker's creditors presents the same sort of issues as the potential conflict among customers. Suppose that at Time 1, Broker acquires 10,000 shares of XYZ Co. common stock for its proprietary account at a time when none of Broker's customers are holding XYZ Co. common stock through it. Thereafter, Customer places a buy order for 10,000 shares of XYZ Co. common stock through Broker, to be credited to Customer's securities account with Broker. Broker takes Customer's money and falsely reports to Customer that it has purchased 10,000 shares for Customer's account, but in fact, Broker does not do so. If Broker fails, who gets the 10,000 shares, Customer or Broker's creditors? Under Revised Article 8, the answer is clear--Customer wins. [117] Under old Article 8 the answer is probably the same, though it is not quite as clear. But if we truly believe in the notion that "the securities that a broker buys and holds for someone belong to that **\*1516** person and that person alone," it seems that the creditors should win. At the time the 10,000 shares were bought, they belonged to Broker, which is to say they were assets that could and should have been used to pay the claims of Broker's general creditors. Broker never did buy any securities for Customer. As to Customer, the case is just the same as the one discussed above in which Broker never held any XYZ stock.

Similarly, under a regime of "my securities belong to me," the resolution of potential disputes between customers and secured creditors would turn on quirks of timing. If Broker buys 10,000 shares for Customer and thereafter pledges those 10,000 shares to Bank, then the simple property concepts rule would dictate that Customer wins. The shares belonged to Customer and Bank

cannot take them away. Suppose, however that Broker buys 10,000 shares for its proprietary account and pledges those 10,000 shares to Bank. Thereafter, Customer places a buy order for 10,000 shares of XYZ Co. common stock through Broker, to be credited to Customer's securities account with Broker. Broker takes Customer's money, and falsely reports to Customer that it has purchased 10,000 shares for Customer's account, but in fact, Broker does not do so. For a true believer in simple property concepts, this is another easy case. The 10,000 units belonged to Broker, and then Broker pledged them to Bank. At that point, they "belonged" to Bank, and hence fall under our simple rule that "when a broker or other intermediary buys and holds securities for someone, those securities belong to that person and that person alone." Accordingly, Customer cannot take away Bank's property any more than Bank could take away Customer's property in the previous example.

The point illustrated by these examples is that a rule that "securities belong to the people they belong to" is not a rule that works to the advantage of investors or any other particular category of potential claimant. Rather, it is a temporal rule. Whoever acquired a property interest first wins. Or, to be more realistic, it is a rule under which one has some possibility of improving one's litigation posture in the insolvency of an intermediary if one can construct a plausible argument that one's interest was temporally prior to others' claims. If we pass from simple hypotheticals to imagining what might occur in an actual case, it should be fairly clear that the chances that one can confidently reconstruct the precise temporal sequence in which all potential claimants acquired their interests is not great. In the modern system in which securities are held in fungible bulk and in which securities trades are not settled one by one, but by multilateral netted clearing arrangements, it is quite likely that we would encounter circumstances in which it is logically impossible to assign any nonarbitrary answer to the question "who was first" even if we had complete  **\*1517**  and accurate records. In any event, the likelihood that we would have such records is rather slim considering that we are, by hypothesis, dealing with cases in which the intermediary has been stealing and cooking the books.

Thus, despite the intuitive appeal of the notion that "securities a broker holds for its customers belong to them," it would be an exercise in self-delusion to suppose that we could protect investors who hold through intermediaries by adopting a commercial law regime based on simplistic property concepts of that sort. It is easy to create a simple hypothetical in which that sort of rule seems advantageous to customers--that is what we all implicitly do when we start our consideration of these problems by wondering how it could be that "the Bank" can get "my securities." Yet primitive property notions work in that fashion only if one assumes that the facts will always happen to have occurred in such a fashion that one will always be in the particular position for which such a rule would be advantageous.

Thus, to assess the effect of commercial law rules on the risks the investors face in holding through intermediaries, we must put aside the appealing notion that we could somehow resolve all such problems simply by applying the notion that the securities a broker holds for its customers belong to the customers. Instead, we must dispassionately examine risks that investors do and do not face, and the role that commercial law rules can and cannot play in managing those risks.

## 2. Customers Do Not Take Intermediary Credit Risk

If Revised Article 8 had the effect of imposing on entitlement holders the credit risk of their intermediaries, there would indeed be cause for alarm. A legal regime under which the claims of customers in respect of the securities positions held through a broker or other custodian were treated in the same fashion as the obligations of the broker or custodian to its general creditors would be entirely inconsistent with the expectations and ordinary understanding of the custodial relationship. Revised Article 8 has no such effect. To the contrary, Revised Article 8, more so than present law, ensures that entitlement holders do not take the credit risk of their intermediary.

Revised Section 8-503(a) provides as follows:

To the extent necessary for a securities intermediary to satisfy all security entitlements with respect to a particular financial asset, all interests in that financial asset held by the securities intermediary  **\*1518**  are held by the securities intermediary for the entitlement holders, are not property of the securities intermediary, and are not subject to claims of creditors of the securities intermediary, except as otherwise provided in Section 8-511.

This subsection is the specific expression of a fundamental point that underlies the entire structure of Part 5--that a security entitlement is not merely a contractual claim against the intermediary; it is a sui generis form of property interest in the assets held by the intermediary. The significance of the "except as otherwise provided in Section 8-511" language at the end of Section 8-503(a) will be explored fully below. Before doing so, however, it is useful to consider further the general proposition stated in Section 8-503(a).

Note that under Section 8-503(a) all units of a particular financial asset that are held by an intermediary are subject to this first priority claim of the intermediary's entitlement holders. Thus, if an intermediary acquires securities for its own account, and thereafter customers acquire claims to that issue of securities, all units of that security will be devoted first to the customers' claims. It would make no difference that the intermediary bought those securities for its own account and was acting properly at the time it did so, nor would it matter that at the time the securities were acquired they would have been assets subject to claims of Broker's general creditors. Thus, under Revised Article 8, general creditors take subject to the risk of a shortfall in the assets needed to satisfy the claims of an intermediary's custodial activities; but the firm's custodial customers do not take the risk of a shortfall in the assets needed to satisfy claims of the firm's general creditors. As was noted above, this result might well not be reached if one attempted to apply primitive property concepts. [118]

It is worth noting that the principle that entitlement holders of an intermediary do not take the credit risk of the intermediary is the basic distinction between securities accounts and bank deposit accounts from the perspective of basic private law concepts. A depositor of a bank is a creditor of the bank. That is all. The depositor's claim is no different from the claim of any other creditor. [119] For example, bank depositors have no greater claims against the assets of a failed bank than counterparties to derivatives contracts with the bank. Moreover, banks do not, and are not supposed to, "hold" the depositors' "money" "for them." Quite the contrary, banks do, and are supposed to, take the customers' money and use it  **\*1519**  in their proprietary business operations, such as lending to others, trading--or "speculating" if you like--in securities, foreign exchange, derivatives, etc., etc. If a securities intermediary did with its "customers' securities" the things that a bank does with its "depositors' money," the securities firm would be guilty of a crime. [120]

Federal securities law specifies--in the excruciating detail necessary to give operational meaning to this notion in the modern world--that broker-dealers holding securities for their customers may not use "customers' securities" in their proprietary business, but must hold, in a position free from any liens or changes, exactly the amount and kind of the securities for which their customers have claims. Under current state law, the same proposition could presumably be derived from bailment or other common law analysis of the relationship between an intermediary and its custodial customers, and/or from general statements in banking law for bank custodians. Here again, unlike current commercial law, Revised Article 8 does not leave this key point to inference. Rather, Revised Article 8 states the general point directly in Section 8-504:

(a) A securities intermediary shall promptly obtain and thereafter maintain a financial asset in a quantity corresponding to the aggregate of all security entitlements it has established in favor of its entitlement holders with respect to that financial asset. The securities intermediary may maintain those financial assets directly or through one or more other securities intermediaries.

(b) Except to the extent otherwise agreed by its entitlement holder, a securities intermediary may not grant any security interests in a financial asset it is obligated to maintain pursuant to subsection (a).

Thus, what Revised Article 8 does is to state, clearly and cleanly, but in a fashion that makes sense in light of the actual practices of the modern world, the point that underlies the intuitive notion that "the customers' securities belong to the customers." Section 8-504 says explicitly that an intermediary must maintain a one-to-one match of securities that it holds to claims of its entitlement holders and that those securities must be held free from any security interests. Section 8-503 states explicitly that these securities are not subject to claims of the firm's general creditors.

### *1520  3. Theft Risk

Though Revised Article 8 makes it clear that customers do not take the credit risk of their intermediary, it will remain the case under Revised Article 8, as under present law, that persons holding securities through an intermediary do face intermediary theft risk. There is a risk that the intermediary will wrongfully dispose of securities that it was required to hold for its customers, dissipate the proceeds of such wrongful transfers, and fail, leaving a shortfall in the assets needed to satisfy customer claims. Realistically, there simply is not anything that commercial law rules can do to eliminate or minimize this risk. Nothing that one says in commercial law rules is going to change the very simple proposition that if someone steals your property, it will not be there any more. Regrettably, the alchemists were wrong; gold cannot be produced out of nothingness.

It would, of course, be possible to have commercial law rules that said that if an intermediary wrongfully disposes of securities that should have been held for entitlement holders, the entitlement holders can recover those securities from the transferee.

Even if there were no other reasons for rejecting that approach, it is worth noting that it is highly unlikely that doing so would have any material impact in reducing intermediary theft risk. To recover wrongfully transferred securities from the transferee, one has to figure out which securities were wrongfully transferred and where those securities went. Under modern conditions, in which firms commonly carry proprietary and customer positions in a single account with a clearing corporation or other upper tier intermediary and in which all trades are settled on a net basis, it is likely that the only way that one could identify a particular transferee as the recipient of "the customer's" securities would be by arbitrary accounting or tracing conventions. [121] For purposes of argument, however, let us ignore that major factor and consider whether it would be desirable to allow recovery from transferees, assuming that one could identify those transferees.

Let us begin by seeing exactly what Revised Article 8 actually says on these issues, and how Revised Article 8 differs from present law. Consider a simple hypothetical: Firm A fails and it is discovered that there is a shortfall in the shares of XYZ Co. stock to satisfy the claims of customers of Firm A who held XYZ Co. stock through accounts with Firm A. By further accounting investigations it is determined that at an earlier time Firm A **\*1521** did have sufficient shares of XYZ Co. stock to satisfy customer claims and that at some point thereafter, Firm A transferred shares of XYZ Co. stock to Firm B.

Let us simply stipulate that we have persuaded ourselves, by whatever accounting conventions we find most plausible, that it was the transfer to Firm B that caused the result that Firm A had a shortfall of shares of XYZ Co. stock needed to satisfy its customers' claims. Let us consider whether the customers of Firm A can recover the wrongfully transferred securities from Firm B under current law or under Revised Article 8, and whether they should be permitted to do so.

Under current law, the customers of Firm A had a proportionate property interest in the fungible bulk of shares of XYZ Co. stock that Firm A carried for its customers. [122] Thus, the customers presumably had an adverse claim [123] that could be asserted against anyone into whose hands the securities came, [124] unless that transferee was protected by the bona fide purchaser rules. To qualify for protection under the bona fide purchaser rules, the transferee must be a "purchaser for value in good faith and without notice of any adverse claim" and must have taken by a formally appropriate means. [125] In the ordinary case in which the transaction is settled by entries on the books of a clearing corporation, Firm B will be able to qualify as a bona fide purchaser. [126] That result is no different from the result if Firm A had held certificates in bearer form or in street name and had delivered the certificates to Firm B with any necessary indorsement. [127]

Revised Article 8 makes no material change in this result. Firm A was required to hold sufficient shares of XYZ Co. stock to satisfy the claims of its entitlement holders. [128] To the extent necessary to satisfy their claims, the entitlement holders had a pro rata property interest in all shares of XYZ Co. stock held by Firm A. [129] That property interest, however, cannot be asserted against any purchaser from Firm A who "gives value, obtains control, and does not act in collusion" with Firm A in violating the rights of Firm A's customers. [130] The requirement that the purchaser "obtain control" **\*1522** covers the same matters as the requirement under present law that the purchaser take by a formally appropriate transfer. [131] Thus, if the transfer from Firm A to Firm B was settled by physical delivery or by a book-entry transaction on the records of a clearing corporation or any other securities intermediary, Firm B will satisfy the "control" requirement and can qualify for protection against the claims of Firm A's entitlement holders.

