# Exhibit 1

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                 CASE NO.  18-MD-2865 (LAK)

 3   _____
                                             )
 4   IN RE:                                  )
                                             )
 5   CUSTOMS AND TAX ADMINISTRATION OF       )
     THE KINGDOM OF DENMARK                  )
 6   (SKATTEFORVALTNINGEN) TAX REFUND        )
     SCHEME LITIGATION                       )
 7   _____)

 8

 9

10

11

12

13            C O N F I D E N T I A L

14

15

16

17

18     REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

19                     EXAMINATION OF

20                       EMRE CARR

21

22                  DATE: April 1, 2022

23

24

25        REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 12

```
1    E M R E  C A R R,
2           called as an expert witness, having been
3    first duly sworn according to law, testifies as
4    follows:
5
6
7
8    EXAMINATION BY MR. WEINSTEIN:
9        Q    Good morning, Dr. Carr?
10       A    Good morning.
11       Q    Throughout the day today, I'll be
12   asking you questions.  And for the sake of
13   Michael Friedman, the court reporter, please
14   let me finish my questions before you answer
15   and I will try to let you finish your answers
16   before I go on.
17            If both of us fail or one of us
18   fails on that, we will certainly hear about
19   it from Mike.  So let's do our best there.
20            If you have any trouble either
21   understanding one of my questions or hearing
22   my questions, please ask me to either clarify
23   or to restate it so that when you do answer,
24   we understand that you have understood the
25   question and heard the question fully.
```

1    hypothetical, one possibility was for the
2    short seller to borrow the shares.
3        Q    Right. So when I said in that
4    question that the short -- that the seller
5    had no shares to deliver, that left some room
6    in your mind as to whether the seller might
7    have some shares to deliver?
8            MS. LICHTENSTEIN: Objection.
9            MR. WEINSTEIN: I'll withdraw it.
10       Q    Let me give you this hypothetical,
11   sir.
12           The same counterparties, DDC Cayman
13   has agreed to sell 10,400 shares of Maersk
14   stock to RJM Capital with a settlement date
15   of April 17th. And then, on April 17th,
16   DDC Cayman has no shares to deliver. Whether
17   it owned them in the first place or borrowed
18   them, it has zero.
19           Can that trade be settled by the
20   custodian?
21           MS. LICHTENSTEIN: Objection.
22       A    Well, again, the short -- the
23   seller can -- can borrow the shares
24   that -- that they are -- that they are
25   selling, which is the nature of short

1      selling, and the transaction or transactions
2      by the custodian settle on a net basis at the
3      end of April 17th in your hypothetical.
4          Q    So my hypothetical had the seller
5      not getting any shares, either from its --
6      what it already had or even from borrowing.
7               And you're saying it could be
8      settled if the seller borrows?
9               MS. LICHTENSTEIN:  Objection.
10         A    Perhaps I cannot sort of comprehend
11     the hypothetical that you are -- you are
12     providing in a meaningful -- you know, in a
13     realistic way.  It's just a hypothetical,
14     maybe.
15              And that's why I cannot provide a
16     different or fuller answer than just saying
17     the seller can have the shares and borrow the
18     shares, and at the end of the day, the --
19     the -- the custodian will effectively settle
20     all the transactions on the -- settling on
21     that day on a net basis.
22         Q    So --
23         A    And that process I describe in the
24     report, you know, more fully.
25         Q    So if the seller is able to borrow

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 220

```
1    shares, would you agree with me that the
2    seller has to receive those shares by
3    delivery by the settlement date in order to
4    fulfill its sale?
5            MS. LICHTENSTEIN:  Objection.
6            (Whereupon a discussion was held
7        off the record.)
8            THE VIDEOGRAPHER:  The time is
9        4:06 p.m. and we're going off the
10       record.
11           (Whereupon a discussion was held
12       off the record.)
13           (Brief recess taken.)
14           THE VIDEOGRAPHER:  Stand by.  The
15       time is 4:21 p.m. and we're back on
16       record.
17       Q    Dr. Carr, if a custodian at the end
18   of the day has customers who, in the
19   aggregate, are long a stock, would you expect
20   to see holdings of that stock at the
21   sub-custodian level?
22           MS. LICHTENSTEIN:  Objection.
23       A    What you will be seeing at the
24   sub-custodian essentially is driven by the
25   net longs -- net of longs and shorts from the
```

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 221

1  custodian, meaning that -- and I discuss this
2  in my report, I think at length, meaning that
3  depending on whether longs exceed or shorts
4  exceed, that's going to affect what you see
5  at the sub-custodian. And if the net amount
6  comes to essentially zero, you are not going
7  to see moments of -- or, you know, entries
8  made for the day in the -- in the
9  sub-custodian accounts and -- as I discussed.
10         So it depends on not whether
11 there's a long customer, but rather whether
12 the net of the customers' longs and shorts,
13 what that number is as net zero amount, if
14 the long and shorts are equal, that amount
15 would result in no parallel entries for
16 securities or cash at the stock
17 sub-custodians.
18     Q    So if at the end of a settlement
19 date, and let's just take April 17, 2013 as
20 an example of a settlement date, the
21 custodian has 20 customers who have purchased
22 Maersk stock and that stock's been delivered
23 to those customers on the settlement date.
24         Where would one find those
25 holdings?

