UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to case nos.:<br>18-cv-07828; 19-cv-01785; 19-cv-01867;<br>19-cv-01893; 19-cv-01781; 19-cv-01783;<br>19-cv-01866; 19-cv-01895; 19-cv-01794;<br>19-cv-01865; 19-cv-01904; 19-cv-01798;<br>19-cv-01869; 19-cv-01922; 19-cv-01800;<br>19-cv-01788; 19-cv-01870; 18-cv-07827;<br>19-cv-01791; 19-cv-01792; 19-cv-01928;<br>19-cv-01926; 19-cv-01868; 18-cv-07824;<br>19-cv-01929; 19-cv-01803; 19-cv-01806;<br>19-cv-01906; 19-cv-01801; 19-cv-01894;<br>19-cv-01808; 19-cv-01810; 19-cv-01809;<br>18-cv-04833; 19-cv-01911; 19-cv-01898;<br>19-cv-01812; 19-cv-01896; 19-cv-01871;<br>19-cv-01813; 19-cv-01930; 18-cv-07829;<br>18-cv-04434; 19-cv-01815; 19-cv-01818;<br>19-cv-01931; 19-cv-01918; 19-cv-01873;<br>19-cv-01924; 19-cv-10713; 21-cv-05339. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**Declaration Commenting on Defendants Memorandum of Law of**
**24 June 2024**
**(Jury Instructions regarding the Danish Statute of Limitations)**

**By**
**Mads Bryde Andersen,**
Professor of Law
Center for Business Law and Public Regulation
University of Copenhagen

Copenhagen, Denmark
July 24, 2024

Contents

I. Background ................................................................................................................... 3
II. The inquisitorial procedure does not govern the start of SKAT's limitations period ............. 4
III. The statements made in Section II are in full alignment with Danish court practice. ......... 9
IV. Conclusion ................................................................................................................. 12

I, Mads Bryde Andersen, professor of law, declare the following:

### I.     Background

1. On 24 June 2024, I signed a Declaration on certain aspects of Danish law in which, among other things, I discussed certain aspects of the Danish statutory limitations of monetary claims in Danish law (see Section VI, paras. 139 to 218, pages 35 to 53), in the following referred to as **my First Declaration**.

2. On the same date, 24 June 2024, Defendants in the present litigation filed a Memorandum of Law Regarding Issues of Foreign Law (the **Memorandum**) with suggestions on how the Court should instruct the Jury on the matters of Danish law and resolve certain questions of Danish law. The Defendants also submitted a declaration from their expert Kasper Pilgaard (the **Pilgaard Declaration**).

3. At the request of Plaintiff, Customs and Tax Administration of The Kingdom of Denmark (Skatteforvaltningen, in the following, **SKAT**), I have reviewed the Memorandum and the Pilgaard Declaration and provided my responses. Nothing in the Memorandum or the Pilgaard Declaration changes my opinions that I have stated in the First Declaration, and I disagree with the Defendants' statements of Danish law for the reasons I have stated in the First Declaration. The present supplementary declaration will further show why – in my opinion – the Court should *not* rely on these suggestions in regard to the statute of limitation issues of the dispute.

4. As to my qualifications and impartiality, I refer to Section I of my First Declaration.

## II. The inquisitorial procedure does not govern the start of SKAT's limitations period.

5. In Section E of the Memorandum (page 10, Section 1), Defendants suggest that the Court should instruct the Jury that SKAT's claims are subject to a three-year limitation period "running from the point at which SKAT knew or should have known of its claims against the [d]efendants".

6. Whereas I *agree* with this (general) statement in the Memorandum, I *disagree* with the suggestions made in the subsequent paragraphs of the Memorandum that in determining from what point "SKAT knew or should have known of its claims against the [d]efendants", the Court should instruct the Jury that the Danish Legal Concept of the so-called *inquisitorial procedure principle* should apply, to the effect that (i) SKAT was obliged to "seek information to clarify the facts of those claims" before it decided them, (ii) SKAT "should have known" of its claims "when SKAT had grounds to seek information to clarify the facts of those claims", and (iii) the limitations period "begins running as to SKAT's claims when SKAT had grounds to seek additional information regarding a certain *type* of claim, even if those grounds are not particularized as to any particular type of claim of that type". It is my respectful opinion that if the Court were to adopt defendants' suggestions, then it would give the Jury an incorrect instruction of Danish law.

