# Exhibit 2

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 18MT

May 22, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

```
 1   frustrated not at the orchestration but at the manual
 2   processes and that I really wanted to automate things as
 3   quickly as possible.
 4 Q. I understand. But the reason you were frustrated at the
 5   manual processes is because they allowed for the
 6   possibility of things going wrong, yes?
 7 A. Yes, correct.
 8 Q. The problem about something going wrong is that
 9   a mistake could jeopardise, at least in part, the object
10   of the exercise which was being conducted, which was to
11   ensure settled zero trading, yes?
12 A. Yes, correct.
13 Q. In order to facilitate the making of a refund
14   application on behalf of the buyer, correct?
15 A. Yes, that's correct.
16 Q. In a way which meant that no one had to bring in cash
17   from outside and no one had to buy in shares from
18   outside, correct?
19 A. Yes. In fact I would say more than just needs to, but
20   it was not —— not just not needed but it was impossible
21   to bring shares and cash from outside in the particular
22   model that we had constructed. I have explained this in
23   my PowerPoint, the last four slides which I mentioned in
24   the morning. If it would help, then I would like to, as
25   part of my evidence with you, just walk through these
```

133

```
 1   four slides at some point, if possible.
 2 Q. I don't think so at the moment, Mr Shah, let's see how
 3   we go. When you say it was impossible, that is because
 4   you had set up a system which simply didn't involve and
 5   allow for external shares or external cash to come in,
 6   correct?
 7 A. Yes. Well, yes, the way I would explain that is that
 8   any shares or cash that came in would have had to have
 9   been returned immediately, because every account was
10   zero.
11 Q. Yes.
12 A. That meant that that cash —— that any external cash or
13   shares would have nowhere to go, so it would have to be
14   returned the moment it came in.
15 Q. Okay.
16 A. And that's the definition of netting to zero. Netting
17   to zero means zero cash or shares from outside. Given
18   that that is the status of the model, any shares or cash
19   coming from outside would be in excess of the model.
20 Q. Very good.
21 MR JUSTICE ANDREW BAKER: But, Mr Shah, if, through some
22   human error in sending the trading messages that needed
23   to be sent to set the various transactional elements up,
24   if through some human error that was not corrected to
25   get everything back in balance you ended up with
```

134

```
 1   transactions apparently on the books that did not net
 2   out to zero in the sense that we have been discussing,
 3   is it right that none of the participants involved would
 4   have been in a position to settle the trades, because
 5   nobody had anything like the cash or access to the
 6   shares that would have been required if it couldn't be,
 7   as it were, self—settling through the settlement loop?
 8 A. Yes. So if that happened then, as Solo had provided
 9   guarantees it would be down to Solo to fund that and the
10   way Solo would fund that would be to go to its
11   subcustodian, for example JP Morgan, and explain to them
12   that it needed a credit line in order to borrow shares,
13   for example, or cash, that would be used to settle the
14   trades in the omnibus account.
15     Why I say credit line is because any shares and cash
16   would have remained within the borders of JP Morgan but
17   in Solo's omnibus account at JP Morgan. So that is one
18   scenario.
19     The second scenario would have been that we would
20   have had to cancel the incorrect trades which would have
21   led to a loss of credibility. And regarding the credit
22   line, it is also worth adding that, for example, if
23   £100 million worth of credit line was needed and
24   JP Morgan only gave us 10 million, then we would have to
25   settle those trades £10 million at a time over a number
```

135

```
 1   of days.
 2 MR JUSTICE ANDREW BAKER: Am I right to understand —— sorry,
 3   am I right to understand ——
 4 A. It wasn't ——
 5 MR JUSTICE ANDREW BAKER: Am I right to understand that when
 6   you referred a moment ago to Solo having provided
 7   guarantees ——
 8 A. Yes.
 9 MR JUSTICE ANDREW BAKER: —— if that kicked in at all, that
10   would only kick in if the GSS team had communicated
11   approval to clear trades when, because there was some
12   human error had gone in, perhaps they shouldn't really
13   have approved them in the first place.
14 A. Exactly. The numbers in the guarantee emails would not
15   balance and they wouldn't sum to zero.
16 MR JUSTICE ANDREW BAKER: Because the primary —— is it right
17   that the primary intention, if there was an
18   implementation error of this kind coming from outside
19   Solo, ie coming in from one of the counterparties, which
20   meant that there was a mismatch, the primary intention
21   would be that Solo would then not approve or ensure that
22   the error was corrected because it was only supposed to
23   be approving when everything balanced out so it could be
24   done on this "kill it or fill it" basis?
25 A. Exactly, yes. So the clients who received the
```

