# Exhibit 4

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2                 CASE NO.  18-MD-2865 (LAK)

 3

 4     _____
                                      )
 5     IN RE:                         )
                                      )
 6     CUSTOMS AND TAX ADMINISTRATION OF )
       THE KINGDOM OF DENMARK         )
 7     (SKATTEFORVALTNINGEN) TAX REFUND )
       SCHEME LITIGATION              )
 8     _____)

 9

10

11

12

13                   C O N F I D E N T I A L

14

15

16

17     REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL

18                         EXAMINATION OF

19                          GRAHAM WADE

20

21                     DATE: March 16, 2022

22

23

24

25         REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

```
 1    G R A H A M  W A D E,
 2           called as an expert witness, having been
 3    first duly sworn according to law, testifies as
 4    follows:
 5
 6
 7    EXAMINATION BY MR. PRUDEN:
 8         Q    Good morning Mr. Wade?
 9         A    Good morning.  Sorry.
10              Can we get the -- I can't actually
11    see who's talking.
12              MR. OXFORD:  Okay.  Greg, can you
13         say something, make sure we have our
14         video fixed on you?
15              MR. PRUDEN:  Sure.  Can you hear me
16         now?  Can you see me now?
17              THE WITNESS:  That's fine.  Sorry.
18              MR. OXFORD:  Yeah, you're ready for
19         your close-up.
20              Just before you start, Greg, I
21         wanted to put something on the record.
22              We have an agreement with counsel
23         that communications during deposition
24         breaks between the parties' counsel and
25         the parties' expert will remain
```

1    A    I do not believe I've issued an
2  opinion on exactly what documents were
3  distributed to which participants in
4  the -- in the transactions.
5    Q    Did you give an opinion as to
6  generally what documents were distributed to
7  various participants?
8        MR. OXFORD:  Objection.
9    A    I don't believe I've given an
10  opinion as to the specific knowledge of any
11  individual participant.
12    Q    So you don't have any opinion
13  either way on what Mr. Markowitz,
14  Ms. Markowitz, or the plans actually saw in
15  terms of documents.
16        Is that right?
17        MR. OXFORD:  Objection to the form.
18    A    Yeah, I -- I have not expressed an
19  opinion on what any participant, including
20  those people, may or may not have seen and
21  exactly what documents they saw.
22    Q    Are you familiar with the term "net
23  settlement?"
24        MR. OXFORD:  Objection to form.
25    A    The phrase "net settlement" can be

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 295

1   used in a wide variety of different contexts,
2   so I'm familiar with it in a number of
3   different situations.
4       Q   Does it refer to the settling of
5   two or more transactions that offset each
6   other?
7       MR. OXFORD:  Objection to form.
8       I'm sorry.  Can you repeat the question,
9       please?
10      Q   Does it -- does the term "net
11  settlement" to you refer to settling two or
12  more transactions that offset each other?
13      MR. OXFORD:  Mike, you have my
14      objection.
15      A   In -- without being clear for what
16  purpose we are talking about netting, I don't
17  have a -- I'm unable to answer that question.
18      Q   Okay.  Why don't we look at
19  Exhibit 5000, which I believe is your opening
20  report -- 5001.  It's a slightly different
21  dimension.
22      So it's -- I want Mr. Wade to go to
23  his opening report, which is Exhibit 5000.
24      MR. OXFORD:  I think it's 50001,
25      Mike.

