# Exhibit 4, Part 2

"*minutes rather than hours*". Sunrise understood other brokers had access to the Brokermesh platform and the platform itself formed part of a closed network without wider market access. Sunrise also assumed that all the Broker Firms were executing roughly the same volumes of trading.

A. *Trade sizes*

4.126 Between February and August 2015, Sunrise used Brokermesh to purportedly execute Cum-Dividend Trading, to the value of approximately £25.4 billion in Danish equities and £11.2 billion in Belgian equities on behalf of the Solo Clients.

4.127 Analysis of the Cum-Dividend Trading reveals the following:

- Sunrise purportedly executed 'buy' orders on behalf of Solo Clients in 15 Danish stocks over 11 cum-dividend dates. An average of 15.4% of the available shares in each stock was traded, which were cumulatively worth a total of £25.4 billion. The volumes also equated to an average of 36 times the total number of all shares traded in those stocks on European exchanges.

- Sunrise purportedly executed 'buy' orders on behalf of Solo Clients in 15 Belgian stocks over 10 cum-dividend dates. An average of 6.1% of the available shares in each stock was traded, which were cumulatively worth a total of £11.2 billion. The volumes also equated to an average of 22 times the total number of all shares traded on European exchanges.

- The aggregate value of Cum-Dividend Trades purportedly executed by Sunrise on behalf of Solo Clients on a cum-dividend date were in a range of approximately £92 million to £10 billion for a Danish equity and approximately £47 million to £6 billion for a Belgian equity.

4.128 The Authority considers that it is significant for market surveillance and visibility that individual trades were below the applicable disclosable thresholds. For example, section 29 of the Danish Securities Trading Act required shareholders holding over 5% of Danish-listed stock to be publicised. Similarly, Belgian law requires pursuant to Article 6 of the 'Law of 2 May 2007 on disclosure of major holdings in issues whose shares are admitted to trading on a regulated market and laying down miscellaneous provisions' holders of more than 5% of the existing

voting rights to notify the issuer and the Belgian Financial Services Markets Authority of the number and proportion of voting rights that he/she holds.

4.129  The purported Cum-Dividend Trading executed by Sunrise on behalf of the Solo Clients represented up to 20% (an average of 15.4%) of the shares outstanding in companies listed on the Danish stock exchange, and up to 9.6% (an average of 6.1%) of the shares outstanding in companies listed on the Belgian stock exchange.

   B.  *Awareness and review of Solo Trading*

4.130  Sunrise ought to have been aware of the trade sizes it purportedly executed on behalf of the Solo Clients across the Relevant Period, as the volume of trading being conducted was made available to the Firm's senior management through internal communications and on a data system that was regularly reviewed for profit and loss purposes.

4.131  Once the Solo Trading commenced, Sunrise did not consider undertaking a review of the sizes and volumes of the transactions executed to ensure the level of trading was consistent with their understanding of the Solo Clients' risk profile. In fact, Sunrise did not analyse the sizes and volumes of the Solo Trading at all.

4.132  An internal report at the Firm suggested that it purportedly executed trades on behalf of 48 Solo Clients in Stock A on 25 February 2015, which was the first day the Firm started the Solo Trading. The approximate value of the trading purportedly executed on behalf of a Solo Client was in a range of £21 million to £26 million, and on aggregate to the approximate value of £1 billion.

4.133  When interviewed, Sunrise acknowledged that the aforementioned trades in isolation were "*quite large trades*" and combined were "*a huge amount of trades*". Sunrise further represented that this scale of trading "*was something that we have not covered, we have not seen or anticipated or, to a certain extent, were aware of*". However, Sunrise also said that it was common for Sunrise's Equity Finance Desk to deal in large notional values, therefore the size of transactions undertaken on the Brokermesh platform "*did not, in themselves, appear unusual*".

4.134  On 20 March 2015, almost a month after the Solo Trading had commenced, an internal Sunrise email provided an update which stated "*so far we have traded 7 stocks on the platform (with another 40 or so to go) Total Gross Brokerage is*

41

*DKK996,355 around GBP75,000 after conversation and commission share with platform, so not a bad start. Could I have a quick word?"*.

4.135 To reach these figures, Sunrise would have had to execute trades on behalf of the Solo Clients to the approximate value of £15.5 billion in order to generate gross commission of DKK 996,355 (which equates to approximately £97,000) within almost a month.

4.136 Sunrise never queried how it was possible to source sufficient liquidity, cash or financing for trades that had a nominal value of billions of pounds within a single day. Nor did Sunrise enquire how such liquidity, cash or financing could be found within a closed network of clients (most of whom were individual 401(k) Pension Plans) without access to liquidity from public exchanges. This was despite the fact that the purported Solo Trading on Brokermesh represented multiple times the entire daily volume of trading across virtually all European exchanges.

4.137 This early indication of the volume of trading ought to have prompted Sunrise to consider the financial crime risk posed by the Solo Trading and review whether the Solo Trading was in line with the Solo Clients' trading profiles, enquire into how the Solo Clients had sufficient funds to settle the trades and question whether the trade sizes affected the Solo Clients' low risk rating.

4.138 Sunrise failed to do this. Sunrise's position was that because all the trades would have been subject to the Solo Group's approval and ultimately settled by the Solo Group, Sunrise accepted all trade orders, no matter what their volume and did not undertake checks as to the source of funds of the transactions it executed, even if they were particularly large.

**The German Trade**

4.139 On 3 September 2015, Sunrise executed a EUR 5 million 'buy' order on behalf of a broker client ("Client X") of 146,397 shares in a German stock at a specified intraday price of EUR 34.15 ("the German trade"). The German trade was executed at nearly twice the prevailing market price of the German stock. Sunrise executed the German trade in circumstances where the onboarding of Client X and the unusual nature of the German trade itself ought to have led it to consider the serious financial crime risks arising from the transaction. A trade confirmation from Sunrise regarding the German trade referenced a commission of EUR 200.

42

4.140 As part of assessing how the Firm could be used for the purposes of money laundering and financial crime, Sunrise was required under Regulation 20 of the 2007 Regulations to assess the risks posed by its clients' trading behaviours, particularly in instances where customers request a complex or unusually large transaction which has no apparent economic or lawful purpose.

4.141 Firms must have adequate policies, procedures, systems and controls that provide for the identification and scrutiny of such transactions and any other activity which may be related to money laundering. They must also be sufficiently comprehensive so that they are able to identify specific strategies or individual trades that may be used to further financial crime.

