**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to:  The cases identified in Appendix A | MASTER DOCKET<br><br>18-md-02865-LAK |

<u>**DEFENDANT ROBERT KLUGMAN'S OFFER OF PROOF**</u>
<u>**REGARDING INVOLVEMENT AND ADVICE OF COUNSEL**</u>

**Table of Contents**

I.    INTRODUCTION ................................................................................................................ 3

II.   EVIDENCE ......................................................................................................................... 4

    A.   Evidence and Expected Testimony Regarding Mr. Klugman's Knowledge of Legal Advice Addressing the Dividend Arbitrage Strategy in Germany and Belgium Prior to His Denmark Investment ................................................................................................................ 4

    B.   Evidence and Expected Testimony Regarding Mr. Klugman's Knowledge of Legal Advice Concerning Trading in Denmark Prior to and During the Course of His Denmark Investment ................................................................................................................................ 8

    C.   Evidence and Expected Testimony Regarding Mr. Klugman's Knowledge of Kaye Scholer's Role in the Trading Strategy in Denmark ................................................................ 11

III.  CONCLUSION .................................................................................................................. 16

I.  **INTRODUCTION**

Defendant Robert Klugman makes the following offer of proof in response to the Court's September 6, 2024 Order (the "Order"). Dkt. 155.[1] Mr. Klugman notes that his expected testimony will track in material respects the testimony adduced by SKAT in his January 28, 2021 deposition.[2]

As described more specifically below, we expect that Mr. Klugman would testify that international and domestic attorneys at prominent law firms were integrally involved in the design and review of, and provided advice on, the Trial 1 Defendants' trading strategy for implementation in Denmark, as had been implemented in other countries, and provided specific and interrelated legal advice, including advice regarding: (1) the establishment of partnerships for purposes of the trading strategy; (2) the creation of United States pension plans and/or other tax-advantaged vehicles to engage in the strategy; (3) the tax treaty between the United States and Denmark; (4) reporting requirements under domestic and international securities laws; (5) the meaning of legal concepts such as beneficial ownership under foreign law; and (6) how to respond to United States regulators who examined the plans and trading at issue. In addition, lawyers at Kaye Scholer were involved in the actual submission of the tax reclaim forms to the Danish taxing authority. And, because its address was listed on various forms, Kaye Scholer

---

[1] Mr. Klugman recognizes that the Order demands a "complete" offer of proof and has endeavored in good faith herein to provide a full and complete recitation of all testimonial and documentary evidence that he proposes to introduce and all the arguments that he intends to make at trial. Mr. Klugman respectfully requests leave to supplement this offer of proof as the parties finalize their exhibits and get closer to trial, and to the extent that Plaintiff introduces evidence and/or makes argument at trial not contemplated at the time of this submission.

[2] Plaintiff's motion *in limine* (Dkt. 1125) reserves the right to argue, after the close of evidence, that the Court should not instruct the jury on evidence (or argument) that Defendants relied on advice of counsel "in representing in the tax refund claims that the plans were qualified under the Internal Revenue Code" to the extent Defendants fail to establish the elements of that separate issue at trial. *See id.* at 2, n.1. Accordingly, Mr. Klugman understands that neither Plaintiff's motion, nor the Order, contemplates pre-trial preclusion of evidence in that regard, and excludes such evidence from this offer of proof. Mr. Klugman respectfully requests leave to supplement this submission to the extent that the Court directs an offer of proof on such evidence.

3

also received statements and other documents reflecting what Mr. Klugman believed was the trading and surrounding transactions employed for the strategy. Mr. Klugman would testify that he relied heavily and in good faith on the advice, involvement, and oversight of Kaye Scholer, and other domestic and international attorneys at all relevant times, to ensure that neither he, nor any attorney acting on his behalf, made any false statements of fact with knowledge or reckless disregard to their falsity, acted with any intent to convince Plaintiff to rely upon such statements to its detriment, aided or abetted a fraud committed by others, had any intent to defraud, or made any material misrepresentations. To the extent not directly stated below, Mr. Klugman also adopts the offers of proof of Trial 1 defendants Richard Markowitz and John van Merkensteijn submitted contemporaneously herewith, insofar as he will testify that he communicated consistently with these individuals throughout the relevant period and relied at all times on the full range of advice and involvement provided by counsel to Messrs. Markowitz and van Merkensteijn. All of this evidence is critical to his defense and demonstrates that Mr. Klugman was at all times acting in good faith, and at no point had any intent to defraud SKAT.

