*Exhibit 26*

# KAYE SCHOLER LLP

Michael Ben-Jacob
212.836.8310
michael.ben-jacob@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212.836.8000
Fax 212.836.6310
www.kayescholer.com

## MEMORANDUM

**TO:**    John H. van Merkensteijn, III
           Matthew R. Stein
           Jerome Lhote
           Richard Markowitz
           Adam LaRosa

> PRIVILEGED & CONFIDENTIAL
> ATTORNEY CLIENT COMMUNICATION

**FROM:**  Michael Ben-Jacob

**DATE:**  June 20, 2014

**SUBJECT:**  Michelle Investments:  Pension Plan Trades: Transactions with "Disqualified Persons"

---

### Facts

The Michelle Investments LLC Pension Plan (the "Michelle Plan") used the structure referred to as the "Michelle Structure" to implement certain trading transactions as described herein.  The chart attached hereto as Exhibit "A" depict the Michelle Structure.  The first part of this memorandum outlines our understanding from discussions with you of the facts and set-up of the Michelle Structure and the organization of the associated structure as well as the trading activity and related operations of the structure.  The second part of this memorandum provides an analysis of certain issues related to transactions with "disqualified persons" under the Internal Revenue Code of 1986 (the "Code").

Michelle

CHICAGO • FRANKFURT • LONDON • LOS ANGELES • NEW YORK • PALO ALTO • SHANGHAI • WASHINGTON, DC • WEST PALM BEACH

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 2 -                        June 20, 2014
Richard Markowitz
Adam LaRosa

## I.    Michelle Structure

### A.    Set-Up and Organization

Michelle Investments LLC, a Delaware limited liability company ("Michelle LLC"), was formed on or about November 15, 2007. John H. van Merkensteijn, III, Matthew R. Stein, Richard Markowitz and Jerome Lhote (the "Members") are equal members of Michelle LLC. The Members also engage in unrelated investment and other business activities through other entities, including Argre Management LLC ("Argre"), another investment firm operating from the same offices as Michelle LLC. Each of the Members own 19.75% of Argre; Adam LaRosa owns the remaining 21% interest.

On or about May 10, 2012, Michelle LLC established the Michelle Plan, which is a prototype 401(k) plan. As a prototype plan, the Michelle Plan is intended to be qualified under Section 401(a) of the Code.[1] We understand that the service provider that maintains this prototype plan has sought and obtained an IRS response letter regarding the tax qualified status of the form of the plan. The Members jointly act as the trustees of the Michelle Plan pursuant to a trust agreement.

### B.    Trading and Related Operations

Solo Capital Partners LLP ("Solo"), a U.K.-based financial services firm, presented the Michelle Plan trustees with the trading strategy discussed below. Solo is authorized and regulated in the U.K. by the Financial Services Authority, but is not regulated by any regulatory or quasi-regulatory agency in the United States. Solo is independent of Michelle LLC, Argre,

---

[1] All "Section" references herein are to the Code and the Treasury Regulations thereunder.

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              – 3 –                              June 20, 2014
Richard Markowitz
Adam LaRosa

the Members, and any affiliated entity of any of them and there is no common ownership

between Solo, Michelle LLC, Argre or any such entity.  We understand that (i) Solo provided the

entire structure of the trading strategy to the trustees and (ii) the trustees had little or no ability to

negotiate the financial terms of the arrangement, which were basically the same, or more

favorable to the Michelle Plan, as arrangements that existed between Solo or other providers

which engage in this trading strategy and unrelated third parties who were and are engaging in

similar trading activities with Solo or those other providers.

The investment and trading strategy outlined by Solo was as follows:  the Michelle Plan

would enter into a custodial agreement with Solo pursuant to which (i) the Michelle Plan would

transfer assets to a custodial account of which Solo was the custodian, (ii) Solo provided the

Michelle Plan trustees with information about the securities of certain publicly-traded companies

on certain foreign (non-U.S.) stock exchanges, (iii) on or before the ex-dividend date for such

shares, the Michelle Plan would direct Solo to purchase shares of some or all of the companies

presented by Solo[2], (iv) Solo would guarantee the Michelle Plan's trades vis-à-vis a third-party

broker, allowing the Michelle Plan to make highly leveraged trades, (v) the purchased shares

would be held in the custodial account, (vi) the Michelle Plan would take a short futures position

in shares of such company by selling to an unrelated third party a cash-settled single stock future,

which would not expire until at least one day after the dividend record date of the purchased

shares, (vii) on behalf of the Michelle Plan, a third party would submit a tax reclamation request

---

[2] If some of the shares were too thinly-traded or otherwise deemed unacceptable by the trustees, the trustees utilized
other shares.  This was typically done after additional consultations with Solo.

Michelle

KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 4 -                              June 20, 2014
Richard Markowitz
Adam LaRosa

to the appropriate authorities with respect to the gross dividend amount previously withheld on

the sale by such authorities, (viii) the Michelle Plan would receive a payment equal to the net

dividend amount of the shares it held, (ix) the Michelle Plan would cause Solo to sell the shares

it holds in the market and settle the futures contract for cash, and (x) the Michelle Plan would

remit a specified percentage of the net dividend amount to Solo (which would then pay

significant fees and expenses incurred in the transactions described above which fees are

separate from third party professional and other fees paid by the Michelle Plan related to such

transactions.)  The purpose of the short futures position was to hedge against loss of principal in

order to minimize or eliminate the economic risk of holding the shares.

The Michelle Plan simultaneously entered into a securities lending agreement with a third

party under which it lent securities in exchange for cash.  We understand that (a) the securities

lending arrangements embodied in a number of documents are typical of those entered into by

organizations in the United Kingdom and comply with United States securities lending

regulations, (b) the purpose of this arrangement was to generate the necessary liquidity to

implement the trades, and (c) investing in this arrangement does not guarantee payments to Solo

or indemnify Solo, and no payments or other benefits were received by the Michelle Plan,

Michelle LLC, the Members or their affiliates.

As noted, while the decisions as to which securities to purchase are solely within the

purview of the Michelle Plan trustees, they did take into account the recommendations of Solo.

The trading orders were executed by Mr. LaRosa pursuant to a power of attorney executed by the

Michelle Plan granting him authority to execute trades on behalf of the Plan.  Mr. LaRosa

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 5 -                                    June 20, 2014
Richard Markowitz
Adam LaRosa

receives compensation of $5,000 for acting as attorney-in-fact and is not separately indemnified by any party (and does not receive benefits or compensation from any party other than this payment) for his actions pursuant to the power of attorney.

