# Exhibit 1

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | MASTER DOCKET |
| CUSTOMS AND TAX ADMINISTRATION OF THE | |
| KINGDOM OF DENMARK | 18-md-2865 (LAK) |
| (SKATTEFORVALTNINGEN) TAX REFUND | |
| SCHEME LITIGATION | |
| | |
| This document relates to all cases listed in Appendix A. | |

---

### REBUTTAL EXPERT REPORT OF FELICITY TOUBE QC

---

#### Purpose of the Expert Engagement

1.  I have been asked by Counsel for SKAT,[1] the Customs and Tax Administration of the Kingdom of Denmark, to reply to the report of Emre Carr ("**The Carr Report**"), dated December 31, 2021.  Specifically, SKAT has requested my expert opinion on whether, as a matter of construction of certain English law Custody Agreements, regulatory issues, and the business practice related to such custody agreements, the Pension Plan had transferred to the Solo Custodians all right, title and interest to any purported dividends allegedly received by the Pension Plans (the "**Dividends**") on account of purported Danish securities which were allegedly custodied with the Solo Custodians and which served as the basis of the vouchers issued by the Solo Custodians and provided to SKAT (the "**Issue**").

---

[1]    I have been informed by counsel for the Plaintiff that at the time of the events alleged in the complaint, the Plaintiff was known as "SKAT."  Pursuant to Danish Legal Order 804, entered on June 6, 2018, the Plaintiff changed its legal name to Skatteforvaltningen, effective as at July 1, 2018.

A.  **Qualifications and Preparation of the Report**

2.  My qualifications were detailed in Section A of my report dated December 31, 2021 (the "**Initial Toube Report**") and my curriculum vitae was also included as Appendix C in the Initial Toube Report.  My compensation for preparing this rebuttal is the same as stated in the Initial Toube Report.

3.  I have been requested to provide an expert report on certain issues of English law which are relevant to the above-captioned proceedings (the "**Proceedings**") which are pending before the United States District Court for the Southern District of New York (the "**Court**").  I understand that this report will be placed before the Court, and I understand my duties to the Court.

4.  A complete listing of the materials I reviewed and considered in forming my opinions and conclusions rendered in this report is attached hereto as Appendix B.

5.  In providing this report, I do not intend to, and do not, waive any legal professional privilege belonging to SKAT and SKAT's rights are reserved.

B.  **Summary of Opinions**

6.  The Carr Report concludes that the Pension Plans were entitled to the alleged Dividends. That conclusion is based on the book entry credits on the Pension Plan's account statements created by the applicable Solo Custodian.  *See, e.g.* Carr Report at ¶¶ 17(c), 144, 145, 160(c), and 172(c).  I do not agree that the ownership of the alleged Dividends can be determined solely by the recorded entries on the account statements. Rather the question of ownership of any alleged Dividend in the context of the Custodian and Pension Plan relationships is a question to be determined by the proper construction of the provisions of the applicable agreements entered into between the Pension Plan and the Solo Custodian. In particular, whether the alleged Dividend was the property of the Pension Plan upon receipt by the Solo Custodian, in the event any Dividend was actually received, falls to be determined by reference to the custody agreement between the Pension Plan and its Solo Custodian.

7.    As set out more fully in this reply report, in my opinion the Pension Plans did not have any right, title or interest to any alleged Dividend that they purportedly received under the unmodified Solo Custody Agreements, the 2014 Old Park Lane Custody Agreements, and/or the 2015 Solo Custodian Custody Agreements (if and to the extent that the Pension Plan had not requested that the Dividends be treated as Client Money, insofar as the relevant agreement provided that such a request could be made).

### *Opinions as to the Solo Custody Agreements*

8.    It is my opinion that the proper construction of the Solo Custody Agreements as a matter of English law informed by business practices, and in the light of the relevant regulatory framework, is as follows:

(1)    Pursuant to the 2012 Solo Custody Agreements, to the extent that a Dividend was actually directed to any Pension Plan either (i) the Dividend would be subject to immediate set off upon receipt to satisfy any obligation owed by the Pension Plan to Solo and as a result there will be no Dividend remaining to which the Pension Plan could have rights, title or interest, or (ii)  all right, title and interest to the Dividend would have automatically transferred to Solo upon receipt of those funds under a title transfer collateral agreement ("**TTCA**"), to ensure payment by the Pension Plan of its future and prospective obligations to Solo. Accordingly, by operation of the 2012 Solo Custody Agreement, to the extent that any Pension Plan was entitled to a Dividend it would have either been immediately set off against any outstanding debt to Solo, or all right, title and interest would have automatically been transferred to Solo, and under either scenario, the Pension Plan itself would not have held any right, title or interest in such alleged Dividend.

(2)    Pursuant to the 2014 Solo Custody Agreement, to the extent that a Pension Plan actually received any Dividends either (i) the Dividend would be subject to immediate set off upon receipt in order to satisfy any obligation owed by the Pension Plan to Solo and as a result there will be no Dividend remaining to which the Pension Plan could have rights, title or interest, or (ii) all right, title and interest to the Dividend would have automatically transferred to Solo upon receipt of those funds under the TTCA, if and to the extent that the Pension Plan

had not requested that those funds be treated as Client Money. Accordingly, by operation of the 2014 Solo Custody Agreement, to the extent that any Pension Plan was entitled to a Dividend (and the Pension Plan had not requested that those funds be treated as Client Money) it would have either been immediately set-off against any outstanding debt to Solo, or all right, title and interest would have automatically been transferred to Solo, and under either scenario, the Pension Plan itself would have not have held any right, title, or interest to such alleged Dividend, unless the Pension Plan requested that the alleged Dividend be treated as Client Money.

(3)    My opinion as to the effect of the 2012 and 2014 Solo Custody Agreements is supported by the 2014 Solo Modification Letters that were sent to a subset of the Pension Plans. Those letters state that *prior to* the modifications set out therein, money, which would include any alleged Dividend, received by Solo or held by Solo in the Pension Plan's account would not be treated as Client Money. It falls to be inferred that prior to the attempted modifications, funds received or held by Solo would either be subject to immediate set-off or the TTCA as described above.

(4)    I do not reach a conclusion below as to whether the 2014 Modification Letters were effective in modifying the 2012 and 2014 Custody Agreements. If they are so effective, Dividends received *after* the effective date of the modifications would not be subject to the TTCA and would be treated as Client Money.

### *Opinions as to the Old Park Lane Custody Agreements*

9.    It is my opinion that the proper construction of the Old Park Lane Custody Agreements as a matter of English law, informed by business practices, and in the light of the relevant regulatory framework, is as follows:

(1)    Pursuant to the Old Park Lane Custody Agreements, to the extent that a Dividend was actually directed to any Pension Plan either (i) the Dividend would be subject to immediate set-off upon receipt to satisfy any obligation owed by the Pension Plan to Old Park Lane and as a result there will be no Dividend remaining to

which the Pension Plan could have rights, title or interest, or (ii) all right, title and interest to the Dividend would have automatically transferred to Old Park Lane upon receipt of those funds under a TTCA, to ensure payment by the Pension Plan of its future and prospective obligations to the Old Park Lane. Accordingly, by operation of the Old Park Lane Custody Agreement, if and to the extent that any Pension Plan was entitled to a Dividend it would have either been immediately set off against any outstanding debt to Old Park Lane, or all right, title and interest would have automatically been transferred to Old Park Lane and, under either scenario, the Pension Plan itself would not have held any right, title, or interest to such alleged Dividend.

(2)    My opinion as to the effect of the Old Park Lane Agreement is supported by the Amendment to these agreements, which expressly removed the TTCA provisions in the original Old Park Lane Agreements and required the Pension Plan to maintain a Minimum Cash Balance, which provided the Custodian with an alternative package of security rights. These revisions demonstrate that prior to the effectiveness of the Amendment, funds received or held by Old Park Lane were either subject to immediate set-off or to the TTCA as described above. Dividends received by the Custodian after the effective date of the Amendment were not subject to the TTCA and would instead be treated as Client Money.

### *Opinions as to the 2015 Solo Custodian Custody Agreements*

10.    It is my opinion that the proper construction of the 2015 Solo Custodian Custody Agreements (including the 2015 Solo Custody Agreement, the 2015 OPL Custody Agreement, the 2015 Telesto Custody Agreement, and the 2015 West Point Custody Agreement)  as a matter of English law, informed by business practices, and in the light of the relevant regulatory framework, is that all right, title and interest to any Dividends which were not subject to immediate set-off (in which case there will be no Dividend remaining to which the Pension Plan could have rights, title or interest) transferred to the Custodian, pursuant to a TTCA, upon receipt of those funds, but only to the extent that the Client had not requested that those funds be treated as Client Money.

