UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND SCHEME LITIGATION<br><br>This document relates to case nos.:<br>18-cv-07828; 19-cv-01785; 19-cv-01867; 19-cv-01893; 19-cv-01781; 19-cv-01783; 19-cv-01866; 19-cv-01895; 19-cv-01794; 19-cv-01865; 19-cv-01904; 19-cv-01798; 19-cv-01869; 19-cv-01922; 19-cv-01800; 19-cv-01788; 19-cv-01870; 18-cv-07827; 19-cv-01791; 19-cv-01792; 19-cv-01928; 19-cv-01926; 19-cv-01868; 18-cv-07824; 19-cv-01929; 19-cv-01803; 19-cv-01806; 19-cv-01906; 19-cv-01801; 19-cv-01894; 19-cv-01808; 19-cv-01810; 19-cv-01809; 18-cv-04833; 19-cv-01911; 19-cv-01898; 19-cv-01812; 19-cv-01896; 19-cv-01871; 19-cv-01813; 19-cv-01930; 18-cv-07829; 18-cv-04434; 19-cv-01815; 19-cv-01818; 19-cv-01931; 19-cv-01918; 19-cv-01873; 19-cv-01924; 19-cv-10713; 21-cv-05339. | MASTER DOCKET<br><br>18-md-2865 (LAK) |

**PROPOSED JOINT STIPULATION OF FACTS RELATING TO PORTIONS OF KASPER PILGAARD'S DECLARATIONS AND DR. EMRE CARR'S EXPERT REPORT**

Pursuant to the Court's Orders dated August 4, 2024 (*see* ECF No. 1116 at 4) and August 6, 2024 (*see* ECF No. 1118 at 4 n.16), plaintiff Skatteforvaltningen ("SKAT") and defendants respectfully submit the following proposed joint stipulation of facts relating to Kasper Pilgaard's declarations and Dr. Emre Carr's expert report:

**Stock Trading**

1. A "stock" is a type of security that represents the ownership of a fraction of the issuing corporation. A "stock" may be referred to as a "share" since it represents ownership of a share of the company. The owners of a company's stocks are referred to as "shareholders."

2. Stocks issued by Danish corporations are normally listed for trading on Nasdaq Copenhagen (formerly known as the Copenhagen Stock Exchange). Investors can ask members of the Exchange to buy or sell a Danish stock on their behalf. These members, referred to as "stockbrokers," or simply "brokers," are licensed by the Exchange to conduct stock trading with each other on behalf of their clients.

3. In Denmark, all listed Danish shares are dematerialized, *i.e.*, they are no longer traded in physical form. Instead, all holdings and transfers of Danish shares are tracked electronically through "book entries" by the Danish Central Securities Depository, known as "VP Securities."

4. Stock trading generally involves three related processes: (1) trade execution; (2) clearing; and (3) settlement.

5. First, an investor places an order to buy or sell shares of an issuer, typically through a broker. The broker then seeks to execute the trade consistent with the investor's instructions. The investor typically provides the security identifier or symbol, whether he or she is seeking to buy or sell, and the number of shares to be traded. The investor may also specify the price at which he or she is willing to trade, how long the order should remain in force, and other instructions (such as settlement date). The fact that an order is placed to buy or sell a specific number of shares at the price at which the person is willing to trade does not mean that the broker can execute that order. The broker must find a counterparty who is willing to take the other side of the trade for that amount of shares and at that price. Trade execution occurs when a seller agrees to sell, and a buyer agrees to buy, a security at a specified quantity and price. The day a trade is executed is referred to as the "Trade Date," which is often referred to as "T" in trading discussions and documentation.

6. When a stock trade is executed, the investor typically receives a trade confirmation from the executing broker. This is a document that details the stock traded,

whether it was bought or sold, the quantity of shares traded, the price at which they were traded, the Trade Date, and the Settlement Date (see below), and is used to ensure that the terms of the trade are accurate and in accordance with the investor's instructions.

7.      Executing brokers have multiple options for executing customer trades. For example, a broker can elect to take the opposite side of the trade and book the trade to its own proprietary account, match the transaction internally with another client's order, seek liquidity from another party in the market, or a combination of the three.

