# EXHIBIT 1

**The Court's reasoning and decision**

***Procedural objections***

*Regarding violation of the presumption of innocence*

The defendant has claimed acquittal as the presumption of innocence in the case against him must be considered violated due to a number of public statements made, among others, by ministers and by an acting head of SØIK, and as the defendant's right to a fair trial has therefore been violated. The defendant has referred to the Charter of Fundamental Rights of the European Union, Article 47, which states that everyone has the right to a fair and public hearing within a reasonable time by an independent court previously established by law, and Article 48, which states that everyone charged with a criminal offense shall be presumed innocent until proven guilty according to law, and the European Convention on Human Rights (ECHR), Article 6(2), which states that everyone has the right to a fair trial. 2, which states that everyone charged with a criminal offense shall be presumed innocent until proved guilty according to law.

According to the case law of the European Court of Human Rights, statements by public officials referring to suspected persons as guilty may violate Article 6(2) of the ECHR.

The same issue was tried on the basis available at the time during the preparation of this case pursuant to section 846(1) of the Danish Administration of Justice Act, where the defendant claimed the case was dismissed.

By the Eastern High Court's decision of December 14, 2023, the High Court upheld the Court in Glostrup's decision of September 29, 2023, according to which the claim for dismissal was not upheld.

The High Court found that regardless of whether the statements in question might involve a violation of Article 6(2) of the ECHR and/or a violation of section 1016a or section 1017(2)(3) of the Danish Administration of Justice Act, also in view of the procedural guarantees under the Administration of Justice Act and sections 3, 62 and 64 of the Constitution, the nature of the statements meant that it could not be assumed on the present basis that the defendant would not receive a fair trial. The High Court noted that the question of inadmissibility could be raised again during the main hearing, cf. section 862(4) of the Administration of Justice Act.

In connection with the main hearing, the same statements were documented that were documented in connection with the hearing during the case preparation regarding this issue. In addition, a statement of December 6, 2023, from Foreign Minister Lars Løkke Rasmussen to the police is documented. Based on the available information, the District Court finds that some of the statements made by ministers in the period from November 17, 2015 through April 3, 2023 are of such a nature that they may be perceived as or may leave the impression that the ministers in question consider the defendant guilty of a criminal act in connection with the refund of dividend tax, which statements could involve a violation of the defendant's rights under Article 6(2) ECHR.

However, after an overall assessment of the available information and the course of the case, the Court of Appeal finds, also in view of the legal safeguards that follow from the Administration of Justice Act and the Constitutional
§§ Sections 3, 62 and 64 that the accused will be able to receive and has received a fair trial before an independent and impartial tribunal.

The Court of Appeal therefore finds that the defendant's claim for acquittal with reference to Articles 47 and 48 of the Charter of Fundamental Rights of the European Union and Article 6(2) of the ECHR cannot be upheld.

Regardless of whether there may have been public statements made by some ministers that could involve a violation of the defendant's rights under Article 6(2) of the ECHR, the District Court notes that the issue of any compensation as a consequence of a possible violation cannot be dealt with in the present case, which has not been claimed either. It is also noted that any claim from the defendant for compensation would have to be brought in a separate case brought by the defendant against the state.

*About the specialty principle*

The defendant has also claimed acquittal with reference to the fact that the defendant cannot be prosecuted for aggravated fraud and attempted fraud in this case due to the speciality principle set out in sections 17 and 51 of the Extradition Act, which has implemented the EU Framework Decision on the European Arrest Warrant, and with reference to Executive Order No. 10 of 13 October 2022 of the Treaty of 17 March 2022 on Extradition between the United Arab Emirates and the Kingdom of Denmark, Article 10. The defendant has referred to the fact that the basis for extradition of the defendant from the United Arab Emirates to Denmark is the letter of October 4, 2023 to the central authority in the Kingdom of Denmark from the Ministry of Justice in the United Arab Emirates, which according to the defendant must be considered the competent authority, in which letter reference is made to the fact that the defendant is requested to be extradited on the basis of a case concerning money laundering. The defendant has also stated that he cannot be prosecuted for an offense other than the one for which he was originally extradited. It is also stated that Denmark has not made any requests for changes to the decision of October 4, 2023 from the United Arab Emirates.

It is not disputed by the defendant that the request for extradition of the defendant to Denmark has been processed by the courts in the United Arab Emirates on the basis of a European arrest warrant issued by the Court in Glostrup, in which the charge of aggravated fraud and attempted fraud, including the claim for increased punishment under section 88 of the Danish Criminal Code, is identical to the charge brought in this case, and it is not disputed by the defendant that the courts in the United Arab Emirates have made a final decision on extradition of the defendant on this basis.

According to the available information, the District Court assumes that the extradition took place in accordance with local law in the United Arab Emirates and pursuant to a bilateral agreement concluded between the United Arab Emirates and Denmark, cf. the stated in the letter of October 4, 2023.

On the basis of the available information, the Court of Appeal also assumes that the courts in the United Arab Emirates have made a final decision that the defendant must be extradited to Denmark on the basis of the European Arrest Warrant issued by the Court in Glostrup, which states the charge of aggravated fraud and attempted fraud and a reference to section 88 of the Danish Criminal Code.

Based on the nature, content and what has emerged about the background to the letter of October 4, 2023 from the Ministry of Justice in the United Arab Emirates to the central authority in the Kingdom of Denmark, the Court of Appeal also finds that the letter must be considered a letter of information (verbal note) to the Danish authorities about the status of the extradition of the defendant. The District Court has

In this connection, it was emphasized that the letter of 4 October 2023 refers to the fact that a decision has been made to extradite the defendant to Denmark and that the extradition of the defendant will take place after the completion of the investigation regarding local pending cases against the defendant.

Accordingly, and on the basis of the available information, it can be assumed that the defendant has been extradited on the basis that the courts in the United Arab Emirates have made a final decision to extradite the defendant on the basis of a European arrest warrant issued by the Court in Glostrup, in which the charge of aggravated fraud and attempted fraud, including the claim for increased punishment under section 88 of the Criminal Code, is identical to the charge brought in this case, and that this basis cannot be deemed to have changed subsequently. Accordingly, and as the extradition meets the conditions for extradition to Denmark in the Extradition Act, including sections 17 and 51, the Court of Appeal finds no basis for upholding the defendant's claim for acquittal with reference to the basis for extradition.

### The court's assessment of guilt

#### Concerning the facts of the case

According to the information in the case and the testimony of the defendant, the court can assume that the defendant, under the auspices of Solo Capital Partners LLP, Old Park Lane Capital Plc, West Point Derivatives Ltd and Telesto Mar- kets LLP (the Solo companies) as custodian bank, was responsible for setting up a trading structure whereby the participants entered into agreements on the purchase and sale of certain shares, respectively loans/lending of shares and forward or futures to hedge risk in predetermined constellations between parties who were not already in possession of shares.

