# Exhibit 1

The court in Glostrup



Print

JUDGMENT

delivered on 7 December 2017

Court No. 15-8058/2017 Police No.
SEARCH-76141-00001-17

Prosecution
Mo      1
Sven Jørgen Nielsen
CPR number          XXXX and

CPR Number          XXXX

Judges have been involved in this case.

Indictment received on September 8, 2017.

Sven Jørgen Nielsen and                          is charged with

1.
Both

Fraud of a particularly serious nature pursuant to section 279 of the Danish Penal Code, cf.
section 286(2),



2.
Sven Jørgen Nielsen

SKSK00362949-0001
SKSK00362949-0001
MTKC24/820.2/1
SKSK003............._1_
SKAT_MDL_001_00850298
Confidential

Violation of section 155, 2nd sentence, cf. 1st sentence of
the Danish Penal Code, by abusing his position as a caseworker at SKAT
on 27 August 2007 in order to obtain or other unjustified gain, in order to
violate public law, as the defendant, as described in relation 1, cause ███████
██████████████████████████ total of total undue payment
████████████ kr. from SKAT.

3.
Sven Jørgen Nielsen

Infringement of Section 144 of the Danish
Penal Code by in the period from 23 March 2006 to 25 February 2011 as a
caseworker at SKAT, where he dealt with applications for repayment of withheld
dividend tax, by ████████████████████ whose company
████ received withheld dividend tax from SKAT on ████████████ kr. i
2004 and on ███████████ DKK in 2007, wrongfully receiving a total of DKK
2,083,000 by the following transfers to the defendant's account:

| | |
|---|---|
| 23 March 2006: | 30.000 kr. |
| 4 May 2006: | 20.000 kr. |
| 4 July 2006: | 20.000 kr. |
| 22. august 2006: | 50.000 kr. |
| 27. november 2006: | 10.000 kr. |
| 16 March 2007: | 25.000 kr. |
| 26 March 2007: | 75.000 kr. |
| 18 April 2007: | 25.000 kr. |
| 25 June 2007: | 25.000 kr. |
| 20 July 2007: | 40.000 kr. |
| 2. august 2007: | 20.000 kr. |
| 17. august 2007: | 60.000 kr. |
| 28. august 2007: | 30.000 kr. |
| 14. september 2007: | 50.000 kr. |
| 11 October 2007: | 50.000 kr. |
| 22 October 2007: | 50.000 kr. |
| 30 October 2007: | 20.000 kr. |
| 3. december 2007: | 35.000 kr. |
| 5 February 2008: | 20.000 kr. |
| 11 February 2008: | 25.000 kr. |
| 29 February 2008: | 70.000 kr. |
| 28 March 2008: | 18.000 kr. |
| 15 April 2008: | 15.000 kr. |
| 7 May 2008: | 20.000 kr. |
| 23 May 2008: | 15.000 kr. |
| 20 June 2008: | 50.000 kr. |
| 11 July 2008: | 35.000 kr, |
| 26. august 2008: | 75.000 kr. |
| 1 October 2008: | 75.000 kr. |

SKSK00362949-0002
SKSK00362949-0001

MTKC24/820.2/2
SKSK003█2█4█-0001_11
Confidential                                                    SKAT_MDL_001_00850299

| | | |
|---|---|---|
| | 28. november 2008: | 75,000 kr. |
| | 15 January 2009: | 25,000 kr. |
| | February 6, 2009; | 150,000 kr. |
| | February 27, 2009; | 50,000 kr. |
| | 12 March 2009: | 75,000 kr |
| | 31 March 2009: | 75,000 kr |
| | 7 May 2009 · | 75,000 kr. |
| | 22 June 2009: | 75,000 kr |
| | 17. september 2009: | 25,000 kr. |
| | 4. november 2009: | 50,000 kr. |
| | 13 January 2010: | 75,000 kr. |
| | 26 February 2010: | 75,000 kr. |
| | 11 June 2010: | 10,000 kr. |
| | 30 June 2010: | 25,000 kr. |
| | 21 July 2010: | 25,000 kr. |
| | 31. august 2010: | 30,000 kr. |
| | 8 October 2010: | 30,000 kr. |
| | 6. december 2010: | 25,000 kr. |
| | 31 January 2011: | 30,000 kr. |
| | 25 February 2011: | 30,000 kr. |

Claims

The prosecution has asked for a prison sentence.

Pursuant to Section 75(1) of the Danish Penal Code, cf. Section 76(1) or, alternatively, Section 76(4) cf. subsection (1), the prosecution has also requested confiscation of DKK 37,416,285.18 from the defendant ▮(ratio 1) and pursuant to section 75(1) of the Danish Penal Code, cf. section 76(1), on the confiscation of DKK 2,083,000 from accused Nielsen (ratio 2).

Finally, as regards the accused, the prosecution ▮▮▮sought disqualification from participating in the management of a business enterprise in Denmark or abroad without being personally and indefinitely liable for the company's obligations, cf. section 79(2), second sentence, of the Danish Criminal Code.

The defendant, Sven Jørgen Nielsen, has pleaded not guilty and pleaded not guilty to the confiscation claim.

Defendant ▮▮▮▮▮has pleaded not guilty and pleaded not guilty to the confiscation and disqualification charges.

Explanations

During the trial, the defendants and witnesses Lisbeth Rømer, Laurits Cramer, Dorthe Pannerup Madsen, Torben Børge Rasmussen, Bente Klein Fridberg, Liselotte Dileng, Claus Gade Jørgensen and Sarah testified

SKSK00362949-0003
SKSK00362949-0001

**MTKC24/820.2/3**
SKSK003▮▮▮▮▮-▮▮▮▮_▮▮
SKAT_MDL_001_00850300

Confidential

Bidstrup Nielsen.

