# Exhibit 3

CERTIFIED TRANSLATION



# THE DANISH SUPREME COURT'S JUDGMENT

### delivered on Thursday 1 September 2022

---

**Case no. BS-26376/2021-HJR**
(First division)

A
B
C
and
D
(Attorney Ole Spiermann for all)

vs.

The Disciplinary Board of the Danish Bar and Law Society (Advokatnævnet)
(Attorney Martin Simonsen)

Intervener in support of A, B, C and D:

The Association of Danish Law Firms (Danske Advokater)
(Attorney Torben Bondrup)

Intervener in support of the Disciplinary Board:

The Danish Ministry of Taxation
(Attorney Boris Frederiksen and Attorney Steffen Sværke)

and

**Case no. BS-26377/2021-HJR**

E,
B,
A,
C

2

and
D
(Attorney Ole Spiermann for all)

vs.

The Danish Ministry of Taxation
(Attorney Boris Frederiksen and Attorney Steffen Sværke)

In a previous instance, the Danish Eastern High Court, 24th division, gave its
ruling on 23 June 2021 (BS-57859/2019-OLR and BS-10276/2020-OLR).

Six judges ruled in the case: Henrik Waaben, Hanne Schmidt, Oliver Talevski,
Anne Louise Bormann, Kristian Korfits Nielsen and Jørgen Steen Sørensen.

**Claims**
The parties have reiterated their claims.

**Supplementary statement of facts**
E's final legal opinion of 4 August 2014 states, i.a., as follows:

> "*4. Assumptions*
>
> For the purpose of the Opinion, we have assumed that:
> …
>
> 9. The contemplated transaction was not structured by F;
>
> 10. F will perform the role of the securities custodian, but no other role,
> e.g. assisting in the reclaiming of Danish withholding tax on the
> Equities, and F carry out its role as custodian in relation to the
> contemplated transaction in accordance with its standard procedures
> which are in line with normal procedures for custodian banks in
> general;
> …
>
> 12. F has been requested to perform the role of the custodian;
>
> 13. F has no reason to assume that or information or knowledge about
> whether or not a person or entity other than USPF will file for a tax
> reclaim with respect to the dividend withholding tax withheld on the
> Dividend paid on the Equities.

*5. Opinion*

Based solely on our understanding of the facts outlined in Section 3 and the assumptions outlined in Section 4 above, which we have conducted no separate examination or verifications, and subject to the qualifications set out in Section 7, we find that:

5.1 F will not be subject to Danish tax liability as a result of the contemplated transaction.

5.2 F should not be subject to Danish civil law liability to compensate the Danish state for any loss suffered as a result of its role in the contemplated transaction.

The following circumstances, however, prevents us from reaching a more definitive opinion on the position of F:

1. The fact that USPF in the Forward Transaction enters into OTC forward contracts (and not e.g. listed futures) to hedge their position could in principle allow for a "perfect hedge" of USPF's position in the Equities, which eliminates ownership risk, and could arguably also point in the direction of another identified party assuming such ownership risk, which could then be considered the beneficial owner of the dividend received on the Equities, rather than USPF. This would arguably entail the possibility of an arbitrage identifiable to F in which the standard documentation of ownership issued by F could be misleading in a manner known or suspected by F.

2. The fact that a tax opinion has not been obtained by USPF (or F on the exact transaction carried out by USPF (the tax opinion assumes futures and not OTC forward contracts) would make it more difficult for F to claim that it has by definition acted in good faith (and thus not culpable) on the Danish tax treatment of the transaction, which by a professional party may reasonably be assumed to contain issues in relation to ownership of the Equities.

3. The cases concerning sale of "empty" companies outlined in 6.2.1, below, have demonstrated the willingness of the Danish tax authorities and the Danish courts to place liability for losses suffered by the tax authorities with other parties involved in the transactions triggering the loss when the transactions are deemed to have a questionable nature. In light thereof, it is not certain how the Danish tax authorities would perceive the contemplated transaction over the Equities and, if deemed questionable, how the Danish court system would respond.

However, even if deemed questionable, it is our view that the role of F in the contemplated transaction is not comparable to the role of the parties held liable, including the banks, in the "empty" companies cases, which were more severe and instrumental in relation to the loss suffered by the tax authorities.

5.3 F should not be subject to Danish criminal liability as a result of its role in the contemplated transaction."

In its judgment of 28 April 2022 (BS-26436/2020-OLR), the Eastern High Court found for E in a case brought by the Danish Customs and Tax Administration on liability for damages in connection with the advice given to F. The judgment has been appealed to the Supreme Court.

New exhibits have been presented to the Supreme Court, including an e-mail of 10 October 2016 from a German tax authority (Finanzamt für Steuerstrafsachen und Steuerfahndung Wuppertal) to the Danish tax authorities, SKAT. The Danish translation of this e-mail states, i.a.:

"Our office has information on Cum-Ex transactions carried out through a German bank as custodian.

The following Danish shares have been traded over the dividend registration date:
…

We also have statements from the law firms E, Copenhagen, and G, confirming that the German bank has acted lawfully.

The transactions were carried out exclusively in 2014. However, it must be assumed that similar transactions were also carried out in 2015. US Pension Plans have requested a refund of the Danish dividend tax.

The names of the relevant pension plans and additional material are available in our office and may be disclosed if interested."

In 2012, the Association of Danish Law Firms published a guide on legal investigations. This guide states, i.a., as follows:

*2.2.1 General legal investigation*
The purpose of a legal investigation is to ensure a quick and effective investigation of a given course of events for the applicant and – if desired – also an assessment of whether there are grounds for initiating legal action against any of those involved.

For such general legal investigations, there will be no special requirements for the investigator's impartiality beyond what follows from the legal ethics rules at any given time. Hence, the attorney will be able to investigate an undertaking to which he or she is an adviser, carry out the investigation without contradiction and also carry out a confidential investigation for the applicant. The attorney will also be able to conduct any subsequent legal proceedings against the persons concerned on behalf of the principal.

### 2.2.2 Legal investigations by outside attorneys
The purpose of a legal investigation by an outside attorney is to carry out an impartial and objective investigation and assessment of whether there are grounds for initiating legal action in a specific case.

The criteria for when an investigation is a legal investigation by an outside attorney are:

1. Ensuring the attorney's independence before and after the investigation. The applicant must therefore not have an established client relationship with the attorney or another attorney from the same law firm, cf. the legal ethics rules. The attorney and attorneys from the same law firm are also not allowed to take on legal tasks for the applicant while the task is being solved and may not subsequently handle cases suggested by the investigation.

2. The investigation should be based on written terms of reference. The terms of reference should specify the investigator's mandate, the required framework, any timeframes, etc.

3. Ensuring that the attorney as an investigator has access to all written material relevant to the investigation, such as e-mail correspondence.

4. The parties concerned must be allowed contradiction in relation to the facts and, where appropriate, also in relation to questions of a legal nature before the investigation is concluded.

5. To the extent that the investigation report is intended to be published, the terms of reference should be published at the same time as the conclusions and recommendations of the investigation are published, at the latest.

6. The conclusions of the investigation are made available to those concerned at the same time as the publication, if any, at the latest.

      7.   The investigation should conclude with assessments and possible recommendations, but should not present itself as a decision."

**Supplementary statements**
C and V7 have given supplementary statements before the Supreme Court.

<u>C</u> has supplementarily stated, i.a., that he cannot confirm his full statement before the High Court and that he wishes to supplement and elaborate on the statement.

The news about the Panama Papers broke around 5-6 April 2016, giving rise to an internal investigation in E to find out if any of the attorneys were connected to the Panama Papers. V7 sent an e-mail to all the partners, asking if anyone had connections with Panama Papers. No one had been connected with the companies mentioned in the Panama Papers, but one partner did mention H, and that he may have provided advice to I while he was a partner in E, i.e. by the end of 2009 at the latest. Against that background, V7 searched H's case list on I with no hits. They extended the search to see if similar advice had been given to others. V7 searched more broadly for, i.a. "stock loan" or (in Danish) "aktielån", and something emerged in this connection.

He was aware that, in the course of its general supervisory duties, the General Council of the Danish Bar and Law Society (Advokatrådet) asked H for a report and H gave such a report. At the end of April 2016, H made a post on LinkedIn, telling that the General Council had received his report, considered it and closed the case without criticism. He does not remember if he saw H's report to the General Council.

V7 sent an e-mail, stating that he had searched for content or words such as "stock loan" instead of names. The e-mail contained a list of 13-14 cases with case numbers and client names. Two cases were highlighted in yellow and legal opinions on these two cases were attached. He did not know how the two highlighted cases had been selected. He was asked to review the list and therefore read the two attached legal opinions. The framework was that, partly on the basis of the Panama Papers, partly on the basis of rumours of H's advice, they would investigate their risk, in any. There were no specific cases or claims for damages. It was general risk management for a specific reason. His role was to relate to V7's information. He was not involved in the organisation of the investigation. The reason why V7 focused on stock loans was that there had been certain information about I and the general nature of what had happened with regard to H.

I had prepared two legal opinions in cases in which H was responsible at the time. He was not himself aware of the content of the legal opinions in question. Together with V7 and J, he talked to K, who explained the relevant kinds of advice and transactions. K stated that he was updating a legal opinion which he had previously given to a client himself.

K stated that the two legal opinions prepared by H were representative and he was therefore not interested in the other cases in the e-mail from V7.

He was aware of the new recommendations on cross-border tax advice. K was a tax expert and he himself had more focus on compliance than the tax partners and therefore wanted to see the final legal opinion to ensure that it reflected the new guidelines. Having reviewed the legal opinion, he agreed that it was as it should be and he sent it back to K. He can confirm his statement in the High Court judgment that there was nothing to latch on to in relation to the advice. As regards the updated legal opinion, K had to ensure that the factual basis was up to date to ensure that it was in line with the recommendations. K was an expert and the right person to discuss the advice with. They looked at H's two old legal opinions and K's latest, updated legal opinion.

He did not like that type of advice, but it was within the legal framework and recommendations, as they found that it was unproblematic to view the parties involved as beneficial owners and that they were therefore entitled to a dividend tax refund. However, he did not like advice on the type of activities that were not business-oriented but only given in relation to financial transactions. He looked at it from a society point of view and did not think that the public would like it either. There was a press risk that he discussed with V7 and J, but they agreed that it was what it was. Meaning that E continued with the advice as previously. There was nothing new. He does not know if the others were talking to anyone else in E.

The recommendations on cross-border tax advice would apply even if they were not written down. They were not restrictive in relation to advice already given. They merely stated explicitly what was already in force. There was nothing else for E to do in the light of the recommendations. According to the recommendations, this type of advice could be given, but attention should be paid.

In connection with the investigations in the spring of 2016, he participated in a meeting with V7, K and J. There was also a separate process between him and K on the updated legal opinion. He discussed the advice in general with V7 and J. They concluded that the advice could continue. There was nothing fishy going on. He merely worried more about bad press than the others. There was no discussion of the possibility of fraud. Otherwise, they would have investigated it even further. E would not have been able to continue giving advice in case of suspected fraud unless fraud was 100 % disproved. No one had that thought, or the advice could not have continued.

In its grounds, the High Court refers to advice on complex models in such a way as to give the impression that it is remarkable advice, and he does not agree with this.

The advice given to F e.g. relates to a complicated process, but not everything that is complicated is suspicious. Many cases are complicated. V1 felt comfortable giving opinions as he had that under control, and K did not think it was complicated as it was his area of expertise. Things are not suspicious just because others find them complicated.

He did not see the legal opinion on F until October 2018. He cannot remember if he read H's tax opinion in the spring of 2016. There was press coverage about the opinion in question, but the case ended with the General Council refusing to pursue the case.

In relation to the tender at the end of 2016, there was an investigation of SKAT's and the Ministry of Taxation's handling of dividend tax refund requests. It was an administrative investigation. The investigation itself did not concern tax law and criminal law. This was supplementary. E did not narrow the scope of the investigation in relation to the terms of reference. They assessed what they should investigate and presented this to the Ministry of Taxation which had no comments at the mid-term meeting on 11 August 2017 and in a draft report submitted for consultation to the Ministry of Taxation.

He was surprised that the conclusions of the Legal Adviser to the Danish Government, Kammeradvokaten, concerning furloughed officials should be taken into account. These persons were key to the process. This was peculiar as the focus of the investigation was the handling by the authorities and the behaviour and reaction of the individual employees. It was suspicious to use your own attorney's assessment of key issues when you wanted an independent legal investigation. According to the terms of reference, a new assessment required new material, but E had the same material as the Legal Adviser to the Danish Government, Kammeradvokaten, since no interrogations were made. E had nothing to add to the material from the Legal Adviser to the Danish Government, Kammeradvokaten, as regards the repatriated senior employees, and this also limited the assessment of some of the other employees.

In her statement to the High Court, A stated, i.a., that E made employment law assessments concerning 14 persons of which eight were affected by the investigation made by the Legal Adviser to the Danish Government, Kammeradvokaten, and she did not agree that there were free upward reins. He agrees with that description.

He did not mention the dissatisfaction that they had to rely on the conclusions made by Legal Adviser to the Danish Government, Kammeradvokaten, at the meeting with the Minister of Taxation and the tax rapporteurs, as the investigation had been concluded at the time. The politicians knew the terms of reference as they had adopted them themselves.

He believes that it was natural that the Ministry of Taxation, during the tender, would not name suspected persons or companies. No one knew what a suspicion would lead to. He understands that they did not want to disclose the names to an unknown number of bidders.

