# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re:

CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKAT) TAX REFUND LITIGATION

18 MD 2865 (LAK)

------------------------------x

November 20, 2018
9:30 a.m.

Before:

HON. LEWIS A. KAPLAN,

District Judge

APPEARANCES

HUGHES HUBBARD & REED LLP
Attorneys for Plaintiff SKAT
BY: MARC A. WEINSTEIN
WILLIAM R. MAGUIRE
SARAH L. CAVE
NEIL J. OXFORD

CAPLIN & DRYSDALE, CHARTERED
Attorneys for The Bradley London Pension Plan and Doston Bradley
BY: MARK D. ALLISON
ZHANNA A. ZIERING

WILLIAMS & CONNOLLY
Attorneys for Sander Gerber Pension Plan
BY: AMY McKINLAY

APPEARANCES (Cont'd)

MORVILLO, ABRAMOWITZ, GRAND, IASON & ANELLO P.C.
Attorneys for Adam LaRosa
BY: EDWARD M. SPIRO

GUSRAE, KAPLAN, NUSBAUM, PLLC
Attorneys for Goldstein Defendants
BY: MARTIN H. KAPLAN

DEWEY PEGNO & KRAMARSKY
Attorneys for Defendant Ben-Jacob
BY: THOMAS E.L. DEWEY

KATTEN MUCHIN ROSENMAN LLP
Attorneys for Defendant Klugman
BY: DAVID L. GOLDBERG

KOSTELANETZ & FINK, LLP
Attorneys for John Doscas, David Freelow and Sterling Alpha Plan and Delmar Plan
BY: ERIC SMITH
JULIET L. FINK

JOHN M. HANAMIRIAN
Attorneys for Acorn Summer, Greggory Summers, Acron Nowell and Shree Shaw

K&L GATES LLP
Attorneys for DW Construction, Inc. Retirement Plan
BY: JOHN C. BLESSINGTON

(Case called)

THE DEPUTY CLERK: Counsel for plaintiff SKAT, are you ready?

MR. WEINSTEIN: Yes. Good morning, your Honor. Marc Weinstein, Bill Maguire, Sarah Cave, and Neil Oxford from Hughes Hubbard & Reed.

THE COURT: Good morning.

THE DEPUTY CLERK: For Defendants Bradley London Pension Plan and Doston Bradley, are you ready?

MR. ALLISON: Yes. Good morning, your Honor. Mark Allison, Caplin & Drysdale, on behalf of the plan and dozens others as you know.

THE COURT: Yes.

THE DEPUTY CLERK: Defendant Sander Gerber Pension Plan, are you ready?

MS. McKINLAY: Yes. Good morning, your Honor. Amy McKinlay from Williams & Connolly.

THE DEPUTY CLERK: Defendant Adam LaRosa, are you ready?

MR. SPIRO: Edward Spiro of Morvillo, Abramowitz, Grand, Iason & Anello. Good morning, your Honor.

THE COURT: Good morning.

THE DEPUTY CLERK: Defendant Goldstein Law Group 401(k) Profit Sharing Plan and Sheldon Goldstein, are you ready?

MR. KAPLAN: Ready. Martin H. Kaplan, Gusrae Kaplan, Nusbaum, PLCC, for the Goldstein defendants.

Good morning, your Honor.

THE COURT: Good morning.

THE DEPUTY CLERK: Defendant Michael Ben-Jacob, are you ready?

MR. DEWEY: Yes. Tom Dewey for Mr. Ben-Jacob.

THE COURT: Good morning.

THE DEPUTY CLERK: Defendant Robert Klugman, are you ready?

MR. GOLDBERG: Good morning, your Honor. David Goldberg from Katten Muchin.

THE COURT: Good morning.

THE DEPUTY CLERK: Defendant John Doscas, David Freelow, and the Sterling Alpha Plan and Delmar Plan, are you ready?

MR. SMITH: Yes, your Honor. Eric Smith, Kostelanetz & Fink, and Juliet Fink.

THE COURT: Good morning.

THE DEPUTY CLERK: Defendant Acorn Summers, Greggory Summers, Acron Nowell, and Shree Shaw, are you ready?

MR. HANAMIRIAN: I am, your Honor. John Hanamirian.

THE COURT: Good morning.

