# Exhibit 6

CERTIFIED TRANSLATION

ISBN 978-87-619-4433-7

# Danish Court Procedure

Civil, bailiff, probate and criminal proceedings


Authors
Lars Lindencrone Petersen

**Release year:** 2023

**Edition:** 9

9th edition/1st printing

Batch: Integra, India

Mechanical, photographic or other reproduction of this book or parts thereof is not permitted under applicable Danish copyright law.

2023 Karnov Group Denmark A/S, Copenhagen

**ISBN:** 978-87-619-4433-7

**Published by:** Karnov Group Denmark A/S

Cover: Axel Surland, Ljungbyhed

Printing: Drukarnia WDS, Sandomierz, Poland

All rights reserved.

The book provides the reader with a comprehensive, integrated presentation of

Danish court procedure which is traditionally divided into civil proceedings, criminal proceedings, insolvency proceedings, etc. Danish administration of justice is the only presentation of administration of justice that provides a comprehensive textbook and handbook view of the entire administration of justice, including civil cases, bailiff cases, probate cases and criminal cases, as well as a comprehensive overview of the cross-cutting principles of procedural law.

## II. Civil litigation

### C. Case preparation

#### 1. Oral or written preparation?

Traditionally, litigation was prepared orally, meaning that all procedural steps were taken in court hearings. These hearings were often quite short, as they simply consisted of the parties' representatives appearing and submitting a pleading to the court, which then set the deadline for the other party to submit the next pleading.

Thus, it was not often that anything really productive happened at these meetings, and a number of years ago a legal basis was created for the court to decide that pleadings should only be sent to the court and the other party - written preparation - so that the waste of resources associated with these meetings could be avoided.

In the following years, written preparation became increasingly popular as courts increasingly tightened the control of

time spent on individual cases, and the court reform on 1 January 2007 took this step fully by abolishing the possibility of oral preparation.

Printed from Karnov for use in accordance with the licence terms

conclusion suffered from such an impairing defect as to justify a reduction in the price, that the plaintiff's possible

---

307

claim has lapsed as a result of late complaint (due to inaction) or that the claimant is at fault for ... and that his possible claims must therefore have lapsed.

The pleas can thus be formulated quite briefly. Whether **the facts** to support plea are sufficient, must appear from the evidence, the result of which the party or his lawyer will state in the proceedings. How the law in this area is to be interpreted is in principle left to the court itself, but the court is happy to hear the party's opinion in the proceedings, cf. the comments above.

In principle, the parties' factual submissions, like the claims, are frozen at the end of the preparatory phase, i.e. preclusion occurs for the purpose of the desired concentration. From this point in time, factual pleas can, in principle, only be amended (except for full or partial waiver of pleas) or new pleas made with the consent of the opposing party or - if not granted - with the court's authorisation, which requires that the delay is excusable, cf. Danish Administration of Justice Act §§ 357 and 363. On the other hand, the pleas may be freely amended and new pleas may be raised as long as the preparation is ongoing.

Although the Administration of Justice Act seems to equate claims and pleas in this , it is often a more serious matter to change your claim at an advanced stage. Therefore, greater liberality is usually shown with regard to new pleas, but even here there are limits, cf. e.g. *TfS 1999.717 V* about a case concerning the accountant's liability for incorrect calculation of tax on a property sale. Only during the main hearing did the auditor put forward a plea that the taxpayer had not suffered any loss other than the loss of interest, but the High Court cut off this - important - new plea.

The negotiation maxim also applies to factual arguments: the court can only take into account arguments that the party has asserted (or that cannot be waived), see Danish Administration of Justice Act § 338.

## 5. Evidentiary requirements - burden of proof, assessment of evidence, strength of evidence and discovery

Before juggling with the terms used in the headline in the following, some evidential concepts must first be defined:

Standard of proof is an overarching term for the burden of proof, assessment of evidence and strength of evidence. Burden of proof is an expression of who will be prejudiced if something is unclear after the presentation of evidence in the case. Assessment of evidence is the judgement of the evidence made by the court, cf. section 344the Danish Administration of Justice Act (1) of below. Strength of evidence is the degree of certainty required for something to be considered proven.

---

308

There is a very important principle in civil proceedings regarding the court's free assessment of evidence, cf. Danish Administration of Justice Act § 344(1): "On the basis of what has passed during the proceedings and the presentation of evidence, the court shall determine the facts on which the judgement of the case shall be based."

It follows that there can be no prior requirements as to what evidence must be presented in order for a particular alleged fact to be considered proven. The assessment of evidence is "free" - which is not the same as "arbitrary" or "random". The judgement of evidence must be exercised in an objective manner that can be communicated and explained to the outside world. The judgement of evidence should be made in such a way that it can be assumed that other judges would reach the same result.

Printed from Karnov for use in accordance with the licence terms

It is a manifestation of the free assessment of evidence when certain testimonies are given special weight, see e.g. *UfR 2009.1102 Ø* and *UfR 2009.1105 Ø* concerning municipal parking attendants. In both of these cases, the High Court noted that the municipal parking attendants are "specially trained for their work" and that there is therefore "a presumption that they exercise their administrative authority as parking attendants in accordance with the provisions of a prepared manual". However, the two cases are also a further illustration of the free assessment of evidence, as the parking attendant's statement was used in the latter case "after an overall assessment of the information in the case [there was] such doubt as to whether A's car was [illegally] parked in the disabled parking space or [legally] in the space next to it at the time of the inspection" that the parking fine was cancelled. Doubt about the scope of the prohibition can also lead to acquittal, cf. *UfR 2012.1962 Ø*, where the sign "Max. 2 hours" could be understood as both a daytime ban and a 24-hour ban.

In some areas of law, it has even been necessary to recall - or perhaps rather: reintroduce - the free assessment of evidence. For example, in the field of commercial tenancy law, it has been established practice that a landlord who wanted to announce a rent increase with reference to the value of the leased property had to fulfil his burden of proof by presenting evidence of the rent level in comparable leases.

Since 2000, section 81the Commercial Tenancy Act (5) of has clarified that in disputes about the amount of future rent, the rule in section 344 on the court's free assessment of evidence applies. This reference is intended to establish that evidence may also be presented in other ways than through lists of comparative leases, for example through expert , witnesses, etc. and that it is then up to the court's free assessment of evidence whether the parties have presented sufficient , cf. for example *UfR 2001.2255 V, Dades A/S*, which consequently allows expert valuation.

However, for cost reasons, and because there has not actually been a change in the legal position procedurally, it is still the starting point that documentation of a claim under section 81 must be made by presenting comparative leases, cf. *UfR 2002.1750 H, Dades A/S* (which, however, concerns a case about the "value of the leased property", not about the "market rent"). *Christian Gangsted-Rasmussen* UfR 2002 B p. 400 ff. consequently states that comparative tenancies must continue to be the primary means of proof regarding the question of the value of the tenancy and the market rent. If this evidence cannot be produced, expert opinion is an option. See similarly *Niels Gangsted-Rasmussen* in UfR 2004 B p. 397 ff. who finds that expert opinion should be cut off as superfluous evidence if there are newly signed and newly regulated leases.

Comparable leases still play a major role in residential leases, and here it is therefore the tenant who must prove that there are no comparable leases, cf. *UfR 2012.2159 V*, where the High Court emphasises that "the housing court, which has local knowledge and where lay judges have participated, has not found it proven that there are no comparable leases".

One of the points where civil procedure is still rather formalised is in the area of so-called procedural 'provocations' (or: invitations). Unlike in criminal proceedings, the court does not have to find an absolute, objective truth (the so-called material truth), but a relative, subjective (i.e. party-dependent) truth based on the procedural material that the parties themselves provide the court with in the form of claims, pleas and evidence. The parties must therefore carefully consider what they should provide in order to prove actual course of events. In this respect, civil proceedings also differ from administrative proceedings, in which the administrative authority itself provides the information as a result of the official maxim.

Invitations to the opposing party occur, for example, where one party states his opinion of a certain part of the course of events and invites the opposing party to state whether he agrees with this opinion. If he does, the court cannot and must not hear evidence on the issue, as superfluous or irrelevant evidence must be excluded by the court, cf. section 341. The court is not normally required to verify whether the facts are as the parties agree to .

When one party agrees, it is important for the other party to have it upheld. A statement made in one of the pleadings is of course conclusive and binding, but if the statement is made orally during a preparatory hearing or during the main hearing itself, the party for whom the statement is important must ask to have it entered into the court record. Such a statement made in a pleading or at a court hearing is often referred to as a binding procedural statement, and it will normally be binding both in this instance and in any appeal instance, cf. *UfR 2019.3344 H*,

Printed from Karnov for use in accordance with the licence terms

*Codan Forsikring A/S* with detailed criteria for the interpretation of

*310*

the scope of pleadings. See also *UfR 1991.153 H, Superfos Korn A/S*, where the High Court agreed on a statement of damages, but where the statement could be waived before the Supreme Court after *UfR 1989.1108 H, Dansk Eternit Fabrik A/S*, new guidelines for such statements had emerged.

However, it is of course best if the procedural declaration specifies whether it is also to be binding in the event of an appeal, but in practice this is rarely explicitly stated. Procedural agreements probably have a lower degree of dispositive effect than actual property law agreements, just as more ordinary declarations and statements during preparation cannot be given effect as binding procedural declarations, cf. *UfR 2000.310 H, E4 A/S*. If, to the knowledge of the opposing party, a pleading has been made on the basis of a certain case law and this is changed, the pleading can normally be waived during an appeal of the case.

If, on the other hand, the other party does not agree, each party must consider who will be harmed if the relevant point in the course of events is unclear when the court makes a judgement in the case. The party who will be harmed by this is said to have the burden of proof for the circumstance in question, and must ensure that they provide the necessary evidence by calling witnesses, presenting documents, conducting an expert opinion with the court's authorisation, etc. The fact that a party has the burden of proof means that a lack of evidence is detrimental to him. Who has the burden of proof may be stated in a legal provision relevant to the case or in the wording of a contract (although this word itself is not used).

More often, however, burden of proof rules must be established on the basis of theory and practice. Burden of proof rules should normally be drawn up with careful consideration of the material rules so that the burden of proof rules promote the intentions behind the material rules. See, for example, the Supreme Court's comments in *UfR 2009.799 H, Haubjerg Interiør A/S*, where it was unclear under the parties' contract whether a "framework agreement" for the supply of office furniture to institutions under the Region of Southern Denmark implied exclusive rights for the company. The Supreme Court stated that it was incumbent on the company to prove that the framework agreement granted it an exclusive right, and this burden of proof had not been met.

If there is doubt as to whether a framework agreement involves exclusive rights, the burden of proof that this is the case must rest with the party claiming to have been granted exclusive rights, cf. *UfR 2009.799 H, Haubjerg Interiør A/S*, concerning a framework agreement on office furniture for institutions under the Region of Southern Denmark following an EU tender.

*311*

Standard of proof refers to the question of the probability that must be established before the court can infer the existence of a certain fact. It is usually assumed that any burden of proof rule also indirectly contains a standard of proof. The strength of evidence requirement may vary as a result of the strength of evidence in the other circumstances of the case, e.g. the requirement for the strength of evidence that a loss has been suffered is weakened to some extent if the error committed is very serious, see for example *UfR 2000.521 H, Dan Skoubo*, and *UfR 2017.753 V, Alte Finans ApS*, both on auditor liability for faulty advice, and *UfR 2023.2688 H, Anne Black ApS*, on infringement of intellectual property rights.

For example, when the Danish Marketing Practices Act (section 13) states that "the trader must be able to document the accuracy of statements of actual circumstances ", the specific requirements for documenting the accuracy of a statement vary depending on the circumstances of the individual case, cf. *UfR 2015.2565 H, Papiruld Danmark A/S*, and *UfR 2015.3331/2 H, Colgate-Palmolive A/S*. The requirement for documentation cannot be fulfilled by simply probabilizing the accuracy of the information in question, cf. the two decisions mentioned above (on the current

Section 3(3) of the Danish Marketing Practices Act). On the other hand, actual scientific proof of correctness cannot necessarily be required, cf. *UfR 2015.3331/2 H* on the correctness of the name of Unilever's toothpaste "Zendium Syreforsvar".

