# Exhibit 8

CERTIFIED TRANSLATION

**U.1997.88H**

**H.D. November 6, 1996 in case I 235/1994 and I 238/1994**

*Chubb Insurance Company of Europe (adv. Klaus Søgaard, Copenhagen)*
mod
*dentist Torben Holm Nikolajsen (adv. Steen Harrsen, Holbæk, n.d.)*
and
*Zürich Forsikring (adv. Mogens Bach, Copenhagen)*
against

*dentist Torben Holm Nikolajsen (adv. Steen Harrsen, Holbæk, n.d.).*

*Common topics 3 Insurance 1 Insurance 3.2 Insurance 7.8 Insurance 7.9*
**Accident with oversawing of fingers not intentionally caused by the policyholder.**

♦ In August 1990, a 45-year-old dentist, A, sold his half of a dental clinic with a transfer date of January 1, 1991. He had previously been insured for accidents and occupational disability under F1 and F2, so that in the event of an occupational disability insurance event, there would be a total sum insured of approximately DKK 18 million to be paid out immediately and over a number of years. In the fall of 1990, A began to investigate the possibility of buying another clinic and came into contact with a couple of dentists who wanted to sell, but no purchase agreement was concluded. After being approached by an insurance agent from F2, A entered into an agreement in December 1990 on a reorganization and increase of the insurances, whereby the total sum insured for 3 accident insurances and 2 occupational disability insurances amounted to almost DKK 30 million. Immediately after the subscriptions, A was injured while working with a chainsaw in his garden, whereby the outer joint of his left thumb had to be amputated, and 25% of the joint and several ligaments on the left index finger were sawed off, so that he could no longer work as a dentist. Arguing that there was no accident and that A had intentionally caused the injury, F1 and F2 refused to recognize that this was a coverable insured event. As the injury appeared by its external objective nature to be an accident and F1 and F2 had not proved that A had intentionally caused the accident, they were sentenced to recognize that it was a covered loss.[1]

## Eastern High Court

*Eastern High Court judgment June 17, 1994 (6th district)*
(Risbjørn, Lisbet Wandel and Lyngesen).

On December 14, 1990, the plaintiff, Torben Holm Niko- lajsen, was cutting down trees in his garden using a chainsaw. While working, the saw hit a couple of fingers on the claimant's left hand. The claimant was thereby disabled. The plaintiffs degree of disability has not yet been finally determined, but according to the information provided by the plaintiff, it must be expected that he is unable to continue his profession as a dentist.

At the time of the injury, the plaintiff was insured by the defendants, Zurich Insurance and Chubb Insurance Company of Europe, respectively.

These cases, which have been negotiated in connection with each other, mainly concern whether Torben Holm Nikolajsen

**89**

deliberately sawed their fingers in order to obtain insurance payouts of several million DKK.

As the defendants have refused to acknowledge that the additional damage is covered by the insurance contracts entered into, the plaintiff brought an action against the defendants on 10 December 1991, claiming that both defendants should be ordered to acknowledge that the plaintiff's injury on 14 December 1990 at the property Dragebakken 235, Odense, is a damage event justifying coverage, covered by the insurance policies taken out by the plaintiff with the defendants.

The plaintiff has been granted free legal aid.

The defendants have both claimed final acquittal, alternatively acquittal against recognition that a minor part of the plaintiff's injury on December 14, 1990, as determined at the court's assessment, is considered a coverable event the insurance policies taken out with the respective defendants.

The facts of the case are as follows:

The applicant was born in 1945. He is a trained carpenter and has for some years participated in the operation of a construction company. In 1964 he became a soldier, and after a short time in the military police, he joined the hunter corps. He was in the defense for a total of 15 years and ended with the military rank of master sergeant. The applicant then studied to become a student and in 1984 graduated as a dentist. From 1984 to 1987, he was employed as a dental assistant in Aarhus. In 1987, the plaintiff bought a half share of a dental clinic community in Odense. The purchase price was DKK 1.2 million. In the contract for the joint clinic, it was stipulated, among other things, that the participants each ran their own separate practices with their own patients. New patients were to be distributed equally or by special agreement.

As regards the clinic community's finances, accounts for the years 1988 to 1990, among others, were submitted during the proceedings. It appears therefrom, inter alia, that the plaintiff in these years had annual fee income of approximately DKK 1.2 million. After deduction of its own direct costs and share of the community's costs and after write-downs and allocations, etc. the plaintiff made a profit amounting to DKK 600,000 to DKK 660,000 annually. From the years' profits, the plaintiff has been paid amounts for private use that have annually amounted to between
DKK 570,000 and DKK 690,000. In the corresponding years, the plaintiff's personal tax returns show taxable income of approximately DKK 200,000. In these years, the plaintiff had negative taxable property assessments of amounts that fell from approximately DKK 424,000 in 1988 to approximately DKK 316,000 in 1990. On January 2, 1991, the plaintiff sold half of the joint venture, and his taxable assets thereby changed to be positive in 1991 by approximately DKK 1 million. A statement of commitments with the plaintiff's bank presented in the case shows, among other things, that on 2 January 1991 the plaintiff had deposits of approximately DKK 1.5 million and outstanding loans of approximately DKK 900,000 or a total balance in the plaintiff's favor of approximately DKK 600,000. This amount consisted of approximately DKK 167,000 in investment fund accounts and approximately DKK 437,000 that was at the plaintiff's free disposal. From the clinic community's accounts, it is stated that the other participant in the joint venture had fee income of approximately DKK 2.2 million annually in the years 1988-1990.

In the applicant's opinion, the clinic community did not function satisfactorily and in November 1989 the applicant approached

UfR ONLINE

U.1997.88H

**1** U 1907.65 H, U 1953B.18ff, U 1987.7 H, Drachmann Bentzon and Knud Christensen: "Lov om forsikringsaftaler m. kom." 2nd ed. p. 619, Lyngsøe: "Forsikringsaftalelov m. kom." 4th ed. (1992) pp. 91, 116 and 121ff, and the same: "Dansk Forsikringsret" 7th ed. (1994) p. 203ff and 810, Bengt Lindell: "Bevisbvrdan i fvrsdkringsmål", NFT 1992, p. 213, and Heler: "Fvrsdkringsrett", 2nd ed. (1982) pp. 259f, 272f and 317.

lawyer with a view to either termination of the partnership or another amicable solution. During the spring and summer of 1990, it was agreed that the applicant should withdraw from the partnership. The withdrawal date was set for January 2, 1991, and on that day the plaintiff received a withdrawal amount of DKK 1,380,000 from his former partner in the clinic community.

In May 1990, the plaintiff began searching for another practice, and during the summer, he inspected several clinics with a view to a possible purchase thereof. The plaintiff also placed advertisements in the Danish Dental Association's magazine. This brought him into contact with dentist Strandby Christensen in Odense in August 1990. Strandby Christensen was a member of a joint practice with his wife and two other dentists. Before the plaintiff's injury, Strandby Christensen had provided him with, among other things, a profit and loss statement concerning this joint practice for 1989. The statement showed total fee income for Mr. and Mrs. Strandby Christensen including health insurance payments of approximately DKK 1.9 million. This gave a profit of approximately DKK 1 million before depreciation. These amounts were distributed with approx. 70% to Mr. Strandby Christensen and approx. 30% to his wife. The plaintiff had also been provided with a list according to which the inventory in Mr. and Mrs. Strandby Christensen's clinics was valued at approximately DKK 821,000. On April 4, 1992, Mr. Strandby Christensen made the following statement concerning the plaintiff's negotiations with Mr. Strandby Christensen about the purchase of a clinic:

"I hereby confirm that I have contacted dentist Torben Holm in response to his advertisement in Tandlæ- gebladet regarding the purchase of a clinic.

I also confirm that Torben Holm and his wife have visited our clinic and have received accounts, valuation reports, etc.

During the inspection of the clinic and later by phone, Torben Holm expressed an interest in taking over our share, together or in parts, and that the takeover should take place in early 1991, possibly March 1, 1991."

Regarding the plaintiff's insurance, there are 3 accident insurance policies (sum insurances) and some occupational disability insurance policies with regular payments.

Regarding the accident insurance, each of the defendant companies has an insurance of 2 million DKK.

**90**

Furthermore, through his membership of the Danish Dental Association, the plaintiff is a mandatory member of a group accident insurance with an insurance sum of DKK 350,000. This insurance has been concluded with the defendant Chubb Insurance Company of Europe via the Dental Association's administration fund.

As regards the accident insurance in Zurich, this was originally taken out in 1980 with a sum insured of DKK 400,000 in the event of death and a sum insured of DKK 1 million in the event of disability. On November 21, 1990, the plaintiff filed an application to increase these sums insured to DKK 495,000 on death and DKK 2 million on disability. The request was immediately granted.

Regarding the accident insurance with the defendant Chubb Insurance Company of Europe, it is stated that on December 4, 1990, the plaintiff submitted an application for accident insurance with a sum insured of DKK 1 million in the event of death and DKK 2 million in the event of disability. The insurance policy was issued on December 10, 1990 with an effective date of December 4, 1990.

Regarding the plaintiff's disability insurance with regular payments, it has been stated that the plaintiff is partly insured in Zurich and partly through insurance taken out with the Danish Dental Association's Administration Fund. Some of these insurances specifically cover the plaintiff's possible loss of income in the first year after an

occupational disability. Other policies cover the claimant's corresponding losses for a subsequent number of years.

For the first year after any disability, the claimant was insured under a policy with Zurich Insurance for an amount of approximately DKK 257,000. On October 30, 1990, this amount was increased to a total coverage of approximately DKK 617,000. On November 21, 1990, the total amount insured in the first year of absence was further increased to approximately DKK 841,000.

For subsequent years, when the plaintiff was still able to work, he was originally insured through two insurance policies with Zurich Insurance with annual sums insured totaling approximately DKK 513,000. On October 30, 1990, this coverage was extended to an amount of approximately DKK 742,000. On November 21, 1990, the insurance coverage was further extended to an amount of approximately DKK 842,000, and so that the expiry of the payment period for the insurance policies, which had previously been the plaintiff's 60th , now became the plaintiff's 65th . Through his membership of the Danish Dental Association, the plaintiff was further secured through the Danish Dental Association's Administration Fund. This fund provides an insurance coverage which, in the first year after the occurrence of occupational disability, amounts to 116% of the payments received by the dentist from the public health insurance. The claimant has stated that, in relation to his turnover in the old clinic community, this would have resulted in payment of approximately DKK 402,000 in the first year.

For subsequent years of continued disability, dentists are covered until the age of 65 under a compulsory insurance scheme with the administration fund, where the insurance amount is approximately DKK 108,000 annually.

The insurance cover in the administration fund may be extended by special agreement between the fund and the individual dentist. On December 9, 1990, with effect from December 10, 1990, the plaintiff requested that insurance coverage in the administration fund be extended by approximately DKK 330,000 in the first year and approximately DKK 330,000 in the second year.

DKK 324,000 in each of the following years.

All of the above insurance policies state that, according to the insurance terms and conditions, they do not compensate for damage caused by the injured party through intent or gross negligence.

It is further stated that on December 12, 1990, the plaintiff requested PFA Pension to increase his pension savings plan so that the annual contributions were increased from approx.

DKK 38,000 to DKK 55,800. In his application, the plaintiff stated that the change in pension savings should take effect on December 13, 1990 or December 1, 1990. On December 27, 1990, PFA Pension informed the plaintiff that the increase had been approved with effect from December 1, 1990. It has been stated that the pension savings scheme includes a provision that the savings will continue without payment of premiums if the insured becomes at least 2/3 disabled.

On December 9, 1990, significant vandalism was committed the premises of the client community. The vandalism was reported to the police, but is reportedly unsolved. The vandalism meant that the clinic could not serve patients for the next 14 days. The clinic has received a significant amount in compensation for damaged inventory, etc. The plaintiff has twice received compensation for operating losses totaling approximately DKK 70,000.

On December 13, 1990, the plaintiff rented a chainsaw from Silvan Byggemarked in Odense. The saw was originally ordered to be collected on Saturday, December 15 and returned on Monday, December 17. Immediately after the accident, the chainsaw was sent by the claimant to the Danish Forest Research Institute for examination. The Institute has stated the following in a statement:

"Re: Dolmar Chainsaw model 111 Series no. 026/128376 belonging to the company "Silvan" in Odense.

The chainsaw appears brand new with the type approval sticker affixed. Defects and deficiencies could be found:

- The bark support was loose.
- Chain tension not correct.
- The saw was supposedly delivered to yours truly with the accessories provided by Silvan, which were missing: tightening for chain and for tightening chains

**91**

loose screws on the machine. Also missing was an instruction manual containing instructions for safe use and maintenance of the saw. Apparently, this is a brand new chainsaw that has not previously been rented out. In our opinion, the preparation of the machine has been deficient as the chain has not been run in before the rental and the bolts holding the bark support were not tightened and locked (loctite).

In our opinion, the loose bark support may well have caused the chainsaw to behave in an unexpected manner and thereby been a significant cause of the subsequent accident. We also find it reprehensible and irresponsible to rent out chainsaws without providing the necessary instruction (qualified personnel) and providing the necessary tools and an instruction book."

According to records from Odense Hospital's emergency room on December 14, 1990, the plaintiff arrived at the emergency room at 13:00. The record states, among other things: "Pt. was today cutting down trees in the garden with a chainsaw. Believes he may have put the saw down, after which the saw fell down and he wanted to catch it. Grabbed so that the chainsaw started. Got the chainsaw over his left hand." It also appears from the medical records that the following lesions were found on the plaintiff's fingers on the left hand: The outer joint of the thumb was almost completely amputated, so that it hung in a loose skin flap. The injury to the thumb had occurred on the side of the finger where the nail is located. On the same side of the index finger, there was an open lesion across the middle joint of the finger. 25% of the joint and several ligaments were sawed off. There was sensation on the side of the index finger against the palm.

In a statement issued on January 15, 1991 by a doctor at the Department of Orthopedic Surgery at Odense Hospital is a question that reads:

"Do you estimate that the insured will later be able to resume the above-mentioned work in whole or in part, and if so, when?" Answered as follows:

"Same work. Over a couple of months, but at a reduced pace." In a statement submitted to PFA Skade on behalf of the insurance company Chubb Insurance Company of Europe around the turn of the year 1990/1991, the claimant stated the following about the accident:

"I had rented a chainsaw from SILVAN to cut down a few trees in my garden.

During this work I see sparks at the saw blade, so I immediately lift the saw up and attach it to a thick branch just above the saw cut. I use the bark support (the teeth that are under the saw blade but in front of the motor) to hold the saw, which is now idling. I then check to see if I've hit a nail (my 6-year-old son has sometimes driven nails into the wood). Since I can't see anything, I brush/feel with my left hand in and around the cut, while still holding the saw with my right hand. During this maneuver, the saw jerks and falls on my left hand at the same time.

I instinctively try to hold/stop the saw from falling towards my left hand by tightening my grip on the handle with my right hand (a pure reflex movement). This activates the "speed buttons" to the maximum and the saw hits my left hand with full revolutions.

This causes the hand to be heavily leathered, with the outer joint of the thumb hanging by a thin thread of skin and the index finger cut about halfway through at the joint between the second and third joints. The index finger is also rotated 90° perpendicular to the normal bending movement.

A technical examination of the saw shows the following: There are 2 bolts holding the bark support. One bolt has broken off completely and the other is very loose, which is why the bark support (on which the saw was resting) has been able to "oscillate" around one bolt. So one of the bolts broke off while I was idling the saw, which caused the saw to jerk and it fell on my hand."

In connection with the court hearing, the plaintiff's lawyer asked consultant physician T. Barfred, Department of Orthopaedic Surgery at Odense Hospital some questions, which the consultant physician answered in a statement dated February 14, 1994 as follows:

"The answer to question 1, whether the anesthetic and the method dentists use for dental treatment can be used for anesthetizing hands/fingers, is affirmative, i.e. the anesthetic can also be used elsewhere on the body, e.g. fin- branches.

The answer to question 2, whether this will be observed and noted in the medical record. This is unlikely to be the case. Any puncture wounds will probably be covered by blood associated with the injury. The fluid that may have been injected will only be observed if the fluid is very close to the area to be operated on. However, the effect of any injection, namely loss of sensation (sensitivity), will usually be recognized.

The answer to question 3, whether the sensitivity in the 2nd finger volar would be present if the finger was anesthetized, is that the sensation (sensitivity) on the volar side of the index finger, i.e. the palm side of the finger, will not be present if the finger has been anesthetized within approximately 2 hours. The duration will depend on the anesthetic used. The above journal entry was made on the basis of an examination at approx. 13.30. The patient arrived at 13.00, but the time of injury is not stated in the injury record."

During the court hearing, testimony was given by the plaintiff and witness statements by the plaintiff's former partner, Merete Andersen, dentist Chr. Strandby Christensen, insurer Palle Borch, Zurich, deputy director Helge Thers, PFA, Bodil Wagner, Dansk Tandlægeforenings Administrationsfond, Kirsten Hesselkilde, Codan, and business manager Knud Kristensen, Silvan.

The applicant has about the cooperation in the joint clinic

**92**

explained, inter alia, that disagreements arose in particular when the applicant felt disadvantaged regarding new patients. His working day was far from being utilized. There were many hours without patients and he also had to take days off occasionally. The clinic community therefore did not work, and in May 1990 it was agreed that the partnership would buy the plaintiff's half share. A few months of difficult negotiations regarding the non-competition clause followed, but probably in October 1990 the agreement was finalized. It was signed and dated January 2, 1991.

The plaintiff had received several inquiries on his advertisements in Tandlægebladet about buying a new clinic. In August 1990, the inquiry came from Strandby Christensen. The accounting material provided to the plaintiff by Strandby Christensen showed that the turnover of the Strandby Christensen spouses' clinics amounted to approximately DKK 1.9 million. Of this, approximately DKK 1.4 million was in Mr. Strandby Christensen's clinic. With the plaintiff's turnover in the clinic community of approx. DKK 1.2 million, where he had far from utilized his labor, and where his partner had had a turnover of more than DKK 2 million, the plaintiff had no doubt that he could manage to take over both the clinics run by the spouses Strandby Christensen. In addition, Strandby Christensen's

clinics were appropriately equipped with modern equipment. Mr. Strandby Christensen had said that he first wanted to sell Mrs. Strandby Christensen's clinic. The plaintiff knew that this would be difficult to sell on its own, as its patient base was small. To put himself in the best negotiating position, he therefore let Strandby Christensen understand that he was only interested in buying his clinic. As Strandby Christensen then realized that his wife's clinic was unsaleable, the plaintiff figured that he could buy both clinics for a reasonable price. Before the accident, the plaintiff and Strandby Christensen had discussed the value of goodwill, and the plaintiff had mentioned March 1, 1991 as a possible takeover date. This also gave Strandby Christensen time to try to sell his wife's clinic first.

After the accident, the claimant did not immediately tell Strandby Christensen about it. The doctors had promised the claimant that he would be able to start working as a dentist again within a few months. However, Strandby Christensen heard about the accident through other means and contacted the claimant. The claimant then told him that the doctors had said that the claimant only had to undergo an operation and then he could probably start working as a dentist again. Mr. Strandby Christensen confirmed that he still wanted to sell to the plaintiff. The plaintiff knows that Mrs. Strandby Christensen was angry with him because he had not immediately told her about the accident. At a later stage and for the purposes of the trial, the plaintiff asked Mr. Strandby Christensen sign a statement about the course of their negotiations. Mr. Strandby Christensen did not wish to sign the statement prepared by the plaintiff, but on April 4, 1992, drafted his own statement about the course of the negotiations. The plaintiff knows that Mrs. Strandby Christensen's clinic was not sold until 1992 and that Mr. Strandby Christensen's clinic was not sold until 1993.

At a time that the plaintiff does not remember today, he had previously met insurer Borch. He met Borch again at the dental fair in Vejle in the fall of 1990. The conversation turned to insurance, and the plaintiff said that he was about to buy a new clinic. Borch believed that the plaintiff was underinsured, and they arranged a meeting at Borch's office in Odense. The meeting took place on October 30, 1990 and lasted several hours. Borch had guessed that it was Strandby Christensen's clinic that the plaintiff was in the process of buying. The claimant did not tell Borch about his considerations to also buy Mrs. Strandby Christensen's clinic. In response to Borch's question, the plaintiff stated that the turnover was approximately DKK 1.4 million in Mr. Strandby Christensen's clinic. On this basis, Borch calculated that the claimant should have insurance coverage of approximately DKK 841,000 in the first year after any disability and approximately DKK 850,000 in each of the following years. Accordingly, during the meeting, the plaintiff took out additional insurance for the first year of approximately DKK 360,000 and for each of the following years additional insurance of DKK 229,000. The plaintiff had imagined that the amended insurance policies would not take effect until March 1, 1991, when the purchase of the new clinic had been finalized. However, Borch that the insurances should take effect immediately, this was therefore agreed. During the meeting with Borch, the plaintiff did not realize that his insurance coverage for the first year, when he took out an additional insurance of approximately DKK 360,000, only amounted to approximately DKK 617,000. Only when the plaintiff subsequently saw a letter from Borch dated November 8, 1990, did he realize that he was still underinsured in the first year. In the letter, Borch stated that when the purchase of the new clinic had been finalized, the plaintiff should have changed his insurance policies for the first year so that the total coverage would reach the calculated amount of approx DKK 841,000.

