Exhibit 6



London

This is to certify that the attached document is, to the best of my knowledge and belief a true, accurate and complete translation from Danish into English of the attached document from the Eastern Court of Appeal, Division 2, of June 26, 2008 in appeal no. B-2584-07.

Yours sincerely,

Andrzej Orville

Senior Project Manager

Wednesday, January 22, 2025

Consortra Translations Ltd
Rex House,
4-12 Regent Street
London
SW1Y 4RG
UK

U.2009.239∅

# Eastern Court of Appeal (Ø.L.D) Division 2 June 26, 2008 in appeal case #B-2584-07

It was established that the 75% loss of earning capacity was caused by discomfort after a traffic accident. Under the given circumstances, the opinion of the Forensic Medicine Council could not lead to a different result.

On February 9, 2004, A was involved in a traffic accident when he was driving a tractor and was hit by a car. Shortly afterwards, A experienced headaches that worsened, for which he was treated, among other things like a sprained cervical spine.

The National Board of Occupational Injuries recognized the accident as an occupational injury and stated that there was a causal link between the incident and the concomitant discomfort from the neck area. A's loss of earning capacity, which was assessed at 45% in 2006, was increased to 75% in 2007. A's annual salary was calculated at DKK 268,000. A filed a lawsuit against the responsible party's insurance company, F, claiming payment of differential compensation for loss of earning capacity calculated on the basis of an annual income of DKK 298,500. F, which acknowledged the liability, claimed that A had not proved that there was a causal link between the traffic accident and A's temporary and permanent inconvenience. A statement from the Forensic Medicine Council stated, among other things, that the probability that the accident impact could have caused the condition described in the case was low. The District Court acquitted F. A appealed to the Court of Appeal, which initially noted that it was for A to prove that there was a causal link between the traffic accident and A's loss of earning capacity and that there was no basis for easing this burden of proof. On the basis of the course of illness stated in the evidence, and as the parties agreed that A had no pre-existing conditions and that there were no competing causes of injury, the Court of Appeal found it established that there were the necessary so-called bridge symptoms and thus a causal link between the collision on 9 February 2004 and A's subsequent discomfort, which had resulted in a loss of earning capacity of 75%. In the opinion of the Court of Appeal, the medical opinion, including that it could not be assessed with certainty whether the accident had caused A permanent discomfort, could not under the given circumstances lead to a different result. F was thus ordered to pay compensation to A. The Court of Appeal found no basis for setting aside the National Board of Occupational Injuries' calculation of the annual salary, which was then used as the basis for the calculation of compensation.

(Hedegaard Madsen, Sanne Kolmos, Lone Kerrn-Jespersen). *A (attorney Christian Riewe, Copenhagen)* versus *Lærerstandens Brandforsikring G/S (insurance company, represented by attorney Christina Neugebauer with attorney Nicolai Mailund Clan, Copenhagen).*

**City Court**

***Copenhagen City Court ruling, 26 November 2007.***
*Background information in the case, and the parties' claims.*

This case, brought on February 16, 2006, concerns compensation for a traffic accident suffered by the Complainant on February 9, 2004, when, as an employee of the Municipal Road Department, he was hit by a car while driving a tractor. The Respondent has recognized the liability for damages, but there is a dispute as to whether there is a causal connection between the accident and the Complainant's discomforts. There is also a dispute about the calculation of the Complainant's annual salary.

Printed from Karnov for use in accordance with the license terms

The Complainant claims that the Respondent must pay DKK 569,441.34 plus procedural interest of DKK 447,903.07 from November 25, 2005, and DKK 121,538.27 from October 16, 2007, until payment is made.

The claim concerns loss of earnings, pain and suffering and loss of earning capacity compensation.

The Respondent's assertions.

The ruling does not contain a complete statement of the case; see section 218a of the Danish Administration of Justice Act.

*The information in the case.*

The case includes a transcript from the patient's primary care physician's medical records and former doctor's medical records, a note dated February 9, 2004 from the emergency room doctor's medical records, a statement dated May 6, 2004 from specialist in neurology Morten Kraft, a statement dated December 1, 2004 from specialist in neurosurgery, Dr. Finn Jensen, a statement dated December 13, 2004 from specialist Frede Duus and a note from a medical consultation with medical consultant Peter Rasmussen.

On May 11, 2006, the National Board of Occupational Injuries determined the Complainant's loss of earning capacity at 45% and his annual salary at DKK 268,000. On August 29, 2007, the Board increased the loss of earning capacity to 75%.

The case also includes a statement of estimate dated August 8, 2006 from DanCrash and a supplementary statement dated October 3, 2006. Finally, the Forensic Medicine Council has submitted a statement dated July 12, 2007.

*240*

The Forensic Medicine Council's statement of July 12, 2007 states, among other things, the following:

"...

Question 3:

...

The discomfort that occurred immediately after the collision in the form of neck discomfort is considered with some probability to be attributable to the accident on February 9, 2004, while the other discomfort that occurred is not considered to be attributable to this.

...

It appears from Appendix H that it is likely to have been a low-energy collision. On this basis, the Forensic Medical Board assumes in both cases that the probability that the impact could have caused the condition described in the case is low. However, it should be noted that "crach tests" and assessments of injuries that are not detectable as a consequence of changes in speed are beyond the expertise of the Forensic Medicine Council.

Question 4:

...

The most recently described discomforts are unspecific and may be due to a number of different, often complex

Printed from Karnov for use in accordance with the license terms

conditions, which is why it cannot be assessed with certainty whether the incident on February 9, 2004 has caused the Complainant permanent harm.

..."

*Explanations.*

The Complainant has given evidence during the proceedings.

*The Complainant* has explained that he was employed at the Municipality of Midtdjurs road department, which takes care of curbs, paving stones, asphalt etc. In winter, there is also snow removal, salting and everything else that needs to be done. He was also a firefighter on call, which was in addition to the 37 hours in the municipality. Every year he received a winter allowance for being available from November to March/April. There was also a lot of overtime every year. He was employed for 15 years by the municipality as a roadway worker. He has been in the labour market since he was 17 years old. He was happy working for the municipality.

On February 9, 2004, he was in his tractor. He had reached the T-junction. He saw the other party about to turn left from the way he was coming. He stopped slightly away from the intersection to give the other party space. He saw that she was blinded and that she might not have seen him. He tried to reverse, but couldn't get the tractor into gear. He held onto the steering wheel and braced himself. When the other party hit the tractor, he felt his head jerk back and forward. He felt something happen in his neck. It didn't hurt, but he felt a headache soon after. He spoke to the other party. He then continued his work. He felt more and more pain in his head and neck. He finished work 4 hours later. Around 18:00, his head hurt a lot. It was like a tight headband and it went down his neck. He called the doctor on duty, who was rudely brief and just told him to take some painkillers and he would be fine. He doesn't remember any discussion about whether pain radiated into his arms. After a few days, he also had radiation in his arms. There was also ringing in his ears and problems in his jaw joint. He took painkillers, but continued to work and received no other treatment. After about 11 days, he went to his family doctor because the pain was so bad he felt something had to be done. He still had headaches and neck pain and tingling in his jaw. After 2½ months after the accident, he went on sick leave. By then he was taking 15 painkillers a day and was still in pain. He now came in for a series of examinations. The pain is there all the time and gets worse if he does anything. He has to stay still and cannot do anything. He also has problems with memory and is sensitive to sounds. He has to write everything down on notes if he wants to remember it. He is very affected by this. He can't read a line of text because he's bothered by the text changing and moving. He can't read a book either. He has difficulty chewing. It is as if everything is tensing up.

He tried working at a lumber store where he had to put goods on the shelves. It didn't work. He can't cope with having to strain his eyes to compare numbers and codes on the goods.

He is keen to get back to work. Before the accident, he had no problems with headaches and the like. Since the accident, he has had no other accidents. The specialists have not found any psychological problems with him either. He is absolutely certain that the accident is the cause of the discomfort.

*The opinions of both parties.*

In its Statement of Claim dated October 15, 2007, the *Complainant* states the following:

*that* the Respondent has recognized the liability and must therefore pay full compensation to the Complainant,

*that* there is a causal link between the traffic accident on February 9, 2004 and the Complainant's sick leave,

Printed from Karnov for use in accordance with the license terms

*that* the Complainant is therefore entitled to lost earnings and pain and suffering up to the date of the National Board of Occupational Injuries' decision of July 14, 2005, cf. Appendix ---, and

*that* the Complainant is entitled to differential compensation for loss of earning capacity as stated in the case's appendices - - - - and - - - -.

In a Statement of Claim dated October 24, 2007, the *Respondent* stated the following:

*that* there is no causal link between the traffic accident on February 9 and the Complainant's temporary and permanent discomforts,

*that* the Complainant did not visit his own doctor until February 20, 2004 (11 days after the accident) and was not on sick leave until April 20, 2004 (2½ months after the accident),

*241*

*that* the necessary bridging symptoms between the traffic accident and the allegedly severely debilitating symptoms described in the case file are therefore not present,

*that* there are no objective findings whatsoever to support that the Complainant suffered disabling injuries,

*that* there is a massive mismatch between the physical impact of the accident and the health complaints,

*that* this is supported by the medical documents and the expert opinions of DanCrash; and

*that* this - not least - is supported by the Forensic Medicine Council's statement of July 12, 2007, which states, among other things, that the probability that the impact could have caused the condition described in the case is low,

*that* the National Board of Occupational Injuries' assessment in the occupational injury case is not relevant in connection with the assessment of this civil action,

*that* the National Board of Occupational Injuries has not taken a position on causality,

*that* the National Board of Occupational Injuries has not been aware of the Forensic Medicine Council's statement of July 12, 2007, and

*that* the assessment of evidence in a work-related injury case is completely different, as the legal basis is completely different, which is why the two systems cannot be compared.

In relation to the Complainant's claim for damages, we submit,

*that* the annual salary set by the Complainant is too high,

*that* the annual salary should be set significantly lower than that claimed by the Complainant,

*that* the determination of the Complainant's annual salary may be based on the annual salary of DKK 268,000 determined by the National Board of Occupational Injuries, which is more in accordance with the submitted R-75 printouts (Appendix - - - -) and the questionnaire completed by the Complainant in which the annual income is stated to be DKK 230,000 (Appendix - - - -) and

*that* the Respondent should therefore also for this reason, at least in part, be acquitted of the claim raised.

Printed from Karnov for use in accordance with the license terms

Overall, we thus claim,

*that* the burden of proving the requisite causal link lies with the Complainant,

*that* the Complainant has failed to meet this burden of proof; and

*that* the Respondent should therefore be found not liable.

The parties have essentially proceeded accordingly.

**The Court's reasoning and decision:**
According to the Forensic Medicine Council's statement of July 12, 2007, the Complainant has not proved that there is a causal link between the traffic accident on February 9, 2004 and the Complainant's discomforts, which is why the Respondent is acquitted.

