# Exhibit 7



London

This is to certify that the attached document is, to the best of my knowledge and belief a true, accurate and complete translation from Danish into English of the attached extract from U.2000.298H on Compensation for unjustified dismissal – No compensation granted for own termination of employment contract.

Yours sincerely,

Andrzej Orville

Senior Project Manager

Wednesday, January 22, 2025

Consortra Translations Ltd
Rex House,
4-12 Regent Street
London
SW1Y 4RG
UK

**U.2000.298H**

***Compensation for unjustified dismissal – No compensation granted for own termination of employment contract.***

*Employment and labour law 2.2, 272.1, 272.3 and 27.3 - Administration of Justice 21.1.*

♦ From 1977 to 1981, H and M, who were married, ran a business selling products to florists through a private limited company. After the company's bankruptcy, the business was taken over by another company, S, in which H and M were then employed. After a customer stated that she had bought goods from H without an invoice and paid H in cash, H was fired. Later that morning, M left the company, after which S announced that it considered this a breach of the employment contract, but took note of his unilateral termination of employment. At the same time, S reserved the right to claim damages from M. H and M both brought an action against S claiming damages for unjustified dismissal. The Court of Appeal stated that, at the time of the dismissal, H had not been made aware of the amounts that S had acquired or what documentation S had for his serious accusation against her. H was thus not informed of the identity of the customer who had made the statement to S until S filed a Statement of Defence during the trial. Under these circumstances, S had a very heavy burden of proof, and as it was not established with sufficient certainty that H had appropriated payments to S, and the dismissal was found unjustified. H, whose seniority was to be calculated from 1977, was therefore awarded compensation of approximately DKK 344,000.[1]

On the other hand, S was acquitted of M's claim, as it was proven that he had left the workplace without indicating that he would continue to make his labour available to M regardless of what had happened. S therefore had the discretion to perceive the situation in such a way that he had terminated the employment contract.[2] S was not successful in his independent claims against H and M. The Court of Appeal's Judgment was upheld by the Supreme Court on those grounds. On referral from the District Court, the case had been heard by the Court of Appeal as the first instance, as a trade union had acted as a representative for both of them during the case. The Supreme Court stated that H's and M's claims had not been raised by the "same party" and that the district court therefore did not have the legal authority under the Administration of Justice Act Section 227(1) to refer the case to the Court of Appeal. The case should therefore not have been heard by the Court of Appeal as first instance, cf. section 232.

**299**

**Supreme Court of Denmark (H.D.) November 3, 1999 in case II 89/1998**

*NPA Group A/S (adv. Ole Sigetty, Copenhagen)*
versus
*Kristelig Funktionær-Organisation as representative for H (adv. Søren Juhl, Copenhagen)*
versus
*Kristelig Funktionær-Organisation as representative for M (attorney Søren Juhl, Copenhagen)*
versus
*NPA Group A/S (counsel Ole Sigetty, Copenhagen).*

### Eastern Court of Appeal

***Eastern Court of Appeal judgment of February 5, 1998 (14th district)***

(Ebbe Christensen, Teilmann, Jytte Scharling).

The Complainants H and M, who are married, were until March 27, 1995 employed as salaried employees in the company run by the Respondent, NPA Group A/S, located at Grønttorvet 63-89, 2500 Valby. This case concerns whether the Respondent was entitled to dismiss H on March 27, 1995 and whether M breached his employment contract on the same day by leaving work.

*Claims:*

The Complainants submit the following claims:

Order the Respondent, NPA Group A/S, to pay to the Complainant (H) DKK 344,587 and to the Complainant M to pay DKK 391,197 together with interest from the institution of proceedings on July 13, 1995 until payment is made. The Respondent has claimed acquittal, or as an alternative against payment of a smaller amount to the Complainants determined at the court's discretion.

The Respondent has furthermore made the following independent claims: Order Complainant H to pay the Respondent, NPA Group A/S, DKK 14,032.25 and order Complainant M to pay the Respondent DKK 12,390, all with interest from December 8, 1995 until payment is made. The Complainants have claimed acquittal of the Respondent's independent claims.

The Complainants have summarised their claims as follows:

Complainant H:
*Section 3(2) of the Danish Salaried Employees Act, cf. section 2.*
| | |
|---|---:|
| 6 months' notice at DKK 23,300 incl. pension supplement | DKK 139,800.00 |
| *Section 2a reimbursement:* | |
| 2 months at DKK 23,000 incl. pension supplement | DKK 46,600.00 |
| *Section 2b reimbursement:* | |
| 6 months at DKK 23,300 incl. pension supplement. | DKK 139,800.00 |
| The first two days of unemployment at DKK 456 | DKK 912.00 |
| Holiday pay, 12 ½ % of the notice period of 139,800 | DKK <u>17,475.00</u> |
| In total | DKK <u>344,587.00</u> |

---

1   U 1988 160 H, Lars Svenning Andersen: Salaried employees law (Funktionærret), 2nd ed (1998), pp 573-576 and 607-610, H G Carlsen: Danish salaried employees law (dansk funktionærret), 6th ed, pp 251-255, and Ole Hasselbalch: employment law (Ansættelsesretten), 2nd edition (1977), pp 530-533

2   Lars Svenning Andersen: Salaried employees law (Funktionærret), 2nd ed (1998), pp 626-630, H G Carlsen: Danish salaried employees law (dansk funktionærret), 6th ed, pp 240 et seqq, and Ole Hasselbalch: employment law (Ansættelsesretten), 2nd ed (1977), p 533

Copyright© 2023 Karnov Group Denmark A/S                                                                                     1

Complainant M:
*Section 3(2) of the Danish Salaried Employees Act, cf. section 2:*

| | |
|---|---|
| 6 months' notice at DKK 24,780 incl. pension supplement | DKK 148,680.00 |
| *Section 2a reimbursement:* | |
| 3 months at DKK 24,780 incl. pension supplement | DKK 74,340.00 |
| *Section 2b reimbursement:* | |
| 6 months at DKK 24,780 incl. pension supplement. | DKK 148,680.00 |
| The first two days of unemployment at DKK 456 | DKK 912.00 |
| Holiday pay, 12 ½ % of the notice period at DKK 148,680 | DKK 18,585.00 |
| In total | DKK 391,197.00 |

The Respondent's independent claims constitute a claim for compensation pursuant to Section 4 of the Danish Salaried Employees Act corresponding to half a month's salary from each of the Complainants plus DKK 2,382.25 in respect of H as compensation for the amounts wrongfully obtained.

The parties agree on the quantification of the amounts in question.

*The circumstances of the case:*

The information in the case shows, among other things, that in the years 1977-1981, the Complainant M ran a business selling accessory products to florists. The business was run through a limited liability company called Prila Products ApS. However, the limited liability company was declared bankrupt, and the company's business was bought out of the bankruptcy estate by the Respondent in 1981. The Complainants were employed in the Respondent's company by employment contracts dated December 15, 1981. At the time of the dismissal, Complainant H worked as store manager in the Respondent's business at Grønttorvet 63-89. M worked as a bookkeeper in the company's office at the same location. Among other things, M shared an office with the Respondent's manager Finn Nørregaard Petersen and his partner Glenne Lindenstrøm. On Saturday March 25, 1995, Finn Nørregaard Petersen was called by an employee of the Respondent, Tom Kjær, who stated that he and another employee, Michael Andersen, believed that they had found that the Complainant H had failed to enter a sale on the cash register and had kept the payment himself. A meeting was held at the company to discuss the matter on Sunday morning. Finn Nørregaard Petersen, Glenne Lindenstrøm, Tom Kjær and Michael Andersen attended the meeting. Later that same day, a meeting was held with the customer whose payment the suspicion related to. The customer, Solvej Lund Larsen, signed the following statement at the meeting:

"...

**300**

The undersigned hereby acknowledges having purchased goods from H, employed by NPA Group, without account and paid cash to H. The settlement was only calculated on a calculator with a normal strip of paper, for which VAT was not calculated.

Solvej Lund Larsen.

..."

During the case, it was agreed that the statement was formulated by Finn Nørregaard Petersen. On Monday morning March 27, 1995 at approximately 05:00, Finn Nørregaard Petersen contacted the Complainants by telephone and informed H that she should not enter the company in future. M was asked by Finn Petersen to bring H's keys to the company. Later that morning, M left the company. During the proceedings, the parties disagree as to whether M left the company without authorisation or whether he had received the Respondent's permission to do so. The Complainants contacted their trade union organisation (Den Kristelige Fagbevægelse) the same morning, whose director wrote to the Respondent by fax the same day:

"...

With reference to the telephone conversation of today, I can hereby confirm that we look after the interests of H and M as both trade union organisations.

I have had a meeting with both of them today, during which I have been informed about H's dismissal by phone.

I hereby request information (in writing) about the reasons for this. We can confirm that M has been asked to take time off in week 13 at the company's expense. In this connection, I refer to section 3(1) of the Danish Salaried Employees Act.

As the trade union for both, we reserve the right to return to our members' claims with reference to the Danish Salaried Employees Act.

I look forward to receiving your written reply as soon as possible, but before Thursday March 30, 1995.

..."

The Respondent's manager replied the same day by fax:

"...

*About H & M*

In reference to our telephone conversation today, I enclose copies of our letters of today sent to your two members. We refer to the content of the letters and to our reservation regarding compensation.

As we have in the meantime received your fax today at 14:16, I can confirm that M has not been asked to take time off.

What has happened is stated in our letter of today's date to M, and your member has thus unilaterally terminated the employment relationship.

..."

The letter to H is worded as follows:

"...

*Expulsion*

With reference to a telephone conversation this morning at 5:05, we hereby confirm that we have dismissed you from your position at NPA Group A/S due to inaccuracies found with cash balance, cash vouchers and delivery notes, and because we have found that you have sold goods to customers without charging VAT and kept the money yourself without registering the sale in the cash register. We reserve the right to claim compensation.

As this is a serious accusation, we have of course investigated the matter thoroughly.

We have 4 witnesses as well as the customer you sold goods to last week without an invoice, where you kept the money yourself.

This person testified in writing yesterday, Sunday March 26, 1995 at 19:10, that it is correct what happened as stated above.

..."

It states in the letter to M:

"...

*Regarding the termination of your employment*

In continuation of what happened today in our office, where you unilaterally handed over your keys to the company and left the building after remarking that you had better quit immediately, we must inform you that we consider what happened to be a breach of contract on your

part, but that we have taken note of your unilateral termination of employment, but in this regard we must reserve the right to compensation.

Your employment has thus ended as of today ... "

The information in the case also indicates that the Respondent mainly sells products to wholesalers. In addition to cash sales in the Respondent's business, goods were also sold on credit. This was done to account customers who paid monthly. These credit sales were recognised in the cash register as credit sales. In addition, short-term credit was granted to regular customers. These credit sales were recorded by the Respondent's clerks on handwritten sheets of paper, often on so-called cash notes, which were also used to record cash sales on the cash register. For such credit sales, the handwritten notes were inserted into a binder in the store. When the customer paid, the amount was entered on the cash register on a machine-stamped cash note, and the first note was removed from the binder and either given to the customer or discarded. During the case, three handwritten *cash notes* labelled with the name Solvej Lund Larsen were presented as exhibits B, C and D.

*Explanations:*

During the proceedings, statements were made by the Complainants and by Mr Finn Nørregaard Petersen, Director, Glenne Lindenstrøm, Michael Andersen, Tom Kjær, Solvej Lund Larsen, Ib Artman and lawyer Ebbe Mogensen.

