# Exhibit 8



London

This is to certify that the attached document is, to the best of my knowledge and belief a true, accurate and complete translation from Danish into English of the attached extract from U.2000.197H on Accident resulting in death deemed intentionally caused by the deceased.

Yours sincerely,

Andrzej Orville

Senior Project Manager

Wednesday, January 22, 2025

Consortra Translations Ltd
Rex House,
4-12 Regent Street
London
SW1Y 4RG
UK

U.2000.197H

*Accident resulting in death deemed intentionally caused by the deceased.*

*Insurance 3.2.*

- ♦ On February 20, 1995, A, who had taken out a full accident insurance policy with the insurance company, F, died as a result of a traffic accident on an expressway. F refused to pay the sum insured to A's widow, E, with reference to the fact that the damage was caused intentionally, as A, in F's opinion, had committed suicide. It was found that A, for no demonstrable reason, had suddenly driven out of his own lane and into the opposite lane, where he drove directly into an oncoming truck without having reduced speed or attempted to avoid or brake before the collision. It was also assumed that shortly before the accident, A had been prescribed antidepressant medication and referred to a psychiatrist due to depressive tendencies, in addition to which E and A's own doctor had expressed to the police immediately after the accident that it was or could very well be a case of suicide. As F had proved that A had intended to hit the oncoming truck, F was acquitted of E's claim for payment of the insurance sum. (Dissent).

**Danish Supreme Court (H.D.) October 29, 1999 in case I 190/1998**

E (attorney Anders Kirk, Århus)
versus
*Topdanmark Forsikring A/S (attorney Joan Colding, Viborg).*

| | | |
|---|---|---|
| 1. | Accident insurance sum insured | DKK 553.000.00 |
| 2. | Replacement for damaged Toyota Corolla | DKK 115,000.00 |
| 3. | Funeral expenses - net, cf. section 12 of the Tort Liability Act | DKK 9,374.85 |
| 4. | Compensation for loss of breadwinner in accordance with section 12, cf. section 13 of the Tort Liability Act | DKK 424,396.80 |
| | In total | DKK 1,101,771.65 |

With regard to the alternative claim, the first three items are calculated in a similar way, while item 4 is calculated at the minimum remuneration of DKK 328,500.

The Respondent has not disputed the amounts in items 1-3, nor is there any disagreement between the parties about the actual calculation of the loss of survivor loss compensation, but the Respondent has argued that any compensation for loss that would go to a survivor must be set at the minimum compensation.

The circumstances of the case are as follows:

The Complainant's spouse, Mr A, who was 41 years old at the time of his death, was a qualified assistant accountant and worked as such until he was made redundant at the end of November 1990. He then received unemployment benefits until 1993, when he was offered a job for 7 months at a community centre. After the job ended, he again received unemployment benefits at the highest daily rate.

On February 20, 1995, A was driving his car (a 1990 Toyota Corolla) towards Aarhus along the expressway in the Municipality of

## Western Court of Appeal

*Ruling by the Western Court of Appeal of April 7, 1998 (Division 1)*

(C. Haubek, Bjerg Hansen, Eva Skov (acting)).

On February 20, 1995, A died as a result of a traffic accident on the expressway between Mols and Aarhus in the Municipality of Rosenholm. The deceased's car was insured with the Respondent (insurance company) Topdanmark Forsikring A/S, and he had taken out a full accident insurance policy with the same insurance company with a sum insured of DKK 553,000 upon death.

**198**

In letters dated April 10, 1995 and May 17, 1995, the Complainant in this case, E, who was married to A, notified a preliminary claim against the Respondent based on the two insurance policies totalling DKK 1,007,874.85. In a letter dated May 30, 1995, the Respondent refused to pay compensation on the grounds that the harm and damage had been caused intentionally, as A had committed suicide (according to the insurance company).

In these proceedings brought on April 3, 1996, the Complainant, E, has principally claimed that the Respondent, Topdanmark Forsikring A/S, be ordered to pay DKK 1,101,771.65 with interest amounting to DKK 424,396.80 from February 20, 1995 and DKK 677,374.85 from May 17, 1995 until payment is made.

As an alternative, the Complainant has claimed that the Respondent be ordered to pay DKK 1,005,874.85 with interest of DKK 328,500 from February 20, 1995 and DKK 677,374.85 from May 17, 1995 until payment is made. The Respondent has claimed acquittal, or as an alternative payment of a lesser amount than DKK 1,005,874.85.

The Complainant has summarised the claim according to its main claim as follows:

Rosenholm after having driven the Complainant to Tirstrup Airport. The accident, in which A was killed, took place at 07:22 when he crossed into the opposite lane and collided head-on with an oncoming semitrailer. After the accident, the police took a report and investigated the scene and the drivers of the two vehicles.

The police report states that, at the time of the accident, the conditions at the accident site were wet, but there was no precipitation. Visibility was good and there was daylight. In the section of the report relating to the use of seat belts concerning A, both the Yes and Don't know boxes have been ticked. Blood samples taken showed that neither the deceased nor the driver of the truck, Hans Ingolf Preben Dahl, were under the influence of alcohol. The police report prepared by police officer Jørgen Bardung also states that he and a colleague arrived at the scene of the accident at 08:05. The report states the following about the location of the two cars:

"Party I's passenger car was parked in the western half of the carriageway facing south at a distance of 9 meters south of the 21.5

Copyright© 2023 Karnov Group Denmark A/S

km marker. The entire front of the car was torn off. The engine was 14 meters into the field to the west of the accident site.

Party 2's truck was parked in the ditch on the eastern side of the road facing north at a distance of 63 meters north of the 21.5 km marker. The truck's left front wheel and front bridge were torn off. It had come to a standstill after first running down 24 meters of crash barriers and emergency telephone 21Ø (east).

The trailer contained a load of 29 tons of coal."

The police report states the following about the accident site:

"The accident site is a 12.5 meter wide expressway divided into two lanes with a dashed lane line. There is an emergency lane on both sides of the road, which is separated from the other carriageway by a continuous edge line. A crash barrier has been installed along the eastern side of the road.

On both sides of the road, emergency telephones labelled 21V and 21Ø have been set up at the accident site.

There are C55 signs on the expressway indicating a speed limit of 90 km/h.

An investigation at the accident site revealed impressions in the road surface on the eastern carriageway approximately 26 m south of the 21.5 km marker, where the truck's front wheel had been torn off and the front had fallen down and scraped against the road. An oil slick was also seen on the road at the same location.

The 24-meter long guardrail east of the road was torn up, and the emergency telephone 21Ø (east) was broken.

No blockage marks were seen on the road. (wet carriageway)."

After finishing at the accident site, the two police officers drove to Aarhus Municipal Hospital to question the driver of the truck, among other things. The police report states about this questioning:

"Hans Ingolf Preben Dahl was ... questioned about the case. As a possible Respondent, he was questioned pursuant to Section 752 of the Penal Code. He explained that he was driving his semitrailer along the expressway towards the north.

**199**

He was located on the eastern half of the road. He was travelling at a speed of approximately 80 km/h and had the car's headlights were dipped. There was no other traffic in the lane for a good distance ahead. There was heavy traffic on the oncoming lane, to the south. The witness first noticed Party 1 when it was at a distance of about 10 meters in front of the truck. Party 1 then pulled diagonally across the lane towards the Respondent in a sharp arc. The interviewee was somewhat shocked, but did not have time to react before he was hit with great force against his left front. As a result, he completely lost control of the truck and the front wheel was torn off, which meant that he could neither steer nor brake. The truck continued into the road verge, where it ploughed up a guardrail. The witness stated that the truck was loaded with a total of 29 tons of coal, which he had just picked up at the Studstrup plant."

During the morning of February 20, 1995, the police informed A's spouse, Complainant E, who was in Copenhagen, of his death. The deceased's parents-in-law were also informed of the death. The police report states the following about the notification:

"Party 1's parents-in-law H and M, - - -, were personally notified by the patrol at 11:10. They reliably recognised Party 1 at the hospital (AKH) at 11:35. Both stated that Party 1 has had mental health problems for the past 4 years. On several occasions, they were afraid that he might commit suicide. Party 1's mother was also mentally unbalanced. She committed suicide.

At 11:45, Party 1's wife E was personally notified by Rødovre Police at the company - - -. The message was delivered by duty officer Per Siig.

The wife had told the patrol that he had almost certainly committed suicide. Their relationship was falling apart and the plan was for them to move apart."

The police carried out further questioning on February 20, 1995 and the following days. The following is stated in the police report:

"Another witness, social and health care student Hanne Hansen, ... was interviewed by telephone for the report at 13:10. She explained that she was driving along the expressway to the south about 3 cars behind Party 1. She was driving at a speed of about 90 km/h. At some point, she noticed the oncoming Party 2, who started to pull his truck out to the right (the eastern emergency lane). She immediately saw a flash and a lot of debris flying around the truck. She did not see the collision itself, but quickly realised what had happened.

The interviewee immediately stopped and ran to the accident site, where she arrived with a paramedic. The truck driver was not seriously injured. He climbed out of the truck himself. They ran to Part 1's car, where they realised that he was trapped. He had a pulse but was unconscious. They could not get him out. The interviewee was holding Party 1's head when he suddenly rolled his eyes and gasped slightly. After that, there was no pulse. She now realised that he had died. Witness doctor Mogens Kold … then came to the scene. He stated that death had occurred.

Continued on Tuesday, 21.02.95

Another witness, kitchen assistant trainee Pia Klausen, ... was interviewed for the report at 08:30 hours on that day. She explained that, prior to the accident, she had entered the expressway at Ebeltoft/Randersvejen to drive towards Aarhus. She was driving behind Party 1, who she believed had also entered the expressway at the same place. She drove 50-100 meters behind him and had the impression that the Party was driving at approx. 100 km/h, when at one point he began to pull to the left as a truck approached heading north. Party 1 had crossed the centre line before he righted the car and got back into his own lane, after which he continued southbound. The driver was somewhat startled by this manoeuvre, and after another 1½ km had been covered, Party 1 began to pull to the left again, at the same time as a truck (Party 2) came driving in the opposite direction. The manoeuvre took place so close in front of Party 2 that it was unable to react, and the collision occurred with great force in Party 2's half of the roadway, throwing debris, including Party 1's engine, into the air. The interviewee was unable to brake and slowly passed the accident site, after which she stopped and tried to get other vehicles to stop. She then ran to Party 1, where there was already someone trying to give first aid. As for Party 2, she realised that he was able to get out of his truck himself.

She had nothing further to add to her explanation.

Another witness, doctor Mogens Kold, ... was questioned about the case at 09:50 on that day. He stated that he was driving his car in a northerly direction along the expressway and was in a queue travelling at a speed approx. 80 km/h when traffic suddenly came to a standstill. He thought it was around 07:20 and when arrived at the scene of the accident about 10 minutes later, he realised what had happened. He rushed to Party 1's car, where Party 1 was trapped. He immediately realised that there was no pulse and that there were no reactions in the pupils when illuminated. The interviewer observed Party 1 for approximately 10 minutes. and pronounced him dead at 07:35, but he believed the Party had died as a result of the accident.

**200**

Secretariat, Feb 21, 1995.

Copyright© 2023 Karnov Group Denmark A/S                          2

When contacted by phone, doctor Peter Christensen stated that he became aware of the incident via TV.

