# Exhibit 9



London

This is to certify that the attached document is, to the best of my knowledge and belief a true, accurate and complete translation from Danish into English of the attached extract from U.1999.1706H on Death by fall of approximately 6 meters from a roof not covered by accident insurance, as the fall was caused by the insured's intent or gross negligence.

Yours sincerely,

Andrzej Orville

Senior Project Manager

Wednesday, January 22, 2025

Consortra Translations Ltd
Rex House,
4-12 Regent Street
London
SW1Y 4RG
UK

U.1999.1706H

*Death by fall of approximately 6 meters from a roof not covered by accident insurance, as the fall was caused by the insured's intent or gross negligence.*

Insurance 1 and 3.2.

- A, who had taken out family accident insurance with insurance company F, was found lifeless in a yard and was pronounced dead on arrival at the hospital due to a skull/brain lesion. The death was caused by a fall from a rooftop parking space located approximately 6 meters above the yard. The High Court found that A had walked up a ramp to the roof parking lot and across the lot to a railing before the edge of the roof and that he had voluntarily climbed over the railing and walked to the edge of the roof, from where he had fallen down. Considering the obvious risk of falling associated with this behavior, the accident was found to be caused by gross negligence. F was therefore acquitted of a claim from A's widow E for payment of the insurance sum. The Supreme Court found it proven beyond reasonable doubt that A's death was caused by him by intent or gross negligence and upheld the verdict. (Dissent to uphold E's claim).[1]

H.D. July 5, 1999 in case II 443/1997

*Anni Sejersbøl (adv. Erik Turley, Hillerød, n.d.)*
mod
*Skandia Forsikring A/S (formerly Forsikringsselskabet Kgl. Brand A/S) (attorney Christian Schow Madsen, Copenhagen).*

## Eastern High Court

### Eastern High Court judgment August 8, 1997 (13th district)

(Vagn Joensen, Reisz, Gert Peter Jensen (deputy)).

The plaintiff, Anni Sejersbøl's, now deceased husband, Finn A. Sejersbøl, took out a family accident insurance policy with the defendant, insurance company Kongelig Brand, in 1986. On February 9, 1994, Finn Sejersbøl was found lifeless in a farm in Hillerød with a head wound, presumably caused by

**1707**

a fall of approximately 6 m from a rooftop parking lot and was pronounced dead on arrival at the hospital.

In these proceedings, which were brought on April 2, 1996, the plaintiff, who is the beneficiary under the insurance policy, claimed that the defendant should be ordered to pay the sum insured of DKK 586,000 with interest pursuant to section 24(2) of the Insurance Contracts Act from February 23, 1994.

The defendant has claimed acquittal and has argued that there is no accident in the sense of insurance law, alternatively that the insured event was caused by the insured intentionally or through gross negligence or under the influence of self-induced intoxication.

*The circumstances of the case:*

The general terms and conditions applicable to the insurance include the following provisions:

"1.1 The insurance covers demonstrable bodily injury to the insured person as a result of an accident.

1.2 Accident means a sudden external event whereby the insured is involuntarily injured . . The insurance does not cover:

...

3.4 Accidents caused by the insured or an insured person through intent or gross negligence or under the influence of self-induced intoxication . . This applies regardless of the state of mind of the insured or insured person at the time of the accident."

According to a police report dated February 9, 1994, Finn Sejersbøl, who drove as a driver for the emergency medical services in Hillerød, was stopped by the police the same day at 16:50 and after an alcohol test was arrested and charged with drunk driving. The report states, among other things, that "the driving seemed a little unsafe, as the car "sailed". Sejersbøl was brought to the police station, where he did not want to make a statement to the police, but wanted the case to be brought forward as a confession case without defense counsel.

A blood sample was taken which, according to a statement from the Forensic Chemistry Institute, showed an alcohol concentration with a mean value of 1.401‰ and a minimum value of 1.30‰.

Finn Sejersbøl was released at 06:27 PM.

According to a police report of the same date, a police patrol was sent to Østergade 6 in Hillerød at 19.16 after the police had received a telephone report that a man was lying in the yard. The report states, among other things:

"I could not feel a pulse on the carotid artery. Furthermore, 4 large tufts of hair were seen lying about 30-40 cm from his head.

Søren G. immediately ran back to the patrol car and requested ... the criminal police to the scene, as the preceding could indicate murder/attempted murder."

Resuscitation was attempted in vain. On arrival at the emergency room at 07:39 PM, the injured person was found to be dead.

Later that evening, the police established that the deceased was identical to Finn Sejersbøl. 2 police assistants were sent to Finn Sejersbøl's residence to inform the relatives. The report states, among other things:

"During the drive to CH, the deceased's wife, Anni, told us that the deceased had "hidden" alcohol abuse for a long time. However, he had, as a New Year's resolution, set himself the goal of no longer drinking. She also stated that she found it hard to believe that he had committed suicide, but if that turned out to be the case, she thought it must have been because he had been caught driving under the influence of alcohol and that as a result he could no longer cope with the situation."

The death certificate of February 10, 1994 , among other things:

"At the post-mortem examination, external signs of violence revealed a severe scrape injury of the left half of the skull extending from the left cheek and up over the hairline. There are clear traces of hair having been torn off directly above the root. There are also bloodshot areas around both eyes, superficial lesions on the back of the left hand . .

.The severe cranial lesion found may very well have been caused by a fall from the nearby roof. The post-mortem examination did not reveal any immediate signs of external signs of violence that would suggest a prior struggle or other unusual event. There are many indications of suicide, but the manner of death will only be determined after an autopsy."

In the autopsy report of February 10, 1994, the conclusion states, among other things:

---

1 Ivan Sørensen: Den private syge- og ulykkesforsikring - et forsikringsretligt studie (1990), pp. 72-75 and 162-177, same: Forsikringsret, 2nd edition (1977), pp. 129-130, 142-143, 336-337 and 396, Preben Lyngsøe: Dansk forsikringsret, 7th edition (1994), pp. 203, 224-226, 243-253, 805 ff and 810 ff, Trolle in U a 1973 B.189 ff, Niels Pontoppidan in U 1987 B.55 ff, Jørgen Nørgaard in U 1996 B.191 ff, and Bo von Eyben in Forhandlingerne ved det 33. nordiske juristmøde, volume 2, pages 632-633 and 637.

