# Exhibit 12



London

This is to certify that the attached document is, to the best of my knowledge and belief a true, accurate and complete translation from Danish into English of the attached extract from Consolidated Act 2016-03-02 no. 193 concerning agreements and other legal transactions in the field of property law.

Yours sincerely,

Andrzej Orville

Senior Project Manager

Wednesday, January 22, 2025

Consortra Translations Ltd
Rex House,
4-12 Regent Street
London
SW1Y 4RG
UK

Consolidated Act 2016-03-02 no. 193

# Consolidated Act of 2016-03-02 No. 193 concerning agreements and other legal transactions in the field of property law*

The text of the act was consolidated by Karnov on **2022-05-28**, which is the date of entry into force of the most recent amendment.

as amended in L 2021-11-27 no. 2158

## III. On invalid declarations of will[103]

**Section 30**
A declaration of will is not binding on the person making it if the person to whom it was made elicited it by fraud or realised or should have realised[117] that it was elicited[118] by the fraud of a third party.[119]

Paragraph 2. If the person to whom the declaration is made has fraudulently presented incorrect facts that can be assumed to be of significance for the declaration or has fraudulently concealed such facts, the declaration is deemed to have been elicited by the fraud thus shown, unless it is credibly shown that it had no effect on the declaration.[120]

**Footnotes**

**Notes**

103
A *declaration of will* is a private statement that intends (supported by a legal intention) to produce legal effects, either in the form of an order binding the recipient or in the form of a promise binding the issuer. Chapter III thus contains the general rules of Danish law on both invalid promises and invalid orders. However, the act does not provide an exhaustive regulation of invalid declarations of will. Thus, the act does not contain any rules on the defects in capacity that arise in connection with agreements entered into by minors or persons who lack legal capacity, cf. in particular Section 1 of the Guardianship Act (minority) and Section 6 of the Guardianship Act (deprivation of legal capacity). In the case of defects in the formulation of an agreement, the act does not contain direct provisions on forgery and falsification, but the rules about these can be inferred from Section 1 of the Contract Act, as no promise can be said to have been 'made' in these cases.

The rules in Sections 28–33 are characterised by the fact that there is a discrepancy on the part of the declarant between their will and the content of the declaration made. In the prioritisation of the declarant's will and the recipient's expectation, a distinction is made, on one hand, between *strong grounds for invalidity* (in particular Section 28 (on violent, compulsive coercion) and Section 32(2) (on certain cases of misrepresentation)) and, on the other hand, *weak grounds for invalidity* (Section 29 (non-violent coercion), Section 30 (fraud), Section 31 (exploitation), Section 32(1) (misspelling and other, similar mistakes), and Section 33 (declarations of will that it would be contrary to common decency to enforce)). The main idea is that the declarant cannot—or only with difficulty can—protect himself against a discrepancy that arises in cases covered by the area of strong grounds for invalidity, but declarants can—or can more easily—protect themselves against a discrepancy that arises in cases covered by the area of weak grounds for invalidity. Therefore, the good or bad faith of the recipient of the declaration determines the impact of the two types of grounds for invalidity.

In the case of the strong grounds for invalidity, the declarant's objection will prevail even against a bona fide declaration recipient, whilst, in general, in the case of the weak grounds for invalidity, whether the declarant is bound depends on whether the recipient realised or should have realised the lack of consistency between the declarant's will and the content of the declaration—i.e. whether the *recipient of the declaration was acting in bad faith* (very precisely at the time when the declaration came to his knowledge, see Section 39(1)). However, the wording of the act remains that the recipient of the declaration who is acting in such bad faith is not

found in favour of—whereas it is *not* expressly stated that a recipient of the declaration who is acting in good faith is found in favour of. The reason for this is stated in the **Draft** on p. 76: 'The fact that this has not been stated directly [that the bona fide recipient of the promise is found in favour of], but that it is only indirectly stated that it applies in general, is due to the views that it should perhaps not be without exception. Particularly with regard to gifts and legal transactions, where the person in question assumes obligations which are manifestly disproportionate to what he receives in return, cf. Section 32, there has been doubt as to whether, notwithstanding the good faith of the other party, in the circumstances, the lack of will on the part of the declarant might not be attributed significance, with the result that he is required to compensate the other party only for the loss the latter has suffered by relying on the declaration as valid […]. According to the chosen wording of Section 34(1) [which, in the final act, became Section 32(1) and which on this point corresponds to Sections 29, 30, and 31], the courts are not unconditionally precluded from taking into account the lack of will on the part of the declarant, where the application of the general rule would cause particular unfairness to the declarant, and deviation therefrom would not conflict with the general interest in certainty that motivates the rule.' The quotation seems in particular to suggest that the absence of an interest in turnover may, depending on the circumstances, mean that good faith on the part of the recipient of the declaration does not necessarily result in him being able to rely on a promise with a weak ground for invalidity—e.g. where there is a promise of a gift, cf., for illustration, U 1981 1070 Ø, where the fact that the promise was a promise to pay a fairly large amount of money on a regular basis to the Apostolic Church seems to have had an impact on the result (the promise, after the promisor's departure from the church, was considered non-binding under the doctrine of insufficient conditions).

The legal consequences of a promise being valid or invalid are not described in the act but follow from general rules: A promise being invalid means that it gives rise neither to natural performance, i.e. performance of the contract according to its immediate content, nor to a positive interest in performance (i.e. compensation that places the promisor in the financial position he would be in were the contract performed). If a promise is invalid—and the invalidity is asserted—only the negative contractual interest can be claimed (i.e. compensation that places the recipient of the promise in the economic position he would have been in had the contract never been concluded).

