# Exhibit 1

P1GRSKA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   IN RE CUSTOMS AND TAX
    ADMINISTRATION OF THE KINGDOM
4   OF DENMARK
    (SKATTEFORVALTNINGEN) TAX
5   REFUND SCHEME LITIGATION
                                        18 MD 2865 (LAK)
6   ------------------------------x
                                        Trial
7
                                        New York, N.Y.
8                                       January 16, 2025
                                        9:30 a.m.
9   Before:

10                  HON. LEWIS A. KAPLAN,

11                                      District Judge
                                         -and a Jury-
12
                        APPEARANCES
13
    HUGHES HUBBARD & REED LLP
14       Attorneys for Plaintiff SKAT
    BY:  MARC A. WEINSTEIN
15       WILLIAM MAGUIRE
         NEIL OXFORD
16       JOHN McGOEY

17  KOSTELANETZ LLP
         Attorneys for Defendants Azalea Pension Plan, et al
18  BY:  SHARON McCARTHY
         DANIEL C. DAVIDSON
19
    WILMER CUTLER PICKERING HALE AND DORR LLP
20       Attorneys for Defendants Avanix Management LLC, et al
    BY:  PETER NEIMAN
21       ANDREW S. DULBERG
         BRITTANY R. WARREN
22
    Also Present:  Camilla Laursen
23                 Kelby Ballena - tech
                   John Christopher - tech
24

25

P1GRSKA5                          R. Markowitz - Cross

1    existed?

2    A.  No, it was limited to the two issues that they raised in

3    their email.

4    Q.  Now, I want to step back for a second and talk about --

5    withdrawn.

6           Actually, let's do it this way, sir.  After that

7    initial transaction involving Broadgate, how interested were

8    you in exploring further opportunities with Solo?

9    A.  This was a successful transaction.  Solo did what they said

10   they were going to do.  It was our first dividend arbitrage

11   investment.  Now, at that point, I had spent a year and a half

12   or more studying it and working on it and wanting to do those.

13   And we said to Solo and to Rob Klugman, we'd like to see about

14   the opportunity to do some more.

15   Q.  And was a new idea developed?

16   A.  It was.

17   Q.  What was the new idea?

18   A.  A year later, in 2011, the Solo proposed that maybe this

19   time that we would use an entity that could take advantage of

20   the U.S.-German Double Taxation Treaty, and they said it should

21   be a foundation or a not for profit entity and that they would

22   try to identify a custodian to perform the role that PNC and

23   others -- because this was not going to be a fund.  This was

24   going to be a direct customer relationship that an entity would

25   have with the custodian.

P1GRSKA5                         R. Markowitz - Cross

1   Q.  So the Broadgate transaction had a fund, and this was a

2   different structure?

3   A.  Yes.

4   Q.  And what did that mean in terms of whether PNC was the

5   right service provider?

6   A.  Not the right service provider for that fund.

7   Q.  Can you explain?

8   A.  Well, it was going to need to be someone who could custody

9   the shares and broker the shares, if possible provide leverage,

10  and kind of combine the roles of what Merrill Lynch and PNC had

11  done into one, and that was what Solo had identified.  They did

12  not need a PNC for that fund, and you don't need an

13  administrator when you are just doing it yourself and receiving

14  daily account statements from the custodian.

15  Q.  All right.  Now, in connection with this idea that was

16  being discussed, you mentioned that this was going to involve

17  the U.S.-Germany treaty instead of the Ireland-Germany treaty.

18  What was the advantage of using the U.S.-German treaty rather

19  than the Ireland-Germany treaty?

20  A.  A U.S. investor could avail themselves of a larger reclaim

21  of withholding tax because there was a zero rate.  The Ireland

22  fund was subject to a partial refund of the taxes.

23  Q.  All right.  I want to show you, sir, a document marked as

24  Defense Exhibit 31E for identification.  Let me know if you

25  recognize this document, sir?

1    A.  I recognize this document as an email.

2    Q.  What is it?

3    A.  An email that I sent to Michael Ben-Jacob and others on

4    March 16, 2011.

5    Q.  Can you please tell the jury who Michael Ben-Jacob is?

6    A.  Michael Ben-Jacob at the time was a lawyer and a partner at

7    the firm Kaye Scholer.

8    Q.  What is the firm Kaye Scholer?

9    A.  A very large New York-based law firm.

10   Q.  And did one of your group have a preexisting relationship

11   with the Kaye Scholer law firm?

12   A.  John had a relationship with Michael.

13   Q.  And over the years, how did the relationship with Kaye

14   Scholer and Michael Ben-Jacob develop?

15   A.  We decided to start working with Kaye Scholer at this

16   point, and Michael would introduce us to various other lawyers

17   who would provide services based on whether it was a tax issue,

18   securities issue, document review.  And the relationship

19   developed to be quite close, and they were involved in many of

20   the transactions we worked on at Argre on a going-forward

21   basis.

