# Exhibit 3

| | |
|---|---|
| From: | Axel Haelterman <axel.haelterman@freshfields.com> |
| To: | Richard Markowitz |
| CC: | Jerome Lhote; Adam LaRosa; John H. van Merkensteijn, III; Matthew Stein |
| Sent: | 4/23/2012 12:00:50 PM |
| Subject: | RE: Tax Advice Regarding Belgium Investments |
| Attachments: | Argre Descriptive overview.doc |

Dear all,

Further to our phone calls and prior to finalise any document, I first wanted you to review the wording that you will find attached in the unfinished draft memo.

I just wanted to make sure that given the manner in which we have to phrase our observations, you would still be interested in receiving the worked out version of the memo.

Such wording reflects the fact that the intended trades are apparently been done on the market and that the intended tax results are apparently still realised but that the presence of, as we are told, a relevant number of short sellers in the market makes the legal basis for invoking a dividend withholding tax exemption somewhat doubtful.
And the tax risk is for the buyer, not for the seller.
Also it is the buyer who "creates this market" by availing himself of the benefit of the pricing that apparently occurs in the market.

If your clients feel comfortable with the manner in which we try to correctly state the facts of these trades, then we will be finalising our text.

If you have questions, please do not hesitate to contact me.

Axel
Haelterman

-----Original Message-----
From: Richard Markowitz
[mailto:rmarkowitz@argremgt.com]
Sent: 18 April 2012 15:23
To: HAELTERMAN,
Axel (AXH)
Cc: Jerome Lhote; Adam LaRosa; John H. van Merkensteijn, III;
Matthew Stein
Subject: Tax Advice Regarding Belgium Investments

Axel:

I
believe that some colleagues of ours at Solo Capital contacted you on our behalf.

We look forward to speaking with you and we're wondering if you would have some time this evening (Brussels time) to speak?

Please let us
now your availability and the best number to reach
you.



CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER    WH_MDL_00283320

Regards,

Richard


Richard Markowitz
Argre Management LLC

This
email is confidential and may well also be legally privileged. If you have
received it in error, you are on notice of its status. Please notify us
immediately by reply email and then delete this message from your system.
Please do not copy it or use it for any purposes, or disclose its contents
to any other person: to do so could be a breach of confidence. Thank you for
your co-operation. Please contact our IT Helpdesk on +44 (0) 20 7785 2000 or
email ITHelpdesk@freshfields.com if you need assistance.

Freshfields
Bruckhaus Deringer LLP is a limited liability partnership registered in
England and Wales with registered number OC334789. It is authorised and
regulated by the Solicitors Regulation Authority. In Belgium, it is
registered with the RPM/RPR Brussels number 0538 335 152 and professional
rules are available at www.barreaudebruxelles.be and www.baliebrussel.be.
For regulatory information please refer to
www.freshfields.com/support/legalnotice.

A list of the members (and of the
non-members who are designated as partners) of Freshfields Bruckhaus
Deringer LLP and their qualifications is available for inspection at its
registered office, 65 Fleet Street, London EC4Y 1HS. Any reference to a
partner means a member, or a consultant or employee with equivalent standing
and qualifications, of Freshfields Bruckhaus Deringer LLP or any of its
affiliated firms or entities.

# Freshfields Bruckhaus Deringer

## MEMORANDUM FOR ARGRE MANAGEMENT LLC

You have informed us that one of your clients, who is a US pension arrangement (Individual retirement Account under Code Section 408), envisages entering into a T+4 settled purchase of Belgian listed shares, the day before the share start trading ex coupon. Hence settlement will occur ex coupon.

You have asked to describe to you the tax consequences attached to the fact that such purchase does entail the requirement fort he seller to pay to the purchaser, through the market, a „market claim", which is an indemnity for the fact that the share sold cum coupon is eventually settled ex coupon.

