WILMERHALE

January 28, 2025

**Peter G. Neiman**

+1 212 295 6487 (t)
+1 212 230 8888 (f)
peter.neiman@wilmerhale.com

**VIA EMAIL, HAND, AND ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

>      Re:   In re Customs and Tax Administration of the Kingdom of Denmark
>            (Skatteforvaltningen) Tax Refund Scheme Litigation, No. 18-md-02865-LAK
>            (S.D.N.Y.)

Dear Judge Kaplan:

SKAT's January 26 filings seek (1) to preclude Defendants from presenting evidence that Defendants sought specific legal advice on multiple episodes that SKAT has contended were red flags, and (2) ask the court to exclude tax and regulatory filings that evidence good faith, the absence of an intent to conceal, and the ease with which SKAT could have discovered its claims had it acted with the diligence required.  SKAT's arguments fail.

A.      **Advice-of-Counsel Evidence**

Defendants' January 20 proffer identified ten episodes in which counsel's advice directly responded to an asserted red flag SKAT has identified.  While we seek to offer all identified episodes, we focus in this reply on the four most critical items of evidence:  legal advice about (1) the use of separate emails for trading instructions; (2) the 95-5 partnership split; (3) payments to Ganymede; and (4) U.S. disclosure requirements.

Plaintiffs argue that the evidence is "designed to bolster the improper inference that defendants must not have done anything wrong because they hired lawyers to advise on collateral aspects of their Solo transactions."  ECF No. 1400 at 4.  That ignores that SKAT has rendered these items *not* collateral by the way it has chosen to try this case.  SKAT has alleged that the use of separate emails, the 95-5 partnership split, and the payments to Ganymede are all badges of fraud.  Tr. 558:1-14 (Mr. Dubinsky testifying that "[t]here would be no reason" for there to be 34 emails and not one single email copying all 34 plans); Tr. 848:22-24 (examination of Mr. Markowitz asking him if 34 emails went out at 7 a.m. instructing on the trading); Ex. 1 (P. Lerner Dep. Tr. 127:19-130:12); Ex. 2 (PX 62) (August 2014 General Partnership Agreement of Loggerhead

WILMERHALE

Honorable Lewis A. Kaplan
January 28, 2025
Page 2

Services General Partnership); Tr. 713:5-714:5 (SKAT's examination of Mr. Markowitz); Tr. 594:14-25 (Mr. Dubinsky's testimony on this split); Tr. 771:2-3, 771:10-15, 771:6-9, 772:20-774:15, 867:21-868:8 (questioning from SKAT to Mr. Markowitz about payments to Ganymede). And SKAT has repeatedly alleged that Defendants acted as if they had something to hide. Defendants are entitled to show that they acted properly in each of these instances, and indeed obtained legal advice on each. And Defendants are entitled to show that they sought and obtained advice that significant disclosure would be required and chose to go forward with the transactions and to make those disclosures.

SKAT does not cite a single case in which a Court has precluded actual legal advice received on conduct alleged to be a badge of fraud. Instead, SKAT cites to *Sec. & Exch. Comm'n v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013), which is far afield. The *Tourre* court precluded "evidence relevant *solely* to show that lawyers attended meetings or set up meetings," which is wholly inapplicable to the facts of this case, where the attorneys were involved in the details of the transactions. *Id.* at 684 (emphasis added). Nor has SKAT cited any case in which a Court has precluded legal advice on disclosure obligations relevant to a defendant's mental state.

SKAT also attempts to minimize or mischaracterize the advice actually received, based on its own cramped reading of the relevant documents. But the documents show far more than SKAT acknowledges, and on top of that, Defendants proffer the testimony of Mr. Markowitz which would add additional heft to the evidence.

1. **Separate Emails (PX 1267)**

SKAT boldly asserts that Kaye Scholer "never provided any legal advice" on the practice of sending separate emails for each plan's trading instructions. But that is just not a fair reading of Mr. Wells' email, PX1267 (ECF No. 1392, Dulberg Decl. Ex. 8), and it certainly does not reflect Mr. Markowitz's understanding of that email, which is what matters. Mr. Wells wrote that separate emails were, in his words, "probably a good idea." The most natural reason is that he held that view for legal reasons. After all, using separate emails is administratively more cumbersome, and SKAT never suggests any non-legal reason why Mr. Wells would have endorsed it. Mr. Markowitz will testify that he understood Mr. Wells to be giving legal advice.

