# Exhibit 2

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 18MT

May 22, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

```
 1     increments of 5,000, but some increments have been
 2     skipped out, correct?
 3  A. Yes, that looks right.
 4  Q. This wasn't accidental, Mr Shah. Someone had
 5     deliberately determined to ensure that the numbers were
 6     all different, correct?
 7  A. Well, yes. I agree that they weren't accidental.
 8     I don't know the logic behind them but yes, it is
 9     obvious that they are unique.
10  Q. And someone had decided that they ought to be unique,
11     yes?
12  A. Yes.
13  Q. And someone had also decided that it was a good idea not
14     to make the pattern too obvious and it was worth
15     skipping out a few of the 5,000 increments, correct? It
16     is obvious someone has decided that; it couldn't be
17     accidental.
18  A. Yes, these numbers were produced in a spreadsheet and
19     the ones that are missing may have been allocated to
20     a different client.
21  Q. All of these are ——
22  A. But I can see the usefulness of having unique numbers,
23     because they can be matched to the short sellers.
24  Q. There may be another use which we will come on to in
25     a moment, Mr Shah. But it is right that all of these
```

117

```
 1     were Argre plans, yes?
 2  A. Yes, these ones were, yes.
 3  Q. So why not just make the volumes the same for each of
 4     the Argre plans?
 5  A. I don't know the answer to that and it could have been
 6     something that was discussed with the clients.
 7  Q. Mr Shah, can I suggest to you that the reason the plans
 8     were all given varying amounts to trade in
 9     non-continuous increments is because you thought, and
10     perhaps the clients thought as well, that SKAT might be
11     less likely to appreciate the resulting withholding tax
12     applications were associated than would be the case if
13     they were all for identical numbers. Would you agree?
14  A. Well, at the time we didn't think that we would be able
15     to hoodwink SKAT in such a simplistic way. If SKAT had
16     the controls that we expected them to have, then this
17     type of deception would have been picked up. But
18     I think the reason for the uniqueness of each number is
19     to do with the matching of the buyers and the sellers.
20  Q. I suggest the real reason was you didn't want anyone to
21     notice there was a pattern and investigate further,
22     Mr Shah. You deny that?
23  A. No, I don't recollect that.
24  Q. Just —— I just want to ask you something about an answer
25     you just gave, you said:
```

118

```
 1     "Answer: Well, at the time we didn't think that we
 2     would be able to hoodwink SKAT in such a simplistic
 3     way."
 4  A. Yes.
 5  Q. The implication of that is you gave some thought to what
 6     it would take to hoodwink SKAT and you thought it would
 7     take something more complicated?
 8  A. No, maybe I should have phrased that better, saying that
 9     if anyone wanted to try and deceive or hoodwink SKAT,
10     I don't think that having unique numbers of shares would
11     be the way to do it.
12  Q. It may not be the only ——
13  A. But my recollection is that in no way did we give any
14     thought trying to trick or deceive or hoodwink SKAT at
15     the time.
16  Q. Can we go, please, to paragraph 451 of your first
17     witness statement at {V/27/81}. So paragraph 451. Do
18     you see you say there, Mr Shah:
19     "I had no involvement in deciding what trading the
20     clients would undertake —— it was of no importance to
21     me. My aim was simply to have as many clients as
22     possible because this was how profits were generated.
23     I assumed the clients talked to each other."
24     Do you see that?
25  A. Yes.
```

119

```
 1  Q. Can we also, since we are looking at your statement,
 2     look also at page {V/27/116}, paragraph 637, please.
 3  A. 63 ...?
 4  Q. 637. You see where you say:
 5     "I did not instruct the [pension plans] on how to
 6     trade, nor, to the best of my understanding did any of
 7     the staff at Solo or my other companies. The clients
 8     were, for the most part, experienced traders. If they
 9     were not experienced traders, it was up to them to
10     obtain the assistance they needed. The Solo staff were
11     instructed not to educate the USPPs, but there were
12     several others, for example brokers, who were able to
13     give the USPPs the information and assistance they
14     needed."
15     If you look at paragraph 638, just below that, you
16     see you also say:
17     "Solo did not instruct the clients about which dates
18     to trade, or which shares to trade. As regards the
19     shares to be traded it was just common sense —— Danish
20     companies who were paying a dividend."
21     Now, the evidence which you give in the passages of
22     your witness statement that I have just shown you,
23     Mr Shah, are simply untrue; correct?
24  A. No, I don't agree with that. I think the language used
25     is simplistic but I don't agree with that comment.
```

