# Exhibit 3

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 19MT

May 23, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

```
 1   sign exactly the same agreement where SCP, through its
 2   GSS desk, was identified as the adviser, they would have
 3   signed and that is what would have happened and
 4   therefore I think the premise of the question is one way
 5   or the other, surely it was your choice to have this bit
 6   of the cash flow that was being generated ultimately for
 7   the benefit of Ganymede rather than Solo; why did you
 8   make that choice?
 9 A. I see, sorry, yes. The (inaudible — overspeaking) ——
10 MR JUSTICE ANDREW BAKER: If it was not your choice —— let
11   me finish —— let me finish. If it was not your choice,
12   I have the premise of my interruption wrong and
13   I apologise. If it was your choice, I think it was
14   pretty obvious that is what Mr Rabinowitz was asking
15   you, and you should perhaps just concentrate on
16   answering what you are being asked.
17       So if it was your choice, why did you choose to put
18   this bit of the cash flow through Ganymede rather than
19   keeping it in Solo?
20 A. Well, the answer to the question is I don't believe it
21   was my choice, as I was not the director of this company
22   at the time. To give you a fuller answer, I would
23   assume that it is more tax-efficient to have fees paid
24   to a company that didn't pay corporation tax rather than
25   a company that does have to pay corporation tax in the

                                49

 1   UK. So this looks like tax planning and this would be
 2   most likely at the suggestion of the tax structurers.
 3 MR RABINOWITZ: Mr Shah, it may well have been about tax
 4   planning, but you were in ultimate control of Ganymede,
 5   you were in ultimate control of SCL, you were in
 6   ultimate control of SCP. The suggestion that this was
 7   not your choice cannot be right.
 8 A. Well, there are other ways to get the payment to me
 9   tax-efficiently using SCP. So I think the decision to
10   use Ganymede doesn't really make too much difference
11   compared to using SCP.
12 Q. All right. Can I ask you this, Mr Shah. We know, of
13   course, that the whole basis of the application made to
14   SKAT was that the US pension plan had suffered
15   a withholding of tax in relation to a dividend received
16   by the plan, correct?
17 A. Yes, that's correct.
18 Q. Given that, Mr Shah, why do you say it made sense that
19   rather than the US pension plan being able to keep the
20   substantial part of what SKAT was paying by way of
21   a refund, it should be Ganymede that should have that
22   money, or around 60% of it? What is it you say you were
23   contemplating?
24 A. Well, this was in line —— my recollection is this is in
25   line with the charges that were being offered by the ——

                                50

 1   what I would call the other clearers, custodians and
 2   prime brokers. It is my recollection that
 3   Macquarie Bank, ED&F Man and Investec, who offered
 4   similar services, were charging in excess of 50%. We
 5   didn't force the US pension plans to do business with
 6   us, but this looks like they agreed that they are happy
 7   to pay this money to Ganymede or to me, ultimately, for
 8   providing the services that Solo provided.
 9 Q. So because of what Solo provided or you personally
10   provided, because Ganymede was your company, you felt
11   entitled to take 60% of what apparently was tax which
12   was withheld from them?
13 A. To me, this looks like a commercial arrangement that
14   both parties agreed to.
15 Q. I'm just trying to understand what it is that you think
16   you provided, Mr Shah, which ——
17 A. Well, okay. So I can see according to this particular
18   agreement the services being provided are tax reclaim
19   advisory services and it looks like the clients
20   voluntarily agreed. I don't think they were forced.
21   I don't think a gun was put to their head to sign the
22   agreement. It looks like both sides of the agreement
23   signed the agreement willingly.
24 Q. That is true, Mr Shah, plainly. We have the document
25   which was signed. That wasn't my question.

                                51

 1 A. Yes.
 2 Q. What was it that you consider that you provided ——
 3   Ganymede, (inaudible) —— which meant that —— maybe you
 4   didn't think it was appropriate that you should be
 5   getting 60% of this, but if you did, what is it that you
 6   provided in relation to the scheme which meant that you
 7   should get to keep 60% of the proceeds of what
 8   apparently was their withheld tax?
 9 A. Well, in my witness statement I say that Ganymede
10   provided an introduction to Solo, Ganymede I think also
11   did some other work on behalf of the pension plans, for
12   example negotiating lower reclaim agent fees,
13   negotiating lower brokerage fees, and the charges were
14   in line with the markets, as it were, at the time. So
15   that's a fuller answer.
16       This particular agreement refers to tax reclaim
17   advice, but in later agreements I think the agreements
18   are broader, to just cover any type of consultancy or
19   advisory work, and that would include an introduction to
20   SCP and therefore I have described the fees paid as ——
21   they can be classed as introduction and/or success fees.
22 Q. Mr ——
23 A. But ultimately, yes, I think success fees is probably
24   the best description, yes.
