# Exhibit 4

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 23MT

June 7, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

1    is 1.5%, yes?
2  A. Yes, correct.
3  Q. And if you look across to the left-hand side, you see in
4    row 2 that there is a reference to the DCAs; that is the
5    dividend credit advices, yes?
6  A. Yes, I see that.
7  Q. Then in cell B2 there is the total of withholding tax
8    reclaimed that is pulled from another tab. Do you see
9    the figure there, B2?
10 A. Yes, I see that.
11 Q. Take it from me that that has been pulled from another
12   tab and that it reflects the withholding tax reclaims,
13   okay?
14 A. Okay.
15 Q. If you then look at cell B23 and we click on cell B23,
16   we can see that there is a formula at the top to
17   calculate 1.5% of the total value of withholding tax
18   reclaimed and you can see that if you look at the
19   relevant row, cell B23 is in the Pogo row. Do you see
20   that?
21 A. Yes, I see that.
22 Q. Can we just go to your fifth witness statement,
23   please --
24 MR JUSTICE ANDREW BAKER: Sorry, just before you do, it is
25   to get you, I think, to confirm something I've been told

117

1    that I don't think is contentious, Mr Shah. In cell A5,
2    the reference to "longs", that will be a reference to
3    the effective share being taken by or being due to the
4    applicants themselves, correct?
5  A. Yes, that's correct.
6  MR JUSTICE ANDREW BAKER: After the element of profit
7    sharing with Ganymede?
8  A. Yes, that's correct.
9  MR JUSTICE ANDREW BAKER: Thank you.
10 MR RABINOWITZ: Thank you very much.
11       If we can go to, as I say, your fifth witness
12   statement, {V/39/2}. Do you see where it says:
13   "Para 700."
14   You say:
15   "Add the following sentence to the end:
16   "I calculated Mark's bonus as 1.5% of gross
17   dividends multiplied by shares traded~..."
18       And in fact it was 1.5% of the withholding tax
19   refunds, as we saw in Mr Rao's spreadsheet, correct?
20 A. Yes, I can see that now. This sentence is wrong.
21 Q. In your first witness statement you said that you set
22   the bonuses for Mr Patterson to ensure he was paid
23   enough money to prevent him from leaving to join
24   a competitor. Do you recall that?
25 A. Yes, I recall that.

118

1  Q. Here you say you didn't discuss or agree the 1.5% figure
2    with Mr Patterson, but Mr Shah, you must have discussed
3    the basis upon which his bonus was calculated if you
4    wanted to make sure that he wouldn't leave, correct?
5  A. No, I didn't discuss a percentage with him. I made
6    a judgment, I made a decision myself and I judged the
7    amount of bonus that I would -- that I thought would be
8    enough for him to stay and not leave.
9  Q. At the very least you would have told him what you had
10   decided, you say on your own; yes?
11 A. No, my recollection is I just told him the amount and it
12   was up to him to dispute that.
13 Q. Okay. I'm going to move on, if I may, Mr Shah. I want
14   to ask you some questions about dividend credit advices,
15   or as they are referred to in some of the court
16   documents credit advice notices.
17       Now, you have given a few answers in your evidence
18   so far that I just want to remind you about before
19   moving on to ask you some questions about this topic.
20   I'm going to identify three points and I'm going to just
21   remind you of them and after that I will ask you some
22   questions, okay. I just want to in a sense bring these
23   back and put them on the table.
24       So there are three points. The first is that you
25   have confirmed that you understood that each and every

119

1    withholding tax application would involve a dividend
2    credit advice. Again, I don't suggest we turn that up,
3    but for the transcript that was at Day 20MT, page 82,
4    line 23. {day20MT/82:23}.
5        Secondly, you have confirmed that in the tax reclaim
6    process the central thing the custodian does is to
7    provide a dividend credit advice. Do you recall giving
8    that answer?
9  A. Yes, I remember that.
10 Q. Again, for the transcript, Day 20MT, page 84, lines 5 to
11   12. {day20MT/84:5}. And third, you have confirmed that
12   the trading under the GSS model was intended to always
13   settle to zero without ever leading to a profit and
14   loss. We have been round that a few times, but again,
15   the transcript, you said this at Day 18MT, page 134,
16   lines 16 to 19 {day18MT/134:16}, and again at Day 19MT,
17   page 67, lines 19 to 24 {day19MT/67:19}, okay?
18 A. Yes, okay.
19 Q. Mr Shah, given those points, I think you will agree with
20   me that it is fair to say that the purpose of the GSS
21   trading was to facilitate the production of the DCA to
22   be submitted in connection with the tax reclaim
23   application, correct?
24 A. Yes, I agree.
25 Q. And the sole, or at least the primary purpose of a DCA

