# Exhibit 1

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 19MT

May 23, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

DEFENDANTS'
EXHIBIT
**DX5782**
Case No:18-MD-2865 (LAK)

Thursday, 23 May 2024

2 (9.30 am)

3            (Proceedings delayed)

4 (9.34 am)

5            Housekeeping

6 MR JUSTICE ANDREW BAKER: Good morning, Mr Goldsmith.

7    I understand we may be having a slight technical delay

8    with Denmark but there are some matters to raise that we

9    can deal with anyway. I in fact had a couple of very

10   small points, so may I take the liberty of going first.

11        Forgive me, either Mr Rabinowitz or Mr Goldsmith if

12   got clarification of this during openings and then that

13   was already enough weeks ago that I have forgotten, but

14   I am aware that it is said that SCP, when acting as

15   custodian, had a subcustodianship arrangement set up

16   with JP Morgan, albeit by definition if the trading

17   model operated as designed it would never in fact have

18   to have any shares at the subcustodian.

19        I'm not sure I clarified one way or the other —— and

20   in any event, as I say, I've forgotten what the answer

21   was if I did clarify it with you —— whether, when the

22   further Solo custodians came on board, Old Park, Telesto

23   and West Point, they also entered into JP Morgan

24   subcustody agreement or subcustody agreements with

25   a different subcustodian, or whether they didn't in fact

1

1    do so at all. It may be you will be coming on to that

2    in due course in the questions.

3 MR RABINOWITZ: I will check. My immediate reaction is to

4    think they didn't because by the time they came on board

5    in 2014 the ecosystem had evolved so that they weren't

6    using ——

7 MR JUSTICE ANDREW BAKER: All right, but you can clarify

8    that —— if it deserves any questions, you can pick them

9    up. If it is simply a matter at some point identifying

10   from the documentary material the position for me then

11   I will leave that with you.

12 MR RABINOWITZ: The position, in answer to your question, my

13   Lord, is I don't recall it being raised, but if it was

14   raised we haven't given you the clarification.

15 MR JUSTICE ANDREW BAKER: All right.

16        Then the other point I had for Mr Head, in fact, and

17   at the risk of disclosing, by asking it, approximately

18   where I may have got to in my getting ahead of my

19   pre-reading, there is a reference at the end of

20   Mr Horn's main trial witness statement at

21   paragraph 122 —— you don't need to look it up but you

22   will note the reference —— there is a reference there to

23   what he says he identified in the sample trade

24   documentation by way of additional loan arrangements of

25   some kind between trade date and settlement date. That

2

1    is an additional wrinkle or element, if it existed, that

2    I do not think I was conscious of from what I have been

3    given as a sample trade summary and what we went through

4    during openings.

5        Now, of course, there is a range of possibilities.

6    It could be a case of him referring to something that we

7    have been referring to using slightly different language

8    and it is not a new element, or it could even be that he

9    is just mistaken about that, or it could be that he is

10   referring to something that was there in relation ——

11   I think he is describing specifically the NCB iteration

12   of the trading —— that was there but nobody has

13   suggested that it has any material bearing on anything

14   and that is why I have not been shown it. But because

15   it wasn't in the statement cross-referenced to any

16   particular document, I wasn't able just to look at

17   a document and see what it was he was referring to.

18        So again, I'm not, by raising the question, inviting

19   additional evidence to be called, but if it is

20   immediately apparent from a document or documents what

21   it is he might be referring to, that I could at least

22   have looked at, at some point before he is called, so

23   that I actually understand what he is referring to,

24   because otherwise if this had been a —— notionally

25   that's in written form the evidence that you would be

3

1    leading from him in chief, it is a little point of

2    detail where I would immediately be looking at the

3    witness and saying, "I'm not sure I actually understand

4    that, can counsel help me with that?" So if you do that

5    in advance for me, it is catered for.

6 MR HEAD: We will do, my Lord.

7 MR JUSTICE ANDREW BAKER: Yes, Mr Goldsmith.

8 MR GOLDSMITH: My Lord, if I can hand up this very brief

9    note which deals with one point of homework from

10   yesterday which was the query about the forward pricing

11   in one of the spreadsheets we looked at and why it was

12   a negative number even though the market price figure

13   and the interest were not filled in.

14 MR JUSTICE ANDREW BAKER: Indeed, why it was a value at all

15   rather than either a zero or, you know, an error,

16   "Reference value not present", or whatever it is that

17   Excel sometimes gives you, yes.

18 MR GOLDSMITH: Yes, I see that. So we have set it out here.

19   I don't propose to go through it now, not least because

20   Mr Shah is here but perhaps I can tell you at a very

21   high level, although it looks complicated the answer

22   actually is relatively straightforward, which is that

23   the forward pricing formula is as we went through in

24   opening: market price plus interest minus expected

25   dividends, and in the form —— in the —— and you will see

4

1    that reflected in the complicated formula there.
2  MR JUSTICE ANDREW BAKER:  There it is.  Now that it is
3    bigger, typed out on the page and it is larger, no,
4    I can see that now, sorry.  My eye may simply not
5    have been picking up the minus sign after the 360 on the
6    screen.  I see.
7  MR GOLDSMITH:  That's the only input that they had at that
8    stage, the —— thank you, my Lord.
9  MR JUSTICE ANDREW BAKER:  I follow.  That is very helpful,
10    thank you.
11        Yes, good morning, Mr Shah.  Can I just check that
12    you are seeing and hearing us again?
13  A.  Yes, everything is fine on my side, thank you, my Lord.
14  MR JUSTICE ANDREW BAKER:  Yes, Mr Rabinowitz.
15            MR SANJAY SHAH (continued)
16        Cross—examination by MR RABINOWITZ (continued)
17  MR RABINOWITZ:  Good morning or good afternoon, Mr Shah.  It
18    is good morning.  I forgot where you were.
19        I would like now to look with you at the Solo
20    withholding tax applicants in 2012—2013.  If we can start with the
21    counterparties in 2012—2013.  If we can start with the
22    Solo withholding tax applicants and then move on to the
23    trading counterparties and just to be clear again,
24    I think I mentioned this earlier, when I am referring to
25    the Solo withholding tax applicants, I mean the persons

5

1    who claimed to be entitled to the refunds in the
2    withholding tax applications based on dividend credit
3    advices from Solo custodians, okay?
4  A.  Okay.
5  Q.  The first group of Solo withholding tax applicants in
6    2012—2013 were US plans formed by Argre or their
7    associates, correct?
8  A.  Yes, that's correct.
9  Q.  Those I am going to refer to as the original Argre
10    plans.  It was you who first asked Argre whether they
11    had any US pension plans that might engage in the GSS
12    trading, correct?
13  A.  It could have been me or Raj Shah at that time, but it
14    could well be me.  I think there were several
15    conversations at that time with them.
16  Q.  Okay.  Mr Markowitz in his deposition —— in the
17    deposition evidence in the United States said that when
18    he received a communication from you, asking whether he
19    had a pension fund in the United States that could be
20    used for trading equities and derivatives, he understood
21    that you were asking this question in the context of
22    a dividend arbitrage strategy.  Can you assist as to how
23    he would have understood that at that time?  Did you
24    have a conversation with him in which you explained why
25    you wanted to find out whether he had a pension plan

6

1    that could be used?
2  A.  I think it was his understanding that we were only going
3    to be conducting dividend arbitrage business with Argre.
4  Q.  So, when you were asking whether he had a pension plan
5    available, you also made clear that that is why you
6    wanted to ascertain whether he had a pension plan
7    available to be used in dividend arbitrage activity?
8  A.  Yes.  If it wasn't made clear in an email, then that
9    would have been assumed and understood by us both, yes.
10  Q.  Okay.  As a consequence of these discussions between you
11    and possibly Raj Shah with Mr Markowitz and the other
12    principals of Argre, they did subsequently establish
13    pension plans and those pension plans became clients of
14    SCP, correct?
15  A.  Yes, and they also had existing pension plans as well.
16    That is my recollection.
17  Q.  All right.
18  MR JUSTICE ANDREW BAKER:  Mr Rabinowitz, I apologise to
19    interrupt you.  May I just interrupt you to raise
20    a concern.  I would ask everybody who has access to
21    a realtime screen please not to look at it.  I have
22    accessed in the way I normally do the realtime by right
23    clicking and asking it to open in a new window, which it
24    did.  The version of the realtime transcript that I am
25    looking at now contains on the right—hand side certain

7

1    private notes I made to myself this morning whilst, as
2    I have effectively just indicated to Mr Head, doing some
3    advance pre—reading in relation to Mr Horn's statement.
4    That has certainly never happened before, because those
5    private notes I was making by highlighting a passage in the
6    statement that allowed me then to enter a note.  I don't
7    mind indicating that one of those notes, which reflects
8    the question I just raised with Mr Head, was
9    highlighting that little sentence or two in
10    paragraph 122 and noting to myself, "What is this
11    about?"
12        Other notes are not notes that I would be happy at
13    this stage in any way, shape or form to reveal.  I don't
14    know why that has happened, because previously if I have
15    been making private notes like that, they would only
16    appear when I am in the document on to which I have
17    attached those notes, so that is why you will understand
18    I suddenly found myself with a concern that those might
19    have become visible to everybody that has the realtime
20    open.  There is a hand up from the back which may be
21    giving a technical explanation.
22        (Discussion off the record)
23        That is certainly what I had understood but what had
24    slightly taken me by surprise was seeing notes that
25    I was making attached to Mr Horn's statement, which is

8

Confidential

SKAT_MDL_001_00838248

1  obviously in a completely different part of the
2  workspace, are now there when I am in the —— in this
3  morning's realtime transcript and I'm not sure I was
4  expecting that to happen.
5  MR JONES:  My Lord ——
6  MR JUSTICE ANDREW BAKER:  I don't mind you glancing at it,
7    Mr Jones, just to confirm that you are not seeing any
8    yellow digital Post—it notes.
9  MR JONES:  We can only see ours.  Would your Lordship like
10    to give me the transcript line where your note appears
11    and if you wish to authorise me, I will go back to check
12    that it is not there.
13  MR JUSTICE ANDREW BAKER:  You see, that is the oddity; it is
14    simply there.  It doesn't matter where I go.  If
15    I scroll down from page 1, line 1, all the way to the
16    bottom of this morning's transcript so far, those notes
17    to myself as a certain number of as it were digital
18    yellow Post—it notes are just fixed on the right—hand
19    side.
20  MR JONES:  I can confirm I cannot see that on the screen.
21  MR JUSTICE ANDREW BAKER:  Very good.  I apologise if that is
22    in fact in some way always what happens if as a matter
23    of timing you make the notes when the realtime is open
24    or whatever, but there it is.
25  MR RABINOWITZ:  All I can see on my screen is one of the

9

1    yellow things with a note with a pen on top of it, it is
2    closed, you can't see what it says, and it is staying on
3    the screen all the time.  Below it, it says "MA—" and
4    that is all I can see.  We don't want to click on it,
5    just in case it is the one that your Lordship is ...
6  MR HEAD:  My Lord, so far as we are concerned, this is
7    normal.  If I go into my workspace and mark—up
8    a document within Opus then it will come on to my
9    timeline of documents on the right—hand side of the
10    page, even though it doesn't form part of the realtime
11    transcript.  It is —— as we understand it, Opus simply
12    gives you a list of documents that have either been
13    referred to during the course of cross—examination or
14    documents that you have identified ——
15  MR JUSTICE ANDREW BAKER:  Is it therefore just
16    an indication —— I'm not sure I would have been able to
17    tell you that this was so —— that this may be the first
18    time in the case where I have chosen to make that kind
19    of private note to myself on a day when we are sitting
20    and having a realtime transcript so that it pops up on
21    the realtime version of the transcript for me for that
22    day, whereas otherwise any time I have done that, it has
23    been on a reading day so there is not a transcript.
24  MR HEAD:  Or it may be my Lord because you have not made
25    a note before court starts, so it could have been a day

10

1  on which we were sitting, but if you marked up documents
2    after court had finished then you wouldn't notice
3    because you perhaps wouldn't be going into that part of
4    the ——
5  MR JUSTICE ANDREW BAKER:  Because the system would not then
6    associate them or tie them into the realtime transcript
7    for the day because it would have closed down by then.
8  MR HEAD:  Yes.  I think that is right.  But in any event
9    I think your Lordship's notes are secure.
10  MR JUSTICE ANDREW BAKER:  Thank you.  I'm sorry to have set
11    a hare running but you can understand why it suddenly
12    gave me a moment of panic because it was the first time
13    that had appeared to me on screen in the context of this
14    case.
15  MR RABINOWITZ:  And it is not on our screen, my Lord.
16  MR JUSTICE ANDREW BAKER:  All right.  Sorry, Mr Shah.
17    Thank you very much, Mr Rabinowitz.
18  MR RABINOWITZ:  Mr Shah, in answer to a question I just
19    asked you about the Argre planes which were used, you
20    suggested in answer to my question that they set up
21    plans to be used —— you said that you thought they were
22    not just new plans, but existing pension plans as well.
23    You are not suggesting, are you, that for the
24    purposes of becoming involved in the GSS trading they
25    used existing plans?

11

1  A.  I think they did.
2  Q.  All right.
3  A.  That is my recollection.  But they did create new plans
4    as well, yes.
5  Q.  I think you are wrong about that.  I'm just going to
6    take you to a document just to show you.  Can we go to
7    {A/93/39}, please.  Thank you.  What you have here is
8    a schedule of the withholding tax applicants and the
9    first one as you see in front of you on page 39 —— they
10    go all the way to page 41 —— are the original Argre
11    plans.  You can see that on the left—hand side.
12    If you look at the formation dates on the second
13    from right column and you scroll down, and if we can
14    just go over the page, please {A/93/40}, just to see the
15    dates.  And again, over to page {A/93/41}.  That is
16    where they end.  You see, Mr Shah, that —— if we just go
17    back to page {A/93/39}, please —— none of those were
18    incorporated prior to 3 May 2012.  Your contact with
19    Mr Markowitz was in April and it therefore does appear,
20    as I have suggested to you, that all the plans that
21    became involved as original Argre plans were set up
22    subsequent to your making contact with Mr Markowitz to
23    see whether he would be interested in using a plan for
24    GSS trading.  Do you see that?
25  A.  Yes, that's clear on this document.  However, I do

12

1      recall that they had their own personal pension plans
2      that had been in existence for years.  It could be the
3      case that they didn't use those for this trading.
4   Q. They may well have had, but they didn't use it for this
5      trading, as you say.  Many of the Argre plans, the
6      original Argre plans, had no money in their Solo
7      accounts when they began GSS trading; do you recall
8      that?
9   A. Yes, I would agree with that.
10  Q. Yes.  And the fact that they didn't have any money in
11     their Solo cash accounts when they started trading
12     wasn't a problem because of course the GSS Model didn't
13     require the US pension plans to have any cash at all in
14     order for them to trade, correct?
15  A. Yes, that's correct.
16  Q. Can I just ask you this: by 2012, you had been engaged
17     in cum—ex trading with Argre for a number of years
18     including in relation to the Broadgate transaction,
19     correct?
20  A. Yes, correct.
21  Q. And you had obviously built a relationship of trust with
22     them, correct?
23  A. Yes, correct.
24  Q. And they had invested substantial capital in both the
25     Broadgate and Ezra transactions as well, correct?

13

1   A. Yes.  So I did mention that I don't recollect at the
2      time —— sorry, I don't recollect the Ezra trade, but
3      I was reminded about that a couple of days ago.  So yes,
4      I agree with you.
5   Q. Would you have explained to Argre, and I suggest you
6      must have, that under the GSS Trading Model it would not
7      be necessary for them to invest capital?
8   A. Yes, and specifically the explanation would have been
9      that they would have been able to —— and that the pension
10     plans would have lent their shares out in order to raise
11     the cash needed to pay for the shares, so that was the
12     reason for no requirement for external money.
13  Q. And they would also have understood that no external
14     leverage and financing would be required because the GSS
15     Trading Model didn't involve any external movements of
16     shares as the trade would all be internally settled to
17     zero within Solo, correct?
18  A. I don't recall explaining that to them, no.  I explained
19     to them the activities of the pension plan from the
20     pension plan's perspective.
21  Q. But they must have been interested to understand how it
22     was that no external leverage or financing would be
23     required?
24  A. I don't remember any specific conversation about that.
25     I explained or we explained the fact pattern to them

14

1      from the perspective of the pension plan and they seemed
2      to be satisfied with that.  They were aware that Solo
3      was acting as a custodian and clearer and therefore
4      naturally Solo would be responsible for settlements.
5   Q. Mr Shah, I'm trying, I really am, I'm not just being
6      difficult about this —— why would they have been willing
7      to participate in a scheme where they couldn't possibly
8      have understood why it was that they didn't need to
9      obtain any funding unless you explained to them that
10     effectively there was going to be a loop which meant
11     that ultimately everything would be zero settled?
12  A. No, I didn't explain to them the loop.  The loop is
13     quite a recent concept for me and it was necessary for
14     them to understand that they were lending the shares out
15     in order to raise cash to purchase the shares.  I think
16     that is all they needed to know.  They seemed to be
17     happy with that.  I don't have any recollection of any
18     hesitancy on their side.  As well as that, they were
19     also quite resourceful in terms of getting their own
20     advice and they were —— if needed, they were able to
21     fund these accounts.  But we told them that on this
22     occasion they didn't need to do that.
23  Q. So what it seems you are saying, Mr Shah, is that you
24     withheld even from your trusted investor the fact that
25     the GSS Trading Model did not involve any external

15

1      movement of shares?
2   A. Solo was talking —— I was talking and Solo was talking
3      to Argre in the context of providing services to
4      a client.  Our conversation was limited to providing
5      those services.  The activities beyond their involvement
6      was not of their concern and it was in fact
7      confidential.  So it is not normal for a prime broker or
8      a custodian to discuss the business of other clients
9      with each other.
10  Q. Mr Shah, these people, you told me, were people you
11     trusted.  You had done other transactions with them.
12     But you were still not willing to tell them the truth
13     about exactly what it is your scheme involved, correct?
14  A. No, that's not correct.  No, that's not correct.
15  Q. You didn't tell them the truth about what your scheme
16     involved.  You withheld key aspects of that scheme from
17     them?
18  A. No, that is not correct.  We gave them the information
19     that they needed and they decided to participate.
20  Q. So you gave them half the story because you were not
21     willing to give them the whole story?
22  A. I wouldn't say half the story.  I would say even less
23     than that, probably an eighth of the story, yes.
24  Q. Right.  Well, I'm happy to go with that.  Can I move on
25     to the Zeta plans, then, Mr Shah and for this purpose

16

1   can we go to {A/39/52}. Thank you very much. You can
2   see at the bottom of the page reference to four plans
3   associated with Mr Summers, Mr Gerber and Mr Doscas,
4   yes?
5   A. Yes.
6   Q. These US pension plans were the other group of Solo
7   withholding tax applicants at the outset of 2012,
8   correct?
9   A. Yes, that's correct.
10  Q. And these pension plans were all associated with an
11  entity called Zeta Financial Partners, yes?
12  A. Yes, that's correct.
13  Q. Zeta Financial Partners was an entity ran by
14  Grenville Solomon and Darren Thorpe; do you recall?
15  A. Yes, that's correct.
16  Q. Mr Solomon and Mr Thorpe were long—standing contacts of
17  yours, correct?
18  A. Not Grenville Solomon, but Darren Thorpe, yes.
19  Q. Okay. You were the person who was responsible for
20  recruiting the Zeta plans to become involved in GSS
21  trading in 2012 with regard to Danish shares, correct?
22  A. Yes, that's correct.
23  Q. And to become Solo withholding tax applicants as well,
24  correct?
25  A. Yes, that's correct.

                                17

1   Q. And when the four Zeta plans began GSS they also
2   had no money in their Solo cash accounts, correct?
3   A. Yes, that's correct.
4   Q. Can I ask you this in relation to the Zeta plans
5   individuals: again, did you explain to them why they
6   needed no cash? Did you explain to them that the way
7   your scheme worked, there would be no external shares
8   brought in, no external cash brought in?
9   A. No, I didn't tell them that. I told them the same
10  information as Argre.
11  Q. And is your evidence that they never asked you: how is
12  this all working, that we don't need to put cash in?
13  A. Well, the explanation was the same as with Argre, that
14  the shares in their account will be lent out and that
15  would raise enough cash to pay for their share purchase.
16  Q. And they didn't ask how all of this, without anyone
17  putting money in, could acquire shares sufficient to
18  give rise to a withholding tax application?
19  A. My recollection is that they had enough information to
20  decide to participate. They didn't ask for any further
21  information. I would also assume that if they were not
22  happy with the information that they were given and if
23  they weren't given any more information, it was up to
24  them if they wanted to participate or not.
25  Q. They didn't ask and you certainly weren't going to tell

                                18

1   them, correct?
2   A. Yes, correct. And it is also worth mentioning that the
3   principals of these pension plans, as well the Zeta
4   partners, they had years of experience of dividend
5   arbitrage and cum—ex trading. One of the reasons why
6   I wanted to onboard them was I wanted to get them to do
7   their own due diligence totally independently of Argre
8   and everybody else, and come to the same conclusion,
9   based on the information we provided them, that they
10  would be entitled to a valid withholding tax reclaim.
11  Q. You wanted them to do their own due diligence but you
12  were withholding on your account seven eighths of the
13  relevant information, Mr Shah?
14  A. No, I wasn't withholding information. I provided them
15  with the information I thought they needed. My
16  recollection is that they didn't ask for any further
17  information.
18  Q. And the further information involved seven eighths of
19  the scheme which you didn't tell them; yes?
20  A. Yes, which is confidential ——
21  Q. And you expected them ——
22  A. —— like I mentioned earlier.
23  Q. And you expected them to do meaningful due diligence
24  knowing less than a quarter of what the scheme actually
25  involved?

                                19

1   A. They were participating as withholding tax applicants
2   and they were provided with all of the information
3   relevant to their activity. So nothing was withheld
4   from them regarding the information that they needed.
5   Q. But what was withheld from them was what the ultimate
6   scheme involved, Mr Shah; what it was that you were
7   actually doing in order to produce these reclaims in
8   circumstances where the person making the reclaim had
9   never had tax withheld by the dividend paying company.
10  You never explained any of that to them?
11  A. Well, as you know, I don't agree with that comment. But
12  I gave them the information they needed and that was
13  also the case for all of the other participants who
14  traded using the Solo GSS business.
15  Q. Can we go, please, to {MTKC17/527/1}. Thank you very
16  much. Mr Shah, what you see in front of you is a letter
17  from SCL, Solo Capital Limited, to HMRC's Criminal
18  Investigation Unit dated 10 December 2014. If we go on
19  to page {MTKC17/527/2}, just to see that this is
20  a letter which you signed; do you see that?
21  A. Yes, I can see my signature there.
22  Q. Can I just give you a moment to remind yourself of the
23  whole letter. So can we go back to page {MTKC17/527/1}.
24  Say when you want to go over the page, Mr Shah.
25  A. Starting to read this, I don't actually recognise this

                                20

1    letter, but I will, if you don't mind take a few moments
2    to read this ——
3  MR JUSTICE ANDREW BAKER:  That is, Mr Shah, what you were
4    just asked to do.  Just do it, please.
5  A.  Yes, yes.
6    (Pause).  Ah yes, I remember this now.  Yes.
7  MR RABINOWITZ:  Okay.  So as you have seen, you are
8    responding here to an order from the Blackfriars
9    Crown Court for information in relation to three pension
10   plans and they are the pension plans that you see
11   referred to on page 1 at numbered points 1 to 3 and they
12   are three Zeta plans; correct?
13 A.  Yes, correct.
14 Q.  And since the SCL letter is in response to an order from
15   the Blackfriars Crown Court, and indeed is addressed to
16   HMRC Criminal Investigations Unit, you would obviously
17   have checked this letter carefully before you signed it;
18   correct?
19 A.  Yes, that's correct.
20 Q.  In the second paragraph of your response you tell the
21   court that a search has been undertaken of SCL's files
22   in order to provide the response.  Do you see that?
23 A.  Yes, I see that.
24 Q.  The second paragraph:
25   "Having searched through SCL's files, I believe that

21

1    the only information SCL has that is responsive to the
2    order is the enclosed agreements."
3    Do you see that?  So you say you have checked your
4    files?
5  A.  Yes, correct.
6  Q.  If you just go to the penultimate paragraph of the
7    letter on page {MTKC17/527/2}, you say you also
8    conducted a search for emails before writing the letter;
9    do you see that?
10 A.  Yes, correct ——
11 Q.  And you say ——
12 A.  —— I see that.
13 Q.  You say you did not find any; yes?
14 A.  Yes, correct.
15 Q.  So what you are telling HMRC is that a thorough search
16   of SCL's records has been conducted, indeed conducted by
17   you, for the purposes of responding to the court order;
18   correct?
19 A.  Yes, I agree.
20 Q.  Can we then go back to page {MTKC17/527/1}.  In the
21   third to fifth paragraphs you explain that the Zeta
22   plans had an account to trade German shares with SCL and
23   you explain that there were agreements between SCL,
24   Acupay and the Zeta plans.  Do you see that?
25 A.  No, that's not quite correct, because this relates to

22

1    tax —— withholding tax refunds that were applied to
2    using our DTV account.  At this point in time SCL was no
3    longer authorised by the FCA; it was SCP who was
4    operating as the custodian.  SCL had transferred its
5    business to SCP back in March 2012.  There was no
6    agreement at this point with these funds for —— with SCL
7    to trade shares.  From what I can see in front of me,
8    there is no reference to trading shares.
9  Q.  Let's just see exactly what it says ——
10 A.  This specifically concerns using our DTV account, which
11   is an account with the German tax authorities which is
12   used for withholding tax reclaims in Germany.
13 Q.  So are you saying, I think you are saying, and what you
14   said to HMRC, effectively concerned whether there were
15   tax reclaims made in respect of these funds with regard
16   to German withholding tax; yes?
17 A.  Yes, in particular using this DTV account number which
18   was owned by SCL, yes.
19 Q.  Well, let's just go through it, because I think you know
20   where I am going with this, Mr Shah, so let's just go
21   through it and see what you tell them and then we can
22   look at the reality and you can explain on the top of
23   what pin you are dancing, once we have done that.
24 A.  Sorry, I don't know what you are aiming for here, but
25   I will wait for you to ask the questions.

23

1  Q.  So let's just take this more slowly.  The agreements
2    with Acorn Capital, Acorn Corp and Sander concerned the
3    use by the funds of an account held by SCL which is
4    referred to as the DTV filer number, so you refer to
5    particular agreements and you say that those agreements
6    related to the use of a particular account; yes?
7  A.  Yes (inaudible — overspeaking) ——
8  Q.  Identify agreements ——
9  A.  —— the agreements, if that is possible.  But that is my
10   recollection, yes.
11 Q.  You then say:
12   "The agreements allowed the Funds to use the Account
13   to process requests for tax refunds or tax relief from
14   German withholding tax.  Under each of those three
15   agreements, fees were payable by the Funds to Acupay in
16   respect of the Funds' use of the account.  Acupay and
17   SCL agreed to share those fees pursuant to the sums,
18   terms of the agreement numbered 4 above."
19   So you refer to the fact that there was an agreement
20   to share funds between Acupay and SCL, where funds were
21   collected with regard to the three Zeta pension funds;
22   correct?
23 A.  Yes, if those fees were received.
24 Q.  If those fees ——
25 A.  If the reclaims were received, yes.

24

Confidential

SKAT_MDL_001_00838252

1  Q.  That's fine.  You then say you:
2        " ... have checked SCL's records relating to the
3      Account and there are no records of any transactions by
4      the Funds in relation to the Account.  From the searches
5      I have carried out I don't believe there were any other
6      transactions between SCL and the Funds."
7        So you are not just dealing with the particular
8      accounts, you are actually saying you do not believe
9      there were any other transactions between SCL and the
10     funds, yes?
11  A.  Yes, I can see that.
12  Q.  And the last paragraph, you also say —— well, I have
13     read that, so we don't need to worry about that.
14        So effectively you are telling HMRC that, so far as
15     you can see on the search you have done, these Zeta
16     plans never filed any German tax reclaims via Acupay in
17     circumstances in which SCL were involved, yes?
18  A.  Yes.  Using that, "the Account", and "the Account" is
19     with a capital A, yes.
20  Q.  With respect, Mr Shah, that is not quite right.  Because
21     you say:
22        "I have checked SCL's records relating to the
23     Account and there are no records of any transactions by
24     the Funds in relation to the Account.  From the searches
25     I have carried out, I do not believe there were any

25

1      other transactions between SCL and the Funds."
2        It is not just about the account; do you see that?
3  A.  Yes, I see that.  But I think in this context this is
4      referring to any other transactions regarding German
5      withholding tax.
6  Q.  That is certainly the case, and I accept that.  What you
7      told HMRC here, Mr Shah, is not true, was it?
8  A.  No, I believe it is accurate.
9  Q.  The Zeta plans, Mr Shah, did enter into German cum—ex
10     trades facilitated by Solo; correct?
11  A.  German —— no.
12  Q.  They did also submit tax reclaims to the German tax
13     authorities via Acupay, correct?
14  A.  It is unclear whether they actually went ahead with
15     submitting those reclaims.  I don't recall if they did
16     or not.
17  Q.  And in fact SCL, Mr Shah, was paid as a result of those
18     German tax reclaims made by Acupay for the Zeta funds.
19     That is the truth, isn't it?
20  A.  My recollection is that the clients, so these three
21     funds, decided not to go ahead with submitting the
22     reclaims and therefore my recollection is that SCL
23     didn't receive any fees as the reclaims were not
24     submitted and therefore not paid.
25  Q.  Can we just keep this open on the left—hand side.  On

26

1      the right—hand side can we go, please, to
2      {MTKC2/269.01/2}.  Thank you very much.  If we just look
3      first at the lower part of this page on the right—hand
4      side.  You can see there is an email from you to Ms Vyas
5      and Mr Bains on 20 April 2012, copied to Raj Shah and
6      Mr Horn:
7        "Subject: US pension funds — potential new custody
8      clients ."
9        Do you see that?
10  A.  Yes.
11  Q.  You identify three plans for which custody accounts may
12     need to be opened and you note they have already been
13     KYC'd —— Know Your Client process —— and you identify
14     those plans, correct?
15  A.  Yes, I can see that.
16  Q.  And they are the same plans to which you refer in your
17     letter to HMRC on the left—hand side, correct?
18  A.  Yes, that's correct.
19  Q.  Then at the bottom of page 1, going on to page 2, we see
20     that you send another email chasing Ms Vyas; do you see
21     that?
22        "Jazzer —— these are the entities we have filed ~... "
23  A.  Yes.
24  Q.  You see:
25        "Hi Dipti,

27

1        "This is rather urgent."
2        Sorry, I misled you.  So do you see that, from you
3      to Dipti and Jas?
4  A.  Yes.
5  Q.  And then if we go back to page {MTKC2/269.01/1}, please,
6      higher up, Dipti Vyas responds on the same day asking
7      for the KYC information for those entities; do you see
8      that?
9  A.  Yes.
10  Q.  And then the same email, you also say to Jazzer,
11     Mr Bains, that these plans are:
12        " ... the entities we have filed reclaims in Germany
13     for via Acupay.  We would have KYC'd them already."
14     Yes?
15  A.  Yes, I can see that.
16  Q.  And those German tax reclaims for the three Zeta plans
17     were filed in 2011, do you recall?
18  A.  Yes.  I don't actually recall if the reclaims went
19     ahead.  Based on what this email says, it looks like the
20     reclaims were submitted.  I can see that.  But my
21     recollection is still that they were not paid.
22  Q.  Let's just carry on.  If we can go next on the
23     right—hand side to {MTKC1/329.1/3}.  Thank you.  The
24     first full email on the page, dated 27 June 2011:
25        "Subject: Billing the ZFP Pension Funds for the

28

Confidential

1    initial submission of reclaims."
2        That is from Ms Haniffa at Acupay to Rajen Shah; do
3    you see that?
4    A.  Yes, please, can you just give me a moment.  I will just
5    read that.
6    Q.  It is quite short.
7    A.  Okay, I have read that.
8    Q.  If you go to the bottom of page {MTKC1/329.1/1} on to
9    the top of page {MTKC1/329.1/2}, you see the response
10   from Rajen Shah the following day, copying and
11   Sanjeev Davé in on his response.  Do you see that?
12   A.  Yes.
13   Q.  We probably need to go over.  {MTKC1/329.1/2}.
14   A.  Yes, I saw that.  I saw that on the previous screen,
15   yes.
16   Q.  You will have seen that all these emails ——
17   MR JUSTICE ANDREW BAKER:  I am slightly lost on the screen.
18      I saw the text before, the text was a reply from
19      Rajen Shah saying that he was happy for Acupay to
20      invoice the full amount and then Solo would invoice
21      Acupay for half, but I think at the moment I have not
22      quite seen where you were identifying that that was
23      copied to Mr Sanjay Shah.
24   MR RABINOWITZ:  Go to the bottom of page 1, please.
25      {MTKC1/329.1/1}.  From Raj Shah to Ms Haniffa.

29

1    MR JUSTICE ANDREW BAKER:  There it is.  Bottom of the page,
2        30 June 2011, or 00:01 hours, whichever time zone that
3        was, that is Mr Rajen Shah ——
4    A.  On my screen, I can't see the bottom of that page.
5    MR JUSTICE ANDREW BAKER:  If your screen is the same as
6        ours, you can, Mr Shah.  Bottom right, you just get the
7        "From" and "Sent" and "To" information on the email.
8    A.  Yes.
9    MR JUSTICE ANDREW BAKER:  And then if you go over the page
10       {MTKC1/329.1/3} ——
11   A.  Yes, I can see that.
12   MR JUSTICE ANDREW BAKER:  —— that is the email that says
13       from Rajen Shah:
14       "Just back from the Big Apple!
15       "Happy for you to invoice the entire amount~..."
16       And he is going to get Sanjeev to issue the Solo
17       invoice to Acupay; do you see that?
18   A.  Yes, I see that.
19   MR JUSTICE ANDREW BAKER:  Mr Rabinowitz was just showing us
20       both that that response from Rajen Shah was copied to
21       you, bottom of page 2.
22   MR RABINOWITZ:  If we just go back to the bottom of
23       page {MTKC1/329.1/2} for a moment, you will see,
24       Mr Shah, that these are all sent to persons at SCL; do
25       you see that?  Sanjeev Davé, SCL address, and when it

30

1    comes to you, it is also your SCL address.  Do you see
2    that?
3    A.  Yes, that's correct, yes.
4    Q.  Okay.  If we then go to the substance of Ms Haniffa's
5    email on page {MTKC1/329.1/3}, she says she hopes he is
6    enjoying the big apple, and then says:
7        "I am in the process of creating the invoices for
8    the initial submission of the reclaims to the BZSt for
9    the ZFP pension funds."
10       Do you see that?
11   A.  Yes, I can see that.
12   Q.  She is referring here to tax reclaims submitted to the
13   German tax authorities on behalf of the Zeta plans,
14   correct?
15   A.  Yes, correct, yes.
16   Q.  Those reclaims would have been submitted by, at the
17   latest, 29 June 2011, given the date of this email?
18   A.  Yes, I can see from that message that the reclaims were
19   submitted, yes.
20   Q.  If we then go back to Raj Shah's reply, beginning on the
21   bottom of page 2 and on to page 3, we see —— we need to
22   go on to page 3 to see what he actually says.  We will
23   have to go back to page 2 to see he copies this to you
24   and to Sanjeev Davé.  Do you see that, bottom of page 2?
25   If we then go on to page 3 ——

31

1    A.  Yes.
2    Q.  —— you see that in his reply he says:
3        "I will ask Sanjeev to issue an invoice to Acupay
4    for 75,000 euros."
5        Yes?
6    A.  Yes, I see that.
7    Q.  Sanjeev Davé was Solo's finance director at the time,
8    correct?
9    A.  Yes, that's correct.
10   Q.  If we then scroll up you see there is then some
11   discussion about what the invoice from SCL to Acupay
12   might say, and you see in the email from Raj Shah to
13   Sanjeev Davé and Ms Spoto, dated 30 June 2011 at 11:55,
14   we have that on the screen ——
15   A.  Yes.
16   Q.  Raj Shah gives detailed instructions as to what the
17   narrative for each invoice should say.  Do you see that?
18   He says ——
19   A.  Yes, it looks like I have been dropped off that email
20   chain as well.
21   Q.  That may be so.
22   A.  Yes.
23   Q.  But what he says is each invoice should also say,
24   "Billing as per the agreement~..." made by the pension
25   fund with Acupay and SCL?

32

1 A. Yes, I can see that.

2 Q. And all of that suggests, Mr Shah, first that the Zeta
3   plans in conjunction with Solo and Acupay did make
4   reclaims to the German tax authority, correct?

5 A. Yes, that is what it looked like, yes.

6 Q. Secondly, that Acupay did bill fees, correct?

7 A. Yes, it looks like the invoices were going to be issued,
8   yes.

9 Q. And third, that SCL billed Acupay in respect of its
10   entitlement to what was paid, correct?

11 A. Yes, that's correct.

12 Q. And again, Mr Shah, that suggests that what you told
13   HMRC Criminal Unit under order from the Blackfriars
14   Crown Court was wrong?

15 A. I would just say that on page 3 of that email it looks
16   like the invoices are issued at the initial submission
17   of the reclaims, it doesn't suggest that the reclaims
18   are being paid.

19 Q. Okay, but that is not all you say in your letter to
20   HMRC. Effectively, you say in your letter to HMRC:
21       "I have checked SCL's records relating to the
22   Account and there are no records of any transaction by
23   the Funds in relation to the Account. From the searches
24   I have carried out, I do not believe there were any
25   other transactions between SCL and the Funds."

33

1       And that is simply incorrect, Mr Shah?

2 A. Well, my recollection is that, as I have said before,
3   either the reclaims were not submitted or that they were
4   withdrawn. I don't have any reason to believe that the
5   information in the letter that I sent to HMRC was
6   inaccurate. For a fuller answer, I would want to see
7   more supporting documentation. But in answer to your
8   question, I don't agree with that comment.

9 Q. Mr Shah, I suggest that you know full well, in fact you
10   accepted in your answer a little while ago, that you
11   accepted that the reclaims applications had been
12   submitted. I think where you had a doubt is as to
13   whether they were actually paid, yes? And that is
14   reflected in the invoices ——

15 A. I answered your question based on what I read. What
16   I can see here, again having read it again, is that the
17   invoices are being created for the initial submissions.
18   So I will have to backtrack and say that what this looks
19   like is that the invoices were to be issued before the
20   initial submission. But, as I mentioned earlier, my
21   recollection is that the reclaims did not proceed and
22   I still believe what I say in that letter is
23   accurate. I don't have any recollection now of that
24   letter. It has been 10 years.

