# Exhibit 2

# OPUS2

Skatteforvaltningen v Solo Capital Partners LLP & Others

Day 1MT

April 15, 2024

Opus 2 - Official Court Reporters

Phone: 020 3008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

Monday, 15 April 2024

1
2    (10.00 am)
3           Housekeeping
4   MR JUSTICE ANDREW BAKER:  Good morning, Mr Rabinowitz.  We
5       are here at last .
6   MR RABINOWITZ:  Yes, indeed, my Lord.
7       May it please your Lordship, I , together with the
8       individuals  your Lordship has seen have signed our
9       written submissions, appear in this matter for SKAT.
10      This, of course, as your Lordship knows, being the trial
11      of the dispute between SKAT and various parties, arising
12      out of the circumstances in which SKAT came to pay some
13      12.09 billion  Danish krone  —— that is about
14      £1.44 billion  —— in purported tax refunds to various
15      persons, no part of which, as your Lordship knows, we
16      say was in fact payable.
17      That has, of course, again as my Lord is aware,
18      given rise to a number of claims in a number of
19      jurisdictions  against a number of parties, by which SKAT
20      seeks remedies in relation to the sums that it has paid
21      and for which it contends in these proceedings before
22      this court that the parties before this court are in
23      some respects liable.
24      My Lord, in terms of the defendants, as your
25      Lordship knows, there are 17 sets of defendants who are

1

1      still  active and before the court.
2   MR JUSTICE ANDREW BAKER:  Yes.
3   MR RABINOWITZ:  They are, and your Lordship will have to
4      forgive me as I run through them, but it seems to me the
5      least  I should be doing.  They are the Sanjay Shah
6      defendants and Usha Shah, represented by Mr Jones KC and
7      his team; the DWF defendants, represented by Mr Head KC
8      and his team; Mr Devonshire, represented by Mr Jory KC;
9      Mr Lui represented by PC Byrne; Mr Bains, represented by
10     DLA Piper; Messrs Knott and Hoogewerf represented by
11     Reed Smith; and I should just pause there to apologise
12     to anyone whose name I have mispronounced.  It is going
13     to happen, I'm afraid.  I  will do my best.
14     Lindisfarne , represented by its  principals ,
15     Mr Hogarth and Mr Baker, and then a number of
16     individuals  who are representing themselves, my Lord.
17     If  I can run through those for your
18     Lordship: Mr Fletcher, Mr Jain, Mr Godson, Mr Klar,
19     Mr Koerner, Mr Murphy, Messrs Oakley and Mitchell,
20     Mr Patterson and Mr Smith.
21     Ms Bhudia is also a defendant but is not
22     participating  in the  trial .  In addition to these active
23     defendants, as your Lordship may recall, SKAT has
24     already had default judgment on liability  but not
25     quantum against three further groups of defendants, the

2

1      claims against which are therefore live  before your
2      Lordship for the purposes of quantum only.
3   MR JUSTICE ANDREW BAKER:  Yes.
4   MR RABINOWITZ:  Those are the claims are against — again,
5      if  I can just identify them — Syntax, SCL and the two
6      Polaris  entities  and that is a  list  of the parties .
7      My Lord, in terms of my oral opening of the case,
8      subject to your Lordship, I'm acutely aware that your
9      Lordship has been deluged with long and I hope
10     reasonably helpful written submissions that explain in
11     some detail what the case is about and more generally
12     the position taken by various parties .
13   MR JUSTICE ANDREW BAKER:  Yes.  I did want to make one
14     observation just to inform the parties  where I have got
15     to in relation to that.  For several reasons, but
16     including their respective length, the amount of time
17     I in fact found I had last week alongside other
18     commitments at the start of a new term and the fact that
19     I was conscious that in proportionate terms as the trial
20     progresses even within openings I'm likely  a
21     practical  reality  to hear more from Mr Jones and
22     Mr Head respectively than from any other individual
23     representative or team, I therefore focused first ,
24     having read SKAT's opening, on those openings I have
25     received from defendants other than the Shah defendants

3

1      and the DWF defendants.
2      As we speak, I would not be able to claim to have
3      read yet or rather to have completed yet my reading of
4      the Shah defendants' and the DWF defendants' written
5      openings.
6      I have read carefully the first  sections of them
7      which include overviews and skimmed through the rest.
8      But I will have to be, in my own time, catching up on
9      the rest of the detail of their  written openings outside
10     court hours as we get going.
11     But I thought I ought to mention that just in case
12     anybody then popped up and said they were not willing
13     for you to get going on the documentary opening today
14     and that I should instead take the morning or the day to
15     finish that reading.  I anticipate in the way the matter
16     has been conducted generally that is probably not an
17     application anyone will make, but I thought I should
18     raise it to check.  Nobody is popping up on their feet
19     to say so.
20   MR RABINOWITZ:  Your Lordship, before I carry on, and
21     I probably should have said this at the outset, but your
22     Lordship will obviously want to have a break for
23     transcribers.  Is there any particular time that your
24     Lordship ——
25   MR JUSTICE ANDREW BAKER:  Yes.  I think in the morning if

4

Confidential

1  you aim essentially for 11.30 for 10 minutes or so, and
2  then in the afternoon, we are trying to take shorter
3  sitting afternoons, essentially 3 o'clock more or less
4  on the dot for as short as break as we can all manage,
5  just to stretch legs and take a comfort break if we need
6  it. Thank you. Yes.
7  MR RABINOWITZ: My Lord.
8  MR JONES: My Lord, may I just check that we were hoping
9  that there would be people attending remotely. In the
10  past we have seen them on screen. I think it has been
11  arranged that we will not see them on screen but I have
12  no way at the moment of checking that they are logged
13  in. Is there any technician in court who can assist us
14  with that or not? I think not.
15  MR JUSTICE ANDREW BAKER: I think the answer is that the
16  Opus operatives in the back corner of the room —— do we
17  have those logged in online?
18  MR JONES: I think it is confirmed. I'm sorry to interrupt.
19  I wanted to make certain that my client was listening,
20  thank you.
21  MR RABINOWITZ: My Lord, I should also apologise. There is
22  one more individual defendant representing himself who
23  I failed to mention, and that is Mr Preston.
24      My Lord, in terms of the oral opening, I'm obviously
25  not going to be able to cover the case in the same

5

1  detail that it is covered in the written document
2  because I only have —— only! —— I only have six days,
3  but what I propose to do, if I can just identify for
4  my Lord a road map, first I'm going to say something
5  about the shape of the case generally.
6  MR JUSTICE ANDREW BAKER: Yes.
7  MR RABINOWITZ: Secondly, as my Lord has requested, I'm
8  going to walk your Lordship through the basic trading
9  structure in the Solo Scheme in 2012—2013, as described
10  at paragraph 90 of our written opening.
11      Third, I propose to address your Lordship on what,
12  if any, misrepresentations were made to SKAT and in that
13  context I will also say something briefly about
14  reliance.
15      Fourth, to say something about what we have called
16  the Solo Scheme, in the course of which introducing your
17  Lordship to some of the key players in that scheme and
18  identifying some of the key features of that scheme,
19  including obviously by reference to the documentation
20  before the court.
21      Fifth, having done that, I propose to say something
22  about the second of the schemes with which this trial is
23  generally concerned, and that is what your Lordship
24  knows we have called the Maple Point Scheme, which was
25  again, as my Lord will know, a breakaway from the

6

1  original Solo Scheme, involving a number of individuals
2  who had been part of the first Solo Scheme.
3      Sixth, I will turn, again subject to your Lordship,
4  to deal with the third of the schemes, namely the
5  Klar Scheme, which as my Lord may recall is a simplified
6  version, or was a simplified version of the Solo Scheme,
7  doing much the same thing.
8  MR JUSTICE ANDREW BAKER: Yes.
9  MR RABINOWITZ: And having done that we will deal with the
10  issues relating first to the English law of tracing,
11  which may be relevant as we go along, and secondly to
12  certain issues of Danish law, to the extent that that is
13  going to matter. Those, subject to your Lordship, will
14  be matters taken by Mr O'Leary.
15  MR JUSTICE ANDREW BAKER: Thank you. In my typical fashion,
16  Mr Rabinowitz, I have three matters I would quite like
17  to raise as early possible. I don't want you to fail to
18  have concluded any purely preliminary remarks about how
19  we are going to proceed before I do that but I probably
20  do want to raise them before we start to get into
21  a first matter of any substance in terms of opening.
22  MR RABINOWITZ: The only thing I was going to cover before
23  I got into that substance is housekeeping points and
24  that may be the time to deal with your Lordship's
25  points.

7

1  MR JUSTICE ANDREW BAKER: Yes, thank you.
2  MR RABINOWITZ: Your Lordship has very kindly listed
3  a half—day hearing for this Friday, to deal with some of
4  the case management matters which have arisen since the
5  PTR.
6  MR JUSTICE ANDREW BAKER: Yes, and I have seen, which may
7  shorten the time you need to spend now on it, I have
8  seen a letter from Pinsent Masons with an agenda as
9  things stand at least.
10  MR RABINOWITZ: I'm grateful.
11  MR JUSTICE ANDREW BAKER: And the suggestion that it might
12  be that we will need more than the three—hour morning
13  that I had initially set aside. I'm not, as I speak,
14  able to say we will definitely be able to go into the
15  afternoon but I have that on board as something I need
16  to look at.
17  MR RABINOWITZ: I'm grateful for that, my Lord. On the
18  basis that that is a possibility, then according to the
19  Commercial Court guides skeletons will be served at 4 pm
20  on Tuesday, that is to say tomorrow. But again ...
21  MR JUSTICE ANDREW BAKER: Well, given everything else that
22  is going on and given the slightly miscellaneous nature
23  of the points that arise, albeit that there may then be
24  a reasonably important discussion to be had as to what
25  we do with the trial timetable, depending on what

8

Opus 2
Official Court Reporters

transcripts@opus2.com
020 3008 6619

Confidential

SKAT_MDL_001_00834753

1  decisions I might have made on prior points, I'm not
2  sure I would insist on treating it as now as a heavy
3  application with skeletons due sequentially tomorrow and
4  so on.
5      I think it would be helpful — as we have done with
6  other substantial case management hearings, it probably
7  would be helpful for there to be exchange sequentially
8  so that SKAT, that has oversight of all the different
9  bits and pieces, puts something in first and any
10  defendants who are going to participate on Friday can
11  then just focus responsively on the parts that affect
12  them.
13      I don't know whether it would be possible to do an
14  exchange late Wednesday and then something coming in
15  Thursday from defendants.
16  MR RABINOWITZ:  That is what we were going to ...
17  MR JUSTICE ANDREW BAKER:  Thank you.
18  MR RABINOWITZ:  My Lord, your Lordship wanted to raise three
19  points, I think.
20  MR JUSTICE ANDREW BAKER:  Yes.  The first is this, and for
21  these purposes I may need to ask for early assistance
22  from our EPE operator.  If they could put up
23  {F/361/119}.  So page 119.  Is it possible to show that
24  so we have all of paragraph 242 on the screen, which
25  goes over the page.  {F/361/120}.

9

1      There we are.  If I just read out that paragraph,
2  which is only in fact a single sentence, and
3  I appreciate that it is in the nature of an overarching
4  summary sentence or paragraph where one says for the
5  details see elsewhere, but it says:
6      "For the reasons set out in the respective Defendant
7  Annexes, SKAT alleges that the defendants—..."
8      So that is all of them, apart from those identified
9  in the footnote.
10      "... jointly assisted in the making of the WHT
11  Application Representations [so that is all of them] and
12  the Custodian CAN Representations by actions taken by
13  them in furtherance of the deceits [all of them] in
14  pursuance of a [that is singular] common design to
15  defraud—..."
16      Now, I don't in fact understand that in quite those
17  literal terms, in the way I have just interpolated them
18  by way of comment, to be SKAT's case and I don't think
19  anybody else understands it to be SKAT's case, but I did
20  feel it was appropriate just to raise, at this very
21  early stage, that as I understand it in fact there are
22  in various ways narrowings of that apparently
23  unqualified and overarching proposition so that, for
24  example, as regards the DWF defendants, liability
25  against them is not asserted in respect of the

10

1  Solo Scheme, as SKAT calls it, after the point at which
2  each of them has left Solo.  And conversely liability is
3  not asserted against Sanjay Shah in relation to the
4  Maple Point Scheme and so on.
5      Now, by way of observation at this stage there are
6  a few other places, I will just mention them for the
7  transcript, for example, paragraph 287 {F/361/140},
8  paragraph 299 {F/361/144}, where similarly, if read in
9  isolation, you might possibly be misled into thinking
10  that the allegation is more all—encompassing against all
11  defendants.
12      That all said, I haven't found it as clear simply
13  from the written openings as I would have perhaps liked
14  it to have been just to have in front of me as a working
15  document what that therefore means in practice.
16      If I can just — sorry, I haven't got the page
17  number because the copy I'm using is not the bundle
18  copy.  If our operator could find the DWF defendants'
19  opening at paragraph 27.  So that is page 16 of the
20  opening.
21  MR HEAD:  {F/381/1}, I believe.
22  MR JUSTICE ANDREW BAKER:  That doesn't look right.  Can we
23  try page {F/381/16}.  Yes, that does look right.
24      As it appears, there in paragraph 27 the DWF
25  defendants' team have translated into a pithy summary

11

1  what they understand the scope of their alleged
2  liability involvement to translate to.
3      So, for example, Mr Horn, they say they understand
4  the claim against him therefore comes down to as regards
5  damages 559 million krone re Solo Scheme up
6  to July 2013, 2.7—odd billion krone re
7  Maple Point Scheme, and as regards other types of
8  remedy, traceable proceeds of £24.8—odd million relating
9  in some way to the Solo Scheme and £14.6—odd —
10  £14.7—odd million relating to the Maple Point Scheme.
11      Now, for a slightly fuller but still very concise
12  summary analysis of what the claim against Mr Horn it is
13  said ultimately boils down to in money terms, one might
14  wish to have just an indication of the degree to which
15  those are cumulative or involve areas where, for
16  example, if the traceable proceeds claim succeeds there
17  will have to be some election at point of judgment by
18  SKAT and/or recovering that relief will in fact in and
19  of itself reduce any damages claim.
20      So, subject to explanatory comment of that type
21  which could be in a footnote, I find myself wondering
22  whether by the time any defendant has to give
23  evidence — so that is the sort of timescale I have in
24  mind, not something that you and your team need to start
25  scrambling to get together overnight or anything like

12

1  that —— but might it be possible before the first week
2  of defence evidence actually to have a comprehensive
3  equivalent of that sort of level of detail in a single
4  document for all defendants?
5      So it is almost like —— but without all the
6  formalities of recitals and so on, but it's almost like
7  a summary version of the draft order that if today
8  I accelerated all the way to the end and said you have
9  proved all of your claims and we will skip every other
10  process, but if we had got to that point, what in fact
11  would the substantive content of the relief sought in
12  a judgment order look like, defendant by defendant.
13      Just to have that as a working document for
14  everybody, in particular before the defendants then go
15  into the witness box, I think would be useful and it
16  would flush out if by any chance, for example ——
17  I happened to pick on Mr Horn as a for instance —— if by
18  any chance their summary there is not quite what SKAT
19  thinks it should be, that would flush out those
20  differences at that stage that can then be discussed
21  offline.  Does that make sense?
22  MR RABINOWITZ:  Completely, my Lord, and we will do that as
23  soon as we can.
24  MR JUSTICE ANDREW BAKER:  Thank you.
25      Then my second point of housekeeping affected

13

1  Lindisfarne.  I hope Mr Baker or Mr Hogarth, who is here
2  today, won't mind my asking this question and I hope in
3  a sense that if the answer to it is no, they will take
4  it as a compliment that the written submissions they
5  have served have caused me to ask the question.
6      As I read those written submissions, they came
7  across very much as a written opening settled by
8  counsel.  If it has not been, then take it as
9  a compliment, as I have indicated, that it comes across
10  thus professionally written.
11      If it had been settled by counsel, I was only going
12  to raise at least the possibility whether fully
13  accepting that counsel are not —— there is no legal
14  representation briefed for trial, but whether as
15  a matter of professional niceties I should be entitled
16  to know who of counsel has settled the written opening.
17  MR HOGARTH:  We wrote the statement and we had it checked
18  out with a barrister, but he didn't add virtually
19  anything to it, we wrote the statement ourselves.
20  MR JUSTICE ANDREW BAKER:  That is all you need to say.  In
21  that case take it as a compliment that it occurred to me
22  even to raise the question.  But I will raise the
23  follow—on very tiny question —— this is not the trial
24  judge's attempt only to demonstrate that he has actually
25  read the documents —— and don't give me an immediate

14

1  answer, take it away and just look at it: in your
2  paragraph 38, there is a sentence at the end that is
3  worthy of your trial judge, that is to say it is at
4  least a triple negative, and I do tie myself up in those
5  sometimes, as I have read it a couple of times I find
6  myself thinking that the final "not" in that last
7  sentence of your paragraph 38, I wonder if that is wrong
8  and actually that sentence has ended up because of the
9  double or triple negative having, as it were, the
10  opposite meaning to what you intended.
11      But don't give me an answer now.  Just, if you
12  wouldn't mind, take that away and at some point
13  communicate through my clerk and to the parties whether
14  it is correctly written or whether I should treat it as
15  something that needs a typo correction.
16  MR HOGARTH:  Can we just send a note to yourself?
17  MR JUSTICE ANDREW BAKER:  Just by email to my clerk, copied
18  to the represented parties, as to whether we should
19  identify that as a correction that needs to be made.
20  Thank you.
21  MR HOGARTH:  Yes, I will do that.  Thank you.
22  MR JUSTICE ANDREW BAKER:  The other matter I wanted to raise
23  was the position of Mr Knott and Mr Hoogewerf and
24  Mr Bergson.  Thank you very much, after our exchange
25  through my clerk at the end of last week, for having the

15

1  courtesy to attend.
2      As I understand the position, Mr Bergson, obviously
3  you with Reed Smith have continued to be retained up to
4  and including the settling of those written opening
5  submissions, which I have read and for which I'm
6  grateful, on the behalf of Mr Knott and Mr Hoogewerf,
7  but other than doing me the courtesy of making a brief
8  appearance this morning, as things stand you and
9  Reed Smith are not instructed to attend and represent
10  Messrs Knott and Hoogewerf at trial; is that right?
11  MR BERGSON:  Yes, my Lord.
12  MR JUSTICE ANDREW BAKER:  Yes.  I do feel, and I would very
13  much prefer not to end up becoming sidetracked in
14  a possible dispute or debate as to whether I share the
15  view that has been expressed that you can acceptably
16  have solicitors on the record if you are an individual
17  litigant and then conduct a trial yourself.
18      I'm not sure I regard it as self—evident that that
19  is correct, and I'm not sure that when the White Book
20  editors have said what they have said, which I have seen
21  because you referred me to it His Honour Judge Pelling
22  king's counsel has said, I'm not sure that they have not
23  confused two rather different concepts.  Or rather I'm
24  not sure that, with respect to him, Judge Pelling might
25  not have confused two rather different concepts.

16

1    One is a litigant who is acting in person and
2    another is a litigant who is an individual.  At least in
3    my ordinary use of the language I would not say, as
4    things stand, that Messrs Knott and Hoogewerf are acting
5    in person.  The reason they are not acting in person is
6    because they have Reed Smith acting for them and they
7    are on the record.
8        They are individual litigants, the same as Mr Jain,
9    Mr Godson and lots of other individuals, and indeed for
10   that matter Sanjay Shah is an individual as litigant
11   rather than a corporate entity as litigant.  But they
12   are not acting in person, they are acting through
13   Reed Smith, because Reed Smith are on the record, and so
14   I think at least provisionally my understanding of the
15   comment in the White Book that says when somebody is
16   acting in person all things being equal they have an
17   absolute right, for example to attend a trial and
18   conduct their case themselves, even if they are being
19   assisted by somebody who is so qualified that they could
20   be on the record for them is not the same thing as
21   saying that somebody who does have legal representation
22   on the record is entitled simply to stand up as if they
23   were litigating in person, because they are not.
24       But in a sense I would prefer not to have to invite
25   argument about that and make a ruling about that.  My

17

1    greater focus at this stage is the pragmatic and
2    practical difficulty that for as long as Reed Smith are
3    on the record but indicating that they and you are not
4    really instructed to attend trial, what is everybody
5    else supposed to do?  Because on the face of things it
6    is not professionally proper for any of the represented
7    parties to be corresponding directly with Mr Knott and
8    Mr Hoogewerf because they have Reed Smith on the record.
9        Reed Smith are going to say we are not responding
10   to, as it were, trial correspondence, because we are not
11   instructed to take an active part in trial and were it
12   correct that Mr Knott and Mr Hoogewerf had some
13   procedural right to attend and conduct their own case on
14   their feet, as it were, even though they had Reed Smith
15   acting, I think we could get into all sorts of quite
16   awkward complications with people trying to decide when
17   is something happening on which they are entitled to
18   correspond directly with Mr Knott and Mr Hoogewerf
19   because in effect that is the sort of thing that would
20   be the subject matter of direct discussion between
21   counsel about matters of presentation to the court and
22   when are we doing something that really ought still to
23   be correspondence with Reed Smith.
24       That is by way of rather lengthy preamble for saying
25   that as it presently stands, and subject to any

18

1    difficulty this gives rise or is perceived to give rise
2    for you or Reed Smith, as it presently seems to me if
3    the intention is that Reed Smith are not to be on the
4    record and that was going to become the position,
5    I rather feel the sooner that is formalised the better
6    and Mr Knott and Mr Hoogewerf are simply in the same
7    position then as Mr Jain, Mr Godson and other litigants
8    in person; they are fully litigating in person, albeit
9    in their case they had your legal representation through
10   to and including the completion of the written openings.
11   MR BERGSON:  My Lord, that is heard loud and clear.  I can
12   confirm that Reed Smith anticipates coming off the
13   record before the end of the week.  So the debate in
14   terms of the point you put to me as regards my clients'
15   entitlements to exercise a right of audience on their
16   own behalf is arid, and I don't think we need to get
17   into it.
18   MR JUSTICE ANDREW BAKER:  Because the first time −− other
19   than this dialogue, the first time in practice when they
20   would have been required to be deciding what, if any,
21   contribution to make by way of advocacy at trial will be
22   when we get to the couple of days for defendants'
23   opening remarks, which will be the end of next week.
24   MR BERGSON:  I think next Thursday for other defendants, my
25   Lord.  So the position will be tied off this week.

19

1    MR JUSTICE ANDREW BAKER:  Very good.  Mr Bergson, I am very
2    grateful for that, and at least so far as I am
3    concerned, and subject to any submission to the contrary
4    by any other party, although I repeat my thanks for the
5    courtesy you and Reed Smith have shown in attending
6    today, if you would otherwise not have attended today or
7    would like to be released, I'm certainly content that
8    you not feel under any obligation to attend for the rest
9    of this week if that gives rise to any difficulty, or in
10   particular if it would give rise to the incurring of any
11   further fees Mr Knott and Mr Hoogewerf would prefer not
12   to incur.
13       So I leave that in your hands and your clients'
14   hands as to how much, if at all, you or anyone from
15   Reed Smith continues to attend this week.
16   MR BERGSON:  I'm grateful, my Lord, and given your
17   indication I propose to be released.  So thank you.
18   MR JUSTICE ANDREW BAKER:  Yes, Mr Rabinowitz, thank you.
19           Opening submissions by MR RABINOWITZ
20   MR RABINOWITZ:  So the introduction to the shape of the
21   case.
22   MR JUSTICE ANDREW BAKER:  Yes.
23   MR RABINOWITZ:  Just to say this at the outset, my Lord,
24   I will in making these submissions be assuming
25   a reasonably detailed level of knowledge on the part of

20

1    your Lordship in relation certainly to issues which your
2    Lordship has considered in the course of your judgment.
3    But if at any point I say something and assume that
4    knowledge when it is not there, your Lordship will
5    obviously let me know.
6    MR JUSTICE ANDREW BAKER:  Thank you, Mr Rabinowitz.
7          At the risk of utter pedantry, and some in court
8    know that I do find it both pedantic on my part but
9    nonetheless something I do mention from time to time,
10   for Opus as our transcribers, please remember I am not
11   Mr Justice Baker, I have never been Mr Justice Baker and
12   I never will be Mr Justice Baker.  My judicial title
13   does include my first name because there was a more
14   senior Mr Justice Baker when I came to the bench, so
15   since this is an historic record of the proceedings that
16   should be reflected in the transcript any time I'm being
17   mentioned on the transcript.  Thank you.
18         Yes.
19   MR RABINOWITZ:  My Lord, in terms of the general shape of
20   the case, as your Lordship knows, SKAT in these
21   proceedings advances a number of causes of action
22   against the defendants under English law or if
23   applicable under Danish law, both in relation to those
24   parties we say were responsible for deceiving SKAT into
25   paying out the sums I have mentioned, but also in

                              21

1    relation to those involved in if you like receiving and
2    dealing with the proceeds obtained through what we say
3    was a scheme.
4          However, whilst your Lordship will very likely in
5    due course have to address those various different
6    causes of action, it is I would suggest fair to say that
7    this case at its heart is about allegedly fraudulent
8    misrepresentations on which we say SKAT relied and as
9    a result paid out very large amounts and suffered
10   losses.
11         There are a few caveats to this statement which
12   I will come back to at the end of my introduction
13   but for now, my Lord, staying with the claim for
14   fraudulent misrepresentation, that raises in the normal
15   way in particular the following issues.
16         First, what representations were made; second, which
17   defendants bear responsibility for those
18   representations; third, were any of the alleged
19   representations false; fourth, did any of the relevant
20   defendants know that they were false; fifth, did SKAT in
21   fact rely on any of those representations; and if so,
22   sixth, what were the losses that were suffered as
23   a result.
24         My Lord, in consequence of your Lordship's foresight
25   in ordering the validity issues trial, we say that if

                              22

1    my Lord finds that the representations for which we
2    contend were made, those representations being in
3    general terms, going to whether as regards the
4    withholding tax applicants, shares in the relevant
5    company were owned by them, dividends declared by those
6    Danish companies were paid to them by a Danish company
7    and in an amount in respect of those dividends so
8    paid —— sorry, and an amount in respect of those
9    dividends so paid was withheld from them in respect of
10   tax, then we say, my Lord, that in light of your
11   Lordship's validity issues judgment, and indeed the
12   largely undisputed facts, the answer to the question of
13   falsity is largely clear.  And I accept that there is
14   a caveat, which I will come back to.
15   MR JUSTICE ANDREW BAKER:  And in any event the answer to the
16   question of falsity —— sorry, the question of falsity
17   can be addressed on a single defined basis as to what
18   Danish tax law did or did not require as set out in the
19   validity issues judgment, rather than at this very long
20   factual trial finding that we have to be engaged in
21   a series of differing and alternative arguments as to
22   whether they would or would not be false if X or if Y or
23   if Z concerning Danish tax law, which is really why we
24   chose to have that trial.
25   MR RABINOWITZ:  And it definitely proves worthwhile for the

                              23

1    reasons I have tried to articulate.
2    MR JUSTICE ANDREW BAKER:  Thank you.  Just going back to the
3    proper law point, am I right to understand, at least in
4    your submission for the purposes of this main trial now,
5    that the combined consequence of the case management
6    orders that I was persuaded to make concerning proper
7    law and the pleading of foreign law and what then
8    happened on the pleadings is that there is a limited
9    number of defendants who positively aver that the claims
10   against them fall to be determined under Danish law?
11   MR RABINOWITZ:  Your Lordship is right.
12   MR JUSTICE ANDREW BAKER:  When I come to —— in due course,
13   at the end of the case, when I come to be making
14   decisions on liability in relation to the claims made
15   against those defendants therefore, potentially I need
16   to grapple with the question of governing law but it
17   only arises then in SKAT versus those defendants, even
18   if I decide, as it were, in SKAT versus one or more of
19   those defendants that one or more of SKAT's claims
20   against them is to be dealt with under Danish law for
21   that reason, when it then comes to, for example, SKAT v
22   Sanjay Shah I am still determining that on the basis of
23   English law and therefore there is that possibility
24   because of that procedural history that I am determining
25   in a sense similar or equivalent claims by SKAT against

                              24

1      D1 and D2, where I'm determining it on the basis of
2      English law against D1 but determining it on the basis
3      of Danish law against D2, and if that's what it is,
4      that's what it is.
5  MR RABINOWITZ:  It is conceivable that your Lordship could
6      therefore reach on the same facts different results
7      depending on whether the defendant has sought to rely on
8      Danish law or English law.
9  MR JUSTICE ANDREW BAKER:  In particular, if there is some
10     aspect of Danish law as proved or as determined at the
11     end that makes a difference.  Yes, all right.
12 MR RABINOWITZ:  Can I just, since your Lordship raises it,
13     identify for your Lordship the handful of defendants
14     that do rely on Danish law.
15 MR JUSTICE ANDREW BAKER:  Yes.
16 MR RABINOWITZ:  They are Messrs Knott and Hoogewerf, and
17     Mr Fletcher, the Jain defendants and the Godson
18     defendants.
19 MR JUSTICE ANDREW BAKER:  Yes.
20 MR RABINOWITZ:  Now, I think I have just said that if your
21     Lordship decides the representations that we allege were
22     made were indeed made, then the answer to the question
23     of falsity is now clear.
24        That is because, as we have noted, that is at
25     paragraph 36 of our main skeleton, the principal

25

1      defendants —— and by that I mean the SS defendants, with
2      all due respect to the other defendants —— the DWF
3      defendants and Mr Klar accept that in and of themselves
4      the three schemes did not result in the WHT applicants
5      owning any Danish shares as a matter of Danish tax law,
6      or indeed receiving or being entitled to receive any
7      dividends paid by the relevant Danish company, or indeed
8      those parties suffering any withholding tax on any such
9      dividends.
10        I said that it was subject to certain caveats and
11     my Lord may have picked these up, in particular ——
12     my Lord may not have picked these up as well because
13     they are identified in the SS defendants' written
14     opening, I'm not inviting your Lordship to go there, but
15     it is paragraph 331 of that opening.  Again, I am not
16     inviting you to go to there but I will give the
17     reference {F/382/141} and no doubt Mr Jones will address
18     in his oral opening.
19        The main caveat, as we understand it, that the SS
20     defendants appear to identify relates, it seems, to
21     whether the brokers that were used for these trades may
22     have had other non-Solo clients who were not short
23     sellers, which as my Lord may recall is a point we
24     address in some detail in our skeleton at
25     paragraph 38.1, again I'm not going to say any more

26

1  about that now.  We will see what Mr Jones says about
2  that.
3        By contrast to the SS defendants, so far as we can
4      tell, Mr Klar does not rely on any such caveats, in
5      respect of falsity in the way I have described it, and
6      it appears from the DWF defendants' openings that they
7      do not either.
8        But, my Lord, even allowing for the caveats
9      persisted in by the SS defendants going to falsity, we
10     do say nonetheless that the key issues to be explored in
11     the trial in relation to the fraud claims are likely to
12     be identifying the representations made and whether they
13     were relied on by SKAT, and identifying which defendants
14     bore or bear responsibility for the alleged
15     representations by virtue of where they appear in what
16     we have described as the scheme.  Again, I want to be
17     careful because I am trying to be as neutral as
18     possible, your Lordship will understand what I mean when
19     I say "scheme", it is not of itself intended to carry
20     pejorative connotations, but it is our case that there
21     was a scheme.
22        And identifying whether those defendants ——
23 MR JUSTICE ANDREW BAKER:  I think I have made the
24     observation before that I don't in general think of the
25     word "scheme" itself as pejorative, rather than that it

27

1      indicates that at least some of the actors involved
2      structured or intended to structure all the different
3      parts of what is put forward as the trading pattern in
4      a particular way to achieve a particular affect.  That
5      is a scheme of transactions, if nothing else, a way of
6      doing things that was, as it were, deliberately
7      designed.  And there may be questions, as I have picked
8      up, of which of the different defendants or groups of
9      defendants were privy in the sense of having knowledge
10     and awareness of the fact it had all the different
11     moving parts that ended up amounting to SKAT says —— and
12     we will get into the detail of that, and I know that
13     that is contentious, but as SKAT says looping or
14     self-cancelling or netting out and so on.  There are
15     shades of issue over who knew how much, to what extent
16     are certain people in fact only aware that they are
17     doing a certain thing that has a certain shape to them
18     not necessarily knowing the wider set of transactions
19     that, say, Sanjay Shah and Solo will fit that into.
20     That is a separate point.
21 MR RABINOWITZ:  Indeed but ——
22 MR JUSTICE ANDREW BAKER:  But the scheme itself I regard as
23     simply they might say trading model, but I'm not sure
24     I regard it as anything other than synonymous with that
25     but using one fewer word.

28

Confidential

1　　MR RABINOWITZ:  Your Lordship will understand when I am
2　　using the word "scheme", I am not just referring to it
3　　like "trading model"; I'm referring to a trading model
4　　the objective of which was to, in a sense, facilitate
5　　the production of application for a tax refund.  And
6　　your Lordship again is right to say what is going to
7　　matter, so what is undeniably the fact, is that there
8　　was this trading model which did give rise to
9　　applications which involved certain documents, which did
10　 give rise to refunds (inaudible) more than that.
11　　　　What your Lordship is going to have to grapple with,
12　　and given the number of defendants it is not going to be
13　　straightforward, is the role played —— some defendants
14　　it is very easy to see what their role is, other
15　　defendants who in a sense are on the outside of the
16　　scheme, it is going to be more difficult to work out
17　　precisely what responsibility they bear and I'm hoping
18　　to be able to help your Lordship a little bit with that
19　　in opening.
20　　　　Indeed, not only what role they bear but what they
21　　knew about in a sense the wider scheme in which they
22　　were participating, whether knowingly or not.
23　　　　Now, the same point really arises in respect of ——
24　　or comes back in respect of the question your Lordship
25　　may also have to grapple with which is the losses SKAT

29

1　　has suffered as a result of any wrongdoing.  At one
2　　level this may be more straightforward because the
3　　losses, we say at least, flow directly from the making
4　　of the WHT applications, so that one just has to look at
5　　what was paid out in consequence of those applications
6　　to get a sense of the loss.  But that doesn't answer the
7　　question of what losses any particular defendant should
8　　be liable for, in a sense that goes back to the point
9　　your Lordship raised with me as one of your three
10　 housekeeping points, and again a lot of that will depend
11　 obviously on the precise role and responsibility of that
12　 defendant.
13　　MR JUSTICE ANDREW BAKER:  Going all the way back to the
14　　overall aggregate figure in loss that SKAT says, as it
15　　were, collectively across the different, as it says,
16　　schemes it was caused to pay out, the proportionately
17　　small difference between the very large totals that you
18　　mentioned right at the outset this morning and the very
19　　large totals that I have previously mentioned in
20　　judgments is the absence now from this trial of
21　　ED&F Man; is that right?
22　　MR RABINOWITZ:  Correct, my Lord.
23　　MR JUSTICE ANDREW BAKER:  Because I had previously got
24　　a number in mind that it was very close to £1.5 billion,
25　　we are now talking proportionately a small percentage

30

1　　below that because of the amount of the 1.5 billion that
2　　is all ED&F Man, the subject of a separate claim.
3　　MR RABINOWITZ:  My Lord is right.
4　　MR JUSTICE ANDREW BAKER:  Thank you.
5　　MR RABINOWITZ:  Since in order to resolve these key issues
6　　your Lordship is likely to need by the end of the trial
7　　to have a detailed understanding of the role played by
8　　each particular defendant in or in relation to the
9　　relevant schemes and over what period, as I have already
10　 noted, I am proposing to spend some time in opening
11　 trying to identify for your Lordship which defendants
12　 were involved in what activity as regards what was, we
13　 say, the commission of a fraud against SKAT.
14　　　　My Lord, although again as I have already noted
15　　I will cover all three schemes in my opening, it is fair
16　　to say that I will be spending most of my time on the
17　　Solo Scheme, and that is perhaps not surprising given
18　　that, as your Lordship knows, the Solo Scheme accounts
19　　for around three-quarters of the value of SKAT's claim,
20　　being 9.025 billion Danish krone out of the total of
21　　12.09 billion krone losses claimed, so 1 billion out of
22　　1.5 billion, effectively.
23　　　　And it is also perhaps not surprising I will be
24　　spending time, subject to your Lordship, mainly on the
25　　Solo Scheme because, again as your Lordship is aware,

31

1　　the Solo Scheme is the one in which all the defendants
2　　actively before your Lordship, with the exception of
3　　Lindisfarne, are alleged to have participated.
4　　MR JUSTICE ANDREW BAKER:  Yes.
5　　MR RABINOWITZ:  Again, I'm trying to be careful, because I'm
6　　trying to be as neutral as possible, that is where the
7　　pattern was established as to what needed to be done.
8　　MR JUSTICE ANDREW BAKER:  Yes, and one reason why, for the
9　　exercise you are going to come on to at some point
10　 today, that I raised last week, that is why for the
11　 purposes of an initial slightly more close walk through
12　 the way the thing was set up to work or not as the case
13　 may be, it seems to me provisionally one could
14　 meaningfully take the first of the first Solo model
15　 variants because we probably can meaningfully conduct
16　 the trial on the basis that if we all understand the
17　 explanation that SKAT gives to that and any rival
18　 nuances or explanations of that, one can then operate to
19　 some extent on the basis that when one then turns to
20　 Maple Point, it was set up to work essentially in the
21　 same way as that Solo model except that there were the
22　 following twists, or Solo model variants to, one twist
23　 or change was they went to forwards rather than futures,
24　 for example one can—...
25　　　　But that which SKAT says about it, which SKAT says

32

Confidential

1    means it didn't ultimately work, doesn't really change
2    as a result of that, as it at least provisionally seems
3    to me, that which the defendants collectively say as to
4    why they were at least honest in thinking that it did
5    work isn't really that much affected by the changes
6    although why the changes were made no doubt in the
7    normal way may become explored to some extent in
8    evidence because there may be indirect ways in which
9    those aspects of the history as it developed are alleged
10   to be indicators one way or the other of honesty or
11   dishonesty. We can get to that.
12       But for understanding what is going on, one probably
13   can just focus, at least initially, on that first Solo
14   variant so that we all understand what we are looking at
15   overall.
16   MR RABINOWITZ: Your Lordship is entirely right about that.
17   As your Lordship will have read and we will see the Solo
18   2013 model is largely what is adopted by Maple Point.
19   The Solo model evolves in 2014 to 2015 in a variety of
20   ways so as to become much more complicated, involving
21   many more counterparties, but the original 2012—2013
22   model is that which is adopted by Maple Point, maybe
23   with some changes, but not very many.
24       The Klar Scheme is substantially more simple, so if
25   one is able to grasp the 2012—2013 scheme, that does set

33

1    everyone up fairly well for the other two schemes your
2    Lordship is going to have to look at.
3       Can I just turn then to looking at the 2012—2013
4    model and can I begin by again just asking the EPE
5    person to get paragraph 90 of our written submissions on
6    the screen, that is {F/361/41}.
7       As your Lordship knows, this provides a summary of
8    the transaction stages, in the first version of the Solo
9    model, in operation 2012—2013. I should just note,
10   my Lord, that an almost identical summary is included at
11   paragraph 7 of the sample trade summary at {A/95/3}.
12   The only reason I mention it is because that is
13   a document which has been agreed with the DWT defendants
14   and the Sanjay Shah defendants.
15   MR JUSTICE ANDREW BAKER: Yes, and I had reminded myself
16   after I got my clerk to send the message to you copied
17   to everybody else that cited your opening at 90, that in
18   fact your opening at 90 in turn reflected section B1.i
19   of the sample trade summary.
20   MR RABINOWITZ: I don't think it matters but I just wanted
21   to mention that, because in a sense one is dealing with
22   an agreed document.
23   MR JUSTICE ANDREW BAKER: And if after this exercise one
24   wants to go back and look at an actual example with the
25   identified counterparties and the numbers all worked

34

1    through, one can therefore look at in the sample trades
2    summary one of those worked examples that is said to be
3    representative of this model for the purposes of putting
4    flesh on what you are about to go through with me.
5    MR RABINOWITZ: I am going to do precisely that.
6    MR JUSTICE ANDREW BAKER: Thank you.
7    MR RABINOWITZ: And I am going to use it following words
8    like "putting flesh on". We will come back to that, but
9    it may help if I give people references to both
10   documents. I hope I will remember to do that.
11   MR JUSTICE ANDREW BAKER: Yes, thank you.
12   MR RABINOWITZ: So can I, just before taking your Lordship
13   through the summary of the sample trade, just make the
14   following six preliminary observations going to the
15   context in which the activity which we are going to look
16   at took place and they are largely not in dispute. To
17   the extent they are in dispute I will try and identify
18   the extent of that dispute.
19       So they are six. First, as your Lordship will have
20   seen, and as we will come on to shortly, although the
21   activity through which we are going to go involves
22   a number of different apparently independent entities,
23   in reality a great many of those entities were owned or
24   controlled by individuals who were connected to
25   Sanjay Shah, and who had been introduced by him to the

35

1    Solo Scheme. That is especially true for the trading
2    counterparties of the Solo applicants, whose owners or
3    controllers, as my Lord will have picked up or will see,
4    were almost all friends, family, ex—colleagues or
5    business associates of Sanjay Shah.
6       The position in relation to the Solo applicants
7    themselves, who are also obviously involved in this
8    scheme, is more nuanced and I will come back to that.
9       Secondly, again as your Lordship will have picked
10   up, and again as is not in fact in dispute, although the
11   activity through which we are going to go all relates to
12   buying and selling Danish shares, or interests in Danish
13   shares, in fact none of the buyers, sellers, stock
14   lenders or forward parties owned or had any ownership
15   interest in any such Danish shares during the relevant
16   period.
17       As I say, I don't understand that to be in dispute
18   either, although there are some caveats raised by the SS
19   defendants, as I have identified.
20       Third, although, as we will come on to, the activity
21   was designed so as to give the impression of, as I have
22   noted, independent steps taken by independent entities
23   interested in trading Danish shares, in reality the
24   steps taken by all participants were pre—arranged and in
25   fact closely choreographed by someone within the

36

Confidential                                                    SKAT_MDL_001_00834760

1 Solo Group, for the most part by Mr Patterson, and that
2 as we will come to is accepted by almost all the main
3 defendants with the exception of Sanjay Shah, and we
4 will have to deal with that in due course. It remains
5 to be seen the extent to which this is disputed by the
6 other –– I'm going to call them non-main defendants,
7 I hope they will forgive me for that.
8    Fourth, and again I don't understand this to be in
9 dispute by anyone, the whole purpose of the arrangements
10 that we are about to go through was to enable these
11 purported trades to happen without anyone having to pay
12 any money at all for their participation in the share
13 trading activity, other than the fees of service
14 providers. Indeed, again as my Lord will have picked
15 up, one of the main purposes of this arrangement was to
16 avoid the need for anyone to commit material amounts of
17 money in respect of these purported trades.
18    That followed, again as your Lordship will have
19 picked up, from Solo's inability in 2011 and 2012 to
20 find external financing which led to the development of
21 the Solo model involving internalised net settlement to
22 zero which required no external funding to buy shares,
23 and that too is common ground.
24    I'm not going to give your Lordship the references
25 unless your Lordship wants them.

37

1 MR JUSTICE ANDREW BAKER: And indeed again not meaning by
2 making this sort of observation to overlook the position
3 of other defendants who in their different ways may
4 respectively be saying that they did not have visibility
5 of everything, so they are not necessarily aware they
6 will be saying of, as it were, the overarching scheme or
7 the lightbulb, in a sense what is described by
8 Mr Sanjay Shah as his lightbulb moment is precisely, he
9 says, as I understand it, an understanding or
10 realisation that things can be so structured as not to
11 require any, as it were, externally sourced movement of
12 shares or cash, and yet generate an externally generated
13 payment of a tax reclaim coming in from SKAT at the end
14 of the process.
15    In a sense therefore it is –– at least as regards
16 the Sanjay Shah defendants certainly, and Mr Sanjay Shah
17 in particular, it is positively averred that that was
18 the realisation as to what, overall, the trading model
19 would generate and the battleground at a certain level,
20 taking on board the observations in the written opening
21 that one nonetheless still then has to analyse through
22 whether SKAT has established its causes of action as
23 pleaded. But at a certain level the main factual
24 battleground will be over whether that was or was not
25 an honest moment of realisation or a moment, as SKAT may

38

1 be saying, when people should have said: hang on, that
2 can't possibly be right, or something of that sort.
3 MR RABINOWITZ: Precisely, my Lord. Can I just make clear,
4 as we understand it, it is not only the Sanjay Shah
5 defendants which accept this, as I understand it, the
6 DWF defendants accept it as well. If I can give your
7 Lordship references –– Mr Head when he opens will
8 correct me if I'm wrong –– paragraph 193 and 130
9 {F/381/37} and {F/381/47}.
10 MR JUSTICE ANDREW BAKER: Yes.
11 MR RABINOWITZ: Now, the fifth of my preliminary
12 observations, I'm sorry they are taking as long as they
13 are, again there is no dispute about this either, the
14 purported trades that we are going to go through were
15 deliberately structured on a cum-ex basis. That is to
16 say, they involved particular dates being chosen for
17 particular steps that focused on the buyer in each case
18 entering into trades to buy shares on the date on which
19 actual shareholders in the relevant Danish companies
20 became entitled to a dividend under Danish tax law, that
21 is to say on the declaration date. But at the same time
22 deliberately departing from, and I am trying to use
23 neutral language here, deliberately departing from the
24 standard on exchange settlement cycle so that the trade
25 settled after the record date, which as my Lord knows is

39

1 the date on which VP Securities checked its share
2 register ––
3 MR JUSTICE ANDREW BAKER: Yes.
4 MR RABINOWITZ: –– to identify the persons to whom the
5 payment of dividends would be distributed on the payment
6 date.
7    Sixth, and this is the final observation –– again
8 I don't understand this to be in dispute either –– the
9 whole purpose of this activity, and I can only say that
10 for the purposes of those central to the scheme because
11 the people on the outside will have to see the extent to
12 which they understood this, the whole purpose of the
13 trading activity that we are going to look at was to
14 lead to a point when a custodian ultimately owned by
15 Sanjay Shah could produce a credit advice note, or
16 a CAN, or a DCA, that could be submitted by a tax agent
17 to SKAT with a view to making a claim for a refund for
18 tax allegedly withheld.
19    Can I pause there, your Lordship may well be very
20 familiar with these terms, and I think you are because
21 they emerge from pages 31 and 32 of your judgment, but
22 we have produced a glossary of certain trading terms on
23 a single piece of paper which it may be useful to have,
24 just in case anyone in court, or indeed your Lordship or
25 your Lordship's judicial assistant, might find it

40

```
 1    useful.  Can I just pause just to hand that up.
 2        (Handed).
 3    MR JUSTICE ANDREW BAKER:  Yes, of course, thank you.
 4    MR RABINOWITZ:  It really just has things like what is
 5        a cum—ex trade, what is a cum—cum trade, what is the
 6        declaration date and so on.
 7    MR JUSTICE ANDREW BAKER:  As with all such things, at some
 8        appropriate point if a digital copy of that can also be
 9        provided through my clerk.  In fact, having just
10        mentioned that, might I also say to everybody in the
11        case if I have not already received it, and in respect
12        of this type of communication nobody needs to copy
13        everybody else in, I would like to have a clean Word
14        copy, if such a thing exists, of each set of written
15        opening submissions, for my own purposes.
16            I think I may have one from the DWF defendants,
17        although something odd has happened with the —— I can't
18        make it look clean, Mr Head.  I don't know if you
19        understand what I mean by that.  I have the version in
20        which some small corrections were made to the version
21        originally served that says it is the clean version, but
22        it still seems to have some track changes in it and
23        I can't get rid of those, but that is a very minor
24        issue.
25            So I may have one or two already in Word, but for
```

41

```
 1    future purposes to be able to quote quickly how things
 2        were put by different parties it is always helpful for
 3        the judge to have a Word copy, if I can have that at
 4        some point through my clerk, thank you.
 5    MR RABINOWITZ:  My Lord, with that introduction, I was going
 6        to invite your Lordship, if your Lordship wanted to, to
 7        re—read paragraph 90 of our written submissions and
 8        paragraph 7 of our sample trade summary, I don't know if
 9        your Lordship wants to take the time just to do that?
10    MR JUSTICE ANDREW BAKER:  No, don't worry, I have been
11        looking at it enough on and off, alongside all the
12        written openings, that I am very happy for you to launch
13        in a little to the detail.
14    MR RABINOWITZ:  I'm grateful, my Lord.
15            My Lord, we have a basic illustration of this first
16        version of the standard trading model at {B/45.1/1}.
17        I wonder if we could just go to that.  Thank you.  Now,
18        I should just note about this that it is agreed with the
19        SS defendants and the DWF defendants in the sample trade
20        summary at paragraph 7, that this does indeed represent
21        a basic illustration of the trading model.  As your
22        Lordship can see, this broadly reflects the steps
23        summarised in paragraph 90 of our written submissions.
24        If we can just go through this, starting first with the
25        equity trades shown in the middle line.
```

42

```
 1    MR JUSTICE ANDREW BAKER:  Yes.  And just one reason, just so
 2        you are aware, I suspect what I am about to say will fit
 3        neatly enough with how you were about to take me through
 4        things, but one reason I was keen to do this exercise
 5        right at the outset is because of course we are all
 6        conscious that any diagram of this sort ultimately seeks
 7        to represent the totality of everything that happens,
 8        looking backwards after it has all happened, when what
 9        in fact happens is that various elements happen in
10        a sequential series of steps at different times and it
11        is important therefore just to walk through and unpack
12        how the trading model, taken at face value, operates or
13        purports to operate, as it were, one step at a time.
14        Because there may be some questions I have got for you,
15        as it were, at a —— well, before we then come on to what
16        is going to happen in the future in terms of closing
17        things out, on its face the position we have now created
18        at this point is X, Y or Z, if you see what I mean.
19    MR RABINOWITZ:  Understood, yes.
20    MR JUSTICE ANDREW BAKER:  Thank you.
21    MR RABINOWITZ:  I will obviously highlight the dates when
22        these transactions take place.  If we just look at the
23        equity trades in the middle line of the top diagram,
24        involving a buyer, an equity broker and a short seller,
25        what happens in this part of the transaction, again as
```

43

```
 1    the diagram shows, is that the short seller in the
 2        orange block on the right—hand side of the diagram sells
 3        to the equity broker in the middle, the blue block in
 4        the middle, who sells to the buyer on the left—hand side
 5        of the diagram.
 6    MR JUSTICE ANDREW BAKER:  Yes.
 7    MR RABINOWITZ:  As your Lordship saw from paragraph 90.1 of
 8        our written submissions, it's paragraph 7.1 of the
 9        sample trade summary, the equity trade shown on the
10        middle line occurred on the declaration date, which is
11        the working date before the ex—date, applicable to the
12        relevant Danish dividend declaring companies.  In each
13        case, again as I have noted, I think, settlement was
14        fixed to take place the day after the record date.  That
15        is on the payment date.
16    MR JUSTICE ANDREW BAKER:  Yes.  And it goes without saying
17        for those of us in the room, but just so that it is said
18        anyway, that the entity identified here as buyer will be
19        the entity that in due course claims to have suffered
20        a withholding and therefore makes, through a tax reclaim
21        agent, a WHT refund application to SKAT.
22    MR RABINOWITZ:  Precisely that, my Lord.
23    MR JUSTICE ANDREW BAKER:  Yes, all right.
24    MR RABINOWITZ:  So in this transaction, just looking at the
25        equity broker for a moment, the equity broker acts as
```

44

Confidential

SKAT_MDL_001_00834762

1    match principal or agent.  It doesn't matter which for
2    practical purposes and we have sought to explain why at
3    paragraph 38.1 of our main skeleton.  I'm not going to
4    go through that now.  I just give the punchline.  The
5    broker only every traded on back-to-back terms in
6    respect of the same Danish shares at the same price for
7    settlement on the same date, and the brokers only traded
8    with Solo clients, being prohibited from trading, under
9    the Solo model, with any external parties.  The latter
10   arises out of Mr Sanjay Shah's evidence, for your
11   Lordship's note at paragraph 499.  I'm not suggesting we
12   go there now.
13       So you have this closed system with a broker showing
14   that the trading was on back-to-back terms.
15       Now, again, as we explain at paragraph 90.4 of our
16   written submissions, the equity trades, so that's the
17   middle line, were immediately given up by the broker to
18   SCP, that is the sole Solo custodian at the time, which
19   meant in effect SCP would take over the settlement
20   execution obligations that would otherwise be for the
21   broker.
22   MR JUSTICE ANDREW BAKER: Yes.
23   MR RABINOWITZ:  In his third report, Mr Sharma, the DWF
24   defendants' expert describes give up arrangements as
25   being a novation of the party to whom the trade is given

45

1    up into the position of the original contracting party.
2    Your Lordship I think is familiar with this from the
3    validity trial, that is paragraph 5.7.1 to 5.7.3 of
4    Mr Sharma's report.  The same language in relation to
5    novation is used by the DWF defendants in their written
6    submissions, that's at paragraph 386.1.
7        Just going back to the diagram, SCP in effect steps
8    into the position of the equity broker and therefore
9    becomes the interface between the buyer and the short
10   seller.
11   MR JUSTICE ANDREW BAKER: Yes.
12   MR RABINOWITZ:  That is the first step down the middle line
13   of the top diagram.
14   MR JUSTICE ANDREW BAKER: All right, and therefore that's
15   the first point at which I pause you to say — and all
16   of my questions will be questions that are asking and
17   are to be answered on a — taking the transaction terms
18   as documented at face value, leaving to one side for
19   that purpose that aspect of SKAT's argument in due
20   course, as we will say that once you have understood the
21   totality of the picture, you end up, you are going to
22   submitting in due course, with an argument as to whether
23   this is to be treated as real or sham trading in the
24   first place.
25       But in a sense, for all sorts of reasons, including

46

1    in part in due course testing that very argument, just
2    taking what the transactions appear to be providing for,
3    that first equity trade in itself is made on a cum-div
4    date and will therefore have been at a cum-div price, as
5    I understand it.  On our actual facts, will those prices
6    be, if I can put it this way, real world prices; ie that
7    part of the trading model will be to operate by
8    reference to real word Danish exchange prices to price
9    the equity trade?
10   MR RABINOWITZ:  At that stage of the transaction, yes.
11   MR JUSTICE ANDREW BAKER: Yes.  And the pricing will be
12   back-to-back between seller, broker, acting as agent or
13   match principal, or buyer, obviously.
14   MR RABINOWITZ:  Yes, and we will see that on one of the
15   models we are going to look at later.
16   MR JUSTICE ANDREW BAKER:  And other things being equal,
17   therefore, so the same assumption on which these
18   questions arise as to what this trading on its face
19   purports to provide for, that equity trade as entered
20   into obliges physical settlement, delivery versus
21   payment, or DVP, as discussed in my validity issues
22   judgment, on record date plus 1, which would be, if it
23   happened, an exchange on record date plus 1 of the
24   price, P, put up in cash by the buyer ——
25   MR RABINOWITZ:  Yes.

47

1    MR JUSTICE ANDREW BAKER: —— against a transfer to the buyer
2    of shares, by one means or other, put up by the seller
3    for delivery ultimately to the buyer, and which in
4    Danish company law terms, at least if I am still
5    operating on the basis of the analysis I gave it in the
6    validity issues judgment, those will necessarily be, if
7    they existed and were put up by the seller and were
8    transferred but only on the record date plus 1 ex-div
9    shares at the point at which they are transferred.
10   MR RABINOWITZ:  Correct.
11   MR JUSTICE ANDREW BAKER:  Now, as a matter of contract in
12   the equity trade, does the buyer have a contractual
13   right —— I mean, one way of testing it, assume there is
14   nothing else involved.  That in fact —— that trade in
15   fact is all that there was and it settled DVP, the
16   seller who had been short —— I mean, let's not even get
17   into stock lending —— actually managed to acquire
18   outright —— on a non-standard, instantly settled trade
19   with a big bank, actually bought in the shareholding it
20   had promised to sell and that got delivered, that would
21   be a delivery of that shareholding in return for the
22   full contractual price.
23   MR RABINOWITZ:  Yes.
24   MR JUSTICE ANDREW BAKER:  In the meantime, a dividend has
25   been declared on the same dividend declaration date on

48

Confidential

SKAT_MDL_001_00834763

1    which the equity trade was put on. The buyer, as
2    I would be provisionally understanding it, has some
3    species then, implied if not express, based on the date
4    on which the trade is done, of contractual entitlement
5    to a payment —— let me put it neutrally —— a payment
6    reflecting the dividend that has been declared and
7    circulated, because one consequence of that settlement
8    completion, as an old-fashioned English lawyer might
9    call it, one consequence of that completion of that
10    trade occurring on record date plus 1 is that buyer is
11    not going to be recipient in the ordinary course of the
12    waterfall of payment coming out from the company to
13    VP Securities and so on. So at least contractually one
14    assumes it has some right to some kind of balancing or
15    compensation payment.
16    MR RABINOWITZ: My Lord, yes.
17    MR JUSTICE ANDREW BAKER: A question I have is: is that
18    a contractual right to the net dividend amount or the
19    gross dividend amount? You don't necessarily need to
20    give me an answer, but at some stage that might be worth
21    thinking about. As it seems to me the way —— the way
22    things are subsequently documented ——
23    MR RABINOWITZ: It's gross.
24    MR JUSTICE ANDREW BAKER: —— appears to treat it as a right
25    only to the net amount, because that is what is then

49

1    treated as a payment between the parties. But that may
2    be wrong.
3    MR RABINOWITZ: Well, it may be wrong, but —— again, I'm not
4    going to give your Lordship a complete answer to the
5    question, but another way of looking at it is that it is
6    an entitlement to the gross amount, less —— in other
7    words you have a contractual entitlement to the gross
8    amount, less tax, which may be coming to the same thing,
9    to be deducted.
10    MR JUSTICE ANDREW BAKER: And then the related question, for
11    what it is worth, because of course we all appreciate
12    that —— or at least I think we all appreciate in court
13    that what we are dealing with for the purposes of this
14    trial is a structured trading model in which what you
15    and I are currently debating doesn't end up happening.
16    But, if it had been, in the sense I have just described,
17    just that equity trade and nothing else ever happened
18    other than a settlement DVP, would the buyer be entitled
19    to set off its contractual entitlement to
20    a dividend-related amount, to put it neutrally, against
21    the purchase price, so that actually to achieve
22    settlement it wouldn't have to put up the purchase price
23    in full. Strictly, it would be entitled to put up
24    purchase price less the dividend amount to which it is
25    entitled.

50

1    MR RABINOWITZ: Yes.
2    MR JUSTICE ANDREW BAKER: Albeit there would no doubt then
3    need to be careful book—keeping entries to keep a track
4    of exactly what has happened. That is another question
5    that occurs to me.
6    MR RABINOWITZ: I'm not going to answer them now, but I just
7    want to identify what the questions are. The first
8    question is on the assumption, and I think this must be
9    right, that there is a contractual right to a payment,
10    in respect of the dividend, is that a contractual right
11    to the payment of the dividend gross or net.
12    MR JUSTICE ANDREW BAKER: Yes.
13    MR RABINOWITZ: And there may be nuances between the two.
14    The second question that arises is that on the basis
15    whether the entitlement is to gross or net, can that
16    contractually be set off.
17    MR JUSTICE ANDREW BAKER: So that one could make what you
18    and I, as old—fashioned sale contract lawyers, might
19    call —— one could make a valid tender of the price by
20    tendering in cash only P minus D, where P is the full
21    contractual price and D is the dividend—related
22    entitlement, be that the gross dividend amount or the
23    net dividend amount.
24    MR RABINOWITZ: My instinct contractually —— and I'm sure
25    I will be kicked under the table from the back so please

51

1    don't hold this against me —— is that if it is a mere
2    matter of contract, subject to particular implied terms
3    which may arise by virtue of Danish law, there is no
4    reason why you shouldn't be able to set off because
5    there would be two debts due in different directions.
6    MR JUSTICE ANDREW BAKER: Yes.
7    MR RABINOWITZ: But again, I can't, off the top of my head,
8    say to your Lordship that that is an answer that your
9    Lordship can rely on.
10    MR JUSTICE ANDREW BAKER: Yes. The subtlety would
11    potentially be whether, on a true analysis of that,
12    taking it at face value as a set of contractual
13    obligations, you accrue or acquire the entitlement to
14    the dividend—related contractual payment only by
15    completing, and to complete you have to have tendered
16    the full purchase price.
17    MR RABINOWITZ: That is (inaudible — overspeaking).
18    MR JUSTICE ANDREW BAKER: And would that in fact, as
19    a matter of English law set—up analysis, affect the
20    ability to call them mutual debts capable of set—off, in
21    order to achieve the very completion of the transaction
22    that gives rise to one of the two entitlements.
23    MR RABINOWITZ: So just putting it in a way that I, with my
24    simple way of thinking, understand. The third question
25    that arises, or at least the question that arises in the

52

Confidential

SKAT_MDL_001_00834764

1    context of the set—off is: is the dividend amount due
2    and payable prior to the point at which the amount
3    payable for the shares has been paid.
4    MR JUSTICE ANDREW BAKER: Yes, quite. All right, thank you.
5    So at that point one then moves in chronological
6    sequence, as it were, to the futures ——
7    MR RABINOWITZ: The futures (inaudible — overspeaking).
8    MR JUSTICE ANDREW BAKER: —— that are put on about the
9    same time.
10   MR RABINOWITZ: Precisely. That is the one described at the
11   top of this diagram. As your Lordship sees from the
12   diagram, the futures trade involved futures being sold
13   from the buyer.
14   MR JUSTICE ANDREW BAKER: Yes.
15   MR RABINOWITZ: Also the WHT applicant, as your Lordship
16   pointed out earlier, again on the left—hand side. So
17   future —— involving futures sold from the buyer to
18   a futures broker, green in the middle.
19   MR JUSTICE ANDREW BAKER: Yes.
20   MR RABINOWITZ: And then on to the short seller, shown on
21   the right, again in orange. And again, as we have
22   explained at paragraph 90.2 of our written submissions,
23   paragraph 7.2 of the sample trade summary, the futures
24   transactions were entered into on the same date as the
25   equity trades, as I think your Lordship suggested to me,

53

1    that is to say on the declaration date.
2    MR JUSTICE ANDREW BAKER: Yes.
3    MR RABINOWITZ: And these transactions related to the same
4    quantity of the same Danish shares as the equity trades.
5    MR JUSTICE ANDREW BAKER: Yes.
6    MR RABINOWITZ: And they were for settlement a number of
7    weeks or months later.
8    MR JUSTICE ANDREW BAKER: And again in the trading model,
9    that's done back—to—back as to price, that is to say
10   buyer sells futures to the intermediate party,
11   intermediate party sells future to seller at the same
12   futures price.
13   MR RABINOWITZ: Precisely.
14   MR JUSTICE ANDREW BAKER: And is that futures price also, as
15   it were, taken on the facts from real world market data
16   because there will have been an active futures market,
17   I assume, in relation to these listed Danish shares, or
18   is it a price that is a calculated price derived from,
19   ie by the parties putting this together, calculated from
20   the equity trade price, it may or may not be with or
21   without some involvement of the anticipated or actual
22   dividend declared?
23   MR RABINOWITZ: I'm going to suggest an answer but we will
24   check it.
25   MR JUSTICE ANDREW BAKER: Subject to checking.

54

1    MR RABINOWITZ: It is the latter.
2    MR JUSTICE ANDREW BAKER: Subject to checking, you think
3    that the futures price by reference to which that
4    back—to—back pair of futures is put on, is itself, as it
5    were, a calculated byproduct of the pricing that has
6    been chosen of the equity trade?
7    MR RABINOWITZ: Precisely, rather than taken from the model.
8    MR JUSTICE ANDREW BAKER: It may be taken in conjunction, in
9    some direct or indirect way, with the amount of the
10   dividend?
11   MR RABINOWITZ: Precisely.
12   MR JUSTICE ANDREW BAKER: All right. But again on the same
13   basis as we have been otherwise —— other things being
14   equal, and taking them at face value as transactions for
15   these purposes, those represent, essentially,
16   straightforward pricing hedges for, if one can focus on
17   the buyer's position, a buyer who is just committed on
18   the face of things to buy some shares at a certain
19   price. Those are shares that have a market price that
20   will move up and down, so in terms of exposure to the
21   market price they have become long, they now have a long
22   exposure position on their exposure to the market price
23   of the share they have referenced, from the moment they
24   enter into the trade, the equity trade. By selling
25   futures in the same volume they are attempting simply to

55

1    hedge that market price movement exposure created for
2    them by their long position.
3    MR RABINOWITZ: My Lord, yes.
4    MR JUSTICE ANDREW BAKER: And therefore that being its, as
5    it were, transactional function, in and of itself
6    am I right to think that the futures trades have no
7    involvement or affect as regards how, if at all, the
8    delivery versus payment obligations created by the
9    equity trade are or are not going to be performed on
10   record date plus 1.
11   MR RABINOWITZ: Yes, my Lord.
12   MR JUSTICE ANDREW BAKER: They are purely in relation to
13   hedging out the price movement exposure.
14   MR RABINOWITZ: Yes.
15   MR JUSTICE ANDREW BAKER: And I will say this, if only so
16   that it is observed, obviously a potential question
17   observes in the context in due course of the sham
18   trading allegation, why one bothers to do that, if this
19   is all a sham.
20   MR RABINOWITZ: I will come back to it.
21   MR JUSTICE ANDREW BAKER: Because on one view, bothering to
22   enter into, albeit matched players, albeit in all the
23   way SKAT says as part of an overall trading model that
24   will eventually all net out to zero, but it might be
25   said that the reason one bothers to hedge out the price

56

Confidential                                                                    SKAT_MDL_001_00834765

1    exposure is because you think you are exposed.
2    MR RABINOWITZ:  Or you want to give the appearance of
3       thinking you (inaudible — overspeaking).
4    MR JUSTICE ANDREW BAKER:  All right, and that may be the way
5       in which that argument then has to be looked at.  All
6       right.
7    MR RABINOWITZ:  We will submit in due course that that is in
8       fact what was going on.  Things become clearer as one
9       gets into the 2014 story.
10    MR JUSTICE ANDREW BAKER:  All right, thank you, fine.
11    MR RABINOWITZ:  Then the third step involved, and this goes
12       to the bottom part of the top diagram, if I can put it
13       that way, is the stock loan aspects.
14    MR JUSTICE ANDREW BAKER:  Yes.
15    MR RABINOWITZ:  There you have the buyer, the WHT applicant,
16       in orange on the left—hand side, lending shares to the
17       stock lender, at the bottom, in purple.
18    MR JUSTICE ANDREW BAKER:  Yes.
19    MR RABINOWITZ:  Which then lends them on to the short
20       seller, in orange on the right—hand side again, so
21       buyer, back to seller, through stock loan entity.  And
22       again, as your Lordship will recall, we say at
23       paragraph 90.3 of our written submissions the stock
24       loans were entered into a few days after the time when
25       the first few steps were taken, so on the day after the

57

1    record date, and again they related to the same quantity
2    of the same Danish shares as the equity trades and the
3    stock loans were for settlement on the same day as the
4    equity trades, that is on the payment date, and the
5    amount of the cash collateral matched the price on the
6    equity date, that despite the market price of the shares
7    having changed by the time of the stock loan, not least
8    because the shares are now ex—dividends, and your
9    Lordship may recall that was a point which I think was
10   made by the experts, or our expert at least, in the
11   validity trial.
12   MR JUSTICE ANDREW BAKER:  Yes, so that is cash collateral
13      equal to the full original equity trade price that one
14      might find oneself in a judgment summary of all of this
15      calling P, all right.  But I'm right, aren't I, also, or
16      am I right, that the logic underlying all of this is
17      such that it may be that on the facts, which I think is
18      what you have said in the written opening, that matched
19      pair of stock lending trades is put on either on the
20      record date or on record date plus 1 but either way for
21      settlement on record date plus 1, the same day as the
22      equity trade is prima facie supposed to be settling.
23      The logic of the trading model in fact only requires
24      that that is a share, a pair of share lending
25      transactions that is put in place on or after the

58

1    ex—date and on or before the settlement date, with
2       a settlement date of record date plus 1.
3    MR RABINOWITZ:  Yes.
4    MR JUSTICE ANDREW BAKER:  So if for whatever reason you
5       happened to do the same model and your equity trade at
6       step one had been for settlement on record date plus 7
7       rather than record date plus 1, you could replicate all
8       of this and all that would matter, other things being
9       equal, as regards the stock lending, is that you have
10      that put in place as a pair of trades at some point
11      between the ex—date and record date plus 7 for
12      settlement on record date plus 7.  Unless there is some
13      additional subtly about making the settlement beyond the
14      payment date.
15   MR RABINOWITZ:  I think there might be, because the buyer is
16      undertaking to provide a stock loan to provide shares to
17      the seller.  If that completed prior to the point in
18      time ——
19   MR JUSTICE ANDREW BAKER:  I said —— but no, always making
20      sure that your settlement of the share loan was also the
21      same as your settlement date of the equity trade.  So if
22      you had decided to do equity trade settlement record
23      date plus 7 ——
24   MR RABINOWITZ:  Absolutely, sorry, I ——
25   MR JUSTICE ANDREW BAKER:  —— the trade —— the trade for the

59

1    stock loans could be put in place at any point between
2       ex—date and record date plus 7 for settlement on record
3       date plus 7 and this model would still work in the same
4       way, or not work in the same way, as the case may be.
5    MR JUSTICE ANDREW BAKER:  Exchange can be any time, completion has to
6       the same date.
7    MR JUSTICE ANDREW BAKER:  Thank you.
8    MR RABINOWITZ:  And then just pausing there, my Lord, the
9       theory behind the model, we have now had the three
10      steps, the theory behind the Solo model goes that
11      because the buyer and the sellers have equal and
12      opposite obligations in terms of share delivery and cash
13      payments, albeit via different intermediaries, in the
14      one case via the equity broker and the other case via
15      the stock loan entity, and because everyone shares
16      a single custodian, which at this stage was SCP, it is
17      said that the trades were internally settled, net
18      settled, without the need for anyone to effect
19      a physical delivery of any shares or provide any cash.
20   MR JUSTICE ANDREW BAKER:  And then just taking two
21      additional points on the stock lending stage of this
22      trading model, as it were, at the point prior to the
23      settlement or net settlement or whatever it comes to be,
24      when put on, were they stock loans with a defined
25      duration or were they stock loans that were terminable

60

1    on notice by the lender or the like?
2    MR RABINOWITZ:  They had a duration.  We will look at
3        a sample and I will show your Lordship that.
4    MR JUSTICE ANDREW BAKER:  And was that a duration that was
5        related to the futures, subsequently forward trade end
6        date or in some sense independent of that, or does it
7        not matter?
8    MR RABINOWITZ:  To some extent it didn't matter, because it
9        was always going to unwind, as we will see when we get
10        to the fourth step.
11    MR JUSTICE ANDREW BAKER:  In a similar way to how I was
12        just, for completeness, analysing how the equity trade
13        would work if that is all you had, as it were by parity
14        if you only had the stock lending and there was no
15        equity trading relating —— involving the same parties
16        already in place, if this was simply buyer trading to
17        lend shares to a stock loan intermediary operating on
18        a back—to—back basis, trading to lend the same volume of
19        shares to seller, the nature of the stock lending trades
20        at face value are trades under which the seller party ——
21        in your written opening you have referred to them
22        generally as the short seller party —— has now become,
23        on the face of things, entitled to receive a transfer of
24        shares by way of stock loan on the settlement date,
25        record date plus 1, but only if it can put up P, our

61

1    cash —— in this context, our cash collateral amount, to
2        do an exchange to receive the transfer by way of stock
3        loan and the buyer has undertaken equivalent opposite
4        obligations to deliver that volume of shares by way of
5        stock loan in exchange for a tender of the cash —— the
6        amount, P, but tendered to it by way of cash collateral
7        for a stock loan.
8    MR RABINOWITZ:  Indeed.  I think the only other thing to
9        think about in that context is the give—up to the
10        custodian.
11    MR JUSTICE ANDREW BAKER:  Yes.  But that ultimately affects
12        the identity of the party ——
13    MR RABINOWITZ:  Precisely.  It is a novation, but the
14        obligation ——
15    MR JUSTICE ANDREW BAKER:  The nature of the obligation is
16        that.  All right.
17        Mr Rabinowitz, this has been extremely helpful and
18        I appreciate that it is probably taking a little time,
19        but I did feel that doing this exercise as setting the
20        scene in a sense for everything that follows was of
21        value in what is going to be this very long trial.
22        We should take our mid—morning break at that point.
23        Unless there is anything more you were going to say on
24        that stage, it seems to me where we would want to move
25        then is to what then happens on the record date,

62

1    including the process of what book—keeping entries are
2        made to reflect what is said then to be the net
3        settlement process that happens.
4    MR RABINOWITZ:  What I was going to do, subject to your
5        Lordship, was take your Lordship through the fourth step
6        of the unwind.  I will show your Lordship —— I will put
7        flesh on this, if I can put it that way.
8    MR JUSTICE ANDREW BAKER:  I will leave —— I am quite keen,
9        as we have done it in sequence, to get my head properly
10        round, before we get to the unwind, which I appreciate
11        SKAT will be saying was always in everybody's mind, or
12        at least everybody that had visibility of the whole
13        model always had it in mind that there would
14        subsequently be an unwind, but I am quite keen, before
15        one gets to the unwind, which is a separate and later ——
16    MR RABINOWITZ:  It is.
17    MR JUSTICE ANDREW BAKER:  —— matter, of the —— I am keen to
18        get my head around the —— at least to some extent the
19        practical implications of the book—keeping entries made
20        on record date plus 1 that is said to constitute the net
21        settlement relied on by SKAT, as I understand it, as
22        indicating that in substance nobody has ever paid
23        anything and no shares have ever moved, relied on by
24        defendants collectively at least as having been thought
25        at the time to represent meaningfully a settlement of

63

1    trades with interests passing.  Because I'm interested
2        to know in particular the extent to which, in this net
3        settlement process where things are netting to zero, to
4        what extent were equal and opposite book entries by way
5        of cash or securities positions made, to what extent
6        were they not made at all because they were simply
7        treated as having netted off and therefore they didn't
8        even generate ——
9    MR RABINOWITZ:  Nothing happened.
10    MR JUSTICE ANDREW BAKER:  —— entries in an account
11        anywhere —— and for these purposes what I mean by an
12        account, I appreciate is the account records created by
13        and at the custodian of cash or securities positions.
14        It is by way of those account records purportedly
15        holding for or with custodian clients.
16        Very good.
17    MR RABINOWITZ:  Understood.
18    MR JUSTICE ANDREW BAKER:  Thank you.  We seem to have
19        a clock on the wall, which is the habit in this
20        building, running somewhat fast.  My laptop reckons it
21        is 11.35, so let's say 11.45, please.  Thank you very
22        much.
23    (11.35 am)
24                    (A short break)
25    (11.48 am)

64

1  MR JUSTICE ANDREW BAKER:  Yes, Mr Rabinowitz, thank you.
2  MR RABINOWITZ:  I'm going to take your Lordship to some of
3      the internal accounting in a moment.  Can I just correct
4      something I said.
5  MR JUSTICE ANDREW BAKER:  Yes.
6  MR RABINOWITZ:  And confirm something I said as well.  In
7      terms of the stock loans, I think I said they had a date
8      in fact that was incorrect, they are open, so they are
9      recallable, in theory, at any time.
10  MR JUSTICE ANDREW BAKER:  Yes.  I wondered if that might be
11      the case, because I saw the language being used ——
12      I know I'm jumping ahead now, but when we get to the
13      unwind phase I saw the language being used of recall,
14      rather than anything else.  I did wonder if that was
15      not, as it were, an equal and opposite fresh trade but
16      rather an operation of the existing trade which
17      therefore perhaps implied that it had been terminable
18      rather than a fixed duration in the first place.
19          All right, thank you.
20  MR RABINOWITZ:  So far as the future pricing was concerned,
21      it was as I suggested it was, that is to say the price
22      was determined in a sense internally rather than by
23      reference to the market.
24  MR JUSTICE ANDREW BAKER:  Thank you.
25  MR RABINOWITZ:  In terms of internal documentation, can

65

1      I invite your Lordship to go, please, to a spreadsheet
2      that we have, I think Mr Goldsmith is going to deal with
3      the EPE, at {MTKC1/607} which is the custodian SCP's
4      material —— sorry, internal documentation.
5          What I am going to be able to show your Lordship are
6      entries for the buyer, and entries in respect of the
7      stock loan as well.  We don't have all the entries but
8      in a sense this reflects —— your Lordship identified two
9      possibilities, one is that there was nothing, the other
10      is there was something which was entered into, I will
11      show your Lordship that it is the something that was
12      entered into which is right.
13          If we can go into this first to the cash equity tab,
14      your Lordship sees looking at rows 205, 206, just take
15      that as an example, the example we were looking at, TDC,
16      7 August 2013, your Lordship sees a debit to the buyer's
17      account of 209—odd million Danish krone, so buying on
18      the 7th for completion on the 13th.  Your Lordship sees
19      those two entries.  The first, it is rows C and D
20      I think, and if your Lordship goes across to row L, your
21      Lordship can see the debit which matches the price.
22  MR JUSTICE ANDREW BAKER:  Yes.
23  MR RABINOWITZ:  Reflecting the fact that there was no money
24      in the buyer's account, so the full amount gets debited.
25          What your Lordship can also see, if we can go to the

66

1      statement, is the dividend being credited, if we go to
2      row 106, your Lordship sees, again for TDC, row, is the
3      J, your Lordship sees the crediting of an amount.
4  MR JUSTICE ANDREW BAKER:  Column J, yes.
5  MR RABINOWITZ:  In respect of the dividend.
6  MR JUSTICE ANDREW BAKER:  Yes.
7  MR RABINOWITZ:  Now, in terms of the stock loan, we will
8      come back to it.  We couldn't find the entry for the
9      stock loan for this TDC trade, but we do think it is
10      there; we just weren't able to locate it.  This
11      particular spreadsheet is not easy to navigate, my Lord.
12          What I think your Lordship can take away from
13      this —— and we will come back to the other entries once
14      we have more time to, these ones we could find; the
15      other ones because of some difficulty getting into the
16      spreadsheet we were not able to locate —— is that the
17      trades are reflected in the custodians' books in respect
18      of purchase by the buyer where he has debited an amount,
19      doesn't have any money so the full amount is debited,
20      and credited to his accounts are the dividend.
21  MR JUSTICE ANDREW BAKER:  But in —— I need to be careful,
22      because the answers may in part depend on whether these
23      are accounting entries for which in and of themselves,
24      as it were, an accrual—type convention like ordinary
25      book—keeping for a business is being operated or whether

67

1      these are in the nature only of, as it were, pure cash
2      accounts.
3          Because the equity trade —— because the equity trade
4      is put on, on trade date not later than the day before
5      the ex—date, in fact usually done on the dividend
6      declaration date, the last cum—div trading day, but your
7      stock lending trades, come what may, are not going to be
8      put on as trades until at least one if not more trading
9      days later and then going to be given the same
10      settlement date, are those entries —— so as a for
11      instance that entry that Mr Goldsmith first navigated to
12      showing buyer being debited an amount of nearly 210 ——
13      that is million krone, I assume —— which is a purchase
14      price amount, is that then an entry that is made on the
15      trade date showing a —— by way, as it were, of an
16      accounting record of, taking things again at face value,
17      a payment obligation falling due on 13 August 2013,
18      settlement date, or is that in the nature of a, at least
19      again taking it at face value, cash movement entry that
20      is therefore only posted on the settlement date on which
21      date it will be equaled and matched by a crediting entry
22      of the same amount described as being the receipt of
23      cash collateral on the stock loan.
24  MR RABINOWITZ:  I don't know the answer to that, my Lord.
25      I will have to come back to you.

68

1    MR JUSTICE ANDREW BAKER:  Because it may be that that detail
2        is necessary to answer what I had been thinking were
3        going to be my questions and it maybe therefore we can
4        move on, but just so I have identified them, what I was
5        trying to get into my head as a picture is whether when
6        you then get to the settlement or completion date as on
7        the face of things stated by these different
8        transactions, the record date plus 1, are you on that
9        date —— in some record—keeping sense, are you crediting
10       as a cash payment made that day to the buyer the cash
11       collateral being, by this sequence of book entries, as
12       it were treated as posted by the —— posted in favour of
13       the buyer and simultaneously debiting the buyer that
14       same amount so that if one showed it the equivalent in
15       this context of a simple retail banking current account,
16       you know, you would find a nil balance at the start of
17       the day and then receive cash collateral , x hundred
18       million krone, pay out exactly the same amount by way of
19       share purchase price, end of day, surprise , surprise ,
20       balance still zero, or is it more complex than that?
21           And then, as it were, the equivalent question in
22       relation to the custody of securities , are there account
23       records created in which —— but ultimately in one sense
24       simultaneously and so as to be —— so as to cancel each
25       other out, that the buyer is both credited with

69

1        receiving shares and debited with transferring shares
2        which are being, in a sense, recorded as the completion
3        of the sale in and the stock loan out, or is it
4        more case where these other entries are made that record
5        accurately enough on their face what each different
6        transaction in itself purportedly creates but in terms
7        of a custody record of "here are the shares we hold in
8        custody for you" either there is simply no such record
9        at all , or it something that just always shows a nil
10       balance throughout?
11   MR RABINOWITZ:  I don't know the answer to that but we will
12       look for that, my Lord.
13   MR JUSTICE ANDREW BAKER:  That is the level of detail at
14       which at some point I might be assisted further in this
15       opening phase of the trial just to have that unpacked
16       for me, because what I then have in mind very much is
17       that is the practical outworking as at least I'm now
18       able to see it —— again putting to one side the
19       different defendants' positions as to how much of that
20       was or wasn't visible to different defendants or
21       different categories at the time, but that is the
22       practical outworking of what is called the internalised
23       net settlement of this series of transactions that are
24       different in some respects in character from each other
25       but in material respects net out cash movement and

70

1        securities movement obligations to net zero.
2    MR RABINOWITZ:  We will look at that and come back to your
3        Lordship about that.
4    MR JUSTICE ANDREW BAKER:  Thank you.  But however that may
5        be, is it then at or about this point, the record date
6        plus 1 settlement or completion date, that the custodian
7        then generates the credit advice note?
8    MR RABINOWITZ:  It is on the settlement date that it does
9        that, yes.
10   MR JUSTICE ANDREW BAKER:  And that then —— and I have in
11       mind in that respect, for example, particularly how
12       I think the Lindisfarne written opening has described
13       it —— it will potentially be said —— and again, it may
14       be —— it may be, so far as it goes, uncontentiously said
15       to be a record that is generated because and so as to
16       reflect one particular one of these various book—keeping
17       internalised net settlement entries , namely the one that
18       operates by reference to the net dividend amount and
19       a sense in which it is being credited to the buyer and
20       book—keeping entry is what triggers the custodian to say
21       here is an advice of a credit entry that has been made
22       in one of your accounts with us, and we then get into
23       the debate in due course as to what that does or does
24       not convey either to the addressee of that credit advice
25       note, namely the buyer, or SKAT, when received by SKAT

71

1        in conjunction with a reclaim form.
2    MR RABINOWITZ:  Indeed.
3    MR JUSTICE ANDREW BAKER:  Yes, thank you.
4    MR RABINOWITZ:  So just going on with the trade, as it were.
5    MR JUSTICE ANDREW BAKER:  Yes.
6    MR RABINOWITZ:  I think we haven't yet covered the unwind of
7        the stock loans.  That does need to be done because
8        otherwise the short seller is left with an obligation to
9        return shares that it doesn't own and the buyer is left
10       with an obligation to return cash collateral that it
11       doesn't have.  So, as pre—planned, this then leads to an
12       unwinding of all the trades in the first three steps to
13       return the participants to their original positions, and
14       that is what occurs by way of the fourth step, as we
15       explain at paragraph 90.5 of our written submissions,
16       and as we show in the bottom diagram, which your
17       Lordship now sees on the screen, the unwind of the WHT
18       applications by acquistion of the shares.
19           As your Lordship sees, the trades were unwound some
20       time later by entering into reverse trades with a buyer
21       selling the same quantity of shares to the broker, who
22       sells the same quantity of shares to the original short
23       seller .
24   MR JUSTICE ANDREW BAKER:  Yes.
25   MR RABINOWITZ:  And the futures being sold by the short

72

1    seller  to the broker, who then sells to the buyer, and
2    with the stock loans being recalled  so that the original
3    short  seller  is required to return the shares and the
4    original  buyer is required to return the cash collateral
5    so that, as I say, the positions have closed out again
6    without any need for any physical transfer of shares or
7    cash at all .
8    MR JUSTICE ANDREW BAKER: Yes.  And at that point, going
9        back to one of the questions  I  asked earlier  about the
10       initial  stage of the model, at that point what had been
11       put on as a matched pair of futures  in this  version of
12       the model in later  iterations  matched pairs of
13       over—the—counter forwards.  They come in, in the sense
14       that  —— they come into play and have a meaningful effect
15       to the overall  scheme with a lower case "s" in the sense
16       that this  unwinding on the equity trade or reverse equal
17       and opposite equity trade  will  be priced by reference to
18       real world market data at the date when the unwind is
19       done, but, of course, that is ,  all  things being equal,
20       going to be different  to the pricing  you did at the
21       start , but you have hedged that, so it  doesn't generate
22       anybody making a share price—related profit or loss that
23       would need to be funded.
24   MR RABINOWITZ: And that may be the purpose of the futures,
25       as I think your Lordship identified .

<center>73</center>

1    MR JUSTICE ANDREW BAKER: So that is, therefore,  ultimately
2        a part of everything, in  the fullest  sense, netting out
3        to a nil  sum game other than the question of whether it
4        is  or is  not effective  to cause SKAT to make a payment
5        out.
6    MR RABINOWITZ: Exactly that.
7    MR JUSTICE ANDREW BAKER: Thank you.
8    MR RABINOWITZ: So, my Lord, that's how we worked through
9        the paragraph 90.
10   MR JUSTICE ANDREW BAKER: Yes, thank you very much.
11   MR JUSTICE ANDREW BAKER: What I was going to do next, and again this
12       may simply reflect  what your Lordship has just seen, but
13       we are going to take your Lordship through an example of
14       2012—2013 trade, to put some flesh on the bones of
15       how this worked.
16   MR JUSTICE ANDREW BAKER: Thank you.
17   MR RABINOWITZ: Can we for that purpose please go to
18       {C/271.2/1}.  Can we open that, please.  Thank you.  So
19       just to identify  what this is ,  it  is  a sample trades
20       list  which was attached to your Lordship's order of
21       the  —— following the June 2023 CMC.
22   MR JUSTICE ANDREW BAKER: Yes.
23   MR RABINOWITZ: I'm not inviting you to go there.  It is at
24       {C/271/1}.  The Solo 2012—2013 sample trades are Solo 1,
25       2, 3 and 9.  I'm going to take your Lordship through

<center>74</center>

1    Solo 3, which is the example used in the Solo trade
2    summary, and Solo 3 is the trade that your Lordship will
3    find  in  row 4, so it  is  the AOI Pension Plan trade.
4    MR JUSTICE ANDREW BAKER: Yes.
5    MR RABINOWITZ: Your Lordship can see, if you look at column
6        I, that is  identified  as Solo 4.
7    MR JUSTICE ANDREW BAKER: Yes.
8    MR RABINOWITZ: If your Lordship then looks at column B,
9        your Lordship sees the name AOI and that again —— we saw
10       when we went through paragraph 90 —— is the WHT
11       applicant, the equity buyer and the futures trade in the
12       diagram that we looked at.
13   MR JUSTICE ANDREW BAKER: Yes.
14   MR RABINOWITZ: AOI, the WHT applicant here, was what we
15       have called one of these original  Argre plans, represented
16       by Mr Adam LaRosa, and I will  come back and say a little
17       bit  more about that later.
18   MR JUSTICE ANDREW BAKER: Just for our transcript, that is
19       A—r—g—r—e.
20   MR RABINOWITZ: A—r—g—r—e, correct.  And Adam LaRosa,
21       L—a—R—o—s—a.
22       If we then go to column L, going along to the right,
23       the seller  column, that is  to say the short  seller , your
24       Lordship sees that for this trade, looking in  row 4,
25       that was Rock Capital.  It  has been highlighted by the

<center>75</center>

1    EPE operator, which is helpful.  And that was a company
2    owned by Mr Koerner, one of the defendants.
3        If your Lordship then goes on to look next at column
4    M, it  is  the equity broker column.  Down to row 4, your
5    Lordship sees the equity broker was Novus, which your
6    Lordship can see from column Q was also the futures
7    broker for this  trade, again in  row 4, thank you, and
8    that, my Lord may recall,  was a company majority owned
9    by Mr Murphy, another of the defendants.
10       If we then go to column O, one has the stock loan
11   entity .
12   MR JUSTICE ANDREW BAKER: Yes.
13   MR RABINOWITZ: And your Lordship sees row 4, that was
14       Colbrook.  That is  a Martin Smith company, and those
15       were the trading examples in the Solo 3 sample trade.
16       For the sake of completeness, your Lordship may wish to
17       note, just looking at column H, that the custodian here
18       is  SCP, if we can go back to column H.
19   MR JUSTICE ANDREW BAKER: Yes.
20   MR RABINOWITZ: And your Lordship may also wish just to
21       glance at column C, which identifies  the Danish share in
22       question.  Your Lordship saw this  when we looked at some
23       of the underlying book entries, TDC.
24   MR JUSTICE ANDREW BAKER: Yes.
25   MR RABINOWITZ: And in column E, that identifies  the amount

<center>76</center>

1    of shares traded here, in row 4: 4.5 million. Your
2    Lordship sees that.
3         If we can then please go to the sample trade summary
4    itself ——
5    MR JUSTICE ANDREW BAKER:  Just before we do that —— my
6    curiosity having been piqued —— if we go to the right,
7    so later column numbers —— column letters, I should
8    say —— when we then get into S, T, U, V, is that then on
9    the unwind?
10   MR RABINOWITZ:  Yes, that is on the unwind.
11   MR JUSTICE ANDREW BAKER:  All right, thank you, yes.
12   MR RABINOWITZ:  Can we then —— I don't think —— we may come
13   back to this, but can we go to {A/95/4}, sample trade
14   summary.
15   MR JUSTICE ANDREW BAKER:  Thank you.
16   MR RABINOWITZ:  And your Lordship sees just looking at B1.ii
17   just above paragraph 8, it is addressed to Solo 3, Solo
18   3 example, and your Lordship also sees that the key
19   dates relevant to the ——
20   MR JUSTICE ANDREW BAKER:  I think one page on, please.
21   {A/95/5}. There we are, yes. Thank you.
22   MR RABINOWITZ:  Your Lordship sees the key dates relevant to
23   the dividend are set in italics immediately before the
24   text. Your Lordship sees that. So on 7 August, that is
25   the declaration date, Rock Capital agreed to sell

                              77

1    4.5 million TD shares to Novus as broker.
2         Can we look at paragraph 8.1, please. Sorry, my
3    fault {A/95/4}.
4    MR JUSTICE ANDREW BAKER:  There we are. Thank you.
5    MR RABINOWITZ:  7 August 2013, declaration date, Rock
6    Capital agreed to sell 4.5 million TD shares to Novus as
7    broker at a price of 47.385 Danish krone. Settlement
8    date 13 August. That is the payment date and Novus then
9    enters into —— can we just scroll down, please, thank
10   you {A/95/5}.
11        Novus then entered into a back—to—back agreement to
12   sell the same number of shares at the same price or the
13   same settlement date as AOI. Your Lordship sees that.
14        Then at paragraph 8.2 your Lordship sees the
15   reference to the futures trade aspect of the
16   transaction. So on the settlement date —— sorry, so
17   also on the declaration date AOI agreed to sell to Novus
18   as broker 45,000 flexible futures in 100k lots in
19   respect of TDC shares —— your Lordship sees the price ——
20   with an expiry of date of 21 March 2014.
21        Novus as broker enters into a back—to—back agreement
22   to sell to Rock Capital the same quantity of futures at
23   the same price with the same expiry date, and then your
24   Lordship sees the sample trade summary. It gives your
25   Lordship references to the emails from SCP approving the

                              78

1    trade. I'm going to take your Lordship to those emails,
2    but just if I can first show your Lordship the
3    underlying trading emails between the counterparties
4    themselves.
5    MR JUSTICE ANDREW BAKER:  Yes.
6    MR RABINOWITZ:  Can we first go to {MTKC9/102/1}. If we
7    open that on the left—hand side of the screen, if that
8    is possible {MTKC9/102/1}. Thank you. If we can open
9    on the right—hand side of {MTKC9/101/1}.
10        So just looking at the left—hand side, page 1, as
11   your Lordship sees from the top, this is an email from
12   Mr Adam LaRosa of AOI, 7 August 2011, emailing Novus at
13   11.03 to seek liquidity for AOI in respect of sample
14   trade Solo 3, which we have looked at, and identifying
15   for the buy transaction the specific equity trade on the
16   specific terms your Lordship has seen in outline
17   including, as your Lordship will note, a price to four
18   decimal points.
19        If we can, still on the left—hand side, go to
20   page {MTKC9/102/2}. Thank you. At the top —— are we in
21   page 2? On the left—hand side your Lordship sees at the
22   top an email at precisely the same time on the same day,
23   again from Mr LaRosa, here sending another email to
24   Novus seeking liquidity for the specific futures trade
25   at the specific price, here in respect of a sale of

                              79

1    futures transactions.
2         If we can then go still in the same document to
3    page {MTKC9/102/4}. Thank you. And your Lordship sees
4    here an email from Mr Murphy on behalf of Novus at 11.17
5    on the same day, responding to Mr LaRosa in respect of
6    the equity trades request for liquidity:
7         "Many thanks for the request. Will seek
8    liquidity and get back to you."
9         And your Lordship can see that this relates to the
10   equity trades because if your Lordship ——
11   MR JUSTICE ANDREW BAKER:  Yes.
12   MR RABINOWITZ:  —— sees the email below. Your Lordship sees
13   that.
14   MR JUSTICE ANDREW BAKER:  That is the one, it is buy cash
15   equities, and they are the purchase price rather than
16   the futures price, yes.
17   MR RABINOWITZ:  If we can go, then, back to page
18   {MTKC9/102/3}, your Lordship sees at the top of the page
19   that Mr Murphy sends an identical email at the same time
20   in respect of the futures trade requests, and you can
21   see how this relates to the future trade again because
22   if your Lordship looks below that your Lordship sees the
23   trade to which this is responding, "sell futures".
24        Then in relation to the document on the right—hand
25   side of the screen, can we go to page {MTKC9/101/2} of

                              80

1  that, please. Your Lordship sees on page 2 of that
2  document Mr Murphy sends an email on 7 August 2013 at
3  11.28, so that is within 11 minutes, and he asks —— it
4  is addressed to sp@novus, which is a Novus email
5  address. Mr Murphy asks:
6      "... on behalf of our client ... "
7      For liquidity in respect of the TDC futures with
8  expiry 21 March 2014, which is what Mr LaRosa wanted.
9      If we then go then to page {MTKC9/101/1}, so back
10  a page, and your Lordship sees there an email from
11  Mr Murphy on 7 August at 11.33, so that is five minutes
12  later. He asks for liquidity "on behalf of our client"
13  in respect of the TDC shares, the settlement on
14  13 August, so that is the payment date which again is
15  the clear Mr LaRosa wanted.
16      If we can go to page {MTKC9/101/3} of that, your
17  Lordship sees an email from, top of the page, Mr —— from
18  Rock Capital, signed by Mr Alex, that is Mr Koerner:
19      "long time no speak. I will check my availability
20  how many shares I can sell."
21      The time appears to be 12.36, but he is in Germany;
22  I think it is likely, therefore, it was 11.36.
23  MR JUSTICE ANDREW BAKER: Yes.
24  MR RABINOWITZ: If we can go then to page {MTKC9/101/4}, top
25  of the page, your Lordship sees a further message from

81

1  Mr Koerner of Rock Capital at 12.50, in 11.50 UK:
2      "Got so far 16.0 Mio shares.
3      "Let me know how many you want."
4      If we can then go on to page {MTKC9/101/5}, top of
5  the page, Mr Burge of Novus replies at 12.59 UK time,
6  asking to buy various shapes of TDC shares at specific
7  prices, including 4.5 million shares at, as your
8  Lordship sees, DKK 47.3850, the specific price that
9  Mr LaRosa wanted.
10      And your Lordship sees also that Mr Burge adds:
11      "Please advise if this suits before seeking approval
12  from your clearer to trade."
13      If we then go to page {MTKC9/101/6}, over the page,
14  your Lordship sees Mr Koerner's response at 13.01 UK
15  time. He says:
16      "Will do thanks.
17      " ... could you please check markets oft if you can
18  find a hedge?"
19      And then if we go to page {MTKC9/101/7}, top of the
20  page, Mr Burge replies 13.08 UK time, so seven minutes
21  later, offering futures with expiry 21 March 2014 at a
22  price of 46.46 krone for 45,000 lots, which is what
23  Mr LaRosa wanted.
24      If we then go to page {MTKC9/101/8}, Mr Koerner, as
25  your Lordship sees, replies at 13.15 to accept the

82

1  offer.
2      Then if we can go back to the document on the
3  left—hand side of the screen, so that is {MTKC9/102/1}.
4  On that if we can go to page {MTKC9/102/5}, top of the
5  page. Thank you. Your Lordship sees that at 13.16
6  Mr Burge of Novus confirms that Novus can execute the
7  equity trade, and he asks Mr LaRosa to seek approval
8  from his clearer "before we can trade".
9      If we then go over to page {MTKC9/102/6}, your
10  Lordship sees an identical email at exactly the same
11  time from Mr Burge in respect of the futures trade
12  request. And then if we go over to page {MTKC9/102/7},
13  your Lordship sees that Mr LaRosa replies at 13.22 in
14  respect of the equity trade to say he will seek approval
15  from the clearer "now".
16      Then on page {MTKC9/102/8}, if we can go to that, an
17  identical email from Mr LaRosa sent at 13.22, so
18  precisely the same time, this time in respect of the
19  futures trade.
20      Then to page {MTKC9/102/10}. Thank you. Top of the
21  page, there is an email from the GSS team at SCP, so
22  trader approvals, the same day at 13.31, sent to
23  Mr LaRosa for AOI and copied to Novus. This approves
24  the equity buy trade by AOI and says that Solo will
25  effect clearance.

83

1      If we can go back a page to page {MTKC9/102/9}, your
2  Lordship sees an identical message from GSS, also
3  exactly the same time, 13.31, sent to Mr LaRosa at AOI,
4  copied to Novus, in respect of the future sale trade by
5  AOI.
6      If we can then go on to page {MTKC9/102/14}, your
7  Lordship sees there the equity trade confirmation from
8  Novus, and we can see the futures trade confirmation
9  from Novus if we go to page {MTKC9/102/13}. Thank you.
10  And if you look at the bottom line —— not easy to read.
11  MR JUSTICE ANDREW BAKER: Bottom line of the numbers or the
12  small print at the very bottom?
13  MR RABINOWITZ: The small print at the very bottom, your
14  Lordship sees numbers of units —— thank you. 45,000
15  units.
16  MR JUSTICE ANDREW BAKER: Yes.
17  MR RABINOWITZ: And that covers the 4.5 million shares. So
18  lot size 100 times 45,000 gives you that.
19      If I can ask your Lordship next to go back to the
20  document we have I think on the right—hand side ——
21  MR JUSTICE ANDREW BAKER: Just pausing there, the futures
22  reference price is the equity trade price that is being
23  put on at the same time and then what you have
24  previously mentioned in, for example, your paragraph 90
25  summary, the 46.46 price is therefore the future strike

84

1　　price.
2　　MR RABINOWITZ:  Right.
3　　MR JUSTICE ANDREW BAKER:  Yes, thank you.
4　　MR RABINOWITZ:  If we can go back to the document we have on
5　　　　the right-hand side of the screen, so that is
6　　　　{MTKC9/101}, can we go, please, to
7　　　　page {MTKC9/101/16} -- it only has 14 pages?  Just give
8　　　　us one second.  Okay, we don't need to look at that.
9　　　　　　The point I was going to make, my Lord, effectively
10　　　further emails in relation to this in this series of
11　　　trades, on the face of it, these emails purport to
12　　　demonstrate arm's length trades between independent
13　　　counterparties in a properly sequenced order.
14　　　　　I will obviously have to come back to that to show
15　　　your Lordship the role that Mr Patterson admits to
16　　　having played in this, in telling the counterparties,
17　　　effectively choreographing exactly what was going to
18　　　happen, telling the counterparties who to trade with,
19　　　when and at what prices.
20　　　　　So it all looks pukka and arm's length and
21　　　independent; in fact, Mr Patterson behind the scenes was
22　　　basically saying to people this is what you do, this is
23　　　when you do it, this is who you do it with.
24　　　　　For the moment, can we just go back, please, to the
25　　　sample trade summary {A/95/5}, so we can just look at

85

1　　what is said at paragraph 8.3.  Thank you.  As your
2　　Lordship sees, we explain here that on 12 August 2013,
3　　that is the record date, AOI agree to lend 4.5 million
4　　TDC shares to Colbrook, which in turn agreed to lend
5　　4.5 million  TD shares to Rock Capital, in both cases for
6　　collateral of 47.385 krone per share, which was the same
7　　price as under the equity trades, for settlement on
8　　13 August 2013.  That is the same date as under the
9　　equity trades, the payment date.
10　　　Can I just show your Lordship the underlying trade
11　　emails for this.
12　　　Can we go, please, to {MTTE/1917/1}.  Thank you.
13　　And if we can start with the email at the bottom of the
14　　chain at page {MTTE/1917/3}, if we go to page 3 of that.
15　　Thank you.  And your Lordship sees this is recorded as
16　　having been sent on 12 August 2013, so that's the record
17　　date, from Alex Smith who is Martin Smith's son and the
18　　other director of Colbrook, to Mr LaRosa at AOI.
19　　　Mr Smith is copied into the email.  The time stamp
20　　is 4.51 am, but that is probably because it has been
21　　received by Mr LaRosa in New York, in a different time
22　　zone -- I think he is in Dubai.  As your Lordship sees,
23　　Alex Smith asks whether AOI have any interest in lending
24　　some TDC shares for VD -- that is value date -- or
25　　settlement date of 13 August 2013.

86

1　　If we can then please, look still on page 3, at the
2　　top email of the page.  Mr LaRosa replies on 12 August
3　　at 3.19 pm; again, we think that is Dubai.  So 7.19 am
4　　New York time he says:
5　　　　"Yes, we do have interest ..."
6　　　　And he attaches terms, and although I'm afraid we
7　　don't have the attachment we can see what the terms are
8　　from the SCP approval email which I will come to
9　　shortly.
10　　MR JUSTICE ANDREW BAKER:  Just pausing there, that's because
11　　Dubai is three hours ahead of us in the summer and four
12　　hours ahead of us in the winter because they don't
13　　change clocks, is that right?
14　　MR RABINOWITZ:  That's right.  And I think at this stage it
15　　is eight hours ahead --
16　　MR JUSTICE ANDREW BAKER:  At this stage, 4.51 New York,
17　　bottom email, will have been -- they do have daylight
18　　saving, so that will have been 9.51 am here, and 3.19 pm
19　　Dubai would be just after midday here and just after
20　　7.00 in the morning in New York.  Yes, fine.  Thank you.
21　　MR RABINOWITZ:  If we just carry on with the email chain --
22　　thank you, my Lord.  If we go to page {MTTE/1917/2}, we
23　　see that Mr Smith replies on 12 August, 7.22 am New York
24　　time, so 3.22 Dubai time.
25　　MR JUSTICE ANDREW BAKER:  Yes.

87

1　　MR RABINOWITZ:  Three minutes later.  And he agrees the
2　　terms.  If your Lordship then looks at the email above
3　　that, this is from Mr LaRosa, 7.29 New York time, saying
4　　that approval will be sought, so that is seven minutes
5　　later, approval will be sought from the clearer.
6　　　　If we go then to the document we have at {R3/6/1},
7　　please, top of the page.  Thank you.  We have an email
8　　from SCP to Mr LaRosa at AOI, 12 August 2013.  Your
9　　Lordship sees the time stamp, 12.47 UTC, which is --
10　　New York is four hours behind in the summer, that is
11　　8.47 am New York time.
12　　　　Unfortunately, my Lord, because of issues of
13　　disclosure given by Mr Koerner and Mr Smith we don't
14　　have the underlying trading emails between Colbrook and
15　　Rock Capital in relation to the other half of the stock
16　　loan.  Mr Koerner has given no disclosure at all.  But
17　　what we do have are the related emails that involve the
18　　team at SCP and individual trading companies and that
19　　give us a sense of what is happening.
20　　　　To that end, can we go to {MTKC9/197.1/1}.  Thank
21　　you.  And this is, as your Lordship sees, an email from
22　　SCP to Rock Capital on 12 August 2013, 12.45 pm UTC, and
23　　your Lordship sees that it says SCP:
24　　　　"... acknowledges receipt of the requested trade
25　　... "

88

Confidential

1    But notes that:
2         "The Trade will only be accepted for 'give—up' to
3    [SCP] once the Trade is approved by [SCP] ..."
4         And your Lordship sees it sets out the terms of the
5    stock loan with Colbrook described as the counterparty
6    at the bottom, including the quantity, which is
7    described as "Price" but in fact means the amount of
8    collateral.  It gives the settlement date as well, all
9    of which, your Lordship may recall, mirror the equity
10   trade.
11   MR JUSTICE ANDREW BAKER:  Yes.
12   MR RABINOWITZ:  And as your Lordship sees from this SCP
13   approval email, there are also specific terms regarding
14   interest and stock loan fees.
15        The reference to cash rebate interest and spread
16   relates to the interest on the cash collateral, and the
17   reference to stock rebate interest and spread are the
18   stock lending fees.
19        We can go then, please, to {MTKC9/197.2/1}.  As your
20   Lordship sees, this is an email from GSS to Rock on
21   12 August 2013 at 12.47 UTC, so two minutes after the
22   last email, and as your Lordship sees, this now approves
23   the stock loan with Colbrook on the same terms we just
24   saw.
25        If we can then go back to the sample trade summary

                               89

1    at {A/95/5}, look at paragraph 9.  As your Lordship
2    sees, we say here on 13 August 2013 SCP issued a credit
3    advice note, a CAN, in respect of this AOI trade.
4    MR JUSTICE ANDREW BAKER:  Yes.
5    MR RABINOWITZ:  I will take you to the credit advice note
6    shortly.
7    MR JUSTICE ANDREW BAKER:  Yes.  But reflecting one of the
8    earlier questions and answers in relation to that and,
9    as with all of those sorts of questions and answers,
10   subject always to the argument that will follow in due
11   course as to what this all amounted to, but simply in
12   terms of the factual record there will then have been
13   a credit entry item in the amounts shown there in the
14   underlying accounting records kept by SCP as, it says,
15   custodian that will have been, as it were, matched to
16   and the reason for the generation of that credit advice
17   note.
18   MR RABINOWITZ:  Indeed.
19   MR JUSTICE ANDREW BAKER:  Yes.
20   MR RABINOWITZ:  So, my Lord, that is all I was going to say
21   by way of introduction in terms of Solo trading
22   structure.
23   MR JUSTICE ANDREW BAKER:  Thank you.
24   MR RABINOWITZ:  And we will come back to your Lordship with
25   the book entries, if I may.

                               90

1    MR JUSTICE ANDREW BAKER:  Thank you.
2    MR RABINOWITZ:  I was going to next move on, my Lord, to say
3    something about our case about the representations that
4    we say were made to SKAT.
5    MR JUSTICE ANDREW BAKER:  Yes.
6    MR RABINOWITZ:  And the structure I was proposing to follow
7    in this part of the opening is first to show your
8    Lordship the key part of SKAT's pleaded case on the
9    representations; secondly, to identify for your Lordship
10   the context on which the applications were made; third,
11   to take your Lordship through the key documents which we
12   say contained the representations; and, fourth, to say
13   something very briefly about reliance.
14   MR JUSTICE ANDREW BAKER:  Thank you.
15   MR RABINOWITZ:  So can we please begin with the particulars
16   of claim which your Lordship will find at {B/5.1/1}.
17        Now, all the pleadings on misrepresentation are,
18   obviously, in the particulars of claim.  Your Lordship
19   will recall that following your Lordship's validity
20   issues judgment we received a request for further
21   information from the DWF defendants asking for clarity
22   about our case in the particulars of claim.  Your
23   conclusions and this, being so, it may be helpful in
24   seeking to understand SKAT's misrepresentation case to
25   look at both documents.  So perhaps we can have the

                               91

1    other document, the RFI, on the right—hand side of the
2    screen, if we can.  We can keep the document that you
3    have there on the left and we can bring up the document
4    which we have at {B/117.16/1}.  Thank you very much.
5        Starting with the document you have on the left—hand
6    side, can we go to page {B/5.1/8}, please, of the
7    particulars of claim.  Thank you.  We are going to look
8    under the heading "Dividend WHT Regime".
9    MR JUSTICE ANDREW BAKER:  Yes.
10   MR RABINOWITZ:  Your Lordship will be familiar with this.
11   We set out the Danish tax law context for a WHT
12   application and in paragraphs 6 to 9 we summarise the
13   basics of the WHT regime, withholding tax regime.
14   Perhaps I can ask your Lordship to read, perhaps, 6 to 9
15   to yourself.
16   MR JUSTICE ANDREW BAKER:  Yes.  (Pause).
17   MR RABINOWITZ:  We are going to have to flip the pages when
18   your Lordship gets to ——
19   MR JUSTICE ANDREW BAKER:  Yes, if we go over the page,
20   please.  Thank you.  {B/5.1/9}.
21        Yes, if we can get the bottom of that page up.  Yes,
22   and then over the page {B/5.1/10}.  Yes, thank you.
23   MR RABINOWITZ:  Thank you.  So just summarising what your
24   Lordship has seen, we plead, paragraph 7 {B/5.1/8}, that
25   Danish companies are obliged to withhold tax and

                               92

Confidential                                                                          SKAT_MDL_001_00834774

1  dividends declared and only to pay to shareholders the
2  dividend net of withholding tax at a rate of 27%.
3      At paragraph 8 {B/5.1/9}, as your Lordship saw,
4  include that a shareholder who has been taxed on
5  dividends received may apply for a refund on any part of
6  the tax that was not in fact due.
7      In paragraph 9 we explain that the US and the
8  Malaysian double tax treaty with Denmark provided that
9  qualifying US and Malaysian entities were to be exempt
10  from any taxation, whilst UK or Luxembourg entities were
11  only to be taxed at a rate of 15%.
12      Then, my Lord, just staying with this document, if
13  we can look at paragraph 10 {B/5.1/10}, your Lordship
14  sees we explain that a shareholder in a Danish company
15  that seeks a refund had to complete a tax relief form,
16  and we there set out the materials required by that
17  form. Your Lordship is familiar with that.
18  MR JUSTICE ANDREW BAKER:  Yes.
19  MR RABINOWITZ:  And then if we can look at paragraph ──
20  sorry, if we can go to page {B/5.1/11} of that pleading.
21  My Lord sees, not least from the heading above,
22  paragraph 13, this section is dealing with the WHT
23  applications. If we can go, please, it is on this page,
24  paragraph 17, this describes for your Lordship the
25  documents that were contained with each WHT application.

93

1  Can I just invite your Lordship to look at that
2  paragraph, please.
3  MR JUSTICE ANDREW BAKER:  Yes.
4  MR RABINOWITZ:  We will come on in due course and show your
5  Lordship those documents.
6  MR JUSTICE ANDREW BAKER:  Yes. Thank you.
7  MR RABINOWITZ:  Just pausing there, just staying there, your
8  Lordship sees the reference in paragraph 17(c) to shares
9  held and we accept, as I think we must, that that has
10  caused some confusion due to infelicitous drafting on
11  our part, the use of the word "held", and I ought to
12  just clarify our position.
13      I can come back to this in more detail if necessary,
14  but just to make clear, we say the representations about
15  shareholding in the applications concerned ownership of
16  Danish shares, not a positive settled balance of shares
17  at a particular point in time.
18      But, my Lord, the latter concept, positive share,
19  settled balance or not, at a particular point in time
20  is, of course, highly relevant to the issue of falsity
21  which ── of the representations which your Lordship
22  considered in the validity judgment, and that we say is
23  because as the custodians never held any positive
24  settled balance of Danish shares for their clients,
25  which was registered directly or indirectly through

94

1  a subcustodian with VP Securities, because they didn't
2  hold those shares it was impossible for the applicants
3  to own any shares, receive any dividends or suffer any
4  taxation.
5      Just looking next, if we can, at paragraph 19 of the
6  particulars of claim on page {B/5.1/13}, as your
7  Lordship sees, we say there what we say the four key
8  representations were that were made in the application
9  as a whole. Can I just ask your Lordship to remind
10  yourself of what we say they were?
11  MR JUSTICE ANDREW BAKER:  Yes, thank you.
12  MR RABINOWITZ:  If we can then look at the RFI response on
13  the right-hand side of the screen, and if we can go in
14  that to page {B/117.16/8}. Thank you. At the bottom of
15  the page your Lordship sees response 3, and this seeks
16  to clarify what is meant in relation to the first
17  alleged representation we identify by the reference to
18  share ownership, and your Lordship sees we say here
19  that:
20      "The WHT Applications represented that, at the time
21  of the dividend declaration by the ... Danish company,
22  the WHT Applicants were the owners of the shares
23  specified in the relevant [CANs] as a matter of Danish
24  tax law."
25      And then we say, if we can just probably go over the

95

1  page {B/117.16/9}:
2      "The requirements for ownership under Danish tax law
3  are set out in the Validity Issues Judgment."
4      We go on to make reference to a positive settled
5  balance of shares. As I have already noted, my Lord,
6  I accept that this is a concept more accurately relevant
7  to falsity, not to the terms of the representation
8  itself, and I would invite your Lordship effectively to
9  ignore it in the context of looking at the
10  representation itself.
11      Still with the RFI response, if we can go on to
12  page {B/117.16/9}, please, and we are on that, looking
13  at response 4, as my Lord sees that is seeking to
14  identify, give further information, as to what is
15  alleged in the reference in the context of the second
16  representation we advance, what we mean by the receipt
17  of a dividend.
18      Can I just invite your Lordship to go, please, to
19  page {B/117.16/10}, to read what we say in the main body
20  of paragraph 4 and also paragraph 4.1.
21  MR JUSTICE ANDREW BAKER:  Yes.
22  MR RABINOWITZ:  Thank you. We can then go on to
23  page {B/117.16/11}, where we have the substance ──
24  MR JUSTICE ANDREW BAKER:  Not now, because it does get into
25  the argument, but at the thick end of a year from now

96

Confidential                                                                SKAT_MDL_001_00834775

1  when we are looking at closing argument there will be
2  a need, it seems to me, to explore a little carefully
3  that additional reference to what is said about payments
4  being received, because as I apprehend a consequence of
5  the validity issues judgment is that at least stated now
6  in the abstract and with the benefit of that judgment,
7  taking onboard points the defendants wish to make about
8  that as context, but as we would now see things you
9  could be somebody that never received any such payment
10 but yet had been the party entitled to the shareholding
11 in the relevant sense at the relevant time who had
12 suffered the withholding of tax.  Conversely, you could
13 be somebody that did, because you were the record date
14 shareholder, in the terminology I used, receive
15 a payment of that description and yet not be the person,
16 strictly speaking, who was the person materially liable
17 to tax.
18 MR RABINOWITZ:  Your Lordship is right.  But, obviously, as
19 we say in paragraph 4.1, in the ordinary course —— I'm
20 not saying —— I have effectively accepted your
21 Lordship's point, that theoretically they could be
22 different people.
23 MR JUSTICE ANDREW BAKER:  Yes.
24 MR RABINOWITZ:  But in the ordinary course, if you have
25 someone who has received a dividend —— sorry, has

97

1  received payment, that might be regarded as confirmation
2  that they had received the dividend in the sense that
3  your Lordship identifies while being the person entitled
4  to the dividend at the relevant date.  But your Lordship
5  is right, we will have to come back to that.
6  MR JUSTICE ANDREW BAKER:  Yes.
7  MR RABINOWITZ:  I was just going to invite your Lordship to
8  go on to page {B/117.16/11}.  Have we looked at response
9  5 on page 11.
10 MR JUSTICE ANDREW BAKER:  Yes.
11 MR RABINOWITZ:  The response to that —— so your Lordship
12 sees the response.  We may need to go over the page.
13 {B/117.16/12}.
14 MR JUSTICE ANDREW BAKER:  Thank you.
15 MR RABINOWITZ:  If I can then ask your Lordship to go back
16 to the particulars of claim which you have on the
17 left-hand side of the screen.  Can we just look at
18 paragraph 21 on that {B/5.1/13}.  You have that open.
19 And this sets out the representations we say were
20 specifically made in the CANs themselves, and again can
21 I invite your Lordship just to look at what we say about
22 that, and that is —— your Lordship is obviously going to
23 have to go over the page to see that.
24 MR JUSTICE ANDREW BAKER:  Yes.
25 MR RABINOWITZ:  Thank you.  {B/5.1/14}.

98

1  MR JUSTICE ANDREW BAKER:  Just for the [draft] transcript,
2  what you have said has come out as "plans", but I think
3  what you said was CANs, C—A—N—s.
4  MR RABINOWITZ:  Thank you.
5  MR JUSTICE ANDREW BAKER:  Thank you.  Yes.
6  MR RABINOWITZ:  So that is the pleading and we can leave
7  those for the moment.  Can I then just say something
8  further about the context in which we say the
9  representations were made, and the first point to make
10 in this regard, my Lord, as we note in paragraph 218 of
11 the main skeleton, and this is pretty straightforward,
12 it is always necessary in construing statements, and
13 indeed the impact they might be expected to have on
14 a reasonable representee, with the known characteristics
15 of the actual representee, to have regard to the context
16 in which those representations or misstatements were
17 made.
18     That is a proposition which appears to be accepted
19 by certainly the DWF defendants and the SS defendants as
20 well, and for your Lordship's note that is clear from
21 the DWF submissions at paragraph 44.1.  We don't need to
22 turn that up, and from the SS defendants' submissions at
23 paragraph 85, and again we don't need to turn that up.
24     My Lord, there is also agreement, at least with the
25 DWF defendants, when they say —— and again we don't need

99

1  to turn this up, this is at paragraph 460 to 461 of
2  their submissions —— that in the present case the
3  relevant context was that an application was being made
4  to the Danish tax authority SKAT for tax relief in
5  respect of a tax imposed on a dividend payment.
6      In other words, in seeking to understand objectively
7  what statements are made, we submit that it is plainly
8  important to have in mind that the statements were made
9  in connection with an application in the context of
10 a system for refunding amounts of dividend tax that had
11 been withheld by a Danish company that had distributed
12 a dividend to its shareholders.
13     Logically, therefore, we say that the documentation
14 submitted as part of such an application would
15 objectively be understood to have as its aim to
16 demonstrate, or at least seek to demonstrate, that the
17 conditions for a valid WHT refund application under
18 Danish tax law had in fact been met by the applicant,
19 otherwise it would be difficult to know why this form
20 was being put in.
21     Because, of course, my Lord, the Danish tax
22 authority would have no interest in or responsibility
23 for paying refunds of tax to persons who had never
24 suffered any tax imposed in the first place from which
25 to seek relief, or which were not in fact entitled to

100

1  any such refund as a matter of Danish tax law.
2      So that we say is the relevant context in which the
3  question of what representations were made should be
4  approached.
5      Can I turn next, my Lord, just to look at some of
6  the documents making up the applications and the express
7  statements they contained.
8  MR JUSTICE ANDREW BAKER:  But does that mean that the
9  question of, as it were, tax context in which one has to
10  construe the purport of any content of that claim
11  documentation to work out what, if any, representations
12  of fact it makes in particular to the tax reclaim
13  situation and is different to, for example, the putting
14  in of a tax return on the other hand?  Because if
15  I submit my tax return to HMRC and as well as making
16  declarations that I will do in that that I think I am
17  putting in what I believe to be accurate information
18  about monies I have received which are likely to be
19  taxable, I also put in information in various boxes that
20  are to do with things that are by nature deductions or
21  reliefs or entitlements that will go to reduce my tax
22  bill.
23      At one level, functionally, I am actually doing
24  something in that latter respect that is equivalent to
25  this: I'm saying I'm a taxpayer and I'm saying that

101

1  I potentially owe less tax than I might otherwise owe
2  because of these elements.  I'm not sure I find it
3  a natural way of describing what I do when I return my
4  tax return as providing, as you just put it, an attempt
5  to demonstrate that I satisfy conditions.
6  MR RABINOWITZ:  It may be that it is different --
7  MR JUSTICE ANDREW BAKER:  I'm providing --
8  MR RABINOWITZ:  -- because you're obliged --
9  MR JUSTICE ANDREW BAKER:  It has to be an honest return, but
10  I'm providing what is an honest return of what I believe
11  is the information the tax man will need to assess how
12  much tax he should charge me.
13  MR RABINOWITZ:  Your Lordship started that question by
14  asking whether I thought it was the same as.
15  MR JUSTICE ANDREW BAKER:  Yes.
16  MR RABINOWITZ:  And in my respectful submission perhaps your
17  Lordship has answered that question: not for that
18  reason.
19  MR JUSTICE ANDREW BAKER:  Perhaps for that reason it is not
20  really quite the same.
21  MR RABINOWITZ:  And it may be the reason that it is
22  different is that when you put in the tax return it is
23  because you have to put in the tax return.  You have to
24  provide this information.  You obviously don't have to
25  claim set-offs, but you certainly have to put in -- you

102

1  have to tell HMRC something and that is why you are
2  providing the information.  I'm not sure that beyond
3  that one is -- it really helps shall -- I don't know
4  whether one is right to be characterising that -- that
5  as the context.  Here, it is rather different, because
6  here you don't have to do anything, but you are doing
7  something in order to obtain actually a refund.  That is
8  what the heading is.
9  MR JUSTICE ANDREW BAKER:  Yes, and although I, of course,
10  appreciate that to the extent it was an influence on me
11  when we were on analysing the Revenue Rule, the relevant
12  analysis I was wrong to think led to the conclusion that
13  the Revenue Rule applied, but would you say that
14  factually speaking it is nonetheless still true as an
15  element of what is happening that the WHT applicant in
16  whose name the tax reclaim is put forward is, as you
17  have just said, without any obligation to do so if it
18  chooses not to do so, but it is choosing to go to SKAT,
19  in effect saying I have become one of your taxpayers but
20  I have become one of your taxpayers in circumstances
21  where either I shouldn't have been at all or I should
22  have only have been to the tune of 15% or 10% and I want
23  the excess.
24  MR RABINOWITZ:  We very much say that, my Lord.  In our
25  respectful submission, that is absolutely the context in

103

1  which --
2  MR JUSTICE ANDREW BAKER:  That you would say still
3  constitutes an element of context and evident purpose of
4  document in the light of which one has to look at how
5  much it is in the document amounts to a statement of
6  fact at all and that which amounts to statements of
7  fact, what is it purporting to convey.
8  MR RABINOWITZ:  Precisely.  Because the tax context -- leave
9  aside the tax issue, but there can be no doubt when you
10  look at these forms headed "tax reclaim", referencing
11  a number of occasions, tax reclaim, tax refund, they are
12  purporting to be people on whom a tax has been imposed
13  when it shouldn't have been, as your Lordship says,
14  either to the full extent or not at all.
15      And this is -- in other words, the statements which
16  are made are not made without that context.  It matters
17  that it is that context --
18  MR JUSTICE ANDREW BAKER:  Yes.
19  MR RABINOWITZ:  -- when you try and understand what it is
20  objectively that they are representing.
21  MR JUSTICE ANDREW BAKER:  Thank you.
22  MR RABINOWITZ:  Can I then take your Lordship to some
23  documents.  Can we start, again sticking with sample
24  trade Solo 3, just because we have gone thus far with it
25  we may as well stay with it, just to use that as the

104

1    samples.  If  I can invite your Lordship to go  first  to
2    {R3/13/1}.  Thank you.  What your Lordship sees here is
3    the  cover  letter  from Goal, that is the tax agent, to
4    SKAT, dated 28 August 2013.
5    MR JUSTICE ANDREW BAKER:  Yes.
6    MR RABINOWITZ:  Can I just invite your Lordship to briefly
7        look at that, at what it says.
8    MR JUSTICE ANDREW BAKER:  Yes, thank you.
9    MR RABINOWITZ:  So your Lordship sees Goal says that it is
10       enclosing a tax reclaim form on behalf of its  client ,
11       AOI Pension Plan:
12           " ... together with evidence of payment and tax
13       deduction paid on the above client's  securities ."
14           And we obviously rely on those words in support of
15       our case that the WHT application represented that there
16       had been a withholding or deduction of tax from
17       a payment received by AOI in respect of a Danish
18       security owned by AOI.
19           If we go next, please, to page {R3/13/2} of the same
20       document.  Your Lordship sees the tax reclaim form and
21       again your Lordship sees this  is  filed by Goal on behalf
22       of AOI.  Your Lordship sees "Claim", just at the top, on
23       behalf of the beneficial  owner.  There is a tick there.
24    MR JUSTICE ANDREW BAKER:  Yes.
25    MR RABINOWITZ:  And after saying that it is filed on behalf

105

1    of the beneficial  owner it then says, as your Lordship
2    sees, that it is a:
3        "Claim is made for refund of Danish dividend tax."
4        And your Lordship sees the total given.  Now, again,
5    as your Lordship knows, we say that those words
6    expressly or impliedly  represented that the applicant,
7    AOI, had suffered a withholding of tax on dividends
8    received from a Danish company, because we say that
9    applying for a refund of Danish dividend tax on the
10   basis of a form dealing with claims to  relief  from
11   taxation necessarily  presupposes that Danish dividend
12   tax or an amount in respect thereof has been withheld
13   from or been imposed upon a dividend received by an
14   applicant, here AOI, who has some basis for and is
15   seeking the refund of that dividend tax.
16       Unless AOI had suffered such a withholding of tax on
17   dividends received , there was nothing in respect of
18   which it could apply for a refund.  Of course, my Lord,
19   SKAT could not refund money that had not been paid to it
20   in the first  place.
21   MR JUSTICE ANDREW BAKER:  Yes.
22   MR RABINOWITZ:  We say, further, that this is reinforced by
23       the fact that the tax refund form, as your Lordship
24       sees, looking just underneath Goal's signature, then
25       notes that:

106

1        " ... documentation is enclosed dividend advice(s),
2    number 1."
3        I don't know whether we can see that, actually.
4    Right at the bottom.
5    MR JUSTICE ANDREW BAKER:  Yes.
6    MR RABINOWITZ:  There you go, yes, just above the "Financial
7        institution " line .
8        And your Lordship sees also there is a warning on
9    the form itself :
10       "(This documentation is obligatory)."
11       So the dividend advice is obligatory; again, we say
12   that emphasises the importance to the WHT application
13   that there is this dividend advice.
14   MR JUSTICE ANDREW BAKER:  Because both the smaller standard
15       font text saying as documentation is enclosed, ie
16       meaning there is enclosed dividend advice and a number,
17       and so on, also the  slightly  larger  italicised  font
18       is  all part of the standard form in blank, correct?
19   MR RABINOWITZ:  Yes.
20   MR JUSTICE ANDREW BAKER:  So in this example at this point
21       in the form what has been inputted by Goal in the
22        beneficial  owner section is the name, address, the
23        email, the signature stamp of Goal and the number 1 for
24        the documentation enclosed, the number of credit advices
25        enclosed.  Yes.

107

1    MR RABINOWITZ:  Exactly that.  I think your Lordship said
2        and the Danish dividend tax right at the top.
3    MR JUSTICE ANDREW BAKER:  And the amount just above that,
4        yes, thank you.
5    MR RABINOWITZ:  So —— and we rely on the fact —— just the
6        references to the dividend advice, we rely on the fact
7        that the form refers to that, which I'm going to show
8        your Lordship, again as in a sense being the context in
9        which these representations are made; that is to say,
10       what is being reclaimed is a dividend ——
11   MR JUSTICE ANDREW BAKER:  Yes.
12   MR RABINOWITZ:  —— paid from which tax was withheld.
13       If we can then look —— we can probably do this
14       before the break, subject to your Lordship —— at
15       a dividend credit advice which accompanied this
16       particular  application , which we can see at page
17       {R3/13/5}.  Thank you.  So your Lordship sees it is
18       issued by SCP, custodian, and it is issued in  relation
19       to the AOI trade that we have been through, dated
20       13 August.  And as your Lordship sees, it says:
21       "Please be advised that we have credited your
22   account ..."
23       That is AOI's account:
24       " ... for the value date of 13th August 2013.  This
25   payment represents the dividend as shown below."

108

Confidential

1    Now, as your Lordship sees, the notice or the advice
2    then goes on to set out details of the number of TD
3    shares, 4.5 million.  That can only sensibly refer to
4    a shareholding by AOI of that amount of TDC shares.  And
5    then your Lordship sees the reference to a gross
6    dividend, significantly also the net dividend, all of
7    this again in the context of an application for a tax
8    refund in respect of tax withheld, and indeed your
9    Lordship sees that the amount of tax is set out as well.
10   That would be the tax withheld.
11       And then, as your Lordship sees ——
12   MR JUSTICE ANDREW BAKER:  Other things being equal,
13   I appreciate you will say, and it will be part of the
14   argument that I will considering in due course, that one
15   ends up potentially needing to take care as to what
16   something conveys given the context.  But other things
17   being equal, the information in the block there against
18   the various items is descriptive of a dividend that will
19   undoubtedly have existed.
20       That is to say, there will have been a declared
21   dividend of however many krone per share it was that
22   that on a shareholding of 4.5 million would generate
23   that much by way of gross dividend in respect of which
24   there would, by operation of the basic withholding tax
25   regime, have been, necessarily on the company's part,

109

1    a deduction of that amount in tax resulting in a net
2    dividend in amount of that.
3    MR RABINOWITZ:  Your Lordship is correct if you assume that
4    there was in fact a shareholding held by this particular
5    person.
6    MR JUSTICE ANDREW BAKER:  But why?
7    MR RABINOWITZ:  Because ——
8    MR JUSTICE ANDREW BAKER:  As a description of something that
9    is real it might be said this doesn't in terms, as
10   a document itself, say anything at all about who, if
11   anyone, and in particular whether AOI, has been
12   a shareholder at any stage.
13   MR RABINOWITZ:  No.
14   MR JUSTICE ANDREW BAKER:  Rather than that it has been
15   credited with an amount in an account.
16   MR RABINOWITZ:  Which represents a dividend.
17   MR JUSTICE ANDREW BAKER:  Which per the custodian is treated
18   as representing something.
19   MR RABINOWITZ:  And in respect of which tax has been
20   withheld.  That I think —— your Lordship is right,
21   context is going to matter here.
22   MR JUSTICE ANDREW BAKER:  Obviously I am teasing that at
23   even this incredibly early stage in a very long trial
24   because I certainly have in mind that there is the
25   capacity for context of credit advice note as issued by

110

1    a custodian and what it does or does not state to the
2    addressee of the credit advice note ——
3    MR RABINOWITZ:  Yes.
4    MR JUSTICE ANDREW BAKER:  —— which is not SKAT ——
5    MR RABINOWITZ:  No.
6    MR JUSTICE ANDREW BAKER:  —— is one thing and is one
7    potential intellectual exercise.  It may or may not be
8    different whether as produced as part of a package with
9    a descriptor in the form that says this is my evidence
10   of something, the application package says, taken as
11   a whole, something that may or may not be capable of
12   being spelt out in the same way from the credit advice
13   note on its own ——
14   MR RABINOWITZ:  I completely accept that.
15   MR JUSTICE ANDREW BAKER:  —— which may not matter in the
16   case of some defendants.  Given their relevant roles, it
17   may matter more for some other defendants.
18   MR RABINOWITZ:  Your Lordship is right.  There may be
19   defendants who know absolutely nothing about the context
20   and who see something like this without knowing anything
21   about the context and think —— subject to one point
22   which I will come to —— well, what is wrong with that,
23   there is a custodian who is making these entries on my
24   behalf.  The tax point is slightly problematic even for
25   those defendants if —— well, one doesn't know what else

111

1    they know.
2    MR JUSTICE ANDREW BAKER:  Yes.
3    MR RABINOWITZ:  Very different question, as your Lordship
4    puts to me as well, where you know the context in which
5    this is being produced.
6    MR JUSTICE ANDREW BAKER:  Yes.  Or may be.  Yes, I see that.
7    MR RABINOWITZ:  So with respect, I largely go along with
8    what your Lordship says other than the tax point, it
9    seems to me, even for ——
10   MR JUSTICE ANDREW BAKER:  All right, thank you.
11   MR RABINOWITZ:  I wonder whether that is a convenient ...
12   MR JUSTICE ANDREW BAKER:  Oh yes, thank you.  Yes.  On the
13   basis, as before, that if we all try and go on digital
14   devices of some sort that have likely got the same and
15   an accurate time and not the clock on the wall that is
16   running a bit fast, we will try to resume at 2 o'clock.
17   Thank you very much.
18   (1.02 pm)
19        (The short adjournment)
20   (2.00 pm)
21   MR JUSTICE ANDREW BAKER:  Yes, Mr Rabinowitz.  Thank you.
22   MR RABINOWITZ:  My Lord, I'm grateful.
23       My Lord, I have shown you the three documents that
24   form part of the WHT applications: cover letter, tax
25   reform fund and the advice notice.

112

Confidential                                                                       SKAT_MDL_001_00834779

1    MR JUSTICE ANDREW BAKER:  Yes.
2    MR RABINOWITZ:  Your Lordship obviously is aware that there
3        was more than one tax agent and more than custodian and
4        that there are other versions of the same type of
5        document.  I wonder if I can just quickly show your
6        Lordship some of those.  They are all in  slightly
7        different language, slightly  different formats.
8    MR JUSTICE ANDREW BAKER:  Yes.
9    MR RABINOWITZ:  But as your Lordship will see, they are all
10        riffs  on the same tune, if we can put it that way.
11            If we go to look at some of the other tax agent
12        cover letters ,  if we first  take an Acupay example
13        {R2/13/1}.  Thank you.  So this is the cover letter from
14        Acupay for sample trade Solo 2, and your Lordship sees
15        from the first  paragraph this says that what is attached
16        is "a reclaim application to obtain a  full  refund of
17        Danish dividend tax".  Again, we would suggest, implying
18        that some Danish dividend tax has in fact been paid to
19        SKAT which is to be refunded by SKAT.
20            If I can then show your Lordship examples of the Koi
21        and Syntax letters, they are the other tax agents, we
22        can see an example of Syntax if we go to {R8/19/1}.
23        Thank you very much.  If your Lordship looks at the
24        first  paragraph here, your Lordship sees the reference
25        to this being "a reclaim  application" in the context of

                                113

1        a double taxation treaty  between the US and Denmark:
2            "...  for a complete refund of Danish Dividend Tax
3        that was previously withheld~..."
4            And then if we can look at the Koi  letter ,
5        {R19/13/1}.  Thank you.
6            Again, as your Lordship sees,  this  again refers to
7        seeking:
8            "...  a complete refund of Danish Dividend Tax that
9        was previously withheld in  relation to their
10        investments."
11            If I can then show your Lordship other credit advice
12        notices, and if I can just start with the other three
13        Solo custodians.  If we can go first  to an example of
14        a WPD CAN  for sample trade Solo 15, we have that
15        at {R15/13/1}.  So West Point.
16    MR JUSTICE ANDREW BAKER:  Yes.
17    MR RABINOWITZ:  And your Lordship sees the format is unique
18        to West Point but the information within it  is  familiar .
19        Again, in the context of giving advice about a credit ——
20        dividend credit for a client , therefore dividend credit
21        advice.  Your Lordship sees a reference to number of
22        shares and for good measure dividends per share, and it
23        then sets out payment details by reference to, as your
24        Lordship sees, gross dividend per share towards the
25        bottom of the page and next to that your Lordship sees

                                114

1        withholding tax deducted and then net dividend.
2            If I can then ask your Lordship to look at a Telesto
3        credit advice notice.  This goes to sample Solo 6.
4        {R6/25/3}.  Again, your Lordship sees the format is
5        different .  The categories of information are identical ,
6        save that it is  called a credit  advice rather than
7        a dividend credit advice.  Your Lordship sees that at
8        the top.  And your Lordship sees there is  still
9        a reference to withholding tax deducted.
10            The final Solo custodian, OPL, if we can look at
11        that, which relates to sample trade Solo 4, we have one
12        at {R4/19/3}, please.  Thank you.  Again, this has its
13        own unique format.  Information in it is  again identical
14        to WPD and Telesto, save that your Lordship sees it just
15        refers to tax rather than withholding tax deducted, and
16        it is  labelled "Income advice", rather than credit
17        advice or dividend credit  advice.
18            If we then look at custodian advice notices for
19        other custodians, if  we can go to Lindisfarne ——
20    MR JUSTICE ANDREW BAKER:  Just before we do that, one thing
21        you did invite  me in the reading list  to have looked at
22        in advance if I  had time was a sample of application
23        documentation —— sorry, a set of application
24        documentation for each of some of the sample trades, and
25        I  did do that.

                                115

1            Can I just  clarify  something about those collections
2        of documents.  It relates  to one of the ones you were
3        just showing me, I think.  If  we look at {R6/25/3}.
4    MR RABINOWITZ:  That is on the screen, I think —— no.
5    MR JUSTICE ANDREW BAKER:  That was the Telesto one, I think.
6        This is part of the example set of documentation with
7        a Telesto credit advice note.
8            If we just go on in that tab, we then get at page
9        {R6/25/6} the power of attorney confirming Acupay's
10        authority to submit the tax reclaim.  You have then got
11        page {R6/25/7}, the tax residency, tax—free status
12        certification .  In this case, it is  a Labuan entity so
13        it  comes in that form.
14            Then at page {R6/25/8} there is that, which goes on
15        for another nine or 10 pages.  I have no idea what that
16        is .  Is that in fact something that was submitted with
17        this?
18    MR RABINOWITZ:  So, my Lord, that is not what is submitted
19        to SKAT, this is an internal SKAT payment document.
20    MR JUSTICE ANDREW BAKER:  I guessed as much.  All I was
21        simply going to say, so you have heard it, and if
22        I  shouldn't  have done what I am about to say I have
23        done, somebody can tell me what I should do instead,
24        because of that, and because I could see myself going
25        back to these  little  clips of documentation repeatedly

                                116

1    during the course of the trial , I have saved for myself
2    copies of each of the sets of documentation that you
3    cited .    This is paragraph 6.1(a) of the reading list ,
4    where you referred me to where I would find these, so
5    I have downloaded and saved.  But in each case if
6    I found this sort of material at the back end, I have
7    removed it.  I'm hoping therefore that what I have then
8    created for my own purposes is a little clip of the
9    documents as presented to SKAT in each case.
10        I think I'm remembering, but I'm now going to let
11    you down by not remembering which one it was, but
12    one of the references in the reading list was to the
13    wrong tab, but I find what I needed.  I think it
14    might be Lindisfarne 1, where the wrong tab was given.
15    But there we are.  That is for completeness only.
16    MR RABINOWITZ:  We will see that right now because I am
17    about to take you to ––
18    MR JUSTICE ANDREW BAKER:  Good.  Thank you for that.  My
19    assumption was that was something that may have been
20    associated with that application but wouldn't be part of
21    the materials submitted and you have confirmed that,
22    thank you.
23    MR RABINOWITZ:  I did notice your Lordship looked at the
24    power of attorney, which is itself interesting and
25    I didn't take your Lordship to it , because it talks

117

1    about making reclaims of taxes, et cetera, but ...
2    MR JUSTICE ANDREW BAKER:  Yes, thank you.
3    MR RABINOWITZ:  Can I then just show your Lordship an
4    example of Lindisfarne and it is in relation to sample
5    trade Lindisfarne 1.
6    MR JUSTICE ANDREW BAKER:  Yes.
7    MR RABINOWITZ:  Your Lordship will have that {R19/13/3}.
8    MR JUSTICE ANDREW BAKER:  That is the one where in the
9    reading list it was said to be R21.
10    MR RABINOWITZ:  I apologise.
11    MR JUSTICE ANDREW BAKER:  I found it anyway because you said
12    it was Lindisfarne 1 so I could therefore find it .
13    MR RABINOWITZ:  So again the core details are the same as
14    your Lordship saw with the SCP CAN, albeit with the
15    addition of an ex–date on this form.
16    MR JUSTICE ANDREW BAKER:  Yes.
17    MR RABINOWITZ:  Although there is no introductory language
18    about crediting a payment representing the dividend, the
19    document is of course headed, "Dividend credit advice".
20    I'm not sure there is any other –– it does also refer to
21    tax again, not tax withheld, but just tax.
22        If we can then go to an example of Indigo, and this
23    relates to sample trade Indigo 1 {R24/19/3}.  Again,
24    your Lordship sees the presentation is slightly
25    different .    It contains the same details as

118

1    Lindisfarne 1, although here it is called the credit
2    advice dividend –– they take the three words and they
3    get mixed around somewhat –– instead of a dividend
4    credit advice.  Again, your Lordship sees the reference
5    to tax rather than withheld tax, et cetera.  But
6    otherwise pretty much the same.
7        In terms of Maple Point, if I can show your Lordship
8    the example for North Channel Bank, NCB 2, we have that
9    at {R22/80/3}.  Thank you very much.  Here, your
10    Lordship sees that the NCB CAN is labelled, "Dividend
11    credit for non–resident taxpayer status", and again it
12    is a different format from Indigo and Lindisfarne.  It
13    also contains some additional information in that it
14    gives holdings as at –– as a reference, that is actually
15    a reference to the declaration date, and like WPD and
16    the Telesto CANs it refers to tax deducted and indeed,
17    as your Lordship sees, "Dividend subject to withholding
18    tax".
19    MR JUSTICE ANDREW BAKER:  Yes.
20    MR RABINOWITZ:  And then if my Lord looks at the bottom of
21    this notification , your Lordship sees a statement that
22    this is "Not a tax certificate".
23    MR JUSTICE ANDREW BAKER:  Yes.
24    MR RABINOWITZ:  Now, we would respectfully suggest that
25    whilst there may have been some significance in that in

119

1    Germany, or for German tax purposes, NCB being a German
2    bank, it doesn't change the import of the
3    representations being made here. I understand that may
4    be said to be more significant than that by one of the
5    defendants but they will explain to your Lordship why
6    that is so.
7        So far as concerns the Klar Scheme, and their
8    custodian, as your Lordship knows, was Salgado ––
9    MR JUSTICE ANDREW BAKER:  Just before we go there, I haven't
10    looked at them in detail, am I right to remember that it
11    is NCB whose form and format of these credit advice
12    notes includes some Ts and Cs on the back?
13    MR RABINOWITZ:  Yes, that's right.
14    MR JUSTICE ANDREW BAKER:  Yes.
15    MR RABINOWITZ:  So Klar have as their custodian Salgado and
16    we have an example of that at {R16/6/4}.  Again,
17    different format.  The basic information is the same or
18    very similar, including the reference to there being
19    a tax amount, which is deducted from a gross dividend
20    that has led to the payment of a net dividend.  Your
21    Lordship sees that.
22        My Lord, those then are the relevant documents in
23    which the representations for which we contend are
24    found.
25    MR JUSTICE ANDREW BAKER:  Subject to this, Mr Rabinowitz,

120

Confidential

1    for completeness ——
2    MR RABINOWITZ:  Yes.
3    MR JUSTICE ANDREW BAKER:  —— I don't have in my head any
4        feel for proportionately the significance of these
5        examples to the whole, but your opening referred me to
6        the fact that some WHT refund claims were in fact
7        presented and processed by reference strictly speaking
8        to a predecessor form.
9    MR RABINOWITZ:  That's correct.  Your Lordship is right.
10   MR JUSTICE ANDREW BAKER:  Which is, as it happens, something
11       I had not previously been aware of at all because others
12       in court will remember the first time I looked at least
13       in some detail at this documentation really was in the
14       Goal tax back summary judgment argument and I think
15       I even exhibited a copy of the form 06.003 to that
16       summary judgment.  I think at that stage I —— it is not
17       criticism of anybody, I think I probably came away with
18       an understanding that we were always going to be looking
19       at that form, so I think it may have been your written
20       opening that first properly made me aware that, at least
21       to some extent, we might be looking at a different form.
22   MR RABINOWITZ:  Perhaps I should show that to your Lordship
23       because your Lordship has it in mind.  Just to explain
24       what that is, it was a form used I think in four of the
25       25 of the sample trades.  I note that for your Lordship.

121

1        It is Solo 1 and 9, Salgado 1 and 2.
2    MR JUSTICE ANDREW BAKER:  Yes.
3    MR RABINOWITZ:  If I could show your Lordship an example of
4        that, {R16/6/2}, and this is in fact Salgado 1, sample
5        trade Salgado 1.  Thank you very much.
6    MR JUSTICE ANDREW BAKER:  Yes.
7    MR RABINOWITZ:  Again, your Lordship sees that it is a form
8        which is entitled, "Claim to relief from Danish dividend
9        tax".
10   MR JUSTICE ANDREW BAKER:  Yes.
11   MR RABINOWITZ:  And in the second box your Lordship sees
12       that it refers to the owner/usufructuary of the said
13       shares or participants.  And I know there is a point
14       made by the DWF defendants about the reference to the
15       usufructs.  Again, I will leave it to my learned friends
16       to develop that if they want.  And then your Lordship
17       sees there are a number of headings, including column 2,
18       number of securities; column 7, total dividends;
19       column 8, percentage refund claims; column 9, refunds
20       claimed in Danish krone.  And then in the next box your
21       Lordship sees there is a place for certification for
22       payment of dividends and it says, as your Lordship sees:
23           "This is to certify that the dividends stated in
24       column 7 were paid after deduction of dividend tax—…"
25           Does your Lordship see on the left—hand side, there

122

1    is, "Attestation certification"?
2    MR RABINOWITZ:  Yes.
3    MR RABINOWITZ:  If your Lordship looks at the italicised
4        parts of that:
5           "Certification for payment of dividends—…"
6    MR JUSTICE ANDREW BAKER:  I have got there.
7    MR RABINOWITZ:  I'm grateful.
8    MR JUSTICE ANDREW BAKER:  So in this case, because this is
9        not a tax exempt example, this is a 15% example, you end
10       up with a certification in the form you have just stated
11       which is therefore on the face of things giving an
12       amount which will have been 27% of the gross dividend
13       amount.
14   MR RABINOWITZ:  Correct.
15   MR JUSTICE ANDREW BAKER:  Correct?
16   MR RABINOWITZ:  Correct.
17   MR JUSTICE ANDREW BAKER:  Which is then in fact different to
18       the refund amount claimed but that is because the refund
19       amount claimed is only the 12% excess of 15.
20   MR RABINOWITZ:  Your Lordship is right.  In terms of ——
21   MR JUSTICE ANDREW BAKER:  I think I picked up, but it may
22       just be one of those where by coincidence it happens to
23       be also an example of an instance where, perhaps without
24       going back to the applicant, something is assumed to be
25       an error and it is processed anyway.  But in one of the

123

1        examples you invited me to look at, I think for Solo 1,
2        which is on this form, that certification actually has
3        0.00 in it, even though there is in fact a claim made at
4        the full 27% deduction rate, and it may be, if it
5        matters, that that will be one where that was assumed to
6        be a claim on the basis of the full deduction or
7        clarification was sought, or whatever.  But there it is.
8        All right.  Thank you.
9    MR RABINOWITZ:  So I don't think there is anything else
10       I was going to say about that, my Lord, other than
11       obviously to note, as your Lordship will have picked up
12       anyway, that these refund forms would always have been
13       accompanied by a credit advice notice, which may have
14       made the position clearer.
15   MR JUSTICE ANDREW BAKER:  Yes.
16   MR JUSTICE ANDREW BAKER:  Can I then say something very briefly about
17       reliance.
18   MR JUSTICE ANDREW BAKER:  Sorry, no, for absolute
19       completeness, if and to the extent that at the end of
20       the trial this detail matters, does the older style form
21       have in it language equivalent to the statement in the
22       form 06.003 that says attaching evidence of dividend
23       payment or similar is mandatory?  You remember the bit
24       in italics to which you drew my attention?
25   MR RABINOWITZ:  I do.  I'm just quickly having a look.

124

1    I don't think it is, my Lord, in a way, no. I don't
2    think it has and I suspect what probably did the same
3    function was the attestation certification .
4    MR JUSTICE ANDREW BAKER: It may be that in practice, as far
5    as I'm concerned, as indicated by all the sample
6    examples, a credit advice note or dividend credit advice
7    was in fact always submitted but it may be that the form
8    itself did not say that providing something of that kind
9    is mandatory.
10   MR RABINOWITZ: Although, just looking at footnote 5 —— your
11   Lordship sees certificate of full payment of dividends
12   in the attestation certification that I showed your
13   Lordship. If your Lordship then looks at footnote 5
14   itself , leaving aside the Danish and just concentrating
15   on the English:
16       "Certification shall be given by the company,
17   financial institution or any other institution paying
18   the dividends stated in column 7."
19   MR JUSTICE ANDREW BAKER: Yes.
20   MR RABINOWITZ: So perhaps it did require —— the language is
21   "shall be given."
22   MR JUSTICE ANDREW BAKER: Yes, it is slightly odd, actually.
23   I mean —— we can come back to it. On the face of
24   things, what is described here as the certificate of
25   deduction of tax item, with a footnote 5, is that part

                          125

1    of the form that has to be signed on the bottom left.
2    MR RABINOWITZ: Yes.
3    MR JUSTICE ANDREW BAKER: Where there is a place for a dated
4    signature under that certification in respect of which
5    the footnote says that certification is supposed to have
6    been completed by —— it would be the equivalent of
7    Lindisfarne or Salgado or whoever it might be, and
8    actually that is not completed at all in this example,
9    but it might be said that in its place the dividend
10   credit advice is provided. I see that.
11   MR RABINOWITZ: Yes.
12   MR JUSTICE ANDREW BAKER: All right, thank you.
13   MR HEAD: My Lord, I hesitate to interrupt ——
14   MR JUSTICE ANDREW BAKER: If I am misreading that, then of
15   course.
16   MR HEAD: We think my Lord that the rubric you have just
17   been referring to underneath the signature, where it
18   says the certificate of deduction is to be given:
19       " ... by the company, financial institution or other
20   institution paying the dividends stated in column 7."
21       That to be a reference to the actual issuing
22   company, the company paying out the dividend. So it is
23   an old form.
24   MR JUSTICE ANDREW BAKER: I see, re.
25   MR HEAD: It was then passed —— following completion, there

                          126

1    may have been an apprehension that it would be passed on
2    for certification to the issuing company itself.
3    MR JUSTICE ANDREW BAKER: I see that way of reading it,
4    Mr Head. But are you nonetheless agreeing with me that
5    that —— in terms of the way in which the form is
6    structured, that appears to be intended to apply to the
7    little block on the bottom left and that, where here
8    there is in fact an uncompleted signature line, as
9    drafted this form is calling for a signature in that
10   place as being the attestation signature?
11   MR HEAD: My Lord, yes.
12   MR JUSTICE ANDREW BAKER: As distinct from the signature
13   bottom right, which is Goal as submitting agent signing
14   the form as a whole.
15   MR HEAD: Indeed.
16   MR JUSTICE ANDREW BAKER: Yes.
17   MR HEAD: Just while I am on my feet, my Lord, and apologies
18   to Mr Rabinowitz, we agree that this form does not
19   require any documentation to be sent along with it. The
20   reason for which —— although in fact there are examples
21   of where forms did accompany them, but the reason why it
22   did not require that is because details of the dividend
23   and deductions were in the central part of the form, in
24   other words above the attestation, in contrast to the
25   later 003.

                          127

1    MR JUSTICE ANDREW BAKER: I see that, yes. Thank you. That
2    is very helpful.
3        Yes, Mr Rabinowitz.
4    MR RABINOWITZ: Thank you. So just saying something very
5    briefly about reliance.
6    MR JUSTICE ANDREW BAKER: Yes.
7    MR RABINOWITZ: Your Lordship will no doubt be aware of
8    a lively debate in recent years, both in some
9    authorities , and indeed also in some of the academic
10   writings , about whether there is an additional
11   requirement in the context of reliance that the claimant
12   must at least in some circumstances show that it gave
13   contemporaneous conscious thought to the fact that some
14   representations were being impliedly made.
15       We have addressed some of the authorities. Your
16   Lordship has seen them. I'm not going to get into the
17   detail of them. It is interesting . Your Lordship is
18   aware, or may not be aware, that there has been an even
19   more recent authority than the one we have referred to
20   there, so the debate carries on. This one was handed
21   down by Mr Justice Zacaroli in a case called Farol
22   Holdings v Clydesdale Bank. We have that —— I'm not
23   inviting —— perhaps I will invite your Lordship to look
24   at it very briefly , it's at {MAC/104/1}.
25   MR JUSTICE ANDREW BAKER: As we speak, then, as far as you

                          128

Confidential                                                    SKAT_MDL_001_00834783

1    are aware, at least chronologically speaking this is
2    currently the last word on the topic?  It may or may not
3    be the last word on the topic in terms of authority
4    ultimately, but this is the most recent description.
5    MR RABINOWITZ:  Yes, although things move fast in this
6       particular debate.  I know things move fast, but there
7       is a lot being said about it, it doesn't really move
8       (inaudible) very much when you stand back.  But
9       19 March, and Mr Justice Zacaroli deals with this really
10      beginning at paragraph 220 at page {MAC/104/46}.
11   MR JUSTICE ANDREW BAKER:  Thank you.
12   MR RABINOWITZ:  So perhaps to read to your Lordship,
13      Mr Justice Zacaroli expresses in perfectly clear terms:
14       "There was some debate, particularly in the parties'
15      written submissions, as to whether there is a distinct
16      requirement in all cases that the representation must be
17      'actively present' to the representee's mind, or that
18      the representee must have given 'contemporaneous
19      conscious thought' to the representation at the time it
20      was made.  This is a question that has been given
21      extensive recent consideration in –..."
22      The Leeds case, Loreley and Crossley v
23      Volkswagen by Mr Justice Waxman.
24      "The issue identified in the relevant passages in
25      those cases was that sometimes the court has found that

1    a misrepresentation was relied on, apparently without
2    a finding that the representee gave conscious or active
3    thought to the representation (see for example the cases
4    [cited in Loreley]).   An extreme example {discussed from
5    ... Leeds} is the –..."
6      Over the page, thank you, {MAC/104/47}:
7      "... representation by a diner at a restaurant, made
8    by the conduct of ordering a meal, that they have an
9    intention to pay for it ..."
10    Sorry –– thank you very much:
11    "... that they have an intention to pay for it ..."
12    And then there is a reference to Ray, a criminal
13    case, but often cited in the cases dealing with the
14    misrepresentation in civil law:
15    "It is highly unlikely that the waiter who took the
16    order gave any thought to whether such an implied
17    representation was being made.
18    "As Cockerill J noted [in Loreley], the cases in
19    which inducement has been found without distinct
20    evidence of understanding or awareness are where the
21    representation is simple and cannot be missed by the
22    representee, and where it is at the heart of the
23    transaction.  In such cases, it might be said that the
24    fact represented, albeit implied from some other conduct
25    or statement, is so obvious it goes without saying.

1    Unless, therefore, the representee actively thinks about
2    it and decides not to rely on it, it might be said that
3    it goes without saying that the representee relied on
4    it.  That would explain, for example, cases where
5    someone who gives their opinion on a matter –– where the
6    facts are not equally known by both sides –– may be held
7    to make an implied statement that he knows facts which
8    justify his opinion."
9      And there is a reference to Smith v Land and House:
10    "It will be rare, if ever, that a representee thinks
11    further than that they trust the person giving the
12    opinion and assume that he knows facts which support it.
13    Yet the court is unlikely to require evidence that the
14    representee actively thought at the time that the
15    representation was being made."
16    Paragraph 223, if I could just show your Lordship
17    that:
18    "I doubt the utility (as did Cockerill J) of
19    breaking down this causation question into distinct
20    elements and seeking to find a single universally
21    applicable test for those elements.  It is essential to
22    keep in mind that in every case it is necessary to show,
23    as a matter of fact, that the claimant's decision to
24    take the action (or refrain from taking action) which
25    caused it loss must have been caused by the

1    representation made by the defendant.  The evidence
2    required to satisfy that requirement will differ greatly
3    depending on where on the spectrum the case lies (from
4    'it goes without saying', at one end, to a complex
5    representation said to be implied from conduct and
6    statements, at the other)."
7      Then I'm not going to get into what was said ––
8   MR JUSTICE ANDREW BAKER:  Apart from anything else, there
9    are lots of aspects to that, and at the risk of getting
10    metaphysical or neurological or something or other on
11    a Monday morning in a Commercial Court trial, one aspect
12    of that entire debate is that the court can recognise,
13    at least as a distinct possibility, depending on the
14    circumstances, that the making of a statement or conduct
15    which we as lawyers would analyse in terms of
16    a statement carrying with it an implication or conduct
17    conveying a certain thing by implication can in fact
18    operate upon somebody's mind without them being
19    conscious of the fact that that is what is happening to
20    them.  Thus the waiter, if they were stopped and asked:
21    are you only serving this chap because you are assuming
22    he is intending to pay for it?  He is almost certainly
23    going to say yes.  Why are you making that assumption
24    they might in some respects actually struggle to
25    articulate, depending on their sophistication and

Confidential

1    whether English is their first language.
2  MR RABINOWITZ: They might just ask you what you want for
3    your meal and to stop bothering them because it is so
4    obvious. My Lord, we say this is that sort of case, my
5    learned friend ——
6  MR JUSTICE ANDREW BAKER: Or it may or may not be, because,
7    as I understand it, you also make a submission which we
8    will not go into any detail but it will be one thing
9    I will need to think about much later in the case, that
10   there can be, as it were, staged reliance, so that you
11   can have a case in which you can design a system that
12   says, which may in itself be a degree of box—ticking
13   that doesn't involve much conscious thought, if you
14   receive X, Y, Z, take action accordingly. That can be
15   instructions to human operators who are then doing that,
16   but if the reason you set that system up is because you
17   have formed the view that —— for example an application
18   form, that if an application form has been filled in in
19   a certain way, that will be indicating certain
20   information that I'm happy to say is sufficient for
21   action to be taken, it is effectively that system design
22   coupled with the operation of that system at least
23   potentially might give rise to a finding of reliance,
24   although at the point of processing each individual
25   application you might not be able to say that the

                                133

1    processor is actively looking at the material that we
2    will analyse in terms of the making of representations
3    and saying to themselves: am I being given
4    a representation by this person?
5  MR RABINOWITZ: Indeed.
6  MR JUSTICE ANDREW BAKER: Or something equivalent to that.
7  MR RABINOWITZ: Your Lordship's analysis of course explains
8    the point that is made in some of the writings about if
9    you are going to have to have active consideration each
10   time, what about some —— it's effectively an automated
11   process where the process has been set up, there is not
12   a human being that is looking at it at that point.
13  MR JUSTICE ANDREW BAKER: It does mean it ends up becoming,
14   whatever else is true, a very fact—sensitive matter
15   where therefore it may or may not be important to get to
16   the bottom of some of the more esoteric legal debates
17   depending on what ultimate findings of fact I'm finding
18   myself making in terms of how SKAT actually did or did
19   not operate, did or not give conscious thought to
20   things, at what stage in the process, and so on.
21  MR RABINOWITZ: We do make in that context —— and I'm not
22   treading back from anything your Lordship has said, we
23   do in that context also rely on what I think
24   Mr Justice Zacaroli said, he was really trying to
25   explain the waiter example, about there being cases

                                134

1    where the position is just so simple and obvious that
2    there will be a reliance on implied representation, that
3    you don't need the metaphysical debate that may be
4    entailed in the active conscious consideration type
5    point. And we —— as your Lordship said, it may or may
6    not be the case but our case is that actually this is
7    a case where it is obvious. If someone is applying for
8    a tax refund, there is a representation that some tax
9    has been withheld, but we will get there in the next
10   year.
11  MR JUSTICE ANDREW BAKER: Yes, all right. Thank you.
12  MR RABINOWITZ: Slowly. So I was then going to just say
13   this, my Lord, about the centrality of
14   misrepresentations and I touched on it when I described
15   the overall shape of the case, but I do need to just
16   address a point which is made by some of the defendants,
17   namely the suggestion that all of the causes of action
18   advanced by SKAT are, so it is said, dependent on SKAT
19   establishing each of the requirements for an English law
20   deceit claim.
21      With due respect to my learned friends, that is
22   largely correct, but it is subject, we would
23   respectfully submit, to four caveats or exceptions,
24   which I shall just identify, just so my learned friends
25   at least know what we say about this as well.

                                135

1      The first and most obvious caveat is that if Danish
2    law applies, and in a sense this goes back to an
3    exchange your Lordship and I had; if Danish law applies,
4    as alleged by a number of defendants, then plainly it
5    will not be necessary for SKAT to satisfy your Lordship
6    in respect of all the requirements of an English law
7    cause of action for deceit. And in a way that is an
8    obvious point.
9      The second caveat is where the claim is based on
10   mistaken payment. Now, where a claim is based on
11   a mistaken payment, that is to say if you have a claim
12   in restitution or unjust enrichment, depending on what
13   you want to call it, the law does not require the
14   mistake to have been induced by a misrepresentation. It
15   doesn't really matter what the reason is for the
16   mistake, it could be negligence on the part of the
17   person making the mistake, it could be induced by
18   nothing at all other than their own negligence.
19      What matters there is that there is a mistake which
20   causes the payment to be made. And obviously claims in
21   unjust enrichment restitution are distinct from claims
22   in misrepresentation, and there are claims in unjust
23   enrichment restitution in this case, which do not depend
24   upon establishing a misrepresentation. They do
25   obviously depend on establishing that a mistake was

                                136

1    made.
2    MR JUSTICE ANDREW BAKER: I hear and understand that as
3        a statement in the abstract.  Is it correct, though,
4        that as pleaded ——
5    MR RABINOWITZ: Yes.
6    MR JUSTICE ANDREW BAKER:   —— SKAT has pleaded
7        simplicitor : we made payments that were mistaken in the
8        sense that they were payments of —— payments that so far
9        as SKAT was concerned were or were supposed to be
10       refunds of tax that had been paid and in fact there had
11       not been tax paid and without more we therefore have
12       a claim?
13   MR RABINOWITZ: I hope I'm going to answer your Lordship's
14       question, but can I answer it in this way and your
15       Lordship will say if I haven't.
16           SKAT does plead that it made mistaken payments, but
17       what it does also plead is that it made those mistaken
18       payments because of the misrepresentation.
19   MR JUSTICE ANDREW BAKER: Yes.
20   MR RABINOWITZ: Because the misrepresentation part of that
21       allegation plea is unnecessary, so it doesn't really
22       matter why they made the mistake, if they made the
23       mistake, they made the mistake. In our respectful
24       submission —— I mean, I'm only spending time on this for
25       the sake of completion, because in my respectful

137

1    submission we will make out a misrepresentation case.
2    MR JUSTICE ANDREW BAKER: I follow that so far as it goes.
3    MR RABINOWITZ: Indeed. But I do want ——
4    MR JUSTICE ANDREW BAKER: But you understand that a reason
5        why from time to time you may find your trial judge's
6        antennae just buzzing a little over what causes of
7        action are actually pleaded, as distinct , it might be,
8        from what causes of action could in theory exist but may
9        or may not be the causes of action SKAT has chosen to
10       plead, is that for example I am not clear in my mind,
11       and if we have to go there, we would have to go there,
12       whether the Supreme Court's decision decides that
13       a simple mistake claim that says on the part of a tax
14       authority: without reference to the basis of the mistake
15       we have in error paid out a tax refund that was not due,
16       whether there is actually a decision in the case that
17       that is not subject to the Revenue Rule.
18   MR RABINOWITZ: I understand ——
19   MR JUSTICE ANDREW BAKER: I'm not suggesting by raising that
20       that I would form a view that it was subject to the
21       Revenue Rule, but whether ——
22   MR RABINOWITZ: I understand.
23   MR JUSTICE ANDREW BAKER:  —— that isn't quite how SKAT has
24       ever pleaded its case —— that then has the consequence
25       that it is not covered by the Supreme Court. It would

138

1    then have the further consequence that it would then, in
2        theory, be open to the defendants to defend that claim
3        on the basis that it is of an argument that that gets
4        caught by the Revenue Rule, notwithstanding the Supreme
5        Court's decision, for example.
6    MR RABINOWITZ: My Lord, that is very clear. I am well
7        forewarned and we understand why your Lordship's
8        antennae are up about it.
9    MR JUSTICE ANDREW BAKER: It is not necessarily for the sake
10       of shutting out a possible claim rather than being
11       careful as to whether, if it is in play, that its being
12       in play has other ramifications.
13   MR RABINOWITZ: I entirely understand what your Lordship
14       said.
15           Anyway, that is our second caveat, subject to your
16       Lordship's caveat ——
17   MR JUSTICE ANDREW BAKER: My caveat to your caveat. Yes.
18   MR RABINOWITZ: I'm not sure that I need to even mention
19       this , but obviously the proposition that you do not need
20       a misrepresentation for a mistake claim is one which is
21       supported by Supreme Court authority.  That is Pitt v
22       Holt.  I'm not going to say any more about it, because
23       if there is a debate about it, I don't think it is going
24       to be at that point.
25           The third caveat is that whilst it may be necessary

139

1    to establish deceit against some defendants for the
2        purposes of the English law conspiracy claim, it is not
3        necessary to establish deceit against all the defendants
4        for that purpose.  What I mean by that, my Lord, is
5        this : some defendants may be liable for conspiracy even
6        if they are not or could not be made personally liable
7        for any of the misrepresentations, because, for example,
8        their knowledge of the deception of SKAT by others made
9        it appropriate that they should be regarded as part of
10       the conspiracy even though you could not find that they
11       actually made the misrepresentation.
12           Equally, they may be responsible for other acts
13       carried out as part of the conspiracy, since removed
14       from the primary making of the misrepresentations, such
15       as for example money laundering.  That is to say the
16       distribution of money thereafter.  And those claims,
17       whilst they may depend upon someone being found liable
18       for the fraudulent misrepresentation, do not require
19       those defendants to be made liable for it .
20           The final caveat I want to identify , my Lord,
21       is that SKAT does have an alternative claim against
22       Lindisfarne for negligent misrepresentation, and that is
23       a bit like the first of the ones, it is not the primary
24       caveat, but I should identify that.
25   MR JUSTICE ANDREW BAKER: Yes.

140

Confidential                                                   SKAT_MDL_001_00834786

April 15, 2024                 Skatteforvaltningen v Solo Capital Partners LLP & Others                 Day 1MT

1    MR RABINOWITZ:  That was all I was going to say about, at
2       this stage, the misrepresentation part of the case.
3    MR JUSTICE ANDREW BAKER:  Yes.
4    MR RABINOWITZ:  My Lord, what I was going to do next is to
5       move to say something about the Solo Scheme —— as I have
6       said earlier,  it  was the most important of the three
7       schemes —— and really to take your Lordship through
8       a series of schematics we produced which are really
9       there to assist your Lordship in seeing where everyone
10      fitted  into the picture.  I don't think they have yet
11      been handed out but I think the defendants have all got
12      them and they are, I think, in the electronic version,
13      but we have A3 copies.
14         I'm going to take your Lordship through this, just
15      to identify  how things work, and there are five pages
16      for Solo and then there are —— we have schematics for
17      the other schemes as well.
18         Before I launch into the schematic, can I mention
19      two other documents which your Lordship has in addition
20      to  all the written openings, where your Lordship will
21      have a good list of who is involved and what it is  said
22      that they do.
23         Your Lordship has the dramatis personae.
24   MR JUSTICE ANDREW BAKER:  Yes.
25   MR RABINOWITZ:  At {A/93/1} and your Lordship also has

141

1       a schedule of key fact documents which is at {A/94/1}.
2       Again, they will be —— your Lordship may find those from
3       time to time very helpful in  identifying  which defendant
4       is said to be involved in what.
5          As I said,  my Lord, the purpose of these schematics
6       is again intended to be neutral and intended to simply
7       identify  schematically where people fit in.
8          They are online or on the electronic bundle at
9       {F/391/1}.  Your Lordship has, I hope, now got the A3
10      versions.
11   MR JUSTICE ANDREW BAKER:  I have, thank you.
12   MR RABINOWITZ:  So if I can just take your Lordship through
13      this ——
14   MR JUSTICE ANDREW BAKER:  I can say without necessarily
15      claiming that I  will  have taken on board all of the
16      detail, I  had identified  and downloaded and looked
17      a little  at copies of I think all five of these, if
18      there are five of them.  So just checking, there is one
19      relating to  —— or, yes, relating to where different
20      parties  fitted  in, SKAT says, to the Solo Scheme, one
21      for the Maple Point Scheme, one for the KLar Scheme, and
22      then separately diagrams relating to Varengold Bank and
23      Dero Bank, which I understand is relating to the
24      investment activity to acquire interest in those banks,
25      rather than anything directly to do with the trading

142

1       patterns.
2    MR RABINOWITZ:  Correct, yes.
3    MR JUSTICE ANDREW BAKER:  Thank you.
4    MR RABINOWITZ:  So your Lordship has these and your Lordship
5       has looked at them and it may be I can take them more
6       quickly than I otherwise would.  If  I  am going too
7       slowly or too fast, your Lordship will  say so.
8    MR JUSTICE ANDREW BAKER:  Thank you.
9    MR RABINOWITZ:  Looking at the first slide, and again we can
10      move thorough this fairly quickly, that is intended to
11      identify  for your Lordship the four Solo custodians.
12   MR JUSTICE ANDREW BAKER:  Yes.
13   MR RABINOWITZ:  These are obviously the organisations which
14      produced the CANs which supported the Solo applications.
15      Just to add some flesh to the bones, as your Lordship
16      sees, taking them in some sort of chronological order,
17      SCP, the third custodian in the row, was a custodian
18      from 2012—2015.  OPL, the last one in the row,
19      from August 2014 to May 2015.
20         Telesto, the second of the custodians shown, was
21      from February 2015 to May 2015, and WPD, the first
22      custodian in the row, from February to May 2015 as well.
23         Each of the custodians is a defendant to these
24      proceedings but as your Lordship may recall, the claims
25      against them are stayed because they are all in

143

1       administration.  For your Lordship's note, the
2       reference, we don't need to go to that, is at
3       {C/14.1/1}.
4          Can I ask your Lordship, please,  if you would, to go
5       to {B/6.1/1}, and if we can just open that, please.
6       Okay.  So this is  —— your Lordship may have not seen
7       this before, it  is the master application spreadsheet.
8       Just so your Lordship knows the status of this,  none of
9       the active defendants have taken issue with the
10      spreadsheet, but it  effectively  is a spreadsheet which
11      has information relating to all the applications for
12      which SKAT paid out.
13         Now, the application ——
14   MR JUSTICE ANDREW BAKER:  So this is the master schedule as
15      attached to the particulars of claim, just listing out
16      all of the applications paid by SKAT individually making
17      up between them the universe of claims.
18   MR RABINOWITZ:  Precisely.  It is simply so that your
19      Lordship has that factual information, which is useful
20      when you want to get a sense of who was responsible for
21      doing what or how much, if I can put it that way.
22         Now, this spreadsheet can be a bit fiddly  and rather
23      than taking up time trying to find the right parts,
24      subject to your Lordship, I  think this has been agreed
25      with the other parties , Mr Goldsmith is going to take

144

Confidential                                                                      SKAT_MDL_001_00834787

1    responsibility  for operating the spreadsheet to get us
2    to the right place as quickly as we can.  If he doesn't
3    do it well, we can sack him and get someone else to do
4    it.
5         But if your Lordship looks first  at column K — he
6    will sack me before that happens, I can tell you.
7         If you look at column K, my Lord, your Lordship
8    sees, Mr Goldsmith is doing this, you can use the  filter
9    arrow at the top left —hand column to limit it to the
10   Solo custodians, which I think Mr Goldsmith has done.
11   MR JUSTICE ANDREW BAKER:  Yes.
12   MR RABINOWITZ:  And you can then highlight column D and what
13       that enables you to see, looking at the bottom
14       right—hand side ——
15   MR JUSTICE ANDREW BAKER:  I see, yes.
16   MR RABINOWITZ:  —— is the total sum that was paid out in
17       respect of Solo applications from those four platforms.
18   MR JUSTICE ANDREW BAKER:  Yes.
19   MR RABINOWITZ:  So you get the figure there of just under
20       6 —— is it — 9.025 billion Danish krone, that is
21       £1.077 billion, approximately.
22   MR JUSTICE ANDREW BAKER:  Yes.
23   MR RABINOWITZ:  That was also the total amount paid out by
24       SKAT by way of purported tax refunds in response to the
25       Solo applications.

1         If we then  filter  column K to limit it to Solo
2    Capital Partners, so looking now at each of the
3    custodians separately.
4    MR JUSTICE ANDREW BAKER:  Yes.
5    MR RABINOWITZ:  So we limit to Solo, we highlight D, and
6        that shows the amount of WHT claimed and paid by SKAT in
7        response to SCP CAN Solo applications, and again your
8        Lordship sees at the bottom, krone 5.440 billion.
9    MR JUSTICE ANDREW BAKER:  Yes, yes.
10   MR RABINOWITZ:  £649 million, approximately.  And then if
11       we do the exercise again for OPL, by filtering so it is
12       only OPL, and we again highlight D —— you've done that
13       already that's very good.  Your Lordship sees
14       1.84  billion  Danish krone in respect of OPL CANs, if
15       I can put that way.
16       If we do that again for Telesto, highlighting column
17       K and highlighting column D, and again your Lordship
18       sees 920 million Danish krone there, 110 million for
19       Telesto CANs.
20       If we then go back to column K and we filter it for
21       WPD, West Point, again highlighting D, your Lordship
22       seeing the figure at the bottom of 881 million krone,
23       £105 million.
24       Since we have the master spreadsheet open, it might
25       just be worth showing your Lordship the split of Solo

1    applications between 2012—2013 and 2014—2015, and your
2    Lordship will see the reason for this  if we do that.  If
3    we go back to column K and we select all four
4    applicants, all four Solo custodians, and we go back to
5    column I, 2012—2013, your Lordship will see that throws
6    up a figure, right—hand bottom, of 719 million krone,
7    that is  £85.8 million out of a total of 9.025 billion
8    Danish krone, and that is 8%, my Lord.  So if you break
9    it down, we will do the figure again, but it is  8% in
10   20112—2013 and 92% in 2014—2015, and that gives your
11   Lordship a sense of how the scheme accelerated over
12   time.
13       I don't think we even really need to do it for the
14   other pair, because one assumes the spreadsheet will
15   produce the 92% figure, your Lordship sees at the bottom
16   there 8  billion —odd Danish krone, that is  £992 million,
17   which is 92%.
18   MR JUSTICE ANDREW BAKER:  I envisage, since all that
19       information is there in a spreadsheet and it looks as if
20       there are members of your team that know how to work
21       spreadsheets, and even if there aren't members of the
22       team who are this able to work spreadsheets, I'm sure
23       there are somewhere, on the basis that to at least an
24       external pair of eyes sometimes pictures paint more
25       words and more quickly than lots of words, in due course

1    at some point in the case —— I'm now looking all the way
2    ahead to what might even be useful to have in a future
3    judgment, whatever the decision on the different  issues
4    might be ——  some of that I'm sure could be illustrated
5    by graphs rather than by descriptions.
6    MR RABINOWITZ:  Definitely.  It is much clearer.
7    MR JUSTICE ANDREW BAKER:  The graphs by numbers of
8        applications  made against time.
9    MR RABINOWITZ:  Definitely.
10   MR JUSTICE ANDREW BAKER:  Either in aggregate, broken down
11       across the three different  schemes, and so on, and
12       value.  Not to excess, but a few as (inaudible —
13       overspeaking).
14   MR RABINOWITZ:  It will not be difficult to do, we just have
15       our graphs for each scheme and we will produce those for
16       your Lordship, certainly  long before closing.
17       So that is that.  If we then go on to slide 2,
18       page 2 of this.  It is  slightly  more complicated ——
19       well, not slightly ; much more complicated.
20   MR JUSTICE ANDREW BAKER:  Sorry, and that pattern ——
21       obviously this is  not a precise match to the breakdown
22       you just showed me, with Mr Goldsmith's help, between
23       the ex—date cut—offs but that pattern of an accelerating
24       volume and value of refund claims being made by what you
25       call  the Solo Scheme explains why, when one gets to, for

Confidential

1  example, the DWF defendants, your total claim alleged
2  against them as regards participation in the Solo Scheme
3  is proportionately a modest percentage of the
4  Solo Scheme total, even though it still is a very large
5  number in absolute terms.
6  MR RABINOWITZ:  Indeed.
7  MR JUSTICE ANDREW BAKER:  Yes.
8  MR RABINOWITZ:  I mean, one of the stories of this case
9  which emerges as you look into the detail is that
10  everyone involved —— not everyone.  At some point people
11  realise they could make money by going off on their own.
12  So they start with Solo and everyone thinks: well, this
13  is good, but why am I sharing what I am having to share
14  with X or Y, Mr Sanjay Shah, why don't I do something of
15  my own?  You get to the applicants themselves, which we
16  will in due course, who get introduced by someone, at
17  some point the applicants, some of them, think why are
18  we doing it through the introducer or through people,
19  which means that our cut of what we are getting is X,
20  whereas if we sign directly with Sanjay Shah, it will be
21  X plus whatever it is per cent.  That is the story of
22  this case, as your Lordship sees, because everyone
23  thinks this is fantastic, why don't we do this and make
24  more for ourselves.
25      So the Maple Point people split off to do it

149

1  themselves at a time when the Solo Scheme starts really
2  accelerating.
3  MR JUSTICE ANDREW BAKER:  Yes, thank you.
4  MR RABINOWITZ:  So we have slide 2 open.  Your Lordship will
5  also find this online or electronically at {F/391/2}.
6  MR JUSTICE ANDREW BAKER:  Yes.
7  MR RABINOWITZ:  What your Lordship sees on this slide is
8  that in addition to Solo custodians, who are still there
9  in blue, we also show in orange the owners and other
10  relevant persons associated with the Solo custodians.
11  MR JUSTICE ANDREW BAKER:  Yes.
12  MR RABINOWITZ:  If I can just take your Lordship through
13  this relatively briefly, starting with Mr Sanjay Shah,
14  your Lordship sees him shown in the top right—hand
15  orange box.
16  MR JUSTICE ANDREW BAKER:  Yes.
17  MR RABINOWITZ:  And that is because, as is admitted by the
18  SS defendants' written openings at paragraph 164, we
19  don't need to turn that up, Sanjay Shah was the ultimate
20  beneficial owner of all of the four Solo custodians, as
21  well as the various corporate SS defendants that we list
22  here that you find between him and the custodians,
23  including immediately below Mr Sanjay Shah, your
24  Lordship sees SCL and AESA, and then a level down your
25  Lordship sees Solo Holdings and then in the middle of

150

1  the slide, just moving to the left of the slide, your
2  Lordship sees an entity called Elysium Global.
3  MR JUSTICE ANDREW BAKER:  Yes.
4  MR RABINOWITZ:  Then to the left of that your Lordship sees
5  another Elysium entity called Elysium Dubai.  Does your
6  Lordship see that, to the left and down?
7  MR JUSTICE ANDREW BAKER:  Yes.
8  MR RABINOWITZ:  And then further to the left of that your
9  Lordship sees also Treefrog, which was formerly known as
10  Arche Cayman, and also Ganymede, which is a company
11  which looms large in the story.
12  MR JUSTICE ANDREW BAKER:  Yes.
13  MR RABINOWITZ:  Sanjay Shah also admits, as your Lordship
14  may have picked up, that he was also the ultimate
15  beneficial owner of what we call the conduit companies,
16  that is further to the left and down, and I will come
17  back to those shortly as well.  You see them as ACAI,
18  Fire, Philo and Parla.
19  MR JUSTICE ANDREW BAKER:  Yes.
20  MR RABINOWITZ:  It is also not in dispute that not only was
21  Sanjay Shah the ultimate owner but he was also —— this
22  is admitted by the SS defendants in their opening —— he
23  was also the controlling mind of all of these companies.
24  That is at paragraph 165 of the SS defendants' written
25  opening.  Again, I don't invite your Lordship to go

151

1  there yet but it is {F/382/66}.
2      The position with respect to control of the Solo
3  custodians is a little bit more complex.  Not much, but
4  a little bit more, because Sanjay Shah admits that he
5  was the CEO of SCP, so the one second to the right,
6  until January 2014.  It is a blue custodian.  And in
7  2014, January 2014, Ms Stratford took over the role of
8  CEO of SCP.
9  MR JUSTICE ANDREW BAKER:  Yes.
10  MR RABINOWITZ:  That for your Lordship is identified in the
11  list of common ground points at paragraph 14(b) we don't
12  need to go there, {A/42/14}.  But as my Lord may have
13  picked up, there is a slight dispute as to whether
14  Ms Stratford, even after she became CEO, continued to
15  act on Sanjay Shah's directions and instructions even
16  though she had replaced him as CEO.  We will have to get
17  into that with the witnesses in the evidence.
18      There is also a similar dispute as to Sanjay Shah's
19  role in connection with the three other custodians, WPL,
20  OPL and Telesto, and again those are matters that are
21  going to need to be explored with the witnesses.
22      My Lord, I can't recall when you said you wanted to
23  take the afternoon break.
24  MR JUSTICE ANDREW BAKER:  As near as a convenient point
25  allows it to 3 o'clock.

152

April 15, 2024    Skatteforvaltningen v Solo Capital Partners LLP & Others    Day 1MT

1    MR RABINOWITZ:  I think now then would be a mid—point.
2    MR JUSTICE ANDREW BAKER:  Very good.  Let's take the break,
3        then and as I said  this  morning, because we have
4        a  slightly  shorter  sitting  afternoon, deliberately  so,
5        if  we try to keep the afternoon break to the minimum we
6        can  all  manage, just to stretch legs and take a comfort
7        break if  we need it.
8            Five minutes or so.  Thank you.
9    (2.57 pm)
10                    (A short break)
11    (3.04 pm)
12    MR JUSTICE ANDREW BAKER:  Yes, Mr Rabinowitz.  Thank you.
13    MR RABINOWITZ:  My Lord, I was just going to ask your
14        Lordship if we could go back to SCP, which is the third
15        custodian shown in blue.
16    MR JUSTICE ANDREW BAKER:  Yes.
17    MR RABINOWITZ:  That, as your Lordship may have picked up
18        from the footnotes, was a partnership incorporated on
19        13 September 2011.  Immediately above SCP your Lordship
20        sees that there is  a box in which we identify certain
21        members of SCP and your Lordship ought to see some
22        familiar  names there, including  a number of the
23        corporate defendants, as  well  as the number of the
24        independent defendants.
25    MR JUSTICE ANDREW BAKER:  Yes.

                        153

1    MR RABINOWITZ:  Your Lordship sees SCL, Solo Holdings,
2        Jas Bains, Mr Horn, Mr Jain, Mr Hoogewerf, Mr Patterson,
3        Mr Sanjay Shah and Elysium Dubai.
4    MR JUSTICE ANDREW BAKER:  Yes.
5    MR RABINOWITZ:  I can ask your Lordship if we can then
6        please go to the document we have at {MTK/28/1}.  Thank
7        you very much.  As your Lordship sees, this  is
8        a Companies House document and your Lordship might find
9        this  a useful document because it identifies not only
10        which individuals  and corporate  entities  were members of
11        SCP but also the period during which they were a member.
12        What I propose to do, subject to your Lordship, is to
13        point out certain defendants identified  by this document
14        and give your Lordship a high level  explanation of where
15        they  fit  into the Solo schematic.
16            I am going to try at this stage to avoid going into
17        too much detail as to what they did as part of the
18        Solo Scheme because I will  deal with that anyway as we
19        come to the chronological run through of the schemes
20        both in 2012—2013 and indeed thereafter.
21            So just on MTK/28, if you have that open and you
22        look back at the schematic for a moment, if I can start
23        with the defendants who are corporate members of SCP,
24        all  of whom, as I have noted, were ultimately owned by
25        Sanjay Shah, as he has admitted.  The first one listed

                        154

1    in the orange box above SCP, as your Lordship sees, is
2    SCL, that is Solo Capital Limited, and if your Lordship
3    then looks at the document we have on screen,
4    {MTK/28/4}, your Lordship sees, second entry in, Solo
5    capital,  a member of SCP from —— again your Lordship
6    sees  this  from the document, 13 September 2011 to
7    2 February 2015.  That is just to remind your Lordship,
8    and your Lordship may recall, that SCL is one of the
9    default  judgment parties against whom SKAT has default
10    judgment on liability  but not quantum.
11        In  fact ,  as your Lordship may recall,  we explain
12    this  in  our main skeleton, paragraph 70.1, I'm not going
13    to turn it  up, SCL was actually  the first  Solo entity
14    incorporated by Mr Sanjay Shah and between 2009 and 2011
15    it  was the main regulated entity  for Solo's business
16    activities  in the United Kingdom, 2009 to 2011 being the
17    period  in which Solo was involved in German
18    cum—ex trading, which as your Lordship may recall  forms
19    part  of the background to the Solo Scheme.
20        But perhaps I can just mention now that, again as
21    your Lordship will  have picked up from our main
22    skeleton,  aside from Sanjay Shah, the defendants
23    involved with SCL were —— and again these are familiar
24    names to your Lordship —— Mr Rajen Shah and
25    Mr Guenther Klar, who was then called

                        155

1    Guenther Grant—Klar and they joined SCL in 2009, as well
2    as Mr Graham Horn and Jas Bains, both of whom joined in
3    2010.
4        SCL's main role in the events between 2012 and 2015
5    was, as your Lordship may have picked up, twofold.
6        First,  it  was until  April 2014 the owner of
7    Elysium Dubai, when that company was transferred to the
8    ownership of Elysium Global.  That again is common
9    ground with the defendants.
10        Secondly, SCL was the corporate vehicle through
11    which from 1 April 2012 to 2 February 2015 Sanjay Shah
12    formally  participated in the management of SCP.
13        The reason for that date range, my Lord, is that
14    Sanjay Shah was personally  a member of SCP until
15    31 March 2012 and you can see that if we go to the
16    document we have on the screen and go to page
17    {MTK/28/3}.  Thank you.  Just looking at the Sanjay Shah
18    entry.  Your Lordship sees he resigned on 31 March 2012.
19    MR JUSTICE ANDREW BAKER:  Yes.
20    MR RABINOWITZ:  SCL ceased to be a member of SCP on
21    2 February 2015 and your Lordship has seen that entry.
22        The second corporate member of SCP, again your
23    Lordship sees  it  from the orange box, was Solo Group
24    Holdings.  We refer to it  as Solo Holdings in that box
25    as  well ,  and just seeing where in a fitted  in,  we just

                        156

Confidential                                             SKAT_MDL_001_00834790

1  saw that SCL resigned as a member of SCP on
2  2 February 2015 and as your Lordship sees if we go to
3  page 1 of the document we have on the screen, your
4  Lordship sees Solo Group Holdings, Solo Holdings, became
5  a member of SCP the same day, taking over SCL's role as
6  the corporate member of SCP.
7      Just to remind your Lordship of this, although, as
8  you may recall, Solo Holdings is a defendant in these
9  proceedings, again the claims against it are stayed
10  because it is also in administration along with the Solo
11  custodians.
12      Now, Solo Holdings' role in the story is in brief
13  that it was the owner of OPL, shown on the graph, and
14  you can see that from the line coming out of OPL.
15  MR JUSTICE ANDREW BAKER:  Yes.
16  MR RABINOWITZ:  In addition, in 2015 it also acquired the
17  shares in Novus, that was one of the brokers that was
18  involved in the model, and I will come back to
19  that, if I may.
20      Solo Holdings was also the entity that in late 2014
21  entered into exclusivity agreements with the tax agents,
22  Goal and Acupay.  That is all common ground.
23  Effectively what was happening in that period is that
24  the Solo Scheme was concerned by the fact that there
25  were competitor tax agents and it was trying to lock its

157

1  tax agents into only putting in its applications, if
2  I can put it that way.
3      Just staying then with slide 2 of the Solo
4  schematic, just looking at the third corporate member of
5  SCP, your Lordship sees Elysium Dubai mentioned there
6  and Elysium Dubai was another SCP member and one of the
7  SS defendants.  I have already mentioned that it was
8  owned by SCL until April 2014.  At that point it was
9  called Solo Capital Dubai Limited and its ownership was
10  in April 2014 transferred to Elysium Global.
11      Now, Sanjay Shah remained the ultimate owner of
12  Elysium Dubai at all times and your Lordship sees that
13  reflected on slide 2 on the left-hand side and we also
14  note that in the footnote to the Elysium Dubai box.
15      Now, as again I apprehend my Lord will have picked
16  up, Elysium Dubai was in effect the Solo Dubai office.
17  It was where Sanjay Shah was based at all material times
18  and it was where all the other Solo defendants moved or
19  joined over time.  That actually includes Mr Klar,
20  Rajen Shah, later Mr Graham Horn, and Mr Dhorajiwala,
21  and they all worked as either employees or consultants
22  to Elysium Dubai or as consultants to Mr Sanjay Shah
23  personally.
24      If your Lordship just glances at footnote 8 to
25  slide 2, your Lordship sees, this is common ground, the

158

1  dates in 2013 on which the DWF defendants ——
2  MR JUSTICE ANDREW BAKER:  Yes.
3  MR RABINOWITZ:   —— cease to work for Sanjay Shah and the
4  Solo Scheme.  Rajen Shah ceased to work for Solo
5  in April 2013; Graham Horn, June 2013; Mr Dhorajiwala
6  September 2013, all dates at a time when Elysium Dubai
7  was still part of the Solo Group.
8      If we then go back to the slide and just look at ——
9  we have looked at the corporate members of SCP, that is
10  to say SCL and Solo Holdings, if your Lordship looks at
11  the orange box immediately above SCP, again your
12  Lordship has seen a number of the defendants were
13  individual members of SCP.  Again, just to put some
14  flesh on that for your Lordship, if we go back to the
15  document we have on the screen at {MTK/28/1} I will just
16  show you some other defendants who are shown here.
17      If we go to page 1, we are there, your Lordship sees
18  a reference to Mr Jas Bains.  If we go over the page
19  {MTK/28/2}, your Lordship sees he was a member
20  from March 2012 to July 2013.  July 2013 is when he left
21  SCP and he thereafter acted until the summer of 2014 as
22  a consultant to Sanjay Shah personally.
23      If we then just go to page —— we are on page 2 of
24  the company search.  Your Lordship sees a reference for
25  Mr Horn, Graham Mckenzie Horn, recorded here as being

159

1  an SCP member from March 2012 until February 2013.
2  Again, this is not in dispute, at that point he moved to
3  Dubai to be employed by Elysium Dubai.  And again that
4  is accepted by the DWFs in their written opening,
5  paragraph 267.
6      So far as concerns Mr Horn, it is common ground that
7  he was the chief operating officer of SCP whilst there
8  and a member of its management committee.
9      He was also the head of the GSS department
10  until June 2013 when he left Solo.  He was replaced in
11  that role by Mr Dhorajiwala, who also shortly thereafter
12  in September 2013 left Solo, and again that is common
13  ground.
14      Just pausing there, on the subject of the GSS
15  department, that department, as your Lordship may have
16  picked up from the parties' written openings, was Solo's
17  custody and clearing business.  It was the group at Solo
18  which effectively oversaw the Solo model trading and
19  settlement and it also oversaw the production of the
20  credit advice notices or the DCAs.
21      Then just looking further at slide 2, if your
22  Lordship glances at footnote 5, we see there is
23  a reference to other members of the GSS team, including
24  Mr Omar Arti, who was the head of GSS
25  from February 2014, Nirav Patel, Adam Forsyth, Martin

160

Confidential

1    Ward, Jason Browne and Jess Spoto.  My Lord, I'm sorry
2    to be taking so much time over this, but it is  a useful
3    way in which to identify  the people who are going to ——
4    who your Lordship is going to see and hear from.
5    MR JUSTICE ANDREW BAKER:  Thank you.
6    MR RABINOWITZ:  Again, for your Lordship's note the people
7    who I have just mentioned, they are all  identified  as
8    members of GSS at paragraph A1(a)(3) of Mr Patterson's
9    defence.
10        If we can go back to the document we have on the
11    screen at {MTK/28/7}, your Lordship sees second entry in
12    a reference to Mr James Edward Hoogewerf.  He became
13    an SCP member from September 2012, stayed a member
14    until March 2014.  I will come back to him when I say
15    something about the other Solo custodians.
16        On the same page that we have on the screen, page 7,
17    a  little  lower down, your Lordship sees a reference to
18    Mr Mankash Jain, recorded here as an SCP member
19    from March 2012 to 31 January 2014, after which, as your
20    Lordship may have picked up, he went up to set up the
21    Malaysian Solo applicants alongside two other members of
22    the SCP members who are recorded in the document, so
23    again one sees this  fertilisation  of other players from
24    within Solo.
25        If your Lordship can please go to page {MTK/28/11}

161

1    of the document we have on screen, your Lordship sees
2    a reference there to Michael Smyth, recorded as a member
3    of SCP from 31 March 2012 to 31 January 2014.
4    Immediately below that your Lordship sees a reference to
5    Michael Turner, a member from 1 December 2012 to
6    31 January 2014.
7        If we go back to page 9, two entries down, your
8    Lordship sees a reference to Mr Patterson,
9    Mark Patterson, also known, as your Lordship will have
10    picked up, as Pogo.  He remains a defendant, albeit
11    currently incarcerated in Denmark following his
12    conviction there, and the person —— Mr Patterson is the
13    person that Sanjay Shah in his interview with SOIC ——
14    described by Mr Sanjay Shah as his lieutenant.  That,
15    for your Lordship's note, I don't think we need to go
16    there, is {MTKC26/587/26}.
17        Now, Mr Patterson, your Lordship will see, is
18    recorded as a member of SCP from March 2013
19    to January 2014, after which he moved to Dubai and
20    worked for Elysium Dubai and Sanjay Shah personally
21    through his various corporate vehicles .
22        I have already mentioned to my Lord and we will need
23    in due course to look more carefully at Mr Patterson's
24    role in coordinating  all the trading.
25        Now, just turning to the other custodians, I can

162

1    deal with these substantially  more quickly, I hope, so
2    slide  2, your Lordship sees in one of the blue boxes on
3    the right —hand side OPL, Old Park Lane.  From the
4    schematic itself  your Lordship can see it  was owned by
5    Solo Holdings, if you follow the solid , unbroken line,
6    and then ultimately owned by Sanjay Shah.  Your Lordship
7    follows the lines and sees that.
8        The director and CEO of OPL, at least from around
9    mid—2015 to the end of 2015, again this is not in
10    dispute, is  Mr Charles Knott, who is of course one of
11    the defendants before your Lordship.
12        Then looking across at WPD, which is the first in
13    line of the custodians in blue, if  your Lordship sees
14    immediately above that, it  is  owned, at least 90%, owned
15    by the wonderfully named Hooloomooloo, is  again one
16    of the SS defendants and it was, as Mr Shah admits,
17    ultimately owned by Mr Shah.
18    MR JUSTICE ANDREW BAKER:  Yes.
19    MR RABINOWITZ:  And it is common ground, my Lord, that
20    Mr James Hoogewerf, a defendant, was a director of WPD
21    from September 2013, which was the date of its
22    acquisition by Hooloomooloo.  He was also its CEO
23    from October 2013 and then that's in the list of common
24    grounds at paragraph 531(i).
25        The final custodian, Telesto, your Lordship sees,

163

1    second box, blue, that was a partnership incorporated on
2    10 October 2013.  It had various members including
3    Solo Holdings and again Mr Hoogewerf, and I don't think
4    I need to say anything else about it  for the moment.
5    MR JUSTICE ANDREW BAKER:  Yes.
6    MR RABINOWITZ:  Just still on slide 2 but focusing next, if
7    I may, on Ganymede, and the conduit companies ——
8    MR JUSTICE ANDREW BAKER:  Just before we do that and going
9    back to those custodians, and in fact going all the way
10    back to SCP, since we still  have the document on screen,
11    the Companies House return with all of the historic
12    lists  of the members of that as an LLP, the
13    correspondence address that is given, if  not for  all  of
14    them, for the vast majority of them, of 10 Exchange
15    Square was whose address connected to SCP?
16    MR RABINOWITZ:  It is Solo's office, I think that is where
17    Mr Sanjay Shah was.  Was it SCP's office as well?  It
18    was SCP's office, my Lord.
19    MR JUSTICE ANDREW BAKER:  As distinct from
20    4 Throgmorton Avenue, which is the address I think that
21    appears on the Solo credit advice notes, or have I got
22    that wrong?
23    MR JUSTICE ANDREW BAKER:  I think they moved.
24    MR JUSTICE ANDREW BAKER:  They moved.  Right, thank you.
25    MR RABINOWITZ:  I will check that and come back to you, but

164

Confidential                                                                                                              SKAT_MDL_001_00834792

1    I think they moved, my Lord.
2    MR JUSTICE ANDREW BAKER:  But it is an address connected to
3        the LLP rather than to any given individual or
4        otherwise?
5    MR RABINOWITZ:  That is my understanding, my Lord.
6        So Ganymede first, your Lordship sees at the bottom
7        left-hand side.  I have already noted that it is not in
8        dispute that Sanjay Shah was the ultimate owner of
9        Ganymede.  The directors of Ganymede again included some
10       familiar names including Rajen Shah and Mr Horn,
11       although as we have explained in the DWF annex, I don't
12       think we need to turn that up, Rajen Shah was a director
13       on 20 September 2011.  He left on 1 April 2013.  Mr Horn
14       was a director from April 2013 but also left
15       in June 2013.
16       Now, as my Lord will have picked up, Ganymede is an
17       entity of some significance in this matter, because, as
18       your Lordship will have seen, it is the entity to which
19       the lion's share of the proceeds of the Solo
20       applications were made, and the entity which in turn
21       paid a number of the other participants in the
22       Solo Scheme.  Again, your Lordship will have seen this,
23       and we will get into the detail of this, there were
24       arrangements in place whereby although the applications
25       were made by the applicants, they effectively ceded most

165

1    of the money to Ganymede.
2        We cover this in our main skeleton between
3        paragraphs 112 and 113.  I don't think we need to turn
4        that up, but perhaps I can just summarise the key points
5        for your Lordship as follows.
6    MR JUSTICE ANDREW BAKER:  Yes.
7    MR RABINOWITZ:  All Solo applicants were clients of
8        Ganymede, with whom they entered into consultancy or
9        advisory agreements.  Pursuant to those agreements,
10       either called consultancy or advisory agreements,
11       Ganymede was paid a success fee by way of a percentage
12       of the proceeds of the Solo applications, so by way of
13       a percentage of the refund, ranging from between 63—95%.
14   MR JUSTICE ANDREW BAKER:  Yes.
15   MR RABINOWITZ:  Ganymede then in turn itself also made
16       payments to the trading counterparties in the Solo model
17       and also to those who were introducers of the Solo
18       applicants.  So Ganymede —— the applicants themselves
19       keep some, most of it goes to Ganymede.  Ganymede then
20       make payments to the trading counterparties and also
21       make payments to the people who introduced, put together
22       the package of Solo applicants, including in both cases
23       to persons who are defendants in this claim and who fell
24       into one or other or both of those categories.
25       Again, I will go back into the detail of that in the

166

1    course of the week.
2        If your Lordship then ——
3    MR JUSTICE ANDREW BAKER:  Is it right that —— again, as with
4        many questions one has in this case one needs to phrase
5        it in terms of other things being equal and without
6        prejudice to submissions that may or may not be made as
7        to reality versus appearance and so on, but other things
8        being equal and taking relevant documentation at face
9        value, at least some of those who are engaged in one way
10       or the other in the trading transactions are charging
11       fees that are not stated to be dependent on success,
12       whereas others of them are only paid in effect expressly
13       on the basis of success.  Is that right?
14       So, for example, if I'm remembering correctly, it is
15       a point that Lindisfarne emphasise in their written
16       opening, they say that anything they earned was —— for
17       doing what they did was simply based on the transaction
18       numbers, not tied to whether it successfully generated a
19       refund.
20       It may be a separate question whether in practice
21       they would ever have been paid had they not been
22       successful because of course all the applications I'm
23       going to be looking at are applications that were
24       successful.
25       I think it is also said by Messrs Oakley and

167

1    Mitchell that anything they agreed to be paid was on the
2        face of it not dependent on the success of the
3        transactions.  When I say success, I mean success in
4        terms of ultimately generating a successful tax reclaim.
5        I don't know whether that is agreed or whether SKAT will
6        be saying that everybody involved was involved on the
7        basis that they only got paid anything ever, if and to
8        the extent that applications successfully generated tax
9        reclaims.
10   MR RABINOWITZ:  My Lord, Lindisfarne may be a separate case,
11       but if you put aside Lindisfarne, our case is that
12       actually what was happening here is that all
13       participants in the trading scheme got paid out of SKAT
14       refunds.  That is clear from the timing of the payments
15       and the amount of the payments and the basis of the
16       payments, which we will come to.
17       They tended to be worked out on the basis of
18       a percentage of the gross dividend that was paid and
19       that is inconsistent with there being a payment
20       regardless of success.
21       Now, Lindisfarne may be a special case.  I don't off
22       the top of my head know the detail for that.  But one of
23       the points we make is that ——
24   MR JUSTICE ANDREW BAKER:  Well, let's not get into the
25       detail.  I will simply observe that it does not

168

1  immediately strike me as necessarily consistent only
2  with a fee payable contingent upon success that the fee
3  is calculated by reference to the amount that will be
4  paid if the application is successful. Nor is it
5  necessarily, it seems to me, inconsistent with an
6  unconditional entitlement to some species of brokerage
7  or other fee that in fact because all the applications
8  were successful, they actually got paid traceably from
9  those proceeds. Because there may, at least with some
10  of the actors involved, be a prior question of whether
11  they entered into agreements to take a certain role or
12  play a certain part on a simple unconditional basis of
13  so many basis points per transaction, or the like. But
14  we may need to look at that at some point.
15  MR RABINOWITZ: We will come to that. But in a way,
16  my Lord, your Lordship may be right, it is not
17  necessarily inconsistent with what I have suggested is
18  the position. But if you have a scheme where the
19  trading counterparties are being paid not by reference
20  to how they do or don't do in their trades, which are
21  all in any event choreographed or orchestrated, but by
22  reference to a completely extraneous event which is
23  payment of a dividend by SKAT, or repayment of
24  a dividend by SKAT and a percentage out of that. That
25  is the first point.

169

1      Leave aside whether they say we get paid in any
2  event, in circumstances where the scheme works, there
3  are no examples of it not working, with respect, that
4  may be a distinction without a difference.
5  MR JUSTICE ANDREW BAKER: Yes.
6  MR RABINOWITZ: But we will come to that in due course.
7  Certainly what does look odd, and I'm being as neutral
8  about this as possible, is that you have trading
9  companies where the set—up is the basis of the payment
10  is not how they do the trading, but it is based upon
11  a fixed percentage of something completely extraneous to
12  what they are doing, which is an application made for
13  a tax refund.
14  MR JUSTICE ANDREW BAKER: It may be that there is a capacity
15  for that to be part of a submission, if you require it,
16  depending on what any individual defendant is saying as
17  to their state of knowledge, a submission to the effect
18  that they must have appreciated ——
19  MR RABINOWITZ: Exactly.
20  MR JUSTICE ANDREW BAKER: —— that the sole purpose of their
21  involvement together with anybody else's involvement was
22  the generation of a tax reclaim from SKAT.
23  MR RABINOWITZ: Your Lordship is right. I'm only raising
24  that in the context of your Lordship putting to me,
25  perfectly fairly, because that is what they say, some

170

1  people say you should assume some innocence because they
2  only ever got paid if it worked for what they did ——
3  sorry, they got paid regardless of whether it worked or
4  not. In the scheme of things with respect that doesn't
5  take them very far, is my submission.
6  MR JUSTICE ANDREW BAKER: I understand how that argument
7  will potentially play out. All right, thank you.
8  MR RABINOWITZ: So we have done the Ganymede. I have made
9  the point that they then (inaudible) the trading
10  counterparties and the introducers and we will see that
11  in due course.
12      Just moving on to the conduits: Fire, ACAI, Parla
13  and Philo, it is common ground that these are BVI
14  companies, all incorporated within a window of about
15  six weeks between 29 May 2015 and 8 July 2015, all
16  initially owned and controlled by Usha Shah, and then
17  later owned and controlled by Elysium Global or
18  Sanjay Shah. That is paragraphs 28, 30, 31 and 32 in
19  the list of common ground issues.
20      Just to remind your Lordship, the conduit companies
21  are relevant and important because after July 2015 they
22  took over Ganymede's role in distributing the proceeds
23  of the Solo applications, and we will obviously come
24  back and look at that later.
25  MR JUSTICE ANDREW BAKER: But the timing of their

171

1  involvement means that, for example, the DWF defendants,
2  or rather the claims against the DWF defendants don't
3  end up involving those conduit companies at all, because
4  they only come in at the later stages of the
5  Solo Scheme, then.
6  MR RABINOWITZ: Indeed.
7  MR JUSTICE ANDREW BAKER: Yes.
8  MR RABINOWITZ: Just going back to a point your Lordship
9  raised earlier, Mr Goldsmith tells me that the SCP CANs
10  from March 2014 onwards do have the 10 ——
11  MR JUSTICE ANDREW BAKER: Ah, right, just the change of
12  address point.
13  MR RABINOWITZ: The address 10 Exchange Square. That is
14  from March 2014.
15  MR JUSTICE ANDREW BAKER: Yes.
16  MR RABINOWITZ: If we can then just go back to the schematic
17  and go to the third page of that {F/391/3}, this has
18  a fair amount more detail on it. As your Lordship can
19  see from the heading, this seeks to identify for your
20  Lordship the Solo applicants and to show below the Solo
21  custodians —— show them below the Solo custodians of
22  which they are the clients.
23      We have sought to identify for your Lordship on this
24  slide the different groups that emerge, they are shown
25  in purple boxes. They are, as your Lordship sees, US

172

1    Solo applicants, and I think there are nine different
2    groups of those.  I will say something about them in due
3    course.  Your Lordship sees the Malaysian Solo
4    applicants, there were two main groups of those which
5    I will again address.
6        Your Lordship also sees to the right—hand side of
7    this slide, yellow boxes, all of which have red rings
8    around them.  So your Lordship sees Mr Mike Murphy,
9    Daniel Fletcher, John Devonshire, Mr Tucci, Mr Bradley,
10   Mr Godson, Mr Crescenzo, Mr Lehman.  Not one of the
11   Lehman Brothers.
12       I should just explain the red outline around that.
13   These are introducers in the yellow boxes, the people
14   who introduced the US Solo applicants or the Malaysian
15   applicants, and the red outline is intended to signify
16   they are persons who received payments from Ganymede or
17   the conduit companies in respect of the introductions.
18   MR JUSTICE ANDREW BAKER:  Yes.
19   MR RABINOWITZ:  I'm not going to take up more time on
20   getting into the detail of that at the moment, my Lord.
21       Can I then invite your Lordship to go on to slide 4.
22   Thank you very much.  Now we have the —— just looking at
23   the slide, the whole of the bottom of the schematic has
24   all the players that your Lordship has already seen.
25   MR JUSTICE ANDREW BAKER:  Yes.

173

1    MR RABINOWITZ:  As well as on the right—hand side grey
2    boxes, and in those grey boxes your Lordship will see
3    the trading counterparties involved in the Solo model
4    trading and associate defendants.  So short sellers and
5    stock lenders, then forward counterparties and then the
6    brokers.
7    MR JUSTICE ANDREW BAKER:  Yes.
8    MR RABINOWITZ:  And again the red framing is intended to
9    identify persons who again received payment from
10   Ganymede or the conduit companies for what they were
11   doing.  That applies, as your Lordship sees, to everyone
12   other than the brokers in the last box.  I should say in
13   relation to the brokers in the last box that some of
14   them, like Novus, did receive payments for what they
15   were doing, but we have left out the red outline,
16   because not all of them received payments, so we were
17   trying to be very fair.
18   MR JUSTICE ANDREW BAKER:  Yes.
19   MR RABINOWITZ:  If I can just say something first about the
20   short sellers in the grey box and then I will say
21   something about the stock lenders or forward or future
22   counterparties, again keeping it at a high level and
23   I will come back to say a little bit more of the detail
24   in due course.
25       If we can just for this purpose go to the schedule

174

1    of trading counterparties which we had at {B/110.1/1}.
2    This was attached to SKAT's pleading.  Thank you very
3    much.
4    MR JUSTICE ANDREW BAKER:  Yes.
5    MR RABINOWITZ:  Now, as my Lord sees from the side heading
6    on the top left, it refers to the Solo WHT scheme
7    starting at page 1.  Table 1 identifies the short
8    sellers, and again your Lordship sees we set out here in
9    each case the ultimate beneficial owner.  That is UBO.
10   MR JUSTICE ANDREW BAKER:  Yes.
11   MR RABINOWITZ:  The domicile, the date of incorporation and
12   the issued share capital, which if your Lordship glances
13   at the last box your Lordship will see was almost always
14   very small or relatively small, if it existed at all.
15       The schedule also sets out the date of the striking
16   off, where relevant, of the relevant entity, because as
17   my Lord will note most of the trading parties in the
18   Solo Scheme, albeit not all, were struck off after the
19   trading ceased.  And by "after the trading ceased",
20   I mean after the Solo trading ceased.  So for the most
21   part —— they were not all set up just in time to do the
22   trading but many of them were and then they were struck
23   off shortly after the trading ceased.
24       If your Lordship then goes over to page {B/110.1/3},
25   where table 2 starts.  Thank you.  Your Lordship sees

175

1    that we do the same for the stock lenders involved in
2    the Solo Scheme.  Again, ultimate beneficial owner,
3    domicile, date of incorporation, date of striking off,
4    share capital.  And your Lordship will note these were
5    companies that were involved in many hundred million
6    dollars' worth of deals, put it that way, in the trading
7    that we looked at.  The share transactions were worth
8    many hundreds of millions of dollars of krone, pounds,
9    dollars, however one wants to look at.
10       If your Lordship looks at the share capital
11   involved, that again gives your Lordship some indication
12   of whether those trading with these companies really
13   understood there to be any genuine trade at which
14   parties were put at risk.
15       If we then go over to page {B/110.1/5}, just to look
16   at table 3, which starts at page 5, your Lordship will
17   see that we do the same for forward counterparties,
18   forward/future counterparties.  I ought just to say
19   this: this schedule as amended, we think it is correct,
20   but it is subject to one small correction.  That relates
21   to something relevant to the Maple Point Scheme, and
22   since we have the document open now perhaps I can just
23   identify what it is.
24       If we go to page {B/110.1/7}, entry 103 refers to an
25   entity called Evimer FZC.  That was a forward

176

Confidential

1  counterparty in the Maple Scheme. It wasn't a short
2  seller and therefore it shouldn't appear at number 103.
3  So if my Lord will just bear in mind that that is an
4  error. It is where it should be at entry 108 over the
5  page, but it shouldn't be there as well.
6      Just going back to the Solo Scheme, I ought ——
7  MR JUSTICE ANDREW BAKER: 109, in fact, over the page, yes
8  {B/110.1/8}. And on that very point, that correction
9  having been made, is it the position that as regards at
10  least the corporate entities involved as any species of
11  trading counterparty, any given counterparty is only
12  ever either a short seller or a stock lending company or
13  a future or forward counterparty, or are there any
14  individual entities that do, maybe not in the same
15  transaction, but across the whole piece, sometimes do
16  one thing and sometimes do one of the other things?
17  MR RABINOWITZ: I will be corrected if I am wrong, but there
18  are entities which do more than one function and indeed
19  do more than one function sometimes in the same
20  transaction.
21  MR JUSTICE ANDREW BAKER: Right. I had certainly understood
22  that when one comes on to the Klar Scheme, one of the
23  simplifications was that type of simplification, namely
24  that it may be Salgado was being used but an entity was
25  being used to fulfil multiple different roles in the

177

1  trading structure. But you are saying you think there
2  were instances of that in the other schemes as well?
3  MR RABINOWITZ: Yes, I think there are some examples and
4  I think we will see them when we go through some of the
5  trading later on.
6      So just in the context —— just to identify two other
7  in a sense in doubt entries here, the SS defendants have
8  also queried the inclusion of two entities called Leda
9  and Metis. They both appear on page 3. And I think
10  they say they shouldn't be there. I will come back to
11  that in due course if I may, but subject to those three,
12  Evimer, where we accept that it was wrong, and Leda and
13  Metis ——
14  MR JUSTICE ANDREW BAKER: That is in —— those entries, rows
15  30 and 31, are therefore still in the short seller
16  section; is that right?
17  MR RABINOWITZ: Correct.
18  MR JUSTICE ANDREW BAKER: Thank you.
19  MR RABINOWITZ: Subject to that, we don't understand anyone
20  to suggest that there are any inaccuracies in this
21  document.
22  MR JUSTICE ANDREW BAKER: Thank you.
23  MR RABINOWITZ: Now, I'm going to be referring to the
24  schedule as we go along, so can we try and keep this on
25  the screen on the left—hand side, if we may.

178

1  Can we on the right—hand side of the screen, please,
2  get up the main skeleton, our main skeleton {F/361/36},
3  paragraph 78. I just want to say something about the
4  principles behind the short sellers. Thank you.
5      So, my Lord, as we say, or as we explain or as we
6  suggest at paragraph 78, Mr Sanjay Shah admits that he
7  introduced most of the individuals behind the short
8  sellers to GSS. Given the reference to Mr Shah's
9  evidence about this in footnote 132 —— I wasn't
10  proposing to turn it up —— we also identify in that
11  footnote the handful of short sellers who exceptionally
12  Sanjay Shah says that he didn't introduce to the
13  Solo Scheme, as your Lordship sees from that.
14  MR JUSTICE ANDREW BAKER: Yes.
15  MR RABINOWITZ: We also explain at paragraph 78 that you can
16  divide the individuals who Mr Shah accepts he introduced
17  to GSS into three categories, namely first the former
18  employees of Solo, secondly friends of Sanjay Shah, and
19  third, long—standing business contacts of Mr Shah. And
20  as we go through the schedule of trading companies,
21  counterparties, I will briefly mention to your Lordship
22  which category that party falls into.
23      So if we go back, then, to the schedule of trading
24  parties, left—hand side of the screen, and we go back to
25  {B/110.1/1} where we have the short sellers. We start

179

1  with the short sellers owned by the defendants Oakley
2  and Mitchell, and your Lordship sees —— I think there
3  are five of them, it is not in dispute that
4  Messrs Oakley and Mitchell were long—standing business
5  contacts of Mr Shah and your Lordship sees from what we
6  say there they were behind —— Oakley and Mitchell were
7  together behind the different shares, those short
8  sellers.
9      If your Lordship looks across, you will see that
10  four of them were Cayman companies, one of them was an
11  English company. DDC, Procap, GrayTek, Opal, all
12  incorporated in 2014, were the Cayman ones. The English
13  company is called Orca. DDC incorporated earlier in
14  2012, your Lordship sees it has a share capital of $200,
15  while Orca, the English company, was incorporated a few
16  years earlier with £10 of share capital.
17      The other Cayman companies incorporated at various
18  dates in 2014 did have, as your Lordship sees, more
19  substantial share capital.
20      Now, Orca is a defendant in these proceedings along
21  with Messrs Oakley and Mitchell. The reason why the
22  other (inaudible) companies are not defendants, my Lord,
23  is because they have been struck off, as your Lordship
24  sees, from the schedule.
25  MR JUSTICE ANDREW BAKER: In relation to this categorisation

180

1       of individuals , does SKAT have any position or evidence
2       in relation to Mr Celotto, who is cited as a co—owner of
3       Procap with Mr Oakley and Mr Mitchell and is not a name
4       I otherwise think I'm familiar with?
5   MR RABINOWITZ:  He is mentioned in the Oakley and Mitchell
6       witness statements, but beyond that, my Lord ——
7   MR JUSTICE ANDREW BAKER:  So for what it is worth, SKAT
8       has no particular case on whether he, Mr Celotto,
9       independently of Messrs Oakley and Mitchell, had any
10      background of connection to Sanjay Shah.  Thank you.
11  MR RABINOWITZ:  Correct.  Just staying with the schedule, if
12      your Lordship looks at the next four entries, numbers 6
13      to 9, they are all short sellers owned by
14      Mr Michael Murphy who is also a defendant in these
15      proceedings: Schmet, Sciron, Baja and Nisus, and your
16      Lordship sees that each of those was a BVI incorporated
17      in 2014 or 2015 with zero par value, that is to say zero
18      issued share capital .
19          The companies are not defendants in these
20      proceedings and as again, as your Lordship will have
21      picked up, that is because they have all been struck
22      off, and that is all having occurred within a year of
23      SKAT suspending withholding tax claims or reclaims,
24      which it did in August 2015.
25          Again, if we look, if we can, back at our main

181

1       skeleton, paragraph 78 {F/361/36}, my Lord sees
2       a reference to say Sanjay Shah's evidence that Mr Murphy
3       was a friend of his, and again the reference is in the
4       footnote, my Lord {F/361/36}.
5   MR JUSTICE ANDREW BAKER:  Yes.
6   MR RABINOWITZ:  Again, back to the schedule, on the
7       left—hand side, if we then look at the next entry, which
8       is number 10, that is Rock Capital, a Gibraltar company
9       owned Mr Koerner, Alexander Koerner, established earlier
10      in 2011 with a share capital of £100 and we have already
11      seen my Lord that Rock Capital was the short seller in
12      the Solo 3 sample trade that we went through this
13      morning.
14  MR JUSTICE ANDREW BAKER:  Yes.
15  MR RABINOWITZ:  And whilst Mr Koerner is, as your Lordship
16      knows, a defendant in these proceedings, Rock Capital is
17      not because it was struck off in August 2016, as your
18      Lordship sees.  Again, looking on the right—hand side of
19      the screen at our main skeleton, paragraph 78
20      {F/361/36}, we explain that Mr Sanjay Shah admits that
21      Mr Koerner was a business contact with whom he also
22      socialised .
23          Then just going —— staying with the paragraph 78 for
24      the moment, your Lordship sees in paragraph 78
25      a reference to Rajeev Dave, who was a close friend of

182

1       Sanjay Shah from their college days.  He was also the
2       brother of Sanjeev Dave, who appears a little further
3       up, still in the same paragraph.  He was Solo's finance
4       director in Dubai, at least at an early stage of the
5       relevant events, and I can tell your Lordship he was
6       also director of SCL from July 2013 to January 2014.
7       And that, for my Lord's note, is a reference that you
8       will find at {MTK/29/2}.
9          If we then go back to the left—hand side of the
10      screen, to the schedule {B/110.1/1}, just to look at the
11      Rajeev Dave short sellers , your Lordship sees them on
12      this page at 11 and 12 and over the page at row 13.
13      {B/110.1/2}.  Thank you.  A Squared Investments, a good
14      name, and if we go back to page {B/110.1/1} your
15      Lordship sees it relate to the first two of those,
16      that is to say Abra and SPK Cayman, they were
17      incorporated in 2012 and 2013 respectively, both in the
18      Cayman Islands and there is a note, as your Lordship
19      sees, that Sanjeev Dave was the owner of SPK Cayman
20      from March 2015 onwards.
21          Just staying with Rajeev Dave for the moment, his
22      third company, A Squared Investments on page
23      {B/110.1/2}, if we go back to that, your Lordship sees
24      that was a UAE company.
25  MR JUSTICE ANDREW BAKER:  Yes.

183

1   MR RABINOWITZ:  And it did have —— incorporated in 2013 and
2       it did have £100,000 of whatever the currency is share
3       capital —— dirham.  I'm not sure what that's actually
4       worth.  £2,000, apparently.
5          If we then stay on {B/110.1/3}, just looking at the
6       other Sanjeev Dave companies —— sorry, that is
7       Sanjeev Dave companies, numbers 30 to 32, top of the
8       page, starting with the one at the top, which is
9       SPK Consultants, a UAE company incorporated on
10      24 February 2015 with issued share capital of 10,000
11      dirham, that's about £2,000.
12          Then numbers 30 and 31, Leda and Metis, these are
13      the ones that the SSD defendants have queried.  They
14      were Cayman companies incorporated in 2011 and as the
15      two footnotes there make clear, they were originally
16      owned by other persons also involved with Solo but were
17      later transferred to Sanjeev Dave, and just for
18      my Lord's note, Rajeev and Sanjeev Dave are both
19      defendants in SKAT's proceedings in Dubai, which is
20      where they are based.
21          Go back to page {B/110.1/2}, please.  If your
22      Lordship looks at rows 14 to 17, your Lordship sees four
23      short sellers .  That is Aronex, Miralty, Wicklow and
24      CFS.  They are ones where Sanjay Shah says he does not
25      recognise their owners, although we would note, my Lord,

184

1    that the trader for those entities , Mr Richard Mills,
2    was in fact a business contact of Mr Sanjay Shah's.
3    I don't propose to go to that now, but Mr Mills' role as
4    trader for these entities emerges clearly from certain
5    Skype messages we have, and I don't propose we go there,
6    {MTO/8}.
7         Mr Mills was also the owner of his own short seller
8    that we can find at page {B/110.1/3}, if your Lordship
9    goes on to page 3. Thank you, Gulf Management Group
10   number 36, your Lordship will see, owned by Mr Mills.
11  MR JUSTICE ANDREW BAKER:  Yes.
12  MR RABINOWITZ:  And Mr Mills, as we say in paragraph 78, was
13    a business contact of Mr Sanjay Shah.
14         Now if we go again back to the left—hand side of the
15    screen, back to page {B/110.1/2}, just looking at rows
16    18 to 21, your Lordship sees four  Dilip Shah short
17    sellers : Black Square, DE Market View, Glendale and
18    RKDS. As your Lordship again sees, they are all Cayman
19    companies set up in 2013 or 2014 with share capital of
20    less than $1,000.
21         According to Sanjay Shah's evidence, Dilip Shah was
22    formerly a broker at Solo and your Lordship can see
23    a reference for that at paragraph 78 on the right—hand
24    side.
25  MR JUSTICE ANDREW BAKER:  Thank you.

185

1  MR RABINOWITZ:  There is a reference also to another former
2    Solo employee, Jason Browne.  Mr Browne, I think I have
3    already mentioned, worked at the GSS department at Solo.
4    He was in fact a long—standing employee of the
5    Solo Group.  Can we in relation to Mr Browne just go to
6    {MTK/90/1} on the left—hand side, please.  Thank you.
7    This is Mr Browne's FCA registration.
8  MR JUSTICE ANDREW BAKER:  Yes.
9  MR RABINOWITZ:  You can see beginning, looking at page 1,
10    that he began at SCL in January 2011 and if your
11    Lordship looks at the bottom of page 1 and to the top of
12    page {MTK/90/2}, he was at SCP in 2012 and 2013 and he
13    then moved to WPD until mid—September 2014.
14  MR JUSTICE ANDREW BAKER:  Yes, thank you.
15  MR RABINOWITZ:  If we can then go back to the schedule, I'm
16    sorry, {B/110.1/2}.  Thank you very much.  Just looking
17    down the UBO column to numbers 22 through to 25, your
18    Lordship sees that Mr Browne was behind four of the
19    short  sellers  and as your Lordship sees, looking at the
20    dates of incorporation, fourth one along, each of those
21    companies was established in the BVI on 5 December 2014,
22    which is around three months after Mr Browne left WPD,
23    so he leaves WPD and he sets up these short sellers.
24         To finish off Mr Browne's story, although not
25    a defendant in these proceedings, he is a defendant in

186

1    the Dubai proceedings.
2         My Lord, I don't know what time you want to carry
3    on.  This is taking, I know ——
4  MR JUSTICE ANDREW BAKER:  Why don't we see if we can
5    complete this section of this , that is to say the short
6    sellers that we are nearly got to the end of, then we
7    need to stop.
8  MR RABINOWITZ:  I'm grateful, my Lord.
9  MR JUSTICE ANDREW BAKER:  Just in relation to Mr Browne's
10    companies there, they all  appear to be given two
11    different  names; is that because they were incorporated
12    under one set of names and at some point there was
13    a change of names?
14  MR RABINOWITZ:  They changed their names, my Lord.  After
15    trading finished .
16  MR JUSTICE ANDREW BAKER:  Okay, thank you.  Yes, thank you.
17  MR RABINOWITZ:  So staying with the short sellers your
18    Lordship then looks,  still  on page {B/110.1/2}, your
19    Lordship sees references to Mr Paul Warner, to four
20    companies.
21  MR JUSTICE ANDREW BAKER:  Yes.
22  MR RABINOWITZ:  Again, your Lordship sees they are all
23    companies set up in the BVI in December 2014, zero par
24    value.  Sanjay Shah's evidence is he didn't know
25    Mr Warner.  We give the reference for that in our main

187

1    skeleton at footnote 132, and just while we are looking
2    at paragraph 78 {F/361/36}, can I just identify for
3    my Lord the last two groups of short sellers , whose
4    owners were known to Sanjay Shah, as he acknowledges.
5    The first  is Dai Griffiths .  We say that he was a friend
6    of Sanjay Shah and Mr Shah says the same thing.  The
7    second is Mr Stuart Wilson, who was a business contact
8    of Mr Shah's.
9         Then going back to the schedule of trading
10    counterparties,  if we go to page {B/110.1/3}, just to
11    find  their companies, starting with Mr Griffiths, number
12    33, your Lordship sees LDW, a reference to among others
13    Mr Griffiths .
14  MR JUSTICE ANDREW BAKER:  Yes.
15  MR RABINOWITZ:  Mr Griffiths is not a defendant in these
16    proceedings but he is a defendant in SKAT's proceedings
17    in Dubai, where he is based.
18         And then Stuart Wilson, your Lordship sees numbers
19    34 and 35: Blumarble and Chem Capital.
20  MR JUSTICE ANDREW BAKER:  Yes.
21  MR RABINOWITZ:  They were incorporated in 2012 and 2013, and
22    that is the short  sellers .
23  MR JUSTICE ANDREW BAKER:  Thank you.
24  MR RABINOWITZ:  And probably, subject to your Lordship ——
25

188

Confidential                                                                    SKAT_MDL_001_00834798

1            Housekeeping
2    MR JUSTICE ANDREW BAKER:  Yes, one point I did want to
3        mention just before we broke, is  this , and it concerns
4        our agenda for Friday, and I hope in particular  Mr. Choo
5        is  listening .
6            Is there any positive opposition to the application
7        made on behalf of Mr Bains for Mr. Choo to be allowed to
8        conduct advocacy at trial?
9    MR RABINOWITZ:  No, not from us.
10   MR JUSTICE ANDREW BAKER:  Would there be any objection to my
11       considering that application simply on the papers and
12       not taking up time with it on Friday?
13   MR RABINOWITZ:  Certainly no objection from us, my Lord.
14   MR JUSTICE ANDREW BAKER:  In relation to both aspects,
15       before you all say that's your final  position, I feel in
16       the circumstances I probably should make clear that at
17       least  if  my memory has not failed me I do think Mr. Choo
18       instructed me at the Bar.  Now, that is now long enough
19       ago that I'm doubting my own memory, but I believe in
20       his  time at DLA he was my instructing solicitor at least
21       on one arbitration matter that did go to a hearing.  He
22       will  forgive me if  I say I would have to consult my own
23       past records from practice as to whether prior to or
24       after that one reasonably significant  case that I have
25       some memory of, whether I also worked for him on

189

1        paperwork and advice on other matters, but it is the
2        fact that I know we conducted an arbitration together
3        where he was my instructing solicitor ,  I was counsel,
4        that I have in mind.
5            If anybody had a thought that that should affect my
6        attitude towards the application that he conduct
7        advocacy before me, say so now or otherwise I will  treat
8        it  as a neutral factor and I will  consider that
9        application on the papers.
10           Very good.  And then it may be that that means that
11       if  he and Mr Bains are happy to just follow what happens
12       after the fact that that saves them the need to attend
13       on Friday.  But that is a matter for them, as to whether
14       they are going to make submissions on any other
15       aspects.
16           All  right ,  very good.  All  right ,  10 o'clock
17       tomorrow, please.  Thank you very much.
18   (4.02 pm)
19   (The hearing adjourned until 10 o'clock on Tuesday,
20               16 April 2024)
21
22
23
24
25

190

1                INDEX
2                                    PAGE
3    Housekeeping        .........................................1
4    Opening submissions by MR RABINOWITZ ................20
5    Housekeeping         .....................................189
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

191

**A**

ala3 (1) 161:8
a22 (1) 141:13 142:9
a4214 (1) 152:12
a931 (1) 141:25
a941 (1) 142:1
a953 (1) 34:11
a954 (2) 77:13 78:3
a955 (4) 77:21 78:10 65:25 90:1
ability (1) 52:20
able (14) 4:2 5:25 8:14,14 29:18 33:25 42:1 52:4 66:5 67:10,16 70:18 133:25 147:22
above (11) 77:17 88:2 93:21 105:13 107:6 100:3 127:24 155:13 159:1 159:11 163:14
abra (1) 103:16
absence (1) 30:20
absolute (3) 17:17 124:18 149:5
absolutely (3) 59:24 103:25 111:19
abstract (2) 97:6 137:3
academic (1) 128:9
acai (2) 151:17 171:12
accelerated (2) 13:8 147:11
accelerating (2) 140:23 150:2
accept (9) 23:13 26:3 39:5,6 82:25 94:9 96:6 111:14 178:12
acceptably (1) 16:15
accepted (5) 57:2 69:2 97:20 99:10 160:4
accepting (1) 14:13
accepts (1) 179:16
accompanied (2) 108:15 124:13
accompany (1) 127:21
according (2) 8:18 185:21
accordingly (1) 133:14
account (11) 64:10,12,12,14 66:17,24 69:15,22 100:22,23 110:15
accounting (4) 65:3 67:23 60:16 60:14
accounts (4) 31:18 67:20 66:2 71:22
accrual type (1) 67:24
accrue (1) 52:13
accurate (2) 101:17 112:15
accurately (2) 70:5 96:6
achieve (3) 26:4 50:21 52:21
acknowledges (2) 188:4
acquire (3) 48:17 52:13
acquired (1) 157:16
acquisition (1) 163:22
acquisition (1) 72:18
across (8) 14:7,9 30:15 66:20 148:11 163:12 177:15 180:9
actod (1) 159:21
acting (9) 17:1,4,5,6,12,16,18 115 47:12
action (12) 21:21 22:6 38:22 131:24,24 133:14,21 135:17 136:7 138:7,8,9
actions (1) 102:1
active (8) 2:1,22 18:11 54:16 130:2 134:9 135:4 144:9
actively (5) 3:2 2 129:17 131:1,14 154:1
activities (1) 155:16
activity (9) 31:12 35:15,21 36:11,20 37:13 40:9,13 142:24
actor (2) 28:1 169:10
acts (2) 44:25 140:12
actual (6) 34:24 39:19 47:5

54:21 99:15 126:21
actually (24) 13:2 14:24 15:8 48:17,19 50:21 101:23 103:7 107:3 119:14 124:2 125:22 126:8 132:24 134:18 135:6 138:7,16 140:11 155:13 156:19 168:12 169:8 184:1
acupay (3) 113:12,14 157:22
acupays (1) 116:9
acutely (1) 3:8
adam (4) 75:16,20 79:12 160:25
ad (2) 14:18 143:15
addition (5) 2:22 110:15 141:19 150:8 157:16
additional (5) 59:13 60:21 97:3 119:13 120:10
address (14) 6:11 22:5 26:17,24 61:5 107:22 157:16 164:13,15,20 165:2 172:12,13 173:5
addressed (4) 23:17 77:17 81:4 120:15
addresses (2) 71:24 111:2 158:1
aggregate (2) 30:14 140:10
adds (1) 82:10
adjourned (1) 190:19
adjournment (1) 112:19
administration (2) 144:1 157:10
admits (6) 65:15 151:13 152:4 163:16 179:6 94:02
admitted (3) 150:17 151:22 154:25
adopted (2) 33:18,22
advance (2) 96:16 115:22
advances (1) 23:21
advice (39) 40:15 71:17,21,24 90:3,5,16 107:11,13,16 100:6,15 109:1 110:25 111:2,12 112:25 114:11,19,21 115:3,6,7,16,17,17,18 116:7 118:19 119:2,4 120:11 124:13 125:6,6 126:10 160:20 164:21 190:1
advises (3) 107:1,24
advise (1) 62:11
advised (1) 100:21
advisory (2) 106:9,10
advisory (3) 19:21 189:8
aea (1) 150:24
affect (5) 9:11 22:14 52:19 56:7 190:5
affected (2) 13:25 32:5
affects (1) 62:11
afraid (2) 2:13 67:6
after (27) 11:1 15:24 34:16,23 39:25 43:8 44:14 57:24,25 58:25 87:19,19 89:21 105:25 122:24 146:3 158:7 162:1 173:8 180:22 186:20 189:24 190:12
afternoon (5) 2 8:15 152:23 153:4,5
again (10) 28:1 3:4 6:25 7:3 8:20 26:15,22 25:6 29:6 30:10 31:14,25 32:5 34:4 36:9,10 37:8,14,10 38:1 39:13 40:7 43:25 44:13 45:15 50:3 52:7 53:16,21,24 54:8 55:12 57:20,22 58:1 67:2 65:19,19,23 66:1 83:24 74:11 75:9 76:7 79:23 80:11 81:14 81:3 102:7,9,15,19 108:24 113:17 116:22,25 179:25 183:11 190:1 114:6,6,19 115:4,12,13,21 117:25 118:11 119:23 123:6,6,8,12 127:21 135:14 149:1 175:13

119:4,11 120:16 122:7,15 142:2,6 143:9 146:7,11,12,16,17,21 147:9 151:25 152:20 155:5,20,23 156:6,22 157:9 158:15 159:11,13 160:2,3,12 161:6,23 163:9,15 164:3 165:9,22 165:25 167:3 173:5
alternative (2) 23:21 140:21
although (21) 20:4 31:14 33:6 35:20 36:10,10,20 41:17 87:6 93:9 110 17 119:1 125:10 127:20 129:5 135:7 165:11,24 184:25 186:24
always (12) 42:2 59:19 61:9 63:11,13 70:9 90:19 96:19 156:19 157:15 159:2 161:5 163:18 164:5,8,19,24 120:14 120:21 122:18 175:13
amended (1) 176:19
among (1) 188:12
amount (48) 3:16 23:7,8 31:1 49:18,19,25 50:6,6,20,24 51:22,23 53:1,2 55:9 58:5 62:1,6 64:24 67:3,18,19 60:12,14,22 69:14,16 71:18 76:25 89:7 106:12 100:3 109:4,9 110:1,2,15 109:13 129:12,13,18,10 172:18
announcement (1) 90:11
amounting (1) 28:11
amounts (6) 22:8 34:3 39:20 90:13 100:10 104:5,6
analyse (3) 30:21 132:15 134:2
analysing (1) 61:12 103:11
analysis (6) 12:4 40:12,25 52:11,19 103:12 134:7
andor (1) 11:12
andrew (351) 1:4 2:2 3:13 4:25 5:15 6:6 7:8,15 8:1,6,11,21 9:17,20 11:22 13:24 14:20 15:17,22 20:6 49:20 50:4 51:6 52:8 21:6 23:15 24:2,12 25:9,15,19 27:23 28:22 30:13,23 31:4 32:4,8 34:15,23 35:6,11 38:1 39:15 40:3 41:3,7 42:10 43:1,20 44:6,16,23 45:22 46:11,14 47:11,16 48:11,24 49:17,24 50:10 51:2,12,17 52:6,10,18 54:2,5,8,14,25 55:2,8,12 56:4,12,15,21 57:4,10,14,18 58:12 59:19,25 60:7,20 61:4,11 65:1,5,16,24 66:9 67:4,6 67:6,13,19,21,22 70:1,8,20 71:6,9,15,24 73:4 77:15,21 78:12 75:7,13,16 76:12,19,24 77:5,11,15,20 78:4 79:5 80:11 81:23 84:11,16,21 85:3 90:6,10,14,24 99:1,5,11,8 92:8,10,14,19 98:1,10:8 102:7,9,15,19 103:9 104:2,18,21 105:5,6,24 106:1 107:11 108:10 109:7 113:17 114:6,6,19 167:25 173:6 175:15 178:8 179:10,15 181:14 182:21

183:1,6 184:16 185:7 186:1 189:25
alternative (2) 23:21 140:21
although (21) 20:4 31:14 33:6 35:20 36:10,10,20 41:17 87:6 93:9 110 17 119:1 125:10 127:20 129:5 135:7 165:11,24 184:25 186:24
always (12) 42:2 59:19 61:9 63:11,13 70:9 90:19 96:19 156:19 157:15 159:2 161:5 163:18 164:5,8,19,24 120:14 120:21 122:18 175:13
amended (1) 176:19
among (1) 188:12
anyhow (1) 64:11
aoi (26) 75:3,9,14 78:13,17 79:11,12,23,24 84:3,5 86:3,18,23 88:0 90:3 105:11,17,18,22 106:7,14,16 100:19 109:4 110:11
aois (1) 100:23
apart (2) 10:3 132:8
apologies (1) 127:17
apologise (3) 2:11 5:21 110:10
apparently (4) 10:22 35:22 130:1 184:4
appear (7) 19:26 20:27:15 47:2 177:2 178:9 167:16 180:7
appearance (3) 16:8 57:2 167:7
appears (8) 11:24 27:6 49:24 81:21 99:18 127:6 164:21 189:11
applicable (3) 21:23 44:11 131:21
applicant (9) 53:15 57:15 75:11,14 100:18 101:5 106:6,14 123:24
applicants (20) 23:4 26:6 36:25 45:22 46:7 4 149:15,17 161:21 165:25 166:7,18,19,22 172:20 173:1,4,14,15 188:4,14
application (33) 4:17 9:3 10:11 29:5 44:21 92:12 94:19 100:4,14 133:3 109:5 107:10 113:16,25

137:2,6,19 130:2,4,19,23 139:9,17 140:25 141:3,24 142:11,14 143:3,8,13 144:14 145:11,15,18,22 146:4,9 147:10 148:7,10,20 149:25 150:3,6,11,16 150:25,25 153:17,20,22 153:2,12,16,25 154:4 152:16,22 158:4 159:9 162:16 168:2 169:7 171:2
annex (1) 165:11
annexes (1) 10:7
another (9) 17:2 50:5 51:4 76:9 79:23 116:15 151:15 158:6 186:1
answer (18) 5:15 14:3 15:1,11 23:12,15 25:22 30:6 49:20 50:4 51:6 52:8 54:23 68:24 69:2 70:11 137:13,14
answered (2) 46:17 102:17
answers (3) 67:22 90:8,9
antennae (2) 138:6 139:8
anticipate (1) 4:15
anticipated (1) 54:21
anticipates (1) 91:12
anybody (6) 4:12 10:19 73:22 121:17 170:22 190:5
anyone (10) 2:12 4:17 20:14 37:9,11,16 40:24 60:18 100:11 170:10
anything (17) 12:25 14:19 20:24 62:23 63:23 65:14 103:6 110:10 111:20 124:9 132:8 134:22 142:25 164:4 167:16 168:1,7
anyway (6) 64:18 118:11 123:25 126:12 139:15 154:18
anywhere (1) 64:11
aoi (26) 75:3,9,14 78:13,17 79:11,12,23,24 84:3,5 86:3,18,23 88:0 90:3 105:11,17,18,22 106:7,14,16 100:19 109:4 110:11
aois (1) 100:23

115:22,23 117:20 133:17,18,25 144:7,13 169:4 172:12 116:11 190:6,9
applications (27) 29:9 30:4,5 72:16 91:10 93:13 94:5 95:20 101:6 112:24 143:16 144:11,16 145:17,25 146:7 147:1 148:8 158:1 165:20,24 166:12 167:22,23 168:8 169:7 171:21
applied (1) 103:13
applies (3) 136:2,3 174:11
apply (3) 93:5 106:10 127:6
applying (9) 106:9 135:7
appreciate (8) 30:17 53:1,12 62:10 63:10 66:12 103:10 109:13
appreciated (1) 170:18
apprehend (1) 171:6
apprehension (1) 127:1
approached (1) 10:14
appropriate (3) 10:20 41:8 140:9
approval (2) 81:1 83:7,14 87:8 88:4,5 89:13
approvals (1) 83:22
approved (1) 69:3
approves (2) 83:23 89:22
approving (1) 70:25
approximately (2) 145:21 146:10
april (9) 1:1 156:6,11 158:8,10 159:5 165:13,14 190:2 191:13
arbitration (3) 189:21 190:2
arche (1) 151:10
areas (1) 12:15
arent (2) 58:15 147:21
argue (3) 75:15,19,20
argument (12) 17:25 46:19,22 47:1 57:5 90:10 96:25 97:1 109:14 121:14 139:3 171:6
arguments (1) 23:21
arid (1) 19:16
arguway (6) 64:18 118:11 123:25 126:12 139:15 154:18
arisen (1) 8:4
arises (6) 24:17 29:23 45:10 51:14 52:25,25
arising (1) 1:11
arms (2) 85:12,20
around (7) 31:19 63:18 119:3 163:8 173:8,12 106:22
arranged (1) 5:1
arrangement (1) 37:15
arrangements (3) 37:9 45:24 165:24
arrow (1) 145:9
arti (1) 160:24
articulate (2) 24:1 132:25
aside (6) 8:13 106:4 125:14 117:5,6 114:16 146:17
ask (11) 9:21 16:5 84:19 92:14 95:9 98:5 115:2 133:2 144:3 153:13 154:5
asked (2) 73:9 132:20
asking (6) 14:2 34:4 46:16 82:6 91:21 102:14
aspect (4) 25:19 46:19 78:15 132:11
aspects (5) 33:9 57:13 132:9 109:14 190:15
assassent (1) 162:11
assess (1) 102:11
assist (2) 5:13 141:9
assistance (1) 9:21
assistant (1) 40:25
assisted (3) 10:10 17:19 70:14
associate (1) 174:4
associated (2) 127:20 150:10
associates (1) 36:5

assume (9) 21:3 48:13 54:17 68:13 110:3 131:12 171:1
assumed (2) 43:24,25
assumes (2) 49:14 147:14
assuming (2) 20:24 132:21
assumption (4) 47:17 51:8 117:19 132:23
attached (4) 74:20 113:15 144:15 175:2
attaches (1) 87:6
attaching (1) 124:22
attachment (1) 83:17
attempt (2) 14:24 102:4
attempting (1) 55:25
attend (8) 16:1,9 17:17 18:4,13 20:0,15 190:12
attended (1) 20:6
attending (2) 5:9 20:5
attention (1) 124:24
attestation (5) 123:1 125:3,12 127:10,24
attitude (1) 190:6
attorney (2) 116:9 117:24
audience (1) 19:15
august (25) 66:16 68:17 77:24 78:5,8 79:16 81:2,11,14 88:2,8,16,25 87:2,23 88:8,22 89:21 96:20 101:16 133:4 181:21 182:1
authorities (2) 128:9,15
authority (7) 100:4,22 116:10 120:19 129:2 134:18 139:21
automated (1) 134:10
availability (1) 13:19
avenue (1) 160:20
aver (1) 24:9
averred (1) 30:17
avoid (2) 37:16 154:16
aware (13) 1:17 3:8 20:16 31:25 50:5 43:2 113:2 121:11,20 128:7,14,16 129:3 171:6
awareness (2) 20:10 130:20
away (6) 15:1,12 67:12 121:17
awkward (1) 10:16

**B**

b (1) 75:8
b1011 (4) 175:7 179:25 183:10,14
b1012 (6) 103:13,23 184:21 185:15 186:16 187:18
b1013 (4) 175:24 184:5 185:8 188:10
b1015 (1) 176:15
b1016 (1) 176:19
b1017 (1) 176:24
b1018 (1) 177:8
b1716l (1) 92:4
b17l6l0 (1) 96:19
b1716l1 (2) 96:24 98:13
b1716l2 (1) 90:13
b17168 (1) 95:14
b1716l9 (2) 96:1,12
b1i (1) 34:16
b1ll (1) 77:16
b4511 (1) 42:16
b511 (1) 91:16
b5110 (2) 92:22 93:13
b5112 (1) 93:19
b5113 (2) 95:9 98:16
b5114 (1) 92:25
b518 (2) 92:6,24
b519 (2) 92:20 93:3
b6ll (1) 144:5
back (19) 5:16 22:12 23:14 24:2 29:24 30:8,13 34:24 35:6 36:6 46:7 51:25 56:20 57:21 67:0,6 68:25 71:2 73:9 75:16 76:18 77:13 80:8,17 81:9 83:2 84:1,19 85:4,14,24 89:25 90:18 93:12 94:13 96:5,15 116:25

123:24 125:23 129:6
134:22 136:2 146:20
147:3,4 151:17 153:14
154:22 157:18 159:8,14
161:10,14 162:7
164:9,10,25 166:25 171:24
172:8,16 174:23 177:6
178:10 179:23,24 181:25
185:14,15 186:15 188:9
**background** (2) 155:19
181:10
**backtoback** (8) 45:5,14
47:12 54:9 55:4 61:18
78:11,21
**backwards** (1) 43:8
**bains** (6) 2:9 154:2 156:2
158:20 190:7 190:11
**baja** (1) 181:15
**baker** (357) 1:4 2:2,15
3:3,13 4:25 5:15 6:6 7:8,15
8:1,6,11,21 9:17,20 11:22
13:24 14:1,20 15:17,22
16:12 19:10 20:1,16,22
21:6,11,11,12,14 23:15
24:2,12 25:9,15,19 27:23
28:22 30:13,23 31:4 32:4,8
34:15,23 35:6,11 38:1
39:10 40:3 41:3,7 42:10
43:1,20 44:6,16,25 45:22
46:11,14 47:11,16
48:1,11,24 49:17,24 50:10
51:2,12,17 52:6,10,18
53:4,8,14,19
54:2,5,8,14,25 55:2,8,12
56:4,12,15,21
57:4,10,14,18 58:12
59:4,19,25 60:7,20 61:4,11
62:11,15 63:8,17 64:10,18
65:1,5,10,24 66:22
67:4,6,21 69:1 70:13
71:4,10 72:3,5,24 73:8
74:1,7,10,16,22
75:4,7,13,18 76:12,19,24
77:5,11,15,20 78:4 79:5
80:11,14 81:23
84:11,16,21 85:3
87:10,20,25 89:11
90:4,7,19,23 91:1,5,14
92:9,16,19 93:10 94:3,16
95:11 96:21,24 97:23
98:6,10,14,24 99:1,5 101:8
102:7,9,15,19 103:9,10
104:2,18,21 105:5,8,24
106:21 107:5,14,20
108:3,11 109:12
110:6,8,14,17,22
111:4,6,15
112:2,6,10,12,21 113:1,8
114:16 115:20 116:5,20
117:18 118:2,6,8,11,16
119:19,23 120:9,14,25
121:3,10 122:2,6,10
123:2,6,8,15,17,21
124:15,10 125:4,19,22
126:3,12,14,24
127:3,12,16 128:1,6,25
129:11 132:13 133:6
134:6,13 135:11
137:2,6,19 138:2,4,19,23
139:9,17 140:25 141:3,24
142:11,14 143:3,8,12
144:14 145:11,15,18,22
146:4,19 147:18
148:7,10,20 149:7
150:3,6,11,16
150:3,7,12,19 152:9,24
153:2,12,16,25 154:4
156:19 157:15 159:2 161:5
163:16 164:5,8,19,24
165:2 166:6,14 167:3
168:7,15 171:4,20
172:6,25 174:5,8,15
173:18,25 174:7,16
175:4,10 177:7,21
178:14,10,22 179:14

30:17 46:9 47:12 50:1
51:13 59:11 60:1 79:3
85:12 88:14 114:1 144:17
147:1 148:22 150:22
155:14 156:4 166:2,13
171:15
**beyond** (3) 59:13 103:2
181:6
**bhudia** (1) 1:22
**big** (1) 101:22
**bill** (1) 101:22
**billion** (14) 1:13,14 12:6
30:24 31:1,20,21,21,22
61:10,21 146:8,14 147:7
**billioncold** (1) 147:16
**bit** (9) 29:18 75:17 112:16
124:23 140:23 144:22
153:7 177:23 179:3
**bits** (1) 9:9
**black** (1) 105:17
**blank** (1) 107:18
**block** (4) 4:2,3 109:17
52:7 82:7
**blumarble** (1) 188:19
**board** (3) 6:15 38:20 142:15
**body** (1) 96:19
**boils** (1) 12:13
**bones** (2) 74:14 143:15
**book** (6) 16:19 17:15 64:4
69:11 76:23 90:5
**bookkeeping** (6) 51:3
63:1,19 67:25 71:16,20
**books** (1) 67:17
**boot** (3) 104:13 159:1
**before** (38) 1:21,22 2:1 3:1
4:20 6:20 7:19,20,22
13:1,14 19:13 27:24 32:2
35:12 43:15 44:11 59:1
63:10,14 66:4 77:5,23
62:11 83:8 100:14 112:13
**bothers** (2) 56:10,25
**bottom** (5) 7:12,17 72:16
84:10,11,12,13 86:13
87:17 89:6 92:21 95:14
146:6,22 147:6,15 165:6
173:23 186:11
**bought** (1) 48:19
**box** (15) 13:15 122:11,20
150:15 153:20 155:1
156:23,24 158:14 159:11
164:1 174:12,13,20 175:13
**boxes** (7) 101:19 163:2
172:25 173:7,13 174:2,2
**break** (12) 4:22 5:4,5 62:2
64:24 100:14 147:8 152:23
152:3,5,7,10
**breakaway** (1) 6:25
**breakdown** (1) 148:21
**breaking** (1) 133:19
**brief** (2) 16:7 157:12
**briefed** (1) 14:14
**briefly** (8) 6:13 91:13 105:6
124:16 128:5,24 150:13
179:21
**bring** (1) 92:3
**broadly** (1) 42:22
**broke** (1) 189:3
**broken** (1) 148:10
**broker** (22) 43:24 44:3,25,25
45:5,13,17,21 46:8 47:12
56:5,12 60:12,19
76:6,5,7 78:1,7,18,21
185:22
**brokerage** (1) 169:6
**brokers** (6) 26:21 45:7
157:17 174:6,12,13
**brother** (1) 103:2
**brothers** (1) 173:11
**browne** (6) 161:1
186:2,2,5,18,22

**brownes** (3) 186:7,24 187:9
**building** (1) 64:20
**bundle** (2) 11:17 142:8
**burge** (5) 82:5,10,20 83:6,11
**business** (10) 36:5 67:25
75:15 160:17 179:19
180:4 182:21 185:2,15
188:7
**buy** (7) 37:22 39:18 55:18
79:15 80:14 82:6 83:24
**buyer** (37) 39:17 43:24
44:4,18 46:9 47:13,24
48:1,3,12 49:1,10 50:18
53:13,17 54:10 55:17
71:18,23 80:21 81:25
61:16 62:3 66:6 67:18
70:18 72:3 73:1,4
75:11
**buyers** (4) 36:13 55:17
66:16,24
**buying** (2) 56:2 66:17
**buzzing** (1) 130:6
**bwi** (4) 171:13 181:16 186:21
187:23
**byproduct** (1) 55:5
**byrne** (1) 2:9

---
C
---

**c** (2) 66:19 76:21
**c1411** (1) 14:1 3
**c2711** (1) 74:2
**c27121** (1) 74:18
**calculated** (4) 54:18,19 55:5
169:3
**call** (7) 37:6 49:9 51:19
52:20 136:13 148:25
151:15
**called** (15) 6:15,24 70:22
75:15 115:6 119:1 120:21
151:2,5 155:25 158:9
166:10 176:25 178:8
180:13
**calling** (2) 58:15 127:9
**calls** (1) 11:1
**came** (4) 1:12 14:6 21:14
121:17
**cancel** (1) 69:24
**cannot** (1) 130:21
**cans** (9) 95:23 90:20 99:3,3
119:16 143:14 146:14,19
172:9
**cant** (5) 39:2 41:17,23 52:7
152:22
**capable** (2) 52:20 111:11
**capacity** (3) 110:25 170:14
**capital** (28) 75:25 77:25
76:6,22 81:18 82:7 85:6
88:15,22 146:2 155:2,5
158:9 175:12 176:4,10
180:14,16,19 181:18
182:8,10,11,16 184:3,10
185:19 188:19
**care** (1) 109:15
**careful** (5) 27:17 32:5 51:3
67:21 139:11
**carefully** (3) 4:9 97:2 162:23
**carried** (1) 160:13
**carries** (1) 120:20
**carry** (4) 20:27:19 67:21
187:2
**carrying** (1) 132:16
**cases** (10) 86:5 129:16,25
130:3,13,18,23 131:4
131:21 132:14 132:14
170:2 189:16
**cash** (27) 38:12 47:24 51:20
52:5,12 60:12,19
62:1,1,5,6 64:5,13 66:13
62:1,19,23 69:10,17
70:25 72:10 73:4,7 80:14
89:15,16
**catching** (1) 4:8
**categories** (4) 70:21 115:5
166:24 179:17
**categorisation** (1) 180:25
**category** (1) 179:22

**caught** (1) 139:4
**causation** (1) 133:19
**cause** (2) 74:4 136:7
**caused** (5) 14:5 30:16 94:10
131:25,25
**caveats** (3) 20:21 22:6 38:22
135:17 136:20 138:6,8,9
135:17 136:25 138:6,8,9
140:20,24
**caveat** (1) 23:14 26:19
136:1,9
139:15,16,17,17,25
140:20,24
**cayman** (9) 151:10
100:10,12,17 183:16,18,19
184:14 185:18
**cease** (1) 159:3
**ceased** (6) 156:20 159:4
175:19,19,20,23
**codol** (1) 165:25
**colotto** (2) 101:2,8
**cent** (1) 149:21
**central** (2) 40:10 127:23
**cc** (6) 152:5,8,14,16
163:8,22
**certain** (9) 5:19 7:12 26:10
20:16,17,17 29:9 30:12,24
131:16,19 153:20 154:13
199:11,12 185:4
**certificate** (4) 119:22
125:11,24 126:18
**certification** (12) 116:12
122:21 123:1,5,10 124:2
125:16,20 126:4,5 127:2
**certify** (1) 122:23
**cetera** (2) 118:1 119:5
**cfs** (1) 104:24
**chain** (2) 86:14 87:21
**chance** (2) 13:16,18
**change** (6) 32:23 33:1 87:3
120:2 172:11 187:13
**changed** (2) 58:7 187:14
**changes** (4) 33:5,6,23 41:22
**channel** (1) 119:8
**chap** (1) 132:21
**chapter** (1) 71:20,24
**characterising** (1) 103:4
**characteristics** (1) 93:14
**charge** (1) 102:12
**charging** (1) 167:10
**charles** (1) 163:10
**check** (6) 4:13 5:8 54:24
81:19 62:17 164:25
**checked** (2) 14:17 40:1
**checking** (4) 5:12 54:25 55:2
142:18
**chem** (1) 180:19
**chief** (1) 160:7
**choo** (3) 109:4,7,17
**chooses** (1) 103:18
**choosing** (1) 103:18
**choreographed** (2) 36:25
170:21
**choreographing** (1) 85:17
**chose** (1) 23:24
**chosen** (3) 39:16 55:6 138:7
**chronological** (3) 53:5
143:16 154:19
**chronologically** (1) 129:1
**circulated** (1) 61:9
**circumstances** (6) 1:12
103:20 128:12 132:14
170:2 189:16
**cited** (5) 34:17 117:3
130:1,10 181:1
**civil** (1) 130:14
**claimant** (1) 128:11
**claimants** (1) 133:23
**claimed** (5) 31:21 122:20
123:18,19 166:6
**claims** (23) 1:10 3:1,4 13:9
29:4 14:19,25 27:11 44:19
106:10 121:6 122:19

**136:20,21,22 140:16**
143:24 144:17 148:24
157:9 172:21 181:5
**clarification** (1) 124:7
**clarify** (3) 94:12 95:16 116:1
**clarity** (1) 91:21
**clean** (3) 41:13,10,21
**clear** (13) 11:12 19:11 23:13
25:23 39:3 94:14 99:20
129:13 130:10 139:6
168:14 184:15 189:16
**clearance** (1) 45:25
**clearer** (7) 57:8 62:12
83:8,15 88:5 124:14 148:6
**clearing** (1) 160:17
**clearly** (1) 185:4
**clerk** (6) 15:13,17,25 34:16
100:5 102:20
**client** (5) 5:19 81:6,12
105:10 114:20
**clients** (9) 14:20 15:3 26:22
45:8 64:15 94:24 105:13
166:7 172:22
**clip** (1) 117:8
**clips** (1) 110:25
**clock** (2) 64:19 112:15
**clocks** (1) 87:13
**close** (3) 30:24 32:11 182:25
**closed** (2) 45:13 73:5
**closely** (3) 43:18 46:7 148:16
**closing** (3) 43:16 49:7 148:16
**clydesdale** (1) 128:22
**cmc** (1) 74:21
**cockerill** (2) 130:18 131:18
**coincidence** (1) 123:22
**colbrook** (6) 76:14 86:4,18
80:14 89:5,23
**collateral** (12) 50:5,12
62:1,6 68:23 69:11,17
72:10 73:4 86:6 89:8,16
**collections** (1) 116:1
**collectively** (3) 30:15 33:3
163:24
**college** (1) 103:1
**column** (33) 67:4
75:5,8,22,23
76:3,4,6,10,17,18,21,25
77:7,7 122:17,18,19,19,24
125:18 126:20
145:5,7,9,12
146:1,16,17,20 147:3,5
186:17
**combined** (1) 24:5
**come** (42) 22:12 23:14
24:12,13 32:9 35:8,20
36:8,20 37:2 43:15 56:20
67:8,13 68:7,25 71:2
73:13,14 75:16 77:12
85:14 87:8 90:24 94:4,13
98:5 99:2 111:22 125:23
151:16 169:13 170:18
161:14 164:25 168:16
169:15 170:6 171:23 172:4
174:23 178:10
**comes** (7) 12:4 14:9 24:21
29:24 69:23 116:13 117:22
**comfort** (5) 5:5 153:6
**coming** (6) 9:14 19:12 38:13
49:12 50:8 157:14
**comment** (3) 10:18 12:20
181:10
**commercial** (2) 8:19 132:11
**commission** (1) 31:13
**commit** (1) 37:16
**commitments** (1) 3:18
**committed** (1) 35:17
**common** (2) 10:8 39:23
**communicate** (1) 15:13
**communication** (1) 41:12
**companies** (10) 23:6 39:19
44:12 88:10 92:25
151:15,23 164:7,11,12

**170:9** 171:14,20 172:3
179:20 180:10,17,22
181:19 184:6,7,14 185:9
186:21 187:10,20,23
**company** (23) 25:6 26:7
40:4 49:12 76:1,8,14 93:14
95:21 100:11 106:8 125:16
126:19,22,22 127:2 151:10
156:7 159:24 177:12
180:11,13,15 182:22
183:22,24 188:9
**companys** (1) 100:25
**compensation** (1) 45:15
**competitor** (1) 157:25
**complete** (6) 50:4 52:15
59:8 91:1 105:17
126:6,8
**completed** (4) 53:9 97:4
126:6,8
**completely** (4) 13:22 111:14
169:22 170:11
**completeness** (1) 61:12
**completion** (1) 19:10 49:8,9
52:21 60:5 66:18 69:6 70:2
71:6 126:25 137:25
**complex** (3) 69:20 132:4
**complicated** (3) 33:20
148:18,19
**complications** (1) 18:16
**compliment** (3) 14:4,9,21
**comprehensive** (1) 13:2
**conceivable** (1) 23:5
**concentrating** (1) 125:14
**concept** (2) 94:18 96:6
**concepts** (2) 16:23,25
**concerned** (7) 6:23 20:3
65:20 94:15 125:5 137:9
175:19
**concerning** (2) 23:23 24:6
**concerns** (3) 120:7 160:6
189:3
**concise** (1) 12:11
**concluded** (1) 7:8
**conclusion** (1) 103:12
**conclusions** (1) 91:23
**conditions** (2) 100:17 102:5
**conduct** (1) 16:17 17:10
18:13 32:15 130:8,24
132:5,16,16 169:8 190:6
**conducit** (6) 151:15 164:7
171:20 172:3 173:17
174:10
**conduits** (1) 171:12
**confirm** (2) 19:12 65:6
**confirmation** (3) 84:7,8 98:1
**confirmed** (2) 5:18 117:21
**confirming** (1) 116:9
**confirms** (1) 83:6
**confused** (2) 16:23,25
**confusion** (1) 9:10
**conjunction** (2) 55:6 72:1
**connected** (3) 164:15
165:2
**connection** (3) 100:9 152:19
181:10
**connotations** (1) 27:20
**conscious** (9) 19:3 43:16
123:14 129:19 130:2
132:19 133:13 134:19
135:4
**consequence** (8) 22:24 24:5
30:5 40:7,9 97:4 138:24
139:7
**consider** (1) 100:8
**consideration** (3) 124:23
134:9 135:4
**considered** (2) 21:2 94:22
**considering** (2) 100:14
199:11
**consistent** (1) 91:1
**conspiracy** (4) 140:2,5,10,13

Confidential

SKAT_MDL_001_00834801

constitute (1) 63:20
constitutes (1) 104:3
construe (1) 101:10
construing (1) 99:12
consult (1) 99:24
consultancy (2) 166:8,10
consultant (1) 159:22
consultants (3) 150:21,22
184:9
contact (4) 182:21 185:2,13
188:7
contacts (2) 179:19 180:5
contained (3) 91:12 93:25
101:7
contains (2) 118:25 119:13
contemporaneous (2) 128:13
129:10
contemplated (2) 23:2 120:23
contends (1) 121:1
content (3) 13:11 20:7
101:10
contentious (1) 28:13
context (39) 6:13 35:15 53:1
56:17 62:1,9 69:15 91:10
92:11 96:9,15 97:8 99:8,15
100:3,9 101:2,9 103:5,25
104:3,8,16,17 108:8
109:7,16 110:21,25
111:19,21 112:4 113:25
114:19 128:11 134:21,23
170:24 178:6
contingent (1) 169:2
continued (2) 16:3 152:14
continues (1) 20:15
contract (3) 48:11 51:18
52:2
contracting (1) 46:1
contractual (4) 12:22
49:4,16 50:7,19 51:9,10,21
52:12,14
contractually (3) 49:13
51:16,24
contrary (1) 20:3
contrast (2) 27:3 127:24
contribution (1) 19:21
control (1) 152:2
controlled (3) 35:24
176:17,8
controllers (1) 36:3
controlling (1) 151:23
convenient (2) 112:11
152:24
convention (1) 67:24
conversion (2) 11:2 97:12
convey (2) 71:24 104:7
conveying (1) 132:17
conveys (1) 109:16
conviction (1) 162:12
coordinating (1) 162:24
coowner (1) 180:2
copied (5) 15:17 34:16 83:23
84:4 86:19
copies (3) 117:2 141:13
142:17
copy (7) 11:17,18 41:8,12,14
42:5 121:15
core (1) 118:13
corner (1) 5:16
corporate (2) 17:11 150:21
153:23 154:10,23
156:20,22 157:6 158:4
159:9 162:21 177:10
correct (19) 16:19 18:12
30:22 39:8 48:10 65:3
75:20 107:18 110:3 121:9
123:14,15,16 135:22 137:3
143:2 176:19 178:17
181:11
corrected (1) 177:17
correction (4) 15:15,19
176:20 177:8
corrections (1) 41:20
correctly (2) 15:14 167:14
correspond (1) 18:13
correspondence (3) 18:10,23
164:11

corresponding (1) 18:7
couldn't (1) 67:8
counsel (7) 14:8,11,13,16
16:22 18:21 190:3
counterparties (19) 33:21
34:25 36:2 79:3
85:13,16,18 166:16,20
169:19 171:10 174:3,5,22
175:5 176:17,18 179:21
188:6
counterparty (5) 89:5
177:1,11,11,13
couple (2) 15:5 19:22
coupled (1) 133:22
course (43) 1:10,17 6:16
21:2 22:5 24:12 37:4 41:3
43:5 44:19 46:20,22 47:1
69:11 50:11 56:17 57:7
71:23 73:19 90:11 94:4,20
97:19,24 100:21 103:9
106:18 109:14 117:1
118:19 126:15 134:7
136:13 135:13 174:24
178:11
courtesy (3) 16:1,7 20:5
courts (2) 138:12 139:5
cover (8) 5:25 7:22 31:15
105:3 112:24 113:12,13
166:2
covered (6) 4:1 72:6 138:25
covers (1) 84:17
created (4) 43:17 56:1,8
64:12 69:23 117:8
creates (1) 70:6
credit (34) 40:15 71:7,21,24
90:2,5,13,16 107:24
108:15 110:25 111:2,12
114:11,19,20,20
115:3,6,7,16,17 116:7
118:19 119:1,6 121:10
124:13 125:6,6 126:10
160:20 164:21
credited (6) 67:1,20 69:25
71:19 100:21 110:15
crediting (4) 67:3 68:21 69:9
68:9 183:1
crescenzo (1) 173:10
criminal (1) 130:12
criticism (1) 121:17
crossley (1) 129:22
cs (1) 120:12
cucurum (1) 41:5
cumdirn (3) 47:3,4 68:6
cumex (3) 39:15 41:5 155:18
cumulative (1) 12:15
curiosity (1) 7:7:6
currency (1) 184:7
current (1) 69:15
currently (3) 50:15 129:2
162:11
custodian (27) 10:12 40:14
45:16 60:16 62:10
66:13,15 66:3 71:6,20
76:17 90:15 100:10 110:17
111:1,23 113:3 115:10,18
120:8,15 143:17,17,22
152:6 153:15 163:23
custodians (23) 67:17 94:23
165:11,18 114:13
143:11,20 116:23 146:3
147:4 150:6,10,20,22
152:3,19 157:11 161:15
162:5 163:13 164:9
172:21,21
custody (4) 69:22 70:7,8
138:12
cut (1) 149:19
cutoffs (1) 148:23
cycle (1) 39:24

D

d (8) 51:20,21 66:19 145:12
146:5,12,17,21
d1 (2) 25:1,2

d2 (2) 25:1,3
dai (1) 188:5
damages (2) 12:5,19
daniel (1) 173:9
danish (67) 1:13 7:12 21:23
23:6,6,18,23 24:10,20
25:3,6,10,14 26:5,5,7
31:20 36:12,12,15,23
39:19,20 44:12 45:6 47:8
48:4 52:3 54:4,17 58:2
66:17 76:21 78:7 92:11,25
93:16 94:16,24 95:23,23
96:2 100:4,11,18,20 101:1
105:17 106:3,8,9,11 108:2
113:17,18 114:2,8
122:8,20 125:14 136:1,3
145:20 146:14,18 167:8,16
180:15,16
dat (87) 39:18,22,25 40:16
41:6 44:10,11,14,15 45:7
47:4,22,23 48:8,25 49:3,10
53:24 54:1 56:10
50:1,4,6,20,20,21
59:1,2,2,6,7,11,14,16,21,23
60:2,3,4 61:6,24,25 62:25
63:20 65:7
68:4,6,10,15,18,20,21
69:6,8,9 71:5,6,8 73:18
77:25
78:5,8,8,13,16,17,20,23
81:14 86:3,8,9,17,24,25
89:8 97:13 90:4 100:15
97:15 105:16 163:21
175:11,15 176:3,3
dated (3) 105:4 108:19 126:3
dates (8) 39:16 43:21
77:19,22 159:1,6 160:18
186:20
dave (9) 102:25
182:3,11,19,21
104:6,7,17,18
day (14) 4:14 44:14 57:25
50:3,21 68:4,6 69:10,17,19
166:23 172:1,2 174:4
79:22 80:5 83:22 187:19
184:13,19
defined (2) 23:17 60:24
definitely (4) 8:14 23:25
86:19
defraud (1) 10:15
degree (2) 12:14 133:12
deliberately (3) 20:6
39:15,22,25 153:4
deliver (1) 62:4
delivered (1) 60:20
delivery (6) 47:20 48:3,21
56:8 60:12,19
delugod (1) 3:19
demonstrate (5) 14:24 85:12
100:16,16 102:5
denmark (3) 93:6 114:1
162:11
departing (2) 39:22,23
department (4) 160:9,15,15
186:3
depend (5) 30:10 67:22
136:23,25 160:17
dependant (3) 135:10
167:11 168:2
depending (8) 8:25 25:7
132:3,13,25 134:17 136:12
39:13 40:6 151:20
152:13,16 160:2 163:10
165:6 180:3
derro (1) 142:23
described (13) 6:9 27:5,16
38:7 50:16 53:8 62:22
71:12 99:5,7 125:24
136:21 138:7 164:19
distinction (1) 170:4
distributed (2) 83:10 171:3
distributing (1) 171:22
distribution (1) 110:16
divide (1) 179:16
dividend (81) 39:20 44:12
48:24,25 49:8,10,18 52:24
50:20,23,23 53:1 54:22
67:1 67:15,20 68:5 71:18
72:21 88:8 92:14,20 97:12
135:14 171:7 172:15
175:23 178:23,24 182:19
183:20,20,23 184:5
distributing (1) 171:22
distribution (1) 110:16
divide (1) 179:16
dividend (81) 39:20 44:12
48:24,25 49:8,10,18 52:24
50:20,23,23 53:1 54:22
67:1 67:15,20 68:5 71:18
72:21 88:8 92:14,20 97:12
100:15 124:8 140:25
141:1,4 144:17,20
145:2,6,9,15,17,21,22,23
146:13,16,18,20 147:1,3,7
147:17,23,24 148:10,13,20
148:24,25 149:1,2,10,12
149:17,18,22
divides (2) 23:19 24:22
dividend-related (3) 50:20
51:21 52:14
dividends (19) 23:5,7,9
26:7,9 40:5 93:1,5 95:3
106:7,17 116:22
122:18,22,23 123:5
125:11,18 126:20
dkk (1) 82:8
dla (2) 20:22 188:10
document (40) 6:1 11:15
13:4,13 34:13,22 60:2,24
81:2 83:2 84:20 85:4 88:6
92:1,2,3,5 93:12 104:4,5
105:20 110:10 113:5
116:19 118:19
160:10,22 162:3 164:22
169:22 172:6 173:8 174:14
175:22 176:2 177:21
documentary (1) 4:13
documentation (17) 6:19
65:25 66:4 100:13 101:11
101:15,16 110:24 115:23,24
116:6,25 117:2 121:13
127:19 167:8
documented (2) 46:16 49:22
documents (15) 14:25 29:9
35:10 91:11,25 93:25 94:5
101:6 104:23 112:20 114:2
117:9 120:12 141:19 143:2
166:11 167:9
does (31) 11:23 13:21 17:21
21:13 27:4 33:25 42:20
61:6 61:7 61:8,23,23 72:7
96:26 101:8 101:1,1
113:10 122:25 124:20
127:13 135:13 136:15
145:11 145:24 171:4
167:17 170:12 174:11,15
178:16 167:12 170:17
doing (17) 2:5 7:7 16:7
18:22 28:6,17 62:19
102:13 103:6 133:15
144:21 145:8 169:18
167:17 170:12 174:11,15
dollars (3) 176:6,8,9
domicile (2) 175:11 176:3
done (5) 6:21 7:9 9:5 32:7
49:4 54:9 63:9 68:5 72:7
73:19 116:22,23 145:10
146:12 171:8
dont (59) 7:17 9:13 10:16,18
15:2 16:19 16:15 19:16
34:20 36:17 37:6 40:8
41:18 42:8,10 49:19 52:1
66:7 66:24 70:11 77:12
85:17,22 88:15
99:21,23,25 102:24
105:3,10,9 107:11 108:13
115:6 116:8 117:2,5,6,16
119:7,9,11 120:24
123:12,16 125:3,6
146:12 152:5,6 153:2
159:6 160:3 162:20 171:17
email (27) 15:7 79:11,22,23
80:4,12,19 83:11,24 84:19
83:10,17,21 86:11,19

Confidential　　　　　　　　　　　　　　　　SKAT_MDL_001_00834802

87:2,8,17,21 88:2,7,21
89:13,20,22 107:23
emailing (1) 79:12
emails (8) 78:25 79:1,3
85:10,11 86:11 88:14,17
emerge (2) 40:21 172:24
emerges (2) 149:9 155:4
emphasise (1) 167:15
emphasises (1) 107:12
employed (1) 160:3
employee (2) 186:2,4
employees (2) 158:21 179:18
enable (1) 37:10
enables (1) 145:13
enclosed (5)
107:1,15,16,24,25
enclosing (1) 105:10
end (24) 11:10 15:2,25 16:13
19:13,23 22:12 24:13
25:11 31:6 38:13 46:21
50:15 61:5 69:19 88:20
96:25 117:6 123:9 124:19
132:4 163:9 172:3 187:6
ended (2) 15:20 28:11
ends (2) 109:15 134:13
engaged (2) 23:20 167:9
english (15) 7:10 21:22
24:23 25:2,8 49:8 52:19
125:15 133:1 135:19 136:6
140:2 180:11,12,15
enough (4) 42:11 43:3 70:5
189:10
enrichment (3) 136:12,21,23
entailed (1) 135:4
enter (2) 55:24 56:22
entered (9) 47:19 53:24
57:24 66:10,12 78:11
157:21 166:8 169:11
entering (2) 39:18 72:20
enters (2) 78:9,21
entire (1) 132:12
entirely (3) 31:16 139:13
entities (13) 3:16 35:22,23
36:22 93:9,10 154:10
177:10,14,18 178:8
185:1,4
entitled (13) 14:15 17:22
81:6 86:19 99:20
50:16,21,25 61:23 97:10
98:3 100:25 122:8
entitlement (8) 49:4
50:6,7,19 51:15,22 52:13
146:19
entitlements (3) 19:15 52:22
101:21
entity (18) 17:11 44:18,19
57:21 60:15 76:11 116:12
151:2,5 155:13,15 157:20
165:17,18,20 175:16
176:25 177:24
entries (22) 51:3 63:1,19
64:4,10 66:6,6,7,19
67:13,23 68:10 69:11 70:4
71:17 76:23 90:25 101:23
157:2 178:14 101:12
entry (15) 67:8
68:11,14,19,21 71:20,21
90:13 155:4 156:18,21
161:11 176:24 177:4 182:7
envisage (1) 147:18
epe (4) 9:22 34:4 66:3 76:1
equal (14) 47:16 47:16 55:14
58:13 59:9 60:11 64:4
61:25 73:16,19 109:12,17
167:5,8
equaled (1) 68:21
equality (2) 131:6 140:12
equities (1) 101:5
equity (51) 42:25 43:23,24
44:3,9,25,25 45:16 46:8
47:3,9,19 48:12 49:1 50:17
53:25 54:4,25 59:5,21,22
60:16 61:12,15 66:13
76:4,5 79:15 80:6,10

83:7,14,24 84:7,22 86:7,9
89:9
equivalent (9) 33:3 24:25
62:3 69:14,21 101:24
124:21 126:6 134:15
error (3) 123:25 138:15
177:4
esoteric (1) 136:16
especially (3) 36:1
essentially (4) 5:1,3 32:20
62:21
establish (2) 160:1,5
established (4) 32:7 38:22
182:9 186:21
establishing (3) 135:19
182:20
et (2) 118:1 119:5
evan (24) 3:20 10:20 14:22
18:14 24:14 24:17 27:8
48:16 64:8 110:23 111:24
112:9 121:15 124:3 128:16
129:18 140:5,10 147:13,21
148:2 149:4 152:14,15
170:2
events (2) 156:4 183:5
eventually (1) 56:24
ever (9) 50:17 63:22,23
92:4,9 101:6 102:4
empressed (1) 16:15
empresses (1) 129:13
expressly (2) 16:6 123:3
extensive (1) 129:21
extent (18) 7:12 28:15 32:19
33:7 35:17,18 37:5 40:11
61:8 63:18 64:2,4,5 101:10
104:14 121:21 124:19
101:6 101:6
external (4) 37:20,22 45:9
147:24
externally (2) 38:11,12
extraneous (2) 169:22
170:11
extreme (1) 130:4
extremely (1) 62:17
eyes (1) 147:24

**Column 3 (F)**

f36119 (1) 9:23
f36120 (1) 9:23
f36140 (1) 11:7
f36144 (1) 11:8
f36136 (5) 179:2 182:1,4,20
188:2
f36141 (1) 34:4
f3811 (1) 11:2
f38116 (1) 11:3
f38137 (1) 39:9
f38147 (1) 39:9
f38214t (1) 26:17
f38266 (1) 152:1
f3911 (1) 142:9
f3912 (1) 150:5
f3913 (1) 172:17
face (19) 16:5 43:12,17
7:2,10,21 9:9,20 13:1
32:14,14 33:13 34:8 35:19
42:15,24 46:12,15,25 47:3
51:7 57:25 65:18 66:13,19
123:11 125:23 167:8 160:2
facie (1) 58:22
facilitate (1) 29:4
facto (1) 199:8
factorextive (1) 134:14
factual (4) 23:20 38:23
90:12 144:19
factually (1) 103:14
fail (1) 73:17
failed (2) 5:23 189:17
fair (4) 22:6 31:15 172:18
174:17
fairly (3) 34:1 143:10 170:25
fall (1) 24:10
falls (1) 179:22
false (2) 22:19,20 23:22

falsity (8) 23:13,16,16 25:23
27:5,9 94:20 96:7
familiar (9) 40:20 46:2 92:10
93:17 114:18 153:22
155:23 165:10 181:4
family (1) 36:4
fantastic (1) 149:23
far (13) 20:2 27:5 65:20
71:14 82:2 104:24 120:7
128:23 125:18 137:8 138:2
160:6 171:5
fard (1) 152:21
fashion (1) 7:15
fast (5) 64:20 112:16 129:5,6
143:7
fault (1) 78:3
favour (1) 69:12
features (1) 6:18
february (9) 143:21,22 155:7
156:11,21 157:2 160:1,25
184:10
fee (4) 166:11 169:2,2,7
fed (7) 10:20 16:12 19:5
20:8 62:10 121:4 189:15
fees (5) 20:11 37:13
69:14,18 167:11
feet (3) 4:18 18:14 127:17
fell (1) 186:23
fertilisation (1) 161:25
fewer (6) 11:6 22:11 57:24,25
148:12 180:15
fewer (1) 20:25
fiddly (1) 144:22
figure (6) 30:14 145:19
166:22 167:6,9,15
133:16,18 160:20
formalised (1) 19:5
formalities (1) 13:6
formally (1) 156:12
format (6) 114:17 115:4,13
119:12 120:11,17
formats (1) 111:7
formed (1) 133:17
former (2) 179:17 186:1
formerly (2) 91:9 105:22
forms (14) 40:10 124:12
127:21 155:16
forsyth (1) 160:25
forward (3) 28:3 36:14 61:5
103:16 174:5,21 176:17,25
177:13
forwardfuture (1) 176:18
forwards (2) 32:23 73:13
found (8) 3:17 11:12 117:6
138:24 127:19 129:25
130:19 140:17
four (17) 79:17 87:11 88:10
93:9 105:13 110:25 111:12
145:17 147:3,4 150:20
100:10 162:19 168:12
185:16 186:10 187:19
fourth (8) 6:15 22:19 37:8
61:10 63:5 72:14 91:4
160:9
framing (1) 174:8
fraud (2) 27:11 31:13
fraudulent (3) 22:7,14
140:18
fresh (1) 65:15
frezza (4) 36:9 10:9 189:4,12
190:13
friends (5) 36:4 122:15
135:21,24 179:18
front (1) 11:14
fulfil (1) 177:25
full (12) 48:22 50:23 51:20
52:16 58:13 66:24 67:18
104:13 110:16 124:4,6
155:7
fuller (1) 12:11
fullest (1) 74:2
fully (2) 172:19 187:9
function (6) 101:25 101:23
functionally (1) 101:23

143:15 159:14
fletcher (3) 2:18 25:17 173:9
flexible (1) 78:18
flip (1) 92:17
flow (1) 30:1
flows (3) 13:16,19
focus (4) 9:11 18:1 33:13
55:16
focused (3) 2:3 39:17
focusing (1) 164:6
follow (5) 90:10 91:6 138:2
163:5 190:11
followed (1) 37:16
following (8) 22:15 32:22
35:7,14 74:21 91:19
126:25 162:11
followon (1) 14:23
follows (3) 61:22 163:7 166:5
font (2) 107:15,17
footnote (13) 10:9 12:21
125:10,13,25 126:5
158:14,24 160:22 179:11
102:4 108:1
footnotes (2) 153:10 104:15
foreign (1) 2t:7
foresight (1) 22:24
forewarned (1) 139:7
forgive (2) 24:7 109:22
form (38) 72:1 93:15,17
90:20 106:10,19 107:11
108:7 111:9 112:24 116:3
117:9,16,21,24 122:7
123:10 124:20,22 125:7
123:10 138:20 139:6,14,16,23
133:10,18 138:20

fund (1) 112:25
funded (1) 73:23
funding (1) 37:22
further (15) 2:25 20:11
70:14 81:25 85:10 91:20
96:14 99:8 106:22 131:11
160:13 162:20 166:21,20
183:2
furtherance (1) 10:13
future (11) 42:1 43:16 53:17
54:11 65:20 80:21 84:4,25
148:7 174:7 176:17
futures (36) 32:23
53:6,7,12,12,17,18,23
54:10,12,16,16 55:3,4,15
56:6 61:5 72:25 73:11,24
75:11 76:6 78:15,18,22
79:2t 60:1,16,20,23 81:7
82:21 83:11,19 84:8,21
fzc (1) 176:25

**Column 7 (G)**

game (4) 150:12,25
ganymede (16) 151:10 164:7
165:6,9,9,16
166:1,8,11,15,19,19,19
171:8 173:16 174:10
ganymedes (1) 171:2
gave (4) 48:5 128:12
172:22 184:24
general (3) 21:19 23:3 27:24
generally (5) 3:1 4:16
6:5,23 61:22
generate (5) 38:12,19 64:8
73:21 109:22
generated (4) 38:12 71:15
167:10 168:8
generates (1) 71:7
generating (1) 168:4
generation (2) 90:16 170:22
genuine (1) 176:13
german (3) 120:1,3 155:17
germany (2) 81:21 120:1
get (42) 4:10,13 7:20 12:25
16:15 19:16,22 28:12 30:6
33:11 34:5 41:23 60:16
61:9 63:9,10,18 65:12
69:5,6 71:22 77:8 80:8
92:21 96:24 116:8 119:3
149:15,16 152:16 165:25
168:24 170:1 179:2

goal (8) 105:3,9,21
107:21,23 121:14 127:13
157:22
goals (1) 106:24
godson (5) 2:18 17:9 19:7
25:17 173:10
goes (19) 9:25 30:8 44:16
57:1 60:10 66:20 71:14
127:25 130:5 135:1 136:14
130:25 131:3 134:6 136:8
138:2 166:19 175:24 185:9
going (115) 2:12 4:10,13
5:25 6:6,8 7:13,19,22 8:22
9:10,16 14:11 18:9 19:4
23:3 24:2 26:25 27:9
29:6,11,12,16 30:13 32:9
33:12 34:2 35:5,7,14,15,21
75:11 76:8 78:15,18,22
59:24 60:8 62:18 63:14,17
64:16,25 65:12 71:23
67:25 88:19 90:16 121:25
47:15 49:11 50:4 51:6
54:23 56:9 57:8 61:9
74:11,13,25 75:22 79:1
85:9,17 90:20 92:4,22,22
96:7,22 100:7 110:7,10
109:10,15,16 122:5 129:6
132:7,23 134:9 135:3 138:25
42:5 43:16 45:3 46:7,21
47:15 49:11 50:4 51:6
54:23 56:9 57:8 61:9
74:11,13,25 75:22 79:1
good (12) 1:4 20:1 64:16
114:22 117:18 141:21
146:13 149:13 153:2
183:13 190:10,16
governing (1) 24:16
graham (4) 156:2 158:20
159:5,25
grantklar (1) 156:1
graph (1) 157:13
graphs (3) 140:5,7,15
grapple (3) 24:16 29:11,25
grasp (1) 33:23
grateful (9) 8:10,17 16:6
20:2,16 42:14 112:22
92:18 139:3 140:25
graytek (1) 100:11
great (1) 35:23
greater (1) 81:1
greatly (1) 132:2
green (1) 53:18
grey (3) 176:1,2,20
griffiths (4) 160:8,11,13,15
gross (13) 49:19,23 50:6,7
51:11,15,22 109:5,23
114:12 132:19 143:23
168:18
ground (10) 37:23 152:11
56:9 157:22 158:25
160:6,13 161:19 171:13,19
grounds (1) 163:24
group (7) 37:13 163:23 164:3
177:1 190:7 165:9 166:11
groups (6) 2:25 8:18 172:24
173:2,4 183:3
gss (11) 63:21 84:2 89:20
160:9,14,23,24 161:8
gst (1) 188:3
guenther (2) 155:25 156:1
guessed (1) 116:20
guides (1) 8:9
gulf (1) 185:9

**Column 8 (H)**

h (2) 76:17,10
half (1) 40:15

April 15, 2024                     Skatteforvaltningen v Solo Capital Partners LLP & Others                     Day 1MT

halfday (1) 8:3
hand (2) 41:1 101:14
handed (3) 41:2 120:20
141:11
handful (2) 25:13 179:11
handout (2) 20:13,14
hang (1) 39:1
happen (5) 2:13 37:11
43:9,16 85:18
happened (9) 13:17 24:8
41:17 43:8 47:23 50:17
51:4 59:5 64:9
happening (7) 18:17 50:15
88:19 103:15 132:19
157:23 160:12
happens (9) 43:7,9,25 62:25
63:1 121:10 123:22 145:6
150:10 151:1
happy (3) 42:12 133:20
190:11
havent (5) 11:12,16 72:6
120:9 137:15
having (18) 3:24 6:21 7:9
15:9,25 20:9 37:11 41:9
58:7 63:24 64:7 77:6 85:16
86:16 124:25 149:13 177:9
181:22
head (20) 2:7 3:22 11:21
39:7 41:18 52:7 63:9,18
69:5 121:3 126:13,16,25
127:6,11,15,17 160:9,24
162:22
headed (2) 104:10 118:19
heading (5) 92:8 93:21 103:8
172:19 175:5
headings (1) 122:17
hear (3) 3:21 137:2 161:4
heard (2) 19:11 116:21
hearing (3) 8:3 189:21
190:19
hearings (1) 9:6
heart (2) 22:7 130:22
heavy (1) 9:2
hedge (3) 56:1,25 82:18
hedged (1) 73:21
hedges (1) 55:16
hedging (1) 56:13
held (5) 94:9,11,23 110:4
131:6
help (3) 29:18 35:9 140:22
helpful (9) 3:10 9:5,7 42:2
62:17 76:11 91:23 128:2
142:3
helps (1) 103:3
here (35) 1:5 14:1 39:23
44:10 70:7 71:21 75:14
76:17 77:1 79:23,25 80:4
86:2 87:18,19 90:2 95:18
103:5,6 105:2 106:16
110:21 113:24 119:1,9
120:3 125:24 127:7 150:22
159:16,25 161:18 162:16
175:8 178:7
hesitate (1) 126:13
high (2) 154:14 174:22
highlight (4) 43:21 145:12
146:5,12
highlighted (1) 75:25
highlighting (3) 146:16,17,21
highly (2) 94:20 130:15
himself (1) 5:22
historic (2) 21:10 164:11
history (2) 24:24 33:9
hmrc (2) 101:15 103:1
hogarth (5) 2:15 14:1,17
15:16,21
hold (3) 52:1 70:7 95:2
holding (1) 64:15
holdings (14) 119:14 120:22
150:25 154:1 156:24,24
157:4,4,8,12,20 159:10
163:5 164:3
hons (1) 139:22
honest (4) 33:4 38:25
102:9,10
honesty (1) 33:10

honour (1) 16:21
hoogewerf (12) 2:10 15:23
16:6,10 17:4 18:8,12,18
19:6 20:11 25:16 154:2
hook (9) 3:9 14:1,2 15:23
189:4
hope (12) 12:3,12 13:17
177:17 133:12 142:9 163:1
189:4
hoping (1) 5:8 29:17 117:7
horn (12) 12:3,12 13:17
154:2 156:2 158:20
159:5,25,25 160:6
165:10,13
hours (5) 6:10 87:11,12,15
88:10
house (3) 13:9 154:8
164:11
housekeeping (7) 1:3 7:23
13:25 30:10 109:1 191:3,5
however (4) 22:4 71:4
202:11 176:9
human (2) 133:15 134:12
hundred (2) 69:17 176:5
hundreds (1) 176:8

                  I

idea (1) 116:15
identical (7) 83:10 89:10
83:10,17 84:2 115:5,13
identified (14) 40:20 63:3
34:25 36:19 64:18 66:6
69:4 73:25 75:6 129:24
142:16 152:10 154:13
161:7
identifies (15) 76:21,25 98:3
154:9 175:7
identify (28) 3:5 6:3 15:19
25:13 26:20 31:11 35:17
40:4 51:7 74:19 91:9 95:17
96:14 135:24 140:20,24
141:15 142:7 143:11
153:20 161:3 172:19,23
143:18 146:11 172:16,22
188:2
identifying (6) 6:18
27:12,13,22 79:14 142:3
identil (2)
ie (3) 47:6 54:19 107:15
ignore (1) 96:9
illustrated (1) 148:4
illustration (2) 42:15,21
im (93) 2:13 3:8,20 5:18,24
6:4,7 8:10,13,17 9:1 11:17
16:5,18,19,22,23 20:7,16
21:16 25:1 26:14,25 27:11
28:5,17 32:5,5 37:6,24
29:3,17 32:5,5 37:6,24
65:2,12 70:17 74:23,25
79:1 87:6 97:19
101:25,25,25 102:2,7,14
102:22 107:12 112:17
117:7,10,10 118:20 123:7
124:25 125:5 126:16,22
130:9 127:14 136:11,23
119:13 120:17 133:20
144:11,19 147:19
instinstruct (1) 148:4
instead (3) 4:14 116:23
117:1
instinct (1) 51:24
institution (5) 107:7
125:17,17 126:19,20
instructed (5) 16:9 18:11,11
39:15 189:18
instructing (1) 189:20 190:3

idea (1) 116:15
identical (7) 83:10 89:10
83:10,17 84:2 115:5,13

important (6) 8:24 43:11
100:8 134:15 141:6 171:21
imposed (4) 100:5,24 104:12
106:13
impossible (1) 95:2
impression (1) 36:21
inability (1) 37:19
inaccuracies (1) 170:20
inaudible (8) 29:10 52:17
53:7 57:3 129:8 148:12
171:9 180:22
incarcerated (1) 162:11
include (3) 4:7 21:3 93:4
included (2) 34:10 165:9
includes (2) 120:12 158:19
including (17) 3:16 6:19 16:4
19:10 16:25 63:1 70:17
82:7 09:6 120:10 122:17
150:23 153:22 160:23
160:23 165:10 166:22
inclusion (1) 178:8
income (1) 115:16
inconsistent (3) 160:19
169:5,17
incorporated (15) 153:18
155:14 164:1 171:14
181:17 184:1,9,14 187:11
188:21
incorporation (3) 175:11
176:3 186:20
incorrect (1) 65:8
incredibly (1) 110:23
incur (2) 20:12
incurring (1) 20:10
independent (1) 39:22
36:22,22 61:6 65:12,21
153:24
independently (1) 181:9
indic (1) 191:1
indicated (2) 14:9 125:5
indicates (1) 83:21
indicating (3) 163:13 82:22
133:19
indication (3) 12:14 20:17
176:10
indicators (1) 33:10
introduction (1) 198:22,23 199:12
indirect (2) 33:8 93:9
indirectly (1) 94:25
individual (2) 3:22 5:22
16:16 17:2,8,10 80:18
133:24 159:13 165:3
179:6,18 181:1
individually (1) 144:16
individuals (9) 1:8 2:16 7:1
17:9 35:24 154:10
179:16 181:1
induced (2) 136:14,17
inducement (1) 130:19
inevitable (2) 103:10
inefficities (1) 90:10
influence (1) 103:10
inform (1) 3:14
information (17) 91:21 96:14
101:17,19 102:11,24 103:2
109:17 116:18 115:5,13
119:13 120:17 133:20
144:11,19 147:19
inadequate (1) 32:11 73:10
initially (3) 8:13 33:13
171:16
innocence (1) 171:1
inputted (1) 107:21
insist (1) 9:2
instance (3) 13:17 68:11
123:23
instances (1) 178:2
instantly (1) 68:18
instead (3) 4:14 116:23
117:1
instinct (1) 51:24
institution (5) 107:7
125:17,17 126:19,20
instructed (5) 16:9 18:11,11
39:15 189:18
instructing (1) 189:20 190:3

instructions (2) 133:15
152:15
intellectual (1) 111:7
intended (9) 15:10 27:19
20:2 127:6 142:6,6 143:10
173:15 174:8
intending (1) 132:22
intention (3) 19:3 130:9,11
interest (9) 36:15 86:23 87:5
94:14,15,16,17 100:22
142:24
interested (2) 36:23 64:1
interesting (3) 117:24
128:17
interests (3) 36:12 64:1
interface (1) 46:9
intermediaries (1) 60:18
intermediary (1) 61:17
intermediate (2) 54:10,11
internal (4) 65:3,25 66:4
116:19
internalised (3) 37:21 70:22
71:17
internally (2) 60:17 65:22
interpolated (1) 10:17
interrupt (2) 5:18 126:13
interview (1) 162:13
into (56) 7:20,23 8:14
11:9,25 13:15 18:15 19:17
21:20 28:12,19 39:20
46:1,7 47:20 48:17 53:24
52:24 56:22 57:9,24
66:10,12,13 67:15 69:5
71:22 72:20 73:14 77:8
70:9,11,21 84:19 96:24
120:16 131:19 137:23 158:1
141:10,18 149:9 152:17
154:15,16 157:21 158:1
165:23 166:8,24,25 168:24
169:11 173:20 179:17,22
introduce (1) 179:12
introduced (6) 35:25 149:16
166:21 173:14 179:7,16
introduction (1) 149:18
introducers (3) 166:17
176:10 191:1
introducing (1) 6:16
introduction (4) 20:20 22:12
42:5 90:21
introductions (1) 173:17
introductory (1) 118:17
investment (1) 162:14
investments (3) 141:10
183:13,22
invite (14) 17:24 42:6 66:1
94:1 96:8,18 90:7,21
105:1,6 115:21 120:8
151:25 173:21
invited (1) 124:1
inviting (4) 26:14,16 74:23
162:5
involve (3) 12:15 88:17
112:1
involved (24) 22:1 28:1 29:9
31:12 36:7 39:16 68:11
53:12 57:11 141:21 142:4
149:10 155:17,23 157:18
157:25 165:22 166:16
involvement (6) 12:2 54:21
29:16 46:10 53:6 148:12
involves (1) 35:21
involving (7) 7:1 33:20 37:21
43:24 53:17 61:15 172:3
islands (1) 183:18
isnt (2) 33:5 130:23
isolation (1) 11:9
issued (7) 99:2 100:18,18
100:25 175:12 181:18
issues (17) 7:10,12 21:1
22:15,25 23:11,19 27:10
31:5 47:21 48:6 88:12
91:20 96:3 97:5 100:19
112:1,4 122:13 129:6
135:25 147:20 168:5,22
182:2,3 ar 190:21 192:6
knowing (2) 28:18 111:20

italicised (2) 107:17 123:3
italics (2) 77:23 124:24
item (2) 90:13 125:25
items (1) 109:18
iterations (1) 73:12
its (27) 2:14 110:8 22:7 38:22
40:1 43:17 44:8 47:18
49:23 50:19 96:4
100:12,15 105:10 111:13
115:12 126:9 128:24
134:10 138:24 139:11
157:22 158:1,9 168:20
163:21,22
itself (20) 12:19 27:19,25
22:22 47:3 55:4 56:5 70:6
77:4 96:8,10 107:9 110:8
112:12 163:4 166:15

                  J

j (4) 67:3,4 130:18 131:16
jain (6) 2:18 17:8 19:7 25:17
154:2 161:18
james (2) 161:12 163:20
january (8) 152:6,7 161:19
162:3,9 163:8 164:4 187:10
jas (3) 154:2 156:2 159:18
jason (2) 161:1 186:2
jess (1) 161:1
john (1) 173:9
joined (3) 156:1,2 158:19
jointly (1) 10:10
jones (6) 2:6 3:21 5:8,18
26:17 27:1
jory (1) 2:8
judge (4) 15:3 16:21,24 42:3
judges (2) 14:24 130:5
judgement (20) 2:24 12:17
13:12 21:2 23:11,19 40:21
47:22 48:6 56:11 91:10
94:22 96:3 97:5,6
121:14,16 148:3 155:9,10
judgments (1) 30:20
judicial (2) 21:12 40:25
july (6) 52:6 159:20,20
171:15,21 183:6
jumping (1) 65:12
june (4) 74:21 159:5 160:10
165:15
jurisdictions (1) 1:9
justify (1) 131:8

                  K

k (6) 145:5,7 146:1,7,20
147:3
kc (3) 2:6,7,8
keen (4) 43:6 63:8,14,17
keep (6) 51:3 92:2 131:22
153:5 166:19 190:12
keeps (1) 172:22
kept (1) 90:14
key (1) 6:17,18 27:10 31:5
77:18,22 91:8,11 95:7
142:1 161:6
kicked (1) 51:25
kind (2) 49:6 126:10
kindly (1) 8:2
kingdom (1) 155:16
kings (1) 16:22
klar (11) 2:18 7:5 26:3 27:4
35:23 37:20 38:14 155:5
162:6 165:18 167:9
knew (2) 20:15 29:21
knott (12) 2:10 15:23
16:6,10 17:4 167:3,12,18
168:4 122:15 170:1
leaves (1) 186:23
leaving (2) 66:10 143:14
led (3) 37:20 103:12 120:14
leda (3) 178:8,12 184:12
leeds (1) 129:22 130:5
left (19) 11:2 72:8,9 92:3
132:2 127:7 151:1,4,6,8,16
159:20 160:10,12
165:13,14 174:15 175:6
186:22

knowingly (1) 29:22
knowledge (5) 20:25 21:4
28:9 140:8 170:7
known (5) 19:14 131:6 151:9
162:9,15,24
knows (14) 1:10,15,25 6:24
21:20 30:14 36:7 39:25
162:9,15,17 144:8 182:16
koerner (11) 2:19 76:2 81:18
82:1,24 88:13,16
162:9,19,21,24
koerners (1) 02:14
koi (2) 113:20 114:4
kronc (22) 1:13 12:5,6
31:20,21 66:17 68:13
69:18 78:7 62:22 86:6
92:5 100:22 120:11 145:20
148:6,14,18,22 147:6,8,16
176:8

                  L

l (2) 66:20 75:22
labelled (2) 115:16 119:10
labuan (1) 110:12
land (1) 113:17
lane (1) 163:13
language (10) 17:3 39:23
46:4 65:11,13 113:7
118:17 124:21 125:20
133:17
laptop (1) 61:20
large (5) 22:9 30:17,19 149:4
151:11
largely (5) 23:12,13 33:18
35:16 112:7 135:22
larger (1) 107:17
larosa (20) 75:16,20,21
79:12,23 80:5 81:6,15
82:9,23 83:7,13,17,23 84:3
86:18,21 87:2 88:3,8
last (14) 1:5 3:17 15:6,25
57:12 69:10 79:22 129:2,3
143:18 174:12,13 175:13
169:13 174:14
liked (1) 11:13
likely (7) 32:4 123:24 27:11
31:6 41:22 101:10 112:14
limit (3) 145:9 146:1,5
limited (3) 24:8 155:2 158:9
lindisfarne (17) 2:14 14:1
32:3 71:12 115:19 117:11
160:4 174:22 181:12 126:7
140:22 167:15
line (12) 42:25 43:23 44:10
45:17 46:12 84:10,11
107:7 127:8 157:14
163:5,13
lines (1) 163:7
lines (1) 165:19
liquidity (6) 79:13,24 80:6,8
81:7,12
list (11) 3:6 74:20 115:21
172:14 20:2 24:5 28:3
30:5 33:2,4,13 38:15 48:4
63:12,18,24 68:8,9,10 70:17
93:21 97:5 99:24 100:16
121:22 128:12 129:1
132:13 133:22 135:2
163:15 167:3,8,10,16 167:9
169:9 170:3 180:4
189:17,20
litigant (5) 16:17
17:1,2,10,11
litigants (2) 17:8 19:7
litigating (1) 17:9 19:7
little (15) 29:18 42:13 62:18
75:16 07:2 116:21 117:8
121:6 134:6,12 137:10
127:7 138:6 162:17
183:2
live (1) 3:1
lively (1) 128:8
lloyd (6) 161:23 165:3
59:16,20 60:15 61:17,24

62:3,5,7 66:7 67:7,9 60:23
70:3 76:10 80:16
89:5,14,23
**loans (8)** 57:24 58:3
60:1,24,25 65:7 72:7 73:2
**located (2)** 67:10,16
**lock (1)** 53:17
**logged (2)** 5:12,17
**logic (2)** 58:16,23
**logically (1)** 100:13
**long (12)** 3:9 18:2 23:19
39:12 55:21,21 56:2 62:21
81:19 110:23 148:16
189:18
**longstanding (3)** 179:19
180:4 186:1
**look (60)** 8:16 11:22,23
13:12 15:1 30:4 34:2,24
35:1,15 40:13 41:18 43:22
47:15 61:2 70:12 71:2 75:5
76:3 78:2 84:10 85:8,25
87:1 90:1 91:25 92:7
93:13,19 94:1 95:12
90:17,21 101:5 104:4,10
105:7 108:13 113:11 114:4
115:2,10,18 116:3
124:1,25 128:23 145:1,7
149:9 154:22 159:8 162:23
169:14 170:7 171:24
176:9,15 181:25 182:7
183:10
**looked (13)** 57:5 75:12 76:22
79:14 90:8 115:21 117:23
120:10 121:12 142:16
143:5 159:9 176:7
**looking (33)** 13:14 34:3
42:11 63:8 64:24 50:5
66:14,15 75:24 76:17
77:16 79:10 95:5 96:9,12
97:1 106:24 121:18,21
125:10 134:1,12 143:9
145:13 146:2 148:1 156:17
158:6 160:21 163:12
167:23 173:22 182:18
184:5 185:15 186:9,16,19
188:1
**looks (18)** 75:8 80:22 85:20
41:23,13 119:20 123:3
125:13 145:5 147:19 155:3
150:10 176:10 180:9
181:12 184:22 186:1
187:18
**looms (1)** 151:11
**looms (1)** 20:13
**lords (2)** 183:7 18# 18
**lordship (453)** 1:7,9,10,15,25
2:3,10,23 3:2,8,9
4:20,22,24 6:8,11,17,23
7:3,13 8:2 9:18 21:1,2,4,20
22:4 24:11 25:5,12,13,21
26:14 27:10
29:1,6,11,18,24 30:9
31:6,11,18,24,25 32:2
33:16,17 34:2,7 35:12,19
40:19,24 42:6,8,9,22 44:7
46:2 50:4 52:8,9
53:11,15,25 57:22 58:9
61:3 63:5,5,6 65:2
66:1,5,8,11,14,16,18,20,21,25
67:2,3,12 71:3 72:17,19
73:25 74:12,13,25
75:2,5,8,9,24
76:3,5,6,13,16,20,22
77:2,16,18,22,24
78:10,13,14,19,24,25
79:1,2,11,16,17,21
80:3,9,10,12,18,22,22
83:1,10,17,25
82:8,10,14,25 85:15,15
86:2,10,15,22 88:2,9,21,23
89:4,9,12,20,22 90:1,24
91:8,9,11,16,18
92:10,14,18,24
93:3,13,17,24 94:1,5,8,21

95:7,9,15,18 96:8,18 97:18
98:3,4,7,11,15,21,22
102:13,17 104:13,22
105:1,2,6,9,20,21,22
106:1,4,5,23 107:8
108:1,8,14,17,20
109:1,5,9,11 110:3,20
111:18 112:1,8
113:2,6,9,16,20,23,24
114:6,11,17,21,24,25
115:2,4,7,8,14 117:23,25
116:1,4,13,17,21,24
118:1,3,8 119:4,7,10,17,24
119:2,7,16,19,22,24
122:3,7,11,16,21,22,25
123:3,20 124:11
125:11,13,13
126:1,7,14,19,22 127:6
128:1,8,10,16,18,22
129:8,18,23 131:11 133:1
134:2,17 135:8,10,18
**lordley (3)** 129:22 130:4,18
**losses (6)** 22:10,22 29:25
30:3,7 31:21
**lot (3)** 30:10 84:18 129:7
170:19 79:18 82:22
132:9 147:25
**loud (1)** 19:11
**lower (2)** 73:15 161:17
**lui (1)** 2:9
**luxembourg (1)** 93:10

---

**M**

**m (1)** 76:4
**mac1041 (1)** 120:24
**mac1046 (1)** 120:10
**mac1047 (1)** 130:6
**main (20)** 24:4 25:25 26:19
37:2,15 38:23 45:9 56:19
99:11 155:12,15,25 156:4
166:2 173:14 179:2,2
168:25 180:17 181:20
164:2,12
**mainly (1)** 31:24
**majority (2)** 76:8 164:14
**make (32)** 35:11 44:20
101:12
**making (21)** 10:10 16:7
26:2,16 33:14 20:3 38:2
40:17 59:13,19 73:22

101:6,15 111:23 118:1
132:14,23 134:4,18 136:17
51:25 186:3
140:14 144:16
**malaysian (5)** 93:8,9 161:21
173:3,14
**man (3)** 30:21 31:2 102:11
**manage (2)** 5:4 153:6
**managed (1)** 48:17
**management (6)** 8:4 9:6
24:5 156:12 160:8 185:9
**mandatory (2)** 124:23 125:9
**manila (1)** 103:7,14,16
**many (13)** 23:23 35:23
80:7 81:20 82:3 109:21
167:4 169:13 175:22
176:5,8
**map (1)** 6:4
**maple (12)** 6:24 11:4 127:10
32:20 33:18,22 119:7
142:21 149:25 176:21
177:1
**march (15)** 78:20 81:8 82:21
129:9 156:15,18 159:20
161:16 174:10 162:3,10
172:10,14 183:20
**mark (1)** 162:9
**market (10)** 54:15,16
55:19,21,22 56:1 58:6
65:23 73:10 185:17
**martin (3)** 76:14 86:17
126:21
**masons (1)** 8:8
**master (3)** 144:7,14 146:24
**match (3)** 45:1 47:13 148:21
**matched (7)** 56:22 50:5,18
68:21 73:11,12 90:15
**matches (1)** 66:21
**material (6)** 37:16 66:4
70:25 117:6 134:1 158:17
**materially (1)** 97:16
**materials (2)** 93:16 117:21
**matter (21)** 1:9 4:15 7:13,21
14:15 15:22 17:10 18:20
26:5 29:7 45:1 48:11
52:2,19 59:8 61:7,0 63:17
95:21 101:1 110:21
111:15,17 131:5,23 134:14
136:15 137:22 165:17
189:13 190:13
**matters (11)** 7:14,16 8:4
148:2 154:9 18:4
125:20 136:19 152:24
124:5,20 136:19 152:20
**mio (1)** 8:22
**miralty (1)** 137:4
**mine (1)** 89:9
**miscellaneous (1)** 8:22
**misled (1)** 11:19
**mispronounced (1)** 42:11
**misreading (1)** 126:14
**misrepresentation (16)**
22:14 91:17,24 130:11,14
136:14,22,24 137:10,20
138:1 139:20 140:11,18,22
141:2
**misrepresentations (5)** 6:12
22:8 135:14 140:7,14
**mission (1)** 133:21
**misstatements (1)** 99:16
**mistake (11)**
134:16,17,19,25
137:22,23,23 138:13,14
139:20
**mistaken (5)** 136:10,11
137:7,16,17
**mitchell (9)** 2:19 166:1
180:2,4,6,21 181:3,5,9
**mixed (1)** 119:3
**modd (37)** 20:23 29:3,3,8
32:14,21,22 33:18,19,22
34:4,9 35:3 37:21 38:16
42:16,21 43:2 45:9 47:7
50:14 54:10 55:7 56:1,5
58:23 59:5 60:3,9,10,22
60:13 70:14 25 113:5,20
64:22 70:16,19 74:10 92:4
102:12 103:24 108:15
103:1 112:17 113:23
116:20 116:9,9 122:5

30:18 140:10 84:24
158:5,7 161:7 162:22
164:4 173:20 182:24
183:21
**monday (2)** 1:1 132:11
**money (10)** 12:13 37:12,17
66:23 67:19 106:19
140:15,16 149:11 166:1
**monies (1)** 101:18
**months (2)** 54:7 186:22
**more (50)** 3:11,21 5:5,22
8:12 11:10 21:13 24:18,19
26:25 29:10,16 30:2 32:11
33:20,21,24 36:8 62:25
67:14 68:8 69:20 70:4
75:17 94:13 96:6 111:17
113:3,3 120:4 128:19
134:16 137:11 139:20,22
143:5 147:24,25 148:10,19
161:1 163:14 162:3,23
163:1 172:10 173:19
**morning (10)** 1:4 14,25
8:12 16:8 30:16 87:20
132:11 153:1 182:13
**most (10)** 31:16 37:1 129:4
136:1 141:6 165:25 166:19
175:17,20 179:7
**move (9)** 55:20 62:24 69:4
91:2 129:5,6,7 141:5
143:10
**moved (8)** 63:23 158:18
160:2 162:19 164:23,24
165:1 186:13
**movement (6)** 30:11 56:1,5,10
82:7 84:17 86:3,5 109:3,22
146:10,18,22,23
147:6,7,16 176:5
**mmills (5)** 185:1,3,7,10,12
**mind (18)** 12:24 14:2 15:12
30:2 63:11,13 70:16
71:11 100:8 110:24 121:23
129:17 130:22 138:2 15:3
133:3,15 139:18,19 144:3
147:13 150:19 152:12,21
153:7 162:15,22 166:4
157:10 160:9 169:14 187:7
190:12
**needed (2)** 32:7 117:13
**needing (1)** 109:15
**needs (4)** 15:15,19 41:12
167:4
**negative (2)** 15:4,9
**negligence (2)** 136:16,18
**negligent (1)** 140:22
**net (27)** 37:21 49:10,25
51:11,15,23 56:24
60:17,23 63:2,20 64:2
70:25,25 71:1,17,18 93:2
109:6 110:1 115:1 120:20
**netted (1)** 64:7
**netting (3)** 28:14 64:3 74:2
**neurological (1)** 132:10
**neutral (6)** 27:17 326 39:23
142:6 170:7 190:2
**neutrally (2)** 49:5 50:20
**never (5)** 21:11,12 94:23
97:9 100:23
**next (16)** 19:23,24 74:11
76:3 16:19 91:2 95:5 101:5
105:19 114:6 144:6 181:12
139:9 141:4 166:3 189:14
**nicetiess (1)** 14:15
**nil (3)** 59:16 70:9 74:3
**nine (2)** 116:15 173:1
**nirav (1)** 160:25
**nirava (1)** 101:15
**nobody (3)** 4:18 41:12 63:22
**none (2)** 36:13 46:2
**nonetheless (5)** 21:9 27:10
38:21 103:14 127:4
**nonmain (1)** 37:6
**nonresident (1)** 119:11

<div style="margin-left:auto">

---

**N**

**name (7)** 2:12 116:9
103:16 107:22 181:3
183:14
**named (1)** 163:15
**namely (6)** 7:4 71:17,25
135:17 177:23 179:17
**names (7)** 153:22 155:24
165:10 107:11,12,13,14
**narrowings (1)** 10:22
**natural (1)** 102:3
**nature (7)** 6:22 10:3 61:19
62:15 68:1,18 101:20
**navigate (1)** 67:11
**navigated (1)** 68:11
**ncb (4)** 119:8,10 120:1,11
**near (1)** 152:24
**nearly (2)** 68:12 187:6
**neatly (1)** 43:3
**necessarily (11)** 20:18 38:5
48:6 69:19 106:11 109:25
139:9 142:14 169:1,5,17
**necessary (7)** 60:2 94:13
99:12 131:22 136:5 139:25
140:3
**need (44)** 5:5 8:7,12,15 9:21
12:4 14:20 19:16 24:15
31:6 37:16 49:19 51:3
60:18 67:21 72:7 73:6,23
85:8 87:2 90:12
99:21,23,25 102:11 133:9
135:3,15 139:18,19 144:3
147:13 150:19 152:12,21
153:7 162:15,22 166:4
157:10 160:9 169:14 187:7
190:12
**nonsolo (1)** 26:22
**nonstandard (1)** 48:18
**nor (1)** 169:4
**normal (2)** 2:14 33:7
**north (1)** 119:8
**note (31)** 15:16 44:9 60:15
42:18 63:11 71:7,25 76:17
79:17 90:3,5,17 99:10,20
110:25 111:2,13 116:7
114:8 122:5,11 125:6 144:1
158:14 161:6 162:15
179:13 180:15 184:7,22
186:5,14
**noted (9)** 25:24 31:10,14
36:22 44:13 96:5 150:18
154:24 165:7
**notes (4)** 89:1 106:25 120:12
136:18
**nothing (8)** 28:5 48:14 50:17
64:9 66:9 106:17 111:19
136:18
**notice (6)** 61:1 109:1 112:21
116:5 119:24 125:18
160:20
**notices (1)** 114:12 115:18
**notification (1)** 119:21
**notwithstanding (1)** 69:9
**novation (5)** 45:25 46:5
62:13
**novus (20)** 76:5
**nth (1)** 152:21,21 79:12,24
80:4 81:4 82:5 83:6,6,23
84:4,8,9 157:17 174:14
**nuanced (1)** 36:8
**nuances (2)** 32:18 51:13
**number (32)** 1:18,18,20 1:19
7:1 11:17 21:21 24:9 29:12
30:24 35:22 54:6 78:12
136:4 149:5 153:22,23
159:12 165:21 177:2 182:12
185:10 188:11
**numbers (11)** 34:25 77:7
84:11,14 148:7 167:18
188:18

---

**O**

**o (1)** 76:10
**oakley (9)** 2:19 167:25
180:1,4,6,21 181:3,5,9
**objection (2)** 109:10,13
**objective (1)** 29:4
**objectively (3)** 100:6,15,
104:20
**obligation (7)** 20:0 62:14,15
68:17 72:8,10 103:17
**obligations (6)** 45:20 52:13
56:6 60:2 62:4 81:2
**obligatory (2)** 107:10,11
**obliged (2)** 92:25 102:0
**obliges (1)** 47:20
**observation (5)** 3:14 11:5
27:24 30:2 40:7
**observations (3)** 35:14 30:20
39:12
**observe (1)** 160:25
**observed (1)** 56:16
**observes (1)** 56:17
**obtain (2)** 103:7 113:16
**obtained (1)** 22:2
**obvious (6)** 130:25 133:4
135:1,7 136:1,8
**obviously (25)** 4:22 5:24
6:19 16:2 21:5 30:1 36:7
43:21 47:13 56:16 85:14
91:10 97:10 98:22 102:2#
104:13 110:22 113:2
124:11 136:20,23 139:19
143:13 160:21 171:23
**occasions (1)** 104:11
**occurred (3)** 14:21 44:10
181:22
**occurring (1)** 49:10
**occurs (2)** 51:5 72:14

</div>

oclock (5) 5:3 112:16 152:25 190.16,19
octobor (2) 163:23 164:2
odd (3) 41:17 125:22 170:7
offer (1) 83:1
official (1) 83:21
office (4) 150:16 164:16,17,10
officer (1) 160:7
offline (1) 13:21
oft (1) 82:17
often (1) 130:13
ok (1) 112:12
okay (3) 85:8 144:6 187:16
old (2) 125:23 163:3
older (1) 124:20
oldfashioned (2) 49:8 51:18
olf (1) 7:7
omar (1) 160:24
onboard (1) 97:7
once (3) 46:20 67:13 89:3
ones (7) 67:14,15 116:2 140:23 180:12 184:13,24
oneself (1) 50:14
online (3) 5:17 142:8 150:5
onwards (2) 172:10 183:20
opal (1) 130:11
open (11) 65:8 74:18 79:7,8 90:16 139:2 144:5 146:24 166:3 176:22
opening (35) 3:7,24 4:13 5:24 6:10 7:21 11:19,20 14:7,16 16:4 19:23 20:19 26:14,15,18 29:19 31:10,15 34:17,18 38:20 41:15 58:10 61:21 70:15 71:12 91:7 121:5,20 121:22,25 160:4 167:16 191:4
openings (11) 3:20,24 4:5,9 11:19 20:10 27:6 42:12 144:20 150:10 160:16
opens (1) 39:7
operate (5) 32:18 43:13 47:7 132:18 134:19
operated (1) 67:25
operates (2) 43:12 71:18
operating (4) 48:5 61:17 145:1 160:7
operation (4) 34:9 65:16 109:24 133:22
operatives (1) 5:16
operator (3) 9:22 11:18 71:1
operators (1) 133:15
opinion (3) 131:5,8,12
opl (10) 115:10 143:10 146:11,12,14 152:20 157:13,14 163:3,8
opposite (6) 15:10 60:12 62:5 66:4 65:15 73:17
opposition (1) 109:6
opus (2) 5:16 21:10
oral (3) 3:7 5:24 26:18
orange (9) 44:2 53:21 57:16,20 150:9,15 155:1 156:23 159:11
orca (1) 100:13,15,20
orchestrated (1) 169:21
order (9) 13:7,12 31:5 52:21 74:20 85:13 103:7 130:16 143:16
ordering (2) 22:25 130:8
orders (1) 24:6
ordinary (5) 17:3 49:11 67:24 97:19,24
organisations (1) 143:13
original (9) 7:1 33:21 46:1 58:13 72:13,22 73:2,4 75:15
originally (2) 41:21 184:15
others (4) 121:11 140:8 167:12 180:12
otherwise (11) 20:6 45:20 55:13 72:8 100:19 102:1 119:6 143:6 165:4 181:14 190:7

ought (6) 4:11 18:22 94:11 153:21 176:10 177:6
ourselves (2) 34:19 169:24
outline (4) 79:16 173:12,15 174:15
outright (1) 43:18
outset (4) 42:1 20:23 30:18 43:5
outside (3) 4:9 29:15 40:11
outworking (2) 70:17,22
over (7) 9:25 28:15 31:9 63:9,12 92:19,22 95:25 96:12,23 130:6 138:6 147:11 152:7 157:5 150:19 159:18 161:2 171:12 175:24 176:15 177:4,7 183:12
overall (6) 30:14 33:15 38:10 56:23 73:15 135:15
overarching (3) 10:3,23 38:6
overlook (1) 7:2
overnight (1) 12:25
oversaw (2) 160:18,19
oversight (1) 9:8
overspeaking (4) 52:17 53:7 57:3 148:13
overthecounter (1) 73:13
overviews (1) 4:7
owe (2) 102:1,1
own (15) 4:2 8:13 13:13 19:16 41:15 72:9 95:1 111:3 115:13 117:8 130:16 149:11,15 185:7 189:19,22
owned (21) 23:5 35:23 36:14 60:14 76:22 105:18 154:24 158:8 163:4,8,14,14,17 171:16,17 100:1 181:13
owner (14) 105:23 106:1 107:22 150:20 151:15,21 156:15 157:13 152:11 165:8 175:9 176:2 105:19 185:5
ownership (6) 36:14 94:15 95:10 96:2 156:9 150:9
owing (1) 26:5

**P**

p (6) 47:24 51:20 56:15 61:25 62:6
package (3) 111:8,10 166:22
pages (3) 40:21 85:7 92:17 116:15 141:15
paid (36) 1:20 22:9 23:6,8,9 26:7 30:5 53:3 63:22 105:13 106:19 108:12 113:10 122:24 137:10,11 138:15 144:12,16 138:5 146:20 163:4 165:21
pain (1) 187:19
pair (7) 55:4 58:19,24 59:10 73:11 147:14,24
pairs (1) 73:12
paper (1) 40:23
papers (2) 189:11 190:9
paperwork (1) 190:1
par (2) 181:17 187:23
paragraph (80) 6:10 9:24 10:1,4 11:7,8,19,24 15:2,7 25:25 26:15,25 34:5,11 39:8 42:7,8,20,23 44:7,8 45:3,11,15 46:3,6 53:22,23 57:23 72:15 74:9 75:10 77:17 70:2,14 84:24 86:1 90:1 92:24 93:7,13,19,22,24 94:2,8 148:19 169:23 159:9 97:16 160:1
paragraphs (3) 92:12 166:3 171:10
parity (1) 61:13
park (1) 163:3
parla (2) 151:18 171:12
part (39) 1:15 7:2 18:11 47:1,7 50:23 57:12 67:22 74:7 91:7,8 93:5 94:11 100:14 107:25 111:6,17,20 116:6 117:20 118:12,24 126:6 117:20 124:12 141:7 159:11 139:17 137:16 179:1,6,9 135:6 152:11 143:16
partial (1) 116:19
participants (5) 36:24 72:13 122:13 165:21 168:15
participate (1) 9:10
participated (2) 52:3 156:12
participating (2) 22:10 37:12
particicipation (2) 37:12 149:2
particular (26) 4:23 11:14 20:10 22:15 25:9 26:11 20:4,4 30:7 31:0 32:17 39:16,17 52:2 64:22 67:11 71:16 91:17,19 101:12 181:8 100:4,11 129:6 181:8 189:4
particularly (2) 71:11 129:14
particulars (6) 91:15,18 92:7 95:6 96:16 146:15
parties (23) 111:3,10,22 3:6,12,14 15:13,18 18:7 21:24 26:8 36:14 42:2 45:9 50:1 54:19 61:15 129:14 122:20 124:21 159:9 160:16 175:17
partnership (2) 153:18 164:1
parts (5) 9:11 20:3,11 123:4 144:23
party (10) 20:4 45:25 46:1 54:10,11 61:20,22 62:12 97:10 179:22
passages (1) 129:24
passed (2) 126:25 127:1
passing (1) 64:1
past (5) 50:18 109:23 128:10 141:13 150:6,8
pattern (2) 20:3 32:7
patterns (1) 143:1
patterson (2) 161:8 162:23
paul (1) 187:19
pause (2) 11:1 40:19 41:1
payable (1) 46:15 92:16
paying (5) 60:8 84:21 87:10 94:7 160:14
pay (8) 1:12 30:16 37:11 69:18 93:1 130:9,11 132:22
payable (4) 1:16 53:2,3 169:2
paying (5) 21:25 100:23 125:17 126:20,22
payment (44) 38:13 40:5,5 44:15 47:21 49:5,5,9,12,15 50:1 51:9,11 52:14 56:8 58:4 59:14 60:17 69:10 74:4 78:8 81:16 86:9 97:9,15 98:1 100:5 105:12,17 106:25 116:19 110:6 128:11 116:19 118:18 122:8,8,12,12,19 125:11 136:10,11,20 168:19 60:13 97:3

137:7,8,8,16,18 166:16,20,21 168:14,15,16 173:16 174:14,16
pc (1) 2:9
pedantic (1) 21:8
pejorative (2) 27:20,25
pelling (2) 16:21,24
pension (2) 75:3 105:11
people (18) 5:9 18:16 28:16 35:9 39:1 40:15 85:2 97:22 104:12 142:7 149:10,18,25 161:3,6 166:21 171:17 189:16
per (7) 08:6 109:21 110:7 114:22,24 149:21 169:13
perceived (1) 19:1
percentage (8) 30:25 122:19 149:3 166:11,13 168:18 122:21 126:3,9 127:10
perfectly (2) 129:13 170:25
performed (1) 56:9
perhaps (17) 11:13 31:17,23 65:17 91:25 92:14,14 102:16,19 121:22 123:25 125:20 120:23 129:12 155:20 166:6 176:22
period (5) 31:9 36:16 154:11 155:17 157:23
persisted (1) 27:9
person (18) 17:1,5,5,12,16,23 19:8 34:5 97:15,16 90:3 110:5 131:11 134:4 136:17 162:12,13
personal (1) 141:23
personally (5) 140:6 154:8 158:23 159:22 162:20
perspective (2) 8:10 14:12
persuaded (1) 21:6
phase (2) 65:13 70:15
philo (2) 151:18 171:13
phrase (1) 167:4
physical (3) 47:20 60:19 73:6
pick (1) 13:17
pickel (20) 26:11,12 20:7 36:3,9 37:14,19 123:21 124:11 151:14 152:13 153:17 155:25 158:15 160:16 161:20 162:10 145:5 169:5 141:10
pictures (1) 147:24
piece (2) 40:23 177:15
pieces (1) 9:9
pinsent (1) 0:8
piper (1) 2:10
piqued (1) 177:6
pity (1) 11:25
pitt (1) 139:21
place (17) 35:16 43:22 44:14 54:20 92:5 109:10 66:1 61:16 65:18 100:24 66:9 122:21 126:3,9 127:10 135:6 137:6
places (1) 11:6
plainly (2) 100:7 136:4
plan (2) 75:3 165:1
plans (2) 75:15 99:2
platforms (1) 145:17
play (5) 73:14 139:11,12 169:12 171:7
played (3) 29:13 31:7 85:16
player (2) 6:17 56:22
plea (1) 137:21
plead (4) 92:24 137:16,17 138:10
pleaded (6) 83:22 138:16 137:6 24:7 93:20 99:6
pleading (4) 24:7 93:20 99:6 175:2
pleadings (2) 24:8 91:17

please (38) 1:7 21:10 51:25 64:21 66:1 74:17,18 77:3,20 78:2,9 82:11,17 85:6,24 86:12 87:1 88:7 89:19 91:15 115:12 144:4,5 154:6 161:25 179:1 184:21 186:6 190:17
plus (20) 47:22,23 48:8 59:2,6,7,11,12,23 60:2,3 61:25 63:20 09:8 71:6 149:21
pm (9) 8:19 87:3,18 88:22 112:16,20 153:9,11 190:18
poge (1) 162:10
pointed (1) 53:16
points (13) 7:23,25 8:23 9:1,19 30:10 60:21 79:18 97:7 152:11 166:4 168:23 169:13
polaris (1) 3:6
popped (1) 4:12
popping (1) 4:18
position (2) 3:12 15:23
positions (5) 64:5,13 70:19 72:13 73:5
positive (5) 94:16,18,23 96:4 109:6
positively (2) 24:9 38:17
possibilities (1) 96:9
possibility (4) 8:10 14:12 24:23 132:13
possible (10) 7:17 9:13,23 13:14 16:14 27:10 32:9 79:8 130:10 178:0
possibly (2) 11:9 39:2
posted (3) 60:20 69:12,12
potential (2) 56:16 111:7
potentially (7) 24:15 52:11 71:13 102:1 109:15 133:23 171:7
pounds (1) 176:8
power (2) 19:9 117:24
practical (6) 3:21 18:2 45:2 63:19 70:17,22
practice (5) 111:15 19:19 125:1 167:20 189:23
pragmatic (1) 18:1
preamble (1) 10:24
prearranged (1) 36:24
precise (2) 30:11 140:1
precisely (14) 29:17 35:5 38:8 30:3 44:22 53:10 54:13 55:7,11 62:13 79:22 83:18 104:8 144:18
predecessor (1) 121:8
prefer (3) 16:13 17:24 20:11
prejudice (1) 167:6
preliminary (3) 7:18 35:14 39:11
preplanned (1) 72:11
present (2) 100:2 129:17
presentation (2) 18:21 118:24
presented (2) 117:9 121:7
presently (2) 10:25 19:2
preston (1) 5:23
presupposes (1) 106:11
pretty (2) 99:11 119:6
previously (6) 40:25 47:4,7,8,24 55:11,21,22 50:21,22,24 60:10 66:5,11 80:15
pure (1) 68:1
purely (2) 7:18 56:12
purple (2) 57:17 172:25
purport (2) 85:11 101:10
purported (5) 1:14 37:11,17 39:14 145:24

purportedly (2) 64:14 70:6
purporting (2) 106:7,12
purports (2) 43:13 47:19
purpose (3) 37:9 40:9,12 46:19 73:24 74:17 106:3 140:4 142:5 170:20 174:25
purposes (16) 3:2 9:2 22:4 32:11 35:3 37:15 60:10 41:15 42:1 45:2 50:13 55:15 64:11 117:8 120:11 140:2
pursuance (1) 10:14
pursuant (1) 166:9
puts (2) 9:9 112:4
putting (9) 35:3,8 52:23 54:19 70:18 101:13,17 150:1 172:20

**Q**

q (1) 76:6
qualified (1) 17:19
qualifying (1) 93:9
quantity (6) 54:4 50:1 72:21,22 78:22 09:6
quantum (3) 2:25 3:2 155:10
queried (2) 170:8 184:13
question (33) 14:2,5,22,23 23:12,16,16 24:16 25:22 26:24 30:7 49:17 50:5,10 51:4,8,14 52:24,25 56:16 69:21 74:3 76:22 101:3,9 102:13,17 112:3 129:20 131:19 137:14 167:20 169:10
questions (21) 3:7 43:14 46:16,16 47:16 51:7 63:9 73:9 90:8,9 167:4
quickly (8) 4:2 113:15 124:25 143:6,10 145:2 147:25 163:1
quite (9) 7:16 10:16 13:18 10:15 53:4 63:8,14 102:20 129:20
quote (1) 42:1

**R**

r15131 (1) 116:15
r1662 (1) 122:4
r1664 (1) 120:16
r19131 (1) 114:5
r19133 (1) 118:7
r21 (1) 110:9
r2131 (1) 113:13
r22803 (1) 119:9
r24193 (1) 110:23
r3131 (1) 105:2
r3132 (1) 119:3
r3135 (1) 100:17
r361 (1) 83:6
r4193 (1) 115:12
r6253 (2) 115:4 116:3
r6256 (1) 116:9
r6257 (1) 116:11
r6291 (1) 113:22
rabinowitz (346) 1:4,6 2:3 3:4 4:20 5:7,21 6:7 7:9,16,22 8:2,10,17 9:16,10 13:22 20:18,19,20,23 21:6,19 22:2,20 23:9,21 30:2,3 32:5 33:16 34:20 35:2,5,12 39:3,11 40:4 41:4 42:5,14 43:10,21 44:6,7,22,24 42:5,14 45:3,10 46:12 47:10,14,25 51:4,8,9,13,24 52:7,17 53:7,17,23 54:3,6,9 55:1,11 56:3 57:2,11,15,17,20 60:5,9,11,20 61:18 62:8,12,18,23,18,17 63:4,16 64:16 67:7 61:17,22 68:2,18,22 65:7,57 66:24 70:11 71:2,8

Confidential     SKAT_MDL_001_00834806

72:2,4,6,25 73:24
74:6,8,11,17,23
75:5,8,14,20 76:13,20,25
77:10,12,16,22 78:5 79:6
80:12,17 81:24 84:13,17
85:2,4 87:14,21 88:17 89:12
90:5,16,20,24 91:2,6,15
92:10,17,23 93:19 94:4,7
95:12 96:22 97:18,24
98:7,11,15,25 99:4,6
102:6,8,13,16,17 103:4
104:9,16,22 105:6,9,25
106:22 107:6,19
108:1,5,12
110:3,7,13,16,19
111:3,5,14,18
112:3,7,11,21,22 113:2,9
114:17 116:4,10 117:16,23
118:3,7,10,13,17
119:20,24 120:13,15,25
121:2,9,22 122:3,7,11
123:3,7,14,16,20
124:9,16,25 125:10,20
126:2,11 127:10 128:3,4,7
129:5,12 133:2 134:5,7,21
135:12 137:5,13,20
138:3,18,22 139:6,13,18
141:1,4,25 142:12
143:2,6,9,13 144:18
145:12,16,19,23 146:5,10
148:6,9,14 149:6,8
150:4,7,12,17
151:4,8,13,20 152:10
153:1,12,13,17 154:1,5
156:20 157:16 159:3 161:6
163:19 164:6,16,23,25
165:5 166:7,15 168:18
169:15 170:6,19,23 171:8
172:6,8,13,16 173:19
174:1,8,19 175:5,11
177:17 178:3,17,19,23
179:11 181:5,11 182:6,15
187:8,14,17,22
188:15,21,24 189:9,13
191:4
**raise (9)** 4:18 7:17,20 9:10
10:20 14:12,22,22 15:22
**raised (4)** 30:9 32:10 36:18
172:9
**raises (2)** 22:14 25:12
**raising (2)** 138:19 170:23
**rajeev (4)** 182:25 183:11,21
190:16
**rajon (5)** 155:24 158:20
159:4 165:10,12
**ramifications (1)** 139:12
**range (1)** 156:13
**ranging (1)** 166:13
**rare (1)** 133:10
**rate (3)** 93:2,11 124:4
**rather (29)** 4:3 16:23,23,25
17:11 18:24 19:5 23:19
27:25 32:23 55:7 59:7
65:3,16,16,22 20:10:15
103:5 110:14 115:6,15,16
119:5 139:10 142:25
144:22 148:5 165:3 172:2
**ray (1)** 130:12
**re (3)** 12:5,6 126:24
**reach (1)** 25:6
**read (14)** 3:24 4:3,6 10:1
11:8 14:6,25 15:5 16:5
33:17 84:10 92:14 96:19
129:12
**reading (7)** 4:3,15 115:21
117:3,12 118:9 127:3
**real (6)** 46:23 47:6,8 54:15
73:18 110:9
**realisation (3)** 38:10,18,25
**realise (1)** 149:11
**reality (4)** 3:21 35:24 36:3
167:7
**really (20)** 18:4,22 23:23
29:23 33:1,5 41:4 102:20
103:3 121:13 129:7,9

134:24 136:15 137:21
141:7,8 147:13 150:1
151:8
**reason (21)** 17:5 24:21 32:8
34:12 43:1,4 52:4 56:25
59:4 90:16 102:18,19,21
127:20,21 133:16 136:15
138:7 142:3 156:13 180:21
181:6 182:12 190:25
**reasonable (1)** 99:14
**reasonably (4)** 3:10 8:24
20:25 189:24
**reasons (4)** 3:15 10:6 24:1
66:5
**rebate (2)** 89:15,17
**recall (15)** 2:23 7:5 26:23
57:22 58:9 65:13 76:8 89:9
91:19 143:24 152:22
155:0,11,10 157:0
**recallable (1)** 65:9
**recalled (1)** 73:2
**receipt (3)** 68:22 88:24 96:16
**receive (8)** 26:6 61:23 62:2
69:17 95:3 97:14 133:14
174:14
**received (19)** 3:25 41:11
71:25 86:21 91:20 93:5
97:4,9,25 98:1,2 101:10
105:17 106:8,13,17 173:16
174:9,16
**receiving (3)** 22:1 76:7 110:1
**recent (14)** 120:8,19 129:4,21
**recipient (1)** 69:11
**recitals (1)** 13:6
**reckons (1)** 64:20
**reclaim (13)** 38:13 44:20
72:1 101:12 103:16
104:10,11 105:10
113:16,25 116:10 168:4
170:22
**reclaimed (1)** 100:10
**reclaims (3)** 110:1 168:9
183:23
**recognise (2)** 132:12 184:25
**record (43)** 16:16
17:7,13,20,22 18:3,8
19:4,13 21:15 39:25 44:14
67:22,23 68:8 49:10 56:10
58:1,20,20,21
59:2,6,7,11,12,22 60:2,2
61:25 62:25 63:20 68:16
63:8,16 90:12 97:11,5
110:3 116:9 117:11 165:8
181:23
**recorded (7)** 70:2 86:15
159:25 160:18 161:22,18
**recordkeeping (1)** 69:9
**records (9)** 64:12,16 69:23
90:14 189:23
**recovering (1)** 12:18
**red (5)** 173:7,12,15 174:8,15
**reduce (2)** 12:19 101:21
**reed (16)** 2:11 16:3,9
17:6,13,13 18:2,8,9,14,23
19:2,3,12 20:5,15
**refer (3)** 190:3 110:20
156:24
**reference (52)** 6:19 26:17
65:10 106:21 113:20
73:17 78:15 84:22
89:15,17 94:8 95:17
96:4,15 97:3 109:5 110:21
135:2
**relied (6)** 22:8 27:13
32:23,23 130:1 133:15
**refer (27)** 121:13 118:15
100:6,25 106:10 122:8
**relids (1)** 101:21
**rely (10)** 22:21 25:7,14 27:4
52:9 105:14 108:5,13
134:23
**remained (1)** 158:11
**remains (2)** 37:4 162:10
**remarks (2)** 7:18 19:23
**remedies (1)** 1:20
**remedy (1)** 12:8
**remember (5)** 21:10 35:10
120:10 121:12 124:23
**remembering (3)** 117:10,11
**remind (4)** 95:9 155:7 157:7

171:20
**reminded (1)** 34:15
**remotely (1)** 5:9
**removed (2)** 117:7 140:13
**repayment (1)** 169:23
**repeat (1)** 20:4
**repeatedly (1)** 116:25
**replaced (2)** 152:16 160:10
**replicate (1)** 59:7
**replies (6)** 62:5,20,25 63:13
87:2,23
**report (2)** 45:23 46:4
**reports (6)** 16:9 42:20
43:7 55:15 63:25
**representation (19)** 14:14
17:21 19:9 95:17
96:7,10,16 109:16,19
130:3,7,17,21 131:18
132:1,1 134:4 135:2,8
134:2
**representations (27)**
10:11,12 22:16,18,19,21
23:1,2 25:21 27:12,15
91:3,9,12 94:14,21 95:8
96:19 99:9,16 101:3,11
108:9 120:3,23 128:14
**represented (14)**
2:6,7,8,9,9,10,14 15:10
16:6 75:15 95:20 105:15
106:6 130:24
**representing (9)** 99:14,15
129:18 130:2,22
**representing (5)** 116:9 52:22
104:20 110:18 116:10
**represents (2)** 100:25 110:16
**request (4)** 80:6,7 83:12
91:20
**requested (2)** 6:7 88:24
**requests (1)** 00:20
**require (9)** 23:10 38:11
52:20 127:19,22 131:13
136:13 140:10 170:15
**required (6)** 19:20 37:22
73:3,4 93:16 132:2
**requirement (3)** 128:21
129:16 132:2
**requirements (3)** 96:2
115:19 136:6
**requires (1)** 58:22
**research (1)** 116:11
**resigned (2)** 156:10 157:1
**resolve (1)** 31:5
**respect (47)** 10:25 16:24
23:7,8,9 26:2 27:5
29:23,24 37:17 41:11 45:6
47:6,8 48:16 49:24 59:22
66:14,18 67:5,17 71:11
70:19 79:13,25 80:5,20
81:7,13 83:11,14,18 84:4
90:3 100:5 101:24 105:17
106:12,17 109:8,23 110:19
112:7 124:6 + 133:6 136:15
145:17 146:14 152:2 170:3
171:4 173:17
**respectful (4)** 102:16 103:25
137:23,25
**respective (2)** 3:16 10:6
**respectively (3)** 3:22 30:4
183:17
**respects (4)** 1:23 70:20,24
113:16
**respond (10)** 8:9 60:5,23
95:12,15 96:11,13
98:8,11,12 145:19 146:8
149:25 150:16 155:7
**responded (2)** 148:25
146:17 152:2 170:3
**responsibility (6)** 22:17
27:14 29:17 30:11 100:22
145:17
**responsible (3)** 21:24 140:12
144:20
**responsively (1)** 9:11

**rest (4)** 7:9 20:8
**restaurant (1)** 130:7
**restitution (3)** 136:12,21,23
**result (5)** 22:9,23 26:4 30:1
33:2
**resulting (1)** 110:1
**results (1)** 25:6
**resume (1)** 112:16
**retail (1)** 69:15
**retained (1)** 16:3
**return (15)** 48:21 72:9,10,13
170:15 171:11
102:3,4,9,10,22,25 166:11
**revenue (5)** 103:11,13
138:17,21 139:4
**reverse (2)** 72:20 73:16
**rfi (3)** 92:1 95:16 96:1
**richard (1)** 185:1
**rid (1)** 41:25
**riffs (1)** 113:10
**righthand (17)** 44:2 57:20
79:9 80:24 84:20 85:9 92:1
95:13 145:14 147:6 150:14
163:1 173:6 174:1 179:1
182:18 185:23
**rings (1)** 173:7
**rise (9)** 1:18 19:1,1 20:9,10
29:8,10 52:22 133:23
**risk (3)** 21:7 132:9 176:14
**rival (1)** 32:17
**rkts (1)** 185:18
**road (1)** 6:4
**rock (13)** 75:25 77:25
78:5,22 81:10 82:1 86:5
88:15,22 89:20
110:7,7,24 190:24
**role (16)** 29:13,14,20 30:11
31:7 35:15 152:7,19 156:4
157:5,12 160:11 162:24
169:11 171:22 185:3
**roles (2)** 111:16 177:25
**room (2)** 5:16 44:17
**rose (1)** 3:22
**row (13)** 66:20 67:2,2
75:3,24 76:4,7,13 77:1
143:17,18,22 163:12
**rows (5)** 66:14,19 178:14
162:18 169:25
**rubric (1)** 126:16
**ruling (1)** 17:25
**run (3)** 2:4,17 154:19
**running (2)** 64:20 112:16

<table>
<tr><td colspan="1">S</td></tr>
</table>

**s (2)** 73:15 77:8
**sack (2)** 145:3,6
**sake (3)** 76:16 137:25 139:9
**sale (4)** 81:10 83:19 75:25
84:4
**salgado (7)** 120:8,15
122:1,4,5 126:7 177:24
**same (79)** 5:25 7:7 17:8,20
19:6 25:6 29:22 32:21
30:21 45:6,6,7 46:4 47:17
48:25 50:8 53:9,24
54:3,4,11 55:12,25
56:1,2,3,21 59:5,24
60:3,4,6 61:15,18 68:9,22
69:14,18 72:21,22
76:12,13,22,23,25 77:1,7
80:18,22,22 89:3,3,12
90:2,11 108:18 110:4
111:7 112:9,9 113:3,3
116:6,6,17,21,24 117:3,3
122:25 126:10,24 127:3
161:6 163:23 164:17
172:25 173:3,6,8 176:11

116:4 155:3 156:16 157:3
159:15 161:11,16 162:1
164:10 178:25 179:1,24
182:19 183:10 185:15
**scroll (1)** 70:9
**search (1)** 159:24
**second (16)** 6:22 13:25
22:16 51:14 85:8 96:15
122:11 136:9 139:15
143:20 152:5 155:4 156:2
161:11 164:1 188:7
**secondly (6)** 6:7 7:11 36:9
**section (5)** 34:18 93:22
107:22 178:16 187:5
**sections (1)** 1:6
**securities (9)** 40:13 49:9
64:5,15 69:22 71:1 95:1
105:13 122:18
**security (1)** 105:18
**see (61)** 5:11 10:5 27:1 29:14
33:17 36:3 40:11 42:22
43:18 47:14 61:9 66:21,25
70:10 75:5 76:6 80:9,21
84:8 87:7,23 97:8 98:23
107:3 108:16 111:20 112:6
113:9,22 116:24 117:16
122:25 126:10,24 127:3
147:2,5 151:6,17 152:1
156:15 157:14 160:22
161:4 162:17 163:4 171:10
172:19 174:2 175:13
176:17 178:4 180:9
183:18,19,23 184:16,19
**seeing (8)** 79:24 82:11
91:24 96:13 100:6 100:15
114:7 131:20
**seek (6)** 79:13 80:7 83:7,14
100:16,25
**seeking (8)** 79:24 82:11
91:24 96:13 100:6 100:15
114:7 131:20
**seeks (5)** 120 43:6 93:15
95:15 172:19
**seem (1)** 64:18
**seems (11)** 2:4 19:2 26:20
32:13 33:2 41:22 49:21
62:24 97:2 112:9 169:5
**seen (18)** 5:8 5:10 8:4,8
16:20 35:20 37:5 74:12
77:16 92:24 128:16 144:6
156:21 159:12 165:10,22
176:4
**sees (171)** 53:11 66:14,16,18
67:2,3 72:11,19 73:9,24
76:5,13 77:2,16,18,22,24
78:13,16,19,24 79:11,21
80:3,12,12,18,22
81:1,10,17,25
82:8,10,14,25 83:3,10,13
84:22,5,23,9 89:4,12,20,22
90:2 93:14,21 94:8
95:7,15,16 96:17 98:22
100:17,20 109:1,5,6,9,20
113:12 114:24 116,6,16,19
**scs (2)** 156:4 157:5
**scope (1)** 121:3
**scp (54)** 45:18,19 46:7 60:16
76:10 78:25 83:21 87:8
88:8,18,22,23 89:3,3,12
90:2,14 108:18 110:4
111:7 112:9,9 113:3,3
116:6,6,17,21,24 117:3,3
122:25 126:10,24 127:3
161:6 163:23 164:17
172:25 173:3,6,8 176:11

Confidential

April 15, 2024                    Skatteforvaltningen v Solo Capital Partners LLP & Others                    Day 1MT

187:19,22 188:12,18
select (1) 147:3
selfcancelling (1) 20:14
selfevident (1) 16:18
sell (8) 40:20 77:25
70:6,12,17,22 80:23 81:20
seller (26) 43:24 44:1 46:10
47:12 48:2,7,16 53:20
54:11 57:20,21 59:17
61:19,20,22 72:8,23 73:1,3
75:23,23 177:2,12 178:15
182:11 185:7
sellers (2) 20:3 36:1
60:11 174:4,20 175:8
179:4,8,11,25 180:1,8
181:13 183:11 184:23
185:17 186:19,22 187:6,17
180:3,22
selling (3) 16:12 55:24 72:21
sells (6) 44:2,4 54:10,11
72:22 73:1
send (2) 15:16 34:16
sending (1) 79:23
sends (2) 80:19 81:2
senior (2) 21:14
sense (35) 13:21 14:3 17:24
24:25 26:9 29:4,15,21
30:6,8 34:21 38:7,15 46:25
50:16 61:6 62:20 65:22
66:6 69:6,23 70:2 71:19
73:13,15 74:2 88:19 97:11
103:14 138:2 137:6
144:20 147:11 178:7
sensibly (1) 109:3
sent (5) 83:17,22 84:3 86:16
112:19
sentence (5) 10:2,4 15:2,7,8
separate (5) 20:20 31:2
63:15 167:20 168:10
separately (2) 142:22 146:3
september (7) 153:19 155:6
159:6 160:12 161:13
163:21 165:13
sequence (3) 53:6 63:9 69:11
sequenced (1) 85:13
sequential (1) 43:10
sequentially (2) 9:3,7
series (5) 23:21 43:10 70:23
85:10 141:8
served (8) 8:19 14:5 41:21
service (1) 37:13
serving (1) 132:21
set (28) 8:13 10:6 23:18
28:10 32:12:20 33:25
41:14 50:19 51:16 52:4,12
77:23 92:11 93:16 96:3
109:2,9 115:23 116:6
133:16 134:11 161:20
185:17 188:15 187:12,23
setoff (2) 52:20 53:1
setoffs (1) 102:25
sets (7) 125 49:4 98:19
114:23 117:2 175:15
186:23
settling (1) 62:19
settled (12) 14:7,11,16
39:25 40:15,18 60:17,18
94:16,19,24 96:4
settlement (44) 37:21 39:24
44:13 45:7,19 47:20 49:7
50:18,22 54:6 58:3,21
59:1,2,6,12,13,20,21,22
60:2,23,23 61:24
63:3,21,25 64:3
68:10,18,20 69:6 70:23
71:6,8,17 78:7,13,16 81:13
86:7,25 89:6 160:19
settling (3) 54:3 62:1
setup (2) 52:9 170:9
seven (2) 82:20 88:4
several (1) 3:15
shades (1) 28:15
shah (68) 2:5,8 3:4,5 4:1 4:11
17:10 24:22 28:19 34:14
35:25 36:5 37:3 38:8,16,16
39:4 40:15 149:14,20
150:13,19,23 151:13,21
152:4 154:3,25
155:14,22,24 156:11,14,17
158:11,17,20,22
159:3,4,22 162:13,14,20
163:6,16 161:14,17
165:6,10,12 171:16,18
179:6,12,16,18,19 180:5
181:10 182:10 183:1
184:24 185:13,16,21
184:4,6,6
shahs (6) 45:10 152:15,18
179:8 182:2 105:2,21
187:24 188:8
shall (4) 103:3 125:16,21
135:24
sham (3) 46:25 56:17,19
shape (5) 6:5 20:20 21:19
28:17 135:15
shapes (1) 62:6
share (3) 16:14 37:12 40:1
55:23 56:24,24 59:9
60:12 69:19 73:22 76:21
86:6 96:18 95:16 109:21
114:22,24 116:13 165:19
175:12 176:4,7,10
180:14,16,19 181:10
102:10 184:2,10 185:19
similarly (1) 11:8
shareholder (4) 93:4,14
97:14 110:12
shareholders (3) 39:19 93:1
100:12
shareholding (7) 48:19,21
94:15 97:10 109:4,22
shares (66) 23:4 26:5
36:12,13,15,23 37:22
38:12 39:18 45:6 48:2,9
53:15 48:18 55:18,19
57:16 58:2,6,8 59:16
60:15,19 61:17,19,24 62:4
63:23 70:1,1,7
72:9,10,21,22 73:3,6 77:1
78:1,6,12,19 111:3,20
82:2,6,7 84:17 86:4,5,24
94:8,16,16,24 95:2,3,22
96:5 109:3,4 114:22
115:13 137:17 100:7
42:23 60:16 131:20
123:15 137:17 100:7
sharing (1) 110:15
sharma (1) 45:23
sharmas (1) 46:4
short (41) 5:4 26:22 43:24
44:1 46:9 60:16 52:20
57:19 61:22 64:24
72:8,22,25 73:1,5 75:23
79:17 177:11,12 178:15
179:4,7,11,25 180:1,7
74:4 91:4 100:4 103:18
105:4 196:19 111:4
113:19 119 116:19 117:9
134:18 135:18,18 136:5
140:8,21 142:20 144:12,16
150:7 160:11 175:23
160:5,13 169:23,24 170:22
181:1,7,23
116:3 146:25
shown (13) 20:5 42:25 44:9
35:20 90:13 100:25 112:23
143:20 150:14 153:25
157:13 159:16 172:24
shows (3) 44:1 70:9 146:6
shutting (1) 139:10
side (37) 44:2,4 46:18 53:16
57:16,20 70:18
79:7,9,10,19,21 80:25 83:3
84:20 85:5 92:1,6 95:13
90:17 122:25 145:14
150:15 163:1 165:7 173:16
174:1 175:5 178:25
179:1,24 182:7,10 188:3
131:9
simile (1) 86:17
smyth (1) 162:2
socialised (1) 182:22
soic (1) 160:2
sold (3) 53:12,17 72:25
sole (2) 45:18 170:20
solicitor (2) 100:20 190:3
solicitors (1) 16:16
solid (1) 163:5
solo (19) 6:9,16 7:1,2,6
11:1,2 12:5,9 28:9 29:17
31:17,18,25 32:1,14,21,22
33:13,17,19 34:8 36:3,2,6
37:1,21 45:8,9,10 60:10
74:24,24 75:1,1,2,6 76:15
77:17,17 79:14 83:24
90:21 104:24 113:14
114:13,14 115:3,10,11
122:1 124:1 141:5,16,21
142:20 143:11,14
149:25 137:18 145:21
165:22 166:3 170:20 173:4
145:1 164:14 165:4
144:2 154:16 183:4
staged (1) 133:10
113:5,15,16
155:2,4,13,17,19
156:23,24
157:4,4,8,10,12,18,20,24
33:13,17,19 163:5
166:1,21 165:19,22
166:7,12,16,17,22 171:21
172:5,20,20,21 173:1,3,14
176:3 175:6,18,20 176:2
177:6 179:13,16 182:12
184:16 185:22 186:2,3,5
186:16 164:16 183:3
somebody (6) 17:15,19,21
97:9,13 116:23
somebodys (1) 132:18
someone (7) 36:25 97:25
135:3 135:7 140:17 145:3
169:16
something (51) 6:4,13,15,21
8:15 9:9,14 12:24 15:15
18:17,22 21:3,9 39:2 41:17
65:4,6 66:10,11 70:9
91:13,19 99:7 101:24
103:1,7 109:16 110:8,18
111:10,11,20 116:1,16
117:19 121:10 123:24
124:16 125:8 128:4 132:10
146:15 147:3 156:9
147:24 177:15,16,19
somewhat (2) 6:14 70:9
somewhere (1) 147:23
son (1) 86:17
soon (1) 13:23
sooner (1) 19:5
sophistication (1) 132:18
sort (10) 12:23 13:3 18:19
38:2 39:2 43:6 112:14
117:6 113:4 111:16
sorts (3) 18:15 46:25 90:9
sought (7) 13:11 25:7 45:2
88:4,5 124:7 172:23
sourced (1) 38:11
speak (4) 4:2 8:13 81:19
130:19
speaking (4) 97:16 103:14
121:7 129:1
113:6,7 110:24 125:22
148:10,19 153:4
slowly (2) 135:12 143:7
small (8) 30:17,25 41:20
84:12,13 175:14,16 176:20
smaller (1) 107:14
smith (24) 2:11,20 16:3,9
17:6,13,13 18:2,8,9,14,23
19:2,3,12 20:5,15 76:14
99:2,3,10,16 105:8 20:2
131:9
smiths (1) 86:17
smyth (1) 162:2
socialised (1) 182:22
soic (1) 160:2
sold (3) 53:12,17 72:25
sole (2) 45:18 170:20
solicitor (2) 100:20 190:3
solicitors (1) 16:16
solid (1) 163:5
solo (19) 6:9,16 7:1,2,6
31:17,18,25 32:1,14,21,22
33:13,17,19 34:8 36:3,2,6
37:1,21 45:8,9,10 60:10
74:24,24 75:1,1,2,6 76:15
77:17,17 79:14 83:24
90:21 104:24 113:14
163:16 178:7
ssd (1) 184:1
stage (19) 102:1 11:5 13:20
18:1 47:10 49:20 60:16,21
62:24 73:10 07:14,16
110:12,23 121:16 134:20
141:2 154:16 183:4
staged (1) 133:10
32:9 143 172:4
stamp (3) 16:10 109:3
stand (5) 8:9 16:8 17:4,22
129:8
standard (4) 39:24 42:16
107:14,18
standards (1) 65:5
start (11) 3:10 7:20 12:24
69:16 73:21 86:13 104:23
114:12 149:12 154:22
179:25
started (1) 102:13
starting (6) 42:24 92:5
150:13 175:7 184:8 188:11
starts (3) 150:1 175:25
186:11
stated (7) 69:7 97:5 122:23
163:10 125:18 126:20
127:11
statement (12) 14:17,19
22:11 67:1 106:5 119:21
124:21 130:25 131:7
187:12,20 21:9 39:2 41:17
statements (8) 99:12
100:7,20 101:7 104:6,15
132:6 181:6
status (3) 116:11 119:11
144:8
stay (2) 104:25 184:5
stayed (3) 143:25 157:9
staying (8) 22:13 93:12 94:7
114:19 115:13 126:6,11
183:21 187:17
step (7) 43:13 46:12 57:11
76:3 96:14 97:17 152:3
step (9) 36:22,24 51:21
60:10 72:12
sticking (1) 104:23
still (24) 12:11 18:22
39:2 45:12 46:15 48:22
76:24 88:5 99:22 135:13
96:11 103:14 104:2 115:8
117:25 137:13 159:21
159:21
sums (2) 1:20 21:25
support (2) 105:14 131:10
supported (2) 139:21 143:14
supposed (4) 183:5 152:1
supreme (4) 138:12,25
special (2) 160:21
species (3) 49:3 169:6
177:10
specific (7) 79:15,16,24,25
82:6,8 89:13
specifically (1) 90:20
specified (1) 95:23
spectrum (1) 132:3
spelt (1) 111:12
spend (2) 8:7 31:10
spending (3) 31:16,24
117:24
spk (3) 183:16 91:6 93:4
split (2) 146:25 149:25
spnovus (1) 81:4
spoto (1) 161:1
spread (2) 09:15,17
spreadsheet (11) 66:1
67:11,16 144:7,10,10,22
145:1 146:24 147:16,19
spreadsheets (2) 147:21,22
square (3) 164:15 172:13
165:17
squared (2) 183:13,22
ss (16) 26:1,11,19 27:3,9
36:18 42:19 99:16,22
163:16 178:7
ssd (1) 184:1
stage (19) 102:1 11:5 13:20
18:1 47:10 49:20 60:16,21
62:24 73:10 07:14,16
110:12,23 121:16 134:20
141:2 154:16 183:4
staged (1) 133:10
32:9 143 172:4
stamp (3) 16:10 109:3
stand (5) 8:9 16:8 17:4,22
129:8
standard (4) 39:24 42:16
107:14,18
standards (1) 65:5
start (11) 3:10 7:20 12:24
69:16 73:21 86:13 104:23
114:12 149:12 154:22
179:25
started (1) 102:13
starting (6) 42:24 92:5
150:13 175:7 184:8 188:11
starts (3) 150:1 175:25
186:11
stated (7) 69:7 97:5 122:23
163:10 125:18 126:20
127:11
statement (12) 14:17,19
22:11 67:1 106:5 119:21
124:21 130:25 131:7
187:12,20 21:9 39:2 41:17
statements (8) 99:12
100:7,20 101:7 104:6,15
132:6 181:6
status (3) 116:11 119:11
144:8
stay (2) 104:25 184:5
stayed (3) 143:25 157:9
staying (8) 22:13 93:12 94:7
114:19 115:13 126:6,11
183:21 187:17
step (7) 43:13 46:12 57:11
76:3 96:14 97:17 152:3
step (9) 36:22,24 51:21
60:10 72:12
sticking (1) 104:23
still (24) 12:11 18:22
39:2 45:12 46:15 48:22
76:24 88:5 99:22 135:13
96:11 103:14 104:2 115:8
117:25 137:13 159:21
159:21
sums (2) 1:20 21:25
support (2) 105:14 131:10
supported (2) 139:21 143:14
supposed (4) 183:5 152:1
supreme (4) 138:12,25
65:7 66:7 67:7,9 68:7,23
89:5,14,17,18,23 174:5,21
176:1 177:12
stop (2) 133:3 187:7
stories (1) 149:8
story (5) 57:9 149:21 151:11
157:12 186:24
straightforward (3) 29:13
30:2 55:16 99:15
stratford (2) 152:7,14
stretch (2) 5:5 153:6
strictly (3) 50:23 97:16 121:7
strike (2) 34:9 140:6
striking (2) 175:15 176:3
struck (5) 175:10,22 180:23
101:21 102:17
structure (5) 6:9 28:2 90:22
91:6 178:1
structured (4) 2:2 30:10
50:14 127:6
struggle (1) 172:6
stuart (2) 180:7,18
style (1) 124:20
subcustodian (1) 95:1
subject (30) 3:8 7:3,13 12:20
18:20,25 20:3 26:10
31:2,24 52:2 54:25 55:2
63:4 90:10 108:14 111:23
144:13 144:23 157:5 161:2
154:12 160:14 176:20
178:11,19 188:24
submit (5) 57:7 100:7
101:15 116:10 135:23
submitted (6) 10:16 100:14
116:16,18 117:21 125:7
submitting (4) 42:12 125:11
subsequently (3) 49:22 61:5
63:14
substance (4) 7:21,23 63:22
96:23
substantial (2) 9:6 100:8
substantially (2) 9:24 160:1
substantive (1) 131:1
subtlety (1) 52:10
such (2) 93:9 55:1
succeeds (1) 12:16
success (8) 166:11 167:11,13
160:2,3,3,20 169:2
successful (5) 167:22,24
160:4 169:4,8
successfully (2) 167:18 168:8
suffer (1) 95:3
suffered (8) 89:22 90:21
44:19 97:12 100:24
106:7,16
sufficient (1) 133:20
suggest (6) 22:6 54:23
113:17 119:24 178:20
179:6
suggested (3) 53:25 65:21
168:15
suggesting (2) 45:11 139:19
suggestion (2) 8:11 135:17
suits (1) 82:11
sum (2) 74:3 145:16
summarise (2) 92:12 166:4
summarised (1) 92:23
summarises (1) 92:23
summary (25) 10:4 11:25
12:12 13:7,18
34:7,10,11,19 35:2,13
42:8,20 44:9 53:23 58:14
60:25 69:25 121:14 96:18
85:20 122:11 167:14,16
surname (1) 2:11 20:22
sums (2) 1:20 21:25
support (2) 105:14 131:10
supported (2) 139:21 143:14
supposed (4) 183:5 152:1
supreme (4) 138:12,25
139:4,21
sure (15) 9:2 16:10,19,22,24
20:23 51:24 59:20 102:2
103:2 118:20 139:18
surprise (2) 69:19
surprising (2) 3 31:17,23
suspect (2) 43:2 125:2
suspending (1) 181:23
synonymous (1) 20:24
syntax (3) 3:5 113:21,22
system (6) 43:13 100:10
133:11,16,21,22

_____
                  T
_____

t (1) 77:8
tab (4) 46:13 116:8
117:13,14
table (4) 51:25 175:7,25
176:1
taken (14) 3:12 7:14 10:12
36:22,24 43:12 54:15
55:7,8 57:25 111:10
136:2,3 144:9
taking (20) 35:12 38:20
39:12 46:17 47:12 52:12
55:14 60:20 62:18
68:16,19 97:7 131:24
143:16 144:23 157:5 161:2
167:8 187:3 189:12
talking (1) 39:25
talks (1) 77:4
tax (118) 1:14 23:4,10,18,23
26:5,8 29:5 38:13 39:20
40:16,18 44:20 50:8
92:11,13,25 93:2,6,8,15
95:24 96:2 97:12,17
100:4,5,8,10,21,23,24
106:9,18 108:17 109:23
110:1,10 111:24 112:8,24
133:3,11,17,18,21 114:2,8
115:19,15,15 116:10,11
138:21,23 120:1,9,19
119:5,5,16,10 122:6,22
123:21 143:22 157:5 161:2
surname (1) 2:11 20:22
taxable (1) 101:19
taxation (4) 93:10 95:4
106:11 114:1
taxed (2) 93:4,11
taxes (1) 118:1
taxfree (1) 116:11
taxpayer (2) 100:25 119:11
taxpayers (2) 103:19,20
teal (4) 78:1,6 86:5 109:2
tdc (11) 66:15 67:2,9 76:23
78:19 81:7,13 82:6 86:4,16
159:21
team (10) 2:7,8 3:23 11:25
12:24 83:21 88:18
147:20,22 160:23
teasing (1) 110:22
technician (1) 5:13
telesto (10) 115:2,14 116:5,7
114:9,10 116:20 146:16,19
110:23 116:23
telling (2) 65:16,18
tells (1) 172:9
tended (1) 160:17
tender (2) 51:19 62:5
tendered (2) 52:5 62:6
tendering (1) 51:20
term (1) 3:18
terminable (1) 60:25 65:17
terminology (1) 97:14
terms (46) 1:24 3:7,19 5:24
7:21 10:17 12:13 19:14

Confidential                                                                                    SKAT_MDL_001_00834808

21:19 23:3 40:20,22 43:16
45:5,14 46:17 48:4 52:2
55:20 60:12 65:7,25 67:7
70:6 79:16 87:6,7 88:2
89:4,13,23 90:12,21 96:7
110:9 119:7 123:20 127:5
129:3,13 132:15 134:2,19
149:5 167:5 160:4

**test** (1) 131:21
**testing** (2) 47:1 48:13
**text** (2) 77:24 107:15
**thank** (126) 5:6,21 7:1,3
9:17 13:24 15:20,21,24
20:17,18 21:6,17 24:2 31:4
35:6,11 41:3 42:4,17 43:20
53:4 57:10 60:7 64:18,21
65:1,19,24 71:4 72:3
74:7,10,16,16 76:7
77:11,15,21 78:4,9 79:8,20
80:3 83:5,20 84:9,14 65:3
86:1,12,15 87:20,22
88:7,20 90:23 91:1,14
92:4,7,20,22,23 94:6
95:11,14 96:22 98:14,25
99:4,5 104:21 105:23
100:4,17 112:10,12,17,21
113:13,23 114:5 115:12
117:18,22 118:2 119:9
122:5 124:0 126:12
128:1,4 129:11 130:6,14,18
135:11 142:11 143:3,8
173:22 175:2,25 178:18,22
179:4 181:10 183:13
185:5,5 186:6,14,16
187:16,16 188:23 190:17
**thanks** (3) 20:4 80:7 82:16
**thats** (17) 25:3,4 45:16
46:6,14 54:9 74:8 86:16
87:10,14 120:13 121:9
146:13 163:23 184:3,11
189:15
**themselves** (11) 2:16 17:18
26:3 36:7 67:23 79:4 98:20
134:3 149:15 150:1 166:18
**theoretically** (1) 97:21
**theory** (5) 60:9,10 65:9
138:8 139:2
**thereafter** (4) 140:16 154:20
159:21 160:11
**therefore** (33) 3:1,23 11:15
12:4 25:13,23 25:6 35:1
38:15 43:11 44:20 46:8,14
47:4,17 56:4 64:7 65:17
68:20 69:3 76:1 81:22
84:25 100:13 114:20 117:7
178:15
**thereof** (1) 106:12
**thick** (1) 96:25
**thing** (15) 7:7,22 17:20
18:19 28:17 32:12 41:14
50:2 62:0 111:6 115:20
132:17 133:8 177:16 188:6
**thinking** (7) 11:9 53:4
49:21 52:24 57:3 69:2
**thinks** (5) 13:19 131:1,10
149:12,23
**third** (15) 6:11 7:4 22:18
36:20 45:23 52:24 57:11
91:10 139:25 143:17
153:14 158:4 172:17
179:19 183:22
**thorough** (1) 143:10
**thoub** (6) 18:14 124:3
137:3 140:10 149:4 152:16
**thought** (12) 4:11,17 63:24
102:14 120:13 129:19
130:3,16 131:14 133:13
134:19 190:5
**three** (19) 2:25 7:16 9:18
26:4 30:9 31:15 60:9 72:12
87:11 80:1 112:23 116:12
129:2 141:6 148:11 152:19

178:11 179:17 186:22
**threehour** (1) 8:12
**threequarters** (1) 33:19
**throgmorton** (1) 164:20
**through** (47) 2:4,17 4:7 6:8
15:13,25 17:12 19:9 22:2
32:11 35:1,4,13,21 36:11
37:10 38:21 39:14 41:9
80:6,10 65:11,12 86:7,9
115:24 121:25 160:20
**thud** (2) 145:10,13
75:10 91:11 94:25 108:19
141:7,14 142:12 149:10,18
150:12 156:19 186:10
162:21 178:4 179:20
182:12 166:17
**throughout** (1) 70:10
**throws** (1) 147:5
**thursday** (2) 5:19 104:24
**thus** (1) 105:23
**tie** (1) 15:4
**tied** (1) 19:25 167:18
**time** (76) 3:16 4:8,23 7:24
8:7 12:22 19:10,19
21:9,9,16 31:10,16,24
39:21 42:9 43:13 45:18
53:9 57:24 58:7 59:10 64:9
62:18 63:25 65:9 67:14
70:21 72:20 79:22 80:19
81:19,21 62:5,15,20
83:11,18,18 84:3,23
86:19,21 87:4,24,24
88:3,9,11 94:17,19 95:20
97:11 112:15 115:22
12:11 129:19 131:14
134:10 137:24 163:5,18
142:3,3 144:23 147:12
148:8 150:1 158:19 159:6
161:2 173:19 175:21 187:2
189:12,20
**times** (5) 9:13 40:18 76:7
150:10 186:17
**timescale** (1) 12:23
**timetable** (1) 6:25
**timing** (2) 160:14 171:25
**tiny** (1) 14:23
**title** (1) 21:12
**today** (6) 4:13 13:7 14:2
20:6,6 32:10
**together** (8) 1:7 12:25 54:19
105:12 166:21 170:21
180:7 190:2
**tomorrow** (3) 20:9 70:5
**too** (4) 37:23 143:6,7 154:17
**took** (4) 35:16 130:15 152:7
171:22
**topic** (2) 129:1,22
**total** (8) 33:20 106:4 122:18
145:16,23 147:7 149:1,4
**totality** (3) 43:7 46:21
**totals** (2) 30:17,19
**touched** (1) 135:14
**towards** (2) 114:24 190:6
**traceable** (2) 12:0,16
**traceably** (1) 169:8
**tracing** (1) 7:10
**track** (2) 41:12 51:3
**trade** (96) 34:11,19 35:13
39:24 41:5,5 42:8,19
48:12,14,18 49:1,4,10
55:6,24,24 56:9 58:13,22
59:5,21,22,25,25 61:5,12
65:15,16 67:9 60:3,3,4,15
**turn** (15) 7:3 34:3,18 66:4
75:1,2,13 89:2 90:9
99:22,23 101:12 116:2,5
117:11 174:7,8
**trade** (19) 12:22 3:19 6:22
31:11 32:5,6 39:20 58:5
134:24 144:21 157:25
171:17
**ts** (1) 130:12
**tucci** (1) 173:9
**tuesday** (2) 3:20 190:19
**tune** (2) 103:22 113:10
**turn** (15) 7:3 34:3,18 66:4
75:1,2,13 89:2 90:9
99:22,23 101:12 116:2,5
117:11 174:7,8

**traded** (3) 45:5,7 77:1
**trader** (3) 83:22 185:1,4
**trades** (37) 26:21 35:1
37:11,17 39:14,18 42:25
43:25 45:16 53:25 54:4
56:6 58:2,4,19 59:10 60:17
61:19,20 64:1 67:17 66:7,8
72:12,19,20 74:19,24
80:6,10 85:11,12 86:7,9
115:24 121:25 160:20
**trading** (66) 6:8 28:3,23
29:3,3,8 36:1,23 37:13
36:10 40:13,22 42:16,23
43:12 45:8,14 46:23
61:15,16,18 68:6,8 76:15
79:3 80:16,10 90:20
140:25 155:18 160:18
161:6,14 169:16 170:8,10
171:9 174:3,4
**unbroken** (1) 163:5
**uncompleted** (1) 127:8
**unconditional** (2) 90:16,10
**uncontentiously** (1) 71:14
**undeniably** (1) 29:7
**underlying** (6) 58:16 76:23
79:3 86:0 89:10 146:10
**underneath** (2) 106:24
126:17
**undo** (35) 10:16,21
12:1,3 16:2 24:5 26:19
36:17 37:8 38:9 39:4,5
40:8 41:19 47:5 52:24
63:21 91:24 104:6 104:19
120:3 133:7 137:2
138:4,18,22 139:7,15,17
162:23 171:6 173:0 187:4
**understanding** (8) 17:14
31:7 33:12 38:9 49:2
121:18 130:20 165:5
**understood** (7) 40:12 43:19
46:20 64:17 100:15 176:13
177:21
**undertaken** (1) 62:3
**undertaking** (1) 59:16
**undisputed** (1) 23:22
**undoubtedly** (1) 100:19
**unfortunately** (1) 80:12
**unique** (2) 104:17 135:11
**unit** (1) 36:16
**units** (2) 64:14,15
**universally** (1) 131:24
**universe** (1) 144:17
**unjust** (3) 130:12,21,22
**unless** (5) 37:25 59:12 62:23
106:16 131:1
**unlikely** (2) 130:15 131:13
**unnecessary** (1) 137:21
**unpack** (1) 43:11
**unpacked** (1) 70:15
**unqualified** (1) 60:23
**until** (11) 60:8 152:6
156:6,14 158:0 159:6
160:1,10 161:14 168:16
190:19
**unused** (11) 61:9
63:6,10,14,15 63:13
72:6,17 73:18 77:9,10
**unwinding** (2) 72:12 73:16
**unwound** (1) 72:19
**upon** (6) 100:13 132:18
136:24 140:17 169:2
170:10
**use** (9) 26:21 46:5 65:11,13
75:1 97:14 121:24
177:24,25
**used** (12) 13:15 40:23 51:3
164:18 182:3 164:9 161:2
**usha** (2) 2:6 171:16
**using** (3) 11:17 28:25 29:2
**usually** (1) 60:5
**usufructs** (1) 122:15
**utc** (3) 38:20 99:21
**utility** (1) 131:18
**utter** (1) 21:7

**type** (12) 20 41:12 113:4
135:4 177:23
**types** (1) 72:7
**typical** (1) 7:15
**typo** (1) 16:15

---

### V

**v** (6) 24:21 77:8 128:22
129:22 131:9 139:21
**valid** (2) 51:19 100:17
**validity** (12) 22:25 23:11,19
46:3 47:21 48:6 58:11
97:19 99:42 98:3 97:5
**value** (16) 31:19 43:12 46:18
52:12 55:14 61:20 62:21
68:16,19 86:24 108:24
148:12,24 167:9 181:17
187:24
**varengold** (1) 142:22
**variant** (1) 33:14
**variants** (2) 32:15,22
**variety** (1) 33:19
**various** (14) 1:11,14 3:12
10:22 22:5 43:9 71:16 154:2
162:19 169:18 150:21
162:21 164:2 160:17
**vast** (1) 164:14
**vd** (1) 86:24
**vehicle** (1) 156:10
**vehicles** (1) 162:17
**version** (10) 7:6,6 13:7 34:8
41:19,20,21 42:16 73:11
141:12
**versions** (2) 113:4 142:10
**versus** (5) 24:17,18 47:20
58:1 187:7
**virtually** (1) 14:18
**virtue** (2) 27:15 52:3
**visibility** (2) 38:4 63:12
**visible** (1) 70:20
**volkswagen** (1) 129:23
**voluntarily** (5) 55:25 61:18 62:4
112:11 113:5
**vp** (3) 40:1 49:13 95:1

---

### W

**waitor** (3) 130:15 132:20
134:25
**walk** (3) 6:8 32:11 43:11
**wall** (2) 84:9 112:15
**wants** (4) 34:24 37:25 42:9
179:7
**ward** (1) 161:1
**warner** (2) 187:19,25
**warning** (1) 107:8
**wasnt** (3) 70:20 177:1 179:9
**waterfall** (1) 49:12
**waveform** (1) 60:4,4
**way** (66) 6:15 5:12 10:17,18
11:5 12:9 13:8 18:24 19:21
22:15 27:5 28:4,5 30:13
32:12,21 33:7,10 47:6
48:13 49:21,21 50:5
52:23,24 55:9 56:23
57:4,15 80:20 64:4
61:11,24 62:2,4,6 63:7
64:4,14 65:15 69:9 70:14
77:20 84:10 85:22 95:13
103:6 120:10 134:6 141:6
166:11,12 167:9 169:15
176:6
**ways** (4) 10:22 33:8,20 36:3
**wednesday** (1) 9:14
**week** (13) 3:17 13:1 15:25
19:13,23,25 20:9,15 32:10
167:1
**weeks** (2) 5:4 7 171:15
**went** (32) 23:7,15 60:1 161:20
182:12
**werent** (2) 67:10 95:9
**west** (3) 114:15,18 146:21
**whatever** (7) 59:4 60:23
124:7 134:11 166:5 167:16
187:4
**whereas** (2) 149:20 167:12
**whereby** (1) 165:24

**whilst** (7) 22:4 93:10 119:25
135:25 140:17 160:7
182:15
**white** (2) 16:19 17:15
**whoever** (1) 126:7
**whole** (10) 37:9 49:9,12
63:12 95:9 111:11 121:5
127:14 173:23 177:15
**whom** (8) 40:4 45:25 104:12
154:24 155:9 156:2 166:8
182:21
**whose** (6) 2:12 36:2 103:16
142:18 167:4 168:1
**wht** (24) 10:10 26:4 30:4
44:21 53:15 57:15 72:17
75:10,14 92:8,11,13
93:22,25 95:20,22 100:17
103:15 105:15 107:12
112:24 121:6 146:6 175:6
**wicklow** (1) 184:23
**wider** (2) 28:10 29:21
**willing** (1) 4:12
**wilson** (2) 180:7,18
**window** (1) 171:14
**winter** (1) 87:12
**wish** (4) 12:14 76:16,20 97:7
**withheld** (13) 29:10 50:19
100:11 106:12 108:12
115:16 106:7,16 109:24
118:21 119:5 135:9
**withhold** (1) 92:25
**withholding** (15) 23:4 26:8
44:20 92:13 93:2 97:6,8
105:16 106:7,16 109:24
115:1,9,15 119:17 181:23
**witness** (2) 13:15 181:6
**witnesses** (2) 152:17,21
**wonder** (5) 15:7 42:17 65:14
112:11 113:5
**wondered** (1) 65:10
**wonderfully** (1) 163:15
**wondering** (1) 12:21
**wont** (1) 5:12
**work** (14) 29:16 32:12,20
33:1,5 60:3,4 61:13 101:11
141:15 147:20 262:3,9,4
**worked** (11) 34:25 35:2
74:2,3 108:21 162:20
168:17 171:2,3 166:2
189:25
**working** (4) 11:14 13:13
44:11 170:3
**works** (1) 170:2
**world** (3) 47:6 54:15 73:18
**worry** (1) 42:10
**worth** (7) 49:20 50:11 166:25
176:6,7 181:7 104:4
**worthwhile** (1) 23:25
**worthy** (1) 15:3
**wouldnt** (3) 15:12 50:22
117:20
**wpd** (10) 114:14 115:14
119:15 143:21 146:21
163:12,20 166:13,22,23
**wpl** (1) 113:20
**writing** (2) 128:10 134:8
**written** (39) 1:9 3:10 4:4,9
6:1,10 11:13
14:4,6,7,10,16 15:14 16:4
19:10 26:13 34:5 38:20
41:16 42:7,12,23 48:8
45:16 46:5 53:22 57:23
121:19 129:15 140:24
150:10 151:24 160:6,16
167:15
**wrong** (11) 15:7 39:8 50:2,3
103:12 111:22 117:13,14
164:22 177:17 178:12
**wrongdoing** (1) 30:1
**wrote** (2) 88:9 09:21

---

### X

**x** (3) 23:22 43:18 69:17
133:14 149:16,19,21

---

### Y

**y** (4) 23:22 43:18 133:14
149:14
**year** (3) 96:25 135:10 181:22
**years** (2) 120:8 180:16
**yellow** (2) 173:7,13
**yet** (4) 31:3 32:12 72:6
97:10,15 131:11 121:5
127:14 173:23 177:15
**york** (8) 06:21 87:4,16,20,23
88:3,10,11
**youre** (1) 102:8
**yourself** (4) 15:16 16:17
92:15 95:10
**youve** (1) 146:12

---

### Z

**z** (3) 23:23 43:18 133:14
**zacaroli** (4) 122:1 129:9,13
134:12
**zero** (8) 37:22 56:24 64:3
69:20 71:1 181:17,17
187:23
**zone** (1) 20:3

---

### 0

**000** (1) 126:3
**003** (1) 127:25
**06003** (2) 121:15 124:22

---

### 1

**1** (38) 31:21 47:22,23 48:8
49:10 56:10 50:20,21
59:2,7 61:25 63:20 69:9
72:12,5 108:12 102:0
175:14 118:5,12,23 119:1
**137** (14) 110:5,23 76:22
91:1,10 110:25 143:7
**150** (1) 77:19
**1576** (2) 120:13 166:25
**158** (1) 124:22
**1607** (1) 123:0
**16** (1) 72:18
**160** (1) 116:18
**163** (1) 116:8
**1658** (1) 121:6
**16700** (1) 126:7
**168** (1) 176:20
**17** (1) 123:22
**171** (1) 127:24
**172** (1) 123:1
**174** (1) 176:18
**185** (1) 123:2

<!-- Dense numeric index, partial OCR -->

---

**1301 (1)** 82:14
**1308 (1)** 82:20
**1315 (1)** 82:25
**1316 (1)** 83:5
**132 (2)** 179:9 188:1
**1322 (2)** 83:13,17
**1331 (2)** 83:22 84:3
**13th (2)** 66:18 108:24
**14 (2)** 85:7 184:22
**144 (1)** 1:14
**146odd (1)** 12:9
**147odd (1)** 12:10
**14h (1)** 152:11
**15 (9)** 1:1 30:24 31:1,22
    93:11 103:22 114:14
    123:9,19
**16 (2)** 11:19 190:20
**160 (1)** 82:2
**164 (1)** 150:18
**165 (1)** 151:24
**17 (3)** 1:25 93:24 184:22
**17c (1)** 94:8
**18 (1)** 185:16
**184 (1)** 146:14
**189 (1)** 191:5
**19 (2)** 95:5 129:9
**193 (1)** 39:8

---
**2**
---

**2 (23)** 74:25 79:21 81:1
    112:16 113:14 119:8
    122:1,17 148:17,18 150:4
    155:7 156:11,21 157:2
    158:3,13,25 159:23 160:21
    163:2 164:6 175:25
**20 (2)** 165:13 191:4
**200 (2)** 112:20 180:14
**2000 (2)** 184:4,11
**2009 (3)** 155:14,16 156:1
**2010 (1)** 156:3
**2011 (10)** 37:19 79:12
    153:19 155:6,14,16 165:13
    182:10 184:14 186:10
**20112013 (1)** 147:10
**2012 (15)** 37:19
    156:4,11,15,18 159:20
    160:1 161:13,19 162:3,5
    180:14 183:17 186:12
    188:21
**20122013 (10)** 6:9 33:21,25
    34:3,9 74:14,24 147:1,5
    154:20
**20122015 (1)** 143:18
**2013 (38)** 12:6 33:18 66:16
    68:17 78:5 81:2
    86:2,8,16,25 88:8,22 89:21
    90:2 105:4 108:24
    159:1,5,6,20,20
    160:1,10,12 162:18
    163:21,23 164:2
    165:13,14,15 183:6,17
    184:1 185:19 186:12
    188:21
**2014 (30)** 33:19 57:9 78:20
    81:8 82:21 143:19
    152:6,7,7 156:6 157:20
    158:8,10 159:21 160:25
    161:14,19 162:3,6,19
    172:10,14 180:12,18
    181:17 183:6 185:19
    186:13,21 187:23
**20142015 (2)** 147:1,10
**2015 (19)** 33:19
    143:19,21,21,22 155:7
    156:4,11,21 157:2,16
    163:9 171:15,15,21
    181:17,24 183:20 184:10
**2016 (1)** 102:17
**2023 (1)** 74:21
**2024 (2)** 1:1 190:20
**205 (1)** 66:14
**206 (1)** 66:14
**209odd (1)** 66:17
**21 (5)** 78:20 81:8 82:21
    98:18 185:16
**210 (1)** 60:12

**218 (1)** 99:10
**22 (1)** 186:17
**220 (1)** 129:10
**223 (1)** 131:16
**24 (1)** 184:10
**242 (1)** 9:24
**248odd (1)** 12:8
**25 (2)** 121:25 186:17
**257 (1)** 153:9
**267 (1)** 160:5
**27 (5)** 11:19,24 93:2 123:12
    124:4
**27odd (1)** 12:6
**28 (2)** 105:4 171:18
**287 (1)** 11:7
**29 (1)** 171:15
**299 (1)** 11:8

---
**3**
---

**3 (17)** 5:3 74:25 75:1,2 76:15
    77:17,18 79:14 86:14 87:1
    95:15 104:24 152:25
    176:16 178:9 182:12 185:9
**30 (4)** 171:18 178:15
    184:7,12
**304 (1)** 153:11
**31 (10)** 40:21 156:15,18
    161:19 162:3,3,6 171:18
    178:15 184:12
**319 (2)** 87:3,18
**32 (3)** 40:21 171:18 184:7
**322 (1)** 87:24
**33 (1)** 188:12
**331 (1)** 26:15
**34 (1)** 188:19
**35 (1)** 188:19
**36 (2)** 25:25 185:10
**38 (2)** 15:2,7
**381 (2)** 26:25 45:3
**3861 (1)** 66:6

---
**4**
---

**4 (13)** 8:19 75:3,6,24
    76:4,7,13 77:1 96:13,20
    115:11 164:20 173:21
**402 (1)** 190:18
**41 (2)** 96:20 97:19
**441 (1)** 99:21
**45 (9)** 77:1 78:1,6 82:7
    84:17 86:3,5 109:3,22
**45000 (4)** 78:18 82:22
    84:14,18
**451 (2)** 06:20 07:16
**460 (1)** 100:1
**461 (1)** 100:1
**4646 (2)** 82:22 84:25
**47385 (2)** 78:7 86:6
**473850 (1)** 82:8
**499 (1)** 45:11

---
**5**
---

**5 (7)** 98:9 125:10,13,25
    160:22 176:16 186:21
**531i (1)** 163:24
**5440 (1)** 146:8
**559 (1)** 12:5
**571 (1)** 46:3
**573 (1)** 46:3

---
**6**
---

**6 (5)** 92:12,14 115:3 145:20
    181:12
**61o (1)** 117:3
**6395 (1)** 166:13
**649 (1)** 146:10

---
**7**
---

**7 (21)** 34:11 42:8,20
    59:6,11,12,23 60:2,3 66:16
    77:24 78:5 79:12 81:2,11
    92:24 122:10,24 125:18
    126:20 161:16

**700 (1)** 87:20
**701 (1)** 155:12
**71 (1)** 44:8
**719 (2)** 87:3 147:6
**72 (1)** 53:23
**722 (1)** 87:23
**729 (1)** 88:3
**78 (10)** 179:3,6,15
    182:1,19,23,24 185:12,23
    188:2
**7th (1)** 66:18

---
**8**
---

**8 (8)** 77:17 93:3 122:19
    147:8,9,16 158:24 171:15
**81 (1)** 78:2
**82 (1)** 78:14
**83 (1)** 86:1
**847 (1)** 88:11
**85 (1)** 99:23
**858 (1)** 147:7
**881 (1)** 146:22

---
**9**
---

**9 (9)** 74:25 90:1 92:12,14
    93:7 122:1,19 162:7
    181:13
**90 (10)** 6:10 34:5,17,18
    42:7,23 74:9 75:10 84:24
    163:14
**901 (1)** 44:7
**902 (1)** 53:22
**9025 (3)** 31:20 145:20 147:7
**903 (1)** 57:23
**904 (1)** 45:15
**905 (1)** 72:15
**92 (3)** 147:10,15,17
**920 (1)** 146:18
**951 (1)** 87:18
**992 (1)** 147:16