The only difference between Revised Article 8 and current law on this point is that Revised Article 8 uses a somewhat different form of words than does present law to express the limitation to the finality principle. Under present law, the customers of Firm A will not be able to recover the securities from Firm B, except in highly unusual circumstances that would warrant a finding that Firm B did not take the securities "in good faith" and "without notice" of adverse claims. Similarly, under Revised Article 8, the customers of Firm A will not be able to recover the securities from Firm B, except in highly unusual circumstances that would warrant a finding that Firm B acted "in collusion" with Firm A. The differences between these two locutions will be discussed below. For present purposes the important point is to realize that what matters from the standpoint of the risks faced by customers of a wrongdoing intermediary is not how the exception will be worded, but whether the general principle will apply. The only way one could effect a material change in risk allocation by altering commercial law rules would be to adopt a principle that cases of intermediary theft from their customers should not be governed by the same finality principles as any other case in which A transfers securities to B in circumstances where A's action in doing so was wrongful against someone. Both old Article 8 and Revised Article 8 opt for application of the usual finality principle.

General rejection of the finality principle as applied to this species of potential adverse claim would be a dramatic change in the basic commercial law foundations of securities transfers. Nor is there any reason to think that such a change would be advantageous for investors. Obviously, in litigation arising out of the occurrence of this hypothetical event, the customers of Firm A would recover more if they could pursue claims against Firm B rather than being limited to their rights against the wrongdoer itself. But it is a non sequitur to go from that to the assertion that investors generally would be better off if they could pursue transferees in the event of wrongdoing by their intermediary. Firm B is as likely to be a broker with clientele of widows and orphans as is Firm A. Saying that the "owners" can get "their property" back if their intermediary wrongfully transferred it **\*1523** just means that some other "owners" are going to get "their property" taken away.

### 4. Should the Finality Rules Differ for Transferees Who Take Securities as Collateral, Rather than as Outright Buyers?

Now, let us consider whether the application of finality principles to securities transfers does or should differ if the transferee is a purchaser who takes securities as collateral for an obligation rather than a purchaser who takes the securities in settlement of an outright sale. Consider the following hypothetical: Firm A fails and it is discovered that there is a shortfall in the shares of XYZ Co. stock needed to satisfy the claims of customers. By further accounting investigations it is determined that at an earlier time Firm A did have sufficient shares of XYZ Co. stock to satisfy customer claims and that at some point thereafter, Firm A transferred shares of XYZ Co. stock to Firm B in a secured transaction, that is, Firm A transferred the securities to Firm B as collateral for an advance of money or other obligation of Firm A to Firm B. Assume, again, that appropriate accounting conventions permit us to conclude that it was the transfer to Firm B that caused the result that Firm A had a shortfall of shares of XYZ Co. stock needed to satisfy its customers' claims.

Under current law this case is treated exactly the same as the prior hypothetical concerning an outright sale by Firm A to Firm B. Firm A's customers have an adverse claim, but that claim would be cut off if Firm B qualifies as a bona fide purchaser. The requirements that a secured party transferee must satisfy to qualify as a bona fide purchaser are exactly the same as for any other transferee. That has been the case for more than a century. [132]

Under Revised Article 8, that is generally also the case, although Revised Article 8 does protect the claims of the customers of Firm A in certain circumstances where current law may not do so. Whether the entitlement holders of Firm A can assert their claim against the pledgee, Firm B, turns on the general provisions of Section 8-503, discussed above in connection with a transfer to an outright buyer, as well as the special provisions of Section 8-511. The relevant parts of Section 8-511 are as follows:

(a) Except as otherwise provided in subsections (b) and (c), if a securities intermediary does not have sufficient interests in a particular financial asset to satisfy both its obligations to entitlement holders **\*1524** who have security entitlements to that financial asset and its obligation to a creditor of the securities intermediary who has a security interest in that financial asset, the claims of entitlement holders, other than the creditor, have priority over the claim of the creditor.

(b) A claim of a creditor of a securities intermediary who has a security interest in a financial asset held by a securities intermediary has priority over claims of the securities intermediary's entitlement holders who have security entitlements with respect to that financial asset if the creditor has control over the financial asset.

If the securities in our hypothetical were transferred to Firm B either by delivery of physical certificates or by a book-entry transfer on the records of a clearing corporation or some other intermediary (other than Firm A itself), then Firm B will have obtained "control." In that case, the rule in Section 8-511(b) simply restates, in the terminology of priorities, the general point stated in Section 8-503 that the customers of a failed intermediary cannot recover from purchasers securities that the firm wrongfully transferred. [133]

Why then, one might ask, is Section 8-511(b) included at all? The answer is that Section 8-511(a) states a new rule that subordinates the claim of a secured party transferee to the claims of an intermediary's entitlement holders in any case in which the secured party does not obtain "control." All that subsection (b) does is remove a secured party transferee who does obtain control from the subsection (a) subordination provision. Were there no subsection (a), there would be no need for subsection (b). One of the ironies of the common reactions of casual readers of Revised Article 8 is that the provision that most often excites concern--Section 8-511--is a provision that is included only because of the decision of the drafting committee to include

a new provision in Article 8 that subordinates the claims of secured creditors to those of customers in one common category of financing transaction.

To understand how these provisions operate in practice, it is necessary to understand a bit about financing practices in the securities markets. The sense of unease that people initially feel upon realizing that under Revised Article 8--as under current law--the customers of a broker could suffer a loss as a result of a wrongful pledge by the firm, just as they could suffer a  **\*1525** loss as a result of any other wrongful transfer, may be in large part a result of unfamiliarity with the financing practices of the securities business.

Secured financing of securities firms is conducted in an entirely different fashion from secured financing of merchants who deal in tangible goods. Merchants of goods commonly grant blanket liens to their lenders covering all of their inventory. Securities firms who are carrying both customer and proprietary positions do not do that. Rather, securities firms designate specifically which positions they are pledging. SEC regulations embody the general principles that customers' securities cannot be pledged for loans for the firm's proprietary business; customers' securities can be pledged only to fund loans to customers, and only with the consent of the customers. [134]  Another SEC rule implements these prohibitions in a fashion tailored to modern securities firm accounting systems by requiring brokers to maintain a sufficient inventory of securities at all times, free from any liens, to satisfy the claims of all of their customers for fully paid and excess margin securities. [135]  A firm that granted a lender a blanket lien on all securities it held, both customer and proprietary, would be violating the SEC rules.

Secured bank lending to securities firms typically occurs in one of two forms. In what is known as a "hard pledge" the lender requires the borrower to have the collateral transferred outright to the lender. In the book-entry environment, that means that the borrower instructs the clearing corporation to debit the securities from its account and credit them to the account of the lender. There the securities will remain unless and until the lender gives instructions to the clearing corporation to return them to the borrower. From the perspective of the mechanics of property transfers--which, after all, is all that Article 8 deals with--the transaction is indistinguishable from any other transfer, such as a transfer to an outright buyer. Note too, that the transaction is the book-entry equivalent of a physical pledge of certificated securities in bearer form or in registered form with indorsement. Under Revised Article 8, the secured party in such a case would have obtained "control," [136]  and hence, the security interest would have priority over competing claims, including claims of the pledgor's customers. [137]  The proposition that a secured lender in such circumstances  **\*1526**  takes the securities free from adverse claims is hardly something new in Revised Article 8. That has been the law for centuries.

The other common form of bank lending to securities firms is what is known as "agreement to pledge (AP)" or "agreement to deliver" financing. In an AP lending arrangement, the securities are not moved from the borrower's account to the lender's account on the books of the clearing corporation. Rather, the borrower signs an agreement identifying specific securities as collateral, and designates on its own records that those securities have been pledged to the lender. Under both present law and Revised Article 8, this suffices for perfection of the security interest. From the perspective of the mechanics of property transfers, the transaction is essentially the same as an ordinary transaction with one of the firm's customers. That is, the firm agrees that it is now holding certain securities not for its own proprietary account, but for someone else, and makes appropriate entries on its books to reflect this fact. There is learned disagreement among experts on Article 8 about what the result would be if a broker were to fail and it turned out that the firm had falsified its books in such fashion that it showed the same securities as being both held for customers and pledged to an AP lender. [138]  Some lawyers feel that the AP lender would prevail on the theory that what happens in any insolvency is that you divide up the assets that remain after satisfaction of the claims of persons holding perfected security interests. Some lawyers feel that the outcome would depend on the temporal sequence; since neither the AP lender nor the customers could qualify as bona fide purchasers who take free from adverse claims, whoever was later in time would take subject to the prior interest. Other lawyers, and I suspect this may be the most common view, feel that the AP lender and the customers would share pro rata, on the basis of old Section 8-313(2), which provides that all purchasers from an intermediary of securities held by that intermediary in fungible bulk share pro rata. Under Revised Article 8, the AP lender loses. That is the point of subsection (a) of Section 8-511, which specifies that the claims of entitlement holders have priority over the claims of a secured creditor who has not obtained control. [139]

Thus, even if we confine our attention to the setting of bank lending to securities brokers, we see that the major respect in which the rules set  **\*1527**  out in Section 8-511 alter present law is a change in favor of the position of customers. One must also bear in mind that the category of "transferee who acquired its interest in securities in a transaction intended to provide financing to or otherwise secure an obligation of a securities firm" cannot be translated simply into "bank" or other commercial lender.

The providers of financing to securities intermediaries include numerous entities that are far from what one first imagines in thinking of secured lenders to brokers.

One of the major sources of financing for securities dealers is the repurchase agreement market. [140] A broker-dealer (Firm A) that needs overnight financing will enter into a transaction in which it sells securities, usually government securities, to someone else (Firm B), and simultaneously agrees to repurchase those securities from Firm B the next day, at a price that returns to B the money it paid plus one day's interest. In essence, Firm B is advancing money to Firm A, and is taking an interest in the securities to ensure that if Firm A does not perform its obligation to return that money to B (by repurchasing the securities) then B will be protected against loss because it will be able to keep the securities. The development of the repo markets makes it difficult, if not simply impossible, to draw a precise line between a transfer of securities in settlement of an outright sale, and a transfer of securities as collateral for an obligation to repay money. Lawyers can and do argue endlessly about the characterization of repos for purposes of various legal issues. Revised Article 8 is drafted in such a way that it is generally not necessary to make that characterization. [141] But, if one were to try to change the law to create a rule that "secured lenders" to a broker take subject to the risk that the broker was wrongfully pledging securities that should have been held for customers, one would have to deal with repos. If one really does want to have a rule that anyone who takes an interest in securities from a broker in a financing transaction has to give back those securities if it turns out that the firm was wrongfully pledging customer securities, then it is hard to see any reason not to apply that rule to repo buyers as well as to providers of financing in any other form of transaction. But if one were to do that—in the interests of "protecting investors"—the results would be a bit surprising. The sources of financing in the repo markets are not just, and probably not even primarily, banks or other commercial lenders. For example, mutual funds, particularly money **1528** market mutual funds, are among the major participants in the repo markets. [142] If one really does think that sound public policy dictates that providers of financing to securities firms should lose to customers of the firm in the event that the firm has wrongfully transferred securities, then one has to bite the bullet and say that one thinks it sensible to shift the risk of loss from the customers of a failed securities firm to shareholders of a money market mutual fund.

Securities lending transactions are another good example of a common form of transaction in which firms that are, in essence, collective representatives of individual investors take security interests in securities from brokers in order to secure obligations of the brokers. In a variety of circumstances, a broker may find itself in a position where it is obligated to deliver a certain security in settlement of a trade, but does not have that exact security in its inventory. The most common such scenario would be when a customer of the firm "sells short." Suppose that a customer of Firm A sells short 10,000 shares of XYZ common stock. The firm executes a trade as seller of 10,000 shares in the same fashion as for any other sale. The customer, however, does not have the 10,000 shares and so will not be delivering them to the broker for settlement in the usual way. The customer becomes obligated to deliver the security to the firm, but the customer is betting that the price will decline so that the customer can buy in the security at a lower price to satisfy its delivery obligation to the broker. On the "street side" the transaction looks just like any other sale by the firm for one of its customers, and the broker is obligated to deliver the securities at settlement date. If the firm has a sufficient quantity of that security in its own proprietary account, it can use those securities to make the delivery. If the firm does not have the necessary 10,000 shares of XYZ, it may get them by a securities lending transaction. Firm B would lend 10,000 shares of XYZ stock to Firm A so that Firm A can settle. Firm A becomes obligated to redeliver an equivalent quantity of that security to Firm B. Firm B wants to be assured that it will not run any risk of loss in the event that Firm A fails to perform that obligation. Accordingly, Firm B will require Firm A to transfer other securities, usually government securities, to Firm B as collateral for Firm A's obligation to redeliver the 10,000 shares of XYZ. Thus, Firm B has a security interest in the government **1529** securities as collateral for an obligation of Firm A. Suppose that Firm A fails, and it turns out to have been the case that the government securities that Firm B took as collateral in the stock lending transaction were securities that Firm A should not have used as collateral, because those securities were necessary to satisfy the claims of customers of Firm A who were holding those government securities in their accounts. If one really does believe that anyone who takes a transfer of securities from a broker as collateral for an obligation of the broker should take subject to the risk that the broker was acting wrongfully in pledging the securities, then the answer would have to be that the customers of Firm A can recover the government securities from Firm B. The entities that engage in securities lending—the "Firm B's"—are quite varied, and certainly not confined to the categories that one typically has in mind when one thinks of "secured creditors." Any entity that holds a large and diverse securities portfolio and is looking for a way of enhancing the returns of that portfolio is a likely provider of securities in securities lending transactions. Pension funds would be a good example. So once again we see that we would be shooting ourselves in the foot if we sought to protect investors by changing the commercial law rules to exclude secured parties from the protections against adverse claims that we afford to other purchasers.