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 222

1    A    Well, remember -- and again, I
2    discuss these things at length in all
3    reports.
4         But shares are dematerialized in
5    most cases, and in the cases of these Danish
6    stocks in particular.  And they're recorded
7    in terms of electronic entries reflecting
8    the -- you know, the dematerialized shares.
9         And to your question, it doesn't
10   matter whether it's 20 customers or ten
11   customers, et cetera.  What you are supposed
12   to see is no -- no parallel entries in the
13   sub-custodians if the longs and shorts are
14   zero, net zero at the end of the day,
15   and -- and the custodians' records will
16   reflect the holdings of the shorts and longs
17   of the custodians' customer accounts.
18        So I think that's the answer to
19   your question.
20   Q    Well, so you mentioned if the longs
21   and shorts are net zero at the end of the
22   day.  So I just --
23   A    Netted to zero.
24   Q    Okay.  So I just want to understand
25   that.

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 223

1       If, again, the custodian has 20
2   customers for whom shares of Maersk stock
3   were delivered today so now they are the
4   owners of the stock, what other kind of
5   positions would cause there to be no holdings
6   reflected at the sub-custodian level on
7   behalf of that custodian?
8          MS. LICHTENSTEIN:  Objection.
9       A   Well, you know, I don't think the
10  number of customers has any particular
11  implication here.  And, you know, I think,
12  you know, the -- I don't follow your use of
13  the word "deliver" in that -- in that
14  context.
15          What -- the way it really works at
16  the -- at the clearing organizations is they
17  look at all the trades executed over the
18  course of the day and what they are going to
19  transact with the -- with other institutions
20  depends on the net amount of the activity
21  within their customers, among their
22  customers.
23          And if the net amount comes to
24  zero, you're not going -- if the net amount
25  comes to a positive number, you're going to

1    see corresponding cash and share movements
2    with another institution.  If the net amount
3    comes to a negative number, you're going to
4    see similar activity in the opposite
5    direction of -- of the long, and if it
6    happens to net to zero, then you're not going
7    to see parallel movements of cash or
8    securities at another sub-custodian or
9    another financial institution,
10   because -- because it netted to zero.
11        And like I said, I mean, that's
12   a -- that's, you know, described at length in
13   my reports.
14      Q   But just to be clear, sir, I'm not
15   asking you whether the records at the
16   sub-custodian would change based on the
17   transactions that happened during the day,
18   okay?  I'm not asking you about that.
19        I understand your position
20   is -- well, let me start over.  Let me start
21   with a hypothetical.
22        J.P. Morgan Chase is the
23   sub-custodian for Solo Capital.  At the
24   beginning of the day, J.P. Morgan Chase's
25   records says it's holding 1,000 shares of

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 225

```
1    Maersk on behalf of Solo Capital.
2           Okay?
3       A   Okay.  I mean, it's a
4    hypothetical --
5       Q   Okay.
6       A   -- you are developing.  Yes, I
7    understand.
8       Q   During that day, Solo Capital's
9    customers trade in Maersk stock, but the
10   positions they take offset to zero during
11   that day.  Okay?
12          And is what you're explaining that
13   because those positions throughout the day
14   net to zero, you won't see any parallel, you
15   know, activity happening at the sub-custodian
16   because on a net basis, essentially, nothing
17   really happened at Solo Capital?
18          Right?
19          MS. LICHTENSTEIN:  Objection.
20      A   I'm trying to understand your
21   hypothetical fully.  But to the extent that
22   we are dealing with a hypothetical, I
23   think -- you know, I've plainly said that if
24   the -- you know, what you expect to see in
25   terms of parallel movements at sub-custodian,
```