7. Relying on this alleged *inquisitorial procedure principle*, the Memorandum suggests that SKAT is subject to an "Investigative Obligation", and that the Court should therefore instruct the Jury that SKAT's claims are time bar limited from the point in time where certain – albeit not specified – investigations could have made SKAT's claims against the defendants known to SKAT.

8. I respectfully disagree with this understanding of Danish law for the following reasons:

4

9.  *First*, although I agree (as already stated in para. 189 of my First Declaration) that Danish public entities are obliged to take steps to collect the information necessary to handle cases within their competences, the following observations lead me to the clear and undoubted *conclusion* that this so-called inquisitorial procedure principle does not imply a duty to investigate into each and every detail that might be of relevance for deciding the case in question or to confirm independently the truth of all information provided to the administrative agency in question (see para. 190 of my First Declaration).

10. It would always fall under the discretion of any administrative agency, subject to the decisions taken on the political level, to decide how cases within their competences should be handled, what information should be presented, and under what circumstances additional examination should take place in order to handle the cases.

11. Therefore, it is important to note (as I have stated in para. 200 of my First Declaration) that in the present litigation SKAT alleges that the WHT applicants submitted *fraudulent* information to SKAT by referring to *fictitious* transactions and shares. Should the so-called inquisitorial procedure principle apply in such a case as described in the Memorandum, to the effect that SKAT was under some kind of obligation to take active steps to reveal this fraud, SKAT would have to collect outside information to investigate the truthfulness of all information it receives for every claim, even when SKAT receives what appears to be sufficient information to decide the claim.

12. It is obvious that SKAT is not under such a duty under Danish law to investigate all information that appears to be complete and sufficient to determine a claim, and none of the case law relied on in the Memorandum (and discussed below in Section III) give basis for assuming such an obligation.

13.     Quite contrary, two of the cases that I have referred to in my First Declaration clearly show that no such obligation exists:

14.     The first case is the Supreme Court decision reported in *U 2010.261 H* (attached as Exhibit 55 to my First Declaration) where the claimant in question (a county) had taken active steps to investigate into the causes of some environmental damage that it had detected. In August 1999 the claimant received a report that confirmed the suspicion that a particular enterprise was liable for the damage. The Supreme Court held that from *that* time (but not before) could the claimant not have been unaware of its claim.

15.     The other case is the High Court Decision reported in *U 1997.1546/2 V* (attached as Exhibit 56 to my First Declaration) which held that the claimant (the copyright fee collecting society "NCB") was *not* expected to have known of the fraud committed by the debtor until the report of a special investigation was produced. For further details on this case, I refer to paras. 193 to 195 of my First Declaration.

16.     To ascertain whether a specific WHT application in the present litigation was fraudulent would require in depth analysis of the presented (fraudulent) documentation. Not even the information received by SKAT at some point in time that *some* WHT applications might be fraudulent, would give SKAT reason to assume that *all* WHT applications were or that the WHT applications of specific applicants were.

17.     Even if SKAT suspected that *some* applications might be fraudulent, to follow up on such suspicion would require specific examinations of each and every WHT application to reject or ascertain this suspicion. Clearly, SKAT could not by studying the documentation provided by the applicants ascertain *which* of the numerous applications received every hour of the day *were* fraudulent – or even more or less *likely* to be fraudulent.

18.     Such investigative tasks would obviously require substantial resources and planning which go far beyond what SKAT – or, for that reason, any other Danish administrative agency – is obliged to invest in its case handling under the so-called inquisitorial procedure principle.

19.     In my opinion the Jury should *only* be instructed to rely on the inquisitorial procedure *if* the Defendants can establish that SKAT was able to ascertain – on the face of each WHT application – that these applications were clearly fraudulent.

20.     *Secondly*, defendants' suggestion that the time bar limitation period begins running from the point in time when SKAT had grounds to seek information to clarify the facts of the WHT claims also misstates Danish law. As I explained in paragraph 159 of my First Declaration, the test for whether the claimant "should have" become aware of its claim is whether the claimant had sufficient information for a "prudent person" acting in the claimant's shoes to assess the basis for its claim, which includes (but is not limited to) knowing what is necessary to plead its claim.