136

```
 1      guarantees, they can hold Solo to those guarantees.
 2   MR JUSTICE ANDREW BAKER:  Yes.
 3   A.  And there would be an imbalance in the omnibus account.
 4   MR RABINOWITZ:  Okay.  Mr Shah, just sticking with the
 5      episode which led to you sharing your muppet picture
 6      with people, you personally became involved in trying to
 7      fix the problems caused by the trading that day,
 8      correct?
 9   A.  Yes, correct.
10   Q.  Can we go, please, to {MTKC6/171/1}, thank you.  If we
11      can look first at the email in the lower part of the
12      page, on the next day, that is Saturday 9 March, we see
13      you send an email to Mr Patterson and Mr Nirav Patel
14      about Friday and you say:
15          "Can you both come up with a timeline for the CHR
16      and COLOB trades which happened on Monday so we can work
17      out the bottleneck.  For instance, please include the
18      times that we sent pricing, times orders were sent to
19      brokers, times brokers responded, times tas entries were
20      received and then times approved, times brokers sent
21      bclear orders to Solo."
22          It is clear from this, Mr Shah, that Solo was
23      sending pricing information to the participants in the
24      GSS trading; correct?
25   A.  Yes, yes.  We have seen that in an earlier email.

                               137

 1   Q.  Yes.  And you were obviously well aware that that was
 2      happening, correct?
 3   A.  Yes, correct.
 4   Q.  Something had gone wrong on this particular occasion and
 5      you wanted to know where the misstep had occurred,
 6      correct?
 7   A.  Yes.  That's correct.  And I would say that that was
 8      best practice at the time, to find the problem.
 9   Q.  And also presumably because you might have been exposed
10      to someone trying to blame you, not you personally but
11      Solo, and you wanted to understand the extent to which
12      that might be justified or whether the fault might have
13      lay elsewhere, correct?
14   A.  Yes, that's correct.
15   Q.  And if you then look at the email at the top of the
16      page, Mr Patterson responds to you the following day,
17      saying he will:
18          "... send you details of the events from Friday on
19      Skype.  Nirav is looking into the timings ... and will
20      revert."
21          If we can go next, please, to {MTKC6/187/1}, thank
22      you.  This is the email you sent to Mr Rajen Shah and
23      Mr Dhorajiwala on 11 March 2013.  The date is in
24      American format.  Can you just have a very quick glance
25      at that yourself.

                               138

 1   A.  (Pause).  Okay.
 2   Q.  So perhaps Mr Patterson has set out for you or you have
 3      set out a timeline of the events that occurred on
 4      8 March, which included next to each relevant time
 5      Mr Patterson's summary of what was happening at the
 6      time, correct?
 7   A.  Yes.  I think this follows on from the previous email
 8      where I think it was Nirav or one of the others said
 9      that they were going to send me a breakdown and the
10      timeline.  I think I then copied and pasted that and
11      sent that to Raj and Anupe.
12   Q.  The first nine or so entries reflect Mr Patterson's
13      coordination of the GSS trading.  Just have a look at
14      them and tell me if you agree?
15   A.  Yes.
16   Q.  And you can see there his dealings with the US Solo
17      applicants, so the buyer.  One can see the reference to.
18          "Danish orders sent to Adam LaRosa."
19          At 15:14, correct?
20   A.  Yes.
21   Q.  And these also reflect Mr Patterson's coordination of
22      the short sellers.  You can see his reference to
23      contacting Paul Oakley at 13:51.  Do you see that?
24   A.  Yes.
25   Q.  And to sending Danish orders to Mr Oakley at 16:38.  Do

                               139

 1      you see that?
 2   A.  Yes, but from this I can't tell who is sending the
 3      orders.  Maybe it was the broker that sent the orders.
 4   Q.  Okay.  And you see his reference to sending Danish
 5      orders to another of the short sellers, Rajeev -- Rajeev
 6      Dave that is -- at 15:47?
 7   A.  Yes, but again, I can't see from this who sent the
 8      orders.
 9   Q.  Mr Dave confirms that he replied to Novus at 15:57; do
10      you see that?
11   A.  Yes.
12   Q.  Why would the broker send the Danish order to the
13      seller, Mr Shah?
14   A.  Yes, that's normal.  So the chain of the instructions
15      are the pension plan first contacts the broker, Novus,
16      to say that they want to buy a particular number of
17      shares.  That broker then contacts potential short
18      sellers to -- with almost a copy and paste email, saying
19      they would like to buy a particular number of shares in
20      the same Danish company and that's why a broker would
21      send an order.  So I think when they say "order", they
22      are talking about a request for liquidity or a request
23      to trade.
24   Q.  Okay.
25   A.  But the language used, "orders", that is not incorrect,

                               140
```