1          MR. BONGIORNO:  I'm sure you're
2     right.
3          MR. OXFORD:  I might have added an
4     extra zero in there.  I think it's 5000.
5          MR. BONGIORNO:  I can assure you
6     that none of us is certain as to which
7     number it is, but I think we know what
8     document we're talking about.  It's
9     Mr. Wade's December 31, 2001 New Year's
10    Eve celebratory report.
11    Q    So if you go to Paragraph 238 of
12  that document, Page 96?
13         Are you there?
14    A    I am, yeah.
15    Q    Okay.  And here, I believe you
16  acknowledge in the first sentence the
17  "theoretical ability to net settle offsetting
18  EDB transactions."
19         Right?
20         MR. OXFORD:  Objection to form,
21    misstates the document.
22    A    I -- sorry.  Did you say is that
23  what it says?  It says, "Notwithstanding the
24  theoretical ability to net settle offsetting
25  DVP transactions, one could not independently

1    settle any of these transactions because
2    there was no cash, and even if the parties
3    had access to cash, they could still not have
4    worked because there were no shares."
5        Q    Right.  My question to you is that
6    there is at least a theoretical ability to
7    net settle offsetting DVP transactions.
8        Right?
9        MR. OXFORD:  Object to the form.
10       Asked and answered.
11       A    Depending on the exact facts and
12   circumstances, if there were two completely
13   offsetting transactions, same counterparties,
14   exactly the same terms, and subject to a
15   netting agreement, then it is potentially
16   possible to net settle those two
17   transactions.
18            But what it would not do is create
19   any new shares or any new cash out of thin
20   air.  So in the context of this transaction,
21   I don't think that that is a relevant
22   consideration.
23       Q    Well, I'm not asking you about this
24   transaction.  I'm asking you about -- I think
25   it's about nine words in the report, okay,

1   which is the "theoretical ability to net
2   settle offsetting DVP transactions."
3          You acknowledge -- I think you just
4   stated in your answer that it is at least
5   theoretically possible to net settle
6   offsetting DVP transactions.
7          Right?
8          MR. OXFORD:  Object to the form.
9       Asked and answered.  You can answer
10      again.
11      A    Subject to a range of particular
12  features which were not present in the
13  transactions that I have reviewed, if you
14  have two completely offsetting transactions,
15  same terms, same counterparties, netting
16  agreement in place, and whatever other
17  requirements there are, it is possible that
18  those two transactions could be
19  net -- netted.
20      Q    DVP stands for "delivery versus
21  payment."
22          Right?
23      A    Correct.
24      Q    Okay.  So, in theory, DVP
25  transactions could be net settled.

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 299

1              Correct?
2              MR. OXFORD:  Object to the form.
3         Asked and answered.
4         A    No, it's not a DVP transaction that
5    can be net settled.  It's if there are two
6    equal and opposite transactions between the
7    same counterparties, same terms, same time
8    period, same number of shares, everything the
9    same, it is possible to offset those two
10   transactions and they -- they effectively
11   cancel each other out.
12        Q    I'm sorry --
13             MR. OXFORD:  Hold on, Mike.
14        A    Sorry.  My point being it is
15   possible to cancel those two trades against
16   each other, but that -- as a result of that,
17   that would no longer be a DVP settlement.
18        Q    But in your report in the words
19   we've just been discussing, you say -- you
20   reference the "theoretical ability to net
21   settle offsetting DVP transactions," right?
22   You'll at least agree with me that's what you
23   said there, and I read it correctly.
24             Right?
25             MR. OXFORD:  Objection to form.

1            Asked and answered.  You can answer it
2       again.
3       A    That is what the words say.  But
4    you asked me to explain what I meant by it,
5    and what I meant by it is that given matching
6    counterparties, matching position, all the
7    terms exactly the same, netting agreement, it
8    would be theoretically possible to treat
9    those trades as settled in that circumstance.
10           But that circumstance is not one
11   that I've observed in the transactions that
12   I've reviewed.
13      Q    Okay.  Let's go to Paragraph 240
14   which is mercifully on the same page.
15      A    Okay.  Yeah.
16      Q    So sorry, so much for mercifully.
17   We're going to go to your reply report.
18           In your reply report --
19           MR. BONGIORNO:  What is the exhibit
20      number again?
21           (Whereupon a discussion was held
22      off the record.)
23      Q    I'm being told that your reply
24   report is 5003 by the most reliable source
25   available to me.

```
 1              Do you have your reply report in
 2     front of you, sir?
 3         A    I do.
 4         Q    Okay.  If you go to Paragraph 240
 5     of your reply report and then you go -- which
 6     is on Page 114.
 7              Are you there?
 8         A    Yeah.
 9         Q    Okay.  I'm going to point you to
10     subparagraph number "3" just toward the
11     bottom of the page, and specifically, your
12     statement in the first sentence, "Net
13     settlements are only possible on bilateral
14     obligations."
15              Do you see that?
16         A    I do.
17         Q    You don't give any citation or
18     other support for that statement.
19              Correct?
20         A    Well, I think in the context of my
21     overall report, it has to be taken in the
22     context of all the comments I make around
23     this in my overall report.
24         Q    Okay.  My question to you is
25     whether or not there's any citation in the
```