4.142 The circumstances of the onboarding of Client X and the nature of the German trade itself ought to have prompted Sunrise to consider associated financial crime risks posed to the Firm. In particular:

a) Sunrise faced difficulties onboarding Client X with the entity whom it proposed would clear the German Trade ("the Clearer") as Client X was not a regulated entity and there were inadequacies and gaps in the KYC documentation and information Client X had provided.

b) Further, there were inconsistencies in the information Client X provided in relation to the KYC documentation requested. When the Clearer required Client X to produce its audited accounts, Client X told Sunrise its "*Audited Accounts are currently in the process*" but then shortly after it stated that as Client X was "*a Cayman firm, it is not required to prepare audited accounts*".

c) Despite Sunrise confirming to the Clearer on 20 August 2015 that it had "*validated*" Client X for the purposes of KYC/AML checks, Sunrise appeared to be unable to provide key information relevant to KYC/AML checks requested by the Clearer on 1 September 2015. This included Client X's latest annual report or audited accounts, recent certificate of incumbency or good standing, Client X's UBO's source of wealth and confirmation whether the trade would be a one-off. In addition, Sunrise told the FCA that "*we are not aware that any explanation was provided at the time of the trading to Sunrise regarding the circumstances of, and rationale for, the trading*" indicating that Sunrise had not carried out the checks it was obliged to under the 2007 Regulations and

its own Compliance Documents and that Sunrise had represented to the Clearer it had.

d) The Clearer noted that "*For our team it seems unusual to see a broker as an underlying client of another broker*" and asked whether Client X would be trading from its own account and asked for an explanation from Client X along with a presentation of its business activities.

e) Between 20 August 2015 and 1 September 2015, Sunrise provided updates in relation to the onboarding of Client X to an individual at a firm it believed to be connected to the Solo Group stating that Client X was not yet set up with the Clearer and hence unable to do a cash trade.

f) On 1 September 2015, an internal email communication at Sunrise stated that they would not be able to "*move forward*" unless Client X provided the additional information requested by the Clearer.

g) On the same day, a Solo Group entity contacted Sunrise regarding a trade in a German stock for Client X. Until that point, Sunrise were unaware of the stock that Client X wanted to trade in, only that it was for a EUR 5 million trade. After Sunrise had explained the onboarding difficulties in relation to Client X, the Solo Group entity suggested "*a way round it with [Client X] being the ultimate buyer*" and that the trade be executed by Sunrise via a specific counterparty to the trade ("Counterparty A") which was a regulated entity whilst Client X would be the underlying client ultimately buying the German stock via Counterparty A. The effect of this would be that the Clearer would no longer need to onboard Client X as a client but instead could onboard Counterparty A.

h) On 3 September 2015, Client X provided instructions to Sunrise to purchase up to 150,000 shares in the German stock at a maximum price of EUR 35 per share for a total consideration of EUR 5 million.

i) This order size represented more than one hundred times the average daily volume of trading in the German Stock (the annual accounts for the issuer of the German stock stated that the average daily volume of shares traded in the German stock were approximately 1,450 in 2014 and 1,150 in 2015).

44

j) At 15:09, a broker confirmed its ability to sell 146,397 shares in the German stock at a price of EUR 34.15 per share equating to a value of EUR 5 million. This appeared to match Client X's instructions and Sunrise confirmed the trade.

k) On 3 September 2015 at 17:19, the Clearer queried the trade with Sunrise on the basis that the "*high was 18.105 and low was 16.2*" (i.e. the actual market price of the German stock was almost half the price Sunrise was proposing to execute the trade at). On 4 September 2015, Sunrise confirmed that the prices were correct and that it was an OTC transaction where "*both sides agree with the prices*".

4.143 Earlier on 3 September 2015, a separate counterparty bought the same quantity of shares as the German trade but at a price of EUR 18.1 per share, which it then sold on the same day at EUR 34.15 per share. The shares sold were in fact the German trade executed by Sunrise, which resulted in a profit of EUR 2.3 million. for the underlying client of that counterparty. The Authority has however not located evidence to suggest that Sunrise knew of this counterparty's earlier purchase.

4.144 Sunrise ignored, or failed to notice, a series of red flags in relation to the German trade and it is a further example of Sunrise failing to identify or manage its financial crime risks.

4.145 Sunrise did not conduct an adequate risk assessment of Client X and did not query the purpose and expected volumes of the trading even though it represented to the Clearer it had. There is no indication that Sunrise complied with its own onboarding requirements or obligations under the 2007 Regulations when conducting CDD on Client X nor did it consider the associated financial crime risks posed to the Firm. This was particularly apparent when the Clearer requested key AML/KYC information about Client X, which Sunrise appeared unable to provide.

4.146 In addition, Sunrise explained that when it was monitoring for potential suspicious activity, it only looked at price movement (as an indicator of potential market abuse). This trade monitoring was carried out on an informal and manual basis which Sunrise said it considered adequate, given that it was executing less than 10 equity trades a day. Yet, Sunrise's informal and manual trade monitoring failed to flag and/or highlight the German trade's agreed intraday price of EUR 34.15, which

was nearly twice that of the prevailing share price of EUR 18. Even when the Clearer queried the price of the German trade, Sunrise did not appear to have any concerns nor did it escalate the trade internally. Sunrise informed the FCA that during the Relevant Period it did not have any policies or procedures for dealing with trades executed at prices significantly off-market.

4.147   The German trade was linked to Solo but it was distinct from the Solo Trading on Brokermesh executed on behalf of Solo Clients. Notwithstanding its complexity, unusual nature and lack of economic rationale, the circumstances of the onboarding of Client X, Sunrise failed to identify or consider the German trade as being potentially suspicious.

**End of the Purported Solo Trading**

4.148   Sunrise executed its last trades for a Solo Client on 29 September 2015. An internal email dated 27 October 2015 stated, "*No formal confirmation but it looks like West Point have shut down… …we cannot do any further trades (last trade 1 month ago) with Solo or any connected entities*". The Solo Trading ceased after an unannounced visit by the Authority to the offices of the Solo Group entities and the Broker Firms on 3 to the 4 November 2015.

**Elysium payment**

4.149   However, on 29 October 2015, Sunrise had been contacted by a Solo Group representative to present an offer by a company called Elysium Global (Dubai) Limited ("Elysium") to purchase debts owed to Sunrise by some of the Solo Clients at a discount of 5%. Elysium was not known to Sunrise and Sunrise had had no interactions with it prior to that point.

4.150   The Solo Group representative mentioned that Elysium would contact Sunrise separately and upon receipt of Sunrise confirmation "*the payment would be made very very quickly… …which is the upside of all this*".

4.151   Sunrise's initial view was that such an offer was not acceptable and debts owed to the Firm by the Solo Clients had to be paid in full.

4.152   Elysium directly contacted Sunrise on 29 October 2015 as "*official confirmation*" that it wanted to extend a debt factoring facility against Sunrise's trading debtors.

46

4.153   In response, Sunrise sent Elysium copies of 75 invoices on 30 October 2015 that appear to be based on a list of outstanding invoices the Firm had received from the Solo Group representative. On 2 November 2015, Elysium confirmed receipt of these invoices and stated that it would get back to Sunrise "*shortly regarding payment*".

4.154   On 3 and 4 November 2015, the Authority made unannounced visits to the offices of the Solo Group entities and the Broker Firms in relation to the Solo Trading. On 4 November 2015, the Authority made an unannounced visit to Sunrise.

4.155   The 75 invoices were paid in full by Elysium on 4 November 2015. On 5 November 2015, Sunrise confirmed to the Solo Group representative that they had received funds (to the approximate value of USD 108,000) from Elysium on 4 November 2015 and stated there were still "*quite a few invoices for Q1, 2 and 3 outstanding*". The Solo Group representative asked Sunrise to "*liaise directly with the custodians*" regarding these outstanding invoices.

4.156   Despite having no agreement in place, Sunrise accepted a payment of approximately USD 108,000 from Elysium, an entity registered in the UAE and unknown to the Firm, relating to 75 US 401(k) Pension Plans. This occurred the same day that the Authority had conducted an unannounced visit alerting Sunrise to possible issues with the Solo Group.

4.157   Sunrise explained that they were not suspicious of the Elysium payment "*particularly as payment was made in full*" and because the Solo Group representative through whom payment was arranged was known to the Firm. Sunrise said its "*normal approach … was to require invoice[s] to be paid in full and … Sunrise did not see any reason to depart from this approach*".