## II.   EVIDENCE

### A.   Evidence and Expected Testimony Regarding Mr. Klugman's Knowledge of Legal Advice Addressing the Dividend Arbitrage Strategy in Germany and Belgium Prior to His Denmark Investment

Although Mr. Klugman did not participate in the trading strategy in Denmark until late 2014, he had reason to believe as early as 2009 that domestic and international law firms engaged by Solo Capital, the other investors, and others (including large investment firms) had examined and given advice on the strategy later employed in Denmark. In some cases, Mr. Klugman participated in phone calls or was included on emails where such advice was given. In other instances, Mr. Klugman received confirmation of the advice after it was initially provided, but before he went forward with his investment in Denmark.

Initially, Mr. Klugman would testify, prominent law firms were involved in and provided advice directly to him, other investors, and Solo Capital concerning an investment in a fund called Broadgate Ireland Funds PLC, a dividend arbitrage trading fund strategy directed by Solo Capital and involving Germany securities. Mr. Klugman would testify that he participated based upon the advice and involvement of attorneys at Crowell & Moring and Norton Rose. *See* Ex. 1, at Bates WH_MDL_00356117 (opinion by Norton Rose describing the transaction and offering legal advice); Ex. 2, van Merkensteijn Dep. Tr. at 367 (recounting Crowell & Moring's involvement); Ex. 3, at Bates WH_MDL_00342378 (email from Richard Markowitz to counsel at Crowell & Moring, copying Mr. Klugman, discussing the business arrangement with Solo); Ex. 4, at Bates WH_MDL_00454318 (email from Richard Markowitz to counsel at Crowell & Moring attaching an "Equity Arbitrage Transaction Letter Agreement"); Ex. 5, at Bates WH_MDL_00342404 (continuing discussions with Crowell & Moring regarding the agreement with Solo); Ex. 6, at Bates WH_MDL_00454256 (same); Ex. 7, at Bates WH_MDL_00454287 (same); Ex. 8 , at Bates WH_MDL_00342371 (email exchange in which Mr. Klugman asks Crowell & Moring attorneys questions regarding the Equity Arbitrage Transaction Agreement). Mr. Klugman is expected to testify that, based on his personal experience, these major, international law firms advised that certain tax-exempt U.S. pension funds and charitable organizations that participated in dividend arbitrage trading in German securities could receive relief from withholding taxes in Germany in compliance with relevant international and United States law upon receipt of tax exemption certification. *See* Ex. 9, Klugman Dep. Tr., at 32 (Mr. Klugman answering questions from SKAT on his investment in the Broadgate Fund).

With regard to Belgian dividend arbitrage trading, Mr. Klugman would note that he did not receive payments from the Kingdom of Belgium, but he would also testify, based on his

personal knowledge, that attorneys at Freshfields and Kaye Scholer both rendered advice that tax-exempt U.S. pension funds and charitable organizations that participated in dividend arbitrage trading involving Belgian securities could receive relief from dividend withholding taxes in the Kingdom of Belgium upon receipt of tax exemption certification from Belgian and United States authorities.  Even when only contemplating making an investment, Mr. Markowitz told Mr. Klugman that he wanted to "have some conversations with the lawyers as a start, so that we had comfort on the basics of the structure."  Ex. 10, at Bates WH_MDL_00458732 (email from Richard Markowitz to others describing obtaining an opinion letter from Freshfields).  Extensive conversations then ensued with Freshfields, resulting in Freshfields examining in detail the transactions comprising the investment strategy and offering a legal opinion.  Ex. 11, at Bates KLUGMAN00061659 (email from Freshfields providing Belgian tax opinion to Mr. Klugman and others); Ex. 12, December 18, 2012 Freshfields Bruckhaus Deringer Opinion on "Investment in Belgian shares," at Bates KLUGMAN00061661 (Freshfields Belgian tax opinion describing the investment strategy); Ex. 13, at Bates KLUGMAN00060791 (email conveying Freshfield attorney advice on disclosure thresholds); Ex. 14, at Bates KLUGMAN00061594 (email conveying Freshfields attorney advice on documents necessary from the U.S. pension fund to engage in the dividend arbitrage strategy); Ex. 15, at Bates KLUGMAN00062778 (email from Freshfields attorney regarding "Belgian domestic withholding tax exemption"); Ex. 16, at Bates KLUGMAN00062881 (calendar invitation including Freshfields attorney with the subject "Duet – Belgium"); Ex. 17, at Bates KLUGMAN00065014 (email reflecting additional advice received from Freshfields attorneys); Ex. 18, at Bates WH_MDL_00281229 (emails further reflecting input from other counsel).