Under the Custodial Agreement with Solo, the Michelle Plan pays fees to Solo as per the schedule attached to the Custodial Agreement. The documents for the transaction indicate that, of the gross amount payable to the Michelle Plan, the Michelle Plan retained approximately 34% and the remaining 66% was paid to Solo. Solo was responsible for paying significant costs and expenses associated with the transaction, including trading commissions, legal fees, brokerage fees, accounting fees, tax reclaim service fees, custodial service fees, leverage providing fees and guaranty fees. Solo does not break down its expenses so that investors such as the Michelle Plan are not provided with a breakout of what portion of the 66% is compensation to Solo and its affiliates and what portion pays for expenses paid to other third party service providers. The Michelle Plan paid its own fees for third party services (legal, accounting, etc.) related to the transaction.

While the documents provide that the 66% paid to Solo is a "fee" to Solo, the understanding of the parties at the time the transaction was entered into was that Solo and the Michelle Plan were instead effectively engaged in a partnership under which the profits would be shared between them under the above profit allocation, with Solo being responsible for all of the partnership's expenses.

Michelle

KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                          - 6 -                                      June 20, 2014
Richard Markowitz
Adam LaRosa

## II.    Discussion of Transactions with Disqualified Persons

### A.    Transactions with Disqualified Persons

A transaction between a retirement plan subject to Section 4975 of the Code and a

"disqualified person" (described in Appendix A) that is prohibited under section 4975 of the

Code (described in Appendix A) will be subject to the tax under Section 4975 of the Code

(described below)[3] unless it meets the requirements of a prohibited transaction exemption under

Section 4975. The Michelle Plan is subject to Section 4975 of the Code but should not be

subject to ERISA since, as we understand, it does not cover employees and only covers the

Members.

Based on the facts above and the discussion below, we conclude that an argument can be

made that the "service provider exemption" should apply to these transactions as described

herein. In order to prevail in such an argument, one would have to prove, as discussed below,

that the fees paid by the Michelle Plan were reasonable fees.

### B.    Taxes under Section 4975

Section 4975 of the Code imposes a tax of 15% of the "amount involved"[4] on any

prohibited transaction for each year (or part of a year) in the "taxable period". The taxable

period begins on the date the prohibited transaction occurs and ends on the earliest of (i) the date

---

[3] The penalty for a prohibited transaction involving an individual retirement account ("IRA") is generally that the
IRA ceases to be an individual retirement account as of the first day of the taxable year in which the prohibited
transaction occurred, and the IRA is treated as if there were a distribution on that first day in an amount equal to the
fair market value (on such first day) of all assets in the account (on such first day).
[4] The "amount involved" generally is defined in Section 4975(f)(4) as the greater of the amount of money and the
fair market value of the other property given or received. However, in the case of services described in the
exemptions in Section 4975(d)(2) (for compensation for certain reasonable services) and (d)(10) (for certain
reasonable compensation and expenses) the "amount involved" is only the compensation that is excessive.

Michelle

KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                        - 7 -                        June 20, 2014
Richard Markowitz
Adam LaRosa

of mailing a notice of deficiency with respect to the 15% tax, (ii) the date on which the tax is

assessed or (iii) the date on which the prohibited transaction is corrected[5]. Section 4975 provides

that this tax is payable by any disqualified person who participates in the prohibited transaction

other than a fiduciary acting only as such[6]. An additional tax of 100% of the amount involved is

imposed on any such disqualified person if the initial 15% tax is imposed and the transaction is

not corrected within the taxable period.

Correcting a prohibited transaction means to undo the transaction to the extent possible

and in any case to place the plan in a position not worse than that in which it would have been if

the disqualified person had acted under the highest fiduciary standards[7].

### C.    Discussion of Prohibited Transactions

Based on the definition of "disqualified person" and the activities of the respective

entities as described above, we believe that none of the entities with which the Michelle Plan has

entered into securities lending arrangements or sold cash-settled stock futures to, or any of the

publicly-traded companies from which the dividends are paid should, as a result of these

activities, become a disqualified person with respect to the Michelle Plan. However, Solo, Mr.

LaRosa and the party which files the tax reclaim forms will be disqualified persons because of

their performance of services with respect to the Michelle Plan, as described herein.[8]

---

[5] Section 4975(f)(2) of the Code.
[6] Therefore, it is possible that if a transaction resulted in more than one disqualified person being liable, each would
have to pay the 15% excise tax.
[7] Section 4975(f)(5).
[8] We understand that none of these publicly traded companies or the entities with which the securities lending
arrangements are entered into have any other relationship to the Michelle Plan which would result in them being
treated as a disqualified person under Section 4975 of the Code.

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                    - 8 -                    June 20, 2014
Richard Markowitz
Adam LaRosa

As to the question of whether the performance of services for the Michelle Plan results in

the service provider being a disqualified person, while there is no direct guidance on this issue, it

is possible to make the argument that a service provider such as Solo does not become a

disqualified person until the agreements to provide services are entered into and, therefore, the

initial transaction between the plan and such service provider would not be prohibited. However,

the Department of Labor ("DOL") could take the position that an exemption is necessary for

even the initial transaction to avoid being a prohibited transaction. In addition, if the Michelle

Plan were to enter into identical or nearly identical transactions with Solo, the DOL could well

view Solo as a disqualified person upon it entering into the second (and such subsequent) such

transaction, even if it would not have challenged the first. In this event, Solo (and any other

service provider) would need to show that they had met the requirements for an exemption for

their activities with respect to the Michelle Plan.

### D.    **Exemptions**

The Code provides for exemptions to the prohibited transaction rules.[9] Section

4975(d)(2) of the Code provides an exemption, called the "Service Provider Exemption", from

the prohibited transaction provisions of Section 4975(c) for "any contract, or reasonable

arrangement, made with a disqualified person for other services necessary for the ... operation of

---

[9] Section 4975(d)(2) also provides an exemption for transactions for certain of the prohibited transactions for a disqualified person other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control with respect to the investment of the plan assets involved in the transaction or renders investment advice with respect to the assets, solely by reason of providing services to the plan but only if the plan receives no less than, and pays no more than, adequate consideration. It is not clear how the concept of "adequate" consideration applies to loans. In addition, this exemption does not exempt prohibited transactions under Section 4975(c)(1)(D), (E) or (F).

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                          - 9 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

the plan, if not more than reasonable compensation is paid therefor".[10] The contract or

arrangement also must permit termination by the plan without penalty on reasonably short notice

under the circumstances to prevent the plan from being locked into an arrangement that has

become disadvantageous.