11.    The analysis and conclusions summarised above and set out in detail below proceeds on the basis of examples of the Solo Custodian Custody Agreements with which I have been provided.  For the avoidance of doubt, and as I have set out below, where a custody agreement to which I have not expressly referred or with which I have not been provided replicates the relevant provisions of the Solo Custodian Custody Agreements with which I have dealt in detail below, the same analysis and conclusions apply in respect of that agreement.

## C.    <u>Factual background</u>

12.    The following is my understanding (from the various documents with which I have been provided) of the relevant facts and matters by way of factual background for my analysis set out below:

(1)    Between 2012 and 2015, over 270 U.S. pension plans, including the 173 plans that are the subject of this report, submitted reclaims to SKAT in which they represented that they were qualified pension plans, had shareholdings in Danish companies, and had received dividends on those shareholdings net of the tax (collectively, "**Pension Plans**").[2]  SKAT has initiated legal Proceedings against the Pension Plans and related entities and individuals in the United States.[3]

(2)    The Pension Plans, acting through their agents and representatives, applied to SKAT claiming repayments of tax withheld on Dividends that they purported to have received on shares of Danish companies.[4]

(3)    SKAT alleges that these applications were fraudulent because the Pension Plans did not own the shares that they claimed to own, did not receive the Dividends they claimed to have received, did not suffer any withheld tax and so were not entitled to the tax refunds they claimed.  SKAT also alleges that these applications were fraudulent because the Pension Plans did not meet the requirements to be

---

2.    *See* Appendix A for a list of all relevant Pension Plans.
3.    *See e.g.* Amended Complaint, *Skatteforvaltningen v. Avanix Management LLC Roth 401K Plan*, No. 19-cv-01867 (LAK) (S.D.N.Y. Apr. 20, 2020), ECF No. 60 ¶¶ 1-12.
4.    *Id.* ¶ 4.

an exempt entity pursuant to the double taxation treaty between the U.S. and Denmark.[5]

### i.  The Solo Custodians

13.  Solo Capital Partners LLP ("**Solo**") and related entities, including Old Park Lane Capital PLC ("**Old Park Lane**" or "**OPL**"), Telesto Markets LLP ("**Telesto**"), and West Point Derivatives Ltd. ("**West Point**") acted as custodians (collectively, the "**Solo Custodians**") for the Pension Plans.[6]  The Solo Custodians allegedly held and administered the purported Danish shares that the Pension Plans claimed to have owned. The alleged Dividends on the Danish shares allegedly held by each Pension Plan would ultimately be paid to the Solo Custodian's account for that Pension Plan.[7]  The Solo Custodians also generated "dividend credit advice" documents (the "**Tax Vouchers**") for the Pension Plans' refund applications to SKAT, claiming that the respective Pension Plan had received dividends on shares of Danish companies.[8]

### ii.  The Custody Agreements

14.  As part of establishing the legal relationship between the Pension Plans and the Solo Custodians, the Solo Custodians required the Pension Plans to execute certain general form custody agreements. The Solo Custodians purportedly provided custodial services to the Pension Plans in accordance with the custody agreements (the "**Solo Custodian Custody Agreements**").  Different Pension Plans entered into Custody Agreements with

---

5.  *Id.* ¶ 4.

6.  *See e.g.* Amended Complaint, *Skatteforvaltningen v. Avanix Management LLC Roth 401K Plan*, No. 19-cv-01867 (LAK) (S.D.N.Y. Apr. 20, 2020), ECF No. 60 ¶¶ 66-68 (identifying "Solo Capital Partners LLP" as plan's broker-custodian); Amended Complaint, *Skatteforvaltningen v. Aerovane Logistics LLC Roth 401K Plan,* No. 18-cv-07828 (LAK) (S.D.N.Y. Apr. 27, 2020), ECF No. 90 ¶¶ 67-69 (identifying "Old Park Lane" as plan's broker-custodian); Amended Complaint, *Skatteforvaltningen v. Basalt Ventures LLC Roth 401(K) Plan*, No. 19-cv-1866 (LAK) (S.D.N.Y. Apr. 20, 2020), ECF No. 55 ¶¶ 66-68 (identifying "Telesto Markets LLP" as plan's broker-custodian); Amended Complaint, *Skatteforvaltningen v. Edgepoint Capital LLC Roth 401K Plan,* No. 18-cv-07827 (LAK) (S.D.N.Y. Apr. 27, 2020), ECF No. 91 ¶¶ 59-61 (identifying "West Point Derivatives Ltd" as plan's broker-custodian).

7.  *See e.g.* KLUGMAN00007326 (Avanix Solo Account Statement); ELYSIUM-04128815 (Aerovane OPL Account Statement); MPSKAT00007223 (Basalt Telesto Account Statement); MPSKAT00006968 (Edgepoint West Point Account Statement).

8.  *Supra* n.6.

different Custodians.  Further, some of the Custody Agreements were subject to subsequent amendments, reinstatements or modifications over time.

(1)     Each of the Pension Plans executed at least one of the following agreements, depending on when they initiated their relationship with the respective Custodians:

    i.   2012 Solo Custody Agreement;

    ii.  2014 Solo Custody Agreement;[9]

    iii. 2015 Solo Custody Agreement;[10]

    iv.  2014 Old Park Lane Custody Agreement;

    v.   2015 Old Park Lane Custody Agreement;

    vi.  2015 Telesto Custody Agreement;

    vii. 2015 West Point Custody Agreement.[11]

(2)     On April 30, 2014, certain Pension Plans also received letters from Solo modifying the terms of the applicable Solo Custody Agreement between the Pension Plan and Solo.[12]

(3)     All of the Custody Agreements are governed by English law.

15.   Where applicable, I have considered the effect of the original 2012 Solo Custody Agreement and the effect, and effectiveness, of any subsequent amendments.

16.   This report is organized as follows.  In Section B(i), I offer my opinions on the treatment of any Dividend received by a Pension Plan under the 2012 Solo Custody Agreements. In Section B(ii), I offer my opinions on the treatment of any Dividend received by a Pension Plan under the 2014 Solo Custody Agreements.  In Section B(iii), I offer my opinions on the effect of purported modifications to Solo Custody Agreements between Solo and certain Pension Plans.  In Section C, I offer my opinions on the treatment of

---

9.    The 2012 Solo Custody Agreement and the 2014 Solo Custody Agreement are referred to collectively as the "Solo Custody Agreements."

10.   The 2015 Solo Custody Agreements, the 2015 Old Park Lane Custody Agreements, and the 2015 Telesto Agreements are referred to collectively as the "2015 Solo Custodian Custody Agreements."

11.   Although not discussed in any detail in this report, to the extent any Pension Plan executed a Custody Agreement with West Point, the terms were substantively identical to the other 2015 Solo Custodian Custody Agreements identified.

12.   See WH_MDL_00297213; WH_MDL_00097253.

any Dividend received by a Pension Plan under the 2014 OPL Custody Agreements. In Section D, I offer my opinions on the treatment of any Dividend received by a Pension Plan under the 2015 Solo Custodian Custody Agreements.

**Analysis**

A. <u>**Contractual Construction – Applicable English Legal Principles**</u>

17. When interpreting contracts, the ultimate aim is to ascertain what a reasonable person, with all the background knowledge available to the parties in the situation they were in at the time of the contract, would have understood the parties to have meant: <u>Investors Compensation Scheme Ltd v West Bromwich Building Society</u> [1998] 1 WLR 896 at [912]; <u>Rainy Sky v Kookmin Bank</u> [2011] UKSC 50 at [14]; <u>Wood v Capita Insurance Services Limited</u> [2017] UKSC at [10].

18. Where there are two possible interpretations of a contract, the court is entitled to prefer the interpretation which is most consistent with business common sense: <u>Rainy Sky v Kookmin Bank</u> at [21]; <u>Wood v Capita Insurance Services</u> at [11].