8.      A stock trade may be executed on a stock exchange, *e.g.,* Nasdaq Copenhagen, in an alternative trading venue, or through the over-the counter ("OTC") market.  Stock trades in the OTC market are generally on the same terms as on-exchange trades but may feature custom trading arrangements, agreed upon between buyers and sellers.  There are various reasons that an investor seeking to trade a large number of shares might prefer to execute the stock trade in the OTC market.

9.      Following execution, a trade is cleared.  Clearing refers, in general terms, to the set of steps involved in validating the transaction and preparing executed trades for settlement.  The steps involved in clearing depend on how and where a trade is executed and relate to the custodian(s), exchange and/or broker(s) accepting the trade and preparing to settle it.

10.     After clearing, a trade is settled, meaning that transfer of shares and cash between the buyer and the seller occurs, where the buyer must transfer the cash to the seller, and the seller must transfer the shares to the buyer.

11.     The day a trade is settled is referred to as the "Settlement Date."  Until October of 2014, Settlement Dates for Danish equity transactions executed on an exchange occurred on the third business day after the Trade Date ("T + 3").  After October 2014, Settlement Dates for Danish equity transactions executed on an exchange occurred on the

second business day after the Trade Date ("T + 2").  Parties that trade securities OTC may choose a Settlement Date that is different from the rules stated above.  This needs to be agreed by the parties at the time the trade is executed, *i.e.*, on the Trade Date.  The parties may want different settlement periods for various reasons.  For instance, the buyer may want a longer settlement time in order to have more time to secure any necessary financing of the trade.

12. Together, clearing and settlement form a process that ensures that sellers get payment for the sold shares and buyers get delivery of the purchased shares.

**Give-Up Agreements**

13. Under a "Give-up Agreement," an executing broker executes a trade as directed by an investor and "gives up" the trades to a designated clearing broker for post-execution services, such as clearing and settlement.  Give-up Agreements are common.

**Custody**

14. In financial markets, a "Custodian" holds securities on behalf of its customers.  Custodians also arrange for the settlement of deliveries of any securities transactions and administer the collection of dividends (see below).  When securities are bought or sold, a Custodian takes care of the delivery and receipt of securities against the agreed amount of cash.

15. It is customary for Custodians to hold securities on behalf of their customers through one or more "Sub-Custodians," *i.e.*, other Custodians forming a custody chain between the customer and the ultimate share issuing company.  When a Custodian uses a Sub-Custodian, the Custodian may maintain "segregated accounts," where each client has its own account with the Sub-Custodian, or an "omnibus account" with the Sub-Custodian, in which the securities of multiple clients of the Custodian are commingled.  As explained below, to hold Danish shares, the ultimate Sub-Custodian in the custody chain must have an

account with VP Securities, where the number of each Danish stock held by the Sub-Custodian is recorded.

16. Custodians may provide their clients with reports about their cash and share holdings, as well as transactional activities, which can be tailored or customized for specific client purposes, including for monitoring the financial performance of shares and other assets.

**Central Securities Depositories**

17. Securities settlements may involve a Central Securities Depository ("CSD"), such as Denmark's VP Securities, which is an institution that keeps records of securities and enables transfer of dematerialized shares. CSDs typically follow a book-entry system for record-keeping allowing them to transfer shares between their participants electronically, allowing for the existence of a dematerialized system.

18. CSDs may offer other services including income collection from issuers and distribution to holders of shares. CSDs have participants or members that use their services.

19. A CSD may offer multiple types of accounts to its participants for different types of securities holdings. For example, a CSD might offer an omnibus account, which is a securities account in which the securities belong to multiple clients of a CSD participant, including or excluding a CSD participant's own securities. A CSD might also offer a segregated account, which can be a fully separate account from the other accounts of the CSD participant or be a subaccount of the CSD participant, be opened in the name of a single client or in the name of the CSD participant (who might give the account any denomination it chooses), and include shares belonging to a single end investor (end investor account) or to multiple end investors (individual client account), depending on whether the single client of the CSD participant is itself holding shares on behalf of others.