The content of the trades was predetermined before the first trade and followed a predetermined structure for the execution of the trades, which was communicated to the players through instructions from, among others, Anthony Mark Patterson, and when the trades were automated in Oktave through the algorithm programmed therein.

In the trading structures, the investors (US pension plans and Labuan companies) appeared as the ultimate buyers of the shares and the short sellers as the ultimate sellers of the shares. In the trading structures, the investors' share purchase agreements were concluded in 2012 and 2013 through one broker and then for the remainder of the trading period through two brokers as intermediaries. Similarly, the share lending agreements were concluded through first one and then two share lenders.

The trades were structured so that the sum of the equity positions that the investors agreed to buy and the short sellers agreed to sell was identical to the sum of the equity positions that the same investors lent and the same short sellers borrowed, so that no money or shares were exchanged in the trades.

It can also be assumed that the amounts credited to the investors' client accounts at the Solo Group as net share dividends for the traded shares arose from a corresponding debiting of the short-sellers' client accounts at the Solo Group. It is undisputed that the short sellers did not receive stock dividends and did not pay dividend tax, but had an amount corresponding to the stock dividends booked with the Solo companies as a result of a profit on the above-mentioned trades.

Furthermore, it can be assumed that the Solo companies issued Dividend Credit Advice (DCAs) to the investors based on the above-mentioned trading processes, corresponding to the net dividend and

caused the investors to submit applications for refund of dividend tax of DKK 9,025,205,871.00 under section 69 B of the Withholding Tax Act in the period 2012-2015 in 3,239 cases, to which the said DCAs were attached. The defendant has confirmed that the only funds received by the trading structure from outside were payments received when the tax authorities granted the applications for refund of dividend tax.

Finally, it can be assumed that in 2015, the Solo companies in the same way caused an additional 160 applications for refund of Danish dividend tax totaling DKK 553,346,302.00 to be submitted on behalf of the investors in 2015, which, however, was not paid, as the tax authorities stopped the payments in August 2015.

The number of transactions, the actors involved and the amount of the reclaimed withholding tax and attempts to do so, see counts 1 and 2 of the indictment, are undisputed by the defendant and supported by the information in the case. It is also undisputed and supported by the documented cash flows that at least 80% of the total recovered dividend tax was subsequently paid to the defendant or to companies controlled by him.

Regarding the processing of the applications for refund of dividend tax, the court can, based on Sven Nielsen and Lisbeth Rømer's explanations, assume that the processing was based on information in a form about who was the dividend recipient and authorized representative, whether there was a tax liability in a country with which a double taxation agreement had been concluded, and whether a note was attached stating that dividends had been paid to the recipient.

They have both explained, among other things, that in their opinion it was the entire basis and a prerequisite for the refund of dividend tax that dividends had been received and dividend tax paid or withheld.

Lisbeth Rømer has further explained that the basis for the refund of dividend tax was the double taxation agreement and the dividend note or DCA, which was a third party declaration confirming that dividend tax had been paid to the person concerned and the amount of the dividend. The system was based on this and on trust in the documents issued.

Lisbeth Rømer has finally explained that in relation to foreign custodian banks, they were unable to check whether the information in the dividend notes was correct.

*Regarding the tax consequences of the described business processes*

According to section 65(1) of the Withholding Tax Act in force at the time of the offense (Legislative Decree no. 1403 of 7 December 2010), a company that adopts or decides to pay or credit dividends on shares must withhold 27 percent of the total dividend (dividend tax).

It follows from section 69 B(1) of the Withholding Tax Act that taxpayers for whom withholding tax has been withheld under section 65 on, among other things, dividends that exceed the final tax under a double taxation agreement are entitled to a refund of the amount (dividend tax refund) within 6 months of receipt of the request for refund.

There is reason to assume that the investors, if they received dividends from Danish listed companies, were taxable to Denmark, cf. section 2(c) of the Danish Corporation Tax Act, cf. section 16 A of the Danish Tax Assessment Act. It can furthermore be assumed that the involved US pension plans and Labuan companies

(the investors) were covered by the tax exemption rules in the double tax treaty between Denmark and the United States and Malaysia respectively.

The defendant has explained and claimed that it was not dividends but dividend compensation that the short sellers paid to the investors, and that the obligation arose as a result of a market convention, which meant that if agreements were entered into for the purchase of shares before or on the day of the general meeting, which were subsequently settled, such a claim arose. The defendant has further explained and claimed that he understood the Danish tax rules to mean that dividend compensation - regardless of whether it could be traced back to an actual dividend payment - in the Danish tax context was to be treated as a taxed dividend and that the share buyer - the investor - was entitled to seek a refund of withheld dividend tax.

The defendant has additionally claimed that the investor is entitled to compensation from the short-seller for lost dividend payments, and that this claim for compensation has tax law consequences, regardless of whether external shares have been included in the transactions. Reference is made to the fact that these are legally binding transactions, and the defendant has referred to the principle of legal acquisition. It is claimed that the investor's claim has actually been honored in the form of a dividend compensation payment, and that a claim for repayment of withholding tax arises all the more, cf. section 69 B(1) of the Withholding Tax Act.

The Court of Appeal finds that there is no support in the wording of section 69 B(1) of the Withholding Tax Act or in the preparatory works of the provision that the entitlement to a refund of dividend tax should arise *solely* as a result of a structured transaction where a share seller as part of the transaction credits the share buyer with a dividend tax compensation corresponding to a calculated net dividend. Such an understanding clearly contradicts the wording of the provision in section 69 B(1) of the Withholding Tax Act, which refers to "dividend tax compensation".
exchange..., in which withholding tax is included.

The Court of Appeal further notes that the conditions of the Withholding Tax Act are objective and that there must therefore also in reality be a dividend in which withholding tax has been withheld, and that the subjective perception of this by the person seeking a refund of withholding tax, regardless of whether it can be considered well-founded, is irrelevant.

The Court of Appeal further notes that if the entitlement to a refund of dividend tax were to arise *solely as* a result of a structured transaction where a share short seller as part of the transaction credits the share buyer with a dividend tax compensation corresponding to a calculated net dividend, this would mean that an unlimited number of applicants, completely independent of the total dividend distribution and the taxation thereof, would be entitled to a dividend tax refund.

The Court of Appeal thus finds that it is a necessary condition for the right to a dividend tax refund under section 69 B(1) of the Withholding Tax Act that the taxpayer requesting the refund has been paid a taxed dividend or has acquired the right to it from someone who has received such payment.