██████████████████████████ Pursuant to Section 871(5) of the Code of Civil Procedure, the statement
to the police report is documented during the proceedings.

Sven Jørgen Nielsen has explained, among other things, that he knows
the co-defendant ████████





In connection with his stays in the United States, he usually received 5-8,000
USD, which he took home. This happened as part of a loan agreement they had
entered into. When he got home, he hid the money and only exchanged it when
he needed it.

████████████████████████████████████
████████████ Sometime during the 80s, he was moved to the department
of dividend tax. Things were completely different back then. There were not
so many shareholders, and he also worked with corporate tax. He was
trained to do the work in the department. He worked with dividend tax until

SKSK00362949-0004
SKSK00362949-0001

MTKC24/820.2/4
SKSK003█████████████

Confidential                                                    SKAT_MDL_001_00850301

His employment ended in 2016.

Back in 2007, the day typically started with reviewing the mail and sorting it, depending on how the individual applications should be processed.

It is an application form, such as the one used in 2007, that is shown during the proceedings. However, some applications were also submitted on "blank" paper. The form had to be created in 3 copies, one for SKAT, one for the bank and one for the company. You could either fill in all the boxes on the form or attach the necessary supporting documents.

Once he had checked that the necessary information was available, he could start processing the application in the case management system called 3S. The screenshots showcased during the case are screenshots from 3S. You did not enter the company name, but just the CVR number, after which the company's name and - if the company had already reported the decision on dividend - also the date of the general meeting appeared in the relevant fields. The date of the request and the name of the person who should have refunded the dividend tax had to be entered yourself. In the "Address" field, it was not necessary to write a full address, but it should say something. Therefore, one typically wrote the name of the bank to which the refund amount was to be paid. The fields "Beneficiary bank", "Account no./IBAN no.", and "Bundle no." also had to be filled in yourself, just as you had to enter the amounts in the boxes "Dividend" and "Refund". Once the amounts were entered, the refund percentage was displayed. As a starting point, this should be 28%. If it wasn't, it was typically a typo that you had to find and correct. In this way, the field functioned as a control field. He knew by heart the reimbursement rates for the countries that came from the most applications, while he had to look up the percentages for the rarer countries

The amount in the field "Dividend available (rate 1)" was not something you entered, but something that appeared if the company had reported that amount had been distributed as dividend. This field, too, together with the "Dividend" field at the bottom of the screen, functioned to a certain extent as a control field, as the total refund of dividend tax shown in the "Dividend" field should not, as a rule, exceed the amount in the field "Dividends available (rate 1)". The reason why this did occasionally happen was that applications for dividend tax refunds often came a few days after a distribution was adopted, while dividends were reported later, as companies had 2 months to report. In this connection, one always looked at the company in question. If it was a listed company, the refund was paid even though the dividend had not yet been reported, since it was also a requirement for the payment of the refund that there was either a certificate from the company concerning the payment of dividends or a certificate of payment of dividends or a

dividend note.

For the purpose of case processing, a checklist had been prepared that the employees could adhere to. He doesn't know who originally made

Checklist. It was continuously revised, he himself was involved in, just as he had participated in the development of the system, 3S, which had been put into use in 2002

Information on the applicant's holding of shares in the company in question differed. It depended on whether you got a dividend note or just an attestation from the company. The applications had to be processed within one month if SKAT did not have to pay interest subsidies. When everything was entered, a payout list was printed at the end of the day, which was then passed on to the bookkeeper, who handled the tasks related to the payment. If there was incorrect or missing information in the payout list, the bookkeeping department contacted the department, but no more was heard if everything was in order. As far as he knows, all payments were made through a bank

account and no cheques were used.

Neither he nor the system could check whether the information obtained from a foreign applicant was correct. However, it was not possible to seek reimbursement for the same dividend twice.

The bundle number was one assigned to the applications themselves. The first two or three digits were a sequential number, while the last two digits indicated the year of application. The bundle number was important when filing applications. It often happened that you needed to find an application again, for example if you received a complaint about a calculation of reimbursement. The items were on file for at least 5 years. The employees themselves made sure that things were put in order and on the archive. It was also the employees themselves who made sure that the material was destroyed when 5 years had passed. The department collaborated on this.

When SKAT processed applications for reimbursement of dividend tax from foreign companies, they had no opportunity to verify the information, but had to rely on the supporting documents that accompanied the application or the certificate on which the application was affixed. There were many discussions about this internally in SKAT, among other things he discussed the question of control with Lisbeth Rømer, who was head of the dividend office, and with Laurits Cramer, who was deputy manager. In this context, they also discussed whether net settlement requirements could also be introduced for foreigners. However, this would require that foreigners who owned Danish shares register in Denmark with, for example, the Central Securities Depository. For this reason, among other things, the discussions did not lead to anything. On the whole, it was like pulling a blanket in relation to SKAT's top management. In this connection, it was also a problem that the top management in SKAT was so frequently replaced. At one point, a system was proposed whereby companies would have to report to which foreigners were distributed dividends. However, this was difficult as the shareholders were not registered by name and often only the name was known, for example

on a bank.

Lisbeth Rømer and Laurits Cramer dealt with matters other than the refund of dividend tax, while the defendant was the only one in the office who had the right to pay dividend tax.