He wondered about the question, as they could obviously not be disclosed. But he also wondered about the answer that the bidders themselves knew who they had given advice to, and he found it arrogant. No names were disclosed to the bidders for them to conflict check, and they had to rely on the legal ethics rules. This means that they should reasonably protect themselves against conflicts of interest.

With regard to the competence requirements in Clause 1.3. of the tender notice, E must not be connected to the Ministry of Taxation, SKAT and the persons who were to be investigated. It was also stated that they should not be connected with the parties involved in the suspected fraud. They considered this based on publicly available information on the companies involved. V7 searched Google and looked up names that he found on the Internet, and there were no hits. The conflict check in January 2017 consisted of name searches and discussions with the tax partners in E. It was not usual for them to make the list themselves. The picture of the parties was very vague. They searched as much as they deemed necessary and practicable. They were not worried. F was not publicly mentioned in the conflict check in January 2017. He was not aware, at the time, that only a limited number of persons in the Ministry of Taxation knew the contents of the police reports. E did not know who had been reported. It was mentioned that SKAT had gone directly to the Danish Public Prosecutor for Serious Economic Crime. SKAT knew the names.

In relation to the subject of the investigation, their instinctive view was that a search for relevant words would yield so many hits that it would be impossible to achieve within the deadline. In relation to the systematic search referred to in the High Court grounds in cases in E's tax department attorneys had provided advice to international clients on the transactions and banking services indicated, it is much easier knowing what you know now and looking back.

They did a search now for the period 2010 to 2017. They have now searched for the following English words: "dividend tax", "withholding tax" and "dividend withholding tax". There are well over 4,000 documents on each of the English search words in the system now. There is probably an overlap where several words appear in the same document. The documents consist of approx. 2/3 e-mails and 1/3 documents (Word, PDF, PowerPoint etc.). Approx. 1/5 of the documents have been deleted since 2017, so there would probably have been 5,000 documents for each search word at the time. He does not know how many cases the documents cover. The easiest outcome of a conflict check is if you find something, because then you stop. As long as you do not find anything, you have to keep going. For the Danish search words, they found between 4,000 and 10,000 hits per word. He does not know whether the search would find all cases but merely notes that the words are mentioned in these documents. This would probably cover most cases, but he does not know for sure. As far as he remembers, E does not have a case category called dividend tax.

In relation to the grounds of the High Court that the information in the cases found in connection with the systematic search should have been assessed, they should in such case have read through the documents and assessed whether it was fraudulent. He does not think it makes sense, as no one in the company would have submitted an opinion that would have involved fraud. Broadly worded, fraud indicates a criminal offence. All attorneys give advice on applicable law limits so this would be what they found and not something criminal.

A conflict check involving system searches usually discloses the names of parties and counterparties etc. and can be done by anyone, whereas an assessment of the information in the cases requires people with a high degree of tax law expertise. The tax department controller could not have investigated the cases as foreseen in the grounds of the High Court, as he was not a lawyer. Using the High Court's grounds, such check could only have been made by a lawyer with tax knowledge. He now finds that they would not have been able to do this by the tender deadline. He does not think that the deadline was discussed in 2017. He confirms his statement before the High Court that they did not consider the possibility of investigating all dividend tax advice cases in 2017. If they were to submit, e.g., 4,000 documents to a legal investigation and assessment, a mere five minutes per document would correspond to about 1/3 of the time allocated to the actual investigation. He finds that it would not have made sense to investigate so many hits. In 2017, they briefly considered searching for terms but immediately rejected it as it would give too many hits. You could always have done something else if you had had the idea, such as asking the tax attorneys to narrow down possible dividend tax cases.

The Public Accounts' Committee's 2016 report mentions an early warning of the risk of unlawful refunds from July 2015. He remembers reading it and thinking that the legal opinions that he had seen in the spring of 2016 were about stock loans, and that he was pleased to note that the Ministry of Taxation also did not believe that this was a case of fraud. The advice was irrelevant to the conflict check, as it was not covered by the investigation. In its communication with the national audit office, Rigsrevisionen, the Ministry of Taxation flatly denied that advice on stock loans was fraud and the Ministry of Taxation did not repudiate the former assessment in the tender documents. He was aware of Rigsrevisionen's observations, but Rigsrevisionen was not the principal.

E did not disclose that they had advised a participant in the alleged fraud, as they did not know. They considered it to be out of the question. They did not know about the police report which mentioned F.

The fact that, in connection with the submission of the bid, they disclosed that they had experience in assessing and preparing legal opinions did not give rise to considerations in relation to qualification, as this was competence

information from the tax department. If you give an opinion, you have understood, and then it is not complicated. He did not imagine that they entailed a risk of conflict. If they had thought that their competences prevented them from bidding, they would not have done so. They did not carry out investigations in connection with the competence information.

From B's statement before the High Court, it appears that it was natural for him to carry out conflict checks and that he asked B if they had reason to believe that they had advised any of the fraudsters, which B refused. He can confirm that description.

In relation to the communication with the tax department, this was not a formalised decree on carrying out conflict checks. Everyone in the tax department talked about the tender, and those in charge of the conflict check spoke to the tax department. This was another form of communication than a tip.

According to V4's statement before the High Court, he stated, i.a., that he was told that the most thorough conflict check in the history of the company was carried out. He would not have used this expression himself, but the conflict check was significantly wider than usual. They always make an effort but here, they made an extra effort.

He can confirm the description of the content and access to the secret part of the Sharepoint system as explained in his statement in the High Court's judgment and in E's attorney's report. The documents came from SKAT and the Ministry of Taxation. There were no other sources. He participated in two or three physical meetings with SØIK, the Danish State Prosecutor for Serious Economic and International Crime. The first meeting was before he was given access to the secret part in which SØIK explained the background for the lack of access. They did not receive information from SØIK, but they were informed that the documents in SØIK's possession had nothing to do with what they were looking into.

He did not wonder why all the police reports were not in the secret part of Sharepoint. He was not interested in the police reports. He was interested in the timing of applications received, processing and payment. He focused on when they should have responded. Therefore, he focused on Excel sheets with dates and amounts for the applications to find out what had run through the system in the summer of 2015 after SKAT should have responded. He had no interest in the criminal qualification as this was not their task. They were to keep away from this. The assessment of administrative liability does not require knowledge of who had requested a refund or exactly how they received it.

They responded to media coverage of L as he was a key figure and very much of interest and relevance to the investigation. He wondered why the Ministry of

Taxation had not given them information about L already. Information about new fraudsters was not important, as they were not investigating the fraudsters and the fraud. They did not perform ongoing investigations. It was not relevant to set up media monitoring, as the fraudsters were not the subject of the investigation.

They were told that they would get all relevant material from SKAT and the Ministry of Taxation, but E did not know the organisation in advance. They therefore held a meeting with SKAT and the Ministry of Taxation to get an overview. In that connection they were given organisational charts and a list of employees. As names appeared, they obtained employment contracts to assess responsibilities and possible misconduct. They asked for them on an ongoing basis and also information about L. They did not ask for anything further; the rest was there. The fact that information relating to L was not available did not raise doubts as to whether they had the full material for the investigation. SKAT and the Ministry of Taxation would make all relevant material available. They took that into account.

In relation to his statement before the High Court that the description of the fraud in the attorney's report was kept in general terms, he thought about the information on the activity in SKAT. They did not have information about the fraud. There was no description of what had actually happened. They were interested in the process in the summer of 2015 to see if those involved did enough, but they did not focus on the actual requests. They did not have to deal with the criminal law part as this was SØIK's responsibility. Focus was on the aggregated information, amounts, number, increase, etc.

He agrees that the terms of reference set the framework for E's investigation. Before the High Court, he stated how reimbursement was made at SKAT, including that they had chosen not to use the official maxim. There was no note on the working method but they could see that this was how it was done. It was evident from the previous investigations and from e-mails, minutes of meetings and correspondence between SKAT and the Ministry of Taxation. Similar descriptions in the previous studies were confirmed by the available material. They did not see the documents used in connection with the refund requests. They had received the information via internal e-mails in SKAT and original minutes. They did not look at how the payment had in fact been made as they did not have and did not request the actual applications.

He can confirm his statement before the High Court that it would not have made a difference if they had paid attention to the advice to F when submitting the bid in 2017. This was not a problem as it was advice on a lawful activity. If they had paid attention to the advice, he would probably have conferred with B who would have confirmed that it was advice on a lawful activity. He would not have known whether advice on possible liability was customary and he would therefore have asked B.

The High Court in its grounds, referring to his statement, states that when submitting the bid, E would have reacted to knowledge of the advice given to F. This is not in line with what he actually stated. He stated the opposite, namely that they would not have refrained from bidding. He agrees that they would have found the advice to F in a search of terms, but they would have assessed the advice and found it to be lawful. Since it was not relevant to the investigation, they would not have refrained from bidding and they would not have informed the Ministry of Taxation about it.

The investigations in April 2016 consisted of a search of H's case portfolio. There were no written traces after the investigation. There were probably some internal e-mails, but no minutes or the like. In connection with the conflict check in 2017, V7 gave him articles with highlighted names in a dossier. When he was done, he returned it. He does not know if V7 still has the articles.

V7 has supplementarily stated, i.a., that he cannot confirm his full statement before the High Court and that he wishes to supplement and elaborate on the statement. He is no longer employed by E.

He can confirm his statement before the High Court about the project regarding streamlining and professionalising compliance in E. He also maintains his statement that he is not aware of an automated system with the possibility of conducting ongoing conflict checks. At E, the conflict of interest rules are designed so that a conflict check is carried out in the event of new parties. E continuously relates to new knowledge in the form of new cases or new parties in existing cases, e.g. new information about officials involved in the dividend case. E could have done a manual conflict check along the way in the event of new information.

In connection with conflict checks, it is common practice to obtain lists from the client with names and company structures that can be searched for in the client and case system. When setting up in the system, parties, counterparties, attorneys and ownership structure must be indicated.

He maintains, as stated before the High Court, that E is above par in terms of compliance and conflict checks. This was true in 2017 and still is today. This was confirmed externally by suppliers of systems, including the supplier of E's system, and when sparring with competitors. E was often asked to participate in committee work on compliance in the legal profession.

The basis for the searches in March and April 2016 was found in articles about I. He used "I" and "M [company]" as search words and no other search words. They searched both the client and case system and the full document database. They usually do not do this, except in the event of a very specific search, as the document database has more than 30 million documents.

A wide search, e.g. using the search word "stock loan", would generate a lot of hits which would then have to be reviewed manually.

When they did the searches in the spring of 2016, they wanted to be sure that they had nothing involving I. At the time, he had not seen a legal opinion prepared by H which was mentioned in the articles. In connection with the media review, the General Council had asked H for a report. He saw H's report to the General Council or mention of it. He wrote to business connections and former colleagues, explaining the content of the report, probably with the report to the General Council attached. C and J also saw H's report to the General Council, but he does not remember if anyone else had seen it. H used the word fraud but he does not remember if he used the word forgery.

We was aware that industrial investors were mentioned in H's report to the General Council. Stock loans and legal opinions were also mentioned. The report gave rise to further searches based on H's cases. He made the list of search words in that connection. There were rumours about H's advice during his time with E. On that basis, they searched for, i.a., "stock loans". H left E around 2010. As his search only involved H, the search related to the period before 2010. The search probably went back to 2007, but he is uncertain about the start time. Before 2010, when H left E, the case list had less information, as the old system was used.

He sparred with C and found 14 cases from H's case list that related to industrial investors and stock loans. He selected two cases which in addition to stock loans also referred to "Danish pension funds" in the subject field and which contained legal opinions. The two cases served as a sample and he asked C to look at them. He does not know whether C reviewed the additional 12 cases, but he saw the list of all 14 cases and could have selected more for review. He does not know whether there were legal opinions in all cases. He did not consider whether the two legal opinions were true and within the framework of legal opinions. He did not read them himself. He merely recovered them and asked C to take a look at them.

Based on the review of H's case list, they contacted K. K stated that he was working on a typical example of a legal opinion at the time. The discussion with K in the spring of 2016 was based on the relevant legal opinion that K was working on with a view to providing future advice. Before the meeting, K said that the two legal opinions from H's case list were covered by the advice he was currently investigating and it was therefore easier to review the current legal opinion.

He participated in a meeting with K and C at which they reviewed the specific legal opinions and also discussed the new recommendations on cross-border tax advice from 2014. C and K discussed both the specific content of the legal opinions in question and the nature of the advice.

It was not a conflict check. K said that all the legal opinions in question were within the rules. K was clearly the right person to discuss the matter with in the light of his experience. At the end of the meeting, he and C were reassured and after the meeting, K submitted the most recent legal opinion. He did not consider any further sampling necessary. There was no discussion of stopping advice in this area, but they did discuss keeping abreast of recommendations and developments.

In connection with the tender for the legal investigation, at the end of 2016, the tender was still being reviewed to find out if E should make a bid. In this connection, a general conflict check was carried out at the time when the case was created, and he was not a part of this. It followed the general guidelines for preparing a bid. He was on the sidelines in relation to preparing the bid.

In January 2017, before E submitted the bid, he repeated and expanded the conflict check. The more thorough conflict check meant that they made their own list of who to search for and then searched for the names in all systems, i.e. both the systems they used in a normal conflict check and in the full document system. He described this as a full search. There were no hits. They also searched in relation to the Ministry of Taxation, SKAT and relevant officials.

He searched Google with the search words "I" and "M [company]" and quickly found several associated names such as "N Bank". He printed the articles and searched for new names mentioned in the articles. Many names were mentioned which had a weak or no connection with I. He did not know if this was the full network. He searched to find information for a conflict check. It was a full picture of the information he was able to find at the time. The background for the search in January 2017 was that they had understood that they must not have advised persons involved in the dividend case and therefore, he searched for publicly available information. The Google searches in January 2017 had nothing to do with H or the list from the spring of 2016. They were based on publicly available information on the dividend case.