THE DEPUTY CLERK: Defendant DW Construction, Inc. Retirement Plan, are you ready?

MR. BLESSINGTON: I am. Good morning, your Honor. John Blessington, on behalf of that plan, six others from Utah, and one from Pennsylvania.

THE COURT: Geographical distribution.

OK. Well, I think it probably makes sense to hear from Mr. Hanamirian first. And, in particular, Mr. Hanamirian, why do we need more than one lead counsel in this case?

MR. HANAMIRIAN: You want me at the podium, your Honor?

THE COURT: Yes.

MR. HANAMIRIAN: I think, your Honor, without getting into the entirety of the specifics down the road, I have been dealing with similar claims on behalf of different nations since 2012. So this type of investment, this cum-ex trade type of investments has been the subject of inquiry, both civil and criminal, in other jurisdictions.

THE COURT: This type of investments, is that what you said?

MR. HANAMIRIAN: I did.

THE COURT: What do you mean by that?

MR. HANAMIRIAN: This type of investment structure, this cum-ex trading structure that underlies the allegations of fraud in this matter.

THE COURT: Maybe you can explain that to me.

MR. HANAMIRIAN: That's been a challenge for a lot of

people, your Honor. But the type of investment itself and the trading structure itself has been the subject of, as I said, inquiry in a number of jurisdictions over the past six or so years. So I have been dealing with --

THE COURT: What is the trading structure? What are you talking about? I don't have any idea what you're talking about.

MR. HANAMIRIAN: That's why I say I think that the analysis and the discussion of that might be premature given the plaintiff's burden in the case. So if I go through and provide testimony in this context, I think it might not be appropriate. I know you're looking at me askance, but the underlying structure, the investment structure, how it came about and the components to it are probably a piece of the assertion with respect to fraud. And so my articulation of it probably is relatively meaningless. It more depends upon the actual structure as articulated potentially by any of the defendants.

So my understanding of the investment vehicle itself, or of cum-ex trading, is one thing. The assertions in this case with respect to fraud or with respect to other wrongful conduct are another thing.

THE COURT: Well, if the objective of your remarks was to explain to me why we should have more than one lead counsel, swung out and missed. If you don't want to explain to me what

the facts are that in your view make it appropriate to have more than one lead counsel I don't see a need for it.

MR. HANAMIRIAN: I think there are certain persons within the defendant group who might have different issues with respect to the defense of the claims. So going down a path on a singular defense theory, this situation is unlike a class action where you have multiple pharmaceutical companies and you say, OK, we are all in, and it's just a factor of allocation of responsibility and anybody can really do that. I have international Fifth Amendment-type concerns that I have to address with respect to one or more of my clients. I have the effect of an international Fifth Amendment or a domestic United States proceeding that I have to address.

THE COURT: What is an international Fifth Amendment claim?

MR. HANAMIRIAN: If you have a Fifth Amendment or an equivalent right in another jurisdiction, is it enforceable with respect to your right to or the assertion of a privilege or a right here within the United States relative to being compelled to testify or provide any kind of testimonial aspect in this proceeding?

So if you have -- and I don't know the answer to that. I have looked pretty hard. But certainly domestically asserting a Fifth Amendment because there is a potential domestic criminal proceeding is a nonevent, that's a loser.

But if you have an equivalent right within another jurisdiction, can you then present that claim here and have it enforced? And that's an issue for us that I think needs to be decided. These matters, most of this is public record, but --

THE COURT: What is public record?

MR. HANAMIRIAN: Most of what I am seeking to protect as against with respect to some other clients that I represent is a matter of -- the fact of investigations in other jurisdictions, foreign jurisdictions, is a public record. But I have to be sensitive to disclosure in the context of this environment, but at the same time I have to protect my client. So I can follow Mr. Allison and his defendants to a certain extent, and certain other certain areas I already know I can't.

THE COURT: For example?

MR. HANAMIRIAN: For example, just even proceeding with respect to testimony, in deposition testimony, will my people be produced or will any of my persons be produced for a deposition? Well, I have some issues with some of that, and so I am going to present some reasons why not in the form of a motion or otherwise. So I have to deal with that.

When you have parallel civil and criminal proceedings, we have parallel civil and criminal proceedings in this case, let alone in the other jurisdictions that I --

THE COURT: What criminal proceedings are you talking about?