For those with a more mathematical mindset, these various requirements for the strength of evidence can be placed on a scale from 0 to 100%, as follows:

1. When a civil lawsuit requires "documentation," "proof," or "evidence," (i.e., different terms for the same standard of evidence strength), it demands a preponderance of the evidence, which should be understood as requiring more than 50% certainty.

2. When a case concerning a temporary injunction or restraining order requires plausibility, less than 50% certainty is sufficient. However, it cannot be precisely determined in advance how low on the scale this can go.

3. In a criminal case (perhaps except for minor fine cases), when "proof beyond a reasonable doubt" is required, the standard must exceed 90% on the scale of evidence strength. This means there should be less than 10% uncertainty regarding the correctness of a conviction in a criminal case. The phrase "reasonable doubt" also indicates that not every doubt should prevent conviction. Hence the threshold is set below 10%; it is not necessary to reach the very top of the scale for a conviction to occur.

*312*

The burden of proof can be characterised as "the objective risk that the party bears that the necessary probability of the party's position will be established when the evidence is assessed", cf. *W.E. von Eyben*: Evidence, p. 21. Or expressed in another way: Which of the parties is to be prejudiced by the fact that the relevant legal fact has not been sufficiently proven, cf. *Henrik Zahle*: On legal proof p. 251. The most important contributions to the doctrine of burden of proof come from *E. Tybjerg*: Om bevisbyrden p. 59, where the starting point is that the burden of proof must be placed on the person who has "acted in a foreign legal sphere" [today one might say: moved outside the norm], regardless of the fact that he claims to have consented to it.

Among other things, consideration must be given to which of the parties has the easiest access to evidence. This particularly clear when the question is whether or not a given event has taken place. It is usually easier to prove that something has happened than that has not. A distinction can also be made between objective and subjective burden of proof, as objective burden of proof is a form of "burden of persuasion" for a given topic of proof, whereas subjective burden of proof is incumbent on the party who at a certain stage of the case will lose if he cannot provide sufficient evidence or counter-evidence, cf. *Peter Bang* in J 1998 p. 396 ff. and in S. U. 1999, 59 on the basic rules and concepts of evidence law that in Danish law influence the determination of the burden of proof in civil litigation, including for example civil tax cases.

One of many examples of the subjective burden of proof is *UfR 2008.857/2 H, Mark Kaczko*, where a used car company had withheld income from the sale of three cars from the company's tax return. It is part of the tax administration's objective burden of proof to show that both the company and the person have failed to disclose income. However, the failure to disclose by the company creates a presumption that the money was at the disposal of the company's main shareholder. Unless he can prove that the money was not available to him he will therefore be taxed on a disguised distribution from the company. As SKAT had first lifted the objective burden of proof for the company's failure to disclose this created a subjective burden of proof for the company's main shareholder. As he could not meet this burden of proof, he was convicted.

Similarly, *TfS 2017.215 Ø* concerning the failure to disclose income from a law firm with the result that the amounts were deemed to have accrued to the owner of the law firm, as he had not proved the opposite. Procedurally, the case is a demonstration of the interaction in several stages between 1) the tax administration's objective burden of proof, 2) the tax administration's probabilization (that the income was at the disposal of the company's owner, etc.) and 3) the subjective burden of proof (that the relevant assumptions were not tenable) of the company, the taxpayer etc. As the subjective burden of proof was not lifted, the tax administration was generally in favour.

Case law in relation to civil tax cases (i.e. what the taxable income is, as opposed to criminal tax cases) has gradually gone so far as to apply a presumption rule with an associated reversal of the burden of proof if a person is found to be in possession of relatively large amounts of cash and cannot adequately account for them. *TfS 2018.135 Ø* found that a person was liable to pay tax on an amount of EUR 66,000 found in his hand luggage on a flight from Tunisia. He claimed that the money was a loan from his sister in Tunisia, but partly because he came forward with this explanation relatively late in the tax process, and partly because the presented loan agreement "had such content that it did not make the existence of the debt relationship probable", the High Court found him taxable on the amount. The High Court stated that "where a taxpayer is in possession of such a significant amount of cash as in the present case, it is incumbent on the taxpayer to document that the amount should not be included in the calculation of the person's taxable income, including because the amount has the character of a loan". Nor is it excluded to apply such a presumption in criminal tax proceedings, provided that all relevant circumstances are taken into account in the assessment of the evidence and counter-evidence is allowed, see ECHR of 7 October 1988, *Salabiaku v France.*

In *UfR 2020.295 V, Forsikringsselskabet Himmerland G/S m.n.*, a private individual with an ordinary income had taken out accident insurance with 17 different insurance companies. He paid DKK 48,000 annually in insurance premiums, and he was insured for a total of DKK 33 million. He was injured with a circular saw while working as a hobbyist and had to have a little finger amputated. A few days after the injury, he cancelled all his insurance policies. The insurance companies refused to pay the insurance benefits. The High Court found that the injury, by its external objective nature, appeared to be an accident and was therefore covered by the insurance policies, unless the insurance companies proved that he had caused the injury with intent or gross negligence.
The High Court found these circumstances "extremely striking" and agreed "after an overall assessment" that the insurance companies had proved "beyond any reasonable doubt" that the plaintiff had intentionally caused the damage.

Material law determines who bears the burden of proof for a particular fact. In contractual relationships, this can be indirectly determined by the wording of the contract, e.g. by something as simple as the wording, as the use of the words "if ..." or "unless .." can actually make all the difference. A statutory provision in this area can also, through its wording and structure, signal who bears the burden of proof, cf. e.g. the difference between the wording in section 8 of the Danish Marriage Act (1), second sentence, on dispositions of a year-round residence) versus section 11, second sentence, of the Act (on dispositions of the other spouse's movable property). This is often a deliberate choice on the part of the legislator, cf. e.g. sections of the Inheritance Act 70-71 with a clear difference in the burden of proof between notarised and witnessed wills as regards the burden of proof as to whether the testator had the ability to act reasonably (by

notarial wills, the contesting party must prove lack of reason, cf. e.g. *FM 2000.89/1 Ø*, but for witness wills, the party invoking the will must prove its validity).

In an action for non-contractual damages, the injured party - regardless of the fact that his burden of proof extends into areas where the tortfeasor often has the easiest access to the evidence - will normally have the burden of proof of fault (see e.g. *UfR 2012.1886 V, Coop Danmark A/S*, about a fall in a shop), for causality and for loss, whereas the tortfeasor will have the burden of proof that the injured party has shown fault or accepted a risk for the occurrence of the damage, and for any lack of adequacy. In areas where it is considered particularly difficult for the injured party to fulfil their burden of proof for fault, the burden of proof may be reversed so that there is a presumption of liability, where the tortfeasor must disprove a presumption of fault in order to go free.

This applies, for example, to the carrier's liability for damaged goods, as it is practically impossible for the injured party to prove what happened to the goods while they were in the carrier's custody. For the same reason, some countries reverse the burden of proof for the management's and the board's liability towards a company suffering a loss.

In the event of loss of or damage to other people's goods, the person who, as a depositary, stores the goods has the burden of proving that no culpable behaviour has occurred, cf. DL 5-8-14. Anyone who, as the policyholder, demands payment of an insurance benefit has the burden of proof that the insured event has occurred. This also applies in a case brought by

the insurance company to recover an insurance benefit already paid, cf. *UfR 2000.2078 V, Trygg-Hansa Forsikring A/S*.

The burden of proof for causal connection between fault and loss is borne by the injured party in a case of non-contractual damages, but according to established practice, the burden of proof regarding causal connection may be weakened in the event very serious errors on the part of the tortfeasor. This is seen, for example, in cases concerning auditor liability, see e.g. *UfR 2014.1346 H, e- Huset A/S*, and *UfR 2015.2075 H, Memory Card Technology A/S*, where the Supreme Court in both cases acquitted auditors who had committed professional errors, referring to the lack of causality between error and loss; the Supreme Court only did this after having established that there were no gross errors (implied: had the errors been sufficiently gross, the causality assessment could have  different). The same was seen in *UfR 2000.2176 H, Commercial Leasing A/S*, on the liability of the introducing bank in connection with an IPO.

In contractual damages cases, the same principles are largely applied as in non-contractual cases. Here, a particularly

---

gross error, just as outside the contract, lead to a weakening of the requirement for proof of causality. See e.g. *UfR 2017.204 V*, where a real estate agent sold properties in Turkey, and where the buyers suffered losses because the purchase sums paid were not locked in until they had a title deed for the property. According to the Danish Association of Estate Agents' Standards for Foreign Activity, in such cases the buyers must be warned in advance in writing and in a clear manner that there is no security for the amount paid. Such a warning was not given, and this was considered to be a serious professional error on the part of the real estate agent. As a result, the requirements for proof of causation were weakened. For some buyers, the evidence showed that it was uncertain whether they would have entered into the purchase agreement anyway, even if they had been properly warned. The requirement for proof of causation could therefore not be met, but as a result of the serious professional error, this had to be to the detriment of the real estate agent, and the High Court therefore stated that there was a causal link between error and loss.

It is not excluded to enter into agreements that directly or indirectly affect the burden of proof. It has already been mentioned that the wording of the contract itself, as a reflex effect, can have an impact on the burden of proof (the word "if..." vs. "unless.."). However, very general burden of proof agreements, e.g. to the detriment of a consumer, must be set aside, e.g. an agreement in a bank's general terms and conditions that a bank statement from the bank must always constitute conclusive evidence of movements and balance. The same applies, for example, to a statement in a guarantee certificate that "a machine-stamped receipt with the date and purchase price is valid as proof of purchase".

However, a reasonably balanced agreement that, for example, brings the parties' agreement into - or out of - an area where a certain burden of proof applies must be respected, also with regard to the burden of proof thus resulting from the agreement, cf. *UfR 1995.856/2 H, Mammen & Drescher A/S, Aarhus*, concerning a fire in a warehouse, where the insurance only partially covered, and where the question therefore arose to what extent the warehouse owner (the depositary) should pay for the damage. If DL 5-8-14 (depositary liability) were to be applied, the burden of proof would be reversed, and the warehouse owner would thus be liable as the cause of the fire was unresolved. However, a footnote to the warehouse's order confirmations that the Danish freight forwarder's terms for storage had been adopted, and these terms have a direct burden of proof. The High Court considered the term to be so onerous that it should have been emphasised, but the Supreme Court considered the freight forwarder terms to have been agreed between the parties. Thus, a straightforward burden of proof regarding culpa had been agreed, and the warehouse was acquitted

---

If a party makes unclear or ambiguous statements during the trial, this may be detrimental to the court's assessment of what evidence can be used in the case. The same applies if he remains

Printed from Karnov for use in accordance with the licence terms

silent unless he has previously contested that view. If the plaintiff in the complaint sets out his view of a course of events and invites the defendant to state whether he agrees, but the defendant ignores the question in the defence and does not return to it in any rejoinder, the court may, on application by the plaintiff at the main hearing - if the defendant now wishes to dispute the view in question - take as evidence that the facts as the plaintiff stated in his application.

This is the so-called procedural harm, which we encounter in many guises in civil proceedings. The procedural harm are not mandatory for the court, but are discretionary. It is therefore facultative, i.e. optional for the court, and the full term for the concept is: facultative procedural harm. For example, if a company sues another company for plagiarising a design and the plaintiff invites the defendant to provide further documentation of its own development work, but this invitation is not complied with, the court may attribute procedural harm to this. It is assumed that when the defendant does not document its development work, this is probably due to the fact that such work has not been carried out, and this supports the plaintiff's plea that there is plagiarism.