In the following time, the plaintiff finally decided to buy Mrs. Strandby Christensen's clinic as well. The plaintiff did not tell Borch about this. The applicant calculated on the basis of the clinics'

total turnover of DKK 1.9 million that he would have an insurance need corresponding to a personal income of approximately DKK 1.1 million. The plaintiff therefore firstly asked Borch to increase the insurance coverage in the first year so that the total coverage reached the level previously calculated by Borch of approximately DKK 841,000. Secondly, the plaintiff asked Borch to calculate the premium cost of increasing the insurance coverage for the following years from the agreed-upon DKK 229,000 to DKK 329,000, thereby raising the total coverage for

93

the following years to approximately DKK 950,000. Finally, the plaintiff asked Borch to investigate what it would cost to extend the payments on these insurance policies until the plaintiff turned 65. The plaintiff has stated that he thereby intended the expiry of these disability insurance policies would correspond to the expiry of the mandatory insurance established by the Danish Dental Association's Administration Fund. On this basis, the plaintiff and Borch met again on

November 21, 1990 at Borch's office. Borch presented the results and informed about the annual premium increases. These were not of a size that gave rise to special considerations. The plaintiff therefore asked Borch to initiate the increases in the insurance policies and the extensions of their expiry dates. At the end of the meeting, they discussed the accident insurance. Borch stated that the maximum was DKK 2 million. The claimant stated that his previous insurance in Zurich, which with indexation was approximately DKK 1.2 million, should be increased to this amount. The claimant proposed that the change should take effect on March 1, 1991 or January 1, 1991, but Borch again insisted that the change should take effect immediately. This was therefore the case.

After the meeting with Borch, the claimant decided to take out additional accident insurance. He had received an offer of insurance with PFA Skade from the Danish Dental Association. He had studied the material sent to him and found that this insurance was a good supplement to Zurich's accident insurance. The situation was rather that while Zurich had progressive coverage for major injuries, PFA's accident insurance had good insurance coverage for minor degrees of disability.

When the plaintiff had decided to buy both spouses Strandby Christensen's clinics, he had calculated that his personal income would be approximately DKK 1.1 million. This level of income was not covered by the additional insurance policies taken out by Borch. The claimant therefore decided to take out additional insurance to reach this level. He chose to take out the additional disability insurance policies using the offers announced by the Danish Dental Association's Administration Fund. The offer included the purchase of a number of modules, whereby additional insurance could be taken out for the first year after any occupational disability and for each of the following years. He had studied the insurance terms more closely and found that there were differences between the Zurich insurance terms and the insurance terms for the modules offered by the Administration Fund. The two insurance schemes therefore complemented each other well. His considerations led him to apply to the Administration Fund for 10 first-year modules and 9 additional modules for the following years. His insurance coverage would thereby be increased in the first year from the amount insured by Zurich of approximately DKK 841,000 to a total of approximately DKK 1,171,000. His insurance coverage for each of the following years would similarly be increased from approximately DKK 950,000 to approximately DKK 1,275,000. The insurance sums thereby exceeded the intended coverage of DKK 1.1 million, but he would subsequently adjust this by terminating a corresponding part of Zurich's insurance coverage. After the accident, the Administration Fund announced it would accept the insurance for the additional modules, but

at the same time, the Fund announced that the insurance would not take effect until January 4, 1991. There was then some correspondence about the possibility of bringing forward the effective date. However, this later became uninteresting when, at the end of June, the Fund announced that it was stopping all payments under the insurance policies. The modules have since been withdrawn.

The plaintiff has discussed insurance with Borch, also by means of the additional modules offered by the Danish Dental Association, but he has not otherwise informed the insurance companies mutually about his insurance policies. He did not believe that he had a duty to do so. He did not inform about his other insurances until he reported the claim to Zurich.

Regarding his financial circumstances before the accident, the claimant argues that the negative taxable assets in his annual tax returns should not be given special significance. At no time did he have any liquidity problems.

In connection with the vandalism at the clinic in December 1990, he received an advance payment on the business interruption insurance shortly before Christmas. The amount was DKK 20,000. The payment was not an indication that he was in financial need, but rather that he believed that the business interruption should be compensated while it was happening. The vandalism was also special in that it was highly targeted. It seemed to be carried out by a person with knowledge of where the damage to a dental clinic would be greatest. Acid was poured on the dental instruments and other vital equipment.

About the accident, the plaintiff explained, among other things, that he, who has almost everything in power tools, had not previously used a chainsaw. He had long thought about felling a couple of birch trees, which

3-4 weeks earlier, he had ordered the saw for pickup on Saturday, December 15th and delivery.

again on Monday. Due to the vandalism at the clinic, he was off work and picked up the saw on December 13. When he it up, it didn't come with any instructions or special tools. On Friday, December 14, he only needed a few hours of work. He was home alone. He sawed until around noon.

12.00. The weather was cold and he had a cup of coffee. He didn't drink any alcohol or use anything that could dull his attention. He was not wearing work gloves at the time of the accident. The accident happened at approximately 12:30. He has described it in his statement to PFA Skade. He has found it difficult to fully

94

accurately describe the details of the accident, and he is not entirely sure that the description in the letter is complete, but it is the closest he can get. He immediately alerted an ambulance, and while he waited, he briefly informed his wife, who was at her workplace, by telephone. The plaintiff has firmly denied that he intentionally sawed his fingers. He also denied that he had previously anesthetized one or more of his fingers. He has also denied that the accident should have happened in the way that he was sawing brushwood by holding the saw in only one hand.

After the accident, he has been mentally affected by the whole process, and this has led to the dissolution of the family. He has had other work for a short period, but is currently living on benefits. His index finger will probably have to be operated on again and possibly amputated. Merete Andersen has explained, among other things, that she has lived with the plaintiff since 1972. They are not married. They have two children together, 9 and 6 years old. In 1988, they bought a house in Odense. The witness has been a housewife, but in 1990 she started working outside the home. The witness has described their relationship in 1990 as good. The plaintiff's cooperation with the partner in the joint clinic went badly, and this affected family life. The witness therefore supported the plaintiff when he chose to leave the partnership. When the witness had found a job in the

Odense, she was pleased that it proved possible to buy Strandby Christensen's practice. The witness was aware that the plaintiff wanted his insurance conditions reassessed and at the same time adjusted to the purchase of the new clinic. After the dental fair in Vejle, the plaintiff had said that he had met insurer Borch. The witness found the agreed changes to the insurance conditions reasonable. In general, the family's financial situation in the latter half of 1990 was good. As mentioned, the witness had found work and the plaintiff had sold his half share in the joint clinic at a reasonable price. It was therefore no problem that the total gross insurance premiums amounted to just over

100,000 kr. and not for just under half that.

The witness stated that she and the claimant had for some time discussed cutting down the two birch trees. The claimant started the work on

December 13. When the witness was at work on December 14, she was by telephone by the claimant that he had his hand. She went to the hospital and was informed of the information the claimant had given about the accident, including that he had put the saw down and it had then started. The witness's first impulse was that the explanation was incoherent and implausible. A nurse explained this by saying that the claimant had severe injuries and great pain and was shocked after the incident. Subsequently, the witness was told by the claimant that the accident happened because the bark support was loose and that the chainsaw, as it was falling, accidentally started when the claimant grabbed it. When the witness returned home after the hospital visit, she found the saw in the garden

and put it in a shed. The tree trunk that the plaintiff had was 30-40 cm in diameter. Their neighbor tried to hand over the saw to the police that evening, but the police refused to accept it.

An attempt was then made to get Silvan to describe the condition of the saw, but the company would not, and the neighbor took the saw back, where it remained until the plaintiff came home from the hospital. It was then sent by the plaintiff for examination. The witness has described the accident as somewhat "squeamish" in relation pain. The witness has dismissed it as quite absurd that the plaintiff would have intentionally sawed his hand. The claimant was happy to use his hands and happy to be a dentist. As a result of the accident and fact that the claimant has been denied compensation, he was so psychologically changed that their cohabitation has now ended. She and the children live on their own. The witness and the claimant have divided the estate and have no mutual claims against each other.

Christian Strandby Christensen has explained that he, who has run a dental practice in Odense since 1959, was thinking of retiring. He and his wife ran a joint practice with two other dentists. In the summer of 1990, he read the plaintiff's advertisement for a new practice in Tandlægebladet, and the witness wrote to the plaintiff that his and his wife's practice was for sale. About a week later, the plaintiff telephoned the witness and that evening they visited the witness and his wife's clinic. The plaintiff was given various figures regarding the clinic. The witness emphasized to the claimant that he was interested in selling both clinics together. Not long afterwards, the claimant called and said he was interested buying both clinics. The claimant believed that he could handle this. The witness pointed out that in the contractual relationship with the other two dentists, there was a provision that one had to personally run the clinic core and could not hire an assistant for a longer period of time. The witness thought that he was diligent, but believes that he would nevertheless have had difficulty managing both clinics. However, the witness did not want to deny that it was possible to manage both clinics. The next thing the witness remembers is that a few months later he was told that the plaintiff had been injured. The witness made contact with the plaintiff, who stated that he was still interested in buying and that the doctors had said that he would be back at work in early 1991.

Copyright© 2023 Karnov Group Denmark A/S                                                                                        6

The witness took note of this and took no action with a view to selling to another party. The witness has stated that he never discussed the purchase price with the plaintiff, nor the date of takeover. Only after the accident did the plaintiff mention that he preferred to take over on March 1, 1991. It was not the witness's impression that they were close to finalizing a purchase agreement. The witness has never heard of a takeover on

December 1, 1990 or December 15, 1990. At a much later date, when the witness had read in the local newspapers

**95**

about the vandalism at the plaintiff's old clinic and that the owner was suspected of insurance fraud, the witness had a meeting with the plaintiff. The plaintiff said that the plaintiff's name had been mentioned in connection with the vandalism, and the plaintiff wanted the witness sign that they had been in serious negotiations about buying the witness' clinic. The witness felt that this did not cover what had happened, and the witness therefore drew up his own statement of April 4, 1992.

The witness has further stated that the purchase price for a dental practice is traditionally determined as goodwill, corresponding to 50-60% of the turnover, plus the value of the inventory. The payment is normally made paid in cash at the time of acquisition. In 1992, the witness sold his wife's clinic and later his own.

Palle Borch has explained, among other things, that he has worked as an insurance agent for the past 15 years. He has taken out insurance policies for a considerable number of dentists on , and he has thus gained a good knowledge of the industry. He first met the plaintiff at the dental fair in 1987 and then again at the same fair in the fall of 1989 in Vejle. The witness contacted the claimant to find out whether his insurance needs were covered. On this basis, the witness prepared an analysis which he sent to the claimant. The analysis had shown that the claimant's disability insurance was short of approximately DKK 258,000 in the first year and approximately DKK 96,000 for each of the following years. The plaintiff stated that he was satisfied with the analysis, but that he was not immediately interested. However, the plaintiff would return to the case in January 1990. However, the plaintiff did not do so. The witness did not meet the plaintiff again until the dental fair in the fall of 1990 in Vejle. The witness again raised the issue of the plaintiffs insurance coverage. The plaintiff was that something should be done and they agreed to meet on October 30, 1990. At this meeting, the claimant told the witness that he was about to take over a new clinic. With his knowledge of the area, the witness could immediately guess that it was Strandby Christensen's clinic that the plaintiff was about to take over. The plaintiff confirmed this and said that he was to take over the clinic on December 1, 1990. The applicant also said that the contract was in order, but that a few things needed to be changed. The plaintiff asked if there would be a lack of insurance coverage if the claimant took 14 days vacation from the closing of his old clinic, which the claimant stated to be the December 1, 1990, and did not take over the new clinic until December 15, 1990. The witness denied that this was an insurance issue. The plaintiff also stated that he was not allowed to take over Mrs. Strandby Christensen's clinic because of a provision in the collective bargaining agreement. When asked by the witness, the plaintiff stated that the turnover would be approximately DKK 1.4 million and that this would be the highest he could achieve in 1991. The witness was to use the figure to make an analysis of the claimant's insurance needs. At the suggestion of the witness, the plaintiff agreed at the meeting to take out insurance for the first year after any disability for a sum of approximately DKK 360,000 and insurance for each of the following years for a sum of approximately DKK 229,000. The witness suggested coverage until the plaintiff turned 60 years, as the witness knows from experience that many dentists are worn down at this time and therefore stop working in the profession.

In addition, the insurance for subsequent years is disproportionately expensive. According to their agreement, the witness prepared after at the meeting, an analysis of the plaintiff's insurance needs prepared and forwarded to the plaintiff on November 8, 1990.

Shortly afterwards, the plaintiff informed that he thought that the analysis looked good, but the plaintiff believed that the insurances should run until his 65th birthday, corresponding to his mandatory insurance with the Danish Dental Association. The plaintiff therefore wanted to know what an extension to this point would cost. On November 21, 1990, the witness sent the requested statement to the plaintiff, and that evening they discussed the matter. At the meeting on November 21, which lasted approximately 1½ hours, the plaintiff decided on the basis of the witness' calculations to raise the sum insured for the first year from approximately DKK 360,000 to approximately DKK 584,000. As the plaintiff also ran a dental clinic, he would, in addition to this amount, receive an annual payment from the administration fund corresponding to 116% of the health insurance company's share of the plaintiff's turnover. For the following years, the insurance of DKK 229,000 was increased to DKK 329,000 and all insurance policies in Zurich were extended to expire at the plaintiff's 65th birthday. The witness indicated to the claimant that he would then be insured "110%+ regardless of future years' inflation. At the meeting, the plaintiff did not mention anything about a turnover of DKK 1.9 million or that he also intended to take over Mrs. Strandby Christensen's clinic. If the witness had heard that the claimant was aiming for a turnover of DKK 1.9 million, the witness would have questioned whether this would be possible for the claimant to achieve. A newly acquired clinic with many new patients is very time-consuming. In addition, in the event of a change of dentist, some patients take the opportunity to find another dentist. The meeting on November 21, 1990 ended with them discussing other insurances. Just before the meeting ended, the plaintiff said that he would like the accident insurance to be increased to DKK 2 million. At the same time, the insurance was to be changed to include the plaintiff's youngest child. The witness pointed out to the plaintiff that his insurance coverage by virtue of the occupational disability insurance was already very good, but the witness wanted to change the accident insurance as requested. The DKK 2 million was not the maximum for accident insurance in Zurich. Moreover, the amount of DKK 2 million is not an unusual sum. At some point, the witness handed the plaintiff the special form showing the progressive coverage for dentists in case of

**96**

e.g. finger injuries. The witness has explained the special progression of compensation for the above-mentioned injuries, stating, among other things, that while the loss of the outermost joint of a thumb normally provides 12% compensation, such an injury at Zurich provides DKK 45,000 in compensation per DKK 100,000 sum insured. Similarly, a lost index finger gives DKK 65,000 in compensation per DKK 100,000 in sum insured. As a result of this progression, the total damage at 100% disability can reach a coverage corresponding to 225% of the sum insured.

At their meetings, the plaintiff did not mention anything about insurance elsewhere. It was not until the spring of 1991 that the witness became aware that the plaintiff had taken out insurance elsewhere. In general, the witness explained that it is not usual for dentists to insure their personal income 100%. This is because dentists must sell their clinic in the event of loss of earning capacity and can then set the sale price as a return. It also not usual for dentists' insurance policies to run until the of 65. Usually, their clinics are paid off long before then, and the need for insurance is therefore reduced. It is also the witness's impression that dentists are usually almost hysterical about not damaging their fingers. If the plaintiff had told the witness before the accident that he would use a chainsaw, the witness would have advised against

the plaintiff this. After the accident, the witness and the plaintiff have talked about the fact that the witness used a chainsaw himself. The witness's experience of using a chainsaw is such that the witness cannot understand how the accident could have happened. Finally, the witness has stated that the plaintiff is the dentist with the highest insurance coverage that the witness is aware of.

Helge Thers, Deputy Director of "PFA Skadeagentur A/S", has explained, among other things, that PFA is the general agent for the defendant company Chubb Insurance Company of Europe. Since 1977, Chubb has offered the special insurance policies to dentists. The insurance policies are special in that they provide better coverage than general accident insurance for injuries to e.g. fingers. Neither PFA nor Chubb advise dentists directly, but they receive advice from the Danish Dental Association's Administration Fund.

Until the plaintiff ceased to be affiliated with the dental profession at the end of December 1990, the plaintiff was covered by the collective accident insurance of DKK 350,000. This sum insured was generally reduced from DKK 565,000 as of January 1, 1990. Through the Danish Dental Association's Administration Fund, various material is distributed to the members of the Dental Association. According to this, they can buy additional accident insurance up to a total sum insured of DKK 2 million. The witness can see from his case that in June 1990 the plaintiff submitted an advertisement from the Dentist Magazine and requested further information. This information was sent to the plaintiff. On December 6, 1990, PFA received the insurance application from the plaintiff, in which he requested accident insurance of DKK 2 million with effect from December 4, 1990. The company approved the insurance subscription on December 10 and accepted the requested effective date. The notification of the plaintiff's injury was received by telephone from the plaintiff on December 17, 1990. The witness immediately realized that this was a case in which he had to take a special interest. This was mainly due to the fact that the injury had occurred so soon after the insurance was taken out, that the plaintiff submitted a very detailed description of the course of events, and that a very long time had passed from the time the claimant had been sent the insurance material until he returned it. Only later did the witness learn that the claimant also had insurance policies in Zurich. Overall, the plaintiff had an insurance coverage that is so high that the witness has never seen anything similar. The circumstances surrounding the plaintiff's taking out the accident insurance are such that the company, had it known these circumstances, would not have taken out the insurance. The company did not ask the plaintiff at the time of taking out the insurance whether he had taken out insurance elsewhere. In August 1991, the company refused to cover the damage. In connection with some statements he had prepared concerning dentists' insurance, the witness explained that a total of 846 dentists were covered by accident insurance through the Danish Dental Association from PFA Skade in Chubb Insurance Company of Europe. In 1993, approx. 20% of dentists were insured for amounts up to DKK 1 million, approx. 50% of dentists were insured for amounts between DKK 1 million and DKK 1.5 million. Approximately 10% were insured for an amount between DKK 1.5 million and DKK 2 million, and approximately 20% were insured for an amount of DKK 2 million or more. The latter was solely due to the fact that the maximum sum insured of DKK 2 million is index-adjusted. In 1990, there were no insurance policies that exceeded DKK 2 million.

Regarding disability insurance, the witness explained that 280 dentists are insured by purchasing extra insurance modules. 75% of the dentists' insurance expires at the age of 60, 15% at the age of 65 and 8% at the age of 67. The annual benefits that these dentists are guaranteed are most frequently in the order of DKK 200,000 to 300,000 annually. 30% are guaranteed an annual amount between DKK 300,000 and DKK 400,000. 5% are guaranteed an amount between 400,000 DKK and 500,000 DKK annually, and 2% is guaranteed an amount between

DKK 500,000 and DKK 600,000 annually. In 1993, 1% were guaranteed an amount between DKK 600,000 and 650,000 annually. This maximum was later reduced to DKK 555,000 annually as the highest benefit in the event of occupational disability.

Bodil Wagner has explained, among other things, that she is the secretary of the Danish Dental Association's Administration Fund. The Danish Dental Association's members have 3 mandatory insurance schemes. The first is an

**97**

disability insurance, whereby they are guaranteed 116% of their previous turnover with health insurance for the first year. This insurance has a waiting period of 1 month. In the following years and until the age of 65, dentists are covered according to a basic module of approximately DKK 108,000, which is indexed and currently provides approximately DKK 120,000 per year. Finally, dentists have a mandatory group accident insurance, which in 1991 was index-adjusted to approx 360,000 DKK. Through the Administration Fund, dentists can purchase additional insurance coverage for all 3 insurance schemes. In order to secure themselves further in the first year after becoming unfit for work, up to 12 extra modules of approximately DKK 39,000 each can be taken out. Of these, the plaintiff has applied for 10 modules. To cover loss of income in the following years, up to 9 extra modules of approximately DKK 39,000 each can be taken out. The plaintiff has applied for the maximum number of modules. Regarding the accident insurance, a maximum of 20 modules each of 100,000 kr. The applicant has taken out the maximum amount. On December 12, 1990, the Administrative Fund received the plaintiff's request to take out additional insurance modules. With regard to the occupational disability insurance, it was stated that the additional insurance coverage was to take effect on December 10, 1990. The applicant had signed the application on December 9, 1990. According to the provisions of the Administrative Fund, the applicant could only join the additional insurance scheme with effect from the beginning of the following month and then only on condition of satisfactory health. It was only after the claimant's accession that the witness was in telephone contact with the claimant. The plaintiff wanted the effective date to be moved to October 1, 1990. The witness has stated that she is not aware of any dentists in the Administrative Fund with similar insurance coverage as the one the plaintiff sought to obtain. The normal is that the dentists insure themselves extra with 5-6 modules. The witness has confirmed that from January to May 1990, part of the insurance was paid out according to the first-year modules. The payment was then stopped with immediate effect.