The costs of the case are as laid out below. An appropriate amount of DKK 50,000 has been awarded to cover legal fees and DKK 22,493.13 to cover other costs. In determining the appropriate costs for legal assistance, the court has based its decision on the applicable rates, which the court has found no basis to deviate from. The costs for the appraisal report and the supplementary appraisal report were DKK 18,011.88 and DKK 4,481.25, which amounts were paid by the Respondent.

**The Judgment of the Court:**
The Respondent, insurance company Lærerstandens Brandforsikring G/S, is found not liable.

The Complainant, A, must within 14 days pay the costs of the case to the Respondent, in the amount of DKK 72,493.13.

**Eastern Court of Appeal**

***Easter Court of Appeal ruling.***
The Copenhagen City Court's ruling of November 26, 2007 - - - - was appealed by A with a claim as before the City Court that the Respondent, insurance company Lærerstandens Brandforsikring G/S, be ordered to pay DKK 569,441.34 with interest of DKK 447,903.07 from November 25, 2005 and of DKK 121,538.27 from October 16, 2007, all until payment is made.

The Respondent has finally claimed that the ruling should be upheld.

As before the District Court, the case concerns the question of whether there is a causal link between the collision and the discomforts suffered by the Appellant and, if so, the calculation of the Appellant's annual salary. The parties agree that the annual salary should be set at either DKK 298,500 as argued by the Appellant or DKK 268,000 as argued by the Respondent.

The Appellant has calculated the claim amount of DKK 569,441.34 as follows:

| | |
|---|---|
| Loss of earnings, pain and positive expenses: | DKK 107,458.57. |
| Differential compensation for loss of earning capacity 45% | DKK 340,444.50. |
| Differential compensation for loss of earning capacity 30% | DKK 121,538.27. |
| In total | DKK 569,441.40. |

The differential compensation for loss of earning capacity is calculated on the basis of an annual income of DKK 298,500. In the event that the Court of Appeal concludes that only an annual salary of DKK 268,000 can be used as a basis, as estimated by the National Board of Occupational Injuries in the occupational injury case, the Appellant has calculated the two differential compensation amounts to DKK 246,732 and DKK 60,671.87 respectively.

The Respondent has not disputed the Appellant's numerical calculations and agrees with the claim of DKK 107,458.57.

*The circumstances of the case*

The driver's accident report sent to the Respondent states that the collision occurred on February 9, 2004 at approximately 10:40. The Appellant contacted the emergency doctor the same day, and the following is noted in the emergency doctor's note:

"Emergency room visit: 09 02 2004 at 18:18

CASE SUMMARY:

*242*

In a tractor hit from the side. 10-15 km/h

Didn't hit his head. Now headache. Not vomiting.

Not radiating pain.

Paracetamol is advised as pain relief."

The aforementioned Claim Form, which is dated February 10, 2004, also states, among other things:

*"9. What happened to you?*

...

As I was turning right, I was blinded by the sun so I couldn't see, and I ran into a tractor.

...

*12. The circumstances of the accident*

...

*Your vehicle km/hour*

Maximum 10 km/h

*18. personal injury.*

...

*Nature of injury:* The other party complains of pain in the neck."

Printed from Karnov for use in accordance with the license terms

The Appellant first visited his primary care physician, doctor - - - -, Ryomgaard, on February 20, 2004. The doctor noted the following in the medical record:

"D. 9. 2 exposed to UT. Whiplash. Continued discomfort. Phys."

On the same day, the Appellant filled in a questionnaire from the Respondent concerning the personal injury. He stated that on February 9, 2004 he had contacted the emergency doctor by phone. He stated that his annual income was DKK 230,000. In point 9 of the form concerning any additional information that the Appellant believes is relevant to the case, the Appellant stated the following:

"I still have a headache and it goes down the left side of my neck and shoulder."

The Appellant again visited his own doctor on March 1, 2004, and the doctor noted the following in the medical record:

"Came in with an intermediate certificate for neck injury from February 9. Continued headaches, neck pain and tingling in left hand fingers. Has not been on sick leave."

In the so-called intermediate certificate, the doctor stated that the Appellant was being treated for distortio columna cervicalis, i.e. dislocation of the cervical spine, and she also stated "whiplash injury of the neck". She reported the Appellant's condition as unchanged and further stated when asked whether there had been any complications and if so, which ones:

"-Yes - Constant headaches

-  Pulling pain in the left arm

-   tingling in the fingers of the left hand."

The doctor further stated that the Appellant was being treated by a physiotherapist.

However, the physiotherapist would not start the treatment, and the family doctor referred the Appellant for an X-ray with functional imaging. Subsequently, on March 29, 2004, the Appellant was X-rayed at Grenå Hospital. Normal conditions were found with regard to the cervical spine etc. and no signs of fracture or dislocation.

On April 20, 2004, the Appellant began sick leave from work.

After a referral from his own doctor, the Appellant was examined on May 5, 2004 by specialist in neurology Morten Kraft, Risskov, who in a statement dated May 6, 2004 stated the following, among other things:

*"Problem:* pain in the neck radiating to both arms since the collision in February 2004... .

*Status presens:* The patient sustained a flexion/extension trauma to the cervical spine, and since then the patient has had pain in the neck radiating into both arms. The patient has headaches and is nauseated, unwell and tired. In addition, the patient has a poor memory and sleeps poorly at night, waking up 3-4 times. The patient has also become more irritable and is unable to relax.

From 02/09/2004 - 04/20/2004 the patient has been at work with increasing pain, and now the patient has been on sick leave since 04/20/2004.

AN X-ray of the cervical spine has been performed without abnormality and the patient has received physiotherapy.

*Objective:* psychological nat.

Cranium and cranial nerves including ophthalmoscopy: nothing abnormal found.

There are massive myogenic changes in the cranial attachments of the neck muscles and the trapezius edges, as well as slight restriction of movement in the cervical spine, where the patient can only rotate to 45 degrees on each side.

...

*Conclusion:* The neurologic examination revealed no abnormalities other than myogenic changes and slight restriction of movement in the cervical spine. The patient has sequelae of a whiplash injury and the patient's symptoms as presented are consistent with this. The patient is prescribed Amitriptyline 10 mg tablets at bedtime for the first week and then 20 mg at bedtime. In addition, the patient is advised gentle physiotherapy and preferably gentle activation in a light half-day job so that the patient does not idle too much

..."

In a follow-up statement of September 3, 2004 to the Appellant's own doctor, medical specialist Morten Kraft stated the following, among other things:

"...

05/10/2004: patient informed by phone that he has felt bad taking Amitriptyline. Stopped this and was advised to take Paracetamol for sleeping instead. Will call me about the effect of this.

Q. Amitriptyline

Prescrip. Paracetamol at night

05/18/2004: patient informed by phone that he is not feeling well. Patient has started physiotherapy and foresees a long treatment period.

*243*

Patient has not been able to get part-time work. Will call again in two weeks.

06/01/2004: the condition is unchanged and a check-up is arranged.

06/03/2004: patient came for a check-up and has improved somewhat, but the physiotherapy has not been successful. There is no reason to extend the examination programme at the moment. The patient will come for a check-up after the summer vacation.

08/10/2004: the patient informed me by phone that symptoms have worsened and he will come for a check.

08/20/2004: the patient feels bad and has a lot of pain in the neck. is aggravated by even light physical exertion, and the aggravation can last for a couple of days. The patient's memory remains poor, and the wife can report that the husband, for example, can forget the elements of a conversation he has had. The patient also continues to sleep poorly at night and wakes up two or three times, and he gets sick if there is a lot going on around him and there is agitation.

Printed from Karnov for use in accordance with the license terms

The patient has been to a meeting with the municipality, where they have not been able to recommend any lighter physical work.

Physiotherapy has not helped, nor has Amitriptyline, which has made the patient feel ill.

The patient takes Paracetamol inconsistently and is put on solid medication with Naproxen 500 mg x 3, continues with physiotherapy and will call in two weeks regarding progress.

09/03/2004: the patient states that he has not succeeded in getting pain relief from the treatment, and I have no further treatment offers, please refer to previous submissions.

Finished."

The Appellant was then examined on November 25, 2004 by specialist in neurosurgery, Dr.Med. Finn Jensen, specialist clinic Speciallægernes klinik aps, Skørping. The specialist's statement of December 1, 2004 contains, among other things, the following:

"...

*Status presens:*

...

He suffered no direct blow to the body. There is no memory loss. On the same day, he started having pain in his neck with radiation and headaches.

About 1 week later, the presence of cognitive dysfunctions was observed for the first time, which have since developed further.

*Examinations and treatment*

...

He was also referred to physiotherapy, where he continues to go about once a week. He has also received cranio-sacral treatments 2-3 times without effect.

In April 2004, an X-ray examination of the cervical spine was performed at Grenå Hospital without functional imaging. The result is described as normal.

On May 6, 2004, he was examined by specialist in neuromedicine Morten Kraft, Aarhus. The specialist stated that he complains of pain in his neck radiating to both arms and having headaches. He feels nauseous, unwell and tired. There are cognitive dysfunctions and affective symptoms in the form of emotional instability.

Objectively, a slight restriction of movement in the cervical spine is detected. The lateral rotations are reduced to ½ part. There is no information about forward and backward bending.

...

Printed from Karnov for use in accordance with the license terms

*Current complaints*

*1.*
Constant symptoms from the cervical spine with constant pain radiating to both shoulders and upper arms accompanied by numbness in the hands and all five fingers. This is accompanied by a constant headache. There is a subjective sensation of reduced turning ability in the neck.

The pain worsens with even light strain. He can only sit for 15 minutes before the pain worsens. If he sits with his head tilted forward for more than 5 minutes, the pain also worsens. His maximum walking distance without worsening pain is about 1 km and his maximum lifting capacity without worsening pain is about 5 kg.

*2.*
There is daily pain in the upper and middle part of the thoracic spine without radiation. Triggered by light strain, especially lifting. The aggravation here is not dependent on an aggravation of pain in the neck.

*3.*
Cognitive symptoms include reduced memory, concentration and learning ability.

Affective symptoms include emotional instability, hypersensitivity to light and sound (photophobia and phonophobia), alcohol intolerance. The somatic problems appear in the form of fatigue and difficulty sleeping, especially at night.

*4.*
He complains of hearing loss, but there is also hyperacusis. Thus, he cannot be with more people at the same time as this triggers this sound hypersensitivity. There are no complaints of tinnitus.

*5.*
The injured party may have jaw joint dysfunction. There is pain when he chews and the mouth opening is reduced.

*6.*
With fatigue, symptoms consistent with cerebral asthenopia occur.

...

*The vertebral column*

In the cervical spine there is at least a moderate restriction of movement. At maximum active forward bend, there is a distance between chin and sternum of 6-7 cm.

*244*

Backward bending is reduced by more than 1/3rd and the lateral twists by about ½ on both sides. There is a facet joint syndrome occurring between the 6th and 7th cervical vertebrae.

In the thoracic spine, a normal curvature is seen. At the level of the 6th-8th thoracic vertebra, there is a double-sided facet joint syndrome. In the lumbar spine, normal conditions are seen.

...