**301**

*Complainant H* has explained that she was employed as a shop assistant at Prila Products ApS, a company run by her husband M, on March 1, 1978. After the Respondent took over the company in 1981, she continued her previous work. The Respondent had several premises at the location at Grønttorvet. In 1994, she became store manager in the Respondent's large department, Grønttorvet 63-89. Her work consisted of sales and ensuring that there was an adequate range of goods in the store, as well as managing the other shop assistants. There were 6 store employees in the store. In the beginning, she had a good working relationship with manager Finn Nørregaard Petersen, but in later years she felt that the relationship deteriorated. It happened that the staff went behind her back to Mr Petersen. She had remarked this to Mr Petersen, who had said that it was better that she was unpopular, because he needed to stay on good terms with everyone. She has not received any criticism of her work, either verbally or in writing. Finn Nørregaard Petersen was familiar with the business procedures, including credit sales via notes in the binder. Solvej Lund Larsen had been a customer of the shop for a number of years. She taught flower arranging at evening schools and therefore shopped mainly during the evening school season. She bought accessories, which the students then bought from her. She therefore usually bought on credit at first and then paid when she had sold something. There were never any problems with payment. The Complainant regularly chatted with Solvej Lund Larsen, just as she chatted with other regular customers. It also happened that they occasionally went into the staff lunchroom and had a cup of coffee together. The Complainant remembers that Solvej Lund Larsen shopped in the store on Friday March 24, 1995. She does not remember whether she paid for goods that day or whether she had entered the lunchroom that day. She is sure that Solvej Lund Larsen did not pay in the lunchroom. She always paid at the cash register. The Complainant did not fail to enter payments on the cash register and did not keep payments herself. There was a calculator with a paper roll in the lunchroom. It is the witness who has written the handwritten *cash notes* presented as exhibits B, C and D, except for the total counts and dates. She first saw these documents and Solvej Lund Larsen's statement in December 1995. Due to the passage of time, she could not remember the circumstances around Solvej Lund Larsen's purchase according to the documents presented. The Complainant was unemployed for about a year after her dismissal. She got a new job in May 1996.

The Complainant further explained that there were three cash registers in the shop and two users for each cash register. The three cash registers each had two drawers. Her rule was to only use her register, but after closing time she might use someone else's register. You had to punch in a code, but the Complainant knew the other clerks' codes. She cannot remember whether she sold three boxes of flowerpots to Solvej Lund Larsen on March 24, 1995, or whether she sold anything at all to her on that day. *Complainant M* has explained that he and a partner started the company Prila Products ApS in 1977. He joined the company as an employee on June 1, 1977. The name Prila Products still functions as a pen name on the Respondent's letterhead. It was his spouse who answered the phone on the morning of 27 March. She was shocked to hear that Finn Nørregaard Petersen had told her not to come any more. The Complainant took over the conversation. Mr Petersen said that he was going to get his spouse's keys and come to the store with the keys. He drove to the business and parked in his usual spot. He arrived almost at the same time as Finn Nørregaard Petersen and Glenne Lindenstrøm. The Complainant put all the keys on Finn Nørregaard Petersen's desk. When Finn Nørregaard Petersen and Glenne Lindenstrøm came into the office shortly afterwards, he asked, "What does the company accountant say about the accountant's wife selling outside the cash register?" The Complainant asked if Finn Nørregaard Petersen felt that he should quit as well. Finn Nørregaard Petersen simply asked if he had not heard what he had said and repeated the sentence. The Complainant asked to see evidence for the claim. Finn Nørregaard Petersen denied him this. He asked again, and Glenne Lindenstrøm was about to take something out of her bag, but was stopped by Finn Nørregaard Petersen. The Complainant wanted to go home and talk to his spouse. Glenne Lindenstrøm then said "then we'll say that you're on holiday until further notice". The Complainant took his briefcase and walked out of the office. Finn Nørregaard Petersen followed him and said he wanted the company documents that the Complainant had in his briefcase. The Complainant gave him the papers. The same day, the Complainant contacted his trade union. The Complainant understood the situation to mean that he needed to go home to talk to his spouse, consider the situation and then return to the company. The company's practice of selling on credit and recording them on loose notes was not sound accounting. He had suggested to Finn Nørregaard Petersen to acquire a new system where credit sales were registered at the same time as the goods were withdrawn from the warehouse. However, this had not been implemented. The Complainant was unemployed until he started a new business with an entrepreneurial allowance as of 1 January.

September 1, 1996.

**302**

*Finn Nørregaard Petersen* has testified that he is the manager of the Respondent's company and owns share capital. He first heard about the suspicion against H, when an employee, Tom Kjær, called him at home on Saturday March 25, 1995 in the evening. The witness wanted to see evidence of the suspicion and agreed that he and Glenne Lindenstrøm would meet on Sunday morning with Tom Kjær and Michael Andersen. At the meeting, Michael Andersen presented some *cash notes* regarding credit sales to Solvej Lund Larsen that he had found in a rubbish bin. At the meeting, they went through the receipt rolls from the cash registers regarding the sales between 21 and March 25, 1995 without being able to find cash entries that corresponded to these credit notes. Michael and Tom said that they had seen the notes in the credit sales folder on Friday morning and that they had been removed on Friday. They had observed that Solvej Lund Larsen had not paid at the checkout on Friday. They agreed to contact Solvej Lund Larsen and drove to her home. However, she was not at home and it was agreed that Tom and Michael would try to meet her later that evening. On Sunday evening, Tom and Michael him and told him that they had now met Solvej Lund Larsen, who wanted the witness to be present. They then met at Hotel Scandic in Glostrup. The

witness brought the statement of March 26, 1995, the first part of which Glenne Lindenstrøm had written according to his dictation. After discussions with Solvej Lund Larsen, he added the last sentence to the statement, and Solvej Lund Larsen signed the statement. She told him that she had been given a slip of paper at her purchase, a receipt from a calculator. He did not threaten to report her to the police. Solvej Lund Larsen seemed like a very delicate person. Later that evening, the witness called the company's lawyer, Ebbe Mogensen, who said it was important to have evidence and told him to call the office the following day.

On Monday morning, the witness called H and told her not to come to work anymore. H denied having taken money from the company. The witness told M to bring H's keys to the office. There was no question of M quitting. When the witness and Glenne Lindenstrøm arrived at the store, they noticed that M had already arrived. His car was parked near some rubbish bags. M was standing by the rubbish bags himself. It was not his usual parking spot. The witness and Glenne Lindenstrøm entered the business first. M came after a few minutes and said that he wanted a clarification. The witness replied that H had put money in his pocket and that he had written proof. M asked to see this. Glenne Lindenstrøm was about to take Solvej Lund Larsen's statement out of her bag, but the witness said that M should not see it. The witness thought that the lawyer should take a position on this. M then went to the witness' desk, where he threw both his own and H's keys onto the desk and said that he had to stop. The witness asked to get this in writing, but M simply replied that he would not get any more in writing from him than he had received when he was hired. For no reason at all, M took a lot of thousand-kroner notes out of his pocket and said that he also had a lot of money in his pocket. M then left the office. The witness asked for the company's papers and got them in a room outside the office. It was clear that M was leaving the company for good. In the morning, the witness was called by an employee from the trade union. The witness stated that he had nothing to talk to the union about. The witness contacted Mr Mogensen's office. On the same day, he also received a fax dated 27 March from the union. It is the witness who wrote the letters of March 27, 1995 to M and H. The lawyer had approved the wording. The credit sales system still exists. It has not given rise to any problems apart from this case.

**303**

*Glenne Lindenstrøm* testified as a witness that she is employed as a bookkeeper by the Respondent. She attended the meeting on Sunday morning, where they reviewed the receipt rolls from the cash registers and realised that the notes that Michael had found in the waste bags had not been entered into the cash register. When she and Finn Nørregaard Petersen arrived at the company on Monday morning, she noticed that M was parked by the rubbish containers, which was not his usual parking spot. The witness has explained the course of the discussion between Finn Nørregaard Petersen and M in accordance with the witness Finn Nørregaard Petersen. The witness was sure that M left so as not to return. The witness did not say anything about holidays. Others have been employed in H and M's place.

*Michael Andersen* has testified that he has been employed as a clerk at the Respondent's business for 15 years. In 1995, H was his immediate superior. They had excellent cooperation. Solvej Lund Larsen regularly made purchases in the shop. She was usually served by H. They liked to go into the lunchroom and drink coffee for a quarter to half an hour. This was not a common practice in the company and was annoying, as it took place in the middle of the busy period. The clerks in the store had started talking about how they never saw Solvej Lund Larsen pay for the goods she bought. They therefore decided to keep her under observation. On Monday the March 20, 1995, the witness went through the credit note binder. The notes, exhibits B, C and D, were in the folder. The same was the case on the Wednesday when Solvej Lund Larsen made a purchase in the shop. Solvej Lund Larsen also shopped there on Friday March 24, 1995. The witness noted that the 3 documents were in the binder when Solvej Lund Larsen and H went down to the lunchroom. The witness had previously kept Solvej Lund Larsen under observation and noticed that she had not paid at the cash register. When Solvej Lund Larsen came out of the lunchroom, she went directly to her car without paying. An hour later, the witness realised that documents B, C and D had now been removed from the binder. The witness checked the rubbish bags and found the three vouchers in one of the rubbish bags. They were neatly folded. The witness counted through the notes to see if the amount had been entered on the cash register. The witness applied the total count to the notes and wrote the date found of 24 March on one of the notes. The witness and Tom Kjær went through the cash register rolls and checked that the amount had not been entered. Tom had to go to work on Saturday, and the witness asked him to go through the rolls from the cash register again. When the witness and Tom Kjær met Solvej Lund Larsen at her home on Sunday afternoon, they told her that they could not get the cash register amounts to agree for Friday's sales. They asked if she had receipts for her Friday purchase. She first said that she did and started looking, but then said that she had only received a receipt strip from the calculator in the lunchroom and could not find it. She stated that she had paid approximately DKK 2,500 to H. The witness noted that there were several documents from one of the Respondent's competitors at Grønttorvet on the sofa table, just as there were many items from the Respondent in the living room. Solvej Lund Larsen said that she was well aware that she had not paid VAT, but maintained that she had paid for the goods. The witness did not threaten Solvej Lund Larsen with a denouncement to the police. He calmly told her that if she would not admit that she had not received a cash receipt, they would have to report her to the police. At the subsequent meeting at the Scandic Hotel, Solvej Lund Larsen admitted to Finn Nørregaard Petersen that she could see that it was a problem that she had not received a cash receipt with a cash stamp, but she maintained that she had paid for the goods. The addition on the voucher, which Solvej Lund Larsen signed, was due to Solvej Lund Larsen's information about the context of the case. The witness has further explained that he has reviewed the rolls from the cash register used by H on March 24, 1995 and the two other cash registers without being able to find an entry for an amount corresponding to Solvej Lund Larsen's statement about her purchase of 2 or 3 boxes of flowerpots.

*Tom Kjær* testified that he had been employed in the Respondent's store for 14 years. The employees had wondered why they never saw the cash register being used when H sold to Solvej Lund Larsen. On Friday March 24, 1995, Solvej Lund Larsen arrived at around 08:45 to make a purchase. She picked up the goods herself and carried them a few times to her car. The witness asked if she was being served, and Solvej Lund Larsen said yes. When she came in from the car for the last time, she went with H into the lunchroom. At this point, she had not paid at the cash register. When H and Solvej Lund Larsen came out of the lunchroom, they stood talking for about ten minutes at the cash register. Solvej Lund Larsen then left. The witness went to lunch with H at about 09:30. When they returned to the shop at about 10:00, Michael said that the vouchers were still there. Later that day, the witness and Michael Andersen realised that the notes were gone. Michael found them in a rubbish bag. They did not check the cash register rolls on Friday, but the witness reviewed the rolls on Saturday morning. About the meeting with Solvej Lund Larsen on Sunday, the witness has essentially explained in accordance with the witness Michael Andersen. The witness explained that Solvej Lund Larsen said she had paid DKK 2,500 to H on Friday. The payment had been made in the lunchroom, and she had received a receipt from a calculator. There was no mention of a police report.