The deceased stated that he had been prone to depression and had been referred to a psychiatrist. He had also been referred to a psychiatric hospital without, however, having received medical treatment. The deceased was a trained accountant assistant but had not taken any final exam to become a certified accountant. The deceased and his wife had worked in the same company, but due to downsizing they were both were fired. After some time, they both got jobs again, but this did not suit the deceased, and after 4 days he quit. The wife had got a job in Copenhagen. The wife would characterise the now deceased as having completely stopped working. He would sit in the living room/house and look at the snow, but not go out to clean the pavement/stairs, he left that to his wife. The deceased had had many conversations with the now deceased and at times felt that he almost scolded him. There was no doubt in his mind that what happened had to be considered a suicide.

…

Another witness, kitchen assistant Pia Klausen, ... was interviewed at 08:30 for the report. She explained that prior to the accident she had entered the expressway at Ebeltoft/Randersvejen to drive towards Aarhus. She was sure that she saw Party 1 stop at the access ramp and then enter the expressway shortly before the interviewee in same direction. She was driving 50-100 meters behind Party 1 and had the impression that the Party was driving at about 100 km/h, when at one point he started to pull to the left as a truck approached heading north. Party 1 had crossed the centre line before he righted the car and got back into his own lane, after which he continued southbound. The interviewee was somewhat startled by this manoeuvre, and when approximately 1½ km had been covered, Party 1 began to pull to the left again, at the same time as a truck (Party 2) came driving in the opposite direction. The manoeuvre was so close in front of Party 2 that he was unable to take evasive action and the collision occurred with great force in Party 2's half of the carriageway, throwing debris, including Party 1's engine, through the air. The interviewee was unable to brake and slowly passed the accident site with debris sprinkled around her, but without being hit. She stopped immediately afterwards and tried to get the other traffic to stop. She then ran back to Party 1, where someone was already trying to administer first aid.

As for Party 2, she could see that he could get out of the truck himself. She was very affected by the accident and had to have someone drive her from the accident site to her place of education, as she did not feel able to do it herself, and she had to stay at home that day for the same reason.

The interviewee was informed that subsequent investigations had shown that Party 1 had committed suicide and that the incident was not an accident.

The witness, doctor Mogens Kold, ... was questioned about the case at 09:50 on that day. He stated that he was travelling north on the expressway in his car and was in a queue travelling at approximately 80 km/h when traffic suddenly came to a halt. He thought it was 07:20, and when he arrived at the scene of the accident about 10 minutes later, he realised what had happened. He immediately rushed to Party 1, who was trapped. He immediately realised that there was no pulse and that there was no reaction in the pupils to light. Party 1 had a severe open fracture on his left, but there was no bleeding from the site. The interviewee observed Party 1 for approximately 10 minutes and pronounced him dead at 07:35. He had died as a result of the accident and never regained consciousness. It was the interviewer's finding that Party 1 had been wearing his seatbelt." On February 21, 1995, the medical officer Niels Peter Rothgardt issued a death certificate for A. The certificate states that the immediate cause of death was multiple injuries as a result of a road traffic accident. The manner of death is stated as suicide. An autopsy had not been performed.

After the accident, A's car was examined at the Danish Vehicle Inspection Centre in Aarhus by car inspector O. Nyegård Jensen. A certificate dated February 22, 1995 states that no defects were found in the steering system, brakes, tyres or chassis or bodywork. The following is stated under the item "Lights and signalling devices":

"No defects found. The appearance of filaments in the left rear light bulb showed that the normal light had been switched on. Stoplights not activated immediately before or at the moment of collision."

Upon examination of the car's damage, it was found that none of the car's tyres were punctured prior to the collision, and it is stated that "there was no indication that the driver's seat belt had been used at the time of the collision".

A certificate of the same date from the Danish Motor Vehicle Inspectorate states that no defects were found on the truck that A collided with.

Photographs of the two damaged cars were presented during the court hearing.

In the medical record that A's general practitioner, Dr Peter Christensen Skødstrup, kept regarding the deceased, we read:

| | |
|---|---|
| "01-19-94: | K PC: Fear of the heart, stethoscope of lungs and heart; ia, BP 130/80 ECG: nothing to note, sr an. |
| 05-31-94: | K PC: BP 130/80 stethoscope of lungs and heart: nothing to note, blood samples taken, serum rinsed. |
| 06-07-94: | TK PC: results of normal blood tests. |
| 10-24-94: | TK PC: hnev tril phys. Back problems - training - preferably a long-term programme! |
| 10-28-94: | K PC: conversation about back, is somewhat depressed thoughts – prescription seroxat 20 mg XX 1 a day. |
| **201** 11-02-94: | TK PC: regarding insomnia while taking seroxat - ask to take tablets in the morning. |
| 11-18-94: | K PC: conversation about seroxat - could possibly take 1/2 tablet a day. |

| 12-02-94: | K PC conversation. |
|---|---|
| 12-30-94: | K PC: Recurrent back pain for years, treated by chiropractor, physiotherapist, gym etc. |

Now low back pain with movement, no abdominal pressure aggravation.

Obj: lumbar spine is straight with tense musculature, freely movable. Nothing radicular.

/spondylosis col lumbalis col lumbalis recta obs/ - x-ray of cil lumbosacralis in 2 pl. - at the specialist.

| 01-06-95: | K PC: conversation, offer to start work as agreed. |
|---|---|
| 01-18-95: | TK PC: regarding work that he doesn't think he can do. Request to get an appointment with psychiatrist." |

Section 14 E of the terms and conditions of the accident insurance policy taken out for Mr A (item 1) lists the injuries that are not covered:

"Accidents intentionally caused by the injured Party. This applies regardless of the injured person's state of mind and sanity".

Section 20 C (item 2) of the insurance terms and conditions for comprehensive insurance states that the insurance does not cover damage "caused intentionally" or "caused by negligence that can be characterised as gross recklessness, cf. Section 108(2) of the Road Traffic Act".

During the proceedings, the Complainant has submitted some payslips from 1990 regarding Mr A's income at that time.

The Complainant has explained that she met A in 1987 in an accounting firm where they both worked. They moved in together in March 1989, and from the summer of 1992 they lived in Hjortshøj. After they had both changed jobs to a new accounting firm, they were dismissed at the end of 1990 due to illness. The sick leave was due to formaldehyde vapours in the newly refurbished premises. She later won a lawsuit against the company for unfair dismissal, as she had not accepted an employment contract that allowed her to be dismissed after 120 days of sick leave, as her spouse had. In March 1993, she got a new job with - - - as general manager of the Aarhus department. Mr A had no work and went home, but applied for a job as an assistant accountant. In the summer of 1993, he was offered a job for 7 months as an unskilled worker at the local centre in Lystrup. He was interested in trying others, and in early 1994 he investigated the possibility of training as a social and healthcare assistant. However, it was not possible to start that programme. He was upset about not having a job and watched a lot of television, but she doesn't think it's fair to say that he was fully incapacitated. He went to strength training during the day, read books, worked at home and often visited her parents. He never talked about committing suicide. He applied for many jobs and went to many job interviews. On January 1, 1995, he got a job as an assistant accountant in Egå. He was very happy with his new job, but the job didn't go so well as he had difficulty sitting down for a whole day due to back problems. He had many sick days, but was still employed when he died. He didn't talk about his mood, but only about his back problems. He told her that he had been prescribed antidepressants by his doctor. He thought the medication was irrelevant as he had no mental health problems, only back pain. He did not take the medication. He did not tell her that he had been referred to a psychiatrist. Because of her work, she was in Copenhagen 1-2 times a month for courses and meetings. On February 20, 1995, A drove her to the airport as usual. She was due to take the flight at 07:10. A was happy and comfortable and they talked the whole way. He helped her with her luggage and they agreed to talk in the evening. She then left for Copenhagen. There were no problems in their relationship and they had not talked about moving. They had just bought and renovated a house and had planned their summer holiday. They have no children. She was notified of the death by 2 police officers after the company manager asked her to come to his office. The officers informed her that her husband had crashed into a truck and that it looked like he had done it himself. She immediately called her parents, whom she did not see at home, and then her sister. Her sister had also been informed of the accident. She doesn't think she told the police that it must have been suicide or that they were moving away from each other.

Hans Ingolf Preben Dahl Låsby explained that on February 20, 1995 he was driving a semitrailer on his way to Grenaa along the two-lane expressway. He was travelling at a speed of approximately 85 km/h. The truck was heavily loaded as he had picked up coal at Studstrup Power Station. The weather was fine and visibility was good. It was bright and he had lights on the car as required. There was heavy traffic towards Aarhus, and there were also many cars behind him. Shortly in front of him - between 2 and 4 car lengths - a car broke out of the queue in the opposite lane and drove directly into his truck. He hadn't noticed the car until it pulled out. He didn't see if the car swerved or if it had its lights on. The driver of the car did not brake and did not take evasive action. It is his opinion that the car accelerated when it broke out of the queue, as it was going very fast and the entire front axle of the truck was torn off in the collision. The witness did not pull to the right himself, but was pushed to the right by the collision.

**202**

After the accident he pulled up next to the other car, but he doesn't remember if the driver was wearing a seatbelt.

Pia Klausen Ramten has explained that on the day in question, at around 7:30, she was driving south on the expressway on her way to the vocational school in Aarhus. She drove onto the expressway at the exit from Randers-Ebeltoftvejen, where she let a Toyota pass and drive in front of her. Visibility was good and the Toyota had its lights on. There was quite a lot of oncoming traffic. She was travelling at a speed of approximately 100 km/h. When she had driven about ½ kilometer, the Toyota suddenly moved into the opposite lane. This was not in connection with an overtaking manoeuvre. A truck came in the opposite direction and honked, after which the Toyota righted itself and pulled back into its own lane. She said to herself, "why is he driving like this" and slowed down, keeping a distance of 50-100 meters from the Toyota. There were no cars between them. About half a kilometer further on, the car repeated its manoeuvre and drove straight into a truck in the opposite lane. The car had not swerved beforehand, and it is not her opinion

Copyright© 2023 Karnov Group Denmark A/S

that the driver of the car was trying to overtake, as she does not believe there were cars directly in front of the Toyota. In her opinion, the Toyota steered straight into the truck without braking or swerving. It was the same way that the Toyota steered into the opposite lane both times. After the accident, she stopped the car a little further ahead and walked back to the Toyota. She did not notice if the deceased was wearing a seatbelt.

Doctor Peter Christensen Skødstrup, has explained that A became his patient around 1990. The witness cannot remember anything about the deceased's heart problems other than what is mentioned in the medical records. About the consultation on October 28, 1994, he remembers that A was out of work and not feeling well. He was given an antidepressant, but the witness is not sure that he took the medication as he was not motivated to do so. Later he switched to a dose of ½ tablet due to lack of motivation. The witness cannot remember the conversation with the deceased on December 2, 1994, and the consultation on December 30, 1994 only concerned physical complaints. The consultations on 6 and January 18, 1995 were conversations that resulted in him referring the deceased to a psychiatrist. He could not help the deceased as he was not motivated to help himself. The witness must have routinely asked the deceased about suicidal thoughts, but the deceased did not want to talk about it. It is his opinion that the deceased was unable to work due to back problems, but it is difficult to say whether the deceased was mentally ill. There was no danger of suicide. The deceased was sad, but did not seem severely depressed or unbalanced. Regarding his statements to the police, the witness has explained that he does not recall seeing the roadway accident mentioned on TV. He does not recognise the minutes of the interview as his own statements. The interview took place early in the morning when he was busy. He does not remember making a statement about the possibility of suicide, but will not deny this. If so, his statements have been purely speculative.