"The injuries detected were all fresh, caused by strong blunt force trauma while alive, very well as assumed by a fall from a height of 6 meters onto a paved courtyard 02/09/94 between 06:25 PM and 07:25 PM. No signs of violence exerted by another person.

...

*The cause of death* must be assumed to be the detected skull-brain lesions."

According to a statement from the Forensic Chemistry Institute, samples taken on February 10, 1994 at 10:00 a m. showed a blood alcohol concentration of 1.324‰ and 1.22‰ as mean and minimum values, respectively, and an eye fluid alcohol concentration of 1.777‰ and 1.68‰ as mean and minimum values, respectively.

In a letter dated December 5, 1994, the Chief of Police in Hillerød replied to the applicant's lawyer as follows:

"In this connection, I must inform you that the police investigation in the case has only been carried out in order to clarify whether anyone can be held criminally responsible for the event that took place.

The investigation showed that there is nothing to indicate that Finn A. Sejersbøl has died as a result of a criminal offense, which is why the case was dropped."

It is evident from the sketches and photos provided that the parking lot in question is located on the roof of a furniture store. On the side opposite the access ramp, the edge of the roof is adjacent to the gable of a furniture store for part of the distance.

**1708**

adjacent house. On the rest of the stretch, there is no shielding at the roof edge towards the farm in question except for a low wall edge. A 1 m high railing has been installed some distance in from the roof edge, including along the gable of the house in question. The distance between the railing and the wall edge was 1.5 m at the place where Finn Sejersbøl is believed to fallen. The place was illuminated by lamps.

*Explanations:*

During the court hearing, statements were given by the plaintiff and witness statements were given by Detective Mette Hammerich and Detective Bent Blaabjerg.

The plaintiff, Anni Sejersbøl, has explained that she has known her now deceased husband since March 1974. They have a 19-year-old son. Her husband has never been treated for or suffered from depression. He was a balanced person and never talked about suicide. He was trained and worked as a carpenter until 1988, when he fell from a scaffold and was injured. He was hospitalized for 14 days and then went into rehabilitation. However, his left arm and hand never recovered and he had to give up his carpentry work. Instead, he spent 3 ½ years training as a building constructor. Despite many applications, he was unable to find work in this profession. To avoid unemployment, he took a commercial driver's license and got a job as a driver with a haulier who had a contract to drive for the medical services in Hillerød. Shortly before the day of his death, the haulage contractor had lost the contract for the emergency medical services, so the plaintiff's husband and the other drivers had been terminated. This had upset the plaintiff's husband a little. He had said that he had to find another job. He had continuously applied for work as a structural engineer, as he wanted to use his education.

When asked about the police report, the applicant explained that she could not remember what she said to the police officer. It is possible that her husband had a hidden alcohol problem, as he sometimes seemed somewhat strange when she spoke to him and responded vaguely. She asked him if he had been drinking and said that she did not want to be involved. She has no recollection of any New Year's resolutions.

On the day of the accident, February 9, 1994, her husband had to for work at about 03:15 PM, when she came home from work. They only had time to exchange a few remarks. He seemed unremarkable with no signs of alcohol consumption. He was going to drive the family car to take over the emergency ambulance elsewhere. At around 4pm, he called home as usual to tell her which car he was driving so that she could call him if necessary. He then told her that he would be driving over Easter.

The family had a good economy. Her husband was in the Christian unemployment fund and they had built their house themselves. Even if her husband became unemployed, they were still able to stay in the house. She still lives there herself.

Detective Mette Hammerich has explained that she and a colleague were sent to the scene of the accident, which is located 1-200 meters from the police station. The yard in which the deceased was found was closed. The witness and her colleague searched the yard and the roof parking lot, but found no signs that anyone had recently been around the suspected fallout site.

Police officer Bent Blaabjerg has explained, among other things, that he brought Finn Sejersbøl to a halt during a traffic stop due to his conspicuous driving. A breathalyzer test was performed, which showed an alcohol concentration of 1.15‰. The witness informed Finn Sejersbøl that the alcohol concentration was above the permitted limit, and does not believe that he informed Finn Sejersbøl of the reading, as the breathalyzer test is only indicative. Finn Sejersbøl was declared arrested and taken to the station, where his driving license was exchanged for a temporary license. He had seemed depressed by the situation, but no more than usual. After the report of the discovery in the yard, the witness was sent to the scene and identified Finn Sejersbøl.

*Procedure:*

The plaintiff has stated that Finn Sejersbøl's craniocerebral injury must probably be assumed to be caused by a fall from the roof parking lot. The information in the case does not provide any basis for drawing any conclusions about what caused this fall. According to the plaintiff's explanation, it is not likely, or even highly likely, that Finn Sejersbøl would commit suicide. The measured alcohol concentration was below the limit for unconditional driving disqualification and the family's finances were not threatened by this. The rooftop parking lot also considered an illogical choice for a suicide. The height of the drop was only 6 meters and there were beds in the yard. If Finn Sejersbøl had wanted to commit suicide, he would rather have chosen the roof of the hospital, where he visited daily as part of his work. The police sketches show that Finn Sejersbøl hit the yard close to the wall and a bed in the yard, and the injuries show that he fell on his left side, which is not consistent with him jumping out. It is more likely that he went up to the roof parking lot recover after the arrest and that he was looking for a place to sit down. After coming up the ramp, he probably continued straight across the parking lot and climbed over the 1 m high fence to sit on the edge of the wall against the gable of the adjacent house. Possibly after sitting down, he stood up and moved along the gable of the house, where he leaned with his left hand against the gable of the house at the point where the gable ends and where there is a free fall and, due to his disabled hand or dizziness, lost his balance and fell sideways into the yard. It must be considered likely that he was not aware that

**1709**

on this side of the parking lot, which is built into a slope, there was a significant difference in level in contrast to the other sides, where the parking lot is almost level with the surrounding terrain. The fact that Finn Sejersbøl climbed the 1 m high fence cannot mean that the fall cannot be considered an accident or that there was gross negligence, as there was no immediate danger by climbing over the fence at the aforementioned location. In any case, the danger was not obvious to him due to the aforementioned differences in the height of the terrain. Finally, his mental impairment cannot be assumed to have had an impact on the course of events. In any case, it was not the main cause. The measured minimum value of 1.30‰ in the blood must be taken into account, which is significantly below the blood alcohol limit that is considered applicable in theory and practice with regard to claims under accident insurance policies.