The promisor may waive the right to invoke the invalidity on the occasion of a subsequent approval (referred to as 'ratihabition'), cf. **Ussing**: *Aftaler* ['Agreements'] p. 144, unless the promise is invalid as contrary to statute and honesty (cf. in this regard DL 5-1-2) or the ratihabition promise itself is invalid, cf. **Aftaler og mellemmænd** ['Agreements and intermediaries'] p. 115 et seq.

The maker of the invalid promise will also very often, in place of invalidity under contract law, be able to claim that his contractual counterparty has committed a breach of contract (something that in particular may be obvious if, for example, the rules of the contract place the promisor in a better position—e.g. in the form of a right to claim compensation in the form of positive performance (and thus lost profit)—than would a claim for invalidity under contract law, cf. **Almindelig kontraktret** ['General Contract Law'] p. 114 et seq. and, for illustration, U 1977 876 V and, on this subject, **Jørgen Nørgaard** in U 1978 B 279. See also U 2007 3102 H (invalidity incompatible with a claim for compensation in the form of a positive interest in performance)).

There is generally no requirement for the promisor to bring a claim against the recipient of the promise as a condition for claiming that the declaration of will is invalid, but such a claim may exist on a non-statutory basis under general rules, included outside the scope of instances listed in Section 28(2) and Section 32(2), where a duty to bring a claim expressly follows from the act. Whether a duty to bring a claim exists on a non-statutory basis depends, among other things, on the recipient of the promise's good or bad faith, with the result that the less culpability there is on part of the recipient of the promise, the more legitimate it will be to impose on the promisor the duty to bring a claim, with the effect that, after a certain period of time, the promisor loses the right to claim that he is not obliged as a result of the invalidity of his promise (which he knew or should have known).
117
On the other hand, the rule stipulates that fraud, in general, cannot lead to invalidity when the recipient is acting in good faith (at the time of knowledge), cf. above in the note to Chapter III on the phrase 'declarations of will'. If A is defrauded by B, who obtains a promise of payment from A by presenting him with falsified financial statements, A is of course not bound towards B as 'the person to whom the declaration has been made'. If B gives his bank C a transfer document concerning the promise (e.g. a promise concerning collateral), A is also not bound towards the bank, even if its representative relevant in the context is acting in sufficiently good faith, cf. Section 27 of the Bond Act. However, if A makes the promise directly to C—e.g. by appearing at the bank and signing the document there, as occurs in practice—A is bound, if the representative of the bank relevant in the context is acting in good faith (as, in this particular situation, he is 'the person to whom the declaration is made'. See **Aftaler og mellemmænd** ['Agreements and intermediaries'] p. 159 et seq. and U 1991 523 H (commented on by **Blok** in U 1992 B 25), where the recipient of the promise (a loan recipient/insurance recipient) was found to be acting in bad faith concerning the credit insurance company's commitment).

Printed from Karnov for use in accordance with the licence terms

118
For the special evidentiary circumstances with regard to the condition 'elicited', see the note to Paragraph 2.

119
Both false disclosure and concealment can entail the presence of fraud, cf. **Draft** p. 66 et seq. In both respects, a requirement of intent applies: 'Fraud' means an unlawful act consisting in a person knowingly making false disclosures or concealing the truth with the intent to elicit a declaration of will.

See also **Ussing**: *Aftaler* ['Agreements'] p. 140, **Aftaler og mellemmænd** ['Agreements and intermediaries'] p. 157 et seq., **Almindelig kontrakret** ['General Contract Law'] p. 137 et seq., **Mads Bryde Andersen** p. 429 et seqq., and **Kommentar** ['Commentary'] p. 203. See also **David Moalen** in U 2004 B 137 et seq.

With regard to the making of false disclosures, it is a condition for the application of the provision that the person acting fraudulently is aware (1) that the disclosures are false, (2) that the disclosures are capable of have a motivating effect, cf. U 1953 621 Ø, and (3) that the disclosures have been communicated with the aim of eliciting the promise, cf., by way of illustration, U 1952 278 H concerning the latter condition, where this was not considered to have been fulfilled in connection with the conclusion of an insurance agreement, cf. Section 4 of the Insurance Agreement Act (the policyholder, who suffered the consequences of a gunshot wound sustained as a soldier in Frikorps Danmark, should avoid infamy). However, no intent to enrich the recipient of the promise is required. See, especially concerning fraud in insurance agreement law, **Henning Jønsson** and **Lisbeth Kjærgaard**: **Dansk Forsikringsret** ['Danish Insurance Law'], 10th edition (2019) p. 264 et seq.

The limitation of the concept of fraud lies first and foremost in the generally assumed condition that the relationship must be unlawful, see **Aftaler og mellemmænd** ['Agreements and intermediaries'] p. 159. See also **Ussing**: Aftaler ['Agreements'] p. 140.

It will usually be unlawful to make false disclosures in the presence of better knowledge, but certainly not always; thus, for example, ordinary claims—e.g. that a product is 'the best and cheapest in the world'—are usually not unlawful. Of course, a party is not obliged to disclose his financial circumstances, and, obviously, this also includes the fact that he does not want to give more or settle for less than he is currently offering. As a general rule, such concealments are not unlawful, but they may be so in very exceptional cases, cf. U 1992 444 H (settlement, where a bank accepted a debtor's offer of payment of DKK 20,000 against the bank's write-off of a receivable of approx. DKK 275,000, which was considered invalid, cf. Section 30, as the debtor, when making the offer to pay the DKK 20,000, had concealed the fact that he very recently received a lottery win of over DKK 1 million).

The fact that not all facts need to be disclosed, even if they may be relevant to the other party's decision, follows automatically from the fact that a certain leeway must be allowed for ordinary commercial acumen. In many sectors, there will be custom and practice as to what constitutes 'good and proper business practice' regarding the extent of information provision and disclosure at the conclusion of certain contracts, and failure to comply with such norms can tend to suggest a concealment to be fraudulent, cf. **Aftaler og mellemmænd** ['Agreements and intermediaries'] p. 161 et seq.