22           MR. NEIMAN:  All right.  If you look at this

23   particular document, DX 3180, I'll offer it at this time?

24           MR. WEINSTEIN:  Objection, your Honor, based on

25   pretrial rulings.

P1GRSKA5                    R. Markowitz - Cross

1              (In open court)

2              THE COURT:  All right.  We'll come back to that.

3              MR. NEIMAN:  Certainly, your Honor.

4    BY MR. NEIMAN:

5    Q.  Now, can you talk us through what happened -- withdrawn.

6              What did this transaction end up being named?

7    A.  The Ezra transaction.

8    Q.  And what was Ezra?

9    A.  Ezra was a charity.  It was a school based in Queens that

10   Michael Ben-Jacob had a relationship.  He knew the founder of

11   the school and the director of the school, and they were the

12   ones that would be opening an account once Solo identified a

13   custodian and broker to work with.

14   Q.  And what was the basic structure of the trading that was

15   going to occur?

16   A.  It would be substantially similar to the Broadgate fund in

17   terms of purchasing shares, hedging shares, financing shares

18   and one difference -- and then obviously selling those shares

19   and unwinding everything and applying for a reclaim with the

20   German government.  One difference in this transaction was Ezra

21   Academy had the account.  We were going to be investing -- we

22   wanted to invest an approximately similar amount, $40 million,

23   maybe $50 million.  I don't recall the specifics.  And Ezra

24   Academy of Queens——that was the full name of the school——did

25   not have $40 or $50 million, but the investor groups, ourselves

P1GRSKA5                         R. Markowitz - Cross

1    at Argre and some third-party investors, had that money.  And

2    we need to come up with a structure to get that financing to

3    Ezra Academy.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P1GVSKA6                          R. Markowitz - Cross

1  BY MR. NEIMAN:

2  Q.  And who helped you develop that structure?

3  A.  We worked with Michael --

4        MR. WEINSTEIN:  Objection, your Honor.

5        THE COURT:  Sustained.

6  Q.  And what was the structure that was developed?

7  A.  It was a swap transaction between the investor group and

8  Ezra Academy of Queens.

9  Q.  And when you say it was a swap, just explain broadly what

10  that means.

11  A.  A swap is where one party agrees to pay an amount to

12  another party in exchange for a different amount based on

13  different reference points.

14        In this case, we would provide an amount of capital to

15  the transaction and, in return, get percentage of the profits

16  from the transaction.

17  Q.  I see.

18        And you mentioned that your group was going to put in

19  about 40 million.  Again, was that just Argre or more people?

20  A.  It was ourselves at Argre plus some of the same investors

21  who had invested in the Broadgate fund.

22  Q.  And what was your portion of this investment?

23  A.  My personal investment I think would have been, again,

24  similar to one to $2 million.

25  Q.  And did the trading occur?

1    A.  The trading did occur.

2    Q.  Real shares?

3    A.  As far as I know, real shares.  I never asked to see them;

4    the custodian handled all that.

5    Q.  Who was the custodian initially?

6    A.  Deutsche Bank.

7    Q.  And was this transaction profitable?

8    A.  This transaction was not profitable.

9    Q.  What happened?

10   A.  We made the investment in the shares.  Obviously, we were

11   able to hedge them and then sell them.  There was no loss from

12   the hedging.  But there were a lot of fees and expenses that

13   had to be paid.

14           And the Acupay on our behalf submitted refund requests

15   to the German government.  German government came back to Ezra

16   Academy and their attorneys and asked a lot of questions about

17   the trades.  And those questions were answered.  German

18   government asked a second set of questions.  And we were

19   working on providing additional information for the German

20   government.

21   Q.  And what did you eventually decide to do?

22   A.  Ezra Academy withdrew their request for reclaims.

23   Q.  Why?

24   A.  At that time there was some tax cases in Germany about

25   these dividend arbitrage trades, about whether the tax aspects

P1GVSKA6                         R. Markowitz - Cross

1   of them worked, and there was one adverse ruling in one of the

2   states or provinces in Germany.

3          And we decided the German government was likely to

4   just continue to monitor or ask questions about it.  And we

5   would wait and see how the issue would resolve itself over

6   time.

7          And we were advised by the reclaim agent that if and

8   when the situation resolved itself favorably, that the German

9   company would be paying refunds, we would resubmit.

10  Q.  And around this time, what, if anything, did you learn

11  about what Germany was doing going forward?

12  A.  Well, throughout this time, Germany was tweaking and

13  changing their tax laws, putting on different rules and

14  regulations, different requirements.  And the market at this

15  point knew that in 2012, the laws would be changed such that

16  these types of dividend arbitrage transactions would not

17  produce the outcome expected.

18         And so at this time, people knew Germany would no

19  longer be an area to pursue.  And firms would look to other

20  jurisdictions where they could do dividend arbitrage trades.