You have also informed us that your client is intending to avail himself of the benefit of the dividend withholding tax exemption contained in article 10, §3, b of the Belgian-US tax treaty.

Please find below an overview of elements that we consider relevant when describing the consequences of such trade. These elements are based on the information we have received over time from several market participants as to how the market actually operates, in combination with our civil and tax law analysis relating to such trades.

Given the level of aggressiveness of the trades, essentially at the side of buyers seeking a withholding tax exemption in a market where they should be aware that short-selling is ongoing, this memo is a descriptive one delivered on your request, and does not constitute an opinion with respect to a specific trade or transaction. This memo can not be read or construed to contain any recommendation of or approval for such trades which do lead to some legal uncertainty regarding the availability of the exemption that is intended to be invoked.

### A) The Belgian-US tax treaty withholding tax exemption

1. Reference to art 106, §3,b of the treaty including the requirement that the Pension Fund should be the beneficiary of the dividend, which under Belgian law requires that he holds legal title to the shares on dividend payment date.

(TO BE EXPANDED)

### B) Consequences of trading around dividend date

2. Within Euroclear, where most of the Belgian listed shares are being traded, the market functioning rules have been amended a little in order to reduce the number of

Document1/0                                                                                                                    AH

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                              WH_MDL_00283322

situations where a purchase is made cum dividend and a settlement is done ex dividend, resulting in a market claim that needs to be paid (a market claim which in practice is treated in the same manner as an actual dividend). In a standard T+3 setting, no cum/ex transactions arise anymore, but in a T+4 cycle they do.

Indeed, for all mandatory cash distributions, the ESES platform will consistently use three dates: record date, ex date and payment date. The Euroclear recommendation is to have the ex date and the record date '*n*' business days apart, where '*n*' is one day less than the standard settlement cycle. Thus, for a T+3 market, the record date should be two days after the ex date so that the sale transaction on ex-date will necessarily be reflected on record date.

3.  Under the general principles of Belgian civil law this market claim qualifies as "damages". As legal title to the shares passes on trade date *i.e.* as soon as an agreement exists between the buyer and the seller with regard to the asset sold and the price to be paid, the seller of the shares who entered into a trade relating to shares "cum dividend" has the legal obligation to deliver the asset sold. If settlement occurs by a share delivery "ex dividend", then the seller must make whole to the buyer the absence of dividend delivery, via payment in cash, *i.e.* the "market claim". The requirement to pay such market claim is expressly contained in the Euroclear rules and is a necessity in order to indemnify the buyer for receiving a share ex coupon.

The amount of the claim should always be equal, but limited, to the actual damages incurred by the buyer as a result of the incomplete delivery. Since the market generally operates on the basis of an after withholding tax dividend payment, the purchaser would, as a matter of principle, have received only 75% of the nominal dividend amount if he had held the dividend on the dividend ex-date. Therefore, the "market claim" for the buyer should be limited to 75% of the nominal dividend amount on the shares involved. Indeed, if the buyer of the shares were in a position to obtain a withholding tax exemption or reclaim, this situation is linked to characteristics attached to the identity of such buyer and not to the shares or the coupon.

Furthermore, in the Belgian tax practice the "market claim" is treated as a "deemed dividend coupon" and can entitle its recipient to a dividend withholding tax credit as if he had received the actual dividend payment. The market claim is therefore *de facto* treated as a dividend. This tax treatment is not based on statutory language, but has been applied in practice since many years. It is based on the concept that whilst on coupon payment date the seller was still holding the shares, the title to such shares has passed on the previous day, trade date, and hence the seller is actually receiving the coupon payment on behalf of (somewhat as an agent for) the buyer.

The legal basis for this position is that, under the regular rules that govern the functioning of the market, the buyer is holding legal title to the shares as from trade date, whereas legal ownership of the underlying shares is a requirement for a withholding tax credit entitlement. As a result, a buyer who is entitled to a gross dividend on the basis of a Belgian domestic law exemption, can reclaim withholding tax which together with the

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                      WH_MDL_00283323

market claim puts that buyer in a position equal to receiving a gross dividend. We are not aware of any case existing in which the Belgian tax authorities would have challenged this approach.