SKAT also attempts to argue that the exhibit has "little probative value" because it supposedly "sheds no light on why the Argre partners thought this was a good idea in the first place." ECF No. 1400 at 5-6. But that is irrelevant. If the Argre partners relied on Mr. Wells' advice, what they thought before receiving that advice does not matter. Nor does it matter that Mr. Wells and Mr. La Rosa are not going to testify. It is Defendants' mental state that matters, and Mr. Markowitz should be permitted to testify about the impact of the advice on him and his subsequent actions.

WilmerHale

Honorable Lewis A. Kaplan
January 28, 2025
Page 3

Finally, it makes no difference whether Defendants were then using "only 8, not 34, pension plans" or whether the email came "18 months before the trading instructions" or days before the instructions. Nothing in Mr. Wells' advice suggests that it was intended only for an 8 plan universe, not a 34 plan one, and SKAT provides no reason to think that would have mattered. And the evidence is that the trading steps described in the 2014 email are consistent with how Mr. La Rosa handled the trading at the time of Mr. Wells' advice. Tr. 848:13-851:20. There is ample basis for a jury to conclude that this advice provides the very "business reason" Mr. Dubinsky testified he could not possibly imagine. The evidence should be permitted.

### 2. Payments to Ganymede (DX 6030 & DX 3329)

Kaye Scholer squarely advised that paying Solo's fee to Ganymede did not raise "compliance issues." Defendants have proffered that Kaye Scholer did so after being advised of all relevant facts. ECF No. 1391 at 8-9. Nothing more is required. SKAT assumes that the "compliance issues" on which Kaye Scholer advised did *not* include whether paying an entity that did not deliver the services was a badge of fraud. But that is just SKAT's assumption. The phrase "compliance issues" is certainly broad enough to cover possible red flags of fraud. Ex. 3 (U.S. Dep't of Justice Criminal Division, Evaluation of Corporate Compliance Programs at 1-2, available at https://www.justice.gov/criminal/criminal-fraud/page/file/937501/dl?inline= (compliance programs are "designed for maximum effectiveness in preventing and detecting wrongdoing")). A reasonable jury could easily conclude that if all the facts were disclosed to counsel (as the proffered evidence shows), and counsel saw no compliance issues, then the clients could reasonably infer that there was nothing amiss. SKAT is free to cross examine Mr. Markowitz on the topic, but there is no valid basis to exclude the evidence entirely. *See* DX 6030 (Dulberg Decl. Ex. 9), DX 3329 (Dulberg Decl. Ex. 10).

### 3. The 95/5 Partnership Split (DX 3345, DX 6028)

SKAT claims its theory "is that the refund claims were fraudulent because … there were no shares or dividends, not because the friends and family plans' interests in the partnerships' 'profits' were too small." ECF No. 1400 at 7. But SKAT has dwelled over and over on the very small amounts received by the third-party plans, including through its demonstrative used during Mr. van Merkensteijn's testimony showing that the plans in a hypothetical scenario received only 1% of the reclaims, and has elicited hours of testimony from friends and family witnesses, many of whom perceived that the pension plan's trading was primarily for the benefit of the defendants. *See, e.g.*, Ex. 1 (P. Lerner Dep. Tr. 127:19-130:12); Ex. 2 (PX 62) (August 2014 General Partnership Agreement of Loggerhead Services General Partnership); Tr. 713:5-714:5 (SKAT's examination of Mr. Markowitz). The risk that a jury will rely on this testimony to conclude that defendants knew the friends and family reclaims were false is manifest. And that would be deeply unfair, given the legal advice defendants received on this very point. SKAT denies that any such advice was ever given by Kaye Scholer, but defendants' proffer is that Mr. Markowitz understood Kaye Scholer had given that advice, and that proffer is amply corroborated by the documents, which reflect that Kaye Scholer identified the beneficial

WILMERHALE

Honorable Lewis A. Kaplan
January 28, 2025
Page 4

ownership issue, asked to see the precise representation that was being made, and thereafter drafted the partnership agreements reflecting the 95-5 split, well aware that reclaims would be submitted by the 5% partner.  *See* DX 3345 (Dulberg Decl. Ex. 11), DX 6028 (Dulberg Decl. Ex. 12).  Defendants need not identify a specific email containing the advice; legal advice rendered orally or though conduct counts as legal advice.  *See, e.g.*, *LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584 (CSH), 2000 WL 1211584 (S.D.N.Y. Aug. 24, 2000) (noting oral advice of counsel evidence considered at first trial).