120

1  Q. It is not simplistic, Mr Shah; it is misleading and
2     wrong.
3  A. No, I don't agree with that.
4  Q. You say you had no involvement in deciding what trading
5     the clients would undertake. You plainly had some
6     involvement, Mr Shah?
7  A. No -- yes. So just to clarify that point, it wasn't up
8     to me if the client wanted to trade just Danish shares
9     or if, for example, they want to trade -- they wanted to
10    trade Belgian shares. That's the point I'm making
11    there. And also the information provided regarding the
12    volume of shares was -- that was the prerogative of Solo
13    to provide. Any prime broker who allows a hedge -- who
14    is providing an account to a hedge fund has to provide
15    limits and obviously from the pension plans' perspective
16    they want to trade as many shares as they can.
17        But I don't believe I was instructing the --
18    I wasn't instructing the pension plans or the Labuan
19    companies on what exactly to trade. The comment in or
20    the key word in 637 is:
21        "I did not instruct the [US pension plans] on how to
22    trade~..."
23        So "how to trade" means -- to me that means what day
24    to trade, which stocks to trade, which stocks not to
25    trade, what time of the day to trade, how to get the

                                121

1     Danish interest rates from public sources and so on.
2  Q. So just to be clear, I'm trying to understand what you
3     are saying, so what you are saying is that when you said
4     in paragraph 80:
5         "I did not instruct them in how to trade ..."
6         What you are intending to say is you didn't instruct
7     them what day to trade, which stocks to trade, which
8     stocks not to trade, what time of day to trade, how to
9     get the Danish interest rates. Are you still saying,
10    Mr Shah, is it still your evidence, that you didn't tell
11    them which stocks to trade and the price at which to
12    trade?
13 A. Well, I think what I have covered already is that the
14    dates to trade were obvious, which shares to trade on
15    those dates was obvious, the messages that I'm sending
16    to Argre are to do with what trades will be approved by
17    Solo. So this is not something that's out of the scope
18    of a prime broker to provide to their client.
19 Q. Would you agree that it might have been more honest if
20    you had, whilst clarifying what you say you didn't
21    instruct them to do, also explained to the court what
22    you did tell them to do, that is to say the price at
23    which to trade, the volume at which to trade, just to
24    take two examples?
25 A. Yes, I agree that this statement here should have been

                                122

1     more clear.
2  Q. And would you agree that the statement here was
3     misleading, Mr Shah?
4  A. I wouldn't describe it as misleading. It is not
5     incorrect, but it is just, I would say, too vague. Not
6     detailed enough.
7  Q. I'm going to suggest to you, Mr Shah, that what you said
8     here is untrue and that you knew it was untrue?
9  A. I disagree.
10 Q. I'm going to put this to you very squarely: the GSS
11    trading was preplanned, I think you would agree with
12    that, yes?
13 A. Yes.
14 Q. The GSS clients were told when and what to trade, yes?
15 A. No, they weren't told when and what to trade by -- they
16    didn't have to be told when and what to trade, and
17    regarding what to trade, I would describe it as the
18    approvals were provided to them, so they weren't
19    instructed on what to do, the approvals were
20    communicated to them before they traded.
21 Q. Would you accept that you were involved in this
22    personally, Mr Shah?
23 A. Yes, before automation at least.
24 Q. I think as part of one of the answers you have given,
25    you suggested that the numbers that -- the volumes of

                                123

1     trading somehow related to trading limits; is that what
2     you are saying?
3  A. Yes. So Solo decided how many shares each account were
4     going to be approved for trading.
5  Q. And the reason that those particular amounts were
6     chosen, Mr Shah, had nothing to do with trading limits
7     but everything to do with the volume Solo wanted the
8     pension plan to trade, so that everything could balance
9     out to zero, correct?
10 A. Yes, based on the information obtained from the short
11    sellers.
12 Q. Mr Shah, can I suggest that the reason you have been
13    willing, at the very least not to tell the whole truth
14    here, is because this evidence about your involvement
15    and about the extent to which Solo was instructing the
16    trading counterparties what to do all highlights the
17    fact that Solo and you had arrangements in place with
18    these people who were willing to do exactly as you
19    wished in order to facilitate the making of
20    a withholding application. Correct?
21 A. Yes, they wanted to make a profit and so did I. I would
22    also -- I think it is worth also just bringing your
23    attention or bringing the court's attention to the fact
24    that this first witness statement was produced after me
25    not having access to documents that could have provided

                                124