25 Q. Mr Shah, why can't you simply answer that by saying what

                                52
```

```
 1   you provided was a facility which would enable these
 2   pension plans to recover money which, on the basis that
 3   it was tax withheld in circumstances where they had
 4   never held any actual shares, never advanced any money
 5   but were in effect getting money for free from SKAT; why
 6   can't you answer the question in that way, because they
 7   were getting free money from SKAT, weren't they?
 8 A. No, I disagree with that comment.
 9 Q. They were not getting free money from SKAT? They didn't
10   put any money in, they never did anything other than
11   what you told them to do, and in the end, like a magic
12   money tree, SKAT was giving them money, and what you
13   were asking to be paid for was having set up a scheme
14   which enabled them to get money in that way?
15 A. The services provided by Solo were custody and clearing.
16   Services for Ganymede I have just covered. The ability
17   for the investors, so the US pension plans and the
18   Labuan companies, they were able to engage in genuine
19   trading and they were able to submit genuine withholding
20   tax reclaims and this was all possible due to the legal
21   loophole that existed at the time. There was no magic
22   involved. There was no dishonesty involved. There was
23   no fraud involved. That is my recollection.
24 MR JUSTICE ANDREW BAKER: Is it your evidence, then, that
25   you were providing ultimately, in your mind, access to
```
53

```
 1   the legal loophole, or access to the exploitation of
 2   a legal loophole which you say you regarded as legal
 3   even if others might have regarded it as, for
 4   reputational reasons, a type of trading they didn't want
 5   to do?
 6 A. Yes, so Solo were providing access to allow these
 7   clients to access the loophole, but as well as Solo
 8   there were other providers doing the same thing with
 9   other clients.
10 MR RABINOWITZ: My Lord, I'm about to move on.
11 MR JUSTICE ANDREW BAKER: Is that the time? Yes, thank you.
12     Mr Shah, it is 10.55 and Mr Rabinowitz was going to
13   move to a slightly different topic, I think, so we will
14   take our mid-morning break at this point.
15     Just one practical matter, Mr Rabinowitz, is it
16   still the case that you are not available tomorrow and
17   therefore tomorrow's cross-examination will be by
18   Mr Goldsmith on it may be slightly different or discrete
19   topics?
20 MR RABINOWITZ: That is still the case.
21 MR JUSTICE ANDREW BAKER: I am sure you would, without my
22   saying this, but you will have particularly in mind,
23   therefore, that after today from your perspective not
24   only are we breaking for a long weekend because you are
25   not here tomorrow, but we are effectively pausing then
```
54

```
 1   your cross-examination of Mr Shah for 10 days or so, so
 2   I think it is particularly important that you come to
 3   a very good logical point that is fair to him to stop,
 4   even if that might mean today not taking it all the way
 5   to 3 o'clock when you are still in the middle of a topic
 6   and saying, in the way one would coming back the next
 7   day, "That is a convenient enough place to stop". You
 8   need to time the pause to bear that in mind, I think, if
 9   that makes sense.
10     Very good. So 10 minutes, please, Mr Shah. Thank
11   you.
12 (10.57 am)
13         (A short break)
14 (11.11 am)
15 MR JUSTICE ANDREW BAKER: Yes, thank you, Mr Rabinowitz.
16 MR RABINOWITZ: Thank you, my Lord.
17     I'm going to move on, Mr Shah, and ask you some
18   questions about the trading counterparties involved in
19   the 2012-2013 trading. We will come on to the position
20   in 2014 later. Can I ask you, please, to go to
21   {F/379.2/1}. This is a treat and Mr Goldsmith is going
22   to take over the EPE, if he may.
23     Just to explain to you, Mr Shah, what we are looking
24   at, it is a schedule prepared by SKAT's lawyers set out
25   all the trades in the 2012-2013 period based on the
```
55

```
 1   underlying trade documentation. Unless you have any
 2   reason to believe that any part that I'm showing you is
 3   inaccurate I'm going to ask you to assume that the
 4   details set out in the spreadsheet are correct. If it
 5   is not correct, then no doubt your lawyers will make
 6   sure the court knows it is the case, okay.
 7 MR JUSTICE ANDREW BAKER: Mr Rabinowitz, remind me, is this
 8   one of the ones we did do some going through in
 9   openings?
10 MR RABINOWITZ: It is.
11 MR JUSTICE ANDREW BAKER: Mr Shah, you attended remotely
12   while we had the opening sessions on the documents.
13 A. Yes.
14 MR JUSTICE ANDREW BAKER: So you and I will both have seen
15   this and seen Mr Goldsmith selecting and so on to
16   isolate particular parts of it during openings, all
17   right, thank you.
18 A. Yes.
19 MR RABINOWITZ: I hope to go through this fairly quickly.
20   First we are going to look at trades in 2012.
21   Mr Goldsmith is filter to go through that, as he has
22   done. If you look at column E, can you see it now only
23   shows trades with an ex-date in 2012; do you see that.
24 A. Yes, I can see that.
25 Q. Thank you. If we then look at column I, that sets out
```
56