120

```
 1   was to be used to support a tax reclaim, correct?
 2  A. Yes, correct.
 3  Q. I think, Mr Shah, that you do not dispute that you knew
 4     that the information contained in the DCAs was being
 5     used as part of the withholding tax application made to
 6     SKAT for a refund of tax withheld, correct?
 7  A. Yes, that is correct.
 8  Q. And you accepted in answer to a question Mr Head asked
 9     you what must feel now like a long time ago, that you
10     knew that the DCAs would be sent to the tax agents,
11     correct?
12  A. No, I think my answer to that question, and I think
13     I have mentioned this in my witness statement, is that
14     I wasn't aware that the DCAs themselves were being
15     submitted to the tax authorities.
16  MR JUSTICE ANDREW BAKER:  Mr Shah, the question was tax
17     agents.
18  A. Oh, sorry, agent.  Yes, they were being sent to the tax
19     agent.  Yes, that's correct.
20  MR JUSTICE ANDREW BAKER:  In fact we saw, didn't we, in
21     relation to Mr Lehman, there was the period when you had
22     set him up to be the coordinator of that, so that the
23     DCAs were produced, you said, in London, but they were
24     then channeled through to the tax agents via Mr Lehman
25     in New York.
```

121

```
 1  A. Yes, that's right.  I mixed up tax agent with tax
 2     authorities.
 3  MR JUSTICE ANDREW BAKER:  All right, thank you.
 4  MR RABINOWITZ:  In your witness statement, Mr Shah, and you
 5     repeated this in answer to a question from Mr Head, and
 6     you have just said the same, you say you never knew that
 7     the DCAs were being provided to SKAT.  Is that still
 8     your evidence, Mr Shah?
 9  A. Yes, during the relevant period that is my recollection,
10     yes.
11  Q. Can I suggest to you, Mr Shah, that that is simply
12     untrue.  It is a lie.  Do you want to respond to that?
13  A. Well, that's my recollection.  There could be emails or
14     other evidence to show that I was aware of that, but
15     I think I have mentioned before that there has been
16     a long period of time that I haven't actually seen many
17     documents.
18  Q. Now, Mr Shah, one of the things you have seen since you
19     made this statement, so between making the statement you
20     did make and me asking you that question, you have been
21     shown Mr Horn's evidence that you were aware of this.
22     Do you recall?  Shall I show that to you again?
23  A. Yes, I remember his —— what he said about this.  But it
24     is still my recollection that I wasn't aware that the
25     DCAs were being sent by the agents to SKAT.
```

122

```
 1  Q. Okay.  Well, I suggest that Mr Horn was right about this
 2     and you were wrong about this, but you have responded to
 3     that already.
 4       Mr Horn —— Mr Head also showed you one document
 5     relevant to that.  That was a document I don't think we
 6     need to go back to because we have your response to it,
 7     {MTKC2/284/1}.  I'm going to show you some other
 8     documents, if I may, which may help with your
 9     recollection.
10       Can we go, please, to {MTKC5/135/1}.  Thank you.
11     This, as you can see, Mr Shah, is an email from
12     Roger Lehman to you and Rajen Shah dated
13     29 January 2013.  Perhaps you can very quickly otherwise
14     read it to yourself and remind yourself of it, please.
15  A. Okay.  Okay, I have read that now.
16  Q. So you can see that Mr Lehman is saying that he has
17     finished producing what he calls a market guide and he
18     says that is something —— sorry, that is something you
19     had asked him to do, correct?
20  A. Yes, that's correct.
21  Q. And you can see that he is sending you an attachment
22     entitled:
23       "Withholding Tax Guidelines."
24       Do you see that, at the top of the page, the
25     attachment?
```