25 Q. Well, indeed. But when you wrote it, it was in 2014 and

34

1   this correspondence that we were looking at was from
2   2012, and indeed you say in your email —— you say in
3   your letter to HMRC that you checked all the records.
4   At the very least, Mr Shah, you are not providing HMRC
5   with a full explanation of your involvement with the
6   Zeta fund and the applications which are providing made
7   in respect of German cum—ex trading. Do you agree?

8 A. No, no, I still believe that this enquiry from HMRC
9   would have been taken very seriously by my staff and
10   I believe that this letter accurately reflects the
11   status at that time. I would not willingly lie to HMRC
12   and this letter, as I said, would be taken very
13   seriously, not just by me but by the people working for
14   me who were involved in preparing the letter.

15 Q. Mr Shah, the other point about this letter is of course
16   by the time of this letter, which is December 2014,
17   there had also been cum—ex trades/transactions in
18   relation to Danish shares between Solo and the same
19   three Zeta plans in 2012, correct?

20 A. No, that is a different Solo entity, that is not SCL,
21   that is SCP.

22 Q. So, in circumstances where you actually knew that HMRC
23   were looking to understand what your involvement or what
24   the involvement of Solo was with Zeta, you were drawing
25   this distinction between SCL and SCP. Is that what you

35

1   are saying; because they asked about SCL you certainly
2   weren't going to tell them about the fact that there had
3   been very recent transactions with SCP?

4 A. Yes, so this is specifically in relation to a letter
5   issued by SCL. SCL was not involved in GSS and this, at
6   the time of that letter, is an unregulated entity of
7   which I was a director. SCP —— at that time I was not
8   an officer of or CEO at the time, and Stratford Martin
9   would have been, and what I believe is that this letter
10   and the enquiry relates specifically to SCL. It
11   refers —— it relates specifically to the DTV number and
12   it refers specifically to withholding tax reclaims made
13   in Germany.

14       The last sentence of this page says there were no
15   other transactions between SCL and the funds, and
16   I think that is correct. It doesn't talk about SCP.
17   I wasn't in a position, not being an officer of SCP, to
18   make that comment which is specifically from SCL.

19 Q. That is true.

20 A. So the activities taken out in Danish shares was with
21   SCP, not SCL. So as the director, as the officer of
22   SCL, this letter is correct.

23 MR JUSTICE ANDREW BAKER: Mr Rabinowitz, I have to say at
24   least provisionally it seems to me there are potentially
25   three different lines of questioning. One is, is what

36

Confidential

SKAT_MDL_001_00838255

1  Mr Shah has chosen to sign his name under by way of
2  disclosed information factually accurate at all, and if
3  factually accurate on its face, is it nonetheless
4  potentially partially misleading because of
5  a non-disclosure of other details. That is one type of
6  question.
7      Another type of question is whether or to what
8  extent that which he chooses to say in the letter was
9  material that he had been ordered to say, to the extent
10  he was able to do so. That is another line of
11  questioning.
12      A third line of questioning is whether there is
13  material, for example, relating to trading involving SCP
14  that obviously is not referred to at all, whether that
15  failure is in any sense even arguably a breach of the
16  court order, and I'm not sure it is fair on that last,
17  which is what you have really just been putting to him
18  in effect, to pursue that line of questioning if you do
19  not have a case by reference to the terms of the order
20  that he was obliged to disclose it, because I can
21  envisage that you would not get very far with me and you
22  would not get very far with a judge at Blackfriars
23  Crown Court if you were HMRC with a complaint of
24  contempt of court for non-disclosure of material that
25  had not been ordered to be disclosed.

37

1  MR RABINOWITZ: I'm sure my Lord is right. I don't want to
2  debate it. I don't need to spend much more time on
3  this.
4  MR JUSTICE ANDREW BAKER: But it is important. I think in
5  fairness to Mr Shah, if there is a serious point to be
6  made that he has chosen —— because, of course, whether
7  he was an officer or relevant individual for the
8  provision of a formal letter for SCP or not in a sense
9  is neither here nor there. If he is well aware of SCP
10  activities that either make what is said in the letter
11  false or misleading or puts the letter in breach of
12  a court order because it fails to disclose matters of
13  which he was aware, that is one line of questioning, and
14  that seems to be where you are going. If it is not, I'm
15  not sure a question about SCP should really have been
16  asked.
17  MR RABINOWITZ: Again, I don't want to take up time debating
18  with my Lord, but I'm not putting this —— your Lordship
19  says there are three ways in which one could put this,
20  I'm not putting it on the basis that it was a contempt
21  of a court order. My point about this is in
22  circumstances where —— can I just put one question
23  because I don't want to ——
24  MR JUSTICE ANDREW BAKER: I don't want to take excessive
25  time about it but ——

38

1  MR RABINOWITZ: I don't want to be unfair to the witness ——
2  MR JUSTICE ANDREW BAKER: —— you have heard from me my
3  concern, both as to the relevance ultimately and it may
4  be a degree of fairness to the witness of certain uses
5  it may be you have in mind to seek to put this evidence,
6  particularly in relation to factual activity that
7  concerned SCP rather than SCL.
8  MR RABINOWITZ: And I'm going to ask one or two more
9  questions, but to be very clear, I'm not going to make
10  a case about being in contempt of a court order.
11  I don't need to go that far and I'm not going to go that
12  far.
13      Mr Shah, you were asked —— you have made the point
14  and the learned judge has highlighted the fact that this
15  is a letter to SCL and not SCP, but it is right to say,
16  as indeed you yourself said in answer to a question
17  a few moments ago, that SCL had transferred its business
18  to SCP back in March 2012. So that SCL, any business
19  that SCL had conducted was now being conducted by SCP
20  after 2012; correct?
21  A. Yes, that's correct.
22  Q. Do you not think it would have been at the very least
23  helpful, if HMRC were trying to understand the extent to
24  which you might have documents relevant to what Zeta
25  were up to, to have explained that there were

39

1  transactions involving SCP which had taken over the
2  business of SCL in March 2012?
3  A. Well, this looks like a historic enquiry in December ——
4  in 2014 by HMRC, referring to matters three years
5  earlier. This letter is from SCL. If SCP had replied
6  to HMRC I can't remember if they did but that would be
7  something for somebody from SCP, for example
8  Anne Stratford, to provide evidence of.
9  Q. Okay. We are going to ——
10  A. And just to repeat, I don't think there is anything
11  dishonest in this letter.
12  Q. You have said that. I'm going to move on to
13  a different ——
14  MR JUSTICE ANDREW BAKER: For what it is worth and for
15  future purposes when we are considering submissions, do
16  we actually have the court order?
17  MR RABINOWITZ: We haven't been able to see it, my Lord.
18  MR JUSTICE ANDREW BAKER: All right, thank you.
19  MR RABINOWITZ: Can I turn next, Mr Shah, to agreements that
20  were executed between these early Solo withholding tax
21  applicants and Ganymede. They were agreements under
22  which Ganymede became entitled to a percentage share of
23  withholding tax refund from SKAT, correct?
24  A. Could we —— could I see the agreements on the screen?
25  Q. I'm going to take you to them in a moment. Are you

40

Opus 2
Official Court Reporters

transcripts@opus2.com
020 3008 6619

Confidential

SKAT_MDL_001_00838256

DX5782, page 11 of 49

1   unable to answer the question I have just asked you
2   without looking at the agreement? If that is so, that's
3   fine.
4   A. I don't recall agreements specifying specific
5   percentages, no.
6   Q. We will take this a little more slowly. Let's start
7   with this. Ganymede is a company which was in 2012 100%
8   ultimately owned by you, correct?
9   A. Yes, correct.
10  Q. Can you go, please, to your first witness statement at
11  {V/27/95}. Can I ask you, please, to read —— thank you
12  very much —— paragraphs 536.4 and 536.5 to yourself,
13  please.
14  A. Yes. Do I need to go over the page?
15  Q. 536.5 ...  No, I don't think you do.
16  A. Okay.
17  Q. Thank you. Now, in paragraph 536.5 you describe the
18  payments made to Ganymede as "success fees", yes?
19  A. Yes, correct.
20  Q. And you call these success fees, Mr Shah, because any
21  entitlement to the payment to Ganymede wouldn't arise
22  unless and until the application for withholding tax
23  refund had been successful, correct?
24  A. Yes, correct.
25  Q. If we can just on this go back to paragraph 517 of your

41

1   witness statement. That is at page {V/27/91}, please.
2   Thank you. In paragraph 517, which you can now see, you
3   say that the fees would not have to be paid to Ganymede
4   unless and until a withholding tax refund was received.
5   Do you see that?
6   A. Yes, I see that.
7   Q. And that makes sense, as we will see when we look at the
8   contract. In the same paragraph, that is at 517,
9   however, you also say that:
10  "... it was stipulated in the agreement that the
11  clients' payments to Ganymede was discretionary."
12  Do you see that?
13  A. Yes.
14  Q. That is in fact wrong, do you agree?
15  A. I would have to see the agreement. I can't remember all
16  the details of the agreement.
17  Q. Let's have a look at one of the early plans just to see.
18  {MTKC5/109/1}, please. Thanks very much. So you see on
19  page 1 that this is a tax reclaim advisory services
20  agreement dated 1 June 2012, made between Sander Gerber,
21  that is one of the Zeta plans, and Ganymede; do you see
22  that?
23  A. Yes, I can see that.
24  Q. If we then go to page {MTKC5/109/5}, please. You can
25  see that it was in fact signed, this agreement was

42

1   signed by Rajen Shah, do you see?
2   A. Yes, I think he was a director at the time of Ganymede.
3   Q. Okay. But you would obviously have been aware of this
4   agreement at the time?
5   A. I may not have been aware of the details of the
6   agreement, but I would have been aware of the existence
7   of the agreement, yes.
8   Q. And what its key terms provided, presumably?
9   A. Probably, yes.
10  Q. Can we go, then, to page {MTKC5/109/3}. Thank you. On
11  page 3, if you look at clause 1, this provides that:
12  "The Advisor [that is Ganymede in this agreement]
13  will carry out the Services for and on behalf of the
14  Client."
15  And that is the pension plan, yes?
16  A. Yes, I can see that.
17  Q. And you can find the definition of "Services" at the top
18  of this page, immediately above where we have just
19  looked, defined as meaning:
20  "... tax reclaim advisory services —..."
21  Yes?
22  A. Yes, I can see that.
23  Q. Then if you look at clause 2 on the same page, that
24  provides that a fee is payable to Ganymede for the
25  services.

43

1   A. Yes, I can see that.
2   Q. In particular clause 2.1. And then you can see that it
3   is payable, in the introductory language to clause 2:
4   "... within two (2) Business Days of receipt by the
5   Client of the Refund."
6   Yes?
7   A. Yes, I can see that.
8   Q. That language indicates that the payment is mandatory,
9   the fee is payable within two days. There is no
10  discretion there, is there?
11  A. There is another question of agreements that refer to
12  advisory services. This agreement on the first page
13  looks like tax reclaim services, so in this context
14  I think this agreement was issued in the event that
15  Ganymede actually was involved in the submission of
16  withholding tax refunds directly to a tax authority.
17  That is my —— that is what I think. But I do know that
18  this agreement that I see looks different to some other
19  agreements that I have seen, and yes, it could be the
20  case that this was in relation to if Ganymede was
21  actually involved in the submission of reclaims. So
22  obviously it is an agreement that exists, but the first
23  page refers to this as a tax reclaim service, rather
24  than consultancy services or advisory services.
25  Q. Mr Shah, to be fair to you, can you look at the

44

Confidential

1    definition of "Services", which is at the top of the
2    page. It:
3         "... means tax reclaim advisory services-..."
4    A. Yes.
5    Q. Okay, so this is still not about Ganymede actually
6    getting involved, but actually providing, as you
7    describe, or as they are described in this agreement,
8    advisory services; yes?
9    A. Yes, but I would say that there is a different
10   generation of Ganymede agreements that show
11   a discretionary payment.
12   Q. And ——
13   A. I would imagine that those agreements are in possession
14   of SKAT.
15   Q. We will come to those agreements and again, to be fair
16   to you, they do use different language in a variety of
17   different ways and we will come on to them in due
18   course.
19        But there are no other agreements in relation to the
20   pension plans that we have been talking about, which is
21   to say Zeta and the original Argre plans. These are the
22   only agreements that exist between Ganymede and —— this
23   is the Zeta one, but the same is true in relation to
24   Argre. The other form applies much later in relation to
25   other withholding tax applicants, okay.

45

1    A. Okay, that makes sense. Maybe these were the only
2    agreements in existence in 2012 and in subsequent years
3    the agreements were replaced with newer agreements.
4    Q. Yes. Just following through what this agreement
5    actually provided, though, you can see that the word
6    "Fee" in clause 2 is capitalised, obviously meaning it
7    is defined. If you go back to page {MTKC5/109/2}, so if
8    we scroll up a page, about halfway down the page you can
9    see the definition of "Fee" and it is:
10        "... the fee equal to the Relevant Percentage
11   multiplied by the Net Refund Amount."
12        Do you see that?
13   A. Yes, I see that.
14   Q. And again, I don't want to take too much time over this,
15   because we can all read the contract, but if you go a
16   few definitions down:
17        "Net Refund Amount means the Refund Amount less any
18   Costs."
19        Do you see that?
20   A. Yes.
21   Q. And "Refund Amount" we are told is the amount listed in
22   column 3 of the table in the schedule, and we can go to
23   that page ——
24   MR JUSTICE ANDREW BAKER: If we can just, because it will be
25   quicker if you pick up costs now as well, so we don't

46

1    have to come back here.
2    MR RABINOWITZ: "Costs means any amounts payable to the
3    Refund Agent in relation to the Refund."
4         Can you see that?
5    A. Yes, I can see that.
6    Q. If we then go to page {MTKC5/109/6} to look at the
7    schedule to which reference has been made, you can see
8    on this schedule a refund amount identified for each of
9    the companies in respect of which a reclaim application
10   has been or is to be made. Do you see that?
11   A. Yes, I see that.
12   Q. And there is a mix of Belgian and Danish shares here,
13   yes?
14   A. Yes, I see that.
15   Q. The percentage identified for the Belgian shares when
16   the amount is in euros is 60%; do you see that?
17   A. Yes.
18   Q. And when the amount identified is for Danish shares, the
19   amounts are in krone and the percentage is slightly
20   higher at 62.96%, so just under 63%; correct?
21   A. Yes, that's correct. I see that, yes.
22   Q. And we have seen already the definition of "Costs". So
23   under this agreement, Ganymede would be entitled to
24   a fee which was just under 63% of the refund amount
25   actually received, less the cost paid to the refund

47

1    agent; correct?
2    A. Yes, that's correct.
3    Q. And obviously whatever the position was in relation to
4    later agreements, these early agreements involved
5    a precise formula and there was no discretion, correct?
6    A. Yes, that's correct, I agree.
7    Q. Now, the Solo withholding tax applicants were all
8    clients of Solo's GSS division, correct?
9    A. Yes, that's correct.
10   Q. Why were these fees being paid to Ganymede and not Solo,
11   Mr Shah?
12   A. Well, I think on the face of it, it looks like the tax
13   reclaim advice was coming from Ganymede rather than
14   Solo.
15   Q. The tax reclaim advice was coming from Ganymede —— what
16   was it that ——
17   A. I think this is a tax reclaim advisory agreement.
18   Q. Yes.
19   A. So this is what Ganymede is providing, it looks like.
20   I must say that at this point in time it was Raj Shah
21   who was the director, so I ——
22   MR JUSTICE ANDREW BAKER: Mr Shah, it is the judge. Might
23   I invite you just to pause. I envisage —— you tell me
24   if I am wrong, and if I am wrong, that is fine. But
25   I envisage that if you had asked any of these clients to

48

Confidential                                                                                                         SKAT_MDL_001_00838258

1  sign exactly the same agreement where SCP, through its
2  GSS desk, was identified as the adviser, they would have
3  signed and that is what would have happened and
4  therefore I think the premise of the question is one way
5  or the other, surely it was your choice to have this bit
6  of the cash flow that was being generated ultimately for
7  the benefit of Ganymede rather than Solo; why did you
8  make that choice?
9  A.  I see, sorry, yes.  The (inaudible — overspeaking) ——
10 MR JUSTICE ANDREW BAKER:  If it was not your choice — let
11 me finish — let me finish.  If it was not your choice,
12 I have the premise of my interruption wrong and
13 I apologise.  If it was your choice, I think it was
14 pretty obvious that is what Mr Rabinowitz was asking
15 you, and you should perhaps just concentrate on
16 answering what you are being asked.
17      So if it was your choice, why did you choose to put
18 this bit of the cash flow through Ganymede rather than
19 keeping it in Solo?
20 A.  Well, the answer to the question is I don't believe it
21 was my choice, as I was not the director of this company
22 at the time.  To give you a fuller answer, I would
23 assume that it is more tax—efficient to have fees paid
24 to a company that didn't pay corporation tax rather than
25 a company that does have to pay corporation tax in the

49

1  UK. So this looks like tax planning and this would be
2  most likely at the suggestion of the tax structurers.
3  MR RABINOWITZ:  Mr Shah, it may well have been about tax
4  planning, but you were in ultimate control of Ganymede,
5  you were in ultimate control of SCL, you were in
6  ultimate control of SCP.  The suggestion that this was
7  not your choice cannot be right.
8  A.  Well, there are other ways to get the payment to me
9  tax—efficiently using SCP.  So I think the decision to
10 use Ganymede doesn't really make too much difference
11 compared to using SCP.
12 Q.  All right.  Can I ask you this, Mr Shah.  We know, of
13 course, that the whole basis of the application made to
14 SKAT was that the US pension plan had suffered
15 a withholding of tax in relation to a dividend received
16 by the plan, correct?
17 A.  Yes, that's correct.
18 Q.  Given that, Mr Shah, why do you say it made sense that
19 rather than the US pension plan being able to keep the
20 substantial part of what SKAT was paying by way of
21 a refund, it should be Ganymede that should have that
22 money, or around 60% of it?  What is it you say you were
23 contemplating?
24 A.  Well, this was in line —— my recollection is this is in
25 line with the charges that were being offered by the ——

50

1  what I would call the other clearers, custodians and
2  prime brokers.  It is my recollection that
3  Macquarie Bank, ED&F Man and Investec, who offered
4  similar services, were charging in excess of 50%.  We
5  didn't force the US pension plans to do business with
6  us, but this looks like they agreed that they are happy
7  to pay this money to Ganymede or to me, ultimately, for
8  providing the services that Solo provided.
9  Q.  So because of what Solo provided or you personally
10 provided, because Ganymede was your company, you felt
11 entitled to keep 60% of what apparently was tax which
12 was withheld from them?
13 A.  To me, this looks like a commercial arrangement that
14 both parties agreed to.
15 Q.  I'm just trying to understand what it is that you think
16 you provided, Mr Shah, which ——
17 A.  Well, okay.  So I can see according to this particular
18 agreement the services being provided are tax reclaim
19 advisory services and it looks like the clients
20 voluntarily agreed.  I don't think they were forced.
21 I don't think a gun was put to their head to sign the
22 agreement.  It looks like both sides of the agreement
23 signed the agreement willingly.
24 Q.  That is true, Mr Shah, plainly.  We have the document
25 which was signed.  That wasn't my question.

51

1  A.  Yes.
2  Q.  What was it that you consider that you provided ——
3  Ganymede, (inaudible) —— which meant that —— maybe you
4  didn't think it was appropriate that you should be
5  getting 60% of this, but if you did, what is it that you
6  provided in relation to the scheme which meant that you
7  should get to keep 60% of the proceeds of what
8  apparently was their withheld tax?
9  A.  Well, in my witness statement I say that Ganymede
10 provided an introduction to Solo, Ganymede I think also
11 did some other work on behalf of the pension plans, for
12 example negotiating lower reclaim agent fees,
13 negotiating lower brokerage fees, and the charges were
14 in line with the markets, as it were, at the time.  So
15 that's a fuller answer.
16      This particular agreement refers to tax reclaim
17 advice, but in later agreements I think the agreements
18 are broader, to just cover any type of consultancy or
19 advisory work, and that would include an introduction to
20 SCP and therefore I have described the fees paid as ——
21 they can be classed as introduction and/or success fees.
22 Q.  Mr ——
23 A.  But ultimately, yes, I think success fees is probably
24 the best description, yes.
25 Q.  Mr Shah, why can't you simply answer that by saying what

52

Confidential

DX5782, page 14 of 49

SKAT_MDL_001_00838259

1  you provided was a facility which would enable these
2  pension plans to recover money which, on the basis that
3  it was tax withheld in circumstances where they had
4  never held any actual shares, never advanced any money
5  but were in effect getting money for free from SKAT; why
6  can't you answer the question in that way, because they
7  were getting free money from SKAT, weren't they?
8  A. No, I disagree with that comment.
9  Q. They were not getting free money from SKAT? They didn't
10  put any money in, they never did anything other than
11  what you told them to do, and in the end, like a magic
12  money tree, SKAT was giving them money, and what you
13  were asking to be paid for was having set up a scheme
14  which enabled them to get money in that way?
15  A. The services provided by Solo were custody and clearing.
16  Services for Ganymede I have just covered. The ability
17  for the investors, so the US pension plans and the
18  Labuan companies, that were able to engage in genuine
19  trading and they were able to submit genuine withholding
20  tax reclaims and this was all possible due to the legal
21  loophole that existed at the time. There was no magic
22  involved. There was no dishonesty involved. There was
23  no fraud involved. That is my recollection.
24  MR JUSTICE ANDREW BAKER: Is it your evidence, then, that
25  you were providing ultimately, in your mind, access to

53

1  the legal loophole, or access to the exploitation of
2  a legal loophole which you say you regarded as legal
3  even if others might have regarded it as, for
4  reputational reasons, a type of trading they didn't want
5  to do?
6  A. Yes, so Solo were providing access to allow these
7  clients to access the loophole, but as well as Solo
8  there were other providers doing the same thing with
9  other clients.
10  MR RABINOWITZ: My Lord, I'm about to move on.
11  MR JUSTICE ANDREW BAKER: Is that the time? Yes, thank you.
12  Mr Shah, it is 10.55 and Mr Rabinowitz was going to
13  move to a slightly different topic, I think, so we will
14  take our mid—morning break at this point.
15  Just one practical matter, Mr Rabinowitz, is it
16  still the case that you are not available tomorrow and
17  therefore tomorrow's cross—examination will be by
18  Mr Goldsmith on it may be slightly different or discrete
19  topics?
20  MR RABINOWITZ: That is still the case.
21  MR JUSTICE ANDREW BAKER: I am sure you would, without my
22  saying this, but you will have particularly in mind,
23  therefore, that after today from your perspective not
24  only are we breaking for a long weekend because you are
25  not here tomorrow, but we are effectively pausing then

54

1  your cross—examination of Mr Shah for 10 days or so, so
2  I think it is particularly important that you come to
3  a very good logical point that is fair to him to stop,
4  even if that might mean today not taking it all the way
5  to 3 o'clock when you are still in the middle of a topic
6  and saying, in the way one would coming back the next
7  day, "That is a convenient enough place to stop". You
8  need to time the pause to bear that in mind, I think, if
9  that makes sense.
10  Very good. So 10 minutes, please, Mr Shah. Thank
11  you.
12  (10.57 am)
13  (A short break)
14  (11.11 am)
15  MR JUSTICE ANDREW BAKER: Yes, thank you, Mr Rabinowitz.
16  MR RABINOWITZ: Thank you, my Lord.
17  I'm going to move on, Mr Shah, and ask you some
18  questions about the trading counterparties involved in
19  the 2012—2013 trading. We will come on to the position
20  in 2014 later. Can I ask you, please, to go to
21  {F/379.2/1}. This is a treat and Mr Goldsmith is going
22  to take over the EPE, if he may.
23  Just to explain to you, Mr Shah, what we are looking
24  at, it is a schedule prepared by SKAT's lawyers set out
25  all the trades in the 2012—2013 period based on the

55

1  underlying trade documentation. Unless you have any
2  reason to believe that any part that I'm showing you is
3  inaccurate I'm going to ask you to assume that the
4  details set out in the spreadsheet are correct. If it
5  is not correct, then no doubt your lawyers will make
6  sure the court knows it is the case, okay.
7  MR JUSTICE ANDREW BAKER: Mr Rabinowitz, remind me, is this
8  one of the ones we did some going through in
9  openings?
10  MR RABINOWITZ: It is.
11  MR JUSTICE ANDREW BAKER: Mr Shah, you attended remotely
12  while we had the opening sessions on the documents.
13  A. Yes.
14  MR JUSTICE ANDREW BAKER: So you and I will both have seen
15  this and seen Mr Goldsmith selecting and so on to
16  isolate particular parts of it during openings, all
17  right, thank you.
18  A. Yes.
19  MR RABINOWITZ: I hope to go through this fairly quickly.
20  First we are going to look at trades in 2012.
21  Mr Goldsmith is filter to go through that, as he has
22  done. If you look at column E, can you see it now only
23  shows trades with an ex—date in 2012; do you see that.
24  A. Yes, I can see that.
25  Q. Thank you. If we then look at column I, that sets out

56

Opus 2
Official Court Reporters

transcripts@opus2.com
020 3008 6619

Confidential

DX5782, page 15 of 49

SKAT_MDL_001_00838260

1  the equity brokers in 2012 and you can see that there is
2  a single entity, Novus; do you see that?
3  A. Yes, I see that.
4  Q. If we then look at column K, which is called, "Forward
5  entity", but in 2012—2013 that is more a reference to
6  the futures broker. Can you see that there is again
7  a single broker, Novus?
8  A. Yes. So that's the futures broker, yes.
9  Q. And putting the unwinds trades to one side for a moment,
10  as the spreadsheet shows, Novus was the only equity
11  broker and futures broker used for Danish trading by GSS
12  clients in 2012; correct?
13  A. Okay. Can you explain, the orange section are the
14  unwinds; is that correct?
15  Q. Yes, that's right. I am putting that to one side.
16  A. Okay, yes. I can see FGC but they weren't involved in
17  the initiation trades, yes. Okay.
18  Q. You had a long—standing relationship with Novus,
19  correct?
20  A. Yes, it went back a few years, yes.
21  Q. You had used Novus as a broker when you were doing
22  cum—ex trades at Rabobank, yes?
23  A. Yes.
24  Q. And as we have already discussed, Novus was the broker
25  on the Broadgate cum—ex trades in 2010, correct?

57

1  A. Yes, that's correct.
2  Q. And you got to know Mike Murphy the owner of Novus as
3  a result of using Novus as a broker on cum—ex trades;
4  correct?
5  A. Yes, that's correct.
6  Q. You became friends with him, yes?
7  A. Yes.
8  Q. Martin Mann was in charge of structured products
9  brokerage at Novus, correct? Martin Smith, I'm sorry.
10  A. Martin Smith, yes.
11  Q. Thank you. And you also worked with Mr Smith on cum—ex
12  trades where Novus was a broker, whilst at Rabobank;
13  correct?
14  A. Yes, that's correct.
15  Q. And you also worked with him on the Broadgate
16  transaction, correct?
17  A. Yes, correct.
18  Q. Presumably it was as a result of your relationship with
19  Mr Murphy and Mr Smith that Novus became involved in the
20  GSS trading from 2012?
21  A. Yes, that's correct.
22  Q. Mr Murphy and Mr Smith were people that you trusted,
23  correct?
24  A. Yes, correct.
25  Q. If we then look at column H on the spreadsheet, we can

58

1  see that this deals with short seller counterparties and
2  we can see that there are only four short sellers
3  involved in the Solo Scheme in 2012. As you can see,
4  Abra Holdings, Orca Investments, DDC Cayman and
5  BluMarble Capital, yes?
6  A. Yes, could you explain to me why there are some cells
7  with two names or three names? Or two names I can see
8  in some of them. I don't know why that would be,
9  but ...
10  Q. The trades would have been split between two parties
11  where you see —
12  A. Okay, I understand, yes.
13  Q. If you then look at column M, the stock lender column,
14  can you see there is a single stock lend in 2012 and
15  that is Aquila Cayman Limited?
16  A. Yes, I can see that.
17  Q. Can I just ask you some questions about your
18  relationship with the owners of Abra, Orca, DDC,
19  BluMarble and Aquila. Abra was owned by Rajeev Davé,
20  correct?
21  A. Yes, that's correct.
22  Q. And he was a close friend of yours who you had known
23  since college, correct?
24  A. Yes, that's correct.
25  Q. By 2012, you had known him for over 20 years, correct?

59

1  A. Yes, that's correct.
2  Q. And in your witness statement you say that you met
3  Rajeev Davé through Mr Dhorajiwala, but presumably that
4  is an error, because you had known him yourself since
5  college, yes?
6  A. Yes, that's correct.
7  Q. I will give you a reference, paragraph 707 ——
8  A. Yes.
9  Q. Let's not spend time on it, I think it is a clear error
10  and I don't want to waste time on it.
11  It was at your suggestion that Rajeev Davé became
12  a client of (inaudible), correct?
13  A. Yes.
14  Q. Just turning to Orca and DDC, they were owned by
15  Paul Oakley and Owen Mitchell, correct?
16  A. Yes, that's correct.
17  Q. Can we just look at paragraph 430 of your witness
18  statement {V/27/78}. You say at paragraph 430 that you
19  had known Mr Oakley from your time as a trader at the
20  banks and so on, on any view you had known him for
21  a number of years by 2012, correct?
22  A. Yes, that's correct.
23  Q. And just looking at paragraph 431, you also say that you
24  knew Mr Mitchell when he worked at MF Global and you
25  stayed in touch with Mr Mitchell after MF Global went

60

Confidential

DX5782, page 16 of 49

SKAT_MDL_001_00838261

1   bankrupt and you say that at some point you found out
2   that Mr Oakley and Mr Mitchell were business partners;
3   yes?
4   A.  Yes, that's correct.
5   Q.  And then just going back to paragraph 430, you say you
6       were pretty sure it was Mr Patterson who introduced
7       Mr Oakley to Solo.  You see what you say there?
8   A.  Yes, I think I would change that word to "suggested", so
9       it was Mark Patterson who suggested that Paul Oakley and
10      Owen Mitchell should join the GSS platform.
11  Q.  I think this may also be another error.  If you go to
12      paragraph 702 of your first witness statement at
13      page {V/27/127}, it is not important, but I just have to
14      get this right.  Paragraph 702 on page —— I gave you the
15      page, 127, three lines down, you say:
16          "When GSS was operational, I invited Paul to become
17      a client and to sell shares on the platform."
18          Do you see that?
19  A.  Yes.
20  Q.  That suggested it would have been you rather than
21      Mr Patterson who invited Mr Oakley to become a client,
22      because, as you explain in your witness statement,
23      Mr Patterson only joined Solo in March 2013, which was
24      after this date?
25  A.  Yes, that's correct.  Yes.

61

1   Q.  Then if we move on to BluMarble, another of the short
2       sellers, BluMarble was owned by Stuart Wilson; do you
3       recall?
4   A.  Yes.
5   Q.  Thank you.  And again, you had known Mr Wilson for some
6       time, from your time at ING Bank, when he was working at
7       ABN AMRO, yes?
8   A.  Yes, that's correct.
9   Q.  Again, you contacted him to see if he wanted to become
10      a client of GSS, correct?
11  A.  Yes, that's correct.
12  Q.  Okay.  When you contacted Mr Wilson —— let's turn if we
13      can to another of the stock lenders, Aquila.  Aquila was
14      owned by Nilesh —— you are going to have to forgive the
15      pronunciation —— Teraiya?
16  A.  Yes, that's correct and the pronunciation is correct
17      too.
18  Q.  Thank you.  And Mr Teraiya was a friend of yours, yes?
19  A.  Yes, in fact we had worked briefly together at his
20      company Indigo Securities before I started Solo Capital.
21  Q.  And again it was you who invited or introduced your
22      friend Mr Teraiya to the GSS platform at Solo, correct?
23  A.  Yes, that's correct.
24  Q.  Would you have explained to Mr Teraiya when he joined
25      the GSS platform that the purpose of the trading was to

62

1       facilitate  the making of withholding tax applications to
2       SKAT by other Solo clients?
3   A.  No, my conversation with him would have been limited to
4       the activities  of his company on the GSS —— in the GSS
5       business.
6   Q.  Would that be true of all of the other persons that
7       we have been through, that you would simply have told
8       them, in a sense, I don't know if it is seventh eighths
9       or six eighths, which is three quarters, that you would
10      have left out —— sorry, forgive the maths, you would
11      only have told them what mattered to them, and not told
12      them the whole scheme; is that what you are saying?
13  A.  Yes, and that was an easier conversation than with all
14      these individuals who had many years of experience in
15      the dividend arbitrage business.
16  Q.  Okay.  Just generally in terms of the individuals we
17      have been through, so Mr Murphy, Mr Smith, Messrs Oakley
18      and Mitchell, Mr Davé, Mr Wilson, Mr Teraiya, I think
19      you have said they were all people you knew personally
20      and people you trusted, yes?
21  A.  Yes.
22  Q.  And people you felt would have some loyalty to you,
23      correct?
24  A.  Yes, correct.
25  Q.  Would you have told these people that the trading itself

63

1       would not make any material profits for them and any
2       profit would come from the withholding tax refund?
3   A.  At the time I would have told them that the intention
4       was for them to make profits by trading and I wouldn't
5       have told them that income is coming from profits made
6       by pension plans and Labuan companies.
7   MR JUSTICE ANDREW BAKER:  Would you have told them for
8       playing their part in the orchestra, so showing them the
9       third violin part or whatever it might be, but would
10      showing them their part have included an explanation
11      that the trading that you were facilitating  was set up
12      in such a way that they did not have to put any capital
13      on the line or at risk but would be able, in one form or
14      other, to make profits out of the trading?
15  A.  Yes, I would have explained to them the particular role
16      of their company and explained to them how they wouldn't
17      need to provide their own capital in order to trade.
18  MR JUSTICE ANDREW BAKER:  Yes.
19  MR RABINOWITZ:  Just to be clear, Mr Shah, when I asked you
20      whether you would have told these people that the
21      trading itself would not make any material profits and
22      any profit would come from the withholding tax refund,
23      your answer was:
24          "Answer: ... I would have told them that the
25      intention was for them to make profits by trading and

64

Confidential

DX5782, page 17 of 49

SKAT_MDL_001_00838262

1      I wouldn't have told them that the income is coming from
2        profits made by pension plans--..."
3  A.  Yes.
4  Q.  Would you have explained that the only profits that the
5        trading would generate would not come about by reason of
6        them making a profit on their particular trade, but
7        would come about by virtue of a withholding tax
8        application?
9  A.  No, the plan was -- the intention was at the time that
10       each of these companies would make profit by trading.
11       As it turned out, they were paid by Ganymede, but in any
12       event, no, they weren't told that they were receiving
13       any money as a result of withholding tax reclaims.
14  Q.  But Mr Shah, if that was going to happen was that all
15       their trades were going to net to zero or settle at
16       zero, how was it that you could have said to them that
17       they would be making profits by trading?
18  A.  Well, the plan which didn't end up materialising was
19       that these counterparties would have charged a spread in
20       terms of the trading counterparties. In the case of
21       Novus, as a broker, they did earn commission which was
22       standard compared to their other business.
23  Q.  Leave aside Novus which gets commission, but the other
24       parties are all trading, you say it was a plan which
25       didn't materialise, but the whole premise of your GSS

65

1      Trading Model was that all trades would settle to zero,
2        net to zero, and I'm trying to understand, given that
3        that was always the plan, on what basis could you have been
4        saying to them: you will be trading in order to make
5        a profit?
6  A.  Yes, so it would have been possible for these
7        counterparties to unwind their trades at slightly
8        different prices to the pension plans and Labuan
9        companies which would have resulted in the Labuan
10       companies and US pension plans making small losses.
11       Those losses would have found their way into profits in
12       these companies.
13  MR JUSTICE ANDREW BAKER:  Mr Shah, I thought, and maybe I'm
14       getting this wrong again, I thought you had already
15       agreed that it is fundamental to the trading model that
16       everybody who enters into paired transactions that would
17       generate cash obligations, that they are always priced
18       back--to--back, so nobody is ever --
19  A.  Yes, yes.
20  MR JUSTICE ANDREW BAKER:  -- putting in a pricing spread as
21       between, as it were, the two different directions they
22       face in their back--to--back trading?
23  A.  Yes, that's right. I did mention that, that this plan
24       didn't materialise. But when I first approached them
25       I didn't tell them they were going to be trading and not

66

1      making any profits.
2  MR RABINOWITZ:  Did you tell them later that in fact the
3        reason you have never been asked to put in money is
4        because the way in which I have arranged GSS trading is
5        to ensure that all trades are back--to--back and settle to
6        zero?
7  A.  Yes, later on I suggested to them and they agreed that
8        Ganymede will pay them introducing fees, which they were
9        happy with, and they were happy therefore for their
10       companies not to make any profits.
11  Q.  So they all become involved or if they don't become
12       involved they soon learn and then remain involved --
13  A.  Yes.
14  Q.  -- on the basis that they are going to be trading in
15       a way which they know and indeed intend will not produce
16       any profits and they do it because you are paying them
17       a fee through Ganymede; is that right?
18  A.  Yes, that was actually what happened, yes.
19  Q.  So all of this trading is done by people who know that
20       they will not be making a profit and not be making
21       a loss, yes?
22  A.  Yes, the way the trades were designed was that they
23       wouldn't make a -- certainly not a loss, but they
24       didn't make a profit because there was no spread.
25       Can I also just add that one of the reasons why

67

1      I decided that Ganymede should pay them fees is that
2        they -- yes, so they agreed and I agreed that they would
3        be paid totally independent of any other activity. So
4        in my mind their payments were not linked in any way to
5        the receipt of withholding tax reclaims by the
6        applicants.
7  Q.  We will come on to that, Mr Shah.
8  A.  Yes.
9  Q.  I'm going to move on, just because I have to. There is
10       a limit to the amount of time that I can spend on this.
11       But then in 2013 -- we have talked about the 2012
12       trading counterparties, in 2013 there were a number of
13       additional trading counterparties and they were, just
14       tell me if you recognise these names: Mr Alex Körner,
15       Mr Dai Griffiths, Richard Mills and Guenther Klar; yes?
16  A.  Yes, those four individuals I knew well, yes.
17  Q.  You knew them well, you trusted them, and you introduced
18       them to the business of GSS, correct?
19  A.  Yes, that's correct.
20  Q.  And they were obviously people who were loyal to you,
21       correct?
22  A.  Yes. Can I also add that for some of these individuals
23       who hadn't been working for me, they did have years of
24       experience of dividend arbitrage trading and it was
25       useful for me to have such people, because they were

68

DX5782, page 18 of 49

1    able to provide me with information on any market
2    developments while I wasn't in London and also they
3    could tell me if the activity that they were carrying
4    out, for example short selling, was different to their
5    expectations.
6  Q.  And in terms of what you told these people would be
7    involved —— I don't want to go through the whole thing,
8    but can I take it if I asked you what you told them
9    would be involved in the trading and whether they would
10   be making profits and the like, presumably it would have
11   been the same, would it, as what you told the people who
12   became trading counterparties in 2012?
13 A.  Yes.  Yes, the same in 2013, yes.
14 Q.  2013.  So they would be entering into trades not
15   intended to make profits, not going to make losses, but
16   they would be paid a fee by Ganymede for them being
17   willing to be involved in this, yes?
18 A.  Yes, that's correct, yes.
19 Q.  Can I then ask you some questions about the payments
20   made to the counterparties, and if we can start, please,
21   with your first witness statement {V/27/127}.  Can I ask
22   you, Mr Shah, just to look at and read to yourself
23   paragraphs 702 to 704 on this page.
24 A.  Okay.
25       (Pause).  Okay, I have got to the end of 704.