The point that becomes quite clear once one learns a bit about the actual operation of the modern securities markets is that the category of "secured creditor" is just about as diverse as the category of "investor." [143] Sometimes, indeed, it is difficult or

even impossible to make any sense out of the distinction between those categories. In any event, it is certainly not the case that the difference between "secured creditor" and "investor" translates neatly into any lines of class, wealth, power, or the like. It has long been the case that the same adverse claim cutoff rules have been applied to secured creditors as to other purchasers. Revised Article 8 sensibly continues to follow that basic policy.

**\*1530  5. Choice of Words for Statement of the "Bad Actor Transferee" Exception to the Finality Rule**

From the foregoing, it should be clear that general rejection of the finality principle as applied to circumstances in which an intermediary wrongfully transfers securities that it should have retained to satisfy customer claims is simply not a realistic alternative for practical lawmaking, nor is there any reason to think that such a change would be advantageous for investors. From the standpoint of assessing investors' risk, this is the significant point. Only by a wholesale rejection of the finality rules could commercial law rules effect any significant change in the likelihood that securities wrongfully transferred could be recovered.

One can, though, imagine circumstances in which the transferee is not the routine market buyer or pledgee, but is a party whose involvement in the wrongdoing by the transferor is sufficiently blameworthy to warrant an exception to the usual finality rule. The issue is how to express the "bad actor transferee" exception to the finality rule. As has been noted, Revised Article 8 uses a slightly different formulation for this point than does old Article 8. Under Revised Section 8-503, a transferee from an intermediary takes free from claims that the transfer was wrongful against the intermediary's entitlement holders unless the transferee acted in collusion with the wrongdoing intermediary. Thus, in this situation transferees' conduct is assessed under the same standard that other provisions of Revised Article 8 use in assessing the conduct of entities acting as conduits or record-keepers for securities transfers. [144]

Reasonable people could well disagree on the best form of words to express the "bad actor transferee" exception to the finality rule. [145]  One should, however, keep a sense of perspective about what is at stake here. Having devoted my professional life to commercial law, I have great fondness for the subject and a far higher opinion than most people about its importance. It would, however, be either hubris or self-delusion for me to suppose that fine tuning the details of the "bad actor transferee" exception could have any material impact on the inevitable risk of intermediary theft. However one chooses to express the exception, the general principle will preclude recovery of securities from transferees who were wholly blameless  **\*1531**  and unaware of the intermediary's wrongdoing. That is what matters from the standpoint of assessment of investor risks. As a general proposition, thieves tend to be fairly careful about disguising the fact of their theft. In the particular circumstances here under consideration, the only way that one can tell whether a theft has occurred is by conducting an audit of the intermediary's books to see whether its stock records are in balance. It may be difficult for a firm to conceal theft from regulatory authorities who are in a position to conduct such investigations, but if a firm is successful in fooling the policemen, one can be quite sure that the firm will be able to keep the fact of its theft concealed from trading counterparties and pledgees. Securities are among the most liquid forms of property, and securities intermediaries are, by the nature of their business, in a position to transfer securities in anonymous markets. An intermediary who is willing to steal from its customers does not have to go lurking about in back alleys offering bargain prices to dispose of the stolen property; it is already linked into the ordinary trading and settlement system. Thus, even if the commercial law rules resolved every possible doubt against the transferee in any situation where there may have been the slightest basis for suspicion that perhaps the intermediary who ultimately failed might have been wrongfully disposing of customers' securities, that would not eliminate or even materially reduce intermediary theft risk. This is so because the thieving intermediary is just in too good a position to dispose of property to people who will not fall within the purview of the exception, however expansive the exception may be.

The fact that formulation of the "bad actor transferee" exception is a drafting point that would have little impact on allocation of risks does not, of course, mean that one should not care how the point is expressed. If there were no good reasons for the use of the collusion standard, or if it were the case that the collusion standard might allow transferees to escape the consequences of genuinely blameworthy action, or if some other standard would have done a better job of distinguishing between the cases in which adverse claim protection is and is not warranted, there would be adequate grounds for criticism of the drafters' choice.

It may be of some use to sketch the deliberative process on this issue during the Article 8 revision project. The collusion standard was developed in the setting of the issue treated in Section 8-115, concerning the liability of intermediaries and others acting as conduits or record-keepers in securities transfers. [146]  The decision to use the collusion standard in Section  **\*1532**  8-115 was reached long before any work was done on drafting the provisions dealing with the somewhat different problem of stating the "bad actor transferee" exception to the finality rules. When attention was turned to the "bad actor transferee" issue--particularly

in the setting of assertions that a transferee received securities that an intermediary should have retained for its customers--it became apparent that this drafting problem bore many similarities to that encountered in Section 8-115. Here, as in the Section 8-115 context, the argument in favor of the collusion standard is that it provides the necessary "escape valve" without placing undue stress on the ability of securities intermediaries to perform the functions that customers expect of them.

One of the occupational hazards of lawyers is the inclination to forget that the cases where something goes wrong are not the entire universe. When we consider scenarios in which a broker or other intermediary has wrongfully transferred securities and then failed leaving a shortfall, we are likely to begin with a sense that there is little reason to be solicitous of the interests of anyone involved in such a suspicious scenario. That is because we tend to think of the general category under consideration as "cases where broker wrongfully transfers customer securities and then fails." The commercial rules for the securities holding and transfer system must, however, be assessed from the perspective of their impact on all transactions. For purposes of drafting the rules, we must consider the situation as it would appear at the time of any particular transfer. From that perspective, the general category would be "cases where a broker transfers customers' securities." There is nothing in the least bit inherently suspicious about the fact that a broker or other securities intermediary is transferring "customers' securities." That is what brokers are supposed to do. The fact that brokers are in the business of selling things for others necessarily means that they are in a position to harm their customers by selling things that they were not authorized to sell; but there would ordinarily be absolutely no way that any counterparty to a trade with a broker could tell whether the particular transaction was a routine case of an authorized sale or a case where the broker was transferring securities without authority as a means of stealing from its customers. The interests of customers of securities intermediaries would not be served by a rule that required counterparties to transfers from securities intermediaries to investigate whether the intermediary was acting wrongfully against its customers. Quite the contrary, such a rule could operate as an impediment to the ability of securities intermediaries to perform the function that customers want.

The evolution of commercial law rules on a slightly different point provides useful perspective. One application of the finality principle that **\*1533** has long been part of our law is that when a fiduciary transfers securities, neither the transferee nor other parties through whom the transfer is implemented should be subject to the risk that the fiduciary may be acting wrongfully. Old Article 8 provides that neither a purchaser of a security from a fiduciary, nor an issuer who registers transfer at the direction of a fiduciary, has any duty to inquire whether the fiduciary is acting wrongfully as against its beneficiary. [147] The policy reflected in those rules is that if parties who participate in securities transfers bore the risk of wrongful conduct by the fiduciary, they would be likely to demand evidence that the fiduciary was acting rightfully, thereby complicating all transfers by fiduciaries. The point is illustrated most clearly by the rules now found in Part 4 of Article 8, dealing with registration of transfer. An early nineteenth-century case, Lowry v. Commercial & Farmers' Bank, [148] held that an issuer was liable for wrongful transfer if it registered a transfer under circumstances where it had any reason to believe that the fiduciary may have been acting improperly. To protect against risk of such liability, issuers developed the practice of requiring extensive documentation for fiduciary stock transfers, making such transfers cumbersome and time consuming. In the present century, American law has rejected the Lowry principle. Statutes such as the Uniform Fiduciaries Act, the Model Fiduciary Stock Transfer Act, and the Uniform Act for the Simplification of Fiduciary Security Transfers, sought to avoid the delays in stock transfers that could result from issuer's demands for documentation by limiting the issuer's responsibility for transfers in breach of the stockholder's duty to others. This policy is now embodied in rules of Part 4 of Article 8. In short, the commercial law of securities transfers has been based on the notion that it is affirmatively undesirable for counterparties or others involved in implementing securities transfers to bear the burden of investigating the propriety of transfers by persons known to be acting for others.

Some have suggested that although persons who buy securities from intermediaries should not take the risk that the intermediary was acting wrongfully as against customers, different considerations are presented when an intermediary borrows money and grants a security interest in securities. The Article 8 Drafting Committee considered this point at great length and concluded that no such distinction should be drawn. As is the case with outright sales of customers' securities, there is nothing unusual or suspicious about a transaction in which a securities intermediary pledges securities **\*1534** that it was holding for its customers. That is how margin lending is commonly financed. Although some very large brokers may be able to fund margin lending internally, smaller firms can offer that service only by "rehypothecating" their customer's securities. The customer borrows from the broker, granting the broker a security interest in the securities, and the broker obtains the money it lends to the customer by borrowing it from a bank, granting the bank a security interest in the securities that the broker holds as pledgee. In effect, the broker goes to a bank and says, "Here are some securities that I am holding for my customers. I want you to lend money to me, and I will grant you a security interest in these customers' securities. My customers have authorized me to do so." There is nothing suspicious about the transaction. It is, of course, possible that the broker is lying when it asserts that the customers authorized the transaction, but that is no different from the routine transaction in which a broker sells a customer's securities purporting to be authorized by the customer.

It is, by the way, worth noting that margin lending is not a matter of concern only to sophisticated securities investors or speculators, as distinguished from the ordinary retail customer. Today, a large percentage of all retail brokerage accounts are asset management accounts combining a variety of financial services. One important part of that package is the ability to borrow against one's securities. An investor with an asset management account that includes a margin lending agreement can obtain a loan virtually instantaneously. That service is important to many investors. It would be bad policy to enact rules saying that the bank should investigate whether the broker is lying when the broker says that the customer authorized the pledge. Doing so would hurt--not help--customers who hold securities through intermediaries.

Thus, use of the collusion standard in Revised Section 8-503 is entirely warranted by the particular circumstances of the type of cases to which it is directed. It provides ample grounds for reaching any case in which the transferee's conduct, whether as buyer or pledgee, genuinely was blameworthy, yet it does so without impairing the general operation of the finality principle. It may also be worth noting that the collusion standard is by no means novel. The concept of collusion is a familiar one in many legal contexts. [149] Indeed, it is already used in a number of other provisions in **\*1535** the U.C.C. dealing with the assertion of property interests against transferees. [150]

One point that may strike readers of Revised Article 8 as a bit puzzling is why the collusion standard is used in Section 8-503, while the general adverse claim rule for indirect holding system (Section 8-502) retains the more familiar sounding standard of taking "without notice of the adverse claim." If memory serves, this is in large measure a consequence of the ordinary dynamics of any deliberative process involving large numbers of persons having different views and perspectives. As was noted above, the collusion standard was developed in connection with the rules on conduit/record-keeper liability. At one point the Reporter suggested that it might make sense to use the collusion not only in the conduit/record-keeper rules [151] but also in the rules protecting transferees against adverse claims, including the protected purchaser rule for the direct holding system, [152] the general adverse claim cutoff rule for the indirect holding system, [153] and the special adverse claim rule for circumstances in which an intermediary wrongfully transfers securities that should have been retained to satisfy customer claims. [154] That general suggestion was not followed, perhaps because it would have required too great a change in the familiar wording of the adverse claim cutoff rules as applied to garden-variety cases involving certificated securities. [155] Yet, as noted above, the policy **\*1536** considerations that led to the use of the collusion standard in Section 8-115 also bear on the particular adverse claim situation treated in Section 8-503. Hence, the outcome was the use of the collusion standard in Section 8-503 as well as in the conduit/record-keeper provisions, but the use of "notice of adverse claim" standard in Section 8-502 as well as in the protected purchaser rule for the direct holding system.