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 226

```
 1    J.P. Morgan or not, is -- is resulting from
 2    the net amount of the activity at the -- in
 3    your hypothetical at Solo.
 4         Q    If Solo Capital has a customer who,
 5    at the end of the day, owns stock, doesn't
 6    that holding need to be reflected at the
 7    sub-custodian?
 8              MS. LICHTENSTEIN:  Objection.
 9         A    Well, the -- the sub-custodian's
10    records -- and we discussed this, I think
11    twice today -- the sub-custodian's records
12    are reflected on an omnibus level essentially
13    for -- for Solo.  So, you know, every time
14    you ask a question about one individual
15    customer or 20 individual customers
16    in -- in -- separately from all of the
17    customers of Solo, you know, I find it
18    difficult to answer the question because
19    that's not how it works.
20              It works on a -- on an omnibus or
21    sort of combined portfolio, if you will,
22    fashion.
23         Q    Okay.  So let me make it as simple
24    as I can.
25              If Solo Capital has a single
```

1  customer by the name RJM Capital, and at the
2  end of the day, RJM Capital owns 100 shares
3  of Maersk stock, the sub-custodian's records,
4  J.P. Morgan Chase, is going to reflect 100
5  shares of Maersk stock on behalf of its
6  customer, Solo Capital.
7         Correct?
8         MS. LICHTENSTEIN:  Objection.
9    A    You know, assuming that RJM
10 purchased the shares sometime back and
11 there's only one customer -- I mean, I'm
12 trying to figure out -- you're looking at a
13 very different situation than what we are
14 analyzing.  It's simpler, but it's different.
15 So I don't want to misunderstand your
16 hypothetical or your question here.
17        So, you know, Solo's aggregate
18 activity is what's reflected on the
19 sub-custodian's accounts.  If that settlement
20 activity amounts to zero, that's what you see
21 at J.P. Morgan.  If it's a negative, that's
22 what you get -- you see reflected.
23   Q    Sir, let -- just tell me if you can
24 answer the question of if Solo Capital has a
25 single customer that owns 100 shares of

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 228

```
1    Maersk stock at the end of the day, whether,
2    at the sub-custodian level, it will show 100
3    shares being held for Solo Capital.
4             And if there's something
5    complicated in that hypothetical, let me
6    know.
7             MS. LICHTENSTEIN:  Objection.
8        A    It's not complicated, it's the
9    opposite.  It's essentially -- you know, too
10   bare bones.  You know, it's not a realistic
11   or fully developed hypothetical to have a
12   -- to have an immediate answer.
13            I mean, that's what I was trying to
14   articulate.
15       Q    Can you answer the question that if
16   Solo has a single customer who owns
17   100 shares, would that holding be reflected
18   at the sub-custodian level on behalf of Solo?
19            Can you answer that?
20            MS. LICHTENSTEIN:  Objection, asked
21       and answered.  You've asked the same
22       thing a couple times.
23            MR. WEINSTEIN:  Okay.  Let's see if
24       he can answer it this time.
25       A    I'm -- you know, at a minimum, I
```

```
 1   need to know when that transaction took
 2   place, and whether it was -- its settlement
 3   process was completed, and so on and so
 4   forth.  Under those circumstances, you will
 5   see an indication of the net long.
 6           You know, your hypothetical implies
 7   that on a net basis, Solo's customers had one
 8   single long position and that's what you see
 9   reflected.
10       Q   In the sub-custodian's records,
11   that will be reflected.
12           Right?
13       A   In the -- you know, with the
14   additional description I've provided, right.
15       Q   Is it your understanding that with
16   respect to each of the purchases of stock in
17   this case, the counterparties were always
18   Solo Capital customers?
19       A   I don't think the evidence in the
20   SKAT expert reports ascertain that, that that
21   is the case.  But it may very well be so,
22   because that's what they are claiming based
23   on the amount of review -- limited amount of
24   review and limited amount of documents
25   that -- that they cited to.  And I don't
```

CONFIDENTIAL
Emre Carr - April 1, 2022

Page 230

```
 1    think that they -- I'll just say that much.
 2            So it's a possibility.  It's not --
 3    I don't think the -- it's a -- it's a -- you
 4    know, it's a conclusion that has been -- I
 5    don't think it's a finding that has been
 6    fully supported.
 7        Q    Are you aware of any instance in
 8    which the -- a pension plan purchased stock
 9    from a counterparty external to the Solo
10    platform?
11        A    Well, I think you need to, you
12    know, define what you mean by "external."
13    Because, you know, there are a lot of these
14    terms that are being used loosely.
15            So I don't want to misunderstand
16    what you're saying now.  I need the
17    definition of "external" before I go ahead.
18        Q    Are you aware of any instance in
19    which a pension plan in this case purchased
20    stock from a non-Solo customer?
21            MS. LICHTENSTEIN:  Objection.
22        A    I think in the transactions that
23    I -- I reviewed, the transactional
24    counterparties that -- that -- that have been
25    able to -- I've been able to determine were
```