21.     In Professor *Bo von Eyben's* highly reputed handbook, the 2nd edition of which came out in 2019 under the title: "Forældelse efter forældelsesloven af 2007" (*Time bar limitation under the 2007 Danish Limitation Act*), in the following referred to as "**von Eyben**", this understanding is confirmed in Chapter VII, Section 2.1, under the headline "The Suspension Rule as a culpa rule" (*Suspensionsreglen som en culparegel*), pages 444 to 445 (attached as Exhibit 57). After having discussed the wording of the similar provision in the earlier (1908) version of the Danish Limitation Act, *von Eyben* states the following:

> "It is therefore – in particular – of no significance that the reference to "ordinary diligence" has been deleted [in the present Danish Limitation Act]. As with the [culpa rule] in general, culpa/negligence is not a sociological concept, but a normative one [*references to von Eyben and Isager's Textbook on Tort Law omitted*]. When assessing

7

whether the creditor should have acquired knowledge of his claim, the courts are not precluded from stating that the creditor should have exercised a greater degree of diligence than is usually exercised in similar situations. The decision will always depend on a concrete assessment [of] whether the creditor has shown the degree of due diligence required in the situation in question. The key question will typically be whether the creditor should have initiated investigations, etc., that could have provided the creditor with sufficient information for the claim to be asserted. The "severity" of the [culpability assessment] depends on how much is required of the creditor in this respect, and this includes – as in any [culpability assessment] – a number of factors, including, for example, *whether* the creditor must react to the mere suspicion that a claim may exist, *whether* it must be taken into account that further investigations would require professional insight that the creditor did not possess or significant resources, and *whether* subjective circumstances that limited the specific creditor's possibilities of recognition [of the claim] can be taken into account. However, these questions are best illuminated by a review of [case law] in the areas where the suspension rule has particularly demonstrated its practical significance..."

22. Accordingly, as I have explained in paragraphs 196 to 199 of my First Declaration, even where SKAT suspected that certain claims were fraudulent and started an investigation, the limitation period would not start to run against any particular defendant until the investigation revealed to SKAT which particular WHT applications were fraudulent, and what role the defendants might have had with respect to those particular WHT applications.

23. Consequently, under Danish law, SKAT's claims are *not* time bar limited from a hypothetical point in time where a police investigation or similar investigation could have made SKAT's claims against the defendants known to SKAT.

24. *Finally*, the Memorandum's suggestion (pages 14 to 15) that the Court shall instruct the Jury that the limitations period starts running when SKAT had grounds to investigate a "certain *type* of claim, even if those grounds are not particularized as to any particular claim of that type" is a misstatement of Danish law for much the same reasons.

25. As I understand the Memorandum's reference to a certain "type" of claim, it implies that claims falling within certain (undefined) typology are subject to particular rules that *deviate* from what I have stated above (namely that there is no basis in Danish case law that the

time bar limitation period is suspended at the point in time where the claimant may decide to conduct an investigation).

26. This understanding is not supported from any of the case law that have been presented in this litigation, and I would be surprised if such case law existed.

27. Quite contrary, it follows from the case law that I have referred to in my First Declaration, including two of those cases (reported in *U 2010.261 H* and *U 1997.1546/2 V*) that I have discussed in particular above in paras 14 to 15, that in determining whether the claimant "should have" known its claim, Danish courts will look into each of the claims individually.

28. As stated above in para 21, this understanding is confirmed by *von Eyben* in his discussion on how the "culpability test" is applied by Danish courts in determining whether the time bar period of a claim should be suspended, both under earlier legislation and under the present Danish Limitation Act.

### III.  The statements made in Section II are in full alignment with Danish court practice.

29. In their Memorandum, Defendants have claimed that their suggestion discussed above in Section II is in full alignment with Danish court practice. In support of this allegation, the Memorandum makes reference to the following case law: *U 1981.72 H*, *TfS 1988.581 V*, *TfS 2002.617 Ø* and *TfS 1997.403 B*.

30. In my opinion none of the said cases should give the Court reason to instruct the Jury as suggested by the Memorandum, cf. my discussion above in Section II. This is so because *none* of the said cases relate to fraudulent or false information presented by the taxpayers in question to SKAT. Each of the cases fall under the category of cases I have already described (at paras. 177 to 184 of my First Declaration) where SKAT knew or should have known the

information necessary to assess the basis for its claim. I will substantiate this opinion on the following:

31. I have already discussed the Supreme Court decision in *U 1981.72 H* (discussed on page 13 of the Memorandum) in paras. 180 to 184 of my First Declaration. As indicated here, this case did *not* concern fraud: It was clear and undisputed in the case that SKAT could have known of its claim if it had conducted a control inspection of the taxpayer's accounts (see para. 184 of my First Declaration). The main question of the case was thus whether SKAT was obliged to conduct such control inspections within the 5-year limitation period which was applicable at that time. That question (which I have discussed in paras. 182 to 183 in my First Declaration) is not relevant in the present dispute because the fraudulent information – as I have discussed above in Section II – would effectively have prevented SKAT from obtaining knowledge of its claim. Furthermore, as far as I am aware, there is no similar applicable rule of inspections applicable to SKAT's handling of WHT refund applications.