1    report.
2           At Paragraph 240, number "3" on
3    Page 114 of your rebuttal report, is there
4    any citation or support that you provide for
5    that statement?
6           MR. OXFORD:  Object to the form.
7       A   In that specific sentence, in that
8    specific paragraph, I agree that there is not
9    a citation.  But I think it has to be read in
10   the context of my overall report, my initial
11   report, and my rebuttal report as well.
12      Q   Let's go back.  Oh, sorry.
13          Would you agree that net
14   settlements are possible when there are more
15   than two investors and more than two trades?
16          MR. OXFORD:  Object to the form.
17      A   Can you give me an example?
18      Q   I could, but we'd probably --
19   that's standard boilerplate, so let's just
20   move on.
21          When I pointed you to Paragraph 3,
22   did you read the entire paragraph to
23   yourself?
24      A   No, I didn't, actually.
25      Q   Okay.  I'm going to point you to

```
 1    the last sentence of that paragraph where it
 2    says, "The Solo custodians had to settle six
 3    independent obligations (three share
 4    deliveries, each with a matching cash
 5    delivery obligation) between three supposedly
 6    legally distinct and independent entities at
 7    the same time, and there was no legal
 8    mechanism which would allow it to do this."
 9              Do you see that?
10       A      I do see that.
11       Q      You're not a lawyer.
12              Correct?
13       A      I'm not formally trained as a
14    lawyer, no.
15       Q      Do you consider yourself a lawyer
16    even though you're not formally trained?
17              MR. OXFORD:  Objection to form.
18       A      Over the course of my career
19    involved in the structured finance markets,
20    understanding legal issues is something that
21    I have gained some expertise in.  But I am
22    not a fully qualified lawyer.
23       Q      Are you testifying as to legal
24    issues in this matter?
25              MR. OXFORD:  Object to the form,
```

1     asked and answered.
2     A   I think, as I've made clear
3 earlier, I am not expressing any legal
4 opinions in my reports.
5     Q   Do you consider yourself an expert
6 on settlement?
7     MR. OXFORD:  Object to form.
8     A   Over the course of my career,
9 including particularly my time at Barclays, I
10 have spent quite a lot of time dealing with a
11 range of settlement-related matters. So I do
12 consider that I have some expertise in
13 questions related to settlement.
14     Q   Before you submitted your reports,
15 did you read any sources about net
16 settlement?
17     MR. OXFORD:  Object to the form.
18     A   Sorry. Before what point in time?
19     Q   Before you submitted your expert
20 reports in this case, did you read any
21 sources about net settlement?
22     A   There are a number of sources which
23 discuss netting in all its different legal
24 contexts which are referenced in the
25 appendices to my report. So yes, to the