4.158   This indicated further serious weaknesses in Sunrise's financial crime risk management that ultimately led to Sunrise failing to consider their financial crime and money laundering risks in relation to Elysium. Instead, the prime concern for Sunrise in accepting the Elysium payment was whether or not it would result in Sunrise's debts being paid in full.

4.159   Consequently, Sunrise prioritised obtaining prompt payment in full over adequately considering or escalating the associated financial crime and money laundering risks posed to the Firm in relation to the Elysium payment.

47

**Sunrise failed to Identify Any of the Above Issues**

4.160   Sunrise failed to identify any of the above issues.  With respect to anti-money laundering and financial crime risk, during the Relevant Period, Sunrise did not identify any transactions raising any suspicions and no breaches were reported or observed.

## 5. FAILINGS

5.1   The statutory and regulatory provisions relevant to this Notice are referred to in Annex B.

5.2   The JMLSG Guidance has also been included in Annex B, because in determining whether breaches of its rules on systems and controls against money laundering have occurred, and in determining whether to take action for a financial penalty or censure in respect of a breach of those rules, the Authority has also had regard to whether Sunrise followed the JMLSG Guidance.

**Principle 3**

5.3   Principle 3 requires a firm to take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems.

5.4   Sunrise breached this requirement during the Relevant Period in relation to the Solo Group business, as its policies and procedures were inadequate for identifying, assessing and mitigating the risk of financial crime as Sunrise failed to:

   a)   provide adequate guidance on obtaining and assessing adequate information when onboarding clients, with reference to the purpose and intended nature of the business relationship, the anticipated level and nature of activity to be undertaken and when it would be appropriate to enquire as to the source of funds;

   b)   provide adequate guidance on carrying out risk assessments for clients including the relevant risk factors to be taken into account in order to determine the correct level of CDD to be applied, including whether EDD was warranted;

   c)   set out adequate processes or procedures detailing how to conduct EDD, including enhanced monitoring requirements for higher risk clients;

48

d) provide adequate guidance on its risk-based approach for conducting CDD on new clients introduced by authorised firms, where reliance may be placed upon KYC documents provided by the authorised firms for the new clients and detailing the circumstances when it was appropriate to do so;

e) set out formal processes or procedures detailing how and/or specify the circumstances in and frequency with which Sunrise should monitor and document customer transaction activity, throughout the course of its relationship with the Firm, in order to assess financial crime and AML risks; and

f) set out escalation procedures in identifying, managing and documenting financial crime and AML risks.

**Principle 2**

5.5    The Authority considers that Sunrise failed to act with due skill, care and diligence as required by Principle 2 in applying its own (limited) AML policies and procedures and in assessing, monitoring and managing the risks of financial crime it was exposed to in respect of the Solo Group business. In particular, Sunrise failed to:

a) act promptly in implementing a work programme to address deficiencies identified within its Compliance function following a visit from the Authority in November 2014;

b) conduct an adequate risk assessment or adequate due diligence when taking on the Solo Group business which meant that they failed to be identified properly as high risk clients;

c) carry out adequate CDD when onboarding each Solo Client including the purpose and intended nature of the business relationship, the anticipated level and nature of activity to be undertaken, and the source of funds and/or trading history, in order to provide a meaningful basis for transaction monitoring;

d) conduct a risk assessment for each of the Solo Clients, as required by the Compliance Documents, and consequently failed to identify that the Solo Clients presented a higher risk of financial crime and that EDD ought to have been completed;

49

e) conduct any EDD on the Solo Clients that presented a higher risk of money laundering and subsequently failed to identify what EDD measures might have been appropriate for the ongoing monitoring of the Solo Clients;

f) assess each of the Solo Clients against the categorisation criteria set out in COBS 3.5.3 and/or failed to record the results of such assessments, including sufficient information to support the categorisation, contrary to COBS 3.8.2R(2)(a);

g) follow its own compliance policy in that Sunrise started trading on behalf of the Solo Clients before they had been onboarded;

h) conduct any ongoing transaction monitoring of the Solo Trading throughout the Relevant Period;

i) recognise numerous red flags with the Solo Trading including that Sunrise did not consider whether it was plausible and/or realistic that sufficient liquidity was sourced within a closed network of entities for the scale and volumes of trading conducted by the Solo Clients and/or that the profiles of the Solo Clients and the nature of the 401(k) Pension Plans meant that they were highly unlikely to meet the scale and volume of the trading purportedly being carried out and/or at least obtain sufficient evidence of the clients' source of funds to satisfy itself to the contrary;

j) adequately consider financial crime and money laundering risks in respect of the German trade, in circumstances which were highly suggestive of potential financial crime and were entirely different in nature to the other trades introduced by Solo;

k) adequately consider associated financial crime and money laundering risks posed in respect of the Elysium payment whereby the Firm accepted a payment of approximately USD 108,000 from Elysium without any due diligence or agreement in place and shortly after the Authority had conducted an unannounced visit alerting Sunrise to its concerns with the Solo Group; and

l) make and keep adequate (or in some cases any) written records as evidence of work it may have undertaken specifically relating to the consideration and discussion of financial crime and AML matters by Sunrise management.

50

## 6. SANCTION

6.1    The Authority has considered the disciplinary and other options available to it and has concluded that a financial penalty is the appropriate sanction in the circumstances of this particular case.

6.2    The Authority's policy on the imposition of financial penalties is set out in Chapter 6 of DEPP. In determining the financial penalty, the Authority has had regard to this guidance.

6.3    DEPP 6.5A sets out a five-step framework to determine the appropriate level of financial penalty.

**Step 1: disgorgement**

6.4    Pursuant to DEPP 6.5A.1G, at Step 1 the Authority seeks to deprive a firm of the financial benefit derived directly from the breaches where it is practicable to quantify.

6.5    The financial benefit associated with Sunrise's failings is quantifiable by reference to the revenue it derived from the Solo Group business as described in paragraph 4.121 of this Notice, minus custody fees, totalling £407,273.45.

6.6    The figure after Step 1 is therefore **£407,273.45.**

**Step 2: the seriousness of the breaches**

6.7    Pursuant to DEPP 6.5A.2G, at Step 2 the Authority determines a figure that reflects the seriousness of the breaches. Where the amount of revenue generated by a firm from a particular product line or business area is indicative of the harm or potential harm that its breaches may cause, that figure will be based on a percentage of the firm's revenue from the relevant products or business area.

6.8    The Authority considers that the revenue generated by Sunrise from the Solo Group business is indicative of the harm or potential harm caused by its breach. The Authority has therefore determined a figure based on a percentage of Sunrise's revenue during the period of the breaches.