Attorneys at Kaye Scholer also provided their advice based on Freshfield's analysis. *See* Ex. 19, at Bates WH_MDL_00458977 (email from Mr. Markowitz asking that the investors' lawyer, Michael Ben-Jacob at Kaye Scholer, be copied on any correspondence); Ex. 20, at Bates KLUGMAN00062393 (email from Mr. Markowitz reflecting comments on the Freshfields Belgian tax opinion prior to receiving comment from Kaye Scholer); Ex. 21, at Bates KLUGMAN00062389 (email from Michael Ben-Jacob to "supplement[]" Mr. Markowitz' comments on the Freshfields Belgian tax opinion).

Mr. Klugman would testify that his receipt and review of the Freshfield's opinion was important in his consideration of the Belgium investment and ultimately was a significant factor in his decision to become an investor in Denmark. In particular, Mr. Klugman recalls he participated in a March 6, 2013 teleconference with Freshfield attorneys and others, and was provided a legal opinion by Freshfields that analyzed the legal implications of the strategy. Ex. 22, at Bates KLUGMAN00061534. Mr. Klugman saw in that opinion that Freshfield had closely analyzed the trading strategy and provided advice on "[w]hether the Pension Plan would qualify as beneficial owner of such dividends" under, in this case, Belgian law. Ex. 12, at Bates KLUGMAN0006166. While Mr. Klugman was not a client of Freshfields, and the opinion concerned Belgian law, Mr. Klugman would testify that, in his mind and to his understanding, that the opinion continued to establish a track record of Solo Capital and Argre Management securing legal opinions from major law firms and executing substantial due diligence before entering into any dividend arbitrage trading, which was consistent with what Mr. Klugman had seen major financial institutions do throughout his career. It was also the same legal process Mr. Klugman saw them do in Denmark before Mr. Klugman decided to invest in the strategy himself.

Thus, the significance of the involvement of these law firms is not tied to whether they did or did not give correct advice. Neither does it depend on whether Sanjay Shah was correctly describing how he would later actually carry out the transactions described in the legal memoranda. Rather, we would expect Mr. Klugman to testify that essential to his own decision to invest in the dividend arbitrage strategy in Denmark in 2014 was his knowledge that Solo Capital had carried out analogous strategies in Germany *and* Belgium with the participation of multiple, prominent law firms, and that Mr. Klugman believed that these firms were told how the strategy worked and subsequently provided advice to ensure that it was in compliance with law. We would expect Mr. Klugman to testify that in his mind, the involvement of these firms and the advice they gave, as Mr. Klugman saw from the memoranda and learned from his own discussions, established: (1) that Solo Capital had a successful record of carrying out a dividend arbitrage strategy analogous to the strategy in which Mr. Klugman intended to participate in Denmark; (2) both Solo Capital and the other investors were ensuring that they complied with both domestic and international law; and (3) that this strategy was legally legitimate and sound. Mr. Klugman would testify that the participation of and advice given by these lawyers left Mr. Klugman with no reason to suspect that anyone had acted contrary to law or to doubt that the strategy was legitimate — all before he made his decision to invest in Denmark. This evidence is highly relevant as to what was in Mr. Klugman's mind and what his intent was when he ultimately invested in what he thought and was told was an analogous dividend arbitrage strategy in late 2014.