In addition, Section 4975(d)(b) of the Code provides an exemption for the receipt by a

disqualified person of any reasonable compensation for services rendered or the reimbursement

of expenses actually and properly incurred in the performance of duties with the plan (so long as

the person is not also receiving full time pay by the employer or employee organization

maintaining the plan). As with the Service Provider Exemption, the compensation must be

"reasonable."

The Treasury Regulations provide that, generally, whether compensation is reasonable

depends on the particular facts and circumstances of each case[11]. However, any compensation

which would be considered excessive under Section 1.162-7 of the Treasury Regulations will not

be reasonable for purposes of these exemptions.[12] Therefore, the burden of proving that no

prohibited transaction has occurred would be on the service provider, as well as on the fiduciary

of the Plan involved. The reasonableness of any fee will ultimately be a facts and circumstances

question.

---

[10] Certain of the exemptions under Section 4975, including this exemption do not apply to certain transactions in which a plan lends money or pays compensation or buys or sells from or to an owner-employer or certain parties related to an owner employee. We understand that these facts are not present in this case.
[11] Treasury Regulation 54.4975-6(c)(2).
[12] Treasury Regulation 54.4975-6(e)(6).

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 10 -                                     June 20, 2014
Richard Markowitz
Adam LaRosa

As discussed herein, the arrangement between the Michelle Plan and Solo provides for

payment to Solo of 66% of the gross amount payable from the transactions; from this amount

Solo is required to pay significant expenses associated with the transaction which expenses are in

addition to any fees paid by the Michelle Plan.  If this 66% were to be viewed as a fee for

services, or compensation, to Solo, it would appear to be large compared to many investment fee

relationships.  However, the 66% represents the gross amount payable to Solo so that after the

payment of its fees to third parties (including trading commissions, legal fees, brokerage fees,

accounting fees, reclaim services, custodial service fees, leverage providing fees and guaranty

fees paid by Solo), Solo's net "compensation" was less than the 66% and perhaps considerably

less.

Given the size of the payments to Solo in this matter, we would expect the DOL to

closely scrutinize the fee by looking at the fees charged for similar services, if any, as well as the

time and effort expended by Solo.  We would also expect that the DOL would look at how much

of the amount is actually compensation to Solo and how much is payment to third party

providers, and to what extent the payment to third party providers is reasonable compensation.

In this regard, we understand that Solo and other unrelated providers have and do provide similar

arrangements to other investors (both plans and non-plan investors) under arrangements in which

the investors share of the net proceeds is as low as 10%[13].  We also understand from you that the

trustees of the Michelle Plan were not able to find a provider which would provide similar

investment services at a lower cost.  This indicates that the amounts paid to Solo are consistent

---

[13] Because these are private contractual relationships, the details of these transactions are not available to us.
Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 11 -                        June 20, 2014
Richard Markowitz
Adam LaRosa

with or less than those charged other investors. In addition, many hedge fund managers charge a

fee of 20% or more of profits (we understand that some managers charge a fee of up to 50% of

profits), which indicates that market demands often result in arrangements for fees which appear

large but which are deemed by investors as appropriate to attempt to obtain a desired return.[14]

In addition, we would expect that the analysis would consider how much of a return the

Michelle Plan received, compared to that of Solo and other service providers. We understand

that the return to the Michelle Plan has been very favorable even after the payments to Solo.

While the documentation of the transaction cannot be ignored, it should also be noted that

the intent of the parties was that the arrangement was in the nature of a partnership in which each

partner would receive a portion of the gross amount, with Solo bearing all of the costs. In this

context, the provision of a larger allocation to Solo reflects the agreement of the parties that Solo

was essential to the transactions, that the transactions might otherwise not have been possible,

and that Solo was incurring large expenses to effectuate the transactions.

The Treasury Regulations provide that the Service Provider Exemption does not apply to

"self dealing transactions by fiduciaries" – that is, fiduciaries dealing with the income or assets

of a plan in their own interest or for their own account or receiving consideration for their own

personal account from any person dealing with a plan. We understand that none of the trustees

of the Michelle Plan are receiving or have received any direct or indirect benefit or gain from

these transactions.

---

[14] These fees are often part of a complex fee structure which often results in lower fees if certain hurdles are not met.
Michelle

**KAYE SCHOLER LLP**

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 12 -                        June 20, 2014
Richard Markowitz
Adam LaRosa

### E.    Application to Service Providers

It is possible that Solo could be a "fiduciary" (described in Appendix A) with respect to

the Michelle Plan. If so, the DOL could take the position that the Service Provider Exemption

does not apply if Solo uses its authority, control or responsibility to cause the plan to pay

additional fees to it or otherwise pay fees which may benefit Solo or influence its judgment as a

fiduciary. This could be the case, for example, if Solo could authorize additional, unnecessary

trades which resulted in increased fees to it. In this regard, you have informed us that Solo has

no authority over the fees, and no authority to authorize additional fees or additional trades that

could result in additional fees, but that all such trades are authorized on behalf of the Plans by

Mr. LaRosa and that Solo merely effectuates those orders.

As described in this memorandum, Mr. LaRosa has performed services for the Michelle

Plan, and therefore is a service provider and is likely also a fiduciary. We understand that Mr.

LaRosa is also a disqualified person because of his ownership of a profits interest in Argre.[15]

The compensation paid to him will need to qualify under the Service Provider Exemption (or

other exemption) and so must be "reasonable". While this is a question of fact, we understand

that substantial work is involved on Mr. LaRosa's part and so the fee of $5,000 would not seem

unreasonably large. We also understand from you that Mr. LaRosa does not have any authority

to cause this fee to be paid or to increase the amount of the fee.

---

[15] Mr. LaRosa would also appear to be a disqualified person under Section 4975(e)(2)(I) of the Code because he is a
10% or more partner in Argre, which is an entity in which 50% or more of the partnership interests are held by
trustees of the Michelle Plan.

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 13 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

Payment for the services performed by the third party service provider who files the tax

reclaim form or other providers who Solo may pay to perform related services could also be a

prohibited transaction unless it meets the Service Provider Exemption (or other exemption).  This

compensation seems less burdensome on the Michelle Plan than the fees paid to Solo and, for

this reason, we believe less likely to be challenged by the DOL, although as noted in the Facts,

Solo does not break out the amount of those fees and disclose them to investors.