B. <u>**Pursuant to the unmodified Solo Custody Agreements all right, title and interest to any alleged Dividends which were not subject to immediate set-off were transferred to Solo.**</u>

i. <u>**The effect of the 2012 Solo Custody Agreements**</u>

19. I am informed that the first group of Solo Custody Agreements relevant to the Pension Plans in this proceeding were executed in around 2012 (the "**2012 Solo Custody Agreements**"). I have been provided with the following examples of the 2012 Solo Custody Agreements:

(1) The Delvian Custody Agreement[13] entered into between Delvian LLC Pension Plan as the Client and Solo Capital Partners LLP ("**Solo**") as the Custodian (the "**Delvian Custody Agreement**").

---

13.    MPSKAT00023973.

(2)    The RJM-Solo Agreement (2013)[14] entered into by RJM Capital Pension Plan as Client and Solo Capital Partners as Custodian, in 2013 (the "**RJM-Solo Agreement (2013)**").

20.    The material provisions of the 2012 Solo Custody Agreements are as follows:

(1)    Clause 1.1 provides the following definitions:

(a)    "Client Money Rules" means the FSA Rules in chapter 7 of that part of the FSA handbook known as CASS.

(b)    "Investments" means all other assets other than cash of the Client held or administered pursuant to this Agreement.

(c)    "Property" means any cash and Investments of the Client held or administered pursuant to this Agreement.

(d)    "TTC Funds" has the meaning given to it in clause 4.3.

(2)    Clause 2.1 provides that *"[t]he Custodian is authorised and regulated by the Financial Services Authority."*

(3)    Clause 3.1 provides:

*"With effect from the date of this Agreement the Client appoints the Custodian to act as custodian of the Property and to provide lending services to the Client and the Custodian accepts such appointment pursuant to the terms of this Agreement."*

(4)    Clause 4.1 provides:

*"If requested by the Client the Custodian may, in its sole discretion, advance funds to the Client to facilitate the settlement of any transaction relating to Property, or settle any transaction relating to Property for the account of the Client. Any such*

---

14.    MPSKAT00003776.

*funds advanced or amounts settled by the Custodian will immediately become repayable by the Client to the Custodian on demand."* (the "**Lending Provision**")

(5)    Clause 4.2 provides:

*"Any funds received or held by the Custodian for the account of the Client in connection with any transaction relating to Property (including, without limitation, any collateral or margin) and any dividend, distribution or other income on any Investments received by the Custodian for the account of the Client shall be set off, immediately and without notice to the Client, against any liability of the Client to the Custodian that has arisen from or as a result of this Agreement (including, without limitation, any liability of the Client which may have arisen as a result of the Custodian advancing funds to the Client or settling any transaction for the account of the Client under clause 4.1)."* (the "**Set-off Provision**")

(6)    Clause 4.3 provides:

*"The Client agrees that, where any amount of funds received by the Custodian for the account of the Client exceeds the Client's existing liabilities towards the Custodian, all right, title and interest in and to any excess funds which do not become subject to immediate set-off on receipt by the Custodian in accordance with clause 4.2 will transfer to the Custodian free of any liens, claims, charges or encumbrances as security for any future or prospective actual or contingent liabilities of the Client towards the Custodian (such excess funds hereinafter referred to as 'TTC Funds')."* (the "**TTCA Provision**")

(7)    Clause 5.1 provides:

*"Funds in respect of which set-off is applied under clause 4.2 and TTC Funds will not be subject to the protections applicable to client money under the Client Money Rules and, as a consequence, such funds will not be segregated from the Custodian's money. These funds may be used by the Custodian in the course of the Custodian's business and the Client will rank as a general creditor of the Custodian in respect of these funds."*

(8)    Clause 5.2 provides:

*"All funds (if any) other than funds in respect of which set-off is applied under clause 4.2 and TTC Funds will be subject to the protections applicable to client money under, and will be held by the Custodian in accordance with, the Client Money Rules. The effect of the Client Money Rules is that the Client's money is segregated from money belonging to the Custodian and is held subject to a statutory trust designed to ring-fence the money in the event of the Custodian's default."*

21.    In my opinion, the effect of the 2012 Solo Custody Agreements was as follows:

(1)    Clause 3.1 provides that the Pension Plan (*i.e.* the Client) appoints Solo (*i.e.* the Custodian) to act as custodian and to provide lending services to the Pension Plan. In particular:

   (a)  Solo acts as custodian for the Property, which includes cash and Investments of the Pension Plan held or administered pursuant to the agreement. Clause 6.1 provides that Solo will arrange for Investments to be held by Solo or by sub-custodians to be appointed by Solo. Solo holds cash in accordance with clauses 4 and 5 of the agreements.

   (b)  Clause 4.1 provides that Solo may, if requested by the Pension Plan, advance funds to the Pension Plan either to facilitate the settlement of transactions relating to Property, or to settle those transactions. Any funds advanced or amounts settled by Solo become repayable by the Pension Plan to Solo on demand.

(2)    Accordingly, pursuant to the 2012 Solo Custody Agreements, the Pension Plan could incur liabilities to Solo from time to time to repay Solo any funds advanced or amounts settled under the clause 4.1 in those agreements.

(3)    Clause 4.2 provides that any funds received or held by Solo for the account of the Pension Plan in connection with any transaction relating to Property and any dividend, distribution or other income on any Investments received by Solo for the account of the Pension Plan, are immediately set off against the Pension Plan's liabilities to Solo arising as a result of the agreement. It is clear that any alleged Dividends on the Danish Securities would constitute a dividend, distribution, or other income on Investments received by Solo *"for the account of the Client."*

(4)    It follows that when the Dividends were received by Solo for the account of the Pension Plan, to the extent that the Pension Plan owed liabilities to Solo, including in respect of funds advanced or amounts settled under clause 4.1, the Dividends would be immediately set off against the Pension Plan liability to Solo.

Under English law, the effect of this set off would be to net off any Dividend received against the liability of the Pension Plan to the Custodian. To the extent that a Dividend is subject to set off in full, the result is that there will be no Dividend remaining to which the Pension Plan could have rights, title or interest.

(5)     However, when any alleged Dividends were received or held by Solo over and above the sum of the Pension Plan's outstanding liabilities to Solo, those funds would be subject to the TTCA in clause 4.3. Accordingly, upon receipt of any part of an alleged Dividend which was <u>not</u> subject to immediate set-off (*i.e.* where there were no liabilities owed to Solo arising from the relevant agreement), all right, title and interest in and to any such alleged Dividend would be transferred to Solo under the TTCA, which would ensure that the Pension Plan could meet any liabilities to Solo, whether future or present, actual or contingent.

22.    In my opinion, this construction of the 2012 Solo Custody Agreements also accords with business common sense, as it provides Solo with comprehensive protection in respect of its exposure to the Pension Plan:

(1)     Even if there were no current liabilities owed by the Pension Plan to Solo, Solo would be exposed in respect of any future obligations incurred by the Pension Plan if Solo were under an obligation to transfer any funds to the Pension Plan that were in excess of those needed to meet present liabilities (which monies would be set off under Clause 4.2). In those circumstances, if Solo had received funds in excess of the Pension Plan's liabilities existing at the time of receipt and if Solo had been obliged to transfer the excess back to the Pension Plan, it would not have had any funds available to secure the Pension Plan's further repayment obligations.

(2)     If the excess funds were treated as Client Money, Solo would have been required to comply with the CASS Client Money Rules in respect of those funds, including segregating those funds., The Pension Plan could withdraw those funds, and Solo would consequently have no funds available to secure the Pension Plan's further repayment obligations.

(3)     Further, clause 4.2 of the 2012 Solo Custody Agreements provides that funds received *"or held"* can be subject to an immediate right of set-off. Accordingly, if the Pension Plan incurred further obligations to Solo, it is arguable that Solo could set off any sums held as Client Money against those obligations. However, the funds subject to the immediate set-off would need to be marked, or otherwise separated from the remaining Client Money, which would present practical difficulties for Solo.

(4)     The TTCA operates to remedy the foregoing "gaps" in Solo's protection, by providing that all right, title and interest to any income received to the Pension Plan's account in excess of its existing liabilities, including the alleged Dividends, are transferred to Solo in order to ensure payment of the Pension Plan's present or future obligations (current, future, or prospective).

(5)     As a result, all monies received to the Pension Plan's account with Solo, including any alleged Dividends, were either subject to the Set-Off Provisions (if the Pension Plan had actual liabilities to Solo that had already arisen) or were subject to the TTCA (to meet any liabilities of the Pension Plan to Solo that either had already arisen, but had not yet been extinguished by set off, or liabilities that might arise in the future).