20. With respect to VP Securities, foreign custodians holding shares of Danish companies typically use omnibus accounts. These Custodians may be either direct

participants in VP, with their own omnibus accounts at VP, or indirect participants, where their holdings are reflected in the omnibus account of another Custodian. By contrast, segregated or end-investor accounts are the default for domestic investors. For clients of United Kingdom custodians investing in shares issued by foreign companies, the chain of custody will increase in complexity as it may include additional Sub-Custodians and will include the foreign CSD (also referred to as the local CSD, since it is local to the issuer). To hold Danish shares, the ultimate Sub-Custodian in the custody chain must have an account with VP Securities, where the number of each Danish stock held by the Sub-Custodian is recorded.

**Dividends**

21. "Dividends" are distributions, typically in the form of cash, that a company announces and provides to its shareholders, *i.e.*, those who own shares in the company. Companies determine whether to pay a Dividend at all. If a company decides to pay Dividends, it determines the amount, frequency, and dates of Dividend payments.

22. The "Record Date" is the date on which a shareholder is required to own shares to be entitled to receive a Dividend. The company declaring the Dividend determines the Record Date for the Dividend. Any holder of shares who is registered as the owner of the securities at close of business on the Record Date is entitled to the Dividend. This payment is made by the company to VP Securities and passed along the custody chain by any Sub-Custodians and Custodians to the shareholder.

23. The "Ex-Dividend Date" or "Ex-Date" is the first trading date on which the buyer of a share is not entitled to receive the most recently announced Dividend because any trades entered into on or after this date will not settle until after the Record Date, provided the trade was on the exchange or was an OTC trade that used the same settlement timeline. Until October 2014, the Ex-Dividend Date for Danish securities was typically two business days

before the Record Date ("Record Date – 2"). After October 2014, the Ex-Dividend date for Danish securities is usually set one business day before the Record Date ("Record Date – 1").

24. In the days leading up to the Ex-Dividend Date, shares are said to trade "Cum-Dividend." On the Ex-Dividend Date, there is no longer any expectation that a buyer will receive the announced Dividend. The shares are then said to be trading "Ex-Dividend."

**Forward and Future Contracts**

25. A "Forward Contract," or "Forward," is a contract to buy or sell an asset, such as stock, at a specific price on a specified date in the future. Forward contracts are considered "derivatives" because their value is derived from an underlying asset, and therefore are distinct from shares. Forwards are OTC arrangements. The price that the parties agree to in the contract is referred to as the "Forward Price." The Forward Price is primarily based on the price of the underlying asset (in this case, a stock), a hypothetical interest return, and an amount representing any expected dividends during the term of the Forward. A Forward Contract also specifies other terms, including the underlying asset, the amount of the underlying asset to be exchanged, the contract's expiration date, and contract settlement terms. A Forward can be used as a hedge—*i.e.*, an investment that helps limit financial risk, such as the risk in the fluctuations in the price of shares, referred to as "market risk." This is because the contract establishes a fixed price to buy or sell the underlying asset in the future. This reduces but does not eliminate risk because the hedge is not perfect and introduces risk that the Forward counterparty will fail to perform its obligations (known as "Credit Risk"). Physically settled Forwards also have "settlement risk," which is the risk that the parties will not deliver the shares or cash respectively.

26. Similar to a Forward contract, a "Futures Contract," or "Future," is an agreement to buy or sell a specific quantity of an asset at a specified price on a particular date in the future. A Futures Contract specifies the quantity, delivery date, and delivery location

of the underlying asset. Unlike Forward Contracts, most Future Contracts are standardized and can trade on both centralized exchanges and OTC. A key advantage of Futures over Forwards is that they involve a central clearing counterparty ("CCP"), which is a highly regulated and well capitalized financial institution that takes one side of all futures (*i.e.*, the buyer buys from the CCP and the seller sells to the CCP). This means the buyer and seller are only exposed to the Credit Risk of the CCP rather than each other. Exchange-trading also makes it possible for a party to close out a position by taking the opposite side of a contract with someone other than the counterparty to the original contract since the buyer of a contract can sell the same contract and vice versa. Further, the "Flex Futures" at issue in these cases are cleared but not standardized. For example, BClear (now ICE Block) offers services related to equity Futures in Europe. As of June 2014, BClear was a large provider of equity Futures products, including Flex Futures on individual stocks for which parties had the ability to negotiate, among other things, the contract price.