Regardless of whether it is assumed that the investors, based on the agreements entered into, obtained the right to dividend compensation payment as explained by the defendant, it must thus be considered a necessary condition for the right to recovery of dividend tax that the investor obtains a legal claim to such taxed dividend from one who has received such dividend.

As stated above, it must be assumed, in terms of evidence and otherwise undisputed, that objectively no one in the described transactions has received a taxed dividend or has entered into agreements to acquire shares from a third party that has received a taxed dividend.

Thus, the Court of Appeal must assume that the short sellers have not been in a position where they have been able to sell a share with the right to a taxed dividend. The condition in the Withholding Tax Act
§ Section 69 B, subsection 1, regarding a "dividend... in which withholding tax has been withheld", is thus not fulfilled.

The Court of Appeal then finds it proven that the payments of dividend tax refunds as a result of the investors' applications have been made in violation of section 69 B(1) of the Withholding Tax Act and the amounts have been wrongfully received by the investors.

*Regarding the question of violation of section 279 of the Penal Code*

According to the evidence, it can be assumed that the applications that formed the basis for the tax authorities' dividend tax payments in the present case appeared from their content that the investors had received dividends on which dividend tax had been withheld in connection with dividend distributions, but that none of the companies had received a taxed dividend or had acquired rights over shares from outstanding third parties as part of or for use in the transactions.

According to the evidence, it can also be assumed that the applications which in this case formed the basis for the tax authorities' dividend tax payments thus contained incorrect information about withheld dividend tax.

According to the evidence, including the statements of Lisbeth Rømer and Sven Nielsen, it can further be assumed that, according to administrative practice, the tax authorities required a DCA issued by the custodian bank as documentation that taxed dividend payments had been received from a Danish company, which together with a tax exemption declaration formed the basis for the decision to refund dividend tax.

The Court of Appeal therefore finds it proven that the DCAs forwarded to the tax authorities in this case misled the tax authorities into believing that dividends had been received from a Danish company in which dividend tax had been withheld.

According to the legal basis which formed the basis for the processing of applications for refund of withholding tax, and which is supported by the statements from Lisbeth Rømer and Sven Nielsen, the court finds it proven that the tax authorities were thereby misled, which determined that payments were made in violation of section 69 B(1) of the Withholding Tax Act.

In this connection, the Court of Appeal notes that the Court finds that the tax authorities were not brought out of the error that forms the basis for the fraud due to the reports from attorney Michael Amstrup in the summer of 2015.

In this connection, the Court of Appeal emphasized that it was a comprehensive trading system and that the content of the notifications required a number of further investigations before there was sufficient basis for stopping the payments of recovered dividend tax.

The Court of Appeal notes that it cannot lead to a different result that there is no basis to set aside the defendant's statement that the mechanisms around "netting" and the construction around the settlement date made it possible to establish trading structures whereby settlement and registration mechanisms meant that an apparently large number of shares were traded over the general meeting day and that the trading structure in this connection could leave a paper trail confirming the transactions. Furthermore, the Court of Appeal finds it irrelevant whether the trades between the participants can otherwise be considered fictitious, as it has been proven that the trades were of such a nature that the investors did not receive taxable dividends from the share issuer or a right thereto.

In this connection, the District Court has emphasized that, as previously established, it can be assumed, also according to the defendant's statement, that no shares or money were involved in the trading structures, and that the court must also assume that what was "netted" was the respective parties' claims on each other without connection to the issued shares and without the parties contributing capital for the settlement of the transactions.

The District Court finds it proven that the defendant has had a central and controlling role in connection with the construction, operation and development of the trading system that led to the unjustified payments of recovered dividend tax.

In this connection, the District Court has emphasized that the defendant, regarding the management of the GSS business, has explained, among other things, that he was CEO of Solo Capital until the end of 2013, and that Anne Stratford became CEO from January 2014, but that he was still in charge and that they had daily Skype meetings. The defendant further explained that he was involved in the GSS business as part of the team and as owner and that he made a lot of money from the GSS business.

With regard to the defendant's involvement, the Court of Appeal may, according to the evidence, also assume that the defendant had a central role in the continuous expansion of the number of participants in the structured trades and that the establishment of the trading companies was to a significant extent initiated and financed by the defendant for the purpose of trading on the GSS platform.

The District Court thus finds that the objective requirements for conviction under the indictment have been met, noting that the number of players, the number of applications, the amounts recovered, the amounts paid out and the defendant's share of the profits have been proven according to the defendant's statement and the other evidence.

The question is then whether the necessary intent exists.

The defendant has explained, among other things, that these were real transactions with derived legal rights and obligations. The defendant has further explained that it was and still is his opinion that dividend compensation payments can be equated with dividends and that the Solo Group could issue DCAs to its customers, and that it was not unlawful or on an improper basis when the customers subsequently used these DCAs to apply for a refund of dividend tax. The defendant further explained that everything was done within the applicable laws, regulations and market practices and that he ensured this by employing highly competent people and getting the best advice, and that this was a legal loophole and that he acted in good faith.

The defendant has further explained, among other things, that the initiative to obtain a tax opinion in 2012 came from Graham Horn and Rajen Shah, which the defendant had approved, but that he himself did not participate in the communication with Hannes Snellman Advokatpartnerselskab, but that the defendant read the final version of this tax opinion. The defendant, when asked if they would not show the entire circuit, explained that his involvement was minimal and that Rajen Shah and Graham Horn had decided that a tax opinion should include what appeared in the fact-pattern and that he cannot answer authoritatively, whether Hannes Snellman was asked to answer whether a market claim under the circumstances as it was in the GSS system would be considered eligible for dividend tax refunds under tax law, but that it was his opinion that it was not covered by the legal opinion that had been obtained.

Referring to the tax opinion of June 27, 2012, pages 7-9, and when asked about the fact that it is stated as a prerequisite that it is real dividends that are passed on to the American pension fund, the defendant has explained, among other things, that he did not look at the opinion, but relied on Rajen Shah and Graham Horn. The defendant has further explained that he did not contact the advisors personally and that he was told that dividend tax compensation was treated as taxed dividends. The defendant has further explained that Simon Bird, who was asked to review the GSS model, came to the same conclusion, that it was a legal model as described by the defendant, and that the accounting of dividend tax compensation is considered dividend income.

The defendant further asked why they did not ask whether the loophole was legal, explained that the tax experts had the dialog with Danish experts and that he trusted Rajen Shah and Graham Horn and would expect that they would have brought it up to him if there was something.

Witness Anthony Mark Patterson has explained that at the end of 2013 he became aware of the trading structure, where he saw that no dividends and shares were entering the system, and that he was concerned about this. It seemed to him that there was no real movement of shares and money. He is sure that he spoke to the defendant, Raj Shah and other senior employees about his concerns and also those who had created the trading structure. The general response was that there was a legal opinion and that it was understood that there was a loophole. He was told in broad terms that the loophole was that if everyone used the same custodian bank, it could all be "netted". He knew that investors were reclaiming tax even if no dividend tax was paid, which was part of the general conversations he had with people.