SKSK00362949-0006
SKSK00362949-0001

**MTKC24/820.2/6**
SKSK003̶0̶2̶9̶4̶9̶-̶0̶0̶0̶1̶_̶1̶1̶

Confidential                                    SKAT_MDL_001_00850303

They were concerned with the refund of dividend tax. However, there were also others in the office who could handle dividend tax refund cases and who helped when needed.

He believes that his unit was located in Ballerup in 2007. In Ballerup, most employees, including the defendant himself, had their own office. Laurits Cramer sat in the office next to the defendant's, while Lisbeth Rømer sat further down the hall. It was Laurits Cramer who searched the mail, and in this connection he could contact the defendant if there was something he thought the defendant should pay special attention to.

The process guide was prepared in connection with a function moving to Aarhus. It was inappropriate to start typing in 3S before the case processing was completed. He does not immediately recognize the user manual for the corporate and foundation taxation system, but he can confirm that what is stated about the filling in of the "Address" field corresponds to how the system was used. In fact, it was he himself who had come up with the idea that it should be that way.

In 2007, every day at 5 p.m., a list of refunds entered that day was automatically printed. Refunds that were keyed after 5pm didn't get on the next day's list until the next day. A list was printed per bundle number. Once printed, the lists were voted off and countersigned, after which they were sent to the bookkeeping department for payment. There were several colleagues, both co-ordinated and superior, who had the authority to countersign the lists.

When entering information into 3S, he paid little attention to whether the name of the company applying for reimbursement might contain a foreign company name such as Ltd., SA or SARL

It was rare for a case to be selected for separate inspection, but he does remember an application that looked so mysterious that it was processed at SKAT's head office in Østbanegade and another case where there was a major error, which was so obvious that he could correct it himself.

For a period long prior to 2007, there was an agreement that the control department in Østbanegade should receive copies of applications above a certain amount. However, the agreement had ended in 2007 and, as far as he remembers, had not been replaced by a similar agreement. However, since the department was not a control department, it was not necessary to take any action but to forward the case if it felt that there were matters that needed to be investigated. It could be he or possibly Laurits Cramer who should draw attention to it if matters relating to an

application were to be investigated further.

Internal audits were carried out from time to time, but he does not know how often. During the audit, the auditors always reviewed the physical files. He

SKSK00362949-0007
SKSK00362949-0001

**MTKC24/820.2/7**

SKSK003̶0̶2̶9̶4̶9̶-̶0̶0̶0̶1̶_̶1̶1̶

Confidential                                                                SKAT_MDL_001_00850304



Don't know how long an audit took. Auditors were only noticed when they were dealing with one's own affairs. Once the audit was completed, there might well be circumstances that needed to be changed, but he does not know whether the issue of dividend tax has been discussed with internal audits.

Sion.

He does not believe he was aware of the company in 2007 ███████████
██ He didn't get it until 2009, when ███████ traveled to the United States and announced him that the repayments on the loans made by ███████ had given him, in the future to be paid at ████████████ account in Griffon Bank. ███ He did not say anything about the company in this connection, nor does he know otherwise what type of company it was. He did not ask █████████ why he could no longer deposit the money into an account at ███████

███ Nordea-bank. ███████ told him that he had started a company. closet, but he does not remember whether ███████ told him what the purpose of the company was or why he had founded the company. He did not wonder that now the money should be transferred to a foreign account.

It is probably he who entered the information in 3S regarding the applications from ████████████ which was discussed on 27 August 2007. However, he does not remember it separately, just as he does not remember the name

██████████ in this context. He has not spoken to ████████ stating that in 2007 had been paid ███████ DKK in refund. knew that the defendants were working on dividend tax refunds, but they have not spoken further about the defendants' work. If he had known that an application was coming from a friend, he probably wouldn't have processed it until he had talked to the friend. In this case, therefore, if he had known that he was the owner of

█████ ████████████ have called ███████ and asked him, whether he had started making money. If ███████ However, had he said yes and the information otherwise looked correct, he would then have treated the application like any other application.

In 2007, it was not uncommon for 4 months to elapse between receiving an application and the refund of dividend tax. Where the duration of proceedings exceeded one month, interest was payable in accordance with the interest circular, but as a rule this was not done in the first instance and interest was paid only if a subsequent communication was received. The long processing time in 2007 was due, among other things, to the fact that he took time off in lieu for a large part of 2007.

When the applications from ████████████ is processed together, this is because the applications are of the same category. There were not so many applications in each category and it was therefore easy to gather similar applications and process them at once.

He does not remember anything about the payments to ████████████ in 2004 Is on other payments to ████████████ or to ██████

SKSK00362949-0008
SKSK00362949-0001

MTKC24/820.2/8
SKSK003█2█4█-0001_11
Confidential                                                    SKAT_MDL_001_00850305

Personally.

The employee number W418506 does not tell him anything. He only
remembers the employee number WSK00177, which was the employee
number he used during the last years he was employed. He doesn't
think you needed the employee number to log on to 3S. Even if it is his
employee number that appears in the log, it may well be someone else
who made the entry, as there could well be other employees who were
logged on with his employee number and password. This rarely
happened, but could occur, for example, if a new employee had not yet
been created as a user. You never gave your employee number and
password to the other employee, but logged on yourself and then made
the machine available to him. As a user, you could be logged on to
several machines at a time. He has never "borrowed" an employee
number or password from a colleague. The defendant had flexitime in
2007 and never appeared later than 7 a.m. Most of his colleagues also
showed up early. There were 10-15 employees who used the 3S
system. He himself had access to all functions of 3S. It is most likely
that he was the one who entered the 14 applications for dividend tax
refunds                                           But he does
not remember it separately today. It was he who processed 90% of all applications
for dividend tax refunds.