In the period leading up to the tender, discussions were held with the tax partners. Everyone knew that the tender was coming and was aware that E had to position itself as best possible. V4 participated in the group that worked on positioning before the tender. He received the tender documents when they arrived. The tax department chose B as the tax partner for the tender.

According to V4's statement before the High Court, V4 was told that the most thorough conflict check in the history of the company was carried out. He can confirm that description.

According to B's statement before the High Court, C performed the conflict check as the person responsible for the case, and B did not know whether C had spoken to partners other than himself. However, according to B's statement, everyone knew that E would bid on the investigation, and "no one raised their hand". He can confirm that description.

He and C did not focus on legal opinions in the January 2017 investigations. He cannot confirm that there were 10 legal opinions on dividend tax a year. According to B's statement before the High Court, there was a decreasing number of legal opinions on dividend tax after 2016. He can confirm this. There were hundreds of cases with legal opinions back in time in this area. Numbers were clearly decreasing after 2016. For the entire firm in all areas of law, E has made thousands of legal opinions over a 10-year period.

In its grounds, the High Court refers to a systematic search of cases in which attorneys in E's tax department had given advice to international clients on the stated transactions and banking services. This would require a list of the parties involved. International cases accounted for about 20% of E's business and in the areas of transactions and banking services, there would be many cases and significantly more documents and e-mails. They would not only use the case card but would need to use the document system itself. This was not possible to review. He does not know whether international cases accounted for 20% in the tax area.

They tried to make a retrospective search after receiving the Minister of Taxation's letter in October 2018. Here, they searched for, i.a., "withholding tax" and they also searched the document database. Searches on the specific names were uncovered in 2016 and 2017. If they were to search for words that they knew would have given hits at the end of 2018, they would have had an unusual number of hits on both cases and documents, regardless of which relevant terms they used, e.g. "withholding tax" or "stock loans". He cannot say exactly how many hits, but it would be thousands. He could not have done anything different in January 2017. He considers that they would not have been able to process the search result within the deadline, even with further assistance from e.g. the tax or finance department. An assessment of the cases found in a systematic search would have required many weeks of work. It would have been a review of Word and PDF documents, e-mails, attachments, drafts in several versions and final advice. It would have been a lot of information. They would have had to search widely to find all aspects, as they did not have a list.

The conflict check in January 2017 was discussed with the tax department. There was no reason to believe there was something to latch on to. The name F was not disclosed by the Ministry of Taxation, and they did not find it in the articles, so they could not search for it. He can confirm, as stated before the High Court, that in January 2017, E overall did much more than was normally required and that he could not think of anything else they should have done.

In October and November 2018, after receiving the Minister of Taxation's letter, E spent several weeks reviewing the cases with F. He does not know exactly how the review was organised, including whether there was a legal assessment. He can confirm that E received the letter from the Minister of Taxation on a Monday and responded the first time on Friday. The review of the cases with F was initiated by the request from the Minister of Taxation but was only performed when they had responded to the Minister the first time.

If they had had F's name in January 2017, it would have generated hits. A search for "F" would not have generated hits, as the company was not indicated using this abbreviation. However, they did not have the name at the beginning of 2017 but only at the end of October 2018 upon receipt of the Minister of Taxation's letter. Nor did he come across the name when searching on Google. They were confident in their search.

The investigations in the spring of 2016 and January 2017 did not leave traces of writing in the form of notes. There were only e-mails, including the final legal opinion from K in the spring of 2016. As far as he recalls, the investigations did not end with a written report. The results were mostly discussed at meetings, some of which he attended. The conflict check in January 2017 materialised as printed articles where all searched names were highlighted. These articles were handed over to C who was responsible for the case, and he then "signed" off on the case. A regular conflict check was not made until the end of 2016 followed by an extraordinary conflict check in January 2017, for which he was responsible. There were no written documents other than the articles, as there were no hits. Hits for review by the attorney in charge would often be the relevant documentation. As there were no hits, the conflict check was completed. It was not usual to investigate resigned partners as in the spring of 2016. As far as he recalls, there was no written report to the board or similar.

### Supplementary submissions
A, B, C, D and E have supplementarily stated that the conflict check that E should have carried out according to the High Court would be completely unrealistic. As a consequence of the High Court's requirements, the attorneys would de facto have to guarantee that there was no conflict of interest or risk of such, reflecting a rationalisation which is not in tune with what is practicable, cf. the Association of Danish Law Firms' submission before the Supreme Court. The dismissal of the claim against E in the case against the Danish Customs and Tax Administration for damages in connection with the advice given to F in 2014 also shows that even if the advice had been discovered prior to E taking on the legal investigation, there would not have been a conflict of interest.

In any event, the Ministry of Taxation has forfeited its right to invoke a possible conflict of interest. The tax authorities already knew at the time of the investigation that F was suspected of fraud involving dividend tax refunds and that E had advised the bank. This was stated in the e-mail of 10 October 2016

from the German tax authorities to SKAT. There must be identification between SKAT and the Ministry of Taxation and in any case, the Ministry of Taxation can be blamed for not involving SKAT in the assessment of whether E should conduct the investigation.

The Disciplinary Board has supplementarily stated that the High Court has laid down correct and reasonable requirements for conflict checks in a case such as the present one which is of a very special nature. The judgment of the High Court does not concern conflict checks in general and the grounds cannot be transferred to conflict checks in ordinary cases.

The Ministry of Taxation has supplementarily stated that the method directed by the High Court for conflict checks is practical and reasonable. The direction is based on the specific circumstances of the case and shows that E took on a task of a very special nature.

The dismissal of the claim for damages against E cannot lead to a change of assessment of the present case for the very reason that the judgment has been appealed. Furthermore, different assessments must be made in the two cases, as the damages case must be assessed on the basis of the knowledge of Attorney V1 in 2014, whereas the present case must be assessed on the basis of the knowledge of the attorneys in charge in 2017.

The Ministry of Taxation's conduct cannot lead the Ministry of Taxation to accept a possible conflict of interest for E. It is not possible to consent to the use of a disqualified attorney in an investigation of this nature. Furthermore, neither knowledge in the prosecutor's office or SKAT can be attributed to the Ministry of Taxation, and the e-mail of 10 October 2016 cannot otherwise be attributed importance.

**The justification and conclusion of the Supreme Court**

*1. Background and problem definition*
In March 2017, the Ministry of Taxation entered into an agreement with E to conduct an investigation by an outside attorney of the so-called dividend case. E completed the investigation in December 2017.

In October 2018, the Ministry of Taxation became aware that in August 2014 – i.e. before the said investigation – E had submitted a "legal opinion" at the request of the international law firm G as a representative of the German F. E's legal opinion included, i.a., advice on F's possible liability in damages and criminal liability as a custodian bank for US pension plans ("401 K pension plans") that wanted to recover dividend tax in Denmark. At the request of G, E followed up on the advice in 2015 and 2017.

In September 2019, F in the District Court of Glostrup accepted to pay a fine of DKK 110 million for violation of section 279 of the Danish Criminal Code (*straffeloven*), cf. section 286(2) (fraud of a particularly aggravated nature).

When accepting the fine, the bank acknowledged that it had, in the period 2014-2015, i.a. prepared incorrect documentation ("Dividend Credit Advices") for the payment of dividends from Danish shares which the bank's accomplices used, on behalf of US pension plans, to unlawfully obtain not less than DKK 1.1 billion from the recovery of dividend tax from Danish tax authorities.

Following a complaint from the Ministry of Taxation, the Disciplinary Board, by order of 4 July 2019, ordered the attorneys A, B, C and D, all from E, to pay a fine of DKK 10,000 for having disregarded professional conduct for attorneys by assuming the investigation, regardless of the fact that there was a conflict of interest as a result of the advice given to F. At the same time, the Board decided that E's claim for fee from the Ministry of Taxation should lapse.

The case concerns whether there are grounds for overruling the Disciplinary Board's decision.

*2. Disregarding professional conduct for attorneys*

*2.1. Legal basis*
Section 126(1), first sentence, of the Danish Administration of Justice Act (*retsplejeloven*) provides that an attorney must behave in a manner consistent with professional conduct. According to the second sentence of the provision, the attorney must perform his duties thoroughly, conscientiously and in accordance with the legitimate interests of the clients. The principle of professional conduct means, i.a., that an attorney must not perform duties for a client in cases where there is a conflict of interest for the attorney.

Certain legal investigations are referred to as being performed by an "outside attorney". According to the Association of Danish Law Firms' guide on legal investigations (2012), this means i.a. – as an intensification in relation to general legal investigations – that there is no established client relationship between the attorney in question or another attorney from the same firm and the person requesting the investigation. The Supreme Court finds that the term "outside attorney" does not entail stricter requirements for the attorney's independence in relation to other parties than the applicant, but intensified requirements may result, for example, from the nature of the case in question. An infringement of such requirements may involve an infringement of section 126(1) of the Danish Administration of Justice Act.

Attorneys conducting an investigation by an outside attorney must, in line with general requirements in relation to attorneys, reasonably protect themselves against conflicts of interest, cf. also para 12.1 of the General Council's legal ethics rules. The detailed requirements for such a "conflict check" must be determined, i.a. in the light of the nature of the case.

If the Disciplinary Board finds that an attorney has failed to comply with obligations arising from the Danish Administration of Justice Act, the Board may impose a fine on the attorney in accordance with section 147c(1), first sentence, of the Act. A breach of professional conduct requires that the error committed has a certain aggravation, and

it is a necessary but not sufficient condition that the attorney has personally acted culpably, cf. the Supreme Court's judgment. of 16 October 2014 (UfR 2015.60).

*2.2. Assessment of E´s independence (conflict of interest issue)*
As stated by the High Court, the political agreement of 16 December 2016 between a majority of the parties in the Danish parliament, the Folketing, meant that an investigation by an outside attorney of the dividend case should be initiated. As also stated, the case was of great political, economic and social importance, and the Supreme Court upholds that the special nature of the task entailed stricter requirements for the attorney's independence, including in relation to firms with possible links to the unjustified recovery of dividend tax. No importance can be attached to the fact that the investigation should not include an assessment of the legal liability of such firms.

As mentioned, E advised F, i.a. in 2014 and 2015 – i.e. the years leading up to the legal investigation in 2017 – on the bank's possible liability in damages and criminal liability as a custodian bank for US pension plans that wanted a refund of dividend tax in Denmark. In the same years, F contributed to fraud of a particularly serious nature, as the bank prepared incorrect documentation which was used to obtain from Danish tax authorities an undue payment of not less than DKK 1.1 billion in dividend tax refunds.

The Supreme Court then upholds that there was a conflict of interest when E in 2017 undertook to conduct the legal investigation. This is true even though it had not yet been established at the time that F was involved in the said fraud.

*2.3. Assessment of E´s conflict check*
It is not possible to establish in general what investigations an attorney must undertake in order to ensure that there are no conflicts of interest, as this, as pointed out, must be determined in particular in the light of the nature of the case.

In the present case, the specific nature of the task and the fact that E did not have information from the tax authorities on the names of persons or companies suspected of dividend fraud meant that significant requirements had to be imposed on the conflict check. The purpose of a conflict check was, i.a., to ensure, to a reasonable extent, that there were no cases from recent years in which E had provided advice on dividend tax to persons or companies involved in unlawful dividend tax refunds or where there was a not insignificant risk of this. In this connection, it must also be included that at the time of E's conflict check, it was publicly known that international companies had committed extensive fraud involving dividend tax refunds against the Danish authorities.

As stated by the High Court, it must be submitted that C and V7 as part of their conflict check – in addition to the sample survey carried out in 2016 –

took steps to uncover potential client relationships with E in relation to persons and companies which according to the Google search had been publicly reported in connection with the dividend case. As also stated by the High Court, C, according to his statement, also spoke to one or more attorneys in E's tax department to uncover possible conflicts of interest and it must be submitted that the attorney(s) in question expressed the view that there were no cases in the tax department that gave rise to concerns regarding competence.

C has previously stated before the High Court, i.a., *that* he does not "remember whether all the partners in the tax department were asked", *that* there "[were] no tips before assuming the task for the Ministry of Taxation that one or more of the partners in the tax department needed to clear if there were problematic cases" and *that* he would "be 'seriously' surprised if there was no talk in the tax department about the case." He has further stated before the Supreme Court that in relation to the tax department "there [was] no formalised decree to carry out conflict checks" and that there was "another form of communication than a tip".

In the light of the foregoing, it is not possible to determine precisely what conversations C and V7 had with attorneys in E's tax department in order to ensure that there were no problematic cases. However, it must be assumed that they did not, for example, ensure that all relevant attorneys in E were involved and made more fully aware of the stricter competence requirements that applied to the investigation so that in this light they could consider whether there were cases of this kind. The Supreme Court finds that such involvement would have been appropriate to find the case on F.

At least in the present circumstances where no investigations other than those referred to above were initiated, the Supreme Court finds that the aforementioned involvement of relevant attorneys in E was part of a conflict check to a reasonable extent and that the conflict check was therefore not sufficient.

In assessing whether C – had he found the case about advice to F – should have realised that E, as a result of a conflict of interest, could not take on the investigation, particular attention must be paid to the e-mail exchange between E and G in, i.a., February 2014 and to the content of E's legal opinion of 4 August 2014.