MR. HANAMIRIAN: In the motion to seal where there is an assertion with respect to the existence of the criminal proceeding in Denmark and a criminal investigation. So I have got to deal with that.

Certainly, Mr. Allison's clients have similar concerns with respect to the existence of a criminal investigation, but I have potentially further concerns with respect to maybe one or more of those clients with respect to the impact of this proceeding on other criminal investigations.

THE COURT: What do you conceive the effect of designating a lead counsel here would be?

MR. HANAMIRIAN: I don't necessarily know the answer, your Honor.

THE COURT: Neither do I. We are going to talk about that.

MR. HANAMIRIAN: I wanted to be heard with respect to it because I just don't think that this is the kind of case where you can go forward and say like the analogy I gave as far as a civil claim with respect to an MDL.

THE COURT: What do you think we should do, have 140 different motions for a protective order, 140 different sets of interrogatories? I don't think we are going to do that.

MR. HANAMIRIAN: No. If I have to be an outlier, your Honor, or if I end up being an outlier on it, I just want to assure that that status is available. So we don't know

necessarily what it means to be lead counsel in this case, and I can't really find out.

THE COURT: Perfectly fair comment. And of course you can't because we haven't fleshed it out yet.

MR. HANAMIRIAN: So before it gets to that stage, I wanted to be heard. Again, it's not about Mr. Allison. I like Mr. Allison; competent firm, competent people. It's not that. It's a factor that -- I'm a defense attorney. I can't sit still and watch the case go by my people.

THE COURT: Of course. But there is a question of how the case gets organized, what gets done first, what gets done later, how we manage discovery where you have 140 different defendants, all of whom probably want to do different things if left to their own devices. That's not practical.

MR. HANAMIRIAN: I think that there are some who will need to follow suit with respect to what either I or someone else in this role would present and others who need to become outliers. The difficulty from my perspective in identifying particular defendants or particular counsel as outliers is that I think it creates a magnifying glass on those persons for purposes of the plaintiff's focus, right? And so then my fear or my concern with respect to --

THE COURT: You want to have it both ways. You want to hide in the weeds, except when you don't want to hide in the weeds.

MR. HANAMIRIAN: But isn't that a good defense attorney? My concern with respect to even the case proceeding forward beyond the motion to dismiss stage is just this. We are now in a posture where essentially you're forcing the defendants to kind of come out of those weeds. And that's fine for the purpose of the civil case, but I don't think that you can conduct a criminal investigation in Denmark through this civil case and say, OK, we will sue everyone, and just kind of see who is left standing when the music stops, right?

So that's really what is kind of happening. I anticipated not suggesting that I have some superior skill, but I anticipated it might happen. So now, if we are in it, we are in it, and now I have to deal with it. So ultimately, if it's not today, it's going to be during the course of this discovery process that certain persons that I represent, and their roles with respect to this, both domestically and otherwise in this case, will be identified, and I have to deal with it. I don't want it to be the first time that you hear it at that time. I wanted the first time that you heard it to be today.

THE COURT: Thank you.

Mr. Allison.

MR. WEINSTEIN: Your Honor, can I just raise one procedural issue?

THE COURT: Sure.

MR. WEINSTEIN: I think when the case was called

today, it was called with respect to the defendants who originally had been sued in the Southern District. My understanding is we are here on all the cases. I just want to make sure that all defendants, because I think there are some other defendants who may have different attorneys, I just want to make sure everyone on that side is represented and is or can participate in this lead counsel decision.

THE COURT: Of course.

Has everyone had notice?

MR. WEINSTEIN: I believe the court's --

THE COURT: I don't have it in front of me. I have just come off close to two months of trial.

MR. WEINSTEIN: I believe that is the case, your Honor.

THE COURT: Fine.

Mr. Allison.

MR. ALLISON: Thank you, your Honor.

I don't have a grand speech here. The proposal I think for lead counsel, and I think the reason why I was suggested by among the other defense counsel to have this role is obviously we have the largest group of cases that we are representing, and I can say I hope, without misrepresenting anything, that we have a good working relationship with all the defense counsel. We have worked and coordinated together in the almost six months that these proceedings have been ongoing.