In criminal proceedings, the presumption of innocence, cf. article 6 the ECHR(2), cf. (1) of , means that the defendant's refusal to answer must not have a procedural harming effect, but within a very narrow area, a form of prejudicial effect may also be attributed in criminal proceedings if the defendant does not present evidence that is close at hand and which only he has access to, cf.    *UfR 1990.866 Ø*, where an accurate determination of assets and returns in a criminal case of tax fraud required bank statements or similar from the defendant's management company in , and when the defendant despite access to this did not provide this material, which could "disprove" the prosecution's assumptions if necessary, these were used as a basis. This decision is probably on the edge of the "procedural harm" that can be operated with in criminal proceedings, cf. the European Court of Human Rights' judgment of 25 February 1993 in *Funke v. France*, where the defendant in a criminal tax case had been ordered to obtain evidence against himself in the form of bank statements, which was found contrary to Article 6 ECHR.

However, in civil proceedings, invitations plays a special and important role in relation to obtaining evidence, in particular

documents. If a party states its view of a course of events and adds that this view is supported by minutes of the meeting that the other party has prepared but never presented, a procedural request must be made to the other party to produce the minutes. It is established practice to use the language that the other party is invited to produce the specified document.

If a procedural invitation is not complied with, the party who made the request can go even further and apply the rules of the Danish Administration of Justice Act on the duty of disclosure. This means that the court is requested to order the other party to produce the document, cf. sections 298 and 300.

See e.g. *UfR 1993.169 H*, where the "school teacher" in a murder case brought a libel action, i.e. a civil action claiming punishment etc. against Danmarks Radio (DR) and two employees at DR, and where the plaintiff demanded a production order under section 298(1) that DR should produce unedited recordings of two persons' statements. The High Court refused to issue a production order, but the Supreme Court stated: "As it cannot be denied that the unedited recordings concerning .. are of importance to the decision of the case, the Supreme Court, pursuant to section 298 the Danish Administration of Justice Act (1) of , orders Danmarks Radio to produce the unedited recordings concerning ... statements recorded in connection with the TV programme 'Convicted of murder'." See also *UfR 1999.1443 V*, where, in a case concerning the determination of the degree of injury after an accident, the tortfeasor's liability insurance company was ordered to produce the expert medical opinion obtained by the company.

Printed from Karnov for use in accordance with the licence terms

A procedural invitation and thus a possible production order may also include evidence that generally does not concern this particular case, but which may be of importance to it, cf. e.g. *UfR 1993.189 Ø*, where a commercial tenant in a case about disproportionate rent requested a production order for the landlord to produce other leases concerning the same shopping centre. The tenant's request was granted, but this did not apply to the extent that the landlord could prove that this disclosed matters that could be kept secret for the benefit of others than the parties to the case pursuant to Danish Administration of Justice Act §

 298(1), cf. section 171, nor to the extent that individual leases were not comparable.

A request for production may not only include physical documents, but also, for example, electronic material, including e-mails, cf. for example *UfR 1998.1613 Ø*, which in criminal procedure states that a production order against a third party (specifically in connection with a charge of copyright infringement by copying computer programmes for resale) could also include the e-mails that were placed on the defendant's account statements. Thus, electronic communication can also constitute evidence

---

during a trial. Authenticity is subject to the free assessment of evidence. In 2000, the Electronic Signature Act was passed, which serves to secure the proof of a sender's identity, but even with such "proof assurance" there is the possibility of concrete counter-evidence.

On the other hand, disclosure cannot oblige anyone to produce a document or to prepare and submit summaries, cf. *TFA 2014.478 V*. In this case, the heirs of a person who, until his death, had an undivided estate but cohabited with S, wanted an order for production against S. They could obtain this in respect of bank statements, but they could not get S ordered to prepare statements of expenses for improvements to a real **estate**, nor to produce commercial documents, which S claimed not to be in possession .

However, not every request for production will necessarily be granted. Firstly, unnecessary evidence must be avoided, cf. Danish Administration of Justice Act §

 341, and secondly, it must generally be respected if documents are of a purely internal nature, cf. e.g. rejection in *UfR 1968.608 H, Chr. Danielsens eftf.* about accounting material for use in a case about illegal lorry driving, *UfR 1997.837 H, K/S Sanexco Invest IV m.n.*, *UfR 1999.1028 UfR 1999.1028 H, Heini Joensen*, about a lawyer's report in a case about the validity of a share subscription, *H, Heini Joensen*, about a bank's credit recommendation for use in a case against a guarantor, *UfR 1999.1720 H, Bikuben Girobank A/S*, about a bank director's statement to the board regarding an underwriting commitment and *UfR 2000.1877 V, Anni Cortsen*, and *UfR 2006.2 V* about medical consultants' statements to insurance companies. However, even internal material may, under the circumstances, be of such central importance to the case that it may be required to be produced if the purpose cannot be achieved otherwise, cf. *UfR 1986.34 H, Privatbanken A/S and den Danske Provinsbank A/S*, on board minutes for use in criminal proceedings and *UfR 2000.2076 V* on internal accounting material in a limited liability company, which a party was ordered to produce for use in an expert appraisal of the company's value in connection with a division of property. Like *UfR 1999.1028 H.*, loan recommendations at a bank had an internal character. *Heini Joensen*, had the character of internal working documents and could therefore not be required to be produced, cf. *UfR 2010.955 Ø, Ole Roos Eftf. ApS*.

On request for production of internal material, see *Peter Bang* in UfR 1997 B p. 268 ff.

In *UfR 2002.1734 H, Hafnia Holding A/S*, the Supreme Court ordered Danske Bank to produce anonymised transcripts of its board of directors' minutes and recommendations to the board of directors regarding negotiations on a share issue in Hafnia and the bank's granting of loans and credit to Hafnia. The Supreme Court emphasised that there was information that the bank's board of directors had discussed the share issue, that the bank had played a central role in connection with the share issue and that the bank was also a lender and credit provider to Hafnia.

In the aforementioned *UfR 2006.2 V* on the medical consultant's statements to the insurance company, the premises emphasised that the consultant had not examined the injured party but only gave his opinion and that the opinion therefore did not add new factual information to the case.

---

In *UfR 2014.987 V, Ejendomsselskabet Sct. Thomas ApS*, a bank as a third party was not required to present

Board minutes for a 7-month period with accompanying documents to clarify why the bank had decided on a temporary investment freeze. This could be relevant in a case brought by a property company against a savings bank fund claiming compensation for the fund's cancellation of a sale of a property to the bank. The High Court noted that board minutes and recommendations to the bank's board of directors have the character of internal and confidential documents reflecting the board's internal business considerations, the secrecy of which is generally of significant importance. Therefore, such documents cannot generally be required to be produced during legal proceedings, cf. the premises in UfR 2002.1734 H, Hafnia Holding A/S see above. Under certain circumstances, the bank may be ordered to disclose factual information and final decisions from the minutes if there are very special circumstances. The legal basis for the decision is Danish Administration of Justice Act section 299 (the disclosure rule for third parties), in conjunction with Danish Administration of Justice Act sections 169-172 (the witness exemption and witness exclusion rules), again in conjunction with sections 117 ff.

 Financial business.

Finally, the disclosure must not be characterised as a "fishing expedition", contrary to what is permitted under American and English rules on disclosure and discovery. In UfR 2015.3319 H, Ernst & Young, the Supreme Court rejected a very far-reaching discovery request from Finansiel Stabilitet A/S to the auditor in the case concerning possible management and auditor liability following the collapse of Roskilde Bank.

The Supreme Court's premises in the Roskilde Bank case state: "According to the information provided, the request for disclosure concerns virtually all of Ernst & Young's working material relating to the audit of Roskilde Bank for the financial years 2006 and 2007. The material includes all working papers, draft audit reports and reports and other documentation received. - Finansiel Stabilitet A/S has not specified which facts are to be proved by production of the documents, and the Supreme Court finds no basis for ordering the auditors to hand over the documents for the purpose of an investigative review, cf. sections 298 the Danish Administration of Justice Actand 300(1) of ." [my emphasis] See about the ruling Peter Bang in R&R 2016 no. 1 p. 26 ff.

Another of the major cases concerning collapses in the financial sector includes a production order against the Danish FSA in the case concerning potential liability following the collapse of ebh bank cf. the Western High Court's ruling of 15 October 2014 in VL B-427-11:

"The High Court finds that the production of the documents covered by the request for production will constitute a central part of the evidence.

The High Court does not find that the facts they wish to prove in the request for production can be illustrated by the other evidence in the case.

The High Court finds that, considering the size of the claim for damages (DKK 750 million), there are such exceptional circumstances that the information, despite the fact that it is covered by the Danish FSA's stricter duty of confidentiality under the Danish Financial ActSupervisory Authority Companies Act, Section 354 (1)  may be required to be produced in these proceedings. The High Court

notes in this connection that the High Court has not found a basis for limiting the scope of the disclosure order only include such information that documents that the FSA has reacted and that the reactions were not of a serious nature, as information about a lack of reaction in a given situation may also be of importance."

The conclusion of the judgement was: "The Danish FSA is ordered to produce the following documents:

(A)  All enquiries from the Danish FSA to ebh bank A/S in connection with the bank's statutory quarterly reports in the years 2006, 2007 and 2008, including enquiries in letter form and enquiries in the form of statutory notes on oral or telephone enquiries to the bank, except for internal notes.

(B)  All other enquiries from the Danish FSA to EBH Bank A/S in the years 2006, 2007 and 2008, including enquiries in letter form including appendices, as well as enquiries available as statutory notes on oral or telephone enquiries to the bank, except for internal notes.

(C)  All enquiries from ebh bank A/S to the Danish FSA in the years 2006, 2007 and 2008, including enquiries in letter form and enquiries including appendices, which are available as statutory notes on oral or telephone enquiries to the Danish FSA, except for internal notes."

Printed from Karnov for use in accordance with the licence terms

A similar request for a production order against the plaintiff, Finansiel Stabilitet, was not granted, as Finansiel Stabilitet stated that it was not in possession of more documents than those already produced.

On "investigative review", read: fishing trip for material, see *Erik Werlauff* in UfR 2016 B p. 205 et seq. including the possibility of alternative evidential statement of purpose.

It must be taken into account whether the production will involve a deep insight into the private and financial circumstances of the person in question, and a consideration of proportionality should probably be applied, cf. *TFA 2002.39 Ø*, which during an investment company's case against the investor's wife with a claim for payment of part of the husband's debt due to alleged gift transfers to the wife rejected a far-reaching request for production of bank statements for the years from and including 1997. According to the High Court, such an order would be extremely far-reaching and would entail "a comprehensive exposure of the couple's financial transactions" in the years in question.

Discovery orders are not granted if the party in question has a legitimate reason to keep the document secret. A spectacular example is *UfR 2010.980 V*, where a lottery ticket resulted in a prize of DKK 9.3 million, but the player's identity was not known as he had left the lottery retailer without a receipt. Danske Spil tried to identify the winner

by requesting an account of a number of circumstances. A player sued Danske Spil with a claim for the winnings and demanded a production order for Danske Spil to disclose the winning ticket, but Danske Spil was successful in its claim that the plaintiff's wish for disclosure had to give way to Danske Spil's interest in keeping the ticket secret out of consideration for the winner.

Public authorities' internal working documents are exempt from access to documents and cannot generally be demanded to be produced during legal proceedings, see e.g. *TfS 2000.429 V* and from criminal proceedings TfS 2002.742 Ø, discussed in section V C 5.

However, in special circumstances for example if the case has had an atypical course of events at the authority that gives rise to suspicion of misuse of power under administrative law or similar, disclosure may be demanded in accordance with the discovery rules, see *UfR 1999.724 H, Vibeke Mogensen*, on an atypically progressing tax case, see *Jonas Christoffersen* in UfR 2000 B p. 202.

ff. The production order produced such interesting information about the authorities' case processing that Customs & Tax chose to abandon the lawsuit, cf. *Eigil Lego Andersen* in UfR 2001 B p. 442 ff.

Only in connection with the main hearing and judgement will the court decide whether failure to comply with a production order should be given procedural harming effect, cf. *UfR 1999.1475 Ø*.