Kirsten Hesselkilde, who is a secretary at the insurance company Codan, explained that the vandalism at the plaintiff's old clinic differed from other similar cases, as it was unclear how the perpetrator had gained access to the clinic. The insurance company paid out a total of just over DKK 900,000 for damage and missing effects. At some point before Christmas 1990, the plaintiff called the witness and asked for a down payment of DKK 20,000 so that he had something to live on and something to buy Christmas presents with. It was not the witness's impression that the plaintiff meant this as a joke.

Business manager Knud Kristensen, Silvan, explained, among other things, that the plaintiff was given the chainsaw in the company's hardware store. It was handed over by an employee who is no longer employed by the company. It was an employee who was known for taking care of his work. There is a specific person in the department who has the task and responsibility of preparing the machines and instructing customers in their use. The chainsaw provided was quite new, which is why the instructions and tools for tightening it had to be in the toolbox provided at the same time. The day after the accident, the witness heard from

the head of the department that the plaintiff's neighbor had told him that the accident had happened because the plaintiff had been sawing by holding the saw in only one hand and that he had cut his other hand when the saw slipped. In December 1990, the witness spoke to the plaintiff on the telephone and the plaintiff confirmed that the accident had happened in this way. The witness has never heard of similar accidents, and in the witness's opinion it is clearly irresponsible to saw in brushwood by holding the saw in only one hand. The saw, which weighs about 5 kg, will inevitably jump. After the accident, the witness received confirmation from the employee who had delivered the saw to the plaintiff that the saw had been in order when picked up. The department manager said that he had seen the saw when it was picked up and there was nothing wrong with it, but when the neighbor returned with the saw, the chain was slightly loose.

In support of its claim against the defendant companies, the plaintiff argues that the damage is objectively undisputedly covered by the insurance contracts concluded. There is no evidence that the plaintiff intentionally sawed his fingers. There is also no basis for assuming that the plaintiff acted with gross negligence. Section 18 of the Insurance Contracts Act is prescriptive. The plaintiff has not shown any circumstances that can justify a reduced compensation under section 124 of the Insurance Contracts Act.

The accident happened as the plaintiff has explained from the outset and ever since. There is nothing in the plaintiff's circumstances that can justify the suspicion against the plaintiff stated by the defendant companies. The applicant's personal circumstances were normal and his financial circumstances were good. The financial circumstances are shown in a relevant manner in the accounts of the joint clinic. However, the tax information in the annual statements is not relevant to the assessment of the applicant's actual financial circumstances. The plaintiff was happy to be a dentist and actually tried to buy both Strandby Christensen's clinics. Only the accident meant that this purchase was not completed. The plaintiff has credibly explained why the acquisition of the clinics could not take place until March 1, 1991. When insurer Borch has explained about a takeover date in December 1990, Borch must remember incorrectly. When taking over both clinics, it was absolutely realistic to expect that the plaintiff could achieve a turnover of DKK 1.9 million. When acquiring the new clinic, it could not be expected that the Administration Fund would immediately cover 116% of the turnover

**98**

in the old clinic. If this had been the case, Borch would have told the plaintiff about it. After the sale of its half share in the old joint clinic, the plaintiff had the financial opportunity to acquire Strandby Christensen's clinics. It is true that the negotiations on the size of the purchase price and the payment of the purchase price had not been completed. However, the size of the purchase price is quite fixed in the industry, which is why the agreement could quickly be concluded and the plaintiff could calculate the size of the purchase price itself. The actual content of the purchase negotiations is also confirmed by the fact that Strandby Christensen did not try to sell to another party for a very long time after the accident. The size of the insurance policies taken out was based on Borch's calculations. Considering the plaintiff's financial circumstances and expected income from the purchase of the new clinic, it was certainly not unreasonable that the plaintiff received total insurance premiums of approximately DKK 119,000 annually. More than half of the amount relates to pension savings, and the vast majority of the amount is tax deductible. When the plaintiff at the beginning of 1990 had not shown any interest in taking out further insurance with Borch, but did so at the end of the year, this was only natural in view of the fact that the plaintiff had now sold his clinic and was moving into a new one. Regarding the accident, the plaintiff has referred to the fact that the chainsaw was found to have significant defects. The saw was examined by a

impartial body. The claimant has not anesthetized his fingers. If he had, there would not have been sensation in his index finger at 13.30 in the emergency room. The insurance companies have not filed a police report in the case. The burden of proving that the plaintiff intentionally inflicted the injury is on the defendants, and this burden of proof has not been lifted. The requirements for such proof must be of a strength equivalent to conviction in a criminal case.

The plaintiff has stated the subject matter of the case as follows:

In relation to the defendant Zurich Insurance, the subject matter of the case can be stated as an accident insurance of DKK 2 million and a 10-year capitalized benefit from the insurance company of DKK 842,000 annually or a total subject matter of DKK 10,420,000.

In relation to the defendant Chubb Insurance Company of Europe, the amount in dispute can be calculated at DKK 2,350,000, which amount includes the mandatory insurance in the Administration Fund.

In support of their main claim, the defendants have jointly and severally argued that the plaintiff's injury is not covered by the insurance policies taken out with the defendants, that there is no accident, cf. the insurance conditions, that the plaintiff's injury did not occur as a result of an accidental effect independent of the insured's will, and that the plaintiff acted with gross negligence in connection with the occurrence of the injury, which is why he cannot obtain payment of any insurance benefit under the insurance conditions. In support of the alternative claim, the defendants have unanimously claimed that the plaintiff has failed to take reasonable measures as referred to in section 124 of the Insurance Contracts Act to prevent the damage, including reasonable measures to limit the extent of the damage.

In this case, there are many circumstances indicating that the plaintiff intentionally sawed his fingers. This must mean that the burden of proof for the existence of an accident covered by insurance lies with the plaintiff, and the plaintiff has not met this burden of proof. The assessment of evidence in the case is otherwise free and does not require evidence of the same strength as in criminal cases of insurance fraud. It is therefore that no police report has been filed. The circumstances at the end of 1990 must be decisive when assessing the plaintiff's circumstances. Here it should be taken into account that the plaintiff has not been in actual purchase negotiations with Strandby Christensen. Strandby Christensen did not hear mention of the takeover date, March 1, 1991, until after the damage had occurred. The plaintiff has thus falsely told Borch, the insurer, about the date of takeover and about how far the purchase negotiations had . The plaintiff's financial circumstances certainly did not make it reasonable for him to accept payment of annual insurance premiums of approximately DKK 119,000. He had no prospect of any binding agreement on the purchase of a new clinic and thus no secure future financial basis. After the vandalism at the old clinic, he was no longer employed. The plaintiff's taxable income never exceeded approximately DKK 216,000 at any time, in addition to which he had a significant debt from the original clinic purchase. The claimant also had significant interest expenses for house and student debt. The plaintiff's expectations of his future financial circumstances were therefore completely disproportionate to his actual financial situation. The plaintiff's financial circumstances were such that at Christmas 1990 he had to ask for an advance payment from the insurance company. In contrast to the plaintiff's completely precarious financial situation is the fact that he would receive an income of approximately DKK 1.6 million (including approximately DKK 402,000 from the Administration Fund) in the first year and then approximately DKK 1.3 million for approximately 18 years. It is also striking that the plaintiff was initially not interested in taking out insurance, but only in late 1990 showed interest in this. It should be noted in this connection that on December 9, 1990, the plaintiff demanded immediate entry into force despite the fact that he was not interested in insurance

covered until the end of December. Borch had very clearly established that the plaintiff was fully after taking out the accident insurance in Zurich for DKK 2 million. Nevertheless, 14 days later, the plaintiff took out further insurance DKK 2 million. The plaintiff also applied for this accident insurance to be

**99**

entry into force immediately. Another 6 days later, the claimant tried to take out insurance with the Administration Fund. The plaintiff failed tell Borch anything about this. All in all, it is extremely striking that the plaintiff took out so many and such large insurance policies just before the damage occurred. The occurrence of the damage is also incomprehensible, and the plaintiff has found it difficult to explain exactly what happened. The fault found in the chainsaw may have occurred subsequently. In addition, there is information in the case that suggests that the plaintiff sawed the brushwood by holding the chainsaw in only one hand. This is clearly irresponsible. Furthermore, the claimant did not wear work gloves despite the fact that the weather was so cold that he had to warm himself with a cup of coffee. The claimant should know the safety precautions that are necessary when using such a dangerous tool as a chainsaw. The plaintiff was grossly negligent in all cases and is therefore not entitled to compensation.

### The High Court must pronounce:

The plaintiff's injury on December 14, 1990 is covered by the plaintiff's insurance policies with the defendants, unless the defendants prove that the plaintiff caused the injury intentionally or through gross negligence.

Judge Risbjørn says:

The circumstances highlighted by the defendants concerning the insurance certificates and the plaintiff's undetermined occupation, in conjunction with the information concerning the injury itself, do not prove that the plaintiff intentionally injured his hand.

Judge Lisbet Wandel agrees with this result with the following comments:

Based on the information about the occurrence of the damage, it cannot be ruled out that the course of events may have been as described by the plaintiff in the statement to "PFA Skade", and that there may thus have been an accidental incident.

Even after an overall assessment of the above-mentioned circumstances emphasized by the defendants, there is not sufficient evidence of intentional infliction of damage.

Judges Risbjørn and Lisbet Wandel both find that it has not been proven that the plaintiff has caused the damage through gross negligence or that there are circumstances that can lead to the application of section 124 of the Insurance Contracts Act.

These judges then vote to uphold the applicant's claims in both cases.

Judge Lyngesen states:

The witness Borch has testified that the plaintiff informed him that the takeover Strandby Christensen's clinic would take place either on December 1, 1990 or December 15, 1990. The credibility of the witness' testimony is strengthened by the fact that the witness has further explained that the plaintiff justified the two possible takeover dates by the fact that he was considering taking a 14-day vacation and therefore inquired whether he would be considered to be out of practice as a dentist and the insurance coverage would therefore cease if he did not immediately continue in the newly acquired clinic after leaving the previous clinic. It is therefore unreasonable to it proven that the claimant has misrepresented this essential fact to the witness.

The reason for the incorrect information can only be that the plaintiff wanted the revised insurance terms to take effect at a date prior to mid-December 1990, and without the effective date drawing the witness's particular attention, which he would have expected to be the case if he had stated a significantly later date for the takeover of Strandby Christensen's clinic. The effective date thus sought by the plaintiff coincides precisely with the plaintiff's lease of the chainsaw, which the lease agreement the plaintiff had secured 3-4 weeks earlier. I compare the above with the fact that there is objective suspicion in the case. circumstances in that within a period approximately 1½ months prior to the claim, the plaintiff had obtained or attempted to obtain changes or new insurance policies with several insurance companies, whereby the total maximum payments (excluding the pension scheme) would be increased from approx DKK 11 million to approx. DKK 28 million. Finally, I compare the above facts with the fact that the plaintiff has not given any convincing explanation of the specific circumstances regarding the damage addition. On the contrary, it is striking that the plaintiff, who is agile and must be assumed to have normal motor reflexes, when he felt in his right hand that the chainsaw made an unintentional and thus dangerous movement in the direction of his left hand, did not manage to pull his left hand to him, but was hit so that the thumb was not only damaged, but exposed to such a persistent impact that the outer joint of the finger was amputated.

As a result of the above, I find it proven that the damage the plaintiff's left hand was caused by an intentional act on the part of the plaintiff, and I therefore vote to acquit the defendants.

Following the outcome of the vote, the plaintiff's claims are then upheld.

Costs to be paid by the defendant to the State, Zurich Forsikring, DKK 400,000 and from the defendant, Chubb Insurance Company of Europe, DKK 100,000.

## Supreme Court

### Supreme Court ruling.

The appealed judgment was handed down by the Eastern High Court.

Five judges participated in the adjudication: Pontoppidan, Marie-Louise Andreasen, Wendler Pedersen, Per Sørensen and Børge Dahl.

**100**

The appellants, Chubb Insurance Company of Europe and Zürich Forsikring, have claimed acquittal before the Supreme Court.

The defendant, dentist Torben Holm Nikolajsen, has claimed confirmation.

The insurance companies have only argued before the Supreme Court that there is no "accident" and that Nikolajsen has caused the damage intentionally.

Nikolajsen has also had free legal representation before the Supreme Court.

Additional information has been provided to the Supreme Court and new and supplementary explanations have been submitted.

The insurance policies at issue in this case cover accidents, which are defined in the accident insurance policies, but not in the occupational disability insurance policies, with the words "an ... independent of the will of the insured ... effect on the body".

It has been stated that the gross premium expenses for the accident and occupational disability insurance described in the judgment increased from just over DKK 20,000 to just over DKK 60,000 in the fall of 1990, and that only a small part of the amounts were not tax deductible. As a basis for Nikolajsen's considerations about disability insurance, there were needs analyses prepared according to a model used by Zurich Insurance's insurer, which operated

with a net need that was obtained by deducting variable costs and coverage from the Danish Dental Association's schemes from the annual turnover.

In a letter dated February 6, 1996, the Danish Insurers' Association answered some questions from the parties as follows:

Question A.

Is it good insurance practice to advise a person wishing to take out accident insurance to have the insurance take effect immediately upon taking out the insurance, regardless of the fact that the insurance is desired to economically protect against an increase in risk or other circumstances that are expected to occur at a later date? When taking out accident insurance, is it customary for such insurance to take effect when the policy is taken out?

Answer question A:

The effective date of an insurance policy depends on the agreement between the policyholder and the insurance company when the insurance is taken out. It is customary for an accident insurance policy to take effect when the policy is taken out, even if an increase in risk or change in other circumstances is expected later, especially in relation to the coverage of the disability risk. This is partly because the policyholder will be uninsured for a period of time if the insurance does not take effect at the time of subscription and partly because the risk information provided must not be too old.

Question B.

Was it possible to take out disability insurance in 1990 to cover a person's risk of loss of income in a company that would not actually be taken over until 3 months after the time of subscription? It is assumed that current comprehensive information is available at the time of subscription. Please answer the question under the following alternative assumptions:

a. The person has made a legal commitment to take over the business 3 months later.

b. The person has not made a legal commitment, but negotiations are ongoing.

c. The person has not made any legal commitments, nor are any concrete negotiations ongoing.

Answer question B:

In 1990, only 3 insurance companies offered individual disability insurance. In 1990, the prerequisite for taking out such insurance was also that the policyholder presented documentation of his/her earned income, either in the form of pay slips or accounts with an accountant's certificate if the policyholder was self-employed.

An article in Tandlægebladet 1992 with the headline "More sellers than buyers" states

"The conditions for buying and selling dental clinics have changed over the past few years. In 1990, 72 clinics were sold even though there were over 100 for sale. In 1991, there were 130 dentists considering selling, but only 50 clinics found a buyer. The same trend looks set to continue in 1992."

A floor plan and photographs show that there was a clear view of the accident site from the street/sidewalk and through the hedge from a neighbor.

It is reported that the Sachs-Dolmar chainsaw used weighs 7 kilograms in working condition, i.e. with the bar attached and filled with chain oil and gasoline.

In a letter dated December 21, 1995, the Research Center for Forest and Landscape under the Ministry of Environment and Energy (formerly the Forestry Institute) answered some questions from the parties as follows:

Question B.

In the institute's opinion, how long would it take to saw through the outer joint of a thumb when a chainsaw of the mentioned

brand hits your finger and the saw's rotation speed is near maximum?

Alternatively, please state how long it would take to saw over a branch with a diameter of 2 cm.

Answer question B.

Approximately 0.2 second

Question C.

What protection will an ordinary work glove available from a DIY store provide in the situation described in point B? Answer question C.

No or very little protection. Saw through time

... will be approximately the same. Question D.

Will the bark support on a saw of the mentioned brand be able to go

**101**

off if the saw is thrown onto a lawn after an accident has occurred? It is assumed that the person throwing the saw is standing on the lawn.

If the answer is no, please state whether the debarker can detach if it hits a hard material in or on the lawn, such as a tree stump or tile. Can the bark bumper be released manually and if so, with which tool?

Answer to question D.

The bar support cannot come loose, for example due to the saw being thrown onto a lawn, tree stump or tile, without causing visible damage to the saw. The kickstand is mounted with bolts that can be removed manually with hand tools.

...

Question T.

The Danish Forest Research Institute is asked to elaborate on how a loose bark guard on a chainsaw can cause the chainsaw to behave in an unexpected way and thus become a significant cause of accidents.

Answer to question T.

A loose bark guard on a chainsaw can, if the bark guard changes position during use, cause said bark guard to "catch" on twigs and small branches on the trunk or crown of the tree. This condition can cause the saw to suddenly change direction during use. It is difficult to imagine that a loose bark plug could be a major cause of an accident, provided the saw is used according to the applicable regulations.

An article by Niels Henrik Maagaard Mortensen and Hans R.I. Jørgensen in Ugeskrift for Læger 1991, p. 1861 ff, about accidents with chain saws, it appears that the injuries most frequently affected arms and legs and most frequently on the left side, and that almost a third of the accidents were characterized by the injured party as "inattention", "most frequently because you cut your leg in connection with short-term inattention, or because you briefly release the saw with one hand, for example. to hold the workpiece".

In a letter dated November 21, 1995 from the EHLASS project it states, among other things:

"The EHLASS register is a project under the Danish Consumer Agency with an office in the Danish Health Authority... The project collects accident data from 5 hospitals, which together cover 1/7 of Denmark's population and the register is representative of Denmark as a whole. In practice, this means that it is possible to calculate accident figures for the whole country with reasonable certainty based on the register's information.

For this purpose, we have extracted all chainsaw accidents for a 5-year period (1990-1994). ...

Based on this accident data, it can be concluded that there are In these 5 years, there were a total of 280 chainsaw accidents, an average of 56 chainsaw accidents per year in the EHLASS register.

Copyright© 2023 Karnov Group Denmark A/S

Converted to national figures (see above), this means that there have been approximately 392 accidents involving chainsaws in Denmark annually and 1,950 accidents in Denmark in the entire 5-year period.

Accidents mainly affect men (96%) and most accidents occur between the ages of 20-59 and mainly in the residential area (which also includes the surroundings of the home: garden, cottage grounds and the like).

The lesion type was mostly open wounds (89%), but in 12.5% of cases there were deeper lesions such as bone fractures, tendon, muscle and nerve lesions.

Lesions have been described almost everywhere on the body, but the lesions were mainly localized to the forearm, wrist, hand including fingers (66% of the lesions). The thigh, lower leg, knee, ankle and foot incl. toes were damaged in 28% of the cases. ...

It should be pointed out that we have only sorted out accidents in the area of home and leisure activities. The figures for accidents involving chainsaws *are not* included in this study."

In a cover letter dated November 21, 1995, with which the report from the EHLASS project is forwarded, project manager H. Bay-Nielsen states among other things:

"Herewith the promised figures from the EHLASS register. As stated in the memo, there are approximately 400 accidents of this type in Denmark annually. Anything can happen, but yours truly has never heard of attempted self-harm with a chainsaw. As we all know, it is a dangerous instrument, and no one who knows anything about chainsaws would attempt to injure themselves, as the chainsaw does not cut, it rips, and it can work its way down into the "material".

In a statement dated June 30, 1995, made to Zurich Insurance by Erik Tøn- devold, consultant physician and specialist in orthopedic surgery, it is stated, among other things:

"Conclusion:

In my opinion, there is no doubt that there is a causal connection between the current injury and the current condition. The condition is stationary from completed medical treatment in mid-1993.

I understand from the injured party that a compensation case is ongoing, but the way I see it, and with my not insignificant knowledge of chainsaws from childhood, I have to say that the actual mechanism of injury is by no means unknown. The fact that the left second finger is so badly damaged is because the chain comes at a speed of at least 30 meters per second and causes severe soft tissue damage when it hits a finger.

In the earlier versions of that particular chainsaw type, a Sachs-Dolmar, there was an issue with the bark guard, as it had a problem with falling off.

Thus, based on the nature of the lesion, I must postulate a connection between the current event and the current condition.