Printed from Karnov for use in accordance with the license terms

*Summary*

The injured party is a 46-year-old municipal worker who was involved in a tractor accident on February 9, 2004. He drove a stationary tractor and was hit in the front and left side by a turning car. There was no direct blow to the head or body. There is no amnesia.

On the same day, he developed symptoms of a cervical spine dislocation that still exists. There is constant neck pain with radiation, headaches and at least moderate restriction of movement in the neck.

At the same time, the victim has developed a mid-thoracic facet joint syndrome whose symptoms occur independently of the symptoms from the cervical spine.

About a week later, the first symptoms of cognitive and affective symptoms appear, which are now a major part of life. The extent of this should be clarified by a neuropsychological examination.

In addition, there is a subjective sensation of hearing loss and hyperacusis. This should be further investigated by an ear specialist and possibly followed up with a specialist audiologist's report.

Finally, the injured party has symptoms of temporomandibular joint dysfunction that should be examined by a dentist or orthodontist.

Conclusion:

Based on the above, I think we can conclude that

1.
In the accident on February 9, 2004, the injured party suffered a dislocation of the cervical spine, for which he still has symptoms.

2.
The injured party has also suffered a facet joint syndrome with pain in the middle part of the thoracic spine

3.
The injured party has developed cognitive, affective and somatic symptoms similar to those seen after a concussion. This should be further by a neuropsychological examination

4.
Hyperacusis is suspected after the accident. The possibility of inner ear damage is doubtful as he did not hit his head. However, he should be examined by an ear specialist.

5.
The injured party has symptoms consistent with TMJ dysfunction

..."

In a renewed interim certificate to the Respondent, the Appellant's own doctor stated on December 10, 2004 that his condition had deteriorated. Regarding the item *Have there been any complications, and if so, which ones?*, the doctor noted memory problems, jaw pain, hearing loss and constant pain. She again gave the diagnosis as distortio columna cervicalis - dislocation of the cervical spine - and for treatment she listed physiotherapy. In a medical note of the same

date, the doctor stated that on December 1, 2004, the Appellant had been examined for bite function, where the muscles are very affected, and that the Appellant should be examined by an ear, nose and throat specialist.

In the case summary of December 13, 2004 to the Appellant's own doctor, specialist Frede Duus, Grenå Hospital, concluded that the Appellant's neck injury is probably the cause of the sound hypersensitivity he had been suffering from for the past 10 months, and that the hypercusis is likely due to commotio labyrinthi, similar to a concussion in the inner ear. The prognosis for this sound hypersensitivity is impossible to predict, nor can it be treated.

In a medical report dated March 27, 2005 to the Appellant's lawyer, the Appellant's own doctor stated the diagnosis:

"Distortio columna cervicalis - dislocation of the cervical spine, persistent headaches, neck pain and difficulty concentrating with memory loss."

On the medical interview with the Appellant on April 13, 2005, medical consultant Peter Rasmussen stated, among other things, that the Appellant's condition has remained unchanged from the accident until now and that the symptoms are consistent with what can be seen for the described injury mechanism.

In a statement dated August 8, 2006, car inspector Per Bo Hansen, Ingeniørfrmaet DanCrash i/s, answered the following questions, among others, as EES is an expression of the collision energy:

*"Answer to Question 1:*

*"The assessor is requested to calculate using the PC/Scan-Crash system the change in speed of the vehicle in which A was located. The assessor is thus requested to account for the probable speed of the parties at the moment of the collision and the change in speed after the collision."*

Based on the above assumption, assumed EES of approx. 14 km/h, based on the photo documentation and the specific nature of the collision, it is calculated that the speed before the collision was 16-19 km/h for the passenger car, and that this results in a speed change for the car of 20.4 km/h and for the tractor of 5.9 km/h.

*245*

*Answer to Question 2:*

*"Please describe the impact that A was exposed to, including what the impact can best be compared to, if it is assumed that - - - - hit A at a speed of no more than 10 km/h (as stated in the accident report. )."*

...

Accelerations (speed changes) of that magnitude are low-energy collisions. This is of particular computational interest in collisions between cars, as the assumed magnitude of various computational values changes in the low-energy collision range compared to "regular" collisions. In the current case, the nature of the collision, regardless of the energy transfer, must (should) be given special attention, as the collision cannot (by the undersigned) be calculated using the default values of the program.

The definition of a low-energy collision is not clearly "agreed" or scientifically proven (not to DanCrash's knowledge), and the nature and characteristics of the collision must be assessed in each case based on, among other things, the types of vehicle, the damage, the components of the interaction and the speed(s) of the parties.

...

*Answer to Question 6:*

*"The assessor is asked to state which speed change he thinks is the most likely of those stated in questions 4 and 5.*

*The assessor is asked to justify his answer."*

The speed changes range from 1.3 km/h to 6.55 km/h, which corresponds to a difference in energy consumption of 25 times. In order to technically make an energy consumption probable, and thus reach the most probable as requested, the energy consumption expressed in EES value is used. It can be simulated that the tractor achieves an EES of 4 km/h, so the "rest" of the energy in the collision is absorbed by the car and used to "push" the car away from the tractor. The car will thus have to absorb energy corresponding to an EES of 13 km/h, which is in good agreement with the valuation report's indication of the damage.

Applying these values will result in a tractor speed change of 3.92 km/h.

..."

The same car inspector from DanCrash has also submitted a supplementary expert opinion dated October 3, 2006. The Forensic Medicine Council, which has had the following questions submitted, has stated in a statement dated July 12, 2007:

*"Question 1:*

*The Forensic Medicine Council is requested to state which disorders and symptoms can be found in the Complainant based on the medical information available in the case.*

On 02.09.04, the Complainant was involved in a tractor accident in which he was hit by a car while driving a tractor. There are no emergency room records, but later documents in the case state that he was not unconscious in connection with the incident.

In the period before the accident, the patient's own medical records describe complaints of right-sided shoulder discomfort and pain around the left ankle. In the period after the accident, the same journal on 02.20.04 lists complaints of unspecified pain and on 03.01.04 headache, neck pain and tingling sensation in the left hand. Subsequently, continued discomfort is listed until a worsening of the condition is described on 09.20.04.

In the neurological statement of 09.30.04, he complained of neck discomfort, headache, nausea and fatigue as described. Restriction of movement of the cervical spine, muscle tension and soreness in the neck and shoulders are detected.

The neurosurgical specialist's report of 12.01.04 states neck and upper back problems, concentration and memory problems, sensation of impaired hearing, loss of vision and jaw problems. Tenderness around and reduced mobility of the cervical spine is detected.

*Question 2:*

*The Forensic Medicine Council is requested to state whether there is a correlation between the Complainant's objective findings and the Complainant's subjective complaints.*

The medical files in the case describe modest and unspecific objective findings that are not consistent with the subjective complaints. This situation is not uncommon in the few cases where long-term discomfort develops after similar trauma.

Printed from Karnov for use in accordance with the license terms

*Question 3:*
*The Forensic Medicine Council is requested to state whether the disorders and symptoms identified above under Question 1 can be attributed in whole or in part to the Complainant's traffic accident on February 9, 2004.*

*If there are any periods of illness after February 9, 2004 where the ailments cannot be attributed to the Complainant's work accident, please indicate these.*

*In this connection, the Forensic Medicine Council is asked to state separately whether a trauma with a speed change of 3.92 km/h (see Appendix H, answer to Question 6) is likely to cause the condition described in the case.*

*The Forensic Medicine Council is also asked to state separately whether a trauma with a speed change of 5.9 km/h (see Appendix H, answer to question 1) is likely to cause the condition described in the case.*

The discomfort that occurred immediately after the collision in the form of neck discomfort is considered with some probability to be attributable to the accident on 02.09.04, while the other discomfort that occurred is not considered to be attributable to this.

The Forensic Medicine Council does not comment on the causes of sick leave.

It appears from Appendix H that it is likely to have been a low-energy collision.

*246*

On this basis, in both cases, the Forensic Medicine Council assumes that the probability that the impacts could have caused the condition described in the case is low. However, it should be noted that crash tests and assessments of injuries that are not detectable as a consequence of changes in speed are beyond the expertise of the Forensic Medicine Council.

*Question 4:*

*We ask that the Council tell us whether any of the injuries sustained by the Complainant in the accident on February 9, 2004 have caused him any permanent problems.*

*If so, please describe these and give reasons for your answer.*

The most recently described complaints are unspecific and may be due to a number of different, often complex conditions, which is why it cannot be assessed with certainty whether the incident on 09.02.04 has caused the Complainant permanent problems.

*Question 5:*

*Does the case otherwise give the Forensic Medicine Council cause for comment?*

No."

The National Board of Occupational Injuries has recognized the accident as an occupational injury and - in a decision of July 14, 2005 - stated that there is a causal connection between the incident described and the concomitant discomfort from the neck area. In its final decision of August 29, 2007, the Board assessed the Appellant's loss of earning capacity at 75%. His annual salary is calculated at DKK 268,000 with the following reasoning:

Printed from Karnov for use in accordance with the license terms

*"Justification.*

The annual salary is determined based on your earnings in the year prior to  work-related injury. As the injury occurred on February 9, 2004, we have taken 1/12 of the earnings in the year you were injured and 11/12 of the earnings in the previous year.

We have calculated your annual income for 2003 as follows:

Salary: DKK 235,939+ lifelong pension points. DKK 2,684 + employer pension: DKK 28,963= DKK 267,040 /12 x 11= DKK 244,786.66

We have calculated your annual income for 2004 as follows:

Salary: DKK 250,107+ lifelong pension points: DKK 2,684 + employer pension: DKK 29,341= DKK 282,132 /12 x 1= DKK 23,511.

We have added the above 2 annual incomes together, corresponding to an annual salary in the year before the injury of DKK 268,297.66 rounded to **DKK 268,000."**

For the purposes of the case, the Appellant has estimated his annual salary as follows, as the subheading "Beredskabsgården" relates to his on-call duty as a firefighter:

|  |  | *"Estimated annual salary* |
| --- | --- | --- |
| *ROAD DEPARTMENT:* |  |  |
| Overtime pay per month | DKK | 73.56 |
| DKK 73.56 x 12 months | = DKK | 882.72 |
| Overtime pay per month | DKK | 2,629.72 |
| DKK 2,629.72 x 12 months | = DKK | 31,556.64 |
| Winter supplement per month DKK 1,484.28 (only for 5 months) |  |  |
| DKK 1,484.28 x 5 months | = DKK | 7,421.40 |
| Basic salary per month DKK 18,236.35 |  |  |
| DKK 18,236.35 x 12 months | DKK | 218,836.20 |
| In total | = DKK | 258,696.96 |
| Deduct 5 weeks of vacation: |  |  |
| DKK 258,696.96/25 days | *= DKK* | *231,318.20* |
| *ANNUAL FIRE STANDBY* [BEREDSKABSGÅRDEN]*:* |  |  |
| Basic salary per month | DKK | 1,367.36 |
| DKK 1,367.36 x 12 months | = DKK | 16,408.32 |
| Deduct 5 weeks of vacation: |  |  |
| DKK 16,408.32/25 days | *= DKK* | *14,671.77* |
| *Annual ADD AMP:* |  |  |
| DKK 231.318,20 x 9,5 % | = DKK | 21,975.22 |
| *HOLIDAY PAY IS ADDED:* |  |  |
| DKK 231,318.20 x 12,5 % | = DKK | 28,914.77 |
| DKK 14,671.77 x 12,5 % | = DKK | 1,833.97 |
| *In total* | *= DKK* | *298,71.93* |

This amount is rounded off to the nearest DKK 500, i.e. DKK 298,500.00."