*Solvej Lund Larsen*, who has testified as a witness without criminal liability, has explained that she has been buying from the Respondent for several years. If she did not pay immediately, the purchase was written

in a book at the cash register. When she paid later, the amount was entered on the cash register and the purchase voucher was thrown out. She has always paid at the checkout and not in the lunchroom. On Friday 24 March, as far as she remembers, she bought 2 or 3 boxes of flowerpots for a total of around DKK 500. She paid at the checkout before she and H went downstairs for coffee. She does not remember if she got a receipt. On Sunday afternoon, she was approached at her home by Tom and Michael, whom she knew from the shop. They presented her with two notes for credit purchases that they had found in the rubbish bin and which were not registered in the cash register. She had paid for these items. She could not find the receipts. During the court hearing, the witness was shown exhibits B, C and D and explained that she had not seen these before. She has received what is stated in exhibits B and D and has paid for it. However, exhibit C has nothing to with her, as no price is stated on it. She paid for the goods listed on exhibits B and D in February or March. There were two other bills that she was shown on Sunday. It is true that there were some bills from other companies at Grønttorvet in her apartment. These are goods she buys for some courses, where she gets money for three months' purchases and then settles afterwards. Tom and Michael asked her to sign that she had paid. She did not want to do this, as she could not see the reason for doing so, as she had paid. It was the witness who wanted a meeting with Finn Nørregaard Petersen. He asked her to confirm that she had paid with her signature. She felt pressurised in the end and just wanted to go home.

**304**

She signed the declaration of March 26, 1995 without reading it. Finn Nørregaard Petersen wrote something else during the meeting. As she had no proof that she had paid, she asked if the amount could have been entered somewhere other than the cash register. This is exactly what it says on the voucher. The witness has further explained that Finn Nørregaard Petersen called her to a meeting on the Friday before the court hearing. When she arrived, Finn, Michael and Tom were present. Finn began by telling her that she had paid in the lunchroom. The witness said that she had not, and immediately left the meeting.

*Ib Artmann*, who has testified as a witness without criminal liability, has explained that he has been buying from the Respondent for a number of years. He has never bought goods without using the cash register and has never traded with H without getting a receipt. When the business moved to the larger premises a few years ago, a number of items were sold in a kind of warehouse sale. One lot of goods was offered for DKK 1500. The witness offered 1000 DKK. H accepted this, saying that she should also get a silk jacket from the witness, which she did.

*Attorney Ebbe Mogensen* has testified that he first heard about the case on Sunday March 26, 1995 when he was called at his private residence by Finn Nørregaard Petersen. At the time, the witness was an attorney for the Respondent. Finn Nørregaard Petersen told him that he had been told by some employees that H was suspected of having taken money from the till. The witness said that in such cases it was important to obtain evidence and, if possible, a confession, but also referred Finn Nørregaard Petersen to contact the office again on Monday. During the conversation, there was only talk about H, not M.

On Monday March 27, 1995, Finn Nørregaard Petersen called immediately after the office phones opened at 10:00. The witness was in court and did not return until around 13:30, but Finn Nørregaard Petersen spoke to the witness's wife and partner, attorney Anette Mogensen. When the witness returned, Anette Mogensen said that Finn Nørregaard Petersen had seemed "disturbed" and agitated. He had said that M had thrown keys at his head. Shortly after the witness returned, he called Finn Nørregaard Petersen. He could sense that he was angry. Finn Nørregaard Petersen said M had thrown the company's keys on the table in front of him and had left the company. After the conversation with Finn Nørregaard Petersen, it was the witness' opinion that M's behaviour was obviously a sign of quitting, where he left the company in anger and never showed himself again. They had talked about dismissing M, but the witness found it unnecessary. Not much was said about H's contract during the conversation. They had received a statement from a customer and she had been dismissed on Monday morning.

*The parties' procedural presentations:*

In support of her claim, Complainant H has argued that she has not misappropriated money from the Respondent. It is not disputed that this would be grounds for dismissal, but it is submitted that the Respondent has a strict burden of proof that this was the case. The Respondent has not met this burden of proof. The Complainant's explanation has been coherent and credible throughout the case, the witness statements from Tom Kjær and Michael Andersen are inconsistent, e.g. regarding the question of when the cash register rolls registers were compared with the credit notes from Solvej Lund Larsen, and regarding the question of whether Solvej Lund Larsen was threatened with being reported to the police. Solvej Lund Larsen's statement supports the Complainant's statement. It must be given decisive weight that she has explained that she did not pay for the goods mentioned in exhibits B, C and D on March 24, 1995, and that she never paid H in the lunchroom and received a receipt in the form of a strip of paper from a calculator. Regarding the circumstances surrounding the witness' signing of the statement prepared by Finn Nørregaard Petersen, the witness' statement must be accepted.

In support of her claim, the Complainant further submits that the Respondent did not give her sufficient opportunity to defend her interests. The Respondent did not immediately present her with the accusations and the documentation thereof and thereby deprived the Complainant of the opportunity to explain herself while she still had the opportunity to recall what had happened. M asked to see the Respondent's documentation on March 27, 1995. The Respondent refused to do so. Thus, it was not until December 1995, approximately three-quarters of a year after the expulsion, that the Complainant heard of the basis for the suspicion against her. Finally, it is submitted that the Respondent's routines for using cash registers is not suitable for a clear and secure identification of the payments and that the Respondent has therefore prevented a reassuring and proper control, which was detrimental to the Respondent.

**305**

Complainant M, who recognises that a definitive absence from work would constitute a breach of contract, submits that he did not leave work without permission. The Complainant's explanation that he had been authorised to take time off must be accepted. It is therefore undisputed that it was on Finn Nørregaard Petersen's initiative that the Complainant handed in the company's documents. On the same day, the Complainant has always expressed the position in writing to the Respondent. The Respondent cannot rely on a possible spontaneous statement the Complainant, bearing in mind that the Complainant's spouse had just been expelled. It is submitted that the risk of any misunderstanding between the parties must be borne by the Respondent. The Complainant had worked loyally for the company for 18 years and his position was clarified by the trade union's fax that very morning.

Regarding the calculation of their claim, the Complainants have referred to their very long-term employment with the company and the nature of the accusation levelled against H. It is argued that the period of employment must be counted from the first employment in Prila Products ApS. It is disputed that they are at fault.

In support of its claim for acquittal with regard to H's claim, the Respondent has argued that the witness statements together with the discovery of the credit sales notes, without the amount having been entered in the cash register, have documented that H has misappropriated payments to the company. It is striking that H has not been able to remember anything specific from her last working day. It is claimed that the Respondent's director carried out thorough

investigations before he proceeded to dismiss H. The receipt rolls were carefully reviewed, and Solvej Lund Larsen was visited as a precaution. It is further argued that no weight can be attached to Solvej Lund Larsen's statement during the court hearing, as the statement was made without the risk of criminal liability. On the other hand, her statement of March 26, 1995 must be given considerable probative value, as this statement was made in immediate connection with the course of events. It is disputed that it can be given weight that the Complainant was not immediately confronted with the amounts she had appropriated. There is no legal requirement to do so, and it is irrelevant to the Complainant's legal position, as it has not prevented her from protecting her interests.

In support of Complainant's claim, the Respondent argued that it must be assumed from the Complainant's behaviour that he had quit his job. The Respondent was therefore entitled to refuse to accept his labour. It is possible that the Complainant has subsequently regretted his behaviour, but this does not change the fact that the Complainant has breached the terems of employment. Finn Nørregaard Petersen's explanation has on the whole seemed credible and is supported by attorney Ebbe Mogensen's explanation and the other available information.

In support of the claim in the alternative, the Respondent has argued, in respect of both Complainants, that the employment must be counted from the signing of the employment contract of December 15, 1981 and that the Complainants had therefore been employed for 13 years and 4 months in the company when employment ended. It is disputed that employment before this time can be attributed significance, as the Complainant M had worked as a manager in his own company and therefore had no functional status. It is further argued that the compensation must be reduced as both Complainants have shown a significant degree of fault.

In support of the independent claim, the Respondent has claimed that the Complainants, as having been dismissed with good cause and having left employment unjustifiably under Section 4 of the Danish Salaried Employees Act, respectively are obliged to pay compensation equivalent to half a month's salary.

**The Court of Appeal's comments:**

Regarding H.

Two members of the court - judges Ebbe Christensen and Jytte Scharling - stated:

At the time of her expulsion on 27 March, Ms H was not informed of the amounts which, according to the Respondent, she had acquired or what documentation the Respondent had for its serious allegations against the Complainant. The Complainant was thus not informed of the identity of the customer whose payment she had allegedly misappropriated. The Complainant's spouse, who must be considered to have acted in the legitimate interest of the Complainant, asked the same day to be informed of the documentation, but was refused. It must be assumed that the identity of the customer and his statement of 26 March were not made known to the Complainant until the Respondent's reply of December 7, 1995. By not immediately informing the Complainant of the specific basis for the suspicion against her, the Respondent is found to have prevented the Complainant from protecting her interests, including from explaining the circumstances surrounding her use of cash registers by Solvej Lund Larsen while these were fresh in her mind.

Under these circumstances, the Respondent must bear a very heavy burden of proof. Considering the testimony of the witness Solvej Lund Larsen during the court hearing, including her explanation of the circumstances surrounding her signing of the declaration drafted by the witness Finn Nørregaard Petersen, the Respondent is found NOT to have proved with sufficient certainty that the Complainant has misappropriated payments to the Respondent. The dismissal is therefore found to have been unjustified.

As a result of that stated above, these judges find that the Complainant is entitled to salary during the notice period and compensation pursuant to sections 2a and 2b of the Danish Salaried Employees Act as claimed. It was noted that no objection has been raised in the correspondence that the Complainant's seniority should be calculated from her employment date with Prila Products ApS on March 1, 1978, and that the evidence presented during the court hearing does not lead to any other result. There is no basis for reducing the compensation due to the Complainant's own fault.

**306**

Consequently, the Complainant's independent claim must also be dismissed.

District Judge Teilmann states:

Based on the evidence, including the statements given by the witnesses Tom Kjær and Michael Andersen, I find that the witnesses kept the Complainant under observation in the week leading up to the expulsion and that they established that the credit sales slips, exhibits B, C and D, were in the credit sales binder until Friday March 24, 1995 and that they were removed from the binder and found in the bin after Solvej Lund Larsen had left the shop that day. I also put to reason that the witnesses kept an eye on Solvej Lund Larsen during her visits to the shop during the week and that they established that she did not pay at the cash register during these visits. A review of the receipt rolls for the cash register entries on the Complainant's cash register on March 24, 1995 has not revealed any entries corresponding to the goods or the amounts mentioned on the receipts, or any entries that could support Solvej Lund Larsen's explanation that she bought and paid for flowerpots for approximately DKK 500 that day. Accordingly, and in view of the declaration signed by Solvej Lund Larsen and the fact that on March 26, 1995 she could not produce a receipt for her purchases on March 24, 1995, I am satisfied that the Complainant has obtained payment from Solvej Lund Larsen.

The dismissal has therefore been justified and I therefore vote in favour of acquitting the Respondent of this Complainant's claim and to order her to pay the Respondent the amount according to the independent claim.

About M.