Sergeant Jørgen Bardung explained that he prepared the police report on the road accident, but he did not inform the deceased's family of the death. He arrived at the scene of the accident approximately 45 minutes later. The information in the police report about light and weather conditions corresponds to the conditions at the time of the accident. Overtaking was permitted at the location in question. He cannot remember the visibility conditions. It was the opinion of the doctor present that the deceased had been wearing a seatbelt, but the car inspector was of a different opinion. He cannot remember whether he mentioned the possibility of suicide to the police officers who informed the family.

Mogens Kold Egå explained that he is a doctor and arrived at the scene 10-15 minutes after the accident. The deceased's car was parked in the middle of the road and he was trapped in it. The seatbelt was hanging loosely over his left shoulder, but the witness did not see if the belt was fastened. The deceased was very badly injured. His chest was unstable and his head was hanging loose. There was no pulse and there was no reaction in the pupils. He cannot determine from the injuries whether the deceased was wearing a seatbelt at the time of the collision. The entire front of the car had been compressed. He has no knowledge of whether anyone else had seen the deceased beforehand. There were no other people in the car.

Public Health Medical Officer Niels Peter Rothgardt has explained that he issued the death certificate. He described the manner of death as suicide based on the information in the police report and not based on his own examinations of the deceased. These examinations showed that there was looseness in the neck and chest and that A had died as a result of the accident. There was no reason to perform an autopsy. There were no seat belt marks, but the deceased had been wearing thick clothing. The witness reached his conclusion about the cause of death based on the police report's information that the deceased's mother had committed suicide, that the deceased had been depressed and had been referred to a psychiatrist by his own doctor, that the deceased was now inactive, and that his family and work situation were poor. In addition, a witness had seen him pull out into the other lane. After the accident, a witness observed the deceased's pulse, which argues against the possibility of cardiac arrest.

**203**

H explained that A was her son-in-law. She had almost daily contact with him. He had applied for many jobs as a counsellor but had also talked about an education as a social and health care assistant or educator. However, he got a job as an accountant again and thought he could handle it despite his back problems. She is not aware that he had any intention of giving up work. His parents were no longer alive, so he spoke to her a lot. His mother had committed suicide, and he didn't understand his mother's actions and was suicidal himself. She was not aware that he was taking antidepressants. On February 20, 1995 at approximately 9:30, she was contacted personally by the police who asked for her daughter. When she stated that the Complainant had gone to Copenhagen, the police informed her that Mr A had been in an accident and had died. The police asked her to identify him, and she called his brother, who went along to the identification. She did not tell the police that A was going to commit suicide or that he had mental problems. It is her understanding that the police put words in her mouth, to say it was suicide.

Former vehicle inspector O. Nyegård Jensen explained that he examined the two cars involved in the accident. Based on examinations of the bulb in the rear light of the deceased's car, he found that the stoplight had not been switched on before the collision took place. There was no evidence that the seatbelt had been used by the deceased. A seatbelt can become deformed if it is buckled during the collision, but this does not happen in all cases, so it is not possible to determine whether the seatbelt had been used. No faults were found in the cars that could have caused the accident.

In support of her claims, the Complainant submits the following:
Item 1:
The claim is asserted against the Respondent on the basis of A's full accident insurance taken out with the Respondent. The Respondent has not proved that her spouse's death was caused by suicide. The provision in clause 14E of the insurance terms and conditions is therefore not applicable, she is therefore entitled to payment of the accident insurance sum.
Item 2:
The claim is asserted against the Respondent based on A's car insurance policy taken out with the Respondent. The Respondent has not proved that her husband intentionally caused the accident and there is no information that he has shown negligence that can be characterised as gross negligence. The provision in clause 20C of the insurance terms and conditions is therefore not applicable, and she is therefore entitled to be paid the comprehensive insurance amount.
Items 3 and 4:
The claim is asserted under Section 103(1), cf. Section 101(1), of the Road Traffic Act against the Respondent as the liability insurer of the truck with which A collided. The Respondent has neither proved that her husband's death was caused by suicide nor that he contributed to the damage through negligence that can be characterised as gross negligence, cf. Section 101(2) of the Road Traffic Act. She is therefore entitled to have these claims for compensation covered.

In support of her main claim regarding item 4, the Complainant has further argued that the survivor compensation for loss must be determined in accordance with Section 13(1), first sentence, cf. Section 7(5), of the Liability for Damages Act on the basis of the professional income that her deceased husband had during his employment as an assistant accountant, as his last employment was so short-term that the income from this work should not form the basis for the calculation of the compensation for survivor loss.

In support of his alternative claim concerning item 4, the Complainant submits that the compensation for survivor loss must be determined in accordance with Section 13(1), second sentence.

The Complainant has furthermore stated that the Respondent has the burden of proving that the injury was caused intentionally, and the Respondent has not met this burden of proof. The witness statements, according to which the deceased lived a normal life with good family contact and active job search, provide no basis for assuming that A would commit suicide. He distanced himself from his mother's suicide and had not talked about committing suicide himself. He had only spoken to his doctor twice about his state of mind and did not believe that the prescribed medication for depression was necessary, and the referral to a psychiatrist was not used. The deceased did not take any unusual actions prior to the accident that could indicate that he intended to commit suicide, and there is no information about his life and behaviour before the accident that could have motivated suicide. On the day of the accident, nothing out of the ordinary had happened and the deceased had driven his spouse to the airport as he often did before. The fact that the deceased pulled over into the opposite lane could be due to a moment of inattention, a careless overtaking manoeuvre or a bad feeling. The driving behaviour in itself is not sufficient proof of suicide. The seat belt information suggests that the deceased was wearing a seat belt while driving. The police report mentions suicide several times, but neither the Complainant nor her mother can confirm that they would have commented on this at the time. Although, in the emotionally difficult situation in which they were informed of the death, they may have imagined that the deceased could have committed suicide, this is not a sufficient basis for establishing that the deceased intended to cause the accident. The medical officer's assessment that it was a suicide is based exclusively on the information in the police report.

**204**

In support of its main claim, the Respondent submits the following:

Re Item 1:

The Respondent has proved that A's death was caused by suicide, and it follows from clause 14E of the insurance terms and conditions the Complainant is not entitled to payment of the insurance benefit.

Re Item 2:

The Respondent has proved that A caused the traffic accident intentionally, or at least proved that he caused the accident through negligence that can be characterised as gross negligence, and it follows from clause 20C of the insurance terms and conditions the Complainant is not entitled to the insurance benefit.

Re Items 3 and 4:

The Respondent has proved that A caused the traffic accident intentionally, or at least proved that he contributed to the traffic accident through gross negligence, and it follows from Section 103(1), cf. Section 101(2), of the Road Traffic Act that the Complainant is therefore not entitled to the insurance benefits in question.

The Respondent has further argued in relation to the Complainant's main claim in relation to item 4 that the deceased's previous income as an assistant accountant should not form the basis for the calculation of the survivor compensation, cf. Section 13(1), first sentence, cf. Section 7(2) of the Liability for Damages Act, and that the compensation should therefore in any case only be calculated as the minimum compensation under Section 13(1), second sentence, in accordance with the Complainant's alternative claim.

The Respondent has further stated that A's driving prior to and in connection with the accident, as described by witnesses Pia Klausen and Hans Ingolf Preben Dahl and confirmed by the technical examinations of the car, shows that the deceased committed suicide. According to the evidence, it must be assumed that the deceased steered directly towards the truck without trying to avoid it, and that his Toyota even accelerated during this manoeuvre. Pia Klausen, whose testimony must be given great weight, has furthermore explained that the deceased had pulled over towards another truck in a similar manner a short time before, but that he adjusted his Toyota at the last moment so that a collision was avoided. Together, the information from the deceased's medical records about his depressive tendencies and the reactions of the deceased's doctor and family members, as expressed to the police after the accident and reproduced in the police report, there is sufficient evidence to consider it proven that A had intentionally caused the collision.

Judges Berg Hansen and Eva Skov stated:

After the witness statements about A's driving prior to and in connection with the accident on February 20, 1995, including in particular the testimony of the witness Pia Klausen, together with the information about the traffic and visibility conditions at the accident site and the results of the technical investigations of the two cars involved, we find that it must be assumed that the deceased suddenly drove out of his own lane and into the opposite lane for no apparent reason, where he drove directly into the oncoming truck without having reduced speed or tried to avoid or brake before the collision.

It must also be assumed that A had been prescribed antidepressants shortly before and had been referred to a psychiatrist by her doctor due to depressive tendencies.

In addition, both the Complainant and her mother, H, and the deceased's own doctor, Peter Christensen, immediately after the accident - according to the police report - expressed to the police that it was or could very well be a case of suicide. Based on the evidence, we find no basis to assume that the information in the police report about the immediate reaction of all three of them was due to statements from the police officers who informed them of A's death. In light of this and the other information in the case, including particularly the information about A's personal and health conditions, we do not find it possible, after an overall assessment, to attach decisive importance to the statements made by the Complainant and her mother to the Court of Appeal.

Based on the above, we believe that the Respondent has proved that A intended to hit the oncoming truck, and the compensation must therefore be cancelled under the present circumstances. We therefore vote in favour of upholding the Respondent's claim for acquittal.

District Judge C. Haubek stated:

The information about the accident that appears in the statements given to the police and to the Court of Appeal by witnesses Hans Ingolf Preben Dahl and Pia Klausen indicate that the accident occurred when A deliberately drove into the oncoming truck. The police reports indicate that the police officers who dealt with the traffic accident in question were of the opinion that A committed suicide by deliberately driving into the oncoming lane and into an oncoming truck, and according to the information provided, it is

assumed that the police officers who contacted the deceased's parents-in-law, H and M, the deceased's spouse, the Complainant, and the deceased's doctor, Mogens Kold, after the accident, expressed the opinion that the road accident was caused by A's suicide. Against this background, the statements made by these four persons to the police when they were informed of the death must be assessed. Regardless of the fact that the circumstances of the accident indicate that A intentionally drove into the oncoming truck, the evidence before the Court of Appeal does not provide grounds to consider it proven that A committed suicide or otherwise intentionally hit the oncoming truck.

**205**

According to the information available, there is also no grounds for reducing the claim on the car (item 2) under Section 101(3) of the Road Traffic Act.

The information presented to the Court of Appeal about the deceased's professional circumstances does not provide a basis for discretionary determination of the annual salary on the basis of his salary income several years before the death pursuant to Section 7(2) of the Liability for Compensation Act, and the compensation for survivor loss under Section 12 must therefore be determined in accordance with Section 13(1), second sentence.

This judge therefore votes in favour of upholding the Complainant's alternative claim.

The ruling is made by majority vote.

- - -

The Complainant, E, shall pay DKK 50,000 in legal costs to the Respondent.

## Supreme Court

### Supreme Court ruling.

In a previous instance, the ruling was handed down by the 1st division of the Western Court of Appeal on April 7, 1998.

Five judges participated in the ruling: Pontoppidan, Wendler Pedersen, Jørgen Nørgaard, Lene Pagter Kristensen and Henrik Zahle. The Complainant, E, has only repeated his claim in the alternative.

The Respondent, Topdanmark Forsikring A/S, has claimed confirmation. New explanations have been submitted to the Supreme Court.

The parties agree that Topdanmark's claim - which is a claim for acquittal - must be upheld on all claims if it is true that A had intent to hit the oncoming truck.

*Police officer Jørgen Bardung* has stated, among other things, that he was the case officer on this case and therefore wrote the factual information in the police report, which appears in the report. The information about the parents-in-law is based on what his colleagues Bach and Brændstrup told him verbally. He has written in his own words what his colleagues told him. After receiving a telephone call from colleagues in Rødovre, he included the information in the report about his wife's reaction to the news of the death. He does not remember today whether he was notified directly from Rødovre or whether the message went through the duty officer. It was he who interviewed Pia Klausen by phone on February 21, 1995. During the telephone conversation, he informed her that the deceased had committed suicide. This was to reassure her, she was very shaken. It was not necessarily at the end of the conversation that he mentioned this. He also informed the truck driver about this. This was so that he would not have to feel guilty after the accident.