*The defendant* has principally argued that there is no accident in the sense of insurance law, which is the plaintiff's burden of proof, already because Finn Sejersbøl voluntarily forced the railing and thus

Copyright© 2023 Karnov Group Denmark A/S

intentionally performed the act that caused the damage. The insured event therefore did not occur randomly and independently of the insured's will.

Alternatively, the defendant has argued that the insurance event must be considered intentionally caused by Finn Sejersbøl, as it must be considered highly probable that he let himself fall in order to commit suicide. The objective circumstances speak for this. There can be no other plausible reason why he climbed over the railing and moved to the edge of the roof parking lot. It is therefore unlikely that he did so in order to relax. It is also typical for suicides to throw themselves from high places. Finn Sejersbøl also had a sufficient motive for suicide. He was already under psychological pressure, as evidenced by his alcohol abuse, and with his knowledge of his alcohol consumption before driving, he had to expect that he would lose his license and therefore could not continue to earn a living as a driver.

In the further alternative, the defendant claims that Finn Sejersbøl acted with gross negligence, as he must be assumed to have realized that by climbing the railing he exposed himself to the risk of falling and that a fall would result in severe disability or death, and as he could have chosen not to climb the railing.

Most alternatively, the defendant has claimed that the insurance event must be considered to have been caused by self-induced intoxication, possibly in connection with gross negligence. In the assessment, emphasis must be placed on the measured mean values in Finn Sejersbøl's blood as well as in his eye fluid. According to the information in the police report about Finn Sejersbøl's driving, it must also be assumed that his reaction ability was actually affected by the alcohol intake. At least in light of this, it must be considered grossly negligent of him to climb the railing and move to the edge of the roof.

### The High Court's comments:

Based on the evidence, it must be assumed that Finn Sejersbøl's fatal craniocerebral injury was caused by a fall from the roof parking lot.

It must therefore be assumed that Finn Sejersbøl went up the ramp to the roof parking lot and across the lot to the railing before the roof edge. Based on the photos of the parking lot, Finn Sejersbøl became aware that the parking lot on this side was significantly above ground level and that the roof edge was only partially shielded by the adjacent gable on this side. It must also be assumed that Finn Sejersbøl could not have fallen over the approx. 1 m high railing and immediately beyond the roof edge, which was approx. 1.5 m from the railing and was also provided with a raised edge. It must therefore be considered highly probable that Finn Sejersbøl voluntarily climbed over the railing and moved to the edge of the roof, where he fell down.

It is not sufficiently probable that Finn Sejersbøl intentionally let himself fall in order to deprive himself of his life. Considering that Finn Sejersbøl himself climbed over the railing, it is more likely than not that others did not cause his fall, but that the fall was caused by his loss of balance.

The fall is therefore considered to be an accident within the meaning of the insurance policy. Based on the information about the alcohol concentration in Finn Sejersbøl's blood, which must be assumed to have been between 1.30 and 1.40‰ as an average value, and his appearance during the arrest, his alcohol intoxication cannot be considered the main cause of his fall from the roof.

However, considering the obvious risk of falling that was associated with climbing over the railing and walking to the edge of the roof, Finn Sejersbøl is found to have caused the accident through gross negligence.

The High Court therefore upholds the defendant's claim for acquittal. The plaintiff has legal aid. It is stated that the plaintiff has legal expenses insurance.

- - -

The defendant is awarded DKK 30,000 in legal costs. The amount is paid by the plaintiff, Anni Sejersbøl's, legal expenses insurance, alternatively by the state treasury.

## Supreme Court

### Supreme Court ruling.

In a previous instance, judgment was handed down by the 13th division of the Eastern High Court on
August 8, 1997.

Five judges participated in the adjudication: Marie-Louise Andrea- sen, Poul Sørensen, Jørgen Nørgaard, Engholm Jacobsen and Jytte Scharling.

The appellant, Anni Sejersbøl, has repeated her claim.

**1710**

The respondent, Skandia Forsikring A/S, has claimed confirmation. The appellant has further claimed before the Supreme Court that the deceased's injuries may be wholly or partly caused by an assault.

Additional information has been provided to the Supreme Court. It appears from this that the furniture store facing Østergade is designed with ground floor and 1st floor. The part of the store under the parking lot is located on the ground floor. It also shows that there is a greater height difference between the parking lot and the courtyard than between the parking lot and the surrounding terrain.

In a statement dated October 20, 1998, the Council of Forensic Medicine answered the following questions as follows:

*"Question 1.*

The Council of Forensic Medicine considers the bodily injury to Finn A. Sejersbøl suffered bodily injury as stated in the death certificate 02/10/ 1994 (Appendix D) and the autopsy report of 02/10/1994 (Appendix E) as a probable consequence of a fall from a height of approximately 6 meters.

Conclusion. All the injuries detected may well have been caused by a fall from a height of 5-6 meters. The external injuries detected are predominantly left-sided and have the character of abrasions with scratches, which is common in falls, just as severe crushing of the skull with brain injury in combination with chest and abdominal cavity injuries are typical fall injuries. The bruising (discoloration) and swelling of the left eyelid may have occurred together with the lesion on the left side of the forehead. Eyelid bruising (discoloration) is frequently seen as a result of fractures at the base of the skull.

*Question 2.*

Does the Council of Forensic Medicine also consider that the injury to Finn A. Sejersbøl, as stated in appendices D and E, has a character that may be the result of a possible scuffle with a third party, where the third party "knocks" the deceased's torso and/or head against the asphalt pavement in the yard in question.

The answer is no. The widespread crushing of the dome and base of the skull represents a significant traumatic impact that would be difficult to achieve by "banging" the head against the asphalt, just as the proven rib fractures, lung injury and liver injury can hardly be produced in this way.