It would of course be unlawful to conceal certain events that completely distort the value of the object of sale, cf. **Draft** p. 38. 'Thus, the words "or has been guilty of fraudulent concealment of such circumstances" in the second point of Paragraph 2 specifically indicate that elicitation of a declaration of will by mean of fraud may occur not only through the making of false disclosures, but also through passivity on the part of the person in question. Intentional concealment during the conclusion of a legal transaction concerning circumstances that could be of importance to its realisation, of course, will often be perfectly legal. One party must be free to be able to make use of his better knowledge, e.g. concerning the nature of overseas markets, in order to bring about a deal that is particularly good for him, without his concealment of this knowledge of his invalidating the legal transaction. Generating profit from entirely legitimate trading depends to a great extent on such better knowledge. The concealment must, in order for the transaction to be invalid for that reason, be, as it is expressed in Section 31 [which became Section 30 of the act], fraudulent. This will be the case, for example, when a man offers another man shares for purchase at a high price—without stating that he has just learned that the company in question has gone bankrupt, even though he knows that his counterparty is completely unaware of this. It is not possible to lay down a general rule as to the circumstances under which an instance of wilful concealment must be considered fraudulent. The decisive question in this respect must be whether the matter that is concealed is such that a concealment involves a breach of good faith and law in trade and commerce or of common decency, cf. the comments to Section 33 of the Draft.'

Printed from Karnov for use in accordance with the licence terms

If several participants in a tender procedure (or another form of price competition) have—secretly—agreed that they will each add a certain amount to their competing bids, with the aim that they subsequently share the additional amount obtained from, for example, the client who accepts the highest [*sic*] bid, the tender procedure is of course invalid (which is referred to in Danish with the archaic expression 'master pig', concerning which reference can be made in case law to U 1911 18 H).

If a party representing the actual promisor (whether as an employee, agent, or intermediary) obtained a kickback—i.e. payment from a third party for bringing about an agreement between the third party and the promisor—there is obviously a fraudulent relationship in place, and the promisor may have the agreement declared invalid, cf. Section 30. In a power of attorney relationship, an agent who receives a kickback will also have acted in any case outside the scope of his authority. In both cases, the third party must almost automatically be held to be acting in bad faith in this connection, with the result that the agreement is non-binding, cf., for further details, **Ussing**: Aftaler ['Agreements'] p. 142 and 303 and **Aftaler og mellemmænd** ['Agreements and intermediaries'] p. 161.

On the offering shares in ailing companies, see U 1951 17 H (concerning a partnership), but see also U 1978 205 V (an accountant who had agreed with some clients that they should subscribe for 'silent shares' with the right to tax write-offs was not found to have committed acts (failure to disclose his own and the factory's difficult financial situation, the fact that it was his own business that was at issue, and the financial consequences of participating in a company formation) that could be considered covered by Section 30 or Section 33).

Fraud committed by an intermediary, e.g. a proxy or agent, also entails invalidation of the promise, even if the person represented was acting in good faith, cf. U 1922 1000 H.

The person deceived must be able to reclaim the transferred—identifiable—property from the bankruptcy estate of the fraudster, cf. U 1925 433.

A monetary claim—repayment of equity—which normally would not be able to obtain satisfaction in the estate of a company could be asserted in U 1951 17 H in relation to a partnership. In U 1981 887 Ø, which related to a limited partnership, it was held that an objection could not be raised to the detriment of the company's creditors. In U 1993 923 H, concerning a subscription by limited partners (commented on by **Jørgen Nørgaard** in U 1994 B 273 et seq.), neither Section 30 nor Section 31, Section 33, or Section 36 were applicable.

See also U 1978 933 H (an architect was not found, in breach of the rules of the architectural association of which he was a member, by having conducted contractor and supplier activities and as general contractor for the construction of 40–50 detached houses, to have committed an act covered by Section 30 or Section 33 against a buyer who, after the construction of the house, found that the construction cost less than presented in the purchase agreement in question).

See also U 1990 390 H (concealment of information in real estate transactions, where the conduct seems to have skirted close to the area of fraud. The Supreme Court considered the promise to be non-binding, without Section 30 being cited), and see the dissenting view on U 1989 805 H.

See also U 2000 2267 H (a bank's declarations to the effect that a limited liability company's securities were in custody, even though this not the case, did not give rise to liability, as the declarations were elicited through fraud on the part of the company's main shareholders).

See also U 2001 356 H (owners who accepted settlement offers after it was clear to them that the alternative was an expropriation order with a lower amount were not entitled to further compensation, as it was not credibly shown that the principles of consultation, fair and loyal administration, guidance, or equality were breached. The settlement agreement was not considered invalid under either Section 30 or Section 36).

See also U 2002 1116 Ø (when a man who, in August 1994, became aware of a loan that had been paid out through someone else in 1993 impersonating the debtor waited until 1998—after, among other things, having paid payments on the loan and having agreed to defer repayment—before claiming forgery, he had entered into a loan agreement that could not be set aside under Sections 30, 33, or 36).

Printed from Karnov for use in accordance with the licence terms

U 2003 1381 V (a prenuptial agreement considered invalid due to fraud, cf. 30, as the wife had been tricked into signing a prenuptial agreement that gave the husband a significant financial advantage while she thought she was signing the last page of a will, which the husband must have known).

U 2004 1751/2 H (a supplementary agreement on maximising the annual rental payment between customer and supplier could not be enforced against the finance company, as the customer, in the circumstances in question, had no reason to assume that the supplementary agreement was part of the agreement with the finance company, which showed, amongst other things, a much higher rent. Invalidity rejected under both Section 30 and Section 36).