21  Q.  After Germany changed its laws on a going-forward basis,

22  did you continue to do dividend arbitrage trading in Germany?

23  A.  We did no more dividend arbitrage transactions once the

24  laws changed to prevent it.

25  Q.  Why?

P1GVSKA6                        R. Markowitz - Cross

1    A.  Our goal at all points was to do trades that complied with

2    the laws of a country.  And if you complied, you hopefully

3    would have a successful trade.

4    Q.  All right, sir.  I want to zoom out for a minute and talk

5    more generally about the topic of due diligence.

6              Mr. Weinstein asked you some questions about due

7    diligence; not about the diligence you've talked about this

8    afternoon that you did in 2010, but whether you should have

9    done more in 2012, '13, '14, or '15.  And I think he started by

10   asking you whether you did diligence on whether Solo could

11   perform on a guarantee that it issue.  Remember that?

12   A.  I remember that.

13             MR. NEIMAN:  If we could put up Plaintiff's Exhibit

14   1033 in evidence.

15   Q.  And sir, is this the document that was being discussed when

16   Mr. Weinstein was asking you those questions about whether you

17   should have done more diligence on Solo performing on its

18   guarantee?

19   A.  This is the document.

20   Q.  Who was this agreement between?

21   A.  Three parties:  Solo Capital, Xiphias, and Novus Capital, a

22   broker.

23   Q.  And who was Solo extending a guarantee to in this document?

24   A.  Party No. 3, Novus Capital Markets Limited.

25   Q.  So this was not a guarantee to you?

P1GVSKA6                        R. Markowitz - Cross

1          THE COURT:  You understand that the sentence you rely

2     on — and, you know, I wrote it, you relied on it, fair game all

3     around — was written in a very different context.  And it was

4     certainly not intended to open the door to anything and

5     everything you could think of to get Kaye Scholer's name into

6     this trial on the theory that that would show that the

7     defendants didn't act alone.

8          You understand that the thrust of the ruling is that

9     you are not allowed to attempt to set up the argument, whether

10    made only implicitly or explicitly, that how could they have

11    done anything wrong, look at all these lawyers, which is where

12    that was going.

13         MR. NEIMAN:  That is very much not the argument we

14    want to make, but I want to highlight --

15         THE COURT:  No, that's the conclusion you want the

16    jury to draw.

17         MR. NEIMAN:  No, your Honor.  If I may, I want to let

18    you know where we're headed on this.

19         THE COURT:  Okay.

20         MR. NEIMAN:  There are some very specific points that

21    I want to raise regarding Kaye Scholer.

22         Your Honor's ruling as to Kaye Scholer was specific to

23    precluding argument that we acted in good faith in making the

24    beneficial ownership representation to SKAT.  That was the

25    parameter of your Honor's ruling in the sentence before the

P1GVSKA6                        R. Markowitz - Cross

1          MR. WEINSTEIN:  There's a number of responses.

2          One, I don't know exactly what legal advice he's

3    talking about with respect to Ganymede.  The fact that they may

4    show lawyers contracts to look at contract verbiage has nothing

5    to do with this case or whether it was appropriate to pay --

6    his client just said on the stand it was Solo Capital that

7    provided all the services.  Why he wanted me to invoice some

8    entity in the Cayman Islands, I don't know.

9          Now, I don't think they got legal advice about that.

10   They may have provided the contract to Kaye Scholer; has

11   nothing to do with what he just said on the stand.

12         MR. NEIMAN:  Your Honor, I would just direct your

13   attention to the actual document that they sent to Kaye

14   Scholer, which is Exhibit 3329.

15         THE COURT:  Yes, I see it.

16         MR. NEIMAN:  They reviewed the tax and compliance

17   issues.

18         THE COURT:  But that's not what we're talking about.

19   We are not talking about tax and compliant issues.  What we are

20   talking about is whether your clients knew or should have known

21   that Mr. Shah was operating a fraudulent scheme.  And there has

22   been a lot of evidence so far that are red flags not because of

23   compliance issues, but because it shows or tends to show,

24   subject to the rest of the evidence coming in, that your

25   clients were well aware that there was this network of

1   entities, Old Park and all the others, custodians and others,

2   but they all come back to Shah.  And they are all at least

3   consistent with a desire on the part of Shah to hide what was

4   going on from the Danish tax authorities.

5           Now, I understand your client has explanations for why

6   they had all these pension plans, why they had all these

7   entities, all this stuff, that's fair game.  You're entitled to

8   educe that, no question about it.  Maybe the jury will buy it,

9   and maybe it won't.  But that's the purpose.  The purpose is a

10  perfectly proper purpose and it may prevail and it may not,

11  just like your explanations.

12          MR. NEIMAN:  Your Honor, I think in a case in which a

13  specific act is identified as a badge of fraud and in which we

14  are charged with acting negligently with regard to how we

15  handled this set of transactions, it is relevant that our

16  clients sought legal advice about the very --

17          THE COURT:  The legal advice they sought was not along

18  these lines.