### C) *Short trade*

4. As mentioned, in order for the purchaser of shares to obtain an entitlement to reclaim part or whole of the withholding tax on the basis of internal law or treaty law based rate reductions or exemptions, he should have the full legal ownership of the shares, or the right *in rem* that includes the income entitlement, on the date on which the dividend is attributed or becomes payable.

As a rule the contractual provisions of share trades entered into on the markets we are familiar with, provide that legal ownership of the shares transfers on trade date. In fact this is the basis on which, to the best of our knowledge, all trading platforms operate globally and is in accordance with the manner in which such trades are generally executed in most markets. This is also the general rule under Belgian civil law.

However, in case a "short" sale of shares (as opposed to a 'long' sale) the seller would, on trade date, have no legal title to the shares that are sold under the that could, under general civil law rules, transfer to the buyer on such trade date. Indeed, a seller could not cause title to pass on trade date, since a party can not transfer rights that it does not hold itself. In the framework of such a trade, the seller would usually borrow the shares in view of delivery on settlement date so as to be able to meet his duty to deliver (be it ex dividend). We understand you would obtain the shares on a different basis.

The consequence is that in such hypothesis there is in fact little legal basis for the buyer to claim a withholding tax credit for the amount received via its custodian, apart from the fact that the buyer – acting in good faith – would believe that it is the legal owner of the shares on trade date, because it assumed that its counterparty (the identity of which is not known to the buyer) was the legal owner of the Shares involved on trade date (and was thus in a position to transfer the legal title). As a consequence of the fact that he would be unable to claim a tax credit or reclaim for the tax withheld on the shares, in the hypothesis of a "short" sale, the buyer under the could be tempted to claim an amount equal to the gross amount of the dividend on the shares without netting out the Belgian withholding tax payable on these dividends.

We understand that in practice, given the way the trades are operated (whereby the parties buy or sell via a broker and do not know who the seller or the buyer of the shares is, and vice-versa), it should be very difficult (if not impossible) for a buyer to allege that its counter party was short selling and had no legal title to the shares on trade date, as the buyer would not be able to know that it has acquired shares from a short seller. We have not seen in practice that the withholding tax credit or exemption was challenged because the buyer would allegedly have acquired the shares from a short selling seller.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER    WH_MDL_00283324

5.  In the event in which the clearing agent would recognise the short sale and would decide to auto-borrow same like shares on the market as the ones that would be sold short in order to ensure that the basic rule "title passes on trade date" would be respected for the transaction, the seller would, without knowing it himself, become the legal owner of these auto-borrowed shares on trade date. However, the dividend amount on these auto borrowed shares would technically speaking not qualify as a "market claim" available to the buyer under the Transactions but as a 100% payable indemnity for "missing dividend". As these amounts are, pursuant to the Belgian collateral law (*Wet financiële zekerheden*) and contrary to what is in principle the case for dividends, not subject to Belgian withholding tax in the hands of the borrower, we have seen that clearing agents have, in accordance with this tax treatment, been debiting sellers for 100% of the dividend coupon.

According to the Clearstream "*entitlement Compensation Rules – Guide*" (some Belgian shares can apparently be traded through Clearstream as well) it appears that this approach to process transactions for 100% rather than 75% is based on Clearstream's policy to avoid short sales to occur with respect to securities eligible in Clearstream Belgium.

The approach used by the clearing agent in order to setup the aforementioned auto-borrowing is that –based on the basic rule that title should pass on trade date– the seller should have title of such shares on trade date. The practical result would thus be that short sales would no longer be possible around dividend record date.