SKAT argues that Mr. Markowitz "admitted" that Kaye Scholer never rendered such advice.  ECF No. 1400 at 7.  But that is not a fair reading of his deposition testimony.  Mr. Markowitz was asked whether he "ultimately g[ot] an answer to that question," and he responded that "the answer would have been through e-mail, telephone, memorandum, or most importantly, the structure of the partnerships that were created by Kaye Scholer and them saying, 'Don't do this because the pension plan will not be able to make the representation.'"  Ex. 4 (Markowitz Dep. Tr. at 494:3-13).  Nothing in that answer admitted that no advice had been provided.  Rather, it identified multiple channels for that advice to have been conveyed.  And in fact, Peter Wells' testimony confirms the inference from the documentary record:  that Kaye Scholer did provide the advice.  When questioned on the topic, Mr. Wells, after some back and forth, said that he "recall[ed] that there were discussions about beneficial ownership and making a claim of beneficial ownership," Ex. 5 (Wells Dep. Tr. 30:9-11), and that his "recollection is generally the conclusion was that … there was comfort making that … representation," *id*. at 31:18-20.

    4.    **Filing requirements advice (DX 3242, DX 3264)**

Plaintiff notes that Mr. Markowitz testified to the receipt of advice about filing requirements and suggests that this eliminates the need for any documentary evidence on the point.  Not so.  SKAT has waged a sustained attack on Mr. Markowitz's credibility, and Defendants are therefore entitled to corroborate this important testimony with clear documentary evidence.  And the testimony having already been admitted, there can be no unfair prejudice from admission of the documents confirming its accuracy.  *See* DX 3242 (Dulberg Decl. Ex. 14), DX 3264 (Dulberg Decl. Ex. 15).

    B.    <u>**Tax Returns and Other Relevant Documents**</u>

SKAT argues that only disclosure to the Danish government would be relevant to the defendants' state of mind.  But SKAT conspicuously offers no answer to Defendants' point that the conduct alleged would – if true – also potentially violate U.S. law, making defendants' willingness to disclose to the U.S. government highly relevant to their state of mind.

SKAT fares no better in addressing the relevance of this information to the statute of limitations issue.  First, SKAT challenges whether the filings would have been available to it on request.  But SKAT offers no response to the breadth of the treaty language, except to speculate that the

WILMERHALE

Honorable Lewis A. Kaplan
January 28, 2025
Page 5

practice may not go as far as the language permits. SKAT is certainly in a far better position than Defendants to offer evidence (rather than speculation) on the actual practice, and its failure to proffer any such evidence speaks volumes.

SKAT also denigrates the significance of the information to the statute of limitations. But the Forms K-1 show distributions to the defendants' plans from partnerships whose names are matches for friends and family plans that also submitted reclaim applications supported by dividend credit advices from the Solo custodians. DX 3376 (ECF No. 1396-7). SKAT says that the K-1s issued to the Defendants' plans would not have identified the other partners in the partnership, but a simple follow up request for other K-1s issued by the same partnerships would of course have supplied that information. Mr. Markowitz would also testify that the partnership tax returns also included backup work statements prepared by the accountant and submitted to the Internal Revenue Service stating that income is from foreign tax refunds. And SKAT denigrates the information in the FBARs, but those would have conclusively linked each defendant to multiple Solo custodian accounts, by name. DX 3571 (ECF No. 1396-5); DX 3971 (ECF No. 1396-6). A reasonable jury could easily find that a careful and diligent investigator would have followed these leads to their logical conclusion. Nor is there any requirement that these documents identify Solo's underlying fraud. That link in the chain comes from other evidence SKAT actually had in 2014 (e.g., the payment of more in reclaims than collected in tax for two different issuers), but missed because it chose to disable the system that would have caught these over-payments.

The relevant issue for Defendants' statute of limitations argument is when SKAT *should* have identified the fraud. *LC Capital Partners, LP v. Frontier Ins. Grp. Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (establishing that the limitations period runs from the date the injured party "should have discovered" the fraud); *see also In re Integrated Res. Real Estate Sec. Litig.*, 815 F. Supp. 620, 637 (S.D.N.Y. 1993) (the limitations period starts when the injured party "should have discovered the general fraudulent scheme"). This evidence would be helpful to the jury in making that determination, and should be admitted.

Respectfully submitted,

*Peter G. Neiman*

Peter G. Neiman