123

```
 1  A. Yes, I can see that.
 2  Q. We can see that attachment if we go to {MTKC5/136/5},
 3     please.  Do you have anything on your screen yet,
 4     Mr Shah?
 5  A. Not yet, no.
 6  Q. {MTKC5/136/5}.  Thank you.  There is more of that page,
 7     if we can see.  There.  Thank you.  So this, as you can
 8     see, is the page of Mr Lehman's guide which deals with
 9     Denmark.  Under, "Reclaim requirements" —— do you see
10     a side heading there, "Reclaim requirements", Mr Shah?
11  A. Yes, I see that.
12  Q. Under that, Mr Lehman says that what is required to be
13     sent directly to tax authority includes (1):
14       "Reclaim form (very simple)."
15       Do you see that?
16  A. Yes, I see that.
17  Q. And then:
18       "Credit advice from financial institution paying the
19     beneficial owner."
20       Do you see that?
21  A. Yes, I see that.
22  Q. Mr Lehman was informing you that the DCAs were required
23     to be sent to the Danish tax authority as part of
24     a withholding tax application, correct?
25  A. Yes, I can see that from here.
```

124

```
 1  Q.  Can we go, please, briefly to just look at page
 2      {MTKC5/136/3} of this document, that relates to Belgium.
 3      And obviously again this is Mr Lehman's pocket guide to
 4      Belgian claims and you are told again what is required
 5      to be sent to the Belgian tax authority and that
 6      included a tax reclaim form.  You see that is his first
 7      item.  Do you see that, second item?
 8  A.  Yes, I see that.
 9  Q.  And then he refers to a credit advice again, I think it
10      is the fourth indent, from a financial institution to
11      BO; do you see that?
12  A.  Yes, I see that.
13  Q.  BO in this particular case means beneficial owner.  So
14      you understood what he was telling you, yes?
15  A.  Yes.  I see that, yes.  I understand this.
16  Q.  Well, then you understood at the time, Mr Shah, from
17      what Mr Lehman was saying to you, that in order to make
18      these tax reclaims a credit advice would have to be sent
19      to the taxing authority, correct?
20  A.  Yes, I can see that from this document but I don't
21      recall this document or this information when I made
22      those statements in my witness statement.
23  Q.  All right.  But do you accept now that your recollection
24      in your witness statement was incorrect?
25  A.  Yes, I agree that that is incorrect and as this case has
```

125

```
 1      proceeded I am aware now that dividend credit advices
 2      are submitted to SKAT.
 3  Q.  Well, I think the correct answer was you are aware ——
 4      you recall now that you were aware at the time that
 5      these credit advice notices were submitted to ——
 6  MR JUSTICE ANDREW BAKER:  I think to be fair to the witness
 7      I'm not sure that would have been his more accurate
 8      answer, because he has said he does not recall this
 9      document.  So this has not in fact on his evidence
10      refreshed his memory.  So no, it was not the burden of
11      the answers he gave you that he now recalls that he was
12      wrong, the burden of his answers was that he now accepts
13      that what he recalls is wrong.  Subtly, but potentially
14      importantly, that is slightly different.
15  MR RABINOWITZ:  We will look at some more documents,
16      Mr Shah, thank you.
17           Can we go to {MTO/1/1}, please.  Again, if we can
18      just download it.  Thank you very much.  Mr Goldsmith,
19      if he can, will take over the EPE.  Can we go to the
20      "Skype chat messages" tab and just —— I think we may
21      have seen this before, but just to remind you, Mr Shah,
22      as you go along the author you can see is listed in
23      column D, the recipient in column E; do you see that?
24  A.  Yes, I see that.
25  Q.  If we can go now to row 949, please.  Thank you.  Line
```