69

1  Q.  Thank you.  I just want to make sure I understand your
2    evidence.  Can I just ask you to say whether you accept
3    that what I am about to say is a fair summary of that
4    evidence.  You say that you didn't enter into any profit
5    sharing agreements with Messrs Oakley and Mitchell, Klar
6    or Körner, correct?
7  A.  Yes, correct.
8  Q.  You also say there were no specific payment formulae for
9    payments —— for the sums paid to them or their entities,
10   yes?
11 A.  Well, there was no agreement, so therefore there was no
12   percentage, yes, correct.
13 Q.  Okay.  And you also say that the amounts received by
14   them were rather based on the value that you thought
15   they brought to the Solo Group and to ensure their
16   loyalty, correct?
17 A.  Yes, correct.
18 Q.  You do accept, I think, that it was you who determined
19   the amounts to be paid to these trading counterparties,
20   yes?
21 A.  Yes, correct.
22 Q.  And the amounts were going to be paid by your wholly
23   owned company, Ganymede; correct?
24 A.  Yes, correct.
25 Q.  That would obviously come out of Ganymede's profits that

70

1    would otherwise come in large part to you, correct?
2  A.  Yes, correct.
3  Q.  So can I suggest to you, Mr Shah, that contrary to what
4    you say in your witness statement, there was in fact
5    a payment formula that was used to determine the amounts
6    received by the trading counterparties.  Do you dispute
7    that?
8  A.  No.  What I'm aware of is a spreadsheet that shows
9    percentages.  That was used for internal purposes and
10   that was to make sure that Ganymede was not made
11   insolvent by paying out more money, but yes, I agree
12   that I personally —— sorry, internally used a percentage
13   of the profits made by Ganymede, but this percentage was
14   not agreed or shared with each of the people who
15   received the money.
16 Q.  So ——
17 A.  Some of the people also received a lump sum that was not
18   related to any type of percentage.
19 Q.  Again, I just want to understand what you are saying.
20   You are saying that there was a specific payment
21   formula, but it was used by you to ensure that Ganymede
22   was not going to go insolvent, but it did not reflect
23   what these people were paid?
24 A.  No, it did reflect what —— there was a formula that was
25   used to calculate how much to pay them, but this formula

71

1    was not shared with them and there was no agreement.  So
2    when it came to paying them fees an amount would be
3    offered to them and that amount would then be agreed or
4    disputed by them.
5  Q.  But that was a formula which was —— the amount was
6    determined by reference to a formula, a specific payment
7    formula.  Leave aside whether there was an agreement or
8    not.  We will come on to that.  The amount that you
9    paid ——
10 A.  Yes, yes, correct, yes.
11 Q.  —— was the result of the application of a specific
12   payment formula relating to that particular person, yes?
13 A.  Yes, correct.
14 Q.  Okay.
15 A.  Sorry, in most cases but I think in not all cases.
16 Q.  All right.  That payment formula, Mr Shah, was you take
17   the number of shares traded by the relevant counterparty
18   and you multiply it by a percentage of the gross
19   dividend, correct?
20 A.  Yes, either that or a percentage of the withholding tax
21   reclaim amount.  I can't remember.
22 Q.  In terms of whether there was an agreement or not or an
23   understanding, even, can we just look, please, at
24   {F/386/14}.
25 MR JUSTICE ANDREW BAKER:  Mr Shah, it is the judge.  Just

72

Confidential                                                                     SKAT_MDL_001_00838264

1    for my purposes, on that last observation, where you
2    said:
3         "Answer:  ...  either that or a percentage of the
4    withholding tax reclaim amount—..."
5         In the context of the Danish trading, the
6    withholding tax reclaim amount that you were indirectly
7    involved in was always going to be 27% of the declared
8    dividend, correct?
9  A.  Yes, plus Belgium as well.
10 MR JUSTICE ANDREW BAKER:  Right, and therefore there's
11   a sense in which it doesn't really matter whether you
12   choose the gross dividend amount or the withholding tax
13   amount as the figure you are going to use in the
14   formula, although of course the percentage that you
15   would use would be a different percentage if you were
16   basing it on the withholding tax which is only 27% of
17   the gross; is that ——
18 A.  Yes, so I can't remember if it was one or the other.
19 MR JUSTICE ANDREW BAKER:  All right, thank you.
20 MR RABINOWITZ:  We will see exactly what it was in a moment.
21       We have on screen the opening submissions for trial,
22   as you can see, there is a kind of heading above that,
23   or notice.  The openings submissions for trial of
24   Messrs Oakley and Mitchell, okay.  If we can just look
25   at what they say at paragraph 37.  Do you see where they

73

1    say:
2         "It is not denied that a fee structure was in
3    place ..."
4         Do you see that?
5  A.  Okay, yes.
6  Q.  And then in the last two sentences they say:
7         "O&M charged between 1.75% and 2% all—in points
8    based on the 100% dividend per share (EG/Nominal share
9    amount x dividend per share x 22% = fee)."
10        Do you see that?
11 A.  Yes, I see that.
12 Q.  And that is the same payment formula I have suggested to
13   you, correct?  100% dividend being the gross dividend?
14 A.  Yes, and "all—in points" just means percentage.
15 Q.  Okay.
16 A.  Dividend percentage, as in —— yes.
17 Q.  All right, we can go ——
18 A.  One all—in point is 1%, yes.
19 Q.  How would they have known —— they say here that O&M
20   charged between 1.75% and 2%; how would they have known
21   to charge that, if there wasn't an agreement or an
22   arrangement in place between you and them, Mr Shah?
23 A.  Yes, it is a market rate for short sellers .  So the
24   market rate for short sellers  is around 2 to 3 dividend
25   points, that is my recollection, and that wouldn't just

74

1    be specifically  for Oakley and Mitchell, it would be for
2    any interbank trading, for example.  That had been
3    a standard percentage for many, many years.
4  Q.  What you have identified is a range of around 2—3
5    dividend points.  They are very specific  as to what it
6    is they were able to charge and what you would pay, so
7    there must have been some communication and agreement
8    between you, Mr Shah, as to where in what you say is the
9    standard market range the particular amount they were
10   going to get was going to be fixed?
11 A.  Yes, with these experienced traders,  it would have been
12   understood that the amount that they would expect to
13   receive would be the market amount, yes.
14 Q.  There may be an expectation on their part, but ——
15 A.  Yes.
16 Q.  —— there would have to have been a discussion and an
17   agreement with you, Mr Shah, that that is in fact what
18   you were going to pay them?
19 A.  Yes —— well, yes, in my statement I say that there was
20   no agreement.  There was no written agreement.  I would
21   call it an understanding.  I —— yes.  So I would say
22   that they were said that they were expected to get paid.
23 Q.  So there was an agreement but it wasn't in writing?
24 A.  Yes, there was an understanding, but I can't remember
25   any specific  conversation where they said on this trade

75

1    we are going to charge 1.75% and another one where they
2    would charge a different amount.  They provided an
3    invoice and it fell within my parameters, so Ganymede
4    was happy to pay.
5  Q.  All right.  Mr Shah, I suggest that your witness
6    statement, and we will go through a few more examples ——
7  A.  Yes.
8  Q.  —— your witness statement and the way it deals with
9    this is misleading, to say the least, because there
10   was ——
11 A.  Well ——
12 Q.  I'm sorry.
13 A.  I would say that my witness statement was based on my
14   recollection at the time of writing that witness
15   statement, not having been able to see a lot of
16   documents that would have given me a more accurate
17   recollection .
18 Q.  I suggest to you the answer you have given is not
19   satisfactory , but we will come back to that, if I may.
20       I want to, for the moment, just go to {B/62.3/15}.
21   Again, this is —— we can't see it at the top of the
22   page, but it is from Mr Klar's defence, and if we can
23   look at paragraph 45A(8) on the screen, he says:
24       "...  the size of the Amalthea and Cork payments were
25   calculated to reflect  0.5% of the gross dividend which

76

Confidential

SKAT_MDL_001_00838265

1    was the industry standard for brokerage services of the
2    nature provided by Amalthea and Cork."
3        And again, Mr Klar obviously accepts that his
4    trading counterparties got a share of the gross dividend
5    as well, correct?
6  A. Well, I don't —— I wouldn't say they got a share of
7    the gross dividend, but yes, the fee was a percentage of
8    the gross dividend.  So I wouldn't say they received any
9    part of the gross dividend.
10 Q. Are you simply saying that the money that they were paid
11   was not exactly the same money as came into your account
12   from the withholding tax?
13 A. No —— yes.  So the only income that came in was from the
14   investors, but I wouldn't say that Mr Klar's companies
15   received a percentage of that.  In fact, in many cases
16   money was paid out by Ganymede before receiving
17   a corresponding, incoming payment from its other clients
18   in the US and Labuan.
19 Q. But in any event the agreement was that they would get
20   0.5% of the gross dividend as their fee, whenever it was
21   paid?
22 A. Yes —— yes, or a different percentage of the withholding
23   tax reclaim.  But the —— yes, but I think it is
24   interesting also to say that this was a standard as
25   well, the industry standard.

77

1  Q. And it would be right to say that Ganymede would not
2    have paid these trading counterparties, including
3    Mr Klar, any part of the gross dividends or any part of
4    the dividend withheld if the percentage, the withheld
5    27%, had not been paid by SKAT; correct?
6  A. The money received by Ganymede came from Belgian
7    reclaims as well as Danish reclaims.  The money was
8    mixed together and in many cases money was paid out from
9    that single pot.  So I wouldn't say it is easy to trace
10   the money that was paid out ——
11 MR JUSTICE ANDREW BAKER:  Mr Shah, I don't think the
12   question is about tracing, which is not really a matter
13   for you anyway, it is a legal and accountancy matter.
14 A. Yes.
15 MR JUSTICE ANDREW BAKER:  I think the question was more
16   a factual one, that if —— we are focusing on the Danish
17   trading —— if for a particular trade in which let us say
18   Amalthea had been involved, the associated tax reclaim
19   had not been paid by SKAT, Mr Rabinowitz is putting to
20   you that in those circumstances Amalthea would not have
21   been paid by Ganymede any fee or commission, or whatever
22   label was put on it, relating to that transaction,
23   because the tax reclaim had failed.  Do you agree with
24   that or not?
25 A. No.  For any one particular withholding tax reclaim the

78

1    payment paid out by Ganymede wasn't dependent on the
2    payment of the withholding tax amount.  Now, if
3    withholding tax was not paid, there would come a point
4    in time that Ganymede would become insolvent, but the
5    payment going out to Amalthea and Cork and also to the
6    Oakley and Mitchell companies was not dependent on
7    receiving money from the US pension plans, so the
8    payment ——
9  MR RABINOWITZ:  Mr Shah, you could be saying one of two
10   things.  You could be saying: even if it became clear
11   that there wasn't going to be a refund of withholding
12   tax in respect of particular trades, I would still have
13   paid them and they would still have expected to be paid.
14   Or you could be saying: I would have paid them even
15   before the money came in from SKAT.
16 A. Yes, what I am saying is that the payment out to these
17   companies was not dependent on the income.
18 Q. Are you therefore saying your evidence is that even if
19   these applications failed, you would still have made
20   a payment to them which was number of shares times gross
21   dividend times the particular percentage?
22 A. Yes, correct, yes.  So in the case of a short seller,
23   for example, they would earn, let's say, 2%, regardless
24   of whether the withholding tax applicant receives their
25   withholding tax reclaim or not.

79

1  Q. I suggest to you, Mr Shah, that is not true.  Was there
2    ever an occasion on which that happened?
3  A. On which what happened; that withholding tax reclaims
4    were not paid or that money was paid out before
5    receiving money?
6  Q. You can put it whichever way you like, but you can't
7    point to a single example, can you, of a payment being
8    made in circumstances where no withholding tax was
9    received?
10 A. I think that did happen around the time that SKAT's
11   allegations started, around September 2015, when money
12   had to be paid out and money hadn't been received.
13 Q. But that was paid out in the expectation that there was
14   going to be money received?
15 A. No, I do remember paying Oakley and Mitchell's companies
16   after the investigation had started and those payments
17   would have been made knowing that no further income was
18   coming in.
19 MR JUSTICE ANDREW BAKER:  Mr Shah, prior to that happening,
20   which of course we all now know is the start of what
21   eventually has led to this trial and the trial that you
22   are undergoing in Denmark as well, prior, therefore, to
23   what happened in August, September 2015, was there any
24   point at which a withholding tax reclaim generated by
25   the Solo Model was not paid so as to test this question

80

Confidential

1    of whether you went ahead and paid the short seller or
2    the forward counterparty anyway, or prior to this point
3    of August, September, 2015, did every reclaim put in, as
4    far as you remember, succeed?
5  A.  Yes, every reclaim that was submitted was paid, as
6    expected, until September 2015.  The point I'm trying to
7    get across is that Ganymede took risks because they were
8    paying out money and not having absolute certainty that
9    money was coming in.  If that continued for a length of
10   time, then Ganymede would have become insolvent.
11 MR RABINOWITZ:  You say you were paying out money and not
12   having absolute certainty, but until the balloon went
13   up, until 2015 when there was an investigation started,
14   there wasn't an occasion in which you were not paid and
15   therefore you had no basis to think you would not get
16   paid for as long as you were making these applications,
17   Mr Shah?
18 A.  Well, just —— I think what is relevant to this
19   conversation is the fact that the Belgium reclaims took
20   typically more than one year to pay and the Danish
21   reclaims took, I would say, about a month to pay —— to
22   be paid.  So certainly in the case of Belgium, Ganymede
23   was paying money out without knowing whether a reclaim
24   was going to be paid or rejected.  Less so in the case
25   of Denmark, but I don't have a precise recollection of

81

1    Ganymede having to receive income in order to pay out
2    that income, so the payout —— payments going out was not
3    dependent on the income coming in.
4        So from that perspective, Ganymede was taking risk
5    on the withholding tax reclaims being paid.  But I would
6    say fortunately all of the reclaims did get paid, so
7    there was no scenario where a reclaim didn't get ——
8    didn't get paid until September 2015, and then from that
9    point there were some large payments that were made by
10   Ganymede, having not had the income that it was
11   expecting.
12 Q.  Can we go next, please, to {MTKC8/137/1}.  Again, it is
13   a spreadsheet and Mr Goldsmith will take over the EPE,
14   please.  Thank you.  If we can first look at the
15   metadata, you can see that the spreadsheet was created
16   by Mr Horn on 9 May 2013 and it was last modified by
17   Mr Forsyth on 12 May 2013.  Yes?
18 A.  Yes, I can see that.
19 Q.  We have already covered this, but both Mr Horn and
20   Mr Forsyth were involved in the GSS division, correct?
21 A.  Yes, correct.
22 Q.  And they obviously reported ultimately to you, correct?
23 A.  Yes, correct.
24 Q.  Can we have a look, please, at column A, at rows 89 to
25   99.  Thank you.  Do you see those, 89 to 99?  If we just

82

1    take them in turn, at row 89 you see Novus, Mr Murphy's
2    broker; yes?
3  A.  Yes, I see that.
4  Q.  Row 90: AQU01, Mr Teraiya, stock lender Aquila; yes?
5  A.  Yes, I see that.
6  Q.  Row 91: COL01, Mr Smith's stock lender Colbrook; yes?
7  A.  Yes, I see that.
8  Q.  92 is Mr Klar, stock lender Amalthea?
9  A.  Yes, I see that.
10 Q.  And 93 is Abra, that is Rajeev Davé, short seller?
11 A.  Yes.
12 Q.  94 is Orca, that is O&M's short seller?
13 A.  Yes, I see that.
14 Q.  95 is another O&M short seller, it is the second one,
15   that is DDC; do you see that?
16 A.  Yes, I see that.
17 Q.  96 is Blumarble, that is Mr Wilson's first short seller?
18 A.  Yes, I see that.
19 Q.  97 is Mr Wilson's second short seller, Chem Capital?
20 A.  Yes, I see that.
21 Q.  98 is Mr Körner's short seller, Rock Capital?
22 A.  Yes.
23 Q.  99 is Mr Mills' short seller, GMG, yes?
24 A.  Yes, I see that.
25 Q.  If you now look in respect of those same rows, so it's

83

1    89 to 99 at column C, and it's starting with Oakley and
2    Mitchell and their short seller companies, that is rows
3    94 and 95, you can see that the spreadsheet records Orca
4    and DDC and you see that there are two figures for them,
5    2 in column C and then in column D, 1.75, yes?
6  A.  Yes, I see those.
7  Q.  And those figures match the percentage of the gross
8    dividends which Messrs Oakley and Mitchell have
9    themselves expressly acknowledged were the commissions
10   charged by them; yes?  We have seen that.
11 A.  Yes, I see that.
12 Q.  So Oakley and Mitchell's entities were due 2% of the
13   gross dividend initially and 1.75% later, correct?
14 A.  Yes, that is not clear from this spreadsheet but yes,
15   I accept that those two numbers are there and they are
16   probably going to be used in formulae in the main table.
17 Q.  Okay.  If we look next at Amalthea, row 92, another
18   stock lender, you can see that shows 0.5%, or 0.5,
19   I'm sorry, and that again matches what Mr Klar said was
20   the percentage of the gross dividend to which his
21   entities were entitled; do you recall that?
22 A.  Yes, I remember that, yes.
23 Q.  And so the figures in rows 92, 94, 95, of column C4,
24   Amalthea, Orca and DDC, do appear to reflect the
25   percentages of gross dividend to which the identified

84

Confidential

1   trading counterparty or the owners were entitled, yes?
2   A.  Yes.  Well, I'm assuming that the formula is based on
3       those numbers converted to a percentage and multiplied
4       by the gross dividend, but, yes.
5   Q.  Indeed, we will see that.  If we can then look at some
6       of the other percentages identified in the spreadsheet
7       for the other entities .  Novus, at row 89, you see 1% of
8       gross dividend or 1%?
9   A.  Yes.
10  Q.  Aquila and Colbrook, 90 and 91: 0.5?
11  A.  Yes, I see that.
12  Q.  Abra, row 93, is 1; you see that?
13  A.  Yes.
14  Q.  And then BluMarble, Chem Capital, Rock Capital and GMG,
15      all short sellers , at rows 95 to 99, need to get ——
16      well, there is a recording of a figure of 1.5 for them,
17      yes?
18  A.  Yes, I see that.
19  Q.  And those are in fact the percentages of the gross
20      dividend to which those trading counterparties or the
21      owners were entitled, yes?
22  A.  Yes, assuming that were the amounts that were
23      eventually raised as invoices.
24  Q.  In fact, Mr ——
25  MR JUSTICE ANDREW BAKER:  Mr Rabinowitz —— Mr Shah, just to

85

1       assist you on one point that you raised, if Mr Goldsmith
2       could just go to E94, this is  to do with the 2 versus
3       1.75 in relation to Orca and DDC. Do you see that the
4       formula there refers to C94, which is the 2?
5   A.  Yes.
6   MR JUSTICE ANDREW BAKER:  And if Mr Goldsmith goes to the
7       right , again C94, right again, C94.
8   A.  Yes.
9   MR JUSTICE ANDREW BAKER:  But if you now drop down to J,
10      whatever that will be, for DDC.
11  MR RABINOWITZ:  Down one, yes.
12  MR JUSTICE ANDREW BAKER:  Do you see we are now for
13      the March 2013 season, the formula is using the D
14      figure , which is the 1.75?
15  A.  So it looks like Orca was paid 1.75 and DDC was paid 2%,
16      yes.
17  MR JUSTICE ANDREW BAKER:  Other way round, in fact, but it
18      is  also chronological , it 's 2% in 2012 and 1.75% in
19      2013.
20  A.  Okay.  Yes, I see.
21  MR JUSTICE ANDREW BAKER:  You are right it also happens to
22      be the case that on this spreadsheet it is  Orca in 2012
23      and DDC in 2013, I think, but that may be where the
24      change comes in, which I think may be why Mr Rabinowitz
25      was saying 2% and then 1.75% later.

86

1   A.  Okay, yes, that's clear now.
2   MR RABINOWITZ:  Mr Shah, so there was obviously a move from
3       2% to 1.75%?
4   A.  Yes.
5   Q.  There would obviously have been a discussion about that,
6       in order for that to happen, yes?
7   A.  Yes.  I can see now, having seen this spreadsheet, that
8       that would be the case.
9   Q.  And that would have been a discussion between Ganymede,
10      you and Messrs Oakley and Mitchell, in which you said,
11      "You should not be entitled to 2% anymore, you should
12      only be entitled to 1.75%", yes?
13  A.  Yes, that makes sense.  Yes, I think there would have
14      been a negotiation where I could have asked them are
15      they happy with 1.75, yes.
16  Q.  And then they agreed to the 1.75, yes?
17  A.  Yes, that's the most likely  scenario, yes.
18  Q.  So there were in fact agreements about these numbers,
19      people weren't spontaneously ——
20  A.  Yes, I think having just looked at this spreadsheet,
21      I think the case is that my recollection and what
22      I wrote in my witness statement was that there were
23      never any agreements with hard percentages expressed ——
24      sorry, yes, written agreements with hard percentages.
25      Likewise with the agreements that Ganymede had, the

87

1       second generation of agreements with the withholding tax
2       applicants .
3   Q.  Your witness statement didn't say they weren't written
4       agreements, Mr Shah.  You denied that there were any
5       agreements or the use of any specific formulae?
6   A.  Yes.
7   Q.  In fact, you gave the impression it was just up to you
8       to decide how much they were worth for what they were
9       providing?
10  A.  Yes, I remember when I was cross—examined by Mr Head
11      that I said to him that the word "written" should have
12      been added to my witness statement, and that would be
13      a case for these clients  as well.
14  Q.  That wasn't actually on this point, Mr Shah, but are you
15      saying that whenever we see anything which says no
16      agreement or no anything, what we should read that as
17      being is simply the fact that there is  no documents in
18      which the agreement is recorded?
19  A.  Yes, yes, I think just in relation to Ganymede the point
20      there was that there was no written agreement with any
21      hard percentages.
22  Q.  Okay.
23  A.  I accept now that there were verbal agreements, if we
24      can call them that, that the percentages shown on this
25      spreadsheet would be the amounts on the invoices.

88

1  Q.  And just in terms of what we can see from the
2      spreadsheets, it is not just the figures here, the
3      spreadsheet records the whole of the three-—part payment
4      formula that I put to you a moment ago, namely number of
5      shares traded, gross dividend and specified percentage
6      that we have just looked at, and we can see that —— to
7      some extent we have done this —— my Lord has done it ——
8      if we take Oakley and Mitchell as an example, so if we
9      start at row 94 with Orca, we saw in column C it was
10     entitled to 2%.  If you look at cell  G94, we click on
11     it , we can see the percentage —— sorry, the formula at
12     the top; do you see that?
13  A.  Yes.
14  Q.  And there are three parts to that formula.  The first
15     part is the plus sum and then there is a series of
16     numbers and figures in brackets ——
17  MR JUSTICE ANDREW BAKER:  Mr Rabinowitz, unless there really
18     is an additional  line of questioning arising , you are
19     right , we have been there, we have done that, we have
20     got his answers.
21  MR RABINOWITZ:  I'm not going to do that again.  That will
22     save me some time. Can I just see how much I can skip,
23     my Lord, we having done that, or your Lordship having
24     done that. (Pause).
25          Okay, can we go next to {MTKC9/239/1}, please.

                          89

1      Mr Shah, what you see here is an email from you on
2      16 August 2013 to Mr Horn and the subject is DKK, and
3      you can see that you have included an attachment called
4      workbook 1.  Do you see that?
5  A.  Yes, I can see that.
6  Q.  And we can see workbook 1 if we go to {MTKC9/240/1}.
7      Again, it  is a spreadsheet and Mr Goldsmith will
8      manipulate it .  If we can first see the metadata,
9      please.  This was a spreadsheet created and last
10     modified by you, Mr Shah, on 16 August 2013.  Do you see
11     that?
12  A.  Yes, I see that.
13  Q.  So the contents of this spreadsheet at least would have
14     been very clearly known to you, correct?
15  A.  Yes.  At the time.  At this moment, I don't remember the
16     contents.
17  Q.  Okay.  Well, let's see some of the contents, then.
18     Apart from the first tab called "Allocations", each of
19     the tabs refers to a Danish company along with a date.
20     You can see that at the bottom, yes?
21  A.  Yes.
22  MR JUSTICE ANDREW BAKER:  Just because visually it is quite
23     striking , might the witness just be shown that first
24     tab.  When I say striking,  I just mean it looks visually
25     quite different to some of the other spreadsheets we

                          90

1      have been looking at and whether looking at
2      a spreadsheet that looks like that in its  first  tab, you
3      may or may not remember this specific example, but does
4      that look like  a familiar document to you from the time,
5      Mr Shah?
6  A.  Yes, looking at it  now, yes.  Yes.
7  MR RABINOWITZ:  If we can then take a particular spreadsheet
8      just to have a look at that, if we go to
9      TDC, August 2012.  Open that.  Mr Goldsmith has done
10     that for us.  So that relates to the first  trade of
11     Danish shares which was in TDC in August 2012.  In row 3
12     we can see the client codes for the refund applicants,
13     yes?
14  A.  Yes.
15  Q.  So looking at cell  Y3, XIP01, this is obviously
16     a reference —— we have seen this before —— to Xiphias,
17     one of the Argre plans, yes?
18  A.  Yes.
19  Q.  And if you look below that you will see the details  of
20     the reclaim submitted and paid on behalf of those
21     clients , yes?
22  A.  Yes, I see that.
23  Q.  Row 10 sets out the refund amounts paid out in Danish
24     krone, do you see that?  Again, the caption is  all  in
25     column C?

                          91

1  A.  Yes.
2  Q.  And row 11 then sets out the euro equivalent, and again
3      you go back to column C to see that that is what you are
4      being shown, do you see that?
5  A.  Yes, yes, I can see that.
6  Q.  Row 12 then sets out the reclaim fee, so that  is  the fee
7      charged by the tax agents, correct?
8  A.  Yes, that's correct.
9  Q.  And that then gives a net reclaim amount that is
10     calculated in row 13, correct?
11  A.  Yes.
12  Q.  And if you clicked on cell  Y13 you can see that that is
13     calculated by adding the figure in Y12 and Y11, with the
14     number in Y12 being a negative number?
15  A.  Yes.
16  Q.  If you then go down to row 15, that calculates the
17     amount that is retained by what is described there as
18     the "Long", that is to say the pension plan on whose
19     behalf the application was made; correct?
20  A.  Yes, that's correct.
21  Q.  And then under the heading at row 20 you see the
22     calculation of costs, below which are listed the payment
23     to the trading counterparties that we have already seen;
24     do you see that?
25  A.  Yes.

                          92

Confidential

SKAT_MDL_001_00838269

1    Q.  And then row 21, that relates to the applicable
2        percentage and the amount of payment due to the broker,
3        Novus.  Row 22, the amount payable to the stock lender,
4        Aquila; row 23 and 24, the applicable percentages and
5        the amount of payments due to the original short
6        sellers , Abra and Orca.  Do you see that?
7    A.  Yes, I see that.
8    Q.  And if you then look at the numbers in column D, those
9        are the same numbers for each counterparty that we saw
10       when we looked at the earlier spreadsheet, the
11       Horn/Forsyth spreadsheet.  So Novus is entitled to 1%;
12       Aquila to 0.5%; Abra to 1%; Orca to 2%.  Yes?
13   A.  Yes, I see that.
14   Q.  And if you look then at cell  E24, we see that you have
15       calculated the fee owed to Orca for its trading of the
16       TDC shares in 2012 at 243,340 euros; do you see that?
17   A.  Yes, I see that.
18   Q.  And that, you will  recall , exactly matches the amount
19       calculated in the Horn/Forsyth spreadsheet; correct?
20   A.  Yes.
21   Q.  And then below that, rows 29 to 34, you can see
22       a summary table.  Row 30 sets out the total sums payable
23       to Ganymede by the pension plans, do you see that?
24   A.  Yes, yes, I see that.
25   Q.  31 sets out the total  account opening fees that some of

93

1        the pension plans had to pay.  It goes back to cells
2        E10 —— sorry, cell E10 refers to cell  E16.  Do you see
3        that?
4    A.  Yes.
5    Q.  And then row 32 then sets out the total costs, being the
6        fees payable to the trading  counterparties which are
7        a cost to Ganymede, yes?
8    A.  Yes, I see that.
9    Q.  And that then gives the net income to Ganymede in
10       row 33; just over 3 million euros, yes?
11   A.  Yes.
12   Q.  And this is just from the TDC experience.  If I could
13       then ask you then to look at the final  table  in  this  tab
14       beginning at row 36.  As you see, Mr Shah, there are
15       four entries :  first , bonus pool/desk costs, then SS, RS
16       and GH.  Do you see that?
17   A.  Yes.
18   Q.  And the references in 39 to 41 are to you, Rajen Shah
19       and Graham Horn, correct?
20   A.  Yes, correct.
21   Q.  And if you then look at column D in the box, you see
22       that a percentage has been allocated to each of you, 30%
23       for each of you, yes?
24   A.  Yes, I see that.
25   Q.  The remaining 10% to something called bonus pool/desk

94

1        cost; and what was that?
2    A.  That was an amount to cover overheads.
3    Q.  Okay.
4    A.  For the company, yes.
5    Q.  If you then look at column E, the numbers calculated for
6        the three of you are calculated as a percentage
7        identified  for  each of you in column D of the net income
8        which we saw in cell E33, correct?  Effectively  giving
9        you ——
10   A.  Yes, I can see that, yes.
11   Q.  It  is calculating the share of  the overall  profits  from
12       the withholding tax applications once costs have been
13       taken into account for the three of you, yes?
14   A.  Yes.
15   Q.  And you will  recall  —— maybe you won't, maybe you
16       will  —— that the other tabs in your spreadsheet follow
17       exactly the same format, yes?
18   A.  Yes, I would expect that, yes.
19   MR JUSTICE ANDREW BAKER:  Before we switch a tab —— sorry,
20       Mr Goldsmith.
21   MR RABINOWITZ:  He is very quick, my Lord.
22   MR JUSTICE ANDREW BAKER:  Too quick; almost as if he knows
23       where you're going next.
24   MR RABINOWITZ:  He is following the same notes.
25   MR JUSTICE ANDREW BAKER:  Two points of detail, if I might,

95

1        just to  clarify  with you, Mr Shah.  That line 38 —— row
2        38 entry, the description ——
3    A.  Yes.
4    MR JUSTICE ANDREW BAKER:  —— of bonus pool/desk costs, if
5        I was left to my own devices to guess what it might
6        mean, given the language used ——
7    A.  Yes.
8    MR JUSTICE ANDREW BAKER:  —— I might have thought that you
9        were setting  up a bonus pool for the GSS desk employees,
10       obviously not including,  if  they would count as GSS
11       desk, Rajen Shah and Graham Horn, who are more directly
12       profit —sharing.  Is  that right  or wrong?  Because you
13       have said in your answer just a moment ago this was
14       business overheads allowance, which one might have
15       thought was described as business overheads allowance in
16       a spreadsheet.
17   A.  My recollection  is  that the GSS staff  were paid from ——
18       the ones who were employed by Solo would have been ——
19       they would have been paid by the income from the
20       clearing  fees at Solo.  What I think this  refers  to  is
21       payments made to individuals other than Raj and Graham
22       who were helping with the GSS business such as some of
23       the staff  in  Dubai.  I  can't remember if this could have
24       been for, for example, Mark Patterson and Edo Barac, for
25       example.

96

Confidential
SKAT_MDL_001_00838270

1  MR JUSTICE ANDREW BAKER:  All right.
2  A.  But I think it would be a combination of bonus pool and
3      desk costs, so some of that money could have been used,
4      for example, for paying rent, IT costs.
5  MR JUSTICE ANDREW BAKER:  All right, and if Mr Goldsmith ——
6  A.  I think it was a mixture of the two.
7  MR JUSTICE ANDREW BAKER:  Sorry, if Mr Goldsmith could get
8      us to K16 without losing column B for the description,
9      so just highlight K16 —— I don't mean —— yes, I do.
10     Yes.  So that cell there with the 50,000 in it, and
11     there are cells adjacent to it with 50,000 ——
12 A.  Yes.
13 MR JUSTICE ANDREW BAKER:  —— those are said to be account
14     opening fees expressed in euros for various of these
15     pension plans.  I dare say the detail of this is in the
16     other materials that I have now in fact reviewed, but
17     just so far as your recollection is concerned, whose
18     liability is that representing, to pay a 50,000 euro
19     account opening fee?  Whose obligation is that?
20 A.  I don't recall now, but I can see if I can work that out
21     just by looking at this spreadsheet.
22 MR JUSTICE ANDREW BAKER:  And the related question was going
23     to be whether you have a recollection, if that is in the
24     nature of a fee payable by the pension plan for gaining
25     access to the GSS platform account opening in that

97

1      sense, whether ——
2  A.  Yes.
3  MR JUSTICE ANDREW BAKER:  —— as a matter of cash flow that
4      actually got paid directly, or did it in fact get paid
5      via Ganymede, meaning that the figure there that says
6      payable to Ganymede by Long of 343,000 euros, in fact
7      what would have happened is that Ganymede would have
8      received, or in different currency it might be, but the
9      equivalent of 393,000 euros and passed 50,000 on to SCP
10     as an account opening fee for the platform, or do you
11     not remember?
12 A.  I don't remember.  But it is also possible that Solo
13     itself charged an account opening fee to the clients.
14 MR JUSTICE ANDREW BAKER:  Yes.
15 A.  But it is certainly an amount of income paid into my
16     universe, let's put it that way.
17 MR JUSTICE ANDREW BAKER:  If that 50,000 is representing an
18     account opening fee of that kind —— leave aside the cash
19     flow route of how it ends up getting paid, but it is
20     being charged by, in this case, SCP as the platform ——
21 A.  Yes.
22 MR JUSTICE ANDREW BAKER:  —— was SCP then charging anything
23     else by way of clearing and custody fees for what it
24     actually did in the trading?
25 A.  Yes, my recollection is that it would have also charged

98

1      the trade—by—trade clearing fee as well.  That is what
2      I remember.  But I don't remember exactly the details
3      surrounding the account opening fee, but I'm sure it is
4      in some emails, so the information is there somewhere.
5  MR JUSTICE ANDREW BAKER:  All right, thank you.
6  MR RABINOWITZ:  Thank you, Mr Shah.
7          Can we go next, please, to the tab FLS April 2013.
8      And this relates to trading and withholding tax
9      applications in relation to FLSmidth & Co in 2013.  That
10     is how you spell it.  And it takes a very similar form
11     to the previous tab we have looked at, yes, you see
12     that?
13 A.  Yes.
14 Q.  Under "Costs" at row 23, we can see that the number of
15     trading counterparties have increased, yes?
16 A.  Yes, I can see that.
17 Q.  The percentage number in column D allocated to each
18     counterparty is the same that we saw in the Horn/Forsyth
19     spreadsheet, yes?
20 A.  Yes, correct.
21 Q.  And now if you look at column D you will see we are into
22     2013 and the relevant percentage is 1.75.  Do you see
23     that, rows 28 and 29?
24 A.  Yes.
25 MR JUSTICE ANDREW BAKER:  So that is Orca and DDC that we

99

1      were looking at before, thank you.
2  A.  Yes.
3  MR RABINOWITZ:  If you look at the first few under "Costs",
4      so Aquila, Colbrook and Amalthea, they are still at 0.5%
5      each, yes?
6  A.  Yes.
7  Q.  And Abra is still at 1%, yes?
8  A.  Yes, I see that, yes.
9  Q.  Can we just finish this spreadsheet.  Can I ask you,
10     please, to look at the profit—sharing table at row 45.
11     Again, you see the bonus pool/desk costs are allocated
12     10%, yes?
13 A.  Yes.
14 Q.  And then RS, that is Rajen Shah, has now been replaced
15     by AD, and that is Mr Dhorajiwala, yes?
16 A.  Yes, that's correct.
17 Q.  And that is because Rajen Shah left Solo in April 2013,
18     correct?
19 A.  Yes, that's correct.
20 Q.  So Mr Dhorajiwala was promoted and given a percentage,
21     albeit not the same percentage as Mr Rajen Shah had got,
22     yes?
23 A.  Yes, that's correct.
24 Q.  So he gets less and you get more, correct?
25 A.  Yes, yes.