The line between the "collusion" standard and a standard based upon notice of adverse claims is a fine one, particularly if notice is defined carefully, in the fashion of the actual knowledge/willful blindness formulation used in Section 8-105. [156] It is difficult to devise a hypothetical in which it would be clear that different outcomes would be produced by application of these two standards. That, however, may say more about hypotheticals than it does about the choice of standard. In devising a hypothetical, one assumes knowledge of all relevant facts and all legal conclusions that are warranted by those facts. If one stipulates that the facts have been determined to be that a particular transferee chose to accept securities from an intermediary despite the fact that the person had actual knowledge that the intermediary was stealing customers' property in making the transfer, or that a particular transferee was aware of facts showing a significant possibility that the intermediary was acting wrongfully, but deliberately avoided information that would confirm that fact, it seems unlikely that one would conclude that the transferee had not acted in collusion with the intermediary. That acknowledgment, however, is not the same thing as saying that there was no good reason for Revised Article 8 to adopt the collusion standard in this circumstance. Application of a legal rule is not a simple matter of comparing completely known and undisputed data to a measuring standard. Rather, the formulation of the legal standard itself plays a critical role in steering the factual inquiry. The legal standard tells the fact finder what sorts of facts to look for and what framework to have in mind in assessing the cumulative impact of the evidence. That is perhaps the best reason for concluding that the collusion standard does a better job here than other possible standards. The collusion standard orients the inquiry toward the question whether the transferee itself engaged in blameworthy conduct. By contrast, under any standard based solely on "knowledge," **\*1537** "notice," or the like, the inquiry is likely to be diverted toward the quite different question of whether the transferee could have detected that someone else was engaged in blameworthy conduct.

## 6. Is Honesty Bad?

In large measure, the concerns that have been expressed about the priority and adverse claim cutoff rules in Revised Article 8 are instances of the common human phenomenon of "shoot the messenger." The main respect in which Revised Article 8 differs from present law is that it is honest. The rules in Revised Article 8 that have attracted attention and concern are presently on the statute books in every American jurisdiction. But, under current law, the rules are buried within the complexity of such provisions as Sections 8-313 and 8-320, or are stated via innocuous sounding rules such as those protecting bona fide purchasers from adverse claims. Revised Article 8, by contrast, is quite "up front" about what the rules are. It acknowledges facts that cannot be changed by commercial law--in particular, it acknowledges openly that investors who hold through intermediaries do face a certain measure of intermediary risk, that is, the risk that one's intermediary will steal. Yet, it is hard to see why one would think that this is a defect in Revised Article 8; disclosure of risks has generally not been thought an undesirable objective in the securities business.

Though commercial law cannot eliminate and should not obscure intermediary risk, a realistic assessment of the risks that investors face in holding through intermediaries requires an understanding not only of the commercial law rules but also of other aspects of the legal regime that protect investors against intermediary risk. As has been noted herein, broker-dealers and other intermediaries are subject to a detailed regulatory system, a major component of which is directed to ensuring that intermediaries will have sufficient assets to satisfy customer claims and to ensuring that intermediaries do not use customers' securities for their own proprietary business. The protections of the regulatory system are supplemented by the Securities Investor Protection Act ("SIPA"). [157] Securities firms required to register as brokers or dealers are also required to become members of the Securities Investor Protection Corporation ("SIPC"), which provides their customers with protection somewhat similar to that provided by FDIC and other deposit insurance programs for bank depositors. When a member **1538** firm fails, SIPC is authorized to initiate a liquidation proceeding under the provisions of SIPA. If the assets of the securities firm are insufficient to satisfy all customer claims, SIPC makes contributions to the estate from a fund financed by assessments on its members to protect customers against losses up to $500,000 for cash and securities held at member firms, of which not more than $100,000 can be for cash alone.

A recent report by the U.S. General Accounting Office, prompted in part by concerns about the bank deposit insurance system, assessed the adequacy of the SIPC fund as part of the total legal regime for protection of investors in the indirect holding system. [158] As the GAO Report noted, the SIPC system is quite different from bank deposit insurance. Unlike securities intermediaries, banks do take their customers' money and use it in their own business--that is the essence of the business of banking. Thus, in a deposit insurance system, the government is not insuring that the depositors' money "will still be there"; it is insuring the results of the risky business decisions that the bank makes in lending the depositors' money to others. Securities intermediaries, by contrast, are required to maintain an exact one-to-one match of customers' claims and securities held separate from their own business. Thus, in the SIPC system, the government is not insuring against the ordinary risks taken by securities firms in the conduct of their proprietary business, it is insuring against the risk of theft by the intermediaries. [159] The GAO Report pointed out that "the regulatory framework-- including the net capital and customer protection rules--serves as the primary means of customer protection," [160] and concluded that "the regulatory framework within which SIPC operates has thus far been successful in protecting customers while at the same time limiting SIPC's losses." [161]

 **1539**  Though an awareness of the existence and operation of the regulatory and insurance systems is an important element in a realistic assessment of the risks that investors face in holding through intermediaries, one's assessment of the adequacy of these systems is essentially irrelevant for purposes of understanding and assessing Revised Article 8. If one believes that the regulatory or insurance systems need improvements, then one should work for the enactment of such improvements. Revision of Article 8 was not prompted by any concern that such other law is inadequate to provide protections to investors who held through failed intermediaries, nor would a project to change the commercial law rules on securities transfers be a rational response to a concern about inadequacies of the regulatory or insurance systems.

It is a common misperception that the policy choices embodied in Revised Article 8 depend upon the assumption that investors will be adequately protected against risks of intermediary wrongdoing by the regulatory and insurance systems under which securities firms operate, and hence, that in assessing the wisdom of enacting Revised Article 8 one must make predictions about future trends in regulation or deregulation of the financial services industries. [162] That is not true. Revised Article 8 recognizes that the regulatory and insurance systems do provide protection against intermediary risk. But it is not the case that Revised Article 8 foregoes protections that could have been provided by commercial law on the theory that such protections were not necessary because of the regulatory and insurance system.

Even if there were no regulatory or insurance system, it would remain the case that commercial law rules can contribute little to the control of intermediary risk itself. The basic policy of present law and Revised Article 8 is that the commercial law rules should be designed to ensure finality. They should protect the security of title of those who acquire securities. One could establish the commercial law rules on a different premise. One could allow persons who were wrongfully deprived of their securities to recover them from transferees. But, as has been explained in detail in this Article, that choice would not work systematically to the advantage of investors. Rather, that choice would simply allow the consequences of wrongdoing to be shifted in essentially fortuitous ways.

What commercial law can add to the total system of legal rules that affect risks in the securities holding system is not control of intermediary  **\*1540**  risk, but control of systemic risk--that is, the risk that a failure of one securities firm might cause others to fail. Revised Article 8 cannot protect against the failure of one's own intermediary; it can help protect against the risk that an investor will suffer as a result of the failure of someone else's intermediary. Indeed, if there were no regulatory or insurance systems, then it would be even more important to establish clear rules precluding the assertion of adverse claims as Revised Article 8 does. The more thieving intermediaries there are operating undetected in the markets, the greater the chances that securities that come into anyone's hands will be potentially subject to adverse claims arising out of some thieving intermediary's wrongdoing.

## Conclusion: The Need for Prompt, Uniform Enactment

This Article has devoted considerable attention to explaining Revised Article 8 from the perspective of the relationship between individual investors and brokerage firms through which investors hold securities. It has done so simply because it is inevitable that someone approaching this rather arcane subject for the first time will seek to understand it by reference to familiar forms of transactions, and the retail level transaction between customer and broker is the securities transaction most familiar to most lawyers and law professors. There is, however, some danger that the natural tendency to think of the unknown in terms of the familiar may have the subtle, but unfortunate, effect of misleading one into thinking that the issues and concerns that seem most pressing in the relationship between an individual investor and a broker must be the matters of principal concern in Article 8. There is, of course, much to be concerned about in the general legal structure affecting transactions between retail investors and those from whom they acquire financial services. That is why there is an elaborate body of regulatory law dealing with matters on which the economic interests of investors and the economic interests of securities firms diverge. Yet, as has been explained in this Article, Article 8 deals with different matters.

Thus, it simply misses the point to suggest, as does some recent commentary, that although Revised Article 8 does a good job of modernizing the law for the complexities of the clearance and settlement system, it may not do enough to protect the interests of individual investors. Revised Article 8 does not distinguish between individual versus institutional investors, between rich investors or poor investors, between long-term investors and speculators, between investors and traders, or any other such categories. There is no correlation between the Revised Article 8 term "entitlement  **\*1541**  holder" and any such typology. Nor can the relationship between "entitlement holders" and "securities intermediaries" be translated into "customers/consumers/ individual investors" and "brokers." In this respect, Revised Article 8 is just like the real estate recording acts--it protects the title of purchasers generally, without drawing distinctions among the class of purchasers. The real estate recording acts proceed on the entirely sensible basis that protecting security of title is a good thing for everyone, including those who buy, sell, or own real estate as well as those who are professionally engaged in arranging real estate transactions. The general answer to the question of whether Revised Article 8 is beneficial or adverse to the interests of individual securities investors is exactly the same. The main thing that Revised Article 8 does is adapt to the modern indirect holding system, and state in simple and clear terms, rules that provide security of title to purchasers of investment securities who hold through intermediaries in much the same fashion that negotiability concepts provided security of title for the paper-based securities markets of a previous era or that real estate recording acts provide for the real estate markets.

There are, to be sure, some areas of commercial law in which it may make sense to deal separately with transactions affecting individual natural persons and those affecting business entities; but Article 8 is not such a topic. Individual investors have the same interest as all participants in the securities markets in having clear legal rules to govern the mechanical process of settlement of securities trades and rules that assure the finality of securities transfers. Or, to put it in a slightly different fashion, individual investors have the same interest as other securities market participants in assuring that the commercial law rules of the securities settlement system do not operate as an impediment to the continued safe operation of the clearance and settlement system in times of stress in the financial markets. The Bachmann Report on clearance and settlement reform put the point well:

The globalization and increase in the size and complexity of the markets that has occurred over the past decade presents new concerns to the industry. It is not possible to separate the retail market from the institutional, or the domestic market from the international. A broker/dealer for a retail customer may also be engaged in proprietary foreign exchange trading. The counter-party to an individual investor buying a corporate security may be an institution heavily involved in the swap or derivative markets. In addition, hedges today often involve multiple products in multiple markets. The markets ultimately are all bound together; therefore, no one in **1542** the markets, including retail investors, is immune to the risk presented by the complexity, speed and volume of ever-changing markets. . . .

. . . .

We cannot roll back to a more simplistic past. [163]

Thus, in considering Revised Article 8 from the perspective of individual investors, the scenario to keep in mind is not an investor involved in a dispute with her broker about the broker's activities as salesman, but an investor who is seeing the value of her portfolio disappearing during a stock market crash and asking, "Why didn't the government do something to stop the crash?" The Article 8 revision project was one part of the efforts that government and private sector bodies are engaged in to try to be in a better position to do that.

The realization that Revised Article 8 is concerned with clearance and settlement reform rather than regulation of the practices of brokers toward their customers has important implications for the role of individual states in the enactment process. If it were the case that Article 8 was concerned with adjusting the rights and obligations of retail investors vis-'a-vis their securities brokers, one could well understand how the legislatures of different states might well reach different policy decisions on particular points and feel that acting on those different judgments was appropriate notwithstanding the general desirability of uniformity in commercial law. But that is not why the Article 8 revision project was undertaken. To provide an adequate commercial law foundation for modern securities transactions, it is essential that uniform law be adopted at the state level. The major point concerning Article 8 that was made in the various studies prepared after the October 1987 market break was that the lack of uniformity in the various states' versions of Article 8, and resulting choice of law uncertainties, was a significant problem. [164] Similarly, the legislative history of the Market Reform Act of 1990 identifies the problem of potential and actual nonuniformity among the states as the major problem with the commercial law foundation of the securities clearance and settlement system. [165] If these problems are to be resolved by revision of state commercial law, it is essential that the states act promptly and uniformly.

 **1543** Certainly no one would claim perfection for this new statute. No doubt had several more years been spent on the project, minor improvements, or at least changes, might have been made. Yet, it seems clear that in this project there is much more to be gained from prompt uniform enactment than could possibly be gained by trying to improve the statute as enacted in any particular state.

To be sure, state legislatures and bar association or other local review committees reviewing Revised Article 8 need to be assured that a project as complex and arcane as this has received adequate, careful consideration from all affected groups and interests. If Revised Article 8 were the product either of a group of law professors mulling over interesting issues about which they knew little, or a group of industry advocates seeking to have their way by designing rules away from the scrutiny of those charged with the protection of the interests of the public and investors, one would be appropriately leery. Revised Article 8, however, is the product of a process that, in this instance, functioned well to bring together the specialized information of experts in securities clearance and settlement and the practical wisdom of generalist lawyers.