32. In the High Court Decision in *TfS 1988.581 V* (discussed on page 15 of the Memorandum) SKAT alleged that a *known* claim could be suspended until the result of a more general investigation of the taxpayer (a fund broker) that might conclude that further claims could be raised, was concluded. This situation is clearly different from the present case where SKAT have been completely unaware of the specific fraud claims until the result of each of the investigative efforts in the WHT case complex were known. Also for that reason, the case has no relevance to the present dispute.

33. The High Court decision reported in *TfS 2002.617 Ø* (discussed on page 14 of the Memorandum) concerned a tax claim SKAT raised against a Danish taxpayer, a man domiciled in England who held two limited companies, of which one was registered in England and the

other in Denmark. SKAT's claim against the man presumed that he, and not his companies (and their fully owned subsidiary companies), should be taxed for payments which had allegedly been made to these companies under a number of invoices. SKAT obtained knowledge of the two invoices on 7 June 1993. In order to ascertain its tax claim SKAT asked the English tax authorities in February 1994 how these invoices had appeared in the English company owned by the man. On 25 May 1994, the English tax authorities informed SKAT that the English company had been deleted from registration already on 12 January 1993 and that it therefore had ceased to exist before the invoices were made. Since this information should have made SKAT aware of its claim against the man, the High Court held that the claim could have been raised on 25 May 1994 and that it was therefore time bar limited when SKAT brought action against the man on 30 June 1999 (i.e. more than 5 years thereafter, being the time bar limitation period applicable at that time). These facts are clearly different from the facts of the present dispute where SKAT's basis for ascertaining its claim was fraudulent information provided by the WHT applicants.

34.     The Copenhagen City Court decision reported in *TfS 1997.403 B* (discussed on pages 13-14 of the Memorandum) concerned a case which is also clearly different from the present litigation: A creditor (a mortgage company) had taken over the operation of an animal farm in 1983 due to its owner's insolvency, and was therefore liable to pay VAT for the turnover from the farm. It was, however, unclear how long the mortgage company had been operating the farm. This lack of clarity was partly caused by ambiguous answers given by the mortgage company to SKAT's questions. When SKAT raised its claim in 1992, the mortgage company claimed that the claim was time bar limited. The Copenhagen City Court agreed on grounds that the ambiguous answers from the mortgage company should have caused SKAT to raise its claim already in 1984 or 1985.

35. As already said, none of these cases involves information that was fraudulently concealed from SKAT. In all of these cases, SKAT had readily available and sufficient information to assess the basis for its claim. The reason that SKAT's claims failed in those cases was that SKAT knew (or under the "culpability test" discussed above in para. 21 with reference to *von Eyben*, should have known) its claims. In other words, and as already stated in para. 159 of my First Declaration, SKAT did not act as a "prudent person" in pursuing its claims. This, however, is not comparable to what the Defendants in this litigation allege that SKAT should have done in relation to the fraudulent documentation that SKAT was presented with.

36. In conclusion, it is clear and obvious to me that none of the cases referred to in the Memorandum gives the Court any reason to instruct the Jury that public entities like SKAT shall make *active investigations* (like police investigations in criminal matters) on a presumption that facts of relevance to a potential case might be hidden somewhere, and that such principle is sufficient to trigger the statute of limitations against such a public entity.

### IV.    Conclusion

37. For the reasons stated above in Sections II to III, it would be incorrect – as suggested in the Memorandum at page 16 on the top – to instruct the Jury that Danish courts would bar SKAT's claims as untimely because "SKAT had grounds to seek additional information to clarify the facts of those claims but did not timely do so". Nothing in the so-called inquisitorial procedure implies such a duty, and none of the cases relied on in the Memorandum give rise to such a conclusion.

-----oo0oo-----

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 24, 2024

_____
Mads Bryde Andersen