1    extent they're included in that section, they
2    are things that I have referred to.
3         Q    I take it you've read all of those,
4    if they're referenced there?
5              MR. OXFORD:  Object to the form.
6         A    I think this question was kind of
7    right at the start today.
8              The -- I would say the vast
9    majority of the references in Appendix B, I
10   have personally read.  There may be some
11   references in there which are documents or
12   other matters that were made available to me
13   and they're included in that appendix for the
14   purposes of completeness.
15             But, in general, everything that's
16   in this report, was cited to or cited to in
17   this report, I personally reviewed.
18        Q    What about Dr. Carr's report?  Did
19   you read any of the sources that Carr cited
20   upon settlement?
21             MR. OXFORD:  Object to the form.
22        A    I -- in reviewing Dr. Carr's
23   reports, I read a number of citations that he
24   referred to.  I think they -- they are
25   included in my report where I read them.

```
 1         Q     When I say ESMA, you know what I
 2    mean.
 3               Right?
 4         A     Yeah, I do.
 5         Q     Okay.  Let's go to Tab 5114 in the
 6    Wilmer Hale binder --
 7               MR. BONGIORNO:  -- which I will
 8         mark as -- which I will mark as
 9         Exhibit 5114.
10               (Whereupon the above mentioned was
11         marked for Identification.)
12         Q     Do you have that in front of you,
13    sir?
14         A     I do.
15         Q     Is it the "Guidelines on
16    Internalized Settlement Reporting Under
17    Article 9 of CSDR?"
18               Is that what you have in front of
19    you, sir?
20         A     Yeah, "Guidelines on Internalized
21    Settlement Reporting, Article 9."
22         Q     Okay.  If you turn to Page 3 of the
23    document --
24         A     Yeah.
25         Q     -- have you seen this document
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 307

```
1    before?
2        A    I believe I have seen this document
3    before.
4        Q    Are you familiar with it?
5        A    I'm sure you're going to ask me a
6    specific question, but I have reviewed it.  I
7    wouldn't pretend to know the full details of
8    everything that's in this document.
9        Q    Well, I'm going to ask you to look
10   at -- under Roman V, Section 5.1, A and B.
11   I'd ask that you read those two to yourself.
12       A    (Witness reviewing.)
13            Okay.
14       Q    Okay.  So do you agree with me that
15   this description of "internalization" says
16   that "a settlement internalizer may resolve a
17   settlement instruction without involving
18   external parties in the holding chain?"
19            MR. OXFORD:  Objection to form.
20       A    I don't think that's what this
21   says.  I think this is saying that to be
22   within the scope of the ESMA settlement
23   reporting rules, and all they are is
24   reporting that these two conditions need to
25   be satisfied.
```

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 308

```
1       Q    And does this document say that
2    internal settlement may occur without moving
3    any securities held externally?
4            MR. OXFORD:  Object to the form.
5       A    I don't -- I don't know what you
6    mean by "held externally."
7            Externally from whom?
8       Q    You don't know what I mean when I
9    say "held externally," sir?
10           MR. OXFORD:  Objection.
11      A    My question was:  External to who?
12      Q    To the settlement internalizer,
13   external to the settlement internalizer, the
14   entity doing the settling?
15      A    In this situation, my read of what
16   this rule is saying is that in certain
17   circumstances where a custodian actually
18   settles transactions, that those transactions
19   occur as between clients, all of whom are
20   using the same settlement account of that
21   custodian, that that transaction would be
22   within the scope of the reporting
23   requirements for reporting that needs to be
24   made to ESMA.
25           And that's -- I think that's
```

1      basically all it really says.
2          Q    Well, would you agree that this
3      section acknowledges that there are context
4      in which a settlement can be internalized?
5              MR. OXFORD:  Object to form.
6          A    A validly completed settlement -- I
7      mean, the definition of "internalized
8      settlement" means that a settlement has taken
9      place, but the terms of the settlement are
10     such that the deliverer and the receiver of
11     the securities were both within the scope of
12     the same custodian who settled that
13     transaction.
14             But if no transaction is actually
15     settled, then I don't think there's any
16     particular relevance to this.
17         Q    I'm going to ask you to turn to
18     Tab 5123.
19             MR. BONGIORNO:  Mark 5123.
20             (Whereupon the above mentioned was
21         marked for Identification.)
22         A    My binder only goes up to 5122.
23         Q    Lucky you.  Well, actually, not so
24     much.  Just kidding.  You should have that
25     somewhere in the -- in the room.