6.9    Sunrise's revenue is the revenue derived from for the Solo Group business as it relates to the breaches identified in this Notice. The period of Sunrise's breach was

from 17 February 2015 to 4 November 2015. The Authority considers Sunrise's revenue for this period to be **£466,651.87.**

6.10    In deciding on the percentage of the revenue that forms the basis of the step 2 figure, the Authority considers the seriousness of the breaches and chooses a percentage between 0% and 20%. This range is divided into five fixed levels which represent, on a sliding scale, the seriousness of the breach; the more serious the breach, the higher the level. For penalties imposed on firms there are the following five levels:

Level 1 – 0%

Level 2 – 5%

Level 3 – 10%

Level 4 – 15%

Level 5 – 20%

6.11    In assessing the seriousness level, the Authority takes into account various factors which reflect the impact and nature of the breaches, and whether it was committed deliberately or recklessly. DEPP 6.5A.2G lists factors likely to be considered 'level 4 or 5 factors'. Of these, the Authority considers the following factors to be relevant:

1.    The breaches revealed serious or systemic weaknesses in the Firm's procedures and the management systems or internal controls relating to the Firm's governance of financial crime risk; and

2.    The breaches created a significant risk that financial crime would be facilitated, occasioned or otherwise occur.

6.12    Taking all of these factors into account, the Authority considers the seriousness of the breaches to be level 4 and so the Step 2 figure is 15% of £466,651.87.

6.13    Step 2 is therefore **£69,997.78.**

**Step 3: mitigating and aggravating factors**

6.14    Pursuant to DEPP 6.5A.3G, at Step 3 the Authority may increase or decrease the amount of the financial penalty arrived at after Step 2, but not including any amount to be disgorged as set out in Step 1, to take into account factors which aggravate or mitigate the breach.

6.15    The Authority considers that the following factors aggravate the breaches:

1.    The Authority and the JMLSG have published numerous documents highlighting financial crime risks and the standards expected of firms when dealing with those risks. The most significant publications include the JMLSG Guidance and Financial Crime Guide (including the thematic reviews that are referred to therein) which was first published in December 2011. These publications set out good practice examples to assist firms, for example in managing and mitigating money laundering risk by (amongst other things) conducting appropriate customer due diligence, monitoring of customers' activity and guidance of dealing with higher-risk situations. Given the number and detailed nature of such publications, and past enforcement action taken by the Authority in respect of similar failings by other firms, Sunrise should have been aware of the importance of appropriately assessing, managing and monitoring the risk that the Firm could be used for the purposes of financial crime.

2.    The Authority visited Sunrise in November 2014 which, along with the Authority's follow-up letter, put Sunrise on notice that its financial crime and AML controls were weaker than required prior to the commencement of the Solo Group business.

3.    Although Sunrise provided a work programme which included a review of its AML and KYC framework to be completed by July 2015, Sunrise failed to carry out any in-depth review of its financial crime risk controls until April 2016. The commission of this review was driven by commercial considerations as Sunrise was engaging in acquisition discussions with a potential buyer.

6.16    The Authority considers that there are no mitigating factors.

6.17    Having taken into account these aggravating factors, the Authority considers that the Step 2 figure should be increased by 20%.

6.18    Step 3 is therefore **£83,997.34**.

**Step 4: adjustment for deterrence**

6.19    Pursuant to DEPP 6.5A.4G, if the Authority considers the figure arrived at after Step 3 is insufficient to deter the firm who committed the breach, or others, from committing further or similar breaches, then the Authority may increase the penalty.

6.20    The Authority considers that DEPP 6.5A.4G(1)(a) is relevant in this instance and has therefore determined that this is an appropriate case where an adjustment for deterrence is necessary. Without an adjustment for deterrence, the financial penalty excluding disgorgement would be **£83,997.34**. In the circumstances of this case, the Authority considers that a penalty of this size would not serve as a credible deterrent to Sunrise and others and would not meet the Authority's objective of credible deterrence.  As a result, it is necessary for the Authority to increase the penalty to achieve credible deterrence.

6.21    Having taken into account the factors outlined in DEPP 6.5A.4G, the Authority considers that a multiplier of four should be applied at Step 4.

6.22    Step 4 is therefore **£335,989.35**.

**Step 5: settlement discount**

6.23    Pursuant to DEPP 6.5A.5G, if the Authority and the firm on whom a penalty is to be imposed agree the amount of the financial penalty and other terms, DEPP 6.7 provides that the amount of the financial penalty which might otherwise have been payable will be reduced to reflect the stage at which the Authority and the firm reached agreement. The settlement discount does not apply to the disgorgement of any benefit calculated at Step 1.

6.24    The Authority and Sunrise reached agreement to settle so a 30% discount applies to the Step 4 figure.

6.25    The Authority has rounded down the final penalty to the nearest £100. Step 5 is therefore **£642,400.**

54

**Penalty**

6.26    The Authority hereby imposes a financial penalty of **£642,400** on Sunrise for breaching Principle 2 and Principle 3.

## 7.  PROCEDURAL MATTERS

**Decision maker**

7.1    This Notice is given to Sunrise under and in accordance with section 390 of the Act.

7.2    The following statutory rights are important.

**Decision maker**

7.3    The decision which gave rise to the obligation to give this Notice was made by the Settlement Decision Makers.

**Manner and time for payment**

7.4    The financial penalty must be paid in full by Sunrise to the Authority no later than 26 November 2021.

**If the financial penalty is not paid**

7.5    If all or any of the financial penalty is outstanding on 27 November 2021, the Authority may recover the outstanding amount as a debt owed by Sunrise and due to the Authority.

**Publicity**

7.6    Sections 391(4), 391(6) and 391(7) of the Act apply to the publication of information about the matter to which this notice relates.  Under those provisions, the Authority must publish such information about the matter to which this notice relates as the Authority considers appropriate.  The information may be published in such manner as the Authority considers appropriate.  However, the Authority may not publish information if such publication would, in the opinion of the Authority, be unfair to you or prejudicial to the interests of consumers or detrimental to the stability of the UK financial system.

7.7    The Authority intends to publish such information about the matter to which this Final Notice relates as it considers appropriate.

**Authority contacts**

7.8    For more information concerning this matter generally, contact Udani Eriyagolla (direct line: 0207 066 9468 / udani.eriyagolla2@fca.org.uk) or Yashsvy Brizmohun (direct line: 0207 066 9488 / yashsvy.brizmohun2@fca.org.uk) of the Enforcement and Market Oversight Division of the Authority.

Mario Theodosiou

**Head of Department**

**Financial Conduct Authority, Enforcement and Market Oversight Division**

**ANNEX A:  CHRONOLOGY**

| Date | Comment |
|---|---|
| 1 May 2002 | Sunrise is authorised by the Authority. |
| 23 October 2014 | The Solo Group approached Sunrise to discuss the prospect of the Solo Trading. |
| 30 October 2014 | First meeting between Sunrise and the Solo Group representatives at Solo Group offices. |
| 25 November 2014 | The Authority's visit to Sunrise followed by a letter setting out its findings. |
| 16 December 2014 | Second meeting between Sunrise and the Solo Group representatives at Solo Group offices. |
| 17 February 2015 | Sunrise signed services agreements for clearing and settlement services with each of the Solo Group entities. |
| 17 February 2015 | Solo Group provided Sunrise with KYC documents in order to onboard the Solo Clients. |
| 24 February 2015 | Sunrise returned a signed licence agreement for the use of Brokermesh. |
| 25 February 2015 | Sunrise commenced trading on behalf of the Solo Clients before any of the Solo Clients onboarded. |
| 10 March 2015 | First group of Solo Clients recorded as onboarded by Sunrise. |
| 6 August 2015 | Solo sent request to onboard further clients. Sunrise does not onboard these clients. |
| 3 September 2015 | Sunrise executed the German trade. |
| 29 September 2015 | Sunrise executed the last trades on behalf of the Solo Clients. |

| 27 October 2015 | Sunrise decided to cease all trading with the Solo Group or connected entities. |
|---|---|
| 3 November 2015 | Unannounced visit by the Authority to the Solo Group entities and the Broker Firms. |
| 4 November 2015 | Sunrise accepted payment from Elysium and unannounced visit by the Authority to Sunrise. |
| April 2016 | Sunrise commissioned independent compliance consultant conducted review of its Compliance documentation. |
| 22 September 2016 | Solo Group entered into special administration. |

**ANNEX B:  RELEVANT STATUTORY AND REGULATORY PROVISIONS**

**1.     RELEVANT STATUTORY PROVISIONS**

**The Financial Services and Markets Act 2000**

1.1     Pursuant to sections 1B and 1D of the Act, one of the Authority's operational objectives is protecting and enhancing the integrity of the UK financial system.