### B. Evidence and Expected Testimony Regarding Mr. Klugman's Knowledge of Legal Advice Concerning Trading in Denmark Prior to and During the Course of His Denmark Investment

In addition to the above-described testimony regarding the four years of advice that Mr. Klugman and the other Trial 1 Defendant investors received regarding the implementation of the

8

dividend arbitrage strategy in Germany and Belgium, Mr. Klugman will testify that another reason that he decided to invest in the strategy in Denmark was due to the advice and involvement of attorneys at Hannes Snellman, Bech Bruun, Horton, and Kaye Scholer specifically concerning implementing the strategy in Denmark.  In particular, we would expect Mr. Klugman to testify that he received copies of legal opinions from each of these law firms prior to late 2014, when he began his involvement in the Danish trading strategy.  We would expect Mr. Klugman to testify that he was told and believed that the strategy was fully and properly described to attorneys at Hannes Snellman, Bech Bruun, Horton, and Kaye Scholer, and that these firms advised that certain tax-exempt U.S. pension funds and charitable organizations that participated in dividend arbitrage trading involving Danish securities could receive relief from withholding taxes in the Kingdom of Denmark in compliance with relevant international and United States law.  *See* Ex. 23, Defendant Robert Klugman's Responses and Objections to Plaintiff's First Set of Interrogatories.[3]

In particular, Mr. Klugman would testify that he was shown the tax opinion Solo obtained from the law firm Hannes Snellman addressing the implementation of the trading strategy in Denmark.  Ex. 9 at 218.  The opinion described the steps that would be taken to implement the strategy and then considered the Danish tax implications for a U.S. pension fund engaging in those transactions, ultimately concluding that the pension fund "should be entitled to claim a full refund of the Danish dividend withholding imposed on the Equities pursuant to the Denmark-US Tax Treaty."  *Id.*; *see also* Ex. 24, at Bates KLUGMAN00003932.  Mr. Klugman would testify

---

[3] Mr. Klugman informed SKAT at the outset of discovery and repeatedly thereafter of his decision to waive privilege regarding advice pertaining to dividend-arbitrage transactions.  *Id.*  Defendants also produced attorney-client communications and attorney work product to SKAT, and SKAT had a full and fair opportunity to examine Mr. Klugman during his deposition about the involvement of counsel in this matter.  SKAT also deposed four Kaye Scholer attorneys: Peter Wells, Kathleen Wechter, Arthur Woodard, and Michael Ben-Jacob.

9

that seeing that Solo Capital had appropriately sought and received advice from a Danish law firm, who relayed the components of the transactions as Mr. Klugman understood them and provided advice that the U.S. pension plan would be entitled to a reclaim, Mr. Klugman went forward with his investment in good faith and with an understanding that the trading was compliant with both United States and Danish law.  Ex. 9 at 218-19.

Mr. Klugman was also shown the opinion Bech-Bruun provided to North Channel Bank GmbH & Co. KG, which "consider[ed] the Danish liability implications for NCB of acting as a custodian bank in certain transactions over Danish listed equities entered into by a United States pension fund[.]"  Ex. 25, at Bates SKAT_MDL_001_00533266.  After examining the series of transactions contemplated by the trading strategy, which were described in detail, Bech-Bruun also believed the strategy was legally sound, concluding that "[North Channel Bank] should not be subject to Danish civil law liability to compensate the Danish state for any loss suffered as a result [of] its role in the contemplated transaction."  *Id.*, at Bates SKAT_MDL_001_00533270.  Mr. Klugman was not a client of Bech-Bruun, but that fact is irrelevant as Mr. Klugman is not asserting an advice of counsel defense.  Rather, the memorandum is highly relevant to his state of mind as it relayed the series of transactions (as he understood that they would be carried out) and opined on the legality thereof.  Just as he had witnessed in Germany and Belgium, Mr. Klugman saw that yet another prestigious law firm — specifically construing Danish law — had been consulted and provided legal advice that the strategy was sound.  These opinions and the surrounding communications are integral to his defense as they demonstrate his good faith and complete lack of intent to defraud anyone.