### F.    Extension of Credit

As noted above, an extension of credit between a plan and a disqualified person

constitutes a prohibited transaction.  The DOL could look at Solo's guaranty of the trades as an

extension of credit to the Michelle Plan rather than a service in connection with this investment

or as an advance to cover direct expenses which are to be repaid, and take the position that the

extension of credit is not exempted by the Service Provider Exemption.  It could be argued that

the guaranty is a necessary service in order to enter into the investment, and that the Service

Provider Exemption should apply to exempt the guaranty, if its requirements are met.  This

would give Solo the burden of proving that the fees were reasonable and necessary.  Again, even

if the DOL did not view Solo as a disqualified person in the initial transaction between it and the

Michelle Plan, it could take the position that Solo became a disqualified person when later

transactions were consummated.

The DOL has issued an exemption for certain securities lending transactions but those are

not discussed in this memorandum since it is our understanding that Solo will not receive

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 14 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

compensation for securities lending services that will be entered into with an unrelated third

party which is not a disqualified person.

### G.    Other Issues

The Facts section in this memorandum is intended to provide the factual basis for other

memorandum, and so all facts may not be required for the analysis hereunder.  This

memorandum does not address other issues other than those specifically addressed herein.

Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 15 -                          June 20, 2014
Richard Markowitz
Adam LaRosa

### Appendix A - Terms

This Appendix A briefly describes certain terms used in this memorandum.[16]

**Definition of a Prohibited Transaction.** A prohibited transaction includes (i) the sale or

exchange of any property between, or the lending of money or any other extension of credit

between, or the furnishing of goods or services between, a plan and a disqualified person

(Section 4975(c)(1)(A), (B) and (C)), (ii) a transfer to, or use by or for the benefit of, a

disqualified person of the income or assets of a plan (Section 4975(c)(1)(D)), (iii) the act by a

fiduciary whereby he deals with the plan income or assets in his own interest or for his own

account (Section 4975(c)(1)(E)), or (iv) the receipt of any consideration for his own personal

account by a disqualified person who is a fiduciary from any party dealing with the plan in

connection with a transaction involving the income or assets of the plan (Section 4975(c)(1)(F)).

**Definition of a Disqualified Person.** Section 4975(e)(2) defines a disqualified person to

include:  (A) a fiduciary; (B) a person providing services to the plan; (C) an employer any of

whose employees are covered by the plan; (D) an employee organization any of whose members

are covered by the plan; (E) an owner, direct or indirect, of 50% or more of the combined voting

power of all classes of stock entitled to vote or total value of shares of all classes of stock of a

corporation, or of the capital interest or profits interest of a partnership or of the beneficial

interest of a trust or unincorporated enterprise which is an employer or employee organization

described in (C) or (D); (F) a member of the family (as defined) of any individual described in

(A), (B), (C) or (E); (G) a corporation, partnership or trust or estate of which (or in which), 50%

---

[16] These terms are defined in Section 4975 of the Code and this discussion is subject to those definitions.
Michelle

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 16 -                        June 20, 2014
Richard Markowitz
Adam LaRosa

or more of the combined voting power of all classes of stock entitled to vote or total values of

shares of all classes of stock of a corporation, or of the capital interest or profits interest of a

partnership or of the beneficial interest of a trust or estate, is owned directly or indirectly or held

by persons described in (A), (B), (C), (D) or (E); (H) an officer, director (or person having

similar powers or responsibilities), a 10% or more shareholder, or a highly compensated person

(earning 10% or more of the yearly wages of an employer) of a person described in (C), (D), (E)

or (G); or (I) a 10% or more (in capital or profits) partner or joint venturer of a person described

in paragraphs (C), (D), (E) or (G).

   **Definition of Fiduciary.**  Section 4975(e)(3) defines "fiduciary" as any person who (i)

exercises any discretionary authority or discretionary control respecting management of such

plan or exercises any authority or control respecting management or disposition of its assets, (ii)

renders investment advice for a fee or other compensation, direct or indirect, with respect to any

moneys or other property of the plan or has any authority or responsibility to do so, or (iii) has

any discretionary authority or discretionary responsibility in the plan administration.


                                    *    *    *    *    *


   IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department
regulations, we inform you that any U.S. federal tax advice contained in this correspondence
(including any attachments) is not intended or written to be used, and cannot be used, for the
purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or
(ii) promoting, marketing or recommending to another party any transaction or matter addressed
herein.

Michelle

# KAYE SCHOLER LLP

Michael Ben-Jacob
212.836.8310
michael.ben-jacob@kayescholer.com

425 Park Avenue
New York, New York 10022-3598
212.836.8000
Fax 212.836.6310
www.kayescholer.com

## MEMORANDUM

| | | |
|---|---|---|
| **TO:** | John H. van Merkensteijn, III | PRIVILEGED & CONFIDENTIAL |
| | Matthew R. Stein | ATTORNEY CLIENT COMMUNICATION |
| | Jerome Lhote | |
| | Richard Markowitz | |
| | Adam LaRosa | |
| **FROM:** | Michael Ben-Jacob | |
| **DATE:** | June 20, 2014 | |
| **SUBJECT:** | Delvian Plan Trades:  Transactions with "Disqualified Persons" | |

### Facts

Delvian LLC Pension Plan (the "Delvian Plan") used the structure referred to as the "Delvian Structure") to implement certain trading transactions as described herein.  The chart attached hereto as Exhibit "A" depicts Delvian structures.  The first part of this memorandum outlines our understanding from discussions with you of the facts and set-up of the Delvian Structure and the organization of the associated structure as well as the trading activity and related operations of the structure.  The second part of this memorandum provides an analysis of certain issues related to transactions with "disqualified persons" under the Internal Revenue Code of 1986 (the "Code").

Delvian Plan Disqualified Persons

CHICAGO · FRANKFURT · LONDON · LOS ANGELES · NEW YORK · PALO ALTO · SHANGHAI · WASHINGTON, DC · WEST PALM BEACH

KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 2 -                        June ___, 2014
Richard Markowitz
Adam LaRosa

## I.    Delvian Structure

### A.    Set-Up and Organization

1.    Delvian Plan.  Delvian Investments LLC, a Delaware limited liability company

("LLC") was formed on January 13, 2011 by Alicia O'Donnell, its sole member.  On or about

May 22, 2012, Delvian LLC established a 401(k) Plan ("Delvian Plan") for the benefit of its sole

principal.  The Delvian Plan was a prototype plan and had received a favorable determination

letter from the Internal Revenue Service, and it did not cover any employees.  The only person

covered by Delvian Plan was the sole member of the LLC who is also an employee of another

entity but also receives payment for self-employment services from parties other than that entity

or its affiliates.