23.     Pursuant to clause 5.1, funds subject to set-off or the TTCA (the "**TTC Funds**") are not subject to the protections applicable to Client Money under the Client Money Rules. The TTC Funds are therefore not segregated from Solo's money, may be used by Solo in the course of its business, and the Pension Plan would rank as a general creditor in respect of those funds. However, clause 5.2 provides that all funds other than those subject to immediate set-off and the TTCA, will be subject to the Client Money Rules, and will be segregated in a statutory trust designed to ringfence those funds.

24.     Client Money is defined as in the CASS Client Money Rules as money of any currency (a) that a firm receives or holds or on behalf of a client in the course of or in connection with its MiFID[15] business or (b) that the firm holds for a client in the course of carrying on designated investment business that is not MiFID business. In my opinion, when

---

15.     *MiFID* is the *Markets in Financial Instruments Directive* (2004/39/EC). *See also* CASS 6.1.1R.

dealing with the Pension Plan, Solo was either conducting a MiFID business, as it allegedly received, transmitted and executed orders of transferable securities on behalf of clients, or alternatively was conducting a designated investment business that was not MiFID business (namely a safeguarding and administering investments business), as it was safeguarding and administering securities belonging to clients.

25.    CASS Chapter 3 provides that money which a firm receives or holds in connection with an arrangement to secure the obligation of a client in the course of or in connection with its MiFID business, other than a bare security interest, will <u>not</u> be subject to the Client Money rules.  In principle, therefore, the monies that are caught by the Set-Off Provision or the TTCA would not be caught by the Client Money Rules.

26.    As I conclude above, all monies are either caught by the Set-Off Provision or the TTCA. The question therefore arises as to the proper interpretation of (and indeed the need for) clause 5.2, which provides for the protection of any monies not caught by the Set-Off Provision or the TTCA, in circumstances where no monies transferred by the Pension Plans "on behalf of the Client, for the account of the Client, or which is otherwise held by the Custodian for the Client" will in fact in the normal course of events fall into that category.  In my opinion, as a matter of construction under English law clause 5.2 is a "belt and braces" provision, to ensure that Solo is acting in compliance with its regulatory obligations if and to the extent that any funds are not caught by the Set-Off Provision or the TTCA:

(1)    In the usual course of the relationship between Solo and the Pension Plans, to the extent that funds are not subject to the Set-Off Provision under clause 4.2, they will be subject to the TTCA in clause 4.3 in order to secure the Pension Plan's future and prospective obligations.

(2)    However, there may be funds which fall into a "gap" between those provisions. For example, Solo might receive or hold funds for the account of the Pension Plan which the Pension Plan holds on behalf of a third party. Such funds would not be subject to the Set-Off Provision in clause 4.2 or the TTCA in clause 4.3 as they would not be received or held by Solo *"in connection with any transaction*

*relating to Property"* and do not comprise *"any dividend, distribution or other income on any Investments".*

(3)   Pursuant to the CASS Rules, any funds which are not subject to immediate set-off or to which title is not transferred to Solo will be funds held by Solo on behalf of or for a client, and must be held by Solo in accordance with the Client Money Rules. The purpose of clause 5.2 is therefore to ensure that Solo complies with its regulatory obligations in all eventualities, including if and to the extent that it holds funds for or on behalf of a client which are outside the scope of the Set-Off Provision and the TTCA.

(4)   For the avoidance of doubt, any alleged Dividends will not be within the scope of clause 5.2, as they are TTC Funds pursuant to clause 4.3.

27.   In summary, my opinion is that pursuant to the 2012 Solo Custody Agreements any alleged Dividends, to the extent that they are not subject to the immediate Set-Off Provision in clause 4.2, will be subject to the TTCA in clause 4.3 by which all right, title and interest in those Dividends will pass to the Solo Custodian upon receipt.  Under either scenario, the 2012 Solo Custody Agreement operates to deprive the Pension Plan of any right, title or, interest in any alleged Dividend.

28.   My opinion is equally applicable to the treatment of any Pension Plan that entered into a custody agreement that is substantially similar to the 2012 Solo Custody Agreement examined herein.

**ii.   The 2014 Solo Custody Agreements**

29.   I am informed that the second group of Solo Custody Agreements relevant to the Pension Plans in this proceeding were entered into in or around 2014 (the "**2014 Solo Custody Agreements**").  I have been provided with the following examples of the 2014 Solo Custody Agreements:

(1)    The RJM-Solo Agreement (2014)[16] entered into between RJM Capital Pension Plan ("**RJM**") as Client and Solo as Custodian (the "**RJM-Solo Agreement (2014)**").

(2)    The Valerius-Solo Agreement[17] entered into between the Valerius LLC Solo 401K Plan as Client and Solo as Custodian, in 2014 (the "**Valerius-Solo Agreement (2014)**").

30.    The RJM-Solo Agreement (2014) and the Valerius-Solo Agreement (2014) are in materially the same terms, but the relevant clauses are numbered differently in each agreement.  For ease of reference, I have dealt with the provisions of the RJM-Solo Agreement (2014) below.  However, for the avoidance of doubt, my opinion is that the effect of the Valerius-Solo Agreement (2014), and any of the other 2014 Solo Custody Agreements which are in materially the same terms, is the same as the effect of the RJM-Solo Agreement (2014), as set out in paragraph 31 below.

31.    The material terms of the RJM-Solo Agreement (2014) are as follows:

(1)    Clause 401.1 provides the following definitions:

(a)    "Cash" means money in any currency credited to an account and any similar claim for repayment of money.

(b)    "Investments" means all assets other than Cash of the Client held or administered pursuant to the Agreement.

(c)    "TTC Funds" has the meaning given to it in clause 4.3.

(2)    Clause 404.1 is in similar terms to the Lending Provision in clause 4.1 in the 2012 Solo Custody Agreements/2012 Solo Agreements, and provides:

---

16.    MPSKAT00104150.
17.    VALER00000147.

*"If requested by the Client the Custodian may, in its sole discretion, advance funds to the Client to facilitate the settlement of any transaction relating to Property, or settle any transaction relating to Property for the account of the Client. Any such funds advanced or amounts settled by the Custodian will immediately become repayable by the Client to the Custodian on demand."*

(3)     Clause 404.2 is in identical terms to the Set-Off Provision in clause 4.2 in the 2012 Solo Custody Agreements, and provides:

*"Any funds received or held by the Custodian for the account of the Client in connection with any transaction relating to Cash (including, without limitation, any collateral or margin) and any dividend, distribution or other income on any Investments received by the Custodian for the account of the Client shall be set off, immediately and without notice to the Client, against any liability of the Client to the Custodian that has arisen from or as a result of this Agreement (including, without limitation, any liability of the Client which may have arisen as a result of the Custodian advancing funds to the Client or settling any transaction for the account of the Client under Clause 4.1 )."*

(4)     Clause 404.3 is in different terms to the Original TTCA Provision in clause 4.3 of the 2012 Solo Custody Agreements, and provides:

*"The Client agrees as a condition to the continued provision by the Custodian of services to the Client, that all Cash transferred to the Custodian by the Client, on behalf of the Client, for the account of the Client or which is otherwise held by the Custodian for the Client from time to time for the purpose of securing or otherwise meeting the Client's obligations to the Custodian whether present or future, actual or contingent or prospective shall be transferred to the Custodian with full ownership so that the Client no longer has a proprietary claim over it ('TTC Funds'). The Client acknowledges and agrees that:*

*404.3.1 all right, title and interest in and to TTC Funds shall vest in the Custodian free and clear of any liens, claims, charges or encumbrances or any other interest of the Client or any third person;*

*404.3.2 the Custodian will not segregate TTC Funds from the Custodian's own assets and the Custodian may use the TTC Funds in the course of its own business. If the Custodian becomes insolvent, the Client will rank only as a general creditor;*

*404.3.3 no mortgage, charge, lien, pledge, encumbrance or other security interest is intended to be or is created in favour of the Custodian in the TTC Funds;*

*404.3.4 TTC Funds shall be treated by the Custodian as collateral in accordance with Chapter 3 of the FCA handbook known as CASS (as*

*amended from time to time) and not as client money in accordance with the Client Money Rules in that sourcebook; and*

*404.3.5 if the Custodian determines in its discretion that the TTC Funds held are more than is necessary to cover the Client's obligations whether present or future, the Custodian will return an appropriate amount of TTC Funds to the Client."* (the "**2014 Solo TTCA Provision**")

(5)     Clause 404.5 provides:

*"The parties acknowledge that, at any time, the Client may request for Cash to be treated as Client Money as defined and set out in the Client Money Rules and not as TTC Funds. The Client agrees and acknowledges that the acceptance of such request by the Custodian may be conditional on amendments being made to this Agreement and any Fees pursuant to Clause 15 (Fees)."*

32.     Clauses 404.1 and 404.2 of the RJM-Solo Agreement (2014) are materially the same as the Lending Provision and the Set-Off Provision in clauses 4.1 and 4.2 of the 2012 Solo Custody Agreements, and the analysis as to the effect of those provisions therefore mirrors that set out in paragraphs 21 and 22 above.