27.     After the Future or Forward opening date, the value of the Future or Forward changes as the price of the underlying asset, *i.e.*, the share price, fluctuates. Depending on the change in the market price of the underlying asset on the unwind (or the maturity) date and number of the contracts, one party can incur significant gains or losses when the contract is unwound (or matures).

**Stock loans**

28.     A stock loan is a transaction whereby one party (the stock lender) transfers specified quantities of one or more shares to another party (the stock borrower) in exchange for "Collateral," *i.e.*, cash or other securities that can be used to protect the lender if the borrower does not return the shares.

29.     A stock loan can be used as a type of financing transaction, *i.e.,* the share lender can borrow cash (the Collateral) in return for lending the shares. Stock loans play

several important roles in the market and is widely understood to promote market efficiency and liquidity. Regulators, such as the European Securities and Markets Authority, an independent authority that promotes stable and orderly markets, have noted the efficiency of stock loans. So has the European Central Bank. Among the benefits of stocks loans is facilitating price discovery, *i.e.*, the true value of shares.

30. During a stock loan, the borrower may sell or further lend out the shares during the loan term but must return the same number of shares of the same kind to the lender either at a date determined at the start of the loan or, more typically, when either party decides to end the loan.

31. The lender may use the Collateral, including spending the cash Collateral, during the term of the loan, but must return the Collateral to the borrower at a date determined at the start of the loan or, more typically, when either party decides to end the loan. The lender retains market exposure—meaning risk that the value of the shares will increase or decrease—to the loaned shares at all times because the borrower's obligation is only to return the loaned shares, regardless of any changes to their value during the life of the transaction.

32. The share lender is typically compensated by way of a fee, or a "borrow fee," which is generally agreed upon before the transaction, while the share borrower is typically compensated with interest on the Collateral transferred. Generally, the lender is entitled to receive Dividend compensation payments, which are calculated by reference to any Dividends paid by the issuers of the transferred shares during the life of the transaction.

33. In Europe, stock loan transactions are commonly done pursuant to the Global Master Securities Lending Agreement, or "GMSLA," which is a template agreement. Such transactions are OTC and are bilateral contracts directly between the borrower and lender.

34. Stock lending involves exposure to various risks, including the risk of a significant change in the price of shares (an increase or decrease) that would leave one party to the stock loan at risk that, should the other party default, the Collateral posted when the loan was agreed to might not match the value of the shares. Therefore, under the GMSLA the exposed party can request an adjustment to the amount of Collateral any time there are changes in the value of either the loaned shares or the Collateral, but in practice, most parties to a stock loan transaction operate a daily review and adjustment process (see Marked-to-Market, below).

35. Reflecting the existence of such risk, the amount of Collateral posted in international stock lending transactions depends on the underlying shares. The parties agree on the amount of Collateral to be given to the share lender, as well as the required daily Collateral above the loan amount the share borrower needs to maintain, *i.e.*, "Overcollateralization."

36. Under the GMSLA, the shares and Collateral are required to be "Marked-to-Market" daily—meaning their value is re-calculated based on the latest day's market prices. In simple terms, the values of both the shares loaned and the Collateral provided are determined each day and an excess amount is calculated. The excess amount is the amount of Collateral to be added or returned on demand to maintain the ratio of the value of the shares to the value of the Collateral based on the terms that were originally agreed upon.

37. The share lender generally has settlement exposure to the share borrower. Specifically, this is the risk that the share borrower fails to transfer the cash Collateral in return for the shares at the start of the transaction or fails to return the shares when the shares lender returns the cash Collateral at the end of the transaction. The share borrower has the equivalent but opposite settlement exposure to the share lender.