In assessing the defendant's explanation, the District Court emphasized that he had read the final version of Hannes Snellman's tax-legal opinion from 2012 and therefore had to be familiar with the stated assumptions in at least this version, where it is assumed that the investor should have full ownership rights over the shares, including the right to receive the dividend distributed on the day of dividend approval, just as it is a prerequisite that the dividend for which the investor will actually claim a refund of withholding tax is a dividend payment that the investor as shareholder has received from the dividend-distributing Danish company. The Court of Appeal has also emphasized that the Defendant must also have been aware that Hannes Snellman had not been asked to assess whether the accounting of dividend tax compensation is considered dividend income, and thus has not been presented with Solo's overall model that formed the basis for the payment of dividend tax.

Furthermore, the District Court emphasized that based on the testimony of the witness Antony Mark Patterson, it is assumed that Patterson had expressed concern about the trading structure, where shares and dividends were not entering the system, to, among others, the defendant.

The District Court has also emphasized that Hannes Snellman in their June 2012 correspondence with Graham Horn and Raj Shah clearly emphasized the importance of the fact that these were in fact dividends that the US pension plan had received from the dividend distributing company, that the Head of Compliance, Gerry Pitts, in the email of 16. July 2013 to the defendant expressed concern that no lawyers had ever been asked to comment on the GSS model in its entirety, that Michael Herron in a board memo dated April 16, 2015 stated that the lawyers who prepared tax opinions on Danish tax matters should be informed of the entire structure, the unusual elements and the size of the transactions, and that only with this information would they get a useful opinion, which knowledge the court assumes has come to the knowledge of the defendant.

Against this background, the Court of Appeal finds that the defendant's statement that he only trusted the employees who obtained advice and that he himself was convinced of the legality of the dividend tax refunds must be disregarded.

Nevertheless, and in spite of the above, the defendant, according to his testimony, failed to cause an investigation to be carried out into whether dividend compensation under the circumstances as it was in the GSS system would be considered eligible for dividend tax refunds under tax law by referring to advisors knowledgeable in Danish tax law or to the authorities in Denmark, including also regardless of the unusual elements of the transactions and the size of the amounts paid out in dividend tax refunds from the Danish state.

The Court of Appeal then finds that the defendant had no basis for the opinion that a search based on the booked transactions, which had no other purpose than to form the basis for applications for refund of dividend tax, could be lawful.

The Court of Appeal therefore finds that it must be assumed that the defendant was aware of which parts of the model were likely to be "approved" if advice was obtained, while he was also aware that questions regarding other parts of the model, including in particular the overall trading structure, would most likely lead to the assessment made by the court above under the heading "*Regarding the tax consequences of the described trading models".
course"*, and which appears unquestionable.

The Court of Appeal also emphasized that the GSS model was structured in such a way that it consisted of complicated trading constellations between a number of actors, which were expanded with more actors along the way, and that a network of 288 smaller companies were involved as investors with very different names on whose behalf a total of 3,399 dividend notes were submitted.
In addition, it is emphasized that the trades on the GSS platform and the individual investors' purchases etc. of shares were limited, including in relation to reporting obligations etc. and that in connection with the establishment of investors for trading on the GSS platform, the defendant had strong opinions on naming etc. so that they appeared unconnected, just as the system was designed so that the trades were distributed among many players with an average equal distribution of trade sizes and profits.

The Court of Appeal has also emphasized that the participants were to a large extent former employees and other persons with whom the defendant had a personal relationship, and that the establishment of the trading companies, as previously stated, was to a significant extent initiated and financed by the defendant for the purpose of trading on the GSS platform. The Court of Appeal finds that the atypical circumstances point towards a motive that

The defendant wanted the actors to question the trades and the reasons behind them as little as possible.

The District Court also finds that it further strengthens this assumption that the defendant, through his companies, paid very significant bonuses to the players.

The Court of Appeal thus finds that these circumstances support that the defendant was aware that his activities were of a nature where he did not want the attention of the regulatory authorities, and that the model thus seems to be designed to conceal from the Danish tax authorities that the underlying transactions were without dividend tax reality, as neither shares nor dividend payments from Danish companies were involved.

Based on an overall assessment, the Court of Appeal finds it proven that the defendant at least considered it highly probable that the applications for refund of dividend tax mentioned in the indictment were unjustified, and that the employees of the tax authorities were thus misled into believing that dividend tax was withheld in Denmark.

Against this background, the defendant is found guilty of aggravated fraud and attempted fraud, cf. section 279, cf. section 286(2) of the Danish Criminal Code, cf. section 21, in accordance with the indictment.

### *Sentencing*

The sentence is imprisonment for 12 years, cf. section 279 of the Danish Criminal Code, cf. section 286(2), cf. in part section 21.

The Court of Appeal has particularly emphasized the nature, scope and gravity of the offences, including that the defendant was found guilty of fraud for DKK 9,025,205,871 and attempted fraud for DKK 553,346,302, and the defendant's central and controlling role in the crime, which was carefully planned and systematically organized and along the way further streamlined by the development of a software system that meant that the crime escalated dramatically, the cross-border nature of the crime by exploiting double taxation agreements and the trust in the custodian banks' third party statements, that the crime took place over a long period of approximately 3 years, and that the defendant enriched himself with a large billion DKK amount, which constituted by far the largest part of the proceeds corresponding to at least 80 percent.

In addition, the court emphasized that the crime was only brought to an end when the tax authorities paused the payments in 2015 due to a suspicion of fraud.

In view of the above, the District Court finds that there are extremely aggravating circumstances and that there is thus a basis for applying section 88(1), second sentence, of the Danish Criminal Code.

The Court of Appeal has not attached particular importance to the fact that the crime was committed against the tax authorities, including the tax authorities' administration of the control of dividend tax refund applications has not been given importance in the sentencing.

Furthermore, the age of the offender and the length of the case processing time are not taken into account when determining the penalty, given the nature, extent and course of the crime.

There are no circumstances that could lead to a lighter prison sentence. The facts

stated by the defendant cannot lead to a different result.

Pursuant to section 86(5) of the Penal Code, full abridgement is granted for the detention of the defendant in the United Arab Emirates provided that the detention is on the basis of a related case.

### *Disqualification*

The offenses were committed by the defendant in his capacity as owner and director and/or beneficial manager of the UK companies Solo Capital Partners LLP, Old Park Lane Capital Plc, West Point Derivatives Ltd and Telesto Markets LLP.