The letter of 24 July 2007 to            from SKAT, which he has under-
written, is a letter, with which he            have written for fun.
Presumably because at some point they have sat and talked about their work.
Normally, such letters were not sent from SKAT. He doesn't remember how the idea
for the letter came about or who got it. He also does not remember where the letter

was made, but it was probably made in his office in SKAT.            has
seen the letter, but he has never received it or handed it over. This is on the
basis of information from       he has written the amount of
DKK and the name of Griffon Bank into the letter. The letter is incomplete, among
other things, the journal number is definitely not correct and the date is probably
wrong. He does not know why he did not make a letter that was correctly crafted.
He also does not know why he signed the letter. It was probably a reflex. He didn't

know                        address or account number of Griffon
Bank and therefore did not provide this information in the letter. He doesn't
know why he didn't have this information. The phrase about the long
turnaround time was a standard phrase that was used in many contexts. He
had no knowledge of                  when he made the letter. The
letter was not written in 2007, but probably in 2005 or 2006.

He can see today that it is strange that the information in the letter
corresponds to that of the payment to                  which see-
Nere took place.

Alleged that the defendant has previously explained to the police that he sat and made
the letter at night at       and that the letter and list of bank details

SKSK00362949-0009
SKSK00362949-0001

**MTKC24/820.2/9**
SKSK003ᴏᴣ᠎ᴏᴏᴏᴧ_ᴧᴧ
Confidential                                                          SKAT_MDL_001_00850306

Concerning ██████████████ Presumably made at the same time, the
defendant has explained that it may well be true that he has previously explained such.
However, he has since had time to think things through and has remembered that this
was not how things were done

Nor does the defendant believe that the letter and the list of bank details were in the same
place in his home. It must be something that the Swedish police have got wrong. The list,

which was made by ████████ Believe he was in a folding folder while the
letter was in a tray for discarding. He had to use the account details on the
list, in particular the IBAN data relating to Griffon Bank, in connection with
his payments to ████████ He thinks he got the list of ████████
in 2009.



In relation to fact 3, defendant Sven Jørgen Nielsen has explained that all the
amounts referred to as transfers to his account are either loans or wages for

work he has performed for ████████ He believes that he and ████████ Included
The 2006 agreement asked ' ████████ whether he could borrow money from him.

He didn't know if ████████ had money and he doesn't remember how big
loans he asked for, or how it all came about. He also doesn't remember what
████████ dealt with in 2006. They did not enter into a written agreement on
the loans, but only an oral agreement. He doesn't remember where. Presumably
he just gave ████████ his account number, after which he has been paid the
money. He does not remember why the loan amounts are of such different sizes. At
the time of the conclusion of the loan agreement, they did not specify how or when the
loans would be repaid. They first talked about that when moving to the United States,
████████ and it was mentioned that he could move to the United States and

work for ████ when he retired. No interest or security was payable
on the loans. He did not wonder where the money for the lo████
came from, and at no time did he ask him about it.

He does not know why they did not in the first place, but only in 2011, when SKAT



demanded this, entered into a written agreement on the loans. Not all the amounts were part of the written loan agreement, as he did not have an overview of how much money he had borrowed from ▮▮▮▮ At one point, prepared an addendum to the loan agreement. He believes that he and ▮▮▮▮ made loan the agreement together, while ▮▮▮▮ did not participate in drawing up the supplementary agreement. The defendant does not know why only the loan agreement and not the supplementary agreement have been signed. It is true that, according to the loan agreement, he was supposed to start paying off the loan on December 11, 2011. However, it never came to fruition as he did not have the money for it.

▮▮▮▮ continued to pay him money even after 25 February 2011, but from then on he was paid the amounts in cash when he visited ▮▮▮▮ in United States. As he recalls, the amounts were paid out in USD, but when it appears from information from his bank that a large proportion of the foreign currency payments he made into his bank account during the same period were in euros, then he must have been paid part of the amounts in euros. After January 2015, payments ceased from ▮▮▮▮ He understood it to mean that ▮▮▮▮ had run out of money.

He is probably the one who prepared the spreadsheets found during the search at his home, which contain a detailed overview of his finances. He could therefore have found all the sums from which he had received ▮▮▮▮ but chose to concentrate on the amounts that SKAT had asked questions about by letters of 15 February and 14 March 2011.

He may have prayed ▮▮▮▮ for help in responding to inquiries from SKAT and that it is ▮▮▮▮ who has written the draft letter which is found on a USB stick with him. However, he does not remember anything further about it. He first approached a lawyer regarding the tax case later in 2011.

The salary he has received from ▮▮▮▮ He has been given to find information about different companies and translate them from Danish to English. The information was publicly available, and ▮▮▮▮ Could well have found myself The defendant received DKK 145,000 for the consultancy work, which he spent a week time on. He doesn't know why ▮▮▮▮ paid the fee ad several times. It were ▮▮▮▮ who fixed the payment for the consultancy work. There was no question in this connection of setting off part of the fee against the loans ▮▮▮▮ granted to him.

▮▮▮▮ He does not know for what amount he has sold foreign currency, but if the statements show that he has sold for a total of about DKK 258,000, then it is probably true.

Defendant ▮▮▮▮ who only wished to answer questions from his counsel, has explained, among other things, that he was The ▮▮▮▮ company had only one bank account, the account at Griffon Bank in Dominica.