In this respect, the Supreme Court notes as follows:

It appears from G's e-mail to E of 3 February 2014, i.a., *that* F was not itself to be a party to the transaction in question but only to provide services, *that* the parties to the transaction "will realize a tax benefit in Denmark which probably consists in a double refund of dividend withholding tax" and *that* F was concerned about whether to pay attention to "issues" in Denmark such as "tax fraud". It appears from

attorney V1's reply to G on the same day, i.e., *that* transactions such as the ones described "may entail a possibility for two shareholders to reclaim the same withholding tax… ('cum-/ex trades')", and *that* such transactions "are generally problematic from a legal perspective and most often it is not possible to provide the kind of opinion regarding legal and liability issues which is normally requested by the parties involved." On 6 February 2014, G asked E if a legal opinion "could be a reasoned 'should' opinion (i.e. 'F should not be subject to criminal prosecution etc.') subject to certain reasonable assumptions (e.g. acting in good faith, relied on expert opinion, no participation in – potentially – unjustified tax advantage etc.) and reservations (no precedent/case law, etc.)". In a reply dated 7 February 2014, V1 reiterated that the transaction in question "is problematic from a Danish legal point of view" and that "should level cannot be promised".

The following days saw further e-mail exchange between G and attorneys in E, i.a. on the basis of attorney H's "tax opinion" of 27 June 2012. G's e-mail of 13 February 2014 states, i.a., *that* the law firm does not need a "reconfirmation… from a tax perspective, but a reasoned tax analysis of the risk that our client might be exposed if acting as custodian in this project", and *that* the relevant question is whether F under Danish tax law "could be held liable or even prosecuted as supporting/facilitating a tax evasion committed by one of the other players in this transaction...". It is furthermore stated, i.a., *that* E can assume that "[t]he structure was not developed by our client", *that* "[o]ur client will perform the role of the securities custodian, but no other role", *that* "[o]ur client… is not actively marketing this structure to others", and *that* "[o]ur client has no information or knowledge about whether or not the tax reimbursement claim will be submitted twice/by a second person."

In the meantime, various draft legal opinions were exchanged between E and G and on 4 August 2014, E issued its final opinion. Para 4 ("Assumptions") states, i.a., *that* "[t]he contemplated transaction was not structured by F", *that* "F will perform the role of the securities custodian, but no other role…", and *that* "F has no reason to assume that – or information or knowledge about whether or not – a person or entity other than USPF will file for a tax reclaim with respect to the dividend withholding tax withheld on the Dividend paid on the Equities." In conclusion, para 5 ("Opinion") states, i.a. *that* "F should not be subject to Danish civil law liability to compensate the Danish state for any loss suffered as a result of its role in the contemplated transaction", but *that* a range of circumstances "prevents us from reaching a more definitive opinion on the position of F". It is also stated that "F should not be subject to Danish criminal liability as a result of its role in the contemplated transaction."

Against this background, the Supreme Court finds that C – had he found the case about advice to F – should have realised that there was a not

inconsiderable risk that F was involved in the unlawful recovery of dividend tax and that E therefore could not assume the investigation.

As regards A, B and D, the Supreme Court assumes that they authorised C to carry out a conflict check on their behalf and that they left all the details of this check to him. In these circumstances and in view of the particular nature of the case, the Supreme Court finds that all four attorneys must be judged on the basis of C's check.

For the reasons given by the High Court, the Supreme Court also upholds that the information on experience with advice on the recovery of dividend tax given by E in connection with his bid to the Ministry of Taxation cannot be given any significance. The same applies to the information about the Ministry of Taxation's discussions with the Ministry of Justice and the prosecutor's office and the fact that the Ministry of Taxation did not involve SKAT in the assessment of E's bid, including the fact that the Ministry of Taxation was not made aware of an e-mail dated 10 October 2016 from the German tax authorities to SKAT.

*2.4. Conclusion about disregarding professional conduct for attorneys*
In the light of the foregoing, the Supreme Court upholds that A, B, C and D have disregarded professional conduct for attorneys by assuming the legal investigation in question.

The Supreme Court also upholds that they are each subject to a fine of DKK 10,000.

*3. Waiver of fees*
The agreement to investigate the dividend case was made between the Ministry of Taxation and E and it must be assumed that the fee for the investigation, if any, is to be paid to E and not A, B, C or D personally. There is nothing in this regard to justify the fact that these attorneys have a sufficient legal interest in their claims for payment of fee to E and the Supreme Court therefore allows the Ministry of Taxation's claim for rejection.

As regards E's claims for payment of fees, the Supreme Court upholds that due to the present conflict of interest, there is a significant deficiency in the investigation and that E is then not entitled to a fee in the case.

*4. Overall conclusion and legal costs*
The Supreme Court upholds the judgment of the High Court, but rejects the claims of A, B, C and D against the Ministry of Taxation.

The Supreme Court's legal costs are set to cover the attorney's costs. Emphasis has been placed in particular on the scope and nature of the case, including the scope of the attorneys' work

### IT IS HELD THAT:

The Supreme Court upholds the High Court's judgment but rejects the claims of A, B, C and D against the Ministry of Taxation.

A, B, C and D must jointly pay legal costs before the Supreme Court of DKK 320,000 to the Disciplinary Board and with E jointly pay DKK 400,000 to the Ministry of Taxation.

The imposed legal costs are payable within 14 days of the delivery of this Supreme Court judgment, and interest is payable according to section 8 a of the Danish Interest Act (*renteloven*).

# THIS IS TO CERTIFY

that the foregoing

**"Judgment"**

is a true and faithful translation of the
attached document
in the Danish language produced to me.

This translation consists of 25 (twentyfive) pages, including this page.

In witness whereof I have hereunto set
my hand and affixed my seal of office
this 15th day of September 2022.



Certified Translator at Aarhus, Denmark

Lea Mathiasen



# HØJESTERETS DOM

**afsagt torsdag den 1. september 2022**

---

**Sag BS-26376/2021-HJR**
(1. afdeling)

A
B
C
og
D
(advokat Ole Spiermann for alle)

mod

Advokatnævnet
(advokat Martin Simonsen)


Biintervenient til støtte for A, B, C og D:

Danske Advokater
(advokat Torben Bondrup)

Biintervenient til støtte for Advokatnævnet:

Skatteministeriet
(advokat Boris Frederiksen og advokat Steffen Sværke)


og

**Sag BS-26377/2021-HJR**

E,
B,
A,
C

2

og
D
(advokat Ole Spiermann for alle)

mod

Skatteministeriet
(advokat Boris Frederiksen og advokat Steffen Sværke)

I tidligere instans er afsagt dom af Østre Landsrets 24. afdeling den 23. juni 2021
(BS-57859/2019-OLR og BS-10276/2020-OLR).

I pådømmelsen har deltaget seks dommere: Henrik Waaben, Hanne Schmidt,
Oliver Talevski, Anne Louise Bormann, Kristian Korfits Nielsen og Jørgen Steen
Sørensen.

**Påstande**
Parterne har gentaget deres påstande.

**Supplerende sagsfremstilling**
Af Es endelige legal opinion af 4. august 2014 fremgår bl.a.:

> "4. *Assumptions*
>
> For the purpose of the Opinion, we have assumed that:
> …
>
> 9. The contemplated transaction was not structured by F;
>
> 10. F will perform the role of the securities custodian, but no other role,
> e.g. assisting in the reclaiming of Danish withholding tax on the
> Equities, and F carry out its role as custodian in relation to the con-
> templated transaction in accordance with its standard procedures
> which are in line with normal procedures for custodian banks in gen-
> eral;
> …
>
> 12. F has been requested to perform the role of the custodian;
>
> 13. F has no reason to assume that - or information or knowledge about
> whether or not - a person or entity other than USPF will file for a tax
> reclaim with respect to the dividend withholding tax withheld on the
> Dividend paid on the Equities.

*5. Opinion*

Based solely on our understanding of the facts outlined in Section 3 and the assumptions outlined in Section 4 above, which we have conducted no separate examination or verifications, and subject to the qualifications set out in Section 7, we find that:

5.1 F will not be subject to Danish tax liability as a result of the contemplated transaction.

5.2 F should not be subject to Danish civil law liability to compensate the Danish state for any loss suffered as a result of its role in the contemplated transaction.

The following circumstances, however, prevents us from reaching a more definitive opinion on the position of F:

1. The fact that USPF in the Forward Transaction enters into OTC forward contracts (and not e.g. listed futures) to hedge their position could in principle allow for a "perfect hedge" of USPF's position in the Equities, which eliminates ownership risk, and could arguably also point in the direction of another identified party assuming such ownership risk, which could then be considered the beneficial owner of the dividend received on the Equities, rather than USPF. This would arguably entail the possibility of an arbitrage identifiable to F in which the standard documentation of ownership issued by F could be misleading in a manner known or suspected by F.

2. The fact that a tax opinion has not been obtained by USPF (or F on the exact transaction carried out by USPF (the tax opinion assumes futures and not OTC forward contracts) would make it more difficult for F to claim that it has by definition acted in good faith (and thus not culpable) on the Danish tax treatment of the transaction, which by a professional party may reasonably be assumed to contain issues in relation to ownership of the Equities.

3. The cases concerning sale of "empty" companies outlined in 6.2.1, below, have demonstrated the willingness of the Danish tax authorities and the Danish courts to place liability for losses suffered by the tax authorities with other parties involved in the transactions triggering the loss when the transactions are deemed to have a questionable nature. In light thereof, it is not certain how the Danish tax authorities would perceive the contemplated transaction over the Equities and, if deemed questionable, how the Danish court system would respond. However,

4

> even if deemed questionable, it is our view that the role of F in the
> contemplated transaction is not comparable to the role of the parties
> held liable, including the banks, in the "empty" companies cases,
> which were more severe and instrumental in relation to the loss suf-
> fered by the tax authorities.
>
> 5.3 F should not be subject to Danish criminal liability as a result of its
> role in the contemplated transaction."

Ved Østre Landsrets dom af 28. april 2022 (BS-26436/2020-OLR) er E frifundet i
en sag anlagt af Skatteforvaltningen om erstatningsansvar i anledning af råd-
givningen af F. Dommen er anket til Højesteret.

Der er for Højesteret fremlagt nye bilag, herunder en mail af 10. oktober 2016
fra en tysk skattemyndighed (Finanzamt für Steuerstrafsachen und Steuerfahn-
dung Wuppertal) til SKAT. Af denne mail fremgår i dansk oversættelse bl.a.:

> "Der foreligger for vores kontor oplysninger om Cum-Ex-transaktioner,
> som er gennemført via en tysk bank som depotbank.
>
> Der er handlet med følgende danske aktier over udbytteregistrerings-
> dagen:
> …
>
> Der foreligger også erklæringer fra advokatkontorerne E, København,
> og G, der har bekræftet, at den tyske bank har forholdt sig legalt.
>
> Der er udelukkende tale om transaktioner, der har fundet sted i 2014.
> Man må imidlertid gå ud fra, at der også i 2015 er gennemført tilsva-
> rende transaktioner. Det er det amerikanske pensionsfonde [US Pension
> Plans], der har anmodet om refusion af den danske udbytteskat.
>
> Navnene på de pågældende pensionsfonde og yderligere materiale fo-
> religger på vores kontor og kan videregives, såfremt det har interesse."

Danske Advokater har i 2012 udgivet en vejledning om advokatundersøgelser. I
vejledningen anføres bl.a.:

> *"2.2.1 Den almindelige advokatundersøgelse*
> Formålet med en advokatundersøgelse er at sikre rekvirenten en hurtig
> og effektiv undersøgelse af et givent hændelsesforløb og – om ønsket –
> tillige en vurdering af, om der er grundlag for at indlede retlige skridt
> mod nogen af de involverede.

For sådanne, almindelige advokatundersøgelser vil der ikke være sær-
lige krav til undersøgerens habilitet udover det, der til enhver tid følger
af de advokatetiske regler. Således vil advokaten kunne undersøge en
virksomhed, som den pågældende i øvrigt er rådgiver for, kunne fore-
tage undersøgelsen uden kontradiktion og ligeledes foretage en fortro-
lig undersøgelse for rekvirenten. Advokaten vil også på vegne af hverv-
giver kunne føre en eventuel efterfølgende retssag mod de berørte per-
soner.

### 2.2.2 Uvildige advokatundersøgelser
Formålet med en uvildig advokatundersøgelse er at få foretaget en uvil-
dig og objektiv undersøgelse og vurdering af, om der i en konkret sag
er grundlag for at indlede retlige skridt.

Kriterierne for, hvornår der er tale om en uvildig advokatundersøgelse
er:

1. Sikring af advokatens uafhængighed før, under og efter undersøgel-
sen. Rekvirenten må derfor ikke have et fast klientforhold til advokaten
eller en anden advokat fra samme advokatvirksomhed, jf. nærmere de
advokatetiske regler. Advokaten og advokater fra samme advokatvirk-
somhed må heller ikke påtage sig advokatopgaver for rekvirenten,
mens opgaven pågår, og må ikke efterfølgende beskæftige sig med sa-
ger, som undersøgelsen lægger op til.

2. Der bør være et skriftligt kommissorium for undersøgelsen. Kommis-
soriet bør angive undersøgerens mandat, de nødvendige rammer, even-
tuelle tidsrammer mv.

3. Sikring af, at advokaten som undersøger får adgang til alt skriftligt
materiale, som er relevant for undersøgelsen, f.eks. e-mail korrespon-
dance.

4. De berørte skal have lejlighed til kontradiktion i forhold til de faktu-
elle oplysninger og efter omstændighederne tillige i forhold til spørgs-
mål af retlig karakter, inden undersøgelsen afsluttes.

5. I det omfang undersøgelsesrapporten tænkes offentliggjort, bør kom-
missoriet offentliggøres senest samtidig med offentliggørelsen af under-
søgelsens konklusioner og anbefalinger.