We have coordinated on common defense positions, and I respect Mr. Hanamirian's concerns. There are, obviously, differing views about different positions, and there will come different points in time where we will differ, and there may be a need for a different position to be taken for a specific group of defendants.

The way I understood the lead counsel role to work, even though there is not any particular precedent that I am aware of, is really as a coordinator, sort of a quarterback, to make sure that we have common singular filings that are made to the extent possible, and where that is not possible to flag that for the court. That has been the role that we have envisioned. We have managed it so far in the first six months, and again, without going out on a limb here, I have had I think a good working relationship with plaintiff's counsel, and I hope and expect that that would continue, again, on behalf of all defendants where possible. And I would just hope to continue sort of playing that role.

THE COURT: This, of course, is very unlike any of the other MDLs I have done because the plethora of parties is on the defense side, not on the plaintiff's side, and it is not a representative action. And that, of course, necessarily means that there is a possibility, probably quite significant, that there will be some variation of positions among the defense group. And my conception for the role of lead counsel is very

tentative and very general at this moment, but it's going to need to become more specific.

Now, I went forward in the way I did, without trying to firm up what the role is exactly, because I wanted to see if there was a consensus on an individual or a group that would function.

Now, it is, of course, very important that the lead counsel communicate with all defense counsel and that there be an attempt to reach common positions to the extent that's possible. I wanted to see really, when I put out the notice, whether we had one person or some small representative group, and basically what I got back is that everybody is content with, at least at this point, you performing that role on your own, obviously talking to everybody all along. And then there is Mr. Hanamirian's position, which although I understand the sensitivity he has, I don't have enough information to understand. It's not his fault. He has obligations to his clients and feels he can't tell me more today without letting some cat, in a very prejudicial way, out of the bag. I don't know if that's true or not. I accept his judgment. So we will go forward on the basis of one, at least for now, and it's you.

The next thing is I think we have to put some flesh on the bones. We need to develop a form of an order that says what it is you are supposed to do and not do, and I think it needs also to address the question of who is paying for it, to

the extent that it is not your clients.

Now, I don't remember any longer how many of these cases you have.

MR. ALLISON: It's roughly 104 or so, give or take.

THE COURT: So this may not be an issue. I remember when I was a far younger lawyer, we were counsel in an antitrust case with 63 defendants, and my firm represented General Motors, back in the day when there were no Japanese companies that were significant or German companies significant in the US automobile industry, and General Motors just paid for whatever coordination and that kind of work that there was. And if your clients are happy to do that, that's fine, and if not, we have to address it. And maybe they are. I am not asking right now, but maybe they are.

So I think the next step here is that we need to develop a form of order that will specify the role of lead counsel. Obviously, coordination of discovery is high on the list. I do not foresee, at least at the present time, having each of 140 defendants in the position of starting its own discovery program against the plaintiffs or anybody else. There will be, in my conception, at least a proposal on behalf of a substantial majority of the defendants in the case for what they think should be a common staging of discovery and who is going to take responsibility for that.

Now, that's not to say that any defendant would be

foreclosed from asking non-repetitive questions at a deposition, but the conception is there will be one deposition of a witness, just to take that as an example, and you can play that out across documents and admissions and interrogatories and everything else. I can see an analogue to that to motion practice.

So I am looking to counsel to propose a structure now to how we manage this case. And that will take, I imagine, a fair amount of consultation among counsel to come up with something that at least most, and hopefully everybody, can sign on to that will protect the court's interest in an economic or an efficient way of addressing the litigation, and an expeditious way, if I didn't say that, while respecting the rights of people with divergent interests.

So do you have a suggestion for how we go about that?

MR. ALLISON: Well, your Honor, yesterday, I believe it was, I had a sort of preliminary conversation with plaintiff's counsel, not specifically anticipating your ruling on the lead counsel role, but just to start the conversation about how we are going to make this process more efficient in both directions, because likewise I understand 140 depositions of the same witness for the plaintiff makes no sense. Likewise, we would have concern of 140 individual separate depositions in the other direction. That may or may not make sense given that there is probably some overlap in information

and knowledge and testimony.

THE COURT: Forgive me for interrupting. It would not surprise me, although I don't know, if these 140 defendants don't fall into some finite group of categories that have a good deal in common with one another and are differently situated from other groups of defendants, and maybe there is a way of approaching that that would be cost-effective.