The formal procedure described here with a request for a production order against the opposing party will by no means always be chosen, as the party will often instead repeat the invitation in his next pleading, perhaps even in letter form, and he will then during the main hearing in his proceedings ask the court to attribute procedural harm to the opposing party, see section 298, see section 344(2). Section 299, cf. section 300, contains rules on a third party's production order. When it is only rarely that the duty to disclose is applied to a party it is because a production order against a party cannot be enforced, just as a party is not obliged to give evidence. The opposite is a production order or witness warrant in relation to a third party: Here, there is an obligation to comply (unless there is a witness exemption or exclusion), cf. e.g. *FM 2002.60/4 V* on discovery orders to banks regarding a spouse's accounts during probate proceedings. Thus, while a third party can be compelled, a party tot he case cannot be forced, but the risk of application of the facultative procedural harm will usually put sufficient pressure on the party.

The scope of procedural invitation and the related prejudicial effect is not so broad that a party can go on a major fishing expedition to see if useful evidence turns up - or in the words of the Supreme Court in *UfR 2011.431 H, Fællesskabet Fristaden Christiania m.n.*: disclosure of documents "for use

Printed from Karnov for use in accordance with the licence terms

for an investigative review" (Fristaden Christiania's case against the state regarding the right to use the area) demands for various notes, presentations, etc. refused. For example, several years of board minutes etc. cannot be provoked in this way, but a specific topic can be specified with an invitation to present (extract) minutes on this particular topic. However, the party does not have any actual control that the invitation is effectively and faithfully complied with in all details. Searches etc. cannot be carried out as in more serious cases within the criminal process.

By limiting the scope of procedural invitation, Danish law differs in its somewhat pragmatic approach from, for example, the far more formalised American procedural law. Here, discovery regulations (and related disclosure) can require very extensive access to the opposing party's documents, correspondence, minutes, etc. and a refusal to comply with disclosure provocations can have extremely far-reaching consequences in the form of loss of the case, conviction for
"contempt of court" (court fines etc.). Before dismissing this as a cumbersome and formalistic system, it should be remembered that several of the rules are designed to compel each party, e.g. business versus consumer, to provide the other party with lists of all relevant evidence, including documents in their possession. While this part of the case preparation may seem cumbersome, it can be extremely useful in preventing loss of justice due to lack of evidence for a "weak" party. In fact, it establishes a counterpart to the investigation phase in criminal cases. It is therefore not entirely unfounded when the attempt to create a common European procedural law operates with rather far-reaching discovery rules, see *Marcel Storme* (ed.): Rapprochement du Droit Judiciaire de l'Union européenne; Approximation of Judiciary Law in the European Union, especially chapter 4 of the draft procedural directive, which is strongly influenced by Anglo-American procedural law, cf. *Per Henrik Lindblom* in SvJT 1996 p. 793 ff, especially p. 820 ff.

The Danish editing rules are, as can be seen above from practice regarding provocations against public authorities and banks etc., not particularly favourable to a party with weak resources compared to a party with strong resources, cf. *Erik Werlauff* in Festskrift for Bernhard Gomard p. 248 ff.


## 6. The negotiation maxim

The provision in Danish Administration of Justice Act § 338 plays such an important role in civil proceedings that it deserves to be quoted verbatim, see § 338:

"The court or tribunal may not award a party more than he has alleged and may only take into account pleas in law put forward by the party or which cannot be waived."

This is the maxim of negotiation (the principle of negotiation), which can probably be characterised as the most important principle of civil procedure. Ne ultra petita partium - not beyond the parties' demands.

The negotiation maxim does not mean that the parties themselves "control" the negotiations (the court does this, of course, as it formally manages the proceedings), but rather that the parties themselves decide what should be included in the negotiations and thus determine the framework within which the court's decision will made.

The counterpart of the negotiation maxim is the official maxim (the principle of investigation), where the court (or the administrative authorities) is responsible for providing the procedural material and informing the case. The official maxim is used, for example, in countries that have separate administrative courts, as they usually take care to include the necessary procedural material in the case to reach the substantively correct decision, and they can also deviate from the negotiation maxim. For example, the Swedish administrative courts may, special reasons, depart from the parties' claims and pleas to the detriment of the administrative authority, provided that the interests of third parties are not . It will be seen from the wording that such a legal situation has not abandoned the negotiation maxim in favour of a purely official maxim. Rather, it is a modified negotiation maxim with elements of the official maxim in it.

The main reason for the negotiation maxim is that the parties know the case better than the court does, and that they themselves are best able to assess which claims and pleas the case can bear in terms of arguments and costs, see *Finn Taksøe-Jensen*: Materiel processledelse i borgerlige sager p. 98 ff. and 377 ff. In support of the maxim, it can also be argued that it is important that the adversarial maxim is allowed to have an effect on the substance of the case.

Printed from Karnov for use in accordance with the licence terms

ISBN 978-87-619-4433-7

# Dansk retspleje

Civil-, foged-, skifte- og straffeprocessen


Forfattere
**Lars Lindencrone Petersen**

**Udgivelsesår:** 2023

**Udgave:** 9

9. udgave/1. oplag

Sats: Integra, Indien

**ISBN:** 978-87-619-4433-7

**Udgivet af:** Karnov Group Denmark A/S

Omslag: Axel Surland, Ljungbyhed

Tryk: Drukarnia WDS, Sandomierz, Polen

Mekanisk, fotografisk eller anden gengivelse af denne bog eller dele af den er ikke tilladt ifølge gældende dansk lov om ophavsret.

All rettigheder forbeholdes.

2023 Karnov Group Denmark A/S, København

Bogen giver sin læser en samlet, integreret fremstilling af dansk retspleje, der ellers traditionelt fremstilles opdelt i civilproces, straffeproces, insolvensproces etc. Dansk retspleje er den eneste fremstilling af retsplejen, der giver et samlet lærebogs- og håndbogsmæssigt billede af hele retsplejen, omfattende både civile retssager, fogedsager, skiftesager og straffesager tillige med et samlet overblik over de tværgående procesretlige principper.

## II. Civile retssager

### C. Sagens forberedelse

#### 1. Mundtlig eller skriftlig forberedelse?

Traditionelt blev retssager forberedt mundtligt, dvs. at alle processkridt blev foretaget i retsmøder. Disse retsmøder var ofte ganske kortvarige, idet de blot bestod i, at parternes repræsentanter mødte op og afleverede et processkrift til retten, der herefter fastsatte fristen for den anden parts indlevering af det næste processkrift.

Det var således ikke ofte, at der foregik noget egentlig produktivt på disse møder, og der blev da også for en årrække siden tilvejebragt hjemmel til, at retten kunne bestemme, at processkrifter blot skulle sendes til retten og modparten – skriftlig forberedelse – således at det ressourcespild, der var forbundet med disse møder, kunne undgås.

I de følgende år vandt skriftlig forberedelse stigende indpas i forbindelse med, at retterne i stadig stigende grad strammede styringen af

tidsforbruget på de enkelte sager, og ved domstolsreformen pr. 1. januar 2007 blev skridtet taget fuldt ud, idet muligheden for mundtlig forberedelse blev afskaffet.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

indgåelse led af en sådan værdiforringende mangel, at der er grundlag for et afslag i prisen, at sagsøgerens eventuelle

krav er bortfaldet som følge af for sen reklamation (som følge af passivitet), eller at sagsøgeren har udvist egen skyld ved at …, og at hans eventuelle krav derfor må være bortfaldet.

Anbringenderne kan således udformes ganske kort. Om det faktum, der skal bære anbringendet frem, er tilstrækkeligt, må fremgå af bevisførelsen, om hvis resultat parten eller hans advokat udtaler sig i proceduren. Hvordan jus på området skal fortolkes, ved retten i princippet selv, men den hører gerne partens opfattelse heraf i proceduren, jf. bemærkningerne ovenfor.

Parternes faktiske anbringender fastfryses principielt ligesom påstandene ved forberedelsens afslutning, dvs. at der indtræder præklusion af hensyn til den ønskede koncentration. Fra dette tidspunkt kan faktiske anbringender principielt kun ændres (bortset fra helt eller delvist frafald af anbringender) eller nye anbringender fremsættes med modpartens accept, eller – hvis den ikke gives – med rettens tilladelse, som forudsætter, at forsinkelsen er undskyldelig, jf. RPL §§ 357 og 363. Derimod kan anbringenderne frit ændres og nye fremsættes, så længe forberedelsen foregår.

Selv om retsplejeloven synes at ligestille påstande og anbringender i så henseende, er det dog oftest en alvorligere sag at ændre sin påstand på et fremskredent tidspunkt. Der udvises derfor normalt større liberalitet med hensyn til nye anbringender, men også her er der grænser, jf. fx TfS 1999.717 V om en sag om revisors erstatningsansvar for forkert beregning af skatten ved et ejendomssalg. Først under hovedforhandlingen fremsatte revisor et anbringende om, at skatteyderen ikke havde lidt noget tab ud over rentetabet, men landsretten afskar dette – vigtige – nye anbringender.

Også så for faktiske anbringender gælder forhandlingsmaksimen: Retten kan kun tage hensyn til anbringender, som parten har gjort gældende (eller som ikke kan frafaldes), jf. RPL § 338.

## 5. Beviskrav – bevisbyrde, bevisbedømmelse, bevisstyrke og edition

Inden der i det følgende jongleres med de udtryk, der er anvendt i overskriften, skal nogle bevismæssige begreber indledningsvis fastlægges:

Beviskrav er et overordnet udtryk for bevisbyrde, bevisbedømmelse og bevisstyrke. Bevisbyrde er et udtryk for, hvem det skal komme til skade, hvis noget er uklart efter bevisførelsen i sagen. Bevisbedømmelse er den bedømmelse af beviserne, som retten foretager, jf. nedenfor om RPL § 344, stk. 1. Bevisstyrke er den grad af sikkerhed, der kræves, for at noget kan anses for at være bevist.

Der gælder et meget vigtigt princip i civilprocessen om rettens frie bevisbedømmelse, jf. RPL § 344, stk. 1: »På grundlag af det, der er passeret under forhandlingerne og bevisførelsen, afgør retten, hvilke faktiske omstændigheder der skal lægges til grund for sagens pådømmelse.«

Det følger heraf, at der ikke på forhånd kan opstilles bestemte krav til, hvilke beviser der skal fremlægges, for at et bestemt påberåbt faktum kan anses for at være bevist. Bevisbedømmelsen er "fri" – hvilket dog ikke er det samme som "vilkårlig" eller "tilfældig". Bevisbedømmelsen skal udøves på en objektiv måde, som kan meddeles og forklares omverdenen. Bevisbedømmelsen bør foretages på en sådan måde, at det må antages, at andre dommere ville nå til samme resultat.

Det er et udslag af den frie bevisbedømmelse, når visse vidneudsagn tillægges særlig vægt, jf. fx om kommunale p-vagter *UfR 2009.1102 Ø* og *UfR 2009.1105 Ø*. Landsretten bemærkede i begge disse sager, at de kommunale parkeringsvagter er »særligt uddannede til deres arbejde«, og at der derfor er »en formodning for, at de udøver deres forvaltningsmyndighed som parkeringsvagter i overensstemmelse med en udarbejdet vejlednings bestemmelser herom«. De to sager er dog samtidig en yderligere illustration af den frie bevisbedømmelse, idet p-vagtens udsagn blev lagt til grund i sidstnævnte sag, hvorimod der i førstnævnte sag »efter en samlet bedømmelse af sagens oplysninger [var] tilvejebragt en sådan tvivl om, hvorvidt A's bil på kontroltidspunktet [ulovligt] stod parkeret på invalideparkeringspladsen eller [lovligt] på pladsen ved siden af denne«, at p-bøden blev ophævet. Også tvivl om forbuddets udstrækning kan føre til frifindelse, jf. *UfR 2012.1962 Ø*, hvor skiltet »Maks. 2 timer« både kunne forstås som et forbud i dagtimerne og et forbud døgnet rundt.