It's hard for me to see how you can inflict such an injury on yourself, as the old types of chainsaws were quite heavy

**102**

and could barely be held with one hand. The earlier types of saws also didn't have a so-called "dead man's switch", which meant that you could easily keep the chain running while putting the saw down. "

Torben Holm Nikolajsen has also explained that during the meeting at Strandby Christensen's clinic, he stated that he had the world's best non-compete clause, which did not prevent him from having a clinic in Odense. It is true that it was a condition of the non-compete clause that he had to talk to Strandby Christensen's partners, as they were not allowed to treat his former patients according to the clause. However, he intended to use the option under the clause to treat former patients against paying DKK 1,000 to Greve, and he would indemnify Strandby Christensen's partners if they were to get one of his

former patients. He had agreed with Greve that the reference in the clause to entering into a special agreement with Greve simply meant that you had to call Greve and then pay DKK 1,000. Moreover, he had no intention of keeping any of his former patients. There was no reason to believe that Strandby Christensen's partners would not enter into the obligation in question, as they would be released. He therefore did not show the non-compete clause to Strandby Christensen. He is a "do it yourself" man. He has many power tools, including several saws, including a hand-held circular saw.

Christian Strandby Christensen has also explained that when Nikolajsen asked him in the fall of 1990 when the takeover could take place, he replied that this was irrelevant and that he just wanted reasonable time for settlement. There was no specific takeover date in the air. He had not considered the takeover date himself. It was about finding someone who

March 1, 1991 could well have been the takeover date if he had been given 2-3 months' notice. What happened cannot be characterized as real negotiations. He put forward on

At no point did he make an actual asking price, but possibly mentioned to Nikolajsen that the purchase price for good-will was 50-60% of revenue. In addition to the price for goodwill, the cost of inventory and other items would have been included. As mentioned, Nikolajsen had received an appraisal list and information about the turnover figures, allowing him to estimate a purchase price himself. Much later, i.e. in March 1992, Nikolajsen came to his and his wife's home with a statement that Nikolajsen wanted their signatures on. This statement was a confirmation that they had been in serious negotiations with Nikolajsen. Neither he nor his wife would sign this statement. Instead, a few days later, he wrote another statement - the statement of April 4, 1992, reproduced in the judgment - and sent it to Nikolajsen. The reference in this statement to the fact that the takeover should take place in early 1991, possibly March 1, 1991, was inserted at Nikolajsen's request, as Nikolajsen had said during the visit that such a takeover date had been Nikolajsen's wish. He had only received this information during the aforementioned visit in March 1992. It is true that the passage in the statement in question can be read to mean that Nikolajsen had expressed to him the wish in question about the takeover date before the visit in March 1992, but in that case this is incorrect. His and his wife's clinics were sold for almost DKK 1.5 million together, in the case of his wife's clinic on July 1, 1992. He was approached about selling his own clinic in the fall of 1992 or the beginning of 1993. He did not perceive the contact with Nikolajsen in 1990 to mean that Nikolajsen was waiting for feedback from him. His partners would have had to approve Nikolajsen. However, they would never have approved Nikolajsen if they had been informed that they could not treat his former patients for a 2-year period. He did not discuss Nikolajsen with his partners. He did not perceive him as a serious buyer.

Tove Strandby Christensen has explained, among other things, that she and her husband had tried unsuccessfully to sell their clinics from around 1988/89.

Helle Andersen has explained, among other things, that she was a clinical assistant at Nikolajsen in the latter half of 1990. She was employed by him in January 1988 as a trainee clinical assistant and was trained on July 19, 1990. Nikolajsen talked about buying a new clinic and expressed interest in bringing her on board. I think it was around October 1990 that Nikolajsen started talking about this. It gave her peace of mind, because it gave her the prospect of a permanent job even after the turn of the year 1990/91. Nikolajsen mentioned that the other clinic was Strandby Christensen's clinic. She and Nikolajsen talked about this several times.

She believes they talked about Nikolajsen taking over Strandby Christensen's clinic in early 1991.

Leif Erland Henriksen has explained that he was Nikolajsen's neighbor in December 1990. There were some birch trees in Nikolajsen's garden. It was natural to cut them down as they took the sun off the terrace. Sometime in December 1990, Nikolajsen's wife Merete came to him and said that Nikolajsen had cut his finger and was in the hospital. She asked if he wanted to return the saw to Silvan, where it was rented, which he agreed do. She brought the saw to him. He noticed that the bark holder was dangling. He thought that if there was a question of compensation, it would not be appropriate if the saw was delivered to Silvan. So he drove to the police station and asked at the desk what he should do. The person he spoke to said that he should have the saw deregistered at Silvan and take it back. He found no other faults with the saw and did not find that the chain was loose.

Karsten Hajslund has explained, among other things, that in 1990 he was department manager for the hardware and garden center at Silvan in

**103**

Odense. Chainsaws were included. When renting, the customer was told how to operate the rented equipment, but instruction manuals were not usually handed out.

Palle Borch has also explained that if Nikolajsen had stated that he would take over Strandby Christensen's clinic on March 1, 1991, the insurance case would not have been taken up until February. Among other things, a health certificate must not more than one month old. Disability insurance can be taken out before the purchase of a new clinic, and he has no instructions from the head office about how long before, but the purpose of the insurance is to cover the need, and it is unrealistic to take out disability insurance, for example, three months before taking over a new clinic. He insures 36 dental clinics in Odense and the surrounding area. There are about 45 in total. After the letter of November 8, 1990, he wrote to Nikolajsen for a reply, whereupon Nikolajsen indicated that he would like to have the insurance cover extended to the age of 65, as his basic cover in the Danish Dental Association's Administration Fund ran until that time. On November 21, 1990, they had a meeting during which insurance policies were signed as described in his statement in the High Court judgment. There was no question of buying Tove Strandby Christensen's share of the clinic as well. Nikolajsen did not mention anything about taking out insurance in other companies. This would not have been necessary as he had Nikolajsen 110% covered. He would have been completely baffled if Nikolajsen had said that he would take out insurance with other companies. On December 10, 1990, Nikolajsen called him and asked where the insurance policies had gone. He called the company, which stated that they had received satisfactory medical certificates and that the insurance policies were on their way, which he immediately informed Nikolajsen by telephone.

**Supreme Court comments.**

The Supreme Court agrees that Torben Holm Nikolajsen's injury by its external objective character appears to be an accident and is therefore covered by the insurances, unless the insurers prove that he has caused the injury intentionally. The purpose of an accident insurance policy means that the fact that the policy's description of an accident includes the requirement that there must be an effect on the body independent of the insured's will does not relieve the insurers of this burden of proof.

There is a presumption against a person intentionally sawing off fingers with a chainsaw. The available information about the actual event that caused the injury does not contradict this presumption. On the contrary, taking into account the information about the saw used, the workplace, the time of the injury and the available

statements regarding the saw and the injury, it is entirely plausible that the injury could have occurred as explained by Nikolajsen.

The restructuring and renewal of Nikolajsen's insurance policies occurred after a representative from Zurich Insurance's approached him and reviewed his insurance needs. The most significant changes to coverage and premium costs involve the insurance policies issued by Zürich Insurance. Based on the information available, there is no basis to reject that Nikolajsen planned for and had a realistic opportunity to secure future employment that could generate income which, at least according to the needs analysis model used by Zurich Insurance, was not disproportionate to the total premium and coverage.

It is noted in this context that Zurich Insurance did not request information about future employment and income prospects in the insurance application forms.

On this basis, the Supreme Court finds that the insurance companies have not, through the circumstances they have highlighted - some of which were unusual - proven that Nikolajsen intentionally caused the accident.

The Supreme Court then upholds the judgment.

### For it is known to be right:

*The judgment of the High Court is upheld.*

*The appellant, Chubb Insurance Company of Europe, must pay DKK 100,000 and the appellant, Zürich Forsikring, DKK 525,000 in legal costs to the Danish State.*

*The sums ordered must be paid within 14 days of the judgment of this Supreme Court.*

**U.1997.88H**

**H.D. 6. november 1996 i sag I 235/1994 og I 238/1994**

Chubb Insurance Company of Europe (adv. Klaus Søgaard, Kbh.)
mod
tandlæge Torben Holm Nikolajsen (adv. Steen Harrsen, Holbæk,
e.o.)
og
Zürich Forsikring (adv. Mogens Bach, Kbh.)
mod
tandlæge Torben Holm Nikolajsen (adv. Steen Harrsen, Holbæk,
e.o.)

Almindelige emner 3 Forsikring 1 Forsikring 3.2 Forsikring 7.8
Forsikring 7.9

**Ulykke med oversavning af fingre ikke forsætligt forvoldt
af forsikringstager selv.**

♦ En 45-årig tandlæge A solgte i august 1990 sin halvpart af en
tandlægeklinik med overdragelse pr. 1. januar 1991. Han havde
hidtil været dels ulykkesforsikret dels erhvervsudygtighedsfor-
sikret i F1 og F2, således at der ved en erhvervsinvaliderende
forsikringsbegivenheds indtræden ville blive tale om en samlet
forsikringssum på ca. 18 mio. kr., der skulle udbetales dels
straks dels over en årrække. I efteråret 1990 begyndte A at
undersøge muligheden for at købe en anden klinik og kom
herunder i forbindelse med et tandlægepar, der ville sælge,
uden at der dog blev indgået nogen købsaftale. Efter henven-
delse fra en forsikringsagent fra F2 indgik A i december 1990
aftale om en omlægning og forhøjelse af forsikringerne, hvor-
ved den samlede forsikringssum for 3 ulykkesforsikringer og
2 erhvervsudygtighedsforsikringer kom op på knap 30 mio. kr.
Umiddelbart efter tegningerne heraf kom A under arbejde med
en motorkædesav i sin have til skade, hvorved venstre tommel-
fingers yderste led måtte amputeres, og 25% af leddet og flere
ledbånd på venstre pegefinger blev bortsavet, således at han
ikke længere kunne fungere som tandlæge. Under anbringende
af, at der ikke forelå et ulykkestilfælde, og at A forsætligt
havde forårsaget skaden, nægtede F1 og F2 at anerkende, at
der var tale om en dækningsberettiget forsikringsbegivenhed.
Da tilskadekomsten efter sin ydre objektive karakter fremtrådte
som et ulykkestilfælde, og F1 og F2 ikke havde godtgjort, at
A forsætligt havde forvoldt ulykken, blev de dømt til at aner-
kende, at der var tale om en dækningsberettiget skade.[1]

**Østre Landsret**

**Østre Landsrets dom 17. juni 1994 (6. afd.)**

(Risbjørn, Lisbet Wandel og Lyngesen).

  Den 14. december 1990 fældede sagsøgeren, Torben Holm Niko-
lajsen, træer i sin have og anvendte hertil en motordrevet kædesav.
Under arbejdet ramte saven et par fingre på sagsøgerens venstre
hånd. Sagsøgeren blev herved invalideret. Sagsøgerens invaliditets-
grad er endnu ikke endeligt fastslået, men efter det af sagsøgeren
oplyste må det forventes, at han er ude af stand til at fortsætte sit
erhverv som tandlæge.

På skadetidspunktet var sagsøgeren forsikret hos de sagsøgte,
henholdsvis Zürich Forsikring og Chubb Insurance Company of
Europe.
  Disse sager, der er forhandlet i forbindelse med hinanden, drejer
sig især om, hvorvidt Torben Holm Nikolajsen

**89**

med vilje har savet sig i fingrene med det formål at opnå udbetaling
af forsikringsydelser på adskillige millioner kr.
  Idet de sagsøgte har nægtet at anerkende, at skadestilføjelsen er
dækket af de indgåede forsikringsaftaler, har sagsøgeren den 10.
december 1991 anlagt sag imod de sagsøgte med påstand over for
begge om, at de tilpligtes at anerkende, at sagsøgerens tilskadekomst
den 14. december 1990 på ejendommen Dragebakken 235, Odense,
er en dækningsberettiget skadebegivenhed, omfattet af de af
sagsøgeren hos de sagsøgte tegnede forsikringer.
  Der er meddelt sagsøgeren fri proces.
  De sagsøgte har begge nedlagt endelig påstand om frifindelse,
subsidiært frifindelse mod anerkendelse af, at en efter rettens skøn
nærmere fastsat mindre del af sagsøgers tilskadekomst den 14. de-
cember 1990 anses for en dækningsberettiget skadebegivenhed i
henhold til de hos de respektive sagsøgte tegnede forsikringer.
  Sagens nærmere omstændigheder er således:
  Sagsøgeren er født i 1945. Han er uddannet tømrer og har i nogle
år deltaget i driften af et byggefirma. I 1964 blev han soldat, og
efter en kort tid ved militærpolitiet kom han til forsvarets jægerkor-
ps. Han var i forsvaret i alt i 15 år og sluttede med militær rang af
oversergent. Sagsøgeren læste herefter til student og afsluttede i
1984 uddannelsen som tandlæge. I årene fra 1984 til 1987 var han
ansat som tandlægeassistent i Århus. I 1987 købte sagsøgeren en
halvpart af et tandlægeklinikfællesskab i Odense. Købesummen
var 1,2 millioner kr. I kontrakten for klinikfællesskabet var det bl.a.
bestemt, at deltagerne drev hver deres adskilte praksis med hver
deres patienter. Fordelingen af nye patienter skulle ske ligeligt eller
efter særlig aftale.
  Vedrørende klinikfællesskabets økonomi er under sagen fremlagt
regnskaber for årene 1988 til 1990. Det fremgår heraf bl.a.,
at sagsøgeren i disse år havde årlige honorarindtægter på ca. 1,2
millioner kr. Efter fradrag af egne direkte omkostninger og andel
af fællesskabets omkostninger samt efter nedskrivning og henlæg-
gelse m.v. fremkom et overskud til sagsøgeren, der årligt beløb sig
til fra 600.000 kr. til 660.000 kr. Af årenes overskud har sagsøgeren
til privatforbrug fået udbetalt beløb, der årligt har været mellem
570.000 kr. og 690.000 kr. Sagsøgerens personlige skatteopgørelser
viser i de tilsvarende år skattepligtige indkomster på ca. 200.000
kr. Sagsøgeren havde i disse år negative skattepligtige formueop-
gørelser på beløb, der faldt fra ca. 424.000 kr. i 1988 til ca. 316.000
kr. i 1990. Pr. 2. januar 1991 solgte sagsøgeren halvparten af kli-
nikfællesskabet, og hans skattepligtige formue ændredes herved til
i 1991 at være positiv med ca. 1 million kr. Af en i sagen fremlagt
engagementsoversigt med sagsøgerens bank fremgår det bl.a., at
sagsøgeren 2. januar 1991 havde indestående på ca. 1,5 million kr.
og skyldige lån på ca. 900.000 kr. eller en samlet saldo i sagsøge-
rens favør på ca. 600.000 kr. Dette beløb forelå som ca. 167.000
kr. på investeringsfondskonti, og ca. 437.000 kr., der var til sagsø-
gerens frie disposition. Fra klinikfællesskabets regnskaber kan det
endvidere anføres, at den anden deltager i fællesskabet i årene 1988-
1990 havde honorarindtægter på ca. 2,2 millioner kr. årligt.
  Klinikfællesskabet fungerede efter sagsøgerens opfattelse ikke
tilfredsstillende, og i november 1989 henvendte sagsøgeren sig til

---

[1]  U 1907.65 H, U 1953B.18ff, U 1987.7 H, Drachmann Bentzon og Knud Christensen: Lov om forsikringsaftaler m. kom. 2. udg. s. 619, Lyngsøe: Forsik-
ringsaftalelov m. kom. 4. udg. (1992) s. 91, 116 og 121ff, og samme: Dansk Forsikringsret 7. udg. (1994) s. 203ff og 810, Bengt Lindell: Bevisbvrdan i
fvrsdkringsmål, NFT 1992, s. 213, og Heler: Fvrsdkringsrett, 2. udg. (1982) s. 259f, 272f og 317.

advokat med henblik på enten ophævelse af fællesskabet eller anden forligsmæssig løsning. I løbet af foråret og sommeren 1990 opnåedes der enighed om, at sagsøgeren skulle udtræde af fællesskabet. Udtrædelsesdatoen blev fastsat til den 2. januar 1991, og sagsøgeren fik denne dag fra sin hidtidige kompagnon i klinikfællesskabet udbetalt et udtrædelsesbeløb på 1.380.000 kr.

Sagsøgeren begyndte i maj 1990 at søge efter anden praksis, og han bestigtede i løbet af sommeren flere klinikker med henblik på eventuel køb deraf. Sagsøgeren indrykkede tillige annoncer i Dansk Tandlægeforenings blad. Herved kom han i august måned 1990 i kontakt med tandlæge Strandby Christensen i Odense. Strandby Christensen var deltager i et klinikfællesskab sammen med sin hustru og med to andre tandlæger. Inden sagsøgerens tilskadekomst havde han af Strandby Christensen bl.a. fået udleveret en resultatopgørelse vedrørende dette klinikfællesskab for 1989. Opgørelsen viste for ægtefællerne Strandby Christensen samlede honorarindtægter inklusive sygesikringens afregninger på i alt ca. 1,9 million kr. Dette gav et overskud på ca. 1 million kr. før afskrivninger. Disse beløb var fordelt med ca. 70% til hr. Strandby Christensen og ca. 30% til dennes hustru. Sagsøgeren havde endvidere fået udleveret en oversigt, hvorefter inventaret i ægtefællerne Strandby Christensens klinikker var vurderet til ca. 821.000 kr. Vedrørende sagsøgerens forhandlinger med hr. Strandby Christensen om køb af klinik har hr. Strandby Christensen den 4. april 1992 afgivet sålydende erklæring:

»På foranledning kan jeg hermed bekræfte, at jeg har henvendt mig til tandlæge Torben Holm som svar på hans annonce i Tandlægebladet om køb af praksis.

Ligeledes bekræfter jeg, at Torben Holm sammen med sin kone har set på vores klinik og har modtaget regnskaber, vurderingsopgørelse m.v.

Ved besigtigelsen af klinikken og senere telefonisk har Torben Holm udtrykt interesse for at overtage vores andel, samlet eller delt, samt at overtagelsen gerne skulle finde sted inden 1. juni 1991, evt. 1. marts 1991.«

Vedrørende sagsøgerens forsikringsforhold foreligger dels 3 ulykkesforsikringer (sumforsikringer) og dels nogle erhvervsudygtighedsforsikringer med løbende udbetalinger.

Vedrørende ulykkesforsikringerne foreligger der i hvert af de sagsøgte selskaber en forsikring på 2 millioner

**90**

kr. Endvidere er sagsøgeren via sit medlemskab af Dansk Tandlægeforening obligatorisk medlem af en gruppeulykkesforsikring med en forsikringssum på 350.000 kr. Denne forsikring er via tandlægeforeningens administrationsfond indgået med sagsøgte Chubb Insurance Company of Europe.

For så vidt angår ulykkesforsikringen i Zürich er denne oprindelig tegnet i 1980 med en dækningssum på 400.000 kr. ved død og en dækningssum på 1 million kr. ved invaliditet. Den 21. november 1990 indgav sagsøgeren begæring om forhøjelse af disse forsikringssummer til henholdsvis 495.000 kr. ved død og 2 millioner kr. ved invaliditet. Begæringen blev straks imødekommet.

Vedrørende ulykkesforsikringen hos sagsøgte Chubb Insurance Company of Europe er det oplyst, at sagsøgeren den 8. december 1990 fremsendte begæring om tegning af ulykkesforsikringen med en forsikringssum på 1 million kr. ved død og 2 millioner kr. ved invaliditet. Forsikringspolicen er udstedt den 10. december 1990 med ikrafttrædelsesdato den 4. december 1990.

Vedrørende sagsøgerens erhvervsudygtighedsforsikringer med løbende udbetalinger er det oplyst, at sagsøgeren dels er forsikret i Zürich og dels ved forsikringer tegnet i Dansk Tandlægeforenings Administrationsfond. Nogle af disse forsikringer dækker sagsøgerens eventuelle indtægtstab i det første år efter en opstået

erhvervsudygtighed. Andre af forsikringerne dækker sagsøgerens tilsvarende tab i et efterfølgende antal år.

For så vidt angår det første år efter en eventuel erhvervsudygtighed var sagsøgeren sikret i henhold til police med Zürich Forsikring for et beløb på ca. 257.000 kr. Den 30. oktober 1990 blev dette beløb forøget til en dækning på i alt ca. 617.000 kr. Den 21. november 1990 blev det samlede forsikringsbeløb i det første fraværsår yderligere udvidet til nu at være ca. 841.000 kr.

For efterfølgende år, hvor sagsøgeren fortsat måtte være erhvervsudygtig, var han oprindeligt forsikret gennem to forsikringer i Zürich Forsikring med årlige forsikringssummer på i alt ca. 513.000 kr. Den 30. oktober 1990 blev denne dækning udvidet til et beløb på ca. 742.000 kr. Den 21. november 1990 blev forsikringsdækningen yderligere udvidet til et beløb på ca. 842.000 kr., og således at udløbet af udbetalingsperioden for forsikringerne, der hidtil havde været sagsøgerens fyldte 60. år, nu blev sagsøgerens fyldte 65. år.