Printed from Karnov for use in accordance with the license terms

During the proceedings, the Appellant has submitted a medical article and translation thereof, in Danish with the title "Significant back injuries occurring from low-intensity accelerations. A series of slide injuries", published in Arch Phys Med Rehabil Vol 86, November 2005.

*Explanation*

In the Court of Appeal, the Appellant, A., gave evidence.

The Appellant has additionally explained, among other things, that the driver had to turn right. He stopped in his tractor 5-10 cm from the curb and about 40 cm from the center of the road. The tractor did not have a headrest or seat belt. The driver visited him that evening.

*Procedural in court*

The parties have essentially repeated their arguments before the district court.

The Appellant has further argued that the *burden of proof* for causal connection is *relaxed* in this case, as it is partly an occupational injury and partly an injury within an area with a stricter liability standard (strict liability). As regards the determination of the annual salary, the Appellant claims that the annual salary of DKK 298,500 is correctly calculated as it takes into account the Appellant's employment conditions, including fixed foreseeable supplements, and that the calculated differential compensation for the loss of earning capacity is thus correctly calculated.

The Respondent has disputed that there should be a relaxed burden of proof with regard to causality.

It is agreed during the proceedings that the Appellant did not suffer from pre-existing conditions and that there is no question of competing causes of injury.

*247*

**The Court of Appeal's decision:**

As a preliminary remark, the Court of Appeal notes that it is incumbent on the Appellant to prove that there is a causal link between the traffic accident that the Appellant suffered on February 9, 2004 and the Appellant's loss of earning capacity. The Court of Appeal does not find that there is a basis for easing this burden of proof.

The Appellant has been working since he was 17 years old and had been employed by the Municipality of Midtdjurs for 15 at the time of the accident. In the period after the accident and until his sick leave on April 20, 2004, he was at work, but had to take pain medicine. It is undisputed that the Appellant's loss of earning capacity, as determined by the National Board of Occupational Injuries, is 75%.

Based on the evidence, the Court of Appeal finds that on the day of the collision February 9 2004, the Appellant contacted the emergency medical service and complained of a headache, and that the driver stated in the claim form to the Respondent that "the other party complains of pain in the neck". The Court of Appeal also found that these complaints continued at the consultations on February 20 and March 1, 2004 with the Appellant's own doctor, who stated in a so-called interim certificate dated March 1, 2004 that the Appellant was being treated for sprain of the cervical spine, whiplash, neck injury and that the condition was unchanged with constant headaches, pulling pain in the left arm and tingling in the fingers of the left hand.

The Court of Appeal further finds that the Appellant's above-mentioned symptoms are described in detail in the statements of May 6 and September 3, 2004 from specialist in neurology Morten Kraft, who demonstrated, among other things, massive myogenic changes and who concluded that the Appellant has consequences after a whiplash lesion and that his symptoms, as they appear, are consistent with this.

Printed from Karnov for use in accordance with the license terms

Finally, the Court of Appeal found that the Appellant's previously stated complaints and additional complaints in the form of hypersensitivity to light and sound as well as jaw discomfort are described in more detail in the statement of December 1, 2004 from specialist in neurosurgery, Dr.Med. Finn Jensen, in a statement dated December 13, 2004 from medical specialist Frede Duus and in a statement dated April 13, 2005 from medical consultant Peter Rasmussen.

On the basis of the course of the illness stated in the evidence, and as the parties agree that the Appellant had no pre-existing conditions and that there are no competing causes of injury, the Court of Appeal is satisfied that there are the necessary so-called bridge symptoms and thus a causal link between the collision on February 9, 2004 and the Appellant's subsequent discomfort, which has resulted in a loss of earning capacity of 75%. In the opinion of the Court of Appeal, the Forensic Medicine Council's opinions, including that it cannot be assessed with certainty whether the accident has caused the Appellant permanent discomfort, cannot, under the given circumstances, lead to a different result.

According to section 7(1) of the Liability for Compensation Act, the annual salary is the injured party's total earned income in the year preceding the date of the injury. Based on the Appellant's financial information, the National Board of Occupational Injuries has assessed the Appellant's annual salary at DKK 268,000, cf. section 24(1)1st sentence of the Workers' Compensation Act, according to which the annual salary is the injured person's total earnings in the year before the occupational injury occurred. The Court of Appeal finds no basis for setting aside the National Board of Occupational Injuries' calculation, which is therefore used as the basis for the calculation of compensation in this case instead of the amount of DKK 298,500 calculated by the Appellant.

The Respondent must then pay the Appellant DKK 107,458.57 to cover loss of earnings, pain and suffering and positive expenses, DKK 246,732 in differential compensation for loss of earning capacity (45%) and DKK 60,671.87 in differential compensation for loss of earning capacity (30%), totaling DKK 414,862.44 with interest as determined below.

Following the course and outcome of the case, the Respondent must pay the Appellant DKK 100,000 in legal costs for both courts. The amount covers the Appellant's expenses in two instances for legal assistance, court fees of the amount won totaling DKK 20,520 and DKK 2,740+ VAT to cover expenses for extracts and collection of documentation.

Finally, the Respondent must pay the costs incurred by the Respondent for expert opinion and assessment totaling DKK 22,493.13.

**The judgment of the court:**
*The Respondent, insurance company Lærerstandens Brandforsikring G/S, shall pay the Appellant, A, DKK 414,862.44 plus procedural interest amounting to DKK 354,190.57 from November 25, 2005 and DKK 60,671.87 from October 16, 2007, respectively, until payment is made.*

*The Respondent shall pay DKK 100,000 in legal costs for both courts to the Appellant.*

*The amount ordered shall be paid within 14 days of the delivery of this judgment.*

**Footnotes**

U.2009.239Ø

# Ø.L.D. 26. juni 2008 i anke 2. afd. B-2584-07

## Det fandtes godtgjort, at erhvervsevnetab på 75 % var forårsaget af gener efter et færdselsuheld. Retslægerådets udtalelse kunne under de givne omstændigheder ikke føre til et andet bevisresultat.

Den 9. februar 2004 var A udsat for et trafikuheld, idet han som fører af en traktor blev påkørt af en personbil. A fik kort efter hovedpine, der tiltog, og kom under behandling for bl.a. forstuvning af halshvirvelsøjlen. Arbejdsskadestyrelsen anerkendte ulykken som en arbejdsskade og anførte, at der var årsagssammenhæng mellem hændelsen og de samtidig opståede gener fra området omkring nakken. A's erhvervsevnetab, der i 2006 blev fastsat 45 %, blev i 2007 forhøjet til 75 %. A's årsløn blev beregnet til 268.000 kr. A anlagde retssag mod den ansvarlige skadevolders forsikringsselskab, F, med påstand om betaling af differenceerstatning for erhvervsevnetab opgjort på grundlag af en årsindkomst på 298.500 kr. F, der anerkendte erstatningspligten, gjorde gældende, at A ikke havde godtgjort, at der var årsagssammenhæng mellem færdselsuheldet og A's midlertidige og varige gener. Af en erklæring fra Retslægerådet fremgik bl.a., at sandsynligheden for, at påvirkninger havde kunnet forårsage den i sagen beskrevne tilstand, var ringe. Byretten frifandt herefter F. A ankede til landsretten, der indledningsvis bemærkede, at det påhvilede A at bevise, at der var årsagssammenhæng mellem færdselsuheldet og A's erhvervsevnetab, og at der ikke var grundlag for at lempe denne bevisbyrde. På baggrund af det efter bevisførelsen oplyste sygdomsforløb, og da der mellem parterne var enighed om, at A ikke havde forudbestående lidelser, og at der ikke forelå konkurrerende skadesårsager, fandt landsretten det godtgjort, at der forelå de nødvendige såkaldte brosymptomer og dermed årsagssammenhæng mellem påkørslen den 9. februar 2004 og A's efterfølgende gener, der havde medført et erhvervsevnetab på 75 %. Retslægerådets udtalelse, herunder at det ikke med sikkerhed kunne vurderes, hvorvidt ulykken havde påført A varige gener, kunne efter landsrettens opfattelse under de givne omstændigheder ikke føre til et andet bevisresultat. F blev således pålagt at betale erstatning til A. Landsretten fandt ikke grundlag for at tilsidesætte Arbejdsskadestyrelsens opgørelse af årslønnen, der herefter blev lagt til grund ved erstatningsberegningen.

(Hedegaard Madsen, Sanne Kolmos, Lone Kerrn-Jespersen). *A (adv. Christian Riewe, Kbh.)* mod *Lærerstandens Brandforsikring G/S (adv. Christina Neugebauer v/adv. Nicolai Mailund Clan, Kbh.).*

## Byretten

### *Københavns Byrets dom 26. november 2007.*

*Sagens baggrund og parternes påstande.*

Denne sag, der er anlagt den 16. februar 2006, vedrører erstatning i anledning af et færdselsuheld, som sagsøger var udsat for den 9. februar 2004, hvor han som ansat i kommunens vejafdeling i en traktor blev påkørt af en personbil. Sagsøgte har anerkendt erstatningspligten, men der er tvist om spørgsmålet, om der er årsagsforbindelse mellem ulykken og de gener, sagsøger har. Der er endvidere tvist om opgørelsen af sagsøgers årsløn.

Sagsøger har nedlagt påstand om, at sagsøgte skal betale 569.441,34 kr. med tillæg af procesrente af 447.903,07 kr. fra den 25. november 2005, og af 121.538,27 kr. fra den 16. oktober 2007, alt til betaling sker.

Påstanden vedrører tabt arbejdsfortjeneste, svie og smerte samt erhvervsevnetabserstatning.

Sagsøgte har nedlagt påstand om frifindelse.

Dommen indeholder ikke en fuldstændig sagsfremstilling, jf. retsplejelovens § 218 a.

*Oplysningerne i sagen.*

Der foreligger i sagen udskrift fra egen læges journal og tidligere egen læges journal, notat af 9. februar 2004 fra lægevagtens journal, en erklæring af 6. maj 2004 fra speciallæge i neurologi Morten Kraft, en erklæring af 1. december 2004 fra speciallæge i neurokirurgi, dr.med Finn Jensen, en erklæring af 13. december 2004 fra speciallæge Frede Duus samt et notat fra lægesamtale med lægekonsulent Peter Rasmussen.

Den 11. maj 2006 fastsatte Arbejdsskadestyrelsen sagsøgers erhvervsevnetab til 45% og hans årsløn til 268.000 kr. Den 29. august 2007 forhøjede Arbejdsskadestyrelsen erhvervsevnetabet til 75%.