Two members of the court - judges Ebbe Christensen and Teilmann - state:

It must be assumed that the Complainant left the workplace on March 27, 1995 after handing in both the spouse's and his own keys. If the Complainant understood the situation to mean he was entitled to take time off until further notice at the company's expense in order to consider his position, it was incumbent on him, after he and the trade union had received the Respondent's letters of March 27, 1995, to indicate that he would continue to make his labour available to the Respondent regardless of what had happened. By not responding in this way, the Complainant is found to have given the Respondent the opportunity to perceive the situation to mean that the Complainant had terminated the employment relationship. We therefore vote in favour of dismissing the Respondent's claim.

The Complainant's failure to give notice as stated above is not found to be a breach of such a nature that it entitles the Respondent to compensation under Section 4 of the Danish Salaried Employees Act. The claim should therefore be dismissed.

District Judge Jytte Scharling states:

According to the testimony of the witness Finn Nørregaard Petersen, supported by the testimony of attorney Ebbe Mogensen, I find that the witness perceived the Complainant's statements and actions at the meeting on the morning of March 27, 1995 as an indication that the Complainant was definitely leaving his employment. According to the Complainant's explanation, I also assume that the Complainant had been given the impression he could leave the workplace with the

Respondent's permission. It was thus on Finn Nørregaard Petersen's initiative, and not at the Respondent's request, that the Complainant handed in the company's documents. Thus, a misunderstanding had arisen between the Complainant and the Respondent. Considering the circumstances under which the Complainant left the company, including that the Complainant's spouse had just been dismissed and that Finn Nørregaard Petersen had refused to present his documentation for the grounds for dismissal, as well as the fact that the Complainant's trade union immediately on the same day expressed the Complainant's view of the course of events, the Respondent is found to be the closest to bear the risk for the misunderstanding that arose. By maintaining that the Complainant had terminated the employment relationship and thereby refusing the Complainant to return to work, the Respondent is found to have breached the employment agreement with the Complainant. As a result of the above, I find that the Complainant is entitled to salary during the notice period and compensation in accordance with the Danish Salaried Employees Act, sections 2a and 2b as alleged.

It should be noted that no objection has been raised in the exchange of pleadings against the Complainant's seniority being calculated from his employment with Prila Products ApS on March 1, 1978, and that the evidence presented during the court hearing is not likely to lead to a different result. There is no basis for reducing the compensation due to the Complainant's own errors.

Judgment shall be given in favour of both Complainants by a majority of votes.

- - -

Neither party shall pay the legal costs to the other party.


**307**
**Supreme Court**

**Supreme Court Ruling.**

In the previous instance, a ruling was handed down by the 14th division of the Eastern Court of Appeal on February 5, 1998.

Five judges participated in the ruling: Hornslet, Poul Sørensen, Melchior, Asbjørn Jensen and Søgaard.

The ruling was appealed by NPA Group A/S against the trade union, Kristelig Funktionær-Organisation, the as representative of H and by the trade union Kristelig Funktionær-Organisation, as the representative of M, against NPA Group A/S.

NPA Group A/S has repeated its claims against H and has also made a subsidiary claim for payment of a small amount in respect of the independent claim for damages.

Kristelig Funktionær-Organisation, as the representative of H, has claimed confirmation.

Kristelig Funktionær-Organisation as representative of M has withdrawn its claim.

NPA Group A/S has claimed confirmation against M.

NPA Group A/S has not disputed before the Supreme Court that H's and M's seniority should be calculated from June 1, 1977 and March 1, 1978, respectively.

The letter of March 27, 1995 from NPA Group A/S to M, reproduced in the ruling, was responded to by Kristelig Funktionær-Organisation in a letter dated April 6, 1995 in which the organisation stated, among other things:

"As the case is presented to us, on the morning of March 27, 1995, M was informed by you that he was to take time off, which was interpreted as holiday days at your expense.

Your interpretation in the following letter of March 27, 1995 does not match our information, and we can only see it as an unjustified dismissal. … "

It appears from the case that it was originally brought before the Copenhagen City Court. On November 9, 1995, pursuant to an application under Section 227(1) of the Danish Administration of Justice Act, the City Court referred the case to the Court of Appeal on the grounds that *the case concerns a claim with a financial value exceeding DKK 500,000.*

New explanations have been submitted to the Supreme Court.

**The Supreme Court's comments.**

H's and M's claims were both under the current Court of Appeal jurisdiction, and the fact that Kristelig Funktionær-Organisation acts as agent for both of them does not mean that the claims are raised by "the same party", see the second sentence of Section 228(1). The District Court was therefore not authorised to refer the case to the Court of Appeal pursuant to Section 227(1) of the Administration of Justice Act. It should therefore not have been heard by the Court of Appeal as first instance; see Section 232. As regards H, the Supreme Court agrees for the reasons stated by the Court of Appeal that the expulsion was unjustified.

As there is no basis for reducing the amount awarded to her, the Supreme Court upholds the Judgment in the relationship between NPA Group A/S and H.

For the reasons stated by the Court of Appeal, the Supreme Court also upholds the Judgment in the relationship between NPA Group A/S and M.

**The Judgment of the Court:**

*The Court of Appeal's Judgment is upheld.*

*Neither party shall pay the other party's legal costs before the Supreme Court.*

*The amount ordered must be paid within 14 days of publishing the ruling by this Supreme Court.*

**U.2000.298H**

*Erstatning for uberettiget bortvisning. - Ikke erstatning for egen ophævelse af ansættelsesforholdet.*

*Ansættelses- og arbejdsret 2.2, 272.1, 272.3 og 27.3 - Retspleje 21.1.*

♦ H og M, der var ægtefæller, drev fra 1977 til 1981 gennem et anpartsselskab en virksomhed med salg af produkter til blomsterhandlere. Efter selskabets konkurs blev virksomheden overtaget af et selskab S, som H og M derefter blev ansat i. Efter at en kunde havde afgivet en erklæring om, at hun havde købt varer af H uden regning og betalt kontant til H, blev denne bortvist. Senere samme morgen forlod M virksomheden, hvorefter S meddelte, at man betragtede dette som en misligholdelse af ansættelsesforholdet, men tog hans ensidige ophævelse af ansættelsesforholdet til efterretning. Samtidig forbeholdt S sig ret til at kræve erstatning hos M. H og M anlagde begge sag mod S med påstand om erstatning for uberettiget bortvisning. Landsretten udtalte, at H ved bortvisningen ikke var blevet gjort bekendt med, hvilke beløb hun efter S's opfattelse havde tilegnet sig, eller hvilken dokumentation S havde for sin alvorlige beskyldning mod hende. H fik således ikke oplyst identiteten på den kunde, der havde afgivet erklæringen over for S, før S afgav svarskrift under retssagen. Under disse omstændigheder påhvilede der S en særdeles tung bevisbyrde, og da det ikke fandtes godtgjort med tilstrækkelig sikkerhed, at H havde tilegnet sig betalinger til S, blev bortvisningen fundet uberettiget. H, hvis anciennitet skulle beregnes fra 1977, fik derfor tilkendt en erstatning på ca. 344.000 kr.[1] Derimod blev S frifundet for M's krav, idet det blev lagt til grund, at han havde forladt arbejdspladsen uden at tilkendegive, at han uanset det passerede fortsat stillede sin arbejdskraft til rådighed for S. S havde derfor haft føje til at opfatte situationen således, at han havde ophævet ansættelsesforholdet.[2] S fik ikke medhold i sine selvstændige krav mod H og M. Landsrettens dom blev stadfæstet af Højesteret i henhold til grundene. Efter henvisning fra byretten var sagen blevet pådømt af landsretten som 1. instans, idet en faglig organisation havde optrådt som mandatar for dem begge under sagen. Højesteret udtalte, at H's og M's krav ikke havde været rejst af »samme part«, og at byretten derfor ikke havde haft hjemmel til i medfør af retsplejelovens § 227, stk. 1, at henvise sagen til landsretten. Sagen burde derfor ikke have været påkendt af landsretten som 1. instans, jf. § 232.

**299**

**H.D. 3. november 1999 i sag II 89/1998**

*NPA Group A/S (adv. Ole Sigetty, Kbh.)*
mod
*Kristelig Funktionær-Organisation som mandatar for H (adv. Søren Juhl, Kbh.)*
og
*Kristelig Funktionær-Organisation som mandatar for M (adv. Søren Juhl, Kbh.)*
mod
*NPA Group A/S (adv. Ole Sigetty, Kbh.).*

## Østre Landsret

### Østre Landsrets dom 5. februar 1998 (14. afd.)

(Ebbe Christensen, Teilmann, Jytte Scharling).

Sagsøgerne H og M, der er ægtefæller, var indtil den 27. marts 1995 ansat som funktionærer i den af sagsøgte, NPA Group A/S, drevne virksomhed, beliggende Grønttorvet 63-89, 2500 Valby. Denne sag drejer sig om, hvorvidt sagsøgte den 27. marts 1995 var berettiget til at bortvise H, og om M samme dag misligholdt sin ansættelsesaftale ved at forlade sit arbejde.

*Påstande:*

Sagsøgerne har nedlagt følgende påstande:

Sagsøgte, NPA Group A/S, tilpligtes til sagsøger H at betale 344.587 kr. og til sagsøger M at betale 391.197 kr. alt med procesrente fra sagens anlæg den 13. juli 1995, til betaling sker.

Sagsøgte har påstået frifindelse, subsidiært mod betaling af mindre beløb til sagsøgerne fastsat efter rettens skøn.

Sagsøgte har endvidere nedlagt følgende selvstændige påstande:

Sagsøger H tilpligtes at betale til sagsøgte, NPA Group A/S, 14.032,25 kr. og sagsøger M tilpligtes at betale til sagsøgte 12.390 kr. alt med procesrente fra den 8. december 1995, til betaling sker.

Sagsøgerne har påstået frifindelse over for sagsøgtes selvstændige påstande.

Sagsøgerne har opgjort deres krav således:

Sagsøger H:

*Funktionærlovens § 3, stk. 2, jf. § 2.*

| | |
|---|---:|
| 6 måneders opsigelse a kr. 23.300 inkl. pensionstillæg | kr. 139.800,00 |
| *§ 2 a godtgørelse:* | |
| 2 måneder a kr. 23.000 inkl. pensionstillæg | kr. 46.600,00 |
| *§ 2 b godtgørelse:* | |
| 6 måneder a kr. 23.300 inkl. pensionstillæg | kr. 139.800,00 |
| De to første ledighedsdage a kr. 456 | kr. 912,00 |
| Feriepenge, 12 ½ % af opsigelsesvarslet på 139.800 | kr. 17.475,00 |
| I alt | kr. 344.587,00 |

---

[1] U 1988.160 H, Lars Svenning Andersen: Funktionærret, 2. udg. (1998), s. 573-576 og 607-610, H.G. Carlsen: Dansk funktionærret, 6. udg., s. 251-255, og Ole Hasselbalch: Ansættelsesretten, 2. udg. (1977), s. 530-533.

[2] Lars Svenning Andersen: Funktionærret, 2. udg. (1998), s. 626-630, H.G. Carlsen: Dansk funktionærret, 6. udg., s. 240 ff, og Ole Hasselbalch: Ansættelsesretten, 2. udg. (1977), s. 533.

Sagsøger M:

*Funktionærlovens § 3, stk. 2, jf. § 2:*

| | |
|---|---:|
| 6 måneders opsigelse a kr. 24.780 inkl. pensionstillæg | kr. 148.680,00 |
| *§ 2 a godtgørelse:* | |
| 3 måneder a kr. 24.780 inkl. pensionstillæg | kr. 74.340,00 |
| *§ 2 b godtgørelse:* | |
| 6 måneder a kr. 24.780 inkl. pensionstillæg | kr. 148.680,00 |
| De to første ledighedsdage a kr. 456 | kr. 912,00 |
| Feriepenge, 12 ½ % af opsigelsesvarslet på kr. 148.680 | kr. 18.585,00 |
| I alt | kr. 391.197,00 |

Sagsøgtes selvstændige påstande udgør krav på erstatning i henhold til funktionærlovens § 4 svarende til en halv månedsløn fra hver af sagsøgerne med tillæg for så vidt angår H af 2.382,25 kr. som erstatning for de uretmæssigt oppebårne beløb.