*Police officer Jens Bach* has explained, among other things, that he remembers the case in question, although he does not remember all the details today. Together with his colleague Brændstrup, he had to inform the parents-in-law about the death. The parents-in-law reacted relatively calmly and expressed that they were not completely surprised. They mentioned that their son-in-law had mental health problems. It was clear that they could have expected something like this. In the same context, they mentioned that one of the deceased's parents had recently taken his own life. According to his recollection, they did not directly mention that the deceased had probably committed suicide, but it was clear from the conversation that this was what they meant. He and his colleague did not mention anything about suicide.

*Police officer Lars Åby Brændstrup* has explained that he and his colleague Bach were asked to inform the relatives. The parents-in-law were a little startled by what he and his colleague were after, but they mentioned at the beginning of the conversation that they had heard about an accident on the expressway and that they had wondered if it was their son-in-law, knowing that he had just driven their daughter to the airport. They mentioned that things were not going well between him and their daughter and that he had been depressed. Later, either at home, in the chapel or on the drive, information came out that could imply suicide, and that the deceased's mother had also committed suicide. He cannot remember which of the in-laws said this, but he believes it was the mother-in-law, as she was the one who spoke to them the most. He thinks he remembers that PC Bardung was sitting at the desk when he returned to the station and that he then informed Bardung about what they had learnt from the parents-in-law. What is stated in the police report undoubtedly corresponds to what he mentioned to Bardung. However, he does not remember today that he mentioned that the deceased's mother was mentally unbalanced. Neither he nor his colleague put anything in the parents-in-law's mouth.

*Pia Klausen* has explained that she was too shocked after the accident to drive herself and was therefore driven to Aarhus in her own car. She saw the accident on TV in the evening. When she thought things through, she came to the conclusion that it had to be suicide. It could not be an accident. She had already come to this conclusion in the afternoon. She was not questioned by the police until the next day.

### The Supreme Court's comments.

Four judges - Pontoppidan, Wendler Pedersen, Jørgen Nørgaard and Lene Pagter Kristensen - stated:

For the reasons stated by the Court of Appeal, which are supported by the explanations given to the Supreme Court, we agree that it has been established beyond reasonable doubt that A intended to hit the oncoming truck. We therefore vote in favour of upholding the judgment.

**206**

Judge Henrik Zahle states:

The case contains much information about the deceased A's social, health and family situation, including that he had been unemployed for a long time and found his new job difficult, that he was somewhat depressed and suffered from back pain, and that his wife would probably terminate the cohabitation. However, these difficulties are not unusual and would in other contexts be compatible with an assumption of accidental death. As stated by the Court of Appeal, his relatives and his doctor expressed - immediately after the death - that it could very well have been suicide, and this shows that it would not be incomprehensible or surprising to them if

the deceased committed suicide, but these assessments of the deceased's general life situation have only very limited evidential relevance when deciding *whether* the deceased committed suicide on February 20, 1995 or died as a result of a traffic accident. The technical investigation shows that the deceased did not brake before the collision, but this *can be* reconciled with the fact that the collision was due to, for example, distraction or a feeling of anger did not end before the collision. The truck driver's statement that the deceased may have accelerated immediately before the collision has no evidentiary weight given the very short time and the dramatic event that occurred immediately after. Pia Klausen's explanation may be decisive about the two time A drove across the centre line, as this driving style can be understood as an expression of a decision to commit suicide by colliding with an oncoming truck, a decision that - one must assume – he regretted. However, it cannot be ruled out that the driving behaviour must be understood in another way, including, in addition to distraction or ill health as the deceased's attempt to overtake, possibly in different ways at the two crossings of the centre line.

Although it is an obvious possibility that the deceased committed suicide on February 20, 1995, the available information about his actions can also be understood in another manner, so that it is not beyond all reasonable doubt that the deceased intentionally drove into the truck. It can therefore not be assumed that the deceased committed suicide.

With regard to the individual items, it should also be noted that the accident insurance policy only excludes intent (item 1), that there is no basis for assuming gross negligence, cf. clause 20C of the comprehensive insurance policy (item 2), and that there is no basis for reducing compensation for funeral expenses and compensation for loss of support due to gross negligence (items 3 and 4).

I therefore vote in favour of accepting E's claim. The decision is taken by majority vote.

**The Judgement of the Court:**

*The Court of Appeal's ruling is upheld.*

*In costs before the Supreme Court, the Appellant, E, shall pay DKK 50,000 to the Respondent, Topdanmark Forsikring A/S.*

*The ordered costs must be paid within 14 days of the ruling of this Supreme Court.*

Copyright© 2023 Karnov Group Denmark A/S                                             8

**U.2000.197H**

*Ulykke med døden til følge anset for forsætligt fremkaldt af afdøde.*

*Forsikring 3.2.*

- A, der i forsikringsselskabet F havde tegnet en heltidsulykkesforsikring, afgik den 20. februar 1995 ved døden som følge af en trafikulykke på en motortrafikvej. F nægtede at udbetale forsikringssummen til A's enke E under henvisning til, at skaden var forvoldt med forsæt, idet A efter F's opfattelse havde begået selvmord. Det blev lagt til grund, at A uden påviselig årsag pludselig var kørt ud af sin egen vognbane og over i den modsatte, hvor han kørte direkte ind i en modkørende lastbil, uden at han inden sammenstødet havde nedsat farten eller forsøgt at undvige eller bremse. Det blev desuden lagt til grund, at A kort inden ulykken var blevet ordineret antidepressiv medicin og henvist til psykiater på grund af depressive tendenser, hvortil kom, at E og A's egen læge umiddelbart efter ulykken over for politiet havde givet udtryk for, at der var eller meget vel kunne være tale om selvmord. Da F havde godtgjort, at A havde haft forsæt til at påkøre den modkørende lastvogn, blev F frifundet for E's krav om udbetaling af forsikringssummen. (Dissens).

**H.D. 29. oktober 1999 i sag I 190/1998**

*E (adv. Anders Kirk, Århus)*
mod
*Topdanmark Forsikring A/S (adv. Joan Colding, Viborg).*

**Vestre Landsret**

*Vestre Landsrets dom 7. april 1998 (1. afd.)*

(C. Haubek, Bjerg Hansen, Eva Skov (kst.)).

Den 20. februar 1995 afgik A ved døden som følge af en trafikulykke på motortrafikvejen mellem Mols og Århus i Rosenholm Kommune. Afdødes personbil var kaskoforsikret i det sagsøgte forsikringsselskab, Topdanmark Forsikring A/S, og han havde i samme forsikringsselskab tegnet en heltidsulykkesforsikring med en forsikringssum på 553.000 kr. ved død.

Sagsøgeren under denne sag, E, der var gift med A, anmeldte ved skrivelser af 10. april 1995 og 17. maj 1995

**198**

et foreløbigt krav over for sagsøgte på grundlag af de to forsikringer på i alt 1.007.874,85 kr. Ved skrivelse af 30. maj 1995 afviste sagsøgte at betale erstatning under henvisning til, at skaden var forvoldt med forsæt, idet A efter forsikringsselskabets opfattelse havde begået selvmord.

Under denne sag, der er anlagt den 3. april 1996, har sagsøgeren, E, principalt påstået sagsøgte, Topdanmark Forsikring A/S, dømt til at betale 1.101.771,65 kr. med procesrente af 424.396,80 kr. fra den 20. februar 1995 og af 677.374,85 kr. fra den 17. maj 1995, til betaling sker.

Subsidiært har sagsøgeren påstået sagsøgte dømt til at betale 1.005.874,85 kr. med procesrente af 328.500 kr. fra den 20. februar 1995 og af 677.374,85 kr. fra den 17. maj 1995, til betaling sker.

Sagsøgte har påstået frifindelse, subsidiært betaling af et mindre beløb end 1.005.874,85 kr.

Sagsøgeren har opgjort kravet i henhold til sin principale påstand således:

| | | | |
|---|---|---|---|
| 1. | | Forsikringssum ulykkesforsikring | 553.000,00 kr. |
| 2. | | Erstatning for ødelagt Toyota Corolla | 115.000,00 kr. |
| 3. | | Begravelsesudgifter - netto, jf. erstatningsansvarslovens § 12 | 9.374,85 kr. |
| 4. | | Erstatning for tab af forsørger i henhold til erstatningsansvars- lovens § 12, jf. § 13 | <u>424.396,80 kr.</u> |
| | I alt | | 1.101.771,65 kr. |

For så vidt angår den subsidiære påstand er de første 3 poster opgjort på tilsvarende måde, mens post 4 er opgjort til minimumserstatningen på 328.500 kr.

Sagsøgte har ikke størrelsesmæssigt bestridt post 1-3, og der er heller ikke uenighed mellem parterne om selve beregningen af forsørgertabserstatningen, men sagsøgte har gjort gældende, at en eventuel erstatning for tab af forsørger skal fastsættes til minimumserstatningen.

Sagens nærmere omstændigheder er følgende:

Sagsøgerens ægtefælle, A, der ved sin død var 41 år, var uddannet revisorassistent og arbejdede som sådan, indtil han blev afskediget med udgangen af november 1990. Han modtog herefter dagpenge, indtil han i 1993 var i jobtilbud i 7 måneder på et lokalcenter. Efter jobtilbuddets ophør modtog han atter dagpenge med højeste dagpengesats.

Den 20. februar 1995 førte A sin personbil, en Toyota Corolla, årgang 1990, mod Århus ad motortrafikvejen i Rosenholm Kommune efter at have kørt sagsøgeren til Tirstrup Lufthavn. Ulykken, hvorved A blev dræbt, fandt sted kl. 07.22, idet han kørte over i den modsatte kørebanehalvdel og stødte frontalt sammen med en modkørende lastbil med påhængsvogn. Efter uheldet optog politiet rapport og foretog undersøgelser af uheldsstedet og af førerne af de to køretøjer.

Af politirapporten fremgår det, at der på uheldsstedet på tidspunktet, hvor ulykken fandt sted, var vådt føre, men ingen nedbør. Det var sigtbart, og der var dagslys. Der er i rapportens rubrik vedrørende brug af sikkerhedssele vedrørende A sket afkrydsning såvel i Ja-feltet som i Vides ikke-feltet. Udtagne blodprøver viste, at hverken afdøde eller føreren af lastbilen, Hans Ingolf Preben Dahl, var påvirkede af spiritus. Det fremgår endvidere af politirapporten, der er udarbejdet af politiassistent Jørgen Bardung, at han sammen med en kollega ankom til ulykkesstedet kl. 08.05. Om de to bilers placering er der angivet følgende i rapporten:

»Part l's personbil holdt i den vestlige kørebanehalvdel med fronten mod syd i en afstand af 9 m syd for 21,5 km stenen. Hele bilens front var revet af. Motoren lå 14 m. inde på marken mod vest for uheldsstedet.

Part 2's lastbil holdt ude i vejgrøften i den østlige side af vejen med fronten mod nord i en afstand af 63 m nord for 21,5 km stenen. Lastvognens venstre forhjul og forbro var revet af. Den var standset

efter at den først havde nedkørt 24 m autoværn og nødtelefon 21 Ø.