The discoloration of the skin and subcutaneous tissue on the eyelids may be a result of direct blows to the eye regions, but the lack of abrasions and wounds in these areas argues against these being fight lesions, but that they are rather a result of the severe fractures at the base of the skull, see answer to question 1. The lesions on the left hand and elbow cannot be considered typical fight and defense lesions either.

*Question 3.*

Does the Council of Forensic Medicine also consider that the injury to Finn A. Sejersbøl, as stated in appendices D and E, has a character that may indicate a blow with a blunt instrument, e.g. a baseball bat or similar? No. The lesions are not typical of blunt instrument blows, e.g. a baseball bat or similar. Blows with objects do not usually result in abrasions with scrapes, but rather abrasions that look like pressure marks. With blows, the skull fractures are usually localized to the dome of the skull.

No marks in the skin corresponding to the rib fractures, lung lesion or liver lesion were detected, and it is therefore unlikely that they were caused by blows with a blunt instrument."

**Supreme Court comments.**

The Supreme Court finds that it can be assumed, especially after the answers given by the Forensic Medical Council, that Finn Sejersbøl's fall was not caused by another person's blow, participation in a scuffle or similar. Three judges, Poul Sørensen, Jørgen Nørgaard and Engholm Jacobsen, then pronounce:

Regardless of whether it may be assumed that Finn Sejersbøl died as a result of an accident, as this term is defined in section 1.2 of the common conditions, we find that the insurance company is not obliged to pay the insurance sum to Anni Sejersbøl, as we find it proven beyond reasonable doubt that his death was caused by him "by intent or gross negligence", see section 3.4 of the conditions.

We therefore vote to uphold the verdict.

Judges Marie-Louise Andreasen and Jytte Scharling state: Based on the fact that Finn Sejersbøl's fatal injuries were caused by a fall from the roof parking lot under undisclosed circumstances, we find that the incident must be considered an accident. In our opinion, it has not been established that Finn Sejersbøl has culpably caused the insured event.

Based on the information about the structural conditions at the site, we assume that the parking lot, when accessed via the access ramp, appears to be located on the first floor. The accident happened one evening in February, and it was dark in the yard of the property Østergade 6. It is not established that it must have been clear to Sejersbøl that there was a drop of approximately 6 meters from the parking lot to this yard, and that there was therefore a significant risk of walking out onto the up to 1.5 m wide, flat roof area between the railing and the roof edge. Under these circumstances, we do not find it sufficiently proven that Finn Sejersbøl caused the accident through gross negligence.

For the reasons stated by the High Court, we believe that Sejersbøl's alcohol intoxication cannot be considered to have been the main cause of the accident.

We therefore vote to the appellant's claim. The decision shall be made by a majority of votes.

## 1711

**For it is known to be right:**

*The judgment of the High Court is upheld.*

*The Danish Treasury must pay DKK 40,000 in legal costs to the respondent, Skandia Forsikring A/S.*

*The ordered costs must be paid within 14 days of the date of this Supreme Court judgment.*

Copyright© 2023 Karnov Group Denmark A/S                                                                                             4

**U.1999.1706H**

*Død ved fald på ca. 6 meter fra et tag ikke omfattet af ulykkesforsikring, da faldet var fremkaldt ved forsikredes forsæt eller grove uagtsomhed.*

*Forsikring 1 og 3.2.*

♦ A, der havde tegnet en familieulykkesforsikring hos forsikringsselskabet F, blev fundet livløs i en gård og blev ved ankomsten til hospitalet konstateret død på grund af kranie/hjernelæsion. Døden skyldtes et fald fra en tagparkeringsplads, der lå ca. 6 meter over gården. Landsretten lagde til grund, at A havde bevæget sig op ad en rampe til tagparkeringspladsen og over pladsen til et rækværk før tagkanten, og at han frivilligt var kravlet over rækværket og havde bevæget sig hen til tagkanten, hvorfra han var faldet ned. Under hensyn til den åbenlyse risiko for at falde, som var forbundet med denne adfærd, fandtes ulykken forvoldt ved grov uagtsomhed. F blev derfor frifundet for et krav fra A's enke E om betaling af forsikringssummen. Højesteret fandt det godtgjort ud over enhver rimelig tvivl, at A's død var fremkaldt af ham ved forsæt eller grov uagtsomhed, og stadfæstede dommen. (Dissens for at tage E's påstand til følge).[1]

**H.D. 5. juli 1999 i sag II 443/1997**

*Anni Sejersbøl (adv. Erik Turley, Hillerød, e.o.)*
mod
*Skandia Forsikring A/S (tidl. Forsikringsselskabet Kgl. Brand A/S) (adv. Christian Schow Madsen, Kbh.).*

## Østre Landsret

### Østre Landsrets dom 8. august 1997 (13. afd.)

(Vagn Joensen, Reisz, Gert Peter Jensen (kst.)).

Sagsøgeren, Anni Sejersbøls, nu afdøde mand, Finn A. Sejersbøl, tegnede i 1986 en familieulykkesforsikring hos sagsøgte, Forsikringsselskabet Kongelig Brand. Den 9. februar 1994 blev Finn Sejersbøl fundet livløs i en gård i Hillerød med et kvæstningssår i hovedet, antageligt efter

**1707**

et fald på ca. 6 m fra en tagparkeringsplads, og blev ved ankomsten til hospitalet konstateret død.

Under denne sag, der er anlagt den 2. april 1996, har sagsøgeren, der er begunstiget i henhold til forsikringen, påstået sagsøgte dømt til at betale forsikringssummen 586.000 kr. med renter i henhold til forsikringsaftalelovens § 24, stk. 2, fra den 23. februar 1994.

Sagsøgte har påstået frifindelse og har gjort gældende, at der ikke foreligger et ulykkestilfælde i forsikringsretlig forstand, subsidiært at forsikringsbegivenheden er fremkaldt af forsikrede forsætligt eller ved grov uagtsomhed eller under indflydelse af selvforskyldt beruselse.