U 2004 2400 H (in connection with a delivery of elements of air conditioning systems for SEK 161,625, a contractual penalty of SEK 11,500 per day was agreed, resulting in a total penalty of SEK 721,280. In another agreement for payment of SEK 257,929, the penalty was agreed at SEK 50,000 per day, which resulted in a total penalty of SEK 1,434,000. As the buyer had not shown credibly that the company would suffer a loss of such magnitudes, both penalty amounts were reduced under Section 36(1) to a total of SEK 100,000. The Supreme Court expressly stated that in connection with the agreements on the contractual penalties in question, no incorrect disclosures had been made of such a nature that the agreements were invalid under Section 30 of the Contract Act concerning fraud.

U 2005 134 Ø (special prenuptial agreement not set aside under Section 30 or Section 36).

U 2005 761 SH (an investment agreement was not invalid due to fraud or failed preconditions because, before the agreement was entered into, a due diligence investigation was carried out, which contained many warnings, and no further investigations had been carried out despite requests to do so).

U 2010 1304 V (sellers of detached houses were found to have acted fraudulently by not ensuring that buyers received previous condition reports).

U 2013 2041 H (related to a leasing agreement in connection with which the fraud provision was the subject of litigation before the High Court, but not before the Supreme Court.) See **Jonathan Kærn** in ET 2013 349 et seq.

U 2018 49 H (a bank's advice to a cooperative housing association did not entail the invalidity of an interest rate swap agreement (under Section 30 or 36) or its possible termination, and the advice did not result in liability for damages on the part of the bank).

U 2022 3573 Ø (a court record concerning a third party that was included in a bank's assessment of a loan application from S turned out to be false. The bank should have realised this and that S's acceptance of the credit agreement was elicited by the third party by means of fraud. Therefore, S was not bound by the credit agreement, cf. Section 30(1) of the Contract Act.)

A special rule on fraud is found in Section 4 of the Insurance Agreement Act. See, in this connection, U 1991 523 H (commented on by **Blok** in U 1991 B 25 et seqq.): Although the Insurance Agreement Act was applicable to credit insurance also with regard to the relationship between the insured creditor and the insurance company, the question of possible fraud had to be decided under Section 30 of the Insurance Agreement Act and not under Section 4 of the Insurance Agreement Act, with the result that fraud committed by the policyholder could not be claimed against the creditor if the latter was acting in good faith. The insurance company was not found liable as it had to be concluded that the creditor knew or should have known that there was a fraudulent relationship).

120
It is the person who has been defrauded who must prove he is the victim of fraud, see Paragraph 1. When the person who has been defrauded has discharged this burden of proof, Paragraph 2 lightens the burden of proof, in that the recipient of the promise would have to prove that the fraud did *not* elicit the promise. See **Draft** p. 69 and **Ussing**: Aftaler ['Agreements'] p. 143.

The reversal of the burden of proof in Paragraph 2 benefits the declarant and presumably applies regardless of whether it is the recipient of the promise himself or a third party who has committed fraud, cf. U 1991 523 H (on a credit insurance agreement), which is commented on by **Blok** in U 1992 B 25 et seqq. (especially 33) and discussed to in the note to Paragraph 1 in relation to the phrase 'third party'. See also **Stig Jørgensen:** Kontraktsret ['Contract Law'], vol. 1, p. 139.

LBKG 2016-03-02 nr 193

# Lovbekendtgørelse 2016-03-02 nr. 193 om aftaler og andre retshandler på formuerettens område [*]

Lovteksten er konsolideret af Karnov den **2022-05-28**, som er ikrafttrædelsesdato for den seneste ændring.

som ændret ved L 2021-11-27 nr. 2158

## III. Om ugyldige viljeserklæringer [103]

**§ 30**

En viljeserklæring er ikke bindende for afgiveren, hvis den, til hvem erklæringen er afgivet, har fremkaldt den ved svig eller har indset eller burdet indse [117], at den var fremkaldt [118] ved svig fra tredjemands side. [119]

Stk. 2. Har den, til hvem erklæringen er afgivet, svigagtigt givet urigtige oplysninger om omstændigheder, som kan antages at være af betydning for erklæringen, eller gjort sig skyldig i svigagtig fortielse af sådanne omstændigheder, anses erklæringen for at være fremkaldt ved den således udviste svig, medmindre det gøres antageligt, at denne ikke har indvirket på erklæringen. [120]

**Fodnoter**

**Noter**

[103]
En *viljeserklæring* er et privat udsagn, som tilsigter (er båret af en retshandelsvilje) at udløse retsvirkninger, enten i form af et påbud, som binder adressaten, eller i form af et løfte, som forpligter afgiveren. Kapitel III indeholder således dansk rets almindelige regler om både ugyldige løfter og ugyldige påbud. Loven giver imidlertid ikke en udtømmende regulering af ugyldige viljeserklæringer. Loven indeholder således ingen regler om de habilitetsmangler, der opstår ved aftale indgået af mindreårige eller personer, som savner retlig handleevne, jf. herom navnlig værgemålsloven § 1 (mindreårighed) og værgemålsloven § 6 (fratagelse af retlig handleevne). Ved tilblivelsesmangler indeholder loven heller ikke direkte bestemmelser om falsk og forfalskning, men reglerne herom kan dog udledes af aftalelovens § 1, idet der kan siges ikke at være »afgivet« et løfte i disse tilfælde.