19          MR. NEIMAN:  Your Honor, that's Mr. Weinstein's

20  assertion.  That's not binding evidence on us.  We're allowed

21  to lay a foundation in an attempt to show --

22          THE COURT:  Okay.  You put your clients on the stand

23  and say they put all of the relevant facts — all of the

24  relevant facts — to Kaye Scholer, and that's a different

25  matter.

P1LVSKA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE CUSTOMS AND TAX
ADMINISTRATION OF THE KINGDOM
OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND SCHEME LITIGATION

                                  18 MD 2865 (LAK)

------------------------------x

                                  Trial

                                  New York, N.Y.
                                  January 21, 2025
                                  9:35 a.m.

Before:

                  HON. LEWIS A. KAPLAN,

                                  District Judge
                                 -and a Jury-

                     APPEARANCES

HUGHES HUBBARD & REED LLP
     Attorneys for Plaintiff SKAT
BY:  MARC A. WEINSTEIN
     WILLIAM MAGUIRE
     NEIL OXFORD
     JOHN McGOEY

KOSTELANETZ LLP
     Attorneys for Defendants Azalea Pension Plan, et al
BY:  SHARON McCARTHY
     DANIEL C. DAVIDSON

WILMER CUTLER PICKERING HALE AND DORR LLP
     Attorneys for Defendants Avanix Management LLC, et al
BY:  PETER NEIMAN
     ANDREW S. DULBERG
     BRITTANY R. WARREN

Also Present:  Camilla Laursen
                Kelby Ballena - tech
               John Christopher - tech

P1LVSKA1                       R. Markowitz - Cross

1    and their function in my experience is one of the most

2    important ones for a fund.

3    Q.  All right.  Let's turn to the next page of the exhibit.

4    And you'll see there the independent auditors' report to the

5    directors of Broadgate Ireland Fund.  Do you see that?

6    A.  I see that.

7    Q.  And if you turn to the next page, we'll see the substance

8    of the independent auditors' opinion.

9            How important was it to you that the auditors

10   concluded that the financial statements gave a true and fair

11   view of the affairs of the company?

12   A.  This was an important feature because it was something

13   required by the fund.  And Moore Stephens, the chartered

14   accountants from the UK and Ireland expressing this opinion,

15   was the -- I guess the last step in just wrapping this up.

16   Q.  All right.  Now, let's talk about the second transaction

17   with Solo, the Ezra investment.  Okay?

18           Mr. Weinstein asked you some questions about Deutsche

19   Bank related to the Ezra transaction.  Do you recall that?

20   A.  I remember that, yes.

21   Q.  Remind the jury what Deutsche Bank's role was in the Ezra

22   transaction?

23   A.  Deutsche Bank was the custodian holding the securities and

24   the cash from the investment.

25   Q.  And Mr. Weinstein asked you about a time about two months

P1LVSKA1                         R. Markowitz - Cross

1    into the trading when Deutsche Bank sent a termination notice.

2              Do you recall that?

3    A.  I do.

4    Q.  How far into the plan of Ezra trading were you at that

5    time?

6    A.  It had all been completed by that time.

7    Q.  What understanding do you have of the reason why Deutsche

8    Bank sent that termination notice?

9              THE COURT:  Sustained.

10             MR. NEIMAN:  I'll rephrase, your Honor.

11   Q.  Mr. Markowitz, did anyone share with you any information

12   about the reason why Deutsche Bank issued that termination

13   notice?

14   A.  I think I recall that we received email -- emails from Solo

15   Capital with the rationale provided by Deutsche Bank.

16             THE COURT:  I take it this is all offered for state of

17   mind, not for the truth of anything that was said to them,

18   right?

19             MR. NEIMAN:  Exactly, your Honor.

20             THE COURT:  All right.

21   Q.  What do you recall learning from the email?

22   A.  To be honest, I don't recall one way or the other right

23   now.

24   Q.  Let me see if I can refresh your recollection, sir.

25   A.  Thank you.

1    Q.  Sir, take a look at Defendants' Exhibit 6031, and the

2    bottom email on the page.  And let me know if that refreshes

3    your recollection about what information was shared with you

4    about the reason why Deutsche Bank provided the termination

5    notice after the trading had been completed.

6    A.  This does refresh my memory.  And this is consistent with

7    what we had learned -- what we learned from Solo or received

8    from Solo at the time.

9    Q.  Can you explain what it was.

10   A.  That Deutsche Bank had decided after an internal decision

11   and senior management that they did not want to be

12   participating in the dividend arbitrage transactions involving

13   German shares for reputational risks to Deutsche Bank.

14   Q.  All right.  What was going on in Germany at around this

15   time about the rules related to dividend arbitrage trading as

16   you understood it?