However to the best of our knowledge and absent contractual provisions providing the contrary, the seller should not be under a legal obligation to actually hold these shares on trade date (apart from specific regulatory restrictions on short positions, for example in relation to shares of certain Belgian financial institutions (see *infra*)). In other words, there should not be a legal obligation for the seller to enter into a lending agreement on trade date if the seller were to find himself in a short position. Provided obviously that upon settlement it is actually in a position to deliver the shares it has sold.

In conclusion: when a buyer purchases shares the day before the ex-coupon date and receives settlement with ex-dividend stock to which is added a "market claim" payment, the legal basis for such buyer to claim full ownership as of trading date is doubtful. Indeed, any such buyer is aware or should be aware that around such period a number of seller would proceed with short sales of such shares, and can as a result not transfer title on trade date. In practice we are aware that such buyers have been referring to the opaque nature of the market, and the impossibility for them to assess whether and to which extent they have been buying from a short seller. On that basis they have been submitting ownership attestations in view of obtaining the withholding tax exemption, either at source or through a reclaim. We would assess that this factual analysis could lead to a "filing position" for such approach, albeit it in shaky legal grounds.

### D) Disclosure of short position

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                                                         WH_MDL_00283325

6.  In 2010 Euroclear has added a new Section 20.7.2.1. (c) to the Euroclear Handbook containing its operating rules version September 2010.

*"When a Participant has transferred securities cum-distribution that has acquired ex distribution, the Participant must ensure, notwithstanding Section 20.7.2.1 (e), that the recipient of the resulting market claim is made aware, when applicable, of the fact that the market claim does not constitute a dividend for tax purposes"*

First of all, the specific drafting of Section 20.7.2.1 (c) seems to suggest that Euroclear follows our legal analysis, whereby a distinction should be made between a short and a long cum-ex transaction. In case of a short transaction the legal basis for being able to transfer title on trading date is not there and as a result tax issues could arise.

The addition also shows that Euroclear is considering these trades to lead to an uncertain legal basis for any buyer, and that therefore an attempt should be made to make the buyer aware of the fact that he is receiving a market claim from a short seller.

In essence, Section 20.7.2.1. (c) of the Euroclear Handbook requires participants to disclose their position *towards the recipient of a dividend market claim* in case of a short cum-ex situation, in case such market claim would not constitute a dividend for tax purposes. This last provision raises a number of questions:

(a)  First of all the recipient of the market claim is not always known to the seller, especially when dealings are done on the exchange or via a broker which functions as a kind of a black box. In other words, it is not self evident to know to who the disclosure (if any) should be made; and

(b)  Even if this identity of the recipient of the market claim (i.e. the purchaser) would be known to the seller, then it is not self evident to any seller to establish whether or not the market claims constitutes a dividend for tax purposes. Indeed, not only is this a highly tax technical question for unsophisticated sellers, but also it raises the question whether the analysis should be made from the point of view of and under the tax legislation applicable to the seller, the purchaser or the issuer of the shares, which can all be different.

Hence, the question arises whether the disclosure obligation imposed in this section is a workable one.

It has to be stated that looking at the Euroclear Handbook September 2010 version, we would assume that any actor who enters into a trade through Euroclear as a direct Participant, thus having entered into an agreement to participate into the Euroclear settlement system, will actually be bound by the requirements of the Handbook. Accepting the T&C's of a market one is trading on, indeed implies adhering to some form of "adherence contract" that contains the rules and regulations of the market. As a result this Section can be viewed as such a "contractual provision" imposed on the market

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER                                           WH_MDL_00283326

participants. However, the question remains whether this contractual provision is a workable one.

In our view, it is relevant for any short seller to actually proceed with a disclosure. Such disclosure is a clear indication that the seller is warning the "market" (he does not actually know the buyer) about a short sale and about the fact that this may have certain consequences to the buyer.

CONFIDENTIAL / PRIVILEGED - SUBJECT TO 502(d) ORDER

WH_MDL_00283327