126

```
 1      949 is a message from you to Ms Stratford, you see that
 2      in columns D and E, and if you go to column H we can see
 3      that you say:
 4           "Martin Ward will speak to you about a couple of
 5      things."
 6           And for present purposes I am interested in the
 7      second point that you raise which we can find at row
 8      953, you say there:
 9           "2.  We need an authorised signatory for the DCAs
10      which are produced for the Belgium market.  It looks
11      like you and Jim would be the auth sigs for Telesto.
12      Which doesn't look good as you are each the auth sigs of
13      SCP and WP.  Martin will discuss with you."
14           Do you see that?
15  A.  Yes, I see that.
16  Q.  And there is then some back and forth between you and
17      Ms Stratford where she asks if that is actually correct.
18      And if we go down to row 956 we see you respond:
19           "According to the database yes but Martin can
20      double-check."
21           Do you see that?
22  A.  Is it possible to highlight that?
23  Q.  Can you see the little ——
24  A.  If you give me the time stamp then I will be able to ...
25  Q.  There you go.
```

127

```
 1  A.  Okay, yes.
 2  Q.  Okay.  And then if we go on to row 962, you say:
 3           "Ok so maybe another auth sig other than for you
 4      Solo?  I'm happy to put my name on, as I'm known to the
 5      Belgium inspector for previous years DCAs."
 6           Do you see that?
 7  A.  Yes, I see that.
 8  Q.  Mr Shah, what this indicates is that you were aware that
 9      the Belgian tax inspector was receiving the Solo DCAs,
10      correct?
11  A.  Yes, I can see that from this message.
12  Q.  And this suggests that at the time you would have been
13      aware of the fact that the Belgian tax inspector was
14      receiving Solo's DCAs, correct?
15  A.  Yes, that —— at the time that would have been the case.
16  Q.  Now, you are not suggesting, are you, Mr Shah, that you
17      did not know that in Denmark the position was the same
18      in relation to Danish DCAs, that is to say that the DCAs
19      would be sent to SKAT?
20  A.  Well, I think what I would say is that in my witness
21      statement I made that statement not having seen this
22      message for the past eight or nine years, so this
23      message I haven't seen for a very long time, I don't
24      remember this message and I still would like to say that
25      what I wrote in my witness statement was based on my
```

128

1    recollection.
2  Q.  Okay.
3  A.  And my recollection was that during the relevant period
4    I don't recall DCAs being submitted to the tax
5    authorities.
6  Q.  I appreciate that when you wrote that you say you hadn't
7    seen these documents and that your recording of your
8    recollection may therefore have been inaccurate, yes?
9  A.  Yes.
10  Q.  And had you seen these documents, they would have helped
11    you to better recall that you were aware that the DCAs
12    were being sent to SKAT, correct?
13  A.  Yes, assuming that they were being sent to Belgium, they
14    would have been sent to SKAT as well, yes.
15  MR JUSTICE ANDREW BAKER: Sorry Mr Shah, it is a topic on
16    which I occasionally have an interest in being a little
17    careful, some might say pedantic, but can I just
18    understand, you have now been shown this much additional
19    documentation.
20  A.  Yes.
21  MR JUSTICE ANDREW BAKER: The suggestion on it has been that
22    it makes it look as if you must have been aware at the
23    time, and I think you have indicated that you agree with
24    that, but does it actually as you sit there cause you to
25    have any memory one way or the other? Has it in fact

129

1    changed in your own mind so that you now have a memory
2    of being aware at the time?
3  A.  No, my memory hasn't changed, no.
4  MR RABINOWITZ: Okay. Can we —— I'm grateful for that,
5    my Lord.
6    Can we look at one other document which may assist.
7    It may not assist in terms of my Lord's question, but
8    let's just show it to you anyway. {MTKC7/865/5},
9    please. Thank you. If you look at the email at the
10    bottom of the page, Mr Shah, dated 25 April 2013 from
11    Mr Stef Lambersy to Mr Horn and others on the subject of
12    long form reclaims, it is then forwarded to you.
13    I think we have seen this already.
14    Can I just invite you to read Stef Lambersy's email,
15    please, which you would have seen at the time.
16  A.  Yes, I will just read it.
17  Q.  Thank you.
18  A.  Okay, I have read that.
19  Q.  As you see, it relates to what Acupay is sending the
20    Danish tax authorities, yes?
21  A.  Yes, I see that.
22  Q.  If we then look at the email from you in the same chain
23    but higher up, bottom half of page {MTKC7/865/4},
24    please. Thank you. Dated 25 April 2013. You say:
25    "Seeing as the bulk have already been submitted,