100

Opus 2
Official Court Reporters

transcripts@opus2.com
020 3008 6619

Confidential

SKAT_MDL_001_00838271

DX5782, page 26 of 49

1    Q.  Just looking at the percentage figures again in column
2        D, acknowledging that there may not have been a written
3        agreement, would you have been the one who negotiated
4        the understanding, agreement, whatever you want to call
5        it, which resulted in the figures that we see in column
6        D, Mr Shah?
7    A.  Yes, I would have negotiated those on behalf of
8        Ganymede, yes.
9    Q.  Okay.  My Lord, on the basis that I don't —— I'm not
10       going to stop for the day now, you don't have to ——
11       not going to say that!  But I'm making sufficient time
12       to think that because I'm moving on to a slightly
13       different topic if we took the break now that would work
14       rather well.
15   MR JUSTICE ANDREW BAKER:  Right, thank you very much.
16       Mr Shah, might I, just while it happens to be in my
17       mind because you mentioned it in passing this morning ——
18       it is not at all on the topic we have just been on, but
19       it will then end up on the transcript for the same
20       morning when I am a long way in the future looking back
21       at this.  Could we just bring up {V/27/50}.  You
22       mentioned in passing, because it was indirectly related
23       to one of the questions, the Ezra Academy trade and how
24       you had not remembered that.  Should I, in light of the
25       evidence you have now given, just be putting a line

101

1        through paragraph 277 of your witness statement?
2    A.  Yes.
3    MR JUSTICE ANDREW BAKER:  Because it is something you have
4        acknowledged that you don't have any recollection of,
5        although you have now recently seen the documents on it?
6    A.  Yes.  That would be very good, thank you.
7    MR JUSTICE ANDREW BAKER:  All right.  Thank you.
8        So we will take the lunch break now.  We will still
9        resume at 1.30 pm London time, although we are breaking
10       a few minutes early.
11       You heard, I think, Mr Shah, my indication to
12       Mr Rabinowitz, which I'm sure he would have had in mind
13       anyway as an appropriate approach, he will be aiming
14       this afternoon to get to what will be a good and logical
15       point for the sequence of questions he needs to ask you
16       that will hopefully be fair to you, bearing in mind that
17       for his cross-examination of you we are then breaking
18       until we come back after the court vacation, and as
19       I think will have been explained to you, your
20       cross-examination tomorrow will be by Mr Goldsmith on
21       some separate and discrete topics, which may mean —— he
22       will help us with that tomorrow —— that the more general
23       chronological flow that you are going through with
24       Mr Rabinowitz, we may be sort of parking that today,
25       dealing with some separate topics with Mr Goldsmith

102

1        tomorrow, and then coming back to the main chronological
2        run of things with Mr Rabinowitz when we come back after
3        the week's break.  That may mean, but we are in
4        Mr Rabinowitz's hands, that he gets to a logical point
5        to stop a little ahead to 3 o'clock, but we will leave
6        that to him to sort out from his notes over the short
7        adjournment, all right.
8    A.  Okay, my Lord, thank you.
9    MR JUSTICE ANDREW BAKER:  So 1.30, please, and as you know,
10       the witness warning still applies.
11   (12.24 pm)
12                   (The short adjournment)
13   (1.30 pm)
14   MR JUSTICE ANDREW BAKER:  Yes.  Good afternoon again,
15       Mr Shah.  Thank you, Mr Rabinowitz.
16   MR RABINOWITZ:  I'm grateful, my Lord.
17       Mr Shah, we are going to just look at an example of
18       one of the trading counterparties to see how what we saw
19       in the spreadsheet follows through into invoices
20       rendered, and if we can take your college friend
21       Rajeev Davé as that example, just looking again at the
22       spreadsheet, just to pick up the details relating to
23       Rajeev Davé, can we go, please, to {MTKC9/240/1}, and
24       again Mr Goldsmith will control the EPE, please.
25       If we go back to the TDC August 2012 tab, please,

103

1        thank you.  Rajeev Davé's short seller Abra is in row 23
2        and you can see from D23, Abra is entitled to 1% of the
3        gross dividend of the shares traded.  If we then look at
4        cell E23, thank you, we can see the sum of 73,920 euros
5        as being due to Rajeev Davé for the trading in TDC
6        shares in August 2012, yes?
7    A.  Yes, I can see that.
8    Q.  Thank you.  If we can then go to {MTKC8/87/1}, please.
9        Thank you.  At the bottom of the page we can see there
10       is an email from Mr Horn to Mr Dhorajiwala and you, and
11       Mr Horn is sending an updated invoicing spreadsheet for
12       your comments; do you see that?
13   A.  Yes, I see that.
14   Q.  You can see the topic is:
15       "Payments Gany 19 April 2013."
16       If we just go up, we can see you reply to this email
17       with some comments on the attachment; do you see that?
18   A.  Yes, I see that.
19   Q.  It is clear from that that you would have looked at the
20       attachment at the time, correct?
21   A.  Yes, agreed.
22   Q.  Thank you.  If we can then go to the spreadsheet itself
23       at {MTKC7/627/1}, please.  This one is called, "Payments
24       Gany 19 April 2013".  Again, if Mr Goldsmith controls
25       the EPE, and just looking at the metadata first, please,

104

Confidential                                              SKAT_MDL_001_00838272

DX5782, page 27 of 49

1   you can see it was created by Graham Horn on
2   19 April 2013, last modified by him on 21 April 2013.
3   Do you see that?
4   A.  Yes.
5   Q.  And as we saw, you did see it in May 2013, correct?
6   A.  I would have done.
7   Q.  If we then just look at the substance of the
8       spreadsheet, looking at the column A, that lists again
9       a number of the Solo clients which are the US Solo
10      applicants, again you can see Xiphias in row 11; do you
11      see that?
12  A.  Yes.
13  Q.  If we can then look at cell BB1.  You can see the
14      heading there, "Invoices to Ganymede", yes?
15  A.  Correct.
16  Q.  If I can then ask you to look, please, at columns BH to
17      BO, and if we look, for example, at cell BM2, we can see
18      that that relates to Abra?
19  A.  Yes.
20  Q.  Each column from BH to BO relates to a different Danish
21      share, correct?  We can see the Danish share identified
22      in row 3.
23  A.  Yes, I see that.
24  Q.  Thank you.  And each row is assigned to a different Solo
25      applicant.  We saw that from column A, do you recall?

105

1   A.  Yes.
2   Q.  So if you look at the row that we were just looking at,
3       that sets out the amount attributable to Abra in respect
4       of trading in TDC shares in 2012 for each US Solo
5       applicant, yes?
6   A.  Yes, I see that.
7   Q.  Thank you.  And you can see that the total figure for
8       Abra in respect of trading in TDC in 2012 is 73,926
9       euros?
10  A.  Yes, I see that.
11  Q.  And that, you will recall, is the exact same figure in
12      euros that we saw in your spreadsheet as being due in
13      respect of Abra short selling of TDC shares
14      in August 2012, correct?
15  A.  Yes, that's correct.
16  Q.  If I can ask you then to look at column BO, you can see
17      that this sums up the total amounts due in respect of
18      Abra's short selling, and you can see from cell BO23 it
19      amounts to 136,524 euros.  Do you see that?
20  A.  Yes.
21  Q.  If we can next please go to ——
22  MR JUSTICE ANDREW BAKER:  Just before we do, just looking at
23      the way this spreadsheet works, if Mr Goldsmith can just
24      go a little further to the right, do we then —— yes, so
25      we then get a different set of —— no, that is too far.

106

1   We then go into a different set of columns, but they are
2   then all relating to Orca and they will have their own
3   total and so on.  All right, I follow, thank you.
4   MR RABINOWITZ:  And just on this spreadsheet before we move
5       off it, column BZ and then CA, you can see this
6       identifies amounts already invoiced and then to be
7       invoiced, obviously working by reference to that
8       formula.
9   MR JUSTICE ANDREW BAKER:  Yes, thank you.
10  MR RABINOWITZ:  If we then go to {MTKC8/149.3/2}, thank you.
11      At the bottom of this page we can see there is an email
12      from Rajeev Davé dated 27 March 2013.  Do you see that,
13      right at the bottom?
14  A.  Yes, I see that, yes.
15  Q.  And it is addressed to you, as you can see, at Ganymede.
16      Do you see that?
17  A.  Yes.
18  Q.  And we can see here he is sending you a reminder of the
19      email below.  In order to see what is said on the email
20      below, we need to go to page {MTKC8/149.3/3}, please:
21          "Please accept this email as a written request from
22      A Squared Investments FZE to set up a services agreement
23      with Ganymede Cayman Limited.
24          "Please let me know what KYC documentation you
25      require from us."

107

1       A Squared Investments was another short seller owned
2   by Rajeev Davé, correct?
3   A.  Yes, that's correct.
4   Q.  If we then look at your response above that, please, you
5       need to go halfway up page {MTKC8/149.3/2}, you email
6       him on 9 April 2013 from your Ganymede email asking that
7       he provide a draft services agreement.  Do you see that?
8   A.  Yes, I see that.
9   Q.  Thank you.  And if we scroll up, still on page 2, you
10      can see that Rajeev Davé then replies to you on 11 May
11      stating:
12          "As per our discussion last week — please see
13      attached a copy of our invoice issued to Ganymede.
14          "Also attached is a copy of the signed agreement for
15      your records."
16          The discussion he is referring to would obviously
17      have been with you, Mr Shah; correct?
18  A.  Yes.
19  Q.  If we go to the email above that, you can see that you
20      say that you would like to settle the invoice in US
21      dollars; do you see that?
22  A.  Yes, I can see that.
23  Q.  And if we go on to page {MTKC8/149.3/1} at the bottom,
24      Mr Rajeev Davé then attaches an invoice in US dollars.
25      Do you see that?

108

Confidential

SKAT_MDL_001_00838273

1   A.  Yes, I can see that.
2   Q.  And above that we see you email custody@solo.com asking
3       for payment:
4           " ... from my account GAN02."
5           Yes?
6   A.  Yes, I can see that.
7   Q.  That was your account, the account of your company,
8       Ganymede, at Solo, correct?
9   A.  Yes, that's correct.
10  Q.  If we then go back to page {MTKC8/149.3/2} of this
11      document, Mr Davé's email with his original invoice.
12      Keep that on the left-hand side of the screen. Can we
13      have on the right-hand side of the screen, please,
14      {MTKC8/136.2/1}. Thank you.
15          We can see this is an invoice from A Squared
16      Investments FZE dated 7 May 2013 to Ganymede and this is
17      obviously attached to the email we just looked at. You
18      see that the email is in — for an amount in euros, yes?
19  A.  Yes.
20  Q.  Looking back on the left-hand side, you responded to
21      Mr Davé's email asking for the invoice to be re-sent in
22      US dollars, yes?
23  A.  Yes.
24  Q.  We need to go to page {MTKC8/149.3/1}, I'm so sorry.
25      Please see — and you say:

                            109

1           "Dear Custody,
2           "Please can you arrange ... soonest ... from my
3       account-..."
4           And then on the top — where is that? I'm not
5       seeing that. It is page {MTKC8/149.3/2}.
6   MR JUSTICE ANDREW BAKER:  Was it not the top of page 2?
7       Yes.
8   MR RABINOWITZ:  Please, sorry. I'm so sorry.
9           "Dear Rajeev,
10          "If you agree, we'd like to settle this in USD.
11      Please can you provide you USD SSIs. Once received
12      we'll make payments immediately."
13          You obviously did see the invoice at the time, the
14      euro invoice at the time, correct?
15  A.  Yes, I can see that.
16  Q.  Just looking at the invoice, you see the amount is
17      436,524 euros and that matches the figure that we saw
18      Mr Horn had calculated in his 19 April spreadsheet that
19      we looked at as being due for Abra's short selling ; do
20      you recall?
21  A.  Yes, I agree.
22  Q.  So you have got Abra doing the short selling, an invoice
23      from A Squared. Do you recall that Mr Horn's
24      spreadsheet pre-dated the sending of this email,
25      Mr Shah — sorry, the sending of this invoice, Mr Shah?

                            110

1   A.  I can't remember, but I accept that, yes.
2   Q.  Take it from me, this — the invoice —
3   A.  Yes, that's fine. I agree.
4   Q.  — the spreadsheet was in April, the invoice is in May.
5   A.  Yes, I agree.
6   Q.  So the amount is in respect of Abra trading and this is
7       an example of fees apparently due to one company
8       involved in the GSS Trading Model being invoiced by
9       another company owned by the same individual, correct?
10  A.  Yes, that's correct.
11  Q.  And that is because the fee was really owed to the
12      individual , not to the specific company used for short
13      selling , and that is why you didn't really mind who sent
14      the invoice ; correct?
15  A.  Yes, that's correct.
16  Q.  Can you see that the description of the fees given is as
17      per 6 April 2013 consultancy agreement?
18  A.  Yes, I can see that.
19  Q.  If we can now go on the right-hand side to
20      {MTKC8/84.01/1}. Thank you. This is the consultancy
21      agreement between, as you can see, A Squared Investments
22      and Ganymede. If you look at the top, it is said to be
23      effective from 6 April 2013 and it was the other
24      attachment to Mr Davé's email that we just saw.
25          You would obviously have seen this at the time,

                            111

1       given the exchange we saw between you and Mr Davé
2       relating to this agreement, yes?
3   A.  Yes.
4   Q.  Would the discussion that we saw you had with
5       Mr Davé also have been about what should be said in this
6       agreement, Mr Shah?
7   A.  I can't remember if this was drafted by somebody from my
8       office or by Rajeev Davé himself.
9   Q.  I think you had said to him, "Please send us a draft",
10      in one of your emails —
11  A.  Yes.
12  Q.  — and there was subsequently a discussion which is why
13      I am asking whether he had discussed with you what he
14      should say in the draft — in the consultancy services
15      agreement that he was going to send to you?
16  A.  I don't remember having any detailed discussion about
17      what should go into the agreement or what should not.
18      It could be the case that somebody from my office may
19      have provided him with information, but I don't recall .
20  Q.  Okay. If we just look at clause 1 of the agreement, so
21      that is on the right-hand side, we can see it sets out
22      the services to be provided by A Squared Investments to
23      Ganymede:
24          "'A Squared' will consult with the officers and
25      employees of 'GCL' concerning matters relating to

                            112

**113**

1  securities, derivatives, investments and generally any
2  aspects relating to financial markets."
3       If you then go on to page {MTKC8/84.01/2} and just
4  look at clause 5, the fees stipulated that:
5       "'GCL' shall pay 'A Squared' a negotiated fee based
6  on increased revenue and productivity as a result of the
7  services rendered by 'A Squared'-..."
8       Yes?
9  A. Yes, I can see that.
10 Q. Now, Mr Shah, you understood that what
11 A Squared Investments was going to be paid for was the
12 participation by one of Mr Davé's companies as a short
13 seller in GSS trading, yes?
14 A. Yes.
15 Q. And that the trading was intended to facilitate the
16 making of a withholding tax application, yes?
17 A. Yes, that is correct.
18 Q. Why did the contract not just say any part of that?
19 A. Well, this contract, as well as the contracts issued
20 which Ganymede to other clients, referred to consultancy
21 or advisory fees to be as broad and general as possible,
22 to capture any business activities that we may be doing
23 with each other.
24 Q. Mr Shah, this is a contract made specifically in order
25 for Rajeev Davé to be able to bill you in respect of his

**114**

1  participation in the trading which gave rise to
2  a withholding tax application. If you look at the
3  caption, it really has nothing to do with what in
4  fact —— I was going to say A Squared did for you, but it
5  wasn't actually A Squared, it was another company, it
6  was another of his companies. So my question —— perhaps
7  I will let you answer you that: do you accept that, that
8  it had nothing to do with what A Squared actually —— or
9  Abra, even —— actually did?
10 A. Well, this is an agreement with A Squared and the
11 trading activity was Abra. The other thing I can see
12 here is that Graham Horn signed this agreement as
13 director. I do agree with you in terms of activity, but
14 we could have had an agreement saying that the —— that
15 A Squared or Abra would be paid 1% of dividend of any
16 trades that they undertake, but this agreement was kept
17 broad enough to allow for other business.
18 Q. If you thought that what you were doing was perfectly
19 legitimate, Mr Shah ——
20 A. Yes.
21 Q. —— this is not the only agreement where you have this.
22 Why do the agreements never actually set out what it is
23 that these people are actually being paid for?
24 A. Well, I don't think there is any secret, because we have
25 spreadsheets, quite a few spreadsheets I have seen,

**115**

1  showing the percentages. My only comment here is that
2  these agreements were kept wide enough to allow for
3  other business activity.
4  Q. Can I ask you, please, to go to ——
5  MR JUSTICE ANDREW BAKER: Just before we do, it is the
6  tiniest of points, Mr Shah, but I have noted, as we have
7  been looking at that email exchange on the left and then
8  also at the agreement on the right, that Rajeev Davé
9  when he is writing his own name in fact has a E acute at
10 the end; is that in fact more correctly how I should be
11 spelling his surname when I potentially refer to him,
12 and for that matter his brother as well, in a judgment,
13 do you know? Is that how it always was when he was
14 sending things to you?
15 A. The English spelling can be either. The Indian
16 pronunciation is "Davé", it is an Indian surname but
17 I have always known him and his brother as Rajeev and
18 Sanjeev Davé and other people call them that.
19 MR JUSTICE ANDREW BAKER: I hear that is a matter of
20 pronunciation, but to be fair to them in their absence
21 it does look as if his personal preference when
22 rendering his name in writing was to use the E acute; is
23 that right?
24 A. Yes, looking at this document, it looks like the E acute
25 is his preference, yes.

**116**

1  MR JUSTICE ANDREW BAKER: All right, thank you.
2  MR RABINOWITZ: Thank you.
3       Mr Shah, can we go next to paragraph 707 in your
4  first witness statement {V/27/128}. Can I just ask you
5  to remind yourself of what you say about the
6  arrangements you had made with Rajeev Davé here. It is
7  really the last three sentences of paragraph 707.
8  A. Yes, I can see that.
9       (Pause.) I have read that now.
10 Q. So you say here that you had no profit—sharing agreement
11 with Rajeev Davé, that you approached him to become
12 a client of GSS and that he paid a pretty modest sum
13 for giving you some good general knowledge of dividend
14 arbitrage markets, and you also say that the payments
15 were completely unrelated to the GSS business, yes?
16 A. Yes, correct.
17 Q. That is simply not true, Mr Shah, either that this is
18 what is you received from him or that this is what you
19 were paying to him. Having gone through the documents,
20 would you accept that?
21 A. Well, I can see that that sentence says that dialogue
22 was completely unrelated. What I would say is that he
23 did have information to provide. I can't remember what
24 information he provided to me or my colleagues at the
25 time, not just in terms of dividend arbitrage, but the

Confidential                                                                             SKAT_MDL_001_00838275

DX5782, page 30 of 49

1    hedge fund business in general, given his background.
2    But I —— yes, and also I would say, like I have said
3    with some of the other clients, that there was no
4    written profit—sharing agreement.
5        In this case, I wouldn't say that paying 1% is
6    actually a profit—sharing agreement. It is a fee for
7    trading.
8    Q.  So it is at least a fee for trading?
9    A.  I would say that I didn't agree to share my profits with
10   him.  In this particular case, there was an agreement
11   that he would receive 1% of the dividends for the trades
12   that he undertook.
13   Q.  So to the extent ——
14   A.  But not in relation to my profit —— sorry, or Ganymede's
15   profit, I should say.
16   Q.  So to the extent that this —— I think what you have now
17   accepted is that he was being paid for participating in
18   the trading, yes?
19   A.  Yes, he was getting paid to trade, yes.
20   Q.  Not because he was providing you with some useful
21   information unrelated to the GSS business?
22   A.  Well, when I provided this statement, as I said before,
23   I didn't actually have access to documentation and what
24   I wrote there was my recollection at the time.  Now
25   I have seen more documents including spreadsheets, so my

117

1    recollection has changed because of that.
2    MR JUSTICE ANDREW BAKER:  Just so I understand, are you
3    saying that when you wrote the statement you simply did
4    not remember that Rajeev Davé was a short seller through
5    his corporate vehicle and that is what he was paid for?
6    A.  Yes, I can't —— I couldn't remember when I made this
7    statement which of the individuals had which role and
8    I can't remember what percentages were being paid.  I do
9    remember that I didn't enter into profit—sharing
10   agreements where I agreed to pay regardless of whether
11   Ganymede made a profit or not.
12   MR JUSTICE ANDREW BAKER:  Well, are you saying —— perhaps
13   I confused you by specifically saying short seller.  Are
14   you saying when you wrote the statement that you did not
15   remember that Rajeev Davé, through a corporate vehicle,
16   was a trading counterparty in the structure and that
17   that is what he was being paid for?  Because ——
18   A.  Yes, I can't remember ——
19   MR JUSTICE ANDREW BAKER:  —— I think what is being put to
20   you, is your statement makes it look as if you had an
21   ad hoc, informal consultancy arrangement with him and
22   were paying him for consultancy services, and ——
23   A.  Yes, I ——
24   MR JUSTICE ANDREW BAKER:  I'm trying to clarify what exactly
25   you are saying you remembered when writing the

118

1    statement.
2    A.  Yes, I can remember that he was a client or his
3    companies were clients of GSS, but I can't remember to
4    what extent he traded and if he was a short seller or
5    had another type of activity.  I do remember that not
6    just him but most of the other people who were clients
7    were also selected because they could provide me and my
8    colleagues with additional intelligence that could lead
9    to new trading ideas.
10   MR RABINOWITZ:  Just let me ask you, if I may, just two
11   other questions about that, Mr Shah.  It does seem ——
12   you were —— leave aside whether you couldn't remember
13   what this old college friend of yours was doing in
14   relation to the trading that you were engaged upon and
15   why you were paying him, leave aside whether that is the
16   position at the moment, when you produced your witness
17   statement you were presumably given or saw the written
18   opening from SKAT, yes?
19   A.  Yes, I remember that, Davé.
20   Q.  That referred to Rajeev Davé as one of the trading
21   counterparties, take it from me.  You will have seen
22   that?
23   A.  Okay, yes.
24   Q.  You were present virtually, if that is the right
25   expression, when we opened the case orally and we went

119

1    through the spreadsheets, yes?
2    A.  Yes.
3    Q.  Again, you would have seen all the percentages
4    identified in those spreadsheets related to the various
5    entities who were trading counterparties?
6    A.  Yes.
7    Q.  And when Mr Jones asked you to confirm that your
8    evidence was true, however unclear your memory may have
9    been unprompted when you did your statement, by the time
10   he asked you that, it must have been something on your
11   mind that Rajeev Davé was a trading counterparty and
12   that there was this spreadsheet which showed that people
13   were getting paid a percentage amount from the dividend,
14   correct?
15   A.  Yes, but my understanding of that question was, was this
16   witness statement correct at the time I submitted it.
17   Q.  I'm just going to suggest to you, Mr Shah, that what you
18   said here about Rajeev Davé was untrue and that when you
19   made this statement you knew that what you were saying
20   was inaccurate?
21   A.  Well, I still say that my recollection, when I wrote
22   this at the end of last year, was correct to the best of
23   my recollection.  I think it was then submitted
24   in January again, and by that time I had not seen the
25   spreadsheet in the openings.

120

Confidential                                                          SKAT_MDL_001_00838276

DX5782, page 31 of 49

1    Q.  Just one other point I want to just go over with you
2        about this.  You said, I think, that you were not paying
3        Rajeev Davé a share of profits.  In fact, we saw from
4        your spreadsheet that the money owed to Rajeev Davé was
5        shown as a cost to Ganymede which came out of its
6        profits, yes?
7    A.  Yes, but my —— what I would say is that this phrase
8        "profit sharing" suggests that there is an agreement to
9        pay a profit, a percentage of the profits that Ganymede
10       makes, and that's not accurate because even if Ganymede
11       makes zero profit they would still —— Ganymede would
12       still pay the fee.
13   Q.  Now, Mr Shah, I have taken you through your witness
14       statement where you, I think wrongly, say that there was
15       no agreed payment formula applicable to the trading
16       counterparties of the Solo withholding applicants and
17       I'm not going to go back over that.  But it is not just
18       your witness statement where you made denials about
19       there being an agreed payment formula applicable to the
20       trading counterparties, you also denied this in your
21       defence; correct?
22   A.  Right now, I don't recall what was said in the defence.
23   Q.  Right.  Well, let's have a look at that.  {B/70.1.1/1}.
24       That is, as you can see, your amended defence to SKAT's
25       schedule 5B to the particulars of claim, okay?

                                121

1    A.  Okay.
2    Q.  I just want you to see what document it is.  If we can
3        then go to page {B/70.1.1/172}, we can see on page 172
4        that you have signed a statement of truth attesting to
5        your belief that the facts stated in the defence were
6        true and you did so both on your own behalf and on
7        behalf of the various entities, including Ganymede, yes?
8    A.  Yes, I can see that.
9    Q.  Can we then go to page {B/70.1.1/51}, please.  You can
10       just see from the heading:
11            "Agreements to reward participants in the Solo WHT
12       Scheme."
13            That is the topic that you are going to deal with
14       under —— in these paragraphs.  And if you can then go to
15       page {B/70.1.1/55}.
16   A.  Can you tell me where I should be looking?
17   Q.  Sure.  At page 55, that is where you start to deal with
18       the counterparties and if we can just take a few
19       examples of that.  Paragraph 38O.9 on page 55 you
20       address Messrs Oakley and Mitchell.  And in
21       paragraph 38O.9.5 ——
22   MR JUSTICE ANDREW BAKER:  What page?
23   MR RABINOWITZ:  {B/70.1.1/56}.  There you go, sorry —— you
24       can see that you deal with the remuneration you say
25       that:

                                122

1        "The fees paid to Mr Mitchell and Mr Oakley were for
2        their market knowledge.  No payment formula was reached
3        as alleged or at all."
4            Yes?
5    A.  Yes, I see that.
6    Q.  And that is, we have seen, not true; correct?
7    A.  Can you just remind me when this defence was served,
8        because I think it could have been before I saw these
9        spreadsheets?
10   MR JUSTICE ANDREW BAKER:  Mr Shah, why is that relevant to
11       the question?  The question is whether you now agree
12       that what is said there is not true?
13   A.  Sorry.  Well, yes, having seen the spreadsheets now
14       I accept that there was a payment formula.
15   MR JUSTICE ANDREW BAKER:  Thank you.
16   MR RABINOWITZ:  If you look at paragraph 38O.10 on page 56,
17       you are dealing with Mr Klar there.  Thank you very
18       much.  At 38O10.4 on page {B/70.1.1/57} we can see:
19            "No payment formula agreement was reached with
20       Mr Klar as alleged or at all."
21            And again, as we have seen, that is not true;
22       correct?
23   A.  Yes, having seen the spreadsheets today I can say that
24       there was a payment formula.
25   Q.  If you then look next at paragraph 38O.11.3 on

                                123

1        page 57 ——
2    A.  Yes.
3    Q.  —— you can see there in relation to Mr Körner that you
4        denied there was a formula agreed with Mr Körner and you
5        say the payments made to him were discretionary in
6        nature.  Again, Mr Shah, certainly just dealing with
7        whether there was a formula agreed, that was untrue as
8        well; yes?
9    A.  Yes, I agree that there was a formula based on the
10       spreadsheets I have seen.
11   Q.  Just to be clear as to what you were responding to, if
12       we can bring up on the right-hand side of the screen the
13       particulars of claim schedule 5B at {B/12/22}, you can
14       see just looking, for example, at 80(n) in relation to
15       Rajeev Davé, what was alleged was an agreement that as
16       an award for his participation in the Solo withholding
17       tax scheme through the forward contract companies owned
18       and/or controlled —— sorry, I'm just trying to see where
19       you are —— you have brought it up, thank you:
20            "... through the 'short seller' companies owned
21       and/or controlled by him, Mr Davé would be entitled to
22       a share in the profits —..."
23            But the first sentence is:
24            "An agreement with Rajeev Davé that as a reward for
25       his participation in the Solo WHT Scheme through the

                                124

Confidential                                                      SKAT_MDL_001_00838277

DX5782, page 32 of 49

1    'short seller' ... and/or controlled by him, Mr Davé
2    would be entitled to a share in the profits of the Solo
3    WHT Applications according to the formula-..."
4        And you see the formula is set out?
5    A. Yes, I see that.
6    Q. And then at the top of —— where is the next one? On
7    page {B/70.1.1/58} on the left—hand side you can see
8    responding to that you say:
9        "Paragraph 80(n) is denied.
10       "Mr Sanjay Shah met March Rajeev Davé socially
11   through Mr Dhorajiwala whilst Mr Davé was working at
12   a London hedge fund. Mr Davé informed Mr Sanjay Shah
13   that he wanted to move to Dubai, and that his brother
14   (Sanjeev) was also about to relocate to Dubai.
15   Mr Sanjay Shah subsequently engaged Mr Sanjeev Davé as
16   a finance-..."
17       Et cetera:
18       "Mr Rajeev Davé did not work ..."
19       Et cetera, et cetera. And then 38O.14.3:
20       "No payment formula agreement was reached with
21   Rajeev Davé as alleged or at all."
22       And again, that is not true either, yes?
23   A. Yes, I agree, based on the spreadsheets I have seen
24   today.
25   Q. Mr Shah, given you would be very much aware what your

125

1    own company Ganymede was paying to these persons and
2    why, I'm going to suggest to you that what you said in
3    your defence as well as your witness statement were not
4    just innocent oversights or errors but they were,
5    rather, deliberate untruths intended to mislead the
6    court. Would you like to comment on that?
7    A. Yes. Well, first of all, I don't remember the payment
8    formula. It was such a long time ago. I can't remember
9    when I signed off on my defence. I don't know if it is
10   possible to see that, because it could have been during
11   a time that I was still unable to access documents.
12   Q. It was, to be fair to you ——
13   A. So I think the defence was based on my recollection at
14   the time I signed off.
15   Q. To be fair to you, it was at a time when you were
16   incarcerated, so that ——
17   A. Yes, so being incarcerated also meant that I didn't have
18   access to documents that would have refreshed my memory.
19   Having seen the spreadsheet in detail today, I do agree
20   that these submissions that we have been discussing are
21   not correct and that there was a payment formula.
22   Q. But, Mr Shah, whether or not this is the sort of thing
23   which could possibly have slipped your mind, you saw
24   that an allegation was expressly made about this in the
25   claim; that, if nothing else would have done, would have

126

1    prompted you to at least think about what the nature of
2    the arrangement was with these parties before you put
3    something in your defence?
4    A. Well, I can't actually remember when I was shown the
5    defence and when I agreed to submit the defence, and it
6    could have been a time where I wasn't able to have
7    access to the information I needed to provide a more
8    accurate answer. These events happened more than
9    10 years ago and it is impossible for anyone to keep
10   this type of information in their minds. Long—term
11   memory storage doesn't work like that.
12   Q. Do you authorise signing of legal documents without
13   taking the care to ensure that what you are saying is
14   true, Mr Shah?
15   A. Well, in the event of this —— sorry, the answer to your
16   question is yes, I will always take care over documents
17   that I sign or my electronic signature is applied to,
18   yes.
19   Q. Mr Shah, I suggest to you that you were willing to tell
20   deliberate untruths about this because you were willing
21   to acknowledge the real basis on which these persons
22   were being paid in your witness statement. Do you want
23   to respond to that?
24   A. Well, what I would say is that my witness statements
25   contained information that to the best of my knowledge

127

1    was correct at the time and only today I have been able
2    to see the spreadsheet from over 10 years ago, again in
3    detail, with the formulas, and I have accepted that
4    there are errors in the defence that is on the screen
5    now.
6    Q. I suggest to you that you were willing to tell
7    deliberate untruths about this, Mr Shah, because you
8    understood that the fact that these persons were paid by
9    reference to a formula that relates to the withholding
10   tax refund pointed towards the payments being made for
11   assistance in facilitating the making of withholding tax
12   applications. That is true, isn't it?
13   A. Sorry, I think there are —— there seems to be a couple
14   of embedded points in that. Would you be able to break
15   that question down?
16   Q. Sure. You didn't want to tell the truth about this in
17   your witness statement because you understood that the
18   fact that these persons were —— you understood that the
19   fact these persons were being paid by reference to
20   a formula —— let me do it this way —— I'm not sure I can
21   break it down.
22       You understood that the fact that these persons were
23   being paid by reference to a formula that related to the
24   applications for refunds pointed towards you paying them
25   for assisting in making those applications, and you

128

1  didn't want to say that?
2  A. At the beginning of your question you said I was
3     deliberately untruthful, but I reject that I was being
4     deliberately untruthful regarding my recollection.
5         The second point I would like to make is that the
6     payments that were owed to these participants was
7     payable regardless of if Ganymede made a profit or if
8     the reclaims were paid.
9         I, from my perspective, if I had made those changes
10    to the defence that we have just discussed now, in my
11    view that does not change my view on my honest belief of
12    the legality of the activity that Solo and the clients
13    were involved in at the time.
14 MR RABINOWITZ: Thank you, Mr Shah.
15    My Lord, I have reached ——
16 MR JUSTICE ANDREW BAKER: Just before we move on, it may be
17    that Mr Rabinowitz was about to tell me that that is
18    a good enough end of a topic to move on to different
19    cross-examination, but just in case what I am about to
20    do affects what he is about to say, I think in fairness
21    to you, Mr Shah, I ought to remind you of something
22    because of an answer you gave, because it may mean that
23    I need to ask you to undertake an exercise for me in the
24    break that we are going to have.
25         Could we find the transcript for Tuesday

129

1  {day17MT/18} and bring up in the mini pagination 18 to
2  19. Is that 18? All right. So this is page 18 of the
3  transcript from when Mr Jones called you and got you to
4  verify your statements, do you understand?
5  A. Yes.
6  MR JUSTICE ANDREW BAKER: You may remember that because your
7     third statement did not undergo any correction or
8     clarification he got you to verify that one when he
9     showed it to you, right?
10 A. Yes.
11 MR JUSTICE ANDREW BAKER: But for the first, the second and
12    the fourth he got you to identify all of those and then
13    at the end of this page, you see there he says:
14    "Question: Have you reviewed these three
15    statements, that is the first, second and fourth before
16    starting your evidence today?"
17         You say yes, you have.
18 A. Yes.
19 Q. And the next question was:
20    "Question: And, taken together and subject to the
21    corrections and clarifications in the fourth witness
22    statement, are the contents of these three statements
23    true and accurate to the best of your knowledge and
24    belief?"
25         And you said:

130

1         "Answer: Yes, that's correct."
2         Do you see that?
3  A. Yes, I see that.
4  MR JUSTICE ANDREW BAKER: Now, one of the answers you gave
5     me a few minutes ago was when that question was asked of
6     you on Monday you thought you were being asked in
7     relation to the first statement to confirm whether you
8     thought that it was true when you wrote it. Is that an
9     answer you still adhere to?
10 A. Yes, in relation to the first witness statement, that ——
11 MR JUSTICE ANDREW BAKER: Well, in that case, Mr Shah,
12    I require you, in the period between now and when your
13    evidence resumes after the vacation week that we are
14    having, because it happens to give you an opportunity to
15    do so, carefully to re-read your first statement from
16    start to finish and to prepare, if you are able to ——
17    you can comment in a moment if this is going to be not
18    possible for you practically —— prepare, for our
19    purposes, any further corrections that you now wish to
20    make to identify those matters that you will say you
21    thought were true and accurate when you wrote that
22    statement but you no longer think are true and accurate.
23    Do you understand?
24 A. Yes, I understand.
25 MR JUSTICE ANDREW BAKER: And again, to be fair to you, I'm

131

1     sure you do understand that I anticipate that
2     submissions may be made to me that the question you were
3     asked by your counsel was clear enough, that you were
4     being asked to verify whether today you believed the
5     contents were true and accurate, and I'm not going to
6     revisit that and I'm not by asking you to do this
7     exercise indicating any view, provisional or otherwise,
8     of what I might make of any such submission.
9         But I think if you are adhering to the evidence that
10    you have given, that when you gave that verification you
11    thought you were just being asked, "Was it true what
12    I wrote it", then we ought to know, so that it doesn't
13    have to come out piecemeal under cross-examination, how
14    much of the statement you no longer are happy to swear
15    to as true.
16         Do you understand?
17 A. Yes, I understand.
18 MR JUSTICE ANDREW BAKER: Now, given your current situation
19    and what it may be, I can't remember the precise
20    overlapping of dates, what it may be is happening in
21    Denmark next week while we have a court vacation week,
22    is that something practically speaking that you would be
23    able to do with access to a laptop on which you could
24    actually create in Word, or some other format, a sort of
25    errata sheet or correction document? Because I'm very

132

Confidential                                                                              SKAT_MDL_001_00838279

1  keen —— although I think it is an important exercise
2  I would like you to be able to undertake, I'm very keen
3  not to ask you to do something that practically speaking
4  you are just not in a position to do because of your
5  circumstances.
6  A. Yes, I think I can do that. The only court date I have
7  in Denmark is next Friday, 31 May.
8  MR JUSTICE ANDREW BAKER: Very good.
9  Mr Jones, I am —— sorry, Mr Shah.
10 A. Can I just possibly add that, or ask: I have been shown
11 spreadsheets today that I didn't see in detail when
12 Mr Jones asked me that question, so when I did answer
13 that question, I did believe that the content of my
14 first witness statement didn't contain errors which I'm
15 aware of today. So if I provide this list of addenda,
16 there could be more addenda in the future, based on more
17 documents that I see.
18 MR JUSTICE ANDREW BAKER: I understand in principle the
19 nature of that comment and you will appreciate that
20 I therefore understand that all I can be asking you to
21 do at this stage is the best you believe you honestly
22 can with the statement as it now stands and your
23 exposure to this trial, if I can put it that way, to
24 date. I am aware, because you say it in your fourth
25 statement, of the fact that you don't have the

133

1  fully —fledged access to all of the trial materials that
2  we all have, so I appreciate that necessary limitation
3  in the exercise for you.
4  A. Yes. Okay.
5  MR JUSTICE ANDREW BAKER: The other thing I was going to
6  raise at this point, if that might otherwise be a point
7  at which at least Mr Rabinowitz is going to pause his
8  cross—examination, Mr Jones, is this —— well, it is also
9  to an extent Mr Rabinowitz —— if I said that that is you
10 gone for most of today, Mr Rabinowitz, by my calculation
11 on the sitting hours we are currently keeping you will
12 have had two and two thirds days, which by happy
13 coincidence is exactly one third of SKAT's
14 cross—examination time estimate of eight days. Or if
15 you prefer to ignore Mr Goldsmith, I think it is
16 38.1% —— there you go —— of your effective
17 cross—examination estimate of seven days.
18 I think I would like from you an indication based on
19 how much ground you know you are hoping to cover
20 whether, if therefore you should be a third of the way
21 through the overall SKAT cross—examination or
22 approaching 40% of the way through your own
23 cross—examination, whether we are at least on target, if
24 not potentially slightly ahead of schedule or whether we
25 are under any time pressure in relation to completing