Revised U.C.C. Article 8 is the product of more than five years' work, beginning with the study undertaken by the American Bar Association's Advisory Committee on the Settlement of Market Transactions. The Article 8 Drafting Committee worked on the project for three years. As I recall, there were at least nine three-day Drafting Committee meetings, all of which were attended by a large group of advisers and observers. Prior to final approval by the American Law Institute in May 1994 and by the National Conference of Commissioners on Uniform State Laws in August 1994, preliminary drafts had been discussed at the 1992 and 1993 NCCUSL annual meetings, at the 1992 and 1993 ALI Council meetings, at an ALI Members Consultative Group meeting in January 1993, at the ALI annual meeting in May 1993, and at a special ALI Members Consultative Group meeting in September 1993 to which all members of the Institute were invited. I and others also made presentations on the revision project at meetings of the American Bar Association, the Association of American Law Schools, various state and local bar associations and numerous continuing legal education programs. The project was also been publicized in the relevant periodicals, including the Business Lawyer, the U.C.C. Bulletin, the Commercial Law Annual, and the ABA U.C.C. Committee newsletter.

The Drafting Committee and Reporter made special efforts to reach out to groups with interests in the matters covered by Article 8, in order to **\*1544** learn the problems and needs of the securities business and to explain to the industry and to the bar the approach taken in Revised Article 8. Meetings were arranged with individual securities firms, banks involved in securities clearance, custody, and processing, domestic and foreign clearing corporations, mutual funds, transfer agents, and lenders to securities firms, as well as with industry organizations, including the Securities Industries Association, the Public Securities Association, the Securities Transfer Association, and the Investment Company Institute, the New York Clearing House, and the U.S. Working Committee of the Group of Thirty, an independent, nonpartisan, nonprofit organization that is working with the industry to implement improvements in the clearance and settlement systems for securities trading in the United States and globally.

Moreover, the Article 8 revision project was prompted by, and closely monitored by, the governmental institutions that have both expertise in the operations of the securities markets and statutory responsibility for protection of the interests of all investors. Representatives of the Securities and Exchange Commission, the Department of the Treasury, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, and the Commodities Futures Trading Commission attended every Drafting Committee meeting. The SEC's Market Transactions Advisory Committee followed the Article 8 project closely, devoting several all-day meetings to review of early drafts and the final version.

Thus, the Article 8 revision is the product of many years of work, involving a large group of knowledgeable lawyers and business people from all sectors of the securities industry, as well as representatives from all of the securities regulatory agencies and central banking authorities that have responsibility for the securities clearance and settlement system. Perhaps equally, if not more important, the drafting process for revisions of the Uniform Commercial Code is structured in such a fashion that many, if not most, of the key players were not narrowly focused experts but intelligent and dedicated generalist lawyers. Among those who brought to bear this perspective--which, after all, is essentially the same as that of the conscientious legislator--were not only the members of the Drafting Committee, who had ultimate decision-making power on specific points of policy and drafting, but also the membership of the U.C.C.'s sponsoring bodies, the ALI and NCCUSL, and the innumerable other lawyers who studied and commented upon drafts presented at the various bar association programs and continuing legal education projects devoted to the project during the drafting process. Speaking personally, as Reporter, I found the participation of the dedicated generalists absolutely essential. They provided a reservoir of common sense and practical wisdom against which **\*1545** specific arguments or contentions of the specialists could be tested. That was particularly important in a project such as this where one's initial intuitions about what rules would best serve the interests of individual investors proved to be a most uncertain guide. I would not feel nearly as confident about the general conclusion expressed in this Article--that there is nothing in Revised Article 8 that is adverse to the interests of individual investors--were it not the case that exactly these concerns had been considered so carefully and at such length by persons whose natural inclination was to examine each issue from the perspective of any possible impact on their own interests as investors. [166] Finally, and perhaps most importantly, the fact that generalist lawyers played the key role in the Article 8 revision project helped to ensure that the revision succeeds on what may be the most important level-- making a technical subject understandable to ordinary practicing lawyers and judges.

## Footnotes

[a]   Professor, Boston College Law School. The author served as Reporter to the Drafting Committee to Revise U.C.C. Article 8. My thanks to Fred Miller, Paul Shupack, and Richard B. Smith for comments on an earlier draft.

[1]   The American Law Institute & National Conference of Commissioners on Uniform State Laws, Uniform Commercial Code Revised Article 8. Investment Securities (With Conforming and Miscellaneous Amendments to Articles 1, 4, 5, 9, and 10) (1994 Official Text with Comments). The final text appears in 2C Uniform Laws Annotated (West Supp. 1995). Citations herein without other indication are to the 1994 version. The prior revision is cited as the 1978 version.

[2]   Inasmuch as the objective of this Article is to provide a basis for understanding the policies that underlie Revised Article 8, it makes no effort at a comprehensive explanation of the operation of the statute itself. The prefatory note and official comments that accompany Revised Article 8 provide quite extensive explanation both of the statute and the modern securities holding system. Readers not familiar with Revised Article 8 should find these an adequate basis for obtaining

a general understanding of the new substantive provisions. Detailed section-by-section explanations will be available in a forthcoming volume of William D. Hawkland's Uniform Commercial Code Series on Revised Article 8, which I am currently preparing. Similarly, no effort has been made in this Article to provide comprehensive citations to the literature discussing Article8. The best sources for such references are the articles included in the December 1990 issue of the Cardozo Law Review. See 12 Cardozo L. Rev. 305 (1990).

It may also be worth noting that the objectives of this Article complicate the usual disclaimer. While the views expressed herein are mine alone, a considerable amount of the explanatory material in this Article is adapted from various memoranda, explanatory articles, and reporter's notes that I prepared in the course of my work as Reporter. In those formats, much of this material was presented to the members of the Article 8 Drafting Committee, to the ALI and NCCUSL, and to other bodies that reviewed drafts of Revised Article 8 during the drafting process.

[3]     Some of the principal documents in the current literature on clearance and settlement reform are the following: Bachmann Task Force, Report of the Bachmann Task Force on Clearance and Settlement Reform in U.S. Securities Markets (1992); Bank for Int'l Settlements, Cross-Border Securities Settlements (1995) [hereinafter Cross-Border Securities Settlements]; Bank for Int'l Settlements, Delivery Versus Payment in Securities Settlement Systems (1992) [hereinafter Delivery Versus Payment in Securities Settlement Systems]; Division of Mkt. Regulation, U.S. Secs. & Exch. Comm'n, Progress and Prospects: Depository Immobilization of Securities and Use of Book-Entry Systems (1985); Group of Thirty, Clearance and Settlement Systems in the World's Securities Markets (1989) [hereinafter Group of Thirty, Clearance and Settlement Systems]; Morgan Guar. Trust Co. of New York, Brussels Office, as Operator of the Euroclear System, Cross-border Clearance, Settlement, and Custody: Beyond the G30 Recommendations (1993); Office of Technology Assessment, U.S. Congress, Trading Around the Clock: Global Securities Markets and Information Technology: Background Paper (1990); Organisation for Economic Co-operation and Dev., Systemic Risks in Securities Markets (1991); Patrick Parkinson et al., Board of Governors of the Fed. Reserve Sys., Clearance and Settlement in U.S. Securities Markets (1992); U.S. Steering Comm., Group of Thirty Clearance & Settlement Project, Status Report on Efforts to Implement the Group of Thirty Recommendations in the United States (1991); U.S. Working Comm., Group of Thirty Clearance & Settlement Project, Implementing the Group of Thirty Recommendations in the United States (1990); U.S. Working Comm., Group of Thirty Clearance & Settlement Project, Issues Affecting Implementation of the Group of Thirty Recommendations in the United States (1991).

[4]     Cross-Border Securities Settlements, supra note 3, at 40.

[5]     See Sara Webb et al., A Royal Mess: Britain's Barings PLC Bets on Derivatives and the Cost Is Dear, Wall St. J., Feb. 27, 1995, at A1.

[6]     The Chairman of the Board of Governors of the Federal Reserve System.

[7]     Alan Greenspan, Remarks at the Financial Markets Conference of the Federal Reserve Bank of Atlanta (Mar. 3, 1995).

[8]     Id.

[9]     Id.

[10]     Bachmann Task Force, supra note 3, at 14-15.

[11]     Group of Thirty, Clearance and Settlement Systems, supra note 3, at 14-15.

[12]     SEC Rule 15c6-1, 17 C.F.R. s 240.15c6-1 (1995).

[13]  See, e.g., Delivery Versus Payment in Securities Settlement Systems, supra note3; Group of Thirty, Clearance and Settlement Systems, supra note 3, at 11 (recommending that a DVP system be put in place for settlement of all securities trades by 1992).

[14]  See Robert J. Woldow, Clearance and Settlement in the U.S. Securities Markets: An Overview of the Role of the National Securities Clearing Corporation in Equities Trading (1990) (unpublished manuscript).

[15]  See, e.g., Richard B. Smith, A Piece of Paper, 25 Bus. Law. 923 (1970); Richard B. Smith, A Piece of Paper Revisited, 26 Bus. Law. 1769 (1971).

[16]  See Transfer Agents Operating Direct Registration System, Exchange Act Release No. 35,038, 59 Fed. Reg. 63,652 (1994) (soliciting comment on policy implications of, and regulatory issues raised by, a transfer agent operated book-entry registration system).

[17]  The practice of registering ownership in the name of a nominee partnership is the odd by-product of a quirk in the rules concerning the registration of transfer. When a certificate is presented to an issuer's transfer agent for registration of transfer, the transfer agent is bound, at peril of liability for wrongful registration, to assure itself that the person purporting to act as, or on behalf of, the registered owner is in fact authorized to do so. That is why transfer agents require signature guaranties and other evidence of authorization. If securities are registered in the name of a corporation, the thought has been that the only satisfactory evidence of authorization would be a certified copy of a resolution of the board of directors authorizing a particular officer to transfer the corporation's securities. By contrast, for securities registered in the name of a general partnership, the thought has been that the transfer agent can safely act on the instructions of any general partner. Thus, to avoid the nuisance of getting a board of directors' resolution each time a corporation, qua shareholder of another corporation, wishes to register a transfer, corporations commonly have their ownership interest recorded in the name of a nominee partnership, which serves no function other than to hold formal title for the corporate beneficial owner. That way, changes in registration can be effected by the appropriate corporate official, without other evidence of authority, because that corporate official will be made a general partner of the nominee partnership.

[18]  Group of Thirty, Clearance and Settlement Systems, supra note 3, at 7.

[19]  Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97 (codified as amended at 15 U.S.C. s 78q-1 (1994)).

[20]  15 U.S.C. s 78q-1(e).

[21]  See Order Approving Proposed Rule Changes Relating to the Changes Regarding Book-Entry Settlement of Securities Transactions, Exchange Act Release No. 34-32,455, 58 Fed. Reg. 33,679 (1993) (order approving book-entry settlement rules for self-regulatory organizations).

[22]  See Order Approving on an Accelerated Basis Changes Regarding Depository Eligibility Requirements, Exchange Act Release No. 34-35,798, 60 Fed. Reg. 30,909 (1995) (order approving self-regulatory organization rules on new issue depository eligibility).

[23]  See, e.g., Interim Report of the Working Group on Financial Markets app. D at 15-16 (1988). The Working Group consisted of the Undersecretary for Finance of the Department of the Treasury, the Chairman of the Board of Governors of the Federal Reserve System, the Chairman of the Securities and Exchange Commission, and the Chairman of the Commodity Futures Trading Commission.

24     Letter from David S. Ruder, Chairman, Securities and Exchange Commission, to David E. Nelson, Chair, ABA Business Law Section (Oct. 25, 1988).

25     See, e.g., Coordinated Clearance and Settlement Act of 1990, H.R. Rep. No. 477, 101st Cong., 2d Sess. 6 (1990). The report notes that

       [a]nother weakness in our system revealed by the October 1987 market break is the lack of uniformity and clarity among state laws governing the transfer and pledge of securities. The lack of harmony among various state laws detracts from the liquidity of the clearance and settlement system by making it burdensome (and in some cases, impracticable) for investors to finance their payment obligations in one market by pledging the value of their positions in another market as collateral for loans.

       Id. (footnote omitted).

26     The SEC's Advisory Committee followed the work of the Article 8 Drafting Committee closely, having concluded early in its own deliberations that if it were possible to address the problems within the existing U.C.C. state law framework, that would be preferable to an exercise of the new federal preemptive authority.

       Although federal preemption seems like an easy solution, it would in fact probably result in far greater complexity. For one thing, there are some important financial markets, e.g., the markets in money market instruments, that may lie beyond the scope of federal preemptive authority because of the complexities of the definitional structure of the federal securities laws. Thus, one would inevitably have different bodies of law for aspects of securities transactions covered by federal law and those left to state law. Experience in other areas of commercial law in recent years speaks strongly to the extreme complexity that results from partial federal preemption of aspects of the Uniform Commercial Code, e.g., Reg. CC and Article 4, or the Federal Food Security Act and U.C.C. s 9-307.

27     Martin J. Aronstein, The New/Old Law of Securities Transfer: Calling a "Spade" a "Heart, Diamond, Club or the Like," 12 Cardozo L. Rev. 429, 429, 436 (1990).