1.2     Pursuant to section 206 of the Act, if the Authority considers that an authorised person has contravened a requirement imposed on it by or under the Act, it may impose on that person a penalty in respect of the contravention of such amount as it considers appropriate.

**The Money Laundering Regulations 2007**

1.3     Regulation 5 provides:

**Meaning of customer due diligence measures**

*"Customer due diligence measures" means—*

*(a) identifying the customer and verifying the customer's identity on the basis of documents, data or information obtained from a reliable and independent source;*

*(b) identifying, where there is a beneficial owner who is not the customer, the beneficial owner and taking adequate measures, on a risk-sensitive basis, to verify his identity so that the relevant person is satisfied that he knows who the beneficial owner is, including, in the case of a legal person, trust or similar legal arrangement, measures to understand the ownership and control structure of the person, trust or arrangement; and*

*(c) obtaining information on the purpose and intended nature of the business relationship."*

1.4     Regulation 7 provides:

**Application of customer due diligence measures**

*(1) "…, a relevant person must apply customer due diligence measures when he—*

*(a) establishes a business relationship;*

*(b) carries out an occasional transaction;*

*(c) suspects money laundering or terrorist financing;*

59

*(d) doubts the veracity or adequacy of documents, data or information previously obtained for the purposes of identification or verification.*

*(2) Subject to regulation 16(4), a relevant person must also apply customer due diligence measures at other appropriate times to existing customers on a risk-sensitive basis."*

1.5    Regulation 8 provides:

**Ongoing monitoring**

*"(1) "A relevant person must conduct ongoing monitoring of a business relationship.*

*(2) Ongoing monitoring" of a business relationship means—*

   *(e) scrutiny of transactions undertaken throughout the course of the relationship (including, where necessary, the source of funds) to ensure that the transactions are consistent with the relevant person's knowledge of the customer, his business and risk profile; and*

   *(f) keeping the documents, data or information obtained for the purpose of applying customer due diligence measures up-to-date.*

*(3) Regulation 7(3) applies to the duty to conduct ongoing monitoring under paragraph (1) as it applies to customer due diligence measures. "*

1.6    Regulation 14 provides:

**Enhanced customer due diligence and ongoing monitoring**

*"(1) A relevant person must apply on a risk-sensitive basis enhanced customer due diligence measures and enhanced ongoing monitoring—*

   *(a) in accordance with paragraphs (2) to (4);*

   *(b) in any other situation which by its nature can present a higher risk of money laundering or terrorist financing.*

*(2) Where the customer has not been physically present for identification purposes, a relevant person must take specific and adequate measures to compensate for the higher risk, for example, by applying one or more of the following measures—*

   *(a) ensuring that the customer's identity is established by additional documents, data or information;*

60

> (b) supplementary measures to verify or certify the documents supplied, or requiring confirmatory certification by a credit or financial institution which is subject to the money laundering directive;
>
> (c) ensuring that the first payment is carried out through an account opened in the customer's name with a credit institution."

1.7    Regulation 17 provides:

**Reliance**

*"(1) A relevant person may rely on a person who falls within paragraph (2) (or who the relevant person has reasonable grounds to believe falls within paragraph (2)) to apply any customer due diligence measures provided that—*

> *(a) the other person consents to being relied on; and*
>
> *(b) notwithstanding the relevant person's reliance on the other person, the relevant person remains liable for any failure to apply such measures.*

*(2) The persons are—*

> *(a) a credit or financial institution which is an authorised person;*
> *…*

*(4) Nothing in this regulation prevents a relevant person applying customer due diligence measures by means of an outsourcing service provider or agent provided that the relevant person remains liable for any failure to apply such measures."*

1.8    Regulation 20 provides:

**Policies and Procedures**

*"(1) A relevant person must establish and maintain appropriate and risk-sensitive policies and procedures relating to—*

> *(a) customer due diligence measures and ongoing monitoring;*
>
> *(b) reporting;*
>
> *(c) record-keeping;*
>
> *(d) internal control;*
>
> *(e) risk assessment and management;*

61

*(f) the monitoring and management of compliance with, and the internal communication of, such policies and procedures,*

*in order to prevent activities related to money laundering and terrorist financing.*

*(2) The policies and procedures referred to in paragraph (1) include policies and procedures—*

*(a) which provide for the identification and scrutiny of—*

*(i) complex or unusually large transactions;*

*(ii) unusual patterns of transactions which have no apparent economic or visible lawful purpose; and*

*(iii) any other activity which the relevant person regards as particularly likely by its nature to be related to money laundering or terrorist financing;"*

## 2.    RELEVANT REGULATORY PROVISIONS

2.1    In exercising its powers to impose a financial penalty, the Authority has had regard to the relevant regulatory provisions published in the Authority's Handbook. The main provisions that the Authority considers relevant are set out below.

### Principles for Business ("Principles")

2.2    The Principles are a general statement of the fundamental obligations of firms under the regulatory system and are set out in the Authority's Handbook.

2.3    Principle 2 provides:

*"A firm must conduct its business with due skill, care and diligence."*

2.4    Principle 3 provides:

*"A firm must take reasonable care to organise and control its affairs responsibly and effectively, with adequate risk management systems."*

### Senior Management Arrangements, Systems and Controls ("SYSC")

2.5    SYSC 3.2.6E provides:

*"The FCA, when considering whether a breach of its rules on systems and controls against money laundering has occurred, will have regard to whether a firm has*

62

*followed relevant provisions in the guidance for the UK financial sector issued by the Joint Money Laundering Steering Group."*

2.6    SYSC 3.2.6R provides:

*"A firm must take reasonable care to establish and maintain effective systems and controls for compliance with applicable requirements and standards under the regulatory system and for countering the risk that the firm might be used to further financial crime."*

2.7    SYSC 6.1.1R provides:

*"A firm must establish, implement and maintain adequate policies and procedures sufficient to ensure compliance of the firm including its managers, employees and appointed representatives (or where applicable, tied agents) with its obligations under the regulatory system and for countering the risk that the firm might be used to further financial crime."*

2.8    SYSC 6.3.1R provides:

*"A firm must ensure the policies and procedures established under SYSC 6.1.1 R include systems and controls that:*

*(1) enable it to identify, assess, monitor and manage money laundering risk; and*

*(2) are comprehensive and proportionate to the nature, scale and complexity of its activities."*

2.9    SYSC 6.3.6 provides:

*"In identifying its money laundering risk and in establishing the nature of these systems and controls, a firm should consider a range of factors, including:*

*(1) its customer, product and activity profiles;*

*(2) its distribution channels;*

*(3) the complexity and volume of its transactions;*

*(4) its processes and systems; and*

*(5) its operating environment."*

2.10    SYSC 6.3.7 provides:

*"A firm should ensure that the systems and controls include:*

*(3) appropriate documentation of its risk management policies and risk profile in relation to money laundering, including documentation of its application of those policies;*