C. **Evidence and Expected Testimony Regarding Mr. Klugman's Knowledge of Kaye Scholer's Role in the Trading Strategy in Denmark**

We would expect Mr. Klugman to also testify that the advice he received from, and intense involvement of, Kaye Scholer further informed and strengthened his decision to invest in the trading strategy in Denmark. The advice from Kaye Scholer is thus also highly relevant when the jury considers whether Mr. Klugman intended to defraud SKAT. Although Mr. Klugman did not become a Kaye Scholer client until shortly before he began his investment in the strategy in 2014, he saw communications and was told of Kaye Scholer's intense involvement since the strategy was implemented in Denmark in 2012. Ex. 9 at 293.

One of the documents Mr. Klugman would testify that he relied on was the June 20, 2014, memorandum that attorney Michael Ben-Jacob from Kaye Scholer sent to the principals of Argre Management. Ex. 26, at Bates KLUGMAN00067808. The memorandum first described the partnership agreements and pension plans that were created to carry out the strategy. *Id.*, at Bates KLUGMAN00067809. Then, Kaye Scholer describes its understanding of the strategy, which in detail laid out the different steps of the transactions as Mr. Klugman understood them. *Id.*, at Bates KLUGMAN00067810 - KLUGMAN00067811. The memorandum also noted that in the case of the particular pension plan it was examining, 66% of the proceeds would be paid to Solo. *Id.*, at Bates KLUGMAN00067812. The memorandum then provided legal advice concerning whether the pension plan would be tax-exempt. *Id.*, at Bates KLUGMAN00067813. Mr. Klugman already testified that his review of this memorandum solidified in his mind that Kaye Scholer clearly knew how the trades worked. Ex. 9 at 303-304 ("[T]hey knew all the agreements we were entering into. They obviously knew how the trade worked. They wrote it in their memorandum."). Indeed, Mr. Klugman added that there were later communications back and forth between Kaye Scholer and the Treasury Department leading Mr. Klugman to conclude

11

that Kaye Scholer "couldn't have possibly answered those questions without knowing everything that [] we were doing." *Id.* Moreover, in some cases, Kaye Scholer also had direct conversations with Solo Capital. *See, e.g.,* Ex. 27, at Bates WH_MDL_00355584 (billing entry from Peter Wells with the description: "Attention to issues related to reclaim matters. Call with Solo Capital re: the same.").[4]

Functionally, Mr. Klugman would testify that Kaye Scholer was heavily involved in executing the transactions. In order to carry out the trading strategy, Mr. Klugman gave Kaye Scholer power of attorney so that they could help Mr. Klugman set up "all the elements of the transaction . . . . All of it, every element." Ex. 9 at 63; Ex. 28, June 30, 2014 Limited Power of Attorney, at Bates KLUGMAN00026019. This work included on-boarding the plans and completing (and signing) various on-boarding forms on behalf of the plans, Ex. 29, at Bates WH_MDL_00355489 (billing 2.5 hours for uploading entity forms for on-boarding); drafting the partnership documents and plan payment instructions, Ex. 30, at Bates WH_MDL_00355641 (billing 4.0 hours for same); drafting client custody agreements, guarantee deeds, and beneficial owner declaration forms, Ex. 31, at Bates WH_MDL_00282562; advising on the stock-lending agreements, Ex. 32, at Bates WH_MDL_00282642; reviewing forward contracts, Ex. 33, at Bates WH_MDL_00394151; providing other United States tax and compliance advice, Ex. 34, at Bates WH_MDL_00286571; liaising with Elite Pension Consultants to create the pension plans, Ex. 35, at Bates WH_MDL_00227861; interacting with the reclaim agents, Ex. 36, at Bates WH_MDL_00355663 (billing described as: "Reach out to reclaim agents for summaries;

---

[4] Although only some billing records are cited herein, Mr. Klugman would intend to offer further billing records corroborative of the facts laid out in the offer of proof. Because those records are voluminous, Mr. Klugman is not providing them as an exhibit, but can of course do so if helpful to the Court's determination.

meeting with R. Klugman; review information regarding Danish reclaims"); and, in at least some cases, reviewing trade confirmations.