2.    Delvian Partnership.  Based on their respective contributions to the partnership,

the Delvian Plan was allocated 5% of the capital of the Delvian Partnership, and  Quartet was

allocated 95%.  They each maintained capital accounts in that amount but the Delvian

Partnership Agreement provided that any profits were to be divided as follows:  (i) first, to the

partners in proportion to, and to the extent of, their capital accounts; (ii) then, up to the next

$50,000 to the Delvian Plan; and (iii) thereafter, in proportion to the respective percentage

interests of the partners.[1]  Quartet LLC directly paid certain expenses on behalf of the

Partnership related to the Partnership's initial start-up activities and trading costs and was

reimbursed for such expenses.  Mr. Adam LaRosa was appointed manager of the Partnership

---

[1] We note that, in this instance, the proportionate capital accounts and the percentage interest are the same.
Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 3 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

with day-to-day ministerial management authority over the Partnership assets. The Delvian Plan

made an investment in a New York general partnership, known as the Delvian General

Partnership ("Delvian Partnership"). The other partner in the Delvian Partnership was Quartet

Investment Partners LLC, a Delaware limited liability company ("Quartet LLC"), formed on or

about April 19, 2012. Messrs. van Merkensteijn, Stein, Markowitz and Lhote (or trusts for the

benefit of their respective families) each held a 25% interest in Quartet LLC, with equal

economic and voting rights. These individuals are also the shareholders of the entity in which

Ms. O'Donnell is an employee.

     3.     <u>Delvian 2013 Partnership</u>. On or about February 1, 2013, the Delvian Plan and

other partners formed a new general partnership (the "Delvian 2013 Partnership"). The Delvian

2013 Partnership is similar in most respects to the Delvian Partnership, except that the members

are the Delvian Plan, the Bernina Pension Plan ("Bernina"), the AOI Pension Plan ("AOI"), the

Genesha Pension Plan ("Genesha") and the RJM Pension Plan ("RJM") (collectively, the

"Investing Plans"). Each of the latter four plans are qualified under Section 401(a) of the Code.

Each plan is maintained by a single member limited liability company owned by each of Mr. van

Merkensteijn (Bernina), Mr. Stein (AOI), Mr. Lhote (Genesha) and Mr. Markowitz (RJM)

respectively. The Delvian Plan received a 5% partnership interest in this new Delvian 2013

Partnership and each of Bernina, AOI, Genesha and RJM received a 23.75% partnership interest

in the new Delvian 2013 Partnership based on contributions to the Delvian 2013 Partnership.

The Delvian 2013 Partnership Agreement provides that distributions to the partners shall be

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 4 -                              June ___, 2014
Richard Markowitz
Adam LaRosa

made in the following order of priority: (i) first, in proportion to, and to the extent of, each

partner's capital account; and (ii) thereafter, in proportion to the respective percentage interests

of the partners.[2]

### B.    Trading and Related Operations—In General

Solo Capital Partners LLP ("Solo"), a U.K. based financial services firm, presented

certain potential investors with the trading strategy discussed below.  Solo is authorized and

regulated in the U.K. by the Financial Services Authority, but is not regulated by any regulatory

or quasi-regulatory agency in the United States.  Solo is independent of Delvian LLC, Quartet,

the Investing Plans, and any affiliated entity of any of them and there is no common ownership

between Solo, Delvian or any such entity.  We understand that (i) Solo provided the entire

structure of the trading strategy to the investing entity and (ii) the investing entity had little or no

ability to negotiate the financial terms of the arrangement, which were basically the same, or

more favorable to the investing entity, as arrangements that existed between Solo or other

providers which engage in this trading strategy and unrelated third parties who were and are

engaging in similar trading activities with Solo or those other providers.

The investment and trading strategy outlined by Solo was as follows:  the investing entity

would enter into a custodial agreement with Solo pursuant to which (i) the investing entity would

transfer assets to a custodial account of which Solo was the custodian, (ii) Solo provided the

investing entity with information about the securities of certain publicly traded companies on

---

[2] We note that, in this instance, the proportionate capital accounts and the percentage interests are the same.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 5 -                           June ___, 2014
Richard Markowitz
Adam LaRosa

certain foreign (non-U.S.) stock exchanges, (iii) on or before the ex-dividend date for such

shares, the investing entity would direct Solo to purchase shares of some or all of the companies

presented by Solo[3], (iv) Solo would guarantee the investing entity's trades vis-à-vis a third-party

broker, allowing the investing entity to make highly leveraged trades, (v) the purchased shares

would be held in the custodial account, (vi) the investing entity would take a short futures

position in shares of such company by selling to an unrelated third party a cash-settled single

stock future, which would not expire until at least one day after the dividend record date of the

purchased shares, (vii) on behalf of the investing entity, a third party would submit a tax

reclamation request to the appropriate authorities with respect to the gross dividend amount

previously withheld on the sale by such authorities, (viii) the investing entity would receive a

payment equal to the net dividend amount of the shares it held, (ix) the investing entity would

cause Solo to sell the shares it holds in the market and settle the futures contract for cash, and

(x) the investing entity would remit a specified percentage of the net dividend amount to Solo

(which would then pay significant fees and expenses incurred in the transactions described above

which fees are separate from third party professional and other fees paid by the investing entity

related to such transactions.)  The purpose of the short futures position was to hedge against loss

of principal in order to minimize or eliminate the economic risk of holding the shares.

     The investing entity simultaneously entered into a securities lending agreement with a

third party under which it lent securities in exchange for cash.  We understand that (a) the

---

[3] If some of the shares were too thinly-traded or otherwise deemed unacceptable by the trustees, the investing entity utilized other shares.  This was typically done after additional consultations with Solo.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 6 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

securities lending arrangements embodied in a number of documents are typical of those entered into by organizations in the United Kingdom and comply with United States securities lending regulations, (b) the purpose of this arrangement was to generate the necessary liquidity to implement the trades, and (c) investing in this arrangement does not guarantee payments to Solo or indemnify Solo, and no payments or other benefits were received by the investing entity, any investor or their affiliates.

As noted, while the decisions as to which securities to purchase are solely within the purview of the investing entity, they did take into account the recommendations of Solo. The trading orders were executed by Mr. Adam LaRosa pursuant to a power of attorney executed by the Delvian Plan granting him authority to execute trades on behalf of the Plan.