33.     The TTCA in clause 404.3 of the RJM-Solo Agreement (2014) is worded differently from the TTCA in clause 4.3 of the 2012 Solo Custody Agreements. However, in my opinion, clause 404.3 similarly operates to transfer all right, title and interest to any alleged Dividends to Solo upon receipt of those Dividends (subject to clause 404.5), for the following reasons:

(1)     Clause 404.3 provides that *"all Cash transferred to the Custodian by the Client, on behalf of the Client, for the account of the Client or which is otherwise held by the Custodian for the Client"* shall be transferred to Solo with full ownership so that the Pension Plan no longer has a proprietary claim over it. In my opinion, any alleged Dividends will amount to Cash *"transferred to the Custodian for the account of the Client"* or otherwise *"Cash held by the Custodian on behalf of the Client"*.

(2)     Clause 404.3.2 mirrors the provisions in clause 5.1 of the 2012 Solo Custody Agreements, as it provides that Solo will not segregate the TTC Funds, may use

the TTC Funds in the course of its own business, and that the Pension Plan will only rank as a general creditor in respect of those funds. Accordingly, Solo is similarly entitled to use the Dividends in the course of its own business, and to intermix those funds with its own, in the same way as under the 2012 Solo Custody Agreements.

(3)     Clause 404.3.4 clarifies that the TTC Funds shall be treated by Solo as collateral in accordance with Chapter 3 of CASS, and not as client money in accordance with the Client Money Rules. This also mirrors clause 5.1 of the 2012 Solo Custody Agreements, which provides that the TTC Funds will not be held in accordance with the Client Money Rules.

(4)     Clause 404.3.5 provides that if Solo determines in its discretion that the TTC Funds held are more than is necessary to cover the Pension Plan's obligations, it will return an appropriate amount of the TTC Funds to the Pension Plan. There is no similar provision in the 2012 Solo Custody Agreements. However, in my opinion the effect of clause 404.3.5 is that, following title in the relevant funds having been transferred to Solo in accordance with the TTCA, the Custodian may re-transfer title to the Pension Plan if it determines (in its discretion) that the funds held are in excess of what is necessary to cover the Client's obligations.

(5)     Accordingly, all rights, title and interest in any alleged Dividends received by Solo which are not subject to immediate set-off under clause 404.2, will be immediately transferred to Solo upon receipt, subject to clause 404.5.

34.     As set out above, the foregoing analysis is subject to the provision in clause 404.5 of the RJM-Solo Agreement (2014).  Clause 404.5 is a material deviation from the provisions of the 2012 Solo Custody Agreements, as it provides that the Client may request for Cash to be treated as Client Money as defined in the Client Money Rules, and not as TTC Funds.  It also provides that the Custodian's acceptance of the Client's request may be conditional on amendments being made to the agreement and any Fees pursuant to clause 15, although the nature of the amendments and dependency on Fees is not specified.  It follows that the Pension Plan must request that the Dividends be treated as Client Money

and the Custodian must accept that request, in order for those Dividends to be treated as Client Money.

35.    In my opinion, the effect of clause 404.5 is that if and to the extent that any Pension Plan specifically requested for Cash to be treated as Client Money, Solo would be under an obligation to hold the cash in accordance with the Client Money Rules, subject to the caveat that this obligation might be conditional on amendments to the agreement or the charging of any fees. Accordingly, if and to the extent that the Pension Plan specifically requested in the present case that any alleged Dividends be treated as Client Money, the rights, title and interest to any alleged Dividends (insofar as not subject to set-off) would not be transferred to the Solo Custodian under the TTCA, and title to those Dividends would remain with the Pension Plan.

36.    My opinion as to the operation of clause 404.5 is supported by the following provisions of the RJM-Solo Agreement (2014) which are different from those in the 2012 Solo Custody Agreements:

(1)    The Client is able to request that all Cash be held as Client Money rather than as TTC Funds pursuant to RJM-Solo Agreement (2014), which it was not able to do under the 2012 Solo Custody Agreements. However, the Client remains able to incur obligations to the Custodian from time to time, as the Custodian may advance funds or settle transactions to the Client in accordance with clause 404.1.

(2)    Under the 2012 Solo Custody Agreements, the Custodian is protected against exposure to any prospective obligations incurred by the Client by obtaining title to any excess funds under the TTCA. However, under the RJM-Solo Agreement (2014), the Client may request that those excess funds be treated as Client Money and therefore right, title and interest to those funds would not transfer to the Custodian if that request were made. It follows that there would be a "gap" in the Custodian's protection, in respect of the Client's future and prospective obligations to the Custodian.

(3)    I note that this "gap" is partly remedied in the RJM-Solo Agreement (2014) by the form of security introduced by way of clause 405 of that agreement, which

has no mirroring provision in the 2012 Solo Custody Agreements. Clause 405.1 provides that the Client is required to transfer an amount equal to or greater than €20,000 as security for its prospective obligations (the "**Minimum Cash Balance**"). Pursuant to clause 405.2 the Client is required to maintain the Minimum Cash Balance at all times until the agreement is terminated. Further, clause 405.3 provides that the Custodian may deduct from the Minimum Cash Balance any fees that may accrue or be invoiced.

(4)   The Minimum Cash Balance therefore potentially fills the "gap" in the Custodian's protection, as the Client's prospective obligations are secured by a fixed and constant lump sum being made available to the Custodian from which it can deduct sums it is owed by the Client.

37.   In summary, my opinion is that as a general proposition any right, title and interest to any alleged Dividends will transfer to Solo pursuant to the 2014 Solo Custody Agreements. However, the operation of this provision would be limited if and to the extent that a Pension Plan has specifically requested that the Solo Custodian treat those Dividends as Client Money. In those circumstances, any alleged Dividends would be treated as Client Money.

### iii.   Modifications to the Solo Custody Agreements

Effect of the modifications

38.   On or around 30 April 2014, Solo sent letters to several Pension Plans purporting to modify the course of dealing established by the 2012 Solo Custody Agreements[18] (the "**2014 Solo Modification Letters**"). The 2014 Solo Modification Letters provided, materially:

> "We write to confirm that notwithstanding the provisions contained within the Client Custody Agreement entered into between you and Solo Capital Partners LLP (Solo), with immediate effect we will treat all receipts of dividend, distributions or other income pertaining to your Investments (as such term is defined in the Client Custody Agreement) which we receive for your account as client money in accordance with the Client Money Rules of the Financial Conduct Authority (FCA).

---

18.   WH_MDL_00297213; WH_MDL_00097253.

*This means such monies will be placed by Solo for you in a segregated client account with an approved financial institution. Client money will be segregated from Solo's own assets."*

39. I have not conducted an analysis as to whether the 2014 Solo Modification Letters purported to modify both the 2012 Solo Custody Agreements and the 2014 Solo Custody Agreements, but for completeness I have considered the effect and effectiveness of the modification in respect of both sets of agreements.

40. In my opinion, the 2014 Solo Modification Letters support the conclusion that I reach above, namely that prior to the issue of the 2014 Solo Modification Letters all right, title and interest in any Dividends was transferred to Solo pursuant to the TTCA Provisions in the 2012 Solo Custody Agreements and the 2014 Solo Custody Agreements as set out in paragraphs 20 and 31 above. I reach this conclusion for the following reasons:

(1) The 2014 Solo Modification Letters provide that the substantive arrangements contained therein are being introduced *"notwithstanding the provisions contained in the Client Custody Agreement"*, indicating that the treatment of the receipts of any dividend, distribution or other income pertaining to the Investments as client money differed from or was contrary to the previous provisions contained in the 2012 Solo Custody Agreements and the 2014 Solo Custody Agreements.