Accordingly, and in view of the nature and extent of the offenses, cf. the above under sentencing, the District Court finds that the conditions in section 79(2), second sentence, cf. section 79(1), cf. section 78(2), of the Danish Criminal Code for denying the defendant the right to participate in the management of a business enterprise in Denmark or abroad without being personally and unlimitedly liable for the enterprise's obligations are met.

For the reasons which, according to the above, lead to the stated disqualification, the District Court finds that the disqualification must take place until further notice, cf. section 79(3) of the Danish Criminal Code.

### *Deportation*

The defendant was sentenced to 12 years' imprisonment for particularly serious fraud under section 279, cf. section 286(2) and attempted fraud, cf. section 21 of the Danish Criminal Code. The conditions for deporting the defendant under section 24(1), cf. section 22(1) and (6), of the Danish Aliens Act are then met. According to section 26(2) of the Danish Aliens Act, the defendant must thus be deported unless it would certainly be contrary to Denmark's international obligations.

It appears from Executive Order no. 1700 of 23 November 2020 on the implementation of certain provisions of the Withdrawal Agreement between the United Kingdom and the EU as regards the right to enter, reside and work in Denmark Section 16(1), cf. Article 20(1) of the Withdrawal Agreement, that as the alleged offenses were committed before 1 January 2021, the defendant's circumstances must be assessed as for foreigners covered by EU rules, as the defendant is a British citizen.

Expulsion can then only take place if it is in accordance with the principles that apply under EU rules on restriction of the right to free movement, cf. section 26 b of the Aliens Act.

According to Article 27(1) of Directive 2004/38/EC of 29 April 2004 (the Residence Directive), a restriction on the right of free movement and residence can only be justified on grounds of public policy, public security or public health and may not be based on economic considerations. According to Article 27(2), expulsion must comply with the principle of proportionality and may be based exclusively on the personal conduct of the person concerned. The personal conduct must constitute a genuine, present and sufficiently serious threat affecting one of the fundamental interests of society.

The defendant has been sentenced to 12 years' imprisonment for aggravated fraud and attempted fraud, and after an overall assessment of the nature and extent of the crime committed, the sentencing court finds that the crime is an expression of behavior that constitutes a real, immediate and sufficiently serious threat affecting a fundamental interest of society, cf. Article 27(2), second indent of the Residence Directive.

Based on the available information about the defendant's circumstances, including that he has never lived in Denmark and has no family, professional or social ties to Denmark, together with the information about the defendant's ties to the United Kingdom, the defendant does not have such ties to Denmark that deportation can be considered contrary to the principle of proportionality in Article 27(2), first indent, in conjunction with Article 28(1) of the Directive.

The Residence Directive can therefore not be assumed to prevent deportation, cf. Article 33(1) of the Directive and section 26 b of the Danish Aliens Act, cf. section 2(3). Against this background, the order of deportation pursuant to the provisions invoked is upheld as decided below.

For the reasons which, according to the above, lead to the defendant being deported, the Court of Appeal finds that the defendant must be deported with a permanent entry ban pursuant to section 32(4)(7) of the Danish Aliens Act.

### *Confiscation*

#### <u>Confiscation from the defendant:</u>

*Regarding deposits on accounts with Varengold Bank:*

The defendant has explained that the deposits originate from transfers from Solo and that he has no objection to the money being confiscated if he is found guilty. According to the documented information, the court finds it proven that the deposits originate from the transfers regarding refund of dividend tax that Solo received from the Danish tax authorities, then and according to the result of the evidence, the deposits must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Relating to the properties (1) Flat 36, Altus House, 335-337 Bromley Road, London, SE6 2DR, title no TGL406119, (2) Flat 40, Altus House, 335-337 Bromley Road, London, SE6 2DR, title no TGL406124, (3) 73 Aurora Apartments, 10 Buckhold, London SW18 4FW, title no TGL392601, (4) 74 Aurora Apartments, 10 Buckhold, London SW18 4FW, title no GL392610, (5) 67 Balcombe Street, London NW1 6HD, title no LN200530, (7) 92 Boston Place, London NW1 6EX, title no LN242519, (8) 102 Boston Place, London NW1 6EX, title no LN113325, (9) Flat 27, Brandan House, Sovereign Place, Harrow, HA1 2FN, title no NGL806039, (13) Flat G01, 28 Lovat Lane, London EC3R 8EB, title no AGL336905, (14) Apartment 23, Monroe House, 7 Lorne Close, London NWB 7JN, title no NGL797603, (15) Flat 6, 41 Tavistock Crescent, London W11 1AD, title no BGL91988 and (16) Flat 8, 41 Tavistock Crescent, London W11 1AD, title no BGL92473:*

The defendant has explained that the properties were purchased with funds derived from the recovery of dividend tax from Denmark and Belgium, and he accepts that the properties will be confiscated if he is found guilty. Accordingly, based on the documented information and taking into account that the properties were acquired during the period in which the defendant, according to the evidence, was found guilty of fraud for a billion DKK, the court finds that it is proven that the properties were acquired for funds derived from the refund of Danish dividend tax.

Subsequently and according to the result of the evidence, the properties must be confiscated in accordance with section 75(1) of the Penal Code, cf. section 76(1).

*Relating to the properties (10) 10 Endeavor Court, Stoke, Plymouth PL1 5AX, title no DN566627, (17) 109 Valletort Road, Plymouth, PL1 5PN, title no DN566959 and (18) 111 Valletort Road, Plymouth, PL1 5PN, title no DN5666619:*

According to the evidence, it can be assumed that the properties were acquired in 2008 and partly financed with loans that were repaid in 2015.

The Court of Appeal finds that the conditions in section 76a(1) of the Danish Criminal Code for confiscation are undoubtedly met, as the evidence shows that the defendant has been convicted of an act of such a nature that it can yield substantial proceeds and that it is punishable by imprisonment for six years or more.

The question is whether the defendant has proved that the properties were acquired in a lawful manner or with lawfully acquired funds, cf. section 76a(4) of the Danish Criminal Code. The District Court notes that the properties were purchased in 2008 for GBP 149,995 each, according to the information provided, and that the loans were repaid with GBP 122,700.30 each in 2015. Thus, the financing of the property is predominantly financed with funds that are presumed to originate from the criminal offense.

On this basis, the District Court finds that the defendant has not proved that the properties were acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code, and the properties must therefore be confiscated in accordance with the prosecution's claim.

*Relating to the property (6) 84 Boston Place, London, NW1 6EX, title no LN93201:*

Based on the evidence, it can be assumed that the property was acquired in 2008 and financed with loans that were repaid in 2015.

The District Court finds that the conditions in section 76a(1) of the Danish Criminal Code for confiscation are undoubtedly met, cf. the above.