SKSK00362949-0011
SKSK00362949-0001

MTKC24/820.2/11
SKSK00362949-0001_11
SKAT_MDL_001_00850308

Confidential

It may well be true that the account number ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was no longer exists.

The defendant has not on behalf ▮▮▮▮▮▮▮▮▮▮ submitted an application for a refund of dividend tax, and he was not aware prior to his arrest in May 2017 that dividends had been paid with ▮▮▮▮▮▮▮▮ kr. to Bankas Snoras. He did not, therefore, see the request for transfer of 12 September 2007 before the proceedings and also doubts whether he had seen it in the Case. ▮▮▮▮▮▮▮▮▮▮▮ have not transferred the well ▮▮▮▮▮▮ nn-The request relates.

Nor has he previously seen the request for a transfer of 28 September 2007 or caused such a transfer to be ▮▮▮▮▮▮▮▮ ▮▮ effected on behalf of the ber 2007.

▮▮▮▮▮▮▮▮▮▮▮ have never had an account in Bankas Snoras. The money transferred by the request of 27 November 2007 came from Griffon Bank.

It may well be that from ▮▮▮▮▮▮▮▮▮ a number of larger sums have been transferred to him. The defendant does not know why Bankas Snoras was involved in the transfers. The money transferred from ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

He has no connection to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮

It is the defendant who signed the loan agreement between himself and Griffon Bank both personally and for ▮▮▮▮▮▮▮▮▮ as a guarantor ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SKSK00362949-0012
SKSK00362949-0001
**MTKC24/820.2/12**
SKSK00▮▮▮▮▮▮▮-▮▮▮▮_▮▮

Confidential                                                                                    SKAT_MDL_001_00850309



In 2006, Sven borrowed money from defendants for the first time.

The defendant does not recall having previously seen the letter from SKAT Ballerup dated 24 July 2007 concerning the reimbursement of ▮▮▮▮▮ or the list of account numbers found during the search at the home of co-defendant Sven Nielsen.

▮▮▮▮▮ is a good friend to whom he has lent money in connection with the fact that business did not go so well. ▮▮▮▮▮ is also a good friend, which he has borrowed DKK 3-400,000 in connection with ▮▮▮▮▮

As a witness, Lisbeth Rømer has explained, among other things, that she was employed by SKAT from 1 May 1979 to 30 November 2013, but that she has now retired. She is a trained lawyer and has held many functions in SKAT. In the period 2002-13, she was head of the department dealing with dividend tax. The consideration of dividend tax issues had not been collected before she took over responsibility for the area in 2002. Therefore, no one had really taken an interest in the area. In the beginning, there were a total of 15-20 employees in the department, but as more and more digital solutions were introduced, the staff was reduced. The department dealt not only with the refund of dividend tax, but also, for example, with the reporting of dividends. During her time in the department, the department's procedures and guidelines etc. were continuously developed.

In order to receive a refund of dividend tax, it is a prerequisite that you are the owner of the dividend-bearing shares at the time of distribution of dividends and have received the dividend. She recognised the form presented as the form to be used when applying for a refund of dividend tax, although it was the English version of the form that was most commonly used. In order to be eligible for a dividend tax refund, the application must bear a declaration from the local tax authorities to the effect that the applicant was liable to tax in the country concerned and that a dividend note was attached.

When applications came in, they were typically reviewed superficially by the deputy head of the department, Laurits Cramer, who assessed whether the

SKSK00362949-0013
SKSK00362949-0001

MTKC24/820.2/13
SKSK00362949-0001_11
SKAT_MDL_001_00850310

Confidential

At first glance, the gene looked reasonable. If the amounts involved were not very large or there were other things that were particularly noticed, the cases were then transferred to the defendant Sven Nielsen, who then carried out a more thorough examination of the applications in connection with the case processing. It was only if the department was very busy that cases were also assigned to others than Sven Nielsen.

If the proceedings took longer than 30 days, interest had to be paid. It happened automatically. The interest was not calculated in 3S, but was calculated by the accounting department in connection with the payment. Sven Nielsen was familiar with the interest rate rules. Precisely in order to avoid having to pay interest, applications from specific persons or companies were not collected, but applications were processed continuously as they came in.

She is surprised that no interest has been paid on an application received on 25 April 2007 and not notified until 27 August 2007, since that should have been done automatically.

The proportion of dividend tax that could be refunded depended on the individual double taxation convention. It was therefore important to know the applicant's address when examining an application. Only the name of the bank to which the payment was to be made could be entered in the address field if the applicant and the bank were domiciled in the same country. Only with three countries, Malaysia, Switzerland and France, had double taxation treaties been concluded which meant that all the 28% of dividends paid in dividend tax in Denmark could be refunded.

The bundle number was the serial number of the case and the number used to file the files. Everyone in the department had access to the archive, and it was easy for everyone to find and take a bundle number on the archive.

Questions relating to dividend tax were originally regarded as an accounting task in SKAT. The establishment of a separate division for dividend tax did not mean that the department was henceforth regarded as a genuine control unit. Thus, they continued to select cases for control only if something looked strange, for example if the amounts involved were exorbitant. This happened, for example, in connection with the refund of dividend tax on some shares in TDC, where an application was received concerning such a large proportion of the total share volume in the company that it was agreed to investigate the matter further. In this connection, they contacted Deutsche Bank, among others, and tried to find out who had been present at the general meeting. However, the investigations did not lead to anything and in the end the application was granted and the dividend tax was refunded.