6. Undersøgelsens konklusioner gøres tilgængelig for de berørte senest
samtidig med en eventuel offentliggørelse.

7. Undersøgelsen bør konkludere med vurderinger og eventuelle anbe-
falinger, men ikke fremstå som en afgørelse.”

**Supplerende forklaringer**
Til brug for Højesteret er der afgivet supplerende forklaring af C og V7.

<u>C</u> har suppleret forklaret bl.a., at han ikke kan vedstå sin samlede forklaring
for landsretten, og at han ønsker at supplere og uddybe forklaringen.

Omkring den 5.-6. april 2016 brød nyheden om Panama Papers ud, hvilket gav
anledning til en intern undersøgelse hos E for at finde ud af, om der var advo-
kater, der havde tilknytning til Panama Papers. V7 sendte en mail ud til alle
partnerne for at høre, om der var nogen med forbindelser til Panama Papers. In-
gen havde haft forbindelse med de omtalte selskaber i Panama Papers, men en
partner nævnte H, og at han muligvis havde ydet rådgivning til I, mens han var
partner i E, dvs. senest ved udgangen af 2009. V7 søgte på den baggrund i Hs
sagsliste på I. Der var ingen hits. De udvidede søgningen, da der kunne være
tale om lignende rådgivning til andre. V7 søgte bredere på bl.a. ”stock loan” el-
ler ”aktielån”, og der dukkede noget op i den forbindelse.

Han var bekendt med, at Advokatrådet som led i sin almindelige tilsynsfunk-
tion bad H om en redegørelse, og at H afgav en redegørelse. I slutningen af
april 2016 lavede H et opslag på Linkedin, hvor han fortalte, at Advokatrådet
havde modtaget hans redegørelse, taget den til efterretning og afsluttet sagen
uden kritik. Han kan ikke huske, om han så Hs redegørelse til Advokatrådet.

V7 sendte en mail, hvor han redegjorde for, at han havde søgt på indhold eller
ord, f.eks. ”stock loan”, i stedet for navne. Mailen indeholdt en liste med 13-14
sager med sagsnumre og klientnavne. To sager var markeret med gult, og legal
opinions i disse to sager var vedhæftet. Han vidste ikke, hvordan de to marke-
rede sager var blevet udvalgt. Han blev bedt om at gennemgå listen og læste
derfor de to vedhæftede legal opinions. Rammen var, at de dels på grundlag af
Panama Papers, dels på grund af rygter om Hs rådgivning, ville afsøge deres
mulige risiko. Der var ikke nogen konkrete sager eller erstatningskrav. Der var
tale om almindelig risikohåndtering, da der var en konkret anledning. Hans
rolle var at forholde sig til det, V7 kom med. Han var ikke involveret i tilrette-
læggelsen af undersøgelsen. Baggrunden for, at V7 fokuserede på aktielån, var,
at der havde været noget fremme vedrørende I om den overordnede karakter af
det, der var foregået med hensyn til H.

Der var tale om to legal opinions udarbejdet af I i sager, hvor H var sagsansvar-
lig tilbage i tid. Han havde ikke selv kendskab til indholdet af de pågældende
legal opinions. Sammen med V7 og J talte han med K, som forklarede, hvilken
slags rådgivning og transaktioner der var tale om. K fortalte, at han var ved at
opdatere en legal opinion, som han tidligere selv havde afgivet til en klient. K

oplyste, at de to legal opinions udarbejdet af H var repræsentative, og han interesserede sig derfor ikke for de andre sager i mailen fra V7.

Han kendte til de nye anbefalinger om grænseoverskridende skatterådgivning. K var skattetekniker, og han havde selv mere compliancefokus end skattepartnerne og ville derfor gerne se den endelige legal opinion for at sikre, at den afspejlede de nye retningslinjer. Han var efter gennemsyn enig i, at den var, som den skulle være, og han sendte den tilbage til K. Han kan vedstå sin forklaring i landsrettens dom om, at der ikke var noget at komme efter i forhold til rådgivningen. Med hensyn til den opdaterede legal opinion skulle K sikre, at det faktuelle grundlag var opdateret, så de var sikre på, at den levede op til anbefalingerne. K var specialist og var den rette at drøfte rådgivningen med. De kiggede på Hs to gamle legal opinions og Ks seneste, opdaterede legal opinion.

Han var ikke vild med den type rådgivning, men den var inden for de juridiske rammer og anbefalinger, da de vurderede, at det var uproblematisk at anskue de involverede parter som reelle ejere, og at de derfor var berettigede til refusion af udbytteskat. Men han syntes ikke om rådgivning om den type aktiviteter, som ikke var forretningsorienteret, men kun med henblik på finansielle transaktioner. Han havde samfundsbrillerne på og mente heller ikke, at offentligheden ville bryde sig om det. Der var en presserisiko, som han drøftede med V7 og J, men de blev enige om, at det var, som det var. Det vil sige, at E fortsatte med rådgivningen som hidtil. Der var intet nyt. Han ved ikke, om de andre talte med andre i E.

Anbefalingerne om grænseoverskridende skatterådgivning ville gælde, selv hvis de ikke var skrevet ned. De var ikke begrænsende i forhold til allerede ydet rådgivning. De formulerede blot eksplicit, hvad der allerede gjaldt. Der var ikke noget, E skulle gøre anderledes på baggrund af anbefalingerne. Det fremgik af anbefalingerne, at man kunne yde den type rådgivning, men at man skulle være opmærksom.

I forbindelse med undersøgelserne i foråret 2016 deltog han i et møde med V7, K og J. Der var desuden et separat forløb mellem ham og K om den opdaterede legal opinion. Han drøftede rådgivningen generelt med V7 og J. De konkluderede, at rådgivningen kunne fortsætte. Der var ikke ugler i mosen. Han var blot mere bekymret for dårlig presse, end de andre var. Det blev ikke drøftet, at der kunne være tale om svindel. Ellers havde de undersøgt meget mere. E ville ikke kunne have fortsat rådgivningen ved mistanke om svindel, medmindre det blev 100 % afkræftet, at der skulle være tale om svindel. Ingen fik den tanke, for så ville rådgivningen ikke være fortsat.

I landsrettens præmisser omtales rådgivning om komplekse modeller på en sådan måde, at det giver indtryk af, at der er tale om påfaldende rådgivning, hvilket han ikke er enig i. Rådgivningen af F vedrører f.eks. et kompliceret forløb,

men ikke alt kompliceret er mistænkeligt. Mange sager er komplicerede. V1 følte sig komfortabel med at afgive opinions, da han havde styr på det, og K syntes ikke, at det var kompliceret, da det var hans ekspertområde. Noget er ikke mistænkeligt, blot fordi andre synes, det er kompliceret.

Legal opinion om F så han først i oktober 2018. Han kan ikke huske, om han i foråret 2016 læste Hs tax opinion. Der var presseomtale vedrørende den pågældende opinion, men sagen sluttede ved, at Advokatrådet ikke ville forfølge sagen.

I forhold til udbuddet i slutningen af 2016 var der tale om en undersøgelse af SKATs og Skatteministeriets departements håndtering af anmodninger om refusion af udbytteskat. Det var en administrativ undersøgelse. Undersøgelsen vedrørte ikke i sig selv skattejura og strafferet. Det lå ved siden af. Der var ikke tale om, at E indsnævrede undersøgelsens emne i forhold til kommissoriet. De vurderede, hvad de skulle undersøge, og præsenterede det for Skatteministeriet, som ikke havde nogen kommentarer på midtvejsmødet den 11. august 2017 og ved udkast til redegørelse sendt i høring til Skatteministeriet.

Han undrede sig over, at Kammeradvokatens konklusioner vedrørende hjemsendte embedsmænd skulle lægges til grund. Disse personer var hovedpersoner i forløbet. Det var ejendommeligt, da fokus for undersøgelsen var myndighedernes håndtering og de enkelte medarbejderes adfærd og reaktion. Det var mystisk, at man brugte sin egen advokats vurdering af centrale spørgsmål, når man ville have en uafhængig advokatundersøgelse. I henhold til kommissoriet forudsatte en ny vurdering nyt materiale, men E havde det samme materiale som Kammeradvokaten, da der ikke skulle foretages afhøringer. E kunne ikke sige andet end Kammeradvokaten vedrørende de hjemsendte overordnede medarbejdere, og det begrænsede også vurderingen af nogle af de andre medarbejdere.

Af As forklaring for landsretten fremgår, at hun forklarede bl.a., at E foretog ansættelsesretlige vurderinger vedrørende 14 personer, hvoraf 8 var påvirket af Kammeradvokatens undersøgelse, og at hun ikke var enig i, at der var frit spil opefter. Han er enig i den beskrivelse.

Han nævnte ikke utilfredsheden med, at de skulle lægge Kammeradvokatens konklusioner til grund, på mødet med skatteministeren og skatteordførerne, da undersøgelsen på dette tidspunkt var slut. Politikerne kendte kommissoriet, da de selv havde vedtaget det.

Han mener, at det var naturligt, at Skatteministeriet ikke under udbuddet ville give navne på folk eller selskaber under mistanke. Ingen vidste, hvad en mistanke ville føre til. Han kan godt forstå, at man ikke ønskede at udlevere navnene til et ukendt antal bydere. Han undrede sig over spørgsmålet, da det var

åbenbart, at det ikke kunne oplyses. Men han undre sig også over svaret om, at byderne selv vidste, hvem de havde rådgivet, som han mente var arrogant. Byderne fik ingen navne til at foretage konflikttjek, men skulle blot læne sig op ad de advokatetiske regler. Det vil sige, at de i rimeligt omfang skulle sikre sig mod interessekonflikt.

Vedrørende habilitetskravene i pkt. 1.3 i udbudsbekendtgørelsen måtte E ikke have forbindelse til Skatteministeriet, SKAT og de personer, der skulle undersøges. Det blev også oplyst, at de ikke måtte have forbindelse til de involverede i den formodede svindel. Det opfattede de som baseret på offentligt tilgængelige oplysninger om de selskaber, som var involverede. V7 foretog søgninger på Google og slog navne op, som han fandt på internettet, og der var ingen hits. Konflikttjekket i januar 2017 bestod af søgning på navne og drøftelser med skattepartnerne i E. Det var ikke sædvanligt, at de selv lavede listen. Partsbilledet var meget diffust. De ledte så meget, som de vurderede nødvendigt og praktisk muligt. De var ikke bekymrede. F var ikke offentligt omtalt ved konflikttjekket i januar 2017. Han var ikke klar over dengang, at kun et begrænset antal personer i Skatteministeriets departement kendte indholdet af politianmeldelserne. E vidste ikke, hvem der var blevet anmeldt. Der var tale om, at SKAT var gået direkte til bagmandspolitiet. SKAT kendte navnene.

I forhold til undersøgelsens emne var deres instinktive opfattelse, at en søgning på relevante ord ville give så mange hits, at det ikke ville kunne nås inden fristen. I forhold til den systematiserede afsøgning omtalt i landsrettens præmisser af sager, hvor advokater i Es skatteafdeling havde ydet rådgivning for internationale klienter om de angivne transaktioner og bankydelser, er det en del nemmere, når man ved, hvad de nu ved, og kigger tilbage.

De har lavet en søgning nu for perioden 2010 til 2017. De har nu søgt på følgende engelske ord: "dividend tax", "withholding tax" og "dividend withholding tax". Der er godt og vel 4.000 dokumenter på hvert af de engelske søgeord i systemet nu. Der er formentlig overlap, hvor flere ord optræder i samme dokument. Dokumenterne er fordelt med ca. 2/3 mails og 1/3 dokumenter (word, pdf, powerpoint mv.). Der er slettet ca. 1/5 af dokumenterne siden 2017, så der ville formentlig have været 5.000 dokumenter ved hvert søgeord dengang. Hvor mange sager, dokumenterne er fordelt på, ved han ikke. Det nemmeste udfald af et konflikttjek er, hvis man finder noget, for så stopper man. Så længe man ikke finder noget, må man fortsætte. På de danske søgeord fandt de ved søgningen nu mellem 4.000 og 10.000 hits pr. ord. Han kan ikke vide, om søgningen ville finde alle sager, men blot konstatere, at det er dokumenter, hvor ordene er nævnt. Det ville nok dække de fleste sager, men det ved han ikke med sikkerhed. E har, så vidt han husker, ikke en sagskategori, der hedder udbytteskat.

I forhold til landsrettens præmisser om, at man burde have vurderet oplysningerne i de fremfundne sager i forbindelse med den systematiserede afsøgning, skulle de i givet fald have læst dokumenterne igennem og vurderet konkret, om det var svindel. Han mener ikke, at det giver mening, da ingen i firmaet ville have sendt en opinion afsted, der ville have indebåret svindel. Det er bredt formuleret, men svindel indikerer noget strafbart. Alle advokater rådgiver om grænserne for gældende ret, så det ville være det, de fandt, og ikke noget strafbart.