MR. ALLISON: That's exactly what we were thinking, your Honor. At the same time, and to be transparent about it, obviously defendants have an equal concern about the fact that we have a potential duplicative process ongoing in Denmark, and we want to figure out a way to -- not take advantage, but to recognize that information is being provided now potentially in two different jurisdictions that may itself overlap, and there may be a way to make that process more efficient in utilizing the information that is going in both jurisdictions.

So, again, just very tentatively, we have talked about having a meeting next week after the holidays to try to start contemplating a little bit more about that and how to bring this into reality.

THE COURT: So what sort of a timetable seems to you to make sense to expect defendants, in collaboration with the plaintiffs, to have a proposal about an order regulating the lead counsel role and how we are going to manage this case?

MR. ALLISON: I am completely speculating, your Honor,

but given the holidays, this week we are talking really about --

THE COURT: Tough time of the year.

MR. ALLISON: I am going to guess a good goal would be before the Christmas holiday to have a sort of more concrete plan that encompasses both the lead counsel role and sort of a game plan for general approach with the plaintiff.

THE COURT: All right. That makes sense to everybody? Does anybody else want to be heard on this?

OK. So let's set the target date for proposal for December 18. How's that?

If anybody wants to respond to whatever that proposal may be, maybe Mr. Hanamirian is going to want to respond, just maybe -- just guessing, Mr. Hanamirian -- let's look at a date.

How about January 11, taking account of the holidays, for any response?

And then let's put down a conference for 9:30 on January 24 in all the cases, but this is the subject: How would we be organizing this case going forward and whatever the views are about the various proposals. OK?

Sir.

MR. WEINSTEIN: Thank you, your Honor.

So we will obviously work with defendants to try to come up with a reasonable proposal to manage the case. In the meantime, one, because we are talking about a conference two

months out, let me just revisit what had happened at the initial conference about at least document production in the case.

We had served, with your Honor's permission, document requests, at least on the Southern District defendants as they then existed. The defendants, consistent with your Honor's order, responded with respect to objections and those types of responses, but did not produce documents because your Honor had said they should not until your Honor had decided it was time to move that forward. In our view it's time to move that forward, at least, and not have another two months go by without that process going. So we would propose that for those who have already responded and said they will produce documents, notwithstanding their objections, that should now happen. We will serve the remaining defendants with document requests, let them respond and ultimately produce. So that's with respect to documents.

I think the only other issue raised by what has been discussed here today is there was a prior case management order on some of the issues, it's pretrial order number 1, which has certain dates in it that I think should be at least put off for now, or ultimately decided what to do with those. For example, there is a discovery cutoff date. More pressing for us, there is a date on which no additional parties may be joined, and that's January 20. So I think it would make sense for us to,

one, work with defendants on how the case will be managed.

THE COURT: Those two dates are adjourned sine die.

Anybody want to be heard on whether the defendants should not begin to produce documents?

MR. WEINSTEIN: Let me just add, there was a third date. In the prior order, there are dates such as March 31 for the amendment of pleadings. Perhaps we can just be on the working assumption that there will be in the future, perhaps after the January 24 conference, a new scheduling order with all dates.

THE COURT: That's adjourned too.

Mr. Allison.

MR. ALLISON: In terms of discovery, I certainly understand plaintiff's request. We would prefer, however, to wait until we have had an opportunity to confer with plaintiff about the overall case management, including as it relates to discovery, before we begin that process, because the effort involved in this kind of a production is not easy, and if there is a way to make it more efficient, I'd rather figure that out first than start engaging in that difficult task.

THE COURT: Well, the plaintiff has a universe of documents that it wants from every defendant, and I imagine they are the same.

Are they the same, requests the same?

MR. WEINSTEIN: Yes.

THE COURT: OK. The defendants, I imagine, are going to wind up negotiating those requests. You have made some objections. But to the extent you haven't objected, I see no reason why the documents shouldn't now be produced. And to the extent you work it out, no reason why they shouldn't be produced. And if there is some subset as to which there are objections, no reason why we shouldn't get the objections brought before the court.

MR. ALLISON: Your Honor, there were objections that were served on plaintiff on behalf of all of the Southern District defendants. They were extensive, as you would expect.