På enkelte retsområder har det ligefrem været nødvendigt at erindre om – eller måske snarere: genindføre – den frie bevisbedømmelse. Fx har det på erhvervslejerettens område været fast praksis, at en udlejer, der ønskede at varsle lejeforhøjelse under henvisning til det lejedes værdi, skulle løfte sin bevisbyrde bl.a. gennem fremlæggelse af beviser for lejeniveauet i sammenlignelige lejemål.

Siden 2000 er det i <u>erhvervslejelovens § 81</u>, stk. 5, præciseret, at ved tvister om størrelsen af den fremtidige leje finder reglen i <u>RPL § 344</u> om rettens frie bevisbedømmelse anvendelse. Med denne henvisning har det været hensigten at fastslå, at bevisførelse også kan ske på anden måde end gennem oversigter over sammenligningslejemål, fx gennem syn og skøn, vidneførsel mv., og at det herefter er op til rettens frie bevisbedømmelse, om parterne har fremlagt tilstrækkeligt bevis, jf. fx *UfR 2001.2255 V, Dades A/S*, der i konsekvens heraf tillader syn og skøn.

Af omkostningsmæssige grunde, og fordi der reelt ikke er sket en ændring af retstilstanden processuelt, er det dog fortsat udgangspunktet, at dokumentation af et krav efter § 81 skal ske ved fremlæggelse af sammenligningslejemål, jf. *UfR 2002.1750 H, Dades A/S* (der dog vedrører en sag om »det lejedes værdi«, ikke om »markedslejen«). *Christian Gangsted-Rasmussen* UfR 2002 B s. 400 ff. anfører i konsekvens heraf, at sammenligningslejemål fortsat må være det primære bevismiddel vedrørende spørgsmålet om det lejedes værdi og om markedsleje. Hvis dette bevis ikke kan føres, er syn og skøn en mulighed. Se tilsvarende *Niels Gangsted-Rasmussen* i UfR 2004 B s. 397 ff., der finder, at syn og skøn skal afskæres som overflødig bevisførelse, hvis der findes centrale nyindgåede og nyregulerede lejemål.

Sammenligningslejemål spiller fortsat en stor rolle ved beboelseslejemål, og her er det derfor lejeren, der må bevise, at der ikke findes sammenlignelige lejemål, jf. *UfR 2012.2159 V*, hvor landsretten lægger vægt på, at »boligretten, der har lokalkendskab, og hvor lægdommere har medvirket, ikke [har] fundet det bevist, at der ikke findes sammenlignelige lejemål«.

Et af de punkter, hvor civilprocessen fortsat er temmelig formaliseret, er på området for de såkaldte processuelle "provokationer" (eller: opfordringer). Retten skal ikke som i straffesager finde frem til en absolut, objektiv sandhed (den såkaldte materielle sandhed), men til en relativ, subjektiv (dvs. partsafhængig) sandhed på grundlag af det processtof, som parterne selv forsyner retten med i form af påstande, anbringender og beviser. Parterne må derfor nøje overveje, hvad de bør fremskaffe for hver især at bevise, hvordan det faktiske begivenhedsforløb har været. Civilprocessen adskiller sig derfor også på dette punkt fra forvaltningsprocessen, hvor forvaltningsmyndigheden selv sørger for sagens oplysning som følge af officialmaksimen.

Opfordringer til modparten forekommer fx, hvor den ene part udtaler sin opfattelse af en bestemt del af begivenhedsforløbet og opfordrer modparten til at erklære, om han er enig i denne opfattelse. Er han det, hverken kan eller må der foranstaltes bevisførelse om spørgsmålet, eftersom overflødig eller irrelevant bevisførelse skal afskæres af retten, jf. § 341. Retten skal normalt ikke efterprøve, om det faktisk forholder sig, således som parterne er enige om at lægge til grund.

Når en part erklærer sig enig, er det vigtigt for den anden part at få dette fastholdt. En erklæring, der afgives i et af processkrifterne, er naturligvis bevisfast og bindende, men afgives erklæringen mundtligt under et forberedende retsmøde eller under selve hovedforhandlingen, må den part, for hvem erklæringen er vigtig, bede om at få den ført til retsbogen. En sådan erklæring afgivet i et processkrift eller i et retsmøde betegnes ofte som en bindende proceserklæring, og den vil normalt binde både i denne instans og i en eventuel ankeinstans, jf. *UfR 2019.3344 H*,

*Codan Forsikring A/S*, med nærmere kriterier for fortolkning af

proceserklæringers rækkevidde. Se tillige *UfR 1991.153* H, *Superfos Korn A/S*, hvor der for landsretten havde været enighed om en erstatningsopgørelse, men hvor erklæringen herom kunne fragås for Højesteret, efter at der ved *UfR 1989.1108* H, *Dansk Eternit Fabrik A/S*, var fremkommet nye retningslinjer for sådanne opgørelser.

Det er dog naturligvis bedst, hvis det i proceserklæringen præciseres, om den også skal være bindende under en eventuel anke, men det er i praksis kun sjældent, noget sådant udtrykkeligt præciseres. Processuelle aftaler har formentlig en ringere grad af dispositiv virkning end egentlig formueretlige aftaler, ligesom mere almindelige erklæringer og udtalelser under forberedelsen ikke kan tillægges virkning som bindende proceserklæringer, jf. *UfR 2000.310* H, *E4 A/S*. Hvis en proceserklæring kendelig for modparten er afgivet ud fra en bestemt retspraksis, og denne ændres, vil proceserklæringen normalt kunne fragås under anke af sagen.

Er modparten derimod ikke enig, må hver part gøre sig sine tanker om, hvem det vil komme til skade, hvis det pågældende punkt i begivenhedsforløbet står uklart, når retten skal dømme i sagen. Den, som dette vil komme til skade, siges at have bevisbyrden for den pågældende omstændighed, og han må sørge for at føre de fornødne beviser gennem indkaldelse af vidner, fremlæggelse af dokumenter, foretagelse af syn og skøn med rettens tilladelse mv. At en part har bevisbyrden, vil dermed sige, at manglende bevis kommer ham til skade. Det vil kunne fremgå af en for sagen relevant lovbestemmelse eller af en kontrakts formulering, hvem der har bevisbyrden (uden at selve dette ord dog anvendes).

Endnu oftere må bevisbyrderegler imidlertid opstilles på grundlag af teori og praksis. Bevisbyrderegler bør normalt opstilles under nøje hensyntagen til de materielle regler, således at bevisbyrdereglerne fremmer de intentioner, som ligger bag de materielle regler. Se fx Højesterets bemærkninger i *UfR 2009.799* H, *Haubjerg Interiør A/S*, hvor det efter parternes kontrakt var uklart, om en »rammeaftale« om levering af kontormøbler til institutioner under Region Syddanmark indebar en eneret for firmaet. Højesteret udtalte, at det påhvilede firmaet at godtgøre, at der ved rammeaftalen var tillagt det en eneret, og denne bevisbyrde var ikke blevet løftet.

Er der tvivl, om en rammeaftale indebærer eneret, må bevisbyrden for, at dette er tilfældet, påhvile den, der påberåber sig at være tillagt en eneret, jf. *UfR 2009.799* H, *Haubjerg Interiør A/S*, om en rammeaftale om kontormøbler til institutioner under Region Syddanmark efter EU-udbud.

Bevisstyrke er udtryk for spørgsmålet om, hvilken sandsynlighed der skal tilvejebringes, før retten kan lægge til grund, at et bestemt faktum foreligger. Det antages normalt, at enhver bevisbyrderegel også indirekte indeholder et bevisstyrkekrav. Bevisstyrkekravet kan variere som følge af bevisstyrken i sagens øvrige omstændigheder, fx således at kravet til bevisets styrke for, at der er lidt et tab, afsvækkes i nogen grad, hvis den begåede fejl er meget alvorlig, jf. fx *UfR 2000.521* H, *Dan Skoubo*, og *UfR 2017.753* V, *Alte Finans ApS*, begge om revisoransvar for fejlrådgivning, samt *UfR 2023.2688* H, *Anne Black ApS*, om krænkelse af immaterialrettigheder.

Når der fx står i markedsføringsloven (§ 13), at »den erhvervsdrivende skal kunne dokumentere rigtigheden af angivelser om faktiske forhold«, så varierer de konkrete krav, der stilles med hensyn til dokumentationen for en oplysnings rigtighed, under hensyn til omstændighederne i det enkelte tilfælde, jf. *UfR 2015.2565* H, *Papiruld Danmark A/S*, og *UfR 2015.3331/2* H, *Colgate-Palmolive A/S*. Kravet til dokumentation kan ikke opfyldes ved blot at sandsynliggøre rigtigheden af den pågældende oplysning, jf. de to nævnte afgørelser (om den dagældende

markedsføringslovs § 3, stk. 3). På den anden side kan der ikke nødvendigvis kræves et egentlig videnskabeligt bevis for rigtigheden, jf. *UfR 2015.3331/2 H* om rigtigheden af navnet på Unilevers tandpasta »Zendium Syreforsvar«.

Under en sag om et midlertidigt forbud kræves der mindre end dokumentation, nemlig kun sandsynliggørelse.

Hvis man er mere matematisk indstillet, kan man lægge disse forskellige bevisstyrkekrav ind på en søjle fra 0 til 100 pct., nemlig som følger:

1. Når der i en civil retssag kræves »dokumentation«, »godtgørelse«, »bevis« etc. (i.e. forskellige betegnelser for det samme bevisstyrkekrav), kræves der herved sandsynlighedsovervægt, hvilket må forstås som mere end 50 pct. bevisstyrke.

2. Når der i en sag om et midlertidigt forbud eller påbud kræves sandsynliggørelse, er mindre end 50 pct. bevisstyrke herved tilstrækkeligt, uden at man dog på forhånd med sikkerhed kan sige, præcis hvor langt ned på søjlen man kan gå.

3. Når der i en straffesag (måske bortset fra små bødesager) kræves »bevis ud over enhver rimelig tvivl«, skal man op over 90 pct. på bevisstyrkeskalaen, idet der bør være mindre end 10 pct. usikkerhed om rigtigheden af domfældelsen i en straffesag. Udtrykket »rimelig tvivl« viser samtidig, at det ikke er enhver tvivl, der skal kunne forhindre domfældelse. Derfor brøken på under 10 pct.; man skal ikke helt til tops på søjlen, for at der kan dømmes.

*312*

Bevisbyrden kan karakteriseres som »den objektive risiko, parten bærer for, at der ved sagens bevisbedømmelse foreligger den nødvendige sandsynliggørelse for partens standpunkt«, jf. *W.E. von Eyben*: Bevis s. 21. Eller udtrykt på en anden måde: Hvem af parterne det skal komme til skade, at der ikke er ført et tilstrækkeligt bevis for det relevante retsfaktum, jf. *Henrik Zahle*: Om det juridiske bevis s. 251. De væsentligste bidrag til læren om bevisbyrde stammer fra *E. Tybjerg*: Om bevisbyrden s. 59, hvor der tages udgangspunkt i, at man må lægge bevisbyrden på den, der har »handlet på fremmed Retsomraade« [i dag kunne man måske sige: bevæget sig uden for det, der er <u>normen</u>], uanset at han gør gældende at have samtykke dertil.

Der må bl.a. tages hensyn til, hvem af parterne der har den letteste bevisadgang. Særligt klart træder dette frem, når spørgsmålet drejer sig om, hvorvidt en given begivenhed har fundet sted eller ikke. Normalt er det nemmere at bevise, at noget er sket, end at dette ikke er tilfældet. Der kan endvidere skelnes mellem objektiv og subjektiv bevisbyrde, idet objektiv bevisbyrde er en form for "overbevisningsbyrde" for et givet bevistema, hvorimod subjektiv bevisbyrde påhviler den, der på et bestemt stadium af sagen vil tabe, hvis han ikke kan føre tilstrækkeligt bevis eller modbevis, jf. *Peter Bang* i J 1998 s. 396 ff. og i S.<u>U. 1999, 59</u> om de grundlæggende bevisretlige regler og begreber, der i dansk ret har indflydelse på fastlæggelsen af bevisbyrden i civile retssager, herunder fx civile skattesager.