Gennem sit medlemskab af Dansk Tandlægeforening var sagsøgeren yderligere sikret via Tandlægeforeningens Administrationsfond. Denne fond giver en forsikringsmæssig dækning, der i det første år efter opstået erhvervsudygtighed udgør 116% af tandlægens modtagne betalinger fra den offentlige sygesikring. Sagsøgeren har oplyst, at dette i forhold til hans omsætning i det gamle klinikfællesskab ville have medført udbetaling af ca. 402.000 kr. det første år.

For følgende år med fortsat erhvervsudygtighed er tandlæger i henhold til en obligatorisk forsikringsordning med administrationsfonden dækket indtil deres 65. år med en forsikring, hvor forsikringsbeløbet er ca. 108.000 kr. årligt.

De forsikringsmæssige dækninger i administrationsfonden kan ved særlig aftale mellem fonden og den enkelte tandlæge udvides. Den 9. december 1990 begærede sagsøgeren med ikrafttræden fra den 10. december 1990 den forsikringsmæssige dækning i administrationsfonden udvidet med ca. 330.000 kr. det første år og ca. 324.000 kr. hvert af de følgende år.

Om samtlige ovennævnte forsikringer er det oplyst, at de i henhold til forsikringsbetingelserne ikke erstatter opståede skader, såfremt disse er fremkaldt af den tilskadekomne ved forsæt eller ved grov uagtsomhed.

Det er endvidere oplyst, at sagsøgeren den 12. december 1990 i PFA Pension har anmodet om, at hans pensionsopsparingsordning blev forøget, således at de årlige indbetalinger blev forhøjet fra ca. 38.000 kr. til 55.800 kr. Sagsøgeren anførte i sin begæring, at ændringen af pensionsopsparingen skulle træde i kraft den 13. december 1990 eller den 1. december 1990. PFA Pension har den 27. december 1990 meddelt sagsøgeren, at forhøjelsen var godkendt med virkning fra den 1. december 1990. Det er oplyst, at der til pensionsopsparingsordningen er knyttet en bestemmelse om, at opsparingerne fortsætter uden præmiebetaling, såfremt den forsikrede bliver erhvervsudygtig med mindst 2/3.

Den 9. december 1990 blev der begået betydeligt hærværk i klinikfællesskabets lokaler. Hærværket blev anmeldt til politiet, men er efter det oplyste uopklaret. Hærværket bevirkede, at klinikken ikke kunne betjene patienterne i de næste ca. 14 dage. Klinikfællesskabet har modtaget et betydeligt beløb i erstatning for ødelagt inventar m.v. Sagsøgeren har ad to gange fået udbetalt en samlet driftstabserstatning på i alt ca. 70.000 kr.

Den 13. december 1990 lejede sagsøgeren i Silvan Byggemarked i Odense en motorkædesav. Saven var oprindelig bestilt afhentet lørdag den 15. december med tilbagelevering mandag den 17. december. Kædesaven blev straks efter uheldet af sagsøgeren sendt til undersøgelse i Skovteknisk Institut. Instituttet har i en erklæring udtalt følgende:

»Vedr.: Dolmar Motorsav model 111 Serie nr. 026/128376 tilhørende firmaet »Silvan« i Odense.

Motorsaven fremtræder som fabriksny med påklæbet typegodkendelsesmærkat. Af fejl og mangler kunne konstateres:
- Barkstød sad løst.
- Kædespænding ikke korrekt.
- Saven blev angiveligt leveret til undertegnede med det tilbehør der var udleveret fra Silvan, der manglede: værktøj til opstramning af kæde samt til efterspænding af

**91**

løse skruer på maskinen. Tillige savnedes en instruktionsbog indeholdende anvisninger for sikker brug og vedligeholdelse af saven.

Tilsyneladende er der tale om en helt fabriksny motorsav der ikke tidligere har været udlejet. Ifølge vor opfattelse har klargøringen af maskinen været mangelfuld idet kæden ikke har været indkørt inden udlejningen og boltene der skulle fastholde barkstødet ikke var efterspændte og låste (loctite).

Efter vor mening kan det løstsiddende barkstød meget vel have været årsag til, at motorsaven har opført sig på en uventet måde og derved været en væsentlig årsag til det efterfølgende uheld. Vi finder ligeledes at det er forkasteligt og uforsvarligt at udleje motorsave uden at give den fornødne instruktion (kvalificeret personale) og medlevere det nødvendigste værktøj samt en instruktionsbog.«

Ifølge journal fra Odense Sygehus' skadestue den 14. december 1990 ankom sagsøgeren til skadestuen kl. 13.00. Det hedder i journalen bl.a.: »Pt. var i dag ved at fælde træer i haven med en motorsav. Mener muligvis at have stillet saven fra sig, hvorefter saven faldt ned, og han ville gribe den. Greb således at motorsaven startede. Fik derved motorsaven over venstre hånd.« Det fremgår endvidere af journalen, at der fandtes følgende læsioner af sagsøgerens fingre på venstre hånd: Tommelfingerens yderste led var næsten fuldstændigt amputeret, således at det hang i løs hudlab. Læsionen af tommelfingeren var sket fra den side af fingeren, hvor neglen sidder. På samme side af pegefingeren fandtes en åben læsion henover fingerens midterste led. 25% af leddet og flere ledbånd var bortsavede. Der konstateredes følelse i pegefingerens side mod håndfladen.

I en erklæring udstedt den 15. januar 1991 af en læge på Ortopædkirurgisk Afdeling på Odense Sygehus er et spørgsmål, der lyder: »Skønner De, at den forsikrede senere helt eller delvist vil kunne genoptage ovennævnte arbejde, og da hvornår?« besvaret således: »Samme arbejde. I løbet af et par måneder, men i reduceret tempo.«

Sagsøgeren har i en erklæring, der omkring årsskiftet 1990/1991 er indsendt til PFA Skade på vegne forsikringsselskabet Chubb Insurance Company of Europe oplyst følgende om uheldet:

»Jeg havde lejet en motorsav i SILVAN for at fælde et par træer i min have.

Under dette arbejde ser jeg gnister ved savklingen, og jeg løfter derfor straks saven op og sætter den fast i en tyk gren lige over savsnittet. Jeg bruger barkstødet (de tænder som befinder sig under savklingen men foran motoren) til at fastholde saven, som nu er i tomgang. Derefter ser jeg efter, om jeg har savet i et søm (min 6-årige søn har sommetider slået søm i træet). Da jeg ikke kan se noget, børster/føler jeg efter med venstre hånd i og ved savsnittet, idet jeg stadig holder saven med højre hånd. Under denne manøvre giver det et ryk i saven, og den falder samtidig ned på min venstre hånd.

Jeg prøver instinktivt at holde/standse savens fald mod min venstre hånd, idet jeg min højre hånd strammer grebet om håndtaget (en ren refleksbevægelse). Herved aktiveres »hastighedsknapperne« maximalt, og saven rammer min venstre hånd med fulde omdrejninger.

Herved læderes hånden kraftigt, idet tommelfingerens yderste led herefter hænger i en tynd hudtråd, og pegefingeren er savet ca. halvt igennem i leddet mellem andet og tredie led. Pegefingeren er desuden drejet 90° vinkelret på den normale bøjebevægelse.

En teknisk undersøgelse af saven viser følgende: Der er 2 bolte som skal fastholde barkstødet. Den ene bolt er gået helt af da den anden sidder meget løs, og derfor har barkstødet (som saven hvilede på) kunnet »pendle« om den ene bolt. Den ene bolt er altså gået af, mens jeg holdt saven i tomgang, og derfor gav det et ryk i saven, og den faldt ned på min hånd.«

I forbindelse med domsforhandlingen har sagsøgerens advokat stillet overlæge T. Barfred, Ortopædkirurgisk Afdeling på Odense Sygehus nogle spørgsmål, som overlægen i en erklæring af 14. februar 1994 har besvaret således:

»Svaret på spørgsmål 1, hvorvidt det bedøvelsesmiddel og den metode tandlæger anvender ved tandbehandling kan finde anvendelse ved bedøvelse af hænder/fingre, er bekræftende, altså bedøvelsesmidlet kan også anvendes andetsteds på kroppen f.eks. i fingrene.

Svaret på spørgsmål 2, hvorvidt dette vil blive iagttaget og noteret i journalen. Det vil næppe være tilfældet. Eventuelle stiklæsioner vil formentlig være dækket af blod i forbindelse med skaden. Den væske, der kunne være indsprøjtet, vil kun blive iagttaget, hvis væsken ligger helt tæt på det område, hvor man skal operere. Effekten af evt. indsprøjtning, nemlig ophævet følelse (sensibilitet), vil dog almindeligvis blive erkendt.

Svaret på spørgsmål 3, om sensibiliteten i 2. finger volart ville være tilstede, såfremt fingeren var bedøvet, er, at følelsen (sensibiliteten) på volarsiden af pegefingeren altså håndfladesiden af fingeren ikke vil være tilstede, hvis fingeren er blevet bedøvet indenfor ca. 2 timer. Varigheden vil være afhængig af det anvendte bedøvelsesmiddel. Ovennævnte journalnotat er foretaget på basis af undersøgelse kl. ca. 13.30. Patienten ankom kl. 13.00, men skadetidspunktet er ikke anført i skadejournalen.«

Under domsforhandlingen er afgivet forklaring af sagsøgeren og vidneforklaring af sagsøgerens tidligere samlever, Merete Andersen, tandlæge Chr. Strandby Christensen, assurandør Palle Borch, Zürich, underdirektør Helge Thers, PFA, Bodil Wagner, Dansk Tandlægeforenings Administrationsfond, Kirsten Hesselkilde, Codan, og forretningsfører Knud Kristensen, Silvan.

Sagsøgeren har om samarbejdet i klinikfællesskabet

**92**

bl.a. forklaret, at der navnlig opstod uoverensstemmelser, da sagsøgeren følte sig forfordelt vedrørende nye patienter. Hans arbejdsdag var langtfra udnyttet. Der var mange timer uden patienter, og han måtte også holde fridage indimellem. Klinikfællesskabet fungerede derfor ikke, og i maj 1990 blev det aftalt, at kompagnonen skulle købe sagsøgerens halvpart. Der fulgte derefter nogle måneder med vanskelige forhandlinger vedrørende konkurrenceklausulen, men formentlig i oktober 1990 var aftalen klar. Den blev underskrevet og dateret den 2. januar 1991.

Sagsøgeren havde fået flere henvendelser på sine annoncer i Tandlægebladet om køb af ny klinik. I august 1990 kom henvendelsen fra Strandby Christensen. Af det regnskabsmateriale, som sagsøgeren fik udleveret af Strandby Christensen, fremgik det, at omsætningen i ægtefællerne Strandby Christensens klinikker tilsammen var ca. 1,9 million kr. Heraf var de ca. 1,4 million kr. i hr. Strandby Christensens klinik. Med sagsøgerens omsætning i klinikfællesskabet på ca. 1,2 million kr., hvor han langtfra havde udnyttet sin arbejdskraft, og hvor hans kompagnon havde haft en omsætning på mere end 2 millioner kr., var sagsøgeren ikke i tvivl om, at han kunne klare at overtage begge de af ægtefællerne Strandby Christensen drevne klinikker. Hertil kom, at Strandby Christensens

klinikker var hensigtsmæssigt indrettet med moderne udstyr. Strandby Christensen havde fortalt, at han først ønskede at sælge fru Strandby Christensens klinik. Sagsøgeren vidste, at denne ville blive svær at sælge alene, da dens patientgrundlag var ringe. For at bringe sig i den bedste forhandlingsposition lod han derfor Strandby Christensen forstå, at han kun var interesseret i at købe hans klinik. Efterhånden som Strandby Christensen derefter måtte erkende, at hustruens klinik var usælgelig, regnede sagsøgeren med, at han kunne købe begge klinikker for en rimelig pris. Inden ulykken havde sagsøgeren og Strandby Christensen drøftet værdien af goodwill, og sagsøgeren havde nævnt den 1. marts 1991 som mulig overtagelsesdag. Derved fik Strandby Christensen også tid til at prøve først at få solgt hustruens klinik.

Efter ulykken fortalte sagsøgeren ikke straks Strandby Christensen derom. Lægerne havde stillet sagsøgeren i udsigt, at han i løbet af nogle måneder så småt kunne komme i gang igen som tandlæge. Imidlertid hørte Strandby Christensen på anden måde om ulykken og kontaktede sagsøgeren. Sagsøgeren fortalte da, at lægerne havde sagt, at sagsøgeren blot skulle igennem en operation, så kunne han formentlig starte som tandlæge på ny. Hr. Strandby Christensen bekræftede, at han fortsat ønskede at sælge til sagsøgeren. Sagsøgeren var, at fru Strandby Christensen blev vred på ham, fordi han ikke straks havde fortalt om ulykken. På et senere tidspunkt og til brug for retssagen bad sagsøgeren hr. Strandby Christensen om at underskrive en erklæring om forløbet af deres forhandlinger. Strandby Christensen ønskede ikke at underskrive den af sagsøgeren udarbejdede erklæring, men affattede den 4. april 1992 sin egen erklæring om forhandlingsforløbet. Sagsøgeren ved, at fru Strandby Christensens klinik først blev solgt i 1992, og at hr. Strandby Christensens klinik først blev solgt i 1993.

På et tidspunkt, sagsøgeren ikke kan huske, havde han tidligere mødt assurandør Borch. Han mødte Borch på ny på dentalmessen i Vejle i efteråret 1990. Talen faldt på forsikringer, og sagsøgeren fortalte, at han stod foran køb af ny klinik. Borch mente, at sagsøgeren var underforsikret, og de aftalte et møde på Borchs kontor i Odense. Mødet fandt sted den 30. oktober 1990 og varede adskillige timer. Borch havde gættet, at det var Strandby Christensens klinik, sagsøgeren var i færd med at købe. Sagsøgeren fortalte ikke Borch om sine overvejelser om tillige at købe fru Strandby Christensens klinik. På Borchs spørgsmål oplyste sagsøgeren, at omsætningen var ca. 1,4 million kr. i hr. Strandby Christensens klinik. På dette grundlag udregnede Borch, at sagsøgeren skulle have en forsikringsmæssig dækning for det første år efter eventuel erhvervsudygtighed på ca. 841.000 kr. og hvert af de følgende år på ca. 850.000 kr. I henhold hertil tegnede sagsøgeren under mødet en yderligere forsikring det første år på ca. 360.000 kr. og for hvert af de følgende år yderligere forsikring på 229.000 kr. Sagsøger havde forestillet sig, at de ændrede forsikringer først skulle træde i kraft den 1. marts 1991, hvor købet af den ny klinik var gået i orden. Borch insisterede imidlertid på, at forsikringerne skulle træde i kraft straks, og dette blev derfor aftalen. Under mødet med Borch blev sagsøgeren ikke klar over, at hans forsikringsmæssige dækning det første år, når han tegnede en yderligere forsikring på ca. 360.000 kr., kun kom op på ca. 617.000 kr. Først da sagsøgeren efterfølgende så et brev af 8. november 1990 fra Borch, blev han klar over, at han fortsat det første år var underforsikret. I brevet oplyste Borch, at sagsøgeren, når købet af den ny klinik var gået i orden, skulle have ændret sine forsikringer for det første år, således at den samlede dækning derved nåede op på det beregnede beløb på ca. 841.000 kr.

I den følgende tid bestemte sagsøgeren sig endeligt for at købe tillige fru Strandby Christensens klinik. Sagsøgeren fortalte ikke Borch herom. Sagsøgeren beregnede på grundlag af klinikkernes samlede omsætning på 1,9 million kr., at han ville få et forsikringsbehov svarende til en personlig indtægt på ca. 1,1 million kr. Sagsøgeren bad derfor Borch for det første om at forhøje forsikringsdækningen det første år, således at den samlede dækning nåede op på det af Borch tidligere beregnede niveau på ca. 841.000 kr. For det andet bad sagsøgeren Borch om at udregne, hvad det ville koste i præmie at forhøje forsikringen for de følgende år fra de tegnede 229.000 kr. til 329.000 kr., hvorved den samlede dækning for de

**93**

følgende år kom op på ca. 950.000 kr. Endelig bad sagsøgeren Borch undersøge, hvad det ville koste at forlænge udbetalingerne på disse forsikringer indtil sagsøgerens fyldte 65. år. Sagsøgeren har oplyst, at han herved tilsigtede, at udløbet af disse erhvervsudygtighedsforsikringer kom til at svare til udløbet af det af Dansk Tandlægeforenings Administrationsfond oprettede obligatoriske forsikring. På dette grundlag mødtes sagsøgeren og Borch igen den 21. november 1990 på Borchs kontor. Borch forelagde resultatet og orienterede om de årlige præmiestigninger. Disse var ikke af en størrelse, som gav anledning til særlige overvejelser. Sagsøgeren bad derfor Borch iværksætte forhøjelserne af forsikringerne og forlængelserne af disses udløb. Ved mødets afslutning kom de til at drøfte ulykkesforsikringen. Borch oplyste, at maksimum var 2 million kr. Sagsøgeren erklærede, at hans hidtidige forsikring i Zürich, der med indeksregulering var ca. 1,2 million kr., burde forhøjes til dette beløb. Sagsøgeren foreslog, at ændringen trådte i kraft pr. 1. marts 1991 eller pr. 1. januar 1991, men Borch insisterede igen på, at ikrafttrædelsen burde være straks. Dette blev derfor tilfældet.

Efter mødet med Borch bestemte sagsøgeren sig for at tegne yderligere en ulykkesforsikring. Han havde fra Dansk Tandlægeforening modtaget tilbud om forsikring i PFA Skade. Han havde studeret det tilsendte materiale og fundet, at denne forsikring var et godt supplement til Zürichs ulykkesforsikring. Forholdet var nærmere det, at medens Zürich havde en progressiv dækning ved store skader, havde PFA's ulykkesforsikring en pæn forsikringsdækning ved mindre invaliditetsgrader.

Da sagsøgeren havde bestemt sig for at købe begge ægtefællernes Strandby Christensens klinikker, havde han som anført beregnet, at hans personlige indkomst ville være ca. 1,1 million kr. Dette indtægtsniveau var ikke dækket af de af Borch yderligere tegnede forsikringer. Sagsøgeren bestemte sig derfor for at tegne yderligere forsikringer for at opnå dette niveau. Han valgte at tegne de yderligere erhvervsudygtighedsforsikringer ved brug af de af Dansk Tandlægeforenings Administrationsfond annoncerede tilbud. Tilbuddet omfattede køb af et antal moduler, hvorved man yderligere kunne forsikres dels det første år efter eventuel erhvervsudygtighed og dels hvert af de følgende år. Han havde studeret forsikringsbetingelserne nærmere og fundet, at der var forskelle på Zürichs forsikringsbetingelser og forsikringsbetingelserne for de af Administrationsfonden tilbudte moduler. De to forsikringsordninger supplerede derfor hinanden godt. Hans overvejelser endte med, at han anmodede Administrationsfonden om tegning af 10 første års moduler og 9 ekstra moduler for de følgende år. Hans forsikringsmæssige dækning ville derved i det første år blive forøget fra det af Zürich sikrede beløb på 841.000 kr. til i alt ca. 1.171.000 kr. Hans forsikringsmæssige dækning for hvert af de følgende år ville på tilsvarende måde blive forøget fra ca. 950.000 kr. til ca. 1.275.000 kr. Forsikringssummerne kom derved op over den tilsigtede dækning på 1,1 million kr., men det ville han efterfølgende regulere ved at opsige en tilsvarende del af Zürichs forsikringsdækning. Efter ulykkens indtræden meddelte Administrationsfonden, at man ville antage forsikringerne vedrørende de ekstra moduler, men

fonden meddelte samtidig, at forsikringerne først ville træde i kraft den 4. januar 1991. Derefter var der nogen korrespondance om mulighederne for at få ikrafttrædelsestidspunktet fremrykket. Dette blev dog siden uinteressant, da fonden i slutningen af juni meddelte, at man standsede enhver udbetaling i henhold til forsikringerne. Modulerne er senere trukket tilbage.

Sagsøgeren har med assurandør Borch drøftet forsikring også ved hjælp af de af Dansk Tandlægeforening udbudte tillægsmoduler, men han har i øvrigt ikke orienteret forsikringsselskaberne gensidigt om sine forsikringer. Dette har han ikke ment, at han har haft pligt til. Først i skadesanmeldelsen til Zürich har han oplyst om sine andre forsikringer.

Vedrørende sine økonomiske forhold for ulykken har sagsøgeren henvist til, at den negative skattepligtige formue i hans årsopgørelser ikke bør tillægges særlig betydning. Han har ikke på noget tidspunkt haft likviditetsmæssige problemer.

I forbindelse med hærværket i klinikken i december 1990 fik han kort for jul udbetalt et acontobeløb på driftstabsforsikringen. Beløbet var 20.000 kr. Udbetalingen var ikke udtryk for, at han var i pengenød, men nærmere for, at han mente, at drifttabet burde erstattes, mens det indtraf. Hærværket var i øvrigt specielt derved, at det var særdeles målrettet. Det virkede som udført af en person med kendskab til, hvor skaderne på en tandlægeklinik ville være størst. Der var således f.eks. hældt syre på tandlægeinstrumenterne og på andet vitalt udstyr.