Der foreligger endvidere i sagen en skønserklæring af 8. august 2006 fra DanCrash og en tillægsskønserklæring af 3. oktober 2006. Endelig har Retslægerådet afgivet en erklæring af 12. juli 2007.

240

Af Retslægerådets erklæring af 12. juli 2007 fremgår blandt andet følgende:

».. .

Spørgsmål 3:

. . .

De umiddelbart efter påkørslen opståede gener i form af nakkegener vurderes med nogen sandsynlighed at kunne henføres til trafikuheldet den 09.02.04, mens de øvrige opståede gener vurderes til ikke at kunne henføres til dette.

. . .

Det fremgår af bilag H, at der sandsynligt har været tale om en lavenergikollision. På dette grundlag formoder Retslægerådet i begge de adspurgte tilfælde, at sandsynligheden for at påvirkninger har kunnet forårsage den i sagen beskrevne tilstand er ringe. Det skal dog anføres, at »crach-test« og vurderinger af skader, der ikke er påviselige som konsekvens af hastighedsændringer, ligger udenfor Retslægerådets sagkundskab.

Spørgsmål 4:

. . .

De seneste beskrevne gener er uspecifikke og kan skyldes en række forskelligartede, ofte komplekse forhold, hvorfor det ikke med sikkerhed kan vurderes, hvorvidt hændelsen den 09.02.04 har påført sagsøger varige gener.

. . .«

*Forklaringer.*

Der er under sagen afgivet forklaring af sagsøger.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

*Sagsøger* har forklaret, at han var ansat ved Midtdjurs Kommunes vejafdeling, der tager sig af kantsten, fliser, asfalt m.v. Om vinteren er der endvidere snerydning, saltning og alt andet forefaldende. Han var også brandmand som tilkaldevagt, hvilket var ud over de 37 timer i kommunen. Hvert år fik han et vintertillæg for at stå til rådighed fra november til marts/april måned. Der var også meget overarbejde hvert år. Han var ansat i 15 år i kommunen som vejarbejder. Han har været på arbejdsmarkedet, siden han var 17 år. Han var glad for arbejdet i kommunen.

Den 9. februar 2004 holdt han i sin traktor. Han var kommet hen til T-krydset. Han så modparten, der skulle svinge til venstre ad den vej, han kom. Han holdt lidt fra krydset for at give plads til modparten. Han så, at hun blev blændet, og at hun muligvis ikke havde set ham. Han forsøgte at bakke, men kunne ikke få den i gear. Han holdt fast i rattet og spændte sig fast. Da modparten ramte traktoren, mærkede han, at hovedet røg tilbage og frem. Han mærkede noget i nakken. Det gjorde ikke ondt, men han fik kort efter hovedpine. Han talte med modparten. Han fortsatte herefter sit arbejde. Han fik mere og mere ondt i hovedet og i nakken. Han havde fri efter 4 timer. Omkring kl. 18 havde han meget ondt i hovedet. Det var ligesom et stramt pandebånd, og det gik ned i nakken. Han ringede til vagtlægen, der var meget kort [for hovedet] og blot sagde, at han skulle tage noget smertestillende, og at det så nok ville gå. Han husker ikke, at der blev talt om, hvorvidt der var udstråling i armene. Efter nogle dage fik han også udstråling i armene. Der kom også øresusen og problemer i kæbeleddet. Han tog smertestillende piller, men fortsatte med at arbejde og fik ikke anden behandling. Efter ca. 11 dage gik han til egen læge, fordi smerterne var så store, at der måtte ske et eller andet. Det var fortsat hovedpine og ondt i nakken og snurren i fingrene. Efter 2½ måned efter ulykken blev han sygemeldt. Han var da oppe på at tage 15 smertestillende piller dagligt og havde alligevel smerter. Han kom nu til en række undersøgelser. Smerterne er der hele tiden og bliver forværret, hvis han laver noget. Han er nødt til at holde sig i ro og kan ikke lave noget. Han har også hukommelsesbesvær og er følsom over for lyde. Han er nødt til at skrive alt ned på sedler, hvis han skal huske det. Det er han meget påvirket af. Han kan ikke se en film med tekst på, fordi han bliver generet af teksten, der skifter og flimrer. Han kan heller ikke læse en bog. Han kan have svært ved at tygge. Det er, som om det hele spænder op.

Han har været til arbejdsprøvning i en tømmerhandel, hvor han skulle sætte varer op på hylderne. Det gik ikke. Han kan ikke klare at skulle flytte blikket for at sammenligne tal og koder på varerne.

Han vil hellere end gerne tilbage i arbejdet. Før ulykken havde han ingen gener i form af hovedpine og lignende. Efter ulykken har han ikke været ude for andre ulykkestilfælde. Speciallægerne har heller ikke fundet nogen psykologiske problemer hos ham. Han er helt sikker på, at ulykken er årsagen til generne.

*Parternes synspunkter.*

*Sagsøger* har i påstandsdokument af 15. oktober 2007 anført følgende:

*at* sagsøgte har anerkendt erstatningspligten og derfor skal betale fuld erstatning til sagsøger,

*at* der er årsagssammenhæng mellem færdselsulykken den 9. februar 2004 og sagsøgers sygeperiode,

*at* sagsøger derfor har krav på tabt arbejdsfortjeneste og svie og smerte frem til datoen fra Arbejdsskadestyrelsens afgørelse af 14. juli 2005, jf. bilag - - -, samt

*at* sagsøger har krav på differenceerstatning for erhvervsevnetab, som opgjort i sagens bilag - - - og - - -.

*Sagsøgte* har i påstandsdokument af 24. oktober 2007 anført følgende:

*at* der ikke er årsagssammenhæng mellem færdselsuheldet den 9. februar og sagsøgers midlertidige og varige gener,

*at* sagsøger først opsøgte egen læge den 20. februar 2004 (11 dage efter uheldet) og først blev sygemeldt den 20. april 2004 (2½ måned efter uheldet),

*at* der derfor ikke består de nødvendige brosymptomer mellem færdselsuheldet og de i sagsakterne beskrevne angiveligt svært invaliderende gener,

*at* der ikke er nogen objektive fund overhovedet, der underbygger, at sagsøger skulle have pådraget sig invaliderende skader,

*at* der er et massivt misforhold mellem den fysiske påvirkning ved ulykken og de helbredsmæssige klager,

*at* dette underbygges af det lægelige materiale samt skønserklæringerne fra Dan Crash, og

*at* dette - ikke mindst - underbygges af Retslægerådets erklæring af 12. juli 2007, hvoraf det bl.a. fremgår, at sandsynligheden for, at påvirkningen har kunnet forårsage den i sagen beskrevne tilstand, er ringe,

*at* Arbejdsskadestyrelsens vurdering i arbejdsskadesagen ikke er relevant i forbindelse med vurdering af nærværende civile søgsmål,

*at* Arbejdsskadestyrelsen ikke har taget stilling til årsagssammenhængen,

*at* Arbejdsskadestyrelsen ikke har været bekendt med Retslægerådets erklæring af 12. juli 2007, og

*at* bevisvurderingen i arbejdsskadesagen er en ganske anden, da der er tale om et helt andet lovgrundlag, hvorfor de to systemer ikke kan sammenlignes.

I relation til sagsøgers erstatningsopgørelse gøres det gældende,

*at* den af sagsøger fastsatte årsløn er for høj,

*at* årslønnen bør fastsættes væsentligt lavere end gjort af sagsøger,

*at* der ved fastsættelsen af sagsøgers årsløn eventuelt kan tages udgangspunkt i den af Arbejdsskadestyrelsen fastsatte årsløn på 268.000 kr., der er bedre i overensstemmelse med de fremlagte R-75 udskrifter (bilag - - -) og det af sagsøger udfyldte spørgeskema, hvori årsindtægten angives at være 230.000 kr. (bilag - - -) og

*at* sagsøgte derfor også af denne grund, i hvert fald delvist, bør frifindes for det rejste krav.

Samlet set gøres det således gældende,

*at* bevisbyrden for, at der foreligger den fornødne årsagssammenhæng, påhviler sagsøger,

*at* sagsøger ikke har løftet denne bevisbyrde, og

*at* sagsøgte derfor bør frifindes.

Parterne har i det væsentligste procederet i overensstemmelse hermed.

**Rettens begrundelse og afgørelse:**

Efter Retslægerådets erklæring af 12. juli 2007 har sagsøger ikke godtgjort, at der er årsagssammenhæng mellem færdselsuheldet den 9. februar 2004 og sagsøgers gener, hvorfor sagsøgte frifindes.

Vedrørende sagens omkostninger forholdes som nedenfor bestemt. Der er tilkendt et passende beløb til dækning af udgift til advokatbistand på 50.000 kr. og til dækning af øvrige omkostninger 22.493,13 kr. Retten har ved fastsættelsen af passende udgift til advokatbistand taget udgangspunkt i de gældende takster, som retten ikke har fundet grundlag for at fravige. Udgiften til skønsrapporten og tillægsskønsrapporten har været 18.011,88 kr. og 4.481,25 kr., hvilke beløb er udlagt af sagsøgte.

**Thi kendes for ret:**

Sagsøgte, Lærerstandens Brandforsikring G/S, frifindes.

Sagsøger, A, skal inden 14 dage betale sagens omkostninger til sagsøgte med 72.493,13 kr.

# Østre Landsret

**Østre Landsrets dom.**

Københavns Byrets dom af 26. november 2007 - - - er anket af A med påstand som for byretten om, at indstævnte, Lærerstandens Brandforsikring G/S, dømmes til at betale 569.441,34 kr. med procesrente af 447.903,07 kr. fra den 25. november 2005 og af 121.538,27 kr. fra den 16. oktober 2007, alt til betaling sker.

Indstævnte har endeligt påstået stadfæstelse.

Som for byretten vedrører sagen spørgsmålet om, hvorvidt der er årsagsforbindelse mellem påkørslen og de gener, appellanten har, og i givet fald opgørelsen af appellantens årsløn. Parterne er enige om, at årslønnen bør fastsættes til enten 298.500 kr. som fremført af appellanten eller til 268.000 kr., hvilket indstævnte har gjort gældende.

Påstandsbeløbet på 569.441,34 kr. har appellanten opgjort således:

| | |
|---|---:|
| Tabt arbejdsfortjeneste, svie og smerte, positive udgifter: | 107.458,57 kr. |
| Differenceerstatning for erhvervsevnetab 45 %: | 340.444,50 kr. |
| Differenceerstatning for erhvervsevnetab 30 %: | 121.538,27 kr. |
| I alt | 569.441,40 kr. |

Differenceerstatningen for erhvervsevnetab er opgjort på grundlag af en årsindkomst på 298.500 kr. For det tilfælde, at landsretten må nå frem til, at der alene kan lægges en årsløn på 268.000 kr. til grund, således som Arbejdsskadestyrelsen har skønnet i arbejdsskadesagen, har appellanten opgjort de to differenceerstatningsbeløb til henholdsvis 246.732 kr. og 60.671,87 kr.