Parterne er enige om den talmæssige opgørelse af de omhandlede beløb.

*Sagens omstændigheder:*

Det fremgår af sagens oplysninger blandt andet, at sagsøgeren M i årene 1977-1981 drev en virksomhed med salg af accessoriske produkter til blomsterhandlere. Virksomheden blev drevet gennem et anpartsselskab kaldet Prila Products ApS. Anpartsselskabet blev imidlertid taget under konkursbehandling, og den af selskabet drevne virksomhed blev i 1981 købt ud af konkursboet af sagsøgte. Sagsøgerne blev ansat i sagsøgtes virksomhed ved ansættelsesaftale af 15. december 1981. Sagsøgeren H arbejdede ved bortvisningen som butikschef i sagsøgtes virksomhed på Grønttorvet 63-89. M arbejdede som bogholder i virksomheden på dennes kontor samme sted. M delte blandt andet kontor med sagsøgtes direktør Finn Nørregaard Petersen og dennes samleverske Glenne Lindenstrøm.

Lørdag den 25. marts 1995 blev direktør Finn Nørregaard Petersen ringet op af en medarbejder hos sagsøgte, Tom Kjær, der oplyste, at han og en anden medarbejder, Michael Andersen, mente at have konstateret, at sagsøgeren H havde undladt at slå salg ind på kasseapparatet og selv havde beholdt betalingen. Søndag formiddag blev der afholdt et møde i virksomheden til drøftelse af forholdet. I mødet deltog Finn Nørregaard Petersen, Glenne Lindenstrøm, Tom Kjær og Michael Andersen. Senere samme dag blev der holdt et møde med den kunde, hvis betaling mistanken vedrørte. Kunden, Solvej Lund Larsen, underskrev på mødet sålydende erklæring:

» . . .

Undertegnede erkender hermed, at have købt varer af H, ansat hos NPA Group, uden regning og

**300**

betalt kontant til H. Kun afregning på en regnemaskine m normal strimmel som der ikke er beregnet moms af.

Solvej Lund Larsen.

. . . «

Der er under sagen enighed om, at erklæringen er formuleret af Finn Nørregaard Petersen.

Mandag morgen den 27. marts 1995 ca. kl. 5.00 kontaktede Finn Nørregaard Petersen telefonisk sagsøgerne og meddelte H, at hun ikke skulle møde i virksomheden fremover. M blev af Finn Petersen bedt om at medbringe Hs nøgler til virksomheden. Senere samme morgen forlod M virksomheden. Der er under sagen uenighed mellem parterne om, hvorvidt M uberettiget forlod virksomheden, eller om han havde fået sagsøgtes tilladelse hertil. Sagsøgerne kontaktede samme morgen deres faglige organisation, Den Kristelige Fagbevægelse, hvis forretningsfører samme dag ved telefax skrev således til sagsøgte:

» . . .

Under henvisning til telefonisk samtale d.d. kan jeg hermed bekræfte at vi varetager H og M's interesse som begges faglige organisation.

Jeg har d.d. haft møde med begge, hvorunder jeg er blevet orienteret om H's telefoniske bortvisning.

Jeg beder hermed om orientering (skriftlig) om begrundelse herfor.

Vi kan bekræfte at M er blevet bedt om at holde fri i uge 13 for firmaets regning. Jeg henviser i den forbindelse til funktionærlovens bestemmelser § 3 stk. 1.

Som faglig organisation for begge forbeholder vi vor ret til at vende tilbage for så vidt angår vore medlemmers krav under henvisning til funktionærloven.

Jeg imødeser Deres skriftlige svar hurtigst muligt, dog inden torsdag den 30. marts 1995.

. . . «

Sagsøgtes direktør besvarede samme dag henvendelsen ved sålydende telefax:

» . . .

*Vedr. H & M*

I fortsættelse af vor telefonsamtale i dag fremsender jeg vedlagt kopier af vore breve af d.d. til Deres 2 medlemmer. Vi henviser til brevenes indhold og til vort forbehold om erstatning.

Da vi i mellemtiden har modtaget Deres faxskrivelse i dag, kl. 14.16, kan jeg afkræfte, at M er blevet bedt om at holde fri.

Det passerede fremgår af vor skrivelse af d.d. til M, og Deres medlem har således foretaget en ensidig ophævelse af ansættelsesforholdet.

. . . «

Den nævnte skrivelse til H er sålydende:

» . . .

*Bortvisning*

Under henvisning til telefonsamtale i morges kl. 5.05 bekræfter vi hermed at have bortvist dig fra dit arbejde hos NPA Group A/S grundet konstaterede unøjagtigheder med kassebeholdning, kassebilag og følgesedler, samt fordi vi har konstateret, at du har solgt varer til kunder uden at opkræve moms og selv beholdt pengene uden at registrere salget i kassen. Vi skal forbeholde os erstatningskrav.

Da dette er en grov beskyldning, har vi naturligvis undersøgt sagen nøje.

Vi har 4 vidner samt den kunde, du i sidste uge solgte varer til uden regning, hvor du selv beholdt pengene. Vedkommende har

igår, søndag den 26. marts 1995 kl. 19.10, skriftligt bevidnet, at det er korrekt, at det er foregået, som anført ovenfor.
. . .«
Det hedder i skrivelsen til M:
». . .
*Vedr. ophævelse af dit ansættelsesforhold*
I fortsættelse af det i dag på vort kontor passerede, hvor du dels ensidigt afleverede dine nøgler til firmaet og dels forlod virksomheden efter bemærkning om, at du også hellere måtte holde op omgående, må vi meddele, at vi betragter det passerede som en misligholdelse fra din side, men at vi har taget din ensidige ophævelse af ansættelsesforholdet til efterretning, men vi skal i den forbindelse forbeholde os erstatning.

Dit ansættelsesforhold er således ophørt med i dag, . . . «

Det fremgår af sagens oplysninger endvidere, at sagsøgte fortrinsvis sælger produkter til grossister. Ud over kontantsalg i sagsøgtes virksomhed er der tillige solgt varer på kredit. Dette er sket til kontokunder, der betalte månedsvis. Dette kreditsalg blev slået ind i kassen som kreditsalg. Herudover blev der ydet korterevarende kredit til faste kunder. Dette kreditsalg blev af sagsøgtes ekspedienter noteret på håndskrevne ark papir, oftest på såkaldte kontantnotaer, der tillige blev anvendt til at slå kontant salg ind på kasseapparatet. Ved sådant kreditsalg blev de håndskrevne notaer indsat i et ringbind, der stod i butikslokalet. Når kunden betalte, blev beløbet slået ind på kasseapparatet på en maskinstemplet kontantnota, og den første nota blev udtaget af ringbindet og enten overgivet til kunden eller bortkastet. Der er under sagen som bilagene B, C og D fremlagt 3 håndskrevne »kontantnotaer« påført navnet Solvej Lund Larsen.

*Forklaringer:*
Der er under sagen afgivet forklaring af sagsøgerne samt af direktør Finn Nørregaard Petersen, Glenne

**301**

Lindenstrøm, Michael Andersen, Tom Kjær, Solvej Lund Larsen, Ib Artman og advokat Ebbe Mogensen.

*Sagsøgeren H* har forklaret, at hun blev ansat som ekspedient i den af hendes ægtefælle M drevne virksomhed Prila Products ApS den 1. marts 1978. Efter sagsøgtes overtagelse af virksomheden i 1981 fortsatte hun sit hidtidige arbejde. Sagsøgte havde flere lokaler på grønttorvet. I 1994 blev hun butikschef i sagsøgtes store afdeling, Grønttorvet 63-89. Hendes arbejde bestod i ekspedition samt i at sørge for, at der var det tilstrækkelige vareudbud i forretningen, samt at lede de øvrige ekspedienter. De var i alt 6 butiksansatte i forretningen. I begyndelsen var hendes samarbejde med direktør Finn Nørregaard Petersen godt, men i de senere år følte hun, at forholdet blev mindre godt. Det skete, at personalet gik uden om hende til Finn Nørregaard Petersen. Hun havde bemærket dette til Finn Nørregaard Petersen, der havde sagt, at det var bedre, at hun var upopulær, idet han skulle holde sig gode venner med alle. Hun har hverken mundtligt eller skriftligt modtaget kritik af sit arbejde. Finn Nørregaard Petersen var bekendt med forretningsgangene, herunder også kreditsalget via notaer i ringbindet. Solvej Lund Larsen havde været kunde i forretningen en del år. Hun underviste i blomsterbinding på aftenskoler og handlede derfor fortrinsvis i aftenskolesæsonen. Hun købte tilbehør, som eleverne så efterfølgende købte af hende. Hun handlede derfor som regel i starten på kredit og betalte så, når hun havde fået solgt noget. Der var aldrig problemer med betalingen. Sagsøgeren sludrede jævnligt med Solvej Lund Larsen, ligesom hun sludrede med andre faste kunder. Det er også sket, at de en gang imellem gik ind i personalets frokoststue og fik en kop kaffe sammen. Sagsøgeren husker, at Solvej Lund Larsen handlede i forretningen fredag den 24. marts 1995. Hun husker ikke, om hun betalte varer, eller om hun var med inde i frokoststuen denne dag. Hun er sikker på, at Solvej Lund Larsen ikke har betalt i frokoststuen. Hun betalte altid ved kassen. Sagsøgeren har ikke undladt at slå betalinger ind på kasseapparatet og har ikke selv beholdt betalinger. Der var en regnemaskine med strimmel i frokoststuen. Det er vidnet, der har skrevet de håndskrevne »kontantnotaer« fremlagt som bilag B, C og D, bortset fra sammentællingerne og datoerne. Hun har først set disse bilag og Solvej Lund Larsens erklæring i december 1995. På grund af den forløbne tid kunne hun da ikke huske nærmere om omstændighederne omkring Solvej Lund Larsens køb i henhold til de fremlagte bilag. Sagsøgeren var efter bortvisningen arbejdsløs i ca. et år. Hun fik nyt arbejde i maj 1996.

Sagsøgeren har supplerende forklaret, at der var tre kasseapparater i forretningen og to brugere til hvert kasseapparat. De tre kasseapparater havde hver to skuffer. Hun havde det princip kun at bruge sin egen kasse, men efter lukketid kunne det ske, at hun brugte en andens kasse. Man skulle slå en kode ind, men sagsøgeren kendte de andre ekspedienters koder. Hun kan ikke huske, om hun solgte 3 kasser urtepotter til Solvej Lund Larsen den 24. marts 1995, eller om hun i det hele taget solgte noget til hende den pågældende dag.