Lastvognen havde en tilkoblet kerre og var belæsset med i alt 29 tons kul.«

Om uheldsstedet er der følgende oplyst i politirapporten:

»Uheldsstedet er en 12,5 m bred motortrafikvej opdelt i to kørebanehalvdele med en stiplet vognbanelinie. Der er i begge sider af vejen anlagt et nødspor, som er adskilt fra den øvrige kørebane med en ubrudt kantlinie. Langs den østlige side af vejen er der på stedet opsat autoværn.

På begge sider af vejen er der ved uheldsstedet opstillet nødtelefoner mærket 21 V og 21 Ø.

Der er på motortrafikvejen opsat C 55 tavler med angivelse af fartbegrænsning på 90 km/t.

Ved en undersøgelse på uheldsstedet sås der på den østlige vejbane ca. 26 m syd for 21,5 km stenen aftryk i vejbelægningen, hvor lastvognens forhjul er revet af og fronten er faldet ned og skuret mod vejbanen. Der sås ligeledes på samme sted en olieplamage på vejen.

24 m Autoværn øst for vejen var revet op, ligesom nødtelefon 21 Ø var knækket.

Der sås ingen blokadespor på vejen. (våd kørebane).«

Efter at være færdige på ulykkesstedet kørte de to politiassistenter til Århus Kommunehospital for bl.a. at foretage afhøring af lastbilens fører. Om denne afhøring hedder det i politirapporten:

»Hans Ingolf Preben Dahl

blev . . . afhørt til sagen. Han blev som evt. sigtet afhørt under iagttagelse af rpl.'s § 752. Han forklarede, at han med sit lastvognstog kørte ad motortrafikvejen mod nord.

Han var placeret i vejens østlige kørebanehalvdel. Han kørte med en hastighed af ca. 80 km/t og havde

**199**

bilens nærlys tændt. Der var ingen anden trafik i vognbanen et godt stykke frem. I den modkørende kørebanehalvdel var der tæt trafik mod syd. Afhørte bemærkede først part 1, da denne var i en afstand af ca. 10 m foran lastbilen. Part 1 trak da skråt over mod afhørte i en skarp bue. Afhørte blev noget chokeret, men nåede ikke at reagere, inden han med stor kraft blev påkørt mod sin venstre front. Han mistede derved totalt herredømmet over lastvognen, som fik forhjulet revet af, hvilket bevirkede, at han hverken kunne styre eller bremse. Lastvognen fortsatte ud i rabatten, hvor den pløjede noget autoværn op. Afhørte oplyste, at lastvognen var belæsset med i alt 29 tons kul, som han netop havde hentet på Studstrupværket.«

Politiet underrettede i løbet af formiddagen den 20. februar 1995 A's ægtefælle, sagsøgeren E, der befandt sig i København, om hans død. Også afdødes svigerforældre blev underrettet om dødsfaldet. Om underretningen anføres følgende i politirapporten:

»Part 1's svigerforældre H og M, ———, blev kl. 1110 personligt underrettet af patruljen. De foretog med sikkerhed genkendelse af part 1 på AKH kl. 1135. Begge oplyste, at part 1 igennem de sidste ca. 4 år har haft psykiske problemer. De har flere gange været bange for at han evt. ville begå selvmord. Part 1's moder var ligeledes psykisk ude af balance. Hun begik selvmord.

Part 1's hustru E blev kl. 1145 personligt underrettet af Rødovre politi i firmaet — — —. Meddelelsen overbragt af vagthavende Per Siig.

Hustruen havde udtalt til patruljen, at han næsten med sikkerhed havde begået selvmord. Deres samlivsforhold var ved at gå i stykker, og det var planen, at de skulle flytte fra hinanden.«

Den 20. februar 1995 og de følgende dage foretog politiet yderligere afhøringer. Herom er følgende anført i politirapporten:

»Vidnet social og sundhedselev Hanne Hansen . . . er telefonisk afhørt til rapporten kl. 1310. Hun forklarede, at hun kørte ad motortrafikvejen mod syd placeret ca. 3 biler efter part 1. Hun kørte med en hastighed af ca. 90 km/t. Hun bemærkede på et tidspunkt den modkørende part 2, der i sin lastvogn begyndte at trække ud mod højre (det østlige nødspor). Hun så umiddelbart efter et glimt og en masse stumper fløj omkring lastbilen. Hun så ikke selv påkørslen, men blev hurtigt klar over, hvad der var sket.

Afhørte standsede straks og løb til uheldsstedet, hvortil hun kom sammen med en falckredder. Lastvognschaufføren var ikke kommet alvorligt til skade. Han kravlede selv ud af bilen. De løb derfor hen til Part 1's personbil, hvor de konstaterede, at han sad fastklemt. Han havde puls, men var bevidstløs. De kunne ikke få ham ud. Afhørte stod og holdt hovedet på part 1, da han pludselig rullede med øjnene og gispede let. Derefter var der ingen puls. Hun var nu klar over, at han var afgået ved døden. Vidnet læge Mogens Kold kom da til stede. Han oplyste, at døden var indtrådt.

Fortsat tirsdag den 210295

Vidnet køkkenassistentelev Pia Klausen . . . blev d.d. kl. 0830 afhørt til rapporten. Hun forklarede, at hun forud for uheldet var kørt ind på motortrafikvejen ved Ebeltoft/Randersvejen for at køre mod Århus. Hun kom her til at køre bag part 1, som hun mente ligeledes kørte ind på motortrafikvejen samme sted. Hun kørte 50-100 m bag denne og havde indtryk af at parten kørte med ca. 100 km/h, da han på et tidspunkt begyndte at trække mod venstre, da en lastbil kom imod med retning mod nord. Part 1 var kommet over midterlinien, inden han igen fik rettet bilen op og kom tilbage i sin egen kørebanehalvdel, hvorefter han fortsatte videre mod syd. Afhørte var noget forskrækket over denne manøvre og da der var blevet tilbagelagt yderligere ca. 1½ km, begyndte part 1 igen at trække mod venstre, samtidig med at en lastbil (part 2) kom kørende i modsatte retning. Manøvren skete så tæt foran part 2, at denne ikke kunne nå at reagere, og sammenstødet skete med stor kraft i part 2's kørebanehalvdel, hvorved vragstumper, herunder part l's motor blev kastet op i luften. Afhørte kunne ikke nå at bremse og passerede langsomt uheldsstedet, hvorefter hun standsede og forsøgte at få den øvrige trafik til at standse. Hun løb herefter frem til part 1, hvor der allerede var en, der søgte at give førstehjælp. M h.t. part 2 kunne hun konstatere, at denne selv kunne komme ud af sin lastbil.

Hun havde ikke yderligere at tilføje sin forklaring.

Vidnet læge Mogens Kold . . . blev d.d. kl. 0950 afhørt til sagen. Han oplyste, at han var kørende i sin personbil i nordlig retning ad motortrafikvejen og befandt sig i en kø, der holdt en hastighed på ca. 80 km/h, da der pludselig blev en standsning i trafikken. Han mente, at klokken da var ca. 0720 og da han ca. 10 min. senere var fremme ved uheldsstedet, blev han opmærksom på, hvad der var sket. Han skyndte sig hen til part l's personbil, hvor part 1 sad fastklemt. Han kunne umiddelbart konstatere, at der ikke var nogen puls, ligesom der ikke var reaktioner i pupillerne ved belysning. Afhørte observerede part 1 i ca. 10 min. og erklærede ham for død kl. 0735, men han mente, parten var død som følge af uheldet.

Sekretariatet 21. feb. 1995.

Læge Peter Christensen oplyste d.d. ved tlf. henvendelse herfra, at han blev bekendt med det skete via TV.

Om nu afdøde oplyste afh., at denne havde haft tendens til depressioner og var blevet henvist til psykiater. Han var ligeledes blevet henvist til

**200**

Psykiatrisk Hospital uden dog at være kommet i medicinsk behandling. Nu afdøde var uddannet revisorass. men havde ikke taget nogen afsluttende eksamen til reg. revisor. Nu afdøde og hustru havde arbejdet i samme firma, men grundet nedskæringer var de begge

blevet fyret. Efter nogen tid havde de begge igen fået job, men dette passede ikke nu afdøde, og efter 4 dage holdt han op. Hustruen havde fået job i København. Afh. vil betegne nu afdøde som fuldstændig gået i stå. Han kunne sidde inde i stuen/huset og se det sne uden for, men at gå ud for at rengøre fortov/trappe, det orkede han ikke, dette overlod han til hustruen. Afh. havde haft mange samtaler med nu afdøde, og følte til tider, at han næsten skældte ham ud. Der var for afh. ingen tvivl om, at det skete måtte betragtes som et selvmord.

. . .

Vidnet køkkenassistent Pia Klausen . . . blev d.d. . . . kl. 0830 afhørt til rapporten. Hun forklarede, at hun forud for uheldet var kørt ind på motortrafikvejen ved Ebeltoft/Randersvejen for at køre mod Århus. Hun var sikker på, at hun så part 1 holde stille ved tilkørselsrampen for så at begive sig ned på motortrafikvejen kort før afhørte med samme retning. Hun kørte 50-100 m bag part 1 og havde indtryk af, at parten kørte med ca. 100 km/h, da han på et tidspunkt begyndte at trække mod venstre, da en lastbil kom imod med retning mod nord. Part 1 var kommet over midterlinien, inden han igen fik rettet bilen op og kom tilbage i sin egen kørebanehalvdel, hvorefter han fortsatte videre mod syd. Afhørte var noget forskrækket over denne manøvre, og da der var blevet tilbagelagt yderligere ca. 1½ km, begyndte part 1 igen at trække mod venstre, samtidig med at en lastbil (part 2) kom kørende i modsatte retning. Manøvren skete så tæt foran part 2, at denne ikke kunne nå at foretage undvigemanøvre, og sammenstødet skete med stor kraft i part 2's kørebanehalvdel, hvorved vragstumper, herunder part l's motor, blev kastet gennem luften. Afhørte kunne ikke nå at bremse og passerede langsomt uheldsstedet med vragstumper dryssende omkring sig, dog uden at blive ramt. Hun standsede op umiddelbart efter og forsøgte at få den øvrige trafik til at standse. Hun løb herefter tilbage til part 1, hvor der allerede var en, der forsøgte at give førstehjælp. M.h.t. part 2 kunne hun se, at denne selv kunne komme ud af lastbilen. Hun var meget berørt af uheldet og måtte have en til at køre sig fra uheldsstedet til sit uddannelsessted, idet hun ikke så sig i stand til at gøre det selv, og hun havde været nødt til at blive hjemme d.d. af samme årsag.

Afhørte blev gjort bekendt med, at undersøgelser efterfølgende havde vist, at part 1 havde begået selvmord, og at der ikke var tale om et hændeligt uheld.

Vidnet, læge Mogens Kold . . . blev d.d. kl. 0950 afhørt til sagen. Han oplyste, at han kørte ad motortrafikvejen i nordlig retning i sin personbil og befandt sig i en kø, der kørte med ca. 80 km/h, da der pludselig kom en standsning i trafikken. Han mente, at klokken var 0720, og da han ca. 10 min. senere kom frem til uheldsstedet, blev han klar over, hvad der var sket. Han skyndte sig straks hen til part 1, der sad fastklemt. Han kunne umiddelbart konstatere, at der ikke var nogen puls, ligesom der ikke var reaktioner i pupillerne ved belysning. Part 1 havde et svært åbent benbrud på venstre ben, men der var ingen blødning fra stedet. Afhørte observerede part 1 i ca. 10 min. og erklærede ham for død kl. 0735. Han var død som følge af uheldet og kom aldrig til bevidsthed. Det var afhørtes konstatering, at part 1 havde haft sin sikkerhedssele spændt.«

Den 21. februar 1995 udfærdigede embedslæge Niels Peter Rothgardt dødsattest vedrørende A. I attesten er det anført, at den umiddelbare dødsårsag var multiple læsioner, som var en følge af færdselsulykke. Dødsmåden er angivet som selvmord. Obduktion havde ikke fundet sted.