*Sagens omstændigheder:*

De for forsikringen gældende fællesbetingelser indeholder bl.a. følgende bestemmelser:

»1.1. Forsikringen dækker påviselig legemlig skade på den forsikredes person som følge af ulykkestilfælde.
1.2. Ved ulykkestilfælde forstås her en pludselig ydre hændelse, hvorved den forsikrede ufrivilligt kommer til skade . . . Forsikringen dækker ikke:
. . .
3.4. Ulykkestilfælde, der er fremkaldt af den forsikrede eller af en sikret ved forsæt eller grov uagtsomhed eller under indflydelse af selvforskyldt beruselse . . . Dette gælder uanset forsikredes eller sikredes sindstilstand ved fremkaldelsen af ulykkestilfældet.«

Ifølge politirapport af 9. februar 1994 blev Finn Sejersbøl, der kørte som chauffør for lægevagten i Hillerød, standset af politiet samme dag kl. 16.50 og efter en alkotest anholdt som sigtet for spirituskørsel. I rapporten er det bl.a. anført, at »kørslen virkede lidt usikker, idet bilen »sejlede«. Sejersbøl blev bragt til politistationen, hvor han ikke ønskede at udtale sig til politiet, men ønskede sagen fremmet som tilståelsessag uden forsvarer.

Der blev udtaget en blodprøve, hvori der ifølge erklæring fra Retskemisk Institut fandtes en alkoholkoncentration med en middelværdi på 1,401 ‰ og en mindsteværdi på 1,30‰.

Finn Sejersbøl blev løsladt kl. 18.27.

Ifølge politirapport af samme dato blev en politipatrulje kl. 19.16 sendt til Østergade 6 i Hillerød, efter at politiet havde modtaget telefonisk anmeldelse om, at en mand lå i gården. I rapporten er bl.a. anført:

»Jeg kunne ikke mærke puls på halspulsåren. Endvidere sås 4 store hårtotter ligge ca. 30-40 cm fra hans hoved.

Søren G. løb straks tilbage til patruljebilen og rekvirerede . . . kriminalpolitiet til stedet, idet det forhåndværende kunne tyde på drab/drabsforsøg.«

Der blev forgæves forsøgt genoplivning. Ved indbringelsen til skadestuen kl. 19.39 konstateredes, at tilskadekomne var død.

Senere samme aften konstaterede politiet, at afdøde var identisk med Finn Sejersbøl. 2 politiassistenter blev sendt til Finn Sejersbøls bopæl for at underrette de pårørende. I rapporten er bl.a. anført:

»Under kørslen til CH fortalte nu afdødes hustru, Anni, at nu afdøde gennem længere tid havde haft et »skjult« alkoholmisbrug. Han havde imidlertid - som et nytårsforsæt - sat sig det mål, at han ikke ville drikke længere. Hun oplyste endvidere, at hun havde svært ved at tro, at han skulle have begået selvmord, men hvis det viste sig at være tilfældet, mente hun, at det måtte være fordi han var blevet taget for spirituskørsel og at han som følge deraf ikke længere kunne overskue situationen.«

I dødsattest af 10. februar 1994 er bl.a. anført:

»Ved ligsynet konstateret af ydre tegn til vold en svær skrabelæsion af venstre kraniehalvdel strækkende sig fra venstre kind og op over hårgrænsen. Der er tydelige spor efter, at hår direkte er revet af kort over roden. Endvidere er der blodunderløbne partier omkring begge øjne, overfladiske læsioner på venstre håndryg . . . Den påviste svære kranielæsion kan meget vel antages at være opstået ved et fald fra det nærliggende tag. Der er ikke ved ligsynet umiddelbart fundet tegn på ydre tegn til vold, som giver mistanke om forudgående kamp eller anden usædvanlig hændelse. Meget tyder på selvmord, men dødsmåden skal fastlægges først efter obduktion.«

I obduktionserklæring af 10. februar 1994 er i konklusionen bl.a. anført:

---

[1] Ivan Sørensen: Den private syge- og ulykkesforsikring - et forsikringsretligt studie (1990), s. 72-75 og 162-177, samme: Forsikringsret, 2. udg. (1977), s. 129-130, 142-143, 336-337 og 396, Preben Lyngsøe: Dansk forsikringsret, 7. udg. (1994), s. 203, 224-226, 243-253, 805 ff og 810 ff, Trolle i U 1973 B.189 ff, Niels Pontoppidan i U 1987 B.55 ff, Jørgen Nørgaard i U 1996 B.191 ff, og Bo von Eyben i Forhandlingerne ved det 33. nordiske juristmøde, bind 2, side 632-633 og 637.

»De påviste læsioner var alle friske, opstået ved kraftig stump vold i live, meget vel som antaget ved fald fra 6 meters højde ned på asfalteret gårdsplads den 09.02.94 mellem kl. 18.25 og 19.25.

Ingen tegn på vold udøvet af anden person.

. . .

*Dødsårsagen* må antages at være de påviste kranie-hjernelæsioner.«

Ifølge erklæring fra Retskemisk Institut blev der i prøver udtaget den 10. februar 1994 kl. 10.00 fundet en alkoholkoncentration i blodet på 1,324‰ og 1,22‰ som henholdsvis middel- og mindsteværdi og en alkoholkoncentration i øjenvæske på 1,777‰ og 1,68‰ som henholdsvis middel- og mindsteværdi.

I skrivelse af 5. december 1994 har politimesteren i Hillerød bl.a. svaret sagsøgerens advokat følgende:

»I den anledning skal jeg meddele, at politiets efterforskning i sagen alene har været udført med henblik på at få klarlagt hvorvidt nogen kan gøres strafferetlig ansvarlig for den stedfundne begivenhed.

Efterforskningen viste, at der ikke er noget, der indikerer, at Finn A. Sejersbøl er afgået ved døden som følge af strafbart forhold, hvorfor sagen blev henlagt.«

Det er af foreviste rids og fotos fremgået, at den omhandlede parkeringsplads ligger på taget af en møbelforretning. På siden modsat opkørselsrampen støder tagkanten på en del af strækningen op til gavlen på et

**1708**

tilstødende hus. På den øvrige del af strækningen er der ingen afskærmning ved tagkanten mod den omhandlede gård bortset fra en lav murkant. Et stykke inde fra tagkanten, herunder langs nævnte husgavl, er opsat et 1 m højt rækværk. Afstanden mellem rækværket og murkanten var på det sted, hvor Finn Sejersbøl antages at være faldet, 1,5 m. Stedet var oplyst af lamper.