Reglerne i §§ 28-33 er kendetegnet ved, at der hos erklæringsgiveren viser sig en uoverensstemmelse mellem erklæringsgiverens vilje, og indholdet af den afgivne erklæring. Ved prioriteringen af erklæringsgiverens vilje og adressatens forventning sondres der mellem de p.d.e.s. såkaldt *stærke ugyldighedsgrunde* (navnlig § 28, (om voldelig kompulsiv tvang) og § 32, stk. 2 (om visse tilfælde af forvanskning), og p.d.a.s. de såkaldt *svage ugyldighedsgrunde* (§ 29 (ikke voldelig tvang), § 30 (svig), § 31 (udnyttelse), § 32, stk. 1 (fejlskrift og anden lignende fejltagelse), og § 33 (viljeserklæringer, som det ville stride mod almindelig hæderlighed at gøre gældende). Den bærende tanke, er at erklæringsgiveren ikke - eller dog kun vanskeligt - kan gardere sig mod den uoverensstemmelse, som opstår i tilfælde, som dækkes af området for stærke ugyldighedsgrunde, men erklæringsgiverne kan - eller dog lettere kan - gardere sig mod den uoverensstemmelse, som opstår i tilfælde, som dækkes af området for svage ugyldighedsgrunde. Derfor

bliver erklæringsmodtagerens gode henholdsvis onde tro afgørende for gennemslagskraften af de to typer af ugyldighedsgrund.

Ved de stærke ugyldighedsgrunde slår erklæringsgiverens indsigelse igennem selv over for en godtroende erklæringsmodtager, mens det generelt er ved de svage ugyldighedsgrunde afgørende for erklæringsgiverens bundethed, om adressaten indså eller burde indså den manglende overensstemmelse mellem erklæringsgiverens vilje og erklæringsindhold - altså om *erklæringsmodtageren var i ond tro* (helt præcist på dét tidspunkt, hvor erklæringen kom til hans kundskab, jf. § 39, 1. pkt.). Men lovens ord er til stadighed, at erklæringsmodtageren i sådan ond tro ikke vinder ret - hvorimod det *ikke* udtrykkeligt udtales, at en erklæringsmodtager i god tro vinder ret. Om baggrunden herfor hedder det i **Udkast** s. 76: »At man ikke har udtalt denne direkte [at den godtroende løftemodtager vinder ret], men kun indirekte tilkendegivet, at den gælder i Almindelighed, skyldes Hensynet til Anskuelser om, at den maaske ikke bør være undtagelsesfri. Navnlig med Hensyn til Gaver og Retshandler, hvorved den paagældende paatager sig Forpligtelser, som stå i åbenbart Misforhold til, hvad han derfor erholder, jfr. § 32, har der været Tvivl, om der ikke uanset den anden Parts gode Tro efter Omstændighederne kunde tillægges Viljesmangel hos den erklærende Betydning, så at det kun pålægges ham at tilsvare den anden Part Erstatning for det Tab, denne har lidt ved at stole på Erklæringen som gyldig [...]. Ifølge den valgte Affattelse af § 34, 1ste Stykke [som i den endelige lov blev til § 32, stk. 1, og som på dette punkt svarer til §§ 29, 30 og 31] ere Domstolene ikke ubetinget afskårne fra at tage Hensyn til Viljesmangelen hos den erklærende, hvor Anvendelsen af Hovedreglen vilde medføre særlig Ubillighed for den erklærende, og dens Fravigelse ikke vilde komme i Strid med det almindelige Sikkerhedshensyn, som motiverer Reglen.« Med citatet synes der navnlig at være lagt op til, at fravær af omsætningshensyn efter omstændighederne kan bevirke, at god tro hos erklæringsmodtageren ikke nødvendigvis fører til, at denne kan støtte ret på et løfte behæftet med en svag ugyldighedsgrund - f.eks. hvor der er tale om et gaveløfte, jf. til illustration U 1981 1070 Ø, hvor det forhold, at der var tale et gaveløfte om løbende betaling af større beløb til den Apostolske Kirke, synes at have haft betydning for resultatet (løftet ansås efter løftegiverens udmeldelse af kirken for uforbindende under henvisning til læren om bristende forudsætninger).

Retsvirkningerne af, at et løfte er gyldigt henholdsvis ugyldigt, er ikke beskrevet i loven, men følger af almindelige regler: At et løfte er ugyldigt, vil sige, at det hverken forpligter til naturalopfyldelse, dvs. opfyldelse af kontrakten efter dens umiddelbare indhold, eller til positiv opfyldelsesinteresse (dvs. en erstatning, der økonomisk stiller løftegiveren, som om kontrakten er opfyldt). Er et løfte ugyldigt - og gøres ugyldigheden gældende - kan der kun blive tale om at kræve den negative kontraktsinteresse (dvs. en erstatning, der økonomisk stiller løftemodtageren, som om kontrakten aldrig var blevet indgået).

Løftegiver kan give afkald på at påberåbe sig ugyldigheden ved en efterfølgende godkendelse (såkaldt ratihabition), jf. **Ussing**: Aftaler, s. 144, medmindre der er tale om et løfte som er ugyldigt som stridende mod lov og ærbarhed (jf. herved DL 5-1-2) eller ratihabitionsløftet i sig selv er ugyldigt, jf. **Aftaler og mellemmænd** s. 115 f.

Afgiveren af det ugyldige løfte vil også meget ofte i stedet for aftaleretlig ugyldighed kunne påberåbe sig, at hans kontraktspart har begået kontraktsbrud (noget, der navnlig kan være nærliggende, hvis f.eks. kontraktens regler stiller løftegiveren bedre - f.eks. i form af en ret til at kræve erstatning i form af positiv opfyldelse (og dermed mistet fortjeneste) - end aftaleretlig ugyldighed, jf. **Almindelig kontraktret** s. 114 f. og til illustration U 1977 876 V og hertil **Jørgen Nørgaard** i U 1978 B 279. Se også U 2007 3102 H (ugyldighed uforenelig med krav om erstatning i form af positiv opfyldelsesinteresse).