17   A.  From the information we had received from the marketplace

18   and from lawyers, starting in 2010, continuing 2011, Germany

19   was altering their rules and regulations regarding dividend

20   withholding tax.  And those rules slowly changed over time and

21   such that by the end of 2011, most -- we certainly understood

22   that dividend arbitrage transactions in Germany would no longer

23   be consistent with the laws of the land in Germany.

24   Q.  Given those changes that were ongoing in Germany in 2011,

25   was it surprising to you that Deutsche Bank had decided to stop

P1LVSKA1                        R. Markowitz - Cross

1    participating?

2    A.  I don't know if I was surprised one way or the other.  It

3    was certainly a -- to me a reasoned decision that for their own

4    internal reasons made sense because of the fact that they are

5    the largest German bank and perhaps they didn't want to be seen

6    participating in a dividend arbitrage transaction involving

7    German shares especially as the law was changing.

8    Q.  All right, sir.  We talked briefly last week about Kaye

9    Scholer and the lawyer Michael Ben-Jacob in connection with

10   this first Ezra transaction.  Do you recall that?

11   A.  I remember those discussions, yes.

12   Q.  How closely did you work with the lawyers at Kaye Scholer

13   on the Ezra transaction?

14   A.  Their involvement was --

15           MR. WEINSTEIN:  Objection, your Honor.

16           THE COURT:  Pardon?

17           MR. WEINSTEIN:  Objection.

18           THE COURT:  All right.  Come to the sidebar.

19           (Continued on next page)

20

21

22

23

24

25

P1LVSKA1                          R. Markowitz - Cross

1              (In open court)

2              THE COURT:  Next question, please.

3              MR. NEIMAN:  Thank you, your Honor.

4    BY MR. NEIMAN:

5    Q.  Sir, you talked about the reputational risk issue that

6    arose in 2010 and 2011.  What impact, if any, did you see that

7    having on the ability to find custodians going forward?

8    A.  It significantly hampered the ability to find some of the

9    larger players in the market who were concerned about what I

10   discussed last week, that even though a transaction works, is

11   consistent with the law, the institution may decide they don't

12   want to participate directly or even indirectly because they

13   might get at odds with a foreign country, the tax authorities

14   of a foreign country, or there might be an article in the front

15   page of *The Wall Street Journal* about a transaction, and large

16   institutions shy away from that.

17   Q.  Did that raise any issues -- withdrawn.

18              For Argre, how concerned were you about those kind of

19   risks?

20   A.  Well, for Argre, we didn't have a multinational business,

21   far from it.  We were located here in Manhattan.  While we did

22   transactions around the world, we didn't pay taxes -- you know,

23   we did not do business with other foreign countries per se.

24   And while everyone's concerned about what their reputation is,

25   it was not as much of a concern for us as long as we were

P1LVSKA1                         R. Markowitz - Cross

1    comfortable that the transactions were working.

2    Q.  All right.  I want to ask you to look at Plaintiff's

3    Exhibit 2227.  And let's put this one on the screen because

4    this was handed out to you by Mr. Weinstein and I'm not sure

5    it's in any of the binders, but we can put it up on the screen.

6         All right.  And if we could turn to the third page of

7    the exhibit.  We can zoom in at the bottom there on the email

8    that Mr. Weinstein was asking you about.

9    A.  I see it.

10   Q.  Okay.  And so this is in September of 2011.  When is that

11   in relation to the end of the Ezra transaction?

12   A.  The trading for the Ezra transaction had already been

13   completed by this time.

14   Q.  Okay.  And in this email, Mr. Shah is providing to you and

15   to Mr. Stein a list of prime broker leverage providers which we

16   believe can help with dividend strategies.  Do you see that?

17   A.  I do.

18   Q.  And the kinds of firms that are listed here, are these

19   small or large and established companies?

20   A.  It's a mix, but some of them are quite large.

21   Q.  All right.  And the next sentence says:  As discussed, it

22   will be preferable if you approach them independently of Solo.

23         Do you see that?

24   A.  I do.

25   Q.  And Mr. Weinstein asked if you understood Mr. Shah to be

1    Q.  Mr. Markowitz, what kind of disclosures did you have to

2    make to U.S. authorities related to the level of trading and

3    the existence of foreign accounts?

4    A.  We had to make significant disclosures to the U.S.

5    government for both the amount of trading we did on a monthly

6    basis, the holdings we had, and we also had to do certain tax

7    filings for the balances in our accounts in a foreign country

8    like the UK.

9    Q.  And before you ever started trading in Denmark at all, what

10   did you know about the existence of those disclosure

11   requirements?

12   A.  Either in late 2011, perhaps early 2012, I had received

13   from a number of law firms just courtesy memos that they would

14   send out, you know, people I knew, that highlighted and

15   summarized a new set of reporting requirements that arose out

16   of the great financial crisis of 2008 and 9.