130

1    this is academic now ..."
2    And it is clear given your response that you
3    obviously read the email which had been forwarded to you
4    from Stef Lambersy, yes?
5  A.  Yes.
6  Q.  If we then scroll up further, still on page 4, you can
7    see that Mr Horn then responds to your suggestion that
8    it is all academic because the bulk have already been
9    submitted and he notes there were some DCAs still to be
10    submitted. Do you see that, top of the page?
11  A.  Yes, I see that.
12  Q.  If we then scroll up to the email from you on
13    page {MTKC7/865/3}, dated 25 April 2013, on the bottom
14    half of page 3, you say:
15    "We should do the needful once the DCAs have been
16    issued."
17    So Mr Shah —— sorry, Mr Horn notes that there were
18    some DCAs not yet submitted and you respond to say:
19    "We should do the needful once the DCAs have been
20    issued."
21    Yes?
22  A.  Yes.
23  Q.  And the needful you had in mind, Mr Shah, once the DCAs
24    were issued, was to provide them to the tax agents so
25    that they too could be submitted, yes?

131

1  A.  Send them to the tax agents, yes.
2  Q.  So that they could be submitted as well, to SKAT?
3  A.  Well, so far on this email I haven't seen anything that
4    shows that the —— that Acupay have sent DCAs to SKAT.
5  Q.  Can we go back to the email at the bottom of page ——
6    just go back to the email at the bottom of
7    page {MTKC7/865/5}, please?
8  A.  Yes, that first email I didn't see anything referring to
9    credit advices.
10  Q.  Okay. Can we go, then, on to page {MTKC7/865/3}. We
11    are still on page 3. If you look at the top of page 3,
12    do you see Mr Horn's reply:
13    "Majority are with Acupay awaiting next submission
14    date."
15    Do you see that?
16  A.  Yes, I see that.
17  Q.  He is obviously still talking about the DCAs, yes?
18  A.  Yes.
19  Q.  And he is explaining to you that the majority of the
20    DCAs that have not yet been submitted are actually with
21    Acupay already awaiting the next submission date, yes?
22  A.  Well, from this email from Graham Horn it is still not
23    clear to me whether they are talking about the reclaim
24    form being submitted or is he talking about the DCAs
25    being submitted? So far, this hasn't jogged any memory

132

### Page 133

1  from the relevant period. This is quite an old email as
2  well.
3  Q. Mr Shah, he is plainly talking about the DCAs, we can
4  see that from the previous two emails.
5  A. Yes, but where he is saying:
6      "Majority are with Acupay awaiting next submission
7  date."
8      To me that is not clear if he means that the DCAs
9  are being submitted or whether only the long form
10 reclaim form is being submitted.
11 Q. Given that the previous ——
12 A. And also this doesn't jog any memory.
13 Q. Right. Given that two previous emails were about the
14 DCAs which were with Acupay —— sorry, he is talking
15 about ——
16 A. Yes.
17 Q. —— the two previous emails were about the DCAs, when he
18 says:
19     "Majority are with Acupay ..."
20     It is clear, and it would have been clear to you at
21 the time, Mr Shah, that he was talking about the DCAs;
22 yes?
23 A. Well, I don't have any memory of this email. I haven't
24 seen it probably since it was sent to me 11 years ago
25 and it is not clear —— for me, reading this email now,

### Page 134

1  it is not clear whether he is talking about the
2  submission of the reclaim forms or the submission of the
3  DCAs and it is still my recollection that I had ——
4  I don't remember the DCAs being submitted to any tax
5  authority, SKAT in particular. That is my memory. But
6  as I said at the beginning of this session, there could
7  be some documents that contradict that, but my memory at
8  the time of writing my witness statement and now is that
9  I don't recall these DCAs being submitted to SKAT.
10 Q. All right.
11 A. If that had been the case, I'm sure that there would
12 have been many, many, many emails being very specific in
13 saying that DCAs have been submitted to SKAT on
14 a certain date. But I don't recall any such emails
15 being received by me.
16 MR JUSTICE ANDREW BAKER: Mr Shah, does it follow from what
17 you have accepted and do say you remember that whatever
18 else is true, at the time you would have known that
19 a tax agent is only going to submit whatever it is that
20 they submitted after and on the basis of receipt of DCAs
21 for the batch that it is going to be submitting?
22 A. Yes.
23 MR JUSTICE ANDREW BAKER: So come what may, the DCAs have to
24 get to the tax agent before there is any question,
25 either on an individual basis or a batch submission