134

1  the cross—examination?
2  MR RABINOWITZ: My Lord, I would estimate that we are
3  broadly on target.
4  MR JUSTICE ANDREW BAKER: Thank you. Because then,
5  Mr Jones, one thing I was going to say, and Mr Shah is
6  also obviously listening to this, I would ask that
7  Mr Shah reflect after we finish tomorrow on how this
8  week has been and whether the three one and a half—hour
9  sessions that we have been using: 9.30 to 11.00, our
10 time, mid—morning break, lunch 12.30 to 1.30, and then
11 a single one and a half—hour session in the afternoon
12 running to 3 o'clock our time, he has felt broadly
13 speaking he has been able to cope with.
14 Of course, Mr Shah, I appreciate it is a stressful
15 process and that makes —— again, no indication one way
16 or the other as to what I will or won't eventually make
17 of the evidence, I appreciate it is a stressful process,
18 so merely saying it is a tough process, that I'm afraid,
19 goes with the territory. But there was an application
20 made to me in relation to the sitting hours and so
21 I think it is fair to you to ask you to review that and
22 to make it known whether, based on this week's
23 experience, you feel comfortable enough, if I use that
24 phrase, comfortable enough with keeping to these sitting
25 hours, and I do give permission of my own motion to the

135

1  Meaby & Co partners at an appropriate point next week,
2  whatever else they may or may not be doing in having
3  contact with Mr Shah, to arrange to make contact with
4  him to discuss that topic. They will obviously take
5  care to have that discussion in a way that focuses
6  solely on the aspect of fatigue and stamina, how he has
7  found it, and not allow that discussion to descend in
8  any way to discussion of the substance of the evidence.
9  Does that make sense, Mr Jones?
10 MR JONES: That will be scripted entirely properly, as you
11 would imagine.
12 MR JUSTICE ANDREW BAKER: Very good. And that having been
13 done —— first of all, Mr Rabinowitz, anything from you
14 within your cross—examination arising out of the concern
15 I have raised with Mr Shah, my invitation to him to
16 revisit his first statement on that basis, at this
17 stage, I mean?
18 MR RABINOWITZ: At this stage, no, my Lord. Obviously when
19 we get what we get from Mr Shah, that may give rise
20 to ——
21 MR JUSTICE ANDREW BAKER: I understand that. And the
22 obvious corollary is whether there is a preference,
23 Mr Goldsmith, based on you knowing what your own scope
24 of work is for what we are going to do tomorrow, whether
25 you would prefer to break now and have a clean start at

136

Confidential
DX5782, page 35 of 49                                                SKAT_MDL_001_00838280

1  9.30 tomorrow morning or whether in fact you would even
2  like to make a start now and if it is the latter, do we
3  take a five—minute break and give you half an hour?
4  I am personally relaxed either way. Obviously I would
5  be upset if we broke today for the —— broke now for the
6  day and then found that we were tight for time tomorrow.
7  But if you felt comfortable that we would not be, I am
8  entirely in your hands as a matter of preference as to
9  whether you would prefer to have a clean start or make
10  a start today.
11  MR GOLDSMITH: I think, my Lord, a five—minute break and at
12  least I can cover some material today, I think that
13  would be very helpful.
14  MR JUSTICE ANDREW BAKER: Very good.
15  So Mr Shah, what we are going to do, I said
16  five minutes, in fact I was making the mistake that
17  I have told other people not to make of looking at the
18  clock on the wall in this courtroom, which is never
19  correct. It may be closer to a 10—minute break.
20  It is just after 2.20 London time. We will take
21  a pause and a comfortable break. We will resume at 2.30
22  so that Mr Goldsmith, on his completely separate topic,
23  will try to cover some ground that it makes sense to
24  cover in half an hour of today and that may then save
25  him some time tomorrow morning but we will still aim for

137

1  a hard stop at 3 pm London time today, all right.
2  Thank you very much.
3  (2.21 pm)
4              (A short break)
5  (2.31 pm)
6  MR JONES: My Lord, may I detain you for a moment or two.
7  MR JUSTICE ANDREW BAKER: Yes, of course, Mr Jones.
8  MR JONES: I have some things, just to warn you, at the end
9  of the day, whenever we get there, which are probably
10  best said when Mr Shah's not still with us.
11  I wasn't, I'm afraid to say, concentrating in the
12  last 45 seconds before we rose, I was aware you were
13  having an exchange with Mr Goldsmith but I didn't hear
14  it properly.
15  When we gave our agreement to Mr Shah being
16  cross—examined by more than one person to accommodate
17  Mr Rabinowitz's difficulties, we did agree that
18  he wouldn't be cross—examined on the same day by two
19  different people. Now, your Lordship is going to be in
20  charge of this, it is not for me to dictate and I'm not
21  being difficult with Mr Goldsmith, but given that it is
22  2.35 and my client originally wanted to stop at 2.45,
23  I personally would prefer that we stick to what
24  I thought we had all agreed. That is not to be critical
25  of Mr Goldsmith wanting to make a start this

138

1  afternoon ——
2  MR JUSTICE ANDREW BAKER: Well, I invited him to contemplate
3  that ——
4  MR JONES: Yes.
5  MR JUSTICE ANDREW BAKER: —— by giving him that option
6  without being aware that that might be cutting across an
7  element of what you say has been agreed. So there it
8  is.
9  MR JONES: My Lord, I would ask to stick to that original
10  thought if we may, given the time of the day. It might
11  have been different if we were between the morning and
12  the afternoon sessions, but I would prefer to stick to
13  it if your Lordship is prepared to contemplate that.
14  MR JUSTICE ANDREW BAKER: Mr Goldsmith?
15  MR GOLDSMITH: My Lord, I do just want to say for the record
16  that my understanding of what we agreed was that we
17  would not cross—examine on the same topics and not that
18  it wouldn't necessarily be the same —— obviously it was
19  contemplated I would be on tomorrow because that is when
20  Mr Rabinowitz isn't there.
21  All of that said, I'm entirely in my Lord's hands.
22  Given the opportunity, given the preference, I would
23  prefer to get started but equally I'm happy to wait
24  until tomorrow morning. I just wanted to make that
25  clear.

139

1  MR JUSTICE ANDREW BAKER: Very good.
2  I am in the awkward position, I hope you have
3  followed that exchange, Mr Shah ——
4  A. Yes, I did.
5  MR JUSTICE ANDREW BAKER: I am in the slightly awkward
6  position that it would have made a difference to me in
7  what I offered to Mr Goldsmith to have heard what
8  Mr Jones indicated. Equally, if it would turn out that
9  Mr Goldsmith's understanding of what had been previously
10  agreed was correct, it may not ultimately have affected
11  my final view as to giving Mr Goldsmith the option to
12  continue today.
13  In part, obviously, I had in mind that if one way or
14  the other we had in effect got half an hour or so saved
15  on where we might have been, collectively in all of our
16  interests we might aim ultimately to save that half
17  an hour effectively at the end of a Friday rather than
18  at the end of the Thursday. But there it is.
19  I don't consider in the circumstances, this having
20  arisen slightly on the hoof, that I should press to my
21  original thought of giving Mr Goldsmith the option to
22  start today. He was obviously prepared and preparing on
23  the basis of making good use of a single day to get
24  through the topics he is going to get through so we will
25  on that basis adjourn, as far as the evidence is

140

Confidential

1    concerned, to tomorrow morning.  As it happens, Mr Jones
2    has indicated that there are some matters he wants to
3    raise  by way of housekeeping or otherwise that we should
4    probably discuss without Mr Shah overhearing us, so we
5    can get that done without extending the court sitting
6    day today for  staff  and the transcribers.
7        Mr Shah, apologies if that ends up meaning that we
8    have teed you up to think you were going to start on
9    a  different  topic with Mr Goldsmith only to get you to
10   put the driver back in the bag, but there we are, we are
11   going to pause your evidence until 9.30 tomorrow
12   morning.  The witness warning still  applies  subject to
13   the exceptions I have discussed.  I hope you understood
14   in my observations before we took that short break that
15   you will  be being contacted at some point by Meaby & Co,
16   just to talk  about the issue of stamina and fatigue and
17   how you have found this week.
18   A.   Yes.
19   MR JUSTICE ANDREW BAKER:  As you have heard, I have
20       authorised them to have that conversation with you, so
21       don't worry but that  is  a  different  topic  to what
22       I have previously said they are allowed to talk to you
23       on during your cross—examination.
24        Subject to that addition and the other exceptions
25       that we have previously mentioned, the witness warning

141

1    still  applies and we will see you again tomorrow
2    morning.  I  will  ask at those at your end to disconnect
3    so that we can have the other housekeeping discussions
4    we are going to have at this end.
5        Thank you very much.
6    A.   Thank you my Lord.
7        (In the absence of the witness)
8                   Housekeeping
9    MR JUSTICE ANDREW BAKER:  Yes, Mr Jones.
10   MR JONES:  My Lord, thank you.
11        I  have two topics.  One which I'm just going to
12       raise  as a point of  I'm afraid correction of one of
13       Mr Rabinowitz's questions, and then after we have looked
14       at that I just want to deal with the  practicalities  of
15       what your Lordship has ——
16   MR JUSTICE ANDREW BAKER:  What I have asked Mr Shah to do,
17       yes.
18   MR JONES:  Can I ask for the transcript to come up for today
19       [draft] 115, that  is  using the page numbers of today.
20       {day19MT/119}.
21   MR JUSTICE ANDREW BAKER:  Yes.
22   MR JONES:  Lines 6 and 7.  So your Lordship will see that
23       what is there.  I  can tell  you without any question that
24       the witness statement being referred to there  is  the
25       first  witness statement and the reference to that is

142

1    [draft] page 111, so we know from page 111 what is being
2       referred  to.  The difficulty  I  have with the premise of
3       the question is that  it  was impossible.  So what we know
4       is that that witness statement was dated 19 January, and
5       we know SKAT's written opening ——
6    MR JUSTICE ANDREW BAKER:  In its final version and for that
7       matter substantial parts of the content, although
8       reviewed and then signed up to in mid—January, were from
9       a month or so before that anyway.
10   MR JONES:  Yes, our  ——  I am going to call it the informal,
11       pre—PTR draft ——
12   MR JUSTICE ANDREW BAKER:  And what you are going to remind
13       me is the written opening only came about 10 days later.
14   MR JONES:  15 March.
15   MR JUSTICE ANDREW BAKER:  A month later.
16   MR JONES:  15 March.  So the position is the premise of that
17       question was wrong.  Mr Shah agreed it, but he couldn't
18       have agreed it as being correct.  So I'm not ——  I made
19       you all an implicit promise yesterday that I wouldn't
20       jump up and down during the course of the evidence, so
21       we wondered whether I should, but it seemed to me that
22       by the time I had made a decision Mr Rabinowitz had
23       moved on and I did not want to interrupt him.  I didn't
24       think that was fair.  But the premise of that question
25       wasn't right.  I  just ask him to reflect  on that and see

143

1    if  he wants to do or say anything about it on a future
2       occasion.  I'm not suggesting he should do so today and
3       I  plainly couldn't raise  it  in Mr Shah's presence,
4       unless  I  had done it  instantly.
5    MR JUSTICE ANDREW BAKER:  I think, Mr Jones, that is
6       a very ——  on the face of things that is a fair
7       observation and it is  a matter for Mr Rabinowitz whether
8       he feels  ——  and he will reflect on this obviously
9       between now and a week on Tuesday ——  whether he feels in
10       fairness  to Mr Shah and/or to any submissions that
11       Mr Rabinowitz is going to be making in closing that he
12       wishes to revisit  that as efficiently  as he can, because
13       these things sometimes end becoming a bit awkward.
14        But whether he wishes to do so to make clear, if he
15       thinks this is  correct, that he should withdraw any
16       suggestion that the witness statement was produced, in
17       the sense of  initially  drafted and signed, with the
18       benefit of seeing the written opening and the criticism
19       is therefore more ——  still made but limited to the
20       failure to correct  after seeing the written opening.
21   MR JONES:  Correct.  It would seem to me ——  it seems fairer
22       to raise  it  now than just leave  it  until next March and
23       say that part of the answers we can put to one side.  So
24       that was my first part.
25        So far as  practicalities  are concerned, let me just

144

Confidential

SKAT_MDL_001_00838282

DX5782, page 37 of 49

1  remind your Lordship of where we are. Mr Shah has
2  a laptop to which he has access in the visitor centre
3  but not in his cell, so he can make use of it. He
4  cannot, however, communicate anything which he types on
5  to it. That can only be achieved by somebody attending
6  and uploading the material on a USB stick. That is the
7  only way that can be done.
8     Now, practically, there may be an ability to do that
9  if he is in court on Friday because he is allowed to
10  take the laptop to court and his Danish lawyer can do
11  that for us and send it to us. So I can't say that is
12  precisely how it could be done, but that would mean any
13  work he does for your Lordship would be done the night
14  before Thursday evening, which would leave, without
15  Friday, Saturday, Sunday or ——
16  MR JUSTICE ANDREW BAKER: A week Monday.
17  MR JONES: Yes. So my Lord, can I just park that for
18  a moment, until we have made further enquiries, but that
19  is the current position.
20  MR JUSTICE ANDREW BAKER: Did he have —— does he have a hard
21  copy even just of his own witness statement? No. Oh,
22  yes, he does.
23  MR JONES: I thought —— well, I thought that hard copy was
24  only in the room in which he was giving his evidence.
25  If he has it with —— I'm told he could have it with him.

145

1  But the difficulty ——
2  MR JUSTICE ANDREW BAKER: Because an alternative, if it were
3  practicable, and if he is allowed writing implements,
4  would be for him to use a hard copy, if there is a hard
5  copy available to him, and simply make deletions.
6  MR JONES: Actually writing physically is more difficult for
7  him because he has ——
8  MR JUSTICE ANDREW BAKER: The arthritis.
9  MR JONES: For obvious reasons. The second point that goes
10  with it is —— I'm not in any event or in any way trying
11  to revisit the decision your Lordship made as it were on
12  the hoof, without assistance from the Bar, because we
13  are entirely within your prerogative to do that, but he
14  does not have access to documents for the purposes of
15  checking what documents might or might not apply to his
16  witness statement. So, my Lord, I am not making
17  submissions about that, I just want your Lordship to be
18  aware of the limitations. So ——
19  MR JUSTICE ANDREW BAKER: Well, I am, and I think
20  I indicated to Mr Shah that I am. But equally he has
21  given the answer he has given and I can see that it may
22  be submitted that it was not on the face of things that
23  credible an answer that an intelligent man really did
24  not understand that when you said to him, "Are those
25  statements true bearing in mind in that regard the

146

1  corrections you have recently made just a few days ago",
2  that he thought you were asking him a completely
3  different question, but that is the answer he has given
4  and I thought I was giving him, in fairness to him, the
5  opportunity, aware of the limitation that he —— the
6  difference between the material he may have had access
7  to when preparing the statement and what he has seen now
8  is not as great as if between then and now he had had
9  general access to Opus 2 and so on, but that he ought to
10  have the opportunity on a careful re—read of the first
11  statement, it having been clarified I hope sufficiently
12  that what we are interested in is what he now says he
13  believes to be true; if there are aspects that he now,
14  having seen what he has seen, no longer stands by, he
15  should have the chance, given that answer, to volunteer
16  that and not have it dragged out of him through
17  cross—examination.
18  MR JONES: I was extremely careful, I hope, this afternoon,
19  in not inviting you to revisit that and I made no
20  attempt to interrupt your flow when you were dealing
21  with Mr Shah and it seems to me the less I say about
22  that until I have reflected on it the better, because
23  those may be matters for submission in due course and
24  they are not for submission now.
25     My concern only is to bring to your Lordship's

147

1  attention the necessary limitation on the exercise that
2  we have —— that he has been set.
3     Now, precisely what those limits are, I will make
4  sure I'm on top of by the time we come back next week ——
5  the week after next, but I just needed you to know that
6  the proposition that he can go away and with access to
7  documents in any meaningful sense go through that
8  witness statement again ——
9  MR JUSTICE ANDREW BAKER: That is not what I asked him,
10  Mr Jones. You heard what I asked. I did not ask him to
11  go through his witness statement and cross—reference any
12  documents at all. What I asked him to do was carefully
13  re—read the statement and identify whether, where we are
14  at now, he is now saying there are things in there that
15  he could no longer swear to as being what he believes to
16  be true, because on what —— on the answer he has given
17  as to what he says he understood the question in chief
18  to have been, you failed, with respect —— not through
19  any fault of yours, it might be said, given the way you
20  posed the question —— but it turns out that according to
21  his evidence you have not extracted from him his
22  evidence—in—chief as to what, at the time he was sworn
23  to give that evidence—in—chief, he believed to be true.
24  That and that only is my concern.
25     And as I indicated, I think, when he raised the same

148

Confidential

DX5782, page 38 of 49

SKAT_MDL_001_00838283

1  issue with me, I am perfectly alive to the fact, and
2  indeed Mr Shah himself then also confirmed it, that
3  anything he does do between now and then can't on his
4  side be as it were a warranty that in the course of the
5  further cross—examination other points might not then
6  emerge which he has not, on this further and further
7  opportunity to correct what he would have said in chief,
8  has not generated a change, but he is then shown some
9  documents and accepts something or makes a further
10 change; that will all end up going into the overall
11 assessment of weight and so on at the end of the case
12 and I am alive to that.
13      I just do not want him, in the circumstances, to
14 continue to be cross—examined as if the content of the
15 first witness statement, as we have all read it, is what
16 he was —— what, properly concentrating on the question,
17 what today, Monday of this week —— no, Tuesday of this
18 week, are you saying to the court you believe to be the
19 truth, as if that is indeed the content of that first
20 witness statement, because effectively his own statement
21 now is that is not what he said in chief.
22      So there it is.
23 MR JONES: My Lord, I do understand. I just wanted you to
24 know. We will do what we can to facilitate that and we
25 will work out a practical plan for it to be perfected

149

1  somehow.
2      May I ask you this, because when you asked me
3  earlier on whether he had access to the transcript,
4  I said no. It seems to me useful in the circumstances
5  if he may be given now access to the transcript. There
6  is normally no inhibition on that, so I'm not asking
7  strictly for permission but having said earlier he
8  wasn't receiving them, it is right that I say that that
9  may now change. So what we would propose, unless your
10 Lordship has objection or SKAT wants to make objection,
11 is that he be provided with the transcripts for this
12 week, obviously minus anything which has taken place in
13 his absence, which we will carefully deal with.
14 MR JUSTICE ANDREW BAKER: Putting it the other way round,
15 which is perhaps a neater way around, he —— subject to
16 any observations from SKAT, he might, if there is a way
17 of achieving this, be given a copy of the transcript of
18 his evidence this week.
19 MR JONES: Yes.
20 MR JUSTICE ANDREW BAKER: So anything that is in the
21 transcript that is not part of his testimony ——
22 MR JONES: Gets removed.
23 MR JUSTICE ANDREW BAKER: —— can be blanked out or excised
24 in some way.
25 MR JONES: And we ought to be able to deal with that

150

1  electronically, double—check it, we can then send it to
2  his Danish lawyer who will then be able to go in and
3  upload it to his laptop I think practically, so
4  (inaudible — overspeaking) ——
5  MR JUSTICE ANDREW BAKER: Subject to any observations from
6  SKAT, it occurs to me that it may be I should consider
7  giving permission otherwise on the same terms as to the
8  practicalities for the Meaby partners to be allowed to
9  speak directly to Mr Shah concerning the practicality of
10 conducting the exercise.
11 MR JONES: Yes. I would prefer that, rather than leaving it
12 to the Danish lawyer because ——
13 MR JUSTICE ANDREW BAKER: —— rather than potentially
14 leading to some Chinese whispers and a longer chain of
15 communication.
16 MR JONES: Yes.
17 MR JUSTICE ANDREW BAKER: So, Mr Rabinowitz, on provision of
18 transcript but limited to his testimony in the
19 circumstances and permission as a further exception to
20 the purdah rule for Meaby's to talk to him about the
21 practicalities of doing that exercise.
22 MR RABINOWITZ: No objection at all, my Lord.
23 MR JONES: I am very grateful.
24 MR JUSTICE ANDREW BAKER: And have I been clear enough from
25 SKAT's point of view as to the limited nature and

151

1  purpose of the opportunity I have wanted to give him and
2  that, if I can put it this way, and you know why I am
3  saying this, that by giving him that opportunity that it
4  is not intended to create, as it were, disproportionate
5  or inappropriate further ammunition to anybody by
6  reference to, "Oh, and you didn't make that change even
7  in the week when the judge asked you to revisit the
8  statement".
9  MR RABINOWITZ: My Lord, no. As I understand what your
10 Lordship is doing is ensuring that there is no
11 cross—examination on what Mr Shah would suggest is
12 a false basis, which is to say I'm pursuing on the basis
13 that something is still his evidence and because he says
14 he has misunderstood a question from my learned
15 friend ——
16 MR JUSTICE ANDREW BAKER: The key question in chief, in
17 effect that wasn't really what he, as it were, should
18 have been saying was his evidence—in—chief, yes.
19 MR RABINOWITZ: Exactly. If, as he says, he misunderstood
20 the question, if it as he says, I am cross—examining on
21 the basis that something is his evidence and he has had
22 a look at it and all he thought he was doing was
23 confirming it was true when it was written but he no
24 longer thinks it is true, then we are all wasting a lot
25 of time, and in my respectful submission it is entirely

152

Confidential

DX5782, page 39 of 49

SKAT_MDL_001_00838284

1    appropriate that we avoid me having to cross—examine on
2    a false basis, which is what that would involve ——
3  MR JUSTICE ANDREW BAKER:  All right.  I am grateful.
4  MR RABINOWITZ:  With respect, I do not understand the
5    problem.  If he was able to —— presumably he was told
6    that he was going to be asked this question and he
7    needed to confirm it; if he was able to do the exercise
8    to ensure he could confirm it then, then he ought to be
9    able to do the exercise and make sure on the proper
10   basis of the question he can confirm it now.  I am not
11   trying to create problems for my learned friend, but it
12   ought not to be ——
13 MR JUSTICE ANDREW BAKER:  No, I see it.  Of course, there is
14   the distinction now that, subject to permissions of
15   various types that I have given, he is now in purdah
16   because he is in the middle of his evidence, whereas
17   what you might in due course be submitting is the
18   equivalent opportunity that he really had once already
19   and saw fruition in the form of the fourth witness
20   statement was at a time when he was more generally free,
21   but subject to the limitations of his general
22   circumstances, to talk about the case with his legal
23   advisers, whereas now the exercise has to be an entirely
24   personal one of re—reading the statement and saying, "Is
25   that still what I think is correct".

                              153

1  MR RABINOWITZ:  Although one imagines that when he did his
2    fourth witness statement there was that discussion
3    anyway.
4  MR JUSTICE ANDREW BAKER:  Well, I follow that too.
5  MR RABINOWITZ:  I don't want to make submissions and I am
6    genuinely not trying to make his life more difficult,
7    but in my respectful submission what your Lordship has
8    said was entirely the appropriate thing to do in order
9    to save us time going forward, and it is fair to
10   Mr Shah.
11 MR JUSTICE ANDREW BAKER:  Very good, thank you.
12 MR RABINOWITZ:  Could I just very quickly respond to my
13   learned friend's observation?
14 MR JUSTICE ANDREW BAKER:  Yes.
15 MR RABINOWITZ:  First, can I thank my learned friend for not
16   rising.  I have looked at it.  Reading it, it is pretty
17   clear to me, and it may have been clear to Mr Shah, that
18   I was talking about his fourth witness statement, but
19   that's not recorded on the transcript.  If I had said
20   his fourth witness statement it would have been clear
21   and made sense.  But if I look at it again and ——
22   I don't want to make people go and check a tape ——
23   I will simply clarify to Mr Shah at some appropriate
24   point that that is what I had in mind, if I can do it in
25   an efficient way, so that he understands exactly the

                              154

1    premise, the correct premise of the question.
2  MR JUSTICE ANDREW BAKER:  What I will say, Mr Rabinowitz,
3    because it does happen occasionally —— of course we
4    appreciate that we are all working at the moment anyway
5    from what, as far as Opus is concerned, is only the
6    draft transcript as it has been coming up in realtime.
7    On any given day, there is any number of little bits and
8    pieces of "inaudible" or arrow heads to show that the
9    live transcriber has not quite caught us perfectly and
10   they are tidied up.  But perhaps that does mean that
11   if —— they are obviously listening to me.  If particular
12   attention could be paid to that passage around —— give
13   me the page number again, Mr Jones ——
14 MR JONES:  Between [draft] page 111 and [draft] page 115,
15   and the precise passage is page [draft] 115
16   {day19MT/119}.
17 MR JUSTICE ANDREW BAKER:  So if particular attention could
18   just be paid in perfecting the transcript for today to
19   the passage at what at the moment is [draft] page 110 or
20   so through to [draft] page 116 or so, then
21   Mr Rabinowitz's further reflection on Mr Jones'
22   observation may be by reference to the most accurate
23   version that Opus is able to produce of exactly what was
24   said and I will then leave it in your hands as to
25   whether in the light of that you wish to revisit it,

                              155

1    leave it alone completely, or as the case may be.
2  MR RABINOWITZ:  I just want to make clear, I'm not saying
3    I did say "fourth", because it was late in the
4    afternoon.  I was getting very excited because I knew
5    I was close to finishing for the week, so it is
6    perfectly possible I left out at least one word.  But
7    obviously if I did leave it out, I will need to deal
8    with it.
9  MR JUSTICE ANDREW BAKER:  Very good.  Thank you very much.
10   Anything else from anybody else at this stage?
11 MR HEAD:  My Lord, you are looking at me.  I would prefer to
12   update your Lordship tomorrow, if I may.  At the moment
13   I anticipate being relatively short in that, but I will
14   update your Lordship tomorrow, if I may.
15 MR JUSTICE ANDREW BAKER:  As we have done with what happened
16   on Tuesday, I will take anything of that sort or any
17   other matters of housekeeping at the end of the evidence
18   session for Mr Shah whenever it is that Mr Goldsmith
19   gets to the end of his questions.
20   All right, very good.
21 MR RABINOWITZ:  Can I mention one other thing?  I'm sorry.
22 MR JUSTICE ANDREW BAKER:  Yes, Mr Rabinowitz.
23 MR RABINOWITZ:  Your Lordship may actually have dealt with
24   this, but we are slightly unclear on this side.  In
25   terms of any corrections that Mr Shah can produce, the

                              156

Confidential

```
 1      timing of anything that he is going to produce, I think
 2      your Lordship may have raised it but I don't know
 3      whether we got to a landing on when ——
 4  MR JUSTICE ANDREW BAKER:  I feel in some difficulty about
 5      giving a direction now by way of any hard deadline
 6      whilst aspects of the  practicalities  may be up in the
 7      air .  I think it goes without saying that on the
 8      Sanjay Shah side generally, and within the limits of the
 9       practicalities , that the sooner the exercise can be done
10      and the product of it , if it does include or involve any
11      degree of deletion or correction of bits from that first
12      statement, can be communicated to the rest of us but
13       particularly  SKAT who are in the middle of
14      cross—examining ——
15  MR JONES: I understand.
16  MR JUSTICE ANDREW BAKER:  —— the better, but I'm not going
17      to give you a deadline, a specific deadline to work to,
18      because I think I'm not in a position to identify one.
19  MR JONES: Yes, thank you.
20  MR JUSTICE ANDREW BAKER:  Very good.  Yes, so 9.30 tomorrow,
21      and I will see you in a week and a bit's time,
22      Mr Rabinowitz.  Thank you.
23   (2.57 pm)
24   (The hearing adjourned until 9.30 am on Friday, 24 May 2024)
25
```