28     See U.C.C. s 8-503 (1994).

29     See id. s 8-504.

30     See id. s 8-505.

31     See id. s 8-506.

32     See id. s 8-507.

33     See id. s 8-508.

34     See id. s 9-115.

35     The development of a special law of documents of title is a manifestation of essentially the same phenomenon.

36     See U.C.C. s 8-313 cmts. 2, 4 (1978).

37    Bains v. Piper, Jaffray & Hopwood, Inc., 497 N.W.2d 263, 267 (Minn. App. 1993).

38    The provision of old Article 8 dealing with creditor process said that the interest of a person who holds through an intermediary "may be reached by a creditor by legal process upon the financial intermediary on whose books the interests of the debtor appears," U.C.C. s 8-317(4) (1978), but did not explicitly state that this was the exclusive method. In New York, where DTC is located, it was thought necessary to add special legislation to the civil procedure statutes to eliminate this potential problem. N.Y. Civ. Prac. L. & R. 5201(c)(4) (McKinney 1983).

39    U.C.C. s 8-112(c) (1994) ("The interest of a debtor in a security entitlement may be reached by a creditor only by legal process upon the securities intermediary with whom the debtor's securities account is maintained ....").

40    At one point during the course of the Article 8 revision project, one of the participants in the drafting committee meetings, Professor Mooney, aptly observed that questions of this sort lie more within the expertise of a faculty of theology than of law.

41    See U.C.C. ss 8-110, 9-103(6) (1994).

42    This, unlike most of the other clearance and settlement jargon employed herein, is not an established term of art. One of the few discussions in the clearance and settlement literature that separately identifies this aspect of the family of concerns that are often grouped together under the heading of "finality" is found in Cross-Border Securities Settlements, supra note 3, at 53-54.

43    Obviously this, like all such general principles, is subject to exceptions, for example, for circumstances in which the purchaser itself acted wrongfully in acquiring the securities. The precise statement of the exceptions to the finality principle will be explored below, but one should not allow questions about the details of the exceptions to obscure the broad consensus on the basic principle.

44    Prior to the U.C.C., the adverse claim cut-off rules set out in the Uniform Negotiable Instruments Law could be applied to certain forms of debt securities, though a fair bit of uncertainty was created by the effort to squeeze investment securities into the Negotiable Instruments Law definitions. For equity securities, the Uniform Stock Transfer Act, promulgated in 1910, accomplished, to some extent, the objective of making stock certificates fully "negotiable." See James S. Rogers, Negotiability, Property, and Identity, 12 Cardozo L. Rev. 471, 476-78 (1990).

45    Commercial Code art. V (Tentative Draft No. 1, 1946) (statement by Soia Mentschikoff, Assistant Chief Reporter).

46    U.C.C. s 8-302 (1978).

47    Id. ss 8-302(1), 8-308(1) & (6), 8-311(a).

48    Id. s 8-311(a).

49    U.C.C. s 8-320(3) (1962).

50    See Laura Jereski et al., Bitter Fruit: Orange County, Mired in Investment Mess, Files for Bankruptcy, Wall St. J., Dec. 7, 1994, at A1.

51 The example of the Orange County bankruptcy is used herein purely as an illustration of the type of disturbance in the securities markets that might give rise to adverse claim problems that may not be adequately dealt with by present Article 8. No inference is intended concerning any issues that may actually have arisen out of the Orange County matter itself--a matter on which the author is wholly ignorant.

52 U.C.C. s 8-313 cmt. 4 (1978).

53 Id.

54 Professor Guttman's recent criticism of some aspects of Revised Article 8 is an example of the same confusion between general policy and specific technique. Guttman seems to be contending that the adverse claim cut-off rules are properly applied to certificated securities because they are negotiable instruments, but analogous rules should not be applied to the intangible interests of purchasers in the indirect holding system. See Egon Guttman, Mediating Industry and Investor Needs in the Redrafting of U.C.C. Article 8, 28 UCC L.J. 3, 14-23 (1995).

55 Compare Fidelity & Casualty Co. v. Key Biscayne Bank, 501 F.2d 1322, 1326 (5th Cir. 1974) ("The 'good faith' and 'without notice' requirements are practically synonymous.") with First Nat'l Bank v. Lewco Sec. Corp., 860 F.2d 1407, 1413 (7th Cir. 1988) ("It must be stressed that section 8-302 imposes two independent requirements for a purchaser of securities to attain BFP status: the purchaser must take the securities in good faith, and without notice of adverse claims. These two requirements must not be confused or conflated ...." (footnote omitted)).

56 See Goodman v. Harvey, 111 Eng. Rep. 1011 (K.B. 1836); Crook v. Jadis, 110 Eng. Rep. 1028 (K.B. 1834); Gill v. Cubitt, 107 Eng. Rep. 806 (K.B. 1824).

57 See, e.g., M.D. Chalmers, A Digest of the Law of Bills of Exchange, Promissory Notes and Cheques 71 (1878) ("A ' Bona fide holder for value without notice' is a holder for value who, at the time he becomes the holder and gives value, is really and truly without notice of any facts which, if known, would defeat his title to the bill.").

58 These thoughts about possible linguistic sources of the confusion about the role of the phrase "good faith" in the "bona fide purchaser" rules were set out in a memorandum, dated April 5, 1991, which the author prepared in connection with the work of an American Bar Association task force studying possible amendments to Article 1 of the U.C.C., and, in abbreviated form, in a memorandum, dated June 24, 1993, from the Reporter to the Article 8 Drafting Committee. See Memorandum from James S. Rogers to Co-Chairs, ABA Task Force on U.C.C. Article 8 (Apr. 5, 1991) (on file with author); Memorandum from James S. Rogers to Drafting Committee to Revise U.C.C. Article 8 (June 24, 1993) (on file with author). The full historical account presented therein will, when circumstances permit, be reworked into a form appropriate for publication as an article. This argument, it may be noted, is the point that Professor Guttman misunderstands and then labels "patent nonsense." Guttman, supra note 54, at 31n.137.

59 See, e.g., Goodman v. Simonds, 61 U.S. (20 How.) 343 (1857); Harvey, 111 Eng. Rep. at 1013.

60 See, e.g., Colin v. Central Penn Nat'l Bank, 404 F. Supp. 638, 641-43 (E.D. Pa. 1975).

61 153 Eng. Rep. 1225 (1847).

62 Id. at 1228.

63  61 U.S. (20 How.) 343 (1857).

64  Id. at 366-67.

65  Graham v. White-Phillips Co., 296 U.S. 27, 31-32 (1935).

66  See, e.g., Hollywood Nat'l Bank v. IBM, 113 Cal. Rptr. 494, 498-99 (1974).

67  On the different meanings of "good faith" in the context of good faith purchase and good faith performance, see E. Allen Farnsworth, Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 U. Chi. L. Rev. 666 (1963).

68  Because of the ambiguity of the words "bona fide," the phrase "bona fide purchaser" was not retained in Revised Article 8 as the term of art to describe the persons protected by s 8-303. The term "protected purchaser" was drawn from "protected holder" used in the Convention on International Bills and Notes prepared by the United Nations Commission on International Trade Law ("UNCITRAL").

69  U.C.C. s 8-105(a)(2) (1994). The direct statement approach is also used in subsection (a)(3) of s 8-105, which provides that a purchaser is charged with notice of an adverse claim if the purchaser "has a duty, imposed by statute or regulation, to investigate whether an adverse claim exists, and the investigation so required would establish the existence of the adverse claim." That provision codifies the result in First Nat'l Bank v. Lewco Sec. Corp., 860 F.2d 1407 (7th Cir. 1988), which disqualified from adverse claim protection a purchaser who failed to comply with applicable SEC rules requiring it to check with a stolen security registry before taking securities certificates offered for sale or pledge.

70  For discussion of some of the problems created by the 1978 structure, see Jeanne L. Schroeder & David G. Carlson, Security Interests Under Article 8 of the Uniform Commercial Code, 12 Cardozo L. Rev. 557 (1990). For a brief explanation of why the revision returns to the pre-1978 structure, see Revised Article 8 prefatory note IV.B.2 (1994).

71  See U.C.C. s 9-203(1)(a) (1994); see also id. s 9-115(2) (attachment of security interest in securities account or commodity account); s 9-115(3) (description of investment property in security agreement); s 9-115(6) (security interest in unindorsed registered securities by possession).

72  Control with respect to security accounts is defined in s 9-115(1)(e). That definition, which is essentially a derivation from the definition of control with respect to security entitlements in s 8-106(d) & (e), appears in Article 9 rather than in Article 8 as a consequence of technical details of drafting structure. Inasmuch as Article 8 deals with mechanics of transfer of interests in securities, it speaks of creation and transfer of interests in specific securities. In Article 9, however, it is convenient to have a simple mechanism for establishing a security interest in all positions held by a debtor, or all positions held through a certain account. To accommodate that form of transaction, it is convenient to include the collective description "security account" as one of the sub-categories of "investment property." Having done so, the Article 8 control definition, which is written in terms of control with respect to a security entitlement, needs to be adapted to fit the notion of a security interest in a security account. That is all that the s 9-115(1)(e) definition of control with respect to security accounts does.

Control with respect to commodity contracts and commodity accounts is defined in s 9-115(1)(e) in a fashion analogous to the Article 8 definition of control with respect to security entitlements and security accounts. The control definition for commodities positions appears in Article 9 rather than Article 8 because commodity positions are excluded from the coverage of Revised Article 8. See U.C.C. s 8-103(f) (1994).

73    Id. ss 8-106(a), 8-301(a).

74    Id. s 8-106(d).

75    Comment 6 to s 9-115 explains that this automatic perfection rule is a reflection of the existing practice in secured finance of securities firms. Section 9-115(4)(d) establishes an analogous rule for commodity intermediaries.

76    See, e.g., Note, Super-Priority of Securities Intermediaries Under the New Section 9-115(5)(c) of the Uniform Commercial Code, 108 Harv. L. Rev. 1937 (1995).

77    The text of s 9-115(5)(c) is as follows:

Except as otherwise agreed by the securities intermediary, a security interest in a security entitlement or a securities account granted to the debtor's own securities intermediary has priority over any security interest granted by the debtor to another secured party.

An analogous rule for commodity intermediaries is set out in s 9-115(5)(d):

Except as otherwise agreed by the commodity intermediary, a security interest in a commodity contract or a commodity account granted to the debtor's own commodity intermediary has priority over any security interest granted by the debtor to another secured party.

78    A quirk of the drafting history on a minor organizational point accounts for the fact that paragraph (c) states the rule for intermediary versus another secured party in general terms, rather than covering only the intermediary versus external control secured party case that is not already dealt with by the general control priority rule in paragraph (a). In the early drafts, the definition of "control" did not include a provision specifying that a debtor's own securities intermediary is deemed to have control. See October 6, 1992 Draft, s 9-603. Accordingly, the perfection and priority rules dealt separately with control security interests and security interests granted to a debtor's own intermediary. See id. ss 9-304(7)(b), 9-604(b). Later drafts adopted the technique of including the intermediary as secured party situation within the definition of control, see January 4, 1993 Draft, s 9-116(a)(4). That provision remained in the final version as s 8-106(e). Having made that change, the special priority rule for intermediary versus external lender cases could have been narrowed so that it dealt only with intermediary versus another control secured party, leaving the intermediary versus noncontrol secured interest to the general control priority rule. As it happened, however, the intermediary versus external secured party priority rule was retained in general language, even though a special rule is really needed only for cases of priority conflicts between an intermediary and another control secured party.

79    My recollection is that in the course of a tour at one of the major clearing banks for United States Treasury securities, I was told that at one point in the daily settlement cycle, that bank would typically have advanced on behalf of its dealers a sum in the tens of billions range. Or, perhaps it was a hundred billion, but even if it was a mere one billion, the point stands. As Senator Everett Dirksen said of the federal budget, "a billion here, a billion there, and pretty soon you're talking real money."

80    See U.C.C. s 9-116(1) (1994) (securities intermediary who credits customer's account prior to payment has automatically perfected security interest securing customer's obligation to pay).

81    For example, where goods are covered by a document of title, one can perfect either by filing with respect to the goods themselves, or by taking a security interest in the document, but a security interest in the document has priority over a security interest in the goods. U.C.C. s 9-304(2) (1994). Similarly, one can perfect a security interest in a document of title itself, or in chattel paper, either by filing or possession, but a secured party who chooses not to take possession, relying on filing, will generally lose to a secured party who does take possession. Id. s 9-308.

82    See, e.g., Permanent Editoral Bd. for the UCC, PEB Study Group Uniform Commercial Code Article 9: Report, 97-105 (Dec. 1, 1992).

83    See U.C.C. s 9-115(5)(b) (1994) (equal priority rule for conflicting control security interests of external secured parties); id. s 9-115(5)(e) (equal priority rule for conflicting noncontrol, automatically perfected security interests granted by broker or intermediary).