*(4) appropriate measures to ensure that money laundering risk is taken into account in its day-to-day operation, including in relation to:*

*(a) the development of new products;*

*(b) the taking-on of new customers; and*

*(c) changes in its business profile."*

2.11    SYSC 9.1.1 R provides:

*"A firm must arrange for orderly records to be kept of its business and internal organisation, including all services and transactions undertaken by it, which must be sufficient to enable the appropriate regulator or any other relevant competent authority under MiFID or the UCITS Directive to monitor the firm's compliance with the requirements under the regulatory system, and in particular to ascertain that the firm has complied with all obligations with respect to clients."*

**Conduct of Business Sourcebook (COBS)**

2.12    COBS 3.3.1A(EU) provides:

*"Articles 45(1) and (2) of the MiFID Org Regulation require firms to provide clients with specified information concerning client categorisation.*

*45(1) Investment firms shall notify new clients, and existing clients that the investment firm has newly categorised as required by Directive 2014/65/EU, of their categorisation as a retail client, a professional client or eligible counterparty in accordance with that Directive.*

*(2) Investment firms shall inform clients in a durable medium about any right that client has to request a different categorisation and about any limitations to the level of client protection that a different categorisation would entail."*

2.13    COBS 3.3.1B(R) provides:

*"The information referred to in article 45(2) of the MiFID Org Regulation (as reproduced at COBS 3.3.1AEU) must be provided to clients prior to any provision of services."*

2.14    COBS 3.5.2 provides:

**Per Se Professional Clients**

*"Each of the following is a per se professional client unless and to the extent it is an eligible counterparty or is given a different categorisation under this chapter:*

*(1) an entity required to be authorised or regulated to operate in the financial markets. The following list includes all authorised entities carrying out the characteristic activities of the entities mentioned, whether authorised by an EEA State or a third country and whether or not authorised by reference to a directive:*

> *(a) a credit institution;*

> *(b) an investment firm;*

> *(c) any other authorised or regulated financial institution;*

> *(d) an insurance company;*

> *(e) a collective investment scheme or the management company of such a scheme;*

> *(f) a pension fund or the management company of a pension fund;*

> *(g) a commodity or commodity derivatives dealer;*

> *(h) a local;*

> *(i) any other institutional investor;*

*(2) in relation to MiFID or equivalent third country business a large undertaking meeting two of the following size requirements on a company basis:*

> *(a) balance sheet total of EUR 20,000,000;*

> *(b) net turnover of EUR 40,000,000;*

> *(c) own funds of EUR 2,000,000;*

*(3) in relation to business that is not MiFID or equivalent third country business a large undertaking meeting any1of the following conditions:*

> *(a) a body corporate (including a limited liability partnership) which has (or any of whose holding companies or subsidiaries has) (or has had at any time during the previous two years) 1called up share capital or net assets of at least £51 million (or its equivalent in any other currency at the relevant time);*

> *(b) an undertaking that meets (or any of whose holding companies or subsidiaries meets) two of the following tests:*

>> *(i)      a balance sheet total of EUR 12,500,000;*

65

(ii)    *a net turnover of EUR 25,000,000;*

(iii)    *an average number of employees during the year of 250;*

(c) *a partnership or unincorporated association which has (or has had at any time during the previous two years) net assets of at least £5 million (or its equivalent in any other currency at the relevant time) and calculated in the case of a limited partnership without deducting loans owing to any of the partners;*

(d) *a trustee of a trust (other than an occupational pension scheme, SSAS, personal pension scheme or stakeholder pension scheme) which has (or has had at any time during the previous two years) assets of at least £10 million (or its equivalent in any other currency at the relevant time) calculated by aggregating the value of the cash and designated investments forming part of the trust's assets, but before deducting its liabilities;*

(e) *a trustee of an occupational pension scheme or SSAS, or a trustee or operator of a personal pension scheme or stakeholder pension scheme where the scheme has (or has had at any time during the previous two years):*

(i) *at least 50 members; and*

(ii) *assets under management of at least £10 million (or its equivalent in any other currency at the relevant time);*

(f) *a local authority or public authority.*

(4) *a national or regional government, a public body that manages public debt, a central bank, an international or supranational institution (such as the World Bank, the IMF, the ECP, the EIB) or another similar international organisation;*

(5) *another institutional investor whose main activity is to invest in financial instruments (in relation to the firm's MiFID or equivalent third country business) or designated investments (in relation to the firm's other business). This includes entities dedicated to the securitisation of assets or other financing transactions."*

2.15    COBS 3.5.3 provides:

**Elective professional clients**

*"A firm may treat a client other than a local public authority or municipality3 as an elective professional client if it complies with (1) and (3) and, where applicable, (2):*

66

*(1) the firm undertakes an adequate assessment of the expertise, experience and knowledge of the client that gives reasonable assurance, in light of the nature of the transactions or services envisaged, that the client is capable of making his own investment decisions and understanding the risks involved (the "qualitative test");*

*(2) in relation to MiFID or equivalent third country business in the course of that assessment, at least two of the following criteria are satisfied:*

> *(a) the client has carried out transactions, in significant size, on the relevant market at an average frequency of 10 per quarter over the previous four quarters;*

> *(b) the size of the client's financial instrument portfolio, defined as including cash deposits and financial instruments, exceeds EUR 500,000;*

> *(c) the client works or has worked in the financial sector for at least one year in a professional position, which requires knowledge of the transactions or services envisaged; (the "quantitative test"); and*

*(3) the following procedure is followed:*

> *(a) the client must state in writing to the firm that it wishes to be treated as a professional client either generally or in respect of a particular service or transaction or type of transaction or product;*

> *(b) the firm must give the client a clear written warning of the protections and investor compensation rights the client may lose; and*

> *(c) the client must state in writing, in a separate document from the contract, that it is aware of the consequences of losing such protections.*

2.16    COBS 3.8.2R provides:

*"(2) A firm must make a record in relation to each client of:*

*the categorisation established for the client under this chapter, including sufficient information to support that categorisation;"*

**Decision Procedure and Penalties Manual ("DEPP")**

2.17    Chapter 6 of DEPP, which forms part of the Authority's Handbook, sets out the Authority's statement of policy with respect to the imposition and amount of

financial penalties under the Act. In particular, DEPP 6.5A sets out the five steps for penalties imposed on firms.

2.18    DEPP 6.2.3G provides:

*"The FCA's rules on systems and controls against money laundering are set out in SYSC 3.2 and SYSC 6.3. The FCA, when considering whether to take action for a financial penalty or censure in respect of a breach of those rules, will have regard to whether a firm has followed relevant provisions in the Guidance for the UK financial sector issued by the Joint Money Laundering Steering Group."*

**Enforcement Guide**

2.16 The Enforcement Guide sets out the Authority's approach to taking disciplinary action. The Authority's approach to financial penalties and suspensions (including restrictions) is set out in Chapter 7 of the Enforcement Guide.