Indeed, Mr. Ben-Jacob himself, using his power of attorney, gave GoalTaxBack signing authority to sign reclaim forms on behalf of Mr. Klugman's pension plans. Ex. 37, at Bates SKSK00000041-0001. In addition, the mail for the plans was sent to Kaye Scholer. Ex. 9 at 166 (explaining that "we had centralized mailing to Kaye Scholer's office"). Mr. Klugman would also testify that he believed that Kaye Scholer had access to the trading e-mail accounts of the plans as well. *Id.* at 205-206. Finally, in at least one case, Kaye Scholer signed letters to the plans' custodians authorizing payment of broker fees. Ex. 38, at Bates KLUGMAN00006171.

Generally speaking, Mr. Klugman described Kaye Scholer's involvement as such:

> [I]t was in line with the role of lawyers that I've worked with, you know, throughout my entire career from big law firms. It was just, generally speaking, making sure everything was done correctly. . . . [F]rom what I saw, it was – you know, kind of from – to use an overused expression, "from womb to tomb," they helped us in setting up the entities, they helped in getting us to be approved clients of the entities. They knew what trades were going on. They helped us with tax issues, securities law issues, reporting issues, yeah, just in line with how I've worked with other law firms my whole career.

Ex. 9 at 302-303; *see also id.* at 63-64 ("Kaye Scholer was involved in every part of the transaction. The intensity was more in the setting up. But then there were also plenty of other issues, plenty of other U.S. issues involved in reporting and U.S. tax.").

Mr. Klugman would testify that many lawyers at Kaye Scholer were involved in every aspect of the trading strategy. In addition to Mr. Ben-Jacob, another attorney at Kaye Scholer, Peter Wells, was "the second most senior attorney actively involved in the transaction." *Id.* at 143. Mr. Klugman noted that, like Mr. Ben-Jacob, Mr. Wells was involved in "all parts of the transaction." *Id.* In addition to Mr. Ben-Jacob and Mr. Wells, at least eight other Kaye Scholer attorneys and staff worked on and provided legal advice about the Danish trading. *See, e.g.*, Ex.

13

39, at Bates WH_MDL_00355497. Of the millions paid to Kaye Scholer by the Investor Defendants, Klugman himself personally paid several hundreds of thousands of dollars after becoming a Kaye Scholer client in mid-2014.

Mr. Klugman would testify that Kaye Scholer further advised Mr. Klugman with respect to IRS inquiries and spoke directly to the IRS regarding Mr. Klugman's plans. In 2014, when IRS asked for certain information with respect to the plans, it was Kaye Scholer who responded to the IRS on behalf of the pension plans and ensured that they were qualified. Ex. 40, at Bates KLUGMAN00006429; Ex. 41, at Bates KLUGMAN00006434; Ex. 42, at Bates KLUGMAN00006420. Once the forms came in from the IRS indicating that the plans were qualified, Kaye Scholer sent them to the reclaim agents "so they can move on the reclaims." Ex. 43, at Bates KLUGMAN00006407.

Moreover, when the Federal Reserve had questions about the plans, it was Kaye Scholer attorney Peter Wells, along with other attorneys at Kaye Scholer, who compiled the information and interacted with the Federal Reserve. Ex. 44, at Bates KLUGMAN00006233; Ex. 45, at Bates KLUGMAN00006245; Ex. 46, at Bates WH_MDL_00355609-WH_MDL_00355610 (reflecting Peter Wells' call with the Federal Reserve and responding to its requests)).