Under the Custodial Agreement with Solo, the investing entity pays fees to Solo as per the schedule attached to the Custodial Agreement. The documents for the transaction indicate that, of the gross amount payable to the investing entity, the investing entity retained approximately 34% and the remaining 66% was paid to Solo. Solo was responsible for paying significant costs and expenses associated with the transaction, including trading commissions, legal fees, brokerage fees, accounting fees, tax reclaim service fees, custodial service fees, leverage providing fees and guaranty fees. Solo does not break down its expenses so that investors are not provided with a breakout of what portion of the 66% is compensation to Solo and its affiliates and what portion pays for expenses paid to other third party service providers. The investing entity paid its own fees for third party services (legal, accounting, etc.) related to the transaction.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 7 -                        June ___, 2014
Richard Markowitz
Adam LaRosa

While the documents provide that the 66% paid to Solo is a "fee" to Solo, the

understanding of the parties at the time the transaction was entered into was that Solo and the

investing entity were instead effectively engaged in a partnership under which the profits would

be shared between them under the above profit allocation, with Solo being responsible for all of

the partnership's expenses.

    **C.**    **Delvian Partnership and Transactions**

The Delvian Partnership transferred funds into a custodial account opened in the name of

the Delvian Plan, as agent for the Partnership, with Solo acting as custodian (the "Solo

Account"). Solo provides the Delvian Partnership with a list of possible stocks which could be

purchased using this account. The partners in the Delvian Partnership, including the trustee of

the Delvian Plan, together determine the stocks to be purchased and instruct Mr. LaRosa to

execute the purchases pursuant to a power of attorney executed by the Delvian Plan, as agent for

the Delvian Partnership. After these instructions are effected, the transactions continue in the

same manner as described above. Mr. LaRosa receives compensation of $5,000 for acting as

attorney-in-fact and is not separately indemnified by any party for his actions pursuant to the

power of attorney or for acting as manager of the Delvian Partnership. The Delvian Plan, as

agent for the Delvian Partnership, also entered into a custodial agreement with Solo pursuant to

which (i) Solo has custody of the assets of the Delvian Plan which had been contributed to the

Delvian Partnership and (ii) Solo arranges for and guarantees the Plan's trades vis-à-vis a third-

party broker. The Delvian Plan also opened another account in its own name at First Republic

Bank in the United States (the "Delvian Account"). This account was set up to receive any

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    ~ 8 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

distributions from the Delvian Partnership to the Delvian Plan and was not held by the Delvian

Plan on behalf of the Delvian Partnership. The Delvian Account, being an account of the Delvian

Plan and not either of the partnerships discussed herein, has accordingly remained in the name of

the Delvian Plan throughout.

     As noted above, notwithstanding the existence of the Delvian Partnership, the Delvian

Plan acted as the nominee for the Delvian Partnership pursuant to terms specified in the

partnership agreement because, for foreign tax purposes, the legal agreements underlying the

transaction are all in the name of the Delvian Plan. We understand that, prior to the creation of

the Delvian 2013 Partnership, the Delvian Partnership distributed the amounts in the Solo

Account which were attributable to the Delvian Partnership to its partners. At the time of

creation of the Delvian 2013 Partnership, the Solo Account had a positive balance, however,

none of these amounts were attributable to an interest in the Delvian Partnership.

     The Delvian 2013 Partnership was operated in the same manner as the Delvian

Partnership described above.

## II.    Discussion of Delvian 2013 Partnership Transaction

### A.    Delvian 2013 Partnership Transaction: Transactions with Disqualified Persons

     A transaction between a retirement plan subject to Section 4975[4] of the Code and a

"disqualified person" (described in Appendix A) that is prohibited under section 4975 of the

Code (described in Appendix A) will be subject to the tax under Section 4975 of the Code

---

[4] All "Section" references herein are to the Code and the Treasury Regulations thereunder.

Delvian Plan Disqualified Persons

KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 9 -                              June ___, 2014
Richard Markowitz
Adam LaRosa

(described below)[5] unless it meets the requirements of a prohibited transaction exemption under

Section 4975.  The Delvian Plan and the other Investing Plans which invest in the Delvian 2013

Partnership are subject to Section 4975 of the Code but should not be subject to ERISA since, as

we understand, they do not cover employees other than the sole proprietor of the company

sponsoring each such plan.

      Based on the facts above and the discussion below, we conclude that an argument can be

made that the "service provider exemption" should apply to these transactions as described

herein.  In order to prevail in such an argument, one would have to prove, as discussed below,

that the fees paid by the Investing Plans were reasonable fees.

**B.**    **Taxes under Section 4975**

      Section 4975 of the Code imposes a tax of 15% of the "amount involved"[6] on any

prohibited transaction for each year (or part of a year) in the "taxable period".  The taxable

period begins on the date the prohibited transaction occurs and ends on the earliest of (i) the date

of mailing a notice of deficiency with respect to the 15% tax, (ii) the date on which the tax is

assessed or (iii) the date on which the prohibited transaction is corrected[7].  Section 4975 provides

that this tax is payable by any disqualified person who participates in the prohibited transaction

---

[5] The penalty for a prohibited transaction involving an individual retirement account ("IRA") is generally that the IRA ceases to be an individual retirement account as of the first day of the taxable year in which the prohibited transaction occurred, and the IRA is treated as if there were a distribution on that first day in an amount equal to the fair market value (on such first day) of all assets in the account (on such first day).
[6] The "amount involved" generally is defined in Section 4975(f)(4) as the greater of the amount of money and the fair market value of the other property given or received.  However, in the case of services described in the exemptions in Section 4975(d)(2) (for compensation for certain reasonable services) and (d)(10) (for certain reasonable compensation and expenses) the "amount involved" is only the compensation that is excessive.
[7] Section 4975(f)(2) of the Code.

Delvian Plans Disqualified Persons

KLUGMAN00067832

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                  - 10 -                                  June ___, 2014
Richard Markowitz
Adam LaRosa

other than a fiduciary acting only as such[8]. An additional tax of 100% of the amount involved is

imposed on any such disqualified person if the initial 15% tax is imposed and the transaction is

not corrected within the taxable period.

    Correcting a prohibited transaction means to undo the transaction to the extent possible

and in any case to place the plan in a position not worse than that in which it would have been if

the disqualified person had acted under the highest fiduciary standards[9].

### C.    Discussion of Prohibited Transactions

    Based on the definition of "disqualified person" and the activities of the respective

entities as described above, we believe that none of the entities with which the Investing Plans or

the Delvian 2013 Partnership has entered into securities lending arrangements or sold cash-

settled stock futures to, or any of the publicly-traded companies from which the dividends are

paid should, as a result of these activities, become a disqualified person with respect to the

Investing Plans. However, Solo, Mr. LaRosa and the party which files the tax reclaim forms will

be disqualified persons because of their performance of services with respect to the Investing

Plan or the Delvian 2013 Partnership, as described herein.[10]

    As to the question of whether the performance of services for the Investing Plan results in

the service provider being a disqualified person, while there is no direct guidance on this issue, it

is possible to make the argument that a service provider such as Solo does not become a

---

[8] Therefore, it is possible that if a transaction resulted in more than one disqualified person being liable, each would
have to pay the 15% excise tax.
[9] Section 4975(f)(5).
[10] We understand that none of these publicly traded companies or the entities with which the securities lending
arrangements are entered into have any other relationship to the Investing Plans which would result in them being
treated as a disqualified person under Section 4975 of the Code.