(2) In particular, the letters set out that the consequence of receipts of any dividend, distributions or other income pertaining to the Pension Plan's purported Investments being treated as client money in accordance with the FCA Client Money Rules *"means that such monies will be placed by Solo for you in a segregated client account"* and *"will be segregated from Solo's own assets"*. This is contrary to the provisions of clause 5.1 of the 2012 Solo Custody Agreements and clause 404.3.2 of the RJM-Solo Agreement (2014) which respectively provide that TTC Funds will not be segregated from the Custodian's own assets, and that the Custodian may use those funds in the course of its own business. It is also contrary to clause 5.2 of the 2012 Solo Custody Agreements

and clause 404.3.4 of the RJM-Solo Agreement (2014), which provide that the TTC Funds will not be subject to the Client Money Rules.

(3)    The express identification of dividends, distributions, and other income pertaining to the Investments in the 2014 Solo Modification Letters, and the corresponding statement that those sums would be held as client money from the date of the modifications, further supports my opinion that prior to those modifications the Dividends were not held as Client Money under the 2012 Solo Custody Agreements and the 2014 Solo Custody Agreements.

(4)    Accordingly, as the arrangements in the 2014 Solo Modification Letters plainly differ from, and are expressed by Solo to differ from, the provisions of the 2012 Solo Custody Agreements and the RJM-Solo Agreement (2014), it falls to be inferred that the Dividends were not (prior to the date on which such modifications may have taken effect) held as Client Money under the unmodified agreements.

(5)    It follows that those sums were, as I have already concluded, either subject to immediate set-off or were TTC Funds, to which title was transferred to Solo.

<u>Effectiveness of the modifications</u>

*2012 Solo Custody Agreements*

41.    Clause 20.1 of the 2012 Solo Custody Agreements provides that, subject to clause 20.2, the agreements may only be varied with the written consent of both parties. However, clause 20.2 provides that the agreement may be varied by the Custodian giving written notice to the Client to take effect on the date of the notice, but only to the extent that changes in legal and regulatory requirements necessitate an immediate change or changes in the manner in which the Custodian can provide services under the Agreement.

42.    Based on the information available to me, it does not appear that the Pension Plans provided written consent to the variations to the 2012 Solo Custody Agreements set out in the 2014 Solo Modification Letters, and in particular the letters were not countersigned

by the relevant Pension Plans.  Accordingly, in order to be effective, those variations must have been necessitated by changes in the legal and regulatory requirements regarding Solo's provision of custodial services under the 2012 Solo Custody Agreements.

43.   I am not aware of the circumstances surrounding the 2014 Solo Modification Letters. However, to the extent that the variations to the 2012 Solo Custody Agreements were necessitated by changes in the applicable legal and regulatory requirements, they would be effective.  However, I note that the 2014 Solo Modification Letters themselves make no reference to any change in any applicable legal or regulatory requirement.

44.   If the modifications were effective, they would take effect from the date of the letters. In respect of Clients who received notice of the variation, Dividends received by the Solo Custodian for the account of those Clients after the date of the notice, and which were not subject to immediate set-off, would have been held as Client Money after the date of those letters and the Solo Custodian would not have had title to those funds.

*2014 Solo Custody Agreements*

45.   Clause 423.1 of the RJM-Solo Agreement (2014) provides that:

>   *"The Custodian may amend the terms of this Agreement:*
>
>   *423.1.1 by written notice to the Client (which may be by email) and such amendment shall take effect ten Business Days following the date of the notice (or such later date as may be specified in the notice); or*
>
>   *423.1.2 to the extent that changes in legal and regulatory requirements necessitate an immediate change or changes in the manner in which the Custodian can provide services under this Agreement, by written notice to the Client (which may be by email) and such amendment shall take effect on the date of the notice."*

46.   I am not aware whether the 2014 Solo Modification Letters, or similar modifications, were provided by the Solo Custodian in respect of any or all of the 2014 Solo Custody Agreements (although I have set out the effect of any such modifications on that agreement above).

47.    However, if they were, in accordance with clause 420 and 423.1, any such modification would be effective ten business days following the date of the written notice provided to the Client, or alternatively, if the modification was necessitated by changes in the applicable legal and regulatory requirements, from the date of the written notice.  After the effective date, any Dividends which were received by the Solo Custodian for the account of the Pension Plans to whom notice was provided, and which were not subject to immediate set-off, would have been held as Client Money and the Solo Custodian would not have had title to those funds.

## C.    Pursuant to the Old Park Lane Custody Agreements all right, title and interest to the Dividends was transferred to the Custodian.

### i.    The Old Park Lane Custody Agreements

48.    The Basalt-OPL Agreement[19] was entered into between Basalt Ventures LLC Roth 401(K) Plan as the Client and Old Park Lane as the Custodian (the "**Basalt-OPL Agreement**").  The material terms of the Basalt-OPL Agreement are as follows:

(1)    Clause 1.1 defines the following terms:

(a)    "Cash" means money in any currency credited to an account and any similar claim for repayment of money.

(b)    "Property" means any Cash and Investments of the Client held or administered pursuant to this Agreement.

(c)    "TTC Funds" has the meaning given to it in Clause 4.3.

(2)    Clause 4.1 provides:

*"If requested by the Client the Custodian may, in its sole discretion, advance funds to the Client to facilitate the settlement of any transaction relating to Property, or settle any transaction relating to Property for the account of the Client.  Any such*

---

19.    JHVM_0001244.

*funds advanced or amounts settled by the Custodian will immediately become repayable by the Client to the Custodian on demand."*

(3)     Clause 4.2 provides:

*"Any funds received or held by the Custodian for the account of the Client in connection with any transaction relating to Cash (including, without limitation, any collateral or margin) and any dividend, distribution or other income on any Investments received by the Custodian for the account of the Client shall be set off, immediately and without notice to the Client, against any liability of the Client to the Custodian that has arisen from or as a result of this Agreement (including, without limitation, any liability of the Client which may have arisen as a result of the Custodian advancing funds to the Client or settling any transaction for the account of the Client under Clause 4.1 )."*

(4)     Clause 4.3 provides:

*"The Client agrees as a condition to the continued provision by the Custodian of services to the Client, that all Cash transferred to the Custodian by the Client, on behalf of the Client, for the account of the Client or which is otherwise held by the Custodian for the Client from time to time for the purpose of securing or otherwise meeting the Client's obligations to the Custodian whether present or future, actual or contingent or prospective shall be transferred to the Custodian with full ownership so that the Client no longer has a proprietary claim over it ('TTC Funds').  The Client acknowledges and agrees that:*

*4.3.1 all right, title and interest in and to TTC Funds shall vest in the Custodian free and clear of any liens, claims, charges or encumbrances or any other interest of the Client or any third person;*

*4.3.2 the Custodian will not segregate TTC Funds from the Custodian's own assets and the Custodian may use the TTC Funds in the course of its own business.  If the Custodian becomes insolvent, the Client will rank only as a general creditor;*

*4.3.3 no mortgage, charge, lien, pledge, encumbrance or other security interest is intended to be or is created in favour of the Custodian in the TTC Funds;*

*4.3.4 TTC Funds shall be treated by the Custodian as collateral in accordance with Chapter 3 of the FCA handbook known as CASS (as amended from time to time) and not as client money in accordance with the Client Money Rules in that sourcebook; and*

*4.3.5 if the Custodian determines in its discretion that the TTC Funds held are more than is necessary to cover the Client's obligations whether present or future, the Custodian will return an appropriate amount of TTC Funds to the Client."*

(5)    Clause 4.5 provides:

> *"The parties acknowledge that, at any time, the Client may request for Cash to be treated as Client Money as defined and set out in the Client Money Rules and not as TTC Funds. The Client agrees and acknowledges that the acceptance of such request by the Custodian may be conditional on amendments being made to this Agreement and any Fees pursuant to Clause Error: Reference source not found (Fees)."* [sic]

(6)    Clause 5.1 provides that the Client is obliged to maintain a Minimum Cash Balance of €500,000 and clause 5.4 provides that the Custodian may deduct any fees that may accrue or be invoiced from the Minimum Cash Balance.

49.    The following agreements are in materially the same terms as the Basalt-OPL Agreement:

(1)    The Roadcraft-OPL Agreement[20], entered into between Roadcraft Technologies LLC Roth 401(K) Plan as the Client and Old Park Lane as Custodian (the "**Roadcraft-OPL Agreement**").