The question is whether the defendant has proved that the property was acquired in a lawful manner or with lawfully acquired funds, cf. section 76a(4) of the Danish Criminal Code. The District Court notes that the property was purchased in 2008 for 860,000 GBP, mortgaged with 970,000 GBP and the loan was repaid with 942,994.31 GBP in 2015. The financing of the property is thus, according to the available information, financed with funds that are presumed to have originated from the criminal offense.

On this basis, the District Court finds that the property must be confiscated in accordance with the prosecution's claim.

The District Court notes regarding the stated lifelong right of use for the defendant's sister and mother that it must depend on an assessment under English law whether this right can be extinguished, and that this has no bearing on whether the confiscation claim can be upheld.

*In respect of the property (19) defendant's beneficial interest in 69 Clifton Avenue, Ground floor flat, Wembley HA9 6BN, title no. AGL265851:*

According to the evidence, it can be assumed that the property was acquired in 2007 and partly financed with loans that were repaid in 2015.

The District Court finds that the conditions in section 76a(1) of the Danish Criminal Code for confiscation are undoubtedly met, cf. the above.

The question is whether the defendant has proved that the property was acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code. The District Court notes that the property was purchased in June 2007 without a purchase price being stated. The defendant has repaid a loan of GBP 125,000 in the property in 2015. It is thus unclear from the available information whether the repayment of the loan involves repayment of a small part of the purchase price or whether the financing of the property is predominantly financed with funds that are presumed to have originated from the criminal offense.

On this basis, the District Court finds that the defendant has not proved that the property was acquired in a lawful manner or by lawfully acquired means, cf. section 76a(4) of the Danish Criminal Code, and the property must therefore be confiscated in accordance with the prosecution's claim.

*Summary of confiscation from the defendant*

According to the result of the evidence, confiscation of DKK 7,220,164,697 (equivalent to 80% of DKK 9,025,205,871), including the assets alleged by the prosecution, can be made from the defendant, cf. section 75(1), cf. section 76(1) and section 76a(1) of the Danish Criminal Code.

*Confiscation at Aesa S.a.r.l:*

The defendant has explained that he owns the company, that the assets originate from, and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the shares being confiscated if he is found guilty. Accordingly, and based on the documented information, the court finds it proven that the deposits originate from the transfers regarding refund of Danish dividend tax that Solo received from the Danish tax authorities and that the shares are financed by funds from refund of Danish dividend tax. Accordingly, and based on the evidence, the deposits and the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Elysium Global (Dubai) Limited:*

The defendant has explained that he owns the company, that the assets originate from, and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the shares being confiscated if he is found guilty. Accordingly, and based on documented information, the court finds it proven that the deposits originate from the transfers regarding refund of dividend tax that Solo received from the Danish tax authorities and that the shares are financed by funds from refund of Danish dividend tax. Accordingly, and based on the evidence, the deposits and the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Elysium Global Limited:*

The defendant has explained that he owns the company and that the assets originate from the refund of Danish dividend tax. He has stated that he has no objection to the money being confiscated if he is found guilty. Based on this and the documented information, the court is satisfied that the deposits originate from the transfers regarding refund of dividend tax that Solo received from the Danish tax authorities, and based on the evidence, the deposits must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Elysium Global Trading Limited:*

The defendant has explained that he owns the company and that the assets originate from the refund of Danish dividend tax. He has stated that he has no objection to the money being confiscated if he is found guilty. Accordingly, and based on the documented information, the court finds it proven that the assets originate from the transfers regarding refund of dividend tax that Solo received from the Danish tax authorities. Accordingly, and following the result of the evidence, the deposits must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at 6 Ephl Covent Garden Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at 7 Ephl Covent Garden Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at 8 Ephl Covent Garden Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Forfeiture at Bycor Capital Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Rolten Capital Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Mala Holdings One Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1) of the Danish Criminal Code, cf. section 76(1).

*Confiscation at Solten Holdings One Limited:*

The defendant has explained that he owns the company and that the property was acquired with funds derived from a refund of Danish dividend tax. He has stated that he has no objection to the property being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the property was acquired with funds originating from the transfers regarding the refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the property must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Trillium Capital S.a.r.l (formerly VEM Holding S.a.r.l):*

The defendant has explained that he owns 58% of the company, that the assets originate from, and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court finds it proven that the deposits originate from the dividend tax refund transfers that Solo received from the Danish tax authorities, and that the shares are financed by funds from the refund of Danish dividend tax. Subsequently and following the outcome of the evidence, the deposits and the shares must be confiscated under section 75(1) of the Danish Criminal Code, cf. section 76(1).

*Confiscation at ARAYA Holdings Limited:*

The defendant has explained that he owns the company and that the assets are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he

is found guilty. Accordingly, and based on the documented information, the court is satisfied that the assets were financed with funds from the transfers regarding refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the assets must be confiscated under section 75(1) of the Danish Criminal Code, cf. section 76(1).

*Confiscation at Treefrog Capital Limited (formerly Arche Cayman Limited):*

The defendant has explained that he owns the company and that the receivable stems from payments he has made with funds from the refund of Danish dividend tax. He has stated that he has no objection to the asset being confiscated if he is found guilty. Accordingly, and based on the documented information, the court finds it proven that the receivable originates from the transfers regarding refund of dividend tax that Solo received from the Danish tax authorities. Hereafter and after the result of the evidence, the asset must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Bellview Financial Ltd:*

The defendant has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Solo received from the Danish tax authorities. Accordingly and according to the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Colbrook Ltd:*

The defendant has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Solo received from the Danish tax authorities. Accordingly and according to the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at PCM Capital Ltd:*

The defendant has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the dividend tax refund transfers that Solo received from the Danish tax authorities. Accordingly and according to the result of the evidence, the shares must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at T & S Capital:*

The defendant has explained that he owns the company and that the shares are financed by funds from the refund of Danish dividend tax. He has stated that he has no objection to the assets being confiscated if he is found guilty. Accordingly, and based on the documented information, the court is satisfied that the shares were acquired with funds from the transfers relating to the refund of dividend tax that Solo

received from the Danish tax authorities. Subsequently, and following the outcome of the evidence, the shares must be confiscated in accordance with section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Usha Shah*

*Vedrørende Clifton Avenue 69A, Wembley HA9 6BN, title no. NGL625888:*

As previously stated, the conditions in section 76a(1) of the Penal Code are undoubtedly met in relation to the defendant, and confiscation of the property of his wife Usha Shah can then take place, unless the asset was acquired more than 5 years before the criminal offense that forms the basis for confiscation under paragraph 1, or the marriage, cohabitation or relationship did not exist at the time of acquisition.

The Court of Appeal must assume that the conditions for applying the exceptions mentioned are not met. Accordingly, and as there are no circumstances proving that the property was acquired by lawful means, cf. section 76a(4) of the Danish Criminal Code, the property 69A Clifton Avenue must be confiscated from Usha Shah, cf. section 76a(2), cf. subsection 1.