A known problem was that there was virtually no possibility of carrying out checks on the refund of dividend tax. Everyone in the department talked about it, and she did what she could to bring the problem to a higher level in SKAT. She thus wrote a large number of notes on the problems of

SKSK00362949-0014
SKSK00362949-0001
**MTKC24/820.2/14**
SKSK00362949-0001
Confidential                                                      SKAT_MDL_001_00850311

The matics, which were put up in the system. In the notes, she proposed, among other things, a net settlement model to ensure that from the outset no higher amount of dividend tax was deducted than the individual double taxation treaties dictated. She was pleased when there was an internal audit, as this was an opportunity to point out the problems that existed. It may well be true that, at some point prior to 2007, internal audit complained that no interest had been paid in a number of cases.

The witness is not aware of whether Sven Nielsen has disclosed his passwords to other employees, but lending passwords to others was not something the management approved.

SKAT surveyed 10% of its employees every year. She is aware that Sven Nielsen was at one time subject to such an investigation, as at one point, including in connection with a meeting on 12 August 2011, she provided some information about Sven Nielsen's relationship with the unit in charge of employee control. However, she did not hear anything about the case afterwards and does not know if the investigation led to anything.

You could not pay out money to yourself via 3S, but everyone would be able to enter incorrect information into the system. Before a refund was paid, it had to be signed by the caseworker and another person in the department. Among others, Laurits Cramer and herself had the authority to countersign. However, the countersignature was a matter of form and no real checks were carried out on it. In the bookkeeping, two signatures also had to be affixed before payment could take place.

She never heard the name ███████ before, but she knew very well that Sven Nielsen had a friend named ███████ Jog that he visited this friend sometimes Florida.

It is true that she has previously explained to the police that she had her suspicions, which she had not shared with anyone. What she hadn't shared with others was that internal audit had approached her. She didn't tell police she had a clue what was wrong. She hadn't, and in fact she was annoyed that she was never told what the employee control had led to.

The "Dividend available (rate 1)" and "Yield" fields at the bottom of the screen in 3S served as a clue, but did not allow for a real check, as you did not have to apply for a refund of dividend tax in the same year in which you received the dividend. The department did not check whether the dividend declarations made by the companies were correct.

As a witness, Laurits Cramer has explained, among other things, that he was employed by SKAT from 1 July 1969 to 31 October 2013. He has been dealing with dividend tax since the late 60s. The first 10-15 years it was only peripheral, but when Lisbeth Rømer became office manager in 2002, he became her deputy

SKSK00362949-0015
SKSK00362949-0001

**MTKC24/820.2/15**
SKSK00░░░░░░░░░░░░

Confidential                                                      SKAT_MDL_001_00850312

and got to deal more with the area. It is true that it was his job to search the post relating to dividend tax. When applications for a refund of dividend tax came, he passed them on to the defendant Sven Nielsen, and thereafter the witness had nothing more to do with the case unless problems arose. He knows that interest had to be calculated after 30 days, but he does not know who made this calculation.

He did not collect applications from the same applicant for joint treatment, but he does not know what Sven Nielsen did. A major problem was that it was not really possible to control the refund of dividend tax, as the control basis had disappeared with the establishment of the Central Securities Depository. He talked a lot about this both in the department and in other contexts, and others therefore considered him a "grumpy ass".

However, he carried out a summary check of the applications, for example by checking which companies were distributing dividends so that he could stop applications for companies which had not made distributions. In addition, he regularly attended general meetings of the listed companies and regularly read stock exchange news in the newspaper.

They didn't borrow passwords from each other. He thinks he would have known about it if that were the case, as he was preoccupied with such things. He had no reason to carry out a closer inspection of Sven Nielsen's work. He is not familiar with the procedures for printing out lists of refunds for payment.

He does not believe that he was the one who selected TDC for audit. It may well have been Sven Nielsen or Lisbeth Rømer who did this, as it was Lisbeth Rømer who searched the post when he was not there.

Dorthe Pannerup Madsen has testified as a witness that she has been employed by SKAT since 1981, when she was employed as an office trainee in the Customs Service. In March 2014, she was given responsibility for the dividend tax office, where defendant Sven Nielsen was employed, while already in 2013 she had been given responsibility for the actual payment of the dividend tax refunds

When she took over responsibility for the office in 2014, there were no written procedures for handling the case, but only instructions for entering into the system. There was a feature in 3S that was supposed to trigger an alarm if you paid out more in refunds than had been distributed, but this feature did not work. She doesn't know how long it hadn't worked, and she can't describe the function in detail. It is true that this was probably something she had been told by Sven Nielsen.

Torben Børge Rasmussen has testified as a witness, among other things, that in 2011 he was employed as a subject consultant at SKAT. He was in the employee control, which was tasked with carrying out audits of SKAT's own employees. At some point, another unit of the Tax, EcoCrimea, became aware that

SKSK00362949-0016
SKSK00362949-0001
SKSK00░░2░4░-░0░1_11
Confidential

had been paid large sums of money from the defendant; ██████████ to defendant Sven Nielsen. The employee control therefore asked Sven Nielsen for a statement regarding this and had some correspondence with him, after which a meeting was arranged. Before the meeting, some additional bank statements came to light, from which it appeared that Sven Nielsen had had a total of just over DKK 2 million transferred from the years 2006-11