Ved et konflikttjek giver opslag i systemet som udgangspunkt navne på parter og modparter mv., og alle kan lave det, hvorimod en vurdering af oplysningerne i sagerne kræver folk med en høj grad af skatteretlig ekspertise. Controlleren i skatteafdelingen kunne ikke have undersøgt sagerne som forudsat i landsrettens præmisser, da han ikke var jurist. Med landsrettens præmisser kunne tjekket kun være lavet af en jurist med kendskab til skat. Det vurderer han nu, at de ikke ville have kunnet nå inden udbudsfristen. Han mener ikke, at der var en drøftelse om tidsfristen i 2017. Han vedstår sin forklaring for landsretten om, at de ikke i 2017 overvejede muligheden for at undersøge alle sager med rådgivning om udbytteskat. Hvis de skulle underkaste f.eks. 4.000 dokumenter en juridisk undersøgelse og vurdering, ville det ved blot 5 min. pr. dokument svare til ca. 1/3 af tidsforbruget til selve undersøgelsen. Det er hans vurdering, at det ikke ville have givet mening at undersøge så mange hits. De havde i 2017 en kort tanke om at søge på termer, men afviste det straks, da det ville give for mange hits. Man kunne altid have gjort noget andet, hvis man havde fået idéen til det, f.eks. bede skattejuristerne om at indsnævre mulige sager om udbytteskat.

I Statsrevisorernes beretning fra 2016 omtales en early warning om risiko for uretmæssig refusion fra juli 2015. Han kan huske, at han læste det og tænkte, at de legal opinions, som han havde set i foråret 2016, handlede om aktielån, og at han var glad for at konstatere, at Skatteministeriet heller ikke mente, at der var tale om svindel. Rådgivningen var irrelevant i forhold til konflikttjekket, da det ikke var omfattet af undersøgelsen. I kommunikationen med Rigsrevisionen afviste Skatteministeriet blankt, at rådgivning om aktielån skulle være svindel, og Skatteministeriet tog ikke i udbudsmaterialet afstand fra det tidligere vurderede. Han var opmærksom på Rigsrevisionens bemærkninger, men Rigsrevisionen var ikke hvervgiver.

E oplyste ikke, at de havde rådgivet en aktør i den formodede svindel, da de ikke vidste det. De anså det for udelukket. De kendte ikke til politianmeldelsen, hvor F var nævnt.

At de i forbindelse med afgivelse af tilbuddet gav oplysninger om, at de havde erfaring med vurdering og udarbejdelse af legal opinions, gav ikke anledning til overvejelser i forhold til habilitet, da der var tale om kompetenceoplysninger

fra skatteafdelingen. Hvis man afgiver en opinion, har man forstået det, og så er det ikke kompliceret. Han forestillede sig ikke, at de indebar en risiko for interessekonflikt. Hvis de havde ment, at deres kompetencer forhindrede et bud, havde de ikke budt. De foretog ikke undersøgelser i anledning af, at de gav oplysninger om kompetencer.

Af Bs forklaring for landsretten fremgår, at det var naturligt, at han lavede konflikttjek, og at han spurgte B, om de havde grund til at tro, at de havde rådgivet nogen af svindlerne, hvortil B svarede nej. Han kan bekræfte den beskrivelse.

I forhold til kommunikationen med skatteafdelingen var der ikke tale om et formaliseret dekret om gennemførelse af konflikttjek. Alle i skatteafdelingen talte om udbuddet, og de, der stod for konflikttjekket, talte med skatteafdelingen. Der var tale om en anden form for kommunikation end et dessin.

Af V4s forklaring for landsretten fremgår, at han forklarede bl.a., at han fik at vide, at der blev lavet det grundigste konflikttjek i firmaets historie. Det er ikke et udtryk, som han selv ville have brugt, men de lavede et konflikttjek i betydeligt videre omfang end normalt. De gør sig altid umage, men de gjorde sig ekstra umage her.

Han kan bekræfte beskrivelsen af indholdet og adgangen til den hemmelige del af Sharepointsystemet som gengivet i hans forklaring i landsrettens dom og i Es advokatredegørelse. Materialet kom fra SKAT og Skatteministeriet. Der var ikke andre kilder. Han deltog i to eller tre fysiske møder med SØIK. Det første møde var inden, han fik adgang til den hemmelige del, hvor SØIK redegjorde for baggrunden for lukketheden. De fik ikke oplysninger fra SØIK, men de fik oplyst, at materialet, som SØIK havde, ikke havde noget at gøre med det, de skulle se på.

Han undrede sig ikke over, at alle politianmeldelserne ikke var på den hemmelige del af Sharepoint. Han interesserede sig ikke for politianmeldelserne. Han interesserede sig for tidspunktet for modtagne ansøgninger, behandling og udbetaling. Han havde fokus på, hvornår man skulle have reageret. Han havde derfor fokus på excel-ark med datoer og beløb for ansøgningerne med henblik på, hvad der var løbet igennem systemet i sommeren 2015, efter at SKAT skulle have reageret. Han havde ikke interesse i den strafferetlige kvalifikation, da det ikke var deres opdrag. Det skulle de holde sig fra. Vurderingen af et administrativt ansvar forudsætter ikke viden om, hvem der havde anmodet om refusion eller præcist, hvordan de havde fået det.

De reagerede på medieomtale af L, da han var en central person og i høj grad af interesse og relevans for undersøgelsen. Han undrede sig over, at Skatteministeriet ikke havde givet dem oplysninger om L allerede. Det havde ikke betyd-

ning med oplysninger om nye svindlere, da de ikke skulle undersøge svind-lerne og svindlen. De lavede ikke løbende undersøgelser undervejs. Det var ikke relevant at sætte en overvågning af mediebilledet op, da svindlerne ikke var emnet for undersøgelsen.

De havde fået at vide, at de ville få alt relevant materiale fra SKAT og Skattemi-nisteriet, men E kendte ikke organisationen på forhånd. De holdt derfor et møde med SKAT og Skatteministeriet for at få et overblik. De fik i den forbin-delse organisationsdiagrammer og en liste over medarbejdere. Efterhånden som navne dukkede op, rekvirerede de ansættelseskontrakter med henblik på at vurdere ansvarsområde og mulige forsømmelser. Det bad de om løbende og så oplysninger om L. De bad ikke om yderligere, resten var der. At oplysninger vedrørende L ikke var der, foranledigede ikke tvivl om, hvorvidt de havde det fulde materiale til brug for undersøgelsen. SKAT og Skatteministeriet ville stille alt relevant materiale til rådighed. Det lagde de til grund.

I forhold til hans forklaring for landsretten om, at beskrivelsen af svindlen i ad-vokatredegørelsen blev holdt i overordnede termer, tænkte han på oplysnin-gerne om aktiviteten hos SKAT. De havde ikke oplysninger om svindlen. Der var ingen beskrivelse af, hvad der faktisk var foregået. De interesserede sig for forløbet i sommeren 2015 for at se, om de involverede gjorde nok, men de hav-de ikke fokus på selve anmodningerne. De skulle ikke beskæftige sig med den strafferetlige del, da den lå hos SØIK. Fokus var på de aggregerede oplysninger, mængder, antal, stigning mv.

Han er enig i, at kommissoriet udstikker rammerne for Es undersøgelse. For landsretten forklarede han om, hvordan refusion foregik hos SKAT, herunder at man havde fravalgt at anvende officialmaksimen. Der var ikke et notat om ar-bejdsmetoden, men de kunne konstatere, at det foregik sådan. Det fremgik af de tidligere undersøgelser og af mails, mødereferater og korrespondance mellem SKAT og Skatteministeriet. Tilsvarende beskrivelser i de tidligere undersøgelser blev bekræftet af det tilgængelige materiale. De så ikke selve de dokumenter, der blev brugt i forbindelse med refusionsanmodningerne. De havde fået oplys-ningerne via interne mails i SKAT og oprindelige mødereferater. De kiggede ikke på, hvordan udbetalingen de facto var foregået, da de ikke havde og heller ikke rekvirerede selve ansøgningerne.

Han kan vedstå sin forklaring for landsretten om, at det ikke ville have gjort en forskel, hvis de havde været opmærksomme på rådgivningen til F ved afgivelse af tilbuddet i 2017. Det var ikke et problem, da der var tale om rådgivning om en lovlig aktivitet. Hvis de havde været opmærksomme på rådgivningen, ville han nok have konfereret med B, som ville have bekræftet, at det var rådgivning om en lovlig aktivitet. Han ville ikke have vidst, om rådgivning om et muligt ansvar var sædvanligt, og han ville derfor have spurgt B.

13

I landsrettens præmisser anføres med henvisning til hans forklaring, at E ved afgivelse af tilbuddet ville have reageret på kendskab til rådgivningen af F. Det er ikke i overensstemmelse med, hvad han faktisk forklarede. Han forklarede det modsatte, nemlig at de ikke ville have afstået fra at byde. Han er enig i, at de ville have fundet rådgivningen af F ved en søgning på termer, men de ville have vurderet rådgivningen og fundet den lovlig. Da det ikke omhandlede det, der skulle undersøges, ville de ikke havde afstået fra at byde, og de ville ikke have oplyst Skatteministeriet om det.

Undersøgelserne i april 2016 bestod af en søgning i Hs sagsportefølje. Der var ikke skriftspor efter undersøgelsen. Det var formentligt nogle interne mails, men ingen mødereferater eller lignende. I forbindelse med konflikttjekket i januar 2017 gav V7 ham artikler med markerede navne i et chartek. Da han var færdig med det, afleverede han det tilbage. Han ved ikke, om V7 stadig har artiklerne.

V7 har supplerende forklaret bl.a., at han ikke kan vedstå sin samlede forklaring for landsretten, og at han ønsker at supplere og uddybe forklaringen. Han er ikke længere ansat hos E.

Han kan vedstå sin forklaring for landsretten om projektet vedrørende effektivisering og professionalisering af compliance hos E. Han fastholder desuden sin forklaring om, at han ikke har kendskab til et automatiseret system med mulighed for at foretage løbende konflikttjek. Interessekonfliktreglerne er hos E indrettet således, at der laves et konflikttjek, hvis der kommer nye parter. E forholder sig løbende til ny viden i form af nye sager eller nye parter i eksisterende sager, f.eks. nye oplysninger om involverede embedsmænd i udbyttesagen. E kunne have lavet et manuelt konflikttjek undervejs ved nye informationer.

Ved konflikttjek er det almindeligt, at der udleveres lister fra klienten med navne og selskabsstrukturer, der kan søges på i klient- og sagssystemet. Ved oprettelse i systemet skal der angives parter, modparter, advokater og ejerstruktur.

Han fastholder, som forklaret for landsretten, at E er over niveau med hensyn til compliance og konflikttjek. Det gjaldt i 2017 og stadig i dag. Det blev bekræftet eksternt fra leverandører af systemer, herunder leverandøren af Es system, og ved sparring med konkurrenter. E blev ofte bedt om at deltage i udvalgsarbejde vedrørende compliance inden for advokatbranchen.

Grundlaget for søgningerne i marts og april 2016 blev fundet i artikler om I. Han brugte "I" og "M [selskab]" som søgeord, ikke andre søgeord. De søgte både i klient- og sagssystemet og i den fulde dokumentdatabase. Det gør de som hovedregel ikke, kun hvis der er tale om en meget præcis søgning, da der er over 30 mio. dokumenter i dokumentdatabasen. En bred søgning, f.eks. med

søgeordet "aktielån", ville generere rigtig mange hits, som derefter skulle gen-
nemgås manuelt.

Da de lavede søgningerne i foråret 2016, ville de være sikre på, at de ikke havde
noget med I. Han havde på det tidspunkt ikke set en legal opinion udarbejdet af
H, som var omtalt i artiklerne. I forbindelse med medieomtalen havde Advo-
katrådet bedt H om en redegørelse. Han så Hs redegørelse til Advokatrådet el-
ler omtale af den. H skrev til forretningsforbindelser og tidligere kolleger, hvor
han redegjorde for indholdet af redegørelsen, formentlig med selve redegørel-
sen til Advokatrådet vedhæftet. C og J så også Hs redegørelse til Advokatrådet,
men han husker ikke, om andre havde set den. H brugte ord som svindel, men
han husker ikke, om han brugte ordet dokumentfalsk.

Han var opmærksom på, at industrielle investorer var omtalt i Hs redegørelse
til Advokatrådet. Aktielån og legal opinions var også nævnt. Redegørelsen gav
anledning til yderligere søgninger baseret på Hs sager. Han lavede listen over
søgeord i den forbindelse. Der var rygter om Hs rådgivning i hans tid hos E. De
søgte på baggrund heraf på bl.a. "stock loans" (aktielån på engelsk). H forlod E
omkring 2010. Da han kun søgte i forhold til H, vedrørte søgningen perioden
før 2010. Søgningen gik formentlig tilbage til 2007, men han er usikker på start-
tidspunktet. Før 2010, hvor H forlod E, havde sagslisten færre oplysninger, da
det var det gamle system, man anvendte.

Han sparrede med C og fandt 14 sager fra Hs sagsliste, som vedrørte industri-
elle investorer og aktielån. Han udvalgte to sager, som udover aktielån også
omtalte "Danish pension funds" i emnefeltet, og som indeholdt legal opinions.
De to sager fungerede som en stikprøve, som han bad C kigge på. Han ved
ikke, om C gennemgik de yderligere 12 sager, men han så listen med alle 14 sa-
ger og kunne have valgt flere til gennemgang. Han ved ikke, om der var legal
opinions i alle sagerne. Han forholdt sig ikke til, om de to legal opinions var ret-
visende og inden for rammerne af legal opinions. Han læste dem ikke selv. Han
fandt dem blot frem og bad C kigge på dem.

På baggrund af gennemgangen af Hs sagsliste tog de fat i K. K sad ifølge ham
selv og arbejdede på et typeeksempel på en legal opinion på det tidspunkt.
Drøftelsen med K i foråret 2016 tog udgangspunkt i den aktuelle legal opinion,
som K arbejdede på, med henblik på fremadrettet rådgivning. K sagde før mø-
det, at de to legal opinions fra Hs sagsliste var dækket af den rådgivning, han
sad med nu, og at det derfor var nemmere at gennemgå den aktuelle legal opi-
nion.