THE COURT: I haven't spent almost 50 years doing this in New York without knowing that.

MR. ALLISON: Of course, your Honor.

It does require some negotiation or resolution with plaintiff, both because of the volume and because of the nature of the information to produce. That's why it's got to be worked out first.

THE COURT: So get to work on it. To the extent there is material that's been requested as to which there is no objection, it's to be produced. And as you work out the objections, and I hope I don't have to work out the objections, but I will if I have to, and what usually happens then is nobody is happy. That's all there is to it. There is no discovery stay with respect to plaintiff's document discovery.

MR. ALLISON: OK, your Honor.

THE COURT: Anything else this morning?

MR. WEINSTEIN: Not from plaintiff, your Honor.

THE COURT: Sir, you are?

MR. BLESSINGTON: John Blessington.

I should say long-time listener, first-time caller.

THE COURT: Mike and the Mad Dog.

MR. BLESSINGTON: There you go.

Your Honor, it doesn't just concern me, but this is our first time before you. As I said, we represent plans and defendants from Utah as well as from Pennsylvania. I understand there are also plans in Massachusetts, Illinois, Florida. We are all now before you. There are motions to dismiss in those other states, in those other jurisdictions. I guess my question is something that may ultimately get ironed out, but I didn't know how the Court was going to handle those non-SDNY motions to dismiss.

THE COURT: My intention is that when I issue a decision, I will probably issue an order to show cause why that shouldn't control in all the other cases, and everybody will have an opportunity to tell me at that point that they are unique and different and should take another bite at the apple, and the plaintiff will probably have a different view, and I will sort them out.

MR. BLESSINGTON: I appreciate that, your Honor.

We served yesterday just a letter. We are sort of in a unique situation. The one plan in Pennsylvania, we have yet to file, for reasons I explained in the letter, we have yet to file a motion to dismiss, in part because of negotiations with SKAT over what would be the scope of that motion, but also because of the procedural posture of the case at the time we were due to file it. At that point, the MDL was granted, and then the case was closed and you had issued your stay. So I would just simply ask that at some point we be allowed to file that motion in the MDL docket and have it considered with all the other non-SDNY plans, or motions I should say, your Honor.

THE COURT: How is it different from the motion that I have before me?

MR. BLESSINGTON: Other than Pennsylvania law applies when we are dealing with the 9(b).

THE COURT: How does Pennsylvania law apply when you deal with the 9(b)?

MR. BLESSINGTON: Let me back up, your Honor. The reason that we didn't file initially is that Pennsylvania, believe it or not, has a two-year statute of limitations dealing with fraud claims. And under Third Circuit law, if there is a date in the complaint, as there is in the complaint in Pennsylvania, as there is in all of the complaints, in which they identify when they first learned of the alleged fraud and it's outside the statute of limitations, then it can be raised

in a 12(b)(6) context.

THE COURT: That's not Pennsylvania law. That's federal law.

MR. BLESSINGTON: Of course. But it's a two-year statute of limitations, which, to be completely candid, I didn't know there was a state that had such a short trigger on a fraud claim.

We brought that to SKAT's attention, and there were negotiations back and forth. We asked them, frankly, to voluntarily withdraw those claims, and we just learned yesterday that they have agreed to do so.

I am not challenging, your Honor, nor would I ever, your approach with the show cause. We simply just haven't filed it, and I just want to make sure we get it on file because it hasn't been filed. Because it would have been filed in the Eastern District of Pennsylvania, but then the MDL got granted. Actually, Ms. Cave requested that all dates be suspended. You endorsed that. And then you issued a pretrial order form, which you formally stayed all motions to dismiss.

THE COURT: Look, if you want to file it, go ahead and file, and I will probably stay it.

MR. BLESSINGTON: That's what I am addressing, your Honor.

THE COURT: What is the need to file it now if it's stayed? How are you prejudiced by not putting it on file?

MR. BLESSINGTON: I am not saying I am prejudiced. I just want to get it on file so whatever order you issue will apply to that motion as well. I didn't do a very good job in explaining.

THE COURT: That's fine.

MR. BLESSINGTON: Thank you, your Honor. That was the only issue.

THE COURT: Anything else?

All right. Thank you, all.

(Adjourned)