Som ét blandt mange eksempler på den subjektive bevisbyrde kan nævnes *UfR 2008.857/2 H, Mark Kaczko*, hvor et brugtbilselskab havde udeholdt indtægter fra salg af tre biler fra selskabets selvangivelse. Det er omfattet af skatteforvaltningens objektive bevisbyrde at påvise, at der er sket udeholdelse både hos et selskab og hos en person. Men udeholdelsen fra selskabet skaber en formodning for, at pengene har stået til disposition for selskabets hovedaktionær. Medmindre denne kan påvise, at pengene ikke tilgik ham, bliver han derfor beskattet af en maskeret udlodning fra selskabet. Da SKAT først havde løftet den objektive bevisbyrde for selskabets udeholdelse, skabte dette en subjektiv bevisbyrde hos selskabets hovedaktionær. Da han ikke kunne løfte denne bevisbyrde, blev han dømt.

Tilsvarende *TfS 2017.215 Ø* om udeholdelse af indtægter hos et advokatselskab med den følge, at beløbene ansås for at være tilgået advokatselskabets ejer, da han ikke havde bevist det modsatte. Processuelt er sagen en demonstration af samspillet i flere led mellem 1) Skatteforvaltningens objektive bevisbyrde, 2) Skatteforvaltningens sandsynliggørelse (af, at indtægterne stod til disposition for selskabets ejer, etc.) og 3) den subjektive bevisbyrde (for, at de pågældende formodninger ikke var holdbare) hos selskabet, skatteyderen m.fl. Da den subjektive bevisbyrde ikke blev løftet, fik skatteforvaltningen i det hele medhold.

I retspraksis i relation til civilretlige skattesager (dvs. hvad den skattepligtige indkomst udgør, modsat skattestraffesager) er man efterhånden gået så vidt som til at anvende en formodningsregel med tilknyttet omvendt bevisbyrde, hvis en person findes i besiddelse af relativt store kontantbeløb og ikke kan redegøre fyldestgørende for disse. *TfS 2018.135* Ø fandt, at en person var skattepligtig af et beløb på 66.000 euro, som blev fundet i hans håndbagage på en flyrejse fra Tunesien. Han hævdede, at pengene var et lån fra hans søster i Tunesien, men dels fordi han fremkom med denne forklaring relativt sent i skatteprocessen, og dels fordi den fremlagte låneaftale »havde et sådant indhold, at den ikke sandsynliggjorde gældsforholdets bestående«, fandt landsretten ham skattepligtig af beløbet. Landsretten udtalte, at »hvor en skatteyder er i besiddelse af en så betydelig kontantsum som i den foreliggende sag, påhviler det skatteyderen at dokumentere, at beløbet ikke skal indgå ved opgørelsen af den pågældendes skattepligtige indkomst, herunder fordi beløbet har karakter af et lån«. –Det er heller ikke udelukket at anvende en sådan formodningsregel under en skattestraffesag, når blot der ved bevisbedømmelsen tages hensyn til alle relevante omstændigheder, og modbevis tillades, jf. EMD af 7. oktober 1988, *Salabiaku mod Frankrig.*

I *UfR 2020.295* V, Forsikringsselskabet Himmerland G/S m.fl., havde en privatperson med en almindelig indkomst tegnet ulykkesforsikring i 17 forskellige forsikringsselskaber. Han betalte 48.000 kr. årligt i forsikringspræmier, og han var ulykkesforsikret for i alt 33 mio. kr. Han kom under hobbyarbejde til skade med en rundsav og måtte have en lillefinger amputeret. Få dage efter tilskadekomsten opsagde han alle forsikringerne. Forsikringsselskaberne nægtede at udbetale forsikringsydelsen. Landsretten fandt, at tilskadekomsten efter sin ydre objektive karakter umiddelbart fremtrådte som et ulykkestilfælde og derfor var dækket af forsikringerne, medmindre forsikringsselskaberne beviste, at han havde forvoldt skaden med forsæt eller grov uagtsomhed. Landsretten fandt de nævnte omstændigheder »særdeles påfaldende« og tiltrådte »efter en samlet vurdering«, at forsikringsselskaberne »ud over enhver rimelig tvivl« havde godtgjort, at sagsøgeren med forsæt havde forvoldt skaden.

Det afgøres af materiel ret, hvem der bærer bevisbyrden for et bestemt forhold. I kontraktforhold kan dette fremgå indirekte af aftalens formulering, fx af noget så simpelt som ordstillingen, idet anvendelsen af hhv. ordet »hvis …« eller »medmindre …« reelt kan gøre hele forskellen. Også en lovbestemmelse på området kan gennem sit ordvalg og sin opbygning signalere, hvem der bærer bevisbyrden, jf. fx forskellen mellem ordvalget i *ægtefællelovens § 8*, stk. 1, 2. pkt. (om dispositioner over helårsbolig) over for lovens § 11, 2. pkt. (om dispositioner over den anden ægtefælles erhvervsløsøre). Dette er ofte et helt bevidst valg fra lovgivers side, jf. fx *arvelovens §§ 70-71* med en klar bevisbyrdeforskel mellem hhv. notar- og vidnetestamenter for så vidt angår bevisbyrden for, om testator havde evnen til at handle fornuftsmæssigt (ved

notartestamente skal den anfægtende bevise manglende fornuft, jf. fx *FM 2000.89/1* Ø, men ved vidnetestamente skal den, der påberåber sig testamentet, bevise dets gyldighed).

I en sag om erstatning uden for kontrakt vil skadelidte – uanset at hans bevisbyrde herved rækker ind på områder, hvor skadevolderen ofte har lettest adgang til beviserne – normalt have bevisbyrden for culpa (se fx *UfR 2012.1886* V, Coop Danmark A/S, om en faldskade i en forretning), for kausalitet og for tab, hvorimod skadevolderen vil have bevisbyrden for, at skadelidte har udvist egen skyld eller accepteret en risiko for skadens indtræden, og for evt. manglende adækvans. På områder, hvor det anses særlig vanskeligt for skadelidte at løfte sin bevisbyrde for culpa, kan bevisbyrden være vendt om, så der foreligger et præsumptionsansvar, hvor skadevolderen må modbevise en skyldformodning for at gå fri.

Dette gælder fx ved transportørens ansvar for skadet gods, idet det her er praktisk set umuligt for skadelidte at bevise, hvad der skete med godset, mens det var i transportørens varetægt. Af samme årsag har nogle lande omvendt bevisbyrde for bestyrelses- og direktionsansvaret over for det tablidende selskab.

Den, der som depositar opbevarer andres gods, har ved godsets bortkomst eller beskadigelse bevisbyrden for, at der ikke er handlet culpøst, jf. DL 5-8-14. Den, der som forsikringstager kræver en forsikringsydelse udbetalt, har bevisbyrden for, at forsikringsbegivenheden er indtrådt. Dette gælder også under en sag, der anlægges af

forsikringsselskabet til tilbagesøgning af en allerede udbetalt forsikringsydelse, jf. *UfR 2000.2078 V, Trygg-Hansa Forsikring A/S*.

Bevisbyrden for årsagssammenhæng mellem culpa og tab bæres i en sag om erstatning uden for kontrakt af skadelidte, men beviskravet vedrørende årsagssammenhæng kan efter fast praksis afsvækkes, hvis der er tale om meget grove fejl hos skadevolderen. Dette ses eksempelvis inden for sager om revisoransvar, jf. fx *UfR 2014.1346 H, e-Huset A/S*, og *UfR 2015.2075 H, Memory Card Technology A/S*, hvor Højesteret i begge tilfælde frifandt revisorer, der havde begået faglige fejl, under henvisning til manglende kausalitet mellem fejl og tab; Højesteret gjorde først dette efter at have konstateret, at der ikke var tale om grove fejl (underforstået: havde fejlene været tilstrækkeligt grove, kunne kausalitetsbedømmelsen være faldet anderledes ud). Tilsvarende sås i *UfR 2000.2176 H, Commercial Leasing A/S*, om introduktionsbankens ansvar ved børsintroduktion.

I sager om erstatning i kontraktforhold anvendes i vid udstrækning samme principper som uden for kontraktforhold. Her kan en særligt

grov fejl således ligesom uden for kontrakt føre til, at beviskravet vedrørende kausalitet afsvækkes. Se fx *UfR 2017.204 V*, hvor en ejendomsmægler solgte ejendomme i Tyrkiet, og hvor køberne led tab, fordi de indbetalte købesummer ikke var fastlåst, indtil de havde skøde på ejendommen. Af Dansk Ejendomsmæglerforenings Normer for udlandsaktivitet fremgår det, at køberne i sådanne tilfælde på forhånd skal advares skriftligt og på tydelig måde om, at der ikke er sikkerhed for det indbetalte beløb. En sådan advarsel var ikke givet, og dette ansås for at være en alvorlig faglig fejl fra mæglerens side. Dette førte til, at kravene til bevis for årsagssammenhæng blev afsvækket. For nogle køberes vedkommende fremstod det nemlig efter bevisførelsen som usikkert, om de alligevel ville have indgået købsaftalen, selv om de var blevet behørigt advaret. Kravet om bevis for årsagssammenhæng kunne derfor synes ikke at være opfyldt, men som følge af den alvorlige faglige fejl måtte dette komme mægleren til skade, og landsretten lagde herefter til grund, at der var årsagssammenhæng mellem fejl og tab.

Det er ikke udelukket at træffe aftale, der direkte eller indirekte påvirker bevisbyrden. Det er allerede nævnt, at selve kontraktens formulering som en refleksvirkning kan få betydning for bevisbyrden (ordet »hvis ...« contra ordet »medmindre ...«). Helt generelle bevisbyrdeaftaler, fx til skade for en forbruger, må dog tilsidesættes, fx en aftale i en banks almindelige forretningsvilkår om, at et kontoudtog fra banken altid skal udgøre endegyldigt bevis for bevægelser og saldo. Det samme gælder fx en bemærkning i et garantibevis om, at »[k]un maskinafstemplet kassebon med dato og købspris gælder som dokumentation for købet«.

Men en rimeligt afbalanceret aftale, der fx bringer parternes aftale inden for – eller ud af – et område, hvor der gælder en bestemt bevisbyrde, må respekteres, også for så vidt angår den bevisbyrde, der således følger af aftalen, jf. *UfR 1995.856/2 H, Mammen & Drescher A/S, Århus*, om en brand i et pakhus, hvor forsikringen kun delvis dækkede, og hvor der derfor opstod spørgsmål om, i hvilket omfang pakhusets ejer (depositaren) skulle betale for skaderne. Hvis DL 5-8-14 (depositaransvaret) skulle anvendes, ville der være omvendt bevisbyrde, og pakhusejeren ville dermed være ansvarlig, idet brandårsagen var uopklaret. Men i en fodnote til pakhusets ordrebekræftelser hed det, at de danske speditørvilkår for opbevaring var vedtaget, og disse vilkår har en ligefrem bevisbyrde. Landsretten anså vilkåret for at være så byrdefuldt, at det burde være fremhævet, men Højesteret anså speditørvilkåret for at være vedtaget mellem parterne. Dermed var der aftalt ligefrem bevisbyrde vedrørende culpa, og dermed gik pakhusejeren fri.

Hvis en part under retssagen erklærer sig på en uklar eller tvetydig måde, kan dette komme ham til skade ved rettens bedømmelse af, hvad der bevismæssigt kan lægges til grund under sagen. Det samme gælder, hvis han forholder sig

tavs, medmindre han tidligere har bestridt den pågældende opfattelse. Hvis sagsøgeren i stævningen gengiver sin opfattelse af et begivenhedsforløb og opfordrer sagsøgte til at erklære, om han er enig, men sagsøgte forbigår spørgsmålet i svarskrift og ikke vender tilbage dertil i en eventuel duplik, kan retten efter anmodning fra sagsøgeren under hovedforhandlingen – hvis sagsøgte nu vil bestride den pågældende opfattelse – bevismæssigt lægge til grund, at det forholder sig, som sagsøgeren angav i sin stævning.