Om ulykken har sagsøgeren bl.a. forklaret, at han, der har næsten alt i elektrisk værktøj, ikke tidligere har brugt en motordrevet kædesav. Han havde længe tænkt på at fælde et par birketræer, der skyggede, og årstiden var velegnet. 3-4 uger tidligere havde han bestilt saven til afhentning lørdag den 15. december og aflevering igen om mandagen. På grund af hærværket på klinikken havde han fri og hentede derfor saven allerede den 13. december. Da han fik den udleveret, fulgte der hverken brugsanvisning eller særligt værktøj med. Fredag den 14. december manglede han kun et par timers arbejde. Han var alene hjemme. Han savede indtil ca. kl. 12.00. Det var koldt i vejret, og han fik en kop kaffe. Han nød ingen alkohol og brugte ikke noget, der kunne sløve hans opmærksomhed. Han havde ikke arbejdshandsker på i ulykkesøjeblikket. Ulykken skete ca. kl. 12.30. Han har beskrevet den i erklæringen til PFA Skade. Han har haft svært ved helt

**94**

nøjagtigt at beskrive enkelthederne i ulykkesforløbet, og han er ikke helt sikker på, at beskrivelsen i brevet er fuldstændig, men det er det nærmeste, han kan komme. Han alarmerede straks en ambulance, og medens han ventede, nåede han kort telefonisk at orientere hustruen, der var på sin arbejdsplads. Sagsøgeren har bestemt afvist, at han skulle have savet sig i fingrene med vilje. Han har tillige afvist, at han forinden skulle have bedøvet en eller flere af fingrene. Han har endvidere afvist, at ulykken rettelig skulle være sket på den måde, at han savede kvas ved kun at holde saven i den ene hånd.

Efter ulykken har han været psykisk præget af hele forløbet, og dette har medført, at familien nu er oplyst. Han har i en kortere periode haft andet arbejde, men lever for tiden af understøttelse. Pegefingeren skal formentlig opereres på ny og muligvis amputeres.

Merete Andersen har bl.a. forklaret, at hun siden 1972 har boet sammen med sagsøgeren. De er ikke gift. De har sammen 2 børn på henholdsvis 9 år og 6 år. I 1988 købte de huset i Odense. Vidnet har været hjemmegående, men fik i 1990 udearbejde. Vidnet har betegnet deres samliv i 1990 som godt. Sagsøgerens samarbejde med kompagnonen i klinikfællesskabet gik dårligt, og dette påvirkede familielivet. Vidnet støttede derfor sagsøgeren, da han valgte at forlade klinikfællesskabet. Da vidnet havde fået arbejde i

Odense, var hun glad for, at det viste sig muligt at købe Strandby Christensens praksis. Vidnet var klar over, at sagsøgeren ønskede sine forsikringsforhold revurderet og samtidig tilpasset købet af den nye klinik. Sagsøgeren havde efter dentalmessen i Vejle fortalt, at han havde truffet assurandør Borch. Vidnet fandt de aftalte ændringer af forsikringsforholdene rimelige. Generelt var familiens økonomiske forhold i sidste halvdel af 1990 gode. Vidnet havde som nævnt fået arbejde, og sagsøgeren havde fået solgt sin halvpart i klinikfællesskabet til en rimelig pris. Det var derfor ikke noget problem, at de samlede forsikringspræmier beløb sig til brutto godt 100.000 kr. og netto til knap det halve.

Vidnet har oplyst, at hun og sagsøgeren i nogen tid havde drøftet, om de 2 birketræer skulle fældes. Sagsøgeren begyndte arbejdet den 13. december. Da vidnet den 14. december var på arbejde, fik hun telefonisk af sagsøgeren at vide, at han var kommet til skade med hånden. Hun indfandt sig på sygehuset og blev gjort bekendt med de oplysninger, sagsøgeren havde givet om ulykken, herunder at han havde stillet saven fra sig, og den da var gået i gang. Vidnets første indskydelse var, at forklaringen var usammenhængende og usandsynlig. En sygeplejerske forklarede dette med, at sagsøgeren havde svære læsioner og store smerter samt var chokeret efter hændelsen. Efterfølgende fik vidnet af sagsøgeren at vide, at uheldet var sket, fordi barkstøtten sad løs, og at motorsaven, da den var ved at falde, ved et uheld gik i gang, da sagsøgeren greb fat i den. Da vidnet kom hjem efter hospitalsbesøget, fandt hun saven i haven og lagde den ind i et skur. Træstammen, som sagsøgeren havde savet i, var 30-40 cm i diameter. Deres nabo forsøgte samme aften at aflevere saven til politiet, men politiet afviste at tage imod den. Derefter blev det forsøgt at få Silvan til at beskrive savens tilstand, men det ville firmaet ikke, og naboen tog saven med tilbage, hvor den forblev, indtil sagsøgeren kom hjem fra hospitalet. Herefter blev den af sagsøgeren sendt til undersøgelse. Vidnet har betegnet sagsøgeren som noget »pivet« i relation til smerter. Vidnet har afvist det som værende ganske absurd, at sagsøgeren med vilje skulle have savet sig i hånden. Sagsøgeren var glad for at bruge sine hænder og glad for at være tandlæge. Som følge af ulykken og det forhold, at sagsøgeren er blevet nægtet erstatning, blev han så psykisk forandret, at deres samliv nu er ophørt. Hun og børnene bor for sig selv. Vidnet og sagsøgeren har delt boet og har ikke gensidigt krav imod hinanden.

Christian Strandby Christensen har bl.a. forklaret, at han, der siden 1959 har drevet tandlægepraksis i Odense, tænkte på at gå på pension. Han og hans hustru drev sammen med to andre tandlæger virksomhed i et klinikfællesskab. I sommeren 1990 læste han i Tandlægebladet sagsøgerens annonce efter en ny praksis, og vidnet skrev til sagsøgeren, at hans og hans hustrus praksis var til salg. Ca. 1 uge senere telefonerede sagsøgeren til vidnet og samme aften besigtigede de vidnets og vidnets hustrus klinik. Sagsøgeren fik udleveret forskelligt talmateriale vedrørende klinikken. Vidnet understregede over for sagsøgeren, at han var interesseret i at sælge begge klinikker samlet. Ikke ret lang tid derefter telefonerede sagsøgeren og fortalte, at han var interesseret i at købe begge klinikker. Sagsøgeren mente, at han kunne klare dette. Vidnet gjorde opmærksom på, at der i kontraktsforholdet til de to andre tandlæger var en bestemmelse, hvorefter man personligt skulle drive klinikkerne og ikke måtte ansætte assistent i længere tid. Vidnet syntes selv, at han var flittig, men mener, at han desuagtet ville have haft svært ved at klare begge klinikker. Vidnet har dog ikke villet afvise, at det kunne lade sig gøre at klare begge klinikker. Det næste, vidnet erindrer, er, at han nogle måneder senere fik at vide, at sagsøgeren var kommet til skade. Vidnet fik kontakt med sagsøgeren, der oplyste, at han fortsat var interesseret i at købe, og at lægerne havde sagt, at han ville komme i arbejde igen i begyndelsen af 1991.

Copyright © 2023 Karnov Group Denmark A/S

Vidnet tog dette til efterretning og foretog sig intet med henblik på at sælge til anden side. Vidnet har oplyst, at han aldrig har drøftet købesum med sagsøgeren og heller ikke overtagelsesdag. Først efter ulykken har sagsøgeren nævnt, at han helst ville overtage pr. 1. marts 1991. Det var i det hele ikke vidnets indtryk, at der var tæt på at afslutte en købsaftale. Vidnet har aldrig hørt om overtagelse den 1. december 1990 eller den 15. december 1990. På et langt senere tidspunkt, hvor vidnet i de lokale aviser havde læst

**95**

om hærværket i sagsøgerens gamle klinik, samt at indehaveren var mistænkt for forsikringssvig, havde vidnet et møde med sagsøgeren. Sagsøgeren fortalte, at sagsøgerens navn havde været nævnt i forbindelse med hærværket, og sagsøgeren ville have vidnet til at skrive under på, at de havde været i seriøse forhandlinger om køb af vidnets klinik. Dette mente vidnet ikke dækkede det passerede, og vidnet udformede derfor sin egen erklæring af 4. april 1992. Vidnet har yderligere oplyst, at købesummen for en tandlægepraksis traditionelt fastsættes som goodwill, svarende til 50-60% af omsætningen, med tillæg af inventarets værdi. Betalingen erlægges normalt kontant ved overtagelsen. Vidnet fik i 1992 solgt hustruens klinik og senere sin egen.

Palle Borch har bl.a. forklaret, at han i de sidste ca. 15 år har arbejdet som assurandør. Han har tegnet forsikringer for en betragtelig del af tandlægerne på Fyn, og han har derved opnået et godt kendskab til branchen. Han traf første gang sagsøgeren på dentalmessen i 1987 og derefter på ny på samme messe i efteråret 1989 i Vejle. Vidnet henvendte sig til sagsøgeren for at høre, om hans forsikringsbehov var dækket. Vidnet udarbejdede på dette grundlag en analyse, som han tilsendte sagsøgeren. Analysen havde vist, at sagsøgerens erhvervsudygtighedsforsikring manglede ca. 258.000 kr. det første år og ca. 96.000 kr. for hvert af de følgende år. Sagsøgeren meddelte, at han var tilfreds med analysen, men at han ikke umiddelbart var interesseret. Sagsøgeren ville dog vende tilbage til sagen i januar 1990. Dette gjorde sagsøgeren imidlertid ikke. Vidnet traf derefter først på ny sagsøgeren på dentalmessen i efteråret 1990 i Vejle. Vidnet rejste igen spørgsmålet om sagsøgerens forsikringsdækning. Sagsøgeren var indstillet på, at nu skulle der ske noget, og de aftalte at mødes den 30. oktober 1990. På dette møde fortalte sagsøgeren, at han stod foran at overtage en ny klinik. Vidnet kunne med sit kendskab til området straks gætte, at det var Strandby Christensens klinik, som sagsøgeren var ved at overtage. Sagsøgeren bekræftede dette og fortalte, at han skulle overtage klinikken den 1. december 1990. Sagsøgeren fortalte også, at kontrakten var i orden, men at nogle få ting skulle ændres. Sagsøgeren spurgte, om der ville mangle forsikringsdækning, hvis sagsøgeren tog 14 dages ferie fra ophøret af sin gamle klinik, som sagsøgeren angav til at være den 1. december 1990, og først overtog den nye klinik den 15. december 1990. Vidnet afviste, at dette var et forsikringsmæssigt problem. Sagsøgeren fortalte også, at han ikke måtte overtage fru Strandby Christensens klinik på grund af en bestemmelse i klinikfællesskabets overenskomst. På vidnets spørgsmål oplyste sagsøgeren, at omsætningen ville være ca. 1,4 million kr., og at dette ville være det højeste, han ville kunne opnå i 1991. Sagsøgeren skulle bruge tallet for at lave en analyse af sagsøgerens forsikringsbehov. På vidnets forslag accepterede sagsøgeren på mødet, at der vedrørende det første år efter eventuel erhvervsudygtighed blev tegnet en forsikring med en sum på ca. 360.000 kr. og en forsikring for hvert af de følgende år med en sum på ca. 229.000 kr. Vidnet foreslog dækning indtil sagsøgerens fyldte 60. år, da vidnet erfaringsmæssigt ved, at mange tandlæger er nedslidt på dette tidspunkt og derfor stopper i erhvervet. Hertil kommer, at forsikringen for efterfølgende år er uforholdsmæssig dyr. I henhold til deres aftale udarbejdede vidnet efter

mødet en analyse af sagsøgerens forsikringsbehov, og denne blev fremsendt til sagsøgeren den 8. november 1990.

Kort efter meddelte sagsøgeren, at han syntes, at analysen så godt ud, men sagsøgeren mente, at forsikringerne skulle løbe til hans fyldte 65. år svarende til hans obligatoriske forsikring i Dansk Tandlægeforening. Sagsøgeren ville derfor gerne vide, hvad en forlængelse til dette tidspunkt ville koste. Vidnet afleverede den 21. november 1990 den ønskede opgørelse herover til sagsøgeren, og samme aften drøftede de sagen. På mødet den 21. november, der varede ca. 1½ time, bestemte sagsøgeren sig på grundlag af vidnets udregninger for at hæve forsikringssummen det første år fra ca. 360.000 kr. til ca. 584.000 kr. Når sagsøgeren samtidig drev tandlægeklinik, ville han ud over dette beløb i påkomne tilfælde tillige opnå en årlig ydelse fra administrationsfonden svarende til 116% af sygesikringens andel af sagsøgerens omsætning. For så vidt angik de følgende år blev forsikringen på 229.000 kr. forhøjet til 329.000 kr., og alle forsikringer i Zürich forlænget til udløb ved sagsøgerens 65. år. Vidnet tilkendegav over for sagsøgeren, at denne herefter ville være forsikringsmæssigt dækket »110%« uanset kommende års inflation. Sagsøgeren nævnte ikke på mødet noget om en omsætning på 1,9 millioner og heller intet om, at han havde tænkt sig tillige at overtage fru Strandby Christensens klinik. Hvis vidnet havde vidst, at sagsøgeren stilede mod en omsætning på 1,9 millioner kr., ville vidnet have draget i tvivl, hvorvidt dette ville være muligt for sagsøgeren at opnå. En nyerhvervet klinik med mange nye patienter er meget tidsrøvende. Hertil kommer, at en del patienter i tilfælde af tandlægeskift benytter lejligheden til at finde sig en anden tandlæge. Mødet den 21. november 1990 endte med, at de drøftede andre forsikringer. Lige inden mødet sluttede, sagde sagsøgeren, at han gerne ville have ulykkesforsikringen forhøjet til 2 millioner kr. Forsikringen skulle samtidig ændres til tillige at omfatte sagsøgerens yngste barn. Vidnet påpegede over for sagsøgeren, at hans forsikringsmæssige dækning i kraft af erhvervsudygtighedsforsikringerne allerede var særdeles god, men vidnet ville gerne ændre ulykkesforsikringen som begæret. De 2 millioner kr. var ikke maksimum for ulykkesforsikring i Zürich. Beløbet 2 millioner kr. er i øvrigt ikke en usædvanlig sum. Vidnet har på et tidspunkt til sagsøgeren udleveret det særlige skema, der viser den progressive dækning for tandlæger i tilfælde af

**96**

bl.a. fingerskader. Vidnet har redegjort for den særlige progression ved erstatning af de nævnte skader og herunder bl.a. oplyst, at mens tab af det yderste led af en tommelfinger normalt giver 12% invaliditetserstatning, så giver sådan skade hos Zürich 45.000 kr. i erstatning pr. tegnet 100.000 kr. i forsikringssum. På tilsvarende måde giver en mistet pegefinger 65.000 kr. i erstatning pr. 100.000 kr. i tegnet forsikringssum. Som følge af denne progression kan de samlede skader ved 100% invaliditet komme helt op på en dækning svarende til 225% af den tegnede forsikringssum.

Sagsøgeren nævnte på deres møder intet om forsikringer andre steder. Først i foråret 1991 blev vidnet klar over, at sagsøgeren havde tegnet forsikringer andre steder. Vidnet har generelt om tandlægers forsikring forklaret, at det årlige er sædvanligt, at tandlæger forsikrer deres personlige indtægt 100%. Dette skyldes, at tandlæger ved tab af erhvervsevne må sælge deres klinik, og da kan sætte salgssummen til forrentning. Det er heller ikke sædvanligt, at tandlægers forsikringer løber til deres fyldte 65. år. Sædvanligvis er deres klinikker længe forinden betalt, og forsikringsbehovet er derfor formindsket. Det er i øvrigt vidnets indtryk, at tandlæger sædvanligvis er nærmest hysteriske med henblik på ikke at beskadige deres fingre. Hvis sagsøgeren forinden ulykken havde fortalt vidnet, at han ville anvende motorsav, ville vidnet have frarådet

Copyright © 2023 Karnov Group Denmark A/S

sagsøgeren dette. Efter ulykken har vidnet og sagsøgeren talt om, at vidnet selv anvendte motorsav. Vidnets erfaring med anvendelsen af motorsav er således, at vidnet ikke kan forstå, hvordan ulykken kan være sket. Vidnet har afslutningsvis udtalt, at sagsøgeren er den i forsikringsmæssig henseende højest inddækkede tandlæge, som vidnet har kendskab til.

Helge Thers, der er underdirektør i PFA Skadeagentur A/S, har bl.a. forklaret, at PFA er generalagent for det sagsøgte selskab Chubb Insurance Company of Europe. Siden 1977 har Chubb udbudt de særlige forsikringer til tandlæger. Forsikringerne er specielle derved, at de giver en bedre dækning end ulykkesforsikringer i almindelighed for skader på bl.a. fingre. Hverken PFA eller Chubb rådgiver direkte tandlægerne, men disse får rådgivningen fra Tandlægeforeningens Administrationsfond.

Indtil sagsøgeren ved udgangen af december 1990 ophørte med at være tilknyttet tandlægeerhvervet, var sagsøgeren dækket af den kollektive ulykkesforsikring på 350.000 kr. Denne sumforsikring var i øvrigt pr. 1. januar 1990 generelt nedsat fra 565.000 kr. Gennem Tandlægeforeningens Administrationsfond udsendes forskelligt materiale til tandlægeforeningens medlemmer. I henhold hertil kan disse købe ulykkesforsikringer, nemlig op til en samlet forsikringssum på 2 millioner kr. Vidnet kan af sin sag se, at sagsøgeren i juni måned 1990 indsendte en annonce fra Tandlægebladet og begærede nærmere oplysninger fremsendt. Disse oplysninger blev tilsendt sagsøgeren. Den 6. december 1990 modtog PFA forsikringsbegæringen fra sagsøgeren, hvor han anmodede om ulykkesforsikringen på 2 millioner kr. med ikrafttræden den 4. december 1990. Selskabet godkendte forsikringstegningen den 10. december og accepterede den ønskede ikrafttrædelsesdato. Meddelelsen om sagsøgerens tilskadekomst indløb telefonisk fra sagsøgeren den 17. december 1990. Vidnet var straks klar over, at dette var en sag, han måtte interessere sig særligt for. Dette skyldtes navnlig, at skaden var sket så hurtigt efter forsikringens tegning, at sagsøgeren fremsendte en meget udførlig beskrivelse af hændelsesforløbet, og at der var gået meget lang tid, fra sagsøgeren havde fået tilsendt forsikringsmaterialet, og indtil han returnerede dette. Først senere hørte vidnet, at sagsøgeren også havde forsikringer i Zürich. Samlet havde sagsøgeren en forsikringsmæssig dækning, der er så høj, at vidnet aldrig har set noget lignende. Omstændigheder omkring sagsøgerens tegning af ulykkesforsikringen er således, at selskabet, hvis det havde kendt disse omstændigheder, ikke ville have tegnet forsikringen. Selskabet har ikke på tidspunktet for tegningen spurgt sagsøgeren, om han havde tegnet forsikring andetsteds. Selskabet afviste i august 1991 at dække skaden. Vidnet har i forbindelse med nogle af ham udarbejdede opstillinger vedrørende tandlægers forsikringer forklaret, at der gennem Dansk Tandlægeforening fra PFA Skade i Chubb Insurance Company of Europe i alt er sikret 846 tandlæger ved ulykkesforsikring. I 1993 var ca. 20% af tandlægerne forsikret med beløb op til 1 million kr., ca. 50% af tandlægerne var forsikret med et beløb mellem 1 million kr. og 1,5 millioner kr. Ca. 10% var sikret et beløb mellem 1,5 millioner kr. og 2 millioner kr., og ca. 20% var sikret et beløb på 2 millioner kr. eller mere. Det sidste skyldtes udelukkende, at forsikringssummens maksimum på 2 millioner kr. er indeksreguleret. I 1990 var der ingen forsikringer, der oversteg 2 millioner kr.

Vedrørende erhvervsudygtighedsforsikringerne har vidnet bl.a. forklaret, at 280 tandlæger er sikret ved køb af ekstra forsikringsmoduler. 75% af tandlægernes forsikring udløber ved det fyldte 60. år, 15% ved det fyldte 65. år og 8% ved det fyldte 67. år. De årlige ydelser, som disse tandlæger er sikret, er hyppigst i størrelsesorden 200.000 til 300.000 kr. årligt. 30% er sikret et årligt beløb mellem 300.000 kr. og 400.000 kr. 5% er sikret et beløb mellem 400.000 kr. og 500.000 kr. årligt, og 2% er sikret et beløb mellem

500.000 kr. og 600.000 kr. årligt. I 1993 var 1% sikret et beløb mellem 600.000 kr. og 650.000 kr. årligt. Dette maksimum er senere faldet til 555.000 kr. årligt som den højeste ydelse i tilfælde af erhvervsudygtighed.