Indstævnte har ikke bestridt appellantens talmæssige opgørelser og er i givet fald enig i kravet på 107.458,57 kr.

*Sagens omstændigheder*

Af bilistens skadeanmeldelse til indstævnte fremgår, at påkørslen skete den 9. februar 2004 ca. kl. 10.40. Appellanten kontaktede samme dag vagtlægen, og i lægevagtsnotatet er følgende noteret:

»Lægevagtsbesøg: 09 02 2004 kl. 18:18

EPIKRISE:

*242*

I en traktor påkørt i siden. 10-15 km/t

Slog ikke hovedet. Nu hovedpine. Ikke kastet op.

Ikke radierende smerter.

Tilrådes pamol.«

Af førnævnte skadesanmeldelse, som er dateret 10. februar 2004, fremgår videre bl.a.:

»*9. Hvad skete der?*

. . .

Da jeg skulle svinge til højre blev jeg blændet af solen så jeg intet kunne se og ramte derved en traktor.

. . .

*12. Uheldets nærmere omstændigheder*

. . .

*Deres køretøj km/time*

Højst 10 km/t

*18. Personskade.*

. . .

*Tilskadekomstens art:* Modparten klager over smerter i nakken.«

Appellanten opsøgte første gang egen læge, læge - - -, Ryomgaard, den 20. februar 2004. Lægen noterede følgende i journalen:

»D. 9. 2 udsat for UT. Piskesmæld. Fortsatte gener. Fys.«

Samme dag udfyldte appellanten et spørgeskema fra indstævnte vedrørende personskaden. Han anførte, at han den 9. februar 2004 telefonisk havde kontaktet vagtlægen. Han oplyste sin årsindtægt til 230.000 kr. I skemaets punkt 9 om eventuelle supplerende oplysninger, som appellanten mener har betydning for sagen, har appellanten anført følgende:

»Jeg har stadig hovedpine og det trækker ned i venstre side af nakken og skulder.«

Appellanten opsøgte på ny egen læge den 1. marts 2004, og lægen noterede følgende i journalen:

»Kommer med en mellemattest til nakkeskade fra d. 9. februar. Fortsat hovedpine, nakkesmerter og snurren i ve hånds fingre. har ikke været sygemeldt.«

I den nævnte såkaldte mellemattest oplyste lægen, at appellanten var under behandling for distortio columna cervicalis, dvs. forvridning i halshvirvelsøjlen, og hun angav endvidere »-piskesmældslæsion af nakken«. Appellantens tilstand oplyste hun som uændret og anførte endvidere ud for spørgsmål om, hvorvidt der var tilstødt komplikationer og da hvilke:

»-Ja - Konstant hovedpine

- trækkende smerter ud i ve. arm

- snurren i ve. hånds fingre.«

Lægen oplyste yderligere, at appellanten var under behandling hos fysioterapeut.

Fysioterapeuten ville imidlertid ikke begynde behandlingen, og egen læge henviste appellanten til røntgen med funktionsoptagelser. Herefter blev appellanten den 29. marts 2004 røntgenfotograferet på Grenå Sygehus. Der fandtes normale forhold for så vidt angår halshvirvelsøjlen m.m. og ingen tegn til fractur eller luksation.

Den 20. april 2004 lod appellanten sig sygemelde fra sit arbejde.

Efter henvisning fra egen læge blev appellanten den 5. maj 2004 undersøgt af speciallæge i neurologi Morten Kraft, Risskov, som i en erklæring af 6. maj 2004 anførte bl.a. følgende:

»*Problemstilling:* smerter i nakken med udstråling til begge arme siden påkørsel i februar 2004.  . . .

*Aktuelt:*  . . . Patienten pådrog sig et fleksions-/ekstensionstraume mod halscolumna, og siden har patienten haft smerter i nakken strålende ud i begge arme. Patienten har hovedpine og er forkvalmet, utilpas og træt. Desuden har patienten en dårlig hukommelse, og han sover dårligt om natten, hvor han vågner 3-4 gange. Patienten er også blevet mere pirrelig, og patienten kan ikke finde ro til at slappe af.

Patienten har fra 09/02/2004 - 20/04/2004 været i arbejde med tiltagende smerter, og nu har patienten været sygemeldt siden 20/04/2004.

RU af col. cervicalis er foretaget uden abnormitet, og patienten har fået fysioterapi . . .

*Objektivt:* psykisk nat.

Kraniet og kranienerver inklusive ophthalmoskopi: intet abnormt.

Der findes massive myogene forandringer i nakkemusklernes kraniefæstere og trapeziusrandene, samt let bevægeindskrænkning i halscolumna, hvor patienten kun kan rotere til 45 gr. på hver side.

. . .

*Konklusion:* der er ved neurologisk undersøgelse intet abnormt påvist udover myogene forandringer og let bevægeindskrænkning i halscolumna. Patienten har følger efter en whiplashlæsion, og patientens symptomer, som de ses, er i overensstemmelse hermed. Patienten er medgivet recept på tbl. Amitriptylin 10 mg til sovetid den første uge og herefter 20 mg til sovetid. Desuden tilrådes patienten forsigtig fysioterapi og gerne forsigtig aktivering i et lettere halvdagsarbejde således, at patienten ikke går for meget i tomgang

. . .«

I en opfølgende erklæring af 3. september 2004 til appellantens egen læge anførte speciallæge Morten Kraft bl.a. følgende:

». . .

10/05/2004: pt. opl. tlf., at han har fået det dårligt på Amitriptylin. Ophører hermed og tilrådes i stedet Paracetamol til sovetid. Ringer om effekten heraf.

Sp. Amitriptylin

Rp. Paracetamol pro nocte

18/05/2004: pt. opl. tlf., at han har det dårligt. Pt. er kommet i fysioterapi og forudser en lang

*243*

behandlingsperiode. Pt. har ikke kunnet få halvtidsarbejde. Ringer igen om fjorten dage.

01/06/2004: tilstanden er uændret, og der aftales kontrol.

03/06/2004: pt. kommer til kontrol og har fået det noget bedre, men fysioterapien er ikke lykkedes. Der er ikke baggrund for at udvide undersøgelsesprogrammet i øjeblikket. Pt. kommer til kontrol efter sommerferien.

10/08/2004: pt. opl. tlf., at sympt. er forværrede, og pt. kommer til kontrol.

20/08/2004: pt. har det dårligt og har mange sm i nakken., Sm. forværres af selv let fysisk anstrengelse, og smerteforværringen kan holde i et par døgn. Pt. husker fortsat dårligt, og hustruen kan fortælle, at manden f.eks. kan glemme elementerne i en samtale, han har haft. Pt. sover også fortsat dårligt om natten og vågner to-tre gange, og han bliver dårlig, hvis der sker meget omkring ham, og der er uro.

Pt. har været til møde i kommunen, hvor man ikke har kunnet anvise noget let fysisk arbejde.

Fysioterapi har ikke hjulpet og heller ikke Amitriptylin, som pt. har fået det dårligt af.

Pt. tager inkonstant Paracetamol og sættes på fast medicin med Naproxen 500 mg x 3, fortsætter med fysioterapi og ringer om fjorten dage vedr. forløbet.

03/09/2004: pt. oplyser, at det ikke er lykkedes at få smertelindring på behandlingen, og jeg her herefter ikke yderligere behandlingstilbud, idet der venligst henvises til tidligere fremsendte.

Afsluttes.«

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

Appellanten blev herefter den 25. november 2004 undersøgt af speciallæge i neurokirurgi, dr.med. Finn Jensen, Speciallægernes klinik aps, Skørping. Speciallægens erklæring af 1. december 2004 har bl.a. følgende indhold:

». . .

*Aktuelle:*

. . .

Han pådrog sig intet direkte slag. Der er ingen glemsel. Samme dag begyndte han at få smerter i nakken med udstråling samt hovedpine.

Ca. 1 uge senere observeredes for første gang tilstedeværelsen af kognitive dysfunktioner, der siden har udviklet sig yderligere.

*Undersøgelser og behandling*

. . .

Han henvises også til fysioterapi, hvor han fortsat går ca 1 gang om ugen. Han har samtidig fået kranio-sakrale behandlinger 2-3 gange uden effekt.

I april 2004 er der foretaget en røntgenundersøgelse af halshvirvelsøjlen på Grenå Sygehus uden funktionsoptagelser. Resultatet beskrives som normalt.

Den 6. maj 2004 undersøges han af speciallæge i neuromedicin Morten Kraft, Århus. Denne anfører, at han klager over smerter i nakken med udstråling til begge arme og hovedpine. Han føler sig forkvalmet, utilpas og er træt. Der er kognitive dysfunktioner og affektive symptomer i form af emotionel instabilitet.

Objektivt påvises en let bevægelsesindskrænkning i halshvirvelsøjlen. Sidedrejningerne er reduceret til ½-delen. Der er intet oplyst om for- og bagudbøjningen.

. . .

*Aktuelle klager*

*1.*

Konstante symptomer fra halshvirvelsøjlen med konstante smerter med udstråling til begge skuldre og overarme ledsaget af sovende fornemmelser i hænder og alle fem fingre. Dette er ledsaget af en konstant hovedpine. Der er subjektiv fornemmelse af nedsat drejeevne i nakken.

Smerterne forværres ved selv let belastning. Han kan således kun sidde i 15 minutter, før smerterne forværres. Hvis han sidder med hovedet foroverbøjet i mere end 5 minutter, forværres smerterne ligeledes. Hans maksimale gangdistance uden smerteforværring er ca. 1 km og hans maksimale løfteevne ligeledes uden smerteforværring er ca 5 kg.

*2.*

Der er daglige smerter i den øvre og midterste del af brysthvirvelsøjlen uden udstråling. Udløses ved let belastning specielt løft. Forværringen her er ikke afhængig af en smerteforværring i nakken.

*3.*

Kognitive symptomer visende sig ved en reduceret hukommelse, koncentrationsevne og nedsat indlæringsevne.

De affektive symptomer viser sig ved imotionel instabilitet, overfølsomhed for lys og lyde (foto- og fonofobi), alkohol-intolerance. De somatiske problemer optræder i form af træthed og problemer med at sove specielt om natten.

*4.*

Han klager over nedsat hørelse, men der er samtidig hyperakusis. Han kan således ikke være sammen med flere mennesker på samme tid, da dette udløser denne lydoverfølsomhed. Der er ingen klager over tinnitus.

*5.*

Skadelidte har muligvis en kæbeledsdysfunktion. Der gør ondt, når han tygger og mundåbningen er reduceret.

*6.*

Ved udtrætning opstår symptomer foreneligt med en cerebral astenopi.

. . .

*Hvirvelsøjlen*

I halshvirvelsøjlen er der en mindst middelsvær bevægelsesindskrænkning. Ved maksimal aktiv foroverbøjning er der en afstand mellem hage og brystben på

6-7 cm. Bagudbøjningen er reduceret med mere end 1/3 del og sidedrejningerne med ca. ½-delen til begge sider. Der findes et facetledssyndrom mellem 6. og 7. halshvirvel.