*Sagsøgeren M* har forklaret, at han sammen med en kompagnon startede virksomheden Prila Products ApS i 1977. Han tiltrådte som ansat i virksomheden den 1. juni 1977. Navnet Prila Products fungerer stadig som binavn på sagsøgtes brevpapir. Det var hans ægtefælle, der tog telefonen den 27. marts om morgenen. Hun fortalte chokeret, at Finn Nørregaard Petersen havde sagt, at hun ikke skulle komme mere. Sagsøgeren overtog samtalen. Finn Nørregaard Petersen sagde, at han skulle få sin ægtefælles nøgler og komme ind til virksomheden med nøglerne. Han kørte ind til forretningen og parkerede på sin sædvanlige plads. Han ankom næsten samtidig med Finn Nørregaard Petersen og Glenne Lindenstrøm. Sagsøgeren lagde alle nøglerne på Finn Nørregaard Petersens skrivebord. Da Finn Nørregaard Petersen sammen med Glenne Lindenstrøm kort efter kom ind på kontoret, spurgte han, »hvad siger firmaets bogholder til, at bogholderens kone sælger uden om kassen?«. Sagsøgeren spurgte, om Finn Nørregaard Petersen dermed mente, at han skulle holde op i virksomheden. Finn Nørregaard Petersen spurgte blot, om han ikke havde hørt, hvad han havde sagt, og gentog sætningen. Sagsøgeren bad om at se beviser for påstanden. Finn Nørregaard Petersen nægtede ham dette. Han spurgte på ny, og Glenne Lindenstrøm var ved at tage noget frem fra sin taske, men blev standset af Finn Nørregaard Petersen. Sagsøgeren ville hjem og tale med sin ægtefælle. Glenne Lindenstrøm sagde »så siger vi, at du holder ferie indtil videre«. Sagsøgeren tog sin mappe og gik ud af kontoret. Finn Nørregaard Petersen fulgte efter ham og sagde, at han ville have de af virksomhedens papirer, som sagsøgeren havde i sin mappe. Sagsøgeren gav ham papirerne. Samme dag henvendte sagsøgeren sig til sin fagforening. Sagsøgeren opfattede situationen således, at han skulle hjem for at tale med sin ægtefælle, overveje situationen og derefter vende tilbage til virksomheden.

Firmaets praksis vedrørende salg på kredit ved notat på løse sedler var ikke regnskabsmæssig forsvarlig. Han havde foreslået Finn Nørregaard Petersen at anskaffe et nyt system, hvor kreditsalg blev registreret, samtidig med at varerne blev trukket fra lageret. Dette var imidlertid ikke blevet gennemført. Sagsøgeren var arbejdsløs, indtil han med iværksætterydelse påbegyndte ny virksomhed pr. 1. september 1996.

*Finn Nørregaard Petersen* har som vidne forklaret, at han er direktør i det sagsøgte selskab og ejer aktiekapitalen. Han hørte første gang om mistanken mod

**302**

H, da en medarbejder, Tom Kjær, ringede hjem til ham lørdag den 25. marts 1995 om aftenen. Vidnet ville se beviser for mistanken

og aftalte, at han og Glenne Lindenstrøm skulle mødes søndag formiddag med Tom Kjær og Michael Andersen. På mødet foreviste Michael Andersen nogle »kontantnotasedler« vedrørende kreditsalg til Solvej Lund Larsen, som han havde fundet i en affaldsspand. På mødet gennemgik de revisionsrullerne fra kasseapparaterne vedrørende salget i tiden fra den 21.- 25. marts 1995 uden at kunne finde kasseopslag, der svarede til disse kreditsedler. Michael og Tom fortalte, at de havde set, at de nævnte sedler sad i kreditsalgsmappen fredag formiddag, og at de var fjernet i løbet af fredagen. De havde observeret, at Solvej Lund Larsen ikke havde betalt ved kassen om fredagen. De blev enige om at kontakte Solvej Lund Larsen og kørte til hendes bopæl. Hun var imidlertid ikke hjemme, og det blev herefter aftalt, at Tom og Michael skulle prøve at træffe hende senere på aftenen. Søndag aften ringede Tom og Michael til ham og fortalte, at de nu havde truffet Solvej Lund Larsen, der gerne ville have, at vidnet kom til stede. De mødtes herefter på Hotel Scandic i Glostrup. Vidnet medbragte erklæringen af 26. marts 1995, hvis første led Glenne Lindenstrøm havde skrevet efter hans diktat. Efter drøftelserne med Solvej Lund Larsen påførte han erklæringen den sidste sætning, og Solvej Lund Larsen underskrev erklæringen. Hun fortalte, at hun havde fået et stykke papir på sit køb, en regnestrimmel. Han truede ikke med politianmeldelse. Solvej Lund Larsen virkede som en meget sart person. Vidnet ringede senere på aftenen til virksomhedens advokat, advokat Ebbe Mogensen, der sagde, at det var vigtigt at have beviser, og i øvrigt henviste ham til at ringe til kontoret den følgende dag.

Mandag morgen ringede vidnet til H og sagde, at hun ikke skulle møde mere. H nægtede at have tilegnet sig midler fra virksomheden. Vidnet sagde til M, at denne skulle tage Hs nøgler med til kontoret. Det var ikke på tale, at M skulle holde op. Da vidnet og Glenne Lindenstrøm ankom til forretningen, bemærkede de, at M allerede var kommet. Hans bil holdt parkeret ved nogle affaldssække. M stod selv ved affaldssækkene. Det var ikke hans sædvanlige parkeringsplads. Vidnet og Glenne Lindenstrøm kom først ind på kontoret. M kom efter nogle minutter og sagde, at han ville have en forklaring. Vidnet svarede, at H havde puttet penge i lommen, og at han havde skriftligt bevis. M bad om at se dette. Glenne Lindenstrøm var ved at tage Solvej Lund Larsens erklæring frem fra tasken, men vidnet sagde, at M ikke ville få dette at se. Vidnet tænkte herved, at dette burde advokaten tage stilling til. M gik herefter hen til vidnets skrivebord, hvor han smed både sine egne og Hs nøgler ned i bordet og sagde, at så måtte han også holde op. Vidnet bad om at få dette skriftligt, men M svarede blot, at han ikke ville få mere skriftligt fra ham, end han havde fået ved sin ansættelse. M tog helt umotiveret en masse tusindkronesedler op af lommen og sagde, at han også gik med mange penge på lommen. Herefter forlod M kontoret. Vidnet bad om at få virksomhedens papirer og fik dem i et lokale uden for kontoret. Det var helt klart, at M forlod firmaet for altid. Om formiddagen blev vidnet ringet op af en medarbejder fra Kristelig Fagforening. Vidnet tilkendegav, at han ikke havde noget at tale med fagforeningen om. Vidnet kontaktede advokat Mogensens kontor. Samme dag modtog han endvidere telefax af 27. marts fra fagforeningen. Det er vidnet, der har forfattet skrivelserne af 27. marts 1995 til M og H. Advokaten havde godkendt formuleringen. Kreditsalgssystemet eksisterer stadig. Det har ikke givet anledning til problemer bortset fra denne sag.

*Glenne Lindenstrøm* har som vidne forklaret, at hun er ansat som bogholder hos sagsøgte. Hun deltog i mødet søndag formiddag, hvor de gennemgik revisionsrullerne fra kasseapparaterne og konstaterede, at de sedler, som Michael havde fundet i affaldsposerne, ikke var slået ind på kasseapparatet. Da hun og Finn Nørregaard Petersen ankom til virksomheden mandag morgen, bemærkede hun, at M holdt parkeret ved affaldscontainerne, hvilket ikke var hans sædvanlige parkeringsplads. Vidnet har om forløbet af diskussionen mellem Finn Nørregaard Petersen og M forklaret i overensstemmelse med vidnet Finn Nørregaard Petersen. Vidnet var sikker på, at M gik for ikke at vende tilbage. Vidnet har ikke sagt noget om ferie. Der er blevet ansat andre i H og Ms sted.

*Michael Andersen* har som vidne forklaret, at han har været ansat som ekspedient hos sagsøgte i 15 år. H var i 1995 hans umiddelbart overordnede. De havde et udmærket samarbejde. Solvej Lund Larsen handlede jævnligt i forretningen. Hun blev som regel ekspederet af H. De gik gerne ind i frokoststuen og drak kaffe i en kvart til en halv time. Det var ikke sædvanlig praksis i øvrigt i virksomheden og virkede irriterende, idet det fandt sted midt i den travle tid. Ekspedienterne i forretningen var begyndt at tale om, at de aldrig så, at Solvej Lund Larsen betalte for de varer, hun købte. De besluttede derfor at holde hende under observation. Mandag den 20. marts 1995 gennemgik vidnet ringbindet med kreditsedler. Da sad notaerne, bilag B, C og D, i mappen. Det samme var tilfældet om onsdagen, hvor Solvej Lund Larsen handlede i forretningen. Solvej Lund Larsen handlede også i forretningen fredag den 24. marts 1995. Vidnet bemærkede, at de 3 bilag sad i ringbindet, da Solvej Lund Larsen

**303**

og H gik ned i frokoststuen. Vidnet havde forinden holdt Solvej Lund Larsen under observation og bemærkede, at hun ikke havde betalt ved kassen. Da Solvej Lund Larsen kom ud fra frokoststuen, gik hun direkte ud til sin bil uden at betale. En time senere konstaterede vidnet, at bilagene B, C og D nu var fjernet fra ringbindet. Vidnet kontrollerede affaldssækkene og fandt de tre bilag i en af affaldsposerne. De var foldet pænt sammen. Vidnet regnede sedlerne igennem for at se, om beløbet var slået ind på kasseapparatet. Vidnet påførte sedlerne sammentællingen og skrev findedatoen den 24. marts på en af sedlerne. Vidnet og Tom Kjær gennemgik kassestrimlerne og kontrollerede, at beløbet ikke var slået ind. Tom skulle møde på arbejde om lørdagen, og vidnet bad ham gennemgå revisionsrullerne fra kassen på ny. Da vidnet og Tom Kjær søndag eftermiddag traf Solvej Lund Larsen hjemme, sagde de til hende, at de ikke kunne få kassen til at stemme vedrørende fredagens salg. De spurgte, om hun havde bilag for sit køb om fredagen. Hun sagde først, at det havde hun, og begyndte at lede, men sagde så, at hun blot havde fået en regnestrimmel, der stammede fra regnemaskinen i frokoststuen, og ikke kunne finde denne. Hun oplyste, at hun havde betalt ca. 2.500 kr. til H. Vidnet bemærkede, at der på sofabordet lå flere bilag fra en af sagsøgtes konkurrenter på Grønttorvet, ligesom der i stuen var mange varer fra sagsøgte. Solvej Lund Larsen sagde, at hun godt var klar over, at hun ikke havde betalt moms, men fastholdt, at hun havde betalt for varerne. Vidnet har ikke truet Solvej Lund Larsen med politianmeldelse. Han sagde stille og roligt til hende, at hvis hun ikke ville indrømme, at hun ikke havde fået et kontantbilag, så måtte de foretage politianmeldelse. På det efterfølgende møde på Scandic Hotel erkendte Solvej Lund Larsen over for Finn Nørregaard Petersen, at hun godt kunne se, at det var et problem, at hun ikke havde fået et kontantbilag med kassestempel, men hun fastholdt, at hun havde betalt for varerne. Tilføjelsen på bilaget, som Solvej Lund Larsen skrev under, skyldtes Solvej Lund Larsens oplysning om sagens sammenhæng.

Vidnet har yderligere forklaret, at han har gennemgået revisionsrullerne fra den af H den 24. marts 1995 betjente kasse og de to andre kasser uden at kunne finde et kasseopslag på et beløb svarende til Solvej Lund Larsens forklaring om hendes køb af 2 eller 3 kasser urtepotter.