Efter ulykken blev A's personbil undersøgt på Statens Bilinspektion i Århus af bilinspektør 0. Nyegård Jensen. Af attest af 22. februar 1995 fremgår det, at der ikke blev konstateret mangler ved styreapparat, bremser, dæk eller chassis og karosseri. Under punktet »Lygter, tegn- og signalgivningsapparater« er følgende anført:

»Ingen mangler konstateret. Udseendet af glødetråde i venstre baglygtepære viste, at almindeligt lys havde været tændt. Stoplyset ikke aktiveret umiddelbart før eller i kollisionsøjeblikket.«

Ved gennemgang af bilens beskadigelser blev det konstateret, at ingen af bilens dæk var punkteret før kollisionen, ligesom det er angivet, at der »var ikke tegn på, at førersædesikkerhedsselen havde været anvendt i kollisionsøjeblikket«.

Af en attest af samme dato fra Statens Bilinspektion fremgår det, at der ikke blev konstateret mangler ved den lastbil, som A kolliderede med.

Der har under domsforhandlingen været forevist fotografier af de to beskadigede biler.

I den journal, som A's praktiserende læge, læge Peter Christensen, Skødstrup, førte vedrørende afdøde, er det anført:

| | | |
|---|---|---|
| »19-01-94: | K PC: | Bange for hjertet, st.p et c; ia, BT 130/80 EKG: ia, sr an. |
| 31-05-94: | K PC: | BT 130/80 st. p et c: ia, der tages blodprøver, cerumenskylles. |
| 07-06-94: | TK PC: | svar på normale blodprøver. |
| 24-10-94: | TK PC: | hnev tril fys. Ryginsufficiens - optræning - gerne et langvarigt program! |
| 28-10-94: | K PC: | samtale omkring ryg, er noget depressiv i sin tanke - rc t seroxat 20 mg XX 1 dagl. |
| **201** 02-11-94: | TK PC: | ang søvnbesvær på seroxat - anb at tage tabl om morgenen. |
| 18-11-94: | K PC: | samtale omkring seroxat - kunne evt tage 1/2 tabl x i dagl?. |
| 02-12-94: | K PC. | samtale. |
| 30-12-94: | K PC: | Gennem år recidiverende ryggener, behandlet hos kiropraktor, fysioterapeut, træningscenter mv. |

Nu smerter lavt i lænden ved bevægelser, ingen bugpresseforværring.

Obj: lænderyggen er lige med spændt muskulatur, frit bevægelig. Intet radikulært.

/spondylosis col lumbalis col lumbalis recta obs/ - rtg af cil lumbosacralis i 2 pl. - ad speclægernes hus.

06-01-95:   K PC: samtale, anb at starte på sit arbejde som aftalt.

18-01-95:   TK PC: ang. arbejde, som han ikke mener at kunne klare. Anb at få en tid hos psykiater.«

I punkt 14 E i forsikringsvilkårene for den ulykkesforsikring, som var tegnet for A (post 1), er anført som skader, der ikke dækkes: »Ulykkestilfælde, der skyldes tilskadekomnes forsæt. Dette gælder uanset tilskadekomnes sindstilstand og tilregnelighed«.

Af forsikringsvilkårene for kaskoforsikringen punkt 20 C (post 2) fremgår det, at forsikringen ikke dækker skade »forvoldt med forsæt« eller »forvoldt ved en uagtsomhed, der kan betegnes som grov hensynsløshed, jf. færdselslovens § 108, stk. 2«.

Sagsøgeren har under sagen fremlagt nogle lønsedler fra 1990 vedrørende A's indkomst på daværende tidspunkt.

Sagsøgeren har forklaret, at hun mødte A i 1987 i et revisionsfirma, hvor de begge arbejdede. De flyttede sammen i marts 1989, og fra sommeren 1992 boede de i Hjortshøj. Efter at de begge havde skiftet arbejdsplads til et nystartet revisionsfirma, blev de afskediget i slutningen af 1990 på grund af sygdom. Sygefraværet skyldtes formaldehyddampe i de nyindrettede lokaler. Hun vandt senere en retssag mod firmaet for uberettiget afskedigelse, da hun ikke som sin ægtefælle havde accepteret en ansættelsesaftale med adgang til fyring efter 120 sygedage. I marts 1993 fik hun nyt arbejde hos — — — som daglig leder af Århus-afdelingen. A havde ikke arbejde og gik hjemme, men søgte job som revisorassistent. I sommeren 1993 kom han i jobtilbud i 7 måneder som ufaglært på lokalcentret i Lystrup. Han var interesseret i at prøve andet arbejde, og i begyndelsen af 1994 undersøgte han muligheden for at tage en uddannelse som social- og sundhedsassistent. Det var imidlertid ikke muligt at påbegynde uddannelsen på det tidspunkt. Han var ked af ikke at have arbejde og så en del fjernsyn, men hun mener ikke, at man kan sige, at han var gået i stå. Han gik til styrketræning om dagen, læste, arbejdede i hjemmet og besøgte ofte hendes forældre. Han har aldrig talt om at begå selvmord. Han søgte mange job og var til mange ansættelsessamtaler. Fra den 1. januar 1995 fik han arbejde som revisorassistent i Egå. Han var meget glad for sit nye job, men ansættelsen forløb ikke så godt, da han på grund af rygproblemer havde svært ved at sidde ned en hel dag. Han havde mange sygedage, men var fortsat ansat, da han døde. Han talte ikke om sit humør, men alene om sine problemer med ryggen. Han fortalte hende, at han havde fået antidepressiv medicin hos sin læge. Han mente, at medicinen var irrelevant, da han ikke havde psykiske problemer, men kun ondt i ryggen. Han tog ikke medicinen. Han har ikke fortalt, at han var blevet henvist til psykiater. På grund af sit arbejde var hun i København 1-2 gange om måneden til kurser og møder. Den 20. februar 1995 kørte A hende til lufthavnen, som han plejede. Hun skulle med flyet kl. 7.10. A var glad og godt tilpas, og de talte sammen hele vejen. Han hjalp hende med bagagen, og de aftalte at tale sammen om aftenen. Herefter tog hun til København. Der var ingen problemer i deres samlivsforhold, og de havde ikke talt om at flytte fra hinanden. De havde lige købt og istandsat hus og havde planlagt deres sommerferie. De har ingen børn. Hun modtog meddelelse om dødsfaldet af 2 politifolk, efter at firmaets direktør havde bedt hende om at komme op på hans kontor. Betjentene oplyste, at hendes mand var kørt ind i en lastbil, og at det så ud til, at han havde gjort det selv. Hun ringede straks til sine forældre, som hun ikke traf hjemme, og derefter til sin søster. Søsteren havde også fået underretning om, at det var sket med vilje. Hun mener ikke, at hun har sagt til politiet, at det må have været selvmord, eller at de var ved at flytte fra hinanden.

Hans Ingolf Preben Dahl, Låsby, har forklaret, at han den 20. februar 1995 kørte med et lastvognstog på vej til Grenaa ad motortrafikvejen. Han kørte med en hastighed på cirka 85 km i timen. Bilen var tungt læsset, da han havde hentet kul på Studstrupværket. Vejret var fint og sigtbarheden god. Det var lyst, og han havde lys på bilen som påbudt. Der var tæt trafik mod Århus, og der var også mange biler bag ham. Kort foran ham - mellem 2 og 4 personbilslængder - brød en bil ud af køen i den modsatte vognbane og kørte direkte ind i hans lastvogn. Han havde ikke bemærket bilen, før den trak ud. Han så ikke, om bilen slingrede, eller om den havde lys på. Føreren af bilen bremsede ikke og foretog ingen undvigemanøvre. Det er hans opfattelse, at bilen accelererede, da den brød ud af køen, idet det gik meget stærkt, og hele lastbilens foraksel blev revet af ved sammenstødet. Vidnet trak ikke selv til højre, men blev skubbet til højre ved sammenstødet. Efter uheldet var

**202**

han henne ved den anden bil, men han husker ikke, om føreren havde sikkerhedssele på.

Pia Klausen, Ramten, har forklaret, at hun den pågældende dag ved halv otte-tiden kørte ad motortrafikvejen mod syd, da hun skulle til Teknisk Skole i Århus. Hun kørte ned på motortrafikvejen ved nedkørslen fra Randers-Ebeltoftvejen, hvor hun lod en Toyota passere og køre foran hende. Der var god sigtbarhed, og Toyotaen havde lys på. Der var forholdsvis meget modkørende trafik. Hun kørte med en hastighed på ca. 100 km i timen. Da hun havde kørt ca. ½ kilometer, kørte Toyotaen pludselig over i den modsatte vejbane. Det var ikke i forbindelse med en overhaling. En lastbil kom i den modsatte retning og dyttede, hvorefter Toyotaen blev rettet op og trak tilbage i egen banehalvdel. Hun tænkte »hvordan er det, han kører« og satte farten ned og holdt en afstand til Toyotaen på 50-100 m. Der kørte ingen biler imellem dem. Ca. l½ km længere fremme gentog bilen sin kørsel og kørte lige over i en lastbil i den modsatte kørebane. Bilen havde ikke slingret forinden, og det er ikke hendes opfattelse, at føreren af bilen forsøgte af overhale, da hun ikke mener, der var biler lige foran Toyotaen. Efter hendes opfattelse styrede Toyotaen lige ind i lastbilen uden at bremse eller undvige. Det var på samme måde, at Toyotaen styrede over i den modsatte vejbane begge gange. Efter ulykken standsede hun bilen lidt længere fremme og gik tilbage til Toyotaen. Hun bemærkede ikke, om afdøde havde sikkerhedssele på.

Læge Peter Christensen, Skødstrup, har forklaret, at A blev hans patient omkring 1990. Vidnet kan ikke huske andet om afdødes hjerteproblemer end det, der er omtalt i journalen. Om konsultationen den 28. oktober 1994 kan han huske, at A var uden arbejde og havde det dårligt. Han fik et antidepressivt middel, men vidnet er ikke sikker på, at han tog medicinen, da han ikke var motiveret for det. Senere overgik han til en dosis på ½ tablet på grund af manglende motivation. Vidnet kan ikke huske samtalen med afdøde den 2. december 1994, og konsultationen den 30. december 1994 angik kun fysiske gener. Konsultationerne den 6. og 18. januar 1995 var samtaler, som resulterede i, at han henviste afdøde til en psykiater. Han kunne ikke hjælpe afdøde, da denne ikke selv var motiveret for hjælp. Vidnet må rutinemæssigt have spurgt afdøde om selvmordstanker, men det har afdøde ikke oplyst om. Det er hans opfattelse, at afdøde ikke kunne klare at arbejde på grund af rygproblemer, men det er vanskeligt at sige, om afdøde var psykisk syg. Der var ingen fare for selvmord. Afdøde var ked af det, men forekom

ikke voldsomt deprimeret eller uligevægtig. Om sine udtalelser til politiet har vidnet forklaret, at han ikke erindrer at have set færdselsuheldet omtalt på tv. Han kan ikke genkende referatet fra afhøringen som sine egne udtalelser. Afhøringen foregik tidligt om morgenen, hvor han havde travlt. Han husker ikke at have udtalt sig om muligheden for selvmord, men vil ikke afvise dette. I givet fald har hans udtalelser været rent spekulative.