*Forklaringer:*

Der er under domsforhandlingen afgivet forklaring af sagsøgeren og vidneforklaring af kriminalassistent Mette Hammerich og politiassistent Bent Blaabjerg.

Sagsøgeren, Anni Sejersbøl, har bl.a. forklaret, at hun har kendt sin nu afdøde mand siden marts 1974. De har en søn på 19 år. Hendes mand har aldrig været behandlet for eller lidt af depressioner. Han var en ligevægtig person og har aldrig talt om selvmord. Han var uddannet som og arbejdede som tømrer indtil 1988, hvor han under arbejdet faldt ned fra et stillads og kom til skade. Han var hospitalsindlagt i 14 dage og gik derefter til genoptræning. Hans venstre arm og hånd blev imidlertid aldrig gode igen, hvorfor han måtte opgive at genoptage arbejdet som tømrer. I stedet gennemførte han over 3 ½ år en uddannelse som bygningskonstruktør. Trods mange ansøgninger kunne han ikke få arbejde i dette fag. For ikke at gå ledig tog han erhvervskørekort og fik arbejde som chauffør hos en vognmand, som havde kontrakt på kørsel for lægevagten i Hillerød. Kort før dødsdagen havde vognmanden mistet kontrakten på lægevagtkørslen, hvorfor sagsøgers mand og de øvrige chauffører var blevet sagt op. Det havde gjort sagsøgers mand lidt ked af det. Han havde sagt, at han måtte finde noget andet arbejde. Han havde løbende søgt arbejde som bygningskonstruktør, idet han ønskede at bruge sin uddannelse.

Foreholdt politirapporten forklarede sagsøgeren, at hun ikke kunne huske, hvad hun udtalte til politiassistenten. Det er muligt, at hendes mand havde et skjult alkoholproblem, idet han sommetider kunne virke noget underlig, når hun talte til ham, og svare diffust. Hun har da spurgt ham, om han havde drukket, og udtalt, at det ville hun ikke være med til. Hun har ingen erindring om noget nytårsforsæt.

På ulykkesdagen den 9. februar 1994 skulle hendes mand af sted på arbejde ca. kl. 15.15, hvor hun kom hjem fra arbejde. De havde kun tid til at veksle et par bemærkninger. Han virkede upåfaldende uden tegn på spiritusindtagelse. Han skulle køre i familiens bil for at overtage lægevagtbilen andetsteds. Kl. ca. 16 ringede han hjem, som han plejede, for at fortælle, hvilken bil han kørte i, så hun eventuelt kunne ringe ham op. Han fortalte da, at han skulle køre påsken over.

Familien havde en god økonomi. Hendes mand var i den kristelige arbejdsløshedskasse, og de havde selv bygget deres hus. Selv om hendes mand blev arbejdsløs, kunne de sagtens blive boende i huset. Hun bor der selv endnu.

Kriminalassistent Mette Hammerich har bl.a. forklaret, at hun sammen med en kollega blev sendt til ulykkesstedet, som er beliggende 1-200 m fra politigården. Den gård, hvori afdøde blev fundet, var lukket. Vidnet og kollegaen foretog undersøgelse i gården og på tagparkeringspladsen, men fandt ingen tegn på, at nogen for nylig havde opholdt sig omkring det formodede nedfaldssted.

Politiassistent Bent Blaabjerg har bl.a. forklaret, at han under patruljekørsel bragte Finn Sejersbøl til standsning på grund af hans påfaldende kørsel. Der blev foretaget en alkometertest, som viste en alkoholkoncentration på 1,15‰. Vidnet gjorde Finn Sejersbøl bekendt med, at alkoholkoncentrationen var over det tilladte, og vil ikke mene, at han har oplyst om måletallet, idet alkometertesten kun er retningsgivende. Finn Sejersbøl blev erklæret for anholdt og indbragt til stationen, hvor hans kørekort blev ombyttet med et midlertidigt kørekort. Han havde virket trykket af situationen, men ikke mere end normalt. Efter anmeldelsen om fundet i gården, blev vidnet sendt til stedet og identificerede Finn Sejersbøl.

*Procedure:*

Sagsøgeren har anført, at Finn Sejersbøls kranie-hjernelæsion formentlig må antages at skyldes et fald fra tagparkeringspladsen. Hvad der har forårsaget dette fald, giver sagens oplysninger ingen holdepunkter for at slutte noget om. Det er efter sagsøgerens forklaring ikke sandsynligt - endsige overvejende sandsynligt - at Finn Sejersbøl ville begå selvmord. Den målte alkoholkoncentration var under grænsen for ubetinget førerretsfrakendelse, og familiens økonomi var i øvrigt ikke truet heraf. Tagparkeringspladsen måtte endvidere anses som et ulogisk valg for et selvmord. Faldhøjden var kun 6 m, og der var bede i gården. Hvis Finn Sejersbøl ville have begået selvmord, ville han snarere have valgt taget på sygehuset, hvor han kom dagligt som led i sit arbejde. Politiets skitser viser, at Finn Sejersbøl har ramt gården tæt på muren og et bed i gården, og læsionerne viser, at han er faldet på venstre side, hvilket alt ikke er foreneligt med, at han skulle have sprunget ud. Det er mere sandsynligt, at han er gået op på tagparkeringspladsen for at sunde sig efter anholdelsen, og at han har søgt efter et sted at sidde ned. Han har antageligt efter at være kommet op ad rampen fortsat lige over parkeringspladsen og har forceret det 1 m høje hegn for at sætte sig på murkanten op ad gavlen på det tilstødende hus. Han har - muligt efter at have siddet ned - rejst sig og bevæget sig langs husgavlen, hvor han på det sted, hvor husgavlen ender, og hvor der er frit fald, har støttet sig med venstre hånd mod husgavlen og på grund af den invaliderede hånd eller svimmelhed har tabt balancen og er faldet sidelæns ned i gården. Det må anses som sandsynligt, at han ikke har været opmærksom på, at

**1709**

der på denne side af parkeringspladsen, der er bygget ind i en skrænt, var en betydelig niveauforskel i modsætning til de andre sider, hvor pladsen er næsten i niveau med det omgivende terræn.