Der stilles i almindelighed ikke krav om reklamation fra løftegiver til løftemodtager som betingelse for at kunne gøre gældende, at viljeserklæringen er ugyldig, men et sådant krav kan på ulovbestemt grundlag bestå efter almindelige regler, også uden for de i § 28, stk. 2, og § 32, stk. 2, opregnede tilfælde, hvor en reklamationspligt udtrykkeligt følger af loven. Om der på ulovbestemt grundlag består en reklamationspligt afhænger bla. af løftemodtagerens gode/onde tro, således at jo mindre der er at bebrejde løftemodtageren, jo mere nærliggende vil det være at pålægge løftegiveren

reklamationspligt med den virkning, at løftegiver efter en vis tids forløb mister retten til at gøre gældende, at han ikke er forpligtet som følge af sit løftes ugyldighed (som han kendte eller burde kende).

117
Modsætningsvis ligger det i reglen, at svig i almindelighed ikke kan medføre ugyldighed, når adressaten er i god tro (på kundskabstidspunktet), jf. ovenfor i noten til kapitel III ad ordet »viljeserklæringer«. Besviges A af B, som opnår et betalingsløfte fra A ved forevisning for denne af forfalskede regnskaber, er A naturligvis ikke bundet over for B som »den, til hvem erklæringen er afgivet«. Giver B sin bank C transport på løftet (f.eks. et kautionsløfte), er A heller ikke bundet over for banken, heller ikke selv om dennes i sammenhængen relevante repræsentant er i nok så god tro, jf. gældsbrevslovens § 27. Men hvis A afgiver løftet direkte over for C - f.eks. ved som i praksis at møde op i banken og underskrive dokumentet dér - bindes A, hvis bankens i sammenhængen relevante repræsentant er i god tro (idet den pågældende netop i denne situation er »den, til hvem erklæringen er afgivet«. Se **Aftaler og mellemmænd** s. 159 f. samt U 1991 523 H (kommenteret af **Blok** i U 1992 B 25), hvor løftemodtageren (en lånemodtager/forsikringsmodtager) fandtes at være i ond tro om kreditforsikringsselskabets tilsagn).

118
Om de særlige bevisforhold med hensyn til betingelsen "fremkaldt" henvises til noten til stk. 2.

119
Såvel urigtige oplysning som fortielser kan medføre, at der foreligger svig, jf. **Udkast** s. 66 f. I begge henseender gælder et krav om forsæt: Ved »svig« forstås et retsstridigt forhold, bestående i, at en person mod bedre vidende giver urigtige oplysninger eller fortier sandheden med forsæt til derved at fremkalde en viljeserklæring.

Se nærmere **Ussing**: Aftaler, s. 140, **Aftaler og mellemmænd** s. 157 f., **Almindelig kontraktret** s. 137 f., **Mads Bryde Andersen** s. 429 ff. og **Kommentar** s. 203. Se også **David Moalen** i U 2004 B 137 f.

For så vidt angår meddelelse af urigtige oplysninger er det en betingelse for anvendelse af bestemmelsen, at den, der udviser svigen, (1) er klar over, at oplysningerne er urigtige, (2) at oplysningerne kan virke motiverende, jf. herved U 1953 621 Ø, og (3) at oplysningerne er meddelt med det formål at fremkalde løftet, jf. til illustration U 1952 278 H om den sidstnævnte betingelse, hvor dette ikke ansås for opfyldt i forbindelse med indgåelse af en forsikringsaftale, jf. forsikringsaftaleloven § 4 (forsikringstageren, der led af følgerne ved en skudlæsion, som han var påført som soldat i Frikorps Danmark, søgte at undgå infami). Der kræves derimod ikke nogen hensigt til at skaffe løftemodtageren en berigelse. Se særligt om svig i forsikringsaftaleretlig forstand, **Henning Jønsson** og **Lisbeth Kjærgaard**: Dansk Forsikringsret, 10. udg. (2019) s. 264 f.

Begrænsningen af svigsbegrebet ligger først og fremmest i den almindeligt antagne betingelse om, at forholdet skal være retsstridigt, jf. **Aftaler og mellemmænd** s. 159. Se også **Ussing**: Aftaler, s. 140.

Det vil som oftest være retsstridigt mod bedre vidende at give urigtige oplysninger, men bestemt ikke altid, idet f.eks. almindelige anprisninger - f.eks. af en vare som »verdens bedste og billigste« - normalt ikke retsstridige. En part har naturligvis ikke pligt til at oplyse om sine økonomiske forhold og herunder naturligvis heller ikke om, at han ikke vil give mere eller nøjes med mindre, end han nu byder. Sådanne fortielser er som det klare udgangspunkt ikke retsstridige, men kan dog være det i helt exceptionelle tilfælde, jf. U 1992 444 H (forlig, hvor en bank modtog en skyldners tilbud om betaling af 20.000 kr. mod bankens afskrivning af et tilgodehavende på ca. 275.000 kr. anset for ugyldigt, jf. § 30, idet skyldneren ved fremsættelsen af tilbuddet om betaling af de 20.000 kr. havde fortiet, at han netop forinden havde modtaget en lotterigevinst på over 1 million kr.)