17            They were generally referred to as TIC, T-I-C,

18   filings, which I think refer to treasury information, and I

19   can't recall what the C stands for.  But we knew in 2011/2012

20   that if you were purchasing securities with or through foreign

21   custodians, you would -- it didn't have to be just foreign

22   securities, any securities.  The treasury department and the

23   U.S. government wanted to have a record of that and knowledge

24   of that.

25   Q.  Did that give you any pause about whether to pursue this

P1LVSKA3                         R. Markowitz - Cross

1            (At sidebar)

2            MR. NEIMAN:  Your Honor, I just want to put in the

3    actual disclosure forms that were filed to corroborate what the

4    witness said, which was that he understood in advance that they

5    would have to do it and they, in fact, did it.  It goes to his

6    good faith.  Because he understood that there was going to be

7    substantial disclosure around this trading.  And if he had

8    something to hide, as SKAT would suggest, then that might have

9    been a grave concern for him, but it wasn't.

10           MR. WEINSTEIN:  What he had was something to hide from

11   Denmark.

12           THE COURT:  Obviously.

13           Sustained.

14           MR. NEIMAN:  Your Honor, could I be heard further on

15   this?

16           THE COURT:  Briefly.

17           MR. NEIMAN:  I don't think that's fair at all.

18           THE COURT:  Well, you haven't --

19           MR. NEIMAN:  No, well --

20           THE COURT:  Your doing a very thorough job.  You're

21   doing a wonderful job.  But we're not going to stay here till

22   the 4th of July.

23           MR. NEIMAN:  May I ask a summary question --

24           THE COURT:  This is irrelevant.

25           (Continued on next page)

P1LVSKA3                         R. Markowitz - Cross

1                 (In open court)

2                 THE COURT:  Objection sustained.

3       BY MR. NEIMAN:

4       Q.  Now, Mr. Markowitz, in addition to these TIC forms, were

5       there any disclosures required, as you understood it, about the

6       existence of foreign accounts?

7                 MR. WEINSTEIN:  Objection.

8                 THE COURT:  Sustained.

9       Q.  Mr. Markowitz, I want to ask you to look next at a document

10      marked as Plaintiff's Exhibit 3370 -- Defendants' Exhibit 3370.

11      Apologies.

12      A.  I'm sorry, 30 --

13      Q.  3370.

14                THE COURT:  It's not in the book.

15      Q.  You don't have it?

16      A.  I don't, no.

17                MR. NEIMAN:  Let's put it up on the screen.  This is a

18      simple document just for the witness, not for the jury, please.

19      Q.  Do you recognize this document, sir?

20      A.  I do.

21      Q.  What is it?

22      A.  It's a tax form 5500 EZ for -- that one-participant pension

23      plans are required to file with the IRS.

24                MR. NEIMAN:  I offer Defendants' Exhibit 3370.

25                MR. WEINSTEIN:  No objection.

P1ORSKA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE CUSTOMS AND TAX
ADMINISTRATION OF THE KINGDOM
OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND SCHEME LITIGATION

                           18 MD 2865 (LAK)

------------------------------x

                           Trial

                           New York, N.Y.
                           January 24, 2025
                           9:30 a.m.

Before:

                  HON. LEWIS A. KAPLAN,

                           District Judge
                           -and a Jury-

                    APPEARANCES

HUGHES HUBBARD & REED LLP
     Attorneys for Plaintiff SKAT
BY:  MARC A. WEINSTEIN
     WILLIAM MAGUIRE
     NEIL OXFORD
     JOHN McGOEY

KOSTELANETZ LLP
     Attorneys for Defendants Azalea Pension Plan, et al
BY:  SHARON McCARTHY
     DANIEL C. DAVIDSON

WILMER CUTLER PICKERING HALE AND DORR LLP
     Attorneys for Defendants Avanix Management LLC, et al
BY:  PETER NEIMAN
     ANDREW S. DULBERG
     BRITTANY R. WARREN

Also Present:  Camilla Laursen
              Kelby Ballena - tech
              John Christopher - tech

P1ORSKA3                          Wade - Direct

1   know, sometimes you have to commit to a trade on one side when

2   you haven't lined up how you're going to finance it or vice

3   versa.  So, you know, there would be some discretion given to

4   traders, but $480 million of unfunded position, that is very

5   large.  Even in an investment bank for an experienced trader,

6   that is a very large funding exposure to be running, and you

7   certainly wouldn't be happy if your trader did nothing about it

8   for four days and just said, Don't worry.  It will be fine.  I

9   don't see it has any relation to ordinary market practice.

10  Q.  Mr. Wade, what would happen if the liquidity didn't

11  magically appear?

12  A.  As I've already explained, the pension plan had no other

13  way to finance the position.  It would have failed on that

14  trade.  You know, Solo would have failed in its role to settle

15  the trade because it didn't have the funding either, so it

16  would have caused the wipeout of both Solo and the pension

17  plan.

18          MR. OXFORD:  Mr. Ballena, can we pull up slide 21,

19  please?