### Page 135

1  basis, of the tax agent submitting anything at all?
2  A. Yes. Yes, because the DCAs show the amount of
3  withholding tax to be reclaimed and it could just be
4  that the reclaim form itself was the only document
5  submitted to SKAT and that the agent then held a copy of
6  that DCA in their safe, as it were, or in their
7  archives.
8  MR RABINOWITZ: Can I ask you to look at something else,
9  please, Mr Shah. Can we go to the transcript for
10 Day 17MT, page 125. {day17/125:9}. Just pick this up
11 at line 9. You can see that we had the following
12 exchange between lines 9 and 23:
13     "Question: How do you say SKAT would have known
14 that these were cum-ex trades?
15     "Answer: Well, they could have asked.
16     "Question: No, that is not what I asked you. You
17 say that they in inverted commas somehow 'approved' this
18 by paying. How do you say SKAT would have known or knew
19 that these were cum-ex trades, Mr Shah?
20     "Answer: My point is that ——
21     "Question: No, answer my question and then you can
22 comment.
23     "Answer: They wouldn't have known that they were
24 cum-ex trades, but they would have known that the CANs
25 were genuine.

### Page 136

1      "Question: They would have known —— they would
2  certainly have thought that the CANs were genuine,
3  Mr Shah?
4      "Answer: Thought, yes. But my belief was that they
5  knew the CANs were genuine."
6      Do you see that?
7  A. Yes.
8  Q. Can you help me with this, Mr Shah: if you did not know
9  that the CANs or DCAs were being sent to SKAT, how could
10 you have believed at the time that SKAT thought those
11 documents were genuine?
12 A. Well, what I've said is, in my witness statement I have
13 said during the relevant period I didn't know that the
14 CANs were being —— or the DCAs were being submitted to
15 SKAT, but having read documents and witness statements
16 and so on, it is clear to me that the DCAs were
17 submitted.
18 Q. It goes further than that ——
19 A. So there is a difference —— sorry ——
20 Q. You are talking here about your belief. Your belief ——
21 A. Yes, my belief ——
22 Q. —— at the time was you knew that the CANs were genuine?
23 A. No, it doesn't say at the time. In line 22 it doesn't
24 say "My belief at the time".
25 Q. You appear —— Mr Shah, just to put this in context, this

```
 1   evidence related to you saying the fact that SKAT were
 2   paying made you think that SKAT were approving of the
 3   trades.  So this whole question and answer related to
 4   what was happening at the time and what you believed at
 5   the time; do you follow?
 6 A. Yes.  What I am saying is that during the relevant
 7   period I don't remember the CANs being submitted.  But
 8   this answer given at 22 is based on the information I've
 9   had more recently.
10 Q. Mr Shah, that is simply untrue again.  Can we just get
11   on to the screen what you said in your witness
12   statement.  It is at {V/27/11}.  Paragraph 30.
13 A. Paragraph 30?
14 Q. 30.  At the bottom of that paragraph, bottom of the
15   page, you say:
16     "This structure having been 'approved' by SKAT
17   initially by issuing the refunds, the remainder of the
18   trading ~..."
19     If we can then go over the page {V/27/12}:
20     "... simply continued as such and the business
21   infrastructure set up around the trading was designed
22   only to maximise Solo's and Ganymede's profits ..."
23     Am I in the right paragraph?
24 MR JUSTICE ANDREW BAKER:  Yes.
25 MR RABINOWITZ:  Yes.  So that is what prompted the question
```