157

```
 1                    INDEX
 2                                              PAGE
 3  Housekeeping      ........................................1
 4  MR SANJAY SHAH (continued)   ..........................5
 5  Cross—examination by MR RABINOWITZ (continued) .......5
 6  Housekeeping      .....................................142
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

158

Confidential
DX5782, page 41 of 49
SKAT_MDL_001_00838286

## A

a3952 (1) 17:1
a9339 (2) 12:7,17
a9340 (1) 12:14
a9341 (1) 12:15
ability (2) 53:16 145:8
able (37) 3:16 10:16 14:9
  15:20 37:10 40:17 50:19
  53:18,19 64:13 69:1 75:6
  76:15 113:25 127:6
  126:11,14 131:16 132:23
  133:2 133:13 150:25 151:2
  153:5,7,9 155:23
abn (1) 62:7
above (6) 24:18 43:18 73:22
  100:4,19 109:2
abra (19) 59:4,10,18 93:10
  91:15,52,2 100:7
  104:1,2 105:10 106:3,8,13
  110:22 111:6 114:9,11,15
abras (2) 106:18 110:19
absence (3) 115:20 142:7
  150:13
absolute (2) 81:8,12
academy (1) 101:23
accept (10) 26:6 70:2,18
  84:15 80:23 107:21 111:1
  114:7 116:20 123:14
accepted (4) 34:10,11
  117:17 120:3
accepts (2) 77:3 149:9
access (19) 7:20 53:25
  54:1,6,7 97:25 117:23
  126:11,18 127:7 132:23
  134:3 135:17 152:17
  146:6,9 148:6 150:1,5
accessed (1) 7:22
accommodate (1) 138:16
according (3) 51:17 125:3
  148:20
account (34) 18:14 19:12
  22:22 23:2,10,11,17
  24:3,6,12,16
  25:3,4,18,18,23,24 26:2
  33:22,23 77:11 93:25
  95:13 97:13,19,25
  98:10,13,18 90:3 109:4,7,7
  110:3
accountancy (1) 78:13
accounts (6) 13:7,11 15:21
  18:2 25:8 27:11
accurate (12) 26:6 34:23
  37:2,3 76:16 121:10 127:8
  127:13 133:2,12,15,12
  155:22
accurately (1) 35:10
achieved (1) 145:5
achieving (1) 150:17
acknowledge (1) 127:21
acknowledged (2) 84:9 102:4
acknowledging (1) 101:2
acorn (2) 24:2,2
acquire (1) 16:17
across (2) 81:7 139:6
acting (2) 1:14 15:3
activities (6) 16:19 16:5
  36:20 38:10 63:4 113:22
activity (10) 7:7 20:3 39:6
  68:3 69:1 114:11,13 115:3
  119:5 129:12
actual (1) 53:1
actually (34) 3:23 4:3,22
  19:24 20:7,25 25:8 26:14
  28:10 31:22 34:13 35:22
  40:16 44:15,21 45:5,6 46:5
  47:25 67:10 88:14 98:4,24
  112:5,9,21,23 117:6,23
  127:4 132:24 146:6 156:23
acupay (18) 22:24
  24:15,16,20 25:16
  26:13,18 28:13 29:2,19,21
  30:17 32:3,11,25 33:3,6,9
ad (2) 100:15 110:21
add (3) 67:25 66:22 133:10

added (1) 88:12
addenda (2) 133:15,16
adding (1) 92:13
addition (1) 141:24
additional (6) 2:24 3:1,19
  68:13 89:10 119:8
address (3) 30:25 31:1 131:9
addressed (2) 21:15 107:15
adhere (1) 131:9
adhering (1) 132:9
adjacent (1) 97:11
adjoin (1) 110:25
adjoined (1) 157:24
adjournment (2) 103:7,12
adjournments (1) 88:10
adjust (4) 15:20 48:15
  52:17
advice (1) 6:3
advisor (1) 49:2
advisors (1) 133:23
advisor (1) 43:12
advisory (16) 42:19 43:20
  44:12,24 45:5,8 46:17
  51:19 52:19 113:21
affected (1) 140:10
affects (1) 129:20
afraid (3) 135:18 136:11
  142:12
after (15) 5:5 11:2 39:20
  54:23 60:25 61:24 80:16
  102:18 103:2 131:13 135:7
  137:20 142:13 144:20
  148:5
afternoon (8) 5:17 102:14
  103:14 135:11 139:1,12
  147:18 156:4
again (84) 3:18 5:12,23
  12:15 18:5 33:12 34:16,16
  38:17 45:15 46:14 57:6
  62:5,9,21 66:14 71:19
  76:21 77:3 82:12 84:19
  86:7,7 89:21 90:7 91:24
  92:2 100:11 101:1
  103:14,21,24 104:24
  105:8,10 120:3,24 123:25
  135:15 142:1 148:8 154:21
  155:13
agent (3) 47:3 48:1 52:12
agents (1) 92:7
ago (11) 1:13 14:3 34:10
  39:17 89:4 96:13 126:8
  127:9 128:2 131:5 147:1
agree (21) 13:9 14:4 20:11
  22:10 34:8 35:7 42:14 48:6
  71:11 78:23 110:10,21
  113:25 114:13 117:9
  121:11 124:9 125:23
  128:9 138:17
agreed (24) 24:17 51:6,14,20
  66:15 67:7 68:2,2 71:14
  72:3 87:16 104:21 118:10
  121:15,19 124:4,7 127:15
  138:24 139:7,16 140:10
  143:17,18
agreement (17) 1:24 23:6
  24:18,19 32:24 41:2
  42:10,15,16,20,25
  43:4,6,7,12 44:12,14,18,22
  45:7 46:4 47:23 48:17 49:1
  51:18,22,23,23 52:16
  52:16 62:5,8,24 63:5 68:6
  68:19 71:1,7,8,10 72:1,5
  72:22 81:5,6 82:8,12 83:8
  84:17,24 100:4
amended (1) 121:24
ammunition (1) 152:5
amount (40) 29:20 30:15
  46:11,17,17,21,21
  72:2,3,5,8,21 73:4,6,12,13
  74:9 75:9,12,11 76:2 79:2
  92:9,17 93:2,3,5,18 95:2
  93:15 106:3 109:18 110:3
  110:4 114:9,10 121:8
  139:6,9,12,18 146:7 147:3
  147:5,9,21 152:10 155:18
amounts (12) 47:2,19
  70:13,19,22 71:5 85:22
  88:25 91:23 106:17,19
  126:12,24,25
anew (1) 62:7
andor (5) 52:21 124:18,21
  125:1 144:10
andrew (146) 1:6 2:7,15
  4:7,14 5:2,9,14 7:18
  9:6,13,21 10:15 11:5,10,16
  21:3 23:17 30:1,5,9,22
  36:23 38:4,24 39:2
  40:14,16 66:24 48:22
  49:10 53:24 54:11,21
  55:15 56:7,11,14 44:7 67:1
  68:20 68:23 78:1 79:8
  84:4,19 85:18,22 91:15,18
  86:6,9,12,17,21 89:17
  97:1,5,7,11,22

48:4,4 52:17,17 70:5
  87:18,23,24,25 88:1,4,5,23
  114:22 115:2 118:10
  122:11
ah (1) 21:6
ahead (7) 2:18 26:14,21
  20:19 41:1 103:5 134:24
aim (2) 137:25 140:16
aiming (2) 25:24 102:13
air (1) 157:7
albeit (2) 1:16 100:21
alibi (1) 65:16
alive (2) 149:1,12
allegation (1) 126:24
allegations (1) 10:11
alleged (4) 123:3,20 124:15
  125:21
allor (3) 74:7,14,18
allocated (3) 94:22 99:17
  100:11
allocations (1) 90:18
allow (4) 54:6 114:17 115:2
  136:7
allowance (2) 96:14,15
allowed (6) 8:6 24:12 141:22
  145:9 146:3 151:8
almost (1) 95:22
alone (1) 156:1
along (1) 90:19
already (10) 1:13 27:12
  20:13 47:22 57:24 66:14
  82:19 92:23 107:6 153:18
alt (46) 1:23 7:5,15 14:13
  15:19 18:1,21 19:2 20:13
  22:7 25:12 26:12 28:10
  31:11 39:6,9,12,14,19
  50:13 53:18,19 60:9
  61:11 67:25 68:22 69:2
  73:11 73:24 77:9 78:22
  80:1 82:16,18 106:6 108:2
  108:12,13 109:1,1,13 110:2
  110:5 113:8 142:6,17
anticipate (2) 132:1 156:13
anybody (2) 152:5 156:10
anymore (1) 87:11
anyone (2) 10:16 127:9
anything (5) 3:13 40:10
  53:10 80:15,16 80:22
  112:16 116:9,10,12 150:2
  152:7 153:6
anyway (7) 1:9 78:13 81:2
  102:13 143:9 154:3 155:4
apart (1) 90:18
apologies (3) 7:18 9:21
  49:13
apparent (1) 3:20
apparently (3) 51:11 52:8
  111:7
appear (3) 8:16 12:19 44:24
appeared (1) 91:13
appears (1) 9:10
apple (2) 30:14 31:6
applicable (4) 93:1,4
  121:15,19
applicant (3) 79:24 105:25
  106:5
applicants (16) 5:20,22,25
  6:2,18 17:7,23 20:1
  40:21 45:25 61:7 68:6 88:2
  104:6 106:14
application (10) 10:24 88:17
  92:10 113:16 114:2 115:19
  applications (12) 6:2 34:11
  35:6 63:1 79:19 81:16
  95:12 99:9 125:3
  126:18,23
apply (1) 146:15
appreciate (5) 133:19 134:2
  135:14,17 155:4
approach (1) 102:13
approached (2) 66:24 116:11
approaching (1) 134:22
appropriate (6) 52:4 102:13
  136:1 153:1 154:6,23
aquala (9) 59:5,10,14
  83:4 85:10 93:4,12 100:10
  141:12 142:1
aquo1 (1) 83:4
aquila (9) 59:5,10,14,22
  83:4 85:10 93:4,12 100:10
arbitrage (8) 6:22 7:3,7
  63:15 66:24 116:14,25
argre (19) 6:6,9,10 7:3,12

123:10,15 129:16 130:6,11
  131:4,11,25 132:10
  133:8,18 134:5 135:4
  136:12,21 137:14 130:7
  139:2,5,14 140:1,5 141:19
  144:5 145:16,20
  146:2,8,19 144:18 150:9
  151:5,13,17,24 152:16
  153:3,13 154:4,11,14
  155:2,17 156:9,15,22
  157:4,16,20
anne (1) 40:8
another (15) 27:20 37:7,10
  44:11 61:11 62:1,13 76:1
  83:16 84:17 108:1 111:9
answer (32) 1:20 2:12 4:21
  11:16,20 34:6,7,10 39:16
  41:1 49:20,22 52:15,25
  72:3 39:8 41:11 50:12
  142:15,23 73:3 76:18
  96:13 114:7 127:8,15
  102:15 105:16 106:7,9,13
  115:6 116:9 119:10 129:9
  134:21,23 143:15 148:10
answered (1) 34:15
answering (1) 10:16
answers (3) 09:20 131:4
  145:23
anticipated (2) 132:1 156:13

11:19 12:10,21 13:5,6,17
  14:5 16:3 18:10,13 19:7
  45:21,24 91:17
arguably (1) 37:15
arise (1) 41:21
arising (2) 89:10 136:14
around (7) 50:22 74:24 75:4
  80:10,11 150:15 155:12
arrange (2) 110:2 136:3
arranged (1) 67:4
arrangement (5) 1:15 51:13
  74:22 118:21 127:2
arrangements (2) 2:24 116:6
arrow (1) 155:6
arthritis (1) 146:8
ascertain (1) 7:6
aside (5) 65:23 72:7 90:18
  110:12,15
ask (38) 7:20 13:16
  18:4,16,20,25 19:16 23:25
  32:3 39:8 41:11 50:12
  55:17,20 56:3 59:17
  58:3,24 39:2 40:14,18
  74:16 80:12 96:21 99:9
  102:5,9 104:17 112:18,20
  117:14 118:15 124:22
  128:3,9 134:16 150:2 155:4
  156:21
asked (29) 6:10 11:10 17:4
  14:1 56:7,11,14
  4:6,24 48:22 49:19 53:24
  54:11,21 55:15 56:7,11
asking (21) 5:11 54:17,24
  64:11,16 86:13,20 72:23
  73:10,19 78:11,15 80:19
  85:25 86:6,9,12,17,21
  89:17 97:11,22 99:15,22,25
assessment (1) 149:11
assigned (1) 105:24
assist (2) 6:22 66:1
assistance (2) 120:11 146:12
assisting (1) 120:25
associate (1) 11:6
associated (3) 17:3,10 70:18
associates (1) 6:7
assume (3) 10:21 49:23 56:3
assumed (1) 7:9
assuming (2) 85:2,22
attached (5) 8:17,25
  bank (2) 51:3 62:6
attaches (1) 100:24
attachment (4) 90:3
  106:17,20 111:24
attachment (1) 90:23
attempt (2) 9:11 127:12
attended (1) 56:11
attending (1) 145:5
attention (3) 148:1
  155:12,17
attorney (1) 122:4
attributable (1) 106:3
august (9) 80:23 81:3
  90:2,10 91:9,11 103:15,25
  104:6 106:14
authorise (2) 9:11 127:12
authorised (2) 23:1 141:20
authorities (3) 21:3 116:21
  33:13
authority (2) 33:4 44:16
avoid (1) 153:1
award (1) 126:16
aware (15) 1:14 15:2 38:9,13
  43:3,8,17 71:8,12 125:9
  135:15,24 138:12 139:6
  154:25 155:5
awkward (3) 140:2,5 144:13

## B

b (1) 97:8
b1222 (1) 124:13
b62315 (1) 76:20
b70111 (1) 121:23
b701172 (1) 122:17
b70115l (1) 122:9
b70115S (1) 121:15
b70156 (1) 122:23
b70157 (1) 121:18
b70158 (1) 125:7
back (31) 8:20 9:11 12:17
  23:20 22:20 25:5 28:5
  30:14,22 31:20,23 39:18
  41:25 46:7 47:1 55:6 57:20
  61:5 76:19 92:9 94:1
  101:20 102:18 103:1,2,25
  108:8,17,19 121:19 126:17
  127:22 128:18,12:11 141:10
background (1) 117:1
backtoback (3) 66:18,22
  67:5
backtrack (1) 34:10
bag (1) 141:10
bailor (1) 27:5 28:11
baker (16) 1:6 2:7,15 4:7,14
  5:2,9,14 7:18 9:6,13,21
  10:15 11:5,10,16 21:3
  29:17 30:1,5,9,12,19 36:23
  38:4,24 39:2 40:14,16
  66:24 97:6,9,17,22
  98:3,14,21,24 99:8,10,11
  99:15 100:2,3,7 103:9,14
  106:22 107:1 109:13 117:2
  122:23 126:3,25 127:10,17
  140:20 146:17 148:19
  153:7,9 157:11
balloon (1) 83:12
bank (2) 51:3 62:6
bankrupt (1) 61:1
banks (1) 60:20
bar (1) 96:24
based (17) 6:2 19:9 20:19
  34:15 53:25 70:14 74:6
  76:13 85:2 113:5 124:9
  125:23 126:13 133:6
  136:14 150:20 153:24
basing (1) 73:16
basis (16) 30:20 50:13 53:2
  66:3 67:14 81:15 101:9
  127:21 136:16 140:23,25
  152:12,12,21 153:2,10
bear (1) 55:8
bearing (3) 3:13 102:16
  146:25
became (8) 7:13 12:21 60:22
  50:6,19 60:11 69:12 79:10
becoming (2) 10:24 145:19
before (27) 3:2 4:4 10:15
  21:17 22:6 24:18 27:3,13
  62:20 77:16 79:5 89:17
  91:16 99:16 109:9 110:22
  123:11 124:15 143:2,13,20
  147:1 155:11 122:12 153:8
  154:7,14

138:12 141:14 143:9
  145:14
began (2) 13:7 18:1
beginning (3) 31:20 94:14
  129:2
behalf (8) 31:13 43:13 52:11
  64:17 100:17 122:6,7
  148:2,12
being (51) 2:13 15:5 33:18
  34:17 35:6 36:17 39:10,19
  48:10 49:6,16 50:19,25
  51:18 69:16 74:13 80:7
  82:5 68:17 92:4,14 94:5
  92:20 100:5 106:12 107:2
  111:8 114:23 117:17
  118:8,17,19 121:19 126:17
  127:22 128:10,19,23
  131:6 132:4,11 134:13,17
  143:11 144:22 149:6,7
  156:21 157:3
belgian (3) 47:12,15 70:6
belgium (3) 73:9 81:19,22
belief (3) 122:5 129:11
  130:24
believe (16) 21:25 25:5,8,25
  26:8 33:24 34:4,22 35:8,10
  36:9 49:20 56:2 133:13,21
  149:10
believed (2) 132:4 148:23
believes (2) 147:13 149:15
below (6) 10:3 91:19 92:10
  93:21 107:19,20
benefit (2) 69:7 144:18
best (6) 52:2 106:7 108:2
  126:9 130:23 133:21 138:10
better (2) 147:22 157:16
between (30) 2:25 7:10
  22:23 24:20 25:2,16 26:1
  33:25 35:18,21 36:15
  40:22 60:24 75:2 87:9
  91:23 116:20 152:23 153:10
beyond (1) 16:5
bh (2) 105:16,20
big (2) 30:14 31:6
bigger (1) 5:3
bill (2) 33:6 113:25
billed (1) 33:9
billing (2) 20:25 32:24
bit (3) 49:5,18 144:13
blacklivars (4) 21:8,15 33:13
  37:20
blanked (1) 150:23
blumable (6) 59:5,19 62:1,2
  83:17 85:14
bm2 (1) 105:17
bn (3) 105:17,20 106:16
bo23 (1) 106:10
board (2) 1:22 2:4
bonus (6) 94:15,25 96:4,9
  97:2 100:11
both (9) 7:9 13:24 30:20
  25:22 34:16 52:21 89:12
  122:6
bottom (17) 9:16 17:2 27:19
  29:8,24 30:1,4,6,21,22
  31:21,24 90:20 104:9
  107:22 136:14 140:23,25
  152:12,12,21 153:2,10
box (1) 91:21
brackets (1) 39:16
broach (2) 37:15 38:11
break (16) 54:14 55:13
  101:13 102:8 103:3
  120:14,21 129:24 135:20
  134:6 141:9 141:16
breaking (3) 54:24 102:9,17
brief (1) 63:4
briefly (1) 62:19
bring (4) 101:23 102:10
  148:2 155:17
broad (2) 113:21 114:17
broader (1) 52:18
broadgate (4) 13:18,25

57:25 58:15
broadly (2) 135:3,12
broke (2) 137:5,5
broker (13) 16:7
57:6,7,8,11,11,21,24
58:3,12 65:21 83:9 92:9
77:1
brokers (2) 51:2 57:1
brother (3) 115:12,17 125:13
brought (4) 10:8,8 70:15
126:19
built (1) 13:21
business (23) 7:3 16:8 20:14
23:5 39:17,18 40:2 44:4
51:5 61:2 63:5,15 65:22
68:10 96:14,15,22 113:22
114:17 115:3 116:15
117:1,21
bz (1) 107:5
bzst (1) 31:8

_____ C _____

c (5) 84:1,5 89:9 91:25 92:3
c4 (1) 84:23
c94 (3) 86:4,7,7
ca (1) 107:5
calculate (1) 71:25
calculated (8) 76:25
92:10,13 93:15,19 95:5,8
103:16
calculates (1) 92:16
calculating (1) 95:11
calculation (2) 92:22 134:10
call (7) 41:20 51:1 75:21
88:24 101:4 115:18 143:10
called (9) 3:19,22 17:11 57:4
90:3,18 94:25 104:23
130:3
came (5) 1:22 2:4 72:2
77:11,13 78:6 79:15 121:5
143:13
cannot (3) 9:20 50:7 145:4
cant (24) 10:2 30:4 40:6
42:15 52:25 53:6 72:21
73:18 75:24 76:21 80:6
96:23 111:1 112:7 116:23
123:8 154:6 155:6 128:8
127:4 132:19 145:11 149:3
capital (13) 1:24 14:7 20:17
24:2 25:19 59:5 62:20
64:12,17 83:19,21
85:16,14
capitalised (1) 46:6
caption (2) 0:24 114:3
capture (1) 113:22
care (3) 127:13,16 136:5
careful (2) 147:10,18
carefully (4) 21:17 131:15
139:2 141:10
carried (3) 25:5,25 33:24
carry (2) 20:22 43:13
carrying (1) 69:3
cases (4) 72:15,15 77:15
78:8
cash (14) 13:11,13 14:11
15:15 18:2,6,6,12,15
49:6,16 66:17 90:3,16
catered (1) 4:5
caught (1) 155:9
cayman (3) 59:4,15 107:23
cell (13) 80:10 91:15 92:12
93:14 94:2,2 95:6 97:10
104:4 105:13,17 106:18
145:3
cells (3) 59:6 94:1 97:11
centre (1) 145:2
ceo (1) 36:8
certain (3) 7:25 9:17 39:4
certainty (2) 81:8,12
cetera (3) 125:17,19,19
chain (2) 32:20 151:14
chance (1) 147:15
change (7) 61:8 86:24
129:11 149:8,10 150:7
152:6

changed (1) 118:1
changes (1) 129:9
charge (6) 58:8 74:21 75:6
76:1,2 138:20
charged (8) 65:19 74:7,20
84:10 92:7 98:1,20,25
charges (2) 50:25 52:13
charging (2) 51:4 98:22
chasing (1) 27:20
check (4) 2:3 5:11 9:11
154:22
checked (6) 21:17 22:3
25:2,22 33:21 35:3
checking (1) 146:15
chem (2) 83:19 85:14
chief (5) 4:1 14:8 17 149:7,21
152:16
choice (8)
49:5,8,10,11,13,17,21 50:7
choose (2) 49:17 73:12
chooses (1) 37:8
chosen (3) 10:18 37:1 36:6
chronological (3) 86:18
102:23 103:1
circumstances (13) 20:8
25:17 35:22 38:22 53:3
78:20 80:8 133:15 109:10
149:13 150:4 151:19
149:2,5
claimed (1) 6:1
clarification (3) 1:12 2:14
130:8
clarifications (1) 130:21
clarified (2) 1:19 147:11
clarify (5) 1:21 2:7 96:1
114:5 126:1
classed (1) 52:21
clause (7) 43:11,23 44:2,3
46:6 112:20 113:4
clean (2) 136:25 137:9
clear (20) 5:23 7:5,8 12:25
39:9 60:9 64:19 79:10
84:14 87:1 104:19 124:11
132:3 139:25 144:14
151:24 156:17,17,20 156:2
clearer (1) 15:3
clearors (1) 51:1
clearing (4) 53:15 96:20
98:23 99:1
clearly (1) 90:14
click (2) 10:4 49:10
clicked (1) 92:12
clicking (1) 7:23
client (12) 16:4 27:13 43:14
44:5 60:12 61:17,21 62:10
91:12 116:12 119:2 130:22
clients (22) 7:13 16:8 26:20
27:8 42:11 48:8,25 51:19
54:7,9 57:12 63:2 77:17
88:13 91:21 96:15 103:5
113:20 117:3 119:3,6
129:12
clock (1) 137:18
close (2) 59:22 156:5
closed (2) 10:2 11:7
closer (1) 120:19
closing (1) 144:11
co (3) 99:9 136:1 141:15
codes (1) 91:12
coincidence (1) 134:13
col01 (1) 83:6
colbrook (3) 83:6 85:10
100:4
colleagues (2) 116:24 119:8
collected (1) 24:21
collectively (1) 140:15
college (4) 59:23 60:5
103:20 119:13
column (30) 12:13 66:12
56:22,25 57:4 58:25
59:13,13 62:24 84:1,5,5,23
89:9 91:25 92:3 93:8 94:21
95:5,7 97:8 99:17,21
101:1,5 105:8,20,25
106:16 107:5

columns (2) 105:16 107:1
combination (1) 97:2
come (22) 10:8 19:8
45:15,17 47:1 55:2,19
64:2,22 65:5,7 68:7 70:25
71:1 72:6 76:19 79:3
102:10 103:2 112:13
142:18 140:4
comes (2) 31:1 86:24
comfortable (4) 135:23,24
137:7,21
coming (11) 2:1 48:13,15
55:6 6:5 65:1 80:18 81:9
82:3 103:1 155:6
comment (8) 20:11 34:8
36:18 53:8 115:1 126:14
131:17 133:19
comments (2) 100:12,17
commercial (1) 51:13
commission (3) 65:21,23
78:21
commissions (1) 84:9
communicate (1) 145:4
communicated (1) 157:12
communication (1) 6:18
75:7 151:15
companies (18) 47:9 53:18
64:6 65:10 66:9,10,12
67:10 77:14 79:6,17 80:15
84:2 113:12 114:6 119:3
124:17,20
company (28) 20:9 41:7
49:21,24,25 51:10 62:20
63:4 64:16 70:23 90:19
95:4 109:7 111:7,9,12
114:5 126:1
compared (2) 50:11 65:22
complaint (1) 47:23
completely (6) 9:1 116:15,22
137:22 147:2 156:1
completing (1) 134:25
complicated (2) 42:1 51:1
concentrate (1) 49:15
concentrating (2) 138:11
149:16
concept (1) 15:13
concern (7) 2:20 4:16 16:6
39:3 136:14 147:25 148:24
concerned (8) 10:6 23:14
24:2 39:7 97:17 141:1
144:25 155:5
concerning (2) 112:25 151:9
concerns (2) 10:1 113:23
conclusion (1) 19:8
conducted (5) 22:8,16,16
22:18,19,18 33:16
conducting (3) 7:3 151:10
confidential (2) 16:7 19:20
confirm (7) 9:7,20 122:19
54:7,9 57:12 63:2 77:17
confirmed (1) 149:2
confirming (1) 152:23
confused (1) 110:13
conjunction (1) 33:1
conscious (1) 3:2
consequence (1) 7:10
consider (3) 52:2 140:19
151:6
considering (1) 40:15
consult (1) 112:24
consultancy (8) 44:24 52:18
111:17,20 112:14 113:20
110:21,22
contact (4) 12:18,22 136:3,3
contacted (3) 62:9,12 141:15
contacts (1) 17:16
contain (1) 133:14
contained (1) 127:25
contains (1) 7:25
contemplate (2) 139:2,13
contemplated (1) 139:14
contemplated (1) 139:20
contempt (3) 37:24 38:20
39:10
content (4) 133:13 143:7
149:14,19

contents (5) 90:13,16,17
130:22 132:5
context (6) 6:21 11:13 16:3
26:3 44:13 73:5
continue (2) 160:14 169:16
158:4,5
contract (6) 42:8 46:15
113:18,19,24 124:17
contracts (1) 113:19
contrary (1) 71:3
control (4) 50:4,5,6 103:24
controlled (3) 124:18,21
125:1
controls (1) 104:24
convenient (1) 5:17
conversation (8) 6:24 14:24
16:4 63:3,13 75:25 81:19
141:20
conversations (1) 6:15
converted (1) 8:5
cope (1) 135:13
copied (5) 27:5 29:23 30:20
copies (1) 31:23
copy (7) 106:13,14
145:21,23 146:4,5 150:17
copying (1) 29:10
cork (3) 76:24 77:2 79:5
corollary (1) 136:22
copy (1) 24:2
corporate (2) 118:5,15
corporation (2) 49:24,25
correct (192) 6:7,8,12 7:14
13:14,15,19,20,22,23,25
14:17 16:13,14,14,18
145:5 152:11 155:9 152:12
crossexamine (2) 139:17
153:3
crossexamined (4) 88:10
138:16,18 149:14
crossexamining (2) 150:20
157:14
crossreference (1) 148:11
crossreferenced (1) 3:15
crown (4) 21:9,15 33:14
37:23
cumex (9) 119:17 19:5 26:9
35:7,17 57:22,25 58:3,11
currency (1) 98:8
current (2) 132:10 145:19
currently (3) 134:11
custodian (4) 1:15 15:3 16:8
23:4
custodians (3) 1:22 6:3 51:1
custody (5) 27:7,11 53:15
96:10 119:11
custoyolocom (1) 109:2
cutting (1) 139:8

_____ D _____

d (9) 84:5 86:13 93:8 94:21
95:7 99:17,21 101:2,6
d23 (1) 104:2
dai (1) 60:15
dancing (1) 23:23
danish (18) 37:21 15:18
36:20 47:12,18 57:11 73:5
78:7,16 81:20 90:19
91:11,23 105:20,21 145:10
151:2,12
dare (1) 97:15
darren (2) 17:14,16
date (7) 2:25,25 31:17 61:24
90:19 133:6,24
dated (7) 20:10 37:23 32:3
42:20 107:12 109:16 143:4
dates (3) 12:12,15 132:20
dav (43) 29:11 30:25 31:24
32:7,13 59:19 60:3,11
63:18 83:10 103:21,23
104:5 107:12 108:2,18,20
121:3,4 126:15,21,24
129:1 133:11,14 138:10
143:23 152:6

day (16) 10:19,22,23,25 11:7
28:6 29:10 55:7 101:10
137:6 138:9,18 139:18
140:23 141:6 155:7
day17mt19 (2) 142:20
155:16
days (9) 16:3 44:4,9 55:1
134:12,16,17 143:13 157:1
ddc (1) 119:1 36:4 93:15
84:4,24 86:3,10,15,23
99:25
deadline (3) 157:5,17,17
deal (8) 1:9 122:13,17,24
142:14 150:1,25 156:7
deals (3) 4:9 59:1 76:6
dealt (1) 156:23
dear (2) 110:1,9
debate (1) 98:2
debating (1) 38:17
december (3) 20:10 35:16
43:2
decide (3) 10:20 88:8
decided (3) 16:19 26:21 60:1
decision (3) 50:9 143:22
146:11
declared (1) 73:7
defined (2) 61:9 46:7
definition (5) 1:16 41:17
45:1 46:9 47:22
definitions (1) 46:16
degree (2) 39:4 157:11
delay (1) 1:7
delayed (1) 1:3
deletion (1) 157:11
deletions (1) 157:15
deliberate (3) 126:5 127:20
128:7
deliberately (2) 129:3,4
demand (1) 121:10
denied (6) 74:2 68:4 121:20
124:4 125:9
denmark (5) 1:8 80:22 81:25
132:21 133:7
dependent (47) 79:1,6,17
82:3
dependent (3) 6:16,17
derivatives (2) 6:20 113:1
descend (1) 136:7
describe (2) 41:17 45:7
described (4) 45:7 52:20
92:17 96:15
describing (1) 3:11
description (4) 52:24 96:2
97:8 111:16
deserves (1) 2:8
designed (2) 1:17 67:22
design (4) 96:9,11 97:3
detail (6) 4:2 95:25 97:15
126:19 128:3 133:11
detailed (2) 50:16 112:16
details (7) 37:5 42:16 43:5
56:4 91:19 99:2 103:22
detain (1) 130:6
determine (1) 71:5
determined (2) 70:18 72:6
developments (1) 69:2
devices (1) 96:5
dhorajiwala (5) 60:3
110:15 100:104 110:25,1
127:12,16 133:17
144:14,15 146:7 149:24
dialogue (1) 116:21
dictate (1) 130:20
didnt (45) 1:21 2:4
13:3,4,10,12 14:15
15:6,12,22 16:15 16:9:18:10
19:5,14,23 41:20 44:10
54:4 65:18,25 66:24,25
67:24 70:4,7,8 87:8,3
111:13 117:9,23 118:3
121:14 126:15,21,24
129:1 133:11,14 138:10
143:23 152:6
difference (3) 50:10 140:6

147:6
different (5) 1:25 3:7 9:1
35:20 36:25 40:13 44:18
45:9,16,17 54:13,18
66:6,21 69:4 73:5 76:2
77:22 90:25 98:8 101:13
105:20,24 106:25 107:1
129:18 138:9 139:11
141:9,21 147:3
difficult (4) 15:6 138:21
146:6 156:6
difficulties (1) 138:17
difficulty (3) 143:2 146:1
157:4
digital (2) 9:8,17
diligence (3) 19:7,11,23
dipti (3) 27:25 28:3,6
direction (1) 157:5
directions (1) 66:21
directly (4) 44:16 96:11 98:4
151:9
director (2) 32:7 36:7,21
43:2 40:21 49:9 21 114:13
disagree (1) 53:0
disclose (7) 37:20 38:12
disclosed (2) 37:4,23
disclosing (1) 2:17
disconnect (1) 142:2
discrete (2) 56:16 102:21
discretion (2) 44:10 48:5
discretionary (3) 42:11 45:11
124:5
discuss (3) 36:8 136:4 114:1
discussed (4) 57:24 112:13
129:10 141:13
discussing (1) 126:20
discussion (14) 0:22 32:11
75:16 87:5,9 108:12,16
112:4,12,16 136:5,7,8
154:2
discussions (2) 7:10 142:3
dishonest (1) 40:11
dishonesty (1) 53:22
disproportionate (1) 154:4
dispute (1) 71:6
distinction (2) 35:5 155:1
dividend (39) 6:2,22 7:3,7
19:4 20:18 50:15 63:15
68:24 72:19 73:8,12
74:4,9,13,13,16,24 75:6
76:25 77:4,7,8,9,20 78:4
79:21 84:13 20,25
80:6,13,19 90:15 104:3
114:15 116:13,15 120:23
dividends (4) 4:25 78:3 84:8
117:11
division (2) 48:8 82:20
dkk (1) 99:2
document (13) 3:16,17,20
8:16 10:8 12:3 13:5,21,24
91:4 109:11 115:24 122:2
132:25
documentary (1) 2:10
documentation (5) 2:24 34:7
56:1 107:24 117:23
documents (22) 2:20
10:9,12,14 11:1 39:24
56:12 76:16 88:17 102:5
116:19 127:25 126:11,18
127:12,16 133:17
144:14,15 146:7 149:24
does (15) 12:19 49:25 91:3
115:21 119:12 129:11
143:12 153:13 155:10,17
dollars (3) 108:21,24 109:22
doesnt (7) 39:11,13 40:11
done (22) 10:22 16:11 21:23

Opus 2
Official Court Reporters

transcripts@opus2.com
020 3008 6619

Confidential

DX5782, page 43 of 49

SKAT_MDL_001_00838288

89:7,7,19,23,24 91:9 105:6
126:25 136:13 141:5 144:4
145:7,12,13 156:15 157:9
dont (67) 2:13,21 4:19
8:6,13 9:6 10:4
14:1,2,10,24 15:17 18:12
20:11,25 21:1 23:24
25:5,13 26:15 28:18
34:4,8,23 38:1,2,17,23,24
39:1,11 40:10 41:4,15
46:14,25 49:20 51:20,21
52:16 128:15,21 143:20
draft (12) 108:7 112:9,14
142:19 143:1,11
155:6,14,14,15,19,20
drafted (2) 142:7 144:17
dragged (1) 107:16
drawing (1) 35:24
driver (1) 141:10
drop (1) 06:9
dropped (2) 32:19
dtv (5) 22:3,10,17 24:4 36:11
dubai (3) 96:25 125:13,14
due (16) 2:2 19:7,11,23
45:17 53:20 84:12 93:2,5
104:5 106:12,17 110:19
111:7 147:23 153:17
during (7) 1:12 3:4 10:13
56:16 126:10 141:23
143:20

E

e (5) 56:22 95:5 115:9,22,24
e10 (2) 94:2,2
e16 (1) 94:2
e23 (1) 106:4
e24 (1) 93:14
e33 (1) 95:8
e94 (1) 86:2
earlier (7) 5:24 19:22 34:20
40:5 93:10 150:3,7
early (4) 40:20 42:17 68:4
102:10
earn (2) 65:21 79:23
easier (1) 53:15
easy (1) 73:9
ecosystors (1) 2:5
eef (1) 51:3
edo (1) 06:24
effect (4) 37:18 53:5 140:14
152:17
effective (2) 111:23 134:16
effectively (9) 8:2 15:10
23:14 25:14 33:20 54:25
95:8 140:17 149:20
efficient (1) 151:25
efficiently (1) 144:12
egnominal (1) 76:8
eight (1) 134:14
eighth (1) 16:23
eighths (4) 19:12,18 63:8,9
either (11) 1:11 4:15 10:12
34:3 38:10 72:20 73:3
115:15 116:17 125:22
137:4
electronic (1) 127:17
electronically (1) 151:1
element (3) 4:2,3,14 139:7
else (6) 19:8 98:23 126:25
136:2 156:10,10
email (32) 7:8 27:4,20
28:10,19,24 30:7,12
31:5,17 32:12,19 33:15
35:2 90:1 104:10,16

107:11,19,19,21
108:5,6,19
109:2,11,17,18,21 110:24
111:24 115:7
emails (4) 22:8 29:16 99:4
112:10
embedded (1) 128:14
emerge (1) 149:4
employed (1) 96:18
employees (2) 96:9 112:25
enable (1) 53:1
enabled (1) 53:14
enclosed (1) 22:2
end (2) 19:12 16:53:11
exact (1) 106:11
exactly (13) 16:13 23:9 49:1
73:20 77:11 93:18 95:17
99:2 110:24 134:13 152:19
154:25 155:23
example (17) 37:13 40:7
52:12 69:4 75:2 79:23 80:7
89:8 91:3 96:24,25 97:4
103:17,21 105:17 111:7
124:14
examples (2) 76:6 122:19
excel (1) 4:17
exception (1) 151:19
exceptions (2) 141:13,24
excess (1) 51:4
excessive (1) 38:24
exchange (4) 112:1 115:7
130:13 149:5
excised (1) 150:23
excited (1) 156:4
exdate (1) 56:23
exercise (1) 40:8
exercise (11) 120:23 132:7
133:1 134:3 118:1
151:10,21 153:7,9,23
157:9
exist (1) 45:22
existed (2) 3:1 53:21
existence (3) 13:2 43:6 46:2
existing (3) 7:15 11:22,25
exists (1) 44:22
expect (2) 75:12 95:10
expectation (2) 75:14 08:13
expectations (1) 69:5
expected (4) 4:24 19:21,23
75:22 79:13 81:6
expecting (2) 84:1 96:2
experience (5) 19:4 63:14
68:24 94:12 135:23
explained (2) 98:23 103:26
22:21,23 23:22 55:23
57:13 59:6 61:22
explained (3) 6:24
14:5,18,25,25 15:9 20:10
39:25 62:24 64:15,16 65:4
102:19
explaining (1) 14:18
explanation (5) 8:21 14:8
18:13 35:5 64:10
explanations (1) 145:6
exposure (1) 133:23
expressed (2) 87:23 97:14
expression (1) 119:25
expressly (2) 84:9 126:24
extending (1) 141:5
extent (8) 37:3,9 39:23 09:7
117:13,16 119:1 134:9
external (7) 14:12,13,15,22
15:25 187,8
extracted (1) 148:21
extremely (1) 147:18
eye (1) 5:4
ezra (3) 13:25 14:2 101:23

F

f37921 (1) 55:21
f38614 (1) 72:24
face (5) 37:3 48:12 66:22
114:6 166:22
facilitate (3) 61:13 115:15
149:24

facilitated (1) 26:10
facilitating (2) 64:11 128:11
facility (1) 53:1
factual (2) 39:6 78:16
factually (2) 37:2,3
failed (3) 78:22 79:19 148:18
fails (1) 30:12
failure (2) 37:15 144:20
fair (14) 37:16 44:25 45:15
55:3 70:3 102:16 115:20
126:12,15 131:25 135:21
143:24 144:6 154:8
fairer (1) 141:20
fairly (1) 56:19
forgive (3) 1:11 62:14 63:10
forgot (1) 5:18
forgotten (2) 1:13,20
form (8) 3:25 4:25 0:13
05:19,24 66:13 99:10
153:19
formal (1) 38:8
format (2) 95:17 122:6
formation (1) 12:12
formed (1) 6:6
formula (38) 4:23 5:1 48:5
71:5,21,24,25
72:5,6,7,12,16 73:9 74:12
85:2 06:4,13 89:4,11,14
97:19,24 98:10,13,18
99:1,3 111:11 113:5
117:6,0 121:12
feel (2) 135:23 157:4
feds (2) 144:8,9
fees (29) 24:15,17,23,24
26:23 33:6 41:18,20 42:3
48:10 49:23
52:12,13,20,21,23 67:8
60:1 72:2 93:25 94:6 96:20
97:14 00:23 117:16
113:4,21 123:1
fell (1) 76:3
felt (4) 51:10 03:22 135:12
137:7
few (11) 21:1 39:17 46:16
57:20 76:6 100:3 102:10
114:25 122:18 131:5 147:1
fgc (1) 57:16
fifth (1) 22:21
figure (9) 4:12 73:13 85:16
86:14 92:13 90:5 106:7,11
110:17
figures (7) 84:4,7,23 89:2,16
101:1,5
filed (4) 25:16 37:22
20:12,17
filer (1) 24:4
files (3) 21:21,25 22:4
filled (1) 4:13
filter (1) 56:21
final (4) 94:13 140:11 143:6
169:6
finance (3) 32:7 125:16
financial (3) 17:11,13 113:2
financing (2) 14:14,22
fine (4) 6:25 22:13 43:17
129:25
finally (1) 56:20
finds (5) 5:13 25:1 41:3 48:24
111:3
finish (5) 49:11,11 100:9
133:16 144:1