84    A brief description of the "mark to market" arrangements used in commodity futures dealings can be found in id. s 9-115 cmt. 8.

85    Under U.C.C. s 9-306(3), Y's security interest in the securities account as proceeds of the inventory will be perfected if either the dispute arises within 10 days after the Debtor acquires the securities with cash proceeds of the inventory, or if Y has filed a financing statement that happens to include investment property as one of the categories of collateral claimed.

86    Note that the case is the same whether X is Debtor's own securities intermediary, who has control by virtue of s 8-106(e), or any other lender to whom Debtor granted a security interest in the securities account who took the necessary steps to acquire control under s 8-106(d). The outcome does not depend on the special rule in s 9-115(5)(c) concerning the priority of security interests held by intermediaries. Rather, the outcome is determined by the general control priority rule in s 9-115(5)(a).

87    See U.C.C. s 1-103 (1994).

88    See id. s 9-115 cmt. 9.

One question that was raised in the ALI discussions of this hypothetical is how the s 9-115 priority rule, which does not turn on awareness of adverse claims, fits together with the adverse claim cut-off rules of Article 8 under which one of the requirements for protection against adverse claims is that the purchaser take without notice of adverse claims. See ss 8-303, 8-502, 8-510. The answer is that the Article 8 adverse claim cut-off rules do not determine whether someone has a property interest that might potentially be asserted against a purchaser. That question is governed by other law. Thus, one never gets to the question of whether a purchaser qualifies for Article 8 adverse claim protection unless one has first determined that the claimant has a property interest that, under other law, could be asserted against transferees. In the Article 9 context, the Article 9 rules determine whether a particular claimant has a property interest and whether that interest is superior or subordinate to another interest. In the above hypothetical, the new Article 9 control priority rule provides that the inventory lender's interest in the Debtor securities account is subordinate to the control secured party's conflicting claim. Thus, there is no need for the control secured party to look to Article 8 adverse claim cut-off rules; hence the question whether the control secured party would or would not qualify for protection under the Article 8 adverse claim rules is quite literally irrelevant.

This is by no means an anomalous situation. As the following examples illustrate, the fact that one does not fit within the class of purchasers protected by Article 8 cut-off rules does not determine whether one has a property interest, or whether one's property interest is superior to another's interest.

Suppose that Father owns certificated securities. Father delivers the certificates, without indorsement, to Daughter. Father dies. Daughter claims the securities, contending that there has been a completed gift. Wife claims the securities under Father's will or intestate distribution rules. Daughter is not a "protected purchaser" under s 8-303 because the certificates were not indorsed to her. That, however, does not determine the outcome of the dispute. Rather, the dispute would be determined under the law of gifts, or by Article 8's general transfer rules, not by the Article 8 adverse claim cut-off rules.

Or, consider another somewhat similar example in which claimants have knowledge of conflicting claims. Suppose that Father owns bearer bonds. Father tells Daughter that he is giving them to her; he takes the bonds out of a safe deposit box to which only he has the key and puts them in a safe deposit box to which both he and Daughter have keys. Later, at a family gathering, Father gets angry with Daughter and tells Daughter and Son that he is giving the bonds to Son, not

Daughter. Accordingly, Father moves them to a safe deposit box to which he and Son, but not Daughter, have keys. At the next family gathering, Father gets angry with Son and tells Son and Daughter that he is giving the bonds to Daughter, not Son. This pattern is repeated, with the bonds going back and forth between the safe deposit boxes after each family fight. Son and Daughter each know that the other will claim the bonds upon Father's eventual demise, and each fervently hopes to be the one who happens to be in Father's good graces when the grim reaper finally appears. When Father dies, Son and Daughter each claim as donee, and Wife claims under Father's will. Because Son and Daughter know perfectly well about each other's claim, neither could qualify as a protected purchaser under the Article 8 adverse claim cut-off rules. That, however, is irrelevant. Whether Son, Daughter, or neither get the bonds is determined by the law of gifts, or perhaps by Article 8's general transfer rules.

Thus, in the hypothetical where we have a priority dispute between Y, an inventory lender claiming Debtor's securities account as proceeds, and X, another secured creditor claiming a direct security interest, the fact that knowledge of a conflicting claim might disqualify X from the protections of the Article 8 adverse claim cut-off rules has nothing to do with the question of whether X wins or loses the Article 9 priority dispute. One could, of course, make the Article 9 priority rules turn on knowledge if that were thought desirable for some other reason, but the fact that the Article 8 adverse claim cut-off rules are affected by knowledge does not mean that the Article 9 priority rules must also be determined on the basis of knowledge.

89  In re Frank v. James Talcott, Inc., 692 F.2d 734 (11th Cir. 1982); First Nat'l Bank & Trust Co. v. Atlas Credit Corp., 417 F.2d 1081 (10th Cir. 1969); Hutchison v. C.I.T. Corp., 576 F. Supp. 1 (W.D. Ky. 1982); In re Southwest Pa. Natural Resources, Inc., 11 B.R. 900 (Bankr. W.D. Pa. 1981); In re Miller, 14 U.C.C. Rep. Serv. (Callaghan) 1042 (Bankr. D. Or. 1974); In re Gunderson, 4 U.C.C. Rep. Serv. (Callaghan) 358 (Bankr. S.D. Ill. 1967); J.I. Case Credit Corp. v. Foos, 717 P.2d 1064 (Kan. Ct. App. 1986); Rockwell Int'l Credit Corp. v. Valley Bank, 707 P.2d 517 (Idaho Ct. App. 1985); Alaska v. Fowler, 611 P.2d 58 (Alaska 1980); Production Credit Ass'n v. Melland, 278 N.W. 2d 780 (N.D. 1979); National Bank v. Dugger, 335 So. 2d 859 (Fla. Dist. Ct. App. 1976); Madison Nat'l Bank v. Newrath, 275 A.2d 495 (Md. Ct. App. 1971).

90  In re Smith, 326 F. Supp. 1311 (D. Minn. 1971); Todsen v. Runge, 318 N.W.2d 88 (Neb. 1982).

91  Berga v. Amit Int'l Trade, Ltd., 511 F. Supp. 432 (E.D. Pa. 1981); Grossmann v. Saunders, 376 S.E.2d 66 (Va. 1989); Shallcross v. Community State Bank & Trust Co., 434 A.2d 671 (N.J. Super. Ct. Law Div. 1981); Fowler, 611 P.2d at 58; Bloom v. Hilty, 234 A.2d 860 (Pa. 1967). In a very few cases, such misconduct has actually been found. See General Ins. Co. of Am. v. Lowry, 570 F.2d 120 (6th Cir. 1978) (unperfected security interest in corporate stock was not defeated by debtor's subsequent grant of perfected security interest to its own lawyer, who had represented debtor in negotiating the agreement with the prior secured party); Thompson v. United States, 408 F.2d 1075 (8th Cir. 1969) (security interest in personal property which was unperfected because recorded only in real estate files was not defeated by debtor's subsequent grant of perfected security interest in related family corporation under common control with debtor).

92  See Guttman, supra note 54; see also Jeanne L. Schroeder, Is Article 8 Finally Ready This Time? The Radical Reform of Secured Lending on Wall Street, 1994 Colum. Bus. L. Rev. 291. The tone of Schroeder's article is rather curious. Although Schroeder concludes that all of the basic policy choices embodied in Revised Article 8 are fundamentally sound, confessing the error of her initial intuitive reaction that the Article 8 rules might be adverse to the interests of individual investors, see id. 494-96, the article nonetheless contains a number of rhetorical flourishes suggesting the contrary, see id. 299-300, 493-94, 500-01.

93  Not only are these functions analytically separate, they involve entirely different systems of legal regulation. A person or firm that provides investment advisory services is subject to regulation under the Investment Advisors Act of 1940. A firm that acts as a broker, that is, enters into contracts for the purchase or sale of securities as agent for its customer, is subject to regulation as a broker-dealer under the Securities Exchange Act of 1934. The firms that act as securities custodians are commonly banks, and hence are subject to regulation under the variety of regulatory schemes that we have in the United States for the various categories of banking institutions chartered under federal and state law.

94      See Guttman, supra note 54, at 31-33.

95      See 1 George E. Palmer, The Law of Restitution s 2.14 (1978).

96      Note, for example, that in Martinez v. Dempsey-Tegeler & Co., 112 Cal. Rptr. 414 (1974), where the spouse of a broker's customer sued the broker for having sold securities at the customer's direction, the court ruled that s 8-318 exonerated broker from liability because the broker neither "knew or had reason to know of the marital discord" and the plaintiff had "at no time advised defendant of any of the facts [relating to plaintiff's claim]." Id. at 416.

97      In one circumstance, however, an intermediary's liability under s 8-115 does turn on awareness of adverse claims. If a broker or other intermediary receives a physical certificate from its customer, and that certificate turns out to have been stolen, the firm is not protected against liability if it had notice of the adverse claim of the true owner. U.C.C. s 8-115(3) (1994). Under s 8-105(a), a person has notice of an adverse claim if the person has actual knowledge, acts in willful blindness, or fails to satisfy a duty of investigation imposed by statute. The different standard here is a recognition of the fact that it is both proper and feasible to require securities professionals to guard against entry of stolen certificates into the securities holding system. One of the points that Guttman overlooks in his criticism of s 8-115, see Guttman, supra note 54, at 31-33, is that virtually all of the cases under old s 8-318 "good faith reasonable commercial standards" test that he lauds are in fact cases about stolen security certificates that would be treated in essentially the same fashion under revised s 8-115(3).

98      These concerns are not purely speculative. A situation not unlike the one hypothesized here did occur in the mid-1980s. At that time, trading in mortgage-backed securities was still settled by physical delivery of certificates and registration of transfer on the books of the issuer of the securities. In 1985, assertions of adverse claims arising out of the failure of several of the then unregulated government securities dealers played havoc in the mortgage-backed securities markets as a consequence of the provisions of old s 8-403 under which an issuer faced potential liability if it registered transfer after receiving notification of an adverse claim. See Thomas C. Baxter, Jr. & Ernest T. Patrikis, Article 8's Adverse Claim Procedures: The Uncharted Hazards of a Safe Harbor, 20 UCC L.J. 327 (1988). Reducing this potential source of systemic risk was the main reason for the revisions to ss 8-403 and 8-404 that drop the "notification/adverse claim" approach, adopting instead the same rule as in s 8-115 under which third parties cannot interfere with registration of transfer except by obtaining legal process. Thus, Revised Article 8 uses the same standard for all record-keepers, whether they be issuers, transfer agents, clearing corporation, or other intermediaries.

99      U.C.C. s 8-504(a) (1994).

100      Id. s 8-505(a).

101      Id. ss 8-504(c)(1), 8-505(a)(1), 8-506(1), 8-507(a)(1), 8-508(1).

102      Id. ss 8-504(c)(2), 8-505(a)(2), 8-506(2), 8-507(a)(2), 8-508(2).

103      The rule in s 8-509(a) is essential given the drafting approach of using general statements of the core duties of a securities intermediary as a way of defining the relationships to which the indirect holding system rules in Article 8 apply. Some of the duties in ss 8-503 through 8-508 are the subject of elaborate, comprehensive regulation under other law. For example, the SEC broker-dealer regulations dealing with the safekeeping of customer securities, SEC Rule 15c3-3, 17 C.F.R. s 240.15c3-3 (1995), implement in specific detail the general principle expressed in s 8-503; and the extensive rules on transmission of proxy materials, SEC Rule 14b-1, 17 C.F.R. s 240.14b-1 (1995), implement in detail one aspect of the general principle expressed in s 8-506. It should be noted, though, that whether s 8-509(a) applies depends on whether the regulation in question does deal in a comprehensive fashion with the relevant Article 8 duty. That is the point of the opening phrase of s 8-509, "[i]f the substance of a duty imposed ... by ss 8-504 through 8-508 is the subject of other statute, regulation, or rule ...." The fact that an intermediary has complied with such other regulations as may apply to

it does not, in itself, mean that the intermediary has satisfied all of its duties under Article 8, for there may be aspects of the Part 5 duties that are not covered by other regulation.

104    U.C.C. s 8-102(a)(10) (1994). The general question whether Revised Article 8 should adopt the definition of good faith that incorporates "reasonable commercial standards of fair dealing" or retain the old Article 1 "honesty in fact" definition had been discussed at a number of drafting committee meetings in the early course of the Article 8 revision project. It was not until the January 1994 meeting in Albuquerque, New Mexico, that the Drafting Committee reached a final decision to adopt the broader definition of good faith as part of the package of provisions that included the "agreement/ due care" formulation devised at that meeting.

105    See Shields v. Newbridge Sec., Inc. (In re Lloyd Sec., Inc.), No. 90-0985S, 1992 WL 318588 (Bankr. E.D. Pa.); Ouderkirk v. Central Nat'l Bank, 23 N.E. 875, 878 (N.Y. 1890).