**JMLSG GUIDANCE– PART I (dated 19 November 2014)**

**A risk-based approach – governance, procedures and internal controls**

2.19    JMLSG Paragraph 4.5 provides:

*"A risk-based approach requires the full commitment and support of senior management, and the active co-operation of business units.  The risk-based approach needs to be part of the firm's philosophy, and as such reflected in the procedures and controls.  There needs to be a clear communication of policies and procedures across the firm, along with the robust mechanisms to ensure that they are carried out effectively, weaknesses are identified, and improvements are made wherever necessary."*

2.20    JMLSG Paragraph 4.13 provides:

*"Whatever approach is considered the most appropriate to the firm's money laundering/terrorist financing risk, the broad objective is that the firm should know at the outset of the relationship who their customers are, where they operate, what they do, their expected level of activity with the firm and whether or not they are likely to be engaged in criminal activity. The firm then should consider how the profile of the customer's financial behaviour builds up over time, thus allowing the firm to identify transactions that may be suspicious."*

2.21    JMLSG Paragraph 4.16 provides:

*"A risk assessment will often result in a stylised categorisation of risk: e.g., high/medium/low. Criteria will be attached to each category to assist in allocating customers and products to risk categories, in order to determine the different*

*treatments of identification, verification, additional customer information and monitoring for each category, in a way that minimises complexity."*

2.22    JMLSG Paragraph 4.22 provides:

*"While a risk assessment should always be performed at the inception of a customer relationship (although see paragraph 4.16 below), for some customers a comprehensive risk profile may only become evident once the customer has begun transacting through an account, making the monitoring of transactions and on-going reviews a fundamental component of a reasonably designed RBA. A firm may also have to adjust its risk assessment of a particular customer based on information received from a competent authority."*

2.23    JMLSG Paragraph 4.25 provides:

*"For firms which operate internationally, or which have customers based or operating abroad, there are additional jurisdictional risk considerations relating to the position of the jurisdictions involved, and their reputation and standing as regards the inherent ML/TF risk, and the effectiveness of their AML/CTF enforcement regime."*

2.24    JMLSG Paragraph 4.32 provides:

*"The firm should assess its risks in the context of how it might most likely be involved in money laundering or terrorist financing. In this respect, senior management should ask themselves a number of questions; for example:*

> ➢ *What risk is posed by the firm's customers? For example:*
>> *o Complex business ownership structures, which can make it easier to conceal underlying beneficiaries, where there is no legitimate commercial rationale;*
>> *o An individual meeting the definition of a PEP (see paragraphs 5.5.18);*
>> *o Customers (not necessarily PEPs) based in, or conducting business in or through, a high risk jurisdiction, or a jurisdiction with known higher levels of corruption or organised crime, or drug production/distribution; and*
>> *o Customers engaged in a business which involves significant amounts of cash, or which are associated with higher levels of corruption (e.g., arms dealing, extractive industries, construction).*
>> *o Customers engaged in industries that might relate to proliferation activities.*

> ➢ *What risk is posed by a customer's behaviour? For example:*
>> *o Where there is no commercial rationale for the customer buying the product he seeks;*

69

*o Requests for a complex or unusually large transaction which has no apparent economic or lawful purpose;*
*o Requests to associate undue levels of secrecy with a transaction;*
*o Situations where the origin of wealth and/or source of funds cannot be easily verified or where the audit trail has been deliberately broken and/or unnecessarily layered; and*
*o The unwillingness of customers who are not private individuals to give the names of their real owners and controllers.*

➢ *How does the way the customer comes to the firm affect the risk? For example:*
  *o Occasional transactions (see paragraph 5.3.6) v business relationships (see paragraph 5.3.5);*
  *o Introduced business, depending on the effectiveness of the due diligence carried out by the introducer; and*
  *o Non face-to-face acceptance.*

➢ *What risk is posed by the products/services the customer is using? For example:*
  *o Can the product features be used for money laundering or terrorist financing, or to fund other crime?*
  *o Do the products allow/facilitate payments to third parties?*
  *o Is the main risk that of inappropriate assets being placed with, or moving from, or through, the firm?*
  *o Does a customer migrating from one product to another within the firm carry a risk?"*

2.25    JMLSG Paragraph 4.44 provides:

*"The application of CDD measures is intended to enable a firm to form a reasonable belief that it knows the true identity of each customer and beneficial owner, and, with an appropriate degree of confidence, knows the types of business and transactions the customer is likely to undertake. The firm's procedures should include procedures to:*

➢ *Identify and verify the identity of each customer on a timely basis*

➢ *Identify and take reasonable, risk based measures to verify the identity of, any ultimate beneficial owner*

➢ *Obtain appropriate additional information to understand the customer's circumstances and business."*

2.26    JMLSG Paragraph 4.45 provides:

70

*"Based on the risk assessment carried out, a firm will determine the level of CDD that should be applied in respect of each customer and beneficial owner. It is likely that there will be a standard level of CDD that will apply to the generality of customer, based on the firm's risk appetite."*

2.27    JMLSG Paragraph 4.50 provides:

*"Where a customer is assessed as carrying a higher risk, then depending on the product sought, it will be necessary to seek additional information in respect of the customer, to be better able to judge whether or not the higher risk that the customer is perceived to present is likely to materialise. Such additional information may include an understanding of where the customer's funds and wealth have come from. Guidance on the types of additional information that may be sought is set out in section 5.5."*

2.28    JMLSG Paragraph 4.51 provides:

*"Where the risks of ML/TF are higher, firms must conduct enhanced due diligence measures consistent with the risks identified. In particular, they should increase the degree and nature of monitoring of the business relationship, in order to determine whether these transactions or activities appear unusual or suspicious. Examples of EDD measures that could be applied for higher risk business relationships include:*

> ➢ *Obtaining, and where appropriate verifying, additional information on the customer and updating more regularly the identification of the customer and any beneficial owner*

> ➢ *Obtaining additional information on the intended nature of the business relationship*

> ➢ *Obtaining information on the source of funds or source of wealth of the customer*

> ➢ *Obtaining information on the reasons for intended or performed transactions*

> ➢ *Obtaining the approval of senior management to commence or continue the business relationship*

> ➢ *Conducting enhanced monitoring of the business relationship, by increasing the number and timing of controls applied, and selecting patterns of transactions that need further examination*

> ➢ *Requiring the first payment to be carried out through an account in the customer's name with a bank subject to similar CDD standards"*

71

2.29    JMLSG Paragraph 4.61 provides:

"*Firms must document their risk assessments in order to be able to demonstrate their basis, keep these assessments up to date, and have appropriate mechanisms to provide appropriate risk assessment information to competent authorities.*"

**Customer due diligence**

2.30    JMLSG Paragraph 5.1.5 provides:

"*The CDD measures that must be carried out involve:*

> *(a) identifying the customer, and verifying his identity (see paragraphs 5.3.2);*

> *(b) identifying the beneficial owner, where relevant, and verifying his identity (see paragraphs 5.3.8); and*

> *(c) obtaining information on the purpose and intended nature of the business relationship (see paragraphs 5.3.21).*"

2.31    JMLSG Paragraph 5.3.125 provides:

"*To the extent consistent with the risk assessment carried out in accordance with the guidance in Chapter 4, the firm should ensure that it fully understands the company's legal form, structure and ownership, and must obtain sufficient additional information on the nature of the company's business, and the reasons for seeking the product or service.*"

**Enhanced due diligence**

2.32    JMLSG Paragraph 5.5.1 provides:

"*A firm must apply EDD measures on a risk-sensitive basis in any situation which by its nature can present a higher risk of money laundering or terrorist financing. As part of this, a firm may conclude, under its risk-based approach, that the information it has collected as part of the customer due diligence process (see section 5.3) is insufficient in relation to the money laundering or terrorist financing risk, and that it must obtain additional information about a particular customer, the customer's beneficial owner, where applicable, and the purpose and intended nature of the business relationship.*"