In addition, Kaye Scholer attorneys had conversations with attorneys at the Danish Law firm Horten, and then provided Horten's advice to and discussed it with Mr. Klugman and the other investors. On December 2, 2014, Michael Ben-Jacob sent an email to Mr. Markowitz, Peter Wells, Mr. van Merkensteijn, and Mr. Klugman noting that Mr. Ben-Jacob spoke to a lawyer in Copenhagen regarding reporting requirements under Danish law pertaining to the trading strategy to discuss whether one looks "to legal title ownership and not to beneficial ownership" in construing those requirements. Ex. 47, at Bates KLUGMAN00006330; Ex. 48, at

Bates WH_MDL_00355492-00355493 (billing for the call with Danish counsel, another call with the clients, and various communications related to the same). Ten days later, Michael Ben-Jacob had a second phone call with the Danish lawyer, which he related to Mr. Klugman and the other investors. Ex. 49, at Bates WH_MDL_00245083 (requesting follow-up call); Ex. 50, at Bates WH_MDL_00317141 (Danish lawyer offering "guidance" on the questions raised for the follow-up call); Ex. 51, at Bates KLUGMAN00006293; Ex. 52, at Bates WH_MDL_00355494 (billing for a call and emails with Danish counsel, 2.0 hours). Mr. Ben-Jacob then wrote that, based on what he learned from the Danish lawyer, he did not believe the trading strategy would trigger any reporting requirements under Danish law. Ex. 47 ("Taking these practicalities together with the fact that in your case a reasonable, although not unassailable, argument can be made that you are not acting in concert[,] my own conclusion would be not to file.").

The Kaye Scholer memorandum, Mr. Klugman's interactions with multiple lawyers at Kaye Scholer, and the emails described above are highly relevant to and probative of Mr. Klugman's state of mind. They demonstrate: (1) Mr. Klugman took steps to ensure that the trading strategy (as he understood it) was vetted by a prominent law firm who was involved in every aspect of the trading; (2) that Mr. Klugman was attempting to follow any legal obligations he had with respect to his investment in the trading strategy; (3) the transactions that made up the trading strategy (at least as Mr. Klugman understood them) were known to Kaye Scholer who relied on those representations for their legal advice; and (4) Mr. Klugman had no reason to believe anything fraudulent was going on as Kaye Scholer itself was heavily involved in executing the strategy. Yet again, the importance of this is not whether such advice is or is not a correct statement of Danish law, but instead that this evidence demonstrates that Mr. Klugman had no intent to defraud SKAT.

15

In sum, all of the above advice and involvement of several major United States and international law firms reflect that Mr. Klugman did not make any false statements with knowledge or reckless disregard to its falsity, nor act with any intent to convince Plaintiff to rely upon such statements to its detriment, nor aid or abet a fraud committed by others, nor knowingly make any material misrepresentations in the preparation, execution and submission of the one-page forms entitled "Claims to Relief from Danish Dividend Tax," required by Plaintiff in connection with dividend withholding claims. Ex. 53, at Bates KLUGMAN00039292; Ex. 54, at Bates KLUGMAN00039300, Ex. 55, at Bates KLUGMAN00059888; Ex. 56, at Bates KLUGMAN00039307.

### III.  CONCLUSION

For the reasons described in Defendants' response to Plaintiff's Motion *in limine* (Dkt. 1161), the expected testimony and other evidence described above is "essential for the jury's determination of each Defendant's state of mind." *Id.* at 3.  For Mr. Klugman, his knowledge of the lengths to which Solo and the other investors went to hire attorneys to ensure that Solo's dividend arbitrage strategy was implemented in accordance with German, Belgian, and ultimately Danish law, and the legal memoranda and communications that he saw reflecting that advice is highly relevant to his good faith belief and understanding that these transactions accorded with those laws.  Moreover, his own efforts to confirm that the trading strategy was legitimate and complied with law is also highly probative of his good faith intent.  Precluding such critical evidence would prevent Mr. Klugman from offering a complete defense to SKAT's allegations.

Dated: New York, New York
September 26, 2024

                           KATTEN MUCHIN ROSENMAN LLP

By:      */s/ David L. Goldberg*
      David L. Goldberg
      Michael M. Rosensaft

      50 Rockefeller Plaza
      New York, NY 10020
      Tel.: (212) 940-8800
      Fax: (212) 940-8776
      david.goldberg@katten.com

*Attorneys for Defendants Robert Klugman, RAK Investment Trust, Aerovane Logistics LLC Roth 401K Plan, Edgepoint Capital LLC Roth 401K Plan, Headsail Manufacturing LLC Roth 401K Plan, The Random Holdings 401K Plan, The Stor Capital Consulting LLC 401K Plan*