Delvian Plan Disqualified Persons

KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                        - 11 -                        June ___, 2014
Richard Markowitz
Adam LaRosa

disqualified person until the agreements to provide services are entered into and, therefore, the

initial transaction between the plan and such service provider would not be prohibited. However,

the DOL could take the position that an exemption is necessary for even the initial transaction to

avoid being a prohibited transaction. In addition, if an Investing Plan were to enter into identical

or nearly identical transactions with Solo, the DOL could well view Solo as a disqualified person

upon it entering into the second (and such subsequent) such transaction, even if it would not have

challenged the first. In this event, Solo (and any other service provider) would need to show that

they had met the requirements for an exemption for their activities with respect to the Investing

Plans investing in the Delvian 2013 Partnership.

### D.    Exemptions

The Code provides for exemptions to the prohibited transaction rules[11]. Section

4975(d)(2) of the Code provides an exemption, called the "Service Provider Exemption", from

the prohibited transaction provisions of Section 4975(c) for "any contract, or reasonable

arrangement, made with a disqualified person for . . . other services necessary for the . . .

operation of the plan, if not more than reasonable compensation is paid therefor".[12] The contract

or arrangement also must permit termination by the plan without penalty on reasonably short

---

[11] Section 4975(d)(20) also provides an exemption for transactions for certain of the prohibited transactions for a disqualified person other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control with respect to the investment of the plan assets involved in the transaction or renders investment advice with respect to the assets, solely by reason of providing services to the plan but only if the plan receives no less than, and pays no more than, adequate consideration. It is not clear how the concept of "adequate" consideration applies to loans. In addition, this exemption does not exempt prohibited transactions under Section 4975(c)(1)(D), (E) or (F).
[12] Certain of the exemptions under Section 4975, including this exemption do not apply to certain transactions in which a plan lends money or pays compensation or buys or sells from or to an owner-employer or certain parties related to an owner employee. We understand that these facts are not present in this case.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 12 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

notice under the circumstances to prevent the plan from being locked into an arrangement that
has become disadvantageous.

      In addition, Section 4975(d)(10) of the Code provides an exemption for the receipt by a
disqualified person of any reasonable compensation for services rendered or the reimbursement
of expenses actually and properly incurred in the performance of duties with the plan (so long as
the person is not also receiving full time pay by the employer or employee organization
maintaining the plan). As with the Service Provider Exemption, the compensation must be
"reasonable."

      The Treasury Regulations provide that, generally, whether compensation is reasonable
depends on the particular facts and circumstances of each case[13]. However, any compensation
which would be considered excessive under Section 1.162-7 of the Treasury Regulations will not
be reasonable for purposes of these exemptions.[14] Therefore, the burden of proving that no
prohibited transaction has occurred would be on the service provider, as well as on the fiduciary
of the Plan involved. The reasonableness of any fee will ultimately be a facts and circumstances
question.

      As discussed herein, the arrangement between the Investing Plans and Solo provides for
payment to Solo of 66% of the gross amount payable from the transactions; from this amount
Solo is required to pay significant expenses associated with the transaction which expenses are in
addition to any fees paid by the Investing Plans and the Delvian 2013 Partnership. If this 66%

---

[13] Treasury Regulation 54.4975-6(e)(2).
[14] Treasury Regulation 54.4975-6(e)(6).

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                      – 13 –                              June __, 2014
Richard Markowitz
Adam LaRosa

were to be viewed as a fee for services, or compensation, to Solo, it would appear to be large

compared to many investment fee relationships. However, the 66% represents the gross amount

payable to Solo so that after the payment of its fees to third parties (including trading

commissions, legal fees, brokerage fees, accounting fees, reclaim services, custodial service fees,

leverage providing fees and guaranty fees paid by Solo), Solo's net "compensation" was less

than the 66% and perhaps considerably less.

Given the size of the payments to Solo in this matter, we would expect the Department of

Labor to closely scrutinize the fee by looking at the fees charged for similar services, if any, as

well as the time and effort expended by Solo. We would also expect that the Department of

Labor would look at how much of the amount is actually compensation to Solo and how much is

payment to third party providers, and to what extent the payment to third party providers is

reasonable compensation. In this regard, we understand that Solo and other unrelated providers

have and do provide similar arrangements to other investors (both plans and non-plan investors)

under arrangements in which the investors share of the net proceeds is as low as 10%[15]. We also

understand from you that the trustees of the Investing Plans were not able to find a provider

which would provide similar investment services at a lower cost. This indicates that the amounts

paid to Solo are consistent with or less than those charged other investors. In addition, many

hedge fund managers charge a fee of 20% or more of profits (we understand that some managers

charge a fee of up to 50% of profits), which indicates that market demands often result in

---

[15] Because these are private contractual relationships, the details of these transactions are not available to us.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 14 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

arrangements for fees which appear large but which are deemed by investors as appropriate to attempt to obtain a desired return.[16]

In addition, we would expect that the analysis would consider how much of a return the Investing Plan received, compared to that of Solo and other service providers. We understand that the return to the Investing Plans has been very favorable even after the payments to Solo.

While the documentation of the transaction cannot be ignored, it should also be noted that the intent of the parties was that the arrangement was in the nature of a partnership in which each partner would receive a portion of the gross amount, with Solo bearing all of the costs. In this context, the provision of a larger allocation to Solo reflects the agreement of the parties that Solo was essential to the transactions, that the transactions might otherwise not have been possible, and that Solo was incurring large expenses to effectuate the transactions.

The Treasury Regulations provide that the Service Provider Exemption does not apply to "self dealing transactions by fiduciaries" -- that is, fiduciaries dealing with the income or assets of a plan in their own interest or for their own account or receiving consideration for their own personal account from any person dealing with a plan. We understand that none of the trustees of the Investing Plans or the companies or sole proprietors of the companies maintaining the Investing Plans are receiving or have received any direct or indirect benefit or gain from these transactions.