(2)    The FWC Capital-OPL Agreement[21] entered into between FWC Investment Trust as the Client and Old Park Lane as Custodian (the "**FWC-OPL Agreement**").

(3)    The Proper Pacific-OPL Agreement[22] entered into between DBA Investment Trust, on behalf of the Proper Pacific LLC 40k Plan, as the Client and Old Park Lane as Custodian (the "**Proper Pacific-OPL Agreement**") (the agreements collectively, the "**Old Park Lane Custody Agreements**").

50.    The provisions of the Old Park Lane Custody Agreements concerning the treatment of any alleged Dividends are in materially the same terms as the RJM-Solo Agreement (2014). Accordingly, the analysis set out in paragraphs 21 to 27 above applies. In summary:

---

20.    WH_MDL_00337590.
21.    FWCCAP00000107.
22.    ELYSIUM-07245693.

(1)     Pursuant to clause 4.1, the Pension Plan may incur obligations to Old Park Lane from time to time to repay any funds advanced or amounts settled in respect of transactions. When Old Park Lane receives any alleged dividends, distributions, or other income pertaining to purported Investments for the account of the Pension Plan, those sums will be immediately set-off against any existing liabilities of the Pension Plan to Old Park Lane, pursuant to clause 4.2.

(2)     Funds in excess of the Pension Plan's liabilities to Old Park Lane will not be subject to set-off.  However, in order to secure the Pension Plan's obligations to Old Park Lane, all right, title and interest to those funds will be transferred to Old Park Lane pursuant to the TTCA in clause 4.5.

(3)     As distinct from the 2012 Solo Custody Agreements, the Pension Plan has the right specifically to request that Cash be treated as Client Money and not as TTC Funds, pursuant to clause 4.5.  However, to ensure that Old Park Lane maintains adequate security in respect of the Pension Plan's obligations, Old Park Lane is required to transfer and maintain a Minimum Cash Balance from which the Custodian can deduct fees which may accrue or be invoiced to the Pension Plan.

(4)     Accordingly, all right, title and interest to any alleged Dividends which are not subject to immediate set-off will be transferred to Old Park Lane, but only to the extent that those alleged Dividends are not being treated as Client Money at the specific request of the Client.

ii.     **The Amendment to the Old Park Lane Custody Agreements supports my opinion that any right, title and interest to the Dividends transferred to the Custodian under the 2014 OPL Custody Agreement.**

51.     I am instructed that a number of the Old Park Lane Custody Agreements were amended by Old Park Lane in 2015.  I have reviewed two examples of the amended agreements (collectively, the "**Amended Old Park Lane Custody Agreements**"):

(1)    On 6 October 2015, OPL amended the FWC-OPL Agreement[23] (the "**Amended FWC-OPL Agreement**").

(2)    On 6 October 2015, OPL provided an updated version of its Terms and Conditions for custody services to Proper Pacific[24] (the "**Amended Proper Pacific-OPL Custody Terms**").

52.    In summary, the amendment removed the TTCA Provision and introduced an alternative package of rights comprising maintenance of a Minimum Cash Balance from which the Custodian was able to deduct its fees or seek payment of obligations.  It falls to be inferred that, prior to the amendment, the Custodian was protected in respect of its exposure to the Client by the TTCA, which protection was exchanged by the amendment for the Minimum Cash Balance.  Accordingly, in my opinion, the amendment to the Old Park Lane Custody Agreements provides strong support to the conclusion I have reached above, that the TTCA in the unamended agreements provided protection to the Custodian for payment of the unpaid present or future obligations of the Client.

53.    The relevant provisions in the Amended FWC-OPL Agreement and the Amended Proper Pacific-OPL Custody Terms relating to the treatment of the Dividends are in the same terms.  The material terms of those agreements are as follows:

(1)    Clause 7.1 is in materially the same terms as the Lending Provision in the 2012 Solo Custody Agreements, the 2014 Solo Custody Agreements, and the Old Park Lane Custody Agreements.  It provides that the Custodian may advance funds to the Client to facilitate the settlement of any Transaction relating to Property or settle any Transaction relating to Property on account for the Client. Any such funds advanced or amounts settled by the Custodian will immediately become due and payable by the Client to the Custodian on demand.

(2)    Clause 7.2 is in materially the same terms as the Set-Off Provisions in the 2012 Solo Custody Agreements, the 2014 Solo Custody Agreements, and the Old Park Lane Custody Agreements. It provides that any funds received or held by the

---

23.    FWCCAP00003136.
24.    PROPPACIF00003291.

Custodian in connection with any transaction relating to Cash and any dividend, distribution or other income on any Investments, will be set off against any liability owed by the Client to the Custodian arising as a result of the Terms.

(3)    Clause 7.3 provides:

> "On termination as notified by one party to the other in accordance with Clause 2.1 or Clause 21.2, or upon the Custodian receiving notice from you that you do not wish to receive any further services from the Custodian, the Custodian will, at your request, promptly instruct Jarvis or another sub-custodian (as appointed from time to time) to transfer all Client Money subject first to any set-off pursuant to Clause 7.2 above, to an account designated by you."

(4)    Clause 8 is in materially the same terms as the Minimum Cash Balance provisions in the 2014 Solo Custody Agreements and the Old Park Lane Agreements. Clause 8.1 of the amended agreement provides that the Client is required to transfer a Minimum Cash Balance of an amount equal or greater to €50,000 *"as security of your prospective obligations."* The Client is required to maintain the Minimum Cash Balance at all times. Clause 8.4 provides that the Custodian can deduct from the Minimum Cash Balance any fees that may accrue or be invoiced including, but not limited to, the Fees (which are defined in clause 18.1 as the sums payable for the Custodian's services under the Agreement).

54.    For present purposes, the primary difference in the Amended OPL Custody Agreements compared with the 2012 and 2014 Solo Custody Agreements and the unamended OPL Custody Agreements, is that the TTCA provision is omitted from the amended agreements. The amendment to the Amended OPL Custody Agreements, which outlines the changes made and is in the same terms in respect of both amended agreements, provides as follows:[25]

(1)    Paragraph 2 provides that *"clause 8 ('Title Transfer Collateral Arrangements') shall be deleted in its entirety."*

---

25.    *See* PROPPACIF00003325 ("Amendment to Terms and Conditions for Custody Services").

(2)    Paragraph 3 replaces sub-clause 5 of the clause entitled *"Custody of Client Investments"* to remove the reference to the transfer of TTC Funds to the Custodian under clause 4.3.

(3)    Paragraph 4 provides that the definition of "TTC Funds" shall be deleted from the Schedule to the Terms containing the definitions.

55.    In my opinion, the effect of the Amended OPL Custody Agreements is as follows:

(1)    Any funds received or held by the Custodian on account for the Client in connection with any transaction relating to Cash, and any dividend, distribution or other income on any Investments, will be immediately set-off against any outstanding liabilities of the Client owing to the Custodian.

(2)    However, as there is no TTCA provision, right, title and interest in any funds received in excess of the Client's existing obligations, including the Dividends, will not be transferred to the Custodian.

(3)    Clause 7.3 provides that upon termination of the agreement the Custodian will instruct the sub-custodian to transfer all Client Money to the Client, subject first to any set-off. It falls to be inferred from this provision that prior to termination any funds received or held by the Custodian on account for the Client which are not subject to set-off, will be held as Client Money by the sub-custodian.

(4)    The Custodian is therefore in the same practical position as set out in paragraph 36 above, where the Client, pursuant to the 2014 Solo Custody Agreements, requests that all Cash not subject to set-off be treated as Client Money by the Custodian. In those circumstances, the Custodian would not be protected in respect of any obligations incurred by the Client from time to time, such as in respect of funds advanced or amounts settled under clause 7.1. This "gap" in the Custodian's protection is remedied by the requirement to provide a Minimum Cash Balance from which the Custodian can deduct its fees, as set out in clause 8.

56.  In summary, under the amended agreements the TTCA has been exchanged for protection in the form of the Minimum Cash Balance, which provides a buffer for the Custodian against its exposure to the Client in respect of prospective liabilities which are incurred from time to time.

57.  The Amended OPL Custody Agreements go one step further than the 2014 Solo Custody Agreements and the Old Park Lane Custody Agreements, as the Client does not need to request that any Cash not subject to set-off be treated as Client Money because treatment of Cash as Client Monies is provided for as a default.