*Relating to Usha Sha's beneficial interest in 69 Clifton Avenue, Ground floor flat, Wembley HA9 6BN, title no. AGL265851:*

According to the available information, it must be assumed that the property was acquired no later than June 2007 and thus more than 5 years before the offense charged, which is why the property cannot be confiscated under section 76a(2), cf. subsection 1, of the Danish Criminal Code.

In the alternative, during the main hearing, it was argued that GBP 125,000 of the property's equity should be confiscated under section 76(4) of the Penal Code, as the amount used for redemption was received as a gift.

Regarding the claim for confiscation under section 76(4) of the Danish Criminal Code, the Court must note that the provision is not mentioned in the confiscation notice served on Usha Shah. Accordingly, and as Usha Shah has not been present during the hearing of the matter, the court finds that there can be no confiscation under this provision.

The Court must then assess whether it has been established that the conditions in the more subsidiary claim under section 75(1), cf. section 76(1), of the Danish Criminal Code are met, and that it is thus a case of redemption with proceeds from the criminal offense which has accrued directly to Usha Shah. The Court of Appeal finds that the prosecution has not demonstrated such a direct connection between the refund of dividend tax and Usha Shah's repayment of the loan of GBP 125,000 that the conditions in section 75(1), cf. section 76(1), of the Danish Criminal Code can be considered fulfilled.

Finally, it has been claimed, most alternatively, that confiscation of an equity corresponding to the redeemed amount may take place under section 76a(2) of the Danish Criminal Code, cf. subsection 1.

The Court of Appeal must note that the redemption took place during the period of the offense and that the conditions for making partial confiscation, as previously stated, are in principle fulfilled. The Court of Appeal also finds that it has not been proven that the redemption was made by lawful means, cf. section 76a(4) of the Danish Criminal Code. In this respect, the District Court has emphasized that

the repayment of the mortgage on the property has thus, according to the available information, been made with funds that are presumed to have originated from the criminal offense.

On this basis, the District Court finds that GBP 125,000 of the property's equity must be confiscated, cf. section 76a(2) of the Danish Criminal Code, cf. subsection 1.

*Confiscation at IPIS UK (Battersea London 1) Limited (in liquidation):*

The liquidator of the company has confirmed that the former Treefrog Capital Limited (formerly Arche Cayman Limited) and now Barracuda EM Holdings Limited contributed GBP 6,000,000 and was 80% owner of IPIS UK (Battersea London 1) Limited, which built and owned the properties where 80% of the proceeds of sale are seized. The seized proceeds are administered by the liquidator.

The defendant has explained that he owns the company formerly Treefrog Capital Limited (formerly Arche Cayman Limited) and now Barracuda EM Holdings Limited. Thus, the Court must assume that the defendant is the ultimate owner of the proceeds administered by the liquidator.

It can be assumed that the deposit of GBP 6,000,000 was paid during the period of the offense from a company owned by the defendant. On this basis, the District Court finds that the assets were transferred to a legal person over which the defendant has a controlling influence. Accordingly, and as the other conditions for confiscation under section 76a(1), cf. (3), of the Danish Criminal Code are met, the prosecution's request for confiscation is granted.

The Court of Appeal has noted that the prosecution has not objected to the liquidator's comments regarding fees, and further notes that payment for the liquidator's work must depend on an assessment under English law of whether this right can be enforced, and that this has no bearing on whether the confiscation claim can be upheld.

*Confiscation at Athena Equity Trading S.a.r.l (in bankruptcy):*

The defendant has explained that he was the last owner of the company before it went bankrupt and that the funds originated from a refund of Danish dividend tax. Based on this and the documented information, the court is satisfied that the funds originate from the refund of dividend tax that Solo received from the Danish tax authorities. Subsequently, and according to the evidence, the deposit must be confiscated under section 75(1), cf. section 76(1), of the Danish Criminal Code.

*Confiscation at Eris Investments Ltd:*

Mankash Jain has explained in particular that he owns Eris Investments Ltd. He has contested the confiscation claim and in particular argued that the transfers of funds documented by the prosecution originate from profits from currency trading. He has further explained that the account documented was a joint account with Solo for several clients and that Solo was authorized to hold his funds in this account.

As a preliminary remark, the District Court must note that it is incumbent on the prosecution to prove that the funds in question are funds that have directly accrued from the criminal offense, cf. section 75(1) of the Danish Criminal Code, or are proceeds received in bad faith, cf. section 76(4) of the Danish Criminal Code.

The Court of Appeal finds that the prosecution, which has documented from account statements where a large amount is included from an account in Danish kroner, but which also show a number of other transactions and deposits that have not been accounted for, has not documented that the funds received by Eris Investments Ltd. originated from the dividend tax fraud of which the defendant has been found guilty. Furthermore, the prosecution has not demonstrated that there is a basis for setting aside Mankash Jain's explanation as to why he was entitled to a payment from Solo.

Against this background, the prosecution's confiscation claim regarding confiscation at Eris Investments Ltd is not accepted.

**For it is known to be right:**

The defendant is punished with imprisonment for 12 years.

Until further notice, the defendant is disqualified from participating in the management of a business enterprise in this country or abroad without being personally and unlimitedly liable for the company's obligations.

The defendant is expelled from Denmark with a permanent entry

ban. The defendant's property is confiscated:

**1.**
DKK 7,220,164,697 (corresponding to 80% of DKK 9,025,205,871) regarding relation 1 with the defendant, including confiscation of

a. The following amounts plus accrued interest, which are held in seized accounts at Varengold Bank AG (Germany):
(1) EUR 512.227,19 on account 1026600111
(2) USD 99,985 on account 1026600219
(3) GBP 159.801,62 on account 1026601312
(4) AUD 14,100 on account 1026601819

b. The following seized immovable properties located in the UK:
(1) Flat 36, Altus House, 335-337 Bromley Road, London, SE6 2DR, title no TGL406119
(2) Flat 40, Altus House, 335-337 Bromley Road, London, SE6 2DR, title no TGL406124
(3) 73 Aurora Apartments, 10 Buckhold, London SW18 4FW, title no TGL392601
(4) 74 Aurora Apartments, 10 Buckhold, London SW18 4FW, title no GL392610
(5) 67 Balcombe Street, London NW1 6HD, title no LN200530
(6) 84 Boston Place, London, NW1 6EX, title no LN93201
(7) 92 Boston Place, London NW1 6EX, title no LN242519
(8) 102 Boston Place, London NW1 6EX, title no LN113325
(9) Flat 27, Brandan House, Sovereign Place, Harrow, HA1 2FN, title no NGL806039