██████████████████ At the meeting, which took place on 17 June 2011, Sven Nielsen was presented with the new information. Sven Nielsen was somewhat surprised by these and asked for the meeting to be postponed so that he could seek legal assistance. At the meeting that was later held with the lawyer, it emerged, among other things, that the loan document had only been prepared in connection with the now arising tax case. Sven Nielsen also

said that he had received a consultancy fee from ██████████ in the light of the the fact that he had found various company information for ████████████ ████

In connection with the case, an internal meeting was also held with Sven Nielsen's boss, Lisbeth Rømer. At the meeting, Lisbeth Rømer said that she had no reason to believe that Sven Nielsen was not doing his job as he should, and that he was an employee she trusted. They inspected the filing cabinets in Sven Nielsen's office, but Lisbeth Rømer said that it was like looking for a needle in a haystack if they wanted to find something there, and they therefore did not take any further action. The meeting with Lisbeth Rømer probably took about an hour. It was probably the witness himself or Alan Martens who brought up the question of Sven Nielsen's ability to "fix" with the numbers. By the way, you did not talk about the procedures in the department. He does not recall whether there was any suspicion at that time of improper use of the system. After the meeting, the investigation was halted

and the tax case took its course.

Bente Klein Fridberg has testified, among other things, that she has been employed by SKAT for 38 years. Today she holds the title of subject consultant. From 2006 to 2013, she was placed in the dividend department, where she was a colleague of defendant Sven Nielsen. She was a caseworker in several areas and occasionally dealt with dividend tax refunds if the department was busy. There was no written instruction on how to handle the cases, but Sven Nielsen had told her how to proceed.

The witness is not aware that there was written guidance regarding the use of 3S. She had gotten to know the system herself by using it. Using the system required logging in with your own password. They didn't use each other's passwords. The applications entered during the day were placed on a list which had to be checked before being handed in to the accounts for payment of the amounts. Initially, the list had to be signed by 2 people before it was handed in to the bookkeeping, but there was no control of the list in this connection and this scheme was therefore abolished in 2011.

A number of the fields you had to fill in when entering an application were

Confidential

Mandatory. This was the case, for example, with the date on which it was decided to pay dividends. If the company making the distribution had not already reported this and the information therefore appeared automatically, it was entered on the basis of what was stated in the application. The field "Dividends available (rate 1)" could not be used to determine with certainty the amount of dividend tax refundable, since in some cases refunds of amounts other than those indicated in this field could also be claimed. If the number in the "Yield" field exceeded the amount in the "Yield available (rate 1)" field, a warning was given. However, we could continue even if we were given this warning. If it said 0 in the field "Dividends available (rate 1)", it could be because no reporting from the distributing company had yet taken place. The witness does not remember whether in this case a notice was obtained, but if she had received a request for a refund of dividend tax in respect of a company listed with 0, she would probably have investigated the matter further, among other things by posting on the tab with the company's reports. Dividend tax refunds could be claimed the very day after the dividend decision was taken, while companies had one month to report the information.

All case handlers could access the information reported by the companies. When processing an application, you would typically start by going to the company's main page to see what appeared on that page.

In the address field, you would typically enter the name of the bank that had applied for a refund of dividend tax on behalf of the shareholder. If you had 14 applications from the same bank, you would typically only enter the bank's name once and settle for the country code of the other 13.

The refund percentage came up automatically after entering in the "Yield" and "Refund" fields. The percentage had to correspond to the percentage applicable under the Double Taxation Convention with the country concerned and could thus be used as a field of control. Annex extract 10, p. 28, shows what is entered under bundle number 109. The signatures on the page show how to countersigned. She doesn't remember whether the caseworker signed left or right.



SKSK00362949-0018
SKSK00362949-0001

Confidential



SKSK00362949-0019
SKSK00362949-0001

**MTKC24/820.2/19**

SKSK00362949-0001_11

Confidential                                    SKAT_MDL_001_00850316

Sarah Bidstrup Nielsen has testified as a witness that on 1 August 2015 she was employed at the dividend office in Skat. Dorthe Pannerup Madsen was her boss, while defendant Sven Nielsen was in charge of her training. She worked with Sven Nielsen until January 2016 and performed both case processing and entry into the 3S system. She does not remember using Sven Nielsen's passwords, but it cannot be ruled out that it happened at the

beginning of her employment.

When the notes she took in connection with her training at the dividend office say "Applicant's name - use name file", it means that you had to use the spreadsheet that was included in the application, which you had to copy from. In the "Address" field, you wrote the address, if you had it. The most important thing was to write the country code in the address field. It could well happen that the name of the bank was written, but only if it was a Danish bank. The bundle numbers were generated automatically by the system, but applied to the application preferably by the case workers.



Personal relationships

In this case, defendant Sven Jørgen Nielsen has been detained from there

SKSK00362949-0020
SKSK00362949-0001

**MTKC24/820.2/20**
SKSK00362949-0001_TT
SKAT_MDL_001_00850317

Defendant ▮▮▮▮▮▮▮▮▮ has been detained in the course of the present proceedings from
on ▮▮▮▮▮▮

Reasons and decision of the Court of First Instance

The question of guilt

Ratio 1

On 31 March 2016, during a search at the premises of defendant
Sven Jørgen Nielsen, a letter dated 24 July 2007 and addressed to
▮▮▮▮▮▮▮▮▮▮▮▮ defendant was found.
Nielsen, among other things, appears:

> "Skattecenter Ballerup has processed your application for reimbursement of
> dividend tax.
>
> The amount that can be refunded amounts to DKK. ▮▮▮▮▮▮▮ and will shortly be
> transferred to your account number xxxxx with Griffon Bank.
>
> Skattecenter Ballerup regrets the long turnaround time and the inconvenience
> this may have caused you."