Han deltog i et møde med K og C, hvor de gennemgik de konkrete legal opini-
ons, og de diskuterede desuden de nye anbefalinger om grænseoverskridende
skatterådgivning fra 2014. C og K drøftede både det konkrete indhold af de på-

gældende legal opinions og arten af rådgivningen. Der var ikke tale om et kon-
flikttjek. K sagde, at alle de pågældende legal opinions lå inden for reglerne. K
var klart den rette at drøfte spørgsmålet med på baggrund af hans erfaring. Mø-
det sluttede ved, at han og C var betryggede, og K videresendte efter mødet
den seneste legal opinion. Han anså ikke yderligere stikprøver for nødvendigt.
Det blev ikke drøftet at stoppe rådgivningen på området, men de drøftede, at
man skulle holde sig ajour med anbefalinger og udvikling.

I forbindelse med udbuddet af advokatundersøgelsen var der i slutningen af
2016 stadig tale om et gennemsyn af udbuddet med henblik på, om E skulle
byde. Der blev i den forbindelse gennemført et almindeligt konflikttjek ved
sagsoprettelsen, som han ikke var en del af. Det fulgte de almindelige retnings-
linjer for oprettelse af tilbudssager. Han var på sidelinjen i forhold til oprettel-
sen af tilbudssagen.

I januar 2017, inden E afgav tilbud, gentog og udbyggede han konflikttjekket.
Det mere grundige konflikttjek bestod i, at de selv lavede listen over, hvem der
skulle søges på, og at de derefter søgte på navnene i alle systemer, dvs. både de
systemer, som de brugte ved et normalt konflikttjek, og i det fulde dokumentsy-
stem. Det var det, han beskrev som en fuld søgning. Der var ingen hits. De la-
vede også søgninger i forhold til Skatteministeriet, SKAT og relevante embeds-
mænd.

Han søgte på Google med søgeordene "I" og "M [selskab] " og fandt hurtigt
flere associerede navne, f.eks. "N Bank". Han skrev artiklerne ud og søgte på
nye navne, som var nævnt i artiklerne. Der var nævnt mange navne med svag
eller nogen tilknytning til I. Han havde ikke overblik over, om det var det fulde
netværk. Han søgte med henblik på at finde informationer til et konflikttjek.
Det var et fuldstændigt billede af, hvad han havde mulighed for at finde af in-
formationer på daværende tidspunkt. Baggrunden for søgningen i januar 2017
var, at de havde forstået, at man ikke måtte have rådgivet personer involveret i
udbyttesagen, og derfor søgte han på offentligt tilgængelige oplysninger. Goog-
lesøgningerne i januar 2017 havde ikke noget at gøre med H eller listen fra for-
året 2016. De var baseret på offentligt tilgængelige oplysninger om udbyttesa-
gen.

Der var i tiden op til udbuddet drøftelser med skattepartnerne. Alle vidste, at
udbuddet var på vej, og var opmærksomme på, at E skulle positionere sig bedst
muligt. V4 deltog i den gruppe, der arbejdede på positionering op til udbuddet.
Da udbuddet kom, fik han udbudsmaterialet. Skatteafdelingen valgte B som
skattepartner på udbuddet.

Af V4s forklaring for landsretten fremgår, at V4 fik at vide, at der var lavet det
grundigste konflikttjek i firmaets historie. Han kan tiltræde den beskrivelse.

Af Bs forklaring for landsretten fremgår, at C som sagsansvarlig lavede kon-
flikttjekket, og at B ikke vidste, om C havde talt med andre partnere end ham
selv. Efter Bs forklaring vidste alle imidlertid, at E ville byde ind på undersøgel-
sen, og "ingen rakte hånden op". Han kan tiltræde den beskrivelse.

Han og C fokuserede ikke på legal opinions i undersøgelserne i januar 2017.
Han kan ikke bekræfte, at der var tale om 10 legal opinions om udbytteskat om
året. Ifølge Bs forklaring for landsretten var der tale om et aftagende antal legal
opinions om udbytteskat efter 2016. Dette kan han bekræfte. Der var tale om
hundredvis af sager med legal opinions tilbage i tid på området. Det var klart
aftagende efter 2016. For hele firmaet på alle retsområder har E lavet tusindvis
af legal opinions over en 10-årig periode.

I landsrettens præmisser omtales en systematiseret afsøgning af sager, hvor ad-
vokater i Es skatteafdeling havde ydet rådgivning for internationale klienter om
de angivne transaktioner og bankydelser. Det ville forudsætte en liste over in-
volverede parter. Internationale sager udgjorde ca. 20 % af Es forretning, og in-
den for områderne transaktioner og bankydelser ville der være mange sager og
væsentligt flere dokumenter og mails. De ville ikke bare kunne bruge sagskor-
tet, men ville skulle bruge selve dokumentsystemet. Det var ikke muligt at gen-
nemgå. Han ved ikke, om internationale sager udgjorde 20 % på skatteområdet.

De prøvede at lave en søgning med tilbagevirkende kraft efter modtagelsen af
skatteministerens brev i oktober 2018. Her søgte de bl.a. på "withholding tax",
og de søgte også i dokumentdatabasen. Søgninger på de konkrete navne var af-
dækket i 2016 og 2017. Hvis de skulle søge på ord, som de i slutningen af 2018
vidste ville have givet noget, ville det give usandsynlig mange hits både på sa-
ger og dokumenter, uanset hvilke relevante termer, f.eks. "withholding tax" el-
ler "stock loans", de forsøgte med. Han kan ikke sige præcist hvor mange hits,
men det ville være flere tusinde. Han kunne ikke have gjort noget anderledes i
januar 2017. Han vurderer, at de ikke ville kunne have nået at behandle søgere-
sultatet inden for tidsfristen, selv med yderligere assistance fra f.eks. skatte- el-
ler finansafdelingen. En vurdering af fremfundne sager ved systematiseret af-
søgning ville have krævet mange ugers arbejde. Det ville have været en gen-
nemgang af word, pdf, mails, vedhæftede dokumenter, udkast i flere versioner
og endelig rådgivning. Det ville have været mange oplysninger. De skulle have
søgt meget bredt for at fange alle aspekter, da de ikke havde en liste.

Konflikttjekket i januar 2017 blev drøftet med skatteafdelingen. Der var ingen
grund til at tro, at der var noget at komme efter. Navnet F var ikke udleveret af
Skatteministeriet, og de havde det ikke fra artiklerne, så det kunne de ikke søge
på. Han kan bekræfte, som forklaret for landsretten, at E i januar 2017 samlet
gjorde langt mere, end der normalt kræves, og at han ikke kunne komme i
tanke om andet, de skulle have gjort.

I oktober og november 2018, efter modtagelsen af skatteministerens brev, brug-te E flere uger på at gennemgå sagerne med F. Han ved ikke præcis, hvordan gennemgangen blev organiseret, herunder om der var en juridisk vurdering. Han kan bekræfte, at E modtog brevet fra skatteministeren en mandag og sva-rede første gang om fredagen. Gennemgangen af sagerne med F var initieret af henvendelsen fra skatteministeren, men foregik efter, at de havde svaret mini-steren første gang.

Hvis de havde haft Fs navn i januar 2017, ville der være kommet hits. En søg-ning på "F" ville ikke have genereret hits, da selskabet ikke var angivet med denne forkortelse. De havde imidlertid ikke navnet i starten af 2017, men først i slutningen af oktober 2018 ved modtagelsen af skatteministerens brev. Han stødte heller ikke på navnet ved søgninger på Google. De var betryggede ved deres søgning.

Undersøgelserne i foråret 2016 og januar 2017 efterlod ikke skriftspor i form af notater. Der var alene tale om mails, herunder om den endelige legal opinion fra K i foråret 2016. Undersøgelserne endte, så vidt han husker, ikke med en skriftlig afrapportering. Resultaterne blev for det meste drøftet på møder, hvoraf han deltog i nogle. Konflikttjekket i januar 2017 materialiserede sig ved udskrift af artikler med markering af alle søgte navne. Disse artikler blev over-draget til C, som var ansvarlig for sagen, og han "signede" herefter af på sagen. Der blev først lavet et almindeligt konflikttjek ultimo 2016 og derefter et ekstra-ordinært konflikttjek i januar 2017, som han stod for. Der var ikke andre skrift-lige dokumenter end artiklerne, da der ikke var nogen hits. Hits til gennemgang hos den sagsansvarlige jurist ville ofte være den relevante dokumentation. Da der ikke var nogen hits, blev konflikttjekket afsluttet. Det var ikke sædvanligt at undersøge fratrådte partnere, som det skete i foråret 2016. Der var, så vidt han husker, ikke en skriftlig afrapportering til bestyrelsen eller lignende.

**Supplerende anbringender**
<u>A, B, C, D og E</u> har supplerende anført navnlig, at det konflikttjek, som E ifølge landsretten skulle have foretaget, ville være helt urealistisk. Landsrettens krav fører til, at advokaterne reelt skulle afgive garanti for, at der ikke forelå en inte-ressekonflikt eller risiko herfor, og er udtryk for en efterrationalisering uden sammenhæng med, hvad der er praktisk muligt, jf. Danske Advokaters indlæg for Højesteret. Frifindelsen af E i sagen mod Skatteforvaltningen om erstatning i anledning af rådgivningen af F i 2014 viser i øvrigt, at selv hvis rådgivningen var blevet opdaget forud for, at E påtog sig advokatundersøgelsen, ville der ikke have foreligget en interessekonflikt.

Skatteministeriet har under alle omstændigheder fortabt sin ret til at påberåbe sig en mulig interessekonflikt. Skattemyndighederne vidste allerede på tids-punkt for undersøgelsen, at F var mistænkt for svindel med tilbagesøgning af

udbytteskat, og at E havde rådgivet banken. Dette fremgik af mailen af 10. oktober 2016 fra de tyske skattemyndigheder til SKAT. Der må ske identifikation mellem SKAT og Skatteministeriet, og det kan i hvert fald bebrejdes Skatteministeriet, at ministeriet ikke inddrog SKAT i vurderingen af, om E skulle forestå undersøgelsen.

<u>Advokatnævnet</u> har supplerende anført navnlig, at landsretten har opstillet korrekte og rimelige krav til konflikttjek i en sag som den foreliggende, der har en helt særlig karakter. Landsrettens dom angår ikke konflikttjek i almindelighed, og præmisserne kan ikke overføres på konflikttjek i sædvanlige tilfælde.

<u>Skatteministeriet</u> har supplerende anført navnlig, at den metode, som landsretten har anvist for konflikttjek, er praktisk og rimelig. Anvisningen er begrundet i sagens konkrete omstændigheder og udtryk for, at E påtog sig en opgave af helt særlig karakter.

Frifindelsen af E i erstatningssagen kan ikke føre til en ændret vurdering af den foreliggende sag, allerede fordi dommen er anket. Desuden skal der foretages forskellige vurderinger i de to sager, idet erstatningssagen skal vurderes ud fra advokat V1s viden i 2014, mens den foreliggende sag skal vurderes ud fra de ansvarlige advokaters viden i 2017.

Skatteministeriets adfærd kan ikke føre til, at ministeriet har accepteret en eventuel interessekonflikt for E. Det er ikke muligt at samtykke til at anvende en inhabil advokat i en undersøgelse af den foreliggende karakter. Desuden kan hverken viden i anklagemyndigheden eller SKAT tilregnes Skatteministeriet, og mailen af 10. oktober 2016 kan heller ikke i øvrigt tillægges betydning.

**Højesterets begrundelse og resultat**

*1. Sagens baggrund og problemstilling*
I marts 2017 indgik Skatteministeriet aftale med E om at gennemføre en uvildig undersøgelse af den såkaldte udbyttesag. I december 2017 afsluttede E undersøgelsen.

I oktober 2018 blev Skatteministeriet bekendt med, at E i august 2014 – dvs. inden den nævnte undersøgelse – havde afgivet en "legal opinion" efter anmodning fra det internationale advokatfirma G som repræsentant for den tyske F. Es legal opinion indeholdt bl.a. rådgivning om Fs mulige erstatnings- og strafferetlige ansvar som depotbank for amerikanske pensionsordninger ("401 K pension plans"), der ønskede tilbagesøgning af udbytteskat i Danmark. E fulgte efter anmodning fra G op på rådgivningen i 2015 og 2017.

I september 2019 vedtog F i Retten i Glostrup at betale en bøde på 110 mio. kr. for overtrædelse af straffelovens § 279, jf. § 286, stk. 2 (bedrageri af særlig grov

beskaffenhed). Ved bødevedtagelsen erkendte banken sig skyldig i, at den i perioden 2014-2015 bl.a. havde udarbejdet urigtig dokumentation ("Dividend Credit Advices") for udbetaling af udbytte fra danske aktier, som bankens medgerningsmænd på vegne af amerikanske pensionsordninger anvendte til fra danske skattemyndigheder uberettiget at få udbetalt ikke under 1,1 mia. kr. i tilbagesøgning af udbytteskat.

Efter klage fra Skatteministeriet pålagde Advokatnævnet ved kendelse af 4. juli 2019 advokaterne A, B, C og D, alle fra E, hver en bøde på 10.000 kr. for at have tilsidesat god advokatskik ved at påtage sig undersøgelsen, uanset at der som følge af rådgivningen af F forelå en interessekonflikt. Nævnet bestemte samtidig, at Es krav på salær fra Skatteministeriet skulle bortfalde.

Sagen angår, om der er grundlag for at tilsidesætte Advokatnævnets afgørelse.