Der er her tale om den såkaldte processuelle skadevirkning, som vi møder i mange forklædninger i civilprocessen. Skadevirkningen er ikke obligatorisk for retten, men beror på et skøn. Den er således fakultativ, dvs. valgfri, for retten, og den fulde betegnelse for begrebet er derfor: fakultativ processuel skadevirkning. Hvis fx en virksomhed sagsøger en anden for at have plagieret et design, og sagsøgeren opfordrer sagsøgte til at fremlægge nærmere dokumentation for sit eget udviklingsarbejde, men denne provokation ikke efterkommes, kan retten tillægge dette en processuel skadevirkning. Det lægges herved til grund, at når sagsøgte ikke dokumenterer sit udviklingsarbejde, skyldes dette formentlig, at et sådant ikke er foretaget, og herved bestyrkes sagsøgerens anbringende om, at der foreligger et plagiat.

I straffeprocessen må der allerede som følge af uskyldsformodningen, jf. herved EMRK art. 6(2), jf. (1), ikke opereres med en processuel skadevirkning af den tiltaltes nægtelse af at svare, men inden for et ganske snævert område vil det dog også inden for straffeprocessen kunne tillægges en form for skadevirkning, hvis tiltalte ikke fremlægger helt nærliggende beviser, som kun han er rådig over, jf. UfR 1990.866 Ø, hvor en nøjagtig fastlæggelse af formue og afkast i en straffesag om skattesvig krævede kontoudskrifter eller lignende fra tiltaltes administrationsselskab i Schweiz, og da tiltalte trods adgang hertil ikke fremskaffede dette materiale, der i givet fald kunne "modbevise" anklagemyndighedens formodninger, lagdes disse til grund. Denne afgørelse er formentlig på kanten af, hvilken "skadevirkning" der kan opereres med i straffeprocessen, jf. Menneskerettighedsdomstolens dom af 25. februar 1993 i Funke mod Frankrig, hvor tiltalte i en afgiftsstraffesag var blevet pålagt at skaffe beviser mod sig selv i form af kontoudtog, hvilket fandtes stridende mod EMRK art. 6.

Provokationer spiller imidlertid inden for civilprocessen en særlig og vigtig rolle i relation til fremskaffelsen af beviser, herunder i særdeleshed

dokumenter. Hvis en part udtaler sin opfattelse af et begivenhedsforløb og tilføjer, at denne opfattelse støttes af et mødereferat, som modparten har udfærdiget, men aldrig givet fra sig, må der fremsættes en processuel opfordring til modparten om at fremlægge referatet. Der anvendes herved efter fast praksis den sprogbrug, at modparten opfordres til at fremlægge det nærmere angivne dokument.

Hvis en processuel provokation ikke efterkommes, kan den part, der har fremsat opfordringen, gå endnu videre og anvende retsplejelovens regler om editionspligt. Dette indebærer, at retten anmodes om at pålægge modparten at fremlægge dokumentet, jf. §§ 298 og 300.

Se fx UfR 1993.169 H, hvor »skolelæreren« i en drabssag anlagde injuriesag, dvs. et civilt søgsmål med påstand om straf mv., mod Danmarks Radio (DR) og to medarbejdere ved DR, og hvor sagsøgeren herunder krævede afsagt en editionskendelse efter § 298, stk. 1, om, at DR skulle fremlægge uredigerede optagelser af to personers forklaringer. Landsretten sagde nej til at afsige editionskendelse, men Højesteret udtalte: »Da det ikke kan afvises, at de uredigerede optagelser vedrørende … er af betydning for sagens afgørelse, pålægger Højesteret i medfør af RPL § 298, stk. 1, Danmarks Radio at fremlægge de uredigerede optagelser vedrørende … forklaringer optaget i forbindelse med TV-udsendelsen 'Dømt for mord'.« Se også UfR 1999.1443 V, hvor det under en sag om fastlæggelse af méngrad efter en ulykke blev pålagt skadevolderens ansvarsforsikringsselskab at fremlægge den sagkyndige lægeudtalelse, selskabet havde indhentet.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

En processuel provokation og dermed en eventuel editionskendelse kan også omfatte beviser, der som udgangspunkt ikke vedrører netop denne sag, men som kan få betydning for den, jf. fx *UfR 1993.189 Ø*, hvor en erhvervslejer under en sag om misforholdsleje begærede editionskendelse for, at udlejeren skulle fremlægge andre lejekontrakter vedrørende det samme butikscenter. Heri fik lejeren medhold, men det gjaldt dog ikke, i det omfang udlejeren kunne godtgøre, at der herved blev røbet forhold, der af hensyn til andre end sagens parter kunne holdes hemmelige i medfør af RPL § 298, stk. 1, jf. § 171, og heller ikke i det omfang enkelte lejemål ikke var sammenlignelige.

En editionsbegæring kan ikke blot omfatte fysiske dokumenter, men også fx elektronisk materiale, herunder e-mails, jf. fx *UfR 1998.1613 Ø*, der inden for strafferetsplejen fastslår, at en editionskendelse over for tredjemand (konkret i forbindelse med sigtelse for overtrædelse af ophavsretsloven ved at have kopieret edb-programmer til videresalg) også kunne omfatte de e-mails, som var placeret på sigtedes kontoangivelser. Også elektronisk kommunikation kan således udgøre beviser

*318*

under en retssag. Autenticiteten er genstand for den frie bevisbedømmelse. I 2000 blev vedtaget lov om elektroniske signaturer, som tjener til at sikre beviset for en afsenders identitet, men selv med en sådan "bevissikring" er der mulighed for konkret modbevis.

Derimod kan edition ikke forpligte nogen til at udfærdige et dokument eller til at udfærdige og fremlægge oversigter, jf. *TFA 2014.478 V*. Her ville arvingerne efter en person, der til sin død sad i uskiftet bo, men samlevede med S, have et editionspålæg mod S. Det kunne de få for så vidt angår kontoudtog, men de kunne ikke få S tilpligtet at udfærdige oversigter over udgifter til forbedringer af en fast ejendom, ej heller til at fremlægge handelsdokumenter, som S angav ikke at være i besiddelse af.

Det er dog ikke enhver editionsbegæring, der nødvendigvis bliver efterkommet. Dels skal overflødig bevisførelse undgås, jf. RPL § 341, og dels må det som udgangspunkt respekteres, hvis dokumenter har rent intern karakter, jf. fx afslag i *UfR 1968.608 H, Chr. Danielsens eftf.*, om regnskabsmateriale til brug for en sag om ulovlig fragtmandskørsel, *UfR 1997.837 H, K/S Sanexco Invest IV m.fl.*, om en advokatrapport i en sag om gyldigheden af anpartstegning, *UfR 1999.1028 H, Heini Joensen*, om en banks kreditindstilling til brug for en sag mod en kautionist, *UfR 1999.1720 H, Bikuben Girobank A/S*, om en bankdirektions redegørelse til bestyrelsen vedrørende en emissionsgaranti samt *UfR 2000.1877 V, Anni Cortsen*, og *UfR 2006.2 V* om lægekonsulenters udtalelser til forsikringsselskaber. Selv internt materiale kan dog efter omstændighederne have en så central betydning for sagen, at det kan kræves fremlagt, hvis formålet ikke kan nås på anden måde, jf. *UfR 1986.34 H, Privatbanken A/S og den Danske Provinsbank A/S*, om bestyrelsesprotokoller til brug under en straffesag og *UfR 2000.2076 V* om internt regnskabsmateriale i et aktieselskab, som part blev tilpligtet at fremlægge til brug for syn og skøn over selskabets værdi i forbindelse med en bodeling. Låneindstillinger hos en bank havde i lighed med *UfR 1999.1028 H. Heini Joensen*, karakter af interne arbejdsdokumenter og kunne derfor ikke kræves fremlagt, jf. *UfR 2010.955 Ø, Ole Roos Eftf. ApS*.

Om edition vedrørende internt materiale se *Peter Bang* i UfR 1997 B s. 268 ff.

Ved *UfR 2002.1734 H, Hafnia Holding A/S*, pålagde Højesteret Danske Bank at fremlægge anonymiserede udskrifter af sine bestyrelsesprotokoller samt indstillinger til bestyrelsen for så vidt angår forhandlinger om en aktieemission i Hafnia og om bankens lån- og kreditgivning til Hafnia. Højesteret lagde vægt på, at der forelå oplysninger om, at bankens bestyrelse havde drøftet emissionen, at banken havde spillet en central rolle i forbindelse med emissionen, og at banken samtidig var lån- og kreditgiver til Hafnia.

I den foran nævnte *UfR 2006.2 V* om lægekonsulentens udtalelser til forsikringsselskabet lægger præmisserne vægt på, at konsulenten ikke havde undersøgt skadelidte, men alene udtalte sit skøn, og at udtalelsen derfor ikke tilførte sagen nye faktuelle oplysninger.

*319*

I *UfR 2014.987 V, Ejendomsselskabet Sct. Thomas ApS*, blev en bank som tredjemand ikke pålagt at fremlægge

bestyrelsesprotokollater for en 7-måneders periode med tilhørende dokumenter til belysning af, hvorfor banken havde besluttet et midlertidigt investeringsstop. Dette kunne eventuelt få betydning under en sag, som et ejendomsselskab havde anlagt mod en sparekassefond med krav om erstatning for fondens ophævelse af en handel om en ejendom til banken. Landsretten bemærkede, at bestyrelsesreferater og indstillinger til bankens bestyrelse har karakter af interne og fortrolige dokumenter, der reflekterer bestyrelsens interne forretningsmæssige overvejelser, hvis hemmeligholdelse generelt har væsentlig betydning. Sådanne dokumenter kan derfor som udgangspunkt ikke kræves fremlagt under retssager, jf. præmisserne i *UfR 2002.1734 H, Hafnia Holding A/S*, jf. foran. Efter omstændighederne kan det pålægges banken at videregive faktiske oplysninger og endelige beslutninger fra referaterne, hvis der foreligger ganske særlige omstændigheder. Retsgrundlaget for afgørelsen er RPL § 299 (editionsreglen for tredjemand), smh. med RPL §§ 169-172 (vidnefritagelses- og vidneudelukkelsesreglerne), atter smh. med §§ 117 ff. i lov om finansiel virksomhed.

Endelig må editionen ikke få karakter af en "fisketur", modsat hvad der er tilladt efter amerikansk og engelske regler om disclosure og discovery. I *UfR 2015.3319 H, Ernst & Young*, gav Højesteret afslag på en meget vidtgående editionsbegæring fra Finansiel Stabilitet A/S over for revisor i sagen om eventuelt ledelses- og revisoransvar efter sammenbruddet i Roskilde Bank.

I Højesterets præmisser i Roskilde Bank-sagen hedder det: »Editionsbegæringen angår efter det oplyste stort set alt Ernst & Youngs arbejdsmateriale vedrørende revisionen af Roskilde Bank for regnskabsårene 2006 og 2007. Materialet omfatter bl.a. alle arbejdspapirer, udkast til revisionsprotokoller samt modtagne rapporter og anden dokumentation. – Finansiel Stabilitet A/S har ikke angivet, hvilke kendsgerninger der skal bevises ved fremlæggelse af dokumenterne, og Højesteret finder ikke grundlag for i medfør af editionsreglerne at pålægge Revisionen at udleverede dokumenterne til brug for *en undersøgelsesmæssig præget gennemgang*, jf. retsplejelovens § 298 og § 300, stk. 1.« [min fremhævelse] Se om kendelsen *Peter Bang* i R&R 2016 nr. 1 s. 26 ff.

Fra en anden af de store sager om sammenbrud i den finansielle sektor kan nævnes en editionskendelse over for Finanstilsynet i sagen om eventuelt ansvar efter ebh banks sammenbrud, jf. Vestre Landsrets kendelse af 15. oktober 2014 i *VL B-427-11*. I præmisserne hedder det:

»Landsretten finder, at en fremlæggelse af de dokumenter, der er omfattet af editionsbegæringen, vil udgøre et centralt led i bevisførelsen.