Bodil Wagner har bl.a. forklaret, at hun er sekretær i Dansk Tandlægeforenings Administrationsfond. Tandlægeforeningens medlemmer har 3 obligatoriske forsikringsordninger. Den første er en

### 97

erhvervsudygtighedsforsikring, hvorved de det første år er sikret 116% af deres hidtidige omsætning med sygesikringen. Denne forsikring har en karenstid på 1 måned. I de følgende år og indtil deres 65. leveår er tandlægerne sikret i henhold til et grundmodul på ca. 108.000 kr., hvilket modul er indeksreguleret og i dag giver ca. 120.000 kr. pr. år. Endelig har tandlægerne en obligatorisk gruppeulykkesforsikring, der i 1991 var indeksreguleret til ca. 360.000 kr. Gennem Administrationsfonden kan tandlæger købe yderligere forsikringsmæssig dækning til alle 3 forsikringsordninger. Med henblik på at sikre sig yderligere i det første år efter opstået erhvervsudygtighed kan der tegnes op til 12 ekstra moduler hver på ca. 39.000 kr. Heraf har sagsøgeren søgt tegnet 10 stk. moduler. Til sikring af mistet erhvervsindtægt i de følgende år kan der tegnes op til 9 ekstra moduler hver på ca. 39.000 kr. Her har sagsøgeren søgt tegnet det maksimale antal moduler. Vedrørende ulykkesforsikringen kan der højst tegnes 20 moduler hver på 100.000 kr. Sagsøgeren har tegnet det maksimale antal. Administrationsfonden modtog den 12. december 1990 sagsøgerens begæring om tegning af ekstra forsikringsmoduler. Vedrørende erhvervsudygtighedsforsikringen var det anført, at den yderligere forsikringsdækning skulle træde i kraft den 10. december 1990. Sagsøgeren havde underskrevet begæringen den 9. december 1990. Sagsøgeren kunne i henhold til Administrationsfondens bestemmelser først komme med i den yderligere forsikringsordning med virkning fra næstfølgende måneds begyndelse og da kun under forudsætning af tilfredsstillende helbredsforhold. Først efter sagsøgerens tilskadekomst var vidnet i telefonisk kontakt med sagsøgeren. Sagsøgeren ønskede da at opnå, at ikrafttrædelsestidspunktet blev rykket til den 1. oktober 1990. Vidnet har oplyst, at hun ikke i Administrationsfonden har kendskab til tandlæger med tilsvarende forsikringsmæssig dækning som den, sagsøgeren søgte at opnå. Det normale er, at tandlægerne forsikrer sig ekstra med 5-6 moduler. Vidnet har bekræftet, at der fra januar til maj 1990 er udbetalt en del af forsikringsydelserne i henhold til første-års-modulerne. Udbetalingen blev herefter standset med øjeblikkelig virkning.

Kirsten Hesselkilde, der er ekspeditionssekretær i forsikringsselskabet Codan, har bl.a. forklaret, at hærværket i sagsøgerens gamle klinik adskilte sig fra andre tilsvarende tilfælde, idet det var uopklaret, hvordan gerningsmanden havde skaffet sig adgang til klinikken. Forsikringsselskabet udbetalte i alt godt 900.000 kr. for skader og forsvundne effekter. På et tidspunkt før jul 1990 telefonerede sagsøgeren til vidnet og bad om en acontobetaling på 20.000 kr., så han havde noget at leve af og noget at købe julegaver for. Det var ikke vidnets indtryk, at sagsøgeren mente dette som en spøg.

Forretningsfører Knud Kristensen, Silvan, har bl.a. forklaret, at sagsøgeren fik motorkædesaven udleveret i firmaets isenkramafdeling. Den blev udleveret af en medarbejder, der ikke mere er ansat i firmaet. Det var en medarbejder, der var kendt for at passe sit arbejde. Der er i afdelingen en bestemt person, der har den opgave og det ansvar at klargøre maskinerne og at instruere kunderne i brugen deraf. Den udleverede motorsav var ganske ny, hvorfor instruktion og værktøj til efterspænding skulle ligge i den samtidige udleverede værktøjskasse. Dagen efter ulykken hørte vidnet fra

afdelingslederen, at sagsøgerens nabo havde fortalt, at ulykken var sket derved, at sagsøgeren havde savet ved kun at holde saven i én hånd, og at han havde skåret sig i den anden hånd, da saven smuttede. I december 1990 talte vidnet i telefon med sagsøgeren, og sagsøgeren bekræftede da, at uheldet var sket på denne måde. Vidnet har aldrig hørt om tilsvarende ulykker, og det er efter vidnets opfattelse klart uforsvarligt at save i kvas ved kun at holde saven i én hånd. Saven, der vejer ca. 5 kg, vil da uvægerligt hoppe. Efter ulykken fik vidnet af den medarbejder, der havde udleveret saven til sagsøgeren, bekræftet, at saven havde været i orden ved afhentningen. Afdelingslederen fortalte, at han havde set saven, da den blev afhentet, og der var da intet i vejen med den, men da naboen kom tilbage med saven, sad kæden løst los.

Sagsøgeren har til støtte for sin påstand over for de sagsøgte selskaber gjort gældende, at skaden objektivt set ubestridt er dækket af de indgåede forsikringsaftaler. Der er intet bevis for, at sagsøgeren forsætlig skulle have savet sig i fingrene. Der er heller intet grundlag for at antage, at sagsøgeren har handlet groft uagtsomt. Forsikringsaftalelovens §18 er præceptiv. Sagsøgeren har intet forhold udvist, der kan berettige til en nedsat erstatning efter forsikringsaftalelovens §124.

Uheldet er sket, således som sagsøgeren straks fra starten og stedse sidenhen har forklaret. Der er intet i sagsøgerens forhold, der kan berettige til den af de sagsøgte selskaber anførte mistanke mod sagsøgeren. Sagsøgeren havde normale personlige forhold, og han havde gode økonomiske forhold. De økonomiske forhold fremgår på relevant måde af regnskaberne fra klinikfællesskabet. De skattemæssige oplysninger i årsopgørelserne er derimod ikke relevante for bedømmelsen af sagsøgerens reelle økonomiske forhold. Sagsøgeren var glad for at være tandlæge og har reelt forsøgt at købe begge Strandby Christensens klinikker. Kun ulykken medførte, at dette køb ikke blev gennemført. Sagsøgeren har trovædigt redegjort for, hvorfor overtagelsen af klinikkerne først kunne ske den 1. marts 1991. Når assurandør Borch har forklaret om en overtagelsesdato i december 1990, må Borch huske forkert. Ved overtagelse af begge klinikker var det absolut realistisk at forvente, at sagsøgeren kunne opnå en omsætning på 1,9 million kr. Ved købet af den ny klinik kunne det ikke forventes, at Administrationsfonden straks ville dække 116% i forhold til omsætningen

**98**

i den gamle klinik. Hvis dette havde været tilfældet, ville Borch have fortalt sagsøgeren derom. Efter salget af sin halvpart i det gamle klinikfællesskab havde sagsøgeren økonomisk mulighed for at erhverve Strandby Christensens klinikker. Der er rigtigt, at forhandlingerne om købesummens størrelse og erlæggelsen af købesummen ikke var afsluttet. Størrelsen af købesummen ligger imidlertid i branchen ganske fast, hvorfor aftalen herom hurtigt kunne indgås, og sagsøgeren kunne selv udregne købesummens størrelse. Det reelle indhold af købsforhandlingerne bekræftes også af, at Strandby Christensen i meget lang tid efter ulykken forsøgte at sælge til anden side. Vedrørende de tegnede forsikringers størrelse beroede disse på Borchs beregninger. I betragtning af sagsøgerens økonomiske forhold og forventede indtægter ved køb af den nye klinik var det bestemt ikke urimeligt, at sagsøgeren betalte samlede forsikringspræmier på ca. 119.000 kr. årligt. Godt halvdelen af beløbet vedrører pensionsopsparingen, og i øvrigt er beløbet for langt den største dels vedkommende skattemæssigt fradragsberettiget. Når sagsøgeren i begyndelsen af året 1990 ikke havde vist interesse for at tegne yderligere forsikringer hos Borch, men gjorde dette i slutningen af året, var dette kun naturligt set på baggrund af, at sagsøgeren nu havde solgt sin klinik og var på vej ind i en ny. Vedrørende ulykken har sagsøgeren henvist til, at motorsaven blev fundet behæftet med væsentlige fejl. Saven er undersøgt af en

uvildig instans. Sagsøgeren har ikke bedøvet sine fingre. I så fald ville der ikke kl. 13.30 på skadestuen have været konstateret følelse i pegefingeren. Forsikringsselskaberne har ikke indgivet politianmeldelse i sagen. Bevisbyrden for, at sagsøgeren forsætlig har tilføjet sig skaden, påhviler de sagsøgte, og denne bevisbyrde er ikke løftet. Kravene til et sådant bevis må være af en styrke svarende til domfældelse i en straffesag.

Sagsøgeren har opgjort sagsgenstandene således:

I forhold til sagsøgte Zürich Forsikring kan sagsgenstanden opgøres til en ulykkesforsikring på 2 millioner og en 10 år kapitaliseret ydelse fra forsikringsselskabet på 842.000 kr. årligt eller en samlet sagsgenstand på 10.420.000 kr.

I forhold til sagsøgte Chubb Insurance Company of Europe kan sagsgenstanden opgøres til 2.350.000 kr., hvilket beløb er inklusive den obligatoriske forsikring i Administrationsfonden.

De sagsøgte har sammenstemmende til støtte for deres principale påstand gjort gældende, at sagsøgerens tilskadekomst ikke er dækket af de hos de sagsøgte tegnede forsikringer, at der ikke foreligger et ulykkestilfælde, jf. forsikringsbetingelserne, at sagsøgers tilskadekomst ikke er opstået som følge af en tilfældig, af den forsikredes vilje uafhængig indvirkning, samt at sagsøger i forbindelse med skadens opståen har handlet groft uagtsomt, hvorfor han i henhold til forsikringsbetingelserne ikke kan opnå udbetaling af nogen forsikringsydelse. Til støtte for den subsidiære påstand har de sagsøgte sammenstemmende gjort gældende, at sagsøger har undladt at træffe rimelige foranstaltninger, som omtalt i forsikringsaftalelovens §124 til forebyggelse af skaden, herunder rimelige foranstaltninger til begrænsning af skadens omfang.

I sagen er der mange omstændigheder, der tyder på, at sagsøgeren forsætligt har savet sig i fingrene. Dette må medføre, at bevisbyrden for, at der foreligger en forsikringsdækket ulykke, påhviler sagsøgeren, og denne bevisbyrde har sagsøgeren ikke løftet. Bevisbedømmelsen i sagen er i øvrigt fri og kræver ikke bevis af samme styrke som i straffesager om forsikringssvig. Det er derfor uden betydning, at der ikke er indgivet politianmeldelse. Det afgørende ved bedømmelsen af sagsøgerens forhold må være omstændighederne i slutningen af 1990. Her bør det tages i betragtning, at sagsøgeren ikke har været i reelle købsforhandlinger med Strandby Christensen. Strandby Christensen har først efter skadens indtræden hørt overtagelsesdatoen, den 1. marts 1991, omtalt. Sagsøgeren har således urigtigt til assurandør Borch fortalt om overtagelsesdato og om, hvor langt forhandlingerne om købet var nået. Sagsøgerens økonomiske forhold gjorde det bestemt ikke rimeligt, at han påtog sig betaling af årlige forsikringspræmier på ca. 119.000 kr. Han havde ikke udsigt til nogen bindende aftale om køb af ny klinik og dermed ikke noget sikkert fremtidigt økonomisk grundlag. Efter det besynderlige hærværk på den gamle klinik var han ikke i arbejde mere. Sagsøgerens skattepligtige indkomst har ikke på noget tidspunkt været over ca. 216.000 kr., hvortil kom, at han havde en betydelig gæld fra de oprindelige klinikkøb. Sagsøgeren havde endvidere betydelige renteudgifter til hus og studiegæld. Sagsøgerens forventninger til sine fremtidige økonomiske forhold stod derfor i fuldstændig misforhold til hans reelle økonomiske situation. Sagsøgerens økonomiske forhold var da også således, at han ved juletid 1990 måtte bede om en acontoudbetaling fra forsikringsselskabet. Over for sagsøgerens aldeles usikre økonomiske forhold står det faktum, at han ved forsikringerne ville opnå en indkomst det første år på ca. 1,6 million kr. (inklusive ca. 402.000 kr. fra Administrationsfonden) og derefter ca. 1,3 millioner kr. i ca. 18 år. Det er endvidere påfaldende, at sagsøgeren oprindelig ikke var interesseret i tegning af forsikringer, men først i slutningen af 1990 viser interesse herfor. Det må i denne forbindelse bemærkes, at sagsøgeren den 9. december 1990 kræver ikrafttræden straks trods det, at han forsikrings-

mæssigt er dækket indtil udgangen af december måned. Borch havde meget klart fastslået, at sagsøgeren efter tegning af ulykkesforsikringen i Zürich på 2 millioner var fuldstændig forsikringsmæssigt dækket. Desuagtet tegnede sagsøgeren 14 dage senere yderligere en forsikring på 2 millioner kr. Også denne ulykkesforsikring begærede sagsøgeren til

**99**

ikrafttræden straks. Yderligere 6 dage derefter prøvede sagsøgeren at tegne forsikring i Administrationsfonden. Sagsøgeren undlod at fortælle Borch noget herom. I det hele er det overordentlig påfaldende, at sagsøgeren har tegnet så mange og så store forsikringer, lige før skaden indtrådte. Skadesbegivenhedens indtræden er i øvrigt uforståelig, og sagsøgeren har haft svært ved at forklare præcist herom. Den konstaterede fejl ved kædesaven kan være indtruffet efterfølgende. Herudover foreligger der i sagen oplysninger, som lader formode, at sagsøgeren har savet kvas ved kun at holde motorsaven i én hånd. Dette er klart uforsvarligt. Sagsøgeren anvendte endvidere ikke arbejdshandsker trods det, at det var så koldt i vejret, at han måtte varme sig på en kop kaffe. Sagsøgeren undlod at holde de sikkerhedsforanstaltninger, som er nødvendige, når man anvender et så farligt redskab som en motordrevet kædesav. Sagsøgeren har i alle tilfælde handlet groft uagtsomt og har dermed ikke krav på erstatning.

### Landsretten skal udtale:

Sagsøgerens tilskadekomst den 14. december 1990 er dækket af sagsøgerens forsikringer hos de sagsøgte, medmindre de sagsøgte beviser, at sagsøgeren har fremkaldt skaden med forsæt eller ved grov uagtsomhed.

Dommer Risbjørn udtaler:

Det findes ikke ved de af de sagsøgte fremhævede omstændigheder vedrørende forsikringstegningerne og sagsøgerens ikke fastlagte erhvervsforhold sammenholdt med oplysningerne vedrørende selve tilskadekomsten bevist, at sagsøgeren forsætligt har beskadiget sin hånd.

Dommer Lisbet Wandel tilslutter sig dette resultat med følgende bemærkninger:

Det findes ikke ud fra oplysningerne om skadens opståen at kunne udelukkes, at hændelsesforløbet kan have været således, som sagsøgeren har redegjort for i erklæringen til PFA Skade, og at der således kan have foreligget et hændeligt uheld.

Heller ikke efter en samlet vurdering af de af de sagsøgte fremhævede, ovenfor angivne, omstændigheder, findes der at foreligge tilstrækkeligt bevis for forsætlig skadestilføjelse.

Dommerne Risbjørn og Lisbet Wandel finder begge, at det ikke er godtgjort, at sagsøgeren har fremkaldt skaden ved grov uagtsomhed, eller at der foreligger forhold, som kan føre til, at forsikringsaftalelovens §124 bringes i anvendelse.

Disse dommere stemmer herefter for at tage sagsøgerens påstand i begge sager til følge.

Dommer Lyngesen udtaler:

Vidnet Borch har forklaret, at sagsøgeren over for ham oplyste, at overtagelsen af Strandby Christensens klinik ville finde sted enten den 1. december 1990 eller den 15. december 1990. Troværdigheden af vidnets forklaring er bestyrket derved, at vidnet yderligere har forklaret, at sagsøgeren begrundede de 2 mulige overtagelsesdatoer med, at han overvejede at afvikle 14 dages ferie og derfor forhørte sig om, hvorvidt han ville blive anset som værende ude af erhverv som tandlæge og den forsikringsmæssige dækning dermed ophøre, hvis han efter ophøret i den tidligere klinik ikke straks fortsatte i den nyerhvervede klinik. Det er derfor utænkeligt at anse det for bevist, at sagsøgeren vedrørende denne væsentlige omstændighed har afgivet urigtig oplysning over for vidnet. Baggrunden for den

urigtige oplysning kan kun være, at sagsøgeren ville opnå, at de ændrede forsikringsforhold trådte i kraft på et tidspunkt før midten af december 1990, og uden at ikrafttrædelsestidspunktet påkaldte sig vidnets særlige opmærksomhed, hvilket han måtte forvente ville være tilfældet, såfremt han oplyste om et væsentligt senere tidspunkt for overtagelsen af Strandby Christensens klinik. Det af sagsøgeren således tilstræbte ikrafttrædelsestidspunkt er netop sammenfaldende med sagsøgerens leje af motorsaven, hvilket tidsmål sagsøgeren havde sikret sig 3-4 uger tidligere. Jeg sammenholder ovenstående med, at der i sagen foreligger objektivt mistænkelige omstændigheder derved, at sagsøgeren inden for et tidsrum af ca. 1½ måned før skadestilføjelsen i flere forsikringsselskaber har opnået eller forsøgt at opnå ændring eller nytegning af forsikringer, hvorved de samlede maksimale udbetalinger (ekskl. pensionsordningen) ville blive forøget fra ca. 11 mill. kr. til ca. 28 mill. kr. Endelig sammenholder jeg ovennævnte forhold med, at sagsøgeren ikke har afgivet nogen overbevisende forklaring om de nærmere omstændigheder ved skadestilføjelsen. Tværtimod er det påfaldende, at sagsøgeren, der er adræt og må antages at have normale motoriske reflekser, da han i sin højre hånd mærkede, at motorsaven foretog en utilsigtet og dermed faretruende bevægelse i retning af hans venstre hånd, ikke nåede at trække den venstre hånd til sig, men blev raret således, at tommelfingeren ikke kun blev beskadiget, men udsat for en så vedholdende påvirkning, at fingerens yderste led blev amputeret.

Som følge af det anførte finder jeg det bevist, at beskadigelsen af sagsøgerens venstre hånd skyldes en forsætlig handling fra sagsøgerens side, og jeg stemmer derfor for at frifinde de sagsøgte.

Efter udfaldet af stemmeafgivningen tages herefter sagsøgerens påstande til følge.

- - -

I sagsomkostninger til statskassen betales af sagsøger, Zürich Forsikring, 400.000 kr. og af sagsøgte, Chubb Insurance Company of Europe, 100.000 kr.

## Højesteret

## Højesterets dom.

Den indankede dom er afsagt af Østre Landsret.

I pådømmelsen har deltaget fem dommere: Pontoppidan, Marie-Louise Andreasen, Wendler Pedersen, Per Sørensen og Børge Dahl.

**100**

Appellanterne, Chubb Insurance Company of Europe og Zürich Forsikring, har for Højesteret påstået frifindelse.

Indstævnte, tandlæge Torben Holm Nikolajsen, har påstået stadfæstelse.

Forsikringsselskaberne har for Højesteret alene gjort gældende, at der ikke foreligger et »ulykkestilfælde«, og at Nikolajsen har forvoldt skaden med forsæt.

Nikolajsen har også for Højesteret haft fri proces.

Til brug for Højesteret er der tilvejebragt yderligere oplysninger og afgivet nye og supplerende forklaringer.

De af sagen omhandlede forsikringer omfatter ulykkestilfælde, som i ulykkesforsikringerne, men ikke i erhvervsudygtighedsforsikringerne, er nærmere definERet bl.a. med ordene »en ... af den forsikredes vilje uafhængig ... indvirkning på legemet«.

Det er oplyst, at bruttopræmieudgiften til de i dommen beskrevne ulykkes- og erhvervsudygtighedsforsikringer ved dispositionerne i efteråret 1990 steg fra godt 20.000 kr. til godt 60.000 kr., og at kun en mindre del af beløbene ikke var skattefradragsberettiget.

Som grundlag for Nikolajsens overvejelser om erhvervsudygtighedsforsikringstegning forelå behovsanalyser udarbejdet efter en af Zürich Forsikrings assurandør anvendt model, som opererede

med et nettobehov, der fremkom ved fra årsomsætningen at fratrække variable omkostninger og dækning fra Dansk Tandlægeforenings ordninger.

Assurandør-Societetet har i skrivelse af 6. februar 1996 besvaret nogle spørgsmål fra parterne således:

Spørgsmål A.