I brysthvirvelsøjlen ses en normal krumning. På niveau 6.-8. brysthvirvel er der et dobbeltsidigt facetledssyndrom.

I lænden findes normale forhold.

. . .

*Resumé*

Skadelidte er en 46-årig kommunalarbejder, der den 9. februar 2004 er involveret i en trafikulykke. Han er fører af en traktor, der holder stille og rammes fortil og på venstre side af en drejende personbil. Han fik ikke noget direkte slag mod hoved eller krop. Der er ingen amnesi.

Samme dag udvikler han symptomer på en forvridning i halshvirvelsøjlen, der fortsat eksisterer. Det drejer sig om konstante nakkesmerter med udstråling, hovedpine og en mindst middelsvær bevægelsesindskrænkning i nakken.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

Samtidig har skadelidte udviklet et midtthoracalt facetledssyndrom, hvis symptomer optræder uafhængigt af symptomerne fra halshvirvelsøjlen.

Ca. 1 uge senere dukker de første symptomer op på kognitive og affektive symptomer, som i dag fylder meget i tilværelsen. Omfanget af dette bør afklares ved en neuropsykologisk undersøgelse.

Hertil kommer subjektiv fornemmelse af hørenedsættelse samt hyperacusis. Dette bør nærmere undersøges af en ørelæge og eventuelt følges op med en audiologisk speciallægeerklæring.

Endelig har skadelidte symptomer på en kæbeledsdysfunktion, der bør undersøges af en tandlæge evnt. af en specialtandlæge.

Konklusion:

På basis af ovenstående mener jeg, at man kan konkludere, at

1.

skadelidte ved ulykken den 9. februar 2004 pådrager sig en forvridning i halshvirvelsøjlen, hvilket han fortsat har symptomer på.

2.

skadelidte samtidig har pådraget sig et facetledssyndrom med smerter i den midterste del af brysthvirvelsøjlen

3.

skadelidte har udviklet kognitive, affektive og somatiske symptomer lignende de, man ser efter en hjernerystelse. Dette bør nærmere kvantificeres ved en neuropsykologisk undersøgelse

4.

der er mistanke om hyperacusis efter ulykken. At der skulle være sket en skade på det indre øre er tvivlsomt, da han ikke har slået hovedet. Han bør dog undersøges nærmere af en ørelæge.

5.

skadelidte har symptomer foreneligt med en kæbeledsdysfunktion

. . .«

I en fornyet mellemattest til indstævnte oplyste appellantens egen læge den 10. december 2004, at tilstanden var forværret. Vedrørende punktet »Er der tilstødt komplikationer, og da hvilke?« noterede lægen hukommelsesproblemer, kæbesmerter, nedsat hørelse og konstante smerter. Diagnosen oplyste hun igen som distortio columna cervicalis - forvridning af halshvirvelsøjlen, og om behandling anførte hun fysioterapi. I et journalnotat af samme dato anførte lægen, at appellanten den 1. december 2004 havde fået undersøgt bidfunktionen, hvor musklerne er meget påvirkede, og at appellanten skulle undersøges af en øre-, næse-, halslæge.

I en epikrise af 13. december 2004 til appellantens egen læge konkluderede speciallæge Frede Duus, Grenaa, at appellantens nakkeskade formentlig er årsag til den lydoverfølsomhed, som han havde været generet af de sidste 10

måneder, og at hypercusis formentlig er opstået på grund af commotio labyrinthi svarende til en hjernerystelse i det indre øre. Prognosen for denne lydoverfølsomhed er umulig at forudsige, og behandles kan den heller ikke.

I en lægeerklæring af 27. marts 2005 til appellantens advokat har egen læge anført som diagnose:

»Distortio columna cervicalis - forvridning af halshvirvelsøjle, vedvarende hovedpine, nakkesmerter og koncentrationsbesvær med nedsat hukommelse.«

Om lægesamtale med appellanten den 13. april 2005 anførte lægekonsulent Peter Rasmussen bl.a., at appellantens tilstand har været uændret fra ulykken og indtil nu, og at symptomerne er i overensstemmelse med, hvad der kan ses ved den beskrevne skadesmekanisme.

I en skønserklæring af 8. august 2006 har bilinspektør Per Bo Hansen, Ingeniørfirmaet DanCrash i/s, besvaret bl.a. følgende spørgsmål således, idet EES er udtryk for kollisionsenergien:

»*Svar, spørgsmål 1:*

»*Skønsmanden anmodes om på PC/Scan-Crash systemet at beregne hastighedsændringen i det køretøj, hvor A befandt sig. Skønsmanden anmodes således om at redegøre for parternes sandsynlige hastighed i sammenstødsøjeblikket samt hastighedsændringen efter sammenstødet.*«

Ud fra ovenstående antagelse, antaget EES på ca. 14 km/t jf. fotodokumentation, samt kollisionens særlige egenart beregnes, at hastigheden inden kollisionen er 16 - 19 km/t for personbilen, samt at det medfører en hastighedsændring for bilen på 20,4 km/t, og for traktoren på 5,9 km/t.

*Svar, spørgsmål 2:*

»*Skønsmanden bedes beskrive den påvirkning, A blev udsat for, herunder hvad påvirkningen bedst kan sammenlignes med, såfremt det lægges til grund, at - - - påkørte A med fart på højst 10 km/t (som oplyst i skadesanmeldelsen . . .).*«

. . .

Accelerationer (hastighedsændringer) i den størrelsesorden er lavenergikollisioner. Dette har særlig beregningsmæssig interesse i kollisioner mellem biler, da antagelse af diverse beregningsmæssige værdiers størrelse ændres i lavenergikollisionsområdet i forhold til »almindelige« kollisioner. I aktuelle tilfælde skal (bør) kollisionens egenart uanset energioverførslen underkastes særlig opmærksomhed, da kollisionen ikke (af undertegnede) kan beregnes under anvendelse af programmets defaultværdier.

Definitionen på en lavenergikollision er ikke entydigt »vedtaget« eller videnskabeligt bevisført (ikke kommet til DanCrash's kendskab), og kollisionens natur og egenart skal således vurderes i hvert enkelt tilfælde ud fra bl.a. køretøjtyperne, beskadigelserne, interaktionens komponenter og parternes hastighed(er).

. . .

*Svar, spørgsmål 6:*

»*Skønsmanden bedes oplyse hvilken hastighedsændring, han finder er den mest sandsynlige af de oplyste i spørgsmål 4 og 5.*

Printet fra Karnov til brug i overensstemmelse med licensvilkårene

*Skønsmanden bedes begrunde sit svar.«*

Hastighedsændringerne spænder fra 1,3 km/t til 6,55 km/t, hvilket svarer til en forskel i energiforbrug på 25 gange. For teknisk set at sandsynliggøre et energiforbrug, og dermed finde den mest sandsynlige som forespurgt, benyttes energibetragtningen udtrykt i EES-værdi. Det kan simuleres, at traktoren opnår en EES på 4 km/t, hvorfor »resten« af energien i kollisionen optages af bilen og medgår til at »skubbe« bilen væk fra traktoren. Bilen vil dermed skulle optage energi svarende til en EES på 13 km/t, hvilket er i god overensstemmelse med taksatorrapportens angivelse af skaderne.

Disse værdiers anvendelse vil medføre en hastighedsændring af traktoren på 3,92 km/t.

. . .«

Samme bilinspektør fra DanCrash har endvidere afgivet en supplerende skønserklæring af 3. oktober 2006.

Retslægerådet, der har haft forelagt følgende spørgsmål, har i erklæring af 12. juli 2007 udtalt:

*»Spørgsmål 1:*

*Retslægerådet anmodes om at oplyse, hvilke lidelser samt symptomer, der kan konstateres hos sagsøger ud fra de i sagen foreliggende lægelige oplysninger.*

Sagsøger var den 09.02.04 udsat for et trafikuheld, hvor han som fører af traktor blev påkørt af personbil. Der foreligger ingen skadestuejournal, men det oplyses i sagens senere akter, at han ikke var bevidstløs i forbindelse med hændelsen.

I egen læges journal beskrives i perioden inden trafikuheldet klager over højresidige skuldergener samt smerter omkring venstre ankel. I perioden efter trafikuheldet er i samme journal den 20.02.04 anført klager over smerter uden nærmere angivelse samt den 01.03.04 hovedpine, nakkegener og snurrende fornemmelse i venstre hånds fingre. Efterfølgende er anført fortsatte gener, indtil der den 20.09.04 beskrives en forværring af tilstanden.

I neurologisk erklæring af 30.09.04 beskrives klager over nakkegener, hovedpine, kvalme og træthed. Der påvises bevægelsesindskrænkning af halshvirvelsøjlen samt muskelspændinger og ømhed i nakke og skuldre.

I neurokirurgisk speciallægeerklæring af 01.12.04 anføres nakke- og øvre ryggener, koncentrations- og hukommelsesbesvær, fornemmelse af nedsat hørelse, udtrætning af synet samt kæbegener. Der påvises ømhed omkring og nedsat bevægelighed af halshvirvelsøjlen.

*Spørgsmål 2:*

*Retslægerådet anmodes om at oplyse om, hvorvidt der er overensstemmelse mellem de hos sagsøger konstaterbare objektive fund, og sagsøgers subjektive klager.*

Der er i sagens lægelige akter beskrevet beskedne og uspecifikke objektive fund, der ikke er i overensstemmelse med de subjektive klager. Dette forhold er ikke ualmindeligt i de få tilfælde, hvor der udvikles længerevarende gener efter lignende traumer.

*Spørgsmål 3:*

*Retslægerådet anmodes om at oplyse om, hvorvidt de ovenfor under spørgsmål 1 konstaterbare lidelser samt symptomer helt eller delvist kan henføres til sagsøgers færdselsulykke den 9. februar 2004.*

*Såfremt der er sygeperioder efter den 9. februar 2004, hvor lidelserne ikke kan henføres til sagsøgers arbejdsulykke, bedes disse angivet.*

*Retslægerådet bedes i den forbindelse særskilt oplyse, om et traume med en hastighedsændring på 3,92 km/t (der henvises til bilag H, besvarelse af spørgsmål 6) er egnet til at forårsage den i sagen beskrevne tilstand.*

*Retslægerådet bedes ligeledes særskilt oplyse, om et traume med en hastighedsændring på 5,9 km/t (der henvises til bilag H, besvarelse af spørgsmål 1) er egnet til at forårsage den i sagen beskrevne tilstand.*

De umiddelbart efter påkørslen opståede gener i form af nakkegener vurderes med nogen sandsynlighed at kunne henføres til trafikuheldet den 09.02.04, mens de øvrige opståede gener vurderes ikke at kunne henføres til dette.

Retslægerådet udtaler sig ikke om årsager til sygemeldinger.

Det fremgår af bilag H, at der sandsynligt har været tale om en lavenergikollision. På dette grundlag

formoder Retslægerådet i begge de adspurgte tilfælde, at sandsynligheden for at påvirkninger har kunnet forårsage den i sagen beskrevne tilstand er ringe. Det skal dog anføres, at crash-test og vurderinger af skader, der ikke er påviselige som konsekvens af hastighedsændringer, ligger udenfor Retslægerådets sagkundskab.