*Tom Kjær* har som vidne forklaret, at han har været ansat i sagsøgtes butik i 14 år. Medarbejderne havde undret sig over, at de aldrig så, at der blev slået ind på kasseapparatet, når H handlede

med Solvej Lund Larsen. Om fredagen den 24. marts 1995 kom Solvej Lund Larsen ca. kl. 8.45 for at handle. Hun tog selv varer og bar dem ad nogle gange ud i sin bil. Vidnet spurgte, om hun blev ekspederet, og Solvej Lund Larsen sagde ja. Da hun sidste gang kom ind fra bilen, gik hun sammen med H ind i frokoststuen. På dette tidspunkt havde hun ikke betalt ved kasseapparatet. Da H og Solvej Lund Larsen kom ud fra frokoststuen, stod de og snakkede ca. ti minutter ved kassen. Herefter gik Solvej Lund Larsen. Vidnet gik nu ca. kl. 9.30 til frokost sammen med H. Da de ca. kl. 10 kom tilbage i forretningen, sagde Michael, at bilagene stadig var der. Senere samme dag konstaterede vidnet og Michael Andersen, at sedlerne var væk. Michael fandt dem i en affaldssæk. De kontrollerede ikke kassestrimlerne om fredagen, men vidnet gennemgik revisionsrullerne lørdag morgen. Om mødet med Solvej Lund Larsen om søndagen har vidnet i det væsentlige forklaret i overensstemmelse med vidnet Michael Andersen. Vidnet har forklaret, at Solvej Lund Larsen sagde, at hun havde betalt 2.500 kr. til H om fredagen. Betalingen var sket i frokoststuen, og hun havde fået en regnestrimmel som kvittering. Der blev ikke talt om politianmeldelse.

*Solvej Lund Larsen*, der har afgivet forklaring som vidne uden strafansvar, har forklaret, at hun har handlet nogle år hos sagsøgte. Hvis hun ikke betalte straks, blev købet skrevet i en bog ved kassen. Når hun så senere betalte, blev beløbet slået ind på kasseapparatet, og papiret på det købte blev smidt ud. Hun har altid betalt ved kassen og ikke i kaffestuen. Fredagen den 24. marts købte hun, så vidt hun husker, 2 eller 3 kasser urtepotter for i alt ca. 500 kr. Hun betalte ved kassen, inden hun og H gik ned for at drikke kaffe. Hun husker ikke, om hun fik kvittering. Søndag eftermiddag blev hun opsøgt på sin bopæl af Tom og Michael, som hun kendte fra forretningen. De foreviste to sedler på kreditkøb, som de havde fundet i skraldespanden, og som ikke var registreret i kassen. Hun havde betalt disse varer. Hun kunne ikke finde kvitteringerne. Vidnet er under domsforhandlingen forevist bilagene B, C og D og har hertil forklaret, at disse har hun ikke set før. Hun har fået det, der står på bilag B og D, og har betalt det. Derimod har bilag C ikke noget med hende at gøre, da der ikke er anført nogen pris på bilaget. Varerne anført på bilag B og D har hun betalt i februar eller marts måned. Det var to andre sedler, hun fik forevist om søndagen. Det er rigtigt, at der lå nogle regninger fra andre virksomheder på Grønttorvet i hendes lejlighed. Det er varer, hun køber ind til nogle skoler, hvor hun får penge til 3 måneders indkøb og afregner efterfølgende. Tom og Michael bad hende skrive under på, at hun havde betalt. Dette ville hun ikke, idet hun ikke kunne se begrundelsen herfor, da hun jo havde betalt. Det var vidnet, der ønskede et møde med Finn Nørregaard Petersen. Han bad hende skrive under på, at hun havde betalt. Hun følte sig presset til sidst og ville bare hjem. Hun

**304**

underskrev erklæringen af 26. marts 1995 uden at læse denne. Finn Nørregaard Petersen skrev noget til under mødet. Da hun ikke havde noget bevis for, at hun havde betalt, spurgte hun, om beløbet kunne være slået ind et andet sted end kasseapparatet. Det er korrekt, hvad der står på bilaget. Vidnet har yderligere forklaret, at Finn Nørregaard Petersen indkaldte hende til et møde fredag før domsforhandlingen. Da hun kom, var Finn, Michael og Tom til stede. Finn indledte med at sige til hende, at hun havde betalt inde i kaffestuen. Vidnet sagde, at det havde hun ikke gjort, og forlod straks mødet.

*Ib Artmann*, der har afgivet forklaring som vidne uden strafansvar, har forklaret, at han igennem en årrække har handlet hos sagsøgte. Han har aldrig købt varer uden om kasseapparatet og har aldrig handlet med H uden at få kvittering. Da forretningerne flyttede til de større lokaler for nogle år siden, blev der solgt en række varer på en slags lagerudsalg. Et vareparti var udbudt til 1500 kr. Vidnet bød 1000 kr. H accepterede dette, idet hun sagde, at så skulle hun også have en silkejakke af vidnet, hvilket hun fik.

*Advokat Ebbe Mogensen* har som vidne forklaret, at han første gang hørte om sagen søndag den 26. marts 1995, da han blev ringet op på sin private bopæl af Finn Nørregaard Petersen. Vidnet var på daværende tidspunkt advokat for sagsøgte. Finn Nørregaard Petersen fortalte, at han fra nogle ansatte havde fået at vide, at man mistænkte H for at have taget af kassen. Vidnet sagde, at det i et sådant tilfælde var vigtigt at skaffe bevis og om muligt en tilståelse, men henviste i øvrigt Finn Nørregaard Petersen til at henvende sig igen til kontoret om mandagen. Der var under samtalen kun tale om H, ikke om M.

Mandag den 27. marts 1995 ringede Finn Nørregaard Petersen, umiddelbart efter at kontorets telefoner åbnede kl. 10.00. Vidnet var i retten og kom først tilbage omkring kl. 13.30, men Finn Nørregaard Petersen talte med vidnets hustru og kompagnon, advokat Anette Mogensen. Da vidnet kom tilbage, fortalte Anette Mogensen, at Finn Nørregaard Petersen under telefonsamtalen har virket »forstyrret« og ophidset. Han havde fortalt, at M havde smidt nøgler i hovedet på ham. Kort efter at vidnet var kommet tilbage, ringede han til Finn Nørregaard Petersen. Han kunne mærke, at denne var vred. Finn Nørregaard Petersen fortalte, at M havde kastet sine nøgler til virksomheden ned i bordet foran ham og var gået fra virksomheden. Det var vidnets opfattelse efter samtalen med Finn Nørregaard Petersen, at Ms behandling havde karakter af en udvandring, hvor han havde forladt virksomheden i vrede for aldrig at vise sig mere. De havde talt om at kontrabortvise M, men vidnet fandt det overflødigt. Der blev ikke under samtalen talt så meget om Hs forhold. Man havde fået en erklæring fra en kunde, og hun var blevet bortvist mandag morgen.

*Parternes procedure:*

Sagsøgeren H har til støtte for sin påstand gjort gældende, at hun ikke har tilegnet sig penge fra sagsøgte. Det bestrides ikke, at dette ville være bortvisningsgrund, men det gøres gældende, at sagsøgte har en streng bevisbyrde for, at det har været tilfældet. Denne bevisbyrde har sagsøgte ikke løftet. Sagsøgerens forklaring har været sammenhængende og troværdig gennem hele sagsforløbet, hvorimod vidneforklaringerne fra Tom Kjær og Michael Andersen er uoverensstemmende blandt andet vedrørende spørgsmålet om, hvornår revisionsrullerne fra kasseapparaterne er sammenholdt med kreditsedlerne fra Solvej Lund Larsen, samt vedrørende spørgsmålet om, hvorvidt Solvej Lund Larsen er truet med politianmeldelse. Solvej Lund Larsens forklaring støtter sagsøgerens forklaring. Det må tillægges afgørende vægt, at hun har forklaret, at hun ikke betalte for de i bilag B, C og D nævnte varer den 24. marts 1995, og at hun aldrig har betalt til H i frokoststuen og mod kvittering i form af en strimmel fra regnemaskinen. Vedrørende omstændighederne omkring vidnets underskrivelse af den af Finn Nørregaard Petersen udfærdigede erklæring må vidnets forklaring lægges til grund.

Til støtte for sin påstand har sagsøgeren endvidere gjort gældende, at sagsøgte ikke har givet hende tilstrækkelig mulighed for at varetage sine interesser. Sagsøgte forelagde hende ikke straks anklagerne og dokumentationen herfor og har derved frataget sagsøgeren muligheden for at forklare sig, mens hun endnu havde mulighed for at erindre, hvad der var sket. M bad den 27. marts 1995 om at se sagsøgtes dokumentation. Dette blev afslået af sagsøgte. Sagsøgeren har således først i december 1995, ca. ¾ år efter bortvisningen, fået kendskab til grundlaget for mistanken mod hende.

Det gøres endelig gældende, at sagsøgtes tilrettelæggelse af kassefunktionen ikke er egnet til at gennemføre en entydig og sikker

identifikation af betalingerne, og at sagsøgte derfor har afskåret sig fra en betryggende og egentlig kontrol, hvilket må komme sagsøgte til skade.

Sagsøgeren M, der erkender, at en endelig bortgang fra arbejdet ville være en misligholdelse, har gjort gældende, at han ikke uberettiget har forladt sit arbejde. Sagsøgerens forklaring om, at han havde fået tilladelse til at holde fri, må lægges til grund. Det er således ubestridt, at det var på Finn Nørregaard Petersens initiativ, at sagsøger afleverede virksomhedens papirer. Sagsøgeren har allerede samme dag skriftligt tilkendegivet sit standpunkt over for sagsøgte. Sagsøgte kan ikke støtte ret på en eventuel spontan

**305**

tilkendegivelse fra sagsøgerens side, hvorved der må henses til, at sagsøgerens ægtefælle netop var blevet bortvist. Det gøres gældende, at risikoen for en eventuel misforståelse mellem parterne må bæres af sagsøgte. Sagsøgeren havde arbejdet loyalt i virksomheden igennem 18 år, og hans holdning blev præciseret ved fagforeningens telefax allerede samme formiddag.

Vedrørende opgørelsen af deres krav har sagsøgerne henvist til deres meget langvarige ansættelse i virksomheden og karakteren af den mod H rejste beskyldning. Det gøres gældende, at ansættelsestiden må regnes fra første ansættelse i Prila Products ApS. Det bestrides, at de har udvist egen skyld.

Sagsøgte har til støtte for sin frifindelsespåstand for så vidt angår Hs krav gjort gældende, at det ved vidneforklaringerne sammenholdt med fundet af kreditsalgsnotaerne, uden at beløbet er blevet slået ind på kassen, er blevet dokumenteret, at H har tilegnet sig betalinger til virksomheden. Det er påfaldende, at H ikke har kunnet huske noget konkret fra sin sidste arbejdsdag. Det gøres gældende, at sagsøgtes direktør har foretaget grundige undersøgelser, før han skred til bortvisning af H. Revisionsrullerne er gennemgået omhyggeligt, og Solvej Lund Larsen er opsøgt for en sikkerheds skyld. Det gøres yderligere gældende, at der ikke kan tillægges Solvej Lund Larsens forklaring under domsforhandlingen vægt, idet forklaringen er afgivet uden strafansvar. Derimod må hendes erklæring af 26. marts 1995 tillægges betydelig bevisværdi, idet denne erklæring er afgivet i umiddelbar tilknytning til begivenhedsforløbet. Det bestrides, at det kan tillægges vægt, at sagsøgeren ikke straks er foreholdt, hvilke beløb hun har tilegnet sig. Der er intet krav herom i loven, og det er uden betydning for sagsøgerens retsstilling, idet det ikke har forhindret hende i at varetage sine interesser.

Over for sagsøgeren Ms påstand har sagsøgte til støtte for sin frifindelsespåstand gjort gældende, at det efter sagsøgerens adfærd må lægges til grund, at han er udvandret fra sit arbejde. Sagsøgte har derfor været berettiget til at nægte at modtage hans arbejdskraft. Det er muligt, at sagsøgeren efterfølgende har fortrudt sin adfærd, men dette ændrer ikke ved, at sagsøgeren har misligholdt sit ansættelsesforhold. Finn Nørregaard Petersens forklaring har i det hele virket troværdig og støttes af advokat Ebbe Mogensens forklaring og de i øvrigt foreliggende oplysninger.