Politiassistent Jørgen Bardung har forklaret, at han har udfærdiget politirapporten om færdselsuheldet, men han har ikke underrettet afdødes familie om dødsfaldet. Han ankom til uheldsstedet ca. 45 minutter efter. Oplysningerne i politirapporten om lys- og vejrforhold svarer til de forhold, der var på stedet på uheldstidspunktet. På det pågældende sted var overhaling tilladt. Han kan ikke huske oversigtsforholdene. Det var den tilstedeværende læges opfattelse, at afdøde havde brugt sikkerhedssele, men bilinspektøren var af en anden opfattelse. Han kan ikke huske, om han har nævnt muligheden for selvmord for de politifolk, der underrettede familien.

Mogens Kold, Egå, har forklaret, at han er læge og ankom til ulykkesstedet 10-15 minutter efter uheldet. Afdødes bil holdt midt på vejen, og afdøde sad fastklemt i den. Sikkerhedsselen hang løst hen over hans venstre skulderparti, men vidnet så ikke, om selen var spændt. Afdøde var meget slemt tilredt. Hans brystkasse var ustabil, og hovedet hang løst. Der var ingen puls, og der var ingen reaktion i pupillerne. Han kan ikke ud fra kvæstelserne afgøre, om afdøde havde sikkerhedssele på ved sammenstødet. Hele bilens frontparti var blevet trykket ind. Han har ikke kendskab til, om andre havde set til afdøde forinden. Der var ikke andre personer i bilen.

Embedslæge Niels Peter Rothgardt har forklaret, at han har udstedt dødsattesten. Han har beskrevet dødsmåden som selvmord ud fra de oplysninger, der var i politirapporten, og ikke på grundlag af egne undersøgelser af afdøde. Disse undersøgelser viste, at der var løshed i nakke og brystkasse, og at A var død som følge af uheldet. Der var ingen grund til at foretage obduktion. Der var ingen mærker efter sikkerhedssele, men afdøde havde haft tykt tøj på. Vidnet nåede til sin konklusion om dødsmåden ud fra politirapportens oplysninger om, at afdødes mor havde begået selvmord, at afdøde havde været depressiv og af egen læge var blevet henvist til psykiater, at afdøde var gået i stå, og at hans familie- og arbejdsmæssige situation var dårlig. Desuden var han af et vidne blevet set trække ud i den anden kørebane 2 gange. Efter uheldet havde et vidne observeret puls hos afdøde, hvilket taler imod, at der kunne være tale om hjertestop.

H har forklaret, at A var hendes svigersøn. Hun havde stort set dagligt kontakt med ham. Han havde søgt meget arbejde som revisor, men havde også talt om en uddannelse som social- og sundhedsassistent eller

**203**

pædagog. Han fik dog atter arbejde som revisor og mente at kunne klare det trods rygproblemerne. Hun er ikke bekendt med, at han skulle have haft til hensigt at opgive arbejdet. Hans forældre levede ikke mere, så han talte meget med hende. Hans mor havde begået selvmord, og han forstod ikke moderens handling og var selv mod selvmord. Hun var ikke klar over, at han fik antidepressive midler. Den 20. februar 1995 kl. ca. 9.30 blev hun kontaktet personligt af politiet, som spurgte efter hendes datter. Da hun oplyste, at sagsøgeren var taget til København, underrettede politiet hende om, at A var kørt galt og var død. Politiet bad hende identificere ham, og hun ringede til hans bror, som tog med til identifikationen. Hun har ikke sagt til politiet, at A ville begå selvmord, eller at han skulle have psykiske problemer. Det er hendes opfattelse, at politiet lagde hende i munden, at der var tale om selvmord.

Fhv. bilinspektør O. Nyegård Jensen har forklaret, at han foretog undersøgelsen af de to biler, der var involveret i ulykken. Ud fra undersøgelser af pæren i baglygten på afdødes bil kunne han konstatere, at stoplyset ikke havde været tændt, før kollisionen fandt sted. Der var ikke tegn på, at sikkerhedsselen havde været anvendt af afdøde. En sele kan få deformationer, hvis den er spændt ved kollisionen, men det sker ikke i alle tilfælde, og det er derfor ikke muligt at afgøre, om selen havde været anvendt. Der blev ikke konstateret fejl ved bilerne, der kunne begrunde ulykken.

Sagsøgeren har til støtte for sine påstande gjort følgende gældende:
Ad post 1:
Kravet gøres gældende mod sagsøgte på grundlag af A's heltidsulykkesforsikring tegnet hos sagsøgte. Sagsøgte har ikke ført bevis for, at hendes ægtefælles død skyldes selvmord. Bestemmelsen i forsikringsvilkårenes punkt 14 E finder derfor ikke anvendelse, og hun har således krav på at få udbetalt ulykkesforsikringssummen.
Ad post 2:
Kravet gøres gældende mod sagsøgte på grundlag af A's bilkaskoforsikring tegnet hos sagsøgte. Sagsøgte har ikke ført bevis for, at hendes ægtefælle forsætligt har fremkaldt uheldet, og der foreligger ikke oplysninger om, at han har udvist en uagtsomhed, som kan betegnes som grov hensynsløshed. Bestemmelsen i forsikringsvilkårenes punkt 20 C finder derfor ikke anvendelse, og hun har således krav på at få udbetalt kaskoforsikringsbeløbet.
Ad post 3 og 4:
Kravet gøres efter færdselslovens § 103, stk. 1, jf. § 101, stk. 1, gældende mod sagsøgte som ansvarsforsikrer for den lastbil, som A kolliderede med. Sagsøgte har hverken ført bevis for, at hendes ægtefælles død skyldes selvmord, eller for, at han ved en uagtsomhed, som kan betegnes som grov, har medvirket til skaden, jf. færdselslovens § 101, stk. 2. Hun har således krav på at få dækket disse erstatningskrav.

Sagsøgeren har til støtte for sin principale påstand vedrørende post 4 yderligere gjort gældende, at erstatningen for tab af forsørger skal fastsættes efter erstatningsansvarslovens § 13, stk. 1, 1. pkt., jf. § 7, stk. 5, på grundlag af den erhvervsindtægt, som hendes afdøde ægtefælle havde under sin ansættelse som revisorassistent, idet hans seneste arbejdsforhold var så kortvarigt, at indtægten ved dette arbejde ikke skal danne grundlag for beregningen af erstatningen for tab af forsørger.

Sagsøgeren har til støtte for sin subsidiære påstand vedrørende post 4 gjort gældende, at erstatningen for tab af forsørger skal fastsættes efter § 13, stk. 1, 2. pkt.

Sagsøgeren har i øvrigt nærmere anført, at sagsøgte har bevisbyrden for, at skaden er sket med forsæt, og denne bevisbyrde har sagsøgte ikke løftet. Vidneforklaringerne, hvorefter afdøde levede et normalt liv med god familiekontakt og aktiv jobsøgning, giver ikke grundlag for at antage, at A ville begå selvmord. Han tog afstand fra sin mors selvmord og havde ikke selv talt om at begå selvmord. Han havde kun to gange talt med sin læge om sin sindstilstand og mente ikke selv, at den ordinerede medicin mod depression var nødvendig, og henvisningen til psykiater er ikke blevet anvendt. Afdøde har ikke foretaget usædvanlige handlinger forud for uheldet, der kunne tyde på, at han ville begå selvmord, og der foreligger i det hele taget ikke oplysninger om hans liv og levned før ulykken, der har kunnet motivere selvmord. Den dag, uheldet fandt sted, var der ikke sket noget usædvanligt, og afdøde havde som ofte før kørt ægtefællen til lufthavnen. At afdøde trak over i den modsatte kørebanehalvdel, kan skyldes et øjebliks uopmærksomhed, en uforsigtig overhaling eller et ildebefindende. Kørslen i sig selv er ikke tilstrækkeligt bevis for, at der var tale om selvmord. Oplysningerne om sikkerhedsselen tyder på, at afdøde benyttede sele under kørslen. Politirapporten omtaler flere gange

selvmord, men hverken sagsøgeren eller hendes mor kan bekræfte, at de skulle have udtalt sig herom på daværende tidspunkt. Selv om de i den følesesmæssigt vanskelige situation, hvor de fik meddelelse om dødsfaldet, kan have gjort sig forestillinger om, at afdøde kunne have begået selvmord, er dette ikke tilstrækkeligt grundlag for at fastslå, at afdøde havde forsæt til ulykken. Embedslægens vurdering om, at der var tale om selvmord, bygger udelukkende på oplysningerne i politirapporten.

Sagsøgte har til støtte for sin principale påstand gjort følgende gældende:

 **204**

Ad post 1:

Sagsøgte har ført bevis for, at A's død skyldtes selvmord, og det følger af forsikringsvilkårenes punkt 14 E, at sagsøgeren herefter ikke har krav på udbetaling af forsikringsydelsen.

Ad post 2:

Sagsøgte har ført bevis for, at A har forvoldt færdselsuheldet med forsæt, eller i hvert fald bevis for, at han har forvoldt uheldet ved en uagtsomhed, der kan betegnes som grov hensynsløshed, og det følger af forsikringsvilkårenes punkt 20 C, at sagsøgeren herefter ikke har krav på forsikringsydelsen.

Ad post 3 og 4:

Sagsøgte har ført bevis for, at A har forvoldt færdselsuheldet med forsæt, eller i hvert fald bevis for, at han ved grov uagtsomhed har medvirket til færdselsuheldet, og det følger af færdselslovens § 103, stk. 1, jf. § 101, stk. 2, at sagsøgeren derfor ikke har krav på de pågældende forsikringsydelser.

Sagsøgte har yderligere vedrørende sagsøgerens principale påstand i relation til post 4 gjort gældende, at afdødes tidligere indkomst som revisorassistent ikke skal danne grundlag for beregningen af tabet af forsørger, jf. erstatningsansvarslovens § 13, stk. 1, 1. pkt., jf. § 7, stk. 2, at erstatningen derfor i hvert fald kun skal beregnes som minimumserstatningen efter § 13, stk. 1, 2. pkt., i overensstemmelse med sagsøgerens subsidiære påstand.

Sagsøgte har nærmere anført, at A's kørsel forud for og i forbindelse med ulykken, som den er beskrevet af vidnerne Pia Klausen og Hans Ingolf Preben Dahl og bekræftet af de tekniske undersøgelser af bilen, viser, at afdøde har begået selvmord. Det må efter bevisførelsen lægges til grund, at afdøde styrede direkte ind mod lastbilen uden at forsøge at undvige, og at hans Toyota oven i købet accelererede under denne manøvre. Pia Klausen, hvis vidneforklaring må tillægges meget stor vægt, har endvidere forklaret, at afdøde på tilsvarende måde kort tid før var trukket over mod en anden lastbil, men at han i sidste øjeblik rettede sin Toyota op, således at et sammenstød blev undgået. Sammenholdt med oplysningerne fra afdødes lægejournal om hans depressive tendenser og reaktionerne fra afdødes læge og familiemedlemmer, således som de kom til udtryk over for politiet efter uheldet og blev gengivet i politirapporten, foreligger der tilstrækkeligt bevis for at anse det for godtgjort, at A havde forsæt til sammenstødet.

Landsdommerne Bjerg Hansen og Eva Skov udtaler:

Efter vidneforklaringerne om A's kørsel forud for og i forbindelse med ulykken den 20. februar 1995, herunder navnlig vidnet Pia Klausens forklaring, sammenholdt med oplysningerne om trafik- og oversigtsforholdene på ulykkesstedet samt resultatet af de tekniske undersøgelser af de to involverede biler finder vi, at det må lægges til grund, at afdøde uden påviselig årsag pludselig er kørt ud af sin egen vognbane og over i den modsatte, hvor han er kørt direkte ind i den modkørende lastbil, uden at han forinden sammenstødet har nedsat farten eller forsøgt at undvige eller bremse.