Den omstændighed, at Finn Sejersbøl har forceret det 1 m høje hegn kan ikke indebære, at faldet ikke kan anses som et ulykkestilfælde, eller at der har foreligget grov uagtsomhed, idet der ikke var

nogen umiddelbar fare ved at kravle over hegnet på det ovennævnte sted. Faren har i alt fald ikke været indlysende for ham på grund af de ovennævnte forskelle i terrænhøjden. Endelig kan hans spirituspåvirkethed ikke antages at have haft betydning for hændelsesforløbet. Den har i al fald ikke været hovedårsagen. Der må regnes med den målte mindsteværdi på 1,30‰ i blodet, hvilket er væsentligt under den promillegrænse, der i teori og praksis anses for gældende med hensyn til krav i henhold til ulykkesforsikringer.

*Sagsøgte* har principalt gjort gældende, at der ikke foreligger et ulykkestilfælde i forsikringsretlig forstand, hvilket er sagsøgerens bevisbyrde, allerede fordi Finn Sejersbøl frivilligt forcerede rækværket og dermed med vilje foretog den skadesudløsende handling. Forsikringsbegivenheden er derfor ikke indtrådt tilfældigt og uafhængigt af forsikredes vilje.

Subsidiært har sagsøgte gjort gældende, at forsikringsbegivenheden må anses forsætligt fremkaldt af Finn Sejersbøl, idet det må anses som overvejende sandsynligt, at han lod sig falde for at begå selvmord. De objektive omstændigheder taler herfor. Der kan ikke være anden sandsynlig begrundelse for, at han forcerede rækværket og bevægede sig til kanten af tagparkeringspladsen. Det er således usandsynligt, at han skulle have gjort det for at slappe af. Det er endvidere typisk for selvmordere at kaste sig ud fra høje steder. Finn Sejersbøl havde endvidere et tilstrækkeligt selvmordsmotiv. Han var i forvejen under et psykisk pres, hvilket det fremkomne om hans alkoholmisbrug viser, og måtte med sit kendskab til sit alkoholforbrug før kørslen påregne, at han ville miste sit kørekort og derfor ikke fortsat kunne ernære sig som chauffør.

Mere subsidiært har sagsøgte gjort gældende, at Finn Sejersbøl har handlet groft uagtsomt, idet han må antages at have indset, at han ved at forcere rækværket udsatte sig for at falde ned, og at et fald ville resultere i svær invaliditet eller døden, og idet han kunne have valgt at lade være med at forcere rækværket.

Mest subsidiært har sagsøgte gjort gældende, at forsikringsbegivenheden må anses fremkaldt ved selvforskyldt beruselse eventuelt i forbindelse med grov uagtsomhed. Ved bedømmelsen må der lægges vægt på de målte middelværdier såvel i Finn Sejersbøls blod som i hans øjenvæske. Efter det i politirapporten oplyste om Finn Sejersbøls kørsel må det endvidere lægges til grund, at hans reaktionsevne også faktisk var påvirket af alkoholindtagelsen. I al fald under hensyn hertil må det anses for groft uagtsomt af ham at forcere rækværket og bevæge sig hen til kanten af taget.

### Landsrettens bemærkninger:

Efter det fremkomne må det lægges til grund, at Finn Sejersbøls dødelige kranie-hjernelæsion skyldes et fald fra tagparkeringspladsen.

Det må herefter antages, at Finn Sejersbøl har bevæget sig op ad rampen til tagparkeringspladsen og over pladsen til rækværket før tagkanten. Det lægges efter de foreviste fotos af pladsen til grund, at Finn Sejersbøl herunder er blevet opmærksom på, at pladsen til denne side lå betydeligt over terræn, og at tagkanten kun på en del af denne side var skærmet af den tilstødende gavl. Det må videre lægges til grund, at Finn Sejersbøl ikke kan være faldet over det ca. 1 m høje rækværk og umiddelbart videre ud over tagkanten, der var ca. 1,5 m fra rækværket og yderligere var forsynet med en opkant. Det må herefter anses for overvejende sandsynligt, at Finn Sejersbøl frivilligt er kravlet over rækværket og har bevæget sig hen til tagkanten, hvor han er faldet ned.

Det findes ikke tilstrækkeligt sandsynliggjort, at Finn Sejersbøl forsætligt har ladet sig falde for at berøve sig livet. Det findes endvidere under hensyn til, at Finn Sejersbøl selv er kravlet over rækværket, overvejende sandsynligt, at andre ikke har forårsaget hans fald, men at faldet skyldes, at han har mistet balancen.

Faldet findes herefter at måtte anses som en ulykke i forsikringspolicens forstand. Efter det oplyste om alkoholkoncentrationen i Finn Sejersbøls blod, der må antages at have udgjort mellem 1,30 og 1,40‰ som middelværdi, og hans fremtræden under anholdelsen, findes hans alkoholpåvirkethed ikke at kunne anses som hovedårsag til hans fald fra taget.

Under hensyn til den åbenlyse risiko for at falde, som var forbundet med at kravle over rækværket og gå frem til tagkanten, findes Finn Sejersbøl imidlertid at have forvoldt ulykken ved grov uagtsomhed.

Landsretten tager derfor sagsøgtes påstand om frifindelse til følge.

Sagsøgeren har fri proces. Det er oplyst, at sagsøgeren har retshjælpsforsikring.

— — —

Der tillægges sagsøgte 30.000 kr. i sagsomkostninger. Beløbet udredes af sagsøgeren, Anni Sejersbøls, retshjælpsforsikring, subsidiært af statskassen.

## Højesteret

### Højesterets dom.

I tidligere instans er afsagt dom af Østre Landsrets 13. afdeling den 8. august 1997.

I pådømmelsen har deltaget fem dommere: Marie-Louise Andreasen, Poul Sørensen, Jørgen Nørgaard, Engholm Jacobsen og Jytte Scharling.

Appellanten, Anni Sejersbøl, har gentaget sin påstand.

**1710**

Indstævnte, Skandia Forsikring A/S, har påstået stadfæstelse.

Appellanten har for Højesteret yderligere gjort gældende, at afdødes læsioner helt eller delvis kan skyldes et overfald.