At man ikke behøver at give oplysninger om alle kendsgerninger, selv om de kan have betydning for modpartens beslutning, følger allerede af, at der må indrømmes et vist spillerum for den almindelige forretningsdygtighed. Inden for mange brancher vil der gælde kutyme og sædvane for, hvad der er »god og ordentlig forretningsskik« vedr. omfanget af oplysning og information ved givne kontrakters afslutning, og manglende overholdelse af sådanne

normer vil kunne trække i retning af at anse en fortielse for svigagtig, jf. **Aftaler og mellemmænd** s. 161 f. Det vil selvsagt være retsstridigt at fortie bestemte begivenheder, der helt forrykker salgsgenstandens værdi, jf. **Udkast** s. 38. »Man har saaledes i Paragrafens 2det Punktum gennem Ordene »eller har gjort sig skyldig i svigagtig Fortielse af saadanne Omstændigheder« særlig tilkendegivet, at Fremkaldelse af en Viljeserklæring ved Svig kan ske ikke blot ved, at der gives urigtige Oplysninger, men ogsaa ved Passivitet fra vedkommendes Side. En forsætlig Fortielse under Indgaaelsen af en Retshandel angaaende Omstændigheder, som kunne være af Betydning for dens Istandkomst, vil naturligvis ofte være ganske lovlig. Den ene Part maa frit kunne benytte sig af sin bedre Viden, f. Eks. om oversøiske Markeders Beskaffenhed, til at gøre en for ham særlig god Forretning, uden at hans Fortielse af denne hans Viden gør Retshandelen ugyldig. Udbyttet af den fuldt ud legitime Handel beror i høj Grad paa en saadan bedre Viden. Fortielsen maa, for at Retshandelen af den Grund skal kunne blive ugyldig, være, som det er udtrykt i § 31 [som blev til § 30 i loven], svigagtig. Dette vil f. Eks. være Tilfældet, naar en Mand tilbyder en anden Aktier til Købs til høj Kurs, uden at han, skønt han er klar over, at Medkontrahenten er ganske uvidende herom, oplyser, at han lige har faaet at vide, at det paagældende Aktieselskab er gaaet fallit. At opstille en almindelig Regel om, under hvilke Omstændigheder en forsætlig Fortielse maa anses for svigagtig, lader sig ikke gøre. Det afgørende Synspunkt i saa Henseende maa være, om det Forhold, der forties, er et saadant, at en Fortielse indeholder et Brud paa Tro og Love i Samhandelen eller almindelig Hæderlighed, jfr. Bemærkningerne til Udkastets § 33.«

Har flere deltagere i en licitation (eller anden form for priskonkurrence) - hemmeligt - aftalt, at de hver især skal lægge et bestemt beløb til deres konkurrerende bud, således at de efterfølgende deler det opnåede merbeløb hos f.eks. den bygherre, der antager højeste bud, er licitationen naturligvis ugyldig (og man taler her med et gammelt udtryk om en såkaldt »mestergris«, hvorom der fra retspraksis kan henvises til U 1911 18 H).

Har en part, der repræsenterer den egentlige løftegiver (det være sig som ansat, fuldmægtig eller formidler) under hånden opnået en *returkommission* - altså betaling fra tredjemand for at bringe en aftale i stand mellem denne og løftegiveren - foreligger der selvsagt et svigagtigt forhold, og løftegiveren kan få aftalen erklæret ugyldig, jf. § 30. I fuldmagtsforhold vil en fuldmægtig, der modtager returkommission i øvrigt have handlet i hvert fald uden for sin beføjelse. I begge tilfælde må tredjemand nærmest pr. automatik være i ond tro herom, således at aftalen er uforbindende, jf. nærmere **Ussing**: Aftaler, s. 142 og 303 og **Aftaler og mellemmænd** s. 161.

Om udbud af andele i nødlidende selskaber kan henvises til U 1951 17 H (om et interessentskab), men se også U 1978 205 V (en revisor, der med nogle klienter havde aftalt, at de skulle tegne »stille anparter« med ret til skattemæssige afskrivninger, fandtes ikke at have udvist forhold (manglende oplysning om sin egen og fabrikkens vanskelige økonomiske situation, om at det drejede sig om hans egen virksomhed samt om de økonomiske konsekvenser af deltagelse i en selskabsdannelse), der kunne anses for omfattet af § 30 eller § 33).

Svig udøvet af en mellemmand, f.eks. en fuldmægtig eller en agent, medfører også løftets ugyldighed, selvom den repræsenterede var i god tro, jf. U 1922 1000 H.

Den besvegne må kunne vindicere den overdragne - identificerbare - ting fra besvigerens konkursbo, jf. U 1925 433.

Et pengekrav - tilbagebetaling af egenkapital - der normalt ikke ville kunne opnå fyldestgørelse i boet efter et selskabet, kunne gøres gældende i U 1951 17 H om et interessentskab. I U 1981 887 Ø om et kommanditselskab antoges en indsigelse ikke at kunne fremføres til skade for selskabskreditorerne. I U 1993 923 H om en tegning af kommanditanparter (kommenteret af **Jørgen Nørgaard** i U 1994 B 273 f) fandtes hverken § 30 eller § 31, § 33 og § 36 anvendelige.

Se også U 1978 933 H (en arkitekt fandtes ikke, ved i strid med reglerne for det arkitektforbund, som han var medlem af, at have drevet entreprenør- og leverandørvirksomhed og som hovedentreprenør forestået opførelse af 40-50 parcelhuse, at have udvist et forhold omfattet af § 30 eller § 33 over for en køber, der efter husets opførelse fandt ud af, at opførelsen kostede mindre end det fremgik af den pågældende specificerede købsaftale).

Se endvidere U 1990 390 H (fortielse af oplysninger ved handler med fast ejendom, hvor man forekommer at have været tæt på området for svig. Højesteret anså løftet for uforpligtende, uden at § 30 blev citeret) og se dissensen til U 1989 805 H.

Se også U 2000 2267 H (en banks erklæringer om, at anpartsselskabs værdipapirer lå i depot, selv om dette ikke var tilfældet, var ikke ansvarspådragende, da erklæringerne var fremkaldt ved svig fra selskabets hovedaktionærer).