20  Q.  So we're now at your last red flag on the stock loans.  The

21  parties specified the price, which was out of date.  Can you

22  explain to the jury what you mean by that, please?

23  A.  Yeah.  So as I've already explained, the way the GMSLA

24  works is that you calculate the value of the cash that's to be

25  provided based on what the prevailing market price of the

1    shares are.  So in ordinary market practice, you don't actually

2    normally need to specify a price for the cash collateral in the

3    stock loan because the market approach and the way the

4    documentation works is that you value the shares based on the

5    market price, and that determines the amount of cash

6    collaterally you're provided.

7            In these trades, they specified the price at which the

8    cash was to be computed.  So that's slightly unusual, but the

9    more significant element, in my view, is that the price they

10   used was always exactly the same price as they used for the

11   purchase, which by the time the stock loan gets entered into is

12   several days out of date.

13   Q.  You referenced GMSLA in that answer.  It's a term we've

14   heard before, but can you clarify what that is?

15   A.  Yeah, sorry.  It's the global master stock lending

16   agreement.

17   Q.  What is that in the context of the transaction we're

18   talking about?

19   A.  Well, so, as I've already mentioned, the GMSLA is the

20   industry standard for stock lending.  All of the -- I think you

21   were shown a number of them yesterday, so all the pension plans

22   entered into that document with the stock lending

23   counterparties.

24           MR. OXFORD:  Can we pull up slide 22, please?

25   Q.  Using this slide, Mr. Wade, can you illustrate the pricing

1    point you were making a moment ago?

2    A.  Yes.  So the step two, which is the purchase, the Xiphias

3    plan purportedly purchased the shares for 966.4163 Danish

4    kroner per share.  And in step three, which is five days later,

5    the stock loan was also agreed at exactly the same price to

6    four decimal places.

7    Q.  In your experience, Mr. Wade, is it at all consistent with

8    market price to use an out-of-date price in a stock lending

9    arrangement?

10   A.  No.  I mean, I've never seen it in my career.  And there's

11   a good reason for that because the whole point of a stock

12   lending agreement is that you're -- the way the cash collateral

13   is calculated versus the value of the shares you're trying

14   to -- as far as possible, you can never completely eliminate

15   the risk, but you're trying to reduce the risk as much as you

16   can between the two counterparties.  So the whole idea of the

17   stock loan agreement is to try and keep the value of the cash

18   collateral that's used to track with the value of the shares.

19         So if you're using a price that is several days out of

20   date, share prices move around, you know, quite violently at

21   times, so you are pretty much guaranteeing that one of the

22   parties to the stock loan is doing a very off-market and, you

23   know, highly risky trade.

24   Q.  So the two dates here are the trade date of the purchase,

25   which is the 20th of March, and then there's the trade date

P1ORSKA3                    Wade - Direct

1    of the stock loan, which is the 25th of March; is that

2    correct?

3    A.   That's correct.

4    Q.   And did you, sir, conduct an analysis of whether the share

5    price of these Novo Nordisk shares changed at all between the

6    20th and the 25th of March?

7    A.   I did, yes.

8              MR. OXFORD:  Can we pull up the next slide, please?

9    Q.   Is this the analysis you performed?

10   A.   It is, yes.

11   Q.   Okay.  Can you just use this to illustrate your point to

12   the jury, please?

13   A.   Yes.  So as you can see, in the top left, the price that

14   was actually used for the stock loan was 966 Danish kroner per

15   share.  The closing price on the trade date of the stock loan,

16   five days later, was Danish kroner 939 per share.  So the share

17   price has dropped by about 27 Danish kroner per share.

18             So in the right-hand column, I then computed what the

19   purported cash collateral provided was, which is the figure

20   we've seen in the earlier trade approval.  That was the

21   2.75 billion Danish kroner.  The actual value of the shares on

22   that day, on the day the stock loan was entered into, was

23   2.67 billion Danish kroner.  So in the bottom right, I then

24   compute the difference, and converting it into U.S. dollars,

25   that essentially means that Aquila Cayman was providing

1    $13 million more cash than the prevailing market value of the

2    shares.

3            So even putting aside, you know, the haircut that we

4    talked about.  Let's say that was in the region of $48 million.

5    Even if you ignore that point, the cash that was being provided

6    in this particular transaction was about $13 million more than

7    the prevailing market price of the shares.

8    Q.  In your experience, if one were to go into the market and

9    try and replicate this pricing, if Aquila Cayman were to go

10   into the market to try and on-lend or re-hypothecate, I think

11   we heard, these shares into the market, would that be possible,

12   sir?

13   A.  I mean, I can't see how it would.  You're going into the

14   market and trying to do a trade at an out-of-date and

15   off-market price.  You might get really lucky once.  There

16   might be some reason why there happens to be someone in the

17   market that has got a particular reason to do a trade at a

18   weird price, but this happened on every single one of the

19   trades.  And whether the share price went up or down, it

20   happened.  So the idea that you could consistently, time and

21   time again, find someone in the market who was prepared to

22   finance you at an out-of-date price is just not incredible to

23   me.