137

```
 1   and answer at Day 17MT at page 125, Mr Shah.  What you
 2   said at the time about SKAT approving, as you understood
 3   it, these ——
 4 A. No.  No, I disagree.  Because in paragraph 30 I would
 5   have referred to the DCAs or the CANs being submitted to
 6   SKAT.  What I said on Day 17MT is based on my more
 7   recent knowledge, not from the relevant period but from
 8   now, from the last few months.
 9 MR JUSTICE ANDREW BAKER:  Sorry, Mr Shah, I think you may be
10   misunderstanding Mr Rabinowitz's point.  What he is
11   telling you, and I think you should take it from him, if
12   he has got that wrong Mr Jones can correct it in
13   re—examination, Mr Rabinowitz is telling you that the
14   questions he asked that resulted in the answer by you
15   that it was your belief ~...  That was a series of
16   questions that arose out of this paragraph.  So he
17   started with this paragraph, where you were talking
18   about what you thought at the time and that you thought
19   at the time that SKAT's payment had in some way been
20   a mark of approval, and he is telling you that that was
21   the trigger for the questions in therefore the context
22   of which you gave the answer that you are now
23   disagreeing with him about.  Do you understand?
24 A. I think I understand, but the only way I can answer that
25   is saying what I said on Day 17MT wasn't based on my
```

138

```
 1   memory of the relevant period but based on my knowledge
 2   on Day 17MT that the DCAs had been given to SKAT.  So
 3   I still maintain my position that during the relevant
 4   period I wasn't aware that DCAs were being submitted to
 5   SKAT.
 6 MR RABINOWITZ:  Mr Shah, I have given you an opportunity to
 7   deal with that and I'm not going to do it again.  The
 8   truth, Mr Shah, is that you knew perfectly well at the
 9   time that the DCAs were being sent to SKAT, and your
10   attempt to deny it is, frankly, simply not true.
11 A. No, I disagree.  But in my —— as far as I'm concerned,
12   it is a very minor point, because I wouldn't have any
13   concerns if the DCAs were being submitted to SKAT.  But
14   my recollection, based on very, very —— well, what I can
15   see now are very, very few emails and Skype messages,
16   didn't actually form any memory.  Had there been
17   hundreds or thousands of emails over the course of those
18   three years, then I would have had some memory of DCAs
19   being submitted to SKAT.  It could have been that SKAT
20   could have been questioning the DCAs but I don't have
21   any recollection of that.
22     I think it is a minor point.  I wouldn't have any
23   concerns whatsoever if the DCAs were being submitted to
24   SKAT.
25 Q. All right.  Well, I suggest ——
```

139

```
 1 A. For me, it is a minor issue.
 2 Q. I think it is probably not for you to decide if it is
 3   a minor issue or not, Mr Shah.
 4 A. I said from my perspective it is not a big issue.
 5 Q. I am going to suggest to you that what you were trying
 6   to do in your evidence was to suggest that you didn't
 7   understand the importance of the DCAs in relation to the
 8   application process because you are keen, here as
 9   elsewhere, to distance yourself from any wrongdoing, in
10   this case in relation to representations made to SKAT.
11   And that's the truth, isn't it?
12 A. No.  I didn't have any recollections of these DCAs at
13   the time being submitted to SKAT.  I wouldn't have had
14   any hesitation, I believed the DCAs were genuine, and
15   I think the point I'm making is that the submission of
16   the reclaims was the domain of the tax agents.  Once the
17   DCAs had been produced by Solo and submitted to the
18   agents, it wasn't anything that I was concerned with.
19 Q. Just to be clear, you, I think in answer to a question
20   from my Lord, made clear that nothing would go from the
21   tax agents unless at least they had the DCAs from you,
22   yes?
23 A. Yes, of course.  The DCAs were required by the tax
24   agents in order to fill out the forms.
25 Q. Mr Shah, again I'm going to suggest —— I'm going to make
```