finished (1) 11:2
finishing (1) 156:5
first (45) 1:10 6:5,10 10:17
11:12 12:9 27:3 28:24 33:2
41:10 44:16,22 56:20
61:12 66:21 69:2 82:4 83:8
94:13 04:11 140:5,6 149:6
92:1 94:9
flow (6) 49:6,18 98:3,19
102:23 147:20
fls (1) 99:7
flsmidth (1) 99:9
focuses (1) 136:5
focusing (1) 78:16
follow (4) 5:9 95:16 107:3
154:4
followed (1) 14:0
following (3) 29:10 46:4
95:24
follows (1) 103:19
force (1) 51:5
forced (1) 51:20

71:10,13,21 76:3 77:16
78:1,6,21 79:1,4
81:7,10,22 82:1,4,10
87:9,25 88:19 93:23 94:7,9
98:5,6,7 101:8 105:14
107:15,23 108:6,13
109:8,16 111:12 112:23
113:20 118:11
121:5,9,10,11 122:7 126:1
129:7
ganymedes (2) 70:25 117:14
gave (11) 11:12 16:10,20
20:12 61:14 88:7 113:4
122:19 131:4 132:10
138:25
gd (2) 112:25 113:5
general (6) 102:22 113:21
114:11 117:7 149:3 151:21
generally (4) 63:16 113:1
153:16 154:17
generate (2) 65:5 66:17
generated (3) 49:6 80:24
149:8
generation (3) 44:11 45:10
88:1
genuine (2) 53:10,19
genuinely (1) 154:6
gerber (2) 17:3 42:20
german (14) 22:22 23:11,16
24:14 25:16
26:4,9,11,12,18 20:16
31:13 33:4 35:7
germany (3) 23:12 28:12
36:13
get (31) 19:6 30:6,16
37:3,23,22 50:8 52:7 53:14
61:14 75:10,22 77:9
81:7,15 82:6,7,8 85:15
97:7 98:4 100:24 102:14
106:25 136:19,19 138:9
139:23 140:23,24 141:5 04
gets (5) 65:23 100:24 103:14
150:22 156:19
getting (12) 2:18 15:19 45:6
52:5 53:5,7,6 66:19 98:19
117:19 120:13 156:4
gh (1) 91:16
give (15) 9:10 16:21 18:10
20:22 29:4 49:22 60:7
131:14 135:25 136:19
137:3 140:23 152:5 152:12
157:17
given (33) 2:3 14:3 18:3 31:17 50:10 66:2 76:16,18
96:6 100:20 105:21 111:16
112:1 117:1 119:17 125:23
132:10,18 138:21
139:10,22,22 146:21,21
147:3,15 148:16,19
150:6,17 153:15 155:7
given (5) 4:17 10:12 32:16
92:9 94:9
giving (12) 8:21 53:12 95:8
116:13 139:5 140:11,21
145:24 147:4 151:7 152:3
157:5
glancing (1) 9:6
global (2) 80:24,25
gmg (2) 83:25 85:14
goes (5) 86:6 94:1 135:19
146:9 157:7
going (83) 1:10 6:9 7:2 11:3
12:15 16:10 18:25 23:20
27:19 30:16 33:7 36:2
139:20 145:24 154:17
193:5,17 153:15 155:7
conclusion
G
g94 (1) 09:10
gaining (1) 97:24
gan02 (1) 109:4
gany (2) 104:15,24
ganymede (82) 40:21,22
43:2,12,24 44:15,20
45:5,10,22 47:23
48:10,13,15,19 49:7,18
50:4,10,21 51:7,10
52:3,9,10 53:16 65:11
67:8,17 60:1 69:16 70:23

135:5 136:24 137:15
138:19 140:24 141:8,11
142:4,11 143:10,12 144:11
149:10 153:6 154:9
157:1,16
goldwraith (37) 1:6,11
56:15,21 62:13 86:1,6 90:7
91:9 95:20 97:5,7
102:20,25 103:24 104:24
106:23 134:15 136:23
137:11,22 138:13,23,25
139:14,15 140:7,11,21
141:9 156:18
goldsmiths (1) 140:9
gone (2) 116:19 134:10
good (22) 1:6 5:11,17,17,18
9:21 55:3,10 102:6,16
103:14 116:13 129:18
133:8 136:12 137:14
140:1,23 156:11 156:9,20
157:20
graham (5) 94:19 96:11,21
105:1 114:12
grateful (3) 103:16 151:23
153:3
great (1) 147:8
grenville (2) 17:14,10
griffiths (1) 60:15
gross (21) 72:12 73:12,17
74:13 76:25 77:4,7,8,9,20
78:3 79:20 04:7,13,20,25
85:4,8,19 89:5 104:3
ground (2) 134:19 137:23
group (3) 6:15 7:10 15:15
gss (38) 6:11 11:24 12:24
13:7,12 16:6,14 15:25
17:20 10:1 20:14 36:5 48:8
49:2 57:11 58:20 61:10,16
62:10,22,25 63:4,4 65:25
67:4 68:18 82:20
96:9,10,17,22 97:5 119:11
119:3
guenther (1) 60:15
guess (1) 96:5
gun (1) 51:21

H

h (1) 58:25
hadnt (2) 82:20 80:12
half (7) 16:20,22 29:21
137:3,24 140:14,16
halfhour (2) 135:8,11
halfway (2) 66:6 108:5
hand (2) 43:8 0:20
hands (4) 103:4 137:8
139:21 155:24
hanifía (2) 29:2,25
hanifías (1) 31:4
happen (5) 9:6 65:14 00:10
67:6 155:3
happened (10) 8:4,14 49:3
67:18 80:2,3,23 96:7 127:8
156:15
happening (2) 80:19 132:20
happens (3) 6:22 100:8 148:4
happy (14) 8:12 15:17 16:24
18:22 29:19 30:15 51:6
67:9,9 76:4 87:15 132:4
134:12 139:23
hard (9) 87:20,21,24 88:10
138:1 145:20,23 146:4,4
157:5
hare (1) 11:11
havent (2) 2:14 40:17
having (28) 1:7 10:20 21:25
34:16 53:13 76:10,13,13,22
77:2 94:8 117:20 118:25
134:16 136:19 137:1 138:2
140:1,19 140:9 147:11,14
head (10) 2:16 4:6 8:2,8
10:6,24 11:8 51:20 88:10

Confidential

156:11

heading (4) 73:22 92:21
105:14 122:10
heads (1) 155:8
hear (2) 115:19 138:13
heard (5) 39:2 102:11 140:7
141:19 148:10
hearing (2) 5:12 157:24
hedge (2) 117:1 125:12
held (2) 24:3 53:4
help (2) 4:4 102:22
helpful (3) 5:9 39:23 137:13
helping (1) 96:22
here (21) 4:18,20 12:7 21:8
23:24 26:7 31:12 34:16
38:9 47:1,12 54:25 74:19
89:2 90:1 107:18 114:12
115:1 116:6,10 120:18
hesitancy (1) 15:18
hi (1) 27:25
high (1) 4:21
higher (2) 28:6 47:20
highlight (1) 97:9
highlighted (1) 39:14
highlighting (2) 8:5,9
himself (2) 112:8 149:2
historic (1) 40:3
hmrc (19) 21:16 22:15 23:14
25:14 26:7 27:17
33:13,20,20 34:5
35:3,4,8,11,22 37:23 39:23
40:4,6
hmrcs (1) 20:17
hoc (1) 110:21
holdings (1) 59:4
homework (1) 4:9
honest (1) 129:11
honestly (1) 133:21
hoof (2) 140:20 146:12
hope (5) 50:19 140:2 141:13
147:11,18
hopefully (1) 102:16
hopes (1) 31:5
hoping (1) 134:19
horn (1) 27:6 82:16,19 90:2
94:19 96:11 104:10,11
105:1 110:18 114:12
hornforsyth (3) 93:11,19
99:18
horns (4) 2:20 8:3,25 110:23
hour (4) 137:3,24 140:14,17
hours (4) 30:2 134:11
135:20,25
housekeeping (2) 1:5 141:3
142:3,8 156:17 158:3,6
however (4) 12:25 42:9
120:8 145:4

—— I ——

ideas (1) 119:9
identified (12) 2:23 10:14
47:8,15,18 49:2 75:4 84:25
85:6 95:7 105:21 120:4
identifies (1) 107:6
identify (7) 24:8 27:11,13
130:12 131:20 148:13
157:18
identifying (2) 9:20 29:22
ignore (1) 134:15
im (75) 1:19 3:18 4:3 9:3
10:16 11:10 12:5 15:5,5
16:24 37:16 30:1,16,18,20
39:8,9,11 49:12,25 51:15
54:10 55:17 56:2,3 58:9
66:2,13 68:9 71:8 76:12
81:6 84:19 85:2 89:21 99:3
101:9,10,11,12 102:12
103:16 109:24 110:4,8
118:24 120:17 121:17
124:18 126:2 128:20
131:25 132:5,6,25
143:18 144:2 145:25
146:10 148:4 150:6 152:10
156:21 157:16,18

imagine (2) 45:13 136:11
imagines (1) 154:1
immediate (1) 2:3
immediately (4) 3:20 4:2
43:18 110:12
implements (1) 146:3
implicit (1) 143:19
important (4) 38:4 55:2
61:13 133:1
impossible (2) 127:9 143:3
impression (1) 88:7
inaccurate (3) 34:6 56:11
102:20
inappropriate (1) 152:5
inaudible (6) 24:7 49:9 52:3
60:12 151:4 155:8
incarcerated (2) 126:16,17
include (2) 52:19 157:10
included (2) 64:10 90:3
including (5) 13:18 70:2
96:10 117:25 122:7
income (13) 64:5 65:1 77:13
79:17 80:17 82:1,2,3,10
94:9 95:7 96:19 98:15
incoming (1) 77:17
incorporated (1) 12:10
incorrect (1) 34:1
increased (2) 99:15 113:6
independent (1) 60:3
independently (1) 19:7
index (1) 158:1
indian (2) 115:15,16
indicated (5) 2:8 140:8
141:2 146:20 148:25
indicates (1) 41:8
indication (4) 10:16 102:11
134:18 135:15
indigo (1) 62:20
indirectly (2) 73:6 101:22
individual (3) 38:7 111:9,12
individuals (7) 10:5 63:14,16
68:16,22 96:21 116:7
industry (2) 77:1,25
informal (2) 110:21 143:10
information (30) 16:10
18:10,19,21,22,23
19:9,13,14,15,17,18
20:2,4,12 21:9 22:1 26:7
30:7 34:5 37:2 69:1 99:4
112:19 116:23,24 117:7
127:10,25
informed (1) 125:12
ing (1) 62:6
inhibition (1) 150:6
initial (5) 29:1 31:8 33:16
34:17,20
initially (2) 84:13 144:17
innocent (1) 126:4
input (1) 5:7
insolvent (4) 71:11,22 79:4
81:10
instantly (1) 144:4
instructions (1) 32:16
intelligence (1) 119:8
intelligent (1) 146:21
intend (1) 67:15
intended (4) 69:15 113:15
126:5 132:4
intention (3) 64:3,25 65:9
interbank (1) 75:2
interest (2) 4:13,24
interested (3) 12:23 14:21
147:12
interesting (1) 77:24
interests (1) 310:16
internal (1) 71:9
internally (2) 14:16 71:12
internet (4) 7:19,19 143:23
147:20
interruption (1) 49:12
into (18) 1:23 10:7 11:1,5,6
26:9 60:11,16 60:14 70:4
77:11 95:13 98:15 99:21
103:19 107:1 112:17 118:17

149:10

introduced (3) 61:6 62:21
77:18
introducing (1) 67:8
introduction (3) 52:10,19,21
introductory (1) 40:3
invest (1) 14:7
invested (1) 51:3
invested (1) 15:24
investigation (3) 20:18 40:16
81:13
investigations (1) 21:16
investments (8) 59:4 107:22
100:1 109:16 111:21
112:22 113:1,11
investor (1) 15:24
investors (3) 53:17 77:14
invitation (1) 136:15
invite (1) 68:23
invited (4) 61:16,21 62:21
139:2
inviting (3) 3:18 147:19
invoice (23) 20:20,20
30:15,17 32:5,11,17,23
76:3 100:13,20,24
109:11,15,21
110:13,14,16,22,25
111:1,13,16,16,22,25
111:2,4,14
invoiced (3) 107:6,7 111:6
invoices (10) 31:7 33:7,16
34:16,17,19 65:23 88:25
109:18 105:14
invoicing (1) 104:11
involve (4) 14:15 15:25
153:2 157:10
involved (5) 13:18 14:19
15:20 16:23 104:22
involvement (4) 16:5
35:5,23,24
involving (2) 37:13 40:1
isnt (3) 26:19 128:12 139:20
isolate (1) 56:10
issued (7) 33:7,16 34:19 36:5
44:14 108:13 113:19
iteration (1) 3:11
its (14) 23:4 33:9 37:3 39:17
43:8 49:1 77:17 83:25 84:1
94:14 98:12 93:15 121:5
143:6
itself (4) 63:25 64:21 98:13
104:22
ive (1) 1:10

—— J ——

j (1) 86:9
january (2) 120:24 143:4
jas (1) 20:3
jazzer (2) 27:22 20:10
join (1) 61:10
joined (2) 41:23 62:24
jones (4) 9:5,7,9,20 120:7
130:3 133:9,12 134:18
135:5 136:9,10 138:6,5,8
139:4,9 140:8 141:1
142:9,10,16,22
143:10,14,16 144:5,5,21
145:17,23 146:6,9 147:18
148:10 149:23
150:19,22,25 151:11,16,23
155:13,14,21 157:15,19
jp (7) 1:16,21
judge (5) 37:22 39:14 48:22
72:25 152:7
judgment (1) 115:12
jump (1) 143:20
june (5) 28:24 30:2 31:17
32:13 42:20

—— K ——

k (1) 57:4
k16 (2) 97:8,9
kcon (2) 133:1,2
keep (5) 26:25 50:19 52:7
109:12 127:9
keeping (3) 49:19 134:11
135:24
kept (2) 114:16 115:2
key (3) 16:16 43:8 152:6
kind (4) 2:25 10:18 73:22
98:18
kind (8) 60:15 70:5 77:3 73:2
83:8 86:9 102:13 111:8
klars (2) 76:22 77:14
know (7) 35:22 60:24 63:19
68:16,17 120:19 156:9
krona (9) 4:15 6:14 15:16
20:11 23:10,24 27:13 94:9
44:17 50:12 54:2 79:8 84:7
94:9 97:24
knowing (4) 19:24 60:17
81:23 136:23
knowledge (4) 116:13 123:2
127:25 130:23
known (11) 59:22,25
60:4,19,20 62:5 74:19,20
50:1 56:1 95:22
knows (2) 56:6 95:22
krner (4) 60:14 70:6 124:3,4
krners (1) 83:21
krone (2) 47:19 94:3
kyc (2) 20:7 107:24
kycd (2) 27:13 20:13

—— L ——

label (1) 78:22
labuan (5) 53:16 64:6 66:8,9
77:18
landing (1) 157:3
language (5) 3:7 44:3,8
45:16 96:6
laptop (4) 132:23 145:2,10
151:3
large (2) 71:1 82:9
larger (1) 5:3
last (12) 25:12 36:14 37:16
73:1 74:6 82:16 90:9 101:25
111:2 125:22 126:3 136:18
140:10 149:23
late (1) 11:19
later (10) 42:24 48:4 52:17
67:17 68:6 85:1 95:17
84:3 143:13,15
latest (1) 31:17
latter (1) 137:2
lawyer (3) 145:10 151:2,12
lawyers (2) 55:24 56:5
lead (1) 119:8
leading (2) 4:3 151:14
learn (1) 67:12
learned (5) 39:14 152:14
153:11 154:13,15
least (13) 3:21 4:19 35:4
36:24 39:22 76:9 86:13
117:8 127:1 134:7,23
137:12 156:6
leave (1) 2:11 65:23 72:7
98:18 101:5 119:12,15
144:22 145:14 155:24
156:1,7
leaving (1) 151:11
led (1) 80:23
left (5) 63:10 96:5 100:17
115:7 156:6
lefthand (6) 12:21 26:25
77:17 109:12,20 125:7
legal (7) 52:20 54:1,2,2
78:13 127:12 153:22
legality (1) 129:12
legitimate (1) 114:19
lend (1) 59:14
lender (6) 59:13 83:4,6,8
84:18 93:3

lenders (1) 62:13
lending (1) 15:14
length (1) 81:4
lent (2) 14:10 18:14
less (7) 16:22 19:24 46:17
47:25 83:24 100:24 147:21
let (8) 49:10,11 78:17
107:24 114:7 119:10
120:20 144:25
lets (13) 23:9,19,20 24:1
20:22 41:6 42:17 60:9
44:13,18 48:12,19 50:1
51:6,13,19,22 86:15 90:24
91:2 115:24
loop (3) 15:10,12,12
loophole (4) 53:21 54:1,2,7
lords (1) 139:21
lordship (19) 9:9 10:5 38:18
89:23 130:19 139:13
142:15,22 145:1,13
146:11,17 150:10 152:10
154:7 156:12,14,23 157:2
lordships (2) 1:19 147:25
losing (1) 97:8
loss (2) 67:21,23
losses (6) 63:17 70:5 73:24
84:6 87:10 122:20
met (2) 60:2 125:10
metadata (3) 82:15 90:8
104:25
nil (2) 60:24,25
nilof (8) 55:5 153:16
157:13
midjanuary (1) 143:4
midmorning (2) 54:14
135:10
might (28) 3:21 6:11 8:18
32:12 39:24 48:22 54:3
55:4 64:9 90:23 95:25
96:5,8,14 98:8 101:16
140:15,16 146:15,15
147:8 153:6 139:6,10
153:17
mike (1) 58:2
million (1) 94:10
mills (2) 60:15 63:23
mind (17) 8:7 9:6 21:1 39:5
53:25 54:22 55:8 68:4
101:17 102:12,16 111:13
120:11 126:23 146:13
144:25 154:24
minds (1) 127:10
mini (1) 130:1
minus (3) 4:24 5:5 150:12
minutes (4) 55:10 102:10
131:5 137:16
mislead (1) 126:5
misleading (3) 37:4 38:11
76:9
mislead (1) 30:23
mistake (1) 137:16
mistaken (1) 3:9
misunderstood (2) 152:14,19
mitchell (16) 60:15,24,25
61:2,10 63:10 70:5 73:24
75:1 76:6 84:2,8 87:10
89:3 122:20 123:3
mitchells (2) 60:15 84:12
mix (1) 47:12
mixed (1) 78:8
mixture (1) 97:6
model (9) 1:17 13:12 16:6,15
15:25 66:1,15 60:25 111:8
modest (1) 116:12
modified (3) 82:16 90:10
105:2
moment (1) 11:22 20:22
29:4,21 30:23 40:25 57:9
73:20 74:20 89:20 95:10
96:13 119:16 131:17 138:6
moments (2) 21:1 39:17
monday (3) 131:6 145:16
146:7
money (40) 13:6,10 16:12
18:2,17 50:22 51:7
55:2,4,7,9,10,12,14
looking (28) 4:2 7:25
35:1,23 41:23 55:23 60:23
91:1,1,6,15 97:21 100:1
101:1,20 103:21 104:25
108:16 116:7,24 122:16
124:14 137:17 156:11
looks (4) 21:20 32:19
33:7,15 34:18 40:3
44:13,18 48:12,19 50:1
51:6,13,19,22 86:15 90:24
91:2 115:24
looping (1) 14:14,22
looking (1) 145:21
looks (21) 8:15,25 12:22
20:8 63:1 65:6,17 66:10
67:1,20,20 99:10 100:16
101:11 113:16 128:11,25
147:18 140:23 144:11
146:16
man (2) 51:3 146:23
mandatory (1) 44:8
manipulate (1) 90:8
mann (1) 58:8
many (6) 43:14 53:4 75:3,3
77:15 78:8
march (10) 23:5 39:18 40:2
83:26 116:3 107:12,15,10
143:14,16 144:22 123:3
mark (2) 61:9 96:24
marked (1) 11:1
market (8) 4:12,24 69:1
74:23,24 75:9,13 122:3
markets (3) 52:14 113:2
116:16
markowitz (4) 6:16 7:11
12:19,22
markup (1) 10:7
martin (4) 36:8 58:8,9,10
matches (3) 84:19 93:18
110:17
material (10) 2:10 3:13
37:9,13,24 64:1,21 137:12
145:16 147:6
materialise (2) 65:25 66:24
materialising (1) 65:18
materials (2) 97:16 134:1
maths (1) 63:10
matter (13) 2:9 9:14,22
54:15 73:11 78:12,13 96:3
104:4 111:22 112:20 113:4
117:14 143:7 143:7
144:7
mattered (1) 63:11
matters (8) 1:8 30:12 40:4
112:25 131:20 141:2
142:2 143:7
maybe (5) 46:1 52:3 66:13
95:15,15

—— M ——

m (1) 59:13
ma (1) 10:3
macquarie (1) 51:3
magic (3) 53:11,21
made (2) 20:4 84:16 103:1
makes (10) 42:7 46:1 55:9
87:13 110:20 121:10,11
135:15 137:23 139:19
making (21) 8:15,25 12:22
20:8 63:1 65:6,17 66:10
67:1,20,20 99:10 100:16
101:11 113:16 128:11,25
147:18 140:23 144:11
146:16

meaby (3) 136:1 141:15
151:8
meabys (1) 151:20
mean (1) 5:25 55:4 90:24
96:6 97:9 102:13 145:12
129:12 136:17 145:12
155:10
meaning (4) 43:19 46:6 98:5
141:7
meaningful (2) 19:23 148:7
means (4) 45:1 46:17 47:2
74:14
meant (4) 15:10 52:3,6
126:17
memory (3) 120:8 126:18
127:11
mention (3) 14:1 66:23
156:2
mentioned (6) 5:24 19:22
34:20 101:17,22 141:25
mentioning (1) 97:2
merely (1) 135:18
message (1) 31:10

Confidential

SKAT_MDL_001_00838290

DX5782, page 45 of 49

65:13 67:3 71:11,15
77:10,11,16 78:6,7,8,10
79:7,15 80:4,5,11,12,14
81:8,9,11,23 97:3 121:4
month (3) 81:21 143:9,15
meet (27) 12:23 24:1 34:7
38:2 38:8 41:6 49:23 57:5
71:11 76:6,16 78:15 81:20
96:11 100:24 102:22
115:10 117:25 127:7,8
133:16,16 138:16 144:20
152:6,10 152:20 156:6
morgan (2) 1:16,23
morning (14) 1:6 5:11,17,18
8:1 101:17,20 137:1,25
139:11,24 141:1,12 142:2
mornings (2) 9:3,16
meet (6) 50:2 71:9 157:17
119:6 134:10 155:22
motion (1) 135:25
move (13) 5:22 16:24 40:12
54:10,13 55:17 62:1 68:9
67:2 107:4 125:13
129:16,10
moved (1) 143:23
movement (1) 16:1
movements (1) 14:15
moving (1) 101:12
ms (6) 27:4,20 29:2,25 31:4
125:17 30:17
mtkc132911 (2) 29:8,25
mtkc132912 (3) 29:9,13
30:23
mtkc132913 (3) 28:23 30:10
31:5
mtkc175271 (3) 20:15,23
22:20
mtkc175272 (2) 20:19 22:7
mtkc2269011 (1) 28:5
mtkc2269012 (1) 27:2
mtkc5091 (1) 42:18
mtkc5092 (1) 46:7
mtkc5093 (1) 43:10
mtkc5095 (1) 42:24
mtkc5096 (1) 47:6
mtkc76271 (1) 104:23
mtkc813621 (1) 109:14
mtkc81371 (1) 82:12
mtkc814931 (2) 100:23
109:24
mtkc814932 (4) 107:10
108:5 109:10 109:15
mtkc814933 (1) 107:20
mtkc884011 (1) 111:20
mtkc884012 (1) 113:3
mtkc8871 (1) 104:8
mtkc92391 (1) 89:25
mtkc92401 (2) 90:6 103:23
much (21) 11:17 17:1 20:16
27:2 38:2 41:12 42:18
45:24 46:14 50:10 71:25
88:8 89:22 101:15 123:18
125:25 132:16 134:19
138:2 142:5 156:9
multiply (1) 72:18
murphy (4) 50:2,19,22 63:17
murphys (1) 83:1
must (5) 14:6,21 48:20 75:7
120:10
myself (5) 8:1,10,18 9:17
10:19

                    N

name (3) 37:1 115:9,22
namely (1) 9:4
names (4) 59:7,7,7 68:14
narrative (1) 32:17
naturally (1) 15:4
nature (6) 77:2 97:24 124:6
127:1 131:19 151:25
ncb (1) 3:11
neater (1) 150:15
necessarily (1) 139:18
necessary (4) 14:7 15:13
24:2 140:1

need (19) 2:21 15:8,22 10:12
25:13 27:12 29:13 31:21
38:2 39:11 41:14 55:8
64:17 85:15 107:20 108:5
109:24 129:23 156:7
needed (11) 14:11 15:16,20
16:19 18:6 19:15 20:4,12
50:17 64:8 153:7
needs (1) 102:15
negative (2) 4:12 92:14
negotiated (3) 101:3,7 113:5
negotiating (2) 52:12,13
negotiation (1) 87:14
neither (1) 38:9
net (7) 46:11,17 65:15 66:2
92:9 94:9 95:7
never (13) 1:17 8:4 18:11
20:9,10 25:16 53:4,4,10
67:3 87:23 114:22 137:18
newer (1) 66:3
next (19) 28:22 40:19 55:6
82:12 84:17 89:25 95:23
99:7 106:21 116:13 120:3
122:16 129:23 120:21
122:1 134:4
old (3) 120:2 119:10 133:7
136:1 144:22 148:4,5
nilesh (1) 62:14
nobody (2) 3:12 66:18
nondisclosure (2) 37:5,24
none (1) 12:17
nonetheless (1) 37:3
nor (1) 13:20:9
normal (2) 10:7 16:7
normally (2) 7:22 150:6
note (8) 2:22 4:9 8:6 9:10
10:1,19,25 27:12
noted (1) 115:6
notes (15)
8:1,5,7,12,12,15,17,24
9:8,16,18,23 11:9 95:24
103:6
nothing (4) 20:3 114:3,8
125:21
notice (2) 11:2 73:23
noting (1) 8:10
notionally (1) 3:24
novus (17)
57:2,7,10,18,21,24
58:2,3,9,12,19 65:21,23
83:1 85:7 93:3,11
number (18) 4:12 9:17 13:17
23:17 24:4 36:11 60:21
68:12 72:17 79:20 89:4
92:14,16 99:14,17 105:9
155:7,13
numbered (2) 21:11 24:18
numbers (8) 46:5 85:5
87:18 89:16 93:8,9 95:5
142:19

                    O

oakley (19) 60:15,19
61:2,7,9,21 63:17 70:5
73:24 75:1 79:6 80:15
84:1,8,12 87:10 69:2
120:22 123:1
objection (3) 150:10,10
13:8
obligation (1) 97:19
obligations (1) 66:17
obliged (1) 37:20
observation (4) 73:1 144:7
154:13 155:22
observations (1) 141:14
150:16 151:5
obtain (1) 15:9
obvious (3) 49:14 136:22
146:9
obviously (32) 9:1 13:21
34:15 34:7 43:3 44:22
46:6 48:3 68:20 79:25 73:5
82:22 87:2,5 91:15 96:10
110:13 111:25 135:6
136:4,18 137:4 139:18
140:13,22 144:8 150:22
155:11 156:7

occasion (4) 15:22 80:2
81:14 144:2
occasionally (1) 155:3
occurs (1) 151:6
oclock (3) 55:3 105:3 135:12
oddity (1) 9:13
offered (4) 50:25 51:3 72:3
140:7
office (2) 112:6,18
officer (4) 36:8,17,21 38:7
officers (1) 112:4
okay (44) 6:3,4,16 7:10
17:19 21:7 20:7 34:4 33:19
44:19 46:13 48:3 45:5,25
46:1 51:17 56:6
57:13,16,17 59:12 62:12
63:16 69:4,25 70:13
72:14 73:24 74:5,15 84:17
86:20 87:1 88:22 89:25
90:17 95:3 101:9 103:8
112:20 119:23 121:25
122:1 134:4
on (3) 74:7,19 83:14
onus (1) 83:12
onboard (1) 19:6
once (4) 23:23 95:12 110:11
153:18
ones (3) 56:8 96:18
open (5) 7:23 20:8 20:21
26:25 91:9
opened (2) 27:12 119:25
opening (16) 4:24 56:12
73:21 93:25 97:14,19,25
98:10,13 98:9 114:9 119:18
143:5,13 144:18,20
openings (6) 1:12 3:4
56:9,16 73:23 120:25
operated (1) 1:17
operating (1) 23:4
operational (1) 61:16
opportunity (8) 131:14
149:22 147:5,10 149:7
152:1,3 153:18
option (3) 139:5 140:11,21
155:5,23
orally (1) 119:25
orange (1) 57:13
orca (15) 59:4,16 60:14
83:12 84:3,24 86:3,15,22
89:9 93:6,12,15 99:25
150:21
partially (1) 37:4
participants (3) 20:1
122:11 129:6
participated (4) 15:7 16:19
10:20,24
participating (2) 20:1 117:17
participation (4) 113:12
114:1 124:16,25
particular (21) 3:16 23:17
24:5,6 25:7 44:2 51:17
52:16 56:16 64:15 65:6
72:12 75:9 78:17,25
79:12,21 91:7 117:10
155:11,17
particularly (4) 39:6 54:22
55:2 157:13
particulars (2) 121:25 124:13
parties (4) 51:14 59:10 65:24
90:24
partners (6) 17:11,13 19:4
61:2 136:1 153:8
partly (3) 56:16 60:14 137:2
passage (4) 8:5 155:12,15,19
passed (1) 90:9
passing (2) 101:17,22
pattern (1) 14:5
patterson (5) 61:6,9,21,23
96:24
paul (3) 60:15 61:9,16
pause (9) 21:6 48:23 55:8
90:25 89:24 116:9 134:7
137:21 141:11
pausing (1) 54:25
pay (20) 14:11 18:15
49:24,25 51:7 67:8 68:1

151:4
owed (4) 93:15 111:11 121:4
own (2) 60:15 61:10
own (15) 13:1 15:19 19:7,11
64:17 96:5 107:2 115:9
122:6 126:1 134:22 135:25
136:23 145:21 149:20
owned (11) 23:18 41:8 59:19
60:14 62:21,16 70:23 108:1
111:9 124:17,20
owner (4) 42:16 44:8
45:11 50:8 70:8 71:5,20
72:6,12,16 74:12 77:17
79:1,2,5,8,16,20 80:7 89:3
92:22 93:22 109:3
121:15,19 123:2,14,16,24
125:20 126:7,21
owners (3) 59:10 65:1,21

                    P

pagination (1) 130:1
paid (78) 26:17,24 28:21
33:10,10 34:13 42:3 47:25
48:6 49:10 51:24 55:18
65:11 68:3 69:16
70:9,19,22 71:23 72:9
72:25 77:10,16,21
78:2,5,8,10,19,21
79:1,3,13,13,14
80:4,4,12,13,25
81:1,5,14,16,22,24
113:11 114:15,23 116:12
117:17,19 118:5,8,17
118:21,23 119:9 120:18
155:12,18
paired (1) 96:9
panic (1) 11:12
paragraph (27) 2:21 8:10
21:20 24:2 25:2
41:17,25 42:2,8
60:7,17,18,23 61:5,12,14
73:25 76:23 102:1 116:3,7
120:12 137:17 138:10
111:17
paragraphs (4) 22:21 41:12
69:23 122:14
parameters (1) 76:3
park (2) 1:22 145:17
parking (1) 102:24
part (20) 9:1 10:10 11:3 27:3
50:20 56:2 64:6,9,10 71:1
75:14 77:9 78:3,3 89:15
113:18 140:13 144:23,24
150:21
perceptive (5) 14:20 15:1
54:23 62:4 129:9
percentage (36) 40:22 46:10
47:15,19 70:12
71:12,13,16 72:18,20
73:1,16,15 74:14,16 75:3
77:7,15,22 78:4 79:21
84:7,20 85:3 89:5,11 93:2
94:22 95:6 99:17,22
100:20,21 101:1 120:13
121:24 123:12 124:13,18
120:3
perfected (1) 149:25
perfectly (1) 155:18
perfecting (1) 155:18
period (2) 55:25 131:12
permission (4) 135:25 156:7
151:7,19
permissions (1) 153:14
person (4) 17:19 20:8 72:12
138:16
personal (3) 13:1 115:21
153:24
personally (5) 51:9 63:19
71:12 137:4 138:23
persons (9) 5:25 30:24 63:6
126:1 127:21
pervasive (5) 14:20 15:1
54:23 62:4 129:9
phrase (2) 121:7 135:24
physically (1) 146:6
pick (3) 2:8 46:25 103:22
picking (1) 5:5
piecemeal (1) 132:13
pieces (1) 153:8
pin (1) 123:23

71:25 75:6,18 76:4
81:20,21 82:1 94:1 97:18
113:5 118:10 121:9,22
payable (11) 24:15 43:24
44:3,9 47:2 93:3,22 94:6
97:24 98:6 129:7
paying (17) 20:9 50:20 67:16
71:11 72:2 80:15
81:8,11,23 87:4 116:19
117:5 118:22 119:15 121:2
126:1 128:24
payment (32) 41:21 44:6
45:11 50:8 70:8 71:5,20
72:6,12,16 74:12 77:17
79:1,2,5,8,16,20 80:7 89:3
92:22 93:22 109:3
121:15,19 123:2,14,16,24
125:20 126:7,21
pays (2) 52:24 74:8,9 100:12
111:17
pc (2) 42:24 74:8,9 100:12
111:17
penultimate (1) 22:6
people (25) 16:10,10 19:5
50:22 61:19,20,22,25
64:20 67:19 60:20,25
66:6,11 71:14,17,23 87:19
114:23 115:18 119:6
120:12 137:17 138:10
plus (3) 4:24 73:9 99:9
pm (7) 102:9 103:11,13
138:1,3,5 157:23
pointed (2) 128:10,24
points (10) 1:10 21:11
74:7,14,25 75:5 95:25
115:6 128:14 149:5
pool (2) 96:9 97:2
pooldesk (4) 94:15,25 96:4
100:11
pops (1) 10:20
posed (1) 140:20
position (12) 2:10,12 36:17
48:3 55:19 119:16 133:4
140:2,6 143:16 145:10
157:10
possession (1) 45:13
possibilities (1) 3:5
possible (8) 24:9 53:20 66:6
98:12 113:21 120:16
131:18 156:6
possibly (4) 7:11 15:7 126:23
153:10
posit (1) 9:8,18
potential (1) 27:7
potentially (5) 36:24 37:4
115:11 134:24 151:13
practicable (1) 146:3
practicality (5) 14:15 149:25
practicalities (6) 142:14
144:25 151:8,21 157:6,9
practically (1) 153:11
practically (5) 131:18 132:22
136:14 132:3 138:23
precise (4) 40:5 81:25
132:19 155:15
precisely (2) 145:12 148:3
predated (1) 110:24
prefer (8) 134:15 136:25
137:9 138:23 139:12,23
151:11 156:11
preference (5) 115:21,25
136:22 137:8 139:22
premise (8) 49:4,12 65:25
143:2,16,21 155:1,1
prepare (2) 131:16,18
prepared (3) 135:21 139:10
140:22
preparing (3) 35:14 140:22

place (4) 55:7 74:3,22
150:12
plainly (2) 51:24 144:3
plan (18) 6:25 7:4,6 12:23
14:19 15:1 43:15
50:14,16,19 65:9,18,24
66:3,23 92:16 97:24
149:25
planes (1) 11:19
planning (2) 50:1,4
plans (60) 6:6,10,11
7:13,13,15 11:21,22,22,25
12:3,11,20,21 13:1,5,6,13
14:10,20 16:25
17:2,6,10,20 18:1,4 19:3
21:10,10,12 22:22,24
25:16 26:9 27:11,14,16
20:11,16 31:13 33:3 35:19
42:17,21 45:20,21 51:5
52:11 53:2,17 64:6 65:2
66:8,10 79:7 91:17 93:23
94:1 97:15
platform (7) 61:10,17
62:3,25 97:25 98:10,20
playing (1) 64:8
please (49) 7:21 12:7,14,17
20:15 21:4 27:1 28:5
29:4,24 41:10,11,13
42:1,18,24 55:10,20 69:20
72:23 82:12,14,24 99:25
90:9 99:7 100:10
103:9,23,24,25
104:8,23,25 105:16 106:21
107:20,21,24 108:4,12
109:13,25 110:2,8,11
130:1,3,5 157:23
pm (2) 102:9 103:11,13
plenty (1) 140:20
pointed (2) 128:10,24
points (10) 1:10 21:11
74:7,14,25 75:5 95:25
115:6 128:14 149:5
pool (2) 96:9 97:2
profit (15) 64:2,22 65:6,10
66:5 67:20,24 70:4
117:14,15 110:11
121:8,9,11 129:7
profitsharing (6) 96:2
100:10 116:10 117:4,6
118:9
promise (1) 143:19
promoted (1) 100:20
prompted (1) 127:1
pronunciation (4) 62:15,16
115:16,20
proper (1) 153:9
properly (3) 136:10 130:14
149:16
propose (2) 4:19 150:9
proposition (1) 148:6
provide (10) 21:22 40:8
64:17 69:1 100:7 110:11
116:23 119:7 127:7 133:19
provided (22) 19:9,14 20:2
43:8 46:5 51:8,9,10,16,18
52:2,6,10 53:1,15 76:2
77:2 112:19,22 116:24
117:22 150:11
providers (1) 54:8
provides (2) 43:11,24
providing (10) 16:3,4 15:4
45:6 48:19 51:3 53:25 54:6
80:9 117:20
proviso (2) 38:8 151:17
provisional (1) 152:7
provisionally (1) 36:24
purchase (2) 15:15 30:15
purdah (2) 151:20 153:15
purpose (3) 36:6 20:25
152:1
purposes (7) 11:24 22:17
40:15 71:9 73:1 131:19
146:14

147:7
preptr (1) 143:11
prereading (2) 2:9 24:10
prerogative (1) 146:13
presence (1) 144:5
present (2) 4:16 119:24
press (1) 140:20
pressure (1) 134:25
presumably (6) 43:8 58:18
60:3 69:10 119:17 153:5
pretty (4) 49:14 61:6 116:12
156:14
previous (2) 29:14 99:11
previously (4) 8:14 140:9
141:22,25
price (2) 4:12,24
priced (1) 66:17
prices (1) 66:6
pricing (3) 4:10,23 66:20
prime (2) 16:7 51:2
principals (2) 7:12 19:3
principle (1) 133:18
prior (4) 10:2 18:8 19:22 81:2
private (4) 8:1,5,15 10:19
probably (7) 16:20 23:13
43:9 52:23 84:16 138:9
141:4
problem (2) 13:12 153:5
problems (1) 153:11
proceed (1) 34:21
proceedings (1) 1:1
proceeds (1) 52:7
process (6) 24:13 27:13 37:7
135:15,17,18
produce (5) 20:7 67:15
115:5,5,25 153:17
produced (2) 119:16 144:16
product (1) 157:10
productivity (1) 113:6
products (1) 58:8
profit (15) 64:2,22 65:6,10
66:5 67:20,24 70:4
117:14,15 110:11
121:8,9,11 129:7
profitsharing (6) 96:2
100:10 116:10 117:4,6
118:9
promise (1) 143:19
promoted (1) 100:20
prompted (1) 127:1
pronunciation (4) 62:15,16
115:16,20
proper (1) 153:9
properly (3) 136:10 130:14
149:16
propose (2) 4:19 150:9
proposition (1) 148:6
provide (10) 21:22 40:8
64:17 69:1 100:7 110:11
116:23 119:7 127:7 133:19
provided (22) 19:9,14 20:2
43:8 46:5 51:8,9,10,16,18
52:2,6,10 53:1,15 76:2
77:2 112:19,22 116:24
117:22 150:11
providers (1) 54:8
provides (2) 43:11,24
providing (10) 16:3,4 15:4
45:6 48:19 51:3 53:25 54:6
80:9 117:20
proviso (2) 38:8 151:17
provisional (1) 152:7
provisionally (1) 36:24
purchase (2) 15:15 30:15
purdah (2) 151:20 153:15
purpose (3) 36:6 20:25
152:1
purposes (7) 11:24 22:17
40:15 71:9 73:1 131:19
146:14

Confidential

SKAT_MDL_001_00838291

pursuant (1) 24:17
pursue (1) 37:18
pursuing (1) 152:12
puts (1) 38:11
putting (10) 18:17 37:17
  38:18,20 57:9,15 66:20
  78:19 101:25 150:14

---

Q

q (379) 6:5,9,16 7:4,10,17
  12:2,5 13:4,10,16,21,24
  14:5,13,21 15:5,23
  16:9,15,20 17:6,10,24
  17:6,10,13,16,19,23
  18:1,4,11,16,25
  19:11,18,21,23 20:5,15,22
  21:14,20,24
  22:6,11,13,15,20
  23:9,13,19 24:1,8,11,24
  25:1,12,20 26:6,9,12,17,25
  27:11,16,19,24
  28:5,10,16,22 29:6,8,13,16
  31:4,12,16,20
  32:2,7,10,16,21,23
  33:4,9,12,19 34:9,25
  35:15,22 36:19 39:22
  40:9,12,25
  41:6,10,15,17,20,25
  42:7,14,17,24
  43:3,8,10,17,23 44:2,8,25
  45:5,12,15 46:4,14,21
  47:6,12,15,18,22
  48:3,7,10,15,18 50:12,18
  51:9,15,24 52:2,22,25 53:9
  56:25 57:4,9,15,10,21,24
  58:2,6,8,11,15,18,22,25
  59:10,13,17,22,25
  60:2,7,9,14,17,23
  61:5,11,20
  62:1,5,9,12,10,21,24
  63:6,16,22,25 65:4,14,23
  67:11,14,19 68:7,9,17,20
  69:6,14,19
  70:1,8,13,18,22,25
  71:3,16,19
  72:5,11,14,16,22
  74:6,12,15,17,19