106    Ray A. Brown, The Law of Personal Property s 11.2 (3d ed. 1975).

107    Id. s 11.5; Joseph Story, Commentaries on the Law of Bailments s 31 (4th ed. 1846); see also Klar v. H & M Parcel Room, Inc., 61 N.Y.S.2d 285 (1946); Gramore Stores, Inc. v. Bankers Trust Co., 402 N.Y.S.2d 326, 327 (Sup. Ct. 1978).

108    See Brown, supra note 106, s 11.5.

109    See, e.g., U.C.C. s 8-504(c)(2) (1994).

110    Id. s 8-504(a).

111    Although the concept of good faith performance is most commonly discussed in the context of whether a particular course of action constitutes good faith performance of a contractual obligation, see, e.g., Permanent Editoral Bd. for the UCC, PEB Commentary on the Uniform Commecial Code Commentary No. 10 (1990), the language of s 1-203 makes clear that the good faith performance obligation attaches to both statutory duties and contractual duties. "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." U.C.C. s 1-203 (1994) (emphasis added). In the context here under consideration, the good faith performance obligation operates, so to speak, between statute and agreement, just as in the more familiar setting it operates between agreement and performance.

112    Restatement (Second) of Contracts, s 205 cmt. a (1979).

113    U.C.C. s 1-103 states this general point explicitly: "Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

114    See U.C.C. s 8-504 cmt. 4 (1994):

In each of the sections where the "agreement/due care" formula is used, it provides that entering into an agreement and performing in accordance with that agreement is a method by which the securities intermediary may satisfy the statutory duty stated in that section. Accordingly, the general obligation of good faith performance of statutory and contract duties, see Sections 1-203 and 8-102(a)(10), would apply to such an agreement. It would not be consistent with the obligation of good faith performance for an agreement to purport to establish the usual sort of arrangement between an intermediary and entitlement holder, yet disclaim altogether one of the basic elements that define that relationship. For example, an agreement stating that an intermediary assumes no responsibilities whatsoever for the safekeeping of the entitlement

holder's securities positions would not be consistent with good faith performance of the intermediary's duty to obtain and maintain financial assets corresponding to the entitlement holder's security entitlements.

115    See id.

116    See Memorandum from James S. Rogers, Reporter, Drafting Committee to Revise UCC Article 8, to Council of the American Law Institute (Nov. 22, 1993) (on file with author):

At the ALI and NCCUSL annual meetings in 1993, some concern was expressed about the rules in revised Article 8 that provide that a person who purchases an interest in investment property from a securities intermediary and who takes "control" acquires its interest free from adverse claims, including claims by the customers of the intermediary that the intermediary was acting wrongfully in transferring the investment property to the purchaser. One application of this general rule is that a lender to a securities intermediary who takes a security interest in securities held by the intermediary can qualify as a purchaser who takes free from adverse claims. The Reporter readily acknowledges that, at first blush, this rule seems troublesome. When the Reporter first began to study the problems of the commercial law of the indirect holding system, over four years ago, his reaction was that the policy embodied in rules such as the buyer in the ordinary course of business rule of Article 9, Section 9-307(1), should carry over into the world [of] securities dealers to produce the result that a customer of a securities firm would always win in any potential dispute with a secured lender to the firm. In the four years since then, the Reporter has probably spent more time than any other person thinking about this issue and discussing it with literally hundreds of other persons. The result of that consideration is that the Reporter has come to realize that his initial reaction, while entirely understandable, was wrong. He is now firmly convinced that a rule saying that persons who provide secured financing to securities dealers take subject to the risk that the dealer was acting wrongfully against customers would be more likely to hurt investors who hold securities through intermediaries than to help them, that such a rule would be inconsistent with the fundamental policies that have long formed the core of the commercial law of the securities transfer system, and that such a rule could have a material adverse impact on the financial system. The basic point that the Reporter's initial reaction overlooked is that the commercial rules for the securities holding and transfer system must be assessed from the perspective of their impact on the millions and millions of transactions in which no wrongful conduct occurred, rather than from the post hoc perspective of what rule might be most advantageous to a particular class of persons in litigation that might arise out of the occasional case in which someone has acted wrongfully.

See also Schroeder, supra note 92, at 494-96 (conceding error of author's initial reaction to Article 8 priority rules).

117    U.C.C. s 8-503(a) (1994).

118    See supra text accompanying note 117.

119    See, e.g., 3 Michie on Banks and Banking s 181 (1974).

120    Securities Exchange Act of 1934, s 32, 15 U.S.C. s 78ff (1994) (criminal penalties for willful violation of Act and rules thereunder); SEC Rule 15c3-3, 17 C.F.R. s 240.15c3-3 (1995) (safeguarding customer securities).

121    See generally Rogers, supra note 44; James S. Rogers, UCC Article 8--Investment Securities: The Need for Revision to Accommodate Securities Holding Through Financial Intermediaries, 1993 Com. L. Ann. 419.

122    U.C.C. s 8-313(1)(d)(ii), (iii) (1978).

123    Id. s 8-302(2).

124     Id. s 8-315.

125     Id. s 8-302.

126     Id. ss 8-302(1)(c) & 8-313(1)(g).

127     Id. s 8-302(1)(a).

128     U.C.C. s 8-504 (1994).

129     Id. s 8-503 (a), (b).

130     Id. s 8-503(e).

131     See id. s 8-106.

132     See, e.g., 🚩 Swift v. Tyson, 41 U.S. (16 Pet.) 1 (1842).

133     If the pledgee takes under circumstances that would disqualify a transferee from protection under s 8-503 (e.g., the pledgee acted in collusion) then the priority rule in s 8-511(b) would not protect the pledgee, because its interest in the securities, that is, the security interest, could be recovered by Firm A's liquidator under s 8-503. See U.C.C. s 8-511 cmt. 1 (1994).

134     SEC Rule 8c-1, 17 C.F.R. s 240.8c-1 (1995); SEC Rule 15c2-1, 17 C.F.R. s 240.15c2-1 (1995).

135     SEC Rule 15c3-3, 🚩 17 C.F.R. s 240.15c3-3 (1995).

136     U.C.C. s 8-106 (1994).

137     Id. ss 8-503(e), 8-511(b).

138     Evidently there is no experience. My recollection is that when the general counsel of the Securities Investor Protection Corporation was asked about this during the Article 8 revision process, the answer was that no one could recall that ever having happened.

139     For a restrained criticism of the s 8-511(a) subordination rule, see Howard M. Darmstadter, Revised Article 8 and the Agreement to Pledge, 28 UCC L.J. 202 (1995).

140     See Marcia Stigum, The Repo and Reverse Markets (1989).

141     See Revised Article 8 prefatory note s III.C.10 (1994).

142    As of January 31, 1995, money market funds held over $80 billion in repurchase agreements. Letter from Paul S. Stevens, General Counsel, Investment Company Institute, to Richard C. Hite, President, National Conference of Commissioners on Uniform State Laws (Mar. 24, 1995).

143    Another example of secured lending collateralized by securities that is not immediately obvious is the discount lending role of the Federal Reserve system. Discount lending by the Federal Reserve Banks to other banks is almost entirely conducted in the form of loans secured by pledge of government securities from the borrowing banks. There is no special federal statutory regime for these secured transactions. The Federal Reserve Banks' rights as secured lenders are governed by state law under the U.C.C. Banks which borrow from the Fed at the discount window would commonly also be engaged in the business of acting as securities custodians, holding government securities for the account of customers. Thus, a commercial law rule that deprived secured parties of the protections afforded to other sorts of transferees could have adverse effects on the central bank operations of the Federal Reserve system.

144    See U.C.C. ss 8-115, 8-404 (1994); supra text accompanying notes 94-98.

145    Indeed, reasonable people did disagree on just this point-- interminably--throughout the Revised Article 8 drafting process. Schroeder's recent article, supra note 92, is a good example of the proclivity of law professors to devote disproportionate attention to this very small point of drafting technique.

146    See supra text accompanying notes 94-98.

147    See U.C.C. ss 8-304, 8-403(3) (1994).

148    15 F. Cas. 1040, 1048 (C.C.D. Md. 1848) (No. 8581).

149    See, e.g., Black's Law Dictionary 264 (6th ed. 1990) ("[A]n agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose.").

150    Section 9-504(4) provides that a purchaser at a public sale in foreclosure of a security interest obtains good title even if the secured party failed to comply with the Article 9 requirements for conduct of the sale, provided that the "purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale." See, e.g., Sheffield Progressive, Inc. v. Kingston Tool Co., 405 N.E.2d 985 (Mass. App. Ct. 1980).

The concept of collusion is also used in the proceeds provisions of Article 9. Comment 2 to s 9-306 notes that while a secured party is generally entitled to reach cash proceeds, "recipients of the funds of course take free of any claim which the secured party may have in them as proceeds.... [except in the case of] a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party." See, e.g., J.I. Case Credit Corp. v. First Nat'l Bank, 991 F.2d 1272 (7th Cir. 1993); Harley-Davidson Motor Co. v. Bank of New England, 897 F.2d 611 (1st Cir. 1990).

151    U.C.C. ss 8-115, 8-404(a)(4) (1994).

152    Id. s 8-303.

153    Id. s 8-502.

154    Id. s 8-503.

155    Alternatively, the Reporter suggested that if the "notice of adverse claim" standard were to be retained for s 8-303, the same standard might be used for all of the related indirect holding system rules, including s 8-503 as well as s 8-502. That suggestion did not fly either, but perhaps that is just as well. The Reporter role probably leads one to place excessive value on formal consistency over practical judgments attuned to particular circumstances; the role of Drafting Committee member probably inclines one in the opposite direction.

156    Accordingly, it is highly unlikely that enactment of Revised Article 8 makes any real change on this point in those jurisdictions, such as New York, in which it is clear that the "without notice" requirement for bona fide purchaser status imposes no affirmative obligation of investigation. New York has a nonuniform provision which provides: "[T]o constitute notice of an adverse claim or a defense, the purchaser must have knowledge of the claim or defense or knowledge of such facts that his action in taking the security amounts to bad faith." N.Y. U.C.C. Law s 8-304(4) (McKinney 1990).

157    15 U.S.C. ss 78aaa-lll (1994). See generally Michael E. Don & Josephine Wang, Stockbroker Liquidations Under the Securities Investor Protection Act and Their Impact on Securities Transfers, 12 Cardozo L. Rev. 509 (1990).

158    See generally U.S. Gen. Accounting Office, Securities Investor Protection: The Regulatory Framework Has Minimized SIPC's Losses (1992).

159    The above passage is, of course, intended as a very rough description in which the qualifications that would be needed to make each statement precise have intentionally been omitted in the interest of highlighting the core difference between the SIPC system and bank deposit insurance.

160    U.S. Gen Accounting Office, supra note 158, at 22.

161    Id. at 3. Note that the $500,000 limit on SIPA coverage applies to the shortfall per account remaining after the bankruptcy distribution, not the dollar value of the account. For example, if a customer has claims amounting to $10,000,000, and the pro rata distribution of the assets yields $9,500,000, SIPA insurance would cover the $500,000 shortfall. Guttman seems to misunderstand this point, implying that since "middle class customer-investors ... especially professionals dependent on such investments as 'nest eggs' for their retirement" may have securities portfolios having an aggregate value in excess of $500,000, it necessarily follows that "such federal protection is insufficient to cover the needs of many investors." Guttman, supra note 54, at 18. The GAO Report notes the fallacy of that reasoning. U.S. Gen Accounting Office, supra note 158, at 16.

162    See Schroeder, supra note 92, at 499.

163    Bachmann Task Force, supra note 3, at 3-4.

164    Interim Report of the Working Group on Financial Markets, supra note 23, at app. D at 15-16.

165    H.R. Rep. No. 477, 101st Cong., 2d Sess. 6-7 (1990).

166    One question that has sometimes been raised concerning the Article 8 revision project is whether representatives of organized consumer law groups played an active role in the drafting process. Consumer law advocacy groups have participated actively in the work of some U.C.C. revision projects, e.g., Article 2 (Sales) and Article 9 (Secured Transactions), but have not done so in others, e.g., Article 5 (Letters of Credit) and Article 8. The explanation,

presumably, is that consumer law advocates naturally devote their limited resources to matters that genuinely concern the groups or interests they represent. For the reasons explained in this Article, Revised Article 8 is not the sort of legislation that raises significant concerns from the perspective of individual investors in their dealings with brokers, let alone the sort of issues that are within the traditional province of consumer protection law. Similarly, although the Chair of the Revised Article 8 Drafting Committee wrote to a number of groups that represent the interests of individual investors at the beginning of the revision project, none of them judged the project to be of sufficient concern to their constituencies to come to drafting committee meetings or communicate any other comments.

43 UCLALR 1431

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.