2.33    JMLSG Paragraph 5.5.2 provides:

72

*"As a part of a risk-based approach, therefore, firms should hold sufficient information about the circumstances and business of their customers and, where applicable, their customers' beneficial owners, for two principal reasons:*

> *to inform its risk assessment process, and thus manage its money laundering/terrorist financing risks effectively; and*

> *to provide a basis for monitoring customer activity and transactions, thus increasing the likelihood that they will detect the use of their products and services for money laundering and terrorist financing."*

2.34    JMLSG Paragraph 5.5.9 provides:

*"The ML Regulations prescribe three specific types of relationship in respect of which EDD must be applied.  They are:*

> *where the customer has not been physically present for identification purposes (see paragraphs 5.5.10);*

> *in respect of a correspondent banking relationship (see Part II, sector 16:  Correspondent banking);*

> *in respect of a business relationship or occasional transaction with a PEP (see paragraph 5.5.18)."*

**Monitoring Customer Activity**

2.35    JMLSG Paragraph 5.7.2 provides:

*"Monitoring customer activity helps identify unusual activity. If unusual activities cannot be rationally explained, they may involve money laundering or terrorist financing. Monitoring customer activity and transactions that take place throughout a relationship helps firms know their customers, assist them to assess risk and provides greater assurance that the firm is not being used for the purposes of financial crime."*

**JMLSG Part II – Wholesale Markets**

2.36    JMLSG Part 2 Paragraph 18.14 provides:

*"OTC and exchange-based trading can also present very different money laundering risk profiles. Exchanges that are regulated in equivalent jurisdictions, are transparent and have a central counterparty to clear trades, can largely be seen as carrying a lower generic money laundering risk. OTC business may, generally, be less well regulated and it is not possible to make the same generalisations concerning the money laundering risk as with exchange-traded products.  For*

*example, trades that are executed as OTC but then are centrally cleared, have a different risk profile to trades that are executed and settled OTC. Hence, when dealing in the OTC markets firms will need to take a more considered risk-based approach and undertake more detailed risk-based assessment."*

2.37    JMLSG Part 2 Paragraph 20.12 provides:

*"A firm should also consider, as part of its wider obligations in respect of financial crime and to mitigate reputational risk, whether there are any red flags that warrant further investigation. Some of the questions firms may wish to consider include, where relevant, whether the size and reputation of the service providers (administrator, investment manager, auditor, lawyers etc) match the funds profile and whether the due diligence procedures for investors into the fund appropriate?*

*Whilst structures associated with funds are often complex and involve a number of jurisdictions, an important question is: does it make sense? For example, why is a fund regulated and listed in different jurisdictions? Also, where, an administrator is located in non-equivalent jurisdiction or specific concerns have been identified, closer inspection of the administrator's due diligence activities and background should be considered."*

**ANNEX C: 401(K) PENSION PLAN**

<u>Employer Created 401(k) Plans</u>

1.1     A 401(k) is a qualified profit sharing plan that allows employees to contribute a portion of their wages to individual retirement accounts. Employers can also contribute to employees' accounts. Any money that is contributed to a 401(k) below the annual contribution limit is not subject to income tax in the year the money is earned, but then is taxable at retirement.  For example, if John Doe earns $100,000 in 2018, he is allowed to contribute $18,500, which is the 2018 limit, to his 401(k) plan. If he contributes the full amount that he is allowed, then although he earned $100,000, his taxable income for income tax purposes would be $81,500. Then, he would pay income tax upon any money that he withdraws from his 401(k) at retirement. If he withdraws any money prior to age 59 1/2, he would be subject to various penalties and taxes.

1.2     Contribution to a 401(k) plan must not exceed certain limits described in the Internal Revenue Code. The limits apply to the total amount of employer contributions, employee elective deferrals and forfeitures credits to the participant's account during the year. The contribution limits apply to the aggregate of all retirement plans in which the employee participates. The contribution limits have been increased over time.  Below is a chart of the contribution limits:

| Year | Employee Contribution Limit | Employer Contribution Limit | Total Contribution | Catch Up Contribution (only for individuals Age 50+) |
|------|------|------|------|------|
| 1999 | $10,000 | $20,000 | $30,000 | 0 |
| 2000 | $10,500 | $19,500 | $30,000 | 0 |
| 2001 | $10,500 | $24,500 | $35,000 | 0 |
| 2002 | $11,000 | $29,000 | $40,000 | $1,000 |
| 2003 | $12,000 | $28,000 | $40,000 | $2,000 |
| 2004 | $13,000 | $28,000 | $41,000 | $3,000 |
| 2005 | $14,000 | $28,000 | $42,000 | $4,000 |
| 2006 | $15,000 | $29,000 | $44,000 | $5,000 |
| 2007 | $15,500 | $29,500 | $45,000 | $5,000 |
| 2008 | $15,500 | $30,500 | $46,000 | $5,000 |
| 2009 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2010 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2011 | $16,500 | $32,500 | $49,000 | $5,500 |
| 2012 | $17,000 | $33,500 | $50,000 | $5,500 |
| 2013 | $17,500 | $34,000 | $51,000 | $5,500 |
| 2014 | $17,500 | $34,500 | $52,000 | $5,500 |
| 2015 | $18,000 | $35,000 | $53,000 | $6,000 |

If an individual was aged 30 in 1999, the absolute maximum that he could have contributed including the maximum employer contributions would be $746,000.

Minimum Age Requirements

1.3    In the United States, the general minimum age limit for employment is 14. Because of this, an individual may make contributions into 401(k) plans from this age if the terms of the plan allow it. The federal government does not legally require employers to include employees in their 401(k) plans until they are at least 21 years of age. If you are at least 21 and have been working for your employer for at least one year, your employer must allow you to participate in the company's 401(k) plan. As a result, some employers' plans will not allow individuals to invest until they are at least 18 or 21 depending upon the terms of the plan.

One-Participant 401(k) Plans

1.4    A one-participant 401(k) plan are sometimes called a solo 401(k). This plan covers a self-employed business owner, and their spouse, who has no employees. These plans have the same rules and requirements as other 401(k) plans, but the self-employed individual wears two hats, the employer and the employee.

**ANNEX D: SUNRISE VOLUMES OF TRADING**

**Graph A** Compares the volume of trading in five selected listed Danish stocks purportedly executed by Sunrise on behalf of Solo Clients and the aggregate volume traded on European exchanges by all other market participants on the same trading dates on which Sunrise purportedly executed the trades. This volume is shown as a percentage of the total number of outstanding shares in those particular stocks on those trading dates. It also contains the approximate value of the trading in GBP.



**Graph B** Compares the volume of trading in five selected listed Belgian stocks purportedly executed by Sunrise on behalf of Solo Clients and the aggregate volume traded on European exchanges by all other market participants on the same trading dates on which Sunrise purportedly executed the trades. This volume is shown as a percentage of the total number of outstanding shares in those particular stocks on those trading dates. It also contains the approximate value of the trading in GBP.



Graph C Compares the volume of trading in five selected listed Danish stocks together with five selected listed Belgian stocks purportedly executed by Sunrise on behalf of Solo Clients and the aggregate volume traded on European exchanges in those particular stocks by all other market participants on the same trading dates on which Sunrise purportedly executed those trades. This volume is shown as a percentage.



78