### E.    Application to Service Providers

---

[16] These fees are often part of a complex fee structure which often results in lower fees if certain hurdles are not met.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 15 -                              June ___, 2014
Richard Markowitz
Adam LaRosa

It is possible that Solo could be a "fiduciary" (described in Appendix A) with respect to the Investing Plans. If so, the DOL could take the position that the Service Provider Exemption does not apply if Solo uses its authority, control or responsibility to cause the plan to pay additional fees to it or otherwise pay fees which may benefit Solo or influence its judgment as a fiduciary. This could be the case, for example, if Solo could authorize additional, unnecessary trades which resulted in increased fees to it. In this regard, you have informed us that Solo has no authority over the fees, and no authority to authorize additional fees or additional trades that could result in additional fees, but that all such trades are authorized on behalf of the Plans by Adam LaRosa and that Solo merely effectuates those orders.

As described in this memorandum, Adam LaRosa has performed services for the Investing Plans and the Delvian 2013 Partnership, and therefore is a service provider and is likely also a fiduciary. We understand that Mr. LaRosa is not otherwise a disqualified person, since he is not an employee covered under any of the plans, and not otherwise within the definition described in Appendix A by reason of his employment, family relationship or equity ownership of any entity. The compensation paid to him will need to qualify under the Service Provider Exemption (or other exemption) and so must be "reasonable". While this is a question of fact, we understand that substantial work is involved on Mr. LaRosa's part and so the fee of $5,000 would not seem unreasonably large. We also understand from you that Mr. LaRosa does not have any authority to cause this fee to be paid or to increase the amount of the fee.

Payment for the services performed by the third party service provider who files the tax reclaim form or other providers who Solo may pay to perform related services could also be a

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 16 -                        June ___, 2014
Richard Markowitz
Adam LaRosa

prohibited transaction unless it meets the Service Provider Exemption (or other exemption). This

compensation seems less burdensome on the Investing Plans than the fees paid to Solo and, for

this reason, we believe less likely to be challenged by the Department of Labor, although as

noted in the Facts, Solo does not break out the amount of those fees and disclose them to

investors.

**F.      Extension of Credit**

As noted above, an extension of credit between a plan and a disqualified person

constitutes a prohibited transaction. The DOL could look at Solo's guaranty of the trades as an

extension of credit to the Investing Plans rather than a service in connection with this investment

or as an advance to cover direct expenses which are to be repaid, and take the position that the

extension of credit is not exempted by the Service Provider Exemption. It could be argued that

the guaranty is a necessary service in order to enter into the investment, and that the Service

Provider Exemption should apply to exempt the guaranty, if its requirements are met. This

would give Solo the burden of proving that the fees were reasonable and necessary. Again, even

if the DOL did not view Solo as a disqualified person in the initial transaction between it and the

Investing Plans, it could take the position that Solo became a disqualified person when later

transactions were consummated.

The DOL has issued an exemption for certain securities lending transactions but those are

not discussed in this memorandum since it is our understanding that Solo will not receive

compensation for securities lending services that will be entered into with an unrelated third

party which is not a disqualified person.

Delvian Plan Disqualified Persons

KLUGMAN00067839

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                          - 17 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

### G.    "Solo Account"

In addition, to the extent that the Department of Labor viewed the "use" of the Solo

Account by Delvian 2013 Partnership as a transaction between the plans investing in that

Partnership and the investors in the Delvian Partnership, this could be challenged as a prohibited

transaction since each of the members of Quartet (an investor in the Delvian Partnership) is a

disqualified person with respect to his LLC's plan (each an investor in the Delvian 2013

Partnership).

### H.    Other Issues

The Facts section in this memorandum is intended to provide the factual basis for other

memorandum, and so all facts may not be required for the analysis hereunder.  This

memorandum does not address other issues other than those specifically addressed herein.

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                                    - 18 -                        June ___, 2014
Richard Markowitz
Adam LaRosa

## Appendix A - Terms

This Appendix A briefly describes certain terms used in this memorandum.[17]

**Definition of a Prohibited Transaction**.  A prohibited transaction includes (i) the sale or exchange of any property between, or the lending of money or any other extension of credit between, or the furnishing of goods or services between, a plan and a disqualified person (Section 4975(c)(1)(A), (B) and (C)), (ii) a transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan (Section 4975(c)(1)(D)), (iii) the act by a fiduciary whereby he deals with the plan income or assets in his own interest or for his own account (Section 4975(c)(1)(E)), or (iv) the receipt of any consideration for his own personal account by a disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan (Section 4975(c)(1)(F)).

**Definition of a Disqualified Person.**  Section 4975(e)(2) defines a disqualified person to include:  (A) a fiduciary; (B) a person providing services to the plan; (C) an employer any of whose employees are covered by the plan; (D) an employee organization any of whose members are covered by the plan; (E) an owner, direct or indirect, of 50% or more of the combined voting power of all classes of stock entitled to vote or total value of shares of all classes of stock of a corporation, or of the capital interest or profits interest of a partnership or of the beneficial interest of a trust or unincorporated enterprise which is an employer or employee organization described in (C) or (D); (F) a member of the family (as defined) of any individual described in (A), (B), (C) or (E); (G) a corporation, partnership or trust or estate of which (or in which), 50%

---

[17] These terms are defined in Section 4975 of the Code and this discussion is subject to those definitions.

Delvian Plan Disqualified Persons

# KAYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                          - 19 -                          June ___, 2014
Richard Markowitz
Adam LaRosa

or more of the combined voting power of all classes of stock entitled to vote or total values of
shares of all classes of stock of a corporation, or of the capital interest or profits interest of a
partnership or of the beneficial interest of a trust or estate, is owned directly or indirectly or held
by persons described in (A), (B), (C), (D) or (E); (H) an officer, director (or person having
similar powers or responsibilities), a 10% or more shareholder, or a highly compensated person
(earning 10% or more of the yearly wages of an employer) of a person described in (C), (D), (E)
or (G); or (I) a 10% or more (in capital or profits) partner or joint venturer of a person described
in paragraphs (C), (D), (E) or (G).

   **Definition of Fiduciary.**  Section 4975(e)(3) defines "fiduciary" as any person who (i)
exercises any discretionary authority or discretionary control respecting management of such
plan or exercises any authority or control respecting management or disposition of its assets,
(ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to
any moneys or other property of the plan or has any authority or responsibility to do so, or
(iii) has any discretionary authority or discretionary responsibility in the plan administration.

*  *  *  *  *

   IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with Treasury Department
regulations, we inform you that any U.S. federal tax advice contained in this correspondence
(including any attachments) is not intended or written to be used, and cannot be used, for the

Delvian Plan Disqualified Persons

**K**AYE SCHOLER LLP

John H. van Merkensteijn, III
Matthew R. Stein
Jerome Lhote                              - 20 -                              June ___, 2014
Richard Markowitz
Adam LaRosa

purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Delvian Plan Disqualified Persons