58.  Accordingly, pursuant to the Amended FWC-OPL Agreement and the Amended Proper Pacific-OPL Agreement, all right, title and interest in any funds held or received to the Client's account which are not set-off against the Client's liabilities to the Custodian under clause 7.2, including the Minimum Cash Balance, does not transfer to the Custodian.  It follows that Old Park Lane would not have had title to any Dividends for the purposes of any Tax Vouchers submitted to SKAT on behalf of FWC or Proper Pacific pursuant to the amended agreements.

59.  For the avoidance of doubt, my opinion is that the foregoing analysis and conclusions would apply to any Custody Agreements which are in materially the same terms as the Amended FWC-OPL Agreement and the Amended Proper Pacific-OPL Agreement.

Effectiveness of the amendments to the OPL Custody Agreements

60.  Clause 24.1 of the unamended Proper Pacific-OPL Agreement and the unamended FWC-OPL Agreement is in the same terms as clause 423.1 of the RJM-Solo Agreement (2014).  Accordingly, the same analysis as set out in paragraph 47 above applies in respect of when and whether the Amended OPL Custody Agreements will be effective.   In summary, the amendments will take effect either ten business days after the date of the notice, or if the amendments were necessitated by changes in the applicable legal and regulatory requirements, from the date of the written notice.

61.  The Amended OPL Custody Agreements do not provide that any funds which were previously treated as TTC Funds, and to which the Custodian therefore obtained title under the unamended OPL Custody Agreements, fall to be prospectively treated as Client

Money. In my opinion, the Custodian would therefore retain title to any Dividends to which it had title prior to the effective date of the amendments, but would not obtain title to any Dividends received after that date.

**D.** **Pursuant to the 2015 Solo Custodian Custody Agreements, all right, title and interest to the Dividends transferred to the Custodians, to the extent that those sums were not subject to set-off and the Client did not request that those sums be treated as Client Money.**

    **i.** **The 2015 Solo Custodian Custody Agreements**

62.    I am informed that the Solo Custodians issued new form Custody Agreements in or around 2015 ("**2015 Solo Custodian Custody Agreements**"). I have been provided with the following examples of the 2015 Solo Custodian Custody Agreements:

    (1)    The Form OPL Custody Agreement (2015)[26] which is dated February 2015;

    (2)    The Form Solo Custody Terms[27] which is dated July 2015;

    (3)    The Form Telesto Custody Terms which is dated July 2015[28] (collectively, "**2015 Sample Agreements**").

63.    I do not express my opinions as to whether the 2015 Solo Custodian Custody Agreements were entered into by any specific Pension Plan, but I proceed on the basis that they are applicable as between specific Pension Plans and the applicable Solo Custodian.

64.    The 2015 Solo Custodian Custody Agreements are in materially the same terms as the 2014 Solo Custody Agreements. I have referred to each of the 2015 Solo Custodian

---

26.    JHVM_0004738.
27.    FWCCAP00001045.
28.    PROPPACIF00001123. I have been informed that none of the Pension Plans selected as Bellwethers used West Point as a custodian. However, the 2015 West Point Custody Agreement is substantially identical to the other 2015 Solo Custodian Custody Agreements, and my analysis set out herein would be equally applicable to the 2015 West Point Custody Agreement.

Custody Agreements set out in paragraph 62 above in the following, by referring to the relevant Pension Plan for each:

(1)     Clauses 8.2 (Old Park Lane), 5.3 (Solo) and 5.3 (Telesto) of the 2015 Sample Agreements substantially replicate the TTCA Provision in clause 404.3 of the RJM-Solo Agreement (2014).

(2)     Clauses 8.4 (Old Park Lane), 5.5 (Solo) and 5.5 (Telesto) of the 2015 Sample Agreements substantially replicate the Client Election clause in clause 404.5 of the RJM-Solo Agreement (2014), which provides that the Pension Plan may specifically request for Cash to be treated as client money as defined in the Client Money Rules and not as TTC Funds.

(3)     Clauses 9.1 and 9.3 (Old Park Lane), clauses 6.1 and 6.3 (Solo), and clauses 6.1 and 6.3 (Telesto) of the 2015 Sample Agreements substantially replicate clauses 405.1 and 405.3 of the RJM-Solo Agreement (2014), which respectively provide that the Pension Plan must maintain a Minimum Cash Balance as security for its prospective obligations and that the Solo Custodian can deduct from the Minimum Cash Balance any fees that may accrue or be invoiced.

65.     Accordingly, in my opinion, the same analysis as set out in respect of the 2014 Solo Custody Agreements in paragraphs 32 to 37 above applies in respect of the 2015 Solo Custodian Custody Agreements. In summary:

(1)     Any Cash received or held by the Solo Custodian for the account of the Pension Plan, including any alleged Dividends, which was not subject to set-off, and which was therefore in excess of the Pension Plan's outstanding liabilities to the Solo Custodian, would be subject to the TTCA provisions in the respective 2015 Solo Custodian Custody Agreements.

(2)     However, the Pension Plan could request that Cash which would otherwise be subject to the TTCA and be treated as TTC Funds, be treated as Client Money. In those circumstances, the Cash would be held in accordance with the CASS Client Money Rules and would be segregated from the Solo Custodian's assets.

(3)    In order to secure the Pension Plan's obligations to the Solo Custodian, the Pension Plan would be required to transfer and maintain a Minimum Cash Balance from which the Solo Custodian could deduct fees owed to it by the Pension Plan.

(4)    Accordingly, all right, title, and interest to any alleged Dividends not subject to immediate set-off would transfer to the Solo Custodian, but only to the extent that the Pension Plan had not requested that those funds be treated as Client Money.

## E.   <u>Conclusion</u>

66.   In conclusion, the contention in The Carr Report that the Pension Plans were entitled to alleged Dividends is incorrect.  This conclusion is one based only on book entry credits on the Pension Plan's account statements created by the applicable Solo Custodian.  In fact the Solo Custody Agreements either (a) immediately transferred any interest of the Pension Plans in the Dividends to the applicable Solo Custodian, (b) immediately set off any alleged Dividend to satisfy any obligation owed by the Pension Plan to the Solo Custodian (in which case, there would be no Dividend remaining to which the Pension Plan could have any right, title or interest) or (c) during the period of time in which the custody agreements with Client Money Provisions were in place, immediately transferred any interest of the Pension Plans in the Dividends to the applicable Solo Custodian unless the Pension Plan requested that the alleged Dividends be treated as Client Money.

67.   Specifically:

(1)    My opinion is that pursuant to the 2012 Solo Custody Agreements all right, title and interest to any Dividends received by the Solo Custodian and not subject to immediate set-off would transfer to Solo automatically and immediately, by operation of law, upon receipt. Any alleged Dividends not subject to set-off would also be transferred to the Solo Custodian pursuant to the 2014 Solo Custody Agreements, to the extent that the Pension Plan had not requested that the Solo Custodian treat the Dividends as Client Money. The Pension Plans

would not obtain any rights, title or interest to any Dividends which were subject to set-off.

(2)     My opinion as to the effect of the 2012 and 2014 Solo Custody Agreements is supported by the 2014 Solo Modification Letters, as those letters state that *prior to* the modifications contained therein, money received to or held in the Pension Plan's account would be treated as TTC Funds.  If the 2014 Solo Modification Letters were effective in amending the 2012 and 2014 Solo Custody Agreements, Dividends received after the effective date of the modifications would not be subject to the TTCA and would be treated as Client Money. However, I do not express an opinion as to whether those modifications were effective.

(3)     In my opinion, all right, title and interest to any Dividends not subject to immediate set-off would also be transferred to the applicable Solo Custodian automatically and immediately, by operation of law pursuant to the Old Park Lane Custody Agreements and the 2015 Solo Custodian Custody Agreements, but only to the extent that those any alleged Dividends were not held as Client Money in accordance with any specific request to do so by the Pension Plan.  My opinion as to the effect of the Old Park Lane Agreements is supported by the Amendment to those agreements, which exchanged the TTCA Provision for a Minimum Cash Balance, indicating that the TTCA Provision had previously provided the Solo Custodian with security in respect of the Pension Plan's unpaid present or future obligations.

**FELICITY TOUBE QC**

felicitytoube@southsquare.com

1 February 2022

SIGNED.................................................

**FELICITY TOUBE QC**


DATED......1 | 2 | 22.........................