(10) 10 Endeavour Court, Stoke, Plymouth PL1 5AX, title no DN566627
(13) Flat G01, 28 Lovat Lane, London EC3R 8EB, title no AGL336905
(14) Apartment 23, Monroe House, 7 Lorne Close, London NWB 7JN, title no
NGL797603
(15) Flat 6, 41 Tavistock Crescent, London W11 1AD, title no BGL91988
(16) Flat 8, 41 Tavistock Crescent, London W11 1AD, title no BGL92473
(17) 109 Valletort Road, Plymouth, PL1 5PN, title no DN566959
(18) 111 Valletort Road, Plymouth, PL1 5PN, title no DN5666619
(19) Defendant's Ideal share of 69 Clifton Avenue, Ground floor flat,
Wembley HA9 6BN, title no. AGL265851

**3.**
At **Usha Shah**, confiscated:

a. The following seized immovable property located in the United Kingdom:
(1) Clifton Avenue 69A, Wembley HA9 6BN, title no. NGL625888:
(2) 125,000 GBP in the equity in Usha Sha's beneficial interest in 69 Clifton Avenue, Ground
floor flat,Wembley HA9 6BN, title no. AGL265851

**8.**
At **Aesa S.a.r.l.** is confiscated:

a. The following amounts plus accrued interest, which are held in seized
accounts at ING Luxembourg S.A. (Luxembourg):
(1) EUR 9.582,73 on account LU26 0141 4481 8170 0000
(2) GBP 121.700,58 on account LU08 0141 6481 8170 3030
c. the following seized shares in Varengold Bank AG (Germany):
(1) 160,000 units on deposit/account 1088846300

**9.**
At **Elysium Global (Dubai) Limited** is confiscated:

a. The following seized amounts plus accrued interest, which are deposited
with Varengold Bank AG (Germany):
(1) EUR 7.650

b. The following amounts plus accrued interest, which are held in seized
accounts at Varengold Bank AG (Germany):
(1) EUR 28.475,01 on account DE38200301331026140110
(2) USD 18,996.55 on account DE09200301331026141214

c. The following seized shares in Varengold Bank AG (Germany):
(1) 973,812 shares on deposit/account no. 7013 104259 in Dero Bank AG

**10.**
At **Elysium Global Limited** is confiscated:

a. The following amounts plus accrued interest accrued on seized assets

accounts in Varengold Bank AG (Germany):
(1) EUR 168.142.082,43 on account 1029 1201 10
(2) EUR 56,555.38 on account 1029 1201 29
(3) GBP 14.999.916,63 on account 1029 1213 11

**11.**
At **Elysium Global Trading Limited** is confiscated:

a. The following amounts plus accrued interest, which are deposited in a seized account with Varengold Bank AG (Germany):
(1) EUR 50,100,000 on account IBAN DE32 2003 O 133 1 092 540 1 13

**13.**
At **6 Ephl Covent Garden Limited** is confiscated:

a. The following seized real estate located in United Kingdom:
(1) Apartment 6, 12 Great Newport Street, London WC2H 7JD, title no NGL970116

**14.**
At **Ephl Covent Garden Limited** is confiscated:

a. The following seized real estate located in United Kingdom:
(1) Apartment 7, 12 Great Newport Street, London WC2H 7JD, title no NGL970113

**15.**
At **8 Ephl Covent Garden Limited** is confiscated:

a. The following seized real estate located in United Kingdom:
(1) Apartment 8, 12 Great Newport Street, London WC2H 7JD, title no NGL970114

**16.**
At **Bycor Capital Limited** is confiscated:

a. The following seized immovable property located in the UK:
(1) Flat 75, Babbage Point, 20 Norman Road, London London SE10 9FA, title no TGL439518

**17.**
At **Rolten Capital Limited** is confiscated:

a. The following seized immovable property located in the UK:
(1) Flat 76, Babbage Point, 20 Norman Road, London SE10 9FA, title no TGL439524

**18.**
At **Mala Holdings One Limited** is confiscated:

a. The following seized immovable property located in the UK:
(1) Apartment 3, 12 Great Newport Street, London WC2H 7JD, title no NGL970117

**19.**
At **Solten Holdings One Limited** is confiscated:

a. The following seized immovable property located in the UK:
(1) Apartment 4, 12 Great Newport Street, London WC2H 7JD, title no NGL970115

**21.**
At **IPIS UK (Battersea London 1) Limited** is confiscated:

a. The seized 80% of the proceeds from the sale of IPIS UK (Battersea London
1) Limited's real estate located in the UK:
(1) 1 to 13 (odd numbers) Yelverton Road and 58, 60, 62, 64, 66, 68 and 70 York Road, Battersea,
London, title no SGL 164889

**23.**
At **Trillium Capital S.a.r.l (formerly VEM Holding S.a.r.l)** is confiscated:

a. The following amounts plus accrued interest, deposited in the seized account of ING Luxembourg
S.A. (Luxembourg)
(1) EUR 888,240.52 on account LU17 0141 5544 1230 3000
b. The following seized shares in Dero Bank AG (Germany):
(1) 9,675,000 shares on deposit/account 7000005001 in Dero Bank AG

**24.**
At **Athena Equity Trading S.a.r.l** is confiscated:

a. The following amounts plus accrued interest, deposited in the seized account of ING Luxembourg
S.A. (Luxembourg)
(1) EUR 20,325.20 on account LU10 0141 2481 8160 0000

**27.**
At **ARAYA Holdings Limited** is confiscated:

a. The following seized Contigent Convertible bonds of Varengold Bank AG (Germany):
(1) EUR 5,000,000 in deposit no. 1089436300 Page 10

**28.**
At **Treefrog Capital Limited (formerly Arche Cayman Limited)** is confiscated:

a. The following seized receivables plus accrued interest with the company
Capmartin Limited, which is held in police custody/account:
(1) EUR 3,075,000

**30.**
At **Bellview Financial Ltd.** will be confiscated:

a. The following seized shares in Varengold Bank AG (Germany):

(1) 176,963 shares on deposit/account 1088866300 in Varengold Bank AG

**31.**
At **Colbrook Ltd.** is confiscated:

a. The following seized shares in Varengold Bank AG (Germany):
(1) 84,174 shares on deposit/accounts 10909996300/1026066300 in Varengold Bank AG

**32.**
**Eris Investments Ltd.** is acquitted of the claim for confiscation.

**33.**
At **PCM Capital Ltd.** is confiscated:

a. The following seized shares in Varengold Bank AG (Germany):
(1) 160,000 shares on deposit/account 1087786300 in Varengold Bank AG

**36.**
At **T & S Capital**, confiscated:

a. The following seized shares in Varengold Bank AG (Germany):
(1) 194,446 shares in the custody account 1026046300 at Varengold Bank


AG The defendant shall pay the costs.