Along with the letter was found a sheet with a list containing a number of
information relating to accounts with Nordea Bank Danmark A/S, Bankas
Snoras (Lithuania) and Griffon Bank Limited (Commonwealth of Dominica).
The list also included account information relating to ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮



SKSK00362949-0021
SKSK00362949-0001
SKSK00▮▮▮▮▮▮▮▮▮▮

**MTKC24/820.2/21**

Confidential

SKAT_MDL_001_00850318

Defendant Sven Jørgen Nielsen has explained with regard to the processing of applications to SKAT for reimbursement of dividend tax in 2007 that he was responsible for the vast majority of this tax and that it was probably he who on 27 August 2007 between 7.42 and 8.02 made the entries in the case processing system 3S that led to DKK being paid to Bankas Snoras in Lithuania with a settlement date of 12 September

████████ 2007. Defendant Sven Jørgen Nielsen's explanation is supported by the fact that the entries in 3S were made using defendant Sven Jørgen Nielsen's employee number, and by the explanations about the case processing in SKAT in 2007, which were otherwise given during the 2007 tax administration.

gene.

It appears from the entries made in the case processing system 3S on 27 August 2007 between 7.42 and 8.02 that they were made on the basis of applications for reimbursement of dividend tax received from SKAT on 25 April and 25 May 2007 respectively. However, it has not been possible to present the applications during the proceedings, as SKAT has stated that they are regarded as accounting documents and are therefore generally disposed of after 5 years.

As Bankas Snoras went bankrupt in 2011, it has not been possible to fully map the cash flow of the September 2007 disbursement of the ████████ DKK from SKAT to Bankas Snoras. However, it is clear from the documents before the Court that the amount was recorded by the bank as having been paid in favour of: ████████ and it is clear from the documents before the Court that large sums were subsequently paid out from the account of Bankas Snoras at the request of either ████████ ter Griffon Bank, which, according to the defendant's ████████ own statement, was the bank of ████████ Griffon Bank went After the defendant ████████ Explanation bankruptcy in 2012.

According to the prosecution's calculations, in a case where the entire amount paid in ████████ dividend tax in Denmark is to be refunded, the payment of an amount of just over DKK 1 billion in dividend tax would have required the holding of dividend-bearing shares amounting to more than DKK 1 billion.



In that regard, it should be noted that, following the evidence given in the course of the proceedings before the tax authorities, it must be assumed that the payment of a refund of dividend tax required both a countersignature and two signatures.

SKSK00362949-0022
SKSK00362949-0001

**MTKC24/820.2/22**
SKSK00░░░░░░░░-0001_11

Confidential                                                SKAT_MDL_001_00850319

and that the absence of a countersignature or the signatures of the accounts would have prevented the amount from being paid out.
Les,

Against this background, the court finds that both defendants are guilty of fraud as detailed in Count 1 of the indictment and that in no case should the limitation period for the offence be calculated from a date prior to 27 August 2007.

The defendants are therefore found guilty of the facts of the case 1.

Fact 2 After

what has been stated above regarding fact 1, the court finds it proven that defendant Sven Jørgen Nielsen has abused his position as a caseworker at SKAT as described in more detail in relation to the indictment 2.

The defendant Sven Jørgen Nielsen is therefore found guilty of the facts of the case 2.

Ratio 3

Neither on the basis of the defendant's own testimony nor of the explanations otherwise given during the proceedings, it can be assumed that the sums paid b▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇defendant Sven Jørgen Nielsen are payments for consultancy work, loans or customary gifts.

Against this background, and in the light of the facts stated in relation to fact 1, the court finds that the amounts were wrongly received by defendant Sven Jørgen Nielsen as described in detail in fact 3 of the indictment.

In view of the continuity with which payments from the▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
The defendant Sven Jørgen Nielsen has been committed, and given the uniformity and internal coherence that exists between them, the offence must be regarded as a continuing crime, so that no part of the criminal liability in this regard is

obsolete.

The defendant Sven Jørgen Nielsen is therefore found guilty on the facts of the case. 3

## Sentencing

The sentence for defendant Sven Jørgen Nielsen is fixed at imprisonment for 6 years, cf. section 279 of the Danish Penal Code, cf. section 286(2); section 155, second sentence; and section 144.



SKSK00362949-0023
SKSK00362949-000*
SKSK00362949-0001_11
Confidential

**MTKC24/820.2/23**

SKAT_MDL_001_00850320



The punishment for the ██████████████ is fixed at imprisonment for 5 years, cf. accused section 279 of the Penal Code, cf. section 286(2).

In determining the sentence, the court took into account the exceptional gravity and extent of the offence, including the enrichment which ████████████ scar obtained by the crime.

Disqualification and confiscation



The Court is hereby adjudicated:

Defendant Sven Jørgen Nielsen is sentenced to 6 years in prison.

The defendants confiscate ██████████ Kr.

Defendan ████████████ punishable by imprisonment for 5 years.

The defendants confiscate ██████████ Kr.



SKSK00362949-0024
SKSK00362949-000ⁱ
**MTKC24/820.2/24**
SKSK00╓╓╓╓╓╓-╓╓╓╓_ⁱⁱ
Confidential                                SKAT_MDL_001_00850321



judge

The transcript is confirmed, Glostrup
Court, 7 December 2017



retsassessor

SKSK00362949-0025
SKSK00362949-0001

**MTKC24/820.2/25**

SKSK00362949-0001_11

SKAT_MDL_001_00850322