*2. Tilsidesættelse af god advokatskik*

*2.1. Retsgrundlaget*
Efter retsplejelovens § 126, stk. 1, 1. pkt., skal en advokat udvise en adfærd, der stemmer med god advokatskik. Efter bestemmelsens 2. pkt. skal advokaten herunder udføre sit hverv grundigt, samvittighedsfuldt og i overensstemmelse med, hvad berettigede hensyn til klienternes tarv tilsiger. I princippet om god advokatskik ligger bl.a., at en advokat ikke må udføre opgaver for en klient i tilfælde, hvor der foreligger en interessekonflikt for advokaten.

Visse advokatundersøgelser betegnes som "uvildige". Efter Danske Advokaters vejledning om advokatundersøgelser (2012) ligger det heri bl.a. – som en skærpelse i forhold til almindelige advokatundersøgelser – at der ikke består et fast klientforhold mellem den pågældende advokat eller en anden advokat fra samme virksomhed og den, der rekvirerer undersøgelsen. Højesteret finder, at betegnelsen "uvildig" ikke indebærer skærpede krav til advokatens uafhængighed i forhold til andre end rekvirenten, men skærpede krav kan f.eks. følge af den pågældende sags karakter. En overtrædelse af sådanne krav kan indebære en overtrædelse af retsplejelovens § 126, stk. 1.

Advokater, der skal gennemføre en uvildig undersøgelse, skal på linje med, hvad der generelt gælder for advokater, i rimeligt omfang sikre sig imod interessekonflikter, jf. også pkt. 12.1 i Advokatrådets dagældende etiske regler. De nærmere krav til et sådant "konflikttjek" må fastlægges bl.a. i lyset af sagens karakter.

Finder Advokatnævnet, at en advokat har tilsidesat pligter, der følger af retsplejeloven, kan nævnet efter lovens § 147 c, stk. 1, 1. pkt., pålægge advokaten en bøde. Tilsidesættelse af god advokatskik kræver, at den begåede fejl har en vis

grovhed, og det er en nødvendig, men ikke tilstrækkelig betingelse, at advoka-
ten personligt har handlet culpøst, jf. Højesterets dom af 16. oktober 2014 (UfR
2015.60).

*2.2. Vurdering af Es uafhængighed (spørgsmålet om interessekonflikt)*
Som anført af landsretten fulgte det af den politiske aftale af 16. december 2016
mellem et flertal af Folketingets partier, at der skulle igangsættes en uvildig ad-
vokatundersøgelse af udbyttesagen. Som ligeledes anført var der tale om en sag
af stor politisk, økonomisk og samfundsmæssig betydning, og Højesteret tiltræ-
der, at opdragets særlige karakter indebar skærpede krav til advokatens uaf-
hængighed, herunder i forhold til selskaber med mulig tilknytning til uberet-
tiget tilbagesøgning af udbytteskat. Det kan ikke tillægges betydning, at undersø-
gelsen ikke skulle omfatte en vurdering af retligt ansvar for sådanne selskaber.

E rådgav som nævnt bl.a. i 2014 og 2015 – dvs. i årene op til advokatundersøgel-
sen i 2017 – F om bankens mulige erstatnings- og strafferetlige ansvar som de-
potbank for amerikanske pensionsordninger, der ønskede tilbagesøgning af ud-
bytteskat i Danmark. F medvirkede i de samme år til bedrageri af særlig grov
beskaffenhed, idet banken udarbejdede urigtig dokumentation, som blev an-
vendt til fra danske skattemyndigheder uberettiget at få udbetalt ikke under 1,1
mia. kr. i tilbagesøgning af udbytteskat.

Herefter tiltræder Højesteret, at der forelå en interessekonflikt, da E i 2017 påtog
sig at stå for advokatundersøgelsen. Det gælder, selv om det på daværende
tidspunkt endnu ikke var fastslået, at F var involveret i det nævnte bedrageri.

*2.3. Vurdering af Es konflikttjek*
Det er ikke muligt generelt at fastslå, hvilke undersøgelser en advokat skal
iværksætte for at sikre, at der ikke er tale om interessekonflikter, idet dette som
anført må fastlægges bl.a. i lyset af sagens karakter.

I den foreliggende sag indebar opdragets særlige karakter og det forhold, at E
ikke fra skattemyndighederne havde oplysninger om navne på personer eller
virksomheder, som var mistænkt for udbyttesvindel, at der måtte stilles betyde-
lige krav til konflikttjekket. Et konflikttjek måtte bl.a. have til formål i rimeligt
omfang at sikre, at der ikke forelå sager fra de senere år, hvor E havde ydet råd-
givning om udbytteskat til personer eller virksomheder, som var involveret i
uberettiget tilbagesøgning af udbytteskat, eller hvor der var en ikke ubetydelig
risiko for dette. Det må i den forbindelse også indgå, at det på tidspunktet for
Es konflikttjek var offentligt kendt, at internationale virksomheder over for dan-
ske myndigheder havde begået omfattende svindel med tilbagesøgning af ud-
bytteskat.

Som anført af landsretten må det lægges til grund, at C og V7 som led i deres
konflikttjek – ud over den stikprøveundersøgelse, der var gennemført i 2016 –

tog skridt til at afdække mulige klientrelationer hos E i forhold til personer og selskaber, som ifølge søgning på Google havde været offentligt omtalt i forbindelse med udbyttesagen. Som ligeledes anført af landsretten talte C efter sin forklaring også med en eller flere advokater i Es skatteafdeling for at afdække mulige interessekonflikter, og det må lægges til grund, at den eller de pågældende advokater gav udtryk for, at der i skatteafdelingen ikke var sager, som gav anledning til habilitetsmæssige betænkeligheder.

For landsretten har C yderligere forklaret bl.a., *at* han ikke kan "huske, om alle partnerne i skatteafdelingen blev spurgt", *at* der "ikke inden påtagelsen af opgaven for Skatteministeriet [blev] givet et dessin til en eller flere af partnerne i skatteafdelingen om, at skatteafdelingen skulle cleare af, om der var problematiske sager", og *at* det ville "overraske ham 'helt vildt', hvis ikke der blev talt sammen i skatteafdelingen om sagen". For Højesteret har han supplerende forklaret bl.a., at der i forhold til skatteafdelingen "ikke [var] tale om et formaliseret dekret om gennemførelse af konflikttjek", og at der var tale om "en anden form for kommunikation end et dessin".

Det kan efter det anførte ikke præcist fastlægges, hvilke samtaler C og V7 havde med advokater i Es skatteafdeling med henblik på at sikre, at der ikke forelå problematiske sager. Det må imidlertid lægges til grund, at de f.eks. ikke sikrede sig, at alle relevante advokater i E blev inddraget og gjort mere indgående bekendt med, hvilke skærpede habilitetskrav der gjaldt for undersøgelsen, således at de i dette lys kunne overveje, om der forelå sager af den anførte karakter. Højesteret finder, at en sådan inddragelse havde været egnet til at finde frem til sagen om F.

I hvert fald under de foreliggende omstændigheder, hvor der heller ikke blev iværksat andre undersøgelser end dem, der er omtalt ovenfor, finder Højesteret, at den nævnte inddragelse af relevante advokater i E hørte med til et konflikttjek i rimeligt omfang, og at det foretagne konflikttjek derfor ikke var tilstrækkeligt.

Ved vurderingen af, om C – hvis han havde fundet sagen om rådgivning af F – burde have indset, at E som følge af interessekonflikt ikke kunne påtage sig undersøgelsen, må der navnlig lægges vægt på mailvekslingen mellem E og G i bl.a. februar 2014 og på indholdet af Es legal opinion af 4. august 2014.

Herom bemærker Højesteret nærmere:

Det fremgår af Gs mail til E af 3. februar 2014 bl.a., *at* F ikke selv skulle være part i den omhandlede transaktion, men alene levere tjenesteydelser, *at* parterne i transaktionen "will realize a tax benefit in Denmark which probably consists in a double refund of dividend withholding tax", og *at* F var bekymret for, om man skulle være opmærksom på "issues" i Danmark, f.eks. "tax fraud". Af

advokat V1s svar samme dag til G fremgår bl.a., *at* transaktioner som de beskrevne "may entail a possibility for two shareholders to reclaim the same withholding tax… ('cum-/ex trades')", og *at* sådanne transaktioner "are generally problematic from a legal perspective and most often it is not possible to provide the kind of opinion regarding legal and liability issues which is normally requested by the parties involved." Den 6. februar 2014 spurgte G E, om en legal opinion "could be a reasoned 'should' opinion (i.e. 'F should not be subject to criminal prosecution etc.') subject to certain reasonable assumptions (e.g. acting in good faith, relied on expert opinion, no participation in – potentially – unjustified tax advantage etc.) and reservations (no precedent/case law, etc.)". I et svar af 7. februar 2014 gentog V1, at den omhandlede transaktion "is problematic from a Danish legal point of view", og at "should level cannot be promised".

I de følgende dage var der yderligere mailveksling mellem G og advokater i E, bl.a. på grundlag af advokat Hs "tax opinion" af 27. juni 2012. I Gs mail af 13. februar 2014 anføres bl.a., *at* advokatfirmaet ikke har behov for en "reconfirmation… from a tax perspective, but a reasoned tax analysis of the risk that our client might be exposed if acting as custodian in this project", og *at* det relevante spørgsmål er, om F efter dansk skatteret "could be held liable or even prosecuted as supporting/facilitating a tax evasion committed by one of the other players in this transaction...". Endvidere anføres bl.a., *at* E kan lægge til grund, at "[t]he structure was not developed by our client", *at* "[o]ur client will perform the role of the securities custodian, but no other role", *at* "[o]ur client… is not actively marketing this structure to others", og *at* "[o]ur client has no information or knowledge about whether or not the tax reimbursement claim will be submitted twice/by a second person."

I tiden herefter blev der udvekslet forskellige udkast til legal opinion mellem E og G, og den 4. august 2014 afgav E sin endelige opinion. I pkt. 4 ("Assumptions") anføres bl.a., *at* "[t]he contemplated transaction was not structured by F", *at* "F will perform the role of the securities custodian, but no other role…", og *at* "F has no reason to assume that – or information or knowledge about whether or not – a person or entity other than USPF will file for a tax reclaim with respect to the dividend withholding tax withheld on the Dividend paid on the Equities." I pkt. 5 ("Opinion") anføres som konklusion bl.a., *at* "F should not be subject to Danish civil law liability to compensate the Danish state for any loss suffered as a result of its role in the contemplated transaction", men *at* en række omstændigheder "prevents us from reaching a more definitive opinion on the position of F". Det anføres også, at "F should not be subject to Danish criminal liability as a result of its role in the contemplated transaction."

Højesteret finder på denne baggrund, at C – hvis han havde fundet sagen om rådgivning af F – burde have indset, at der var en ikke ubetydelig risiko for, at F

var involveret i uberettiget tilbagesøgning af udbytteskat, og at E derfor ikke kunne påtage sig undersøgelsen.

For så vidt angår A, B og D lægger Højesteret til grund, at de bemyndigede C til at gennemføre et konflikttjek på deres vegne, og at de i det hele overlod til ham, hvad dette tjek nærmere skulle bestå i. Under disse omstændigheder og i lyset af sagens særlige karakter finder Højesteret, at alle fire advokater må bedømmes på grundlag af Cs tjek.

Af de grunde, som landsretten har anført, tiltræder Højesteret endvidere, at de oplysninger om erfaring med rådgivning om tilbagesøgning af udbytteskat, som E i forbindelse med sit tilbud gav Skatteministeriet, ikke kan tillægges betydning. Det samme gælder oplysningerne om Skatteministeriets drøftelser med Justitsministeriet og anklagemyndigheden og den omstændighed, at Skatteministeriet ikke inddrog SKAT i vurderingen af Es tilbud, herunder at Skatteministeriet ikke fik kendskab til en mail af 10. oktober 2016 fra de tyske skattemyndigheder til SKAT.

*2.4. Konklusion om tilsidesættelse af god advokatskik*
Højesteret tiltræder efter det anførte, at A, B, C og D har tilsidesat god advokatskik ved at påtage sig den omhandlede advokatundersøgelse.

Højesteret tiltræder endvidere, at de hver er pålagt en bøde på 10.000 kr.

*3. Bortfald af salær*
Aftalen om undersøgelse af udbyttesagen blev indgået mellem Skatteministeriet og E, og det må lægges til grund, at salær for undersøgelsen i givet fald tilkommer E og ikke A, B, C og D personligt. Der er ikke over for dette anført noget, som kan begrunde, at disse advokater har tilstrækkelig retlig interesse i deres påstande om betaling af salær til E, og Højesteret tager derfor Skatteministeriets påstand om afvisning til følge.

Med hensyn til Es påstande om betaling af salær tiltræder Højesteret, at der som følge af den foreliggende interessekonflikt er tale om en væsentlig mangel ved undersøgelsen, og at E herefter ikke har krav på salær i sagen.

*4. Samlet konklusion og sagsomkostninger*
Højesteret stadfæster landsrettens dom, dog således at As, Bs, Cs og Ds påstande over for Skatteministeriet afvises.

Sagsomkostninger for Højesteret er fastsat til dækning af advokatudgift. Der er lagt vægt på navnlig sagens omfang og karakter, herunder advokatarbejdets omfang.

## THI KENDES FOR RET:

Landsrettens dom stadfæstes med den ændring, at As, Bs, Cs og Ds påstande over for Skatteministeriet afvises.

I sagsomkostninger for Højesteret skal A, B, C og D solidarisk betale 320.000 kr. til Advokatnævnet og sammen med E solidarisk betale 400.000 kr. til Skatteministeriet.

De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse og forrentes efter rentelovens § 8 a.