Landsretten finder ikke, at de forhold, de ønsker bevist ved editionsbegæringen, kan belyses ved den øvrige bevisførelse i sagen.

Landsretten finder, at der under hensyn til erstatningskravets størrelse (750 mio. kr.) foreligger sådanne ganske særlige omstændigheder, at oplysningerne, uanset at de er omfattet af Finanstilsynets skærpede tavshedspligt i henhold til lov om finansiel virksomhed § 354, stk. 1, kan kræves fremlagt under denne retssag. Landsretten

*320*

bemærker i den forbindelse, at landsretten ikke har fundet grundlag for at begrænse omfanget af editionspålægget til alene at omfatte sådanne oplysninger, som dokumenterer, at Finanstilsynet har reageret, og at der ikke var tale om reaktioner af alvorlig karakter, idet også oplysninger om manglende reaktion i en given situation vil kunne være af betydning.«

Herefter var kendelsens konklusion: »Det pålægges Finanstilsynet at fremlægge følgende dokumenter:

(A) Alle henvendelser fra Finanstilsynet til ebh bank A/S i anledning af bankens lovpligtige kvartalsindberetninger i årene 2006, 2007 og 2008, herunder henvendelser i brevform samt henvendelser, der foreligger som lovpligtige notater om mundtlige eller telefoniske henvendelser til banken, bortset fra interne notater.

(B) Alle øvrige henvendelser fra Finanstilsynet til EBH Bank A/S i årene 2006, 2007 og 2008, herunder henvendelser i brevform inkl. bilag, samt henvendelser, der foreligger som lovpligtige notater om mundtlige eller telefoniske henvendelser til banken, bortset fra interne notater.

(C) Alle henvendelser fra ebh bank A/S til Finanstilsynet i årene 2006, 2007 og 2008, herunder henvendelser i brevform samt henvendelser inkl. bilag, der foreligger som lovpligtige notater om mundtlige eller telefoniske henvendelser til Finanstilsynet, bortset fra interne notater.«

En tilsvarende begæring om editionskendelse over for sagsøgeren, Finansiel Stabilitet, blev ikke imødekommet, idet Finansiel Stabilitet erklærede ikke at være i besiddelse af flere dokumenter end de allerede fremlagte.

Om »undersøgelsespræget gennemgang«, læs: fisketur efter materiale, se nærmere *Erik Werlauff* i UfR 2016 B s. 205 ff., herunder om muligheden for alternativ bevismæssig formålsangivelse.

Det må tages i betragtning, om editionen vil indebære et dybtgående indblik i den pågældendes private og økonomiske forhold, og der bør antagelig herved anlægges en proportionalitetsbetragtning, jf. *TFA 2002.39 Ø*, der under en investeringsselskabs sag mod investors hustru med krav om betaling af en del af mandens gæld pga. påståede gaveoverførsler til hustruen afslår en vidtrækkende editionsbegæring om, at ægteparret skulle fremlægge kontoudtog for årene fra og med 1997. Et pålæg herom ville, bemærkede landsretten, være særdeles vidtgående, og det ville indebære »en omfattende blotlæggelse af ægteparrets økonomiske dispositioner« i de pågældende år.

Editionspåbud gives ikke, hvis den pågældende part har en saglig grund til at hemmeligholde dokumentet. Se som et spektakulært eksempel *UfR 2010.980 V*, hvor en lottokupon gav en gevinst på 9,3 mio. kr., men hvor spillerens identitet ikke kendtes, idet han havde forladt lottoforhandleren uden kvittering. Danske Spil søgte at identificere vinderen

ved at opfordre til at redegøre for en række faktiske omstændigheder. En spiller sagsøgte Danske Spil med krav om gevinsten og krævede editionskendelse for, at Danske Spil skulle fremlægge vinderkuponen, men Danske Spil fik medhold i, at sagsøgerens ønske om edition måtte vige for Danske Spils interesse i ud fra hensynet til vinderen at hemmeligholde kuponen.

Offentlige myndigheders interne arbejdsdokumenter er undtaget fra aktindsigt og kan som udgangspunkt ikke kræves fremlagt under retssager, jf. fx *TfS 2000.429 V* og fra straffeprocessen *TfS 2002.742 Ø*, omtalt under afsnit V C 5. Under særlige omstændigheder, fx hvis sagen hos myndigheden har haft et atypisk forløb, der giver grundlag for mistanke om forvaltningsretlig magtfordrejning eller lignende, kan fremlæggelse dog forlanges efter editionsreglerne, jf. *UfR 1999.724 H, Vibeke Mogensen*, om en atypisk forløbende afgiftssag, jf. *Jonas Christoffersen* i UfR 2000 B s. 202 ff. Editionspålægget frembragte i øvrigt så interessante oplysninger om myndighedernes sagsbehandling, at Told & Skat valgte at opgive retssagen, jf. *Eigil Lego Andersen* i UfR 2001 B s. 442 ff.

Først i forbindelse med hovedforhandlingen og dommen tager retten stilling til, om undladelse af at efterkomme et editionspålæg skal tillægges processuel skadevirkning, jf. *UfR 1999.1475 Ø*.

Den her beskrevne formelle fremgangsmåde med begæring om editionspålæg over for modparten vil langtfra altid blive valgt, idet parten ofte i stedet vil gentage provokationen i sit næste processkrift, måske tillige i brevform, og han vil derefter under hovedforhandlingen i sin procedure bede retten tillægge forholdet processuel skadevirkning for modparten, jf. § 298, jf. § 344, stk. 2. I § 299, jf. § 300, er der regler om tredjemands editionspligt. Når der kun sjældent skrides til anvendelse af editionspligten over for en part, skyldes dette, at en editionskendelse over en part ikke kan fuldbyrdes, ligesom en part ikke har pligt til at afgive forklaring. Modsætningen er editionskendelse eller vidnekendelse i forhold til tredjemand: Her er der pligt til efterkommelse (medmindre der gælder vidnefritagelse eller -udelukkelse), jf. fx *FM 2002.60/4 V* om editionspålæg til banker vedrørende en ægtefælles konti under en skiftesag. Mens tredjemand således kan tvinges, kan en part ikke tvinges, men risikoen for anvendelse af den fakultative processuelle skadevirkning vil normalt lægge et tilstrækkeligt pres på parten.

Området for processuelle provokationer og for den hermed sammenhængende skadevirkning er ikke så bredt, at en part kan tage på en større fisketur hos sin modpart med henblik på, om brugbart bevismateriale dukker op – eller med Højesterets ord i *UfR 2011.431 H, Fællesskabet Fristaden Christiania m.fl.*: udlevering af dokumenter »til brug

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

for en undersøgelsesmæssig præget gennemgang« (Fristaden Christianias sag mod staten om brugsret til området) krav om diverse notater, oplæg mv. afslået. Der kan fx ikke på denne måde fremprovokeres flere års bestyrelsesprotokollater mv., men der kan angives et bestemt tema med opfordring til at fremlægge (ekstrakt)protokollater om netop dette emne. Men nogen egentlig kontrol af, at provokationen effektivt og loyalt efterkommes i alle detaljer, har parten ikke. Der kan ikke foretages ransagning mv. som under alvorligere sager inden for straffeprocessen.

> Gennem denne indskrænkning i rækkevidden af processuelle provokationer adskiller dansk ret sig i sin noget pragmatiske holdning fra fx den langt mere formaliserede amerikanske procesret. Her kan der gennem forskrifter om discovery (og hermed sammenhængende disclosure) kræves meget vidtgående indsigt i modpartens dokumenter, korrespondance, protokollater mv., og en nægtelse af at efterkomme disclosure-provokationer kan få yderst vidtrækkende følger i form af tab af sagen, domfældelse for »foragt for retten« (rettergangsbøder mv.). Inden man afviser dette som et tungt og formalistisk system, bør man erindre, at adskillige af reglerne er opstillet med henblik på at tvinge den enkelte part, fx firmaet mod forbrugeren, til at forsyne modparten med lister over alle relevante bevismidler, herunder dokumenter, som er i partens besiddelse. Vel kan denne del af sagsforberedelsen forekomme tung, men den kan være yderst velegnet til at forebygge retstab som følge af bevismangel for en "svag" part. I virkeligheden etableres der herved et modstykke til efterforskningsfasen i straffesager. Det er derfor ikke helt ugrundet, når det forsøg, der har været gjort på at skabe en fælleseuropæisk retsplejelov, opererer med temmelig vidtgående discovery-forskrifter, jf. *Marcel Storme* (red.): Rapprochement du Droit Judiciaire de l'Union européenne; Approximation of Judiciary Law in the European Union, særligt kap. 4 i udkastet til et procesdirektiv, der herved er stærkt præget af anglo-amerikansk procesret, jf. *Per Henrik Lindblom* i SvJT 1996 s. 793 ff., særligt s. 820 f.

De danske editionsregler er, som det ses foran af praksis vedrørende provokationer over for offentlige myndigheder og banker mv., ikke specielt venlige over for en ressourcesvag part i forhold til en ressourcestærk, jf. *Erik Werlauff* i Festskrift for Bernhard Gomard s. 248 ff.

## 6. Forhandlingsmaksimen

Bestemmelsen i RPL § 338 spiller en så stor rolle i civilprocessen, at den fortjener ordret citat, jf. § 338:

> »Retten kan ikke tilkende en part mere, end han har påstået, og kan kun tage hensyn til anbringender, som parten har gjort gældende, eller som ikke kan frafaldes.«

*323*

Der er her tale om forhandlingsmaksimen (forhandlingsgrundsætningen), der formentlig kan betegnes som den borgerlige retsplejes vigtigste grundsætning. Ne ultra petita partium – ikke ud over parternes krav.

Forhandlingsmaksimen betyder ikke, at parterne selv »styrer« forhandlingerne (det gør retten naturligvis, idet den foretager den formelle procesledelse), men derimod at parterne selv bestemmer, hvad der skal inddrages i forhandlingerne, og dermed bestemmer parterne de rammer, inden for hvilke rettens afgørelse skal ligge.

Forhandlingsmaksimens modstykke er officialmaksimen (undersøgelsesprincippet), hvor det er retten (eller forvaltningsmyndighederne), der selv skal tilvejebringe processtoffet og oplyse sagen. Officialmaksimen bruges fx i de lande, der har særskilte forvaltningsdomstole, idet disse da normalt drager omsorg for at inddrage det nødvendige processtof i sagen for at nå frem til den materielt rigtige afgørelse, ligesom de kan fravige forhandlingsmaksimen. Fx gælder det for de svenske forvaltningsdomstole, at de, når særlige grunde foreligger, kan fravige parternes påstande og anbringender til skade for forvaltningsmyndigheden, forudsat tredjemands interesser ikke berøres deraf. Det vil ses af formuleringen, at en sådan retstilstand ikke har forladt forhandlingsmaksimen til fordel for en rendyrket officialmaksime. Snarere er der tale om en modificeret forhandlingsmaksime med elementer af officialmaksimen i sig.

Forhandlingsmaksimens væsentligste baggrund er, at parterne kender sagen bedre, end retten gør, og at de selv bedst kan skønne, hvilke påstande og anbringender sagen argumentations- og omkostningsmæssigt skal bære, jf. *Finn Taksøe-Jensen*: Materiel procesledelse i borgerlige sager s. 98 ff. og 377 ff. Til støtte for maksimen kan endvidere anføres betydningen af, at kontradiktionsmaksimen får lov at virke på processtoffet.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

I, the undersigned, Christian Otto Juel Hansen, certify that I am fluent in both the English and Danish languages and that the preceding text in the English language is to the best of my knowledge and belief a true and faithful translation of "Danish Court Procedure" (Dansk retspleje), 9th edition (2023) by Lars Lindencrone Petersen in the Danish language.

Copenhagen, 20 January 2025

Christian Otto Juel Hansen
Assistant Attorney