Er det udtryk for god forsikringsskik at rådgive en person, der ønsker at tegne en ulykkesforsikring, til at lade forsikringen træde i kraft straks ved tegningen, uanset at forsikringen ønskes for økonomisk at sikre imod en risikoforøgelse eller andre omstændigheder, der forventes at indtræde på et senere tidspunkt? Er det ved tegning af ulykkesforsikring sædvanligt, at en sådan træder i kraft ved tegningen?

Svar på spørgsmål A:

En forsikrings ikrafttrædelsestidspunkt beror på aftalen mellem forsikringstager og forsikringsselskabet i forbindelse med forsikringstegningen. Det er sædvanligt, at en ulykkesforsikring træder i kraft ved tegningen, også selv om der senere forventes en risikoforøgelse eller ændring i andre forhold, specielt i relation til dækningen af invaliditetsrisikoen. Dette beror dels på, at forsikringstageren vil være uforsikret i en periode, hvis forsikringen ikke træder i kraft på tegningstidspunktet og dels på, at de afgivne risikooplysninger ikke må være for gamle.

Spørgsmål B.

Kunne en erhvervsudygtighedsforsikring i 1990 tegnes til afdækning af en persons risiko for indtægtstab i en virksomhed, der først skulle faktisk overtages 3 måneder efter tegningstidspunktet? Det forudsættes, at der på tegningstidspunktet foreligger aktuelle helbredsoplysninger. Der ønskes en besvarelse af spørgsmålet under følgende alternative forudsætninger:

a. Personen har forpligtet sig juridisk til at overtage virksomheden 3 måneder senere.

b. Personen har ikke forpligtet sig juridisk, men der foregår forhandlinger herom.

c. Personen har ikke forpligtet sig juridisk, og der pågår heller ikke konkrete forhandlinger herom.

Svar på spørgsmål B:

Der var i 1990 kun 3 forsikringsselskaber, der udbød individuelle erhvervsudygtighedsforsikringer. Forudsætningen for tegning af sådanne forsikringer var også i 1990, at forsikringstager fremlagde dokumentation for sin arbejdsindkomst enten i form af lønsedler eller regnskab med revisorpåtegning, hvis forsikringstager var selvstændig.

Af en artikel i Tandlægebladet 1992 med overskriften »Flere sælgere end købere« fremgår bl.a.:

»Vilkårene for køb og salg af tandklinikker har ændret sig i løbet af de sidste par år. I 1990 blev der solgt 72 klinikker, selv om der var over 100 til salg. I 1991 var der 130 tandlæger, som overvejede at sælge, men kun 50 klinikker, der fandt en køber. Den samme tendens ser ud til at fortsætte i 1992.«

Af en fremlagt plantegning og optagne fotografier fremgår, at der var frit indsyn til ulykkesstedet fra gade/fortov og gennem hæk fra nabo.

Det er oplyst, at den anvendte Sachs-Dolmar motorkædesav i brugsklar stand, det vil sige med sværd påsat samt kædeolie og benzin påfyldt, vejer 7 kilo.

Forskningscentret for Skov og Landskab under Miljø- og Energiministeriet (tidligere Skovteknisk Institut) har i en skrivelse af 21. december 1995 besvaret nogle spørgsmål fra parterne således:

Spørgsmål B.

Hvor lang tid vil det efter instituttets opfattelse tage at oversave det yderste led på en tommelfinger, når en motorsav af det nævnte

fabrikat rammer fingeren og savens omdrejningshastighed er nær det maksimale?

Alternativt bedes det oplyst, hvor lang tid det vil tage at oversave en gren med en diameter på 2 cm.

Svar på spørgsmål B.

Cirka 0.2 sekund

Spørgsmål C.

Hvilken beskyttelse vil en almindelig arbejdshandske, der kan indkøbes i et byggemarked, yde i den i pkt. B beskrevne situation.

Svar på spørgsmål C.

Ingen eller kun en meget ringe beskyttelse. Gennemsavningstiden ... vil være tilnærmelsesvis den samme.

Spørgsmål D.

Vil barkstødet på en sav af nævnte fabrikat kunne gå

**101**

løs, såfremt saven, efter der er indtrådt en ulykke, kastes på en græsplæne? Det forudsættes, at personen, der kaster saven, står på plænen.

Besvares spørgsmålet benægtende, bedes det oplyst, hvorvidt barkstødet kan løsne sig, såfremt det rammer et hårdt materiale i eller på græsplænen, f.eks. en træstub eller en flise. Kan barkstødet løsnes manuelt og i bekræftende fald med hvilket værktøj?

Svar på spørgsmål D.

Barkstødet kan ikke løsne sig f.eks. på grund af, at saven bliver kastet på en græsplæne, træstub eller en flise, uden at der samtidig opstår synlige brudskader på saven. Barkstødet er monteret med bolte, der kan demonteres manuelt med almindeligt forekommende håndværktøj.

...

Spørgsmål T.

Skovteknisk Institut anmodes om at uddybe, hvorledes et løstsiddende barkstød på en motorsav kan være årsag til at motorsaven opfører sig på en uventet måde og dermed bliver en væsentlig årsag til uheld.

Svar på spørgsmål T.

Et løstsiddende barkstød på en motorsav kan, hvis barkstødet under brugen ændrer stilling, forårsage, at nævnte barkstød »hænger fast« i kviste og små grene på stammen eller i kronen på træet. Forholdet kan medføre, at saven pludselig ændrer retning under brugen. Det er vanskeligt at forestille sig, at et løstsiddende barkstød kan blive en væsentlig årsag til et uheld, forudsat saven anvendes efter de gældende forskrifter.

Af en artikel af Niels Henrik Maagaard Mortensen og Hans R.I. Jørgensen i Ugeskrift for Læger 1991, s. 1861 ff, om ulykker med motorkædesave fremgår, at skaderne hyppigst ramte arme og ben og hyppigst på venstre side, og at knap en tredjedel af uheldene af den skadelidte karakteriseredes som »uopmærksomhed«, »hyppigst fordi man i forbindelse med kortvarig uopmærksomhed saver sig i benet, eller fordi man kortvarigt slipper saven med den ene hånd, fx. for at holde emnet«.

I en skrivelse af 21. november 1995 fra EHLASS-projektet hedder det bl.a.:

»EHLASS-registret er et projekt under Forbrugerstyrelsen med kontor i Sundhedsstyrelsen ... Projektet indsamler ulykkesoplysninger på 5 sygehuse, der samlet dækker 1/7 af Danmarks befolkning og registret er repræsentativt for Danmark som helhed. Dette betyder i praksis, at man med rimelig sikkerhed på basis af registrets oplysninger kan beregne ulykkestal for hele landet.

Vi har til dette formål udtrukket alle ulykker med motorkædesave for en 5-års periode (1990-1994). ...

På basis af disse ulykkesoplysninger kan man konkludere, at der i disse 5 år var ialt 280 ulykker med motorkædesave, dvs. 56 ulykker af denne type i gennemsnit pr. år i EHLASS-registret.

Omregnet til landstal (jvf. ovenfor) betyder det, at der årligt har været ca. 392 ulykker med motorkædesave i Danmark og i hele 5-års perioden 1.950 ulykker i Danmark.

Ulykkerne rammer fortrinsvis mænd (96%) og de fleste ulykker sker i alderen 20-59 år og fortrinsvis i boligområdet (der også omfatter boligens omgivelser: have, sommerhusgrunde og lignende).

Læsionstypen var i de fleste tilfælde åbne sår (89%), men i 12,5% af tilfældene var der dybere læsioner som knoglebrud, sene- muskel- og nervelæsioner.

Der er beskrevet læsioner næsten overalt på kroppen, men læsionerne var fortrinsvis lokaliseret til underarm, håndled, hånd inkl. fingre (66% af læsionerne). Lår, underben, knæ, ankel og fod inkl. tæer blev læderet i 28% af tilfældene. ...

Det skal pointeres, at vi kun har usorteret ulykker indenfor hjemme- og fritidsaktiviteternes område. Tallene for arbejdsulykker med motorsave er *ikke* medregnet i denne undersøgelse.«

I en følgeskrivelse af 21. november 1995, hvormed redegørelsen fra EHLASS-projektet blev fremsendt, udtalte projektleder H. Bay-Nielsen bl.a.:

»Hermed de lovede tal fra EHLASS-registret. Der er, som det fremgår af notatet, ca. 400 ulykker af denne type i Danmark årligt. Alt kan ske, men undertegnede har aldrig hørt om selvskadeforsøg med motorsave. Det er som bekendt et farligt instrument, og ingen der ved noget om motorsave vil forsøge at påføre sig selv en læsion, da motorsaven ikke skærer, men flænser, og at den selv kan arbejde sig ned i »materialet«.+

I en erklæring af 30. juni 1995 udfærdiget af overlæge Erik Tøndevold, speciallæge i ortopædisk kirurgi, til Zürich Forsikring hedder det bl.a.:

»*Konklusion:*

Der er efter mit skøn ingen tvivl om, at der foreligger en årsagssammenhæng mellem den aktuelle skade og den nuværende tilstand.

Tilstanden er stationær fra afsluttet, lægelig behandling medio 1993.

Jeg forstår på tilskadekomne, at der kører en erstatningssag, men sådan som jeg må anskue dette, samt med mit fra barndommen ikke ubetydelige kendskab til motorsave, må jeg sige, at selve skademekanismen ikke på nogen måde er ubekendt. At venstre 2. finger er så vidt ødelagt, skyldes at kæden kommer med mindst 30 meter per sekund og laver en svær bløddelsskade, når den rammer en finger.

I de tidligere udgaver af specielt den pågældende motorsavstype, en Sachs-Dolmar, var det et problem med barkstødet, idet det havde et problem med at falde af.

Jeg må således ud fra læsionens karakter postulere sammenhæng mellem den aktuelle begivenhed og den nuværende tilstand.

Det er for mig svært at se, at man kan påføre sig selv en sådan læsion, idet de gamle typer motorsave var ret tunge

**102**

og næsten ikke kunne holdes med én hånd. De tidligere typer save havde heller ikke nogen såkaldt »dødemandsknap«, hvilket gjorde, at man sagtens kunne have kæden løbende mens man satte saven fra sig. ...«

Torben Holm Nikolajsen har supplerende bl.a. forklaret, at han under mødet på Strandby Christensens klinik oplyste, at han havde verdens bedste konkurrenceklausul, der ikke forhindrede ham i at have klinik i Odense. Det er rigtigt, at det var en forudsætning i den omtalte konkurrenceklausul, at han skulle tale med Strandby Christensens kompagnoner, da disse ifølge klausulen ikke måtte behandle hans tidligere patienter. Han havde imidlertid tænkt sig at benytte sig af muligheden efter klausulen for at behandle tidligere patienter mod at betale 1.000 kr. til Greve, og han ville friholde Strandby Christensens kompagnoner, hvis de skulle få en af hans

tidligere patienter. Han havde aftalt med Greve, at henvisningen i klausulen til, at der skulle indgås en særlig aftale med Greve, blot betød, at man skulle ringe til Greve og så betale 1.000 kr. I øvrigt havde han slet ikke tænkt sig at beholde nogle af sine tidligere patienter. Der var ikke grund til at tro, at Strandby Christensens kompagnoner ikke ville indgå på den omhandlede forpligtelse, da de jo ville blive friholdt. Han viste derfor ikke konkurrenceklausulen til Strandby Christensen. Han er udpræget »gør det selv« mand. Han har meget elværktøj, således flere save, herunder en håndbåret rundsav.

Christian Strandby Christensen har supplerende bl.a. forklaret, at han på Nikolajsens spørgsmål efteråret 1990 om, hvornår der i givet fald kunne ske overtagelse, svarede, at dette var underordnet, og at han blot ville have rimelig tid til afvikling. Der lå ikke en bestemt overtagelsesdag i luften. Han havde ikke selv gjort sig overvejelser om overtagelsestidspunktet. Det drejede sig om at finde en, der ville købe. 1. marts 1991 kunne godt have været overtagelsesdag, hvis han havde fået 2-3 måneders varsel. Man kan ikke karakterisere det passerede som realitetsforhandlinger. Han fremsatte på intet tidspunkt et egentligt prisforlangende, men nævnte muligvis over for Nikolajsen, at købsprisen for good-will var 50-60% af omsætningen. Ud over prisen for good-will ville være kommet prisen for inventar m.m. Nikolajsen havde som omtalt fået en vurderingsliste og oplysning om omsætningstallene, så han kunne selv skønne sig frem til en handelspris. Langt senere, d.v.s. i marts 1992, kom Nikolajsen ud på hans og hans kones bopæl med en erklæring, som Nikolajsen ønskede deres underskrifter på. Denne erklæring gik ud på en bekræftelse af, at de havde været i seriøse forhandlinger med Nikolajsen. Denne erklæring ville hverken han eller hans kone underskrive. I stedet skrev han nogle dage efter en anden erklæring - den i dommen gengivne erklæring af 4. april 1992 - og sendte den til Nikolajsen. Henvisningen i denne erklæring til, at overtagelsen gerne skulle finde sted først i 1991, eventuelt 1. marts 1991, blev indsat efter ønske fra Nikolajsen, idet Nikolajsen under besøget havde sagt, at et sådant overtagelsestidspunkt havde været Nikolajsens ønske. Han havde først fået denne oplysning under det omtalte besøg i marts 1992. Det er rigtigt, at den omtalte passus i erklæringen kan læses således, at Nikolajsen over for ham havde fremsat det pågældende ønske om overtagelsestidspunktet før besøget i marts 1992, men dette er i så fald forkert. Hans og hans kones klinikker blev solgt for knap 1,5 millioner kroner tilsammen, for hans kones kliniks vedkommende pr. 1. juli 1992. Han fik henvendelsen om salg af sin egen klinik i efteråret 1992 eller begyndelsen af 1993. Han opfattede ikke kontakten til Nikolajsen i 1990 således, at Nikolajsen ventede på en tilbagemelding fra ham. Hans kompagnoner skulle i givet fald have godkendt Nikolajsen. De ville imidlertid aldrig have godkendt Nikolajsen, hvis det var blevet oplyst, at de ikke måtte behandle hans tidligere patienter i en 2-års periode. Han drøftede ikke Nikolajsen med sine kompagnoner. Han opfattede ham ikke som et seriøst køberemne.

Tove Strandby Christensen har bl.a. forklaret, at hun og hendes ægtefælle fra cirka 1988/89 havde haft forgæves forsøg på at sælge deres klinikker.

Helle Andersen har bl.a. forklaret, at hun var klinikassistent hos Nikolajsen i sidste halvdel af 1990. Hun blev ansat hos ham i januar 1988 som klinikassistentelev og blev udlært den 19. juli 1990. Nikolajsen talte om, at han ville købe en ny klinik, og udtrykte interesse for at få hende med. Det var vist omkring oktober 1990, at Nikolajsen begyndte at tale om dette. Det gav hende ro i sindet, fordi hun således fik udsigt til fast arbejde også efter årsskiftet 1990/91. Nikolajsen omtalte, at den anden klinik var Strandby Christensens klinik. Hun og Nikolajsen talte om dette flere gange.

Hun mener, at de talte om, at Nikolajsen skulle overtage Strandby Christensens klinik i begyndelsen af 1991.

Leif Erland Henriksen har forklaret, at han i december 1990 var nabo til Nikolajsen. Der stod nogle birketræer i Nikolajsens have. Det var naturligt at fælde dem, da de tog solen ved terrassen. En gang i december 1990 kom Nikolajsens kone Merete ind til ham og sagde, at Nikolajsen havde savet sig i fingeren og var på sygehuset. Hun spurgte, om han ville aflevere saven til Silvan, hvor den var lejet, hvilket han sagde ja til. Hun havde saven med ind til ham. Han bemærkede, at barkholderen hang og dinglede. Han tænkte på, at hvis der opstod spørgsmål om erstatning, var det ikke hensigtsmæssigt, hvis saven var afleveret til Silvan. Han kørte derfor til politigården og spurgte ved skranken, hvad han skulle gøre. Den, som han talte med, sagde, at han skulle få saven afmeldt hos Silvan og tage den med tilbage. Han konstaterede ikke andre fejl ved saven og konstaterede ikke, at kæden var løs.

Karsten Hajslund har bl.a. forklaret, at han i 1990 var afdelingschef for isenkram og havecentret i Silvan i

**103**

Odense. Kædesave hørte herunder. Ved udlejning fortalte man kunden om, hvordan det lejede skulle betjenes, men man udleverede normalt ikke instruktionsbøger.

Palle Borch har supplerende bl.a. forklaret, at hvis Nikolajsen havde oplyst, at han skulle overtage Strandby Christensens klinik den 1. marts 1991, ville man først have taget forsikringssagen op en gang i februar. Blandt andet må en helbredserklæring ikke være mere end en måned gammel. En erhvervsudygtighedsforsikring kan tegnes før købet af ny klinik, og han har ikke instruktioner fra hovedkontoret om, hvor lang tid før, men forsikringstegningen går ud på at dække behovet, og det er urealistisk at tegne en erhvervsudygtighedsforsikring f.eks. tre måneder før overtagelsen af en ny klinik. Han forsikrer 36 tandklinikker i Odense og omegn. Der er omkring 45 i alt. Efter brevet af 8. november 1990 rykkede han Nikolajsen for svar, hvorefter Nikolajsen tilkendegav, at han gerne ville have forsikringsdækningen forlænget til det 65. år, da hans grunddækning i Tandlægeforeningens Administrationsfond løb til dette tidspunkt. Den 21. november 1990 havde de et møde, hvorunder der tegnedes forsikringer som beskrevet i hans forklaring i landsretsdommen. Der var ikke tale om køb også af Tove Strandby Christensens klinikandel. Nikolajsen nævnte ikke noget om tegning af forsikringer i andre selskaber. Dette ville heller ikke have været nødvendigt, da han havde dækket Nikolajsen 110% ind. Han ville have været helt uforstående, hvis Nikolajsen havde sagt, at han ville tegne forsikringer i andre selskaber. Den 10. december 1990 ringede Nikolajsen til ham og spurgte, hvor forsikringerne blev af. Han ringede til selskabet, der oplyste, at man havde fået tilfredsstillende lægeerklæringer, og at forsikringerne var på vej, hvilket han straks meddelte Nikolajsen telefonisk.

**Højesterets bemærkninger.**

Højesteret tiltræder, at Torben Holm Nikolajsens tilskadekomst efter sin ydre objektive karakter fremtræder som et ulykkestilfælde og derfor er dækket af forsikringerne, medmindre forsikringsselskaberne beviser, at han har forvoldt skaden med forsæt. En ulykkesforsikrings formål tilsiger, at det forhold, at det indgår i forsikringens beskrivelse af et ulykkestilfælde, at der skal være tale om en af forsikredes vilje uafhængig indvirkning på legemet, ikke fritager forsikringsselskaberne for denne bevisbyrde.

Det har formodningen imod sig, at en person med vilje saver fingre af sig selv med en motorkædesav. De foreliggende oplysninger om selve den skadevoldende begivenhed taler ikke imod denne formodning. Tværtimod findes skaden, under hensyn til det oplyste om den anvendte sav, arbejdsstedet, skadestidspunktet og de forelig-

gende erklæringer om saven og skaden, meget vel at kunne være sket som forklaret af Nikolajsen.

Omlægningen og nytegningen af Nikolajsens forsikringer skete efter, at Zürich Forsikrings assurandør havde henvendt sig til ham og gennemgået hans forsikringsbehov. Den væsentligste ændring af dækning og præmieudgift angår de forsikringer, der er tegnet hos Zürich Forsikring. Efter det foreliggende er der ikke grundlag for at afvise, at Nikolajsen planlagde og havde realistisk mulighed for at skaffe sig fremtidig beskæftigelse, som kunne give en indtjening, der ikke - og i hvert fald ikke efter den af Zürich Forsikring anvendte behovsanalysemodel - var ude af proportion med den samlede præmie og dækning. Det bemærkes i denne forbindelse, at Zürich Forsikring ikke i forsikringsbegæringsskemaerne anmodede om oplysninger om fremtidige beskæftigelses- og indtjeningsforhold.

På denne baggrund finder Højesteret, at forsikringsselskaberne ikke gennem de omstændigheder, som de har fremhævet, og som til dels var påfaldende, har godtgjort, at Nikolajsen forsætligt har forvoldt ulykken.

Højesteret stadfæster herefter dommen.

**Thi kendes for ret:**

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for Højesteret skal appellanten, Chubb Insurance Company of Europe, betale 100.000 kr. og appellanten, Zürich Forsikring, 525.000 kr. til statskassen.*

*De idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.*

I, the undersigned, Hossam Farooq Khawaja, certify that I am fluent in both the English and Danish languages and that the preceding text in the English language is to the best of my knowledge and belief a true and faithful translation of the supreme court judgment printed as "U 1997.88 H" in the Danish language.

Copenhagen, 22 January 2025

*Hossamfk*

Hossam Farooq Khawaja
Assistant Attorney