*Spørgsmål 4:*

*Retslægerådet bedes oplyse, om nogen af de skader, som sagsøger eventuelt pådrog sig ved ulykken den 9. februar 2004 har påført ham varige gener.*

*Retslægerådet bedes i bekræftende fald beskrive disse samt begrunde sit svar.*

De seneste beskrevne gener er uspecifikke og kan skyldes en række forskelligartede, ofte komplekse forhold, hvorfor det ikke med sikkerhed kan vurderes, hvorvidt hændelsen den 09.02.04 har påført sagsøger varige gener.

*Spørgstmål 5:*

*Giver sagen i øvrigt Retslægerådet anledning til bemærkninger?*

Nej.«

Arbejdsskadestyrelsen har anerkendt ulykken som en arbejdsskade og i en afgørelse af 14. juli 2005 anført, at der er årsagssammenhæng mellem den beskrevne hændelse og de samtidig opståede gener fra området omkring nakken. Appellantens erhvervsevnetab er af styrelsen i dens endelige afgørelse af 29. august 2007 vurderet til 75 %. Hans årsløn er beregnet til 268.000 kr. med følgende begrundelse:

*»Begrundelse*

Årslønnen er fastsat ud fra Deres indtægt i det år, der gik forud for arbejdsskadens indtræden. Da skaden skete den 9. februar 2004, har vi taget 1/12 af resultatet i det år, De kom til skade, og 11/12 af resultatet i det foregående år.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene.

Deres årsindtægt for år 2003 har vi beregnet således:

Løn: 235.939 kr. + atp. 2.684 kr. + arbejdsgiverpension: 28.963 kr. = 267.040 kr./12 x 11 = 244.786,66 kr.

Deres årsindtægt for år 2004 har vi beregnet således:

Løn: 250.107 kr. + atp.: 2.684 kr. + arbejdsgiverpension: 29.341 kr. = 282.132 kr. /12 x 1 = 23.511 kr.

Ovennævnte 2 årsindtægter har vi lagt sammen svarende til en årsløn året inden skaden på 268.297,66 kr. afrundet til 268.000 kr.«

Appellanten har til brug for sagen skønnet sin årsløn således, idet underoverskriften »Beredskabsgården« vedrører hans tilkaldevagt som brandmand:

|  |  | »Skønnet årsløn |
|---|---|---|
| *VEJAFDELING:* |  |  |
| Overtidsbetaling pr. måned | kr. | 73,56 |
| kr. 73,56 x 12 måneder | = kr. | 882,72 |
| Overtidsbetaling pr. måned | kr. | 2.629,72 |
| kr. 2.629,72 x 12 måneder | = kr. | 31.556,64 |
| Vintertillæg pr. måned kr. 1.484,28 (kun i 5 måneder) |  |  |
| kr. 1.484,28 x 5 måneder | = kr. | 7.421,40 |
| Grundløn pr. måned kr. 18.236,35 |  |  |
| kr. 18.236,35 x 12 måneder | kr. | 218.836,20 |
| I alt | = kr. | 258.696,96 |
| Fratrækkes 5 ugers ferie: |  |  |
| kr. 258.696,96/25 dage | = kr. | *231.318,20 årligt* |
| *BEREDSKABSGÅRDEN:* |  |  |
| Grundløn pr. måned | kr. | 1.367,36 |
| kr. 1.367,36 x 12 måneder | = kr. | 16.408,32 |
| Fratrækkes 5 ugers ferie: |  |  |
| kr. 16.408,32/25 dage | = kr. | *14.671,77 årligt* |
| *TILLÆGGES AMP:* |  |  |
| kr. 231.318,20 x 9,5 % | = kr. | 21.975,22 |
| *TILLÆGGES FERIEPENGE:* |  |  |
| kr. 231.318,20 x 12,5 % | = kr. | 28.914,77 |
| kr. 14.671,77 x 12,5 % | = kr. | 1.833,97 |
| *I alt* | = kr. | *298.713,93* |

Dette beløb afrundes til nærmeste med 500 delelige kronebeløb, det vil sige kr. 298.500,00.«

Appellanten har under sagen fremlagt en lægelig artikel og oversættelse heraf, på dansk med overskriften »Signifikant rygskade opstået ved lavniveau accelerationer. En serie af rutschebaneskader«, offentliggjort i Arch Phys Med Rehabil Vol 86, november 2005.

*Forklaring*

Der er i landsretten afgivet forklaring af appellanten, A.

Appellanten har supplerende forklaret bl.a., at bilisten skulle dreje til højre. Han holdt selv i sin traktor 5-10 cm fra kantstenen og ca. 40 cm fra midten af vejen. Traktoren havde ikke nakkestøtte eller sikkerhedssele. Bilisten besøgte ham samme aften.

*Procedure*

Parterne har i det væsentlige gentaget deres procedure for byretten.

Appellanten har yderligere gjort gældende, at bevisbyrdekravet for årsagsforbindelse er lempet i denne sag, idet der dels er tale om en arbejdsskade, dels en skade inden for et område med en skærpet ansvarsnorm (objektivt ansvar). For så vidt angår fastsættelsen af årslønnen har appellanten gjort gældende, at årslønnen på 298.500 kr. er korrekt opgjort, da den tager højde for appellantens ansættelsesforhold, herunder fast påregnelige tillæg, og at den opgjorte differenceerstatning for erhvervsevnetabet således er korrekt opgjort.

Indstævnte har heroverfor bestridt, at der skulle være tale om en lempet bevisbyrde med hensyn til årsagssammenhæng.

Der er under sagen enighed om, at appellanten ikke led af forudbestående lidelser, og at der heller ikke er spørgsmål om konkurrende skadesårsager.

247

## Landsrettens afgørelse:

Landsretten bemærker indledningsvis, at det påhviler appellanten at bevise, at der er årsagssammenhæng mellem det færdselsuheld, appellanten var udsat for den 9. februar 2004, og appellantens erhvervsevnetab. Landsretten finder ikke, at der er grundlag for at lempe denne bevisbyrde.

Appellanten har været i arbejde, siden han var 17 år, og havde på ulykkestidspunktet været ansat i Midtdjurs Kommune i 15 år. I perioden efter ulykken og indtil sygemeldingen den 20. april 2004 var han på arbejde, men måtte tage smertestillende medicin. Det er ubestridt, at appellantens erhvervsevnetab, som fastslået af Arbejdsskadestyrelsen, er på 75 %.

Efter bevisførelsen lægger landsretten til grund, at appellanten samme dag som påkørslen skete, den 9. februar 2004, kontaktede lægevagten og klagede over hovedpine, og at bilisten i skadesanmeldelsen til indstævnte anførte, at »modparten klager over smerter i nakken«. Landsretten lægger endvidere til grund, at disse gener fortsat bestod ved konsultationerne henholdsvis den 20. februar og den 1. marts 2004 hos egen læge, der i en såkaldt mellemattest af 1. marts 2004 oplyste, at appellanten var under behandling for forstuvning af halshvirvelsøjlen, piskesmæld, læsion af nakken, og at tilstanden var uændret med konstant hovedpine, trækkende smerter ud i venstre arm og snurren i venstre hånds fingre.

Landsretten lægger yderligere til grund, at appellantens ovennævnte symptomer er uddybende beskrevet i erklæringerne af 6. maj og 3. september 2004 fra speciallæge i neurologi Morten Kraft, der påviste bl.a. massive myogene forandringer, og som konkluderede, at appellanten har følger efter en whiplashlæsion, og at hans symptomer, som de ses, er i overensstemmelse hermed.

Landsretten lægger endelig til grund, at appellantens hidtil angivne gener samt yderligere tilkomne gener i form af bl.a. overfølsomhed over for lys og lyde samt kæbegener er omtalt nærmere i erklæring af 1. december 2004 fra speciallæge i neurokirurgi, dr.med. Finn Jensen, i erklæring af 13. december 2004 fra speciallæge Frede Duus og i erklæring af 13. april 2005 fra lægekonsulent Peter Rasmussen.

På baggrund af det efter bevisførelsen oplyste sygdomsforløb, og da der mellem parterne er enighed om, at appellanten ikke havde forudbestående lidelser, og at der ikke foreligger konkurrerende skadesårsager, finder landsretten det godtgjort, at der foreligger de nødvendige såkaldte brosymptomer og dermed årsagssammenhæng mellem påkørslen den 9. februar 2004 og appellantens efterfølgende gener, der har medført et erhvervsevnetab på 75 %. Retslægerådets udtalelse, herunder at det ikke med sikkerhed kan vurderes, hvorvidt ulykken har påført appellanten varige gener, kan efter landsrettens opfattelse under de givne omstændigheder ikke føre til et andet bevisresultat.

Efter erstatningsansvarslovens § 7, stk. 1, regnes som årsløn skadelidtes samlede erhvervsindtægt i det år, der går forud for datoen for skadens indtræden. Arbejdsskadestyrelsen har på baggrund af appellantens økonomiske oplysninger vurderet appellantens årsløn til 268.000 kr., jf. lov om arbejdsskadesikring § 24, stk. 1, 1. pkt., hvorefter årslønnen udgør tilskadekomnes samlede arbejdsfortjeneste i året før arbejdsskadens indtræden. Landsretten finder ikke grundlag for at tilsidesætte Arbejdsskadestyrelsens opgørelse, som derfor lægges til grund ved erstatningsopgørelsen også under denne sag i stedet for det af appellanten opgjorte beløb på 298.500 kr.

Indstævnte skal herefter betale appellanten henholdsvis 107.458,57 kr. til dækning af tabt arbejdsfortjeneste, svie og smerte samt positive udgifter, 246.732 kr. i differenceerstatning vedrørende erhvervsevnetab (45%) og 60.671,87 kr. i differenceerstatning vedrørende erhvervsevnetab (30 %), i alt 414.862,44 kr. med renter som nedenfor bestemt.

Efter sagens forløb og udfald skal indstævnte i sagsomkostninger for begge retter betale appellanten 100.000 kr. Beløbet dækker appellantens udgifter i to instanser til henholdsvis advokatbistand, retsafgift af det vundne beløb med i alt 20.520 kr. og 2.740 kr. + moms til dækning af udgifter til ekstrakt og materialesamling.

Indstævnte skal endeligt selv betale de af indstævnte afholdte udgifter til syn og skøn på i alt 22.493,13 kr.

## Thi kendes for ret:

*Indstævnte, Lærerstandens Brandforsikring G/S, skal til appellanten, A, betale 414.862,44 kr. med tillæg af procesrente af henholdsvis 354.190,57 kr. fra den 25. november 2005 og af 60.671,87 kr. fra den 16. oktober 2007, alt til betaling sker.*

*I sagsomkostninger for begge retter skal indstævnte betale 100.000 kr. til appellanten.*

*Det idømte betales inden 14 dage efter denne doms afsigelse.*

## Fodnoter