Til støtte for den subsidiære påstand har sagsøgte for så vidt angår begge sagsøgerne gjort gældende, at ansættelsen må regnes fra ansættelseskontrakten af 15. december 1981, og at sagsøgerne således ved ansættelsens ophør havde været beskæftiget i 13 år og 4 måneder i virksomheden. Det bestrides, at ansættelse før dette tidspunkt kan tillægges betydning, idet sagsøgeren M havde virket som direktør i sin egen virksomhed og derfor ikke havde funktionærstatus. Det gøres endvidere gældende, at erstatningen må nedsættes, idet begge sagsøgerne har udvist en betydelig grad af egen skyld.

Til støtte for den selvstændige påstand har sagsøgte gjort gældende, at sagsøgerne som henholdsvis bortvist med rette og som havende forladt ansættelsen uberettiget efter funktionærlovens § 4 er forpligtet til at betale en erstatning svarende til en halv månedsløn.

## Landsrettens bemærkninger:

Vedrørende H.

To af rettens medlemmer - landsdommerne Ebbe Christensen og Jytte Scharling - udtaler:

H blev ved bortvisningen den 27. marts 1995 ikke gjort bekendt med, hvilke beløb hun efter sagsøgtes opfattelse havde tilegnet sig, eller hvilken dokumentation sagsøgte havde for sin alvorlige beskyldning mod sagsøgeren. Sagsøgeren fik således ikke oplyst identiteten på den kunde, hvis betaling hun skulle have tilegnet sig. Sagsøgerens ægtefælle, der må anses for at have handlet i berettiget varetagelse af sagsøgerens interesse, bad samme dag om at blive gjort bekendt med dokumentationen, men fik afslag herpå. Det må lægges til grund, at sagsøgeren først ved sagsøgtes svarskrift af 7. december 1995 blev bekendt med identiteten på kunden og dennes erklæring af 26. marts 1995. Ved ikke straks at underrette sagsøgeren om det konkrete grundlag for mistanken mod hende findes sagsøgte at have afskåret sagsøgeren fra at varetage sine interesser, herunder fra nærmere at redegøre for omstændighederne omkring hendes kassebetjening af Solvej Lund Larsen, mens disse var i frisk erindring,

Under disse omstændigheder må der påhvile sagsøgte en særdeles tung bevisbyrde. Når henses til vidnet Solvej Lund Larsens forklaring under domsforhandlingen, herunder hendes forklaring om omstændighederne omkring hendes underskrivelse af den af vidnet Finn Nørregaard Petersen koncipierede erklæring, findes sagsøgte ikke at have godtgjort med tilstrækkelig sikkerhed, at sagsøgeren har tilegnet sig betalinger til sagsøgte. Bortvisningen findes herefter at have været uberettiget.

Som følge af det anførte finder disse dommere, at sagsøgeren har krav på løn i opsigelsesperioden samt godtgørelse i henhold til funktionærlovens § 2 a og § 2 b som påstået. Det bemærkes herved, at der ikke i skriftvekslingen er rejst indsigelse mod, at sagsøgerens anciennitet skal regnes fra hendes ansættelse i Prila Products ApS den 1. marts 1978, og at det under domsforhandlingen fremkomne ikke findes at kunne føre til andet resultat. Der findes ikke grundlag for at nedsætte erstatningen på grund af egen skyld hos sagsøgeren. I

**306**

konsekvens heraf skal sagsøgeren endvidere frifindes for sagsøgtes selvstændige påstand.

Landsdommer Teilmann udtaler:

Efter bevisførelsen, herunder de af vidnerne Tom Kjær og Michael Andersen afgivne forklaringer, lægger jeg til grund, at vidnerne i ugen op til bortvisningen holdt sagsøgeren under observation, og at de herunder konstaterede, at kreditsalgssedlerne, bilag B, C og D, sad i kreditsalgsringbindet indtil fredag den 24. marts 1995, og at de blev fjernet fra ringbindet og fundet i skraldespanden, efter at Solvej Lund Larsen denne dag havde forladt forretningen. Jeg lægger endvidere til grund, at vidnerne holdt øje med Solvej Lund Larsen under dennes besøg i forretningen i ugens løb, og at de konstaterede, at hun ikke betalte ved kasseapparatet under disse besøg. Der har ikke ved gennemgangen af revisionsrullerne for kasseopslagene på sagsøgerens kasse den 24. marts 1995 kunnet findes opslag, svarende til varerne eller beløbene nævnt på bilagene, eller opslag, der kan støtte Solvej Lund Larsens forklaring om, at hun denne dag købte og betalte urtepotter for ca. 500 kr. Herefter, og når henses til den af Solvej Lund Larsen underskrevne erklæring sammenholdt med, at hun ikke den 26. marts 1995 kunne forevise kvittering for sine køb den 24. marts 1995, finder jeg det godtgjort, at sagsøgeren har tilegnet sig betaling fra Solvej Lund Larsen.

Bortvisningen har herefter været berettiget, og jeg stemmer derfor for at frifinde sagsøgte for denne sagsøgers krav og for at dømme hende til at betale til sagsøgte beløbet ifølge den selvstændige påstand.

Vedrørende M.

To af rettens medlemmer - landsdommerne Ebbe Christensen og Teilmann - udtaler:

Det må lægges til grund, at sagsøgeren den 27. marts 1995 forlod arbejdspladsen efter at have afleveret såvel sin ægtefælles som sine egne nøgler. Dersom sagsøgeren opfattede situationen således, at han var berettiget til at holde fri indtil videre på firmaets regning med henblik på at overveje sin stilling, måtte det påhvile ham, efter at han og fagforeningen havde modtaget sagsøgtes skrivelser af 27. marts 1995, at tilkendegive, at han uanset det passerede fortsat stillede sin arbejdskraft til rådighed for sagsøgte. Ved ikke at reagere på denne måde findes sagsøgeren at have givet sagsøgte føje til at opfatte situationen således, at sagsøgeren havde ophævet ansættelsesforholdet. Vi stemmer derfor for at frifinde sagsøgte for denne sagsøgers påstand.

Sagsøgerens manglende tilkendegivelse som ovenfor anført findes ikke at være en misligholdelse af en sådan karakter, at den giver sagsøgte ret til erstatning efter funktionærlovens § 4. Sagsøgeren bør derfor frifindes for kravet herom.

Landsdommer Jytte Scharling udtaler:

Efter vidnet Finn Nørregaard Petersens forklaring, der støttes af advokat Ebbe Mogensens forklaring, lægger jeg til grund, at vidnet opfattede sagsøgerens udtalelser og handlinger på mødet den 27. marts 1995 om morgenen som en tilkendegivelse om, at sagsøgeren definitivt forlod sin ansættelse. Efter sagsøgerens forklaring lægger jeg endvidere til grund, at sagsøgeren havde fået opfattelsen af, at han kunne forlade arbejdsstedet med sagsøgtes tilladelse. Det var således på Finn Nørregaard Petersens initiativ, og ikke på sagsøgerens foranledning, at sagsøgeren afleverede virksomhedens papirer. Der var således opstået en misforståelse mellem sagsøgeren og sagsøgte. Når henses til de omstændigheder, hvorunder sagsøgeren forlod virksomheden, herunder at sagsøgerens ægtefælle netop var blevet bortvist, og at Finn Nørregaard Petersen havde nægtet at forevise sin dokumentation for bortvisningsgrundlaget, samt til at sagsøgerens faglige organisation straks samme dag tilkendegav sagsøgerens opfattelse af forløbet, findes sagsøgte at være den nærmeste til at bære risikoen for den opståede misforståelse. Ved at fastholde, at sagsøgeren havde ophævet ansættelsesforholdet, og derved nægte sagsøgeren at vende tilbage til sit arbejde, findes sagsøgte at have misligholdt ansættelsesaftalen med sagsøgeren.

Som følge af det anførte finder jeg, at sagsøgeren har krav på løn i opsigelsesperioden samt godtgørelse i henhold til funktionærlovens § 2 a og § 2 b som påstået. Det bemærkes herved, at der ikke i skriftvekslingen er rejst indsigelse mod, at sagsøgerens anciennitet skal regnes fra hans ansættelse i Prila Products ApS den 1. juni 1977, og at det under domsforhandlingen fremkomne ikke findes at kunne føre til andet resultat. Der findes ikke grundlag for at nedsætte erstatningen på grund af egen skyld hos sagsøgeren.

Der afsiges vedrørende begge sagsøgere dom efter stemmeflertallet.

— — —

Ingen af parterne betaler sagsomkostninger til den anden part.

# Højesteret

## Højesterets dom.

I tidligere instans er afsagt dom af Østre Landsrets 14. afdeling den 5. februar 1998.

I pådømmelsen har deltaget fem dommere: Hornslet, Poul Sørensen, Melchior, Asbjørn Jensen og Søgaard.

Dommen er anket af NPA Group A/S over for Kristelig Funktionær-Organisation som mandatar for H og af Kristelig Funktionær-Organisation som mandatar for M over for NPA Group A/S.

NPA Group A/S har over for H gentaget sine påstande og har vedrørende det selvstændige erstatningskrav tillige nedlagt en subsidiær påstand om betaling af et mindre beløb.

Kristelig Funktionær-Organisation som mandatar for H har påstået stadfæstelse.

**307**

Kristelig Funktionær-Organisation som mandatar for M har gentaget sin påstand.

NPA Group A/S har over for M påstået stadfæstelse.

NPA Group A/S har ikke for Højesteret bestridt, at Hs og Ms anciennitet skal beregnes fra henholdsvis den 1. juni 1977 og den 1. marts 1978.

Den i dommen gengivne skrivelse af 27. marts 1995 fra NPA Group A/S til M blev besvaret af Kristelig Funktionær-Organisation ved en skrivelse af 6. april 1995, hvori organisationen bl.a. anførte: »Som sagen er fremlagt for os, modtog M d. 27. marts 1995 om morgenen den besked af Dem, at han skulle tage fri, hvilket blev opfattet som feriedage for Deres regning.

Deres udlægning i flg. brevet af 27. marts 1995 stemmer ikke med vores oplysninger, og vi kan kun opfatte det som en uberettiget bortvisning. . . .«

Det fremgår af sagen, at den oprindelig blev anlagt ved Københavns Byret. I henhold til begæring efter retsplejelovens § 227, stk. 1, henviste byretten den 9. november 1995 sagen til landsretten med den begrundelse, at »sagen angår et krav, der har en økonomisk værdi over 500.000 kr.«.

Til brug for Højesteret er der afgivet nye forklaringer.

**Højesterets bemærkninger.**

Hs og Ms krav var begge under retsplejelovens dagældende landsretsgrænse, og den omstændighed, at Kristelig Funktionær-Organisation optræder som mandatar for dem begge, betyder ikke, at kravene er rejst af »samme part«, jf. herved § 228, stk. 1, 2. pkt. Byretten har herefter ikke haft hjemmel til i medfør af retsplejelovens § 227, stk. 1, at henvise sagen til landsretten. Den burde derfor ikke have været påkendt af landsretten som første instans, jf. § 232.

Vedrørende H tiltræder Højesteret af de grunde, der er anført af landsretten, at bortvisningen var uberettiget.

Da der ikke er grundlag for at nedsætte det beløb, hun er blevet tilkendt, stadfæster Højesteret herefter dommen i forholdet mellem NPA Group A/S og H.

Af de grunde, der er anført af landsretten, stadfæster Højesteret ligeledes dommen i forholdet mellem NPA Group A/S og M.

**Thi kendes for ret:**

*Landsrettens dom stadfæstes.*

*Ingen af parterne skal betale sagsomkostninger for Højesteret til den anden part.*

*Det idømte beløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.*