Det må endvidere lægges til grund, at A kort forinden var blevet ordineret antidepressiv medicin og henvist til psykiater af sin læge på grund af depressive tendenser.

Hertil kommer, at såvel sagsøgeren og hendes mor, H, som afdødes egen læge, Peter Christensen, umiddelbart efter ulykken - ifølge politirapporten - over for politiet gav udtryk for, at der var eller meget vel kunne være tale om selvmord. Vi finder efter bevisførelsen ikke grundlag for at antage, at de oplysninger, der fremgår af politirapporten om den umiddelbare reaktion, som de alle tre fremkom med, skyldes udtalelser fra de politifolk, der underrettede dem om A's død. Herefter og efter sagens oplysninger i øvrigt, herunder navnlig oplysningerne om A's personlige og helbredsmæssige forhold, finder vi efter en samlet vurdering ikke at kunne tillægge de forklaringer, som sagsøgeren og hendes mor har afgivet i landsretten, afgørende betydning.

På baggrund af det anførte har sagsøgte efter vores opfattelse godtgjort, at A havde forsæt til at påkøre den modkørende lastvogn, og erstatningen skal derfor under de foreliggende omstændigheder bortfalde. Vi stemmer derfor for at tage sagsøgtes påstand om frifindelse til følge.

Landsdommer C. Haubek udtaler:

De oplysninger om ulykken, der fremgår af forklaringerne afgivet dels til politiet, dels i landsretten af vidnerne Hans Ingolf Preben Dahl og Pia Klausen, tyder på, at ulykken er sket ved, at A med vilje er kørt ind i den modkørende lastbil. Det fremgår af politirapporterne, at de politiassistenter, der behandlede den pågældende færdselsulykke, var af den opfattelse, at A begik selvmord ved med vilje at køre over i den modkørende kørebanehalvdel og ind i en modkørende lastbil, og det lægges efter det oplyste til grund, at de politiassistenter, der efter ulykken rettede henvendelse til afdødes svigerforældre, H og M, til afdødes ægtefælle, sagsøgeren, og til afdødes læge, Mogens Kold, gav udtryk for, at færdselsuheldet skyldtes A's selvmord. På denne baggrund skal de udtalelser, som disse 4 personer fremkom med over for politiet i forbindelse med, at de blev orienteret om dødsfaldet, vurderes. Uanset at omstændighederne ved uheldet som anført tyder på, at A med vilje kørte ind i den modkørende lastbil, giver bevisførelsen for landsretten ikke grundlag for at anse det for bevist, at A begik selvmord eller i øvrigt med vilje påkørte den modkørende lastbil. Der er efter det oplyste heller ikke i

 **205**

øvrigt grundlag for efter færdselslovens § 101, stk. 3, at nedsætte kravet vedrørende bilen (post 2).

De oplysninger, der er forelagt landsretten om afdødes erhvervsforhold, giver ikke grundlag for i medfør af erstatningsansvarslovens § 7, stk. 2, skønsmæssigt at fastsætte årslønnen på grundlag af hans lønindtægt flere år før dødsfaldet, og erstatningen for tab af forsørger efter § 12 skal derfor fastsættes i overensstemmelse med § 13, stk. 1, 2. pkt.

Denne dommer stemmer derfor for at tage sagsøgerens subsidiære påstand til følge.

Der afsiges dom efter stemmeflertallet.

— — —

I sagsomkostninger skal sagsøgeren, E, betale 50.000 kr. til sagsøgte.

# Højesteret

## Højesterets dom.

I tidligere instans er afsagt dom af Vestre Landsrets 1. afdeling den 7. april 1998.

I pådømmelsen har deltaget fem dommere: Pontoppidan, Wendler Pedersen, Jørgen Nørgaard, Lene Pagter Kristensen og Henrik Zahle.

Appellanten, E, har alene gentaget sin subsidiære påstand.

Indstævnte, Topdanmark Forsikring A/S, har påstået stadfæstelse.

Til brug for Højesteret er der afgivet nye forklaringer.

Parterne er enige om, at Topdanmarks påstand - som er en påstand om frifindelse - skal tages til følge vedrørende samtlige krav, hvis det lægges til grund, at A havde forsæt til at påkøre den modkørende lastvogn.

*Politiassistent Jørgen Bardung* har bl.a. forklaret, at han hos politiet har været sagsbehandler på sagen og derfor har skrevet de faktiske oplysninger ind i politirapporten, som fremgår af denne. Oplysningerne om svigerforældrene er baseret på, hvad kollegaerne Bach og Brændstrup oplyste ham mundtligt. Han har med sine egne ord skrevet det, som kollegaerne oplyste. Han har efter telefonisk meddelelse fra kollegaer i Rødovre indført oplysningerne i rapporten om hustruens reaktion efter oplysningen om dødsfaldet. Han husker ikke i dag, om han fik direkte besked fra Rødovre, eller om beskeden er gået gennem vagthavende. Det var ham, der telefonisk foretog afhøringen af Pia Klausen den 21. februar 1995. Han oplyste under telefonsamtalen denne om, at afdøde havde begået selvmord. Det var for at berolige hende, der var stærkt rystet. Det har ikke nødvendigvis været til sidst i samtalen, at han har oplyst herom. Han har også oplyst lastbilchaufføren herom. Det var, for at han ikke skulle gå rundt med skyldfølelse efter ulykken.

*Politiassistent Jens Bach* har bl.a. forklaret, at han husker den omhandlede sag, om end han ikke i dag husker alle detaljer. Han skulle sammen med kollegaen Brændstrup underrette svigerforældrene om dødsfaldet. Svigerforældrene reagerede relativt roligt og gav udtryk for, at det ikke kom helt bag på dem. De nævnte, at svigersønnen havde psykiske problemer. Det lå i luften, at noget som dette kunne de godt have forventet. De nævnte i samme sammenhæng, at en af afdødes forældre nylig havde taget sit eget liv. De nævnte efter hans erindring ikke direkte, at afdøde nok havde begået selvmord, men det lå i samtalen, at det var det, de mente. Han og kollegaen nævnte intet om selvmord.

*Politiassistent Lars Åby Brændstrup* har bl.a. forklaret, at han blev bedt om sammen med sin kollega Bach at underrette de pårørende. Svigerforældrene var ganske vist lidt forskrækkede over, hvad han og hans kollega kom efter, men de nævnte allerede i starten af samtalen, at de havde hørt om et uheld på motorvejen, og at de da havde tænkt på, om det var deres svigersøn, idet de vidste, at han netop havde kørt deres datter til lufthavnen. De nævnte, at det ikke gik så godt mellem ham og deres datter, og at han havde været deprimeret. Senere kom det frem, enten i hjemmet, i kapellet eller på køreturen, at det kunne være selvmord, og at afdødes mor jo også havde begået selvmord. Han kan ikke huske, hvem af svigerforældrene der sagde dette, men han mener, at det var svigermoderen, idet det var hende, der talte mest til dem. Han mener at kunne erindre, at politiassistent Bardung sad ved skrivebordet, da han kom hjem til stationen, og at han da orienterede Bardung om, hvad de havde erfaret hos svigerforældrene. Hvad der er anført i politirapporten, svarer utvivlsomt til det, som han har nævnt for Bardung. Dog husker han i dag ikke, at han skulle have nævnt, at afdødes mor var psykisk ude af balance. Hverken han eller kollegaen har lagt svigerforældrene noget i munden.

*Pia Klausen* har bl.a. forklaret, at hun efter ulykken var for chokeret til selv at køre og derfor i sin egen bil blev kørt til Århus. Hun så om aftenen om ulykken i tv. Da hun fik tænkt tingene igennem, kom hun selv til den konklusion, at der måtte være tale om selvmord. Det kunne ikke være et uheld. Denne konklusion var hun kommet til allerede om eftermiddagen. Hun blev først afhørt af politiet næste dag.

### Højesterets bemærkninger.

Fire dommere - Pontoppidan, Wendler Pedersen, Jørgen Nørgaard og Lene Pagter Kristensen - udtaler:

Af de af landsretten anførte grunde, der bestyrkes af de forklaringer, der er afgivet til brug for Højesteret, tiltræder vi, at det ud over enhver rimelig tvivl er godtgjort, at A havde forsæt til at påkøre den modkørende lastvogn. Vi stemmer derfor for at stadfæste dommen.

**206**

Dommer Henrik Zahle udtaler:

Der foreligger i sagen en række oplysninger om afdøde A's sociale, helbredsmæssige og familiære situation, herunder at han havde været arbejdsløs gennem længere tid og fandt sit nye arbejde vanskeligt, at han var noget depressiv og led af rygsmerter, og at hans hustru antagelig ville ophæve samlivet. Disse vanskeligheder er dog ikke usædvanlige og ville i andre sammenhænge lade sig forene med en antagelse om dødsfald som følge af en ulykke. Hans pårørende og hans læge gav - som anført af landsretten - umiddelbart efter dødsfaldet udtryk for, at der meget vel kunne være tale om selvmord, og dette viser, at det ikke ville være uforståeligt eller overraskende for dem, hvis afdøde begik selvmord, men disse vurderinger af afdødes almindelige livssituation har kun meget begrænset bevismæssig relevans ved en stillingtagen til, *om* afdøde den 20. februar 1995 begik selvmord eller døde som følge af en trafikulykke. Af den tekniske undersøgelse fremgår, at afdøde ikke har bremset inden sammenstødet, men dette *kan* forenes med, at sammenstødet skyldtes f.eks. distraktion eller ildebefindende, der ikke afsluttedes før kollisionen. Lastbilchaufførens forklaring om, at afdøde muligt accelererede umiddelbart inden sammenstødet, har ikke nogen bevismæssig vægt i betragtning af den meget korte tid og den dramatiske begivenhed, der fulgte straks efter. Afgørende kan herefter blive Pia Klausens forklaring om de to kørsler over midterlinien, idet denne køremåde kan forstås som udtryk for en beslutning om at begå selvmord ved at kollidere med en modkørende lastbil, en beslutning, der ganske vist - må man antage - fortrydes i første omgang. Det kan imidlertid ikke udelukkes, at køremåden må forstås på anden måde, herunder foruden distraktion eller ildebefindende som afdødes forsøg på overhaling - eventuelt må forstås på forskellig måde ved de to passager af midterlinien.

Selv om det er en nærliggende mulighed, at afdøde begik selvmord den 20. februar 1995, kan de foreliggende oplysninger om hans handlemåde altså tillige forstås på anden måde, således at det ikke ligger uden for enhver rimelig tvivl, at afdøde forsætligt er kørt ind i lastbilen. Det kan derfor ikke lægges til grund, at afdøde har begået selvmord.

Om de enkelte poster skal supplerende bemærkes, at ulykkesforsikringspolicen kun undtager forsæt (post 1), at der ikke er grundlag for at antage, at der foreligger grov hensynsløshed, jf. kaskoforsikringen punkt 20 C (post 2), og at der ikke er grundlag for at nedsætte erstatningen for begravelsesudgifter og forsørgertabserstatning på grund af grov uagtsomhed (post 3 og 4).

Jeg stemmer derfor for at tage E's påstand til følge.

Afgørelsen træffes efter stemmeflertallet.

### Thi kendes for ret:

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for Højesteret skal appellanten, E, betale 50.000 kr. til indstævnte, Topdanmark Forsikring A/S.*

*De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.*