Der er til brug for Højesteret tilvejebragt yderligere oplysninger.

Det fremgår heraf, at møbelforretningen ud mod Østergade er indrettet med stueetage og 1. sal. Den del af forretningen, der er under parkeringspladsen, er beliggende i stueplan. Det fremgår endvidere, at der er en større højdeforskel mellem parkeringspladsen og gårdspladsen end mellem parkeringspladsen og det øvrige omliggende terræn.

Retslægerådet har i erklæring af 20. oktober 1998 besvaret følgende spørgsmål således:

*Spørgsmål 1.*

Anser Retslægerådet den Finn A. Sejersbøl påførte legemsskade som anført i dødsattest af 10/2 1994 (bilag D) og obduktionserklæring af 10/2 1994 (bilag E) som en sandsynlig følge af et fald fra en højde på ca. 6 meter.

Ja. Alle de påviste læsioner kan meget vel være opstået ved et fald fra 5-6 meters højde. De påviste ydre læsioner er overvejende venstresidige og har karakter af hudafskrabninger med skurestriber, hvilket er hyppigt forekommende ved fald, ligesom svær knusning af kraniet med hjernekvæstelse i kombination med bryst- og bughulelæsioner er typiske faldlæsioner. Blodudtrædningerne (misfarvning) og hævelsen i venstre øjenlåg kan være opstået sammen med læsionen i venstre side af panden. Blodudtrædningerne i øjenlågene (misfarvninger) ses hyppigt som følge af brud i kraniets basis.

*Spørgsmål 2.*

Anser Retslægerådet i øvrigt at den Finn A. Sejersbøl påførte legemsskade som anført i bilag D og E, har en karakter der kan være resultatet af et eventuelt håndgemæng med tredjemand, hvor denne »banker« afdødes overkrop og/eller hoved mod den i den omhandlede gård værende asfaltbelægning.

Nej. Den meget udbredte knusning af kraniets kuppel og basisdel er udtryk for en betydelig traumatisk påvirkning, som vanskeligt vil kunne opnås ved, at »banke« hovedet ned mod asfalten, ligesom

de påviste ribbensbrud, lungekvæstelse og leverlæsion næppe kan frembringes på denne måde.

Misfarvningerne i hud og underhud på øjenlågene kan være en følge af direkte slag mod øjenregionerne, men manglen på hudafskrabninger og sår i disse områder, taler imod, at det kan være slagsmålslæsioner, men at de snarere er følge af de svære brud i kraniets basis jf. svar på spørgsmål 1. Heller ikke læsionerne på venstre hånd og albue kan anses for typiske slagsmåls- og afværgelæsioner.

*Spørgsmål 3.*

Anser Retslægerådet i øvrigt at den Finn A. Sejersbøl påførte legemsskade som anført i bilag D og E, har en karakter der kan tyde på slag med stumpt instrument, f.eks. baseballkølle eller lignende.

Nej. Læsionerne er ikke typiske for slag med stumpt instrument, f.eks. en baseball kølle eller lignende. Slag med genstande medfører sædvanligvis ikke hudafskrabninger med skurestriber, men derimod hudafskrabninger, der har karakter af trykmærker. Ved slag er kraniebruddene oftest lokaliserede til kraniets kuppeldel.

Der er ikke påvist mærker i huden svarende til de påviste ribbensbrud, lungelæsion eller leverlæsion, og det er derfor usandsynligt, at de er opstået ved slag med stumpt instrument.«

**Højesterets bemærkninger.**

Højesteret finder, at det - særligt efter de af Retslægerådet givne svar - kan lægges til grund, at Finn Sejersbøls fald ikke var forårsaget af en andens slag, deltagelse i et håndgemæng eller lignende.

Tre dommere - Poul Sørensen, Jørgen Nørgaard og Engholm Jacobsen - udtaler herefter:

Uanset om det måtte antages, at Finn Sejersbøl døde ved et ulykkestilfælde, således som dette begreb er defineret i fællesbetingelsernes pkt. 1.2, finder vi, at forsikringsselskabet ikke er forpligtet til at udbetale forsikringssummen til Anni Sejersbøl, idet vi finder det godtgjort ud over enhver rimelig tvivl, at hans død er fremkaldt af ham »ved forsæt eller grov uagtsomhed«, jf. betingelsernes pkt. 3.4.

Vi stemmer derfor for at stadfæste dommen.

Dommerne Marie-Louise Andreasen og Jytte Scharling udtaler:

Idet vi lægger til grund, at Finn Sejersbøls dødelige læsioner skyldes et fald fra tagparkeringspladsen under uoplyste omstændigheder, finder vi, at hændelsen må betragtes som et ulykkestilfælde.

Efter vores opfattelse er det ikke godtgjort, at Finn Sejersbøl forsætligt har fremkaldt forsikringsbegivenheden.

Efter oplysningerne om de bygningsmæssige forhold på stedet lægger vi til grund, at parkeringspladsen, når man indfinder sig på den via tilkørselsrampen, fremtræder som beliggende i 1. sals højde. Ulykken skete en aften i februar måned, og der var mørkt i gården til ejendommen Østergade 6. Det findes ikke godtgjort, at det må have stået Sejersbøl klart, at der var et fald på ca. 6 meter fra parkeringspladsen til denne gård, og at der derfor var en betydelig risiko ved at gå ud på det op til 1,5 m brede, flade tagareal mellem rækværket og tagkanten. Under disse omstændigheder finder vi det ikke tilstrækkeligt godtgjort, at Finn Sejersbøl har fremkaldt ulykken ved grov uagtsomhed.

Af de grunde, der er anført af landsretten, mener vi, at Sejersbøls alkoholpåvirkethed ikke kan anses for at have været hovedårsag til ulykken.

Vi stemmer derfor for at tage appellantens påstand til følge.

Afgørelsen træffes efter stemmeflertallet.

**1711**
**Thi kendes for ret:**

*Landsrettens dom stadfæstes.*

*I sagsomkostninger for Højesteret skal statskassen betale 40.000 kr. til indstævnte, Skandia Forsikring A/S.*

*De idømte sagsomkostningsbeløb skal betales inden 14 dage efter denne højesteretsdoms afsigelse.*