Se endvidere U 2001 356 H (ejere, der accepterede forligstilbud, efter at det stod klart for dem, at alternativet var en ekspropriationskendelse med et lavere beløb, havde ikke krav på yderligere erstatning, da det ikke var sandsynliggjort, at principper om partshøring, saglig og loyal forvaltning, vejledning eller lighedsgrundsætninger var tilsidesat. Forligsaftalen blev ikke anset for ugyldig i medfør af hverken § 30 eller § 36).

Se også U 2002 1116 Ø (da en mand, der i august 1994 blev bekendt med et lån, som var udbetalt ved, at en anden i 1993 havde udgivet sig for skyldneren, først i 1998 - efter bl.a. at have betalt ydelser på lånet og aftalt henstand med afdrag - gjorde falskindsigelsen gældende, var han indtrådt i låneaftalen, der ikke kunne tilsidesættes efter §§ 30, 33 eller 36)

U 2003 1381 V (en ægtepagt anset ugyldig som følge af svig, jf. 30, da hustruen var blevet lokket til at underskrive en ægtepagt, der gav manden en væsentlig økonomisk fordel, mens hun troede, at hun underskrev sidste side i et testamente, hvilket manden måtte indse).

U 2004 1751/2 H (tillægsaftale om maksimering af den årlige lejebetaling mellem kunde og leverandør kunne ikke gøres gældende over for finansieringsselskab, da kunden ikke efter de konkrete omstændigheder havde grund til at antage, at tillægsaftalen var en del af aftalen med finansieringsselskabet, hvoraf bla. fremgik en væsentlig større leje. Ugyldighed afvist efter både § 30 og § 36).

U 2004 2400 H (i forbindelse med en leverance af elementer til indeklimaanlæg til 161.625 SEK blev der aftalt en konventionalbod ved forsinkelse på 11.500 SEK pr. dag, hvilket førte til et samlet bodsbeløb på 721.280 SEK. I en anden aftale om betaling af 257.929 SEK, var boden aftalt til 50.000 SEK pr. dag, hvilket førte til et samlet bodsbeløb på 1.434.000 SEK. Da køberen ikke havde sandsynliggjort, at selskabet ville lide et tab af sådanne størrelser, blev begge bodsbeløb nedsat i medfør af § 36, stk. 1, til i alt 100.000 SEK. Højesteret udtalte udtrykkeligt, at der ikke i forbindelse med aftalerne om de pågældende konventionalbøder var afgivet urigtige oplysninger af en sådan karakter, at aftalerne var ugyldige i medfør af aftalelovens § 30 om svig.

U 2005 134 Ø (særejeægtepagt ikke tilsidesat efter § 30 eller § 36).

U 2005 761 SH (en investeringsaftale var ikke ugyldig på grund af svig eller svigtende forudsætninger, da der forud for aftalen var foretaget en due dilligence-undersøgelse, der indeholdt mange advarsler, og da der trods opfordringer hertil ikke var foretaget yderligere undersøgelser).

U 2010 1304 V (sælgere af parcelhuse fandtes at have handlet svigagtigt ved ikke at sørge for, at køberne fik udleveret tidligere tilstandsrapporter).

U 2013 2041 H (vedrørte en leasingaftale i forbindelse med hvilken, der blev procederet på svigsbestemmelsen for landsretten, men ikke for Højesteret. Se herom **Jonathan Kærn** i ET 2013 349 ff.

U 2018 49 H (en banks rådgivning af en andelsboligforening medførte ikke, at en renteswapaftale var ugyldig (efter § 30 eller § 36) eller kunne ophæves, ligesom rådgivningen ikke medførte et erstatningsansvar for banken).

U 2022 3573 Ø (en retsbog vedrørende tredjemand, der indgik i en banks vurdering af en låneansøgning fra S, viste sig at være falsk. Banken burde have indset dette, samt at S' accept af kreditaftalen var fremkaldt af tredjemand ved svig. S var derfor ikke forpligtet af kreditaftalen, jf. aftalelovens § 30, stk. 1).

Som en særregel om svig kan nævnes forsikringsaftaleloven § 4. Se hertil U 1991 523 H (kommenteret af **Blok** i U 1991 B 25 ff.): Uanset at forsikringsaftaleloven var anvendelig på kreditforsikringer også for så vidt angår forholdet mellem den sikrede kreditor og forsikringsselskabet, måtte spørgsmålet om eventuel svig afgøres efter aftalelovens § 30 og ikke efter forsikringsaftalelovens § 4, således at svig udøvet af forsikringstageren ikke kunne gøres gældende over for kreditor, såfremt denne var i god tro. Forsikringsselskab blev frifundet, da det måtte lægges til grund, at kreditor vidste eller burde vide, at der forelå et svigagtigt forhold).
120
Det er den besvegne, der skal bevise, at han har været udsat for svig, jf. stk. 1. Når den besvegne har løftet denne bevisbyrde, indtræder der ifølge stk. 2 den lettelse i bevisbyrden, at løftemodtageren skal bevise, at svigen *ikke* har fremkaldt løftet. Se **Udkast** s. 69 og **Ussing**: Aftaler, s. 143.

Den vending af bevisbyrden, der sker ved stk. 2, sker til fordel for erklæringsgiveren, og gælder antagelig uanset, om det er løftemodtageren selv eller tredjemand, der har udvist svigen, jf. U 1991 523 H (om en kreditforsikringsaftale), som er kommenteret at **Blok** i U 1992 B 25 ff. (særligt 33) og omtalt i noten til stk. 1 ad ordene »tredjemands side«. Se også **Stig Jørgensen:** Kontraktsret, 1. bd., s. 139.

Printet fra Karnov til brug i overensstemmelse med licensvilkårene