24   Q.  If the parties had used the market price on the date of the

25   stock loan, the 939 Danish kroner as opposed to the 966.2

1    email -- the wrong email was sent.

2    Q.  Mr. Wade, one more question about Mr. Neiman's opening.

3         Did you read when he said that Mr. Markowitz and

4    Mr. van Merkensteijn entered into what they understood to be

5    legitimate transactions known as dividend arbitrage

6    transactions, first in Germany, then in Belgium, and finally in

7    Denmark?

8    A.  I did.

9    Q.  Based on your market experience, do you have an opinion on

10   the types of dividend arbitrage transactions that the

11   defendants purported to do in those three jurisdictions?

12        MR. NEIMAN:  Objection, your Honor.

13        THE COURT:  Ground.

14        MR. NEIMAN:  Can I be heard at sidebar on this?

15        THE COURT:  Yup.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

P1OVSKA4                    Wade - Direct

 1              (At sidebar)

 2              MR. NEIMAN:  Your Honor, we had a whole dialogue in

 3    connection with the Hannes Snellman opinion letter about how

 4    SKAT's theory of the case was not that the transactions as the

 5    defendants said they understood them was improper, but rather

 6    that it was improper because there were no shares and the

 7    defendants, they claim, knew that.  That's their theory of the

 8    case.

 9              We were, therefore, precluded from putting in the

10    Hannes Snellman opinion letter, we were precluded from putting

11    in the opinion letters that were received in the German

12    transaction, and the opinion letter that was for the Belgian

13    transactions.

14              Now what Mr. Oxford appears to be trying to do is to

15    get this witness to say that even as the defendants understood

16    those transactions, they were improper.  That is a 180 shift of

17    position after our client is already off the stand and has been

18    precluding from testifying about the legal opinions he received

19    in connection with each of those transactions.

20              MR. OXFORD:  Your Honor, we're not seeking to

21    introduce any legal opinions by any means.  He's a market

22    practice expert.  So the word "legal" will not come from his

23    mouth.  I think they put it at issue in opening, and I think

24    it's appropriate for him to testify about that and I don't

25    think it opens any door.

1          THE COURT:  I'm going to ask the reporter to read back

2     to me the pending question.

3          (Record read)

4          THE COURT:  I don't understand, Mr. Neiman, why you

5     think that opinion would do what you say it does.

6          MR. NEIMAN:  Here's what I anticipate, your Honor.

7     Mr. Oxford can correct me if I'm wrong, but what I anticipate

8     is that the witness is going to say these were Cum/Ex

9     transactions which are not real dividend arbitrage

10    transactions, but something bad.  That's the generic term for

11    it, your Honor.  And --

12         THE COURT:  Something tells me the word "bad" is not

13    going to come out of his lips directly or indirectly.

14         MR. NEIMAN:  But I think that's going to be the

15    implication.

16         And, your Honor, our clients' got careful and specific

17    legal advice on the transactions that they understood they were

18    doing, which we were precluded from introducing.  And for

19    Mr. Oxford now to try to have this witness describe the

20    transactions as they were understood by our clients as being

21    improper in some way conflicts with that ruling which they

22    sought.

23         THE COURT:  I don't think that's what the question

24    calls for.

25         MR. NEIMAN:  Well, perhaps Mr. Oxford can tell us what

P1OVSKA4                        Wade - Direct

1    he anticipates the witness is going to say.

2              MR. OXFORD:  I think he's going to give us -- tell the

3    jury what his market experience is and what the market

4    experience would say about whether these transactions were

5    commonly done in these other jurisdictions.

6              MS. McCARTHY:  He's going to say, isn't he, that

7    there's no reputable market participant that would have

8    participated in dividend arbitrage after 2012.

9              MR. OXFORD:  I think he would say that the market

10   understood that these transactions were only appropriate for a

11   brief period in Germany and were never appropriate outside

12   Germany.

13             MR. NEIMAN:  Your Honor, given that they precluded

14   us --

15             THE COURT:  Excuse me.

16             What is he going to say "appropriate" means?

17             MR. OXFORD:  I think he would say the market

18   understood that these were proper transactions that were the

19   basis for a reclaim.

20             THE COURT:  I'm sorry, say it again.

21             MR. OXFORD:  That these were appropriate to conduct

22   and apply for a reclaim.

23             THE COURT:  He's going to say it was appropriate to do

24   them and --

25             MR. WEINSTEIN:  I'm sorry, your Honor.  I'm sorry, I

P1OVSKA4                        Wade - Direct

1    just interrupted.

2              (Counsel conferred)

3              MR. OXFORD:  Your Honor, we can withdraw the question.

4              THE COURT:  Okay.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25