140

1  the point one more time: what you were just saying is
2  completely false and you were well aware at the time
3  that the DCAs were also being forwarded to SKAT, and we
4  will see that.
5      Prior to August 2013 ——
6  A. Sorry, just for the record, I strongly disagree with
7  that.
8  Q. Thank you. Prior to August 2013 you were not
9  a signatory of the DCAs, the original signatories having
10 been Mr Horn and Mr Bains, yes?
11 A. Yes, I remember that.
12 Q. But you did regularly see copies of the DCAs going to
13 the tax agents, yes?
14 A. Yes, I recall that.
15 Q. The DCAs were normally sent to the tax agents by someone
16 in the GSS division, correct?
17 A. Yes, that's correct.
18 Q. And you were sometimes copied directly on those emails,
19 yes?
20 A. Yes, I would have been.
21 Q. We can see an example of that if we go to {MTKC7/349/1}.
22 If you look at the email at the bottom of page 1, this
23 is from Mr Horn to Ms Benge, copied to you on
24 11 April 2013. Do you see that?
25 A. Yes, I see that.

141

1  Q. And Mr Horn is sending the DCAs to Ms Benge. You see
2  that?
3  A. Yes, I see that.
4  Q. And he is also saying again that the originals have been
5  posted and he would like her to confirm safe receipt,
6  yes?
7  A. Yes, I see that.
8  Q. And you would obviously have been aware of this at the
9  time, yes?
10 A. Yes.
11 Q. Mr Shah, why do you say Goal would need the originals as
12 well as an email copy if —— but for the fact that they
13 were going to be sent to SKAT?
14 A. Well, like I said, I wasn't aware that the DCAs were
15 being submitted to the tax authorities. I understand
16 that the agents required either the originals or pdfs.
17 Q. But here they were being sent both, Mr Shah?
18 A. Yes, but I think after some time only —— pdfs were the
19 only things that were being sent to the agents.
20 Q. Mr Shah, even where you were not copied in by way of
21 your personal email address, you were obviously also the
22 recipient of emails sent to the reclaims@solo.com email
23 group since 2012, and as you told my Lord in your
24 evidence, on Day 20MT, you had the reclaims@solo email
25 account open on your work PC at all times when you were

142

1  in the office, correct?
2  A. No, I think I said I had it added to my Outlook, but it
3  is not the case that I would have regularly checked
4  that.
5  Q. Okay. But you would have seen DCAs when they were sent
6  or copied to the reclaims address as well, yes?
7  A. Yes, when I looked at that email account, I would have
8  seen that, yes.
9  Q. Just to take an example of one of those, if we go to
10 {MTKC8/117/1}, if we can look —— sorry. Thank you.
11 Just looking first at the bottom of page 1, there is an
12 email there from Mr Horn to Mr Lambersy of Acupay, dated
13 9 May 2013. Do you see that?
14 A. Yes, yes, I see that.
15 Q. The reclaims group is copied; do you see that?
16 A. Yes.
17 Q. So you would therefore have received this email, yes?
18 A. Yes.
19 Q. Mr Horn says he is attaching DCAs to his email. Do you
20 see that?
21 A. Yes, I see that.
22 Q. And these all relate to Danish shares, correct?
23 A. From what I can see on this page, yes. But I can't see
24 over —— if there is a continuation of this email.
25 Q. Go to page {MTKC8/117/2}, just to see. Thank you.

143

1  A. Yes, it looks like they are all Danish companies.
2  Q. Thank you. If we can go back to page {MTKC8/117/1}, at
3  the top of the page, just to see Mr Lambersy's reply, we
4  see he attaches copies of the original DCAs to the
5  email. Do you see that?
6  A. Yes, I see.
7  Q. This is sent in copy again to the reclaims address and
8  therefore to you also, yes?
9  A. Yes, I see that.
10 Q. And you would have looked at these DCAs, yes?
11 A. No. Even if that was sent to the reclaims email account
12 on my office computer, it wouldn't have been necessary
13 for me to open them. They were documents that were
14 produced by Solo.
15 Q. Just in terms of that, the extent to which you looked at
16 your reclaims account, on Day 20MT, page 35, line 9
17 {day20MT/35:9}, Mr Goldsmith was asking you about your
18 familiarity /intimacy, however you like to put it, with
19 the reclaims account and he said this:
20 "Question: You did regularly check your
21 reclaims@solo.com emails, did you not?"
22 "Answer: Yes, my recollection is that when I was in
23 the office I would have my email account open at all
24 times, yes."
25     Do you remember giving that evidence,

144