  75:4,14,16,23 76:5,8,12,18
  77:10,19 78:1 79:10
  80:1,6,13 82:12,19,22,24
  83:4,6,8,10,12,14,17,19,21,23,25
  84:7,12,17,23
  85:5,10,12,14,19,24
  87:5,9,16,18 88:3,7,14,22
  89:1,14 90:6,13,17
  91:15,19,23
  92:2,6,9,12,16,21
  93:1,8,14,18,21,25
  94:5,9,12,18,21,25
  95:3,5,11,15 99:14,17,21
  100:7,9,14,17,20,24
  101:9 104:6,14,19,22
  105:5,7,13,16,20,24
  106:2,7,11,16,21
  107:15,18 108:4,9,19,23
  109:2,7,10,20,24
  110:2,4,6,11,16,19
  111:2,4,6,11,16,19
  112:4,9,12,20
  113:10,15,18,24 114:18,21
  115:4 116:10,17
  116:18,21,24 118:18,21
  120:3,7,17 121:1,13,23
  122:2,9,17 123:6,25
  124:3,11 125:6,25
  126:12,15,22 127:12,19
  128:6,16 130:19
  quarter (1) 19:24
  quarters (1) 63:9
  query (1) 4:10
  question (50) 2:12 3:18 6:21
  8:8 11:18,20 34:8,15
  37:6,7 38:15,22 39:16 41:1
  44:14,15 45:3,10 49:8
  120:3,7,17 121:1,13,23
  122:2,9,17 123:6,25
  124:3,11 125:6,25
  126:12,15,22 127:12,19
  128:6,16 130:19

realtime (11) 7:21,22,24
  8:19 9:3,23 10:10,20,21
  11:6 155:6
reason (5) 14:2 34:4 56:2
  65:5 67:3
reasons (4) 19:5 54:4 67:25
  166:9
recall (26) 2:13 13:1,7 14:18
  17:14 26:15 20:17,18 41:4
  62:3 84:21 93:18 95:15
  97:20 105:25 106:11
  116:2 120:12,15 119:11
  122:13 156:19
receipt (2) 4:4 60:5
receive (4) 26:23 75:13 62:1
  117:11
received (19) 6:18 24:23,25
  42:4 47:25 50:15 70:13
  71:6,15,17 77:6,15 78:6
  80:9,12,14 98:8 110:11
  112:9,15 116:6 140:11
receives (1) 79:24
receiving (5) 65:12 77:16
  79:7 80:5 150:0
recently (21) 102:5 147:1
reclaim (30) 19:10 20:8
  42:19 43:20 44:13,23 45:3
  47:9 48:13,15,17 51:18
  52:12,16 72:21 73:4,6
  77:23 78:10,23,25 79:25
  80:24 81:3,5,23 82:7 91:16
  92:6 93:14,19,21 94:25
  94:24,10 113:23
relating (11) 25:2,22 33:21
  37:13 72:12 76:22 103:22
  107:2 112:2,25 113:2
relation (30) 3:10 8:3 13:18
  18:4 21:9 25:4,24 31:8
  35:18 36:4 39:6 44:20
  45:19,23,24 47:3 48:3
  50:15 52:6 63:18 99:9 111:17
  117:14 119:14 124:3,14
  131:7,10 134:25 135:20
  relationship (4) 13:21 57:18
  58:18 59:18

128:10
refunds (5) 1:6 21:3 24:13
  44:16 128:24
regard (4) 17:21 23:15 24:21
  146:25
regarding (2) 54:2,3
regards (3) 20:4 26:4
  146:20
reject (1) 129:3
rejected (1) 21:14
related (6) 24:6 71:18 97:22
  101:22 120:4 128:23
relates (9) 22:25 36:10,11
  91:10 93:1 99:8 105:18,20
  128:9
relating (11) 25:2,22 33:21
  37:13 72:12 76:22 103:22
  107:2 112:2,25 113:2
relation (30) 3:10 8:3 13:18
  18:4 21:9 25:4,24 31:8
  35:18 36:4 39:6 44:20
  45:19,23,24 47:3 48:3
  50:15 52:6 63:18 99:9 111:17
  117:14 119:14 124:3,14
  131:7,10 134:25 135:20
relationship (4) 13:21 57:18
  58:18 59:18
relatively (2) 4:22 156:13
relaxed (1) 137:4
relevance (1) 39:3
relevant (19) 19:3 20:3 32:7
  24:4 26:10 72:17 81:18
  99:22 123:10
relief (1) 24:13
relocate (12) 125:14
remain (1) 67:12
remaining (1) 94:25
remember (38) 14:24 21:6
  40:6 42:15 72:21 73:18
  75:24 80:15 81:4 82:22
  88:10 90:15 91:3 96:20
  98:11,12 99:2,2 111:1
  112:7,16 116:23
  119:2,3,5,12,19 126:7,8
  127:6 130:12 132:19
  remembered (2) 101:24
  118:25
remind (7) 20:22 56:7 116:5
  123:7 129:21 143:12 145:7
  reminded (1) 14:3
  remotely (1) 107:10
  remotely (1) 56:11
  remuneration (1) 122:24
  rondered (2) 103:20 113:7
  rondering (1) 115:21
  rent (1) 97:4
  repeat (1) 01:10
  replaced (2) 16:3 100:14
  replied (1) 60:5
  replies (1) 108:10
  reply (4) 29:18 31:20 32:2
  100:18
  reported (1) 82:22
  representing (2) 97:18 98:17
  reputational (1) 54:4
  request (1) 107:21
  require (3) 13:13 107:25
  131:12
  required (2) 14:14,23
  requirement (1) 14:12
  reread (3) 131:15 147:10
  148:13
  rereading (1) 153:24
  resent (1) 109:21
  resourceful (1) 15:19
  respect (16) 23:15 24:16
  25:20 33:9 35:7 47:9 70:12
  83:25 106:3,8,13,17 111:6
  135:23 146:18 153:7,9
  respond (7) 127:23 154:12

responded (1) 109:20
responding (4) 21:8 22:17
  124:11 125:8
responds (1) 28:6
response (7) 21:14,20,22
  29:9,11 30:20 108:4
responsible (2) 15:4 17:19
responsive (1) 32:1
rest (1) 157:12
result (6) 26:17 58:3,18
  65:13 72:11 113:6
resulted (2) 66:9 101:5
resume (2) 103:17 157:22
resumes (1) 131:13
retained (1) 92:17
reveal (1) 8:13
revenue (1) 113:6
review (1) 135:21
reviewed (3) 97:16 130:14
  143:8
revisit (7) 132:16 136:16
  144:12 146:11 147:19
  152:7 155:25
reward (2) 122:11 124:24
richard (1) 68:15
righthand (5) 7:25 9:18
  10:9 27:1,3 28:23 109:13
  111:19 112:21 124:12
rise (3) 18:10 114:3 136:19
rising (1) 156:16
risk (3) 2:17 64:13 62:4
risks (1) 8:17
rock (2) 83:21 85:14
role (2) 84:15 118:7
room (1) 145:24
rose (3) 118:12 106:9
round (29) 60:17 150:14
route (1) 98:19
row (29) 83:1,4,6 84:17
  85:7,12 89:9 91:11,23
  93:1,3,4,22 94:5,10,14
  96:1 99:14 100:10 109:1
  105:10,22,24 106:2
rows (7) 82:24 83:25 84:23
  85:15 93:21 99:23
rs (2) 94:15 100:14
run (1) 103:2
running (3) 11:11 135:12

---

S

sane (31) 18:9,13 19:8
  27:16 28:6,10 30:5 35:18
  42:3,20 44:4,11 45:9 54:8
  49:11 74:12 77:11
  83:25 93:9 95:17,24 99:18
  100:21 101:19 106:1
  111:9 138:18 139:17,18
  144:25 153:18
sample (2) 2:22 3:3
sandor (2) 24:2 42:20
sanjay (7) 5:15 29:23
  125:10,12,15 157:8 158:4
sanjeev (10) 29:11 30:16,25
  31:20 32:3,7,13 115:18
  125:14,15
satisfactory (1) 76:19
satisfied (1) 15:2
saturday (1) 145:15
save (4) 09:22 137:24 156:18
  154:9
saved (1) 140:14
saw (20) 29:14,14,18 89:9
  93:19 99:18 100:5,18
  105:5,25 106:12 110:17
  112:24 116:2,1 119:17
  131:6,11,14,16,18,19
  saying (38) 4:3 15:23
  25:13,15 25:8 29:9 35:1
  52:25 62:3 66:3 67:23
  66:4 71:19,20 77:10
  79:9,10,14,16 88:18,21
  94:2,8,14,16,21,24 95:8
  97:20 99:11,16,18,21,23
  94:2,8,14,16,21,24 95:8
  105:3,5,10,13,17,21,22
  105:3,5,10,13,17,21,22
  106:6,7,10,16,18,19
  107:5,11,12,14,15,16,18,19

149:18 152:3,18 153:24
  156:2 157:7
scenario (2) 82:7 87:17
schedule (8) 12:8 46:22
  47:7,8 55:24 121:25
scheme (15) 15:7
  16:15,15,16,17 59:9 19:12
  20:6 53:5,6,8 53:7 59:3 63:12
  134:3,16,18 135:5,5 69:3
  135:13 157:21
scl (43) 20:17 21:14
  22:1,22,23 23:2,4,6,18
  24:3,17,20 25:6,9,17
  26:1,17,22 30:24,25 31:1
  32:11,25 33:9,25 35:20,25
  36:1,5,5,10,15,18,21,22
  37:3,8,12 40:25 41:1
  rottom (1) 145:24
  seek (1) 39:5
  seem (2) 119:11 144:21
  seemed (3) 15:1,16 143:21
  seems (7) 15:23 26:24 30:14
  32:19 144:21 147:21
  150:4
  seen (22) 21:7 29:16,22
  44:19 47:22 56:14,15
  84:10 87:7 91:16 92:23
  102:5 111:25 114:25
  117:25 119:21 120:3,24
  123:6,12,13 129:10
  125:23 126:19 147:7,14,14
  selected (1) 119:7
  selecting (1) 56:15
  sell (1) 61:17
  seller (19) 59:7 61:2 69:1
  83:10,12,16,17,19,21,23
  84:2 106:1 108:1 113:13
  118:4,13 119:4 124:20
  scripted (1) 136:10
  scroll (5) 9:15 12:13 32:10
  46:8 108:9
  search (4) 21:21 22:8,15
  25:15
  searched (1) 21:25
  searchos (3) 25:4,24 33:23
  season (1) 86:13
  second (10) 12:12 120:24
  83:16,19 80:1 129:5
  130:11,15 166:9
  secondly (1) 33:6
  seconds (1) 138:12
  secret (1) 114:24
  section (1) 11:4
  scots (1) 11:9
  securities (2) 62:20 113:1
  see (297) 3:17 4:18,25 5:4,6
  9:9,13,20,25 10:2,4
  12:9,11,14,16,23,24 17:2
  20:16,19,20,21
  21:10,22,22 32:3 10,12,24
  23:7,9,21 25:11,25 26:2,3
  27:4,9,15,19,20,24
  28:2,7,15,20 29:3,9,11
  30:4,11,17,18,23,25
  31:1,10,11,18,21,22,23,24
  32:2,6,10,12,17 33:1
  34:16,18 46:7,24 47:24
  62:2,5,6,7,12,15,17,10,21,23,25
  43:1,16,22 44:1,2,7,18
  46:5,9,12,13,19
  47:4,5,7,10,11,16,20,21
  49:9 51:17 56:22,23,24
  57:1,2,3,6,16
  59:1,2,3,7,11,14,16
  61:7,18 62:9 73:20,22,25
  74:5,10,11 76:15,21
  82:15,18,25
  83:1,3,5,7,9,13,15,16,18,20,22
  87:7 88:15 89:1,8,11,22
  90:1,3,4,5,6,8,10,12,17,20
  91:12,19,22,24
  92:3,4,5,12,21,24
  93:6,7,13,14,16,17,21,23,24
  94:2,8,14,16,21,24 95:8
  97:20 99:11,16,18,21,23
  94:2,8,14,16,21,24 95:8
  105:3,5,10,13,17,21,22
  105:3,5,10,13,17,21,22
  106:6,7,10,16,18,19
  107:5,11,12,14,15,16,18,19

108:7,8,10,12,19,21,22,25
  109:1,2,6,15,18,25
  110:13,15,16 111:16,18,21
  112:21 113:9 114:11
  116:8,21 121:24
  122:2,3,10,24 123:5,18
  124:5,14,18 125:4,5,7
  126:10 128:2 130:13
  131:2,3 133:11,17
  142:1,22 143:25 144:5,21
  145:13 144:11 147:21
  150:4
  seeing (6) 5:2 62:9 9:7
  110:5 144:10,20
  seek (1) 39:5
  seem (2) 119:11 144:21
  seemed (3) 15:1,16 143:21
  seems (7) 15:23 26:24 30:14
  32:19 144:21 147:21
  150:4
  seen (22) 21:7 29:16,22
  44:19 47:22 56:14,15
  84:10 87:7 91:16 92:23
  102:5 111:25 114:25
  117:25 119:21 120:3,24
  123:6,12,13 129:10
  sell (1) 61:17
  sellers (6) 59:2 62:2 74:23,24
  85:15 86:18
  selling (6) 69:4 106:13,18
  110:19,22 111:13
  send (5) 27:20 112:9,15
  145:11 151:1
  sending (5) 100:11 107:18
  110:21,25 115:16
  sense (15) 37:15 38:8 42:7
  46:1 50:18 55:9 63:8 73:11
  87:13 90:1 136:9 137:23
  sent (4) 30:7,24 34:5 111:13
  sentence (4) 9:3 36:14
  sentences (2) 74:6 116:7
  separate (3) 102:21,25
  137:22
  september (5) 80:11,23
  81:3,6 82:8
  sequence (1) 102:15
  series (1) 89:15
  serious (1) 30:3
  seriously (2) 35:9,13
  served (1) 143:23
  service (4) 44:23
  services (27) 16:3,5 42:19
  43:13,17,20,25
  44:12,13,24,24 45:1,5,8
  51:4,8,18,19 53:15,16 77:1
  107:22 108:7 112:14,22
  123:7 118:22
  session (2) 135:11 156:18
  sessions (3) 36:12 133:9
  139:12
  set (15) 1:15 4:18 11:10,20
  62:20 89:14,15 132:14,16
  64:11 106:25 107:1,22
  114:22 125:4 144:2
  sets (9) 56:25 91:23 92:2,6
  93:14,19,21,25 94:5
  setting (1) 36:9
  settle (5) 65:16 66:1 67:5
  100:20 110:10
  settled (2) 14:16 15:11
  settlement (1) 2:21
  settlements (1) 15:4
  seven (3) 13:10 134:17
  seventh (1) 83:2
  several (1) 6:14
  shah (155) 4:20 5:11,15,17

Confidential

SKAT_MDL_001_00838292

6:13 7:11 11:16,18 12:16
15:5,23 16:10,25 19:13
20:6,16,24 21:3 23:20
25:20 26:7,9,17 27:5
29:2,10,19,23,25
30:3,6,13,20,24 32:12,16
33:2,12 34:1,9 35:4,15
37:1 38:5 39:13 40:19
41:20 43:1 44:25
48:11,20,22 50:3,12,18
51:16,24 52:25 54:12
55:10,24 56:11 64:19
65:14 66:13 66:7 69:22
71:3 72:16,25 74:22
75:8,17 76:5 76:11 79:9
80:1,19 81:17 85:25 87:2
88:4,14 90:1,10 91:5
94:14,18 96:1,11 99:6
100:14,17,21 101:6,16
102:11 103:15,17 108:17
110:20,25 112:6 113:10,24
114:19 115:6 116:3,17
119:11 120:17 121:13
122:2 124:10 125:2
125:10,12,15,25 126:22
127:16,19 126:7 129:14,21
131:11 133:9 135:5,7,14
136:3,15,19 137:15 138:15
140:3 141:4,7 142:16
143:17 144:10 145:1
146:20 147:21 149:2 151:9
152:11 154:10,17,23
156:10,25 157:8 158:3
shahs (3) 31:20 138:10 144:3
shall (1) 113:5
shape (1) 8:13
share (16) 10:15 24:17,20
40:22 74:8,8,9 77:4,6
95:11 105:21,21 117:9
121:3 124:22 125:2
shared (2) 71:14 72:1
shares (38) 1:10 14:10,11,16
15:14,15 16:1 17:21
18:7,14,17 22:22 23:7,8
35:18 36:20 47:12,15,18
53:4 61:17 72:17 79:20
89:5 91:11 93:16 104:3,6
106:1 109:8 121:16 122:11
124:16,23 125:2 126:12
sharing (2) 70:5 121:3
sheet (1) 132:25
short (38) 29:6 55:13 59:1,2
62:1 69:4 74:23,24 79:22
82:13
83:10,12,14,17,19,21,23
84:2 85:15 93:5 103:6,12
104:1 106:13,18 108:1
110:19,22 111:12 113:12
118:4,13 119:4 124:20
125:3 134:1 141:16 156:13
should (31) 3:2,17,24 18:15
49:15 50:21,21 52:4,7
61:10 66:1 87:11,11
88:11,16 101:24
112:5,14,17,17 115:10
117:5 135:2 136:22,23
135:8 140:20 141:3 143:1
144:2,15 147:15 151:6
152:17
show (3) 12:6 45:10 155:8
showed (2) 120:12 130:9
showing (5) 30:19 56:2
64:8,10 115:1
shown (8) 3:14 48:24 90:23
92:4 121:5 127:4 133:10
149:8
shows (4) 56:23 57:10 71:8
86:14
side (24) 5:13 7:25 9:19 10:9
12:11 15:18 26:25
27:1,4,17 28:23 57:6 93:8
109:12,13,20 111:19
112:21 124:12,22 156:24
157:8
sides (1) 51:22
sign (5) 5:5 37:1 49:1 51:21
127:17

signature (2) 20:21 127:17
signed (14) 20:20 21:17
22:25 43:1 49:3 51:23,25
100:14 114:12 122:4
126:9,14 143:8 144:17
signing (1) 127:12
similar (3) 51:4 99:10
since (3) 21:14 59:23 60:4
single (7) 5:7,2 59:14 78:9
80:7 135:11 140:21
sitting (6) 10:19 11:1 134:11
135:20,24 141:5
situation (1) 132:18
six (1) 63:9
size (1) 76:24
skat (18) 40:23 45:14
50:14,20 53:5,7,9,12 63:2
76:5,19 79:15 119:18
134:21 150:10,16 151:9
153:14,15 151:25
skats (6) 55:24 60:10 121:24
134:13 143:5 151:25
skip (1) 89:22
slight (1) 13:7
slightly (12) 3:7 8:24 29:17
47:19 54:13,16 66:7
101:12 134:24 140:5,20
156:24
slipped (1) 126:23
slowly (2) 24:1 41:6
small (2) 1:10 66:10
smith (6) 58:9,10,11,19,22
63:17
smiths (1) 83:6
socially (1) 125:10
solely (1) 136:6
solo (60) 1:22 5:19,22,25
6:3,5 13:6,11 14:17 15:2,4
16:4,9,12,18 17:22 18:4
solomon (3) 17:14,16,18
solos (2) 32:7 48:8
somebody (4) 40:7 112:7,18
145:5

somehow (1) 150:1
something (14) 1:3,6,19 9:24
40:7 94:25 102:2 120:10
112:9 122:21 132:22 133:3
149:9 152:13,21
sometimes (2) 4:17 144:13
somewhere (1) 99:4
soon (1) 67:12
sooner (1) 157:9
soonest (1) 110:2
sort (5) 102:24 103:6 126:22
132:24 156:16
space (1) 151:9
speaking (3) 122:2 133:3
135:13
specific (12) 14:24 41:4 70:8
71:20 72:6,11 75:5,25 88:5
91:3 111:12 157:17
specifically (13) 3:11 14:8
23:10 36:4,10,11,12,18
75:1 113:24 118:10
specified (1) 89:5
specifying (1) 41:4
spell (1) 99:10
spelling (2) 115:11,15
spend (3) 38:2 60:9 60:10
split (1) 59:10
spontaneously (1) 87:19
spoto (1) 132:13
spread (3) 65:19 66:20 67:24
spreadsheet (43) 56:4 57:10
58:25 71:8 82:13,15
84:3,14 85:6 86:22 87:7,20
88:25 89:3 90:7,9,13

subject (10) 27:7 28:25 90:2
130:20 141:12,24 150:5
151:5 153:14,21
submit (3) 26:12 53:19 127:5
submitted (12) 26:24 26:20
31:12,16,19 34:3,12 81:5
91:20 120:16,23 146:22
submitting (3) 26:15,21
153:17
subsequent (2) 12:22 46:2
subsequently (3) 7:12
122:13 146:5
substance (3) 14:4 105:7
136:8
substantial (3) 13:24 50:20
143:7
succeed (1) 81:4
success (4) 41:10,20
52:21,23
successful (1) 41:23
suddenly (2) 8:18 11:11
suffered (1) 50:14
sufficient (3) 10:17 101:11
sufficiently (1) 147:1
suggest (12) 14:5 13:17 34:9
71:3 76:5,18 80:1 120:17
12:20 61:8,9,20 67:7 74:12
suggesting (2) 11:23 144:2
suggestion (4) 90:2,6 60:11
144:16
suggests (3) 33:2,12 121:8
sum (4) 71:17 90:15 104:4
116:12
summary (3) 3:3 70:3 93:22
summers (1) 17:3
sums (4) 24:17 70:9 93:22
106:17
sunday (1) 145:15
supporting (1) 34:7
sure (20) 1:19 4:17 50:16
37:16 38:1,15 54:21 56:6
61:6 70:1 71:10 99:3
102:12 122:17 128:16,20
132:1 148:4 153:9
surely (1) 49:5
surname (2) 115:11,16
surprise (1) 8:24
surrounding (1) 99:3
swear (2) 112:14 148:15
switch (1) 95:19
sworn (1) 148:22
system (1) 110:11

—— T ——

tab (8) 90:18,24 91:2 94:13
95:19 99:7,11 103:25
table (5) 45:22 64:16 93:22
94:13 100:10
tabs (2) 90:19 95:16
taken (9) 8:24 35:9,12 36:20
40:1 95:13,21 133:20 150:2
150:12
takes (1) 90:19
taking (3) 55:4 82:4 127:13
talk (5) 36:16 141:16,22
151:20 153:22
talked (1) 60:11
talking (5) 24:12,22 45:20
154:18
tap (1) 156:22
target (3) 134:23 135:3
tax (33) 5:20,22,25 6:2,5
14:13,24 26:16 29:10,20
20:1,9 23:1,1,11,12,15,16
24:13,13,24 25:16
26:5,12,12,18 26:16
35:13 116:7 130:16,18
43:20 44:13,16,16,23
45:5,8,18 47:12,15,17
49:21,25 50:1,2,3,15
63:1 64:2,22 65:7,13 66:5
63:7,17 67:10 69:7 76:5
102:1,23 103:19 116:19
118:4,15 120:1 121:11

77:12,23 78:10,23,25
79:2,3,12,24,25 80:3,8,24
82:5 88:1 92:7 95:12 99:8
113:16 114:2 127:10
128:10,11
taxefficient (1) 49:23
taxefficiently (1) 50:9
tdc (9) 91:9,11 93:16 94:12
103:25 106:5 106:4,8,13
technical (2) 1:7 8:21
toed (1) 141:8
telecoms (1) 1:12
telling (2) 22:15 25:14
toraiya (6) 6:25,18,22,24
63:18 83:4
terms (13) 19:14 24:18
37:19 43:0 63:16 65:20
69:6 72:22 89:1 116:13
116:25 151:7 156:25
territory (1) 135:19
test (1) 80:25
testimony (2) 150:21 156:14
text (2) 29:18,10
thank (65) 5:6,10,13
11:10,17 12:7 17:1 20:15
27:2 28:23 40:18 41:11,17
42:2 43:10 54:11
55:10,15,16 56:17,25
58:11 62:5,18 70:19 73:9
82:14,23 89:16 94:5,11
100:1,4,8,9,22 105:20
106:7 107:3,9,10 108:9
109:14 111:20 116:1,2
123:15 121:24 124:19
135:1,13 136:12 138:1
140:1,5 142:5 149:23
154:1,3,15,15 155:20
157:12
thanks (1) 42:18
thats (65) 3:25 5:7 6:8 12:25
13:15 16:14,14
17:9,12,15,22,25 18:3
21:19 22:25 23:1 27:16
31:3 32:9 33:11 39:21 41:2
47:21 48:2,6,9 50:17 52:15
57:8,15 58:1,5,14,21
59:21,24 60:1,6,16,22
61:4,25 62:8,11,16,23
66:23 66:19 69:10 88:7,12
90:22 100:13 101:9 101:22
theres (11) 6:19 14:19
thereafter

124:17,20,25 125:11
134:21,22 140:24,24
147:16 148:7,11,18 150:8
thursday (3) 1:1 140:18
145:14
tidied (1) 155:10
tie (1) 11:6
tight (1) 137:6
time (78) 2:4 6:13,15,23
10:3,18,22 11:12 14:2 23:2
30:2 32:7 35:11,16
36:6,7,8 38:2,17,25 43:2,4
46:14 48:20 49:20 52:14
53:21 54:11 55:8
56:9,13,18 60:2,5,17,24
60:19 61:6 62:6,16 63:7
69:6,8,11 137:17 141:10
79:4 81:3,6,20 82:25 83:6
timeline (1) 10:9
times (2) 79:20,21
timing (3) 9:23 157:1
tiniest (1) 115:6
today (25) 56:22 55:4
102:24 123:23 125:24
126:19 128:1 130:16 132:4
133:11,15 134:10
137:5,10,12,24 138:1
144:12 146:17 155:10
together (3) 62:19 78:8
130:20
told (24) 15:21 16:10 18:9
26:7 33:12 46:21 53:11
63:7,13,11,25
64:3,5,7,20,24 65:1,12
69:6,8,11 137:17 141:10
153:5
tomorrow (18) 54:16,25
102:20 103:4 133:5,17
136:24 137:1,6,25
139:19,24 141:1,11 142:1
156:12,14 157:20
tomorrows (1) 54:17
too (6) 46:14 50:10 62:17
95:22 106:25 156:4
tools (5) 81:7,19,21 101:13
141:14
topic (11) 54:13 55:5
101:13,18 104:14 122:23
134:20 144:19
topics (6) 54:19 102:21,25
139:17 140:24 142:11
total (6) 93:22,25 94:5
106:7,17 107:3
totally (2) 19:7 68:3
touch (1) 60:25
towards (2) 120:10,24
trace (1) 78:9
tracing (1) 78:12
trade (16) 2:2,23 3:3 13:14
14:2,16 22:22 23:7 56:1
64:17 65:6 76:25 77:17
90:10 101:23 117:9
tradebytrade (1) 99:1
traded (5) 20:14 72:17 89:5
104:3 119:4
trades (20) 26:10 55:25
56:20,23 57:9,17,22,25
58:3,12 59:10 65:6 65:1,7
67:5,22 99:14 79:12
146:21 146:24 149:23
trading (89) 1:16 3:12
5:20,23 6:12,20 11:26

12:24 13:3,5,7,11,17
14:6,15 15:2,17 18:1
19:5 23:8 35:7 37:13 53:19
54:4 55:18,19 57:5 58:20
62:25 63:25
64:4,13,16,21,25
65:5,10,17,20,24
66:1,4,15,22,25 67:4,14,19
68:12,13,24 69:9,12 70:19
71:6 73:5 75:2 77:4
78:2,17 85:1,20 92:20
93:15 94:6 96:24 106:4,8
103:18 108:12 109:18
112:8 130:4 133:21,23
137:6,10,13,14 138:21
140:1,4 141:2,16,22,25
142:15 143:3,4 144:19
150:9 151:12 152:25 153:1
155:7
transaction (4) 13:18 33:22
58:16 78:22
transactions (13) 13:25
16:11 25:3,6,9,23 26:1,4
33:25 36:3,15 40:1 66:16
transcriber (1) 155:9
transcribers (1) 141:6
transcript (72) 7:24
9:3,10,16 10:1,11,20,21,23
142:18 150:3,5,17,21
135:10,12 137:8,20 138:5
transacts (1) 155:16
transferred (2) 23:4 36:17
treat (1) 53:12
tree (1) 53:12
trial (7) 2:20 73:21,23
80:21,21 133:23 134:1
true (28) 28:7 36:19 45:23
51:24 63:6 00:1 116:17
120:8 122:6 123:6,12,20
123:23 121:23 125:20
trust (1) 13:21
trusted (5) 15:24 16:11
58:22 63:20 68:17
truth (6) 16:12,15 26:19
122:4 126:16 149:19
trying (10) 15:5 39:23 51:15
66:2 81:6 118:24 124:18
146:10 153:11 154:6
tuesday (4) 12:25 144:9
149:17 156:16
turn (4) 49:19 62:12 63:1
140:8
turned (1) 65:11
turning (1) 60:14
turns (1) 140:20
type (7) 37:5,7 52:10 54:4
86:5 153:17 155:25
typed (1) 5:3
types (2) 145:4 153:15
typically (1) 81:20

—— U ——

uk (1) 50:1
ultimate (4) 20:5 50:4,5,6
ultimately (10) 15:11 39:3
41:8 49:6 51:7 52:3 55:20
82:22 140:10,16
unable (2) 41:1 126:11
unclear (3) 26:14 120:0
146:6
undergo (1) 130:7
undergoing (1) 80:22
underlying (1) 56:1
understand (30) 1:7 2:3 4:3
8:17 10:11 11:11 14:25
19:5 31:12,16 33:20,22
59:11,12 60:20,25 62:15,17
67:25,27 59:19 74:12
113:23 131:24 133:2
udiscerned
udiscerned
understanding (8) 7:2 72:23
75:21,24 101:24 102:15

139:16 140:9
understand (1) 154:25
understood (14) 6:20,21 7:9
  8:23 14:13 15:8 75:12
  113:10 128:8,17,18,22
  141:13 148:17
undertake (3) 114:16 129:23
  133:2
undertaken (1) 21:21
undertook (1) 117:12
unfair (1) 39:1
unit (3) 20:18 21:16 33:13
united (2) 6:17,19
universe (1) 98:16
unless (7) 15:9 41:22 42:4
  56:1 89:17 144:4 150:9
unprompted (1) 120:9
unregulated (1) 36:6
unrelated (3) 116:15,22
  117:21
until (13) 41:22 42:4
  81:6,12,13 82:8 102:18
  139:24 141:11 144:22
  145:18 147:22 157:24
untrue (2) 120:18 124:7
untruthful (2) 129:3,4
untruths (3) 126:5 127:20
  128:7
unwind (1) 66:7
unwinds (2) 57:9,14
update (2) 156:12,14
updated (1) 104:11
upload (1) 151:3
uploading (1) 145:6
upon (1) 119:14
upset (1) 137:5
urgent (1) 20:1
usb (1) 145:6
usd (2) 110:10,11
used (18) 6:20 7:1,7
  11:19,21,25 23:12
  57:11,21 71:5,9,12,21,25
  84:16 96:6 97:3 111:12
useful (3) 68:25 117:20
  150:4
uses (1) 39:4
using (14) 2:6 3:7 12:23
  20:14 23:2,10,17 25:18
  50:9,11 58:3 86:13 135:9
  142:19

                V

v27127 (2) 61:13 69:21
v27128 (1) 116:4
v2750 (1) 101:21
v2778 (1) 60:18
v2791 (1) 42:1
v2795 (1) 41:11
vacation (3) 102:18 131:13
  132:21
valid (1) 19:10
value (3) 4:14,16 70:14
variety (1) 45:16
various (4) 97:14 120:4
  122:7 153:15
vehicle (2) 118:5,15
verbal (1) 88:23
verification (1) 132:10
verify (3) 130:4,8 132:4
version (4) 7:24 10:21 143:6
  155:23
versus (1) 86:2
via (4) 25:16 26:13 28:13
  98:5
violin (1) 64:9
virtually (1) 119:24
virtue (1) 65:7
visible (1) 8:19
visitor (1) 145:2
visually (1) 90:22,24
voluntarily (1) 51:20
volunteer (1) 147:15
vyas (3) 27:4,20 20:6

                W

wait (2) 23:25 139:23
wall (1) 137:18
wanting (1) 138:25
wants (3) 141:2 144:1
  150:10
warn (1) 138:8
warning (3) 103:10
  141:12,25
warranty (1) 149:4
wasnt (20) 3:15,16 7:8 13:12
  19:14 36:17 51:25 69:2
  74:21 75:23 79:1,11 81:14
  88:16 114:5 127:8 138:11
  143:25 150:8 152:17
waste (1) 60:10
wasting (1) 152:24
way (48) 1:19 2:24 7:22 8:13
  9:15,22 12:10 16:6 37:1
  49:4 50:20 53:6,14 55:4,6
  64:12 66:11 67:4,15,22
  68:4 76:8 80:6 86:17
  98:16,23 101:20 106:24
  120:20 133:23 134:20,22
  135:15 136:5,8 137:4
  146:9 147:9 154:5 7 146:10
  140:19 150:14,15,16,24
  152:2 154:25 157:5
ways (3) 30:19 45:17 50:8
wed (1) 110:10
week (18) 100:12 131:13
  132:21,21 135:8 136:1
  137:18 139:24 140:11,16
  148:4,5 149:17,18
  150:21,22 157:5 156:5
  157:21
weekend (1) 54:24
weeks (3) 1:13 103:3 135:22
weight (1) 149:11
went (9) 3:3 4:23 26:14
  20:18 57:20 60:25 81:1,12
  119:25
werent (9) 2:5 18:23,25 36:2
  53:7 57:16 65:12 67:19
  88:3
west (1) 1:23
whatever (7) 4:16 68:3 64:9
  78:21 86:10 101:4 136:2
whenever (4) 77:20 88:15
  138:9 156:18
whereas (3) 10:22 153:16,23
whichever (2) 30:2 60:6
whilst (4) 8:1 58:12 125:11
  157:6
whispers (1) 151:14
whole (7) 16:21 20:23 50:13
  63:12 65:25 69:7 09:3
wholly (1) 70:22
whose (3) 92:18 97:17,19
wht (3) 122:11 124:25 125:3
wide (1) 113:7
willing (6) 15:6 16:12,21
  69:17 127:19 128:6
willingly (3) 35:11 51:23
wilson (4) 62:2,5,12 63:18
wilsons (2) 03:17,19
window (1) 7:23
wish (3) 9:11 131:19 155:25
wishes (2) 144:12,14
withdraw (1) 144:15
withdrawn (1) 34:4
withheld (10) 15:24 16:16
  20:3,5,9 51:12 52:8 53:5
  78:4,4
withholding (60) 5:20,22,25
  6:2,5 12:0 17:7,23 18:18
  19:10,12,14 20:1
  36:12 40:20,23 41:24 42:7
  44:16 45:25 48:7 50:15
  53:19 63:1 64:2,22 65:7,13
  68:5 72:20 73:4,6,12,16
  77:12,22 76:25
  79:2,3,11,24,25 80:3,8,24
  82:5 88:1 95:12 99:8
  113:16 114:2 121:16
  124:16 128:9,11

                X

witness (52) 2:20 4:3 39:1,4
  41:10 42:1 52:9 60:2,17
  61:12,22 60:21 71:4
  76:5,8,13,14 87:22 80:3,12
  90:23 102:1 103:10 116:4
  119:16 120:16 121:4,15,16
  139:14 131:10 133:14
  141:12,25 142:7,24,25
  143:4 144:16 145:21
  146:16 148:8,11 149:15,20
  149:23 94:25 100:12 127:9
  128:2 143:13
wont (2) 95:15 135:16
work (10) 52:11,19 97:20
  101:13 125:18 127:11
  136:24 145:13 149:25
  157:17
workbook (2) 90:4,6
worked (5) 18:7 58:11,15
  60:24 62:19
working (7) 10:12 35:13 62:6
  66:23 107:7 125:11 155:4
works (1) 106:1
workspace (2) 9:2 10:7
worry (2) 25:13 141:21
worth (3) 19:2 40:14 88:8
wouldnt (17) 11:2,3 16:22
  41:21 64:14 65 4 67:23
  74:25 77:6,8,14 78:9 117:5
  138:10 139:16 143:19
wrinkle (1) 3:1
writing (8) 2:28 75:23 76:14
  115:9,22 118:25 146:3,6
written (15) 3:25 75:20
  87:24 88:3,11,20 101:2
  107:21 117:4 118:20 152:3
  143:15,19,14 146:20 152:23
wrong (4) 34:8 42:9 46:14
  48:24,24 49:12 66:14
  96:12 143:17
wrongly (1) 121:14
wrote (9) 34:25 87:22
  117:24 118:5 119:24 121:1
  131:8,21 132:12

                X

x (2) 74:9,9
xip01 (1) 91:15
xiphias (2) 91:15 105:10

                Y

y11 (1) 92:13
y12 (2) 92:13,14
y13 (1) 92:12
y3 (1) 91:15
year (2) 81:20 120:22
years (14) 13:2,17 19:4
  34:24 40:4 46:2 57:20
  59:25 60:21 61:10 66:18
  75:3 127:9 128:2
yellow (3) 9:8,18 10:1
yesterday (2) 4:10 143:19
youre (1) 95:23
yours (5) 17:17 59:22 62:18
  119:13 148:19
yourself (6) 20:22 39:16
  41:12 60:4 69:22 116:5

                Z

zero (9) 4:15 14:17 15:11
  65:15,16 66:1,2 67:6
  121:11
zeta (24) 16:25 17:11,13,20
  18:1,4 19:3 21:12 22:21,24
  24:21 25:15 26:9,10 28:16
  31:13 33:2 35:6,19,21
  39:24 42:21 45:21,23
zfp (2) 20:25 31:9
zone (1) 30:2

                0

0001 (1) 9:20
05 (7) 76:25 77:20 84:10,18
  85:10 93:12 100:4

                1

      1

1 (24) 9:15,15 21:11,11
  27:19 29:24 42:19,20
  43:11 74:10 85:7,8,12
  90:4,6 93:11,12 100:7
  106:2 112:20 114:15
  117:5,11 158:5
10 (10) 20:18 34:24 55:1,10
  91:23 94:25 100:12 127:9
  128:2 143:13
100 (3) 41:7 74:8,13
1055 (1) 54:12
1057 (1) 54:12
10minute (1) 137:19
11 (3) 92:2 105:10 108:10
110 (1) 155:19
1100 (1) 135:9
111 (3) 143:1,1 155:14
1155 (1) 32:13
116 (1) 155:20
12 (2) 82:17 92:6
122 (2) 2:21 8:10
1224 (1) 103:11
1230 (1) 135:10
127 (1) 61:15
13 (1) 92:10
130 (4) 102:9 103:9,13
136524 (1) 106:19
142 (1) 158:6
15 (4) 85:16 92:16 143:14,16
16 (2) 90:2,10
172 (1) 122:3
175 (15) 74:7,20 76:1
  84:5,13 86:3,14,15,18,25
  87:3,12,15,16 99:22
18 (3) 130:1,2,2
19 (6) 104:15,24 105:2
  110:18 130:2 143:4

      2

2 (27) 27:19 30:21
  31:21,23,24 43:23 44:3,4
  46:6 74:7,20,24 79:23
  84:5,12 86:2,4,15,18,25
  87:3,11 89:10 92:10 140:6
  140:19 147:9
20 (3) 27:5 59:25 92:21
2010 (1) 57:25
2011 (5) 28:17,24 30:2 31:17
  32:13
2012 (5) 12:18 13:16
  17:7,21 23:5 27:5 33:2,19
  39:18,20 40:2 41:7 42:20
  46:2 56:20,23 57:1,12
  58:20 59:3,14,25 60:21
  66:11 69:12 66:11,12
  91:9,11 93:16 103:25
  104:6 106:4,8,14
20122013 (5) 5:21 6:6
  55:19,25 57:5
2013 (26) 61:23 68:11,12
  89:13,14 90:16 17
  86:13,19,20 90:2,10
  99:7,9,22 100:17
  104:15,24 105:2,2,5
  107:12 108:6 109:16
  111:17,23
2014 (6) 2:5 20:18 34:25
  35:16 40:4 55:20
2015 (6) 80:11,23 81:3,6,3
  82:8
2024 (2) 1:1 157:24
21 (3) 44:2 93:1 105:2
22 (2) 74:9 93:3
220 (1) 137:20
221 (1) 138:3
23 (5) 1:1 75:4 93:14 99:14
  104:1
230 (1) 137:21
231 (1) 138:5
235 (1) 138:22

      3

3 (16) 12:18 21:11
  31:21,22,25 33:15 43:11
  46:22 55:5 74:20 91:10
  94:10 103:5 105:22 135:13
  138:1
30 (4) 30:2 32:13 93:22
  94:22
31 (2) 93:25 133:7
32 (1) 94:5
33 (1) 94:10
34 (1) 93:21
343000 (1) 98:6
36 (1) 94:14
360 (1) 5:5
37 (1) 73:25
38 (1) 94:12
381 (1) 134:16
38o10 (1) 123:16
38o104 (1) 123:18
38o113 (1) 123:25
38o143 (1) 125:19
38o95 (1) 122:19
38o95 (1) 122:21
39 (2) 32:9 94:10
393000 (1) 98:6

      4

4 (1) 24:18
40 (1) 134:22
41 (2) 12:10 94:18
430 (3) 60:17,10 61:5
431 (1) 60:23
436524 (1) 110:17
45 (2) 100:10 138:12
45a8 (1) 76:23

      5

5 (3) 143:4 158:4,5
50 (1) 51:4
50000 (5) 97:10,11,18
51 (5) 41:25 42:2,8
5364 (1) 41:12
5365 (3) 41:12,15,17
55 (2) 122:17,19
56 (1) 123:16
57 (1) 124:1
5b (2) 121:25 124:13

      6

6 (3) 111:17,23 142:22
60 (5) 47:16 50:22 51:11
  52:5,7
6296 (1) 47:20
63 (2) 47:20,24

      7

7 (2) 109:16 142:22
702 (3) 61:12,14 69:23
704 (2) 69:23,25
707 (3) 60:7 116:3,7
73920 (1) 104:4
73926 (1) 106:4
75000 (1) 32:4

      8

8
80n (2) 124:14 125:9
89 (5) 82:24,25 83:1 84:1
  85:7

      9

9 (2) 82:16 108:6
90 (2) 83:4 85:10
91 (2) 83:6 85:10
92 (3) 83:8 84:17,23
93 (2) 83:10 85:12
930 (6) 1:2 135:9 137:1
  141:11 157:20,24
934 (1) 1:4
94 (4) 83:12 84:3,23 89:9
95 (4) 83:14 84:3,23 85:15
96 (1) 83:17
97 (1) 83:19
98 (1) 83:21
99 (5) 82:25,25 83:23 84:1
  85:15

                W